# EXHIBIT 19

**Susan Hennelly**

| | |
|---|---|
| **From:** | Susan Hennelly |
| **Sent:** | Tuesday, March 03, 2015 3:31 PM |
| **To:** | BoardOfDirectors |
| **Subject:** | Sale of Apartment 1801 and Maid's Room 2219 |
| **Attachments:** | Kwok board package.pdf |

We have received a contract for the sale of the 2,950 shares allocated to Apartment 1801 and the 50 shares allocated to Maid's Room 2219 from Sherry 1800s, LLC (Haroche) to Genever Holdings LLC (Miles Kwok).

Attached are copies of the contract of sale, Mr. Kwok's application and several letters of reference.

The purchase price is $67,500,000, plus $2,500,000 for the furnishings. The 2015 maintenance is $55,214 per month plus an additional $936 for the Maid's Room. This is a residential apartment and will be used by Mr. Kwok and his family.

Due to Mr. Kwok's foreign status and purchasing in an LLC, he will be required to sign an occupancy agreement and personally guarantee the lease. He will also be required to provide a security deposit.

This apartment encompasses the entire floor and is approximately 7,300 sq. ft. plus 2,170 sq. ft. of terraces. Attached is a floor plan.

Mr. Kwok has also entered into a contract to purchase Maid's Room 719 which he will purchase simultaneously, if approved.

Michael Horvitz and Fred Seegal have interviewed Miles Kwok and his son, Mileson Kwok. His wife, Hing Chi, was present via Skype.

Very truly yours,

Michael J. Ullman
Executive Vice President
& Chief Operating Officer
The Sherry Netherland Hotel
781 Fifth Avenue
New York, NY 10022
P: 212-231-6811   F: 212-832-4845
For reservations and special offers, go to

1

**SN 0027**

Executed Contract of Sale

SN 0028

Contract of sale cooperative apartment (9-2000)
Prepared by the Committee on Condominiums and Cooperatives of the Real Property Section of the New York State Bar Association

CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

## Contract of Sale - Cooperative Apartment

This Contract is made as of February_____, 2015 between the "Seller" and the "Purchaser" identified below.

**1 Certain Definitions and Information**
**1.1 The "Parties" are:**

1.1.1 "Seller": Sherry 1800s, LLC
*Prior names used by Seller:*
*Address: 1233 Rock Rimmon Road, Stamford, CT 06903*

*Tax ID. No.: 20-0780554*

1.1.2 "Purchaser": Genever Holdings LLC

*Address:*

*S.S. No.:*

1.2 The "Attorneys" are *(name, firm name, address and telephone, fax).*

1.2.1 "Seller's Attorney"
Michael J. Jones, Esq.
Ivey, Barnum & O'Mara, LLC
170 Mason Street, Greenwich, CT 06830
Tel: 203-661-6000
Fax: 203-661-7088
mjones@ibolaw.com

1.2.2 "Purchaser's Attorney"
Ira Gilbert, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison, LLP
1285 Avenue of the America
New York, NY 10019-6064
Tel: 212-373-3529
Fax: 212-492-0529
igilbert@paulweiss.com

1.3 The "Escrowee" is *the [Seller's]* Attorney.

1.4 The Managing Agent is *(name, address and telephone, fax):*
*Sherry Netherland Hotel*
*Susan Hennelly*
*781 Fifth Avenue, 1st, New York, NY 10022*
*Tel: 212-231-6811 Fax: 212-832-4845*

1.5 The real estate "Broker(s)" (see ¶ 12) is/are: John Burger,
and Kathy Sloane, Brown Harris Stevens and Serena
Boardman, Sotheby's 1.6 The name of the cooperative housing
corporation ("Corporation") is:
Sherry Netherland, Inc.

1.7 The "Unit" number is: 1801, which encompasses the
entire *
1.8 The Unit is located in "Premises" known as: 781 Fifth
Avenue, New York, NY
1.9 The "Shares" are the shares of the Corporation allocated to
the Units.
* 18th Floor, except elevator hallway and including Maid's
Room 1519

1.10 The "Lease" is the Corporation's proprietary lease or
occupancy agreement for the Unit, given by the Corporation
which expires on
1.11 "Personalty" is the following personal property, to the
extent existing in the Unit on the date hereof: the refrigerators,
freezers, ranges, ovens, built-in microwave ovens, dishwashers,
garbage disposal units, cabinets and counters, lighting fixtures,
chandeliers, wall-to-wall carpeting, plumbing and heating
fixtures, central air-conditioning and/or window or sleeve units,
washing machines, dryers, screens and storm windows, window
treatments, switch plates, door hardware, mirrors, built-ins not
excluded in ¶ 1.12 and all of the ~~furnishings including but not
limited to everyday china, pots, pans, cooking items,
flatware, as well as crystal glasses and decanters, etc in the
bar area~~ and personal property (except as
specifically excluded in 1.12), including but
not limited to all items set forth in the series of videos contained in the DVD(the "DVD") delivered by Brown Harris Stevens
to Unit 1801 at 2.00 pm on February 20, 2015.

(See 1.12 below.)

(*) 1.12 Specifically excluded from this sale is all personal property
not included in ¶ 1.11 and all contents included in the unit
with the exception of 13 paintings and drawings, one antique
secretary desk on east wall of LR (will be replaced) personal
"knick-knacks" such as small boxes, clocks, picture frames,
pictures, etc.
1.13 The sale [does] [does not] include Seller's interest in
[Storage]/ [Servant's Room #1519]/ [Parking Space]
("Included Interests")
1.14 The "Closing" is the transfer of ownership of the Shares
and Lease.
1.15 The date scheduled for Closing is  no later than 3/6/15
("Scheduled Closing Date") at 10:00 A.M. (See ¶¶ 9 and 10)
1.16 The "Purchase Price" is: $67,500,000.00
1.16.1 The "Contract Deposit" is: $7,000,000.00
1.16.2 The "Balance" of the Purchase Price due at Closing is:
$63,000,000.00 (See ¶ 2.2.2)  See SR18 in Second Rider
1.17 The monthly "Maintenance" charge is $57,085.53  (See ¶
4)
1.18 The "Assessment", if any, payable to the Corporation, at
the date of this Contract is NONE, payable as follows:
1.19 [Purchaser]  shall pay the Corporation's flip tax, transfer
fee (apart from the transfer agent fee) and/or waiver of option
fee ("Flip Tax"), if any.
~~1.20 Financing Options (Delete two of the following ¶¶ 1.20.1,
1.20.2 or 1.20.3)~~
~~1.20.1 Purchaser may apply for financing in connection with this
sale and Purchaser's obligation to purchase under this Contract is
contingent upon issuance of a Loan Commitment Letter by the
Loan Commitment Date (¶18.1.2).~~
~~1.20.2 Purchaser may apply for financing in connection with this
sale but Purchaser's obligation to purchase under this Contract is
not contingent upon issuance of a Loan Commitment Letter.~~
~~1.20.3 Purchaser shall not apply for financing in connection with
this sale.~~
~~1.21 If ¶ 1.20.1 or 1.20.2 applies, the "Financing Terms" for ¶ 18
are: a loan of $ _____ for a term of _____ years or such lease~~

(*) 1.12 — Specifically excluded from this sale are thirteen (13) paintings and drawings; one antique secretary desk
on east wall of LR (to be replaced by a piece of furniture that resembles this); personal 'knick knacks' such
as small boxes, clocks, picture frames, pictures, etc. (but if 'knick knacks' are in the DVD, they are
included); file cabinets in GII's office and contents thereof; all the clothing, framed photographs(except specific frame to be
designated by buyer) and the model of the Seller's private yacht located in Seller's office.

Case 22-50073   Doc 50-4

*Contract of sale cooperative agreement, 7-1901*
*Prepared by the Committee on Condominium and Cooperatives of the Real Property Section of the New York State Bar Association*

CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

## Contract of Sale - Cooperative Apartment

This Contract is made as of February 21, 2015 between the "Seller" and the "Purchaser" identified below.

### 1 Certain Definitions and Information

1.1 The "Parties" are:

1.1.1 "Seller": Sherry 1800s, LLC
*Prior names used by Seller:*
*Address: 1233 Rock Rimmon Road, Stamford, CT 06903*

1.1.2 "Purchaser": Genever Holdings LLC

*Address:*

*Tax ID. No.: 20-0780,154*

*S.S. No.:*

1.2 The "Attorneys" are *(name, firm name, address and telephone, fax).*

1.2.1 "Seller's Attorney"
Michael J. Jones, Esq.
Ivey, Barnum & O'Mara, LLC
170 Mason Street, Greenwich, CT 06830
Tel: 203-661-6300
Fax: 203-661-7088
mjones@ibholaw.com

1.2.2 "Purchaser's Attorney"
Ira Gilbert, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison, LLP
1285 Avenue of the America
New York, NY 10019-6064
Tel: 212-373-3529
Fax: 212-492-0529
igilbert@paulweiss.com

1.3 The "Escrowee" is *the [Seller's] Attorney.*

1.4 The Managing Agent is *(name, address and telephone, fax):*
Sherry Netherland Hotel
Susan Hennelly
781 Fifth Avenue, 1", New York, NY 10022
Tel: 212-331-6811 Fax: 212-832-4845

1.5 The real estate "Broker(s)" *(see ¶ 12)* is/are: John Burger, and Kathy Sloane, Brown Harris Stevens and Sorena Boardman, Sotheby's 1.6 The name of the cooperative housing corporation ("Corporation") is:
Sherry Netherland, Inc.

1.7 The "Unit" number is: 1801, which encompasses the entire *

1.8 The Unit is located in "Premises" known as: 781 Fifth Avenue, New York, NY

1.9 The "Shares" are the shares of the Corporation allocated to the Unit.
* 18th Floor, except elevator hallway and including Maid's Room 1519

1.10 The "Lease" is the Corporation's proprietary lease or occupancy agreement for the Unit, given by the Corporation which expires on

1.11 "Personality" is the following personal property, to the extent existing in the Unit on the date hereof: the refrigerators, freezers, ranges, ovens, built-in microwave ovens, dishwashers, garbage disposal units, cabinets and counters, lighting fixtures, chandeliers, wall-to-wall carpeting, plumbing and heating fixtures, central air-conditioning and/or window or sleeve units, washing machines, dryers, screens and storm windows, window treatments, switch plates, door hardware, mirrors, built-ins not ~~excluded in ¶ 1.12 and all of the furnishings including but not~~ ~~limited to everyday china, pots, pans, cooking items,~~ ~~flatware, as well as crystal glasses and decanters, etc. in the~~ ~~bar area~~ and personal property (except as specifically excluded in 1.12), including but ~~not limited to all items set forth in~~ the series of videos contained in the DVD (the "DVD") delivered by Brown Harris Stevens to Unit 1801 at 2:00 pm on February 20, 2015.

/ *(See 1.12 below)* *

1.12 ~~Specifically excluded from this sale is all personal property~~ ~~not included in ¶ 1.11 and all contents included in the unit~~ ~~with the exception of 13 paintings and drawings, one antique~~ ~~secretary desk on east wall of LR (will be replaced) personal~~ ~~"knick-knacks" such as small boxes, clocks, picture frames,~~ ~~pictures, etc.~~

1.13 The sale ~~[does]~~ [does not] include Seller's interest in ~~[Storage]/~~ [Servant's Room #1519]/ ~~[Parking Space]~~ ("Included Interests")

1.14 The "Closing" is the transfer of ownership of the Shares and Lease.

1.15 The date scheduled for Closing is no later than 3/6/15 ("Scheduled Closing Date") at 10:00 A.M. (See ¶ 9 and 10)

1.16 The "Purchase Price" is: $67,500,000.00

1.16.1 The "Contract Deposit" is: $7,000,000.00

1.16.2 The "Balance" of the Purchase Price due at Closing is: $63,000,000.00 (See ¶ 2.2.2)   See SR18 in Second Rider

1.17 The monthly "Maintenance" charge is $57,085.53   (See ¶ 4)

1.18 The "Assessment", if any, payable to the Corporation, at the date of this Contract is NONE, payable as follows:

1.19 [Purchaser] shall pay the Corporation's flip tax, transfer fee (apart from the transfer agent fee) and/or waiver of option fee ("Flip Tax"), if any.

1.20 ~~Financing Options (Delete two of the following ¶¶ 1.20.1, 1.20.2 or 1.20.3)~~

~~1.20.1 Purchaser may apply for financing in connection with this sale and Purchaser's obligation to purchase under this Contract is contingent upon issuance of a Loan Commitment Letter by the Loan Commitment Date (¶ 18.1.2).~~

~~1.20.2 Purchaser may apply for financing in connection with this sale but Purchaser's obligation to purchase under this Contract is not contingent upon issuance of a Loan Commitment Letter.~~

~~1.20.3 Purchaser shall not apply for financing in connection with this sale.~~

~~1.21 If ¶ 1.20.1 or 1.20.2 applies, the "Financing Terms" for ¶ 18 are: a loan of $ ____ (in a form of ____ years) at such lesser~~

* 1.12 – Specifically excluded from this sale are thirteen (13) paintings and drawings; one antique secretary desk on east wall of LR (to be replaced by a piece of furniture that resembles this desk); personal 'knick knacks' such as small boxes, clocks, picture frames, pictures, etc. (but if 'knick knacks' are in the DVD, they are included); file cabinets in Gil's office and contents thereof; all the clothing, framed photographs(except specific frame to be designated by buyer) and the model of the Seller's private yacht located in Seller's office.

SN 0030

amount or shorter term as applied for or acceptable to Purchaser; and the "Loan Commitment Date" for ¶ 18 is _____ calendar days after the Delivery Date. _____

1.22 The "Delivery Date" of this Contract is the date on which a fully executed counterpart of this Contract is deemed given to and received by Purchaser or Purchaser's Attorney as provided in ¶ 17.3.

1.23 All "Proposed Occupants" of the Unit are:

1.23.1 persons and relationship to Purchaser:

1.23.2 pets:

1.24 The Contract Deposit shall be held in [a non-] IOLA escrow account. If the account is a non- IOLA account then interest shall be paid to the Party entitled to the Contract Deposit. The Party receiving the interest shall pay any income taxes thereon. The escrow account shall be a segregated bank account at Depository: BNY MELLON

Address: 10 Mason Street, Greenwich, CT 06830 (See ¶ 27)

1.25 This Contract is continued on attached rider(s)

**2 Agreement to Sell and Purchase; Purchase Price; Escrow**

2.1 Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the Seller's Shares, Lease, Personally and any Included Interests and any other items included in this sale, for the Purchase Price and upon the terms and conditions set forth in this Contract.

2.2 The Purchase Price is payable to Seller by Purchaser as follows:

2.2.1 the Contract Deposit at the time of signing this Contract by Purchaser's good check to the order of Escrowee; and

2.2.2 the Balance at Closing, only by cashier's or official bank check or certified check of Purchaser payable to the direct order of Seller. The check(s) shall be drawn on and payable by a branch of a commercial or savings bank, savings and loan association or trust company located in the same City or County as the Unit. Seller may direct, on reasonable Notice (defined in ¶ 17) prior to Closing, that all or a portion of the Balance shall be made payable to persons other than Seller (see ¶ 17.7).

**3 Personalty**

3.1 Subject to any rights of the Corporation or any holder of a mortgage to which the Lease is subordinate, this sale includes all of the Seller's interest, if any, in the Personalty and the Included Interests.

3.2 No consideration is being paid for the Personalty or for the Included Interests; nothing shall be sold to Purchaser if the Closing does not occur.

3.3 Prior to Closing, Seller shall remove from the Unit all the furniture, furnishings and other property not included in this sale, and repair any damage caused by such removal.

**4 Representations and Covenants**

4.1 Subject to any matter affecting title to the Premises (as to which Seller makes no representations or covenants), Seller represents and covenants that:

4.1.1 Seller is, and shall at Closing be, the sole owner of the Shares, Lease, Personalty and Included Interests, with the full right, power and authority to sell and assign them. Seller shall make timely provision to satisfy existing security interest(s) in the Shares and Lease and have the same delivered at Closing (See ¶10.1);

4.1.2 the Shares were duly issued, fully paid for and are non-assessable;

4.1.3 the Lease is, and will at Closing be, in full force and effect and no notice of default under the Lease is now or will at Closing be in effect;

4.1.4 the Maintenance and Assessments payable as of the date hereof are as specified in ¶ 1.17 and 1.18;

4.1.5 as of this date, Seller neither has actual knowledge nor has received any written notice of any increase in Maintenance or any Assessment which has been adopted by the Board of Directors of the Corporation and is not reflected in the amounts set forth in ¶¶ 1.17 and 1.18;

4.1.6 Seller has not made any material alterations or additions to the Unit without any required consent of the Corporation or, to Seller's actual knowledge, without compliance with all applicable law. This provision shall not survive Closing.

4.1.7 Seller has not entered into, shall not enter into, and has no actual knowledge of any agreement (other than the Lease) affecting title to the Unit or its use and/or occupancy after Closing, or which would be binding on or adversely affect Purchaser after Closing (e.g. a sublease or alteration agreement);

4.1.8 Seller has been known by no other name for the past 10 years except as set forth in ¶ 1.1.1.

4.1.9 at Closing in accordance with ¶ 15.2:

4.1.9.1 there shall be no judgments outstanding against Seller which have not been bonded against collection out of the Unit ("Judgments");

4.1.9.2 the Shares, Lease, Personalty and any Included Interests shall be free and clear of liens (other than the Corporation's general lien on the Shares for which no monies shall be owed), encumbrances and adverse interests ("Liens");

4.1.9.3 all sums due to the Corporation shall be fully paid by Seller to the end of the payment period immediately preceding the date of Closing;

4.1.9.4 Seller shall not be indebted for labor or material which might give rise to the filing of a notice of mechanic's lien against the Unit or the Premises; and

4.1.9.5 no violations shall be of record which the owner of the Shares and Lease would be obligated to remedy under the Lease.

4.2 Purchaser represents and covenants that:

4.2.1 Purchaser is acquiring the Shares and Lease for residential occupancy of the Unit solely by the Proposed Occupants identified in ¶ 1.23

4.2.2 Purchaser is not, and within the past 7 years has not been, the subject of a bankruptcy proceeding.

4.2.3 if ¶ 1.20.3 applies, Purchaser shall not apply for financing in connection with this purchase.

4.2.4 Each individual comprising Purchaser is over the age of 18 and is purchasing for Purchaser's own account (beneficial and of record);

4.2.5 Purchaser shall not make any representations to the Corporation contrary to the foregoing and shall provide all documents in support thereof required by the Corporation in connection with Purchaser's application for approval of this transaction; and

4.2.6 there are not now and shall not be at Closing any unpaid tax liens or monetary judgments against Purchaser.

4.3 Each Party covenants that its representations and covenants contained in ¶ 4 shall be true and complete at Closing and, except for ¶ 4.1.6, shall survive Closing but any action based thereon must be instituted within one year after Closing.

**5 Corporate Documents**

Purchaser has examined and is satisfied with, or (except as to any matter represented in this Contract by Seller) accepts and assumes the risk of not having examined, the Lease, the Corporation's Certificate of Incorporation, By-laws, House Rules, minutes of shareholders' and directors' meetings, most recent audited financial statement and most recent statement of tax deductions available to the Corporation's shareholders under Internal Revenue Code ("IRC") §216 (or any successor statute).

**6 Required Approval and References**

6.1 This sale is subject to the unconditional consent of the Corporation.

6.2 Purchaser shall in good faith:

6.2.1 submit to the Corporation or the Managing Agent an application with respect to this sale on the form required by the Corporation, containing such data and together with such documents as the Corporation requires, and pay the applicable

SN 0031

fees and charges that the Corporation imposes upon Purchaser. All of the foregoing shall be submitted within 10 business days after the Delivery Date, or, if ¶ 1.20.1 or 1.20.2 applies and the Loan Commitment Letter is required by the Corporation, within 3 business days after the earlier of (i) the Loan Commitment Date (defined in ¶ 1.21) or (ii) the date of receipt of the Loan Commitment Letter (defined in ¶ 18.1.2);

6.2.2 attend (and cause any Proposed Occupant to attend) one or more personal interviews, as requested by the Corporation; and

6.2.3 promptly submit to the Corporation such further references, data and documents reasonably requested by the Corporation.

6.3 Either Party, after learning of the Corporation's decision, shall promptly advise the other Party thereof. If the Corporation has not made a decision on or before the Scheduled Closing Date, the Closing shall be adjourned for 30 business days for the purpose of obtaining such consent. If such consent is not given by such adjourned date, either Party may cancel this Contract by Notice, provided that the Corporation's consent is not issued before such Notice of cancellation is given. If such consent is refused at any time, either Party may cancel this Contract by Notice. In the event of cancellation pursuant to this ¶ 6.3, the Escrowee shall refund the Contract Deposit to Purchaser.

6.4 If such consent is refused, or not given, due to Purchaser's bad faith conduct, Purchaser shall be in default and ¶ 13.1 shall govern.

**7 Condition of Unit and Personalty; Possession**

7.1 Seller makes no representation as to the physical condition or state of repair of the Unit, the Personalty, the Included Interests or the Premises. Purchaser has inspected or waived inspection of the Unit, the Personalty and the Included Interests and shall take the same "as is", as of the date of this Contract, except for reasonable wear and tear. However, at the time of Closing, the appliances shall be in working order and required smoke detector(s) shall be installed and operable.

7.2 At Closing, Seller shall deliver possession of the Unit, Personalty and Included Interests in the condition required by ¶ 7.1, broom-clean, vacant and free of all occupants and rights of possession.

**8 Risk of Loss**

8.1 The provisions of General Obligations Law § 5-1311, as modified herein, shall apply to this transaction as if it were a sale of realty. For purposes of this paragraph, the term "Unit" includes built-in Personalty.

8.2 Destruction shall be deemed "material" under GOL § 5-1311, if the reasonably estimated cost to restore the Unit shall exceed 5% of the Purchase Price.

8.3 In the event of any destruction of the Unit or the Premises, when neither legal title nor the possession of the Unit has been transferred to Purchaser, Seller shall give Notice of the loss to Purchaser ("Loss Notice") by the earlier of the date of Closing or 7 business days after the date of the loss.

8.4 If there is material destruction of the Unit without fault of Purchaser, this Contract shall be deemed canceled in accordance with ¶ 16.3, unless Purchaser elects by Notice to Seller to complete the purchase with an abatement of the Purchase Price; or

8.5 Whether or not there is any destruction of the Unit, if without fault of Purchaser, more than 10% of the units in the Premises are rendered uninhabitable, or reasonable access to the Unit is not available, then Purchaser shall have the right to cancel this Contract in accordance with ¶ 16.3 by Notice to Seller.

8.6 Purchaser's Notice pursuant to ¶ 8.4 or ¶ 8.5 shall be given within 7 business days following the giving of the Loss Notice except that if Seller does not give a Loss Notice, Purchaser's Notice may be given at any time at or prior to Closing.

8.7 In the event of any destruction of the Unit, Purchaser shall not be entitled to an abatement of the Purchase Price (i) that exceeds the reasonably estimated cost of repair and restoration or (ii) for any loss that the Corporation is obliged to repair or restore; but Seller shall assign to Purchaser, without recourse, Seller's claim, if any, against the Corporation with respect to such loss.

**9 Closing Location**

The Closing shall be held at the location designated by the Corporation or, if no such designation is made, at the office of Seller's Attorney.

**10 Closing**

10.1 At Closing, Seller shall deliver or cause to be delivered:

10.1.1 Seller's certificate for the Shares duly endorsed for transfer to Purchaser or accompanied by a separate duly executed stock power to Purchaser, and in either case, with any guarantee of Seller's signature required by the Corporation;

10.1.2 Seller's counterpart original of the Lease, all assignments and assumptions in the chain of title and a duly executed assignment thereof to Purchaser in the form required by the Corporation;

10.1.3 FIRPTA documents required by ¶ 25;

10.1.4 keys to the Unit, building entrance(s), and, if applicable, garage, mailbox, storage unit and any locks in the Unit;

10.1.5 if requested, an assignment to Purchaser of Seller's interest in the Personalty and Included Interests;

10.1.6 any documents and payments to comply with ¶ 15.2

10.1.7 If Seller is unable to deliver the documents required in ¶ 10.1.1 or 10.1.2 then Seller shall deliver or cause to be delivered all documents and payments required by the Corporation for the issuance of a new certificate for the Shares or a new Lease.

10.2 At Closing, Purchaser shall:

10.2.1 pay the Balance in accordance with ¶2.2.2;

10.2.2 execute and deliver to Seller and the Corporation an agreement assuming the Lease, in the form required by the Corporation; and

10.2.3 if requested by the Corporation, execute and deliver counterparts of a new lease substantially the same as the Lease, for the balance of the Lease term, in which case the Lease shall be canceled and surrendered to the Corporation together with Seller's assignment thereof to Purchaser.

10.3 At Closing, the Parties shall complete and execute all documents necessary:

10.3.1 for Internal Revenue Service ("IRS") form 1099-S or other similar requirements;

10.3.2 to comply with smoke detector requirements and any applicable transfer tax filings; and

10.3.3 to transfer Seller's interest, if any, in and to the Personalty and Included Interests.

10.4 Purchaser shall not be obligated to close unless, at Closing, the Corporation delivers:

10.4.1 to Purchaser a new certificate for the Shares in the name of Purchaser; and

10.4.2 a written statement by an officer or authorized agent of the Corporation consenting to the transfer of the Shares and Lease to Purchaser and setting forth the amounts of and payment status of all sums owed by Seller to the Corporation, including Maintenance and any Assessments, and the dates to which each has been paid.

**11 Closing Fees, Taxes and Apportionments**

11.1 At or prior to Closing,

11.1.1 Seller shall pay, if applicable:

11.1.1.1 the cost of stock transfer stamps; and

11.1.1.2 transfer taxes, except as set forth in ¶ 11.1.2.2

11.1.2 Purchaser shall pay, if applicable:

11.1.2.1 any fee imposed by the Corporation relating to Purchaser's financing; and

Case 22-50073   Doc 50-4   Filed 02/28/22   Entered 02/28/22 21:19:53   Page 8 of 159

11.1.2.2 transfer taxes imposed by statute primarily on Purchaser (e.g., the "mansion tax"),

11.2 The Flip Tax, if any, shall be paid by the Party specified in ¶ 1.19.

11.3 Any fee imposed by the Corporation and not specified in this Contract shall be paid by the Party upon whom such fee is expressly imposed by the Corporation, and if no Party is specified by the Corporation, then such fee shall be paid by Seller.

11.4 The Parties shall apportion as of 11:59 P.M. of the day preceding the Closing, the Maintenance, and anyother periodic charges due the Corporation (other than Assessments) and STAR Tax Exemption (if the Unit is the beneficiary of same), based on the number of the days in the month of Closing.

11.5 Assessments, whether payable in a lump sum or installments, shall not be apportioned, but shall be paid by the Party who is the owner of the Shares on the date specified by the Corporation for payment. Purchaser shall pay any installments payable after Closing provided Seller had the right and elected to pay the Assessment in installments.

11.6 Each Party shall timely pay any transfer taxes for which it is primarily liable pursuant to law by cashier's, official bank, certified or attorney's escrow check. This ¶11.6 shall, survive Closing.

11.7 Any computational errors or omissions shall be corrected within 6 months after Closing. This ¶11.7 shall survive Closing.

**12 Broker**

12.1 Each Party represents that such Party has not dealt with any person acting as a broker, whether licensed or unlicensed, in connection with this transaction other than the Broker(s) named in ¶ 1.5.

12.2 Seller shall pay the Broker's commission pursuant to a separate agreement The Broker(s) shall not be deemed to be a third-party beneficiary of this Contract.

12.3 This ¶12 shall survive Closing, cancellation or termination of this Contract.

**13 Defaults, Remedies and Indemnities**

13.1 In the event of a default or misrepresentation by Purchaser, Seller's sole and exclusive remedies shall be to cancel this Contract, retain the Contract Deposit as liquidated damages and, if applicable, Seller may enforce the indemnity in ¶ 13.3 as to brokerage commission or sue under ¶ 13.4. Purchaser prefers to limit Purchaser's exposure for actual damages to the amount of the Contract Deposit, which Purchaser agrees constitutes a fair and reasonable amount of compensation for Seller's damages under the circumstances and is not a penalty. The principles of real property law shall apply to this liquidated damages provision.

13.2 In the event of a default or misrepresentation by Seller, Purchaser shall have such remedies as Purchaser is entitled to at law or in equity, including specific performance, because the Unit and possession thereof cannot be duplicated.

13.3 Subject to the provisions of ¶ 4.3, each Party indemnifies and holds harmless the other against and from any claim, judgment, loss, liability, cost or expense resulting from the indemnitor's breach of any of its representations or covenants stated to survive Closing, cancellation or termination of this Contract. Purchaser indemnifies and holds harmless Seller against and from any claim, judgment, loss, liability, cost or expense resulting from the Lease obligations accruing from and after the Closing. Each indemnity includes, without limitation, reasonable attorneys' fees and disbursements, court costs and litigation expenses arising from the defense of any claim and enforcement or collection of a judgment under this indemnity, provided the indemnitee is given Notice and opportunity to defend the claim. This ¶ 13.3 shall survive Closing, cancellation or termination of this Contract.

13.4 In the event any instrument for the payment of the Contract Deposit fails of collection, Seller shall have the right to sue on the uncollected instrument. In addition, such failure of collection shall be a default under this Contract, provided Seller gives Purchaser Notice of such failure of collection and, within 3 business days after Notice is given, Escrowee does not receive from Purchaser an unendorsed good certified check, bank check or immediately available funds in the amount of the uncollected funds. Failure to cure such default shall entitle Seller to the remedies set forth in ¶ 13.1 and to retain all sums as may be collected and/or recovered.

**14 Entire Agreement; Modification**

14.1 All prior oral or written representations, understandings and agreements had between the Parties with respect to the subject matter of this Contract, and with the Escrowee as to ¶ 27, are merged in this Contract, which alone fully and completely expresses the Parties' and Escrowee's agreement. 14.2 The Attorneys may extend in writing any of the time limitations stated in this Contract. Any other provision of this Contract may be changed or waived only in writing signed by the Party or Escrowee to be charged.

**15 Removal of Liens and Judgments**

15.1 Purchaser shall deliver or cause to be delivered to Seller or Seller's Attorney, not less than 10 calendar days prior to the Scheduled Closing Date a Lien and Judgment search, except that Liens or Judgments first disclosed in a continuation search shall be reported to Seller within 2 business days after receipt thereof, but not later than the Closing. Seller shall have the right to adjourn the Closing pursuant to ¶ 16 to remove any such Liens and Judgments. Failure by Purchaser to timely deliver such search or continuation search shall not constitute a waiver of Seller's covenants in ¶4 as to Liens and Judgments. However, if the Closing is adjourned solely by reason of untimely delivery of the Lien and Judgment search, the apportionments under ¶ 11.3 shall be made as of 11:59 P.M. of the day preceding the Scheduled Closing Date in ¶ 1.15.

15.2 Seller, at Seller's expense, shall obtain and deliver to the Purchaser the documents and payments necessary to secure the release, satisfaction, termination and discharge or removal of record of any Liens and Judgments. Seller may use any portion of the Purchase Price for such purposes.

15.3 This ¶ 15 shall survive Closing.

**16 Seller's Inability**

16.1 If Seller shall be unable to transfer the items set forth in ¶ 2.1 in accordance with this Contract for any reason other than Seller's failure to make a required payment or other willful act or omission, then Seller shall have the right to adjourn the Closing for periods not exceeding 60 calendar days in the aggregate, but not extending beyond the expiration of Purchaser's Loan Commitment Letter, if ¶ 1.20.1 or 1.20.2 applies.

16.2 If Seller does not elect to adjourn the Closing or (if adjourned) on the adjourned date of Closing Seller is still unable to perform, then unless Purchaser elects to proceed with the Closing without abatement of the Purchase Price, either Party may cancel this Contract on Notice to the other Party given at any time thereafter.

16.3 In the event of such cancellation, the sole liability of Seller shall be to cause the Contract Deposit to be refunded to Purchaser and to reimburse Purchaser for the actual costs incurred for Purchase's lien and title search, if any.

**17 Notices and Contract Delivery**

17.1 Any notice or demand ("Notice") shall be in writing and delivered either by hand. Overnight delivery or certified or registered mail, return receipt requested, to the Party and simultaneously, in like manner, to such Party's Attorney, if any, and to Escrowee at their respective addresses or to such other address as shall hereafter be designated by Notice given pursuant to this ¶ 17.

