# **<u>EXHIBIT B</u>**

Friedman Declaration

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF CONNECTICUT
### BRIDGEPORT DIVISION

| | |
|---|---|
| In re:<br><br>Ho Wan Kwok[1]<br><br>    Debtor. | Chapter 11 Case No.<br><br>22-50073 (JAM) |
| Pacific Alliance Asia Opportunity Fund L.P.,<br><br>   Movant,<br><br>vs.<br><br>Ho Wan Kwok,<br><br>   Respondent | March 1, 2022 |

### DECLARATION OF PETER FRIEDMAN IN SUPPORT OF MOTION OF PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. FOR A DECLARATION OF INAPPLICABILITY OF THE AUTOMATIC STAY OR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO SECTION 362(d)(2) OF THE BANKRUPTCY CODE

I, Peter Friedman, declare:

1.  I am an attorney admitted to practice law in the State of New York and Washington, D.C. and am a partner at the law firm of O'Melveny & Myers, 7 Times Square, New York, NY 10036, counsel for Pacific Alliance Asia Opportunity Fund L.P. ("PAX"). I respectfully submit this Declaration in support of PAX's *Motion of Pacific Alliance Asia Opportunity Fund L.P. for Entry of Order Confirming the Inapplicability of the Automatic Stay or, in the Alternative, Relief from the Automatic Stay Pursuant to Section 362(d)(2) of the Bankruptcy Code*.

---

[1] The last four digits of the Debtor's taxpayer identification number are 9595.

2.      Attached as Exhibit 1 is a true and correct copy of the February 9, 2022 Decision and Order of Justice Ostrager in *PAX v. Kwok, et al.*, Index No. 652077/2017 (N.Y. Sup. 2022), ECF No. 1181.

3.      Attached as Exhibit 2 is a true and correct copy of the September 30, 2020 Decision and Order in *PAX v. Kwok, et al.*, Index No. 652077/2017 (N.Y. Sup. 2021), ECF No. 591.

4.      Attached as Exhibit 3 is a true and correct copy of the October 15, 2020 Decision and Order in *PAX v. Kwok, et al.*, Index No. 652077/2017 (N.Y. Sup. 2021), ECF No. 630.

5.      Attached as Exhibit 4 is a true and correct copy of the March 16, 2021 Decision and Order in *PAX v. Kwok, et al.*, Index No. 652077/2017 (N.Y. Sup. 2021), ECF No. 728.

6.      Attached as Exhibit 5 is a true and correct copy of the February 9, 2022 Final Order of Civil Contempt in *PAX v. Kwok, et al.*, Index No. 652077/2017 (N.Y. Sup. 2021), ECF No. 1182.

7.       Attached as Exhibit 6 is a true and correct copy of the September 15, 2020 Decision and Order in *PAX v. Kwok, et al.*, Index No. 652077/2017 (N.Y. Sup. 2021), ECF No. 549.

8.      Attached as Exhibit 7 is a true and correct copy of the Complaint dated April 18, 2017, in *PAX v. Kwok, et al.*, Index No. 652077/2017 (N.Y. Sup. 2021), ECF No. 2.

9.      Attached as Exhibit 8 is a true and correct copy of the February 3, 2021 Judgment of in *PAX v. Kwok, et al.*, Index No. 652077/2017 (N.Y. Sup. 2021), ECF No. 716.

10.      Attached as Exhibit 9 is a true and correct copy of the Personal Guarantee, filed as Exhibit 23 to PAX's Statement of Material Facts in Support of PAX's Motion for Partial Summary Judgment, at KWOK000652, in *PAX v. Kwok, et al.*, Index No. 652077/2017 (N.Y.

Sup. 2020), ECF No. 455.

11.     Attached as Exhibit 10 is a true and correct copy of screenshots from the website https://voyage.vesselfinder.com/dcad1f224b32615145e66055d9856504 (last accessed on February 28, 2022).

12.     Attached as Exhibit 11 is a true and correct copy of PAX's Memorandum of Law in Support of Motion for Order of Contempt, dated December 24, 2020, in *PAX v. Kwok, et al.,* Index No. 652077/2017 (N.Y. Sup. 2020), ECF No. 689.

13.     Attached as Exhibit 12 is a true and correct copy of Pax's Memorandum of Law in Further Support of Motion for Order of Contempt, dated January 27, 2021, in *PAX v. Kwok, et al.*, Index No. 652077/2017 (N.Y. Sup. 2021), ECF No. 709.

14.     Attached as Exhibit 13 is a true and correct copy of the Executed Contract of Sale in *PAX v. Kwok, et al.*, Index No. 652077/2017 (N.Y. Sup. 2021), ECF No. 256.

15.     Attached as Exhibit 14 is a true and correct copy of the September 22, 2021 Decision and Order in *PAX v. Kwok, et al.*, Index No. 652077/2017 (N.Y. Sup. 2021), ECF No. 904.

16.     Attached as Exhibit 15 is a true and correct copy of the February 18, 2022 Court Notice in *PAX v. Kwok, et al.*, Index No. 652077/2017 (N.Y. Sup 2022), ECF. No. 1191.

*[ Signature follows on next page ]*

Dated: March 1, 2022
New York, New York

Respectfully submitted,

*/s/  Peter Friedman*

Peter Friedman
pfriedman@omm.com
O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

*Attorney for Pacific Alliance Asia*
*Opportunity Fund L.P.*

# EXHIBIT 1

# SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY

PRESENT:    **HON. BARRY R. OSTRAGER**                PART        **IAS MOTION 61EFM**

*Justice*

--------------------------------------------------------------------------X

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND
L.P.,

|                    |              |
|--------------------|--------------|
| **INDEX NO.**      | 652077/2017  |
| **MOTION DATE**    |              |
| **MOTION SEQ. NO.**| 019          |

Plaintiff,

- v -

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN
GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a
WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a
HAOYUN GUO, GENEVER: HOLDINGS LLC, and
GENEVER HOLDINGS CORPORATION,

**DECISION + ORDER ON MOTION**

Defendants.

--------------------------------------------------------------------------X

HON. BARRY R. OSTRAGER

In this 2017 case with 1,180 docket entries – almost all of which involve defendant Kwok

Ho Wan's ("Kwok") efforts to avoid and deceive his creditors by parking his substantial personal

assets with a series of corporations, trusted confidants, and family members -- this Court is called

upon to determine whether the plaintiff, Pacific Alliance Asia Opportunity Fund L.P. ("PAX"),

has met the burden of establishing that the Court should enter a final Order of Civil Contempt

against Kwok.  For the reasons that follow, this Court is simultaneously issuing a final Order of

Civil Contempt.

PAX secured a judgment against Kwok in the sum of $116,402,019.57 on February 3,

2021 (NYSCEF Doc. No. 716).  Thereafter, PAX undertook a year's long effort to enforce its

judgment by first identifying and then attempting to levy upon Kwok's assets in the United

States.  PAX encountered difficulty identifying assets over which Kwok exercised control

because Kwok, who is a self-declared multi-billionaire, had secreted his assets in a maze of

corporate entities and with family members.  This scheme has enabled Kwok to assert that he has

no assets despite his lavish lifestyle, which plaintiff has catalogued with material from social

media clippings, photographs and videotapes showing Kwok living large and boasting of his wealth, expensive homes, private plane, and yacht. As noted in the transcript of proceedings of February 2, 2022, this evidence is of little probative value, as the witnesses sponsoring this evidence have no first-hand knowledge of the authenticity of this "evidence" other than that it is accessible on various websites.

On February 2, 2022, this Court held an evidentiary hearing at which seven witnesses submitted direct testimony by affidavit and were made available for cross-examination. The hearing followed protracted proceedings by PAX to locate and levy upon assets owned by defendant Kwok. Those proceedings established, among other things, that Kwok exercised dominion and control over a yacht called the Lady May and resulted in a series of orders restraining Kwok and/or the registered owners of the yacht called Lady May from removing the Lady May from the Court's jurisdiction. The first such Order was issued on September 30, 2020, as described in detail *infra,* and was followed by an October 15, 2020 Order that restrained "Mr. Kwok and/or the registered owners of . . . the yacht, the 'Lady May'" from leaving the jurisdiction. (NYSCEF Doc. No. 630). As detailed *infra*, Kwok spent much of July, August and September of 2020 on the Lady May. Contemporaneously with the proceedings resulting in the September 30 and October 15, 2020 restraining Orders, Kwok and his cohorts made arrangement for the Lady May to sail to Florida in early October 2020 and, thereafter, to the Bahamas. On March 16, 2021, the Court issued a conditional order of civil contempt which directed that if Kwok failed to return the Lady May to the jurisdiction of this Court by May 31, 2021, he would be subject to a $500,000.00 fine for each day that the Lady May remained outside the jurisdiction of this Court.

The Appellate Division, First Department, affirmed this Court's order holding Kwok in conditional civil contempt, finding that "the daily fine of $500,000.00 was intended to strongly

encourage defendant to purge himself of the contempt, which, despite being permitted to

accomplish, he has shown no interest in doing. . .” NYSCEF Doc. No. 953, 199 AD3d 423

(2021). The Appellate Division further held:

> The motion court acted within its discretion in holding defendant in civil contempt, as
> plaintiff established by clear and convincing evidence that defendant violated a lawful,
> clear mandate of the court, of which he had knowledge, and that such violation resulted
> in prejudice to plaintiff's rights (*see El-Dehdan v El-Dehdan*, 26 NY3d 19, 29 [2015];
> Judiciary Law § 753). … The motion court is instructed to proceed with an evidentiary
> hearing to resolve a dispute as to ownership and control of the yacht, and to assess
> appropriate penalties.

Pursuant to the Appellate Division's Order, this Court scheduled the February 2, 2022

evidentiary hearing to resolve the issue of whether Kwok beneficially owns and controls the

yacht. Kwok failed to testify at the February 2, 2022 hearing, having previously invoked his

Fifth Amendment right to decline to testify or respond to discovery requests relating to the Lady

May in response to PAX's asset discovery efforts. PX 27, 28, 29, 30.[1] This invocation of the

Fifth Amendment notwithstanding, Kwok is an active litigant in multiple fora and he has given

prior testimony in this and other proceedings.

Kwok also filed a complaint in this court captioned *Guo Wengui a/k/a Miles Kwok v*

*Hong Zeng*, 157025/2020, which references a blog post from Freebeacon.com dated September

8, 2017 in which Kwok complains about “several incidents involving *his* 152-foot motor yacht,

Lady May...”  (Complaint ¶ 8, NYSCEF Doc. No. 001) (“the Zeng Complaint”). The Zeng

Complaint describes Kwok as an “outspoken critic of the CCP” who has gone to great “lengths

to expose the rampant corruption within the CCP and the Chinese government.” The

*Washington Post* reported that a former advisor to President Trump, Steve Bannon, was arrested

in 2020 while on board the Lady May, and described Mr. Bannon as a friend and business

---

[1] “PX” refers to Plaintiff's Trial Exhibits.

associate of Kwok, "a vocal online critic of the Chinese government who was once close with that country's intelligence service but is now wanted by authorities in Beijing on charges of fraud, blackmail and bribery." Other news outlets have reported that Mr. Bannon utilized Kwok's private jet on more than one occasion to travel to political rallies.

The testimony adduced at the hearing out of the mouths of defendants' witnesses clearly and convincingly demonstrated that Kwok beneficially owns and controls the Lady May and has utter contempt for this Court and the judicial process.

Kwok once was the sole shareholder of Hong Kong Investments Limited ("HK International"). The testimony adduced at the hearing established that in 2014 Kwok transferred a 100% interest in HK International to one Qu Guo Jiao for no consideration. Ms. Qu was a trusted business associate of the Kwok family. Thereafter, Kwok fled China and on February 23, 2015, HK International purchased the Lady May for £ 28 million GBP. No testimony adduced at the hearing established the source of funds to purchase the Lady May, but the uncontradicted testimony of Kwok's daughter Mei Guo established that Ms. Qu did not provide the funds to purchase the yacht. Tr. 44.[2] Consequently, a reasonable inference is that Kwok provided the funds to HK International which were used to purchase the yacht. It is undisputed that Ms. Qu transferred the ownership of the Lady May to Kwok's daughter, Mei Guo, on or around June 17, 2017, for $1 or no consideration. Tr. 47. According to Ms. Guo's affidavit (NYSCEF Doc. No. 1162), Ms. Guo ultimately transferred ownership of the Lady May to the current title holder HK International Funds Investments (USA) Limited, LLC ("HK USA"). Ms. Guo further avers that she is the sole owner of HK USA, although all of the multi-million dollar annual expenses for the

---

[2] "Tr." refers to the transcript of the evidentiary hearing, efiled at NYSCEF Doc. No. 1179.

Lady May, including fuel, maintenance, and the captain and crew are paid by Golden Spring

(New York) Ltd. ("Golden Spring."), which is allegedly the Kwok family office.

At the hearing Ms. Guo testified that her brother had bought the Lady May for her. Tr.

46. The Court cannot credit this testimony as there is no evidence that Ms. Guo's brother was

involved with the corporate transactions leading to Ms. Guo's acquisition of the title to the yacht.

And, indeed, in response to a question from the Court, Ms. Guo acknowledged that her brother

was not involved in any of the transfers that occurred before she acquired the yacht. Tr. 47.

Other testimony adduced at the hearing established that Kwok was repeatedly on the

yacht every summer and that Ms. Guo was infrequently on the yacht. Trial Tr. 88:8-20. The

Lady May's captain testified that Kwok was aboard the yacht for a significant portion of the

months of July, August and September in 2020 and that this was consistent with his usual

practice in the summer. Trial Tr. 87:24-88:7. Subsequent to this Court's September 30, 2020

restraining Order, in October 2020 the Lady May was sent to Florida and then the Bahamas for

repairs and was subsequently dispatched to Italy in October 2021, purportedly at the direction of

Golden Spring. Ms. Guo acknowledged that she was aware of both this Court's September 30,

2020 restraining Order and this Court's subsequent March 16, 2021 Order directing that the Lady

May be returned to the Court's jurisdiction Tr. 55; 57-60; 62.

Ms. Guo testified that on the one hand, she directed the Lady May's itinerary but, on the

other hand, testified that security for Kwok was such a concern that there would be no

memorialization of any itinerary. Tr. 52. She further testified that when her father was on the

yacht unaccompanied by her he had the freedom to choose wherever he wanted to go. Tr. 50.

The fundamental issue, however, is who directed the yacht to be removed from this Court's

jurisdiction in October 2020. Ms. Guo claims that in early October 2020 she no longer wished to

5

FILED: NEW YORK COUNTY CLERK 02/09/2022 04:33 PM
NYSCEF DOC. NO. 1181
INDEX NO. 652077/2017
RECEIVED NYSCEF: 02/09/2022
Case 22-50073    Doc 57-2    Filed 03/01/22    Entered 03/01/22 22:13:12    Page 12 of
134

use the yacht and relayed that instruction to Golden Spring which, in turn, relayed her directive
to the then captain of the ship, Captain Heaslop. Tr. 53.

Upon further questioning, Ms. Guo admitted that it was Golden Spring that advised her
that the yacht needed to be moved to a warmer place. Tr. 55. Ms. Guo then repeated her
retracted testimony that her brother had given her the yacht, and she stated that her brother is the
sole owner of Golden Spring. Tr. 56. This testimony is not credible given that on September 30,
2020 the Court entered a temporary restraining order restraining Kwok

> . . . from making or causing any sale, assignment, transfer, or interference with any
> property in which he has an interest, or from paying over or otherwise disposing of any
> debt now due or thereafter coming due to him, subject to the exceptions set forth in
> CPLR 5222 and in the ordinary course.

NYSCEF Doc. No. 591. Significantly, Captain Heaslop, the then Captain of the Lady May,
testified that Mr. Kwok told Captain Heaslop that Kwok would no longer be a guest on the Lady
May "a few days" before the Lady May departed for Florida in early October 2020 (and
apparently after the issuance of this Court's September 30, 2020 Order). Tr. 89. Captain
Heaslop also contradicted Ms. Guo's testimony that Ms. Guo gave Captain Heaslop instructions
about the yacht's movement. Tr. 94.

Ms. Guo also acknowledged having subsequently read the Court's March 16, 2021 Order
requiring the Lady May to be returned to the Court's jurisdiction by May 31, 2021 (NYSCEF
Doc. No. 728). She further acknowledged that she had discussed the Order with her lawyer
(whose services were paid for by Golden Spring) and that she had *ignored* the Order.

Russell Stockil, the Yacht Management Director for Yachtzoo SARL, testified that his
company had a management contract with HK USA dated May 2021 and that he communicated
with HK USA and Golden Spring, but never with Ms. Guo. Tr. 78. This was also the testimony
of successor Captain Momchil Ivanov. Tr. 82. In short, Ms. Guo's testimony that she owns and

6

controls the Lady May cannot be credited in any respect. Ms. Guo appears to be a woman in her

twenties, has introduced no evidence that she exercised dominion and control of the Lady May,

and provided no confirmation that she came into possession of the Lady May, other than as a

ruse to shield the Lady May from being levied upon by her father's creditors.

The machinations associated with the shell game Kwok has orchestrated with respect to

the Lady May are of a piece with every other evasive and contemptuous act Kwok has taken

during the five years this litigation has been pending, which is why there are 1,180 docket entries

in this case.

The Court has the authority to hold Kwok in civil contempt under Judiciary Law

§ 753—and "to punish [him], by fine and imprisonment"—where, as here, the Court "expressly

find[s] that [Kwok's] actions were calculated to or actually did defeat, impair, impede, or

prejudice the rights or remedies of a party to a civil proceeding." *Oppenheimer v. Oscar Shoes,

Inc.*, 111 A.D.2d 28, 28 (1st Dep't 1985) (citing N.Y. Judiciary Law § 753). Section 753 sets

forth four requirements:

> [T]o find that contempt has occurred in a given case, it must be determined that
> [1] a lawful order of the court, clearly expressing an unequivocal mandate, was in
> effect. [2] It must appear, with reasonable certainty, that the order has been
> disobeyed . . . [3] Moreover, the party to be held in contempt must have had
> knowledge of the court's order, although it is not necessary that the order actually
> have been served upon the party . . . [4] Finally, prejudice to the right of a party to
> the litigation must be demonstrated.

*Fleetwood Fin. v Walter J. Dowd, Inc.*, 2016 WL 11546917, at *2 (N.Y. Sup. Ct. Sept. 14, 2016)

(citing *McCormick v Axelrod*, 59 N.Y.2d 574, 583, *amended*, 60 N.Y.2d 652 (1983)). The

testimony adduced in this case satisfies each element of this standard. Indeed, the Appellate

Division intimated as such. *See Pacific Alliance Asia Opportunity Fund L.P.*, 199 A.D.3d 423

(1st Dep't 2021) ("[PAX has] established by clear and convincing evidence that [Kwok] violated

7

FILED: NEW YORK COUNTY CLERK 02/09/2022 04:33 PM

NYSCEF DOC. NO: 1181

Case 22-50073    Doc 57-2    Filed 03/01/22    Entered 03/01/22 22:13:12    Page 14 of
134

INDEX NO. 652077/2017

RECEIVED NYSCEF: 02/09/2022

a lawful, clear mandate of the court, of which he had knowledge, and that such violation resulted in prejudice to plaintiff's rights. . .").

The extent of PAX's ongoing "prejudice" turns on whether PAX has demonstrated that it could ultimately levy on the Lady May to satisfy its now centi-million dollar judgment against Kwok.  Under CPLR § 5225, "money or other personal property" is leviable where the debtor holds the requisite "interest." To satisfy this requirement, "[i]t is not necessary that the judgment debtor have legal title to the property; a beneficial interest is sufficient." Weinstein, Korn & Miller, New York Civil Practice: CPLR ¶ 5225.09. "A beneficial interest is '[a] right or expectancy in something . . . as opposed to legal title to that thing.'" *Peterson v. Islamic Rep. of Iran*, 2013 WL 1155576, at *30 (S.D.N.Y. Mar. 13, 2013) (citing Black's Law Dictionary, Interest (9th ed. 2009)).  Kwok has much more than a beneficial interest in the Lady May.  Not only does Kwok control the yacht, it appears he provided the funds to purchase it and he is the person who principally enjoys the use of the yacht.

The key factor is whether "the property benefitted [the beneficial owner] as if he had received the property directly." *Id*. (quoting *Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*, 609 F.3d 111, 120 (2d Cir. 2010); *see also Gliklad v. Chernoi*, 129 A.D.3d 604 (1st Dep't 2015) (upholding rejection of the judgment debtor's contention that he no longer held an interest in property because he transferred his interest to his daughters); *Colfin Bulls Funding B, LLC v. Ampton Invs., Inc*., 112 N.Y.S.3d 868 (Table), at *2, 6 (N.Y. Sup. Ct. 2018) (granting judgment creditor's turnover motion notwithstanding judgment debtor's assertion that he transferred property to a corporation, because even if true, the evidence showed that he "retained control and/or an interest" in the property).

8

Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 15 of 134

The evidence clearly and convincingly demonstrates that Kwok holds a beneficial interest in and controls the Lady May. In the latter connection, the Court takes notice of the filing of the Zeng case and draws an inference from all the record facts that Kwok has taken extraordinary steps to shield the yacht from his creditors. Moreover, Kwok's "family office" funds the yacht's day-to-day operations and maintenance.

The Court finds that Ms. Guo's testimony was not only internally inconsistent and dissembling, but also significantly undermined by the testimony of Captains Heaslop and Ivanov and Mr. Stockil, who stated that they have never taken yacht-related direction from Ms. Guo in the four and-a-half years that she directly or indirectly held title to the yacht.

In addition, it is established New York law that a party's invocation of the Fifth Amendment in a civil proceeding "may form the basis of an adverse factual inference." *DeBonis v. Corbisiero*, 155 AD2d 299, 300 (1st Dep't 1989). An adverse inference may be applied whenever a factual determination is necessary or permitted, including in the context of contempt motions. *S.E.C. v. Durante*, No. 01 Civ. 9056 (DAB) (AJP), 2013 WL 6800226, at *10 (S.D.N.Y. Dec. 19, 2013), *aff'd*, 641 F. App'x 73 (2d Cir. 2016); *LiButti v. United States*, 107 F.3d 110, 120–25 (2d Cir. 1997).

Similarly, under the missing witness rule, "[a] trier of fact may draw the strongest inference that the opposing evidence permits against a witness who fails to testify." *Crowder v. Wells & Wells Equip., Inc.*, 11 A.D.3d 360, 361 (1st Dep't 2004) (applying adverse inference where defendant who failed to appear "would be knowledgeable about a material issue raised by the evidence").

PAX is entitled to an adverse inference under both of these avenues. Kwok has invoked his Fifth Amendment right against self-incrimination in response to PAX's post-judgment discovery, including in response to requests specifically about the Lady May. While Kwok

9

argues that an adverse inference is not appropriate here because "[o]nly after a threshold showing

that a piece of evidence is authentic is a party obligated to respond to it," this contention fails of

its own weight. PAX has proffered substantial admissible evidence that Kwok has the requisite

beneficial interest in and control of the Lady May.  *See People v. Primo*, 96 N.Y.2d 351, 753

N.E.2d 164 (2001) (explaining that evidence is probative if it "tends to prove the existence or

non-existence of a material fact, *i.e.*, a fact directly at issue in the case").

As of February 7, 2022, the Lady May has remained outside the jurisdiction of the Court

for 268 days. Based on the daily fine of $500,000 imposed by this Court and affirmed by the

Appellate Division, the resultant fine would amount to $134,000,000.00, which is more than

PAX's outstanding judgment of nearly $120 million and a multiple of the GBP £ 28 million

purchase price of the Lady May.  Nevertheless, if billionaire litigants can simultaneously seek to

use Court process in New York and elsewhere in the United States while knowingly and

intentionally violating Court orders, there is no rule of law.  Kwok must remit $134,000,000.00

to PAX within five business days of the service of this Court's Order with Notice of Entry. The

Court is prepared to exercise its full authority under Judiciary Law § 753 in the event the fine is

not timely paid.

Dated:  February 9, 2022

*Barry Ostrager*

BARRY R. OSTRAGER, J.S.C.

| CHECK ONE: | | CASE DISPOSED | | | X | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|---|
| | X | GRANTED | | DENIED | | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | | REFERENCE |

10

# EXHIBIT 2

# SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY

| PRESENT: | HON. BARRY R. OSTRAGER | PART | IAS MOTION 61EFM |
|---|---|---|---|
| | *Justice* | | |

-------------------------------------------------------------------X

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

Plaintiff,

- v -

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO, GENEVER HOLDINGS LLC, and GENEVER HOLDINGS CORPORATION,

Defendants.

-------------------------------------------------------------------X

| INDEX NO. | 652077/2017 |
|---|---|
| MOTION DATE | |
| MOTION SEQ. NO. | 011 |

**DECISION + ORDER ON MOTION**

HON. BARRY R. OSTRAGER

On September 30, 2020, the Court held oral argument via Skype, with counsel for all parties. On consent, the Court entered a temporary restraining order restraining Mr. Kwok from making or causing any sale, assignment, transfer, or interference with any property in which he has an interest, or from paying over or otherwise disposing of any debt now due or thereafter coming due to him subject to the exceptions set forth in CPLR 5222 and in the ordinary course.

The Court will hear further argument, and if necessary, conduct an evidentiary hearing, on October 15, 2020 at 10:00 am via Microsoft Teams. Defendants must file their opposition to Motion 011 by October 13, 2020 at 4:00 pm. Plaintiff must file their reply, if any, by October 14, 2020 at 4:00 pm. If either party intends to call witnesses, they must exchange witness lists with one another and e-file a witness list with the Court no later than October 13, 2020.

Additionally, the Court will hear oral argument on Plaintiff's Motion 008 for damages and attorney's fees on October 15, 2020 at 10:00 am via Microsoft Teams. Defendants must file

their opposition to Motion 011 by October 13, 2020 at 4:00 pm and Plaintiff must file their reply,

if any, by October 14, 2020 at 4:00 pm.

