**UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION**

-----------------------------------------------------------------X
: 
In re:                                                                    : Chapter 11
                                                                          : 
    Ho Wan Kwok,                                              : Case No. 22-50073 (JAM)
                                                                          : 
                                                                          : Ref. Dkt. No. 57
                                                                          : 
                    Debtor.                                       : Response Deadline: May 15, 2022 at 5:00 pm (ET)
                                                                          : 
-----------------------------------------------------------------X

**DEBTOR'S OBJECTION TO MOTION OF
PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. FOR ENTRY OF
AN ORDER CONFIRMING THE INAPPLICABILITY OF THE AUTOMATIC
STAY OR, IN THE ALTERNATIVE, RELIEF FROM THE AUTOMATIC
<u>STAY PURSUANT TO SECTION 362(d)(2) OF THE BANKRUPTCY CODE</u>**

TO THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE:

Ho Wan Kwok (the "<u>Debtor</u>"), through his below proposed counsel, hereby files this Objection to the *Motion of Pacific Alliance Asia Opportunity Fund L.P. for Entry of an Order Confirming the Inapplicability of the Automatic Stay or, in the Alternative, Relief from the Automatic Stay Pursuant to Section 362(d)(2) of the Bankruptcy Code*, dated March 1, 2022 [Dkt. No. 57] (the "<u>PAX Motion</u>"), filed by Pacific Alliance Asia Opportunity Fund L.P. ("<u>PAX</u>"). Substantially contemporaneous with the filing of this Objection, the Debtor filed the *Declaration of Mr. Ho Wan Kwok in Support of the Chapter 11 Case and Certain Motions*, dated March 15, 2022 (the "<u>Kwok Declaration</u>" or "<u>Kwok Decl.</u>"), which the Debtor incorporates herein by reference. In support hereof, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Debtor commenced this Chapter 11 case with certain objectives, specifically to: (a) create a single forum to orderly address the various competing claims asserted against him; (b) afford stakeholders an efficient opportunity to investigate the Debtor's assets, liabilities and financial affairs, given what the Debtor perceives to be a misunderstanding in that regard; (c) establish what assets are estate property and, in turn, available for distribution to the competing creditor interests; and, hopefully (d) reach consensus with creditors (including PAX) on a fair and equitable distribution of estate assets pursuant to a Chapter 11 plan.  Kwok Decl. ¶ 2.

2.      As noted in the Kwok Declaration, this Chapter 11 case is designed and funded (through unsecured, subordinated post-petition financing) to allow a fair investigation and for stakeholders to present whatever admissible evidence they deem appropriate, as part of the typical Chapter 11 adversary process.  Kwok Decl. ¶ 3.  This bankruptcy is, in other words, intended to allow a reasoned vetting of all pertinent demonstrable case facts, without prejudicing any creditor's economic rights – except to the extent that any unsecured creditor hoped to jump ahead in payment priority via a "race to the courthouse" which is necessarily unfair to some.  Id.  The automatic stay and the breathing spell afforded thereby is critical to the Debtor's reorganization effort.   As countless courts have observed, the automatic stay is "central" to "an orderly bankruptcy process," and a "fundamental debtor protection" that "not only protects debtors but protects creditors as well."

3.      The PAX Motion seeks to thwart the fundamental protections of the bankruptcy stay and, if granted, would materially impair the Debtor's ability to administer this case, severely impede the Debtor's reorganization efforts, and significantly prejudice the Debtor, the estate, and all of the Debtor's creditors.  Through its Motion, PAX seeks one thing – to have the Debtor thrown

2

in jail.  PAX states that it seeks to enforce the February 9 Contempt Order (defined below), "except to the extent any relief requires [the Debtor] to immediately pay any money to PAX."  PAX Motion ¶ 9.  But, the February 9 Contempt Order requires *only one thing* – that the Debtor tender immediate payment of a $134 million prepetition fine to PAX.  Failure to do this – which is clearly subject to the automatic stay, as, among other things, it would require the use of estate assets to the detriment of the Debtor's many other creditors, *and which PAX is expressly asking the Court not to authorize* – could well result in the Debtor's imprisonment under the February 9 Contempt Order.  Moreover, as reflected in his filed schedules of assets and liabilities and statement of financial affairs (see Dkt. Nos. 77, 78), the Debtor does not presently have the cash or other assets sufficient to immediately pay the $134 million fine.[1]

4.    PAX claims that its intent in seeking stay relief is to "bring the valuable Lady May to the United States and prevent dissipation."  PAX's true goal, though, is to have the Debtor imprisoned.  And, even if PAX's self-described intent were true, this goal has substantively been achieved through the bankruptcy filing.  Whatever interest the Debtor may ultimately be determined to have in the Lady May is now part of the bankruptcy estate and squarely under this Court's jurisdiction.  See 11 U.S.C. § 541(a) (creating a worldwide estate comprising all of the Debtor's legal and equitable interests in property, "wherever located and by whomever held," as of the filing date).  And, although the Debtor does not have the ability to direct the physical movement of the Lady May (see Kwok Decl. ¶ 18), to the extent that the Debtor is determined to have an interest in the Lady May, this Court would have the authority under the Bankruptcy Code to authorize appropriate relief.  See, e.g., 11 U.S.C. § 542 (requiring turnover of estate property).

---

[1]    For the avoidance of doubt, the Debtor reserves all rights respecting all claims or amounts allegedly owing to PAX, including, without limitation, the right to object to such claims or amounts on any applicable grounds and all rights respecting whether all or any portion of such claims or amounts are dischargeable in bankruptcy.

The PAX Motion, therefore, does not further any goals of this bankruptcy case or provide any additional benefit to creditors.

5.    The PAX Motion should be denied for three principal reasons.  <u>First</u>, the February 9 Contempt Order is plainly civil in nature and, thus, subject to the automatic stay.  It is designated as a "final order of civil contempt" and the Debtor was found to be in "civil contempt"[2]; it was issued pursuant to New York Judiciary Law § 753 (a civil contempt statute); it is predicated on a "clear and convincing" evidentiary standard (not a "beyond a reasonable doubt" standard) and does not contain a "willfulness" finding; although the Order contemplates imprisonment, this is to compel compliance with the Order and could (theoretically) be purged (thus, the Debtor, again in theory, would "hold the keys to his jail cell," which applicable jurisprudence tells us is "a sure sign that the contempt is civil"); and the amounts to be paid under the Order are to be paid to PAX, the movant in the litigation.

