UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

In Re                          *   Case No. 22-50073 (JAM)
                               *
     HO WAN KWOK,              *   Bridgeport, Connecticut
                               *   March 1, 2022
               Debtor.         *
                               *
* * * * * * * * * * * * * * *


TRANSCRIPT OF MOTION TO EXTEND
DEADLINE TO FILE SCHEDULES OR PROVIDE REQUIRED INFORMATION
BEFORE THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For the Debtor:                BENNETT SILVERBERG, ESQ.
                               Brown Rudnick, LLP
                               Seven Times Square
                               New York, NY  10036

For the Creditor, Pacific      PATRICK M. BIRNEY, ESQ.
 Alliance Asia Opportunity     PETER FRIEDMAN, ESQ.
 Fund L.P.:                    STUART M. SARNOFF, ESQ.
                               ASHLEY MARIE, ESQ.
                               O'Melveny & Myers LLP
                               Times Square Tower
                               7 Times Square
                               New York, NY  10036

                               PATRICK M. BIRNEY, ESQ.
                               Robinson & Cole LLP
                               280 Trumbull Street
                               Hartford, CT  06103-3597

For the Creditor, Logan        JAY MARSHALL WOLMAN, ESQ.
 Cheng:                        Randazza Legal Group, PLLC
                               100 Pearl Street, 14th Floor
                               Hartford, CT  06103


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

APPEARANCES Cont'd:

For the U.S. Trustee:          HOLLEY L. CLAIBORN, ESQ.
                               Office of the United States
                                  Trustee
                               The Giaimo Federal Building
                               150 Court Street, Room 302
                               New Haven, CT  06510

1    (Proceedings commenced at 4:03 p.m.)

2          THE CLERK:  22-50073, Ho Wan Kwok.

3          THE COURT:  Okay.  Good afternoon.  If we could

4    have appearances for the record, starting with the debtor's

5    counsel, please?

6          MR. SILVERBERG:  Good afternoon, Your Honor.  It's

7    Bennet Silverberg of Brown Rudnick.  I'm joined by my

8    sponsor attorney, Dylan Kletter.

9          THE COURT:  Good afternoon to both of you, and I

10   think --

11         MR. KLETTER:  Good afternoon.

12         THE COURT:  -- Attorney Silverberg, there may have

13   been an order entered allowing your admission pro hac vice

14   is it?

15         MR. SILVERBERG:  Yes, Your Honor, and we thank you

16   for that.

17         THE COURT:  Okay.  Thank you.

18         MR. BIRNEY:  Good afternoon, Your Honor.  Patrick

19   Birney, Robinson & Cole, on behalf of Pacific Alliance Asia

20   Opportunity Fund L.P., or PACS.  With me in the courtroom,

21   Your Honor, to my right is Attorney Peter Friedman.

22         THE COURT:  Good afternoon.

23         MR. BIRNEY:  To my left is Attorney Stuart

24   Sarnoff.

25         THE COURT:  Good afternoon.

1           MR. BIRNEY:  And a couple other folks.  Attorney

2   David Harbach and Ashley Marie from -- all from O'Melveny.

3   Your Honor, the motions for pro hac vice have been filed and

4   granted by Your Honor, and Mr. Friedman will be taking over

5   with lead argument today.

6           THE COURT:  Okay.  Thank you.  Thank you, all.

7   Welcome, everyone.

8           Go ahead, Attorney Claiborn.

9           MS. CLAIBORN:  Good afternoon, Your Honor.  Holley

10  Claiborn for the U.S. Trustee.

11          THE COURT:  Good afternoon.

12          Attorney Wolman.

13          MR. WOLMAN:  Good afternoon, Your Honor.  Jay

14  Wolman of, Randazza Legal Group, the Creditor, Logan Cheng.

15          THE COURT:  Good afternoon.  Okay.

16          MR. WOLMAN:  And, thank you very much, Your Honor,

17  for permitting me to appear remotely.

18          THE COURT:  Yes, as I noted -- oh, I forgot to put

19  the camera on.  Sorry, Attorney Wolman.  We're doing

20  different --

21          MR. WOLMAN:  It's okay.

22          THE COURT:  -- kinds of hearings today, so I don't

23  even know if you can -- if that works, but in any event,

24  it's there.

25          As I noted, you know, this was an expedited

1    hearing, so you were allowed to participate today remotely.

2    We are back in court.  There are a number of us in the

3    courtroom but people are masked and apparently, you know,

4    comfortable with distancing and so we'll proceed today.

5          Now before we talk about anything specifically, I

6    got a message that there is an interpreter here today for

7    the debtor.

8          MR. SILVERBERG:  Yes, Your Honor.

9          THE COURT:  And before we talk anything about

10   that, I just want to -- do other counsel understand that the

11   debtor has an interpreter today?

12         MR. FRIEDMAN:  Yes, Your Honor.  Peter Friedman,

13   from O'Melveny and Myers, on behalf of PACS.  We do

14   understand.

15         THE COURT:  Okay.  And do you have an opposition

16   to the interpreter?

17         MR. FRIEDMAN:  No, Your Honor.  I have no

18   opposition to the interpreter.

19         THE COURT:  Okay.  And you believe the interpreter

20   is qualified to interpret whatever the debtor is saying?

21         MR. FRIEDMAN:  I don't have any basis one way or

22   another, Your Honor.

23         THE COURT:  Okay.  I understand from the Office of

24   the United State's Trustee's pleadings that were filed, I

25   think yesterday, I could be -- I think I'm correct -- that

1     there was an interpreter for the debtor at the initial

2     debtor interview that your office conducted.  Is that

3     correct?

4             MS. CLAIBORN:  Yes, Your Honor. The U.S. Trustee

5     used the services of an interpreter over the telephone, and

6     then the debtor had his own personal interpreter who was

7     present physically with the debtor.

8             THE COURT:  So did -- so is the gentleman that's

9     here today -- I shouldn't even say.  I assume it's a

10    gentleman because I'm looking in the back of the courtroom,

11    but is the gentleman here today the same gentleman that was

12    with the debtor during the initial debtor interview?

13            MS. CLAIBORN:  No, Your Honor.

14            MR. SILVERBERG:  No, Your Honor.  This -- the

15    interpreter's name is John Lau.

16            THE COURT:  Okay.  Okay.  I just need to

17    understand at some point if Mr. Lau is going to be

18    interpreting anything that the debtor says, I want to

19    understand Mr. Lau's qualifications, if we get to that

20    point.  Okay?

21            MR. SILVERBERG:  Understand.

22            THE COURT:  You know, we obviously were not

23    prepared to have an interpreter, but that's not necessarily

24    a problem.

25            All I'm suggesting to you is, I don't want there -

1    - I'm not going to have a hearing continue and be held if

2    there is going to be any controversy over the interpreter.

3    That's my point.  Okay?

4              MR. SILVERBERG:  Yes, Your Honor.

5              THE COURT:  Okay.  Thank you.  All right.  Now --

6              THE CLERK:  Judge, I'm sorry.  We didn't pick up

7    what Attorney Claiborn is saying -- said before.  I'm sorry.

8    She's a little far from the mic.

9              THE COURT:  Yeah, it's not your fault, Attorney

10   Claiborn.  The problem is, with all of us with masks and,

11   you know, distancing, it's sometimes -- we might have to ask

12   you to talk a little more loudly.

13             MS. CLAIBORN:  I'll do my best to speak louder.

14             THE COURT:  Thank you.  Even just that -- that

15   angle, unfortunately, picks up your voice better in the

16   microphone.

17             And as I think you're all aware, our record is

18   audio, so we have to be very careful about the microphones.

19   And if there's times when I ask you, or someone asks you to

20   repeat yourself, it's because we need to make sure we have a

21   clear record.  Okay?

22             All right.  So a week or so ago -- and I can pull

23   it up.  You probably all know it better than I at this

24   point,  the clerk's office entered a docket entry in this

25   case regarding certain deficiencies with regard to the

8

1    petition and other documents that are required to be filed

2    in a bankruptcy case by a voluntary debtor.

3            The amended petition was filed.  I saw that.  That

4    corrected that deficiency.  There is a -- I understand, you

5    know, the office is thinking that they can sometimes use

6    other people's numbers, but we don't allow that, and so that

7    was why there was a need for the filing of the amended

8    petition.  So I understand that's been done.

9            I understand there was a notation about a creditor

10    who didn't have an appropriate attention line, and that's

11    been corrected as well.  So the Court appreciates that.

