```
                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF CONNECTICUT
                         BRIDGEPORT DIVISION


In Re                         *   Case No. 22-50073 (JAM)
                              *
      HO WAN KWOK,            *   Bridgeport, Connecticut
                              *   March 22, 2022
               Debtor.        *
                              *
* * * * * * * * * * * * * *   *
```

TRANSCRIPT OF CASE MANAGEMENT CONFERENCE/STATUS CONFERENCE
MOTION OF PACIFIC ASIA OPPORTUNITY FUND L.P. FOR
ENTRY OF AN ORDER CONFIRMING THE INAPPLICABILITY OF THE
AUTOMATIC STAY OR, IN THE ALTERNATIVE, RELIEF
FROM THE AUTOMATIC STAY PURSUANT TO
SECTION 362(d)(2) OF THE BANKRUPTCY CODE
BEFORE THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For the Debtor:                WILLIAM BALDIGA, ESQ.
                               BENNETT SILVERBERG, ESQ.
                               Brown Rudnick, LLP
                               Seven Times Square
                               New York, NY  10036


For the Creditor, Pacific      PETER FRIEDMAN, ESQ.
 Alliance Asia Opportunity     STUART M. SARNOFF, ESQ.
 Fund L.P., Creditor:          DIANA PEREZ, ESQ.
                               O'Melveny & Myers LLP
                               Times Square Tower
                               7 Times Square
                               New York, NY  10036

                               PATRICK M. BIRNEY, ESQ.
                               Robinson & Cole LLP
                               280 Trumbull Street
                               Hartford, CT  06103-3597


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

```
APPEARANCES Cont'd:

For Golden Spring, NY Ltd.,    SCOTT ROSEN, ESQ.
 Creditor:                     Cohen Birnbaum & Shea
                               100 Pearl Street
                               Hartford, CT  06103

For Rui Ma, Creditor:          CAROLLYNN CALLARI, ESQ.
                               Callari Partners LLC
                               1 Rockafeller Plz Floor 10
                               New York, NY  10020-2073

                               PETER ZARELLA, ESQ.
                               McElroy Deutsch
                               225 Liberty Street
                               36th Floor
                               New York, NY  10281

For the U.S. Trustee:          HOLLEY L. CLAIBORN, ESQ.
                               Office of the United States
                                  Trustee
                               The Giaimo Federal Building
                               150 Court Street, Room 302
                               New Haven, CT  06510
```

1          (Proceedings commenced at 2:11 p.m.)

2               THE CLERK:  Case Number 22-50073.  Ho Wan Kwok.

3               THE COURT:  Okay.  Good afternoon.  If we could

4     have appearances for the record, starting with the debtor's

5     counsel, please?

6               MR. BALDIGA:  Good afternoon, Your Honor.  William

7     Baldiga, Brown Rudnick for the debtor, with my partner, Ben

8     Silverberg.

9               THE COURT:  Good afternoon.

10              MR. SILVERBERG:  Good afternoon.

11              MR. ROSEN:  Good afternoon, Your Honor.  Scott

12    Rosen, for Golden Spring New York Limited, the proposed DIP

13    lender.

14              THE COURT:  Okay.  Let me stop you right there.

15    Did you -- is there a motion for DIP financing that's been

16    filed?

17              MR. ROSEN:  Not on for today, Your Honor.  It was

18    just filed this morning.

19              THE COURT:  Okay.  Well, that's why I don't know

20    what's going on.

21              MR. BALDIGA:  No relief today.

22              THE COURT:  Attorney Rosen, did you -- I'm sure

23    you did, but I'm asking.  Did you file a notice of

24    appearance?

1        MR. ROSEN:  I was just retained and I will be

2    filing a notice of appearance.

3        THE COURT:  Okay.  Thank you.

4        MR. ROSEN:  By tomorrow morning.

5        THE COURT:  Thank you.  Okay.  Go ahead, counsel.

6        MR. FRIEDMAN:  Good afternoon, Your Honor.  It's

7    Peter Friedman, from O'Melveny & Myers, on behalf of PACS,

8    and I'm joined by Diana Perez and Stuart Sarnoff, of

9    O'Melveny & Myers, and my friend, Mr. Birney.

10       THE COURT:  Good afternoon.

11       MR. FRIEDMAN:  My friend, Mr. Birney of Robinson

12   and Cole.

13       THE COURT:  Good afternoon.

14       MS. PEREZ:  Good afternoon, Your Honor.

15       THE COURT:  Couple of -- oh, I'm sorry.  Go ahead,

16   Attorney Claiborn.

17       MS. CLAIBORN:  Sorry.  We ran out of seats, so --

18       THE COURT:  That's okay.  Sorry.

19       MS. CLAIBORN:  -- Holley Claiborn for the U.S.

20   Trustee.

21       THE COURT:  Do you want another chair from over

22   here?

23       MS. CLAIBORN:  That's okay.  I'm good with the

24   bench.

25       THE COURT:  Okay.  Go ahead, counsel.  If you can

5

1    just come forward, because you need to -- our record is only

2    audio, so you have to speak into a microphone.

3           MS. CLAIBORN:  Do you want me to come that close?

4           THE COURT:  Sure, you can come wherever you're

5    comfortable.

6           MS. CALLARI:  As long as you -- wherever you can

7    hear me best.  Good afternoon, Your Honor.  Carollynn

8    Callari with Callari Partners on behalf of Rui Ma and

9    certain other creditors.  You have, thankfully, approved my

10   pro hac vice at Entry 89.  I am here with sponsoring

11   counsel.  Kristen Mayhew was unable to be here, but her

12   colleague, Peter Zarella from --

13          THE COURT:  Okay.

14          MS. CALLARI:  -- McElroy and Deutsch is here with

15   me.

16          THE COURT:  Okay.  Thank you very much.

17          And, you know, you don't have to sit all the way

18   back there.  I mean, you can sit closer.  Whatever you might

19   desire.  Okay?  I know we're trying to maintain social

20   distancing as well, but whatever you're comfortable with.

21   Sorry if there aren't enough chairs.

22          MS. CALLARI:  It's okay.  Thank you.

23          THE COURT:  Okay.  A couple of housekeeping

24   matters before we start on anything today.

25          And these are just things that are just how the

6

1    District of Connecticut works, which maybe is different from

2    some of your experiences in other districts, but we don't

3    take phone calls about questions for things on the calendar.

4         If you have a question about something on the

5    calendar, you take that question, you put it in an email to

6    the appropriate courtroom deputy box and then that courtroom

7    deputy will either respond or not respond depending upon

8    your question.

9         If your question is how is the judge going to

10   rule, I would think that you're not going to get a response.

11        If your question is, what time do I have to be

12   there, you'll probably get a response, but you should know

13   that regardless.

14        We don't take phone calls.  In the past, there

15   have been counsel who have taken advantage of that situation

16   and to a point where other people felt that those counsel

17   and those parties were being treated with -- disparately or

18   with more of an in, for lack of a better term.  And so we

19   don't do that here in Connecticut.  So I just want to give

20   everybody notice of that.

21        Also, I think, you know, there's a lot going on in

22   this case, which I understand and that's fine.  We've got a

23   lot of different motions that have been filed.

24        Obviously, I didn't know -- I've been court all

25   day, so I wouldn't know that there was a DIP financing

1    motion filed, but we don't need people to submit any binders

2    or any information of exhibits or anything unless you're

3    asked to do so, okay?

4            Because we do everything -- we essentially do

5    everything paperless,and when we have hearings and exhibits,

6    I require the parties to file those exhibits on the docket,

7    and we use the docket to put together the exhibits,

8    essentially, unless I say but you know what, I know you did

9    that but I still need you to do X, Y, and Z, and then that's

10   what you'll do.  Okay?  But we do not need any paper unless

11   we ask for it.  Everything on the computer.  Okay?

12           So those are just minor housekeeping issues.  I do

13   believe, although I could be completely wrong, that most of

14   the motions for admission of visiting counsel have been

15   granted in this case, so I don't think there's any

16   outstanding motions from any of the parties here, but if

17   there is an outstanding motion, would someone bring it to my

18   attention right now?

19           MR. FRIEDMAN:  There are none outstanding for

20   PACS, Your Honor.

21           THE COURT:  Okay.  Thank you.  Any for the debtor?

22           MR. BALDIGA:  We're good, Your Honor.  Thank you.

23           THE COURT:  Okay.  Okay.  All right.  That's

24   helpful.

25           Then, I don't -- oh, yes, there was one other

1    housekeeping matter for the debtor.

2           We had asked during the last hearing, which I

3    don't have my note in front of me but it was a few weeks

4    ago, obviously, to supply a list of names of people that

5    were referred to in what -- a presentation that counsel made

6    -- debtor's counsel made during that hearing, and I don't

7    think we've received that list.

8           And I know that the person in the back is

9    interpreting, but that's a little -- you've got to try to be

10   a little softer because all I can hear is you,

11   unfortunately, and I won't be able to hear the lawyers.

12   Okay?

13          We need that information, because our record is

14   only audio.  We don't have stenographers.  There are not

15   enough funds in a budget given to the judiciary for

16   bankruptcy courts to have a stenographer.  If you all want

17   to bring in a stenographer, you're more than welcome to.

18          I mean, you have to pay for it and you need to

19   tell the Court in advance if you're interested in doing

20   that, but otherwise, our official record -- and that

21   wouldn't be an official record, even if you had a

22   stenographer.

23          Our official record is the audio, and therefore,

24   when there's any kinds of issues with regard to not just

25   people's names, but a name of a building or whatever, and

9

1    it's not clear, we're going to need the parties to submit

2    that information to the courtroom deputy otherwise our

3    record won't be clear, and that is obviously of utmost

4    importance to the Court that the record be clear.  Okay?

5         So those are the housekeeping matters I have.

6    Does anyone have any housekeeping matters before we start

7    talking about the case today?

8         Okay.  Hearing none, then we have two matters on

9    today's calendar.  The first is the Chapter 11 case

10   management conference that these -- that our court in the

11   District of Connecticut has in every Chapter 11 case, and

12   then there also is the motion of PACS that was filed and an

13   expedited hearing was granted on that, a preliminary

14   expedited hearing, on the motion of PACS for the entry of an

15   order confirming the inapplicability of the automatic stay,

16   or in the alternative for relief from the stay.

17        I have looked at a number of the briefs and the

18   replies and then the responses in the replies on that issue,

19   and we'll talk about that when we get to it.

20        I would make an assumption that I probably

21   shouldn't make, but I will make an assumption that given

22   that there has been, apparently, and I'm not suggesting I

23   understand every of it -- every bit of it because there's no

24   way I could at this point, but given that there appears to

25   be protracted litigation between the creditors and the

10

1   debtor, I would assume that there has been no discussions

2   and certainly no resolution of the motion that's been filed

3   by PACS. Am I correct on that assumption? Yes. I've got

4   heads nodding?

5            MR. FRIEDMAN: Yes. So, Your Honor, Peter

6   Friedman.

7            As it relates to the debtor, that's correct. We

8   have reached an agreement with the creditors who filed

9   conditional statements on language for -- with respect to a

10  proposed order.

11           THE COURT: Okay.

12           MR. FRIEDMAN: Which we just were able to do

13  moments before the hearing which, if the motion is granted,

14  we will circulate to everybody before an order is settled.

15  But we have not had discussions or -- with respect to the

16  specific motion that was filed.

17           THE COURT: Okay. That's fair. I'm just asking

18  the question, because what I think I saw -- and we're not

19  going to -- we're going to address a few things first before

20  we really address your motion, counsel.

21           But the -- what I believe I saw -- and I just

22  would like you to tell me if I'm wrong or right, okay, which

23  is all I'm asking you to do at this point, was that there

24  was a statement, I think -- or, you know, not a -- it was a

25  sentence in a paragraph or two, or maybe it was more than

1    one place, where I believe PACS said that you would agree to

2    relief from the automatic stay for the limited purpose of

3    getting the ship, for lack of a better term, I'm not sure if

4    that's the proper term, into the jurisdiction of the United

5    States, and specifically into the New York Court's

6    jurisdiction.  Am I correct that that's what your papers

7    say?

8              MR. FRIEDMAN:  Yes, Your Honor.

9              THE COURT:  Okay.  That's what I wanted to make

10   sure I was reading that properly.  Okay?  Because as I'm

11   sure you know, I've had a lot of things to read and that's

12   fine.  I have no problem with that but, you know, in this

13   case there is -- obviously there is a lot of different

14   interests at stake on -- in many different -- and many

15   different stakeholders, so -- go ahead, counsel, I'm sorry.

16             MR. FRIEDMAN:  To be clear, Your Honor, or if the

17   debtor refuses to do that, for an appropriate court to, you

18   know, impose other nonmonetary sanctions.

19             THE COURT:  Okay.  Thank you, Attorney Friedman.

20   All right.  So just see if you give me -- so, Attorney

21   Baldiga or Attorney Silverberg, which of the two of you are

22   going to make a presentation in connection with the Chapter

23   11 case management conference?

24             MR. BALDIGA:  I will, Your Honor.

25             THE COURT:  All right.  Fine.  Thank you.

12

1          So as I'm sure you've reviewed, we have an order

2     that -- in the District of Connecticut Bankruptcy Court,

3     that we issue in all Chapter 11 cases, where we expect the

4     debtor and -- and the debtor is here.  I see him, correct?

5          MR. BALDIGA:  Yes, Your Honor.

6          THE COURT:  Okay.

7          MR. BALDIGA:  If I could introduce --

8          THE COURT:  Sure.

9          MR. BALDIGA:  -- Ho Wan Kwok, the debtor.

10         THE COURT:  Yes.

11         MR. BALDIGA:  And you were right, Your Honor, that

12    he has his interpreter with him.  I think she's been quieter

13    since your --

14         THE COURT:  Yes, she has, and I appreciate that.

15         MR. BALDIGA:  -- comment.

16         THE COURT:  This room is odd.  Sometimes the

17    people in the back I can hear better than the people in the

18    front.  I don't know why, but I didn't -- you know, I don't

19    really have any control over that, but I appreciate that.

20    Thank you.

21         MR. BALDIGA:  Well, let us know if it's

22    distracting and we'll --

23         THE COURT:  And I agree that the interpreter is

24    already speaking a little more softly and I'm not --

25         MR. BALDIGA:  Thank you.

13

1          THE COURT:  -- hearing her, so I appreciate that.

2    Thank you.

3          MR. BALDIGA:  Thank you, Your Honor.

4          THE COURT:  Okay.  So in our order scheduling an

5    initial Chapter 11 case management conference, we ask a

6    series of question -- you know, we have a numbered paragraph

7    with 18 things in it, I think -- yeah, 18 things, that the

8    judge expects the debtor and the debtor's counsel to explain

9    to the Court, just so that the Court can understand what's

10   happening in this Chapter 11 case.

