UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

|  |  |  |
|---|---|---|
| In re: | : | CHAPTER 11 |
|  | : |  |
| HO WAN KWOK, | : | Case No. 22-50073(JAM) |
| Debtor. | : |  |
|  | : | April 6, 2022 |
|  | : |  |

**OBJECTION OF CREDITORS RUI MA AND WEICAN MENG
TO THE DEBTOR'S PROPOSED POSTPETITION FINANCING FACILITY**

Creditors Rui Ma and Weican Meng ("**Creditors**"), by and through their undersigned counsel, hereby submit this objection to the motion of the Debtor for approval of a postpetition financing facility (the "**Motion**") [Docket No. 117], and respectfully state as follows:

**PRELIMINARY STATEMENT**

1. If the Motion is an attempt by the Debtor to "do everything by the book" and to provide "extraordinary transparency" (as the Debtor's proposed counsel previously represented to the Court would be done),[1] it fails. The Motion should be denied because the proposed financing facility (the "**DIP**" or "**DIP Facility**") is illusory, is set up to benefit the Debtor (not his estate or creditors) and gives inequitable leverage over the course of this case to the Debtor and to Golden Spring (New York) Ltd. ("**Golden Spring**" or "**Proposed Lender**"), an insider of the Debtor.[2] The Debtor has failed to establish that the DIP Facility benefits the estate, and his conclusory and

---

[1] The Debtor's proposed counsel made these statements at the hearings before the Court held on March 22, 2022.

[2] The Bankruptcy Code defines the term "insider" to include among other things relatives, corporations of which the debtor is a director, officer or person in control, and affiliates. 11 U.S.C. § 101(31)(A), (E). This definition "is neither exclusive nor exhaustive" and other persons may be insiders. *E.g., In re TS Emp., Inc.*, 603 B.R. 700, 708 (Bankr. S.D.N.Y. 2019) (citations omitted). Here, the Proposed Lender is an entity owned and controlled by the Debtor's son and with a long record of funding the Debtor's lavish expenses on non-commercial terms. *E.g.*, Motion ¶ 2. Accordingly, the Creditors submit that the Proposed Lender is an insider of the Debtor within the meaning of the Bankruptcy Code.

1

KBM/M1738/1001/1823585v1
04/06/22-HRT/BD

self-serving assertions are not entitled to business judgment deference. Accordingly, the Motion should be denied.

## ARGUMENT

2.  The Motion describes a DIP Facility purporting to offer "generous" $8 million financing from his son (through his son's controlled-entity Golden Spring) that is unsecured and subordinated to general unsecured claims without any administrative or other priority repayment rights. [ECF 117 at p. 2 ¶¶1,3]. The DIP Facility contemplates the Debtor's proposed financial advisor, Verdolino & Lowey, P.C. ("**V&L**"), to take receipt of the loan proceeds and be the sole authorized signatory for disbursement of funds in accordance with the Budget. [*Id.* ¶ 2.]. The Motion also asserts that "*[n]o* DIP Loan proceeds will be used to pay or reimburse the DIP Lender for any costs, expenses, or indemnification in connection with the DIP Facility." [ECF 117 at p. 6 ¶17 (emphasis added)].

3.  This is all illusory because the funding obligations under the DIP Facility are terminated, and the claims thereunder become superpriority administrative expenses, upon an Event of Default (as used in the Motion), which includes the following events:

    (a) The Debtor fails to submit budgets as required or information requested by the Proposed Lender, or otherwise breaches the credit agreement;
    (b) The Debtor files a motion to dismiss or convert this case to chapter 7;
    (c) PAX obtains stay relief to proceed with its state court litigation;
    (d) The New York court denies a motion to transfer venue of PAX litigation;
    (e) This case is dismissed or converted to chapter 7;
    (f) A chapter 11 trustee is appointed in this case; and
    (g) The Debtor's exclusive right to propose a plan is terminated.

*See* ECF 117 Exh. C (Credit Agreement) § 8.

4.  These Events of Default are either wholly within the control of the Debtor (*e.g.*, reporting requirements, the filing of motions to convert or dismiss the case) or that appear to have

2

a significant risk of occurring (*e.g.*, appointment of a trustee, termination of exclusivity, relief from stay for PAX or denial of venue transfer).  In other words, the proposed funding can be terminated at any time at the whim of the Debtor, or upon the occurrence of any one of several events, each of which has a significant probability of occurring (with the corollary that the probability of no such events occurring is low).  Accordingly, the DIP Facility is illusory.

