**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

| | |
|---|---|
| In re:<br><br>Ho Wan Kwok,[1]<br><br>Debtor. | Chapter 11 Case No.<br><br>22-50073 (JAM) |

**PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.'S OBJECTION TO DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL DIP ORDERS (I) AUTHORIZING THE DEBTOR TO OBTAIN UNSECURED, SUBORDINATED POSTPETITION FINANCING AND (II) SCHEDULING INTERIM AND FINAL HEARINGS, AND (III) GRANTING RELATED RELIEF**

TO THE HONORABLE JULIE A. MANNING,
UNITED STATES BANKRUPTCY JUDGE:

Pacific Alliance Asia Opportunity Fund L.P. ("PAX"), by and through its undersigned counsel, respectfully submits this objection (the "Objection") to the *Debtor's Motion for Entry of Interim and Final DIP Orders (I) Authorizing the Debtor to Obtain Unsecured, Subordinated Postpetition Financing and (II) Scheduling Interim and Final Hearings, and (III) Granting Related Relief* [ECF No. 117] (the "Motion").[2] In support of this Objection, PAX respectfully states as follows:

**PRELIMINARY STATEMENT**

1. Golden Spring (New York) Ltd. ("Golden Spring" or the "DIP Lender") is the quintessential "insider" entity that was formed and funded by the Debtor[3] and now is allegedly

---

[1] The last four digits of the Debtor's taxpayer identification number are 9595.

[2] Capitalized terms used but not defined in this Objection shall have meanings given to such terms in the Motion.

[3] *See Declaration of Peter Friedman in Support of Pacific Alliance Asia Opportunity Fund L.P.'s Objection to Debtor's Motion for Entry of Interim and Final DIP Orders (I) Authorizing the Debtor to Obtain Unsecured, Subordinated Postpetition Financing, and (II) Scheduling Interim and Final Hearings, and (III) Granting Related Relief*, attached hereto as **Exhibit A** (the "Friedman Decl."), Ex. 1, Feb. 5, 2016 Aff. of Kwok Ho Wan at ¶ 36, *Ace*

controlled by the Debtor's son. It serves as the Debtor's "family office" that pays for most, if not all, of the Debtor's enormous living and legal expenses. Under the guise of the Debtor's "business judgment," the Motion seeks authorization for Golden Spring to make a purported loan of additional money to a debtor who (i) claims under oath to have no business, assets, or cash flow, (ii) commenced this case for the purpose of re-litigating his liabilities to PAX, and (iii) based on his portrayal of his assets, has no chance to confirm a chapter 11 plan.

2. Boiled down to its essence, the Debtor wants to borrow $8,000,000 from his family to defend purported assets of $3,850. The Court can infer two things from this proposed transaction: First, the Debtor knows that his asset disclosures are materially false and Golden Spring's cash is readily available to defend his falsehoods. Second, Golden Spring will spend massive sums to manipulate this proceeding to protect itself from alter ego, veil piercing, and substantive consolidation claims. Otherwise, spending over 2,000 times the amount of the Debtor's alleged assets[4] to fund a chapter 11 case makes no sense. A debtor-in-possession ("DIP") loan designed to protect false disclosures and a third party's assets should not receive this Court's blessing.

3. Moreover, the Debtor is seeking to burden his estate with additional debt that, depending on the outcome of numerous case-deciding motions pending against him, could lead to the incurrence of at least $2,000,000 in super-priority administrative expenses that would benefit no one except the Debtor and his son. The Proposed DIP Facility is pre-wired to default if, among other things, a trustee is appointed or stay relief is granted and is designed to force the court to choose between DIP defaults and granting the substantive relief to which PAX is entitled. As such,

---

*Decade Holdings Limited v. UBS AG*, Index No. 653316/2015 (N.Y. Sup. Ct.), NYSCEF Doc. No. 27 ("Feb. 5, 2016 Kwok Aff.").

