## **EXHIBIT A**

**FRIEDMAN DECLARATION**

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION**

|  |  |
|---|---|
| In re:<br><br>Ho Wan Kwok,[1]<br><br>                       Debtor. | Chapter 11 Case No.<br><br>22-50073 (JAM) |

**DECLARATION OF PETER FRIEDMAN IN SUPPORT OF PACIFIC ALLIANCE
ASIA OPPORTUNITY FUND L.P.'S OBJECTION TO DEBTOR'S MOTION
FOR ENTRY OF INTERIM AND FINAL DIP ORDERS (I) AUTHORIZING
THE DEBTOR TO OBTAIN UNSECURED, SUBORDINATED
POSTPETITION FINANCING AND (II) SCHEDULING INTERIM
AND FINAL HEARINGS, AND (III) GRANTING RELATED RELIEF**

I, Peter Friedman, declare:

1.      I am an attorney admitted to practice law in the State of New York and Washington,

D.C. and am a partner at the law firm of O'Melveny & Myers, 7 Times Square, New York, NY

10036, counsel for Pacific Alliance Asia Opportunity Fund L.P. ("PAX"). I respectfully submit

this Declaration in support of *Pacific Alliance Asia Opportunity Fund L.P.'s Objection to Debtor's

Motion for Entry of Interim and Final DIP Orders (I) Authorizing the Debtor to Obtain Unsecured,

Subordinated Postpetition Financing and (II) Scheduling Interim and Final Hearings, and

(III) Granting Related Relief.*

2.      Attached as **Exhibit 1** is a true and correct copy of the February 5, 2016 Affidavit

of Kwok Ho Wan, filed in *Ace Decade Holdings Limited v. UBS AG,* Index No. 653316/2015

(N.Y. Sup. Ct.), NYSCEF Doc. No. 27.

3.      Attached as **Exhibit 2** is a true and correct copy of the May 19, 2021 Affidavit of

Yanping Wang, filed in *Pacific Alliance Asia Opportunity Fund L.P. v. Kwok Ho Wan,* Index No.

---

[1] The last four digits of the Debtor's taxpayer identification number are 9595.

652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 806.

4.      Attached as **Exhibit 3** is a true and correct copy of excerpts from a transcript of the May 27, 2021 Hearing before Justice Ostrager in *Pacific Alliance Asia Opportunity Fund L.P. v. Kwok Ho Wan,* Index No. 65077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 833.

5.      Attached as **Exhibit 4** is a true and correct copy of a letter from M. Carvalho to E. Moss, dated February 1, 2021, filed as Exhibit 13 to *PAX's Memorandum of Law in Opposition to Nonparty Movant Yvette Wang's Motion for Relief Pursuant to CPLR 5240* in *Pacific Alliance Asia Opportunity Fund L.P. v. Kwok Ho Wan,* Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 765.

6.      Attached as **Exhibit 5** is a true and correct copy of excerpts from a transcript of the December 18, 2020 341 Meeting in *In re Genever Holdings LLC,* Case No. 20-12411 (Bankr. S.D.N.Y. 2020).

7.      Attached as **Exhibit 6** is a true and correct copy of a letter from K. Kearney to E. Moss, dated April 7, 2021, filed as Exhibit 13 to *PAX's Memorandum of Law in Opposition to Nonparty Movant Yvette Wang's Motion for Relief Pursuant to CPLR 5240* in *Pacific Alliance Asia Opportunity Fund L.P. v. Kwok Ho Wan,* Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 766.

8.      Attached as **Exhibit 7** is a true and correct copy of excerpts from a transcript of the February 2, 2022 Evidentiary Hearing before Justice Ostrager in *Pacific Alliance Asia Opportunity Fund L.P. v. Kwok Ho Wan,* Index No. 65077/2017 (N.Y. Sup. Ct.), NYCEF Doc. No. 1179.

9.      Attached as **Exhibit 8** is a true and correct copy of the February 9, 2022 Decision and Order on Motion, *Pacific Alliance Asia Opportunity Fund L.P. v. Kwok Ho Wan,* Index No. 65077/2017 (N.Y. Sup. Ct.), NYCEF Doc. No. 1181.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 6, 2022                    Respectfully submitted,
New York, New York

*/s/ Peter Friedman*
Peter Friedman
**O'MELVENY & MYERS**
Time Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
Email:  pfriedman@omm.com

*Attorneys for Pacific Alliance Asia*
*Opportunity Fund L.P.*

# EXHIBIT 1

Case 22-50073   Doc 179-1   Filed 04/06/22   Entered 04/06/22 16:09:03   Page 6 of 94

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------x

ACE DECADE HOLDINGS LIMITED,                    :

                                                  :

                         Plaintiff,                    :   Index No. 653316/2015 (Bransten, J.)

                                                  :

                -v.-                           :   Motion Sequence No. 001

                                                  :

UBS AG,                                         :

                                                  :

                         Defendant.                    :

-----------------------------------------------------------------x

**AFFIDAVIT OF KWOK HO WAN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**

    KWOK HO WAN being duly sworn, hereby deposes and says:

    1.     I am the employer of Yong Yu, the Director and sole shareholder of Ace Decade Holdings Limited ("Ace Decade").

    2.     I make this Affidavit based upon my personal knowledge.

    3.     I first began having discussions with UBS AG ("UBS") about potential investments in 2010.  I have been a client of UBS since July 2012.

    4.     My main contact person at UBS has been Stephen Wong, who is a Managing Director of the Wealth Management and Swiss Bank Department at UBS.

    5.     I met Mr. Wong in May 2010.  Since that time, Mr. Wong has advised me on numerous matters relating to investments and financing on projects such as aircraft acquisitions. Over the years, I have depended and relied upon Mr. Wong's and UBS's knowledge and expertise in making investment and financing decisions.

6.      In addition, I have had an account at UBS since July 2012 for an investment vehicle that I control.  Since then, I have opened other accounts at UBS for two other investment vehicles that I control and have obtained financing from UBS for two airplanes.

7.      In early to mid-2014, I began discussions with UBS regarding an investment opportunity (the "Investment") in an upcoming placement of H-shares (the "Shares") of Haitong Securities Co., Ltd. ("Haitong").

8.      From 2014, when I first began discussions with UBS, to May 13, 2015, when Ms. Yu and I authorized the final payment of HK $2 billion (approximately US $260 million) to enter into this Investment, Mr. Wong and I communicated frequently through telephone calls, in-person meetings, and electronic messages.  Throughout this period, including after January 9, 2015 when I moved to New York, Mr. Wong made numerous misrepresentations, which I relied upon in deciding to make this Investment.

9.      UBS was a joint global coordinator and placement agent for the Shares, and held itself out as knowledgeable and experienced in providing advice on this Investment.

10.      At the outset, Mr. Wong assured me that if UBS got my business, it would protect my interests and provide the best possible terms for a loan to finance part of the Investment. Mr. Wong told me that because of the size of the Investment that I was planning to make, senior executives from UBS globally would participate in structuring the deal.  Mr. Wong told me that he would serve as my personal contact and as UBS's representative throughout the Investment but that he would be acting under the instructions of senior executives from UBS offices in the United States, Switzerland, England, and Hong Kong.

11.     Based on these representations that senior executives at UBS globally would be involved in structuring and overseeing this Investment and that UBS would act in my best interests, I entrusted UBS to act as my advisor for the Investment.

12.     I have read Mr. Wong's affirmation submitted in support of UBS's motion to dismiss Ace Decade's complaint.  In it, he affirmed under penalty of perjury that "[t]he first time I heard of Ace Decade was when I learned of this lawsuit in October 2015." (Affirmation of Stephen Wong ¶ 3.)  I was astonished when I read this statement because it is false.  To the contrary, Mr. Wong and UBS not only had previously heard of Ace Decade, but also they were the ones who advised me on which of my employees to appoint as sole shareholder and Director of Ace Decade, to utilize Ace Decade to enter into a side agreement with an intermediary entity that would hold legal title to the Shares, and how best to transfer the funds necessary for the Investment from one of my UBS accounts to the Ace Decade account.  In sum, Mr. Wong and UBS knew that the ultimate investor in the Investment was Ace Decade.

13.     UBS advised that because the planned Investment comprised greater than 5% of the outstanding H-shares of Haitong, if I invested through Ace Decade directly, applicable disclosure requirements would require certain filings.

14.     UBS advised that if I invested through an intermediary entity, with the intermediary entity holding legal title to the Shares, no such disclosure would be required.

15.     UBS recommended that I select Haixia Huifu Asset Investment and Fund Management Co., Ltd. ("Haixia") as the intermediary for the Investment.  UBS said that it recommended Haixia because Haixia was best qualified to act for Ace Decade.  UBS further stated that Haixia was independent of UBS and would protect my and Ace Decade's interests. Relying on these representations, I selected Haixia as the intermediary for the Investment.

16.     At no time did UBS disclose that Haixia was controlled by its joint venture partner, State Development & Investment Corp. ("SDIC").  Nor did UBS disclose that Lu Bo, who served as the principal contact between UBS and Haixia, was previously the CFO of the joint venture between UBS and SDIC.  I did not become aware of Haixia's close relationship with UBS until July 21, 2015 (after Ace Decade had made the Investment and after UBS had liquidated the Shares), when Mr. Wong disclosed that relationship during a telephone call, which I took from my office in New York.

17.     Mr. Wong initially said that if we chose Haixia as the intermediary to make the Investment, we would not need to undergo Haixia's Know Your Customer ("KYC") process. However, he later said that we needed to prepare some paperwork to undergo a background examination for Haixia, but he did not explain if this paperwork was for Haixia's KYC process. Mr. Wong asked to review the resumes of some of my employees to assess whose background would most likely satisfy Haixia's requirements so that such employee could be appointed as the Director and sole shareholder of Ace Decade.  He reviewed these resumes and advised that Ms. Yu's resume and background was best suited to satisfy Haixia's requirements and thus, that I should appoint Ms. Yu as the Director and sole shareholder of Ace Decade.  Mr. Wong said that he would provide comments on Ms. Yu's resume and asked her to send it to him.  (*See* Ace Decade Exhibits 3 and 4.)

18.     Mr. Wong subsequently gave comments on Ms. Yu's resume to make it more likely to satisfy Haixia's requirements.

19.     Mr. Wong and I also discussed on multiple occasions potential financing for the Investment.  Mr. Wong stated that Ace Decade should obtain financing for part of the Investment

through UBS rather than another bank because UBS would handle the financing on the most favorable terms to Ace Decade.

20.     During discussions about the loan financing, I told Mr. Wong that Ace Decade would not make the Investment unless the loan documents did not include any provisions that would permit UBS to demand repayment of the loan (a "margin call") based on short term price fluctuations of the Shares and unless UBS represented that it would provide Ace Decade with adequate time (for example, five business days to pay the first 25%, 10 business days to pay the second 25%, and 20 business days to pay the remaining 50%) to meet any margin calls.

21.     Mr. Wong stated on more than one occasion in 2014 that the loan financing documents would be consistent with my requirements, specifically that there was no repayment or margin call trigger based on short term price fluctuations.

22.     Mr. Wong also stated on several occasions in 2014 and 2015 that UBS would work with Ace Decade to allow it to meet any margin calls and UBS would not sell any of the Shares as a result of any margin call without giving Ace Decade adequate time.

23.     Mr. Wong also stated numerous times in 2014 and 2015 that UBS had made a loan to a large shareholder of Ping An Insurance Group ("Ping An").  Mr. Wong explained that the Ping An shareholder's loan was substantially larger than Ace Decade's, but that UBS had never sold off any of the shares owned by that shareholder following a margin call.  Mr. Wong stated that when a margin call had been triggered, UBS had worked with the Ping An shareholder to resolve the situation without selling any of his shares.  Mr. Wong said repeatedly that UBS would give Ace Decade the same treatment as it gave to the Ping An shareholder and would work cooperatively to allow Ace Decade to meet any margin calls but in any event would not sell the Shares following a margin call without giving Ace Decade adequate time.

24.     Throughout our discussions about the Investment, Mr. Wong repeatedly stated that I could trust him and UBS, and that he and UBS were always working in my best interests.

25.     On December 14, 2014, while discussing the Investment, Mr. Wong told me in a message on WhatsApp (a mobile messaging application for smart phones):  "Once I've promised General Manager Guo, I'll definitely make utmost efforts; I'm only hoping General Manager Guo will trust me."  Later that day, he told me in another message:  "I have no reason not to strive for the best for General Manager Guo!"  (General Manager Guo is what Mr. Wong called me.)

26.     Also on December 14, 2014, Mr. Wong left me a voice message, stating that during the negotiations over the Investment "General Manager Guo's interests must be guaranteed," and that he had involved top UBS management from offices around the world to assist.

27.     On December 15, 2014, Mr. Wong left me a voice message stating that he was working on the terms of the Investment in order to "protect [me]."

28.     On December 19, 2014, Mr. Wong left me a voice message stating:  "General Manager Guo, you can rest absolutely assured, and I will completely protect your interests."

29.     As a result, I believed that Mr. Wong and UBS were acting in Ace Decade's best interests and I trusted that the representations Mr. Wong made about the loan financing documents were true and that UBS would not sell the Shares without working with Ace Decade to allow it to meet any margin calls.

30.     On January 9, 2015, while I was still negotiating the terms of the Investment with UBS, I moved to New York with Ms. Yu and other employees with the intention of expanding my business projects to New York and to find investors interested in investing in Ace Decade.

31.    I first discussed this plan to move to New York to find investors for Ace Decade with Mr. Wong in December 2014.  I subsequently had multiple discussions with Mr. Wong about finding investors for Ace Decade by telephone from New York in March, May, and June 2015.

32.    On February 9, 2015, Ace Decade signed a Memorandum of Understanding (the "MOU"), governed by U.S. law, with China Golden Spring Group (Hong Kong) Limited ("Golden Spring Hong Kong").  The MOU provided that Ace Decade would acquire Haitong Shares and Golden Spring Hong Kong would establish a branch in New York to find investors for projects relating to the Haitong Shares.

33.    In furtherance of the MOU, Golden Spring Hong Kong formed a company called Golden Spring (New York) Ltd. ("Golden Spring New York"), which was incorporated in March 2015 in Delaware and registered to do business in New York.  Golden Spring New York is wholly owned by Golden Spring Hong Kong.

