**<u>EXHIBIT A</u>**

Friedman Declaration

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION**

| | |
|---|---|
| In re:<br><br>HO WAN KWOK[1]<br><br>             Debtor. | Chapter 11 Case No.<br><br>22-50073 (JAM)<br><br>April 6, 2022 |
| Pacific Alliance Asia Opportunity Fund L.P.,<br><br>             Movant<br><br>v.<br><br>Ho Wan Kwok,<br><br>             Respondent. | |

**DECLARATION OF PETER FRIEDMAN IN SUPPORT OF PACIFIC ALLIANCE ASIA
OPPORTUNITY FUND L.P.'S MOTION TO DISMISS CHAPTER 11 CASE OR, IN THE
ALTERNATIVE, PARTIAL JOINDER TO UNITED STATES TRUSTEE'S MOTION
FOR AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE**

I, Peter Friedman, declare:

      1.      I am an attorney admitted to practice law in the State of New York and

Washington, D.C. and am a partner at the law firm of O'Melveny & Myers, 7 Times Square,

New York, NY 10036, counsel for Pacific Alliance Asia Opportunity Fund L.P. ("PAX"). I

respectfully submit this Declaration in support of PAX's Motion to Dismiss Chapter 11 Case or,

in the Alternative, Partial Joinder to United States Trustee's Motion for an Order Directing the

Appointment of a Chapter 11 Trustee.

      2.      Attached as Exhibit 1 is a true and correct copy of the February 3, 2021 Judgment

---

[1] The last four digits of the Debtor's taxpayer identification number are 9595.

in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 716.

3.      Attached as Exhibit 2 is a true and correct copy of the February 3, 2021 Decision

and Order in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1181.

4.      Attached as Exhibit 3 is a true and correct copy of the transcript of the March 1,

2022 hearing before this Court.

5.      Attached as Exhibit 4 is a true and correct copy of the Amended Complaint filed

in *PAX v. Kwok,* Case No. 22-01073-dsj (Bankr. S.D.N.Y.), Dkt. No. 3.

6.      Attached as Exhibit 5 is a true and correct copy of the Statement of Material Facts

in Support of Plaintiff PAX's Motion for Partial Summary Judgment, dated July 24, 2020, in

*PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 410.

7.      Attached as Exhibit 6 is a true and correct copy of the Personal Guarantee, filed as

Exhibit 23 to PAX's Statement of Material Facts in Support of PAX's Motion for Partial

Summary Judgment, at KWOK000652, in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup.

2020), Dkt. No. 455.

8.      Attached as Exhibit 7 is a true and correct copy of the Complaint, dated January

30, 2018, filed in *Wengui v. Wu,* Case No. 18-cv-00845 (S.D.N.Y.), Dkt. No. 1.

9.      Attached as Exhibit 8 is a true and correct copy of the Fourth Deed of Settlement,

filed as Exhibit 40 to the Affirmation of E. Moss in Support of PAX's Motion for Partial

Summary Judgment, in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. 2020), Dkt. No. 472.

10.      Attached as Exhibit 9 is a true and correct copy of Genever Defendants'

Corporate Documents, filed as Exhibit 5 to PAX's Motion for Pre-Judgment Attachment in *PAX

v. Kwok,* Index No. 652077/2017 (N.Y. Sup. 2020), Dkt. No. 252.

11.      Attached as Exhibit 10 is a true and correct copy of the Affidavit of Yan Ping

Wang and Exhibit A thereto, dated May 16, 2018, in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. Nos. 182, 183.

12.     Attached as Exhibit 11 is a true and correct copy of the Executed Contract of Sale in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 256.

13.     Attached as Exhibit 12 is a true and correct copy of Genever Holdings LLC's Schedules, dated November 3, 2020, in *In re Genever Holdings LLC*, Case No. 20-12411-jlg (Bankr. S.D.N.Y.), ECF No. 4.

14.     Attached as Exhibit 13 is a true and correct copy of the deposition of Daniel Podhaskie, dated December 11, 2019, in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.).

15.     Attached as Exhibit 14 is a true and correct copy of a letter from L. Vartan to E. Moss, dated June 7, 2021, filed as Exhibit 14 to the Affidavit of S. Sarnoff in Support of PAX's Motion for a Final Order of Contempt Against Defendant Kwok, in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1075.

16.     Attached as Exhibit 15 is a true and correct copy of the September 15, 2020 Decision and Order in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 549.

17.     Attached as Exhibit 16 is a true and correct copy of the September 18, 2020 Decision and Order in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 685.

18.     Attached as Exhibit 17 is a true and correct copy of the October 8, 2021 Order Granting Debtor's Second Renewed Motion to Approve the Revised Settlement Agreement in *In re Genever Holdings LLC,* Case No. 20-12411-jlg (Bankr. S.D.N.Y.), ECF 141.

19.     Attached as Exhibit 18 is a true and correct copy of the Notice of Appeal, dated March 2, 2021, in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 725.

20.     Attached as Exhibit 19 is a true and correct copy of the Brief for Defendant-

Appellant, dated September 2, 2021, in *PAX v. Kwok et al.*, Case No. 2021-00740 (N.Y. App.

Div.), Dkt. No. 12.

21.     Attached as Exhibit 20 is a true and correct copy of Respondent's Brief, dated

October 6, 2021, in *PAX v. Kwok et al.*, Case No. 2021-00740 (N.Y. App. Div.), Dkt. No. 14.

22.     Attached as Exhibit 21 is a true and correct copy of the Reply Brief for

Defendant-Appellant, dated October 15, 2021, in *PAX v. Kwok et al.*, Case No. 2021-00740

(N.Y. App. Div., First Dep't), Dkt. No. 16.

23.     Attached as Exhibit 22 is a true and correct copy of the September 30, 2020

Decision and Order in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 591.

24.     Attached as Exhibit 23 is a true and correct copy of the October 15, 2020

Decision and Order in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 630.

25.     Attached as Exhibit 24 is a true and correct copy of the Affidavit of Kwok Ho

Wan in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss the Complaint, dated

February 5, 2016, filed as Exhibit 11 to the Affirmation of E. Moss in Support of PAX's

Opposition to Nonparty Movant Yvette Wang's Motion for Relief in *PAX v. Kwok,* Index No.

652077/2017 (N.Y. Sup. Ct.), Dkt. No. 764.

26.     Attached as Exhibit 25 is a true and correct copy of excerpts from the deposition

of Kwok Ho Wan, dated October 3, 2018, in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup.

Ct.), Dkt. No. 785.

27.     Attached as Exhibit 26 is a true and correct copy of the February 2, 2022

evidentiary hearing transcript in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.).

28.     Attached as Exhibit 27 is a true and correct copy of a letter from M. Carvalho to

E. Moss, dated February 1, 2021 in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt.

No 765.

29.     Attached as Exhibit 28 is a true and correct copy of the May 27, 2021 hearing

transcript in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.).

30.     Attached as Exhibit 29 is a true and correct copy of the Memorandum of Law in

Support of PAX's Motion for a Turnover Order Against Defendant Miles Kwok and

Appointment of a Receiver, dated June 21, 2021, in *PAX v. Kwok,* Index No. 652077/2017 (N.Y.

Sup. Ct.), Dkt. No 846.

31.     Attached as Exhibit 30 is a true and correct copy of the September 22, 2021

Decision and Order in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 904.

32.     Attached as Exhibit 31 is a true and correct copy of the Notice of Motion for

Order of Civil Contempt as to Defendant Miles Kwok for His Failure to Comply With the

Court's Turnover Order, dated January 7, 2022,  in *PAX v. Kwok,* Index No. 652077/2017 (N.Y.

Sup. Ct.), Dkt. No. 1078.

33.     Attached as Exhibit 32 is a true and correct copy of the Reply Memorandum of

Law in Further Support of PAX's Motion for an Order of Civil Contempt as to Defendant Miles

Kwok for his Failure to Comply With the Court's September 22, 2021 Turnover Order, dated

January 24, 2022, in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1116.

34.     Attached as Exhibit 33 is a true and correct copy of the February 18, 2022 Court

Notice in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1191.

35.     Attached as Exhibit 34 is a true and correct copy of the February 15, 2022

Suggestion of Bankruptcy in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No.

1190.

36.     Attached as Exhibit 35 is a true and correct copy of the March 4, 2022 Decision

and Order on Voluntary Withdrawal of Contempt Motion in *PAX v. Kwok,* Index No.

652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1193.

37.     Attached as Exhibit 36 is a true and correct copy of the March 16, 2021 Decision

and Order of Conditional Contempt in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.),

Dkt. No. 728.

38.     Attached as Exhibit 37 is a true and correct copy of the January 20, 2022 Order in

*PAX v. Kwok,* Case No. 2021-01010 (N.Y. App. Div., First Dep't), NYSCEF Dkt. No. 22.

39.     Attached as Exhibit 38 is a true and correct copy of the January 14, 2022 Third

Interim Decision and Order on Motion in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.),

Dkt. No. 1098.

40.     Attached as Exhibit 39 is a true and correct copy of the February 9, 2022 Final

Order of Civil Contempt in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No.

1182.

41.     Attached as Exhibit 40 is a true and correct copy of the Notice of Appeal, dated

February 10, 2022, in *PAX v. Kwok,* Case No. 22-00609 (N.Y. App. Div., First Dep't), NYSCEF

Dkt. No. 1.

42.     Attached as Exhibit 41 is a true and correct copy of the Summary Statement on

application for Expedited Service and/or Interim Relief, dated February 14, 2022, in *PAX v.

Kwok,* Case No. 22-00609 (N.Y. App. Div., First Dep't), NYSCEF Dkt No. 5.

43.     Attached as Exhibit 42 is a true and correct copy of screenshots from the website

https://www.vesselfinder.com/vessels/LADY-MAY-IMO-1012359-MMSI-319059500 (last

accessed on April 6, 2022).

44.     Attached as Exhibit 43 is a true and correct copy of the October 15, 2020 hearing

transcript in *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.).

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Dated: April 6, 2022                                  Respectfully submitted,
New York, New York

                                                     */s/ Peter Friedman*
                                                     Peter Friedman
                                                     pfriedman@omm.com
                                                     O'MELVENY & MYERS LLP
                                                     Seven Times Square
                                                     New York, NY 10036
                                                     Telephone: (212) 326-2000
                                                     Facsimile: (212) 326-2061

                                                     *Attorney for Pacific Alliance Asia*
                                                     *Opportunity Fund L.P.*

# EXHIBIT 1

FILED: NEW YORK COUNTY CLERK 02/03/2021 12:28 PM
NYSCEF DOC. NO. 716
INDEX NO. 652077/2017
RECEIVED NYSCEF: 02/03/2021

Case 22-50073   Doc 183-1   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 10 of
161

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PACIFIC ALLIANCE ASIA OPPORTUNITY
FUND L.P.,

                Plaintiff,

    v.

KWOK HO WAN, *a/k/a* KWOK HO, *a/k/a* GWO
WEN GUI, *a/k/a* GUO WENGUI, *a/k/a* GUO
WEN-GUI, *a/k/a* WAN GUE HAOYUN, *a/k/a*
MILES KWOK, *a/k/a* HAOYUN GUO,
GENEVER HOLDINGS CORPORATION, and
GENEVER HOLDINGS LLC,

                Defendants.

17 652077

Index No. 652077/2017

[~~PROPOSED~~] JUDGMENT

WHEREAS, on April 18, 2017, Plaintiff Pacific Alliance Asia Opportunity Fund L.P.,

filed a complaint against Defendant Kwok Ho Wan, a/k/a Kwok Ho, a/k/a Gwo Wen Gui, a/k/a

Guo Wengui, a/k/a Guo Wen-Gui, a/k/a Wan Gue Haoyun, a/k/a Miles Kwok, a/k/a Haoyun Guo

("Kwok"), alleging a cause of action for breach of contract against Defendant Kwok.

WHEREAS, on April 18, 2019, Plaintiff filed a First Amended Complaint against Kwok,

and Genever Holdings LLC, and Genever Holdings Corporation (together with Genever

Holdings LLC, the "Genever Defendants"), alleging causes of action for (i) breach of contract

against Defendant Kwok and (ii) veil piercing against the Genever Defendants.

WHEREAS, on July 24, 2020, Plaintiff moved for partial summary judgment on its

breach of contract claim against Kwok, and the motion was fully briefed and heard before Justice

Barry R. Ostrager, who issued a Decision and Order dated September 15, 2020, which was

entered in the New York County Clerk's Office on September 16, 2020, granting Plaintiff's

motion on Count I of the Amended Complaint for breach of contract, and directed Plaintiff move

by Notice of Motion to establish damages on Count I no later than October 14, 2020.

17 652077

WHEREAS, (i) on September 21, 2020, Plaintiff moved by Notice of Motion to establish damages, legal fees and expenses; (ii) Plaintiff agreed to temporarily withdraw, without prejudice and with the Court's permission and the other parties' understanding that it would be renewed at a later date, the portion of its application relating to legal fees and expenses (i.e., enforcement costs); and (iii) the motion was fully briefed and heard before Justice Barry R. Ostrager, who issued a Decision and Order dated December 18, 2020 (the "Damages Order"), and entered into the New York County Clerk's office on December 18, 2020, directing the Clerk of Court to enter judgment in favor of Plaintiff and against Defendant Kwok in the amount of $46,426,489.00 plus contractual interest at a rate of 15% per annum from effective date of December 31, 2010 and at the statutory rate of 9% per annum from the date of entry of this decision and order.

NOW, upon motion of O'Melveny & Myers LLP, attorneys for Plaintiff, it is:

ADJUDGED that Plaintiff Pacific Alliance Asia Opportunity Fund L.P., having a business address at 33/F, Three Pacific Place, 1 Queen's Road East, Hong Kong, have judgment against and do recover from Defendant Kwok Ho Wan, residing at 781 Fifth Avenue, 18th Floor, New York, NY 10022, the amount of _____**$46,426,489.00**_____, plus contractual interest in the amount of _____**$69,448,939.71**_____, plus post-judgment interest at the statutory rate of 9% in the amount of _____**$526,590.86**_____, for a total of

**X** _**$116,402,019.57**_____, and Plaintiff shall have execution thereof.

~~Judgment signed and entered this ___th day of _____, 2021~~

**FILED**
**Feb 03 2021**
**NEW YORK**
**COUNTY CLERK'S OFFICE**

_Milton Adam Tingling_
Clerk

3 rd          Feb.          2021

2

2 of 4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PACIFIC ALLIANCE ASIA OPPORTUNITY
FUND L.P.,

        Plaintiff,

     v.

KWOK HO WAN, *a/k/a* KWOK HO, *a/k/a* GWO
WEN GUI, *a/k/a* GUO WENGUI, *a/k/a* GUO
WEN-GUI, *a/k/a* WAN GUE HAOYUN, *a/k/a*
MILES KWOK, *a/k/a* HAOYUN GUO,
GENEVER HOLDINGS CORPORATION, and
GENEVER HOLDINGS LLC,

        Defendants.

Index No. 652077/2017

**AFFIRMATION OF EDWARD MOSS, ESQ.**



F I L E D
Feb 03 2021
NEW YORK
COUNTY CLERK'S OFFICE

I, Edward Moss, an attorney duly admitted to practice before the Courts of the

State of New York, hereby affirm, under penalty of perjury, pursuant to the Civil Practice Law

and Rules of the State of New York § 2106, as follows:

1.     I am a member of the bar of this Court and a partner in the law firm of O'Melveny

& Myers LLP, counsel of record for Plaintiff Pacific Alliance Asia Opportunity Fund L.P.

("PAX") in this matter.

2.     I am fully familiar with the facts and circumstances in this action. For purposes

of entry of this judgment, I submit this affirmation waiving costs and disbursements.

Dated:   January 25, 2021        By: */s/ Edward Moss*        
       New York, New York           Edward Moss

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
Index No. 652077/2017

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND
L.P.,

Plaintiff,

-against-

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN
GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI,
a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK,
a/k/a HAOYUN GUO, GENEVER HOLDINGS
CORPORATION, and GENEVER HOLDINGS LLC,

Defendants.

**JUDGMENT**

[PROPOSED] JUDGMENT

**O'MELVENY & MYERS LLP**

TIMES SQUARE TOWER
7 TIMES SQUARE
NEW YORK, NEW YORK  10036
(212) 326-2000

Attorneys for Plaintiff Pacific Alliance Asia Opportunity
Fund, L.P.

**F I L E D**
Feb 03 2021
NEW YORK
COUNTY CLERK'S OFFICE

# EXHIBIT 2

FILED: NEW YORK COUNTY CLERK 02/09/2022 04:33 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 1181
RECEIVED NYSCEF: 02/09/2022

Case 22-50073    Doc 183-1    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 15 of
161

# SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY

PRESENT:    HON. BARRY R. OSTRAGER                    PART        IAS MOTION 61EFM

*Justice*

-------------------------------------------------------------------------------X

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

| | |
|---|---|
| **INDEX NO.** | 652077/2017 |
| **MOTION DATE** | |
| **MOTION SEQ. NO.** | 019 |

Plaintiff,

- v -

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO, GENEVER: HOLDINGS LLC, and GENEVER HOLDINGS CORPORATION,

**DECISION + ORDER ON MOTION**

Defendants.

-------------------------------------------------------------------------------X

HON. BARRY R. OSTRAGER

In this 2017 case with 1,180 docket entries – almost all of which involve defendant Kwok Ho Wan's ("Kwok") efforts to avoid and deceive his creditors by parking his substantial personal assets with a series of corporations, trusted confidants, and family members -- this Court is called upon to determine whether the plaintiff, Pacific Alliance Asia Opportunity Fund L.P. ("PAX"), has met the burden of establishing that the Court should enter a final Order of Civil Contempt against Kwok. For the reasons that follow, this Court is simultaneously issuing a final Order of Civil Contempt.

PAX secured a judgment against Kwok in the sum of $116,402,019.57 on February 3, 2021 (NYSCEF Doc. No. 716). Thereafter, PAX undertook a year's long effort to enforce its judgment by first identifying and then attempting to levy upon Kwok's assets in the United States. PAX encountered difficulty identifying assets over which Kwok exercised control because Kwok, who is a self-declared multi-billionaire, had secreted his assets in a maze of corporate entities and with family members. This scheme has enabled Kwok to assert that he has no assets despite his lavish lifestyle, which plaintiff has catalogued with material from social

media clippings, photographs and videotapes showing Kwok living large and boasting of his

wealth, expensive homes, private plane, and yacht.  As noted in the transcript of proceedings of

February 2, 2022, this evidence is of little probative value, as the witnesses sponsoring this

evidence have no first-hand knowledge of the authenticity of this "evidence" other than that it is

accessible on various websites.

On February 2, 2022, this Court held an evidentiary hearing at which seven witnesses

submitted direct testimony by affidavit and were made available for cross-examination.  The

hearing followed protracted proceedings by PAX to locate and levy upon assets owned by

defendant Kwok.  Those proceedings established, among other things, that Kwok exercised

dominion and control over a yacht called the Lady May and resulted in a series of orders

restraining Kwok and/or the registered owners of the yacht called Lady May from removing the

Lady May from the Court's jurisdiction.  The first such Order was issued on September 30,

2020, as described in detail *infra,* and was followed by an October 15, 2020 Order that restrained

"Mr. Kwok and/or the registered owners of . . . the yacht, the 'Lady May'" from leaving the

jurisdiction.  (NYSCEF Doc. No. 630).  As detailed *infra*, Kwok spent much of July, August and

September of 2020 on the Lady May.  Contemporaneously with the proceedings resulting in the

September 30 and October 15, 2020 restraining Orders, Kwok and his cohorts made arrangement

for the Lady May to sail to Florida in early October 2020 and, thereafter, to the Bahamas.  On

March 16, 2021, the Court issued a conditional order of civil contempt which directed that if

Kwok failed to return the Lady May to the jurisdiction of this Court by May 31, 2021, he would

be subject to a $500,000.00 fine for each day that the Lady May remained outside the jurisdiction

of this Court.

The Appellate Division, First Department, affirmed this Court's order holding Kwok in

conditional civil contempt, finding that "the daily fine of $500,000.00 was intended to strongly

2

encourage defendant to purge himself of the contempt, which, despite being permitted to

accomplish, he has shown no interest in doing. . .” NYSCEF Doc. No. 953, 199 AD3d 423

(2021). The Appellate Division further held:

> The motion court acted within its discretion in holding defendant in civil contempt, as
> plaintiff established by clear and convincing evidence that defendant violated a lawful,
> clear mandate of the court, of which he had knowledge, and that such violation resulted
> in prejudice to plaintiff's rights (*see El-Dehdan v El-Dehdan*, 26 NY3d 19, 29 [2015];
> Judiciary Law § 753). … The motion court is instructed to proceed with an evidentiary
> hearing to resolve a dispute as to ownership and control of the yacht, and to assess
> appropriate penalties.

Pursuant to the Appellate Division's Order, this Court scheduled the February 2, 2022

evidentiary hearing to resolve the issue of whether Kwok beneficially owns and controls the

yacht. Kwok failed to testify at the February 2, 2022 hearing, having previously invoked his

Fifth Amendment right to decline to testify or respond to discovery requests relating to the Lady

May in response to PAX's asset discovery efforts. PX 27, 28, 29, 30.[1] This invocation of the

Fifth Amendment notwithstanding, Kwok is an active litigant in multiple fora and he has given

prior testimony in this and other proceedings.

Kwok also filed a complaint in this court captioned *Guo Wengui a/k/a Miles Kwok v

Hong Zeng*, 157025/2020, which references a blog post from Freebeacon.com dated September

8, 2017 in which Kwok complains about “several incidents involving *his* 152-foot motor yacht,

Lady May...” (Complaint ¶ 8, NYSCEF Doc. No. 001) (“the Zeng Complaint”). The Zeng

Complaint describes Kwok as an “outspoken critic of the CCP” who has gone to great “lengths

to expose the rampant corruption within the CCP and the Chinese government.” The

*Washington Post* reported that a former advisor to President Trump, Steve Bannon, was arrested

in 2020 while on board the Lady May, and described Mr. Bannon as a friend and business

---

[1] “PX” refers to Plaintiff's Trial Exhibits.

associate of Kwok, "a vocal online critic of the Chinese government who was once close with that country's intelligence service but is now wanted by authorities in Beijing on charges of fraud, blackmail and bribery." Other news outlets have reported that Mr. Bannon utilized Kwok's private jet on more than one occasion to travel to political rallies.

The testimony adduced at the hearing out of the mouths of defendants' witnesses clearly and convincingly demonstrated that Kwok beneficially owns and controls the Lady May and has utter contempt for this Court and the judicial process.

Kwok once was the sole shareholder of Hong Kong Investments Limited ("HK International"). The testimony adduced at the hearing established that in 2014 Kwok transferred a 100% interest in HK International to one Qu Guo Jiao for no consideration. Ms. Qu was a trusted business associate of the Kwok family. Thereafter, Kwok fled China and on February 23, 2015, HK International purchased the Lady May for £ 28 million GBP. No testimony adduced at the hearing established the source of funds to purchase the Lady May, but the uncontradicted testimony of Kwok's daughter Mei Guo established that Ms. Qu did not provide the funds to purchase the yacht. Tr. 44.[2] Consequently, a reasonable inference is that Kwok provided the funds to HK International which were used to purchase the yacht. It is undisputed that Ms. Qu transferred the ownership of the Lady May to Kwok's daughter, Mei Guo, on or around June 17, 2017, for $1 or no consideration. Tr. 47. According to Ms. Guo's affidavit (NYSCEF Doc. No. 1162), Ms. Guo ultimately transferred ownership of the Lady May to the current title holder HK International Funds Investments (USA) Limited, LLC ("HK USA"). Ms. Guo further avers that she is the sole owner of HK USA, although all of the multi-million dollar annual expenses for the

---

[2] "Tr." refers to the transcript of the evidentiary hearing, efiled at NYSCEF Doc. No. 1179.

Lady May, including fuel, maintenance, and the captain and crew are paid by Golden Spring

(New York) Ltd. ("Golden Spring."), which is allegedly the Kwok family office.

At the hearing Ms. Guo testified that her brother had bought the Lady May for her.  Tr.

46.  The Court cannot credit this testimony as there is no evidence that Ms. Guo's brother was

involved with the corporate transactions leading to Ms. Guo's acquisition of the title to the yacht.

And, indeed, in response to a question from the Court, Ms. Guo acknowledged that her brother

was not involved in any of the transfers that occurred before she acquired the yacht.  Tr. 47.

Other testimony adduced at the hearing established that Kwok was repeatedly on the

yacht every summer and that Ms. Guo was infrequently on the yacht.  Trial Tr. 88:8-20.  The

Lady May's captain testified that Kwok was aboard the yacht for a significant portion of the

months of July, August and September in 2020 and that this was consistent with his usual

practice in the summer.  Trial Tr. 87:24-88:7.  Subsequent to this Court's September 30, 2020

restraining Order, in October 2020 the Lady May was sent to Florida and then the Bahamas for

repairs and was subsequently dispatched to Italy in October 2021, purportedly at the direction of

Golden Spring.  Ms. Guo acknowledged that she was aware of both this Court's September 30,

2020 restraining Order and this Court's subsequent March 16, 2021 Order directing that the Lady

May be returned to the Court's jurisdiction  Tr. 55; 57-60; 62.

Ms. Guo testified that on the one hand, she directed the Lady May's itinerary but, on the

other hand, testified that security for Kwok was such a concern that there would be no

memorialization of any itinerary.  Tr. 52.  She further testified that when her father was on the

yacht unaccompanied by her he had the freedom to choose wherever he wanted to go.  Tr. 50.

The fundamental issue, however, is who directed the yacht to be removed from this Court's

jurisdiction in October 2020.  Ms. Guo claims that in early October 2020 she no longer wished to

5

use the yacht and relayed that instruction to Golden Spring which, in turn, relayed her directive to the then captain of the ship, Captain Heaslop. Tr. 53.

Upon further questioning, Ms. Guo admitted that it was Golden Spring that advised her that the yacht needed to be moved to a warmer place. Tr. 55. Ms. Guo then repeated her retracted testimony that her brother had given her the yacht, and she stated that her brother is the sole owner of Golden Spring. Tr. 56. This testimony is not credible given that on September 30, 2020 the Court entered a temporary restraining order restraining Kwok

> . . . from making or causing any sale, assignment, transfer, or interference with any property in which he has an interest, or from paying over or otherwise disposing of any debt now due or thereafter coming due to him, subject to the exceptions set forth in CPLR 5222 and in the ordinary course.

NYSCEF Doc. No. 591. Significantly, Captain Heaslop, the then Captain of the Lady May, testified that Mr. Kwok told Captain Heaslop that Kwok would no longer be a guest on the Lady May "a few days" before the Lady May departed for Florida in early October 2020 (and apparently after the issuance of this Court's September 30, 2020 Order). Tr. 89. Captain Heaslop also contradicted Ms. Guo's testimony that Ms. Guo gave Captain Heaslop instructions about the yacht's movement. Tr. 94.

Ms. Guo also acknowledged having subsequently read the Court's March 16, 2021 Order requiring the Lady May to be returned to the Court's jurisdiction by May 31, 2021 (NYSCEF Doc. No. 728). She further acknowledged that she had discussed the Order with her lawyer (whose services were paid for by Golden Spring) and that she had *ignored* the Order.

Russell Stockil, the Yacht Management Director for Yachtzoo SARL, testified that his company had a management contract with HK USA dated May 2021 and that he communicated with HK USA and Golden Spring, but never with Ms. Guo. Tr. 78. This was also the testimony of successor Captain Momchil Ivanov. Tr. 82. In short, Ms. Guo's testimony that she owns and

6

Case 22-50073    Doc 183-1    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 21 of
161

controls the Lady May cannot be credited in any respect.  Ms. Guo appears to be a woman in her

twenties, has introduced no evidence that she exercised dominion and control of the Lady May,

and provided no confirmation that she came into possession of the Lady May, other than as a

ruse to shield the Lady May from being levied upon by her father's creditors.

The machinations associated with the shell game Kwok has orchestrated with respect to

the Lady May are of a piece with every other evasive and contemptuous act Kwok has taken

during the five years this litigation has been pending, which is why there are 1,180 docket entries

in this case.

The Court has the authority to hold Kwok in civil contempt under Judiciary Law

§ 753—and "to punish [him], by fine and imprisonment"—where, as here, the Court "expressly

find[s] that [Kwok's] actions were calculated to or actually did defeat, impair, impede, or

prejudice the rights or remedies of a party to a civil proceeding." *Oppenheimer v. Oscar Shoes,

Inc.*, 111 A.D.2d 28, 28 (1st Dep't 1985) (citing N.Y. Judiciary Law § 753).   Section 753 sets

forth four requirements:

> [T]o find that contempt has occurred in a given case, it must be determined that
> [1] a lawful order of the court, clearly expressing an unequivocal mandate, was in
> effect. [2] It must appear, with reasonable certainty, that the order has been
> disobeyed . . . [3] Moreover, the party to be held in contempt must have had
> knowledge of the court's order, although it is not necessary that the order actually
> have been served upon the party . . . [4] Finally, prejudice to the right of a party to
> the litigation must be demonstrated.

