# EXHIBIT 13

*PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. VS. KWOK HO WAN*

*DANIEL PODHASKIE*
*December 11, 2019*



ELLEN GRAUER
COURT REPORTING CO. LLC
A U.S. Legal Support Company

*Original File 293035B.txt*
*Min-U-Script® with Word Index*

**Page 1**

```
 1  SUPREME COURT OF THE STATE OF NEW YORK
 2  COUNTY OF NEW YORK
    -------------------------------------------x
 3  PACIFIC ALLIANCE ASIA OPPORTUNITY
    FUND L.P.,
 4
                    Plaintiff,
 5
             - against -
 6
    KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO
 7  WEN GUI, a/k/a GUO WENGUI, a/k/a GUO
    WEN-GUI, a/k/a WAN GUE HAOYUN, a/k/a
 8  MILES KWOK, a/k/a HAOYUN GUO,
 9                  Defendant.
10  Index No.: 652077/2017
    -------------------------------------------x
11
12              605 Third Avenue
                New York, New York
13
                December 11, 2019
14              2:56 p.m.
15
16       VIDEOTAPED EXAMINATION BEFORE TRIAL
17  of DANIEL PODHASKIE, before Melissa Gilmore, a
18  Shorthand Reporter and Notary Public of the
19  State of New York.
20
21
22
23       ELLEN GRAUER COURT REPORTING CO., LLC
             126 East 56th Street, Fifth Floor
24              New York, New York 10022
                    212-750-6434
25                  REF: 293035B
```

**Page 2**

```
 1  A P P E A R A N C E S :
 2
 3  O'MELVENY & MYERS LLP
 4  Attorneys for Plaintiff
 5       7 Times Square
 6       New York, New York 10036
 7  BY:  EDWARD MOSS, ESQ.
 8       STUART SARNOFF, ESQ.
 9       ELI A. GROSSMAN, ESQ.
10       PHONE 212-728-5651
11       E-MAIL emoss@omm.com
12          ssarnoff@omm.com
13          egrossman@omm.com
14
15
16  HODGSON RUSS LLP
17  Attorneys for Defendant
18       605 Third Avenue, Suite 2300
19       New York, New York 10158
20  BY:  JILLIAN MARIE SEARLES, ESQ.
21       PHONE 646-218-7591
22       E-MAIL jsearles@hodgsonruss.com
23
24
25
```

**Page 3**

```
 1  A P P E A R A N C E S : (Cont'd)
 2
 3  LAWALL & MITCHELL, LLC
 4  Attorneys for the Genever Entities
 5       55 Madison Avenue
 6       Morristown, New Jersey 07960
 7  BY: AARON A. MITCHELL, ESQ.
 8       PHONE 914-760-8963
 9       E-MAIL aaron@lmesq.com
10
11
12  ALSO PRESENT:
13       YVETTE WANG, Genever
14       DAN MACOM, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1  ------------------ I N D E X --------------------
 2  WITNESS               EXAMINATION BY        PAGE
 3  DANIEL PODHASKIE   MR. MOSS                    8
 4                     MR. MITCHELL              119
 5
 6  DIRECTIONS:  PAGE 91, 93
 7
 8
 9  --------------- E X H I B I T S ----------------
10  PODHASKIE          DESCRIPTION          FOR I.D.
11  Exhibit 1          Corporate representative    9
12                     notice for the deposition
13                     of Genever New York
14  Exhibit 2          Notice for the deposition   9
15                     of Genever BVI
16  Exhibit 3          Collection of corporate    20
17                     documents, Bates Stamped
18                     KWOK143 through 194
19  Exhibit 4          Certificate of             55
20                     Registration of Charge
21  Exhibit 5          Notice of Satisfaction or  56
22                     Release of Registered
23                     Charge Pursuant to
24                     Section 165
25
```

Page 5

```
 1  ------------ E X H I B I T S (Cont'd) -----------
 2  PODHASKIE       DESCRIPTION            FOR I.D.
 3  Exhibit 6       Defendant's Memorandum of      58
 4                  Law in Opposition to
 5                  Plaintiff's Motion for an
 6                  Order of Pre-Judgment
 7                  Attachment
 8  Exhibit 7       Certificate of                 65
 9                  Registration of Charge
10  Exhibit 8       Notice of Satisfaction or      69
11                  Release of Registered
12                  Charge
13  Exhibit 9       Declaration of Trust and      103
14                  Agreement
15  Exhibit 10      Letter from Stevenson         112
16                  Wong dated March 4, 2015
17
18
19              (EXHIBITS TO BE PRODUCED)
20
21
22
23
24
25
```

Page 6

```
 1            STIPULATIONS
 2
 3          IT IS HEREBY STIPULATED AND
 4  AGREED by and between the attorneys for the
 5  respective parties herein that the sealing,
 6  and filing be, and the same are hereby
 7  waived.
 8          IT IS FURTHER STIPULATED AND
 9  AGREED that all objections, except as to the
10  form of the question, shall be reserved to
11  the time of the trial.
12          IT IS FURTHER STIPULATED AND
13  AGREED that the within deposition may be
14  sworn to and signed before any officer
15  authorized to administer an oath, with the
16  same force and effect as if signed to before
17  the court.
18
19          - oOo -
20
21
22
23
24
25
```

Page 7

```
 1          P R O C E E D I N G S
 2
 3          THE VIDEOGRAPHER: This is the
 4  videotaped deposition of Mr. Daniel T.
 5  Podhaskie, taken by the plaintiff in the
 6  matter of Pacific Alliance Asia
 7  Opportunity Fund L.P. versus Wan, et al.,
 8  in the Supreme Court of the State of New
 9  York in the County of New York.  The Index
10  Number is 652077/2017.
11          This deposition is being held at the
12  offices of Hodgson Russ, and today's date
13  is December 11, 2019.
14          My name is Dan Macom.  I'm from
15  Ellen Grauer, a U.S. Legal Support
16  Company.
17          Our court reporter today is
18  Ms. Melissa Gilmore, also from Ellen
19  Grauer, a U.S. Legal Support Company.
20          All counsel here today, their
21  appearances will appear on the written
22  record.
23          I will ask at this time that our
24  court reporter please swear in the
25  witness.
```

Page 8

```
 1  D A N I E L   P O D H A S K I E,   called as
 2     a witness, having been sworn by a Notary
 3     Public, was examined and testified as
 4     follows:
 5
 6  EXAMINATION BY
 7  MR. MOSS:
 8     Q.    Mr. Podhaskie, you are here as a
 9  corporate representative for two entities; is
10  that correct?
11     A.    Yes.
12     Q.    And one of those entities is Genever
13  Holdings, LLC, right?
14     A.    Correct.
15     Q.    And I'm going to refer to that
16  entity today as Genever New York.  Is that
17  okay?
18     A.    That's fine.
19     Q.    Will you understand what I mean when
20  I say Genever New York that I'm referring to
21  Genever Holdings, LLC?
22     A.    Yes.
23     Q.    And the other entity you are here on
24  behalf of is Genever Holdings Corporation BVI;
25  is that correct?
```

Page 9

PODHASKIE

1                PODHASKIE
2   A.   Yes.
3   Q.   And I'm going to refer to that
4 entity as Genever BVI.  Is that okay?
5   A.   That's fine.
6   Q.   And you'll understand that when I'm
7 talking about Genever BVI, I mean Genever
8 Holdings Corporation?
9   A.   I do.
10   Q.   Thank you.
11      I assume there is no reason why you
12 can't give truthful and accurate testimony here
13 today?
14   A.   No.
15     (Podhaskie Exhibit 1, Corporate
16    representative notice for the deposition
17    of Genever New York, marked for
18    identification.)
19     (Podhaskie Exhibit 2, Notice for the
20    deposition of Genever BVI, marked for
21    identification.)
22     THE VIDEOGRAPHER: We are on the
23 record.  The time is 2:59 p.m.
24   Q.   Mr. Podhaskie, I have handed you
25 what we have marked as Podhaskie 1 and

Page 10

PODHASKIE

1                PODHASKIE
2 Podhaskie 2.  Number 1 is the corporate
3 representative notice for the deposition of
4 Genever New York, and Exhibit 2 is the notice
5 for the deposition of Genever BVI.  Is that --
6 is that correct?
7     MR. MITCHELL: Object to the form of
8    the question.
9   A.   (Document review.)  Exhibit 1 is a
10 deposition notice to Genever New York and
11 Exhibit 2 is a deposition notice to Genever
12 BVI, as you previously defined them.
13   Q.   Great.  Thank you.
14     Now, if you can take a look, please,
15 we can start with Exhibit 1.  Please take a
16 look at the last page of that exhibit.
17     And do you see that there are five
18 deposition topics?
19   A.   Yes.
20   Q.   Are you prepared to testify on those
21 five topics today?
22   A.   Yes.
23   Q.   And if you can please take a look at
24 Exhibit 2, at the last page of that exhibit, do
25 you see that there are five deposition topics

Page 11

PODHASKIE

1                PODHASKIE
2 on that page?
3   A.   Yes.
4   Q.   Are you prepared to testify on those
5 five deposition topics today?
6   A.   Yes.
7   Q.   What did you do to prepare to
8 testify on behalf of Genever New York and
9 Genever BVI on these topics that we just
10 covered?
11     MR. MITCHELL: Object to the form of
12    the question.
13     You can answer.
14   A.   I reviewed each one of these
15 deposition notices and the topics that were
16 designated.  I reviewed the corporate records
17 for Genever New York and for Genever BVI.  I
18 spoke with Miles Kwok.  I spoke with Guo Qiang
19 and I spoke with Yvette Wang.
20     MR. MITCHELL: Maybe, just to go on
21    the record here, just because
22    Mr. Podhaskie is an attorney, I'm
23    certainly going to allow you to ask
24    questions regarding the 30(b)(6)
25    discussions he had with those individuals,

Page 12

PODHASKIE

1                PODHASKIE
2    but anything outside of that, I'm going to
3    assert privilege.
4     MR. MOSS: Sure.  Understood.
5    That's helpful.
6 BY MR. MOSS:
7   Q.   So let's start with Mr. Kwok.  What
8 did you discuss with Mr. Kwok in connection
9 with preparing for your testimony here today as
10 a corporate representative?
11   A.   I asked him if he would have any
12 knowledge about the topics that are listed on
13 the notice of deposition.
14   Q.   And what did he say?
15   A.   He indicated he would not know.
16   Q.   Anything else about your
17 conversation with Mr. Kwok as it relates to
18 your preparation for your corporate
19 representative topics today?
20   A.   Did I discuss anything else with him
21 about this, the preparation?  Other than that,
22 no.
23   Q.   Who is Guo Qiang?
24   A.   He is Mr. Kwok's son.
25   Q.   And did you speak with Mr. Qiang by

Page 13

PODHASKIE

1 PODHASKIE
2 phone, in person? How did you communicate?
3 MR. MITCHELL: Just for
4 clarification, his first name is Qiang.
5 MR. MOSS: Sorry.
6 Q. Mr. Guo. Let me try it again.
7 When you speak with Mr. Kwok's son,
8 how did you communicate with him?
9 A. By telephone.
10 Q. Who called who?
11 A. I was with Yvette Wang at the time
12 and she called Guo Qiang.
13 Q. And where was Guo Qiang located when
14 you spoke with him?
15 A. I believe he was in England.
16 Q. And what did the two of you discuss?
17 A. We discussed the deposition topics
18 that were noticed and the corporate formalities
19 of both Genever New York and Genever BVI.
20 Q. Do you remember anything he told
21 you?
22 A. Yes.
23 Q. Can you just tell me your best
24 recollection about what Guo Qiang told you
25 during that conversation to prepare for your

Page 14

1 PODHASKIE
2 corporate representative testimony?
3 A. How much time do I have?
4 Q. As much as you need.
5 A. Well, we went through each of the
6 topics one by one. We discussed the formation
7 and business purpose of both Genever BVI and
8 Genever New York. We discussed the corporate
9 and ownership structure of both Genever BVI and
10 Genever New York. We discussed the personnel
11 management and organization structure of both
12 Genever BVI and Genever New York. We discussed
13 Genever BVI's relationship to Mr. Kwok and
14 Genever New York. And we discussed the assets
15 that are currently held by both Genever BVI and
16 Genever New York.
17 Q. Anything else you remember?
18 A. I think we briefly discussed the
19 purchase of the residence at The
20 Sherry-Netherland Hotel in New York.
21 Q. And do you recall anything about
22 that discussion?
23 A. Yes.
24 Q. Can you tell me what you remember?
25 A. Anything specific that you're

Page 15

1 PODHASKIE
2 looking for?
3 Q. You said it was a brief discussion.
4 Just anything you remember about that brief
5 discussion.
6 A. He told me that they were looking to
7 buy a residence at -- you know, somewhere in
8 New York, and that he had attended the meetings
9 with The Sherry-Netherland with his father, you
10 know, he attended a lot of the meetings, spoke
11 with the president of the -- or the vice
12 president, I'm not sure of the title, of The
13 Sherry-Netherland.
14 He had signed some application forms
15 to purchase the residence on behalf of Genever
16 New York and I think that's about it.
17 Q. When you say they were looking to
18 buy residences, who is the "they" you're
19 referring to?
20 A. The Guo family.
21 Q. And is that Mr. Kwok and his son or
22 is that something broader than that?
23 A. In particular, it was Guo Qiang,
24 Mr. Kwok's son.
25 Q. When was the conversation you had

Page 16

1 PODHASKIE
2 with Guo Qiang?
3 A. I believe this past Monday,
4 December 9.
5 Q. You said you also spoke with
6 Ms. Yvette Wang to prepare for your testimony;
7 is that correct?
8 A. She was present when I had the
9 conversation with Guo Qiang.
10 Q. Did you have any conversations with
11 her other than her being present for the
12 conversation with Guo Qiang?
13 A. Yes.
14 Q. In connection with preparation for
15 this deposition?
16 A. Yes.
17 Q. And can you tell me what the two of
18 you discussed, please?
19 A. I think we discussed the address for
20 Genever and who maintains -- whether it has an
21 office here in New York, Genever New York, that
22 is, and the same for Genever BVI.
23 Q. Anything else?
24 A. No. I think that's it.
25 Q. What is Ms. Wang's role with Genever

Case 22-50073    Doc 183-3    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 7 of
PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. VS.                                    241
KWOK HO WAN

DANIEL PODHASKIE
December 11, 2019

Page 17

PODHASKIE

1  New York?
2     A.   I don't know.
3     Q.   What is Ms. Wang's role with Genever
4  BVI?
5     A.   I don't know.
6     Q.   Well, you're prepared to testify
7  about the personnel of Genever New York, right,
8  that's topic 3, in Exhibit 1; is that right?
9     A.   Yes.
10    Q.   Are you prepared to testify on that?
11    A.   I am.
12    Q.   You didn't ask Ms. Wang what her
13 role was with Genever New York?
14    A.   I think you're assuming she has a
15 role with Genever New York.
16    Q.   Did you ask her whether she has a
17 role with Genever New York?
18    A.   Yes.
19    Q.   And what did she tell you?
20    A.   She has no official role with
21 Genever New York.
22    Q.   Does she have an unofficial role
23 with Genever New York?
24         MR. MITCHELL: Object to the form of

Page 18

PODHASKIE

1     the question.
2         You can answer.
3     A.   What do you mean by "unofficial
4  role"?
5     Q.   Well, you testified that you didn't
6  know whether she had a role with Genever New
7  York. Is that -- is that your testimony?
8         MR. MITCHELL: Object to the form of
9     the question.
10    A.   If that's what the record reflects.
11    Q.   I asked you, what is Ms. Wang's role
12 with Genever New York, and you answered, I
13 don't know.
14         Do you recall that testimony?
15    A.   Yes.
16    Q.   Is that accurate?
17    A.   Yes.
18    Q.   Okay. Do you know whether she has
19 any role, official or unofficial, with Genever
20 New York? And by "her," I'm referring to
21 Yvette Wang.
22    A.   I don't know.
23    Q.   Did you ask her whether she had a
24 role with Genever New York?

Page 19

PODHASKIE

1     A.   What do you mean by "role"? Can you
2  be more specific?
3     Q.   I asked you what Ms. Wang told you
4  and you answered she has no official role with
5  Genever New York.
6         What did you mean by the word
7  "role"?
8     A.   She is not employed by Genever New
9  York.
10    Q.   Does she have any duties,
11 responsibility in connection with, affiliation
12 with Genever New York?
13         MR. MITCHELL: Object to the form of
14    the question.
15    A.   I don't know.
16    Q.   You didn't ask her?
17    A.   No.
18    Q.   Let's -- let's focus on Genever BVI.
19         Mr. Podhaskie, I'm going to hand you
20 a collection of corporate documents that were
21 produced to us in this case by -- by one of the
22 Genever entities, I'm not sure which one, but
23 they have Kwok Bates stamps on them, and I'm
24 going to look at -- I'm going to direct your

Page 20

PODHASKIE

1  attention to various documents within here. If
2  there are other documents you feel you need to
3  look at to answer questions or you want to flip
4  through this, you're more than welcome to.
5         (Podhaskie Exhibit 3, Collection of
6     corporate documents, Bates Stamped KWOK143
7     through 194, marked for identification.)
8         MR. MITCHELL: Are you marking this
9     as Podhaskie 3?
10        MR. MOSS: I'm marking this together
11    as 3, yes.
12    Q.   So Mr. Podhaskie, Exhibit 3, as I
13 mentioned, is a compilation of documents. They
14 are in sequential Bates order, and they are
15 KWOK143 through KWOK194. And they are various
16 corporate documents with respect to the two
17 Genever entities.
18        So I would like to direct your
19 attention to page -- the Bates page 176. This
20 is entitled "Authorization to Date Director's
21 Resolution," and it's Bates stamped KWOK176.
22        Can you identify this document?
23    A.   (Document review.) It is entitled
24 "Authorization to Date Director's Resolution,"

Case 22-50073    Doc 183-3    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 8 of
241
PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. VS.
KWOK HO WAN
DANIEL PODHASKIE
December 11, 2019

Page 21

PODHASKIE

1
2 and it appears to be dated effective the 12th
3 day of February, 2015.
4     Q.    And it relates to the Genever BVI
5 entity?
6     A.    Yes.
7     Q.    And is this a true and correct copy
8 of this Authorization to Date Director's
9 Resolution, as far as you can tell?
10     A.    Based on the documents that I
11 reviewed in preparation for today, it would
12 appear to be true and accurate.
13     Q.    And is that -- that signature at the
14 bottom, is that Mr. Kwok's signature?
15         MR. MITCHELL: Object to the form of
16     the question.
17     A.    I don't know.
18     Q.    Kwok Ho Wan, do you see underneath
19 the signature line, it has the words
20 typewritten "Kwok Ho Wan"?
21     A.    Yes.
22     Q.    Is that Miles Kwok?
23     A.    Yes.
24     Q.    Do you have any reason to believe
25 that's not his signature?

Page 22

PODHASKIE

1
2     A.    No.
3     Q.    And it says here, "The undersigned
4 is forming a corporation under the laws of the
5 British Virgin Islands, such corporation to be
6 known as Genever Holdings Corporation, the
7 company."
8         Did I read that correctly?
9     A.    You're reading from the beginning of
10 the first paragraph?
11     Q.    Yes, the first sentence.
12     A.    (Document review.)  Yes.
13     Q.    And the undersigned is Mr. Kwok; is
14 that right?
15     A.    Correct.  Correct.
16     Q.    Mr. Kwok formed Genever Holdings
17 Corporation, correct?
18     A.    That's what this document reflects.
19     Q.    And you don't have any reason to
20 believe this document that was produced from
21 Mr. Kwok's or Genever's files is inaccurate, do
22 you?
23     A.    No.
24     Q.    Take a look, please, Mr. Podhaskie,
25 at page KWOK145.

Page 23

PODHASKIE

1
2     Q.    Can you identify this document which
3 is -- the title of it is "Territory of the
4 British Virgin Island Acts, BVI Companies Act
5 2004, Certificate of Incorporation, Section 7
6 for Genever Holdings Corporation."
7         Can you identify this?
8         MR. MITCHELL: Object to the form of
9     the question.
10     A.    Yes.  This appears to be a copy of
11 the certificate of incorporation for Genever
12 BVI.
13     Q.    Do you have any reason to believe
14 that this document is not authentic and
15 accurate?
16     A.    Based on the documents that I
17 reviewed in preparation for today, this appears
18 to be an accurate copy.
19     Q.    And is it correct that Genever BVI
20 was incorporated in the BVI on February 13,
21 2015?
22     A.    Yes, I believe that's correct.
23     Q.    Who besides Mr. Kwok was involved in
24 forming Genever BVI?
25     A.    Guo Qiang.

Page 24

PODHASKIE

1
2     Q.    That's Mr. Kwok's son?
3     A.    Correct.
4     Q.    Anybody else?
5     A.    Not that I'm aware of.
6     Q.    Why was Genever BVI formed?
7     A.    Initially, it was formed to own a
8 US-based company that was going to purchase
9 real estate.
10     Q.    And was the US-based company Genever
11 New York?
12     A.    Yes.
13     Q.    And was the real estate the
14 apartment at The Sherry-Netherland Hotel?
15     A.    That ultimately ended up being the
16 real estate that Genever purchased.
17     Q.    So is it your testimony that, at the
18 time, there was the thought to buy some real
19 estate in the United States, but they just
20 didn't know exactly what that real estate was
21 going to be?
22         MR. MITCHELL: Object to the form of
23     the question.
24         You can answer.
25     A.    They wanted to invest in real estate

Page 25

PODHASKIE

1 in the United States, and they didn't know
2 which asset they were going to purchase or
3 where they were going to purchase.
4    Q.   Was the plan at the time of
5 formation to buy one -- you said which asset
6 they were going to purchase.
7         Was the plan at the time of
8 formation to purchase one asset or several
9 assets?
10   A.   I don't know what the plan was.  I
11 know they had looked at several different
12 properties and ultimately chose The
13 Sherry-Netherland.
14   Q.   Has the purpose of Genever BVI
15 changed since the purpose at its formation?
16        MR. MITCHELL: Object to the form of
17     the question.
18        You can answer.
19   A.   No.
20   Q.   No purposes have been added or
21 subtracted?
22        MR. MITCHELL: Object to the form of
23     the question.
24   A.   It's not reflected from the

Page 26

PODHASKIE

1 documents and the conversations I had in
2 preparation for today.
3    Q.   What business has Genever BVI
4 conducted?
5    A.   It owns Genever New York, which owns
6 the residence at The Sherry-Netherland.
7    Q.   Any other business that Genever BVI
8 has conducted other than owning Genever New
9 York?
10        MR. MITCHELL: Object to the form of
11     the question.
12   A.   No.
13   Q.   Has Genever BVI ever entered into
14 any contracts?
15   A.   By contract, can you specify more?
16 I think the answer is yes.
17   Q.   Okay.  Can you elaborate?
18   A.   It entered into -- sorry -- Genever
19 BVI entered into a pledge agreement with an
20 entity called Roscalitar 2, and also with an
21 entity called Blue Capital Limited.
22   Q.   Other than those two pledge
23 agreements, has Genever BVI entered into any
24 contracts?

Page 27

PODHASKIE

1    A.   Not from the documents and the
2 conversations I had in preparation for today.
3    Q.   Does Genever BVI have a bank
4 account?
5    A.   No.
6    Q.   Has Genever BVI ever paid any money
7 to any other person or entity?
8         MR. MITCHELL: Object to the form of
9     the question.
10   A.   When you say "any other person or
11 entity," who are you referring to?
12   Q.   Any person or entity other than
13 Genever BVI.
14   A.   Has Genever BVI paid any money to
15 any other person or entity other than Genever
16 BVI?
17   Q.   Yeah, to anyone.  Has it ever
18 incurred a debt that it needed to pay money
19 for?  Has it ever cut a check?  Has it ever
20 spent any money on any goods or services?
21   A.   It hired a registered agent in the
22 BVI and paid them for secretarial services.
23   Q.   Other than that?
24   A.   No, not from -- I did not see that

Page 28

PODHASKIE

1 from the documents and the conversations I had
2 in preparation for today.
3    Q.   Do you know where the money came
4 from to pay the registered agent for the
5 secretarial services?
6    A.   I believe it came from Bravo Luck.
7    Q.   Has Genever BVI ever received any
8 money from any person or entity?
9    A.   No, that's not apparent from the
10 documents that I've reviewed in preparation for
11 today.
12   Q.   At the time of Genever BVI's
13 formation, was Mr. Kwok its sole shareholder?
14   A.   Yes.  And by Mr. Kwok, you're
15 referring to Miles Kwok?
16   Q.   Yes.
17   A.   Yes.
18   Q.   So for purposes of clarity of the
19 record, thank you for mentioning that, when I
20 refer to Mr. Kwok, I'm going to be referring to
21 Miles Kwok.  When I'm referring to Guo Qiang, I
22 will be referring to Mr. Kwok's son.
23        Is that okay?
24   A.   That's fine.

Case 22-50073   Doc 183-3   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 10 of
241
PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. VS.
KWOK HO WAN
DANIEL PODHASKIE
December 11, 2019

Page 29

PODHASKIE

1
2    Q.   And that's the way you have been
3  using those terms during the course of this
4  deposition, right?
5    A.   Yeah.  That's fine.
6    Q.   Can you direct your attention to the
7  next page, please, Mr. Podhaskie, which is
8  Bates stamped KWOK147.  The top, it says,
9  "Incorporated under the BVI Business Companies
10  Act 2004," and then it says, "Genever Holdings
11  Corporation," in the middle.
12    A.   Yes.
13    Q.   Can you please identify this
14  document?
15    A.   This appears to be a copy of the
16  share certificate for Genever BVI.
17    Q.   And as far as you know, this is a
18  true, correct, authentic and accurate document?
19    A.   Again, based on the documents I
20  reviewed in preparation for today, it would
21  appear to be an accurate copy.
22    Q.   And this provides that Mr. Kwok is
23  the owner of 1,000 shares, and those shares
24  have a par value of .001 cents; is that
25  correct?

Page 30

PODHASKIE

1
2    A.   I think it's .001 dollar, but yes.
3    Q.   Yes.  Thank you.  001 dollar?
4    A.   Yes.
5    Q.   Thank you.
6        And so the total value of Mr. Kwok's
7  share holding in Genever Corporation -- Genever
8  BVI would be one dollar; is that right?
9        MR. MITCHELL: Object to the form of
10    the question.
11    A.   If the math adds up, then yes.
12  That's what it appears to say here.
13    Q.   Did Mr. Kwok pay a dollar for his
14  shares?
15    A.   From the documents I reviewed,
16  that's not reflected.
17    Q.   Do you know whether or not he paid
18  any amount of money for his shares, Mr. Kwok?
19    A.   I don't know.
20    Q.   Has Mr. Kwok been the sole
21  shareholder of Genever BVI for the entirety of
22  Genever BVI's existence?
23    A.   From the documents that I reviewed
24  in preparation for today, yes.
25    Q.   So Mr. Kwok is the sole owner of

Page 31

PODHASKIE

1
2  Genever BVI?
3        MR. MITCHELL: Object to the form of
4    the question.
5    A.   He is the sole shareholder of
6  Genever BVI.
7    Q.   And are you distinguishing between
8  shareholders and owners because it's a
9  corporation?  Is that why?
10    A.   Yes.
11    Q.   But there is nobody else who owns
12  Genever BVI; is that correct?
13        MR. MITCHELL: Object to the form of
14    the question.
15    A.   Other than Mr. Kwok?
16    Q.   Yes.
17    A.   Based on the documents I reviewed
18  today, there's no other shareholder besides
19  Mr. Kwok.
20    Q.   Who is Zhang Wei?
21    A.   He is a colleague of Mr. Kwok's that
22  lives in China that ultimately lent the money
23  to purchase The Sherry-Netherland.
24    Q.   Is he a family member of Mr. Kwok?
25    A.   I would be speculating, so I don't

Page 32

PODHASKIE

1
2  know.
3        MR. MITCHELL: I caution the witness
4    not to speculate.
5    Q.   When you say Zhang Wei ultimately
6  lent the money to purchase The
7  Sherry-Netherland, to whom did Zhang Wei lend
8  the money?
9    A.   He lent the money to Bravo Luck, a
10  company that, at that time, was owned by
11  Mr. Kwok's son, Guo Qiang, and then Guo Qiang
12  ended up funding the purchase of The
13  Sherry-Netherland through Bravo Luck.
14    Q.   Does Mr. Zhang Wei have any -- own
15  any of the shares of Genever BVI?
16    A.   Based on the documents that I
17  reviewed in preparation for today, his
18  ownership is not reflected on those documents.
19    Q.   At any time during Genever BVI's
20  existence, did Mr. Zhang Wei own any shares of
21  Genever BVI?
22    A.   From the documents that I reviewed
23  in preparation for today, that is not
24  reflected.
25    Q.   Mr. Kwok was the sole director of

Page 33

PODHASKIE

Genever BVI at the time it was formed; is that correct?
A. Yes. Again, based on what I reviewed for today.
Q. Has Genever BVI, during the course of its existence, ever had any directors other than Mr. Kwok?
A. Yes.
Q. Who were those other directors?
A. There was a corporate secretary, a registered agent in the BVI that acted as a director as well.
Q. Is that Elian First Director?
A. Yes.
Q. And was that director -- was Elian First Director only a director for a day or so, until it was replaced by Mr. Kwok?
A. I don't know how long it was, but it was a short period of time initially, yes.
Q. A day or a couple of days?
A. Yes.
Q. Other than Elian First Director, which was a director of Genever BVI for a day or a couple of days, has there been any other

Page 34

PODHASKIE

director of Genever BVI besides Mr. Kwok?
MR. MITCHELL: Object to the form of the question.
You can answer.
A. No.
Q. Has Mr. Kwok ever stopped being a director of Genever BVI?
A. No.
Q. He's still a director to this day?
A. He is currently still a director.
Q. He is currently still the only director?
A. He is the only director. Guo Qiang is the president.
Q. Has Genever BVI ever had any offices?
MR. MITCHELL: Object to the form of the question.
A. When you say "offices," do you mean like business office, corporate office, something like that?
Q. Yes.
A. It has a mailing address in the British Virgin Islands, but it does not have an

Page 35

PODHASKIE

office that is what we typically think of as an office like this.
Q. Genever BVI has never had a business or a corporate office?
A. Correct.
Q. Is the mailing address that Genever BVI has the mailing address for its registered agent for service of process?
A. In the BVI?
Q. Yes.
A. Yes.
Q. Does it have any other -- does Genever hold -- strike that.
Does Genever BVI have any other mailing address other than the mailing address for its registered agent for service of process in the BVI?
A. Yes.
Q. What other addresses does it have?
A. There is another address in Hong Kong where it maintains its books and records.
Q. And what is that address?
A. I don't know it off the top of my head. If I had the records in front of me, I

Page 36

PODHASKIE

would be able to find it.
Q. And what is that address? Is it the office of another company?
A. It's -- from what I understand, it's just another mailing address or another -- just an office where they keep the books and records.
Q. And who's in charge of maintaining the books and records?
A. Guo Qiang.
Q. Any other addresses besides the registered agent for service of process in the BVI and the mailing address where the books and records are kept in Hong Kong?
A. No, not that I'm aware of.
Q. Has Genever BVI ever had any employees?
A. No.
Q. Does Genever BVI have a phone number?
A. I think there is a phone number for the registered agent, but other than that, no.
Q. Does Genever BVI have an e-mail address?

Case 22-50073   Doc 183-3   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 12 of
241
PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. VS.
KWOK HO WAN
DANIEL PODHASKIE
December 11, 2019

PODHASKIE

1
2    A.   No.
3    Q.   Does Genever BVI have any officers?
4    A.   Yes.
5    Q.   You mentioned Guo Qiang.
6    A.   Yes.
7    Q.   What is his role at Genever BVI?
8    A.   He is the president.
9    Q.   When did he become the president?
10   A.   May of 2015.
11   Q.   Did Genever BVI have any officers
12   from the time it was formed in February of 2015
13   until Guo Qiang became the president in May of
14   2015?
15   A.   If you consider a director an
16   officer, then yes.
17   Q.   And that would have been Mr. Kwok?
18   A.   Correct.
19   Q.   And Elian for a day or two?
20   A.   Yes.
21   Q.   Other than directors and other
22   than -- strike that.
23        Other than directors, between
24   February of 2015, when it was formed, and May
25   of 2015, when Guo Qiang became president, did

PODHASKIE

1
2    Genever BVI have any officers?
3    A.   No.
4    Q.   Who appointed or elected Guo Qiang
5    as president in May of 2015?
6    A.   Mr. Kwok.
7    Q.   Has -- strike that.
8        Has Genever BVI ever had any other
9    officers, I'm not talking about directors, just
10   officers, other than Guo Qiang, the president?
11   A.   No.
12   Q.   Is Guo Qiang still the president?
13   A.   From the documents that I reviewed
14   in preparation for today, yes.
15   Q.   Between May of 2015, when he was
16   appointed president by Mr. Kwok, and today, has
17   Guo Qiang ever -- did he ever stop being
18   president for any period of time?
19   A.   Not that I'm aware of.
20   Q.   Did Mr. Kwok ever have an officer
21   role at Genever BVI?
22   A.   Not that I'm aware of.
23   Q.   And you're not aware of any other
24   officers besides Guo Qiang?
25   A.   Yes.  Correct.

PODHASKIE

1
2    Q.   Has Genever BVI ever had a board
3    meeting?
4        MR. MITCHELL: Object to the form of
5    the question.
6    A.   From the documents that I reviewed,
7    it's not reflected in there.
8    Q.   So based on everything you've seen,
9    the answer to that question is no?
10       MR. MITCHELL: Object to the form of
11   the question.
12   A.   If Genever BVI had a board meeting,
13   it was not reflected in the documents I
14   reviewed for today's preparation.
15   Q.   What documents does Genever BVI
16   maintain?
17       MR. MITCHELL: Object to the form of
18   the question.
19   A.   The corporate documents that were
20   generated when it was formed, the share
21   certificate, the register of directors and
22   shareholders, and there was a resolution
23   appointing Guo Qiang as president as well.
24   Q.   And you know that there's an address
25   where those documents are maintained, but

PODHASKIE

1
2    you're not sure of if it's an office or a room or
3    what it is?
4    A.   Yes.
5    Q.   Do you know whether or not -- do you
6    know who owns that address, the address in Hong
7    Kong where the records are maintained?
8    A.   I believe it's a UBS office, but I'm
9    speculating.
10       MR. MITCHELL: Again, I caution the
11   witness not to speculate.
12   Q.   UBS meaning the investment bank?
13   A.   Yes.
14   Q.   Are there any individuals who are
15   authorized to act on behalf of Genever BVI?
16       MR. MITCHELL: Object to the form of
17   the question.
18   A.   Yes.
19   Q.   Who?
20   A.   Mr. Kwok and Guo Qiang.  Me, for
21   this deposition.  And whoever either one of
22   them appoints to act for the company.
23   Q.   Has either Mr. Kwok or Guo Qiang
24   ever appointed anyone to act for Genever BVI
25   other than you in connection with this

Page 41

PODHASKIE

1   deposition?
2     A.   I don't know.
3         MR. MITCHELL: Just object to the
4     form of that question.
5     Q.   Who specifically appointed you to
6   act for Genever BVI for this deposition?
7     A.   Guo Qiang.
8     Q.   Are you authorized to act for
9   Genever BVI for any purpose other than this
10  deposition currently?
11        MR. MITCHELL: Object to the form of
12    the question.
13    A.   I don't know.
14    Q.   What actions has Mr. Kwok taken on
15  behalf of Genever BVI?
16        MR. MITCHELL: Object to the form of
17    the question.
18        You can answer.
19    A.   Other than signing the corporate
20  formation documents, I don't know.
21    Q.   What actions has Guo Qiang taken on
22  behalf of Genever BVI?
23        MR. MITCHELL: Object to the form of
24    the question.

Page 42

PODHASKIE

1     A.   I don't really understand what you
2   mean by "what actions." Can you be more
3   specific?
4     Q.   To your knowledge, has Guo Qiang
5   ever done anything, ever attended a meeting,
6   spent money, engaged in any type of business
7   interaction at all ever on behalf of Genever
8   BVI?
9         MR. MITCHELL: Object to the form of
10    the question.
11    A.   He was involved in the formation.
12  He was involved in the purchase of The Sherry,
13  in reviewing the different properties that they
14  thought about purchasing. He signed various
15  documents for Genever BVI. He communicated
16  with the representatives of The
17  Sherry-Netherland for the purchase. He
18  communicated with the real estate brokers for
19  the purchase.
20    Q.   When you say he signed various
21  documents for Genever BVI, which documents are
22  you referring to?
23    A.   He signed a request for an
24  employer -- an EIN, employer identification

Page 43

PODHASKIE

1   number.
2         MR. MITCHELL: Just so -- he's
3     asking you about Genever BVI.
4         THE WITNESS: Oh, okay.
5     A.   Oh, that might have been for Genever
6   New York.
7         So for Genever BVI --
8         MR. MOSS: Thank you for the
9     clarification.
10    Q.   Let's just go back.
11        You had an answer earlier, he was
12  involved in the formation, he was involved in
13  the purchase of The Sherry, and you had -- if
14  you want to go back and take a look at that
15  answer, that's fine, but I just want to make
16  sure the record is clear.
17        Was that answer relating to Genever
18  New York or Genever BVI?
19    A.   (Reviewing.) So I guess, just to be
20  clear, Guo Qiang was involved in the formation
21  of Genever BVI. After he was appointed as
22  president, I recall seeing several documents
23  that he signed for Genever BVI in his capacity
24  as president. I don't recall what those are,

Page 44

PODHASKIE

1   as I sit here.
2         Other than that, I can't think of
3   anything.
4     Q.   Genever BVI is the sole owner of
5   Genever New York; is that correct?
6         MR. MITCHELL: Object to the form of
7     the question.
8     A.   Yes.
9     Q.   Is Genever BVI also the sole member
10  of Genever New York?
11    A.   Yes.
12    Q.   Is it correct that Genever New
13  York -- strike that.
14        Is it correct that Genever BVI
15  formed Genever New York?
16    A.   Yes. From the documents I reviewed,
17  I believe that's accurate.
18    Q.   Can you direct your attention,
19  Mr. Podhaskie, to Exhibit 3, page KWOK193.
20  It's a document entitled "Genever Holdings
21  Corporation Written Consent of Director." It's
22  Bates stamped KWOK193 to 194.
23        Can you identify this document?
24    A.   (Document review.) Yes.

Case 22-50073    Doc 183-3    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 14 of
241

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. VS.
KWOK HO WAN
DANIEL PODHASKIE
December 11, 2019

PODHASKIE

1
2    Q.    Please do so.
3    A.    From the documents that I reviewed
4    in preparation for today, this appears to be a
5    copy of Genever BVI's written consent of sole
6    director, dated February 12, 2015.
7    Q.    And the signature block is Ho Wan
8    Kwok.
9        Is that Mr. Kwok?
10   A.    Yes.
11   Q.    Do you have any reason to believe
12   that this is not an accurate and authentic
13   document?
14   A.    No.
15   Q.    This document mentions Andrea Sanft,
16   S-A-N-F-T.
17       Who is she?
18   A.    She is a lawyer either with the firm
19   of Paul Weiss or Williams & Connolly.
20   Q.    And she was authorized to be an
21   authorized person on behalf of Genever BVI
22   according to this written consent; is that
23   correct?
24   A.    Yes, that's correct.
25   Q.    And she was authorized to be an

PODHASKIE

1
2    authorized person to form Genever New York and
3    to take such other acts and do such other
4    things as are necessary to permit Genever New
5    York to exist and obtain authority to do
6    business in the state of New York and New York
7    City; is that correct?
8        MR. MITCHELL: Object to the form of
9        the question.
10       You can answer.
11   A.    Yes, based on this written consent
12   of the sole director, that's accurate.
13   Q.    Is Genever New York an asset of
14   Genever BVI?
15       MR. MITCHELL: Object to the form of
16       the question.
17   A.    If you assume that a ownership of a
18   limited liability company is an asset, then
19   yes.
20   Q.    Is that your understanding, that a
21   ownership of a limited liability company is an
22   asset?
23   A.    That is my personal understanding.
24       In my capacity as a representative
25   for Genever, I don't know.

PODHASKIE

1
2    Q.    You don't know whether or not
3    Genever BVI has an understanding as to whether
4    or not Genever New York is one of its assets?
5        MR. MITCHELL: Object to the form of
6        the question.
7    A.    So what is the question?
8    Q.    Is Genever New York an asset of
9    Genever BVI?
10   A.    Does Genever BVI consider Genever
11   New York an asset?
12   Q.    Yes.
13   A.    Yes.
14   Q.    Genever BVI considers Genever New
15   York to be one of Genever BVI's assets?
16   A.    Correct.
17       MR. MITCHELL: Object to the form of
18       the question, asked and answered.
19   Q.    Has Genever BVI ever held any assets
20   other than Genever New York?
21   A.    From the documents that I reviewed
22   in preparation for today, no.
23   Q.    Has Genever BVI ever acquired an
24   asset other than Genever New York?
25   A.    Again, from what I reviewed in

PODHASKIE

1
2    preparation for today, no.
3    Q.    Has Genever BVI ever sold an asset
4    other than Genever New York?
5        MR. MITCHELL: Object to the form of
6        the question.
7    A.    Again, from what I reviewed in
8    preparation for today, no.
9    Q.    Are any of Genever BVI's assets
10   currently encumbered or pledged?
11       MR. MITCHELL: Object to the form of
12       the question.
13   A.    The assets are not -- I don't think
14   I can answer because it's a little complicated.
15   The assets are not pledged.  Genever BVI's
16   assets are not pledged to anyone.
17   Q.    Let's just be clear what we're
18   talking about when we're talking about assets.
19       Does Genever BVI currently have any
20   assets other than Genever New York?
21   A.    Yes, they have their shares.
22   Q.    Whose shares?
23   A.    Genever BVI.
24   Q.    But doesn't Mr. Kwok hold those
25   shares?

Page 49

PODHASKIE

1
2    A.   Yes.
3         MR. MITCHELL: Object to the form of
4    the question.
5    Q.   So my question is, does Genever BVI
6    itself hold any assets other than Genever New
7    York?
8    A.   No.
9    Q.   Is Genever New York currently
10   encumbered?
11        MR. MITCHELL: Object to the form of
12   the question.
13   A.   What do you mean by "encumbered"?
14   Q.   Is it currently pledged to anyone?
15   A.   No.
16   Q.   Does anyone currently have a lien
17   against it?
18   A.   No.
19   Q.   Has it been promised to anybody in
20   connection with any possible future
21   transaction?
22        MR. MITCHELL: Object to the form of
23   the question.
24   A.   There's the order from Judge
25   Ostrager in the case indicating that if Genever

Page 50

PODHASKIE

1
2    New York has to -- enters into a contract to
3    sell The Sherry-Netherland residence, it has to
4    provide PAX with written notice.
5    Q.   Other than Justice Ostrager's order,
6    is Genever New York encumbered in any way?
7         MR. MITCHELL: Object to the form of
8    the question.
9    A.   No, not that I'm aware of.
10   Q.   You testified that there was a point
11   in time where the assets of Genever BVI were
12   pledged -- strike that.
13        Has Genever BVI been assigned to
14   anyone?
15        MR. MITCHELL: Object to the form of
16   the question.
17   A.   No.
18   Q.   You mentioned that there was a time
19   when Genever BVI's assets were pledged to an
20   entity called Roscalitar 2; is that correct?
21        MR. MITCHELL: Object to the form of
22   the question.
23   A.   I believe that Genever BVI pledged
24   its shares to Roscalitar 2, but yes.
25   Q.   Pledged its shares in Genever New

Page 51

PODHASKIE

1
2    York?
3    A.   Its shares in Genever BVI.
4    Q.   Genever BVI pledged its own shares,
5    100 percent of its shares to Roscalitar 2?
6    A.   Yes, I believe that's accurate.
7    Q.   And by virtue of pledging a hundred
8    percent of its own shares, it was also pledging
9    Genever New York and the assets held by Genever
10   New York; is that correct?
11   A.   Yes.
12   Q.   Why was Genever BVI -- why were
13   Genever BVI shares pledged to Roscalitar 2?
14        MR. MITCHELL: Object to the form of
15   the question.
16   A.   Because Zhang Wei had asked Genever
17   to pledge its shares via the loan.
18   Q.   Why did Zhang Wei want Genever to
19   pledge its shares?
20   A.   As security for the loan that he
21   gave to Genever ultimately to buy the
22   residence.
23   Q.   Who made the decision to pledge the
24   shares of Genever BVI to Roscalitar 2?
25        MR. MITCHELL: Object to the form.

Page 52

PODHASKIE

1
2    A.   On behalf of Genever?
3    Q.   Yes.
4    A.   Guo Qiang.
5    Q.   Was Mr. Kwok involved in that
6    decision?
7    A.   I believe he was. I don't know for
8    certain.
9    Q.   Did he know about the pledge at the
10   time it was entered into?
11   A.   I believe so.
12        MR. MITCHELL: I just caution the
13   witness. He said I believe. Don't
14   speculate. If you're speculating, please
15   don't do so, but...
16   Q.   Was there any board resolution or
17   any official activity to commemorate the pledge
18   to Roscalitar 2?
19   A.   Not from what I reviewed in
20   preparation for today.
21   Q.   Is Roscalitar 2 owned by Zhang Wei?
22   A.   I don't know.
23   Q.   Is it controlled by Zhang Wei?
24   A.   I don't know.
25   Q.   Do you know who owns or controls

Case 22-50073    Doc 183-3    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 16 of
241
PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. VS.
KWOK HO WAN
DANIEL PODHASKIE
December 11, 2019

Page 53

PODHASKIE

1    Roscalitar 2?
2        A.   No.
3        Q.   There came a time when the pledge to
4    Roscalitar 2 was taken off; is that correct?
5        A.   Yes.
6        Q.   And that was in or around May of
7    2015; is that right?
8        A.   When the pledge was taken off?  I'd
9    have to review the dates, but it sounds
10   somewhere around that time.
11       Q.   Why was the pledge to Roscalitar 2
12   taken off?
13       A.   I don't know.
14       Q.   Was there any board meeting or
15   activity, formal corporate resolution around
16   that?
17       A.   Not from what I reviewed in
18   preparation for today.
19       Q.   I think you testified earlier that
20   later, after the pledge to Roscalitar was taken
21   off, Genever BVI shares were pledged to a
22   company called Blue Capital; is that correct?
23       A.   Yes.
24       Q.   And why were the shares pledged to

Page 54

PODHASKIE

1    Blue Capital?
2        A.   Guo Qiang was looking to obtain a
3    loan facility and he wanted to pledge the
4    shares of Genever BVI to Blue Capital as
5    security for a loan facility.
6        Q.   What was the loan for?
7        A.   He wanted to invest, you know, do
8    other kinds of investments.
9        Q.   Do you know who controls or owns
10   Blue Capital?
11       A.   No.
12       Q.   Was Mr. Kwok involved in the
13   decision to pledge Genever BVI's shares to Blue
14   Capital?
15       A.   I don't know.
16       Q.   Did he know about the pledge?
17       A.   I don't know.
18       Q.   Was the pledge to Blue Capital at
19   some point taken off?
20       A.   Yes, I believe so.
21       Q.   Why?
22       A.   I don't know.
23       Q.   And, currently, there's no pledge of
24   Genever BVI; is that correct?

Page 55

PODHASKIE

1        A.   Yes.
2            (Podhaskie Exhibit 4, Certificate of
3        Registration of Charge, marked for
4        identification.)
5        Q.   Mr. Podhaskie, I have handed you
6    Exhibit 4.
7            Can you identify this document?
8        A.   (Document review.)  This appears to
9    be a copy of the pledge from Genever BVI to
10   Roscalitar 2.
11       Q.   And it was put on on May 21, 2015;
12   is that correct?
13       A.   Yes.
14       Q.   Does this appear, based on your work
15   to prepare for this deposition, does this
16   appear to be a true and correct copy of the
17   registration of charge?
18       A.   (Document review.)  Yes.
19       Q.   And is this, this charge, Exhibit 4,
20   is that a document that Genever BVI would have
21   retained in the ordinary course of its
22   business?
23       A.   Yes.
24       Q.   Is the same true for the other

Page 56

PODHASKIE

1    exhibits that I've shown you today, other than
2    Exhibits 1 and 2, so Exhibits 3 and 4 are also
3    documents that would have been retained by
4    Genever BVI in the ordinary course of its
5    business?
6            MR. MITCHELL: I just want to ask
7        you, for the record, you asked him about
8        4, he said yes.
9            So you're really only asking him
10       about 3 now, correct?
11           MR. MOSS: Yes.
12       Q.   If you can flip through 3.  Are
13   those documents that Genever BVI or Genever New
14   York maintained in the ordinary course of its
15   business?
16       A.   (Document review.)  Yes.
17           (Podhaskie Exhibit 5, Notice of
18       Satisfaction or Release of Registered
19       Charge Pursuant to Section 165, marked for
20       identification.)
21       Q.   You have been handed Exhibit 5,
22   Mr. Podhaskie, which is a Notice of
23   Satisfaction or Release of Registered Charge
24   Pursuant to Section 165.

Case 22-50073    Doc 183-3    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 17 of
241
PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. VS.
KWOK HO WAN
DANIEL PODHASKIE
December 11, 2019

Page 57

PODHASKIE

1          PODHASKIE
2    Can you identify this document,
3    please?
4    A.   This appears to be a copy of a
5    Notice of Satisfaction or Release of Registered
6    Charge dated May -- sorry -- March 17, 2017.
7    Q.   And does this appear to be a true
8    and correct and authentic copy of the
9    satisfaction of charge?
10    A.   From what I reviewed in preparation
11    for today, yes.
12    Q.   And is this a document that Genever
13    BVI would have maintained in the ordinary
14    course of its business?
15    A.   Yes.
16    Q.   And is that consistent with Genever
17    BVI's testimony that the pledge to Roscalitar 2
18    was taken off on March 17, 2017?
19          MR. MITCHELL: Object to the form of
20      the question.
21    A.   Yes.
22    Q.   After March 17, 2017, was Genever
23    BVI ever again pledged to Roscalitar 2?
24    A.   From the documents that I reviewed
25    in preparation for today, no.

Page 58

1          PODHASKIE
2          (Podhaskie Exhibit 6, Defendant's
3      Memorandum of Law in Opposition to
4      Plaintiff's Motion for an Order of
5      Pre-Judgment Attachment, marked for
6      identification.)
7    Q.   Mr. Podhaskie, you have been handed
8    Exhibit 6, which is Defendant's Memorandum of
9    Law in Opposition to Plaintiff's Motion for an
10    Order of Pre-Judgment Attachment filed by
11    Hodgson Russ LLP on behalf of the defendant.
12          Have you ever seen this document
13    before?
14    A.   Yes.
15    Q.   I'm going to direct your attention
16    to page 9, and I would like to direct your
17    attention -- you see the paragraph that starts
18    "As explained"?
19    A.   Which page -- which number 9?
20    Q.   Sure.  It's 9 or 15 of 30.
21    A.   Okay.  Yes.
22    Q.   And if you jump down one, two,
23    three, four, five -- six lines down.
24    A.   Uh-huh.
25    Q.   Do you see a sentence that starts

Page 59

1    with "While Kwok"?
2    A.   Yes.
3    Q.   "While Kwok is the sole shareholder
4    of Genever BVI, since May of 2015, the assets
5    of Genever BVI -- which by virtue of its
6    ownership of Genever USA include the
7    apartment -- have been pledged in their
8    entirety to Roscalitar 2, an unrelated third
9    party not owned by Kwok."
10          Do you see that?
11    A.   Yes.
12    Q.   And if you look at the top, do you
13    see that this document is dated May 16 of 2018?
14    A.   Yes.
15    Q.   And as of this date, the assets of
16    Genever BVI were not, in fact, pledged to
17    Roscalitar 2; is that correct?
18          MR. MITCHELL: Object to the form of
19      the question.
20    A.   I think we established that the
21    Genever BVI pledge to Roscalitar 2 was removed
22    effective March 17, 2017, if I'm not mistaken.
23    Q.   So this is not a true statement; is
24    that correct?

Page 60

1          PODHASKIE
2          MR. MITCHELL: Object to the form of
3      the question.
4    A.   I don't know that the release of the
5    charge was publicly available to Hodgson Russ
6    when they filed this brief.
7    Q.   So try to focus on the question.
8    I'm not asking you whether or not Hodgson Russ
9    knew that the statement was false.
10          I'm just asking you whether or not
11    this statement, when it was made to the court
12    on May 16, 2018, was true or false.
13          MR. MITCHELL: Object to the form of
14      the question.
15    A.   (Document review.)  Again, if the
16    release of the charge was not publicly
17    available and was not known to Hodgson Russ,
18    then this statement would have been accurate.
19    Q.   Let me try it again.
20          Was this statement true or false?
21          MR. MITCHELL: Object to the form of
22      the question.
23    Q.   When it was made on May 16, 2018?
24          MR. MITCHELL: Asked and answered.
25    A.   And the statement you're referring

PODHASKIE

1  to is?
2  Q.   Is the representation here that the
3  assets of Genever BVI have been pledged in
4  their entirety to Roscalitar 2 since May 2015.
5
6  A.   Again, I would refer to my prior
7  answer.
8  Q.   Mr. Podhaskie, that's a false
9  statement, correct?
10  MR. MITCHELL: Object to the form of
11  the question.
12  A.   What do you mean by "false
13  statement"?
14  Q.   I mean, it was not true, as of
15  May 16, 2018, that the assets of Genever BVI
16  were pledged to Roscalitar 2, right?
17  A.   The pledge was released with an
18  effective date of March 17, 2017. I don't know
19  when this was filed with the BVI records or
20  with the BVI Business Companies Act.
21  So I don't know what was available
22  in May of 2018 that would have reflected
23  whether or not the assets were still pledged.
24  Q.   Were the assets of Genever BVI
25  pledged to Roscalitar 2 as of May 16, 2018?

PODHASKIE

1
2  MR. MITCHELL: Objection to the form
3  of the question, asked and answered.
4  You have asked him the same question
5  six times. You're not getting the answer
6  you want. I'm sorry for that. But he has
7  answered it.
8  MR. MOSS: He hasn't answered it.
9  A.   Okay. So what was the question?
10  Q.   Were the assets of Genever BVI
11  pledged to Roscalitar 2 as of May 16, 2018?
12  A.   The pledge from Genever BVI to
13  Roscalitar 2 was released effective March 17,
14  2017.
15  Q.   So the answer to my question is no,
16  right?
17  MR. MITCHELL: Object to the form of
18  the question.
19  A.   What was your question?
20  Q.   Try to listen to the question and
21  answer the question I'm asking. You'd know the
22  question I was asking if you were trying to
23  answer it.
24  MR. MITCHELL: Objection to whatever
25  that was.

PODHASKIE

1
2  Q.   Were the assets of Genever BVI
3  pledged to Roscalitar 2 as of May 16, 2018?
4  MR. MITCHELL: Objection, asked and
5  answered.
6  A.   Again, the pledge to Roscalitar 2
7  from Genever BVI was released effective
8  March 17, 2017. I think that answers your
9  question.
10  Q.   Did anyone at Genever BVI or Genever
11  New York review this brief before it was filed
12  with the court?
13  MR. MITCHELL: Object to the form of
14  the question. This is outside of the
15  scope of what you asked him in terms of
16  your deposition notices. You didn't ask
17  him about any legal documents filed or
18  anything of that nature.
19  So if he can answer the question, I
20  will allow him to answer it, but he
21  certainly can't be expected to have that
22  knowledge.
23  Q.   Can you answer?
24  A.   I don't know.
25  Q.   By the way, do you know when Genever

PODHASKIE

1
2  BVI received -- you testified earlier that the
3  satisfaction of charge document was maintained
4  by Genever BVI in the ordinary course of its
5  business, right?
6  A.   Yes.
7  Q.   Do you know when Genever BVI
8  received a copy of that document?
9  A.   I don't.
10  Q.   Do you have any reason to believe
11  that it took a year for Genever BVI to receive
12  a copy of that document?
13  A.   I don't know how long it took for
14  them to receive the document.
15  Q.   Is it your best understanding that
16  Genever BVI, when you say it maintained the
17  document in its ordinary course, would have had
18  that document in its files by the end of 2017?
19  MR. MITCHELL: Object to the form of
20  the question.
21  A.   I don't know, but based on my
22  experience with lawyers and people in the BVI,
23  they do things much slower than we do.
24  Q.   Do you know whether or not the
25  satisfaction of charge of the Roscalitar pledge

Page 65

PODHASKIE

1   was publicly available in 2017?
3   A.   I don't know.
4   Q.   It's not Genever BVI's testimony
5   that it takes a year for documents registered
6   in -- relating to charges in the BVI to become
7   publicly available, is it?
8         MR. MITCHELL: Object to the form of
9   the question.
10        And, again, this is outside the
11   scope of the 30(b)(6) notice.  If he
12   knows, he can answer, but he certainly
13   can't be expected to know.
14   A.   I don't know how long it takes.
15        (Podhaskie Exhibit 7, Certificate of
16   Registration of Charge, marked for
17   identification.)
18   Q.   You have been handed Exhibit 7,
19   Mr. Podhaskie.
20        Can you identify this document?
21        MR. MITCHELL: I'm sorry.  We are
22   calling this 7?
23        MR. MOSS: Yes.
24   A.   (Document review.)  It appears to be
25   a copy of a Certificate of Registration of

Page 66

PODHASKIE

2   Charge dated February 14, 2018.
3   Q.   And is this the charge, the pledge
4   to Blue Capital that you testified that was
5   made in connection with Guo Qiang's loan?
6   A.   It would appear to be, yes.
7   Q.   To your knowledge, is this -- to
8   Genever BVI's knowledge, is this a true and
9   accurate copy of the pledge document?
10   A.   (Document review.)  Yes, it appears
11   to be.
12   Q.   And is this a document that Genever
13   BVI maintains in the ordinary course of its
14   business?
15   A.   This would be, yes.
16   Q.   And is Genever BVI's testimony that
17   it's not sure whether or not its sole director
18   and sole shareholder, Mr. Kwok, knew about this
19   pledge when it was entered into?
20        MR. MITCHELL: Object to the form of
21   the question.
22        You can answer.
23   A.   I don't know.
24   Q.   Who would know the answer to that
25   question?

Page 67

PODHASKIE

2   A.   Probably Mr. Kwok.
3   Q.   Well, you recall Mr. Kwok testified
4   that he didn't know anything about any pledges,
5   right?  Did you know that?
6         MR. MITCHELL: Object to the form of
7   the question.
8   A.   If that's what his testimony was.  I
9   don't recall exactly what he testified to.
10   Q.   At the time this pledge was entered
11   into, Mr. Kwok was still the sole shareholder
12   and sole director of Genever BVI, right?
13   A.   Yes.
14   Q.   Were there any discussions at
15   Genever BVI regarding the fact that this
16   charge, this pledge was entered into when
17   Pacific Alliance's lawsuit was pending?
18        MR. MITCHELL: Objection to the form
19   of the question.
20   A.   Not that I'm aware of.
21   Q.   You testified earlier that this Blue
22   Capital pledge, at some point, was taken off or
23   satisfied; is that correct?
24   A.   That's my understanding, yes.
25   Q.   Did that -- did you testify -- let

Page 68

PODHASKIE

2   me just ask, what was the reason for it being
3   taken off?
4   A.   I don't know.
5   Q.   Was it taken off -- was the
6   reason -- strike that.
7         Was it taken off for anything having
8   to do with Pacific Alliance's lawsuit?
9         MR. MITCHELL: Object to the form of
10   the question.
11   A.   I don't know.
12   Q.   Was it taken off for anything having
13   to do with The Sherry-Netherland's proprietary
14   lease?
15        MR. MITCHELL: Object to the form of
16   the question.
17   A.   I don't know.
18   Q.   Were the pledges in violation of
19   Genever New York's proprietary lease with The
20   Sherry-Netherland?
21        MR. MITCHELL: Object to the form of
22   the question.  It calls for a legal
23   conclusion.
24   A.   No.
25   Q.   Did Genever -- no.  Okay.

Page 69

PODHASKIE

1              PODHASKIE
2      (Podhaskie Exhibit 8, Notice of
3    Satisfaction or Release of Registered
4    Charge, marked for identification.)
5    Q.   You have been handed Exhibit 8,
6    Mr. Podhaskie.
7         Can you identify it, please?
8    A.   This appears to be a copy of a
9    Notice of Satisfaction or Release of Registered
10   Charge.  It's dated effective June 12, 2018.
11   Q.   And is this the satisfaction of the
12   Blue Capital charge that we were just talking
13   about?
14   A.   Yes.
15   Q.   Is this a true and correct copy,
16   authentic copy of the satisfaction of charge?
17        MR. MITCHELL: Object to the form of
18     the question.
19   A.   It would appear to be, yes.
20   Q.   And is this a document that's
21   maintained by Genever BVI in the ordinary
22   course of its business?
23        MR. MITCHELL: Object to the form of
24     the question.
25   A.   Yes, it would be.

Page 70

PODHASKIE

1              PODHASKIE
2    Q.   And you don't have anything to add
3    about discussions around this or why this
4    pledge was taken off, right?
5    A.   No, I don't know why it was taken
6    off.
7    Q.   Did you ask Guo Qiang, when you
8    spoke to him to prepare for the deposition, why
9    this pledge was taken off?
10   A.   No.
11   Q.   Did Genever BVI -- anyone at Genever
12   BVI ever have any discussions about
13   transferring ownership of Genever BVI to anyone
14   other than Mr. Kwok?
15        MR. MITCHELL: Object to the form of
16     the question.
17   A.   I don't know.  Not that I'm aware
18   of.
19   Q.   Did Genever BVI, or anyone on behalf
20   of Genever BVI, ever approach The
21   Sherry-Netherland to ask whether or not the
22   ownership of Genever BVI could be restructured
23   and assigned to Mr. Kwok's son?
24        MR. MITCHELL: Object to the form of
25     the question.

Page 71

PODHASKIE

1              PODHASKIE
2    A.   No, not on behalf of Genever BVI.
3    Q.   On behalf of anyone?  Were there
4    ever any -- was there ever a request to The
5    Sherry-Netherland to transfer or assign
6    ownership of Genever BVI or Genever New York or
7    The Sherry-Netherland to Mr. Kwok's son?
8         MR. MITCHELL: Object to the form of
9      the question.
10   A.   There was a request made to The
11   Sherry-Netherland to transfer ownership from
12   Mr. Kwok to Guo Qiang, his son.
13   Q.   To transfer ownership of what?
14   A.   The Sherry-Netherland.
15   Q.   And when was that request made?
16   A.   I don't recall the date off the top
17   of my head.
18   Q.   Whose idea was it to make that
19   request?
20   A.   I believe Guo Qiang.
21   Q.   Why was the request made?
22   A.   Because he initially wanted to
23   purchase The Sherry-Netherland himself and The
24   Sherry didn't like the idea of someone his age
25   at the time, you know, a mid 20-year-old,

Page 72

PODHASKIE

1              PODHASKIE
2    owning this residence.  And so his father
3    became the owner and then they had the idea of,
4    after the fact, maybe approaching the board and
5    seeing if Guo Qiang could become the owner.
6    Q.   And did Mr. Kwok know about that
7    request?
8    A.   Yes, I think he was aware of it.
9    Q.   Do you know who made the request to
10   The Sherry-Netherland?
11   A.   Who specifically, no.
12   Q.   Were there ever any other
13   discussions about transferring ownership of
14   Genever BVI, Genever New York or The
15   Sherry-Netherland to anyone other than
16   Mr. Kwok?
17        MR. MITCHELL: Object to the form of
18     the question.
19   A.   I don't know.
20   Q.   Other than the discussions we have
21   talked about, about the pledges?
22   A.   Yes.
23        MR. MITCHELL: Sorry.  Just for the
24     record, I just want to make sure.
25        You're answering his question that

Page 73

PODHASKIE

1     PODHASKIE
2  you understood his question to mean only
3  discussions about the pledges, correct,
4  not, yes, there were other -- the record
5  is just not clear.  I just want to make
6  sure --
7        MR. MOSS: Let me try it again.
8        MR. MITCHELL: Yeah.
9     Q.   Other than the pledges that we've
10 talked about to Roscalitar 2 and Blue Capital,
11 and other than the request to transfer
12 ownership of The Sherry-Netherland to
13 Mr. Kwok's son, were there ever any discussions
14 about pledges, transfers or assignments of
15 either Genever BVI, Genever New York or The
16 Sherry-Netherland?
17    A.   There was a trust agreement with
18 Bravo Luck, but other than that, I don't know.
19    Q.   Is it true that Mr. Kwok has an
20 ownership interest in The Sherry-Netherland
21 apartment?
22       MR. MITCHELL: Object to the form of
23    the question.
24    A.   No, that's not accurate.
25    Q.   Does Mr. Kwok own The

Page 74

1     PODHASKIE
2  Sherry-Netherland apartment through his
3  ownership of Genever BVI which, in turn, owns
4  Genever New York which, in turn, owns the
5  apartment?
6        MR. MITCHELL: Object to the form of
7     the question.
8     A.   No, that's not accurate.
9     Q.   Okay.  Is it true that Mr. Kwok's
10 ownership interest in the apartment is through
11 a limited liability company?
12       MR. MITCHELL: Object to the form of
13    the question.
14    A.   That's not accurate.
15    Q.   This is Exhibit 24 from Mr. Kwok's
16 deposition.
17       MR. MOSS: Sorry.  We don't have
18    extra copies, but we handed it out today
19    during Mr. Kwok's deposition.
20       THE VIDEOGRAPHER: Counsel, we have
21    three minutes left on the tape.
22       We are now off the tape.  The time
23    is 4:25 p.m.
24       (Recess taken.)
25       THE VIDEOGRAPHER: This marks the

Page 75

PODHASKIE

1     PODHASKIE
2  beginning of tape number two.  We are now
3  back on the record.  The time is 4:38 p.m.
4  BY MR. MOSS:
5     Q.   Mr. Podhaskie, you have in front of
6  you Yvette Wang's, Yan Ping Wang's affidavit
7  submitted in this case on May 16, 2018 or --
8  it's sworn on May 15, and the ECF stamp is
9  May 16.
10       Do you see that?
11    A.   Yes.
12    Q.   This was Exhibit 24 from Mr. Kwok's
13 deposition earlier today.
14       Do you recall I asked you whether or
15 not Mr. Kwok has an ownership interest in the
16 apartment through a limited liability company
17 and you testified, no, he does not?
18       Do you recall that testimony?
19    A.   Yes.
20    Q.   Take a look at paragraph 2.  The
21 first sentence reads, "Mr. Kwok's ownership
22 interest in the apartment through a limited
23 liability company is not in real property."
24       Is it a true statement that Mr. Kwok
25 has an ownership interest in The

Page 76

1     PODHASKIE
2  Sherry-Netherland apartment through a limited
3  liability company?
4        MR. MITCHELL: Object to the form of
5     the question.
6     A.   Mr. Kwok does not have an ownership
7  interest in the apartment.  He has an ownership
8  interest in The Sherry-Netherland Corporation,
9  which then leases the real property to Genever
10 New York.
11    Q.   So Mr. Kwok's ownership interest is
12 in The Sherry-Netherland Corporation?
13    A.   His ownership interest of the shares
14 of The Sherry-Netherland Corporation, is that
15 what you're referring to?
16    Q.   You testified he has a ownership
17 interest in The Sherry-Netherland Corporation.
18    A.   Yes.
19    Q.   That's correct, Mr. Kwok has an
20 ownership interest in The Sherry-Netherland
21 Corporation?
22    A.   Yes.
23    Q.   And that ownership interest relates
24 to the apartment on the 18th floor?
25       MR. MITCHELL: Object to the form of

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND, L.P. VS.
KWOK HO WAN

DANIEL PODHASKIE
December 11, 2019

Page 77

PODHASKIE

2 the question.
3    A.    He has a proprietary lease to the
4 apartment on the 18th floor, yes.
5    Q.    That's related to that ownership
6 interest --
7    A.    Yes.
8    Q.    -- in The Sherry-Netherland
9 Corporation, right?
10    A.    Yes.
11    Q.    And Mr. Kwok owns that interest in
12 The Sherry-Netherland Corporation shares
13 through Genever New York and through Genever
14 BVI, right?
15        MR. MITCHELL: Object to the form of
16    the question.
17    A.    Yes.
18    Q.    Does anyone else, other than
19 Mr. Kwok, Miles Kwok, have an ownership
20 interest in the shares of The Sherry-Netherland
21 Hotel with respect to the 18th floor apartment?
22    A.    I don't know.
23    Q.    As Genever BVI and Genever New
24 York's corporate representative, can you
25 identify anyone else, sitting here today?

Page 78

PODHASKIE

2        MR. MITCHELL: Object to the form of
3    the question.
4    A.    Sitting here in this room?
5    Q.    Yeah.
6    A.    That has an ownership interest in --
7        MR. MITCHELL: That was my
8    objection.
9        MR. MOSS: Okay. That's what
10    happens when you depose a lawyer.
11        MR. MITCHELL: For the record,
12    several people in the room will gladly
13    accept an ownership share in The Sherry.
14    Q.    As Genever BVI's and Genever New
15 York's corporate representative here today, can
16 you identify anyone else who has an ownership
17 interest in the shares of The Sherry-Netherland
18 Hotel with respect to the 18th floor apartment
19 beside Mr. Miles Kwok?
20        MR. MITCHELL: Object to the form of
21    the question.
22    A.    I don't know.
23    Q.    Does Mr. Kwok -- strike that.
24        Has Guo Qiang ever lived in The
25 Sherry-Netherland apartment on the 18th floor?

Page 79

PODHASKIE

2        MR. MITCHELL: Object to the form of
3    the question.
4    A.    When you say "lived," do you mean
5 primary residence?
6    Q.    I mean, has he ever resided there
7 for extended periods of time?
8    A.    Yes.
9    Q.    Has The Sherry-Netherland Hotel ever
10 been Guo Qiang's primary residence?
11    A.    Yes.
12    Q.    When?
13    A.    I'm speculating, but I think it was
14 in 2015.
15    Q.    Since 2015, has Guo Qiang ever
16 been -- strike that.
17        Since 2015, has The
18 Sherry-Netherland Hotel ever been Guo Qiang's
19 primary residence?
20    A.    I don't know.
21    Q.    Has he ever visited since 2015?
22        MR. MITCHELL: Object to the form.
23        MR. MOSS: Let me try it again.
24    Strike it.
25    Q.    Has Guo Qiang ever slept in The

Page 80

PODHASKIE

2 Sherry-Netherland apartment since 2015?
3    A.    I assume so, but I can't say, you
4 know, with certainty. I don't -- I don't sleep
5 with him, so.
6    Q.    Let's go back to Exhibit 3,
7 Mr. Podhaskie, and I would like to direct your
8 attention to page KWOK193.
9    A.    Okay.
10    Q.    See it says, in the first paragraph,
11 it refers to Genever BVI being the sole member
12 of Genever New York.
13        Is Genever BVI the sole member of
14 Genever New York?
15    A.    Just for the record, it says "being
16 the sole director of Genever Holdings
17 Corporation."
18    Q.    So take a look at the first
19 resolution. See "Resolved, that Andrea Sanft"?
20        Do you see that?
21    A.    Yes, yes.
22    Q.    And look at the last sentence of
23 that paragraph. "To the extent necessary to
24 complete such actions, the corporation," and
25 the corporation refers to Genever BVI?

Page 81

PODHASKIE

1        PODHASKIE
2   A.   Uh-huh.
3   Q.   "As sole member of Genever New
4   York."
5        Do you see that?
6   A.   Yes.
7   Q.   Is Genever BVI the sole member of
8   Genever New York?
9   A.   Yes.
10  Q.   Has Genever BVI been the sole member
11  of Genever New York since Genever New York's
12  foundation?
13       MR. MITCHELL: Object to the form of
14    the question.
15  A.   Yes.
16       MR. MOSS: Well, that's because it's
17    a bad question.
18  Q.   Has Genever BVI been the sole member
19  of Genever New York's since Genever New York's
20  formation?
21  A.   Yes.
22  Q.   If you look at the third resolution
23  there, there's a resolution relating to Michael
24  O'Connor.
25  A.   Uh-huh.

Page 82

1        PODHASKIE
2   Q.   Who is Michael O'Connor?
3   A.   He is an attorney either with the
4   firm of Paul Weiss or Williams & Connolly.  I'm
5   not sure.  I think Paul Weiss, but I'm not
6   positive.
7   Q.   And so Ms. Sanft was authorized to
8   form Genever New York, and Mr. O'Connor was
9   authorized to cause Genever New York, once
10  formed, to enter into a purchase agreement with
11  The Sherry-Netherland; is that correct?
12       MR. MITCHELL: Object to the form of
13    the question.
14  A.   Yes.
15  Q.   And so the plan, from formation, was
16  that once Genever New York was formed, it would
17  enter into a purchase agreement with The
18  Sherry-Netherland relating to the 18th floor,
19  correct?
20       MR. MITCHELL: Object to the form of
21    the question.
22  A.   Yes.
23  Q.   And the purpose of forming Genever
24  New York was to enter into that agreement with
25  The Sherry-Netherland?

Page 83

1        PODHASKIE
2        MR. MITCHELL: Object to the form of
3    the question.
4   A.   That was one of the purposes, yes.
5   Q.   What were the other purposes?
6   A.   To invest in other real estate as
7   they deemed fit.
8   Q.   Genever New York and Genever BVI
9   were formed within days of each other, right?
10  A.   Yes, around the same time.
11  Q.   You said that Genever New York had
12  other purposes to invest in other real estate
13  as they deemed fit.
14       Has Genever New York ever invested
15  in any other real estate besides The
16  Sherry-Netherland Hotel?
17  A.   No.
18  Q.   So Genever New York and Genever BVI
19  were both formed to hold Mr. Kwok's interest in
20  The Sherry-Netherland apartment?
21       MR. MITCHELL: Object to the form of
22    the question.
23  A.   That's not accurate.
24  Q.   Okay.  What's inaccurate about it?
25  A.   Initially, Guo Qiang, Mr. Kwok's

Page 84

1        PODHASKIE
2   son, wanted to purchase the apartment at The
3   Sherry-Netherland.  They formed the
4   corporations with the understanding that he
5   would be the actual owner, but The
6   Sherry-Netherland did not like the idea of Guo
7   Qiang being the owner because they felt that he
8   was too young.
9   Q.   So is it your testimony that Genever
10  New York and Genever BVI were formed to hold
11  Guo Qiang's interest in The Sherry-Netherland,
12  but Mr. Kwok just ended up being the owner
13  because that's what The Sherry-Netherland
14  wanted?
15  A.   They were formed to own the real
16  estate that Guo Qiang and the family wanted to
17  invest in.  They made Mr. Kwok the sole member
18  of Genever BVI, and as the sole member of
19  Genever BVI, the owner of Genever New York
20  because The Sherry-Netherland felt that Guo
21  Qiang was too young to be the owner of this
22  particular apartment.
23  Q.   I direct your attention to page 178
24  of Exhibit 3.
25       Can you identify this document?

Case 22-50073   Doc 183-3   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 24 of
PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. VS.
KWOK HO WAN
241
DANIEL PODHASKIE
December 11, 2019

Page 85

PODHASKIE

1   A.   (Document review.)  It is a -- looks
2 like a printout from the New York State
3 Department of State, the corporations public
4 inquiry system for Genever Holdings LLC.
5   Q.   And it shows -- and that's the
6 entity we have been referring to as Genever New
7 York, right?
8   A.   Yes.
9   Q.   And this document refers to Genever
10 New York being incorporated in New York
11 effective February 17, 2015; is that correct?
12   A.   That's what this says, yes.
13   Q.   And that's consistent with Genever's
14 understanding, right?
15   A.   Yes.
16   Q.   And so Genever New York was formed
17 about five days after Genever BVI was formed?
18   A.   I don't recall exactly, but they
19 were formed around the same time.
20   Q.   Does it refresh your recollection if
21 I told you a few minutes ago we looked at
22 documents showing that Genever BVI was formed
23 on February 12?
24   A.   No.  Which document were we looking

Page 86

PODHASKIE

1 at?
2   Q.   Why don't you take a look at 145?
3   MR. SARNOFF: Of Exhibit 3.
4   A.   (Document review.)  Yes, it was
5 formed -- according to this, it was formed
6 February 13, 2015.
7   Q.   Genever BVI was formed on
8 February 13, 2015, and Genever New York was
9 formed on February 17, 2015, right?
10   MR. MITCHELL: Object to the form of
11   the question.
12   A.   Yes, based on these documents.
13   Q.   So four days apart?
14   A.   That would be correct.
15   Q.   What was Genever -- Genever New York
16 was formed to enter into the agreement with The
17 Sherry-Netherland Hotel, correct?
18   MR. MITCHELL: Object to the form of
19   the question, asked and answered.
20   A.   Yes, that was one of the purposes.
21   Q.   Has the business purpose of Genever
22 New York changed over time?
23   A.   No.
24   Q.   Have any purposes been added or

Page 87

PODHASKIE

1 subtracted?
2   A.   No.
3   Q.   What business has Genever New York
4 conducted since it was formed in February 2015?
5   A.   It owns The Sherry-Netherland
6 apartment.
7   Q.   Any other business?
8   A.   No.
9   Q.   Has Genever New York ever entered
10 into a contract other than its contracts with
11 The Sherry-Netherland Hotel?
12   A.   I don't know.
13   Q.   Has Genever New York ever spent or
14 disbursed any money?
15   A.   Yes.
16   Q.   To whom?
17   A.   The Sherry-Netherland.
18   Q.   For maintenance fees?
19   A.   Yes.
20   Q.   Anything else?
21   A.   I think that's it.
22   Q.   Does The Sherry-Netherland -- has
23 Genever New York spent any money on anything
24 else other than to The Sherry-Netherland for

Page 88

PODHASKIE

1 maintenance fees?
2   A.   Not that I know of.
3   Q.   Does the -- does Genever New York
4 have a bank account?
5   A.   Yes.
6   Q.   With which bank?
7   A.   Chase.
8   Q.   When was that formed?
9   A.   2018.
10   Q.   Does the money from the -- do the
11 payments to The Sherry-Netherland come from
12 that bank account?
13   A.   Yes.
14   Q.   How is that bank account funded?
15   A.   It receives money from Golden Spring
16 New York.
17   Q.   Who owns Golden Spring New York?
18   A.   China Golden Spring Group Hong Kong
19 Limited.
20   Q.   Who owns China Golden Spring Group
21 Hong Kong Limited?
22   A.   Guo Qiang.
23   Q.   Does Mr. Kwok have any interest in
24 China Golden Spring Group Hong Kong Limited?

Page 89

PODHASKIE

1          PODHASKIE
2          MR. MITCHELL: Object to the form of
3     the question.
4     A.   No.
5     Q.   Before 2018, did Genever New York
6  have a bank account?
7     A.   Before what year?
8     Q.   2018.
9     A.   I don't know.
10    Q.   Did Genever New York have to pay
11  maintenance to The Sherry-Netherland before
12  2018?
13    A.   Yes.
14    Q.   Where did that money come from?
15    A.   I believe it came from Golden Spring
16  New York.
17    Q.   Has anyone, other than Golden Spring
18  New York, ever put any money into Genever New
19  York's bank account?
20    A.   I don't know.
21    Q.   So, to your knowledge, Genever New
22  York did not have any bank account prior to
23  2018?
24         MR. MITCHELL: Object to the form of
25    the question.

Page 90

1          PODHASKIE
2     A.   I don't know.
3     Q.   Do you know why Genever New York
4  formed a bank account in 2018?
5     A.   I don't know.
6     Q.   Has any money ever been deposited
7  into Genever New York's bank account other than
8  money from Golden Spring that was meant to pay
9  the maintenance to The Sherry-Netherland hotel?
10    A.   I don't know.
11    Q.   Genever New York and Genever BVI are
12  parties to this lawsuit.
13         You're aware of that?
14    A.   Yes.
15    Q.   And Genever New York and Genever BVI
16  were represented by the Hodgson Russ firm up
17  until a few weeks ago; is that right?
18    A.   That's correct.
19    Q.   And now they are represented by
20  Mr. Mitchell's firm; is that correct?
21    A.   Yes.
22    Q.   Who was paying Genever New York and
23  Genever BVI's legal fees to Hodgson Russ?
24         MR. MITCHELL: Object to the form of
25    the question.

Page 91

1          PODHASKIE
2     A.   I don't know.
3     Q.   Who is paying Genever BVI and
4  Genever New York's legal fees to Mr. Mitchell's
5  firm?
6          MR. MITCHELL: I'm going to instruct
7     him not to answer, privilege.
8          MR. MOSS: Who pays the bills is
9     privileged?
10 DI      MR. MITCHELL: Potentially.  I'm
11    asserting privilege.  You can make the
12    argument it's not.
13    Q.   Are you going to follow your
14  counsel's instruction?
15    A.   I will follow my counsel's
16  instruction.
17    Q.   Do you know whether Mr. Kwok is
18  paying Genever BVI and Genever New York's legal
19  fees in connection with this lawsuit?
20    A.   He's not.
21    Q.   But you don't know who is?
22    A.   No.
23    Q.   Mr. Kwok and Genever New York sued
24  The Sherry-Netherland Hotel a few years ago in
25  a dispute relating to maintenance of his

Page 92

1          PODHASKIE
2  terrace.
3          Does that sound familiar?
4     A.   Yes.
5     Q.   And Mr. Kwok and Genever New York
6  were represented by the same law firm --
7     A.   Yes.
8     Q.   -- in that lawsuit?
9          Who paid that law firm's legal fees?
10    A.   I don't know.
11         MR. MITCHELL: Just for
12    clarification of the record, do you have
13    the name of the firm?  Just because it's
14    not my firm, I don't believe it was
15    Hodgson Russ, I just want to make sure --
16    when you say the same firm, you mean they
17    both had the same attorney, not that it
18    was one of either of our firms, correct?
19         MR. MOSS: Correct.
20    Q.   So I don't know -- do you know the
21  name of the firm?
22    A.   That represented Genever and
23  Mr. Kwok in the prior lawsuit against The
24  Sherry?
25    Q.   Yes.

Page 93

PODHASKIE

A.   I think it was Stone Magnanini.

Q.   Do you know who was paying Stone Magnanini's legal fees for Genever New York?

A.   I don't know.

Q.   Do you know whether or not Stone Magnanini was paid legal fees from one person or entity or from two people or entities in connection with that lawsuit?

MR. MITCHELL: Object to the form.

A.   I don't know.

Q.   In other words, did the same person or entity pay the legal fees for both Mr. Kwok and Genever in The Sherry-Netherland lawsuit?

A.   I don't know.

Q.   Does the same person or entity pay the legal fees for Mr. Kwok and both Genever entities in this lawsuit?

DI       MR. MITCHELL: I instruct my client not to answer.

MR. MOSS: That's a yes-or-no question.

Q.   Does the same person or entity pay the legal fees for both Mr. Kwok and Genever entities in this lawsuit?

Page 94

PODHASKIE

MR. MITCHELL: That one, you can answer.

A.   I don't know.

Q.   Has Genever BVI been the sole shareholder of Genever New York for the entirety of Genever New York's existence?

A.   No, that's not accurate.

Q.   Why not?

A.   Genever New York is an LLC. It has members. It doesn't have shareholders.

Q.   Has Genever BVI been the sole member of Genever New York for the entirety of Genever New York's existence?

A.   Yes.

Q.   Does Mr. Kwok control Genever BVI?

A.   No.

Q.   Who does?

A.   Guo Qiang.

Q.   Does Mr. Kwok control Genever New York?

A.   No.

Q.   Who does?

A.   Guo Qiang.

Q.   Mr. Kwok does not control Genever

Page 95

PODHASKIE

BVI, even though he's the sole director and the sole shareholder?

MR. MITCHELL: Object to the form of the question, asked and answered.

A.   Yes.

Q.   Does Zhang Wei have any role with respect to Genever New York?

A.   I don't know.

Q.   Does Zhang Wei own any of the membership interests of Genever New York?

A.   That's not reflected from the documents I reviewed in preparation for today.

Q.   Does Genever New York have any directors?

A.   No, I don't think so.

Q.   Has it ever had any directors? "It" being Genever New York?

A.   I think it has just an authorized person and its sole member. Other than that, no.

Q.   The sole member is Genever BVI?

A.   Yes.

Q.   Who's the authorized person?

A.   Guo Qiang.

Page 96

PODHASKIE

Q.   Have there ever been any other authorized persons for Genever New York other than Guo Qiang?

MR. MITCHELL: Object to the form of the question.

A.   Other than the attorneys that were referenced in the resolutions in the formation in the purchase of The Sherry, no.

Q.   Does Genever New York have any offices?

A.   No.

Q.   Has it ever had any offices?

A.   No.

Q.   Does Genever New York have any employees?

A.   No.

Q.   Has Genever New York ever had any employees?

A.   No.

Q.   Does Genever New York have a phone number?

A.   I don't know.

Q.   Since Genever New York does not have any directors, I assume it's never had a board

Page 97

PODHASKIE

1   meeting; is that right?
2   MR. MITCHELL: Object to the form.
3   A.   That was not reflected from the
4   documents that I reviewed for today's
5   preparation.
6   Q.   Does Genever New York have any
7   address?
8   MR. MITCHELL: Object to the form of
9   the question.
10  A.   781 Fifth Avenue.
11  Q.   And what is that?
12  A.   That's The Sherry-Netherland.
13  Q.   Genever New York's -- strike that.
14  Is the 18th floor part of the
15  address?
16  A.   Yes.
17  Q.   So Genever New York's address is the
18  apartment that Mr. Kwok lives in on the 18th
19  floor of The Sherry-Netherland?
20  A.   That's the mailing address for
21  Genever New York.
22  Q.   Does it have any other addresses?
23  A.   Not that I'm aware of.  Actually,
24  there might be an address for its registered

Page 98

PODHASKIE

1   agent for service of process in Albany, but
2   other than that, I'm not aware of any.
3   Q.   Other than the address for a
4   registered agent, Genever New York does not
5   have any addresses apart from The
6   Sherry-Netherland Hotel?
7   A.   No, not that I'm aware of.
8   Q.   Does Genever New York possess any
9   documents?
10  MR. MITCHELL: Object to the form of
11  the question.
12  A.   Yes.
13  Q.   Where are they maintained?
14  A.   I believe in The Sherry-Netherland,
15  but I'm not -- I don't know for sure.
16  Q.   Are any of the Genever New York's --
17  are any of Genever New York's documents
18  maintained in -- at the British Virgin Islands
19  address where Genever BVI's documents are held?
20  MR. MITCHELL: Object to the form of
21  the question.
22  A.   I don't know.
23  Q.   Are Genever -- are any Genever BVI
24  documents maintained at The Sherry-Netherland?

Page 99

PODHASKIE

1   A.   I don't know.
2   Q.   What documents does Genever New York
3   possess?
4   A.   Its corporate formation documents,
5   its stock register, the mail it receives.
6   Q.   Are there any people who are
7   authorized to act on behalf of Genever New
8   York?
9   MR. MITCHELL: Object to the form of
10  the question, asked and answered.
11  A.   You mean other than Mr. Kwok and his
12  son?
13  Q.   Well, so is Mr. Kwok authorized to
14  act on behalf of Genever New York?
15  A.   Mr. Kwok?  I don't know.
16  Q.   Is Guo Qiang authorized to act on
17  behalf of Genever New York?
18  A.   Yes.
19  Q.   Who authorized him to do that?
20  A.   He was authorized by Genever BVI.
21  Q.   And did Mr. Kwok, as the sole
22  director and sole shareholder of Genever BVI,
23  authorize Genever BVI to authorize Guo Qiang to
24  act on behalf of Genever New York?

Page 100

PODHASKIE

1   MR. MITCHELL: Object to the form of
2   the question.
3   A.   I would assume so.  I don't know for
4   certain, but I know that, in or around
5   May 2015, Guo Qiang was made an authorized
6   person for Genever New York.
7   Q.   What assets does Genever New York
8   hold?
9   A.   It owns the shares in The
10  Sherry-Netherland Corporation and it has a bank
11  account with JPMorgan Chase.
12  Q.   And that's the bank account that's
13  funded by Golden Spring New York whose purpose
14  is to hold the money to pay the maintenance
15  fees for The Sherry-Netherland?
16  A.   The bank account's purpose, I don't
17  know if it's to hold the money, but it is --
18  the bank account is used to pay the maintenance
19  for Genever New York.
20  Q.   And you can't identify any other
21  payments that have come out of the bank
22  account, other than to pay the maintenance for
23  The Sherry-Netherland Hotel?
24  A.   I don't know.

Case 22-50073   Doc 183-3   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 28 of
241
PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. VS.
KWOK HO WAN

DANIEL PODHASKIE
December 11, 2019

PODHASKIE

1      PODHASKIE
2   Q.   Has Genever New York ever held any
3 other assets -- by the way, strike that.
4      What's the most money that's ever
5 been in that JPMorgan account, that Chase
6 account for Genever New York?
7      MR. MITCHELL: Object to the form of
8   the question.
9   A.   I don't know.
10   Q.   Any sense?
11   A.   Not really, no.
12   Q.   More than $3 million?
13   A.   The monthly maintenance for The
14 Sherry is about 60,000. So, you know, enough
15 to cover that every month.
16   Q.   Has Genever New York ever held any
17 other assets besides the Chase account and the
18 ownership in The Sherry-Netherland?
19   A.   I don't know.
20   Q.   Has Genever New York ever sold any
21 assets?
22   A.   Not that I'm aware of.
23   Q.   Are you aware of any acquisitions
24 other than the bank account and the shares of
25 The Sherry-Netherland?

1      PODHASKIE
2   A.   It's not reflected in the documents
3 I reviewed for today.
4   Q.   Other than Justice Ostrager's order,
5 are any of -- is Genever New York encumbered in
6 any way?
7      MR. MITCHELL: Object to the form of
8   the question.
9   A.   There is a trust agreement between
10 Genever New York and Bravo Luck, Mr. Kwok and
11 Genever BVI, I believe, that involves The
12 Sherry-Netherland residence, but other than
13 that, and Justice Ostrager's order, I'm not
14 aware of any other encumbrances.
15   Q.   Are you aware of whether Genever New
16 York's assets have ever been encumbered in the
17 past other than the trust agreement and Justice
18 Ostrager's order?
19      MR. MITCHELL: Object to the form of
20   the question.
21   A.   I would say the pledge agreements we
22 discussed earlier to Roscalitar 2 and Blue
23 Capital. Other than that, I'm not aware of
24 any.
25      (Podhaskie Exhibit 9, Declaration of

1      PODHASKIE
2 Trust and Agreement, marked for
3   identification.)
4   Q.   Mr. Podhaskie, you have been landed
5 Exhibit 9.
6      Is this the trust agreement that you
7 have been referring to relating to Bravo Luck
8 and the Genever entities?
9   A.   (Document review.) Yes, this
10 appears to be a copy of that trust agreement.
11   Q.   It's dated February 17, 2015.
12      Is that when it was entered into?
13   A.   Yes.
14   Q.   If you look at the bottom on the
15 left-hand side, do you know whose signature
16 that is? I'm sorry. The bottom of the first
17 page, 543.
18   A.   Yes.
19   Q.   Whose is it?
20   A.   Guo Qiang.
21   Q.   How about on the right-hand side,
22 whose signature is that?
23   A.   I don't know for certain, but it
24 looks like Mr. Kwok's.
25   Q.   And on page 544, is it same thing,

1      PODHASKIE
2 Guo Qiang's signature is on the left and
3 Mr. Kwok's is on the right?
4   A.   It appears so, yes.
5   Q.   And on page 545, is Guo Qiang's the
6 first signature and Mr. Kwok's are the next
7 three?
8      MR. MITCHELL: Object to the form of
9   the question.
10   A.   You mean the three below the other
11 three signatures besides Guo Qiang's?
12   Q.   Yes.
13   A.   Yes, it appears so.
14   Q.   Guo Qiang signed on behalf of Bravo
15 Luck Limited; is that right?
16   A.   Yes.
17   Q.   And Mr. Kwok signed on behalf of
18 Genever New York, Genever BVI and Mr. Kwok,
19 himself, right?
20   A.   Yes.
21   Q.   Do you know whether or not
22 counsel -- there was any counsel who
23 represented any of the parties in connection
24 with this agreement?
25   A.   I don't know.

Page 105

PODHASKIE

1              PODHASKIE
2     Q.   Do you know where this agreement was
3   maintained?
4     A.   I don't know.
5     Q.   So I want to direct your attention
6   down in the background section.
7              Number 2 -- first of all, do you see
8   at the top, when it defines the parties, the
9   BVI company is Genever Holdings Corporation?
10    A.   Yes.
11    Q.   That's the company we have been
12  referring to as Genever BVI, right?
13    A.   Yes, I believe so.
14    Q.   And the company, Genever Holdings
15  LLC, which you and I have been referring to as
16  Genever New York, is referred to in this
17  document as the US SPV; is that right?
18    A.   Yes.
19    Q.   And SPV stands for special purpose
20  vehicle; is that right?
21    A.   I believe so, yes.
22    Q.   And if you look in the background,
23  number 2, it says, "The purpose of the BVI
24  company," which is Genever BVI, "is a special
25  purpose vehicle holding the US SPV."

Page 106

1              PODHASKIE
2              Do you see that?
3     A.   Yes.
4     Q.   And the US SPV is Genever New York,
5   right?
6     A.   Yes.
7     Q.   So according to this document, the
8   purpose of Genever BVI is to hold Genever New
9   York, right?
10    A.   That's what this says, yes.
11    Q.   Is that accurate?
12    A.   That's one of the purposes, as I
13  understand it, yes.
14    Q.   And in number 3, "The purpose of the
15  US SPV," that's Genever New York, right?
16    A.   Yes.
17    Q.   So "The purpose of Genever New York
18  is a special purpose vehicle holding a property
19  situated at," and then it has several units on
20  the 18th floor at The Sherry-Netherland."
21             Is that right?
22    A.   That's what it says, yes.
23    Q.   So the purpose of Genever New York
24  is to be a special purpose vehicle to hold the
25  18th floor residence, right?

Page 107

PODHASKIE

1              PODHASKIE
2     A.   That's one of the purposes, yes.
3     Q.   The document doesn't say it's one of
4   the purposes.  It says it's the purpose, right?
5              MR. MITCHELL: Object to the form.
6     A.   The document says that the US SPV is
7   a special purpose vehicle holding a property
8   situated at, and it references the 18th floor
9   of The Sherry-Netherland.
10    Q.   You said one of the purposes was to
11  hold the apartment, and I'm just saying the
12  document says the purpose of the US SPV, right?
13  Not one of the purposes.
14    A.   Yes.
15    Q.   And it says the purpose of the BVI
16  Company is to hold Genever New York, not one of
17  the purposes, right?
18    A.   Right.  But it's one of the
19  purposes.
20    Q.   And it says, in number 4, that "For
21  the avoidance of doubt, the trustee is holding
22  the BVI Company and the US SPV," those are the
23  two Genever entities, right?
24    A.   Yes.
25    Q.   "The trustee is holding the Genever

Page 108

1   entities in trust for the owner."
2              And the owner is Bravo Luck; is that
3   correct?
4     A.   Yes.
5     Q.   And it says that the owner, which is
6   Bravo Luck, is a beneficial owner of New
7   York -- Genever New York and Genever BVI,"
8   right?
9     A.   That's what it says, yes.
10    Q.   Is that consistent with Genever's
11  understanding?
12    A.   Yes.
13    Q.   Did Genever New York or Mr. Kwok
14  ever disclose to The Sherry-Netherland, when it
15  was applying for the lease, that Bravo Luck was
16  going to be the beneficial owner of the Genever
17  entities?
18    A.   I don't know.
19    Q.   You think The Sherry-Netherland
20  would have wanted to know who the beneficial
21  owner of the apartment was going to be?
22             MR. MITCHELL: Object to the form of
23   the question, calls for speculation.
24    Q.   You can answer.

Case 22-50073   Doc 183-3   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 30 of
241
PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. VS.
KWOK HO WAN
DANIEL PODHASKIE
December 11, 2019

PODHASKIE

1    A.   I don't know what The
2  Sherry-Netherland would have wanted to know,
3  but I know that they knew the money came from
4  Bravo Luck.
5    Q.   Did you, in the course of your
6  review of documents to prepare for this
7  deposition, did you see any document evidencing
8  that The Sherry-Netherland knew that Bravo Luck
9  was going to be the beneficial owner of the
10 apartment?
11   A.   I didn't see anything in my
12 preparation for today.
13   Q.   See there are covenants by the
14 trustee in Section 3?  See those covenants?
15   A.   Are we still on page 1?
16   Q.   Sorry.  Section 3, "The trustee
17 further covenants with the owner."
18        Do you see that?
19   A.   Oh.  Yes, yes, yes.
20   Q.   And you see on the first page that
21 the trustee is Mr. Kwok?
22   A.   Yes.
23   Q.   So take a look at 3.4, "The trustee
24 covenants that it will not create or allow to

PODHASKIE

1  be created any charge, mortgage or lien on the
2  BVI company, the US SPV and/or assets held by
3  the BVI company and/or the US SPV unless with
4  the prior written approval of the owner and the
5  co-owners."
6        Do you see that?
7    A.   Yes.
8    Q.   The pledges to Blue Capital and
9  Roscalitar 2 would require prior written
10 approval of the owner and the co-owners under
11 this agreement; is that right?
12   A.   Yes.
13   Q.   And the owner is Bravo Luck?
14   A.   Yes.
15   Q.   And who are the co-owners?  The
16 co-owners, if you look at background, page 1,
17 543, Section 6, "The owner made known to the
18 trustee that certain parties" -- "third parties
19 may co-own the property through the owner in
20 accordance with the co-operation plan and the
21 trustee is also acting as a trustee for those
22 third parties."
23        Do you know who those co-owner third
24 parties are?

PODHASKIE

1    A.   I don't know.
2    Q.   Did --
3    A.   I'm sorry.  I don't know who the
4  co-owners are.  The owner is defined as Bravo
5  Luck.
6    Q.   Yes.  Did Mr. Kwok, the trustee, get
7  prior written approval of the owner, Bravo
8  Luck, or any of the co-owners before pledging
9  the shares of Genever BVI to either Roscalitar
10 2 or Blue Capital?
11        MR. MITCHELL: Object to the form of
12   the question.
13   A.   I don't know.
14   Q.   Have you seen any documents
15 suggesting that such written approval was
16 obtained?
17        MR. MITCHELL: Object to the form of
18   the question.
19   A.   I didn't see any in my preparation
20 for today.
21   Q.   As of early 2015, when Mr. Kwok was
22 applying to The Sherry-Netherland board, who
23 owned Bravo Luck?
24        MR. MITCHELL: Object to the form of

PODHASKIE

1    the question.
2    A.   I think, as of January 2015, Bravo
3  Luck was owned by Guo Qiang.
4    Q.   Isn't it true that Mr. Kwok,
5  himself, was also a 50 percent owner of Bravo
6  Luck?
7    A.   I think Guo Qiang transferred
8  50 percent of the ownership in Bravo Luck to
9  his father around that time.
10   Q.   By the way, what business is Guo
11 Qiang in?
12   A.   Finance.
13        (Podhaskie Exhibit 10, Letter from
14   Stevenson Wong dated March 4, 2015, marked
15   for identification.)
16   Q.   Mr. Podhaskie, you have been handed
17 Exhibit 10, which is a letter from Stevenson
18 Wong dated March 4, 2015, to the board of
19 directors of The Sherry-Netherland, regarding
20 the application of Mr. Kwok Ho Wan to become a
21 shareholder of The Sherry-Netherland, Inc.,
22 Bravo Luck Limited, the company.
23        Do you see that?
24   A.   Yes.

Case 22-50073 Doc 183-3 Filed 04/06/22 Entered 04/06/22 17:07:45 Page 31 of
241
PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. VS.
KWOK HO WAN
DANIEL PODHASKIE
December 11, 2019

Page 113

PODHASKIE

1  Q.  Was Stevenson Wong representing
2  Mr. Kwok in connection with his application to
3  become a shareholder of The Sherry-Netherland?
4      MR. MITCHELL: Object to the form of
5  the question.
6      And, additionally, this is outside
7  of the scope of the 30(b)(6) notice. If
8  he has knowledge, I will allow him to
9  answer, but note my objection for the
10  record.
11      MR. MOSS: Well, Genever New York
12  was a --
13      MR. MITCHELL: If you're asking
14  about Genever New York. You asked
15  specifically about Mr. Kwok, who his
16  attorney was.
17      MR. MOSS: Sure. But Mr. Kwok was
18  buying this on behalf of an entity,
19  Genever New York.
20      MR. MITCHELL: Are you asking about
21  the entity?
22  BY MR. MOSS:
23  Q.  I'm asking, what was Stevenson
24  Wong's role -- who was Stevenson Wong

Page 114

PODHASKIE

1  representing in connection with The
2  Sherry-Netherland application?
3      A.  I don't know. Based on this letter,
4  it appears they were representing Mr. Kwok or
5  his family, but I don't know.
6      Q.  If you look at page -- the second
7  page, SN74, Stevenson Wong writes, "We confirm
8  that, A, the company," which is defined on the
9  previous page as Bravo Luck, "is legally and
10  beneficially owned as to 50 percent by Mr. Kwok
11  Ho Wan and 50 percent by Mr. Guo Qiang,
12  respectively."
13      Do you see that?
14      A.  Yes.
15      Q.  Is it correct that, as of March 4,
16  2015, Mr. Kwok owned 50 percent of Bravo Luck?
17      A.  That is what this letter reflects.
18  I was not prepared to talk about the ownership
19  of Bravo Luck today.
20      Q.  Do you have any reason to believe
21  that this document is inaccurate?
22      A.  No.
23      Q.  Do you know whether or not Bravo
24  Luck -- do you know whether or not Mr. Kwok's

Page 115

PODHASKIE

1  ownership interest in Bravo Luck has increased
2  or decreased or stayed the same since March 4,
3  2015?
4      MR. MITCHELL: Object to the form of
5  the question. Again, I think this is
6  outside the scope. I will allow him to
7  answer if he has the knowledge, but...
8      A.  I understand that Guo Qiang is
9  currently the 100 percent owner of Bravo Luck.
10      Q.  Do you understand how it came to be
11  that Mr. Kwok lost his 50 percent?
12      MR. MITCHELL: Same objection.
13      A.  I don't know.
14      Q.  Do you know when that happened?
15      MR. MITCHELL: Same objection.
16      A.  I don't know.
17      Q.  Have you seen any documents relating
18  to that transfer?
19      MR. MITCHELL: Same objection.
20      A.  Not in my preparation for today's
21  deposition.
22      MR. MOSS: Why don't we take a break
23  now? Let's go off the record.
24      THE VIDEOGRAPHER: We are now off

Page 116

PODHASKIE

1  the record. The time is 5:27 p.m.
2      (Recess taken.)
3      THE VIDEOGRAPHER: We are now back
4  on the record. The time is 5:36 p.m.
5  BY MR. MOSS:
6      Q.  Mr. Podhaskie, you've answered a lot
7  of questions today saying yes or no based on
8  the documents I had access to in my review.
9      Did you have access to Genever New
10  York and Genever BVI's full set of files?
11      MR. MITCHELL: Object to the form of
12  the question.
13      I don't know that that's exactly
14  what he said, but I know you're
15  paraphrasing, but...
16      MR. MOSS: Okay.
17      A.  Whatever they had, I reviewed, so.
18      Q.  Did you ever ask to see any
19  documents that weren't provided to you?
20      MR. MITCHELL: Object to the form of
21  the question.
22      A.  No.
23      Q.  Do you have any reason to believe
24  that there were documents missing from your

PODHASKIE

1
2  review?
3     A.   I don't know.  There's no reason for
4  me to think anything was missing, I don't know.
5     Q.   Did you say any document referencing
6  the fact that Guo Qiang has control of Genever
7  BVI?
8          MR. MITCHELL: Object to the form of
9     the question.
10    A.   There's a document that indicates
11 he's the president of Genever BVI.  Other than
12 that, no.
13    Q.   Do you know whether or not that
14 document was produced to us in this litigation?
15    A.   I don't know.  I believe it was, but
16 I don't know.
17    Q.   Did you ever see any document
18 providing that Genever BVI authorized Guo Qiang
19 to act on behalf of Genever New York?
20    A.   There was a document that Guo Qiang
21 became the authorized person of Genever New
22 York.  I don't recall who executed it or what,
23 but I remember seeing a document that indicated
24 he was the authorized person, and Guo Qiang, he
25 signed an application for an EIN for Genever

PODHASKIE

1
2  New York.
3     Q.   Have you ever seen any document or
4  did you see any document in the course of your
5  review providing that Yvette Wang had any role
6  with Genever BVI or Genever New York?
7          MR. MITCHELL: Object to the form of
8     the question.
9     A.   I know that she signed an affidavit
10 in connection with the litigation that made
11 statements about Genever and The
12 Sherry-Netherland.  Other than that, I don't
13 recall.
14    Q.   Do you know where she obtained the
15 information she put in her affidavit relating
16 to Genever and The Sherry-Netherland?
17          MR. MITCHELL: Object to the form of
18    the question, and I think this is outside
19    the scope of the 30(b)(6).
20          If he has the knowledge, I'm glad to
21    let him answer.
22          MR. MOSS: Okay.
23    A.   I don't know.
24          MR. MOSS: Nothing further at this
25    time.  Thank you, Mr. Podhaskie.

PODHASKIE

1
2          MR. MITCHELL: Just before you start
3     going off the record, I just have a couple
4     questions for Mr. Podhaskie, just to
5     clarify the record.
6          MR. MOSS: Sure.
7  EXAMINATION BY
8  MR. MITCHELL:
9     Q.   Mr. Podhaskie, you were provided
10 with a number of exhibits today.  One of those
11 exhibits was Podhaskie 3 -- Exhibit 3, rather.
12    A.   Yes.
13    Q.   If you'll note, these were
14 identified, when questions were asked, by Bates
15 stamps number, Kwok, and then a number.
16         Do you see that?
17    A.   Yes.
18    Q.   Looking now at Podhaskie -- is it
19 your understanding that these documents were
20 produced by Mr. Kwok's attorney in relation to
21 this litigation?
22         MR. MOSS: Objection, leading.
23    A.   Yes.
24    Q.   Looking at Exhibit Podhaskie 4, do
25 you see any such Bates stamps?

PODHASKIE

1
2     A.   No.
3     Q.   Prior to today, do you have any
4  recollection of seeing this document?
5          MR. MOSS: What document?
6          MR. MITCHELL: Exhibit 4 that we're
7     talking about.
8          MR. MOSS: Okay.
9     A.   I think I may have seen it as one of
10 the documents that was filed in connection with
11 the litigation, but other than that, no.
12    Q.   Have you seen -- in your review of
13 the documents, Genever BVI and Genever New York
14 as they have been referred to here today, in
15 reviewing in preparation for this deposition,
16 did you see those documents within their
17 records?
18         MR. MOSS: Objection to the form.
19    A.   Did I see Exhibit 4?
20    Q.   Exhibit 4, correct.
21         MR. MOSS: I don't know what "those
22    documents" mean.
23    Q.   Exhibit 4, this set of pages that is
24 Exhibit 4.
25    A.   So did I see Exhibit 4 in connection

Case 22-50073   Doc 183-3   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 33 of
PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. VS.                                    241
KWOK HO WAN

DANIEL PODHASKIE
December 11, 2019

PODHASKIE

1        PODHASKIE
2   with the documents I reviewed in connection for
3   today's deposition?
4        Q.   Correct.
5        A.   I saw it in connection with -- if I
6   recall, I saw it in connection with the filings
7   that were made in the New York litigation.
8        Q.   Was it contained within the records
9   that you reviewed in preparation for today?
10       A.   The records maintained by Genever
11  New York?
12       Q.   Correct.
13       A.   And Genever BVI?  I don't think so.
14       Q.   Exhibit 5, do you see a Bates stamp
15  on that document?
16       A.   (Document review.)  No.
17       Q.   Now, this document appears to have
18  been filed in the litigation or in a
19  litigation, anyway.  I believe that's the
20  docket number in this case.
21       A.   Yes, it appears so.
22       Q.   Do you recall seeing this document
23  before today?
24       A.   Again, I think I may have seen this
25  when I reviewed the litigation file as

PODHASKIE

1        PODHASKIE
2   something that was filed in the litigation.
3        Q.   Do you recall seeing this document
4   within the books and records maintained by
5   Genever New York?
6        A.   I don't recall, no.
7        Q.   How about Genever BVI?
8        A.   I don't recall.
9        Q.   Exhibit 6, which is the memorandum?
10       A.   Yes.
11       Q.   Do you see any Bates stamps on
12  there?
13       A.   (Document review.)  No.
14       Q.   But there is a docket filing number,
15  correct?
16       A.   Yes.
17       Q.   Do you recall seeing this document
18  in the books and records maintained by Genever
19  New York?
20       A.   Exhibit 6?
21       Q.   Correct.
22       A.   No.
23       Q.   Genever BVI?
24       A.   No.
25       Q.   Exhibit 7, do you see a Bates stamp

PODHASKIE

1        PODHASKIE
2   number on this document, when you find it?
3        A.   (Document review.)  No.
4        Q.   Do you know -- up top, do you see
5   that it was filed in this proceeding in the
6   eCourt's filing system?
7        A.   By "the proceeding," you're
8   referring to the litigation?
9        Q.   Correct.
10       A.   Yes.
11       Q.   In your review of Genever New York's
12  books and records, do you recall seeing this
13  document?
14       A.   I don't recall.
15       Q.   In your review of Genever BVI's
16  books and records, do you recall seeing this
17  document?
18       A.   I don't recall.
19       Q.   Exhibit 8, do you see a Bates stamp
20  number on here?
21       A.   No.
22       Q.   And Exhibit 8, at the top, do you
23  see -- would you agree that it was filed in New
24  York County Clerk in this litigation?
25            MR. MOSS: Objection, leading.

PODHASKIE

1        PODHASKIE
2        A.   Yes.
3        Q.   And prior to today, do you recall
4   seeing this document?
5        A.   I think I would have seen it in
6   connection with my review of the litigation
7   file.
8        Q.   In your review of the Genever New
9   York books and records, do you recall seeing
10  this document?
11       A.   I don't recall.
12       Q.   And in your review of the books and
13  records for Genever BVI, do you recall seeing
14  this document?
15       A.   I don't recall.
16            MR. MITCHELL: No further questions.
17            MR. MOSS: No questions.
18            MR. SARNOFF: Thank you.
19            THE VIDEOGRAPHER: This concludes
20       today's deposition.  We are now going off
21       the record.  The time is 5:46 p.m.  Thank
22       you.
23            (Time noted:  5:46 p.m.)
24
25

Page 125

### ACKNOWLEDGMENT

1
2
3    STATE OF          )
4                      :ss
5    COUNTY OF         )
6
7        I, DANIEL PODHASKIE, hereby certify
8    that I have read the transcript of my testimony
9    taken under oath in my deposition; that the
10   transcript is a true, complete and correct
11   record of my testimony, and that the answers on
12   the record as given by me are true and correct.
13
14
15
16   _____
17        DANIEL PODHASKIE
18
19
20   Signed and subscribed to before me
21   this _____ day of _____, _____.
22
23
24   _____
25   Notary Public, State of _____

Page 126

### CERTIFICATE

1
2
3    STATE OF NEW YORK )
4                      :ss
5    COUNTY OF RICHMOND)
6
7        I, MELISSA GILMORE, a Notary Public
8    within and for the State of New York, do hereby
9    certify:
10       That DANIEL PODHASKIE, the witness
11   whose deposition is hereinbefore set forth, was
12   duly sworn by me and that such deposition is a
13   true record of the testimony given by such
14   witness.
15       I further certify that I am not
16   related to any of the parties to this action by
17   blood or marriage; and that I am in no way
18   interested in the outcome of this matter.
19       IN WITNESS WHEREOF, I have hereunto
20   set my hand this 16th day of December, 2019.
21
22
23
24   _____
25   MELISSA GILMORE

Page 127

1                *** ERRATA SHEET ***
2        ELLEN GRAUER COURT REPORTING CO., LLC
3           126 East 56th Street, Fifth Floor
            New York, New York 10022
                 212-750-6434
4
5    NAME OF CASE: PACIFIC ALLIANCE v. KWOK HO WAN
     DATE OF DEPOSITION: DECEMBER 11, 2019
6    NAME OF WITNESS: DANIEL PODHASKIE
7    PAGE  LINE      FROM          TO        REASON
8    ___|____|_____|_____|_____
9    ___|____|_____|_____|_____
10   ___|____|_____|_____|_____
11   ___|____|_____|_____|_____
12   ___|____|_____|_____|_____
13   ___|____|_____|_____|_____
14   ___|____|_____|_____|_____
15   ___|____|_____|_____|_____
16   ___|____|_____|_____|_____
17   ___|____|_____|_____|_____
18   ___|____|_____|_____|_____
19
20                  _____
21   Subscribed and sworn before me
22   this____day of_____,20__.
23
24   _____    _____
25   (Notary Public)      My Commission Expires:

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. vs.
KWOK HO WAN

DANIEL PODHASKIE
December 11, 2019

113:7

## $

**$3 (1)**
101:12

## A

**AARON (1)**
3:7
**aaron@lmesqcom (1)**
3:9
**able (1)**
36:2
**accept (1)**
78:13
**access (2)**
116:9,10
**accordance (1)**
110:21
**according (3)**
45:22;86:6;106:7
**account (17)**
27:5;88:5,13,15;
89:6,19,22;90:4,7;
100:12,13,19,23;101:5,
6,17,24
**account's (1)**
100:17
**accurate (19)**
9:12;18:17;21:12;
23:15,18;29:18,21;
44:18;45:12;46:12;
51:6;60:18;66:9;73:24;
74:8,14;83:23;94:8;
106:11
**acquired (1)**
47:23
**acquisitions (1)**
101:23
**Act (13)**
23:4;29:10;40:15,22,
24;41:7,9;61:20;99:8,
15,17,25;117:19
**acted (1)**
33:12
**acting (1)**
110:22
**actions (4)**
41:15,22;42:3;80:24
**activity (2)**
52:17;53:16
**Acts (2)**
23:4;46:3
**actual (1)**
84:5
**Actually (1)**
97:24
**add (1)**
70:2
**added (2)**
25:21;86:25
**additionally (1)**

address (22)
16:19;34:24;35:7,8,
16,16,21,23;36:3,6,14,
25;39:24;40:6,6;97:8,
16,18,21,25;98:4,20
**addresses (4)**
35:20;36:12;97:23;
98:6
**adds (1)**
30:11
**administer (1)**
6:15
**affidavit (3)**
75:6;118:9,15
**affiliation (1)**
19:12
**again (16)**
13:6;29:19;33:4;
40:10;47:25;48:7;
57:23;60:15,19;61:6;
63:6;65:10;73:7;79:23;
115:6;121:24
**against (2)**
49:17;92:23
**age (1)**
71:24
**agent (9)**
27:22;28:5;33:12;
35:9,17;36:13,23;98:2,
5
**ago (3)**
85:22;90:17;91:24
**agree (1)**
123:23
**AGREED (3)**
6:4,9,13
**agreement (14)**
26:20;73:17;82:10,
17,24;86:17;102:9,17;
103:2,6,10;104:24;
105:2;110:12
**agreements (2)**
26:24;102:21
**al (1)**
7:7
**Albany (1)**
98:2
**Alliance (1)**
7:6
**Alliance's (2)**
67:17;68:8
**allow (5)**
11:23;63:20;109:25;
113:9;115:7
**amount (1)**
30:18
**and/or (2)**
110:3,4
**Andrea (1)**
45:15;80:19
**answered (12)**
18:13;19:5;47:18;

60:24;62:3,7,8;63:5;
86:20;95:5;99:11;
116:7
**apart (2)**
86:14;98:6
**apartment (24)**
24:14;59:8;73:21;
74:2,5,10;75:16,22;
76:2,7,24;77:4,21;
78:18,25;80:2;83:20;
84:2,22;87:7;97:19;
107:11;108:22;109:11
**apparent (1)**
28:10
**appear (8)**
7:21;21:12;29:21;
55:15,17;57:7;66:6;
69:19
**appearances (1)**
7:21
**appears (17)**
21:2;23:10,17;29:15;
30:12;45:4;55:9;57:4;
65:24;66:10;69:8;
103:10;104:4,13;
114:5;121:17,21
**application (5)**
15:14;112:21;113:3;
114:3;117:25
**applying (2)**
108:16;111:23
**appointed (5)**
38:4,16;40:24;41:6;
43:22
**appointing (1)**
39:23
**appoints (1)**
40:22
**approach (1)**
70:20
**approaching (1)**
72:4
**approval (4)**
110:5,11;111:8,16
**argument (1)**
91:12
**around (8)**
53:7,11,16;70:3;
83:10;85:20;100:5;
112:10
**Asia (1)**
7:6
**assert (1)**
12:3
**asserting (1)**
91:11
**asset (10)**
25:3,6,9;46:13,18,
22;47:8,11,24;48:3
**assets (29)**
14:14;25:10;47:4,15,
19;48:9,13,15,16,18,
20;49:6;50:11,19;51:9;

59:5,16;61:4,15,23,24;
62:10;63:2;100:8;
101:3,17,21;102:16;
110:3
**assign (1)**
71:5
**assigned (2)**
50:13;70:23
**assignments (1)**
73:14
**assume (5)**
9:11;46:17;80:3;
96:25;100:4
**assuming (1)**
17:15
**Attachment (2)**
58:5,10
**attended (3)**
15:8,10;42:6
**attention (9)**
20:2,20;29:6;44:19;
58:15,17;80:8;84:23;
105:5
**attorney (5)**
11:22;82:3;92:17;
113:17;119:20
**Attorneys (3)**
3:4;6:4;96:7
**authentic (5)**
23:14;29:18;45:12;
57:8;69:16
**authority (1)**
46:5
**Authorization (3)**
20:21,25;21:8
**authorize (1)**
99:24,24
**authorized (21)**
6:15;40:15;41:9;
45:20,21,25;46:2;82:7,
9;95:19,24;96:3;99:8,
14,17,20,21;100:6;
117:18,21,24
**available (5)**
60:5,17;61:21;65:2,7
**Avenue (2)**
3:5;97:11
**avoidance (1)**
107:21
**aware (18)**
24:5;36:16;38:19,22,
23;50:9;67:20;70:17;
72:8;90:13;97:24;98:3,
8;101:22,23;102:14,15,
23

## B

**back (5)**
43:11,15;75:3;80:6;
116:4
**background (3)**
105:6,22;110:17

bad (1)
81:17
**bank (17)**
27:4;40:12;88:5,7,
13,15;89:6,19,22;90:4,
7;100:11,13,17,19,22;
101:24
**Based (13)**
21:10;23:16;29:19;
31:17;32:16;33:4;39:8;
46:11;55:15;64:21;
86:13;114:4;116:8
**Bates (13)**
19:24;20:7,15,20,22;
29:8;44:23;119:14,25;
121:14;122:11,25;
123:19
**became (4)**
37:13,25;72:3;
117:21
**become (5)**
37:9;65:6;72:5;
112:21;113:4
**beginning (2)**
22:9;75:2
**behalf (17)**
8:24;11:8;15:15;
40:15;41:16,23;42:8;
45:21;52:2;58:11;
70:19;71:2,3;99:8,15,
18,25;104:14,17;
113:19;117:19
**below (1)**
104:10
**beneficial (4)**
108:7,17,21;109:10
**beneficially (1)**
114:11
**beside (1)**
78:19
**besides (8)**
23:23;31:18;34:2;
36:12;38:24;83:15;
101:17;104:11
**best (2)**
13:23;64:15
**bills (1)**
91:8
**block (1)**
45:7
**Blue (14)**
26:22;53:23;54:2,5,
11,14,19;66:4;67:21;
69:12;73:10;102:22;
110:9;111:11
**board (8)**
39:2,12;52:16;53:15;
72:4;96:25;111:23;
112:19
**books (10)**
35:22;36:7,10,14;
122:4,18;123:12,16;
124:9,12

**both (10)**
13:19;14:7,9,11,15;
83:19;92:17;93:13,17,
24
**bottom (3)**
21:14;103:14,16
**Bravo (26)**
28:7;32:9,13;73:18;
102:10;103:7;104:14;
108:3,7,16;109:5,9;
110:14;111:5,8,24;
112:3,6,9,23;114:10,
17,20,24;115:2,10
**break (1)**
115:23
**brief (1)**
15:3,4;60:6;63:11
**briefly (1)**
14:18
**British (4)**
22:5;23:4;34:25;
98:19
**broader (1)**
15:22
**brokers (1)**
42:19
**business (20)**
14:7;26:4,8;29:9;
34:21;35:4;42:7;46:6;
55:23;56:6,16;57:14;
61:20;64:5;66:14;
69:22;86:22;87:4,8;
112:11
**buy (5)**
15:7,18;24:18;25:6;
51:21
**buying (1)**
113:19
**BVI (203)**
8:24;9:4,7,20;10:5,
12;11:9,17;13:19;14:7,
9,12,15;16:22;17:5;
19:19;21:4;23:4,12,19,
20,24;24:6;25:15;26:4,
8,14,20,24;27:4,7,14,
15,17,23;28:8;29:9,16;
30:8,21;31:2,6,12;
32:15,21;33:2,6,12,24;
34:2,8,16;35:4,8,10,15,
18;36:14,17,20,24;
37:3,7,11;38:2,8,21;
39:2,12,15;40:15,24;
41:7,10,16,23;42:9,16,
22;43:4,8,19,22,24;
44:5,10,15;45:21;
46:14;47:3,9,10,14,19,
23;48:3,19,23;49:5;
50:11,13,23;51:3,4,12,
13,24;53:22;54:5,25;
55:10,21;56:5,14;
57:13,23;59:5,6,17,22;
61:4,15,19,20,24;
62:10,12;63:2,7,10;
64:2,4,7,11,16,22;65:6;
66:13;67:12,15;69:21;
70:11,12,13,19,20,22;
71:2,6;72:14;73:15;
74:3;77:14,23;80:11,
13,25;81:7,10,18;83:8,
18;84:10,18,19;85:18,
23;86:8;90:11,15;91:3,
18;94:5,12,16;95:2,22;
98:24;99:21,23,24;
102:11;104:18;105:9,
12,23,24;106:8;107:15,
22;108:8;110:3,4;
111:10;117:7,11,18;
118:6;120:13;121:13;
122:7,23;124:13
**BVI's (19)**
14:13;28:13;30:22;
32:19;45:5;47:15;48:9,
15;50:19;54:14;57:17;
65:4;66:8,16;78:14;
90:23;98:20;116:11;
123:15

# C

**called (7)**
8:1;13:10,12;26:21,
22;50:20;53:23
**calling (1)**
65:22
**calls (2)**
68:22;108:24
**came (6)**
28:4,7;53:4;89:15;
109:4;115:11
**can (41)**
10:14,15,23;11:13;
13:23;14:24;16:17;
18:3;19:2;20:23;21:9;
23:2,7;24:24;25:19;
26:16,18;29:6,13;34:5;
41:19;42:3;44:19,24;
46:10;48:14;55:8;
56:13;57:2;63:19,23;
65:12,20;66:22;69:7;
77:24;78:15;84:25;
91:11;94:2;108:25
**capacity (2)**
43:24;46:24
**Capital (14)**
26:22;53:23;54:2,5,
11,15,19;66:4;67:22;
69:12;73:10;102:23;
110:9;111:11
**case (4)**
19:22;49:25;75:7;
121:20
**cause (1)**
82:9
**caution (1)**
32:3;40:10;52:12
**cents (1)**

29:24
**certain (4)**
52:8;100:5;103:23;
110:19
**certainly (3)**
11:23;63:21;65:12
**certainty (1)**
80:4
**Certificate (7)**
23:5,11;29:16;39:21;
55:3;65:15,25
**certify (1)**
125:7
**changed (2)**
25:16;86:23
**charge (21)**
36:9;55:4,18,20;
56:20,24;57:6,9;60:5,
16;64:3,25;65:16;66:2,
3;67:16;69:4,10,12,16;
110:2
**charges (1)**
65:6
**Chase (4)**
88:8;100:12;101:5,
17
**check (1)**
27:20
**China (4)**
31:22;88:19,21,25
**chose (1)**
25:13
**City (1)**
46:7
**clarification (3)**
13:4;43:10;92:12
**clarify (1)**
119:5
**clarity (1)**
28:19
**clear (4)**
43:17,21;48:17;73:5
**Clerk (1)**
123:24
**client (1)**
93:19
**colleague (1)**
31:21
**collection (2)**
19:21;20:6
**commemorate (1)**
52:17
**communicate (2)**
13:2,8
**communicated (2)**
42:16,19
**Companies (3)**
23:4;29:9;61:20
**Company (25)**
7:16,19;22:7;24:8,
10;32:10;36:4;42:22;
46:18,21;53:23;74:11;
75:16,23;76:3;105:9,

11,14,24;107:16,22;
110:3,4;112:23;114:9
**compilation (1)**
20:14
**complete (2)**
80:24;125:10
**complicated (1)**
48:14
**concludes (1)**
124:19
**conclusion (1)**
68:23
**conducted (3)**
26:5,9;87:5
**confirm (1)**
114:8
**connection (18)**
12:8;16:14;19:12;
40:25;49:20;66:5;
91:19;93:9;104:23;
113:3;114:2;118:10;
120:10,25;121:2,5,6;
124:6
**Connolly (2)**
45:19;82:4
**Consent (4)**
44:22;45:5,22;46:11
**consider (2)**
37:15;47:10
**considers (1)**
47:14
**consistent (3)**
57:16;85:14;108:11
**contained (1)**
121:8
**Cont'd (1)**
3:1
**contract (3)**
26:16;50:2;87:11
**contracts (3)**
26:15,25;87:11
**control (4)**
94:16,20,25;117:6
**controlled (1)**
52:23
**controls (2)**
52:25;54:10
**conversation (5)**
12:17;13:25;15:25;
16:9,12
**conversations (4)**
16:10;26:2;27:3;
28:2
**co-operation (1)**
110:21
**co-own (1)**
110:20
**co-owner (1)**
110:24
**co-owners (6)**
110:6,11,16,17;
111:5,9
**copies (1)**

11,14,24;107:16,22;
110:3,4;112:23;114:9
**copy (18)**
21:7;23:10,18;29:15,
21;45:5;55:10,17;57:4,
8;64:8,12;65:25;66:9;
69:8,15,16;103:10
**corporate (21)**
8:9;9:15;10:2;11:16;
12:10,18;13:18;14:2,8;
19:21;20:7,17;33:11;
34:21;35:5;39:19;
41:20;53:16;77:24;
78:15;99:5
**Corporation (23)**
8:24;9:8;22:4,5,6,17;
23:6;29:11;30:7;31:9;
44:22;76:8,12,14,17,
21;77:9,12;80:17,24,
25;100:11;105:9
**corporations (2)**
84:4;85:4
**correctly (1)**
22:8
**counsel (4)**
7:20;74:20;104:22,
22
**counsel's (2)**
91:14,15
**County (3)**
7:9;123:24;125:5
**couple (3)**
33:21,25;119:3
**course (12)**
29:3;33:6;55:22;
56:5,15;57:14;64:4,17;
66:13;69:22;109:6;
118:4
**court (6)**
6:17;7:8,17,24;
60:11;63:12
**covenants (4)**
109:14,15,18,25
**cover (1)**
101:15
**covered (1)**
11:10
**create (1)**
109:25
**created (1)**
110:2
**currently (11)**
14:15;34:11,12;
41:11;48:10,19;49:9,
14,16;54:24;115:10
**cut (1)**
27:20

# D

**DAN (2)**
3:14;7:14
**Daniel (3)**
7:4;125:7,17

Case 22-50073   Doc 183-3   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 37 of
241

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. v.
KWOK HO WAN

DANIEL PODHASKIE
December 11, 2019

**date (7)**
7:12;20:21,25;21:8;
59:16;61:18;71:16

**dated (9)**
21:2;45:6;57:6;
59:14;66:2;69:10;
103:11;112:15,19

**dates (1)**
53:10

**day (7)**
21:3;33:17,21,24;
34:10;37:19;125:21

**days (5)**
33:21,25;83:9;85:18;
86:14

**debt (1)**
27:19

**December (2)**
7:13;16:4

**decision (3)**
51:23;52:6;54:14

**Declaration (1)**
102:25

**decreased (1)**
115:3

**deemed (2)**
83:7,13

**defendant (1)**
58:11

**Defendant's (2)**
58:2,8

**defined (3)**
10:12;111:5;114:9

**defines (1)**
105:8

**Department (1)**
85:4

**depose (1)**
78:10

**deposited (1)**
90:6

**deposition (33)**
6:13;7:4,11;9:16,20;
10:3,5,10,11,18,25;
11:5,15;12:13;13:17;
16:15;29:4;40:21;41:2,
7,11;55:16;63:16;70:8;
74:16,19;75:13;109:8;
115:22;120:15;121:3;
124:20;125:9

**designated (1)**
11:16

**DI (2)**
91:10;93:19

**different (2)**
25:12;42:14

**direct (9)**
19:25;20:19;29:6;
44:19;58:15,16;80:7;
84:23;105:5

**director (23)**
32:25;33:13,14,16,
17,17,23,24;34:2,8,10,

**directors (10)**
33:7,10;37:21,23;
38:9;39:21;95:15,17;
96:25;112:20

**Director's (3)**
20:21,25;21:8

**disbursed (1)**
87:15

**disclose (1)**
108:15

**discuss (3)**
12:8,20;13:16

**discussed (10)**
13:17;14:6,8,10,12,
14,18;16:18,19;102:22

**discussion (3)**
14:22;15:3,5

**discussions (8)**
11:25;67:14;70:3,12;
72:13,20;73:3,13

**dispute (1)**
91:25

**distinguishing (1)**
31:7

**docket (2)**
121:20;122:14

**Document (74)**
10:9;20:23,24;22:12,
18,20;23:2,14;29:14,
18;44:21,24,25;45:13,
15;55:8,9,19,21;56:17;
57:2,12;58:12;59:14;
60:15;64:3,8,12,14,17,
18;65:20,24;66:9,10,
12;69:20;84:25;85:2,
10,25;86:5;103:9;
105:17;106:7;107:3,6,
12;109:8;114:22;
117:5,10,14,17,20,23;
118:3,4;120:4,5;
121:15,16,17,22;122:3,
13,17;123:2,3,13,17;
124:4,10,14

**documents (61)**
19:21;20:2,3,7,14,
17;21:10;23:16;26:2;
27:2;28:2,11;29:19;
30:15,23;31:17;32:16,
18,22;38:13;39:6,13,
15,19,25;41:21;42:16,
22,22;43:23;44:17;
45:3;47:21;56:4,14;
57:24;63:17;65:5;
85:23;86:13;95:13;
97:5;98:10,18,20,25;
99:3,5;102:2;109:7;
111:15;115:18;116:9,
20,25;119:19;120:10,
13,16,22;121:2

**dollar (4)**
30:2,3,8,13

**done (1)**
42:6

**doubt (1)**
107:21

**down (3)**
58:22,23;105:6

**during (5)**
13:25;29:3;32:19;
33:6;74:19

**duties (1)**
19:11

## E

**earlier (6)**
43:12;53:20;64:2;
67:21;75:13;102:22

**early (1)**
111:22

**ECF (1)**
75:8

**eCourt's (1)**
123:6

**effect (1)**
6:16

**effective (7)**
21:2;59:23;61:18;
62:13;63:7;69:10;
85:12

**EIN (2)**
42:25;117:25

**either (7)**
40:21,23;45:18;
73:15;82:3;92:18;
111:10

**elaborate (1)**
26:18

**elected (1)**
38:4

**Elian (4)**
33:14,16,23;37:19

**Ellen (2)**
7:15,18

**else (11)**
12:16,20;14:17;
16:23;24:4;31:11;
77:18,25;78:16;87:21,
25

**E-MAIL (2)**
3:9;36:24

**employed (1)**
19:9

**employees (3)**
36:18;96:16,19

**employer (2)**
42:25,25

**encumbered (6)**
48:10;49:10,13;50:6;
102:5,16

**encumbrances (1)**
102:14

**end (1)**
64:18

**ended (3)**
24:15;32:12;84:12

**engaged (1)**
42:7

**England (1)**
13:15

**enough (1)**
101:14

**enter (4)**
82:10,17,24;86:17

**entered (10)**
26:14,19,20,24;
52:10;66:19;67:10,16;
87:10;103:12

**enters (1)**
50:2

**entirety (5)**
30:21;59:9;61:5;
94:7,13

**Entities (12)**
3:4;8:9,12;19:23;
20:18;93:8,18,25;
103:8;107:23;108:2,18

**entitled (3)**
20:21,24;44:21

**entity (19)**
8:16,23;9:4;21:5;
26:21,22;27:8,12,13,
16;28:9;50:20;85:7;
93:8,13,16,23;113:19,
22

**ESQ (1)**
3:7

**established (1)**
59:21

**estate (11)**
24:9,13,16,19,20,25;
42:19;83:6,12,15;
84:16

**et (1)**
7:7

**even (1)**
95:2

**evidencing (1)**
109:8

**exactly (4)**
24:20;67:9;85:19;
116:14

**EXAMINATION (2)**
8:6;119:7

**examined (1)**
8:3

**except (1)**
6:9

**executed (1)**
117:22

**Exhibit (47)**
9:15,19;10:4,9,11,15,
16,24,24;17:9;20:6,13;
44:20;55:3,7,20;56:18,
22;58:2,8;65:15,18;

69:2,5;74:15;75:12;
80:6;84:24;86:4;
102:25;103:5;112:14,
18;119:11,24;120:6,19,
20,23,24,25;121:14;
122:9,20,25;123:19,22

**exhibits (5)**
56:2,3,3;119:10,11

**exist (1)**
46:5

**existence (5)**
30:22;32:20;33:7;
94:7,14

**expected (2)**
63:21;65:13

**experience (1)**
64:22

**explained (1)**
58:18

**extended (1)**
79:7

**extent (1)**
80:23

**extra (1)**
74:18

## F

**facility (2)**
54:4,6

**fact (4)**
59:17;67:15;72:4;
117:6

**false (5)**
60:9,12,20;61:8,12

**familiar (1)**
92:3

**family (4)**
15:20;31:24;84:16;
114:6

**far (2)**
21:9;29:17

**father (3)**
15:9;72:2;112:10

**February (13)**
21:3;23:20;37:12,24;
45:6;66:2;85:12,24;
86:7,9,10;87:5;103:11

**feel (1)**
20:3

**fees (12)**
87:19;88:2;90:23;
91:4,19;92:9;93:4,7,13,
17,24;100:16

**felt (2)**
84:7,20

**few (3)**
85:22;90:17;91:24

**Fifth (1)**
97:11

**file (2)**
121:25;124:7

**filed (10)**

58:10;60:6;61:19;
63:11,17;120:10;
121:18;122:2;123:5,23
**files (3)**
22:21;64:18;116:11
**filing (3)**
6:6;122:14;123:6
**filings (1)**
121:6
**Finance (1)**
112:13
**find (2)**
36:2;123:2
**fine (5)**
8:18;9:5;28:25;29:5;
43:16
**firm (10)**
45:18;82:4;90:16,20;
91:5;92:6,13,14,16,21
**firms (1)**
92:18
**firm's (1)**
92:9
**first (13)**
13:4;22:10,11;33:14,
17,23;75:21;80:10,18;
103:16;104:6;105:7;
109:21
**fit (2)**
83:7,13
**five (6)**
10:17,21,25;11:5;
58:23;85:18
**flip (2)**
20:4;56:13
**floor (11)**
76:24;77:4,21;78:18,
25;82:18;97:15,20;
106:20,25;107:8
**focus (2)**
19:19;60:7
**follow (2)**
91:13,15
**follows (1)**
8:4
**force (1)**
6:16
**form (113)**
6:10;10:7;11:11;
17:25;18:9;19:14;
21:15;23:8;24:22;
25:17,23;26:11;27:9;
30:9;31:3,13;34:3,18;
39:4,10,17;40:16;41:5,
12,17,24;42:10;44:7;
46:2,8,15;47:5,17;48:5,
11;49:3,11,22;50:7,15,
21;51:14,25;57:19;
59:19;60:2,13,21;
61:10;62:2,17;63:13;
64:19;65:8;66:20;67:6,
18;68:9,15,21;69:17,
23;70:15,24;71:8;

72:17;73:22;74:6,12;
76:4,25;77:15;78:2,20;
79:2,22;81:13;82:8,12,
20;83:2,21;86:11,19;
89:2,24;90:24;93:10;
95:4;96:5;97:3,9;
98:11,21;99:10;100:2;
101:7;102:7,19;104:8;
107:5;108:23;111:12,
18,25;113:5;115:5;
116:12,21;117:8;
118:7,17;120:18
**formal (1)**
53:16
**formalities (1)**
13:18
**formation (13)**
14:6;25:6,9,16;
28:14;41:21;42:12;
43:13,21;81:20;82:15;
96:8;99:5
**formed (27)**
22:16;24:6,7;33:2;
37:12,24;39:20;44:16;
82:10,16;83:9,19;84:3,
10,15;85:17,18,20,23;
86:6,6,8,10,17;87:5;
88:9;90:4
**forming (3)**
22:4;23:24;82:23
**forms (1)**
15:14
**foundation (1)**
81:12
**four (2)**
58:23;86:14
**front (2)**
35:25;75:5
**full (1)**
116:11
**Fund (1)**
7:7
**funded (2)**
88:15;100:14
**funding (1)**
32:12
**FURTHER (5)**
6:8,12;109:18;
118:24;124:16
**future (1)**
49:20

## G

**gave (1)**
51:21
**generated (1)**
39:20
**Genever (416)**
3:4,13;8:12,16,20,21,
24;9:4,7,7,17,20;10:4,
5,10,11;11:8,9,17,17;
13:19,19;14:7,8,9,10,

12,12,13,14,15,16;
15:15;16:20,21,22,25;
17:4,8,14,16,18,22,24;
18:7,13,20,25;19:6,9,
13,19,23;20:18;21:4;
22:6,16,23:6,11,19,24;
24:6,10,16;25:15;26:4,
6,8,9,14,19,24;27:4,7,
14,15,16;28:8,13;
29:10,16;30:7,7,21,22;
31:2,6,12;32:15,19,21;
33:2,6,24;34:2,8,16;
35:4,7,14,15;36:17,20,
24;37:3,7,11;38:2,8,21;
39:2,12,15;40:15,24;
41:7,10,16,23;42:8,16,
22;43:4,6,8,18,19,22,
24;44:5,6,10,11,13,15,
16,21;45:5,21;46:2,4,
13,14,25;47:3,4,8,9,10,
10,14,14,15,19,20,23,
24;48:3,4,9,15,19,20,
23;49:5,6,9,25;50:6,11,
13,19,23,25;51:3,4,9,9,
12,13,16,18,21,24;
52:2;53:22;54:5,14,25;
55:10,21;56:5,14,14;
57:12,16,22;59:5,6,7,
17,22;61:4,15,24;
62:10,12;63:2,7,10,10,
25;64:4,7,11,16;65:4;
66:8,12,16;67:12,15;
68:19,25;69:21;70:11,
11,13,19,20,22;71:2,6,
6;72:14,14;73:15,15;
74:3,4;76:9;77:13,13,
23,23;78:14,14;80:11,
12,13,14,16,25;81:3,7,
8,10,11,11,18,19,19;
82:8,9,16,23;83:8,8,11,
14,18,18;84:9,10,18,
19,19;85:5,7,10,17,18,
23;86:8,9,16,16,22;
87:4,10,14,24;88:4;
89:5,10,18,21;90:3,7,
11,11,15,15,22,23;
91:3,4,18,18,23;92:5,
22;93:4,14,17,24;94:5,
6,7,10,12,13,13,16,20,
25;95:8,11,14,18,22;
96:3,10,15,18,21,24;
97:7,14,18,22;98:5,9,
17,18,20,24,24;99:3,8,
15,18,21,23,24,25;
100:7,8,20;101:2,6,16,
20;102:5,10,11,15;
103:8;104:18,18;
105:9,12,14,16,24;
106:4,8,8,15,17,23;
107:16,23,25;108:8,8,
14,17;111:10;113:12,
15,20;116:10,11;117:6,
11,18,19,21,25;118:6,

6,11,16;120:13,13;
121:10,13;122:5,7,18,
23;123:11,15;124:8,13
**Genever's (2)**
22:21;85:14;108:11
**Gilmore (1)**
7:18
**given (1)**
125:12
**glad (1)**
118:20
**gladly (1)**
78:12
**Golden (9)**
88:16,18,19,21,25;
89:15,17;90:8;100:14
**goods (1)**
27:21
**Grauer (2)**
7:15,19
**Great (1)**
10:13
**Group (3)**
88:19,21,25
**guess (1)**
43:20
**Guo (71)**
11:18;12:23;13:6,12,
13,24;15:20,23;16:2,9,
12;23:25;28:22;32:11,
11;34:14;36:11;37:5,
13,25;38:4,10,12,17,
24;39:23;40:20,23;
41:8,22;42:5;43:21;
52:4;54:3;66:5;70:7;
71:12,20;72:5;78:24;
79:10,15,18,25;83:25;
84:6,11,16,20;88:23;
94:19,24;95:25;96:4;
99:17,24;100:6;
103:20;104:2,5,11,14;
112:4,8,11;114:12;
115:9;117:6,18,20,24

## H

**hand (1)**
19:20
**handed (8)**
9:24;55:6;56:22;
58:7;65:18;69:5;74:18;
112:17
**happened (1)**
115:15
**happens (1)**
78:10
**head (2)**
35:25;71:17
**held (8)**
7:11;14:15;47:19;
51:9;98:20;101:2,16;
110:3
**helpful (1)**

12:5
**HEREBY (3)**
6:3,6;125:7
**herein (1)**
6:5
**himself (3)**
71:23;104:19;112:6
**hired (1)**
27:22
**Ho (5)**
21:18,20;45:7;
112:21;114:12
**Hodgson (8)**
7:12;58:11;60:5,8,
17;90:16,23;92:15
**hold (1)**
35:14;48:24;49:6;
83:19;84:10;100:9,15,
18;106:8,24;107:11,16
**holding (6)**
30:7;105:25;106:18;
107:7,21,25
**Holdings (13)**
8:13,21,24;9:8;22:6,
16;23:6;29:10;44:21;
80:16;85:5;105:9,14
**Hong (6)**
35:21;36:15;40:6;
88:19,22,25
**Hotel (1)**
14:20;24:14;77:21;
78:18;79:9,18;83:16;
86:18;87:12;90:9;
91:24;98:7;100:24
**hundred (1)**
51:7

## I

**idea (4)**
71:18,24;72:3;84:6
**identification (11)**
9:18,21;20:8;42:25;
55:5;56:21;58:6;65:17;
69:4;103:3;112:16
**identified (1)**
119:14
**identify (13)**
20:23;23:2,7;29:13;
44:24;55:8;57:2;65:20;
69:7;77:25;78:16;
84:25;100:21
**inaccurate (3)**
22:21;83:24;114:22
**Inc (1)**
112:22
**include (1)**
59:7
**incorporated (3)**
23:20;29:9;85:11
**Incorporation (2)**
23:5,11
**increased (1)**

Case 22-50073   Doc 183-3   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 39 of 241

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. vs.
KWOK HO WAN

DANIEL PODHASKIE
December 11, 2019

115:2
**incurred (1)**
27:19
**Index (1)**
7:9
**indicated (2)**
12:15;117:23
**indicates (1)**
117:10
**indicating (1)**
49:25
**individuals (2)**
11:25;40:14
**information (1)**
118:15
**Initially (4)**
24:7;33:20;71:22;
83:25
**inquiry (1)**
85:5
**instruct (2)**
91:6;93:19
**instruction (2)**
91:14,16
**interaction (1)**
42:8
**interest (21)**
73:20;74:10;75:15,
22,25;76:7,8,11,13,17,
20,23;77:6,11,20;78:6,
17;83:19;84:11;88:24;
115:2
**interests (1)**
95:11
**into (17)**
26:14,19,20,24;50:2;
52:10;66:19;67:11,16;
82:10,17,24;86:17;
87:11;89:18;90:7;
103:12
**invest (5)**
24:25;54:8;83:6,12;
84:17
**invested (1)**
83:14
**investment (1)**
40:12
**investments (1)**
54:9
**involved (8)**
23:23;42:12,13;
43:13,13,21;52:5;
54:13
**involves (1)**
102:11
**Island (1)**
23:4
**Islands (3)**
22:5;34:25;98:19

**J**

**January (1)**

112:3
**Jersey (1)**
3:6
**JPMorgan (2)**
100:12;101:5
**Judge (1)**
49:24
**jump (1)**
58:22
**June (1)**
69:10
**Justice (4)**
50:5;102:4,13,17

**K**

**keep (1)**
36:7
**kept (1)**
36:15
**kinds (1)**
54:9
**knew (4)**
60:9;66:18;109:4,9
**knowledge (9)**
12:12;42:5;63:22;
66:7,8;89:21;113:9;
115:8;118:20
**known (3)**
22:6;60:17;110:18
**knows (1)**
65:12
**Kong (6)**
35:22;36:15;40:7;
88:19,22,25
**Kwok (100)**
11:18;12:7,8,17;
14:13;15:21;19:24;
21:18,20,22;23:13,16;
23:23;28:14,15,16,21,
22;29:22;30:13,18,20,
25;31:15,19,24;32:25;
33:8,18;34:2,7;37:17;
38:6,16,20;40:20,23;
41:15;45:8,9;48:24;
52:5;54:13;59:2,4,10;
66:18;67:2,3,11;70:14;
71:12;72:6,16;73:19,
25;75:15,24;76:6,19;
77:11,19,19;78:19,23;
84:12,17;88:24;91:17,
23;92:5,23;93:13,17,
24;94:16,20,25;97:19;
99:12,14,16,22;102:10;
104:17,18;108:14;
109:22;111:7,22;
112:5,21;113:3,16,18;
114:5,11,17;115:12;
119:15
**KWOK143 (2)**
20:7,16
**KWOK145 (1)**
22:25

**J**

**KWOK147 (1)**
29:8
**KWOK176 (1)**
20:22
**KWOK193 (3)**
44:20,23;80:8
**KWOK194 (1)**
20:16
**Kwok's (26)**
12:24;13:7;15:24;
21:14;22:21;24:2;
28:23;30:6;31:21;
32:11;70:23;71:7;
73:13;74:9,15,19;
75:12,21;76:11;83:19,
25;103:24;104:3,6;
114:25;119:20

**L**

**landed (1)**
103:4
**last (3)**
10:16,24;80:22
**later (1)**
53:21
**Law (4)**
58:3,9;92:6,9
**LAWALL (1)**
3:3
**laws (1)**
22:4
**lawsuit (10)**
67:17;68:8;90:12;
91:19;92:8,23;93:9,14,
18,25
**lawyer (2)**
45:18;78:10
**lawyers (1)**
64:22
**leading (2)**
119:22;123:25
**lease (4)**
68:14,19;77:3;
108:16
**leases (1)**
76:9
**left (2)**
74:21;104:2
**left-hand (1)**
103:15
**Legal (13)**
7:15,19;63:17;68:22;
90:23;91:4,18;92:9;
93:4,7,13,17,24
**legally (1)**
114:10
**lend (1)**
32:7
**lent (3)**
31:22;32:6,9
**Letter (4)**
112:14,18;114:4,18

**liability (6)**
46:18,21;74:11;
75:16,23;76:3
**lien (2)**
49:16;110:2
**Limited (12)**
26:22;46:18,21;
74:11;75:16,22;76:2;
88:20,22,25;104:15;
112:23
**line (1)**
21:19
**lines (1)**
58:23
**listed (1)**
12:12
**listen (1)**
62:20
**litigation (12)**
117:14;118:10;
119:21;120:11;121:7,
18,19,25;122:2;123:8,
24;124:6
**little (1)**
48:14
**lived (2)**
78:24;79:4
**lives (2)**
31:22;97:19
**LLC (6)**
3:3;8:13,21;85:5;
94:10;105:15
**LLP (1)**
58:11
**loan (6)**
51:17,20;54:4,6,7;
66:5
**located (1)**
13:13
**long (3)**
33:19;64:13;65:14
**look (18)**
10:14,16,23;19:25;
20:4;22:24;43:15;
59:13;75:20;80:18,22;
81:22;86:3;103:14;
105:22;109:24;110:17;
114:7
**looked (2)**
25:12;85:22
**looking (7)**
15:2,6,17;54:3;
85:25;119:18,24
**looks (2)**
85:2;103:24
**lost (1)**
115:12
**lot (2)**
15:10;116:7
**LP (1)**
7:7
**Luck (26)**
28:7;32:9,13;73:18;

102:10;103:7;104:15;
108:3,7,16;109:5,9;
110:14;111:6,9,24;
112:4,7,9,23;114:10,
17,20,25;115:2,10

**M**

**MACOM (2)**
3:14;7:14
**Madison (1)**
3:5
**Magnanini (2)**
93:2,7
**Magnanini's (1)**
93:4
**mail (1)**
99:6
**mailing (8)**
34:24;35:7,8,16,16;
36:6,14;97:21
**maintain (1)**
39:16
**maintained (14)**
39:25;40:7;56:15;
57:13;64:3,16;69:21;
98:14,19,25;105:3;
121:10;122:4,18
**maintaining (1)**
36:9
**maintains (3)**
16:20;35:22;66:13
**maintenance (9)**
87:19;88:2;89:11;
90:9;91:25;100:15,19,
23;101:13
**management (1)**
14:11
**March (11)**
57:6,18,22;59:23;
61:18;62:13;63:8;
112:15,19;114:16;
115:3
**marked (11)**
9:17,20,25;20:8;
55:4;56:20;58:5;65:16;
69:4;103:2;112:15
**marking (2)**
20:9,11
**marks (1)**
74:25
**math (1)**
30:11
**matter (1)**
7:6
**may (26)**
6:13;37:10,13,24;
38:5,15;53:7;55:12;
57:6;59:5,14;60:12,23;
61:5,15,22,25;62:11;
63:3;75:7,8,9;100:6;
110:20;120:9;121:24
**Maybe (2)**

11:20;72:4

**mean (17)**
8:19;9:7;18:4;19:2,
7;34:20;42:3;49:13;
61:12,14;73:2;79:4,6;
92:16;99:12;104:10;
120:22

**meaning (1)**
40:12

**meant (1)**
90:8

**meeting (5)**
39:3,12;42:6;53:15;
97:2

**meetings (2)**
15:8,10

**Melissa (1)**
7:18

**member (13)**
31:24;44:10;80:11,
13;81:3,7,10,18;84:17,
18;94:12;95:20,22

**members (1)**
94:11

**membership (1)**
95:11

**Memorandum (3)**
58:3,8;122:9

**mentioned (3)**
20:14;37:5;50:18

**mentioning (1)**
28:20

**mentions (1)**
45:15

**Michael (2)**
81:23;82:2

**mid (1)**
71:25

**middle (1)**
29:11

**might (2)**
43:6;97:25

**Miles (6)**
11:18;21:22;28:16,
22;77:19;78:19

**million (1)**
101:12

**minutes (2)**
74:21;85:22

**missing (2)**
116:25;117:4

**mistaken (1)**
59:23

**MITCHELL (141)**
3:3,7;10:7;11:11,20;
13:3;17:25;18:9;19:14;
20:9;21:15;23:8;24:22;
25:17,23;26:11;27:9;
30:9;31:3,13;32:3;
34:3,18;39:4,10,17;
40:10,16;41:4,12,17,
24;42:10;43:3;44:7;
46:8,15;47:5,17;48:5,

11;49:3,11,22;50:7,15,
21;51:14,25;52:12;
56:7;57:19;59:19;60:2,
13,21,24;61:10;62:2,
17,24;63:4,13;64:19;
65:8,21;66:20;67:6,18;
68:9,15,21;69:17,23;
70:15,24;71:8;72:17,
23;73:8,22;74:6,12;
76:4,25;77:15;78:2,7,
11,20;79:2,22;81:13;
82:12,20;83:2,21;
86:11,19;89:2,24;
90:24;91:6,10;92:11;
93:10,19;94:2;95:4;
96:5;97:3,9;98:11,21;
99:10;100:2;101:7;
102:7,19;104:8;107:5;
108:23;111:12,18,25;
113:5,14,21;115:5,13,
16,20;116:12,21;
117:8;118:7,17;119:2,
8;120:6;124:16

**Mitchell's (2)**
90:20;91:4

**Monday (1)**
16:3

**money (24)**
27:7,15,19,21;28:4,
9;30:18;31:22;32:6,8,
9;42:7;87:15,24;88:11,
16;89:14,18;90:6,8;
100:15,18;101:4;109:4

**month (1)**
101:15

**monthly (1)**
101:13

**more (5)**
19:3;20:5;26:16;
42:3;101:12

**Morristown (1)**
3:6

**mortgage (1)**
110:2

**MOSS (34)**
8:7;12:4,6;13:5;
20:11;43:9;56:12;62:8;
65:23;73:7;74:17;75:4;
78:9;79:23;81:16;91:8;
92:19;93:21;113:12,
18,23;115:23;116:6,
17;118:22,24;119:6,
22;120:5,8,18,21;
123:25;124:17

**most (1)**
101:4

**Motion (2)**
58:4,9

**much (3)**
14:3,4;64:23

**N**

**name (4)**
7:14;13:4;92:13,21

**nature (1)**
63:18

**necessary (2)**
46:4;80:23

**need (2)**
14:4;20:3

**needed (1)**
27:19

**New (191)**
3:6;7:8,9;8:16,20;
9:17;10:4,10;11:8,17;
13:19;14:8,10,12,14,
16,20;15:8,16;16:21,
21;17:2,8,14,16,18,22,
24;18:7,13,21,25;19:6,
9,13;24:11;26:6,9;
43:7;19:44:6,11,13,16;
46:2,4,6,6,13;47:4,8,
11,14,20,24;48:4,20;
49:6,9;50:2,6,25;51:9,
10;56:14;63:11;68:19;
71:6;72:14;73:15;74:4;
76:10;77:13,23;78:14;
80:12,14;81:3,8,11,11,
19,19;82:8,9,16,24;
83:8,11,14,18;84:10,
19;85:3,7,11,11,17;
86:9,16,23;87:4,10,14,
24;88:4,17,18;89:5,10,
16,18,18,21;90:3,7,11,
15,22;91:4,18,23;92:5;
93:4;94:6,7,10,13,14,
20;95:8,11,14,18;96:3,
10,15,18,21,24;97:7,
14,18,22;98:5,9,17,18;
99:3,8,15,18,25;100:7,
8,14,20;101:2,6,16,20;
102:5,10,15;104:18;
105:16;106:4,8,15,17,
23;107:16;108:7,8,14;
113:12,15,20;116:10;
117:19,21;118:2,6;
120:13;121:7,11;
122:5,19;123:11,23;
124:8

**next (2)**
29:7;104:6

**nobody (1)**
31:11

**Notary (2)**
8:2;125:25

**note (2)**
113:10;119:13

**noted (1)**
124:23

**notice (15)**
9:16,19;10:3,4,10,
11;12:13;50:4;56:18,
23;57:5;65:11;69:2,9;
113:8

**noticed (1)**

13:18

**notices (2)**
11:15;63:16

**Number (19)**
7:10;10:2;36:21,22;
43:2;58:19;75:2;96:22;
105:7,23;106:14;
107:20;119:10,15,15;
121:20;122:14;123:2,
20

**O**

**oath (2)**
6:15;125:9

**Object (107)**
10:7;11:11;17:25;
18:9;19:14;21:15;23:8;
24:22;25:17,23;26:11;
27:9;30:9;31:3,13;
34:3,18;39:4,10,17;
40:16;41:4,12,17,24;
42:10;44:7;46:8,15;
47:5,17;48:5,11;49:3,
11,22;50:7,15,21;
51:14,25;57:19;59:19;
60:2,13,21;61:10;
62:17;63:13;64:19;
65:8;66:20;67:6;68:9,
15,21;69:17,23;70:15,
24;71:8;72:17;73:22;
74:6,12;76:4,25;77:15;
78:2,20;79:2,22;81:13;
82:12,20;83:2,21;
86:11,19;89:2,24;
90:24;93:10;95:4;96:5;
97:3,9;98:11,21;99:10;
100:2;101:7;102:7,19;
104:8;107:5;108:23;
111:12,18,25;113:5;
115:5;116:12,21;
117:8;118:7,17

**Objection (12)**
62:2,24;63:4;67:18;
78:8;113:10;115:13,
16,20;119:22;120:18;
123:25

**objections (1)**
6:9

**obtain (2)**
46:5;54:3

**obtained (2)**
111:17;118:14

**O'Connor (3)**
81:24;82:2,8

**off (21)**
35:24;53:5,9,13,22;
54:20;57:18;67:22;
68:3,5,7,12;70:4,6,9;
71:16;74:22;115:24,
25;119:3;124:20

**office (10)**
16:21;34:21,21;35:2,

3,5;36:4,7;40:2,8

**officer (3)**
6:14;37:16;38:20

**officers (6)**
37:3,11;38:2,9,10,24

**offices (5)**
7:12;34:17,20;96:11,
13

**official (4)**
17:21;18:20;19:5;
52:17

**once (2)**
82:9,16

**one (27)**
8:12;11:14;14:6,6;
19:22,23;25:6,9;30:8;
40:21;47:4,15;58:22;
83:4;86:21;92:18;93:7;
94:2;106:12;107:2,3,
10,13,16,18;119:10;
120:9

**only (5)**
33:17;34:12,14;
54:10;73:2

**oOo (1)**
6:19

**Opportunity (1)**
7:7

**Opposition (2)**
58:3,9

**order (8)**
20:15;49:24;50:5;
58:4,10;102:4,13,18

**ordinary (8)**
55:22;56:5,15;57:13;
64:4,17;66:13;69:21

**organization (1)**
14:11

**Ostrager (1)**
49:25

**Ostrager's (4)**
50:5;102:4,13,18

**out (2)**
74:18;100:22

**outside (6)**
12:2;63:14;65:10;
113:7;115:7;118:18

**over (1)**
86:23

**own (8)**
24:7;32:14,20;51:4,
8;73:25;84:15;95:10

**owned (7)**
32:10;52:21;59:10;
111:24;112:4;114:11,
17

**owner (27)**
29:23;30:25;44:5;
72:3,5;84:5,7,12,19,21;
108:2,3,6,7,17,22;
109:10,18;110:5,11,14,
18,20;111:5,8;112:6;
115:10

**owners (1)**
31:8

**ownership (34)**
14:9;32:18;46:17,21;
59:7;70:13,22;71:6,11,
13;72:13;73:12,20;
74:3,10;75:15,21,25;
76:6,7,11,13,16,20,23;
77:5,19;78:6,13,16;
101:18;112:9;114:19;
115:2

**owning (2)**
26:9;72:2

**owns (13)**
26:6,6;31:11;40:6;
52:25;54:10;74:3,4;
77:11;87:6;88:18,21;
100:10

**P**

**Pacific (3)**
7:6;67:17;68:8

**page (21)**
10:16,24;11:2;20:20,
20;22:25;29:7;44:20;
58:16,19;80:8;84:23;
103:17,25;104:5;
109:16,21;110:17;
114:7,8,10

**pages (1)**
120:23

**paid (6)**
27:7,15,23;30:17;
92:9;93:7

**par (1)**
29:24

**paragraph (5)**
22:10;58:17;75:20;
80:10,23

**paraphrasing (1)**
116:16

**part (1)**
97:15

**particular (2)**
15:23;84:22

**parties (8)**
6:5;90:12;104:23;
105:8;110:19,19,23,25

**party (1)**
59:10

**past (2)**
16:3;102:17

**Paul (3)**
45:19;82:4,5

**PAX (1)**
50:4

**pay (11)**
27:19;28:5;30:13;
89:10;90:8;93:13,16,
23;100:15,19,23

**paying (4)**
90:22;91:3,18;93:3

**payments (2)**
88:12;100:22

**pays (1)**
91:8

**pending (1)**
67:17

**people (4)**
64:22;78:12;93:8;
99:7

**percent (9)**
51:5,8;112:6,9;
114:11,12,17;115:10,
12

**period (2)**
33:20;38:18

**periods (1)**
79:7

**permit (1)**
46:4

**person (17)**
13:2;27:8,11,13,16;
28:9;45:21;46:2;93:7,
12,16,23;95:20,24;
100:7;117:21,24

**personal (1)**
46:23

**personnel (2)**
14:10;17:8

**persons (1)**
96:3

**PHONE (5)**
3:8;13:2;36:20,22;
96:21

**Ping (1)**
75:6

**plaintiff (1)**
7:5

**Plaintiff's (2)**
58:4,9

**plan (5)**
25:5,8,11;82:15;
110:21

**please (12)**
7:24;10:14,15,23;
16:18;22:24;29:7,13;
45:2;52:14;57:3;69:7

**pledge (32)**
26:20,23;51:17,19,
23;52:9,17;53:4,9,12,
21;54:4,14,17,19,24;
55:10;57:17;59:22;
61:17;62:12;63:6;
64:25;66:3,9,19;67:10,
16,22;70:4,9;102:21

**pledged (21)**
48:10,15,16;49:14;
50:12,19,23,25;51:4,
13;53:22,25;57:23;
59:8,17;61:4,16,23,25;
62:11;63:3

**pledges (7)**
67:4;68:18;72:21;
73:3,9,14;110:9

**pledging (3)**
51:7,8;111:9

**pm (7)**
9:23;74:23;75:3;
116:2,5;124:21,23

**Podhaskie (157)**
7:5;8:8;9:1,15,19,24,
25;10:1,2;11:1,22;
12:1;13:1;14:1;15:1;
16:1;17:1;18:1;19:1,
20;20:1,6,10,13;21:1;
22:1,24;23:1;24:1;
25:1;26:1;27:1;28:1;
29:1,7;30:1;31:1;32:1;
33:1;34:1;35:1;36:1;
37:1;38:1;39:1;40:1;
41:1;42:1;43:1;44:1,
20;45:1;46:1;47:1;
48:1;49:1;50:1;51:1;
52:1;53:1;54:1;55:1,3,
6;56:1,18,23;57:1;
58:1,2,7;59:1;60:1;
61:1,8;62:1;63:1;64:1;
65:1,15,19;66:1;67:1;
68:1;69:1,2,6;70:1;
71:1;72:1;73:1;74:1;
75:1,5;76:1;77:1;78:1;
79:1;80:1,7;81:1;82:1;
83:1;84:1;85:1;86:1;
87:1;88:1;89:1;90:1;
91:1;92:1;93:1;94:1;
95:1;96:1;97:1;98:1;
99:1;100:1;101:1;
102:1,25;103:1,4;
104:1;105:1;106:1;
107:1;108:1;109:1;
110:1;111:1;112:1,14,
17;113:1;114:1;115:1;
116:1,7;117:1;118:1,
25;119:1,4,9,11,18,24;
120:1;121:1;122:1;
123:1;124:1;125:7,17

**point (3)**
50:10;54:20;67:22

**positive (1)**
82:6

**possess (2)**
98:9;99:4

**possible (1)**
49:20

**Potentially (1)**
91:10

**Pre-Judgment (2)**
58:5,10

**preparation (30)**
12:18,21;16:14;
21:11;23:17;26:3;27:3;
28:3,11;29:20;30:24;
32:17,23;38:14;39:14;
45:4;47:22;48:2,8;
52:20;53:19;57:10,25;
95:13;97:6;109:13;
111:20;115:21;120:15;

**pledging (3)**
51:7,8;111:9

121:9

**prepare (6)**
11:7;13:25;16:6;
55:16;70:8;109:7

**prepared (5)**
10:20;11:4;17:7,11;
114:19

**preparing (1)**
12:9

**PRESENT (3)**
3:12;16:8,11

**president (16)**
15:11,12;34:15;37:8,
9,13,25;38:5,10,12,16,
18;39:23;43:23,25;
117:11

**previous (1)**
114:10

**previously (1)**
10:12

**primary (3)**
79:5,10,19

**printout (1)**
85:3

**prior (8)**
61:6;89:22;92:23;
110:5,10;111:8;120:3;
124:3

**privilege (3)**
12:3;91:7,11

**privileged (1)**
91:9

**Probably (1)**
67:2

**proceeding (2)**
123:5,7

**process (4)**
35:9,17;36:13;98:2

**produced (4)**
19:22;22:20;117:14;
119:20

**promised (1)**
49:19

**properties (2)**
25:13;42:14

**property (5)**
75:23;76:9;106:18;
107:7;110:20

**proprietary (3)**
68:13,19;77:3

**provide (1)**
50:4

**provided (2)**
116:20;119:9

**provides (1)**
29:22

**providing (2)**
117:18;118:5

**Public (3)**
8:3;85:4;125:25

**publicly (4)**
60:5,16;65:2,7

**purchase (19)**

14:19;15:15;24:8;
25:3,4,7,9;31:23;32:6,
12;42:13,18,20;43:14;
71:23;82:10,17;84:2;
96:9

**purchased (1)**
24:16

**purchasing (1)**
42:15

**purpose (21)**
14:7;25:15,16;41:10;
82:23;86:22;100:14,
17;105:19,23,25;106:8,
14,17,18,23,24;107:4,
7,12,15

**purposes (14)**
25:21;28:19;83:4,5,
12;86:21,25;106:12;
107:2,4,10,13,17,19

**Pursuant (2)**
56:20,25

**put (3)**
55:12;89:18;118:15

**Q**

**Qiang (64)**
11:18;12:23,25;13:4,
12,13,24;15:23;16:2,9,
12;23:25;28:22;32:11,
11;34:14;36:11;37:5,
13,25;38:4,10,12,17,
24;39:23;40:20,23;
41:8,22;42:5;43:21;
52:4;54:4,3;70:7;71:12,
20;72:5;78:24;79:15,
25;83:25;84:7,16,21;
88:23;94:19,24;95:25;
96:4;99:17,24;100:6;
103:20;104:14;112:4,
8,12;114:12;115:9;
117:6,18,20,24

**Qiang's (7)**
66:5;79:10,18;84:11;
104:2,5,11

**R**

**rather (1)**
119:11

**read (2)**
22:8;125:8

**reading (1)**
22:9

**reads (1)**
75:21

**real (13)**
24:9,13,16,18,20,25;
42:19;75:23;76:9;83:6,
12,15;84:15

**really (3)**
42:2;56:10;101:11

**reason (11)**

9:11;21:24;22:19;
23:13;45:11;64:10;
68:2,6;114:21;116:24;
117:3
**recall (27)**
14:21;18:15;43:23,
25;67:3,9;71:16;75:14,
18;85:19;117:22;
118:13;121:6,22;
122:3,6,8,17;123:12,
14,16,18;124:3,9,11,
13,15
**receive (2)**
64:11,14
**received (3)**
28:8;64:2,8
**receives (2)**
88:16;99:6
**Recess (2)**
74:24;116:3
**recollection (1)**
13:24;85:21;120:4
**record (29)**
7:22;9:23;11:21;
18:11;28:20;43:17;
56:8;72:24;73:4;74:22;
75:3;78:11;80:15;
92:12;113:11;115:24;
116:2,5;119:3,5;
124:21;125:11,12
**records (17)**
11:16;35:22,25;36:8,
10,15;40:7;61:19;
120:17;121:8,10;
122:4,18;123:12,16;
124:9,13
**refer (4)**
8:15;9:3;28:21;61:6
**referenced (1)**
96:8
**references (1)**
107:8
**referencing (1)**
117:5
**referred (2)**
105:16;120:14
**referring (16)**
8:20;15:19;18:21;
27:12;28:16,21,22,23;
42:23;60:25;76:15;
85:7;103:7;105:12,15;
123:8
**refers (3)**
80:11,25;85:10
**reflected (10)**
25:25;30:16;32:18,
24;39:7,13;61:22;
95:12;97:4;102:2
**reflects (3)**
18:11;22:18;114:18
**refresh (1)**
85:21
**regarding (3)**

11:24;67:15;112:20
**register (2)**
39:21;99:6
**registered (15)**
27:22;28:5;33:12;
35:8,17;36:13,23;
56:19,24;57:5;65:5;
69:3,9;97:25;98:5
**Registration (4)**
55:4,18;65:16,25
**related (1)**
77:5
**relates (3)**
12:17;21:4;76:23
**relating (8)**
43:18;65:6;81:23;
82:18;91:25;103:7;
115:18;118:15
**relation (1)**
119:20
**relationship (1)**
14:13
**Release (7)**
56:19,24;57:5;60:4,
16;69:3,9
**released (3)**
61:17;62:13;63:7
**remember (5)**
13:20;14:17,24;15:4;
117:23
**removed (1)**
59:22
**replaced (1)**
33:18
**reporter (2)**
7:17,24
**representation (1)**
61:3
**representative (9)**
8:9;9:16;10:3;12:10,
19;14:2;46:24;77:24;
78:15
**representatives (1)**
42:17
**represented (5)**
90:16,19;92:6,22;
104:23
**representing (3)**
113:2;114:2,5
**request (9)**
42:24;71:4,10,15,19,
21;72:7,9;73:11
**require (1)**
110:10
**reserved (1)**
6:10
**resided (1)**
79:6
**residence (12)**
14:19;15:7,15;26:7;
50:3;51:22;72:2;79:5,
10,19;102:12;106:25
**residences (1)**

15:18
**Resolution (9)**
20:22,25;21:9;39:22;
52:16;53:16;80:19;
81:22,23
**resolutions (1)**
96:8
**Resolved (1)**
80:19
**respect (4)**
20:17;77:21;78:18;
95:8
**respective (1)**
6:5
**respectively (1)**
114:13
**responsibility (1)**
19:12
**restructured (1)**
70:22
**retained (2)**
55:22;56:4
**review (28)**
10:9;20:24;22:12;
44:25;53:10;55:9,19;
56:17;60:15;63:11;
65:24;66:10;85:2;86:5;
103:9;109:7;116:9;
117:2;118:5;120:12;
121:16;122:13;123:3,
11,15;124:6,8,12
**reviewed (31)**
11:14,16;21:11;
23:17;28:11;29:20;
30:15,23;31:17;32:17,
22;33:5;38:13;39:6,14;
44:17;45:3;47:21,25;
48:7;52:19;53:18;
57:10,24;95:13;97:5;
102:3;116:18;121:2,9,
25
**reviewing (3)**
42:14;43:20;120:15
**right (39)**
8:13;17:8,9;22:14;
29:4;30:8;53:8;61:16;
62:16;64:5;67:5,12;
70:4;77:9,14;83:9;
85:8,15;86:10;90:17;
97:2;104:3,15,19;
105:12,17,20;106:5,9,
15,21,25;107:4,12,17,
18,23;108:9;110:12
**right-hand (1)**
103:21
**role (20)**
16:25;17:4,14,16,18,
21,23;18:5,7,12,20,25;
19:2,5,8;37:7;38:21;
95:7;113:25;118:5
**room (3)**
40:2;78:4,12
**Roscalitar (30)**

26:21;50:20,24;51:5,
13,24;52:18,21;53:2,5,
12,21;55:11;57:17,23;
59:9,18,22;61:5,16,25;
62:11,13;63:3,6;64:25;
73:10;102:22;110:10;
111:10
**Russ (8)**
7:12;58:11;60:5,8,
17;90:16,23;92:15

## S

**same (18)**
6:6,16;16:22;55:25;
62:4;83:10;85:20;92:6,
16,17;93:12,16,23;
103:25;115:3,13,16,20
**Sanft (3)**
45:15;80:19;82:7
**S-A-N-F-T (1)**
45:16
**SARNOFF (2)**
86:4;124:18
**Satisfaction (10)**
56:19,24;57:5,9;
64:3,25;69:3,9,11,16
**satisfied (1)**
67:23
**saw (2)**
121:5,6
**saying (2)**
107:11;116:8
**scope (5)**
63:15;65:11;113:8;
115:7;118:19
**sealing (1)**
6:5
**second (1)**
114:7
**secretarial (1)**
27:23;28:6
**secretary (1)**
33:11
**Section (7)**
23:5;56:20,25;105:6;
109:15,17;110:18
**security (2)**
51:20;54:6
**seeing (12)**
43:23;72:5;117:23;
120:4;121:22;122:3,
17;123:12,16;124:4,9,
13
**sell (1)**
50:3
**sense (1)**
101:10
**sentence (4)**
22:11;58:25;75:21;
80:22
**sequential (1)**
20:15

**service (4)**
35:9,17;36:13;98:2
**services (3)**
27:21,23;28:6
**set (2)**
116:11;120:23
**several (5)**
25:9,12;43:23;78:12;
106:19
**shall (1)**
6:10
**share (4)**
29:16;30:7;39:20;
78:13
**shareholder (12)**
28:14;30:21;31:5,18;
59:4;66:18;67:11;94:6;
95:3;99:23;112:22;
113:4
**shareholders (3)**
31:8;39:22;94:11
**shares (30)**
29:23,23;30:14,18;
32:15,20;48:21,22,25;
50:24,25;51:3,4,5,8,13,
17,19,24;53:22,25;
54:5,14;76:13;77:12,
20;78:17;100:10;
101:24;111:10
**Sherry (7)**
42:13;43:14;71:24;
78:13;92:24;96:9;
101:14
**Sherry-Netherland (83)**
14:20;15:9,13;24:14;
25:14;26:7;31:23;32:7,
13;42:18;50:3;68:20;
70:21;71:5,7,11,14,23;
72:10,15;73:12,16,20;
74:2;76:2,8,12,14,17,
20;77:8,12,20;78:17,
25;79:9,18;80:2;82:11,
18,25;83:16,20;84:3,6,
11,13,20;86:18;87:6,
12,18,23,25;88:12;
89:11;90:9;91:24;
93:14;97:13,20;98:7,
15,25;100:11,16,24;
101:18,25;102:12;
106:20;107:9;108:15,
20;109:3,9;111:23;
112:20,22;113:4;
114:3;118:12,16
**Sherry-Netherland's (1)**
68:13
**short (1)**
33:20
**showing (1)**
85:23
**shown (1)**
56:2
**shows (1)**
85:6

**side (2)**
103:15,21
**signature (9)**
21:13,14,19,25;45:7;
103:15,22;104:2,6
**signatures (1)**
104:11
**signed (12)**
6:14,16;15:14;42:15,
21,24;43:24;104:14,
17;117:25;118:9;
125:20
**signing (1)**
41:20
**sit (1)**
44:2
**sitting (2)**
77:25;78:4
**situated (2)**
106:19;107:8
**six (2)**
58:23;62:5
**sleep (1)**
80:4
**slept (1)**
79:25
**slower (1)**
64:23
**SN74 (1)**
114:8
**sold (2)**
48:3;101:20
**sole (31)**
28:14;30:20,25;31:5;
32:25;44:5,10;45:5;
46:12;59:4;66:17,18;
67:11,12;80:11,13,16;
81:3,7,10,18;84:17,18;
94:5,12;95:2,3,20,22;
99:22,23
**someone (1)**
71:24
**somewhere (2)**
15:7;53:11
**son (13)**
12:24;13:7;15:21,24;
24:2;28:23;32:11;
70:23;71:7,12;73:13;
84:2;99:13
**Sorry (10)**
13:5;26:19;57:6;
62:6;65:21;72:23;
74:17;103:16;109:17;
111:4
**sound (1)**
92:3
**sounds (1)**
53:10
**speak (2)**
12:25;13:7
**special (5)**
105:19,24;106:18,
24;107:7

**specific (3)**
14:25;19:3;42:4
**specifically (3)**
41:6;72:11;113:16
**specify (1)**
26:16
**speculate (3)**
32:4;40:11;52:14
**speculating (4)**
31:25;40:9;52:14;
79:13
**speculation (1)**
108:24
**spent (4)**
27:21;42:7;87:14,24
**spoke (7)**
11:18,18,19;13:14;
15:10;16:5;70:8
**Spring (9)**
88:16,18,19,21,25;
89:15,17;90:8;100:14
**SPV (10)**
105:17,19,25;106:4,
15;107:6,12,22;110:3,4
**ss (1)**
125:4
**stamp (4)**
75:8;121:14;122:25;
123:19
**Stamped (4)**
20:7,22;29:8;44:23
**stamps (4)**
19:24;119:15,25;
122:11
**stands (1)**
105:19
**start (3)**
10:15;12:7;119:2
**starts (2)**
58:17,25
**State (6)**
7:8;46:6;85:3,4;
125:3,25
**statement (9)**
59:24;60:9,11,18,20,
25;61:9,13;75:24
**statements (1)**
118:11
**States (2)**
24:19;25:2
**stayed (1)**
115:3
**Stevenson (6)**
112:15,18;113:2,24,
25;114:8
**still (7)**
34:10,11,12;38:12;
61:23;67:11;109:16
**STIPULATED (3)**
6:3,8,12
**STIPULATIONS (1)**
6:1
**stock (1)**

**99:6**
**Stone (3)**
93:2,3,6
**stop (1)**
38:17
**stopped (1)**
34:7
**strike (11)**
35:14;37:22;38:7;
44:14;50:12;68:6;
78:23;79:16,24;97:14;
101:3
**structure (2)**
14:9,11
**submitted (1)**
75:7
**subscribed (1)**
125:20
**subtracted (2)**
25:22;87:2
**sued (1)**
91:23
**suggesting (1)**
111:16
**Support (2)**
7:15,19
**Supreme (1)**
7:8
**Sure (14)**
12:4;15:12;19:23;
40:2;43:17;58:20;
66:17;72:24;73:6;82:5;
92:15;98:16;113:18;
119:6
**swear (1)**
7:24
**sworn (3)**
6:14;8:2;75:8
**system (2)**
85:5;123:6

**T**

**talk (1)**
114:19
**talked (2)**
72:21;73:10
**talking (6)**
9:7;38:9;48:18,18;
69:12;120:7
**tape (2)**
74:21;75:2
**telephone (1)**
13:9
**terms (2)**
29:3;63:15
**terrace (1)**
92:2
**Territory (1)**
23:3
**testified (11)**
8:3;18:6;50:10;
53:20;64:2;66:4;67:3,

**9,21;75:17;76:16**
**testify (6)**
10:20;11:4,8;17:7,
11;67:25
**testimony (15)**
9:12;12:9;14:2;16:6;
18:8;15;24:17;57:17;
65:4;66:16;67:8;75:18;
84:9;125:8,11
**third (5)**
59:9;81:22;110:19,
23,24
**though (1)**
95:2
**thought (2)**
24:18;42:15
**three (5)**
58:23;74:21;104:7,
10,11
**times (1)**
62:5
**title (2)**
15:12;23:3
**today (47)**
7:17,20;8:16;9:13;
10:21;11:5;12:9,19;
21:11;23:17;26:3;27:3;
28:3,12;29:20;30:24;
31:18;32:17,23;33:5;
38:14,16;45:4;47:22;
48:2,8;52:20;53:19;
56:2;57:11,25;74:18;
75:13;77:25;78:15;
95:13;102:3;109:13;
111:21;114:20;116:8;
119:10;120:3,14;
121:9,23;124:3
**today's (6)**
7:12;39:14;97:5;
115:21;121:3;124:20
**together (1)**
20:11
**told (5)**
13:20,24;15:6;19:4;
85:22
**took (2)**
64:11,13
**top (7)**
29:8;35:24;59:13;
71:16;105:8;123:4,22
**topic (1)**
17:9
**topics (10)**
10:18,21,25;11:5,9,
15;12:12,19;13:17;
14:6
**total (1)**
30:6
**transaction (1)**
49:21
**transcript (1)**
125:8,10
**transfer (5)**

**9,21;75:17;76:16**
**71:5,11,13;73:11;**
115:19
**transferred (1)**
112:8
**transferring (2)**
70:13;72:13
**transfers (1)**
73:14
**trial (1)**
6:11
**true (18)**
21:7,12;29:18;55:17,
25;57:7;59:24;60:12,
20;61:14;66:8;69:15;
73:19;74:9;75:24;
112:5;125:10,12
**trust (7)**
73:17;102:9,17;
103:2,6,10;108:2
**trustee (10)**
107:21,25;109:15,
17,22,24;110:19,22,22;
111:7
**truthful (1)**
9:12
**try (6)**
13:6;60:7,19;62:20;
73:7;79:23
**trying (1)**
62:22
**turn (2)**
74:3,4
**two (10)**
8:9;13:16;16:17;
20:17;26:3,23;37:19;
58:22;75:2;93:8;
107:23
**type (1)**
42:7
**typewritten (1)**
21:20
**typically (1)**
35:2

**U**

**UBS (2)**
40:8,12
**ultimately (5)**
24:15;25:13;31:22;
32:5;51:21
**under (4)**
22:4;29:9;110:11;
125:9
**underneath (1)**
21:18
**undersigned (2)**
22:3,13
**Understood (2)**
12:4;73:2
**United (2)**
24:19;25:2
**units (1)**

106:19
**unless (1)**
  110:4
**unofficial (3)**
  17:23;18:4,20
**unrelated (1)**
  59:9
**up (6)**
  24:15;30:11;32:12;
  84:12;90:16;123:4
**USA (1)**
  59:7
**US-based (2)**
  24:8,10
**used (1)**
  100:19
**using (1)**
  29:3

## V

**value (2)**
  29:24;30:6
**various (4)**
  20:2,16;42:15,21
**vehicle (5)**
  105:20,25;106:18,
  24;107:7
**versus (1)**
  7:7
**via (1)**
  51:17
**vice (1)**
  15:11
**Videographer (8)**
  3:14;7:3;9:22;74:20,
  25;115:25;116:4;
  124:19
**videotaped (1)**
  7:4
**violation (1)**
  68:18
**Virgin (4)**
  22:5;23:4;34:25;
  98:19
**virtue (2)**
  51:7;59:6
**visited (1)**
  79:21

## W

**waived (1)**
  6:7
**Wan (6)**
  7:7;21:18,20;45:7;
  112:21;114:12
**WANG (8)**
  3:13;11:19;13:11;
  16:6;17:13;18:22;19:4;
  118:5
**Wang's (5)**
  16:25;17:4;18:12;

75:6,6
**way (6)**
  29:2;50:6;63:25;
  101:3;102:6;112:11
**weeks (1)**
  90:17
**Wei (11)**
  31:20;32:5,7,14,20;
  51:16,18;52:21,23;
  95:7,10
**Weiss (3)**
  45:19;82:4,5
**welcome (1)**
  20:5
**weren't (1)**
  116:20
**What's (2)**
  83:24;101:4
**who's (2)**
  36:9;95:24
**Whose (6)**
  48:22;71:18;100:14;
  103:15,19,22
**Williams (2)**
  45:19;82:4
**within (6)**
  6:13;20:2;83:9;
  120:16;121:8;122:4
**witness (6)**
  7:25;8:2;32:3;40:11;
  43:5;52:13
**Wong (5)**
  112:15,19;113:2,25;
  114:8
**Wong's (1)**
  113:25
**word (1)**
  19:7
**words (2)**
  21:19;93:12
**work (1)**
  55:15
**writes (1)**
  114:8
**written (10)**
  7:21;44:22;45:5,22;
  46:11;50:4;110:5,10;
  111:8,16

## Y

**Yan (1)**
  75:6
**year (3)**
  64:11;65:5;89:7
**years (1)**
  91:24
**yes-or-no (1)**
  93:21
**York (172)**
  7:9,9;8:16,20;9:17;
  10:4,10;11:8,17;13:19;
  14:8,10,12,14,16,20;

15:8,16;16:21,21;17:2,
8,14,16,18,22,24;18:8,
13,21,25;19:6,10,13;
24:11;26:6,10;43:7,19;
44:6,11,14,16;46:2,5,6,
6,13;47:4,8,11,15,20,
24;48:4,20;49:7,9;
50:2,6;51:2,9,10;
56:15;63:11;71:6;
72:14;73:15;74:4;
76:10;77:13;80:12,14;
81:4,8,11;82:8,9,16,24;
83:8,11,14,18;84:10,
19;85:3,8,11,11,17;
86:9,16,23;87:4,10,14,
24;88:4,17,18;89:5,10,
16,18,22;90:3,11,15,
22;91:23;92:5;93:4;
94:6,10,13,21;95:8,11,
14,18;96:3,10,15,18,
21,24;97:7,22;98:5,9;
99:3,9,15,18,25;100:7,
8,14,20;101:2,6,16,20;
102:5,10;104:18;
105:16;106:4,9,15,17,
23;107:16;108:8,8,14;
113:12,15,20;116:11;
117:19,22;118:2,6;
120:13;121:7,11;
122:5,19;123:24;124:9
**York's (18)**
  68:19;77:24;78:15;
  81:11,19,19;89:19;
  90:7;91:4,18;94:7,14;
  97:14,18;98:17,18;
  102:16;123:11
**young (2)**
  84:8,21
**YVETTE (7)**
  3:13;11:19;13:11;
  16:6;18:22;75:6;118:5

## Z

**Zhang (11)**
  31:20;32:5,7,14,20;
  51:16,18;52:21,23;
  95:7,10

## 0

**001 (3)**
  29:24;30:2,3
**07960 (1)**
  3:6

## 1

**1 (9)**
  9:15,25;10:2,9,15;
  17:9;56:3;109:16;
  110:17
**1,000 (1)**

29:23
**10 (2)**
  112:14,18
**100 (2)**
  51:5;115:10
**11 (1)**
  7:13
**12 (3)**
  45:6;69:10;85:24
**12th (1)**
  21:2
**13 (3)**
  23:20;86:7,9
**14 (1)**
  66:2
**145 (1)**
  86:3
**15 (2)**
  58:20;75:8
**16 (9)**
  59:14;60:12,23;
  61:15,25;62:11;63:3;
  75:7,9
**165 (2)**
  56:20,25
**17 (10)**
  57:6,18,22;59:23;
  61:18;62:13;63:8;
  85:12;86:10;103:11
**176 (1)**
  20:20
**178 (1)**
  84:23
**18th (11)**
  76:24;77:4,21;78:18,
  25;82:18;97:15,19;
  106:20,25;107:8
**194 (2)**
  20:8;44:23

## 2

**2 (37)**
  9:19;10:2,4,11,24;
  26:21;50:20,24;51:5,
  13,24;52:18,21;53:2,5,
  12;55:11;56:3;57:17,
  23;59:9,18,22;61:5,16,
  25;62:11,13;63:3,6;
  73:10;75:20;102:22;
  105:7,23;110:10;
  111:11
**2:59 (1)**
  9:23
**2004 (2)**
  23:5;29:10
**2015 (32)**
  21:3;23:21;37:10,12,
  14,24,25;38:5,15;45:6;
  53:8;55:12;59:5;61:5;
  79:14,15,17,21;80:2;
  85:12;86:7,9,10;87:5;
  100:6;103:11;111:22;

112:3,15,19;114:17;
115:4
**2017 (9)**
  57:6,18,22;59:23;
  61:18;62:14;63:8;
  64:18;65:2
**2018 (17)**
  59:14;60:12,23;
  61:15,22,25;62:11;
  63:3;66:2;69:10;75:7;
  88:10;89:5,8,12,23;
  90:4
**2019 (1)**
  7:13
**20-year-old (1)**
  71:25
**21 (1)**
  55:12
**24 (2)**
  74:15;75:12

## 3

**3 (17)**
  17:9;20:6,10,12,13;
  44:20;56:3,11,13;80:6;
  84:24;86:4;106:14;
  109:15,17;119:11,11
**3.4 (1)**
  109:24
**30 (1)**
  58:20
**30b6 (4)**
  11:24;65:11;113:8;
  118:19

## 4

**4 (17)**
  55:3,7,20;56:3,9;
  107:20;112:15,19;
  114:16;115:3;119:24;
  120:6,19,20,23,24,25
**4:25 (1)**
  74:23
**4:38 (1)**
  75:3

## 5

**5 (3)**
  56:18,22;121:14
**5:27 (1)**
  116:2
**5:36 (1)**
  116:5
**5:46 (2)**
  124:21,23
**50 (6)**
  112:6,9;114:11,12,
  17;115:12
**543 (2)**
  103:17;110:18

**544 (1)**
 103:25
**545 (1)**
 104:5
**55 (1)**
 3:5

### 6

**6 (5)**
 58:2,8;110:18;122:9,
 20
**60,000 (1)**
 101:14
**652077/2017 (1)**
 7:10

### 7

**7 (5)**
 23:5;65:15,18,22;
 122:25
**781 (1)**
 97:11

### 8

**8 (4)**
 69:2,5;123:19,22

### 9

**9 (6)**
 16:4;58:16,19,20;
 102:25;103:5
**914-760-8963 (1)**
 3:8

# EXHIBIT 14



**CHIESA SHAHINIAN & GIANTOMASI PC**

ONE BOLAND DRIVE
WEST ORANGE, NJ 07052

csglaw.com

**LEE VARTAN**
lvartan@csglaw.com
(O) 973.530.2107
(F) 973.530.2307

June 7, 2021

**Via email and regular mail – emoss@omm.com**
Edward Moss, Esq.
O'Melveny & Myers LLP
7 Times Square
New York, NY 10036

Re:    Pacific Alliance Asia Opportunity Fund L.P. v. Kwok Ho Wan, et al.
       Index No. 652077/2017
       Superior Court of the State of Delaware Subpoena K21M-04-001 NEP

Dear Mr. Moss:

      I write in follow-up to our previous conversations concerning your subpoena to my client, HK International Funds Investments (USA) Limited, LLC ("HK International"). As we discussed, HK International was formed in September 2018 as a Delaware limited liability company. Its sole member is Ms. Mei Guo, and its sole asset is the Lady May yacht, which it has owned since April 2020. Documents bearing Bates Nos. HKI-0001 through HKI-0013, which reflect the foregoing, are included with this letter. They are responsive to Requests 14-16 of your subpoena.

      HK International is continuing its search for documents responsive to your subpoena, but so far has found little. As we discussed, HK International has no directors, officers, or employees; has no dedicated e-mail server or e-mail suffix; does not file tax returns; and has no bank account and is not otherwise "capitalized." (*See* Request 17). As promised, I did endeavor to determine how, without a bank account, HK International is able to maintain the Lady May and pay for its staff and crew. I can confirm that all expenses for the Lady May yacht, including staff, crew, and maintenance, are paid by Golden Spring New York. I understand from our conversation that Justice Ostrager ordered Golden Spring New York to provide your client with access to its books and records; HK International does not have access to those books and records.

      Finally, notwithstanding that HK International has no dedicated e-mail server or e-mail suffix, to the extent HK International has communications with Captain Heaslop (*see* Request 2) or communications with the Debtor (*see* Request 4), *concerning its sole asset, the Lady May*, HK International will provide those communications.

**WEST ORANGE** NEW JERSEY         **TRENTON** NEW JERSEY         **NEW YORK** NEW YORK

4814-0050-2765.v1

Edward Moss, Esq.
June 7, 2021
Page 2

Please contact me if you have any questions regarding this letter.

Sincerely,

*/s/ Lee Vartan*

Lee Vartan
Member

# EXHIBIT 15

# SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY

| PRESENT: | **HON. BARRY R. OSTRAGER** | PART | **IAS MOTION 61EFM** |
|---|---|---|---|
| | *Justice* | | |

-----------------------------------------------------------------------------X

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

                       Plaintiff,

                       - v -

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO, GENEVER HOLDINGS LLC, and GENEVER HOLDINGS CORPORATION,

                       Defendants.

| INDEX NO. | 652077/2017 |
|---|---|
| MOTION DATE | |
| MOTION SEQ. NO. | 007 |

**DECISION + ORDER ON MOTION**

-----------------------------------------------------------------------------X

HON. BARRY R. OSTRAGER

      Before the Court is plaintiff Pacific Alliance Asia Opportunity Fund L.P.'s ("Pacific Alliance") motion for partial summary judgement on Count I of the Amended Complaint against defendant Kwok Ho Wan a/k/a Miles Kwok ("Kwok") and defendant Kwok's cross-motion for reargument on motion 006. The Court heard oral argument via Skype on September 14, 2020. Based on the papers submitted and the arguments made on the record of September 14, 2020, and for the reasons that follow, Pacific Alliance's motion for partial summary judgment is granted, and Kwok's motion for reargument on motion 006 is denied.

**Background**

      In 2008, Pacific Alliance entered into an agreement with Spirit Charter Investment Limited ("Spirit"), one of Kwok's business entities, under which Pacific Alliance provided Spirit with a loan facility in the principal amount of $30 million. Kwok executed a personal Guarantee of the loan. In September 2009, Spirit executed a deed under which Shiny Times Holdings Limited ("Shiny Times"), a business listing Kwok as its sole shareholder and director, assumed

the loan debt that Spirit owed to Pacific Alliance. Kwok again executed a personal guarantee in

favor of Pacific Alliance to secure Shiny Times' repayment obligation.

In March 2011, Pacific Alliance and Shiny Times entered into a new loan facility ("2011

Loan Facility") that expressly superseded and replaced the 2009 Deed of Settlement and a 2010

Letter Agreement. Simultaneously, Kwok entered into a new personal guarantee ("2011 Personal

Guarantee") which expressly superseded the 2009 Guarantee. The 2011 Personal Guarantee is

the operative agreement in this action.

In April 2013, the parties entered into a Deed of Settlement, whereby the outstanding

loan amount would no longer be due and owing to Pacific Alliance if Pacific Alliance purchased

certain apartments from Beijing Pangu Investment Inc. ("Beijing Pangu"), another Kwok

business entity, and Shiny Times' made certain installment payments to Pacific Alliance. Beijing

Pangu was required to satisfy ten conditions precedent in connection with the sale and purchase

of each of the apartments by Pacific Alliance. If any such condition was not satisfied by June of

2013, the Deed of Settlement would be terminated in its entirety. Pacific Alliance and Kwok

subsequently executed four extensions of the Deed of Settlement, changing only the date by

which the conditions precedent needed to be satisfied. The latest Deed of Settlement required

that the conditions precedent be satisfied by June of 2015.

Pacific Alliance seeks summary judgment on Count I of the Amended Complaint which

alleges that Kwok failed to satisfy the conditions precedent by June of 2015 and thus, per the

terms of the agreement, the Deed of Settlement was terminated in its entirety and the 2011

Personal Guarantee again controlled.

The Court recently held, in response to Pacific Alliance's motion for sanctions, that

Kwok was judicially estoppel from challenging the authenticity of documents that Kwok had

previously sponsored in proceedings before this Court. *See* NYSCEF Doc. No. 404. Specifically, at his November 2019 deposition, Kwok denied having signed several agreements discussed above, including the 2011 Loan Facility, the 2011 Personal Guarantee, the 2013 Deed of Settlement, and the four Supplemental Deeds. Kwok testified that the documents were forgeries. On the motion for contempt, Pacific Alliance argued, and the Court found, that these denials were inconsistent with the positions Kwok had taken throughout the duration of this 2017 case. As such, the Court held that Kwok was judicially estopped from challenging the authenticity of these agreements in opposition to Pacific Alliance's motion for summary judgment or at trial.

### Kwok's Cross-Motion

Turning first to defendant Kwok's cross-motion for leave to reargue the Court's Decision and Order dated July 7, 2020 (NYSCEF Doc. No. 404), this motion is denied. As stated above, the Court held that Kwok was judicially estopped from challenging the authenticity of the agreements that Kwok had previously sponsored as authentic before the Court in this proceeding. Kwok argues that the Court misapprehended the law in reaching this holding. This Court rejects that argument in its entirety.

At the outset of this case, Kwok moved to dismiss this action on *forum non conveniens* grounds (motion 001). The Court granted Kwok's motion (NYSCEF Doc. No. 102), which decision was subsequently reversed and remitted by the First Department (NYSCEF Doc. 121). In making his motion to dismiss, Kwok argued that the contracts at issue were governed by Hong Kong law. Specifically, Kwok attached to his motion "true and correct" copies of several agreements among the parties including the 2011 Personal Guarantee (NYSCEF Doc. No. 17) and the 2013 Deed of Settlement (NYSCEF Doc. No. 18), which he now contests.

3

Kwok now argues that because the thrust of his argument on the motion to dismiss and the Court's decision related to *forum non conveniens,* (1) he is not actually changing his position on the authenticity of the documents, and (2) the Court did not actually determine the authenticity of the documents. This argument is incorrect. Kwok's assertion that the case should have been dismissed in favor of a resolution in Hong Kong *because the agreements on their face are governed by Hong Kong law* necessarily required an argument by Kwok, and an acceptance by the Court, that the agreements were authentic and not forgeries, as Kwok now claims.

Kwok further argues that in any event judicial estoppel cannot apply because there was no final determination on the merits on the issue of whether the contracts were authentic, because the First Department reversed this Court's decision on the motion to dismiss. This argument is not supported by the case law in the First Department. Judicial estoppel is an equitable doctrine used to prevent a party from changing its position during the same litigation. *See e.g. Nestor v. Britt*, 270 A.D.2d 192, 193 (2000) ("[u]nder the doctrine of judicial estoppel, or estoppel against inconsistent positions, a party is precluded from inequitably adopting a position directly contrary to or inconsistent with an earlier assumed position in the same proceeding."). Indeed, because judicial estoppel is used to prevent parties from changing their position in the same litigation – a final determination *cannot* be a prerequisite for judicial estoppel. *See id* (precluding the landlord from relying on a different lease on appeal than had been relied on at the trial-court level in the same proceeding).

Additionally, the Court notes that Kwok never pleaded that the documents were forgeries in either of his Answers, which is an affirmative defense. *See e.g., Proner v. Julien & Schlesinger, P.C.*, 214 A.D.2d 460, 461 (First Dept. 1995) (granting a motion for leave to amend the pleadings to add affirmative defense of forgery); *Great Am. Ins. Co. v. Giardino,* 71 A.D.2d

836, 836 (Fourth Dept. 1979) (holding that "proof of defendants' handwriting was material in light of their affirmative defense of forgery").

Kwok's recent, uncorroborated assertion that the agreements are forgeries is inconsistent with his prior position in this litigation – and therefore provides an appropriate basis for judicial estoppel. Accordingly, Kwok's cross-motion for reargument is denied, and the agreements previously sponsored by Kwok are accepted as authentic for the purpose of evaluating plaintiff's motion for partial summary judgment.

**Pacific Alliance's Motion**

The Court is granting summary judgment in favor of plaintiff Pacific Alliance holding defendant Kwok liable for breach of contract under the 2011 Personal Guarantee. By the plain terms of the 2013 Deed of Settlement, the failure to satisfy the conditions precedent to the settlement by June 30, 2015, would result in reverting to the 2011 Personal Guarantee being in full force and effect. *See* NYSCEF Doc. 461.

> **Clause 3.4:** Reversion of the Facility Letter after 31 July 2013. In the event that all conditions precedent set out in Clause 3.2 for all Apartments have not been satisfied by 31 July 2013 (or such later date agreed by the Parties in writing[— here, 30 June 2015, per the fourth and final supplemental Deed of Settlement]), **then the entire settlement as contemplated under this Deed shall be terminated and the Parties acknowledge that the Facility Letter shall revert and be in full force and effect immediately** after 31 July 2013 (or such later date agreed by the Parties in writing) and Shiny Times shall be obliged to settle the Total Outstanding Amount and any interest accrued thereon in accordance with the terms and conditions of the Facility Letter. (emphasis added).

*See also* NYSCEF Doc. No. 472 "Fourth Supplemental Deed of Settlement" (changing the date to satisfy the conditions precedent to "30 June 2015").

Plaintiff Pacific Alliance has shown, and defendant Kwok has failed to refute, that several of the conditions precedent in the 2013 Deed of Settlement were not fulfilled. Namely, defendant Kwok failed to deliver clean title, failed to provide plaintiff with an invoice for the

purchase of the apartments, failed to provide plaintiff with evidence regarding the payment of all relevant taxes and charges in connection with the sale and purchase of the apartments, and failed to deliver the House Ownership Certificates of any of the Apartments to plaintiff. *See* NYSCEF Doc. No. 461 ¶ 3.2 (e)(g)(h)(i).

Kwok does not dispute that these conditions were never satisfied. Instead, in opposition, Kwok argues that plaintiff Pacific Alliance failed to mitigate its damages when it allegedly did not act on an opportunity to potentially seize the three apartments with the aid of Beijing police.

First, even taking Kwok's version of events as true, mitigation speaks to damages, not liability, and thus these events would not preclude partial summary judgment on liability. Second, as demonstrated by the documentary evidence sponsored by both parties, the alleged opportunity to take possession of the three apartments with the aid of police only came up *after* June 2015, and thus the 2013 Deed of Settlement had already been nullified in its entirety and the 2011 Personal Guarantee was in full force and effect. Third, Kwok has never pleaded, in either of his Answers, mitigation, which is an affirmative defense. *See e.g. Eskenazi v. Mackoul,* 72 A.D.3d 1012, 1014 (2d Dep't 2010) (referring to "the affirmative defense of failure to mitigate damages").

Finally, under Hong Kong law, a party is only required to act *reasonably* to mitigate damages. *See* Affirmation of Vishal Prakash Melwani at ¶17.2 (NYSCEF Doc. No. 535) *and see* Affirmation of Phillip Loukis Georgiou (NYSCEF Doc. No. 498)  at ¶¶ 18.3 and 21. The record currently indicates that to take advantage of the alleged offer of the Beijing Police, Pacific Alliance would have needed to pay RMB35m [approximately USD$5.5 million] per unit to get them released. *See* NYSCEF Doc. No. 519 PAX-KWOK-017288.  The prospect of paying approximately $16 million for assets that the parties had agreed would be transferred free of

6

charge to settle a debt would likely not have qualified as a *reasonable* opportunity to mitigate damages under Hong Kong law. Nevertheless, the Court reserves decision as to the issue of damages.

Under the 2011 Personal Guarantee

- Kwok "irrevocably and unconditionally. . . guarantee[d] to PAX [Pacific Alliance] the due and punctual payment of [Shiny Times'] [o]bligations [under the 2011 Facility] and agree[d] that promptly on PAX's demand he will pay to PAX all [o]bligations that are due but unpaid";

- Kwok "irrevocably and unconditionally agree[d] (as primary obligor and not only as surety) to indemnify and hold harmless PAX on demand from and against any and all losses incurred by PAX as a result of any [o]bligation [of Shiny Times] being or becoming void, voidable, unenforceable, or ineffective as against Shiny Times for any reason whatsoever . . . .";

- Kwok agreed that his "obligations . . . under this Guarantee shall constitute and be continuing obligations which shall not be released or discharged by any intermediate payment of [Shiny Times'] [o]bligations [under the 2011 Loan Facility] or any of them, shall continue in full force and effect until the unconditional and irrevocable payment and discharge in full of [those o]bligations and are in addition to and independent of, and shall not prejudice or merge with, any other security (or any right of setoff) which PAX may at any time hold in respect of [those o]bligations or any of them;"

- PAX was permitted to seek recourse against Kwok as primary obligor without first enforcing the debt against Shiny Times; and

- Kwok agreed to a catchall waiver of any defenses based on "any other act, event or omission which might operate to discharge, impair or otherwise affect the Guarantor or any of the Obligations or any of the rights, powers, and remedies conferred upon [PAX LP] by this Guarantee or by law."

Kwok does not argue that either he or Shiny Times made any payments under the 2011 Loan Facility or the 2011 Personal Guarantee to satisfy the debt. Accordingly, the Court finds Kwok liable for breach of the 2011 Personal Guarantee.

## **Conclusion**

The remaining issue in the action – Count II of the Amended Complaint – seeks to hold two of Kwok's companies—Genever Holdings LLC and Genever Holdings Corporation— liable

7

for Kwok's debt to Pacific Alliance as alter egos. This action was scheduled for a jury trial on

October 5, 2020. Due to the Covid-19 pandemic, the Court is unable to have a jury trial on that

date and the trial is rescheduled for January 15, 2021.

Accordingly, it is hereby,

ORDERED that defendant Kwok's cross-motion for reargument is denied; and it is

further

ORDERED that plaintiff's motion for partial summary judgment on Count I of the

Amended Complaint is granted in favor of  Pacific Alliance Asia Opportunity Fund L.P. and

against Kwok Ho Wan, a/k/a Kwok Ho, a/ka, GWO Wen Gui, a/ka/ Gui Wengui, a/ka/ Guo

Wen-Gui, a/ka/ Wan Gue Haoyun a/k/a Miles Kwok a/ka/ Haoyun Guo to the extent of holding

defendant Kwok liable for breach of contract; and it is further

ORDERED that plaintiff shall move no later than October 14, 2020 by notice of motion

returnable in the Submissions Part to establish damages on Count I by presenting affidavits on

personal knowledge and evidence in admissible form as to the principal amount due and owing

under the 2011 Personal Guarantee, the rate of interest applicable under the 2011 Personal

Guarantee, and the date from which interest is accruing, so that the Clerk of Court may calculate

the total amount due and owing as of the date of entry of judgment; and it is further

ORDERED that plaintiff shall simultaneously move for an award of legal fees and

expenses, setting forth the document which plaintiff is relying on and attaching invoices for

services rendered; and it is further

8

ORDERED that the parties appear for a status conference on December 22, 2020 at 10:20

am.

Dated: September 15, 2020

BARRY R. OSTRAGER, J.S.C.

| CHECK ONE: | | CASE DISPOSED | | | X | NON-FINAL DISPOSITION | | |
| CHECK IF APPROPRIATE: | | GRANTED | | DENIED | X | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | | REFERENCE |

9

# EXHIBIT 16

# SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY

PRESENT:    **HON. BARRY R. OSTRAGER**         PART      **IAS MOTION 61EFM**

*Justice*

-------------------------------------------------------------------------X

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

Plaintiff,

- v -

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a
GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a WAN GUE
HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO,
GENEVER HOLDINGS LLC, and GENEVER HOLDINGS
CORPORATION,

Defendants.

-------------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 652077/2017 |
| **MOTION DATE** | |
| **MOTION SEQ. NO.** | 009 |

**DECISION + ORDER ON MOTION**

HON. BARRY R. OSTRAGER

The Court heard oral argument on motion 009 by plaintiff for damages on December 18, 2020 via Microsoft Teams. In accordance with the documents submitted and the proceedings on the record, plaintiff's motion is granted to the extent of awarding plaintiff damages of $46,426,489.00 (unpaid principal) plus contractual interest pursuant to the 2011 Personal Guarantee at a rate of 15% per annum from effective date of December 31, 2010. *See* Aff. of Jon Lewis made on personal knowledge (NYSCEF Doc. No. 563).

**Procedural History**

On September 15, 2020, the Court issued a Decision and Order on Motion 007, plaintiff's motion for summary judgement (NYSCEF Doc. No. 549). The Court found Kwok Ho Wan ("Kwok") liable for breach of contract, specifically the 2011 Personal Guarantee entered into by the parties. In this Decision and Order, the Court expressed skepticism about Kwok's newly raised mitigation argument but reserved ruling on the issue until the Court determined damages. The Court directed plaintiff to file a motion setting forth both damages pursuant to the 2011 Personal Guarantee and attorney's fees which the Court expressly found that plaintiff is entitled

to under the contract. The issue of damages, and whether the Court should pierce the corporate veil and hold the Genever defendants liable remained outstanding.

Because the veil piercing issue will require a trial by jury, the Court asked plaintiff to withdraw the portion of Motion 009 which sought attorney's fees, and to renew it at the resolution of the entire action. Plaintiff agreed to do so, and thus this motion only addresses the damages portion of Motion 009.

The initial briefing on this motion included a cross-motion by defendant Kwok to amend his Answer to assert mitigation as an affirmative defense. In its November 12, 2020 Status Conference Order (NYSCEF Doc. No. 648) the Court directed that Kwok need not amend his Answer to argue his mitigation defense. Accordingly, this Decision and Order addresses the merits of plaintiff's motion for damages and Kwok's mitigation defense.

## Discussion

As the Court had already found Kwok liable under the 2011 Personal Guarantee, plaintiff filed a straightforward motion setting forth the interest owed on the unpaid principal pursuant to the terms of the agreement. In opposition, defendants argue that plaintiff had a duty to mitigate its damages, specifically by pursuing an offer from the Beijing police to potentially sell apartments to plaintiff – the same apartments that Kwok was supposed to transfer to plaintiff to satisfy his debt owed to plaintiff.

As stated in the Decision and Order on Motion 007 (NYSCEF Doc. No. 549):

> In April 2013, the parties entered into a Deed of Settlement, whereby the outstanding loan amount would no longer be due and owing to Pacific Alliance if Pacific Alliance purchased certain apartments from Beijing Pangu Investment Inc. ("Beijing Pangu"), another Kwok business entity, and Shiny Times' made certain installment payments to Pacific Alliance Beijing Pangu was required to satisfy ten conditions precedent in connection with the sale and purchase of each of the apartments by Pacific Alliance. If any such condition was not satisfied by June of 2013, the Deed of Settlement would be terminated in its entirety. Pacific Alliance

2

> and Kwok subsequently executed four extensions of the Deed of Settlement,
> changing only the date by which the conditions precedent needed to be satisfied.
> The latest Deed of Settlement required that the conditions precedent be satisfied
> by June of 2015. . . .
> [S]everal of the conditions precedent in the 2013 Deed of Settlement were not
> fulfilled. Namely, defendant Kwok failed to deliver clean title, failed to provide
> plaintiff with an invoice for the purchase of the apartments, failed to provide
> plaintiff with evidence regarding the payment of all relevant taxes and charges in
> connection with the sale and purchase of the apartments, and failed to deliver the
> House Ownership Certificates of any of the Apartments to plaintiff. . . .

Because the conditions precedent were not satisfied by June 30, 2015 the Deed of Settlement was

terminated and its entirety and the 2011 Personal Guarantee was once again in full force and

effect.

Defendants first argue that plaintiff had a duty to mitigate its damages "once the Deed of

Settlement was breached." However, the Deed of Settlement was never "breached" because the

Deed of Settlement never went into effect, because the conditions precedent were not satisfied by

June 30, 2015. Defendants argue that the conditions listed above were not conditions precedent,

because "the Deed of Settlement was not conditioned upon anything happening before it could

come into full force and effect" (*See* Def. Sur-Reply at p. 7). The Court rejects this argument

raised for the first time in defendants' sur-reply. Defendants had until June 30, 2015 to satisfy the

conditions precent. Failure to meet the conditions prior to June 30, 2015 was not a breach of the

agreement, and on June 30, 2015, the failure to meet the conditions precedent resulted in the

nullification of the Deed of Settlement and reversion to the 2011 Personal Guarantee, not a

"breach" of the agreement.

Defendants next argue that there are genuine issues of material fact that would show

plaintiff had the opportunity to mitigate its damages prior to the expiration of the Deed of

Settlement.  First, the Court has already found – based on documentary evidence submitted by

both parties – that the opportunity presented by the Beijing police only came up *after* June 2015

3

when the Deed of Settlement had already expired. *See* NYSCEF Doc. No. 549 at p. 6. Second, it

does not make a difference as a matter of law when the police presented the opportunity to

plaintiff. If it was prior to June 30, 2015, then plaintiff did not know whether or not Kwok would

fulfill the conditions precedent and transfer plaintiff the apartments, and thus there was nothing

to mitigate and no reason to pursue alternative methods of procuring the apartments. If it was

after June 30, 2015, the 2011 Personal Guarantee was in effect, and under Hong Kong law,

mitigation is inapplicable to a debt-repayment claims. Both plaintiff and Kwok's experts in Hong

Kong law affirm this. *See* Melwani Aff. (NYSCEF Doc. No. 640) at ¶ 10 ("the Court of Final

Appeal … has confirmed … that mitigation is not applicable to claims for repayment of a debt")

*and* Georgiou Aff. (NYSCEF Doc. No. 667) at ¶ 7 ("I agree with Mr. Melwani that the principle

of mitigation does not apply to a claim for repayment of a debt where that claim is made under a

. . . personal guarantee.").

Defendants further argue that plaintiff had an obligation to pursue the offer from the

Beijing police because plaintiff was allegedly being presented with an opportunity to receive the

benefit it had bargained for under the Deed of Settlement – the apartments. As stated above,

plaintiff did not have an obligation to pursue mitigation of a debt-repayment claim. However,

even if plaintiff did have a duty to mitigate, as the Court has already found, plaintiff is only ever

required to *reasonably* mitigate damages. The proposal to purchase the apartments from the

Beijing police for $17 M, when plaintiff was supposed have the apartments transferred to it for

zero dollars (in satisfaction of a debt) is hardly receiving the benefit for which plaintiff had

bargained.

Finally, defendants argue that plaintiff has possession of the keys to the apartments, and

that that must be worth something to offset the contractual damages under the 2011 Personal

Guarantee. Defendants cite no legal authority for this contention. While this type of conclusory assertion is insufficient to bar judgment as a matter of law, the Court notes that even under the Deed of Settlement, plaintiff did not bargain for mere possession of the apartments, and instead plaintiff bargained for clean title so that it could legally sell the apartments in satisfaction of the debt Kwok owed plaintiff. *See* Pl. Reply Memo at p. 11.

In conclusion, Kwok's mitigation argument is without merit and plaintiff is entitled to contractual damages and interest under the 2011 Personal Guarantee.

The Court notes that plaintiff's Second Cause of Action for veil piercing against the Genever defendants must still be tried. A trial on the remaining claim was set for January 15, 2021. The parties have submitted a stipulation requesting to adjourn the trial without a date, in light of (1) the present prohibition on jury trials in New York State due to the Covid-19 pandemic, and (2) the bankruptcy stay against one of the Genever defendants. This request is granted. A status conference is scheduled for May 4, 2021 at 10:00 am to report on the status of the Genever bankruptcy.

Accordingly, it is hereby,

ORDERED the Clerk of Court is directed to enter judgment in favor of plaintiff Pacific Alliance Asia Opportunity Fund L.P. and against defendant Kwok Ho Wan in the amount of $46,426,489.00 plus contractual interest pursuant to the 2011 Personal Guarantee at a rate of 15% per annum from effective date of December 31, 2010 and at the statutory rate of 9% per annum from the date of entry of this decision and order.

December 18, 2020
**DATE**

BARRY R. OSTRAGER, J.S.C.

5

Case 22-50073   Doc 183-3   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 65 of 241

**CHECK ONE:**    ☐ **CASE DISPOSED**      ☒ **NON-FINAL DISPOSITION**

☒ **GRANTED**    ☐ **DENIED**    ☐ **GRANTED IN PART**    ☐ **OTHER**

**APPLICATION:**    ☐ **SETTLE ORDER**    ☐ **SUBMIT ORDER**

**CHECK IF APPROPRIATE:**    ☐ **INCLUDES TRANSFER/REASSIGN**    ☐ **FIDUCIARY APPOINTMENT**    ☐ **REFERENCE**

6

# EXHIBIT 17

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re:                                                      Chapter 11

Genever Holdings LLC,                                       Case No. 20-12411 (JLG)

                                    Debtor.
--------------------------------------------------------x

### ORDER GRANTING DEBTOR'S SECOND RENEWED MOTION
### TO APPROVE THE REVISED SETTLEMENT AGREEMENT

Upon the Debtor's renewed motion (ECF No 131) (the "**Renewed Motion**") of Genever

Holdings LLC, (the "**Debtor**") seeking approval of a certain settlement agreement between the

Debtor, Pacific Alliance Asia Opportunity Fund L.P. ("**PAX**") and Bravo Luck Limited ( "**Bravo**

**Luck**") (ECF No. 62); and upon the opposition to the Renewed Motion filed by the Office of the

U.S. Trustee via a motion for the appointment of an Operating Chapter 11 Trustee (ECF No. 64)

(the "**UST Opposition**"); and upon the supplemental responses filed by the Debtor, PAX and Bravo

Luck relating to the UST Opposition (ECF Nos. 76, 81, 83, 95, 96, 97, 99, 104, 105 and 106); and

a series of hearings having been held before the undersigned; and upon the record compiled at these

hearings; and the Court having considered the UST Opposition; and upon the September 1, 2021,

decision (the "September 1, 2021 Decision") in which the undersigned determined that the

Restated Settlement meets the standards of reasonableness and is supported by the creditors and

major stakeholders in the Chapter 11 case, but denied the Renewed Motion due to issues relating to

certain aspects of the proposed retention of Melanie L. Cyganowski, Esq. and her firm, Otterbourg,

P.C.; and, thereafter, the Settling Parties having agreed to the Second Amended and Revised

Settlement Agreement between the Debtor, PAX and Bravo Luck (the "**Revised Settlement**

**Agreement**") which addresses the concerns raised by the Court in its September 1, 2021 Decision

as well as the objections of the U.S. Trustee, which no longer has any objections to the Revised

Settlement Agreement and the terms of Melanie L. Cyganowski's employment as Sale Officer for the Debtor; and the Court having agreed to consider final approval of the Renewed Settlement by Notice of Presentment; and based upon the entirety of the record compiled at the various hearings; and good cause appearing therefor; it is hereby

ORDERED as follows:

1.      The Renewed Settlement Motion is granted as set forth herein.

2.      The Revised Settlement Agreement is approved in all respects and shall become effective immediately upon the entry of this Order.

3.      The Debtor's proposed employment of Melanie L. Cyganowski as Sale Officer shall be approved by separate Order to be noticed and entered simultaneously herewith.

4.      The UST Motion seeking the appointment of an Operating Trustee is adjourned *sine die*.

5.      Stay relief is granted to allow PAX to prosecute, and the Debtor to defend, the state court action currently pending in the New York Supreme Court under Docket No. 652077/2017 (the "**State Court Action**"), with the stay to otherwise remain in place for all other purposes, including relating to enforcement or collection of any judgment entered against the Debtor in the State Court Action, pending further order of the Bankruptcy Court upon further notice to all Parties.

6.      The Lift Stay Motion and Conversion Motion filed by PAX are withdrawn as mooted by the approval of the Revised Settlement Agreement.

Dated: New York, New York
        October 8, 2021

                                        /s/ *James L. Garrity, Jr.*
                                        Hon. James L. Garrity, Jr.

# EXHIBIT 18

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

                                     Plaintiff,

               - against -

KWOK HO WAN, et al.,

                               Defendants.

Index No. 652077/2017

Hon. Barry Ostrager

**NOTICE OF APPEAL**

**PLEASE TAKE NOTICE**, that Defendant Kwok Ho Wan hereby appeals to the Appellate Division, First Judicial Department, from the Judgment of the Supreme Court of the State of New York, County of New York dated February 3, 2021, and entered in the office of the New York County Clerk on February 3, 2021 (NYSCEF Doc. No. 716), and from each and every part thereof.

Dated: New York, New York
       March 2, 2021

Respectfully submitted,

BAKER & HOSTETLER LLP

By:  _/s/ John Siegal_
      John Siegal
      Melissa Carvalho
      Erica Barrow
45 Rockefeller Plaza
New York, New York 10111
212-589-1400
jsiegal@bakerlaw.com
mcarvalho@bakerlaw.com
ebarrow@bakerlaw.com
*Attorneys for Defendant Kwok Ho Wan*

To:    Clerk of the County of New York (via NYSCEF)
       All counsel of Record (via NYSCEF)

# Supreme Court of the State of New York
# Appellate Division: First    Judicial Department

Informational Statement (Pursuant to 22 NYCRR 1250.3 [a]) - Civil

| Case Title: Set forth the title of the case as it appears on the summons, notice of petition or order to show cause by which the matter was or is to be commenced, or as amended. | For Court of Original Instance |
|---|---|
| Pacific Alliance Asia Opportunity Fund L.P.<br><br>- against -<br><br>Kwok Ho Wan, et al. | Date Notice of Appeal Filed |
| | For Appellate Division |

| Case Type | | Filing Type | |
|---|---|---|---|
| ■ Civil Action | ☐ CPLR article 78 Proceeding | ■ Appeal | ☐ Transferred Proceeding |
| ☐ CPLR article 75 Arbitration | ☐ Special Proceeding Other | ☐ Original Proceedings | ☐ CPLR Article 78 |
| | ☐ Habeas Corpus Proceeding | ☐ CPLR Article 78 | ☐ Executive Law § 298 |
| | | ☐ Eminent Domain | ☐ CPLR 5704 Review |
| | | ☐ Labor Law 220 or 220-b | |
| | | ☐ Public Officers Law § 36 | |
| | | ☐ Real Property Tax Law § 1278 | |

**Nature of Suit:** Check up to three of the following categories which best reflect the nature of the case.

| | | | |
|---|---|---|---|
| ☐ Administrative Review | ■ Business Relationships | ■ Commercial | ■ Contracts |
| ☐ Declaratory Judgment | ☐ Domestic Relations | ☐ Election Law | ☐ Estate Matters |
| ☐ Family Court | ☐ Mortgage Foreclosure | ☐ Miscellaneous | ☐ Prisoner Discipline & Parole |
| ☐ Real Property (other than foreclosure) | ☐ Statutory | ☐ Taxation | ☐ Torts |

Informational Statement - Civil

| Appeal | |
|---|---|
| Paper Appealed From (Check one only): | If an appeal has been taken from more than one order or judgment by the filing of this notice of appeal, please indicate the below information for each such order or judgment appealed from on a separate sheet of paper. |

| | | | |
|---|---|---|---|
| ☐ Amended Decree | ☐ Determination | ☐ Order | ☐ Resettled Order |
| ☐ Amended Judgement | ☐ Finding | ☐ Order & Judgment | ☐ Ruling |
| ☐ Amended Order | ☐ Interlocutory Decree | ☐ Partial Decree | ☐ Other (specify): |
| ☐ Decision | ☐ Interlocutory Judgment | ☐ Resettled Decree | |
| ☐ Decree | ■ Judgment | ☐ Resettled Judgment | |

| Court: | Supreme Court ▼ | County: | New York ▼ |
|---|---|---|---|
| Dated: 02/03/2021 | | Entered: 02/03/2021 | |
| Judge (name in full): Hon. Barry R. Ostrager | | Index No.:652077/2017 | |
| Stage: ☐ Interlocutory ■ Final ☐ Post-Final | | Trial: ☐ Yes ☐ No   If Yes: ☐ Jury ☐ Non-Jury | |

| Prior Unperfected Appeal and Related Case Information |
|---|

Are any appeals arising in the same action or proceeding currently pending in the court?   ■ Yes ☐ No

If Yes, please set forth the Appellate Division Case Number assigned to each such appeal.

2020-04180 and 2021-00138

Where appropriate, indicate whether there is any related action or proceeding now in any court of this or any other jurisdiction, and if so, the status of the case:

GTV Media Group v. Pacific Asia Alliance Fund L.P., Supreme Court, New York County (Ostrager, J.), Index No. 150823/2021.  Dismissed without prejudice.

| Original Proceeding | |
|---|---|
| Commenced by:  ☐ Order to Show Cause ☐ Notice of Petition ☐ Writ of Habeas Corpus | Date Filed: |
| Statute authorizing commencement of proceeding in the Appellate Division: | |

| Proceeding Transferred Pursuant to CPLR 7804(g) | |
|---|---|
| Court: Choose Court | County: Choose County |
| Judge (name in full): | Order of Transfer Date: |

| CPLR 5704 Review of Ex Parte Order: | |
|---|---|
| Court: Choose Court | County: Choose County |
| Judge (name in full): | Dated: |

| Description of Appeal, Proceeding or Application and Statement of Issues |
|---|

Description:  If an appeal, briefly describe the paper appealed from.  If the appeal is from an order, specify the relief requested and whether the motion was granted or denied.  If an original proceeding commenced in this court or transferred pursuant to CPLR 7804(g), briefly describe the object of proceeding.  If an application under CPLR 5704, briefly describe the nature of the ex parte order to be reviewed.

Defendant-Appellant Kwok Ho Wan is appealing the Judgment in this action entered February 3, 2021. Pursuant to CPLR 5501(a)(1), the appeal from the Judgment brings up for review, inter alia, any non-final judgment or order which necessarily affects the final judgment.

Informational Statement - Civil

FILED: NEW YORK COUNTY CLERK 03/02/2021 04:42 PM
INDEX NO. 652077/2017

NYSCEF DOC. NO. 725
Case 22-50073    Doc 183-3    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 73 of 241
RECEIVED NYSCEF: 03/02/2021

**Issues:** Specify the issues proposed to be raised on the appeal, proceeding, or application for CPLR 5704 review, the grounds for reversal, or modification to be advanced and the specific relief sought on appeal.

Without limiting the arguments that may be presented on appeal, Defendant-Appellant Kwok Ho Wan states: that the Judgment should be reversed in its entirety; that the Supreme Court's orders which, inter alia, imposed sanctions and a judicial estoppel upon him, granted Plaintiff's motion for summary judgment against him, and awarded damages against him, were in error and should be reversed; and that numerous genuine issues of material fact existed as to both liability and damages that should have precluded the entry of summary judgment on either liability or damages.

## Party Information

**Instructions:** Fill in the name of each party to the action or proceeding, one name per line. If this form is to be filed for an appeal, indicate the status of the party in the court of original instance and his, her, or its status in this court, if any. If this form is to be filed for a proceeding commenced in this court, fill in only the party's name and his, her, or its status in this court.

| No. | Party Name | Original Status | Appellate Division Status |
|---|---|---|---|
| 1 | Pacific Alliance Asia Opportunity Fund L.P. | Plaintiff | Respondent |
| 2 | Kwok Ho Wan | Defendant | Appellant |
| 3 | Genever Holdings LLC | Defendant | None |
| 4 | Genever Holdings Corporation | Defendant | None |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |

Informational Statement - Civil

FILED: NEW YORK COUNTY CLERK 03/02/2021 04:42 PM
NYSCEF DOC. NO. 725

INDEX NO. 652077/2017
RECEIVED NYSCEF: 03/02/2021

Case 22-50073   Doc 183-3   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 74 of
241

| Attorney Information |
|---|

**Instructions:** Fill in the names of the attorneys or firms for the respective parties. If this form is to be filed with the notice of petition or order to show cause by which a special proceeding is to be commenced in the Appellate Division, only the name of the attorney for the petitioner need be provided. In the event that a litigant represents herself or himself, the box marked "Pro Se" must be checked and the appropriate information for that litigant must be supplied in the spaces provided.

| Attorney/Firm Name: Edward Moss, O'Melveny & Myers LLP | | | |
|---|---|---|---|
| Address: 7 Times Square | | | |
| City: New York | State: New York | Zip: 10036 | Telephone No: 212-326-2000 |
| E-mail Address: emoss@omm.com | | | |
| Attorney Type: ■ Retained ☐ Assigned ☐ Government ☐ Pro Se ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): 1 | | | |
| Attorney/Firm Name: Stuart Sarnoff, O'Melveny & Myers LLP | | | |
| Address: 7 Times Square | | | |
| City: New York | State: New York | Zip: 10036 | Telephone No: 212-326-2000 |
| E-mail Address: ssarnoff@omm.com | | | |
| Attorney Type: ■ Retained ☐ Assigned ☐ Government ☐ Pro Se ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): 1 | | | |
| Attorney/Firm Name: Robert W. Seiden | | | |
| Address: 1120 Avenue of the Americas | | | |
| City: New York | State: New York | Zip: 10036 | Telephone No: 212-626-6708 |
| E-mail Address: rseiden@seidenlegal.com | | | |
| Attorney Type: ■ Retained ☐ Assigned ☐ Government ☐ Pro Se ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): 1 | | | |
| Attorney/Firm Name: John Siegal, Baker & Hostetler LLP | | | |
| Address: 45 Rockefeller Center | | | |
| City: New York | State: New York | Zip: 10111 | Telephone No: 212-589-1400 |
| E-mail Address: jsiegal@bakerlaw.com | | | |
| Attorney Type: ■ Retained ☐ Assigned ☐ Government ☐ Pro Se ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): 2 | | | |
| Attorney/Firm Name: Aaron Mitchell, Lawall & Mitchell, LLC | | | |
| Address: 99 Church Street, 4th floor | | | |
| City: White Plains | State: New York | Zip: 10601 | Telephone No: 973-285-3280 |
| E-mail Address: aaron@lmesq.com | | | |
| Attorney Type: ■ Retained ☐ Assigned ☐ Government ☐ Pro Se ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): 3 and 4 | | | |
| Attorney/Firm Name: | | | |
| Address: | | | |
| City: | State: | Zip: | Telephone No: |
| E-mail Address: | | | |
| Attorney Type: ☐ Retained ☐ Assigned ☐ Government ☐ Pro Se ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): | | | |

Informational Statement - Civil

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PACIFIC ALLIANCE ASIA OPPORTUNITY
FUND L.P.,

          Plaintiff,

    v.

KWOK HO WAN, *a/k/a* KWOK HO, *a/k/a* GWO
WEN GUI, *a/k/a* GUO WENGUI, *a/k/a* GUO
WEN-GUI, *a/k/a* WAN GUE HAOYUN, *a/k/a*
MILES KWOK, *a/k/a* HAOYUN GUO,
GENEVER HOLDINGS CORPORATION, and
GENEVER HOLDINGS LLC,

          Defendants.

17 652077

Index No. 652077/2017

[~~PROPOSED~~] JUDGMENT

WHEREAS, on April 18, 2017, Plaintiff Pacific Alliance Asia Opportunity Fund L.P.,
filed a complaint against Defendant Kwok Ho Wan, a/k/a Kwok Ho, a/k/a Gwo Wen Gui, a/k/a
Guo Wengui, a/k/a Guo Wen-Gui, a/k/a Wan Gue Haoyun, a/k/a Miles Kwok, a/k/a Haoyun Guo
("Kwok"), alleging a cause of action for breach of contract against Defendant Kwok.

WHEREAS, on April 18, 2019, Plaintiff filed a First Amended Complaint against Kwok,
and Genever Holdings LLC, and Genever Holdings Corporation (together with Genever
Holdings LLC, the "Genever Defendants"), alleging causes of action for (i) breach of contract
against Defendant Kwok and (ii) veil piercing against the Genever Defendants.

WHEREAS, on July 24, 2020, Plaintiff moved for partial summary judgment on its
breach of contract claim against Kwok, and the motion was fully briefed and heard before Justice
Barry R. Ostrager, who issued a Decision and Order dated September 15, 2020, which was
entered in the New York County Clerk's Office on September 16, 2020, granting Plaintiff's
motion on Count I of the Amended Complaint for breach of contract, and directed Plaintiff move
by Notice of Motion to establish damages on Count I no later than October 14, 2020.

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:48 PM
NYSCEF DOC. NO. 715

INDEX NO. 652077/2017
RECEIVED NYSCEF: 02/03/2021

Case 22-50073    Doc 183-3    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 76 of
241

17 652077

WHEREAS, (i) on September 21, 2020, Plaintiff moved by Notice of Motion to establish damages, legal fees and expenses; (ii) Plaintiff agreed to temporarily withdraw, without prejudice and with the Court's permission and the other parties' understanding that it would be renewed at a later date, the portion of its application relating to legal fees and expenses (i.e., enforcement costs); and (iii) the motion was fully briefed and heard before Justice Barry R. Ostrager, who issued a Decision and Order dated December 18, 2020 (the "Damages Order"), and entered into the New York County Clerk's office on December 18, 2020, directing the Clerk of Court to enter judgment in favor of Plaintiff and against Defendant Kwok in the amount of $46,426,489.00 plus contractual interest at a rate of 15% per annum from effective date of December 31, 2010 and at the statutory rate of 9% per annum from the date of entry of this decision and order.

NOW, upon motion of O'Melveny & Myers LLP, attorneys for Plaintiff, it is:

ADJUDGED that Plaintiff Pacific Alliance Asia Opportunity Fund L.P., having a business address at 33/F, Three Pacific Place, 1 Queen's Road East, Hong Kong, have judgment against and do recover from Defendant Kwok Ho Wan, residing at 781 Fifth Avenue, 18th Floor, New York, NY 10022, the amount of _____ **$46,426,489.00** _____, plus contractual interest in the amount of _____ **$69,448,939.71** _____, plus post-judgment interest at the statutory rate of 9% in the amount of _____ **$526,590.86** _____, for a total of **X** _____ **$116,402,019.57** _____, and Plaintiff shall have execution thereof.

~~Judgment signed and entered this ___th day of _____, 2021~~

**F I L E D**
**Feb 03 2021**
**NEW YORK**
**COUNTY CLERK'S OFFICE**

Milton Adam Tingling
Clerk

3 rd          Feb.          2021

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PACIFIC ALLIANCE ASIA OPPORTUNITY
FUND L.P.,

        Plaintiff,

    v.

KWOK HO WAN, *a/k/a* KWOK HO, *a/k/a* GWO
WEN GUI, *a/k/a* GUO WENGUI, *a/k/a* GUO
WEN-GUI, *a/k/a* WAN GUE HAOYUN, *a/k/a*
MILES KWOK, *a/k/a* HAOYUN GUO,
GENEVER HOLDINGS CORPORATION, and
GENEVER HOLDINGS LLC,

        Defendants.

Index No. 652077/2017

**AFFIRMATION OF EDWARD MOSS, ESQ.**



F I L E D
Feb 03 2021
NEW YORK
COUNTY CLERK'S OFFICE

I, Edward Moss, an attorney duly admitted to practice before the Courts of the State of New York, hereby affirm, under penalty of perjury, pursuant to the Civil Practice Law and Rules of the State of New York § 2106, as follows:

1.    I am a member of the bar of this Court and a partner in the law firm of O'Melveny & Myers LLP, counsel of record for Plaintiff Pacific Alliance Asia Opportunity Fund L.P. ("PAX") in this matter.

2.    I am fully familiar with the facts and circumstances in this action. For purposes of entry of this judgment, I submit this affirmation waiving costs and disbursements.

Dated:    January 25, 2021
        New York, New York

By: */s/ Edward Moss* _____
    Edward Moss

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
Index No. 652077/2017

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND
L.P.,

Plaintiff,

-against-

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN
GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI,
a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK,
a/k/a HAOYUN GUO, GENEVER HOLDINGS
CORPORATION, and GENEVER HOLDINGS LLC,

Defendants.

**JUDGMENT**

[PROPOSED] JUDGMENT

**O'MELVENY & MYERS LLP**

TIMES SQUARE TOWER
7 TIMES SQUARE
NEW YORK, NEW YORK  10036
(212) 326-2000

Attorneys for Plaintiff Pacific Alliance Asia Opportunity
Fund, L.P.

# EXHIBIT 19

FILED: APPELLATE DIVISION - 1ST DEPT 09/02/2021 04:31 PM

NYSCEF DOC. NO. 12

2021-00740

RECEIVED NYSCEF: 09/02/2021

*To be Argued by:*
Mark C. Zauderer
*(Time Requested: 15 Minutes)*

# New York Supreme Court

## Appellate Division—First Department

**Appellate Case No.: 2021-00740**

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

*Plaintiff-Respondent,*

– against –

KWOK HO WAN, a/k/a Kwok Ho, a/k/a Gwo Wen Gui, a/k/a Guo Wengui,
a/k/a Guo Wen-Gui, a/k/a Wan Gue Haoyun, a/k/a Miles Kwok, a/k/a Haoyun Guo,

*Defendant-Appellant,*

– and –

GENEVER HOLDINGS CORPORATION and GENEVER HOLDINGS LLC,

*Defendants.*

## BRIEF FOR DEFENDANT-APPELLANT

Ganfer Shore Leeds & Zauderer LLP
360 Lexington Avenue
New York, New York 10017
(212) 922-9250
mzauderer@ganfershore.com
imatetsky@ganfershore.com
jcohen@ganfershore.com

*Attorneys for Defendant-Appellant*

New York County Clerk's Index No. 652077/17

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

PRELIMINARY STATEMENT ............................................................... 1

QUESTIONS PRESENTED ..................................................................... 5

FACTUAL BACKGROUND ................................................................... 5

    A.    The Underlying Transactions and Disputed Documents ...................... 5

    B.    The Spurned Opportunity to Mitigate .................................................. 8

    C.    The Litigation ..................................................................................... 10

ARGUMENT ......................................................................................... 16

    POINT I

    THE MOTION COURT SHOULD NOT HAVE BARRED MR.
    KWOK FROM DISPUTING THE AUTHENTICITY OF
    DOCUMENTS BASED UPON JUDICIAL ESTOPPEL ........................... 16

    A.    The Elements of Judicial Estoppel Were Not Present ........................ 17

        1.    The Motion Court Overlooked the "Prevailing"
            Requirement .............................................................................. 17

        2.    The Motion Court Overlooked the "Prior Action"
            Requirement .............................................................................. 19

    B.    The Motion Court's Invocation of Judicial Estoppel Was
        Unjust .................................................................................................. 22

    C.    PAX's Other Contentions Also Did Not Support Judicial
        Estoppel .............................................................................................. 24

    POINT II

    THE MOTION COURT ERRED BY REJECTING THE DEFENSE
    THAT PAX FAILED TO MITIGATE ITS DAMAGES ........................... 27

CONCLUSION ...................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

## Cases:

*All Terrain Props. v. Hay,*
  265 A.D.2d 87 (2000).........................................................19

*Anonymous v. Anonymous,*
  156 A.D.3d 412 (1st Dep't 2017)........................................17

*Assouline Ritz 1 LLC v. Edward I. Mills & Associates, Architects, PC,*
  91 A.D.3d 473 (1st Dep't 2012).........................................29

*Bajaj v. General Assurance, Co.,*
  18 Misc. 3d 25 (App. Term 2d Dep't 2007)........................25

*Baje Realty Corp. v. Cutler,*
  32 A.D.3d 307 (1st Dep't 2006).........................................19

*Bernstein v. Freudman,*
  180 A.D.2d 420 (1st Dep't 1992)................................ 29, 31

*Bibeau v. Ward,*
  228 A.D.2d 943 (3d Dep't 1996).......................................34

*Bronson v. Jacobs,*
  195 A.D.3d 550 (1st Dep't 2021).......................................16

*Carr v. Caputo,*
  114 A.D.3d 62 (1st Dep't 2013).........................................18

*CDR Créances S.A.S. v. Cohen,*
  23 N.Y.3d 307 (2014).........................................................24

*Charles v. Charles,*
  296 A.D.2d 547 (2d Dep't 2002)........................................23

*Epk Brand v. Leret,*
  194 A.D.3d 644 (1st Dep't 2021).......................................16

*Feliciano-Delgado v. New York Hotel Trades Council,*
  281 A.D.2d 312  (1st Dep't 2001)......................................26

*Ferreira v. Wyckoff Heights Med. Ctr.,*
  24 Misc. 3d 91 (App. Term 2d Dep't 2009), *aff'd*, 81 A.D.3d 587
  (2d Dep't 2011) .......................................................... 21, 23

*Ford Motor Credit Co. v. Colonial Funding Corp.*,
    215 A.D.2d 435 (1995)..........................................................................19

*Goodman v. Skanska USA Civil, Inc.*,
    169 A.D.3d 1010 (2d Dep't 2019)......................................................19

*Houston v. McNeilus Truck & Mfg., Inc.*,
    124 A.D.3d 1205 (4th Dep't 2015) .....................................................20

*Jones Lang Wootton USA v. LeBoeuf, Lamb, Greene & Macrae,*
    243 A.D.2d 168 (1998), *leave dismissed*, 92 N.Y.2d 962 (1998)........18

*Kapchan v. 31 Mt. Hope, LLC*,
    111 A.D.3d 530 (1st Dep't 2013)........................................................26

*Lorenzo v. Kahn*,
    100 A.D.3d 1480 (4th Dep't 2012) .....................................................21

*Lowinger v. Lowinger*,
    303 A.D.2d 723 (2003)........................................................................19

*MacArthur Props. I, LLC v. Galbraith*,
    182 A.D.3d 514 (1st Dep't 2020)........................................................17

*Mack-Cali Realty, L.P. v. Everfoam Insulation Sys., Inc.*,
    110 A.D.3d 680 (2d Dep't 2013).........................................................29

*Mass v. Cornell Univ.*,
    253 A.D.2d 1 (1999), *aff'd*, 94 N.Y.2d 87 (1999) .............................19

*Matter of Aho*,
    39 N.Y.2d 241 (1976)..........................................................................16

*MPEG LA, LLC v. Samsung Elec. Co., Ltd*,
    166 A.D.3d 13 (1st Dep't 2018)..........................................................18

*Napoli v. Bern*,
    187 A.D.3d 510 (1st Dep't 2020)........................................................16

*Nestor v. Britt*,
    270 A.D.2d 192 (1st Dep't 2000)............................................... 21, 22

*NYCTL 1996-1 Trust v. Malihan*,
    276 A.D.2d 443 (1st Dep't 2000)........................................................34

*Olszewski v. Park Terrace Gardens, Inc.*,
    18 A.D.3d 349 (1st Dep't 2005)..........................................................20

*Ouziel v. Baram*,
    305 A.D.2d 564 (2d Dep't 2003)...........................................................26

*Pacific Alliance Asia Opportunity Fund, L.P. v. Kwok*,
    160 A.D.3d 452 (1st Dep't 2018)............................................. 3, 11, 19

*Patmos Fifth Real Estate, Inc. v. Mazl Bldg., LLC*,
    189 A.D.3d 632 (1st Dep't 2020).................................... 3, 17, 20, 21

*Proner v. Julien & Schlesinger, P.C.*,
    214 A.D.2d 460 (1st Dep't 1995)..........................................................26

*Rothstein & Hoffman Elec. Serv., Inc. v. Gong Park Realty Corp.*,
    37 A.D.3d 206 (1st Dep't 2007)...........................................................23

*Seaboard Sur. Co. v. Nigro Bros., Inc.*,
    222 A.D.2d 574 (2d Dep't 1995)..........................................................26

*Tynan Incinerator Co. v. International Fidelity Ins. Co.*,
    117 A.D.2d 796 (2d Dep't 1986)..........................................................29

*Walsh v. Pisano*,
    190 A.D.3d 535 (1st Dep't 2021)..........................................................16

*Wells Fargo Bank N.A. v. Webster Bus. Credit Corp.*,
    113 A.D.3d 516 (1st Dep't 2014)..........................................................18

*White v. Farrell*,
    20 N.Y.3d 487 (2013).................................................................. 29, 33

*Wilmot v. State of N.Y.*,
    32 N.Y.2d 164 (1973)..........................................................................29

*Zelik v. Rubashkin*,
    2019 N.Y. Misc. LEXIS 6844, 2019 N.Y. Slip Op. 33760(U)
    (Sup. Ct. Kings Co. Dec. 11, 2019).....................................................26

## Statutes & Other Authorities:

22 N.Y.C.R.R. § 130.1-1 ......................................................................12

CPLR 327.................................................................................................10

## PRELIMINARY STATEMENT

Plaintiff-Respondent, Pacific Alliance Asia Opportunity Fund L.P. ("PAX"), sued Defendant-Appellant, Kwok Ho Wan a/k/a Miles Kwok ("Mr. Kwok"), for more than $100 million in principal and interest on a guarantee that Mr. Kwok had allegedly signed on a loan to a corporate entity.  Mr. Kwok testified unequivocally at his deposition that the signatures on the guarantee and several related documents were not his and were forgeries.

Plaintiff-Respondent, PAX, is a Cayman Islands investment fund with substantial holdings in China.  Defendant-Appellant, Mr. Kwok, is an individual who previously lived in China but after publicly exposing Chinese governmental corruption, was forced to move to the United States several years ago and to apply for political asylum here.  As a well-known, outspoken dissident dedicated to the overthrow of China's ruling political party, the Chinese Communist Party ("CCP"), Mr. Kwok has been persecuted by the CCP for over 30 years, including having been arrested, spending 22 months in jail after the Tiananmen Square killings, and having his younger brother murdered.  (*See, e.g.,* R574, 622).

As the plaintiff, PAX had the burden of proving that the documents that it relied on to support its claim were genuine and authentic.  Instead of seeking to meet that burden, PAX convinced the motion court to preclude Mr. Kwok from disputing the key documents' authenticity, and thereby to deprive Mr. Kwok of his right to contest PAX's claims on the merits, by misapplying the doctrine of judicial estoppel.

1

The motion court never held an evidentiary hearing or trial on the genuineness of the guarantee and other documents PAX relied upon.  Instead, in a two-page order that did not cite any legal authority, the motion court held that Mr. Kwok was judicially estopped because two years earlier, another individual had submitted an affidavit attaching copies of the documents in connection with an unsuccessful *forum non conveniens* motion by Mr. Kwok.  Mr. Kwok did not sign that affidavit and he testified that he never even saw it.  When Mr. Kwok later sought to investigate the circumstances under which the affidavit was submitted, he learned that the affiant had disappeared and could not be located.  This was particularly suspicious because Mr. Kwok has extensively criticized, and is considered an enemy, by the Chinese government, which forced him to flee China and seek political asylum in the United States.

Rather than prove the genuineness of the documents it relied upon, PAX sought to bypass having to prove the merits of its claim by having the motion court declare that the documents would be deemed authentic, despite Mr. Kwok's testimony that "his" signatures on the documents were forgeries.  It was unjust for the motion court to preclude Mr. Kwok from defending himself against a claim for more than $100 million based on documents he denies having signed.

The motion court's ruling on judicial estoppel was not only unwarranted on the facts, but also erroneous as a matter of law.  It is well-settled that a judicial

2

estoppel may arise only when a party has *prevailed* on a litigated issue through the benefit of its prior position. *See, e.g., Patmos Fifth Real Estate, Inc. v. Mazl Bldg., LLC*, 189 A.D.3d 632, 633 (1st Dep't 2020) ("The claim was not barred by judicial estoppel given that, even if contradictory, none of defendants' prior positions prevailed."). Here, the affidavit on which PAX relies was submitted in support of Mr. Kwok's motion to dismiss this action on *forum non conveniens* grounds, but this Court denied that motion, ruling that the action would go forward in New York and would not be dismissed. *Pacific Alliance Asia Opportunity Fund, L.P. v. Kwok*, 160 A.D.3d 452 (1st Dep't 2018). Mr. Kwok did not prevail on the motion and, for this reason among others, judicial estoppel did not apply.

Predicated entirely on its judicial estoppel ruling, the motion court granted summary judgment against Mr. Kwok on the issue of liability. The authenticity of the guarantee was a critically important issue of fact, in a case claiming more than $100 million in damages. The motion court should have required PAX to meet its burden of proving authenticity, and should have allowed Mr. Kwok to testify and present evidence as to the documents' lack of authenticity and all of the surrounding circumstances. It should not have granted what was effectively a case-terminating sanction based upon an affidavit that was not signed, seen, or blessed by Mr. Kwok, and submitted by former counsel on an unsuccessful procedural motion. Accordingly, this Court should reverse the judgment entered against Mr. Kwok.

3

Although the judgment should be reversed because the motion erroneously excused PAX from proving the authenticity of the documents it relied upon, even assuming *arguendo* that the documents had been found to be authentic, the motion court also independently erred by summarily resolving the issue of damages, also without a hearing or trial. Under the documents relied upon by PAX, it was agreed that the alleged loan and Mr. Kwok's alleged guarantee of it would be canceled if PAX received title to three luxury apartments at a project in Beijing, China (the "Beijing Apartments"). Mr. Kwok presented evidence, much of it drawn from PAX's own e-mails and admissions, that the Beijing police, an arm of the Chinese government, seized those apartments early in 2015 and offered to transfer them to PAX for far less than their market value. PAX could have achieved its objective in the underlying transaction, while offsetting, or at the very least substantially mitigating, its alleged damages by accepting this offer, but it failed to do so. Under both Hong Kong law (which governed the alleged loan documents and guarantees) and New York law, PAX had a duty to mitigate its alleged damages. Issues of fact existed on whether PAX failed to satisfy that duty and if so, whether all or most of its alleged damages could and should have been avoided. Accordingly, even if the judgment against Mr. Kwok on liability is upheld – which it should not be – there should still be a reversal and a remand for trial to determine the amount of damages, if any, that PAX should be awarded after taking its failure to mitigate into account.

## QUESTIONS PRESENTED

1.    Did the motion court err by invoking the doctrine of judicial estoppel to preclude Mr. Kwok from disputing more than $100 million in liability on a guarantee that he had not signed, because another individual submitted an affidavit earlier in the case annexing copies of the documents purportedly bearing Mr. Kwok's signature, even though Mr. Kwok did not gain any favorable outcome as a result of its submission?

2.    Did the motion court err in rejecting, as a matter of law, Mr. Kwok's evidence that PAX failed to mitigate its damages?

## FACTUAL BACKGROUND

### A.    The Underlying Transactions and Disputed Documents

The transactions underlying this action concern a real estate development in Beijing known as the Pangu Plaza.  PAX's Amended Complaint alleges that in 2008, it entered into loan and investment transactions involving the Pangu Plaza with a Hong Kong company, Spirit Charter Investment Limited ("Spirit Charter").  (R144). In 2009, Shiny Times Limited ("Shiny Times"), a Hong Kong corporation, allegedly entered into an agreement under which it assumed certain of Spirit Charter's obligations.  (R144-45).  PAX alleges that Mr. Kwok executed guarantees in connection with these transactions.  (*Id.*).  Mr. Kwok testified at his deposition that he recalls having entered into only a single personal guarantee in connection with a

5

$30 million loan in or about 2008, and that that loan was fully repaid, thereby discharging the guarantee. (R532-33, 540-42, 624-25). PAX's claims in this action do not arise directly from these 2008 and 2009 transactions.

PAX alleges that on March 16, 2011, Shiny Times and PAX entered into an agreement concerning a new loan facility, which superseded and replaced the 2009 agreement. (R145-46). However, when shown a copy of the alleged 2011 loan facility letter (R264-72) at his deposition, Mr. Kwok unequivocally denied that he had signed it, stating that "I can tell you 100 percent that it is not my signature." (R673-74). When shown a copy of an alleged guarantee also dated March 16, 2011 (R253-63), Mr. Kwok testified that "I guarantee with my life this is not my signature." (R679). PAX further alleges that on April 19, 2013, PAX, Shiny Times, Mr. Kwok, and Beijing Pangu entered into an agreement, referred to as the 2013 deed of settlement, in relation to the 2011 Loan Facility. (R273-90). Mr. Kwok testified that this document does not bear his authentic signature either. (R747-51).

According to PAX, the purported 2013 deed of settlement recited that the sum outstanding to PAX was now $52 million, but provided that Shiny Times' debt to PAX and Mr. Kwok's guarantee obligation would be discharged in return if Shiny Times caused PAX to gain ownership of three luxury apartments at the Pangu Palace, the Beijing Apartments. (R147-48). More specifically, according to PAX's Amended Complaint, the parties agreed that PAX would purchase the three Beijing

6

Apartments from Beijing Pangu for $15 million, which Shiny Times would reimburse. (*See id.*). If consummated by July 31, 2013, this alleged transaction would extinguish the debt under the 2011 loan facility letter and the guarantee. (*Id.*). PAX further alleges that the parties agreed to a series of extensions to the 2013 deed of settlement, the last terminating on June 30, 2015. (R148-49, 291-316). Mr. Kwok denied having signed any of these documents. (R753-61).

When Mr. Kwok testified at his deposition that the key documents PAX is suing him on are forgeries, he also provided important context for this assertion, testifying that he believes various individuals and the CCP have worked together to set him up by fabricating documents to exhaust him so that he would stop exposing CCP corruption. (*See* R565-71, 587). Mr. Kwok has also pointed out that in the documents he was shown at his deposition, "some have witnesses, some do not, some have notary, some do not." (R627). Mr. Kwok asserted that "the lawsuit is fake. The document[s], they are all forged," and that the CCP was likely behind the forgeries. (R729; *see also* R604, R607-27, R658-59). Mr. Kwok challenged PAX to allow the documents to be forensically analyzed to help determine their authenticity. (R748-50).

At an evidentiary hearing or trial on the documents' authenticity, Mr. Kwok could also have presented substantial evidence that as a leading opponent of the Chinese government and CCP, he has been subjected to a relentless and extensive

campaign of harassment and targeting, thereby placing his allegations of forgery into

their full context for consideration by the trier of fact.  As will be seen below, PAX

sought to avoid any inquiry and to steer this litigation on a very different course.

## B.    The Spurned Opportunity to Mitigate

As noted above, PAX alleges that it agreed that the obligations under the

purported documents would terminate if certain things happened by a specified date,

which under the last of the purported extension agreements was June 30, 2015.

(R147-49).  The key condition was that PAX would have the opportunity to purchase

and obtain title to the three luxury Beijing Apartments.  In other words, if the

transaction documents proffered by PAX were genuine, then PAX agreed in them to

accept title to the three Beijing Apartments as being equivalent in value to it to the

repayment of its outstanding loan.

In February 2015, the police department in Beijing, an arm of the Chinese

government, seized the Beijing Apartments.  (R 149 ¶ 41).  PAX acknowledged that

this seizure took place in the context of a "political situation."  (R4532).  The Beijing

Police were aware of PAX's interest in acquiring these apartments, had the ability

to transfer title to the apartments, and offered to assist PAX by transferring the

apartments to PAX.  E-mails involving several different PAX employees show that

PAX was aware of this opportunity to acquire the Beijing Apartments that were the

subject of the alleged deed of settlement and related documents.  PAX would have

had to make an initial cash outlay to accept the offer, but that outlay would have been far less than the acknowledged value of the apartments.  PAX officials acknowledged that it was still "a good price" that would result in an immediate profit for PAX.  (R4360).

Multiple PAX employees – including the Chief Operating Officer, Derek Crane (R4328-33), the General Counsel, Catherine Yang (R4339-40), and the group General Counsel and Managing Director, Jon Lewis (R4344-46) – were aware of the Beijing Police's offer to transfer the apartments to PAX at or around the time the offer was made in 2015.  These PAX employees were all unable to identify who, if anyone, may have followed-up with the Beijing Police regarding that offer, what the substance of any of those discussions may have been, or whether any steps were taken to pursue this opportunity.

Instead, PAX elected not to mitigate by accepting the offer of assistance from the Beijing Police.  In other words, even though the Beijing Police afforded PAX the opportunity to obtain the Beijing Apartments that were the subject of the purported deed of settlement and related documents – and thereby eliminate or at least substantially reduce its alleged damages – PAX chose to ignore that opportunity in favor of bringing this lawsuit against Mr. Kwok personally in New York.  In 2012, a PAX officer had referred to "the sheer satisfaction it would create" if PAX were to sue Mr. Kwok personally."  (R4579).  PAX was required to take the reasonable

9

opportunity presented to it to mitigate its alleged losses, rather than seek some sort of perverse "sheer satisfaction" by suing Mr. Kwok for avoidable damages.

## C.    <u>The Litigation</u>

PAX filed its Complaint against Mr. Kwok in the Supreme Court, New York County, on April 18, 2017.  (R96-127).  After filing an Answer, which denied most of the Complaint's allegations (R128-38), Mr. Kwok filed a pre-answer CPLR 327 motion to dismiss the action on grounds of *forum non conveniens*, contending that Hong Kong would be a more convenient forum for the litigation than New York. (NYSCEF Docs. 7-24).  In support of this motion, Mr. Kwok submitted a one-page affidavit that discussed his places of residence at various times.  (NYSCEF Doc. 24). This affidavit that Mr. Kwok signed and swore to was written in Mandarin, accompanied by an English translation.  (*Id.*).  Mr. Kwok's affidavit did not address any other issues.  (*Id.*).

Also submitted in favor of the *forum non conveniens* motion was an affidavit executed by Fiona Yu.  (R3166-68).   The affidavit described Ms. Yu as "an appointed person" of Mr. Kwok but did not explain what this meant.  (R3166).  Ms. Yu's affidavit stated that it was submitted to place various transaction documents before the court.  The documents were located in Hong Kong or China (R3166), at a time when Mr. Kwok had left China to seek asylum in New York.  It recited boilerplate language that the annexed documents were "true and correct" copies but

10

did not explain how Ms. Yu knew this or from where she had obtained the documents. (*Id.*).

After full briefing, the motion court granted Mr. Kwok's motion to dismiss for *forum non conveniens*. (NYSCEF Doc. 102). PAX appealed and this Court reversed, directing that the litigation would proceed in New York. *Pacific Alliance Asia Opportunity Fund v. Kwok*, 160 A.D.3d 452 (1st Dep't 2018). PAX then filed an Amended Complaint (R139-352), which Mr. Kwok answered, again denying most of PAX's allegations. (R357-71).

The parties engaged in extensive discovery, including PAX's taking of Mr. Kwok's deposition. At his deposition, Mr. Kwok was shown copies of the documents on which PAX bases its claims, including the 2011 loan facility letter, the 2011 guarantee, and the series of subsequent extension agreements. Mr. Kwok testified that he did not sign these documents.

Mr. Kwok's testimony that the signatures he was shown were not his was clear and unequivocal. For example, with respect to the March 16, 2011 Loan Facility document he testified, "I can tell you that 100 percent that it is not my signature." (R673-74). With respect to the March 16, 2011 guarantee, he testified, "I guarantee with my life this is not my signature." (R679). As with other documents on which PAX relies, when shown documents written in English and containing what purported to be his signatures, Mr. Kwok testified that they were a "[h]undred

11

percent forged" (R753-54), "hundred percent no" (R757), and "[h]undred percent, they are fakes" (R756). He added with respect to the documents that "I never did this . . . never signed this, and besides that I don't understand English." (R679).

Tellingly, PAX did not seek to take any further discovery on the genuineness of these documents or of Mr. Kwok's purported signatures on them, even though the documents were the basis for its claims against Mr. Kwok that, with interest, now exceeded $100 million. Instead, in an extraordinary effort to avoid meeting its burden of proof, PAX filed an unusual "Motion for Costs and Sanctions" against Mr. Kwok and his then-counsel. The only relief that PAX sought in its notice of motion was an award of costs and sanctions pursuant to 22 N.Y.C.R.R. § 130.1-1. (R372-73). However, in its memorandum of law accompanying the motion, PAX also asked the motion court to deem Mr. Kwok to be bound by the doctrines of judicial admission or judicial estoppel from denying the authenticity of the documents and his signatures on them. (R374-400).

PAX's request for judicial estoppel was primarily based upon the fact that Mr. Kwok's former counsel had submitted copies of the documents as exhibits to Ms. Yu's affirmation. At his deposition, Mr. Kwok emphasized that he had never seen that affirmation before it was shown to him at his deposition. (R801-02). Mr. Kwok further testified that he did not know how the documents annexed to Ms. Yu's affirmation came into her possession or came to be used by his then-counsel in

12

connection with the *forum non conveniens* (R757-58).  Mr. Kwok also consistently stated that he cannot read English.  (*E.g.,* R609, 619-20).  Additionally, Mr. Kwok testified at his deposition in 2019 that by that time, Ms. Yu had "been disappeared for the longest time," under troubling circumstances.  (R802; *see also* R804-05). Thus, it was not possible to ask her where she obtained the documents annexed to her affirmation or about any of the other facts and circumstances surrounding her execution of the affirmation.

PAX also argued that Mr. Kwok's then-counsel had acknowledged the documents' authenticity in a cover letter forwarding a list of exhibits that PAX would use at an upcoming evidentiary hearing on a prejudgment attachment motion. (NYSCEF Doc. 325).  That cover letter from PAX's counsel was submitted only after the parties had stipulated to focus the hearing narrowly on attachment-related issues, not on the merits of PAX's claims.  (NYSCEF Doc. 306).  The cover letter likewise addressed the admissibility of the exhibits at that specific hearing, not for other purposes.  PAX also contended that Mr. Kwok had supposedly acknowledged the documents' genuineness in his counsel's responses to PAX's requests for admissions ("RFAs"), but PAX had not even attached the documents to the RFAs so that anyone could review them, as is required.  (*See* R411-99).

The motion court declined to grant costs or monetary sanctions against Mr. Kwok or his then-counsel, as PAX had sought.  (R59-60).  In a cursory two-page

order, however, the motion court decided "that defendant Kwok is judicially estopped from challenging, in opposition to plaintiff's summary judgment motion or at trial, the authenticity of documents defendant Kwok previously sponsored in proceedings before this Court, notwithstanding that defendant Kwok sought to disavow his signature on those documents during his deposition.  Should the matter proceed to trial, those documents will be admitted into evidence." (R59).  The entire discussion of judicial estoppel was contained in a single paragraph.  (*Id.*).  The motion court's decision did not explain why Mr. Kwok was judicially estopped, did not discuss the legal elements of judicial estoppel or how they were or were not satisfied in this case, did not contain any specific findings of fact, and did not cite even a single legal authority.  (R59-60).

With its adversary thus involuntarily disarmed, PAX then moved for summary judgment against Mr. Kwok.  (R1388-89).  Mr. Kwok opposed the motion and cross-moved for the motion court to reconsider its judicial estoppel ruling.  (R3204-55).  Mr. Kwok also argued in opposition, *inter alia*, that in any event, PAX was not entitled to summary judgment because it had failed to mitigate its alleged damages when it declined the Beijing Police's offer to assist following their seizure of the Beijing Apartments.  (R3224-28).

On September 15, 2020, the motion court granted PAX's motion for partial summary judgment against Mr. Kwok.  (R50-58).  In doing so, the motion court

refused to reconsider its judicial estoppel ruling.  (R52-54).  The motion court also stated it did not consider it "likely" that Mr. Kwok would prevail on his failure-to-mitigate argument, while ultimately holding that the mitigation issue went to the question of damages, which was not yet before the court, rather than the issue of liability.  (R54-57).  The motion court stated that it would have to conduct an evidentiary hearing held on the issue of damages, stating that "we are going to have a damages hearing, and at the damages hearing you will be able to adduce whatever testimony you wish or whatever documents you wish to introduce on the mitigation" issue.  (NYSCEF Doc. 647 at 4, 6-7).

Next, PAX moved to determine the amount owed under Mr. Kwok's alleged guarantee.  (R4121-33).  In opposition, Mr. Kwok presented additional argument and evidence showing that PAX had a clear opportunity to mitigate its damages on the loan by acquiring the Beijing Apartments from the Beijing Police, but had knowingly and deliberately spurned that opportunity in favor of seeking an enormous money judgment against Mr. Kwok.  (R4269-4382, 4529-4957).

In a Decision and Order dated December 18, 2020, the motion court again sided with PAX, holding as a matter of law that PAX had no obligation to mitigate its damages.  (R12-17).  The motion court resolved this issue without conducting the evidentiary hearing that it had expressly stated would be necessary just two months earlier.  The motion court rejected the mitigation defense and found that Mr. Kwok

was liable to PAX for more than $46 million in principal on the alleged guarantees, plus interest at 15% per annum since 2011. (R16-17). On February 5, 2021, the Clerk entered a money judgment against Mr. Kwok in the total amount of $116,402,019.57. Mr. Kwok timely appealed to this Court. (R3-9).[1]

## ARGUMENT

## POINT I

### THE MOTION COURT SHOULD NOT HAVE BARRED MR. KWOK FROM DISPUTING THE AUTHENTICITY OF DOCUMENTS BASED UPON JUDICIAL ESTOPPEL

The motion court held that Mr. Kwok was judicially estopped from disputing the authenticity of the documents that underpinned PAX's entire case against him. The motion court then granted summary judgment in PAX's favor for the full amount it was seeking, and entered judgment against Mr. Kwok for more than $100 million, predicated entirely upon its ruling that Mr. Kwok's sworn denial of signing the documents would be ignored. It did so in a two-page order that did not find that the required elements of judicial estoppel were satisfied, did not identify the specific

---

[1]    Mr. Kwok had previously filed timely notices of appeal from two interlocutory orders. *See* Docket Nos. 2020-04180 and 2021-00138. The appeals from these interlocutory orders were superseded by the judgment and the appeal therefrom. *See Matter of Aho*, 39 N.Y.2d 241, 248 (1976); *Bronson v. Jacobs*, 195 A.D.3d 550, 550 (1st Dep't 2021); *Epk Brand v. Leret*, 194 A.D.3d 644, 644 (1st Dep't 2021); *Walsh v. Pisano*, 190 A.D.3d 535, 536 (1st Dep't 2021); *Napoli v. Bern*, 187 A.D.3d 510, 511 (1st Dep't 2020). Accordingly, this appeal has been perfected from the judgment and the prior, superseded interlocutory appeals were withdrawn, without prejudice, by leave of the Court (*see* Motion Nos. 2021-02347 and 2021-02348).

16

facts that the court believed warranted judicial estoppel, and did not cite any legal authority.  (R59-60).  This was error.

## A.   <u>The Elements of Judicial Estoppel Were Not Present</u>

### 1.   <u>The Motion Court Overlooked the "Prevailing" Requirement</u>

In holding that Mr. Kwok was judicially estopped, the court disregarded a fundamental and well-settled element of that doctrine:  a party can be judicially estopped from taking a position in an action only when the party advanced an allegedly inconsistent position in prior litigation and it *prevailed* on the basis of that prior inconsistent position.  In a series of decisions spanning many years, this Court has repeatedly and squarely held that in the absence of this element, judicial estoppel does not apply:

> The claim was not barred by judicial estoppel given that, even if contradictory, none of defendants' prior positions prevailed.

*Patmos Fifth Real Estate, Inc. v. Mazl Bldg., LLC*, 189 A.D.3d 632, 633 (1st Dep't 2020).

> Plaintiff's assertion that defendants' position in the parties' 1998 Supreme Court action should control is unavailing. . . .  Plaintiff also did not provide an instance in which [defendants' prior] theory was successfully employed in securing a judgment in defendants' favor, as judicial estoppel requires (*see Anonymous v. Anonymous,* 156 A.D.3d 412 (1st Dep't 2017)).

*MacArthur Props. I, LLC v. Galbraith*, 182 A.D.3d 514, 514 (1st Dep't 2020).

> Plaintiff's reliance on the doctrine of judicial estoppel, binding defendant to its litigating position in Supreme Court, is

17

misplaced. This doctrine "precludes a party who assumed a certain position in a prior legal proceeding and who secured a judgment in his or her favor from assuming a contrary position in another action simply because his or her interests have changed." Because defendant did not prevail on its claim in Supreme Court, the doctrine of judicial estoppel does not apply.

*MPEG LA, LLC v. Samsung Elec. Co., Ltd*, 166 A.D.3d 13, 21 (1st Dep't 2018)

(citations omitted).

> The doctrine of judicial estoppel "'precludes a party who assumed a certain position in a prior legal proceeding *and who secured a judgment in his or her favor* from assuming a contrary position in another action simply because his or her interests have changed.'" As plaintiffs did not prevail on their contractual indemnification claim, the doctrine of judicial estoppel does not apply.

*Wells Fargo Bank N.A. v. Webster Bus. Credit Corp.*, 113 A.D.3d 516, 516 (1st Dep't 2014) (emphasis in original; citations omitted).

> The doctrine of judicial estoppel "precludes a party who assumed a certain position in a prior legal proceeding and who secured a judgment in his or her favor from assuming a contrary position in another action simply because his or her interests have changed." Although Carr has been selective in seeking to enforce the 1969 agreement's terms when beneficial to her but rejecting provisions and transactions that are of no benefit to her, or reduce the value of her own interests, Carr did not "secure" a judgment in her favor on the earlier motion, rendering the doctrine inapplicable to the situation presented.

*Carr v. Caputo*, 114 A.D.3d 62, 71 (1st Dep't 2013) (citations omitted).

> "The doctrine of judicial estoppel or the doctrine of inconsistent positions 'precludes a party who assumed a certain position in a prior legal proceeding *and who secured a judgment in his or her favor* from assuming a contrary position in another action simply because his or her interests have changed.'" (*Jones Lang Wootton USA v. LeBoeuf, Lamb, Greene & Macrae,* 243 A.D.2d 168, 176 (1998), *leave*

*dismissed*, 92 N.Y.2d 962 (1998), quoting *Ford Motor Credit Co. v.
Colonial Funding Corp.*, 215 A.D.2d 435, 436 (1995)).  Because third-
party defendants did not secure any formal grant of relief based upon
Sakow's prior statement, it does not implicate the doctrine of
inconsistent positions (*Lowinger v. Lowinger*, 303 A.D.2d 723, 724
(2003); *cf. All Terrain Props. v. Hay*, 265 A.D.2d 87, 93 (2000); *Mass
v. Cornell Univ.*, 253 A.D.2d 1, 5 (1999), *aff'd*, 94 N.Y.2d 87 (1999).

*Baje Realty Corp. v. Cutler*, 32 A.D.3d 307, 310 (1st Dep't 2006) (emphasis in

original).

Here, judicial estoppel did not apply because on the *forum non conveniens*

motion, the motion court never made any determination on the authenticity of the

documents.  (NYSCEF Doc. 102).  Hence, Mr. Kwok did not prevail on that issue,

as is required in order to give rise to a potential judicial estoppel.  Equally important,

when PAX appealed from the motion court's dismissal of this action in favor of a

Hong Kong forum, this Court reversed the motion court's decision and directed that

the litigation would proceed in New York, as it subsequently has.  *Pacific Alliance

Asia Opportunity Fund v. Kwok*, 160 A.D.3d 452 (1st Dep't 2018).  Where a

preliminary determination that might allegedly have supported a judicial estoppel is

overturned in later proceedings, judicial estoppel is unavailable.  *See Goodman v.

Skanska USA Civil, Inc.* 169 A.D.3d 1010, 1012-13 (2d Dep't 2019).

### 2.    The Motion Court Overlooked the "Prior Action" Requirement

Moreover, this Court has held that judicial estoppel applies only where a party

has secured a final determination in its favor in a prior action, rather than in the same

action.  In *Olszewski v. Park Terrace Gardens, Inc.*, 18 A.D.3d 349 (1st Dep't 2005), the Court reversed a trial court order based on judicial estoppel because the inconsistent position was not from a prior action.  In reversing the trial court's order, this Court explained:  "We also reject the employer's argument that the owners are judicially estopped from arguing that plaintiff did not sustain a grave injury. The doctrine of judicial estoppel does not apply here because first, the verdict against the owners cannot be considered a ruling in their favor, and second, the inconsistent positions are being asserted in the same action." *Id.* at 350-51.

Even assuming *arguendo* that judicial estoppel could sometimes arise from inconsistent positions taken with the same action – despite this Court's direct holding to the contrary in *Olszewski* – it still could not apply against Mr. Kwok because his position on the *forum non conveniens* motion did not prevail even within this action. *Patmos Fifth Real Estate, Inc. v. Mazl Bldg., LLC*, cited above, was a case in which the two allegedly inconsistent positions were taken within a single action, and this Court held that "[t]he claim was not barred by judicial estoppel given that, even if contradictory, none of defendants' prior positions prevailed." 189 A.D.3d at 633.

Some cases from other Departments (not followed in the First Department) allow judicial estoppel to be applied where both allegedly inconsistent positions were taken within the same case, but only where the party to be estopped had prevailed on an issue by virtue of its earlier position. *See Houston v. McNeilus Truck*

*& Mfg., Inc.*, 124 A.D.3d 1205, 1208 (4th Dep't 2015) (holding that judicial estoppel may apply to inconsistent positions within the same action, but only "'where the party had prevailed with respect to the earlier position'"); *Lorenzo v. Kahn*, 100 A.D.3d 1480, 1483 (4th Dep't 2012) (same); *Ferreira v. Wyckoff Heights Med. Ctr.*, 24 Misc. 3d 91, 96 (App. Term 2d Dep't 2009) (even if judicial estoppel can apply within the same action, the doctrine "is applied in New York only where the party to be precluded obtained a ruling in its favor based on the assumed position"), *aff'd,* 81 A.D.3d 587, 588 (2d Dep't 2011) (defendant's assertion of judicial estoppel was "without merit" because "the plaintiff never obtained a judgment in her favor by adopting that position").

In declining to reconsider its judicial estoppel ruling, the motion court did not address the requirement that the party to be estopped must have prevailed in a prior litigation – or at the very least, at a prior stage of the same litigation (although that is not the law in the First Department) – through the benefit of its prior inconsistent position. (R52-54). The motion court cited only a single authority, this Court's decision in *Nestor v. Britt*, 270 A.D.2d 192 (1st Dep't 2000). *Nestor* also did not discuss this requirement and cannot outweigh the overwhelming weight of decisions from this Court that did discuss and apply it, including most recently *Patmos*, 189 A.D.3d at 633.

*Nestor* is also distinguishable because the prior position taken by the estopped petitioners in that case – that a 1983 lease rather than a 1970 lease governed the tenancy at issue – was asserted "before, during and after the trial of the underlying owner occupancy proceeding . . . as the exclusive contractual predicate for the relief sought in their petition." *Nestor*, 270 A.D.2d at 193. That is a far cry from this case, in which an individual merely provided copies of documents obtained from an unknown source, in a single instance rather than throughout the litigation, in the context of a preliminary procedural motion that Mr. Kwok lost.

## B.    The Motion Court's Invocation of Judicial Estoppel Was Unjust

The motion court's judicial estoppel directive relied entirely on Mr. Kwok's having "sponsored" the documents before the court, presumably referring to their submission as exhibits to Ms. Yu's affirmation. That affirmation was submitted to support Mr. Kwok's pre-answer motion to dismiss the action on grounds on *forum non conveniens,* contending that it would more conveniently be heard in Hong Kong rather than in New York. While the affirmation indicated that it was based on Ms. Yu's personal knowledge and a review of records, it does not reflect that she actually had any such personal knowledge or to what extent it was based thereon. (R3166-68). There is no evidence that Ms. Yu was involved in the underlying transactions and PAX has never contended that she had any involvement in them. Troublingly,

22

by the time of Mr. Kwok's deposition, Ms. Yu – like many others who have had business or personal connections to Mr. Kwok – had disappeared. (*See* R802-05).

Mr. Kwok testified that he had never read Ms. Yu's affirmation before it was shown to him at his deposition. (R801-02). Mr. Kwok also testified that he does not know how the documents annexed to Ms. Yu's affirmation came into her possession or came to be used in connection with the *forum non conveniens* motion. (R757-58). Even independent of the failure to satisfy the technical elements of judicial estoppel – which itself warrants reversal – estoppel is an equitable doctrine whose invocation under these circumstances was unjust. *See Rothstein & Hoffman Elec. Serv., Inc. v. Gong Park Realty Corp.*, 37 A.D.3d 206, 206 (1st Dep't 2007) (describing judicial estoppel as an "equitable doctrine"); *Charles v. Charles*, 296 A.D.2d 547, 550 (2d Dep't 2002) ("Estoppels are equitable doctrines used to promote fairness and justice.").

Moreover, PAX had a full opportunity to examine Mr. Kwok on the authenticity issue at the deposition and thereafter to conduct any other discovery it wished concerning the genuineness of the disputed documents. *See Ferreira v. Wyckoff Heights Med. Ctr.*, 24 Misc. 3d 91, 96 (App. Term 2d Dep't 2009) ("inasmuch as [the parties] had been given a full opportunity to conduct discovery after plaintiff changed her position, [defendants] would not be prejudiced by plaintiff's change in position"), *aff'd,* 81 A.D.3d 587 (2d Dep't 2011).

23

Mr. Kwok also testified at his deposition that as an outspoken opponent of the Chinese government and ruling party, he has been subjected to a lengthy, relentless, and extensive campaign in which he has been viciously harassed and targeted by the CCP. (*See, e.g.,* R565-71, 622). Had the motion court conducted an evidentiary hearing or trial on the authenticity of the documents, rather than pretermitted that inquiry by invoking judicial estoppel, then Mr. Kwok would also have presented substantial evidence to this effect. Mr. Kwok would thereby have been able to place his allegations of forgery into their full context, thus allowing for a fully informed decision by the trier of fact. Instead, the judicial estoppel ruling effectively served as a terminating sanction in this action, precluding Mr. Kwok on disputed procedural grounds from presenting his defense to the court or a jury. *Cf. CDR Créances S.A.S. v. Cohen*, 23 N.Y.3d 307 (2014) (case-terminating sanctions such as striking a pleading should be granted only when support by clear and convincing evidence).

## C.    PAX's Other Contentions Also Did Not Support Judicial Estoppel

In its motion seeking sanctions including judicial estoppel, PAX also contended that Mr. Kwok had admitted the disputed documents' authenticity in a cover letter submitted before an attachment hearing (NYSCEF Doc. 325), and Mr. Kwok's then-counsel's responses to PAX's RFAs (R411-99). The motion court's judicial estoppel ruling did not mention PAX's contentions regarding the cover letter or RFA responses, much less accept them as a basis for judicial estoppel. (*See* R52-

54, 59-60). In any event, they could not give rise to a judicial estoppel, because Mr. Kwok did not prevail on any issue based upon them. (*See supra* Point I.A).

The cover letter that PAX cited was submitted in connection with an evidentiary hearing on PAX's motion for a prejudgment attachment. (NYSCEF Doc. 325). The parties had already stipulated that this hearing would address *only* whether PAX had grounds for an attachment, and not the merits of the action, on which discovery would be conducted later. (NYSCEF Doc. 306). The cover letter subsequently submitted by PAX's counsel provided the motion court with an exhibit list for the upcoming attachment hearing, while stating that Mr. Kwok was not objecting to the authenticity of PAX's exhibits. (NYSCEF Doc. 325). The context was the admissibility of exhibits at the attachment hearing, not in the proceedings on the merits that would take place subsequently, during which Mr. Kwok directly disputed the documents' authenticity as soon as they were shown to him.

PAX also asserted that Mr. Kwok admitted the authenticity of the documents in responding to PAX's RFAs. (*See* R411-99). Mr. Kwok's then-counsel objected to the RFAs on several grounds, including that copies of the documents at issue were not attached to them, as is required. *See Bajaj v. General Assurance Co.*, 18 Misc. 3d 25, 27 (App. Term 2d Dep't 2007) ("Copies of the documents must accompany the notice to admit unless they have already been furnished."). Mr. Kwok's RFA responses did not admit the authenticity of any specific document. How could they

25

have, when no specific documents were presented for anyone to review?  And as noted above, Mr. Kwok did not prevail on any issue based on either his responses to the RFAs or the cover letter, so they could not form the basis for a judicial estoppel.

Finally, in its decision refusing to reconsider its judicial estoppel holding, the motion court observed that Mr. Kwok's Answer to the Amended Complaint did not plead forgery as an affirmative defense.  (R53-54).  No authority was cited that would bar a litigant from disputing a document's authenticity on this ground.  To the contrary, *Ouziel v. Baram*, 305 A.D.2d 564, 565 (2d Dep't 2003), held that "[n]otwithstanding that the defendant failed to plead forgery as an affirmative defense, he was properly permitted to offer evidence as to the genuineness of the signatures." *See also Kapchan v. 31 Mt. Hope, LLC*, 111 A.D.3d 530, 530-31 (1st Dep't 2013) (holding that unpleaded affirmative defense raised an issue of fact defeating summary judgment); *Feliciano-Delgado v. New York Hotel Trades Council*, 281 A.D.2d 312 316 (1st Dep't 2001) ("in examining the pleadings on a motion for summary judgment, [the court] may take into account an unpleaded defense"); *Seaboard Sur. Co. v. Nigro Bros., Inc.*, 222 A.D.2d 574, 575 (2d Dep't 1995) (holding that an unpleaded defense of forgery could defeat a motion for summary judgment where the opposing party was "not taken by surprise"); *Proner v. Julien & Schlesinger, P.C.*, 214 A.D.2d 460, 460-61 (1st Dep't 1995) (affirming order allowing amendment of answer to add forgery defense); *Zelik v. Rubashkin*,

2019 N.Y. Misc. LEXIS 6844, at *3-4, 2019 N.Y. Slip Op. 33760(U) (Sup. Ct. Kings Co. Dec. 11, 2019) (allowing defendant to add forgery defense that he first raised at his deposition).   Here, Mr. Kwok's Answers to the Complaint and the Amended Complaint denied almost all of PAX's allegations, including those concerning the disputed documents, putting PAX on notice from an early stage of the proceedings that it would need to prove those allegations.   (R128-38, 357-71).   The motion court's passing observation that Mr. Kwok had not expressly pleaded the word "forgery" in his Answer thus provided no additional support for its decision to preclude Mr. Kwok from defending himself against PAX's claim.

## POINT II

### THE MOTION COURT ERRED BY REJECTING THE DEFENSE THAT PAX FAILED TO MITIGATE ITS DAMAGES

As discussed in Point I, the judgment below should be reversed because the motion court improperly relieved PAX from its obligation to prove the genuineness of the documents it sued upon, and precluded Mr. Kwok from presenting his defense. But assuming *arguendo* that the motion court's judicial estoppel ruling was correct and summary judgment had properly been entered on the issue of liability, even in such event, the judgment should still be reversed insofar as it awarded damages to PAX.   The motion court erred by summarily resolving the issue of damages and entering judgment against Mr. Kwok.   It did so without a hearing or trial, in the full

amount of PAX's claim, after erroneously rejecting Mr. Kwok's defense that PAX failed to mitigate its damages.

Even when a contract has allegedly been breached, a plaintiff like PAX may not seek to maximize its damages (including a decade of 15% interest) rather than pursue a reasonable opportunity to eliminate or reduce the resulting damages. Here, the court erred by rejecting, as a matter of law, Mr. Kwok's defense that PAX's damages were largely self-inflicted because PAX knowingly failed to mitigate an avoidable loss. The error was compounded because the motion court ruled on this issue without conducting an evidentiary hearing, just two months after it had specifically stated on the record that an evidentiary hearing was necessary and would be held. (NYSCEF Doc. 647 at 4, 6-7).

That plaintiffs must mitigate their damages, rather than seek to collect for losses that they could have avoided, is a fundamental precept under Hong Kong law, which is invoked in the documents on which PAX relies, as well as under New York law. As attested in the affidavits of Mr. Kwok's Hong Kong law expert (R3260-68, 4622-28, which cited and annexed substantial legal authority under Hong Kong law, "a claimant must take all reasonable steps to mitigate the loss to him consequent upon the defendant's wrong and cannot recover damages for any such loss which he could thus have avoided but failed, through unreasonable action or inaction, to avoid. Put shortly, the claimant cannot recover for avoidable loss." (R4356). As the Hong

Kong law expert attested, the issue of "whether or not a party has taken all reasonable steps to mitigate its loss is primarily a question of fact, not law." (*Id.*).

New York law embodies the same principle. In a breach of contract case, "the injured party has a duty to mitigate." *White v. Farrell*, 20 N.Y.3d 487, 499 (2013). "[T]he duty to mitigate damages arising from a breach of contract is a duty that arises from common law." *Mack-Cali Realty, L.P. v. Everfoam Insulation Sys., Inc*. 110 A.D.3d 680, 682 (2d Dep't 2013). "[A]ssuming liability, [a defendant] should be entitled to limit damages, if any, if the plaintiff failed to make 'reasonable exertions to minimize the injury" caused by the defendant's alleged breach." *Id.* "'[T]here rests on a party seeking damage 'the active duty of making reasonable exertions to render the injury as light as possible.'" *Wilmot v. State of N.Y.*, 32 N.Y.2d 164, 168 (1973) (citation omitted); *see also Assouline Ritz 1 LLC v. Edward I. Mills & Associates, Architects, PC*, 91 A.D.3d 473, 474 (1st Dep't 2012) (defendant was entitled to reduction in damages if it proved that plaintiff failed to mitigate its damages by reselling the subject property).

"A party injured by a breach of contract is required to make a reasonable effort to mitigate its damages. The question of whether that party acted reasonably to mitigate its damages is a question of fact." *Tynan Incinerator Co. v. International Fidelity Ins. Co.*, 117 A.D.2d 796, 797 (2d Dep't 1986) (citations omitted); *accord Bernstein v. Freudman*, 180 A.D.2d 420, 421 (1st Dep't 1992). Thus, neither Hong

29

Kong law nor New York law allows a plaintiff to ignore an opportunity to mitigate the damages resulting from an alleged breach of contract, and then collect from the plaintiff for the losses that it could have avoided.

But that is just what PAX did here, and what the motion court erroneously allowed it to do. In 2015, the Beijing Police seized the three Beijing Apartments. (R149). Under this seizure procedure, which appears to have no clear analog under American law, the police had the ability to convey title to the seized assets. (R3530-35). The Beijing Police offered to assist PAX by conveying title to the Beijing Apartments to PAX. These were the same apartments that PAX alleges Shiny Times had agreed to convey to PAX under the deed of settlement, in full satisfaction of its obligation to repay the loan that Mr. Kwok had supposedly guaranteed.

PAX knowingly spurned the opportunity to acquire the Beijing Apartments through the Beijing Police, and opted instead to pursue enormous damage claims against Mr. Kwok individually – a step that a PAX officer, in a telling display of personal animus, had previously endorsed for "the sheer satisfaction it would create." (R4579). To allow PAX to recover on a nine-figure judgment against Mr. Kwok under these circumstances would be unconscionable.

PAX alleges that it had bargained for the right to acquire the Beijing Apartments. More specifically, the documents proffered by PAX provided that PAX would complete the purchase of the Beijing Apartments, for a total of $15 million,

from Beijing Pangu. (*See* R147). In exchange, Shiny Times, the borrower under the original 2011 Loan Facility, would reimburse Plaintiff the $15 million. (*Id.*). This transaction would completely extinguish the debt allegedly owed under the 2011 loan facility letter and the associated guarantee. (R147). In other words, in the document PAX proffers, it agreed that its obtaining title to the Beijing Apartments was worth the outstanding amount that it alleges was due and owing to it.

Thereafter, PAX was then presented with the ability to acquire the Beijing Apartments – exactly the outcome that it had sought to achieve. The Beijing Police seized the Beijing Apartments from February 2015 and retained them at least until February 2017, during which period they had the authority to convey title to PAX. (R3530-31). The Beijing Police offered to lift any transfer restriction and register PAX as the title holder to the apartments. (*See* R4248-52). PAX personnel reported that the Beijing Police "seemed keen to do this as it was in line with what they were doing for others." (R4360-61).

PAX's internal emails and its own witnesses' deposition testimony show that PAX knew it had the opportunity to take title to the Beijing Apartments, which it asserted was its goal in the underlying transaction, yet it chose to sue Mr. Kwok instead. For example, PAX's Chief Operating Officer, Derek Crane, who had been directly involved in the Pangu Plaza development transaction since 2007, reported within PAX in 2015 that "the police indicated that they could transfer the units to us

31

and any payment would be a matter for us and Pangu.  They said they would revert with more detail but seemed keen to do this as it was in line with what they were doing for others." (R4360-61).  Crane admitted at his deposition that although he was aware of PAX's opportunity to take possession of the apartments – having learned of it "from discussions with [the] team in China, [the] legal team and possibly [the] finance team" – he did nothing about it and is unaware of anyone else at PAX who did.  (R4328-31).  Crane admitted that in mid-2015, PAX decided not to not pursue mitigation and instead to "use whatever resources may be available, whether it be legal advisors, whether it be police, whether it be anybody to try and help recover" money directly from Mr. Kwok. (R4333).

PAX's General Counsel, Catherine Yang, likewise conceded that PAX never pursued the Chinese authorities' offer to assist regarding the Beijing Apartments. (R4339-40).  Jon Lewis, the Group General Counsel and Managing Director of the investment group that formed and operates PAX, similarly testified that he learned of the mitigation opportunity in February 2015, and that the Beijing Police had offered to assist in transferring title to the apartments, but that he had never spoken with the police and did not know of anyone else who had, either then or subsequently.  (R4344-46).

Numerous internal emails amongst senior PAX personnel reflect enthusiasm that there was an alternative means for Plaintiff to obtain the Beijing Apartments.

32

As stated in one e-mail, "[t]here was also positive movement in Beijing. Didn't the police say they would help us get the units?" (R4361). These admissions establish PAX's failure to fulfill its obligation to consider and pursue reasonable mitigation efforts in good faith.

The motion court held that because the last of the alleged extension agreements expired in mid-2015 and hence there was no obligation to mitigate after that date. (R12-14). The motion court cited neither Hong Kong nor New York law for this proposition. The passing of a deadline did not terminate PAX's duty to mitigate, because a contracting party has a continuing duty to mitigate following a breach. (R4355-58, 4623-25). *See White v. Farrell*, 20 N.Y.3d at 499. In any event, if the timing of when the opportunity to mitigate arose is deemed material, then an issue of fact exists as to whether the opportunity arose before or after the July 31, 2015 deadline in the last alleged extension. PAX alleged in its Amended Complaint that the seizure took place in 2015 and two PAX witnesses testified that it occurred in February 2015. (*See* R149, R3530-31, 4344-46).

The motion court suggested it was "likely" that PAX had no duty to mitigate its damages by taking title to the apartments because it would have incurred out-of-pocket expenses in doing so, but it never ruled directly on this point. (R54-57). Hong Kong law, however, recognizes that a plaintiff may at times be required to be

33

expend money in order to mitigate losses where the facts make it reasonable to do

so.  (R4628).

The New York courts have likewise recognized that an aggrieved party may

be required to expend money in order to mitigate its damages.  For example, in

*NYCTL 1996-1 Trust v. Malihan*, 276 A.D.2d 443 (1st Dep't 2000), this Court held

that the defendant seller had breached an apartment-sale contract by failing to pay

the real estate taxes through the date of sale, but that the plaintiff purchaser had failed

to comply with its duty of reasonable mitigation when it failed to pay the taxes to

obtain clean title to the apartment.  *Id*. at 443.  Just as the buyer in *Malihan* was

required to mitigate by making the expenditure to release the tax lien, here PAX's

duty of mitigation required it to make the payment required to transfer title to the

apartments so that Plaintiff could get the benefit of its bargain and mitigate damages.

*See also Bibeau v. Ward*, 228 A.D.2d 943, 946 (3d Dep't 1996) (finding that after

defendant breached contract by failing to title property in plaintiff's name, plaintiff

properly responded by mitigating losses by paying for expenses that contractually

should have been borne by defendant).  PAX's reasonable out-of-pocket costs of

mitigation would have remained recoverable as part of its contract damages.  *See id.*

The motion court also held that the duty to mitigate was inapplicable because

PAX's claim against Mr. Kwok's arises under an alleged personal guarantee to pay

money.  But assuming that the deed of settlement proffered by PAX is genuine, PAX

agreed to accept either repayment of the loan amount *or* title to the Beijing Apartments in satisfaction of the outstanding obligation. The deed of settlement was breached when the conditions for title transfer of the Beijing Apartments were not met by the extended deadline in 2015. (R4626). PAX had a duty to mitigate under this agreement just as it would under any other agreement. (R4623-25). Although the motion court relied on a narrow exception to the duty to mitigate that exists under Hong Kong law where the sole obligation involved is repayment of a debt, Mr. Kwok's Hong Kong law expert explained, with citations of authority, that that limitation "does not apply to situations, such as the one presented here, where the parties have entered into a subsequent agreement to settle the debt which involves alternative forms of repayment, such as the sale and purchase of property." (R4624).

In the alleged agreement upon which PAX relies, PAX had agreed that the value to it of title to the Beijing Apartments was sufficient to discharge the alleged indebtedness. Thus, if PAX had accepted the Beijing Police's offer to convey title, the alleged obligation should have been satisfied in full, except perhaps for reimbursement of PAX's out-of-pocket expenses in acquiring the title. In the alternative, at a minimum, PAX has admitted that if it had obtained title to the Beijing Apartments, it would have made a substantial built-in profit. A PAX employee noted that even if PAX would have incurred some initial cost to acquire the Beijing Apartments, "but that's still a good price" (R4360), "less than the market

price" (R4348), and would have resulted in an "immediate write up" for PAX. (R4359).  Not only would this have sharply reduced the principal amount claimed by PAX, either altogether or at least by tens of millions of dollars, but it also would have reduced PAX's claim for several years' worth of 15% annual interest on that sum – high-rate prejudgment interest that gave rise to a majority of the $116 million judgment against him.

In addition to PAX's failure to mitigate its damages by accepting the Beijing Police's offer to convey title to the Beijing Apartments, PAX received an additional benefit that should have resulted in a set-off against its alleged damages.  PAX was given the keys to – and thus, possession of – the Beijing Apartments for several years.  (*See, e.g.,* R4336-38).  Such possession provided value to PAX that should also result in a set-off against its alleged damages, and the motion court erred by holding as a matter of law that it was valueless.  (R15-16).

Had the motion court conducted an evidentiary hearing or trial on damages, the evidence would have established that PAX had ample opportunity to mitigate its damages by acquiring the Beijing Apartments and that its claim would have been either eliminated or dramatically reduced had PAX done so.  The motion court should have afforded Mr. Kwok the opportunity to present such evidence in order to demonstrate that PAX acted unreasonably in failing to mitigate its damages.  Because it failed to do so, the judgment should be reversed.

## **CONCLUSION**

For all the foregoing reasons, the judgment should be reversed.

Dated:  New York, New York
        September 2, 2021

                 GANFER SHORE LEEDS & ZAUDERER LLP

                 By: _____
                     Mark C. Zauderer
                     Ira Brad Matetsky
                     Jason T. Cohen
               360 Lexington Avenue
               New York, New York 10017
               (212) 412-9500
               mzauderer@ganfershore.com
               *Attorneys for Defendant-Appellant,*
               *Kwok Ho Wan a/k/a Miles Kwok*

## PRINTING SPECIFICATIONS STATEMENT

I hereby certify pursuant to 22 NYCRR 1250.8(j) that the foregoing brief was prepared on a computer using Microsoft Word.

*Type.* A proportionally spaced typeface was used, as follows:

| | |
|---|---|
| Name of typeface: | Times New Roman |
| Point size: | 14 |
| Line spacing: | Double |

*Word Count.* The total number of words in this brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, table of citations, proof of service and this Statement is 9,147.

Dated: September 2, 2021

**STATEMENT PURSUANT TO CPLR § 5531**

# New York Supreme Court

## Appellate Division—First Department

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

*Plaintiff-Respondent,*

– against –

KWOK HO WAN, a/k/a Kwok Ho, a/k/a Gwo Wen Gui,
a/k/a Guo Wengui, a/k/a Guo Wen-Gui, a/k/a Wan Gue
Haoyun, a/k/a Miles Kwok, a/k/a Haoyun Guo,

*Defendant-Appellant,*

– and –

GENEVER HOLDINGS CORPORATION
and GENEVER HOLDINGS LLC,

*Defendants.*

1.    The index number of the case in the court below is 652077/17.

2.    The full names of the original parties are as set forth above. There have been no changes.

3.    The action was commenced in Supreme Court, New York County.

4.    The action was commenced on or about April 18, 2017, by the filing of a Summons and Complaint. Issue was joined on or about April 25, 2018, by service of an Answer.

5.    The nature and object of the action involves breach of contract.

6.    This appeal is from the Judgment in this action entered on February 3, 2021, and brings up for review any and all prior judgments or orders which necessarily affects the final judgment.

7.    This appeal is on the full reproduced record.

# EXHIBIT 20

FILED: APPELLATE DIVISION - 1ST DEPT 10/06/2021 12:42 PM

NYSCEF DOC. NO. 14

2021-00740

RECEIVED NYSCEF: 10/06/2021

*To be Argued by:*
ANTON METLITSKY
*(Time Requested: 15 Minutes)*

# New York Supreme Court

## Appellate Division—First Department

———————

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

*Plaintiff-Respondent,*

– against –

KWOK HO WAN, a/k/a Kwok Ho, a/k/a Gwo Wen Gui, a/k/a Guo Wengui,
a/k/a Guo Wen-Gui, a/k/a Wan Gue Haoyun, a/k/a Miles Kwok, a/k/a Haoyun Guo,

*Defendant-Appellant,*

– and –

GENEVER HOLDINGS CORPORATION and GENEVER HOLDINGS LLC,

*Defendants.*

**Appellate
Case No.:
2021-00740**

═══════════════

## BRIEF FOR PLAINTIFF-RESPONDENT

═══════════════

O'MELVENY & MYERS LLP
Seven Times Square
New York, New York 10036
(212) 326-2000
ssarnoff@omm.com
emoss@omm.com
ametlitsky@omm.com

*Attorneys for Plaintiff-Respondent*

New York County Clerk's Index No. 652077/17

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................1

QUESTIONS PRESENTED.................................................................5

NATURE OF THE CASE .................................................................6

    A.   Factual Background................................................................6

         1.   The Parties' Relationship and PAX's Initial Loans...................6

         2.   The 2011 Loan Facility and 2011 Personal Guarantee...............7

         3.   PAX and Kwok Endeavor to Settle The Outstanding Debt ..............................................................8

         4.   PAX's Efforts to Collect the Debt ...........................................10

    B.   Kwok's Repeated Reliance On The Contracts....................................11

         1.   Kwok Asserts From the Outset of Litigation That the Contracts Are Authentic ..........................................11

         2.   Kwok Adheres to His Position Regarding Authenticity Throughout Discovery and Renewed Attachment Proceedings ..............................................................15

    C.   Kwok Suddenly Disclaims the Contracts' Authenticity ....................17

    D.   PAX's Motions for Summary Judgment and Damages......................20

    E.   Entry of Judgment in Favor of PAX and Kwok's Subsequent Evasion Tactics..............................................................23

ARGUMENT .........................................................................25

I.   THE MOTION COURT PROPERLY BARRED KWOK FROM ABANDONING HIS LONGSTANDING POSITION THROUGHOUT THE LITIGATION THAT THE CONTRACTS WERE AUTHENTIC......26

    A.   The Motion Court Acted Well Within Its Discretion In Barring Kwok's Eleventh-Hour Forgery Argument On The Basis Of Judicial Estoppel..............................................................26

## TABLE OF CONTENTS
### (Continued)

**Page**

B.  Kwok Was Also Barred From Changing Positions Because He Is Bound By His Prior Judicial Admissions.............................................36

C.  In The Alternative, This Court Should Impose Sanctions To Preclude Kwok From Relying On Perjured Testimony......................42

D.  Even If Kwok Had Not Been Barred From Asserting Forgery, PAX Was Nevertheless Entitled To Summary Judgment..................45

II.  THE MOTION COURT CORRECTLY REJECTED KWOK'S MITIGATION ARGUMENTS. ......................................................47

A.  The Motion Court Correctly Determined That PAX Had No Duty To Pursue The Possibility Of Purchasing The Apartments From The Beijing Police. ..............................................................................48

1.  PAX Was Not Subject To A Duty To Mitigate Damages. ........48

2.  Kwok Has Not Identified A Reasonable Opportunity To Mitigate ....................................................................................53

B.  The Motion Court Correctly Rejected Kwok's Argument That PAX's Possession Of Keys To The Apartments Should Have Offset The Damages He Owes. ...........................................................56

CONCLUSION ..................................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*35 W. Realty Co., LLC v. Booston LLC*,
   171 A.D.3d 545 (1st Dep't 2019) ................................................................ 27, 30

*Ah Quin v. Cnty. of Kauai Dep't of Transp.*,
   733 F.3d 267 (9th Cir. 2013) ...............................................................................34

*Bajaj v. Gen. Assurance Co.*,
   18 Misc. 3d 25 (App. Term 2d Dep't 2007) ........................................................38

*Baje Realty Corp. v. Cutler*,
   32 A.D.3d 307 (1st Dep't 2006) ..........................................................................31

*Banco Popular N. Am. v. Victory Taxi Mgmt., Inc.*,
   1 N.Y.3d 381 (2004) ...................................................................................... 46, 47

*Bellino v. Bellino Constr. Co.*,
   75 A.D.2d 630 (2d Dep't 1980) ...........................................................................41

*Bibeau v. Ward*,
   228 A.D.2d 943 (3d Dep't 1996) .........................................................................55

*Cafferty v. Thompson*,
   223 A.D.2d 99 (3d Dep't 1996) ...........................................................................34

*Carr v. Caputo*,
   114 A.D.3d 62 (1st Dep't 2013) ..........................................................................31

*Casper v. Cushman & Wakefield*,
   74 A.D.3d 669 (1st Dep't 2010) ..........................................................................29

*Catanese v. Lipschitz*,
   44 A.D.2d 579 (2d Dep't 1974) ...........................................................................42

*CDR Creances S.A.S. v. Cohen*,
   23 N.Y.3d 307 (2014) ..........................................................................................43

*City of New York v. Black Garter*,
   179 Misc. 2d 597, 685 N.Y.S.2d 606 (N.Y. Sup. Ct. 1999), *aff'd*, 273
   A.D.2d 188 (2d Dep't 2000) ................................................................................35

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Corkran v. Orics Indus., Inc.*,
  62 Misc. 3d 1225(A), 2018 WL 7568231 (N.Y. Sup. Ct. 2018)..........................27

*Czajka v. Dellehunt*,
  125 A.D.3d 1177 (3d Dep't 2015) ........................................................................43

*D&L Holdings v. Goldman Co.*,
  287 A.D.2d 65 (1st Dep't 2001).............................................................. 27, 28, 30

*Env't Concern v. Larchwood Constr. Corp.*,
  101 A.D.2d 591 (2d Dep't 1984) ..................................................................... 3, 30

*Ford Motor Credit Co. v. Colonial Funding Corp.*,
  215 A.D.2d 435 (2d Dep't 1995) .........................................................................35

*Freedman v. Chem. Constr. Corp.*,
  43 N.Y.2d 260 (1977)...........................................................................................56

*Genger v. TPR Inv. Assocs., Inc.*,
  182 A.D.3d 417 (1st Dep't 2020)..........................................................................29

*GJF Constr., Inc. v. Sirius Am. Ins. Co.*,
  89 A.D.3d 622 (1st Dep't 2011)............................................................................42

*Goodman v. Skanska USA Civil, Inc.*,
  169 A.D.3d 1010 (2d Dep't 2019) ........................................................................33

*Gusinsky v. Genger*,
  74 A.D.3d 539 (1st Dep't 2010)............................................................................53

*Hartsdale Fire Dist. v. Eastland Constr., Inc.*,
  65 A.D.3d 1345 (2d Dep't 2009) ..........................................................................29

*Honghui Kuang v. MetLife*,
  159 A.D.3d 878 (2d Dep't 2018) ..........................................................................43

*In the Matter of Daniel C.*,
  99 A.D.2d 35 (2d Dept. 1984)..............................................................................40

*Inter–Power of N.Y. v. Niagara Mohawk Power Corp.*,
  208 A.D.2d 1073 (3d Dep't 1994) ........................................................................27

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Karasik v. Bird*,
  104 A.D.2d 758 (1st Dep't 1984)...........................................................29

*Lorenzo v. Kahn*,
  100 A.D.3d 1480 (4th Dep't 2012) ......................................................29

*Maas v. Cornell Univ.*,
  253 A.D.2d 1 (3d Dep't 1998), *aff'd*, 94 N.Y.2d 87 (1999) ...............29

*MacArthur Props. I, LLC v. Galbraith*,
  182 A.D.3d 514, (1st Dep't 2020)........................................................31

*Matter of People v. Telehublink Corp.*,
  301 A.D.2d 1006 (3d Dep't 2003) ......................................................47

*Montefiore Med. Ctr. v. Crest Plaza LLC*,
  24 Misc.3d 1201, 2009 WL 1675994 (N.Y. Sup. Ct. 2009), *aff'd*, 83
  A.D.3d 1016 (2d Dep't 2011) ..............................................................30

*MPEG LA, LLC v. Samsung Elec. Co., Ltd*,
  166 A.D.3d 13 (1st Dep't 2018)...........................................................31

*Nat'l Commc'ns Ass'n, Inc. v. AT&T*,
  2001 WL 99856 (S.D.N.Y. Feb. 5, 2001) ...........................................55

*Nestor v. Britt*,
  270 A.D.2d 192 (1st Dep't 2000).................................... 27, 28, 32, 33

*New Dance Grp. Studio, Inc. v. Seltzer*,
  293 A.D.2d 298 (1st Dep't 2002).........................................................47

*NYCTL 1996-1 Trust v. Malihan*,
  276 A.D.2d 443 (1st Dep't 2000).........................................................54

*Olszewski v. Park Terrace Gardens, Inc.*,
  18 A.D.3d 349 (1st Dep't 2005)................................................... 29, 30

*Pac. All. Asia Opportunity Fund L.P. v. Kwok Ho Wan*,
  160 A.D.3d 452 (1st Dep't 2018).........................................................15

*Patmos Fifth Real Estate, Inc. v. Mazl Bldg., LLC*,
  189 A.D.3d 632 (1st Dep't 2020).........................................................31

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*People v. Brown*,
  98 N.Y.2d 226 (2002)..................................................................... 36, 46

*Peyton v. State of Newburgh, Inc.*,
  14 A.D.3d 51 (1st Dep't 2004)............................................................47

*Rahman v. Smith*,
  40 A.D.3d 613 (2d Dep't 2007) ..........................................................37

*Tozzi v. Long Island R.R. Co.*,
  170 Misc. 2d 606 (N.Y. Sup. Ct. 1996), *aff'd*, 247 A.D.2d 466 (2d Dep't
  1998).........................................................................................................35

*Wells Fargo Bank N.A. v. Webster Bus. Credit Corp.*,
  113 A.D.3d 513 (1st Dep't 2014)........................................................31

**Statutes**

CPLR 2104..........................................................................................................40

CPLR 3123(a) ............................................................................................... 37, 38

CPLR 3212(b) .....................................................................................................25

CPLR 327(a) .......................................................................................................12

**Other Authorities**

*Authentic*, Merriam-Webster, https://www.merriam-webster.com
  /dictionary/authentic ...................................................................................40

Press Release, SEC Charges Three Media Companies with Illegal Offerings
  of Stock and Digital Assets (Sept. 13, 2021),
  https://www.sec.gov/news/press-release/2021-175 ............................................24

**Treatises**

Prince, Richardson on Evidence § 8-215 (11th ed.) .................................... 36, 37, 40

## PRELIMINARY STATEMENT

This appeal continues the pattern that Defendant-Appellant Kwok Ho Wan ("Kwok") has followed throughout this litigation:  having no bona fide defense to Plaintiff-Respondent Pacific Asia Alliance Opportunity Fund L.P.'s ("PAX") breach of contract claim, Kwok seeks to avoid his debts by making a mockery of the judicial system.  This Court should put an end to it.

In March 2011, Kwok executed a personal guarantee on a debt of more than $46 million that one of his companies owed to PAX.  For years, Kwok evaded PAX's efforts to collect, and no portion of the debt has ever been repaid.  And those efforts continue to this day, even though the motion court granted PAX summary judgment on the merits in September 2020, and on February 3, 2021 entered a damages award of more than $116 million, which is the current amount due to PAX, including accruing interest.  Kwok did not post a bond to stay the judgment pending appeal, yet he simultaneously has refused to pay PAX even a penny of the money the motion court concluded he owes (or even to respond to PAX's judgment demand letter).  Instead, Kwok has engaged in a troubling pattern of dishonest and dilatory tactics to thwart PAX's ability to collect, including shielding his assets using shell corporations, secreting his yacht (the "Lady May") outside this jurisdiction in flagrant contempt of the motion court's orders, and stonewalling PAX's legitimate collection-related discovery efforts.  The motion court, having grown deeply familiar

with Kwok's antics over four years of litigation, has repeatedly decried Kwok's

"shell games," "gamesmanship," and "dissembling," as well as his many attempts

"to mislead the court." R.4425, 4428.

Having no plausible legal or factual defense on the merits, Kwok has

channeled his energies into avoiding his debts and making a mockery of the motion

court's jurisdiction. As his appellate brief makes abundantly apparent, Kwok's

breach of contract is clear as day. So, true to form, Kwok turned to farce, suddenly

testifying at his merits deposition years into the case that the contracts that form the

basis of this action—contracts that he entered into the record from his own files,

whose authenticity he repeatedly admitted, and that he affirmatively relied on earlier

in the litigation—were actually forgeries, and that even a "pig" could have figured

that out.

Kwok's assertion that the contracts at issue are actually forgeries is perhaps

his most brazen effort to manipulate—and, really, to ridicule—this State's judiciary.

From the inception of this litigation, Kwok consistently represented to both the

motion court and this Court that the contracts in question were authentic. Right at

the outset, he submitted his own copies of the very same contracts to the motion

court and contended that the Hong Kong choice-of-law provisions they contain

required dismissal for *forum non conveniens*—an argument the motion court

accepted. This Court reversed the motion court on the law, but never doubted—nor

2

was asked by Kwok to question—the authenticity of the contracts Kwok himself had sponsored.  Indeed, relying on the authenticity of the contracts was a hallmark of Kwok's litigation strategy for years, as he repeatedly argued that they had been substantially performed, admitted to the contracts' authenticity in response to PAX's requests for admission, separately stipulated to their authenticity in advance of an evidentiary hearing, and made numerous other unequivocal judicial admissions binding him to a factual position that has always been apparent:  that the agreements, copies of which Kwok had produced from his own files and sponsored before the court as legitimate, were indeed authentic.  Unsurprisingly, there is also abundant documentary evidence—including scores of contemporaneous correspondence between PAX and Kwok's Hong Kong attorneys—demonstrating that the contracts are in fact real, and that Kwok signed them.

This kind of conduct is simply incompatible with a functioning judicial system, which is why the motion court was quite right to preclude Kwok from switching positions and contesting the authenticity of the contracts under the doctrine of judicial estoppel.  Kwok's conduct is an exaggerated version of exactly the sort of inequitable behavior that doctrine is meant to prevent—it reflects the principle that "a litigant should not be permitted … to lead a court to find a fact one way" and later contend "that the same fact should be found otherwise." *Env't Concern v. Larchwood Constr. Corp.*, 101 A.D.2d 591, 593 (2d Dep't 1984)

(quotation omitted).   Having successfully convinced the motion court that the contracts were so real that they required dismissal on *forum non conveniens* grounds, Kwok cannot be allowed to walk that back because it would now be better for him if the contracts somehow were forgeries.   Kwok's legal objections to that straightforward conclusion—including, principally, his bizarre argument that judicial estoppel applies only to parties who attempted to manipulate courts in prior proceedings, but not to parties that attempt to manipulate the very court they remain before—are meritless.   And while the motion court may have chosen the most obvious doctrine—judicial estoppel—to reject Kwok's gambit, the same result is independently required under numerous other doctrines pressed by PAX before the motion court, and that are elaborated in detail below.   The motion court's summary judgment on the merits should be affirmed.

Kwok's lone other argument—which bears solely on the question of damages, not liability—is equally meritless.   Under an agreement the parties had entered into to attempt to settle their years-long loan dispute, Kwok could satisfy his debt if he transferred to PAX ownership of three Beijing apartments at no cost, such that PAX could then resell them.   Kwok contends that the court should have lowered the contract damages amount because PAX failed to pursue a purported opportunity to mitigate its damages by possibly working with the Beijing police to obtain, at a cost of $17 million, the three apartment units that PAX would have obtained for free

under the parties' contract.  That is wrong for many reasons, including that there was no duty to mitigate under both black letter Hong Kong law and the undisputed facts. Kwok's only other argument as to mitigation—that there was some unspecified value to PAX in possessing keys to the apartments, when what PAX actually needed and expressly contracted for was legal title that would allow it to sell them—is likewise insufficient to withstand summary judgment.

The decisions below should be affirmed.

## QUESTIONS PRESENTED

1.  Whether the motion court abused its discretion by barring Kwok from disputing the authenticity of certain contracts, when he had previously maintained throughout years of litigation that the contracts were authentic; had sponsored the contracts as genuine in numerous pleadings; and had obtained a favorable ruling from the court on the basis of those representations; and when a bald assertion of forgery cannot withstand summary judgment in any event.

Answer: The motion court did not abuse its discretion.

2.  Whether the motion court erred in determining as a matter of law that PAX had no obligation to pursue a speculative opportunity to purchase real estate from the Beijing police to mitigate its damages, when (1) PAX was not subject to a duty

to mitigate under any operable contract, and (2) the purported mitigation opportunity would have required PAX to undertake unreasonable expenditures.

Answer: The motion court did not err.

## NATURE OF THE CASE

### A.    Factual Background

### 1.    The Parties' Relationship and PAX's Initial Loans

a.  In early 2008, Kwok met with representatives of PAX to discuss obtaining funding to finish construction of the Beijing Pangu Plaza, a real estate project undertaken by Kwok and his companies. R.1420 ¶1. PAX agreed to lend Kwok's companies $100 million in two tranches—a $30 million loan in February 2008, conditioned on Kwok's personal guarantee; and (ii) a $70 million loan in March 2008, under which PAX received an equity interest in the real-estate project as collateral. R.1420 ¶2.

b.  Over the next two years, the parties entered into a series of repayment extensions and related agreements. R.1422-1424 ¶¶11-18. In late 2009, Kwok's entities repaid roughly two-thirds of the $148 million owed to PAX and agreed that the balance was outstanding and would continue to accrue interest. R.1423 ¶15. By 2011, the total outstanding debt, including accrued interest, was over $46 million. R.1425 ¶23.

### 2.   The 2011 Loan Facility and 2011 Personal Guarantee

a.   On March 16, 2011, PAX and a Kwok-controlled entity named Shiny Times Limited ("Shiny Times") entered a new facility (the "2011 Loan Facility") that Kwok again guaranteed (the "2011 Personal Guarantee").   These contracts, which expressly superseded and replaced the parties' prior contracts, provided that the amount due was $46,426,489 and that interest would accrue at 15% annually until a repayment date of June 30, 2012.  R.2377 ¶¶3-6.  Under the 2011 Personal Guarantee, Kwok "irrevocably and unconditionally … guarantee[d] to PAX the due and punctual payment of [Shiny Times'] [o]bligations [under the 2011 Facility] and agree[d] that promptly on PAX's demand he will pay to PAX all [o]bligations that are due but unpaid."  R.2388 ¶2.1.  The Personal Guarantee also entitled PAX to reimbursement, including legal fees, for its enforcement efforts.  R.2390 ¶5.3.

The 2011 Loan Facility, which was executed by Kwok on behalf of Shiny Times, contains a choice-of-law provision specifying that it is governed by Hong Kong law.  R.2380 ¶20, R.2382.  The 2011 Personal Guarantee, which Kwok executed on his own behalf, likewise contains a provision stating it is governed by Hong Kong law.  R.2393 ¶10, R.2395.  Kwok and Shiny Times were represented by outside counsel—the Hong Kong law firm Stevenson, Wong & Co. ("Stevenson Wong")—in connection with the agreements.  R.1432 ¶83.

b.  Shiny Times and Kwok failed to make any payments under the 2011 Loan Facility or the 2011 Personal Guarantee, respectively, by the June 30, 2012 deadline. R.1427 ¶¶29-30.

### 3.    PAX and Kwok Endeavor to Settle The Outstanding Debt

a.  In an attempt to resolve the outstanding debt, the parties entered into a series of settlement agreements, each of which ultimately proved unsuccessful when Kwok and his companies failed to perform their obligations.  R. 1428-35.  Like the 2011 Loan Facility and 2011 Personal Guarantee, these contracts are governed by Hong Kong law, and Stevenson Wong again represented Kwok and his entities in connection with the contracts.  R.1432 ¶83, R.1433 ¶49.

As relevant here, on April 19, 2013, PAX, Shiny Times, Kwok, and another Kwok-controlled entity named Beijing Pangu Investment Inc. ("Beijing Pangu") entered a "Deed of Settlement In Relation to Facility Letter Dated 16 March 2011" (the "2013 Deed of Settlement").  R.2530.  Under the 2013 Deed of Settlement, the parties agreed that Shiny Times's debt to PAX under the 2011 Loan Facility, which had at that point reached $52 million, was to be discharged in return for PAX receiving ownership of three apartments in the Beijing Pangu Plaza (the "Apartments") for no net payment.  R.2531-42.  PAX intended to sell the apartments to recoup the debt it was owed.  R.2087-88.

Critically, however, the 2013 Deed of Settlement specified that the settlement would be effected only if ten conditions precedent were satisfied by July 21, 2013. R.2534-35 ¶3.2. The conditions precedent included, among other things, that the parties enter into purchase agreements; that the mortgages be fully discharged; and, most importantly, that Beijing Pangu deliver evidence of legal title transfer, known as "House Ownership Certificates." *Id.*; *see* R.1431 ¶43. If any of the conditions precedent were not fulfilled by the deadline, the 2013 Deed of Settlement provided that "the entire settlement as contemplated under this Deed shall be terminated and the Parties acknowledge that the [2011 Loan Facility] shall revert and be in full force and effect." R.2535 ¶3.4. At that point, "Shiny Times shall be obliged to settle the [t]otal [o]utstanding [a]mount [of the debt] and any interest accrued thereon in accordance with terms and conditions of [the 2011 Loan Facility]." *Id.* By its terms, the 2011 Personal Guarantee would thus also be in effect. R.2388 ¶2.1

b. The conditions precedent were not all satisfied by July 31, 2013. R.1431 ¶46. But Kwok continued to string PAX along as the parties entered four extensions of the 2013 Deeds of Settlement, including supplemental deeds entered into on December 3, 2013, May 15, 2014, July 11, 2014, and February 10, 2015. R.1432 ¶47. The last of these agreements provided that the conditions precedent must be fulfilled by June 30, 2015. R.2720 ¶2.1(a).

Along the way, Kwok did satisfy certain of the conditions precedent.  For example, in November 2013, PAX received keys to the Apartments and executed Property Acceptance Confirmation Notices; Beijing Pangu executed Notices of Housing Delivery; and the parties jointly executed Property Purchase Contracts. R.1433 ¶50.  Other conditions precedent, however, remained unsatisfied as of the final extended deadline of June 30, 2015—and remain unsatisfied—including, most critically, the conveyance of legal title.  R.1434-5 ¶¶55-60; R.2691.

c.  Accordingly, on June 30, 2015, by operation of the terms of the fourth extension to the 2013 Deed of Settlement, the Deed of Settlement terminated and the 2011 Loan Facility and 2011 Personal Guarantee reverted back into effect.  R.2719-21.  Subsequently, on August 3, 2015, a PAX employee reported internally that the Beijing police had communicated with PAX about possible assistance in effectuating a transfer of the apartments.  R.1433 ¶63; R.3165.

### 4.    PAX's Efforts to Collect the Debt

a.  Because Shiny Times had failed to repay any of the sum due under the 2011 Loan Facility, PAX sent on October 16, 2015 a written notice of demand to Kwok at his address set forth in the 2011 Personal Guarantee seeking immediate payment of $71,818,633.44, the then-outstanding debt.  R.2392 § 9.2; *see* R.3128-3129.  Kwok never responded.  R.1436 ¶66.

On February 19, 2016, following the procedure set forth in the 2011 Loan Facility, PAX sent a demand letter to Shiny Times seeking payment of the $82,219,404.08 that was then due and owing.  R.2380 ¶9, R.2383, R.3130-32.  Shiny Times likewise never responded.  R.1436 ¶66.

b.  On February 29, 2016, in an attempt to recoup its debt, PAX commenced an action in the British Virgin Islands to place Shiny Times into liquidation.  R.1436 ¶69.  But Kwok was one step ahead of PAX.  Although PAX succeeded in having Shiny Times wound down, it was unable to collect any of the amount owed under the 2011 Facility Letter or the Personal Guarantee because it turned out that, at least by that time, Shiny Times was a shell company with no assets.  R.1436 ¶70.

## B.    Kwok's Repeated Reliance On The Contracts

Kwok's sole argument on the merits (renewed on appeal) is that the above-described contracts between PAX, Kwok, and Kwok's entities were actually inauthentic forgeries.  That position is contrary to that which Kwok took repeatedly and consistently from the outset of the litigation.

### 1.    Kwok Asserts From the Outset of Litigation That the Contracts Are Authentic

a.  Having learned that Kwok had taken up residence in New York City, where he had significant assets, PAX filed suit in the court below on April 18, 2017, alleging breach of contract for failure to satisfy the 2011 Personal Guarantee.  R.98.  At that point, the outstanding debt stood at approximately $88 million.  R.107 ¶48.

11

b.  Rather than answering the complaint, Kwok, then represented by Boies Schiller Flexner LLP, moved on June 29, 2017 to dismiss for *forum non conveniens* under CPLR 327(a).  Dkt. No. 8.[1]  That motion was premised on a position to which Kwok would continue to adhere for years of litigation:  that the contracts were authentic.  Indeed, Kwok's *forum non conveniens* brief meticulously detailed his conduct in entering into all of the contracts at issue—from PAX's $30 million loan in 2008, to the 2011 Loan Facility and 2011 Personal Guarantee, to the 2013 Deed of Settlement and its subsequent extensions, *id.* at 1, 3-5—and contended that the suit belonged in Hong Kong because, *inter alia*, "[t]he parties entered into each of these agreements in Hong Kong or China" and "each of these agreements contained choice of law provisions specifying that Hong Kong law governs the agreements," *id.* at 4; *see also id.* at 5, 9.  Kwok's counsel likewise represented to the court at oral argument on the motion that "[t]he contracts at issue predominantly were signed in Hong Kong, the contracts are all governed by Hong Kong [law].  They also have a choice of law provision [that] provided for [disputes under] them to be brought in Hong Kong … ."  Dkt. No. 106 at 4:12–19.

In support of this motion, Kwok also proffered a complete set of the parties' agreements, including, among others, the 2011 Loan Facility, the 2011 Personal

---

[1] Unless otherwise indicated, references to "Dkt. No. _" refer to the docket below, NYSCEF Index No. 652077/2017.

Guarantee, and the 2013 Deed of Settlement and the extensions thereto.  R.3166-67.[2]  The documents were attached to an affirmation by Kwok's "appointed person," Fiona Yu, who represented that the submission was "in support of Mr. Kwok's motion to dismiss" based on "[her] personal knowledge and [her] review of [her] records relating to the loan facility" entered into in 2008 and the "relevant transactions thereto."  R.3166 (the "Yu Affirmation").  The affirmation represented that the copies of the documents were "true and correct."  *Id.*  Kwok specifically acknowledged at his deposition that he had "authorized [Ms. Yu] to submit this affidavit on [his] behalf."  R.801.

c. On July 7, 2017, while Kwok's *forum non conveniens* motion was pending, PAX filed a motion for prejudgment attachment, hoping to prevent Kwok from evading his contractual obligations by selling or transferring his luxury New York apartment at the Sherry-Netherland Hotel (the "Residence") or the Genever shell companies through which Kwok owns the Residence, and secreting the proceeds to one of his many offshore accounts or holding companies.  Dkt. No. 28.[3]  In his opposition to that motion, Kwok reasserted his position that the contracts in question

---

[2]  Kwok also produced—and stamped with "KWOK" Bates numbers—each of these contracts in discovery.  R.1085-1180.

[3]  Kwok had purchased the Residence in early March 2015 for approximately $67.5 million in cash, at a time when Kwok's debt to PAX exceeded $70 million. R.2508, 2516 ¶8.

were authentic, arguing that PAX was unlikely to succeed on the merits because of Kwok's substantial performance of the 2013 Deed of Settlement—a defense that, like Kwok's *forum non conveniens* argument, was premised on the argument that the contracts were genuine, and that Kwok had fulfilled several of the conditions precedent set forth in the contracts. *See* R.3110 (arguing that there may have been "substantial performance of the April 19, 2013 Deed of Settlement … because purchase agreements for the three Beijing Pangu apartments were executed and the apartments were delivered to PAX LP's entities").

d.  On September 20, 2017, the motion court, in reliance on Kwok's repeated representations of the authenticity of the contracts, granted Kwok's *forum non conveniens* motion.  Dkt. No. 102.  Giving substantial weight to the contracts' choice-of-law provisions, the court concluded that New York lacked a sufficient interest in deciding the dispute because, *inter alia*, the transaction was "governed by Hong Kong law." *Id.* at 1.  Accordingly, the court dismissed the action and denied PAX's attachment motion as moot. *Id.* at 2; Dkt. No. 103.

e.  PAX appealed to this Court.  Dkt. No. 107.  Kwok's brief on appeal was again premised on the validity of the contracts' choice-of-law provisions, repeatedly representing that the contracts were genuine and should be relied upon in ruling on the *forum non conveniens* motion. *See* Kwok FNC Appeal Br. (Appellate Division, First Department, Jan. 26, 2018), at 2, 5-8, 20 (representing to this Court that "[t]he

breach of contract claim at issue in this action arises from contracts and agreements
negotiated and executed almost exclusively in either Hong Kong or China," *id.* at 2,
and that "each of these agreements contained choice of law provisions specifying
that Hong Kong law would govern," *id.* at 6-7).

On April 5, 2018, this Court reversed the motion court's grant of the *forum
non conveniens* motion. *Pac. All. Asia Opportunity Fund L.P. v. Kwok Ho Wan*, 160
A.D.3d 452 (1st Dep't 2018). The Court's reversal was not based on a rejection of
Kwok's position that the contracts were authentic. Rather, this Court accepted as a
foundational premise of the case that the contracts were genuine, acknowledging that
"the agreements at issue in this breach of contract action concern a Chinese real
estate development project and that most (although not all) of them were negotiated
and executed in Hong Kong or China." *Id.* at 453. Nevertheless, this Court
determined that reversal was required on other grounds—namely, that there was a
sufficient nexus between the action and New York such that New York was not an
inconvenient forum. *Id.*

### 2. Kwok Adheres to His Position Regarding Authenticity Throughout Discovery and Renewed Attachment Proceedings

a. With the action reinstated on the motion court's docket, the parties
proceeded with discovery. On June 11, 2018, Kwok filed responses to PAX's
requests for admission in which he admitted that he "executed" multiple agreements
with the same dates and the same parties as the agreements attached to Fiona Yu's

affirmation in support of Kwok's motion to dismiss.  R.411.  Kwok's responses again unambiguously admitted that he signed each of the key agreements now at issue.  *See* R.424 (regarding the 2011 Loan Facility, admitting that "Shiny Times and PAX executed an agreement in 2011"); R.427 (regarding the 2011 Personal Guarantee, admitting "he executed an agreement in 2011"); R.433 (regarding the 2013 Deed of Settlement, admitting that "he, Shiny Times, Beijing Pangu, and PAX executed an agreement dated April 19, 2013"); R.445, 453, 461, 469 (regarding the extensions to the Deed of Settlement, admitting that "he, Shiny Times, Beijing Pangu, and PAX executed an agreement dated December 3, 2013"; "he, Shiny Times, Beijing Pangu, and PAX executed an agreement dated May 15, 2014"; "he, Shiny Times, Beijing Pangu, and PAX executed an agreement dated July 11, 2014"; and that "he, Shiny Times, Beijing Pangu, and PAX executed an agreement dated February 10, 2015").

b.   PAX then renewed its motion to attach the Residence and the shell companies that hold it.  Kwok again argued in an opposition brief to that motion that prejudgment attachment was not warranted because, since he had complied with some of the 2013 Deed of Settlement's conditions precedent, "substantial performance of the April 19, 2013 Deed of Settlement may have occurred."  Dkt. 167 at 21.  Kwok also argued that "it was still unclear from the record before the Court why supplemental deeds *were executed* notwithstanding the fact that PAX

entities had formally accepted the apartment[s]." *Id.* (emphasis added). Similarly, at oral argument, Kwok's counsel argued that PAX had failed to explain how there "can't be substantial performance of the agreement by which the debts would be paid by delivery of the apartments." Dkt. No. 199 at 19:17–19.

Kwok also expressly stipulated to the authenticity of the contracts in a joint letter to the court submitted by the parties in advance of an April 2019 evidentiary hearing on attachment. Dkt. No. 325. In the letter, Kwok represented that he "does not dispute the authenticity of any of Plaintiff's exhibits," *id.*—which included all the key contracts, including the 2011 Loan Facility, 2011 Personal Guarantee, and 2013 Deed of Settlement, *see* Dkt. No. 326.

Thus, for well over two years of litigation, Kwok consistently maintained and formally represented to both the motion court and this Court his position that the contracts were authentic, shaping the course of discovery and extracting favorable rulings from the motion court on that basis.

### C.    Kwok Suddenly Disclaims the Contracts' Authenticity

a. Two and a half years after this case was filed, Kwok was deposed on the merits on November 25, 2019. At that deposition, Kwok claimed for the first time that all the key contracts were fake documents that he had never seen before, and that his signatures on them were forgeries. As to the 2011 Loan Facility, for example, Kwok claimed "that 100 percent it is not my signature." R.674. Similarly,

for the 2011 Personal Guarantee, Kwok asserted "I guarantee with my life this is not my signature." R.679.  As for the 2013 Deed of Settlement—the same agreement he for two full years had argued had been substantially performed—Kwok protested that "[a]ny Chinese person or even a Chinese pig—I mean, this is ridiculous.  It's so ridiculous.  You forge something like this, you try to accuse me." R.748.  Regarding the December 3, 2013 extension of the Deed of Settlement, Kwok declared it a "[h]undred percent forged. You crazy? Even a pig can tell this is not signed by the same person." R.754.  Similarly, as to the July 11, 2014 extension, he stated: "Hundred percent, they are fakes. To me, it's a shock. This is the first time I have ever seen this kind of document. Wow." R.757.  He testified along similar lines regarding the two other extensions of the Deed of Settlement.  *See* R.756, 761.

b.    In response to Kwok's sudden about-face, PAX wrote to Kwok's then-counsel, Hodgson Russ LLP, to request that they remedy what was plainly perjured testimony.    R.500-03.    In its letter, PAX detailed why the testimony was demonstrably false in light of Kwok's prior representations and conduct, and asked Hodgson Russ to address its client's perjury by abstaining from asserting the newly concocted forgery defense in court filings and by counseling Kwok to recant the false testimony.  *Id.*

When Hodgson Russ refused to do so, PAX filed a motion for sanctions. R.372.  PAX sought monetary sanctions against both Kwok and Hodgson Russ and

additionally argued that Kwok should be precluded from asserting his perjured claim of forgery in subsequent proceedings on three independent grounds:  first, as a sanction for misleading behavior; second, because Kwok could not disavow his prior judicial admissions; and, third, as a matter of judicial estoppel.  R.395-99.

In support of its motion, PAX pointed to the overwhelming record evidence that Kwok's testimony was perjured, including the prior representations and admissions detailed above in the context of the *forum non conveniens* motion and the attachment proceedings (including the express authenticity stipulation), as well as Kwok's responses to PAX's requests for admission.  R.383-86.  PAX also placed before the motion court a trove of communications from Stevenson Wong, Kwok's Hong Kong counsel that had represented him in connection with the agreements, that confirm the contracts' authenticity.  R.386-88.

The motion court held a hearing on PAX's sanctions motion on July 7, 2020, and issued a ruling later that day.  R.59.  While the court did not sanction Kwok, it did hold that Kwok was "judicially estopped from challenging, in opposition to plaintiff's summary judgment motion or at trial, the authenticity of documents defendant Kwok previously sponsored in proceedings before this Court."  *Id.*  The court did not reach the question whether Kwok would also be barred from arguing forgery due to the binding effect of his own prior judicial admissions.

19

## D.    PAX's Motions for Summary Judgment and Damages

a.  PAX then moved for summary judgment on its breach of contract claim.[4]
R.1390.  Notably, Kwok's only response as to liability was to ask the motion court
to reconsider its judicial estoppel ruling.  R.3218-22.  Kwok also argued that
summary judgment on damages was not warranted because of purported fact issues
regarding mitigation of damages by PAX.  R.3224-28.

On September 15, 2020, following oral argument the day prior, the motion
court issued an order granting PAX summary judgment as to liability on the breach
of contract claim.  R.50.  The court first reaffirmed its holding on judicial estoppel,
explaining that "Kwok's recent, uncorroborated assertion that the agreements are
forgeries is inconsistent with his prior position in this litigation"—a position the
court had necessarily adopted in ruling in Kwok's favor on the *forum non conveniens*
motion because "Kwok's assertion that the case should have been dismissed in favor
of a resolution in Hong Kong *because the agreements on their face are governed by
Hong Kong law* necessarily required an argument by Kwok, and an acceptance by
the Court, that the agreements were authentic and not forgeries, as Kwok now
claims."  R.53-54.

---

[4] PAX did not seek summary judgment on Count II of its complaint, which
involves veil piercing claims against Kwok's two Genever shell companies.

Next, the court applied the unambiguous terms of the parties' agreements and concluded that because (i) PAX "has shown, and defendant Kwok has failed to refute, that several of the conditions precedent in the 2013 Deed of Settlement were not fulfilled," such that the 2011 Loan Facility and 2011 Personal Guarantee had reverted back into effect; and (ii) "Kwok does not argue that either he or Shiny Times made any payments under the 2011 Loan Facility or the 2011 Personal Guarantee to satisfy the debt," Kwok was liable to PAX for breach of contract under the 2011 Personal Guarantee.  R.54-56.

Finally, the Court cast significant doubt on Kwok's mitigation argument, noting that "documentary evidence sponsored by both parties" demonstrated that "the alleged opportunity to take possession of the three apartments with the aid of police only came up after June 2015," when "the 2013 Deed of Settlement had already been nullified in its entirety and the 2011 Personal Guarantee was in full force and effect."  R.55.  In any event, because the mitigation argument "speaks to damages, not liability," the court reserved decision on the issue.  R.55-56.

b.  Having obtained judgment in its favor on liability, on September 21, 2020, PAX filed a straightforward motion for damages based on simple arithmetic dictated by the parties' unambiguous contract terms. R.4121.  In response, Kwok revived his mitigation argument.  R.4254.

The motion court rejected Kwok's argument.  R.12.  Reaffirming its prior determination that "based on documentary evidence submitted by both parties … the opportunity presented by the Beijing police only came up *after* June 2015 when the Deed of Settlement had already expired," the court explained that "the Deed of Settlement was never 'breached' because the Deed of Settlement never went into effect, because the conditions precedent were not satisfied by June 30, 2015." R.14-15.  In any event, the court determined that Kwok could not prevail regardless of the timing of the opportunity with the Beijing police, explaining:

> [I]t does not make a difference as a matter of law when the police presented the opportunity to plaintiff.  If it was prior to June 30, 2015, then plaintiff did not know whether or not Kwok would fulfill the conditions precedent and transfer plaintiff the apartments, and thus there was nothing to mitigate and no reason to pursue alternative methods of procuring the apartments.  If it was after June 30, 2015, the 2011 Personal Guarantee was in effect, and under Hong Kong law, mitigation is inapplicable to a debt-repayment claim[].

R.15.  The court also rejected Kwok's argument for the further reason that "[t]he proposal to purchase the apartments from the Beijing police for $17 M, when plaintiff was supposed have the apartments transferred to it for zero dollars (in satisfaction of a debt)," did not represent a reasonable duty to mitigate. *Id.*  Finally, the court determined that Kwok's "conclusory assertion" that damages should be reduced in light of PAX's possession of keys to the Apartments was "insufficient to bar judgment as a matter of law" and was irrelevant because PAX had bargained not for mere possession of the Apartments, but for clean title, which was required for

resale purposes.  R.16.  Because each of Kwok's mitigation arguments lacked merit, the motion court held that PAX was entitled to contractual damages and interest pursuant to the 2011 Personal Guarantee.  *Id.*

### E.    Entry of Judgment in Favor of PAX and Kwok's Subsequent Evasion Tactics

a.  On February 3, 2021, the motion court entered a total judgment against Kwok of $116,402,019.57, which consisted of (i) approximately $46.4 million owed under the contract, (ii) approximately $69.4 million in contractual interest, and (iii) approximately $526.6 thousand in post-judgment interest under the statutory rate (which continues to accrue).  R.6-7.  As noted above, PAX is also contractually entitled to legal fees incurred in connection with enforcing the contract.  R.2390 §5.3; *see* R.7.

b.  Kwok has, of course, done everything he can to date to avoid paying that judgment.  Although he has not posted a bond to stay the judgment pending appeal, Kwok has flagrantly ignored and refused to pay any portion of what he owes, even publicly stating on social media that he has no intention of doing so.  *See* Dkt. Nos. 754, 755 (detailing Kwok's boast in a YouTube video that PAX "won't a get a dime" of his money).  Instead, Kwok has turned his time and energy toward thwarting PAX's legitimate collection efforts.  His primary tactic has been to shield his assets in shell companies held by family members, leading him to claim to personally have no assets, while readily accessing millions of dollars to fund his lavish lifestyle and

enormous legal expenses.  *See, e.g.*, Dkt. No. 750 at 2, 6-7; Dkt. No. 833 at 9:35-
10:3; Dkt. Nos. 764-68 (documenting Kwok's use of the shell company Golden
Spring New York Ltd. as a personal piggy bank).

Indeed, before invoking his rights against self-incrimination under the Fifth
Amendment in connection with pending government investigations against him,[5] *see*
Dkt. No. 760, Kwok—despite being a self-proclaimed billionaire—stated that he had
no assets other than the shell companies that own the Residence.  Dkt. No. 756 at 9;
*see also* Dkt. No. 580 at 101:3-5 (Kwok testimony that "[i]n reality, under the law,"
he had "no" "assets in the United States.").  Kwok's other machinations to avoid
satisfying the judgment have included filing a questionable bankruptcy for one of
the shell companies through which he holds the Residence; stonewalling—and
causing his associates and shell companies to stonewall—PAX's legitimate
collection-related discovery requests; and secreting his yacht, the "Lady May," out
of this jurisdiction in blatant violation of the motion court's express restraining
orders.  *See* Dkt. Nos. 757, 728, 846.

Having witnessed this pattern of misconduct throughout the litigation, the
motion court has repeatedly recognized that Kwok has engaged in a "great deal of

---

[5] Three Kwok-linked media companies recently agreed to pay over $539 million
to settle charges brought by the SEC.  *See* Press Release, SEC Charges Three Media
Companies with Illegal Offerings of Stock and Digital Assets (Sept. 13, 2021),
https://www.sec.gov/news/press-release/2021-175.

gamesmanship, a great deal of dissembling, and some flagrant disregard of court orders," R.4428; *see*, *e.g.*, Dkt. No. 728 at 2 (stating in an order that "it is clear that there has been an intolerable amount of gamesmanship, dissembling, and deceit in proceedings before this Court relating to the whereabouts and ownership of the yacht 'Lady May'"); R.4425 (stating that "Mr. Kwok has attempted to mislead the court" and that "Mr. Kwok is, as the plaintiff contends, playing a shell game with his assets"); Dkt. No. 833 at 9:2-3 (stating that "Mr. Kwok believes that these court proceedings are a game of evasion that he wants to play.").

c. On March 2, 2021, Kwok deployed yet another gambit in his ongoing game of evasion and delay: this appeal. R.3. For the reasons set forth below, each of Kwok's appellate arguments lacks merit.

## ARGUMENT

A motion for summary judgment "shall be granted if … the cause of action … [is] established sufficiently to warrant the court as a matter of law in directing judgment in favor of any party." CPLR 3212(b). PAX readily satisfied that standard—it is, after all, undisputed that Kwok did not satisfy his unambiguous obligations under the 2011 Personal Guarantee, which is the currently operative agreement. *See supra* at 10. The motion court thus properly granted summary judgment based on Kwok's clear contract breach, R.57, and awarded damages as dictated by the contract's plain terms, R.12.

Kwok's sole argument as to liability is that the contracts he personally proffered to the Court and on which he repeatedly relied in briefs, pleadings, and oral arguments were in fact forgeries that Kwok had never seen or even heard of. The motion court properly precluded Kwok from taking that dishonest position. Kwok also challenges the motion court's damages ruling, but that court quite rightly rejected Kwok's mitigation argument in light of undisputed, controlling Hong Kong law that made clear that PAX was not subject to a duty to mitigate. The decisions below should be affirmed.

## I.     THE MOTION COURT PROPERLY BARRED KWOK FROM ABANDONING HIS LONGSTANDING POSITION THROUGHOUT THE LITIGATION THAT THE CONTRACTS WERE AUTHENTIC.

The motion court correctly held that Kwok is judicially estopped from contesting the authenticity of the contracts that form the basis of this lawsuit. There are, moreover, several readily available alternative grounds on which to affirm that determination—namely, on the basis of Kwok's prior judicial admissions; as a sanction for Kwok's perjured testimony; and because Kwok did not adduce sufficient evidence to withstand summary judgment on the authenticity issue.

### A.     The Motion Court Acted Well Within Its Discretion In Barring Kwok's Eleventh-Hour Forgery Argument On The Basis Of Judicial Estoppel.

1.  "Under the doctrine of judicial estoppel, or estoppel against inconsistent positions, a party is precluded from inequitably adopting a position directly contrary

to or inconsistent with an earlier assumed position in the same proceeding," *Nestor v. Britt*, 270 A.D.2d 192, 193 (1st Dep't 2000), or in "a prior proceeding," *Inter–Power of N.Y. v. Niagara Mohawk Power Corp.*, 208 A.D.2d 1073, 1075 (3d Dep't 1994). Judicial estoppel applies where the party "obtain[ed] a favorable ruling or judgment … as a result" of the inconsistent position. *35 W. Realty Co., LLC v. Booston LLC*, 171 A.D.3d 545, 545 (1st Dep't 2019). This "equitable doctrine" can be "invoked by a court at its discretion," *Corkran v. Orics Indus., Inc.*, 62 Misc. 3d 1225(A), 2018 WL 7568231, at *3 (N.Y. Sup. Ct. 2018) (quotation omitted), in order to "prevent abuses of the judicial system," *D&L Holdings v. Goldman Co.*, 287 A.D.2d 65, 71 (1st Dep't 2001).

The motion court properly determined that judicial estoppel bars Kwok from disavowing the authenticity of contracts he had repeatedly sponsored to the court as authentic because Kwok's prior representations had persuaded the court to grant a *forum non conveniens* motion in Kwok's favor. As detailed above, *see supra* at 12-15, Kwok's briefing and argument on the *forum non conveniens* motion repeatedly asserted that the documents were authentic, attached "true and correct" copies of the documents, and urged dismissal based on the contracts' choice-of-law provisions. Kwok suggests that "the motion court never made any determination on the authenticity of the documents." Defendant-Appellant's Opening Brief ("OB") at 19. That is wrong. As the motion court itself explained in its summary judgment order,

R.53, that court necessarily relied on and accepted Kwok's representations that the contracts were authentic. After all, the court had granted Kwok's motion based in large part on the fact that the agreements included a Hong Kong choice-of-law provision.[6] *See id.* And those choice-of-law provisions were obviously relevant only to the extent the contracts were authentic and governed this dispute. The court thus acted well within its discretion in estopping Kwok from relying on his newly concocted forgery defense.

2. Kwok's contrary arguments are meritless.

a. Kwok errs in contending that judicial estoppel applies only when the inconsistent position was taken in a "prior proceeding." OB19-21. It is of course true that this Court routinely applies the doctrine where an inconsistent position was adopted in a separate prior judicial proceeding. *See, e.g.*, *D&L*, 287 A.D.2d at 71. But the Court has held over and over again that judicial estoppel is equally applicable where the inconsistent position was adopted in the *same* proceeding. *See Nestor*, 270 A.D.2d at 193 (judicial estoppel applies where a position is "inconsistent with an earlier assumed position in the same proceeding"); *accord Genger v. TPR Inv.*

---

[6] Below, Kwok suggested that the motion court had not necessarily adopted a position inconsistent with his new forgery argument because he had admitted at his deposition that some of the contracts were real. *See* R.3220 n.19. Not so. Because PAX sued on the 2011 Personal Guarantee, the court's *forum non conveniens* ruling necessarily pertained to that contract, which Kwok asserted at his deposition was forged. *See* R.679.

*Assocs., Inc.*, 182 A.D.3d 417, 418 (1st Dep't 2020); *Casper v. Cushman & Wakefield*, 74 A.D.3d 669, 670 (1st Dep't 2010); *Karasik v. Bird*, 104 A.D.2d 758, 758-59 (1st Dep't 1984). That is also the rule in every other Appellate Division. *See, e.g.*, *Hartsdale Fire Dist. v. Eastland Constr., Inc.*, 65 A.D.3d 1345, 1346 (2d Dep't 2009); *Maas v. Cornell Univ.*, 253 A.D.2d 1, 5 (3d Dep't 1998), *aff'd*, 94 N.Y.2d 87 (1999); *Lorenzo v. Kahn*, 100 A.D.3d 1480, 1482 (4th Dep't 2012). Indeed, Kwok actually *conceded* this point below, acknowledging that "[t]he doctrine of judicial estoppel has been applied to preclude a party 'from inequitably adopting a position directly contrary to or inconsistent with an earlier assumed position in the same proceeding.'" R.3219 (quoting *Maas*, 253 A.D.2d at 5).

In characteristic fashion, Kwok now tries to abandon that concession on appeal, relying on *Olszewski v. Park Terrace Gardens, Inc.*, 18 A.D.3d 349 (1st Dep't 2005). But Kwok's overbroad reading of that case does not withstand scrutiny. In the course of its two-sentence discussion of judicial estoppel, the *Olszewski* Court first determined that judicial estoppel was not applicable because, unlike here, no court had ever accepted the party's prior inconsistent position. *Id.* at 350. The Court went on to state that "the inconsistent positions are being asserted in the same action." *Id.* at 351. But the Court's statement should not be read as establishing a legal precedent restricting judicial estoppel to inconsistent statements in prior proceedings, for at least three reasons. First, such a statement would be

29

dictum, since the Court had already made clear that judicial estoppel did not apply because no court had ever accepted the prior position. *See id.* at 350. Second, that reading of *Olszewski* would place it in irreconcilable conflict with other precedents of this Court and every other Appellate Department. *See supra* at 28-29. Third, such a rule would make no sense. The point of the doctrine is to prevent inequitable manipulation of the judicial system—"a litigant should not be permitted … to lead a court to find a fact one way" and later contend "that the same fact should be found otherwise." *Env't Concern*, 101 A.D.2d at 593 (quotation omitted). That principle applies equally to prior positions taken in the same litigation as to prior litigations, just as this Court and others have repeatedly held.

b.  There is likewise no merit to Kwok's contention that the motion court disregarded what Kwok calls the "'prevailing' requirement" of judicial estoppel. OB17. As this Court has recognized, there is no requirement that the prior inconsistent position have resulted in a final judgment in the estopped party's favor, *see D&L*, 287 A.D.2d at 72; it suffices if the party obtained "a favorable ruling … as a result" of the inconsistent position, *35 W. Realty Co.*, 171 A.D.3d at 545; *see also Montefiore Med. Ctr. v. Crest Plaza LLC*, 24 Misc.3d 1201, 2009 WL 1675994, at *14 (N.Y. Sup. Ct. 2009) (explaining that "the prior inconsistent position must have been adopted by the tribunal in some manner"), *aff'd*, 83 A.D.3d 1016 (2d Dep't 2011). Here, that requirement was amply satisfied by the motion court's

ruling in Kwok's favor on the *forum non conveniens* motion—a ruling which, as set forth above, was based on the court's acceptance of Kwok's original position that the contracts he himself proffered were authentic.

The cases on which Kwok relies, in contrast, involved inconsistent positions that were *never accepted* by a tribunal at any point. *See Patmos Fifth Real Estate, Inc. v. Mazl Bldg., LLC*, 189 A.D.3d 632, 633 (1st Dep't 2020) (the motion court denied the motion in which the inconsistent position was asserted, and this Court affirmed, *see* Index No. 108421/11 Dkt. No. 16 at 4); *MacArthur Props. I, LLC v. Galbraith*, 182 A.D.3d 514, 514 (1st Dep't 2020) (affirming Justice Ostrager's refusal to apply judicial estoppel where the merits of the inconsistent position had never been ruled upon); *MPEG LA, LLC v. Samsung Elec. Co., Ltd,* 166 A.D.3d 13, 21 (1st Dep't 2018) (defendant was not bound to position adopted in motions rejected by the motion court); *Wells Fargo Bank N.A. v. Webster Bus. Credit Corp*., 113 A.D.3d 513, 516 (1st Dep't 2014) (motion court had dismissed claim for contractual indemnification, so plaintiffs had not prevailed on any position with respect to the availability of attorneys' fees under such a claim); *Carr v. Caputo*, 114 A.D.3d 62, 69, 71 (1st Dep't 2013) (no judicial estoppel based on arguments advanced in motion for summary judgment that was denied by motion court); *Baje Realty Corp. v. Cutler*, 32 A.D.3d 307, 310 (1st Dep't 2006) (motion court had not awarded relief based upon prior statements).

This Court's subsequent reversal of the motion court's *forum non conveniens* determination—while at the same time accepting Kwok's ongoing representations as to the contracts' authenticity as a foundational premise, *see supra* at 15—does not alter the result. *Nestor v. Britt* is directly on point. There, petitioner landlords in an owner-occupancy proceeding obtained a judgment of possession in their favor, relying on a 1983 lease. 270 A.D.2d at 192-93. Subsequently, the judgment in the landlords' favor was reversed on appeal, and the respondent tenant moved for an award of fees based on the same lease. *Id.* at 192. This Court held that, because of the landlords' reliance on the 1983 lease in obtaining their initially successful but ultimately reversed judgment, the landlords were estopped from disputing the validity of the lease. *Id.* at 193. The Court refused to permit the landlords to "jettison the 1983 lease only after the adverse order of the Appellate Term," explaining that they could not "now, based on a reversal of their legal fortunes, seek to invalidate provisions of that lease." *Id.* Just so here: having relied upon the authenticity of the contracts in obtaining a ruling in his favor, Kwok cannot, in light of the "reversal of his legal fortunes" occasioned by this Court's reversal on appeal, "seek to invalidate" and thereby "jettison" those same contracts. *Id.*

Kwok suggests that *Nestor* is different because the estopped parties in that case had asserted their prior position "before, during and after the trial." OB22. But the same is true here. Although Kwok remarkably contends that his position that the

contracts are authentic was expressed only "in a single instance," *id.*, he in fact consistently represented that the contracts were authentic for well over two years of litigation, including in his briefing, argument, and other submissions to the motion court *and this Court* in support of the *forum non conveniens* motion, in his opposition to PAX's attachment motions, in response to PAX's requests for admission, and in an authenticity stipulation. *See supra* at 11-17. *Nestor* is thus on all fours with this case.

Kwok's only authority for the proposition that this Court's subsequent ruling affects the judicial estoppel calculus is *Goodman v. Skanska USA Civil, Inc.*, 169 A.D.3d 1010 (2d Dep't 2019), but that case is inapposite. *Goodman* held that for judicial estoppel to apply on the basis of a failure to disclose claims in a bankruptcy proceeding, "there must be a final determination in the bankruptcy proceeding endorsing the party's inconsistent position concerning his or her assets." *Id.* at 1013 (quotation omitted). But that holding was expressly cabined to the bankruptcy context, where courts have held that the reopening of a bankruptcy proceeding by the bankruptcy court "nullif[ies] the final determination upon which … judicial estoppel could be predicated." *Id.* (quotation omitted). This special rule is based on policy considerations unique to bankruptcy and inapplicable here. Judicial estoppel barring a debtor from pursuing a claim that he failed to disclose in a bankruptcy proceeding strikes a careful balance. On the one hand, estopping the debtor from

33

pursuing such a claim is desirable because "[i]f a debtor in possession were permitted to omit claims in bankruptcy and later assert title to them, there might be an inducement to do so, to the prejudice of creditors' interests." *Cafferty v. Thompson*, 223 A.D.2d 99, 102 (3d Dep't 1996). On the other hand, strictly applying judicial estoppel to bar such claims in circumstances when the bankruptcy proceeding has been reopened (which allows for the initially omitted claim to be included) would "operate[] to the detriment primarily of innocent creditors" by depriving them of "a potential recovery," while providing a windfall to the alleged bad actors—the defendants who would otherwise face the claim. *Ah Quin v. Cnty. of Kauai Dep't of Transp.*, 733 F.3d 267, 275 (9th Cir. 2013). These bankruptcy-specific policy considerations have no bearing on the ordinary operation of judicial estoppel.

c. Kwok's fallback argument—that it was "unjust" for the motion court to have given any weight to his *forum non conveniens* motion and the affirmation he submitted in support of that motion (OB22)—is absurd. Although Kwok now tries to attack the credibility of his own witness, Fiona Yu, Kwok conceded under oath that he expressly "authorized [Ms. Yu] to submit this affidavit on [his] behalf." R.801. And even more important, Kwok himself—through his very able counsel at Boies Schiller and Hodgson Russ—relied on Ms. Yu's affidavit and the attached documents in Kwok's motion-court (and appellate) briefing on the *forum non conveniens* motion. The only injustice here would be allowing Kwok to yet again

manipulate the judiciary by abandoning a position on which he earlier prevailed now that he is out of other options. The judicial estoppel doctrine exists for cases precisely like this, because the system "cannot tolerate this playing fast and loose with the courts." *Ford Motor Credit Co. v. Colonial Funding Corp.*, 215 A.D.2d 435, 436 (2d Dep't 1995) (quotation omitted).

Meanwhile, Kwok's insistence that PAX was not prejudiced by his switch in litigation position (OB23) is both irrelevant and wrong. It is irrelevant because there is no prejudice requirement: "detrimental reliance is not a prerequisite to the applicability of judicial estoppel as the intent of said doctrine is not to protect the individual litigant, but to protect the integrity of the judicial system itself." *Tozzi v. Long Island R.R. Co.*, 170 Misc. 2d 606, 613 (N.Y. Sup. Ct. 1996), *aff'd*, 247 A.D.2d 466 (2d Dep't 1998); *see also City of New York v. Black Garter*, 179 Misc. 2d 597, 599, 685 N.Y.S.2d 606, 607 (N.Y. Sup. Ct. 1999), *aff'd*, 273 A.D.2d 188 (2d Dep't 2000). And it is wrong because Kwok's conduct has obviously been prejudicial to PAX. For one thing, PAX was required to expend the time and resources to oppose the *forum non conveniens* motion—and to appeal the motion court's grant of that motion—that was based in large part on the authenticity of the contracts. And PAX would undoubtedly have been prejudiced had the motion court not estopped Kwok from switching positions before summary judgment. Kwok has been stringing PAX along for the better part of a decade, and additional undue delay—including wasted

time and resources dedicated to disproving Kwok's specious assertions that the contracts were forged, *see infra* at 43-45—would certainly have further prejudiced PAX.

### B.    Kwok Was Also Barred From Changing Positions Because He Is Bound By His Prior Judicial Admissions.

In light of its judicial estoppel finding, the motion court did not need to rule on PAX's alternative contention that Kwok was bound by his previous judicial admissions that the contracts are authentic.  *See* R.397.  This Court likewise need not reach that argument, since the motion court's judicial estoppel ruling was correct. But the court's judgment can also be affirmed on the alternative ground that Kwok is bound by his numerous formal judicial admissions that the contracts are authentic.

"A formal judicial admission is an act of a party done in the course of a judicial proceeding, which dispenses with the production of evidence by conceding, for the purposes of the litigation, the truth of a fact alleged by the adversary." *People v. Brown*, 98 N.Y.2d 226, 232 n.2 (2002) (quoting Prince, Richardson on Evidence § 8-215 (11th ed.)).  Unlike informal admissions, which are merely evidence of the fact admitted, "a formal judicial admission takes the place of evidence and is *conclusive* of the facts admitted in the action in which [it is] made." *Id.* (quotation omitted).  To be considered a formal judicial admission, a statement "must be one of fact," "must be deliberate, clear, and unequivocal," and must be "made with sufficient formality and conclusiveness." *Rahman v. Smith*, 40 A.D.3d 613, 615 (2d

Dep't 2007).  Classic examples of formal judicial admissions include "(1) statutory admissions, such as an admission of facts pursuant to notice [under] CPLR 3123; (2) facts admitted by an agreed statement of facts or other stipulations [under] CPLR 3222, 2104; … (3) facts formally admitted in open court, as by a formal plea of guilty in a criminal case," and "(4) facts admitted by the pleadings, [*see*] CPLR 3018(a)," among others.  Richardson on Evidence § 8-215.

As described in detail above, *supra* at 11-17, Kwok repeatedly and unequivocally admitted throughout this litigation, in statements that qualify as formal judicial admissions, that the contracts at issue were authentic, including in (1) his responses to PAX's requests for admission ("RFA"); (2) his stipulation in a joint letter to the court in advance of an attachment hearing; and (3) other representations made in briefs, submissions, and statements in open court in the context of the *forum non conveniens* motion and attachment proceedings.

1. *Kwok's RFA responses.*  As described above, *supra* at 15-16, on June 11, 2018, Kwok submitted responses to PAX's RFAs pursuant to CPLR 3123 in which he admitted the authenticity of the key contracts, R.411—a quintessential formal judicial admission.  *See* Richardson on Evidence § 8-215.

Kwok insists that these admissions are invalid because PAX did not attach copies of the contracts to its RFAs.  But there is no requirement to provide copies of documents that have "already been furnished."  CPLR 3123(a); *Bajaj v. Gen.*

*Assurance Co.*, 18 Misc. 3d 25, 27 (App. Term 2d Dep't 2007) (cited at OB25). PAX was thus under no obligation to attach copies of documents that Kwok had already produced from his own files and submitted to the court in support of his *forum non conveniens* motion.

Nor can Kwok evade the binding force of those admissions by relying on his boilerplate general objections, because Kwok unambiguously admitted in his RFA responses that he signed the key agreements. An example involving the 2013 Deed of Settlement makes this clear. In RFA 19, PAX asked Kwok to "[a]dmit that You, Shiny Times, Beijing Pangu, and PAX LP executed a Deed of Settlement dated April 19, 2013 (the "Original Deed of Settlement"), which among other things confirmed that at the time[] of the Original Deed of Settlement's execution Shiny Times owed to PAX LP $52,000,000." R.433. As expressly permitted by CPLR 3123(a), PAX did not attach the Deed of Settlement to its RFAs because Kwok had already submitted that document as Exhibit 7 to the Yu Affirmation, which swore that it was a "true and correct copy" of that same "Deed of Settlement between PAX LP, Shiny Times, Mr. Kwok, and Beijing Pangu Investment Inc. … dated April 19, 2013." R.3167. Kwok responded as follows:

> Without waiving the Reservation of Rights and General Objections, and subject to them, to the extent that an answer is required, Kwok *admits only that he, Shiny Times, Beijing Pangu, and PAX executed an agreement dated April 19, 2013*, and otherwise objects to this Request as compound and improper because it goes beyond the intended scope and purpose of a notice to admit as contemplated by CPLR 3123 which would allow PAX to attach as

an exhibit a copy of the document at issue and seek an admission as to its genuineness. Notwithstanding, PAX does not merely seek an admission as to the genuineness of the document at issue (a copy of which it has not attached), but rather seeks to obtain an admission as to the legal import of the document at issue based on PAX's characterization of the same. Kwok further objects to PAX's attempt to use the Requests to obtain information in lieu of other disclosure devices, such as depositions or interrogatories.

R.433-34 (emphasis added). In other words, Kwok claimed that the only proper purpose of an RFA was to authenticate a document, and objected because he believed PAX was trying to do more than that (as well as on the baseless grounds that PAX had not sent Kwok a copy of his own, previously furnished document). But there is no doubt that Kwok admitted in his RFA response that he had "executed" the same document that the Yu Affirmation had presented to the motion court as Exhibit 7. As set forth *supra* at 16, Kwok made the same admissions with respect to every other relevant contract, including the 2011 Loan Facility, the 2011 Personal Guarantee, and the four extensions to the Deed of Settlement. R.424, 427, 445, 453, 461, 469. These formal judicial admissions, standing alone, justify the motion court's decision barring Kwok from advancing his subsequent, insincere forgery argument.

2. *Kwok's stipulation in a joint letter to the motion court.* Kwok again formally admitted the authenticity of the contracts when he made a written representation to the motion court in advance of an April 2019 attachment hearing stating without caveat that he "does not dispute the authenticity of any of Plaintiff's

exhibits"—which included the specific contracts he later falsely testified were forged or fake. Dkt. No. 325; *see* Dkt. No. 326. Kwok suggests that this admission does not mean what it says because it "addressed the admissibility of the exhibits at that specific hearing, not for other purposes." OB13; *see also id.* at 25 (stating that this admission was made in "[t]he context" of "the admissibility of exhibits at the attachment hearing, not in the proceedings on the merits that would take place subsequently."). That purported distinction is nonsensical: a document cannot be "authentic" for purposes of one proceeding but not another.[7] And while the parties had agreed to limit the scope of the April 2019 hearing to attachment issues, the fact that Kwok objected to the *admissibility* of the contracts as irrelevant to attachment while expressly stipulating to their *authenticity* is irreconcilable with his current position that they are forgeries. This "agreement between [the] parties or their attorneys" set forth "in a writing" is "binding" under CPLR 2104 and thus falls within another of the prototypical forms of formal judicial admissions specifically enumerated by the leading treatise. *See* CPLR 2104; Richardson on Evidence § 8-215; *see also, e.g.*, *In the Matter of Daniel C.*, 99 A.D.2d 35 (2d Dept. 1984) (holding that a concession "deliberately made" by an attorney "for the express purpose of limiting and defining the facts in issue" is an admission conclusive on the party.).

---

[7] *See Authentic*, Merriam-Webster, https://www.merriam-webster.com /dictionary/authentic ("[N]ot false or imitation: real, actual.")

3. *Kwok's other representations in court submissions.*  Kwok made numerous additional representations to the motion court and to this Court with the requisite degree of "formality and conclusiveness" to qualify as formal judicial admissions. *Rahman*, 40 A.D.3d at 615.  Kwok's repeated and unequivocal representations as to the contracts' authenticity in his *forum non conveniens* briefs before the motion court and on appeal, statements by his counsel at oral argument in support of that motion, and the Yu Affirmation's assertion that the attached contracts were "true and correct," which have been described in detail in the context of the motion court's judicial estoppel ruling, *see supra* at 12-15, 27-28, also all qualify as judicial admissions.  *See, e.g.*, *Bellino v. Bellino Constr. Co.*, 75 A.D.2d 630, 630 (2d Dep't 1980) ("Admissions by counsel, *as by any other agent*, are admissible against a party provided that the statements had been made by the attorney while acting in his authorized capacity." (emphasis added)).

Kwok's briefs at various stages of attachment proceedings likewise included judicial admissions of the contracts' authenticity.  Kwok argued in those briefs that PAX would be unlikely to succeed on the merits of its claim in light of Kwok's "substantial performance of the April 19, 2013 Deed of Settlement … because purchase agreements for the three Beijing Pangu apartments were executed and the apartments were delivered to PAX LP's entities."  R3110 (Aug. 1, 2017 brief); *see also* Dkt. 167 at 21 (in a May 16, 2018 brief, arguing that "substantial performance

41

of the April 19, 2013 Deed of Settlement may have occurred" and stating that "supplemental deeds were executed"). Kwok's counsel then made the same representation at oral argument. *See* Dkt. No. 199 at 19:17–19.

These formal and deliberate representations bear the "trappings of a formal judicial admission," such that Kwok is "bound" by them. *GJF Constr., Inc. v. Sirius Am. Ins. Co.*, 89 A.D.3d 622, 624 (1st Dep't 2011) (concurring opinion); *see, e.g.*, *Catanese v. Lipschitz*, 44 A.D.2d 579, 580 (2d Dep't 1974) ("statement of plaintiff's attorney, in his affirmation in opposition to [a] motion" is "a judicial admission" with binding effect).

Thus, whether viewed through the lens of judicial estoppel, as a function of the binding effect of judicial admissions, or both, the motion court did not err in ruling that Kwok could not pursue his eleventh-hour contentions of forgery in light of his prior representations and conduct in this litigation.

### C.   In The Alternative, This Court Should Impose Sanctions To Preclude Kwok From Relying On Perjured Testimony.

In addition to arguing for preclusion on the grounds set forth above, PAX sought a sanction preventing Kwok from relying on his perjured testimony. While the motion court stated that it was not "inclined" to issue sanctions despite the "questionable" nature of Kwok's testimony and instead achieved the same outcome through the application of judicial estoppel, R.85, this Court may nevertheless affirm on this alternate basis.

42

"[A] court has inherent power to address actions which are meant to undermine the truth-seeking function of the judicial system and place in question the integrity of the courts and our system of justice," including where the provision of false testimony has amounted to "fraud on the court." *CDR Creances S.A.S. v. Cohen*, 23 N.Y.3d 307, 318 (2014). Courts have taken strict measures where "conduct … frustrates the purpose of the CPLR." *Honghui Kuang v. MetLife*, 159 A.D.3d 878, 881-82 (2d Dep't 2018) (sanctioning plaintiff by striking pleading where he engaged in "willful and contumacious conduct in trying to frustrate the discovery process"). The Appellate Division is "vested with [the] … power to substitute its own discretion for that of the motion court" in the sanctions context, *id.* at 881 (alterations omitted), and thus has the authority to impose sanctions in the first instance. *See Czajka v. Dellehunt*, 125 A.D.3d 1177, 1185 (3d Dep't 2015).

Sanctions are amply warranted in this case. The record is replete with evidence that Kwok's deposition testimony disavowing his signature on the contracts was false, such that permitting him to rely on that testimony would be to countenance a "fraud on the court." *Creances*, 23 N.Y.3d at 318. In addition to the abundant judicial admissions and representations of authenticity detailed above, other documents in the record further discredit Kwok's uncorroborated assertions. Specifically, PAX produced from its files scores of emails between its representatives and Stevenson Wong, the law firm that had represented Kwok in his

43

dealings with PAX. *See supra* at 19. These emails included, among other things, communications from Stevenson Wong (i) negotiating the contracts on Kwok's behalf; (ii) relaying that the firm was consulting with and taking direction from its client, Kwok, on the negotiations; and (iii) sending executed versions of the contracts that the lawyers represented had been "signed by Mr. Kwok." *See* R.866-1080. For example, emails from Stevenson Wong stated that "Mr. Guo's signature [on the Deed of Settlement and related documents] was witnessed [and that] Mr. Guo also confirmed his signature to [Aaron Xie of Stevenson Wong] personally," R.866; that an "execution page signed by Mr. Kwok will be forwarded to [PAX]," R.873; and that "documents signed by Mr. Kwok Ho Wan" were attached, R.877.[8]

---

[8]    True to form, Kwok's response to these emails at his deposition was to testify that Stevenson Wong did not actually represent him in his dealings with PAX, but rather that the law firm had forged documents as part of the Chinese government's conspiracy to frame him. R.637, 730. But as PAX explained to the motion court, Kwok's and his former counsel Hodgson Russ's own documents and statements make plain that Kwok's disavowal of his relationship with Stevenson Wong was just more perjury. For example, when Kwok was applying to purchase the Residence, he provided the building's Board with a letter of recommendation from Hank Lo, the Stevenson Wong lead partner who had represented Kwok in his deals with PAX. In that 2015 letter, Lo represented to the Board on Kwok's behalf that (i) Kwok had "engaged [Stevenson Wong] in one of [Kwok's] business transactions about seven years ago" (the original PAX deal was in 2008, exactly seven years earlier); (ii) Kwok had "established a long-standing relationship" with Lo; and (iii) Stevenson Wong had "acted for [Kwok] in various business transactions in different areas, including project financing, fund raising, corporate mergers and acquisitions, and acquisition of aircrafts, leisure boats and properties." R.1081. And in a November 2019 email to PAX's counsel, Hodgson Russ represented that "Stevenson & Wong

Together with those communications, Kwok's prior conduct—on which he relied in asserting a substantial performance defense during attachment proceedings—further undermines any assertion of forgery.  Kwok cannot explain why, if his signature on the contracts was forged and he never entered into the agreements in question, he and his companies nevertheless fulfilled several of the conditions precedent to the 2013 Deed of Settlement, including providing PAX with keys to the Apartments and executed Property Acceptance Confirmation Notices; executing Notices of Housing Delivery; and executing Property Purchase Contracts. *See supra* at 10; R.1433 ¶50.

The record thus readily supports the conclusion that Kwok's testimony was perjured.  At minimum, this effort to mislead the court warrants a sanction precluding Kwok from relying on his testimony as to forgery.

### D.    Even If Kwok Had Not Been Barred From Asserting Forgery, PAX Was Nevertheless Entitled To Summary Judgment.

Even setting aside these three independent bases justifying the motion court's ruling estopping Kwok from pursuing his made-up forgery defense, the grant of summary judgment should be affirmed because PAX would have been entitled to judgment even if Kwok had been permitted to argue forgery.  Kwok failed to adduce

---

is no longer counsel for Mr. Kwok," thus confirming the obvious fact that Stevenson Wong had previously represented Kwok.  R.1083-84.

evidence sufficient to create a genuine issue of fact on the issue of authenticity—and aside from his perjured, newly invented forgery defense, he had no other defense to summary judgment as to liability.

As set forth above, the evidence demonstrating the authenticity of the contracts—from Kwok's own submissions and representations to the court, to his conduct prior to the onset of litigation, to documentary evidence produced by PAX—is overwhelming.  In the face of that mountain of evidence, all that Kwok mustered was his eleventh-hour, unsupported testimony disavowing his signature on the contracts, which lacks any evidentiary value because it is directly undermined by his own judicial admissions, *see Brown*, 98 N.Y.2d at 232 n.2, and would have been insufficient to defeat summary judgment in any event, *see Banco Popular N. Am. v. Victory Taxi Mgmt., Inc.*, 1 N.Y.3d 381, 384 (2004) ("Something more than a bald assertion of forgery is required to create an issue of fact contesting the authenticity of a signature.").  Indeed, in opposing PAX's sanctions motion and in seeking reargument of the motion court's judicial estoppel ruling, Kwok never offered any corroborating evidence, such as handwriting expert analysis, and never requested an evidentiary hearing on the issue.  *See* R.1283-1309, 3206-22.  Kwok now says that the court should have "held an evidentiary hearing or trial on the genuineness of the guarantee and other documents PAX relied upon." OB2.  But Kwok waived that argument by failing to raise it below.  And it is wrong in any

event, because no evidentiary hearing was required—if a "bald assertion of forgery" did not suffice to create a genuine issue of fact, *Banco Popular*, 1 N.Y.3d at 384, then no hearing was necessary when the only "evidence" provided in support of forgery was just such a bald assertion.

In these circumstances, Kwok has not demonstrated a triable issue of fact as to authenticity. *See, e.g.*, *Peyton v. State of Newburgh, Inc.*, 14 A.D.3d 51, 54 (1st Dep't 2004) (affidavit disavowing authenticity of a signature "must be viewed as conclusory, self-serving and wholly insufficient to rebut defendants' entitlement to summary relief as a matter of law"); *New Dance Grp. Studio, Inc. v. Seltzer*, 293 A.D.2d 298, 299 (1st Dep't 2002) (party's "self-serving affidavit … was insufficient to create an issue of fact"); *Matter of People v. Telehublink Corp.*, 301 A.D.2d 1006, 1008-09 (3d Dep't 2003) (an "unsubstantiated, self-serving assertion" was "insufficient to raise a question of fact"). Accordingly, PAX was and is entitled to judgment as a matter of law even setting aside estoppel and his own binding admissions.

## II.  THE MOTION COURT CORRECTLY REJECTED KWOK'S MITIGATION ARGUMENTS.

Kwok's second contention is that the motion court erred in awarding damages because PAX failed to pursue what Kwok suggests was a potential opportunity to purchase the Apartments from the Beijing police, and because PAX's possession of

keys, even without legal title, somehow conferred some unspecified value. The motion court correctly rejected these arguments.

### A. The Motion Court Correctly Determined That PAX Had No Duty To Pursue The Possibility Of Purchasing The Apartments From The Beijing Police.

One of the conditions precedent to satisfying the 2013 Deed of Settlement was that PAX receive legal title to the Apartments at no net cost. *See supra* at 9. That indisputably never happened. But Kwok contends that PAX should have attempted to mitigate its damages by pursuing a potential opportunity to purchase the Apartments from the Beijing police for approximately $17 million. Kwok's argument fails for two reasons: (i) PAX was not subject to a duty to mitigate damages under any contract; and (ii) the opportunity to purchase the apartments from the Beijing police did not represent a reasonable mitigation opportunity in any event.

### 1. PAX Was Not Subject To A Duty To Mitigate Damages.

Kwok has not been consistent about which agreement he suggests imposed on PAX a duty to mitigate. At times, he has insisted that the duty to mitigate arose under the 2011 Personal Guarantee, *see* R.4254, while on other occasions he has attributed that duty to the 2013 Deed of Settlement, *see, e.g.*, R.4946-49, OB34-35. Either way, he cannot prevail.

**2011 Personal Guarantee.** There was no duty to mitigate under the 2011 Personal Guarantee as a matter of uncontested, black letter Hong Kong law. Both

48

sides' experts agree that, under Hong Kong law, there is no duty to mitigate under that contract because it is a guarantee of a repayment of a debt.[9]  *See* R.4441 ¶10; R.4624 ¶7 (affirmation by Kwok's expert that "I agree with [PAX's expert] that the principle of mitigation does not apply to a claim for repayment of a debt where that claim is made under a loan agreement or a personal guarantee").  Kwok now concedes this point on appeal, acknowledging an "exception to the duty to mitigate that exists under Hong Kong law where the sole obligation involved is repayment of a debt." OB35.

**2013 Deed of Settlement**.  For three reasons, it is clear as a matter of law that PAX was not subject to a duty to mitigate under the 2013 Deed of Settlement either.

First, there was no duty to mitigate under the 2013 Deed of Settlement because, as a result of Kwok's failure to satisfy the conditions precedent by the extended deadline of June 30, 2015, the Deed of Settlement was null and void prior to the post-June 2015 Beijing Police contact.  Contrary to Kwok's assertion on appeal, the Deed of Settlement was never "breach[ed]" (OB33); rather, Kwok failed to satisfy the conditions precedent set forth in Clause 3.2, such that the contemplated

---

[9]    Kwok notes that the motion court, prior to being apprised of this controlling Hong Kong law, had originally stated that it would hold an evidentiary hearing on damages. *See, e.g.*, OB15 (citing Dkt. No. 647 at 4, 6-7).  Following the parties' damages briefing, however, the court correctly determined that there was no triable issue of fact and ruled on the damages issue as a matter of law.

settlement never became effective and never canceled Kwok's 2011 Personal Guarantee and the underlying debt—the 2011 Personal Guarantee, in other words, remained in effect. *See* R.2535 ¶3.4 (2013 Deed of Settlement) ("In the event that all conditions precedent set out in Clause 3.2 for all Apartments have not been satisfied by 31 July 2013 (or such later date agreed by the Parties in writing"—here, 30 June 2015, per the fourth and final supplemental Deed of Settlement)—"then the entire settlement as contemplated under this Deed shall be terminated and the Parties acknowledge that the [2011] Facility Letter shall revert and be in full force and effect immediately").

A Hong Kong court would honor this plain and unambiguous language to hold that (i) the 2013 Deed of Settlement terminated on June 30, 2015, before the purported police contact, and (ii) the 2011 Loan Facility and 2011 Personal Guarantee had reverted to be in full force and effect—that is, they were never canceled. R.1445-49 ¶¶9-18. Thus, there was never an opportunity, or obligation, to "mitigate" under the 2013 Deed of Settlement.

Kwok contends that there is a factual dispute as to the date of the Beijing police contact, but he has no evidence in support of that contention. The only documents Kwok cites that reference the purported mitigation opportunity are emails from July and August 2015—*after* the settlement had expired in June 2015. *See* R.4360-61, 4359. Kwok also points out that PAX stated in its complaint and two

witnesses testified that the Apartments were seized in February 2015 (OB33). But that is irrelevant—the purported opportunity to mitigate arose not when the Apartments were seized, but when the police supposedly offered to sell PAX the Apartments. Unsurprisingly, Kwok blatantly mischaracterizes the testimony of PAX's General Counsel, Jon Lewis. Kwok says that Mr. Lewis "testified that he learned of the mitigation opportunity in February 2015." OB32. In fact, Mr. Lewis testified that he had learned about the opportunity "[a]fter the apartments had been seized by the police, which occurred sometime in February 2015, I believe." R.4345. Mr. Lewis quite clearly testified that the seizure occurred in February 2015, and that he learned of the opportunity sometime thereafter. And Mr. Lewis also made clear that this purchase opportunity was irrelevant because "the settlement agreement has expired." R.4349. Kwok simply has no evidence that the mitigation opportunity arose before June 30, 2015.

Accordingly, the motion court correctly concluded "based on documentary evidence submitted by both parties … that the opportunity presented by the Beijing police only came up *after* June 2015 when the Deed of Settlement had already expired." R.14-15. Because there is no genuine dispute that only the 2011 Loan Facility and 2011 Personal Guarantee were in effect at the time of the purported Beijing police contact, the expired Deed of Settlement could not have imposed a duty on PAX to pursue that speculative opportunity.

Second, even *assuming* that PAX had learned of the opportunity to obtain the apartments prior to June 30, 2015 (it did not), Kwok's argument would still fail. As shown above, Kwok could not have "breached" the Deed of Settlement because it was nullified in its entirety after June 30, 2015. But he likewise could not have "breached" the Deed of Settlement by failing to satisfy the conditions precedent *before* the June 30, 2015 expiration date, since he had, as a matter of contract, *until that date* to satisfy them. *See* R.2535 ¶3.4. Thus, if the Beijing police opportunity arose prior to June 30, 2015, Kwok would not have been in breach of the 2013 Deed of Settlement, and PAX accordingly could not have been under a duty to mitigate under that contract at that time. The timing of the opportunity to purchase the Apartments from the Beijing police is thus irrelevant—either way, there could not have been a duty to mitigate.

Third, even setting all that aside, PAX could not have been subject to a duty to mitigate under 2013 Deed of Settlement for another reason: as with the 2011 Personal Guarantee, the 2013 Deed of Settlement was a guarantee of a repayment of a debt, and therefore the Hong Kong rule that there is no duty to mitigate under such contracts, *see supra* at 48-49, applies with equal force. Kwok contends that because the Deed of Settlement contemplated repayment of the debt with assets, rather than with cash, the contract does not count as a debt repayment guarantee. OB35. But that distinction is irrelevant on its face, and Kwok offers nothing to support that

52

position other than his expert's conclusory testimony, which itself does not include a single citation. *See id.* (citing R.4624¶8). Because "the construction of foreign law is a legal question," *Gusinsky v. Genger*, 74 A.D.3d 539, 540 (1st Dep't 2010), this court is free to reject that unsupported testimony and hold that the undisputed Hong Kong rule rejecting a duty to mitigate for debt-repayment contracts applies no matter how the debt is to be repaid, and thus applies to the 2013 Deed of Settlement.

## 2. Kwok Has Not Identified A Reasonable Opportunity To Mitigate

Even assuming that PAX was subject to a duty to mitigate (which it plainly was not), Kwok's mitigation argument would still fail because, as the motion court found, the possibility of purchasing the apartments from the Beijing Police did not constitute a *reasonable* opportunity to mitigate, as required under Hong Kong law. Although Kwok contends in his brief that the motion court "never ruled directly on this point" (OB33), he is wrong: the court squarely and correctly rejected Kwok's argument because a "plaintiff is only ever required to *reasonably* mitigate damages" and "[t]he proposal to purchase the apartments from the Beijing police for $17 M, when plaintiff was supposed have the apartments transferred to it for zero dollars (in satisfaction of a debt) is hardly receiving the benefit for which plaintiff had bargained." R.15. Kwok identifies no error in this determination.

Kwok does not and cannot dispute that (i) under the 2013 Deed of Settlement, PAX would have received the three apartments free of charge; (ii) to obtain the

apartments via Beijing Police assistance (if that were even possible), PAX would have had to pay a total of RMB105 million, or nearly $17 million; (iii) PAX valued the apartments at RMB 167 million (approximately $27 million), such that it would recoup about $10 million if it were able to resell them, and (iv) Kwok's outstanding debt at that time was approximately $78 million. R.4359-60, 4402 ¶¶5-6. Moreover, Hong Kong law provides that to mitigate damages, a plaintiff is "not expected to act unreasonably in incurring expense, taking on risk or other inconvenience," and is not required to "take extreme steps outside the ordinary course of business." R.3618 ¶ 17.2. No reasonable factfinder could conclude that PAX should have spent (i.e., put at risk) $17 million for a chance at receiving title to the three apartments that it was supposed to receive for free in exchange for the possibility that it might be able to later (at some unspecified time) sell them for $27 million, and thus potentially clear $10 million—or, less than 13% of the approximately $78 million Kwok owed on the debt at the time. R.4402 ¶6.

Kwok offers no Hong Kong authority to the contrary. Instead, he relies solely on New York case law, which is neither applicable nor helpful to his position. *NYCTL 1996-1 Trust v. Malihan*, 276 A.D.2d 443, 443 (1st Dep't 2000), stands only for the uncontroversial proposition that damages can be capped when some unreasonable lack of diligence on the part of the nonbreaching party amounted to a failure to mitigate, which is not true here for the reasons just explained. *Bibeau v.*

*Ward*, 228 A.D.2d 943, 946 (3d Dep't 1996), is likewise inapposite—that case involved the question whether a plaintiff could recover costs he was "required" to incur as a result of the defendant's breach and says nothing about the kind of costs that would be reasonable to expect a plaintiff to undertake in order to mitigate.

Below, Kwok relied on a third New York decision that illustrates precisely how unreasonable the supposed mitigation opportunity was in this case. *See* R.4257 (citing *Nat'l Commc'ns Ass'n, Inc. v. AT&T*, 2001 WL 99856 (S.D.N.Y. Feb. 5, 2001)). There, the plaintiff claimed nearly $22 million in lost profits that could have been wholly avoided if the plaintiff had posted a deposit that it could have secured via a "minimal" out-of-pocket expense: paying the interest rate on a credit line. *Nat'l Cmmc'ns*, 2001 WL 99856, at *2 n.1, *8. The court held that the plaintiff had failed to mitigate because, among other things, (i) obtaining such a credit line was "routine practice" for the defendant; (ii) the interest payment was "minimal"; and (iii) it was undisputed that making the deposit would have avoided entirely the $22 million in claimed damages. *Id*. at *8–9. The situation here could not be more different. PAX would have had to pay $17 million, far from a "minimal" payment; PAX's payment would have guaranteed nothing because it is anybody's guess whether PAX would ever actually have received title to the apartments or successfully resold them; buying the apartments would not have been "routine practice" for PAX; and, perhaps most importantly, instead of spending a

proportionately tiny sum to achieve a huge guaranteed reduction in damages, PAX

would have had to go further out of pocket by $17 million for the entirely speculative

possibility that it might achieve a relatively small reduction ($10 million) of Kwok's

then-$78 million debt.

For these reasons, PAX was under no duty to mitigate—let alone to pursue

the speculative Beijing police offer, which was not a "reasonable" mitigation

opportunity as a matter of law.

**B.     The Motion Court Correctly Rejected Kwok's Argument That
PAX's Possession Of Keys To The Apartments Should Have
Offset The Damages He Owes.**

Finally, Kwok suggests that PAX "received an additional benefit that should

have resulted in a set-off against its alleged damages"—namely, the keys to the

Apartments, which Kwok speculates "provided value to PAX." OB36. The motion

court correctly rejected this unsupported assertion as insufficient to create a triable

issue of fact. *See Freedman v. Chem. Constr. Corp.*, 43 N.Y.2d 260, 264 (1977)

("[C]onclusory assertions will not defeat summary judgment."). Kwok never

adduced any evidence of the actual value of PAX's possession of keys; instead, he

simply asserted below, as he does on appeal, that "such possession surely has value."

R.4259. Without any supporting evidence, Kwok was not entitled to go before a

jury on the damages issue. Moreover, mere possession of the keys to the apartments

was, in point of fact, worthless to PAX. The only value the Apartments had to PAX

was that it could likely have resold them, and what PAX needed to resell them were not keys but legal *title*.  That is what PAX negotiated for and why the Deed of Settlement expressly provided as a condition precedent that PAX must possess title.  R.2087-88.  The motion court correctly held that PAX's possession of the keys to the Apartments had no effect on the damages amount as a matter of law.

## CONCLUSION

This Court should affirm the judgment below.


Dated: October 6, 2021

Respectfully submitted,

STUART SARNOFF
EDWARD MOSS
ANTON METLITSKY
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, N.Y. 10036
(212) 326-2000

*Attorneys for Plaintiff-Respondent Pacific Alliance Asia Opportunity Fund L.P.*

## APPELLATE DIVISION – FIRST DEPARTMENT
## PRINTING SPECIFICATIONS STATEMENT

I hereby certify pursuant to 22 N.Y. C.R.R. §§ 1250.8(f), (j) that the

foregoing brief was prepared on a computer using Microsoft Word.

*Type.* A proportionally spaced typeface was used, as follows:

| | |
|---|---|
| Name of typeface: | Times New Roman |
| Point size: | 14 |
| Line spacing: | Double |

*Word Count.* The total number of words in this brief, inclusive of point

headings and footnotes and exclusive of pages containing the table of contents,

table of authorities, proof of service, and this Statement, is 13,994.

Dated:  New York, New York
         October 6, 2021

# EXHIBIT 21

FILED: APPELLATE DIVISION - 1ST DEPT 10/15/2021 02:10 PM

NYSCEF DOC. NO. 16

RECEIVED NYSCEF: 10/15/2021

2021-00740

*To be Argued by:*
MARK C. ZAUDERER
*(Time Requested: 15 Minutes)*

# New York Supreme Court

## Appellate Division—First Department

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

*Plaintiff-Respondent,*

– against –

KWOK HO WAN, a/k/a Kwok Ho, a/k/a Gwo Wen Gui, a/k/a Guo Wengui,
a/k/a Guo Wen-Gui, a/k/a Wan Gue Haoyun, a/k/a Miles Kwok, a/k/a Haoyun Guo,

*Defendant-Appellant,*

– and –

GENEVER HOLDINGS CORPORATION and GENEVER HOLDINGS LLC,

*Defendants.*

**Appellate
Case No.:
2021-00740**

## REPLY BRIEF FOR DEFENDANT-APPELLANT

GANFER SHORE LEEDS & ZAUDERER LLP
360 Lexington Avenue
New York, New York 10017
(212) 922-9250
mzauderer@ganfershore.com
imatetsky@ganfershore.com
jcohen@ganfershore.com

*Attorneys for Defendant-Appellant*

New York County Clerk's Index No. 652077/17

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

PRELIMINARY STATEMENT ............................................................1

ARGUMENT ....................................................................................2

POINT I

THE JUDGMENT SHOULD BE REVERSED BECAUSE IT WAS
BASED ON AN INCORRECT APPLICATION OF JUDICIAL
ESTOPPEL ......................................................................................2

    A.    The Elements of Judicial Estoppel Were Not Present ...............2

    B.    PAX's Judicial Admissions Theory, Which Was Not
            Adopted by the Motion Court, Lacks Merit ...............................8

    C.    PAX's "Sanctions for Perjury" Theory, Which Was
            Not Adopted by the Motion Court, Lacks Merit ......................12

    D.    PAX's Contention that It Was Entitled to Summary
            Judgment Apart from the Judicial Estoppel Ruling Is
            Meritless ...................................................................................15

POINT II

THE JUDGMENT SHOULD BE REVERSED BECAUSE THE
MOTION COURT ERRED BY REJECTING THE DEFENSE
THAT PAX FAILED TO MITIGATE ITS DAMAGES............................16

CONCLUSION ................................................................................20

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases:

*35 W. Realty Co., LLC v. Booston LLC,*
 171 A.D.3d 545 (1st Dep't 2019)..........................................................2

*Bank of N.Y. Mellon v. Gordon,*
 171 A.D.3d 197 (2d Dep't 2019)...........................................................8

*Barish v. Association of the Bar,*
 20 N.Y.2d 154 (1967)...........................................................................5

*Bernstein v. Freudman,*
 180 A.D.2d 420 (1st Dep't 1992)........................................................18

*Carr v. Caputo,*
 114 A.D.3d 62 (1st Dep't 2013)............................................................3

*CDR Créances S.A.S. v. Cohen,*
 23 N.Y.3d 307 (2014).................................................................... 13, 14

*D & L Holdings, LLC v. RCG Goldman Co. LLC,*
 287 A.D.2d 65 (1st Dep't 2001).........................................................3, 4

*Goodman v. Skanska USA Civil, Inc.,*
 169 A.D.3d 1010 (2d Dep't 2019).........................................................5

*Koch v. National Basketball Ass'n,*
 245 A.D.2d 230 (1st Dep't 1997)........................................................5, 6

*MacArthur Props. I, LLC v. Galbraith,*
 182 A.D.3d 514 (1st Dep't 2020)...........................................................3

*Matter of Daniel C.,*
 99 A.D.2d 35 (2d Dep't 1984).............................................................11

*Matter of Daniel M. G. v. Annette P.,*
 181 A.D.3d 461 (1st Dep't 2020)......................................................8, 12

*Matter of Nonhuman Rights Project, Inc. v. Breheny,*
 189 A.D.3d 583 (1st Dep't 2020), *leave to appeal granted,*
 36 N.Y.3d 912 (2021)............................................................................7

*Micro-Link, LLC v. Town of Amherst,*
 155 A.D.3d 1638 (4th Dep't 2017) .................................................... 5-6

*MPEG LA, LLC v. Samsung Elec. Co., Ltd*,
    166 A.D.3d 13 (1st Dep't 2018) ............................................................................3

*Napoli v. Bern*,
    171 A.D.3d 489 (1st Dep't 2019) .........................................................................14

*Nestor v. Britt*,
    270 A.D.2d 192 (1st Dep't 2000) ...........................................................................6

*Olszewski v. Park Terrace Gardens, Inc.*,
    18 A.D.3d 349 (1st Dep't 2005) ..............................................................................7

*Orr v. Urban American Mgmt. Corp.*,
    172 A.D.3d 512 (1st Dep't 2019) .................................................................. 4, 5, 6

*Pacific Alliance Asia Opportunity Fund v. Kwok*,
    160 A.D.3d 452 (1st Dep't 2018) ...........................................................................3

*Patmos Fifth Real Estate, Inc. v. Mazl Bldg., LLC*,
    189 A.D.3d 632 (1st Dep't 2020) .......................................................................3, 4

*Peters v. Peters*,
    146 A.D.3d 503 (1st Dep't 2017) .........................................................................14

*Rahman v. Smith*,
    40 A.D.3d 613 (2d Dep't 2007) ..............................................................................9

*Tynan Incinerator Co. v. International Fidelity Ins. Co.*,
    117 A.D.2d 796 (2d Dep't 1986) ..........................................................................18

*Wells Fargo Bank N.A. v. Webster Bus. Credit Corp.*,
    113 A.D.3d 516 (1st Dep't 2014) .......................................................................3, 4

*Zanani v. Sutton Apts. Corp.*,
    193 A.D.3d 536 (1st Dep't 2021) ...........................................................................5

## Statutes & Other Authorities:

CPLR 3123 ........................................................................................................................9

CPLR 3126 ......................................................................................................................12

## **PRELIMINARY STATEMENT**

PAX argues that Mr. Kwok should be judicially estopped because he initially prevailed in this action when the motion court granted his *forum non conveniens* motion – and thus asks the Court to disregard the critical fact that on PAX's appeal, this Court reversed that very decision below and denied Mr. Kwok's motion. As a matter of New York law, a party whose temporary win is later overturned is not the prevailing party for the application of judicial estoppel. Because the motion court's granting of summary judgment was predicated entirely on its erroneous judicial estoppel ruling, the judgment should be reversed.

Perhaps recognizing the flaws in the motion court's ruling, PAX suggests several other potential grounds for affirmance, which it admits the motion court did not discuss. PAX's alternative arguments fail. PAX's assertion that Mr. Kwok made "formal judicial admissions" that the documents were authentic is not borne out because the statements it cites – which were made not by Mr. Kwok himself, but by former counsel for this non-English-speaking litigant – are cited out of context. None of these statements was a clear, unequivocal, and definitive admission of fact – an essential characteristic of a formal judicial admission. Mr. Kwok's deposition, at which he testified that the documents did not bear his signature, was his first opportunity to speak for himself about the documents and their authenticity.

1

Nor is there a basis for this Court to simply reject Mr. Kwok's testimony as a matter of law, as PAX also suggests. Consistent with this State's policies of affording litigants due process and resolving cases on their merits, Mr. Kwok should be allowed to present his factual defenses to PAX's claims – including evidence regarding whether the documents are authentic – to the trier of fact.

Finally, even if summary judgment on the issue of liability was properly granted in PAX's favor – which it was not – then issues of fact existed on Mr. Kwok's defense that PAX failed to mitigate its damages, as required under both New York and Hong Kong law.

## ARGUMENT

## POINT I

### THE JUDGMENT SHOULD BE REVERSED BECAUSE IT WAS BASED ON AN INCORRECT APPLICATION OF JUDICIAL ESTOPPEL

### A.    The Elements of Judicial Estoppel Were Not Present

PAX concedes, as it must in the face of this Court's precedents, that judicial estoppel applies only "where the party 'obtained a favorable ruling or judgment . . . as a result' of [an allegedly] inconsistent position. (PAX Br. 9, quoting *35 W. Realty Co., LLC v. Booston LLC*, 171 A.D.3d 545, 545 (1st Dep't 2019)). Here, Mr. Kwok did not obtain a "favorable ruling or judgment" on the *forum non conveniens* issue, because after he initially prevailed before the motion court, this Court reversed the decision below, denied Mr. Kwok's motion to dismiss, and directed that this action

2

proceed in New York. *Pacific Alliance Asia Opportunity Fund v. Kwok*, 160 A.D.3d 452 (1st Dep't 2018). Nor did even the motion court's initial decision, much less this Court's reversal, make a determination on the authenticity of documents (which, contrary to PAX's assertion, did not come from Mr. Kwok's "own files").

In numerous decisions discussed in Mr. Kwok's initial Brief (*see* Kwok Br. 17-19), this Court has held that a party must have secured a judgment or other final relief in its favor through the benefit of its prior, allegedly inconsistent position, before judicial estoppel can be invoked. *See, e.g.*, *Patmos Fifth Real Estate, Inc. v. Mazl Bldg., LLC*, 189 A.D.3d 632, 633 (1st Dep't 2020); *MacArthur Props. I, LLC v. Galbraith*, 182 A.D.3d 514, 514 (1st Dep't 2020); *MPEG LA, LLC v. Samsung Elec. Co., Ltd*, 166 A.D.3d 13, 21 (1st Dep't 2018); *Wells Fargo Bank N.A. v. Webster Bus. Credit Corp.*, 113 A.D.3d 516, 516 (1st Dep't 2014); *Carr v. Caputo*, 114 A.D.3d 62, 71 (1st Dep't 2013). Here, Mr. Kwok obviously did not obtain a judgment in his favor in this action, given that this very appeal is taken from the judgment entered *against* him.

PAX argues that a party need not have obtained a judgment in order to be judicially estopped, relying on *D & L Holdings, LLC v. RCG Goldman Co. LLC*, 287 A.D.2d 65, 71 (1st Dep't 2001). While the *D & L Holdings* court held that the document by which the party gained relief need not be *labeled* as a "judgment," it reaffirmed, rather than negated, the rule that judicial estoppel applies only where "a

3

party obtains relief by maintaining one position, and later, in a different action, maintains a contrary position." *Id.* at 71-72. To the contrary, judicial estoppel was applied in that case only because "D & L actually achieved the relief it sought" from the court in the earlier proceeding. *Id.* at 72.

As this Court has explained, to be estopped, a party must "prevail" and obtain a favorable ruling in the litigation by virtue of its alleged prior position. *See, e.g., Patmos*, 189 A.D.3d at 633 ("The claim was not barred by judicial estoppel given that, even if contradictory, none of defendants' prior positions prevailed."); *Wells Fargo*, 113 A.D.3d at 516 (1st Dep't 2014) ("As plaintiffs did not prevail on their contractual indemnification claim, the doctrine of judicial estoppel does not apply."). Here, PAX advances the remarkable argument that Mr. Kwok prevailed in obtaining a favorable ruling on *forum non conveniens* because the motion court initially granted his motion to dismiss – even though this Court, on PAX's appeal from that ruling, reversed the decision below and denied Mr. Kwok's motion.

PAX's position – that a party is deemed to have prevailed on an issue even when an initial ruling in his favor is later reversed – is squarely at odds with recent decisions by this Court explaining what "prevailing" and obtaining a "favorable ruling" mean. This Court's decision in *Orr v. Urban American Mgmt. Corp.*, 172 A.D.3d 512 (1st Dep't 2019), is directly on point. In that case, a party initially was granted relief in a bankruptcy proceeding, but the Bankruptcy Court later reopened

4

the case, thus negating that relief. This Court ruled that after that change, the

Bankruptcy Court's initial ruling could not be the basis for a judicial estoppel:

> The reopening of Kartsanis's bankruptcy case renders the doctrine of judicial estoppel inapplicable as it "nullif[ied] the final determination upon which . . . judicial estoppel could be predicated."

*Id.* at 512 (quoting *Goodman v. Skanska USA Civil, Inc*. 169 A.D.3d 1010, 1013 (2d

Dep't 2019); *Koch v. National Basketball Ass'n*, 245 A.D.2d 230, 230-31 (1st Dep't

1997)).

PAX contends that cases such as *Goodman* are limited to the bankruptcy

context, but suggests no reason that would support any such limitation. PAX argues

that "the reopening of a bankruptcy proceeding by the bankruptcy court 'nullif[ies]

the final determination upon which . . . judicial estoppel could be predicated.'"

(PAX Br. 33 (quoting *Goodman*)). But precisely the same is true in this case: When

this Court reversed the motion court's granting of Mr. Kwok's *forum non conveniens*

motion and denied the motion, it "nullif[ied]" the prior determination in Mr. Kwok's

favor and thereby negated it as a potential predicate for judicial estoppel. *Cf. Barish*

*v. Association of the Bar*, 20 N.Y.2d 154, 158 (1967) ("reversal of a conviction . . .

nullifies it as if it had never been"); *Zanani v. Sutton Apts. Corp.*, 193 A.D.3d 536,

538 (1st Dep't 2021) (where decision in defendant's favor was reversed, award of

attorneys' fees to defendant under a prevailing-party clause "must likewise be

reversed, since the [defendant] is, at this juncture, not the prevailing party"); *Micro-*

*Link, LLC v. Town of Amherst*, 155 A.D.3d 1638, 1640 (4th Dep't 2017) ("'where a court has vacated an earlier order, the doctrine of . . . law of the case no longer applies. . . .  Indeed, 'a vacated judgment has no preclusive force either as a matter of collateral or direct estoppel or as a matter of law of the case.") (citations omitted).

As discussed in our initial Brief, the motion court's and PAX's reliance on *Nestor v. Britt*, 270 A.D.2d 192 (1st Dep't 2000), is misplaced.  (*See* Kwok Br. 21-22).  That decision did not even mention, let alone apply, the "prevailing party" or "favorable ruling" requirement for judicial estoppel; it cannot reasonably be read as overriding decades of this Court's precedents, both before and after *Nestor*, recognizing that requirement.   And PAX's interpretation of *Nestor* cannot be reconciled with this Court's decisions in *Orr* and *Koch*, both of which held that a subsequent litigation development precludes the application of judicial estoppel where it "nullif[ies] the final determination upon which . . . judicial estoppel could be predicated."  *Orr*, 172 A.D.3d at 512; *Koch*, 245 A.D.2d at 231.

Finally, the motion court's judicial estoppel ruling was inconsistent with this Court's holding that judicial estoppel applies only in the context of two or more separate actions or proceedings, while this case involves only a single action.  As discussed in our initial Brief, this Court has squarely held that judicial estoppel requires two successive actions:

6

We also reject the employer's argument that the owners are judicially estopped from arguing that plaintiff did not sustain a grave injury. The doctrine of judicial estoppel does not apply here because first, the verdict against the owners cannot be considered a ruling in their favor, and second, the inconsistent positions are being asserted in the same action.

*Olszewski v. Park Terrace Gardens, Inc*., 18 A.D.3d 349, 350-51 (1st Dep't 2005).

Contrary to PAX's urging, this Court's clearly stated holding that "judicial estoppel does not apply . . . [where the allegedly] inconsistent positions are being asserted in the same action" (*id.*) cannot be disregarded as mere dictum.  Where the Court provides two bases for deciding an issue, both within the same sentence of its opinion, there is no basis for a litigant such as PAX to elevate one as the holding of the case while demoting the other to *obiter* status.  *Cf. Matter of Nonhuman Rights Project, Inc. v. Breheny*, 189 A.D.3d 583, 583 (1st Dep't 2020) ("We decline to overrule any of our alternative holdings in *Lavery*, which petitioner erroneously refers to as 'dicta."), *leave to appeal granted*, 36 N.Y.3d 912 (2021).  Moreover, even assuming *arguendo* that judicial estoppel could sometimes arise from inconsistent positions taken within the same action – despite this Court's direct holding to the contrary in *Olszewski* – it still could not apply against Mr. Kwok, because as discussed above, his position on the *forum non conveniens* motion did not prevail even within the context of this action.

7

The motion court's granting of summary judgment on liability was based entirely on its judicial estoppel decision. Because that decision was erroneous, the judgment should be reversed.

## B.    PAX's Judicial Admissions Theory, Which Was Not Adopted by the Motion Court, Lacks Merit

Urging alternative grounds to uphold its precipitously awarded judgment without any determinations on the merits, PAX also contends that Mr. Kwok made binding "formal judicial admissions" that the documents were authentic. As PAX itself acknowledges (PAX Br. 36), the motion court did not address or rely on Mr. Kwok's supposed "admissions" as a basis for its rulings, either orally or in its written decisions. In this case, this Court should not exercise its discretion to consider in the first instance arguments that the motion court did not reach or address.

Alternatively, if this Court chooses to consider PAX's alternative contentions, it should reject them. "To constitute a judicial admission, a statement must be 'deliberate, clear, and unequivocal.'" *Bank of N.Y. Mellon v. Gordon*, 171 A.D.3d 197, 211 (2d Dep't 2019) (citation omitted); *accord Matter of Daniel M. G. v. Annette P.*, 181 A.D.3d 461, 463 (1st Dep't 2020) (statement could not be considered a formal judicial admission where it "was not sufficiently conclusive or unequivocal to quality" as such). Even PAX acknowledges that "[t]o be considered a formal judicial admission, a statement "must be one of fact," "must be deliberate, clear, and unequivocal," and must be "made with sufficient formality and conclusiveness."

8

(PAX Br. 36-37, quoting *Rahman v. Smith*, 40 A.D.3d 613, 615 (2d Dep't 2007)). The so-called admissions cited by PAX do not meet this standard.

PAX relies primarily upon two alleged admissions, both of which were supposedly made by Mr. Kwok's former counsel. Notably, these "admissions" were not contained in Mr. Kwok's deposition testimony, in which he clearly testified that the documents did not bear his genuine signature, or in any writing signed by Mr. Kwok himself. First, PAX asserts that Mr. Kwok admitted the documents' authenticity in responding to a set of requests for admissions. He did not. PAX's voluminous requests for admissions ("RFAs") (*see* R411-99) included requests that Mr. Kwok admit having executed various documents. However, PAX did not annex those documents as exhibits to its requests for admission. (*Id.*). As a result, neither Mr. Kwok nor anyone on his behalf had the opportunity to review the specific documents at issue, as required by CPLR 3123.

Mr. Kwok's lawyers' responses to the RFAs included a general objection to the RFAs in their entirety as well as specific objections that Mr. Kwok was being asked to stipulate to the authenticity of documents that were not attached. (R411-78; *see, e.g.,* Responses to Request Nos. 10, 13, 19, 30, 37, 44, and 51). Thus, Mr. Kwok did not admit the authenticity of any specific document, much less did he do so conclusively or unequivocally. How could he have done that, when no specific documents were presented for anyone to review? After receiving the responses and

objections submitted by Mr. Kwok's then-counsel, PAX advised counsel that PAX would respond "shortly" in order to address his counsel's objections. But PAX never did so, and it never mentioned the so-called "admissions" again until it filed its sanctions motion.

The second document that PAX mischaracterizes as an "admission" was a cover letter to an exhibit list. (*See* NYSCEF Doc. 325). This document was created after the motion court had scheduled an evidentiary hearing on a motion by PAX to attach a New York apartment that it alleged belonged to Mr. Kwok. In advance of that hearing, the parties, through their counsel, entered into a formal stipulation designed to limit the scope of that specific hearing – not, of course, of the entire action – to the attachment-related issues. (NYSCEF Doc. 306). Thus, the parties stipulated that for purposes of the specific evidentiary hearing on the attachment, the court could assume that PAX had a cause of action against Mr. Kwok and a likelihood of success, so that PAX need not prove these elements at the hearing. (*Id.* at 3). The stipulation emphasized that it addressed only the proof that PAX must present at this particular hearing and that PAX was "not relieved of its obligation to prove the merits of each of its claims in order to obtain a final judgment." (*Id.*).

The parties then prepared for the evidentiary hearing on the attachment. The motion court's practice rules required that in advance of the hearing, the parties submit exhibit lists, noting whether the admissibility of the exhibits was stipulated

or disputed.  On April 19, 2019, PAX's counsel submitted a cover letter to the motion court, "writ[ing] jointly under Practice Rule 28 for Part 61 . . . to provide the Court with the . . . materials ahead of the April 26, 2019 evidentiary hearing on Plaintiff's attachment motion" and stating in that context only that, *inter alia,* Mr. Kwok was not disputing the authenticity of PAX's exhibits (NYSCEF Doc. 325 at 1).

Both the April 3, 2019 stipulation and the April 19, 2019 cover letter reflected the parties' efforts, through their counsel, to focus the upcoming evidentiary hearing on the attachment motion solely on attachment-related issues, it being understood that "full merits discovery [would] be held" later in the case.  (NYSCEF Doc. 306 at 3).  The statements in both documents plainly related solely to the admissibility of the listed exhibits for purposes of the impending attachment hearing.  Mr. Kwok did not thereby admit in this cover letter that the exhibits were authentic for purposes of the subsequent merits proceedings, any more than he stipulated to the exhibits' admissibility at a merits trial or that he would not offer any exhibits of his own at that trial.  *Matter of Daniel C.*, 99 A.D.2d 35 (2d Dep't 1984), cited by PAX, is readily distinguishable, because in that case counsel's stipulation concerning the scope of the issues was made on the record at the trial on the merits, at which the represented party was present in court and testified under oath – not, as here, in a letter submitted in advance of a hearing on an ancillary procedural issue and submitted for purposes of that hearing.

11

A litigant whose counsel entered into a stipulation governing a motion hearing should not be penalized by having the limited-purpose stipulation thrown in his face for a completely different purpose later in the case, and certainly not to the extent of having his main defense vitiated. This Court ought not conclude on the record before it that this cover letter, not signed by Mr. Kwok or even by his counsel, was "sufficiently conclusive or unequivocal to qualify" as a binding judicial admission on Mr. Kwok's behalf. *Matter of Daniel M. G.*, 181 A.D.3d at 463.

This is not a situation in which a party testifies as his or her deposition that "the light was green" and then later submits an affidavit stating "the light was red." Here, Mr. Kwok's first opportunity to speak for himself, when shown the documents at issue, and to address whether they were authentic, was at his deposition. It is undisputed that during his deposition, Mr. Kwok clearly, definitely, and unequivocally stated that his signatures on the documents were *not* authentic. (*See* Kwok Br. 6-7). This Court should not reach out on a theory that the motion court neither discussed nor adopted in order to reject the most reliable evidence of Mr. Kwok's knowledge on a disputed issue of fact: his own deposition testimony.

**C.    PAX's "Sanctions for Perjury" Theory, Which Was Not Adopted by the Motion Court, Lacks Merit**

PAX also suggests that this Court itself grant sanctions against Mr. Kwok. PAX is not seeking sanctions under CPLR 3126 for discovery misconduct, such as failure to provide adequate document discovery or to appear for a deposition.

12

Rather, PAX asks the Court to "preclude[e] Kwok from relying on his testimony as to forgery" because PAX says it does not believe the testimony. (PAX Br. 45). There is no basis for such a sanction.

The type of sanction sought by PAX is rarely sought and even more rarely granted. In *CDR Créances S.A.S. v. Cohen*, 23 N.Y.3d 307 (2014), cited by PAX, the Court of Appeals held that courts have inherent power to impose sanctions for conduct that "undermine the truth-seeking function of the judicial system and place in question the integrity of the courts and our system of justice." *Id.* at 318. But before imposing a sanction on this basis, the moving party "must establish by clear and convincing evidence that the offending 'party has acted knowingly in an attempt to hinder the fact finder's fair adjudication of the case and his adversary's defense of the action." *Id.* at 320. The Court of Appeals emphasized that case-terminating sanctions such as dismissal are "an extreme remedy that 'must be exercised with restraint and discretion,'" and only "where the conduct is particularly egregious, characterized by lies and fabrications in furtherance of a scheme designed to conceal critical matters from the court and the nonoffending party; where the conduct is perpetrated repeatedly and wilfully, and established by clear and convincing evidence". *Id.* at 321 (citation omitted). It is only "the rare case" that could warrant such a sanction, and a court's basis for imposing it should be explained. *Id.* at 322.

In *C.D.R. Créances* itself, the Court of Appeals affirmed the striking of pleadings as a sanction where, *inter alia*, there was testimony that defendants had instructed and conspired with witnesses that they provide false and misleading testimony, including providing them with a written "script" of false answers to be given at depositions; defendants "created fictitious characters" who were the subject of testimony; multiple individuals "repeatedly perjured themselves at their depositions"; and defendants had been criminally convicted for conduct at issue in the litigation. *Id.* at 316-18.

This case, in which the defendant testified that certain documents were inauthentic at his first opportunity to do so, cannot reasonably be analogized to *C.D.R. Créances.* A request that a party "should forfeit his [defenses]" in an action should be denied where it "is unsupported by clear and convincing evidence that [he] engaged in a willful and pervasive scheme to defraud the court that prejudiced [PAX's] ability to [litigate its] claims." *Napoli v. Bern*, 171 A.D.3d 489, 490 (1st Dep't 2019); *see also Peters v. Peters*, 146 A.D.3d 503, 504 (1st Dep't 2017) ("Plaintiff failed to show by clear and convincing evidence that defendants' alleged misstatements were particularly egregious and characterized by lies in furtherance of a scheme designed to conceal critical matters from the court."). To the extent PAX believes there is evidence that contradicts Mr. Kwok's version of the facts, its

14

remedy is the one enjoyed by any litigant who disagrees with its adversary's case: to present its evidence to the trier of fact.

### D.    PAX's Contention that It Was Entitled to Summary Judgment Apart from the Judicial Estoppel Ruling Is Meritless

As the last of its alternative arguments for affirmance, PAX asserts that even if the motion court's order barring Mr. Kwok from disputing the documents' authenticity is overturned, summary judgment was still properly granted because in opposition to PAX's motion, Mr. Kwok did not present evidence or arguments to establish that the documents were forged. (PAX Br. 45-47).

This argument by PAX completely ignores the effect of the preclusion order that the motion court granted at PAX's request; the foundation for summary judgment was that very preclusion order. Purportedly as a sanction, the motion court directed that Mr. Kwok was "judicially estopped from challenging, in opposition to plaintiff's summary judgment motion or at trial, the authenticity of documents defendant Kwok previously sponsored in proceedings before this Court." (R59).

In opposing PAX's summary judgment motion, Mr. Kwok and his counsel were bound by the motion court's directive that they were "judicially estopped from challenging" the authenticity of the documents "in opposition to plaintiff's summary judgment motion". (R59). As part of their opposition papers, Mr. Kwok moved to reargue the judicial estoppel ruling, but the motion court denied that request. (R52-54). Unless and until the motion court's preclusion order was reversed, either by the

15

motion court itself or by this Court, Mr. Kwok was bound by it, as he noted in his

opposition papers.  (*See* R3213 n.1, R3231 n.1, R3256 n.1).  Therefore, he was

barred by court order from disputing the authenticity of the documents, nor could he

request an evidentiary hearing on that issue, as PAX also argues he should have

done.  (*See* PAX Br. 46-47).  It is at best ironic, and at worst disingenuous, for PAX

to fault Mr. Kwok for not challenging the authenticity of the documents in its

summary judgment papers.  That is the very thing that PAX had successfully

convinced the motion court to preclude Mr. Kwok from doing.

## POINT II

### THE JUDGMENT SHOULD BE REVERSED BECAUSE THE MOTION COURT ERRED BY REJECTING THE DEFENSE THAT PAX FAILED TO MITIGATE ITS DAMAGES

The judgment should also be reversed because the motion court improperly

rejected, as a matter of law, Mr. Kwok's defense that PAX failed to mitigate its

alleged damages.  The motion court did so without conducting an evidentiary

hearing or trial, just two months after it had specifically stated on the record that

"[w]e are going to have a hearing on the damages issue" and that Mr. Kwok would

"be permitted to adduce whatever evidence they have [*sic*], if any, on that theory in

connection with the damages hearing."  (NYSCEF Doc. 647 at 6).

PAX does not dispute on appeal that plaintiffs in contract actions are generally

required to mitigate their damages, rather than seek to collect for losses that they

could have avoided, under both Hong Kong and New York law.  Instead, PAX
asserts that there could be no duty to mitigate under the alleged 2013 Deed of
Settlement because that document had expired "prior to the post-June 2015 Beijing
Police contact."  (PAX Br. 49).  However, PAX acknowledges that it learned of this
opportunity after the apartments were seized by the Beijing Police, which admittedly
occurred in February 2015.  (PAX Br. 51).  An issue of fact exists as to how long
afterwards PAX learned of the opportunity, and whether this occurred by June 30,
2015, *i.e.*, within a period of four or five months after the seizures.

PAX also argues that it had no duty to mitigate because the 2013 Deed of
Settlement did not obligate Mr. Kwok to cause the apartments to be turned over to
PAX, but merely allowed him to do so as an alternative means of performance to
payment of the moneys owed under the guarantee.  (PAX Br. 51-52).  However, as
discussed in our initial Brief, PAX had agreed that delivery of the three apartments
to it would represent an acceptable alternative performance in lieu of payment of the
moneys allegedly owed under Mr. Kwok's guarantee.  Mr. Kwok's Hong Kong law
expert opined that Hong Kong law would require a reasonable effort to mitigate
under these circumstances (*see* R4355-58, R4623-26), and PAX supplies no contrary
authority under the law of either jurisdiction.  In particular, Mr. Kwok's Hong Kong
law expert explained, with citations of authority, that the duty to mitigate applies "to
situations, such as the one presented here, where the parties have entered into a

17

subsequent agreement to settle the debt which involves alternative forms of repayment, such as the sale and purchase of property." (R4624). As Mr. Kwok's Hong Kong law expert observed, PAX's expert cited no authority in favor of PAX's contention that the duty to mitigate is inapplicable in this context. (*See* R4624-25). In the absence of such authority, the general rule under Hong Kong law (as under New York law) that a party must mitigate would apply.

PAX disputes whether the Beijing Police offer represented a "reasonable" opportunity to mitigate. Under Hong Kong law, "[w]hether or not a party has taken all reasonable steps to mitigate its loss is primarily a question of fact, not law." (R4356 and R4627, citing authorities). "What constitutes 'reasonable steps' for PAX to have taken must be considered and determined by the trier of fact in consideration of all the surrounding circumstances." (R4627). Under New York law also, "[t]he question of whether that party acted reasonably to mitigate its damages is a question of fact." *Tynan Incinerator Co. v. International Fidelity Ins. Co.*, 117 A.D.2d 796, 797 (2d Dep't 1986) (citations omitted); *accord Bernstein v. Freudman*, 180 A.D.2d 420, 421 (1st Dep't 1992). The motion court did not rule directly on this question, which could not properly be resolved as a matter of law, especially given the evidence that PAX viewed the police offer as representing "a good price" (R4360), "less than the market price" (R4348), and a "positive movement" from PAX's point of view (R4361). If PAX had accepted the Beijing

Police offer, and thereby mitigated its damages by accepting a performance that it had agreed would discharge Mr. Kwok's alleged guarantee, then it could then have asserted a claim for its expenses incurred during the mitigation process.

As noted in our initial Brief, PAX's pursuing and accepting the police offer would not only have substantially reduced the principal amount claimed by PAX, either altogether or at least by tens of millions of dollars, but it also would have reduced PAX's claim for several years' worth of 15% annual interest on that sum, which now represents more than half of the judgment.  Instead, PAX chose to litigate against Mr. Kwok, perhaps in pursuit of its animus against him and desire to enforce the alleged personal guarantee for "the sheer satisfaction it would create."  (R4579).

Finally, PAX belittles Mr. Kwok's argument that its receipt of possession of the three apartments resulted in value to PAX that should have been offset against the amount of any judgment, to be determined at trial.  PAX argues that full performance under the alleged Deed of Settlement required the conveyance of title to PAX, not only possession.  Even if PAX's possession of the three apartments did not represent as much value as the conveyance of title would have, it must necessarily have had *some* value.  The motion court erred by holding that as a matter of law it had no value at all.

19

## **CONCLUSION**

For all the foregoing reasons, the judgment should be reversed.

Dated:  New York, New York
            October 15, 2021

GANFER SHORE LEEDS & ZAUDERER LLP

By:  _Mark C. Zauderer_
        Mark C. Zauderer
        Ira Brad Matetsky
        Jason T. Cohen
360 Lexington Avenue
New York, New York 10017
(212) 412-9500
mzauderer@ganfershore.com
*Attorneys for Defendant-Appellant,*
  *Kwok Ho Wan a/k/a Miles Kwok*

## PRINTING SPECIFICATIONS STATEMENT

I hereby certify pursuant to 22 NYCRR 1250.8(j) that the foregoing brief was prepared on a computer using Microsoft Word.

*Type.* A proportionally spaced typeface was used, as follows:

|  |  |
|---|---|
| Name of typeface: | Times New Roman |
| Point size: | 14 |
| Line spacing: | Double |

*Word Count.* The total number of words in this brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, table of citations, proof of service and this Statement is 4,802.

Dated: October 15, 2021

# EXHIBIT 22

# SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY

| PRESENT: | HON. BARRY R. OSTRAGER | PART | IAS MOTION 61EFM |
|---|---|---|---|
| | *Justice* | | |

--------------------------------------------------------------------------------X

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

Plaintiff,

- v -

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO, GENEVER HOLDINGS LLC, and GENEVER HOLDINGS CORPORATION,

Defendants.

--------------------------------------------------------------------------------X

| INDEX NO. | 652077/2017 |
|---|---|
| MOTION DATE | |
| MOTION SEQ. NO. | 011 |

**DECISION + ORDER ON MOTION**

HON. BARRY R. OSTRAGER

On September 30, 2020, the Court held oral argument via Skype, with counsel for all parties. On consent, the Court entered a temporary restraining order restraining Mr. Kwok from making or causing any sale, assignment, transfer, or interference with any property in which he has an interest, or from paying over or otherwise disposing of any debt now due or thereafter coming due to him subject to the exceptions set forth in CPLR 5222 and in the ordinary course.

The Court will hear further argument, and if necessary, conduct an evidentiary hearing, on October 15, 2020 at 10:00 am via Microsoft Teams. Defendants must file their opposition to Motion 011 by October 13, 2020 at 4:00 pm. Plaintiff must file their reply, if any, by October 14, 2020 at 4:00 pm. If either party intends to call witnesses, they must exchange witness lists with one another and e-file a witness list with the Court no later than October 13, 2020.

Additionally, the Court will hear oral argument on Plaintiff's Motion 008 for damages and attorney's fees on October 15, 2020 at 10:00 am via Microsoft Teams. Defendants must file

their opposition to Motion 011 by October 13, 2020 at 4:00 pm and Plaintiff must file their reply,

if any, by October 14, 2020 at 4:00 pm.

Any violation of the temporary restraining order issued today shall be considered

criminal contempt.

Dated: September 30, 2020

*Barry Ostrager*

BARRY R. OSTRAGER, J.S.C.

| CHECK ONE: | | [ ] CASE DISPOSED | | [X] NON-FINAL DISPOSITION | |
|---|---|---|---|---|---|
| | | [ ] GRANTED | [ ] DENIED | [ ] GRANTED IN PART | [X] OTHER |
| APPLICATION: | | [ ] SETTLE ORDER | | [ ] SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | [ ] INCLUDES TRANSFER/REASSIGN | | [ ] FIDUCIARY APPOINTMENT | [ ] REFERENCE |

2

# EXHIBIT 23

# SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY

PRESENT: **HON. BARRY R. OSTRAGER**          PART          **IAS MOTION 61EFM**

*Justice*

-------------------------------------------------------------------------X

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

|  |  |
|---|---|
| **INDEX NO.** | 652077/2017 |
| **MOTION DATE** | |
| **MOTION SEQ. NO.** | 011 |

Plaintiff,

- v -

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO, GENEVER HOLDINGS LLC, and GENEVER HOLDINGS CORPORATION,

Defendants.

**DECISION + ORDER ON MOTION**

-------------------------------------------------------------------------X

HON. BARRY R. OSTRAGER

On October 15, 2020, the Court held oral argument via Microsoft Teams, with counsel for all parties participating, on plaintiff's motion for a post-judgment restraining order pursuant to CPLR 5229 (motion 011). On September 15, 2020, the Court granted summary judgment in favor of plaintiff on liability, with damages and the issue of whether the corporate defendants are defendant Kwok's alter egos to be determined at a later date. NYSCEF Doc. 549.

Plaintiff's motion for a restraining order pursuant to CPLR 5229 is granted. Mr. Kwok is restrained from making or causing any sale, assignment, transfer, or interference with any property in which he has an interest, whether directly or indirectly, and from paying over or otherwise disposing of any debt now due or thereafter coming due to him subject to the exceptions set forth in CPLR 5222, in accordance with the proceedings on the record of October 15, 2020.

Specifically, Mr. Kwok and/or the registered owners of (1) the Residence at the Sherry-Netherland Hotel and (2) the yacht, "the Lady May" are restrained from making or causing any sale, assignment, transfer, or interference with those assets.

Plaintiff is entitled, under CPLR 5229, to take discovery into the above-identified assets as well as to seek discovery into any other assets that Mr. Kwok may own, whether directly or indirectly.

The next appearance will be a pre-trial conference on November 12, 2020 at 2:00 pm via Microsoft Teams.

_____
October 15, 2020
**DATE**

*[signature]*

BARRY R. OSTRAGER, J.S.C.

| CHECK ONE: | | CASE DISPOSED | | X | NON-FINAL DISPOSITION | |
| --- | --- | --- | --- | --- | --- | --- |
| | X | GRANTED | DENIED | | GRANTED IN PART | OTHER |
| APPLICATION: | | SETTLE ORDER | | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | REFERENCE |

2

# EXHIBIT 24

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

-------------------------------------------------------------x

ACE DECADE HOLDINGS LIMITED,      :

      :

      Plaintiff,      :  Index No. 653316/2015 (Bransten, J.)

      :

      -v.-      :  Motion Sequence No. 001

      :

UBS AG,      :

      :

      Defendant.      :

-------------------------------------------------------------x

### AFFIDAVIT OF KWOK HO WAN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

KWOK HO WAN being duly sworn, hereby deposes and says:

1.      I am the employer of Yong Yu, the Director and sole shareholder of Ace Decade Holdings Limited ("Ace Decade").

2.      I make this Affidavit based upon my personal knowledge.

3.      I first began having discussions with UBS AG ("UBS") about potential investments in 2010.  I have been a client of UBS since July 2012.

4.      My main contact person at UBS has been Stephen Wong, who is a Managing Director of the Wealth Management and Swiss Bank Department at UBS.

5.      I met Mr. Wong in May 2010.  Since that time, Mr. Wong has advised me on numerous matters relating to investments and financing on projects such as aircraft acquisitions.  Over the years, I have depended and relied upon Mr. Wong's and UBS's knowledge and expertise in making investment and financing decisions.

6.      In addition, I have had an account at UBS since July 2012 for an investment vehicle that I control.  Since then, I have opened other accounts at UBS for two other investment vehicles that I control and have obtained financing from UBS for two airplanes.

7.      In early to mid-2014, I began discussions with UBS regarding an investment opportunity (the "Investment") in an upcoming placement of H-shares (the "Shares") of Haitong Securities Co., Ltd. ("Haitong").

8.      From 2014, when I first began discussions with UBS, to May 13, 2015, when Ms. Yu and I authorized the final payment of HK $2 billion (approximately US $260 million) to enter into this Investment, Mr. Wong and I communicated frequently through telephone calls, in-person meetings, and electronic messages.  Throughout this period, including after January 9, 2015 when I moved to New York, Mr. Wong made numerous misrepresentations, which I relied upon in deciding to make this Investment.

9.      UBS was a joint global coordinator and placement agent for the Shares, and held itself out as knowledgeable and experienced in providing advice on this Investment.

10.     At the outset, Mr. Wong assured me that if UBS got my business, it would protect my interests and provide the best possible terms for a loan to finance part of the Investment. Mr. Wong told me that because of the size of the Investment that I was planning to make, senior executives from UBS globally would participate in structuring the deal.  Mr. Wong told me that he would serve as my personal contact and as UBS's representative throughout the Investment but that he would be acting under the instructions of senior executives from UBS offices in the United States, Switzerland, England, and Hong Kong.

11.     Based on these representations that senior executives at UBS globally would be involved in structuring and overseeing this Investment and that UBS would act in my best interests, I entrusted UBS to act as my advisor for the Investment.

12.     I have read Mr. Wong's affirmation submitted in support of UBS's motion to dismiss Ace Decade's complaint.  In it, he affirmed under penalty of perjury that "[t]he first time I heard of Ace Decade was when I learned of this lawsuit in October 2015." (Affirmation of Stephen Wong ¶ 3.)  I was astonished when I read this statement because it is false.  To the contrary, Mr. Wong and UBS not only had previously heard of Ace Decade, but also they were the ones who advised me on which of my employees to appoint as sole shareholder and Director of Ace Decade, to utilize Ace Decade to enter into a side agreement with an intermediary entity that would hold legal title to the Shares, and how best to transfer the funds necessary for the Investment from one of my UBS accounts to the Ace Decade account.  In sum, Mr. Wong and UBS knew that the ultimate investor in the Investment was Ace Decade.

13.     UBS advised that because the planned Investment comprised greater than 5% of the outstanding H-shares of Haitong, if I invested through Ace Decade directly, applicable disclosure requirements would require certain filings.

14.     UBS advised that if I invested through an intermediary entity, with the intermediary entity holding legal title to the Shares, no such disclosure would be required.

15.     UBS recommended that I select Haixia Huifu Asset Investment and Fund Management Co., Ltd. ("Haixia") as the intermediary for the Investment.  UBS said that it recommended Haixia because Haixia was best qualified to act for Ace Decade.  UBS further stated that Haixia was independent of UBS and would protect my and Ace Decade's interests. Relying on these representations, I selected Haixia as the intermediary for the Investment.

16.     At no time did UBS disclose that Haixia was controlled by its joint venture partner, State Development & Investment Corp. ("SDIC").  Nor did UBS disclose that Lu Bo, who served as the principal contact between UBS and Haixia, was previously the CFO of the joint venture between UBS and SDIC.  I did not become aware of Haixia's close relationship with UBS until July 21, 2015 (after Ace Decade had made the Investment and after UBS had liquidated the Shares), when Mr. Wong disclosed that relationship during a telephone call, which I took from my office in New York.

17.     Mr. Wong initially said that if we chose Haixia as the intermediary to make the Investment, we would not need to undergo Haixia's Know Your Customer ("KYC") process. However, he later said that we needed to prepare some paperwork to undergo a background examination for Haixia, but he did not explain if this paperwork was for Haixia's KYC process. Mr. Wong asked to review the resumes of some of my employees to assess whose background would most likely satisfy Haixia's requirements so that such employee could be appointed as the Director and sole shareholder of Ace Decade.  He reviewed these resumes and advised that Ms. Yu's resume and background was best suited to satisfy Haixia's requirements and thus, that I should appoint Ms. Yu as the Director and sole shareholder of Ace Decade.  Mr. Wong said that he would provide comments on Ms. Yu's resume and asked her to send it to him.  (*See* Ace Decade Exhibits 3 and 4.)

18.     Mr. Wong subsequently gave comments on Ms. Yu's resume to make it more likely to satisfy Haixia's requirements.

19.     Mr. Wong and I also discussed on multiple occasions potential financing for the Investment.  Mr. Wong stated that Ace Decade should obtain financing for part of the Investment

through UBS rather than another bank because UBS would handle the financing on the most favorable terms to Ace Decade.

20.    During discussions about the loan financing, I told Mr. Wong that Ace Decade would not make the Investment unless the loan documents did not include any provisions that would permit UBS to demand repayment of the loan (a "margin call") based on short term price fluctuations of the Shares and unless UBS represented that it would provide Ace Decade with adequate time (for example, five business days to pay the first 25%, 10 business days to pay the second 25%, and 20 business days to pay the remaining 50%) to meet any margin calls.

21.    Mr. Wong stated on more than one occasion in 2014 that the loan financing documents would be consistent with my requirements, specifically that there was no repayment or margin call trigger based on short term price fluctuations.

22.    Mr. Wong also stated on several occasions in 2014 and 2015 that UBS would work with Ace Decade to allow it to meet any margin calls and UBS would not sell any of the Shares as a result of any margin call without giving Ace Decade adequate time.

23.    Mr. Wong also stated numerous times in 2014 and 2015 that UBS had made a loan to a large shareholder of Ping An Insurance Group ("Ping An").  Mr. Wong explained that the Ping An shareholder's loan was substantially larger than Ace Decade's, but that UBS had never sold off any of the shares owned by that shareholder following a margin call.  Mr. Wong stated that when a margin call had been triggered, UBS had worked with the Ping An shareholder to resolve the situation without selling any of his shares.  Mr. Wong said repeatedly that UBS would give Ace Decade the same treatment as it gave to the Ping An shareholder and would work cooperatively to allow Ace Decade to meet any margin calls but in any event would not sell the Shares following a margin call without giving Ace Decade adequate time.

24.     Throughout our discussions about the Investment, Mr. Wong repeatedly stated that I could trust him and UBS, and that he and UBS were always working in my best interests.

25.     On December 14, 2014, while discussing the Investment, Mr. Wong told me in a message on WhatsApp (a mobile messaging application for smart phones): "Once I've promised General Manager Guo, I'll definitely make utmost efforts; I'm only hoping General Manager Guo will trust me." Later that day, he told me in another message: "I have no reason not to strive for the best for General Manager Guo!" (General Manager Guo is what Mr. Wong called me.)

26.     Also on December 14, 2014, Mr. Wong left me a voice message, stating that during the negotiations over the Investment "General Manager Guo's interests must be guaranteed," and that he had involved top UBS management from offices around the world to assist.

27.     On December 15, 2014, Mr. Wong left me a voice message stating that he was working on the terms of the Investment in order to "protect [me]."

28.     On December 19, 2014, Mr. Wong left me a voice message stating: "General Manager Guo, you can rest absolutely assured, and I will completely protect your interests."

29.     As a result, I believed that Mr. Wong and UBS were acting in Ace Decade's best interests and I trusted that the representations Mr. Wong made about the loan financing documents were true and that UBS would not sell the Shares without working with Ace Decade to allow it to meet any margin calls.

30.     On January 9, 2015, while I was still negotiating the terms of the Investment with UBS, I moved to New York with Ms. Yu and other employees with the intention of expanding my business projects to New York and to find investors interested in investing in Ace Decade.

31.     I first discussed this plan to move to New York to find investors for Ace Decade

with Mr. Wong in December 2014.  I subsequently had multiple discussions with Mr. Wong

about finding investors for Ace Decade by telephone from New York in March, May, and June

2015.

32.     On February 9, 2015, Ace Decade signed a Memorandum of Understanding

(the "MOU"), governed by U.S. law, with China Golden Spring Group (Hong Kong) Limited

("Golden Spring Hong Kong").  The MOU provided that Ace Decade would acquire Haitong

Shares and Golden Spring Hong Kong would establish a branch in New York to find investors

for projects relating to the Haitong Shares.

33.     In furtherance of the MOU, Golden Spring Hong Kong formed a company called

Golden Spring (New York) Ltd. ("Golden Spring New York"), which was incorporated in

March 2015 in Delaware and registered to do business in New York.  Golden Spring New York

is wholly owned by Golden Spring Hong Kong.

34.     Shortly thereafter, Golden Spring New York signed a lease for part of

the 46th Floor of the General Motors Building at 767 Fifth Avenue, New York, NY 10153.

Ms. Yu and I conduct business relating to Ace Decade from our offices at 767 Fifth Avenue.

35.     Not only had I discussed with UBS my plans to move to New York and to operate

my business projects out of New York in December 2014, I also asked for UBS's help in setting

up my operations in New York.  In March 2015, Mr. Wong and others at UBS, including

Agnes Fu and Liz Lam, arranged to transfer funds from one of my accounts at UBS to my

personal JPMorgan Chase account in New York.

36.     In April 2015, Mr. Wong, Ms. Fu, and Ms. Lam assisted me with setting up

Golden Spring New York by transferring funds from one of my accounts at UBS to Golden

Spring New York's JPMorgan Chase bank account in New York.

37.     UBS also submitted reference letters on my behalf in connection with my

purchase of an apartment in a New York cooperative building.  In a letter dated February 18,

2015 from Mr. Wong to the building's board of directors, Mr. Wong wrote, "I have known Miles

for about five years since he first began working with UBS AG."  (Miles is my English name.)

Mr. Wong also stated, "Over the years, Miles has earned his credibility in our bank.  He is very

reliable and always fulfills his repayment obligations.  For this reason, our bank is happy to have

him as our long-term client."  (Ace Decade Exhibit 1.)

38.     Mr. Wong and Tommy Cheung, also a UBS Managing Director, submitted

another reference letter on my behalf to the board of the apartment building on February 23,

2015, stating:  "Kwok Ho Wan has been a client of ours through a personal investment company

since July 2012."  (Ace Decade Exhibit 2.)

39.     On March 6, 2015, I purchased an apartment in this building.  I, along with

Ms. Yu and other employees and representatives of Ace Decade and Golden Spring New York,

have lived in the apartment since the purchase.

40.     During this period of time after I had moved to New York, Mr. Wong and I

communicated frequently through telephone calls and voice and instant messages.  Mr. Wong

spoke to me by telephone while I was in New York dozens of times and sent numerous

electronic messages to me while I was in New York.  Ms. Yu joined me on some of the calls

with Mr. Wong.  At a minimum, Mr. Wong spoke to me by telephone while I was in New York

on the following dates:

Case 22-50073   Doc 183-3   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 232 of 241

- January 26, 2015 (three calls)

- January 28, 2015 (two calls)

- March 2, 2015

- March 4, 2015 (three calls)

- March 5, 2015

- March 13, 2015

- March 15, 2015

- March 16, 2015 (six calls)

- March 17, 2015 (two calls)

- March 18, 2015 (two calls)

- March 24, 2015

- March 31, 2015

- April 28, 2015 (three calls)

- April 30, 2015 (five calls)

- May 6, 2015 (two calls)

- May 11, 2015 (three calls)

- June 23, 2015 (two calls)

- July 21, 2015

41.     During these calls in 2015, which I participated in from New York, Mr. Wong and I discussed the Investment and the UBS loan on numerous occasions.  On one or more of these calls, Mr. Wong and I also discussed my concerns about the loan, including a margin call trigger based upon the loan-to-value ratio ("LTV ratio"), the size of the loan, the interest rate on

the loan, and the issuance price of the Haitong shares.  Mr. Wong and I also discussed the status

of my efforts to seek investors in New York for Ace Decade.

42.     During this period of time in 2015, I did not raise with Mr. Wong again my

concerns about repayment triggers conditioned on short term price fluctuations of the Shares

because Mr. Wong had previously told me that there were no such triggers.

43.     However, during several of these calls in March, April, and May 2015, Mr. Wong

and I discussed the topic of margin calls generally, and specifically the LTV ratio trigger.

Mr. Wong said that I did not have to worry because UBS would act in my best interests, that

UBS would give Ace Decade adequate time to meet any margin calls, and that UBS would make

every effort to work with Ace Decade to allow it to meet any margin calls.  He also reminded me

several times during this period that UBS had never sold the shares of the Ping An shareholder

following a margin call on its loan, and stated that Ace Decade would receive the same treatment

as the Ping An shareholder.

44.     While I was in New York, Mr. Wong also sent me numerous WhatsApp messages

about the Investment and the UBS loan.  For example, on March 21 and 22, 2015, Mr. Wong and

I exchanged a series of WhatsApp messages in which we discussed the UBS loan for the

Investment.  I told Mr. Wong that some of UBS's proposed conditions, such as the margin call

trigger based upon the LTV ratio for the UBS loan, were "definitely not okay" and "we would

rather not do it than agree to your clauses."  Had I not been relying upon Mr. Wong's prior

representations that the loan financing documents did not contain repayment triggers based on

short term price fluctuations of the Shares, I would have raised that issue again with Mr. Wong

and not focused our discussions solely on the margin call trigger based on the LTV ratio.

45.     Mr. Wong replied that he understood my concerns about potential margin calls, and told me: "You rest assured!. . . I'm working for General Manager Guo!  Don't worry."  I relied upon Mr. Wong's representations that he and UBS were looking out for my interests.  All of these discussions occurred while I was in New York.

46.     On May 8, 2015, Haitong announced that it had obtained the shareholder and regulatory approvals necessary (in February and May, respectively) to issue the Shares, which was expected to occur on May 15.  Haitong also announced that because the trading price of Haitong's shares during the 30 trading days prior had surpassed a pre-agreed threshold, the subscription price would be increased.

47.     After this announcement, I had several discussions with Mr. Wong, by telephone and WhatsApp messages, in order to finalize the terms of the Investment.  Among the topics we discussed were the fact that the loan would have to be increased to reflect the increase in the per share price of Haitong's shares, the amount of the payment required, the LTV ratio, the interest rate, and the method by which we should exchange U.S. dollars for the Hong Kong dollars required for the payment.

48.     During one of our discussions after May 8, Mr. Wong stated yet again that Ace Decade would receive the same treatment as the Ping An shareholder with respect to any margin calls.

49.     Relying on these representations, I decided to make the Investment.  I discussed with Mr. Wong during telephone conversations on May 11 how best to transfer the funds necessary for the Investment from one of my UBS accounts to the Ace Decade account.  Mr. Wong said that I first needed to exchange the funds from U.S. dollars to Hong Kong dollars in my UBS account.  He also gave instructions not to transfer the funds from my UBS account

directly to the Ace Decade account, but rather to transfer the funds from my UBS account to an

account at another bank and then to transfer the funds from that account to the Ace Decade

account.

50.     Relying upon Mr. Wong's advice, I decided to transfer the funds from my UBS

account first to an account at China Minsheng Banking Corp., Ltd. Hong Kong Branch ("China

Minsheng Account") and then to transfer the funds from the China Minsheng Account to the

Ace Decade account.

51.     On May 11, 2015, Ms. Fu sent an e-mail to Ms. Yu, copying Mr. Wong and

Ms. Lam, and asked Ms. Yu to obtain my signature on a payment instruction document that UBS

had prepared.  The document contained a request to transfer HK $860 million (approximately

US $111 million) from my UBS account to the China Minsheng Account that Mr. Wong had

instructed me to use.

52.     In reliance upon Mr. Wong's representations about the Investment and the UBS

loan, I signed the document authorizing the wire transfer.

53.     Later that day, Ms. Lam sent an e-mail to Ms. Yu, copying Mr. Wong and Ms. Fu,

attaching a confirmation of the outgoing transfer from my UBS account.

54.     Following Mr. Wong's instructions, I then authorized the transfer of the funds

from the China Minsheng Account to the Ace Decade account.

55.     After the funds reached the Ace Decade account, on May 13, 2015, Ms. Yu and I

authorized a payment of HK $2 billion (approximately US $260 million) from Ace Decade's

account to an account held by Dawn State Limited ("Dawn State"), a special purpose vehicle and

wholly-owned subsidiary of a Haixia fund, to fund the Investment of the Shares to be issued on

May 15.  Prior to this, I had authorized an initial down payment of approximately US $250

million from Ace Decade's account, through Dawn State, to a UBS security account.  That

payment would have been returned to Ace Decade had the Investment not been completed.

56.     All of the steps I took to make the Investment, including requesting the wire

transfers of approximately HK $860 million (approximately US $111 million) from one of my

UBS accounts to the China Minsheng Account and ultimately to the Ace Decade account and

authorizing the payment of HK $2 billion (approximately US $260 million) from the Ace Decade

account to Dawn State's account on May 13, 2015, occurred from my office or my apartment in

New York.

57.     I would not have made the Investment or authorized this payment in May 2015

had I known that UBS had lied that the loan financing documents did not contain repayment

triggers based on short term price fluctuations of the Shares and that UBS would refuse to work

with Ace Decade to meet any margin calls and would sell off Ace Decade's Shares immediately

if a margin call were made.

58.     Under the terms of an agreement between Ace Decade and Haixia, Haixia was

required to transfer Dawn State (the entity that held legal title to the Shares) to Ace Decade after

July 13, 2015 upon Ace Decade's request.

59.     However, on the morning of July 6, 2015 New York time—just a week before

Haixia would have had to transfer Dawn State to Ace Decade—I learned that UBS was

demanding that I repay approximately US $200 million in less than 24 hours due to short-term

price fluctuation of the Shares.

60.     Had I known that it was possible for UBS to demand payment in such a short

period of time and that UBS had lied about providing adequate time to meet any margin calls, I

would have ensured that Ace Decade had sufficient funds available to make such payment.

61.      Before UBS's deadline, Ace Decade informed UBS that we could obtain the necessary funds quickly, but not before UBS's deadline.

62.      However, on July 6, 2015, Mr. Wong stated that UBS would not give Ace Decade any additional time.  Mr. Wong stated that UBS had already identified buyers for the Shares and would make a substantial profit by selling the Shares instead of allowing Ace Decade to make the payment.

63.      On July 7th, I sent Mr. Wong a WhatsApp message telling him that UBS's margin call was "illegal."  Mr. Wong did not disagree with me or deny that he had told me that there were no repayment triggers based upon short term price fluctuations of the Shares.  Instead, he said that he had told senior management to cancel the sale of the Shares and said that he would ask UBS to return the Shares to me.  Mr. Wong told me that the Shares were still under UBS's control and he promised to come up with a plan for their repurchase.  Mr. Wong reassured me: "I've always been standing by General Manager Guo."

64.      On July 9th, Mr. Wong stated that the decision to sell the shares was made by UBS executives outside of Hong Kong and China.

65.      On July 17th, I reminded Mr. Wong that he had said on numerous prior occasions that "there would never be" a margin call based on short term price fluctuations of the Shares and the many times he had stated that UBS had not sold off the shares of a large Ping An shareholder following a margin call.

66.      In another message on July 17, I said to Mr. Wong: "I told you, it was since last year that I've come to the U.S. for better opportunities, didn't I?  All the information I sent you from the U.S., my requirements, you know them all. . . .  Under these circumstances, all were

handed over to you, [I] all listened to you.  It was you who introduced Haixia . . . .  It turned out
to be messed up like this now."

67.     Mr. Wong did not deny that he had made these misrepresentations and in fact
replied that he understood.

68.     In another message on July 17, I said to Mr. Wong: "You told me several times
that you UBS would not liquidate assets like that; otherwise how I would trust you."  I also told
him:  "If it weren't for you to tell me that margin call was like Ping An, it would not be like that.
There would be reasonable time to get some assets to deal with it."

69.     On July 17, I also said to Mr. Wong:  "You said UBS signed the agreement with
them [Haixia] to permit UBS to sell all the shares within 24 hours of the margin call.  How was
that signed?  How did they implement that?  It's not fair.  You told me back then that was not the
case."

70.     Mr. Wong replied "I've always been firmly opposing them, but they ignored me
and told me it was an order by the Swiss CEO."  He did not deny my assertion that he had
previously stated that the loan agreement would not permit UBS to sell the Shares within 24
hours of the margin call.

71.     At no point during any of our discussions did Mr. Wong deny that he had stated
that UBS would treat Ace Decade the same as the Ping An shareholder.

72.     At no point during any of our discussions did Mr. Wong deny that he had stated
that the loan documents would not contain repayment triggers based on short-term price
fluctuations of the Shares.

73.     At no point during any of our discussions did Mr. Wong deny that he had stated
that UBS would work with Ace Decade and provide it adequate time to meet any margin call.

74.     At no point during any of our discussions did Mr. Wong deny that UBS had engaged in misconduct.

75.     Mr. Wong told me that on July 7, 2015, UBS sold all of the Shares belonging to Ace Decade at HK $11.12, a 20% discount off the closing price of Haitong stock on July 7.

76.     As a result of losing the Haitong shares, Ace Decade lost New York investors, whom I had met with after I had relocated to New York in 2015 and who had been interested in investing in Ace Decade.  For example, on four occasions in New York in April through June 2015, my representatives and/or I met with a co-founder of a private investment firm based in New York.  The firm expressed significant interest in investing in Ace Decade.  However, following UBS's sale of the Haitong Shares belonging to Ace Decade, Ace Decade lost this potential investor.

Case 22-50073   Doc 183-3   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 240 of
241

I swear that the foregoing is true and correct.

[Signature of Kwok Ho Wan on Chinese version]
  Kwok Ho Wan

[Notarization on Chinese version]

CITY OF __Meservey_____          )
                                  )      ss.:
COUNTY OF __Cerro Gordo___        )

I, __Liming Pals____, being duly sworn, depose and say that I am fluent in both the English and

Chinese languages.  I hereby certify that the attached document is an accurate translation of the

Chinese version of "Affidavit of Kwok Ho Wan."

[Name]

Sworn to before me this

5 day of May 2015 ~~May 2015~~ February 2016

Notary Public



PAT FISHER
COMMISSION NUMBER 720993
MY COMMISSION EXPIRES:
2-19-18

NOTARIAL SEAL
IOWA