SN 0033

17.2 The Contract may be delivered as provided in ¶
17.1 or by ordinary mail.

17.3 The Contract or each Notice shall be deemed given and received:

17.3.1 on the day delivered by hand;

17.3.2 on the business day following the date sent by overnight delivery;

17.3.3 on the 5th business day following the date sent by certified or registered mail; or

17.3.4 as to the Contract only, 3 business days following the date of ordinary mailing.

17.4 A Notice to Escrowee shall be deemed given only upon actual receipt by Escrowee.

17.5 The Attorneys are authorized to give and receive any Notice on behalf of their respective clients.

17.6 Failure or refusal to accept a Notice shall not invalidate the Notice.

17.7 Notice pursuant to ¶¶ 2.2.2 and 13.4 may be delivered by confirmed facsimile to the Party's Attorney and shall be deemed given when transmission is confirmed by sender's facsimile machine.

**18 Financing Provisions**

~~18.1 The provisions of ¶¶ 18.1 and 18.2 are applicable only if ¶ 1.20.1 or 1.20.2 applies.~~

~~18.1.1 An "Institutional Lender" is any of the following that is authorized under Federal or New York State law to issue a loan secured by the Shares and Lease and is currently extending similarly secured loan commitments in the county in which the Unit is located: a bank, savings bank, savings and loan association, trust company, credit union of which Purchaser is a member, mortgage banker, insurance company or governmental entity.~~

~~18.1.2 A "Loan Commitment Letter" is a written offer from an Institutional Lender to make a loan on the Financing Terms (see ¶ 1.21) at prevailing fixed or adjustable interest rates and on other customary terms generally being offered by Institutional Lenders making cooperative share loans. An offer to make a loan conditional upon obtaining an appraisal satisfactory to the Institutional Lender shall not become a Loan Commitment Letter unless and until such condition is met. An offer conditional upon any factor concerning Purchaser (e.g. sale of current home, payment of outstanding debt, no material adverse change in Purchaser's financial condition, etc.) is a Loan Commitment Letter whether or not such condition is met. Purchaser accepts the risk that, and cannot cancel this Contract if, any condition concerning Purchaser is not met.~~

~~18.2 Purchaser, directly or through a mortgage broker registered pursuant to Article 12-D of the Banking Law, shall diligently and in good faith:~~

~~18.2.1 apply only to an Institutional Lender for a loan on the Financing Terms (see ¶ 1.21) on the form required by the Institutional Lender containing truthful and complete information and submit such application together with such documents as the Institutional Lender requires, and pay the applicable fees and charges of the Institutional Lender, all of which shall be performed within 5 business days after the Delivery Date;~~

~~18.2.2 promptly submit to the Institutional Lender such further references, data and documents requested by the Institutional Lender; and~~

~~18.2.3 accept a Loan Commitment Letter meeting the Financing Terms and comply with all requirements of such Loan Commitment Letter (or any other loan commitment letter accepted by Purchaser) and of the Institutional Lender in order to close the loan; and~~

~~18.2.4 furnish Seller with a copy of the Loan Commitment Letter promptly after Purchaser's receipt thereof.~~

~~18.2.5 Purchaser is not required to apply to more than one Institutional Lender.~~

~~18.3 If ¶ 1.20.1 applies, then~~

~~18.3.1 provided Purchaser has complied with all applicable provisions of ¶ 18.2 and this ¶ 18.3, Purchaser may cancel this Contract as set forth below, if:~~

~~18.3.1.1 any Institutional Lender denies Purchaser's application in writing prior to the Loan Commitment Date (see ¶ 1.21); or~~

~~18.3.1.2 a Loan Commitment Letter is not issued by the Institutional Lender on or before the Loan Commitment Date; or~~

~~18.3.1.3 any requirement of the Loan Commitment Letter other than one concerning Purchaser is not met (e.g. failure of the Corporation to execute and deliver the Institutional Lender's recognition agreement or other document, financial condition of the Corporation, owner occupancy quota, etc.); or~~

~~18.3.1.4 (i) the Closing is adjourned by Seller or the Corporation for more than 30 business days from the Scheduled Closing Date and (ii) the Loan Commitment Letter expires on a date more than 30 business days after the Scheduled Closing Date and before the new date set for Closing pursuant to this paragraph and (iii) Purchaser in good faith to obtain from the Institutional Lender an extension of the Loan Commitment Letter or a new Loan Commitment Letter on the Financing Terms without paying additional fees to the Institutional Lender, unless Seller agrees, by Notice to Purchaser within 5 business days after receipt of Purchaser's Notice of cancellation on such ground, that Seller will pay such additional fees and Seller pays such fees when due. Purchaser may not object to an adjournment by Seller for up to 30 business days solely because the Loan Commitment Letter would expire before such adjourned Closing date.~~

~~18.3.2 Purchaser shall deliver Notice of cancellation to Seller within 5 business days after the Loan Commitment Date if cancellation is pursuant to ¶18.3.1.1 or 18.3.1.2 and on or prior to the Scheduled Closing Date if cancellation is pursuant to ¶ 18.3.1.3 or 18.3.1.4.~~

~~18.3.3 If cancellation is pursuant to ¶ 18.3.1.1, then Purchaser shall deliver to Seller, together with Purchaser's Notice, a copy of the Institutional Lender's written denial of Purchaser's loan application. If cancellation is pursuant to ¶ 18.3.1.3, then Purchaser shall deliver to Seller together with Purchaser's Notice evidence that a requirement of the Institutional Lender was not met.~~

~~18.3.4 Seller may cancel this Contract by Notice to Purchaser sent within 5 days after the Loan Commitment Date, if Purchaser shall not have sent by then either (i) Purchaser's Notice of cancellation or (ii) a copy of the Loan Commitment Letter to Seller, which cancellation shall become effective if Purchaser does not deliver a copy of such Loan Commitment Letter to Seller within 10 business days after the Loan Commitment Date.~~

~~18.3.5 Failure by either Purchaser or Seller to deliver Notice of cancellation as required by this ¶ 18.3 shall constitute a waiver of the right to cancel under this ¶18.3.~~

~~18.3.6 If this Contract is canceled by Purchaser pursuant to this ¶ 18.3, then thereafter neither Party shall have any further rights against, or obligations or liabilities to, the other by reason of this Contract, except that the Contract Deposit shall be promptly refunded to Purchaser and accept as set forth in ¶ 13. If this Contract is canceled by Purchaser pursuant to ¶ 18.3.1.4, then Seller shall reimburse Purchaser for any non-refundable financing and inspection expenses and other sums reimbursable pursuant to ¶ 13.~~

~~18.3.7 Purchaser cannot cancel this Contract pursuant to ¶ 18.3.1.4 and cannot obtain a refund of the Contract Deposit if the Institutional Lender fails to fund the loan.~~

~~18.3.7.1 because a requirement of the Loan Commitment Letter concerning Purchaser is not met (e.g., Purchaser's financial condition or employment status suffers an adverse change; Purchaser fails to satisfy a condition relating to the sale of an existing residence, etc.) or~~

~~18.3.7.3 due to the expiration of a Loan Commitment Letter issued with an expiration date that is not more than 30 business days after the Scheduled Closing Date.~~

**19 Singular/Plural and Joint/Several**

The use of the singular shall be deemed to include the plural and vice versa, whenever the context so requires. If more than one person constitutes Seller or Purchaser, their obligations as such Party shall be joint and several.

**20 No Survival**

No representation and/or covenant contained herein shall survive Closing except as expressly provided. Payment of the Balance shall constitute a discharge and release by Purchaser of all of Seller's obligations hereunder except those expressly stated to survive Closing.

**21 Inspections**

Purchaser and Purchaser's representatives shall have the right to inspect the Unit within 48 hours prior to Closing, and at other reasonable times upon reasonable request to Seller.

**22 Governing Law and Venue**

This Contract shall be governed by the laws of the State of New York without regard to principles of conflict of laws. Any action or proceeding arising out of this Contract shall be brought in the county or Federal district where the Unit is located and the Parties hereby consent to said venue.

**23 No Assignment by Purchaser; Death of Purchaser**

23.1 Purchaser may not assign this Contract or any of Purchaser's rights hereunder. Any such purported assignment shall be null and void.

23.2 This Contract shall terminate upon the death of all persons comprising Purchaser and the Contract Deposit shall be refunded to the Purchaser. Upon making such refund and reimbursement, neither Party shall have any further liability or claim against the other hereunder, except as set forth in ¶ 12.

**24 Cooperation of Parties**

24.1 The Parties shall each cooperate with the other, the Corporation and Purchaser's Institutional Lender and title company, if any, and obtain execute and deliver such documents as are reasonably necessary to consummate this sale.

24.2 The Parties shall timely file all required documents in connection with all governmental filings that are required by law. Each Party represents to the other that its statements in such filings shall be true and complete. This ¶ 24.2 shall survive Closing.

**25 FIRPTA**

The parties shall comply with IRC §§ 897, 1445 and the regulations thereunder as same may be amended ("FIRPTA"). If applicable, Seller shall execute and deliver to purchaser at Closing a Certification of Non- Foreign Status ("CNS") or deliver a Withholding Certificate from the IRS. If Seller fails to deliver a CNS or a Withholding Certificate, Purchaser shall withhold from the Balance, and remit to the IRS, such sum as may be required by law. Seller hereby waives any right of action against Purchaser on account of such withholding and remittance. This ¶ 25 shall survive Closing.

**26 Additional Requirements**

26.1 Purchaser shall not be obligated to close unless all of the following requirements are satisfied at the time of the Closing:

26.1.1 the Corporation is in good standing;

26.1.2 the Corporation has fee or leasehold title to the Premises, whether or not marketable or insurable; and

26.1.3 there is no pending In rem action, tax certificate/ ien sale or foreclosure action of any underlying mortgage affecting the Premises.

26.2 If any requirement in ¶ 26.1 is not satisfied at the time of the Closing, Purchaser shall give Seller Notice and if the same is not satisfied within a reasonable period of time thereafter, then either Party way cancel this Contract (pursuant to ¶ 16.3) by Notice.

**27 Escrow Terms**

27.1 The Contract Deposit shall be deposited by Escrowee in an escrow account as set forth in ¶ 1.24 and the proceeds held and disbursed in accordance with the terms of this Contract. At Closing, the Contract Deposit shall be paid by Escrowee to Seller. If the Closing does not occur and either Party gives Notice to Escrowee demanding payment of the Contract Deposit, Escrowee shall give prompt Notice to the other Party of such demand. If Escrowee does not receive a Notice of objection to the proposed payment from such other Party within 10 business days after the giving of Escrowee's Notice, Escrowee is hereby authorized and directed to make such payment to the demanding party. If Escrowee does receive such a Notice of objection within said period, or if for any reason Escrowee in good faith elects not to make such payment, Escrowee may continue to hold the Contract Deposit until otherwise directed by a joint Notice by the Parties or a final, non-appealable judgment, order or decree of a court of competent jurisdiction. However, Escrowee shall have the right at any time to deposit the Contract Deposit and the interest thereon, if any, with the clerk of a court in the county as set forth in ¶ 22 and shall give Notice of such deposit to each Party. Upon disposition of the Contract Deposit and interest thereon, if any, in accordance with this ¶ 27, Escrowee shall be released and discharged of all escrow obligations and liabilities.

27.2 The Party whose Attorney is Escrowee shall be liable for loss of the Contract Deposit. If the Escrowee is Seller's attorney, then Purchaser shall be credited with the amount of the contract Deposit at Closing.

27.3 Escrowee will serve without compensation. Escrowee is acting solely as a stakeholder at the Parties' request and for their convenience. Escrowee shall not be liable to either Party for any act or omission unless it involves bad faith, willful disregard of this Contract or gross negligence. In the event of any dispute, Seller and Purchaser shall jointly and severally (with right of contribution) defend (by attorneys elected by Escrowee), indemnify and hold harmless Escrowee from and against any claim, judgment, loss, liability, cost and expenses incurred in connection with the performance of Escrowee's acts or omissions not involving bad faith, willful disregard of this Contract or gross negligence. This indemnity includes, without limitation, reasonable attorneys' fees either paid to retain attorneys or representing the fair value of legal services rendered by Escrowee to itself and disbursements, court costs and litigation expenses.

27.4 Escrowee acknowledges receipt of the Contract Deposit, by check subject to collection.

27.5 Escrowee agrees to the provisions of this ¶ 27.

27.6 If Escrowee is the Attorney for a Party, Escrowee shall be permitted to represent such Party in any dispute or lawsuit.

27.7 This ¶ 27 shall survive Closing, cancellation or termination of this Contract

**28 Margin Headings**

The margin heading do not constitute part of the text of this Contract.

**29 Miscellaneous**

This Contract shall not be binding unless and until Seller delivers a fully executed counterpart of this Contract to Purchaser (or Purchaser's Attorney) pursuant to ¶ 17.2 and 17.3. This Contract shall bind

and inure to the benefit of the Parties hereto and their respective heirs, personal and legal representatives and successors in interest.

**30 Lead Paint**
If applicable, the complete and fully executed Disclosure of
Information on Lead Based Paint and or Lead-Based Paint
Hazards is attached hereto and made a part hereof.

In Witness Whereof, the Parties hereto have duly executed this Contract as of the date first above written.

ESCROW TERMS AGREED TO:

Michael J. Jones ESCROWEE

SELLER:
SHERRY 1800s, LLC

By: _____

PURCHASER:
GENEVER HOLDINGS LLC

By: _____

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM INDEX NO. 652077/2017
NYSCEF DOC. NO. 256    Case 22-50073   Doc 50-4   Filed 02/28/22   Entered 02/28/22 21:19:53   Page 12 of   RECEIVED NYSCEF: 11/28/2018

159

## FIRST RIDER ANNEXED TO AND FORMING A PART OF CONTRACT OF SALE FOR THE 18TH FLOOR KNOWN AS UNIT 1801 AT SHERRY NETHERLAND, INC., 781 FIFTH AVENUE, NEW YORK, NEW YORK, A COOPERATIVE APARTMENT BETWEEN SHERRY 1800s, LLC, AS SELLER, AND GENEVER HOLDINGS LLC, AS PURCHASER, DATED FEBRUARY 21, 2015

31.     In the event of any conflict between the provision of this Rider or any other Rider, and the provisions of the Contract to which this Rider is attached, the provisions of this Rider shall control.

32.     In addition to the representation made by Purchaser in Paragraph 4 of this Contract, Purchaser, jointly and severally, represents and warrants to Seller that Purchaser knows of no outstanding judgments or tax liens and knows of no threatened lawsuit or claim (including criminal and/or tax proceedings).

33.     Supplementing Paragraph 20, the acceptance of the Shares and the assumption of the Lease by Purchaser and the delivery of possession of the Unit and keys by Seller shall be deemed full performance by Seller of Seller's obligations under this Contract, except any of which that survive Closing, and such acceptance and assumption by Purchaser shall discharge Seller from all terms, conditions, representations and agreements required to be performed by Seller under this Contract, except any of which that survive Closing. No liability on the part of Seller shall survive the Closing except as expressly set forth in this Contract.

34.     In the event that there is any refund on real estate taxes attributable to the time period in which Seller has owned the Unit, such refund shall belong solely to Seller. In this regard, Purchaser shall cooperate with Seller in connection with obtaining such refund and Purchaser agrees to sign any reasonable documentation to assist Seller in obtaining such refund. If such refund is delivered to Purchaser (or credited towards Purchaser's monthly maintenance by the Corporation), Purchaser shall promptly remit such refund to Seller. The Parties acknowledge that the provision of this Paragraph 34 shall survive the Closing

35.     An increase in the maintenance or the imposition of an assessment after the date hereof shall not be deemed a misrepresentation or breach by Seller hereunder. In this regard, any assessment imposed by the Corporation after the date of this Contract, shall be solely the obligation of Purchaser if such assessment is payable on or after the date of Closing. Seller will send Purchaser a copy of any notices from the Corporation regarding material facts relating to the Corporation including any maintenance increases.

36.     A "Disclosure of Information on Lead-Based Paint and/or Lead Based Paint Hazards" is attached hereto as Exhibit A hereto. Such document may be executed in counterparts. This Contract shall be deemed executed when signed by the parties hereto notwithstanding that the Broker's signature on such Exhibit A have not yet been obtained. Purchaser acknowledges that Purchaser has received the pamphlet Protect Your Home From Lead in Your Home and Purchaser hereby waives the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards in the Unit and/or the Premises. Purchaser acknowledges that Seller has made no representations to Purchaser concerning the presence of lead paint in the Premises except in the Unit and then only to the extent expressly set forth in the attached disclosure form. Notwithstanding any requirements pursuant to any Local Law, Purchaser

**SN 0037**

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 256
RECEIVED NYSCEF: 11/28/2018

Case 22-50073    Doc 50-4    Filed 02/28/22    Entered 02/28/22 21:19:53    Page 13 of
159

accepts the Premises and Unit in their current "as is" condition concerning the presence of lead paint and any hazards related to same.

37.    All representations made by the Seller in the Contract or any Rider thereto are made to the best of Seller's knowledge and belief without independent investigation and shall not survive the closing.

IN WITNESS WHEREOF, of the parties hereto have executed this Rider to Contract of Sale as of the date first above written.

SELLER:

SHERRY 1800s, LLC

By: _____

PURCHASER:

GENEVER HOLDINGS LLC

By: _____

SECOND RIDER TO CONTRACT OF SALE DATED AS OF FEBRUARY _21_, 2015,
BETWEEN SHERRY 1800S LLC, AS SELLER, AND GENEVER HOLDINGS LLC, AS
PURCHASER, COVERING PREMISES LOCATED AT 781 FIFTH AVENUE, NEW YORK,
NEW YORK, 18TH FLOOR (UNITS 1801, 1804, 1807, 1809, 1811, SERVANT'S ROOM 1519)

SR1.    In case of any inconsistency or conflict between the printed portion of this
Contract or the First Rider, and the provisions of this Second Rider, the provisions of this Second
Rider shall control.

SR2.    Seller shall, promptly after receipt thereof, deliver to Purchaser copies of
any written notices from the Corporation received after the Delivery Date and relating to: (1) any
increase in the amount of the monthly Maintenance as set forth in paragraph 1.17; (2) any
intended or proposed assessment other than the Assessment; (3) any intended or proposed
changes to the "flip tax" or other transfer fee charged by the Corporation or its Managing Agent;
(4) any proposed amendment or modification of the Lease, the Certificate of Incorporation of the
Corporation or the Corporation's By-Laws; (5) any proposed construction or repair work the cost
of which is intended to be borne by the Corporation, its insurers or its shareholders; (6) any
refinancing or other material change with respect to any mortgage affecting the Premises; or (7)
any damage or casualty to the Unit or the Premises.

SR3.    Supplementing paragraph 3.3: In the event Seller removes any light
fixtures from the Unit, such fixtures will be replaced with standard fixtures, so that no exposed
wiring or bulbs remain in place of the removed fixtures. Seller shall, at its own expense and
prior to the Closing, remove from the Unit all furniture, furnishings and other personal property
and/or fixtures not included in this transaction and shall repair in a good and workmanlike
manner any material damage caused by such removal. Any of Seller's personal property not
included in the sale contemplated hereby which is not removed from the Unit prior to the Closing
shall be deemed abandoned property. Purchaser may (but shall not be obligated to) cause any
such abandoned property to be removed from the Unit at Seller's risk and expense. The
provisions of this paragraph shall survive the Closing.

SR4.    Notwithstanding the provisions of paragraph 7 or any other provision of
this Contract to the contrary, Seller represents and warrants that the plumbing, heating, electrical
and air conditioning systems and fixtures and all Personalty shall be in working order at the
Closing, to the extent the responsibility of Seller under the Lease.

SR5.    (a)    As a material inducement to Purchaser entering into this Contract,
Seller hereby represents that Seller has obtained all necessary approvals, permits and certificates
from the Corporation and the New York City Department of Buildings for any work done by
Seller to the Unit. Further, Seller is not obligated to perform any work or expend any monies

SN 0039

2

(other than maintenance) pursuant to any agreement (other than the Lease and other Co-op Documents) with the Corporation that would be binding on Purchaser after Closing.

(b)    Prior to Closing, Seller shall, at its sole cost and expense, cause any and all open permits against the Unit to be closed, discharged, and otherwise paid for, and shall deliver satisfactory proof of same to Purchaser. A Letter of Completion from the NYC Department of Buildings shall be deemed satisfactory proof. Notwithstanding the foregoing, Seller shall not be required to close two open permits that are listed by the New York City Department of Buildings as Job Nos. 101785169 and 101778836, copies of which Jobs are attached hereto. The parties acknowledge the reason for the prior sentence is that the Corporation has stated it will agree in writing to duly close these two open permits. In the event the Corporation does not deliver such written agreement, then Seller may either elect to close these permits, but if it does not, then either party may terminate this Contract.

(c)    Seller shall either (a) deliver to Purchaser a letter of completion from the New York City Department of Buildings evidencing that the Unit has been legally combined, or (b) at Closing, execute and file with the transfer taxes returns an affidavit stating the reasons that the Unit is properly and legally considered to be a single unit with one kitchen and that transfer tax should be paid to New York City at the rate of 1.425%. Seller shall also deliver an indemnity letter to Purchaser indemnifying Purchaser against any costs and damages (including, but not limited to penalties and interest for late payment) resulting from the City's requiring payment at a higher rate of taxation. Notwithstanding the foregoing, if (i) Seller is unable to deliver a letter of completion as set forth above, and (ii) Seller elects to pay the New York City transfer tax at the rate of 1.425% (rather than the so-called "bulk rate" of 2.625%), then Seller's attorneys shall hold in escrow the sum of $840,000 representing the difference between these rates of taxation. Seller's attorneys shall hold such sum for the shorter of (i) two (2) years (representing the current audit period for this tax by the New York City Department of Finance ("DOF"), or (ii) until such time that the Corporation delivers satisfactory written evidence from the New York City Department of Buildings (and/or other appropriate governmental entities) that the Unit has been properly and legally combined. Seller's attorneys shall either release the balance to Seller if it is determined that 1.425% was the appropriate rate of taxation, or pay this sum, plus interest and penalties, if any, in the event it is determined by DOF that 2.625% was the appropriate transfer tax rate.

SR6.    Supplementing paragraph 4.1: "4.1.10. To Seller's knowledge, Seller has not received any written notice of any major repairs or replacements contemplated to the Premises or to the building systems in the Premises (including, without limitation, the heating, plumbing and electrical systems) that could materially affect the Premises or the Unit.

"4.1.11. To Seller's knowledge, there are currently no water leaks into the Unit and there have been no such leaks during the twelve (12)- month period immediately

Doc#: US1:9841154v4

SN 0040

3

preceding the date hereof. In addition, Seller has not been notified during said twelve (12)-month period of any water leaks elsewhere in the Premises which were purported to emanate from the Unit."

"4.1.12 During Seller's ownership of the Unit, to Seller's knowledge, Seller has not been aware of (a) the presence any toxic mold in either the Unit, or (b) any bedbug infestation in the Unit."

"4.1.13 That to Seller's knowledge, there are no claims, actions, suits or legal proceedings of any kind pending or threatened (in writing), which affect the Unit, Seller's ownership of the Unit or which may cause a lien of any kind to be imposed against the Unit or the Seller."

"4.1.14 To Seller's knowledge, in the last twelve (12) months, that neither Seller, nor any person acting on behalf of Seller, has made any complaint (in writing, electronic communication or by telephone) to the Corporation, Managing Agent, superintendent or any other unit owner or tenant-shareholder at the Premises regarding noise, offensive odors, offensive conduct, lack of heat or hot water, or any other disturbance or adverse condition affecting the Unit."

SR7. All representations, warranties and covenants of Seller set forth in this Contract shall be true in all material respects as of the Closing, and Purchaser's obligation to perform under this Contract is expressly conditioned upon there being no breach, inaccuracy or misrepresentation in any of the same.

SR8. If the Corporation approves the Purchaser's application but conditions its consent upon Purchaser complying with requirements outside the scope of the Contract, such as a demand for the Purchaser to deposit funds into escrow, then Purchaser may elect, in its sole discretion, to either (i) comply with such conditions and proceed with the Purchase, or (ii) decline to comply with such conditions. If Purchaser declines to comply, then Purchaser shall deliver to Seller written notice of same and this Contract shall be deemed canceled, and Escrowee shall promptly refund the Contract Deposit to Purchaser. Further, Seller acknowledges and agrees that Purchaser shall only be required to disclose to the Corporation liquid assets of $420,000,000.00 (more than five times the Purchase Price), with supporting documentation as may be required by the Corporation as to the aforesaid amount (such as bank statements). Submission by Purchaser of the foregoing shall be deemed complete for purposes of the "Financial Statement", "Statement of Assets and Liabilities signed by Purchaser or Accountant" and supporting "Verification of Assets" which are required by the Corporation as part of its "Standard Transfer Requirements" Board application. Purchaser may, in its sole discretion, decline any request by the Corporation to submit any documentation showing liquid assets in excess of the aforesaid amount, so that in the event the Corporation rejects the Purchaser's

Doc#: US1:9841154v4

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
NYSCEF DOC. NO. 256
INDEX NO. 652077/2017
RECEIVED NYSCEF: 11/28/2018

Case 22-50073   Doc 50-4   Filed 02/28/22   Entered 02/28/22 21:19:53   Page 17 of
159

4

application for any reason (other than willful bad faith by Purchaser), this Contract shall be deemed canceled, and Escrowee shall promptly refund the Contract Deposit to Purchaser.

SR9.   Supplementing paragraph 11.1.1.2: Seller's obligation with respect to payment of transfer taxes shall apply to transfer taxes imposed by both the City and the State of New York. Within fourteen (14) days following the Closing, Seller shall furnish to Purchaser's attorney proof of filing of such transfer taxes. Seller shall indemnify and hold Purchaser harmless from and against any and all costs, loss or expenses incurred by Purchaser, including reasonable attorneys' fees and disbursements, by reason of Seller's failure to timely perform its obligations with respect to such transfer taxes. The provisions of this paragraph shall survive the Closing.

SR10.   Supplementing paragraph 13: "13.5 Should either party willfully default in its obligations hereunder, it shall be liable to the other for reasonable attorneys' fees and costs incurred by the other party in enforcing this Contract as determined by a court of competent jurisdiction. In the event that either party purports to cancel this Contract and Seller elects to retain the Contract Deposit as liquidated damages, the prevailing party in any subsequent lawsuit shall recover its reasonable attorneys' fees and costs from the non-prevailing party. The award of such attorneys' fees and costs shall be recoverable as actual compensatory damages in addition to the amount of the Contract Deposit and/or liquidated damages which may be payable by either party."

SR11.   Supplementing paragraph 15.1: Purchaser may also deliver a supplemental list of such Liens at a later date but not subsequent to the Closing if Purchaser becomes aware of the same at such later date.

SR12.   Supplementing paragraph 16: "16.4. Seller shall not be deemed unable to transfer the Lease and the Shares if such inability can be overcome by the payment of a sum of money by Seller not in excess of the Purchase Price less any loan payoff, brokerage commission, transfer taxes and customary closing costs."

SR13.   Seller agrees to deliver to Purchaser, at or prior to the execution of this Contract, to the extent within Seller's actual possession, all drawings and plans of the Unit, including the original floor plans, and all renderings of any proposed or completed renovations therein. In addition, Seller agrees to deliver to Purchaser, at or prior to the Closing and to the extent within Seller's actual possession, originals of all instruction manuals and all guaranties and warranty agreements affecting the Unit or any of the appliances or other personalty included in this sale, the rights under which shall be deemed assigned, to the extent assignable, to Purchaser at the Closing.

SR14.   This Contract may be executed in any number of counterparts. Each such counterpart shall for all purposes be deemed to be an original, and all such counterparts shall

SN 0042

Case 22-50073   Doc 50-4   Filed 02/28/22   Entered 02/28/22 21:19:53   Page 18 of
159

5

together constitute and be but one and the same instrument. Facsimile signatures or scanned signatures sent by e-mail shall bind the parties.

SR15   Seller hereby agrees to cooperate with Purchaser if Purchaser elects to obtain leasehold title insurance or the Eagle 9 UCC Cooperative Interest Insurance Policy in connection with Purchaser's purchase of the Unit, including, without limitation, signing a title affidavit in the form requested by the issuer of the Eagle 9 UCC Cooperative Interest Insurance Policy.

SR16.   If for any reason the Corporation does not permit the Purchaser to purchase the Unit, then Purchaser may assign this Contract to another entity within the control of the Purchaser herein.

SR17.   Each of the parties hereto desire that this Contract and the terms thereof (the "Confidential Aspects") be kept confidential to the greatest extent practicable. Accordingly, each of the parties hereto shall, and shall instruct his or her agents, representatives and contractors to, maintain the confidentiality of the Confidential Aspects. It is understood, however, that the Confidential Aspects may be disclosed: (a) to the professional advisors of each of the parties (for example, without limitation, their attorneys and accountants), and to various other third parties (such as, for example, title insurance companies) who may be involved in aspects of the transactions or are otherwise necessary in order to consummate the transactions contemplated hereby; (b) if required to be disclosed by court order, subpoena, or other government process, or if required by law; (c)with the consent of the parties; or (d) if already in the public domain.

SR18.   Notwithstanding anything contained herein to the contrary, the parties hereby agree that the sum of (a) $67,500,000 is hereby allocated to the Purchase Price for the Unit, and that the additional sum of (b) $2,500,000 is hereby allocated to the Personalty included in the Unit. Accordingly, appropriate New York State and City transfer taxes shall be paid by the respective parties based upon the sum of $67,500,000, and, in addition, Purchaser shall pay the New York State sales tax on the Personalty, which Seller shall collect at Closing.

SR19.   Seller represents it will cause the third party sale of an additional maid's Room in the Building to Purchaser either prior to or simultaneously with the closing of this transaction. In the event that Purchaser is unable to buy this additional maid's room either prior to or simultaneous with the actual Closing of this transaction, Seller acknowledges that Purchaser may terminate this Contract and receive a full and prompt refund of the Contract Deposit, with interest. It is within the sole discretion of Purchaser whether to exercise or waive this option to terminate. It is also noted that the Brokers listed in this Contract shall pay for the maid's room, including costs and expenses associated therewith (including transfer taxes).

SN 0043

6

SR20. In the event that for any reason the parties are unable to close this transaction by March 6, 2015, then Purchaser may terminate this Contract and receive a full refund of the Contract Deposit. It is within the sole discretion of Purchaser whether to exercise or waive this option to terminate.

SR21. Seller shall pay the brokerage commissions based upon the total consideration being paid by Purchaser for both the Unit and Personalty (which is the sum of $70,000,000.00).

SHERRY 1800s LLC, Seller

Name:
Title:

GENEVER HOLDINGS LLC, Purchaser

By: _____
Ira J. Gilbert, Authorized Person

Doc#: US1:9841154v4

SN 0044

 3142—Lead paint disclosure, sale of dwelling.
24 CFR Part 35, 40 CFR Part 745, 9-6-96.                                                                 Excelsior, Publisher, NYC 10013

# Disclosure of Information on
# Lead-Based Paint and/or Lead-Based Paint Hazards
## SALES

## Lead Warning Statement

Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

## Seller's Disclosure

(a) Presence of lead-based paint and/or lead-based paint hazards *(Check (i) or (ii) below):*

   (i) ☐ Known lead-based paint and/or lead-based paint hazards are present in the housing *(explain).*

...................................................................................................................................
...................................................................................................................................
...................................................................................................................................

   (ii) ☒ Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the seller *(Check (i) or (ii) below):*

   (i) ☐ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing *(list documents below).*

...................................................................................................................................
...................................................................................................................................

   (ii) ☒ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

## Purchaser's Acknowledgment *(initial)*

   (c) _____ Purchaser has received copies of all information listed above.
   (d) __X__ Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home.*
   (e) _____ Purchaser has *(check (i) or (ii) below):*
     (i) ☐ received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or
     (ii) ☒ waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

## Agent's Acknowledgment *(initial)*

(f) _____ Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

## Certification of Accuracy

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| SELLER Genever Holdings LLC | DATE | SELLER for Sherry 18000 LLC | DATE 2/18/15 |
|---|---|---|---|
| PURCHASER for Bella, authorized person 2-13-15 | DATE | PURCHASER | DATE |
| AGENT | DATE | AGENT | DATE |

SN 0045

# Purchase Application

SN 0046

Purchase Application

New York  **February 26**  20 **15**

Applicant's Name  **"Miles" Kwok Ho Wan   (Genever Holdings LLC)**
(Name or Names must be entered above in manner that Stock Certificate and other Documents are to be drawn.)