Any violation of the temporary restraining order issued today shall be considered

criminal contempt.

Dated: September 30, 2020

BARRY R. OSTRAGER, J.S.C.

| CHECK ONE: | | CASE DISPOSED | | X | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|
| | | GRANTED | | DENIED | | GRANTED IN PART | | X | OTHER |
| APPLICATION: | | SETTLE ORDER | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | | REFERENCE |

2

# EXHIBIT 3

FILED: NEW YORK COUNTY CLERK 10/15/2020 02:52 PM INDEX NO. 652077/2017

NYSCEF DOC. NO.: 630    Case 22-50073    Doc 57-2    Filed 03/01/22    Entered 03/01/22 22:13:12    Page 21 of   RECEIVED NYSCEF: 10/15/2020
134

# SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY

PRESENT:    **HON. BARRY R. OSTRAGER**          PART          **IAS MOTION 61EFM**

*Justice*

--------------------------------------------------------------------------- X

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

                          Plaintiff,

          - v -

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO, GENEVER HOLDINGS LLC, and GENEVER HOLDINGS CORPORATION,

                          Defendants.

--------------------------------------------------------------------------- X

| INDEX NO. | 652077/2017 |
|---|---|
| MOTION DATE | |
| MOTION SEQ. NO. | 011 |

**DECISION + ORDER ON MOTION**

HON. BARRY R. OSTRAGER

On October 15, 2020, the Court held oral argument via Microsoft Teams, with counsel for all parties participating, on plaintiff's motion for a post-judgment restraining order pursuant to CPLR 5229 (motion 011). On September 15, 2020, the Court granted summary judgment in favor of plaintiff on liability, with damages and the issue of whether the corporate defendants are defendant Kwok's alter egos to be determined at a later date. NYSCEF Doc. 549.

Plaintiff's motion for a restraining order pursuant to CPLR 5229 is granted. Mr. Kwok is restrained from making or causing any sale, assignment, transfer, or interference with any property in which he has an interest, whether directly or indirectly, and from paying over or otherwise disposing of any debt now due or thereafter coming due to him subject to the exceptions set forth in CPLR 5222, in accordance with the proceedings on the record of October 15, 2020.

Specifically, Mr. Kwok and/or the registered owners of (1) the Residence at the Sherry-Netherland Hotel and (2) the yacht, "the Lady May" are restrained from making or causing any sale, assignment, transfer, or interference with those assets.

Plaintiff is entitled, under CPLR 5229, to take discovery into the above-identified assets as well as to seek discovery into any other assets that Mr. Kwok may own, whether directly or indirectly.

The next appearance will be a pre-trial conference on November 12, 2020 at 2:00 pm via Microsoft Teams.

<u>October 15, 2020</u>
**DATE**

BARRY R. OSTRAGER, J.S.C.

| CHECK ONE: | | ☐ CASE DISPOSED | | ☒ NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|
| | | ☒ GRANTED | ☐ DENIED | ☐ GRANTED IN PART | | ☐ OTHER |
| APPLICATION: | | ☐ SETTLE ORDER | | ☐ SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | ☐ INCLUDES TRANSFER/REASSIGN | | ☐ FIDUCIARY APPOINTMENT | | ☐ REFERENCE |

2

# EXHIBIT 4

# SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY

PRESENT:     **HON. BARRY R. OSTRAGER**          PART     **IAS MOTION 61EFM**

*Justice*

------------------------------------------------------------------------X

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

|  |  |
|---|---|
| **INDEX NO.** | 652077/2017 |
| **MOTION DATE** | |
| **MOTION SEQ. NO.** | 012 |

Plaintiff,

- v -

KWOK HO WAN, a/k/a KWOK HO, et al.,

**DECISION + ORDER ON MOTION**

Defendants.

------------------------------------------------------------------------X

HON. BARRY R. OSTRAGER

Before the Court is Motion 012 by Plaintiff Pacific Alliance Asia Opportunity Fund L.P.

("PAX") to hold Defendant Kwok Ho Wan ("Kwok") in contempt. This Court previously issued

three orders restraining Kwok's interest in the yacht called the "Lady May." On September 30,

2020, this Court entered a Temporary Restraining Order (the "TRO") preventing Kwok from,

among other things, "interference with any property in which he has an interest." NYSCEF Doc.

No. 591. In issuing the TRO, the Court noted that "[a]ny violation . . . shall be considered

criminal contempt." *Id.* On October 15, 2020, the Court issued the Order, which granted PAX's

motion under CPLR 5229 and expressly restrained the Lady May:

> Mr. Kwok is restrained from making or causing any sale, assignment, transfer, or
> interference with any property in which he has an interest, whether directly or
> indirectly, and from paying over or otherwise disposing of any debt now due or
> thereafter coming due to him subject to the exceptions set forth in CPLR 5222, in
> accordance with the proceedings on the record of October 15, 2020. Specifically,
> Mr. Kwok and/or the registered owners of (1) the Residence at the Sherry-
> Netherland Hotel and (2) the yacht, "the Lady May" are restrained from making
> or causing any sale, assignment, transfer, or interference with those assets.

NYSCEF Doc. No. 630. Counsel for Kwok specifically asked the Court whether Kwok could move the yacht from the jurisdiction for licensing purposes. The Court denied this request at the time and directed counsel to make a motion if necessary.

Plaintiff brings this motion because, despite these orders, the Lady May has been moved outside of the United States.

The Court has reviewed the extensive submissions of the parties in connection with PAX's motion to hold Kwok in contempt. Passing the issue of whether any of Mr. Kwok's attorneys have violated the Code of Professional Conduct, it is clear that there has been an intolerable amount of gamesmanship, dissembling. and deceit in proceedings before this Court relating to the whereabouts and ownership of the yacht "Lady May."

The defendant claims that the yacht was removed from the jurisdiction of this Court for "ordinary course" "winter maintenance" notwithstanding restraints imposed on the movement of the yacht by the Court. Rather than catalogue the many "shell games" defendant Kwok has engaged in with the assistance of counsel who should know better, the Court grants the motion for contempt to the following extent: For every day that the yacht is outside the jurisdiction of this Court after May 15, 2021, defendant Kwok will be fined $500,000. The other restraints relating to the ownership and control of the yacht remain in place.

2

Case 22-50073    Doc 57-2    Filed 03/01/22    Entered 03/01/22 22:13:12    Page 26 of 134

A status conference remains scheduled for May 4, 2021 at 10:00 am.

Dated: March 16, 2021

BARRY R. OSTRAGER, J.S.C.

| CHECK ONE: | | CASE DISPOSED | | | X | NON-FINAL DISPOSITION | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | X | GRANTED | | DENIED | | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | | REFERENCE |

3

# EXHIBIT 5

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PACIFIC ALLIANCE ASIA OPPORTUNITY
FUND L.P.,

Plaintiff,

v.

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO
WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN
GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES
KWOK, a/k/a HAOYUN GUO, GENEVER
HOLDINGS CORPORATION, and GENEVER
HOLDINGS LLC,

Defendants.

Index No: 652077/2017

Hon. Barry R. Ostrager

[PROPOSED] FINAL ORDER
OF CIVIL CONTEMPT

Motion Sequence No. 19

WHEREAS this Court's conditional order of civil contempt, dated March 16, 2021,

directed that if Defendant Kwok Ho Wan ("Kwok") failed to return the Lady May yacht (the

"Lady May") to the jurisdiction of this Court by May 15, 2021, he would be subject to a

$500,000 fine for each day that the Lady May remained outside the jurisdiction;

WHEREAS the Lady May was not returned to the jurisdiction by May 15, 2021;

WHEREAS on November 4, 2021, the Appellate Division's First Department affirmed

this Court's order holding Kwok in conditional civil contempt, finding that "the daily fine of

$500,000 was intended to strongly encourage defendant to purge himself of the contempt, which,

despite being permitted two months to accomplish, he has shown no interest in doing," and

instructing this Court to proceed with an evidentiary hearing to resolve a dispute as to ownership

and control of the yacht, and to assess appropriate penalties;

WHEREAS Kwok to date has failed to return the Lady May to the jurisdiction;

FILED: NEW YORK COUNTY CLERK 02/09/2022 04:33 PM
NYSCEF DOC. NO. 1182    Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 29 of 134

INDEX NO. 652077/2017

RECEIVED NYSCEF: 02/09/2022

WHEREAS the evidentiary hearing specified by the First Department's November 4, 2021 Order was held on February 2, 2022;

WHEREAS both Kwok and the registered title holder of the Lady May, HK International Funds Investments (USA) Limited, LLC, ~~were present~~ *appeared* at the hearing, */ by counsel* proffered evidence and were represented by counsel; and

WHEREAS, based on the evidence adduced at the hearing, the Court determines that PAX has clearly and convincingly established that Kwok has a beneficial interest in and control over the Lady May, *as set forth in the Court's February 9, 2022 Decision and Order.*

Accordingly, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1. Kwok has violated New York Judiciary Law § 753 and is civil contempt of this Court's orders.

2. Kwok is directed to tender immediate payment to PAX in the amount of $134,000,000, representing $500,000 for each day between May 15, 2021 and February 7, 2022.

3. The amount due to PAX shall continue to accrue at the rate of $500,000 per day until Kwok returns the Lady May to the jurisdiction, which additional accrual shall begin ten business days from ~~the date~~ *service* of this Order, *with Notice of Entry.*

4. Payment of the amount set forth in paragraph 2 above shall be made to PAX within five business days of the ~~date~~ *service* of this Order, *with Notice of Entry.*

5. The Court shall exercise its full authority under New York Judiciary Law § 753 in the event the fine is not timely paid to PAX.

It is SO ORDERED this ___*9th*___ day of *February*, 2022.

_____
BARRY R. OSTRAGER, J.S.C.
**BARRY R. OSTRAGER**
JSC.

2

# EXHIBIT 6

# SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY

| PRESENT: | **HON. BARRY R. OSTRAGER** | **PART** | **IAS MOTION 61EFM** |
|---|---|---|---|
| | *Justice* | | |

-------------------------------------------------------------------------X

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

| | **INDEX NO.** | 652077/2017 |
|---|---|---|

Plaintiff,

| | **MOTION DATE** | |
|---|---|---|

- v -

| | **MOTION SEQ. NO.** | 007 |
|---|---|---|

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO, GENEVER HOLDINGS LLC, and GENEVER HOLDINGS CORPORATION,

**DECISION + ORDER ON MOTION**

Defendants.

-------------------------------------------------------------------------X

HON. BARRY R. OSTRAGER

Before the Court is plaintiff Pacific Alliance Asia Opportunity Fund L.P.'s ("Pacific Alliance") motion for partial summary judgement on Count I of the Amended Complaint against defendant Kwok Ho Wan a/k/a Miles Kwok ("Kwok") and defendant Kwok's cross-motion for reargument on motion 006. The Court heard oral argument via Skype on September 14, 2020. Based on the papers submitted and the arguments made on the record of September 14, 2020, and for the reasons that follow, Pacific Alliance's motion for partial summary judgment is granted, and Kwok's motion for reargument on motion 006 is denied.

**Background**

In 2008, Pacific Alliance entered into an agreement with Spirit Charter Investment Limited ("Spirit"), one of Kwok's business entities, under which Pacific Alliance provided Spirit with a loan facility in the principal amount of $30 million. Kwok executed a personal Guarantee of the loan. In September 2009, Spirit executed a deed under which Shiny Times Holdings Limited ("Shiny Times"), a business listing Kwok as its sole shareholder and director, assumed

the loan debt that Spirit owed to Pacific Alliance. Kwok again executed a personal guarantee in
favor of Pacific Alliance to secure Shiny Times' repayment obligation.

In March 2011, Pacific Alliance and Shiny Times entered into a new loan facility ("2011
Loan Facility") that expressly superseded and replaced the 2009 Deed of Settlement and a 2010
Letter Agreement. Simultaneously, Kwok entered into a new personal guarantee ("2011 Personal
Guarantee") which expressly superseded the 2009 Guarantee. The 2011 Personal Guarantee is
the operative agreement in this action.

In April 2013, the parties entered into a Deed of Settlement, whereby the outstanding
loan amount would no longer be due and owing to Pacific Alliance if Pacific Alliance purchased
certain apartments from Beijing Pangu Investment Inc. ("Beijing Pangu"), another Kwok
business entity, and Shiny Times' made certain installment payments to Pacific Alliance. Beijing
Pangu was required to satisfy ten conditions precedent in connection with the sale and purchase
of each of the apartments by Pacific Alliance. If any such condition was not satisfied by June of
2013, the Deed of Settlement would be terminated in its entirety. Pacific Alliance and Kwok
subsequently executed four extensions of the Deed of Settlement, changing only the date by
which the conditions precedent needed to be satisfied. The latest Deed of Settlement required
that the conditions precedent be satisfied by June of 2015.

Pacific Alliance seeks summary judgment on Count I of the Amended Complaint which
alleges that Kwok failed to satisfy the conditions precedent by June of 2015 and thus, per the
terms of the agreement, the Deed of Settlement was terminated in its entirety and the 2011
Personal Guarantee again controlled.

The Court recently held, in response to Pacific Alliance's motion for sanctions, that
Kwok was judicially estoppel from challenging the authenticity of documents that Kwok had

2

previously sponsored in proceedings before this Court. *See* NYSCEF Doc. No. 404. Specifically, at his November 2019 deposition, Kwok denied having signed several agreements discussed above, including the 2011 Loan Facility, the 2011 Personal Guarantee, the 2013 Deed of Settlement, and the four Supplemental Deeds. Kwok testified that the documents were forgeries. On the motion for contempt, Pacific Alliance argued, and the Court found, that these denials were inconsistent with the positions Kwok had taken throughout the duration of this 2017 case. As such, the Court held that Kwok was judicially estopped from challenging the authenticity of these agreements in opposition to Pacific Alliance's motion for summary judgment or at trial.

**Kwok's Cross-Motion**

Turning first to defendant Kwok's cross-motion for leave to reargue the Court's Decision and Order dated July 7, 2020 (NYSCEF Doc. No. 404), this motion is denied. As stated above, the Court held that Kwok was judicially estopped from challenging the authenticity of the agreements that Kwok had previously sponsored as authentic before the Court in this proceeding. Kwok argues that the Court misapprehended the law in reaching this holding. This Court rejects that argument in its entirety.

At the outset of this case, Kwok moved to dismiss this action on *forum non conveniens* grounds (motion 001). The Court granted Kwok's motion (NYSCEF Doc. No. 102), which decision was subsequently reversed and remitted by the First Department (NYSCEF Doc. 121). In making his motion to dismiss, Kwok argued that the contracts at issue were governed by Hong Kong law. Specifically, Kwok attached to his motion "true and correct" copies of several agreements among the parties including the 2011 Personal Guarantee (NYSCEF Doc. No. 17) and the 2013 Deed of Settlement (NYSCEF Doc. No. 18), which he now contests.

3

Kwok now argues that because the thrust of his argument on the motion to dismiss and the Court's decision related to *forum non conveniens,* (1) he is not actually changing his position on the authenticity of the documents, and (2) the Court did not actually determine the authenticity of the documents. This argument is incorrect. Kwok's assertion that the case should have been dismissed in favor of a resolution in Hong Kong *because the agreements on their face are governed by Hong Kong law* necessarily required an argument by Kwok, and an acceptance by the Court, that the agreements were authentic and not forgeries, as Kwok now claims.

Kwok further argues that in any event judicial estoppel cannot apply because there was no final determination on the merits on the issue of whether the contracts were authentic, because the First Department reversed this Court's decision on the motion to dismiss. This argument is not supported by the case law in the First Department. Judicial estoppel is an equitable doctrine used to prevent a party from changing its position during the same litigation. *See e.g. Nestor v. Britt*, 270 A.D.2d 192, 193 (2000) ("[u]nder the doctrine of judicial estoppel, or estoppel against inconsistent positions, a party is precluded from inequitably adopting a position directly contrary to or inconsistent with an earlier assumed position in the same proceeding."). Indeed, because judicial estoppel is used to prevent parties from changing their position in the same litigation – a final determination *cannot* be a prerequisite for judicial estoppel. *See id* (precluding the landlord from relying on a different lease on appeal than had been relied on at the trial-court level in the same proceeding).

Additionally, the Court notes that Kwok never pleaded that the documents were forgeries in either of his Answers, which is an affirmative defense. *See e.g., Proner v. Julien & Schlesinger, P.C.*, 214 A.D.2d 460, 461 (First Dept. 1995) (granting a motion for leave to amend the pleadings to add affirmative defense of forgery); *Great Am. Ins. Co. v. Giardino,* 71 A.D.2d

4

836, 836 (Fourth Dept. 1979) (holding that "proof of defendants' handwriting was material in light of their affirmative defense of forgery").

Kwok's recent, uncorroborated assertion that the agreements are forgeries is inconsistent with his prior position in this litigation – and therefore provides an appropriate basis for judicial estoppel. Accordingly, Kwok's cross-motion for reargument is denied, and the agreements previously sponsored by Kwok are accepted as authentic for the purpose of evaluating plaintiff's motion for partial summary judgment.

**Pacific Alliance's Motion**

The Court is granting summary judgment in favor of plaintiff Pacific Alliance holding defendant Kwok liable for breach of contract under the 2011 Personal Guarantee. By the plain terms of the 2013 Deed of Settlement, the failure to satisfy the conditions precedent to the settlement by June 30, 2015, would result in reverting to the 2011 Personal Guarantee being in full force and effect. *See* NYSCEF Doc. 461.

> **Clause 3.4:** Reversion of the Facility Letter after 31 July 2013. In the event that all conditions precedent set out in Clause 3.2 for all Apartments have not been satisfied by 31 July 2013 (or such later date agreed by the Parties in writing[— here, 30 June 2015, per the fourth and final supplemental Deed of Settlement]), **then the entire settlement as contemplated under this Deed shall be terminated and the Parties acknowledge that the Facility Letter shall revert and be in full force and effect immediately** after 31 July 2013 (or such later date agreed by the Parties in writing) and Shiny Times shall be obliged to settle the Total Outstanding Amount and any interest accrued thereon in accordance with the terms and conditions of the Facility Letter. (emphasis added).

*See also* NYSCEF Doc. No. 472 "Fourth Supplemental Deed of Settlement" (changing the date to satisfy the conditions precedent to "30 June 2015").

Plaintiff Pacific Alliance has shown, and defendant Kwok has failed to refute, that several of the conditions precedent in the 2013 Deed of Settlement were not fulfilled. Namely, defendant Kwok failed to deliver clean title, failed to provide plaintiff with an invoice for the

5

purchase of the apartments, failed to provide plaintiff with evidence regarding the payment of all

relevant taxes and charges in connection with the sale and purchase of the apartments, and failed

to deliver the House Ownership Certificates of any of the Apartments to plaintiff. *See* NYSCEF

Doc. No. 461 ¶ 3.2 (e)(g)(h)(i).

Kwok does not dispute that these conditions were never satisfied. Instead, in opposition,

Kwok argues that plaintiff Pacific Alliance failed to mitigate its damages when it allegedly did

not act on an opportunity to potentially seize the three apartments with the aid of Beijing police.

First, even taking Kwok's version of events as true, mitigation speaks to damages, not

liability, and thus these events would not preclude partial summary judgment on liability.

Second, as demonstrated by the documentary evidence sponsored by both parties, the alleged

opportunity to take possession of the three apartments with the aid of police only came up *after*

June 2015, and thus the 2013 Deed of Settlement had already been nullified in its entirety and the

2011 Personal Guarantee was in full force and effect. Third, Kwok has never pleaded, in either

of his Answers, mitigation, which is an affirmative defense. *See e.g. Eskenazi v. Mackoul,* 72

A.D.3d 1012, 1014 (2d Dep't 2010) (referring to "the affirmative defense of failure to mitigate

damages").

Finally, under Hong Kong law, a party is only required to act *reasonably* to mitigate

damages. *See* Affirmation of Vishal Prakash Melwani at ¶17.2 (NYSCEF Doc. No. 535) *and see*

Affirmation of Phillip Loukis Georgiou (NYSCEF Doc. No. 498)  at ¶¶ 18.3 and 21. The record

currently indicates that to take advantage of the alleged offer of the Beijing Police, Pacific

Alliance would have needed to pay RMB35m [approximately USD$5.5 million] per unit to get

them released. *See* NYSCEF Doc. No. 519 PAX-KWOK-017288.  The prospect of paying

approximately $16 million for assets that the parties had agreed would be transferred free of

charge to settle a debt would likely not have qualified as a *reasonable* opportunity to mitigate damages under Hong Kong law. Nevertheless, the Court reserves decision as to the issue of damages.

Under the 2011 Personal Guarantee

- Kwok "irrevocably and unconditionally. . . guarantee[d] to PAX [Pacific Alliance] the due and punctual payment of [Shiny Times'] [o]bligations [under the 2011 Facility] and agree[d] that promptly on PAX's demand he will pay to PAX all [o]bligations that are due but unpaid";

- Kwok "irrevocably and unconditionally agree[d] (as primary obligor and not only as surety) to indemnify and hold harmless PAX on demand from and against any and all losses incurred by PAX as a result of any [o]bligation [of Shiny Times] being or becoming void, voidable, unenforceable, or ineffective as against Shiny Times for any reason whatsoever . . . .";

- Kwok agreed that his "obligations . . . under this Guarantee shall constitute and be continuing obligations which shall not be released or discharged by any intermediate payment of [Shiny Times'] [o]bligations [under the 2011 Loan Facility] or any of them, shall continue in full force and effect until the unconditional and irrevocable payment and discharge in full of [those o]bligations and are in addition to and independent of, and shall not prejudice or merge with, any other security (or any right of setoff) which PAX may at any time hold in respect of [those o]bligations or any of them;"

- PAX was permitted to seek recourse against Kwok as primary obligor without first enforcing the debt against Shiny Times; and

- Kwok agreed to a catchall waiver of any defenses based on "any other act, event or omission which might operate to discharge, impair or otherwise affect the Guarantor or any of the Obligations or any of the rights, powers, and remedies conferred upon [PAX LP] by this Guarantee or by law."

Kwok does not argue that either he or Shiny Times made any payments under the 2011 Loan Facility or the 2011 Personal Guarantee to satisfy the debt. Accordingly, the Court finds Kwok liable for breach of the 2011 Personal Guarantee.

## **Conclusion**

The remaining issue in the action – Count II of the Amended Complaint – seeks to hold two of Kwok's companies—Genever Holdings LLC and Genever Holdings Corporation— liable

7

for Kwok's debt to Pacific Alliance as alter egos. This action was scheduled for a jury trial on

October 5, 2020. Due to the Covid-19 pandemic, the Court is unable to have a jury trial on that

date and the trial is rescheduled for January 15, 2021.

Accordingly, it is hereby,

ORDERED that defendant Kwok's cross-motion for reargument is denied; and it is

further

ORDERED that plaintiff's motion for partial summary judgment on Count I of the

Amended Complaint is granted in favor of  Pacific Alliance Asia Opportunity Fund L.P. and

against Kwok Ho Wan, a/k/a Kwok Ho, a/ka, GWO Wen Gui, a/ka/ Gui Wengui, a/ka/ Guo

Wen-Gui, a/ka/ Wan Gue Haoyun a/k/a Miles Kwok a/ka/ Haoyun Guo to the extent of holding

defendant Kwok liable for breach of contract; and it is further

ORDERED that plaintiff shall move no later than October 14, 2020 by notice of motion

returnable in the Submissions Part to establish damages on Count I by presenting affidavits on

personal knowledge and evidence in admissible form as to the principal amount due and owing

under the 2011 Personal Guarantee, the rate of interest applicable under the 2011 Personal

Guarantee, and the date from which interest is accruing, so that the Clerk of Court may calculate

the total amount due and owing as of the date of entry of judgment; and it is further

ORDERED that plaintiff shall simultaneously move for an award of legal fees and

expenses, setting forth the document which plaintiff is relying on and attaching invoices for

services rendered; and it is further

8

ORDERED that the parties appear for a status conference on December 22, 2020 at 10:20 am.

Dated: September 15, 2020

_____
BARRY R. OSTRAGER, J.S.C.

| CHECK ONE: | | CASE DISPOSED | | | X | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|---|
| | | GRANTED | | DENIED | X | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | | REFERENCE |

9

# EXHIBIT 7

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

PACIFIC ALLIANCE ASIA OPPORTUNITY
FUND L.P.,

               Plaintiff,

               v.

KWOK HO WAN, *a/k/a* KWOK HO, *a/k/a* GWO
WEN GUI, *a/k/a* GUO WENGUI, *a/k/a* GUO
WEN-GUI, *a/k/a* WAN GUE HAOYUN, *a/k/a*
MILES KWOK, *a/k/a* HAOYUN GUO,

               Defendant.

---

Index No.

**COMPLAINT**

## NATURE OF THE ACTION

1.      This is a straightforward breach of contract case.  Kwok Ho Wan, a/k/a Kwok Ho, a/k/a

Gwo Wen Gui, a/k/a Guo Wengui, a/k/a Guo Wen-Gui, a/k/a Wan Gue Haoyun, a/k/a Miles Kwok,

a/k/a Haoyun Guo ("Kwok"), a reported billionaire, and his controlled entities borrowed millions of

dollars from Plaintiff Pacific Alliance Asia Opportunity Fund L.P. ("PAX LP") but have failed to pay

any of the amount owed to PAX LP under binding written agreements.

2.      In 2008, PAX LP entered into a written agreement with Spirit Charter Investment

Limited ("Spirit Charter"), one of Kwok's business entities, under which PAX LP made available to

Spirit Charter a loan facility in the principal amount of $30 million.  This loan facility was conditioned

on Kwok's execution of a personal guarantee of Spirit Charter's repayment obligations.