6.    <u>Second</u>, PAX's attempt to apply a narrow exception to the general rule that civil contempt proceedings are subject to the stay is unavailing.  Here, PAX's efforts are plainly an attempt to continue prepetition litigation with respect to its alleged prepetition claim.  And, the February 9 Contempt Order clearly relates to estate property, as it would require the Debtor to pay a $134 million fine to PAX (which, to be sure, the Debtor states that he does not presently have the means to do).  Further, enforcement of the February 9 Contempt Order would have a severe and negative impact on the estate.  PAX's attempt to equate this matter to compliance with a document subpoena, or to an injunction narrowly tailored to protect a party's intellectual property rights, thus fails.  In this respect, it bears observing that the New York Supreme Court ("<u>NY State Court</u>"), which issued the February 9 Contempt Order, instructed PAX to withdraw a second

---

[2]    It bears noting that PAX's motion before the New York Supreme Court sought entry of an order for civil contempt.

contempt motion because of the Debtor's bankruptcy filing (which, as PAX notes, it did).  See PAX Motion ¶ 9 n. 38; Court Notice (attached to PAX Motion as Exh. 15).  Indeed, the NY State Court indicated that PAX could renew such motion "upon the conclusion of the bankruptcy proceedings" or upon "an appropriate application in the Bankruptcy Court," strongly indicating the NY State Court's recognition that, contrary to PAX's assertion, the civil contempt proceedings before it are indeed subject to the automatic stay.

7.      Finally, PAX's request, in the alternative, for modification of the automatic stay should likewise be denied.  PAX has failed to carry its heavy burden that stay relief is appropriate. The requested relief is "inextricably intertwined" with this bankruptcy case and would have a drastic and adverse impact on the administration of this case and the estate; PAX does not allege (let alone demonstrate) that this case was commenced in bad faith; modifying the stay to allow PAX to enforce the February 9 Contempt Order would likely "doom" the Debtor's attempt to reorganize; and the centralized administration of this Court represents the most efficient and effective forum in which to resolve all disputes between the Debtor, PAX, and all other creditors and parties in interest.  The Debtor notes, in this regard, that he is in the process of removing the underlying litigation between the Debtor and PAX, ultimately, to this Court, in accordance with 28 U.S.C § 1452, Rule 9027 of the Federal Rules of Bankruptcy Procedure, and Local Rule 9027-1 of the Local Rules of Bankruptcy Procedure.  Further, maintaining the stay would ensure that the Debtor's full time and attention remains focused on administering this case, and not diverted from this case to defending himself with respect to PAX's efforts to enforce the February 9 Contempt Order.

8.      Accordingly, for the reasons set forth herein and in the Kwok Declaration, the PAX Motion should be denied.

## RELEVANT FACTUAL BACKGROUND

9.      A more complete description of the facts and circumstances precipitating this bankruptcy case are set forth in the Kwok Declaration, which the Debtor incorporates herein by reference. The following provides an overview of facts germane to the dispute between the Debtor and PAX.

10.     PAX, a Hong Kong investment fund, commenced actions against the Debtor in New York and the British Virgin Islands ("BVI"). Kwok Decl. ¶ 15. The New York action, commenced in April 2017 before the NY State Court, entirely concerned the collection of a disputed debt. Id.

11.     In 2008, PAX made a $100 million loan (the "PAX Loan") to a Chinese entity called Spirit Carter. Kwok Decl. ¶ 16. The $100 million loan came in two tranches: (1) a $30 million initial loan secured by a personal guaranty made by the Debtor, and (2) a second $70 million dollar loan secured by a 49% interest in the company that owns the land/development that eventually became the Pangu Plaza. Id.

12.     In 2009, PAX received repayment of $100 million, acknowledged satisfaction of the loan, and further acknowledged that the Debtor's obligation under the 2008 personal guaranty has been satisfied. Kwok Decl. ¶ 17. PAX disputes that an "accord and satisfaction" has actually occurred, and asserts claims against the Debtor under what the Debtor maintains is a subsequent-dated personal guaranty that he believes to be a forgery. Id. Without showing the Debtor this guaranty, the Debtor's prior litigation counsel submitted it to the NY State Court in support of certain motions. Id. When the Debtor subsequently learned of the document's existence, he stated that he believes it to be a forgery; but the Court ruled (and the Debtor maintains improperly so) that, by its prior submission, the Debtor no longer had the ability to challenge authenticity. Id.

Consequently, on September 15, 2020, the Court entered summary judgement in PAX's favor without conducting an evidentiary trial. Id. The judgment, with interest, amounts to approximately $125 million as of today. Id. The Debtor timely appealed this judgment to the New York Appellate Division, which appeal remains pending as of today.[3] Id.

13.    Two weeks after summary judgment had been granted in PAX's favor (on October 15, 2020), the NY State Court issued a restraining order respecting the Debtor's assets (the "NYS Restraining Order"). Kwok Decl. ¶ 18. PAX intended to seek payment of the judgment, focusing primarily on a yacht named the "Lady May," which is described further below. Id. The Debtor maintains that he does not own the Lady May; it is owned by his daughter. Id. The boat's maintenance was always paid for by the Debtor's son. Id. The Debtor did have access to the boat, but he did not control it or have the ability to order the boat back to New York. Id. Nevertheless, on March 16, 2021, Justice Ostrager (without conducting an evidentiary hearing) directed the Debtor to return the boat to New York by May 15, 2021, and prospectively fined the Debtor $500,000 for every day that the boat remained outside the jurisdiction. Id. As of earlier this year, the fine exceeded the amount of the judgment that had been entered in PAX's favor and was approximately five or six times the stated value of the yacht. Id.

14.    On February 9, 2022, Justice Ostrager issued a *Final Order of Civil Contempt* (the "February 9 Contempt Order") against the Debtor. Kwok Decl. ¶ 19. In the February 9 Contempt Order, Justice Ostrager found that the Debtor holds a beneficial interest in and controls the Lady May, and ordered the Debtor to pay a $134 million fine to PAX within five business days or risk incarceration for civil contempt. Id. The Debtor does not agree with the February 9 Contempt Order. Id. He believes it was wrongfully issued against him and he has separately appealed this

---

[3]    The Debtor's schedules include a potential malpractice claim against the Debtor's historical litigation counsel.

order to the Appellate Division. <u>Id</u>. Regardless, the Debtor maintains that he simply does not have the means to satisfy the judgment. <u>Id</u>. The threat of imprisonment if the February 9 Contempt Order were enforced is one of the precipitating factors for the commencement of the Debtor's Chapter 11 case. <u>Id</u>.

15.     On March 1, 2022, PAX filed its Motion seeking entry of an order determining that the "that the automatic stay is inapplicable to the enforcement of the … February 9 Contempt Order" or, alternatively, "modifying the automatic stay to permit PAX to enforce the February 9 Contempt Order, except to the extent any relief requires Kwok to immediately pay any money to PAX." PAX Motion ¶ 9. As set forth in the Kwok Declaration, the Debtor believes that granting the relief requested by the PAX Motion would cause him significant harm and materially prejudice the Debtor's estate and its creditors. Kwok Decl. ¶ 19 n.10. Enforcement of the February 9 Contempt Order could result in the Debtor's imprisonment in New York, which the Debtor believes would materially impair his ability to achieve the objectives that he set forth to accomplish in commencing this Chapter 11 Case. <u>Id</u>. Chiefly, if incarcerated, the Debtor will be unable to adequately and appropriately administer this estate, participate in this bankruptcy case, negotiate with creditors, appear and be heard before this Court, consult with and direct counsel, investigate and marshal the assets of the estate, or formulate and negotiate a Chapter 11 plan. <u>Id</u>.