12            What the order that I believe the debtor's

13    counsels are -- not the order, but the deficiency notice

14    that the debtor's counsel is concerned about, that resulted

15    in this motion to extend time to file the schedules, is

16    because -- and I'm telling you both something I know you

17    already know.  This isn't any news to you, the bankruptcy

18    code requires, and the rules, that schedules and statements

19    be filed within 14 days of the filing of the case.

20            For as many reasons as all of us in this room

21    know, that's an important problem -- issue, because a case

22    can't be properly administered if a debtor hasn't met its

23    duties, his duties, in this case his duties, of preparing

24    and filing the schedules and statements of affairs.  That's

25    an essential requirement that this Court, and I think all

1  courts, take very seriously.

2  The deficiency notice said that the case may be

3  dismissed.  It didn't say shall, but I understand the

4  debtor's counsel's desire to then get a hearing quickly held

5  so that you would -- because you don't want to have your

6  case dismissed, and I understand that.

7  So in any event, that was the reason that the

8  motion for an expedited hearing was granted and is set today

9  on the motion to extent time to file the schedules.

10  Now, I understand what you're looking for.  You're

11  looking for 60 days.  You know that you've got two written

12  objections to that already.  I can tell you you're not going

13  to get 60 days.  That's not going to happen.

14  But what I want to know is, have you had any

15  discussions with counsel for the creditors or the U.S.

16  Trustee's office about your request and their objections?

17  MR. SILVERBERG:  Yes, Your Honor.

18  As a matter of fact, we had our -- I'm not sure if

19  Your Honor can hear me.

20  THE COURT:  That's perfect.  Thank you.

21  MR. SILVERBERG:  Your Honor, we had our initial

22  debtor interview with Ms. Claiborn in her office yesterday.

23  It was a three hour interview.

24  At the conclusion of the interview, we asked Ms.

25  Claiborn what the office's position was on the extension

1    request.

2         She made clear that 60 days was going to be -- was

3    going to be met with an objection, and she strongly

4    admonished that we consider requesting an extension that

5    expired in advance of the Section 341 meeting and gave

6    creditors sufficient time to review the schedules and

7    statements so that they can ask informed questions at the

8    341 meeting.

9         Last night, after consulting with the client, who

10   happens -- sorry.  Didn't make the introduction to our

11   client, Mr. Ho Wan Kwok.

12        MR. KWOK:  Good afternoon, Your Honor.

13        THE COURT:  Good afternoon, sir.

14        MR. SILVERBERG:  He goes by Miles.

15        THE COURT:  Good afternoon.  Thank you.  You can

16   have a seat, sir.  Thank you.

17        MR. SILVERBERG:  So yesterday -- last evening,

18   sorry, we made a proposal to the U.S. Trustee to extend the

19   deadline to file the schedules and statements until March

20   16th, which is the Wednesday before the Monday 341 meeting.

21        The reason why we didn't go exactly a week prior

22   is that we're dealing with some of the logistics of

23   translating the schedules and statements into Mr. Kwok's

24   native Chinese, so we want to make sure that when he

25   certifies and attests to the accuracy under penalty of

11

1    perjury that he completely understands in his own language

2    what the schedules and statements are saying so that there's

3    absolutely no question as to what the words are on the page.

4              THE COURT:  I understand.  Okay.

5              So are you saying that you are prepared -- and I'm

6    going to hear from other parties, but I just want to ask you

7    this question.  You are prepared on behalf of the debtor to

8    agree to an extension of time that would expire on March

9    16th?  Is that correct?

10             MR. SILVERBERG:  That is correct, Your Honor.

11             THE COURT:  Okay.  All right.  Thank you.  I'd

12   appreciate that.

13             Now, Attorney Claiborn, you filed the first

14   objection to this motion.  You've now heard counsel and his

15   agreement to limit the extension of time if it's granted, to

16   March 16th.  What else would you like to add to the record,

17   or what other thoughts do you have with regard to the

18   extension request?

19             MS. CLAIBORN:  Your Honor, I think it might be

20   helpful if I could ask the Court to listen to the PACS

21   presentation before the U.S. Trustee opines.

22             THE COURT:  Oh, that's fine.  Okay.

23             MS. CLAIBORN:  And I make that suggestion because

24   there is a long history of the debtor and PACS that I think

25   would be informative to the analysis of what kind of an

1    extension of time makes sense to this case.

2              THE COURT:  That's fine.  Counsel?

3              MR. SILVERBERG:  And, Your Honor, if PACS is go

4    into a gory detail of what led us here, I think it -- you

5    know, I have a presentation I can make as well if you want

6    to hear it.  Otherwise, you can hear -- hear me.

7              THE COURT:  Well, are you suggesting you'd like to

8    make your presentation first?  Is that what you're saying?

9    Or you want to respond to their presentation?

10             MR. SILVERBERG:  I'd like to make our presentation

11   first if that's --

12             THE COURT:  All right.  And your presentation is

13   going to be about why the case was filed and why you need

14   the extension of time?

15             MR. SILVERBERG:  That is correct.  To --

16             THE COURT:  All right.  I'll let them go first,

17   Counsel, and then I will absolutely hear from you.

18             MR. FRIEDMAN:  Thank you, Your Honor.

19             THE COURT:  Go ahead.

20             MR. SILVERBERG:  Do you want me to do it from here

21   or from the podium?

22             THE COURT:  You can do it right from there,

23   counsel.

24             MR. SILVERBERG:  Perfect.  So, Your Honor, what I

25   was proposing to do was to first give a background of Mr.

1    Kwok, the event -- and then follow it up with the events

2    leading to the commencement of this Chapter 11 case, and

3    provide the justification for the extension request.

4         Your Honor, by way of background -- sorry.  Mr.

5    Kwok was born in Shandong Province in China.  He currently

6    resides in Greenwich, CT with his wife of 35 years, Qingzhi.

7    He has two adult children.  Together, they have a son, Mr.

8    Qiang Guo, and a daughter, Ms. Mei Guo.

9         The son lives in the United Kingdom.  The daughter

10   splits her time between New York City and Connecticut.

11   Hopefully more time out of the parents' house now that COVID

12   is receding.

13        He grew up in a large but poor household which

14   inspired his entrepreneurial spirit.  At the age of 13, Mr.

15   Kwok dropped out of middle school and began selling clothing

16   and electronics to help support his family.

17        In May 1989, Mr. Kwok was detained and tortured

18   for his support of the Tiananmen Square protest.  While

19   detained for approximately 20 months, he created key

20   relationships with political activists, intellectuals,

21   business people, and religious leaders.  One of these

22   contacts would later introduce him to a Ms. Ping Sia (ph), a

23   successful businesswoman and investor from Hong Kong.

24        In 1991, Mr. Kwok began to work with Ms. Sia in

25   Yuda Property Company (ph), a company which focused on

1    commercial real estate development in the Henan Province of

2    China.  Shortly after its launch, Yuda successfully

3    developed and constructed the high end Yuda International

4    Trade Center in Henan Province's capital city of Zhengzhou.

5    The commercial complex includes what was at the time the

6    tallest sky scraper in Henan Province, and china's fifth

7    tallest building.

8         Upon completion of its construction, the complex

9    had a then value of 300 million.  The trade center was

10   financially successful and established Mr. Kwok's presence

11   in China's world of real estate developers, particularly in

12   the Henan Province where Yuda continued to develop high-end

13   residential and commercial projects.

14        Around 2000, building on the -- building on the

15   success in Hehan Province, Mr. Kwok shifted his real estate

16   aspirations to Chinese Capital, Beijing where he expanded

17   his business to include private financing for his projects

18   in which his six siblings participated.

19        Through success in Henan Province, Mr. Kwok's

20   immediate and extended family members were lifted out of

21   poverty.

22        In Beijing, Mr. Kwok helped establish Beijing

23   Morgan Investment Company and Beijing Zenith Holdings

24   Company, a real estate development and investment management

25   consultant company.  Entities in which Mr. Kwok's immediate

1    and extended family were shareholders and employees.

2              In 2002, these businesses acquired two parcels

3    spanning approximate 2 million square meters of undeveloped

4    land in Northern Beijing.

5              The value of these parcels increased dramatically

6    after China was named the host country for the 2008

7    Olympics, and the government announced its plans to build

8    the Olympic venue adjacent to these land parcels.

9              The increased value of these parcels spawned Mr.

10   Kwok's long-standing political fight with the Chinese

11   Communist Party.  Deputy Mayor, Gi Wa (ph), attempted to

12   improperly appropriate Morgan Investment's property.  Mr.