11         So the first -- and I assume you were going to

12   tell me this anyway.  The first item on the list is the

13   nature of the debtor's business and the reasons for the

14   Chapter 11 filing.

15         So I understand this is an individual case, and it

16   may not be a business per se, but my understanding, and

17   maybe I'm wrong, is that the individual debtor has been in

18   business, I don't know if he is in business at the time, and

19   operates and is a member of many -- well, I don't know about

20   that.  That's not fair.  What I've heard is that he's a

21   member of different corporate entities, and I want to

22   understand that a little better, and then the reason for

23   this Chapter 11 filing.  I would like you to start there,

24   please.

25         MR. BALDIGA:  Certainly, Your Honor.  And again,

14

1    for the record, William Baldiga, Brown Rudnick, for the

2    debtor.

3           All right.  Your Honor, I do reference as well,

4    because we took seriously the order, and we filed at Docket

5    107, Mr. Kwok's declaration, which went into in some detail

6    under oath, all -- we think all of the 18 questions that are

7    listed, at least those that relate to this case.

8           For example, there is no cash collateral, so --

9    but all the ones that are referenced, and the declaration

10   goes into great length to explain why we're here.  I would

11   like to make a presentation to that --

12          THE COURT:  Sure.

13          MR. BALDIGA:  -- and to be fully responsive to

14   you, but I think I would be remiss without referencing that.

15          THE COURT:  No, and I know it was filed, counsel.

16   I do know it was filed, and I will tell you that I looked at

17   it, but I didn't read it.  I didn't have the opportunity to

18   read it fully, okay?

19          MR. BALDIGA:  There's a lot there, and I think it

20   will take some time to -- there's been a lot of paper filed

21   in the case already from several parties, but I will step

22   back then.  And first, the debtor has no business.

23          THE COURT:  Okay.

24          MR. BALDIGA:  The debtor is one of a very large

25   family that grew up in China.  This debtor in his early 20s

1    was supportive of the protest in Tiananmen Square, watched

2    his brother be shot to death in connection with those

3    protests, and from that time on has been a -- was arrested

4    and tortured and for a while was able to maintain himself as

5    part of a wide ranging family business in real estate

6    development and other businesses in China.

7            After he was released from prison in 1991, the

8    family had some significant success, which we lay out in the

9    declaration as to the real estate development.  In fact, the

10   family's business was very successful.

11           Mr. Kwok, however, has been extremely committed to

12   criticism, political speech, which in this country is

13   recognized, in China, very much not so.  He fled to Hong

14   Kong in 2000 and continued to be very critical of the CCP,

15   of the Chinese Communist Party.  And in fact, on many

16   websites and so forth is listed as the most vocal critic of

17   the CCP in terms of the CCP's watch list and desires to be

18   silenced.

19           He expanded his criticism in 2015.  His family,

20   his brothers, his wife, his daughter, were all arrested.

21   Bruno Wu, who I'll come to later, closely affiliated with

22   several top CCP officials and a foreign agent, entered into

23   a very significant business transaction with PACS, or the

24   parent of PACS.  And Mr. Wu called -- in 2015, called my

25   client, the debtor, to say that his family would be released

16

1    from prison if he would cease his political speech.  He has

2    not done that.

3            In 2017, in fact -- and this is all in the

4    declaration -- and all of the -- during this time, because

5    he was on all of these political watch lists, he cannot

6    maintain business activities.  He cannot even have a bank

7    account, and when he tried to have a bank account, most

8    recently a few years ago, the bank terminated the account.

9            In 2017, he was arranged -- there was arranged a

10   Voice of America interview to be aired on April 19, 2017 in

11   which he was going to be extremely critical of the CCP.

12           During that week, PACS filed it's lawsuit.  That

13   is the significant driving effect -- event precipitating

14   this Chapter 11 case.

15           The CCP had Interpol Red Notice alerts based on

16   fabricated charges seeking his arrest and extradition to

17   China, and Mr. Wu and others sponsored many of the

18   litigations that you see are in this -- that are part of the

19   creditor body here.  Almost all of that litigation, or much

20   of that litigation is sponsored by the same foreign agents

21   who are funding the litigation, admittedly.

22           Since that time there have been several well

23   publicized events in this country to target Mr. Kwok.  Mr.

24   Kwok, at paragraph 16, believes that if he were extradited

25   to China, he would be killed.  He believes that if he were

1    imprisoned here, he would be killed.

2          For that reason he has 24/7 physical security.

3    Notwithstanding that, we have as exhibits to the

4    declaration, Your Honor, three separate criminal proceedings

5    in this country,  federal criminal proceedings of

6    convictions, one of a top DOJ lawyer, another one of Elliott

7    Brody who has been a significant political operative for

8    trying to -- he pled guilty and was convicted for lobbying

9    efforts to have Mr. Kwok extradited to China, which Mr. Kwok

10    believes would be for the purposes of his death.

11          And then another separate criminal proceeding with

12    Nickie Lum Davis, also for lobbying efforts to the Trump

13    administration to have Mr. Kwok extradited and he believes,

14    killed.  This is not Mr. Kwok's nightmares, but these are

15    criminal informations, guilty pleas and so forth attached to

16    the declaration of public information.

17          This is, Your Honor -- and I'll get to the

18    business and financial aspects of these.  I will be the

19    first to acknowledge every individual Chapter 11 case, and

20    I've been involved in a few, is unusual by its very nature.

21    Not many Chapter 11 cases are individuals.

22          This case is extraordinarily unusual.  I'll be the

23    first to admit.  I won't come in and here and stand here and

24    pretend anything that this case is -- I've been doing this

25    38 years.  I've never had a case like this, and I was --

18

1    represented the creditor's committed in the Mike Tyson case,

2    and this case is extraordinary even compared to the Mike

3    Tyson case.

4            But extraordinary does not mean improper and we

5    conditioned taking on this case for Mr. Kwok on the absolute

6    agreement that he would do everything by the book as this

7    Court and -- should and does expect.  And as we should and

8    do expect.  The debtor will toe the line in this courtroom.

9            As an example in prior proceedings, the debtor did

10   take Fifth Amendment protection from time to time.  The

11   debtor understands that while Chapter 11 debtors have from

12   time to time exercised their rights, constitutional rights

13   not to testify, a Chapter 11 case requires extraordinary

14   transparency.

15           The debtor was examined for four hours yesterday

16   by creditors and by the U.S. Trustee.  There was no exercise

17   of any Fifth Amendment privilege or any other privilege.

18   Every single question was answered and there will be many

19   more hours of testimony and every question will continue to

20   be answered.

21           THE COURT:  Was that at the 341 meeting?  Is that

22   what you're --

23           MR. BALDIGA:  Yes, Your Honor.

24           THE COURT:  Okay.  Go ahead.  I'm sorry.  I just

25   want to make sure --

19

1   MR. BALDIGA:  No, that -- that's okay.

2   THE COURT:  Yep.  Okay.

3   MR. BALDIGA:  I am try -- and again -- but just to

4   give an example, and this won't be the time and place for a

5   full exposition of these issues, but on the theory that

6   there are some things that you just couldn't make up, but

7   just -- I want the Court to appreciate that we appreciate,

8   and this debtor appreciates just how unusual this case is,

9   and to know that we come before you appreciating the

10   extraordinary burden we have to make this Court feel

11   reasonably comfortable that this case will be conducted,

12   again, to your full expectations.

13   But just to give an example, a three-person

14   creditor's committee was just formed yesterday.  One member

15   of that committee, Rui Ma, her lawyers, Arkin-Solbakken,

16   confirmed by letter dated September 30, 2020, that her fees

17   to sue Mr. Kwok are being paid by a Mr. Zheng Wu, also known

18   as Bruno Wu.

19   THE COURT:  Known as who?  Was -- you say, also

20   known as who?  I didn't hear you.

21   MR. BALDIGA:  Bruno Wu.

22   THE COURT:  Okay.  Thank you.

23   MR. BALDIGA:  W-U.  And I apologize for not

24   providing to the Court the names from the last hearing.  We

25   will do that this week, as to the last hearing and this

20

1    week.

2              THE COURT:  Yeah.  That would be -- that would be

3    very helpful to the clerk's office.

4              MR. BALDIGA:  Well, I apologize we didn't do that.

5              THE COURT:  Yeah.

6              MR. BALDIGA:  The second member of the Committee,

7    Sam Nunberg, it had been a person friend of Bruno Wu, he

8    helped arranged Rui Ma's lawyers for her, Arkin-Solbakken.

9              Mr. Nunberg, a member of the committee, is the

10   subject of a publically filed, in the United States District

11   Court for the Southern District of Florida, in Case No. 18-

12   20983, in Mr. Kwok's case against Roger Stone.  That Roger

13   Stone.  Roger Stone's statement, as later published in the -

14   - by him, in the *Wall Street Journal* and *New York Times*.

15   I, Roger Stone, retract and apologizes for statements he has

16   made regarding Guo Wen Gui, also known as Miles Kwok.

17             Mr. Stone has publically stated that Mr. Guo has

18   been found guilty and convicted of financial crimes in --

19   and the United States -- in the United States, and that Mr.

20   Guo has violated U.S. election laws by making political

21   donations to Hillary Clinton and financing a presidential

22   run by Steven Bannon.  All of these statements are not true.

23             I failed to do proper research before making those

24   statements and improperly relied on information conveyed to

25   me by Sam Nunberg, this committee member, between early

21

1    September 2017 and the Fall of 2017.  I believe the source

2    of that information was Bruno Wu.

3           So that's -- those are -- and Bruno Wu, Your

4    Honor, just to complete the picture, in his registration as

5    a foreign agent, he serves as Vice Chairman and Secretary

6    General of the National Committee on China/US Relations, as

7    an affiliate of the Charhar Institute, a Chinese

8    governmental think tank, non-governmental think tank, most

9    of the other members of which are senior CCP officials.

10   That's our committee.

11          I'm not disarranging the committee, I'm just

12   saying that in and of itself makes this an extraordinary

13   case.

14          I will come to, later today -- while we've already

15   reached out to the U.S. Trustee to say that even if the U.S.

16   Trustee had not moved for the appointment of an examiner, we

17   think an examiner is in order.

18          We don't see how anyone, including the Court,

19   could be comfortable with the amount of transparency

20   demanded for a successful Chapter 11 case without a truly

21   independent examination of this debtor.

22          Not only do we consent to the appointment of an

23   examiner, we will pay for it.  Mr. Kwok has gone to his

24   family and said if I'm going to have a transparent Chapter

25   11 case, we need to have an examiner and we need to pay for

22

1   it.  And his family has agreed to do that.

2          The reason I referenced the DIP motion earlier on

3   -- and again, this -- I will put this on the list of things

4   that I have never seen before in any other case, Mr. Kwok's

5   son's family office, represented by Mr. Rosen, is committed

6   to make a $8 million DIP loan fully subordinated to all

7   valid creditor claims.  No security.  No administrative

8   priority.  Not even on par with creditor claims, so that it

9   doesn't come out of any creditor pocket.

10          Millions of dollars of that are earmarked for an

11   examiner, so that things can be done right, and so you don't

12   need to just rely on me or Mr. Kwok telling you that we know

13   this and we know that.  So that's one other example of us

14   intending to move this case in the right direction.

15          We filed.  We needed a couple extra days.  The

16   burdens of interpretation from back and forth to China when

17   you absolutely insist that everything be done perfectly, the

18   interpretation does present a timing challenge, but we filed

19   our schedules of statement of affairs.

20          Mr. Kwok has engaged, very experienced and truly

21   independent counsel and financial advisor, that is -- none

22   of us have had anything to do with Mr. Kwok or any of his

23   creditors or family members or whatever until shortly before

24   the case.  A few days before the case.  Truly independent.

25          As I said, Mr. Kwok was examined yesterday for

23

1    more than four hours, answered every single question, and

2    has fully said you tell me when to come back, I'll do it

3    again, and will, I'm sure, be examined for several more

4    hours.  Again, the interpretations make it a challenge, but

5    that's -- he's committed to do that.

6            We filed this comprehensive declaration.  It's in

7    a individual Chapter 11 case, we think it's extraordinary

8    that the debtor goes under oath as to everything that has

9    led up to the case and has done that in a fully transparent

10   way, but we thought that was important.

11           We consent to the appointment of an examiner.  We

12   will provide for the DIP financing to do that.  Your Honor,

13   we commit to file a plan in the next 20 days.  A Chapter 11

14   case is all about treatment of creditors, and we will do

15   that.

16           This case will be too expensive to dwindle for

17   months and months and months.  We want -- in some ways, this

18   case is extraordinary in many ways, but at the end of the

19   day every Chapter 11 case is about money, or it should be.

20   Mr. Kwok wants to pay his creditors and treat them fairly,

21   and is committed to do that.  And the way you do that, we've

22   explained, and he accepts, is to file a plan and confirm a

23   plan.

24           All of this, including today, is to give us a

25   chance to pay our creditors and treat them fairly.  We will

24

1    find out, Your Honor, and you will find out whether our --

2    what our creditors want.  If our creditors want to be paid

3    fairly on their claims and have their claims allowed in fair

4    amounts, then this is going to be a very successful Chapter

5    11 case.

6          If on the other hand, PACS and the other creditors

7    who filed their claims, most of them within a few week

8    period around the Voice of America broadcast, all in an

9    effort to silence -- and at the same time, Mr. Kwok's family

10   was arrested in China.

11         If their goal is to have him killed, which Mr.

12   Kwok believes, or to otherwise exercise retribution or to

13   silence his political speech, then this is going to be very

14   difficult.

15         But we will have that fairly presented in this

16   Court, because a bankruptcy court is the time to reduce all

17   of this to claims, to allowable claims, and to satisfy those

18   claims.  And you will have an opportunity to evaluate

19   yourself what our creditors, such as PACS, really want.  We

20   hope they are going to be commercial.  We have some doubts

21   but we intend to find out.

22         By this Chapter 11 case Mr. Kwok also admittedly

23   wants to stay out of jail.  If he goes to jail, he believes

24   he will be killed.  It is that simple.  He intends to

25   exercise his life and liberty to be able to administer this

1    Chapter 11 case.  He would not be able to do so in jail, and

2    when we get to the PACS exact relief that they frame in a

3    motion for relief, it will be ironic, I feel, to address

4    exactly what they've asked for, but we'll come to that in

5    due course.