5.      Moreover, the DIP Facility provides that prior to entry of a final DIP order by the Court, the DIP loan proceeds "can only be used to pay the administrative expenses of the Debtor's ordinary course professionals". [ECF 117 Exh. C (Credit Agreement) § 2.04 (emphasis added)]. This provision can be interpreted to mean that the $4 million touted as being available to pay professionals of the Creditors' Committee or any examiner (if appointed) may not be available until much later in the case when (and if) the Court enters a final DIP Order.  Further, no budget is provided in connection with the Motion, but rather the DIP Facility leaves it up to the Debtor and insider Lender to determine the budget themselves. [ECF 117 Exh. C (Credit Agreement) p. 2 (noting that the "Initial Budget" means "a budget agreed to by the Debtor and the Lender…")].

6.      Not only is the proposed funding illusory, but it also gives the Debtor and his insider Proposed Lender inequitable control over the progress of this case by controlling the availability of funding and by controlling the structure of any plan for at least two reasons:

(a)     *First*, the DIP Facility contemplates that, upon an Event of Default, the Proposed Lender obtains a superpriority administrative expense claim.  While some language of the Motion suggests that any such superpriority claim is limited to recovery solely from and to the extent of any DIP Facility proceeds received but not yet expended by the Debtor (less the carve out), the Motion and proposed orders fail to effect this result, and instead operate to award superpriority status without limiting its satisfaction to any

3

such unexpended proceeds. *E.g.,* Motion Exh. B (Proposed Final Order) ¶ 9. Accordingly, if (or more plausibly, *when*) one of the proposed Events of Default occurs, the Proposed Lender will have a superpriority administrative expense claim that is <u>not</u> subordinated to general unsecured claims.[3] In fact, in an Event of Default, the Lender's claim to the undisbursed Loan proceeds would also take priority over accrued but unpaid administrative claims (other than a $500,000 professional fee carve out).

(b)      *Second*, the DIP Facility matures on the confirmation of a plan of reorganization. Therefore, notwithstanding the purported subordination of the DIP Facility to general unsecured claims, a plan cannot be confirmed, and general unsecured claims will not be satisfied, without satisfying the DIP Facility. Moreover, the Motion in general, and the proposed orders in particular, do not actually provide that such obligations are not and will not be afforded administrative expense priority. As a practical matter, the DIP Facility is not subordinated to the claims of unsecured creditors if it matures at confirmation or if it does not expressly disclaim any administrative expense priority.

7.      Further, the Debtor is not entitled to any sort of business judgment deference in entering into the DIP Facility. The Debtor continues to live as a billionaire while maintaining under penalty of law that he has no assets or rights, not even a bank account or credit card, and lives off gifts from family. In fact, nothing about the Debtor's conduct or circumstances – either

---

[3] In addition, the Debtor is seeking to incur significant professional expenses, and other administrative expenses, in reliance on DIP Facility funding. To the extent that such funding is subsequently unavailable for any reason, those claims will nonetheless have priority over the claims of general unsecured creditors. Accordingly, unless all such expenses and claims are expressly subordinated to general unsecured claims or are expressly limited to recovery from DIP Facility proceeds (if any), the notion that the DIP Facility is subordinated to or otherwise does not prejudice general unsecured claims is illusory.

prior to or during this case – warrants any baseline deference to his business judgment.[4] Nor does the Debtor's conduct or circumstances allow for presumption of his good faith, a necessary precondition for business judgment deference.[5]

8.  The Debtor negotiated the DIP Facility with an insider, his son. [ECF 117 at p. 5 ("the debtor asked his son to extend additional credit"); p. 6 ("The DIP Lender, an entity controlled by the Debtor's son, has agreed to extend the DIP Financing, on the terms requested by the Debtor.")] In his February 9, 2022 contempt order in the PAX state court litigation, Judge Barry R. Ostrager already found that the Debtor had engaged in "efforts to avoid and deceive his creditors by parking his substantial personal assets with a series of corporations, trusted confidants, and family members." [*See* February 9, 2022 J. Ostrager Decision p. 1]. Because the Proposed Lender is so closely related to the Debtor, and because the Debtor is not entitled to business judgment deference, the Court should evaluate the proposed financing on a standard no lower than entire

---

[4] The Debtor has failed to establish the need for, or the reasonableness of, the proposed financing. Among other things, the DIP offers no budget and nothing beyond cursory platitudes to explain how or why the funds will be used. Further, the ability of the Debtor and this case to survive without interim relief on the DIP Facility, despite the Debtor's representations of the need for such relief to avoid "immediate and irreparable harm," belies the Debtor's representations and his so-called business judgment.