[4] $8,000,000/$3,850=2,078.

the Proposed DIP Facility provides no benefit to the Debtor's estate and would allow the Debtor and his insider "lender" to abuse the bankruptcy process to the detriment of the Debtor's non-insider creditors. Accordingly, the Motion should be denied.[5]

## OBJECTION[6]

### I. THE PROPOSED DIP FACILITY IS AN UNFAIR INSIDER TRANSACTION

4. Troublingly, the Debtor argues that the business judgment standard applies to this transaction, because he contends Golden Spring is not an insider. *See* Motion at ¶ 19. He specifically denies the DIP Lender is an insider: in the *Checklist for Motions and Orders for Use of Cash Collateral and Post-Petition Financing* attached as Exhibit C to the Motion (excerpt pasted below), the Debtor checks the "no" box in response to the question "Is the lender an insider" in section 6(e) of the checklist. This is dishonest and incorrect.[7]

```
6. Waiver/Release Claims v. Lender:
   a. Debtor waives or releases claims against lender, including,
      but not limited to, claims under §§ 506(c), 544-550, 552, and
      553 of the Code?                                                  ☐ Yes ☑ No ☐ N/A
   b. Does the Debtor waive defenses to claim or liens of lender?       ☐ Yes ☑ No ☐ N/A
   c. Is the proposed lender also the pre-petition lender?              ☑ Yes ☐ No ☐ N/A
   d. New post-petition lender?                                         ☐ Yes ☑ No ☐ N/A
   e. Is the lender an insider?                                         ☐ Yes ☑ No ☐ N/A
```

5. Courts find parties to be non-statutory insiders where there are close relationships and non-arm's length transactions between the parties. *See In re Bruno Mach. Corp.*, 435 B.R. 819, 835 (Bankr. N.D.N.Y. 2010). In *Bruno Mach. Corp.*, the court examined the relationship between the debtor, its majority shareholder and president ("Bruno"), and Bruno's long-time friend

---

[5] PAX also adopts and joins in the arguments set forth in the *United States Trustee's Objection to Debtor's Motion for Entry of Interim and Final DIP Orders (I) Authorizing the Debtor to Obtain Unsecured, Subordinated Postpetition Financing and (II) Scheduling Interim and Final Hearings, and (III) Granting Related Relief* [ECF No. 160].

[6] PAX reserves its rights to supplement this Objection based on information it learns in discovery from the Debtor, Golden Spring, and their advisors.

[7] It should be noted that the Debtor also failed to certify to the accuracy of the information contained in the *Checklist for Motions and Orders for the Use of Cash Collateral and Post-Petition Financing*, as required by Appendix H of the Local Bankruptcy Rules.

("Chorbajian") and his company ("TDC"). *Id.* at 828. In finding that a non-statutory insider relationship existed between the debtor and TDC, the court examined the relationship between Bruno and Chorbajian, holding that "the closeness of the relationship between Chorbajian and Bruno, the unusual nature of their business transactions, and the general lack of formality surrounding these transactions lead the court to conclude that both Chorbajian and TDC are non-statutory insiders of [the debtor]." *Id.* at 835. Moreover, the court found that because the parties "engaged in less-than-arm's length transactions" it was not necessary for the court to also find that control was exercised over the debtor. *Id.* at 836.

6. Here, the DIP Lender is obviously a non-statutory insider. The relationship involves a father and son—one significantly closer than the friendship at issue in *Bruno Mach. Corp.*—and includes numerous non-arm's length transactions that lack formality:

- In March 2015, the Debtor "set[] up [Golden Spring] by transferring funds from one of [his] accounts at UBS to [Golden Spring]'s JPMorgan Chase bank account."[8]
- The DIP Lender is wholly owned by China Golden Spring Group (Hong Kong Limited),[9] which purportedly is technically owned by the Debtor's son.
- The DIP Lender operates as the Debtor's "family office."[10]
- The DIP Lender funds the Debtor's lavish lifestyle,[11] including paying millions of dollars in expenses related to his living expenses,[12] funding the Debtor's counsel in

---

[8] Friedman Decl., Ex. 1, Feb. 5, 2016 Kwok Aff. at ¶ 36.

[9] Friedman Decl., Ex. 2, May 19, 2021 Aff. of Yanping Wang at ¶ 3, *Pacific Alliance Asia Opportunity Fund L.P. v. Kwok Ho Wan*, Index No. 65077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 806.

[10] *See Declaration of Mr. Ho Wan Kwok in Support of the Chapter 11 Case and Certain Motions* [ECF No. 107] (the "First Day Decl.") at ¶ 17.

[11] Friedman Decl., Ex. 3, Hr'g Tr. at 9:25–10:3, *Pacific Alliance Asia Opportunity Fund L.P. v. Kwok Ho Wan,* Index No. 65077/2017 (N.Y. Sup. Ct. May 27, 2021), NYSCEF Doc. No. 833 (the Court found that "[i]t's quite undisputed that Golden Spring[] has funded seven-figure payments to facilitate Mr. Kwok's lifestyle . . . ."); *see also* First Day Decl. at ¶ 17.