34.    Shortly thereafter, Golden Spring New York signed a lease for part of the 46th Floor of the General Motors Building at 767 Fifth Avenue, New York, NY 10153. Ms. Yu and I conduct business relating to Ace Decade from our offices at 767 Fifth Avenue.

35.    Not only had I discussed with UBS my plans to move to New York and to operate my business projects out of New York in December 2014, I also asked for UBS's help in setting up my operations in New York.  In March 2015, Mr. Wong and others at UBS, including Agnes Fu and Liz Lam, arranged to transfer funds from one of my accounts at UBS to my personal JPMorgan Chase account in New York.

36.     In April 2015, Mr. Wong, Ms. Fu, and Ms. Lam assisted me with setting up Golden Spring New York by transferring funds from one of my accounts at UBS to Golden Spring New York's JPMorgan Chase bank account in New York.

37.     UBS also submitted reference letters on my behalf in connection with my purchase of an apartment in a New York cooperative building.  In a letter dated February 18, 2015 from Mr. Wong to the building's board of directors, Mr. Wong wrote, "I have known Miles for about five years since he first began working with UBS AG."  (Miles is my English name.) Mr. Wong also stated, "Over the years, Miles has earned his credibility in our bank.  He is very reliable and always fulfills his repayment obligations.  For this reason, our bank is happy to have him as our long-term client."  (Ace Decade Exhibit 1.)

38.     Mr. Wong and Tommy Cheung, also a UBS Managing Director, submitted another reference letter on my behalf to the board of the apartment building on February 23, 2015, stating:  "Kwok Ho Wan has been a client of ours through a personal investment company since July 2012."  (Ace Decade Exhibit 2.)

39.     On March 6, 2015, I purchased an apartment in this building.  I, along with Ms. Yu and other employees and representatives of Ace Decade and Golden Spring New York, have lived in the apartment since the purchase.

40.     During this period of time after I had moved to New York, Mr. Wong and I communicated frequently through telephone calls and voice and instant messages.  Mr. Wong spoke to me by telephone while I was in New York dozens of times and sent numerous electronic messages to me while I was in New York.  Ms. Yu joined me on some of the calls with Mr. Wong.  At a minimum, Mr. Wong spoke to me by telephone while I was in New York on the following dates:

- January 26, 2015 (three calls)

- January 28, 2015 (two calls)

- March 2, 2015

- March 4, 2015 (three calls)

- March 5, 2015

- March 13, 2015

- March 15, 2015

- March 16, 2015 (six calls)

- March 17, 2015 (two calls)

- March 18, 2015 (two calls)

- March 24, 2015

- March 31, 2015

- April 28, 2015 (three calls)

- April 30, 2015 (five calls)

- May 6, 2015 (two calls)

- May 11, 2015 (three calls)

- June 23, 2015 (two calls)

- July 21, 2015

41.     During these calls in 2015, which I participated in from New York, Mr. Wong and I discussed the Investment and the UBS loan on numerous occasions.  On one or more of these calls, Mr. Wong and I also discussed my concerns about the loan, including a margin call trigger based upon the loan-to-value ratio ("LTV ratio"), the size of the loan, the interest rate on

the loan, and the issuance price of the Haitong shares.  Mr. Wong and I also discussed the status of my efforts to seek investors in New York for Ace Decade.

42.     During this period of time in 2015, I did not raise with Mr. Wong again my concerns about repayment triggers conditioned on short term price fluctuations of the Shares because Mr. Wong had previously told me that there were no such triggers.

43.     However, during several of these calls in March, April, and May 2015, Mr. Wong and I discussed the topic of margin calls generally, and specifically the LTV ratio trigger. Mr. Wong said that I did not have to worry because UBS would act in my best interests, that UBS would give Ace Decade adequate time to meet any margin calls, and that UBS would make every effort to work with Ace Decade to allow it to meet any margin calls.  He also reminded me several times during this period that UBS had never sold the shares of the Ping An shareholder following a margin call on its loan, and stated that Ace Decade would receive the same treatment as the Ping An shareholder.

44.     While I was in New York, Mr. Wong also sent me numerous WhatsApp messages about the Investment and the UBS loan.  For example, on March 21 and 22, 2015, Mr. Wong and I exchanged a series of WhatsApp messages in which we discussed the UBS loan for the Investment.  I told Mr. Wong that some of UBS's proposed conditions, such as the margin call trigger based upon the LTV ratio for the UBS loan, were "definitely not okay" and "we would rather not do it than agree to your clauses."  Had I not been relying upon Mr. Wong's prior representations that the loan financing documents did not contain repayment triggers based on short term price fluctuations of the Shares, I would have raised that issue again with Mr. Wong and not focused our discussions solely on the margin call trigger based on the LTV ratio.

45.     Mr. Wong replied that he understood my concerns about potential margin calls, and told me: "You rest assured!. . . I'm working for General Manager Guo!  Don't worry."  I relied upon Mr. Wong's representations that he and UBS were looking out for my interests.  All of these discussions occurred while I was in New York.

46.     On May 8, 2015, Haitong announced that it had obtained the shareholder and regulatory approvals necessary (in February and May, respectively) to issue the Shares, which was expected to occur on May 15.  Haitong also announced that because the trading price of Haitong's shares during the 30 trading days prior had surpassed a pre-agreed threshold, the subscription price would be increased.

47.     After this announcement, I had several discussions with Mr. Wong, by telephone and WhatsApp messages, in order to finalize the terms of the Investment.  Among the topics we discussed were the fact that the loan would have to be increased to reflect the increase in the per share price of Haitong's shares, the amount of the payment required, the LTV ratio, the interest rate, and the method by which we should exchange U.S. dollars for the Hong Kong dollars required for the payment.

48.     During one of our discussions after May 8, Mr. Wong stated yet again that Ace Decade would receive the same treatment as the Ping An shareholder with respect to any margin calls.

49.     Relying on these representations, I decided to make the Investment.  I discussed with Mr. Wong during telephone conversations on May 11 how best to transfer the funds necessary for the Investment from one of my UBS accounts to the Ace Decade account.  Mr. Wong said that I first needed to exchange the funds from U.S. dollars to Hong Kong dollars in my UBS account.  He also gave instructions not to transfer the funds from my UBS account

directly to the Ace Decade account, but rather to transfer the funds from my UBS account to an account at another bank and then to transfer the funds from that account to the Ace Decade account.

50.     Relying upon Mr. Wong's advice, I decided to transfer the funds from my UBS account first to an account at China Minsheng Banking Corp., Ltd. Hong Kong Branch  ("China Minsheng Account") and then to transfer the funds from the China Minsheng Account to the Ace Decade account.

51.     On May 11, 2015, Ms. Fu sent an e-mail to Ms. Yu, copying Mr. Wong and Ms. Lam, and asked Ms. Yu to obtain my signature on a payment instruction document that UBS had prepared.  The document contained a request to transfer HK $860 million (approximately US $111 million) from my UBS account to the China Minsheng Account that Mr. Wong had instructed me to use.

52.     In reliance upon Mr. Wong's representations about the Investment and the UBS loan, I signed the document authorizing the wire transfer.

53.     Later that day, Ms. Lam sent an e-mail to Ms. Yu, copying Mr. Wong and Ms. Fu, attaching a confirmation of the outgoing transfer from my UBS account.

54.     Following Mr. Wong's instructions, I then authorized the transfer of the funds from the China Minsheng Account to the Ace Decade account.

55.     After the funds reached the Ace Decade account, on May 13, 2015, Ms. Yu and I authorized a payment of HK $2 billion (approximately US $260 million) from Ace Decade's account to an account held by Dawn State Limited ("Dawn State"), a special purpose vehicle and wholly-owned subsidiary of a Haixia fund, to fund the Investment of the Shares to be issued on May 15.  Prior to this, I had authorized an initial down payment of approximately US $250

million from Ace Decade's account, through Dawn State, to a UBS security account. That payment would have been returned to Ace Decade had the Investment not been completed.

56.     All of the steps I took to make the Investment, including requesting the wire transfers of approximately HK $860 million (approximately US $111 million) from one of my UBS accounts to the China Minsheng Account and ultimately to the Ace Decade account and authorizing the payment of HK $2 billion (approximately US $260 million) from the Ace Decade account to Dawn State's account on May 13, 2015, occurred from my office or my apartment in New York.

57.     I would not have made the Investment or authorized this payment in May 2015 had I known that UBS had lied that the loan financing documents did not contain repayment triggers based on short term price fluctuations of the Shares and that UBS would refuse to work with Ace Decade to meet any margin calls and would sell off Ace Decade's Shares immediately if a margin call were made.

58.     Under the terms of an agreement between Ace Decade and Haixia, Haixia was required to transfer Dawn State (the entity that held legal title to the Shares) to Ace Decade after July 13, 2015 upon Ace Decade's request.

59.     However, on the morning of July 6, 2015 New York time—just a week before Haixia would have had to transfer Dawn State to Ace Decade—I learned that UBS was demanding that I repay approximately US $200 million in less than 24 hours due to short-term price fluctuation of the Shares.

60.     Had I known that it was possible for UBS to demand payment in such a short period of time and that UBS had lied about providing adequate time to meet any margin calls, I would have ensured that Ace Decade had sufficient funds available to make such payment.

61.     Before UBS's deadline, Ace Decade informed UBS that we could obtain the necessary funds quickly, but not before UBS's deadline.

62.     However, on July 6, 2015, Mr. Wong stated that UBS would not give Ace Decade any additional time.  Mr. Wong stated that UBS had already identified buyers for the Shares and would make a substantial profit by selling the Shares instead of allowing Ace Decade to make the payment.

63.     On July 7th, I sent Mr. Wong a WhatsApp message telling him that UBS's margin call was "illegal."  Mr. Wong did not disagree with me or deny that he had told me that there were no repayment triggers based upon short term price fluctuations of the Shares.  Instead, he said that he had told senior management to cancel the sale of the Shares and said that he would ask UBS to return the Shares to me.  Mr. Wong told me that the Shares were still under UBS's control and he promised to come up with a plan for their repurchase.  Mr. Wong reassured me: "I've always been standing by General Manager Guo."

64.     On July 9th, Mr. Wong stated that the decision to sell the shares was made by UBS executives outside of Hong Kong and China.

65.     On July 17th, I reminded Mr. Wong that he had said on numerous prior occasions that "there would never be" a margin call based on short term price fluctuations of the Shares and the many times he had stated that UBS had not sold off the shares of a large Ping An shareholder following a margin call.

66.     In another message on July 17, I said to Mr. Wong: "I told you, it was since last year that I've come to the U.S. for better opportunities, didn't I?  All the information I sent you from the U.S., my requirements, you know them all. . . .  Under these circumstances, all were

handed over to you, [I] all listened to you.  It was you who introduced Haixia . . . .  It turned out to be messed up like this now."

67.    Mr. Wong did not deny that he had made these misrepresentations and in fact replied that he understood.

68.    In another message on July 17, I said to Mr. Wong: "You told me several times that you UBS would not liquidate assets like that; otherwise how I would trust you."  I also told him:  "If it weren't for you to tell me that margin call was like Ping An, it would not be like that.  There would be reasonable time to get some assets to deal with it."

69.    On July 17, I also said to Mr. Wong:  "You said UBS signed the agreement with them [Haixia] to permit UBS to sell all the shares within 24 hours of the margin call.  How was that signed?  How did they implement that?  It's not fair.  You told me back then that was not the case."

70.    Mr. Wong replied "I've always been firmly opposing them, but they ignored me and told me it was an order by the Swiss CEO."  He did not deny my assertion that he had previously stated that the loan agreement would not permit UBS to sell the Shares within 24 hours of the margin call.

71.    At no point during any of our discussions did Mr. Wong deny that he had stated that UBS would treat Ace Decade the same as the Ping An shareholder.

72.    At no point during any of our discussions did Mr. Wong deny that he had stated that the loan documents would not contain repayment triggers based on short-term price fluctuations of the Shares.

73.    At no point during any of our discussions did Mr. Wong deny that he had stated that UBS would work with Ace Decade and provide it adequate time to meet any margin call.

74.    At no point during any of our discussions did Mr. Wong deny that UBS had engaged in misconduct.

75.    Mr. Wong told me that on July 7, 2015, UBS sold all of the Shares belonging to Ace Decade at HK $11.12, a 20% discount off the closing price of Haitong stock on July 7.

76.    As a result of losing the Haitong shares, Ace Decade lost New York investors, whom I had met with after I had relocated to New York in 2015 and who had been interested in investing in Ace Decade.  For example, on four occasions in New York in April through June 2015, my representatives and/or I met with a co-founder of a private investment firm based in New York.  The firm expressed significant interest in investing in Ace Decade.  However, following UBS's sale of the Haitong Shares belonging to Ace Decade, Ace Decade lost this potential investor.

I swear that the foregoing is true and correct.

[Signature of Kwok Ho Wan on Chinese version]
Kwok Ho Wan


[Notarization on Chinese version]

CITY OF __Meservey_____      )

                                     )     ss.:

COUNTY OF __Cerro Gordo___     )

I, __Liming Pals____, being duly sworn, depose and say that I am fluent in both the English and

Chinese languages.  I hereby certify that the attached document is an accurate translation of the

Chinese version of "Affidavit of Kwok Ho Wan."

[Name]

Sworn to before me this

5 day of ~~May 2015~~ February 2016

Notary Public



PAT FISHER
COMMISSION NUMBER 720993
MY COMMISSION EXPIRES:
2-19-18

# EXHIBIT 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND
L.P.,

                                        Plaintiff,

v.

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO
WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-
GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES
KWOK, a/k/a HAOYUN GUO,

                                        Defendant(s).

Index No. 652077/2017
Hon. Barry R Ostrager

**AFFIDAVIT OF YANPING
WANG**

STATE OF NEW YORK    )
                     ) SS:
COUNTY OF NEW YORK   )

I, Yanping Wang, being duly sworn hereby depose and say:

1.      This affidavit is based upon my own personal knowledge and is provided in

opposition to the motion of plaintiff Pacific Alliance Asia Opportunity Fund L.P. ("PAX")

by order to show cause to: (1) compel nonparty Golden Spring (New York) Ltd.