*Fleetwood Fin. v Walter J. Dowd, Inc.*, 2016 WL 11546917, at *2 (N.Y. Sup. Ct. Sept. 14, 2016)

(citing *McCormick v Axelrod*, 59 N.Y.2d 574, 583, *amended*, 60 N.Y.2d 652 (1983)).   The

testimony adduced in this case satisfies each element of this standard.   Indeed, the Appellate

Division intimated as such.   *See Pacific Alliance Asia Opportunity Fund L.P.*, 199 A.D.3d 423

(1st Dep't 2021) ("[PAX has] established by clear and convincing evidence that [Kwok] violated

7

FILED: NEW YORK COUNTY CLERK 02/09/2022 04:33 PM
NYSCEF DOC. NO. 1181

INDEX NO. 652077/2017

RECEIVED NYSCEF: 02/09/2022

Case 22-50073    Doc 183-1    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 22 of
161

a lawful, clear mandate of the court, of which he had knowledge, and that such violation resulted in prejudice to plaintiff's rights. . .").

The extent of PAX's ongoing "prejudice" turns on whether PAX has demonstrated that it could ultimately levy on the Lady May to satisfy its now centi-million dollar judgment against Kwok.  Under CPLR § 5225, "money or other personal property" is leviable where the debtor holds the requisite "interest." To satisfy this requirement, "[i]t is not necessary that the judgment debtor have legal title to the property; a beneficial interest is sufficient."  Weinstein, Korn & Miller, New York Civil Practice: CPLR ¶ 5225.09. "A beneficial interest is '[a] right or expectancy in something . . . as opposed to legal title to that thing.'"  *Peterson v. Islamic Rep. of Iran*, 2013 WL 1155576, at *30 (S.D.N.Y. Mar. 13, 2013) (citing Black's Law Dictionary, Interest (9th ed. 2009)).  Kwok has much more than a beneficial interest in the Lady May.  Not only does Kwok control the yacht, it appears he provided the funds to purchase it and he is the person who principally enjoys the use of the yacht.

The key factor is whether "the property benefitted [the beneficial owner] as if he had received the property directly." *Id*. (quoting *Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*, 609 F.3d 111, 120 (2d Cir. 2010); *see also Gliklad v. Chernoi*, 129 A.D.3d 604 (1st Dep't 2015) (upholding rejection of the judgment debtor's contention that he no longer held an interest in property because he transferred his interest to his daughters); *Colfin Bulls Funding B, LLC v. Ampton Invs., Inc*., 112 N.Y.S.3d 868 (Table), at *2, 6 (N.Y. Sup. Ct. 2018) (granting judgment creditor's turnover motion notwithstanding judgment debtor's assertion that he transferred property to a corporation, because even if true, the evidence showed that he "retained control and/or an interest" in the property).

8

The evidence clearly and convincingly demonstrates that Kwok holds a beneficial interest in and controls the Lady May. In the latter connection, the Court takes notice of the filing of the Zeng case and draws an inference from all the record facts that Kwok has taken extraordinary steps to shield the yacht from his creditors. Moreover, Kwok's "family office" funds the yacht's day-to-day operations and maintenance.

The Court finds that Ms. Guo's testimony was not only internally inconsistent and dissembling, but also significantly undermined by the testimony of Captains Heaslop and Ivanov and Mr. Stockil, who stated that they have never taken yacht-related direction from Ms. Guo in the four and-a-half years that she directly or indirectly held title to the yacht.

In addition, it is established New York law that a party's invocation of the Fifth Amendment in a civil proceeding "may form the basis of an adverse factual inference." *DeBonis v. Corbisiero*, 155 AD2d 299, 300 (1st Dep't 1989). An adverse inference may be applied whenever a factual determination is necessary or permitted, including in the context of contempt motions. *S.E.C. v. Durante*, No. 01 Civ. 9056 (DAB) (AJP), 2013 WL 6800226, at *10 (S.D.N.Y. Dec. 19, 2013), *aff'd*, 641 F. App'x 73 (2d Cir. 2016); *LiButti v. United States*, 107 F.3d 110, 120–25 (2d Cir. 1997).

Similarly, under the missing witness rule, "[a] trier of fact may draw the strongest inference that the opposing evidence permits against a witness who fails to testify." *Crowder v. Wells & Wells Equip., Inc.*, 11 A.D.3d 360, 361 (1st Dep't 2004) (applying adverse inference where defendant who failed to appear "would be knowledgeable about a material issue raised by the evidence").

PAX is entitled to an adverse inference under both of these avenues. Kwok has invoked his Fifth Amendment right against self-incrimination in response to PAX's post-judgment discovery, including in response to requests specifically about the Lady May. While Kwok

9

Case 22-50073   Doc 183-1   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 24 of
161

argues that an adverse inference is not appropriate here because "[o]nly after a threshold showing

that a piece of evidence is authentic is a party obligated to respond to it," this contention fails of

its own weight. PAX has proffered substantial admissible evidence that Kwok has the requisite

beneficial interest in and control of the Lady May.  *See People v. Primo*, 96 N.Y.2d 351, 753

N.E.2d 164 (2001) (explaining that evidence is probative if it "tends to prove the existence or

non-existence of a material fact, *i.e.*, a fact directly at issue in the case").

As of February 7, 2022, the Lady May has remained outside the jurisdiction of the Court

for 268 days. Based on the daily fine of $500,000 imposed by this Court and affirmed by the

Appellate Division, the resultant fine would amount to $134,000,000.00, which is more than

PAX's outstanding judgment of nearly $120 million and a multiple of the GBP £ 28 million

purchase price of the Lady May.  Nevertheless, if billionaire litigants can simultaneously seek to

use Court process in New York and elsewhere in the United States while knowingly and

intentionally violating Court orders, there is no rule of law.  Kwok must remit $134,000,000.00

to PAX within five business days of the service of this Court's Order with Notice of Entry. The

Court is prepared to exercise its full authority under Judiciary Law § 753 in the event the fine is

not timely paid.

Dated:  February 9, 2022

BARRY R. OSTRAGER, J.S.C.

| CHECK ONE: | | CASE DISPOSED | | X | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|
| | X | GRANTED | | DENIED | | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | | REFERENCE |

10

# EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION


In Re                          *   Case No. 22-50073 (JAM)
                               *
     HO WAN KWOK,              *   Bridgeport, Connecticut
                               *   March 1, 2022
               Debtor.         *
                               *
*  *  *  *  *  *  *  *  *  *  *  *  *  *


TRANSCRIPT OF MOTION TO EXTEND
DEADLINE TO FILE SCHEDULES OR PROVIDE REQUIRED INFORMATION
BEFORE THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For the Debtor:                BENNETT SILVERBERG, ESQ.
                               Brown Rudnick, LLP
                               Seven Times Square
                               New York, NY  10036

For the Creditor, Pacific      PATRICK M. BIRNEY, ESQ.
 Alliance Asia Opportunity     PETER FRIEDMAN, ESQ.
 Fund L.P.:                    STUART M. SARNOFF, ESQ.
                               ASHLEY MARIE, ESQ.
                               O'Melveny & Myers LLP
                               Times Square Tower
                               7 Times Square
                               New York, NY  10036

                               PATRICK M. BIRNEY, ESQ.
                               Robinson & Cole LLP
                               280 Trumbull Street
                               Hartford, CT  06103-3597

For the Creditor, Logan        JAY MARSHALL WOLMAN, ESQ.
 Cheng:                        Randazza Legal Group, PLLC
                               100 Pearl Street, 14th Floor
                               Hartford, CT  06103


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

APPEARANCES Cont'd:

```
For the U.S. Trustee:          HOLLEY L. CLAIBORN, ESQ.
                               Office of the United States
                                  Trustee
                               The Giaimo Federal Building
                               150 Court Street, Room 302
                               New Haven, CT  06510
```

3

1          (Proceedings commenced at 4:03 p.m.)

2              THE CLERK:  22-50073, Ho Wan Kwok.

3              THE COURT:  Okay.  Good afternoon.  If we could

4      have appearances for the record, starting with the debtor's

5      counsel, please?

6              MR. SILVERBERG:  Good afternoon, Your Honor.  It's

7      Bennet Silverberg of Brown Rudnick.  I'm joined by my

8      sponsor attorney, Dylan Kletter.

9              THE COURT:  Good afternoon to both of you, and I

10     think --

11             MR. KLETTER:  Good afternoon.

12             THE COURT:  -- Attorney Silverberg, there may have

13     been an order entered allowing your admission pro hac vice

14     is it?

15             MR. SILVERBERG:  Yes, Your Honor, and we thank you

16     for that.

17             THE COURT:  Okay.  Thank you.

18             MR. BIRNEY:  Good afternoon, Your Honor.  Patrick

19     Birney, Robinson & Cole, on behalf of Pacific Alliance Asia

20     Opportunity Fund L.P., or PACS.  With me in the courtroom,

21     Your Honor, to my right is Attorney Peter Friedman.

22             THE COURT:  Good afternoon.

23             MR. BIRNEY:  To my left is Attorney Stuart

24     Sarnoff.

25             THE COURT:  Good afternoon.

4

```
 1              MR. BIRNEY:  And a couple other folks.  Attorney

 2     David Harbach and Ashley Marie from -- all from O'Melveny.

 3     Your Honor, the motions for pro hac vice have been filed and

 4     granted by Your Honor, and Mr. Friedman will be taking over

 5     with lead argument today.

 6              THE COURT:  Okay.  Thank you.  Thank you, all.

 7     Welcome, everyone.

 8              Go ahead, Attorney Claiborn.

 9              MS. CLAIBORN:  Good afternoon, Your Honor.  Holley

10     Claiborn for the U.S. Trustee.

11              THE COURT:  Good afternoon.

12              Attorney Wolman.

13              MR. WOLMAN:  Good afternoon, Your Honor.  Jay

14     Wolman of, Randazza Legal Group, the Creditor, Logan Cheng.

15              THE COURT:  Good afternoon.  Okay.

16              MR. WOLMAN:  And, thank you very much, Your Honor,

17     for permitting me to appear remotely.

18              THE COURT:  Yes, as I noted -- oh, I forgot to put

19     the camera on.  Sorry, Attorney Wolman.  We're doing

20     different --

21              MR. WOLMAN:  It's okay.

22              THE COURT:  -- kinds of hearings today, so I don't

23     even know if you can -- if that works, but in any event,

24     it's there.

25              As I noted, you know, this was an expedited
```

5

1    hearing, so you were allowed to participate today remotely.

2    We are back in court.  There are a number of us in the

3    courtroom but people are masked and apparently, you know,

4    comfortable with distancing and so we'll proceed today.

5         Now before we talk about anything specifically, I

6    got a message that there is an interpreter here today for

7    the debtor.

8         MR. SILVERBERG:  Yes, Your Honor.

9         THE COURT:  And before we talk anything about

10   that, I just want to -- do other counsel understand that the

11   debtor has an interpreter today?

12        MR. FRIEDMAN:  Yes, Your Honor.  Peter Friedman,

13   from O'Melveny and Myers, on behalf of PACS.  We do

14   understand.

15        THE COURT:  Okay.  And do you have an opposition

16   to the interpreter?

17        MR. FRIEDMAN:  No, Your Honor.  I have no

18   opposition to the interpreter.

19        THE COURT:  Okay.  And you believe the interpreter

20   is qualified to interpret whatever the debtor is saying?

21        MR. FRIEDMAN:  I don't have any basis one way or

22   another, Your Honor.

23        THE COURT:  Okay.  I understand from the Office of

24   the United State's Trustee's pleadings that were filed, I

25   think yesterday, I could be -- I think I'm correct -- that

6

1    there was an interpreter for the debtor at the initial

2    debtor interview that your office conducted.  Is that

3    correct?

4           MS. CLAIBORN:  Yes, Your Honor. The U.S. Trustee

5    used the services of an interpreter over the telephone, and

6    then the debtor had his own personal interpreter who was

7    present physically with the debtor.

8           THE COURT:  So did -- so is the gentleman that's

9    here today -- I shouldn't even say.  I assume it's a

10   gentleman because I'm looking in the back of the courtroom,

11   but is the gentleman here today the same gentleman that was

12   with the debtor during the initial debtor interview?

13          MS. CLAIBORN:  No, Your Honor.

14          MR. SILVERBERG:  No, Your Honor.  This -- the

15   interpreter's name is John Lau.

16          THE COURT:  Okay.  Okay.  I just need to

17   understand at some point if Mr. Lau is going to be

18   interpreting anything that the debtor says, I want to

19   understand Mr. Lau's qualifications, if we get to that

20   point.  Okay?

21          MR. SILVERBERG:  Understand.

22          THE COURT:  You know, we obviously were not

23   prepared to have an interpreter, but that's not necessarily

24   a problem.

25          All I'm suggesting to you is, I don't want there -

7

1    - I'm not going to have a hearing continue and be held if

2    there is going to be any controversy over the interpreter.

3    That's my point.  Okay?

4              MR. SILVERBERG:  Yes, Your Honor.

5              THE COURT:  Okay.  Thank you.  All right.  Now --

6              THE CLERK:  Judge, I'm sorry.  We didn't pick up

7    what Attorney Claiborn is saying -- said before.  I'm sorry.

8    She's a little far from the mic.

9              THE COURT:  Yeah, it's not your fault, Attorney

10   Claiborn.  The problem is, with all of us with masks and,

11   you know, distancing, it's sometimes -- we might have to ask

12   you to talk a little more loudly.

13             MS. CLAIBORN:  I'll do my best to speak louder.

14             THE COURT:  Thank you.  Even just that -- that

15   angle, unfortunately, picks up your voice better in the

16   microphone.

17             And as I think you're all aware, our record is

18   audio, so we have to be very careful about the microphones.

19   And if there's times when I ask you, or someone asks you to

20   repeat yourself, it's because we need to make sure we have a

21   clear record.  Okay?

22             All right.  So a week or so ago -- and I can pull

23   it up.  You probably all know it better than I at this

24   point,  the clerk's office entered a docket entry in this

25   case regarding certain deficiencies with regard to the

8

1    petition and other documents that are required to be filed

2    in a bankruptcy case by a voluntary debtor.

3         The amended petition was filed.  I saw that.  That

4    corrected that deficiency.  There is a -- I understand, you

5    know, the office is thinking that they can sometimes use

6    other people's numbers, but we don't allow that, and so that

7    was why there was a need for the filing of the amended

8    petition.  So I understand that's been done.

9         I understand there was a notation about a creditor

10   who didn't have an appropriate attention line, and that's

11   been corrected as well.  So the Court appreciates that.

12        What the order that I believe the debtor's

13   counsels are -- not the order, but the deficiency notice

14   that the debtor's counsel is concerned about, that resulted

15   in this motion to extend time to file the schedules, is

16   because -- and I'm telling you both something I know you

17   already know.  This isn't any news to you, the bankruptcy

18   code requires, and the rules, that schedules and statements

19   be filed within 14 days of the filing of the case.

20        For as many reasons as all of us in this room

21   know, that's an important problem -- issue, because a case

22   can't be properly administered if a debtor hasn't met its

23   duties, his duties, in this case his duties, of preparing

24   and filing the schedules and statements of affairs.  That's

25   an essential requirement that this Court, and I think all

9

1    courts, take very seriously.

2         The deficiency notice said that the case may be

3    dismissed.  It didn't say shall, but I understand the

4    debtor's counsel's desire to then get a hearing quickly held

5    so that you would -- because you don't want to have your

6    case dismissed, and I understand that.

7         So in any event, that was the reason that the

8    motion for an expedited hearing was granted and is set today

9    on the motion to extent time to file the schedules.

10        Now, I understand what you're looking for.  You're

11   looking for 60 days.  You know that you've got two written

12   objections to that already.  I can tell you you're not going

13   to get 60 days.  That's not going to happen.

14        But what I want to know is, have you had any

15   discussions with counsel for the creditors or the U.S.

16   Trustee's office about your request and their objections?

17        MR. SILVERBERG:  Yes, Your Honor.

18        As a matter of fact, we had our -- I'm not sure if

19   Your Honor can hear me.

20        THE COURT:  That's perfect.  Thank you.

21        MR. SILVERBERG:  Your Honor, we had our initial

22   debtor interview with Ms. Claiborn in her office yesterday.

23   It was a three hour interview.

24        At the conclusion of the interview, we asked Ms.

25   Claiborn what the office's position was on the extension

10

1  request.

2       She made clear that 60 days was going to be -- was

3  going to be met with an objection, and she strongly

4  admonished that we consider requesting an extension that

5  expired in advance of the Section 341 meeting and gave

6  creditors sufficient time to review the schedules and

7  statements so that they can ask informed questions at the

8  341 meeting.

9       Last night, after consulting with the client, who

10  happens -- sorry.  Didn't make the introduction to our

11  client, Mr. Ho Wan Kwok.

12       MR. KWOK:  Good afternoon, Your Honor.

13       THE COURT:  Good afternoon, sir.

14       MR. SILVERBERG:  He goes by Miles.

15       THE COURT:  Good afternoon.  Thank you.  You can

16  have a seat, sir.  Thank you.

17       MR. SILVERBERG:  So yesterday -- last evening,

18  sorry, we made a proposal to the U.S. Trustee to extend the

19  deadline to file the schedules and statements until March

20  16th, which is the Wednesday before the Monday 341 meeting.

21       The reason why we didn't go exactly a week prior

22  is that we're dealing with some of the logistics of

23  translating the schedules and statements into Mr. Kwok's

24  native Chinese, so we want to make sure that when he

25  certifies and attests to the accuracy under penalty of

11

1    perjury that he completely understands in his own language

2    what the schedules and statements are saying so that there's

3    absolutely no question as to what the words are on the page.

4            THE COURT:  I understand.  Okay.

5            So are you saying that you are prepared -- and I'm

6    going to hear from other parties, but I just want to ask you

7    this question.  You are prepared on behalf of the debtor to

8    agree to an extension of time that would expire on March

9    16th?  Is that correct?

10           MR. SILVERBERG:  That is correct, Your Honor.

11           THE COURT:  Okay.  All right.  Thank you.  I'd

12   appreciate that.

13           Now, Attorney Claiborn, you filed the first

14   objection to this motion.  You've now heard counsel and his

15   agreement to limit the extension of time if it's granted, to

16   March 16th.  What else would you like to add to the record,

17   or what other thoughts do you have with regard to the

18   extension request?

19           MS. CLAIBORN:  Your Honor, I think it might be

20   helpful if I could ask the Court to listen to the PACS

21   presentation before the U.S. Trustee opines.

22           THE COURT:  Oh, that's fine.  Okay.

23           MS. CLAIBORN:  And I make that suggestion because

24   there is a long history of the debtor and PACS that I think

25   would be informative to the analysis of what kind of an

12

1    extension of time makes sense to this case.

2              THE COURT:  That's fine.  Counsel?

3              MR. SILVERBERG:  And, Your Honor, if PACS is go

4    into a gory detail of what led us here, I think it -- you

5    know, I have a presentation I can make as well if you want

6    to hear it.  Otherwise, you can hear -- hear me.

7              THE COURT:  Well, are you suggesting you'd like to

8    make your presentation first?  Is that what you're saying?

9    Or you want to respond to their presentation?

10             MR. SILVERBERG:  I'd like to make our presentation

11   first if that's --

12             THE COURT:  All right.  And your presentation is

13   going to be about why the case was filed and why you need

14   the extension of time?

15             MR. SILVERBERG:  That is correct.  To --

16             THE COURT:  All right.  I'll let them go first,

17   Counsel, and then I will absolutely hear from you.

18             MR. FRIEDMAN:  Thank you, Your Honor.

19             THE COURT:  Go ahead.

20             MR. SILVERBERG:  Do you want me to do it from here

21   or from the podium?

22             THE COURT:  You can do it right from there,

23   counsel.

24             MR. SILVERBERG:  Perfect.  So, Your Honor, what I

25   was proposing to do was to first give a background of Mr.

13

1   Kwok, the event -- and then follow it up with the events

2   leading to the commencement of this Chapter 11 case, and

3   provide the justification for the extension request.

4        Your Honor, by way of background -- sorry.  Mr.

5   Kwok was born in Shandong Province in China.  He currently

6   resides in Greenwich, CT with his wife of 35 years, Qingzhi.

7   He has two adult children.  Together, they have a son, Mr.

8   Qiang Guo, and a daughter, Ms. Mei Guo.

9        The son lives in the United Kingdom.  The daughter

10  splits her time between New York City and Connecticut.

11  Hopefully more time out of the parents' house now that COVID

12  is receding.

13       He grew up in a large but poor household which

14  inspired his entrepreneurial spirit.  At the age of 13, Mr.

15  Kwok dropped out of middle school and began selling clothing

16  and electronics to help support his family.

17       In May 1989, Mr. Kwok was detained and tortured

18  for his support of the Tiananmen Square protest.  While

19  detained for approximately 20 months, he created key

20  relationships with political activists, intellectuals,

21  business people, and religious leaders.  One of these

22  contacts would later introduce him to a Ms. Ping Sia (ph), a

23  successful businesswoman and investor from Hong Kong.

24       In 1991, Mr. Kwok began to work with Ms. Sia in

25  Yuda Property Company (ph), a company which focused on

14

1    commercial real estate development in the Henan Province of

2    China.  Shortly after its launch, Yuda successfully

3    developed and constructed the high end Yuda International

4    Trade Center in Henan Province's capital city of Zhengzhou.

5    The commercial complex includes what was at the time the

6    tallest sky scraper in Henan Province, and china's fifth

7    tallest building.

8              Upon completion of its construction, the complex

9    had a then value of 300 million.  The trade center was

10   financially successful and established Mr. Kwok's presence

11   in China's world of real estate developers, particularly in

12   the Henan Province where Yuda continued to develop high-end

13   residential and commercial projects.

14             Around 2000, building on the -- building on the

15   success in Hehan Province, Mr. Kwok shifted his real estate

16   aspirations to Chinese Capital, Beijing where he expanded

17   his business to include private financing for his projects

18   in which his six siblings participated.

19             Through success in Henan Province, Mr. Kwok's

20   immediate and extended family members were lifted out of

21   poverty.

22             In Beijing, Mr. Kwok helped establish Beijing

23   Morgan Investment Company and Beijing Zenith Holdings

24   Company, a real estate development and investment management

25   consultant company.  Entities in which Mr. Kwok's immediate

15

1    and extended family were shareholders and employees.

2            In 2002, these businesses acquired two parcels

3    spanning approximate 2 million square meters of undeveled

4    land in Northern Beijing.

5            The value of these parcels increased dramatically

6    after China was named the host country for the 2008

7    Olympics, and the government announced its plans to build

8    the Olympic venue adjacent to these land parcels.

9            The increased value of these parcels spawned Mr.

10   Kwok's long-standing political fight with the Chinese

11   Communist Party.  Deputy Mayor, Gi Wa (ph), attempted to

12   improperly appropriate Morgan Investment's property.  Mr.

13   Kwok fought back, reporting this corruption to the

14   government, and after a lengthy fight, ultimately recovered

15   Morgan Investment's land parcels.

16           Mr. Kwok then oversaw the successful construction

17   and timely completion of the Beijing Pangu Plaza and Xin

18   Wang Plaza.  The Pangu Plaza has become a Beijing landmark

19   adjacent to the Olympic venue.

20           Mr. Kwok, however, with his criticism of the CCP's

21   corruption, drew a harsh response.  When it became clear his

22   life was in jeopardy, he fled to the United States in 2015.

23   In absentia, the CCP froze or seized his assets in China,

24   including assets held by companies in which he held an

25   interest.

16

1          The CCP also caused the seizure of his assets

2     elsewhere, including Hong Kong, and of caused Interpol to

3     issue a Red Notice for his arrest.

4          In September 2017, he claimed political asylum in

5     the United States and his application remains pending to

6     this day.

7          He continues his criticism of the CCP's corruption

8     and human rights abuses to this day.  Over the years, he has

9     amassed a following on various digital and media platforms

10    such as YouTube, GTV, Twitter, and GETTR -- I actually had

11    to look GETTR up.  I didn't know what it was -- where he

12    shares his personal views and opinions concerning the CCP

13    and the need for democracy in China.

14         He has over 1 million followers across the various

15    social media platforms.  Notably, he has not monetized his

16    social media presence.  Mr. Kwok is not employed and he

17    relies on the support of family, principally his son, to

18    cover his daily living expenses.

19         In Mr. Kwok's son's family office in Golden

20    Spring, New York, his son advances is monthly expenses.

21    Brown Rudnick's retainer was paid by another entity owned by

22    Mr. Kwok's son, Lamp Capital, LLC, as set forth in our

23    attorney compensation declaration at Docket Number 54, which

24    was filed shortly before this hearing.

25         THE COURT:  Okay.  I haven't seen that, but that's

17

1    fine.

2              MR. SILVERBERG:  Turning to the PACS litigation.

3    Though he left China, he didn't leave all his troubles

4    behind.  We suspect the Court will hear quite a bit from

5    PACS's counsel during this case.  We won't get too much into

6    this litigation, but a high level interview might help put

7    things into context.

8              PACS, a Hong Kong investment fund, commenced

9    actions against Mr. Kwok in New York and BBI.  The New York

10   action commenced in 2017.  It was before Justice Ostrager in

11   New York Supreme Court.  In the New York action, Mr. Kwok is

12   represented by BakerHostetler.

13             These are principally collection actions related

14   to a $30 million loan made to a Chinese entity called Spirit

15   Charter, back in 2008.  PACS claims that Mr. Kwok provided a

16   personal guarantee of the PACS debt and reaffirmed that

17   guarantee multiple times over the years, most recently in

18   2011.

19             Mr. Kwok agrees that he provided a personal

20   guarantee in 2008, but asserts that the loan was fully

21   repaid thereafter and that the subsequent documents are

22   forgeries.  And that's the crux of the dispute, Your Honor.

23             Without a hearing, Justice Ostrager entered

24   summary judgment in PACS's favor.  Mr. Kwok has appealed

25   this judgment to the appellate division and the appeal

18

1    remains pending, though stayed as a result of the

2    commencement of this case.

3            In the meantime, PACS sought to enforce a

4    restraining order issued by Justice Ostrager and Mr. Kwok,

5    prohibiting him from transferring or dissipating assets, or

6    moving them outside the jurisdiction of the New York courts.

7            PACS became laser focused on a yacht named the

8    Lady May.  PACS wanted the yacht back in New York so that it

9    could arrest the boat and levy on it.

10           Mr. Kwok denied owning the boat and asserted that

11   he couldn't order the boat back to New York.  Justice

12   Ostrager directed Mr. Kwok to return the boat to New York by

13   May 15th, 2021, or face a massive daily fine of $500,000 for

14   every day the boat remained outside it's jurisdiction.

15           On February 9th Justice Ostrager found that Mr.

16   Kwok beneficially owned and controlled the Lady May, issued

17   a final order of civil contempt against him, and ordered him

18   to pay a $134 million fine to PACS within just five days, or

19   risk jail time.

20           The February 9th decision is also on appeal to the

21   appellate decision.  Mr. Kwok lacked the means to satisfy

22   the fine, retained our firm on February 14th, and filed for

23   Chapter 11 the very next day.  He filed for Chapter 11, not

24   just to obtain the benefit of the automatic stay, but to

25   resolve all his claims in a single forum in an orderly

19

1    manner.

2              It is hopeful that he can agree with his creditors

3    on the terms of a Chapter 11 plan.  Counsel for PACS is in

4    the same building as our firm, just an elevator bank away.

5              His principal assets are litigation claims.

6    Assuming he -- assuming he prevails on these claims, he may

7    be able to fund full recoveries to his creditors.  He will

8    also approach his family members for support to fund the

9    plan.  All options are on the table.

10             Further, as Your Honor noted in the objections,

11   much has been made of supposed shell games and allegations

12   of squirreling assets away.

13             If the allegations are true, and we say they're

14   not, then the bankruptcy case may be the best thing that

15   could have happened for them.  There may be a creditor's

16   committed appointed in the case.  The U.S. Trustee has

17   solicited creditor interest in the participation.  If one is

18   appointed, then they'll have their work to do.

19             Chiefly, we suspect they'll investigate the

20   allegations that PACS made in their papers, which brings us

21   to the motion for the request for the extension of the

22   deadlines.

23             We had very little time to work with Mr. Kwok to

24   prepare his filing.  That's why the papers were so skinny.

25   That's why the deficiency notice ended up on the order.

20

1          If we had more time, we would have made sure that

2     the schedules were filed on time.  Or certainly -- maybe

3     even in advance of the -- maybe contemporaneous with the

4     filing.

5          It was far from ideal circumstances.  We have a

6     considerable amount of work to do on our end to assist Mr.

7     Kwok with the preparation of schedules and statements.  On

8     February 23rd, we advised the United States Trustee's office

9     of Mr. Kwok's intention to seek an extension.

10         On February 24th, as Your Honor noted at Docket

11    27, we filed Mr. Kwok's request for an extension of

12    approximately 60 days.

13         The rationale for the extension was the need for

14    us to work with counsel who had been representing Mr. Kwok

15    for years to ensure that litigation related assets and

16    liabilities were actually -- were accurately captured on the

17    schedules and statements.

18         Also, since Mr. Kwok does not read or write

19    English, he requested a Chinese translation of the official

20    forms.

21         Mr. Kwok is also going to retain a service

22    provider to assist him with the generation of the schedules

23    and statements.  This morning, we began discussions with

24    Strutta (ph), who Your Honor may be familiar with.

25         As I noted, Your Honor, we discussed Mr. Kwok's

21

1    extension request yesterday afternoon with the U.S. Trustee.

2    Yesterday, two parties filed objections to the extension

3    motion, the U.S. Trustee and PACS.  Both pretty much make

4    the same point.  The requested extension was too long and

5    they want to get on with the case.