Applicant's Attorney  **Ira Gilbert, Esq. (igilbert@paulweiss.com)** Telephone **212-373-3529**

Attorney's Firm and Address  **Paul, Weiss, Rifkind, Wharton, & Garrison LLP**
**1285 Avenue of the Americas, New York, NY 10019-6064**

Seller's Name  **Sherry 1800s, LLC**

Seller's Attorney  **Michael J. Jones, Esq.**  Telephone **203-661-6000**

Attorney's Firm and Address  **Ivey, Barnum & O'Mara LLC**
**170 Mason Street, Greenwich, CT 06830**

Closing Date and Time: **No later than 3/6/15 at 10am**  Date of Possession **No later than 3/6/15**

The undersigned hereby offers to purchase  **3,000**  shares of the
capital stock of The Sherry-Netherland, Inc. and the accompanying proprietary lease for
Apartment  **1801***  in the building located at 781 Fifth Avenue, New York, New York, on
the following terms and conditions. * and Maid's room 1519

Purchase Price of Stock $  **67,500,000**  Present Estimated Proprietary Rental Per
Month $ **57,085.53**

Deposit $ **7,000,000**  Special conditions, if any: **Additional sum of $2,500,000**
**is allocated to the personal property included in the unit**

Financing:   Yes ☐  No ☒  Amount **None**  Bank
( Note: This proposal shall result in no legal obligation until a formal contract of purchase and sale is executed by the
parties concerned )

The undersigned has filled out the information sheet below and understands that this
information is essential in considering this application. It is further understood that this
application, when signed by the undersigned, is to be subject to approval by the Seller or
Authorized Representative and to the Terms and Conditions on the reverse side hereof.

Broker **Seller: John Burger, Brown Harris Stevens**
**and Serena Boardman, Sotheby's**        Signature of Purchase Applicant
**Purchaser: Kathy Sloane, Brown Harris**
**Stevens**                               Signature of Purchase Applicant

### Information Regarding Applicant

Home Address: **16A, South Bay Road, Hong Kong** Telephone **+852 2160 0888**

Business Connection and Position: **President and Owner (Securities and Real Estate Investments)**

Business Address: **49/F, Bank of China Tower, No.1**  Telephone **+852 2160 0888**
**Garden Road, Central Hong Kong**
Names of all persons who will reside in the apartment and if children, state number and their
approximate ages:(1) Kwok Ho Wa, Purchaser (2) Ngok Hing Chi; Wife of Purchaser (3)
Guo Qiang; Son of Purchaser (4) Guo Mei; Daughter of Purchaser (5) Yaz Qinghua;
Sister of Purchaser's Wife

Names of all clubs and society memberships, fraternities and honorary societies to which
applicant belongs:  **Mar-a-Lago Club, Palm Beach, FL**
**Trump Golf Course, Palm Beach, FL**

Schools and colleges attended by husband, wife and children:
**Mr. and Mrs. Kwok received their education in China**
**Guo Qiang (son of Mr. Kwok) attended Bard College**

**SN 0047**

Names of all residents in the building known by the applicant: __None__

Does applicant wish to maintain pets, and if so please specify: __No__

References

Landlord:

Present Landlord or Agent __Own a private residence__

Address __16A South Bay Road, Hong Kong__

Approximate Length of Occupancy _____

Previous Landlord or Agent _____

Address _____

Address of previous residence and approximate length of occupancy: _____

Financial:

A.   (Bank- Personal Account) __Steven Wong__

Address __UBS AG 52/F Two International Finance Centre, 8 Finance Street, Central, Hong Kong__

B.   (Business) __Hank Lo, Partner - Stevenson, Wong & Co.__

Address __Central Tower, 28 Queen's Road, Central, Hong Kong__

C.   Stock Broker, C.P.A, Executor, if any _____

Address _____

D.   For information regarding source of income contact _____

Address _____

Personal:

1.   Name __The Rt. Hon. Tony Blair__

Address __PO Box 60519, London W27JU UK__

2.   Name _____

Address _____

3.   Name _____

Address _____

4.   Name _____

Address _____

Special Remarks:

Please give any additional information which may be pertinent or helpful. _____

Mr. and Mrs. Kwok are very impressed with The Sherry-Netherland and look forward to making The Sherry-Netherland the principle residence for their family.

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
NYSCEF DOC. NO. 256
INDEX NO. 652077/2017
RECEIVED NYSCEF: 11/28/2018

Case 22-50073   Doc 50-4   Filed 02/28/22   Entered 02/28/22 21:19:53   Page 24 of
159

Purchase Application

New York _____ 20___

Applicant's Name  KWOK  Ho Wan
(Name or Names must be entered above in manner that Stock Certificate and other Documents are to be drawn.)

Applicant's Attorney  Ira J. Gilbert Esq  Telephone (212) 373-3529

Attorney's Firm and Address Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas, New York, N.Y. 10019-6064

Seller's Name _____

Seller's Attorney_____ Telephone_____

Attorney's Firm and Address_____

Closing Date and Time_____ Date of Possession_____

The undersigned hereby offers to purchase _____ shares of the capital stock of The Sherry-Netherland, Inc. and the accompanying proprietary lease for Apartment _____ in the building located at 781 Fifth Avenue, New York, New York, on the following terms and conditions.

Purchase Price of Stock $_____Present Estimated Proprietary Rental Per Month $_____

Deposit $ 7,000,000  Special conditions, if any:_____

Financing:  Yes ☐  No ☒  Amount_____ Bank_____
( Note: This proposal shall result in no legal obligation until a formal contract of purchase and sale is executed by the parties concerned.)

The undersigned has filled out the information sheet below and understands that this information is essential in considering this application.  It is further understood that this application, when signed by the undersigned, is to be subject to approval by the Seller or Authorized Representative and to the Terms and Conditions on the reverse side hereof.

Broker_____

Signature of Purchase Applicant

Signature of Purchase Applicant

### Information Regarding Applicant

Home Address: 10A, South Bay Road, Hong Kong  Telephone +852

Business Connection and Position:_____

Business Address: 49/F, Bank of China Tower, No.1 Garden Road, Central, Hong Kong
Telephone +852 21600868

Names of all persons who will reside in the apartment and if children, state number and their approximate ages: (1) KWOK Ho Wan (2) NGOK Hing Chi (Ms)
(3) Guo Qiang  (4) Guo Mei (Ms)  (5) Yue Qinghua (Ms)
(1) purchaser; (2) wife of purchaser (3) Son of purchaser (4) daughter of purchaser
(5) Sister of purchaser's wife

Names of all clubs and society memberships, fraternities and honorary societies to which applicant belongs: Mar-a-Lago Club, the Trump Golf Course

Schools and colleges attended by husband, wife and children: Guo Qiang (son of Mr. Guo) had attended Bard College.

SN 0049

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
NYSCEF DOC. NO. 256

INDEX NO. 652077/2017
RECEIVED NYSCEF: 11/28/2018

Case 22-50073   Doc 50-4   Filed 02/28/22   Entered 02/28/22 21:19:53   Page 25 of
159

Personal Letter of Reference

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 256
Case 22-50073   Doc 50-4   Filed 02/28/22   Entered 02/28/22 21:19:53   Page 26 of
RECEIVED NYSCEF: 11/28/2018
159

From The Rt Hon Tony Blair

February 2015

Dear Ladies and Gentlemen of the Board of The Sherry Netherland,

It is my great pleasure that I am writing you this letter of reference for Miles Kwok as a potential owner in your building. I have known Miles for seven years and have only the highest respect for him in business and as a friend. I have worked closely with Miles over the years and have always admired his honesty and loyalty.

Miles is dependable, sincere and extremely responsible as an individual; conducting himself with dignity and intelligence. Miles is honest, forthright and has impeccable taste.

I would highly recommend him to your building as I know that Miles would be a wonderful addition as your neighbour at The Sherry Netherland. Miles is a very accomplished man and, in my opinion, would be a most valuable asset to The Sherry Netherland.

Tony Blair

PO Box 60519
London
W2 7JU
www.tonyblairoffice.org

SN 0051

# Business Letter of Reference

SN 0052

## Stevenson, Wong & Co.
## 史蒂文生黃律師事務所

In association with | AllBright Law Offices | 錦天城律師事務所

Partners:
Willy Y.P. Cheng••    鄭炎潘
Hank H.F. Lo•    勞恒晃
Catherine K.G. Po•••    溥景元
Eric C.H. Lui•    呂志豪
Neville J.J. Watkins••    韋健士
Wendy W.S. Lam•    林穎詩
Lai S. Lam•    林麗媚
Cornelia W.C. Chu•    朱惠潔
Janice L.H. Chin    陳麗卿
Heidi H.Y. Chui•    徐凱怡
Erica Y.Y. Cheng    鄭廷蕊

Senior Consultant:
Angus Forsyth••    藝靈

Consultant:
Sherlynn G. Chan    陳運基

• Notary Public of Hong Kong
  香港公證律師
◦ China-Appointed Attesting Officer
  中國委托公証人
♦ Civil Celebrant of Marriages
  婚姻監禮人

Our Ref  :   EYC/HLO(P)/75450/15

Your Ref  :

Reply Fax  :

Date  :   17 February 2015

**BY POST**

Board of Directors of The Sherry-Netherland
The Sherry-Netherland
781 Fifth Avenue
New York, NY 10022

Dear Board members of The Sherry Netherland,

I am writing this letter of recommendation in support of the application of Mr. Kwok Ho Wan (also known as Miles Kwok) to become a resident shareholder of your cooperative.

I first met Miles when he engaged my law firm in one of his business transactions about seven years ago. I was and am a partner of my firm. We have since established a long-standing relationship. Over the years, my firm has acted for Miles in various business transactions in different areas, including project financing, fund-raising, corporate mergers and acquisitions and acquisition of aircrafts, leisure boats and properties in Hong Kong, China and different parts of the world.

Miles is a successful businessman and a polite, dependable and responsible individual who conducts himself with dignity and intelligence. Putting aside our work relations, Miles has also been a good friend of mine. Personally, I know Miles to be delightful, considerate and respectful. I trust that his personal qualities will definitely make him a good neighbor and responsible steward of your building.

In my opinion, Miles will be a valued addition to your building.

If you wish to contact me personally, please feel free to call me at +852 2533 2552.

Yours faithfully,

**Hank Lo**
Partner
STEVENSON, **WONG & CO.**

香港中環皇后大道中28號    電話 Tel: +852 2526 6311    香港 廣州 上海 北京 成都 重慶 杭州 南京 深圳 蘇州 太原 青島 廈門
中滙大廈4樓、5樓及1602室    傳真 Fax: +852 2845 0638    Hong Kong Guangzhou Shanghai Beijing Chengdu Chongqing
4/f, 5/F & 1602, Central Tower,    電郵 Email: info@sw-hk.com    Hangzhou Nanjing Shenzhen Suzhou Taiyuan Qingdao Xiamen
28 Queen's Road Central, Hong Kong    www.sw-hk.com    Member of Interlaw since 1982

SN 0053

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
NYSCEF DOC. NO. 256

INDEX NO. 652077/2017

RECEIVED NYSCEF: 11/28/2018

Case 22-50073   Doc 50-4   Filed 02/28/22   Entered 02/28/22 21:19:53   Page 29 of
159

18 February 2015

**BY POST**

Board of Directors of The Sherry-Netherland
The Sherry-Netherland
781 Fifth Avenue
New York, NY 10022

Dear Ladies and Gentlemen of the Board of The Sherry Netherland,

It is a great pleasure for me to recommend Kwok Ho Wan, also known as Miles Kwok, to be a shareholder in The Sherry-Netherland, Inc. and a resident in your building. I am a managing director of the Wealth Management and Swiss Bank Department at UBS AG and attach my name card for your kind reference.  I have known Miles for about five years since he first began working with UBS AG. Miles has since been working with us in the areas of securities investment and also in financing his various projects in areas such as aircraft acquisitions.

Miles has been a successful and accomplished entrepreneur who has developed and managed a number of companies, both domestically and internationally.  Over the years, Miles has earned his credibility in our bank.  He is very reliable and always fulfills his repayment obligations. For this reason, our bank is happy to have him as our long-term client.

From a personal standpoint, Miles is a sincere and modest gentleman with a warm heart.  He is financially sound but very humble.  He is also one of the most intelligent, genuine and respectful people I have ever known.

Based on my long standing relationship with Miles, I do recommend Miles to be a shareholder in your cooperative and a resident in your building. I am sure your community will be pleased to have him and his family join you at The Sherry.

If you have any questions, please do not hesitate to contact me at stephen-kc.wong@ubs.com.

Yours faithfully,

**Stephen Wong**

Financial Letter of Reference

SN 0055

Case 22-50073   Doc 50-4   Filed 02/28/22   Entered 02/28/22 21:19:53   Page 31 of
159

UDS

Hong Kong Branch
52/F Two International Finance Centre
8 Finance Street,
Central, Hong Kong
Tel. +852-2971 8888
Fax +852-2971 8001

Feb. 23, 2015

Board of Directors of the Sherry-Netherland
The Sherry-Netherland
781 Fifth Avenue
New York, NY 10022

Dear Sirs,

### Bank Reference – [Application for Real Estate Investments]

We have been asked to provide a reference letter in connection with Application for Real
Estate Investments. We confirm that:

**Kwok Ho Wan**
[client's ID: P746467(7)]

has been a client of ours through a personal investment company since July 2012  and during
this time Mr. Kwok Ho Wan has had a satisfactory banking relationship with us. As at 18 Feb,
2015, the funds involved in this banking relationship is not less than USD400, 000,000.

The above information is based on our experience of this banking relationship as at current
date and is given in confidence for your private use only, without any responsibility on the
part of UBS AG or its employees. This letter may only be used in the business context outlined
at the beginning of this letter and does not constitute a guarantee or any other obligation on
the part of UBS AG. In particular, we are under no obligation to inform you of any subsequent
change of circumstances in this banking relationship.

Yours faithfully,
For and on behalf of
UBS AG Hong Kong Branch

Tommy Cheung
Managing Director

Stephen Wong
Managing Director

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
INDEX NO. 652077/2017
NYSEF DOC. NO. 256
Case 22-50073    Doc 50-4    Filed 02/28/22    Entered 02/28/22 21:19:53    Page 32 of
159
RECEIVED NYSCEF: 11/28/2018



FIFTH AVENUE

# EXHIBIT 20

### SUPREME COURT OF THE STATE OF NEW YORK
### COUNTY OF NEW YORK

-----------------------------------------------------------------x

ACE DECADE HOLDINGS LIMITED,                    :
                                                :
                        Plaintiff,              : Index No. 653316/2015 (Bransten, J.)
                                                :
            -v.-                                : Motion Sequence No. 001
                                                :
UBS AG,                                         :
                                                :
                        Defendant.              :
-----------------------------------------------------------------x

### AFFIDAVIT OF KWOK HO WAN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

KWOK HO WAN being duly sworn, hereby deposes and says:

1.      I am the employer of Yong Yu, the Director and sole shareholder of Ace Decade Holdings Limited ("Ace Decade").

2.      I make this Affidavit based upon my personal knowledge.

3.      I first began having discussions with UBS AG ("UBS") about potential investments in 2010.  I have been a client of UBS since July 2012.

4.      My main contact person at UBS has been Stephen Wong, who is a Managing Director of the Wealth Management and Swiss Bank Department at UBS.

5.      I met Mr. Wong in May 2010.  Since that time, Mr. Wong has advised me on numerous matters relating to investments and financing on projects such as aircraft acquisitions. Over the years, I have depended and relied upon Mr. Wong's and UBS's knowledge and expertise in making investment and financing decisions.

6.      In addition, I have had an account at UBS since July 2012 for an investment vehicle that I control.  Since then, I have opened other accounts at UBS for two other investment vehicles that I control and have obtained financing from UBS for two airplanes.

7.      In early to mid-2014, I began discussions with UBS regarding an investment opportunity (the "Investment") in an upcoming placement of H-shares (the "Shares") of Haitong Securities Co., Ltd. ("Haitong").

8.      From 2014, when I first began discussions with UBS, to May 13, 2015, when Ms. Yu and I authorized the final payment of HK $2 billion (approximately US $260 million) to enter into this Investment, Mr. Wong and I communicated frequently through telephone calls, in-person meetings, and electronic messages.  Throughout this period, including after January 9, 2015 when I moved to New York, Mr. Wong made numerous misrepresentations, which I relied upon in deciding to make this Investment.

9.      UBS was a joint global coordinator and placement agent for the Shares, and held itself out as knowledgeable and experienced in providing advice on this Investment.

10.      At the outset, Mr. Wong assured me that if UBS got my business, it would protect my interests and provide the best possible terms for a loan to finance part of the Investment. Mr. Wong told me that because of the size of the Investment that I was planning to make, senior executives from UBS globally would participate in structuring the deal.  Mr. Wong told me that he would serve as my personal contact and as UBS's representative throughout the Investment but that he would be acting under the instructions of senior executives from UBS offices in the United States, Switzerland, England, and Hong Kong.

11.     Based on these representations that senior executives at UBS globally would be involved in structuring and overseeing this Investment and that UBS would act in my best interests, I entrusted UBS to act as my advisor for the Investment.

12.     I have read Mr. Wong's affirmation submitted in support of UBS's motion to dismiss Ace Decade's complaint.  In it, he affirmed under penalty of perjury that "[t]he first time I heard of Ace Decade was when I learned of this lawsuit in October 2015." (Affirmation of Stephen Wong ¶ 3.)  I was astonished when I read this statement because it is false.  To the contrary, Mr. Wong and UBS not only had previously heard of Ace Decade, but also they were the ones who advised me on which of my employees to appoint as sole shareholder and Director of Ace Decade, to utilize Ace Decade to enter into a side agreement with an intermediary entity that would hold legal title to the Shares, and how best to transfer the funds necessary for the Investment from one of my UBS accounts to the Ace Decade account.  In sum, Mr. Wong and UBS knew that the ultimate investor in the Investment was Ace Decade.

13.     UBS advised that because the planned Investment comprised greater than 5% of the outstanding H-shares of Haitong, if I invested through Ace Decade directly, applicable disclosure requirements would require certain filings.

14.     UBS advised that if I invested through an intermediary entity, with the intermediary entity holding legal title to the Shares, no such disclosure would be required.

15.     UBS recommended that I select Haixia Huifu Asset Investment and Fund Management Co., Ltd. ("Haixia") as the intermediary for the Investment.  UBS said that it recommended Haixia because Haixia was best qualified to act for Ace Decade.  UBS further stated that Haixia was independent of UBS and would protect my and Ace Decade's interests.  Relying on these representations, I selected Haixia as the intermediary for the Investment.

16.     At no time did UBS disclose that Haixia was controlled by its joint venture partner, State Development & Investment Corp. ("SDIC").  Nor did UBS disclose that Lu Bo, who served as the principal contact between UBS and Haixia, was previously the CFO of the joint venture between UBS and SDIC.  I did not become aware of Haixia's close relationship with UBS until July 21, 2015 (after Ace Decade had made the Investment and after UBS had liquidated the Shares), when Mr. Wong disclosed that relationship during a telephone call, which I took from my office in New York.

17.     Mr. Wong initially said that if we chose Haixia as the intermediary to make the Investment, we would not need to undergo Haixia's Know Your Customer ("KYC") process. However, he later said that we needed to prepare some paperwork to undergo a background examination for Haixia, but he did not explain if this paperwork was for Haixia's KYC process. Mr. Wong asked to review the resumes of some of my employees to assess whose background would most likely satisfy Haixia's requirements so that such employee could be appointed as the Director and sole shareholder of Ace Decade.  He reviewed these resumes and advised that Ms. Yu's resume and background was best suited to satisfy Haixia's requirements and thus, that I should appoint Ms. Yu as the Director and sole shareholder of Ace Decade.  Mr. Wong said that he would provide comments on Ms. Yu's resume and asked her to send it to him.  (*See* Ace Decade Exhibits 3 and 4.)

18.     Mr. Wong subsequently gave comments on Ms. Yu's resume to make it more likely to satisfy Haixia's requirements.

19.     Mr. Wong and I also discussed on multiple occasions potential financing for the Investment.  Mr. Wong stated that Ace Decade should obtain financing for part of the Investment

through UBS rather than another bank because UBS would handle the financing on the most favorable terms to Ace Decade.

20.     During discussions about the loan financing, I told Mr. Wong that Ace Decade would not make the Investment unless the loan documents did not include any provisions that would permit UBS to demand repayment of the loan (a "margin call") based on short term price fluctuations of the Shares and unless UBS represented that it would provide Ace Decade with adequate time (for example, five business days to pay the first 25%, 10 business days to pay the second 25%, and 20 business days to pay the remaining 50%) to meet any margin calls.

21.     Mr. Wong stated on more than one occasion in 2014 that the loan financing documents would be consistent with my requirements, specifically that there was no repayment or margin call trigger based on short term price fluctuations.

22.     Mr. Wong also stated on several occasions in 2014 and 2015 that UBS would work with Ace Decade to allow it to meet any margin calls and UBS would not sell any of the Shares as a result of any margin call without giving Ace Decade adequate time.

23.     Mr. Wong also stated numerous times in 2014 and 2015 that UBS had made a loan to a large shareholder of Ping An Insurance Group ("Ping An").  Mr. Wong explained that the Ping An shareholder's loan was substantially larger than Ace Decade's, but that UBS had never sold off any of the shares owned by that shareholder following a margin call.  Mr. Wong stated that when a margin call had been triggered, UBS had worked with the Ping An shareholder to resolve the situation without selling any of his shares.  Mr. Wong said repeatedly that UBS would give Ace Decade the same treatment as it gave to the Ping An shareholder and would work cooperatively to allow Ace Decade to meet any margin calls but in any event would not sell the Shares following a margin call without giving Ace Decade adequate time.

24.     Throughout our discussions about the Investment, Mr. Wong repeatedly stated that I could trust him and UBS, and that he and UBS were always working in my best interests.

25.     On December 14, 2014, while discussing the Investment, Mr. Wong told me in a message on WhatsApp (a mobile messaging application for smart phones):  "Once I've promised General Manager Guo, I'll definitely make utmost efforts; I'm only hoping General Manager Guo will trust me."  Later that day, he told me in another message:  "I have no reason not to strive for the best for General Manager Guo!"  (General Manager Guo is what Mr. Wong called me.)

26.     Also on December 14, 2014, Mr. Wong left me a voice message, stating that during the negotiations over the Investment "General Manager Guo's interests must be guaranteed," and that he had involved top UBS management from offices around the world to assist.

27.     On December 15, 2014, Mr. Wong left me a voice message stating that he was working on the terms of the Investment in order to "protect [me]."

28.     On December 19, 2014, Mr. Wong left me a voice message stating:  "General Manager Guo, you can rest absolutely assured, and I will completely protect your interests."

29.     As a result, I believed that Mr. Wong and UBS were acting in Ace Decade's best interests and I trusted that the representations Mr. Wong made about the loan financing documents were true and that UBS would not sell the Shares without working with Ace Decade to allow it to meet any margin calls.

30.     On January 9, 2015, while I was still negotiating the terms of the Investment with UBS, I moved to New York with Ms. Yu and other employees with the intention of expanding my business projects to New York and to find investors interested in investing in Ace Decade.

31.     I first discussed this plan to move to New York to find investors for Ace Decade with Mr. Wong in December 2014.  I subsequently had multiple discussions with Mr. Wong about finding investors for Ace Decade by telephone from New York in March, May, and June 2015.

32.     On February 9, 2015, Ace Decade signed a Memorandum of Understanding (the "MOU"), governed by U.S. law, with China Golden Spring Group (Hong Kong) Limited ("Golden Spring Hong Kong").  The MOU provided that Ace Decade would acquire Haitong Shares and Golden Spring Hong Kong would establish a branch in New York to find investors for projects relating to the Haitong Shares.

33.     In furtherance of the MOU, Golden Spring Hong Kong formed a company called Golden Spring (New York) Ltd. ("Golden Spring New York"), which was incorporated in March 2015 in Delaware and registered to do business in New York.  Golden Spring New York is wholly owned by Golden Spring Hong Kong.

34.     Shortly thereafter, Golden Spring New York signed a lease for part of the 46th Floor of the General Motors Building at 767 Fifth Avenue, New York, NY 10153. Ms. Yu and I conduct business relating to Ace Decade from our offices at 767 Fifth Avenue.

35.     Not only had I discussed with UBS my plans to move to New York and to operate my business projects out of New York in December 2014, I also asked for UBS's help in setting up my operations in New York.  In March 2015, Mr. Wong and others at UBS, including Agnes Fu and Liz Lam, arranged to transfer funds from one of my accounts at UBS to my personal JPMorgan Chase account in New York.

36.      In April 2015, Mr. Wong, Ms. Fu, and Ms. Lam assisted me with setting up

Golden Spring New York by transferring funds from one of my accounts at UBS to Golden

Spring New York's JPMorgan Chase bank account in New York.

37.      UBS also submitted reference letters on my behalf in connection with my

purchase of an apartment in a New York cooperative building.  In a letter dated February 18,

2015 from Mr. Wong to the building's board of directors, Mr. Wong wrote, "I have known Miles

for about five years since he first began working with UBS AG."  (Miles is my English name.)

Mr. Wong also stated, "Over the years, Miles has earned his credibility in our bank.  He is very

reliable and always fulfills his repayment obligations.  For this reason, our bank is happy to have

him as our long-term client."  (Ace Decade Exhibit 1.)

38.      Mr. Wong and Tommy Cheung, also a UBS Managing Director, submitted

another reference letter on my behalf to the board of the apartment building on February 23,

2015, stating:  "Kwok Ho Wan has been a client of ours through a personal investment company

since July 2012."  (Ace Decade Exhibit 2.)

39.      On March 6, 2015, I purchased an apartment in this building.  I, along with

Ms. Yu and other employees and representatives of Ace Decade and Golden Spring New York,

have lived in the apartment since the purchase.

40.      During this period of time after I had moved to New York, Mr. Wong and I

communicated frequently through telephone calls and voice and instant messages.  Mr. Wong

spoke to me by telephone while I was in New York dozens of times and sent numerous

electronic messages to me while I was in New York.  Ms. Yu joined me on some of the calls

with Mr. Wong.  At a minimum, Mr. Wong spoke to me by telephone while I was in New York

on the following dates:

- January 26, 2015 (three calls)

- January 28, 2015 (two calls)

- March 2, 2015

- March 4, 2015 (three calls)

- March 5, 2015

- March 13, 2015

- March 15, 2015

- March 16, 2015 (six calls)

- March 17, 2015 (two calls)

- March 18, 2015 (two calls)

- March 24, 2015

- March 31, 2015

- April 28, 2015 (three calls)

- April 30, 2015 (five calls)

- May 6, 2015 (two calls)

- May 11, 2015 (three calls)

- June 23, 2015 (two calls)

- July 21, 2015

41.    During these calls in 2015, which I participated in from New York, Mr. Wong
and I discussed the Investment and the UBS loan on numerous occasions.  On one or more of
these calls, Mr. Wong and I also discussed my concerns about the loan, including a margin call
trigger based upon the loan-to-value ratio ("LTV ratio"), the size of the loan, the interest rate on

the loan, and the issuance price of the Haitong shares.  Mr. Wong and I also discussed the status

of my efforts to seek investors in New York for Ace Decade.

42.    During this period of time in 2015, I did not raise with Mr. Wong again my

concerns about repayment triggers conditioned on short term price fluctuations of the Shares

because Mr. Wong had previously told me that there were no such triggers.

43.    However, during several of these calls in March, April, and May 2015, Mr. Wong

and I discussed the topic of margin calls generally, and specifically the LTV ratio trigger.

Mr. Wong said that I did not have to worry because UBS would act in my best interests, that

UBS would give Ace Decade adequate time to meet any margin calls, and that UBS would make

every effort to work with Ace Decade to allow it to meet any margin calls.  He also reminded me

several times during this period that UBS had never sold the shares of the Ping An shareholder

following a margin call on its loan, and stated that Ace Decade would receive the same treatment

as the Ping An shareholder.

44.    While I was in New York, Mr. Wong also sent me numerous WhatsApp messages

about the Investment and the UBS loan.  For example, on March 21 and 22, 2015, Mr. Wong and

I exchanged a series of WhatsApp messages in which we discussed the UBS loan for the

Investment.  I told Mr. Wong that some of UBS's proposed conditions, such as the margin call

trigger based upon the LTV ratio for the UBS loan, were "definitely not okay" and "we would

rather not do it than agree to your clauses."  Had I not been relying upon Mr. Wong's prior

representations that the loan financing documents did not contain repayment triggers based on

short term price fluctuations of the Shares, I would have raised that issue again with Mr. Wong

and not focused our discussions solely on the margin call trigger based on the LTV ratio.

45.     Mr. Wong replied that he understood my concerns about potential margin calls, and told me: "You rest assured!. . . I'm working for General Manager Guo!  Don't worry."  I relied upon Mr. Wong's representations that he and UBS were looking out for my interests.  All of these discussions occurred while I was in New York.

46.     On May 8, 2015, Haitong announced that it had obtained the shareholder and regulatory approvals necessary (in February and May, respectively) to issue the Shares, which was expected to occur on May 15.  Haitong also announced that because the trading price of Haitong's shares during the 30 trading days prior had surpassed a pre-agreed threshold, the subscription price would be increased.

47.     After this announcement, I had several discussions with Mr. Wong, by telephone and WhatsApp messages, in order to finalize the terms of the Investment.  Among the topics we discussed were the fact that the loan would have to be increased to reflect the increase in the per share price of Haitong's shares, the amount of the payment required, the LTV ratio, the interest rate, and the method by which we should exchange U.S. dollars for the Hong Kong dollars required for the payment.

48.     During one of our discussions after May 8, Mr. Wong stated yet again that Ace Decade would receive the same treatment as the Ping An shareholder with respect to any margin calls.

49.     Relying on these representations, I decided to make the Investment.  I discussed with Mr. Wong during telephone conversations on May 11 how best to transfer the funds necessary for the Investment from one of my UBS accounts to the Ace Decade account.  Mr. Wong said that I first needed to exchange the funds from U.S. dollars to Hong Kong dollars in my UBS account.  He also gave instructions not to transfer the funds from my UBS account

directly to the Ace Decade account, but rather to transfer the funds from my UBS account to an account at another bank and then to transfer the funds from that account to the Ace Decade account.

50.     Relying upon Mr. Wong's advice, I decided to transfer the funds from my UBS account first to an account at China Minsheng Banking Corp., Ltd. Hong Kong Branch  ("China Minsheng Account") and then to transfer the funds from the China Minsheng Account to the Ace Decade account.

51.     On May 11, 2015, Ms. Fu sent an e-mail to Ms. Yu, copying Mr. Wong and Ms. Lam, and asked Ms. Yu to obtain my signature on a payment instruction document that UBS had prepared.  The document contained a request to transfer HK $860 million (approximately US $111 million) from my UBS account to the China Minsheng Account that Mr. Wong had instructed me to use.

52.     In reliance upon Mr. Wong's representations about the Investment and the UBS loan, I signed the document authorizing the wire transfer.

53.     Later that day, Ms. Lam sent an e-mail to Ms. Yu, copying Mr. Wong and Ms. Fu, attaching a confirmation of the outgoing transfer from my UBS account.

54.     Following Mr. Wong's instructions, I then authorized the transfer of the funds from the China Minsheng Account to the Ace Decade account.

55.     After the funds reached the Ace Decade account, on May 13, 2015, Ms. Yu and I authorized a payment of HK $2 billion (approximately US $260 million) from Ace Decade's account to an account held by Dawn State Limited ("Dawn State"), a special purpose vehicle and wholly-owned subsidiary of a Haixia fund, to fund the Investment of the Shares to be issued on May 15.  Prior to this, I had authorized an initial down payment of approximately US $250

million from Ace Decade's account, through Dawn State, to a UBS security account.  That payment would have been returned to Ace Decade had the Investment not been completed.

56.     All of the steps I took to make the Investment, including requesting the wire transfers of approximately HK $860 million (approximately US $111 million) from one of my UBS accounts to the China Minsheng Account and ultimately to the Ace Decade account and authorizing the payment of HK $2 billion (approximately US $260 million) from the Ace Decade account to Dawn State's account on May 13, 2015, occurred from my office or my apartment in New York.

57.     I would not have made the Investment or authorized this payment in May 2015 had I known that UBS had lied that the loan financing documents did not contain repayment triggers based on short term price fluctuations of the Shares and that UBS would refuse to work with Ace Decade to meet any margin calls and would sell off Ace Decade's Shares immediately if a margin call were made.

58.     Under the terms of an agreement between Ace Decade and Haixia, Haixia was required to transfer Dawn State (the entity that held legal title to the Shares) to Ace Decade after July 13, 2015 upon Ace Decade's request.

59.     However, on the morning of July 6, 2015 New York time—just a week before Haixia would have had to transfer Dawn State to Ace Decade—I learned that UBS was demanding that I repay approximately US $200 million in less than 24 hours due to short-term price fluctuation of the Shares.