3.      In 2009, another of Kwok's entities, Shiny Times Holdings Limited ("Shiny Times"),

assumed the debt that Spirit Charter owed to PAX LP, which the parties agreed at the time totaled

$45,357,534.25.  Kwok executed a personal guarantee of this debt.

4.      Then in 2011, PAX LP and Shiny Times entered into a written agreement (the "2011

Facility Letter") that expressly superseded prior agreements between the parties.  In the 2011 Facility

Letter, the parties agreed that Shiny Times owed PAX LP $46,426,489 and would repay that amount

(plus 15% annual interest from December 31, 2010) by June 30, 2012.

5.      That same day, Kwok entered into a separate personal guarantee (that similarly

expressly superseded Kwok's prior personal guarantee) under which Kwok guaranteed payment of all

amounts owed to PAX LP by Shiny Times under the 2011 Facility Letter (the "Personal Guarantee").

6.      To date, neither Shiny Times nor Kwok have paid any amount owed to PAX LP under

either the 2011 Facility Letter or the Personal Guarantee.

7.      PAX LP has taken all necessary and appropriate steps in accordance with its contracts

with Shiny Times and Kwok to recover the monies it is owed—now totaling approximately

$88 million including contractual interest—but has recovered nothing because it has been ignored by Shiny Times and Kwok at each step.

8.  Given that Kwok regularly transacts business, is domiciled and resides, and owns real estate in New York, PAX LP brings this action in this Court to enforce its contractual rights against Kwok.

## JURISDICTION AND VENUE

9.  This Court has personal jurisdiction over Kwok pursuant to New York's general personal jurisdiction statute, C.P.L.R § 301, because he is engaged in a continuous and systematic course of "doing business" in New York and is domiciled in the state.

10.  Venue is proper in this Court under C.P.L.R § 503(a) because Kwok's residence is in New York County.

## PARTIES

11.  Plaintiff PAX LP is an investment fund organized as an exempted limited partnership under the laws of the Cayman Islands.

12.  Defendant Kwok is a Chinese national who is domiciled in New York and engages in a continuous and systematic course of "doing business" in New York.

13.  Kwok resides on the 18th Floor of The Sherry-Netherland Hotel in New York City—a residence he purchased in 2015 for $67.5 million through Genever Holdings, LLC ("Genever"), a domestic limited liability company that he solely owns and that maintains its principal place of business in New York State at 80 State Street in Albany.

14.  Kwok also maintains offices at 767 Fifth Avenue for Golden Spring (New York) Ltd. ("Golden Spring"), a Delaware company that he owns, which is registered to do business as a foreign corporation in New York and has a registered agent for service of process in New York.

2

15.     Kwok also has employees or agents in New York, including those who work for Golden

Spring and the attorneys he hired to represent him in two cases in the United States District Court for

the Southern District of New York over the last two years.[1]

## STATEMENT OF FACTS

### *The Shiny Times Loan and Kwok's Personal Guarantee to Repay PAX LP*

16.     PAX LP and Kwok have had business dealings since approximately February 4, 2008,

when PAX LP entered into a written agreement (the "2008 Facility Agreement") with Spirit Charter,

one of Kwok's business entities, under which PAX LP made available to Spirit Charter a loan facility

in the principal amount of $30 million.

17.     This loan facility was conditioned on Kwok's execution of a personal guarantee of

Spirit Charter's repayment obligations.

18.     On March 12, 2008, PAX LP and Spirit Charter amended and restated the 2008 Facility

Agreement ("Amended and Restated 2008 Facility Agreement").

19.     By a deed dated September 17, 2009 (the "September 2009 Deed"), Shiny Times

(another of Kwok's entities), Spirit Charter, PAX LP, and various other parties agreed that Shiny

Times would replace Spirit Charter as the borrower under the Amended and Restated 2008 Facility

Agreement.  The parties to the September 2009 Deed also agreed that the outstanding amount under

the Amended and Restated 2008 Facility Agreement, including accrued and unpaid interest, was then

$45,357,534.25 as of September 12, 2009 (the "Amended 2008 Loan Facility").

---

[1] In 2015, Kwok and Golden Spring were sued for violations of the Fair Labor Standards Act, and in that lawsuit, Kwok (through counsel) acknowledged that he was properly served with a summons and complaint at The Sherry-Netherland Hotel. *Ahn v. Golden Spring (New York) Ltd. et al.*, No. 1:15-cv-09697 (S.D.N.Y. Dec. 11, 2015).  In 2016, Kwok and Genever filed a lawsuit (through counsel) against The Sherry-Netherland Hotel and others relating to a leak in his apartment at the hotel. *Genever Holdings, LLC and Miles Kwok v. The Sherry-Netherland, Inc., et al.*, No. 1:16-cv-06246-GBD (S.D.N.Y. Aug. 5, 2016).

3

FILED: NEW YORK COUNTY CLERK 04/18/2017 04:01 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 04/18/2017

Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 45 of
134

20.     The September 2009 Deed required Kwok to execute a personal guarantee in favor of

PAX LP to secure Shiny Times' due and punctual performance and repayment of the Amended 2008

Loan Facility.  Kwok executed his personal guarantee on November 18, 2009.

21.     PAX LP, Kwok, and Shiny Times thereafter agreed to supersede the foregoing

agreements with two contracts executed on March 16, 2011—the 2011 Facility Letter (attached as

Exhibit A) and the Personal Guarantee (attached as Exhibit B).

22.     In the 2011 Facility Letter, the parties agreed that Shiny Times owed PAX LP

$46,426,489 and would repay that amount (plus 15% annual interest from December 31, 2010) by June

30, 2012.

23.     The parties further agreed in the 2011 Facility Letter that any failure by Shiny Times to

pay any amount owed to PAX LP under the 2011 Facility Letter would constitute an Event of Default,

and that in such event PAX LP could (i) declare the entire loan, accrued and unpaid interest, and any

other money payable to be immediately due and payable without further demand or notice or other

legal formality of any kind, and/or (ii) declare the 2011 Facility Letter terminated.

24.     Finally, like the prior agreements between the parties, the 2011 Facility Letter was

expressly conditioned on Kwok's execution of the Personal Guarantee to fully backstop Shiny Times'

payment obligations to PAX LP:

> The Lender [PAX LP] and the Borrower [Shiny Times] agree to enter into this
> Agreement . . . on the condition that a new personal guarantee of Mr. Kwok (the
> "Personal Guarantee"), in favour of the Lender is delivered to secure the due and
> punctual performance of the Borrower to fully repay the [2011 Facility Letter]
> plus all accrued and unpaid interest in accordance with this Agreement.

25.     Kwok signed the 2011 Facility Letter as a Director of Shiny Times and also, on the

same day, signed the Personal Guarantee, under which Kwok agreed to "irrevocably and

unconditionally" guarantee Shiny Times' payment of all amounts owed under the 2011 Facility Letter.

In particular, Kwok:

(a)      guaranteed to PAX LP the "due and punctual payment" of Shiny Times' obligations under the 2011 Facility Letter;

(b)      agreed "that promptly on [PAX LP's] demand [Kwok] will pay to [PAX LP] all [such amounts] that are due but unpaid";

(c)      agreed to "indemnify and hold harmless [PAX LP] on demand from and against all losses incurred by [PAX LP] as a result of any obligation of Shiny Times under the 2011 Facility Letter being or becoming void, voidable, unenforceable or ineffective as against Shiny Times for any reason whatsoever";

(d)      agreed that PAX LP's demand for payment would constitute *prima facie* evidence that such payment was due and owing;

(e)      agreed that PAX LP could seek repayment from either Shiny Times or Kwok; and

(f)      agreed to indemnify PAX LP from "any and all costs, claims losses, [and] expenses (including legal fees)" incurred as a result of exercising or enforcing the Personal Guarantee.

26.      Furthermore, Kwok agreed to waive several defenses, including those based on the winding up or dissolution of Shiny Times, or PAX LP's inability to recover against Shiny Times "for any reason." Kwok also agreed to a catchall waiver of any conceivable defenses based on "any other act, event or omission which might operate to discharge, impair or otherwise affect the Guarantor or any of the Obligations or any of the rights, powers, and remedies conferred upon [PAX LP] by this Guarantee or by law."

27.      In other words, Kwok signed an unambiguous and ironclad guarantee that he would satisfy Shiny Times' debt to PAX LP under any circumstances.

### The Extensions and Shiny Times' Ultimate Failure to Repay PAX LP

28.      Shiny Times did not repay any portion of the loan principal or accrued interest before the June 30, 2012 repayment date set forth in the 2011 Facility Letter, and the parties subsequently entered into a series of extensions, each labeled a "Deed of Settlement."

5

29.     PAX LP, Shiny Times, and Kwok entered into the first Deed of Settlement (the

"Original Deed of Settlement") along with Beijing Pangu Investment Inc. ("Beijing Pangu"), another

company within the Kwok empire, on April 19, 2013.

30.     The Original Deed of Settlement provided that the total outstanding amount due under

the 2011 Facility Letter plus all accrued and unpaid interest was $52 million as of the date of the

Original Deed of Settlement, and that amount would be no longer due and owing upon the satisfaction

of the following conditions:

> (a)     If PAX LP completed the purchase of three apartments from Beijing
>         Pangu in a series of three separate transactions for approximately $5
>         million each, for a total of approximately $15 million; and
>
> (b)     If Shiny Times completed three installment payments to PAX LP of
>         approximately $5 million each—one installment payment to be made after
>         each separate apartment purchase—for a total of approximately $15
>         million.

31.     Before PAX LP could purchase any of the three apartments from Beijing Pangu,

however, Beijing Pangu was required under the Original Deed of Settlement to satisfy certain

conditions precedent relating to title, taxes, and other common aspects of real estate transactions.  If

any of these conditions were not met for any of the three apartments by July 31, 2013, the Original

Deed of Settlement expressly provided that it would be terminated in its entirety, and the 2011 Facility

Letter would revert into full effect.

32.     Beijing Pangu failed to satisfy these conditions precedent by July 31, 2013,  PAX LP

therefore did not complete its purchase of any of the apartments, and Shiny Times did not make any of

the three installment payments it owed to PAX LP under the Original Deed of Settlement.

33.     Four supplemental deeds of settlement—on December 3, 2013, May 15, 2014, July 11,

2014, and February 10, 2015—extended the dates in the Original Deed of Settlement, including the

repayment date and the date for Beijing Pangu to satisfy the conditions precedent.

6

FILED: NEW YORK COUNTY CLERK 04/18/2017 04:01 PM
NYSCEF DOC. NO. 2

INDEX NO. 652077/2017
RECEIVED NYSCEF: 04/18/2017

Case 22-50073    Doc 57-2    Filed 03/01/22    Entered 03/01/22 22:13:12    Page 48 of
134

34.     Each of the supplemental deeds had the same terms as the Original Deed of Settlement. And the result was the same each time:  Beijing Pangu never met the conditions it was required to satisfy, PAX LP therefore was not required to, and did not, complete its purchase of any of the apartments, and Shiny Times never made any of the three installment payments it owed to PAX LP under the 2011 Facility Letter.

35.     Finally, on March 31, 2015, Shiny Times and PAX LP, together with Worldwide Opportunity Holdings Limited and Empire Growth Holdings Limited, entered into an Option Agreement (the "Option Agreement") that provided, among other things, for the repayment via share sale transaction of amounts owed by Shiny Times to PAX LP.

36.     Pursuant to its terms, the Option Agreement was to terminate if certain conditions relating to the transfer of property (as stated in the Option Agreement) were not satisfied.  None of these conditions were satisfied, and the Option Agreement was terminated without negating Shiny Times' obligation to pay PAX LP.

37.     Thus, the 2011 Facility Letter reverted to being in full force and effect, Kwok's obligations under the Personal Guarantee are fully enforceable, and Kwok is independently liable under the Personal Guarantee for the full amount of Shiny Times' debt owed to PAX LP under the 2011 Facility Letter.

### *PAX LP Seeks to Enforce Its Contractual Rights and Collect Amounts Owed*

38.     On October 16, 2015, after the Deeds of Settlement and Option Agreement were terminated and the 2011 Facility Letter reverted to being in full force and effect, PAX LP sent a written notice of demand (the "Notice of Demand") to Kwok's address in Hong Kong, as specified under the terms of the Personal Guarantee.

39. The Notice of Demand informed Kwok that "Shiny Times ha[d] failed to repay any part

of the sum due" under the 2011 Facility Letter and demanded immediate payment of $71,818,633.44.

The Notice of Demand also informed Kwok that legal proceedings might be commenced against him if

he did not make immediate payment, and reserved PAX LP's contractual rights under both the 2011

Facility Letter and the Personal Guarantee.

40. Kwok never responded to the Notice of Demand.

41. On February 19, 2016, PAX LP sent a letter to Shiny Times demanding payment of

$82,219,404.08 due and owing under the 2011 Facility Letter (the "Shiny Times Demand Letter"),

which represented the principal plus contractual interest of 15% per annum calculated up to the date of

the Shiny Times Demand Letter.

42. Shiny Times never responded to the Shiny Times Demand Letter.

43. When Shiny Times did not respond, PAX LP submitted an application to court in the

British Virgin Islands ("BVI") on February 29, 2016 seeking the appointment of joint liquidators to put

Shiny Times, which is a BVI corporation, into liquidation. The application alleged that (i) Shiny

Times had failed to pay the sum then-owing of $82,410,197.87, (ii) Shiny Times was unable to pay its

debts, and (iii) Shiny Times was insolvent and should be liquidated.

44. Although Shiny Times was in fact placed into liquidation as a result of the BVI

proceeding, PAX LP was unable to collect any of the monies owed to it under the 2011 Facility Letter.

45. To date, Kwok has not repaid any of the money due and owing to PAX LP under the

Personal Guarantee. The sum due and owing—which includes the outstanding principal plus accrued

and unpaid interest—is currently approximately $88 million.

46. As a result of Kwok's failure to repay any of the money due and owing to PAX LP,

Plaintiff has incurred "costs, claims losses, [and] expenses (including legal fees)" in connection with

8

enforcing the Personal Guarantee. Kwok is obligated to indemnify those amounts under the express terms of the Personal Guarantee (*see* Paragraph 25(f)).

## COUNT I – BREACH OF CONTRACT
### Against Defendant Kwok

47.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 46 as though fully set forth herein.

48.     The Personal Guarantee obligates Kwok to repay PAX LP for the loan facility (as amended) that PAX LP made available to Spirit Charter, along with unpaid interest. The current amount due and owing is approximately $88 million.

49.     Plaintiff performed its own obligations under the Personal Guarantee (and other related agreements).

50.     Kwok has not repaid any of the money due and owing to PAX LP under the Personal Guarantee.

51.     As a direct result of Kwok's breach of his payment obligations under the Personal Guarantee, Plaintiff continues to suffer the loss of approximately $88 million dollars, an amount that continues to incur interest.

WHEREFORE, Plaintiff requests judgment against Defendant as follows:

(a)     in the amount of $46,426,489 under the Personal Guarantee;

(b)     in the amount of $41,096,982.46 in interest;

(c)     the reasonable attorneys' fees, costs, and expenses PAX LP has incurred, and will continue to incur, in connection with its enforcement of the Personal Guarantee against Kwok under the Personal Guarantee's indemnification clause; and

(d)     such other and further relief to which PAX LP shows itself justly entitled.

9

DATED:       New York, New York
             April 18, 2017

                                   Respectfully submitted,

                                   THE SEIDEN GROUP

                                   By:_____
                                   Robert W. Seiden (rseiden@seidenlegal.com)
                                   1120 Avenue of the Americas
                                   New York, NY 10036
                                   (212) 626-6708

                                   -and-

                                   O'MELVENY & MYERS LLP
                                   Stuart Sarnoff (ssarnoff@omm.com)
                                   Edward Moss (emoss@omm.com)
                                   7 Times Square
                                   New York, NY 10036
                                   (212) 326-2000


                                   *Attorneys for Plaintiff*

# EXHIBIT 8

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PACIFIC ALLIANCE ASIA OPPORTUNITY
FUND L.P.,

        Plaintiff,

    v.

KWOK HO WAN, *a/k/a* KWOK HO, *a/k/a* GWO
WEN GUI, *a/k/a* GUO WENGUI, *a/k/a* GUO
WEN-GUI, *a/k/a* WAN GUE HAOYUN, *a/k/a*
MILES KWOK, *a/k/a* HAOYUN GUO,
GENEVER HOLDINGS CORPORATION, and
GENEVER HOLDINGS LLC,

        Defendants.

17 652077

Index No. 652077/2017

[~~PROPOSED~~] JUDGMENT

WHEREAS, on April 18, 2017, Plaintiff Pacific Alliance Asia Opportunity Fund L.P.,

filed a complaint against Defendant Kwok Ho Wan, a/k/a Kwok Ho, a/k/a Gwo Wen Gui, a/k/a

Guo Wengui, a/k/a Guo Wen-Gui, a/k/a Wan Gue Haoyun, a/k/a Miles Kwok, a/k/a Haoyun Guo

("Kwok"), alleging a cause of action for breach of contract against Defendant Kwok.

WHEREAS, on April 18, 2019, Plaintiff filed a First Amended Complaint against Kwok,

and Genever Holdings LLC, and Genever Holdings Corporation (together with Genever

Holdings LLC, the "Genever Defendants"), alleging causes of action for (i) breach of contract

against Defendant Kwok and (ii) veil piercing against the Genever Defendants.

WHEREAS, on July 24, 2020, Plaintiff moved for partial summary judgment on its

breach of contract claim against Kwok, and the motion was fully briefed and heard before Justice

Barry R. Ostrager, who issued a Decision and Order dated September 15, 2020, which was

entered in the New York County Clerk's Office on September 16, 2020, granting Plaintiff's

motion on Count I of the Amended Complaint for breach of contract, and directed Plaintiff move

by Notice of Motion to establish damages on Count I no later than October 14, 2020.

FILED: NEW YORK COUNTY CLERK 02/03/2021 12:28 PM
NYSCEF DOC. NO.: 716

INDEX NO. 652077/2017

RECEIVED NYSCEF: 02/03/2021

Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 54 of 134

17 652077

WHEREAS, (i) on September 21, 2020, Plaintiff moved by Notice of Motion to establish damages, legal fees and expenses; (ii) Plaintiff agreed to temporarily withdraw, without prejudice and with the Court's permission and the other parties' understanding that it would be renewed at a later date, the portion of its application relating to legal fees and expenses (i.e., enforcement costs); and (iii) the motion was fully briefed and heard before Justice Barry R. Ostrager, who issued a Decision and Order dated December 18, 2020 (the "Damages Order"), and entered into the New York County Clerk's office on December 18, 2020, directing the Clerk of Court to enter judgment in favor of Plaintiff and against Defendant Kwok in the amount of $46,426,489.00 plus contractual interest at a rate of 15% per annum from effective date of December 31, 2010 and at the statutory rate of 9% per annum from the date of entry of this decision and order.

NOW, upon motion of O'Melveny & Myers LLP, attorneys for Plaintiff, it is:

ADJUDGED that Plaintiff Pacific Alliance Asia Opportunity Fund L.P., having a business address at 33/F, Three Pacific Place, 1 Queen's Road East, Hong Kong, have judgment against and do recover from Defendant Kwok Ho Wan, residing at 781 Fifth Avenue, 18th Floor, New York, NY 10022, the amount of _____ **$46,426,489.00** _____, plus contractual interest in the amount of _____ **$69,448,939.71** _____, plus post-judgment interest at the statutory rate of 9% in the amount of _____ **$526,590.86** _____, for a total of

**X** _____ **$116,402,019.57** _____, and Plaintiff shall have execution thereof.

~~Judgment signed and entered this ___ th day of _____, 2021~~

**FILED**
**Feb 03 2021**
NEW YORK
COUNTY CLERK'S OFFICE

_Milton Adam Tingling._
Clerk

3 rd          Feb.          2021

2

2 of 4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PACIFIC ALLIANCE ASIA OPPORTUNITY
FUND L.P.,

               Plaintiff,

      v.

KWOK HO WAN, *a/k/a* KWOK HO, *a/k/a* GWO
WEN GUI, *a/k/a* GUO WENGUI, *a/k/a* GUO
WEN-GUI, *a/k/a* WAN GUE HAOYUN, *a/k/a*
MILES KWOK, *a/k/a* HAOYUN GUO,
GENEVER HOLDINGS CORPORATION, and
GENEVER HOLDINGS LLC,

               Defendants.

Index No. 652077/2017

**AFFIRMATION OF EDWARD MOSS,
ESQ.**



        I, Edward Moss, an attorney duly admitted to practice before the Courts of the

State of New York, hereby affirm, under penalty of perjury, pursuant to the Civil Practice Law

and Rules of the State of New York § 2106, as follows:

        1.     I am a member of the bar of this Court and a partner in the law firm of O'Melveny

& Myers LLP, counsel of record for Plaintiff Pacific Alliance Asia Opportunity Fund L.P.

("PAX") in this matter.

        2.     I am fully familiar with the facts and circumstances in this action. For purposes

of entry of this judgment, I submit this affirmation waiving costs and disbursements.

Dated:   January 25, 2021        By: */s/ Edward Moss*
        New York, New York           Edward Moss

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
Index No. 652077/2017

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND
L.P.,

Plaintiff,

-against-

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN
GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI,
a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK,
a/k/a HAOYUN GUO, GENEVER HOLDINGS
CORPORATION, and GENEVER HOLDINGS LLC,

Defendants.

## JUDGMENT

[PROPOSED] JUDGMENT

**O'MELVENY & MYERS LLP**

TIMES SQUARE TOWER
7 TIMES SQUARE
NEW YORK, NEW YORK 10036
(212) 326-2000

Attorneys for Plaintiff Pacific Alliance Asia Opportunity
Fund, L.P.

F I L E D

Feb 03 2021

NEW YORK
COUNTY CLERK'S OFFICE

# EXHIBIT 9

FILED: NEW YORK COUNTY CLERK 06/24/2020 05:49 PM

NYSCEF DOC. NO. 455

INDEX NO. 652077/2017

Case 22-50073    Doc 57-2    Filed 03/01/22    Entered 03/01/22 22:13:12    Page 58 of

RECEIVED NYSCEF: 06/24/2020

134

DATED THE 16th DAY OF MARCH 2011


KWOK HO WAN
as Guarantor


in favour of


PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.


---

PERSONAL GUARANTEE

---


Hong Kong


**154**

KWOK000651

THIS GUARANTEE is made the 16th day of March 2011

BETWEEN:

(1)     KWOK HO WAN (郭浩云) holder of Hong Kong identity card no. P746467(7) of Room 411, 4th Floor, Nan Fung Tower, 173 Des Voeux Road Central, Hong Kong (the "Guarantor"); and

(2)     PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P., an exempted limited partnership established under the laws of the Cayman Islands whose registered office is at P.O. Box 472, 2nd Floor, Harbour Place, Grand Cayman, Cayman Islands ("PAX").

**RECITALS**

A.     On or about the date of this Guarantee, PAX and Shiny Times Holdings Limited ("Shiny Times") entered into a facility letter (the "Facility Letter") whereby it was agreed that (a) the total principal amount under the Facility Letter as of the Effective Date US$46,428,489 (the "Outstanding Amount") and (b) the Outstanding Amount shall be deemed as the new revised principal amount under the Facility Letter, which shall accrue interest at the rate of 15% per annum from the Effective Date until fully repaid. It was further agreed that the maturity date for payment of the Loan (as defined in the Facility Letter) shall be on or before 30 June 2012.

B.     A condition precedent to the completion under the Facility Letter is the Guarantor's delivery of this Guarantee to secure due and punctual performance of all of Shiny Times' payment and performance obligations whatsoever (the "Obligations", and "Obligation" shall be construed accordingly), under or in relation to the Facility Letter.

C.     It was further agreed that, immediately after the Effective Date, and upon the completion of the conditions precedent under the Facility Letter, Shiny Times and the Guarantor shall be discharged and released in full from all the obligations, liabilities and responsibilities under the Deed and Letter Agreement (both terms are defined in the Facility Letter) respectively and claims arising out of or in connection with the Deed and Letter Agreement shall also be fully discharged.

1.     **INTERPRETATION**

1.1     **References to Agreements**

Unless otherwise stated, any reference in this Guarantee to any agreement or document (including any reference to this Guarantee or the Facility Letter) shall be construed as a reference to:

(a)     such agreement or document as amended, varied, novated or supplemented from time to time;

(b)     any other agreement or document whereby such agreement or document is so amended, varied or novated; and

(c)     any other agreement or document entered into pursuant to or in accordance with such agreement or document.

KWOK000652

FILED: NEW YORK COUNTY CLERK 06/24/2020 05:49 PM
NYSCEF DOC. NO. 435
INDEX NO. 652007/2017
RECEIVED NYSCEF: 06/24/2020
Case 22-50073    Doc 57-2    Filed 03/01/22    Entered 03/01/22 22:13:12    Page 60 of
134

## 1.2    Clause Headings

Clause headings are for ease of reference only and shall not affect the construction of this Guarantee.

## 2.    GUARANTEE

## 2.1    Guarantee and indemnity

The Guarantor hereby irrevocably and unconditionally:

(a) guarantees to PAX the due and punctual payment of the Obligations and agrees that promptly on PAX's demand he will pay to PAX all Obligations that are due but unpaid; and

(b) agrees (as primary obligor and not only as surety) to indemnify and hold harmless PAX on demand from and against all losses incurred by PAX as a result of any Obligation being or becoming void, voidable, unenforceable or ineffective as against Shiny Times for any reason whatsoever (whether or not known to PAX or any other person), the amount of such loss being the amount that PAX would otherwise have been entitled to recover from Shiny Times,

PROVIDED THAT the total liabilities of the Obligations or amount due from the Guarantor under this Guarantee shall always be limited to the sum of the Outstanding Amount plus interest of the rate of 16% per annum accrued from 31 December 2010 to the date on which all such liabilities are paid in full.

For the avoidance of doubt, this Guarantee came into effect on 31 December, 2010 (the "Effective Date").