## **ARGUMENTS IN OBJECTION**

### I.     **THE FINAL CONTEMPT ORDER IS CIVIL IN NATURE AND SUBJECT TO THE AUTOMATIC STAY.**

16.     With very few exceptions, the filing of a bankruptcy petition and operation of the automatic stay halts all litigation against the debtor. 11 U.S.C. § 362(a)(1); <u>In re Enron Corp.</u>, 306 B.R. 465, 475 (Bankr. S.D.N.Y. 2004) ("The filing of a bankruptcy petition operates as a stay

applicable to all entities regarding the commencement or continuation of judicial proceedings against the debtor.").

17.     The automatic stay is "central" to "an orderly bankruptcy process," and "is designed to provide the debtor with a breathing spell from his creditors." Federal Deposit Insurance Corp. v. Hirsch (In re Colonial Realty Co.), 980 F.2d 125, 137 (2d. Cir. 1992) ("The stay is a procedural rule, designed to provide for an orderly bankruptcy proceeding.  Indeed, so central is the § 362 stay to an orderly bankruptcy process that 'actions taken in violation of the stay are void and without effect.'") (citations omitted); Kookik v. Markowitz, 40 F.3d 567, 568 (2d Cir. 1994) ("The stay is designed to provide the debtor with 'a breathing spell from his creditors.'").  Indeed, the stay is a "fundamental debtor protection[,] that not only protects debtors but protects creditors as well." Enron, 306 B.R. at  475 (citations omitted).

18.     Thus, the "scope of the stay is broad," and exceptions to the stay are construed narrowly.  Enron, 306 B.R. at 475.  Among the few exceptions to the automatic stay are criminal proceedings (e.g., criminal contempt).  See 11 U.S.C. § 362(b)(1).  By contrast, civil proceedings (including civil contempt proceedings), which "are considered private collection devices," are typically subject to the automatic stay.  See In re White, 478 B.R. 177, 181 (Bankr. S.D.N.Y. 2012) ("Generally, actions for civil contempt are considered private collection devices subject to the automatic stay while criminal contempt proceedings are not."); In re Allison, 182 B.R. 881 (Bankr. N.D. Ala. 1995) (purpose of a civil contempt order is to enforce the private rights of a party in litigation).

19.     To be sure, courts in the Second Circuit observe that the line between criminal contempt (exempt from the stay) and civil contempt (subject to the stay) may not always be clear. White, 478 B.R. at 182 ("It is not always easy to distinguish between the two forms of contempt,

and both involve some form of punishment for contumacious disregard of a state court order."). In this respect, it bears observing that courts recognize a presumption in favor of finding civil contempt where it may not be clear.  See United States v. Wendy, 575 F.2d 1025, 1029 n.13 (2d Cir. 1978) ("Finally, while we are satisfied that the contempts here were civil in nature, the presumption in favor of finding civil as opposed to criminal contempt where there is some doubt as to the nature of the contempt, 3 C. Wright, supra, § 704, at 158, militates in favor of concluding that the citations of Mr. Wendy were for civil contempt.").

20.     Here, the February 9 Contempt Order is plainly a civil, not criminal, order and is subject to the automatic stay.  The S.D.N.Y. Bankruptcy Court's decision in In re White is directly on point.  There, the New York Supreme Court issued a prepetition judgment against the debtor in a civil proceeding.  White, 478 B.R. at 179.  The party in whose favor the judgment was entered served subpoenas on the debtor in an effort to identify assets to satisfy the judgment.  Id. at 180. The debtor failed to comply with the subpoenas, and the issuing party moved for an order to compel compliance within 30 days, which order the New York Supreme Court issued.  Id.  After the debtor failed to comply with this order, the party moved for a further order holding the debtor in contempt. Id.  The New York Supreme Court conducted a hearing on the contempt motion, found the debtor in contempt, and issued a civil contempt order directing the sheriff to compel the debtor's compliance and ordering an assessment of damages.  Id.  Days after the issuance of the contempt order, the debtor and his wife filed joint Chapter 7 petitions.  Id.  The other party to the prepetition litigation filed a motion to "annul" or lift the automatic stay to prospectively enforce the contempt order.  Id.  The movant subsequently amended its motion, narrowing the relief requested (i.e., only the assessment of damages, not the arrest of the debtor, and directing the debtor to answer the subpoenas and appear for an examination under Rule 2004 of the Federal Rules of Bankruptcy

Procedure), and arguing that the automatic stay did not apply to the contempt order because it was a criminal, not civil, contempt order issued in light of the debtor's allegedly "contumacious" behavior. <u>Id</u>. at 181.

21.     The S.D.N.Y. Bankruptcy Court denied the motion based on a determination that the contempt order was civil, not criminal, in nature.  <u>First</u>, the court noted that the order was issued pursuant to Judiciary Law § 753 and CPLR § 2308, both of which "authorize[] the court to punish for civil contempt".  <u>White</u>, 478 B.R. at 182-83 ("Similarly, Judiciary Law § 753 authorizes the court to punish for civil contempt, as its title suggests ('Power of courts to punish for civil contempts').").   Moreover, the order itself was "expressly clear that the state court was adjudicating a civil contempt," as it "specifically refer[red] to civil contempt".  <u>Id</u>. at 183.

22.     <u>Second</u>, the court analyzed the applicable evidentiary standard, observing that Judicial Law § 753 applied a "clear and convincing" standard, not "beyond a reasonable doubt," and did not require a "willfulness" finding.  <u>White</u>, 478 B.R. at 183 ("The evidentiary standard is 'clear and convincing,' and does not require a finding of 'willfulness.'  In contrast, Judiciary Law § 750 empowers the court to punish criminal contempts, and requires proof beyond a reasonable doubt that the contemnor has *willfully* disobeyed a court order.") (emphasis in original) (citations omitted); <u>see</u> <u>Iacovacci v. Brevet Holdings, Inc.</u>, Case No. 158735/2016, 2021 N.Y. Slip Op. 50657, at *7 (N.Y. Sup. Ct. May 19, 2021) ("In line with the distinct and separate purposes of the two kinds of contempt, a movant seeking a criminal contempt has the additional requirement to demonstrate that the disobedience of an order was willful – an element that is noticeably absent from the civil contempt statute and case law….  Further, the two types of contempt have different standards of proof: a finding of criminal contempt requires proof beyond a reasonable doubt; whereas a finding of civil contempt requires proof by clear and convincing evidence.").

23.   Consistent with the statute, the contempt order at issue in <u>White</u> applied a "clear and convincing evidentiary standard, and [did] not include a finding of 'willfulness.'" <u>White</u>, 478 B.R. at 183.  The court held that, absent specificity that the contempt was criminal, and without a willfulness finding, "the alleged contempt must be considered to have been civil in nature." <u>Id</u>. (quoting <u>Sentry Armored Courier Corp. v. New York City Off-Track Betting Corp.</u>, 429 N.Y.S.2d 902, 903 (N.Y. App. Div. 1980)).

24.   <u>Third</u>, as the court noted, although the contempt order contemplated the issuance of a warrant and the possible arrest of the debtor, this was done to compel compliance with the order and could be purged through such compliance; thus, the debtor held "the keys to his jail cell," which is "a sure sign that the contempt is civil." <u>White</u>, 478 B.R. at 183 ("Moreover, the Contempt Order authorized the issuance of a warrant to compel White's compliance which meant that the Sheriff would commit White until he complied with the Subpoenas or was relieved of the obligation to do so. Hence, White held the keys to his jail cell and could purge himself of contempt through compliance."; "The contemnor holds the keys to his jail cell, a sure sign that the contempt is civil.").