13   Kwok fought back, reporting this corruption to the

14   government, and after a lengthy fight, ultimately recovered

15   Morgan Investment's land parcels.

16             Mr. Kwok then oversaw the successful construction

17   and timely completion of the Beijing Pangu Plaza and Xin

18   Wang Plaza.  The Pangu Plaza has become a Beijing landmark

19   adjacent to the Olympic venue.

20             Mr. Kwok, however, with his criticism of the CCP's

21   corruption, drew a harsh response.  When it became clear his

22   life was in jeopardy, he fled to the United States in 2015.

23   In absentia, the CCP froze or seized his assets in China,

24   including assets held by companies in which he held an

25   interest.

16

1          The CCP also caused the seizure of his assets

2     elsewhere, including Hong Kong, and of caused Interpol to

3     issue a Red Notice for his arrest.

4          In September 2017, he claimed political asylum in

5     the United States and his application remains pending to

6     this day.

7          He continues his criticism of the CCP's corruption

8     and human rights abuses to this day.  Over the years, he has

9     amassed a following on various digital and media platforms

10    such as YouTube, GTV, Twitter, and GETTR -- I actually had

11    to look GETTR up.  I didn't know what it was -- where he

12    shares his personal views and opinions concerning the CCP

13    and the need for democracy in China.

14         He has over 1 million followers across the various

15    social media platforms.  Notably, he has not monetized his

16    social media presence.  Mr. Kwok is not employed and he

17    relies on the support of family, principally his son, to

18    cover his daily living expenses.

19         In Mr. Kwok's son's family office in Golden

20    Spring, New York, his son advances is monthly expenses.

21    Brown Rudnick's retainer was paid by another entity owned by

22    Mr. Kwok's son, Lamp Capital, LLC, as set forth in our

23    attorney compensation declaration at Docket Number 54, which

24    was filed shortly before this hearing.

25         THE COURT:  Okay.  I haven't seen that, but that's

17

1       fine.

2               MR. SILVERBERG:  Turning to the PACS litigation.

3       Though he left China, he didn't leave all his troubles

4       behind.  We suspect the Court will hear quite a bit from

5       PACS's counsel during this case.  We won't get too much into

6       this litigation, but a high level interview might help put

7       things into context.

8               PACS, a Hong Kong investment fund, commenced

9       actions against Mr. Kwok in New York and BBI.  The New York

10      action commenced in 2017.  It was before Justice Ostrager in

11      New York Supreme Court.  In the New York action, Mr. Kwok is

12      represented by BakerHostetler.

13              These are principally collection actions related

14      to a $30 million loan made to a Chinese entity called Spirit

15      Charter, back in 2008.  PACS claims that Mr. Kwok provided a

16      personal guarantee of the PACS debt and reaffirmed that

17      guarantee multiple times over the years, most recently in

18      2011.

19              Mr. Kwok agrees that he provided a personal

20      guarantee in 2008, but asserts that the loan was fully

21      repaid thereafter and that the subsequent documents are

22      forgeries.  And that's the crux of the dispute, Your Honor.

23              Without a hearing, Justice Ostrager entered

24      summary judgment in PACS's favor.  Mr. Kwok has appealed

25      this judgment to the appellate division and the appeal

18

1    remains pending, though stayed as a result of the

2    commencement of this case.

3            In the meantime, PACS sought to enforce a

4    restraining order issued by Justice Ostrager and Mr. Kwok,

5    prohibiting him from transferring or dissipating assets, or

6    moving them outside the jurisdiction of the New York courts.

7            PACS became laser focused on a yacht named the

8    Lady May.  PACS wanted the yacht back in New York so that it

9    could arrest the boat and levy on it.

10           Mr. Kwok denied owning the boat and asserted that

11   he couldn't order the boat back to New York.  Justice

12   Ostrager directed Mr. Kwok to return the boat to New York by

13   May 15th, 2021, or face a massive daily fine of $500,000 for

14   every day the boat remained outside it's jurisdiction.

15           On February 9th Justice Ostrager found that Mr.

16   Kwok beneficially owned and controlled the Lady May, issued

17   a final order of civil contempt against him, and ordered him

18   to pay a $134 million fine to PACS within just five days, or

19   risk jail time.

20           The February 9th decision is also on appeal to the

21   appellate decision.  Mr. Kwok lacked the means to satisfy

22   the fine, retained our firm on February 14th, and filed for

23   Chapter 11 the very next day.  He filed for Chapter 11, not

24   just to obtain the benefit of the automatic stay, but to

25   resolve all his claims in a single forum in an orderly

1    manner.

2            It is hopeful that he can agree with his creditors

3    on the terms of a Chapter 11 plan.  Counsel for PACS is in

4    the same building as our firm, just an elevator bank away.

5            His principal assets are litigation claims.

6    Assuming he -- assuming he prevails on these claims, he may

7    be able to fund full recoveries to his creditors.  He will

8    also approach his family members for support to fund the

9    plan.  All options are on the table.

10            Further, as Your Honor noted in the objections,

11    much has been made of supposed shell games and allegations

12    of squirreling assets away.

13            If the allegations are true, and we say they're

14    not, then the bankruptcy case may be the best thing that

15    could have happened for them.  There may be a creditor's

16    committed appointed in the case.  The U.S. Trustee has

17    solicited creditor interest in the participation.  If one is

18    appointed, then they'll have their work to do.

19            Chiefly, we suspect they'll investigate the

20    allegations that PACS made in their papers, which brings us

21    to the motion for the request for the extension of the

22    deadlines.

23            We had very little time to work with Mr. Kwok to

24    prepare his filing.  That's why the papers were so skinny.

25    That's why the deficiency notice ended up on the order.

1        If we had more time, we would have made sure that

2    the schedules were filed on time.  Or certainly -- maybe

3    even in advance of the -- maybe contemporaneous with the

4    filing.

5        It was far from ideal circumstances.  We have a

6    considerable amount of work to do on our end to assist Mr.

7    Kwok with the preparation of schedules and statements.  On

8    February 23rd, we advised the United States Trustee's office

9    of Mr. Kwok's intention to seek an extension.

10        On February 24th, as Your Honor noted at Docket

11    27, we filed Mr. Kwok's request for an extension of

12    approximately 60 days.

13        The rationale for the extension was the need for

14    us to work with counsel who had been representing Mr. Kwok

15    for years to ensure that litigation related assets and

16    liabilities were actually -- were accurately captured on the

17    schedules and statements.

18        Also, since Mr. Kwok does not read or write

19    English, he requested a Chinese translation of the official

20    forms.

21        Mr. Kwok is also going to retain a service

22    provider to assist him with the generation of the schedules

23    and statements.  This morning, we began discussions with

24    Strutta (ph), who Your Honor may be familiar with.

25        As I noted, Your Honor, we discussed Mr. Kwok's

1    extension request yesterday afternoon with the U.S. Trustee.

2    Yesterday, two parties filed objections to the extension

3    motion, the U.S. Trustee and PACS.  Both pretty much make

4    the same point.  The requested extension was too long and

5    they want to get on with the case.

6         Your Honor, it bears mentioning that even though

7    the requested extended deadline was after the scheduled 341

8    meeting, we thought maybe we can work with the U.S. Trustee

9    to commence that 341 meeting and adjourn it to make sure

10   that folks had an opportunity to review them and ask

11   informed questions.  We recognize it would be unacceptable

12   to deny the creditors the opportunity to ask informed

13   questions.

14        Mr. Kwok agrees that it's best to work harder to

15   get the scheduled statements on file sooner.  The sooner the

16   schedules are on file, the sooner he can establish a bar

17   date for claims, start reconciling them, and see if he can

18   propose a feasible Chapter 11 plan.

19        And, Your Honor, I already mentioned the proposal

20   that we extend to the United States Trustee, and should we

21   get there, I'm prepared to make a short proffer of what Mr.

22   Kwok's testimony would be if he were called to testify.

23        THE COURT:  Okay.  Thank you.  Let me just think

24   if I have a -- oh, yes, I do have a question or two.  It's

25   not really a question.

22

1        As I mentioned, and you all know, we have audio

2    for our record.  There are some names that you recited

3    during your presentation that I think it would be helpful to

4    get to the clerk's office so that the clerk's office can

5    make sure they're properly spelled and accounted for in the

6    record of this case.

7        MR. SILVERBERG:  Absolutely, Your Honor, and we're

8    happy to provide the English spelling, and I guess my

9    phonetic --

10        THE COURT:  Whatever --

11        MR. SILVERBERG:  -- translation.

12        THE COURT:  -- whatever -- yes.  That would be

13    very helpful because we do want the record to be accurate,

14    and so, I would like you to do that.