6         To go to the issue of Mr. Kwok's business, he

7    can't even have a bank account because of the campaign by

8    the CCP.  No bank will even allow him to have a bank

9    account.  On a full-time basis, he is a critic in memory of

10   his brother, but also more broadly, of the CCP.  That is his

11   life's work.

12        All of his expenses, and we go into great detail

13   in the declaration, are funded by -- his son is

14   independently very wealthy and his son, through his son's

15   family office, Golden Springs, which happens to be out DIP

16   lender, funds everything.  What he eats, what he wears, what

17   he rides in.  Mr. Kwok has nothing.  He would be in the

18   gutter or worse if he didn't have the generosity of his

19   family.

20        But this is not -- and again, this is what it will

21   take an examiner to show and to come to this Court and to

22   report to you and to everyone else, this is not one of these

23   cases where it's a self-settled trust or other creditor

24   manipulation.

25        This is a product of 30 or more years of political

1    speech that has rendered him unable to work and unable to

2    have his own assets.  But he is fortunate.  Indeed,

3    extremely fortunate to have a wealthy family that satisfies

4    his needs, without him being able to earn income.  He has no

5    income.

6        And the reasons for the Chapter 11 filing, most

7    succinctly put, is to stay alive so he can put these

8    creditor claims behind him through the confirmation of a

9    Chapter 11 plan.

10        THE COURT:  Okay.  A couple of things.  I mean,

11   again, I haven't studied this because --

12        MR. BALDIGA:  Understood.

13        THE COURT:  -- it was filed Sunday, I think.

14   Right?

15        MR. BALDIGA:  Yes.

16        THE COURT:  Filed on Sunday and it has several

17   attachments to it, which is fine.  I just want to be clear,

18   I haven't gone through it all.

19        MR. BALDIGA:  Understood, Your Honor.

20        THE COURT:  I haven't had the opportunity to do

21   that, number one.  Number two, you know, there's a few

22   things that you said there, and I'm not -- I'm just asking

23   questions of you and -- like I did --

24        MR. BALDIGA:  Of course.

25        THE COURT:  -- I'm asking questions and getting

27

1    answers.  So you have no opposition.  In fact, I think you

2    said you consent to the United States Trustee's motion to

3    appoint an examiner.

4              MR. BALDIGA:  Yeah.  We haven't talked about the

5    order, and there was a revised order that I haven't even had

6    to -- been able to read, submitted this morning.  But to the

7    concept of an examination, one of an examiner, we agree.  We

8    would have asked for it if the U.S. Trustee didn't.  And

9    third, we'll pay for it.  And I say we, our DIP lender will

10   pay for it.

11             THE COURT:  Well, okay.  I'm just asking questions

12   right now.  We'll get -- I'll have to speak with the U.S.

13   Trustee's office in a little bit.

14             Obviously, the motion is not on today's calender,

15   but if was filed on, I think Saturday.  There is a motion to

16   expedite associated with it.

17             If what you're telling me is, you consent, I guess

18   I need to hear from the creditors, and I will -- not at the

19   moment, but I will ask you, because I don't -- I mean, if

20   there is an ability -- if there is an ability to agree on

21   something without the need for a hearing and protracted

22   findings and things of that nature, then that would

23   obviously be an avenue that I would like to explore.

24             MR. BALDIGA:  Of course.

25             THE COURT:  If there is an opposition, we'll have

1     to address that.

2              With regard to the DIP financing, I think you said

3     already today that you filed the motion today, but you're

4     looking -- are you -- you're looking for expedited relief is

5     what I'm looking at?  I'm seeing some things here.  You're

6     looking that -- for that order to enter quickly.

7              MR. BALDIGA:  But not today, Your Honor, of

8     course.

9              THE COURT:  Oh, I'm not suggesting it's going to

10    enter today.  I'm asking you, what are you looking for as

11    far as timing and --

12             MR. BALDIGA:  As more traditional, a preliminary

13    hearing and then a final hearing.  The --

14             THE COURT:  Well, we do things a little

15    differently on the preliminary and final hearing too, and

16    I'll -- but it might work in your case, if what you've

17    suggested as a road map works because we don't normally in a

18    Chapter 11 case enter a final DIP financing order on -- as

19    quickly as other courts might, because we want to see what's

20    happening with a plan.  Now, if you file a plan, I think you

21    said -- I think I wrote down 20 days or something.

22             MR. BALDIGA:  Yes.

23             THE COURT:  Then maybe.  Maybe there would be a

24    final DIP order in the sooner -- sooner than a later.  But

25    just to be clear, we don't always enter those final orders

29

1    as quickly as some other jurisdictions do in the Chapter 11

2    context, because we want to see how the Chapter 11 case is

3    developing.  That doesn't mean it couldn't happen, I'm just

4    giving you a heads up.

5            The same is true with cash collateral.  You know,

6    if we have a cash -- which I know you're not seeking.  I'm

7    just giving you an example so you understand what the

8    Court's perspective is.

9            We often enter many interim orders of cash

10   collateral before we ever get to a final, because of all the

11   provisions that parties want parties to be bound by, other

12   than themselves in many cases.  So we don't always do that,

13   number one.

14           Number two, I know that there's been a committee

15   formed, because I saw the document and you just confirmed

16   that.

17           I would assume, but I could be wrong, that the

18   committee will want to retain counsel and I'll have to deal

19   with that, and we'll have to deal with the committee's

20   position too, on DIP financing, as -- in addition to some

21   other issues.

22           So it's not a problem from the Court's

23   perspective.  Anything you've said, I'm just giving you --

24   I'm trying to set your expectations, I suppose in some

25   respects.

30

1      MR. BALDIGA:  And that's very appreciated, Your

2  Honor.

3      THE COURT:  Okay.  Which is that we will proceed

4  with whatever we need to proceed with.  But we don't always

5  go to a final hearing on cash collateral or DIP financing in

6  the same way some other courts do.

7      Does that mean that -- as I said, but that -- it

8  depends upon the facts and circumstances of each case.

9  Okay?

10      And so with regard to the DIP financing, I just

11  want to understand what -- you're looking for a hearing in a

12  week, less than a week, ten days, two weeks?  What are you

13  looking for?

14      MR. BALDIGA:  Well, I don't have the case calendar

15  in front of me.  There is a hearing, I think, coming up.  I

16  don't have it.

17      THE COURT:  I'll look.  I can look for you.  Hold

18  on.

19      MR. BALDIGA:  April 12th?

20      UNIDENTIFIED SPEAKER:  Your Honor, they asked for

21  next Monday.  They asked for four and a half days' notice.

22      THE COURT:  Well, that's not going to happen, so

23  don't -- that's not going to happen.

24      UNIDENTIFIED SPEAKER:  Right.

25      MR. BALDIGA:  No, that's why we --

31

1          THE COURT:  Okay.

2          MR. BALDIGA:  I already said --

3          THE COURT:  I'm not going to do an $8 million DIP

4    financing hearing from an insider, essentially I think is

5    what I heard, in four days.  That's not going to happen, so

6    you don't have to worry about that.

7          And as I just said, we have to wait for the

8    committee.  I've got to see what the committee's position --

9    none of this is going to happen with that urgency.  That

10   doesn't mean we can't start talking about it, but I'm not

11   going to -- I'm not going to put anybody in that position,

12   including the Court, because there isn't any -- I haven't

13   been told --

14         MR. BALDIGA:  April 12th, I believe.

15         THE COURT:  April 12th.

16         MR. BALDIGA:  Is your court hearing.

17         THE COURT:  Well, here's what I will tell you.

18   April 12th, we have a -- we do.  We have applications, a

19   bunch of retention professional applications on April 12th

20   in the afternoon.

21         What I'm thinking we're going to end up doing in

22   this case, at least initially, and it might be throughout

23   the whole case, is that we don't schedule the matters on

24   Tuesdays, which is the regular calendar hearings in this

25   court.

                                                                    32

1            MR. BALDIGA:  Okay.

2            THE COURT:  But we're going to schedule them on

3    another day.  And so we -- what we may end up doing is

4    taking the matters that are on April 12th and moving them to

5    April 13th, for example, and it will just be hearings in

6    this Chapter 11 case that the Court will hear that day,

7    nothing else, because there's many, many things going on,

8    and I think the Court needs to devote the time to that as

9    opposed to having it appear on a regular Tuesday hearings

10   calendar in Bridgeport.

11           So I think that's likely to happen, is that --

12   even the one -- even the matters that are -- that appear to

13   be somewhat ministerial, but I'm not sure they are, but

14   that's another -- I mean, you know, you can -- we can all

15   talk about that.  I think even the matters that are on April

16   12th are probably going to be moved --

17           MR. BALDIGA:  Okay.

18           THE COURT:  -- to a date like April 13th.

19           MR. BALDIGA:  I'm sure we'll find a good day.

20           THE COURT:  We just -- I just don't think it makes

21   sense to think that we're going to be able to address issues

22   in a -- on a Tuesday calendar when, you know, we have to

23   hear other matters.  It just doesn't make sense in this

24   case.

25           MR. BALDIGA:  That's my initial sense of this case

1    as well, Your Honor.

2              THE COURT:  Okay.  All right.  So April 12th or

3    13th might work for you on a preliminary hearing on DIP

4    financing.  Is that correct?

5              MR. BALDIGA:  Yes, Your Honor.

6              THE COURT:  All right.  I just want to make a note

7    so I get everybody -- I get everyone's thoughts down and

8    then I can try to figure out where we're going from here.

9              All right.  So with regard to the presentation

10   you've made on the -- and the debtor's affidavit or

11   declaration, I should say -- but I -- as I said, I have read

12   it, but I haven't studied it.

13             I mean, I know you've submitted a lot of

14   information.  You've told me a lot of things.  The one thing

15   that there -- there is -- obviously, there's the litigation

16   with PACS.  I know a little bit about it just given what's

17   been filed, but I think the debtor is involved in other

18   litigation, correct?

19             MR. BALDIGA:  Yes, Your Honor.

20             THE COURT:  Okay.

21             MR. BALDIGA:  And they are -- the litigation

22   adversaries are the creditor body here.

23             THE COURT:  Okay.  And so I guess I'll need to

24   hear about those at some point and figure out what's going

25   to happen with those cases that are pending outside of this

1          bankruptcy court, right?  I mean, we're going to have to

2          address that at some -- in some way.

3                    MR. BALDIGA:  Yes.  And there are two plaintiff

4          litigations for which the debtor is plaintiff.

5                    THE COURT:  Okay.

6                    MR. BALDIGA:  And which constitutes assets of the

7          estate --

8                    THE COURT:  Right.

9                    MR. BALDIGA:  -- and we've disclosed what they

10         are, and they hopefully will be one of the sources of -- one

11         of the means to satisfy creditors.

12                   THE COURT:  Okay.  All right.

13                   MR. BALDIGA:  The adverse litigations, I've

14         described some of them, many of them are defamation -- so-

15         called defamation cases.  Others -- but they're sponsored --

16         ultimately, they all come out of China, almost all at about

17         the same time, all from a similar funding, including with

18         PACS through Bruno Wu, who's --

19                   THE COURT:  But they're pending here in the United

20         States.  All the matters are pending --

21                   MR. BALDIGA:  Yes.

22                   THE COURT:  -- in the United States.

23                   MR. BALDIGA:  I believe all in the United States,

24         yes.

25                   THE COURT:  Okay.

1            MR. BALDIGA:  Because Mr. Kwok has been in the

2    United States since --

3            THE COURT:  Right.

4            MR. BALDIGA:  -- I believe, 2015 --

5            THE COURT:  Right.

6            MR. BALDIGA:  -- or so.

7            THE COURT:  At this moment --

8            MR. BALDIGA:  One in the BVI.  I'm sorry.  I'm

9    corrected.

10           THE COURT:  I'm sorry.  Say that again.

11           MR. BALDIGA:  There's one action in the British

12   Virgin Islands.

13           THE COURT:  Okay.  Okay.  But how many total are

14   there.  Did I -- am I -- is it like 30 or something did I

15   see, is --

16           MR. BALDIGA:  About that, yes.

17           THE COURT:  Okay.  All right.  I just want to make

18   sure I'm reading things properly, I'm not missing things.

19   Okay.  Which I don't think I picked up the British Virgin

20   Islands, but that doesn't mean anything.  I've been looking

21   and I might not have seen that.

22           All right.  Then with regard to this case

23   management conference, what we often do, and I will do in

24   this case bed of there's -- at least at this point, there's

25   still a lot of moving parts.

36

1    I will continue this just in case I have more

2    questions.  I may not.  I may not have any more questions

3    once I really review the declaration of the debtor and all

4    the other questions I may have may come out through other

5    pleadings from other parties, including you.  I mean, it may

6    -- it may all --

7    So what we normally do is, I'm going to continue

8    this conference to whatever the date is that we all choose

9    and, you know, and I'm going to -- we'll address that toward

10   the end of the hearing, but even if it appears on the

11   calendar, I might come out and say, at whatever that next

12   hearing is, I really feel that the conference is concluded

13   and we don't need to schedule anymore.

14   I'm going to address all the issues in the

15   pleadings that are pending on things filed by the debtor,

16   things filed by the creditors, the creditor's committee,

17   U.S. Trustee, whatever.

18   So even though I'm continuing this, I am not -- I

19   don't know if that really means I'll ask you anymore at the

20   -- and obviously, if I do and you're not prepared, I'll give

21   you -- I mean, we'll figure it out.  It's not a problem.

22   MR. BALDIGA:  We'll try to be prepared, you know,

23   because we're going to push this case quickly, as I said,

24   and Chapter 11 cases get old quickly and we're going to push

25   this one to a conclusion.

1          THE COURT:  All right.  Well, we'll see how things

2     go, but that's helpful, all right?  I don't normally allow

3     anyone to ask any questions about the case management

4     conference because you're allowed to question the debtor at

5     the 341 meeting, which obviously happened yesterday, and it

6     appears the 341 meeting is going to -- it's not closed, it's

7     going to be -- the debtor is going to be subject to further

8     questioning.

9          MR. BALDIGA:  In two weeks, there will be --

10         THE COURT:  Okay.

11         MR. BALDIGA:  Yes.

12         THE COURT:  All right.  So then I feel I

13    understand -- I have a good understanding, I should say.

14    I'm not saying I have a thorough understanding, but I have a

15    good understanding of where things be.