[5] The Creditors note the Debtor's attempts to establish his good faith by reference to various media pieces concerning his alleged efforts against the Chinese Communist Party and assorted conspiracy theories. None of this offers slightest shred of admissible evidence, and it is notable that the Debtor entirely ignores the myriad other media pieces concerning his wealth, his con artist schemes to take advantage of people (such as an ivermectin button-down shirt to prevent COVID for $1,820), his pattern of accusing his deemed opponents – including Justice Ostrager (per PAX's counsel at the April 22nd hearing before this Court) – of being CCP agents, and the allegations that the Debtor is actually working for the CCP to identify and undermine dissidents abroad. E.g., Dan Friedman, *A Fugitive Chinese Tycoon Met Steve Bannon. Misinformation Mayhem Ensued*, Mother Jones (2022), https://www.motherjones.com/politics/2022/02/guo-wengui-miles-guo-gettr-steve-bannon/ (accessed April 4, 2022). The Creditors also note the media reports that the Debtor – *during this case* – shut down a video streaming site that he launched in 2020 amid investor claims of fraud and SEC charges. Dan Friedman, *The Misinformation Empire Steve Bannon Built With a Fugitive Chinese Tycoon Is in Trouble*, Mother Jones (March 3, 2022), https://www.motherjones.com/politics/2022/03/the-misinformation-empire-steve-bannon-built-with-a-fugitive-chinese-tycoon-is-in-trouble/ (accessed April 4, 2022).

5

fairness, and the Debtor should be required to establish that any financing is necessary to meet a compelling interest of the estate and narrowly tailored to achieve that interest.[6]

9.     The Motion fails to establish any benefits to the estate from the DIP Facility. There is no budget. Despite some cursory statements concerning the Debtor's unliquidated litigation assets (for which no relevant detail is provided despite such claims apparently being pending since 2015 and 2017) the Debtor has provided no information whatsoever that can justify additional estate expenditures to pursue these so-called assets. Indeed, as the Debtor's schedules identify (again, with no relevant information whatsoever) multiple litigation funding agreements with and security interests in favor of the Proposed Lender on such claims,[7] there is no evidence that any such benefit would inure to the benefit of the estate. Moreover, the DIP Facility does require the estate to reimburse the insider Lender for Out of-Pocket Expenses (including reasonable fees, disbursement, and other charges of counsel) in connection with monitoring the Debtor's compliance with the terms of the DIP Loan Agreement. [ECF 117 at p. 10; Exhibit C (Credit Agreement) p. 7 §7.01)]. The DIP Facility also contains a provision requiring the Debtor to indemnify the Lender in connection with the DIP Facility under certain circumstances. [*Id.*]

10.    Obviously, the Creditors do not object to the Debtor's incurrence of unsecured indebtedness with payment subordination to prepetition general unsecured claims to fund administrative expense claims in this case. But the DIP Facility is not such a financing facility. It offers funding availability at the whim of the Debtor and the insider Proposed Lender, exposes the estate to potentially significant administrative claims incurred in reliance on the availability of

---

[6] The Creditors note that the Proposed Lender seeks interest, default interest, fees, expenses, and indemnification, and requires reporting and other obligations in connection with making the DIP Facility. As the Proposed Lender appears to have a long history of funding the Debtor with no such requirements outside of this case, the Creditors submit that all such conditions are not warranted.

[7] Moreover, to the extent that the Proposed Lender has claims with respect to the Debtor's litigation, no doubt the Proposed Lender is amply incentivized out of its own self-interest to continue to fund such litigation.

6

the DIP Facility, and overall is merely an attempt to control the course of this case and create superpriority administrative expense claims for the sole benefit of the Debtor and his insiders. The Debtor is welcome to continue living off the purported gifts from his wife and children as long as it is without prejudice to general unsecured creditors.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Creditors request that the Court deny the DIP Motion in its entirety and grant such other and further relief as is just and proper.

Dated: April 6, 2022

/s/    *Kristin B. Mayhew*
Kristin Mayhew
**MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**
30 Jelliff Lane
Southport, CT 06890
(203) 319-4000
kmayhew@mdmc-law.com

- and -

Carollynn H.G. Callari (*pro hac vice*)
David S. Forsh (*pro hac vice*)
**CALLARI PARTNERS LLC**
One Rockefeller Plaza, 10th Floor
New York, NY 10020
(212) 202-3050
ccallari@callaripartners.com
dforsh@callaripartners.com

*Attorneys for Rui Ma and Weican Meng*

KBM/M1738/1001/1823585v1
04/06/22-HRT/BD

## CERTIFICATE OF SERVICE

I, Kristin B. Mayhew, hereby certify that a true and accurate copy of the foregoing Objection of Creditors Rui Ma and Weican Meng to the Debtor's Proposed Postpetition Financing Facility was filed with the Court on April 6, 2022. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system. Parties may access this filing through the court's CM/ECF System.

/s/ Kristin B. Mayhew
Kristin B. Mayhew