[12] Friedman Decl., Ex. 4, Feb. 21, 2021 Ltr., *Pacific Alliance Asia Opportunity Fund L.P. v. Kwok Ho Wan,* Index No. 65077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 765 (Letter from M. Carvalho to E. Moss stating that "[the Debtor's] expenses during the relevant time period have been paid for by Golden Spring (New York) Ltd."); *see also* Friedman Decl., Ex. 5, 341 Meeting Tr. at 21–22, *In re Genever Holdings LLC*, No. 20-12411 (Bankr. S.D.N.Y. Dec. 18, 2020) ("This family office [Golden Spring] pays some of the expenses related to the Sherry apartment also, which is about like 1.8 million in total so far.").

4

various litigations,[13] and paying for the upkeep of, employees working on, and legal counsel for the Lady May,[14] which the Debtor likely paid for and "beneficially owns and controls."[15]

### A. The Motion is Subject to Heightened Scrutiny

7. Contrary to the Debtor's claim, because this is an insider transaction, the Court must examine the Proposed DIP Facility with heightened scrutiny and cannot defer to the Debtor's business judgment. *See In re Latam Airlines Group S.A.,* 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020) ("By definition, the business judgment rule is not applicable to transactions among a debtor and an insider of the debtor."); *WHBA Real Estate Ltd. P'ship v. Lafayette Hotel P'ship (In re Lafayette Hotel P'ship)*, 227 B.R. 445, 454 (S.D.N.Y. 1998) ("[S]ince there is an incentive and opportunity to take advantage . . . insiders' loans in a bankruptcy must be subject to rigorous scrutiny." (internal citations omitted)), *aff'd*, 198 F.3d 234 (2d Cir. 1999). "In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).

---

[13] Friedman Decl., Ex. 6, Apr. 7, 2021 Ltr., *Pacific Alliance Asia Opportunity Fund L.P. v. Kwok Ho Wan,* Index No. 65077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 766 (Letter from K. Kearney of Hodgson Russ to E. Moss explaining that the firm has represented Kwok in various matters and that payments received by the firm for its services were made by Golden Spring (New York) Ltd.); *see also* Schedule D [ECF No. 78] (listing Golden Spring as a secured creditor in an unknown amount for "Litigation Funding") and Schedule F [ECF No. 78] (listing Golden Spring as an unsecured creditor for approximately $21,000,000 in "Litigation Funding").

[14] Friedman Decl., Ex. 7, Evidentiary Hr'g Tr. at 55:21–56:23; 64:21–65:5, *Pacific Alliance Asia Opportunity Fund L.P. v. Kwok Ho Wan,* Index No. 65077/2017 (N.Y. Sup. Ct. Feb. 2, 2022 ), NYSCEF Doc. No. 1179.

[15] *See* Friedman Decl., Ex. 8, Decision + Order on Mot. at 4, *Pacific Alliance Asia Opportunity Fund L.P. v. Kwok Ho Wan,* Index No. 65077/2017 (N.Y. Sup. Ct. Feb. 9, 2022), NYSCEF Doc. No. 1181 ("The testimony adduced at the hearing out of the mouths of defendants' witnesses clearly and convincingly demonstrated that Kwok beneficially owns and controls the Lady May . . . . [A] reasonable inference is that Kwok provided the funds to HK International which were used to purchase the yacht.").

### B.     The Proposed DIP Facility Is Inherently Unfair

8.     Bankruptcy courts are reluctant to approve postpetition financing schemes that leverage the bankruptcy process and for which the underlying purpose of the proposed financing is to benefit a party in interest rather than the debtor's estate. *See, e.g., In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) ("The Court is aware that its normal function in reviewing requests for post-petition financing is to defer to a debtor's own business judgment so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest." (internal citation omitted)); *In re Tamarack Resort, LLC.*, No. 09-03911-TLM, 2010 WL 4117459, at *11 (Bankr. N.D. Idaho Oct. 19, 2010) ("[C]ourts look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest." (internal citation omitted)); *In re Tenney Village Co., Inc.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (finding that the proposed financing "would pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the [lender] and the Debtor's principals who guaranteed its debt").

9.     In *Norris Square Civic Ass'n v. St. Mary Hospital (In re St. Mary Hospital)*, the bankruptcy court denied the debtor's proposed postpetition financing arrangement with its parent because the proposed arrangement gave the parent a superpriority lien on all unencumbered assets of the debtor, which the court found was not fair and reasonable in light of the relationship between the parties and the results of the transaction as a whole. 86 B.R. 393, 401-03 (Bankr E.D. Pa. 1988).