("GSNY") to comply with PAX's Article 52 Subpoena; and (2) modify the Court's

October 15, 2020 Order.

2.      I am presently employed as President of GSNY and serve as a Director of the

company.

3.      GSNY is a wholly owned subsidiary of China Golden Spring (Hong Kong) Ltd., a

company chartered in Hong Kong.

4.    GSNY serves as the family office for the Guo family.

5.    Attached hereto as Exhibit A is a true and correct historical list of GSNY's Directors and Officers.

6.    Attached hereto as Exhibit B are true and correct copies of GSNY's Delaware Certificate of Incorporation and Certificate of Revival.

7.    Attached hereto as Exhibit C is a true and correct copy of GSNY's registration to conduct business in the State of New York.

8.    Attached hereto as Exhibit D is a true and correct copy of GSNY's corporate by-laws.

9.    Attached hereto as Exhibit E are true and correct copies of corporate resolutions adopted by GSNY.

10.   Attached hereto as Exhibit F are true and correct copies of GSNY's Delaware Annual Franchise Tax Reports.

11.   Attached hereto as Exhibit G are true and correct copies of GSNY's Biennial Statements submitted to the New York State Department of State.

12.   At present, GSNY employs 16 direct employees and seven independent contractors. These individuals staff GSNY's administrative, finance, legal, and security departments.

Dated: May 19, 2021

Yanping Wang

2

Sworn to me this
_19_ day of May, 2021

Notary Public

JAZMIN PARRA
**Notary** Public, State of New York
No. 01PA6087956
Qualified in Queens County
**C**ommission Expires March 3, 20 23

3

# EXHIBIT 3

1

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NEW YORK : CIVIL TERM : PART 61
 2    -----------------------------------------X
      PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

 3
                          Plaintiff,
 4
                                                     INDEX NO:
                     -against-                       652077/2017
 5
      KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI,
 6    a/k/a GUO WENGUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a
      HAOYUN GUO, GENEVER HOLDINGS CORPORATION, and GENEVER HOLDINGS
 7    LLC,

 8                        Defendants.
      -----------------------------------------X
 9                       MICROSOFT TEAMS
                         May 27, 2021
10
      B E F O R E:
11
                      THE HONORABLE BARRY OSTRAGER,
12                          J U S T I C E

13    A P P E A R A N C E S:

14        O'MELVENY & MYERS LLP
          Attorney for the Plaintiff
15        Times Square Tower
          New York, New York  10036
16        BY:  EDWARD MOSS, ESQ.
               STUART SARNOFF, ESQ.
17
          BAKER HOSTETLER, LLP
18        Attorney for the Defendant
          45 Rockefeller Plaza
19        New York, New York  10111
          BY:  MELISSA CARVALHO, ESQ.
20             JOHN SIEGAL, ESQ.

21        LAWALL & MITCHELL, LLC
          Attorney for the Defendant GENEVER
22        162 E. 64th Street
          New York, New York  10065
23        BY:  AARON A. MITCHELL, ESQ.

24

25
```

KM

```
 1        YANKWITT LLP
          Attorney for the Defendant
 2        140 Grand Street, Suite 705
          New York, New York  NY
 3        BY:  DANIEL ALTER ESQ.

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21                                   Karen Mangano, CSR
                                     Senior Court Reporter
22