6          Your Honor, it bears mentioning that even though

7    the requested extended deadline was after the scheduled 341

8    meeting, we thought maybe we can work with the U.S. Trustee

9    to commence that 341 meeting and adjourn it to make sure

10   that folks had an opportunity to review them and ask

11   informed questions.  We recognize it would be unacceptable

12   to deny the creditors the opportunity to ask informed

13   questions.

14         Mr. Kwok agrees that it's best to work harder to

15   get the scheduled statements on file sooner.  The sooner the

16   schedules are on file, the sooner he can establish a bar

17   date for claims, start reconciling them, and see if he can

18   propose a feasible Chapter 11 plan.

19         And, Your Honor, I already mentioned the proposal

20   that we extend to the United States Trustee, and should we

21   get there, I'm prepared to make a short proffer of what Mr.

22   Kwok's testimony would be if he were called to testify.

23         THE COURT:  Okay.  Thank you.  Let me just think

24   if I have a -- oh, yes, I do have a question or two.  It's

25   not really a question.

22

1            As I mentioned, and you all know, we have audio

2      for our record.  There are some names that you recited

3      during your presentation that I think it would be helpful to

4      get to the clerk's office so that the clerk's office can

5      make sure they're properly spelled and accounted for in the

6      record of this case.

7            MR. SILVERBERG:  Absolutely, Your Honor, and we're

8      happy to provide the English spelling, and I guess my

9      phonetic --

10           THE COURT:  Whatever --

11           MR. SILVERBERG:  -- translation.

12           THE COURT:  -- whatever -- yes.  That would be

13     very helpful because we do want the record to be accurate,

14     and so, I would like you to do that.

15           MR. SILVERBERG:  Absolutely, Your Honor.

16           THE COURT:  I can figure out -- I'll speak with

17     the courtroom deputy, but we could probably have the clerk

18     of the court reach out to you, counsel, and figure out a way

19     to get that information so that we clearly have it for our

20     record and have it accurately.

21           MR. SILVERBERG:  It would be our pleasure.

22           THE COURT:  Okay.  Thank you.  I just want to

23     think if I had any other thought when -- I mean, I had other

24     thoughts, but what -- anything I wanted to say when you were

25     speaking.

23

1        With regard to the 341 meeting, and whatever

2    happens here today, I think, you know, the U.S. Trustee's

3    office -- I think it would make sense, even if your

4    extension is granted to the 16th, to not close that 341

5    meeting after the first meeting.

6        I think that this is a fluid case with a lot of

7    issues, and you know, that's the U.S. Trustee's office call,

8    but I would urge them to consider -- and of course I'm

9    talking to you now, Attorney Claiborn, to consider that the

10    debtor does not seem to have any issue with that 341 meeting

11    taking place more than one day, and I would urge the U.S.

12    Trustee's office to consider doing that, given many issues,

13    including the fact that we're going to -- apparently going

14    to have to have an interpreter there, and there's going --

15    there may or may not be a lot of creditors that have

16    interest and questions.

17        But I want to make sure that they're provided with

18    that opportunity timely and with enough notice that when the

19    documents are filed, they have enough time to intelligently

20    review them.  Okay?

21        So I urge you to, if you would, communicate that

22    with the U.S. Trustee and explain that the debtor's counsel

23    has no problem with that.

24        MS. CLAIBORN:  I will do that, Your Honor.  Thank

25    you.

24

1          THE COURT:  Okay.  Thank you.  All right.  Counsel

2     for PACS, you may proceed.

3          MR. FRIEDMAN:  Thank you.  Your Honor, it's Peter

4     Friedman from O'Melveny and Myers.  I actually gave Mr.

5     Silverberg --

6          MR. SILVERBERG:  Yes.

7          MR. FRIEDMAN:  -- Mr. Silverberg a copy of my

8     deceleration.  I have it in binder form.  I actually have

9     two binders, if I could hand them up to you?

10          THE COURT:  Sure.

11          MR. FRIEDMAN:  I feel like they're maybe helpful

12     for you, you and your clerk --

13          THE COURT:  Sure.

14          MR. FRIEDMAN:  -- when we refer to something --

15          THE COURT:  Thank you.

16          MR. FRIEDMAN:  -- that are in them.  Thank you,

17     Your Honor.

18          THE COURT:  Mr. Friedman, you have no problem with

19     me looking at this binder while counsel is speaking?

20          MR. SILVERBERG:  Your Honor, was that --

21          THE COURT:  I mean, Mr. -- did I say the wrong

22     name?  I apologize.

23          MR. SILVERBERG:  It's okay.

24          THE COURT:  I've got -- I'm looking at two things

25     at the same time.  Yes, you have no problem, then, correct?

25

1        MR. SILVERBERG:  I have no issue, Your Honor.

2        THE COURT:  All right.  Thank you.  I appreciate

3    that, Attorney Silverberg.

4        And, Attorney Friedman, go right ahead.

5        MR. FRIEDMAN:  Your Honor, Peter Friedman of

6    O'Melveny and Myers on behalf of PACS.

7        So, Your Honor, there are many, many, many

8    different things that are worth responding to, but let me

9    start with just the straight forward issue of what Justice

10   Ostrager found.

11       Justice Ostrager found that Mr. Kwok couldn't

12   claim that the documents were a forgery because they were

13   inconsistent -- that was inconsistent with everything he had

14   done.

15       THE COURT:  Hold on one second, Attorney Friedman.

16    (Pause)

17       THE COURT:  That's -- hold on a second, sir.  Just

18   hold on a second, okay?

19       He's got -- he has a right to make his

20   presentation, and you can listen to it later, because we

21   record it and we put it on the -- on docket, and you can

22   then talk to the debtor and interpret it if you can't do it

23   simultaneously.  But we have to go on with the hearing.

24       UNIDENTIFIED SPEAKER:  I understand.  You think he

25   can use the mic?  At least we can more hear better here?

26

1          THE COURT:  Can you just pull the microphone a

2     little bit closer to you, counsel?

3          MR. FRIEDMAN:  Sure, Your Honor.  I have serious

4     doubts as to the good faith of that request.

5          THE COURT:  I understand.  I understand, but I'm

6     not --

7          MR. FRIEDMAN:  These are the kinds of antics, Your

8     Honor --

9          THE COURT:  I completely understand, but we're not

10     -- we're going to proceed.

11          MR. FRIEDMAN:  Yeah.

12          THE COURT:  Okay?

13          MR. FRIEDMAN:  Absolutely.

14          THE COURT:  And as is true in every bankruptcy

15     case in Connecticut and in most of the country, this

16     recording will be placed on the docket of the case after the

17     -- it will be on there by tomorrow morning I think, right?

18     It's pretty -- it's very quick.  It's within 24 hours.  And

19     anybody can listen to it.  And it's not your fault, but the

20     microphones --

21          MR. FRIEDMAN:  Yes.

22          THE COURT:  -- sometimes work well, and sometimes

23     don't.  And for whatever reason, that one today, has not

24     worked well.  That's --

25          MR. FRIEDMAN:  Your Honor, should I try that one

27

1    up there?

2            THE COURT:  Well, maybe it might be better.  Let's

3    see how we do.  Okay?  There has been a problem with that

4    microphone today.  I can't tell you why.

5            MR. FRIEDMAN:  So, Your Honor, Justice Ostrager

6    held -- and it's at, I believe Tab 4 of your binder is the

7    opinion -- that Mr. Kwok couldn't claim the documents were a

8    forgery for a litany of reasons.  Estoppel, that he had made

9    representations in the past, that he -- that he had actually

10   produced those documents.

11           So the claim is just, on its face, not a

12   meaningful claim and not one that this Court should

13   ultimately be able to sit in judgment over the recent

14   findings of Justice Ostrager.

15           THE COURT:  May I ask you a question about Exhibit

16   4?

17           MR. FRIEDMAN:  Yes.

18           THE COURT:  The exhibit that you just pointed me

19   to.  So of course, I haven't reviewed anything --

20           MR. FRIEDMAN:  Yes.

21           THE COURT:  -- before today, but I'm looking at

22   Exhibit 4, and it appears that Justice Ostrager issued this

23   -- let me just see what it -- I apologize.  Let me just see

24   what it is entitled.

25           It's a decision and order on motion that he issued

28

1    this on September 15, 2020.  Is that -- that -- I'm correct

2    in that?

3            MR. FRIEDMAN:  Yes, Your Honor.  This was his

4    summary judgment motion finding that Kwok in fact did owe

5    money to PACS on a personal guarantee.

6            THE COURT:  And then what happened after the

7    summary judgment decision.  Was there an appeal, or is this

8    considered interlocutory, or what is the situation with

9    regard to this specific ruling that you're pointing me to

10   right now?

11           MR. FRIEDMAN:  So it is on appeal.

12           THE COURT:  It is.

13           MR. FRIEDMAN:  It is outside of --

14           THE COURT:  Okay.

15           MR. FRIEDMAN:  So it's not an issue I think this

16   Court could review.

17           THE COURT:  Okay.  That's what --

18           MR. FRIEDMAN:  Yeah.

19           THE COURT:  -- I just want to make sure I

20   understand, because as you can see, there's a lot of

21   documents here and I --

22           MR. FRIEDMAN:  There are.

23           THE COURT:  -- just want to make sure --

24           MR. FRIEDMAN:  There are.

25           THE COURT:  -- I want to understand the status,

29

1    and I do now.  I understand that he made these findings and

2    that's still on appeal at the moment.

3              MR. FRIEDMAN:  Yeah.  But Your Honor asks a great

4    question.  What happened after that?

5              Well, what happened after that, the first thing

6    that happened, is that Mr. Kwok filed a company called

7    Genever New York, for bankruptcy in the Southern District of

8    New York.

9              THE COURT:  And you mentioned that in your

10   papers --

11             MR. FRIEDMAN:  Yeah.

12             THE COURT:  -- so I have that name correct.  I've

13   seen it.

14             MR. FRIEDMAN:  Right.  So very upsetting that that

15   was not listed as an affiliated bankruptcy, because Mr. Kwok

16   owns 100 percent of the equity of a company called Genever -

17   - Genever, British Virgin Islands.

18             It's  Genever Holdings, British Virgin Islands,

19   which in turn owns 100 percent of the equity of a debtor in

20   the Southern District of New York. That is, of course, the

21   classic case of an affiliate.

22             It wasn't listed on a petition.  Really troubling,

23   and one of the animating forces behind why we think no

24   extension should be given beyond the 14 days that congress

25   provides statutorily.

30

1          That entity in the Southern District of New York

2     is now the subject of -- it's too long to get into.

3     Eventually, we will be seeking relief from this Court to

4     permit us to pursue -- to vindicate Mr. Kwok's ownership

5     rights of that entity and to object to bogus claims asserted

6     by his family members.  That's been part of his effort to

7     frustrate our efforts to have that judgment satisfied.

8          Your Honor, Congress listed 14 days for a reason.

9     We think it's important.  I will say, of course, often times

10    I am in a position of asking for an extension of schedules,

11    and to be honest -- and so, for filing dates.

12         And to be honest, I'm not sure I've ever seen

13    anybody object, because ordinarily there's a good reason.

14    It's an operating business and they have hundreds of

15    subsidiaries.  It's an entity that may have to deal on its

16    first couple of days with vendors and creditors and

17    employees and can't pay immediate and prompt attention.

18         None of that's true here.  Mr. Kwok isn't an

19    operating business.  He claimed in his IDI and in his

20    petition, he has no assets at all which, of course, raises

21    the question of how could there possibly be a reorganization

22    purpose here?  How could there be a Chapter 11 purpose?

23         Given all of his asset shuffling and -- not my

24    word for it.  Everything you heard from opposing counsel is

25    his word.  I have Justice Ostrager's opinions, and those

31

1       opinions and findings of fact show that Mr. Kwok uses a maze

2       of entities and family members and trusted confidants to

3       shift around assets.  That kind of person can't be a

4       fiduciary in a Chapter 11 for creditors.  He'll never pursue

5       claims against family members and other related entities.

6       It raises really serious questions about the purpose of this

7       case.

8               I want to add on top of that, Your Honor, there is

9       a $134 million contempt fine.  And that's not just Justice

10      Ostrager imposing that.  That was unanimously affirmed by

11      the appellate division in New York State.

12              THE COURT:  I did see that.

13              MR. FRIEDMAN:   It was Mr. Kwok's doing.  He

14      waited 268 days.  That's why it got so large.  Mr. Kwok

15      cannot challenge in this court, the state court's ruling

16      that Mr. Kwok owns  -- has a beneficial interest in the Lady

17      May.  Frankly, any responsible debtor would have already

18      filed a 58 turnover motion to require the person who is in

19      the custody of the yacht to return it completely to Mr.

20      Kwok.  That obviously hasn't happened.

21              I will note, Your Honor, that later tonight we

22      will be filing a motion asking you to hold the automatic

23      stay does not apply to a civil contempt order against Mr.

24      Kwok, as well as a motion, in the alternative, asking you to

25      hold that if it does apply that the automatic stay be

32

1      modified to permit Justice Ostrager to require that -- to

2      the return of the Lady May the New York Harbor.

3              We're not asking to be able to levy on it or

4      collect on it right now, but Mr. Kwok should not be

5      permitted to keep such a valuable asset outside of the

6      United States, to be brought here where it can be properly

7      monetized eventually and liquidated.

8              Again, Justice Ostrager's findings I don't believe

9      will ultimately be reviewable by this Court and should not

10     be second-guessed, because they are a part of an order

11     that's already on appeal.  Mr. Kwok lost a motion for an

12     interim stay in New York.  He could not even provide any --

13     the slightest level of confidence to anybody that he would

14     have a likelihood of success on that appeal.

15             Now, the reason we believe that civil contempt

16     order is not subject to the automatic stay leads to another

17     issue which is, we also believe it's going to give rise to

18     $134 million non-dischargeable claim.  We noted that in a

19     footnote.

20             We will also be commencing an adversary proceeding

21     to hold that debt non-dischargeable, which also gives rise

22     to the question, how could there ever be a feasible Chapter

23     11 plan when Mr. Kwok will be facing $134 million debt if he

24     ever got a discharge?

25             And I think those kind of issues call into

33

1    question everything in paragraph 15 of the debtor's motion.

2    They talk about retaining counsels, and retaining financial

3    advisors, and proposing plans using other people's money.

4    You know, I realize, Your Honor, that we will have to prove

5    a lot of things to you.  But we have the evidence.  Many of

6    those things have already been established by Justice

7    Ostrager.  This is not a debtor who comes to you with

8    anything even remotely approaching clean hands.

9         For the life of me I can't understand how if a

10   judge has held that you have a beneficial ownership in

11   something worth $30 million, you don't even footnoted in

12   your petition.

13        It's just astonishing.  It's astonishing that

14   somebody wouldn't list an affiliate is a debtor when there's

15   a specific box.

16        It's astonishing that the entity Mr. Kwok uses as

17   his family office is listed as the second largest creditor,

18   when the instructions specifically say don't list insiders.

19   A company controlled by his son that funds his living

20   expenses is the paradigmatic example of a nonstatutory

21   insider.

22        A petition, Your Honor, which was verified, signed

23   under penalty of law, is so rife with dishonesty it's

24   astounding.  I would add even what Brown Rudnick filed this

25   afternoon, which says they will be paid based on a loan

34

1    that was made from Lamp, also Mr. Kwok's family office, to

2    Mr. Kwok.  So Look at the schedule -- the petition.  Lamp

3    turns up as a million-dollar creditor for that loan.

4         But even though that loan is still -- is at Brown

5    Rudnick as a retainer, it's still Mr. Kwok's property, so I

6    don't how they could assess or assert that he has zero

7    assets.  He has the $998,000 of assets that he came into the

8    case with under that loan.  It's a pre-petition loan.

9         Again, just the lack of candor to this Court

10   already is what impels us to believe that there's -- no

11   quarter should be given.

12        I want to note, in our brief, we cited virtually

13   everything Justice Ostrager said, but I didn't cite one

14   portion that I think it's really important.  And it comes on

15   page 7 of Justice Ostrager's opinion.

16        THE COURT:  Which opinion would you like me to

17   look at?  I want to make sure --

18        MR. FRIEDMAN:  This is the contempt order, Your

19   Honor.

20        THE COURT:  So, attached to your objection?

21        MR. FRIEDMAN:  Yes, as well as the U.S. Trustee's.

22        THE COURT:  Oh, but it's also in the book here?

23        MR. FRIEDMAN:  Yes, it's also attached to the U.S.

24   Trustee's objection.

25        THE COURT:  Okay.

35

1          MR. FRIEDMAN:  That might be the easiest way to

2     find it.

3          THE COURT:  If you give me a second, I will locate

4     it.

5        (Pause)

6          THE COURT:  I think I have it here but let me

7     make sure.

8           A decision and order on motion, dated February 9,

9     2022.  That is ten pages.  Is that correct?

10          MR. FRIEDMAN:  It is, Your Honor.

11          THE COURT:  Okay.  Go right ahead.  I have it.

12          MR. FRIEDMAN:  So before I get to the quote, I

13     want to point out this came after a live trial, and this

14     came after Mr. Kwok's daughter, who counsel referenced, was

15     basically held to be a liar by Justice Ostrager.

16          When you read the opinion, you'll see how  -- the

17     lack of credibility that Justice Ostrager referenced with

18     her testimony.  He's not the only judge to do that.  Judge

19     Liman and in the case from the Southern District of New York

20     also cast extreme, extreme doubt over to the credibility of

21     her testimony  relating to the interfamily transfer of

22     funds.

23          Your Honor, on page 7 it says, the machinations

24     associated with the shell game Kwok has orchestrated with

25     respect to the Lady May are of a piece with every other

36

1    evasive and contemptuous act Kwok has taken during the five

2    years this litigation has been pending, which is why there

3    are 1,180 docket entries in this case.

4         And clearly, Your Honor, not to let this case turn

5    out like that case, Kwok has taken so many extraordinarily

6    evasive and dishonest steps that cannot be squared with the

7    good-faith requirements to be a Chapter 11 debtor.  Congress

8    required disclosures be made within 14 days.  The request

9    for 60 days was, to put it mildly, outrageous.  We request

10   the Court deny the motion in the entirety.  But I'm going to

11   say something else, Your Honor.

12        Ultimately, I realized that, you know, your job is

13   to balance a variety of factors.  We believe strongly that

14   no extension should be given.

15        But if an extension were given for a few days,

16   until the end of the week because it's going to be run out

17   today, we of course, you know, aren't going to say, you

18   didn't file something by the end of the day today, the case

19   should be dismissed automatically.

20        So you know, as passionately as I feel about these

21   issues, which I think you can tell, I would not object to it

22   being extended.  Our client would not object to it being

23   extended until Friday.

24        And we think given the fact that Mr. Kwok has said

25   in his IDI that he has no assets, that part of it should be

37

1    easy.  If there are these contingent lawsuits, it it seems

2    impossible to believe they aren't known to him already, and

3    they should be scheduled as soon as possible so that we can

4    frankly dig in.  We may even seek Rule 2004 discovery

5    between his 341 if necessary, depending on what's disclosed

6    in there.

7          But we believe we need a full and fair chance to

8    continue our pursuit of his assets in order to take an

9    appropriate 341 Examination and, you know, that I think -- I

10   don't know if the Court has any questions for me,  but those

11   are the key issues that I thought were worth addressing with

12   respect to our objection.

13          THE COURT:  I'm not sure I have any questions.  I

14   have looked at your objection, although I will say, I didn't

15   look at it until today, and we did have hearings today, and

16   so I looked at the United States Trustee's objection

17   yesterday.  I had more time when that was filed.  I

18   definitely looked at your objection.  However, I'm intending

19   on looking at it again, as I went to the U.S. Trustee's

20   objection, as I will the motion for extension of time.

21          So but I think I was fairly clear at the start of

22   this hearing, there will be no extension of time for 60

23   days.  If there's an extension of time, it will not be for

24   60 days.  Counsel has stated he's made an offer to the

25   United States Trustee's office to go to March 16th.

38

1          You're stating that you would not object if the

2     Court entered order extending the deadline to March 4th.

3     We're not that far apart in some ways, but I understand your

4     position.

5          If the two of you don't want to talk about that

6     and see if you can agree on something, that's fine.  The

7     Court will rule.  I have no problem doing that.

8          But if you want to take time to talk about it, we

9     can do that too, and you can all -- we can take a five-

10    minute recess.  We don't have to take a recess.   We can do

11    whatever you want.

12         But right now, today, the issue is, is there going

13    to be an extension of time granted.  The two objecting

14    parties -- and I think I have been, I think clear, that I

15    obviously find merit to the objections when I said already,

16    there will not be a 60-day extension of time.  It's just --

17    it's not going to happen.  It's not appropriate.  In very

18    few cases I could ever think that it would be appropriate.

19    And this is not one of them.  Okay? So that's clear.  The

20    United States Trustee's office seems to be fine with March

21    16th.  You'd like March 4th.  The 341 meeting is what day?

22         MS. CLAIBORN:  Your Honor, I apologize for

23    interrupting the Court.

24         THE COURT:  That's okay.

25         MS. CLAIBORN:  I didn't yet opine as to what the

39

1    U.S. Trustee's position was with respect to the date.

2           THE COURT:  Oh.  I'm sorry.

3           MS. CLAIBORN:  And I didn't know whether or not

4    counsel wanted to take the Court up on the opportunity to

5    discuss for a minute before we do that or --

6           THE COURT:  I can take a five-minute recess.  It

7    won't --

8           MS. CLAIBORN:  I just don't know whether or not

9    the parties were interested in discussing it.

10          THE COURT:  Yeah.  And if there isn't an

11   interesting discussion, that's fine too.

12          I'm not forcing anyone to do anything.  I'm giving

13   you an opportunity if you'd like to take it.  If you don't

14   want to take it, that's fine.  You know, I have no problem

15   with that.

16          MR. SILVERBERG:  Your Honor, if PACS is going to

17   dig in their heels on the 4th, that's just not going to be

18   worth workable from a logistics standpoint, so --

19          THE COURT:  Well, and that may be true on the

20   negotiation standpoint, but I might order it.  So, you know,

21   that's where we go.  And that's fine.

22          You are -- every single -- you've all made your

23   positions, and I haven't even asked Attorney Wolman what his

24   position might be yet, because he is dissipating in this

25   hearing, but you've made your positions clear.  It's not a

40

1    complex issue for the Court to decide.

2           I do want to look back at the papers for a few

3    minutes, and I can do that now.  I can take a 5, 10, 15-

4    minute recess.  It doesn't matter.  And then I can come back

5    and rule today, or I can rule tomorrow.  It's not complex.

6    I'm not worried about issuing a ruling.  That I can tell

7    you.

8           And so, however you'd like to proceed.  I'm trying

9    to give you an opportunity suggest to me what you think

10   makes some sense.

11          If you'd like a recess to talk about it, that's

12   fine.  If you don't, we can conclude this hearing and I can

13   rule tomorrow, or we can take a recess and I can try to come

14   back and rule tonight.  I have no problem with either one of

15   those ways of proceeding.

16          MR. SILVERBERG:  So, I'm always in deal making

17   mode, so if PACS wants to speak, so --

18          THE COURT:  Well, why don't we take -- it's 10 of

19   5:00.  Why don't we --

20          MR. WOLMAN:  Your Honor.

21          THE COURT:  Yes.  Oh, Attorney Wolman.  I'm sorry.

22          MR. WOLMAN:  Can I be heard?

23          THE COURT:  Go ahead.

24          MR. WOLMAN:  That's all right.  I just wanted to

25   be brief, but I feel like this should be heard.  We did not

41

1    file anything, but we do join generally to Mr. Cheng in the

2    objections both by the U.S. Trustee and by PACS.

3            A little background, Mr. Cheng was the victim in

4    Nevada of Mr. Guo's serial campaign of defamation lawsuits.

5    Mr. Cheng himself opposes the Chinese Communist Party, and

6    he took issue with how Mr. Guo was addressing that movement,

7    as it were, and after Mr. Guo made a defamatory video about

8    Mr. Cheng, my client had a few tweets, and then found

9    himself the subject of the SLAPP suit.

10           Now the Court is aware with about lawsuits that

11   are called strategic lawsuits against (indiscernible)

12   participation.  Nevada has a very strong anti-SLAPP statute.

13   And my client --

14           THE COURT:  Hold on a second, Attorney Wolman.

15   Hold on a second.  The alarm is going off.

16           Glen, do you think we need to --

17           THE MARSHAL: I'll let you know.

18           THE COURT:  Okay.  I'm sorry, but the alarm is

19   going off in the building.

20           MR. WOLMAN:  Okay.

21           THE COURT:  So you just need to wait one second.

22   I mean, you can try to talk.  Can you hear, Attorney Wolman,

23   even when the alarm is going, or -- the United States

24   marshal going to go check right now to see if we need to

25   evacuate.

42

1          MR. WOLMAN:  No, if you need to evacuate, Your

2     Honor --

3          THE COURT:  Well, I don't know that yet.  I'm

4     waiting to find out.

5          MR. WOLMAN:  I'm fine where I am.

6          THE COURT:  They'll let us know.  If we have to

7     evacuate, then I would assume that you'll have to go back

8     out the front door.  Okay?  And stand out in front of the

9     building.  But they'll tell you.  Someone should tell you.

10        (Pause)

11         THE COURT:  John, do we need to evacuate?

12         THE MARSHAL:  Stay for now.

13         THE COURT:  Stay for now?

14         THE MARSHAL:  Stay for now.  We have a problem

15     with the alarm system.  We're rewiring everything.

16         THE COURT:  Okay.

17         THE MARSHAL:  If there's anything, we'll let you

18     know ASAP.

19         THE COURT:  All right.  All right.  Where in the

20     middle -- John, were in the middle of the hearing, so I'm

21     going to keep talking and people are going to keep talking.

22     Okay?  Oh, there.  Okay.  Oh, we'll see.  Okay.

23         Is that right?  Not when we were in court, though,

24     but yeah.  But, okay.  Thank you so much for checking.  I

25     appreciate that.

43

1          All right.  Attorney Wolman, if you could -- and

2     I'm sorry, I don't remember exactly where you left off, but

3     you were talking about a defamation suit and some other

4     issues.

5          MR. WOLMAN:  Right.  Yes, Your Honor.  Mr. Cheng

6     was the victim of Mr. Guo's serial campaign of litigation in

7     Nevada, and he prevailed on an anti-SLAPP motion and the

8     case was dismissed because Mr. Cheng -- Mr. Guo was unable

9     to show that his case had any merit.

10          The Nevada anti-SLAPP Statute has what is called a

11     SLAPP back provision, because although it awards attorney's

12     fees to the successful defendant, that is the not the

13     end-all and be-all of the victimization of being sued.

14          And so that was -- a suit was brought in the

15     Southern District of New York to enforce the judgment of

16     fees, because originally Mr. Guo did not pay until funds

17     came in from Golden Spring New York to pay that judgment,

18     and so we sued to enforce the judgment, and we sued under

19     the SLAPP back theory under the Nevada statute to -- for

20     compensatory damages.

21          And in fact, that case has been teed up for

22     summary judgment with Attorney Gavimen, who was representing

23     Mr. Guo, Mr. Kwok at the time, accelerating his reply

24     memorandum to get in just before the bankruptcy petition was

25     filed and had otherwise been fully briefed.

44

1          Your Honor, this litigation has been ongoing for

2     quite some time and, in fact, a year ago I had the

3     opportunity to take Mr. Guo's deposition.  And there was

4     actually some interest interesting things even here today

5     that I was unaware of before, such as Mr. Guo now residing

6     in Connecticut with his wife.

7          And so these are facts that -- they're facts that

8     come out about Mr. Guo that he states but then does not back

9     up that is of concern.

10          His complaint in Nevada listed a litany of things

11     about his background that his counsel here today recited

12     some of.

13          And yet, when we sought discovery on that in the

14     Southern District of New York, because certainly it must

15     have been germane and relevant, he resisted.  He objected.

16     He refused to back any of that up.

17          We sought certain discovery as to his financial

18     well-being, and he refused.  He resisted.  And in fact, he

19     pleaded the Fifth Amendment in terms of not having to

20     produce that information, and he did so successfully.  Judge

21     Failla felt that the invocation of the Fifth Amendment was

22     well placed and we were to get an adverse inference as a

23     result.

24          This man holds himself out as a billionaire.

25     That's how he presents himself globally.  In fact, on

45

1    February 9, the news was all aflutter, not only with the

2    sanctions award in the PACS case, but with the fact that Mr.

3    Guo, and it spoke specifically about his name, won of venue

4    motion in London on a $500 million claim against UBS where

5    he is the plaintiff.  And maybe it's through one of his

6    entities.  We don't know.

7          And that means the Court should take everything

8    that is said and -- you know, Brown Rudnick, I've got no

9    objection to them trying to trying to pick a fight, but they

10   are new.  They do not know Mr. Guo, and they need to take --

11   and this Court needs to take everything that he says with a

12   grain of salt.

13         And so, I do actually think that March 4th is

14   perhaps too soon, because they need to verify for themselves

15   that they are going to be submitting for the Court,

16   materials that have previously not been verified.  And so,

17   you know, that is going to go under their (indiscernible),

18   and they need to do their due diligence.

19         And so, we want to make sure, certainly, that

20   counsel has time to do that, but also strike a balance here

21   that we have time before the 341 meeting to review.