60.     Had I known that it was possible for UBS to demand payment in such a short period of time and that UBS had lied about providing adequate time to meet any margin calls, I would have ensured that Ace Decade had sufficient funds available to make such payment.

61.     Before UBS's deadline, Ace Decade informed UBS that we could obtain the
necessary funds quickly, but not before UBS's deadline.

62.     However, on July 6, 2015, Mr. Wong stated that UBS would not give Ace Decade
any additional time.  Mr. Wong stated that UBS had already identified buyers for the Shares and
would make a substantial profit by selling the Shares instead of allowing Ace Decade to make
the payment.

63.     On July 7th, I sent Mr. Wong a WhatsApp message telling him that UBS's margin
call was "illegal."  Mr. Wong did not disagree with me or deny that he had told me that there
were no repayment triggers based upon short term price fluctuations of the Shares.  Instead, he
said that he had told senior management to cancel the sale of the Shares and said that he would
ask UBS to return the Shares to me.  Mr. Wong told me that the Shares were still under UBS's
control and he promised to come up with a plan for their repurchase.  Mr. Wong reassured me:
"I've always been standing by General Manager Guo."

64.     On July 9th, Mr. Wong stated that the decision to sell the shares was made by
UBS executives outside of Hong Kong and China.

65.     On July 17th, I reminded Mr. Wong that he had said on numerous prior occasions
that "there would never be" a margin call based on short term price fluctuations of the Shares
and the many times he had stated that UBS had not sold off the shares of a large Ping An
shareholder following a margin call.

66.     In another message on July 17, I said to Mr. Wong: "I told you, it was since last
year that I've come to the U.S. for better opportunities, didn't I?  All the information I sent you
from the U.S., my requirements, you know them all. . . .  Under these circumstances, all were

handed over to you, [I] all listened to you.  It was you who introduced Haixia . . . .  It turned out to be messed up like this now."

67.    Mr. Wong did not deny that he had made these misrepresentations and in fact replied that he understood.

68.    In another message on July 17, I said to Mr. Wong: "You told me several times that you UBS would not liquidate assets like that; otherwise how I would trust you."  I also told him:  "If it weren't for you to tell me that margin call was like Ping An, it would not be like that. There would be reasonable time to get some assets to deal with it."

69.    On July 17, I also said to Mr. Wong:  "You said UBS signed the agreement with them [Haixia] to permit UBS to sell all the shares within 24 hours of the margin call.  How was that signed?  How did they implement that?  It's not fair.  You told me back then that was not the case."

70.    Mr. Wong replied "I've always been firmly opposing them, but they ignored me and told me it was an order by the Swiss CEO."  He did not deny my assertion that he had previously stated that the loan agreement would not permit UBS to sell the Shares within 24 hours of the margin call.

71.    At no point during any of our discussions did Mr. Wong deny that he had stated that UBS would treat Ace Decade the same as the Ping An shareholder.

72.    At no point during any of our discussions did Mr. Wong deny that he had stated that the loan documents would not contain repayment triggers based on short-term price fluctuations of the Shares.

73.    At no point during any of our discussions did Mr. Wong deny that he had stated that UBS would work with Ace Decade and provide it adequate time to meet any margin call.

74.     At no point during any of our discussions did Mr. Wong deny that UBS had engaged in misconduct.

75.     Mr. Wong told me that on July 7, 2015, UBS sold all of the Shares belonging to Ace Decade at HK $11.12, a 20% discount off the closing price of Haitong stock on July 7.

76.     As a result of losing the Haitong shares, Ace Decade lost New York investors, whom I had met with after I had relocated to New York in 2015 and who had been interested in investing in Ace Decade.  For example, on four occasions in New York in April through June 2015, my representatives and/or I met with a co-founder of a private investment firm based in New York.  The firm expressed significant interest in investing in Ace Decade.  However, following UBS's sale of the Haitong Shares belonging to Ace Decade, Ace Decade lost this potential investor.

I swear that the foregoing is true and correct.

[Signature of Kwok Ho Wan on Chinese version]
Kwok Ho Wan

[Notarization on Chinese version]

CITY OF __Meservey_____    )
                                   )    ss.:
COUNTY OF __Cerro Gordo___    )

I, __Liming Pals____, being duly sworn, depose and say that I am fluent in both the English and

Chinese languages.  I hereby certify that the attached document is an accurate translation of the

Chinese version of "Affidavit of Kwok Ho Wan."

[Name]

Sworn to before me this

5 day of ~~May 2015~~ February 2016

Notary Public



PAT FISHER
COMMISSION NUMBER 720993
MY COMMISSION EXPIRES:
2-19-18

# EXHIBIT 21

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NEW YORK : CIVIL TERM : PART 61
 2    ---------------------------------------X
      PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,
 3
                           Plaintiff,
 4
                                                        INDEX NO:
                     -against-                          652077/2017
 5
      KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI,
 6    a/k/a GUO WENGUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a
      HAOYUN GUO, GENEVER HOLDINGS CORPORATION, and GENEVER HOLDINGS
 7    LLC,

 8                          Defendants.
      ---------------------------------------X
 9                         MICROSOFT TEAMS
                            May 27, 2021
10
      B E F O R E :
11
                      THE HONORABLE BARRY OSTRAGER,
12                           J U S T I C E

13    A P P E A R A N C E S :

14        O'MELVENY & MYERS LLP
          Attorney for the Plaintiff
15        Times Square Tower
          New York, New York  10036
16        BY:  EDWARD MOSS, ESQ.
               STUART SARNOFF, ESQ.
17
          BAKER HOSTETLER, LLP
18        Attorney for the Defendant
          45 Rockefeller Plaza
19        New York, New York  10111
          BY:  MELISSA CARVALHO, ESQ.
20             JOHN SIEGAL, ESQ.

21        LAWALL & MITCHELL, LLC
          Attorney for the Defendant GENEVER
22        162 E. 64th Street
          New York, New York  10065
23        BY:  AARON A. MITCHELL, ESQ.

24

25
                              KM
```

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM INDEX NO. 652077/2017

NYSCEF DOC. NO. 833    Case 22-50073   Doc 50-4   Filed 02/28/22   Entered 02/28/22 21:19:53   Page 54 of   RECEIVED NYSCEF: 06/01/2021

159

2

```
 1         YANKWITT LLP
           Attorney for the Defendant
 2         140 Grand Street, Suite 705
           New York, New York  NY
 3         BY:  DANIEL ALTER ESQ.

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21                                           Karen Mangano, CSR
                                             Senior Court Reporter
22