## 2.2    Demands

The amount specified in a demand made by PAX pursuant to this Guarantee as to the amount of any Obligation or the amount due from the Guarantor under this Guarantee shall be *prima facie* evidence that such Obligation or such amount is due and payable.

## 3.    CONTINUING SECURITY

## 3.1    Continuing and Independent Obligations

The obligations of the Guarantor under this Guarantee shall constitute and be continuing obligations which shall not be released or discharged by any intermediate payment of the Obligations or any of them, shall continue in full force and effect until the unconditional and irrevocable payment and discharge in full of the Obligations and are in addition to and independent of, and shall not prejudice or merge with, any other security (or any right of set-off) which PAX may at any time hold in respect of the Obligations or any of them.

## 3.2    Avoidance of Payments

Where any release, discharge or other arrangement, in respect of any Obligation PAX may hold for such Obligation, is given or made in reliance on any payment or other disposition that is avoided or must be repaid (whether in whole or in part) in an insolvency, liquidation or otherwise, and whether or not PAX has conceded or compromised any claim that any such payment or other disposition will or should be avoided or repaid (in whole or in part), this

2

KWOK000653

Guarantee shall continue as if such release, discharge or other arrangement had not been given or made.

**3.3    Immediate Recourse**

PAX shall not be obliged before exercising any of the rights conferred on it by this Guarantee or by law to seek to recover amounts due from Shiny Times or to exercise or enforce any other right or security it may have or hold in respect of the Obligations.

**3.4    Waiver of Defences**

Neither the obligations of the Guarantor contained in this Guarantee nor the rights, powers and remedies conferred upon PAX by this Guarantee or by law shall be discharged, impaired or otherwise affected by:

(a)    the winding-up, dissolution, administration or re-organisation of Shiny Times or any other person or any change in the status, function, control or ownership of Shiny Times or any such person;

(b)    any of the Obligations or any security held by PAX in respect thereof being or becoming illegal, invalid, unenforceable or ineffective in any respect;

(c)    any time or other indulgence being granted or agreed (i) to or with Shiny Times or any other person in respect of the Obligations or any of them or (ii) in respect of any security held by PAX in respect thereof;

(d)    any amendment to, or any variation, waiver or release of, the Obligations or any of them or any security held by PAX in respect thereof;

(e)    any total or partial failure to take or perfect any security proposed to be taken in respect of the Obligations or any of them;

(f)    any total or partial failure to realise the value of, or any release, discharge, exchange or substitution of, any security held by in respect of the Obligations or any of them; or

(g)    any other act, event or omission which might operate to discharge, impair or otherwise affect the Guarantor or any of the Obligations or any of the rights, powers and remedies conferred upon PAX by this Guarantee or by law.

**3.5    No Competition with PAX**

Any right which the Guarantor may have by way of contribution or indemnity in relation to the Obligations, or otherwise to claim or prove as a creditor of Shiny Times or any other person or its estate in competition with PA, shall be exercised by the Guarantor only if and to the extent that PAX so requires and in such manner and upon such terms as PAX may specify, and the Guarantor shall hold all monies, rights or security held or received by it as a result of the exercise of any such right on trust for PAX for application in accordance with the terms of this Guarantee as if such monies, rights or security were held or received by PAX under this Guarantee.

**3.6    Appropriation**

PAX shall not be obliged to apply any sum held or received by it in respect of the Obligations in or towards payment of the Obligations and all such sums may be credited to a suspense or impersonal account and held in such account pending the application from time to time

3

157

KWOK000654

(as PAX may think fit) of such sums in or towards the discharge of such obligations of the Guarantor to PAX as PAX may select.

## 4. PAYMENTS

### 4.1 Grossing Up

All payments made by the Guarantor under this Guarantee shall be made free and clear and without any deduction and free and clear of, and without deduction for or on account of, tax except, in the latter case, to the extent that the Guarantor is required by law to make payment subject to tax. If any tax or amount in respect of tax must be deducted, or any other deduction must be made, from any amount payable or paid by the Guarantor under this Guarantee, the Guarantor shall pay such additional amounts as may be necessary to ensure that PAX receives a net amount equal to the full amount which it would have received had payment not been made subject to tax.

### 4.2 Payments without Set-off

All payments made by the Guarantor under this Guarantee shall be made free and clear of and without any deduction for or on account of any set-off or counterclaim.

### 4.3 Manner of Payment

All payments made by the Guarantor under this Guarantee shall be paid in the manner required by PAX.

## 5. COSTS AND EXPENSES

### 5.1 Transaction Costs

The Guarantor shall on demand of PAX reimburse to PAX on a full indemnity basis all costs and expenses (including legal fees), incurred by PAX in connection with the preparation, negotiation and execution of this Guarantee.

### 5.2 Stamp Taxes

The Guarantor shall promptly pay all stamp, registration and other taxes to which this Guarantee or any judgment given in connection with this Guarantee is or at any time may be subject and shall on demand indemnify PAX against all Obligations, costs, claims and expenses (including legal fees) resulting from any failure to pay or delay in paying any such tax.

### 5.3 Indemnity

The Guarantor shall indemnify and hold harmless PAX from and against any and all costs, claims losses, expenses (including legal fees) and Obligations, which PAX may incur as a result of the exercise or enforcement by PAX of any of the rights or powers conferred on it under this Guarantee or by law.

## 6. WAIVERS AND REMEDIES

No failure by PAX to exercise, nor any delay by PAX in exercising, any right or remedy under this Guarantee shall operate as a waiver thereof nor shall any single or partial exercise of any such right or remedy prevent any further or other exercise thereof or the exercise of any other such right or remedy.

4

KWOK000655

7.    **ADDITIONAL PROVISIONS**

7.1    **Partial Invalidity**

If at any time any provision of this Guarantee is or becomes illegal, invalid or unenforceable in any respect, or this Guarantee is or becomes ineffective in any respect under the law of any jurisdiction, such illegality, invalidity, unenforceability or ineffectiveness shall not affect:

(a)    the legality, validity or enforceability of the remaining provisions of this Guarantee or the effectiveness in any other respect of this Guarantee under such law; or

(b)    the legality, validity or enforceability of such provision or the effectiveness of this Guarantee under the law of any other jurisdiction.

7.2    **Potentially Avoided Payments**

If PAX determines that an amount paid to it under the Facility Letter is capable of being avoided or otherwise set aside on the liquidation or administration of the person by whom such amount was paid, then for the purposes of this Guarantee, such amount shall be regarded as not having been paid.

7.3    **Currency Conversion**

In order to apply any sum held or received by PAX in or towards payment of the Obligations, PAX may purchase an amount in another currency and the rate of exchange to be used shall be that at which, at such time as it considers appropriate, PAX is able to effect such purchase.

7.4    **Currency Indemnity**

If any sum due from the Guarantor under this Guarantee or any order or judgment given or made in relation to this Guarantee has to be converted from the currency (the "first currency") in which the same is payable under this Guarantee or under such order or judgment into another currency (the "second currency") for the purpose of (a) making or filing a claim or proof against the Guarantor, (b) obtaining an order or judgment in any court or other tribunal, or (c) enforcing any order or judgment given or made in relation to this Guarantee, the Guarantor shall indemnify and hold harmless PAX from and against any loss suffered or incurred as a result of any discrepancy between (i) the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency, and (ii) the rate or rates of exchange at which PAX may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof.

7.5    **Rights Cumulative**

The rights and remedies provided by this Guarantee are cumulative and not exclusive of any right or remedy provided by law.

8.    **ASSIGNMENTS**

8.1    **The Guarantor's Rights and Obligations**

The rights and obligations of the Guarantor under this Guarantee are not assignable or transferable and the Guarantor shall not purport to assign any or all such rights or obligations, without the prior written consent of PAX.

5

159

KWOK000656

8.2     PAX's Rights

The rights of PAX under this Guarantee are assignable in whole or in part, and PAX may assign all or any such right without the consent of the Guarantor.

9.     NOTICES

9.1     Communications in Writing

Each communication to be made under this Guarantee shall be made in writing but, unless otherwise stated, may be made by fax or letter.

9.2     Delivery of Notices

Any communication or document to be made or delivered by one person to another pursuant to this Guarantee shall (unless that other person has by 3 days' written notice to the other specified another address or fax number) be made or delivered to that other person at the authorized address or fax number of that person and shall be deemed to have been made or delivered when despatched (in the case of any communication made by fax), or (in the case of any communication made by letter) when left at that address or (as the case may be) five days after being deposited in the post postage prepaid in an envelope addressed to it at that address. Subject to the foregoing, the authorised address and fax number of each party, for the purpose of Clause 9, are as follows:

PA:

    Address:

        15/F, AIA Central
        1 Connaught Road Central
        Hong Kong

    Fax:    +852 2918 0881
    Attn:    Jon Lewis, Group General Counsel

The Guarantor:

    Address:    Room 411, 4th Floor, Nan Fung Tower,
        173 Des Voeux Road Central
        Hong Kong

    *with a copy to*

    Address:    Stevenson, Wong & Co.
        4th Floor, Central Tower
        28 Queen's Road Central
        Hong Kong
    Fax:    +852 2868 9928
    Attn:    Hank Lo

9.3     Notices to PA

Any communication or document to be made or delivered to PAX shall be effective only when received by PAX and then only if it is expressly marked for the attention of the

8

KWOK000657

FILED: NEW YORK COUNTY CLERK 09/24/2020 05:15 PM INDEX NO. 652077/2017

NYSCEF DOC. NO. 455 Case 22-50073 Doc 57-2 Filed 03/01/22 Entered 03/01/22 22:13:12 Page 65 of RECEIVED NYSCEF: 09/24/2020

134

department or officer identified with PA's signature below or such other department or officer as PAX shall from time to time specify for this purpose.

### 9.4 English Language

Each communication and document made or delivered by one party to another pursuant to this Guarantee shall be in English or accompanied by a translation into English which is certified (by an officer of the person making or delivering the same) as being a true and accurate translation.

### 10. GOVERNING LAW

This Guarantee is governed by and shall be construed in accordance with the laws of Hong Kong.

### 11. JURISDICTION

### 11.1 Courts of Hong Kong

Each of the Guarantor and PAX irrevocably agrees that the courts of Hong Kong shall have jurisdiction to hear and determine any suit, action or proceedings, and to settle any disputes, which may arise out of or in connection with this Guarantee (respectively, "Proceedings" and "Disputes") and, for such purposes, irrevocably submits to the jurisdiction of such courts.

### 11.2 Appropriate Forum

The Guarantor irrevocably waives any objection which he might now or hereafter have to Proceedings being brought or Disputes settled in the courts of Hong Kong and agrees not to claim that any such court is not a convenient or appropriate forum.

### 11.3 Service of Process

The Guarantor agrees that the process by which Proceedings are begun may be served on him by being delivered to him personally in connection with all Proceedings in Hong Kong.

### 11.4 Proceedings in Other Jurisdictions

Nothing in Clause 11.1 (*Courts of Hong Kong*) shall (and shall not be construed so as to) limit the right of PAX to take Proceedings against the Guarantor in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not) if and to the extent permitted by applicable law.

### 11.5 General Consent

The Guarantor consents generally in respect of any Proceedings to the giving of any relief or the issue of any process in connection with such Proceedings including the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be made or given in such Proceedings.

### 12. COUNTERPARTS

This Guarantee may be executed in counterparts and such counterparts taken together shall constitute one and the same instrument.

### 13. SOVEREIGN IMMUNITY

KWOK000658

FILED: NEW YORK COUNTY CLERK 07/24/2020 11:15 PM    INDEX NO. 65207772017

NYSCEF DOC. NO. 455    Case 22-50073    Doc 57-2    Filed 03/01/22    Entered 03/01/22 22:13:12    Page 66 of    RECEIVED NYSCEF: 07/24/2020
134

To the extent that the Guarantor may be entitled, in any Hong Kong Court or other court, to claim for himself or his revenues, assets or properties, sovereign immunity from service of process, from suit, from the jurisdiction of any court, from attachment in aid of execution or enforcement of a judgment (interlocutory or final), or from any other legal process, and to the extent that, in any such jurisdiction there may be attributed such a sovereign immunity (whether claimed or not), the Guarantor irrevocably agrees not to claim, and hereby irrevocably waives, such sovereign immunity.

IN WITNESS WHEREOF this Guarantee has been duly executed by the Guarantor and has been signed by PAX.

6

162

KWOK000659

134

EXECUTION PAGE

PERSONAL GUARANTEE

SIGNED, SEALED AND DELIVERED
by KWOK HO WAN
in the presence of:

Signature
of Witness:

Name:
Address:

Occupation:

SIGNED by                                    )
Jon Lewis                                    )
Director, Pacific Alliance Group Asset       )
Management Limited,                          )
the General Partner of                       )
PACIFIC ALLIANCE ASIA                        )
OPPORTUNITY FUND L.P.                        )
in the presence of:-                         )

Signature
of Witness:

Name:     STEFFI TAM
Address:  15/F, AIA CENTRAL, 1 CONNAUGHT ROAD CENTRAL, HONG KONG

Occupation:  LEGAL COUNSEL

163

KWOK000660

# EXHIBIT 10









# EXHIBIT 11

Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 72 of 134

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PACIFIC ALLIANCE ASIA OPPORTUNITY
FUND L.P.,

          Plaintiff,

    v.

KWOK HO WAN, *a/k/a* KWOK HO, *a/k/a* GWO
WEN GUI, *a/k/a* GUO WENGUI, *a/k/a* GUO
WEN-GUI, *a/k/a* WAN GUE HAOYUN, *a/k/a*
MILES KWOK, *a/k/a* HAOYUN GUO,
GENEVER HOLDINGS CORPORATION, and
GENEVER HOLDINGS LLC,

          Defendants.

Index No. 652077/2017

Hon. Barry Ostrager

Part 61

Mot Seq. No. __

**MEMORANDUM OF LAW IN SUPPORT OF PACIFIC ALLIANCE ASIA
OPPORTUNITY FUND L.P.'S MOTION FOR ORDER OF CONTEMPT AGAINST
DEFENDANT KWOK**

FILED: NEW YORK COUNTY CLERK 12/24/2020 04:11 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO: 689
RECEIVED NYSCEF: 12/24/2020

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ................................................................................................. 2

ARGUMENT ...................................................................................................... 4

CONCLUSION ................................................................................................... 6

i

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Financial v. Walter J. Dowd, Inc.*
   No. 113484/2011, 2016 WL 11546917 (Sup. Ct. N.Y. Cnty. Sept. 14, 2016).…………….…..4

*McCormick v. Axelrod,*
   59 N.Y.2d 574, *amended*, 60 N.Y.2d 652 (1983)…………………………………………..4

**Statutes**

Judiciary Law § 753 ...........……………........................……………….......................1, 4

CPLR § 5104 ...........……………........................……………….......................…..1

ii

Pacific Alliance Asia Opportunity Fund L.P. ("PAX") respectfully submits this

memorandum of law in support of its motion, under CPLR § 5104 and Judiciary Law § 753, for

an order (i) finding Defendant Miles Kwok in contempt of Court for disobeying the Court's

October 15, 2020 Restraining Order (the "Order"); (ii) directing Kwok immediately to cause the

return of his yacht (the "Lady May") to the jurisdiction of the Court; and (iii) granting such other

and further relief as the Court deems just and proper.

## PRELIMINARY STATEMENT

This Court previously has recognized that Kwok has "flaunted or exceedingly liberally

interpreted" its orders, and has made "intentional or unintentional misstatements that have misled

the Court."[1]  In the words of Yogi Berra, it is déjà vu all over again:  there is no doubt that Kwok

knowingly has violated this Court's Order restraining him from moving his yacht[2] outside the

Court's jurisdiction and—perhaps worse—he has once again put his counsel in the line of fire by

instructing him to *request the Court's permission to move the yacht even though Kwok knew it*

*already had been moved outside of U.S. territorial waters at the time that request was made*.

The Court should hold Kwok in contempt, require him immediately to return the yacht to the

jurisdiction, and grant whatever additional relief it deems necessary and appropriate to finally

stop Kwok from making a mockery of this proceeding.

---

[1] [Dkt. 647](#) at 26:6–8.

[2] Any suggestion by Kwok in opposition that the yacht technically is not "his" would be
disingenuous nonsense.  If Kwok advances that false argument (which is directly contradicted
by, among other evidence and admissions, Kwok's counsel's request at a recent conference *for
Kwok* to be able to move the yacht outside this Court's jurisdiction), PAX will respond on reply.
PAX notes, however, that any such argument would be irrelevant to this motion because the
Order expressly covers the yacht even if it is held by another registered owner (whether it be a
Kwok shell company or family member).

1

Case 22-50073    Doc 57-2    Filed 03/01/22    Entered 03/01/22 22:13:12    Page 76 of 134

# BACKGROUND

On September 30, 2020, this Court entered a Temporary Restraining Order (the "TRO")

preventing Kwok from, among other things, "interference with any property in which he has an

interest."[3]  In issuing the TRO, the Court noted that "[a]ny violation . . . shall be considered

criminal contempt."[4]  About two weeks later, on October 15, 2020, the Court issued the Order,

which granted PAX's motion under CPLR 5229 and expressly restrained the Lady May:

> Mr. Kwok is restrained from making or causing any sale, assignment,
> transfer, or interference with any property in which he has an interest,
> whether directly or indirectly, and from paying over or otherwise
> disposing of any debt now due or thereafter coming due to him subject to
> the exceptions set forth in CPLR 5222, in accordance with the proceedings
> on the record of October 15, 2020.  ***Specifically, Mr. Kwok and/or the
> registered owners of*** (1) the Residence at the Sherry-Netherland Hotel and
> (2) ***the yacht, "the Lady May" are restrained from making or causing
> any sale, assignment, transfer, or interference with those assets.***[5]

On November 12, 2020, the Court held a conference, during which Kwok's counsel

(presumably at his client's instruction) made a specific point to ask this Court if Kwok could

move the yacht offshore:[6]

> Apparently the boat is registered offshore I believe in the British Virgin
> Islands, and there is a requirement that it return to its home port at six-
> month intervals.  It is not an issue that is going to affect in any way
> ownership or title, but ***it needs to travel offshore at some point for a brief
> period and then come back into the United States***.  And we just wanted to
> disclose that so that there is no thought that this is being secreted or
> transferred.  This is just an ordinary thing it has to do for licensing
> purposes.[7]

---

[3] [Dkt. 591](#) at 1.

[4] *[Id.](#)* at 2.

[5] [Dkt. 630](#).

[6] Moss Aff. Ex. 1 (Nov. 12, 2020 Conf. Tr.) at 12:23–25.

[7] *Id.* at 13:9–18.

2

The Court unequivocally responded that Kwok was *not* permitted to remove the yacht from this jurisdiction and would be required to make a motion before doing so:

> You will have to make that application on papers. I don't know anything about the requirement that an asset that has been restrained in the United States should be allowed to go to the British Virgin Islands. I seriously doubt [PAX] wants that yacht to be outside the jurisdiction of the Court . . . You will make a motion with supporting documentation on notice to [PAX], and I will rule on it. What I am not going to have happen is Mr. Kwok move the yacht to the British Virgin Islands and then it becomes potentially unavailable for [PAX] to levy upon . . . that's an application that has to be made on formal motion papers with supporting documentation and appropriate opportunity for [PAX] to reply.[8]

Although Kwok's counsel responded that he "[u]nderstood" "the Court's directive" and would "provide that information in writing,"[9] Kwok made no such motion.

Given their experience with Kwok and his misbehavior, PAX and its counsel were concerned by Kwok's counsel's question and did some research. A few days later—based on publicly available information accessed at MarineTraffic.com—PAX learned that the yacht had in fact departed Fort Lauderdale, Florida, on *November 1, 2020*, and as of November 18, 2020, was located in the Bahamas at or near Old Fort Bay, Nassau.[10] In other words, Kwok had actually moved the yacht out of United States waters approximately *two weeks after the Order* and *two weeks before his counsel sought permission for Kwok to do precisely that at the November 12 conference.*

In light of this information, PAX's counsel wrote to Kwok's counsel on November 18, 2020, providing the information it had accessed as to the yacht's whereabouts, expressing its

---

[8] *Id.* at 13:19–15:4.

[9] *Id.* at 14:2–3, 15:5–6.

[10] Moss Aff. Ex. 2 (Nov. 18, 2020 Ltr.) at Ex. A.

3

Case 22-50073 Doc 57-2 Filed 03/01/22 Entered 03/01/22 22:13:12 Page 78 of
134

concern "given Mr. Kwok's history of making misrepresentations throughout this litigation," and

asking Kwok's counsel to "confirm the location of the Lady May" and "that the vessel will be

back in New York within 48 hours."[11]

Kwok's counsel never responded. Rather, later that night, Kwok's counsel filed a letter

with the Court claiming to know nothing and committing to investigate and report back:

> [W]e have just become aware this evening that the yacht, the Lady May,
> referenced in this Court's restraining order (NYSCEF Doc. 630) and
> discussed during the Pre-Trial conference held before this Court on
> November 11, 2020, is currently in international waters. Although
> Plaintiff's counsel has just sent us a letter regarding the purported
> whereabouts of the yacht, we have not confirmed any details . . . We are
> attempting to gain additional information and will promptly inform the
> Court and counsel when we learn anything further.[12]

But as of today's filing—*five weeks later*—Kwok's counsel has provided no further information

to either the Court or to PAX's counsel. Also as of today, according to MarineTraffic.com, the

yacht is still moored in or around Nassau, Bahamas.[13]


**ARGUMENT**

Under Judiciary Law section 753:

> In order to find that contempt has occurred in a given case, [(1)] it must be
> determined that a lawful order of the court, clearly expressing an
> unequivocal mandate, was in effect. [(2)] It must appear, with reasonable
> certainty, that the order has been disobeyed. [(3)] Moreover, the party to
> be held in contempt must have had knowledge of the court's order,
> although it is not necessary that the order actually have been served upon
> the party. [(4)] Finally, prejudice to the right of a party to the litigation
> must be demonstrated.

---

[11] *Id.*

[12] Dkt. No. Dkt. 649.

[13] *See* Moss Aff. ¶ 5.

4

*McCormick v. Axelrod*, 59 N.Y.2d 574, 583, *amended*, 60 N.Y.2d 652 (1983); *see also Financial v. Walter J. Dowd, Inc.* No. 113484/2011, 2016 WL 11546917, at *2 (Sup. Ct. N.Y. Cnty. Sept. 14, 2016) (Ostrager, J.) (citing *McCormick* and applying the four-pronged test).  PAX easily satisfies each of the four elements for contempt here.

*First*, the Order is a lawful order of the Court: an unequivocal mandate that Kwok is "restrained from making or causing any sale, assignment, transfer, or interference with [the yacht]."[14]

*Second*, Kwok disobeyed the Order by causing the yacht to leave the jurisdiction about two weeks after the Court issued the Order (and continues to disobey it).

*Third*, Kwok is a sophisticated party, who is involved with this litigation and obviously had knowledge of the Order.  Moreover, his counsel specifically sought clarification of the Order at the November 12 conference,[15] during which he stated that he "[u]nderstood" "the Court's directive" that Kwok was required to make a motion before removing the yacht from the jurisdiction.[16]

*Fourth*, PAX has been prejudiced by Kwok's intentional flouting of the Order.  Kwok has been trying for years to frustrate the eventual judgment of this Court, and he has been trying for far longer than that to avoid repaying his debt to PAX.  Kwok shields his assets through family members and shell companies, and it will be difficult enough for PAX to collect on assets within the United States.  If Kwok were permitted to expand his shell game by hiding his yacht

---

[14] *See supra* n.5.

[15] *See supra* n.6.

[16] *See supra* n.9.

5

somewhere on the open seas outside this Court's jurisdiction, PAX's chances of enforcing

against that asset would decrease significantly.

## CONCLUSION

For these reasons, PAX respectfully requests that the Court enter an order, under CPLR

5104 and Judiciary Law section 753, (i) finding Kwok in contempt of Court for disobeying the

Order; (ii) directing Kwok immediately to cause the return of his yacht, the Lady May, to the

jurisdiction of the Court; and (iii) granting such other and further relief as the Court deems just

and proper.

DATED: December 24, 2020                    Respectfully submitted,
          New York, New York

                                     O'MELVENY & MYERS LLP
                                     By: */s/  Edward Moss*
                                     Stuart Sarnoff (ssarnoff@omm.com)
                                     Edward Moss (emoss@omm.com)
                                     7 Times Square
                                     New York, NY 10036
                                     (212) 326-2000

                                     -and-

                                     Robert W. Seiden
                                     (rseiden@seidenlegal.com)
                                     1120 Avenue of the Americas
                                     New York, NY 10036
                                     (212) 626-6708

                                     *Attorneys for Plaintiff Pacific Alliance*
                                     *Asia Opportunity Fund L.P.*

FILED: NEW YORK COUNTY CLERK 12/24/2020 04:11 PM
INDEX NO. 652077/2017

NYSCEF DOC. NO. 689
RECEIVED NYSCEF: 12/24/2020

Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 81 of
134

## CERTIFICATION OF WORD COUNT

Plaintiff hereby certifies that this document complies with the word count provisions of

Commercial Division Rule 17. This memorandum of law was prepared using Microsoft Word,

and the total number of words in this memorandum of law, exclusive of the caption, title, and

signature block, is less than 4,200 words.


DATED: December 24, 2020          Respectfully submitted,
        New York, New York

                                          O'MELVENY & MYERS LLP
                                          By: */s/ Edward Moss*
                                          Edward Moss (emoss@omm.com)
                                          7 Times Square
                                          New York, NY 10036
                                          (212) 326-2000

                                          *Attorneys for Plaintiff Pacific Alliance*
                                          *Asia Opportunity Fund L.P.*

7

# EXHIBIT 12

Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 83 of 134

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PACIFIC ALLIANCE ASIA OPPORTUNITY
FUND L.P.,

                Plaintiff,

       v.