25.   <u>Finally</u>, the court noted that the contempt order authorized the assessment of damages and, although it did not specify whose damages, it "obviously refers to [the moving party in the litigation]." <u>White</u>, 478 B.R. at 183.  Where "the contemnor is liable to the person on whose behalf the subpoena was issued for penalties and damages caused by the contemnor's non-compliance," the penalty is civil, not criminal. <u>Id</u>. at 183.

26.   Here, each factor identified by the court in <u>White</u> weighs decisively in favor of finding the February 9 Contempt Order to be civil in nature and, thus, subject to the automatic stay. <u>First</u>, the February 9 Contempt Order is designated a "final order of civil contempt" and its

finding is expressly confined to "civil contempt." See February 9 Contempt Order (attached to PAX Motion as Exh. 5) (order entitled "Final Order of Civil Contempt" and finding that "[Debtor] has violated New York Judiciary Law § 753 and is [in] civil contempt of this Court's order."). Indeed, PAX's motions seeking entry of the order expressly requested entry of an order for civil contempt. See, e.g., PAX Motion, Exhs. 11, 12; *Memorandum of Law in Support of Plaintiff Pacific Alliance Asia Opportunity Fund L.P.'s Motion for a Final Order of Civil Contempt as to Defendant Miles Kwok*, dated July 8, 2021, in *PAX v. Kwok, et al.*, Index No. 652077/2017 (N.Y. Sup. 2021), ECF No. 857.

27.     Second, the Order was issued pursuant to Judiciary Law § 753, which authorizes civil contempt. See New York Judiciary Law § 753; February 9 Contempt Order at 2 ("[Debtor] has violated New York Judiciary Law § 753 and is [in] civil contempt of this Court's order.").

28.     Third, in his opinion accompanying the February 9 Contempt Order, Justice Ostrager applied a "clear and convincing" evidentiary standard, and did not make any "willfulness" finding. See *Decision and Order on Motion* (attached to PAX Motion as Exh. 1), at 9 ("The evidence clearly and convincingly demonstrates that Kwok holds a beneficial interest in and controls the Lady May.").

29.     Fourth, although the Order provides that the NY State Court shall exercise its full authority under Judicial Law § 753 if the fine is not timely paid to PAX, the possibility of jail as contemplated under the Order would (at least theoretically) be within the Debtor's control (i.e., the Debtor would "hold the keys to his jail cell"). February 9 Contempt Order (fine continues to accrue "until Kwok returns the Lady May to the jurisdiction"; "Court shall exercise its full authority under New York Judiciary Law § 753 in the event the fine is not timely paid to PAX.").

30.    <u>Finally</u>, the February 9 Contempt Order requires payment of amounts to PAX, the party on whose behalf the Order was issued.  February 9 Contempt Order ("Kwok is directed to tender immediate payment to PAX"; "the amount due to PAX shall continue to accrue"; "Payments of the amount set forth in paragraph 2 above shall be made to PAX within five business days from service of this Order, with Notice of Entry.").  Accordingly, the February 9 Contempt Order is plainly a civil, not criminal, order and, consequently, is subject to the automatic stay.

## II.    THE NARROW EXCEPTION TO THE GENERAL RULE THAT CIVIL CONTEMPT ORDERS <u>ARE SUBJECT TO THE AUTOMATIC STAY DOES NOT APPLY HERE</u>.

31.    Certain courts have recognized a narrow exception to the general rule that civil contempt proceedings are subject to the stay, that is where an order is intended "to vindicate the dignity of the court rather than collect a pre-petition claim or obtain property of the estate."  <u>White</u>, 478 B.R. at 183-84.  PAX attempts to categorize the relief it seeks as falling within this narrow exception, <u>see</u> PAX Motion ¶ 11, but this effort fails.

32.    <u>White</u>, again, is directly on point.  There, the S.D.N.Y. Bankruptcy Court cautioned that essentially every instance of contempt "involves an affront to the dignity of a court and every punishment meted out for contempt vindicates that court's dignity."  <u>White</u>, 478 B.R. at 183-84.  "Yet, many if not most civil contempt proceedings are stayed, and a broad construction of the exception would swallow up the rule."  <u>Id</u>. at 184.

33.    The ultimate inquiry is "very fact specific, and decisions recognizing a non-statutory exception or granting stay relief to prosecute a contempt motion 'are useful far more for general guidance than as binding precedents.'"  <u>White</u>, 478 B.R. at 184 (citing <u>Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)</u>, 907 F.2d 1280, 1288 (2d Cir. 1990)).  In <u>White</u>, the contempt order granted two forms of relief:  (i) liquidating the movant's damages that resulted from the debtor's non-compliance, (ii) and compelling the debtor to comply with

subpoenas, and, if necessary, face imprisonment.  Id. at 184.  The court found that the former relief was clearly an effort to continue a prepetition litigation on account of a prepetition claim, and fell squarely within the ambit of the automatic stay.  Id.  And, the latter relief "serve[d] no purpose" as the tools of bankruptcy (e.g. Rule 2004 discovery) enable the same result and eliminate the impetus for the contempt order.  Id.

34.    In Sonnax, the Second Circuit similarly refused to apply the narrow stay exception to a contempt proceeding where the underlying order related to property of the estate (in that instance, an injunction preventing the debtor from engaging in certain business), and was not narrowly tailored to the movant's specific, identified property rights.  Sonnax, 907 F.2d at 1288.

35.    Here, the February 9 Contempt Order requires only one thing – that the Debtor immediately pay a $134 million fine (plus other fines that continue to accrue until the Lady May is returned to New York).  February 9 Contempt Order at 2.  To the extent that the Debtor had assets to immediately pay the fine, such assets would undeniably be property of the estate.  Thus, the February 9 Contempt Order relates to property of the estate and falls outside the narrow stay exception.

36.    Moreover, the impetus for the February 9 Contempt Order, as argued by PAX and determined by the NY State Court, was that PAX was purportedly prejudiced by the Lady May not being within the NY State Court's jurisdiction and available for PAX to levy upon to satisfy its judgment.  NY State Court February 9 Opinion, at 7; *Memorandum of Law in Support of Plaintiff Pacific Alliance Asia Opportunity Fund L.P.'s Motion for a Final Order of Civil Contempt as to Defendant Miles Kwok*, dated July 8, 2021, in *PAX v. Kwok, et al.*, Index No. 652077/2017 (N.Y. Sup. 2021), ECF No. 857, at 4 ("Kwok's violation prejudices PAX by depriving this Court of jurisdiction over a major $27 million asset owned and controlled by Kwok,

which would otherwise be available to contribute to satisfying the Judgment."). This impetus "is clearly an effort to continue a litigation that was commenced pre-petition and to recover a pre-petition claim for damages." White, 478 B.R. at 184.