15        MR. SILVERBERG:  Absolutely, Your Honor.

16        THE COURT:  I can figure out -- I'll speak with

17    the courtroom deputy, but we could probably have the clerk

18    of the court reach out to you, counsel, and figure out a way

19    to get that information so that we clearly have it for our

20    record and have it accurately.

21        MR. SILVERBERG:  It would be our pleasure.

22        THE COURT:  Okay.  Thank you.  I just want to

23    think if I had any other thought when -- I mean, I had other

24    thoughts, but what -- anything I wanted to say when you were

25    speaking.

1               With regard to the 341 meeting, and whatever

2     happens here today, I think, you know, the U.S. Trustee's

3     office -- I think it would make sense, even if your

4     extension is granted to the 16th, to not close that 341

5     meeting after the first meeting.

6               I think that this is a fluid case with a lot of

7     issues, and you know, that's the U.S. Trustee's office call,

8     but I would urge them to consider -- and of course I'm

9     talking to you now, Attorney Claiborn, to consider that the

10    debtor does not seem to have any issue with that 341 meeting

11    taking place more than one day, and I would urge the U.S.

12    Trustee's office to consider doing that, given many issues,

13    including the fact that we're going to -- apparently going

14    to have to have an interpreter there, and there's going --

15    there may or may not be a lot of creditors that have

16    interest and questions.

17              But I want to make sure that they're provided with

18    that opportunity timely and with enough notice that when the

19    documents are filed, they have enough time to intelligently

20    review them.  Okay?

21              So I urge you to, if you would, communicate that

22    with the U.S. Trustee and explain that the debtor's counsel

23    has no problem with that.

24              MS. CLAIBORN:  I will do that, Your Honor.  Thank

25    you.

1          THE COURT:  Okay.  Thank you.  All right.  Counsel

2     for PACS, you may proceed.

3          MR. FRIEDMAN:  Thank you.  Your Honor, it's Peter

4     Friedman from O'Melveny and Myers.  I actually gave Mr.

5     Silverberg --

6          MR. SILVERBERG:  Yes.

7          MR. FRIEDMAN:  -- Mr. Silverberg a copy of my

8     deceleration.  I have it in binder form.  I actually have

9     two binders, if I could hand them up to you?

10          THE COURT:  Sure.

11          MR. FRIEDMAN:  I feel like they're maybe helpful

12     for you, you and your clerk --

13          THE COURT:  Sure.

14          MR. FRIEDMAN:  -- when we refer to something --

15          THE COURT:  Thank you.

16          MR. FRIEDMAN:  -- that are in them.  Thank you,

17     Your Honor.

18          THE COURT:  Mr. Friedman, you have no problem with

19     me looking at this binder while counsel is speaking?

20          MR. SILVERBERG:  Your Honor, was that --

21          THE COURT:  I mean, Mr. -- did I say the wrong

22     name?  I apologize.

23          MR. SILVERBERG:  It's okay.

24          THE COURT:  I've got -- I'm looking at two things

25     at the same time.  Yes, you have no problem, then, correct?

1          MR. SILVERBERG:  I have no issue, Your Honor.

2          THE COURT:  All right.  Thank you.  I appreciate

3     that, Attorney Silverberg.

4          And, Attorney Friedman, go right ahead.

5          MR. FRIEDMAN:  Your Honor, Peter Friedman of

6     O'Melveny and Myers on behalf of PACS.

7          So, Your Honor, there are many, many, many

8     different things that are worth responding to, but let me

9     start with just the straight forward issue of what Justice

10    Ostrager found.

11         Justice Ostrager found that Mr. Kwok couldn't

12    claim that the documents were a forgery because they were

13    inconsistent -- that was inconsistent with everything he had

14    done.

15         THE COURT:  Hold on one second, Attorney Friedman.

16    (Pause)

17         THE COURT:  That's -- hold on a second, sir.  Just

18    hold on a second, okay?

19         He's got -- he has a right to make his

20    presentation, and you can listen to it later, because we

21    record it and we put it on the -- on docket, and you can

22    then talk to the debtor and interpret it if you can't do it

23    simultaneously.  But we have to go on with the hearing.

24         UNIDENTIFIED SPEAKER:  I understand.  You think he

25    can use the mic?  At least we can more hear better here?

26

1          THE COURT:  Can you just pull the microphone a

2     little bit closer to you, counsel?

3          MR. FRIEDMAN:  Sure, Your Honor.  I have serious

4     doubts as to the good faith of that request.

5          THE COURT:  I understand.  I understand, but I'm

6     not --

7          MR. FRIEDMAN:  These are the kinds of antics, Your

8     Honor --

9          THE COURT:  I completely understand, but we're not

10    -- we're going to proceed.

11         MR. FRIEDMAN:  Yeah.

12         THE COURT:  Okay?

13         MR. FRIEDMAN:  Absolutely.

14         THE COURT:  And as is true in every bankruptcy

15    case in Connecticut and in most of the country, this

16    recording will be placed on the docket of the case after the

17    -- it will be on there by tomorrow morning I think, right?

18    It's pretty -- it's very quick.  It's within 24 hours.  And

19    anybody can listen to it.  And it's not your fault, but the

20    microphones --

21         MR. FRIEDMAN:  Yes.

22         THE COURT:  -- sometimes work well, and sometimes

23    don't.  And for whatever reason, that one today, has not

24    worked well.  That's --

25         MR. FRIEDMAN:  Your Honor, should I try that one

1    up there?

2            THE COURT:  Well, maybe it might be better.  Let's

3    see how we do.  Okay?  There has been a problem with that

4    microphone today.  I can't tell you why.

5            MR. FRIEDMAN:  So, Your Honor, Justice Ostrager

6    held -- and it's at, I believe Tab 4 of your binder is the

7    opinion -- that Mr. Kwok couldn't claim the documents were a

8    forgery for a litany of reasons.  Estoppel, that he had made

9    representations in the past, that he -- that he had actually

10   produced those documents.

11           So the claim is just, on its face, not a

12   meaningful claim and not one that this Court should

13   ultimately be able to sit in judgment over the recent

14   findings of Justice Ostrager.

15           THE COURT:  May I ask you a question about Exhibit

16   4?

17           MR. FRIEDMAN:  Yes.

18           THE COURT:  The exhibit that you just pointed me

19   to.  So of course, I haven't reviewed anything --

20           MR. FRIEDMAN:  Yes.

21           THE COURT:  -- before today, but I'm looking at

22   Exhibit 4, and it appears that Justice Ostrager issued this

23   -- let me just see what it -- I apologize.  Let me just see

24   what it is entitled.

25           It's a decision and order on motion that he issued

28

1    this on September 15, 2020.  Is that -- that -- I'm correct

2    in that?

3             MR. FRIEDMAN:  Yes, Your Honor.  This was his

4    summary judgment motion finding that Kwok in fact did owe

5    money to PACS on a personal guarantee.

6             THE COURT:  And then what happened after the

7    summary judgment decision.  Was there an appeal, or is this

8    considered interlocutory, or what is the situation with

9    regard to this specific ruling that you're pointing me to

10   right now?

11            MR. FRIEDMAN:  So it is on appeal.

12            THE COURT:  It is.

13            MR. FRIEDMAN:  It is outside of --

14            THE COURT:  Okay.

15            MR. FRIEDMAN:  So it's not an issue I think this

16   Court could review.

17            THE COURT:  Okay.  That's what --

18            MR. FRIEDMAN:  Yeah.

19            THE COURT:  -- I just want to make sure I

20   understand, because as you can see, there's a lot of

21   documents here and I --

22            MR. FRIEDMAN:  There are.

23            THE COURT:  -- just want to make sure --

24            MR. FRIEDMAN:  There are.

25            THE COURT:  -- I want to understand the status,

1    and I do now.  I understand that he made these findings and

2    that's still on appeal at the moment.

3         MR. FRIEDMAN:  Yeah.  But Your Honor asks a great

4    question.  What happened after that?

5         Well, what happened after that, the first thing

6    that happened, is that Mr. Kwok filed a company called

7    Genever New York, for bankruptcy in the Southern District of

8    New York.

9         THE COURT:  And you mentioned that in your

10   papers --

11        MR. FRIEDMAN:  Yeah.

12        THE COURT:  -- so I have that name correct.  I've

13   seen it.