16         The only thing that I would say that you didn't

17    talk about that -- and that we have to talk about because of

18    PACS's motion is, when you talked about filing, the reason

19    for the filing, you said that the debtor filed to save his

20    life, and I'm not quarreling with that in any way, shape, or

21    form, but obviously it -- the PACS litigation has had an

22    impact on that as well, because the timing of the filing and

23    the issue of the decisions out of the New York court, had to

24    have impacted what's going on.

25         And so I think that in order to be fully accurate

1       -- I guess, I don't remember seeing -- and let me just take

2       a look, because I could have missed it, so just give me a

3       second and I'll see if I can find it.  Of the 55 paragraphs

4       -- I think it was 55.  We talk about PACS -- in the PACS

5       litigation you talk about starting at paragraph 20.

6               MR. BALDIGA:  Yes.

7               THE COURT:  And you talk about the loan.  And you

8       talk about the person guarantee.  And then you talk about

9       the restraining order.  And it says, you have -- it says

10      that the debtor says he has no ability to pay this fine.

11              So the problem that I see with that, or that

12      you're going to have to address at some point, whether it's

13      in connection with this motion to -- for the Court to

14      determine that the stay does not apply, or that relief from

15      the stay should be granted is for some -- right now, you're

16      getting $8 million.  Your client is getting $8 million from

17      a source.  Other loans have been made.  Your being -- again,

18      I'm not quarreling with any of it.  Your firm is getting a

19      retainer of a good amount of money.

20              You say you want to come up with a plan that will

21      be -- that you hope the creditors will accept and as I

22      unfortunately started off this hearing saying, it's clear --

23      and you know, this happens all the time.  I'm not saying

24      there's anything extraordinary, to use your terms, about

25      disputes between a debtor and creditors.

1          But I think that for your client to say he has no

2    ability to pay the fine might be problematic at some point.

3    I mean, this is -- this case was filed and stayed the

4    actions that were occurring in the New York Court, right?

5          MR. BALDIGA:  Yes, Your Honor.

6          THE COURT:  I mean, that's clear.

7          MR. BALDIGA:  Yes.

8          THE COURT:  That the actions that occurred in the

9    New York Court, from what I can see, so again, I'm

10    qualifying this on what I have reviewed, were very extensive

11    and very detailed and the judge's findings were very

12    detailed.

13          And as you know -- I think you know -- I'm not

14    going to litigate that issue that's been litigated in New

15    York.  I mean, that's not going to put be part of this

16    Chapter 11 case.

17          But I have to listen to creditors who come in and

18    say, hey, I've got a motion here and I want you to tell -- I

19    want you to find either that the automatic stay does not

20    apply, or in the alternative, that we're entitled to relief

21    from the stay.

22          And so, that was one of the reasons I asked the

23    question at the beginning of the hearing, and one of the

24    reasons why I asked counsel for PACS the question, which was

25    -- and I'm not sure they would be wholly satisfied, but

1    we're going to start talking about the motion for relief

2    from stay.  Well, it's not a -- I call it that, but it's --

3    really, that's the alternative relief.  The main relief at

4    being sought is the inapplicable ability of the stay, saying

5    that it does in this playa because if it's under (b)(1).

6    362(b)(1).

7          So let's just assume I agree with them, just for

8    the sake of argument here.  I am not ruling right now.  What

9    are you going to do if I do that, number one?  Or what are

10   you going to do if I grant relief from the stay?

11         Do you -- you know, what I -- how I read their

12   papers, and I'm going to give everybody a moment to talk,

13   but what I want you to think about, counsel, because I'm

14   going to turn to PACS and let them present their motion, is

15   what are you going to do.

16         As you know, the bankruptcy court is somewhat

17   constrained and required to address an issue regarding the

18   automatic stay, whether it's the inapplicability or the

19   request for relief from the stay on an expedited basis.

20   Right?  I mean, you know that.  You know that's what the

21   rules provide.

22         MR. BALDIGA:  Of course, Your Honor.

23         THE COURT:  I'm not saying it's going to happen

24   today.  I'm not saying that yet.  I haven't said that yet.

25         But what I am saying is, you're suggesting some

1    pretty aggressive things.  And I don't mean aggressive in a

2    bad way.  I'm talking about, you know, you said you're going

3    to file a pan in 20 days.  You've got DIP financing of $8

4    million.  You know, you want to a lot of things to happen

5    quickly and I understand that.

6              But then I've got the competing claims of the

7    creditors who want a lot of thing -- well, at least one

8    thing to happen quickly.  They want to go get that boat.

9    Right?  Isn't that pretty obvious?

10             So have you had any questions about -- I'm not

11   talking about with opposing counsel.  I'm talking about you

12   with your client, about trying to -- if you really want to

13   make this work, right, and I'm not suggesting you don't, but

14   if you really want to make this work, don't you think if

15   you're going to get the creditors to be in any way

16   supportive of what happens in this case, don't you think you

17   need to seriously consider what -- and I'm not saying you --

18   that's not fair.  I'm not saying you haven't seriously

19   considered.  So let me just step back.

20             Don't you think you need to address the issue of

21   the boat?  Now here, you say -- and Mr. Kwok says, I did

22   have access to the boat, but I did not have the authority to

23   order it back to New York.  I don't understand that

24   sentence.  So can you explain that to me?

25             MR. BALDIGA:  Yes.

1           THE COURT:  Okay.

2           MR. BALDIGA:  Mr. Kwok does not own the boat.

3     Never did.

4           THE COURT:  I don't think anybody -- well, I don't

5     know if even anybody disputes that.

6           MR. BALDIGA:  Okay.

7           THE COURT:  But the New York judge says, it

8     doesn't matter whether he owns it.  He controls it.

9           MR. BALDIGA:  He does --

10          THE COURT:  That's what he -- that's what he said,

11    right?  I mean, I don't think I read that wrong.  I think

12    the New York -- the judge in New York said, he controls it.

13    He didn't -- it -- so if he controls it, then why would he

14    say, I do not have the authority to order it back to New

15    York?  So, go ahead.  Explain that to me.  I'm sorry.

16          MR. BALDIGA:  No, certainly, Your Honor.  And Mr.

17    Kwok does not control the boat.

18          THE COURT:  Okay.

19          MR. BALDIGA:  The judge made the finding that he

20    did.  It doesn't mean that's right.  It's on appeal.  But

21    it's wrong.  And that's okay.  I mean, sometimes judges are

22    wrong.

23          THE COURT:  Yes.

24          MR. BALDIGA:  But I'm not disputing that that's

25    what he found.

43

1          THE COURT:  Okay.

2          MR. BALDIGA:  He found that.

3          THE COURT:  Okay.

4          MR. BALDIGA:  The specific relief that PACS has

5     asked for here, and again this ties into the earlier

6     presentation and it's -- I don't think it's by coincidence,

7     is the enforcement of the state court's February 9 contempt

8     order.  That's the specific relief here at Paragraph 9.

9          THE COURT:  But I asked counsel at the beginning

10    of the hearing, didn't I?  I asked him, aren't you -- aren't

11    you really just wanting to get the boat back into the

12    jurisdiction of the New York Court?

13         MR. BALDIGA:  But that's not what the papers say.

14         THE COURT:  I understand that's not what the

15    papers said, but that's what I asked him.  I'm trying to

16    figure out a way -- not figure out a way.  I'm trying to

17    suggest to you that -- we can be here for years fighting

18    about everything.  You know, it's happened before, it will

19    happen again.

20         Or we can try to see if there's a way -- and you

21    know, I take you at your word that the debtor wants to move

22    forward in a meaningful way to have -- and I'll tell -- I

23    can tell you what you can said.  I mean, I think you said it

24    well.

25         You want to commit to file a plan in the next 20

1    days, and Mr. Kwok wants to pay his creditors fairly, and he

2    wants to have a chance to propose that fair treatment and

3    treat them fairly.  Okay?

4              MR. BALDIGA:  Yes.

5              THE COURT:  So the problem -- the problem that

6    exists -- that existed when this case was filed, right, that

7    has nothing to do with the bankruptcy itself, was all the

8    findings and all the litigation that went on before this.

9    And I understand you're appealing it.  I'm not -- you know,

10   you have every right to do all that.

11             But if you're going to be in this court and try to

12   get the cooperation of the creditors to get a plan confirmed

13   so Mr. Kwok can -- you know, he wants to move on and he

14   wants to save his life, is what you said, and I have no real

15   knowledge about all the in-depth facts that you stated, you

16   know, about unfortunate events and things that apparently

17   occurred.  But this is a situation where I'm going to have

18   to rule on that motion if there isn't an agreement on that

19   motion.  Right?

20             MR. BALDIGA:  Yes.

21             THE COURT:  I'm going to have to rule on that.

22   And you and you might not -- well, somebody's not going to

23   like the way I rule.  Whoever it is.  And then there's going

24   to be an appeal of that too, right?  I mean, there will be,

25   I would assume.  And so then we're going to be continuing

45

1     litigation that's already been continuing in New York for

2     several years.  I think the case was filed in 2017.  I

3     think.  I could be wrong about that.

4              MR. BALDIGA:  Okay, the week of the Voice of

5     America broadcast.

6              THE COURT:  Yeah.

7              MR. BALDIGA:  Yes.

8              THE COURT:  Okay.  So again, I'm suggesting to

9     you, to everyone that, sure, we can do that.  We can

10    continue to litigate everything in this court, but I will

11    have parameters under which that's going to happen, and I

12    have under the bankruptcy code and the bankruptcy rules, I

13    have to decide this motion and it's going to be fast.  I

14    mean, it's going to be sometime soon.

15             And so, you know, I don't know if that's going to

16    work for you or for the creditors, but I'm going to do that.

17    And I, you know -- what I'm going to do now is -- I have let

18    -- and I'm happy to let you talk as long as you want.

19    You're the debtor's counsel.  You should be talking.  This

20    is what we need to talk about.  But I'm going to let

21    Attorney Friedman tell me why I should grant his motion in a

22    minute.  He hasn't talked yet.  I'm going to let him talk.

23             MR. BALDIGA:  I'm going to, of course, listen as

24    well.

25             THE COURT:  And you'll listen and you'll be able

46

1  to reply.  This is a preliminary hearing on the motion that

2  PACS has filed.  I can do many things with that.  I could

3  order a final hearing tomorrow.  I'm not going to do that,

4  but I'm just saying I could do that.

5        I think you really need -- it is the obvious issue

6  in the room that we have to address.  And, you know, I have

7  no problem in any situation ruling, because that's what I'm

8  supposed to do, and then I have no problem if people appeal,

9  because that's why we have Courts of Appeals.  The judges

10  get it wrong, as you said.  Sometimes the judges get it

11  wrong and they need assistance from a higher court to tell

12  them what they did wrong.

13        But I'm going to have to rule.  I have no choice.

14  I have no choice on a couple of levels, including how the

15  bankruptcy code was amended in 2005 that says basically, you

16  know, in 362(e)(2) I think it is, you know, you've got 60

17  days essentially and then there's no more stay.  It's an

18  individual case unless I make some other kind of findings.

19  So I'm going to have to do that at some point, unless I rule

20  within 60 days, which is also extremely possible.

21        So I just ask you to listen to -- and I know you

22  will -- Attorney Friedman, and I ask you both to consider,

23  you know, where things are going to go after today.  I

24  understand -- I've been involved in it when I was a

25  practicing lawyer.  I understand when parties don't agree.

47

1    I understand it, you know.

2              But at some point -- at some point at the end of

3    the day, I don't know where that's going to get us.  But I'm

4    here.  I'll do whatever I can to help you, but there are

5    certain things I have no control over as you know.

6              And the relief from stay issue, and this motion,

7    and the timing that's already started to run, I just think

8    people need to seriously -- and I'm not saying you're not.

9    It comes -- I want to be very careful.  I am not saying that

10   you're not taking any of this -- of course you are.

11             MR. BALDIGA:  I'm taking it exactly as you mean

12   it, Your Honor.

13             THE COURT:  Of course.  Of course you are.

14             MR. BALDIGA:  I appreciate the opportunity at the

15   outset of this hearing to have given you as much background

16   as I have.  I will accept your invitation to sit for a

17   moment and to listen, and I'm sure I'm beat back up in a few

18   moments to talk further as to the boat.  Thank you.

19             THE COURT:  Thank you.  Thank you.

20             Okay, Attorney Friedman, now I am going to proceed

21   with your motion.  Okay?  We essentially concluded the case

22   management portion of the hearing, even though I'm

23   continuing it to a date that we haven't determined yet, but

24   it will probably be, as I discussed, April 13th.

25             But your motion, I granted your motion to expedite

48

1    the hearing on your motion for the Court to determine the --

2    whether the state even applies, and if it does, then for

3    relief from the stay.  So go right ahead.

4           MR. FRIEDMAN:  Good afternoon, Your Honor.  It's

5    Peter Friedman from O'Melveny and Myers.

6           I just -- I wanted to just make a couple of

7    preliminary comments, which is I actually don't believe that

8    Mr. Kwok wants to avoid going to jail, because if he wanted

9    to avoid going to jail, he would not have violated the U.S.

10   Code by submitting a declaration so filled with falsehoods

11   and lies that it's embarrassing.  And what you will uncover

12   in the course of this case -- and they unfortunately were

13   repeated from the lectern.

14          You will find out from this case that Mr. Kwok has

15   had bank accounts.  He's had, you know, people submit

16   letters on his behalf when he purchased an apartment,

17   talking about his long banking relationships.  And that was

18   in 2015.

19          You will hear, if it ever becomes necessary,

20   enormous testimony about how he held himself out as the

21   owner of the Sherry Netherlands apartment, despite his

22   denying that in his declaration.

23          He lists -- he says in his declaration that the

24   PACS agreement was a forgery.  We've put in a footnote all

25   the reasons we know that to be obviously false.  The pattern

49

1    of lying hasn't stopped and it's distressing to see it

2    repeated from the lectern.

3           It's distressing -- you know, Mr. Kwok talks about

4    all the litigation he's been involved with, much of it for

5    people accusing him -- I don't know if it's true or not --

6    of being a Chinese spy.  I know he's frequently accused of

7    being a Chinese spy himself and a collaborator with the

8    Communist Chinese Party.  I have no idea.  I don't know if

9    that's true, but he's effectively had his counsel accuse my

10   client of the exact same thing here today with zero basis.

11          It's sanctionable, in our view, for opposing

12   counsel to stand at a lectern and accuse another party with

13   no basis of conspiring with the Chinese Communist Party.