10.     Contrary to the Debtor's allegations regarding the "generous" financing provided by the DIP Lender, the Proposed DIP Facility contains several provisions that are crafted to provide

6

the DIP Lender with a superpriority claim at the expense of the Debtor's estate if the Debtor defaults under the DIP Loan Agreement:

- Events of Default. The following events of default[16] are prewired to trigger based on the Court's determination of certain motions pending before it:[17]
    - entry of an order granting relief from the automatic stay in connection with the PAX Litigation, and/or the United States District Court for the Southern District of New York denies a motion to transfer venue of the PAX Litigation;
    - without the consent of the DIP Lender, this chapter 11 case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code; or
    - if a chapter 11 trustee is appointed.
- Remedies. Upon an event of default, the DIP Lender is "automatically granted an administrative expense claim having priority over any or all other administrative expenses of any kind . . . in an amount equal to the Undisbursed DIP Loans."[18]

11. There is no evidence of arm's length, good faith negotiations on these terms between the Debtor and the DIP Lender.[19] Further, as discussed below, the Debtor has failed to provide *any* analyses regarding the need and propriety of the Proposed DIP Facility beyond his conclusory statements regarding how "generous" the Proposed DIP Facility is. But if the Court granted the Debtor's request for interim financing and subsequently grants the Stay Motion, Trustee Motion, and/or the Dismissal Motion, the DIP Lender could walk away from the case with a $2,000,000 superpriority administrative claim at the expense of the Debtor's other creditors. This should not be countenanced.

---

[16] *See* DIP Loan Agreement at §§ 8.01 (e)-(g).

[17] *See Motion of Pacific Alliance Asia Opportunity Fund L.P. for Entry of an Order Confirming the Inapplicability of the Automatic Stay or, In the Alternative, Relief from the Automatic Stay Pursuant to Section 362(d)(2) of the Bankruptcy Code* [ECF No. 57] (the "Stay Motion"); *United States Trustee's Motion for an Order Directing the Appointment of an Examiner or, In the Alternative, Motion for Order Directing the Appointment of a Chapter 11 Trustee* [ECF No. 102] (the "Trustee Motion"); *Pacific Alliance Asia Opportunity Fund L.P.'s Motion to Dismiss Chapter 11 Case or, In the Alternative, Partial Joinder to the United States Trustee's Motion for an Order Directing the Appointment of a Chapter 11 Trustee,* filed contemporaneously herewith (the "Dismissal Motion").

[18] *See* DIP Loan Agreement at § 8.02 (b).

[19] If the Court does not deny the Motion outright, it should defer consideration of the Motion until it determines whether a trustee should be appointed, the automatic stay should be lifted, or PAX's forthcoming motion to remand its state court lawsuit against the Debtor is granted rather than approving a DIP loan that may default imminently.

12. Moreover, the vastly disproportionate amount of professional fees the Proposed DIP Facility provides for compared to the Debtor's purported assets (again, over a 2,000:1 ratio) is suspicious, suggesting the Debtor and the DIP Lender are both colluding to use the Proposed DIP Facility to fund a re-litigation of state court claims (which is not an appropriate use of the Bankruptcy Code), and to use this case improperly to try to insulate the DIP Lender from liability on claims like veil piercing, alter ego, and substantive consolidation. This too should be prevented.

## II. THE DIP FINANCING IS NOT IN THE BEST INTERESTS OF THE DEBTOR'S ESTATE

13. The Motion states that the Debtor "requires access to postpetition financing to continue his litigation, potentially to judgment, for the benefit of his creditors [and] to negotiate and achieve confirmation of a plan of reorganization." Motion at ¶ 34.

14. As an initial matter, no budget is attached to the Motion, which makes an evaluation of the proposed use of the DIP proceeds impossible. But one can surmise that the vast majority of the DIP proceeds will be devoted to the Debtor's efforts to improperly re-litigate against PAX and to fight against—rather than for the benefit of—other creditors. Second, contrary to the examples cited in the Motion, this is not a case where a debtor is seeking financing to remain in business. *See, e.g., In re Ames Dep't Stores, Inc.,* 115 B.R. 34 (Bankr. S.D.N.Y. 1990) (operating business sought non-insider financing to continue purchasing inventory and conducting business in chapter 11). There *is nothing* to reorganize here. The Debtor has represented under oath that he has no business, assets, or cash flow. While the Debtor makes conclusory statements that he intends to pay all creditors in full, there is no evidence of how an $8 million DIP loan advances that goal. If the Debtor and his family want to pay creditors in full, they can and should use the vast amounts of cash available to them for that purpose. No DIP financing is needed, nor is a chapter 11 plan required, to do so.