23

24

25
```

KM

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM
INDEX NO. 652077/2017

NYSCEF DOC. NO. 833
Case 22-50073   Doc 179-1   Filed 04/06/22   Entered 04/06/22 16:09:03   Page 31 of
RECEIVED NYSCEF: 06/01/2021
94

3

Proceedings

1          THE COURT:  All right.  Mr. Moss, this is your

2     motion.

3          MR. MOSS: Good afternoon, your Honor.

4          We have two requests in our motion.  One is compel

5     discovery in response to a subpoena and the other is to

6     modify the Court's restraining order.  So I thought I would

7     start with the subpoena.

8          Your Honor, this might be the most straightforward

9     issue that I've argued in front of this Court on this case.

10         CPLR 5223 permits a broad range of discovery on any

11    third party to request information that is relevant --

12    relevant to enforcement of a judgment.

13         As the Court knows, we've been forced -- my client

14    has been forced to serve subpoenas on several third parties

15    trying to find Mr. Kwok's assets because he doesn't hold

16    them in his own name.

17         Perhaps the most important subpoena Pacific

18    Alliance served was a subpoena on an entity called Golden

19    Springs.

20         Golden Springs is a so-called family office for

21    Mr. Kwok's family, but in reality, it is just Mr. Kwok's

22    principal front.  It's an entity that he funded entirely

23    with his own money.  It's an entity that pays all of the

24    expenses for his lavish lifestyle.  Every single expense by

25    their own admission.  It pays legal fees for a host of

KM

Proceedings

1    lawsuits for lawyers to represent Mr. Kwok in his individual

2    capacity in cases in which Golden Springs is not even a

3    party.

4         It pays the legal fees of a lawyer who represents

5    the entity that owns the yacht that's stonewalling me in

6    discovery like the others.

7         It pays the maintenance on the Sherry-Netherland

8    apartment.  We know all of this because Mr. Kwok and his

9    lawyers admitted it in court filings and in discovery

10   responses.

11        I just want to put a fine point on it, your Honor.

12   Mr. Kwok has no money or assets according to him, but he

13   says he funded this entire entity and he uses it to pay

14   every single one of his expenses, his living expenses.

15        What are we talking about here, Judge?  How is this

16   discovery possibly not permitted under the CPLR?  How is it

17   not permitted relevant to enforce a judgment?

18        The opposition that they filed, your Honor, it's a

19   frivolous document, and I want to start with what's not in

20   here.  What's not in it is a dispute about any one of the

21   facts that I just covered about Golden Springs.  They ignore

22   all of them.  They can't dispute them because Mr. Kwok and

23   his lawyers admitted them in discovery responses and in

24   Court filings.  So Golden Springs -- one of their arguments

25   is well, we have corporate documents.  We respect the

KM

5

Proceedings

1    corporate forum.  We have employees.  But it doesn't dispute

2    that it only has one business which is to serve Highness

3    Kwok.  It doesn't even say what the business is besides a

4    family office for his business.  They say we have employees

5    that include security.  That's Mr. Kwok's bodyguard who

6    comes to -- who comes with him to my office when I depose

7    him and hands him bottled water because he's afraid that

8    we're agents of the communists and my water at my firm is

9    going to kill him.  I mean, Judge, this is not a real

10   company.  They pay for Mr. Kwok's people.

11       If Tim Cook got sued for something unrelating to

12   his capacity in Apple, Apple doesn't pay those fees.  Apple

13   doesn't pay his maintenance.  This is Mr. Kwok's piggy bank

14   that he set up with his own money.

15       The principal argument that is in Golden Spring's

16   papers is that Golden Springs is a third party and so we

17   should only be entitled to information about assets that it

18   holds for or transactions that it has conducted with Miles

19   Kwok.

20       That's basically like saying it's a bank; right.

21   You get that we subpoena the bank which we've done.  We get

22   Mr. Kwok's information, but we don't get information about

23   the bank itself.  We don't get information about the bank's

24   other customers.  That's a nice argument for a bank, but it

25   completely ignores the context that Golden Springs is not a

KM

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 833
Case 22-50073    Doc 179-1    Filed 04/06/22    Entered 04/06/22 16:09:03    Page 34 of
94
RECEIVED NYSCEF: 06/01/2021

6

Proceedings

1    third party.  It is the entity that holds Mr. Kwok's money,

2    and it is the entity that pays his legal expenses.  So it's

3    assets are his assets.  It's transactions are his

4    transactions.  And it's financial information is his

5    financial information.

6         The suggestion in the papers that Mr. Kwok and Miss

7    Wang and all of his people should be able to pick and choose

8    and determine which information at Golden Springs relates to

9    Mr. Kwok and which doesn't is a recipe for disaster here,

10   Judge.

11        Mr. Kwok denies even being involved with Golden

12   Springs.  He denies being involved with the entity that owns

13   the boat that we all know he owns because he said he owns

14   the boat on YouTube, the boat which, by the way, is still

15   out of the jurisdiction 15 days incurring $500,000 a day.

16        Mr. Kwok is the same guy who denies owning his

17   apartment that Miss Wang says -- told the Court under oath

18   that he owns it.

19        So the limitation that they're trying to put in

20   here, only things relating to Mr. Kwok, that's nonsense in

21   this case, and it's just a recipe for us to get nothing.

22        Golden Springs also argues on the subpoena that we

23   have to prove alterego to get discovery into it's assets.

24   Well, that's just made up.  There is no case to support

25   that.

KM

Proceedings

1        5223 is a broad standard.  It's a generous

2    standard.  The Court ordered Miss Wang's information to be

3    produced by the banks.  They're not alteregos.  She's not an

4    alterego.  Of course, we don't have to prove that it's an

5    alterego to get it's information.

6        The Court found that Miss Wang might be hiding Mr.

7    Kwok's assets and gave us access to her financial

8    information.  This is much easier.  He's already said it's

9    his money, and he's using it to pay all of his expenses.  I

10   mean, there's no credible opposition to this motion.

11       Finally, there's some arguments about scope.  You

12   know, I read it a few times.  My subpoena is astounding.

13   It's blunderbuss.  It's a fishing expedition.  It's

14   flagrant.  A lot of adjectives, but no substance.  They

15   don't articulate any burden arguments at all.

16       Usually you say, Judge, well, we ran some search

17   terms, and there are too many hits or this is going to be

18   too burdensome to get because it's on a different server.

19   Nothing.  This is basically just a relevance argument that

20   we're asking for too much.

21       If they want to have a discussion about search

22   terms and custodian and which laptops to collect, we welcome

23   that discussion.  We welcome an actual discussion about

24   burden and scope.  But not just saying, well, we think it's

25   too much without any showing -- any showing at all that

KM

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM    INDEX NO. 652077/2017
NYSCEF DOC. NO. 833    Case 22-50073   Doc 179-1   Filed 04/06/22   Entered 04/06/22 16:09:03   Page 36 of   RECEIVED NYSCEF: 06/01/2021
94

8

Proceedings

1    there is an actual burden.

2          I want to just end on one particular argument on

3    the subpoena point because I expect Mr. Alter will focus on

4    it.  We ask -- we do.  He's right.  We ask for information

5    about 60 people and entities, no one knowing to be

6    associated with Kwok.

7          Mr. Alter quips in the brief, well, known by whom?

8    Known by whom?  Known by us, Judge.  Known by us based on

9    spending a lot of money and lot of time to dig through

10   public records, court filings, social media accounts because

11   that's the game Mr. Kwok has forced us to play.

12         The reason we have to ask for this information is

13   because Golden Springs is the hub.  We can't spend the rest

14   of our lives chasing 100 entities.  I mean, my grandkids

15   would be doing this.  Golden Springs is the entity that has

16   the information.  It's produced documents relating to Shiny

17   Times, the entity that was involved in the underlying case.

18   It has the documents.  It is the hub of the empire.  If it

19   doesn't have information about a couple of these entities,

20   if we're wrong about one or two, okay, fine.  Then they

21   should run the search and tell us they don't have it and not

22   produce it.  But run the search terms, collect the ESI and

23   provide the documents.

24         THE COURT:  All right, Mr. Moss.  I understand your

25   argument.  I also understand that Mr. Kwok is incurring

KM

Proceedings

1    $500,000 a day in contempt penalties.  I understand that Mr.

2    Kwok believes that these court proceedings are a game of

3    evasion that he -- that he wants to play.

4            And let me hear from counsel for Golden Springs.

5            MR. ALTER:  Good afternoon, your Honor.  It's

6    Daniel Alter, and we've just heard a lot of talk but

7    relatively little truth, and I'd like to step back and

8    clarify some issues that were quite muddied.

9            First of all, to correct two specifically

10   inaccurate statements, it's my understanding that Mr. Kwok

11   has never said that he is entirely unrelated or has no

12   connection to Golden Springs.  Quite the opposite.  He said

13   that it is his family office.  So let's be accurate about

14   that.

15           The second thing is that, you know, apparently --

16   they take the position that Mr. Kwok has entirely funded

17   Golden Springs.  Well, I don't see the evidence of that.

18   What I see is a statement in the record that he initially

19   provided capital to Golden Springs, but I see no evidence

20   that he's continued to do so or that the capital there now

21   is his.  Let me step back a moment and talk about this.

22           THE COURT:  Before you do so, Mr. Alter, because

23   rightly or wrongly, Mr. Kwok has exhausted the Court's

24   patience with his antics.

25           It's quite undisputed that Golden Springs has

KM

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM          INDEX NO. 652077/2017
NYSCEF DOC. NO. 833    Case 22-50073   Doc 179-1   Filed 04/06/22   Entered 04/06/22 16:09:03   Page 38 of   RECEIVED NYSCEF: 06/01/2021
94

10

Proceedings

1    funded seven-figure payments to facilitate Mr. Kwok's

2    lifestyle, and Mr. Kwok leads a rather extravagant

3    lifestyle, purports to have zero assets whatsoever.

4         So the plaintiff is a judgment creditor.  The

5    plaintiff knows that Golden Springs is funding expenses for

6    Mr. Kwok.  Not minor inconsequential expenses.  Major

7    expenses.  And the judgment creditor is entitled to have

8    discovery of the entity that is funding Mr. Kwok's expenses.

9         The judgment creditor is also entitled to an order

10   directing Golden Springs not to transfer, dispose or

11   otherwise dissipate whatever assets Golden Springs has

12   because the best evidence that has been made available to

13   the Court compellingly suggests that any assets that Golden

14   Springs has were provided to Golden Springs by Mr. Kwok.

15        Now if the discovery that the judgment creditor is

16   seeking from Golden Springs disproves that, well, then we

17   have a different situation than the situation we now have.

18        Under the CPLR, a judgment creditor is entitled to

19   discovery of third parties of which in this case may well be

20   alteregos of Mr. Kwok, but it's not necessary for the

21   judgment creditor to establish that Golden Springs is an

22   alterego of Mr. Kwok.

23        MR. ALTER:  You know, your Honor, we haven't --

24   that's not our position. That's the straw man that has been

25   presented.

KM

Proceedings

1          THE COURT:  Well, be that as it may, unless you can

2     persuade me otherwise, I am granting the judgment creditor's

3     motions in their entirety.

4          As Mr. Moss outlined, he is perfectly prepared to

5     meet and confer and discuss limitations on specific requests

6     that he's made if you can then state to him good cause for

7     that.  But we're past playing games here.

8          MR. ALTER:  Well, your Honor, I'm not here to play

9     games, and if the Court has made it's decision, would it

10    allow me to make my record.

11         THE COURT:  Yes.  Make your record.

12         MR. ALTER: Okay.  Thank you, your Honor.

13         First of all, our argument is not that you have to

14    pierce the corporate veil in order to get third-party

15    discovery under the CPLR for judgment creditors.  It's a

16    relevance argument, and we've already said that there are

17    aspects such as discovery as between Golden Spring and the

18    actual judgment debtor is relevant and appropriate.  So we

19    haven't taken a position that is all out of line with what

20    the law provides.

21         What we have said and what Mr. Moss has proven in

22    his argument is they take the position that Mr. Kwok is

23    Golden Spring and Golden Spring is Mr. Kwok; and therefore,

24    they are entitled to go through the entire file of Golden

25    Spring.

KM

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM INDEX NO. 652077/2017
NYSCEF DOC. NO. 833    Case 22-50073   Doc 179-1   Filed 04/06/22   Entered 04/06/22 16:09:03   Page 40 of   RECEIVED NYSCEF: 06/01/2021
94

12

Proceedings

1          Well, you know, your Honor, that's called piercing

2     the corporate veil, and it's our position that if they want

3     documents independent of the judgment debtor where they make

4     no connection or efforts to make a connection whatsoever,

5     then, yes, they do have to pierce the corporate veil, but

6     that isn't the sum total of our argument.

7          Our argument is that the requests are exceedingly

8     overbroad and that they are irrelevant.  And in fact, let's

9     go for a moment to the facts that Mr. Moss says are

10    overwhelming in this case.

11         If you look at the submission that was actually

12    presented on this motion, there is absolutely no facts

13    presented with regard to the 64 nonparties for which they

14    seek discovery having nothing to do with the judgment

15    debtor.  Just -- not even having anything to do with Golden

16    Spring.  They just want discovery to 64 nonparties.

17         Now your Honor, we heard Mr. Moss say that he knows

18    there is a connection.  Well, wouldn't it be enlightening

19    for the Court to know what that connection is before there

20    is a ruling that Golden Spring has to produce documents that

21    otherwise are clearly irrelevant.  So that's why we assert

22    that those documents should not be discovered unless and

23    until Mr. Moss and PAX comes forward with actual proof that

24    there is a connection.  We don't have that.

25         And with regard to the proof, the overwhelming

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM    INDEX NO. 652077/2017
NYSCEF DOC. NO. 833    Case 22-50073  Doc 179-1  Filed 04/06/22  Entered 04/06/22 16:09:03    Page 41 of    RECEIVED NYSCEF: 06/01/2021
                                    94

                                    13

Proceedings

1    proof that Golden Spring is Mr. Kwok and Mr. Kwok is Golden

2    Spring, at least from the record I've seen, your Honor, and

3    I do not call your Honor's history -- historical

4    recollection into question, but what has been presented on

5    this record is Golden Spring initially helped to capitalize

6    a company.  A lot of folks do that.

7         Secondly, Golden Spring pays for attorneys and has

8    contributed to paying for apartment expenses.  Well, okay.

9         Three, employees of Golden Spring have attended

10   family interests that have to do with the Guo family.  Well,

11   it's a family company.  It's a family office.

12        And Golden Spring's parent has apparently produced

13   documents in response to discovery requests.  So yes,

14   there's a connection as Mr. Kwok has said, but there isn't

15   an identity of entity between Mr. Kwok and Golden Spring,

16   and that's why we referred in our papers to the fact that if

17   that is the case, the law is very clear they do need to

18   pierce the corporate veil and they absolutely would need to

19   pierce the corporate veil to get injunction.  Because as we

20   stated, as much as the Court has lost patience, and I

21   understand your Honor's position, the law is clear that an

22   entity as a matter of due process can not be enjoined

23   without actually being a party.

24        And even if an entity were brought into a

25   litigation as a party, the Courts are constrained.  They can

                              KM

Proceedings

1    not grant prejudgment asset freezes, and that is exactly

2    what PAX is trying to do now.  They are trying to enjoin

3    Golden Spring from expending any of it's own assets for any

4    purpose, and that is contrary to the law.

5        Now, they argue that your Honor has a power to

6    enforce restraining orders.  Of course you do.  And Golden

7    Spring was served with a restraining order, and Golden

8    Spring acts at it's peril if it transfers any property with

9    which Mr. Kwok -- in which Mr. Kwok has an interest, but a

10   Court's enforcement of a restraining notice is not the

11   tantamount to an injunction.  It's an after-the-fact

12   litigation based upon allegations that there had been a

13   violation of the notice.  They're two entirely separate

14   things.

15       So your Honor, respectfully, there isn't either a

16   jurisdictional basis for the injunction nor is there a

17   compelling factual basis for one because they have the

18   relief that the CPLR has provided for.

19       Now, if the Court is going to go ahead and enter

20   certain orders as your Honor has described, I request a few

21   things, a few clarification points.

22       First of all, we would request the Court post a

23   bond.  Order that PAX post a bond.  They are seeking an

24   injunction against Golden Spring from using any of it's

25   assets.  And pursuant to the CPLR 6312(b), a bond is

KM

Proceedings

1   necessary.  It's a necessary element for preliminary relief.

2   So we would ask the Court direct that a bond be posted.

3          We would also ask whether under this jurisdiction,

4   Golden Spring is able to pay lawyers.  Is it able to pay

5   it's employees?

6          Mr. Moss dismisses the fact that the company

7   actually employs 16 employees and seven independent

8   contractors.  Are they not entitled to continue that?  Do

9   they need -- is this injunction going to close Golden

10  Spring?  We need that clarification because Golden Spring

11  does not want to be in violation of your Honor's order.

12          And finally, you know, your Honor, I would request

13  respectfully a stay of the Court's order for a week so that

14  we may seek appellate relief and seek a stay pending appeal.

15          But given that this is, you know, a holiday

16  weekend, we request that the Court stay because again, as I

17  said, Golden Spring does not want to be in violation of this

18  Court's order; but for all the reasons I've stated,

19  honestly, your Honor, the relief requested is a function of

20  facts that Mr. Moss has asserted as judge, jury and

21  executioner.

22          They haven't been presented.  They haven't been

23  adjudicated.  They haven't been formally determined, all of

24  which are necessary for the kind of relief for reaching into

25  Golden Spring and setting aside it's individual identity and

KM

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM    INDEX NO. 652077/2017
NYSCEF DOC. NO. 833    Case 22-50073    Doc 179-1    Filed 04/06/22    Entered 04/06/22 16:09:03    Page 44 of    RECEIVED NYSCEF: 06/01/2021
94

16

Proceedings

1    just securing whatever documents it wants and enjoining all

2    of it's assets.  That's necessary under the law.

3              Thank you, your Honor.

4              THE COURT:  All right.  I take your points.

5              Nothing that you've said suggests that Golden

6    Springs hasn't paid seven figures worth of Mr. Kwok's

7    expenses in the immediate recent past.  Nothing that you

8    said alters the fact that Mr. Kwok flaunts the Court's

9    orders at will.

10             You're correct that PAX needs to post a $500,000

11   bond.  You're correct that I should stay these orders until

12   June 1st at five p.m. to enable you to seek appellate

13   relief, and you're correct that Golden Spring may pay it's

14   employees in accordance with a schedule listing the identity

15   of the employees and the amount of their compensation which

16   you'll provide to Mr. Moss.  And I think that addresses your

17   concerns.

18             MR. ALTER:  With one exception, your Honor, and I

19   appreciate the Court's response to those concerns.  The

20   attorneys.  The attorneys that Golden Springs has been

21   permitted here today to pay.

22             THE COURT:  There's no issue.  Just need to

23   identify the attorneys and the fees that you're paying to

24   them.

25             MR. ALTER:  Okay.

KM

Proceedings

 1          THE COURT:  And, you know, I note that Mr. Kwok has

 2    apparently no concern for the $500,000 a day sanction for

 3    flagrantly violating prior orders of the Court with respect

 4    to the boat that Golden Spring's is paying to maintain and

 5    transport.  And if my calculation is correct, the total of

 6    the contempt sanctions to date is $7.5 million.

 7          Mr. Kwok is just not free to live in New York at an

 8    ultra-luxurious condominium, the cost of which he's paid for

 9    by Golden Springs and ignore the processes of the New York

10    courts.

11          Now does anybody else wish to be heard?

12          MR. MITCHELL:  Your Honor, Aaron Mitchell.  I

13    represent the Genever defendants.  Just one point of

14    clarification.

15          As you're well aware, your Honor, the Genever

16    New York which owns the co-op is in bankruptcy so Golden

17    Spring is not paying the maintenance for that apartment.

18          I believe Mr. Moss is aware as well there was a

19    security deposit paid which the surety is drawing down on

20    which I just want to make that clear for the record.

21          THE COURT:  That is a fair and appropriate

22    clarification.

23          It doesn't alter the fact that prior to the fact

24    that Genever which is another one of Mr. Kwok's many

25    companies was paying for Mr. Kwok's luxury apartment.

KM

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM INDEX NO. 652077/2017
NYSCEF DOC. NO. 833   Case 22-50073   Doc 179-1   Filed 04/06/22   Entered 04/06/22 16:09:03   Page 46 of   RECEIVED NYSCEF: 06/01/2021
94

18

Proceedings

1        Mr. Moss has been pursuing enforcement of a

2    judgment for years now, and it's been my misfortune to have

3    to have presided over these many, many, many motions and

4    hearings, none of which are producing the results that the

5    Court has ordered because Mr. Kwok directly or indirectly

6    through his companies ignores Court orders.

7        But Golden Springs presumably will comply with the

8    Court's order, and Golden Springs, you know, may seek a stay

9    in the Appellate Division either tomorrow or today or on

10   June 1.  And if the Appellate Division stays the Court's

11   order, then the Court's order will be stayed.

12       Otherwise, the Court expects Golden Springs to

13   comply with the Court's orders subject to PAX's posting of

14   $500,000 bond in the event it's determined that there's any

15   overreach here and subject to Golden Springs being able to

16   pay identified lawyers and identified employees in

17   accordance with the schedule.

18       MR. SARNOFF:  Your Honor, this is Stuart Sarnoff.

19   May I just ask one clarification?

20       THE COURT: Yes.

21       MR. SARNOFF: The obligation of PAX to post a bond,

22   is that specifically in respect of the restraining order

23   part of the -- of your decision today?

24       THE COURT:  Yes.

25       MR. SARNOFF: And separate --  so there is no --

KM

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM INDEX NO. 652077/2017
NYSCEF DOC. NO. 833    Case 22-50073   Doc 179-1   Filed 04/06/22   Entered 04/06/22 16:09:03   Page 47 of   RECEIVED NYSCEF: 06/01/2021
94

19

Proceedings

1          THE COURT:  With respect to the restraining order.

2          MR. SARNOFF: So there is no -- there is no stay

3     with respect to the obligation of Golden Spring to comply

4     with the subpoena.  Is that correct?

5          THE COURT:  That's correct.

6          MR. SARNOFF:  Thank you, sir.

7          THE COURT:  Anything else from anybody else?

8          All right.  The Court will enter a memorandum order

9     consistent with the transcript of the proceedings of today.

10    I would strongly urge counsel to order an expedited copy of

11    the transcript of proceedings of today so that in the event