22         And while we're, you know, listed as a creditor, I

23   should note that we put in our motion, we believe ourselves

24   actually to be one of the 20 largest creditors.  But that

25   was not stated in the petition and, in fact, Golden Springs,

46

1    as PACS noted, the insider is listed as a creditor and one

2    of the 20 largest.

3         So there is already some improprieties in the

4    filings here, and, you know, we just want to make sure that

5    we have enough time.  I would prefer a week before the 341

6    meeting rather than, you know, just a few days, because I

7    need to compare to other production, certainly, that we've

8    received in the New York case, and we may have to address

9    governing protective order in that case and how it applies

10   here.

11        But, you know, we do otherwise join in the

12   objection of the U.S. Trustee and in PACS to that 60-day

13   extension, and do request that it be something, you know, at

14   least a week before the 341 meeting.

15        THE COURT:  Okay.  Thank you.  All right.  I'm

16   going to take a ten minute recess.  We'll be back at 5:10,

17   and then I'll hear from the parties if there's anything they

18   would like to report, and then I will rule.  So Court is in

19   recess.

20        THE CLERK:  All rise.  Court is in recess.

21        (Recess from 4:48 p.m. to 5:09 p.m.)

22        THE COURT:  Okay.  We took a short recess after

23   Attorney Silverberg and Attorney Friedman, Attorney

24   Claiborn, and Attorneys Wolman made their statements in

25   connection with the debtor's motion for extension of the

47

1    deadline to file documents required by the bankruptcy code

2    and rules.  I don't know, Attorney Silverberg, Attorney

3    Friedman, if you had any discussions.  I see heads shaking

4    no.

5            MR. SILVERBERG:  Unfortunately -- Your Honor,

6    Bennett Silverman of Brown Rudnick for the debtor.

7    Unfortunately, those discussions were not productive.  We

8    offered to give a couple of days --

9            THE COURT:  That's all right.  I don't need to

10   know.  Thank you.

11           MR. SILVERBERG:  Okay.

12           THE COURT:  That's okay.  I appreciate it, but I

13   don't need to know.  I just need to know that there is no

14   agreement.

15           MR. SILVERBERG:  There is no agreement, Your

16   Honor.

17           THE COURT:  Okay.  Thank you.  Attorney Claiborn.

18           MS. CLAIBORN:  Your Honor, if I could now weigh in

19   on the extension motion, and I also wanted to make some

20   other comments to the Court.

21           THE COURT:  Yes.

22           MS. CLAIBORN:  I'll start with the comments.

23           THE COURT:  Hold on just one second, Attorney

24   Claiborn.  Something is echoing here.  I don't know why it's

25   echoing.  I can hear you, Attorney Claiborn.  Then I can

48

1    hear you again.

2            MS. CLAIBORN:  Oh, that's great.

3            THE COURT:  So we just want to make sure we can

4    hear you properly.

5        (Pause)

6            THE CLERK:  Hello, hello.  I still hear it.

7            THE COURT:  Yeah, I think we're going to have to -

8    - will you be able to record, or do you need to have that

9    resolved?

10           THE CLERK:  It still recording but I don't know if

11   it's going to pick up this echo.

12           THE COURT:  I think we'll be okay.

13           THE CLERK:  Okay.

14           THE COURT:  Let's try it anyway, okay?  And then

15   if it's really bad you tell us and we'll --

16           THE CLERK:  Okay.

17           THE COURT:  -- we'll stop.  Should we alert anyone

18   in our IT department?

19           THE CLERK:  Well, I sent a message to Peter, and

20   hopefully that will -- I will send a message to Will.

21           THE COURT:  Okay.

22           THE CLERK:  Okay.

23           THE COURT:  All right.  Let's see how this goes

24   --

25           MS. CLAIBORN:  Does it make any difference as to

49

1       which microphone I use?

2               THE COURT:  No, it's coming from in here,

3       unfortunately.  So go right ahead and let's see how we do,

4       okay?

5               MS. CLAIBORN:  Thank you.  Your Honor, I wanted to

6       touch briefly on a couple of items, first of which was the

7       petition and the comments that were made by Mr. Kwok's

8       counsel today about his residence in Greenwich, and they

9       were followed by Mr. Wolman's comments about not being aware

10      that Greenwich is a residence.

11              I wanted to point out to the Court that on the

12      petition, the debtor's address in response to the question

13      of where do you live is listed as being Golden Spring.  It

14      does not list his residential address.

15              We had been under the impression that the debtor

16      was going to take some steps to protect that information as

17      to where he actually resides due to some concerns that were

18      expressed.  That hasn't yet happened.

19              But I do want to make a connected point, which is

20      that yesterday's initial debtor interview covered in brief

21      the topic of where does Mr. Kwok get his mail, and the issue

22      about where to send information was broached.

23              And the concern expressed was that perhaps the

24      mail wouldn't reach the right place of it went to the Golden

25      Spring address, which is the only address that the Court has

50

1    reached the debtor.

2            And so, I bring that up because I want to make

3    sure that the debtor does get proper notice in this case of

4    all the appropriate pleadings, and that all parties are

5    aware what is the appropriate address to be using to contact

6    the debtor.

7            The other comment I wanted to make was about the

8    fact that in general, based upon the presentations that have

9    been made today, and based upon the information that was

10   learned yesterday at the initial debtor interview, this case

11   presents an interesting combination of no assets, large debt

12   and a need for an explanation.

13           The U.S. Trustee, at this point in time, believes

14   it may be appropriate to seek an appointment of an examiner,

15   and I wanted to preview that for the Court.  We have made

16   that comment to the debtor's counsel and they are aware.

17           And so I wanted to make those couple of points to

18   Your Honor, and then I want to follow up by saying that with

19   respect to the extension request today, the U.S. Trustee

20   thinks that the date of -- that, sorry, March 9th makes the

21   most sense.

22           It is in between the dates that have been offered

23   by the opposing parties and it does provide over a week of

24   advanced time for parties to take a look at it and digest it

25   and be prepared to conduct a meaningful meeting of

51

1    creditors.

2         THE COURT:  Okay.  Thank you.  Does anyone else

3    wish to be heard?

4         Attorney Silverberg, the issue that was raised

5    about the address is an important one.  The address on the

6    petition is different from the address that you -- well, you

7    didn't given an address, but you said that he resided in

8    Greenwich.  If there's a change of address, we have a local

9    rule about that, and we have a local form and that needs to

10   be completed, because obviously notice has -- and service

11   has to be properly made.

12        So I don't how you're going to proceed on that,

13   but I'm telling you that that is something that I will be

14   paying attention to then, because if the debtor resides in

15   Greenwich, that's not what the petition says.  So I'm not

16   going to say anything further.  I'm telling you what my

17   thought is on that at the moment.  Okay?

18        MR. SILVERBERG:  We understand the issue with

19   respect to the New York address.

20        There was some desire to remain -- to keep his

21   Greenwich, Connecticut address private, given his

22   experiences with the CCP and so on.  So I think, you know,

23   when we prepared the petition, we didn't realize how much

24   that address is already in the public domain.

25        THE COURT:  Okay.

52

1          MR. SILVERBERG:  We've since learned that there

2     may not be as much sensitivity to that address being out

3     there, and once we confirm that with the debtor, we'll

4     complete the appropriate paperwork to amend the address to

5     make sure that he gets notice.

6          THE COURT:  Okay.  All right.  Thank you.

7          Does anyone else wish to be heard on the motion

8     for the extension of the deadline to file documents required

9     by the bankruptcy code and rules?  And our local rules as

10    well.

11     (No audible response)

12          THE COURT:  Okay.  As I indicated earlier today,

13    during the beginning of this hearing, over the course of the

14    last few days I've reviewed documents filed in this case,

15    including the debtor's motion to extend the deadline to file

16    schedules or provide required information seeking an

17    extension to May 2, 2022, which is ECF No. 27.

18          I've also reviewed, and again looked at during the

19    recess, the objection filed by the -- to that motion filed

20    by the Office of the United States Trustee, ECF No. 49, and

21    the objection of PACS, if I may use PACS for short, filed to

22    that motion for extension of time, ECF No. 50.

23          I've also listened to the presentations and

24    arguments of an Attorney Silverberg, Attorney Friedman,

25    Attorney Claiborn, Attorney Wolman, and I've taken those

53

1  arguments into consideration with regard to the request made

2  by the debtor.

3         As I've indicated, and I know you all know, the

4  Bankruptcy Code, in particular Section 521 of the Bankruptcy

5  Code requires the debtor, as part of the debtor's duties, to

6  file a series of documents in order to assist and help to

7  complete the administration of a Chapter 11 case.

8         Those documents are extremely important and they

9  are necessary to provide appropriate notice and information

10  to creditors in order for creditors to have the ability to

11  determine whether or not they would like to have a

12  meaningful questioning of the debtor at the section 341

13  meeting, which the debtor is required under the Bankruptcy

14  Code not only to attend but to testify at, under Sections

15  341, 42, 43 of the Bankruptcy Code.

16         In addition to the code sections that require the

17  debtors to provide -- excuse me, to perform specific duties

18  as part of the burden of coming before the Court, Federal

19  Rule of Bankruptcy Procedure 1007 requires that definite

20  documents be filed, including the statements of schedule --

21  statements of -- statements of financial affairs and

22  schedules of assets, liabilities, and other schedules A

23  through G and H and I in the individual case, and Federal

24  Rule of Bankruptcy Procedure 1007(c) says the time frame to

25  do that is with the petition, or within 14 days thereafter.

54

1      Fourteen days thereafter with regard to this

2   debtor's case would be today, because the case was filed on

3   February 15th, and the Court has considered all the requests

4   that the debtor has made and the arguments advanced in

5   opposition to the request and the Court rules as follows.

6      In accordance with 11 USC Sections 521 and other

7   applicable sections of the Bankruptcy Code that set forth

8   the duties of a debtor, Federal Rule of Bankruptcy Procedure

9   1007(c), and our local role of bankruptcy procedure, 1007-1,

10   the debtor's motion for extension of time is granted in

11   part.

12      The debtor must file all required statements and

13   schedules, including all documents required to be filed in

14   accordance with those bankruptcy sections that I've just

15   recited and the Federal Rules of Bankruptcy Procedure and

16   our local bankruptcy rules on or before March 9, 2022.

17      That is the ruling of the Court.  Does anyone have

18   any questions?

19      MR. SILVERBERG:  No, Your Honor, thank you.

20      THE COURT:  Okay.  That was the only matter that

21   we had to address today.  Attorney Birney, did you have

22   something else that you wanted to address with the Court?

23      MR. BIRNEY:  No.  No, Your Honor.  Just, thank

24   you.  It's glad to be back -- we're glad to be back in

25   person.

55

1          THE COURT:  It's nice to be in person, yes.  Did

2     somebody else have any questions or anything

3          THE COURT:  -- that you wanted to address today?

4          MR. KLETTER:  Oh, Your Honor, may I be excused

5     from future hearing?  Mr. Silverberg can attend any further

6     --

7          THE COURT:  Yes, you've been admitted to pro hac,

8     so yes, you can be excused, counsel.

9          MR. KLETTER:  Thank you.

10          THE COURT:  Okay?

11          MR. SILVERBERG:  Thank you, Your Honor.  The pro

12     hac --

13          THE COURT:  Obviously, for service purposes

14     though, service can still be made at the local address in

15     that service.

16          MR. KLETTER:  Correct.

17          THE COURT:  Even if you're excused, which is fine.

18          MR. KLETTER:  Yep.

19          THE COURT:  If someone makes service on the debtor

20     only at your office, your local office address, that's still

21     deemed appropriate service under the rules.  Okay?

22          MR. KLETTER:  Yes.  Thank you.

23          THE COURT:  Okay.  The only other thing I would

24     say is, I've ruled.  The 341 meeting is already set.  I've

25     already spoken to Attorney Claiborn about my urging with

56

1    regard to the 341 meeting, but that is in the office -- that

2    is in the hands of the Office of the United States Trustee.

3    There is nothing further on the calendar today in this case.

4              Did you have something you wanted to add, Attorney

5    Friedman?

6              MR. FRIEDMAN:  I did, Your Honor, just because I'm

7    unfamiliar with your general practice.  Will you also issue

8    an order, or is the transcript so ordered?

9              THE COURT:  I could do -- if you would prefer me

10   to -- what I would normally do, if you would like, and I'm

11   happy to do it, is I'll just do a virtual order.  Okay?  But

12   that won't get, most likely, put on the docket until

13   tomorrow morning.  It is so ordered as of right now, 5:23

14   p.m. on March 1st, 2002 [sic].  Okay?

15             MR. FRIEDMAN:  Yes.  Thank you.

16             THE COURT:  And when the virtual order enters, it

17   will say as of, whatever I just said.  5:23 p.m. on March

18   1st, 2022.  Okay?  And then you would at least have

19   something other than the transcript of this hearing.

20             I understand there may be other pleadings filed.

21   Parties have mentioned that.  The reason that the Court

22   chose the date that I chose is because I do think it's

23   important to give a meaningful opportunity to creditors to

24   review the information and determine whether or not they

25   want to participate in the 341 meeting, which as I often

57

1    say, the section of the Bankruptcy Code 341 is entitled,

2    Meeting of Creditors, and that's its point.

3          And so I -- that is why I've ruled as I have

4    ruled, and there is nothing further for the Court to attend

5    to this afternoon, unless I'm forgetting something.

6          Okay.  Thank you.  And that's the last matter on

7    today's calendar, so court is adjourned.

8          MR. FRIEDMAN:  Thank you, Your Honor.

9          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

10         MR. SILVERBERG:  Thank you, Your Honor.

11     (Proceedings concluded at 5:23 p.m.)

12         I, CHRISTINE FIORE, Certified Electronic Court

13   Reporter and Transcriber, certify that the foregoing is a

14   correct transcript from the official electronic sound

15   recording of the proceedings in the above-entitled matter.

16

17         *Christine Fiore*

18

19   _____        March 21, 2022

20      Christine Fiore, CERT

21

22

23

24

# EXHIBIT 4

FILED: NEW YORK COUNTY CLERK 04/18/2019 10:50 AM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 309
Case 22-50073 Doc 1631-258 Filed 04/06/23 Entered 04/06/23 17:07:45 Page 84 of
161
RECEIVED NYSCEF: 04/18/2019

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

PACIFIC ALLIANCE ASIA OPPORTUNITY
FUND L.P.,

Plaintiff,

v.

KWOK HO WAN, *a/k/a* KWOK HO, *a/k/a* GWO
WEN GUI, *a/k/a* GUO WENGUI, *a/k/a* GUO
WEN-GUI, *a/k/a* WAN GUE HAOYUN, *a/k/a*
MILES KWOK, *a/k/a* HAOYUN GUO, GENEVER
HOLDINGS LLC, *and* GENEVER HOLDINGS
CORPORATION,

Defendants.

Index No. 652077/2017

Hon. Barry R. Ostrager

Part 61

**FIRST AMENDED COMPLAINT**

## NATURE OF THE ACTION

1.      This is a straightforward breach of contract case.  Kwok Ho Wan, a/k/a Kwok Ho, a/k/a

Gwo Wen Gui, a/k/a Guo Wengui, a/k/a Guo Wen-Gui, a/k/a Wan Gue Haoyun, a/k/a Miles Kwok,

a/k/a Haoyun Guo ("Kwok"), a reported billionaire, and his controlled entities borrowed millions of

dollars from Plaintiff Pacific Alliance Asia Opportunity Fund L.P. ("PAX LP") but have failed to pay

the amount owed to PAX LP under binding written agreements.

2.      In 2008, PAX LP entered into a written agreement with Spirit Charter Investment

Limited ("Spirit Charter"), one of Kwok's business entities, under which PAX LP made available to

Spirit Charter a loan facility in the principal amount of $30 million.  This loan facility was conditioned

on Kwok's execution of a personal guarantee of Spirit Charter's repayment obligations.  Kwok

executed that guarantee, and PAX LP lent $30 million to Spirit Charter on February 4, 2008.

3.      In 2009, another of Kwok's entities, Shiny Times Holdings Limited ("Shiny Times"),

assumed the debt that Spirit Charter owed to PAX LP, which the parties agreed at the time totaled

$45,357,534.25.  Kwok again executed a personal guarantee with respect to that debt.

4.      Then in 2011, PAX LP and Shiny Times entered into a written agreement (the "2011

Facility Letter") that expressly superseded the prior agreements between the parties.  In the 2011

Facility Letter, the parties agreed that Shiny Times owed PAX LP $46,426,489 and would repay that

amount (plus 15% annual interest from December 31, 2010) by June 30, 2012.

5.      That same day, Kwok executed another personal guarantee (that similarly expressly

superseded Kwok's prior personal guarantee) pursuant to which Kwok guaranteed payment of the

amount owed to PAX LP by Shiny Times under the 2011 Facility Letter (the "2011 Personal

Guarantee").

6.      After both Shiny Times and Kwok failed to repay PAX LP, Kwok, Shiny Times, and

Beijing Pangu (another Kwok-controlled entity) negotiated a potential settlement with PAX LP, under

Case 22-50073-JAM Doc 163-1258 Filed 04/06/23 Entered 04/06/23 17:07:45 Page 86 of
161

which PAX LP, to settle the debt, was to take ownership of three apartments located in Beijing that

were owned by Beijing Pangu.  But Kwok and Beijing Pangu failed to meet the specific conditions

precedent for the settlement (including, among other ways, failing to transfer title for the apartments to

PAX LP), even after PAX LP, through four separate extensions, provided Kwok and Beijing Pangu an

additional 23 months to satisfy these conditions.

7.      As the conditions precedent were not satisfied when the last deadline expired at the end

of June 2015, the 2011 Facility Letter and the 2011 Personal Guarantee by their express terms reverted

to being in full force and effect, and PAX LP then began its pursuit of repayment of the mounting,

contractual debt from both Shiny Times and Kwok.  Shiny Times, however, had no assets when PAX

LP had it liquidated in the British Virgin Islands.  And Kwok to this date has refused to repay a penny

of his debt.  In fact, Kwok has recently denied the very existence of the debt and has stated repeatedly

that he should not have to repay it, including on his Twitter account and in a deposition in this very

lawsuit.

8.      Two of Kwok's shell companies—Genever Holdings LLC ("Genever NY") and

Genever Holdings Corporation ("Genever BVI" and together with Genever NY, the "Genever

Defendants")—are liable for his debt to PAX LP because each is Kwok's alter ego.  Kwok is the sole

shareholder and director of Genever BVI, which in turn is the sole shareholder of Genever NY,

through which Kwok purchased a luxury apartment at The Sherry-Netherland Hotel, Inc. (the "Sherry-

Netherland" and the apartment the "Residence") in New York in early March 2015 for $67.5 million in

cash.  Kwok dominates and controls both Genever NY and Genever BVI, neither of which has offices,

employees, or any separate existence apart from being the shells through which Kwok purchased the

Residence.

9.      Kwok purchased the Residence for almost the precise amount of money he owed at the time to PAX LP under the Personal Guarantee.  He formed the Genever Defendants at a time when he knew his debt would be due and owing to PAX LP, and almost immediately thereafter, he purchased the Residence through the Genever Defendants in an attempt to shield that asset from PAX LP.  Kwok has made false statements to both the Sherry-Netherland and this Court about the Genever Defendants in an attempt to further that debt-avoidance effort.  This and other Kwok conduct with respect to the Genever Defendants, detailed below, demonstrates that Kwok has abused the privilege of the corporate form in order to perpetrate a fraud, wrong, or injustice against PAX LP.

10.      PAX LP has taken all necessary and appropriate steps in accordance with its agreements with Shiny Times and Kwok to recover the monies it is owed—now totaling more than $100 million including contractual interest.  To date, however, Shiny Times and Kwok have failed to satisfy even one dollar of their contractual repayment obligations on the outstanding debt.  And as a result of this failure to repay the debt, PAX LP has also incurred "costs, claims losses, [and] expenses (including legal fees)" in connection with enforcing the 2011 Personal Guarantee, which Kwok is obligated to indemnify under the express terms of the 2011 Personal Guarantee.  (*See* Exhibit A § 5.3.)

### JURISDICTION AND VENUE

11.      This Court has personal jurisdiction over Kwok pursuant to New York's general personal jurisdiction statute, C.P.L.R § 301, because he is engaged in a continuous and systematic course of "doing business" in New York, is domiciled in the state, and owns the Residence, located in New York County.

12.      This Court has personal jurisdiction over Genever NY pursuant to C.P.L.R § 301, because it is incorporated in New York and its sole business purpose is to own shares in Kwok's Residence, located in New York County.

13.     This Court has personal jurisdiction over Genever BVI because, as alleged herein, by virtue of Kwok's domination and control over it to perpetrate a fraud against PAX LP, Genever BVI is Kwok's alter ego.  Moreover, Genever BVI has engaged in relevant conduct in, and availed itself of the laws of, New York by becoming the sole shareholder of a New York LLC (Genever NY) and being the indirect owner of the Residence.  Indeed, Genever BVI's sole business purpose is to own (through its 100% ownership of Genever NY) the Residence.  Genever BVI is represented by Kwok's counsel in this litigation (in which that counsel accepted service of and responded to a third-party subpoena to Genever BVI).  Kwok's counsel also made representations to this Court in this case regarding certain pledges of Genever BVI's assets.

14.     Venue is proper in this Court under C.P.L.R § 503(a) because Kwok's residence is in New York County and Genever NY's place of incorporation is New York County.

### PARTIES

15.     Plaintiff PAX LP is an investment fund organized as an exempted limited partnership under the laws of the Cayman Islands.

16.     Defendant Kwok is a Chinese national who is domiciled in New York and engages in a continuous and systematic course of "doing business" in New York.  Kwok is the sole shareholder and director of Genever BVI.  Kwok resides in the Residence.

17.     Defendant Genever NY is a limited liability company established under the laws of New York.  Genever NY's sole business purpose is to own shares in the Residence, which is apartment number 1801 in the Sherry-Netherland.  Genever NY purchased the Residence in 2015 for $67.5 million.

18.     Defendant Genever BVI is a BVI business company established under the laws of the British Virgin Islands.  Genever BVI's sole business purpose is to own (through its 100% ownership of Genever NY) the Residence.

4

# STATEMENT OF FACTS

### *The Loan Facility and Kwok's Personal Guarantees to Repay PAX LP*

19.    PAX LP and Kwok have had business dealings since approximately February 4, 2008, when PAX LP entered into a written agreement (the "2008 Facility Agreement") with Spirit Charter (attached as Exhibit B), one of Kwok's business entities, under which PAX LP made available to Spirit Charter a loan facility in the principal amount of $30 million (*see* Exhibit B § 3).  Kwok executed the 2008 Facility Agreement on behalf of Spirit Charter.  The 2008 Facility Agreement specified that "[PAX LP] shall not be obliged to make the Advance to the Borrower unless it shall first have received . . . a duly executed Kwok[] Guarantee."  (Exhibit B § 4(d).)  Having received Kwok's guarantee, PAX LP lent the full $30 million available under the loan facility to Spirit Charter on February 4, 2008.

20.    On March 12, 2008, PAX LP and Spirit Charter amended and restated the 2008 Facility Agreement ("Amended and Restated 2008 Facility Agreement").  (*See* Exhibit C.)  Kwok executed the Amended and Restated 2008 Facility Agreement on behalf of Spirit Charter, which acknowledges and confirms that Spirit Charter "received the US$30,000,000 principal amount of the Original Facility on 4 February 2008."  (Exhibit C § 2.)

21.    By a deed dated September 17, 2009 (the "September 2009 Deed"), Shiny Times, Spirit Charter, PAX LP, and various other parties agreed that Shiny Times would replace Spirit Charter as the borrower under the Amended and Restated 2008 Facility Agreement.  (*See* Exhibit D.)  Kwok executed the September 2009 Deed on behalf of Shiny Times, Spirit Charter, and himself.  The parties to the September 2009 Deed also agreed that the outstanding amount under the Amended and Restated 2008 Facility Agreement, including accrued and unpaid interest, was $45,357,534.25 as of September 12, 2009.  (*See* Exhibit D at 4.)

22.     The September 2009 Deed required Kwok to execute a new personal guarantee in favor

of PAX LP to secure Shiny Times's repayment of the approximately $45 million then owed under the

Amended and Restated 2008 Facility Agreement.  (*See* Exhibit D § 5.10.)  Kwok executed his personal

guarantee on November 18, 2009.  (*See* Exhibit E.)

23.     In 2011, PAX LP, Kwok, and Shiny Times agreed to supersede the foregoing

agreements with two contracts executed on March 16, 2011—the 2011 Facility Letter (attached as

Exhibit F) and the 2011 Personal Guarantee (attached as Exhibit A).

24.     In the 2011 Facility Letter, the parties agreed that Shiny Times owed PAX LP

$46,426,489 as of that date and would repay that amount, with 15% annual interest running from

December 31, 2010, by June 30, 2012.  (*See* Exhibit F §§ 3, 5.)

25.     The parties further agreed in the 2011 Facility Letter that any failure by Shiny Times to

pay any amount owed to PAX LP under the 2011 Facility Letter would constitute an Event of Default,

and that in such event PAX LP could (i) declare the entire loan, accrued and unpaid interest, and any

other money payable to be immediately due and payable without further demand or notice or other

legal formality of any kind, and/or (ii) declare the 2011 Facility Letter terminated.  (*See* Exhibit F §

13.)

26.     Like the prior agreements between the parties, the 2011 Facility Letter was also

expressly conditioned on Kwok's execution of the 2011 Personal Guarantee to fully backstop Shiny

Times's payment obligations to PAX LP:

> The Lender [PAX LP] and the Borrower [Shiny Times] agree to enter into this
> Agreement . . . on the condition that a new personal guarantee of Mr. Kwok (the
> "Personal Guarantee"), in favour of the Lender is delivered to secure the due and
> punctual performance of the Borrower to fully repay the [2011 Facility Letter]
> plus all accrued and unpaid interest in accordance with this Agreement.

(Exhibit F at 1.)

6

Case 22-50073    Doc 163-1    Filed 04/06/23    Entered 04/06/22 17:07:45    Page 91 of
161

27.    Kwok executed the 2011 Facility Letter on behalf of Shiny Times and on the same day

signed the 2011 Personal Guarantee, under which he agreed to "irrevocably and unconditionally"

guarantee Shiny Times's payment of all amounts owed under the 2011 Facility Letter.  In particular,

Kwok:

(a)    guaranteed to PAX LP the "due and punctual payment" of Shiny Times's
        obligations under the 2011 Facility Letter;

(b)    agreed "that promptly on [PAX LP's] demand [Kwok] will pay to [PAX
        LP] all [such amounts] that are due but unpaid";

(c)    agreed to "indemnify and hold harmless [PAX LP] on demand from and
        against all losses incurred by [PAX LP] as a result of any obligation of
        Shiny Times under the 2011 Facility Letter being or becoming void,
        voidable, unenforceable or ineffective as against Shiny Times for any
        reason whatsoever";

(d)    agreed that PAX LP's demand for payment would constitute *prima facie*
        evidence that such payment was due and owing;

(e)    agreed that PAX LP could seek repayment from either Shiny Times or
        Kwok; and

(f)    agreed to indemnify PAX LP from "any and all costs, claims losses, [and]
        expenses (including legal fees)" incurred as a result of exercising or
        enforcing the Personal Guarantee.

(Exhibit A §§ 2.1–2.2, 3.3, and 5.3.)

28.    Kwok also agreed in the 2011 Personal Guarantee to waive defenses, including those

based on the winding up or dissolution of Shiny Times or PAX LP's inability to recover against Shiny

Times "for any reason."  (Exhibit A § 3.4.)  Kwok further agreed to a catchall waiver of defenses based

on "any other act, event or omission which might operate to discharge, impair or otherwise affect the

Guarantor or any of the Obligations or any of the rights, powers, and remedies conferred upon [PAX

LP] by this Guarantee or by law."  (Exhibit A § 3.4(g).)

29.    In short, Kwok personally executed an unambiguous and ironclad guarantee that he

would satisfy Shiny Times's debt to PAX LP.

7

### The Settlement Attempts, Extensions, and Shiny Times's
### Ultimate Failure to Repay PAX LP

30.     Shiny Times did not repay any portion of the loan principal or accrued interest before

the June 30, 2012 repayment date set forth in the 2011 Facility Letter, and the parties subsequently

structured an attempt to resolve that debt through a settlement agreement—and then several extensions

thereof—each of which was styled a "Deed of Settlement."

31.     PAX LP, Shiny Times, and Kwok entered into the Original Deed of Settlement

(attached as Exhibit G) along with Beijing Pangu, another Kwok-owned company, on April 19, 2013.

Kwok executed the Original Deed of Settlement on behalf of Shiny Times and himself.

32.     The Original Deed of Settlement provided that (i) the total outstanding amount due

under the 2011 Facility Letter plus all accrued and unpaid interest was $52 million as of the date of the

Original Deed of Settlement, and (ii) that amount would no longer be due and owing upon the

occurrence of the following events:

       (a)     If PAX LP completed the purchase of three apartments from Beijing
              Pangu in a series of three separate transactions for approximately $5
              million each, for a total of approximately $15 million; and

       (b)     If Shiny Times completed three installment payments to PAX LP of
              approximately $5 million each—one installment payment to be made after
              each separate apartment purchase—for a total of approximately $15
              million.

(*See* Exhibit G §§ 2–3.1.)