23

24

25
```

KM

8

Proceedings

1   there is an actual burden.

2       I want to just end on one particular argument on

3   the subpoena point because I expect Mr. Alter will focus on

4   it. We ask -- we do. He's right. We ask for information

5   about 60 people and entities, no one knowing to be

6   associated with Kwok.

7       Mr. Alter quips in the brief, well, known by whom?

8   Known by whom? Known by us, Judge. Known by us based on

9   spending a lot of money and lot of time to dig through

10  public records, court filings, social media accounts because

11  that's the game Mr. Kwok has forced us to play.

12      The reason we have to ask for this information is

13  because Golden Springs is the hub. We can't spend the rest

14  of our lives chasing 100 entities. I mean, my grandkids

15  would be doing this. Golden Springs is the entity that has

16  the information. It's produced documents relating to Shiny

17  Times, the entity that was involved in the underlying case.

18  It has the documents. It is the hub of the empire. If it

19  doesn't have information about a couple of these entities,

20  if we're wrong about one or two, okay, fine. Then they

21  should run the search and tell us they don't have it and not

22  produce it. But run the search terms, collect the ESI and

23  provide the documents.

24      THE COURT: All right, Mr. Moss. I understand your

25  argument. I also understand that Mr. Kwok is incurring

KM

Proceedings

1    $500,000 a day in contempt penalties.  I understand that Mr.

2    Kwok believes that these court proceedings are a game of

3    evasion that he -- that he wants to play.

4            And let me hear from counsel for Golden Springs.

5            MR. ALTER:  Good afternoon, your Honor.  It's

6    Daniel Alter, and we've just heard a lot of talk but

7    relatively little truth, and I'd like to step back and

8    clarify some issues that were quite muddied.

9            First of all, to correct two specifically

10   inaccurate statements, it's my understanding that Mr. Kwok

11   has never said that he is entirely unrelated or has no

12   connection to Golden Springs.  Quite the opposite.  He said

13   that it is his family office.  So let's be accurate about

14   that.

15           The second thing is that, you know, apparently --

16   they take the position that Mr. Kwok has entirely funded

17   Golden Springs.  Well, I don't see the evidence of that.

18   What I see is a statement in the record that he initially

19   provided capital to Golden Springs, but I see no evidence

20   that he's continued to do so or that the capital there now

21   is his.  Let me step back a moment and talk about this.

22           THE COURT:  Before you do so, Mr. Alter, because

23   rightly or wrongly, Mr. Kwok has exhausted the Court's

24   patience with his antics.

25           It's quite undisputed that Golden Springs has

KM

Proceedings

1    funded seven-figure payments to facilitate Mr. Kwok's

2    lifestyle, and Mr. Kwok leads a rather extravagant

3    lifestyle, purports to have zero assets whatsoever.

4         So the plaintiff is a judgment creditor.  The

5    plaintiff knows that Golden Springs is funding expenses for

6    Mr. Kwok.  Not minor inconsequential expenses.  Major

7    expenses.  And the judgment creditor is entitled to have

8    discovery of the entity that is funding Mr. Kwok's expenses.

9         The judgment creditor is also entitled to an order

10   directing Golden Springs not to transfer, dispose or

11   otherwise dissipate whatever assets Golden Springs has

12   because the best evidence that has been made available to

13   the Court compellingly suggests that any assets that Golden

14   Springs has were provided to Golden Springs by Mr. Kwok.

15        Now if the discovery that the judgment creditor is

16   seeking from Golden Springs disproves that, well, then we

17   have a different situation than the situation we now have.

18        Under the CPLR, a judgment creditor is entitled to

19   discovery of third parties of which in this case may well be

20   alteregos of Mr. Kwok, but it's not necessary for the

21   judgment creditor to establish that Golden Springs is an

22   alterego of Mr. Kwok.

23        MR. ALTER:  You know, your Honor, we haven't --

24   that's not our position. That's the straw man that has been

25   presented.

# EXHIBIT 22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X
                    :

EASTERN PROFIT CORPORATION LIMITED,     :

                    :

           Plaintiff,       :

                    :

      -v-            :

                    :

STRATEGIC VISION US LLC,        :

                    :

           Defendant.     :

                    :

--------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __6/22/2021__

18-cv-2185 (LJL)

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Eastern Profit Corporation Limited ("Plaintiff" or "Eastern") brings this action

against Defendant Strategic Vision US LLC ("Defendant" or "Strategic") for breach of contract,

a declaratory judgment, and unjust enrichment.[1]  Strategic asserts counterclaims for breach of

contract and fraudulent inducement.

      An in-person bench trial commenced on April 19, 2021 and concluded on April 23, 2021.

Closing statements were made remotely on April 30, 2021.  This opinion constitutes the Court's

Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52.

      For the reasons that follow, the Court finds for Eastern on its claim seeking a declaratory

judgment that the research agreement at issue is void and unenforceable as a matter of Virginia

law and public policy.

---

[1] Eastern also previously brought a claim for fraudulent misrepresentation, but the parties
stipulated to dismissal with prejudice of that claim.  *See* Dkt. No. 299 ¶ 6.

# I.     FINDINGS OF FACT

## A.     Relevant Persons

Eastern is a private limited company registered under the laws of the Hong Kong Special
Administrative Region of the People's Republic of China.

Eastern is, in essence, a shell corporation for an individual named Guo Wengui, also
known as Mile Kwok ("Guo").  Eastern is not registered to do business in the United States.  It
has no office in the United States and no operations in the United States.  It also has no
operations in Hong Kong where it is registered.  Its only asset is a bank account in Hong Kong
that was frozen by the Hong Kong High Court in 2007 and that now has $80,000 in it.  Prior to
2017, the owner and sole director of Eastern was an individual named Han Changhui ("Han").
In 2017, Han transferred ownership and control to Guo's daughter, Guo Mei, who was a friend
of Han's and who is now the owner and sole director of Eastern.

 Guo is a former resident of China who now resides in the United States.  He has
achieved some notoriety in this country and internationally as he has made claims that are critical
of the policies and practices of the Chinese Communist Party ("CCP") while at the same time
making statements supportive of individuals within the Chinese government.  He has applied for
asylum in the United States.  Guo maintains a family office under the name Golden Spring New
York Ltd. ("Golden Spring").

Yvette Wang ("Wang") is an associate of Guo and is the president and director of his
company Golden Spring.

Defendant Strategic is a limited liability company registered and in good standing with
the Nevada Secretary of State.  Strategic's principal place of business is in Arlington, Virginia.

Among other services, Strategic provides private "investigatory research" to clients
within the United States in exchange for monetary compensation.

French Wallop ("Wallop") was and is Strategic's sole manager and only member.
Wallop was married to Malcolm Wallop, the U.S. Senator representing Wyoming from 1977 to
1994, who is now deceased. Wallop resides in Arlington, Virginia.

J. Michael Waller ("Waller") is a long-time friend and professional acquaintance of
Wallop and is an active member of the community of persons in the United States opposed to the
CCP. He holds a Ph.D. in international security affairs from Boston University and has an
extensive academic background. In addition to his work with Strategic, he is also currently
employed as a senior analyst for strategy at the Center for Security Policy, a think tank based in
Washington D.C. Waller has worked with Strategic on a number of projects since 2016 or 2017.

Strategic has never had employees. Nor has Eastern.

### B.        The Origins of the Agreement

The case concerns a research agreement (the "Agreement") dated December 29, 2017 and
signed by Strategic and Eastern on January 6, 2018. Wallop signed on behalf of Strategic.
Wang signed the name Han on behalf of Eastern.

The Agreement stated that it was "for the purpose of [Strategic] providing business
research, reporting, documentation, and other consulting services." The Agreement also
reflected Strategic's promise to "conduct high quality original research and prepare reports on
subjects chosen at [Eastern's] discretion, for the purpose of detecting, stopping, and preventing
crime or other harm to innocent people." PX1.

The Agreement had its origins in meetings among Wallop, Waller, and Guo and persons
associated with Guo in late 2017.

Guo was introduced to Wallop and Waller in late October or early November of 2017, by
an individual named Linchao Han ("L. Han"). A former reporter for the Washington Free

Beacon and current reporter for the Washington Times named Bill Gertz ("Gertz"), who is a mutual acquaintance of Guo, Wallop, and Waller, was also involved in the introduction.

Both Gertz and L. Han are members of the community of persons in the United States who are opposed to the CCP and self-identify as "China Hawks." L. Han had immigrated to the United States from China and worked in the United States Senate for several years (including for the late Senator Wallop) on matters relating to China. Before he immigrated and after the Tiananmen Square Massacre in 1989, L. Han helped found the Independent Federation of Chinese Students and Scholars. Gertz has opposed the CCP through his writings and books. He met Guo when he interviewed him in June or July 2017 and was asked by Guo to be a director of the Rule of Law Foundation, an organization established by Guo in October 2018 to bring about democratic reform in China.

Wallop and Waller also have been involved in activities dedicated to the overthrow of the CCP.

In late 2017, Gertz approached Wallop and offered to introduce her to L. Han with respect to a project Gertz thought might be of interest to Wallop. L. Han, who is a lawyer, was helping Guo with his application to obtain asylum in the United States. Gertz believed that Wallop could provide strategic communications support to Guo who was engaged in activities to oppose the CCP.

Wallop and Waller met with L. Han and Gertz in late October or early November 2017 at Wallop's home in Virginia. L. Han described Guo to Strategic as a wealthy businessman who had moved to the United States to escape political persecution in China and who had recently purchased the penthouse at the Sherry-Netherland Hotel in Manhattan. According to L. Han and Gertz, Guo had developed several broad goals involving the Chinese government that would be

beneficial to the people of China. In particular, Gertz described Guo as a dissident who had broken with the CCP, who was engaged in a whistleblower campaign, and who wanted to devote his resources to undermining the CCP and causing it to collapse. L. Han believed that Guo needed to sustain an image as a "whistleblower" against the CCP. To be a "whistleblower," L. Han believed Guo needed to obtain and publish well-researched information against high-ranking government officials.

Thereafter, Wallop and Waller held several meetings with Guo in late 2017. Other meetings were held with Wang and L. Han. The first meeting, held by Wallop with Guo, was at Guo's apartment in New York City. Subsequent meetings, which were held by Wallop and Waller with L. Han and Wang, were held in Virginia or in Washington, D.C.

Wallop and Waller first met with Guo at his New York apartment on November 21, 2017. L. Han was also in attendance. Guo stated that he was on a mission to dismantle the CCP and described himself as an enemy of the CCP who wanted to use his wealth and influence and contacts to bring out information to expose the contradictions within the CCP to bring it down.

Wallop presented a document reflecting a "Vision" for Guo "to remain safely in [the United States] and accomplish his mission back home," i.e., in China. DX38. The document was prepared at the request of L. Han, who Strategic understood to be Guo's emissary but who in fact acted simply as an intermediary between Strategic and Guo. *See, e.g.*, Trial Tr. at 57. The "Vision" document tracked Wallop's then-understanding of the services Guo desired. It was addressed both to his asylum application and to activities intended to help him undermine figures in the CCP. It was also addressed to transforming Guo's public image. The document reflected the objective for Guo to "transform himself from an apolitical businessman to an international statesman" and to "build a global moral standing, with a sound philosophical or principled base,

to show a positive vision for his country's future that will unite people who ordinarily would never follow a wealthy businessman" as well as to "bring Mr. G into a new community of leaders and follows to accomplish his objectives."  DX38.

In the "Vision," Strategic proposed to provide services to Guo to change his public image and to build that community.  Strategic stated it would "focus on building those communities [of support] in this country, for the purpose of preventing any chance of [Guo] being forcibly repatriated, and as a base from which to expand publicly."  *Id.*  The services would include helping to change his public image, expanding sources of respect, developing a social engagement presence for Guo with policymakers, media figures, and decisionmakers in Washington D.C., making Guo  a thought-leader and policy leader, and building a foundation to educate people from the United States and China on Guo's ideas.  Among the services promised to Eastern was that Strategic would deploy a secretive and untraceable network of persons supportive of and associated with then-President Donald J. Trump.  Strategic proposed to provide an "aggressive defense" against attacks that were expected to intensify and to develop a network of surrogates who could speak on Guo's behalf without being traced back to him and who would be developed from online networks supportive of President Trump.  Wallop proposed a "three-year effort [with] an experienced team in [Washington D.C.] to advise Mr. G and help him navigate the political and policy terrain, develop strategy, execute programming, and coordinate messaging."  DX38.

At the meeting, Guo stated that he "want[ed] now immediately information" and that the "[f]irst month is critical for quality of information."  Trial Tr. at 383-84.

Those ideas were further developed at a second meeting between Guo, Wallop, and Waller on December 4, 2017.  Trial Tr. at 134.  L. Han and Yang were also at the meeting.  At

this meeting, Wallop presented a three-year timeline for the campaign. The objectives were stated to be the following: "Remain free in the United States; Become a thought-leader and an international statesman; Change thinking on China and incubate new ideas and strategies; Develop and build self-replicating personal networks; Successfully drive long-term change back home." DX39.

The proposal had several components, including the establishment of a foundation that would be supportive of Guo's objectives but would be structured so as to avoid the requirement to register with the United States government as an agent of a foreign government or individual. The components included: (1) the creation of "a personal presence in Washington, build friends and allies, make it impossible for US to deport back to China," including the development of "support among Washington influencers and decision-makers" and "support among the president's nationwide grassroots base"; (2) "[d]evelopment of a proper personal presence sufficient to rival the regime," including the purchase of a "Washington residence to show purpose and power, and provide hospitality" (a specific location was mentioned in Georgetown); and (3) the creation of an institutional presence, including through a "Washington-based educational and cultural foundation" that would not have to register under the Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, and through the acquisition of a "[p]hysical office in downtown Washington, D.C." *Id.* The three-year timeline concluded: "Implementation of the three-year effort will require an experienced team in Washington to advise Mr. G. and navigate the political and policy terrain, develop strategy, execute programming, and coordinate messaging. These will all be direct and transparent. Most can be done through the Foundation, which eliminates any need to register under FARA." *Id.*

Strategic also proposed that it would marshal the social media network developed by President Trump and would deploy alternative media to support Guo in ways that Strategic was reluctant to put in writing.  It noted that Strategic could provide an "'[a]ctive defense' campaign" against those who were expected to "apply intense pressure on the US government to deport Mr. G back to China," including through "aggressive second-tier journalists in alternative media (compartmented from the Foundation)," which "will be described verbally," and by "[o]rchestrat[ing] social media campaigns to promote Mr. G, attack his critics when needed, and generate a groundswell of support among the President's nationwide grassroots base to ensure that Mr. G is never forced to leave the US against his will.  This is also compartmented from the Foundation."  DX39.  Strategic proposed to charge anywhere from $33,000 to $120,000 per month for its services.  *Id.*

A subsequent meeting occurred between Wallop, Waller, and L. Han on December 10, 2017.  Trial Tr. at 134-35.

Wallop and Waller had a third meeting with Guo on December 11, 2017.  *Id.* at 134-36. L. Han was also present at the meeting.  *Id.*  At that third meeting, the parties' discussions turned to the investigative services Strategic could provide to Guo.  *Id.* at 137.  Guo stated he was interested in conducting an investigation into members of the CCP with the ultimate objective of helping to overturn the regime.  *See, e.g.*, *id.* at 133, 137, 632-38.  Strategic described its extensive background in investigation, including its relationships with federal law enforcement and other federal agencies that it could exploit.  The investigative services Strategic proposed are described in a PowerPoint prepared by Waller in consultation with L. Han and Wallop entitled, "Time To Get Them: Beginning the psycho-political campaign for China," a portion of which

became the foundation for the Agreement.  PX2.  The PowerPoint described six parts of Phase 1
of the proposed work (the "Plan"):

- Run micro-targeted intelligence collection and analysis;

- Active threat reduction;

- Establish foundation and get it running;

- Network with Russian opposition;

- Acquire appropriate Washington, DC residence; and

- Acquire appropriate Washington, DC foundation offices.

The Plan was discussed at a fourth meeting among Wallop, Waller, Guo, L. Han, and
Yang on or about December 21, 2017.  Trial Tr. at 134-37, 252.

The first part of Phase 1 of the Plan became the foundation for the Agreement.  The goal
was to "[b]uild and operate a secret system for micro-targeted intelligence and collection
analysis."  PX2.  The PowerPoint observed that "[t]his is an extremely sensitive capability that
must be handled with extreme care."  *Id.*  In several bullet points, it describes the "intelligence
and collection analysis."  *Id.*  It would involve ten targets (described as "fish"), who would be
monitored "for several months to understand their habits, patterns, personal and professional
networks, businesses, corruption."  *Id.*  The objectives were to "[k]now what they are going to do
before they do it, so we can anticipate, pre-empt, and disrupt," to obtain "leverage to gain
concessions, protect people, use as political weapon, or as aid in criminal prosecution and asset
recovery," to "[p]rovoke confusion, panic, and infighting within CCP; divide opponents, peel
away potential allies; break the Party's control of corruption information; operate more quickly
than Party can react," to "[e]xpand the capability to go after all desired targets," to "[b]urrow into
commercial and political networks for business purposes," and to "[b]uild an image of
invincibility."  *Id.*  Strategic thus understood that Guo wanted the investigation to uncover

corruption relating to members of the CCP, including crimes committed by members of the CCP, such as the illegal removal of funds from the country. Trial Tr. at 66. Other aspects of the Plan included "reduc[ing] political threats to [Guo] and [his] cause" by "aggressive, grassroots, online social media/activist network in the United States," establishing a foundation for Guo, networking with exiled Russian opposition leaders and internal Russian opposition activists, acquiring a Washington, D.C. residence for Guo, and acquiring a Washington, D.C. office for Guo's foundation office. PX2.

### C. The Negotiation of the Agreement

By mid to late December 2017, the parties were in a position to negotiate the terms of what became the Agreement. *See, e.g.*, Trial Tr. at 137. The terms were initially negotiated by Wallop and Waller with Guo and L. Han. At the final stages, Wang negotiated the terms of the Agreement with Wallop and Waller.

As reflected in the Plan's PowerPoint describing the Plan, it appears that the parties agreed early on that Strategic would obtain information on at least ten targets and that such information would include financial information, tracking information, and information derived from social media.

From the evidence before the Court, the bulk of the negotiations concerned the financial terms of the Agreement. The parties initially disagreed over those terms. Strategic wanted to be paid a monthly retainer and to receive a large "evergreen" deposit that it could hold until the last payment was made in light of the large start-up costs that the operation would require. Guo wanted to pay only on a per report basis. Eastern was willing to pay a deposit but only if it could be recovered if Strategic failed to provide the deliverables as defined in the Agreement. Trial Tr. at 268-69.

Strategic expected Wang to sign the Agreement; Wang had become the liaison for Guo by the end of negotiations. *See, e.g.*, Trial Tr. at 139-40. Strategic expected Wang to sign by December 29, 2017, in Virginia, as she had traveled to Washington D.C. the day prior, but the parties still had an ongoing disagreement about the payment terms. Instead, on December 29, 2017, Wallop gave L. Han and Wang a tour of a number of estates and larger properties in Washington D.C. and its environs that were good candidates for Guo to purchase. *Id.* at 139-41.

The negotiations stalled for a few days but on January 5, 2018, Wang sent a text message to Wallop stating that "both L [L. Han] and M [Guo] advised me that we [sic] supposed to meet again." *Id.* at 149; DX16. Negotiations then continued.

Wallop's negotiations with Wang and with Guo, both before and after January 5, focused on the request that Strategic investigate an additional five subjects, as well on the concept of a "waterline" in the "tank, " (i.e., a minimum amount of work that Strategic would need for the work to be worthwhile). As to the former request, Strategic agreed to investigate an additional five subjects but only for the month of January. As to the latter request, Strategic insisted on a minimum payment and a minimum number of subjects in order to commence the investigation but agreed on a scale for the valuation of each report so that if the parties agreed that Strategic would not deliver a particular report for a particular "fish," an equivalent report would be delivered for another fish.

As expressed in the text messages, Strategic would be paid a monthly fee of $750,000 for each of the first three months of the agreement (January, February, and March of 2018) and would investigate 15 subjects for the first month and 10 subjects for each of February and March. The number of subjects and the monthly rate would be adjusted thereafter. The fee structure was further expressed in a January 5, 2018 text message from Wallop to Wang:

The agreement for 3 months is correct. January we have allowed 15 fish. 10 fish each for Feb and March. We will determine the subsequent monthly costs obviously by the next numbers of fish in the tank, once we have recapped the previous 3 months. That has not changed. We will agree that we will always have 10 fish minimum in the tank which may be adjusted by agreement each month thereafter March 30, 2018 depending on the actual fish count. We have fish count. We have discussed this and agreed to this formula from the beginning with your boss—that we remain flexible with his additions. Naturally if your boss adds or subtracts the number, we shall prorate or add amounts due the following month. The entire point of the water line in the tank was to keep the costs to a minimum and a planned budget for your boss. All of this was to give 30 units of reports per month as planned and agreed. Some months may therefore cost far large amounts than your boss has budgeted, then there will be additional fees per fish, solely becau . . . [the message was cut off].

DX16. The reference to "boss" was to Guo.

In response, Wang wrote: "Can you please send the contract here? . . . There is of course no impasse here. I work with several people, M [Guo] is one of them, saying for this project, he is not the only boss." *Id.* Wang and Wallop agreed that Wang would sign the contract the next day, January 6, 2015, in person. Wang wrote: "[T]his contract and all communications from contract signed tomorrow, are exclusively between NY [Guo], you, M [Waller] and me—four of us." DX17; *see* Trial Tr. at 153-55.

The last-minute negotiations and changes to the terms of the arrangement are reflected in the difference between a draft of the Agreement that Wang was given to negotiate with Wallop and the final Agreement. *Compare* DX6 (draft)*, with* DX4*, and* PX1 (final). The draft of the Agreement, which is dated January 1, 2018, was virtually identical to the final Agreement with a few significant exceptions. The third page of the draft Agreement recited prices of $300,000 annually per subject for each of the three reports Strategic was to prepare: forensic financial reports, tracking reports, and social media reports. It calculated a total of $3,000,000 per year "for 10 units or deliverables for the first stage . . . or $250,000 per month for 12 months." DX6. Each "unit" was a target or fish. It further provided:

> These units or deliverables may be mixed and matched as the Client requests. As one unit is deleted from one fish, an extra fish with the equivalent deliverable is added, as shown in the attached charts. *Such payments will be made following receipt of the agreed-upon number of reports per month.*

DX6 (emphasis added).

The final Agreement similarly required regular monthly installments. It calculated a total of $9,000,000 per year for 30 units, i.e., 10 subjects each with 3 reports, "or $750,000 per month for 12 months." DX4; PX1.

The final Agreement, however, contained a significant change in the language. It provided the same language: "These units or deliverables may be mixed and matched as, the Client requests. As one unit is deleted from one fish, an extra fish with the equivalent deliverable is added, as shown in the attached charts." DX4; PX1. But it deleted the following sentence from the draft Agreement: "Such payments will be made following receipt of the agreed-upon number of reports per month." The change reflected the parties' agreement that Strategic would be paid a flat fee regardless of the number of reports delivered on any particular month. There might be a variation in the number of reports delivered in a particular month depending, for example, on whether Eastern added a new fish. On average, however, Strategic would deliver three reports per month on each subject.

In addition, the concept that the obligation to make regular monthly payments would extend only for the first three months of the contract, as reflected in the draft, was replaced by a new concept in the final Agreement that the term of the Agreement would be three years with $9,000,000 due each year, but that the parties would meet "after the March reports and payments [were] made" to "recap the accounting" and that such meeting would take place "prior to moving forward with the next quarter." DX4; PX1. Thus, the obligation to make regular monthly payments at a rate of $750,000 per month would continue throughout the term of the

13

Agreement—and the Agreement was terminable by either side on 30 days' notice—but the parties agreed to assess the value of the relationship and whether the terms should be changed after the three-month period.

In short, the compromise gave Strategic the comfort that, before it began work, it would receive $1 million that it could devote to the establishment of an infrastructure and that Eastern would not be able to terminate the Agreement without 30 days' notice, thus providing Strategic with an additional $750,000.  The compromise additionally assured Eastern that it was not irrevocably committing itself to the arrangement for the full three years, and that after three months, the parties would look back to review the quality of the work before deciding how to further proceed under the Agreement or whether changes should be made to it.  *See, e.g.*, Trial Tr. at 269-78; PX1 (stating that after the first three months, the parties "will meet to recap the accounting, prior to moving forward with the next quarter" and "that with any change to the numbers above 10 fish in the tank, that [Strategic] will reserve the right to renegotiate [the] financial Agreement").

### D.     <u>The Insertion of Eastern into the Agreement</u>

During negotiations, Guo requested that, to protect his confidentiality and anonymity, he would not sign or be a party to the Agreement but that a separate entity would sign and be a party.  Strategic agreed.

Either on the day the Agreement was signed (January 6, 2018) or only shortly before— the witnesses disagree—Eastern's name was first mentioned to Strategic.  Strategic did very little, if any, investigation into the identity of Eastern.  Wallop simply assumed that it was a shell company associated with Guo and determined that the company was registered in Hong Kong to Guo's daughter but did no other research.  *See, e.g.*, Trial Tr. at 285.

Both Wang and Han testified that, prior to Eastern being added as the party to the Agreement, the two had a conversation in which Wang asked Han if Eastern would be interested in commissioning Strategic to conduct research on figures in the CCP and in funding that research and Han agreed.  *Id.* at 413-14.[2]  The Court finds that testimony not to be credible. Wang signed interrogatories in connection with this case.  One of the interrogatories asked for Eastern to identify the names of each person with knowledge of the Agreement, including its negotiation.  Wang, who signed on behalf of Eastern, did not include the name Han.  DX5.  The Court finds that the testimony regarding Han was an after-the-fact creation to make it appear that Eastern was an entity, separate from Guo.

The more plausible inference, and the one that the Court draws, is that Guo told Wang to provide the name Eastern to Strategic and to sign Han's name to the Agreement.  If there was any conversation between Wang and Han, it was perfunctory, to confirm the arrangement that Guo had already made and directed.  At the time, Eastern was registered to the same address as Guo's family office in Hong Kong.  It is now registered to an address that is also the residential address of Guo's daughter.  Although at the time Han was the ostensible owner of Eastern, it has now been transferred to Guo's daughter but Han could not testify that he received anything in exchange.  Trial Tr. at 596.  Eastern is a shell for Guo and his family.

The Court draws that conclusion from several facts.  At the time of the supposed conversation, Eastern was essentially a defunct entity.  Although, according to Han, its purpose

---

[2] Wang testified that she met briefly with Han, told him that the investigation firm was very capable and could assist in the investigation of high-level governmental officials from China, and asked Han if he had an interest "to be part of this."  Trial Tr. at 414-15.  She testified that she told him the contract requested a $1 million deposit and that Han said he would figure out how to get the money for the project.  *Id.* at 415.  He later called Wang to say he would take care of the payment and that he was onboard and asked Wang to negotiate the contract.  *Id.*

15

was to make real estate investments, it had made no such investments. It had no assets other than the $80,000 frozen in a Hong Kong bank account and it had no operations and no employees. *See, e.g.*, *id.* at 595-96. Its location was in the offices of Guo's family company in Hong Kong and its sole director was Guo's daughter. It had no reason to be fund the research and no ability to pay for the research. There was no evidence that anyone from Eastern read the Agreement or even understood its terms before its name was put on the Agreement. Guo's daughter did not testify at trial. Han testified but his testimony was that he called Guo's daughter, told her about the project and that Eastern was going to participate, and that she agreed on the spot and authorized him to take care of it. *Id.* at 567-69. He admitted that he was not aware of the name Strategic until after this litigation began, that he never saw the Agreement, and that—aside from the obligation to pay $1 million—he did not understand or know any of the terms of the Agreement. *Id.* at 603-05. Han did not even see the Agreement at any time prior to signing, and the first time he saw the Agreement was at his deposition in this case. Even at trial, he testified that he did not know the content of the Agreement and that he had never read the Agreement from beginning to end. Moreover, Wang did not tell Han of the obligation and Han did not know of the obligation Eastern supposedly was assuming to pay Strategic $750,000 a month or even of the obligation ultimately reflected in the Agreement that Eastern would pay Strategic $9 million a year for Strategic's services over a three-year period. *Id.* at 606.

Aside from supposedly arranging for the payment of a $1 million deposit, there is no evidence that Eastern did anything with respect to the Agreement. It did not make payments to Strategic or provide the names of the persons to be investigated to Strategic (or even know which names were being provided to Strategic).

Finally, the testimony of both witnesses was largely conclusory and when accompanied by details, those details were discredited.  Wang did not provide any details of the supposed conversation with Han; her testimony as a whole was undermined by the repeated examples of the prior inconsistent statements that she made at deposition.  While Han's prior inconsistent statements were less pronounced than Wang's, his testimony was no more convincing.  Finally, no director of Eastern even signed the Agreement; the Agreement was signed by Wang who forged Han's signature.

### E.    The Terms of the Agreement

On January 6, 2018, Eastern and Strategic signed the Agreement.  The Agreement is dated December 29, 2017.  Eastern is identified as the Client and Strategic as the Contractor.

The parties executed the Agreement at Wallop's home in Virginia.  The Agreement was ultimately signed by Wang and Wallop.  Wang signed the Agreement in the name Han after Guo approved its final terms for Eastern, which Wang read him over the phone.

The Agreement is stated to be "for the purpose of providing business research, reporting, documentation, and other consulting services."  PX1.  Under the Agreement, Strategic agreed to "conduct high quality original research and prepare reports on subjects chosen at [Eastern's] discretion for the purposes of detecting, stopping, and preventing crime or other harm to innocent people" and to prepare research and reports on . . . three subject categories: A) Financial forensic Historical research; B) Current Tracking research; and C) Social media research."  *Id.*  Eastern was to provide Strategic "the necessary basic information, and desired areas of focus . . . to research," including the "specified subjects" of the reports, identified in the Agreement as "fish." *Id.*  Strategic was to provide Eastern with "comprehensive confidential reports" on 10 "fish" per year on a timetable set forth in the Agreement.  *Id.*

The "Financial forensic Historical research" was to "consist of, but not be limited to, in-depth and detailed reports of existing and historical business and financial transactions, on subjects selected by [Eastern], and relations of the subject as identified by [Eastern]."  *Id.* at 1. Strategic was required to produce a weekly progress report, a preliminary report in the first month of the Agreement, one comprehensive report within three months of the Agreement, and update reports each following month.  *Id.* at 2.  Under "Deliverables," the Agreement specifies that Strategic was required to produce these reports "as specified above one time per subject, subject to occasional updating throughout the year."  *Id.* at 3.

"Current Tracking research" was to "consist of, but not be limited to, in-depth and detailed reports on movements of specified subjects by land, air, and sea (private and commercial); schedules and itineraries, addresses and lodging, means of transportation, names of carriers, manifests, geolocation, major events and significant contacts the subjects involved, videos and audio that can be accessed remotely, and other data that may be of relevance to the overall research, such as past travel records that may [sic] significant to the research."  *Id.* at 2. Strategic was required to produce weekly reports in the first month of the Agreement and thereafter research on a monthly basis.  *Id.*  Under "Deliverables," the Agreement specifies that Strategic was required to produce reports for each subject "monthly or more frequently as [Eastern] directs."  *Id.* at 3.

"Social media research" was to "consist of, but not be limited to, in-depth and detailed reports on the social media usage and networks of specified subjects and public figures."  *Id.* at 2.  Strategic was required to produce research on a weekly basis for the first month of the Agreement and on a monthly basis thereafter.  *Id.*  Under "Deliverables," the Agreement

specifies that Strategic was also required to produce reports for each subject "monthly or more frequently as [Eastern] directs." *Id.* at 3.

In all, Strategic was to provide deliverables on 10 subjects (or fish) on each of the three topics for a total of 30 reports per year. *Id.* (Confusingly, the monthly and weekly deliverables were also referred to as "reports" but were also considered to be "units.") For the first month of the Agreement (January 2018), Strategic was to provide "comprehensive confidential reports" for up to "15 fish for a total of 30 reports." *Id.* at 4. That figure was to "decrease to 10 fish for a total of 30 reports at the beginning of the second month (February) and for (March) and for the duration of [the Agreement]." *Id.*

The research was to be "based on the best practices and standards of the industry, comparable to other top firms with similar services" and Strategic was obligated to "make most diligent efforts to ensure the served render[ed] are of very high quality, revealing a true, complete and full profile of the subject." *Id.* Strategic guaranteed "that all information provided is genuine." *Id.* at 3.

At the same time, the Agreement also reflected the understanding that "occasional unforeseen challenges may arise that will slow or block comprehensive research, and that there may be periods in which information is irregular, unavailable, or incomplete." *Id.* In such circumstances, Strategic was obligated to "endeavor to make all research and reports as complete was possible in a timely scheduled manner." *Id.*

The Agreement reflected the further understanding that Eastern "may not wish for each of the 10 fish to be the subject of all three reports, and that the number of report work duties [sic] per month will vary." *Id.*

The parties agreed that the identity of the fishes or subject might change: "It is also understood that [Eastern] may find it necessary to remove certain fish from time to time, or [Strategic] may find circumstances do not permit sufficient work to research a given fish." *Id.* When a fish was removed from consideration, "a new fish will be put in its place by [Eastern], keeping the number of fish being monitored at any time at 10." *Id.*

In exchange for Strategic's commitment to conduct the identified research and to deliver the reports, Eastern agreed to pay Strategic a monthly fee calculated on a scale of $300,000 for each of the financial forensic historical research, current tracking research, and social media research on a single "fish" for a total of $900,000 per fish per year for an aggregate of $9,000,000 for the 10 fish (or $750,000 per month) to which Eastern and Strategic were committing.

The actual payment for Strategic's services and reports was "to be made in regular monthly installments of US$750,000, at the end of each month." *Id.* at 5. The parties agreed that "for the first 3 months of th[e] Agreement, January, February and March 2018, . . . the payment of $750,000. USD will be wired per [Strategic's] instructions to [Strategic's] US Bank account." *Id.* at 4. "[A]fter the March reports and payments are made, [] all involved Parties will meet to recap the accounting, prior to moving forward with the next quarter." *Id.* Strategic reserved the "right to renegotiate [the] financial Agreement" "with any change to the numbers above 10 fish in the tank." *Id.*

The parties also agreed that Eastern would pay Strategic "a deposit of US$1,000,000 (one million dollars) upon signing the contract," which would "be credited on a prorated basis to the final 1-1/3 (1.3) months of the contract." *Id.* at 5.

The term of the Agreement was three (3) years from the date of signing but the Agreement also provided that "[e]ither party may terminate the contract with 30 days' written notice." No cause was required. *Id.*

The Agreement contemplated that Eastern might want additional subjects to be investigated and gave Eastern the right to "direct [Strategic] to conduct other research, not specified in th[e Agreement] for an additional fee." *Id.* at 4. It noted that both parties anticipated that the contract "could expand to many more subject of research" and that Eastern had "expressly stated that there could be as many as 4000 such 'fish in the tank.'" *Id.* at 5. It provided, "Obviously, negotiations for the far larger range will be agreed upon in writing at a later date." *Id.*

Several provisions of the Agreement reflected the sensitive nature of the assignment and the parties' desire for confidentiality. The Agreement begins with the statement:

> Both parties agree that the nature of this contract, and work related to it, is highly confidential. Both parties are bound by the strictest secrecy not to disclose the existence of the contract, sources and methods used to execute the contract; and participants in formulating, supervising, or executing the contract's provisions, to any third party, except as required under United States law or the laws of the State of Nevada.

PX1.

It includes the agreement that "there will be single line of communication between [Strategic] and [Eastern]" and that "[t]he individuals through which such communication will be made will be identified upon the initiation of this contract." *Id.* at 1. "Any and all materials provided by [Eastern] to [Strategic] will be treated with absolute confidentiality and will not be shared by [Strategic] with any other entity." *Id.*

It also provides that "[Eastern] may direct other entities to pay [Strategic], and that such payments will be deemed satisfactory compensation by [Strategic]." *Id.* at 4.

All of the deliverables were to be provided "by USB drive only"; oral reports were insufficient. *Id.* at 3.

### F. ACA Capital Group Limited Provides the Deposit

Even before the signing of the Agreement and as part of the negotiations that ultimately led to the Agreement, Wallop had requested that Eastern provide a $1 million deposit.

The deposit ultimately was provided by an organization called ACA Capital Group Limited ("ACA"). On January 2, 2018, before the Agreement was finalized, ACA sent two $500,000 wire transfers to Strategic that Strategic understood to be the deposit that the parties had previously discussed in relation to the Agreement then under negotiation.

The parties disagree as to the nature of the relationship between ACA and Eastern and the basis upon which ACA funded the security deposit.

Eastern claims that it borrowed the money from ACA. It points to a loan agreement dated December 29, 2017 (the "Loan Agreement") signed by Han on behalf of Eastern and a William Je ("Je") on behalf of ACA. The document has the formalities associated with a true loan agreement. It purports to document a $1 million loan from ACA to Eastern with a 6-month term and an interest rate of 2% compounded monthly "or otherwise mutually agreed by the Lender and the Borrowing in writing from time to time."[3] PX11. The 2% interest is equivalent to $20,000 for the first month. The Loan Agreement reflects that the loan is not collateralized and that ACA would wire transfer the $1 million to a bank designated by Eastern.

Strategic claims that the $1 million reflects an investment by ACA in the research venture launched by Eastern and Strategic and that, in reality, Eastern did not borrow the $1 million from

---

[3] The Court overrules the objection to the authenticity of the Loan Agreement. There is sufficient information before the Court to support its authenticity for the purposes of admissibility (i.e., a factfinder could find it to be authentic). But, as factfinder, the Court finds that the document does not reflect a genuine loan agreement.

ACA and does not owe $1 million to ACA. It contends that the return of $1 million to Eastern rather than to ACA would represent a windfall to Eastern because Eastern would have no obligation to pay the funds over to ACA.

The Court finds that the $1 million paid from an ACA bank account does not represent a genuine loan from ACA to Eastern. It reaches that conclusion largely for the reasons identified by Strategic. First, Eastern's evidence regarding the extension of the loan is wholly implausible. It is based almost entirely on the testimony of Han, the purported representative of Eastern. According to his testimony, Han, who at the time had ceased his role as owner and director of Eastern, called Je, whom he described as a good friend, upon learning of the obligation to pay Strategic $1 million. Han knew Je as an opponent of the CCP and believed he might be interested in funding anti-CCP research. Je stated that he was willing to extend the $1 million loan and the parties agreed on a six-month term for the loan and a 2% interest rate. Han testified that he saw the Loan Agreement for the first time on December 29, 2017 when he met Je at the Palace Hotel in New York to sign the agreement. The meeting lasted 20 minutes. Han, who does not read English, did not read the agreement which was in English and which he was supposedly signing on behalf of Eastern; Je just pointed out to him the amount of the loan, the interest rate, and the term. Han also did not get approval for the loan from Guo's daughter—the ostensible owner of Eastern—and the agreement he was signing on her behalf. He testified: "I don't need her approval; however, I did report such a matter to her." Trial Tr. at 598-99.

There was no discussion between Han and Je as to how Eastern would repay the loan. Han stated that he gave the issue some thought but his testimony was not credible. He testified that Guo's daughter, who was interested in film, would be able through her film investments to operate Eastern to make it profitable and to generate the $1 million (plus interest) necessary to

repay ACA. *Id.* at 605-06, 610. As Han put it: "I also believe that after the company transferred to Guo Mei and since she is very good in film, I believe she can operate this company and make it profitable." *Id.* at 606; *see also id.* at 610 ("Even though at the time that was 80,000 only, we could still be operating and then we could still be investing in film."). Wang also suggested that the Hong Kong authorities might agree to lift the freeze on the funds based on Strategic's research. *Id.* at 439-40, 510-11. The testimony is implausible. Eastern's assets were limited to $80,000 in a frozen bank account. Regardless of the skill of Guo's daughter as a film investor (as to which no evidence was introduced), there would have been no way for Eastern to satisfy the terms of the purported loan or to repay even the principal that it presumably owed, much less the interest. The monies were more in the form of a gift.

Notably, in its interrogatory responses, Eastern stated that it was Guo who, on behalf of Eastern, ordered the two $500,000 wires totaling $1 million to be sent to Strategic. DX5.

Strategic also points out that after the Agreement was signed, an additional $750,000— the first monthly payment in January 2018—would have been due in just a few weeks, further adding to Eastern's debt load. In all, over $27 million would have been due over the three-year term of the Agreement. Those terms thus had no economic substance for a company with the value of Eastern.

If ACA had loaned the money to Eastern, one would have expected each party to know how much Eastern owed ACA. But the evidence at trial established that Eastern has not repaid the loan, made any principal payments, or made any interest payments. At trial, Han was unable to testify as to how much Eastern owed per month in interest on the loan. Trial Tr. at 607. According to Han, Eastern's only plan to repay the loan is if it wins the litigation. *Id.* at 574. But that is a wholly implausible understanding of the obligations under the loan, which was

reached before there was any litigation and which was made in order for Strategic to perform under the Agreement.

Wang also could not say with confidence what Eastern owed under the loan or what its terms were. Despite being Eastern's corporate representative—who had claimed authority to act for Eastern even during the negotiation of the Agreement, through performance, and through the litigation itself—Wang had not even seen the purported loan agreement when she first testified at her deposition in January 2019, only later seeing it in the litigation file of her prior counsel. *Id.* at 508-09. Although she testified that the counterparty to the loan, Je, had contacted her orally and in person about repayment, that testimony was not credible. All she remembered was that he said that he wanted the loan to be repaid. *Id.* at 504-07. He did not mention what ACA was owed.

There are also irregularities in the loan document and its production. Eastern's agent, Han, is shown to have signed the loan document as "Director," but he was not Eastern's Director at the time. In addition, Eastern did not keep a copy of the loan document after it was signed. There are no accounting records indicating a loan obligation to ACA.

At the same time, however, the evidence does not support that ACA was an investor in the research project. ACA did not provide the names of subjects to be investigated, it did not receive any of the results of the research, there is no evidence that it made any arrangements in advance to receive the results of the research, and there is no credible evidence that it made requests after the fact to see the research. Although there is reference in certain documents to "investors," the Court found convincing Wang's testimony that the reference was to constituents who might use or benefit from the research and not persons who contributed money to fund the Agreement. The source of the funds sent by ACA is unknown to the Court and was not the

subject of testimony.  But regardless of whether those funds are ultimately traceable to Guo as
Strategic suggested or are independent from him, the Court finds that they were a gift on behalf
of Eastern (and Guo) and not provided out of any obligation.

### G.      Strategic's Performance Under the Agreement

The execution of the Agreement imitates a fact pattern imagined by Robert Ludlum and
played out in the Pink Panther.  It was shrouded in the secrecy befitting the best spy novels.  It
was beset with mishaps befitting of Inspector Clouseau.

Because of security concerns and for fear that any electronic communications would be
hacked or be transparent to the CCP, the parties agreed in advance that they would exchange
reports and identification of research subjects only by USB drives and through in-person contact
at secure locations.

Strategic would coordinate with subcontractors (i.e., intelligence analysts in the U.S. and
overseas) to perform the research that Strategic would then incorporate into the reports for Guo.
Guo would not be allowed to contact the team/network because Strategic's relationships and
approach to the research were proprietary, and Strategic declined to reveal the names or titles of
team members.  Pursuant to Guo's instructions and the parties' agreement, instructions to the
investigators who would conduct the work, as well as the actual products of the research, could
not be transmitted by email but only in-person.

The negotiated start date for the work under the contract was January 16, 2018.  *See, e.g.*,
*id.* at 156, 161, 304, 319.  The parties agree that the weekly Financial Forensic Reports, Current
Tracking Reports, and Social Media Reports were due no later than January 23, 2018, January
30, 2018, February 6, 2018 and February 13, 2018.  *See also* PX1.  The parties also agree that the
first monthly Financial Forensic Reports, Current Tracking Reports, and Social Media Reports
were due no later than February 16, 2018.

The parties further agree Strategic ultimately never delivered any "financial forensic [h]istorical research" called for under the Agreement.  Dkt. No. 299-1 ("JSOAF") ¶ 54.  The parties also agree Strategic did not deliver to Eastern any "current tracking research" called for under the Agreement.  *Id.* ¶ 55.  The parties further agree Strategic did not deliver to Eastern any "social media research" called for under the Agreement.  *Id.* ¶ 56.

On or about January 6, 2018—the same day that the Agreement was signed—Wang delivered to Wallop's home in Virginia a set of USB drives containing information for a list of 15 individuals that Eastern wanted investigated under the Agreement (the "Subject List").  Trial Tr. at 156-57; JSOAF ¶ 50.  But when Wallop tried to access the USB drives, she discovered that they were all corrupted.  Surprisingly, Wallop brought the USB drives to a person described as "a neighbor," despite the fact that the Agreement and the information it sought were described as highly secretive.  The "neighbor" tested them and discovered that they did not contain any readable files.  Trial Tr. at 156-57.

On January 8, 2018, Wallop met Wang in New York and obtained three more USB drives.  Fortunately, one of those worked and Wallop was able to download the files for the persons who would be the subject of the investigation.  *Id.* at 76-77, 157-58.  The individuals were virtually all high-ranking CCP members or persons closely related to high-ranking CCP members or their children living in the United States and elsewhere.  PX7.

Wallop and Waller agreed to split the work.  Wallop would focus on domestic investigation.  Waller would focus upon investigation done by investigators overseas.

In early January 2018, Waller travelled to Europe and engaged a 10-person team of computer and data analytic engineers to conduct data mining and research, including research into the "dark web" ("Team 1").  *See, e.g.*, Trial Tr. at 198, 289-92.  Team 1 was led by a person

whom Waller knew. The operation was shrouded in secrecy. Waller purchased computers for the team in cash in three separate countries in order to prevent any electronic tracing of the serial numbers of the devices to the purchaser. He also purchased electronic material in a fourth country for the purposes of camouflaging the actual activity that was taking place. Information could not even be exchanged by encrypted email or encrypted phone. *Id.* at 292. Per the instructions of Guo, information could only be exchanged in person by exchanging USB drives. There was compartmentalization to make sure that if any link in the chain was broken it could not betray the other links in the chain. Travel was onerous because it would take two or three days to do a round trip to meet in a third location to exchange data. Before Waller could give the list of the 15 names to Team 1, he had to print out the names from a computer not connected to the internet, scan them, and then place them onto a new encrypted drive to be delivered to Europe. *Id.* at 304. Guo had also instructed that Strategic not have Mandarin speakers on Team 1 in case they were spies for the CCP. L. Han eventually permitted Waller to hire retired European diplomats who spoke with fluent Mandarin who were not of Chinese background.

Waller gave the names to Team 1 in Washington D.C. and traveled to Europe a few days later to obtain a status report and to collect the research that the team had conducted (which was stored on a USB drive). He received a drive from Team 1 on January 24, 2018 and delivered that material to Wang two days later. *Id.* at 304-05.

Wallop met with Guo at the end of January 2018. *Id.* at 162. At the meeting, Guo stated that he needed the reports by January 26, 2018—10 days after the negotiated start date of the Agreement but three days after the first deadline for the weekly reports.

Strategic delivered a first USB drive to Eastern on January 26, 2018, after Waller's return from Europe. Strategic has admitted that the information contained on the USB drive delivered

to Eastern on January 26, 2018 was "of no use to Mr. Guo or Eastern because it was nothing more than the researchers' own work to familiarize themselves with the fifteen subjects using open-source information." *Id.* at 199; DX2 at 35 ¶ 45. At a meeting with Wang, Waller stated that the drive reflected the work that the team had done to orient itself and that several of the 15 names were misspelled. Trial Tr. at 307-310, 313-14. He also stated that the drive contained the location of some offshore companies and the password to a computer server of the Chinese government. Wang responded with disappointment as to the information, stating that it was not "good enough" and was "all junk." *Id.* at 314. In addition, while L. Han expressed the view that Strategic had good leads and should keep working on them,[4] he also relayed that Guo was angry with the information that was delivered under the Agreement and believed that it reflected that Strategic was incompetent and trying to "rip him off." *Id.* at 320.[5]

Waller traveled to Ireland to receive the second USB drive a few days later and delivered it to Wang in Pennsylvania Station in New York on January 30, 2018. *Id.* at 199, 327-28.

Wang took the second USB drive to Guo and placed it in the "virgin" laptop that had been left by Strategic from the last meeting. The two discovered that the drive did not contain useful information. The information on the drive was limited to raw code that was not actionable by the client but was intended to show that the work was being executed. *Id.* at 200. The parties agree that this second USB drive was not "of any use" to Eastern and that it contained

---