KWOK HO WAN, *a/k/a* KWOK HO, *a/k/a* GWO
WEN GUI, *a/k/a* GUO WENGUI, *a/k/a* GUO
WEN-GUI, *a/k/a* WAN GUE HAOYUN, *a/k/a*
MILES KWOK, *a/k/a* HAOYUN GUO,
GENEVER HOLDINGS CORPORATION, and
GENEVER HOLDINGS LLC,

                Defendants.

Index No. 652077/2017

Hon. Barry Ostrager

Part 61

Mot Seq. No. 12

## MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.'S MOTION FOR ORDER OF CONTEMPT AGAINST DEFENDANT KWOK

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

ARGUMENT ...................................................................................................... 1

    I.     The October 15 Order Prohibited the Lady May from Being Moved
           Outside this Court's Jurisdiction.......................................................... 1

    II.    The Court Should Hold Kwok in Contempt. ........................................ 4

CONCLUSION ................................................................................................. 11

i

Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 85 of 134

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*1319 Third Ave. Realty Corp. v. Chateaubriant Rest. Dev. Co., LLC,*
  2007 WL 2701271 (N.Y. Sup. Ct. Sept. 17, 2007) ................................................. 10

*2619 Realty, LLC v. Fid. & Guar. Ins. Co.,*
  303 A.D.2d 299 (1st Dep't 2003) ................................................................ 2

*Bogoni v. Friedlander,*
  197 A.D.2d 281 (1st Dep't 1994) ................................................................ 6

*Dep't of Hous. Pres. & Dev. of City of New York v. Deka Realty Corp.,*
  208 A.D.2d 37 (2d Dep't 1995) ................................................................ 10

*L & R Expl. Venture v. Grynberg,*
  2011 WL 1564647 (N.Y. Sup. Ct. Apr. 19, 2011) ................................................. 10

*Wengui v. Zeng,*
  Index No. 157025 (N.Y. Sup. Ct. Sept. 2, 2020) ................................................ 5

**Other Authorities**

MERRIAM-WEBSTER.COM, *Interfere* ............................................................... 2

**Rules**

N.Y. R. Professional Conduct 3.3 ................................................................ 4

ii

Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 86 of 134

# PRELIMINARY STATEMENT[1]

Given this case's history, it is not clear whether Kwok's Opposition is the single most disingenuous submission he has made to this Court. But it certainly is up there. With a straight face, Kwok argues that (i) moving and keeping the Lady May outside this Court's jurisdiction did not violate the October 15 Order—even though the Court expressly and repeatedly has said that it did; and (ii) even if moving the yacht were a violation, Kwok should not be sanctioned because he does not own the Lady May—even though he repeatedly has stated, both in a court filing and on social media, that he does. Enough is enough. The Court should hold Kwok in contempt and impose a sanction sufficient to motivate him to comply with the Order and bring his yacht back to this jurisdiction—and keep it here.

## ARGUMENT

### I.   The October 15 Order Prohibited the Lady May from Being Moved Outside this Court's Jurisdiction.

Kwok does not dispute that (i) the October 15 Order restrained, "in accordance with the proceedings on the record of October 15, 2020," both "Kwok and/or the registered owners of . . . 'the Lady May' . . . from making or causing any sale, assignment, transfer, or *interference* with th[at] asset[]";[2] or (ii) the Lady May has been moved out of U.S. waters. Instead, he argues that the move out of the Court's jurisdiction did not technically violate the October 15 Order because

---

[1] This brief refers to (i) Defendant Kwok Ho Wan's Memorandum of Law in Opposition to Plaintiff's Motion for an Order of Contempt (Dkt. No. 698) as the "Opposition" or "Opp;" (ii) the Affirmation of Edward Moss in Further Support of  Pacific Alliance Asia Opportunity Fund L.P.'s Motion for Order of Contempt Against Defendant Kwok as the "Moss Reply Aff."; and (iii) the Affirmation of Nathaniel Francis in Support of Pacific Alliance Asia Opportunity Fund L.P.'s Motion for Order of Contempt Against Defendant Kwok as the "Francis Aff." Unless otherwise specified, (i) defined terms have the meaning given to them in the Memorandum of Law in Support of Pacific Alliance Asia Opportunity Fund L.P.'s Motion for Order of Contempt Against Defendant Kwok (Dkt. No. 689), (ii) all emphasis is added, and (iii) all internal citations and quotations are omitted.

[2] Opp. at 3 (citing (Dkt. No. 630)).

1

Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 87 of 134

(i) the Lady May's "ownership" has not changed; (ii) "Plaintiff neither asked for nor received any direction from the Court prohibiting the Lady May's relocation" at the October 15 hearing; and (iii) the Court explained at the October 15 hearing that ordinary course expenditures—for example, "if Mr. Kwok wants to take a vacation in the middle of the coronavirus pandemic"—were permitted.[3]

These arguments are frivolous. To begin, Kwok has no answer for why moving the yacht does not count as "interference" with the October 15 Order (it does),[4] nor how spending money in the ordinary course on a vacation somehow equates to moving a restrained, multi-million dollar asset outside of the jurisdiction (it does not). Indeed, the Court already has rejected Kwok's "ordinary-course" argument. In response to Kwok's counsel's question seeking clarification as to whether the restraining order applied to the payment of legal fees, the Court explained the contours of what it meant by "ordinary course."[5] *Immediately after that clarification*, Kwok's counsel asked whether the Lady May could be moved to the British Virgin Islands because that was "just an *ordinary thing* that is has to do for licensing purposes."[6] The Court responded in no uncertain terms that Kwok *was not permitted to move the yacht before making (and winning) a motion seeking leave to do so*.[7]

---

[3] Opp. at 6–9.

[4] "[I]t is common practice for the courts of this State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract." *2619 Realty, LLC v. Fid. & Guar. Ins. Co.*, 303 A.D.2d 299, 301 (1st Dep't 2003). The ordinary meaning of "to interfere" is "to interpose in a way that hinders or impedes." Merriam-Webster.com, *Interfere* (*available at* https://www.merriam-webster.com/dictionary/interfere).

[5] *See* Dkt. 691 at 12:23–13:5 (permitting legal fees that are "customary and reasonable").

[6] *Id.* at 13:9–18.

[7] *Id.* at 13:19–24.

2

Worse, Kwok completely ignores this Court's *repeated, clear, and unequivocal statements* that moving the Lady May *would (and did) violate the Order*.  First, at the October 15 hearing (which was expressly incorporated into the October 15 Order that issued later that day), the Court specifically discussed the Lady May and directed Kwok that the yacht and other assets not be moved so that they would be available for collection if PAX were to prevail (*i.e.*, so as not to *interfere* with PAX's potential judgment-enforcement efforts):

> Wherever these assets are held, <u>they are going to remain held where they presently reside</u> and if it's determined that the entities that are presently listed as the owners of the assets are the alter ego of Mr. Kwok or are wholly dominated and controlled by Mr. Kwok, *those assets will be made available to satisfy any judgment that the plaintiff recovers.*[8]

Then, at the November 20 hearing, Kwok's counsel asked "two questions . . . *clarifying the scope of the restraining order* that the Court has entered"—one of which was whether the Lady May could be moved outside the jurisdiction (even though, we now know, it already had been moved by that time).[9]  As noted above, the Court unequivocally answered "no"—not without first making and winning a motion and a further Court order:

> You will have to make that application on papers.  *I don't know anything about the requirement that an asset that has been restrained in the United States should be allowed to go to the British Virgin Islands*.  I seriously doubt Mr. Moss wants that yacht to be outside the jurisdiction of the Court. . . . <u>*What I am not going to have happen is Mr. Kwok move the yacht to the British Virgin Islands* and then it becomes potentially unavailable for Mr. Moss's client to levy upon</u>. . . . Mr. Siegal asked me a question about <u>whether the restraining order can be modified to allow this yacht to move from a US port to the British Virgin Islands</u>, and I said that's an application that has to be made on formal motion papers with supporting documentation and appropriate opportunity for Mr. Moss to reply.[10]

---

[8] [Dkt. No. 647](#) at 22:8–14.

[9] [Dkt. No. 691](#) at 12:23–25.

[10] [Dkt. No. 691](#) at 13:19–15:4.

Finally, at the most recent hearing on December 18, the Court again reiterated what should have been quite obvious to Kwok by that point:

> Okay. So, let me ask you, we have an issue **with respect to a boat that I enjoined Mr. Kwok from moving** which he may or may not have **moved in violation of the Court's order**. . . . It seems to me **I ordered the boat not be moved**.[11]

Given the plain meaning of "interference" (*see supra* note 4) and the Court's repeated, unequivocal directives, there is no question that the October 15 Order has been violated. Kwok's suggestion otherwise is misleading.[12] And if Kwok argues that he should get a pass because the yacht already had been moved by the time of the October 15 hearing (*i.e.*, before his counsel asked and was denied permission to move it), then the answer is quite simple: it should have been brought back **immediately** after the Court issued the October 15 Order.[13]

## II.     The Court Should Hold Kwok in Contempt.

While Kwok advances several other meritless arguments for why he personally should

---

[11] Dkt. No. 695 at 25:15–18, 27:21–22.

[12] *See* N.Y. R. Professional Conduct 3.3(a)(1) (providing that a lawyer's duty of candor toward the tribunal prohibits him or her from knowingly "mak[ing] a false statement of fact or law to a tribunal"); *see also* Dkt. No. 647 at 21:11–16 ("The Court believes . . . that Mr. Kwok has attempted to mislead the Court. The Court believes that Mr. Kwok is, as the plaintiff contends, playing a shell game with his assets, and has violated if not the letter of court orders, the spirit of court orders."), 26:5–9 ("While orders of the Court are either flaunted or exceedingly liberally interpreted, and while intentional or unintentional misstatements that have misled the Court have been made to the Court, we are going to have closure in this case in January of 2021.").

[13] We take Kwok's counsel at his word that he did not know the Lady May already had been moved out of the jurisdiction when he asked the Court if the Lady May could be moved out of the jurisdiction. But later—after being informed by PAX that the yacht was actually out of the jurisdiction—Kwok's counsel wrote to the Court and explained that because his firm had just been informed by PAX about the yacht's location, "we have not confirmed any details," but were "attempting to gain additional information and will promptly inform the Court and counsel when we learn anything further." Dkt. No. 649. Contrary to that representation, however, Kwok did not, before responding to this Motion, provide any additional information to the Court about the yacht's location. *See* N.Y. R. Professional Conduct 3.3(b) ("A lawyer who represents a client before a tribunal and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.").

FILED: NEW YORK COUNTY CLERK 01/27/2021 09:30 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 769
RECEIVED NYSCEF: 01/27/2021

Case 22-50073    Doc 57-2    Filed 03/01/22    Entered 03/01/22 22:13:12    Page 90 of
134

not be held in contempt, they all reduce to his core assertion that he does not own—and therefore cannot control the movements of—the Lady May.  Who does Kwok think he's kidding?

As PAX already has demonstrated, Kwok alleged fewer than five months ago—in a September 1, 2020 complaint *he filed i*n New York Supreme Court—that "pawns of the Chinese Communist Party . . . have attempted to cause Guo [a/k/a Kwok] injury while on *his yacht*."  *See Wengui v. Zeng*, Index No. 157025/2017 (N.Y. Sup. Ct. Sept. 2, 2020), Dkt. No. 1 (Complaint at ¶ 8).  That sentence in Kwok's own complaint ends with a footnote that cites and links to (and thereby incorporates by reference) an article by *freebeacon.com* entitled "Beijing Suspected in Hacking Yacht *Owned by* Chinese Billionaire," which states that "Guo Wengui, who uses the English name *Miles Kwok, said* several incidents involving *his 152-foot motor yacht, Lady May*, appear to be part of a Chinese government effort to threaten and intimidate him."[14]  It is not surprising, then, that in the context of restraining the Lady May, the Court described it as the "27 million-dollar yacht *which Mr. Kwok once claimed to have owned*."[15]

Notably, counsel for the Genever Defendants in this action, Aaron Mitchell, serves as counsel for Kwok personally in *Wengui v. Zeng*.  Mr. Mitchell signed the complaint that repeatedly referred to the Lady May as "his [*i.e.*, Kwok's] yacht" and incorporated by reference the *freebeacon.com* article reporting that the yacht was "owned" by Kwok.  Even though Mr. Mitchell supposedly does not represent Kwok in this case, he argued on Kwok's behalf at the December 18 hearing, contending that his September 2020 complaint "wasn't referring to ownership," but rather merely to "the fact that Mr. Kwok was on that boat," and chided PAX's

---

[14] *See id.* at 3 n.1 (citing https://rntfnd.org/2017/09/18/fbi-investigating-possible-china-cyberattack-on-yacht-in-new-york/).  The complaint also refers to the Lady May as "his" (*i.e.*, Kwok's) yacht in Paragraph 7 and in Prayer for Relief (d).

[15] Dkt. No. 647 at 22:5–6.

Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 91 of
134

counsel for its "absurd reliance" on that pleading.[16]  Given Kwok's track record, perhaps Mr. Mitchell was onto something when he suggested it was "absurd" for PAX to actually rely on Kwok's own words.

Kwok's Opposition is even more disingenuous; it mischaracterizes PAX as arguing that Kwok owns the yacht in part because he was supposedly a "guest" on it (something PAX has never argued), and claims that PAX has no evidence of ownership.[17]  Even if Kwok's ***own pleading***—a judicial admission[18]—were insufficient to establish ownership (and it is more than sufficient), PAX has much, much more:

On May 10, 2017, Kwok "tweeted" (on his since-suspended Twitter account) the following photo of himself sitting on the Lady May, accompanied by Chinese characters that, translated, state "I am posting a few photos of the yacht *I gave to my daughter* and named after her. . . . Her name is Lady May. . . . ***I bought it for 41 million euro***":[19]

---

[16] Dkt. No. 695 at 26:23–27:12.

[17] Opp. at 8–9.

[18] *See Bogoni v. Friedlander*, 197 A.D.2d 281, 291–292 (1st Dep't 1994) (An admission in an initial pleading is a "formal judicial admission" which is "evidence of the facts admitted.").

[19] Francis Aff. Ex. A.

6



20

Then, on August 27, 2017, Kwok (again, on his since-suspended account), referred to the "Lady May" as "*my ship*" and recalled that "two years ago when I was in Miami . . . *I [] signed the most important investment contract of my life*," and it "all seems so meaningful."[21]

But we have saved the best for last.  As an October 14, 2017 YouTube video shows,[22] Kwok was filmed *stating unequivocally that the boat was his*:[23]

> *I decided to sell it* because it has an aluminum body.  With an aluminum body, it drifts a bit at sea.  It's okay in shallow waters.  I wanted to use the heavier one, the bigger one, which is also a Feadship, since it is made of steel.  I wanted to go further out to sea. . . . *I advertised it twice*, but my offers were relatively high, about US$50 million, 31 million euros, which

---

[20] *Id.*

[21] *Id.*

[22] *See* Moss Reply Aff. ¶ 3 (directing the Court to minute 2:50 through minute 4:15 in a YouTube video available at https://youtu.be/T_EkmRpIqh8).

[23] Moss Reply Aff. Ex. 4.

Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 93 of
134

was around US$50 million.  When *I listed* it at that higher price, *I had one offer* just below *my* asking price, but *I did not sell it.*





This is all straight from Kwok's mouth:  *He* bought the Lady May, *he* had it shipped, *he* decided to list it for sale, and *he* put it in his daughter's name to shield it from creditors.  Kwok's contention that he is merely some "guest" aboard the yacht is (yet another) flat-out lie.

---

[24] *Id.*  The screenshots were taken directly from YouTube and already included the captions, which a certified translation confirms are substantially accurate.  *See* Moss Aff. Ex. 4.

Of course, Kwok's contention that he does not own or control the Lady May and that it is really owned by an entity, HK International Funds Investments (USA) Limited LLC, which is wholly owned and controlled by his daughter Mei (pronounced "May") Guo, is right on-brand. Kwok is a self-proclaimed billionaire who, when it suits him, pretends to have no assets[25] precisely because his practice is to use shell companies and his children and employees to shield his assets.  For example, Kwok is now claiming in the Genever bankruptcy case that the Genever Defendants are beneficially owned by another shell company that is owned by his son—despite never disclosing that to the Sherry-Netherland and never making that argument before this Court to try to avoid an attachment.[26]  And not only has Kwok repeatedly stated that the Lady May is "his" (including in the above-described September 2020 complaint that he filed **after** he supposedly gave the yacht to his daughter), but HK International is a mere shell company (i) that did not have the yacht registered in its name until April 2020 (when PAX was in the red zone in this litigation);[27] and (ii) with a "principal office" address of 162 E. 64th Street—the same address as (surprise!) the offices of Mr. Mitchell—who regularly represents Kwok or his shell entities, depending on the case.[28]

*    *    *

During the October 15 hearing, even before the Court knew that Kwok had moved the yacht, it explained that in this "2017 case in which there's been a great deal of gamesmanship, a

---

[25] Dkt. No. 580 at 100:2–3 (testifying that his net worth is "negative"); 101:3–5 (testifying that "[i]n reality, under the law" he has "no" assets).

[26] *See* Moss Reply Aff. Ex. 5 at ¶ 4 (claiming that Bravo Luck is (i) "the beneficial owner" of the Sherry-Netherland apartment and (ii) "a company owned by Mr. Qiang Guo, the son of Mr. Kwok Ho Wan a/k/a Miles Kwok").

[27] *See* Opp. at 4, n.2.

[28] *See* Dkt. No. 705 at 1.

Case 22-50073    Doc 57-2    Filed 03/01/22    Entered 03/01/22 22:13:12    Page 95 of
134

great deal of dissembling, and some flagrant disregard of court orders . . . [t]he Court believes

that Mr. Kwok is, as the plaintiff contends, playing a shell game with his assets . . . ."[29]  The

Court further stated that "we are not going to have any more shell games."[30]  Unfortunately,

Kwok's shell games have continued, his dissembling and gamesmanship have only intensified,

and he has once again flagrantly violated an order of this Court.

     This Court has the discretion to impose a sanction on Kwok sufficient to motivate him to

comply with the October 15 Order.  Indeed, "the purpose of civil contempt is to coerce

obedience to a court order."[31]  In a separate case against him in Nevada, for example, Kwok was

sanctioned $250,000 per day until he finally complied with a court order requiring him to meet

his most basic discovery obligations.[32]  The violation here is far worse.

     Given Kwok's repeated violation of this Court's orders, his obvious financial means as a

self-proclaimed multi-billionaire, and the gravity of and materiality to PAX of the current

violation, PAX respectfully requests a sanction—monetary or otherwise—that is sufficient to

compel Kwok to comply with the October 15 Order and bring the Lady May back to the

jurisdiction immediately.

---

[29] Dkt. No. 647 at 24:9–11; 21:13–15.

[30] Id. at 22:7.

[31] 1319 Third Ave. Realty Corp. v. Chateaubriant Rest. Dev. Co., LLC, 2007 WL 2701271, at *2 (N.Y. Sup. Ct. Sept. 17, 2007); see also Dep't of Hous. Pres. & Dev. of City of New York v. Deka Realty Corp., 208 A.D.2d 37, 42 (2d Dep't 1995) ("A civil contempt penalty is imposed not to punish but, rather, to compensate the injured private party or to coerce compliance with the court's mandate."); L & R Expl. Venture v. Grynberg, 2011 WL 1564647, at *4 (N.Y. Sup. Ct. Apr. 19, 2011) ("The court has authority to punish a litigant that disobeys a lawful mandate.  The purpose of civil contempt is to coerce compliance with a court order or to compensate a party who is injured as a result of disobedience of a court order.").

[32] See Dkt. No. 557 at 2 (ordering Kwok to provide the Court with a phone number where he could be reached and either (i) an address where he would accept service of discovery documents, or (ii) and email address where such documents may be sent).

10

FILED: NEW YORK COUNTY CLERK 01/27/2021 09:30 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 709
RECEIVED NYSCEF: 01/27/2021

Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 96 of
134

# CONCLUSION

For these reasons, PAX respectfully submits that the Court should hold Kwok in

contempt and order appropriate sanctions.

DATED: January 27, 2021  
        New York, New York

Respectfully submitted,

O'MELVENY & MYERS LLP  
By: */s/ Edward Moss*  
Stuart Sarnoff (ssarnoff@omm.com)  
Edward Moss (emoss@omm.com)  
7 Times Square  
New York, NY 10036  
(212) 326-2000

-and-

Robert W. Seiden  
(rseiden@seidenlegal.com)  
1120 Avenue of the Americas  
New York, NY 10036  
(212) 626-6708

*Attorneys for Plaintiff Pacific Alliance*  
*Asia Opportunity Fund L.P.*

11

FILED: NEW YORK COUNTY CLERK 01/27/2021 09:30 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 769
RECEIVED NYSCEF: 01/27/2021

Case 22-50073    Doc 57-2    Filed 03/01/22    Entered 03/01/22 22:13:12    Page 97 of
134

## CERTIFICATION OF WORD COUNT

PAX hereby certifies that this document complies with the word count provisions of
Commercial Division Rule 17. This memorandum of law was prepared using Microsoft Word,
and the total number of words in this memorandum of law, exclusive of the caption, title, and
signature block, is less than 4,200 words.

DATED: January 27, 2021                    Respectfully submitted,
       New York, New York

                                        O'MELVENY & MYERS LLP
                                        By: */s/ Edward Moss*
                                        Edward Moss (emoss@omm.com)
                                        7 Times Square
                                        New York, NY 10036
                                        (212) 326-2000

                                        *Attorneys for Plaintiff Pacific Alliance*
                                        *Asia Opportunity Fund L.P.*

# EXHIBIT 13

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
NYSCEF DOC. NO. 256

INDEX NO. 652077/2017
RECEIVED NYSCEF: 11/28/2018

Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 99 of
134

Susan Hennelly

| | |
|---|---|
| **From:** | Susan Hennelly |
| **Sent:** | Tuesday, March 03, 2015 3:31 PM |
| **To:** | BoardOfDirectors |
| **Subject:** | Sale of Apartment 1801 and Maid's Room 2219 |
| **Attachments:** | Kwok board package.pdf |

We have received a contract for the sale of the 2,950 shares allocated to Apartment 1801 and the 50 shares allocated to Maid's Room 2219 from Sherry 1800s, LLC (Haroche) to Genever Holdings LLC (Miles Kwok).

Attached are copies of the contract of sale, Mr. Kwok's application and several letters of reference.

The purchase price is $67,500,000, plus $2,500,000 for the furnishings. The 2015 maintenance is $55,214 per month plus an additional $936 for the Maid's Room. This is a residential apartment and will be used by Mr. Kwok and his family.

Due to Mr. Kwok's foreign status and purchasing in an LLC, he will be required to sign an occupancy agreement and personally guarantee the lease. He will also be required to provide a security deposit.

This apartment encompasses the entire floor and is approximately 7,300 sq. ft. plus 2,170 sq. ft. of terraces. Attached is a floor plan.

Mr. Kwok has also entered into a contract to purchase Maid's Room 719 which he will purchase simultaneously, if approved.

Michael Horvitz and Fred Seegal have interviewed Miles Kwok and his son, Mileson Kwok. His wife, Hing Chi, was present via Skype.

Very truly yours,

Michael J. Ullman
Executive Vice President
& Chief Operating Officer
The Sherry Netherland Hotel
781 Fifth Avenue
New York, NY 10022
P: 212-231-6811   F: 212-832-4845
For reservations and special offers, go to

1

SN 0027

Executed Contract of Sale

Contract of sale cooperative apartment, 5-2001
Prepared by the Committee on Condominiums and Cooperatives of the Real Property Section of the New York State Bar Association

CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

## Contract of Sale - Cooperative Apartment

This Contract is made as of February_____, 2015 between the "Seller" and the "Purchaser" identified below.

**1 Certain Definitions and Information**
1.1 The "Parties" are:

1.1.1 "Seller": Sherry 1800s, LLC
*Prior names used by Seller:*
*Address: 1233 Rock Rimmon Road, Stamford, CT 06903*

*Tax ID. No.: 20-0780554*

1.1.2 "Purchaser": Genever Holdings LLC

*Address:*

*S.S. No.:*

1.2 The "Attorneys" are *(name, firm name, address and telephone, fax).*

1.2.1 "Seller's Attorney"
Michael J. Jones, Esq.
Ivey, Barnum & O'Mara, LLC
170 Mason Street, Greenwich, CT 06830
Tel: 203-661-6000
Fax: 203-661-7088
mjones@ibolaw.com

1.2.2 "Purchaser's Attorney"
Ira Gilbert, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison, LLP
1285 Avenue of the America
New York, NY 10019-6064
Tel: 212-373-3529
Fax: 212-492-0529
igilbert@paulweiss.com

1.3 The "Escrowee" is *the [Seller's]* Attorney.

1.4 The Managing Agent is *(name, address and telephone, fax):*
*Sherry Netherland Hotel*
*Susan Hennelly*
*781 Fifth Avenue, 1st, New York, NY 10022*
*Tel: 212-231-6811 Fax: 212-832-4845*

1.5 The real estate "Broker(s)" (see ¶ 12) is/are: John Burger, and Kathy Sloane, Brown Harris Stevens and Serena Boardman, Sotheby's 1.6 The name of the cooperative housing corporation ("Corporation") is:
Sherry Netherland, Inc.