37.     PAX suggests that the February 9 Contempt Order "has the ultimate goal of seeing the return of the Lady May to New York." PAX Motion ¶ 16. Even if accurate, the goal of bringing whatever interest the Debtor may be determined to have in the Lady May within the jurisdiction of a competent court has already been achieved through the bankruptcy filing, including the creation of the bankruptcy estate under Bankruptcy Code Section 541(a) (including all legal and equitable interests of the Debtor in property as of the filing date), jurisdiction of the Court over the estate's assets, and tools available under the Bankruptcy Code (e.g., Bankruptcy Code Section 542).

38.     The jurisprudence cited by PAX in support of its position is mischaracterized or misplaced. For example, PAX cites to Roberts v. Bennaceur, No. 3:12-CV-01222, 2015 WL 1471889 (D. Conn. 2015), stating that, in that case, "the defendant filed for bankruptcy after repeatedly failing to disclose information relating to its assets and financial condition," and that "Judge Meyer held that the bankruptcy filing did not preclude the Court from issuing sanctions relating to the debtor's abuses of the disclosure and discovery process…." PAX Motion ¶ 11. PAX mischaracterizes the facts and law in that case. There, the defendants did *not* file for bankruptcy protection; rather, a co-defendant (TriPlanet), for whom the defendants were directors and officers, itself filed for bankruptcy. Roberts, 2015 WL 1471889, at *1. The sanctions motion was being pursued only with respect to the *non-debtor* defendants; it was not being pursued with respect to the debtor. Id. Indeed, the District Court recognized that the action was stayed as against the debtor. Id. ("Following the issuance of a prejudgment remedy in plaintiff's favor and in the

16

midst of innumerable discovery disputes, TriPlanet filed for bankruptcy *and was subject to an automatic bankruptcy stay*. I now address plaintiff's second motion for sanctions and other pending motions *only as to defendants Sophien and Imed Bennaceur*.). Id. (emphasis added). The Court held that the TriPlanet bankruptcy (pending in the S.D.N.Y. Bankruptcy Court) did not prevent sanctions proceedings from moving forward as against the non-debtor defendants in the separate District Court proceeding. Id. There was no stay analysis in the opinion because there were no sanctions proceedings against *the debtor* and, therefore, no need to modify/lift the stay. PAX's assertion that "the court sanctioned the debtor … *after* the bankruptcy filing" is simply wrong. PAX Motion ¶ 11 (emphasis in original).

39.     PAX's reliance on <u>Shaoxing Bon Textiles v. 4-U Performance Group LLC</u>, 2017 WL 6413993 (S.D.N.Y. 2017), is also misplaced. That case involved an entity that was both a co-defendant in litigation pending in the S.D.N.Y District Court and a debtor in a case concurrently pending in the same court (the bankruptcy case was removed to S.D.N.Y. and the reference was withdrawn to the S.D.N.Y District Court). Id. at *1-*2. The S.D.N.Y. District Court had issued an injunction prohibiting the debtor and the other co-defendants from transferring certain funds, including estate assets; the debtor violated this injunction *post-petition*; and the plaintiff moved *post-petition* for a contempt finding and sanctions. Id. at *9-*10. The S.D.N.Y. District Court held that the debtor's requirement to comply with the injunction was not stayed by the bankruptcy filing because the purpose of the injunction and the stay were the same: to preserve estate value. Id. at *9. Although the S.D.N.Y. District Court granted the contempt motion, it did so based on the findings that "[t]he order will not affect the administration of the bankruptcy … and rather than prioritizing one creditor over others … furthers the same goals as the automatic stay by protecting all of 4-U's creditors against further waste of estate property. Id. at *10.

40.    The facts of this case are markedly different.  The Debtor has not violated the February 9 Contempt Order; rather, he filed for bankruptcy (staying the effect of the February 9 Contempt Order) precisely because he knew he could not satisfy its requirements and he did not want to violate it.  More importantly, the February 9 Contempt Order requires only one thing: that the Debtor immediately pay a $134 million fine to PAX or potentially face jail time.  Payment of any such fine to PAX (which, tellingly, PAX is not asking the Court to authorize) would not preserve estate value and, thus, is not congruous with the automatic stay; rather, enforcing the Order would prioritize PAX over other estate creditors and could result in the Debtor being imprisoned to the substantial detriment of the estate and all creditors.

41.    PAX's reliance on Int'l Distrib. Ctrs, Inc. v. Walsh Trucking Co., Inc., 62 B.R. 723, 727 (S.D.N.Y. 1986), is unpersuasive.  First, the procedural posture of that case is materially different.  Unlike here, Walsh did not involve a lift stay request to enforce a prepetition civil contempt order that required the payment of estate proceeds to the movant, and which could have resulted in the debtor's imprisonment; rather, it involved a post-petition motion seeking to hold the debtor in contempt for breaching an injunction restraining the debtor from transferring assets. Id. at 726, 729-730.  Moreover, the S.D.N.Y. District Court *denied the request to hold the debtor in contempt*, noting that the purpose of the underlying injunction was not undermined by the debtor's actions.  Id. at 730 ("The background and purpose of the Order were to ensure that the defendants did not effectively deplete their assets during the stay of judgment, and in fact, they have not, to date, done so.").  Here, as noted, the Debtor did not breach the February 9 Contempt Order (he filed for bankruptcy to avoid such result), and insofar as the underlying purpose of the February 9 Contempt Order is, as PAX suggests, to bring the Debtor's interest in the Lady May

(whatever it may be determined to be) within a competent court's jurisdiction, the Debtor's bankruptcy filing has achieved this end.

42.     PAX's reference to In re Cohoes Indus. Terminal, Inc., 62 B.R. 369, 378 (Bankr. S.D.N.Y. 1986) aff'd, 70 B.R. 214 (S.D.N.Y. 1986), 831 F.2d 283 (2d Cir.1987), is likewise unpersuasive.  There, the S.D.N.Y. Bankruptcy Court declined to find that a landlord had violated the automatic stay when it sought to hold the debtor in contempt for refusing to deliver possession of a property belonging to the landlord, as ordered by a state court.  Id. at 377.  Critically, the property in question was definitively determined not to be estate property and, therefore, the landlord's contempt motion did not "relate to property of the estate."  Id.  ("As to Associates' motion for contempt, the New York Supreme Court order directing the debtor to deliver possession of the leased property to Associates in exchange for the receipt of $350,000 from Associates, relates to property that is not part of the debtor's estate and with respect to which the debtor denies that it holds any possessory interest.").  Here, the February 9 Contempt Order unquestionably relates to property of the estate.

43.     Finally, in Booth vs. Wilson, the S.D.N.Y. District Court found that the automatic stay did not preclude contempt proceedings against a debtor.  1997 WL 241050 (S.D.N.Y. May 7, 1997) (Owen, J.).  But, critically, the S.D.N.Y. District Court found that the motion for contempt was not intended to satisfy a judgment; rather it was intended simply to compel the debtor to turn over documents integral to the plaintiff's case.  Id. at *2.  Here, in contrast, the February 9 Contempt Order compels the Debtor to pay a $134 million fine to PAX or potentially go to jail.

### III.    PAX'S REQUEST TO MODIFY THE AUTOMATIC STAY SHOULD BE DENIED; PAX HAS FAILED TO SATISFY ITS BURDEN THAT STAY RELIEF IS APPROPRIATE.