14        MR. FRIEDMAN:  Right.  So very upsetting that that

15   was not listed as an affiliated bankruptcy, because Mr. Kwok

16   owns 100 percent of the equity of a company called Genever -

17   - Genever, British Virgin Islands.

18        It's  Genever Holdings, British Virgin Islands,

19   which in turn owns 100 percent of the equity of a debtor in

20   the Southern District of New York. That is, of course, the

21   classic case of an affiliate.

22        It wasn't listed on a petition.  Really troubling,

23   and one of the animating forces behind why we think no

24   extension should be given beyond the 14 days that congress

25   provides statutorily.

1          That entity in the Southern District of New York

2     is now the subject of -- it's too long to get into.

3     Eventually, we will be seeking relief from this Court to

4     permit us to pursue -- to vindicate Mr. Kwok's ownership

5     rights of that entity and to object to bogus claims asserted

6     by his family members.  That's been part of his effort to

7     frustrate our efforts to have that judgment satisfied.

8          Your Honor, Congress listed 14 days for a reason.

9     We think it's important.  I will say, of course, often times

10    I am in a position of asking for an extension of schedules,

11    and to be honest -- and so, for filing dates.

12         And to be honest, I'm not sure I've ever seen

13    anybody object, because ordinarily there's a good reason.

14    It's an operating business and they have hundreds of

15    subsidiaries.  It's an entity that may have to deal on its

16    first couple of days with vendors and creditors and

17    employees and can't pay immediate and prompt attention.

18         None of that's true here.  Mr. Kwok isn't an

19    operating business.  He claimed in his IDI and in his

20    petition, he has no assets at all which, of course, raises

21    the question of how could there possibly be a reorganization

22    purpose here?  How could there be a Chapter 11 purpose?

23         Given all of his asset shuffling and -- not my

24    word for it.  Everything you heard from opposing counsel is

25    his word.  I have Justice Ostrager's opinions, and those

1    opinions and findings of fact show that Mr. Kwok uses a maze

2    of entities and family members and trusted confidants to

3    shift around assets.  That kind of person can't be a

4    fiduciary in a Chapter 11 for creditors.  He'll never pursue

5    claims against family members and other related entities.

6    It raises really serious questions about the purpose of this

7    case.

8            I want to add on top of that, Your Honor, there is

9    a $134 million contempt fine.  And that's not just Justice

10   Ostrager imposing that.  That was unanimously affirmed by

11   the appellate division in New York State.

12           THE COURT:  I did see that.

13           MR. FRIEDMAN:   It was Mr. Kwok's doing.  He

14   waited 268 days.  That's why it got so large.  Mr. Kwok

15   cannot challenge in this court, the state court's ruling

16   that Mr. Kwok owns  -- has a beneficial interest in the Lady

17   May.  Frankly, any responsible debtor would have already

18   filed a 58 turnover motion to require the person who is in

19   the custody of the yacht to return it completely to Mr.

20   Kwok.  That obviously hasn't happened.

21           I will note, Your Honor, that later tonight we

22   will be filing a motion asking you to hold the automatic

23   stay does not apply to a civil contempt order against Mr.

24   Kwok, as well as a motion, in the alternative, asking you to

25   hold that if it does apply that the automatic stay be

1    modified to permit Justice Ostrager to require that -- to

2    the return of the Lady May the New York Harbor.

3         We're not asking to be able to levy on it or

4    collect on it right now, but Mr. Kwok should not be

5    permitted to keep such a valuable asset outside of the

6    United States, to be brought here where it can be properly

7    monetized eventually and liquidated.

8         Again, Justice Ostrager's findings I don't believe

9    will ultimately be reviewable by this Court and should not

10   be second-guessed, because they are a part of an order

11   that's already on appeal.  Mr. Kwok lost a motion for an

12   interim stay in New York.  He could not even provide any --

13   the slightest level of confidence to anybody that he would

14   have a likelihood of success on that appeal.

15        Now, the reason we believe that civil contempt

16   order is not subject to the automatic stay leads to another

17   issue which is, we also believe it's going to give rise to

18   $134 million non-dischargeable claim.  We noted that in a

19   footnote.

20        We will also be commencing an adversary proceeding

21   to hold that debt non-dischargeable, which also gives rise

22   to the question, how could there ever be a feasible Chapter

23   11 plan when Mr. Kwok will be facing $134 million debt if he

24   ever got a discharge?

25        And I think those kind of issues call into

33

1    question everything in paragraph 15 of the debtor's motion.

2    They talk about retaining counsels, and retaining financial

3    advisors, and proposing plans using other people's money.

4    You know, I realize, Your Honor, that we will have to prove

5    a lot of things to you.  But we have the evidence.  Many of

6    those things have already been established by Justice

7    Ostrager.  This is not a debtor who comes to you with

8    anything even remotely approaching clean hands.

9           For the life of me I can't understand how if a

10   judge has held that you have a beneficial ownership in

11   something worth $30 million, you don't even footnoted in

12   your petition.

13          It's just astonishing.  It's astonishing that

14   somebody wouldn't list an affiliate is a debtor when there's

15   a specific box.

16          It's astonishing that the entity Mr. Kwok uses as

17   his family office is listed as the second largest creditor,

18   when the instructions specifically say don't list insiders.

19   A company controlled by his son that funds his living

20   expenses is the paradigmatic example of a nonstatutory

21   insider.

22          A petition, Your Honor, which was verified, signed

23   under penalty of law, is so rife with dishonesty it's

24   astounding.  I would add even what Brown Rudnick filed this

25   afternoon, which says they will be paid based on a loan

1  that was made from Lamp, also Mr. Kwok's family office, to

2  Mr. Kwok.  So Look at the schedule -- the petition.  Lamp

3  turns up as a million-dollar creditor for that loan.

4           But even though that loan is still -- is at Brown

5  Rudnick as a retainer, it's still Mr. Kwok's property, so I

6  don't how they could assess or assert that he has zero

7  assets.  He has the $998,000 of assets that he came into the

8  case with under that loan.  It's a pre-petition loan.

9           Again, just the lack of candor to this Court

10  already is what impels us to believe that there's -- no

11  quarter should be given.

12           I want to note, in our brief, we cited virtually

13  everything Justice Ostrager said, but I didn't cite one

14  portion that I think it's really important.  And it comes on

15  page 7 of Justice Ostrager's opinion.

16           THE COURT:  Which opinion would you like me to

17  look at?  I want to make sure --

18           MR. FRIEDMAN:  This is the contempt order, Your

19  Honor.

20           THE COURT:  So, attached to your objection?

21           MR. FRIEDMAN:  Yes, as well as the U.S. Trustee's.

22           THE COURT:  Oh, but it's also in the book here?

23           MR. FRIEDMAN:  Yes, it's also attached to the U.S.

24  Trustee's objection.

25           THE COURT:  Okay.

35

1          MR. FRIEDMAN:  That might be the easiest way to

2     find it.

3          THE COURT:  If you give me a second, I will locate

4     it.

5        (Pause)

6          THE COURT:  I think I have it here but let me

7     make sure.

8          A decision and order on motion, dated February 9,

9     2022.  That is ten pages.  Is that correct?

10         MR. FRIEDMAN:  It is, Your Honor.

11         THE COURT:  Okay.  Go right ahead.  I have it.

12         MR. FRIEDMAN:  So before I get to the quote, I

13    want to point out this came after a live trial, and this

14    came after Mr. Kwok's daughter, who counsel referenced, was

15    basically held to be a liar by Justice Ostrager.

16         When you read the opinion, you'll see how  -- the

17    lack of credibility that Justice Ostrager referenced with

18    her testimony.  He's not the only judge to do that.  Judge

19    Liman and in the case from the Southern District of New York

20    also cast extreme, extreme doubt over to the credibility of

21    her testimony  relating to the interfamily transfer of

22    funds.

23         Your Honor, on page 7 it says, the machinations

24    associated with the shell game Kwok has orchestrated with

25    respect to the Lady May are of a piece with every other

1    evasive and contemptuous act Kwok has taken during the five

2    years this litigation has been pending, which is why there

3    are 1,180 docket entries in this case.

4         And clearly, Your Honor, not to let this case turn

5    out like that case, Kwok has taken so many extraordinarily

6    evasive and dishonest steps that cannot be squared with the

7    good-faith requirements to be a Chapter 11 debtor.  Congress

8    required disclosures be made within 14 days.  The request

9    for 60 days was, to put it mildly, outrageous.  We request

10   the Court deny the motion in the entirety.  But I'm going to

11   say something else, Your Honor.