14   It's outrageous.

15          Your Honor, I want to make a few other points.

16   Now the declaration, which is Docket No. 107, which is his

17   declaration, was submitted on a Saturday.

18          Your Honor, Mr. Kwok's opposition to our motion

19   was filed Wednesday and referred to it, the declaration.  He

20   didn't file it for four more days.  He filed it then, just

21   for the heck of it, in support of a motion that he didn't

22   file until today.

23          It's sort of litigation by incompetent ambush, and

24   that gives you a sense when Mr. Baldiga says, we're going to

25   -- we are going to run this case in an appropriate manner

50

1    and follow every rule, it's just not true.  And the proof,

2    you saw in the petition, you saw in the schedules, you see

3    it in the way they conduct this case.

4          So notwithstanding what you heard I think the

5    actions speak much louder about how this case might go.

6          I do also want to let Court know we don't consent

7    to an appointment of an examiner.  We think an examiner is a

8    tremendous waste of time and money.

9          THE COURT:  Okay.

10         MR. FRIEDMAN:  A trustee should be appointed.

11   We'll be seeking that relief.  Obviously, we'll be filing an

12   objection to the examiner motion whenever the Court requires

13   that that be objected to.

14         If the debtor really is going to file a plan

15   within 20 days, we obviously have to get the examine -- the

16   trustee motion moved very quickly because of the interplay

17   between timing for a trustee and timing of confirmation

18   hearings and a plan.

19         You know, what plan other than I will pay all my

20   creditors in full could make sense here?  I don't know.  You

21   heard yet again, this is somebody who doesn't have any

22   money.

23         I mean, it's unclear whose benefit this case is

24   being even run for, but I don't want to get too far out

25   ahead of where things are going to go, so I'm going to come

51

1    back to this particular motion.

2              Your Honor, you had a colloquy with Mr. Baldiga

3    and sort of asked some questions about what Justice Ostrager

4    actually determined in his hearing, in his sanctions order.

5    And I think it's worth looking at the sanctions order,

6    because it says --

7              THE COURT:  Where -- can you just point me -- is

8    that -- is it -- is it Exhibit A?

9              MR. BALDIGA:  It is Exhibit A to the Friedman

10   declaration.

11             THE COURT:  Okay, if you'd give me a second I'll

12   be able to look at it with you at the same time.  Okay?

13             MR. BALDIGA:  Okay.

14        (Pause.)

15             THE COURT:  Okay, I'm almost there.

16        (Pause.)

17              All right.  I think I'm there.  Let me just check

18   with you, okay, to make sure I'm looking at the right

19   document.

20             So it says, Supreme Court of the State of New

21   York, New York County and then at the top it has an index

22   number and a motion sequence number of 19.

23             MR. FRIEDMAN:  Yes, Your Honor.

24             THE COURT:  Okay.  All right.  Go right ahead

25   then, I'm with you.

52

1      MR. FRIEDMAN:  So on Page 2, the first full

2   paragraph, "On February 2nd, 2022, this Court held an

3   evidentiary hearing at which seven witnesses submitted

4   direct testimony by affidavit and were made available for

5   cross-examination."

6      I'm going to stop quoting.  Some of those

7   witnesses were  -- virtually all of those witnesses were Mr.

8   Kwok's witnesses.  His family members, people whose

9   testimony he submitted.  Right?  So when he tells you the

10  judge got it wrong, remember what was in front of Justice

11  Ostrager and all the opportunities they had to litigate this

12  matter.

13      Going back to quoting.  "Those proceedings

14  established, among other things, that Kwok exercised

15  dominion and control over a yacht called the Lady May."

16      As we go to Page 4, the testimony adduced at the

17  hearing out of the mouths of defendant's witnesses, clearly

18  and convincingly demonstrated that Kwok beneficially owns

19  and controls the Lady May and has utter contempt for this

20  court and the judicial process.  Pause there.

21      Your Honor, if we have to get into it at some

22  point later, we will also show you tweets where Mr. Kwok

23  accused of Justice Ostrager or of being a CCC -- a CCP

24  agent, just to show you how promiscuous he is with that

25  allegation.

53

1      Then, Your Honor, the last page -- I'm sorry, Page

2    8.  "Kwok has much more than a beneficial interest in the

3    Lady May.  Not only does Kwok control the yacht, it appears

4    he provided the funds to purchase it and he is the person

5    who principally enjoys the use of the yacht."

6      These are all facts that a court of competent

7    jurisdiction has found.  They cannot be, whether it's under

8    *Rooker-Feldman* or collateral estoppel or res judicata, as

9    this Court said, they can't be reevaluated here.

10      Mr. Kwak's claims that he doesn't have the ability

11    to bring the yacht back should fall on deaf ears, because

12    defendants claim all the time, I didn't do it after they've

13    been convicted.  Does that make it so?  Right?  He doesn't

14    get to just say, I can't do it when a Court has found he can

15    and he has refused to as an act of utter and complete

16    contempt.

17      Mr. Kwok was in contempt of Justice Ostrager'a

18    opinion for 268 days.  And Justice Ostrager concluded that

19    if billionaire litigants can simultaneously seek to use

20    court process in New York and elsewhere in the United States

21    while knowingly and intentionally violating court orders,

22    there is no rule of law.

23      That's what -- by the way, that's what the stakes

24    were in front of Justice Ostrager and how obviously

25    disturbed he was by this pattern of conduct that Mr. Kwok

54

1   showed.

2           But I read you all of those in order to show, Your

3   Honor, that whatever is in the declaration, whatever factual

4   predicates Mr. Kwok wants to make, whatever loopholes he's

5   looking to escape simply are not available to him in this

6   court given the breadth -- frankly, even if the findings of

7   fact were cursory, they would still be collateral estoppel,

8   but they aren't.  They were deep and based on extensive

9   testimony.

10          Mr. Kwok's protestations to the contrary that he

11  can't do it, if they're addressed, they should be addressed

12  in New York State on appeal.

13          And Mr. Kwok tried to get an interim stay of

14  Justice Ostrager order and interim stay.  He couldn't even

15  get that much less a false stay pending appeal.  That's how

16  little the New York Court of Appeal -- Appellate Division

17  thought of his likelihood of success on the merits.

18          I note, and we submitted this in connection with

19  our schedules, that Mr. Kwok also put on GETTR that if he --

20  you know, he might consider fleeing the jurisdiction,

21  fleeing the United States if the sanctions order was -- the

22  contempt order was pursued.

23          Perhaps Mr. Baldiga should be asked whether, if

24  the stay is lifted, Mr. Kwok intends on fleeing the United

25  State's jurisdiction to avoid the consequences of his

1    contemptuous behavior.

2              Your Honor, a couple of other points that I want

3    to to address.  Obviously, Kwok -- Mr. Kwok has sought to

4    remove the action to federal court.  I think that moots the

5    relief.

6              First of all, it's an obviously deficient form of

7    removal.  *Rooker-Feldman* provides that, mandatory

8    abstention, a permissive abstention are all at play.

9              But even if remand was appropriate, there's still

10   an action pending now in the Southern District of New York,

11   and the Southern District of New York then can have the stay

12   lifted if it's the appropriate forum to order return of the

13   yacht.

14             So the removal, while a quasi-clever tactic to try

15   to cause delay, does nothing to moot our motion or the

16   relief that could be granted if necessary.  And we would

17   amend our order to say that whether it's the state court in

18   New York or the federal court, if the action has properly

19   been removed the stay is lifted.

20             Your Honor, I want to make another point that --

21   just address another point that's in Mr. Kwok's papers.  Mr.

22   Kwok says, don't lift the stay because if the stay is lifted

23   or the stay is modified, I guess to use more -- less

24   colloquial language, the stay -- the code doesn't talk about

25   lifting a stay, it talks about modification or termination

56

1      of the stay.  Don't do it because then I won't get a DIP

2      from Golden Spring, because my family won't lend me the

3      money under those circumstances.

4              There's an old parable about Lincoln, right?  That

5      Lincoln would describe somebody as being like the highway

6      man who comes up to you and says, give me your wallet or

7      else I'll shoot you, and then it will be your fault that I'm

8      a murderer.  Right?

9              If Kwok's family won't lend him the money and the

10     case goes off the rails, this case can't be pursued because

11     Kwok won't bring a boat back or the Court lifts the stay,

12     that's on them.  That's not on the creditor body.  That's

13     not on this Court.  That's a form of hostage taking that I

14     don't think is appropriate to suggest.  If they don't want

15     to lend the money, so be it under that circumstance.

16             What I would say about that is we should stop and

17     think about it, right?  These are the people who Kwok says,

18     you know, fund his lavish lifestyle and have done so for

19     years.

20             These are the people who are going to help resolve

21     claims against the estate, are going to provide a lot of

22     funding to get their dear old dad out of Chapter 11, not

23     have to face sanctions.

24             But if the relief that's granted -- that we ask

25     for is granted, they won't lend money, which doesn't make

1    sense, because of the relief that's granted -- one of two

2    things is going to happen.  He's going to stop his

3    contemptuous behavior.  I don't know why -- and bring the

4    boat back.  I don't know why that would prevent them from

5    wanting to lend money, other than they feel like their

6    favorite toy has been taken away.  Or he'll remain in

7    contempt.  And if he remains in contempt, there's a natural

8    consequence to that behavior.

9          Again, in that circumstance I guess they're

10   willing, if you take him at his word, to let their dad go to

11   jail and have all the terrible things he claims are going to

12   happen, happen.  Also doesn't really make any sense.

13         So I want to now turn to the legal basis for a

14   motion.  We've said the stay doesn't apply because of the

15   exception that has been recognized by virtually every court.

16         Doctrinally, we know that a civil contempt order

17   can be exempt from the automatic stay.  They spend a lot of

18   time in their paper saying, this isn't a criminal contempt

19   order.  We agree.  It's not.  It's a civil contempt order.

20         But civil contempt orders are exempt from the

21   automatic stay where they are designed to vindicate the

22   interests of a Court and are focused on not compensation.

23         And to be clear here the $134 million fine is

24   completely separate from the underlying judgment that was

25   rendered in our client's favor, but because there has been

58

1    an assault on the dignity of the Court.  And I just -- I

2    want to go back to what I read to you.

3           Justice Ostrager said, if billionaire litigants

4    can simultaneously seek to use the Court process in New York

5    and elsewhere in the United States while knowingly and

6    intentionally violating court orders, there is no rule of

7    law.

8           I think there couldn't be a clearer statement

9    about what Justice Ostrager thought the purpose of the

10   sanction was, and it was to, you know, to hold Mr. Kwok in

11   contempt for refusing to abide by court orders and insulting

12   the integrity of the judicial -- and the dignity of the

13   judicial process.

14          So I don't -- from that perspective I think it,

15   you know, then becomes clear that this is the kind of motion

16   -- contempt -- a sanctions order that can be held to be --

17   fall within the exception to the automatic stay.

18          Well, their arguments -- for example they rely on

19   the *White* case.  I think as we explained in our reply brief,

20   first of all, the *White* case recognizes, as it has to, that

21   an exception exists to the automatic stay for civil actions

22   versus -- for certain civil kinds of contempt motions.  That

23   case is about collection of damages, which we're not trying

24   to seek.  We've been very clear, we're not trying to seek

25   damages.  We're not even seeking it necessarily -- we're not

1      even seeking the imposition of additional fines.

2              What we are seeking is to ensure that the Lady May

3      is returned to New York.  Now, the February 9th contempt

4      order specifically does require the return of the Lady May

5      and it says, to the extent the Lady May is not back, fines

6      continue to accrue.  We're not actually asking for fines to

7      continue to accrue.  We're not seeking damages.  We're

8      seeking return of the boat.

9              We're seeking return of the boat for the benefit

10     of all creditors.  We've been quite clear, and we've

11     clarified it even further in our draft order, that the boat

12     will remain subject to further order of this Court.

13             So the kinds of concerns that animated cases like

14     *White*, where one creditor was seeking to obtain a financial

15     advantage for itself in connection with the contempt motion

16     are not present here in any way.

17             Your Honor, I think the -- you know, the debtor

18     also tries to draw a distinction from some of our cases

19     saying that those cases related to post-bankruptcy post-

20     petition sanctions orders.

21             And our response to that is the timing may have

22     been different in those cases but the analytical framework

23     that the Court evaluated, what's the nature of the sanction,

24     what is the person seeking to lift the stay hoping to

25     achieve by doing it? Are they trying to detract from the

1    estate, are they trying to agglomerate or accumulate more

2    for themselves?  Are they trying to just harass the debtor?

3    None of those factors are present here.  We're simply trying

4    to get the debtor to bring back one of its most valuable

5    asset.

6              And they say you shouldn't worry about -- you know

7    that -- why do you need to do that?  The boat is subject to

8    worldwide jurisdiction of the bankruptcy court.  First of

9    all, I think it's very clear that Mr. Kwok doesn't respect

10   bankruptcy -- any court's orders.

11             Second of all, the asset, even if it's subject to

12   worldwide jurisdiction, could potentially continue to

13   dissipate.  It's being used by I don't know whom, but it's

14   always at risk.

15             And has Mr. Kwok done the basic things that a

16   debtor ought to do to assert control over his assets?  Has

17   he filed a turnover motion?  Has he sought to hold his

18   family in contempt for -- with respect to the automatic stay

19   for continuing to exercise control over one of his assets?

20   Of course he hasn't.

21             What he's continued to try to do is squirrel out

22   of Justice Ostrager's ruling that it's his boat and that he

23   controls it.

24             So the fact that the boat is also subject to

25   worldwide jurisdiction of this Court, and frankly, who knows

1    if the court in -- somewhere else, wherever the boat is,

2    would acknowledge the validity of that is of zero comfort to

3    us.

4         Your Honor, the last point I want to make is with

5    respect to the automatic stay, if the automatic stay is

6    held to be applicable.  I think the most important *Sonnax*

7    factors here is that every creditor who's spoken up, our

8    client and the two other creditors, favor this relief.  They

9    want the asset back.  They don't want it floating out there.

10   It benefits all creditors.  The only people it doesn't

11   benefit are Mr. Kwok and his family members, who are not

12   legitimate creditors.

13        I know Mr. Kwok didn't talk about Rui Ma and her

14   creditor claim, other than to cast dispersions on her.  I

15   know her counsel is here.

16        I don't know if she intends on explaining the

17   basis for that claim, but it's a horrifying claim and I'm

18   not surprised counsel didn't go into details about what Mr.