15. The Debtor wants his creditors to bear the risk of burdening the estate with additional debt when his chapter 11 case is objectively futile. *Barbara K. Enterprises* (cited by the Debtor) highlights this issue: the court denied the debtor's DIP motion because the "business [had] no meaningful business plan or budget going forward." *In re Barbara K. Enters., Inc.,* 2008 WL 2439649, at *15. The court found that the "Debtor's proposal for moving forward with this bankruptcy case and with the future operations of the company is akin to a start-up business, as opposed to a business seeking to reorganize through chapter 11." *Id.* at *14. Based on the debtor's pattern of "generalized statements" regarding the debtor's business plan, the court denied the proposed financing because of the "highly unlikely prospects for a successful reorganization of the Debtor." *Id.*

16. Taken at his word, the Debtor merits financing even less than a start-up business, because he has no economic prospects at all. The Motion is based on unsupported, speculative assertions regarding the benefits of the Proposed DIP Facility and the Debtor's prospects for confirming a chapter 11 plan. This is not a legitimate chapter 11 reorganization and the Motion is a transparent attempt to get this Court to bless the Debtor's improper attempt to finance his re-litigation efforts against his creditors, both for his own benefit and that of his family.

### III. SECTION 364(e) IS INAPPLICABLE TO THE DIP LENDER

17. Section 364(e) of the Bankruptcy Code protects the validity and priority of loans made under section 364 in the event of a subsequent reversal of the financing order if the loan was made by, or priority granted to, "an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal," unless the order was stayed pending appeal. 11 U.S.C. § 364(e). Section 364(e) of the Bankruptcy Code does not protect a lender "[w]here it is evident from the loan agreement itself that the transaction has an intended effect that is improper under the Bankruptcy Code, the lender is not in good faith, and it is irrelevant what the improper

purpose is." *In re EDC Holding Co.*, 676 F.2d 945, 948 (7th Cir. 1982) (finding that where a lender extended credit to debtor for an ulterior purpose that was improper under the Bankruptcy Code, the lender was not acting in good faith within the meaning of section 364(e)).

18. The Debtor contends that "the Court should find that the DIP Lender is a 'good faith' lender within the meaning of section 364(e)" because "the terms and conditions of the DIP Financing are fair and reasonable, and purposefully designed to avoid prejudice to the interests of any creditor." Motion at ¶ 40. But, that is wrong. The Proposed DIP Facility is inherently unfair and betrays the Debtor's attempt to benefit himself and his insiders rather than his estate. The absence of good faith is unmistakable, and the protections of section 364(e) should accordingly be denied.

## **CONCLUSION**

19. For the reasons stated above, and while reserving all other rights and remedies, PAX respectfully requests that this Court: (i) deny the relief requested in the Motion and (ii) grant such other and further relief as the Court may deem just and proper. In the event the Court grants the Motion, paragraph 9 of the proposed interim and final orders should be modified to require the DIP Lender to provide written notice of the occurrence of an "Event of Default" or violation of a provision of the DIP orders to the Court, the U.S. Trustee, PAX, and counsel to the official committee of unsecured creditors. Limiting notice to the Debtor under these provisions is improper given the insider relationship between the Debtor and the DIP Lender.

*[Remainder of Page Intentionally Left Blank]*

Dated: April 6, 2022  
Hartford, Connecticut

**Pacific Alliance Asia Opportunity Fund L.P.**

By: */s/ Patrick M. Birney*  
Patrick M. Birney (CT No. 19875)  
Annecca H. Smith (CT No. 31148)  
**ROBINSON & COLE LLP**  
280 Trumbull Street  
Hartford, CT 06103  
Telephone: (860) 275-8275  
Facsimile: (860) 275-8299  
E-mail: pbirney@rc.com  
           asmith@rc.com

-and-

Peter Friedman (admitted *pro hac vice*)  
Stuart M. Sarnoff (admitted *pro hac vice*)  
**O'MELVENY & MYERS LLP**  
7 Times Square  
New York, NY 10036  
Telephone: (212) 326-2000  
Facsimile: (212) 326-2061  
Email:  pfriedman@omm.com  
           ssarnoff@omm.com

**CERTIFICATE OF SERVICE**

I hereby certify that on April 6, 2022, a copy of the foregoing was filed electronically through the Court's CM/ECF System. Notice of this filing will be sent by e-mail to all parties receiving notice by operation of the court's electronic filing system. Parties in interest may access this filing through the Court's CM/ECF System.

/s/  *Patrick M. Birney*
Patrick M. Birney