12    Golden Springs seeks a stay from the the Appellate Division,

13    there is a clear record reflecting what the Court has

14    ordered.

15         Have a nice day and a nice weekend.  Everybody stay

16    safe and thank you.

17
      CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF THE
18    ORIGINAL MINUTES TAKEN OF THIS PROCEEDING.

19

20

21         *Karen Mangano*
         _____
22              KAREN MANGANO, CSR
                Senior Court Reporter
23
      SO ORDERED: June 1, 2021
24

25    BARRY R. OSTRAGER, J.S.C.

                                        KM

# EXHIBIT 4

# BakerHostetler

Baker&Hostetler LLP

45 Rockefeller Plaza
New York, NY 10111

T 212.589.4200
F 212.589.4201
www.bakerlaw.com

Melissa M. Carvalho
direct dial: 212.589.4289
mcarvalho@bakerlaw.com

February 1, 2021

**VIA E-MAIL (EMOSS@OMM.COM)**

Edward Moss
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036

*Re:    Pacific Alliance Asia Opportunity Fund L.P. v. Kwok Ho Wan, et al., Index no.
        652077/2017*

Dear Eddie:

In furtherance of our conversations relating to Plaintiff Pacific Alliance Asia Opportunity Fund
L.P.'s Fourth Set of Requests for the Production of Documents, dated November 6, 2020
("Document Requests"), and Mr. Kwok's responses and objections thereto, please allow the
following to memorialize the state of our discussions to date as well as to supplement and/or
amend Mr. Kwok's responses where necessary.

1.   Mr. Kwok continues to stand by his objection to the definition of "Family Member" used
     throughout Plaintiff's Document Requests.  Specifically, Mr. Kwok objects to the
     definition of "Family Member" as it is overbroad, unduly burdensome, exceeds the scope
     of CPLR §5229 disclosure, and exceeds the scope of this Court's October 15, 2020
     Decision and Order (Dkt. No. 630) ("Order"), which authorizes discovery on the Sherry-
     Netherland residence, the Lady May yacht, and "other assets that Mr. Kwok may own,
     whether directly or indirectly."  Mr. Kwok further objects to the definition of "Family
     Member" to the extent it seeks to bring into its definition individual third parties whom
     he does not control.

2.   Mr. Kwok continues to stand by his objection to the defined Time Period used throughout
     Plaintiff's Document Requests.  Specifically, Plaintiff has defined the relevant time
     period as follows: "Unless otherwise specified, the applicable time period for each
     Interrogatory is January 1, 2008, up to and including the date of production (the "Time
     Period")."  Mr. Kwok objects to the "Time Period" as it is overbroad, unduly
     burdensome, exceeds the scope of CPLR §5229 disclosure, and exceeds the scope of this

Edward Moss
February 1, 2021
Page 2

Court's Order, which authorizes discovery on the Sherry-Netherland residence, the Lady May yacht, and "other assets that Mr. Kwok may own, whether directly or indirectly." The relevant Time Period for purposes of this disclosure is October 15, 2020 (the date of the CPLR §5229 proceedings on the record) through the present date in order to identify any assets that Mr. Kwok "may own, whether directly or indirectly" to satisfy a judgment.

3. Document Requests 8: As we have reported to you, Mr. Kwok responds that there are no documents or communications in his possession, custody, or control with Stephenson Wong, Kingdom Rich, or a Registered BVI Agent. It is our understanding that in response to this disclosure, PAX has revised Document Request 8 to seek *documents and communications with William Je regarding any of Mr. Kwok's assets, investments, bank accounts, equities, stakes, or holdings*. Mr. Kwok is checking to see whether he has documents or communications responsive to your revised request.

4. Document Request 10: We believe that there are no further issues to discuss or address as PAX has been unable to provide a basis for its belief that Mr. Kwok has an ownership interest in the accounts listed in (c) through (i).

5. Document Request 12: Without waiving Mr. Kwok's objection to the Time Period defined by Plaintiff in its Document Requests, Mr. Kwok will produce his 2019 tax returns to Plaintiff.

6. Document Request 13: Without waiving Mr. Kwok's objection to the Time Period defined by Plaintiff in its Document Requests, Mr. Kwok will produce the Genever entity 2019 tax returns to Plaintiff.

7. Document Request 15: It is our understanding that PAX is seeking any assets/financial disclosures that would have been made in connection with Mr. Kwok's application for asylum. We have previously referred you to Form I-589, the Application for Asylum and for Withholding of Removal, which does not request any information relating to an applicant's assets. Please also see www.uscis.gov/policy-manual/volume-8-part-g-chapter-3, which, as has been explained to us by immigration counsel, specifically excludes asylum applicants from the public charge ground of inadmissibility. Mr. Kwok responds that no asset/financial information has been provided by him in connection with his application for asylum.

8. Document Request 16: It is our understanding that PAX would accept the "*source of all payments*" made by Mr. Kwok in lieu of a document production. Mr. Kwok responds that his expenses during the relevant time period have been paid for by Golden Spring (New York) Ltd.

9. Document Requests 17: We will await a list of proposed electronic search terms from PAX.

Edward Moss
February 1, 2021
Page 3

10. Document Request 18: We are confirming that Mr. Kwok does not have responsive Bravo Luck and/or Genever documents in his possession, custody, or control. If he does have responsive documents in his possession, custody, or control, then they will be produced to the extent that they are not duplicative of the documents already produced in this action.

11. Document Requests 19-22: We are confirming that Mr. Kwok does not have responsive Bravo Luck and/or Genever documents in his possession, custody, or control. If he does have responsive documents in his possession, custody, or control, then they will be produced to the extent that they are not duplicative of the documents already produced in this action.

12. With respect to Document Request 21, could you please provide copies of the trust agreement(s) referenced in that request? We are told that Mr. Kwok only has a copy of the trust agreement and it is our understanding that it has already been produced to PAX.

13. Document Request 31: We hereby amend the response to this request in accordance with Mr. Kwok's response to PAX's interrogatory number 29 seeking this same disclosure.[1] As discussed, documents responsive to this request have been previously produced in this litigation by The Sherry-Netherland, Inc. and any further information would need to be sought directly from Golden Spring (New York) Ltd. and/or Bravo Luck. Mr. Kwok has located the loan agreement with Itakura Nan Nan and he will produce it.

14. Document Request 35: Mr. Kwok responds that this information is not in his possession, custody, or control, and will need to be obtained directly from the Genever entities. We note that at least one Genever entity has disclosed its debts in its bankruptcy petition. The documents previously produced in this action by The Sherry-Netherland also provide relevant and responsive documents.

15. Document Request 36: Mr. Kwok responds that he does not have responsive documents in his custody, possession, or control, and maintains, as we have discussed, that the only entities listed in this request which he has an interest in are: Genever Holdings Corporation; Genever Holdings LLC; and Shiny Times Holdings, Ltd.[2]

I will be in touch when I have additional information.

Sincerely,

/s/ Melissa M. Carvalho

---

[1] Mr. Kwok owes Itakura Nan Nan $27,000.00. The following are creditors of Genever Holdings, LLC: The Sherry-Netherland - $891,262.06; Bravo Luck Limited - $67,5000,000.00; Golden Spring (New York) Ltd. - $1,800,000.00; and Qiang Guo - $5,000,000.00.

[2] Shiny Times was seized by the Chinese government in 2017.

Edward Moss
February 1, 2021
Page 4


Melissa M. Carvalho

# EXHIBIT 5

OFFICE OF THE UNITED STATES TRUSTEE
SOUTHERN DISTRICT OF NEW YORK

IN RE:                        .     Case No. 20-12411-JLG
                              .
                              .
GENEVER HOLDINGS, LLC,        .
                              .     201 Varick Street
                              .     New York, NY 10014
                              .
          Debtor.             .     December 18, 2020
. . . . . . . . . . . . . ..         2:30 p.m.


TRANSCRIPT OF 341 MEETING OF CREDITORS
BEFORE RICHARD C. MORRISSEY, ESQ.
OFFICE OF THE U.S. TRUSTEE


TELEPHONIC APPEARANCES:

For the Debtor:          Goldberg Weprin Finkel Goldstein LLP
                         By:  KEVIN J. NASH, ESQ.
                         1501 Broadway, 22nd Floor
                         New York, NY 10036

                         Lawall & Mitchell LLC
                         By:  AARON A. MITCHELL, ESQ.
                         55 Madison Avenue, #400
                         Morristown, NJ 07960

For Pacific Alliance     Foley & Lardner LLP
Asia Opportunity Fund    By:  ALISSA M. NANN, ESQ.
L.P.:                    90 Park Avenue
                         New York, NY 10016

                         O'Melveny & Meyers LLP
                         By:  EDWARD MOSS, ESQ.
                         7 Times Square
                         New York, NY 10036


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311     Fax No. (609) 587-3599**

FILED: NEW YORK COUNTY CLERK 04/28/2021 10:54 PM    INDEX NO. 652077/2017
NYSCEF DOC. NO. 767                                 RECEIVED NYSCEF: 04/28/2021

2

TELEPHONIC APPEARANCES (Cont'd):

For the Sherry-            Stroock & Stroock & Lavan LLP
Netherland Hotel:         By:  GABRIELLE SASSON, ESQ.
                               CURTIS C. MECHLING, ESQ.
                          180 Maiden Lane
                          New York, NY 10038


                          - - -

Wang - Morrissey                                        17

1  or as opposed to the individuals who live there who pay, or is

2  it just that Bravo happens to be the one doing the paying?

3  A    Bravo Luck and Mr. Qiang Guo in the very beginning

4  purchased these apartments.  So they are looking at them as

5  their assets and liability.  So along the way they have been

6  paying all of those maintenance.  Not by individual.  By Bravo

7  Luck, this company.

8  Q    Okay.  And do you know what the monthly maintenance is?

9  A    From this year, it raised a little bit, it's about I think

10 roughly 73,000 per month as a maintenance fee, and plus with

11 assessments every month also.

12 Q    Okay.  What do you mean assessments?

13 A    Assessments as far as Sherry explained that is a

14 assessment every month occurred about like less than 10,000,

15 like this year is 8,000, every month, instead of before, I

16 believe that was quarterly, to improve the entire condition and

17 pay anything which Sherry want to improve, the entire building,

18 maintenance or condition of facility.

19 Q    Okay.  So, in other words, in addition to the 73,000 a

20 month, the Sherry will impose assessments for whatever

21 improvements they're making?

22 A    Yes, sir.

23 Q    Okay.  And is the debtor or Bravo if it's doing the

24 paying, is the debtor current with respect to those maintenance

25 payments?

Wang - Morrissey                                   18

1  A    From this year because of the litigation, the debtor was

2  expecting, but Bravo Luck did not pay from the beginning of

3  this year because of the litigation and ownership.

4  Q    Okay.  So from the beginning of 2020, so from January, is

5  that what you're saying?

6  A    Correct, from January of 2020.

7        MR. NASH:  Richard, just for informational purposes.

8  The Stroock firm represents the Sherry-Netherland.  We listed

9  the Sherry-Netherland for approximately a million dollars on

10 arrears.

11       We also listed, there was a lawsuit,

12 Sherry-Netherland is holding a $3.5 million security deposit.

13 There was a litigation that's listed there where the security

14 deposit, an issue whether it's too much of a security deposit,

15 how it would be applied, and so forth.  So that's listed.

16       It's about a million dollars in arrears that are I

17 think listed on the petition with three or four, maybe even

18 five lawsuits involving the Sherry-Netherland, if I'm not

19 mistaken.

20       MR. MORRISSEY:  Okay.  Thank you, Mr. --

21 A    Yes, the litigation with the Sherry actually affected the

22 payments from this year, yes.

23 Q    Okay.  Thank you.

24       MR. MORRISSEY:  And thank you, Mr. Nash, for adding

25 that color.

Wang - Morrissey                                        19

1  Q    Now since the petition was filed, has the debtor made any

2  maintenance payments?

3  A    No.  No, the debtor didn't, sir.

4  Q    Okay, understood.

5  A    Yeah.

6  Q    Okay.

7  A    Sorry.

8  Q    Okay.  I'm going to turn now to the Pacific Alliance issue

9  and try to understand what that is about and how the debtor

10 itself is connected to that.

11       And I'm going to ask a question in sort of a leading

12 way, but my understanding is that there's an entity called

13 Pacific Alliance Asia Opportunity Fund that sued Mr. Kwok and

14 the debtor in 2017.  And this was in connection with a personal

15 guaranty of a loan obligation.

16       And I guess my question, Ms. Wang, is did that loan

17 obligation relate to the debtor itself or the premises at the

18 Sherry-Netherland?

19 A    This litigation related to Mr. Kwok, K-w-o-k, himself,

20 personally, not related to Genever Holdings LLC, this company.

21 Q    Okay.  And not to the apartment, correct?

22 A    Not to Genever Holdings LLC.  Actually, that was Mr. Kwok

23 himself.  He signed a personal guaranty by himself.  So by then

24 Genever Holdings LLC did not exist.  There was no Sherry

25 property either.

1  Q    Okay.  The loan obligation you mentioned.  The debtor

2  itself, Genever Holdings, is not a party to that loan

3  obligation, is that correct?

4  A    Correct, sir.

5  Q    Okay.  You listed in the schedules, I believe, a $67.5

6  million claim of Bravo Luck Limited, and I believe you

7  mentioned it before, and said it was an unsecured claim, is

8  that correct?

9  A    Yes.  Bravo Luck Limited is listed as non-priority

10 unsecured claim, yes, sir.

11 Q    Okay.  I'd like to interject a comment now, Ms. Wang.  I

12 just wanted to make sure you understand that neither Mr. Kwok

13 or any other individuals or Bravo Luck is represented by Mr.

14 Nash and his firm in this case.  In fact, they can't be

15 represented by Mr. Nash and his firm.

16         To the extent that Bravo Luck or anyone else wishes

17 to assert its or his interest in the debtor, or with respect to

18 the debtor, those entities or individuals would have to retain

19 their own separate counsel.  I just want to make sure you

20 understand that?

21 A    Yes, understood.  Thank you.

22 Q    Okay, thank --

23         MR. NASH:  And, Richard, I think they have their own

24 counsel.  I think it's Pepper Hamilton.

25         MR. MORRISSEY:  You're talking about the individuals

 1  or Bravo Luck?

 2          MR. NASH:  I'm talking about Bravo Luck.

 3  A    Bravo Luck.

 4          MR. NASH:  I don't know Bravo Luck, Pepper Hamilton.

 5  I know I've copied them on e-mails when I did propose bidding

 6  procedures which I sent out to everybody.  But I do think they

 7  represent, it's definitely Bravo Luck, and maybe the son as

 8  well.

 9          MR. MORRISSEY:  Okay, thank you.

10  Q    Now there's another claimant called Golden Spring New York

11  Limited with a $1.8 million claim.  Could you explain, Ms.

12  Wang, what that is?

13  A    This claim is -- Golden Spring New York is the family

14  office located in Manhattan here, paid some of expenses for

15  this apartment also.

16  Q    Could you repeat that last sentence please?

17  A    This family office pays some of the expenses related to

18  the Sherry apartment also, which is about like 1.8 million in

19  total so far.

20  Q    Now when you said paid expenses, is that related to the

21  purchase or is that related to the maintenance or something

22  else?

23  A    That related to some maintenance and like some repair and

24  like the terrace work, et cetera.

25  Q    Okay.  Are they still making such -- paying expenses for

Wang - Morrissey                                22

1  the debtor?

2  A    I believe so.

3  Q    Okay.  I was going to say a word about operating reports a

4  little later, but for right now, any payments that the debtor

5  is receiving from another entity should be reflected in the

6  operating reports.  And you can discuss with Mr. Nash exactly

7  how to do that.  But we want to know if the debtor is getting

8  contributions from somebody, whether it's a related entity or

9  someone controlled by one of the individuals that controls

10  Genever itself.  So if you could please make sure that happens

11  when the operating reports are filed, okay?

12  A    Yes.

13  Q    And once again, Mr. Nash cannot represent Golden Spring

14  New York.

15  A    Okay.

16  Q    Okay.  And also Mr. Guo, G-u-o, I apologize if I'm

17  mispronouncing that, and Bravo Luck, slash Bravo Luck Limited,

18  has a $5 million claim.  Is that separate from the 65, $67.5

19  million claim listed or is that -- is there a difference or is

20  that the same?

21  A    It's separate.  It's separate from the 67.5 Bravo Luck

22  Limited.

23  Q    Okay.  And now those are the two numbers you mentioned

24  before in connection with the purchase of the apartment,

25  correct?

Wang - Morrissey                          23

1   A    Yes.

2   Q    Okay.  So that was -- was that in the form -- that was in

3   the form of a loan?

4   A    I believe they have a trust agreement.

5   Q    Okay.  But in other words, did Bravo Luck forward that

6   money in connection with the purchase with an expectation of

7   being repaid as if it were a loan?

8   A    Yes, that's right.

9   Q    Okay.  And same with Mr. Guo with respect to the $5

10  million, is that correct?

11  A    Yes.

12  Q    Okay.  Do you have documents reflecting that as a loan?

13  A    I believe so.  I have to find out.

14  Q    Okay.

15  A    It's not in front of me right now.

16  Q    Yeah, if you could provide that to Mr. Nash and I would

17  ask Mr. Nash to provide that to me?

18  A    Yes.

19  Q    Okay, thank you.

20        MR. NASH:  We will do that.  I think if I -- there

21  was a, if I'm not mistaken, I did review the closing statement.

22  So I will go back into my e-mails and dig that out.

23        MR. MORRISSEY:  Okay, yes.  And if you could just

24  forward the e-mail to me, that would be the easiest thing.

25        MR. NASH:  Yes.  I forwarded you the insurance as we

Wang - Morrissey                            24

1  were speaking as well.

2          MR. MORRISSEY:  Okay, thank you.

3  Q    Mr. Nash mentioned something, Ms. Wang, earlier about

4  bidding procedures.  Does the debtor intend to sell the co-op?

5  A    Yes, the debtor decided to sell the apartment.

6  Q    Okay.  And are you handling the sale for the debtor?  In

7  other words, are you the principal person handling the sale or

8  is someone else doing that?

9  A    Yes, I'm the person handling this also.  We literally

10 scheduled a meeting with our realtor broker a month ago so.

11 Q    Okay.  That was going to be my next question, whether you

12 had hired a broker.  Who is the broker?

13         MR. NASH:  We have, Richard, let me just help you

14 with this.  We've designated a proposed broker, Harris Stevens,

15 a woman by the name of Kathy Sloane.  She has, as I understand

16 it, a good relationship with the Sherry-Netherland.

17         We setup a call with all parties, I think on Monday,

18 for everybody to speak to the broker and to get her feeling on

19 how this would proceed on a sale.

20         I'm looking to get a consent of all the parties as to

21 the broker, as to possible bidding procedures, and be in a

22 position to file papers with the Court on a consensual basis if

23 we can get it.  And that's why I circulated the papers in

24 advance.  I should send you a copy as well.  But all the

25 counsel have them.

 1              And one of my calls with -- I called Pacific

 2    Alliance.  They wanted to speak to the broker.  And so I

 3    reached out to the broker and I think from the last e-mails

 4    we're looking at a call sometime on the day on Monday.

 5              MR. MORRISSEY:  Okay, thank you.

 6    Q    And, Ms. Wang, I just want to make clear to you that the

 7    broker would have to be retained by the debtor, and that

 8    retention has to be approved by the Bankruptcy Court.  I just

 9    want to make sure you understand that?

10    A    Yes.

11    Q    Okay.

12    A    Thank you, sir.

13    Q    Do you know if the broker has conducted an appraisal?

14    A    Yeah.  This is the same broker when Genever Holdings LLC

15    purchased this apartment.  So she knows this apartment very

16    well, including the facility, the condition and like terrace,

17    you know, all the details.  And then she has a very good

18    relationship with Sherry also, as far as I know.

19    Q    Okay.  But do you know if the debtor has actually done,

20    conducted an appraisal now for 2020?

21    A    No, we didn't.  I think.

22              MR. NASH:  It's a difficult thing to appraise in a

23    sense.  Just to give you a little history.  The apartment was

24    purchased for $70 million.  We do believe it has lost value

25    from that purchase price over the years, as I understand it

# EXHIBIT 6



Kevin M. Kearney
Partner, General Counsel
Direct Dial: 716.848.1385
Direct Facsimile: 716.819.4610
*kkearney@hodgsonruss.com*

April 7, 2021

Edward Moss, Esq.
O'Melveny & Myers LLP
7 Times Square
New York, New York 10036

Dear Mr. Moss:

Re:    Subpoena Duces Tecum served on Hodgson Russ
Pacific Alliance Asia Opportunity Fund, L.P., vs. Guo Wengui, et al.
Index No.: 652077/2017

In response to the subpoena received by Hodgson Russ in this matter, please find below the information appropriate for production under CPLR §§ 5223 and 5224. The firm objects to the subpoena to the extent it seeks information beyond the proper scope of discovery under these sections, and to the extent it seeks confidential information about clients other than the defendants in the underlying action, information protected by the attorney-client privilege.

The firm has represented Mr. Wengui in the following matters. In each instance, our engagement letter was addressed to Mr. Wengui, with a signature block for him.

1.    *Soho China, Ltd., et al. v. Guo Wengui*, Index No. 155066/2017, Supreme Court of New York, New York County;

2.    *Fan Bingbing v. Guo Wengui*, Index No. 156619/2017, Supreme Court of New York, New York County;

3.    *Yan Huang v. Guo Wengui*, Index No. 156552/2017, Supreme Court of New York, New York County;

4.    *Caixin Media Company, Ltd.*, et al. v. Guo Wengui, Index No. 652154/2017, Supreme Court of New York, New York County;

5.    *Pacific Alliance Opportunity Fund L.P. v. Kwok Ho Wan*, Index No. 652077/2017, Appellate Division, First Department of the Supreme Court of New York;

6.    *Rui Ma v. Guo Wengui, et al.*, Index No. 158140/2017, Supreme Court of New York, New York County;

---



Edward Moss, Esq.
April 7, 2021
Page 2

7.   *Weincan ("Watson") Meng and Boxun Inc., v. Guo Wengui a/k/a Miles Kwok,* Index No. 159636/2017, Supreme Court of New York, County of New York;

8.   *Eastern Profit Corporation v. Strategic Vision US LLC, Civil Action No. 18-CV-2185,* United States District Court Southern District of New York;

9.   *Zheng Wu a/k/a Bruno Wu and Yang Lan v. Guo Wengui* Index No. 152123/2018, Supreme Court of New York, County of New York; and

10.  *Baiqiao Tang a/k/a Tang Baiqiao and Jing Geng v. Wengui, Guo, a/k/a Miles Kwok, a/k/a Guo Wengui, a/k/a Ho Wan Kwok, Golden Spring (New York), Ltd., Rule of Law Foundation III Inc., Rule of Law Society IV Inc., and Saraca Media Group, Inc.,* Supreme Court of New York, County of New York.

Payments received by the firm for its services were made by Golden Spring (New York) Ltd.

In addition, single payments were received from the following senders:

1.   ZIBA Limited; and

2.   ACA Capital Group Limited.

Very truly yours,

Kevin M. Kearney
General Counsel

KMK/cat

# EXHIBIT 7

1

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK : PART 61
 2   -------------------------------------------------X
     PACIFIC ALLIANCE ASIA OPPORTUNITY FUND, LP,
 3
                        Plaintiff(s),
 4
              - against -
 5
     KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI,
 6   a/k/a GUO WENGUI, a/k/a GUO WEN GUI, a/k/a WAN
     GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO,
 7   GENEVER HOLDINGS CORPORATION, and GENEVER HOLDINGS LLC
 8                      Defendant(s).

 9   -------------------------------------------------X
     Index No. 652077/2017
10

11                      February 2, 2022 - Via Microsoft Teams

12

13   B E F O R E:   HONORABLE BARRY OSTRAGER, JSC

14

15   A P P E A R A N C E S:

16            O'MELVENY & MYERS LLP
                  Attorneys for Plaintiff
17                7 Times Square
                  New York, New York 10036
18                BY:  STUART SARNOFF, ESQ.
                       DAVID HARBACH, ESQ.
19                     LAURA ARONSSON, ESQ.

20

21            BAKER & HOSTETLER LLP
                  Attorneys for Defendant Kwok Ho Wan
22                45 Rockefeller Plaza
                  New York, New York 10111
23                BY:  JOHN SIEGAL, ESQ.
                       TRACY COLE, ESQ.
24                     ERICA BARROW, ESQ.

25
```