33.     Before PAX LP could complete the purchase the three apartments from Beijing Pangu,

however, Beijing Pangu was required under the Original Deed of Settlement to satisfy certain express

conditions precedent relating to title, taxes, satisfaction of mortgages, and other common aspects of

Chinese real estate transactions.  (*See* Exhibit G § 3.2.)  If any of these conditions were not met for any

of the three apartments by July 31, 2013, the Original Deed of Settlement provided that "the Facility

Letter shall revert and be in full force and effect immediately after such failure and Shiny Times shall

Case 22-50073    Doc 1662-5    Filed 04/06/23    Entered 04/06/22 17:07:45    Page 93 of
161

be obliged to settle any outstanding Total Outstanding Amount and any interest accrued thereon in accordance with the terms of the [2011] Facility Letter." (Exhibit G § 4.2.)

34.    If the 2011 Facility Letter were to revert into full force and effect, Kwok's obligations would also be in full force and effect under the terms of the 2011 Personal Guarantee: "The obligations of [Kwok] . . . shall continue in full force and effect until the unconditional and irrevocable payment and discharge in full of" Shiny Times's payment and performance obligations under the 2011 Facility Letter. (Exhibit A § 3.1.)

35.    Kwok and Beijing Pangu failed to satisfy the conditions precedent by July 31, 2013.

36.    Four supplemental deeds of settlement—on December 3, 2013; May 15, 2014; July 11, 2014; and February 10, 2015 (attached as Exhibits H–K)—extended the dates in the Original Deed of Settlement, including the repayment date and the date for Kwok and Beijing Pangu to satisfy the conditions precedent.

37.    Each of the supplemental deeds had the same terms as the Original Deed of Settlement. And the result was the same each time: Kwok and Beijing Pangu never satisfied several of the required, express conditions. Thus, PAX LP was not required to (and in fact could not) complete its purchase of any of the apartments, and Shiny Times never made any of the three installment payments it owed to PAX LP under the Original Settlement Deed.

38.    Finally, on March 31, 2015, Shiny Times and PAX LP, together with Worldwide Opportunity Holdings Limited and Empire Growth Holdings Limited, entered into an Option Agreement (the "Option Agreement") that provided, among other things, for the potential sale to Kwok of shares in entities that owned the three Beijing Pangu apartments subject to the Original Deed of Settlement (*see* Exhibit L § 2), giving Kwok the option to buy back the apartments from PAX LP.

9

39.     Pursuant to its terms, the Option Agreement was to terminate if certain conditions were

not satisfied:  "For the avoidance of doubt, if any of the following conditions to the Option is not

satisfied, this Agreement shall terminate with immediate effect (without prejudice to any rights or

remedies available to PAX LP under the Deed of Settlement)."  (Exhibit L § 2.)   As none of the

Option Agreement conditions were satisfied, the Option Agreement similarly was terminated without

relieving Shiny Times of its obligation to pay PAX LP under the 2011 Facility Letter.

40.     Thus, when both the last Deed of Settlement and the Option Agreement expired

unsatisfied on June 30, 2015, the 2011 Facility Letter reverted to being in full force and effect, Kwok's

obligations under the 2011 Personal Guarantee became fully enforceable, and Kwok was (and remains)

independently liable under the 2011 Personal Guarantee for the full amount of Shiny Times's debt

owed to PAX LP under the 2011 Facility Letter.

### Kwok Incorporates the Genever Defendants as Shell Companies that he Completely Dominates and Controls to Fraudulently Purchase the Residence in Order to Shield His Assets from PAX LP

41.     In late January or early February 2015, Kwok's Chinese assets—including the three

Beijing Pangu apartments that were to be transferred to PAX LP in the proposed settlement—were

seized by the Chinese government, and Kwok fled to the United States.

42.     Nevertheless, on February 10, 2015, Kwok signed the fourth and final extension of the

Original Deed of Settlement.  (*See* Exhibit K.)  Unlike PAX LP, Kwok knew at the time that his

Chinese assets, including the three apartments, already had been seized, and thus was aware that he

could *never* satisfy the conditions precedent for transferring ownership of the apartments to PAX LP.

Kwok did not inform PAX LP that the apartments had been seized, and instead induced PAX LP to

enter into the fourth and final extension while concealing this important fact.

43.     The new deadline to satisfy the conditions precedent in the fourth and final extension

was June 30, 2015.  Thus, Kwok knew at the time that he executed the February 10, 2015 extension

that he would never satisfy the conditions precedent (indeed, he did not) and, therefore, that he had

only four months to shield his assets before his more than $70 million debt to PAX LP became due and

payable.

44.    Kwok immediately went to work.  On February 13, 2015—a mere 72 hours after

signing the final settlement extension that Kwok knew he could never satisfy—Kwok formed Genever

BVI in the British Virgin Islands and incorporated Genever NY in New York.  Kwok did not capitalize

either entity.  Neither entity opened offices or hired any employees.  Kwok is the sole owner of

Genever BVI, which is the sole owner of Genever NY.  Kwok is the sole director of Genever BVI

based on official filings in the BVI.

45.    Between February 13 and March 24, 2015—again, knowing that he would be unable to

meet the terms of the settlement agreement and that his debt to PAX LP would come due in June

2015—Kwok entered into negotiations with the Sherry-Netherland to purchase the Residence.

46.    In order to induce the Sherry-Netherland to accept his application, Kwok, through his

lawyers, presented financial statements to the Board of the Sherry-Netherland.  These financial

statements represented that Kwok owned and controlled Beijing Zenith, a Chinese company whose

balance sheet showed almost $4 billion in assets.  This balance sheet was a critical piece of Kwok's

application because it was only one of two assets Kwok ever disclosed.

47.    Significantly, Kwok testified in this case that he not only knew at the time he had his

lawyers submit his Sherry-Netherland application that these Beijing Zenith assets already had been

frozen by the Chinese government, but also that, at the time of the application, he did not "have any

ownership interest in Beijing Zenith" and that he had "no control at all over Beijing Zenith."

48.    A few days later, Kwok, again through counsel, presented to the Sherry-Netherland the

financial statements of a second foreign company: Bravo Luck Limited ("Bravo Luck"), which held

over $490 million in a UBS Hong Kong bank account.  While this submission expressly represented

that Kwok and his son owned and controlled Bravo Luck, Kwok again testified in this case that he had

"no ownership interest in Bravo Luck."

49.      As proposed to the Sherry-Netherland, Kwok intended to and did purchase the

Residence through Genever NY, which was wholly-owned by Genever BVI.  The Sherry-Netherland's

Executive Vice President testified he had never seen a resident make a purchase through two separate

shell companies in his four decades in the industry.  Because the Sherry-Netherland recognized that

this structure, coupled with Kwok's failure to disclose any U.S. assets on his application, would make

it difficult to collect the monthly fees it would charge to Kwok, the Sherry-Netherland required Kwok

to put down the largest security deposit in the Sherry-Netherland's history—five years' worth of his

roughly $56,000 in monthly fees.

50.      On the basis of what, according to Kwok's testimony, was false and misleading

financial information presented to the Sherry-Netherland and Kwok's agreement to post the

approximately $3 million security deposit—and at a time when Kwok's debt to PAX LP was more

than $70 million—Kwok and Genever NY obtained the Sherry-Netherland Board's approval to

purchase the Residence for approximately $67.5 million in cash on March 24, 2015.

51.      The Contract of Sale and Proprietary Lease Agreement with the Sherry-Netherland are

signed by Genever NY.  The Purchase Agreement for the apartment lists "'Miles' Kwok Ho Wan

(Genever [NY])" and "Kwok Ho Wan" as the applicant.

52.      Even though Genever NY is listed on the Contract of Sale, Purchase Agreement, and

the Proprietary Lease with the Sherry-Netherland, Genever NY was not capitalized and had no assets

with which to purchase the Residence.  Instead, Kwok purchased the Residence with funds wired from

Bravo Luck.

53.    Kwok all but admitted at his deposition that the funds used to purchase the Residence came from Shiny Times.  When asked whether there was a connection between the Genever Defendants and Shiny Times, he testified that Genever BVI and Shiny Times had a "representative relationship . . . like when you purchase house, there will be some agent on behalf."

***PAX LP Seeks to Enforce Its Contractual Rights and
Collect Amounts Owed, and Kwok and the Genever Defendants
Attempt to Further Shield the Residence in Response***

54.    On October 16, 2015, after the Deeds of Settlement and Option Agreement were terminated and the 2011 Facility Letter reverted to being in full force and effect, PAX LP sent a written notice of demand (the "Notice of Demand") to Kwok's address in Hong Kong, as specified under the terms of the 2011 Personal Guarantee.

55.    The Notice of Demand informed Kwok that "Shiny Times ha[d] failed to repay any part of the sum due" under the 2011 Facility Letter and demanded immediate payment of $71,818,633.44. The Notice of Demand also informed Kwok that legal proceedings might be commenced against him if he did not make immediate payment, and reserved PAX LP's contractual rights under both the 2011 Facility Letter and the 2011 Personal Guarantee.

56.    Kwok never responded to the Notice of Demand.

57.    At around the same time PAX LP sent the Notice of Demand, Kwok and the Genever Defendants listed the Residence for sale.

58.    On February 19, 2016, PAX LP sent a letter to Shiny Times demanding payment of $82,219,404.08 due and owing under the 2011 Facility Letter (the "Shiny Times Demand Letter"), which represented the principal plus contractual interest of 15% per annum calculated up to the date of the Shiny Times Demand Letter.

59.    Shiny Times never responded to the Shiny Times Demand Letter.

13

60.     When Shiny Times did not respond, PAX LP submitted an application to court in the British Virgin Islands on February 29, 2016, seeking the appointment of joint liquidators to put Shiny Times, which is a BVI corporation, into liquidation.  The application alleged that (i) Shiny Times had failed to pay the sum-then-owing of $82,410,197.87, (ii) Shiny Times was unable to pay its debts, and (iii) Shiny Times was insolvent and should be liquidated.

61.     Shiny Times was in fact placed into liquidation as a result of the BVI proceeding, but it had no assets.  Thus, PAX LP was unable to collect any of the monies owed to it under the 2011 Facility Letter through the BVI liquidation proceeding (or at all).

62.     In June 2016, a few months after PAX LP had initiated the BVI liquidation proceeding, Kwok and the Genever Defendants dropped the asking price for the Residence.  That same month, Kwok attempted to further shield the Residence by trying to restructure the ownership of Genever BVI and transfer it into a trust in his son's name.

### *PAX LP Files this Lawsuit, and Kwok and the Genever Defendants Make Clear that They Intend to Frustrate any Judgment Entered in Favor of PAX LP*

63.     PAX LP filed this lawsuit on April 18, 2017.

64.     About a week later, Kwok tweeted that "I neither have to nor should I repay this amount of boring money irrelevant to me."

65.     Only after PAX LP filed suit and took discovery related to its motion for a pre-judgment order of attachment did it learn of all of Kwok's evasive maneuvers discussed above, including: (i) his formation of the Genever Defendants to shield the Residence from PAX LP; (ii) his failure to capitalize the Genever Defendants or observe proper corporate formalities; (iii) his submission of what he himself admitted under oath was false information to the Sherry-Netherland to induce it to approve the purchase of the Residence while Kwok knew that his similarly sized debt to PAX LP was immediately due and owing; (iv) his use of an unprecedented nested shell company

14

structure to protect the Residence from PAX LP; and (v) his apparent use of Shiny Times funds to purchase the Residence.

66.     Kwok's history of lying in an attempt to evade his debt to PAX LP has continued throughout this litigation, including making repeated misrepresentations to the Court and under oath at his deposition.  As detailed above and below, those misrepresentations include false statements about the Genever Defendants and their assets.  As Kwok made these false statements regarding the Genever Defendants in an attempt to avoid having his Residence attached by the Court at PAX LP's request, the Genever Defendants are integrally involved in Kwok's abuse of the corporate form to perpetrate a fraud, wrong, or injustice against PAX LP.

67.     In May 2015, just two months after purchasing the Residence—and while Kwok knew he would have to repay his debt to PAX LP—Kwok pledged Genever BVI's assets (*i.e.*, the Residence) to an entity named Roscalitar 2, in direct violation of the terms of his and Genever NY's agreements with the Sherry Netherland.  Although that pledge was terminated in March 2017, Kwok argued in 2018—in papers submitted to this Court in opposition to PAX LP's attachment request—that the pledge was still effective and should provide a basis for denying the attachment.

68.     Kwok again improperly pledged the Residence in February 2018, after PAX LP had filed this lawsuit, this time to an entity named Blue Capital.  And while that pledge was terminated on June 12, 2018, Kwok's counsel inaccurately represented to the Court—at the June 27, 2018 oral argument on PAX LP's attachment motion—that the "lien is still in effect today."

69.     Kwok also suborned a bogus affidavit in support of his opposition to PAX LP's attachment request.  Specifically, in May 2018, Kwok had his employee Yan Ping Wang file an affidavit with this Court swearing to supposed facts that Kwok argued should defeat PAX LP's attachment request, including about the ownership of the Residence, the pledges of the Residence, and

the source of the funds Kwok used to purchase the Residence.  At her deposition, however, Wang

testified that **she knew nothing** about any of these issues.  And when the Sherry-Netherland asked

Kwok in a letter why he had represented in the Wang affidavit that he had pledged the Residence

(which violated his agreements with the Sherry-Netherland), Kwok's counsel denied that the Wang

affidavit stated that Kwok had pledged the Residence—even though that is precisely what the Wang

affidavit said in no uncertain terms.

70.      Kwok also lied repeatedly about the most basic information regarding the Residence

and the Genever Defendants, including their ownership.  Wang's affidavit swears that Kwok is the

owner of the Residence, but, as noted above, Kwok testified that he did not own it.  Kwok also testified

that he at no time had any ownership or control over the Genever Defendants, even though the

corporate documents for the Genever Defendants make clear that Kwok owns 100% of Genever BVI

(which in turn owns 100% of Genever NY) and is its sole director.  Moreover, in a complaint filed by

Genever NY and Kwok in the Southern District of New York in August 2016, Genever NY and Kwok

alleged that "Genever [NY] is owned and operated by Mr. Kwok."[1]

### COUNT I – BREACH OF CONTRACT
### Against Defendant Kwok

71.      Plaintiff realleges and incorporates by reference each and every allegation contained in

paragraphs 1 through 70 as though fully set forth herein.

72.      The 2011 Personal Guarantee obligates Kwok to repay PAX LP for the loan facility (as

amended) that PAX LP made available to Spirit Charter, along with unpaid interest.  The current

amount due and owing is more than $100 million.

73.      Plaintiff performed under the 2011 Personal Guarantee (and other related agreements).

---

[1] Verified Complaint, *Genever Holdings, LLC and Miles Kwok v. The Sherry-Netherland, Inc., et al.*, Case No. 1:16-cv-06246 (S.D.N.Y. Aug. 5, 2016) (Dkt. No. 1).

74.     Kwok has not repaid any of the money due and owing to PAX LP under the 2011 Personal Guarantee.

75.     As a direct result of Kwok's breach of his payment obligations under the 2011 Personal Guarantee, Plaintiff continues to suffer the loss of more than $100 million.

### COUNT II – VEIL PIERCING
### Against the Genever Defendants

76.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 75 as though fully set forth herein.

77.     Kwok created the Genever Defendants for the purpose of shielding the Residence from PAX LP.

78.     In creating the Genever Defendants, Kwok failed to follow proper corporate formalities. Kwok failed to capitalize either of the Genever Defendants and used funds from a different entity to purchase the Residence, the only asset held by the Genever Defendants.

79.     At no time has either of the Genever Defendants had any employees, offices, or business purpose other than owning the Residence and shielding it from Kwok's creditors, including PAX LP.

80.     Kwok completely dominates the Genever Defendants, which he wholly owns and controls.  The Genever Defendants are the alter egos of Kwok.

81.     Kwok, through his domination and control of the Genever Defendants, abused the privilege of doing business in the corporate form to perpetrate a fraud, wrong, or injustice against PAX LP.

82.     Accordingly, the corporate veil of the Genever Defendants should be pierced, and the Genever Defendants should be held jointly and severally liable for Kwok's breach of contract.

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

      (a)     in the amount greater than $100,000,000 owed as of this date under the 2011 Personal Guarantee ($46,426,489 plus accrued interest) against Kwok and the Genever Defendants as jointly and severally liable as alter egos of Kwok;

      (b)     the reasonable attorneys' fees, costs, and expenses PAX LP has incurred, and will continue to incur, in connection with its enforcement of the 2011 Personal Guarantee against Kwok, and the Genever Defendants as jointly and severally liable as alter egos of Kwok, under the 2011 Personal Guarantee's indemnification clause; and

      (c)     such other and further relief to which PAX LP shows itself justly entitled.

DATED:     New York, New York
             April 18, 2019

                               Respectfully submitted,

                               By: _____

                               O'MELVENY & MYERS LLP
                               Stuart Sarnoff (ssarnoff@omm.com)
                               Edward Moss (emoss@omm.com)
                               7 Times Square
                               New York, NY 10036
                               (212) 326-2000

                               -and-

                               THE SEIDEN GROUP

                               Robert W. Seiden (rseiden@seidenlegal.com)
                               1120 Avenue of the Americas
                               New York, NY 10036
                               (212) 626-6708

                               *Attorneys for Plaintiff*

# EXHIBIT 5

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PACIFIC ALLIANCE ASIA OPPORTUNITY
FUND L.P.,

          Plaintiff,

    v.

KWOK HO WAN, *a/k/a* KWOK HO, *a/k/a* GWO
WEN GUI, *a/k/a* GUO WENGUI, *a/k/a* GUO
WEN-GUI, *a/k/a* WAN GUE HAOYUN, *a/k/a*
MILES KWOK, *a/k/a* HAOYUN GUO,
GENVER HOLDINGS CORPORATION, and
GENEVER HOLDINGS, LLC,

          Defendants.

Index No. 652077/2017

Hon. Barry Ostrager

Part 61

Mot Seq. No. ___

**STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFF PACIFIC
ALLIANCE ASIA OPPORTUNITY FUND L.P.'S MOTION FOR PARTIAL SUMMARY
JUDGMENT**

## I.     The Deal Background[1]

1.      In early 2008, Defendant Miles Kwok met with representatives of Plaintiff Pacific Alliance Asia Opportunity Fund L.P. ("PAX") to discuss obtaining financing to complete construction of the Pangu Plaza in Beijing,[2] a real estate project that Kwok and his companies had undertaken.[3]

2.      Following negotiations, PAX agreed to lend Kwok's companies $100 million in two tranches:[4] (i) a $30 million loan in February 2008, which was conditioned on a personal guarantee by Kwok,[5] and (ii) a $70 million loan in March 2008, under which PAX received an equity interest in the real estate project as collateral.[6]

---

[1] All citations are to the exhibits attached to the July 24, 2020 Affidavit of Edward Moss in Support of Plaintiff Pacific Alliance Asia Opportunity Fund L.P.'s Motion for Partial Summary Judgment.

[2] **Ex. 4** (Zheng Dep. Tr. 15:25–17:3).

[3] **Ex. 9** (Yang Dep. Tr. 37:13–16) ("Pangu is a comprehensive real estate project that is comprised of office buildings, hotel and residential buildings."); **Ex. 4** (Zheng Dep. Tr. 24:3-5) ("The borrower on the paper is those companies, but my understanding was the company was owned by Mr. Miles Kwok.").

[4] **Ex. 9** (Yang Dep. Tr. 50:2–8) ("We have loaned Mr. Kwok a total of 100 million U.S. dollars and this loan was paid in two installments, which are 30 million U.S. dollars and 70 million U.S. dollars. However, I think the $70 million have nothing to do with this litigation."); **Ex. 3** (Lewis Dep. Tr. 78:20–79:7, 80:10–16) ("The February 2008 loan facility was for $30 million. And then there was a separate bridge financing provided for a total of $70 million . . . The total amount of financing provided totaled $100 million."); **Ex. 10** (Nov. 25, 2019 Kwok Dep. Tr. 24:9–13) ("They did make a 30 million and a subsequent 70 million U.S. investment."); **Ex. 1** (2008 Loan Facility § 2(a)–(b)) ("The Lender, the Borrower and other parties are negotiating the terms of a potential short term financing in the total principal amount of US$100,000,000 for the purpose of completing the Pangu Plaza . . . The Lender and the Borrower have agreed that regardless of whether the Pangu Financing is agreed, the Lender will make available US$30,000,000 pursuant to this Facility."); **Ex. 4** (Zheng Dep. Tr. 16:12-19, 17:4-22) ("[T]he $100 million was broken up into . . . a $30 million loan and a $70 million loan.").

[5] **Ex. 1** (2008 Loan Facility at § 4(d)) ("The Lender shall not be obliged to make the Advance to the Borrower unless it shall first have received . . . a duly executed Kwok's Guarantee"); **Ex. 10** (Nov. 25, 2019 Kwok Dep. Tr. 27:11–20) ([T]hey asked that I make a personal guarantee of $30 million.").

[6] **Ex. 6** (2008 Investment Agreement § H); **Ex. 4** (Zheng Dep. Tr. 17:10-18).

2

3.      Each loan carried an interest rate, and PAX's objective in making the loans was to turn a profit by earning that interest.[7]

## II.   The Pre-2011 Agreements

4.      On February 4, 2008, PAX entered into a $30-million loan facility ("2008 Loan Facility") with Spirit Charter Investment Limited ("Spirit Charter"),[8] a Hong Kong company controlled by Kwok.[9] Kwok executed the 2008 Loan Facility on behalf of Spirit Charter.[10]

5.      The loan carried a 30% interest rate.[11]

6.      The 2008 Loan Facility was conditioned on Kwok's execution of a personal guarantee of Spirit Charter's repayment obligations ("2008 Personal Guarantee"),[12] also entered into on February 4, 2008.[13]

7.      On February 4, 2008, as agreed, PAX disbursed $30 million to Spirit Charter.[14]

---

[7] **Ex. 4** (Zheng Dep. Tr. 18:2-8) ("Q. What did PAG stand to benefit from making those loans? . . . A. This is a typical loan structure and we are looking for the interest return.").

[8] **Ex. 1** (2008 Loan Facility); **Ex. 2** (Response to PAX's Requests for Admission ("RFA") No. 1) (admitting that "Spirit Charter and PAX executed an agreement dated February 4, 2008"); **Ex. 3** (Lewis Dep. Tr. 79:18–21) ("30 million was lent under a facility letter in February 2008.").

[9] **Ex. 1** (2008 Loan Facility at KWOK000553) (signature of Kwok as "Director For and on behalf of Spirit Charter"); **Ex. 2** (Response to RFA No. 3) (admitting ownership interest in Spirit Charter).

[10] **Ex. 1** (2008 Loan Facility) (signature of Kwok as "Director For and on behalf of Spirit Charter"); **Ex. 4** (Zheng Dep. Tr. 24:3-5) ("The borrower on the paper is those companies, but my understanding was the company was owned by Mr. Miles Kwok.").

[11] **Ex. 1** (2008 Loan Facility § 7).

[12] **Ex. 1** (2008 Loan Facility at § 4(d)) ("The Lender shall not be obliged to make the Advance to the Borrower unless it shall first have received . . . a duly executed Kwok's Guarantee"); **Ex. 10** (Nov. 25, 2019 Kwok Dep. Tr. 27:11–20) ([T]hey asked that I make a personal guarantee of $30 million.").

[13] **Ex. 5** (2008 Personal Guarantee); **Ex. 10** (Nov. 25, 2019 Kwok Dep. Tr. 94:22–23) ("I did sign a personal guarantee."); **Ex. 11** (Dec. 11, 2019 Kwok. Dep. Tr. 218:3–11) ("At the time, back in 2008, I did a personal guarantee . . . At the time, I personally guarantee for 30 million USD."); **Ex. 4** (Zheng Dep. Tr. 17:10-18).

[14] **Ex. 12** (Standard Chartered Operating Account Consolidated Statement at PAX–KWOK–00004) (recording debit of $30 million to Spirit Charter Investment Limited HKD account on Feb. 4, 2008 by PAX); **Ex. 13** at PAX–KWOK–018058 (Notice of Drawing of US$30,000,000 from Spirit Charter Investment Ltd. to PAX, signed by Kwok as "Director for and on behalf of Spirit Charter Investment

3

Case 22-50073    Doc 183-1    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 107 of
161

8.      Under the terms of a separate March 12, 2008 agreement (the "Investment Agreement"), PAX provided an additional short-term loan of $70 million[15] to Kwok-controlled entities[16] under which PAX received an equity interest in the real estate project as collateral.[17]

9.      This loan also carried a 30% interest rate.[18]

10.     Also on March 12, 2008, PAX and Spirit Charter amended and restated the 2008 Loan Facility ("Amended Loan Facility").[19]  The Amended Loan Facility carried substantially the same terms as the 2008 Loan Facility other than omitting the previous reference to the forthcoming $70 million loan, which by then had been extended.

11.     On September 17, 2009, Shiny Times Limited ("Shiny Times"), a British Virgin Islands ("BVI") company owned and controlled by Kwok,[20] assumed Spirit Charter's obligations under the Amended Loan Facility in a deed of settlement ("2009 Deed of Settlement")[21] that

---

Limited" on "Drawdown date of 4 February 2008"); **Ex. 14** (Amended Loan Facility at § 2) ("The Borrower received the US$30,000,000 principal amount of the Original Facility on 4 February, 2008."); **Ex. 10** (Nov. 25, 2019 Kwok Dep. Tr. 33:7–9) ("Pangu did receive the [ ] investment").

[15] **Ex. 6** (2008 Investment Agreement § H) ("Pacific Alliance will advance a short term loan in a total sum of US$70,000,000 to the investors for the purpose of completing the Pangu Plaza.").

[16] **Ex. 4** (Zheng Dep. Tr. 24:3-5) ("The borrower on the paper is those companies, but my understanding was the company was owned by Mr. Miles Kwok.").

[17] **Ex. 6** (2008 Investment Agreement § H); **Ex. 4** (Zheng Dep. Tr. 17:10-18).

[18] **Ex. 6** (2008 Investment Agreement § 7.1(a)).

[19] **Ex. 14** (Amended Loan Facility); **Ex. 2** (Response to RFA No. 4).

[20] **Ex. 7** (2009 Deed of Settlement at KWOK000630) ("Sealed with the Common Seal of Shiny Times Holdings Limited and Signed by Kwok Ho Wan, its director"); **Ex. 10** (Nov. 25, 2019 Kwok Dep. Tr. 52:15–17) ("Q. [W]ere you the owner of Shiny Times? A. Yes."); **Ex. 15** (Oct. 3, 2018 Kwok Dep. Tr. 10:23–11:2) (Kwok appearing as deposition witness on behalf of Shiny Times); **Ex. 2** (Response to RFA No. 7) (admitting "an ownership interest in Shiny Times"); **Ex. 4** (Zheng Dep. Tr. 24:21-25:7) (testifying that Kwok was the "owner" of "Shiny Times").

[21] **Ex. 7** (2009 Deed of Settlement §§ (F)(2), 4); **Ex. 2** (Response to RFA No. 5) (admitting that Kwok, "Shiny Times, and PAX executed an agreement dated September 17, 2009").

4

expressly superseded and replaced the Amended Loan Facility.[22] Kwok executed the 2009 Deed

of Settlement on behalf of Shiny Times, Spirit Charter, and himself.[23]

12.    The 2009 Deed of Settlement provided that the total debt owed to PAX was

$148,209,598.04:[24] the amount owed under the $30 million facility, including interest, was

$45,357,534.25[25] and the amount owed under the $70 million loan, including interest, was

$102,852,054.79.[26]

13.    The 2009 Deed of Settlement further provided that the approximately $45 million

owed under the $30 million facility would be recapitalized as a revised principal amount and

rolled over into a new facility with an interest rate of 10%,[27] to be repaid by March 12, 2010.[28]

14.    The 2009 Deed of Settlement also provided that the approximately $102 million

owed under the $70 million loan would be settled immediately for $100 million by payment

from Shiny Times to Pacific Alliance Business Advisory ("PABA"), a PAX-related entity.[29]

15.    As agreed, Kwok paid back the $100 million in the fall of 2009 (in two tranches,

$70 million in September,[30] and the remaining $30 million in November[31]) to PABA.

---

[22] **Ex. 7** (2009 Deed of Settlement § (F)(3)).

[23] *Id.* at KWOK000630 ("Sealed with the Common Seal of Shiny Times Holdings Limited and Signed by Kwok Ho Wan, its director").

[24] *Id.* at § (E).

[25] *Id.* at § (E)(1).

[26] *Id.* at § (E)(2).

[27] *Id.* at §§ (F)(3), 5.3.

[28] *Id.* at § (F)(3)(b)).

[29] *Id.* at § (E)(2); (F)(1)); **Ex. 4** (Zheng Dep. Tr. 68:12-17) ("PAG was accepting $100 million as settlement for the 102 million and change that was owed.").

[30] **Ex. 16** (PAX-KWOK-072639) (Standard Chartered September 2009 Account Statement) (recording total deposit of $70 million to PAX).