[4] L. Han, who did not testify at trial, also testified under oath at deposition that the hard drive that Strategic provided contained only "lots of junk information." Trial Tr. at 368. But L. Han was an intermediary between Strategic and Guo and not Guo's agent. *Id.* at 365.

[5] Waller testified that he did report to Wang or L. Han that Eastern had discovered from sources other than social media that one of the people on Eastern's list was carrying a counterfeit non-Chinese passport of a NATO ally. Trial Tr. at 320-21.

"incomplete work product . . . in the form of raw research data." *Id.* at 78-79, 199, 200-01, 359,
383; DX2 at 28 ¶ 24. Among the information on the drive were encrypted email addresses and
passwords of communist figures on Guo's list. Trial Tr. at 329. Strategic did not deliver any
other USB drives to Eastern and Strategic admits it "was unable to prepare any detailed reports."
*Id.* at 79, 359.

After the second meeting, and after Wang had conveyed the message in the wake of that
meeting that work with Strategic might not be continued for a second month, Waller made
arrangements with a new team ("Team 2"). Team 2 was from an obscure organization called the
Allied Special Operations Group ("ASOG"), which was purportedly based in Dallas, Texas.
Conspicuously, Strategic offered no evidence regarding the bona fides, qualifications, or
legitimacy of this organization. It would conduct the research using different methodologies
from those used by Team 1. Rather than using data mining and intrusive computer capabilities,
ASOG claimed it would work with other commercially available databases and contacts within
the federal government to do the research.

Waller testified he met with ASOG in Texas in the first couple of days of February 2018
and presented ASOG with the list of subjects to be investigated, asking the organization to
research a selection of those names to see what it could discover using its own methods. Within
a week, ASOG replied to Waller with its results and Waller flew back to Texas to meet with it.
Waller testified that ASOG gave him an oral report at the meeting and permitted him to view—
but not take—the research ASOC conducted, which Waller testified included detailed tracking
information on the subjects. *Id.* at 95-96, 344-45.

Waller further testified that he told L. Han at a subsequent meeting that ASOG had told
him that it was illegal to obtain this information under federal law given the nature of what was

obtained.[6]  In particular, Waller testified that he stated that he had been told that it would be a

federal crime to investigate further the five subjects ASOG had investigated because the National

Clandestine Service of the CIA had classified the individuals in a category that ASOG said was

called "records protected."  *Id.* at 351-52.  He testified that he was told and conveyed that this

classification is intended to protect foreign subjects from database searches for the purpose of

protecting their records either because they were subjects of criminal or national security

investigations or because they were cooperating with the United States government.  *Id.*  Waller

testified L. Han told him that he understood that the information was classified and that he would

come up with new names.  Trial Tr. at 352-53.  At the same time, however, ASOG was reluctant

to continue work on the assignment without knowing the identity of Strategic's client.  *Id.* at 354.

L. Han, however, ultimately did not provide additional names.  *Id.*

  The testimony regarding ASOG is of dubious veracity.  As noted, Strategic offered no

evidence of the qualifications of ASOG or its competence to do the work that it supposedly

performed.  It also offered no evidence that ASOG actually did any work, save for the testimony

of Waller that he saw work and an invoice for $104,595 that ASOC reduced to $5,412

supposedly based on a "termination credit."  DX56; Trial Tr. at 345, 350.  There was no

evidence offered—from either a fact or expert witness, or in the form of a document or

stipulation—that a classification of "records protected" even existed, much less that there was

any prohibition on ASOG sharing any work it performed with Strategic or with Eastern.  Waller

himself had never heard of the term "records protected" before ASOG mentioned it to him and

he does not know of a legal source for it.  Trial Tr. at 369-71.  All that was offered is the

---

[6] Waller testified that he was instructed by Wang on or about January 30, 2018 that he should not
contact her in connection with the project anymore and that he should work solely with L. Han.
Trial Tr. at 349-50.

testimony of what Waller was told, which was received solely for Waller's state of mind and as background for what he told L. Han, and not for the truth of what was stated.

A few weeks later in February 2018, Wallop and Waller met with L. Han at Wallop's home. *Id.* at 354-56. L. Han told the two to stand down their work.

### H.     Eastern Terminates the Agreement With Strategic

Neither Eastern nor ACA made the first monthly $750,000 payment that was due on February 16, 2018 under the Agreement. Strategic did not deliver any of the monthly reports.

On February 23, 2018, Eastern delivered a letter to Strategic terminating the Agreement. Trial Tr. at 163; DX8; JSOAF ¶ 58.

The letter purported to terminate the Agreement effective immediately and demanded a full and complete refund of the $1 million deposit. After noting that the start date of the Agreement had been delayed from January 6, 2018 to January 16, 2018, the letter listed a number of missteps by Strategic that Eastern claimed constituted a breach of contract and demonstrated that Strategic had fraudulently misrepresented its capabilities. These missteps included the failure to deliver the reports required by the Agreement and the failure to meet the schedule laid out in the Agreement. Eastern demanded that Strategic cease work immediately and return or destroy all materials and information provided by Eastern to Strategic. The letter demanded that the $1 million deposit be returned to ACA at a Singapore address.

Strategic did not return the deposit.

### I.     Guo's Alleged Misrepresentations

Strategic, through Wallop and Waller, claims that Guo misrepresented his identity and his objectives and that they reasonably relied upon his misrepresentations to Strategic's detriment.

Specifically, Guo represented to Wallop and Waller that he was an opponent of the CCP and that he wanted to use the research Strategic would provide to sow discord in that

organization and ultimately to overthrow the CCP and the current regime in China.[7]  Wallop and Waller both testified that they were comfortable entering into an agreement with Guo because they believed that he held the same anti-CCP views that they did and shared their objective of undermining the CCP.  Strategic claims it later learned that Guo was in fact affiliated with the CCP and if it had known that prior to signing the Agreement, it would not have entered into the Agreement.

The Court finds that Wallop and Waller did not rely on Guo's statements that he was anti-CCP, that any such reliance would not have been reasonable given the facts here, and that Strategic has not proved a misrepresentation by Guo.

First, Wallop and Waller's testimony that they relied on Guo's statements was largely conclusory and was undermined by the fact that, despite purportedly being investigators, they did no investigation into Guo's identity or allegiances, much less the identity and allegiances of Eastern, the corporate entity that was later introduced into the transaction.  Guo undoubtedly represented that he was anti-CCP.  He made that point vehemently in his testimony at trial. However, from the evidence, it appears and the Court finds that what attracted Wallop and Waller was the nature of the work: an investigation into alleged corruption by high-ranking members of the CCP, funded by a person who claimed to be a billionaire who would pay them $750,000 per month in order to do that research.  They were less interested in the identity of the funder, Guo, his personal political beliefs, and which faction he sided with in the internecine battles within China.

---

[7] Gertz and L. Han made similar representations about Guo, but they did not do so as Guo's agent and their statements are not attributable to Guo.

Second, any such reliance would have been unreasonable.  According to their testimony, Wallop and Waller largely relied—to the extent they relied on anything—on the testimonials of Gertz and L. Han.  They knew that Gertz and L. Han held similar views to their own views, that Gertz and L. Han had introduced Guo to Strategic, and that if Gertz and L. Han were willing to associate with Guo and to make the introduction, Wallop and Waller simply assumed they should be willing to associate with Guo.

However, much of the information that Strategic now relies upon to suggest that Guo was not genuinely opposed to the current leadership in China was in the public record before the first meetings Wallop and Waller held with Guo and well before the Agreement was signed.  Sufficient evidence was available that should have caused Strategic to investigate.  The fact that it did not do any investigation, or ask Guo to make any representations, undermines the reasonableness of any reliance it claims on Guo's statements.  Even before its first meeting with Guo, Strategic had received information that "some suspect that [Guo] may simply represent a faction in an internal leadership struggle."  DX38; *see, e.g.*, Trial Tr. at 58-59, 203.  Waller was also aware of reports that Guo owed his fortune to ties to the CCP and that he maintained close ties to senior CCP leaders after he left China.  Trial Tr. at 203-04, 206.  In the words of Waller, Guo had made it "very public" that he rose up through the CCP and the secret police apparat, Ministry of State Security ("MSS"), with MSS's Deputy Head of Security Ma Jian ("Jian").  *Id.* at 205, 207.

Against this backdrop, it is telling that Strategic did not investigate Guo but rather simply placed blind faith on the fact that Gertz and L. Han vouched for Guo.  *Id.*; *see also id.* at 85-86, 88.  By that time, however, Gertz had written an article dated May 23, 2017, stating Guo has "close ties to senior Chinese Communist Party leaders, including government ministers and

Politburo members" and "access to Ministry of State Security (MSS) operations overseas and in the United States." DX43. The article also reported that Guo's wife and daughter were permitted to visit him in the United States but were required to return to China after 20 days where they could be used as political leverage against him—information that Strategic now says is evidence of Guo's relationship with the CCP. By October 9, 2017, Gertz had publicly written that "Guo said he maintains close ties to supporters within the Chinese government and security system and is able to obtain many internal documents." DX32. Also in October 2017, the Wall Street Journal published reports—of which Waller was aware—that Guo had met with four officials from China's MSS in his New York apartment. DX34. It is precisely these "close ties," the relationship with the MSS, and the fortune Guo made from the CCP that Strategic now relies on to say that Guo is secretly allied with the CCP.

Wallop testified that she did not know what Eastern or Guo were going to do with the research and thought maybe Guo was going to "run it both ways." Trial Tr. at 89. Yet neither Wallop nor Waller insisted that Guo or Eastern make any representation about their being anti-CCP or using the research only for anti-CCP purposes. At trial, Strategic, presumably a sophisticated party, claimed that it did not include a representation in the Agreement because it was concerned about confidentiality. That explanation was undermined, however, by the evidence that the parties took to keep the Agreement (with its terms) confidential, including that "there's no decrypted electronic copy anywhere." *Id.* at 386. The terms of the Agreement themselves were confidential and kept highly confidential. The parties could have included a representation in the Agreement regarding how the information would be used or about Guo's objectives had Guo's objectives or his allegiances been important to Strategic. The fact that Strategic did not even suggest that such a representation was ever made is revealing, in that it

shows both that Strategic did not rely on any view regarding Guo's politics or allegiances and

that any such reliance was not reasonable. Waller ultimately admitted that the reason that

Strategic did not include a representation—despite the fact that Eastern says it considered Guo's

anti-CCP ties to be material—was because of the assumption that one was not needed: "[I]t was

just second nature to what we both wanted." *Id.* at 386-87.

Finally, there also is no clear and convincing evidence as to whether Guo is a supporter

or opponent of the CCP. Guo asserted forcefully at trial that he was an opponent of the CCP.

But other witnesses testified with equal force as to their belief that he was a friend of the CCP.

There is evidence of statements by him that are consistently hostile to the CCP. But there was

also evidence introduced at trial of a conversation that he had with officials of the CCP at his

apartment in which he declared his loyalty to Chinese President Xi Jinping and the CCP. *See,*

*e.g.*, *id.* at 628-32, 716-21, 727-34, 736-50; DX114B.

> The Court credits a portion of the testimony of Waller. He stated:
> I've worked a lot with communist defectors over the years, actually since I was an
> undergraduate at George Washington University, and had some of them as professors. I
> learned over the years, as well as talking, learning through a lot of people in U.S.
> intelligence and counter-intelligence, that it's very hard to discern whether someone who
> has broken with a communist system, whether it's Soviet or Chinese or others, to discern
> conclusively whether or not they still maintain a loyalty.

Trial Tr. at 204.

Waller went on to state that many defectors and dissidents "still maintain ties because

they had families or other connections, and those ties would be valuable if they were indeed

dissidents or genuine opponents because they could mine those ties for information that would be

useful to the United States, to do damage to their own system." *Id.* at 204-05. Thus, Waller

admitted that evidence of a relationship that someone has with people within the CCP on its own is not necessarily indicative of the fact that he or she is a supporter of the CCP.[8]

Strategic's evidence that Guo was a secret supporter of the CCP largely consisted of the testimony of another member of the Chinese dissident community, Sasha Gong ("Gong"); statements by Guo himself; and circumstantial evidence. Guo testified assertively that he was genuinely anti-CCP, and Eastern offered evidence of its own in support of that contention.

Gong is a journalist and dissident. Gong testified that she interviewed Guo several times beginning in April 2017 and continuing through 2018. The interviews were conducted both off the record and live on-air. In the interviews, Guo claimed to Gong, and has also publicly claimed, that he was arrested for his support of the 1989 Tiananmen Square movement. But Guo also told Gong that, after a time in Hong Kong following Tiananmen Square, he came back to mainland China, where he built real estate, made many high-ranking friends, and became one of the major players in China's intelligence community. Gong claims that Guo said he was one of only three people who could visit Hu Jintao, the former general secretary of the CCP (predecessor to President Jinping) without an appointment. He used this access to battle with the former Vice Mayor of Beijing by allying with MSS Deputy Head Jian. Guo told Gong he maintained connections with senior Chinese leaders and that he believed President Jinping was a good leader; Guo's only goal was to target corrupt persons in the CCP. Strategic argued that those statements are consistent with a continuing relationship with the CCP.

Strategic also argued that there is evidence Guo has moved money from Hong Kong or mainland China since he began speaking out as a dissident through ACA and that persons

---

[8] Waller gave similar testimony when asked if Elliott Broidy, who was revealed to be funding Strategic's defense, was associated with the CCP. Trial Tr. at 387-88; *see also id.* at 181

associated with Guo, such as Han and Wang, were comfortable with sending money from Hong Kong or China into the United States and repaying the obligation to ACA by a transfer of funds into China. It claims that Guo would not have been able to do so without the cooperation of the CCP.

Finally, Strategic argues that Guo has attacked dissidents such as Gong and Bob Fu ("Fu"). Strategic argues that in continuing to attack members of the China Hawk community and dissidents by claiming they are actually controlled by the CCP, Guo continues to turn members of this community against each other.

The evidence is not sufficient to establish that Guo is a supporter of the CCP.

The force of Gong's testimony—that she now believes Guo is a supporter of the CCP based on his associations with certain political leaders, his later harassment of her, and certain pro-CCP statements he is accused of making—is undermined by the fact that even after Guo made the statements to her and after she was aware of his supposed continuing relationships with persons who are members of the CCP, she wrote a letter on his behalf to the United States government supporting Guo's application for asylum and claiming that he was an opponent of the CCP. In her letter, Gong wrote that Guo had challenged the legitimacy of communist leaders in China, worked Chinese intelligence services, and financed operations investigating overseas corruption by Chinese government officials, all of which made him valuable to the United States government. *Id.* at 794-98; DX123.

As to Guo's alleged transfers of money and other circumstantial evidence, Strategic's arguments are based on speculation. It offered no evidence, expert or otherwise, regarding the inferences that can be drawn from the fact that money travelled from Hong Kong or mainland China to the United States supposedly on behalf of Guo. Indeed, Strategic's presentation was

telling for its failure or apparent inability to offer any expert testimony regarding the inferences

to be drawn from Guo's relationships.

As to the attacks on Chinese dissidents, Guo testified that his attacks were only ever in

retaliation: "I have never initiated any attack to any Chinese person. Always it was []they who

attacked me, then I retaliate."  Trial Tr. at 747.  "I have never attacked.  I was always on the side

of retaliation."  *Id.* at 748.  He added: "I have never initiated any attacks on any person, only

under attack under the natural protection do I retaliate.  And also, there were millions of people

or up to a million people online who were attacking me, and . . . it's not possible that I would

retaliate against every one of them either."  *Id.* at 748.[9]  The evidence shows that Guo is

extraordinarily combative, as are other members of the Chinese dissident community.  It does not

demonstrate on which side of the political battle Guo stands.

Finally, there is evidence to question whether Strategic even believed it was defrauded.

Strategic did not assert a counterclaim for fraud when it filed its initial pleadings in this case.

Dkt. No. 22.  Nor did it in its amended pleadings.  Dkt. No. 47.  It only asserted such claim after

it received litigation funding from an alleged opponent of Guo with an interest in undermining

his assertions of hostility to the CCP, a wealthy United States businessperson named Elliott

Broidy, whose credibility also is subject to question.  *See* Dkt. Nos. 114, 127.  Broidy was

convicted of federal crimes before he received a presidential pardon in 2020.[10]  The evidence

---

[9] When asked about whether he had accused Sasha Gong of being a communist spy, Guo
testified: "It was after she called me a spy, then I retaliate."  Trial Tr. at 748.

[10] Eastern offered evidence that Broidy himself was a supporter of the CCP as proof that
Strategic, which accepted litigation funding from him, did not truly care about the political
allegiances of those with whom it did business.  *See, e.g.*, Trial Tr. at 181:24-184:17.  Some of
the evidence was subject to evidentiary challenge.  The Court need not resolve those evidentiary
challenges because it is satisfied from the testimony of Wallop and Waller that they did not
actually or reasonably rely on Guo's representations.

suggests that the claim of fraud was not based on any evidence that Strategic discovered or on any genuine view that Strategic was defrauded but on a recognition that the assertion of a fraud claim would have strategic value in the case or otherwise.

## II.   CONCLUSIONS OF LAW

Eastern brings three claims: a declaratory judgment that the contract is illegal and void as against public policy, breach of contract, and unjust enrichment.  Dkt. No. 93.  Strategic brings two counterclaims for breach of contract and fraudulent misrepresentation.  Dkt. No. 127.

### A.   Eastern's Declaratory Judgment Claim

Each party contends that the other breached the Agreement and that it is entitled to damages.  Before addressing the breach of contract claims, however, the Court must address the argument in Eastern's declaratory judgment claim that the Agreement is void and unenforceable because it violates Virginia's private security services statute and thus Eastern is entitled to a refund of its deposit regardless of whether any party breached the Agreement.  The Court holds that the services contemplated by and performed under the Agreement fall within the conducted prohibited by the statute and that the Agreement is therefore void and unenforceable.  Eastern is entitled to its deposit back.

### 1.   Virginia Private Security Services Statute

Under Virginia law, "a contract made in violation of a statute is void, and there can be no recovery thereon, unless it is apparent from the statute that the legislature did not intend to make the contract void and unenforceable."  *Massie v. Dudley*, 3 S.E.2d 176, 180 (Va. 1939) (holding plaintiffs could not recover under an express contract for a real estate commission where they were not licensed as brokers); *see F. S. Bowen Elec. Co. v. Foley*, 72 S.E.2d 388, 394 (Va. 1952) (violation of statute preventing a contractor from "engaging in business until he has been licensed and registered, and the acts prohibited are termed unlawful and punishment is provided

in the statute for the violation thereof . . . is illegal, not merely invalid") (internal quotation marks and citation omitted). "[I]mplicit in *Bowen* and *Massie* is that failure to abide by the provisions of a specific statute renders a contract invalid," *Am. Demolition & Design v. Pinkston*, 96 Va. Cir. 142, 2017 WL 11452748, at *8 n.2 (Va. Cir. Ct. Aug. 2, 2017), and "[w]here the Court has declared contracts void under this doctrine the plaintiff has not been able to recover damages otherwise due him," *Beard v. Ragan*, 51 Va. Cir. 229, 2000 WL 33258655, at *3 (Va. Cir. Ct. Jan. 12, 2000). Under Virginia law, the "policy behind [a] licensing statute and the underlying voidability of contracts for noncompliance" is to "protect the public from inexperienced, unscrupulous, irresponsible, and incompetent contractors . . . [where] [e]nforcement of the contract is denied the unregistered contractor, not because of the nature of the transaction, but as a penalty for failing to comply with the registration statutes." *Butler v. Creative Design Builders, Inc.*, 24 Va. Cir. 362, 1991 WL 11015277, at *2 (Va. Cir. Ct. Aug. 7, 1991) (quoting *Bacigalupo v. Fleming*, 102 S.E.2d 321, 324 (Va. Ct. App. 1958)). In essence, it would undermine the policy of the statute for a court to award in damages monies for which a party was not entitled to receive pursuant to law or regulation.

Virginia's "Private Security Services Statute" is a licensing statute that requires persons who perform or contract to provide certain private investigatory work to have a license. It makes it unlawful for a person to "engage in the private security services business or solicit private security business in the Commonwealth [of Virginia] without having obtained a license from the Department [of Criminal Justice Services]." Va. Code Ann. § 9.1-139(A). The statute defines a "private security services business" to mean "any person engaged in the business of providing, or who undertakes to provide . . . private investigators . . . to another person under contract, express or implied." Va. Code Ann. § 9.1-138. A "private investigator," in turn, is defined to mean "any

individual who engages in the business of, or accepts employment to make, investigations to
obtain information on (i) crimes or civil wrongs; (ii) the location, disposition, or recovery of
stolen property; (iii) the cause of accidents, fires, damages, or injuries to persons or to property;
or (iv) evidence to be used before any court, board, officer, or investigative committee." *Id.*

Strategic first argues that it did not violate the Private Security Services Statute by
entering into the Agreement because the work performed under the Agreement does not fall
within the purview of the statute. Specifically, it argues that Strategic did not provide private
investigators in Virginia: there was no actual investigation in Virginia as Team 1 and ASOG
were located elsewhere and there was no evidence that there was a target in Virginia.

"[T]he constant endeavor of the courts is to ascertain and give effect to the intention of
the legislature, that intention must be gathered from the words used." *Chase v. DaimlerChrysler
Corp.*, 587 S.E.2d 521, 522 (Va. 2003). Thus, when interpreting statutes, "we start with the plain
language." *U.S. Dep't of Labor v. N.C. Growers Ass'n*, 377 F.3d 345, 350 (4th Cir. 2004); *see
also Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) ("It is well established that when the
statute's language is plain, the sole function of the courts . . . is to enforce it according to its
terms.") (internal quotation marks and citation omitted). "[C]ourts apply the plain language of a
statute unless the terms are ambiguous, or applying the plain language would lead to an absurd
result." *Boynton v. Kilgore*, 623 S.E.2d 922, 925-26 (Va. 2006) (internal citations omitted).
"Ambiguity exists if the text can be 'understood in more than one way or refers to two or more
things simultaneously [or] when the language is difficult to comprehend, is of doubtful import, or
lacks clearness or definiteness.'" *Id.* at 926 n.8 (quoting *Brown v. Lukhard*, 330 S.E.2d 84, 87
(Va. 1985)). "The phrase 'absurd result' is used 'to describe situations in which the law would
be internally inconsistent or otherwise incapable of operation.'" *Id.* at 926 n.9 (quoting *Cook v.*

*Commonwealth*, 597 S.E.2d 84, 87 (Va. 2004)).  But even "if the literal text of the statute produces a result that is, arguably, somewhat anomalous," the courts "are not simply free to ignore unambiguous language because we can imagine a preferable version."  *Sigmon Coal Co., Inc. v. Apfel*, 226 F.3d 291, 308 (4th Cir. 2000), *aff'd sub nom. Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002).

Under the plain language of the statute, Strategic' conduct can qualify as that of a private security services business not only if it is "engaged in the business of providing" a private investigator but also if it "undertakes to provide" private investigators under contracts.  The focus of the statute is not limited to the actual performance of security services or the actual investigation of crimes or civil wrongs; it also is addressed to the agreement to undertake such services, regardless of whether the services are actually performed by the party to the agreement or by someone with whom that party subcontracts.  *See Ervin B. Davis & Co. v. Dep't of Crim. Just. Servs.*, 49 Va. Cir. 447 (1999), *judgment entered*, No. 160-97, 1999 WL 907550 (Va. Cir. Ct. Sept. 13, 1999) ("[T]he statute makes no reference to a quantity of private security services in which the business must engage before the statute applies.").  The act of "undertaking to provide" is what must occur in Virginia.  The statute does not require that the private investigator, or the information he or she seeks to obtain, must be located in Virginia as well.

That the statute requires a private security services business to be licensed if, while in Virginia, it "undertakes to provide" private investigators is reinforced by the statute's reciprocity provision.  Under Section 9.1-140(10), Virginia exempts from its license requirement "[l]icensed or registered private investigators from other states entering Virginia during an investigation originating in their state of licensure or registration when the other state offers similar reciprocity to private investigators licensed and registered by the Commonwealth."  Va. Code Ann.

§ 9.1-140(10).  The statute anticipates that a private security services business operating in Virginia may require its private investigators, whether acting as employees or independent contractors, to enter other states and so it affords consideration to out-of-state investigators entering Virginia.  That Virginia considers allows out-of-state private investigators to enter Virginia "during an investigation originating in their state of licensure or registration" and gives reciprocity to such out-of-state investigators, suggests that the Virginia legislature was focused at least in part on where the investigation "originates" rather than where the investigation may lead.  Indeed, the provision making it unlawful for an unlicensed person to engage in a private security services business in Virginia extends that prohibition to the "undertaking" of such business in Virginia as well.

Setting aside the second question of whether the services that Strategic undertook to provide constitute "private investigation" as defined by the statute, Strategic's conduct manifestly occurred in Virginia.  Strategic operated and continues to operate out of Wallop's home in Virginia.  Trial Tr. at 37.  The Agreement setting forth the services Strategic undertook to provide was executed at Wallop's home in Virginia.  Trial Tr. at 69.  Additionally, much of the work that Strategic did in connection with the Agreement took place in Virginia.  Strategic received the Subject List and the first USB drive from Team 1 in Virginia.  Trial Tr. at 319, 420.

In light of this reading, the Court asked the parties to brief whether, to the extent that the statute could be deemed to regulate commerce outside of its borders, the statute violated the Commerce Clause.  Article I, Section 8, Clause 3 of the United States Constitution empowers Congress to "regulate commerce . . . among the several States."  U.S. Const., Art. I § 8, cl. 3.  The Commerce Clause contains a dormant aspect that denies the states "the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce."  *Or. Waste Sys.,*

*Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 98 (1994). A statute's extraterritorial effect can violate the Commerce Clause when it seeks to regulate commerce that takes place "wholly outside of its borders." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 328 (1989). But the "critical question" is "where the transaction being regulated is consummated" and "in grappling with whether the practical effect of a regulation is to control conduct beyond the boundaries of the State, the circuit courts have focused on the location (or locations) where the contract was formed." *Berman v. City of New York*, 2012 WL 13041996, at *18 (E.D.N.Y. Oct. 3, 2012); *see also Brown v. Hovatter*, 561 F.3d 357, 365 (4th Cir. 2009) (rejecting plaintiffs' challenge to "the way [the State] authorizes them to do business within the State in a profession regulated by the State" because such "complaints do not involve burdens placed on the interstate movement of goods, materials, or other articles of commerce, and the matters of which they complain—the manner of professional practice in [the State]—are not matters protected by the dormant Commerce Clause"). That is because "there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 670 (1981) (quoting *S. Pacific Co. v. Arizona*, 325 U.S. 761, 767 (1945)).

The statute here does not seek to regulate commerce that takes place "wholly outside of its borders." Virginia has an interest in regulating and licensing not just those who take investigative actions within its borders but also those who in Virginia offer such services to persons in Virginia regardless of where the services are actually performed. The statute reflects that interest. It regulates private security services businesses in Virginia where that "private security services business" is defined as engaged in the business of providing, or undertaking to provide, private investigators by implied or express contract. A "private security services

business" thus is subject to regulation when in Virginia it undertakes to provide private investigators. That reading is also consistent with the purpose of the overall statute, which is to create a local licensing and regulatory scheme. "In the immediate case, Virginia is not attempting to regulate a contract occurring wholly outside the Commonwealth. The contract in question was entered into in the Commonwealth of Virginia . . . [and] [w]hile it may be true that elements of the transaction occurred outside of the Commonwealth of Virginia, this does not necessarily deprive Virginia of its interest in regulating the transaction." *Atl. Mach. & Equip., Inc. v. Tigercat Indus., Inc.*, 427 F. Supp. 2d 657, 666 (E.D. Va. 2006).

Strategic argues, second, that the services it undertook to provide did not include investigations of the type enumerated in the statute: "(i) crimes or civil wrongs; (ii) the location, disposition, or recovery of stolen property; (iii) the cause of accidents, fires, damages, or injuries to persons or to property; or (iv) evidence to be used before any court, board, officer, or investigative committee." Va. Code Ann. § 9.1-139(A).

The parties agree that there is little law on this statute. One Virginia state court interpreting the definition of "private investigator" under the statute held that a company fell within the definition of a "private security services business" because it employed "private investigators" to obtain information listed in the statute.[11] In *Ervin B. Davis & Co.*, the court held that the "activities in which the corporation engage[d] as evidenced by the Plaintiff's answers to Defendant's Interrogatories and as described by the company's advertisements, including the web page information submitted . . . comport[ed] with the statutory definition of a

---

[11] *United States v. Commonwealth*, 139 F.3d 984, 986 (4th Cir. 1998), which dealt with the question of whether *Leslie Miller v. Arkansas*, 352 U.S. 187 (1956) precluded the application of the Virginia's licensing and registration requirements to private investigators working solely for the FBI in its Background Investigation Contract Services Program, did not address the question at issue in this case.

private security services business." 1999 WL 33722350, at *2. The court, however, did not

describe in its opinion what those precise activities were and how they fell into clauses (i)-(iv).

It did note that the company's employees had performed surveillance investigations, but it did

not say what information was so surveilled.[12] The court ultimately held that the company was

subject to a statutory exception to the licensing requirement due to its status as a claims adjuster.

*See id.* The case thus does not offer much guidance. Little guidance is also offered from cases

interpreting similar statutes passed in other states.[13]

"In considering the meaning of particular language in context, '[w]ords in a statute

should be interpreted, if possible, to avoid rendering [other] words superfluous." *Eley v.*

*Commonwealth*, 826 S.E.2d 321, 324 (Va. App. Ct. 2019) (quoting *Cook v. Commonwealth*, 597

S.E.2d 84 (Va. 2004)). "It is one of the fundamental rules of construction of statutes that the

intention of the legislature is to be gathered from a view of the whole and every part of the

statute taken and compared together, giving to every word and every part of the statute, if

possible, its due effect and meaning." *Epps v. Commonwealth*, 626 S.E.2d 912 (Va. App. Ct.

2006) (en banc), *aff'd*, 641 S.E.2d 77 (Va. 2007) (quoting *Posey v. Commonwealth*, 96 S.E. 771

---

[12] It also held that any employees of the company who qualify as private investigators, including its proprietor, would be subject to the registration requirement. *Ervin B. Davis & Co.*, 1999 WL 33722350, at *2.

[13] Both parties agree that comparable private investigator statutes are of little help in attempting to ascertain the definition of "crimes or civil wrongs." Strategic submits that most states requiring licenses typically define "private investigation" to include attempts to obtain information about "crimes or civil wrongs" but limit that prong to crimes or wrongs against the state and are therefore of little use. *See* Dkt. No. 360 at 2 & n.2. Other states' statutes do not provide such a limitation but have a catch-all prong that defines private investigation more broadly to include information about "the identity, habits, conduct, business, occupation, honestly, integrity, etc. of any person." *Id.* at 2. Connecticut's equivalent statute comes closest to matching Virginia's, but the parties have not identified case law on the definition of "crimes or civil wrongs," and the statute contains additional definitional prongs for "conducting surveillance activity" and "conducting background investigations." *Id.*; *see* Conn. Gen. Stat. Ann. § 29-152u(4).

(Va. 1918)).  Moreover, under the canon of ejusdem generis, "when a particular class of persons or things is enumerated in a statute and general words follow, the general words are to be restricted in their meaning to a sense analogous to the less general, particular words." *Sainani v. Belmont Glen Homeowners Ass'n, Inc.*, 831 S.E.2d 662, 667 (Va. 2019) (quoting *Martin v. Commonwealth*, 295 S.E.2d 890 (Va. 1982)).

Applying those canons, reading the statute as a whole and interpreting each provision of clauses (i)-(iv) of the statute both individually but also as part of a collective group, the Court concludes that they cover certain of the services Strategic undertook to provide in the Agreement and therefore that Strategic violated the statute by entering into the Agreement.  The Agreement cannot be enforced.

The meaning of the statute can be gleaned from several of its terms.  It addresses only "business" or "employment."  It does not address persons who act as volunteers or do work for themselves and not for others.  Second, the business that is regulated is that of providing "investigations to obtain information"; research that is incidental to some other service is not governed.  A person must be contracted to conduct an "investigation to obtain information." Third, the information must be of a particular type or quality.  As to type, a person is a private investigator if he or she is in the business or accepts employment to make an investigation of three types of information: information regarding "crimes or civil wrong," information regarding "the location, disposition, or recovery of stolen property," and information regarding "the cause of accidents, fires, damages, or injuries to persons or to property."  As to the quality of the information, a person is also a private investigator if he or she conducts an investigation to obtain "evidence to be used for any court, board, officer, or investigative committee."  Clause (iv) thus

addresses an investigation of any subject matter but so long as its objective is to obtain items that would qualify as "evidence."

The Court rejects Strategic's argument that a person can be a private investigator only if he or she is engaged in the process of collecting evidence to be used in some formal proceeding or to prosecute an individual for a specific crime. That argument runs afoul of the principle that the Court must strive to give meaning to each word in a statute and that state legislatures do not write meaningless or superfluous language. Clause (iv) is addressed to the collection of "evidence." It specifically focuses on the collection of information to be used as evidence for a court or an officer, including the collection of evidence to be used in a criminal prosecution. Under the principle of avoiding surplusage, clauses (i)-(iii) must mean something different. They cannot be limited to the collection of evidence for a formal proceeding. Instead, those provisions by their terms are directed to the subject of the investigation—if a person is to offer investigative services for money, it must be licensed if the investigation is to fall within one of the three categories set forth in clauses (i)- (iii).

The Court also rejects Strategic's argument that for an investigation to be of "crimes or civil wrongs" the investigator must be retained to investigate "some specific prosecutable criminal act, rather than generally wrong or detestable behavior involving no particular victim." Strategic's Proposed Findings of Fact & Conclusions of Law at 38 ¶ 3. That interpretation makes no sense and would exclude from the statute much activity that is commonly understood to be private or public investigative activity. It is not an infrequent occurrence that an investigator who sets out on an investigation does not know where it will lead. He or she may start off with a suspicion that the subject may have engaged in one form of conduct that may implicate any number of different laws (none of which is specified in advance) only to come

49

across conduct that may violate another law. There is no reason to think that the Virginia legislature intended to protect the client who starts with a suspicion of specific criminal activity engaged in by the subject and directs the investigator to follow the evidence but deny protection to the putative client who merely starts out with the suspicion that the subject is generally a criminal and asks the investigator to use its know-how to confirm the suspicion. Strategic does not argue that an investigation that starts out with a broad net would fall outside of the protections of the Virginia statute. But that is the implication of its argument. An investigator could opt out of the statute and deprive the client of its protections by the mere expedient of securing an engagement to investigate all crimes, rather than a specific crime.

Strategic's argument that an investigation must concern a "particular victim" is no more persuasive. The number of criminal statutes, both federal and state, that address "victimless" crimes is legion.[14] Victimless crimes are generally understood to include crimes of public corruption where the victim is not an identifiable individual but rather the public at large.[15] Strategic has offered no reason why the Virginia legislature would require a license for the investigation of a crime with an identifiable victim but not for the investigation of a victimless crime.

Once the scope of the statute is properly understood, it is evident that Strategic engaged in a private security services business by undertaking to provide private investigators. First, the

---

[14] *See, e.g.*, Uniform Crime Reporting Program's National Incident-Based Reporting System (2019) (reporting "crimes against society" as 15.8% of reported offenses in 2019); Matthew K. Suess, *Punishment in the State of Nature: John Locke and Criminal Punishment in the United States of America*, 7 Wash. U. Juris. Rev. 367, 384, 388 (2015) ("[T]he expansion of criminal codes in the United States has led to the widespread prosecution of victimless crime. . . . In line with the states, the majority of federal prisoners are convicted of victimless crimes.")

[15] *See, e.g.*, Mat Tromme, *Waging War Against Corruption in Developing Countries: How Asset Recovery Can Be Compliant with the Rule of Law*, 29 Duke J. Comp. & Int'l L. 165, 218 (2019) ("[C]orruption is often seen as a victimless crime.").

Agreement itself reflects that Strategic was hired to conduct research and prepare reports for "the purpose of detecting, stopping, and preventing crime or other harm to innocent people." PX1. It thus was engaged to obtain information through investigators on "crimes or civil wrongs." It is no matter that the Agreement required Strategic to conduct research for the purpose of "detecting . . . crimes," *id.*, while the statute defines a private investigator as one "who . . . accepts employment to make [] investigations to obtain *information* on . . . crimes or civil wrongs," Va. Code Ann. § 9.1-138 (emphasis added). The "research" methods Strategic was to deploy are those involved in investigations and the detection of crime is merely the outcome of the enterprise of engaging in the collection of investigation of crime. It also is no matter that Guo (and Eastern) had ulterior purposes for their detection of criminal activity—to bring down the CCP and to bolster Guo's chances for obtaining asylum. Persons do not hire private investigators only for public-minded reasons. They occasionally will do so because a criminal investigation and a criminal conviction will advance their private interests. Strategic also is not exempted from the coverage of the statute because it undertook to investigate the "crimes" of the ten subjects generically as opposed to specific crimes. To the contrary, the evidence at trial established that Guo had a suspicion that the subjects whom he asked to be investigated had engaged in corruption and other public wrongs and tasked Strategic with finding information regarding that corruption and those public wrongs.

The conclusion that Strategic engaged in conduct regulated by the Virginia Private Security Services Statute but without the license required by that statute is reinforced by the nature of the "reports" Strategic undertook to deliver and the methods it would use to prepare those reports. The reports were not limited to the information that could be gleaned from conventional internet searches or reviews of readily available public information such as a

newspaper reporter or a book author might employ. To prepare the financial reports, Strategic was to review confidential and not readily accessible information, such as "statements, capital sources, inflow and outflow information, bank receipts, financial instruments, financial products, statements of credits, precious metals transfers, commodity transfers, crypto currency exchange, stocks and other equities, business ownership, real property ownership, trusts, large amounts of spending, specific information to indicate the transaction participants, and other data required by [Eastern]." PX1 at 1-2. This information is the stuff of private investigatory work, not mere research. To prepare the tracking research, Strategic was to engage in the activities that are engaged in by those who conduct surveillance, including tracking travel, private or commercial, by land, air, or sea, and obtaining geolocation information and videos and audios that can be accessed remotely. *See id.* To conduct the social media research, Strategic was to review such other information accessible to private investigators, such as criminal databases, sex offender and child abuse databases, passports and identification documents, and comments on social media. *See id.*

As Strategic admitted, the work thus included hacking into Chinese government servers, obtaining evidence of forged U.S. documents, obtaining information regarding social security fraud and tax fraud, finding the location of certain offshore companies, and obtaining information regarding CCP members' bank accounts. *See* Trial Tr. at 308, 314-317. All of this work was to be done "based on the best practices and standards of the industry, comparable to other top firms with similar services," i.e., comparable to others engaged in private investigations—the only conceivable industry with which to compare the services offered by Strategic. PX1 at 3.

Thus, Strategic understood that a portion of the services that Guo sought pertained to the investigation of crimes committed by CCP members. Wallop testified that Guo wanted "to uncover corruption relating to members of the CCP . . . [i]ncluding crimes committed by members of the CCP" and "information about funds stolen by the members of the CCP and taken out of China illegally." Trial Tr. at 65. Wallop testified at her deposition that Guo wanted Strategic to "investigate and retrieve" information on the "great deal of corruption within the leadership" of the CCP, such as "funds that would have been taken out of the country illegally, cash payments." *Id.* at 66. Guo also sought to obtain "information about location and disposition and recovery of stolen assets," and the "cause of injuries to persons or property." *Id.* at 40.

The conclusion that Strategic was engaged in the private security services business, as defined by Virginia law, is further supported by the work that Strategic performed after it was engaged. Wallop admitted that she engaged in surveillance on at least one occasion. Waller hired private investigators. Those investigators included Team 1, which engaged in data mining and research, including research into the dark web, and Team 2, or ASOG, which accessed commercially available databases and also contacts within the federal government. *See supra*. Waller testified that he told Guo that he and Wallop could do the type of work he requested. Trial Tr. at 191-92.

Analyzing the definition of "private investigator" by the company it keeps in the statutory definition of private security services business—which includes persons who fill such quasi law enforcement functions as security officers, personal protection specialists, and electronic security employees—those whom Strategic undertook to employ, and did in fact employ, comfortably fit in. In Strategic's own words, it was to deploy "an extremely sensitive

capability that must be handled with extreme care." PX2. Strategic's investigators were
engaged in the types of activities engaged in by law enforcement.

Strategic argues that its work did not constitute private investigation because Eastern
never reported or made an appointment to report any of the results to law enforcement, nor did
Eastern contract with another party to do so such research after the Agreement was terminated.
Aspects of that argument read as if Strategic is trying to benefit from its own failures. Under
Strategic's argument, if a firm is unable to find information on crimes to report to law
enforcement, it means it could not have undertaken to find such information and therefore it does
not need to be licensed. That argument would require licensure only of good private
investigators; those who are unsuccessful would not ever need to be licensed. That result would
be plainly inconsistent with the intent of the Virginia legislature and the terms of the statute.
More importantly, however, the statute's focus is on an unlicensed business's offer to undertake
private security services and not on the actual use by the counterparty of the information that is
provided. If a firm as part of its business undertakes to investigate crimes within the meaning of
the statute and agrees to do so, it is irrelevant whether the party with whom it contracts
ultimately decides to bring the fruits of the investigation to law enforcement or not.

Because Strategic undertook work that fell within the scope of Virginia's Private Security
Services Statute, but failed to secure the requisite license therein, the Agreement is void and
unenforceable. *See Urban Protective Servs. v. Great Latin Restaurants*, 2007 WL 1660374 (Va.
Cir. Ct. Mar. 5, 2007) (noting prior ruling that plaintiff "could not contract to engage in private
security services as it was not licensed as required by the Code and that the contract was illegal
as a matter of law"); *see also Massie*, 3 S.E.2d at 181; *Bacigalupo*, 102 S.E.2d at 324-25.

Strategic argues that the Agreement cannot be void because Strategic did not commit a "willful" violation of the statute. It devoted much time at trial to the evidence that Wallop and Waller did not believe a license was necessary and that they had engaged in investigations in the past without obtaining a license, as if by long usage, Strategic would acquire the right to act without being regulated. It cites to the language in *Massey*, which states that "where a licensing statute is a police regulation, having for its object the protection of the public, making it unlawful for a person to engage in a business without a license, *and imposing a penalty for its violation*, a contract made by an unlicensed person is void and unenforceable." *Massie*, 3 S.E.2d at 181 (emphasis added). It argues that Virginia only penalizes "willful" private security licensing violations under Va. Code Ann. § 9.1-147(B), which are knowing or intentional, *see Correll v. Commonwealth*, 607 S.E.2d 119, 124 (Va. 2005), and that because any licensing mistake was not willful, the Agreement cannot be void. Assuming that Strategic did not knowingly or willfully violate Virginia law, it still is not entitled to retain Eastern's deposit.

Sections 9.1-147–150 provide for penalties in connection with violations of the statute. Strategic focuses on Section 9.1-147(A), which reads, "It shall be unlawful for any person to: 1. Practice any trade or progression licensed, certified or registered under this article without obtaining the necessary license, certification or registration required by statute or regulation . . . 4. Violate any statute or regulation governing the practice of the private security services businesses or training schools regulated by this article." Va. Code Ann. § 9.1-147(A). "Any person who is convicted of willful violation of [this subsection] shall be guilty of a Class 1 misdemeanor." *Id.* § 9.1-147(B).

But the other sections on penalties—one of which applies here—do not require willful violations. Section 9.1-148 provides that any person convicted of a violation of its provisions,

without reference to willful violation, shall be guilty of a Class 2 misdemeanor. *Id.* § 9.1-148. Section 9.1-149 provides that any person convicted of a violation of its provisions, without reference to willful violation, shall be guilty of a Class 1 misdemeanor. *Id.* § 9.1-149.

Relevant here also is Section 9.1-150, which provides: "Any person required to be licensed, certified or registered by the Board pursuant to this article who violates any statute or Board regulation who is not criminally prosecuted is subject to the monetary penalty provided in this section." *Id.* § 9.1-150. In other words, if Strategic violated Section 9.1-139(A) by engaging in the private security services business without the requisite license from the Department of Criminal Justice Services in Virginia, but did so in a non-willful way, it could be subject to monetary penalty under Section 9.1-150. If the violation was willful, Strategic could be subject to criminal penalties under Section 9.1-147(A). *Massie*'s holding does not require a willful violation; the court requires only that the statute impose a penalty for "a violation." *Massie*, 3 S.E.2d at 181. It thus does not require that a willful violation be imposed to render a contract by an unlicensed person void and unenforceable, only that there is some type of penalty. *See id.*

The Court need not address Strategic's alternative argument that if the Agreement fell within clause (iv), it also falls within the exemption to clause (iv) under Va. Code Ann. § 9.1-140(29), which exempts any individual engaged in "computer or digital forensic services . . ., the acquisition, review, or analysis of digital or computer-based information, in order to obtain or furnish information for evidentiary purposes or to provide expert testimony before a court." Va. Code Ann. § 9.1-140(29). The Court does not rest its conclusion on a finding that the Agreement sought to obtain information on "evidence to be used before any court, board, officer, or investigative committee" under clause (iv), but rather on a finding that Strategic undertook to provide persons to conduct an investigation to obtain information on "crimes" under clause (i).

The Court also rejects Strategic's in pari delicto defense.[16] Strategic argues that even if the Agreement were void as against public policy, Virginia courts will not afford equitable relief where the "objects sought to be achieved" by the plaintiff were also illegal. *Am.-LaFrance & Foamite Indus. v. Arlington Cty.*, 192 S.E. 758, 761 (Va. 1937). It argues that the object of the Agreement was illegal because Eastern intended to share the results of Strategic's investigation with third parties, including ACA and Golden Spring, in exchange for value.

The in pari delicto doctrine provides that where a "the contract is illegal, as involving an immoral purpose, or one for which a punishment is provided, and both parties have knowingly joined therein, they are held to be in pari delicto, and the court will not render aid to relieve either party of the consequences of their acts, but will leave them where it finds them. If the contract is, however, merely invalid, or is based upon a transaction involving no moral turpitude, and is simply contrary to some legal provision relating to the manner, method, or terms of its performance, with no penalty provided other than its invalidity, the court will not require performance of either the express contract or a contract by implication." *Id.* "The doctrine of in pari delicto, like the related doctrine of unclean hands, 'prohibits a party from recovering damages arising from misconduct for which the party bears responsibility, bears fault, or which resulted from [ ] [its] wrongdoing." *Concord Crossroads, LLC v. Human Cap. Res. and Concepts, Inc.*, 2020 WL 9367543, at *11 (E.D. Va. Sept. 2, 2020) (quoting *Ashmore for Wilson v. Dodds*, 262 F. Supp. 3d 341, 353 (D.S.C. 2017)). It is "based on the principle that a party who consents to and participates in an illegal act may not recover from other participants for the consequences of that act." *Lee v. Nationwide Mut. Ins. Co.*, 497 S.E.2d 328, 329 (Va. 1998); *see also Stith v. Thorne*, 488 F. Supp. 2d 534, 541 n. 6 (E.D. Va. 2007) ("The doctrine of in pari

---

[16] Strategic also failed to plead this affirmative defense in its Answer. *See* Dkt. No. 127.

delicto stands for the principle that 'a plaintiff who has participated in the wrongdoing may not recover the damages resulting from the wrongdoing.'") (quoting Black's Law Dictionary 806 (8th ed. 2004)); *see also In re Bogdan*, 414 F.3d 507, 514 (4th Cir. 2005)).

Virginia's Private Security Services Statute does not penalize a party receiving the research from a private security services firm for sharing that research for free with a third party. There is no evidence that Eastern intended to resell the information or that it had contracted to do so. The Court has found that the contribution by ACA was a gift and not part of a sale. The only prohibition on sharing the research comes from the Agreement which contains a confidentiality provision. *See* PX1 ("Both parties agree that the nature of this contract, and work related to it, is highly confidential."). But even if Eastern had shared the information with ACA or others, that action would result in a breach of the Agreement and would not be illegal in and of itself. In short, the wrong here is Strategic offering and agreeing to provide services to Eastern it was not licensed to provide. It was not Eastern's acceptance of those services.

Finally, the Court rejects Strategic's belated argument that the Virginia Private Security Statute is unconstitutionally overbroad and vague. The argument is waived.[17] It also is without merit. A statute is overbroad if it prohibits or chills a substantial amount of protected speech. "The substantiality of the overbreadth is determined examining the amount of protected speech affected in relation to the amount of unprotected speech legitimately regulated by the statute." *Nitke v. Ashcroft*, 253 F. Supp. 2d 587, 606 (S.D.N.Y. 2003). A statute is vague if it "fails to

---