1.7 The "Unit" number is: **1801, which encompasses the entire ***

1.8 The Unit is located in "Premises" known as: 781 Fifth Avenue, New York, NY
1.9 The "Shares" are the shares of the Corporation allocated to the Units.
*** 18th Floor, except elevator hallway and including Maid's Room 1519**

1.10 The "Lease" is the Corporation's proprietary lease or occupancy agreement for the Unit, given by the Corporation which expires on
1.11 "Personalty" is the following personal property, to the extent existing in the Unit on the date hereof: the refrigerators, freezers, ranges, ovens, built-in microwave ovens, dishwashers, garbage disposal units, cabinets and counters, lighting fixtures, chandeliers, wall-to-wall carpeting, plumbing and heating fixtures, central air-conditioning and/or window or sleeve units, washing machines, dryers, screens and storm windows, window treatments, switch plates, door hardware, mirrors, built-ins not excluded in ¶ 1.12 and all of the ~~furnishings including but not limited to everyday china, pots, pans, cooking items, flatware, as well as crystal glasses and decanters, etc in the bar area~~ and personal property (except as specifically excluded in 1.12), including but not limited to all items set forth in

/See 1.12 below. (*)

~~1.12 Specifically excluded from this sale is all personal property not included in ¶ 1.11 and all contents included in the unit with the exception of 13 paintings and drawings, one antique secretary desk on east wall of LR (will be replaced) personal "knick-knacks" such as small boxes, clocks, picture frames, pictures, etc.~~
1.13 The sale [does] [~~does not~~] Include Seller's interest in [~~Storage~~]/ [Servant's Room #1519]/ [~~Parking Space~~] ("Included Interests")
1.14 The "Closing" is the transfer of ownership of the Shares and Lease.
1.15 The date scheduled for Closing is **no later than 3/6/15** ("Scheduled Closing Date") at 10:00 A.M. (See ¶¶ 9 and 10)
1.16 The "Purchase Price" is: **$67,500,000.00**
1.16.1 The "Contract Deposit" is: **$7,000,000.00**
1.16.2 The "Balance" of the Purchase Price due at Closing is: **$63,000,000.00** (See ¶ 2.2.2) **See SR18 in Second Rider**
1.17 The monthly "Maintenance" charge is $57,085.53 (See ¶ 4)
1.18 The "Assessment", if any, payable to the Corporation, at the date of this Contract is NONE, payable as follows:
1.19 [Purchaser] shall pay the Corporation's flip tax, transfer fee (apart from the transfer agent fee) and/or waiver of option fee ("Flip Tax"), if any.
~~1.20 Financing Options (Delete two of the following ¶¶ 1.20.1, 1.20.2 or 1.20.3)~~
~~1.20.1 Purchaser may apply for financing in connection with this sale and Purchaser's obligation to purchase under this Contract is contingent upon issuance of a Loan Commitment Letter by the Loan Commitment Date (¶18.1.2).~~
~~1.20.2 Purchaser may apply for financing in connection with this sale but Purchaser's obligation to purchase under this Contract is not contingent upon issuance of a Loan Commitment letter.~~
~~1.20.3 Purchaser shall not apply for financing in connection with this sale.~~
~~1.21 If ¶ 1.20.1 or 1.20.2 applies, the "Financing Terms" for ¶ 18 are: a loan of $ _____ for a term of _____ years or such lease~~

to Unit 1801 at 2.00 pm of February 20, 2015. the series of videos contained in the DVD(the "DVD") delivered by Brown Harris Stevens

(*) 1.12 -- Specifically excluded from this sale are thirteen (13) paintings and drawings; one antique secretary desk on east wall of LR (to be replaced by a piece of furniture that resembles this); personal 'knick knacks' such as small boxes, clocks, picture frames, pictures, etc. (but if 'knick knacks' are in the DVD, they are included); file cabinets in GII's office and contents thereof; all the clothing, framed photographs(except specific frame to be designated by buyer) and the model of the Seller's private yacht located in Seller's office.

SN 0029

Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 102 of
134

Contract of sale cooperative agreement, 7-1461
Prepared by the Committee on Condominium and Cooperatives of the Real Property Section of the New York State Bar Association

CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

## Contract of Sale - Cooperative Apartment

This Contract is made as of February *21*, 2015 between the "Seller" and the "Purchaser" identified below.

### 1 Certain Definitions and Information

1.1 The "Parties" are:

1.1.1 "Seller": Sherry 1800s, LLC
*Prior names used by Seller:*
*Address: 1233 Rock Rimmon Road, Stamford, CT 06903*

*Tax ID. No.: 20-0780,154*

1.1.2 "Purchaser": Genever Holdings LLC

*Address:*

*S.S. No.:*

1.2 The "Attorneys" are *(name, firm name, address and telephone, fax)*.

1.2.1 "Seller's Attorney"
Michael J. Jones, Esq.
Ivey, Barnum & O'Mara, LLC
170 Mason Street, Greenwich, CT 06830
Tel: 203-661-6900
Fax: 203-661-7088
mjones@ibholow.com

1.2.2 "Purchaser's Attorney"
Ira Gilbert, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison, LLP
1285 Avenue of the America
New York, NY 10019-6064
Tel: 212-373-3529
Fax: 212-492-0529
igilbert@paulweiss.com

1.3 The "Escrowee" is *the [Seller's]* Attorney.

1.4 The Managing Agent is *(name, address and telephone, fax)*:
Sherry Netherland Hotel
Susan Hennelly
781 Fifth Avenue, 1", New York, NY 10022
Tel: 212-231-6811 Fax: 212-832-4845

1.5 The real estate "Broker(s)" *(see ¶ 12)* is/are: John Burger, and Kathy Sloane, Brown Harris Stevens and Sorena Boardman, Sotheby's 1.6 The name of the cooperative housing corporation ("Corporation") is:
Sherry Netherland, Inc.

1.7 The "Unit" number is: 1801, which encompasses the entire *

1.8 The Unit is located in "Premises" known as: 781 Fifth Avenue, New York, NY

1.9 The "Shares" are the shares of the Corporation allocated to the Units.
* 18th Floor, except elevator hallway and including Maid's Room 1519

1.10 The "Lease" is the Corporation's proprietary lease or occupancy agreement for the Unit, given by the Corporation which expires on

1.11 "Personalty" is the following personal property, to the extent existing in the Unit on the date hereof: the refrigerators, freezers, ranges, ovens, built-in microwave ovens, dishwashers, garbage disposal units, cabinets and counters, lighting fixtures, chandeliers, wall-to-wall carpeting, plumbing and heating fixtures, central air-conditioning and/or window or sleeve units, washing machines, dryers, screens and storm windows, window treatments, switch plates, door hardware, mirrors, built-ins not ~~excluded in ¶ 1.12~~ and all of the ~~furnishings including but not limited to everyday china pots pans cooking items flatware as well as crystal glasses and decanters etc in the bar area~~ and personal property (except as specifically excluded in 1.12), including but not limited to all items set forth in the series of videos contained in the DVD (the "DVD") delivered by Brown Harris Stevens to Unit 1801 at 2:00 pm on February 20, 2015.

/See 1.12 below/ ⊛

1.12 Specifically ~~excluded from this sale is all personal property not included in ¶ 1.11 and all contents included in the unit with the exception of 13 paintings and drawings, one antique secretary desk on east wall of LR (will be replaced) personal "knick-knacks" such as small boxes, clocks, picture frames, pictures, etc.~~

1.13 The sale ~~[does] [does not]~~ include Seller's interest in ~~[Storage]/~~ [Servant's Room #1519]/ ~~[Parking Space]~~ ("Included Interests")

1.14 The "Closing" is the transfer of ownership of the Shares and Lease.

1.15 The date scheduled for Closing is **no later than 3/6/15** ("Scheduled Closing Date") at 10:00 A.M. (See ¶ 9 and 10)

1.16 The "Purchase Price" is: $67,500,000.00

1.16.1 The "Contract Deposit" is: $7,000,000.00

1.16.2 The "Balance" of the Purchase Price due at Closing is: $63,000,000.00 (See ¶ 2.2.2) **See SR18 in Second Rider** 4)

1.17 The monthly "Maintenance" charge is $57,085.53 (See ¶ 4)

1.18 The "Assessment", if any, payable to the Corporation, at the date of this Contract is NONE, payable as follows:

1.19 [Purchaser] shall pay the Corporation's flip tax, transfer fee (apart from the transfer agent fee) and/or waiver of option fee ("Flip Tax"), if any.

1.20 ~~Financing Options (Delete two of the following ¶¶ 1.20.1, 1.20.2 or 1.20.3)~~

1.30.1 ~~Purchaser may apply for financing in connection with this sale and Purchaser's obligation to purchase under this Contract is contingent upon issuance of a Loan Commitment Letter by the Loan Commitment Date (¶18.1.2).~~

1.20.2 ~~Purchaser may apply for financing in connection with this sale but Purchaser's obligation to purchase under this Contract is not contingent upon issuance of a Loan Commitment Letter.~~

1.20.3 ~~Purchaser shall not apply for financing in connection with this sale.~~

1.21 If ¶ 1.20.1 or 1.20.2 applies, the "Financing Terms" for ¶ 18 are: a loan of $ _____ for a term of _____ years at such lesser

⊛ **1.12** – Specifically excluded from this sale are thirteen (13) paintings and drawings; one antique secretary desk on east wall of LR (to be replaced by a piece of furniture that resembles this desk); personal 'knick knacks' such as small boxes, clocks, picture frames, pictures, etc. (but if 'knick knacks' are in the DVD, they are included); file cabinets in Gil's office and contents thereof; all the clothing, framed photographs(except specific frame to be designated by buyer) and the model of the Seller's private yacht located in Seller's office.

SN 0030

~~amount or shorter term as applied for or acceptable to Purchaser;~~
~~and the "Loan Commitment Date" for ¶ 18 is _____ calendar~~
~~days after the Delivery Date.~~

1.22 The "Delivery Date" of this Contract is the date on which a fully executed counterpart of this Contract is deemed given to and received by Purchaser or Purchaser's Attorney as provided in ¶ 17.3.

1.23 All "Proposed Occupants" of the Unit are:

1.23.1 persons and relationship to Purchaser:

1.23.2 pets:

1.24 The Contract Deposit shall be held in [a **non-**] IOLA escrow account. If the account is a non- IOLA account then interest shall be paid to the Party entitled to the Contract Deposit. The Party receiving the interest shall pay any income taxes thereon. The escrow account shall be a segregated bank account at Depository: **BNY MELLON**

Address: 10 Mason Street, Greenwich, CT 06830 (See ¶ 27)

1.25 This Contract is continued on attached rider(s).

**2 Agreement to Sell and Purchase; Purchase Price; Escrow**

2.1 Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the Seller's Shares, Lease, Personally and any Included Interests and all other items included in this sale, for the Purchase Price and upon the terms and conditions set forth in this Contract.

2.2 The Purchase Price is payable to Seller by Purchaser as follows:

2.2.1 the Contract Deposit at the time of signing this Contract by Purchaser's good check to the order of Escrowee; and

2.2.2 the Balance at Closing, only by cashier's or official bank check or certified check of Purchaser payable to the direct order of Seller. The check(s) shall be drawn on and payable by a branch of a commercial or savings bank, savings and loan association or trust company located in the same City or County as the Unit. Seller may direct, on reasonable Notice (defined in ¶ 17) prior to Closing, that all or a portion of the Balance shall be made payable to persons other than Seller (see ¶ 17.7).

**3 Personality**

3.1 Subject to any rights of the Corporation or any holder of a mortgage to which the Lease is subordinate, this sale includes all of the Seller's interest, if any, in the Personality and the Included Interests.

3.2 No consideration is being paid for the Personality or for the Included Interests; nothing shall be sold to Purchaser if the Closing does not occur.

3.3 Prior to Closing, Seller shall remove from the Unit all the furniture, furnishings and other property not included in this sale, and repair any damage caused by such removal.

**4 Representations and Covenants**

4.1 Subject to any matter affecting title to the Premises (as to which Seller makes no representations or covenants), Seller represents and covenants that:

4.1.1 Seller is, and shall at Closing be, the sole owner of the Shares, Lease, Personally and Included Interests, with the full right, power and authority to sell and assign them. Seller shall make timely provision to satisfy existing security interest(s) in the Shares and Lease and have the same delivered at Closing (See ¶10.1);

4.1.2 the Shares were duly issued, fully paid for and are non-assessable;

4.1.3 the Lease is, and will at Closing be, in full force and effect and no notice of default under the Lease is now or will at Closing be in effect;

4.1.4 the Maintenance and Assessments payable as of the date hereof are as specified in ¶ 1.17 and 1.18;

4.1.5 as of this date, Seller neither has actual knowledge nor has received any written notice of any increase in Maintenance or any Assessment which has been adopted by the Board of Directors of the Corporation and is not reflected in the amounts set forth in ¶¶ 1.17and 1.18;

4.1.6 Seller has not made any material alterations or additions to the Unit without any required consent of the Corporation or, to Seller's actual knowledge, without compliance with all applicable law. This provision shall not survive Closing.

4.1.7 Seller has not entered into, shall not enter into, and has no actual knowledge of any agreement (other than the Lease) affecting title to the Unit or its use and/or occupancy after Closing, or which would be binding on or adversely affect Purchaser after Closing (except as set forth in ¶ 4.1.6, alteration agreement);

4.1.8 Seller has been known by no other name for the past 10 years except as set forth in ¶ 1.1.1.

4.1.9 at Closing in accordance with ¶ 15.2:

4.1.9.1 there shall be no judgments outstanding against Seller which have not been bonded against collection out of the Unit ("Judgments");

4.1.9.2 the Shares, Lease, Personally and any Included Interests shall be free and clear of liens (other than the Corporation's general lien on the Shares for which no monies shall be owed), encumbrances and adverse interests ("Liens");

4.1.9.3 all sums due to the Corporation shall be fully paid by Seller to the end of the payment period immediately preceding the date of Closing;

4.1.9.4 Seller shall not be indebted for labor or material which might give rise to the filing of a notice of mechanic's lien against the Unit or the Premises; and

4.1.9.5 no violations shall be of record which the owner of the Shares and Lease would be obligated to remedy under the Lease.

4.2 Purchaser represents and covenants that:

4.2.1 Purchaser is acquiring the Shares and Lease for residential occupancy of the Unit solely by the Proposed Occupants identified in ¶ 1.23

4.2.2 Purchaser is not, and within the past 7 years has not been, the subject of a bankruptcy proceeding;

4.2.3 if ¶ 1.20.5 applies, Purchaser shall not apply for financing in connection with this purchase.

4.2.4 Each individual comprising Purchaser is over the age of 18 and is purchasing for Purchaser's own account (beneficial and of record);

4.2.5 Purchaser shall not make any representations to the Corporation contrary to the foregoing and shall provide all documents in support thereof required by the Corporation in connection with Purchaser's application for approval of this transaction; and

4.2.6 there are not now and shall not be at Closing any unpaid tax liens or monetary judgments against Purchaser.

4.3 Each Party covenants that its representations and covenants contained in ¶ 4 shall be true and complete at Closing and, except for ¶ 4.1.6, shall survive Closing but any action based thereon must be instituted within one year after Closing.

**5 Corporate Documents**

Purchaser has examined and is satisfied with, or (except as to any matter represented in this Contract by Seller) accepts and assumes the risk of not having examined, the Lease, the Corporation's Certificate of Incorporation, By-laws, House Rules, minutes of shareholders' and directors' meetings, most recent audited financial statement and most recent statement of tax deductions available to the Corporation's shareholders under Internal Revenue Code ("IRC") §216 (or any successor statute).

**6 Required Approval and References**

6.1 This sale is subject to the unconditional consent of the Corporation.

6.2 Purchaser shall in good faith:

6.2.1 submit to the Corporation or the Managing Agent an application with respect to this sale on the form required by the Corporation, containing such data and together with such documents as the Corporation requires, and pay the applicable

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
NYSCEF DOC. NO. 256
INDEX NO. 652077/2017
RECEIVED NYSCEF: 11/28/2018

Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 104 of
134

fees and charges that the Corporation imposes upon Purchaser. All of the foregoing shall be submitted within 10 business days after the Delivery Date, or, if ¶ 1.20.1 or 1.20.2 applies and the Loan Commitment Letter is required by the Corporation, within 3 business days after the earlier of (i) the Loan Commitment Date (defined in ¶ 1.21) or (ii) the date of receipt of the Loan Commitment Letter (defined in ¶ 18.1.3);

6.2.2 attend (and cause any Proposed Occupant to attend) one or more personal interviews, as requested by the Corporation; and

6.2.3 promptly submit to the Corporation such further references, data and documents reasonably requested by the Corporation.

6.3 Either Party, after learning of the Corporation's decision, shall promptly advise the other Party thereof. If the Corporation has not made a decision on or before the Scheduled Closing Date, the Closing shall be adjourned for 30 business days for the purpose of obtaining such consent. If such consent is not given by such adjourned date, either Party may cancel this Contract by Notice, provided that the Corporation's consent is not issued before such Notice of cancellation is given. If such consent is refused at any time, either Party may cancel this Contract by Notice. In the event of cancellation pursuant to this ¶ 6.3, the Escrowee shall refund the Contract Deposit to Purchaser.

6.4 If such consent is refused, or not given, due to Purchaser's bad faith conduct, Purchaser shall be in default and ¶ 13.1 shall govern.

## 7 Condition of Unit and Personalty; Possession

7.1 Seller makes no representation as to the physical condition or state of repair of the Unit, the Personalty, the Included Interests or the Premises. Purchaser has inspected or waived inspection of the Unit, the Personalty and the Included Interests and shall take the same "as is", as of the date of this Contract, except for reasonable wear and tear. However, at the time of Closing, the appliances shall be in working order and required smoke detector(s) shall be installed and operable.

7.2 At Closing, Seller shall deliver possession of the Unit, Personalty and Included Interests in the condition required by ¶ 7.1, broom-clean, vacant and free of all occupants and rights of possession.

## 8 Risk of Loss

8.1 The provisions of General Obligations Law § 5-1311, as modified herein, shall apply to this transaction as if it were a sale of realty. For purposes of this paragraph, the term "Unit" includes built-in Personalty.

8.2 Destruction shall be deemed "material" under GOL § 5-1311, if the reasonably estimated cost to restore the Unit shall exceed 5% of the Purchase Price.

8.3 In the event of any destruction of the Unit or the Premises, when neither legal title nor the possession of the Unit has been transferred to Purchaser, Seller shall give Notice of the loss to Purchaser ("Loss Notice") by the earlier of the date of Closing or 7 business days after the date of the loss.

8.4 If there is material destruction of the Unit without fault of Purchaser, this Contract shall be deemed canceled in accordance with ¶ 16.3, unless Purchaser elects by Notice to Seller to complete the purchase with an abatement of the Purchase Price; or

8.5 Whether or not there is any destruction of the Unit, if without fault of Purchaser, more than 10% of the units in the Premises are rendered uninhabitable, or reasonable access to the Unit is not available, then Purchaser shall have the right to cancel this Contract in accordance with ¶ 16.3 by Notice to Seller.

8.6 Purchaser's Notice pursuant to ¶ 8.4 or ¶ 8.5 shall be given within 7 business days following the giving of the Loss Notice except that if Seller does not give a Loss Notice, Purchaser's Notice may be given at any time at or prior to Closing.

8.7 In the event of any destruction of the Unit, Purchaser shall not be entitled to an abatement of the Purchase Price (i) that exceeds the reasonably estimated cost of repair and restoration or (ii) for any loss that the Corporation is obliged to repair or restore; but Seller shall assign to Purchaser, without recourse, Seller's claim, if any, against the Corporation with respect to such loss.

## 9 Closing Location

The Closing shall be held at the location designated by the Corporation or, if no such designation is made, at the office of Seller's Attorney.

## 10 Closing

10.1 At Closing, Seller shall deliver or cause to be delivered:

10.1.1 Seller's certificate for the Shares duly endorsed for transfer to Purchaser or accompanied by a separate duly executed stock power to Purchaser, and in either case, with any guarantee of Seller's signature required by the Corporation;

10.1.2 Seller's counterpart original of the Lease, all assignments and assumptions in the chain of title and a duly executed assignment thereof to Purchaser in the form required by the Corporation;

10.1.3 FIRPTA documents required by ¶ 25;

10.1.4 keys to the Unit, building entrance(s), and, if applicable, garage, mailbox, storage unit and any locks in the Unit;

10.1.5 if requested, an assignment to Purchaser of Seller's interest in the Personalty and Included Interests;

10.1.6 any documents and payments to comply with ¶ 15.2

10.1.7 If Seller is unable to deliver the documents required in ¶ 10.1.1 or 10.1.2 then Seller shall deliver or cause to be delivered all documents and payments required by the Corporation for the issuance of a new certificate for the Shares or a new Lease.

10.2 At Closing, Purchaser shall:

10.2.1 pay the Balance in accordance with ¶2.2.2;

10.2.2 execute and deliver to Seller and the Corporation an agreement assuming the Lease, in the form required by the Corporation; and

10.2.3 if requested by the Corporation, execute and deliver counterparts of a new lease substantially the same as the Lease, for the balance of the Lease term, in which case the Lease shall be canceled and surrendered to the Corporation together with Seller's assignment thereof to Purchaser.

10.3 At Closing, the Parties shall complete and execute all documents necessary:

10.3.1 for Internal Revenue Service ("IRS") form 1099-S or other similar requirements;

10.3.2 to comply with smoke detector requirements and any applicable transfer tax filings; and

10.3.3 to transfer Seller's interest, if any, in and to the Personalty and Included Interests.

10.4 Purchaser shall not be obligated to close unless, at Closing, the Corporation delivers:

10.4.1 to Purchaser a new certificate for the Shares in the name of Purchaser; and

10.4.2 a written statement by an officer or authorized agent of the Corporation consenting to the transfer of the Shares and Lease to Purchaser and setting forth the amounts of and payment status of all sums owed by Seller to the Corporation, including Maintenance and any Assessments, and the dates to which each has been paid.

## 11 Closing Fees, Taxes and Apportionments

11.1 At or prior to Closing,

11.1.1 Seller shall pay, if applicable:

11.1.1.1 the cost of stock transfer stamps; and

11.1.1.2 transfer taxes, except as set forth in ¶ 11.1.2.2

11.1.2 Purchaser shall pay, if applicable:

11.1.2.1 any fee imposed by the Corporation relating to Purchaser's financing; and

11.1.2.2 transfer taxes imposed by statute primarily on Purchaser (e.g., the "mansion tax"),

11.2 The Flip Tax, if any, shall be paid by the Party specified in ¶ 1.19.

11.3 Any fee imposed by the Corporation and not specified in this Contract shall be paid by the Party upon whom such fee is expressly imposed by the Corporation, and if no Party is specified by the Corporation, then such fee shall be paid by Seller.

11.4 The Parties shall apportion as of 11:59 P.M. of the day preceding the Closing, the Maintenance, and anyother periodic charges due the Corporation (other than Assessments) and STAR Tax Exemption (if the Unit is the beneficiary of same), based on the number of the days in the month of Closing.

11.5 Assessments, whether payable in a lump sum or installments, shall not be apportioned, but shall be paid by the Party who is the owner of the Shares on the date specified by the Corporation for payment. Purchaser shall pay any installments payable after Closing provided Seller had the right and elected to pay the Assessment in installments.

11.6 Each Party shall timely pay any transfer taxes for which it is primarily liable pursuant to law by cashier's, official bank, certified or attorney's escrow check. This ¶11.6 shall survive Closing.

11.7 Any computational errors or omissions shall be corrected within 6 months after Closing. This ¶11.7 shall survive Closing.

**12 Broker**

12.1 Each Party represents that such Party has not dealt with any person acting as a broker, whether licensed or unlicensed, in connection with this transaction other than the Broker(s) named in ¶ 1.5.

12.2 Seller shall pay the Broker's commission pursuant to a separate agreement The Broker(s) shall not be deemed to be a third-party beneficiary of this Contract.

12.3 This ¶12 shall survive Closing, cancellation or termination of this Contract.

**13 Defaults, Remedies and Indemnities**

13.1 In the event of a default or misrepresentation by Purchaser, Seller's sole and exclusive remedies shall be to cancel this Contract, retain the Contract Deposit as liquidated damages and, if applicable, Seller may enforce the indemnity in ¶ 13.3 as to brokerage commission or sue under ¶ 13.4. Purchaser prefers to limit Purchaser's exposure for actual damages to the amount of the Contract Deposit, which Purchaser agrees constitutes a fair and reasonable amount of compensation for Seller's damages under the circumstances and is not a penalty. The principles of real property law shall apply to this liquidated damages provision.

13.2 In the event of a default or misrepresentation by Seller, Purchaser shall have such remedies as Purchaser is entitled to at law or in equity, including specific performance, because the Unit and possession thereof cannot be duplicated.

13.3 Subject to the provisions of ¶ 4.3, each Party indemnifies and holds harmless the other against and from any claim, judgment, loss, liability, cost or expense resulting from the indemnitor's breach of any of its representations or covenants stated to survive Closing, cancellation or termination of this Contract. Purchaser indemnifies and holds harmless Seller against and from any claim, judgment, loss, liability, cost or expense resulting from the Lease obligations accruing from and after the Closing. Each indemnity includes, without limitation, reasonable attorneys' fees and disbursements, court costs and litigation expenses arising from the defense of any claim and enforcement or collection of a judgment under this indemnity, provided the indemnitee is given Notice and opportunity to defend the claim. This ¶ 13.3 shall survive Closing, cancellation or termination of this Contract.

13.4 In the event any instrument for the payment of the Contract Deposit fails of collection, Seller shall have the right to sue on the uncollected instrument. In addition, such failure of collection shall be a default under this Contract, provided Seller gives Purchaser Notice of such failure of collection and, within 3 business days after Notice is given, Escrowee does not receive from Purchaser an unendorsed good certified check, bank check or immediately available funds in the amount of the uncollected funds. Failure to cure such default shall entitle Seller to the remedies set forth in ¶ 13.1 and to retain all sums as may be collected and/or recovered.

**14 Entire Agreement; Modification**

14.1 All prior oral or written representations, understandings and agreements had between the Parties with respect to the subject matter of this Contract, and with the Escrowee as to ¶ 27, are merged in this Contract, which alone fully and completely expresses the Parties' and Escrowee's agreement. 14.2 The Attorneys may extend in writing any of the time limitations stated in this Contract. Any other provision of this Contract may be changed or waived only in writing signed by the Party or Escrowee to be charged.