44.    In the alternative, PAX seeks entry of an order pursuant to Bankruptcy Code Section 362(d) modifying the automatic stay.  This request should be denied.

45.    Bankruptcy Code Section 362(d)(1)[4] permits modification of the automatic stay, on request of a party in interest, "for cause, including the lack of adequate protection of an interest in property of such party in interest."  11 U.S.C. § 362(d)(1).  As the movant, PAX bears the initial burden of demonstrating adequate "cause" exists to modify the automatic stay.  Sonnax, 907 F.2d at 1285 ("Section 362(d)(1) requires an initial showing of cause by the movant….").  Failure to satisfy this burden results in denial of the motion.  See id.  ("If the movant fails to make an initial showing of cause, however, the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection.").

46.    In Sonnax, the Second Circuit, in affirming the denial of a lift stay request, identified twelve factors (first articulated by the Bankruptcy Court for the District of Utah in In re Curtis, 40 B.R. 795 (Bankr. D. Utah 1984)) when considering a lift stay request:

> (1) "whether relief would result in a partial or complete resolution of the issues;"
>
> (2) "lack of any connection with or interference with the bankruptcy case;"
>
> (3) "whether the other proceeding involves the debtor as a fiduciary;"
>
> (4) "whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;"
>
> (5) "whether the debtor's insurer has assumed full responsibility for defending it;"

---

[4]    Although the caption of the PAX Motion and the proposed order indicate that PAX is seeking stay relief under Section 362(d)(2), PAX's analysis in its Motion focuses on Section 362(d)(1).

(6) "whether the action primarily involves third parties;"

(7) "whether litigation in another forum would prejudice the interests of other creditors;"

(8) "whether the judgment claim arising from the other action is subject to equitable subordination;"

(9) "whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;"

(10) "the interests of judicial economy and the expeditious and economical resolution of litigation;"

(11) "whether the parties are ready for trial in the other proceeding;" and

(12) "impact of the stay on the parties and the balance of harms."

Sonnax, 907 F.2d at 1286.

47.     PAX's Motion focuses on six of the Sonnax factors (1, 2, 4, 7, 10, and 12), but these factors do not support PAX's request.  Rather, they militate strongly against the relief.

**A.      Stay Relief Will Not Help Resolve The Dispute With PAX Or The Bankruptcy Case; Rather, It Would Materially Impair Administration Of This Case And Prejudice The Debtor, The Estate, And Creditors.**

48.     PAX alleges that the first Sonnax factor weighs in favor of stay relief because (i) "[t]he February 9 Contempt Order has the ultimate goal of seeing the return of the Lady May to New York"; (ii) the Debtor failed to disclose its interests in the Lady May as part of his alleged "scheme" to "keep the Lady May out of the reach of his creditors"; and (iii) returning the Lady May to the NYS State Court's jurisdiction will allegedly "facilitate the marshaling of that asset and the ultimate distribution of the proceeds for the benefit of all creditors."  PAX Motion ¶¶ 16-18.  These allegations do not support modification of the stay.

49.     As noted, the February 9 Contempt Order has one requirement – the immediate payment of a $134 million fine to PAX or else the Debtor could be thrown in jail.  PAX asks this Court to lift the stay to allow PAX to enforce the February 9 Contempt Order, but not authorize

21

the Debtor to satisfy the fine – which the Debtor is adamant that he is unable to do, in any event, and even if he could, would be inequitable to the estate's many other creditors. PAX's goal is singular and clear – have the Debtor thrown in jail, nothing more.

50.     Second, the Debtor's interest in the Lady May (whatever it may be) is already subject to this Court's jurisdiction and so, to the extent that one of the "ultimate goals" of the February 9 Contempt Order is to bring the Debtor's interest in the Lady May within a court of competent jurisdiction, such purpose has been achieved through the bankruptcy filing.

51.     Third, Debtor notes that he has now filed his schedules of assets and liabilities and statement of financial affairs (see Dkt. Nos. 77, 78, 79, 80), and such materials include a disclosure in respect of Justice Ostrager's order regarding the Lady May. See Dkt. No. 77, at 5.[5]

52.     Finally, there is no evidence supporting PAX's contention that allowing PAX to enforce the February 9 Contempt Order will facilitate the marshaling of estate value or benefit creditors in this bankruptcy case.

---

[5]     The Debtor's disclosure regarding the Lady May is as follows:

Question 4 – Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not? Watercraft, aircraft, motor homes, ATVs and other recreational vehicles, other vehicles, and accessories. The Debtor previously had access to the use of a yacht named the 'Lady May.' The Lady May is owned by HK International Funds Investments (USA) Limited, LLC, which is owned by the Debtor's daughter. The Lady May is currently in port in Europe. The Debtor currently has no access to the Lady May and has had no access to the Lady May for over a year.

The ownership and/or control of the Lady May was disputed by the Debtor in the New York State Supreme Court action commenced by PAX against the Debtor in response to sanctions and contempt proceedings initiated by PAX. Following an evidentiary hearing, conducted on February 9, 2021, Justice Barry Ostrager found (the 'February 9 Decision'), among other things, that that the evidence established that the Debtor 'beneficially owns and controls' the Lady May. The Debtor disagrees with the February 9 Decision and has appealed it. Due to the pending appeal (which is currently stayed), the Debtor does not include the Lady May as an asset of his estate. However, if included as an asset (which the Debtor anticipates will be resolved through this Chapter 11 Case) of his estate, the Lady May may have significant value – in 2015, the sales price for the Lady May was €28 million.

53.     The Second Circuit's decision in <u>Sonnax</u> is instructive.  There, the debtor was involved in prepetition litigation against Tri Component.  Tri Component obtained an injunction against the debtor prohibiting it from engaging in certain business activities.  907 F.2d at 1282. The debtor filed for bankruptcy, after which Tri Component filed a proof of claim in the bankruptcy case and moved to lift the stay to allow it to proceed in state court with respect to the litigation.  <u>Id</u>.  Tri Component also requested authority to file motions for contempt against the debtor for violating the prepetition injunction.  <u>Id</u>.  As noted, in affirming the district court's denial of the lift stay motion, the Second Circuit highlighted the twelve factors first articulated in <u>Curtis</u>, and focused its analysis on four of those factors:

> We believe four of the <u>Curtis</u> factors are relevant to the instant case: (1) whether the New York proceeding is connected to or might interfere with the bankruptcy case; (2) whether the bankruptcy petition was filed in bad faith; (3) the balance of harms; and (4) the interests of judicial economy and the expeditious and economical resolution of litigation.

<u>Id</u>. at 1286.

54.     As to the first factor, the Second Circuit found it "undeniable" that the state court proceeding would interfere with the bankruptcy case because "the two matters were inextricably intertwined" – i.e., proceeding with the state court action "may have a drastic impact" on the debtor.  <u>Id</u>.  at 1287.  Respecting the second factor, the movant failed to demonstrate bad faith in respect of the bankruptcy filing.  <u>Id</u>. at 1287.  On the third factor, the court observed that lifting the stay "might doom [debtor's] attempts to reorganize," whereas Tri Component would not suffer significant harm by maintaining the stay.  <u>Id</u>.  Finally, the court held that judicial economy favored maintaining the stay, as the bankruptcy proceeding "provides a single, expeditious forum for resolution of disputed issues".  <u>Id</u>.