12        Ultimately, I realized that, you know, your job is

13   to balance a variety of factors.  We believe strongly that

14   no extension should be given.

15        But if an extension were given for a few days,

16   until the end of the week because it's going to be run out

17   today, we of course, you know, aren't going to say, you

18   didn't file something by the end of the day today, the case

19   should be dismissed automatically.

20        So you know, as passionately as I feel about these

21   issues, which I think you can tell, I would not object to it

22   being extended.  Our client would not object to it being

23   extended until Friday.

24        And we think given the fact that Mr. Kwok has said

25   in his IDI that he has no assets, that part of it should be

1    easy.  If there are these contingent lawsuits, it it seems

2    impossible to believe they aren't known to him already, and

3    they should be scheduled as soon as possible so that we can

4    frankly dig in.  We may even seek Rule 2004 discovery

5    between his 341 if necessary, depending on what's disclosed

6    in there.

7         But we believe we need a full and fair chance to

8    continue our pursuit of his assets in order to take an

9    appropriate 341 Examination and, you know, that I think -- I

10   don't know if the Court has any questions for me,  but those

11   are the key issues that I thought were worth addressing with

12   respect to our objection.

13        THE COURT:  I'm not sure I have any questions.  I

14   have looked at your objection, although I will say, I didn't

15   look at it until today, and we did have hearings today, and

16   so I looked at the United States Trustee's objection

17   yesterday.  I had more time when that was filed.  I

18   definitely looked at your objection.  However, I'm intending

19   on looking at it again, as I went to the U.S. Trustee's

20   objection, as I will the motion for extension of time.

21        So but I think I was fairly clear at the start of

22   this hearing, there will be no extension of time for 60

23   days.  If there's an extension of time, it will not be for

24   60 days.  Counsel has stated he's made an offer to the

25   United States Trustee's office to go to March 16th.

1          You're stating that you would not object if the

2     Court entered order extending the deadline to March 4th.

3     We're not that far apart in some ways, but I understand your

4     position.

5          If the two of you don't want to talk about that

6     and see if you can agree on something, that's fine.  The

7     Court will rule.  I have no problem doing that.

8          But if you want to take time to talk about it, we

9     can do that too, and you can all -- we can take a five-

10    minute recess.  We don't have to take a recess.   We can do

11    whatever you want.

12         But right now, today, the issue is, is there going

13    to be an extension of time granted.  The two objecting

14    parties -- and I think I have been, I think clear, that I

15    obviously find merit to the objections when I said already,

16    there will not be a 60-day extension of time.  It's just --

17    it's not going to happen.  It's not appropriate.  In very

18    few cases I could ever think that it would be appropriate.

19    And this is not one of them.  Okay? So that's clear.  The

20    United States Trustee's office seems to be fine with March

21    16th.  You'd like March 4th.  The 341 meeting is what day?

22         MS. CLAIBORN:  Your Honor, I apologize for

23    interrupting the Court.

24         THE COURT:  That's okay.

25         MS. CLAIBORN:  I didn't yet opine as to what the

1    U.S. Trustee's position was with respect to the date.

2              THE COURT:  Oh.  I'm sorry.

3              MS. CLAIBORN:  And I didn't know whether or not

4    counsel wanted to take the Court up on the opportunity to

5    discuss for a minute before we do that or --

6              THE COURT:  I can take a five-minute recess.  It

7    won't --

8              MS. CLAIBORN:  I just don't know whether or not

9    the parties were interested in discussing it.

10             THE COURT:  Yeah.  And if there isn't an

11   interesting discussion, that's fine too.

12             I'm not forcing anyone to do anything.  I'm giving

13   you an opportunity if you'd like to take it.  If you don't

14   want to take it, that's fine.  You know, I have no problem

15   with that.

16             MR. SILVERBERG:  Your Honor, if PACS is going to

17   dig in their heels on the 4th, that's just not going to be

18   worth workable from a logistics standpoint, so --

19             THE COURT:  Well, and that may be true on the

20   negotiation standpoint, but I might order it.  So, you know,

21   that's where we go.  And that's fine.

22             You are -- every single -- you've all made your

23   positions, and I haven't even asked Attorney Wolman what his

24   position might be yet, because he is dissipating in this

25   hearing, but you've made your positions clear.  It's not a

1    complex issue for the Court to decide.

2         I do want to look back at the papers for a few

3    minutes, and I can do that now.  I can take a 5, 10, 15-

4    minute recess.  It doesn't matter.  And then I can come back

5    and rule today, or I can rule tomorrow.  It's not complex.

6    I'm not worried about issuing a ruling.  That I can tell

7    you.

8         And so, however you'd like to proceed.  I'm trying

9    to give you an opportunity suggest to me what you think

10   makes some sense.

11        If you'd like a recess to talk about it, that's

12   fine.  If you don't, we can conclude this hearing and I can

13   rule tomorrow, or we can take a recess and I can try to come

14   back and rule tonight.  I have no problem with either one of

15   those ways of proceeding.

16        MR. SILVERBERG:  So, I'm always in deal making

17   mode, so if PACS wants to speak, so --

18        THE COURT:  Well, why don't we take -- it's 10 of

19   5:00.  Why don't we --

20        MR. WOLMAN:  Your Honor.

21        THE COURT:  Yes.  Oh, Attorney Wolman.  I'm sorry.

22        MR. WOLMAN:  Can I be heard?

23        THE COURT:  Go ahead.

24        MR. WOLMAN:  That's all right.  I just wanted to

25   be brief, but I feel like this should be heard.  We did not

41

1    file anything, but we do join generally to Mr. Cheng in the

2    objections both by the U.S. Trustee and by PACS.

3            A little background, Mr. Cheng was the victim in

4    Nevada of Mr. Guo's serial campaign of defamation lawsuits.

5    Mr. Cheng himself opposes the Chinese Communist Party, and

6    he took issue with how Mr. Guo was addressing that movement,

7    as it were, and after Mr. Guo made a defamatory video about

8    Mr. Cheng, my client had a few tweets, and then found

9    himself the subject of the SLAPP suit.

10           Now the Court is aware with about lawsuits that

11   are called strategic lawsuits against (indiscernible)

12   participation.  Nevada has a very strong anti-SLAPP statute.

13   And my client --

14           THE COURT:  Hold on a second, Attorney Wolman.

15   Hold on a second.  The alarm is going off.

16           Glen, do you think we need to --

17           THE MARSHAL: I'll let you know.

18           THE COURT:  Okay.  I'm sorry, but the alarm is

19   going off in the building.

20           MR. WOLMAN:  Okay.

21           THE COURT:  So you just need to wait one second.

22   I mean, you can try to talk.  Can you hear, Attorney Wolman,

23   even when the alarm is going, or -- the United States

24   marshal going to go check right now to see if we need to

25   evacuate.

1          MR. WOLMAN:  No, if you need to evacuate, Your

2     Honor --

3          THE COURT:  Well, I don't know that yet.  I'm

4     waiting to find out.

5          MR. WOLMAN:  I'm fine where I am.

6          THE COURT:  They'll let us know.  If we have to

7     evacuate, then I would assume that you'll have to go back

8     out the front door.  Okay?  And stand out in front of the

9     building.  But they'll tell you.  Someone should tell you.

10        (Pause)

11         THE COURT:  John, do we need to evacuate?

12         THE MARSHAL:  Stay for now.

13         THE COURT:  Stay for now?

14         THE MARSHAL:  Stay for now.  We have a problem

15    with the alarm system.  We're rewiring everything.

16         THE COURT:  Okay.

17         THE MARSHAL:  If there's anything, we'll let you

18    know ASAP.

19         THE COURT:  All right.  All right.  Where in the

20    middle -- John, were in the middle of the hearing, so I'm

21    going to keep talking and people are going to keep talking.

22    Okay?  Oh, there.  Okay.  Oh, we'll see.  Okay.

23         Is that right?  Not when we were in court, though,

24    but yeah.  But, okay.  Thank you so much for checking.  I

25    appreciate that.

1          All right.  Attorney Wolman, if you could -- and

2     I'm sorry, I don't remember exactly where you left off, but

3     you were talking about a defamation suit and some other

4     issues.

5          MR. WOLMAN:  Right.  Yes, Your Honor.  Mr. Cheng

6     was the victim of Mr. Guo's serial campaign of litigation in

7     Nevada, and he prevailed on an anti-SLAPP motion and the

8     case was dismissed because Mr. Cheng -- Mr. Guo was unable

9     to show that his case had any merit.