19   Kwok is accused to have done in that case.  I'm not

20   surprised at all.

21        The other *Sonnax* factor is obviously sort of --

22   they cut in our favor no matter what, right?  Either, if

23   there's more protracted litigation to go ahead, nobody

24   better to do it than Justice Ostrager.  There may be nothing

25   left to do because the order is already been entered.

1          So it's not like we are dealing with a case that

2     really should be litigated in this forum because it hasn't

3     been addressed extensively somewhere else.  We know it has.

4          Enforcement of the contempt order won't interfere

5     with this case.  It's going to help this case.  The only way

6     it's going to interfere with this case is if Kwok lets it.

7     If Mr. Kwok won't assert his rights, then it will interfere

8     with this case to an extent.  But if he does what he

9     supposed to do, what he's been ordered to do, it will

10    enhance this case, not undermine it.

11         Your Honor, this isn't a real case in the context

12    of the other factors, for example that are cited in *Sonnax*.

13    There's no operating business.

14         He has no innocent employees who would be harmed

15    by an injunction.  He has no business to do except litigate

16    cases.  That's all he does.

17         And if he won't abide by the court's ruling in New

18    York and is incarcerated, he can be deposed wherever he is

19    in the future, unless he flees the jurisdiction, but again,

20    I don't think fleeing the jurisdiction is a basis -- or the

21    threat that he may flee the jurisdiction is a basis for

22    granting -- for denying stay relief.

23         The two other things I would say, Your Honor, is

24    the comparison to *Res Cap* is not well taken.  I'm sure this

25    Court is well familiar with the *Res Cap* case and the $375

63

1    billion residential mortgage book that had to be dealt with

2    that case over two and a half million different homeowners.

3    It's not even apples and oranges.  It's pineapples and

4    concrete how different those are.  There's just nothing in

5    common between this case and *Res Cap*.

6            And the same with *Sonnax*.  The *Sonnax* -- *Sonnax*

7    was an operating business.  This isn't.

8            I don't know if the Court has any questions or --

9    I don't know if anybody thinks something else escaped my

10   attention or I should raise, but I don't have anything

11   further, Your Honor, other than I'd like to rebut any

12   opposition.

13           THE COURT:  I don't have any questions at the

14   moment.  Now I -- well, that's not true.  I do.

15           I set this up, as you I'm sure noticed, as a

16   preliminary hearing under the Bankruptcy Code and the rules.

17   What other information, if any, do I need from you from your

18   perspective to decide -- and I mean your client's

19   perspective --

20           MR. FRIEDMAN:  Sure.

21           THE COURT:  -- obviously -- to decide this motion?

22           MR. FRIEDMAN:  Not a bit.  And I'd go further,

23   Your Honor, to say that Kwok should be barred from trying to

24   introduce any other evidence and should not be allowed to

25   rely on his declaration to the extent it seeks to reconsider

64

1    factual matters determined by Justice Ostrager.

2              THE COURT:  Okay.

3              MR. FRIEDMAN:  Thank you.

4              THE COURT:  I understand your position and I'm

5    just looking to make sure I don't have any further

6    questions, but I don't think I do --

7              MR. FRIEDMAN:  Okay.

8              THE COURT:  -- at the moment.  No, I don't at the

9    moment, but thank you, Attorney Friedman.

10             MR. FRIEDMAN:  Okay.  Your Honor, I don't know if

11   any of the other creditors --

12             THE COURT:  Yeah, I'm going to ask --

13             MR. FRIEDMAN:  Okay.

14             THE COURT:  -- if anybody else wishes to be heard

15   on PACS's motion.  I'm going to let the debtor respond too.

16             No, no, come first, counsel.  I'm going to hear

17   from creditors first and then I'll let the debtor respond,

18   and I'll let PACS respond to the debtor, and that will be

19   that.

20             MS. CALLARI:  Hi.  Good afternoon, Your Honor.

21             THE COURT:  Good afternoon.

22             MS. CALLARI:  Carollynn Callari, with Callari

23   Partners, again, here on behalf of Rui Ma.

24             First, I just want to say that I find it -- and I

25   don't know that I -- any of the counsel in this room.  So

1    it's not meant to be professionally, but when Your Honor

2    sees the complaint that Rui Ma filed, and reads it, you will

3    understand the disgust I feel in any allegation that the

4    merits of her claim are anything but real and that they're

5    part of some sort of conspiracy.

6         When we get to it, Your Honor will see the

7    chronology of the facts of life make their argument

8    impossible that her claims are just made up by this other

9    person and part of his scheme to bring down the debtor.

10        So with that, we support PACS's motion as

11   modified.  We agree to additional language.  In our limited

12   statement we've provided a couple of paragraphs that we

13   thought would be appropriate.

14        PACS's counsel has altered them, but it's a

15   similar concept, which basically means that we support

16   PACS's efforts to basically marshal assets of this estate

17   and to bring them back to this estate, and then have Your

18   Honor determine what happens with them and what is the

19   appropriate priority.

20        And we also noted that this would not bring any

21   advantage to PACS in that any monies received would be

22   subject to this estate and not be superior to any of the

23   other creditors.

24        That was our main concern that this would end up

25   -- you know, if the monetary damages continued and they only

1    went to PACS, that would not be beneficial, and we have

2    clarified that in the order.

3         So with that clarification and with the rebuttal

4    to the disparaging remarks on behalf of Ms. Ma, we support

5    PACS's motion.  Thank you, Your Honor.

6         THE COURT:  Thank you.  Does anyone else wish to

7    be heard before I let the debtor respond?

8         Okay. Seeing no one, go ahead, counsel.  You can

9    respond to Attorney Friedman's -- and attorney for the other

10   creditor, Ms. Callari's assertions with regard to the

11   motion.

12        MR. BALDIGA:  Thank you, Your Honor.  Again,

13   William Baldiga for the debtor.

14        Your Honor, I want to first make sure that we're

15   focused on exactly the relief that PACS has asked for,

16   because they're arguing -- they filed one motion, they seem

17   to be arguing a different one, and I want to address the

18   motion they filed.

19        At Paragraph 9 on Page 7 of their motion --

20        THE COURT:  All right.  Hold on.  Let me catch up

21   with you, okay?

22        MR. BALDIGA:  Okay.

23        THE COURT:  Just give me a second to get where

24   you're talking so that I'm -- Paragraph 9, page what?

25        MR. BALDIGA:  Page 7, Paragraph 9 of their motion

67

1    at docket, 57.

2              THE COURT:  Okay.  Give me a second.  I'm not

3    quite there yet.

4         (Pause)

5              THE COURT:  The relief requested.  Yes, go ahead.

6              MR. BALDIGA:  Okay.  So, I mean that's I think

7    fairly clear.  I think it's consistent with the rest of the

8    motion, but I thought that was the place it was most

9    succinctly and clearly stated that they wish relief as to

10   the enforcement of Justice Ostrager's February 9 contempt

11   order.

12             So let's turn to that order, which is appended to

13   that motion.  Actually, to the --

14             THE COURT:  Attorney declaration.

15             MR. BALDIGA:  -- attorney declaration.

16             THE COURT:  Yep.  I've got it.

17             MR. BALDIGA:  Which is that --

18             THE COURT:  Go ahead.  I've got it.  Tell me where

19   you want me to look.

20             MR. BALDIGA:  I'm a page 134.  I'm sorry.

21             THE COURT:  You're on -- no.  That's the number of

22   pages.  You're -- go to --

23             MR. BALDIGA:  No.  Page 16 of --

24             THE COURT:  16 of 134?

25             MR. BALDIGA:  Yes, I believe so.

68

1          THE COURT:  All right.  Just let me catch up with

2     you.  I'm almost there.

3          (Pause)

4          THE COURT:  Okay.  I'm on page 16 of 134.

5          MR. BALDIGA:  And is that the last page of the

6     order?

7          THE COURT:  Yes, it is.

8          MR. BALDIGA:  It is --

9          THE COURT:  Yes, it is.

10          MR. BALDIGA:  Okay.

11          THE COURT:  On the version I'm looking at, which

12     is the version that's on the docket, yes.

13          MR. BALDIGA:  Okay.  And so let's read what they -

14     -the ruling is, the last sentence obviously.

15          Kwok must remit $134 million to PACS within five

16     business days.  That seems pretty clear cut, although PACS

17     has clarified today and several places in the motion, they

18     are not seeking monetary relief.  So that's -- that's not

19     what they seek.

20          The Court is prepared to exercise its full

21     authority under Judiciary Law 753 in the event that the fine

22     is not timely paid.  Okay.

23          So PACS is saying, we're not seeking relief as to

24     the fine, we're seeking -- obviously the one thing that's

25     left is Judiciary Law 753, which is the state -- New York

1    State law that entitles the Court to imprison for contempt.

2            So when you boil down the motion that was filed --

3    and it's clear, I'm looking at the order that they seek to

4    enforce.  In the order that they seek to enforce by the

5    motion they chose to file, it's not for returning the boat.

6    It's to pay $134 million or go to jail.  Period.  That's --

7            THE COURT:  Well, isn't that -- doesn't their

8    reply say something different, number one?  And number two,

9    if they're seeking to enforce it, doesn't your client have

10   the ability to relieve himself of that contempt by doing

11   exactly what the judge ordered him to do and not go to jail?

12           MR. BALDIGA:  Not by this order.

13           THE COURT:  What -- not by what order?

14           MR. BALDIGA:  Not by the order they're seeking to

15   enforce.  They're asking you to allow them to --

16           THE COURT:  Well, I don't agree with that.

17           MR. BALDIGA:  -- enforce this order.

18           THE COURT:  I'm not sure I agree with you,

19   counsel.  Because if I'm a judge and I order contempt

20   sanction against a client -- against a party, and they come

21   in and they -- and the contempt is because -- at least my

22   reading is that because the boat is outside the jurisdiction

23   and they correct that problem, the judge isn't going to

24   enforce the fine in the contempt order, because he would

25   have purged himself of the contempt by getting the boat back

1    into the jurisdiction to which this whole -- this whole

2    decision was rendered on.

3              I mean that -- if you go -- I'll hear you, but I'm

4    not sure I agree with you on that.

5              MR. BALDIGA:  I - I'm not --

6              THE COURT:  Plus, they've just already just said

7    they don't -- they are not trying to put him in jail.

8    They're not trying to --

9              MR. BALDIGA:  That's why they're not arguing their

10   motion.  I --

11             THE COURT:  Well, but you are -- you're saying --

12   your opposition is you don't want the motion to be granted

13   because they are trying to put him in jail and make him pay

14   the fine.

15             They've just stated, we're not seeking monetary --

16   we're not seeking payment of the fine.  We're not seeking to

17   put him in jail.  We want -- and that's -- I think I asked

18   this question at the very beginning of today's hearing two

19   hours ago.

20             I said, isn't what -- I said, Attorney Friedman,

21   and my reading your papers right?  Isn't that what I said?

22   I said, I'm reading your papers right.  Aren't you asking

23   for the return of the boat to this jurisdiction, to the

24   United States jurisdiction so that the boat is here and

25   subject to the jurisdiction of the courts?

1           And Attorney Friedman said yes.

2           MR. BALDIGA:  In lieu of the fine?

3           THE COURT:  He just said he's not seeking the

4     fine.  He's not seeking a -- at this time, they're not

5     seeking that.

6           And if we go back and we look at what -- at least

7     again, let me step back and say, I am nowhere near as

8     familiar with this is all of you are, but the reason there

9     was a contempt order issue is because the boat was supposed

10    to be seized for the judgment and the boat then disappeared

11    from New York to wherever it went.  The Bahamas.  And then

12    it went somewhere else.  And then it went to Italy or

13    wherever.

14          Well, obviously Justice Ostrager doesn't have the

15    ability to get the boat back from Italy.  I mean, he has an

16    order that somebody may or may not acknowledge in Italy or

17    wherever it is.

18          I don't think he has the -- he doesn't -- his

19    order doesn't allow the boat to be arrested and then under

20    maritime law, brought back to -- because it's not a maritime

21    case -- and brought back to the United States under which

22    the jurisdiction of the United States Court would be --

23    would apply.

24          So this -- unless I'm reading something wrong,

25    which is very possible, but I don't think so, the whole

1    reason the contempt proceeding was brought was because the

2    boat was gone.  It's just like anything else.  You've got an

3    asset you can execute on.  If the asset is gone, you don't -

4    - you can't execute on it.

5         And Judge -- Justice Ostrager, who I apologize at

6    the beginning of the case today I didn't state his name

7    because I didn't have it in front of me and I didn't want to

8    say it improperly -- he said whether -- that PACS has met

9    the burden of establishing that the Court should enter a

10   final order of civil contempt against Kwok for the reasons

11   that follow.  The Court is simultaneously issuing the order.

12        And then he goes through this whole thing.  PACS

13   encountered difficulty identifying assets over which Kwok

14   exercised control.  Then the court had a hearing,

15   apparently, an evidentiary hearing at which a number of

16   people supporting your client appeared.

17        And then that judge made determinations, whether

18   you appeal them are not or -- you know, is a different

19   story, that Mr. Kwok had dominion and control over that boat

20   and that boat's gone.  So that's what the contempt is all

21   about.

22        Attorney Friedman, am I missing the point here?  I

23   just want to know, am I saying something that is inaccurate

24   with regard to why you were seeking this contempt?

25        MR. FRIEDMAN:  You're not, Your Honor.  Also, if

1    you look at page -- if you look at Exhibit 5 of my

2    declaration, is the actual order from Justice Ostrager, and

3    in Paragraph 3 he talks about how fines will continue to

4    accrue until Kwok returns the Lady May to the jurisdiction.

5            THE COURT:  Right, and he says --

6            MR. FRIEDMAN:  So Mr. Baldiga's argument

7    completely --

8            THE COURT:  -- he says that --

9            MR. FRIEDMAN:  -- falls apart when you look at

10    that.

11            THE COURT:  -- the appellate -- the appellate

12    division's first department affirmed this court old order on

13    November 4th, 2021, holding Kwok in conditional civil

14    contempt, finding that the daily fine of $500,000 was

15    intended to strongly encourage defendant to purge himself of

16    the contempt.

17            You know, I've had cases where people have been in

18    jail and they could purge themselves of the contempt and

19    they don't do it.  And I say, well, I don't know what you

20    want me to do.  I mean, you can either purge yourself of the

21    contempt or you can't, or you choose not to.  Excuse me.

22    That is the more appropriate -- those are the more

23    appropriate words.