Rachel C. Simone, CSR, RMR, CRR



2

1    APPEARANCES CONTINUED:

2

3            CHIESA SHAHINIAN GIANTOMASI PC
                 Attorneys for HK International
4             11 Times Square, 34th Floor
             New York, New York 10036
5             BY:  LEE VARTAN, ESQ.

6

7

8                      - 0 -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

53

1  understood you to say that whenever your father took the yacht

2  out, number one, he had to get authorization from you which, I

3  suppose, all guests would; and, number two, I believe you said

4  every time he went out he gave you a detailed itinerary.  So it's

5  no answer to my -- sorry, Madam Interpreter.  Go ahead.  Excuse

6  me.

7       A    I will give you an example, sir.

8            If the yacht is in New York, my father boarded it

9  New York and he told me he is going to Long Island, then I would

10  agree to it.  But if he wants to stop half way, it is his freedom

11  as long as it is within the New York area.  But if he is taking

12  the yacht to Palm Beach, then he would need to give me a very

13  detailed itinerary.

14       Q    Did your father ever take the yacht out without your

15  permission or knowledge?

16       A    Never.

17       Q    Let's look at -- well, we are still on Paragraph 14.

18  Excuse me.

19            You talk about in early October of 2020 no longer

20  wishing to use the boat and relating that to Golden Spring.

21       A    Yes.

22       Q    And then the remainder of the sentence says -- the

23  paragraph says that Golden Spring relayed your directive to

24  Captain Heaslop.

25       A    Yes.

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

54

1      Q     Do you remember this?

2      A     Yes, I remember.

3      Q     What exactly was your directive?

4      A     Because my yacht in every October the winter season,

5  due to the reason of the weather, it needs to be parked in

6  Florida, a warmer place.  So to me this is a very ordinary

7  request.  Golden Spring asked me if I still need to use the yacht

8  because my understanding is that a yacht needs to be moved to a

9  warmer place.

10     Q     I want to make sure I understand the last part of that

11  answer before I ask another question.

12           Did you say that Golden Spring asked you if you

13  wanted to continue to use the yacht?

14     A     It wasn't a request or inquiry, actually, because I

15  already know that the yacht is no longer suitable to be used in

16  New York under the weather conditions.  They were just informing

17  me that the yacht needs to move to a warmer place.

18     Q     So Golden Spring was informing you of that decision?

19     A     It is not informing.  It is more like reporting.

20     Q     I see.

21           So in your affidavit when you say you no longer

22  wish to use the boat for the season due to the weather; was that

23  the reason you relayed the directive, or is it because you heard

24  from Golden Spring that the boat needed to go to Florida?

25     A     Okay.  Let me reiterate my answer, sir.

Rachel C. Simone, CSR, RMR, CRR

**Guo - by Defendant - Cross / Harbach**

55

1          Every year in the past few years in October, that

2     would be the time to arrange for the yacht to be moved to a

3     warmer place.  So this year, that particular year before they

4     moved the yacht to warmer place, they informed me, they told

5     me -- rather, they report to me that the yacht needs to be moved

6     to the warmer place.  So it was more like a routine activity.

7          Q    I understand.

8               So is it true, then, that your directive in

9     response to that information was, Take the yacht to Florida?

10         A    Yes, I agreed to the request sent by the captain.

11         Q    Well, I'm sorry, but that's not what your affidavit

12    says.  Your affidavit refers to a directive, so that's what I am

13    trying to understand.  That was my original question.  What

14    exactly was your directive?

15         A    My communication with the captain is through a

16    representative of the company.  The representative of the company

17    came to me and told me it is about time to move the yacht to a

18    warmer place, so my instruction to the representative is that

19    yes, all right, the yacht needs to move to Florida.  That was my

20    directive.

21              THE COURT:  What is your relationship with Golden

22         Spring?

23              THE WITNESS:  Your Honor, Golden Spring helps me

24         to pay all the expenses for my yacht, including the

25         management fees.

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

56

1          THE COURT:  Do you have an ownership interest in

2      Golden Spring?

3          THE WITNESS:  No.

4          THE COURT:  Why would Golden Spring help you pay

5      all of the expenses associated with operating and

6      maintaining the yacht?

7          THE WITNESS:  Golden Spring belongs to my brother.

8      It is my brother's company.  When the yacht was gifted to me

9      as a gift, I find it very troublesome to form another bank

10      account just to try to manage the yacht; so I requested my

11      brother if he can continue to manage the yacht using his

12      company.  He and I came to an agreement with that.

13          THE COURT:  So it is your testimony that your

14      brother is the sole owner of Golden Spring?

15          THE WITNESS:  Yes, your Honor.

16          THE COURT:  And it was part of your brother's gift

17      to you that he would incur the costs of maintaining and

18      operating the yacht?

19          THE WITNESS:  Yes.

20          THE COURT:  Do you know how much it costs to

21      maintain and operate the yacht for a year?

22          THE WITNESS:  Your Honor, between $2 million to

23      $3 million US dollars.

24          THE COURT:  All right.  We are going to give the

25      court reporter a ten-minute break.  She has been trying to

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

57

```
 1          follow the testimony all morning.  We will resume at 12:15

 2          and go to 1:00 and break for lunch.

 3                    THE WITNESS:  Okay.  Thank you.

 4                         (Short recess taken)

 5                    THE COURT:  All right.  Let's proceed.

 6      BY MR. HARBACH:

 7          Q    Ms. Guo, at the time you directed that the yacht go to

 8      Florida, were you aware that a temporary restraining order had

 9      been entered against your father on September 30?

10                    THE INTERPRETER:  September 30, right, sir?

11                    MR. HARBACH:  Yes, of 2020.

12          A    I do not know about it at that time.

13                    MR. HARBACH:  Could I ask the interpreter to

14          please clarify?  She did not know about it at the time?

15                    THE INTERPRETER:  She did not know about it at the

16          time, sir.

17                    MR. VARTAN:  Your Honor, I will interpose an

18          objection.  I understand that the Court's order was entered

19          in October and not in September.

20                    THE COURT:  (To the witness)  At any time in 2020

21          were you aware that a temporary restraining order was

22          entered against your father prohibiting him from removing

23          the vessel from the territorial United States?

24                    THE WITNESS:  I learned about this matter around

25          the end of 2020.  I can't remember the exact date.  It was
```

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

58

1          sometime in winter.  It possibly is the beginning of 2021.