[31] **Ex. 17** (PAX-KWOK-072638) (Standard Chartered November 2009 Account Statement) (recording total deposit of $30 million to PAX); **Ex. 3** (Lewis Dep. Tr. 89:18–25, 90:2–13) ("It was repaid in two tranches . . . in September and November of 2009 . . . it was fully settled."); **Ex. 4** (Zheng Dep. Tr. 18:9-

5

16.     On November 18, 2009, eight days after repaying the second tranche to complete
the $100 million repayment, Kwok personally guaranteed the approximately $45 million debt
that Shiny Times had assumed (the "2009 Personal Guarantee"),[32] as required by the 2009 Deed
of Settlement.[33]

17.     On the repayment date of March 12, 2010, Shiny Times requested an extension to
December 31, 2010 ("2010 Letter Agreement").[34] PAX agreed on the condition that all other
obligations under the Amended Loan Facility remained unaffected.[35]

18.     Shiny Times failed to repay the amount owed under the Amended Loan Facility
by the extended deadline of December 31, 2010, and Kwok failed to satisfy his guarantor
obligation under the 2009 Personal Guarantee.[36]

### III.    The 2011 Agreements

19.     On March 16, 2011, Shiny Times and PAX entered into a new loan facility
("2011 Loan Facility") that expressly superseded and replaced the 2009 Deed of Settlement and
2010 Letter Agreement.[37]

---

23, 78:18-25) ("So he repaid the 100 and there were about $48 million interest and principal which will
roll over to another deal facility . . . 100 million is repaying 70 million investment principal and also the
interest, and they roll over the first $30 million loan plus interest as a new facility . . . Miles has repaid --
Pangu has repaid $100 million to -- which is 70 million in principal, which is our second tranche, together
with 30 million interest. This is we fully recovered. And then we roll over the first $30 million together
with interest up to that date to a further period.").

[32] **Ex. 18** (2009 Personal Guarantee); **Ex. 2** (Response to RFA No. 9).

[33] **Ex. 7** (2009 Deed of Settlement § (F)(3)(c); § 5.10).

[34] **Ex. 19** (2010 Letter Agreement § (1)) ("Shiny Times wishes to extend the Final Maturity Date from 12
March 2010 to 31 December 2010.").

[35] *Id.* at § (5).

[36] **Ex. 20** (PAX-KWOK-073328) (December 31, 2010 PricewaterhouseCoopers Audit Letter signed by
Kwok confirming outstanding debt of $47,625,410.96).

[37] **Ex. 2** (Response to RFA No. 10); **Ex. 21** (2011 Loan Facility p. 1) ("The Lender and the Borrower
agree to enter into this Agreement to supersede and replace the terms and conditions of the Deed and the
Letter Agreement in full"); **Ex. 9** (Yang Dep. Tr. 100:22–25) ("Regarding the initial $30 million loan . . .

6

20.     The 2011 Loan Facility is governed by Hong Kong law.[38]

21.     Kwok executed the 2011 Loan Facility on behalf of Shiny Times as its

"Director."[39]

22.     The 2011 Loan Facility was conditioned on:

a.   Shiny Times' immediate repayment of $5 million and its execution of the
     agreement itself,[40] and

b.   Kwok's execution of a new personal guarantee ("2011 Guarantee") that secured
     performance by Shiny Times.[41]

23.     The 2011 Loan Facility provided that once those conditions precedent were

satisfied, Shiny Times's debt would be $46,426,489, with an interest rate of 15% and a

repayment date of June 30, 2012.[42]

24.     As required by the 2011 Loan Facility, Kwok entered into a new personal

guarantee ("2011 Personal Guarantee"), also on March 16, 2011,[43] which expressly superseded

the 2009 Guarantee.[44]

25.     The 2011 Personal Guarantee is governed by Hong Kong law.[45]

---

later on we signed a new facility letter on March 16, 2011 to replace and to supersede all the previous
documents."); **Ex. 56** (PAX-KWOK-017468) (Email from Stevenson Wong to PAX attaching an
executed signature page Kwok signed on Shiny Times' behalf).

[38] **Ex. 21** (2011 Loan Facility § 20).

[39] *Id.* at KWOK000648.

[40] *Id.* at § 2(a)); **Ex. 4** (Zheng Dep. Tr.  101:7-18) (The 2011 Facility "does not come into existence until
there's a $5 million payment, and once there's a $5 million payment and that condition is satisfied, there's
going to be a $46 million facility.").

[41] **Ex. 21** (2011 Loan Facility § 2(c)); **Ex. 4** (Zheng Dep. Tr. 71:19-20) ("This new facility is based on Mr.
Kwok's personal guarantee.").

[42] **Ex. 21** (2011 Loan Facility §§ 5–6).

[43] **Ex. 23** (2011 Personal Guarantee); **Ex. 2** (Response to RFA No. 13).

[44] **Ex. 21** (2011 Loan Facility p. 1) ("[A] new personal guarantee of Mr. Kwok . . . shall supersede and
replace the [18 November 2009] Guarantee").

[45] **Ex. 23** (2011 Personal Guarantee § 10).

7

26.    The 2011 Personal Guarantee expressly incorporated the fact that Shiny Times

owed $46,416,489 under the 2011 Loan Facility and had agreed to pay 15% annual interest.[46]

27.    Under the 2011 Guarantee, among other things:

a.    Kwok "irrevocably and unconditionally . . . guarantee[d] to PAX the due and
punctual payment of [Shiny Times'] [o]blgiations [under the 2011 Facility and
agree[d] that promptly on PAX's demand he will pay to PAX all [o]bligations that
are due but unpaid";[47]

b.    Kwok "irrevocably and unconditionally agree[d] (as primary obligor and not only
as surety) to indemnify and hold harmless PAX on demand from and against any
and all losses incurred by PAX as a result of any [o]bligation [of Shiny Times]
being or becoming void, voidable, unenforceable, or ineffective as against Shiny
Times for any reason whatsoever . . . .";[48]

c.    Kwok agreed that his "obligations . . . under this Guarantee shall constitute and be
continuing obligations which shall not be released or discharged by any
intermediate payment of [Shiny Times'] [o]bligations [under the 2011 Loan
Facility] or any of them, shall continue in full force and effect until the
unconditional and irrevocable payment and discharge in full of [those o]bligations
and are in addition to and independent of, and shall not prejudice or merger with,
any other security (or any right of set-off) which PAX may at any time hold in
respect of [those o]bligations or any of them;"[49]

d.    PAX was expressly permitted to seek recourse against Kwok as primary obligor
without first enforcing the debt against Shiny Times; and[50]

e.    Kwok agreed to a catchall waiver of any defenses based on "any other act, event
or omission which might operate to discharge impair or otherwise affect the
Guarantor or any of the Obligations or any of the rights, powers, and remedies
conferred upon [PAX] by this Guarantee or by law."[51]

---

[46] *Id.* at Recital A.

[47] *Id.* at § 2.1(a).

[48] *Id.* at § 2.1(b).

[49] *Id.* at § 2.1(a).

[50] *Id.* at § 3.3.

[51] *Id.* at § 3.4.

8

28.    Kwok belatedly satisfied one of the conditions precedent by paying the $5 million

on April 4, 2011.[52]  Because this payment satisfied a condition precedent to the 2011 Loan

Facility, it did not constitute a payment under that contract and, therefore, did not reduce the

$46,416,489 debt.[53]

29.    Shiny Times failed to make any repayments under the 2011 Loan Facility by the

June 30, 2012 deadline, or at any time thereafter.[54]

30.    Likewise, Kwok failed to make any repayments under the 2011 Personal

Guarantee by the June 30, 2012 deadline, or at any time thereafter.[55]

31.    At no point has PAX been repaid by anyone any amounts due and owing under

either the 2011 Loan Facility or the 2011 Personal Guarantee.[56]

32.    Under the 2011 Personal Guarantee, PAX is entitled to reimbursement, including

legal fees, for its enforcement efforts: "The Guarantor shall indemnify and hold harmless PAX

from and against any and all costs, claims, losses, expenses (including legal fees) and

Obligations, which PAX may incur as a result of the exercise or enforcement by PAX of any of

the right or powers conferred on it under this Guarantee or by law."[57]

---

[52] **Ex. 22** (PAX-KWOK-073279).

[53] **Ex. 60** (Lewis Aff. ¶ 4).

[54] *See, e.g.*, **Ex. 9** (Yang Dep. Tr. 101:7–9) ("[A]fter the facility letter was signed on March 16th, 2011 there was no repayment of the loan."); **Ex. 24** (PAX-KWOK-016653–57) (PricewaterhouseCoopers audit letter confirming outstanding debt of $46,426,489 as of April 10, 2012, signed by Kwok); **Ex. 25** (PAX-KWOK-073335–36) (PricewaterhouseCoopers audit letter confirming outstanding debt of $52 million as of January 7, 2013, signed by Kwok); **Ex. 3** (Lewis Depo. Tr. at 18:15–21) (testifying that this litigation was filed in order to secure "recovery of an amount owed under a . . . facility agreement from March 2011 . . . that [was] covered by a personal guaranty given by Mr. Kwok").

[55] **Ex. 4** (Zheng Dep. Tr. 19:5-13, 103:20-23, 109:6-12) ("Q. Did Mr. Kwok ever pay a penny of the $46,426,489 that is set forth in Section 3 of this facility? A. As far as I know, no.").

[56] **Ex. 60** (Lewis Aff.).

[57] **Ex. 23** (2011 Personal Guarantee § 5.3).

9

FILED: NEW YORK COUNTY CLERK 07/24/2020 10:46 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 410
RECEIVED NYSCEF: 07/24/2020

Case 22-50073   Doc 183-1   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 113 of
161

## IV.    The Failed Settlements

33.    In an attempt to settle the outstanding debt, on April 25, 2012, PAX and Shiny Times entered into a deed of settlement ("2012 Deed of Settlement"), to which Beijing Pangu Investment Inc. ("Beijing Pangu") was also a party.[58]  Beijing Pangu wholly owns Pangu Plaza[59] and is another Kwok-affiliated company.[60]

34.    The 2012 Deed of Settlement provided that Shiny Times's debt to PAX under the March 2011 Facility would be discharged in return for PAX receiving legal ownership of three residential apartments at Pangu Plaza (the "Apartments").[61]

35.    The purpose of this settlement arrangement was to allow PAX to sell the apartments in order to partially recoup the funds owed to PAX.[62]

36.    The 2012 Deed of Settlement contained several conditions that were required to be satisfied before the Apartments could be conveyed to PAX.[63]

---

[58] **Ex. 26** (2012 Deed of Settlement).

[59] **Ex. 10** (Nov. 25, 2019 Kwok Dep. Tr. 15:24–16:3) ("Beijing Pangu Investment, Inc. is the 100 percent owner of Beijing Pangu Plaza.").

[60] *Id.* at 14:21–16:10 (testifying to his family's involvement with and his own role as consultant to Beijing Pangu).

[61] **Ex. 26** (2012 Deed of Settlement § 3.1); **Ex. 9** (Yang Dep. Tr. 49:7–9) ("[T]he Deed of Settlement [] involves using the three apartments to offset the loan.").

[62] **Ex. 27** at PAX–KWOK–012894 (Sept. 12, 2014 email from PAX to Kwok's attorneys at Stevenson Wong stating that, "we will need the right to sell the 3 apartments to any third party prior to 30 June 2015"); **Ex. 3** (Lewis Dep. Tr. 152:18–22) ("We weren't looking to use the apartments.  We were looking to buy the apartments with clear title so they could be liquidated in an attempt to cover the debt that was owed."); **Ex. 4** (Zheng Dep. Tr. 20:9-15, 109:22-110:4, 118:19-119:6) (testifying that "we [would] get this three apartment as a repayment. . . to resell it on the market to recover cash . . . in order to resell those properties in the market to recover the loan and the principal and the interest").

[63] **Ex. 26** (2012 Deed of Settlement § 3.2); **Ex. 9** (Yang Dep. Tr. 106:10–12) ("[I]n the agreement it was stipulated that all these prerequisite conditions have to be met before we can sign the formal agreement.").

10

37.     The parties expressly agreed that if every condition precedent were not satisfied

by June 30, 2012, the 2012 Deed of Settlement would terminate and the 2011 Loan Facility

would "revert and be in in full force and effect immediately".[64]

38.     The conditions were not satisfied, and Kwok did not convey the apartments by the

June 30, 2012 deadline.[65]

39.     On April 19, 2013, PAX, Shiny Times, Kwok, and Beijing Pangu entered into

another Deed of Settlement in relation to the 2011 Loan Facility ("2013 Deed of Settlement").[66]

40.     The 2013 Deed of Settlement provided that the sum outstanding to PAX was $52

million,[67] and that Shiny Times' debt to PAX would be discharged in return for PAX receiving

legal ownership of the Apartments.[68]

41.     According to that contract, PAX would pay a sum certain for each of the three

Apartments, and Shiny Times would then refund that amount to PAX.[69]  PAX would thereby

receive the Apartments for no net payment and would attempt to sell them to recoup the debt it

was owed.[70]

---

[64] **Ex. 26** (2012 Deed of Settlement § 3.2(b)) ("In the event that all conditions precedent set out in Clause 3.2 for all Apartments have not been satisfied by 31 July 2013 (or such later date agreed by the Parties in writing), then the entire settlement as contemplated under this Deed shall be terminated . . . the Facility Letter shall revert and be in full force and effect immediately . . . and Shiny Times shall be obliged to settle the Total Outstanding Amount and any interest accrued thereon in accordance with the terms and conditions of the Facility Letter.").

[65] **Ex. 9** (Yang Dep. Tr. 106:18-20) ("But, these prerequisite conditions have not been met yet, therefore we cannot sign" the agreements to purchase the apartments.).

[66] **Ex. 29** (2013 Deed of Settlement); **Ex. 2** (Kwok's Response to RFA No. 19).

[67] **Ex. 29** (2013 Deed of Settlement § 2.1).

[68] *Id.* at § 3.1.

[69] **Ex. 9** (Yang Dep. Tr. 115:20-116:9).  PAX's General Counsel of Absolute Return, Catherine Yang, testified that this payment structure was designed to provide Kwok with sufficient liquidity to act on the 2013 Deed of Settlement's obligation to convey the Pangu Apartments to PAX.  *Id.* at 118:22–119:16.

[70] **Ex. 4** (Zheng Dep. 118:19–119:6) ("[O]ur plan was as soon as we received legal title of those units, we will resell it.").

11

42.     To this end, the 2013 Deed of Settlement contained ten express conditions

precedent to conveying the Apartments to PAX (the "Conditions Precedent"), which provided

that "[c]ompletion of the sale and purchase of the Apartments is subject to the satisfaction of the

following conditions:"

(a)     Beijing Pangu shall have obtained the House Ownership Certificate
("Grand Title Certificates") for the entire building;

(b)     PAX and Beijing Pangu shall have signed the Purchase Agreements for
the sale and purchase of the Apartments;

(c)     Beijing Pangu and PAX shall have co-registered the sale of the
Apartments on the website of the construction authorities within three days
of receipt of the Grand Title Certificates;

(d)     The mortgage of the Apartments shall have been fully discharged and
released;

(e)     The Apartments are of clean title, free and clear of any encumbrance;

(f)     Beijing Pangu shall have delivered to PAX a letter issued by the
management company of the Apartments waiving the management fee for
the period from the completion date of purchase to the date of actual
occupation by PAX, and a letter issued by Beijing Pangu agreeing to
pay the management fee on behalf of PAX;

(g)     Beijing Pangu shall have delivered to PAX an invoice for the purchase
of the Apartments;

(h)     Beijing Pangu shall have provided evidence to PAX regarding the
payment of all relevant taxes and charges in connection with the sale and
purchase of the Apartments;

(i)     Beijing Pangu shall have delivered the House Ownership Certificate to PAX
LP;

(j)     Beijing Pangu shall have delivered the Apartments to PAX and PAX
shall have satisfied the quality inspection of the Apartments.[71]

---

[71] **Ex. 29** (2013 Deed of Settlement § 3.2).

12

FILED: NEW YORK COUNTY CLERK 07/24/2020 10:46 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 410
RECEIVED NYSCEF: 07/24/2020

Case 22-50073   Doc 183-1   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 116 of
161

43.     The Conditions Precedent "generally correspond to the standard procedures for conveying real property under PRC law and practice" and culminate in the conveyance of the House Ownership Certificates.[72]  House Ownership Certificates provide evidence that legal title has been transferred to the purchaser—"the single most important factor in any real estate transaction."[73]

44.     The 2013 Deed of Settlement provided: "For the avoidance of doubt, PAX LP or its onshore designee shall only be obligated to pay the purchase price of the Apartments in accordance with the terms of the Purchase Agreements after *all* conditions set forth in Clause 3.2 have been satisfied for all Apartments.  The Sale and Purchase of Apartments shall be deemed completed upon satisfaction of *all* conditions precedent set forth in Clause 3.2 for all Apartments."[74]

45.     The 2013 Deed of Settlement provided that if all Conditions Precedent were not satisfied by July 31, 2013, the 2013 Deed of Settlement would terminate and the 2011 Facility Letter would revert to full force and effect.[75]

46.     The Conditions Precedent were not all satisfied by July 31, 2013.[76]

---

[72] **Ex. 30** (Expert Report of Shitong Qiao ("Qiao Report") ¶ 16).

[73] **Ex. 30** (Qiao Report ¶ 16) ("As in the United States, *obtaining title is the final and most important legal requirement in conveying real property in the PRC*. Thus, *any effort to transfer real estate*—regardless of any other steps that might be taken to effectuate transfer—*cannot be completed (either substantially or fully) without title registration taking place and a new House Ownership Certificate being issued*.  It follows that, because PAX never had the Apartments registered in its name and never received the House Ownership Certificates, PAX never legally owned the Apartments, and thus never could have legally sold them.").

[74] **Ex. 29** (2013 Deed of Settlement § 3.3).

[75] *Id.* at § 3.4.

[76] **Ex. 31** (PAX–KWOK–000097) (PAX attorney writing to Stevenson Wong that "[T]oday is the deadline for satisfying the CPs listed in the Deed of Settlement dated April 19, 2013.  We understand that those CPs are not fully satisfied as of now.").

13

47.     Thereafter, the parties agreed to four extensions to the 2013 Deed of Settlement

("Supplemental Deeds") in order to accommodate Kwok by repeatedly providing him with

additional time to satisfy the Conditions Precedent.[77]  Each Supplemental Deed of settlement—

entered into on December 3, 2013;[78] May 15, 2014;[79] July 11, 2014;[80] and February 10, 2015[81]—

set forth a new deadline for satisfaction of the Conditions Precedent, but did not modify the 2013

Deed of Settlement's terms and conditions in any other way.[82]

48.     Kwok, Shiny Times, and Beijing Pangu were represented throughout the

negotiation and execution of all the agreements discussed above by the Hong Kong law firm of

Stevenson, Wong & Co ("Stevenson Wong").[83]

---

[77] Kwok repeatedly requested such extensions, which PAX accommodated for several years.  *See, e.g.*, **Ex. 32** (PAX–KWOK–000861) ("[W]e agree to extend the CP satisfaction deadline from July 31, 2013 to December 31, 2013."); **Ex. 33** (PAX–KWOK–000857) ("According to Lu Tao of Pangu, they may not be able to obtain the ownership certificates by December 31. Therefore, they may want to propose a longer extension."); **Ex. 34** (PAX–KWOK–016729) (claiming it was "impossible for them to raise money for mortgage releasing as previously agreed" and that "Pangu proposed to change the deadline to Mar 31.); **Ex. 35** (PAX–KWOK–00006) ("Per your client's request, we agree to extend the CP satisfaction deadline to March 31, 2014"); **Ex. 36** (PAX–KWOK–001652) (Stevenson Wong referencing the 30 September 2014 completion deadline as "not realistic"); **Ex. 4** (Zheng Dep. Tr.  122:18-24) ("[W]e extended this because, like I said, we need the clean title and Miles need to get some repayments to the bank to get units released from the mortgage. Q. And so you extend the deadline in response to Mr. Kwok's request? A. Yes.").

[78] **Ex. 37** (Supplemental Deed of Settlement); **Ex. 2** (Kwok's Response to RFA No. 30).

[79] **Ex. 38** (Second Supplemental Deed of Settlement); **Ex. 2** (Kwok's Response to RFA No. 37).

[80] **Ex. 39** (Third Supplemental Deed of Settlement); **Ex. 2** (Kwok's Response to RFA No. 44).

[81] **Ex. 40** (Fourth Supplemental Deed of Settlement); **Ex. 2** (Kwok's Response to RFA No. 51).

[82] For example, the second extension provided only for a single amendment: "Deleting all references to '31 December 2013' in Clauses 3.4 of the Deed of Settlement and substituting therefor with '30 June 2014'."  **Ex. 38** (Second Supplemental Deed of Settlement).

[83] *See, e.g.*, **Ex. 5** (2008 Personal Guarantee at PAX-KWOK-05067) (directing all communications to Stevenson, Wong & Co.); **Ex. 6** (2008 Investment Agreement) (Stevenson, Wong & Co. cover page); **Ex. 7** (2009 Deed of Settlement) (same); **Ex. 8** (SN 0053) (Business Letter of Reference from Hank Lo of Stevenson Wong, writing that "I first met Miles when he engaged my law firm in one of his business transactions about seven years ago . . . Over the years, my firm has acted for Miles in various business transactions in different areas"); **Ex. 4** (Zheng Dep. Tr.  26:5-6, 29:4-12, 32:6-18) ("All the contracts that we signed . . . it was represented by Stevenson Wong, Hank Lo.'"), (94:23-95:4) ("Q. What, if any,

14

Case 22-50073   Doc 183-1   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 118 of
161

49.     All of the agreements discussed above are governed by Hong Kong law.[84]

50.     In November 2013, the parties executed Commercialized Property Purchase

Contracts ("Purchase Contracts"),[85] Notices of Housing of Delivery,[86] and Property Acceptance

Confirmation Notes.[87]

51.     These three types of documents are commonly executed as preliminary steps to

real estate transactions.[88]  However, they are not sufficient to effectuate a transfer of real

property under applicable PRC real estate laws.[89]

52.     Ownership can only legally transfer with title registration and receipt of the House

Ownership Certificate by the prospective purchaser.[90]

---

understanding do you have as to whom Mr. Lo was referring to when he said 'our client'? A. He referred
to Miles Kwok, of course.").

[84] *See* **Ex. 26** at § 11.1; **Ex. 29** at § 11.1; **Exs. 37–40** at § 5 ("Clause 11 (Governing Law and Jurisdiction)
of the Deed of Settlement shall be incorporated into this Supplemental Deed as if set out in full in this
Supplemental Deed.").

[85] **Exs. 41–43** (Dkts. 72–74) (signed on November 6, 2013 between Beijing Pangu as the seller and three
PAX–related entities (one entity per apartment: Tianjin Magic Jump Real Estate Co., Ltd.; Tianjin
Kingdom Right Real Estate Co., Ltd.; Tianjin Yanglian Junjie Investment Industry Co., Ltd.) as
purchasers). *See also* **Ex. 9** (Yang Dep. Tr. 130:6–8; 139:9–24) ("These entities signed . . . a purchase
agreement with Pangu.").

[86] **Exs. 44–46** (Dkts. 69–71) (dated November 14, 2013 and delivered by Beijing Pangu to each purchaser
confirming that the Apartments were "ready for delivery").

[87] **Ex. 47** (Dkt. 185) (provided by each purchaser confirming that "keys of [each] unit have been
received," that the apartments have been "inspected," and that the purchaser "agree[s] to formally accept
[each] unit."). *See also* **Ex. 9** (Yang Dep. Tr. 141:10–15) ("We signed this because we physically
received the keys to these apartments."). However, receipt of keys is of no legal significance to property
conveyance or ownership. **Ex. 30** (Qiao Report ¶ 32) ("Property Acceptance Confirmation Notes . . . in
no way are sufficient to transfer real property under applicable PRC and local laws."); **Ex. 4** (Zheng Dep.
Tr. 192:3-6) ("We cannot resell it with a key only. We need a legal title.").

[88] **Ex. 30** (Qiao Report ¶ 32).

[89] *Id.*

[90] *Id.*; **Ex. 9** (Yang Dep. Tr. 109:10–19) ("First of all, [PAX] had to obtain the house ownership
certificate, and then . . . all the prerequisite conditions have to be met according to this agreement").

15

53.     Kwok continued to fail to satisfy this and several other Conditions Precedent by each extended deadline.[91]

54.     The fourth and final settlement extension ("Final Extension") set forth a June 30, 2015 deadline for full compliance with the Conditions Precedent.[92]

55.     At least four of the Conditions Precedent were not satisfied by that deadline, or at any point thereafter.[93]

56.     First, the apartments were seized by the Chinese government in February 2015, and remain confiscated to this day, which leaves Clause 3.2(e) of the 2013 Deed of Settlement unsatisfied.[94]

57.     Second, Beijing Pangu did not provide PAX with an invoice for the purchase of the Apartments,[95] as required by Clause 3.2(g).[96]

58.     Third, Beijing Pangu did not provide PAX with evidence regarding the payment of all relevant taxes and charges in connection with the sale and purchase of the Apartments,[97] leaving Clause 3.2(h) unsatisfied.

---

[91] **Ex. 9** (Yang Dep. Tr. 106:18–19) ("But, these prerequisite conditions have not been met yet").

[92] **Ex. 40** (Fourth Supplemental Deed of Settlement § 2.1(a)).

[93] **Ex. 48** (Dkt. 95) (Yang Aff. ¶ 9).

[94] *Id.* at ¶ 10; **Ex. 50** (Compl., *Beijing Pangu Inv. Co. Ltd. et al. v. Wu*, Case No. 18–cv–845–RA (S.D.N.Y. 2018), Dkt. No. 1, ¶ 57) (Kwok lawsuit alleging that in "late January and early February 2015," authorities "seized and attached . . . real estate assets owned by Pangu" that included the buildings that comprise the Beijing Pangu complex); **Ex. 49** (Ex. C of Qiao Report (Beijing Land Records, accessed May 6, 2019)) (evidencing the earliest seizure by the Beijing Public Security Bureau from February 2, 2015 to February 1, 2017, and the most recent seizure by the Dalian City Intermediate Court, which began February 27, 2019 and is scheduled to last until February 26, 2022).

[95] **Ex. 48** (Dkt. 95) (Yang Aff. ¶ 11).

[96] **Ex. 37** (2013 Deed of Settlement § 3.2(g)).

[97] **Ex. 48** (Dkt. 95) (Yang Aff. ¶ 12). Clause 3.2(h), as do the other Conditions Precedent, corresponds to the standard procedures for conveying real property under PRC law and practice. *See* **Ex. 30** (Qiao Report ¶ 27).  Under PRC law, a purchaser cannot obtain a House Ownership certificate before the transfer taxes and fees have been paid.  Specifically, the Beijing Commission Guidelines regarding

16

FILED: NEW YORK COUNTY CLERK 07/24/2020 10:46 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 410
Case 22-50073   Doc 183-1   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 120 of
161
RECEIVED NYSCEF: 07/24/2020

59.     Fourth, Beijing Pangu did not deliver the House Ownership Certificates for each

of the Apartments to PAX,[98] as required by Clause 3.2(i).

60.     In August 2017, Kwok filed a brief with this Court admitting that title was never

provided to PAX: "It is also our understanding that, in fact, PAX . . . is entitled to possess, rent,

or sell [the apartments] as it chooses, despite not having Property Title Certificates from the

relevant PRC authorities."[99]  Kwok alleged in that same brief that there was a possibility that

"Shiny Times or Kwok has a colorable contractual defense under Hong Kong law based on

substantial performance."[100]

61.     Property Title Certificates are synonymous with House Ownership Certificates—

i.e., proof of title.[101]

62.     As such, by the express terms of the Final Extension, on June 30, 2015 the 2011

Loan Facility (and thus Personal Guarantee) reverted to full force and effect.[102]

63.     On August 3, 2015, a PAX employee reported internally that the Beijing police

were trying to assist PAX in effectuating the transfer of the Apartments.[103]

---

transfer and registration require parties to a transaction to pay the taxes and fees with respect to that
transaction at the tax authority before the Beijing Commission will issue the required House Ownership
Certificates. *See id.* at ¶ 31.

[98] Records from the Beijing City Bureau of State Owned Land and Resources' registration system confirm
that title was never transferred to PAX: title for each of the three Apartments was registered in Beijing
Pangu's name as of May 31, 2013 and remain so as late as February 27, 2019. **Ex. 30** (Qiao Report ¶ 18);
**Ex. 9** (Yang Dep. Tr. 141:19–22) ("[W]e did not have the titles of these properties."); **Ex. 4** (Zheng Dep.
Tr.  119:20-24) ("[T]hey couldn't give us the clean legal title of those three units.").

[99] **Ex. 51** (Dkt. 66) (Defendant's Aug. 1, 2017 Memo. of Law in Opp. to Plaintiff's Motion for Pre–
Judgment Order of Attachment, at 3).

[100] *Id.*

[101] **Ex. 30** (Qiao Report ¶ 16).

[102] **Ex. 40** (Fourth Supplemental Deed of Settlement); **Ex. 52** (Crane Dep. Tr. 271:3–14) (In "mid 2015,
those unit–related agreements expired, meaning that we reverted to the facility agreement deed and
document of 2011.").

[103] **Ex. 57** (PAX-KWOK-019468).