[17] Strategic first made this argument in its post-trial brief, which was also not an issue on which the Court had asked for post-trial briefing. *See Grand Light & Supply Co. v. Honeywell, Inc.*, 771 F.2d 672, 679-80 (2d Cir. 1985) (district court erred in considering claim raised for first time in a post-trial brief); *U.S. Bank Nat'l Ass'n as trustee for Registered Holders of CD 2005-CD1 Com. Mortg. Tr., Com. Mortg. Pass-Through Certificates v. 2150 Joshua's Path, LLC*, 2020 WL 5417085, at *10 (E.D.N.Y. July 2, 2020) ("Plaintiff's remaining arguments—raised for the first time in its post-trial briefs—will not be considered at this juncture.").

'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.'" *Id.* at 608 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).

Strategic argues that the statute is overbroad and vague because it would regulate other types of research, without giving notice to the parties conducting the research, including "political candidates conducting research on opponents, business consultants hired to evaluate competitors, and authors or journalists gathering data for books and reports." Dkt. No. 360 at 9. It cites to *Gurley v. Mo. Bd. of Priv. Investigator Exam's*, 361 S.W.3d 406, 411 (Mo. 2012) in which a plaintiff challenged a private investigator licensing statute as overbroad because it reached further than professional private investigators by requiring, as plaintiff argued, "ordinary citizens to obtain licensure before engaging in all manner of protected First Amendment activity." *Id.* Specifically, the statute made it unlawful for "any person to engage in the private investigator business in [Missouri] unless such person is licensed as a private investigator" where "private investigator business" was defined as:

> [T]he furnishing of, making of, or agreeing to make, any investigation for the purpose of obtaining information pertaining to:
>  (a) Crimes or wrongs done or threatened against the United States or any state or territory of the United States;
> (b) The identity, habits, conduct, business, occupation, honesty, integrity, credibility, knowledge, trustworthiness, efficiency, loyalty, activity, movement, whereabouts, affiliations, associations, transactions, acts, reputation, or character of any person;
> (c) The location, disposition, or recovery of lost or stolen property;
> (d) Securing evidence to be used before any court, board, officer, or investigating committee;
> (e) Sale of personal identification to the public; or
> (f) The cause of responsibility for libel, losses, accident, or damage or injury to persons or property or protection of life or property.

*Id.* at 412. Plaintiff argued that this statute swept in numerous First Amendment-protected activities, pointing specifically to subdivision (9)(b), which could include persons who use a social networking website "to locate a former classmate or to search for a potential romantic partner." *Id.*

Noting that the "primary rule of statutory interpretation is to ascertain the intent of the
legislature from the language used, to give effect to that intent if possible, and to consider the
words in their plain and ordinary meaning," the court determined that the term "business" in the
definition of "private investigator business" limited the scope of private investigator-related
activities listed in the definition and indicated that the statute included within its sweep "only
investigations conducted by commercial entities." *Id.* at 413 (quoting *S. Metro. Fire Prot. Dist.
v. City of Lee's Summit*, 278 S.W.3d 659, 666 (Mo. 2009)). The court thus held that the statute
was not unconstitutionally overbroad because it regulated the activities listed in the statute "only
when done as part of a commercial enterprise carried on for profit or as part of a particular
occupation habitually engaged in for livelihood or gain" and that " none of the hypothetical
unconstitutional applications suggested by [plaintiff] are authorized by the statute when it is so
construed." *Id.*

Here too, Virginia's Private Security Services Statute refers to a "private security services
business," defining it as "any person engaged in the business of providing, or who undertakes to
provide . . . private investigators." Va. Code Ann. § 9.1-138. A private investigator is also
defined only in connection with a commercial enterprise. *See id.* (defining a "private
investigator" as "any individual who engages in the business of, or accepts employment to make,
investigations to obtain information"). Thus, the statute does not cover ordinary citizens doing
social media research. Nor, as the Court held above, does the statute address persons who act as
volunteers or do work for themselves, thus alleviating Strategic's concern that the statute would
require the license of investigations by "authors or journalists gathering data for books and
reports" or by political candidates conducting their own research on opponents. Dkt. No. 360 at
9. The statute also clearly does not cover a business consultant who is hired to evaluate a

competitor's business—Strategic's third hypothetical in its parade of horribles—but who is not in the business of investigating the specific information listed under the statute, or if that consultant was not engaged "to obtain information on (i) crimes or civil wrongs; (ii) the location, disposition, or recovery of stolen property; (iii) the cause of accidents, fires, damages, or injuries to persons or to property; or (iv) evidence to be used before any court, board, officer, or investigative committee." Va. Code Ann. § 9.1-138. If such information arose during the course of the consultant's work, that research would be "incidental" to the consultant's other work, as the statute's focus is on an unlicensed business's offer to undertake private security services and not on the counterparty's actual use of the information that is provided. *See supra.* Indeed, construing the reference to private investigator by the company it keeps in the Virginia Private Security Services Statute, and considering the activities Strategic performed and agreed to perform, what is distinctive about those activities and what qualifies them for regulation is that they constitute conduct, and in particular, conduct that is conventionally engaged in by law enforcement but which Strategic here sold privately for commercial gain.

Strategic's remaining cited cases are either inapposite or do not support its argument. *See Gray v. Dep't of Pub. Safety*, 248 A.3d 212, 217, 223 (Me. 2021) (rejecting challenge to professional investigator licensing requirement that applicants must have "demonstrated good moral character" because it did not prohibit or constrain speech and because denial of plaintiff's application based on his presentation of false information as fact was "narrowly tailored to serve the significant governmental interest in maintaining standards for licensing professional investigators, who are responsible for researching and reporting on some of the most consequential details of people's lives"); *Castillo v. Ingram*, 2015 WL 3559104, at *1 (D. Nev. June 5, 2015) (not reaching question of whether Nevada statute requiring individuals who work

as private investigators in Nevada be licensed by the state violated the Free Speech Clause because plaintiff lacked injury-in-fact); *K-Mart Corp. v. St. Louis Cty.*, 672 S.W.2d 127, 132-33 (Mo. Ct. App. 1984) (ordinance requiring private investigators to first obtain a private watchman's license from the superintendent of police was not overbroad or vague because the state has power to regulate police power and because the "ordinance conveys a sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices").

### 2. Relief

Because the Agreement is void, Eastern is entitled to restitution in the amount of $1 million.

A restitution measure of damages "aims to restore the nonbreaching party to as good a position as the one she occupied before the contract was made, without attempting to compensate her for consequential harms." *360Networks Corp. v. Geltzer (In re Asia Glob. Crossing, Ltd.)*, 404 B.R. 335, 341 (S.D.N.Y. 2009); *Daniel v. Wells Fargo Bank, N.A.*, 2013 WL 5723704, at *8 (E.D. Va. Oct. 17, 2013).

Virginia and New York follow the Restatement (Third) of Restitution and Unjust Enrichment to determine whether a party may recover the value of performance rendered in connection with an illegal and consequently void contract. *See, e.g.*, *T. Musgrove Constr. Co., Inc. v. Young*, 840 S.E.2d 337, 342 (Va. 2020); *Mazzei v. Money Store*, 308 F.R.D. 92, 106 (S.D.N.Y. 2015), *aff'd*, 829 F.3d 260 (2d Cir. 2016).

Under Section 32 of the Restatement (Third) of Restitution and Unjust Enrichment:

A person who renders performance under an agreement that is illegal or otherwise unenforceable for reasons of public policy may obtain restitution from the recipient in accordance with the following rules:

(1) Restitution will be allowed, whether or not necessary to prevent unjust enrichment, if restitution is required by the policy of the underlying prohibition.

(2) Restitution will also be allowed, as necessary to prevent unjust enrichment, if the allowance of restitution will not defeat or frustrate the policy of the underlying prohibition. There is no unjust enrichment if the claimant receives the counterperformance specified by the parties' unenforceable agreement.

(3) Restitution will be denied, notwithstanding the enrichment of the defendant at the claimant's expense, if a claim under subsection (2) is foreclosed by the claimant's inequitable conduct (§ 63).

Restatement (Third) of Restitution and Unjust Enrichment § 32.

Where Section 32(1) applies, the Court need not engage in a traditional unjust enrichment analysis. *Id.* cmt. C. Instead, under Section 32(1), the party that performed under an agreement that is void as against public policy is entitled to recover the value of that performance, without considering whether that party derived any benefit thereunder, where the demands of policy so require. *Id.* § 32(1), Illustration 21. For example, where a client pays for services to a contractor that is not licensed to provide those services, Section 32(1) requires the contractor to return the payments made by the client irrespective of whether it conferred some type of benefit upon the Client. *Id.* Illustration 21 states:

21. A pays B $2000 in advance for a series of medical treatments. After two visits to B's office, A learns that B is not licensed to practice medicine. A repudiates the agreement and asks for his money back. A is entitled to recover $2000 from B by the rule of § 32(1). It is irrelevant to A's recovery that he may have derived benefit from B's services.

*Id.*; *see also* Illustration 4; Illustration 18.

Restitution damages can include, for example, the return of a deposit paid under a contract that the defendant has failed to perform. *See In re Asia Glob. Crossing, Ltd.*, 404 B.R. at 342 (stating that restitution damages are particularly appropriate when used to recover a deposit or down payment paid pursuant to a contract that was not performed by the other party);

*Gulati v. Coyne Int'l Enters. Corp.*, 805 F. Supp. 365, 371 (E.D. Va. 1992) (similar); *Busman v. Beeren & Barry Invs., LLC*, 69 Va. Cir. 375, 379 (Va. Cir. Ct. 2005) (similar).

Here, pursuant to Section 32(1) of the Restatement (Third) of Restitution and Unjust Enrichment and consistent with Illustration 21, Eastern is entitled to recover the $1 million deposit it paid to Strategic, and it is irrelevant whether it derived any benefit from Strategic's attempt to perform under the Agreement.

The Agreement authorized Eastern to "direct other entities to pay [Strategic], and that such payments will be deemed satisfactory compensation." PX1 at 5. The $1 million deposit was paid by ACA. As the payor of the $1 million deposit, it may be that ACA has a claim to that restitution amount as against Eastern. However, the fact that ACA was the immediate payor of the monies due from Eastern does not relieve Strategic of its liability to Eastern in this matter. Nor does it permit Strategic to retain the sums. It is sufficient that the payment of the $1 million relieves Strategic of any liability in restitution to either Eastern or ACA. *See* Restatement (Third) of Restitution and Unjust Enrichment § 48 ("If a third person makes a payment to the defendant to which (as between claimant and defendant) the claimant has a better legal or equitable right, the claimant is entitled to restitution from the defendant as necessary to prevent unjust enrichment."); *see also id.* § 64 cmt. c & Illustration 3.

## B.   Remaining Claims

The Court's ruling that the Agreement is void and that Strategic is not entitled to retain the $1 million deposit but must return it to Eastern disposes of this case. The Court nonetheless addresses the parties' remaining claims in the alternative. The Court concludes that even if the Agreement were not in violation of the Virginia Private Security Services Statute, Eastern would be entitled to the return of $250,000 of its deposit.

### 1. Breach of Contract

Strategic and Eastern each claim that the other materially breached the Agreement. Eastern claims that Strategic breached by failing to provide the weekly reports and monthly reports and thus that it is entitled to return of its deposit on that basis alone. Strategic disputes that it materially breached the agreement and argues that it was Eastern who breached the Agreement by failing to pay the monthly fee as due on February 16, 2019.

The elements of a breach of contract claim under Virginia law are: (1) the existence of a contract; (2) performance or offers by the plaintiff to perform under the contract; (3) the defendant's failure to perform under the contract or breach of the agreement; and (4) actual damage to the plaintiff caused by the breach." *Car Pool LLC v. Hoke*, 2012 WL 4854652, at *3 (E.D. Va. Oct. 11, 2012) (citing *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)); *see also Dodge v. CDW Gov't, Inc.*, 2009 WL 1605010, at *3 (E.D. Va. June 5, 2009) (stating same). Similarly, under New York law, the elements of a breach of contract claim include: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 188-89 (S.D.N.Y. 2011) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)); *see also Tessler v. NBC Universal, Inc.*, 2009 WL 866834, at *6 (E.D. Va. Mar. 31, 2009), *aff'd sub nom. Tessler v. Nat'l Broad. Co.*, 364 F. App'x 5 (4th Cir. 2010) ("[B]oth New York and Virginia law essentially require the same elements for a legally enforceable contract.").[18]

---

[18] Strategic cites to New York law for the breach of contract claim, while Eastern cites to both New York and Virginia law. "Federal courts sitting in diversity apply state substantive law." *Ellington Credit Fund*, 837 F. Supp. 2d at 179-80 (citing *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996)). The Court has included references to both New York and Virginia law but "[w]here both parties rely upon New York law in their briefs, the Court may assume the parties impliedly consent to the application of New York law." *Fort Prods., Inc v. Men's Med.*

### a. The Parties' Claims

Eastern alleges that Strategic breached by failing to provide quality information in the form of the weekly reports by the Agreement's deadlines and that it is entitled to restitution damages in the amount of the $1 million deposit because Strategic conferred no benefit. It argues that Strategic was in material breach no later than January 30, 2018 after it failed to timely deliver the first weekly report on January 23 and when it delivered the USB drives with the "useless" information on January 26 and January 30. Strategic does not deny that it did not provide the report, but rather defends that Eastern substantially hindered its performance and therefore Strategic cannot held it in breach, i.e., it argues frustration of purpose and lack of good faith and fair dealing. It also argues that to the extent it breached the Agreement, the breaches were not material. In addition, Strategic argues, Wang and L. Han instructed Strategic to keep working and thus Eastern lost its right to terminate the contract based on the alleged breaches.

Strategic's counterclaim alleges that Eastern first breached the Agreement by failing to pay the $750,000 monthly payment due on February 16, 2018.[19] It argues Eastern breached the Agreement again when it delivered a termination letter without 30 days' notice. Eastern responds that Strategic's performance was to precede Eastern's payment of the $750,000 and because there was no performance, it did not breach in its failure to pay. In addition, Eastern argues that because $1 million was to be credited to work performed on a prorated basis to the final 1 1/3 months of the Agreement, PX1, it did not fail to pay Strategic the $750,000 because Strategic had the $1 million in its account that it could prorate. If both parties breached, Eastern

---

*Clinic, LLC*, 2016 WL 797577, at *1 n.1 (S.D.N.Y. Feb. 23, 2016) (citing *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such implied consent . . . is sufficient to establish choice of law.") (internal quotation marks and citations omitted)).

[19] The Court rejects Strategic's argument that Eastern breached the contract by having ACA pay the $1 million deposit. *See supra*.

argues it would still get its $1 million deposit less any substantiated benefit conferred by
Strategic, which it claims was zero or at most, $338,709.68 for the 14 days of work performed by
Strategic prior to its breach.

The Court concludes that Strategic did not materially breach the Agreement by delivering
the "useless" USB drives or failing to deliver the weekly reports, but that it did breach by failing
to deliver the first monthly report on February 16, 2018 in accordance with the Agreement.
Eastern also breached by failing to pay the $750,000 monthly fee on February 16, 2018. There is
thus a simultaneous breach. As a result, Eastern was within its rights in terminating the
Agreement shortly after February 16 and Strategic is not entitled to performance or damages
from Eastern. Eastern also is not entitled to performance or damages from Strategic.

### b.    Eastern's Claim

Eastern argues that Strategic breached the Agreement by failing to deliver the progress
report on the financial forensic research each week in the first month of the Agreement, weekly
current tracking reports each week during that first month, and social media research each week
during the first month. The parties agree Strategic never delivered any financial forensic
historical research, current tracking research, or social media research called for under the
Agreement. JSOAF ¶¶ 54-56. The two USB drives that Strategic delivered were useless: the
first contained only the researchers' own work to familiarize themselves with the subjects based
on open source information while the second was unreadable raw material delivered from a
subcontractor who refused to provide the actual information. Strategic also never provided any
monthly reports. Eastern argues that Strategic breached the Agreement. Strategic claims that
any breaches were immaterial or were caused by Eastern who frustrated its performance.

The Court begins, as always, with the Agreement. *See, e.g.*, *Kelly v. Ammado Internet
Servs., Ltd.*, 2012 WL 4829341, at *3 (E.D. Va. Oct. 10, 2012) ("To interpret a contract's terms,

Virginia courts 'consider the words of [the] contract within the four corners of the instrument itself.'") (quoting *Mathews v. PHH Mortg. Corp.*, 724 S.E.2d 196, 201 (Va. 2012)). The Agreement is not a model of clarity. Each side presents powerful arguments. The Court concludes that the failure to deliver the weekly reports or research during the first month was not a material breach.

"A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Horton v. Horton*, 487 S.E.2d 200, 204 (Va. 1997); *see VFS Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp. 3d 372, 379-80 (S.D.N.Y. 2014) ("A breach is material if it "go[es] to the root of the agreement between the parties [and] is so substantial that it defeats the object of the parties in making the contract.").

In some senses, the Agreement here is akin to an installment contract. Strategic was to conduct research on three topic areas with respect to ten individuals designated by Eastern and to deliver the fruits of that research in the form of periodic reports: (i) weekly and then a preliminary report in the first month for financial forensic historical research, (ii) weekly and then monthly in the case of current tracking research, and (iii) weekly and then monthly for social media research. "[T]he most effective way" for Eastern to have made clear that the failure to deliver each of the specified reports each week during the first month would have been to say that time was of the essence in the Agreement. *ADC Orange, Inc. v. Coyote Acres, Inc.*, 857 N.E.2d 513, 516 (N.Y. 2006). For example, where a party has failed to make payment in a contract for the purchase of real estate, "whether [a] [party]'s late installment payment constitutes a material breach depends on whether time [i]s of the essence with respect to that payment." *Id.* (contract for purchase of real property). Whatever its expressed desires in the

Agreement or during contract negotiation, Eastern here did not insist on a provision that time would be of the essence.  It thus cannot avail itself of that doctrine.

The absence of an explicit "time is of the essence" provision is not dispositive, however, of Eastern's claim.  It just requires the exercise of judicial interpretation.  Although "[t]ime is generally of the essence where a definite time of performance is specified in a contract," that is not so where "circumstances indicate a contrary intent."  *Burgess Steel Prod. Corp. v. Mod. Telecomms., Inc.*, 613 N.Y.S.2d 158, 159 (1st Dep't 1994).  "The mere designation of a date upon which a thing is to be performed does not alone bring about [the] result [that time is of the essence]."  *Ring 57 Corp. v. Litt,* 280 N.Y.S.2d 330, 332 (2d Dep't 1967).  "What constitutes a reasonable time for performance depends upon the facts and circumstances of the particular case."  *Zev v. Merman*, 533 N.E.2d 669, 669 (N.Y. 1988).  Indeed, courts have held that "[i]n the absence of a provision that time was of the essence, the plaintiff was required to communicate unequivocal notice that tardy payments would not be accepted."  *Cmty. Nat. Bank & Tr. Co. of N.Y. v. Joseph*, 504 N.Y.S.2d 185, 185 (2d Dep't 1986).

Reviewing the Agreement as a whole, the Court concludes that the requirement that Eastern deliver reports on all three subjects for the 15 fish in each week of the first month was not a material term of the Agreement and that the failure to deliver those weekly reports did not defeat an essential purpose of the Agreement.  The Court starts with the fact that the Agreement was intended to create a long-term relationship between the parties.  Eastern retained Strategic to conduct research over a three-year period terminable only on 30 days' notice.  Although the Agreement gave Eastern the right to "remove certain fish from time to time," it was not necessarily the case that Eastern would choose to do so or that Strategic would find "circumstances do not permit sufficient work to research a given fish."  PX1 at 3.  The

69

Agreement contemplated that Strategic might continue its research on a given subject throughout the entire three-year period. *See, e.g.*, *id.* at 2 (noting that, for current tracking research, Eastern could direct more frequent reporting "for up to a six-month period"). In these circumstances, it is impossible to say that the failure to deliver research on one or more or even all of the subjects in the first couple of weeks of the Agreement would frustrate or defeat the purpose of the Agreement as a whole.

That conclusion is reinforced by numerous other provisions of the Agreement. In the first instance, the timing of the weekly reports and the form which they were to take are stated in the Agreement in somewhat vague terms, hardly the unequivocal and definitive language one would expect if time were of the essence for each of the reports. The financial forensic research was to be in the form of "a progress report . . . each week in the first month," with no specific date set for delivery or specific content required. *Id.* The language with respect to the weekly current tracking research and social media research similarly is general: it refers to "research" not reports and provides for that research to be delivered weekly without setting a date certain. *See id.* It stands in contrast to the more definitive language with respect to the monthly reports— a "preliminary report" on financial forensic historical research in the first month, *id.*; "Current Tracking reports for each subject . . . produced monthly," *id.* at 3; and "Social media reports . . . produced monthly," *id.* Indeed, the weekly reports are not even singled out as "Deliverables." *See id.*

Moreover, Eastern did not give Strategic the final list of subjects to research and was not required to do so until the Agreement was signed, one week before the first weekly reports were due. *See id.* at 1. It thus could not have been within the reasonable contemplation of the parties that Strategic have been required to deliver actionable information as to each and every

one of the subjects in the first couple of weeks of the Agreement.  Strategic did not even know for certain who the subjects were and whether they would be able to be researched.  Indeed, the Agreement itself recognized that the "circumstances [might] not permit sufficient work to research a given fish."  *Id.* at 3.

Furthermore, Strategic was not even required to continue the research for five of the original 15 subjects designated by Eastern beyond the first month, and Eastern would not be entitled to reports on those subjects in the ensuing months.  Strategic was required to research 15 subjects in the first month.  It was required to research only ten subjects in each of the following months.  At the time the Agreement commenced, the parties did not know which, if any, of the 15 initial subjects would form the group of ten subjects for the rest of the research.  It is inconceivable that the failure to deliver information in the first couple of weeks for a subject as to whom research might not continue beyond those first couple of weeks would defeat the purpose of the Agreement.

Finally, after Eastern still had not received the fourth weekly report due by February 13, 2018, it did not warn Strategic that it was late on its payments, in breach of the Agreement, or otherwise indicate that "time was of the essence" in the Agreement.  Even if the Agreement could be considered a time of the essence contract, "a party, by acquiescence or failure to pursue rights diligently under a time of the essence provision, eliminates or waives the provision as a term or implied term of the contract."  *Lockheed Martin Transp. Sec. Sols. v. MTA Cap. Constr. Co.*, 2014 WL 12560686, at *22 (S.D.N.Y. Sept. 16, 2014) (collecting cases); *see Atateks Foreign Trade Ltd. v. Priv. Label Sourcing, LLC*, 2009 WL 1803458, at *21 (S.D.N.Y. June 23, 2009), *aff'd*, 402 F. App'x 623 (2d Cir. 2010) ("[I]t is improper for a party who has waived its right to timely performance to attempt suddenly to cancel the contract without first notifying its

71

counterparty that time is of the essence and re-setting the time for performance within a reasonable time by clear, distinct, and unequivocal notice.") (internal quotation marks and citation omitted); *see also Ring 57 Corp.*, 280 N.Y.S.2d at 332 ("[A]cquiescence in [a] series of delays" waives default).

For those reasons, the Court concludes that the failure to deliver the research or the weekly reports for the first month of the Agreement did not constitute a material breach.

The Court reaches a different conclusion with respect to the monthly reports: the preliminary financial forensic research reports due in the first month and the current tracking and social media reports whose production monthly was listed as a deliverable. The failure to produce those monthly reports was material. The monthly reports play an important role within the context of the Agreement. It was on the basis of the monthly reports that Eastern was to dictate the work to be done by Strategic. The Agreement provided that it was "understood that [Eastern] may not wish for each of the 10 fish to be the subject of all three reports, and that the number of report work duties per month [would] vary." PX1 at 3. That was particularly so with respect to the first month—the reports for which would dictate which ten of the 15 subjects would become the focus of the future reports. Without those reports, Eastern would have no means by which to determine who Strategic should focus on in the ensuing months. And, without a basis to determine who Strategic should investigate, an essential purpose of the Agreement would be defeated.

The monthly reports for the first month also play an important part in the accounting provision of the Agreement. That provision, it will be recalled, reflected that after the "March reports and payments [were] made, . . . all involved Parties will meet to recap the accounting, prior to moving forward with the next quarter." *Id.* at 4. There might be an increase the number

of "fish" thereafter.  *Id.*  The parties might also decide to renegotiate the terms of their agreement.  It was to be at that March meeting that the parties were to discuss whether they found "the proper information requested on target A and any of the couple of categories under target A," and where "this ma[d]e sense or should [they] stop and move on to a different target with a different parameter, and was this working properly."  Trial Tr. at 274.  It is the only provision for a recap set in the Agreement, and that provision for a recap was an essential provision of the Agreement.  It was the basis for the compromise between Strategic, which wanted a monthly retainer regardless of results, and Eastern, which wanted to pay by result.  But, in order for that accounting mechanism to function properly, it could not be based solely on the results of one month's reporting—even the most recent month.  The parties would need to have some trajectory and to understand whether the results for a particular month reflected an increase in what had been found and might suggest additional work to be done, or instead reflected that after exhaustive work a dead-end had been reached.  Strategic's failure to deliver monthly reports thus frustrated an essential provision of the Agreement.

### c.    Strategic's Counterclaim

Strategic's counterclaim alleges that Eastern first breached the Agreement by failing to pay the $750,000 monthly payment due on February 16, which it argues, was required under the Agreement regardless of the deliverables and which it needed to fund Team 1's research.[20]  It also argues Eastern breached the Agreement again when it delivered a termination letter without 30 days' notice.  As shown below, it does not follow from the fact that Strategic failed to deliver the monthly reports that Eastern was privileged to withhold the $750,000 payment.  Analyzing the facts and the law, the correct result is that Eastern still owes Strategic the $750,000 and its

---

[20] The Court rejects Strategic's argument that Eastern breached the contract by having ACA pay the $1 million deposit.  *See supra.*

breach will be satisfied by allowing Strategic to withhold that sum from the money it is holding as a deposit. At the same time, however, Strategic's breach did entitle Eastern to declare that it would cease performing under the Agreement and not pay the next $750,000 installment.

The Court rejects Eastern's interpretation that it was obligated to pay Strategic only upon the delivery of a report and thus that it had no obligation to pay Strategic the $750,000 in mid-February.

Eastern's argument is based on the section of the Agreement headed "Prices." That section states in pertinent part: "The prices for each deliverable "A," "B," and "C" are $300,000 each per subject per year, for a total of $900,000 per fish per year." PX1 at 3. It further states that the pricing for the first month "will include up to 15 fish for a total of 30 reports and will decrease to 10 fish for a total of 30 reports at the beginning of the second month (February) and for (March) [sic] and for the duration of this contract." *Id.* at 4. It contains a paragraph that states:

> (A) Comprehensive historical reports: $300,000 per report (or report-equivalent) per year.
>
> (B) Tracking reports: $300,000 per report (or report-equivalent) per year.
>
> (C) Social media reports: $300,000 per report (or report-equivalent) per year.

*Id.*

The "Prices" section, however, also states that the "solution [of prices per report] does not provide for predictable budgeting or workloads," "[t]o ensure the maximum workload for predictability of the agreed price, [Strategic] will measure the deliverables as 30 units per year (10 fish x 3 reports [A+B+C] each = 30 jobs/reports at any given time)," and "[t]he pricing for 30 units or deliverables per year remains a constant $9,000,000 per ear, or $750,000 per month for 12 months." *Id.* at 3-4.

The parties disagree as to the import of this language.  Eastern argues that it reflects an agreement by the parties that Eastern would pay $300,000 per report only when the reports were delivered.  Strategic responds that the language sets forth the methodology by which the $750,000 per month and $9,000,000 was derived.  The Court concludes that Strategic has the better of the argument.

First, the Court is obliged to give meaning and effect to all of the provisions of the Agreement and to avoid rendering any provision surplusage or meaningless.  *See Goodman v. Resol. Tr. Corp.*, 7 F.3d 1123, 1127 (4th Cir. 1993) ("Contract terms must be construed to give meaning and effect to every part of the contract, rather than leave a portion of the contract meaningless or reduced to mere surplusage."); *Fifth Third Bank, N.A. v. Int'l Bus. Machs. Corp.*, 2021 WL 508727, at *9 (W.D. Va. Feb. 11, 2021) ("[N]o word or clause in a contract will be treated as meaningless if a reasonable meaning can be given to it, and parties are presumed not to have included needless words in the contract.") (quoting *TM Delmarva Power, L.L.C. v. NCP of Va., L.L.C.*, 557 S.E.2d 199, 200 (Va. 2002)); *Berry v. Klinger*, 300 S.E.2d 792, 796 (Va. 1983) ("The court must give effect to all of the language of a contract if its parts can be read together without conflict.").  The Agreement states, in several places, that Eastern is obligated to pay Strategic a monthly fee of $750,000 for Strategic's agreement to the terms of the contract.  That language is unambiguous:  "Payment is to be made in regular monthly installments of US$750,000, at the end of each month."  PX1 at 5.

Second, Strategic's interpretation is the best way to construe the Agreement as a whole to satisfy the purposes of the parties.  *See First Am. Bank of Va. v. J.S.C. Concrete Const., Inc.*, 523 S.E.2d 496, 501 (Va. 2000) ("[T]he court will not treat any word or clause as meaningless if any reasonable interpretation consistent with the other portions of the contract can be ascribed to

it."). As Strategic points out, the Agreement contemplated that there would be circumstances where it would not deliver, or be able to deliver, three reports a month. With respect to financial forensic reports, Strategic's obligation was only to produce "update reports" on a monthly basis after the three-month marker. Most importantly, as Strategic highlights, Eastern had the unfettered discretion to substitute subjects over the term of the Agreement: if it deemed it necessary to remove one subject, it had the right to designate an additional subject to be investigated and thus "the number of report work duties per month will vary." PX1 at 3. The substitution of one subject for another would result in delay in reporting and increased costs for Strategic. But Strategic was willing to accept those increased costs and the discretion that the Agreement gave Eastern over the timing of reports because Eastern would pay a flat monthly fee in exchange for Strategic's agreement to provide the agreed number of reports or report equivalents over the course of the year.

Third, reflecting the fact that Strategic's obligation was measured on an annual and not a monthly basis, the very language to which Eastern points reflects the price per deliverable "per year." There is no price per deliverable per month. Thus, Eastern's own reading of the Agreement, applied literally, would lead to a result that not even Eastern urges—that (notwithstanding the language regarding $750,000 per month), Eastern's only obligation was to pay "$900,000 per fish per year." *Id.*

Contrary to Eastern's argument, Strategic's interpretation does give effect and meaning to each provision of the Agreement. Given the flexibility the Agreement accorded Eastern to request the reports and to the timing of their delivery, as well as with respect to the subjects to be investigated, there was a need to set forth a methodology showing the correspondence between reports owed and money to be paid. In the absence of such a provision, there would be no ready

method to determine whether Eastern received all the reports it was owed in a circumstance where, for example, it had substituted subjects and mixed and matched reports. The language to which Eastern points provided such a method. Eastern's failure to pay $750,000 by its due date was a material breach of the Agreement. *See, e.g.*, *Tandberg, Inc. v. Advanced Media Design, Inc.*, 2009 WL 4067717, at *4 (E.D. Va. Nov. 23, 2009) ("[It] is well-settled that failure to make timely payment constitutes a material breach.") (collecting cases).

Finally, Eastern's argument that Strategic was to deliver quality reports in the first weeks and that if it did not do so, Eastern would have the right both to declare a material breach and to obtain the return of its deposit is, in essence if not in form, an attempt to achieve through contrived contract interpretation the very right to make payment contingent on the delivery of reports and to deprive Strategic of the value of the deposit that it attempted but failed to achieve through contract negotiation. During contract negotiation, Eastern argued that the payments should be due based on deliverables and that if the reports were not of the quality Eastern expected, it would be able to obtain the return of its deposit. Strategic objected to those requests and insisted that it needed the security of a regular monthly payment, a $1 million evergreen deposit, and one-month notice before the contract could be terminated. Those provisions were needed before Strategic embarked on the venture and made the investments necessary to establish a research network, without knowing in advance whether it would be able to successfully research any or all of the subjects. The Agreement permitted Eastern to terminate at any time and for any reason, but that termination would not be effective for one month—ensuring that Strategic would be able to recoup through the deposit the investment it made to begin the research. Eastern's argument would essentially reverse those provisions and frustrate the expressed intent of the parties at the time of contracting. If accepted, it would permit Eastern

to condition payment on the quality of the reports and to recoup its deposit, notwithstanding the 30-day notice provision.

Strategic brings a second, separate claim based on Eastern's failure to provide the proper termination notice under the Agreement, which provides that "[e]ither party may terminate the contract with 30 days' written notice." PX1. Eastern submitted a letter on February 23, 2018 stating that it was terminating the contract and made no payments thereafter. The Agreement indicates that termination would be effective only 30 days after notice of termination. However, when a party materially breaches a contract, the other party is relieved of its future obligations. *See New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 117 (2d Cir. 2006) ("When a party has breached a contract, that breach may excuse the nonbreaching party from further performance if the breach is 'material.'"). Given Strategic's material breach, Eastern was permitted to terminate the Agreement without giving 30 days' notice, and this basis for the counterclaim thus fails.

### d.    Relief

The evidence establishes that Strategic and Eastern both materially breached the Agreement and did so at the same time. Strategic breached by failing to deliver the monthly report on February 16, 2018. Eastern breached when it failed to pay the $750,000 installment on February 16, 2018.

It is black letter law that, upon a material breach of contract, the non-breaching party may elect to cease performance and seek damages. *See, e.g.*, *Lovink v. Guilford Mills, Inc.*, 878 F.2d 584, 586 (2d Cir. 1989) ("A total breach justifies termination of the contract and damages for complete failure of performance."); *The Est. of Mantle v. Rothgeb*, 2007 WL 4548127, at *10 (S.D.N.Y. Nov. 6, 2007) ("If plaintiff did materially breach the Agreement, defendants would have been entitled to terminate the contract and sue for damages."). Absent circumstances not

78

applicable here, a party who fails to perform cannot itself seek damages. *See Optima Media Grp. Ltd. v. Bloomberg L.P.*, 2021 WL 1941878, at *8 (S.D.N.Y. May 14, 2021) ("In order to recover for breach of contract, a party must first show it substantially performed under that contract"); *Car Pool*, 2012 WL 4854652, at *3 (requiring plaintiff's adequate performance of the contract to state a claim). It follows that, upon Strategic's failure to deliver the monthly reports, Eastern had the right to send the termination notice and direct Strategic not to perform any further activities for Eastern. Eastern is not liable for any portion of the $750,000 payment that would have been due in mid-March for services performed from mid-February on, after Eastern validly terminated the Agreement. It also follows that upon Eastern's failure to pay the $750,000 in consideration of the retention of Strategic from mid-January to mid-February, Strategic was no longer required to engage in investigative services for Eastern. Eastern's beach gave it the right at that time to immediately elect to stop working for Eastern and not to incur any additional expenses on its behalf.

It does not follow that either of Eastern or Strategic is entitled to contract damages. Eastern has not identified any damages it suffered by failing to receive the first monthly reports. In addition, by failing to tender payment and materially breaching the Agreement, Eastern is not entitled to damages. At the same time, Strategic too is not entitled to recover damages for Eastern's breach of contract. Had Strategic performed and delivered the monthly reports (regardless of their quality), it would have been entitled to damages for Eastern's premature termination of the Agreement in the amount of at least $750,000—representing the payment it would have been owed for the 30-day period it was entitled to payment after Eastern served a notice of termination (and which was due on February 16). But it did not perform on February 16, and thus it cannot complain that it did not receive the $750,000.

Where "each party breached an obligation due and owing under the contract . . . neither party is entitled to damages from the other." *Buffardi v. Parillo*, 563 N.Y.S.2d 948, 950 (3d Dep't 1990) (finding "no merit in each party's claim that he was relieved from the obligation to perform by the other party's failure to perform" because "[n]either party engaged in the type of conduct that frustrated or prevented the other party from performing, and since both conditions were to be fulfilled in a reasonable time, neither party was justified in waiting for the other party to perform first") (internal citation omitted).

A different conclusion follows with respect to whether Eastern is entitled to recover the full $1 million deposit it paid Strategic at the beginning of the Agreement. It is not entitled to do so on a breach of contract theory. Eastern does not dispute that the parties had agreed that the $1 million deposit could be credited by Strategic against the final 1 and 1/3 months of the Agreement. *See* PX1 at 5. As described above, that agreement was critical to Strategic's agreement to perform investigative services—had Eastern not agreed to provide an advance against its obligations and had it not further agreed that Strategic could retain that sum for as long as the Agreement was in effect, up to a maximum of 1 and 1/3 months, Strategic would not have invested in the infrastructure necessary to carry out the Agreement. The Agreement here was in effect for one month, from January 16, 2018 to February 16, 2018. It follows that, had Strategic not violated the Virginia Private Security Services Statute, Strategic would have been entitled to retain that portion of the $1 million that it earned while the Agreement was in effect, or $750,000. That amount and Strategic's right to retain it are not contingent upon Strategic's

*delivery* of reports—that is the precise contractual provision Eastern demanded but was not able to obtain during contract negotiations. [21]

Eastern is entitled to restitution in the amount of $250,000 on a breach of contract theory. That represents the $1 million deposit Eastern paid less the $750,000 amount that Strategic is owed and entitled to keep under the Agreement. "[I]f a party justifiably refuses to perform on the ground that his remaining duties of performance have been discharged by the other party's breach, the party in breach is entitled to restitution for any benefit that he has conferred by way of part performance or reliance in excess of the loss that he has caused by his own breach." Restatement (Second) of Contracts § 374 (1981); *see also New Windsor*, 442 F.3d at 118 ("[A] plaintiff whose breach was not willful and deliberate may, in some instances, recover so much as his efforts have actually benefited the non-breaching party."). Even if Eastern breached the Agreement by failing to pay the $750,000 due on February 16, it is still entitled to restitution for the benefit it conferred on Strategic, which is equal to the amount in excess of the $750,000 that Strategic is owed, i.e., $250,000. However, that sum is subsumed within the $1 million Eastern is entitled to recover on its claim based on the Virginia Private Security Services Statute.

### 2.     Eastern's Unjust Enrichment Claim

Eastern also bring a claim for unjust enrichment. That claim does not provide any relief for Eastern.

The elements of unjust enrichment are: "(1) a benefit conferred on the defendant by the plaintiff; (2) knowledge on the part of the defendant of the conferring of the benefit; and (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." *The Christian Broad.*

---

[21] That the $750,000 is not contingent on Strategic's delivery of services distinguishes Eastern's reliance on Restatement (Second) of Contracts § 234 cmt. e, f.

*Network, Inc. v. Busch*, 2006 WL 2850624, at *7-8 (E.D. Va. Oct. 3, 2006) (collecting cases);

*see Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (same).

"Where the parties executed a valid and enforceable written contract governing a

particular subject matter, recovery on a theory of unjust enrichment for events arising out of that

subject matter is ordinarily precluded." *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907

N.E.2d 268, 274 (N.Y. 2009) (plaintiff could not use unjust enrichment claim to recover fee paid

because it arose from services governed by engagement letter). The parties do not dispute that

the Agreement is enforceable and that payment of the $1 million deposit was required by the

Agreement. Regardless of whether its breach of contract claim succeeds, Eastern cannot recover

for the $1 million under an unjust enrichment claim. *See UETA Latinamerica, Inc. v. Zafir*, 10

N.Y.S.3d 566, 568 (2d Dep't 2015) (claim for unjust enrichment "only applies in the absence of

an express agreement, and is not really a contract at all, but rather an equitable obligation

imposed in order to prevent a party's unjust enrichment"); *The Christian Broad. Network*, 2006

WL 2850624, at *8 ("Unjust enrichment claims arise 'when there is no contractual

relationship.'") (quoting *Aerotek, Inc. v. Tyonek Native Corp.*, 2005 WL 3372872, at *3 (E.D.

Va. Dec. 8, 2005)); *see also Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 347 F. Supp. 2d 1, 4

(S.D.N.Y. 2004) ("If a valid, enforceable contract existed between the parties, then [plaintiff]

cannot recover under a theory of unjust enrichment. However, if no valid contract was in place

regarding the sale of the goods, [plaintiff] has failed to state a claim for relief under the theory of

unjust enrichment because, absent a contract, the benefit that [defendant] garnered from selling

the merchandise was not at [plaintiff]'s expense.").

### 3. Strategic's Fraud Counterclaim

Strategic argues that Eastern cannot recover the $1 million deposit because it was paid by ACA and because it was the victim of fraud by Guo and Eastern. The Court rejects these arguments.

Under Virginia law, the elements of actual fraud are: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Winn v. Aleda Constr. Co.*, 315 S.E.2d 193, 195 (Va. 1984). The burden of proof applicable to fraud under Virginia law is "clear and convincing evidence," which is "higher than a mere preponderance." *Sweely Holdings, LLC v. SunTrust Bank*, 820 S.E.2d 596, 604 (Va. 2018); *see Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614 (4th Cir. 1999).

Similarly, under New York law, "a claim of fraudulent inducement requires proof (1) that the defendants made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendants, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity, (8) to his injury." *Internet L. Libr., Inc. v. Southridge Cap. Mgmt., LLC*, 2005 WL 3370542, at *5 (S.D.N.Y. Dec. 12, 2005), *aff'd sub nom. ITIS Holdings Inc. v. Southridge Cap. Mgmt. LLC*, 329 F. App'x 299 (2d Cir. 2009). "Each element of [a] fraud claim must be shown by clear and convincing evidence, at the summary judgment stage as well as at trial." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009)

To prevail on a fraud claim under both Virginia and New York law, a plaintiff must establish that the defendant made a false statement. Strategic here failed to do so. Strategic's claim is based on the notion that, at the time Guo requested Strategic to perform investigative

services for Eastern, Guo falsely represented that he was anti-CCP and that he would use the research obtained by Strategic for the purposes of sowing discord in the CCP and eventually overthrowing it. Thus, to prove its case, Strategic would have had to show either that Guo was a proponent of the CCP or at best indifferent to the CCP, or that Guo did not intend to use the research for the stated purposes.

The evidence did not establish Strategic's claim. Although there is evidence that Guo has made statements in favor of the CCP and of some conduct that would suggest that he is not hostile to the Chinese government (or at least not to all parts of it), Guo also testified to being an opponent of the CCP and to an intent to use the Strategic research in a manner hostile to the Chinese government. There is also evidence that Guo made statements consistent with a person who is hostile to the CCP. The evidence at trial does not permit the Court to decide whether Guo is, in fact, a dissident or a double agent. In the absence of a definitive or at least clear answer to that question, Strategic has not satisfied its burden of providing a false statement. Others will have to determine who the true Guo is.

The evidence before the Court also does not establish that Strategic reasonably or actually relied on Guo's representations about his political allegiances and the purposes for which he sought the research.

"In assessing the reasonableness of a plaintiff's alleged reliance, [the Court] considers the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 118 (S.D.N.Y. 2009) (quoting *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 459 (S.D.N.Y. 2007)). "In applying the test of reasonableness, the court must determine whether the plaintiff availed itself of the means

available to it given its size and sophistication." *Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 2016 WL 7374210, at *12 (N.Y. Sup. Ct. Dec. 19, 2016) (internal quotation marks and citation omitted). "Factors to be considered in making this determination may include the particular parties' prior course of dealing, the roles of other participants in the transaction, the time and expense of the investigation, the feasibility of practical[ity] of the plaintiff's performance of a particular type of investigation before entering into the transaction, the foreseeable risk to the plaintiff of failing to undertake the investigation, and responsible industry custom." *Id.* (internal quotation marks and citation omitted).

Before reasonably relying on a representation regarding information material to participation in a significant transaction, a sophisticated party "has a duty to conduct an independent appraisal of the risk it is assuming and a duty to investigate the nature of its business transactions." *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 58 F. Supp. 2d 228, 259 (S.D.N.Y. 1999); *see id.* (noting that they "cannot be heard to complain when they fail to make diligent inquiries"). "Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, . . . courts are particularly disinclined to entertain claims of justifiable reliance." *Crigger v. Fahnestock & Co., Inc.*, 443 F.3d 230, 235 (2d Cir. 2006). "[I]f false representations are made regarding matters of fact, and the means of knowledge are at hand and equally available to both parties, and the party, instead of resorting to them, sees fit to trust himself in the hands of one whose interest is to mislead him, the law, in general, will leave him where he has been placed by his own imprudent confidence." *Persaud Cos., Inc. v. IBCS Grp., Inc.*, 425 F. App'x 223, 226 (4th Cir. 2011) (quoting *Costello v. Larsen*, 29 S.E.2d 856, 858 (1944). "Succinctly put, a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his

predicament." *Rodas v. Manitaras*, 552 N.Y.S.2d 618, 620 (1st Dep't 1990); *accord Crigger*, 443 F.3d at 235; *see also Hitachi Credit*, 166 F.3d at 629 ("A plaintiff cannot claim that its reliance was reasonable and justified when it makes a partial inquiry, with full opportunity of complete investigation, and elects to act upon the knowledge obtained from the partial inquiry.").

Similarly, to establish actual reliance in a fraud action under New York law, "the plaintiff must show a belief in the truth of the representation and a change of position in reliance on that belief." *Hecht v. Components Int'l, Inc.*, 867 N.Y.S.2d 889, 895 (Sup. Ct. 2008) (citing *CBS Inc. v. Ziff-Davis Pub. Co.*, 553 N.E.2d 997, 1000 (N.Y. 1990)). Put another way, the plaintiff must show that the "defendant's misrepresentation induced plaintiff to engage in the transaction in question[.]" *Laub v. Faessel*, 745 N.Y.S.2d 534, 536 (1st Dep't 2002). Actual reliance requires proof "that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'" *Basis PAC-Rim Opportunity Fund (Master) v. TCW Asset Mgmt. Co.*, 48 N.Y.S.3d 654, 656 (1st Dep't 2017) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)).

Strategic is and holds itself out to be a sophisticated entity. Its business includes the investigation of people, including their backgrounds and their financial relationships. Information was available to it that called Guo's political allegiances and objectives into question. Gertz had written an article on May 23, 2017, prior to the Agreement, that described Guo's "close ties to senior Chinese Communist Party leaders, including government ministers and Politburo members," indicated Guo had "access to Ministry of State security operations overseas and in the United States," and noted that "Guo's wife and daughter currently have been allowed by Chinese authorities to visit him in New York but are required to return to China after 20 days, where they can be used for political leverage against Guo." Trial Tr. at 82; DX 43.

Wallop denied seeing this article, despite Strategic's focus on "research and analysis of political intelligence," her 30-year relationship with Gertz, and the fact that Gertz introduced her to Guo. *See, e.g.*, Trial Tr. at 34; *see also id.* at 55-56. In another article, dated October 9, 2017, Gertz had noted that "Guo said he maintains close ties to supporters within the Chinese government and security system." Trial Tr. at 84-85; DX32. It was therefore a matter of public knowledge that Guo had provided funds to security forces in China and maintained relationships with high-level members of the CCP. If Wallop and Waller were concerned that such relationships were consistent with support of the CCP or at least ambivalence towards it, they could have investigated or inquired further. Instead they did not. *See, e.g.*, *PNC Bank, Nat'l Ass'n v. Dominion Energy Mgmt., Inc.*, 2018 WL 1768061, at *11 (E.D. Va. Apr. 12, 2018) ("Examples of unreasonable reliance include 'where a party had information that would excite the suspicions of a reasonably prudent person' or 'where one relies upon an oral statement that is contrary to a written statement in his possession.'") (citation omitted).

If Guo's allegiances and the purpose for which Eastern commissioned the research had been important to Strategic, as it testified, it could have protected itself. It could, for example, have asked for a representation of Guo's loyalties, or at least a recital in a whereas clause in the Agreement. It need not necessarily have feared that including such a representation or recital would have undermined the purpose of the Agreement and the parties' mutual desire for confidentiality. Representations are included in the most confidential of agreements. Moreover, the parties already went to extensive lengths to preserve confidentiality, including by having a confidentiality provision in the Agreement, by using "virgin laptops" to transfer the research data, and by making sure no non-encrypted electronic versions of the Agreement were available.

Moreover, although Strategic argued that Guo did not want references to himself in the Agreement, Strategic need not have acceded to that request.

Indeed, the structure of the Agreement and the deliverables Strategic was obligated to provide to Eastern are themselves inconsistent with the notion of reasonable reliance. The Agreement gave Eastern (and Guo) alone the power to dictate Strategic's research agenda. Strategic did not have input into the subjects of investigation or a veto over them. The Agreement provides that Eastern "will provide the necessary basis information, and desired areas of focus, to [Strategic] to research." PX1. It also provided that Eastern could "direct [Strategic] to conduct other research, not specified in this agreement, for a fee." *Id.* Eastern had the right to select fish. If Eastern had demanded that Strategic research an opponent of the CCP, the Agreement would have required Strategic to do so. Strategic's only option not to investigate a subject was if "circumstances do not permit sufficient work to research a given fish." *Id.*

## CONCLUSION

For the reasons explained above, the Court concludes that Eastern prevails on its claim for a declaratory judgment that the Agreement is unenforceable and void, and Eastern is entitled to restitution in the amount of the $1 million Strategic was never entitled to collect from Eastern. The Court has reviewed the remaining arguments and defenses, which fail.

The parties are directed to meet and confer regarding a proposed form of judgment and to file with the Court a joint stipulation or judgment by June 29, 2021.

SO ORDERED.

Dated: June 22, 2021
     New York, New York

                                   LEWIS J. LIMAN
                         United States District Judge

# EXHIBIT 23

*PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. vs.*
*KWOK HO WAN*

---

*MILES KWOK*
*October 3, 2018*

---



126 East 56th Street, Fifth Floor  New York, New York 10022
P: 212-750-6434   F: 212-750-1097
www.ellengrauer.com

*Original File 247294.TXT*
*Min-U-Script® with Word Index*

1