**15 Removal of Liens and Judgments**

15.1 Purchaser shall deliver or cause to be delivered to Seller or Seller's Attorney, not less than 10 calendar days prior to the Scheduled Closing Date a Lien and Judgment search, except that Liens or Judgments first disclosed in a continuation search shall be reported to Seller within 2 business days after receipt thereof, but not later than the Closing. Seller shall have the right to adjourn the Closing pursuant to ¶ 16 to remove any such Liens and Judgments. Failure by Purchaser to timely deliver such search or continuation search shall not constitute a waiver of Seller's covenants in ¶4 as to Liens and Judgments. However, if the Closing is adjourned solely by reason of untimely delivery of the Lien and Judgment search, the apportionments under ¶ 11.3 shall be made as of 11:59 P.M. of the day preceding the Scheduled Closing Date in ¶ 1.15.

15.2 Seller, at Seller's expense, shall obtain and deliver to the Purchaser the documents and payments necessary to secure the release, satisfaction, termination and discharge or removal of record of any Liens and Judgments. Seller may use any portion of the Purchase Price for such purposes.

15.3 This ¶ 15 shall survive Closing.

**16 Seller's Inability**

16.1 If Seller shall be unable to transfer the items set forth in ¶ 2.1 in accordance with this Contract for any reason other than Seller's failure to make a required payment or other willful act or omission, then Seller shall have the right to adjourn the Closing for periods not exceeding 60 calendar days in the aggregate, but not extending beyond the expiration of Purchaser's Loan Commitment Letter, if ¶ 1.20.1 or 1.20.2 applies.

16.2 If Seller does not elect to adjourn the Closing or (if adjourned) on the adjourned date of Closing Seller is still unable to perform, then unless Purchaser elects to proceed with the Closing without abatement of the Purchase Price, either Party may cancel this Contract on Notice to the other Party given at any time thereafter.

16.3 In the event of such cancellation, the sole liability of Seller shall be to cause the Contract Deposit to be refunded to Purchaser and to reimburse Purchaser for the actual costs incurred for Purchase's lien and title search, if any.

**17 Notices and Contract Delivery**

17.1 Any notice or demand ("Notice") shall be in writing and delivered either by hand, Overnight delivery or certified or registered mail, return receipt requested, to the Party and simultaneously, in like manner, to such Party's Attorney, if any, and to Escrowee at their respective addresses or to such other address as shall hereafter be designated by Notice given pursuant to this ¶ 17.

17.2 The Contract may be delivered as provided in ¶

17.1 or by ordinary mail.

17.3 The Contract or each Notice shall be deemed given and received:

17.3.1 on the day delivered by hand;

17.3.2 on the business day following the date sent by overnight delivery;

17.3.3 on the 5th business day following the date sent by certified or registered mail; or

17.3.4 as to the Contract only, 3 business days following the date of ordinary mail.

17.4 A Notice to Escrowee shall be deemed given only upon actual receipt by Escrowee.

17.5 The Attorneys are authorized to give and receive any Notice on behalf of their respective clients.

17.6 Failure or refusal to accept a Notice shall not invalidate the Notice.

17.7 Notice pursuant to ¶¶ 2.2.2 and 13.4 may be delivered by confirmed facsimile to the Party's Attorney and shall be deemed given when transmission is confirmed by sender's facsimile machine.

18 ~~Financing Provisions~~

18.1 ~~The provisions of ¶¶ 18.1 and 18.2 are applicable only if ¶ 1.20.1 or 1.20.2 applies.~~

18.1.1 ~~An "Institutional Lender" is any of the following that is authorized under Federal or New York State law to issue a loan secured by the Shares and Lease and is currently extending similarly-secured loan commitments in the county in which the Unit is located: a bank, savings bank, savings and loan association, trust company, credit union of which Purchaser is a member, mortgage banker, insurance company or governmental entity.~~

18.1.2 ~~A "Loan Commitment Letter" is a written offer from an Institutional Lender to make a loan on the Financing Terms (see ¶ 1.21) at prevailing fixed or adjustable interest rates and on other customary terms generally being offered by Institutional Lenders making cooperative share loans. An offer to make a loan conditional upon obtaining an appraisal satisfactory to the Institutional Lender shall not become a Loan Commitment Letter unless and until such condition is met. An offer conditional upon any factor concerning Purchaser (e.g. sale of current home, payment of outstanding debt, no material adverse change in Purchaser's financial condition, etc.) is a Loan Commitment Letter whether or not such condition is met. Purchaser accepts the risk that, and cannot cancel this Contract if, any condition concerning Purchaser is not met.~~

18.2 ~~Purchaser, directly or through a mortgage broker registered pursuant to Article 12-D of the Banking Law, shall diligently and in good faith:~~

18.2.1 ~~apply only to an Institutional Lender for a loan on the Financing Terms (see ¶ 1.21) on the form required by the Institutional Lender containing truthful and complete information and submit such application together with such documents as the Institutional Lender requires, and pay the applicable fees and charges of the Institutional Lender, all of which shall be performed within 5 business days after the Delivery Date;~~

18.2.2 ~~promptly submit to the Institutional Lender such further references, data and documents requested by the Institutional Lender; and~~

18.2.3 ~~accept a Loan Commitment Letter meeting the Financing Terms and comply with all requirements of such Loan Commitment Letter (or any other loan commitment letter accepted by Purchaser) and of the Institutional Lender in order to close the loan; and~~

18.2.4 ~~furnish Seller with a copy of the Loan Commitment Letter promptly after Purchaser's receipt thereof.~~

18.2.5 ~~Purchaser is not required to apply to more than one Institutional Lender.~~

18.3 ~~If ¶ 1.20.1 applies, then~~

18.3.1 ~~provided Purchaser has complied with all applicable provisions of ¶ 18.2 and this ¶ 18.3, Purchaser may cancel this Contract as set forth below, if:~~

18.3.1.1 ~~any Institutional Lender denies Purchaser's application in writing prior to the Loan Commitment Date (see ¶ 1.21); or~~

18.3.1.2 ~~a Loan Commitment Letter is not issued by the Institutional Lender on or before the Loan Commitment Date; or~~

18.3.1.3 ~~any requirement of the Loan Commitment Letter other than one concerning Purchaser is not met (e.g. failure of the Corporation to execute and deliver the Institutional Lender's recognition agreement or other document, financial condition of the Corporation, owner occupancy quota, etc.); or~~

18.3.1.4 ~~(i) the Closing is adjourned by Seller or the Corporation for more than 30 business days from the Scheduled Closing Date and (ii) the Loan Commitment Letter expires on a date more than 30 business days after the Scheduled Closing Date and before the new date set for Closing pursuant to this paragraph and (iii) Purchaser is unable in good faith to obtain from the Institutional Lender an extension of the Loan Commitment Letter or a new Loan Commitment Letter on the Financing Terms without paying additional fees to the Institutional Lender, unless Seller agrees, by Notice to Purchaser within 5 business days after receipt of Purchaser's Notice of cancellation on such ground, that Seller will pay such additional fees and Seller pays such fees when due. Purchaser may not object to an adjournment by Seller for up to 30 business days solely because the Loan Commitment Letter would expire before such adjourned Closing date.~~

18.3.2 ~~Purchaser shall deliver Notice of cancellation to Seller within 5 business days after the Loan Commitment Date if cancellation is pursuant to ¶18.3.1.1 or 18.3.1.2 and on or prior to the Scheduled Closing Date if cancellation is pursuant to ¶ 18.3.1.3 or 18.3.1.4.~~

18.3.3 ~~If cancellation is pursuant to ¶ 18.3.1.1, then Purchaser shall deliver to Seller, together with Purchaser's Notice, a copy of the Institutional Lender's written denial of Purchaser's loan application. If cancellation is pursuant to ¶ 18.3.1.3, then Purchaser shall deliver to Seller together with Purchaser's Notice evidence that a requirement of the Institutional Lender was not met.~~

18.3.4 ~~Seller may cancel this Contract by Notice to Purchaser, sent within 5 days after the Loan Commitment Date, if Purchaser shall not have sent by then either (i) Purchaser's Notice of cancellation or (ii) a copy of the Loan Commitment Letter to Seller, which cancellation shall become effective if Purchaser does not deliver a copy of such Loan Commitment Letter to Seller within 10 business days after the Loan Commitment Date.~~

18.3.5 ~~Failure by either Purchaser or Seller to deliver Notice of cancellation as required by this ¶ 18.3 shall constitute a waiver of the right to cancel under this ¶18.3.~~

18.3.6 ~~If this Contract is canceled by Purchaser pursuant to this ¶ 18.3, then thereafter neither Party shall have any further rights against, or obligations or liabilities to, the other by reason of this Contract, except that the Contract Deposit shall be promptly refunded to Purchaser and accept as set forth in ¶ ¶ 13. If this Contract is canceled by Purchaser pursuant to ¶ 18.3.1.4, then Seller shall reimburse Purchaser for any non-refundable financing and inspection expenses and other sums reimbursable pursuant to ¶ 6.~~

18.3.7 ~~Purchaser cannot cancel this Contract pursuant to ¶ 18.3.1.4 and cannot obtain a refund of the Contract Deposit if the Institutional Lender fails to fund the loan:~~

SN 0034

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
NYSCEF DOC. NO. 256

INDEX NO. 652077/2017
RECEIVED NYSCEF: 11/28/2018

Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 107 of
134

18.3.7.1 ~~because a requirement of the Loan Commitment Letter concerning Purchaser is not met (e.g., Purchaser's financial condition or employment status suffers an adverse change; Purchaser fails to satisfy a condition relating to the sale of an existing residence, etc.) or~~

18.3.7.2 ~~due to the expiration of a Loan Commitment Letter issued with an expiration date that is not more than 30 business days after the Scheduled Closing Date.~~

### 19 Singular/Plural and Joint/Several

The use of the singular shall be deemed to include the plural and vice versa, whenever the context so requires. If more than one person constitutes Seller or Purchaser, their obligations as such Party shall be joint and several.

### 20 No Survival

No representation and/or covenant contained herein shall survive Closing except as expressly provided. Payment of the Balance shall constitute a discharge and release by Purchaser of all of Seller's obligations hereunder except those expressly stated to survive Closing.

### 21 Inspections

Purchaser and Purchaser's representatives shall have the right to inspect the Unit within 48 hours prior to Closing, and at other reasonable times upon reasonable request to Seller.

### 22 Governing Law and Venue

This Contract shall be governed by the laws of the State of New York without regard to principles of conflict of laws. Any action or proceeding arising out of this Contract shall be brought in the county or Federal district where the Unit is located and the Parties hereby consent to said venue.

### 23 No Assignment by Purchaser; Death of Purchaser

23.1 Purchaser may not assign this Contract or any of Purchaser's rights hereunder. Any such purported assignment shall be null and void.

23.2 This Contract shall terminate upon the death of all persons comprising Purchaser and the Contract Deposit shall be refunded to the Purchaser. Upon making such refund and reimbursement, neither Party shall have any further liability or claim against the other hereunder, except as set forth in ¶ 12.

### 24 Cooperation of Parties

24.1 The Parties shall each cooperate with the other, the Corporation and Purchaser's Institutional Lender and title company, if any, and obtain execute and deliver such documents as are reasonably necessary to consummate this sale.

24.2 The Parties shall timely file all required documents in connection with all governmental filings that are required by law. Each Party represents to the other that its statements in such filings shall be true and complete. This ¶ 24.2 shall survive Closing.

### 25 FIRPTA

The parties shall comply with IRC §§ 897, 1445 and the regulations thereunder as same may be amended ("FIRPTA"). If applicable, Seller shall execute and deliver to purchaser at Closing a Certification of Non- Foreign Status ("CNS") or deliver a Withholding Certificate from the IRS. If Seller fails to deliver a CNS or a Withholding Certificate, Purchaser shall withhold from the Balance, and remit to the IRS, such sum as may be required by law. Seller hereby waives any right of action against Purchaser on account of such withholding and remittance. This ¶ 25 shall survive Closing.

### 26 Additional Requirements

26.1 Purchaser shall not be obligated to close unless all of the following requirements are satisfied at the time of the Closing:

26.1.1 the Corporation is in good standing;

26.1.2 the Corporation has fee or leasehold title to the Premises, whether or not marketable or insurable; and

26.1.3 there is no pending in rem action, tax certificate/ ien sale or foreclosure action of any underlying mortgage affecting the Premises.

26.2 If any requirement in ¶ 26.1 is not satisfied at the time of the Closing, Purchaser shall give Seller Notice and if the same is not satisfied within a reasonable period of time thereafter, then either Party may cancel this Contract (pursuant to ¶ 16.3) by Notice.

### 27 Escrow Terms

27.1 The Contract Deposit shall be deposited by Escrowee in an escrow account as set forth in ¶ 1.24 and the proceeds held and disbursed in accordance with the terms of this Contract. At Closing, the Contract Deposit shall be paid by Escrowee to Seller. If the Closing does not occur and either Party gives Notice to Escrowee demanding payment of the Contract Deposit, Escrowee shall give prompt Notice to the other Party of such demand. If Escrowee does not receive a Notice of objection to the proposed payment from such other Party within 10 business days after the giving of Escrowee's Notice, Escrowee is hereby authorized and directed to make such payment to the demanding party. If Escrowee does receive such a Notice of objection within said period, or if for any reason Escrowee in good faith elects not to make such payment, Escrowee may continue to hold the Contract Deposit until otherwise directed by a joint Notice by the Parties or a final, non-appealable judgment, order or decree of a court of competent jurisdiction. However, Escrowee shall have the right at any time to deposit the Contract Deposit and the interest thereon, if any, with the clerk of a court in the county as set forth in ¶ 22 and shall give Notice of such deposit to each Party. Upon disposition of the Contract Deposit and interest thereon, if any, in accordance with this ¶ 27, Escrowee shall be released and discharged of all escrow obligations and liabilities.

27.2 The Party whose Attorney is Escrowee shall be liable for loss of the Contract Deposit. If the Escrowee is Seller's attorney, then Purchaser shall be credited with the amount of the contract Deposit at Closing.

27.3 Escrowee will serve without compensation. Escrowee is acting solely as a stakeholder at the Parties' request and for their convenience. Escrowee shall not be liable to either Party for any act or omission unless it involves bad faith, willful disregard of this Contract or gross negligence. In the event of any dispute Seller and Purchaser shall jointly and severally (with right of contribution) defend (by attorneys elected by Escrowee), indemnify and hold harmless Escrowee from and against any claim, judgment, loss, liability, cost and expenses incurred in connection with the performance of Escrowee's acts or omissions not involving bad faith, willful disregard of this Contract or gross negligence. This indemnity includes, without limitation, reasonable attorneys' fees either paid to retain attorneys or representing the fair value of legal services rendered by Escrowee to itself and disbursements, court costs and litigation expenses.

27.4 Escrowee acknowledges receipt of the Contract Deposit, by check subject to collection.

27.5 Escrowee agrees to the provisions of this ¶ 27.

27.6 If Escrowee is the Attorney for a Party, Escrowee shall be permitted to represent such Party in any dispute or lawsuit.

27.7 This ¶ 27 shall survive Closing, cancellation or termination of this Contract

### 28 Margin Headings

The margin heading do not constitute part of the text of this Contract.

### 29 Miscellaneous

This Contract shall not be binding unless and until Seller delivers a fully executed counterpart of this Contract to Purchaser (or Purchaser's Attorney) pursuant to ¶ 17.2 and 17.3. This Contract shall bind

and inure to the benefit of the Parties hereto and their respective heirs, personal and legal representatives and successors in interest.

SN 0035

**30 Lead Paint**
If applicable, the complete and fully executed Disclosure of
Information on Lead Based Paint and or Lead-Based Paint
Hazards is attached hereto and made a part hereof.

**In Witness Whereof,** the Parties hereto have duly executed this Contract as of the date first above written.

ESCROW TERMS AGREED TO:

Michael J. Jones ESCROWEE

SELLER:
SHERRY 1800s, LLC

By: _____

PURCHASER:
**GENEVER HOLDINGS LLC**

By: _____

SN 0036

### FIRST RIDER ANNEXED TO AND FORMING A PART OF CONTRACT OF SALE FOR THE 18TH FLOOR KNOWN AS UNIT 1801 AT SHERRY NETHERLAND, INC., 781 FIFTH AVENUE, NEW YORK, NEW YORK, A COOPERATIVE APARTMENT BETWEEN SHERRY 1800s, LLC, AS SELLER, AND GENEVER HOLDINGS LLC, AS PURCHASER, DATED FEBRUARY 21, 2015

31.    In the event of any conflict between the provision of this Rider or any other Rider, and the provisions of the Contract to which this Rider is attached, the provisions of this Rider shall control.

32.    In addition to the representation made by Purchaser in Paragraph 4 of this Contract, Purchaser, jointly and severally, represents and warrants to Seller that Purchaser knows of no outstanding judgments or tax liens and knows of no threatened lawsuit or claim (including criminal and/or tax proceedings).

33.    Supplementing Paragraph 20, the acceptance of the Shares and the assumption of the Lease by Purchaser and the delivery of possession of the Unit and keys by Seller shall be deemed full performance by Seller of Seller's obligations under this Contract, except any of which that survive Closing, and such acceptance and assumption by Purchaser shall discharge Seller from all terms, conditions, representations and agreements required to be performed by Seller under this Contract, except any of which that survive Closing. No liability on the part of Seller shall survive the Closing except as expressly set forth in this Contract.

34.    In the event that there is any refund on real estate taxes attributable to the time period in which Seller has owned the Unit, such refund shall belong solely to Seller. In this regard, Purchaser shall cooperate with Seller in connection with obtaining such refund and Purchaser agrees to sign any reasonable documentation to assist Seller in obtaining such refund. If such refund is delivered to Purchaser (or credited towards Purchaser's monthly maintenance by the Corporation), Purchaser shall promptly remit such refund to Seller. The Parties acknowledge that the provision of this Paragraph 34 shall survive the Closing

35.    An increase in the maintenance or the imposition of an assessment after the date hereof shall not be deemed a misrepresentation or breach by Seller hereunder. In this regard, any assessment imposed by the Corporation after the date of this Contract, shall be solely the obligation of Purchaser if such assessment is payable on or after the date of Closing,  Seller will send Purchaser a copy of any notices from the Corporation regarding material facts relating to the Corporation including any maintenance increases.

36.    A "Disclosure of Information on Lead-Based Paint and/or Lead Based Paint Hazards" is attached hereto as Exhibit A hereto. Such document may be executed in counterparts. This Contract shall be deemed executed when signed by the parties hereto notwithstanding that the Broker's signature on such Exhibit A have not yet been obtained. Purchaser acknowledges that Purchaser has received the pamphlet Protect Your Home From Lead in Your Home and Purchaser hereby waives the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards in the Unit and/or the Premises. Purchaser acknowledges that Seller has made no representations to Purchaser concerning the presence of lead paint in the Premises except in the Unit and then only to the extent expressly set forth in the attached disclosure form. Notwithstanding any requirements pursuant to any Local Law, Purchaser

SN 0037

accepts the Premises and Unit in their current "as is" condition concerning the presence of lead paint and any hazards related to same.

37.     All representations made by the Seller in the Contract or any Rider thereto are made to the best of Seller's knowledge and belief without independent investigation and shall not survive the closing.

   **IN WITNESS WHEREOF**, of the parties hereto have executed this Rider to Contract of Sale as of the date first above written.

**SELLER:**

**SHERRY 1800s, LLC**

By: _____

**PURCHASER:**

**GENEVER HOLDINGS LLC**

By: _____

SECOND RIDER TO CONTRACT OF SALE DATED AS OF FEBRUARY *21*, 2015,
BETWEEN SHERRY 1800S LLC, AS SELLER, AND GENEVER HOLDINGS LLC, AS
PURCHASER, COVERING PREMISES LOCATED AT 781 FIFTH AVENUE, NEW YORK,
NEW YORK, 18TH FLOOR (UNITS 1801, 1804, 1807, 1809, 1811, SERVANT'S ROOM 1519)

SR1.    In case of any inconsistency or conflict between the printed portion of this
Contract or the First Rider, and the provisions of this Second Rider, the provisions of this Second
Rider shall control.

SR2.    Seller shall, promptly after receipt thereof, deliver to Purchaser copies of
any written notices from the Corporation received after the Delivery Date and relating to: (1) any
increase in the amount of the monthly Maintenance as set forth in paragraph 1.17; (2) any
intended or proposed assessment other than the Assessment; (3) any intended or proposed
changes to the "flip tax" or other transfer fee charged by the Corporation or its Managing Agent;
(4) any proposed amendment or modification of the Lease, the Certificate of Incorporation of the
Corporation or the Corporation's By-Laws; (5) any proposed construction or repair work the cost
of which is intended to be borne by the Corporation, its insurers or its shareholders; (6) any
refinancing or other material change with respect to any mortgage affecting the Premises; or (7)
any damage or casualty to the Unit or the Premises.

SR3.    Supplementing paragraph 3.3: In the event Seller removes any light
fixtures from the Unit, such fixtures will be replaced with standard fixtures, so that no exposed
wiring or bulbs remain in place of the removed fixtures. Seller shall, at its own expense and
prior to the Closing, remove from the Unit all furniture, furnishings and other personal property
and/or fixtures not included in this transaction and shall repair in a good and workmanlike
manner any material damage caused by such removal. Any of Seller's personal property not
included in the sale contemplated hereby which is not removed from the Unit prior to the Closing
shall be deemed abandoned property. Purchaser may (but shall not be obligated to) cause any
such abandoned property to be removed from the Unit at Seller's risk and expense. The
provisions of this paragraph shall survive the Closing.

SR4.    Notwithstanding the provisions of paragraph 7 or any other provision of
this Contract to the contrary, Seller represents and warrants that the plumbing, heating, electrical
and air conditioning systems and fixtures and all Personalty shall be in working order at the
Closing, to the extent the responsibility of Seller under the Lease.

SR5.    (a)    As a material inducement to Purchaser entering into this Contract,
Seller hereby represents that Seller has obtained all necessary approvals, permits and certificates
from the Corporation and the New York City Department of Buildings for any work done by
Seller to the Unit. Further, Seller is not obligated to perform any work or expend any monies

SN 0039

2

(other than maintenance) pursuant to any agreement (other than the Lease and other Co-op Documents) with the Corporation that would be binding on Purchaser after Closing.

(b)     Prior to Closing, Seller shall, at its sole cost and expense, cause any and all open permits against the Unit to be closed, discharged, and otherwise paid for, and shall deliver satisfactory proof of same to Purchaser. A Letter of Completion from the NYC Department of Buildings shall be deemed satisfactory proof. Notwithstanding the foregoing, Seller shall not be required to close two open permits that are listed by the New York City Department of Buildings as Job Nos. 101785169 and 101778836, copies of which Jobs are attached hereto. The parties acknowledge the reason for the prior sentence is that the Corporation has stated it will agree in writing to duly close these two open permits. In the event the Corporation does not deliver such written agreement, then Seller may either elect to close these permits, but if it does not, then either party may terminate this Contract.

(c)     Seller shall either (a) deliver to Purchaser a letter of completion from the New York City Department of Buildings evidencing that the Unit has been legally combined, or (b) at Closing, execute and file with the transfer taxes returns an affidavit stating the reasons that the Unit is properly and legally considered to be a single unit with one kitchen and that transfer tax should be paid to New York City at the rate of 1.425%. Seller shall also deliver an indemnity letter to Purchaser indemnifying Purchaser against any costs and damages (including, but not limited to penalties and interest for late payment) resulting from the City's requiring payment at a higher rate of taxation. Notwithstanding the foregoing, if (i) Seller is unable to deliver a letter of completion as set forth above, and (ii) Seller elects to pay the New York City transfer tax at the rate of 1.425% (rather than the so-called "bulk rate" of 2.625%), then Seller's attorneys shall hold in escrow the sum of $840,000 representing the difference between these rates of taxation. Seller's attorneys shall hold such sum for the shorter of (i) two (2) years (representing the current audit period for this tax by the New York City Department of Finance ("DOF"), or (ii) until such time that the Corporation delivers satisfactory written evidence from the New York City Department of Buildings (and/or other appropriate governmental entities) that the Unit has been properly and legally combined. Seller's attorneys shall either release the balance to Seller if it is determined that 1.425% was the appropriate rate of taxation, or pay this sum, plus interest and penalties, if any, in the event it is determined by DOF that 2.625% was the appropriate transfer tax rate.

SR6.     Supplementing paragraph 4.1: "4.1.10. To Seller's knowledge, Seller has not received any written notice of any major repairs or replacements contemplated to the Premises or to the building systems in the Premises (including, without limitation, the heating, plumbing and electrical systems) that could materially affect the Premises or the Unit.

"4.1.11. To Seller's knowledge, there are currently no water leaks into the Unit and there have been no such leaks during the twelve (12)- month period immediately

Doc#: US1:9841154v4

SN 0040

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 256
Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 113 of
RECEIVED NYSCEF: 11/28/2018
134

3

preceding the date hereof. In addition, Seller has not been notified during said twelve (12)-month period of any water leaks elsewhere in the Premises which were purported to emanate from the Unit."

"4.1.12 During Seller's ownership of the Unit, to Seller's knowledge, Seller has not been aware of (a) the presence any toxic mold in either the Unit, or (b) any bedbug infestation in the Unit."

"4.1.13 That to Seller's knowledge, there are no claims, actions, suits or legal proceedings of any kind pending or threatened (in writing), which affect the Unit, Seller's ownership of the Unit or which may cause a lien of any kind to be imposed against the Unit or the Seller."

"4.1.14 To Seller's knowledge, in the last twelve (12) months, that neither Seller, nor any person acting on behalf of Seller, has made any complaint (in writing, electronic communication or by telephone) to the Corporation, Managing Agent, superintendent or any other unit owner or tenant-shareholder at the Premises regarding noise, offensive odors, offensive conduct, lack of heat or hot water, or any other disturbance or adverse condition affecting the Unit."