55.     Each of these factors favors denial of the PAX Motion.  The underlying state court proceeding is "inextricably intertwined" with this bankruptcy proceeding, and permitting PAX to

move to enforce the February 9 Contempt Order (including potentially seeking the Debtor's imprisonment in New York) would have a "drastic impact" on the Debtor and the estate, and would materially jeopardize the Debtor's effort to reorganize. <u>Residential Capital</u>, 501 B.R. 624, 644 (Bankr. S.D.N.Y. 2013) ("Second, lifting the stay is connected to and will interfere with the Debtors' chapter 11 cases (<u>Sonnax</u> Factor No. 2). Litigation in non-bankruptcy courts would hinder the Debtors' attempts to reorganize by forcing the Debtors to utilize time and resources that would otherwise be spent in resolution of the Debtors' chapter 11 cases.").  PAX does not allege, let alone prove, that the Debtor's filing was in bad faith.  Finally, the centralized administration of this bankruptcy case provides the best avenue for resolving all claims against the estate, and will ensure that all creditors are treated similarly and equitably.  <u>Residential Capital</u>, 501 B.R. at 644 ("Fourth, litigation in another forum would prejudice the interests of other creditors (<u>Sonnax</u> Factor No. 7). Requiring the Debtors to continue litigation in California would upend the 'strong bankruptcy code policy that favors centralized and efficient administration of all claims in the bankruptcy court....' <u>Publicker Indus. Inc. v. United States (In re Cuyahoga Equip. Corp.)</u>, 980 F.2d 110, 117 (2d Cir.1992).").  Moreover, maintaining the stay would ensure that the Debtor's time and attention remains focused on administering this case, and not diverted to defending himself with respect to PAX's enforcement of the February 9 Contempt Order.  <u>Id</u>.

56.    The jurisprudence cited by PAX does not support its position.  In <u>Fleming</u>, the Court granted limited stay relief to allow movants to confirm a prior FINRA arbitration award in a pending Connecticut State Court case.  <u>Ahuja v. Fleming (In re Fleming)</u>, 2020 WL 3816282, at *1 (Bankr. D. Conn. July 2, 2020) (Manning, C.J.).  Applying the <u>Sonnax</u> factors, the Court found that the requested stay relief was appropriate because (i) it "would result in a partial resolution of the issues" (i.e., if the arbitration award were confirmed, bankruptcy litigation regarding the

underlying claim may not be necessary); (ii) the requested stay relief would "not interfere with the bankruptcy case" (rather, it would expedite resolution of the case); and (iii) judicial economy was served by allowing the state court action to proceed to judgment. Id. at *3.

57.    Here, enforcement of the February 9 Contempt Order would not resolve any issues; the Debtor's appeals relating to PAX will still be pending and stayed (PAX is not seeking stay relief to adjudicate such appeals). Residential Capital, 501 at 644 ("First, stay relief might not result in a partial or complete resolution of the issues (Sonnax Factor No. 1). Even if Sweeting were to win an appeal of the dismissal of the Second Sweeting Action, he would still have to come back to this Court to prove the merits of his claim."). The only thing stay relief may accomplish in this instance would be the Debtor's incarceration, which would result in enormous interference with the administration of this case. Moreover, maintaining the stay and resolving all issues in this centralized forum would promote judicial economy. Residential Capital, 501 B.R. at 644 ("Fifth, the interests of judicial economy and economical resolution of the actions are best served by maintaining the automatic stay (Sonnax Factor No. 10). As discussed above, stay relief would only result in adjudication of Sweeting's ability to bring the claims in the Second Sweeting Action; the actual merits of the claims will still have to be litigated and decided. Resolution of these issues would be costly in terms of both judicial resources and the value of the bankruptcy estate. For all of these reasons, the Sonnax factors weigh in favor of denying relief from the automatic stay.").

58.    In Ice Cream Liquidation, the Court granted limited stay relief to allow for the adjudication of certain personal injury tort claims. 281 B.R. 154 (Bankr. D. Conn. 2002). Critical to the Court's conclusion that stay relief was warranted was its determination that: (i) it was precluded from adjudicating the merits of the underlying personal injury tort claims as a result of 28 U.S.C. § 157(b)(5); (ii) the court in which the claims were pending was competent to adjudicate

the merits and ready for trial (pre-trial discovery and dispositive motion practice was largely complete); and (iii) liquidation of the claim was critical to plan confirmation (which was scheduled to commence shortly). Id. at 166-68. None of these issues are at play here. Rather, allowing PAX to enforce the February 9 Contempt Order would likely significantly impair the Debtor's reorganization efforts.

59.     In In re David X. Manners Company, Inc., the Court approved limited stay relief agreed to under a joint stipulation between the Chapter 7 trustee and the movant to allow the movant to reduce a jury verdict obtained after trial to a final judgment, but not to enforce such judgment. 2018 WL 1997674, at *1 (Bankr. D. Conn. Apr. 26, 2018) (Tancredi, J.). The joint stipulation between the Chapter 7 trustee and movant was entered into after the Court granted the movant derivative standing to object to a claim filed by another party (the claimant). Id. In granting limited stay relief, the Court noted that reducing the jury verdict to judgment could resolve the movant's claim objection (the operative facts of both were intertwined) and, thus, provide partial resolution of issues in the bankruptcy case. Id. at *6. Further, the Court found that the relief "would by no means interfere with the bankruptcy case," but, instead, was likely to foster progress in the case. Id. Allowing the state court action to move forward to judgment was more efficient, given the state court's experience with the trial. Id. And, no party would be prejudiced by lifting the stay, as the movant would seek only entry of the judgment, not enforcement. Id. Here, as noted, granting stay relief will not resolve any issues in this case (not even the pending issues between the Debtor and PAX, which are subject to appeal); it would substantially interfere with the administration of this case, as the Debtor could be in jail; will not promote efficiency; and will prejudice the estate and its creditors.

**B.**    **Stay Relief Will Significantly Interfere With The Bankruptcy Case.**

60.    PAX contends that granting stay relief to allow it to enforce the February 9 Contempt Order will not significantly interfere with this bankruptcy case. PAX Motion ¶ 14. This is not true.

61.    Lifting the stay to permit PAX to enforce the February 9 Contempt Order could result in the Debtor's imprisonment. Such a result would significantly interfere with the bankruptcy case, to the detriment of the estate and its creditors. The Debtor's imprisonment would materially impair his ability to achieve the objectives that he set forth to accomplish in commencing this Chapter 11 Case. The Debtor would be unable to adequately and appropriately administer the estate, participate in this bankruptcy case, negotiate with creditors, appear and be heard before this Court, consult with and direct counsel, investigate and marshal the assets of the estate, or formulate and negotiate a Chapter 11 plan. Kwok Decl. ¶ 19 n.10.