10         The Nevada anti-SLAPP Statute has what is called a

11    SLAPP back provision, because although it awards attorney's

12    fees to the successful defendant, that is the not the

13    end-all and be-all of the victimization of being sued.

14         And so that was -- a suit was brought in the

15    Southern District of New York to enforce the judgment of

16    fees, because originally Mr. Guo did not pay until funds

17    came in from Golden Spring New York to pay that judgment,

18    and so we sued to enforce the judgment, and we sued under

19    the SLAPP back theory under the Nevada statute to -- for

20    compensatory damages.

21         And in fact, that case has been teed up for

22    summary judgment with Attorney Gavimen, who was representing

23    Mr. Guo, Mr. Kwok at the time, accelerating his reply

24    memorandum to get in just before the bankruptcy petition was

25    filed and had otherwise been fully briefed.

44

1          Your Honor, this litigation has been ongoing for

2     quite some time and, in fact, a year ago I had the

3     opportunity to take Mr. Guo's deposition.  And there was

4     actually some interest interesting things even here today

5     that I was unaware of before, such as Mr. Guo now residing

6     in Connecticut with his wife.

7          And so these are facts that -- they're facts that

8     come out about Mr. Guo that he states but then does not back

9     up that is of concern.

10         His complaint in Nevada listed a litany of things

11    about his background that his counsel here today recited

12    some of.

13         And yet, when we sought discovery on that in the

14    Southern District of New York, because certainly it must

15    have been germane and relevant, he resisted.  He objected.

16    He refused to back any of that up.

17         We sought certain discovery as to his financial

18    well-being, and he refused.  He resisted.  And in fact, he

19    pleaded the Fifth Amendment in terms of not having to

20    produce that information, and he did so successfully.  Judge

21    Failla felt that the invocation of the Fifth Amendment was

22    well placed and we were to get an adverse inference as a

23    result.

24         This man holds himself out as a billionaire.

25    That's how he presents himself globally.  In fact, on

1    February 9, the news was all aflutter, not only with the

2    sanctions award in the PACS case, but with the fact that Mr.

3    Guo, and it spoke specifically about his name, won of venue

4    motion in London on a $500 million claim against UBS where

5    he is the plaintiff.  And maybe it's through one of his

6    entities.  We don't know.

7         And that means the Court should take everything

8    that is said and -- you know, Brown Rudnick, I've got no

9    objection to them trying to trying to pick a fight, but they

10   are new.  They do not know Mr. Guo, and they need to take --

11   and this Court needs to take everything that he says with a

12   grain of salt.

13        And so, I do actually think that March 4th is

14   perhaps too soon, because they need to verify for themselves

15   that they are going to be submitting for the Court,

16   materials that have previously not been verified.  And so,

17   you know, that is going to go under their (indiscernible),

18   and they need to do their due diligence.

19        And so, we want to make sure, certainly, that

20   counsel has time to do that, but also strike a balance here

21   that we have time before the 341 meeting to review.

22        And while we're, you know, listed as a creditor, I

23   should note that we put in our motion, we believe ourselves

24   actually to be one of the 20 largest creditors.  But that

25   was not stated in the petition and, in fact, Golden Springs,

46

1    as PACS noted, the insider is listed as a creditor and one

2    of the 20 largest.

3            So there is already some improprieties in the

4    filings here, and, you know, we just want to make sure that

5    we have enough time.  I would prefer a week before the 341

6    meeting rather than, you know, just a few days, because I

7    need to compare to other production, certainly, that we've

8    received in the New York case, and we may have to address

9    governing protective order in that case and how it applies

10   here.

11           But, you know, we do otherwise join in the

12   objection of the U.S. Trustee and in PACS to that 60-day

13   extension, and do request that it be something, you know, at

14   least a week before the 341 meeting.

15           THE COURT:  Okay.  Thank you.  All right.  I'm

16   going to take a ten minute recess.  We'll be back at 5:10,

17   and then I'll hear from the parties if there's anything they

18   would like to report, and then I will rule.  So Court is in

19   recess.

20           THE CLERK:  All rise.  Court is in recess.

21       (Recess from 4:48 p.m. to 5:09 p.m.)

22           THE COURT:  Okay.  We took a short recess after

23   Attorney Silverberg and Attorney Friedman, Attorney

24   Claiborn, and Attorneys Wolman made their statements in

25   connection with the debtor's motion for extension of the

1    deadline to file documents required by the bankruptcy code

2    and rules.  I don't know, Attorney Silverberg, Attorney

3    Friedman, if you had any discussions.  I see heads shaking

4    no.

5             MR. SILVERBERG:  Unfortunately -- Your Honor,

6    Bennett Silverman of Brown Rudnick for the debtor.

7    Unfortunately, those discussions were not productive.  We

8    offered to give a couple of days --

9             THE COURT:  That's all right.  I don't need to

10   know.  Thank you.

11            MR. SILVERBERG:  Okay.

12            THE COURT:  That's okay.  I appreciate it, but I

13   don't need to know.  I just need to know that there is no

14   agreement.

15            MR. SILVERBERG:  There is no agreement, Your

16   Honor.

17            THE COURT:  Okay.  Thank you.  Attorney Claiborn.

18            MS. CLAIBORN:  Your Honor, if I could now weigh in

19   on the extension motion, and I also wanted to make some

20   other comments to the Court.

21            THE COURT:  Yes.

22            MS. CLAIBORN:  I'll start with the comments.

23            THE COURT:  Hold on just one second, Attorney

24   Claiborn.  Something is echoing here.  I don't know why it's

25   echoing.  I can hear you, Attorney Claiborn.  Then I can

48

1    hear you again.

2              MS. CLAIBORN:  Oh, that's great.

3              THE COURT:  So we just want to make sure we can

4    hear you properly.

5         (Pause)

6              THE CLERK:  Hello, hello.  I still hear it.

7              THE COURT:  Yeah, I think we're going to have to -

8    - will you be able to record, or do you need to have that

9    resolved?

10             THE CLERK:  It still recording but I don't know if

11   it's going to pick up this echo.

12             THE COURT:  I think we'll be okay.

13             THE CLERK:  Okay.

14             THE COURT:  Let's try it anyway, okay?  And then

15   if it's really bad you tell us and we'll --

16             THE CLERK:  Okay.

17             THE COURT:  -- we'll stop.  Should we alert anyone

18   in our IT department?

19             THE CLERK:  Well, I sent a message to Peter, and

20   hopefully that will -- I will send a message to Will.

21             THE COURT:  Okay.

22             THE CLERK:  Okay.

23             THE COURT:  All right.  Let's see how this goes

24   --

25             MS. CLAIBORN:  Does it make any difference as to

1      which microphone I use?

2              THE COURT:  No, it's coming from in here,

3      unfortunately.  So go right ahead and let's see how we do,

4      okay?

5              MS. CLAIBORN:  Thank you.  Your Honor, I wanted to

6      touch briefly on a couple of items, first of which was the

7      petition and the comments that were made by Mr. Kwok's

8      counsel today about his residence in Greenwich, and they

9      were followed by Mr. Wolman's comments about not being aware

10     that Greenwich is a residence.

11             I wanted to point out to the Court that on the

12     petition, the debtor's address in response to the question

13     of where do you live is listed as being Golden Spring.  It

14     does not list his residential address.

15             We had been under the impression that the debtor

16     was going to take some steps to protect that information as

17     to where he actually resides due to some concerns that were

18     expressed.  That hasn't yet happened.

19             But I do want to make a connected point, which is

20     that yesterday's initial debtor interview covered in brief

21     the topic of where does Mr. Kwok get his mail, and the issue

22     about where to send information was broached.

23             And the concern expressed was that perhaps the

24     mail wouldn't reach the right place of it went to the Golden

25     Spring address, which is the only address that the Court has

1    reached the debtor.

2            And so, I bring that up because I want to make

3    sure that the debtor does get proper notice in this case of

4    all the appropriate pleadings, and that all parties are

5    aware what is the appropriate address to be using to contact

6    the debtor.

7            The other comment I wanted to make was about the

8    fact that in general, based upon the presentations that have

9    been made today, and based upon the information that was

10   learned yesterday at the initial debtor interview, this case

11   presents an interesting combination of no assets, large debt

12   and a need for an explanation.

13           The U.S. Trustee, at this point in time, believes

14   it may be appropriate to seek an appointment of an examiner,

15   and I wanted to preview that for the Court.  We have made

16   that comment to the debtor's counsel and they are aware.