24            MR. BALDIGA:  But, Your Honor --

25            THE COURT:  Justice Ostrager found, whether you

74

1    agree or not, that -- and it wasn't just Justice Ostrager,

2    apparently -- that Mr. Kwok is is in control -- has dominion

3    and control over this boat.  And I think -- I started this

4    whole hearing asking this question.

5         So if he has dominion and control over this boat,

6    and he doesn't want to go to jail, that's what you told me,

7    he doesn't want to go to jail because he's afraid he'll

8    unfortunate -- he'll -- that will be a very unfortunate

9    experience for him and he wants to work with all these

10   creditors, and he wants to have a plan that fair to all of

11   them, then bring back the boat.

12        I don't think that -- and that is why I asked

13   Attorney Friedman that question at the very beginning of the

14   hearing, because I understand your point about the motion

15   said.  Then I read your objection.  Then I read their reply.

16   And my reply -- and my reading of their reply -- and I

17   shouldn't say they.  I'm talking about PACS and the debtor.

18   I should be more careful.  But in PACS's reply.  And I asked

19   -- that's why I asked the question.

20        It seemed to me, yeah, I think you're right in the

21   extent that they're not seeking to impose the monetary fine

22   right now, and they're not seeking to have -- I don't know

23   what that section of New York law is, but you just said to

24   me, I guess that is the section of the New York law that you

25   could put somebody in jail for contempt if they don't purge

1    themself of contempt.  I assume that's what that means.

2           But what I'm saying is it said in the reply, we

3    just want the boat back in our jurisdiction, and not just

4    for us, for all the creditors of the estate.

5           And I actually heard from another creditor who

6    said just that.  She's asked that, and apparently the PACS's

7    -- PACS and their counsel have agreed that the order, if I

8    were to grant the relief requested, would say that, that the

9    boat is not just for -- it's not coming back so PACS can

10   arrest it, or put a lien on it, or do whatever you can on a

11   maritime law, which there's a lot of that -- and the New

12   York judges know how to do that --  then that's not what

13   they're asking.

14          They're asking -- they're asking essentially, in

15   my opinion, to go back to the status quo where -- it's not

16   exactly the status quo, but at least have the boat within

17   the jurisdiction of the United States Court.  That's --

18   court.  That's what they're asking, and that's what he said.

19          So your argument about the fine and the jail,

20   again, the problem with contempt is always the same problem.

21   If the person who is being held in contempt does not choose

22   to purge himself of that contempt, then that person faces

23   the consequences of that choice.  The Court can't do

24   anything about it.  I can't make him do anything about it.

25   If he doesn't do it then, yeah, maybe he will go to jail.

76

1    That's up to the New York Court to decide.

2           But they're not asking that right now.  They're

3    asking him, in my opinion from what I've read, and I'm not

4    ruling today but they're asking for an incremental step.

5    That incremental step you may not like, and you may still

6    oppose it by getting the boat back into New York or the

7    jurisdiction of the United States courts.  But that's what

8    they're asking.  And I think that's pretty clear as of

9    today.

10          Now, you know, relief from stay, or any

11   determination that the stay doesn't apply, can be

12   incremental.  It doesn't have to be a complete resolution.

13   And essentially, that's what PACS is asking.  We're not

14   asking to put him in jail.

15          By the way, he can avoid being in jail if he does

16   with the Court told him he had to do.  But he can't -- we're

17   not asking them to be in jail.  We're asking him to get the

18   boat back in the jurisdiction of the United States.

19          If he chooses not to do that, then he chooses not

20   to do that at his own peril and that's what a contempt order

21   does.  So your argument about what they say in their

22   original motion versus the reply, okay, I understand it, but

23   --

24          MR. BALDIGA:  That was my whole point, Your Honor.

25          THE COURT:  But the reply says that they're not

1    asking for what they said in their original motion.

2              MR. BALDIGA:  And that --

3              THE COURT:  And what they're asking for in their

4    original motion and what they're asking for now should

5    actually benefit your client, not harm your client.

6              MR. BALDIGA:  Thank you, Your Honor. Of course I'm

7    not arguing that the contempt didn't arise from a failure to

8    have the boat in the New York jurisdiction.  Of course.

9              And I'm not arguing, actually, with anything that

10   you said.  I was making the point which you've actually

11   amplified, that the motion as filed is very different from

12   the subsequent papers, and especially today's argument, and

13   I wanted to make that very clear.

14             THE COURT:  I understand.  If you're concerned

15   that I didn't understand that, I'm happy -- I understand

16   that.  Are you -- is that what --

17             MR. BALDIGA:  I'm no longer concerned.

18             THE COURT:  Okay.  Fine.

19             MR. BALDIGA:  You've made that absolutely clear.

20             THE COURT:  I understand.  I understand.

21             MR. BALDIGA:  And so that's --

22             THE COURT:  Okay.

23             MR. BALDIGA:  I appreciate that.

24             Secondly -- and there would be time for further

25   argument on this I expect.  The *Rooker-Feldman* document --

78

1    I'm sorry, doctrine, is a bit of a red herring here, and

2    we'll be able to, with your permission because we don't have

3    leave to file a surreply, but I think given the reply, we'd

4    like to brief this.

5         The *Rooker-Feldman* Doctrine applies to -- under

6    the better of the decided case law, final state court

7    judgment, which we don't have.  But even more importantly,

8    it applies to final judgments on the merits.  It does not

9    apply to supplemental proceedings.

10        For example, in the --

11        THE COURT:  Well, what about the fact that he held

12   an evidentiary hearing and there were witnesses that -- and

13   testimony and exhibits introduced?  That wasn't a

14   supplemental proceeding.  It was a trial.

15        MR. BALDIGA:  Well, enforcement proceed --

16        THE COURT:  It was a trial.

17        MR. BALDIGA:  -- it's an enforcement proceeding.

18        THE COURT:  It was a trial, wasn't it?

19        MR. BALDIGA:  I meant by supplemental as to not

20   going to the merits of the underlying dispute, but as to

21   ways to enforce a judgment.

22        For example, in the *VanderKodde* case at 951 F.3d

23   397, which is a Sixth Circuit decision in 2020, the Sixth

24   Circuit held that the *Rooker Feldman* Doctrine simply does

25   not apply to post-judgment garnishment.  That is, means to

1    collect the debt.  It just didn't apply.  And that's an

2    example of the very limited scope of *Rooker-Feldman.*

3         And that makes sense, especially in the context of

4    a bankruptcy proceeding where the court is dealing with the

5    interest of -- balancing the interest of the debtor and all

6    creditors, and how to deploy what may or may not be assets

7    of the estate and to determine what are assets of the estate

8    and to the disposition of those assets.  That is much

9    different than a final judgment in a state court as to the

10   amount of a claim.

11        And given that they just briefed that in the reply

12   and we haven't had an opportunity to address that, I wanted

13   the Court to know, because we all deal with *Rooker-Feldman*,

14   frankly not that often, that there -- they misapplied

15   *Rooker-Feldman*.  And that's okay.  We'll have, again, an

16   opportunity, I would hope, to address that more fully,

17   including with briefing.

18        So those are the two points, Your Honor, that I'm

19   disappointed to hear that perhaps because the debtor

20   supports it -- you would have thought with the earliest part

21   of their argument they would have been all for an

22   examination, because they would have thought that a truly

23   independent examiner, as opposed to, for example, a trustee

24   that they hope to elect, would be the way to -- it's an

25   unfortunate case, I want to say, Your Honor, where all sides

80

1    cast dispersions on the veracity of others, and that's all

2    we've heard so far, and that's unfortunate.

3         We thought an examiner would be exactly the

4    mechanism, because the one thing about an examiner, as

5    opposed to every other role in a Chapter 11 case, is that

6    only an examiner has no other allegiances and must be

7    fiercely independent and is not elected or appointed, you

8    know, by creditors --

9         THE COURT:  Well, it would still have to be --

10        MR. BALDIGA:  -- or chosen by a debtor.

11        THE COURT:  The examiner would have to be

12   appointed, just like a Chapter 11 trustee would have to be

13   appointed.  So I'm not sure I --

14        MR. BALDIGA:  Well, or elected.

15        THE COURT:  -- agree with that argument.

16        MR. BALDIGA:  Or elected.

17        THE COURT:  Well, but there -- where is the

18   ability to elect a Chapter 11 trustee?  There's an ability

19   to elect a trustee and Chapter 7 after the interim trustee

20   is appointed and -- by the 341 meeting, but I don't know

21   that there's an ability to elect a Chapter 11 trustee.

22        MR. BALDIGA:  Well, actually, I'm not sure.

23        THE COURT:  I don't think there is.

24        MR. BALDIGA:  But in any event, an examiner seems

25   to be -- and maybe I regret having signaled our support for

81

```
1    exactly the relief that the U.S. Trustee thought was most
2    appropriate, just to bring that back to have PACS oppose it,
3    but so be it.  And that might be the nature of the case.
4            In any event, Your Honor, those are the primary
5    points in our position.
6            THE COURT:  Okay.  I'm just looking.  I don't
7    think there's an ability to elect --
8            MR. BALDIGA:  No, I may have spoken too --
9            THE COURT:  -- a Chapter 11 trustee.
10           MR. BALDIGA:  -- too quickly.
11           MS. CALLARI:  Your Honor.
12           THE COURT:  Yes.
13           MS. CALLARI:  May I be helpful.  There is not --
14           MR. BALDIGA:  Oh, there is.  There is.
15           THE COURT:  Where?  There is or is not?
16           MS. CALLARI:  Is not.
17           THE COURT:  No, there is not.  There's nothing --
18   there's no ability to elect a Chapter 11 trustee.
19           MR. BALDIGA:  Excuse me.  Just -- may I have one
20   second, Your Honor --
21           THE COURT:  Yep.
22           MR. BALDIGA:  -- to confer with my partner?
23       (Pause.)
24           Okay.  I'm just reading quickly, Your Honor,
25   Section 1104(b)(1).  "The election of a trustee shall be
```

1    conducted in the same way as under Section 702."

2          THE COURT:  It says, "Except as provided in 11 on

3    request of a party in interest made not later than 30 days

4    after the court orders the appointment of a trustee.  The

5    United States Trustee shall convene a meeting of creditors

6    for the purpose of electing one" -- yeah.

7          Which is the same thing as what happens and

8    Chapter 7.

9          MR. BALDIGA:  Yeah, that's what -- that's what I

10   said.

11         THE COURT:  So -- yeah, but what -- but the

12   election shall be -- so you're saying if they want to come

13   in with somebody else, they can elect them.  That's what

14   you're saying.

15         MR. BALDIGA:  That was my point.  And an examiner,

16   as I understand it, Your Honor, is assiduously independent

17   and without any right of election or other interference.

18   That's why we have examiners with whatever powers the Court

19   --

20         THE COURT:  Well, not many people have examiners.

21   I'm not saying that it doesn't -- it's not going to happen.

22   I'm saying they don't happen as frequently as you're

23   indicating.

24         MR. BALDIGA:  I'm not -- this -- I'm not

25   pretending that anything about this case is frequent.

1          I'm just saying that it would be unfortunate if

2     the debtor were to consent to what would otherwise, in many

3     matters, be a highly contested matter only to have our

4     consent then be used against us to have the mostly litigious

5     creditor say, yeah, but we're going to oppose it because

6     that seems to independent.

7          In any event, that's -- but again, they'll

8     litigate this case as they so choose.

9          MS. CLAIBORN:  Your Honor, if I may make one more

10    comment?

11         THE COURT:  Sure.

12         MS. CLAIBORN:  Holly Claiborn for the U.S.

13    Trustee.

14         THE COURT:  Can you just speak a little bit more

15    into the microphone?  Thank you.

16         MS. CLAIBORN:  Sorry.  Should the order enter from

17    this Court directing the U.S. trustee to appoint a Chapter

18    11 trustee, the U.S. Trustee with do so, and part of that

19    process is to ask for the input of the parties.

20         And subsequent to that, the U.S. Trustee makes a

21    determined decision about who to appoint, and it's after

22    that point, should there be a dispute over the appointment

23    of that particular party as the trustee that there is a

24    process for an election.

25         THE COURT:  Well, yeah.  702(c) says -- and (b),

84

1    "Creditors may elect one person to serve as a trustee in a

2    case if election of a trustee is requested by creditors that

3    may vote under subsection A of this section."

4         So you have to have a creditor who holds an

5    allowable, undisputed, fixed, liquidated, unsecured claim of

6    a kind entitled to distribution under -- and it just talks

7    about Chapter 7 by the way.  It doesn't cite to any Chapter

8    11 provisions, which is kind of interesting.

9         "Does not have an interest -- an interest

10   materially adverse, other than an equity interest, that is

11   not substantial in relation to such creditor's interest as a

12   creditor to the interest of creditors entitled to such

13   distribution and is not an insider."

14        So it's really kind of interesting, because

15   although you're right that you just pointed out 1104(b) says

16   you can elect in the manner set forth in -- provided in

17   subsections (a)(b) and (c) of Section 702 of this title, 702

18   says a creditor may vote for a candidate for trustee only if

19   such creditor holds an allowable, undisputed, fixed,

20   liquidated, unsecured claim of a kind entitled to

21   distribution under, and that it only refers to Chapter 7

22   sections.

23        So I don't know if it really does work.  If it

24   only applies to Chapter 7 sections, this isn't going to be a

25   distribution under any of those sections.  It's a Chapter 11

1    case.  So if that's the case, then there isn't an election

2    of a trustee.  I don't know the answer.

3            I'm just saying, it seems inconsistent right now

4    if you read the actual language of the statute.  It seems a

5    very inconsistent, because you have to do -- you have to

6    have all three prongs of (a) in order to elect under (b).

7    And under 702(a), and 702(a) says entitled to a distribution

8    under section 726(a)(2), 726(a)(3), 726(a)(4), 752, 766 or

9    766(h) or 766(i).

10           MR. BALDIGA:   Your Honor -- I think, Your Honor,

11   the case law would say that the standards are the same in

12   Chapter 7.

13           THE COURT:  Well, it may or may not.

14           MR. BALDIGA:  I'm just --

15           THE COURT:  That's not what the statute says.

16           MR. BALDIGA:  I agree, but --

17           THE COURT:  It's not what the statute says.

18           MR. BALDIGA:  In any event, the biggest point was,

19   we would like the case to proceed on something other than

20   sort of a war of attrition basis, and I thought we had the

21   makings of some good progress in that regard, and we would

22   like the Court to see it that way and move the case in that

23   direction.