2          I came to know about it through my lawyer's telephone call.

3     BY MR. HARBACH:

4          Q    So when the yacht sailed south for Florida in early

5     October of 2020, your testimony is that you did not know about

6     any restraining order that had been entered on September 30?

7               MR. VARTAN:  Same objection, your Honor, with

8          respect to the date.  Certainly if Mr. Harbach has a

9          document he wants to show the witness, I am sure she would

10         be happy to look at it; but I understand the date to be

11         October 15 and not September 30.

12              MR. HARBACH:  To clarify for counsel and the

13         Court, there is a temporary restraining order issued on

14         September 30 of 2020.  It is Document 591 on the Court's

15         docket.  My only question about this is whether the witness

16         was aware that that temporary restraining order had been

17         entered.

18              MR. VARTAN:  Again, your Honor, my understanding

19         is that the September order, not to belabor the point, has

20         nothing at all to do with the Lady May.  Granted, I wasn't

21         part of the proceedings at that point, but my understanding

22         is the Lady May is first made mention before your Honor in

23         October, not September 30.  So, again, I'd invite

24         Mr. Harbach to show the document to the witness if he has

25         something before him.

Rachel C. Simone, CSR, RMR, CRR

**Guo - by Defendant - Cross / Harbach**

62

1    signature.  It is dated March 16 of 2021.

2        A    Okay.

3        Q    And this is the order of the Court that specifically

4    requires that it be returned to New York?

5        A    Okay.  Okay.

6        Q    So my question for you is:  Have you ever seen this

7    order before?

8        A    Can you please go back to the top of the document and

9    show me again because I want to reconfirm.  At this point of time

10   I am not able to confirm it.

11       Q    Okay.  I will give you a little while longer, but then

12   I will move on because it is not crucial.

13                THE COURT:  Can you show her the next page?

14                MR. HARBACH:  Yes, your Honor.

15       A    I really truly do not recall if I have seen this

16   document before, but I do know the content of this document.

17       Q    Okay.  Thank you.

18                Returning to your affidavit, you said in

19   Paragraph 20 that you were aware of the Court's order requiring

20   the Lady May to return to New York in May of '21 and that you

21   learned of that through your counsel?

22       A    Yes.

23       Q    So what I want to make sure I understand is when you

24   learned of the Court's order.  I understood you to say to

25   Justice Ostrager a few minutes ago that you thought you learned

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

63

1    of a restraining order at the end of 2020 or the beginning of

2    2021, is that correct?

3        A    What I remember now is that at the end of 2020 my

4    lawyer called me and informed me that there would be a possible

5    issue as such with Lady May, but I don't remember exactly when I

6    learned about this order, this Court order.  It is probably

7    around 2021, beginning of 2021 between the month of March and

8    April.

9        Q    Okay.  Let me --

10            MR. HARBACH:  I really appreciate your Honor being

11        patient.  I am moving as quickly as I can.

12        Q    Let me add one more piece to the puzzle.  And, again, I

13    am not trying to confuse you.

14            There was a restraining order issued by the Court

15    on October 15 of 2020.  I am going to represent that to you,

16    okay?

17        A    Okay.

18        Q    Do you think that is the order that you learned about

19    toward the end of 2020 from your counsel?

20            MR. VARTAN:  Your Honor, I would object.  I think

21        the question has been asked and answered now a number of

22        times.  Also, we are beginning to conflate dates.  We are

23        looking at Paragraph 20 that talks about a different court

24        order from March.  Mr. Harbach is talking now about an order

25        from October.  I think he is confusing the witness here.

Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM    INDEX NO. 652077/2017

NYSCEF DOC. NO. 1179    Case 22-50073   Doc 179-1   Filed 04/06/22   Entered 04/06/22 16:09:03   Page 79 of    RECEIVED NYSCEF: 02/07/2022
94

Guo - by Defendant - Cross / Harbach

64

1                THE WITNESS:  Thank you.

2                THE COURT:  Just rephrase your question.  This

3       isn't that hard.

4       Q    Ms. Guo, when was the first time you learned about any

5    restraining order from the Court through your counsel?

6                MR. VARTAN:  Same objection.  Asked and answered

7       multiple times.

8                THE COURT:  Overruled.

9                THE WITNESS:  Can I answer the question?

10                THE COURT:  Yes.

11       A    I really do not remember the specific date, but it was

12    somewhere around the beginning of 2021.  It was somewhere around

13    the beginning of 2021.  I really do not remember the specific

14    date.

15       Q    After you learned about the order from your counsel,

16    did you discuss it with your father?

17                MR. VARTAN:  I'd just ask Mr. Harbach to clarify,

18       your Honor, which order he is talking about.  He's mentioned

19       a September order, an October order, a March order?

20                THE COURT:  Let's make this easy.

21                Ms. Guo, did you discuss any Court orders relating

22       to the Lady May with your father?

23                THE WITNESS:  I did not.  I have only discussed it

24       with my lawyers.

25       Q    The lawyer representing you today, Mr. Vartan, is that

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

65

1    the same lawyer who alerted you about the existence of a court

2    order relating to the Lady May?

3        A    Yes.

4        Q    Who is paying for his services?

5        A    Golden Spring.

6            MR. HARBACH:  Your Honor, did you say you wanted

7        to break at 1:00 for lunch?

8            THE COURT:  Yes.  And I wanted to speak with you

9        and Mr. Siegal in the same manner that we did at the

10       beginning of this hearing.

11           MR. HARBACH:  May I suggest that we break now and

12       do that?  The last bit of questioning I have that has to do

13       with this witness involves publication of exhibits and may

14       be a little cumbersome.  I would suggest doing that right

15       after lunch.

16           THE COURT:  All right.  We can do that.

17           For the record, Ms. Guo, I have excluded the press

18       from your testimony because I understand that you were

19       detained and tortured by the CCP and your whereabouts are

20       potentially a matter of interest to the CCP while you seek

21       asylum in the United States.  If there is no disclosure in

22       your examination about your whereabouts, the transcript of

23       your examination will be made public.  And I should add that

24       the plaintiff has consented to this arrangement, which is

25       highly unusual.

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

66

1              THE WITNESS:  Thank you, your Honor, for my

2        protection over my safety and not allow the media's

3        involvement in this proceeding.  Thank you, your Honor.

4              THE COURT:  All right.  We will break for lunch

5        now.  I would like counsel to call me at the same number

6        that I gave you before.

7              MR. VARTAN:  Your Honor, could I first be heard on

8        one issue?

9              THE COURT:  Yes.

10             MR. VARTAN:  With respect to the remainder of

11        Mr. Harbach's cross-examination, can he give me a rough

12        approximation of how much more time he has so that I can

13        plan for other witnesses?

14             MR. HARBACH:  I am happy to do that.  I have a

15        couple small factual questions to ask, and then I have three

16        of the videotapes that we proffered to the Court that I want

17        to show some tiny portions of to the witness.  My guess is

18        30, 40 minutes.

19             MR. VARTAN:  Thank you, Mr. Harbach.

20             Thank you, your Honor.

21             THE COURT:  Okay.  We will resume at 2:00.

22             MR. SIEGAL:  Your Honor, may we call you towards

23        the end of the lunch break or would you like to hear from us

24        now?

25             THE COURT:  I would like to hear from you now.

Rachel C. Simone, CSR, RMR, CRR

Guo - Defendant - Cross / Guo

67

1            MR. SIEGAL:  All right.  I will reach out to

2        O'Melveny and we will call you.

3            THE COURT:  Great.

4            (L U N C H E O N    R E C E S S)

5            MR. HARBACH:  Your Honor, can I continue my

6        questioning?

7            THE COURT:  Yes.

8    BY MR. HARBACH:

9        Q    Ms. Guo, before lunch we talked about all sorts of

10   things, but you mentioned something in one of your answers that I

11   just would like to clarify.

12       A    Okay.

13       Q    I believe you said in one of your answers that if you

14   needed to use the yacht with some friends, for example, you would

15   just contact the captain directly?

16       A    Sometimes I contacted the captain directly.  Sometimes

17   I would contact the captain through Golden Spring.

18       Q    Do you recall the names of any of the captains you

19   contacted directly?

20       A    I communicated mostly with captain that I used earlier,

21   Mr. Craig.  Then I also have contacted Momchil, the current

22   captain of the yacht.

23       Q    You have contacted each of them directly, is that

24   right?

25       A    Yes.

Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM INDEX NO. 652077/2017

NYSCEF DOC. NO. 1179    Case 22-50073   Doc 179-1   Filed 04/06/22   Entered 04/06/22 16:09:03   Page 83 of   RECEIVED NYSCEF: 02/07/2022
94

**Proceedings**

98

```
 1        me tomorrow by conference call at noon.  If you don't have

 2        anything to tell me by conference call at noon, I will just

 3        proceed to have the transcript fully transcribed and

 4        uploaded on the Court's electronic filing system.  I will

 5        rule, certainly, no later than Wednesday of next week.

 6               MR. SIEGAL:  Judge, we will call at noon tomorrow,

 7        a joint call of counsel.

 8               THE COURT:  Okay.  Thank you.  Have a nice day.

 9                      *       *       *

10        The foregoing is hereby certified to be a true and

11    accurate transcript of the proceedings.

12

13

14                     Rachel C. Simone-Ivanac

15                     Rachel C. Simone-Ivanac

16                     Senior Court Reporter

17    SO ORDERED February 7, 2022

18

19

20    BARRY R. OSTRAGER, J.S.C.

21

22

23

24

25
```

Rachel C. Simone, CSR, RMR, CRR

# EXHIBIT 8

Case 22-50073    Doc 179-1    Filed 04/06/22    Entered 04/06/22 16:09:03    Page 85 of
94

# SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY

PRESENT:    **HON. BARRY R. OSTRAGER**          PART          **IAS MOTION 61EFM**

*Justice*

------------------------------------------------------------------------X

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

Plaintiff,

- v -

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO, GENEVER: HOLDINGS LLC, and GENEVER HOLDINGS CORPORATION,

Defendants.

------------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 652077/2017 |
| **MOTION DATE** | |
| **MOTION SEQ. NO.** | 019 |

**DECISION + ORDER ON MOTION**

HON. BARRY R. OSTRAGER

In this 2017 case with 1,180 docket entries – almost all of which involve defendant Kwok Ho Wan's ("Kwok") efforts to avoid and deceive his creditors by parking his substantial personal assets with a series of corporations, trusted confidants, and family members -- this Court is called upon to determine whether the plaintiff, Pacific Alliance Asia Opportunity Fund L.P. ("PAX"), has met the burden of establishing that the Court should enter a final Order of Civil Contempt against Kwok.  For the reasons that follow, this Court is simultaneously issuing a final Order of Civil Contempt.

PAX secured a judgment against Kwok in the sum of $116,402,019.57 on February 3, 2021 (NYSCEF Doc. No. 716).  Thereafter, PAX undertook a year's long effort to enforce its judgment by first identifying and then attempting to levy upon Kwok's assets in the United States.  PAX encountered difficulty identifying assets over which Kwok exercised control because Kwok, who is a self-declared multi-billionaire, had secreted his assets in a maze of corporate entities and with family members.  This scheme has enabled Kwok to assert that he has no assets despite his lavish lifestyle, which plaintiff has catalogued with material from social

media clippings, photographs and videotapes showing Kwok living large and boasting of his

wealth, expensive homes, private plane, and yacht. As noted in the transcript of proceedings of

February 2, 2022, this evidence is of little probative value, as the witnesses sponsoring this

evidence have no first-hand knowledge of the authenticity of this "evidence" other than that it is

accessible on various websites.

On February 2, 2022, this Court held an evidentiary hearing at which seven witnesses

submitted direct testimony by affidavit and were made available for cross-examination. The

hearing followed protracted proceedings by PAX to locate and levy upon assets owned by

defendant Kwok. Those proceedings established, among other things, that Kwok exercised

dominion and control over a yacht called the Lady May and resulted in a series of orders

restraining Kwok and/or the registered owners of the yacht called Lady May from removing the

Lady May from the Court's jurisdiction. The first such Order was issued on September 30,

2020, as described in detail *infra,* and was followed by an October 15, 2020 Order that restrained

"Mr. Kwok and/or the registered owners of . . . the yacht, the 'Lady May'" from leaving the

jurisdiction. (NYSCEF Doc. No. 630). As detailed *infra*, Kwok spent much of July, August and

September of 2020 on the Lady May. Contemporaneously with the proceedings resulting in the

September 30 and October 15, 2020 restraining Orders, Kwok and his cohorts made arrangement

for the Lady May to sail to Florida in early October 2020 and, thereafter, to the Bahamas. On

March 16, 2021, the Court issued a conditional order of civil contempt which directed that if

Kwok failed to return the Lady May to the jurisdiction of this Court by May 31, 2021, he would

be subject to a $500,000.00 fine for each day that the Lady May remained outside the jurisdiction

of this Court.

The Appellate Division, First Department, affirmed this Court's order holding Kwok in

conditional civil contempt, finding that "the daily fine of $500,000.00 was intended to strongly

encourage defendant to purge himself of the contempt, which, despite being permitted to

accomplish, he has shown no interest in doing. . ."  NYSCEF Doc. No. 953, 199 AD3d 423

(2021).  The Appellate Division further held:

> The motion court acted within its discretion in holding defendant in civil contempt, as
> plaintiff established by clear and convincing evidence that defendant violated a lawful,
> clear mandate of the court, of which he had knowledge, and that such violation resulted
> in prejudice to plaintiff's rights (*see El-Dehdan v El-Dehdan*, 26 NY3d 19, 29 [2015];
> Judiciary Law § 753). …  The motion court is instructed to proceed with an evidentiary
> hearing to resolve a dispute as to ownership and control of the yacht, and to assess
> appropriate penalties.