17

## V.     PAX's Enforcement Efforts and This Litigation

64.     On October 16, 2015, PAX sent a written notice of demand ("Notice of Demand")

to Kwok's address in Hong Kong,[104] as listed in the 2011 Personal Guarantee.[105]

65.     The Notice of Demand informed Kwok that "Shiny Times ha[d] failed to repay

any part of the sum due" under the 2011 Facility Letter and demanded immediate payment of

$71,818,633.44, which represented the principal plus contractual interest of 15% per annum

calculated up to the date of the Notice of Demand.[106]

66.     Kwok did not respond to the Notice of Demand.

67.     On February 19, 2016, PAX sent a letter ("Demand Letter") to Shiny Times

demanding payment of $82,219,404.08 due and owing under the 2011 Facility Letter.[107]

68.     Shiny Times never responded to the Demand Letter.

69.     On February 29, 2016, PAX submitted an application to a British Virgin Islands

court seeking the appointment of joint liquidators.  PAX alleged that Shiny Times was insolvent

and unable to pay its $82,410,197.87 debt.[108]

70.     Consequently, Shiny Times was placed into liquidation, but it had no assets and

PAX was unable to recover any of its debt.[109]

71.     On April 18, 2017, PAX filed this lawsuit, alleging that the outstanding debt was

approximately $87 million.[110]

---

[104] **Ex. 53** (Notice of Demand).

[105] **Ex. 23** (2011 Personal Guarantee at KWOK000657).

[106] **Ex. 53** (Notice of Demand).

[107] **Ex. 54** (Demand Letter).

[108] **Ex. 55** (Dkt. 29) (PAX Aff. ¶ 23).

[109] *Id.*

[110] **Ex. 28** (Pleadings).

Case 22-50073    Doc 183-1    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 122 of
161

72.    On June 29, 2017, in support of his Motion to Dismiss this action, Kwok filed the

2011 Loan Facility and 2011 Personal Guarantee with the Court.  The documents were attached

to the affidavit of Fiona Yu, "an appointed person of Defendant Kwok" who "affirm[ed] under

penalty of perjury" that she was attaching "true and correct copies of" eleven of the agreements

discussed above.[111]

73.    At his November 25, 2019 deposition, Kwok denied signing several agreements

discussed above, including the 2011 Loan Facility,[112] 2011 Personal Guarantee,[113] 2013 Deed of

Settlement,[114] and the four Supplemental Deeds.[115]  Kwok testified that the documents were

"fake" and that "if any of this signature belongs to me, I will take full responsibility and I will

give up all—everything. And you should take—you can take it down what I just said."[116]  Kwok

also disavowed his August 2017 representation to the Court regarding title, testifying that the

Property Acceptance Confirmation Notes were the same thing as House Ownership Certificates,

or title.[117]

74.    In his May 29, 2020 opposition to PAX's Motion for Costs and Sanctions, Kwok

argued that some of the money that had been repaid to PAX in 2009 may have been applied to

offset the principal of the $30 million loan under the 2008 Loan Facility.[118]  He also argued that

"internal documents demonstrate that, despite being given the opportunity by the police in

---

[111] **Ex. 58** (Dkt. 11) (Yu Affidavit).

[112] **Ex. 10** (Nov. 25, 2019 Kwok Dep. Tr. 168:14–169:18).

[113] *Id.* at 174:6–24.

[114] **Ex. 11** (Dec. 11, 2019 Kwok Dep. Tr. at 225:6–19).

[115] *Id.* at 230:24–231:7, 233:17–19, 234:12–18, 238:18–24.

[116] *Id.* at 225:6–19.

[117] *Id.* at 294:3–295:15.

[118] **Ex. 61** (Dkt. 390) (Defendant's May 29, 2020 Opp. to PAX's Motion for Costs and Sanctions).

19

Beijing, China to obtain the three apartments that PAX claims it is owed pursuant to the deeds of

settlement, it chose to ignore that opportunity in favor of bringing this suit against Kwok

personally in New York."[119]

75.    On July 7, 2020, in its Decision and Order on that motion, the Court held that

Kwok had "previously sponsored" these contracts in "proceedings before this Court," and was

therefore "judicially estopped from challenging, in opposition to plaintiff's summary judgment

motion or at trial, the authenticity of [these] documents."[120]

76.    As of the date of this filing, July 24, 2020, Kwok's outstanding debt to PAX

inclusive of accrued and unpaid interest is $113,070,739.[121]

DATED: July 24, 2020                    Respectfully submitted,
       New York, New York

                                        O'MELVENY & MYERS LLP
                                        By: /s/ Edward Moss
                                        Stuart Sarnoff (ssarnoff@omm.com)
                                        Edward Moss (emoss@omm.com)
                                        7 Times Square
                                        New York, NY 10036
                                        (212) 326-2000

                                        -and-

                                        Robert W. Seiden
                                        (rseiden@seidenlegal.com)
                                        1120 Avenue of the Americas
                                        New York, NY 10036
                                        (212) 626-6548

                                        *Attorneys for Plaintiff Pacific Alliance
                                        Asia Opportunity Fund L.P.*

---

[119] *Id.*

[120] **Ex. 59** (Dkt. 404) (Decision + Order on PAX's Motion for Costs and Sanctions).

[121] **Ex. 60** (Lewis Aff).

20

# EXHIBIT 6

FILED: NEW YORK COUNTY CLERK 06/24/2020 05:49 PM
NYSCEF DOC. NO. 455
INDEX NO. 652205/2017
RECEIVED NYSCEF: 07/24/2020

Case 22-50073    Doc 183-1    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 125 of
161

DATED THE 16th DAY OF MARCH 2011

KWOK HO WAN
as Guarantor

in favour of

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.

PERSONAL GUARANTEE

Hong Kong

KWOK000651

THIS GUARANTEE is made the 16th day of March 2011

BETWEEN:

(1)   KWOK HO WAN (郭浩云) holder of Hong Kong identity card no. P746467(7) of Room 411, 4th Floor, Nan Fung Tower, 173 Des Voeux Road Central, Hong Kong (the "Guarantor"); and

(2)   PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P., an exempted limited partnership established under the laws of the Cayman Islands whose registered office is at P.O. Box 472, 2nd Floor, Harbour Place, Grand Cayman, Cayman Islands ("PAX").

RECITALS

A.   On or about the date of this Guarantee, PAX and Shiny Times Holdings Limited ("Shiny Times") entered into a facility letter (the "Facility Letter") whereby it was agreed that (a) the total principal amount under the Facility Letter as of the Effective Date US$46,426,489 (the "Outstanding Amount") and (b) the Outstanding Amount shall be deemed as the new revised principal amount under the Facility Letter, which shall accrue interest at the rate of 15% per annum from the Effective Date until fully repaid.   It was further agreed that the maturity date for payment of the Loan (as defined in the Facility Letter) shall be on or before 30 June 2012.

B.   A condition precedent to the completion under the Facility Letter is the Guarantor's delivery of this Guarantee to secure due and punctual performance of all of Shiny Times' payment and performance obligations whatsoever (the "Obligations", and "Obligation" shall be construed accordingly), under or in relation to the Facility Letter.

C.   It was further agreed that, immediately after the Effective Date, and upon the completion of the conditions precedent under the Facility Letter, Shiny Times and the Guarantor shall be discharged and released in full from all the obligations, liabilities and responsibilities under the Deed and Letter Agreement (both terms are defined in the Facility Letter) respectively and claims arising out of or in connection with the Deed and Letter Agreement shall also be fully discharged.

1.   INTERPRETATION

1.1   References to Agreements

Unless otherwise stated, any reference in this Guarantee to any agreement or document (including any reference to this Guarantee or the Facility Letter) shall be construed as a reference to:

(a)   such agreement or document as amended, varied, novated or supplemented from time to time;

(b)   any other agreement or document whereby such agreement or document is so amended, varied or novated; and

(c)   any other agreement or document entered into pursuant to or in accordance with such agreement or document.

1

KWOK000652

FILED: NEW YORK COUNTY CLERK 06/29/2007 05:49 PM    INDEX NO. 652097/2017
NYSCEF DOC. NO. 1337    Case 22-50073    Doc 183-1    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 127 of    RECEIVED NYSCEF: 06/29/2020

161

1.2    Clause Headings

Clause headings are for ease of reference only and shall not affect the construction of this Guarantee.

2.    GUARANTEE

2.1    Guarantee and Indemnity

The Guarantor hereby irrevocably and unconditionally:

(a)    guarantees to PAX the due and punctual payment of the Obligations and agrees that promptly on PAX's demand he will pay to PAX all Obligations that are due but unpaid; and

(b)    agrees (as primary obligor and not only as surety) to indemnify and hold harmless PAX on demand from and against all losses incurred by PAX as a result of any Obligation being or becoming void, voidable, unenforceable or ineffective as against Shiny Times for any reason whatsoever (whether or not known to PAX or any other person), the amount of such loss being the amount that PAX would otherwise have been entitled to recover from Shiny Times,

PROVIDED THAT the total liabilities of the Obligations or amount due from the Guarantor under this Guarantee shall always be limited to the sum of the Outstanding Amount plus interest of the rate of 16% per annum accrued from 31 December 2010 to the date on which all such liabilities are paid in full.

For the avoidance of doubt, this Guarantee came into effect on 31 December, 2010 (the "Effective Date").

2.2    Demands

The amount specified in a demand made by PAX pursuant to this Guarantee as to the amount of any Obligation or the amount due from the Guarantor under this Guarantee shall be *prima facie* evidence that such Obligation or such amount is due and payable.

3.    CONTINUING SECURITY

3.1    Continuing and Independent Obligations

The obligations of the Guarantor under this Guarantee shall constitute and be continuing obligations which shall not be released or discharged by any intermediate payment of the Obligations or any of them, shall continue in full force and effect until the unconditional and irrevocable payment and discharge in full of the Obligations and are in addition to and independent of, and shall not prejudice or merge with, any other security (or any right of set-off) which PAX may at any time hold in respect of the Obligations or any of them.

3.2    Avoidance of Payments

Where any release, discharge or other arrangement, in respect of any Obligation PAX may hold for such Obligation, is given or made in reliance on any payment or other disposition that is avoided or must be repaid (whether in whole or in part) in an insolvency, liquidation or otherwise, and whether or not PAX has conceded or compromised any claim that any such payment or other disposition will or should be avoided or repaid (in whole or in part), this

2

KWOK000653

INDEX NO. 652702/2017
RECEIVED NYSCEF: 07/24/2020

Guarantee shall continue as if such release, discharge or other arrangement had not been given or made.

3.3    Immediate Recourse

PAX shall not be obliged before exercising any of the rights conferred on it by this Guarantee or by law to seek to recover amounts due from Shiny Times or to exercise or enforce any other right or security it may have or hold in respect of the Obligations.

3.4    Waiver of Defences

Neither the obligations of the Guarantor contained in this Guarantee nor the rights, powers and remedies conferred upon PAX by this Guarantee or by law shall be discharged, impaired or otherwise affected by:

(a)    the winding-up, dissolution, administration or re-organisation of Shiny Times or any other person or any change in the status, function, control or ownership of Shiny Times or any such person;

(b)    any of the Obligations or any security held by PAX in respect thereof being or becoming illegal, invalid, unenforceable or ineffective in any respect;

(c)    any time or other indulgence being granted or agreed (i) to or with Shiny Times or any other person in respect of the Obligations or any of them or (ii) in respect of any security held by PAX in respect thereof;

(d)    any amendment to, or any variation, waiver or release of, the Obligations or any of them or any security held by PAX in respect thereof;

(e)    any total or partial failure to take or perfect any security proposed to be taken in respect of the Obligations or any of them;

(f)    any total or partial failure to realise the value of, or any release, discharge, exchange or substitution of, any security held by in respect of the Obligations or any of them; or

(g)    any other act, event or omission which might operate to discharge, impair or otherwise affect the Guarantor or any of the Obligations or any of the rights, powers and remedies conferred upon PAX by this Guarantee or by law.

3.5    No Competition with PAX

Any right which the Guarantor may have by way of contribution or indemnity in relation to the Obligations, or otherwise to claim or prove as a creditor of Shiny Times or any other person or its estate in competition with PA, shall be exercised by the Guarantor only if and to the extent that PAX so requires and in such manner and upon such terms as PAX may specify, and the Guarantor shall hold all monies, rights or security held or received by it as a result of the exercise of any such right on trust for PAX for application in accordance with the terms of this Guarantee as if such monies, rights or security were held or received by PAX under this Guarantee.

3.6    Appropriation

PAX shall not be obliged to apply any sum held or received by it in respect of the Obligations in or towards payment of the Obligations and all such sums may be credited to a suspense or impersonal account and held in such account pending the application from time to time

3

KWOK000654

(as PAX may think fit) of such sums in or towards the discharge of such obligations of the Guarantor to PAX as PAX may select.

## 4.    PAYMENTS

### 4.1    Grossing Up

All payments made by the Guarantor under this Guarantee shall be made free and clear and without any deduction and free and clear of, and without deduction for or on account of, tax except, in the latter case, to the extent that the Guarantor is required by law to make payment subject to tax. If any tax or amount in respect of tax must be deducted, or any other deduction must be made, from any amount payable or paid by the Guarantor under this Guarantee, the Guarantor shall pay such additional amounts as may be necessary to ensure that PAX receives a net amount equal to the full amount which it would have received had payment not been made subject to tax.

### 4.2    Payments without Set-off

All payments made by the Guarantor under this Guarantee shall be made free and clear of and without any deduction for or on account of any set-off or counterclaim.

### 4.3    Manner of Payment

All payments made by the Guarantor under this Guarantee shall be paid in the manner required by PAX.

## 5.    COSTS AND EXPENSES

### 5.1    Transaction Costs

The Guarantor shall on demand of PAX reimburse to PAX on a full indemnity basis all costs and expenses (including legal fees), incurred by PAX in connection with the preparation, negotiation and execution of this Guarantee.

### 5.2    Stamp Taxes

The Guarantor shall promptly pay all stamp, registration and other taxes to which this Guarantee or any judgment given in connection with this Guarantee is or at any time may be subject and shall on demand indemnify PAX against all Obligations, costs, claims and expenses (including legal fees) resulting from any failure to pay or delay in paying any such tax.

### 5.3    Indemnity

The Guarantor shall indemnify and hold harmless PAX from and against any and all costs, claims losses, expenses (including legal fees) and Obligations, which PAX may incur as a result of the exercise or enforcement by PAX of any of the rights or powers conferred on it under this Guarantee or by law.

## 6.    WAIVERS AND REMEDIES

No failure by PAX to exercise, nor any delay by PAX in exercising, any right or remedy under this Guarantee shall operate as a waiver thereof nor shall any single or partial exercise of any such right or remedy prevent any further or other exercise thereof or the exercise of any other such right or remedy.

4

KWOK000655

### 7. ADDITIONAL PROVISIONS

#### 7.1 Partial Invalidity

If at any time any provision of this Guarantee is or becomes illegal, invalid or unenforceable in any respect, or this Guarantee is or becomes ineffective in any respect under the law of any jurisdiction, such illegality, invalidity, unenforceability or ineffectiveness shall not affect:

(a) the legality, validity or enforceability of the remaining provisions of this Guarantee or the effectiveness in any other respect of this Guarantee under such law; or

(b) the legality, validity or enforceability of such provision or the effectiveness of this Guarantee under the law of any other jurisdiction.

#### 7.2 Potentially Avoided Payments

If PAX determines that an amount paid to it under the Facility Letter is capable of being avoided or otherwise set aside on the liquidation or administration of the person by whom such amount was paid, then for the purposes of this Guarantee, such amount shall be regarded as not having been paid.

#### 7.3 Currency Conversion

In order to apply any sum held or received by PAX in or towards payment of the Obligations, PAX may purchase an amount in another currency and the rate of exchange to be used shall be that at which, at such time as it considers appropriate, PAX is able to effect such purchase.

#### 7.4 Currency Indemnity

If any sum due from the Guarantor under this Guarantee or any order or judgment given or made in relation to this Guarantee has to be converted from the currency (the "first currency") in which the same is payable under this Guarantee or under such order or judgment into another currency (the "second currency") for the purpose of (a) making or filing a claim or proof against the Guarantor, (b) obtaining an order or judgment in any court or other tribunal, or (c) enforcing any order or judgment given or made in relation to this Guarantee, the Guarantor shall indemnify and hold harmless PAX from and against any loss suffered or incurred as a result of any discrepancy between (i) the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency, and (ii) the rate or rates of exchange at which PAX may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof.

#### 7.5 Rights Cumulative

The rights and remedies provided by this Guarantee are cumulative and not exclusive of any right or remedy provided by law.

### 8. ASSIGNMENTS

#### 8.1 The Guarantor's Rights and Obligations

The rights and obligations of the Guarantor under this Guarantee are not assignable or transferable and the Guarantor shall not purport to assign any or all such rights or obligations, without the prior written consent of PAX.

5

159

KWOK000656

FILED: NEW YORK COUNTY CLERK 06/29/2020 05:49 PM
INDEX NO. 652052/2017
NYSCEF DOC. NO. 455
RECEIVED NYSCEF: 07/24/2020

Case 22-50073    Doc 183-1    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 131 of
161

8.2   PAX's Rights

The rights of PAX under this Guarantee are assignable in whole or in part, and PAX may assign all or any such right without the consent of the Guarantor.

9.   NOTICES

9.1   Communications in Writing

Each communication to be made under this Guarantee shall be made in writing but, unless otherwise stated, may be made by fax or letter.

9.2   Delivery of Notices

Any communication or document to be made or delivered by one person to another pursuant to this Guarantee shall (unless that other person has by 3 days' written notice to the other specified another address or fax number) be made or delivered to that other person at the authorized address or fax number of that person and shall be deemed to have been made or delivered when despatched (in the case of any communication made by fax), or (in the case of any communication made by letter) when left at that address or (as the case may be) five days after being deposited in the post postage prepaid in an envelope addressed to it at that address. Subject to the foregoing, the authorised address and fax number of each party, for the purpose of Clause 9, are as follows:

PA:

Address:

15/F, AIA Central
1 Connaught Road Central
Hong Kong

Fax:      +852 2918 0881
Attn:     Jon Lewis, Group General Counsel

The Guarantor:

Address:   Room 411, 4th Floor, Nan Fung Tower,
173 Des Voeux Road Central
Hong Kong

*with a copy to*

Address:   Stevenson, Wong & Co.
4th Floor, Central Tower
28 Queen's Road Central
Hong Kong
Fax       +852 2868 9928
Attn:     Hank Lo

9.3   Notices to PA

Any communication or document to be made or delivered to PAX shall be effective only when received by PAX and then only if it is expressly marked for the attention of the

8

KWOK000657

FILED: NEW YORK COUNTY CLERK 09/24/2020 05:15 PM    INDEX NO. 852097/2017

NYSCEF DOC. NO. 455    Case 22-50073    Doc 183-1    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 132 of    RECEIVED NYSCEF: 09/24/2020

161

department or officer identified with PA's signature below or such other department or officer as PAX shall from time to time specify for this purpose.

## 9.4    English Language

Each communication and document made or delivered by one party to another pursuant to this Guarantee shall be in English or accompanied by a translation into English which is certified (by an officer of the person making or delivering the same) as being a true and accurate translation.

## 10.    GOVERNING LAW

This Guarantee is governed by and shall be construed in accordance with the laws of Hong Kong.

## 11.    JURISDICTION

### 11.1    Courts of Hong Kong

Each of the Guarantor and PAX irrevocably agrees that the courts of Hong Kong shall have jurisdiction to hear and determine any suit, action or proceedings, and to settle any disputes, which may arise out of or in connection with this Guarantee (respectively, "Proceedings" and "Disputes") and, for such purposes, irrevocably submits to the jurisdiction of such courts.

### 11.2    Appropriate Forum

The Guarantor irrevocably waives any objection which he might now or hereafter have to Proceedings being brought or Disputes settled in the courts of Hong Kong and agrees not to claim that any such court is not a convenient or appropriate forum.

### 11.3    Service of Process

The Guarantor agrees that the process by which Proceedings are begun may be served on him by being delivered to him personally in connection with all Proceedings in Hong Kong.

### 11.4    Proceedings in Other Jurisdictions

Nothing in Clause 11.1 (*Courts of Hong Kong*) shall (and shall not be construed so as to) limit the right of PAX to take Proceedings against the Guarantor in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not) if and to the extent permitted by applicable law.

### 11.5    General Consent

The Guarantor consents generally in respect of any Proceedings to the giving of any relief or the issue of any process in connection with such Proceedings including the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be made or given in such Proceedings.

## 12.    COUNTERPARTS

This Guarantee may be executed in counterparts and such counterparts taken together shall constitute one and the same instrument.

## 13.    SOVEREIGN IMMUNITY

7

KWOK000658

FILED: NEW YORK COUNTY CLERK 07/24/2020 11:15 PM
INDEX NO. 65207772017

NYSCEF DOC. NO. 455

161

Case 22-50073   Doc 183-1   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 133 of 2017

RECEIVED NYSCEF: 07/24/2020

To the extent that the Guarantor may be entitled, in any Hong Kong Court or other court, to claim for himself or his revenues, assets or properties, sovereign immunity from service of process, from suit, from the jurisdiction of any court, from attachment in aid of execution or enforcement of a judgment (interlocutory or final), or from any other legal process, and to the extent that, in any such jurisdiction there may be attributed such a sovereign immunity (whether claimed or not), the Guarantor irrevocably agrees not to claim, and hereby irrevocably waives, such sovereign immunity.

IN WITNESS WHEREOF this Guarantee has been duly executed by the Guarantor and has been signed by PAX.

162

KWOK000659

FILED: NEW YORK COUNTY CLERK 06/24/2020 05:49 PM
NYSCEF DOC. NO. 455

Case 22-50073   Doc 183-1   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 134 of
161

INDEX NO. 652200/2017
RECEIVED NYSCEF: 07/24/2020

EXECUTION PAGE

PERSONAL GUARANTEE

SIGNED, SEALED AND DELIVERED
by KWOK HO WAN
in the presence of:

Signature
of Witness:

Name:
Address:

Occupation:

SIGNED by                                        )
Jon Lewis                                        )
Director, Pacific Alliance Group Asset           )
Management Limited,                              )
the General Partner of                           )
PACIFIC ALLIANCE ASIA                            )
OPPORTUNITY FUND L.P.                            )
in the presence of:-                             )

Signature
of Witness:

Name:    STEFFI TAM

Address:  15/F, AIA CENTRAL, 1 CONNAUGHT ROAD CENTRAL, HONG KONG

Occupation:  LEGAL COUNSEL

163

KWOK000660

# EXHIBIT 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GUO WENGUI, BEIJING PANGU
INVESTMENT CO., LTD., and BEIJING
ZENITH HOLDINGS CO. LTD.

Plaintiffs,

v.

ZHENG WU A/K/A BRUNO WU,

Defendant.

Civil Action No. \_\_\_\_-CV-_____

**COMPLAINT**

Plaintiffs Guo Wengui ("Guo"), Beijing Pangu Investment Co., Ltd. ("Pangu"), and

Beijing Zenith Holdings Co. Ltd. ("Zenith," together with Pangu, the "Plaintiff Companies")

(collectively, "Plaintiffs") for their complaint and action for money damages against defendant

Zheng Wu a/k/a Bruno Wu ("Wu"), allege as follows:

**PARTIES**

1.      Plaintiff Guo is a Hong Kong citizen who presently resides in New York.  He left

China at the end of 2014.  He has been a longstanding critic of corruption within elements of the

Chinese government and a leading advocate for government reform.

2.      Plaintiff Pangu is organized under the laws of China and has a principal place of

business at 27 Central North 4th Ring Drive, Chaoyang District, Beijing 100101, China.

3.      Plaintiff Zenith is also organized under the laws of China and has a principal

place of business at 317 Datunlu, Chaoyang District, Beijing 100101, China.

4.      On information and belief, Defendant Wu is a United States citizen, who resides

in New City, New York.

## JURISDICTION AND VENUE

5.    The Court has personal jurisdiction because Defendant Wu resides in New York and regularly communicated with Plaintiff Guo from within New York regarding the subject matter that forms the basis for this Complaint.

6.    The Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1332 because Plaintiff Guo is a foreign citizen, the Plaintiff Companies are organized under the laws of a foreign state, and Defendant Wu is a citizen of a U.S. state.

7.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 in that a substantial part of the events giving rise to the claim occurred in this district.

## FACTS

### A.  Plaintiff Guo's Background

8.    Plaintiff Guo grew up in a poor household in Northeast China, where his parents had been exiled by the Chinese Communist Party during the Cultural Revolution.  Plaintiff Guo and his family lived in very difficult and harsh conditions, and his parents regularly struggled to provide food and shelter for their eight children.

9.    Growing up under these circumstances forced him to become entrepreneurial at a very young age. When he was 13 years old, Plaintiff Guo dropped out of middle school and started selling clothing and electronics to make money for his family.

10.    Watching his parents struggle while living in exile also instilled in Plaintiff Guo a passion for democracy and the rule of law.  He often used his earnings to help other poor families and to support those advocating for government reform.  During the Tiananmen Square protests in 1989, he sold his motorbike and donated approximately RMB 3,600 ($500) to student protestors, which was a large sum at the time.  This led to his arrest on May 26, 1989, and subsequent imprisonment from 1989 to 1991.

2

11.     On the day of his arrest, two police officers raided Plaintiff Guo's office and began shooting at his young wife and his three-month old daughter.  When Plaintiff Guo's younger brother attempted to intervene, an altercation ensued and Plaintiff Guo's brother was shot in the process. Even though Plaintiff Guo's brother was rushed to the hospital, the police instructed the doctors not to treat him, causing him to die from blood loss.

12.     While in prison, Plaintiff Guo met many other political activists. This, along with the death of his brother, further strengthened his resolve to fight oppression and corruption.

13.     Plaintiff Guo knew that in order to be an effective voice for government reform, he first had to become successful and influential himself.  As a result, upon his release from prison, he began to get involved in the real estate business.

14.     In 1991, Plaintiff Guo and his family developed the Henan Yuda, a high-end commercial complex worth more than $300 million.  The complex included one of the five tallest buildings in China. The complex was developed exclusively through privately-owned land, and not using any land owned by the government.

15.     Eight years later, in 1998, Plaintiff Guo and his family built Beijing Pangu Plaza and Jinquan Plaza, which together cover an area that is equal to approximately 2 million square meters.  These projects were developed exclusively through privately-owned land, and not using any land owned by the government.

16.     Beijing Pangu Plaza was designed by noted Taiwanese architect C.Y. Lee, and to date is the only privately-owned commercial complex in the Beijing Olympic area.  The complex is owned by Plaintiff Pangu, and consists of five different towers.  The tallest tower is an office building and the smallest tower is a hotel.  The remaining three towers are mixed-use buildings.

17. In 2002, Plaintiff Guo and his family set up Plaintiff Zenith, a real estate development and investment management consulting company, which owns various developments in the Chaoyang District in Beijing.

18. After his success in the real estate business, Plaintiff Guo began investing in various businesses. This included an investment in Founder Securities Co. Ltd. ("Founder Securities"), a company established by Peking University.

**B.** **Plaintiff Guo's Whistleblowing Activities**

19. In 2014, Plaintiff Guo discovered that You Li ("Li"), the CEO and former director of the Founder Group, the parent company of Founder Securities, had embezzled billions of yuan from the Founder Group's investors, including from Plaintiff Guo.

20. Plaintiff Guo took various steps to expose Li's actions, including sending letters to government officials, and submitting accounts about Li's fraud to the Central Commission for Discipline Inspection ("CCDI") through the CCDI's online reporting system. The CCDI is the agency tasked with investigating fraud and corruption within the Communist Party in China.

21. Unbeknownst to Plaintiff Guo, Li was part of a corrupt enterprise, which was headed by a former high-ranking officer of the Central Political and Legal Affairs Commission of the Communist Party of China ("OFFICIAL A").

22. Angered by Plaintiff Guo's whistleblowing, OFFICIAL A, Li, and their corrupt associates used various means to try to intimidate and silence Plaintiff Guo in an effort to hide their corrupt activities. Among other things, Official A and Li used one of their corrupt associates to commence a government investigation against Plaintiff Guo, and to target Plaintiff Guo, his family and businesses with intimidation tactics, including surveillance, arrests and seizures.

23. When Plaintiff Guo found out that Li was attempting to silence him, he decided that it would be best if he left China. Eventually, Plaintiff Guo came to the United States on January 9, 2015. He has resided in New York since that time.

24. Since coming to the United States, Plaintiff Guo has continued to expose the corrupt activities of various Chinese businesses and individuals, including some individuals who have held very senior government positions. For example, in early 2017, Plaintiff Guo exposed widespread allegations of corruption involving the Hainan Group ("HNA"), one of China's largest conglomerates. Among other things, the allegations Plaintiff Guo exposed included that HNA was being used as a vehicle for the corrupt activities of a former high-ranking officer of the CCDI ("OFFICIAL B"). OFFICIAL B worked for the CCDI between 2012 and 2017.

25. Plaintiff Guo's whistleblowing activities have garnered significant attention and support from around the world. He currently has over 596,000 Twitter followers, 169,366 YouTube subscribers and 22,500 Instagram followers. In May 2017, Plaintiff Guo's Twitter account had more than 3.8 billion impressions. He has also been interviewed by many leading newspapers worldwide, including the New York Times, Wall Street Journal, and other international publications.

26. At the same time, being a vocal opponent of corruption has made him a high-profile target for corrupt individuals hoping to maintain the status quo and their personal corrupt empire and ill-gotten wealth. Speaking out against corrupt business leaders and government officials has come with a great amount of risk to his own safety and well-being, along with that of his family members, many of whom are still in China.

## C. **China's Anti-Corruption Campaign**

27.     Two years before Plaintiff Guo came to the United States, the Chinese government, led by China's President Xi Jinping, began an extensive campaign aimed at eradicating corruption from every industry in China.