```
 1   SUPREME COURT OF THE STATE OF NEW YORK

 2   COUNTY OF NEW YORK
     ------------------------------------------------x
 3   PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

 4                         Plaintiff,

 5       -against-

 6   KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN
     GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI,
 7   a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK,
     a/k/a HAOYUN GUY,
 8
                           Defendant.
 9
     Index No.: 652077/2017
10   ------------------------------------------------x

11

12                     7 Times Square
                       New York, New York
13
                       October 3, 2018
14                     9:39 a.m.

15

16           Videotaped Examination Before Trial

17   of the MILES KWOK, before Kristi Cruz, a Notary

18   Public of the State of New York.

19

20

21

22

23       ELLEN GRAUER COURT REPORTING CO. LLC
           126 East 56th Street, Fifth Floor
24             New York, New York 10022
                    212-750-6434
25                  REF:  247294
```

FILED: NEW YORK COUNTY CLERK 05/07/2021 07:59 PM
NYSCEF DOC. NO. 785

INDEX NO. 652077/2017

RECEIVED NYSCEF: 05/07/2021

Case 22-50073   Doc 50-4   Filed 02/28/22   Entered 02/28/22 21:19:53   Page 151 of
159

2

```
 1    A P P E A R A N C E S :

 2

 3    O'MELVENY & MYERS LLP

 4    Attorneys for Plaintiff

 5         Times Square Tower

 6         7 Times Square

 7         New York, New York 10036

 8    BY:  EDWARD MOSS, ESQ.

 9         STUART SARNOFF, ESQ.

10         SARA N. PAHLAVAN, ESQ.

11         212.326.2000

12         emoss@omm.com

13         ssarnoff@omm.com

14         spahlavan@omm.com

15

16

17    HODGSON RUSS LLP

18    Attorneys for Defendant

19         605 Third Avenue, Suite 2300

20         New York, New York 10158

21    BY:  MARK A. HARMON, ESQ.

22         JILLIAN MARIE SEARLES, ESQ.

23         212.751.4300

24         mharmon@hodgsonruss.com

25         jsearles@hodgsonruss.com
```

3

```
 1   A P P E A R A N C E S:   (Cont'd)

 2

 3   ALSO PRESENT:

 4         ELIZABETH YAOYING JIANG, Mandarin Interpreter

 5         DAN MACOM, Videographer

 6         KARIN MAISTRELLO, Golden Spring

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    ------------------- I N D E X -------------------

 2    WITNESS                 EXAMINATION BY          PAGE

 3    MILES KWOK              MR. MOSS                   8

 4

 5

 6    DIRECTIONS:    PAGE   17, 18, 19, 58, 59, 61,

 7                         62, 67, 70, 71, 72, 73,

 8                         78, 101, 102, 117, 118,

 9                         126, 128, 129

10

11

12    --------------- DOCUMENT REQUESTS ---------------

13    PAGE:    129  Document evidencing agreement

14                 with Zhang Wei relating to the

15                 hotel

16

17

18    --------------- E X H I B I T S ---------------

19    KWOK            DESCRIPTION            FOR I.D.

20    Exhibit 1       Genever Holdings LLC        33

21                    Corporate Documents

22    Exhibit 2       Printout from YouTube       59

23    Exhibit 3       Federal Complaint           69

24    Exhibit 4       Letter with attached        73

25                    financial information
```

Case 22-50073   Doc 50-4   Filed 02/28/22   Entered 02/28/22 21:19:53   Page 154 of
159

```
 1                        KWOK

 2    opposition to its attachment motion Mr. Kwok

 3    filed a brief dated May 16, 2018, and relating

 4    to this issue on page 15, the brief reads as

 5    follows:

 6              "Yet Frances," who is PAX's

 7    investigator, "offers no proof beyond his own

 8    assertion that the voices are those of Kwok

 9    and his associates or that Kwok or anyone

10    associated with him uploaded the audio

11    recording in question, and there is

12    substantial reason to question both the

13    authenticity of the audio and the motives

14    behind the individual or entity who uploaded

15    it and represented that it was, in fact, Kwok

16    making the statements in question."

17              Now I'm going play the audio.

18              (Whereupon, an audio/video is

19         played.)

20              THE WITNESS:  I refuse to listen.

21         I'm not going to listen.

22         Q.   Sorry, Mr. Kwok, were you covering

23    your ears?

24         A.   This is all communist.  Everything

25    here is all communist.  Unless you prove this
```

FILED: NEW YORK COUNTY CLERK 05/07/2021 07:59 PM
NYSCEF DOC. NO. 785

INDEX NO. 652077/2017

RECEIVED NYSCEF: 05/07/2021

Case 22-50073   Doc 50-4   Filed 02/28/22   Entered 02/28/22 21:19:53   Page 155 of
159

61

```
1                        KWOK

2      is not communist, then I will listen.  They

3      have recorded over a million of tax audios,

4      videos that are fake.  Unless you could prove

5      this is real, otherwise I will not listen to

6      it.  What relationship is this to me?  Unless

7      you could prove this is what I have said, that

8      this is my words, my audio, my video, then I

9      will listen to it.

10          Q.    You refuse to listen to the video?

11  DI          MR. HARMON:  I object on the same

12          basis and direct the witness not to answer

13          the   question.

14          A.    I have a sensation of committing

15      suicide if you're going play that.  This is

16      communist.  Very simple.  There is like a

17      number of place that the communist that have

18      been proven by the FBI to be fake.  So you

19      want me to commit suicide?  Are you here to

20      kill me?  I here seriously declare for all the

21      videos that you would show as outside the

22      parameters that's causing me mental distress,

23      I will reserve my right to sue.  I like my

24      attorney to note I reserve my right of the

25      personal attacks by the other party against
```

```
 1                        KWOK
 2     me, and I like to ask for the authenticity of
 3     this documents with a person's authenticity.
 4     I like to request an investigation of it.  I'm
 5     done.
 6          Q.   So, Mr. Kwok, you will not answer
 7     any questions about the video?
 8  DI          MR. HARMON:  Same objection.  Same
 9          direction.  Beyond the scope of what I
10          believe appropriate to ask in discovery.
11          A.   I believe this is humiliation, these
12     are threats and will need to pay
13     responsibility for these actions.
14               MR. MOSS:  Please let the record
15          reflect that when Mr. Kwok asked me to
16          stop playing the video, I stopped playing
17          the video.  I will not play it anymore.
18               I note that Mr. Harmon has objected
19          to this line of questioning and instructed
20          Mr. Kwok not to answer any questions about
21          this video.
22               I have that right, right,
23     Mr. Harmon?
24               MR. HARMON:  I'm sorry?
25               MR. MOSS:  I got it right?  You're
```

63

```
1                          KWOK

2          instructing --

3              MR. HARMON:  I thought you said you

4          I have that right, as opposed to it's my

5          right to something.

6              MR. MOSS:  Fair enough.  I'm

7          correct, you're instructing the witness --

8              MR. HARMON:  I'm instructing the

9          witness not to answer the questions for

10         the reasons I've already stated on the

11         record.

12         Q.    What is Golden Spring New York Ltd.?

13         A.    It is Hong Kong Golden Spring, a

14      company that they have expanded in New York.

15         Q.    Who is "they"?

16         A.    Hong Kong Golden Spring.

17         Q.    Who owns Golden Spring New York?

18         A.    Hong Kong Golden Spring owns.

19         Q.    Who owns Hong Kong Golden Spring?

20         A.    Guo Qiang.

21             THE INTERPRETER:  G-U-O, Q-I-A-N-G,

22         phonetic spelling.

23         Q.    Is Guo Qiang a family member of

24      yours?

25         A.    Yes.
```

FILED: NEW YORK COUNTY CLERK 05/07/2021 07:59 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 785
RECEIVED NYSCEF: 05/07/2021

Case 22-50073   Doc 50-4   Filed 02/28/22   Entered 02/28/22 21:19:53   Page 158 of
159

64

```
 1                       KWOK

 2        Q.     What is the relation?

 3        A.     My son.

 4        Q.     Do you have any ownership interest

 5   in Golden Spring Hong Kong?

 6        A.     No.

 7        Q.     Is Guo Qiang the same son as Mileson

 8   or is it a different son?

 9        A.     It's the same person.

10        Q.     Do you have any ownership interest

11   in Golden Spring New York?

12        A.     No.

13        Q.     So Golden Spring is owned by your

14   son?

15        A.     My son also represents the family in

16   owning it.

17        Q.     Does the son represent you in owning

18   it?

19        A.     No.

20        Q.     Your son represents other family

21   members in owning it?

22        A.     Yes.

23        Q.     Does your son represent Zhang Wei in

24   owning Golden Spring?

25        A.     Yes.
```

1                        KWOK

2         Q.    Is your son the sole shareholder of

3    Golden Spring?

4              MR. HARMON:  Object to the form of

5         the question.

6         A.    I'm not really sure.

7         Q.    Do you know of any other

8    shareholders of Golden Spring?

9              MR. HARMON:  Object to the form of

10        the question.

11        A.    I'm not sure.  I don't know.

12        Q.    Does Golden Spring have any

13   directors?

14             MR. HARMON:  Object to the form of

15        the question.

16        A.    I'm not sure.

17             MR. MOSS:  Mark, what's wrong, you

18        don't like that I'm not using one of the

19        entities?

20             MR. HARMON:  I don't know which

21        entity --

22             MR. MOSS:  Hong Kong or New York?

23             MR. HARMON:  I don't know which one

24        you're talking about, or both.

25        Q.    Do any of the Golden Spring entities