SR7. All representations, warranties and covenants of Seller set forth in this Contract shall be true in all material respects as of the Closing, and Purchaser's obligation to perform under this Contract is expressly conditioned upon there being no breach, inaccuracy or misrepresentation in any of the same.

SR8. If the Corporation approves the Purchaser's application but conditions its consent upon Purchaser complying with requirements outside the scope of the Contract, such as a demand for the Purchaser to deposit funds into escrow, then Purchaser may elect, in its sole discretion, to either (i) comply with such conditions and proceed with the Purchase, or (ii) decline to comply with such conditions. If Purchaser declines to comply, then Purchaser shall deliver to Seller written notice of same and this Contract shall be deemed canceled, and Escrowee shall promptly refund the Contract Deposit to Purchaser. Further, Seller acknowledges and agrees that Purchaser shall only be required to disclose to the Corporation liquid assets of $420,000,000.00 (more than five times the Purchase Price), with supporting documentation as may be required by the Corporation as to the aforesaid amount (such as bank statements). Submission by Purchaser of the foregoing shall be deemed complete for purposes of the "Financial Statement", "Statement of Assets and Liabilities signed by Purchaser or Accountant" and supporting "Verification of Assets" which are required by the Corporation as part of its "Standard Transfer Requirements" Board application. Purchaser may, in its sole discretion, decline any request by the Corporation to submit any documentation showing liquid assets in excess of the aforesaid amount, so that in the event the Corporation rejects the Purchaser's

**SN 0041**

4

application for any reason (other than willful bad faith by Purchaser), this Contract shall be deemed canceled, and Escrowee shall promptly refund the Contract Deposit to Purchaser.

SR9.   Supplementing paragraph 11.1.1.2: Seller's obligation with respect to payment of transfer taxes shall apply to transfer taxes imposed by both the City and the State of New York. Within fourteen (14) days following the Closing, Seller shall furnish to Purchaser's attorney proof of filing of such transfer taxes. Seller shall indemnify and hold Purchaser harmless from and against any and all costs, loss or expenses incurred by Purchaser, including reasonable attorneys' fees and disbursements, by reason of Seller's failure to timely perform its obligations with respect to such transfer taxes. The provisions of this paragraph shall survive the Closing.

SR10.   Supplementing paragraph 13: "13.5  Should either party willfully default in its obligations hereunder, it shall be liable to the other for reasonable attorneys' fees and costs incurred by the other party in enforcing this Contract as determined by a court of competent jurisdiction. In the event that either party purports to cancel this Contract and Seller elects to retain the Contract Deposit as liquidated damages, the prevailing party in any subsequent lawsuit shall recover its reasonable attorneys' fees and costs from the non-prevailing party. The award of such attorneys' fees and costs shall be recoverable as actual compensatory damages in addition to the amount of the Contract Deposit and/or liquidated damages which may be payable by either party."

SR11.   Supplementing paragraph 15.1: Purchaser may also deliver a supplemental list of such Liens at a later date but not subsequent to the Closing if Purchaser becomes aware of the same at such later date.

SR12.   Supplementing paragraph 16: "16.4. Seller shall not be deemed unable to transfer the Lease and the Shares if such inability can be overcome by the payment of a sum of money by Seller not in excess of the Purchase Price less any loan payoff, brokerage commission, transfer taxes and customary closing costs."

SR13.   Seller agrees to deliver to Purchaser, at or prior to the execution of this Contract, to the extent within Seller's actual possession, all drawings and plans of the Unit, including the original floor plans, and all renderings of any proposed or completed renovations therein. In addition, Seller agrees to deliver to Purchaser, at or prior to the Closing and to the extent within Seller's actual possession, originals of all instruction manuals and all guaranties and warranty agreements affecting the Unit or any of the appliances or other personalty included in this sale, the rights under which shall be deemed assigned, to the extent assignable, to Purchaser at the Closing.

SR14.   This Contract may be executed in any number of counterparts. Each such counterpart shall for all purposes be deemed to be an original, and all such counterparts shall

Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 115 of
134

5

together constitute and be but one and the same instrument. Facsimile signatures or scanned signatures sent by e-mail shall bind the parties.

SR15   Seller hereby agrees to cooperate with Purchaser if Purchaser elects to obtain leasehold title insurance or the Eagle 9 UCC Cooperative Interest Insurance Policy in connection with Purchaser's purchase of the Unit, including, without limitation, signing a title affidavit in the form requested by the issuer of the Eagle 9 UCC Cooperative Interest Insurance Policy.

SR16.  If for any reason the Corporation does not permit the Purchaser to purchase the Unit, then Purchaser may assign this Contract to another entity within the control of the Purchaser herein.

SR17.  Each of the parties hereto desire that this Contract and the terms thereof (the "Confidential Aspects") be kept confidential to the greatest extent practicable. Accordingly, each of the parties hereto shall, and shall instruct his or her agents, representatives and contractors to, maintain the confidentiality of the Confidential Aspects. It is understood, however, that the Confidential Aspects may be disclosed: (a) to the professional advisors of each of the parties (for example, without limitation, their attorneys and accountants), and to various other third parties (such as, for example, title insurance companies) who may be involved in aspects of the transactions or are otherwise necessary in order to consummate the transactions contemplated hereby; (b) if required to be disclosed by court order, subpoena, or other government process, or if required by law; (c) with the consent of the parties; or (d) if already in the public domain.

SR18.  Notwithstanding anything contained herein to the contrary, the parties hereby agree that the sum of (a) $67,500,000 is hereby allocated to the Purchase Price for the Unit, and that the additional sum of (b) $2,500,000 is hereby allocated to the Personalty included in the Unit. Accordingly, appropriate New York State and City transfer taxes shall be paid by the respective parties based upon the sum of $67,500,000, and, in addition, Purchaser shall pay the New York State sales tax on the Personalty, which Seller shall collect at Closing.

SR19.  Seller represents it will cause the third party sale of an additional maid's Room in the Building to Purchaser either prior to or simultaneously with the closing of this transaction. In the event that Purchaser is unable to buy this additional maid's room either prior to or simultaneous with the actual Closing of this transaction, Seller acknowledges that Purchaser may terminate this Contract and receive a full and prompt refund of the Contract Deposit, with interest. It is within the sole discretion of Purchaser whether to exercise or waive this option to terminate. It is also noted that the Brokers listed in this Contract shall pay for the maid's room, including costs and expenses associated therewith (including transfer taxes).

Doc#: US1:9841154v4

SN 0043

6

SR20.  In the event that for any reason the parties are unable to close this transaction by March 6, 2015, then Purchaser may terminate this Contract and receive a full refund of the Contract Deposit.  It is within the sole discretion of Purchaser whether to exercise or waive this option to terminate.

SR21.  Seller shall pay the brokerage commissions based upon the total consideration being paid by Purchaser for both the Unit and Personalty (which is the sum of $70,000,000.00).

SHERRY 1800s LLC, Seller

Name:
Title:

GENEVER HOLDINGS LLC, Purchaser

By: _____
     Ira J. Gilbert, Authorized Person

Doc#: US1:9841154v4

SN 0044

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 256
Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 117 of
RECEIVED NYSCEF: 11/28/2018
134

3142—Lead paint disclosure, sale of dwelling.
24 CFR Part 35, 40 CFR Part 745, 9-6-96.

Blumberg Excelsior, Publisher, NYC 10013

# Disclosure of Information on
# Lead-Based Paint and/or Lead-Based Paint Hazards
## SALES

### Lead Warning Statement

**Every purchaser of any interest in residential** real property on which a residential dwelling was **built prior to 1978 is notified that such property** may present exposure to lead from lead-based paint **that may place young children at risk of developing** lead poisoning. Lead poisoning in young children **may produce permanent neurological damage,** including learning disabilities, reduced intelligence **quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with** any information on lead-based paint hazards from risk assessments or inspections in the seller's **possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection** for possible lead-based paint hazards is recommended **prior to purchase.**

### Seller's Disclosure

(a) Presence of lead-based paint and/or lead-based paint hazards *(Check (i) or (ii) below):*

   (i) ☐ Known lead-based paint and/or lead-based paint hazards are present in the housing *(explain).*

........................................................................................................................................
........................................................................................................................................

   (ii) ☒ Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the seller *(Check (i) or (ii) below):*

   (i) ☐ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing *(list documents below).*

........................................................................................................................................
........................................................................................................................................

   (ii) ☒ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

### Purchaser's Acknowledgment *(initial)*

(c) _____ Purchaser has received copies of all information listed above.

(d) __X__ Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home.*

(e) _____ Purchaser has *(check (i) or (ii) below):*

   (i) ☐ received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

   (ii) ☒ waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

### Agent's Acknowledgment *(initial)*

(f) _____ Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

### Certification of Accuracy

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| SELLER Genever Wills LLC | DATE | SELLER for Sherry 1800r LLC | DATE 2/18/15 |
|---|---|---|---|
| PURCHASER | DATE 2-13-15 | PURCHASER | DATE |
| AGENT | DATE | AGENT | DATE |

**SN 0045**

Purchase Application

Purchase Application

New York   February 26   20 15

Applicant's Name   "Miles" Kwok Ho Wan   (Genever Holdings LLC)
(Name or Names must be entered above in manner that Stock Certificate and other Documents are to be drawn.)

Applicant's Attorney   Ira Gilbert, Esq. (igilbert@paulweiss.com)   Telephone 212-373-3529

Attorney's Firm and Address   Paul, Weiss, Rifkind, Wharton, & Garrison LLP
1285 Avenue of the Americas, New York, NY 10019-6064

Seller's Name   Sherry 1800s, LLC

Seller's Attorney   Michael J. Jones, Esq.   Telephone 203-661-6000

Attorney's Firm and Address   Ivey, Barnum & O'Mara LLC
170 Mason Street, Greenwich, CT 06830

Closing Date and Time   No later than 3/6/15 at 10am   Date of Possession No later than 3/6/15

The undersigned hereby offers to purchase   3,000   shares of the
capital stock of The Sherry-Netherland, Inc. and the accompanying proprietary lease for
Apartment   1801*   in the building located at 781 Fifth Avenue, New York, New York, on
the following terms and conditions. * and Maid's room 1519

Purchase Price of Stock $   67,500,000   Present Estimated Proprietary Rental Per
Month $ 57,085.53

Deposit $ 7,000,000   Special conditions, if any: Additional sum of $2,500,000
is allocated to the personal property included in the unit

Financing:   Yes ☐   No ☒   Amount   None   Bank
( Note: This proposal shall result in no legal obligation until a formal contract of purchase and sale is executed by the parties concerned )

The undersigned has filled out the information sheet below and understands that this
information is essential in considering this application. It is further understood that this
application, when signed by the undersigned, is to be subject to approval by the Seller or
Authorized Representative and to the Terms and Conditions on the reverse side hereof.

Broker Seller: John Burger, Brown Harris Stevens
and Serena Boardman, Sotheby's
Purchaser: Kathy Sloane, Brown Harris
Stevens

Signature of Purchase Applicant

Signature of Purchase Applicant

## Information Regarding Applicant

Home Address: 16A, South Bay Road, Hong Kong   Telephone +852 2160 0888

Business Connection and Position:   President and Owner (Securities and Real Estate Investments)

Business Address: 49/F, Bank of China Tower, No.1   Telephone +852 2160 0888
Garden Road, Central Hong Kong
Names of all persons who will reside in the apartment and if children, state number and their
approximate ages (1) Kwok Ho Wa, Purchaser (2) Ngok Hing Chi, Wife of Purchaser (3)
Guo Qiang; Son of Purchaser (4) Guo Mei; Daughter of Purchaser (5) Yaz Qinghua;
Sister of Purchaser's Wife

Names of all clubs and society memberships, fraternities and honorary societies to which
applicant belongs:   Mar-a-Lago Club, Palm Beach, FL
Trump Golf Course, Palm Beach, FL

Schools and colleges attended by husband, wife and children:
Mr. and Mrs. Kwok received their education in China
Guo Qiang (son of Mr. Kwok) attended Bard College

SN 0047

Names of all residents in the building known by the applicant: **None**

Does applicant wish to maintain pets, and if so please specify: **No**

References

Landlord:

Present Landlord or Agent **Own a private residence**

Address **16A South Bay Road, Hong Kong**

Approximate Length of Occupancy

Previous Landlord or Agent

Address

Address of previous residence and approximate length of occupancy:

Financial:

A. (Bank- Personal Account) **Steven Wong**

Address **UBS AG 52/F Two International Finance Centre, 8 Finance Street, Central, Hong Kong**

B. (Business) **Hank Lo, Partner - Stevenson, Wong & Co.**

Address **Central Tower, 28 Queen's Road, Central, Hong Kong**

C. Stock Broker, C.P.A., Executor, if any

Address

D. For information regarding source of income contact

Address

Personal:

1. Name **The Rt. Hon. Tony Blair**

Address **PO Box 60519, London W27JU UK**

2. Name

Address

3. Name

Address

4. Name

Address

Special Remarks:

Please give any additional information which may be pertinent or helpful.

**Mr. and Mrs. Kwok are very impressed with The Sherry-Netherland and look forward to making The Sherry-Netherland the principle residence for their family.**

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
NYSCEF DOC. NO. 256

INDEX NO. 652077/2017
RECEIVED NYSCEF: 11/28/2018

Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 121 of
134

## Purchase Application

New York _____, 20___

Applicant's Name __KWOK Ho Wan__
(Name or Names must be entered above in manner that Stock Certificate and other Documents are to be drawn.)

Applicant's Attorney __Ira J. Gilbert Esq__   Telephone (212) 373-3529

Attorney's Firm and Address __Paul, Weiss, Rifkind, Wharton & Garrison LLP__
__1385 Avenue of the Americas, New York, N.Y. 10019-6064__

Seller's Name _____

Seller's Attorney _____   Telephone _____

Attorney's Firm and Address _____

Closing Date and Time _____   Date of Possession _____

The undersigned hereby offers to purchase _____ shares of the capital stock of The Sherry-Netherland, Inc. and the accompanying proprietary lease for Apartment _____ in the building located at 781 Fifth Avenue, New York, New York, on the following terms and conditions.

Purchase Price of Stock $_____ Present Estimated Proprietary Rental Per Month $_____

Deposit $ __7,000,000__ Special conditions, if any: _____

Financing:   Yes ☐   No ☒   Amount _____ Bank _____
( Note: This proposal shall result in no legal obligation until a formal contract of purchase and sale is executed by the parties concerned.)

The undersigned has filled out the information sheet below and understands that this information is essential in considering this application. It is further understood that this application, when signed by the undersigned, is to be subject to approval by the Seller or Authorized Representative and to the Terms and Conditions on the reverse side hereof.

Broker _____

Signature of Purchase Applicant

Signature of Purchase Applicant

### Information Regarding Applicant

Home Address: __10A, South Bay Road, Hong Kong__ Telephone __+852__

Business Connection and Position: _____

Business Address: __49/F, Bank of China Tower, No. 1 Garden Road, Central, Hong Kong__ Telephone __+852 2160 0888__

Names of all persons who will reside in the apartment and if children, state number and their approximate ages: __(1) KWOK Ho Wan   (2) NGOK Hing Chi (Ms)__
__(3) Guo Qiang   (4) Guo Mei (Ms)   (5) Yue Qinghua (Ms)__
__(1) purchaser ; (2) wife of purchaser (3) Son of purchaser (4) daughter of purchaser__
__(5) Sister of purchaser's wife__

Names of all clubs and society memberships, fraternities and honorary societies to which applicant belongs: __Mar-a-Largo Club, the Trump Golf Course__

Schools and colleges attended by husband, wife and children: __Guo Qiang (son of__
__Mr. Guo) had attended Bard College.__

SN 0049

Personal Letter of Reference

SN 0050

From The Rt Hon Tony Blair

February 2015

Dear Ladies and Gentlemen of the Board of The Sherry Netherland,

It is my great pleasure that I am writing you this letter of reference for Miles Kwok as a potential owner in your building. I have known Miles for seven years and have only the highest respect for him in business and as a friend. I have worked closely with Miles over the years and have always admired his honesty and loyalty.

Miles is dependable, sincere and extremely responsible as an individual; conducting himself with dignity and intelligence. Miles is honest, forthright and has impeccable taste.

I would highly recommend him to your building as I know that Miles would be a wonderful addition as your neighbour at The Sherry Netherland. Miles is a very accomplished man and, in my opinion, would be a most valuable asset to The Sherry Netherland.

Tony Blair

PO Box 60519
London
W2 7JU
www.tonyblairoffice.org

Business Letter of Reference

SN 0052

## Stevenson, Wong & Co.
## 史蒂文生黃律師事務所

In association with | AllBright Law Offices | 锦天城律师事务所

Partners:
Willy Y.P. Cheng••          鄭炎潘
Hank H.F. Lo•               勞恒晃
Catherine K.G. Po••         清景元
Eric C.H. Lui•              呂志豪
Neville J.J. Watkins••      韋健士
Wendy W.S. Lam•            林穎詩
Lai S. Lam•                林麗娟
Cornelia W.C. Chu•          朱窝溜
Janice L.H. Chin           陳麗昭
Heidi H.Y. Chui•           徐凱怡
Erica Y.Y. Cheng           鄭廷蕊

Senior Consultant:
Angus Forsyth••            霍震

Consultant:
Sherlynn G. Chan           陳達基

• Notary Public of Hong Kong
  香港公證律師
◊ China-Appointed Attesting Officer
  中國委托公証人
♦ Civil Celebrant of Marriages
  婚姻監禮人

Our Ref    :    EYC/HLO(P)/75450/15

Your Ref   :

Reply Fax  :

Date       :    17 February 2015

**BY POST**

**Board of Directors of The Sherry-Netherland**
The Sherry-Netherland
781 Fifth Avenue
New York, NY 10022

Dear Board members of The Sherry Netherland,

I am writing this letter of recommendation in support of the application of Mr. Kwok Ho Wan (also known as Miles Kwok) to become a resident shareholder of your cooperative.

I first met Miles when he engaged my law firm in one of his business transactions about seven years ago. I was and am a partner of my firm. We have since established a long-standing relationship. Over the years, my firm has acted for Miles in various business transactions in different areas, including project financing, fund-raising, corporate mergers and acquisitions and acquisition of aircrafts, leisure boats and properties in Hong Kong, China and different parts of the world.

Miles is a successful businessman and a polite, dependable and responsible individual who conducts himself with dignity and intelligence. Putting aside our work relations, Miles has also been a good friend of mine. Personally, I know Miles to be delightful, considerate and respectful. I trust that his personal qualities will definitely make him a good neighbor and responsible steward of your building.

In my opinion, Miles will be a valued addition to your building.

If you wish to contact me personally, please feel free to call me at +852 2533 2552.

Yours faithfully,

**Hank Lo**
Partner
STEVENSON, **WONG & CO.**

香港中環皇后大道中28號         電話 Tel: +852 2526 6311         香港 廣州 上海 北京 成都 重慶 杭州 南京 深圳 蘇州 太原 青島 廈門
中滙大廈4樓、5樓及1602室        傳真 Fax: +852 2845 0638         Hong Kong Guangzhou Shanghai Beijing Chengdu Chongqing
4/f, 5/F & 1602, Central Tower,   電郵 Email: info@sw-hk.com         Hangzhou Nanjing Shenzhen Suzhou Taiyuan Qingdao Xiamen
28 Queen's Road Central, Hong Kong   www.sw-hk.com               Member of Interlaw since 1982

SN 0053

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
NYSCEF DOC. NO. 256

INDEX NO. 652077/2017
RECEIVED NYSCEF: 11/28/2018

Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 126 of
134

18 February 2015

**BY POST**

Board of Directors of The Sherry-Netherland
The Sherry-Netherland
781 Fifth Avenue
New York, NY 10022

Dear Ladies and Gentlemen of the Board of The Sherry Netherland,

It is a great pleasure for me to recommend Kwok Ho Wan, also known as Miles Kwok, to be a shareholder in The Sherry-Netherland, Inc. and a resident in your building. I am a managing director of the Wealth Management and Swiss Bank Department at UBS AG and attach my name card for your kind reference.  I have known Miles for about five years since he first began working with UBS AG. Miles has since been working with us in the areas of securities investment and also in financing his various projects in areas such as aircraft acquisitions.

Miles has been a successful and accomplished entrepreneur who has developed and managed a number of companies, both domestically and internationally.  Over the years, Miles has earned his credibility in our bank.  He is very reliable and always fulfills his repayment obligations. For this reason, our bank is happy to have him as our long-term client.

From a personal standpoint, Miles is a sincere and modest gentleman with a warm heart.  He is financially sound but very humble.  He is also one of the most intelligent, genuine and respectful people I have ever known.

Based on my long standing relationship with Miles, I do recommend Miles to be a shareholder in your cooperative and a resident in your building. I am sure your community will be pleased to have him and his family join you at The Sherry.

If you have any questions, please do not hesitate to contact me at stephen-kc.wong@ubs.com.

Yours faithfully,

**Stephen Wong**

Financial Letter of Reference

SN 0055

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 256
RECEIVED NYSCEF: 11/28/2018

Case 22-50073    Doc 57-2    Filed 03/01/22    Entered 03/01/22 22:13:12    Page 128 of
134

☄️ UBS

Hong Kong Branch
52/F Two International Finance Centre
8 Finance Street,
Central, Hong Kong
Tel. +852-2971 8888
Fax +852-2971 8001

Feb. 23, 2015

Board of Directors of the Sherry-Netherland
The Sherry-Netherland
781 Fifth Avenue
New York, NY 10022

Dear Sirs,

### Bank Reference – [Application for Real Estate Investments]

We have been asked to provide a reference letter in connection with Application for Real Estate Investments. We confirm that:

**Kwok Ho Wan**
[client's ID: P746467(7)]

has been a client of ours through a personal investment company since July 2012 and during this time Mr. Kwok Ho Wan has had a satisfactory banking relationship with us. As at 18 Feb, 2015, the funds involved in this banking relationship is not less than USD400, 000,000.

The above information is based on our experience of this banking relationship as at current date and is given in confidence for your private use only, without any responsibility on the part of UBS AG or its employees. This letter may only be used in the business context outlined at the beginning of this letter and does not constitute a guarantee or any other obligation on the part of UBS AG. In particular, we are under no obligation to inform you of any subsequent change of circumstances in this banking relationship.

Yours faithfully,
For and on behalf of
UBS AG Hong Kong Branch

Tommy Cheung
Managing Director

Stephen Wong
Managing Director

Case 22-50073    Doc 57-2    Filed 03/01/22    Entered 03/01/22 22:13:12    Page 129 of 134



# EXHIBIT 14

# SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY

PRESENT:    **HON. BARRY R. OSTRAGER**          PART          **IAS MOTION 61EFM**

*Justice*

--------------------------------------------------------------------------------X

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

|  |  |
|---|---|
| **INDEX NO.** | 652077/2017 |
| **MOTION DATE** |  |
| **MOTION SEQ. NO.** | 018 |

Plaintiff,

- v -

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO, GENEVER HOLDINGS LLC, and GENEVER HOLDINGS CORPORATION,

**DECISION + ORDER ON MOTION**

Defendants.

--------------------------------------------------------------------------------X

HON. BARRY R. OSTRAGER

Before the Court is Motion 018 by PAX for a post-judgment turnover pursuant to CPLR 5255 of Kwok's shares in Genever Holdings Corporation ("Genever BVI") and other relief. In accordance with the transcript of proceedings of September 22, 2021, the motion is granted to the extent of directing Kwok to take the steps necessary to effect the turnover his shares in Genever BVI to PAX. This order is expressly subject to the approval of Justice Adrian Jack who issued a stay in the British Virgin Islands ("BVI") in the related BVI litigation. The Court declines to appoint a receiver at this time.

Accordingly, it is hereby,

ORDERED that Kwok Ho Wan take whatever steps are necessary in the British Virgin Islands to turnover all share certificates with respect to his 100% ownership interest in Genever Holdings Corporation ("Genever BVI"); and it is further

ORDERED that this decision and order is expressly contingent on the approval of Justice Jack in the related proceeding in the British Virgin Islands. Any actions affecting Genever

Holdings LLC, a wholly owned subsidiary of Genever BVI, are subject to the jurisdiction of

Justice Garrity in the Bankruptcy proceeding in the Southern District of New York involving

Genever Holdings LLC, in which PAX is participating.

A status conference is scheduled for November 16, 2021 at 10:00 am.

Dated: September 22, 2021

_____

BARRY R. OSTRAGER, J.S.C.

| CHECK ONE: | | CASE DISPOSED | | | X | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|---|
| | | GRANTED | | DENIED | X | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | | REFERENCE |

2

# EXHIBIT 15

FILED: NEW YORK COUNTY CLERK 02/18/2022 11:18 AM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 1191
Case 22-50073   Doc 57-2   Filed 03/01/22   Entered 03/01/22 22:13:12   Page 134 of
134
RECEIVED NYSCEF: 02/18/2022

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
**JUDGE OSTRAGER, BARRY R.**
**MOTION JUDGE OSTRAGER, BARRY R.**



**Pacific Alliance Asia Opportunity Fund L.P.**

**- v. -**

**Kwok Ho Wan et al**

| | |
|---|---|
| **Index No.** | **652077/2017** |
| **Motion** | **026** |

## COURT NOTICE

Filing on Behalf of - Rose Ann Magaldi, Principal Law Clerk to Justice Ostrager

In light of the bankruptcy filing by Mr. Kwok, the Court proposes that plaintiff either withdraw the pending contempt motion (026) without prejudice to an appropriate application in the Bankruptcy Court and/or without prejudice to renewal before this Court, if appropriate, upon the conclusion of the bankruptcy proceedings. The Court prefers not to keep fully submitted motions pending for an indefinite time. If counsel have an alternative suggestion, the Court will, of course, consider it.

We ask that plaintiff, and any other interested party, efile a letter by March 3, 2022 addressing the issues raised in this Court Notice. Thank you.

DATED 02/18/2022                                     FILED By RoseAnn Magaldi