62.    The jurisprudence cited by PAX misses the mark. In re Dunne involved a U.S. bankruptcy and parallel bankruptcy in Ireland involving the same debtor. 2015 WL 7625609 (Bankr. D. Conn. Nov. 25, 2015) (Shiff, J.). The two estates completely overlapped (i.e., "same debtor and estates consisting of the same property"); the Chapter 7 trustee and official assignee (appointed in Ireland) agreed to work cooperatively to augment the estates; and both agreed not to distribute assets absent further order of the U.S. bankruptcy court. Id. at *3. The official assignee initiated a fraudulent transfer action against the debtor's wife in Ireland to augment the estates, and (following certain arguments raised before the court in Ireland) the Chapter 7 trustee filed a motion in the U.S. bankruptcy court confirming that the automatic stay did not apply to the official assignee's claw-back action. Id. at *4. The U.S. bankruptcy court granted the motion over the objection of the debtor's wife, finding that the stay did not apply because the official assignee and

Chapter 7 trustee were essentially "co-administrators" of the overlapping estates and shared a "symbiotic relationship"; the official assignee's action was attempting to augment both estates; the Chapter 7 trustee supported the official assignee's action; and such action was a more efficient and expeditious means of obtaining the relief requested.[6] Id. at *5.  Here, PAX's efforts are not aimed at augmenting the estate, but rather in seeking the Debtor's imprisonment; PAX's interests are not aligned with either the Debtor or the estate; the Debtor obviously does not support PAX's request; and PAX's requested relief will serve only to hamper progress in this case, not to provide a more efficient or expeditious means of moving the case forward.

63.    In In re Mildred Deli Grocery, Inc., the S.D.N.Y. Bankruptcy Court lifted the stay to allow a prepetition action under the Fair Labor Standards Act to proceed to trial.  2018 WL 1136017 (Bankr. S.D.N.Y. Feb. 28, 2018) (Glenn, J.).  The court's holding was predicated on finding that liquidation of the claim was integral to resolution of the bankruptcy case; all pre-trial discovery and motion practice had been completed and the matter was ready for trial and close to completion; and the debtor would not be harmed and no creditors would be prejudiced because the stay was being lifted solely to permit the liquidation of the claim, not collection.  Id. at *4-*5. Here, PAX is not seeking stay relief to liquidate a claim that is trial-ready; rather, it seeks to have the Debtor jailed.  And, as noted, both the interests of the Debtor and his creditors would be materially harmed by such an outcome.

64.    PAX's assertion that the Debtor is "exploiting the bankruptcy process" to evade sanctions is incorrect, and its reliance on In re Rudaw/Empirical Software Prod. Ltd., 83 B.R. 241 (Bankr. S.D.N.Y. 1988), is unpersuasive.  There, the court granted limited stay relief solely to enable the movant to initiate contempt proceedings against the debtor for violation of a state court

---

[6]    The Court in Dunne also noted that the debtor's wife lacked standing to oppose the Chapter 7 trustee's motion.

preliminary injunction enjoining the debtor from selling a competing product in violation of a contractual agreement.  Id. at 247.  In distinguishing Rudaw, the Second Circuit observed in Sonnax that the Rudaw court "permitted contempt proceedings to proceed where the prepetition order *was not related to property of the estate* and when the order *was specifically tailored to protect carefully defined property rights*."  Sonnax, 907 F.2d at 1287 (emphasis added).

65.    Further, PAX's reliance on In re Cinnabar 200 Haircutters, Inc., 20 B.R. 575 (Bankr. S.D.N.Y. 1982) is similarly inapt.  There, Estee Lauder obtained a prepetition injunction enjoining the debtor from using the tradename "Cinnabar."  Id. at 576.  After the debtor filed for bankruptcy, Estee Lauder sought stay relief to permit contempt proceedings for the debtor's continued use of the Cinnabar tradename in violation of the injunction.  The bankruptcy court granted the relief, observing that the underlying court order related to Estee Lauder's property rights and there was no other means to prevent the dilution of that property right by the debtor's continued use of the name.  Id. at 577.  Here, PAX's request is not intended to protect its property rights, and to the extent that PAX's goal truly is bringing any interest that the Debtor may have in the Lady May within the jurisdiction of a competent court, the bankruptcy filing has achieved this goal.  See 11 U.S.C. § 541(a).

**C.    The Requested Stay Relief Will Not Promote Judicial Economy; Lifting The Stay Will Materially Harm The Debtor And Prejudice Creditors.**

66.    Finally, relying on previously cited case law (which, as explained above, is mischaracterized or misplaced), PAX claims that its requested stay relief is appropriate because it will promote judicial economy and will not materially prejudice creditors.  The Debtor does not question Justice Ostrager's experience with respect to the litigation between the parties.  But, the dispute is, at bottom, a dispute as to the validity of a creditor's claim against a debtor, it does not require specialized expertise to resolve, and this Court is perfectly capable of resolving these

29

matters.  Indeed, as noted, the Debtor is in the process of removing the litigation with PAX ultimately to this Court.  More to the point, PAX is not requesting stay relief to resolve the disputes between the parties (e.g., the pending appeals); rather, it is seeking stay relief solely to enforce the February 9 Contempt Order and have the Debtor incarcerated.  For the reasons described above, the Debtor's reliance on Ice Cream Liquidation, Mildred Deli, and Fleming is unavailing.

67.    PAX's contention that stay relief will benefit all creditors "because it will bring the valuable Lady May to the United States and prevent dissipation" is not true.  First, as noted, whatever interest the Debtor may be determined to have in the Lady May is already squarely under this Court's jurisdiction, and this Court has the authority under the Bankruptcy Code to authorize appropriate relief in this respect (e.g., the turnover provisions of 11 U.S.C. § 542).  Second, the limited stay relief to allow PAX to enforce the February 9 Contempt Order will not bring the Lady May to the United States.  The February 9 Contempt Order does not compel this; rather, it imposes additional fines to the extent the Lady May is not returned.

68.    The Debtor further notes that other pertinent Sonnax factors excluded by PAX in its analysis further militate against the requested relief.   For example, only PAX and the Debtor (and certain affiliates owned by the Debtor) are parties to the underlying dispute; thus, the action does not primarily involve third parties.  Residential Capital, 501 B.R. at 644 ("Third, the California Appeal does not primarily involve third parties; GMACM is the only named defendant in the pending Second Appeal (Sonnax Factor No. 6).").


*[Remainder of page intentionally left blank.]*

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Debtor requests that the Court: (i) deny the relief requested in the PAX Motion; and (ii) grant to the Debtor such other or further relief as deemed appropriate.

Dated: March 15, 2022

**BROWN RUDNICK LLP**

By: */s/ William R. Baldiga*
Dylan P. Kletter, Esq.
185 Asylum Street
Hartford, Connecticut 06103
Telephone: (860) 509-6500
Facsimile: (860) 509-6501
Email: dkletter@brownrudnick.com

-and-

William R. Baldiga, Esq.
Robert J. Stark, Esq.
Bennett S. Silverberg, Esq.
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
Email: wbaldiga@brownrudnick.com
        rstark@brownrudnick.com
        bsilverberg@brownrudnick.com

*Proposed Counsel for*
*Ho Wan Kwok, Debtor*