17           And so I wanted to make those couple of points to

18   Your Honor, and then I want to follow up by saying that with

19   respect to the extension request today, the U.S. Trustee

20   thinks that the date of -- that, sorry, March 9th makes the

21   most sense.

22           It is in between the dates that have been offered

23   by the opposing parties and it does provide over a week of

24   advanced time for parties to take a look at it and digest it

25   and be prepared to conduct a meaningful meeting of

1    creditors.

2            THE COURT:  Okay.  Thank you.  Does anyone else

3    wish to be heard?

4            Attorney Silverberg, the issue that was raised

5    about the address is an important one.  The address on the

6    petition is different from the address that you -- well, you

7    didn't given an address, but you said that he resided in

8    Greenwich.  If there's a change of address, we have a local

9    rule about that, and we have a local form and that needs to

10   be completed, because obviously notice has -- and service

11   has to be properly made.

12           So I don't how you're going to proceed on that,

13   but I'm telling you that that is something that I will be

14   paying attention to then, because if the debtor resides in

15   Greenwich, that's not what the petition says.  So I'm not

16   going to say anything further.  I'm telling you what my

17   thought is on that at the moment.  Okay?

18           MR. SILVERBERG:  We understand the issue with

19   respect to the New York address.

20           There was some desire to remain -- to keep his

21   Greenwich, Connecticut address private, given his

22   experiences with the CCP and so on.  So I think, you know,

23   when we prepared the petition, we didn't realize how much

24   that address is already in the public domain.

25           THE COURT:  Okay.

1          MR. SILVERBERG:  We've since learned that there

2      may not be as much sensitivity to that address being out

3      there, and once we confirm that with the debtor, we'll

4      complete the appropriate paperwork to amend the address to

5      make sure that he gets notice.

6          THE COURT:  Okay.  All right.  Thank you.

7          Does anyone else wish to be heard on the motion

8      for the extension of the deadline to file documents required

9      by the bankruptcy code and rules?  And our local rules as

10     well.

11     (No audible response)

12         THE COURT:  Okay.  As I indicated earlier today,

13     during the beginning of this hearing, over the course of the

14     last few days I've reviewed documents filed in this case,

15     including the debtor's motion to extend the deadline to file

16     schedules or provide required information seeking an

17     extension to May 2, 2022, which is ECF No. 27.

18         I've also reviewed, and again looked at during the

19     recess, the objection filed by the -- to that motion filed

20     by the Office of the United States Trustee, ECF No. 49, and

21     the objection of PACS, if I may use PACS for short, filed to

22     that motion for extension of time, ECF No. 50.

23         I've also listened to the presentations and

24     arguments of an Attorney Silverberg, Attorney Friedman,

25     Attorney Claiborn, Attorney Wolman, and I've taken those

1    arguments into consideration with regard to the request made

2    by the debtor.

3           As I've indicated, and I know you all know, the

4    Bankruptcy Code, in particular Section 521 of the Bankruptcy

5    Code requires the debtor, as part of the debtor's duties, to

6    file a series of documents in order to assist and help to

7    complete the administration of a Chapter 11 case.

8           Those documents are extremely important and they

9    are necessary to provide appropriate notice and information

10   to creditors in order for creditors to have the ability to

11   determine whether or not they would like to have a

12   meaningful questioning of the debtor at the section 341

13   meeting, which the debtor is required under the Bankruptcy

14   Code not only to attend but to testify at, under Sections

15   341, 42, 43 of the Bankruptcy Code.

16          In addition to the code sections that require the

17   debtors to provide -- excuse me, to perform specific duties

18   as part of the burden of coming before the Court, Federal

19   Rule of Bankruptcy Procedure 1007 requires that definite

20   documents be filed, including the statements of schedule --

21   statements of -- statements of financial affairs and

22   schedules of assets, liabilities, and other schedules A

23   through G and H and I in the individual case, and Federal

24   Rule of Bankruptcy Procedure 1007(c) says the time frame to

25   do that is with the petition, or within 14 days thereafter.

54

1          Fourteen days thereafter with regard to this

2     debtor's case would be today, because the case was filed on

3     February 15th, and the Court has considered all the requests

4     that the debtor has made and the arguments advanced in

5     opposition to the request and the Court rules as follows.

6          In accordance with 11 USC Sections 521 and other

7     applicable sections of the Bankruptcy Code that set forth

8     the duties of a debtor, Federal Rule of Bankruptcy Procedure

9     1007(c), and our local role of bankruptcy procedure, 1007-1,

10    the debtor's motion for extension of time is granted in

11    part.

12         The debtor must file all required statements and

13    schedules, including all documents required to be filed in

14    accordance with those bankruptcy sections that I've just

15    recited and the Federal Rules of Bankruptcy Procedure and

16    our local bankruptcy rules on or before March 9, 2022.

17         That is the ruling of the Court.  Does anyone have

18    any questions?

19         MR. SILVERBERG:  No, Your Honor, thank you.

20         THE COURT:  Okay.  That was the only matter that

21    we had to address today.  Attorney Birney, did you have

22    something else that you wanted to address with the Court?

23         MR. BIRNEY:  No.  No, Your Honor.  Just, thank

24    you.  It's glad to be back -- we're glad to be back in

25    person.

55

1          THE COURT:  It's nice to be in person, yes.  Did

2     somebody else have any questions or anything

3          THE COURT:  -- that you wanted to address today?

4          MR. KLETTER:  Oh, Your Honor, may I be excused

5     from future hearing?  Mr. Silverberg can attend any further

6     --

7          THE COURT:  Yes, you've been admitted to pro hac,

8     so yes, you can be excused, counsel.

9          MR. KLETTER:  Thank you.

10          THE COURT:  Okay?

11          MR. SILVERBERG:  Thank you, Your Honor.  The pro

12     hac --

13          THE COURT:  Obviously, for service purposes

14     though, service can still be made at the local address in

15     that service.

16          MR. KLETTER:  Correct.

17          THE COURT:  Even if you're excused, which is fine.

18          MR. KLETTER:  Yep.

19          THE COURT:  If someone makes service on the debtor

20     only at your office, your local office address, that's still

21     deemed appropriate service under the rules.  Okay?

22          MR. KLETTER:  Yes.  Thank you.

23          THE COURT:  Okay.  The only other thing I would

24     say is, I've ruled.  The 341 meeting is already set.  I've

25     already spoken to Attorney Claiborn about my urging with

56

1    regard to the 341 meeting, but that is in the office -- that

2    is in the hands of the Office of the United States Trustee.

3    There is nothing further on the calendar today in this case.

4            Did you have something you wanted to add, Attorney

5    Friedman?

6            MR. FRIEDMAN:  I did, Your Honor, just because I'm

7    unfamiliar with your general practice.  Will you also issue

8    an order, or is the transcript so ordered?

9            THE COURT:  I could do -- if you would prefer me

10   to -- what I would normally do, if you would like, and I'm

11   happy to do it, is I'll just do a virtual order.  Okay?  But

12   that won't get, most likely, put on the docket until

13   tomorrow morning.  It is so ordered as of right now, 5:23

14   p.m. on March 1st, 2002 [sic].  Okay?

15           MR. FRIEDMAN:  Yes.  Thank you.

16           THE COURT:  And when the virtual order enters, it

17   will say as of, whatever I just said.  5:23 p.m. on March

18   1st, 2022.  Okay?  And then you would at least have

19   something other than the transcript of this hearing.

20           I understand there may be other pleadings filed.

21   Parties have mentioned that.  The reason that the Court

22   chose the date that I chose is because I do think it's

23   important to give a meaningful opportunity to creditors to

24   review the information and determine whether or not they

25   want to participate in the 341 meeting, which as I often

57

1    say, the section of the Bankruptcy Code 341 is entitled,

2    Meeting of Creditors, and that's its point.

3          And so I -- that is why I've ruled as I have

4    ruled, and there is nothing further for the Court to attend

5    to this afternoon, unless I'm forgetting something.

6          Okay.  Thank you.  And that's the last matter on

7    today's calendar, so court is adjourned.

8          MR. FRIEDMAN:  Thank you, Your Honor.

9          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

10         MR. SILVERBERG:  Thank you, Your Honor.

11    (Proceedings concluded at 5:23 p.m.)

12         I, CHRISTINE FIORE, Certified Electronic Court

13    Reporter and Transcriber, certify that the foregoing is a

14    correct transcript from the official electronic sound

15    recording of the proceedings in the above-entitled matter.

16

17

18

19    _____   March 21, 2022

20      Christine Fiore, CERT

21

22

23

24