24           THE COURT:  It's interesting they didn't change

25   the statute, because they really should have changed the

86

1      statute.  You know, because it only refers to 7 -- the

2      sections under Chapter 7.

3              They should have -- here's a perfect example where

4      you, you know -- where the code -- that may be exactly your

5      intent that it be the same.  That's not -- if you look at

6      1104(b), then -- and it refers you to subsections (a), (b),

7      and (c) of 702.  702(a) only addresses Chapter 7 sections.

8      So it doesn't make any sense.

9              But anyway, we don't have to decide that today.  I

10     just thought that was interesting.  I mean, I completely

11     understand the election of a trustee under Chapter 7. I just

12     don't think I've ever seen anyone elect a trustee at a 341

13     meeting after -- in a Chapter 11 after they've been

14     appointed by the Office of the United States Trustee.

15             Have you, Attorney Claiborn?

16             MS. CLAIBORN:  No, Your Honor.

17             THE COURT:  Okay.  It really doesn't matter for

18     today's purpose.  I'm sorry I'm --

19             MR. BALDIGA:  I agree.

20             THE COURT:  -- diverting attention, but I'm just

21     trying to -- I really have never seen that.

22             But anyway, okay.  Attorney Friedman, I'm going to

23     give you the opportunity to respond.

24             MR. FRIEDMAN:  Thank you, Your Honor.  Peter

25     Friedman from O'Melveny and Myers on behalf of PACS.

1    I just -- I want to make a couple of points.

2         It's disturbing that Mr. Kwok's counsel thinks

3    that the only neutral person in a bankruptcy should be an

4    examiner.  The debtor is supposed to be a neutral fiduciary

5    for all its creditors.  Obviously, that's not going to

6    happen.

7         Your Honor, with respect to the examiner trustee

8    issue, as we'll get into our objection, examiners are great,

9    except they're not, because ultimately an examiner is just

10   going to issue a report and that report is likely to be

11   hearsay, and an examiner can't pursue causes of action.  It

12   doesn't help.  It doesn't move this case where it needs to

13   be -- to go, and Mr. Kwok just remains in possession with

14   control of the case.

15        As to the actual argument on the motion we're here

16   on, as I mentioned, the order from Justice Ostrager is a two

17   page order.  It's at page 5 -- it's Exhibit 5 to my

18   declaration.  In Paragraph 3, he makes it clear that Kwok is

19   under a continuing obligation to return the Lady May to the

20   jurisdiction.  That's what we're trying to enforce.

21        We are not trying to ask for payment today.  We're

22   not asking for imposition of additional sanctions or

23   contempt fines a $500,000 a day, to be clear.

24        We also are reserving our right to be paid on that

25   $134 million fine, but we're not asking for it to grow.

88

1    We're not asking for us to be paid.

2            Your Honor, *Rooker-Feldman* is concededly a thorny

3    doctrine.  I think we're right.  If we are not right -- you

4    didn't hear anything about collateral estoppel or res

5    judicata after Mr. Kwok had, you know, took the Fifth, had

6    an adverse inference drawn against him, had his family

7    members -- you can read what Justice Ostrager said about his

8    daughter.  I don't want to embarrass her.

9            And so those apply, and you know, those were the

10   decisions that they were collaterally estopped, res judicat

11   applies, that he owns and controls, found by clear and

12   convincing evidence.

13           I don't have anything further.  Oh, I did have a

14   question if I can ask the Court?

15           THE COURT:  Sure.  Go right ahead.

16           MR. FRIEDMAN:  When should we be -- do you have a

17   sense of when we should be prepared to file our papers in

18   connection with the U.S. Trustee's exam - the U.S. Trustee's

19   motion?

20           THE COURT:  Yeah.  I have -- you know, I -- that's

21   a good question.  As I said, I understand that the motion

22   was filed on Saturday and there was a motion to expedite

23   that hearing.  So I am going to address that now.  I think

24   we need to address it now for a number of reasons.  So if

25   you'd give me a second.

89

1          First thing first, the matters in this case -- I'm

2    looking at the courtroom deputy now -- that are scheduled

3    for April 12th at 2:30, we're going -- those are -- and

4    those are all applications to employ professionals at this

5    point.  That's the only thing that's scheduled.  I'm going

6    to reschedule those to April 13th at 10:00 a.m. in this

7    court.  Okay?

8          Now with regard to the examiner motion, I just

9    need to hear from the United States Trustee on -- I want to

10   ask her -- but I am going to address it now, which will end

11   up answering your question as to when you need to file

12   papers in response to it.  Okay?

13         MR. FRIEDMAN:  Okay.  May I sit, Your Honor?

14         THE COURT:  Yes, please.  Go right ahead.

15         So, Attorney Claiborn, I know it's not on the

16   calendar yet because -- and I didn't get a chance to look at

17   it until this morning, but I'm going to -- I am going to

18   grant the -- I'm doing this in court, the United States

19   Trustee's motion for an expedited hearing on the appointment

20   of an examiner.  And that hearing will be held on April 13th

21   at 10:00 a.m., along with the other matters.

22         The parties that -- anyone that wishes to oppose

23   that motion for the appointment of an examiner, or anyone

24   that wants to file anything, you're all filing it on the

25   same day.  We're not going to get into replies and -- we all

1    know what the issue is.  Okay?  You're all -- anyone that

2    wants to file anything in support of or in opposition to the

3    motion for the appointment of an examiner must do so by 5:00

4    p.m. on April 6th.

5            The motion -- I'm sorry, Attorney Claiborn, did

6    you want to be heard on that?

7            MS. CLAIBORN:  I was just going to inquire about a

8    deadline for making service.

9            THE COURT:  Oh, you haven't served the motion yet?

10           MS. CLAIBORN:  No, because we were waiting for

11   Your Honor to issue an order.

12           THE COURT:  Oh, okay.  Sorry.

13           MS. CLAIBORN:  So the order with the motion.

14           THE COURT:  I understand.  All right.  So then --

15   yes.  So then, what we're going to do -- what I'm going to

16   do is -- this order probably isn't going to enter until

17   tomorrow.

18           MS. CLAIBORN:  That's okay.

19           THE COURT:  So your service is going to be

20   required -- well, let's talk for a minute.  Who are you

21   serving?

22           Who are you serving that -- you know, we'd have to

23   go with the debtor's schedules and statements.  Right?

24   Like, what's the creditor list look like?

25           MS. CLAIBORN:  We have made copies to serve the

91

1    entire creditor matrix, which is approximately, I think, 60-

2    something parties.

3            THE COURT:  60?

4            MS. CLAIBORN:  So -- 60-something.

5            THE COURT:  Okay.

6            MS. CLAIBORN:  It's between 60 and 70.  I just

7    don't have the exact number.  So those copies are ready, and

8    ready to go.

9            THE COURT:  How -- I'm asking you a question, a

10   serious question.  Is it possible for you to make service by

11   the close of business on Thursday, or would you rather have

12   Friday?  And if you say Friday, that's fine with me.

13           MS. CLAIBORN:  No, Thursday should be fine.

14           THE COURT:  All right.  So then, I'm going to have

15   you make service of the -- what will be an order granting

16   the expedited hearing and scheduling that hearing for April

17   13th at 10:00 a.m., setting a deadline to file any responses

18   in support of or as opposed to -- or opposed to the motion

19   by 5:00 p.m. on April 6th, having you make service of the

20   motion to appoint an examiner by 5:00 p.m. on March 24th,

21   and then file a certificate of service on the docket of this

22   case demonstrating how service was made by 5:00 p.m. on

23   March 29th.

24           Is that acceptable to the U.S. Trustee's office?

25           MS. CLAIBORN:   Yes, Your Honor.  And I'm assuming

1   that all the dates you've just accounted for are going to be

2   put forth in an order to be entered --

3              THE COURT:  In that order.

4              MS. CLAIBORN:  -- by the Court?

5              THE COURT:  The order granting the motion to

6   expedite will have all those dates in them for you, and

7   those times.

8              MS. CLAIBORN:  Very good.

9              THE COURT:  Okay?

10             MS. CLAIBORN:  We will serve the order in our

11  underlying motion.

12             THE COURT:  Okay, great.  Thank you.

13             MR. BALDIGA:  In that regard, Your Honor, one of

14  the motions that we have filed is to retain service agent,

15  Stretto, and they'd be prepared to --

16             THE COURT:  Yeah.  I don't understand why you need

17  a service agent.  Can you --

18             MR. BALDIGA:  Just for this reason, to take the

19  burden off other parties.  If that were --

20             THE COURT:  Well, but it's going to be an

21  administrative expense to the estate.  Why are you -- why

22  are we doing that?  Why do we need a service agent?  I'm not

23  saying I'm ruling on it, I'm asking you a question.  You

24  brought it up, so I'm asking you a question.  Why do you

25  need a service agent?

1          MR. BALDIGA:  We thought that at the end of the

2     day, that would serve to be most efficient, but if the Court

3     doesn't --

4          THE COURT:  Well, I don't know.  Maybe it will,

5     but I want to hear from other people about it, right?

6          MR. BALDIGA:  Okay.

7          THE COURT:  I mean, that is -- that's on for

8     hearing on the -- that was originally scheduled for hearing

9     on the 12th, isn't it?

10          MR. BALDIGA:  Yes.

11          THE COURT:  So there's an objection deadline with

12     regard to that motion already in place.  There should be.  I

13     haven't looked at --

14          MR. BALDIGA:  Yes.

15          THE COURT:  -- the notice of hearing, but there

16     should be.  So --

17          MR. BALDIGA:  Then I won't volunteer them.

18          THE COURT:  Yeah, I just --

19          MR. BALDIGA:  I'm just trying to accommodate.

20          THE COURT:  You know, all I'm -- look, one thing

21     that -- in every chapter -- in every case regardless of

22     chapter, but certainly in a Chapter 11 case, that the Court

23     is concerned about administrative expenses.  Right?  So we

24     need to figure out whether or not -- if everybody thinks

25     it's good, then fine -- then I'll probably agree.  But I

1       want to make sure everybody thinks it's good.

2                   MR. BALDIGA:  Sure.

3                   THE COURT:  And I -- and maybe I will agree.  I

4       don't know.  I haven't really reviewed it enough to make it

5       an educated ruling, but I just throw out there, you know,

6       like all these applications to employ professionals.

7                   As you said, this is not a normal Chapter 11 case.

8       It's extraordinary.  So I have to watch it and make sure

9       that administrative expenses and things are not handled in a

10      rote manner.  It's going to be decided whether or not it's

11      appropriate under the circumstances of this case.  Okay?

12                  MR. BALDIGA:  Understood, Your Honor.

13                  THE COURT:  Okay.

14                  MR. BALDIGA:  And my -- and just for some of the

15      reasoning, my experience is, especially when it comes to

16      tabulating the voting on a plan, having a professional

17      independent firm that does that has often proved to be

18      beneficial.  But again, everyone will have a chance to speak

19      to that.

20                  THE COURT:  Okay.  Thank you.

21                  MR. BALDIGA:  Thank you.

22                  THE COURT:  Attorney Friedman?

23                  MR. FRIEDMAN:  Your Honor, from PACS's

24      perspective, we will meet and confer with Mr. Kwok.

25                  THE COURT:  We couldn't hear you, Attorney

1    Friedman.

2              MR. FRIEDMAN:  I'm sorry.

3              THE COURT:  I'm sorry.  Say that again.

4              MR. FRIEDMAN:  Sure.  From PACS's perspective, we

5    share concerns, but this is something I will call Mr.

6    Baldiga this week and discuss, Stretto's retention

7    application.

8              So if we can actually take an issue off of your

9    plate from having to be litigated, we will meet and confer

10   in good faith and come back with that.

11             THE COURT:  Yeah.  I thank you.  I anticipate that

12   the parties will have discussions before the objection

13   deadline and will see where we are.  Okay?

14             Attorney Claiborn, I think you wanted to say

15   something else.

16             MS. CLAIBORN:  No, I just was standing to see if

17   the Court had any other questions for me.

18             THE COURT:  No, I -- but I -- that order most

19   likely will not get out obviously right now.  The clerk's

20   office is going to be closing in a little while until

21   tomorrow, but it will get out.  It will be issued and you

22   can -- do you want me to recite those dates for you again,

23   or do you have them?

24             MS. CLAIBORN:  I wrote them down.

25             THE COURT:  Okay.

1          MS. CLAIBORN:  I'm good.

2          THE COURT:  And then we will go from there.

3          Now with regard to today's matters, the Chapter 11

4     case management conference, I already indicated that it's

5     going to be continued.  So that's going to be continued

6     until April 13th at 10:00 a.m. as well.

7          With regard to the motion -- I'm sorry, I just

8     lost my place.  Just, if you would give me -- bear with me

9     for a second.

10         (Pause)

11         THE COURT:  With regard to the motion, Pacific

12    Alliance Asia Opportunity Fund for entry of order confirming

13    the inapplicabilty of the automatic stay, or in the

14    alternative, relief from the automatic stay, pursuant to

15    Section 362(d)(2) of the Bankruptcy Code, the hearing -- the

16    preliminary hearing is continued until April 13th at 10:00

17    a.m.

18         Now, I'm going to do one thing with regard to

19    that.  Hold on one second, please.

20         (Pause).

21         THE COURT:  In PACS's reply to the objection filed

22    by the debtor to this motion, Paragraph 8, Paragraph 9,

23    Paragraph 10, Paragraph 11 talk about the *Rooker-Feldman*

24    Doctrine and res judicata.

25         I'm going to give the debtor until a week from --

97

1    not a week.  Until March 28th at 5:00 p.m. to file a brief

2    no longer than five pages to respond to those specific

3    paragraphs in the reply and that's it.  No more briefing

4    will be allowed in connection with this motion.

5             Does anyone have any questions?

6             MR. BALDIGA:  No, Your Honor.

7             THE COURT:  Okay.  Is there anything further we

8    need to address?  I don't think that there is because

9    there's nothing further on the calendar today.

10            MR. BALDIGA:  No, Your Honor.  Thank you very

11   much.

12            THE COURT:  All right.  So then the hearing in the

13   Kwok matter today are concluded.  This is the last matter on

14   today's calendar, so court is adjourned.

15        (Proceedings concluded at 4:22 p.m.)

16            I, CHRISTINE FIORE, Certified Electronic Court

17   Reporter and Transcriber, certify that the foregoing is a

18   correct transcript from the official electronic sound

19   recording of the proceedings in the above-entitled matter.

20

21

22   *Christine Fiore*

23   _____        March 28, 2022

24      Christine Fiore, CERT

25