Pursuant to the Appellate Division's Order, this Court scheduled the February 2, 2022

evidentiary hearing to resolve the issue of whether Kwok beneficially owns and controls the

yacht.  Kwok failed to testify at the February 2, 2022 hearing, having previously invoked his

Fifth Amendment right to decline to testify or respond to discovery requests relating to the Lady

May in response to PAX's asset discovery efforts.  PX 27, 28, 29, 30.[1]  This invocation of the

Fifth Amendment notwithstanding, Kwok is an active litigant in multiple fora and he has given

prior testimony in this and other proceedings.

Kwok also filed a complaint in this court captioned *Guo Wengui a/k/a Miles Kwok v*

*Hong Zeng*, 157025/2020, which references a blog post from Freebeacon.com dated September

8, 2017 in which Kwok complains about "several incidents involving *his* 152-foot motor yacht,

Lady May..."  (Complaint ¶ 8, NYSCEF Doc. No. 001) ("the Zeng Complaint").  The Zeng

Complaint describes Kwok as an "outspoken critic of the CCP" who has gone to great "lengths

to expose the rampant corruption within the CCP and the Chinese government."  The

*Washington Post* reported that a former advisor to President Trump, Steve Bannon, was arrested

in 2020 while on board the Lady May, and described Mr. Bannon as a friend and business

_____

[1] "PX" refers to Plaintiff's Trial Exhibits.

3

associate of Kwok, "a vocal online critic of the Chinese government who was once close with that country's intelligence service but is now wanted by authorities in Beijing on charges of fraud, blackmail and bribery." Other news outlets have reported that Mr. Bannon utilized Kwok's private jet on more than one occasion to travel to political rallies.

The testimony adduced at the hearing out of the mouths of defendants' witnesses clearly and convincingly demonstrated that Kwok beneficially owns and controls the Lady May and has utter contempt for this Court and the judicial process.

Kwok once was the sole shareholder of Hong Kong Investments Limited ("HK International"). The testimony adduced at the hearing established that in 2014 Kwok transferred a 100% interest in HK International to one Qu Guo Jiao for no consideration. Ms. Qu was a trusted business associate of the Kwok family. Thereafter, Kwok fled China and on February 23, 2015, HK International purchased the Lady May for £ 28 million GBP. No testimony adduced at the hearing established the source of funds to purchase the Lady May, but the uncontradicted testimony of Kwok's daughter Mei Guo established that Ms. Qu did not provide the funds to purchase the yacht. Tr. 44.[2] Consequently, a reasonable inference is that Kwok provided the funds to HK International which were used to purchase the yacht. It is undisputed that Ms. Qu transferred the ownership of the Lady May to Kwok's daughter, Mei Guo, on or around June 17, 2017, for $1 or no consideration. Tr. 47. According to Ms. Guo's affidavit (NYSCEF Doc. No. 1162), Ms. Guo ultimately transferred ownership of the Lady May to the current title holder HK International Funds Investments (USA) Limited, LLC ("HK USA"). Ms. Guo further avers that she is the sole owner of HK USA, although all of the multi-million dollar annual expenses for the

---

[2] "Tr." refers to the transcript of the evidentiary hearing, efiled at NYSCEF Doc. No. 1179.

Lady May, including fuel, maintenance, and the captain and crew are paid by Golden Spring

(New York) Ltd. ("Golden Spring."), which is allegedly the Kwok family office.

At the hearing Ms. Guo testified that her brother had bought the Lady May for her. Tr.

46. The Court cannot credit this testimony as there is no evidence that Ms. Guo's brother was

involved with the corporate transactions leading to Ms. Guo's acquisition of the title to the yacht.

And, indeed, in response to a question from the Court, Ms. Guo acknowledged that her brother

was not involved in any of the transfers that occurred before she acquired the yacht. Tr. 47.

Other testimony adduced at the hearing established that Kwok was repeatedly on the

yacht every summer and that Ms. Guo was infrequently on the yacht. Trial Tr. 88:8-20. The

Lady May's captain testified that Kwok was aboard the yacht for a significant portion of the

months of July, August and September in 2020 and that this was consistent with his usual

practice in the summer. Trial Tr. 87:24-88:7. Subsequent to this Court's September 30, 2020

restraining Order, in October 2020 the Lady May was sent to Florida and then the Bahamas for

repairs and was subsequently dispatched to Italy in October 2021, purportedly at the direction of

Golden Spring. Ms. Guo acknowledged that she was aware of both this Court's September 30,

2020 restraining Order and this Court's subsequent March 16, 2021 Order directing that the Lady

May be returned to the Court's jurisdiction Tr. 55; 57-60; 62.

Ms. Guo testified that on the one hand, she directed the Lady May's itinerary but, on the

other hand, testified that security for Kwok was such a concern that there would be no

memorialization of any itinerary. Tr. 52. She further testified that when her father was on the

yacht unaccompanied by her he had the freedom to choose wherever he wanted to go. Tr. 50.

The fundamental issue, however, is who directed the yacht to be removed from this Court's

jurisdiction in October 2020. Ms. Guo claims that in early October 2020 she no longer wished to

use the yacht and relayed that instruction to Golden Spring which, in turn, relayed her directive to the then captain of the ship, Captain Heaslop.  Tr. 53.

Upon further questioning, Ms. Guo admitted that it was Golden Spring that advised her that the yacht needed to be moved to a warmer place.  Tr. 55.  Ms. Guo then repeated her retracted testimony that her brother had given her the yacht, and she stated that her brother is the sole owner of Golden Spring.  Tr. 56.  This testimony is not credible given that on September 30, 2020 the Court entered a temporary restraining order restraining Kwok

> . . . from making or causing any sale, assignment, transfer, or interference with any property in which he has an interest, or from paying over or otherwise disposing of any debt now due or thereafter coming due to him, subject to the exceptions set forth in CPLR 5222 and in the ordinary course.

NYSCEF Doc. No. 591.  Significantly, Captain Heaslop, the then Captain of the Lady May, testified that Mr. Kwok told Captain Heaslop that Kwok would no longer be a guest on the Lady May "a few days" before the Lady May departed for Florida in early October 2020 (and apparently after the issuance of this Court's September 30, 2020 Order).  Tr. 89.  Captain Heaslop also contradicted Ms. Guo's testimony that Ms. Guo gave Captain Heaslop instructions about the yacht's movement.  Tr. 94.

Ms. Guo also acknowledged having subsequently read the Court's March 16, 2021 Order requiring the Lady May to be returned to the Court's jurisdiction by May 31, 2021 (NYSCEF Doc. No. 728).  She further acknowledged that she had discussed the Order with her lawyer (whose services were paid for by Golden Spring) and that she had *ignored* the Order.

Russell Stockil, the Yacht Management Director for Yachtzoo SARL, testified that his company had a management contract with HK USA dated May 2021 and that he communicated with HK USA and Golden Spring, but never with Ms. Guo.  Tr. 78.  This was also the testimony of successor Captain Momchil Ivanov.  Tr. 82.  In short, Ms. Guo's testimony that she owns and

6

controls the Lady May cannot be credited in any respect.  Ms. Guo appears to be a woman in her

twenties, has introduced no evidence that she exercised dominion and control of the Lady May,

and provided no confirmation that she came into possession of the Lady May, other than as a

ruse to shield the Lady May from being levied upon by her father's creditors.

The machinations associated with the shell game Kwok has orchestrated with respect to

the Lady May are of a piece with every other evasive and contemptuous act Kwok has taken

during the five years this litigation has been pending, which is why there are 1,180 docket entries

in this case.

The Court has the authority to hold Kwok in civil contempt under Judiciary Law

§ 753—and "to punish [him], by fine and imprisonment"—where, as here, the Court "expressly

find[s] that [Kwok's] actions were calculated to or actually did defeat, impair, impede, or

prejudice the rights or remedies of a party to a civil proceeding." *Oppenheimer v. Oscar Shoes,

Inc.*, 111 A.D.2d 28, 28 (1st Dep't 1985) (citing N.Y. Judiciary Law § 753).   Section 753 sets

forth four requirements:

> [T]o find that contempt has occurred in a given case, it must be determined that
> [1] a lawful order of the court, clearly expressing an unequivocal mandate, was in
> effect. [2] It must appear, with reasonable certainty, that the order has been
> disobeyed . . . [3] Moreover, the party to be held in contempt must have had
> knowledge of the court's order, although it is not necessary that the order actually
> have been served upon the party . . . [4] Finally, prejudice to the right of a party to
> the litigation must be demonstrated.

*Fleetwood Fin. v Walter J. Dowd, Inc.*, 2016 WL 11546917, at *2 (N.Y. Sup. Ct. Sept. 14, 2016)

(citing *McCormick v Axelrod*, 59 N.Y.2d 574, 583, *amended*, 60 N.Y.2d 652 (1983)).   The

testimony adduced in this case satisfies each element of this standard.  Indeed, the Appellate

Division intimated as such.  *See Pacific Alliance Asia Opportunity Fund L.P.*, 199 A.D.3d 423

(1st Dep't 2021) ("[PAX has] established by clear and convincing evidence that [Kwok] violated

a lawful, clear mandate of the court, of which he had knowledge, and that such violation resulted in prejudice to plaintiff's rights. . .").

The extent of PAX's ongoing "prejudice" turns on whether PAX has demonstrated that it could ultimately levy on the Lady May to satisfy its now centi-million dollar judgment against Kwok. Under CPLR § 5225, "money or other personal property" is leviable where the debtor holds the requisite "interest." To satisfy this requirement, "[i]t is not necessary that the judgment debtor have legal title to the property; a beneficial interest is sufficient." Weinstein, Korn & Miller, New York Civil Practice: CPLR ¶ 5225.09. "A beneficial interest is '[a] right or expectancy in something . . . as opposed to legal title to that thing.'" *Peterson v. Islamic Rep. of Iran*, 2013 WL 1155576, at *30 (S.D.N.Y. Mar. 13, 2013) (citing Black's Law Dictionary, Interest (9th ed. 2009)). Kwok has much more than a beneficial interest in the Lady May. Not only does Kwok control the yacht, it appears he provided the funds to purchase it and he is the person who principally enjoys the use of the yacht.

The key factor is whether "the property benefitted [the beneficial owner] as if he had received the property directly." *Id.* (quoting *Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*, 609 F.3d 111, 120 (2d Cir. 2010); *see also Gliklad v. Chernoi*, 129 A.D.3d 604 (1st Dep't 2015) (upholding rejection of the judgment debtor's contention that he no longer held an interest in property because he transferred his interest to his daughters); *Colfin Bulls Funding B, LLC v. Ampton Invs., Inc*., 112 N.Y.S.3d 868 (Table), at *2, 6 (N.Y. Sup. Ct. 2018) (granting judgment creditor's turnover motion notwithstanding judgment debtor's assertion that he transferred property to a corporation, because even if true, the evidence showed that he "retained control and/or an interest" in the property).

8

The evidence clearly and convincingly demonstrates that Kwok holds a beneficial interest in and controls the Lady May. In the latter connection, the Court takes notice of the filing of the Zeng case and draws an inference from all the record facts that Kwok has taken extraordinary steps to shield the yacht from his creditors. Moreover, Kwok's "family office" funds the yacht's day-to-day operations and maintenance.

The Court finds that Ms. Guo's testimony was not only internally inconsistent and dissembling, but also significantly undermined by the testimony of Captains Heaslop and Ivanov and Mr. Stockil, who stated that they have never taken yacht-related direction from Ms. Guo in the four and-a-half years that she directly or indirectly held title to the yacht.

In addition, it is established New York law that a party's invocation of the Fifth Amendment in a civil proceeding "may form the basis of an adverse factual inference." *DeBonis v. Corbisiero*, 155 AD2d 299, 300 (1st Dep't 1989). An adverse inference may be applied whenever a factual determination is necessary or permitted, including in the context of contempt motions. *S.E.C. v. Durante*, No. 01 Civ. 9056 (DAB) (AJP), 2013 WL 6800226, at *10 (S.D.N.Y. Dec. 19, 2013), *aff'd*, 641 F. App'x 73 (2d Cir. 2016); *LiButti v. United States*, 107 F.3d 110, 120–25 (2d Cir. 1997).

Similarly, under the missing witness rule, "[a] trier of fact may draw the strongest inference that the opposing evidence permits against a witness who fails to testify." *Crowder v. Wells & Wells Equip., Inc.*, 11 A.D.3d 360, 361 (1st Dep't 2004) (applying adverse inference where defendant who failed to appear "would be knowledgeable about a material issue raised by the evidence").

PAX is entitled to an adverse inference under both of these avenues. Kwok has invoked his Fifth Amendment right against self-incrimination in response to PAX's post-judgment discovery, including in response to requests specifically about the Lady May. While Kwok

9

argues that an adverse inference is not appropriate here because "[o]nly after a threshold showing

that a piece of evidence is authentic is a party obligated to respond to it," this contention fails of

its own weight. PAX has proffered substantial admissible evidence that Kwok has the requisite

beneficial interest in and control of the Lady May. *See People v. Primo*, 96 N.Y.2d 351, 753

N.E.2d 164 (2001) (explaining that evidence is probative if it "tends to prove the existence or

non-existence of a material fact, *i.e.*, a fact directly at issue in the case").

As of February 7, 2022, the Lady May has remained outside the jurisdiction of the Court

for 268 days. Based on the daily fine of $500,000 imposed by this Court and affirmed by the

Appellate Division, the resultant fine would amount to $134,000,000.00, which is more than

PAX's outstanding judgment of nearly $120 million and a multiple of the GBP £ 28 million

purchase price of the Lady May. Nevertheless, if billionaire litigants can simultaneously seek to

use Court process in New York and elsewhere in the United States while knowingly and

intentionally violating Court orders, there is no rule of law. Kwok must remit $134,000,000.00

to PAX within five business days of the service of this Court's Order with Notice of Entry. The

Court is prepared to exercise its full authority under Judiciary Law § 753 in the event the fine is

not timely paid.

Dated: February 9, 2022

*Barry Ostrager*

BARRY R. OSTRAGER, J.S.C.

| CHECK ONE: | | CASE DISPOSED | | X NON-FINAL DISPOSITION | |
|---|---|---|---|---|---|
| | X | GRANTED | DENIED | GRANTED IN PART | OTHER |
| APPLICATION: | | SETTLE ORDER | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | FIDUCIARY APPOINTMENT | REFERENCE |

10