28.     To date, the Chinese government's anti-corruption effort has led to the investigation and punishment of many current and former government officials.  The investigation has also reached various state-owned and private businesses.

29.     In October 2017, President Xi reiterated his commitment to combating corruption at the 19th National Congress of the Communist Party, and the Deputy Chief of the Communist Party has said that authorities will continue to clamp down on corrupt officials through tight supervision and tough penalties.  The CCDI has also warned that officials will continue to be tried and sentenced regardless of their level of seniority.

30.     In November 2017, the Chinese government released draft legislation outlining the powers and functions of a new anti-corruption agency. The new agency will have oversight over China's entire public sector, which employs 62 million people, and will have powers more expansive than those of the CCDI.

## D. **Corrupt Officials Acting Outside the Scope of Their Authority Conspire to Silence Whistleblowers Who Expose Their Activities**

31.     Notwithstanding the efforts of the Chinese government to reform and eliminate corruption, there remain both officials within the government acting outside the scope of their authority and private individuals outside of the government who continue to engage in corrupt activities in order to advance their own personal and business interests.

32.     These corrupt officials and private individuals set their own agenda outside of the scope of the official Chinese government and, in fact, act for their own personal benefit and

contrary to the stated policies and direction of the official Chinese government. They use their power both inside and outside the government to benefit personally, and to attempt to threaten and silence anyone who speaks out against their activities.

33. This is the conspiracy. In particular, a group of individuals, both outside and inside the Chinese government conspired with each other and worked in concert to protect their personal interests and silence Plaintiff Guo. At the center of the conspiracy was OFFICIAL A, who worked together with Li of the Founder Group, Defendant Wu, OFFICIAL B and others. As set forth more fully below, Defendant Wu was integral to the conspiracy, playing a substantial role in efforts to intimidate, silence and discredit Plaintiff Guo and others who attempted to disclose the corrupt activities of the conspirators.

34. On information and belief, OFFICIAL A and OFFICIAL B and their family members secretly controlled stakes in private Chinese corporations, and used their government positions to direct business and funnel kickbacks to these corporations. They did so outside the scope of their governmental authority. Together, and acting in concert with Li, Defendant Wu and others, they have conspired to silence anyone with information that might expose their corrupt behavior. OFFICIAL A and OFFICIAL B have also used their senior positions within the government to cause official government institutions to act on their behalf, giving their actions an appearance of legitimacy. These activities are contrary to the Chinese government's stated position of ending government corruption and in furtherance of protecting these individuals' personal agendas.

### E. Defendant Wu Threatens and Extorts Plaintiff Guo in Furtherance of the Conspiracy

35. On information and belief, Defendant Wu is the co-Chairman and CEO of Sun Seven Stars Entertainment & Media Group Limited and the former Chairman of Sun Media

Group in China. On information and belief, he moved to the United States to advance his own personal financial interests. While here, he has advanced those interests, and those of his co-conspirators, by threatening those who speak out against, and threaten to expose, the corruption of OFFICIAL A, OFFICIAL B, Defendant Wu and their other co-conspirators.

36.     Plaintiff Guo was introduced to Defendant Wu for the first time in or around December 2014 by an associate of OFFICIAL A. At the time, Plaintiff Guo was working to defend himself against the threats directed at him by Li and those working with him. The associate of OFFICIAL A told Plaintiff Guo that Defendant Wu could help him. Plaintiff Guo trusted OFFICIAL A and had no reason to believe that OFFICIAL A and his associates were part of any conspiracy. As a result, Plaintiff Guo began communicating with Defendant Wu.

37.     Defendant Wu first contacted Plaintiff Guo via the online chat platform Wechat. Subsequently, Defendant Wu continued to communicate with Plaintiff Guo by both message and telephone. Plaintiff Guo received substantially all of these communications in New York. On information and belief, Defendant Wu also made the communications from New York.

38.     Defendant Wu initially interacted with Plaintiff Guo under the guise of helping him, but, on information and belief, he appeared friendly at first in an attempt to mislead Plaintiff Guo and to gain Plaintiff Guo's trust.

39.     During their first conversation, Plaintiff Guo asked Defendant Wu to help his family and the employees of the Plaintiff Companies in China who had been harassed and threatened with arrest in China.

40.     On or around December 16, 2014, Defendant Wu contacted Plaintiff Guo regarding an article posted on an overseas website, Boxun.com. The article concerned political favors that Plaintiff Guo allegedly received from a former Chinese government official. This

article was just one of many false articles posted by Boxun regarding Plaintiff Guo. Defendant Wu claimed that he had connections with Boxun and that he could act on Plaintiff Guo's behalf to persuade Boxun to delete the articles. Defendant Wu then proposed to serve as a "middle man" to convey a monetary offer from Plaintiff Guo to Boxun to delete the articles. On information and belief, Defendant Wu intended to take a portion of any amount paid by Plaintiff Guo in the form of a kickback. Plaintiff Guo refused to succumb to this extortion and would not pay. These articles damaged Plaintiff Guo's reputation by spreading false and misleading claims, and were part of a pattern of retaliation by corrupt officials aimed at whistleblowers such as Plaintiff Guo.

41.     Soon after these initial communications, the tone of Defendant Wu's communications with Plaintiff Guo began to change. In particular, Defendant Wu demanded that Plaintiff Guo provide assistance to Defendant Wu and his co-conspirators. Defendant Wu promised Plaintiff Guo protection from what Defendant Wu claimed was "the Chinese government" if Plaintiff Guo acceded to Defendant Wu's demands.

42.     For example, in or around late December 2014, Defendant Wu demanded that Plaintiff Guo help him locate an individual in the United States wanted by Defendant Wu and his co-conspirators. They believed that this individual had evidence that would expose corruption by Defendant Wu and his co-conspirators, and they wanted Plaintiff Guo's help in locating the evidence and destroying it. Defendant Wu told Plaintiff Guo that he was "representing all of the people who are behind me. My brothers and my boss salute you." On information and belief, Defendant Wu's reference to "my brothers and my boss" was a reference to his co-conspirators, including OFFICIAL A and OFFICIAL B. At this point, Plaintiff Guo realized that Defendant

Wu was not attempting to help him, but was instead using Plaintiff Guo to advance the interests of Defendant Wu and his co-conspirators.

43.     Defendant Wu continued to pressure Plaintiff Guo to provide assistance in early January 2015, telling him "you must watch those who fly here, don't let anyone out of your sight, especially the target."  Defendant Wu further told Plaintiff Guo that he was in New York working with the "New York Unit," and that Plaintiff Guo's "job is done when you give us the information."  He also demanded money from Plaintiff Guo.

44.     Throughout this time, Plaintiff Guo made clear to Defendant Wu that he did not want to provide assistance and that he was doing so under duress.  Defendant Wu nonetheless demanded that Plaintiff Guo continue with the mission.  In doing so, Defendant Wu made clear that he was "in charge of this matter."  Whenever Plaintiff Guo expressed reservations, Defendant Wu reminded him that he could only assure Plaintiff Guo's safety if he continued to cooperate.  For example, on or around January 1, 2015, Defendant Wu told Plaintiff Guo in essence that, "once you finish the business you could leave freely.  There will be no restriction and you have free access."

45.     Defendant Wu also demanded that Plaintiff Guo return to China and assured him that he would be safe if he did what Defendant Wu and his co-conspirators wanted.  In a January 7, 2015 telephone conversation, Defendant Wu told him "[t]he Special Investigation team will come to you. After that, you can walk away a free man. You can leave immediately … Be assured! … I can tell you, bound by my honesty, nothing will happen to you." On information and belief, Defendant Wu and his co-conspirators controlled the Special Investigation Team and were able to use it to further their personal agenda.

46.     Defendant Wu likewise suggested that the safety of Plaintiff Guo's family in China depended on Plaintiff Guo's continued cooperation.  On or around January 8, 2015, Defendant Wu threatened Plaintiff Guo, stating that "[a]s long as you follow my instructions, you will be fine and your family will be fine….As long as you explain the few things when you're back, you'll be free to come and go and your safety will be guaranteed.  Join my team.  I guarantee your definite safety."  Plaintiff Guo understood that if he did not accede to Defendant Wu's demands that Defendant Wu and his co-conspirators would cause harm to Defendant Wu's family and business interests in China.

47.     Within days of Defendant Wu making the above threats regarding Plaintiff Guo's family, several of Plaintiff Guo's family members and employees of the Plaintiff Companies were in fact arrested and jailed.  This included Plaintiff Guo's wife and daughter, two of his older brothers and his sister-in-law.  In total, approximately 27 employees of the Plaintiff Companies were arrested from January-to-May 2015.  Plaintiff Guo's elderly parents were also threatened with arrest.  On information and belief, Defendant Wu and his co-conspirators orchestrated these arrests in order to obtain additional leverage over Plaintiff Guo.

48.     Defendant Wu continued to threaten that he and his co-conspirators would use state resources to hurt Plaintiff Guo and his family if he did not do their personal bidding to assist their corrupt organization operating outside of the government.  On or around January 10, 2015, Defendant Wu told Plaintiff Guo:

> First, every request raised to you is made on behalf of the Special Investigation Team of Central Discipline Inspection Commission; Second, you have to go on investigating [individual] in America and collect related information.  You should deliver the related materials to me in a secure way as soon as possible; Third, do whatever I ask you to do unconditionally.  That is good for you; Fourth, for the arrest of your family and staff and seizure of assets and accounts by the Special Investigation Team arrested your family and staff, only once you go back to China and cooperate with the investigation, we can sort that out.

11

49.     Defendant Wu left no doubt what the consequences would be if Plaintiff Guo did
not cooperate, telling Guo that: "if you act recklessly abroad, make yourself an enemy of the
country, you will be dead.  At the same time, the Special Investigation Team will issue the 'Red
Notice' against you and your son."  Defendant Wu further threatened that he and his co-
conspirators had "primarily identified [Plaintiff Guo's] ownership of domestic properties and
assets."

50.     While Defendant Wu, a private individual, purported to be acting on behalf of the
Chinese government, he had no authority to do so.  On information and belief, Defendant Wu is
not registered as a foreign agent.  On information and belief, Defendant Wu was working with
and on behalf of certain corrupt individuals within the government, including OFFICIAL A and
OFFICIAL B, who were acting to protect their personal corrupt enterprise, without authority and
contrary to the actual positions of the Chinese government.

51.     Throughout this time, Plaintiff Guo told Defendant Wu that these threats against
Plaintiff Guo and his business interests, particularly the arrests of the Plaintiff Companies'
employees were damaging Plaintiffs' businesses and relationships with third parties.  Plaintiff
Guo also told Defendant Wu that these threats and arrests of his family members were causing
him extreme stress and anxiety.

52.     Defendant Wu continued to assure Plaintiff Guo that his family members would
be released if Plaintiff Guo cooperated.  For example, Defendant Wu told Plaintiff Guo that the
"more cooperative you are with the organization and in the investigation, the better this thing
will end up.  You must trust me on this."

53.     The threats and coercion continued throughout January 2015 as Defendant Wu,
acting on behalf of his co-conspirators, continued to remind Plaintiff Guo that if he made a

"significant contribution, everything will be forgotten."  Defendant Wu demanded that Plaintiff Guo assist with destroying evidence related to the activities of Defendant Wu and his co-conspirators.  Defendant Wu also made threats stating "[y]ou must try to achieve this.  I'm telling you.  Otherwise we can't overcome this obstacle, you know?"  We really can't.  You can definitely do it.  After this, it will be over.  Your problems will be solved."

54.     On or around January 21, 2015, Defendant Wu accused Plaintiff Guo of imposing additional conditions in return for Plaintiff Guo continuing to provide assistance.  Defendant Wu demanded that Plaintiff Guo do as he was told.  He threatened Plaintiff Guo stating that "[y]our true color, brother, your true color will be shown by your action at this time.  And that's it.  I am not kidding.  In another conversation that day, Defendant Wu again reminded Plaintiff Guo that, "after the meeting everything will be OK, including the banks, seized company properties and freedom of your people.  Please do seize this chance, and do nothing to complicate matters, do it once and for all."

55.     Throughout 2016 and 2017, Defendant Wu used third-parties to threaten, intimidate and silence Plaintiff Guo.  For example, upon information and belief, in September 2017, Defendant Wu offered a senior executive at Plaintiff Guo's security company a multi-million dollar bribe in exchange for his assistance in carrying out Defendant Wu's threats against Plaintiff Guo.

**F.  Defendant Wu and His Co-Conspirators Carry Through on Defendant Wu's Threats by Orchestrating the Seizure of the Plaintiff Companies' Assets Causing Substantial Damages to the Plaintiff Companies and Their Business Interests**

56.     Defendant Wu and his co-conspirators then followed through on his threats regarding Plaintiff Guo's business interests.  On or around January 28, 2015, Chinese authorities acting at the direction of Defendant Wu's co-conspirators began seizing the Plaintiff Companies'

assets. Because of their high-ranking positions in the Chinese government, Defendant Wu's co-conspirators had the power to cause government authorities to issue charges, arrest individuals and conduct seizures. On information and belief, they did so with respect to Plaintiff Guo to further their personal interests and the interests of the corrupt conspiracy.

57.     In particular, these authorities seized and attached the following real estate assets owned by Pangu in or around late January and early February 2015: (1) a hotel; (2) a shopping mall; (3) courtyards; (4) office buildings; and (5) other parts of a building complex where the other Pangu structures are located. While these assets were initially seized in early 2015, they were subsequently released in or around December 2016 and January 2017. However, Chinese authorities, again acting at the direction of Defendant Wu's co-conspirators seized the same assets in or around January 2017.

58.     The same authorities, again acting at the direction of Defendant Wu's co-conspirators, also seized assets of Zenith in or around late January and early February 2015. These assets consist of eight office towers and Zenith's stock holdings. As with the assets of Pangu, these assets were initially seized in early 2015, but were subsequently released in or around December 2016 and January 2017. However, Chinese authorities, again acting at the direction of Defendant Wu's co-conspirators seized the same assets in or around January 2017.

59.     In addition to the asset seizures, Defendant Wu and his co-conspirators have caused other harm to Plaintiffs and their business interests. Specifically, their actions have caused the seizure of the Plaintiff Companies' business and financial files, the suspension of the Plaintiff Companies' new construction projects in China, the cancellation of planned openings of a new shopping mall and movie theater, and layoffs of hundreds of employees due to instability in the businesses. These actions have substantially limited the ability of the Plaintiff Companies

to conduct business, resulting in lost profits and other business opportunities. As a result, the Plaintiff Companies have lost substantial value and halted nearly all regular business operations.

60. The value of the assets seized at the direction of Defendant Wu and his co-conspirators is as follows: (1) Pangu real estate assets: 30.733 billion RMB (approximately $4,822,929,690.00); (2) Zenith real estate assets: 19.077 billion RMB (approximately $2,993,753,610.00); (3) cash held by Pangu, Zenith and their affiliates: 1.073 billion RMB (approximately $168,385,890); and (4) Zenith's stock holdings in Founder Securities Co. Ltd.: 12.921 billion RMB (approximately $2,027,692,530).

61. In addition to these direct damages caused by the actions of Defendant Wu and his co-conspirators, Plaintiffs have suffered other foreseeable damages, operating losses, penalties and fines, lost profits and business opportunities that will be proven at trial as a result of the above-described conduct. These losses total approximately 11.2 billion RMB (approximately $1,757,616,000).

## COUNT I

### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
#### (Direct and Aiding and Abetting)
#### (Plaintiff Companies Only)

62. Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs of the complaint.

63. The Plaintiff Companies, which are real estate developers and owners, have business relationships with numerous third parties, including vendors, customers, lenders and other partners.

64. By the actions described herein, Defendant Wu, in conjunction with his co-conspirators, interfered with these relationships by causing the seizure of the Plaintiff

Companies' assets and interruption of the Plaintiff Companies' current businesses and future business opportunities.

65.     Defendant Wu interfered with the Plaintiff Companies' business relationships through improper means.  In particular, as described herein, Defendant Wu threatened Plaintiff Guo that his business interests would be seized if Plaintiff Guo did not comply with his demands. This coercive behavior amounted to extortion, a crime under New York law, in that Plaintiff Guo felt he had no choice but to comply with the demands.  When he refused, Defendant Wu and his co-conspirators followed through on their threats.  Even after Plaintiff Guo told Defendant Wu that Defendant Wu's actions were having a devastating financial impact on Plaintiff Guo and the Plaintiff Companies, Defendant Wu persisted in his conduct.

66.     As set forth herein, the Plaintiff Companies were damaged by Defendant Wu's intentional interference, including by the seizure of the Plaintiff Companies' assets and through other foreseeable damages, operating losses, penalties and fines, lost profits and business opportunities.

## COUNT II

### AIDING AND ABETTING CONVERSION
### (Plaintiff Companies Only)

67.     Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs of the complaint.

68.     As set forth herein, Defendant Wu, acting with his co-conspirators, interfered with the Plaintiff Companies' property rights in their cash and bank accounts and Zenith's stock holdings by seizing these assets.

69.     Defendant Wu and his co-conspirators intended both to take possession of these assets and to cause the Plaintiff Companies harm by doing so.

70. The Plaintiff Companies are the rightful owners of these assets.

71. Defendant Wu both directly participated in and directed the above-described actions, and had knowledge that the seizures would take place as demonstrated by his statements and threats to Plaintiff Guo.

72. Defendant Wu substantially assisted in the conversion of the Plaintiff Companies' assets by the threatening Plaintiff Guo that the assets would be seized if Plaintiff Guo did not comply with the demands of Defendant Wu and his co-conspirators.

73. As set forth herein, the Plaintiff Companies were damaged by Defendant Wu's conduct, including by the seizure of the Plaintiff Companies' assets and through other foreseeable damages, operating losses, penalties and fines, lost profits and business opportunities.

## COUNT III

### AIDING AND ABETTING TRESPASS
### (Plaintiff Companies Only)

74. Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs of the complaint.

75. As set forth herein, Defendant Wu and his co-conspirators interfered with the Plaintiff Companies' possession of their real property by seizing numerous holdings of the Plaintiff Companies.

76. Defendant Wu and his co-conspirators were without justification for their intrusion and seizure.

77. Defendant Wu both directly participated in and directed the above-described actions, and had knowledge that the seizures would take place as demonstrated by his statements and threats to Plaintiff Guo.

78. Defendant Wu substantially assisted in the trespass on the Plaintiff Companies' real property by the threatening Plaintiff Guo that the assets would be seized if Plaintiff Guo did not comply with the demands of Defendant Wu and his co-conspirators.

79. As set forth herein, the Plaintiff Companies were damaged by Defendant Wu's conduct, including by the seizure of the Plaintiff Companies' assets and through other foreseeable damages, operating losses, penalties and fines, lost profits and business opportunities.

**COUNT IV**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Plaintiff Guo Only)**

80. Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs of the complaint.

81. As set forth herein, Defendant Wu engaged in extreme and outrageous conduct by engaging in a pattern of threats and extortion that culminated in Defendant Wu repeatedly threatening to cause the arrest of Plaintiff Guo's family members and subsequently causing their arrest. He also repeatedly threatened Plaintiff Guo's personal safety if Plaintiff Guo refused to comply with his demands. Defendant Wu also caused the seizure of the Company Plaintiffs' business assets, resulting in the near destruction of these businesses.

82. Through these actions Defendant Wu either intended to cause, or disregarded a substantial probability of causing, severe emotional distress. In particular, Plaintiff Guo told Defendant Wu that Defendant Wu's extortionate threats were causing him severe distress and Defendant Wu nonetheless persisted with his wrongful conduct.

83. Defendant Wu's extreme and outrageous conduct caused Plaintiff Guo severe emotional distress.

## COUNT V

### *PRIMA FACIE* TORT
### (Plaintiff Companies Only)

84.     Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs of the complaint.

85.     As set forth herein, Defendant Wu intended to harm the Plaintiff Companies through his actions by exerting pressure on, and extorting, Plaintiff Guo to comply with his demands.  He took these actions with knowledge that they would cause substantial injury to the Plaintiff Companies.

86.     The above described actions resulted in special damages to the Plaintiff Companies as set forth in paragraphs 60 and 61 herein.

87.     Defendant Wu did not have any excuse or justification for his actions.

### REQUEST FOR RELIEF

Wherefore, Plaintiffs requests the following relief:

A.  That Defendant Wu be held liable for the damages sustained by Plaintiffs as a result of the claims asserted herein and the costs of this suit, including reasonable attorneys' fees; and

B.  Such other relief as the Court deems necessary and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.**

GUO WENGUI, BEIJING PANGU
INVESTMENT CO. LTD., and BEIJING ZENITH
HOLDINGS CO. LTD.,

By their attorneys,


/s/ Peter A. Sullivan
Peter A. Sullivan, Esq.
Shrutih V. Tewarie, Esq. (*pro hac vice application to be submitted*)
FOLEY HOAG LLP
1540 Broadway, 23rd Floor
New York, NY 10036
psullivan@foleyhoag.com
Telephone: (646) 927-5500
Facsimile: (646) 927-5599


Anthony Mirenda, Esq. (*pro hac vice application to be submitted*)
Michael Licker, Esq. (*pro hac vice application to be submitted*)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Telephone: (617) 832-1000
Facsimile: (617) 832-7000


DATED:  JANUARY 30, 2018

# EXHIBIT 8

FILED: NEW YORK COUNTY CLERK 06/24/2020 05:49 PM
NYSCEF DOC. NO. 472
INDEX NO. 652205/2017
RECEIVED NYSCEF: 06/24/2020

Case 22-50073   Doc 183-1   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 157 of
161

THIS FOURTH SUPPLEMENTAL DEED OF SETTLEMENT (this "**Supplemental Deed**")
is made on the          day of          2015

BETWEEN:

(1)   **PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.**, an exempted limited
      partnership organized under the laws of the Cayman Islands whose registered office
      is at P.O. Box 472, 2nd Floor, Harbour Place, Grand Cayman, Cayman Islands ("**PAX
      LP**" or the "**Lender**");

(2)   **SHINY TIMES HOLDINGS LIMITED**, a company incorporated under the laws of the
      British Virgin Islands whose registered office is at P.O. Box 957, Offshore
      Incorporations Centre, Road Town, Tortola, British Virgin Islands ("**Shiny Times**" or
      the "**Borrower**");

(3)   **KWOK HO WAN (郭浩云)**, holder of Hong Kong identity card no. P746467(7) whose
      correspondence address in Hong Kong is at 4th Floor, Central Tower, 28 Queen's
      Road Central, Hong Kong ("**Mr. Kwok**"); and

(4)   **BEIJING PANGU INVESTMENT INC. (北京盘古氏投资有限公司)**, a company
      established under the laws of PRC whose registered office is at 北京市朝阳区北京四
      环中路 27 号 A 座写字楼 37 层 ("**Beijing Pangu**").

(Each of PAX LP, Shiny Times, Mr. Kwok and Beijing Pangu, a "**Party**" and collectively, the
"**Parties**")

WHEREAS:

(A)   On 19 April 2013, PAX LP, Shiny Times, Mr. Kwok and Beijing Pangu entered into a
      deed of settlement (the "**Original Deed of Settlement**") pursuant to which each of
      the Parties agree to settle the Total Outstanding Amount in full and discharge all
      obligations and duties of each Party absolutely in accordance with the terms and
      conditions of the Original Deed of Settlement.

(B)   Pursuant to the Original Deed of Settlement, subject to the satisfaction of all
      conditions precedent described in Clause 3.2 of the Original Deed of Settlement,
      PAX LP agreed to purchase the Apartments in accordance with the terms set out in
      the Original Deed of Settlement. In the event that all conditions precedent have not
      been satisfied by 31 July 2013 (the "**Original Satisfaction Date**"), then the entire
      settlement as contemplated under the Original Deed of Settlement shall be
      terminated and the Parties acknowledge that the Facility Letter shall revert and be in
      full force and effect immediately after 31 July 2013 or such other date agreed by the
      Parties in writing.

On 3 December 2013, the Parties entered into a supplemental deed of settlement (the "**First
Supplemental Deed**") to amend and supplement the Original Deed of Settlement. On 15
May 2014, the Parties entered into a second supplemental deed of settlement (the "**Second
Supplemental Deed**") to amend and supplement the Original Deed of Settlement as
amended and supplemented by the First Supplemental Deed. On [ ] 2014, the Parties
entered into a third supplemental deed of settlement (the "**Third Supplemental Deed**") to
further amend and supplement the Original Deed of Settlement, as further amended and
supplemented by the First Supplemental

**236**

KWOK000733

Deed and the Second Supplemental Deed (the Original Deed of Settlement, as amended, varied and supplemented by the First Supplemental Deed, the Second Supplemental Deed and the Third Supplemental Deed, collectively referred to as the "**Deed of Settlement**") pursuant to which each of the Parties agree to extend the Original Satisfaction Date to 30 September 2014 (the "**Amended Satisfaction Date**") in accordance with the terms of the Third Supplemental Deed.

(D)     Each of the Parties hereby agrees to extend the Amended Satisfaction Date in accordance with the terms of this Supplemental Deed.

**NOW, THEREFORE,** in consideration of the agreements and obligations set forth herein and of other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereto agree as follows:

1.     **Interpretation**

Unless the context otherwise requires, terms defined in the Deed of Settlement have the same meaning in this Supplemental Deed.  The principles of construction set out in the Deed of Settlement shall have effect as if set out in this Supplemental Deed.

2.     **Amendments to the Deed of Settlement**

2.1     With effect from the date of this Supplemental Deed, the following amendments to the Deed of Settlement shall be made:

(a)     Deleting all references to "30 September 2014" in Clauses 3.4 of the Deed of Settlement and substituting therefor with "30 June 2015".

2.2     All references in the Deed of Settlement to "this Deed", "hereunder" and "herein" or other cognate expressions shall be construed as a reference to the Deed of Settlement as supplemented, varied and amended by this Supplemental Deed.

3.     **Representations and Warranties**

3.1     Each Party hereby represents and warrants to the other Party that on the date hereof:

(a)     Corporate Status, Power and Authority.  The Party has full power and authority (corporate or otherwise) to enter into and perform its obligations under this Supplemental Deed.

(b)     Authorization and Enforceability.  The execution and delivery of this Supplemental Deed and the performance of the obligations hereunder has been duly authorized (corporate or otherwise) by the Party.

(c)     Regulatory Approvals.  No consent, waiver, approval or authorization of any governmental authority or any filing, registration or qualification with or notice to, any governmental authority is required on the part of the Party in connection with the Party's execution or delivery of this Supplemental Deed or the performance of any of its obligations hereunder.

2

237

(d)  **Litigation**. To the best knowledge of the Party after having made due inquiry, there are no judicial or administrative actions, proceedings or investigations pending or threatened against the Party that disputes or challenges the validity, binding nature and enforceability of this Supplemental Deed or the ability of the Party to perform the obligations under this Supplemental Deed.

(e)  **Binding obligations**. This Supplemental Deed constitutes legal, valid and binding obligations of the Party enforceable against the Party in accordance with its terms.

**4.    Confirmation of the Deed of Settlement**

4.1  This Supplemental Deed is supplemental to the Deed of Settlement.

4.2  The Deed of Settlement as varied by this Supplemental Deed shall henceforth be read and construed as one document, and continue in full force and effect. Nothing in this Supplemental Deed shall (a) constitute or be construed as constituting any waiver of any of the provisions of the Deed of Settlement or (b) affect or be construed to affect in any way of PAX LP's rights or remedies under the provisions of the Deed of Settlement which were in effect before the date hereof.

**5.    Incorporation of Terms**

The provisions of Clause 6 (Confidentiality) to Clause 11 (Governing Law and Jurisdiction) of the Deed of Settlement shall be incorporated into this Supplemental Deed as if set out in full in this Supplemental Deed and as if references in those clauses to "this Deed" are references to this Supplemental Deed.

*[Remainder of the page intentionally left blank]*

3

238

KWOK000735

EXECUTION PAGE – FOURTH SUPPLEMENTAL DEED OF SETTLEMENT

SEALED with the COMMON SEAL of )
SHINY TIMES HOLDINGS LIMITED )
and SIGNED by Kwok Ho Wan, )
its director )
in the presence of: )
 )

SIGNED, SEALED AND DELIVERED )
by Kwok Ho Wan )
in the presence of: )
 )
 )
 )

EXECUTED AS DEED by )
BEIJING PANGU INVESTMENT INC. )
(北京盘古氏投贸有限公司) and )
SIGNED by )
its legal representative )
in the presence of: )

5

239

KWOK000736

FILED: NEW YORK COUNTY CLERK 09/24/2020 05:49 PM INDEX NO. 652825/2017
NYSCEF DOC. NO. 472
Case 22-50073   Doc 183-1   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 161 of 9/24/2020
161
INDEX NO. 652825/2017
RECEIVED NYSCEF: 09/24/2020

EXECUTION PAGE – FOURTH SUPPLEMENTAL DEED OF SETTLEMENT

IN WITNESS whereof, the Parties hereto have duly executed this Supplemental Deed the day and year first above written.

SEALED with the COMMON SEAL of )
PACIFIC ALLIANCE GROUP )
ASSET MANAGEMENT LIMITED, )
the General Partner of PACIFIC )
ALLIANCE ASIA OPPORTUNITY )
FUND L.P. and SIGNED by )
its authorized signatory )
in the presence of: )

For and on behalf of
Pacific Alliance Group Asset Management Limited

_____
Authorized Signature(s)

CHRISTIE CHING

4

240

KWOK000737