# EXHIBIT 25

*PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. vs.*

*KWOK HO WAN*

---

*MILES KWOK*

*October 3, 2018*

---



ELLEN GRAUER

COURT REPORTING CO. LLC

126 East 56th Street, Fifth Floor  New York, New York 10022

P:  212-750-6434   F:  212-750-1097

www.ellengrauer.com

*Original File 247294.TXT*

*Min-U-Script® with Word Index*

1

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF NEW YORK
    -------------------------------------------------x
3   PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

4                         Plaintiff,

5       -against-

6   KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN
    GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI,
7   a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK,
    a/k/a HAOYUN GUY,
8
                          Defendant.
9
    Index No.: 652077/2017
10  -------------------------------------------------x

11

12                      7 Times Square
                        New York, New York
13
                        October 3, 2018
14                      9:39 a.m.

15

16          Videotaped Examination Before Trial

17  of the MILES KWOK, before Kristi Cruz, a Notary

18  Public of the State of New York.

19

20

21

22

23          ELLEN GRAUER COURT REPORTING CO. LLC
               126 East 56th Street, Fifth Floor
24                New York, New York 10022
                       212-750-6434
25                     REF:  247294

```
 1   A P P E A R A N C E S:

 2

 3   O'MELVENY & MYERS LLP

 4   Attorneys for Plaintiff

 5        Times Square Tower

 6        7 Times Square

 7        New York, New York 10036

 8   BY:  EDWARD MOSS, ESQ.

 9        STUART SARNOFF, ESQ.

10        SARA N. PAHLAVAN, ESQ.

11        212.326.2000

12        emoss@omm.com

13        ssarnoff@omm.com

14        spahlavan@omm.com

15

16

17   HODGSON RUSS LLP

18   Attorneys for Defendant

19        605 Third Avenue, Suite 2300

20        New York, New York 10158

21   BY:  MARK A. HARMON, ESQ.

22        JILLIAN MARIE SEARLES, ESQ.

23        212.751.4300

24        mharmon@hodgsonruss.com

25        jsearles@hodgsonruss.com
```

3

```
 1    A P P E A R A N C E S:   (Cont'd)

 2

 3    ALSO PRESENT:

 4         ELIZABETH YAOYING JIANG, Mandarin Interpreter

 5         DAN MACOM, Videographer

 6         KARIN MAISTRELLO, Golden Spring

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 6 of 269

4

```
 1    ------------------- I N D E X -------------------

 2    WITNESS                   EXAMINATION BY        PAGE

 3    MILES KWOK                MR. MOSS                 8

 4

 5

 6    DIRECTIONS:      PAGE   17, 18, 19, 58, 59, 61,

 7                            62, 67, 70, 71, 72, 73,

 8                            78, 101, 102, 117, 118,

 9                            126, 128, 129

10

11

12    --------------- DOCUMENT REQUESTS ---------------

13    PAGE:     129   Document evidencing agreement

14                    with Zhang Wei relating to the

15                    hotel

16

17

18    --------------- E X H I B I T S ---------------

19    KWOK                DESCRIPTION              FOR I.D.

20    Exhibit 1           Genever Holdings LLC        33

21                        Corporate Documents

22    Exhibit 2           Printout from YouTube       59

23    Exhibit 3           Federal Complaint           69

24    Exhibit 4           Letter with attached        73

25                        financial information
```

5

```
1    ------------ E X H I B I T S (Cont'd)------------

2    KWOK              DESCRIPTION              FOR I.D.

3    Exhibit 5    UBS Hong Kong statement          82

4                 for Bravo Luck Limited

5                 entitled Debit Advice

6    Exhibit 6    Realtor.com printout            88

7

8

9

10              (EXHIBITS TO BE PRODUCED)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

FILED: NEW YORK COUNTY CLERK 05/07/2021 07:59 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 785
Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 8 of
269
RECEIVED NYSCEF: 05/07/2021

6

```
 1              S T I P U L A T I O N S

 2

 3           IT IS HEREBY STIPULATED AND AGREED

 4       by and between the attorneys for the

 5       respective parties herein, that filing and

 6       sealing be and the same are hereby waived.

 7           IT IS FURTHER STIPULATED AND

 8       AGREED that all objections, except as to

 9       the form of the question, shall be

10       reserved to the time of the trial.

11           IT IS FURTHER STIPULATED AND

12       AGREED that the within deposition may be

13       sworn to and signed before any officer

14       authorized to administer an oath, with

15       the same force and effect as if signed

16       and sworn to before the Court.

17           IT IS FURTHER STIPULATED AND

18       AGREED that a copy of the within

19       deposition shall be furnished to counsel

20       for the Witness.

21

22

23                   - oOo -

24

25
```

FILED: NEW YORK COUNTY CLERK 05/07/2021 07:59 PM    INDEX NO. 652077/2017
NYSCEF DOC. NO: 785    Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 9 of    RECEIVED NYSCEF: 05/07/2021
269

59

```
 1                      KWOK

 2      video?

 3   DI           MR. HARMON:  Same objection.  Same

 4           direction.

 5           A.     Refuse to answer.

 6                  MR. MOSS:  I'm going to mark as --

 7           what exhibit are we?

 8                  Actually, could we just go off the

 9           record for a second?

10                  THE VIDEOGRAPHER:  We're now off the

11           record, the time is 11:43 a.m.

12                  (Discussion held off the record.)

13                  THE VIDEOGRAPHER:  We're now back on

14           the record.  The time is 11:44 a.m.

15                  (Kwok Exhibit 2, Printout from

16           YouTube, marked for identification, as of

17           this date.)

18   BY MR. MOSS:

19           Q.     Mr. Kwok, you've been handed

20       Exhibit 2, which is a printout from YouTube

21       and it's entitled "Guo Wengui (Kwok Miles) is

22       planning to sell his private jet and yacht."

23       I'd just like to put on the record that

24       Pacific Alliance cited to this YouTube video

25       in its attachment motion, and that in
```

FILED: NEW YORK COUNTY CLERK 05/07/2021 07:59 PM
INDEX NO. 652077/2017

NYSCEF DOC. NO. 785

RECEIVED NYSCEF: 05/07/2021

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 10 of
269

60

                        KWOK

opposition to its attachment motion Mr. Kwok

filed a brief dated May 16, 2018, and relating

to this issue on page 15, the brief reads as

follows:

           "Yet Frances," who is PAX's

investigator, "offers no proof beyond his own

assertion that the voices are those of Kwok

and his associates or that Kwok or anyone

associated with him uploaded the audio

recording in question, and there is

substantial reason to question both the

authenticity of the audio and the motives

behind the individual or entity who uploaded

it and represented that it was, in fact, Kwok

making the statements in question."

           Now I'm going play the audio.

           (Whereupon, an audio/video is

      played.)

           THE WITNESS:  I refuse to listen.

      I'm not going to listen.

      Q.   Sorry, Mr. Kwok, were you covering

your ears?

      A.   This is all communist.  Everything

here is all communist.  Unless you prove this

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 11 of 269

61

KWOK

2  is not communist, then I will listen.  They

3  have recorded over a million of tax audios,

4  videos that are fake.  Unless you could prove

5  this is real, otherwise I will not listen to

6  it.  What relationship is this to me?  Unless

7  you could prove this is what I have said, that

8  this is my words, my audio, my video, then I

9  will listen to it.

10      Q.    You refuse to listen to the video?

11  DI        MR. HARMON:  I object on the same

12      basis and direct the witness not to answer

13      the   question.

14      A.    I have a sensation of committing

15  suicide if you're going play that.  This is

16  communist.  Very simple.  There is like a

17  number of place that the communist that have

18  been proven by the FBI to be fake.  So you

19  want me to commit suicide?  Are you here to

20  kill me?  I here seriously declare for all the

21  videos that you would show as outside the

22  parameters that's causing me mental distress,

23  I will reserve my right to sue.  I like my

24  attorney to note I reserve my right of the

25  personal attacks by the other party against

FILED: NEW YORK COUNTY CLERK 05/07/2021 07:59 PM
NYSCEF DOC. NO. 785

INDEX NO. 652077/2017
RECEIVED NYSCEF: 05/07/2021

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 12 of
269

62

```
1                        KWOK
2      me, and I like to ask for the authenticity of
3      this documents with a person's authenticity.
4      I like to request an investigation of it.  I'm
5      done.
6           Q.    So, Mr. Kwok, you will not answer
7      any questions about the video?
8  DI            MR. HARMON:  Same objection.  Same
9           direction.  Beyond the scope of what I
10          believe appropriate to ask in discovery.
11          A.    I believe this is humiliation, these
12     are threats and will need to pay
13     responsibility for these actions.
14              MR. MOSS:  Please let the record
15          reflect that when Mr. Kwok asked me to
16          stop playing the video, I stopped playing
17          the video.  I will not play it anymore.
18              I note that Mr. Harmon has objected
19          to this line of questioning and instructed
20          Mr. Kwok not to answer any questions about
21          this video.
22              I have that right, right,
23     Mr. Harmon?
24              MR. HARMON:  I'm sorry?
25              MR. MOSS:  I got it right?  You're
```

FILED: NEW YORK COUNTY CLERK 05/07/2021 07:59 PM
INDEX NO. 652077/2017

NYSCEF DOC. NO. 785
Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 13 of
269

RECEIVED NYSCEF: 05/07/2021

63

```
 1                        KWOK
 2          instructing --
 3               MR. HARMON:  I thought you said you
 4          I have that right, as opposed to it's my
 5          right to something.
 6               MR. MOSS:  Fair enough.  I'm
 7          correct, you're instructing the witness --
 8               MR. HARMON:  I'm instructing the
 9          witness not to answer the questions for
10          the reasons I've already stated on the
11          record.
12          Q.    What is Golden Spring New York Ltd.?
13          A.    It is Hong Kong Golden Spring, a
14     company that they have expanded in New York.
15          Q.    Who is "they"?
16          A.    Hong Kong Golden Spring.
17          Q.    Who owns Golden Spring New York?
18          A.    Hong Kong Golden Spring owns.
19          Q.    Who owns Hong Kong Golden Spring?
20          A.    Guo Qiang.
21               THE INTERPRETER:  G-U-O, Q-I-A-N-G,
22          phonetic spelling.
23          Q.    Is Guo Qiang a family member of
24     yours?
25          A.    Yes.
```

64

```
 1                          KWOK

 2          Q.    What is the relation?

 3          A.    My son.

 4          Q.    Do you have any ownership interest

 5     in Golden Spring Hong Kong?

 6          A.    No.

 7          Q.    Is Guo Qiang the same son as Mileson

 8     or is it a different son?

 9          A.    It's the same person.

10          Q.    Do you have any ownership interest

11     in Golden Spring New York?

12          A.    No.

13          Q.    So Golden Spring is owned by your

14     son?

15          A.    My son also represents the family in

16     owning it.

17          Q.    Does the son represent you in owning

18     it?

19          A.    No.

20          Q.    Your son represents other family

21     members in owning it?

22          A.    Yes.

23          Q.    Does your son represent Zhang Wei in

24     owning Golden Spring?

25          A.    Yes.
```

FILED: NEW YORK COUNTY CLERK 05/07/2021 07:59 PM
NYSCEF DOC. NO. 785

INDEX NO. 652077/2017

RECEIVED NYSCEF: 05/07/2021

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 15 of
269

65

```
 1                        KWOK

 2        Q.    Is your son the sole shareholder of

 3   Golden Spring?

 4             MR. HARMON:  Object to the form of

 5        the question.

 6        A.    I'm not really sure.

 7        Q.    Do you know of any other

 8   shareholders of Golden Spring?

 9             MR. HARMON:  Object to the form of

10        the question.

11        A.    I'm not sure.  I don't know.

12        Q.    Does Golden Spring have any

13   directors?

14             MR. HARMON:  Object to the form of

15        the question.

16        A.    I'm not sure.

17             MR. MOSS:  Mark, what's wrong, you

18        don't like that I'm not using one of the

19        entities?

20             MR. HARMON:  I don't know which

21        entity --

22             MR. MOSS:  Hong Kong or New York?

23             MR. HARMON:  I don't know which one

24        you're talking about, or both.

25        Q.    Do any of the Golden Spring entities
```

```
 1                      KWOK
 2   have employees?
 3        A.    Yes, there are employees.
 4        Q.    Are there employees in the New York
 5   Golden Spring?
 6        A.    Yes.
 7        Q.    What business is Golden Spring in?
 8        A.    Invest in real estate, media.
 9        Q.    What role, if any, do you have for
10   Golden Spring New York?
11        A.    I'm consultant.
12        Q.    What do you do as consultant?
13        A.    Their haven't, give advice.
14        Q.    Does Golden Spring New York have any
15   relationship with Genever Holdings
16   Corporation?
17             MR. HARMON:  Object to the form of
18        the question.  You can answer.
19        A.    No.
20        Q.    Does Golden Spring New York have any
21   relationship with Genever Holdings LLC?
22             MR. HARMON:  Object to the form of
23        the question.
24        A.    No.
25        Q.    Does Golden Spring Hong Kong have a
```

FILED: NEW YORK COUNTY CLERK 05/07/2021 07:59 PM          INDEX NO. 652077/2017

NYSCEF DOC. NO. 785    Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 17 of   RECEIVED NYSCEF: 05/07/2021
269

67

```
 1                        KWOK

 2     relationship with either of the Genever

 3     companies?

 4          A.    No.

 5          Q.    Does Shiny Times New York maintain

 6     its offices at 800 Fifth Avenue?

 7          A.    I do not know.

 8          Q.    Do you know whether or not Shiny

 9     Times has a lease for offices in New York City

10     with a company called Urbana Properties?

11          A.    I do not know.

12          Q.    Do you know whether or not Golden

13     Spring was ever late on any lease payments for

14     its offices?

15          A.    I do not know.

16          Q.    Does Yvette have any role with

17     Golden Spring?

18          A.    CEO.

19          Q.    Any other role?

20          A.    I'm not really sure.

21          Q.    Is she the president?

22          A.    Yes, I think so.

23          Q.    Have certain of your assets been

24     seized by the Chinese government?

25  DI            MR. HARMON:  Again, I think that
```

# EXHIBIT 26

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 19 of 269

1

```
 1  SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NEW YORK : PART 61
 2  ------------------------------------------------X
    PACIFIC ALLIANCE ASIA OPPORTUNITY FUND, LP,
 3
                        Plaintiff(s),
 4
                - against -
 5
    KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI,
 6  a/k/a GUO WENGUI, a/k/a GUO WEN GUI, a/k/a WAN
    GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO,
 7  GENEVER HOLDINGS CORPORATION, and GENEVER HOLDINGS LLC
 8                      Defendant(s).
 9  ------------------------------------------------X
    Index No. 652077/2017
10
11                      February 2, 2022 - Via Microsoft Teams
12
13  B E F O R E:   HONORABLE BARRY OSTRAGER, JSC
14
15  A P P E A R A N C E S:
16          O'MELVENY & MYERS LLP
                Attorneys for Plaintiff
17              7 Times Square
                New York, New York 10036
18              BY:  STUART SARNOFF, ESQ.
                     DAVID HARBACH, ESQ.
19                   LAURA ARONSSON, ESQ.
20
21          BAKER & HOSTETLER LLP
                Attorneys for Defendant Kwok Ho Wan
22              45 Rockefeller Plaza
                New York, New York 10111
23              BY:  JOHN SIEGAL, ESQ.
                     TRACY COLE, ESQ.
24                   ERICA BARROW, ESQ.
25
```

Rachel C. Simone, CSR, RMR, CRR

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 20 of 269

2

1    APPEARANCES CONTINUED:

2

3              CHIESA SHAHINIAN GIANTOMASI PC
                   Attorneys for HK International
4              11 Times Square, 34th Floor
               New York, New York 10036
5              BY:  LEE VARTAN, ESQ.

6

7

8                        - 0 -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rachel C. Simone, CSR, RMR, CRR

**Opening Statement - by Plaintiff - Sarnoff**

1              THE COURT:  All right.  I have an idea for lead

2        counsel for the parties.  We need everybody to mute

3        themselves.

4              Mr. Siegal, I would like you and Mr. Harbach to

5        leave the line open with all the people who dialed in.  And

6        I would like the three of us, counsel and the Court, to have

7        an offline telephone call.  That will take no more than five

8        to ten minutes.  Then we will go back to the Microsoft Teams

9        hearing call, all right?

10             MR. SIEGAL:  Yes, your Honor.

11             MR. HARBACH:  Yes, your Honor.

12             THE COURT:  Thank you very much.

13             (Off-the-record discussion was held.)

14             THE COURT:  Okay.  We are going to resume this

15        hearing.  Counsel for each of the parties will make a brief

16        opening statement.  Then we will proceed with the

17        cross-examination by the defendant of the plaintiff's direct

18        testimony affiants.

19             Mr. Harbach.

20             MR. SARNOFF:  Your Honor, this is Stuart Sarnoff.

21        I was going to make the opening statement and then turn it

22        over to Mr. Harbach.

23             THE COURT:  Okay.

24             MR. SARNOFF:  I will try to be brief, sir.

25             As you recall, PAX demonstrated at the argument on

Rachel C. Simone, CSR, RMR, CRR

**Opening Statement - by Plaintiff - Sarnoff**

4

1    January 14 that the Lady May is and always has been

2    Mr. Kwok's yacht.  And this is despite its clumsy attempts

3    to park legal title first in the family business associate

4    and then in his charter.

5            Now, as of January 14, what have Mr. Kwok's

6    arguments in opposition been?  They were twofold.  First he

7    argued that his daughter was actually a current titleholder,

8    something PAX has not disputed and is not the relevant

9    standard.  And, two, he suggested that some of our evidence

10   which consists of Kwok's social media posts boasting from

11   his own mouth that the Lady May is his haven't been fully

12   authenticated.  But to the extent there is any

13   authentication issue about his own social media -- and there

14   isn't, your Honor -- that would be on Mr. Kwok because it

15   would stem directly from his invocation of the Fifth

16   Amendment during post-judgment asset discovery and his

17   refusal to testify today.

18           Now, back at the January 14 argument, you may

19   recall that I predicted that if the Court were to hold an

20   evidentiary hearing -- something I understand the Appellate

21   Division had requested -- Mr. Kwok would not be able to

22   proffer any new evidence other than Mei Guo coming in here

23   and saying in a self-serving way that she owned and

24   controlled the yacht since 2017, and it turns out I was

25   right.

Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
NYSCEF DOC. NO. 1179

INDEX NO. 652077/2017

RECEIVED NYSCEF: 02/07/2022

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 23 of
269

5

**Opening Statement - by Plaintiff - Sarnoff**

1          As we demonstrated on the 14th of January, there

2     isn't a single piece of paper in the record anywhere that,

3     other than the sort of formal corporate title documents,

4     indicates that Ms. Guo acted as the controlling person over

5     the Lady May's operation in the three-and-a-half years since

6     she took legal title in mid-2017 and when the yacht went

7     rogue in violation of your order in late 2020.  That's

8     pretty telling, isn't it?

9          You may hear Mr. Siegal claim we haven't come up

10    with any hard documentary evidence showing Mr. Kwok's

11    day-to-day operation other than these tweets and social

12    media posts, but, again, that would also be on Mr. Kwok

13    because he's invoked the Fifth Amendment and prevented us

14    from exploring that.

15         What I've just described over the past few minutes

16    was the state of the evidentiary record leading into today's

17    hearing.  So the question before your Honor is likely what's

18    changed with the filing of the five affidavits that Mr. Kwok

19    submitted on January 28.  Absolutely nothing.

20         As your Honor can see from the five-exhibit

21    exhibit binder that is defendant's exhibit binder, the first

22    four being the corporate formal documents that have always

23    been in evidence in this case, Mr. Kwok has not put into

24    evidence even one document -- not a contract, not an e-mail,

25    not a text message or anything of that nature -- that

**Opening Statement - by Plaintiff - Sarnoff**

6

1     indicates that Ms. Guo actually controlled the yacht's

2     operation during the relevant 2017 to late 2020 period.  In

3     fact, the only piece of document that she puts in,

4     Defendant's Exhibit 5, is a purported service agreement with

5     an outfit named Phoenix Crew that even assuming it's

6     genuine -- and there are some problems with it which we will

7     get to -- it only went into effect at the end of 2021, a

8     year after Mr. Kwok committed contempt.

9              Very briefly, what about the five affidavits that

10    Mr. Kwok has but into evidence?  Well, the current captain,

11    Mr. Ivanov, clearly has nothing probative to say because

12    he -- and I mean this pun intended -- first came aboard this

13    past October 2021 when the yacht was already parked

14    illegally in Europe.  He confirms, by the way, that he's

15    never has taken direction from or even communicated with

16    Ms. Guo.  The same is true for the Yachtzoo SARL

17    representative Russell Stockil whose European management

18    company also first got involved with the fugitive yacht in

19    May 2021 and who similarly never seems never to have spoken

20    with or communicated with Ms. Guo.  So given these facts,

21    these two affidavits are not only irrelevant, but they are a

22    serious miscalculation by Mr. Kwok to suggest she actually

23    controlled the yacht operation in mid to late 2021.

24    Mr. Ivanov and Mr. Stockil vividly highlight the total lack

25    of any corresponding evidence that she controlled the yacht

Rachel C. Simone, CSR, RMR, CRR

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 25 of 269

1          during the relevant period, '17 through '20.

2                  What about the former captain, Craig Heaslop?  My

3          partner, David Harbach, will explore on cross-examination

4          some of the problems with that affidavit.  But let me just

5          note up front that he says that he only, quote, interacted,

6          unquote, with Ms. Guo when she was aboard the yacht and,

7          quote, sporadically via phone or text message.  What

8          Mr. Heaslop doesn't say speaks much louder.  He doesn't say

9          he took direction from Ms. Guo or that he understood her to

10         be in control of the yacht.  So that gets us to

11         Mr. Mitchell, Mr. Kwok's personal lawyer, and also after

12         that to Ms. Guo.

13                 Remember that Mr. Mitchell signed a complaint in

14         this state court on Mr. Kwok's behalf in September 2020

15         saying that the Lady May was Mr. Kwok's yacht.  Attorney

16         Mitchell even attached an article to that complaint that

17         made this Kwok ownership point both in its caption and in

18         the body of the article.  That judicial admission, as your

19         Honor noted two weeks ago, is very problematic for Mr. Kwok,

20         so Mr. Mitchell naturally tries to walk it back by saying he

21         filed a pleading that didn't mean plainly what it said.  But

22         he already made this argument to your Honor on December 18.

23         It wasn't credible then, and it isn't credible now.  And I

24         am wrapping up, your Honor.  So that leaves only Mr. Kwok's

25         daughter, Mei Guo.  So let me highlight a few of its main

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 1179
RECEIVED NYSCEF: 02/07/2022

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 26 of
269

**Opening Statement - by Plaintiff - Sarnoff**

8

1          problems.

2                    Ms. Guo says the Lady May, quote, was always

3          intended for her; but this ignores the fact that when her

4          father bought the yacht for $30 million, he first parked it

5          in his company, Hong Kong International, Hong Kong, and his

6          family business associate Ms. Qu.  Only years later was the

7          yacht transferred by Ms. Qu to Ms. Guo for a single dollar.

8          And this, of course, doesn't explain how and why Ms. Qu

9          would voluntarily part with a $30 million asset simply

10         because the young daughter of a business associate had a

11         lifelong love of the water.  Your Honor, I sure wish I had

12         work colleagues like that.  To say the least, your Honor, it

13         is highly unusual to play hot potato with a $30 million

14         asset, but that's not unusual for Mr. Kwok where property is

15         routinely moved around on paper in an endless shell game

16         aimed at shielding his considerable assets while retaining

17         ultimate control over them; the yacht, the Sherry Netherland

18         apartment, and on and on with Mr. Kwok's web of related

19         companies.

20                   Next, Ms. Guo suggests that she signed and

21         directed some NDAs with Lady May crew members.  Again, this

22         appears to be an effort to demonstrate operational control

23         of the yachts.  But where are these NDAs, your Honor?  They

24         are not in defendant's five-exhibit exhibit binder, and they

25         are nowhere else in evidence today.

                    Rachel C. Simone, CSR, RMR, CRR

**Opening Statement - by Plaintiff - Sarnoff**

9

1          She also says she communicated her instruction to

2     move the yacht out of New York in violation of your Honor's

3     order to her father's shell company, Golden Spring, not to

4     her employer -- not to her employee Craig Heaslop.  Let's

5     assume for a moment that that's true.  The Court knows

6     exactly what Golden Spring New York is and who controls it.

7     Mr. Kwok.

8          We can't even be sure that the Golden Spring story

9     is true, your Honor, because defendant has proffered no

10     corroborating Golden Spring affidavit on this point, and

11     Ms. Guo's hearsay statement is directly at odds with the

12     representation that Golden Spring's counsel made to PAX that

13     no Golden Spring personnel actually knew anything about who

14     owned and controlled the yacht.

15          Finally I would note, your Honor, based on the

16     last paragraph of her affidavit it appears that, like her

17     father, Ms. Guo may be someone who doesn't have enough

18     respect for Court authority and Court orders.  Taking

19     Ms. Guo at her word, she says she was aware that this Court

20     had ordered the Lady May to return to New York by May 2021

21     but she decided to disregard it.  While PAX, of course,

22     doubts that it was actually her decision to keep the yacht

23     abroad as opposed to her father's, contemptuous conduct

24     seems to run in the family.

25          In summary, your Honor, as the upcoming

**Opening Statement - Defendant - Siegal**

10

1    cross-examinations will reinforce, it is abundantly clear

2    that Mr. Kwok has failed to proffer any probative evidence

3    to date, yet alone evidence sufficient to rebut PAX's clear

4    and convincing showing that Mr. Kwok has and at all relevant

5    times has had a beneficial interest in his Lady May.

6        Thank you, your Honor.  Mr. Harbach will take over

7    from here.

8        THE COURT:  Okay.

9        Go ahead, Mr. Siegal.

10        MR. SIEGAL:  Thank you, your Honor, and good

11    morning to everyone.

12        John Siegal with the Baker Hostetler law firm

13    representing the defendant, Miles Kwok.  With me are my

14    colleagues Tracy Cole who will handle the cross-examination

15    of the plaintiff's witnesses, and Erica Barrow who will

16    handle certain legal issues hopefully later in the hearing.

17        I have always understood that opening statements

18    aren't to argue the evidence which the Court has not yet

19    heard, so I am not going to do that; but opening statements

20    are not an opportunity to mischaracterize otherwise

21    uncontested facts.  So let me begin by correcting two things

22    that my Brother Sarnoff said that are just flat contradicted

23    by the record.

24        Number one, Mr. Sarnoff referred to when Mr. Kwok

25    first bought the yacht.  It is undisputed, undisputed,

Rachel C. Simone, CSR, RMR, CRR

**Opening Statement - Defendant - Siegal**

1    conceded in PAX's papers that Mr. Kwok has never owned this

2    yacht.  So half of the remand from the Appellate Division

3    regarding ownership is not even contested, and that

4    statement was inaccurate.

5          Secondly, Mr. Sarnoff asserted that Golden Spring

6    is the father's company.  There is no evidence of that, and

7    there is evidence that Golden Spring is the family office of

8    an extended family that includes not just the defendant

9    Mr. Kwok and his daughter Guo Mei, but his son and other

10    uncles and cousins, all of whom -- many of whom certainly

11    the son does, have their own independent business lives,

12    their own independent sources of funds.

13          There is an expression among musicians that if you

14    play something it's close enough for jazz, right?  If you

15    get close, maybe it sounds good.  But that standard doesn't

16    apply to a court of law, and you can't sit there and say,

17    Oh, there's all these companies and they seem intertwined;

18    therefore, Judge, just ignore the formalities.  That is not

19    the standard that applies here.

20          Secondly, we are all corporate lawyers.  We love

21    documents, but there is nothing in the rule of evidence or

22    in the law that says documentary evidence is required to

23    establish a point.  And the best evidence is a witness with

24    personal knowledge who comes in and testifies directly.

25          Mr. Sarnoff says he would love a colleague who

Rachel C. Simone, CSR, RMR, CRR

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 30 of
269

**Opening Statement - Defendant - Siegal**

12

 1    would take title to an asset for him and then transfer it

 2    later, not that that's what happened; but if Mr. Sarnoff

 3    wants to live in a world where such arrangements occur, let

 4    him go live in the People's Republic of China where the

 5    government has a practice of arbitrarily willy-nilly seizing

 6    assets from people who have fallen out of favor.  It's just

 7    not an applicable argument.  The better argument, Judge, is

 8    my son owns an apartment.  I may go visit his apartment.  I

 9    may stay there.  The doorman lets me in.  He greets me.

10    Other employees of the building, they don't know who owns

11    it.  Maybe there is a management company that is an

12    intermediary that gives them directions.  That's the more

13    appropriate analogy here.  And the argument at the end was

14    literally an argument that the alleged sins of the father

15    should be visited on the daughter.

16          So the issue here, the only issue here is who

17    controlled the movement of this yacht during the contempt

18    period.  That is the only issue.  The beneficial interest

19    under CPLR 5223, which PAX continues to argue, is not the

20    standard.  The Appellate Division impliedly made that clear

21    when they remanded for determination of control.  The issue

22    of prejudice was already determined by the Appellate

23    Division, but I have been frustrated by their persistence in

24    making this wrong argument so I did a little more research.

25          It is absolutely crystal clear under the law of

Rachel C. Simone, CSR, RMR, CRR

**Opening Statement - Defendant - Siegal**

13

| | |
|---|---|
| 1 | New York that beneficial ownership -- beneficial interest, |
| 2 | rather, not ownership.  Beneficial interest under 5223 is |
| 3 | not the legal standard on a motion for contempt.  And I say |
| 4 | that because the Court of Appeals in Commonwealth of the |
| 5 | Northern Mariana Islands versus CIBC, 25 NY3d 55, in 2013 |
| 6 | answered a question certified to the Court of Appeals by the |
| 7 | second circuit and held that 5225(b), the turnover statute, |
| 8 | does not encompass the issue of control.  Control is |
| 9 | different than beneficial interest under the turnover |
| 10 | statute.  They are two different legal standards, they are |
| 11 | two different regimes.  And the only issue to be determined |
| 12 | is who controlled this yacht during the contempt period. |
| 13 | The issue here is not prejudice.  The issue is not |
| 14 | whether -- the issue on this motion is not whether this |
| 15 | asset would have been reachable by the plaintiff as a |
| 16 | judgment creditor if it had been in New York.  The issue is, |
| 17 | because we have asserted a defense on behalf of Mr. Kwok, |
| 18 | that he did not have the ability to comply with the Court's |
| 19 | conditional order because he does not control the yacht. |
| 20 | The burden is on the plaintiff to establish by clear and |
| 21 | convincing evidence that Mr. Kwok had control of that asset |
| 22 | during the contempt period. |
| 23 | There is no adverse inference on the issue of |
| 24 | control maybe for lots of reasons, but for two very basic |
| 25 | reasons. |

Rachel C. Simone, CSR, RMR, CRR

**Opening Statement - Defendant - Siegal**

14

1              First, the defense is that Guo Mei controlled the

2       yacht.  Guo Mei is the witness on control.  Mr. Kwok is not

3       a missing witness on the issue of control because he is not

4       the witness.  Guo Mei is, and she will be in court.  So

5       there is no adverse inference on the issue of control.

6              The adverse inference doesn't come into play,

7       according to the United States Supreme Court, unless and

8       until the party invoking the Fifth Amendment privilege

9       refuses to testify, quote, in response to probative evidence

10      offered against them.  That's the Baxter versus Palmigiano

11      case cited in our brief at Page 8.

12             Unless and until Pacific Alliance proffers

13      admissible evidence of control during the period of alleged

14      contempt, there is no adverse inference.  And given that

15      Pacific Alliance has proffered no affirmative evidence

16      whatsoever regarding control of the yacht during the

17      contempt period -- all of the smatterings of edited and

18      unreliable video and social media postings which the

19      authenticity and reliability of which will be an issue this

20      morning, all of them long pre-date this Court's contempt

21      order and this Court's conditional contempt order.

22             So, your Honor, all of this evidence is irrelevant

23      to the issue of control during the relevant period, and none

24      of it establishes probative evidence of the matter in

25      dispute sufficient to trigger the adverse inference.

Rachel C. Simone, CSR, RMR, CRR

**Proceedings**

15

```
 1              So with that, your Honor, I appreciate the

 2      opportunity to open and to hold this hearing.  My colleague

 3      Tracy Cole will handle the cross-examinations on the

 4      plaintiff's case.

 5              Thank you, Judge.

 6              THE COURT:  All right.

 7              The only observation I want to make to both

 8      parties is that when the contempt order was issued, the

 9      Court had before it pleadings immediately prior to the

10      issuance of the contempt order in which Mr. Kwok claimed

11      ownership and control of the vessel.  While that is not

12      dispositive, I have observed to you that the contempt

13      sanctions if sustained based on the factual record that must

14      be made and considered persuades the Court that the

15      conditional contempt order was properly issued, the amount

16      of the contempt sanctions at this point in time exceeds the

17      value of the vessel, which is why we had our sidebar

18      conversation prior to the commencement of this hearing.

19              Plaintiff should call its first witness for

20      cross-examination.  Go ahead, Mr. Harbach.

21              MR. HARBACH:  Good morning, your Honor.  We would

22      be happy to tender Mr. Nat Francis for cross-examination

23      relying on his affidavit, as the Court directed, for his

24      direct testimony.

25              THE COURT:  Mr. Francis, raise your right hand.
```

Rachel C. Simone, CSR, RMR, CRR

Francis - by Plaintiff - Cross / Cole

16

1                    (Nathaniel Francis is duly sworn/affirmed.)

2                    THE COURT:  Cross-examination can commence.

3              NATHANIEL FRANCIS, having been called on behalf of

4    Plaintiff, first having been duly sworn, was examined and

5    testified as follows:

6    CROSS-EXAMINATION

7    BY MS. COLE:

8        Q    Mr. Francis, I am Tracy Cole.  Do you have your

9    affidavit in front of you?

10                   THE COURT:  Ms. Cole's, your audio is defective.

11           See if you can work it out.  I need everyone else to mute

12           their microphone except for Ms. Cole and Mr. Francis.

13                   MS. COLE:  I tested this yesterday.  It was

14           working okay.  Is it working now with everyone muted?

15                   THE COURT:  It is still suboptimal.

16                   MS. COLE:  Okay.  Let me see if I can call it on

17           my cell phone.

18                   THE COURT:  Yes, there is.  You can keep the

19           visual, and then the audio will come from your cell phone.

20                   MS. COLE:  I will do that right now.  Thank you

21           for your patience.

22                         (Brief pause)

23                   THE COURT:  Okay.  Ms. Cole, you appear to be fine

24           now, so let's proceed.

25                   MS. COLE:  Thank you very much for your patience.

Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
NYSCEF DOC. NO. 1179

INDEX NO. 652077/2017

RECEIVED NYSCEF: 02/07/2022

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 35 of
269

Francis - by Plaintiff - Cross / Cole

17

```
 1   BY MS COLE:

 2       Q    Mr. Francis, you did several affidavits and you averred

 3   that you are a senior investigator and certified fraud examiner,

 4   correct?

 5       A    Correct.

 6       Q    You are not proffering yourself as any kind of expert

 7   in technology of social media, correct?

 8       A    Correct.

 9       Q    And your familiarity with Twitter and Instagram is from

10   using it, and, perhaps, from pulling data from it; but you are

11   not an engineer or anything like that, correct?

12       A    That's right.

13       Q    And you have never worked for any of the social media

14   entities like Youtube, Twitter, Instagram, or Facebook?

15       A    Correct.

16       Q    And you have no particular expertise in film editing,

17   or manipulation of images, or how they can be altered in a way

18   that would or would not be apparent, correct?

19       A    Correct.

20       Q    So let's start with your affirmation that is Docket

21   Number 1121 relating to PX 25.

22              THE COURT:  Ms. Cole, there is an exhibit binder

23         which contains more than a half dozen proclamations of

24         Mr. Francis; so if you would refer to the particular

25         affirmations by the number in the binder, that would be
```

Rachel C. Simone, CSR, RMR, CRR

Francis - by Plaintiff - Cross / Cole

18

```
1        helpful to the Court.

2                MS. COLE:  Yes, your Honor.  My apologies.

3                THE COURT:  That's the purpose of the binder.

4                MR. HARBACH:  Your Honor, I don't know if anyone

5        else on the call is having this problem, but we are now

6        hearing echoes.

7                THE COURT:  Everybody who dialed into the call has

8        muted themselves, so --

9    BY MS. COLE:

10       Q    You are looking now at --

11               THE COURT:  Ms. Cole, your audio is in and out.

12       If we can't resolve these issues, we are going to have to

13       conduct this hearing in open court.  So I will give five

14       minutes to work out the technology issues.  If you can't

15       work out the issues, we will adjourn and have an open court

16       proceeding because we can't conduct this proceeding with

17       echoes.

18               MS. COLE:  Thank you, your Honor.

19               THE COURT:  Have your tech people investigate

20       this.  We will take a five-minute adjournment.

21                       (Brief pause)

22               THE COURT:  All right.  It is 10:37.  We can now

23       get started.

24               Go ahead, Ms. Cole.

25               MS COLE:  Thank you, your Honor.
```

Rachel C. Simone, CSR, RMR, CRR

**Francis - by Plaintiff - Cross / Cole**

19

1   CROSS-EXAMINATION

2   BY MS. COLE:

3      Q    Turning to Tab 1, you indicate that you took a

4   screenshot on January 24 of an Instagram post that was dated

5   August 21, 2018.  The owner of this Instagram post -- the owner

6   of this Instagram account, do you know who that is?

7      A    I know the handle is GuoWenGui.

8      Q    And you indicate that the handle refers to a Twitter

9   account at @KwokMiles, correct?

10     A    Correct.

11     Q    So other than those, what else suggests to you who the

12  owner of that Instagram account is?

13     A    I believe that's it.

14     Q    Okay.

15          You don't know who has control over that account,

16  correct?

17     A    Correct.

18     Q    You don't know who has access to that account, correct?

19     A    Correct.

20     Q    And you are aware in your personal experience that that

21  there are multiple social media accounts that post pictures and

22  content relating to Mr. Kwok, correct?

23     A    I am not sure what you mean by that.

24     Q    Are you aware of posts or internet postings that are

25  not attributed to Mr. Kwok or, to your knowledge, have not been

Rachel C. Simone, CSR, RMR, CRR

Francis - by Plaintiff - Cross / Cole

```
 1  posted by him that, nonetheless, relate to him?

 2      A    I am aware of other folks posting about him, if that's

 3  what you are referring to.

 4      Q    Yes, exactly.

 5           So if someone posts pictures of Mr. Kwok, you

 6  don't personally assume that those are posted by Mr. Kwok,

 7  correct?

 8      A    Correct.

 9      Q    Now, you proffered a specific Instagram post dated

10  August 21, 2018, correct?

11      A    Yes.

12      Q    And you don't know when it was actually posted?

13      A    Correct.

14      Q    And you don't know who posted it, correct?

15      A    Yes.

16      Q    Or the circumstances around which it was posted,

17  correct?

18      A    Right.

19      Q    And you have no information -- no personal information

20  about the content of the post, you weren't there for any of the

21  events or cannot speak to how it was reported or the writing on

22  it or anything else, correct?

23      A    Yes.

24      Q    And you can't tell us who created the image, whether it

25  was manipulated or altered, who wrote those words, whether they
```

Rachel C. Simone, CSR, RMR, CRR

**Francis - by Plaintiff - Cross / Cole**

21

1    were contemporaneous with the image or any other substantive

2    information about the content of that post, correct?

3        A    Correct.

4        Q    Thank you.

5            Let's turn to your Tab 2 -- I apologize.  It's

6    Tab 6, sorry.  Tab 6 is an affidavit, Docket Number 1133,

7    relating to a Youtube video entitled "Lady May, Miles Kwok Super

8    Yacht," correct?

9        A    Correct.

10       Q    You agree with me that this exhibit, PX 2, is a

11   collection of different videos that -- my apologies.  It is

12   Tab 6.  It is connected to an exhibit that is Lady May Miles Kwok

13   Super Yacht that, I believe, is PX 2.

14           MS. BARROW:  Yes, that's correct.

15       Q    Okay.

16           So you viewed that video, correct, and you said

17   that you navigated your browser to YouTube, correct?

18       A    Yes.

19       Q    You watched the video, you saw that it was pertaining

20   to the user Richard Conley.  You downloaded the video, and you

21   observed that the metadata suggests the video was uploaded on

22   October 14, 2017, correct?

23       A    Yes.

24       Q    Now, you agree that this video looks like a collection

25   of different videos that have been spliced together, correct?

Rachel C. Simone, CSR, RMR, CRR

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 40 of
269

**Francis - by Plaintiff - Cross / Cole**

22

```
 1        A     Yes.
 2        Q     They appear to be taken at different places and times,
 3   correct?
 4        A     Right.
 5        Q     They show different individuals, different time
 6   periods?
 7        A     Correct.
 8        Q     And you were not a witness to any of the events in the
 9   video, correct?
10        A     I was not.
11        Q     You didn't record any of the segments on the video and
12   you have no idea who did, correct?
13        A     Yes.
14        Q     You didn't maintain or operate or install the equipment
15   that recorded any of the segments of the video, and you don't
16   know who did?
17        A     Correct.
18        Q     You don't know when any of these segments were
19   recorded, where they were recorded geographically in the world,
20   or under what circumstances any of them were recorded, correct?
21        A     Yes.
22        Q     You don't know who created this compilation, do you?
23        A     No.
24        Q     And you don't know for what purpose this compilation
25   was created?
```

Rachel C. Simone, CSR, RMR, CRR

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 41 of 269

Francis - by Plaintiff - Cross / Cole

23

1      A     No.

2      Q     You know that the name -- that the video is attached to

3 a YouTube account under the name of Richard Conley.  You have no

4 other information about this Richard Conley?

5      A     I do not.

6      Q     You have no other information about who this person

7 might be associated with or anything else, correct?

8      A     Correct.

9      Q     And you would agree that they are subtitled in English

10 that appear on the video, correct?

11      A     Correct.

12      Q     These subtitles appear throughout the video, and you

13 don't know who created them, correct?

14      A     Correct.

15      Q     You are not vouching for the accuracy of the subtitles,

16 are you?

17      A     I am not.

18      Q     In fact, the certified translation of portions of the

19 video that you obtained are inconsistent with the subtitles in

20 some respects, correct?

21      A     Could you repeat that?

22      Q     You obtained certified translations for a portion of

23 the video, correct -- oh, wait.  I may be relying on an earlier

24 one.  Just a moment.

25                    (Brief pause)

Rachel C. Simone, CSR, RMR, CRR

Francis - by Plaintiff - Cross / Cole

24

1      Q     Do you know the answer to that question?

2      A     No.

3            MR. HARBACH:  This isn't exactly an objection.  I

4      will just note for the Court that in this affidavit at Tab

5      6, Docket Number 1133, there is no representation by

6      Mr. Francis that he obtained a translation for this

7      particular exhibit, so I don't know that he is competent to

8      answer the question counsel has put to him.

9            MS. COLE:  It seems that way.  Understood.  Thank

10     you.

11     Q     You would agree there is a musical track with the

12  video?

13     A     Correct.

14     Q     And you don't know who created the audio of any portion

15  of it, correct?

16     A     Right.

17     Q     It appears that the segments have been altered at least

18  in the sense that they have been spliced together, correct?

19     A     I don't know enough about that type of technology to

20  answer that.

21           MR. HARBACH:  I just ask that counsel clarify

22     whether we are talking about segments of the exhibit at

23     large or segments within the 2:50 to 4:15 window, which is

24     what PAX has proffered and is relying on.

25           MS. COLE:  I will start with the full video.

Rachel C. Simone, CSR, RMR, CRR

**Francis - by Plaintiff - Cross / Cole**

25

1    Q    Does it appear that the sections that are in that

2    video, do they appear complete to you as though nothing has been

3    removed?

4    A    I am not certain.

5    Q    And within the section of 2:50 to 4:15, which is the

6    part that they proffer, do you know what section that is?  Do you

7    know what I am referring to?

8    A    I would have to watch it again.

9    Q    Do you know if any section, I guess I should say,

10   appears to be a complete -- as you sit here now, appears to be

11   complete and unaltered?

12   A    I don't know.

13        THE COURT:  Ms. Cole, Mr. Francis has no firsthand

14        knowledge of anything.  He is a certified fraud examiner

15        employed by the plaintiff here.  Nothing in Mr. Francis's

16        affidavits, plural, is fully dispositive of the issues on

17        this hearing.  So let's try and move along here.

18        MS. COLE:  Understood, your Honor.  I will make

19        this shorter.

20   Q    For any of the exhibits, I think you have testified

21   that you don't have the background to answer the question whether

22   the images were altered, correct?

23   A    Correct.

24   Q    Or whether they were manipulated in some way, correct?

25   A    Correct.

Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 1179
RECEIVED NYSCEF: 02/07/2022

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 44 of
269

Francis - by Plaintiff - Cross / Cole

26

1     Q    So you cannot testify that they are genuine and

2    accurate and portray what they purport to portray, correct?

3     A    I can only testify to where I got them, correct.

4     Q    All right.

5          So the only other questions I have for you relate

6    to -- Tab 2, do you have that in front of you?

7     A    I do.

8     Q    Now, you averred that you took screenshots of two

9    tweets dated May 10 and August 27, 2017 respectively that

10   appeared on the Twitter feed relating to the handle at

11   @KwokMiles, correct?

12    A    Yes.

13    Q    Exhibit A is a fair and accurate copy, you say, of the

14   screenshots, correct?

15    A    Yes.

16    Q    Now, is Exhibit A a fair and accurate copy of the

17   tweets as they appeared on the Twitter page @KwokMiles?

18    A    Yes.

19    Q    To get the screenshot you did not log on to Twitter,

20   search KwokMiles in the search bar, or go to Twitter.com, is that

21   correct, for both of them?

22    A    I don't recall exactly how I navigated to it.

23    Q    You don't, okay.

24         I am going to show you what I am going to ask --

25   well, it was marked for identification.  It was attached to our

Rachel C. Simone, CSR, RMR, CRR

Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 45 of 269

Francis - by Plaintiff - Cross / Cole

27

```
 1   briefs, pretrial brief as Exhibit -- Erica, could you pull that

 2   up?

 3              MS. BARROW:  Yes, I can share my screen.  It

 4          previously was filed with the Court and it is Docket Number

 5          1169.  It was Exhibit B to the Siegal affirmation that was

 6          filed on Wednesday.

 7              Can I share my screen, your Honor?

 8              THE COURT:  I'm sorry?

 9              MS. BARROW:  Would you like me to share my screen?

10              THE COURT:  I can't hear whoever is speaking.

11              MS. BARROW:  Your Honor, this is Erica Barrow from

12          Baker Hostetler.  Can you hear me now?

13              THE COURT:  Yes.

14              MS. BARROW:  You should have a hard copy of this,

15          everyone should; but I could also provide a virtual copy.

16          It is NYSCEF 11619.

17              THE COURT:  I have a hard copy.

18              MS. BARROW:  Okay.

19              Mr. Francis, would you like to see the exhibit?

20              THE WITNESS:  Yes, please.

21              MS. BARROW:  Sure.

22              THE COURT:  So you are going to Exhibit it to

23          Mr. Francis?

24              MS. COLE:  Yes, your Honor.  I would like to show

25          it to Mr. Francis.
```

Rachel C. Simone, CSR, RMR, CRR

Francis - by Plaintiff - Cross / Cole

28

1                         (Brief pause)

2                  MS. BARROW:  It looks like I don't have screen

3          sharing capabilities.

4                  MS COLE:  Let me try it this way.

5          Q    Do you know of a service called Tweet Tunnel?

6          A    I do.

7          Q    Have you ever used Tweet Tunnel?

8          A    Used it how?  Used it to do what?

9          Q    Have you ever retrieved tweets from Tweet Tunnel?

10         A    I don't know if I have.

11         Q    Okay.

12                 My specific question is going to be whether you

13   retrieved one of these specific tweets from Tweet Tunnel.  I

14   don't know if you have in front of you the exhibit that

15   Ms. Barrow is talking about and I don't know how to get that in

16   front of you; but that is the purpose of showing you that, to see

17   if that refreshes your recollection as to whether you may have

18   used Tweet Tunnel to retrieve that tweet.

19         A    I don't know if I retrieved it from Tweet Tunnel.

20         Q    Is there a way to -- assuming Tweet Tunnel, do you

21   know -- first of all, do you know what Tweet Tunnel is?  Could

22   you explain what it is, generally?

23         A    My understanding is that it archives old tweets.

24         Q    Is that the extent of your understanding?

25         A    Yes.

                    Rachel C. Simone, CSR, RMR, CRR

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 47 of
269

**Francis - by Plaintiff - Cross / Cole**

29

1    Q   Do you know how it archives the tweets?

2    A   I don't.

3    Q   Or the mechanisms for importing the tweets?

4    A   No.

5    Q   Or the security or quality control or verification that

6 they have for the tweets?

7    A   No.

8    Q   Or how they secure their content, correct?

9    A   Correct.

10    Q   Okay.  We will go back to that tweet.

11    In terms of the KwokMiles account, your

12 understanding is that that account was associated with Mr. Kwok,

13 correct?

14    A   Yes.

15    MR. HARBACH:  For clarity of the record, the

16    account with which web platform?  Are you talking about

17    Twitter or Tweet Tunnel?

18    MS. COLE:  My apologies.  I am going back to

19    Twitter.  Thank you for helping me out.

20    Q   To your understanding, Tweet Tunnel is not Twitter,

21 correct, it is a different website?

22    A   Correct.

23    Q   So let's go back to Twitter itself.

24    Your understanding is that @KwokMiles is a

25 Twitter -- is associated with Mr. Kwok, correct?

Rachel C. Simone, CSR, RMR, CRR

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 48 of 269

Francis - by Plaintiff - Cross / Cole

30

1       A       Yes.

2       Q       Do you know who, if anyone, posted content on that

3   website at any time on that account?

4       A       No.

5       Q       Do you know if there was any unauthorized use of that

6   account at any time?

7       A       I don't know.

8       Q       And you haven't actually traced the account to any

9   electronic devices held by Mr. Kwok or anything like that,

10  correct?

11      A       Correct.

12      Q       The account has been suspended, so there is no way for

13  anyone, any of us at this point to verify content; is that

14  correct?

15      A       I don't know the answer to that.  I don't know if there

16  is a technological way to do that.

17      Q       But certainly you haven't tried to or been able to?

18      A       Correct.

19      Q       Okay.

20              MS COLE:  On the Tweet Tunnel, do we want to

21          stipulate to the accuracy?  Would you guys be willing to

22          stipulate to the accuracy of that correspondence, or are we

23          ready to show Mr. Francis?

24              MS. BARROW:  It is in the chat that I shared with

25          all participants.

Rachel C. Simone, CSR, RMR, CRR

**Francis - by Plaintiff - Cross / Cole**

31

```
 1                    MS COLE:  Oh, okay.

 2                    MR. HARBACH:  Your Honor, if I may be permitted to

 3           address Ms. Cole directly for a moment to, hopefully,

 4           streamline this?  If we were in the courtroom, I would go

 5           over to counsel table and whisper it to her.

 6                    THE COURT:  Yes.

 7                    MR. HARBACH:  Ms. Cole, you are welcome to show

 8           the -- I think the document you have been looking for is

 9           what our law firm sent over to you guys as a placeholder to

10           let you know what the exhibit was.  I am alerting you that I

11           don't know whether Mr. Francis has ever seen that version

12           before.  That's all.

13                    MS. COLE:  Okay.  I am just curious if it will

14           refresh his recollection.  If not, that's fine.

15                    MR. HARBACH:  Okay.

16                    MS. COLE:  So let's just take a look.

17                    MS. BARROW:  Mr. Francis, do you see the document

18           that starts with Exhibit B?

19                    THE WITNESS:  I see a page that says Exhibit B.  I

20           am trying to find the actual content.  Okay, I can see it

21           now.

22   BY MS COLE:

23       Q    So do you see there are two lines there talking about

24   Figure 1 source and Figure 2 source?

25       A    I see Docket Number 1126, Exhibit B, but I am not sure
```

Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM    INDEX NO. 652077/2017
NYSCEF DOC. NO. 1179    Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 50 of 269    RECEIVED NYSCEF: 02/07/2022

Francis - by Plaintiff - Cross / Cole

32

1    what -- then I see the two images.

2                THE COURT:  I can't see what you are showing the

3        witness.  I am not sure Mr. Harbach can see it either.

4                MR. HARBACH:  I have a paper copy.  It's black and

5        white.  I can try showing it to the camera.

6                THE COURT:  I mean, the probative value of this is

7        near zero.  Let's not waste the morning on it.

8        Q    Mr. Francis, if the answer is you can't recall whether

9    you recovered the tweet from Twitter or from Tweet Tunnel, then

10   that's that the answer.

11       A    That's the answer.

12       Q    That's fine.

13               MS COLE:  Your Honor, I don't believe I have any

14       other questions.

15               THE COURT:  Okay.  Mr. Francis, you are excused.

16               Your next witness, Mr. Harbach?

17               MR. HARBACH:  Your Honor, I hate to try the

18       Court's patience --

19               THE COURT:  I am not going to entertain any

20       redirect.

21               MR. HARBACH:  Okay, your Honor.

22               THE COURT:  Mr. Francis put in six affidavits all

23       with references to various social media platforms.  The

24       Court will give that evidence such weight as it deserves.

25               Let's proceed.

Rachel C. Simone, CSR, RMR, CRR

33

1          MR. HARBACH:  Your Honor, our next witness we

2     tender for cross-examination is Mr. Todd Price.

3          MS. COLE:  Before we call him, can we discuss a

4     proffer of Mr. Price's testimony?  Will Mr. Price say the

5     only thing he can offer -- because what his affidavits say

6     is he downloaded from the internet on X day in January.

7          MR. HARBACH:  We expect that he will testify

8     consistently with the affidavits that have been proffered to

9     the Court.  As I mentioned before, his affidavits contain

10    more than just business record custodian type of stuff,

11    there is more content to them; but that's what we expect him

12    to testify consistent with, with what was submitted to the

13    Court.

14          MS. COLE:  Is there anything he can say other

15    than -- other than that it was the accuracy of what appeared

16    on the internet on the day he downloaded it, is there

17    anything else he can speak to?

18          MR. HARBACH:  I am not going to answer that

19    open-ended question.  You can cross him.

20          MS. COLE:  Okay, I will ask him.

21          MR. HARBACH:  Your Honor, if it is all right with

22    the Court, one of my colleagues, Laura Aronsson is going to

23    tender this witness, so I will let her have this chair.

24          MS. ARONSSON:  Thank you.

25          Good morning, your Honor.

Rachel C. Simone, CSR, RMR, CRR

Price - by Plaintiff - Cross / Cole

                                                                34

 1              THE COURT:  Mr. Price, raise your right hand.

 2              (Todd Price is duly sworn/affirmed.)

 3              THE COURT:  Ms. Cole, cross-examination.

 4         TODD PRICE, having been called on behalf of Plaintiff,

 5    first having been duly sworn, was examined and testified as

 6    follows:

 7    CROSS-EXAMINATION

 8    BY MS COLE:

 9         Q    Mr. Price, you have testified in your affidavits that

10    you are the chief technology officer at Page Vault, and you were

11    asked -- well, I don't know that you were asked, but you say that

12    you collected information from various websites; is that correct?

13         A    Correct.  Not personally, but our software did.

14         Q    And you can testify that that information that you

15    collected is how it appeared on the website as of the date you

16    collected it; is that the substance of your testimony?

17         A    Yes, it is.  Yes.

18         Q    So because I am not a technical person, as you can

19    tell, you collected content from a website on a certain date,

20    correct?

21         A    Yes.  Again, just to be clear, it was not me

22    personally.  I can only testify that the user of our software

23    collected it and that it existed on a particular date and time on

24    a particular website.

25         Q    And your duty, or your company's duty was to preserve

                    Rachel C. Simone, CSR, RMR, CRR

**Proceedings**

35

1    it as it appeared on that date?

2        A    Correct.

3        Q    Can you tell us anything further about the accuracy or

4    the authenticity of the content that was downloaded?

5        A    I cannot, no.

6        Q    Can you tell us anything about the substance of those

7    materials before you captured them that date?

8        A    I cannot.

9        Q    Then, I don't think I have any further questions.

10            THE COURT:  All right.  You are excused,

11       Mr. Price.

12            Next witness.

13            MR. HARBACH:  Your Honor, we don't have any other

14       witnesses.  I don't know if your Honor would like me to go

15       through a formal offer of our exhibits now or if it is

16       already clear from what we submitted to the Court.  If

17       memory serves, we submitted a column so the Court can see

18       which exhibits are in on consent and which are not.

19            The only other witness that was discussed with our

20       colleagues on the other side as a possible witness was a

21       representative from TransPerfect which is the company that

22       made the translations.  And as we represented to counsel in

23       our meet-and-confer calls, that witness who, again, is not

24       here, that witness would only have testified similar to the

25       way Mr. Price just did, that the business records affidavits

Rachel C. Simone, CSR, RMR, CRR

**Proceedings**

36

1          are -- excuse me, that the certifications of the translation

2          are, in fact, business records of TransPerfect.  That person

3          would not have been the one who actually did the

4          translation.  It was just a records custodian.  So we don't

5          have that witness available for cross.  What we would tender

6          to the Court would be those business record affidavits that

7          accompanied the translation.  I hope that is clear.

8                   Does the Court want me to make a formal tender of

9          the other exhibits or not?

10                   THE COURT:  You need not make a formal tender of

11          the other exhibits.  That's what you did in your submission.

12                   Anything from you, Ms. Cole?

13                   MS. COLE:  Your Honor, I would like to address

14          some of the evidentiary issues and the points that were made

15          by the other side in the brief.  I don't know if this is the

16          time to do that.

17                   THE COURT:  No, this is not the time to do that.

18          You have already briefed the probative value of the

19          witnesses' testimony who appeared this morning.  And there

20          is documentary evidence that has been submitted which I

21          don't believe is controverted.

22                   MS. COLE:  Well, I would like to address certain

23          other -- you know, they argued about the adverse inference.

24          They made some arguments about the admissibility that I

25          disagree with and some case law that I disagree with.

Rachel C. Simone, CSR, RMR, CRR

**Proceedings**

37

| | |
|---|---|
| 1 | THE COURT:  Well, let's get all the testimony in |
| 2 | the case in.  Then we will go through post-hearing issues. |
| 3 | MS. COLE:  Thank you. |
| 4 | THE COURT:  So let's have the defense's first |
| 5 | witness available for cross-examination by the plaintiff. |
| 6 | MR. SIEGAL:  Your Honor, John Siegal here. |
| 7 | The first several witnesses are witnesses for Hong |
| 8 | Kong International, the owner of the vessel.  And Lee Vartan |
| 9 | will be presenting those witnesses for cross-examination. |
| 10 | THE COURT:  Okay. |
| 11 | Mr. Harbach, you are muted.  I don't know if you |
| 12 | want to be or not. |
| 13 | MR. HARBACH:  Sorry, your Honor.  I was commenting |
| 14 | to my colleagues. |
| 15 | THE COURT:  Okay. |
| 16 | MR. HARBACH:  I will note, however, your Honor, |
| 17 | that Guo Mei just appearing on the screen; apropos of our |
| 18 | conversation before this hearing, if it were up to us -- and |
| 19 | perhaps it is not -- we think it would make more sense to |
| 20 | the Court to conduct a cross of Ms. Guo after the other |
| 21 | witnesses, but I understand it is not our case. |
| 22 | THE COURT:  Well, the defendants can present their |
| 23 | witnesses in whatever order they want for cross-examination. |
| 24 | MR. HARBACH:  Thank you, your Honor. |
| 25 | MR. VARTAN:  Good morning, your Honor.  Lee Vartan |

Rachel C. Simone, CSR, RMR, CRR

**Proceedings**

38

1       on behalf of Mei Guo.  Ms. Guo, as your Honor knows, has

2       submitted an affirmation.  We would tender that as her

3       direct testimony and offer her for cross-examination.

4               I will note for the Court, your Honor, that

5       Ms. Guo does need an interpreter, and I believe one is

6       available to her.

7               THE COURT:  All right.

8               THE INTERPRETER:  Yes, I am online.

9               THE COURT:  Ms. Guo, please raise your right hand.

10              THE INTERPRETER:  Your Honor, maybe the

11      interpreter needs to be sworn in first?

12              THE COURT:  Yes.  Please state your name.

13              THE INTERPRETER:  Echo Lim.

14              THE COURT:  Ms. Lim, you are a certified court

15      interpreter?

16              THE INTERPRETER:  No, sir.  I am certified but not

17      by the court.

18              THE COURT:  Who are you certified by?

19              THE INTERPRETER:  I am certified by agency.

20              THE COURT:  By who?

21              THE INTERPRETER:  Agency.

22              THE COURT:  By your agency, all right.

23              Do you swear to interpret Ms. Guo's testimony

24      truthfully and accurately?

25              THE INTERPRETER:  Yes, sir.

Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 1179
RECEIVED NYSCEF: 02/07/2022

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 57 of
269

**Proceedings**

39

```
 1              THE COURT:  All right.

 2              Ms. Guo, please raise your right hand.  Do you

 3    swear to tell the whole truth and nothing but the truth?

 4              Ms. Lim, can you please tell Ms. Guo that she is

 5    muted.

 6              THE INTERPRETER:  I just did.

 7              THE COURT:  Please explain to Ms. Guo that we are

 8    having difficulty hearing her because she is not speaking

 9    into the microphone or because the microphone is not active.

10                   (Brief pause)

11              THE WITNESS:  I'm sorry, your Honor.  Can you hear

12    me now?

13              THE COURT:  Yes.

14              Okay.  Cross-examination can proceed.

15              MR. HARBACH:  Your Honor I could be mistaken, but

16    I don't believe the witness's oath was completed because of

17    the technical problem.

18                   (Mei Guo is duly sworn/affirmed.)

19              MR. HARBACH:  For the record, Madam Translator,

20    what you just administered to the witness was the standard

21    oath given in Court that she swears to tell the truth; is

22    that right?

23              THE INTERPRETER:  Yes, sir.

24              MR. HARBACH:  Thank you.

25              THE COURT:  Please proceed.
```

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

40

1          MEI GUO, having been called on behalf of Defendant,

2    first having been duly sworn through the interpreter, was

3    examined and testified as follows:

4    CROSS-EXAMINATION

5    BY MR. HARBACH:

6        Q    Ms. Guo, first question, what is the correct way to

7    address you?  Is it Mei Guo or Guo Mei?  What are you most

8    comfortable with?

9        A    My Chinese name is Guo Mei, and my English name is Mei

10   Guo, so you can address me as Mei Guo.

11       Q    Thank you, ma'am.

12            It seems clear this morning that you do speak and

13   understand some English?

14       A    Yes.

15       Q    For the clarity of the record, I will make one request

16   going forward.  That is that even if you understand a question I

17   put to you in English, please wait for the interpretation before

18   you answer.

19       A    All right.

20       Q    That way we make sure that you understand my question

21   before you answer it.

22       A    All right.

23       Q    And if at any time you don't understand a question,

24   please just let me know.

25       A    All right.  Thank you.

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

41

1      Q    Do you have a copy of the affidavit that you signed and

2    submitted in connection with today's hearing?

3      A    I don't have it with me.  I don't have it right now

4    next to me.

5      Q    Give me just a moment.  I think I can fix that.

6      A    Thank you.

7      Q    I believe I am sharing my screen now.  Are you able to

8    see that, ma'am?

9      A    Yes, I see it.

10         MR. HARBACH:  Your Honor, can the Court see it?

11         THE COURT:  Yes.

12     Q    So Ms. Guo, what is up on the screen for the record is

13   Docket 1162 in this matter.  And in the caption it says

14   "Affidavit of Mei Guo."

15     A    Okay.

16     Q    I am going to show you the last page of it.  For the

17   record, this is Page 5 of the exhibit.

18         Is that your signature that appears?

19     A    It is my signature.

20     Q    You read this affidavit or had it translated for you

21   before you signed it, didn't you?

22     A    Yes, I have read it.

23     Q    I realize that it is in English.  Did you understand

24   what you read?

25     A    Yes.

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

42

1          Q     My first question about the affidavit concerns

2     Paragraph 8.  I suppose I should ask if -- can read English,

3     ma'am?

4          A     Yes, I can.

5          Q     Paragraph 8 is up there on the screen right now.  Take

6     a moment and read it to yourself and tell me when you are done.

7          A     I am done reading.

8          Q     There is a name mentioned in that paragraph called

9     Qu Guojiao.  And you mentioned that Ms. Qu was a trusted business

10    partner of your brother's, your uncles, and your cousins.

11         A     Yes, but I have something to add on to your earlier

12    explanation, sir.  Guojiao is not the last name.  This person's

13    last name is Qu, Q-U.

14         Q     Thank you for clarifying.

15               My question for you is:  Isn't it true that your

16    father also knows Ms. Qu?

17         A     My father know Ms. Qu.

18         Q     And was Ms. Qu a trusted business partner of your

19    father's as well?

20         A     No, she isn't.

21         Q     Is that according to your father?

22         A     No.  This is according to the fact.

23         Q     Well, whether someone is a trusted business partner has

24    to do with the mind of the person who is doing the trusting,

25    doesn't it?

Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
NYSCEF DOC. NO. 1179

INDEX NO. 652077/2017

RECEIVED NYSCEF: 02/07/2022

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 61 of
269

Guo - by Defendant - Cross / Harbach

43

1        A        I don't quite understand your question, sir.  Can you

2    please elaborate?

3        Q        Let me put it to you this way.  Do you know one way or

4    the other whether your father trusted Ms. Qu?

5        A        I do not know.

6        Q        It is true, however, that your father founded Hong Kong

7    International in 2006, right?

8        A        Yes.

9        Q        And that he owned and controlled that entity until

10   October of 2014 when he transferred it to Ms. Qu, right?

11       A        As far as I know, yes.

12       Q        As far as you know, that transfer was for zero dollars,

13   correct?

14       A        Regarding this, I really do not remember very clearly.

15       Q        Did your father or Ms. Qu discuss that transfer with

16   you at any time around the time it happened?

17       A        No.

18       Q        You state in your affidavit at Paragraph 3, which I

19   have now displayed on the screen, that your father fled China to

20   the United States in early 2015.  Do you see that there?

21       A        Yes, I see it; but in 2015 my father left China from

22   Hong Kong to United States.

23       Q        Thank you for clarifying.  My point was the timeframe.

24       A        Okay.

25       Q        Isn't it true that in February of that year, namely

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

44

```
 1   2015, that Hong Kong International bought the yacht that is at

 2   issue here, correct?

 3       A    Yes.

 4       Q    And Ms. Qu, who was the owner of Hong Kong

 5   International at that time, she didn't come up with the

 6   28 million Euros for the yacht, did she?

 7       A    Correct.  She didn't pay for it.

 8       Q    Your father provided the money, didn't he?

 9       A    Not my father.

10       Q    Do you know where the money came from?

11       A    I do not know where the money coming from, but I have

12   learned that the yacht was bought by my brother.

13       Q    I understand that.  We will get to that a little bit

14   later.

15            Is your testimony that in early 2015 it was your

16   brother who bought the yacht?

17       A    Yes, my brother bought it for me.

18       Q    My question is where the money came from because the

19   bill of sale makes it clear that Hong Kong International

20   purchased the yacht for 28 million Euros.  And my question for

21   you is where did that money come from, if you know?

22       A    I do not know.

23       Q    So earlier when you said your father did not provide

24   the 28 million, the truth is you really don't know one way or the

25   other, correct?
```

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

45

1        A     I know I don't know where the money coming from, but

2   what I know is that this yacht was bought by my brother for me.

3        Q     What do you mean when you say "bought" if you don't

4   know where the money came from?

5        A     When someone gives me a gift I do not need to ask the

6   person where the money purchasing the gift coming from, right?

7        Q     Fair enough, but are you saying that the yacht was

8   given to your brother as a gift?

9              MR. VARTAN:  Objection, misstates the testimony.

10       A     --

11             MR. VARTAN:  I have an objection pending to that

12       question.

13             THE COURT:  The objection is overruled.

14             THE INTERPRETER:  The objection has been

15       translated.

16       Q     You may answer the question because the Court has

17   overruled the objection.

18       A     This yacht was not a gift from someone to my brother.

19   It was a gift from my brother to me.

20       Q     You said that several times, and at the risk of trying

21   the Court's patience I am going to try this once more.

22             You told us a moment ago or you agreed with my

23   question about Hong Kong International purchasing the yacht in

24   February of 2015 for 28 million Euros.

25       A     Yes.

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

46

1      Q     And my question to you was where -- I asked you whether

2   Ms. Qu came up with the $28 million and you said no, correct?

3      A     Correct.

4      Q     And the reason I asked that question was because at the

5   time, it was Ms. Qu that owned and was the sole member of Hong

6   Kong International; isn't that right?

7      A     Correct.

8      Q     I understand your answer that you said a couple of

9   times.  You don't know where the 28 million Euros that landed in

10  the hands of the seller of the yacht came from, right?

11     A     Yes.  I know that this yacht was a gift from my brother

12  to me, so I know that this was my brother's purchase.

13     Q     But you don't know --

14           THE COURT:  How does a yacht get transferred from

15     Hong Kong International to your brother?

16           THE WITNESS:  Your Honor, this yacht, when it was

17     purchased under Hong Kong International it was under the

18     name of Ms. Qu or Qu Guojiao, not under my brother's name.

19           THE COURT:  Are you telling the Court that the

20     boat went from Hong Kong International to Ms. Qu, and then

21     from Ms. Qu to your brother?

22           THE WITNESS:  Your Honor, it is from Hong Kong

23     International to Ms. Qu, then it was transferred to me.  It

24     has never transferred to my brother.

25           THE COURT:  So you received the boat from Ms. Qu

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

47

```
1        after she received the boat from Hong Kong International,

2        correct?

3              THE WITNESS:  Yes, your Honor.

4              THE COURT:  Your brother was not involved in any

5        of the transfers before you acquired the boat, according to

6        your testimony?

7              THE WITNESS:  Correct.

8              THE COURT:  Go ahead, Mr. Harbach.

9              MR. HARBACH:  Thank you, your Honor.

10   CROSS-EXAMINATION (CONTINUED)

11   BY MR. HARBACH:

12       Q    Ms. Guo, isn't it true that when Ms. Qu transferred

13   Hong Kong International to you, as you just told his Honor, that

14   was for one dollar; right?

15             THE INTERPRETER:  Sorry, the interpreter needs a

16        clarification.

17             Is it Hong Kong International that is

18        transferring?

19             MR. HARBACH:  That is correct.

20       A    Yes, it was.

21       Q    Have you ever met Ms. Qu?

22       A    Yes.

23       Q    Do you know what she looks like?

24       A    Yes.

25       Q    I am going to show you what has been marked for
```

Guo - by Defendant - Cross / Harbach

48

1    identification as Plaintiff's Exhibit 53, a photograph.

2                    Can you see that?

3        A    Yes.

4        Q    Is the person depicted in Plaintiff's 53 Ms. Qu?

5        A    The person is slightly different than the person that I

6    met, but I believe it is she.

7        Q    How confident are you of that?

8        A    I am confident.

9        Q    Now, I will put your affidavit back up on the screen.

10                   MR. SIEGAL:  Your Honor, this is John Siegal.

11                   We object to this.  I don't have an Exhibit

12   50-whatever.  It was not disclosed.  It is not on the

13   exhibit list.  I don't have any exhibits higher than 38.  So

14   this picture has not been proffered through the pretrial

15   process.

16                   MR. HARBACH:  Would you like me to respond, Judge?

17                   THE COURT:  Yes.

18                   MR. HARBACH:  First of all, it is a photograph.

19   It is quite simple.  Second of all, it's cross-examination,

20   and that's the reason it hasn't been proffered through the

21   pretrial process.

22                   The reason that Mr. Siegel's exhibits only go up

23   to 38 is because during the course of preparing for this

24   hearing I marked things that I wanted to use on cross

25   starting at number 50, so there won't be a whole lot

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

49

1          exhibits like this.

2                    MR. SIEGAL:  We object.  We get a brief after

3          business hours the night before the hearing, and now we are

4          getting trial by ambush with exhibits that were not

5          disclosed when the Court's order was very clear that trial

6          exhibits were to be disclosed.

7                    THE COURT:  Mr. Siegal, I am overruling the

8          objection.  I want to go on with this hearing.  I don't want

9          any obstruction.  This witness is here to tell the truth.

10         And in order to tell the truth and for the truth to come

11         out, the plaintiff is entitled to cross-examine her.

12                   MR. SIEGAL:  Well, your Honor --

13                   THE COURT:  It is not trial by ambush.

14                   MR. SIEGAL:  -- it is violative of the Court's

15         pre-hearing directive, and we object.

16                   THE COURT:  All right.  Your objection is noted.

17                   Let's move on.  It is 11:45 and we've had fifteen

18         minutes of meaningful testimony.

19                   MR. HARBACH:  Yes, your Honor.

20     BY MR. HARBACH:

21         Q    Let's go to Paragraph 14 of your affidavit.

22         A    Thank you.

23         Q    Do you see that on your screen?

24         A    Yes.

25         Q    Oh, I'm sorry.  I have one question before I get to

                    Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

50

1    that.

2              To your knowledge has Ms. Qu ever set foot on the

3    Lady May?

4        A    Not together with me, but I don't know if she had

5    before that.

6        Q    Okay.

7              Let's now look at Paragraph 14.  You say that you

8    are solely responsible for directing the Lady May's movements.

9        A    Correct.

10       Q    That's not true when your dad is aboard, is it?

11       A    It is true because even if my father needed to board

12   Lady May, he needed my authorization.

13       Q    I understand your answer, but it doesn't exactly

14   respond to my question.  My question is:  When your father is

15   aboard the Lady May without you, for example, he directs the Lady

16   May's movements, doesn't he?

17       A    Your question means that if I am not at sea, if my

18   father is on board, wherever he wants to go he has the freedom to

19   choose; is that so?

20       Q    That's more or less a summary of it.  Sure.

21       A    If I am not on board on Lady May, and if my father is

22   on Lady May, whatever the direction he wanted to go to, he has

23   the freedom choose.  Sure.

24       Q    And you mentioned that he requires your authorization

25   to come aboard?

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

51

1      A      Yes.

2      Q      But he doesn't require your authorization about where

3      to drop anchor, or where to refuel, or where to stay overnight;

4      right?

5      A      --

6                  MR. VARTAN:  Just to clarify, are you asking when

7            she is on board or when she is not on board?

8                  MR. HARBACH:  She can answer both.

9      A      I will need to probably give you a brief education

10     about ownership of yacht.

11                 All these decisions you just mentioned was not

12     idea significance to be made by the owner of the yacht.  It is

13     idea significance made by the -- it is idea significance made by

14     the captain of the yacht.

15     Q      Well, I understand what you just said, but your

16     affidavit mentions movements, directing movements.  That's why I

17     asked my questions; but I will ask my question a different way

18     and then move on.

19     A      Okay.

20     Q      When your father has been out on the yacht without you,

21     how many times has he called you to ask your permission about

22     whether he can drop anchor somewhere?

23                 MR. VARTAN:  Objection.  That ignore's Ms. Guo's

24            testimony from a few moments ago.

25                 THE COURT:  The objection is overruled.

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

52

| | |
|---|---|
| 1 | THE INTERPRETER:  Can you repeat the question, |
| 2 | sir?  I kind of lost my memory about the question just now. |
| 3 | MR. HARBACH:  Sure. |
| 4 | Q    When your father has been out on the yacht alone or |
| 5 | without you, at least; how many times has he called you to ask |
| 6 | your permission about whether he is allowed to drop anchor? |
| 7 | A    Okay.  Before my father board the yacht he always get |
| 8 | my permission, and before getting the permission he has a |
| 9 | detailed itinerary.  All his trips will be following the |
| 10 | itinerary to the T.  And he never did call me during the trip |
| 11 | when he was on the yacht. |
| 12 | Q    Do you have any of those itineraries? |
| 13 | A    My father's safety is very sensitive issue.  It is not |
| 14 | possible for us to have any printout of his itinerary.  His |
| 15 | itinerary was normally briefed to me over the phone when he |
| 16 | called me before he boarded the yacht. |
| 17 | Q    I see. |
| 18 | If there is no documentation about these occasions |
| 19 | when you say your father sought authorization from you, your |
| 20 | testimony is that you just recall that every time he went out he |
| 21 | gave you a detailed itinerary of everywhere he was going to go? |
| 22 | A    When my father boarded the yacht he is my guest.  It is |
| 23 | impossible for me to request all my guests that boarded the yacht |
| 24 | to give me a very detailed plan for their trip. |
| 25 | Q    I understand that, but just a few minutes ago I |

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

53

1   understood you to say that whenever your father took the yacht

2   out, number one, he had to get authorization from you which, I

3   suppose, all guests would; and, number two, I believe you said

4   every time he went out he gave you a detailed itinerary.  So it's

5   no answer to my -- sorry, Madam Interpreter.  Go ahead.  Excuse

6   me.

7          A    I will give you an example, sir.

8                 If the yacht is in New York, my father boarded it

9   New York and he told me he is going to Long Island, then I would

10   agree to it.  But if he wants to stop half way, it is his freedom

11   as long as it is within the New York area.  But if he is taking

12   the yacht to Palm Beach, then he would need to give me a very

13   detailed itinerary.

14          Q    Did your father ever take the yacht out without your

15   permission or knowledge?

16          A    Never.

17          Q    Let's look at -- well, we are still on Paragraph 14.

18   Excuse me.

19                 You talk about in early October of 2020 no longer

20   wishing to use the boat and relating that to Golden Spring.

21          A    Yes.

22          Q    And then the remainder of the sentence says -- the

23   paragraph says that Golden Spring relayed your directive to

24   Captain Heaslop.

25          A    Yes.

Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 1179
RECEIVED NYSCEF: 02/07/2022

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 72 of
269

Guo - by Defendant - Cross / Harbach

54

1      Q      Do you remember this?

2      A      Yes, I remember.

3      Q      What exactly was your directive?

4      A      Because my yacht in every October the winter season,

5    due to the reason of the weather, it needs to be parked in

6    Florida, a warmer place.  So to me this is a very ordinary

7    request.  Golden Spring asked me if I still need to use the yacht

8    because my understanding is that a yacht needs to be moved to a

9    warmer place.

10     Q      I want to make sure I understand the last part of that

11   answer before I ask another question.

12             Did you say that Golden Spring asked you if you

13   wanted to continue to use the yacht?

14     A      It wasn't a request or inquiry, actually, because I

15   already know that the yacht is no longer suitable to be used in

16   New York under the weather conditions.  They were just informing

17   me that the yacht needs to move to a warmer place.

18     Q      So Golden Spring was informing you of that decision?

19     A      It is not informing.  It is more like reporting.

20     Q      I see.

21             So in your affidavit when you say you no longer

22   wish to use the boat for the season due to the weather; was that

23   the reason you relayed the directive, or is it because you heard

24   from Golden Spring that the boat needed to go to Florida?

25     A      Okay.  Let me reiterate my answer, sir.

Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 1179
RECEIVED NYSCEF: 02/07/2022

Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 73 of
269

Guo - by Defendant - Cross / Harbach

55

1            Every year in the past few years in October, that

2     would be the time to arrange for the yacht to be moved to a

3     warmer place.  So this year, that particular year before they

4     moved the yacht to warmer place, they informed me, they told

5     me -- rather, they report to me that the yacht needs to be moved

6     to the warmer place.  So it was more like a routine activity.

7          Q    I understand.

8            So is it true, then, that your directive in

9     response to that information was, Take the yacht to Florida?

10         A    Yes, I agreed to the request sent by the captain.

11         Q    Well, I'm sorry, but that's not what your affidavit

12    says.  Your affidavit refers to a directive, so that's what I am

13    trying to understand.  That was my original question.  What

14    exactly was your directive?

15         A    My communication with the captain is through a

16    representative of the company.  The representative of the company

17    came to me and told me it is about time to move the yacht to a

18    warmer place, so my instruction to the representative is that

19    yes, all right, the yacht needs to move to Florida.  That was my

20    directive.

21            THE COURT:  What is your relationship with Golden

22        Spring?

23            THE WITNESS:  Your Honor, Golden Spring helps me

24        to pay all the expenses for my yacht, including the

25        management fees.

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

56

1          THE COURT:  Do you have an ownership interest in

2     Golden Spring?

3          THE WITNESS:  No.

4          THE COURT:  Why would Golden Spring help you pay

5     all of the expenses associated with operating and

6     maintaining the yacht?

7          THE WITNESS:  Golden Spring belongs to my brother.

8     It is my brother's company.  When the yacht was gifted to me

9     as a gift, I find it very troublesome to form another bank

10    account just to try to manage the yacht; so I requested my

11    brother if he can continue to manage the yacht using his

12    company.  He and I came to an agreement with that.

13         THE COURT:  So it is your testimony that your

14    brother is the sole owner of Golden Spring?

15         THE WITNESS:  Yes, your Honor.

16         THE COURT:  And it was part of your brother's gift

17    to you that he would incur the costs of maintaining and

18    operating the yacht?

19         THE WITNESS:  Yes.

20         THE COURT:  Do you know how much it costs to

21    maintain and operate the yacht for a year?

22         THE WITNESS:  Your Honor, between $2 million to

23    $3 million US dollars.

24         THE COURT:  All right.  We are going to give the

25    court reporter a ten-minute break.  She has been trying to

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

57

```
 1            follow the testimony all morning.  We will resume at 12:15

 2            and go to 1:00 and break for lunch.

 3                     THE WITNESS:  Okay.  Thank you.

 4                         (Short recess taken)

 5                     THE COURT:  All right.  Let's proceed.

 6    BY MR. HARBACH:

 7       Q    Ms. Guo, at the time you directed that the yacht go to

 8    Florida, were you aware that a temporary restraining order had

 9    been entered against your father on September 30?

10                     THE INTERPRETER:  September 30, right, sir?

11                     MR. HARBACH:  Yes, of 2020.

12       A    I do not know about it at that time.

13                     MR. HARBACH:  Could I ask the interpreter to

14            please clarify?  She did not know about it at the time?

15                     THE INTERPRETER:  She did not know about it at the

16            time, sir.

17                     MR. VARTAN:  Your Honor, I will interpose an

18            objection.  I understand that the Court's order was entered

19            in October and not in September.

20                     THE COURT:  (To the witness)  At any time in 2020

21            were you aware that a temporary restraining order was

22            entered against your father prohibiting him from removing

23            the vessel from the territorial United States?

24                     THE WITNESS:  I learned about this matter around

25            the end of 2020.  I can't remember the exact date.  It was
```

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

58

 1          sometime in winter.  It possibly is the beginning of 2021.

 2          I came to know about it through my lawyer's telephone call.

 3   BY MR. HARBACH:

 4          Q    So when the yacht sailed south for Florida in early

 5   October of 2020, your testimony is that you did not know about

 6   any restraining order that had been entered on September 30?

 7                    MR. VARTAN:  Same objection, your Honor, with

 8          respect to the date.  Certainly if Mr. Harbach has a

 9          document he wants to show the witness, I am sure she would

10          be happy to look at it; but I understand the date to be

11          October 15 and not September 30.

12                    MR. HARBACH:  To clarify for counsel and the

13          Court, there is a temporary restraining order issued on

14          September 30 of 2020.  It is Document 591 on the Court's

15          docket.  My only question about this is whether the witness

16          was aware that that temporary restraining order had been

17          entered.

18                    MR. VARTAN:  Again, your Honor, my understanding

19          is that the September order, not to belabor the point, has

20          nothing at all to do with the Lady May.  Granted, I wasn't

21          part of the proceedings at that point, but my understanding

22          is the Lady May is first made mention before your Honor in

23          October, not September 30.  So, again, I'd invite

24          Mr. Harbach to show the document to the witness if he has

25          something before him.

                    Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 1179
Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 77 of
269
RECEIVED NYSCEF: 02/07/2022

Guo - by Defendant - Cross / Harbach

59

1            THE WITNESS:  To answer the question, the answer

2       is that I do not know about it, and I would like to have a

3       look at this document if you have.

4            Thank you.

5            THE COURT:  Ma'am, you testified three minutes ago

6       that you became aware of a temporary restraining order

7       relating to the Lady May sometime in late 2020 or, perhaps,

8       early 2021.  Is that your testimony?

9            THE WITNESS:  Correct.

10           THE COURT:  Mr. Harbach, that's the witness's

11      testimony.  Can we move on?

12           MR. HARBACH:  Sure, your Honor.

13  BY MR. HARBACH:

14      Q    When you mentioned earlier that Golden Spring gave you

15  a report about the yacht needing to sail south in Florida, that

16  was something that was fairly regular in your experience -- I

17  withdraw that question.  I'm sorry.

18           What I mean to ask is:  Was it fairly common for

19  you to exercise direction over the Lady May via Golden Spring?

20      A    These type of normal ordinary routine activities, since

21  we -- since all the parties understood the timeframe or the time

22  point, they will just inform me to execute it.  But if I have

23  guest or I needed the yacht myself, I will directly contact the

24  captain.

25      Q    I see.

Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
NYSCEF DOC. NO. 1179

INDEX NO. 652077/2017
RECEIVED NYSCEF: 02/07/2022

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 78 of
269

Guo - by Defendant - Cross / Harbach

60

1           Based on your experience with Golden Spring, would

2    it be fair to say that as far as you could tell based on your

3    interactions with them, there were people who worked at Golden

4    Spring who knew that you controlled and owned the yacht?

5        A    Yes, all of them know.

6        Q    All right.

7           Now let's return to your affidavit.  I am going to

8    share my screen now to show you Paragraph 20.  Can you see it?

9        A    Yes.

10       Q    Now, in the beginning of this paragraph you mention

11   that you learned through counsel of the Court's order requiring

12   the Lady May to return to New York in May?

13       A    Yes.

14       Q    Okay.  Did you read it, "it" being the order?

15       A    I was informed by my lawyer at the time.

16       Q    My question is did you read it?

17       A    --

18           MR. VARTAN:  Your Honor, I would just caution

19       Ms. Guo not to go into any conversations she had with her

20       counsel.

21           THE COURT:  All she was asked was whether she read

22       the Court's order.

23           MR. VARTAN:  Understood.  I was just cautioning

24       her in advance of responding.

25       A    To answer the question, sir, yes, I have read it.

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

61

1      Q     Okay.  Bear with me just a second, please.

2      A     Okay.

3            THE COURT:  I'm sorry, is there a pending

4      question?

5            MR. HARBACH:  No, your Honor.  I am trying to pull

6      the document up.  Sorry for the delay.  I have it now.

7      Q     What I displayed on the screen now is the order that we

8      have been just talking about.  Do you recognize this as an order

9      that you have read before?

10     A     Can you allow me some time to read it?

11           MR. VARTAN:  Mr. Harbach, can you make that larger

12     to aid the witness?  Thank you.

13     A     Can you go back to the top?

14     Q     Sure.  Let me know when I can continue and I will

15     continue to move it.

16     A     The document date shows September 30, 2020.  I am not

17     too sure if I have read this document before.

18     Q     If you will bear with me a moment, I hope to make this

19     clear.  It is not intended to be a trick question.

20           THE INTERPRETER:  Sorry, I couldn't hear the last

21     sentence of your question?

22     Q     I said that I am going to try and help you.  It is not

23     intended to be a trick question.

24           What I put on the screen now is Document 728 from

25     the Court's docket.  This is the page that has Judge Ostrager's

Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 1179
Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 80 of
269
RECEIVED NYSCEF: 02/07/2022

Guo - by Defendant - Cross / Harbach

62

```
 1   signature.  It is dated March 16 of 2021.

 2        A     Okay.

 3        Q     And this is the order of the Court that specifically

 4   requires that it be returned to New York?

 5        A     Okay.  Okay.

 6        Q     So my question for you is:  Have you ever seen this

 7   order before?

 8        A     Can you please go back to the top of the document and

 9   show me again because I want to reconfirm.  At this point of time

10   I am not able to confirm it.

11        Q     Okay.  I will give you a little while longer, but then

12   I will move on because it is not crucial.

13              THE COURT:  Can you show her the next page?

14              MR. HARBACH:  Yes, your Honor.

15        A     I really truly do not recall if I have seen this

16   document before, but I do know the content of this document.

17        Q     Okay.  Thank you.

18              Returning to your affidavit, you said in

19   Paragraph 20 that you were aware of the Court's order requiring

20   the Lady May to return to New York in May of '21 and that you

21   learned of that through your counsel?

22        A     Yes.

23        Q     So what I want to make sure I understand is when you

24   learned of the Court's order.  I understood you to say to

25   Justice Ostrager a few minutes ago that you thought you learned
```

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

63

1    of a restraining order at the end of 2020 or the beginning of

2    2021, is that correct?

3        A    What I remember now is that at the end of 2020 my

4    lawyer called me and informed me that there would be a possible

5    issue as such with Lady May, but I don't remember exactly when I

6    learned about this order, this Court order.  It is probably

7    around 2021, beginning of 2021 between the month of March and

8    April.

9        Q    Okay.  Let me --

10                MR. HARBACH:  I really appreciate your Honor being

11            patient.  I am moving as quickly as I can.

12        Q    Let me add one more piece to the puzzle.  And, again, I

13    am not trying to confuse you.

14                There was a restraining order issued by the Court

15    on October 15 of 2020.  I am going to represent that to you,

16    okay?

17        A    Okay.

18        Q    Do you think that is the order that you learned about

19    toward the end of 2020 from your counsel?

20                MR. VARTAN:  Your Honor, I would object.  I think

21            the question has been asked and answered now a number of

22            times.  Also, we are beginning to conflate dates.  We are

23            looking at Paragraph 20 that talks about a different court

24            order from March.  Mr. Harbach is talking now about an order

25            from October.  I think he is confusing the witness here.

Rachel C. Simone, CSR, RMR, CRR

Guo - by Defendant - Cross / Harbach

64

1            THE WITNESS:  Thank you.

2            THE COURT:  Just rephrase your question.  This

3       isn't that hard.

4       Q    Ms. Guo, when was the first time you learned about any

5   restraining order from the Court through your counsel?

6            MR. VARTAN:  Same objection.  Asked and answered

7       multiple times.

8            THE COURT:  Overruled.

9            THE WITNESS:  Can I answer the question?

10            THE COURT:  Yes.

11      A    I really do not remember the specific date, but it was

12   somewhere around the beginning of 2021.  It was somewhere around

13   the beginning of 2021.  I really do not remember the specific

14   date.

15      Q    After you learned about the order from your counsel,

16   did you discuss it with your father?

17            MR. VARTAN:  I'd just ask Mr. Harbach to clarify,

18       your Honor, which order he is talking about.  He's mentioned

19       a September order, an October order, a March order?

20            THE COURT:  Let's make this easy.

21            Ms. Guo, did you discuss any Court orders relating

22       to the Lady May with your father?

23            THE WITNESS:  I did not.  I have only discussed it

24       with my lawyers.

25      Q    The lawyer representing you today, Mr. Vartan, is that

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 1179
Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 83 of
269
RECEIVED NYSCEF: 02/07/2022

Guo - by Defendant - Cross / Harbach

65

```
 1    the same lawyer who alerted you about the existence of a court

 2    order relating to the Lady May?

 3        A    Yes.

 4        Q    Who is paying for his services?

 5        A    Golden Spring.

 6             MR. HARBACH:  Your Honor, did you say you wanted

 7        to break at 1:00 for lunch?

 8             THE COURT:  Yes.  And I wanted to speak with you

 9        and Mr. Siegal in the same manner that we did at the

10        beginning of this hearing.

11             MR. HARBACH:  May I suggest that we break now and

12        do that?  The last bit of questioning I have that has to do

13        with this witness involves publication of exhibits and may

14        be a little cumbersome.  I would suggest doing that right

15        after lunch.

16             THE COURT:  All right.  We can do that.

17             For the record, Ms. Guo, I have excluded the press

18        from your testimony because I understand that you were

19        detained and tortured by the CCP and your whereabouts are

20        potentially a matter of interest to the CCP while you seek

21        asylum in the United States.  If there is no disclosure in

22        your examination about your whereabouts, the transcript of

23        your examination will be made public.  And I should add that

24        the plaintiff has consented to this arrangement, which is

25        highly unusual.
```

Rachel C. Simone, CSR, RMR, CRR

**Guo - by Defendant - Cross / Harbach**

66

1              THE WITNESS:  Thank you, your Honor, for my

2      protection over my safety and not allow the media's

3      involvement in this proceeding.  Thank you, your Honor.

4              THE COURT:  All right.  We will break for lunch

5      now.  I would like counsel to call me at the same number

6      that I gave you before.

7              MR. VARTAN:  Your Honor, could I first be heard on

8      one issue?

9              THE COURT:  Yes.

10              MR. VARTAN:  With respect to the remainder of

11      Mr. Harbach's cross-examination, can he give me a rough

12      approximation of how much more time he has so that I can

13      plan for other witnesses?

14              MR. HARBACH:  I am happy to do that.  I have a

15      couple small factual questions to ask, and then I have three

16      of the videotapes that we proffered to the Court that I want

17      to show some tiny portions of to the witness.  My guess is

18      30, 40 minutes.

19              MR. VARTAN:  Thank you, Mr. Harbach.

20              Thank you, your Honor.

21              THE COURT:  Okay.  We will resume at 2:00.

22              MR. SIEGAL:  Your Honor, may we call you towards

23      the end of the lunch break or would you like to hear from us

24      now?

25              THE COURT:  I would like to hear from you now.

                    Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM

INDEX NO. 652077/2017

NYSCEF DOC. NO. 1179

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 85 of
269

RECEIVED NYSCEF: 02/07/2022

Guo - Defendant - Cross / Guo

67

```
 1                    MR. SIEGAL:  All right.  I will reach out to

 2         O'Melveny and we will call you.

 3                    THE COURT:  Great.

 4                    (L U N C H E O N   R E C E S S)

 5                    MR. HARBACH:  Your Honor, can I continue my

 6         questioning?

 7                    THE COURT:  Yes.

 8    BY MR. HARBACH:

 9         Q    Ms. Guo, before lunch we talked about all sorts of

10    things, but you mentioned something in one of your answers that I

11    just would like to clarify.

12         A    Okay.

13         Q    I believe you said in one of your answers that if you

14    needed to use the yacht with some friends, for example, you would

15    just contact the captain directly?

16         A    Sometimes I contacted the captain directly.  Sometimes

17    I would contact the captain through Golden Spring.

18         Q    Do you recall the names of any of the captains you

19    contacted directly?

20         A    I communicated mostly with captain that I used earlier,

21    Mr. Craig.  Then I also have contacted Momchil, the current

22    captain of the yacht.

23         Q    You have contacted each of them directly, is that

24    right?

25         A    Yes.
```

Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 1179
RECEIVED NYSCEF: 02/07/2022

Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 86 of
269

Guo - Defendant - Cross / Guo

68

1    Q    Let me show you now an exhibit that has been marked as

2    Plaintiff's Exhibit 19.  Bear with me one second.  I have cued up

3    the video to one specific part that I want to play for you.  I am

4    sharing my screen now.  I am going to play about ten or twelve

5    seconds of this.  Then I am going to ask you a question, okay?

6    A    Okay.

7                        (Video played.)

8    Q    So first question, Ms. Guo, is that your father who is

9    speaking in the video?

10    A    Yes.

11    Q    I am pausing the video at the 6:59 mark.  You recognize

12    that location, don't you?

13    A    Yes.

14    Q    That's the interior of the apartment that is at the

15    Sherry Netherlands, correct?

16    A    Yes, it is.

17    Q    I am going to represent to you that this video appears

18    to have been created in approximately November of 2017.

19    A    Okay.

20    Q    Do you recall whether you were present when this

21    interview was taped?

22                MR. VARTAN:  Your Honor, I would just object to

23        this similar to the line of cross-examination that was heard

24        this morning.  I don't know that there is any way to know --

25        I should say for Ms. Guo to know when this video was

Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 1179
RECEIVED NYSCEF: 02/07/2022
Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 87 of
269

Guo - Defendant - Cross / Guo

69

1   created.  I understand counsel's representation, but we

2   don't have anything beyond that.

3          MR. HARBACH:  The question wasn't whether the

4   video was created in November of 2017.  I proffered to her

5   that it was created in November 2017 in an attempt to orient

6   her about her memory about whether she was present for it.

7   The question is not the date of it, the question is whether

8   she was present.  That's all.

9          MR. VARTAN:  That would have to presume it was

10  actually created in November of 2017.

11         THE COURT:  No, it wouldn't presume anything.  He

12  is just asking whether she was present when this interview

13  took place.  The date of the interview is irrelevant for

14  purposes of this question.

15  A    I wasn't present.

16  Q    Were you living at the Sherry Netherlands at the

17  time -- I'm sorry.  Were you living at the Sherry Netherlands in

18  November in 2017?

19  A    I stayed there sometimes.  I stayed there once in a

20  while.

21  Q    I want to show you a different video now.  Bear with me

22  just a moment.

23  A    Okay.  And also I have a question for you.

24         So when you showed me the earlier video, I only

25  see the transcription of what my father say and I didn't hear any

Rachel C. Simone, CSR, RMR, CRR

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 88 of 269

Guo - Defendant - Cross / Guo

70

1  audio.  Can you please show me the video with audio that I can

2  hear?

3      Q    I will try and do that for you on the next one.

4              The next one that I want to show you is what has

5  been marked as Plaintiff's Exhibit 20.  Again, I am just going to

6  play a few seconds here.  I will play a few seconds and then ask

7  you a question.  For the record I am playing the beginning of

8  Plaintiff's Exhibit 20.

9              The first question is do you know who the woman is

10 who appears on the right-hand side of the screen at the

11 five-second mark?

12             MR. VARTAN:  Mr. Harbach, nothing was shared.  It

13     didn't work.

14             MR. HARBACH:  Sorry.  It works.  I just forgot to

15     hit a button.

16     Q    How is this now?

17     A    Yes, I can see it.

18                      (Video played.)

19     Q    The question is:  Do you know who the woman is who

20 appears on the right-hand side of the screen at the five-second

21 mark?

22     A    It is one of the crew members that I had before.

23     Q    On the Lady May?

24     A    Yes, on my Lady May yacht.

25     Q    And this scene that we see on the screen right now is

Rachel C. Simone, CSR, RMR, CRR

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 89 of 269

Guo - Defendant - Cross / Guo

71

1    aboard the Lady May, isn't it?

2        A    Yes, on the second floor.

3        Q    So I will play a few more seconds now and ask you

4    another question.

5            The man in the center of the screen in the blue

6    T-shirt holding a phone at the 44-second mark is your father,

7    isn't it?

8            MR. VARTAN:  Again, Mr. Harbach, that didn't play

9        for the assembled audience.

10           MR. HARBACH:  I am trying to get my act together

11       here.  I'm sorry.

12                      (Video played.)

13       Q    Okay.  I have it paused right now at the 44-second

14   mark.  Can you see that, Ms. Guo?

15       A    I can see it now.

16       Q    And the question is:  That man standing in the center

17   of the screen in the blue T-shirt holding the phone at the

18   44-second mark is your father, isn't it?

19       A    Yes.

20       Q    Now, I am going to fast forward to a later part of the

21   video at about the 40-minute mark, and I am going to play a

22   little bit here.

23                      (Video played.)

24       Q    Ms. Guo, are you able to see that vessel coming into

25   the screen now from left to right at the 40:31 mark?

Rachel C. Simone, CSR, RMR, CRR

Guo - Defendant - Cross / Guo

72

```
 1        A    Yes, I see it.

 2        Q    What is that?

 3        A    This name is Lady May 2.

 4        Q    How is the Lady May 2 connected to the Lady May?

 5        A    Both vessels were bought by my brother.

 6        Q    Who owns the Lady May 2?

 7        A    My brother.

 8        Q    Your brother owns it?

 9        A    Yes.

10        Q    Okay.  I am going to fast forward a bit more.  I'm at

11   the 43:56 mark.  That's your father who appears to be holding the

12   device that is making this recording, correct?

13        A    Yes.

14        Q    I know it is a little tough, but do you know who the

15   man with the sunglasses on the left-hand side of the screen at

16   the 44-minute mark is?

17        A    Even though it is not very clear, I can confirm that

18   this is my then captain, Captain Craig.

19        Q    Would that be Craig Heaslop?

20        A    Yes, it is.

21        Q    I know it is difficult to see, but can you make out

22   this logo that appears on the bottom right-hand side of the video

23   screen?  Can you see that?

24        A    I can see it clearly, and I can recognize it.

25        Q    Okay.  It says "Rule of Law Foundation," doesn't it?
```

Rachel C. Simone, CSR, RMR, CRR

**Proceedings**

73

1        A    I cannot see the wording, the writing on it; but I

2   believe that is correct.

3        Q    What is the Rule of Law Foundation?

4        A    I am not able to explain or describe clearly to you

5   because I wasn't involved in this foundation.

6        Q    Isn't it true that the Rule of Law Foundation whose

7   logo appears on the screen was started by your father?

8        A    I really do not know much, but I believe so.

9        Q    Okay.  Thank you.  That's it for this video.

10            Now, the last video I am about to show you,

11   Ms. Guo, has been marked and offered as Plaintiff's Exhibit 2.

12   And it's the same drill as before.  I will play a small clip and

13   then ask you a question.

14            Just so you know, apparently the audio is not

15   playing for anyone, but my question for the moment is just about

16   the video, okay?

17        A    Okay.

18                         (Video played.)

19        Q    Ms. Guo, does the man who appears in Plaintiff's

20   Exhibit 2 in the white suit, white shirt, and white tie; that's

21   your father, isn't it?

22        A    Yes.

23            MR. HARBACH:  Your Honor, can I have a moment to

24        consult with my colleagues, please?

25            THE COURT:  Yes.

Rachel C. Simone, CSR, RMR, CRR

Stockil - by Defendant - Cross / Harbach

74

 1                    (Brief pause)

 2              MR. HARBACH:  I have no further questions.

 3              THE COURT:  Okay.  Ms. Guo is about to be excused.

 4              Ms. Guo, I indicated to you earlier that I

 5     excluded the press from your examination in order to protect

 6     your safety because you were previously detained and

 7     apparently tortured by the CCP.  Your whereabouts could be

 8     of interest to them and I was concerned about your safety.

 9     Also, the plaintiff consented to have a closed proceeding

10     which I indicated to you is extremely unusual.

11              Nothing in your testimony in any way indicates

12     what your present whereabouts are.  As such, when the

13     transcript of these proceedings is transcribed, it will be

14     made public on the court's electronic filing system.

15              THE WITNESS:  Your Honor, thank you again for your

16     protection over my safety.  I am really, from the bottom of

17     my heart, thanking you for that.

18              THE COURT:  All right.  Have a nice day.

19              Next witness for cross-examination?

20              MR. VARTAN:  Your Honor, we would call Russell

21     Stockil on behalf of the defendant.  I believe Mr. Stockil

22     is either logged in or about to log in.  He is the yacht

23     manager at Yachtzoo SARL.

24              THE COURT:  All right.  Let's go ahead.

25              MR. HARBACH:  Can we have the witness sworn, your

                Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 1179
RECEIVED NYSCEF: 02/07/2022

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 93 of
269

Stockil - by Defendant - Cross / Harbach

75

```
 1        Honor?

 2                     (Russell Stockil is duly sworn/affirmed.)

 3                     THE COURT:  Let's proceed.

 4             RUSSELL STOCKIL, having been called on behalf of

 5   Defendant, first having been duly sworn, was examined and

 6   testified as follows:

 7   CROSS-EXAMINATION

 8   BY MR. HARBACH:

 9        Q    Mr. Stockil, can you please spell your name for the

10   court reporter?

11        A    Surname?

12        Q    Both.

13        A    Russell, R-U-S-S-E-L-L.  Stockil, s-T-O-C-K-I-L.

14        Q    Are you the same Russell Stockil who submitted an

15   affidavit to New York State Court in the matter of Pacific

16   Alliance Asia versus Kwok Ho Wan?

17        A    That is correct.

18        Q    Do you have a copy of the affidavit that you submitted

19   in this case, sir?

20        A    I do.

21        Q    Okay.

22                MR. HARBACH:  For the record, it is Document 1156

23        on the docket.

24        Q    Give me one second, please.

25                     (Brief pause)
```

Rachel C. Simone, CSR, RMR, CRR

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 94 of
269

**Stockil - by Defendant - Cross / Harbach**

76

1       Q    I am going to share my screen so it is easier to

2    reference the parts of your affidavit that I am talking about.

3            Can you see that okay, Mr. Stockil?

4       A    Yes.

5       Q    My first question is about Paragraph 3.  Is April '21

6    the first association or business relationship you ever had with

7    anyone associated with the Lady May?

8       A    Yes, that's correct.

9       Q    The representatives that you refer to in Paragraph 3,

10    namely the representatives of HK USA who contacted you, none of

11    them was Ms. Mei Guo, correct?

12       A    Yes, that's correct.

13       Q    In Paragraph 5 you refer to a management contract that

14    Hong Kong USA and Yachtzoo signed on May 1 of last year.  You

15    didn't attach that contract to your affidavit, did you?

16       A    No, I didn't.

17       Q    Paragraph 6 refers to some nondisclosure agreements

18    that you say Ms. Guo countersigned.  You didn't attach any of

19    those to your affidavit either, did you?

20       A    No, I didn't.

21       Q    The end of Paragraph 6 talks about Defendant's

22    Exhibit 5.  Do you have a copy of that?

23       A    I do have a copy of it, yes.

24       Q    Let me put it on the screen here.  Maybe that will

25    help.

Rachel C. Simone, CSR, RMR, CRR

Stockil - by Defendant - Cross / Harbach

1      A    Yes, that's correct.

2      Q    This is the defense Exhibit 5 that you referred to?

3      A    Yes.

4      Q    I am going to go to the last page of it here.  Just a

5   second.

6           MR. HARBACH:  For the record, I am on Page 7 of 8

7      of Defendant's Exhibit 5.  This is the signature page for

8      the agreement.

9      Q    Isn't it true that this document has been signed

10  electronically?

11     A    Yes, that's correct.

12     Q    In other words, you didn't witness Mei Guo put pen to

13  paper and sign this thing?

14     A    No, I didn't witness that.

15     Q    Okay.

16           And I take it, then, your conclusion that she

17  signed it is because of DocuSign or some software that your

18  company uses?

19     A    Well, the conclusion is that it was provided to us by

20  the family representative on our request for execution of

21  agreements.

22     Q    I understand.

23           So you personally -- I'm not talking about your

24  company.  You personally, Russell Stockil, you don't know one way

25  or the other who inserted that signature for Mei Guo, do you?

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 96 of 269

**Stockil - by Defendant - Cross / Harbach**

78

1      A     No, I can't say that I do.

2      Q     Your assumption is that the party who signed this was

3   telling you the truth when they said Mei Guo signed it, right?

4      A     Yes.

5      Q     Okay.

6            And isn't it also in the wrong spot?  In other

7   words, shouldn't Ms. Guo have signed on behalf of the

8   organization, not the employer?

9      A     On behalf of the organization?

10     Q     Let me see if I can help you.  I am not trying to play

11  games here.

12           On the very first page the organization is listed

13  as HK USA.  Do you see that there?

14     A     Yes, that's correct.

15     Q     And the employer is listed as Phoenix?

16     A     You are correct, yes.

17     Q     Okay.  That's all I was saying.

18           Returning to your affidavit, Paragraph 7, you say

19  you never met nor spoke with Kwok Ho Wan.  The same is true for

20  Mei Guo, right?  In other words, you've never met or spoken with

21  her either, correct?

22     A     That is correct, yes.

23     Q     And Paragraph 9 I think this is self-evident, but I

24  want to make sure.

25           All direction on the Lady May's movements comes

Rachel C. Simone, CSR, RMR, CRR

Stockil - by Defendant - Cross / Harbach

79

```
 1   from Ms. Guo through her representatives.  That means, doesn't
 2   it, that none of the direction on the Lady May's movements comes
 3   from Ms. Guo directly?
 4        A    Not to us, no.  They come through the family office.
 5   That's correct.
 6        Q    Mr. Stockil, do you know what the family office is
 7   called or do you know any other names for it?
 8        A    I believe that it is called the Golden Spring.
 9        Q    Okay.
10             MR. HARBACH:  Can I have a minute, Judge, please?
11                  (Brief pause)
12             MR. HARBACH:  Your Honor, we have no further
13        questions for Mr. Stockil.
14             THE COURT:  Mr. Stockil, you are excused.
15             Next witness, please.
16             MR. VARTAN:  Your Honor, we would call next
17        Momchil Ivanov who, I believe, is logging in at the moment.
18             MS. BARROW:  Your Honor, this is Erica Barrow.
19        While we are waiting, as a matter of housekeeping, did you
20        want the parties to formally move to admit certain documents
21        marked into evidence at some point?
22             THE COURT:  Yes.  At the conclusion of the hearing
23        each side will formally tender the documents that they wish
24        to have in evidence.
25             MS. BARROW:  Thank you, your Honor.
```

Rachel C. Simone, CSR, RMR, CRR

Ivanov - by Defendant - Cross / Harbach

80

```
 1                THE COURT:  We will do that on Microsoft Teams,
 2         not by formal paper.
 3                MR. VARTAN:  Mr. Ivanov, can you turn on your
 4         camera, please?
 5                THE WITNESS:  You should be able to see me now.
 6                MR. VARTAN:  Thank you.
 7                Your Honor, Mr. Ivanov previously submitted an
 8         affidavit in this matter.  We submit that as his direct
 9         testimony and offer him for cross-examination.
10                THE COURT:  All right.  Please raise your right
11         hand.
12                (Momchil Ivanov takes the
13              witness stand and is duly sworn/affirmed.)
14                THE COURT:  You may proceed with
15         cross-examination, Mr. Harbach.
16                MR. HARBACH:  Thank you, your Honor.
17           MOMCHIL IVANOV, having been called on behalf of
18    Defendant, first having been duly sworn, was examined and
19    testified as follows:
20    CROSS-EXAMINATION
21    BY MR. HARBACH:
22         Q    Mr. Ivanov, could you please spell your first and last
23    name slowly?
24         A    My first name is M-O-M --
25                     (Brief pause in proceedings due to
```

Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
NYSCEF DOC. NO. 1179

INDEX NO. 652077/2017

RECEIVED NYSCEF: 02/07/2022

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 99 of
269

Ivanov - by Defendant - Cross / Harbach

81

1              court reporter's lost connection.)

2        Q    Mr. Ivanov, because the reporter lost the connection we

3   are going to repeat the first couple of questions, okay?

4        A    I am ready.

5        Q    Referring to your affidavit which is up on the screen

6   right now -- and for the record, it is Document 1157.  When you

7   say in Paragraph 2 that you became the captain of the Lady May in

8   approximately October of '21, was that the beginning of your

9   association with that yacht?

10       A    Yes, sir, that's correct.

11       Q    The next question concerns Paragraph 8 where you say

12  you have never met nor spoken with Kwok Ho Wan about the Lady

13  May, its operations, or its movements.  The same is true with

14  respect to Ms. Mei Guo, correct?

15       A    Well, I have been doing so not directly with Ms. Mei

16  but via the management company.

17       Q    I am with you.  I just want to find out whether you

18  have ever met or spoken with Ms. Mei Guo?

19       A    Not directly sir, no.

20       Q    Okay.  So returning to Paragraph 6 of your affidavit,

21  what you just said is you have not communicated with Ms. Guo

22  directly.  That means you never got any orders or direction from

23  Ms. Guo directly, did you?

24       A    Yes, that's correct.

25       Q    Where is the Lady May right now?

Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
NYSCEF DOC. NO. 1179
INDEX NO. 652077/2017
RECEIVED NYSCEF: 02/07/2022

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 100 of
269

Ivanov - by Defendant - Cross / Harbach

82

1        A     Lady May is currently in Genoa, Italy.

2        Q     How long has it been there?

3        A     I believe the boat arrived approximately a week before

4   I joined the boat, so I would say late September.  I am not sure

5   about the exact date.

6        Q     Late September of 2021?

7        A     Yes, that's correct.

8        Q     When was the last time that the Lady May sailed

9   anywhere with you as the captain?

10       A     I believe the boat has never sailed with me as a

11  captain.  Since I joined the both in early October, the boat has

12  been ported in Genoa.

13       Q     It hasn't gone anywhere?

14       A     That's correct, sir.

15              MR. HARBACH:  One second, Judge, please.

16                     (Brief pause)

17       Q     Mr. Ivanov, one of my colleagues was curious whether

18  you are on the Lady May at this moment?

19       A     Yes, sir, I am indeed.

20       Q     Thank you.

21              MR. HARBACH:  I have no further questions for this

22       witness.

23              Mr. Ivanov, thank you.

24              THE COURT:  You are excused, Mr. Ivanov.

25              Next witness, please.

Rachel C. Simone, CSR, RMR, CRR

Heaslop - by Defendant - Cross / Harbach

83

1          MR. VARTAN:  Your Honor, the defendant would call

2     Craig Heaslop to the stand.

3          Mr. Heaslop likewise has previously submitted an

4     affidavit which the parties and the Court have.  We offer

5     that as his direct testimony and again offer him for

6     cross-examination.

7          THE COURT:  The affidavit is received.  And if you

8     will locate the witness, we will swear him in and have him

9     cross-examined.

10          MR. VARTAN:  He sent me a note saying that he is

11     having some difficulty logging in, but he is keeping me

12     posted.

13          THE COURT:  Fine.  Thank you.

14               (Brief pause)

15          THE COURT:  Mr. Heaslop?

16          THE WITNESS:  Can you hear me okay?

17          THE COURT:  Yes.  Can you raise your right hand,

18     please.  Witness sworn.

19          (Craig Heaslop is duly sworn/affirmed.)

20        CRAIG HEASLOP, having been called on behalf of

21     Defendant, first having been duly sworn, was examined and

22     testified as follows:

23     CROSS-EXAMINATION

24     BY MR. HARBACH:

25        Q    Sir, can you please tell me how to say your last name?

Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
NYSCEF DOC. NO. 1179

INDEX NO. 652077/2017

RECEIVED NYSCEF: 02/07/2022

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 102 of
269

Heaslop - by Defendant - Cross / Harbach

84

1      A      Heaslop.

2      Q      Okay.  Thank you.

3             Could you please spell your name for the court

4      reporter, first and last.

5      A      Craig, C-R-A-I-G.  Heaslop, H-E-A-S-L-O-P.

6      Q      I want to direct your attention to your screen.  Tell

7      me if you can see your affirmation in this case on the screen in

8      front of you?

9      A      Yes.

10     Q      The first question for you is going to be clear down in

11     Paragraph 16.  You say there that when you took the Lady May down

12     to Florida you left in the first week of October.  Do you

13     remember the exact day that you left?

14     A      No, I can't.

15     Q      Are you familiar with a website on the internet called

16     VesselFinder?  Have you ever heard of that?

17     A      Yeah, I know VesselFinder.

18     Q      Would looking at a VesselFinder plot for the Lady May

19     help you remember the exact date that you left New York?

20     A      I don't know if it will help me remember it, no.

21     Q      Would you be willing to take a look at it?

22     A      I can look at it, yeah.

23     Q      I have pulled up on the screen -- and this is just for

24     refreshment purposes and it will not be offered as an exhibit.

25             For the record, I have a Voyage Analyser up on the

Heaslop - by Defendant - Cross / Harbach

85

 1   screen for the Lady May with International Maritime Organization

 2   1012359.

 3       A    That's it.

 4       Q    Say again?

 5       A    That's it.

 6       Q    That's it, okay.

 7            So I will zoom in, and I'm also going to point out

 8   to you that the operative date range that has been selected is

 9   September 1 of 2020 and January 31 of 2022, okay?

10            MR. VARTAN:  Your Honor, I'd object to this.  I

11       don't know that this has been provided prior to the hearing.

12       So this would echo Mr. Siegel's objection that --

13            THE COURT:  He can use anything he wishes to

14       attempt to refresh the witness's recollection.  If it

15       doesn't refresh the witness's recollection, it doesn't

16       refresh the witness's recollection.

17            MR. VARTAN:  Well, that's the other point, your

18       Honor.  I don't believe that the witness said this would

19       refresh his recollection.

20            THE COURT:  I understand, but let's see what

21       happens when he looks at it.

22       Q    I am going to zoom in on New York City, Mr. Heaslop.

23   There appears to be a trajectory from the south of Manhattan out

24   into the Atlantic, and there is a little triangle on that route

25   dated October 9 of 2020.

Rachel C. Simone, CSR, RMR, CRR

Heaslop - by Defendant - Cross / Harbach

1       A    Yes.

2       Q    And a little farther down the track off the coast of

3   New Jersey there is another one that says October 9, 2020.

4            So the question for you is:  Does this refresh

5   yours memory that the actual date of departure of the Lady May

6   was October 9 of 2020?

7       A    I don't pay much attention to the actual date that we

8   leave.  For me it is more what the weather is doing.  I pick the

9   day and date on the weather.

10      Q    Okay, that's fine.  All I can do is ask if it helps you

11  remember.  And you said the first week of October.  That's pretty

12  darn close if it was the 9th.

13           Okay, let's go back to your affidavit.  In

14  Paragraph 17 you say that prior to your departure you had a

15  conversation with Mr. Kwok.

16           My first question is was that conversation in

17  person?

18      A    No.

19      Q    Your affidavit says that he was a guest on the yacht at

20  the time.  Where were you?

21      A    Personally?  I was on the yacht.

22      Q    That's what I was trying to get at, maybe inartfully.

23           You were on the yacht.  Mr. Kwok was on the yacht.

24  Was the conversation, nevertheless, over a telephone or

25  something?

Rachel C. Simone, CSR, RMR, CRR

**Heaslop - by Defendant - Cross / Harbach**

87

```
 1      A    No.  Mr. Kwok was not on the yacht when I had that
 2   conversation with him.  We were docked.
 3      Q    Okay.  So maybe I just misunderstood your affidavit.
 4   Read the first sentence of Paragraph 17.  Just read it to
 5   yourself.  I am just trying to figure out who was a guest on the
 6   yacht at the time.
 7      A    Okay.  What I was saying there was that he was a guest.
 8   I guess that's probably a better way to phrase it.  He wasn't
 9   physically on the boat when we had that conversation.  He had
10   been a guest on the boat.
11      Q    I think you said a moment ago you said that when you
12   had this conversation with him, you yourself was on the yacht?
13      A    I was on the yacht, yes.
14      Q    You remember that?
15      A    Yes.
16      Q    Okay.  And --
17              THE COURT:  Prior to October 2020, when was the
18        last time you recall Mr. Kwok being on the yacht?
19              THE WITNESS:  Prior to October 2020?
20              THE COURT:  Yes.
21              THE WITNESS:  He was on and off the yacht
22        throughout the summer as usual.  Specific dates I couldn't
23        tell you retrospectively when they came and went.
24              THE COURT:  Was he on the yacht for a significant
25        part of the month of July?
```

Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
NYSCEF DOC. NO. 1179

INDEX NO. 652077/2017
RECEIVED NYSCEF: 02/07/2022

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 106 of
269

Heaslop - by Defendant - Cross / Harbach

88

1          THE WITNESS:  That was COVID.  Yes, he was.

2          THE COURT:  How about during the month of August,

3     2020?

4          THE WITNESS:  Yes.

5          THE COURT:  And how about during the month of

6     September 2020?

7          THE WITNESS:  I believe also, yes.

8          THE COURT:  And was Ms. Guo on the yacht during

9     September 2020?

10         THE WITNESS:  We did see Ms. Guo late in the

11    summer.  I am trying to remember what month it was.  I

12    couldn't recall exactly what month.

13         THE COURT:  As between Mr. Kwok and Ms. Guo, how

14    would you compare the duration of the time each of them

15    spent on the yacht during July, August, and September of

16    2020?

17         THE WITNESS:  During those months Mr. Kwok spent

18    more time on the yacht than Ms. Guo.

19         THE COURT:  A lot more time or a little more time?

20         THE WITNESS:  It was a lot more time.

21         THE COURT:  All right.

22         I interrupted you, Mr. Harbach.

23         MR. HARBACH:  That's all right, your Honor.

24    BY MR. HARBACH:

25    Q    Do you recall how long prior to your departure you had

Rachel C. Simone, CSR, RMR, CRR

Heaslop - by Defendant - Cross / Harbach

89

1   this conversation with Mr. Kwok where he said he would no longer

2   be a guest on the yacht, how long before you left?

3        A    From memory, it was a few days.  I think from memory,

4   the window presented itself fairly soon after, and we just packed

5   the both up and left.

6        Q    You say you remember that you were on the yacht and you

7   spoke to Mr. Kwok by phone.  Do you recall whether he said where

8   he was?

9        A    No, I don't believe he did.

10       Q    Paragraph 17 of your affidavit says that you had a

11   subsequent conversation with a representative of Hong Kong USA

12   and confirmed that the yacht was no longer needed in New York.

13   That person wasn't Mei Guo, was it?

14       A    No.

15            MR. HARBACH:  I am revising my examination, your

16       Honor, so if I take a few seconds here it might be

17       worthwhile.

18            THE COURT:  Take your time.

19                 (Brief pause)

20       Q    When Mr. Kwok told you that he was no longer going to

21   be a guest on the yacht, did he also tell you that there was a

22   temporary restraining order in place that had been issued by the

23   Court on September 30?

24       A    No.

25            MR. SIEGAL:  Objection.  Misstates the record.

Rachel C. Simone, CSR, RMR, CRR

Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 108 of 269

**Heaslop - by Defendant - Cross / Harbach**

90

1        Move to strike.

2                    THE COURT:  Overruled.

3                    MR. SIEGAL:  There was no temporary restraining

4        order making any mention --

5                    THE COURT:  The witness has answered the question.

6        The subject of a temporary restraining order did not come up

7        during a conversation that Mr. Kwok had with this witness

8        when Mr. Kwok ceased being a guest on the boat.

9                    (To the witness)  Did Mr. Kwok ever tell you that

10       there had been a temporary restraining order on the yacht?

11                   THE WITNESS:  No, sir.

12                   THE COURT:  Did anybody from HK USA tell you that

13       there had been a temporary restraining order on the yacht?

14                   THE WITNESS:  No, sir.

15                   THE COURT:  Did anybody tell you that there had

16       been a temporary restraining order on the movement of the

17       yacht?

18                   THE WITNESS:  Not at that time, sir, no, not from

19       memory.

20                   THE COURT:  When was the first time you learned

21       that there was a temporary restraining order on the yacht?

22                   THE WITNESS:  I can't recall the exact date.  I

23       think it was from a broker.

24                   THE COURT:  I'm sorry?

25                   THE WITNESS:  I can't recall the exact date.

Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 1179
Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 109 of
269
RECEIVED NYSCEF: 02/07/2022

Heaslop - by Defendant - Cross / Harbach

91

1          THE COURT:  Where were you when you learned of

2      this?

3          THE WITNESS:  We were back in Florida, pretty

4      sure.

5  BY MR. HARBACH:

6      Q    Was that after your resignation?

7      A    No.  That was prior.

8      Q    And did you say a moment ago you learned it from a

9  broker?

10     A    I think it might have been, yeah, from memory.  I

11  didn't know if there was any truth behind it, quite honestly, or

12  just broker talk.

13     Q    When the yacht was in Nassau and Freeport to be

14  repaired and inspected, do you know approximately how long those

15  repairs took?

16     A    Yeah.  They took longer than we thought.  We had delays

17  with equipment.  It took, pretty much, five months.

18     Q    So that's from approximately when to approximately

19  when?

20     A    We went to Freeport in January.  We would stop there

21  right through to -- I think we left in May, so it would have been

22  probably early May-ish.

23     Q    So from January to early May the yacht's, essentially,

24  out of commission?

25     A    Yes.  We were in the dry dock.  Shafts removed.  We had

Rachel C. Simone, CSR, RMR, CRR

Heaslop - by Defendant - Cross / Harbach

 1   to renew our shafts which the company ended up sending the wrong

 2   size.  It took nearly a month for them to produce new ones and

 3   get them in from Europe.  Then they sent the ones that were wrong

 4   so we had to wait for new ones again.  So no one could move the

 5   boat even if they wanted to.

 6       Q    If I represented to you that VesselFinder suggests that

 7   the yacht was in Freeport until at least May 30, would that sound

 8   plausible to you?

 9       A    Yes.

10       Q    If I understand your testimony correctly, at the time

11   that you tendered your resignation which was the end of May, you

12   had heard about a restraining order or something from a broker,

13   but nobody associated with the Lady May or HK USA had said a word

14   to you about it?

15       A    No.

16       Q    Is that correct?

17       A    That's correct, yeah, nothing from HK office to that

18   effect.

19       Q    Did the possibility of a restraining order being on the

20   boat that you heard about through a broker have anything to do

21   with your decision to resign?

22               MR. VARTAN:  Objection, your Honor, to relevance.

23               THE COURT:  The objection is overruled.

24       Q    Looking at Paragraph 24 referring to your first two

25   years as the captain, your interactions with Mr. Kwok were,

Rachel C. Simone, CSR, RMR, CRR

Heaslop - by Defendant - Cross / Harbach

93

1    pretty much, whenever he was aboard the yacht.

2              My question for you is:  When he was aboard, he

3    directed the movements of the yacht, right?  I don't mean he

4    piloted it, but he told you where he wanted to go?

5        A    Yeah.

6        Q    And so that covers -- your first two years as the

7    ship's captain would have been from September of '17 to September

8    of 2019, correct?

9        A    Correct.  That's two years after I started, yeah.

10       Q    Then you also talk about your final year having some

11   limited interactions with him via phone or text message.  That

12   would have been from May of 2020 until May of 2021,

13   approximately?

14       A    I can't really recall the dates that specifically, but

15   yeah.

16       Q    You can correct me because you'd know, but it just

17   occurred to me that there is a gap between your first two years

18   and your last year, because you worked there three years and

19   eight months.  So maybe you didn't mean anything by it, but I am

20   trying to figure out between September of '19 and May of '20,

21   what can you say about your interactions with Mr. Kwok?

22       A    They were business-like, it was more formal.

23       Q    Okay.

24       A    As I worked there longer, I grew -- developed more of,

25   I guess, a relationship with the family.  They had more trust in

Rachel C. Simone, CSR, RMR, CRR

Heaslop - by Defendant - Cross / Harbach

94

1   me as the captain, so our interactions became less formal as time

2   went on.

3       Q    Okay.

4            MR. HARBACH:  Your Honor, at this point I was

5       going to question Mr. Heaslop about the Rule of Law

6       Foundation video that I questioned Ms. Guo about mainly to

7       have him authenticate that it is the Lady May and that it is

8       Mr. Kwok appearing in the video and identifying himself in

9       the video; but if in your Honor's view that would be

10      cumulative and unnecessary, then I won't do it.

11           THE COURT:  It is cumulative and unnecessary

12      unless this witness knows something about the Rule of Law,

13      the relevance of which presently is unclear.

14           MR. HARBACH:  Okay.  In that case, I will forego

15      that.

16      Q    So, toward the end of that paragraph, Paragraph 24,

17   when you are talking about your interactions with Mei Guo, you

18   say that you had some interactions with her when she was aboard

19   and then also sporadically via phone and text message.

20           I take it from what you said already that none of

21   those interactions were about the yacht's movements, correct?

22      A    Correct.

23      Q    Finally, Paragraph 25, just to make sure the horse is

24   dead, that first sentence about your receiving direction about

25   the movement of the yacht exclusively from those three companies

Rachel C. Simone, CSR, RMR, CRR

Heaslop - by Defendant - Cross / Harbach

95

1    listed which you understood to be the family's office; meaning

2    that, therefore, not from Ms. Mei Guo herself, correct?

3        A    Sorry, can you ask that question again?

4        Q    Sure, because it was terrible.

5             Your affidavit says you received direction about

6    the movement of the yacht exclusively from HK International

7    representatives, representatives of Hong Kong USA, or Golden

8    Spring New York Limited.  So my question to you is:  That means,

9    does it not, that none of the direction you received was directly

10   from Ms. Mei Guo, correct?

11       A    Correct.

12            THE COURT:  You did testify, sir, that during

13       July, August, and September of 2020 Mr. Kwok was a frequent

14       guest on the yacht, and presumably he told you where he

15       wanted to go?

16            THE WITNESS:  That's right, your Honor.  There's,

17       like, local movements in the northern area or the southern

18       area where the guests are using the boat.  There's direction

19       about where they want to go, what they want to do on any

20       given day.

21            What I meant -- what I was talking about about not

22       having direction was for the repositioning of the yacht

23       seasonally between the northeast and the southeast.  That

24       came from the office.

25            THE COURT:  I see.  So if Mr. Kwok wanted to go to

Rachel C. Simone, CSR, RMR, CRR

**Proceedings**

96

1      Nantucket, you would take him there?

2              THE WITNESS:  Absolutely, yeah.

3              THE COURT:  If he wanted to go to Bar Harbor,

4      Maine, you would take him to Bar Harbor, Maine?

5              THE WITNESS:  Yes.

6              THE COURT:  Okay.

7              THE WITNESS:  And the same for any of the guests

8      on the both.

9              MR. HARBACH:  Thank you your Honor.  Unless you

10     have any other questions, we do not.

11             THE COURT:  Okay.  This witness is excused.

12             I believe there is one more witness.

13             MR. VARTAN:  Yes, your Honor.  I would turn things

14     back over to Mr. Siegal.

15             MR. SIEGAL:  Your Honor, the last witness on the

16     defense list is Aaron Mitchell regarding the complaint

17     previously filed, should the Court wish to hear

18     cross-examination of Mr. Mitchell.

19             THE COURT:  Mr. Mitchell, raise your right hand.

20             (Aaron Mitchell is duly sworn/affirmed.)

21             THE COURT:  Okay.  Let's proceed.

22             MR. HARBACH:  Thank you, your Honor.

23             Mr. Mitchell, thank you for being here today.  We

24     have no questions and no cross-examination for the witness.

25             THE COURT:  All right.  That was short and sweet.

Rachel C. Simone, CSR, RMR, CRR

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 115 of 269

**Proceedings**

97

```
 1        You are excused, Mr. Mitchell.

 2              THE WITNESS:  Thank you, your Honor.

 3              THE COURT:  All right.  I don't need closing

 4        statements.

 5              Do you think you can have your post-trial

 6        submissions by the end of the day on Friday?

 7              MR. SIEGAL:  Well, I think, your Honor, on how

 8        quickly we can get a rough transcript which we would

 9        obviously like to reference in preparing post-trial

10        submissions.

11              THE COURT:  I will ask the court reporter without

12        intending to impose any unreasonable burdens on her.

13                          (Brief pause)

14              THE COURT:  I will make the post-trial submissions

15        due Monday at 10 a.m.  All I want is a memo and proposed

16        findings of fact.

17              MR. SIEGAL:  Your Honor, if we are not going to

18        have the transcript until --

19              THE COURT:  This is not rocket science,

20        Mr. Siegal.  I can do this with no post-trial submissions if

21        you prefer.

22              MR. SIEGAL:  No, I would not.  We appreciate the

23        opportunity.

24              THE COURT:  Okay.

25              So if you have anything to tell me, you will tell
```

Rachel C. Simone, CSR, RMR, CRR

**Proceedings**

98

1       me tomorrow by conference call at noon.  If you don't have

2       anything to tell me by conference call at noon, I will just

3       proceed to have the transcript fully transcribed and

4       uploaded on the Court's electronic filing system.  I will

5       rule, certainly, no later than Wednesday of next week.

6               MR. SIEGAL:  Judge, we will call at noon tomorrow,

7       a joint call of counsel.

8               THE COURT:  Okay.  Thank you.  Have a nice day.

9                       *       *       *

10      The foregoing is hereby certified to be a true and

11   accurate transcript of the proceedings.

12

13

14                  *Rachel C. Simone-Ivanac*

15                  Rachel C. Simone-Ivanac

16                  Senior Court Reporter

17   SO ORDERED February 7, 2022

18

19   *Barry Ostrager*

20   BARRY R. OSTRAGER, J.S.C.

21

22

23

24

25

Rachel C. Simone, CSR, RMR, CRR

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
INDEX NO. 652077/2017
NYSCEF DOC. Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 117 of
RECEIVED NYSCEF: 02/07/2022

Pacific Alliance Asia v
Kwok

269

February 2, 2022

**$**

**$2 (1)**
   56:22
**$28 (1)**
   46:2
**$3 (1)**
   56:23
**$30 (3)**
   8:4,9,13

**@**

**@KwokMiles (4)**
   19:9;26:11,17;
   29:24

**A**

**Aaron (2)**
   96:16,20
**ability (1)**
   13:18
**able (7)**
   4:21;30:17;41:7;
   62:10;71:24;73:4;
   80:5
**aboard (9)**
   6:12;7:6;50:10,15,
   25;71:1;93:1,2;94:18
**abroad (1)**
   9:23
**Absolutely (3)**
   5:19;12:25;96:2
**abundantly (1)**
   10:1
**access (1)**
   19:18
**accompanied (1)**
   36:7
**according (4)**
   14:7;42:21,22;47:5
**account (14)**
   19:6,9,12,15,18;
   23:3;29:11,12,16;
   30:3,6,8,12;56:10
**accounts (1)**
   19:21
**accuracy (5)**
   23:15;30:21,22;
   33:15;35:3
**accurate (4)**
   26:2,13,16;98:11
**accurately (1)**
   38:24
**acquired (1)**
   47:5
**act (1)**
   71:10
**acted (1)**
   5:4
**active (1)**

**39:9**
**activities (1)**
   59:20
**activity (1)**
   55:6
**actual (3)**
   31:20;86:5,7
**actually (10)**
   4:7;6:1,22;9:13,22;
   20:12;30:8;36:3;
   54:14;69:10
**add (3)**
   42:11;63:12;65:23
**address (3)**
   31:3;36:13,22;40:7,
   10
**adjourn (1)**
   18:15
**adjournment (1)**
   18:20
**administered (1)**
   39:20
**admissibility (1)**
   36:24
**admissible (1)**
   14:13
**admission (1)**
   7:18
**admit (1)**
   79:20
**advance (1)**
   60:24
**adverse (6)**
   13:23;14:5,6,14,25;
   36:23
**affiants (1)**
   3:18
**affidavit (36)**
   7:4;9:10,16;15:23;
   16:9;21:6;24:4;41:1,
   14,20;42:1;43:18;
   48:9;49:21;51:16;
   54:21;55:11,12;60:7;
   62:18;75:15,18;76:2,
   15,19;78:18;80:8;
   81:5,20;83:4,7;86:13,
   19;87:3;89:10;95:5
**affidavits (12)**
   5:18;6:9,21;17:2;
   25:16;32:22;33:5,8,9;
   34:9;35:25;36:6
**affirmation (4)**
   17:20;27:5;38:2;
   84:7
**affirmations (1)**
   17:25
**affirmative (1)**
   14:15
**again (16)**
   5:12;8:21;25:8;
   34:21;35:23;58:18,
   23;62:9;63:12;70:5;
   71:8;74:15;83:5;85:4;

**92:4;95:3**
**against (3)**
   14:10;57:9,22
**agency (3)**
   38:19,21,22
**ago (8)**
   7:19;45:22;51:24;
   52:25;59:5;62:25;
   87:11;91:8
**agree (5)**
   21:10,24;23:9;
   24:11;53:10
**agreed (2)**
   45:22;55:10
**agreement (3)**
   6:4;56:12;77:8
**agreements (2)**
   76:17;77:21
**ahead (6)**
   10:9;15:20;18:24;
   47:8;53:5;74:24
**aid (1)**
   61:12
**aimed (1)**
   8:16
**alerted (1)**
   65:1
**alerting (1)**
   31:10
**alleged (2)**
   12:14;14:13
**Alliance (3)**
   14:12,15;75:16
**allow (2)**
   61:10;66:2
**allowed (1)**
   52:6
**alone (2)**
   10:3;52:4
**along (1)**
   25:17
**altered (4)**
   17:17;20:25;24:17;
   25:22
**always (5)**
   4:1;5:22;8:2;10:17;
   52:7
**ambush (2)**
   49:4,13
**Amendment (3)**
   4:16;5:13;14:8
**among (1)**
   11:13
**amount (1)**
   15:15
**analogy (1)**
   12:13
**Analyser (1)**
   84:25
**anchor (3)**
   51:3,22;52:6
**answered (4)**
   13:6;63:21;64:6;

**90:5**
**apartment (4)**
   8:18;12:8,8;68:14
**apologies (3)**
   18:2;21:11;29:18
**apologize (1)**
   21:5
**apparent (1)**
   17:18
**apparently (2)**
   73:14;74:7
**Appeals (2)**
   13:4,6
**appear (6)**
   16:23;22:2;23:10,
   12;25:1,2
**appeared (6)**
   26:10,17;33:15;
   34:15;35:1;36:19
**appearing (2)**
   37:17;94:8
**appears (14)**
   8:22;9:16;24:17;
   25:10,10;41:18;
   68:17;70:10,20;
   72:11,22;73:7,19;
   85:23
**Appellate (4)**
   4:20;11:2;12:20,22
**applicable (1)**
   12:7
**applies (1)**
   11:19
**apply (1)**
   11:16
**appreciate (3)**
   15:1;63:10;97:22
**appropriate (1)**
   12:13
**approximately (7)**
   68:18;81:8;82:3;
   91:14,18,18;93:13
**approximation (1)**
   66:12
**April (2)**
   63:8;76:5
**apropos (1)**
   37:17
**arbitrarily (1)**
   12:5
**archives (2)**
   28:23;29:1
**area (3)**
   53:11;95:17,18
**argue (2)**
   10:18;12:19
**argued (2)**
   4:7;36:23
**argument (8)**
   3:25;4:18;7:22;
   12:7,7,13,14,24
**arguments (2)**
   4:6;36:24

**Aronsson (2)**
   33:22,24
**around (7)**
   8:15;20:16;43:16;
   57:24;63:7;64:12,12
**arrange (1)**
   55:2
**arrangement (1)**
   65:24
**arrangements (1)**
   12:3
**arrived (1)**
   82:3
**article (2)**
   7:16,18
**Asia (1)**
   75:16
**assembled (1)**
   71:9
**asserted (2)**
   11:5;13:17
**asset (6)**
   4:16;8:9,14;12:1;
   13:15,21
**assets (2)**
   8:16;12:6
**associate (3)**
   4:3;8:6,10
**associated (5)**
   23:7;29:12,25;56:5;
   76:7;92:13
**association (2)**
   76:6;81:9
**assume (2)**
   9:5;20:6
**assuming (2)**
   6:5;28:20
**assumption (1)**
   78:2
**asylum (1)**
   65:21
**Atlantic (1)**
   85:24
**attach (2)**
   76:15,18
**attached (3)**
   7:16;23:2;26:25
**attempt (2)**
   69:5;85:14
**attempts (1)**
   4:2
**attention (2)**
   84:6;86:7
**Attorney (1)**
   7:15
**attributed (1)**
   19:25
**audience (1)**
   71:9
**audio (6)**
   16:10,19;18:11;
   24:14;70:1,1;73:14
**August (6)**

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM    INDEX NO. 652077/2017

NYSCEF DOC. Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    RECEIVED NYSCEF: 02/07/2022
Page 118 of
269

Pacific Alliance Asia v
Kwok

February 2, 2022

19:5;20:10;26:9;
88:2,15;95:13
**authenticate (1)**
94:7
**authenticated (1)**
4:12
**authentication (1)**
4:13
**authenticity (2)**
14:19;35:4
**authority (1)**
9:18
**authorization (3)**
50:12,24;51:2;
52:19;53:2
**available (3)**
36:5;37:5;38:6
**averred (1)**
17:2;26:8
**aware (9)**
9:19;19:20,24;20:2;
57:8,21;58:16;59:6;
62:19

**B**

**back (12)**
3:8;4:18;7:20;
29:10,18,23;48:9;
61:13;62:8;86:13;
91:3;96:14
**background (1)**
25:21
**Baker (2)**
10:12;27:12
**bank (1)**
56:9
**bar (3)**
26:20;96:3,4
**Barrow (16)**
10:15;21:14;27:3,9,
11,11,14,18,21;28:2,
15;30:24;31:17;
79:18,18,25
**based (4)**
9:15;15:13;60:1,2
**basic (1)**
13:24
**Baxter (1)**
14:10
**Beach (1)**
53:12
**Bear (4)**
61:1,18;68:2;69:21
**became (3)**
59:6;81:7;94:1
**begin (1)**
10:21
**beginning (10)**
58:1;60:10;63:1,7,
22;64:12,13;65:10;
70:7;81:8
**behalf (12)**

7:14;13:17;16:3;
34:4;38:1;40:1;74:21;
75:4;78:7,9;80:17;
83:20
**behind (1)**
91:11
**belabor (1)**
58:19
**belongs (1)**
56:7
**beneficial (6)**
10:5;12:18;13:1,1,
2,9
**best (1)**
11:23
**better (2)**
12:7;87:8
**beyond (1)**
69:2
**bill (1)**
44:19
**binder (6)**
5:21,21;8:24;17:22,
25;18:3
**bit (4)**
44:13;65:12;71:22;
72:10
**black (1)**
32:4
**blue (2)**
71:5,17
**board (6)**
50:11,18,21;51:7,7;
52:7
**boarded (4)**
52:16,22,23;53:8
**boasting (1)**
4:10
**boat (17)**
46:20,25;47:1,5;
53:20;54:22,24;82:3,
4,10,11;87:9,10;90:8;
92:5,20;95:18
**body (1)**
7:18
**both (9)**
7:17;15:7;26:21;
51:8;72:5;75:12;
82:11;89:5;96:8
**bottom (2)**
72:22;74:16
**bought (9)**
8:4;10:25;44:1,12,
16,17;45:2,3;72:5
**break (6)**
56:25;57:2;65:7,11;
66:4,23
**brief (20)**
3:15,24;14:11;
16:22;18:21;23:25;
27:1;28:1;36:15;
39:10;49:2;51:9;74:1;
75:25;79:11;80:25;

82:16;83:14;89:19;
97:13
**briefed (2)**
36:18;52:15
**briefly (1)**
6:9
**briefs (1)**
27:1
**broker (5)**
90:23;91:9,12;
92:12,20
**Brother (19)**
10:22;44:12,16,17;
45:2,8,18,19;46:11,
15,21,24;47:4;56:7,
11,14;72:5,7,8
**brother's (5)**
42:10;46:12,18;
56:8,16
**browser (1)**
21:17
**building (1)**
12:10
**burden (1)**
13:20
**burdens (1)**
97:12
**business (13)**
4:3;8:6,10;11:11;
33:10;35:25;36:2,6;
42:9,18,23;49:3;76:6
**business-like (1)**
93:22
**button (1)**
70:15

**C**

**call (19)**
3:7,9;15:19;16:16;
18:5,7;33:3;52:10;
58:2;66:5,22;67:2;
74:20;79:16;83:1;
98:1,2,6,7
**called (15)**
16:3;28:5;34:4;
40:1;42:8;51:21;52:5,
16;63:4;75:4;79:7,8;
80:17;83:20;84:15
**calls (1)**
35:23
**came (11)**
6:12;44:10,18;45:4;
46:2,10;55:17;56:12;
58:2;87:23;95:24
**camera (2)**
32:5;80:4
**can (84)**
5:20;16:2,11,16,18;
17:17;18:22;26:3;
27:3,7,12;31:20;32:3,
5;33:3,5,14,17,19;
34:14,18,22;35:3,6,

17;37:22;39:4,11,14;
40:10;41:5,10;42:2,4;
43:1;48:2;51:8,22;
52:1;56:11;59:11;
60:8;61:10,11,13,14;
62:8,13;63:11;64:9;
65:16;66:11,12;67:5;
70:1,1,17;71:14,15;
72:17,21,23,24,24;
73:23;74:25;75:9;
76:3;78:10;79:10;
80:3;83:16,17,25;
84:7,22;85:13;86:10;
93:16,21;95:3;97:5,8,
20
**capabilities (1)**
28:3
**captain (20)**
6:10;7:2;51:14;
53:24;55:10,15;
59:24;67:15,16,17,20,
22;72:18,18;81:7;
82:9,11;92:25;93:7;
94:1
**captains (1)**
67:18
**caption (2)**
7:17;41:13
**captured (1)**
35:7
**case (9)**
5:23;14:11;15:4;
36:25;37:2,21;75:19;
84:7;94:14
**caution (1)**
60:18
**cautioning (1)**
60:23
**CCP (3)**
65:19,20;74:7
**ceased (1)**
90:8
**cell (2)**
16:17,19
**center (2)**
71:5,16
**certain (5)**
10:16;25:4;34:19;
36:22;79:20
**certainly (4)**
11:10;30:17;58:8;
98:5
**certifications (1)**
36:1
**certified (10)**
13:6;17:3;23:18,22;
25:14;38:14,16,18,19;
98:10
**chair (1)**
33:23
**changed (1)**
5:18
**charter (1)**

4:4
**chat (1)**
30:24
**chief (1)**
34:10
**China (3)**
12:4;43:19,21
**Chinese (1)**
40:9
**choose (2)**
50:19,23
**CIBC (1)**
13:5
**circuit (1)**
13:7
**circumstances (2)**
20:16;22:20
**cited (1)**
14:11
**City (1)**
85:22
**claim (1)**
5:9
**claimed (1)**
15:10
**clarification (1)**
47:16
**clarify (6)**
24:21;51:6;57:14;
58:12;64:17;67:11
**clarifying (1)**
42:14;43:23
**clarity (2)**
29:15;40:15
**clear (14)**
10:1,3;12:20,25;
13:20;34:21;35:16;
36:7;40:12;44:19;
49:5;61:19;72:17;
84:10
**clearly (4)**
6:11;43:14;72:24;
73:4
**clip (1)**
73:12
**close (3)**
11:14,15;86:12
**closed (1)**
74:9
**closing (1)**
97:3
**clumsy (1)**
4:2
**coast (1)**
86:2
**Cole (43)**
10:14;15:3;16:7,8,
12,13,16,20,23,25;
17:1,22;18:2,9,11,18,
24,25;19:2;24:9,25;
25:13,18;27:24;28:4;
29:18;30:20;31:1,3,7,
13,16,22;32:13;33:3,

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM INDEX NO. 652077/2017

NYSCEF DOC. Case 22-50073 Doc 183-4 Filed 04/06/22 Entered 04/06/22 17:07:45 Page 119 of RECEIVED NYSCEF: 02/07/2022
Pacific Alliance Asia v 269
Kwok

February 2, 2022

14,20;34:3,8;36:12,
13,22;37:3

**Cole's (1)**
16:10

**colleague (2)**
11:25;15:2

**colleagues (7)**
8:12;10:14;33:22;
35:20;37:14;73:24;
82:17

**collected (5)**
34:12,15,16,19,23

**collection (2)**
21:11,24

**column (1)**
35:17

**comfortable (1)**
40:8

**coming (5)**
4:22;44:11;45:1,6;
71:24

**commence (1)**
16:2

**commencement (1)**
15:18

**commenting (1)**
37:13

**commission (1)**
91:24

**committed (1)**
6:8

**common (1)**
59:18

**Commonwealth (1)**
13:4

**communicated (5)**
6:15,20;9:1;67:20;
81:21

**communication (1)**
55:15

**companies (3)**
8:19;11:17;94:25

**company (14)**
6:18;8:5;9:3;11:6;
12:11;35:21;55:16,
16;56:8,12;77:18,24;
81:16;92:1

**company's (1)**
34:25

**compare (1)**
88:14

**competent (1)**
24:7

**compilation (2)**
22:22,24

**complaint (3)**
7:13,16;96:16

**complete (3)**
25:2,10,11

**completed (1)**
39:16

**comply (1)**
13:18

**conceded (1)**
11:1

**concerned (1)**
74:8

**concerns (2)**
42:1;81:11

**conclusion (3)**
77:16,19;79:22

**conditional (1)**
13:19;14:21;15:15

**conditions (1)**
54:16

**conduct (4)**
9:23;18:13,16;
37:20

**conference (2)**
98:1,2

**confident (2)**
48:7,8

**confirm (2)**
62:10;72:17

**confirmed (1)**
89:12

**confirms (1)**
6:14

**conflate (1)**
63:22

**confuse (1)**
63:13

**confusing (1)**
63:25

**Conley (3)**
21:20;23:3,4

**connected (2)**
21:12;72:4

**connection (3)**
41:2;81:1,2

**consent (1)**
35:18

**consented (2)**
65:24;74:9

**considerable (1)**
8:16

**considered (1)**
15:14

**consistent (1)**
33:12

**consistently (1)**
33:8

**consists (1)**
4:10

**consult (1)**
73:24

**contact (3)**
59:23;67:15,17

**contacted (5)**
67:16,19,21,23;
76:10

**contain (1)**
33:9

**contains (1)**
17:23

**contemporaneous (1)**

21:1

**contempt (14)**
6:8;12:17;13:3,12,
22;14:14,17,20,21;
15:8,10,12,15,16

**contemptuous (1)**
9:23

**content (11)**
19:22;20:20;21:2;
29:8;30:2,13;31:20;
33:11;34:19;35:4;
62:16

**contested (1)**
11:3

**continue (5)**
54:13;56:11;61:14,
15;67:5

**CONTINUED (1)**
47:10

**continues (1)**
12:19

**contract (3)**
5:24;76:13,15

**contradicted (1)**
10:22

**control (18)**
7:10;8:17,22;12:21;
13:8,8,19,21,24;14:2,
3,5,13,16,23;15:11;
19:15;29:5

**controlled (10)**
4:24;6:1,23,25;
9:14;12:17;13:12;
14:1;43:9;60:4

**controlling (1)**
5:4

**controls (1)**
9:6

**controverted (1)**
36:21

**conversation (11)**
15:18;37:18;86:15,
16,24;87:2,9,12;89:1,
11;90:7

**conversations (1)**
60:19

**convincing (2)**
10:4;13:21

**copy (10)**
26:13,16;27:14,15,
17;32:4;41:1;75:18;
76:22,23

**corporate (3)**
5:3,22;11:20

**correcting (1)**
10:21

**correctly (1)**
92:10

**correspondence (1)**
30:22

**corresponding (1)**
6:25

**corroborating (1)**

9:10

**costs (2)**
56:17,20

**counsel (17)**
3:2,6,15;9:12;24:8,
21;31:5;35:22;58:12;
60:11,20;62:21;
63:19;64:5,15;66:5;
98:7

**counsel's (1)**
69:1

**countersigned (1)**
76:18

**couple (3)**
46:8;66:15;81:3

**course (3)**
8:8;9:21;48:23

**COURT (196)**
3:1,6,12,14,23;
4:19;7:14;9:5,18,18,
19;10:8,18;11:16;
13:4,6;14:4,7;15:6,9,
14,23,25;16:2,10,15,
18,23;17:22;18:1,3,7,
11,13,15,19,22;24:4;
25:13;27:4,8,10,13,
17,22;31:6;32:2,6,15,
19,22,24;33:9,13,22;
34:1,3;35:10,16,17;
36:6,8,10,17;37:1,4,
10,15,20,22;38:4,7,9,
12,14,14,17,18,20,22;
39:1,7,13,21,25;
41:10,11;45:13,16;
46:14,19,19,25;47:4,
8;48:17;49:7,13,16;
51:25;55:21;56:1,4,
13,16,20,24,25;57:5,
20;58:13;59:5,10;
60:21;61:3;62:3,13;
63:6,14,23;64:2,5,8,
10,20,21;65:1,8,16;
66:4,9,16,21,25;67:3,
7;69:11;73:25;74:3,
18,24;75:3,10,15;
79:14,22;80:1,10,14;
81:1;82:24;83:4,7,13,
15,17;84:3;85:13,20;
87:17,20,24;88:2,5,8,
13,19,21;89:18,23;
90:2,5,12,15,20,24;
91:1;92:23;94:11;
95:12,25;96:3,6,11,
17,19,21,25;97:3,11,
11,14,19,24;98:8,16

**courtroom (1)**
31:4

**Court's (16)**
13:18;14:20,21;
32:18;45:21;49:5,14;
57:18;58:14;60:11,
22;61:25;62:19,24;
74:14;98:4

**cousins (2)**
11:10;42:10

**covers (1)**
93:6

**COVID (1)**
88:1

**CPLR (1)**
12:19

**Craig (9)**
7:2;9:4;67:21;
72:18,19;83:2,19,20;
84:5

**C-R-A-I-G (1)**
84:5

**created (10)**
20:24;22:22,25;
23:13;24:14;68:18;
69:1,4,5,10

**credible (2)**
7:23,23

**creditor (1)**
13:16

**Crew (3)**
6:5;8:21;70:22

**cross (4)**
33:19;36:5;37:20;
48:24

**cross-examination (30)**
3:17;7:3;10:14;
15:20,22;16:2,6;19:1;
33:2;34:3,7;37:5,9,
23;38:3;39:14;40:4;
47:10;48:19;66:11;
68:23;74:19;75:7;
80:9,15,20;83:6,23;
96:18,24

**cross-examinations (2)**
10:1;15:3

**cross-examine (1)**
49:11

**cross-examined (1)**
83:9

**crucial (1)**
62:12

**crystal (1)**
12:25

**cued (1)**
68:2

**cumbersome (1)**
65:14

**cumulative (2)**
94:10,11

**curious (2)**
31:13;82:17

**current (3)**
4:7;6:10;67:21

**currently (1)**
82:1

**custodian (2)**
33:10;36:4

**D**

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM

NYSCEF DOC.

INDEX NO. 652077/2017

RECEIVED NYSCEF: 02/07/2022

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 120 of
269

Pacific Alliance Asia v
Kwok

February 2, 2022

**dad (1)**
  50:10
**darn (1)**
  86:12
**data (1)**
  17:10
**date (22)**
  10:3;34:15,19,23;
  35:1,7;57:25;58:8,10;
  61:16;64:11,14;69:7,
  13;82:5;84:19;85:8;
  86:5,7,9;90:22,25
**dated (5)**
  19:4;20:9;26:9;
  62:1;85:25
**dates (3)**
  63:22;87:22;93:14
**daughter (5)**
  4:7;7:25;8:10;11:9;
  12:15
**David (1)**
  7:3
**day (8)**
  33:6,16;74:18;
  84:13;86:9;95:20;
  97:6;98:8
**days (1)**
  89:3
**day-to-day (1)**
  5:11
**dead (1)**
  94:24
**December (1)**
  7:22
**decided (1)**
  9:21
**decision (3)**
  9:22;54:18;92:21
**decisions (1)**
  51:11
**defective (1)**
  16:10
**defendant (10)**
  3:17;9:9;10:13;
  11:8;40:1;74:21;75:5;
  80:18;83:1,21
**defendants (1)**
  37:22
**defendant's (5)**
  5:21;6:4;8:24;
  76:21;77:7
**defense (4)**
  13:17;14:1;77:2;
  96:16
**defense's (1)**
  37:4
**delay (1)**
  61:6
**delays (1)**
  91:16
**demonstrate (1)**
  8:22
**demonstrated (2)**

  3:25;5:1
**departure (3)**
  86:5,14;88:25
**depicted (1)**
  48:4
**describe (1)**
  73:4
**described (1)**
  5:15
**deserves (1)**
  32:24
**despite (1)**
  4:2
**detailed (5)**
  52:9,21,24;53:4,13
**detained (2)**
  65:19;74:6
**determination (1)**
  12:21
**determined (2)**
  12:22;13:11
**developed (1)**
  93:24
**device (1)**
  72:12
**devices (1)**
  30:9
**dialed (2)**
  3:5;18:7
**different (13)**
  13:9,10,11;21:11,
  25;22:2,5,5;29:21;
  48:5;51:17;63:23;
  69:21
**difficult (1)**
  72:21
**difficulty (2)**
  39:8;83:11
**direct (6)**
  3:17;15:24;38:3;
  80:8;83:5;84:6
**directed (4)**
  8:21;15:23;57:7;
  93:3
**directing (2)**
  50:8;51:16
**direction (12)**
  6:15;7:9;50:22;
  59:19;78:25;79:2;
  81:22;94:24;95:5,9,
  18,22
**directions (1)**
  12:12
**directive (8)**
  49:15;53:23;54:3,
  23;55:8,12,14,20
**directly (15)**
  4:15;9:11;11:24;
  31:3;59:23;67:15,16,
  19,23;79:3;81:15,19,
  22,23;95:9
**directs (1)**
  50:15

**disagree (2)**
  36:25,25
**disclosed (3)**
  48:12;49:5,6
**disclosure (1)**
  65:21
**discovery (1)**
  4:16
**discuss (4)**
  33:3;43:15;64:16,
  21
**discussed (2)**
  35:19;64:23
**discussion (1)**
  3:13
**displayed (2)**
  43:19;61:7
**dispositive (2)**
  15:12;25:16
**dispute (1)**
  14:25
**disputed (1)**
  4:8
**disregard (1)**
  9:21
**Division (4)**
  4:21;11:2;12:20,23
**dock (1)**
  91:25
**docked (1)**
  87:2
**Docket (9)**
  17:20;21:6;24:5;
  27:4;31:25;41:13;
  58:15;61:25;75:23
**document (18)**
  5:24;6:3;31:8,17;
  58:9,14,24;59:3;61:6,
  16,17,24;62:8,16,16;
  75:22;77:9;81:6
**documentary (3)**
  5:10;11:22;36:20
**documentation (1)**
  52:18
**documents (5)**
  5:3,22;11:21;79:20,
  23
**DocuSign (1)**
  77:17
**dollar (2)**
  8:7;47:14
**dollars (2)**
  43:12;56:23
**done (2)**
  42:6,7
**doorman (1)**
  12:9
**doubts (1)**
  9:22
**down (3)**
  84:10,11;86:2
**downloaded (4)**
  21:20;33:6,16;35:4

**dozen (1)**
  17:23
**drill (1)**
  73:12
**drop (3)**
  51:3,22;52:6
**dry (1)**
  91:25
**due (4)**
  54:5,22;80:25;
  97:15
**duly (13)**
  16:1,4;34:2,5;
  39:18;40:2;75:2,5;
  80:13,18;83:19,21;
  96:20
**duration (1)**
  88:14
**during (18)**
  4:16;6:2;7:1;12:17;
  13:12,22;14:13,16,23;
  48:23;52:10;88:2,5,8,
  15,17;90:7;95:12
**duty (2)**
  34:25,25

**E**

**earlier (7)**
  23:23;42:11;44:23;
  59:14;67:20;69:24;
  74:4
**early (8)**
  43:20;44:15;53:19;
  58:4;59:8;82:11;
  91:22,23
**easier (1)**
  76:1
**easy (1)**
  64:20
**Echo (2)**
  38:13;85:12
**echoes (2)**
  18:6,17
**edited (1)**
  14:17
**editing (1)**
  17:16
**education (1)**
  51:9
**effect (2)**
  6:7;92:18
**effort (1)**
  8:22
**eight (1)**
  93:19
**either (4)**
  32:3;74:22;76:19;
  78:21
**elaborate (1)**
  43:2
**electronic (3)**
  30:9;74:14;98:4

**electronically (1)**
  77:10
**else (7)**
  8:25;16:11;18:5;
  19:11;20:22;23:7;
  33:17
**e-mail (1)**
  5:24
**employed (1)**
  25:15
**employee (1)**
  9:4
**employees (1)**
  12:10
**employer (3)**
  9:4;78:8,15
**encompass (1)**
  13:8
**end (11)**
  6:7;12:13;57:25;
  63:1,3,19;66:23;
  76:21;92:11;94:16;
  97:6
**ended (1)**
  92:1
**endless (1)**
  8:15
**engineer (1)**
  17:11
**English (6)**
  23:9;40:9,13,17;
  41:23;42:2
**enough (4)**
  9:17;11:14;24:19;
  45:7
**entered (5)**
  57:9,18,22;58:6,17
**entertain (1)**
  32:19
**entities (1)**
  17:14
**entitled (2)**
  21:7;49:11
**entity (1)**
  43:9
**equipment (2)**
  22:14;91:17
**Erica (4)**
  10:15;27:1,11;
  79:18
**essentially (1)**
  91:23
**establish (2)**
  11:23;13:20
**establishes (1)**
  14:24
**Europe (2)**
  6:14;92:3
**European (1)**
  6:17
**Euros (2)**
  44:6,20;45:24;46:9
**even (10)**

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
INDEX NO. 652077/2017

NYSCEF DOC. Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 121 of
RECEIVED NYSCEF: 02/07/2022
269

Pacific Alliance Asia v
Kwok

February 2, 2022

5:24;6:5,15;7:16;
9:8;11:3;40:16;50:11;
72:17;92:5

**events (2)**
20:21;22:8

**everybody (2)**
3:2;18:7

**everyone (4)**
10:11;16:11,14;
27:15

**everywhere (1)**
52:21

**evidence (26)**
4:9,22;5:10,23,24;
6:10,25;8:25;10:2,3,
18;11:6,7,21,22,23;
13:21;14:9,13,15,22,
24;32:24;36:20;
79:21,24

**evidentiary (3)**
4:20;5:16;36:14

**exact (6)**
57:25;82:5;84:13,
19;90:22,25

**exactly (9)**
9:6;20:4;24:3;
26:22;50:13;54:3;
55:14;63:5;88:12

**examination (4)**
65:22,23;74:5;
89:15

**examined (6)**
16:4;34:5;40:3;
75:5;80:18;83:21

**examiner (2)**
17:3;25:14

**example (3)**
50:15;53:7;67:14

**exceeds (1)**
15:16

**except (1)**
16:12

**excluded (2)**
65:17;74:5

**exclusively (2)**
94:25;95:6

**excuse (3)**
36:1;53:5,18

**excused (7)**
32:15;35:10;74:3;
79:14;82:24;96:11;
97:1

**execute (1)**
59:22

**execution (1)**
77:20

**exercise (1)**
59:19

**exhibit (34)**
5:21,21;6:4;8:24;
17:22;21:10,12;24:7,
22;26:13,16;27:1,5,
19,22;28:14;31:10,18,

19,25;41:17;48:1,11,
13;68:1,2;70:5,8;
73:11,20;76:22;77:2,
7;84:24

**exhibits (11)**
25:20;35:15,18;
36:9,11;48:13,22;
49:1,4,6;65:13

**existed (1)**
34:23

**existence (1)**
65:1

**expect (2)**
33:7,11

**expenses (2)**
55:24;56:5

**experience (3)**
19:20;59:16;60:1

**expert (1)**
17:6

**expertise (1)**
17:16

**explain (4)**
8:8;28:22;39:7;
73:4

**explanation (1)**
42:12

**explore (1)**
7:3

**exploring (1)**
5:14

**expression (1)**
11:13

**extended (1)**
11:8

**extent (2)**
4:12;28:24

**extremely (1)**
74:10

## F

**Facebook (1)**
17:14

**fact (6)**
6:3;8:3;23:18;36:2;
42:22;97:16

**facts (2)**
6:20;10:21

**factual (2)**
15:13;66:15

**failed (1)**
10:2

**fair (4)**
26:13,16;45:7;60:2

**fairly (3)**
59:16,18;89:4

**fallen (1)**
12:6

**familiar (1)**
84:15

**familiarity (1)**
17:9

**family (9)**
4:3;8:6;9:24;11:7,
8;77:20;79:4,6;93:25

**family's (1)**
95:1

**far (3)**
43:11,12;60:2

**farther (1)**
86:2

**fast (2)**
71:20;72:10

**father (37)**
8:4;9:17;12:14;
42:16,17,21;43:4,6,
15,19,21;44:8,9,23;
50:11,14,18,21;51:20;
52:4,7,19,22;53:1,8,
14;57:9,22;64:16,22;
68:8;69:25;71:6,18;
72:11;73:7,21

**father's (5)**
9:3,23;11:6;42:19;
52:13

**favor (1)**
12:6

**February (1)**
43:25;45:24

**feed (1)**
26:10

**fees (1)**
55:25

**few (11)**
5:15;7:25;51:24;
52:25;55:1;62:25;
70:6,6;71:3;89:3,16

**fifteen (1)**
49:17

**Fifth (3)**
4:15;5:13;14:8

**Figure (4)**
31:24,24;87:5;
93:20

**filed (4)**
7:21;27:4,6;96:17

**filing (3)**
5:18;74:14;98:4

**film (1)**
17:16

**final (1)**
93:10

**Finally (2)**
9:15;94:23

**find (3)**
31:20;56:9;81:17

**findings (1)**
97:16

**fine (5)**
16:23;31:14;32:12;
83:13;86:10

**firm (2)**
10:12;31:9

**first (44)**
4:3,6;5:21;6:12,18;

8:4;10:25;14:1;15:19;
16:4;28:21;34:5;37:4,
7;38:11;40:2,6;42:1;
48:18;58:22;64:4;
66:7;68:8;70:9;75:5;
76:5,6;78:12;80:18,
22,24;81:3;83:21;
84:4,10,12;86:11,16;
87:4;90:20;92:24;
93:6,17;94:24

**firsthand (1)**
25:13

**five (5)**
3:7;5:18;6:9;18:13;
91:17

**five-exhibit (2)**
5:20;8:24

**five-minute (1)**
18:20

**five-second (2)**
70:11,20

**fix (1)**
41:5

**flat (1)**
10:22

**fled (1)**
43:19

**floor (1)**
71:2

**Florida (9)**
54:6,24;55:9,19;
57:8;58:4;59:15;
84:12;91:3

**folks (1)**
20:2

**follow (1)**
57:1

**following (1)**
52:9

**follows (6)**
16:5;34:6;40:3;
75:6;80:19;83:22

**foot (1)**
50:2

**forego (1)**
94:14

**foregoing (1)**
98:10

**forgot (1)**
70:14

**form (1)**
56:9

**formal (8)**
5:3,22;35:15;36:8,
10;80:2;93:22;94:1

**formalities (1)**
11:18

**formally (2)**
79:20,23

**former (1)**
7:2

**forward (3)**
40:16;71:20;72:10

**Foundation (1)**
72:25;73:3,5,6;94:6

**founded (1)**
43:6

**four (1)**
5:22

**Francis (19)**
15:22,25;16:1,3,8,
12;17:2,24;24:6;
25:13;27:19,23,25;
30:23;31:11,17;32:8,
15,22

**Francis's (1)**
25:15

**fraud (1)**
17:3;25:14

**freedom (3)**
50:18,23;53:10

**Freeport (3)**
91:13,20;92:7

**frequent (1)**
95:13

**Friday (1)**
97:6

**friends (1)**
67:14

**front (6)**
7:5;16:9;26:6;
28:14,16;84:8

**frustrated (1)**
12:23

**fugitive (1)**
6:18

**full (1)**
24:25

**fully (3)**
4:11;25:16;98:3

**funds (1)**
11:12

**further (5)**
35:3,9;74:2;79:12;
82:21

## G

**game (1)**
8:15

**games (1)**
78:11

**gap (1)**
93:17

**gave (4)**
52:21;53:4;59:14;
66:6

**generally (1)**
28:22

**Genoa (2)**
82:1,12

**genuine (2)**
6:6;26:1

**geographically (1)**
22:19

**gets (1)**

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
INDEX NO. 652077/2017
NYSCEF DOC.
Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 122 of
269
RECEIVED NYSCEF: 02/07/2022
Pacific Alliance Asia v
Kwok
February 2, 2022

7:10
**gift (8)**
45:5,6,8,18,19;
46:11;56:9,16
**gifted (1)**
56:8
**given (5)**
6:20;14:14;39:21;
45:8;95:20
**gives (2)**
12:12;45:5
**Golden (28)**
9:3,6,8,10,12,13;
11:5,7;53:20,23;54:7,
12,18,24;55:21,23;
56:2,4,7,14;59:14,19;
60:1,3;65:5;67:17;
79:8;95:7
**good (5)**
10:10;11:15;15:21;
33:25;37:25
**government (1)**
12:5
**Granted (1)**
58:20
**Great (1)**
67:3
**greets (1)**
12:9
**grew (1)**
93:24
**guess (4)**
25:9;66:17;87:8;
93:25
**guest (10)**
52:22;59:23;86:19;
87:5,7,10;89:2,21;
90:8;95:14
**guests (4)**
52:23;53:3;95:18;
96:7
**Guo (74)**
4:22;5:4;6:1,16,20;
7:6,9,12,25;8:2,7,20;
9:17,19;11:9;14:1,2,
4;37:17,20;38:1,1,5,9;
39:2,4,7,18;40:1,6,7,
7,9,10,10;41:12,14;
47:12;57:7;60:19;
64:4,21;65:17;67:9;
68:8,25;71:14,24;
73:11,19;74:3,4;
76:11,18;77:12,25;
78:3,7,20;79:1,3;
81:14,18,21,23;88:8,
10,13,18;89:13;94:6,
17;95:2,10
**Guojiao (3)**
42:9,12;46:18
**Guo's (3)**
9:11;38:23;51:23
**GuoWenGui (1)**
19:7

**guys (2)**
30:21;31:9

**H**

**half (3)**
11:2;17:23;53:10
**hand (7)**
15:25;34:1;38:9;
39:2;80:11;83:17;
96:19
**handle (6)**
10:14,16;15:3;19:7,
8;26:10
**hands (1)**
46:10
**happened (2)**
12:2;43:16
**happens (1)**
85:21
**happy (3)**
15:22;58:10;66:14
**Harbach (94)**
3:4,11,19,22;7:3;
10:6;15:20,21;18:4;
24:3,21;29:15;31:2,7,
15;32:3,4,16,17,21;
33:1,7,18,21;35:13;
37:11,13,16,24;39:15,
19,24;40:5;41:10;
47:8,9,11,19;48:16,
18;49:19,20;51:8;
52:3;57:6,11,13;58:3,
8,12,24;59:10,12,13;
61:5,11;62:14;63:10,
24;64:17;65:6,11;
66:14,19;67:5,8;69:3;
70:12,14;71:8,10;
73:23;74:2,25;75:8,
22;77:6;79:10,12;
80:15,16,21;82:15,21;
83:24;88:22,23,24;
89:15;91:5;94:4,14;
96:9,22
**Harbach's (1)**
66:11
**Harbor (2)**
96:3,4
**hard (4)**
5:10;27:14,17;64:3
**hate (1)**
32:17
**hear (11)**
5:9;27:10,12;39:11;
61:20;66:23,25;
69:25;70:2;83:16;
96:17
**heard (7)**
10:19;54:23;66:7;
68:23;84:16;92:12,20
**hearing (19)**
3:9,15;4:20;5:17;
10:16;15:2,18;18:6,

13;25:17;37:18;39:8;
41:2;48:24;49:3,8;
65:10;79:22;85:11
**hearsay (1)**
9:11
**heart (1)**
74:17
**Heaslop (14)**
7:2,8;9:4;53:24;
72:19;83:2,3,15,19,
20;84:1,5;85:22;94:5
**H-E-A-S-L-O-P (1)**
84:5
**held (3)**
3:13;13:7;30:9
**help (6)**
56:4;61:22;76:25;
78:10;84:19,20
**helpful (1)**
18:1
**helping (1)**
29:19
**helps (2)**
55:23;86:10
**hereby (1)**
98:10
**herself (1)**
95:2
**higher (1)**
48:13
**highlight (2)**
6:24;7:25
**highly (2)**
8:13;65:25
**himself (1)**
94:8
**hit (1)**
70:15
**HK (6)**
76:10;78:13;90:12;
92:13,17;95:6
**Ho (3)**
75:16;78:19;81:12
**hold (2)**
4:19;15:2
**holding (3)**
71:6,17;72:11
**honestly (1)**
91:11
**Hong (20)**
8:5,5;37:7;43:6,22;
44:1,4,19;45:23;46:5,
15,17,20,22;47:1,13,
17;76:14;89:11;95:7
**Honor (104)**
3:10,11,20;4:14;
5:17,20;7:19,22,24;
8:11,12,23;9:9,15,25;
10:6,10;14:22;15:1,
21;18:2,4,18,25;
25:18;27:7,11,24;
31:2;32:13,17,21;
33:1,21,25;35:13,14;

36:13;37:6,13,16,24,
25;38:1,4,10;39:11,
15;41:10;46:16,22;
47:3,9,13;48:10;
49:12,19;55:23;
56:15,22;57:17;58:7,
18,22;59:12;60:18;
61:5;62:14;63:10,20;
64:18;65:6;66:1,3,7,
20,22;67:5;68:22;
73:23;74:15,20;75:1;
79:12,16,18,25;80:7,
16;83:1;85:10,18;
88:23;89:16;92:22;
94:4;95:16;96:9,13,
15,22;97:2,7,17
**Honor's (2)**
9:2;94:9
**hope (2)**
36:7;61:18
**hopefully (2)**
10:16;31:3
**horse (1)**
94:23
**Hostetler (2)**
10:12;27:12
**hot (1)**
8:13
**hours (1)**
49:3
**housekeeping (1)**
79:19

**I**

**idea (5)**
3:1;22:12;51:12,13,
13
**identification (2)**
26:25;48:1
**identifying (1)**
94:8
**ignore (1)**
11:18
**ignores (1)**
8:3
**ignore's (1)**
51:23
**illegally (1)**
6:14
**image (2)**
20:24;21:1
**images (3)**
17:17;25:22;32:1
**immediately (1)**
15:9
**impliedly (1)**
12:20
**importing (1)**
29:3
**impose (1)**
97:12
**impossible (1)**

52:23
**inaccurate (1)**
11:4
**inartfully (1)**
86:22
**includes (1)**
11:8
**including (1)**
55:24
**inconsistent (1)**
23:19
**incur (1)**
56:17
**indeed (1)**
82:19
**independent (2)**
11:11,12
**indicate (1)**
19:3,8
**indicated (2)**
74:4,10
**indicates (3)**
5:4;6:1;74:11
**individuals (1)**
22:5
**inference (5)**
13:23;14:5,6,14,25;
36:23
**inform (1)**
59:22
**information (8)**
20:19,19;21:2;23:4,
6;34:12,14;55:9
**informed (3)**
55:4;60:15;63:4
**informing (3)**
54:16,18,19
**inquiry (1)**
54:14
**inserted (1)**
77:25
**inspected (1)**
91:14
**Instagram (7)**
17:9,14;19:4,5,6,
12;20:9
**install (1)**
22:14
**instruction (2)**
9:1;55:18
**intended (4)**
6:12;8:3;61:19,23
**intending (1)**
97:12
**interacted (1)**
7:5
**interactions (8)**
60:3;92:25;93:11,
21;94:1,17,18,21
**interest (8)**
10:5;12:18;13:1,2,
9;56:1;65:20;74:8
**interior (1)**

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM INDEX NO. 652077/2017
NYSCEF DOC. Case 22-50073 Doc 183-4 Filed 04/06/22 Entered 04/06/22 17:07:45 RECEIVED NYSCEF: 02/07/2022
Page 123 of
269
Pacific Alliance Asia v
Kwok

February 2, 2022

68:14
**intermediary (1)**
  12:12
**International (17)**
  8:5;37:8;43:7;44:1,
  5,19;45:23;46:6,15,
  17,20,23;47:1,13,17;
  85:1;95:6
**internet (4)**
  19:24;33:6,16;
  84:15
**interpose (1)**
  57:17
**interpret (1)**
  38:23
**interpretation (1)**
  40:17
**interpreter (22)**
  38:5,8,10,11,13,15,
  16,19,21,25;39:6,23;
  40:2;45:14;47:15,15;
  52:1;53:5;57:10,13,
  15;61:20
**interrupted (1)**
  88:22
**intertwined (1)**
  11:17
**interview (3)**
  68:21;69:12,13
**into (11)**
  5:16,23;6:7,10;
  14:6;18:7;39:9;60:19;
  71:24;79:21;85:24
**investigate (1)**
  18:19
**investigator (1)**
  17:3
**invite (1)**
  58:23
**invocation (1)**
  4:15
**invoked (1)**
  5:13
**invoking (1)**
  14:8
**involved (3)**
  6:18;47:4;73:5
**involvement (1)**
  66:3
**involves (1)**
  65:13
**irrelevant (3)**
  6:21;14:22;69:13
**Island (1)**
  53:9
**Islands (1)**
  13:5
**issuance (1)**
  15:10
**issue (20)**
  4:13;12:16,16,18,
  21;13:8,11,13,13,14,
  16,23;14:3,5,19,23;

44:2;52:13;63:5;66:8
**issued (5)**
  15:8,15;58:13;
  63:14;89:22
**issues (7)**
  10:16;18:12,14,15;
  25:16;36:14;37:2
**Italy (1)**
  82:1
**itineraries (1)**
  52:12
**itinerary (7)**
  52:9,10,14,15,21;
  53:4,13
**Ivanov (12)**
  6:11,24;79:17;80:3,
  7,12,17,22;81:2;
  82:17,23,24

**J**

**January (10)**
  4:1,5,18;5:1,19;
  19:4;33:6;85:9;91:20,
  23
**jazz (1)**
  11:14
**Jersey (1)**
  86:3
**John (3)**
  10:12;37:6;48:10
**joined (2)**
  82:4,11
**joint (1)**
  98:7
**Judge (8)**
  11:18;12:7;15:5;
  48:16;61:25;79:10;
  82:15;98:6
**judgment (1)**
  13:16
**judicial (1)**
  7:18
**July (3)**
  87:25;88:15;95:13
**Justice (1)**
  62:25

**K**

**keep (2)**
  9:22;16:18
**keeping (1)**
  83:11
**kind (2)**
  17:6;52:2
**knew (2)**
  9:13;60:4
**knowledge (5)**
  11:24;19:25;25:14;
  50:2;53:15
**knows (4)**
  9:5;38:1;42:16;

94:12
**Kong (20)**
  8:5,5;37:8;43:6,22;
  44:1,4,19;45:23;46:6,
  15,17,20,22;47:1,13,
  17;76:14;89:11;95:7
**Kwok (51)**
  4:14,21;5:12,18,23;
  6:8,10,22;7:17,19;
  8:14;9:7;10:2,4,13,
  24;11:1,9;13:17,21;
  14:2;15:10;19:22,25;
  20:5,6,21:7,12;29:12,
  25;30:9;75:16;78:19;
  81:12;86:15,23;87:1,
  18;88:13,17;89:1,7,
  20;90:7,8,9;92:25;
  93:21;94:8;95:13,25
**KwokMiles (2)**
  26:20;29:11
**Kwok's (9)**
  4:2,5,10;5:10;7:11,
  14,15,24;8:18

**L**

**lack (1)**
  6:24
**Lady (48)**
  4:1,11;5:5;7:15;8:2,
  21;9:20;10:5;21:7,12;
  50:3,8,12,15,15,21,
  22;58:20,22;59:7,19;
  60:12;62:20;63:5;
  64:22;65:2;70:23,24;
  71:1;72:3,4,4,6;76:7;
  78:25;79:2;81:7,12,
  25;82:1,8,18;84:11,
  18;85:1;86:5;92:13;
  94:7
**landed (1)**
  46:9
**large (1)**
  24:23
**larger (1)**
  61:11
**last (17)**
  9:16;41:16;42:12,
  13;54:10;61:20;
  65:12;73:10;76:14;
  77:4;80:22;82:8;
  83:25;84:4;87:18;
  93:18;96:15
**late (7)**
  5:7;6:2,23;59:7;
  82:4,6;88:10
**later (6)**
  8:6;10:16;12:2;
  44:14;71:20;98:5
**Laura (1)**
  33:22
**law (11)**
  10:12;11:16,22;

12:25;31:9;36:25;
  72:25;73:3,6;94:5,12
**lawyer (5)**
  7:11;60:15;63:4;
  64:25;65:1
**lawyers (2)**
  11:20;64:24
**lawyer's (1)**
  58:2
**lead (1)**
  3:1
**leading (1)**
  5:16
**learned (13)**
  44:12;57:24;60:11;
  62:21,24,25;63:6,18;
  64:4,15;90:20;91:1,8
**least (4)**
  8:12;24:17;52:5;
  92:7
**leave (2)**
  3:5;86:8
**leaves (1)**
  7:24
**Lee (2)**
  37:8,25
**left (8)**
  43:21;71:25;84:12,
  13,19;89:2,5;91:21
**left-hand (1)**
  72:15
**legal (5)**
  4:3;5:6;10:16;13:3,
  10
**less (2)**
  50:20;94:1
**lets (1)**
  12:9
**lifelong (1)**
  8:11
**likely (1)**
  5:17
**likewise (1)**
  83:3
**Lim (3)**
  38:13,14;39:4
**limited (2)**
  93:11;95:8
**line (2)**
  3:5;68:23
**lines (1)**
  31:23
**list (2)**
  48:13;96:16
**listed (3)**
  78:12,15;95:1
**literally (1)**
  12:14
**little (9)**
  12:24;44:13;62:11;
  65:14;71:22;72:14;
  85:24;86:2;88:19
**live (2)**

12:3,4
**lives (1)**
  11:11
**living (2)**
  69:16,17
**local (1)**
  95:17
**locate (1)**
  83:8
**location (1)**
  68:12
**log (2)**
  26:19;74:22
**logged (1)**
  74:22
**logging (2)**
  79:17;83:11
**logo (2)**
  72:22;73:7
**long (7)**
  14:20;53:9,11;82:2;
  88:25;89:2;91:14
**longer (9)**
  53:19;54:15,21;
  62:11;89:1,12,20;
  91:16;93:24
**look (7)**
  31:16;50:7;53:17;
  58:10;59:3;84:21,22
**looking (5)**
  18:10;31:8;63:23;
  84:18;92:24
**looks (4)**
  21:24;28:2;47:23;
  85:21
**lost (3)**
  52:2;81:1,2
**lot (3)**
  48:25;88:19,20
**lots (1)**
  13:24
**louder (1)**
  7:8
**love (3)**
  8:11;11:20,25
**lunch (6)**
  57:2;65:7,15;66:4,
  23;67:9

**M**

**ma'am (4)**
  40:11;41:8;42:3;
  59:5
**Madam (2)**
  39:19;53:5
**main (2)**
  7:25
**Maine (2)**
  96:4,4
**mainly (1)**
  94:6
**maintain (2)**

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM INDEX NO. 652077/2017

NYSCEF DOC. Case 22-50073 Doc 183-4 Filed 04/06/22 Entered 04/06/22 17:07:45 Page 124 of RECEIVED NYSCEF: 02/07/2022
269

Pacific Alliance Asia v
Kwok

February 2, 2022

22:14;56:21
**maintaining (2)**
56:6,17
**makes (1)**
44:19
**making (3)**
12:24;72:12;90:4
**man (4)**
71:5,16;72:15;
73:19
**manage (2)**
56:10,11
**management (5)**
6:17;12:11;55:25;
76:13;81:16
**manager (1)**
74:23
**Manhattan (1)**
85:23
**manipulated (2)**
20:25;25:24
**manipulation (1)**
17:17
**manner (1)**
65:9
**many (3)**
11:10;51:21;52:5
**March (4)**
62:1;63:7,24;64:19
**Mariana (1)**
13:5
**Maritime (1)**
85:1
**mark (10)**
68:11;70:11,21;
71:6,14,18,21,25;
72:11,16
**marked (7)**
26:25;47:25;48:24;
68:1;70:5;73:11;
79:21
**materials (1)**
35:7
**matter (7)**
14:24;41:13;57:24;
65:20;75:15;79:19;
80:8
**May (69)**
4:1,11,18;5:9;6:19;
7:15;8:2,21;9:17,20,
20;10:5;12:8,9;21:7,
12;23:23;26:9;28:17;
31:2;45:16;50:3,12,
15,21,22;58:20,22;
59:7,19;60:12,12;
62:20,20;63:5;64:22;
65:2,11,13;66:22;
70:23,24;71:1;72:3,4,
4,6;76:7,14;80:14;
81:7,13,25;82:1,8,18;
84:11,18;85:1;86:5;
91:21,23;92:7,11,13;
93:12,12,20;94:7

**maybe (8)**
11:15;12:11;13:24;
38:10;76:24;86:22;
87:3;93:19
**May-ish (1)**
91:22
**May's (5)**
5:5;50:8,16;78:25;
79:2
**mean (8)**
6:12;7:21;19:23;
32:6;45:3;59:18;93:3,
19
**meaning (1)**
95:1
**meaningful (1)**
49:18
**means (4)**
50:17;79:1;81:22;
95:8
**meant (1)**
95:21
**mechanisms (1)**
29:3
**media (8)**
4:10,13;5:12;14:18;
17:7,13;19:21;32:23
**media's (1)**
66:2
**meet-and-confer (1)**
35:23
**Mei (28)**
4:22;7:25;11:9;
14:1,2,4;37:17;38:1;
39:18;40:1,7,7,9,9,10;
41:14;76:11;77:12,
25;78:3,20;81:14,15,
18;89:13;94:17;95:2,
10
**member (1)**
46:5
**members (2)**
8:21;70:22
**memo (1)**
97:15
**memory (8)**
35:17;52:2;69:6;
86:5;89:3,3;90:19;
91:10
**mention (3)**
58:22;60:10;90:4
**mentioned (8)**
33:9;42:8,9;50:24;
51:11;59:14;64:18;
67:10
**mentions (1)**
51:16
**message (4)**
5:25;7:7;93:11;
94:19
**met (6)**
47:21;48:6;78:19,
20;81:12,18

**metadata (1)**
21:21
**microphone (3)**
16:12;39:9,9
**Microsoft (2)**
3:8;80:1
**mid (1)**
6:23
**mid-2017 (1)**
5:6
**might (3)**
23:7;89:16;91:10
**Miles (3)**
10:13;21:7,12
**million (11)**
8:4,9,13;44:6,20,
24;45:24;46:2,9;
56:22,23
**mind (1)**
42:24
**minute (1)**
79:10
**minutes (8)**
3:8;5:15;18:14;
49:18;52:25;59:5;
62:25;66:18
**miscalculation (1)**
6:22
**mischaracterize (1)**
10:20
**missing (1)**
14:3
**misstates (2)**
45:9;89:25
**mistaken (1)**
39:15
**misunderstood (1)**
87:3
**Mitchell (10)**
7:11,13,16,20;
96:16,18,19,20,23;
97:1
**M-O-M (1)**
80:24
**Momchil (4)**
67:21;79:17;80:12,
17
**moment (14)**
9:5;23:24;31:3;
41:5;42:6;45:22;
61:18;69:22;73:15,
23;79:17;82:18;
87:11;91:8
**moments (1)**
51:24
**Monday (1)**
97:15
**money (8)**
44:8,10,11,18,21;
45:1,4,6
**month (7)**
63:7;87:25;88:2,5,
11,12;92:2

**months (3)**
88:17;91:17;93:19
**more (24)**
3:7;12:12,24;17:23;
33:10,11;37:19;
45:21;50:20;54:19;
55:6;63:12;66:12;
71:3;72:10;86:8;
88:18,19,19,20;93:22,
24,25;96:12
**morning (10)**
10:11;14:20;15:21;
32:7;33:25;36:19;
37:25;40:12;57:1;
68:24
**most (1)**
40:7
**mostly (1)**
67:20
**motion (2)**
13:3,14
**mouth (1)**
4:11
**move (13)**
9:2;25:17;49:17;
51:18;54:17;55:17,
19;59:11;61:15;
62:12;79:20;90:1;
92:4
**moved (5)**
8:15;54:8;55:2,4,5
**movement (4)**
12:17;90:16;94:25;
95:6
**movements (10)**
50:8,16;51:16,16;
78:25;79:2;81:13;
93:3;94:21;95:17
**moving (1)**
63:11
**much (9)**
3:12;7:8;16:25;
56:20;66:12;73:8;
86:7;91:17;93:1
**multiple (2)**
19:21;64:7
**musical (1)**
24:11
**musicians (1)**
11:13
**must (1)**
15:13
**mute (2)**
3:2;16:11
**muted (4)**
16:14;18:8;37:11;
39:5
**myself (1)**
59:23

**N**

**name (16)**

23:2,3;38:12;40:9,
9;42:8,12,13;46:18,
18;72:3;75:9;80:23,
24;83:25;84:3
**named (1)**
6:5
**namely (2)**
43:25;76:10
**names (2)**
67:18;79:7
**Nantucket (1)**
96:1
**Nassau (1)**
91:13
**Nat (1)**
15:22
**Nathaniel (2)**
16:1,3
**naturally (1)**
7:20
**nature (1)**
5:25
**navigated (2)**
21:17;26:22
**NDAs (2)**
8:21,23
**near (1)**
32:7
**nearly (1)**
92:2
**need (9)**
3:2;16:11;36:10;
38:5;45:5;51:9;53:12;
54:7;97:3
**needed (6)**
50:11,12;54:24;
59:23;67:14;89:12
**needing (1)**
59:15
**needs (7)**
38:11;47:15;54:5,8,
17;55:5,19
**Netherland (1)**
8:17
**Netherlands (3)**
68:15;69:16,17
**nevertheless (1)**
86:24
**new (21)**
4:22;9:2,6,20;13:1,
16;53:8,9,11;54:16;
60:12;62:4,20;75:15;
84:19;85:22;86:3;
89:12;92:2,4;95:8
**Next (14)**
8:20;32:16;33:1;
35:12;41:4;62:13;
70:3,4;74:19;79:15,
16;81:11;82:25;98:5
**nice (2)**
74:18;98:8
**night (1)**
49:3

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM    INDEX NO. 652077/2017

NYSCEF DOC. NO. 369    RECEIVED NYSCEF: 02/07/2022

Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 125 of
269

Pacific Alliance Asia v
Kwok

February 2, 2022

**nobody (1)**
92:13
**nondisclosure (1)**
76:17
**none (5)**
14:23;76:10;79:2;
94:20;95:9
**nonetheless (1)**
20:1
**noon (3)**
98:1,2,6
**nor (2)**
78:19;81:12
**normal (1)**
59:20
**normally (1)**
52:15
**northeast (1)**
95:23
**Northern (2)**
13:5;95:17
**note (6)**
7:5;9:15;24:4;
37:16;38:4;83:10
**noted (2)**
7:19;49:16
**November (5)**
68:18;69:4,5,10,18
**nowhere (1)**
8:25
**Number (12)**
10:24;17:21,25;
21:6;24:5;27:4;31:25;
48:25;53:2,3;63:21;
66:5
**NY3d (1)**
13:5
**NYSCEF (1)**
27:16

**O**

**oath (2)**
39:16,21
**object (6)**
48:11;49:2,15;
63:20;68:22;85:10
**objection (17)**
24:3;45:9,11,13,14,
17;49:8,16;51:23,25;
57:18;58:7;64:6;
85:12;89:25;92:22,23
**observation (1)**
15:7
**observed (2)**
15:12;21:21
**obstruction (1)**
49:9
**obtained (3)**
23:19,22;24:6
**obviously (1)**
97:9
**occasions (1)**

52:18
**occur (1)**
12:3
**occurred (1)**
93:17
**October (22)**
6:13;21:22;43:10;
53:19;54:4;55:11;
57:19;58:5,11,23;
63:15,25;64:19;81:8;
82:11;84:12;85:25;
86:3,6,11;87:17,19
**odds (1)**
9:11
**off (2)**
86:2;87:21
**offer (6)**
33:5;35:15;38:3;
80:9;83:4,5
**offered (3)**
14:10;73:11;84:24
**office (6)**
11:7;79:4,6;92:17;
95:1,24
**officer (1)**
34:10
**offline (1)**
3:7
**Off-the-record (1)**
3:13
**old (1)**
28:23
**O'Melveny (1)**
67:2
**once (2)**
45:21;69:19
**one (29)**
5:24;10:24;23:24;
28:13;33:22;36:3;
38:5;40:15;43:3;
44:24;47:14;49:25;
53:2;63:12;66:8;
67:10,13;68:2,3;70:3,
4,22;75:24;77:24;
82:15,17;86:3;92:4;
96:12
**ones (3)**
92:2,3,4
**online (1)**
38:8
**only (20)**
6:3,7,21;7:5,24;8:6;
12:16,18;13:11;15:7;
26:3,5;33:5;34:22;
35:19,24;48:22;
58:15;64:23;69:24
**open (4)**
3:5;15:2;18:13,15
**open-ended (1)**
33:19
**opening (2)**
3:16,21;10:17,19
**operate (2)**

22:14;56:21
**operating (2)**
56:5,18
**operation (4)**
5:5,11;6:2,23
**operational (1)**
8:22
**operations (1)**
81:13
**operative (1)**
85:8
**opportunity (3)**
10:20;15:2;97:23
**opposed (1)**
9:23
**opposition (1)**
4:6
**order (52)**
5:7;9:3;13:19;
14:21,21;15:8,10,15;
37:23;49:5,10;57:8,
18,21;58:6,13,16,19;
59:6;60:11,14,22;
61:7,8;62:3,7,19,24;
63:1,6,6,14,18,24,24;
64:5,15,18,19,19,19;
65:2;74:5;89:22;90:4,
6,10,13,16,21;92:12,
19
**ordered (1)**
9:20
**orders (3)**
9:18;64:21;81:22
**ordinary (1)**
54:6;59:20
**organization (4)**
78:8,9,12;85:1
**orient (1)**
69:5
**original (1)**
55:13
**Ostrager (1)**
62:25
**Ostrager's (1)**
61:25
**otherwise (1)**
10:20
**out (23)**
4:24;9:2;12:6;
16:11;18:11,14,15;
29:19;49:11;51:20;
52:4,20;53:2,4,14;
67:1;72:21;81:17;
85:7,23;87:5;91:24;
93:20
**outfit (1)**
6:5
**over (14)**
3:22;5:4,15;8:17;
10:6;19:15;31:5,9;
52:15;59:19;66:2;
74:16;86:24;96:14
**overnight (1)**

51:3
**overruled (6)**
45:13,17;51:25;
64:8;90:2;92:23
**overruling (1)**
49:7
**own (4)**
4:11,13;11:11,12
**owned (6)**
4:23;9:14;11:1;
43:9;46:5;60:4
**owner (7)**
19:5,5,12;37:8;
44:4;51:12;56:14
**ownership (7)**
7:17;11:3;13:1,2;
15:11;51:10;56:1
**owns (4)**
12:8,10;72:6,8

**P**

**Pacific (3)**
14:12,15;75:15
**packed (1)**
89:4
**Page (12)**
14:11;26:17;31:19;
34:10;41:16,17;
61:25;62:13;77:4,6,7;
78:12
**Palm (1)**
53:12
**Palmigiano (1)**
14:10
**paper (5)**
5:2;8:15;32:4;
77:13;80:2
**papers (1)**
11:1
**paragraph (31)**
9:16;42:2,5,8;
43:18;49:21;50:7;
53:17,23;60:8,10;
62:19;63:23;76:5,9,
13,17,21;78:18,23;
81:7,11,20;84:11;
86:14;87:4;89:10;
92:24;94:16,16,23
**park (1)**
4:3
**parked (3)**
6:13;8:4;54:5
**part (8)**
8:9;25:6;54:10;
56:16;58:21;68:3;
71:20;87:25
**participants (1)**
30:25
**particular (6)**
17:16,24;24:7;
34:23,24;55:3
**parties (6)**

3:2,15;15:8;59:21;
79:20;83:4
**partner (4)**
7:3;42:10,18,23
**parts (1)**
76:2
**party (2)**
14:8;78:2
**past (3)**
5:15;6:13;55:1
**patience (4)**
16:21,25;32:18;
45:21
**patient (1)**
63:11
**pause (13)**
16:22;18:21;23:25;
28:1;39:10;74:1;
75:25;79:11;80:25;
82:16;83:14;89:19;
97:13
**paused (1)**
71:13
**pausing (1)**
68:11
**PAX (6)**
3:25;4:8;9:12,21;
12:19;24:24
**PAX's (2)**
10:3;11:1
**pay (4)**
44:7;55:24;56:4;
86:7
**paying (1)**
65:4
**pen (1)**
77:12
**pending (2)**
45:11;61:3
**people (4)**
3:5;12:6;18:19;
60:3
**People's (1)**
12:4
**perhaps (3)**
17:10;37:19;59:7
**period (8)**
6:2;7:1;12:18;
13:12,22;14:13,17,23
**periods (1)**
22:6
**permission (5)**
51:21;52:6,8,8;
53:15
**permitted (1)**
31:2
**persistence (1)**
12:23
**person (11)**
5:4;23:6;34:18;
36:2;42:24;45:6;48:4,
5,5;86:17;89:13
**personal (4)**

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
INDEX NO. 652077/2017
NYSCEF DOC. Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 126 of
269
RECEIVED NYSCEF: 02/07/2022

Pacific Alliance Asia v
Kwok

February 2, 2022

7:11;11:24;19:20;
20:19
**personally (6)**
20:6;34:13,22;
77:23,24;86:21
**personnel (1)**
9:13
**person's (1)**
42:12
**persuades (1)**
15:14
**pertaining (1)**
21:19
**Phoenix (2)**
6:5;78:15
**phone (9)**
7:7;16:17,19;52:15;
71:6,17;89:7;93:11;
94:19
**photograph (2)**
48:1,18
**phrase (1)**
87:8
**physically (1)**
87:9
**pick (1)**
86:8
**picture (1)**
48:14
**pictures (2)**
19:21;20:5
**piece (3)**
5:2;6:3;63:12
**piloted (1)**
93:4
**place (9)**
54:6,9,17;55:3,4,6,
18;69:13;89:22
**placeholder (1)**
31:9
**places (1)**
22:2
**plainly (1)**
7:21
**plaintiff (10)**
13:15,20;15:19;
16:4;25:15;34:4;37:5;
49:11;65:24;74:9
**plaintiff's (10)**
3:17;10:15;15:4;
48:1,4;68:2;70:5,8;
73:11,19
**plan (2)**
52:24;66:13
**platform (1)**
29:16
**platforms (1)**
32:23
**plausible (1)**
92:8
**play (12)**
8:13;11:14;14:6;
68:3,4;70:6,6;71:3,8,

21;73:12;78:10
**played (5)**
68:7;70:18;71:12,
23;73:18
**playing (2)**
70:7;73:15
**pleading (1)**
7:21
**pleadings (1)**
15:9
**please (27)**
27:20;38:9,12;39:2,
4,7,25;40:17,24;43:2;
57:14;61:1;62:8;70:1;
73:24;75:9,24;79:10,
15;80:4,10,22;82:15,
25;83:18,25;84:3
**plot (1)**
84:18
**plural (1)**
25:16
**point (14)**
7:17;9:10;11:23;
15:16;30:13;43:23;
58:19,21;59:22;62:9;
79:21;85:7,17;94:4
**points (1)**
36:14
**ported (1)**
82:12
**portion (2)**
23:22;24:14
**portions (2)**
23:18;66:17
**portray (2)**
26:2,2
**possibility (1)**
92:19
**possible (3)**
35:20;52:14;63:4
**possibly (1)**
58:1
**post (6)**
19:4,5,21;20:9,20;
21:2
**posted (7)**
20:1,6,12,14,16;
30:2;83:12
**post-hearing (1)**
37:2
**posting (1)**
20:2
**postings (2)**
14:18;19:24
**post-judgment (1)**
4:16
**posts (4)**
4:10;5:12;19:24;
20:5
**post-trial (4)**
97:5,9,14,20
**potato (1)**
8:13

**potentially (1)**
65:20
**practice (1)**
12:5
**pre-date (1)**
14:20
**predicted (1)**
4:19
**prefer (1)**
97:21
**pre-hearing (1)**
49:15
**prejudice (1)**
12:22;13:13
**preparing (2)**
48:23;97:9
**present (7)**
37:22;68:20;69:6,8,
12,15;74:12
**presented (1)**
89:4
**presenting (1)**
37:9
**presently (1)**
94:13
**preserve (1)**
34:25
**press (2)**
65:17;74:5
**presumably (1)**
95:14
**presume (2)**
69:9,11
**pretrial (3)**
27:1;48:14,21
**pretty (5)**
5:8;86:11;91:3,17;
93:1
**prevented (1)**
5:13
**previously (5)**
27:4;74:6;80:7;
83:3;96:17
**Price (8)**
33:2,4;34:1,2,4,9;
35:11,25
**Price's (1)**
33:4
**printout (1)**
52:14
**prior (8)**
15:9,18;85:11;
86:14;87:17,19;
88:25;91:7
**privilege (1)**
14:8
**probably (4)**
51:9;63:6;87:8;
91:22
**probative (6)**
6:11;10:2;14:9,24;
32:6;36:18
**problem (2)**

18:5;39:17
**problematic (1)**
7:19
**problems (3)**
6:6;7:4;8:1
**proceed (10)**
3:16;16:24;32:25;
39:14,25;57:5;75:3;
80:14;96:21;98:3
**proceeding (4)**
18:16,16;66:3;74:9
**proceedings (4)**
58:21;74:13;80:25;
98:11
**process (2)**
48:15,21
**proclamations (1)**
17:23
**produce (1)**
92:2
**proffer (4)**
4:22;10:2;25:6;
33:4
**proffered (9)**
9:9;14:15;20:9;
24:24;33:8;48:14,20;
66:16;69:4
**proffering (1)**
17:6
**proffers (1)**
14:12
**prohibiting (1)**
57:22
**properly (1)**
15:15
**property (1)**
8:14
**proposed (1)**
97:15
**protect (1)**
74:5
**protection (2)**
66:2;74:16
**provide (2)**
27:15;44:23
**provided (3)**
44:8;77:19;85:11
**public (2)**
65:23;74:14
**publication (1)**
65:13
**pull (2)**
27:1;61:5
**pulled (1)**
84:23
**pulling (1)**
17:10
**pun (1)**
6:12
**purchase (1)**
46:12
**purchased (2)**
44:20;46:17

**purchasing (2)**
45:6,23
**purport (1)**
26:2
**purported (1)**
6:4
**purpose (3)**
18:3;22:24;28:16
**purposes (2)**
69:14;84:24
**put (9)**
5:23;24:8;32:22;
40:17;43:3;48:9;
61:24;76:24;77:12
**puts (1)**
6:3
**puzzle (1)**
63:12
**PX (3)**
17:21;21:10,13

---

## Q

**Qu (25)**
8:6,7,8;42:9,9,13,
16,17,18;43:4,10,15;
44:4;46:2,5,18,18,20,
21,23,25;47:12,21;
48:4;50:2
**Q-U (1)**
42:13
**quality (1)**
29:5
**quickly (2)**
63:11;97:8
**quite (3)**
43:1;48:19;91:11
**quote (4)**
7:5,7;8:2;14:9

---

## R

**Rachel (1)**
98:15
**raise (7)**
15:25;34:1;38:9;
39:2;80:10;83:17;
96:19
**range (1)**
85:8
**rather (2)**
13:2;55:5
**reach (1)**
67:1
**reachable (1)**
13:15
**read (14)**
41:20,22,24;42:2,6;
60:14,16,21,25;61:9,
10,17;87:4,4
**reading (1)**
42:7
**ready (2)**

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO.
Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 127 of 269
RECEIVED NYSCEF: 02/07/2022
Pacific Alliance Asia v Kwok
February 2, 2022

30:23;81:4
**realize (1)**
    41:23
**really (9)**
    43:14;44:24;62:15;
    63:10;64:11,13;73:8;
    74:16;93:14
**reason (5)**
    46:4;48:20,22;54:5,
    23
**reasons (2)**
    13:24,25
**rebut (1)**
    10:3
**recall (15)**
    3:25;4:19;26:22;
    32:8;52:20;62:15;
    67:18;68:20;87:18;
    88:12,25;89:7;90:22,
    25;93:14
**received (5)**
    46:25;47:1;83:7;
    95:5,9
**receiving (1)**
    94:24
**recess (1)**
    57:4
**recognize (3)**
    61:8;68:11;72:24
**recollection (6)**
    28:17;31:14;85:14,
    15,16,19
**reconfirm (1)**
    62:9
**record (19)**
    5:2,16;10:23;15:13;
    22:11;29:15;33:10;
    36:6;39:19;40:15;
    41:12,17;65:17;70:7;
    75:22;77:6;81:6;
    84:25;89:25
**recorded (4)**
    22:15,19,19,20
**recording (1)**
    72:12
**records (3)**
    35:25;36:2,4
**recovered (1)**
    32:9
**redirect (1)**
    32:20
**refer (3)**
    17:24;76:9,13
**reference (2)**
    76:2;97:9
**references (1)**
    32:23
**referred (2)**
    10:24;77:2
**referring (4)**
    20:3;25:7;81:5;
    92:24
**refers (3)**

19:8;55:12;76:17
**refresh (6)**
    31:14;85:14,15,16,
    19;86:4
**refreshes (1)**
    28:17
**refreshment (1)**
    84:24
**refuel (1)**
    51:3
**refusal (1)**
    4:17
**refuses (1)**
    14:9
**regarding (4)**
    11:3;14:16;43:14;
    96:16
**regimes (1)**
    13:11
**regular (1)**
    59:16
**reinforce (1)**
    10:1
**reiterate (1)**
    54:25
**relate (2)**
    20:1;26:5
**related (1)**
    8:18
**relating (8)**
    17:21;19:22;21:7;
    26:10;53:20;59:7;
    64:21;65:2
**relationship (3)**
    55:21;76:6;93:25
**relayed (2)**
    53:23;54:23
**relevance (2)**
    92:22;94:13
**relevant (5)**
    4:8;6:2;7:1;10:4;
    14:23
**reliability (1)**
    14:19
**relying (3)**
    15:23;23:23;24:24
**remainder (2)**
    53:22;66:10
**remand (1)**
    11:2
**remanded (1)**
    12:21
**Remember (16)**
    7:13;43:14;54:1,2;
    57:25;63:3,5;64:11,
    13;84:13,19,20;
    86:11;87:14;88:11;
    89:6
**removed (2)**
    25:3;91:25
**removing (1)**
    57:22
**renew (1)**

92:1
**repaired (1)**
    91:14
**repairs (1)**
    91:15
**repeat (3)**
    23:21;52:1;81:3
**rephrase (1)**
    64:2
**report (2)**
    55:5;59:15
**reported (1)**
    20:21
**reporter (6)**
    56:25;75:10;81:2;
    84:4;97:11;98:16
**reporter's (1)**
    81:1
**reporting (1)**
    54:19
**repositioning (1)**
    95:22
**represent (2)**
    63:15;68:17
**representation (3)**
    9:12;24:5;69:1
**representative (7)**
    6:17;35:21;55:16,
    16,18;77:20;89:11
**representatives (5)**
    76:9,10;79:1;95:7,7
**represented (2)**
    35:22;92:6
**representing (2)**
    10:13;64:25
**Republic (1)**
    12:4
**request (6)**
    40:15;52:23;54:7,
    14;55:10;77:20
**requested (2)**
    4:21;56:10
**require (1)**
    51:2
**required (1)**
    11:22
**requires (2)**
    50:24;62:4
**requiring (2)**
    60:11;62:19
**research (1)**
    12:24
**resign (1)**
    92:21
**resignation (2)**
    91:6;92:11
**resolve (1)**
    18:12
**respect (4)**
    9:18;58:8;66:10;
    81:14
**respectively (1)**
    26:9

respects (1)
    23:20
**respond (2)**
    48:16;50:14
**responding (1)**
    60:24
**response (2)**
    14:9;55:9
**responsible (1)**
    50:8
**restraining (18)**
    57:8,21;58:6,13,16;
    59:6;63:1,14;64:5;
    89:22;90:3,6,10,13,
    16,21;92:12,19
**resume (3)**
    3:14;57:1;66:21
**retaining (1)**
    8:16
**retrieve (1)**
    28:18
**retrieved (3)**
    28:9,13,19
**retrospectively (1)**
    87:23
**return (4)**
    9:20;60:7,12;62:20
**returned (1)**
    62:4
**Returning (3)**
    62:18;78:18;81:20
**revising (1)**
    89:15
**Richard (3)**
    21:20;23:3,4
**right (65)**
    3:1,9;4:25;11:14;
    15:6,25;16:20;17:12;
    18:22;20:18;22:4;
    24:16;26:4;33:21;
    34:1;35:10;38:7,9,22;
    39:1,2,22;40:19,22,
    25;41:3;42:5;43:7,10;
    45:6;46:6,10;47:14;
    49:16;51:4;55:19;
    56:24;57:5,10;60:6;
    65:14,16;66:4;67:1,
    24;70:25;71:13,25;
    74:18,24;78:3,20;
    80:10,10;81:6,25;
    83:17;88:21,23;
    91:21;93:3;95:16;
    96:19,25;97:3
**right-hand (3)**
    70:10,20;72:22
**risk (1)**
    45:20
**rocket (1)**
    97:19
**rogue (1)**
    5:7
**rough (2)**
    66:11;97:8

route (1)
    85:24
**routine (2)**
    55:6;59:20
**routinely (1)**
    8:15
**rule (7)**
    11:21;72:25;73:3,6;
    94:5,12;98:5
**run (1)**
    9:24
**Russell (7)**
    6:17;74:20;75:2,4,
    13,14;77:24
**R-U-S-S-E-L-L (1)**
    75:13

# S

**safety (5)**
    52:13;66:2;74:6,8,
    16
**sail (1)**
    59:15
**sailed (3)**
    58:4;82:8,10
**sale (1)**
    44:19
**same (11)**
    6:16;58:7;64:6;
    65:1,9;66:5;73:12;
    75:14;78:19;81:13;
    96:7
**sanctions (2)**
    15:13,16
**SARL (2)**
    6:16;74:23
**Sarnoff (8)**
    3:20,20,24;10:22,
    24;11:5,25;12:2
**saw (1)**
    21:19
**saying (7)**
    4:23;7:15,20;45:7;
    78:17;83:10;87:7
**scene (1)**
    70:25
**science (1)**
    97:19
**screen (31)**
    27:3,7,9;28:2;
    37:17;41:7,12;42:5;
    43:19;48:9;49:23;
    60:8;61:7,24;68:4;
    70:10,20,25;71:5,17,
    25;72:15,23;73:7;
    76:1,24;81:5;84:6,7,
    23;85:1
**screenshot (2)**
    19:4;26:19
**screenshots (2)**
    26:8,14
**sea (1)**

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM

INDEX NO. 652077/2017

NYSCEF DOC. Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   RECEIVED NYSCEF: 02/07/2022

Pacific Alliance Asia v
Kwok

Page 128 of
269

February 2, 2022

50:17
**search (2)**
  26:20,20
**season (2)**
  54:4,22
**seasonally (1)**
  95:23
**second (8)**
  13:7;48:19;61:1;
  68:2;71:2;75:24;77:5;
  82:15
**Secondly (2)**
  11:5,20
**seconds (5)**
  68:5;70:6,6;71:3;
  89:16
**section (3)**
  25:5,6,9
**sections (1)**
  25:1
**secure (1)**
  29:8
**security (1)**
  29:5
**seek (1)**
  65:20
**seem (1)**
  11:17
**seems (4)**
  6:19;9:24;24:9;
  40:12
**segments (6)**
  22:11,15,18;24:17,
  22,23
**seizing (1)**
  12:5
**selected (1)**
  85:8
**self-evident (1)**
  78:23
**self-serving (1)**
  4:23
**seller (1)**
  46:10
**sending (1)**
  92:1
**senior (2)**
  17:3;98:16
**sense (2)**
  24:18;37:19
**sensitive (1)**
  52:13
**sent (4)**
  31:9;55:10;83:10;
  92:3
**sentence (4)**
  53:22;61:21;87:4;
  94:24
**September (22)**
  7:14;57:9,10,19;
  58:6,11,14,19,23;
  61:16;64:19;82:4,6;
  85:9;88:6,9,15;89:23;

93:7,7,20;95:13
**serious (1)**
  6:22
**serves (1)**
  35:17
**service (2)**
  6:4;28:5
**services (1)**
  65:4
**set (1)**
  50:2
**several (3)**
  17:2;37:7;45:20
**Shafts (2)**
  91:25;92:1
**share (5)**
  27:3,7,9;60:8;76:1
**shared (1)**
  30:24;70:12
**sharing (3)**
  28:3;41:7;68:4
**shell (2)**
  8:15;9:3
**Sherry (4)**
  8:17;68:15;69:16,
  17
**shielding (1)**
  8:16
**ship's (1)**
  93:7
**shirt (1)**
  73:20
**Short (2)**
  57:4;96:25
**shorter (1)**
  25:19
**show (18)**
  22:5;26:24;27:24;
  30:23;31:7;41:16;
  47:25;58:9,24;60:8;
  62:9,13;66:17;68:1;
  69:21;70:1,4;73:10
**showed (1)**
  69:24
**showing (5)**
  5:10;10:4;28:16;
  32:2,5
**shows (1)**
  61:16
**side (7)**
  35:20;36:15;70:10,
  20;72:15,22;79:23
**sidebar (1)**
  15:17
**Siegal (27)**
  3:4,10;5:9;10:9,10,
  12;27:5;37:6,6;48:10,
  10;49:2,7,12,14;65:9;
  66:22;67:1;89:25;
  90:3;96:14,15;97:7,
  17,20,22;98:6
**Siegal's (2)**
  48:22;85:12

**sign (1)**
  77:13
**signature (5)**
  41:18,19;62:1;77:7,
  25
**signed (10)**
  7:13;8:20;41:1,21;
  76:14;77:9,17;78:2,3,
  7
**significance (1)**
  51:12,13,13
**significant (1)**
  87:24
**similar (2)**
  35:24;68:23
**similarly (1)**
  6:19
**Simone-Ivanac (1)**
  98:15
**simple (1)**
  48:19
**simply (1)**
  8:9
**single (2)**
  5:2;8:7
**sins (1)**
  12:14
**sit (2)**
  11:16;25:10
**six (1)**
  32:22
**size (1)**
  92:2
**slightly (1)**
  48:5
**slowly (1)**
  80:23
**small (2)**
  66:15;73:12
**smatterings (1)**
  14:17
**social (8)**
  4:10,13;5:11;14:18;
  17:7,13;19:21;32:23
**software (3)**
  34:13,22;77:17
**sole (2)**
  46:5;56:14
**solely (1)**
  50:8
**someone (5)**
  9:17;20:5;42:23;
  45:5,18
**sometime (2)**
  58:1;59:7
**Sometimes (3)**
  67:16,16;69:19
**somewhere (3)**
  51:22;64:12,12
**son (3)**
  11:9,11;12:8
**soon (1)**
  89:4

**sorry (17)**
  21:6;27:8;37:13;
  39:11;47:15;49:25;
  53:5;55:11;59:17;
  61:3,6,20;69:17;
  70:14;71:11;90:24;
  95:3
**sort (1)**
  5:3
**sorts (1)**
  67:9
**sought (1)**
  52:19
**sound (1)**
  92:7
**sounds (1)**
  11:15
**source (2)**
  31:24,24
**sources (1)**
  11:12
**south (3)**
  58:4;59:15;85:23
**southeast (1)**
  95:23
**southern (1)**
  95:17
**speak (4)**
  20:21;33:17;40:12;
  65:8
**speaking (3)**
  27:10;39:8;68:9
**speaks (1)**
  7:8
**specific (7)**
  20:9;28:12,13;
  64:11,13;68:3;87:22
**specifically (2)**
  62:3;93:14
**spell (3)**
  75:9;80:22;84:3
**spent (2)**
  88:15,17
**spliced (2)**
  21:25;24:18
**spoke (2)**
  78:19;89:7
**spoken (4)**
  6:19;78:20;81:12,
  18
**sporadically (2)**
  7:7;94:19
**spot (1)**
  78:6
**Spring (27)**
  9:3,6,8,10,13;11:5,
  7;53:20,23;54:7,12,
  18,24;55:22,23;56:2,
  4,7,14;59:14,19;60:1,
  4;65:5;67:17;79:8;
  95:8
**Spring's (1)**
  9:12

**stand (2)**
  80:13;83:2
**standard (6)**
  4:9;11:15,19;12:20;
  13:3;39:20
**standards (1)**
  13:10
**standing (1)**
  71:16
**start (2)**
  17:20;24:25
**started (3)**
  18:23;73:7;93:9
**starting (1)**
  48:25
**starts (1)**
  31:18
**state (5)**
  5:16;7:14;38:12;
  43:18;75:15
**statement (4)**
  3:16,21;9:11;11:4
**statements (1)**
  10:17,19;97:4
**States (5)**
  14:7;43:20,22;
  57:23;65:21
**statute (2)**
  13:7,10
**stay (2)**
  12:9;51:3
**stayed (2)**
  69:19,19
**stem (1)**
  4:15
**still (3)**
  16:15;53:17;54:7
**stipulate (2)**
  30:21,22
**Stockil (14)**
  6:17,24;74:21,21;
  75:2,4,9,13,14;76:3;
  77:24;79:6,13,14
**s-T-O-C-K-I-L (1)**
  75:13
**stop (2)**
  53:10;91:20
**story (1)**
  9:8
**streamline (1)**
  31:4
**strike (1)**
  90:1
**Stuart (1)**
  3:20
**stuff (1)**
  33:10
**subject (1)**
  90:6
**submission (1)**
  36:11
**submissions (4)**
  97:6,10,14,20

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM
INDEX NO. 652077/2017
NYSCEF DOC. Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 129 of
269
RECEIVED NYSCEF: 02/07/2022

Pacific Alliance Asia v
Kwok

February 2, 2022

**submit (1)**
80:8
**submitted (11)**
5:19;33:12;35:16,
17;36:20;38:2;41:2;
75:14,18;80:7;83:3
**suboptimal (1)**
16:15
**subsequent (1)**
89:11
**substance (2)**
34:16;35:6
**substantive (1)**
21:1
**subtitled (1)**
23:9
**subtitles (3)**
23:12,15,19
**sufficient (2)**
10:3;14:25
**suggest (3)**
6:22;65:11,14
**suggested (1)**
4:9
**suggests (4)**
8:20;19:11;21:21;
92:6
**suit (1)**
73:20
**suitable (1)**
54:15
**summary (2)**
9:25;50:20
**summer (2)**
87:22;88:11
**sunglasses (1)**
72:15
**Super (2)**
21:7,13
**suppose (2)**
42:2;53:3
**Supreme (1)**
14:7
**sure (21)**
8:11;9:8;19:23;
27:21;31:25;32:3;
40:20;50:20,23;52:3;
54:10;58:9;59:12;
61:14,17;62:23;
78:24;82:4;91:4;
94:23;95:4
**Surname (1)**
75:11
**suspended (1)**
30:12
**sustained (1)**
15:13
**swear (3)**
38:23;39:3;83:8
**swears (1)**
39:21
**sweet (1)**
96:25

**sworn (9)**
16:4;34:5;38:11;
40:2;74:25;75:5;
80:18;83:18,21
**sworn/affirmed (7)**
16:1;34:2;39:18;
75:2;80:13;83:19;
96:20
**system (2)**
74:14;98:4

**T**

**Tab (7)**
19:3;21:5,6,6,12;
24:4;26:6
**table (1)**
31:5
**talk (3)**
53:19;91:12;93:10
**talked (1)**
67:9
**talking (11)**
24:22;28:15;29:16;
31:23;61:8;63:24;
64:18;76:2;77:23;
94:17;95:21
**talks (2)**
63:23;76:21
**taped (1)**
68:21
**Teams (2)**
3:8;80:1
**tech (1)**
18:19
**technical (2)**
34:18;39:17
**technological (1)**
30:16
**technology (4)**
17:7;18:14;24:19;
34:10
**telephone (3)**
3:7;58:2;86:24
**telling (3)**
5:8;46:19;78:3
**temporary (12)**
57:8,21;58:13,16;
59:6;89:22;90:3,6,10,
13,16,21
**ten (2)**
3:8;68:4
**tender (8)**
15:22;33:2,23;36:5,
8,10;38:2;79:23
**tendered (1)**
92:11
**ten-minute (1)**
56:25
**terms (1)**
29:11
**terrible (1)**
95:4

**territorial (1)**
57:23
**tested (1)**
16:13
**testified (10)**
16:5;25:20;34:5,9;
35:24;40:3;59:5;75:6;
80:19;83:22
**testifies (1)**
11:24
**testify (9)**
4:17;14:9;26:1,3;
33:7,12;34:14,22;
95:12
**testimony (24)**
3:18;15:24;33:4;
34:16;36:19;37:1;
38:3,23;44:15;45:9;
47:6;49:18;51:24;
52:20;56:13;57:1;
58:5;59:8,11;65:18;
74:11;80:9;83:5;
92:10
**thanking (1)**
74:17
**therefore (2)**
11:18;95:2
**though (2)**
25:2;72:17
**thought (2)**
62:25;91:16
**three (5)**
3:6;59:5;66:15;
93:18;94:25
**three-and-a-half (1)**
5:5
**throughout (2)**
23:12;87:22
**tie (1)**
73:20
**timeframe (2)**
43:23;59:21
**times (8)**
10:5;22:2;45:20;
46:9;51:21;52:5;
63:22;64:7
**tiny (1)**
66:17
**title (4)**
4:3;5:3,6;12:1
**titleholder (1)**
4:7
**today (4)**
4:17;8:25;64:25;
96:23
**today's (2)**
5:16;41:2
**Todd (3)**
33:2;34:2,4
**together (4)**
21:25;24:18;50:4;
71:10
**told (8)**

45:22;47:13;53:9;
55:4,17;89:20;93:4;
95:14
**tomorrow (2)**
98:1,6
**took (11)**
5:6;7:9;19:3;26:8;
53:1;69:13;84:11;
91:15,16,17;92:2
**top (2)**
61:13;62:8
**tortured (2)**
65:19;74:7
**total (1)**
6:24
**tough (1)**
72:14
**toward (2)**
63:19;94:16
**towards (1)**
66:22
**traced (1)**
30:8
**track (2)**
24:11;86:2
**Tracy (3)**
10:14;15:3;16:8
**trajectory (1)**
85:23
**transcribed (2)**
74:13;98:3
**transcript (6)**
65:22;74:13;97:8,
18;98:3,11
**transcription (1)**
69:25
**transfer (3)**
12:1;43:12,15
**transferred (6)**
8:7;43:10;46:14,23,
24;47:12
**transferring (1)**
47:18
**transfers (1)**
47:5
**translated (2)**
41:20;45:15
**translation (5)**
23:18;24:6;36:1,4,7
**translations (2)**
23:22;35:22
**Translator (1)**
39:19
**TransPerfect (2)**
35:21;36:2
**trial (3)**
49:4,5,13
**triangle (1)**
85:24
**trick (2)**
61:19,23
**tried (1)**
30:17

**tries (1)**
7:20
**trigger (1)**
14:25
**trip (2)**
52:10,24
**trips (1)**
52:9
**troublesome (1)**
56:9
**true (15)**
6:16;9:5,9;42:15;
43:6,25;47:12;50:10,
11;55:8;73:6;77:9;
78:19;81:13;98:10
**truly (1)**
62:15
**trust (1)**
93:25
**trusted (4)**
42:9,18,23;43:4
**trusting (1)**
42:24
**truth (9)**
39:3,3,21;44:24;
49:9,10,10;78:3;
91:11
**truthfully (1)**
38:24
**try (9)**
3:24;25:17;28:4;
32:5,17;45:21;56:10;
61:22;70:3
**trying (12)**
31:20;45:20;55:13;
56:25;61:5;63:13;
71:10;78:10;86:22;
87:5;88:11;93:20
**T-shirt (2)**
71:6,17
**Tunnel (12)**
28:5,7,9,13,18,19,
20,21;29:17,20;
30:20;32:9
**turn (4)**
3:21;21:5;80:3;
96:13
**Turning (1)**
19:3
**turnover (2)**
13:7,9
**turns (1)**
4:24
**Tweet (15)**
28:5,7,9,13,18,18,
19,20,21;29:10,17,20;
30:20;32:9,9
**tweets (9)**
5:11;26:9,17;28:9,
13,23;29:1,3,6
**twelve (1)**
68:4
**Twitter (12)**

FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM

INDEX NO. 652077/2017

NYSCEF DOC.

RECEIVED NYSCEF: 02/07/2022

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 130 of 269

Pacific Alliance Asia v Kwok

February 2, 2022

17:9,14;19:8;26:10,
17,19;29:17,19,20,23,
25;32:9

**Twittercom (1)**
26:20

**two (15)**
4:9;6:21;7:19;
10:21;13:10,11,24;
26:8;31:23;32:1;53:3;
92:24;93:6,9,17

**twofold (1)**
4:6

**type (3)**
24:19;33:10;59:20

**U**

**ultimate (1)**
8:17

**unaltered (1)**
25:11

**unauthorized (1)**
30:5

**unclear (1)**
94:13

**uncles (2)**
11:10;42:10

**uncontested (1)**
10:21

**under (10)**
12:19,25;13:2,9;
22:20;23:3;46:17,17,
18;54:16

**understood (9)**
7:9;10:17;24:9;
25:18;53:1;59:21;
60:23;62:24;95:1

**undisputed (2)**
10:25,25

**United (5)**
14:7;43:20,22;
57:23;65:21

**unless (4)**
14:7,12;94:12;96:9

**unnecessary (2)**
94:10,11

**unquote (1)**
7:6

**unreasonable (1)**
97:12

**unreliable (1)**
14:18

**unusual (4)**
8:13,14;65:25;
74:10

**up (19)**
5:9;7:5,24;27:2;
37:18;41:12;42:5;
44:5;46:2;48:9,22;
61:6;68:2;81:5;84:23,
25;89:5;90:6;92:1

**upcoming (1)**
9:25

uploaded (2)
21:21;98:4

**USA (7)**
76:10,14;78:13;
89:11;90:12;92:13;
95:7

**use (8)**
30:5;48:24;53:20;
54:7,13,22;67:14;
85:13

**used (6)**
28:7,8,8,18;54:15;
67:20

**user (2)**
21:20;34:22

**uses (1)**
77:18

**using (3)**
17:10;56:11;95:18

**usual (1)**
87:22

**V**

**value (3)**
15:17;32:6;36:18

**various (2)**
32:23;34:12

**Vartan (34)**
37:8,25,25;45:9,11;
51:6,23;57:17;58:7,
18;60:18,23;61:11;
63:20;64:6,17,25;
66:7,10,19;68:22;
69:9;70:12;71:8;
74:20;79:16;80:3,6;
83:1,10;85:10,17;
92:22;96:13

**Vault (1)**
34:10

**verification (1)**
29:5

**verify (1)**
30:13

**version (1)**
31:11

**versus (3)**
13:5;14:10;75:16

**vessel (5)**
15:11,17;37:8;
57:23;71:24

**VesselFinder (4)**
84:16,17,18;92:6

**vessels (1)**
72:5

**via (5)**
7:7;59:19;81:16;
93:11;94:19

**video (40)**
14:18;21:7,16,19,
20,21,24,22;9,11,15;
23:2,10,12,19,23;
24:12,25;25:2;68:3,7,

9,11,17,25;69:4,21,
24;70:1,18;71:12,21,
23;72:22;73:9,10,16,
18;94:6,8,9

**videos (2)**
21:11,25

**videotapes (1)**
66:16

**view (1)**
94:9

**viewed (1)**
21:16

**violation (2)**
5:7;9:2

**violative (1)**
49:14

**virtual (1)**
27:15

**visit (1)**
12:8

**visited (1)**
12:15

**visual (1)**
16:19

**vividly (1)**
6:24

**voluntarily (1)**
8:9

**vouching (1)**
23:15

**Voyage (1)**
84:25

**W**

**wait (3)**
23:23;40:17;92:4

**waiting (1)**
79:19

**walk (1)**
7:20

**Wan (3)**
75:16;78:19;81:12

**wants (4)**
12:3;50:18;53:10;
58:9

**warmer (7)**
54:6,9,17;55:3,4,6,
18

**waste (1)**
32:7

**watch (1)**
25:8

**watched (1)**
21:19

**water (1)**
8:11

**way (21)**
4:23;6:14;17:17;
24:9;25:24;28:4,20;
30:12,16;35:25;40:6,
20;43:3,3;44:24;
51:17;53:10;68:24;

74:11;77:24;87:8

**weather (5)**
54:5,16,22;86:8,9

**web (2)**
8:18;29:16

**website (6)**
29:21;30:3;34:15,
19,24;84:15

**websites (1)**
34:12

**Wednesday (2)**
27:6;98:5

**week (4)**
82:3;84:12;86:11;
98:5

**weeks (1)**
7:19

**weight (1)**
32:24

**welcome (1)**
31:7

**weren't (1)**
20:20

**what's (1)**
5:17

**whatsoever (1)**
14:16

**whenever (2)**
53:1;93:1

**whereabouts (4)**
65:19,22;74:7,12

**wherever (1)**
50:18

**whisper (1)**
31:5

**white (4)**
32:5;73:20,20,20

**whole (2)**
39:3;48:25

**whose (2)**
6:17;73:6

**willing (2)**
30:21;84:21

**willy-nilly (1)**
12:5

**window (2)**
24:23;89:4

**winter (2)**
54:4;58:1

**wish (4)**
8:11;54:22;79:23;
96:17

**wishes (1)**
85:13

**wishing (1)**
53:20

**withdraw (1)**
59:17

**within (3)**
24:23;25:5;53:11

**without (5)**
50:15;51:20;52:5;
53:14;97:11

**witness (89)**
11:23;14:2,3,4;
15:19;22:8;27:20;
31:19;32:3,16;33:1,
23;35:12,19,20,23,24;
36:5;37:5;39:11,20;
46:16,22;47:3,7;49:9;
55:23;56:3,7,15,19,
22;57:3,20,24;58:9,
15,24;59:1,9;61:12;
63:25;64:1,9,23;
65:13;66:1,17;74:15,
19,25;77:12,14;
79:15;80:5,13;82:22,
25;83:8,16,18;85:18;
87:19,21;88:1,4,7,10,
17,20;90:5,7,9,11,14,
18,22,25;91:3;94:12;
95:16;96:2,5,7,11,12,
15,24;97:2

**witnesses (8)**
10:15;35:14;37:7,7,
9,21,23;66:13

**witnesses' (1)**
36:19

**witness's (5)**
39:16;59:10;85:14,
15,16

**woman (2)**
70:9,19

**word (2)**
9:19;92:13

**wording (1)**
73:1

**words (4)**
20:25;77:12;78:7,
20

**work (5)**
8:12;16:11;18:14,
15;70:13

**worked (4)**
17:13;60:3;93:18,
24

**working (2)**
16:14,14

**works (1)**
70:14

**world (2)**
12:3;22:19

**worthwhile (1)**
89:17

**wrapping (1)**
7:24

**writing (2)**
20:21;73:1

**wrong (4)**
12:24;78:6;92:1,3

**wrote (1)**
20:25

**Y**

**yacht (111)**

**FILED: NEW YORK COUNTY CLERK 02/07/2022 02:11 PM** INDEX NO. 652077/2017

NYSCEF DOC. Case 22-50073 Doc 183-4 Filed 04/06/22 Entered 04/06/22 17:07:45 Page 131 of RECEIVED NYSCEF: 02/07/2022
269

Pacific Alliance Asia v
Kwok

February 2, 2022

4:2,24;5:6;6:13,18,
23,25;7:6,10,15;8:4,7,
17;9:2,14,22;10:25;
11:2;12:17;13:12,19;
14:2,16;21:8,13;44:1,
6,12,16,20;45:2,7,18,
23;46:10,11,14,16;
51:10,12,14,20;52:4,
7,11,16,22,23;53:1,8,
12,14;54:4,7,8,13,15,
17;55:2,4,5,9,17,19,
24;56:6,8,10,11,18,
21;57:7;58:4;59:15,
23;60:4;67:14,22;
70:24;74:22;81:9;
86:19,21,23,23;87:1,
6,12,13,18,21,24;
88:8,15,18;89:2,6,12,
21;90:10,13,17,21;
91:13;92:7;93:1,3;
94:25;95:6,14,22
**yachts (1)**
8:23
**yacht's (3)**
6:1;91:23;94:21
**Yachtzoo (3)**
6:16;74:23;76:14
**year (9)**
6:8;43:25;55:1,3,3;
56:21;76:14;93:10,18
**years (8)**
5:5;8:6;55:1;92:25;
93:6,9,17,18
**yesterday (1)**
16:13
**York (17)**
9:2,6,20;13:1,16;
53:8,9,11;54:16;
60:12;62:4,20;75:15;
84:19;85:22;89:12;
95:8
**young (1)**
8:10
**Youtube (4)**
17:14;21:7,17;23:3

## Z

**zero (2)**
32:7;43:12
**zoom (2)**
85:7,22

## 1

**1 (4)**
19:3;31:24;76:14;
85:9
**1:00 (2)**
57:2;65:7
**10 (2)**
26:9;97:15
**10:37 (1)**

18:22
**1012359 (1)**
85:2
**11:45 (1)**
49:17
**1121 (1)**
17:21
**1126 (1)**
31:25
**1133 (2)**
21:6;24:5
**1156 (1)**
75:22
**1157 (1)**
81:6
**11619 (1)**
27:16
**1162 (1)**
41:13
**1169 (1)**
27:5
**12:15 (1)**
57:1
**14 (7)**
4:1,5,18;21:22;
49:21;50:7;53:17
**14th (1)**
5:1
**15 (2)**
58:11;63:15
**16 (2)**
62:1;84:11
**17 (5)**
7:1;86:14;87:4;
89:10;93:7
**18 (1)**
7:22
**19 (2)**
68:2;93:20

## 2

**2 (11)**
21:5,10,13;26:6;
31:24;72:3,4,6;73:11,
20;81:7
**2:00 (1)**
66:21
**2:50 (2)**
24:23;25:5
**20 (7)**
7:1;60:8;62:19;
63:23;70:5,8;93:20
**2006 (1)**
43:7
**2013 (1)**
13:5
**2014 (1)**
43:10
**2015 (5)**
43:20,21;44:1,15;
45:24
**2017 (9)**

4:24;6:2;21:22;
26:9;68:18;69:4,5,10,
18
**2018 (2)**
19:5;20:10
**2019 (1)**
93:8
**2020 (7)**
5:7;6:2;7:14;53:19;
57:11,20,25;58:5,14;
59:7;61:16;63:1,3,15,
19;85:9,25;86:3,6;
87:17,19;88:3,6,9,16;
93:12;95:13
**2021 (15)**
6:7,13,19,23;9:20;
58:1;59:8;62:1;63:2,
7,7;64:12,13;82:6;
93:12
**2022 (1)**
85:9
**21 (5)**
19:5;20:10;62:20;
76:5;81:8
**24 (3)**
19:4;92:24;94:16
**25 (3)**
13:5;17:21;94:23
**27 (1)**
26:9
**28 (6)**
5:19;44:6,20,24;
45:24;46:9

## 3

**3 (3)**
43:18;76:5,9
**30 (10)**
57:9,10;58:6,11,14,
23;61:16;66:18;
89:23;92:7
**31 (1)**
85:9
**38 (2)**
48:13,23

## 4

**4:15 (2)**
24:23;25:5
**40 (1)**
66:18
**40:31 (1)**
71:25
**40-minute (1)**
71:21
**43:56 (1)**
72:11
**44-minute (1)**
72:16
**44-second (3)**
71:6,13,18

## 5

**5 (6)**
6:4;41:17;76:13,22;
77:2,7
**50 (1)**
48:25
**50-whatever (1)**
48:12
**5223 (2)**
12:19;13:2
**5225b (1)**
13:7
**53 (2)**
48:1,4
**55 (1)**
13:5
**591 (1)**
58:14

## 6

**6 (7)**
21:6,6,12;24:5;
76:17,21;81:20
**6:59 (1)**
68:11

## 7

**7 (2)**
77:6;78:18
**728 (1)**
61:24

## 8

**8 (5)**
14:11;42:2,5;77:6;
81:11

## 9

**9 (4)**
78:23;85:25;86:3,6
**9th (1)**
86:12

# EXHIBIT 27

# BakerHostetler

Baker & Hostetler LLP

45 Rockefeller Plaza
New York, NY 10111

T 212.589.4200
F 212.589.4201
www.bakerlaw.com

Melissa M. Carvalho
direct dial: 212.589.4289
mcarvalho@bakerlaw.com

February 1, 2021

**VIA E-MAIL (EMOSS@OMM.COM)**

Edward Moss
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036

*Re:    Pacific Alliance Asia Opportunity Fund L.P. v. Kwok Ho Wan, et al., Index no. 652077/2017*

Dear Eddie:

In furtherance of our conversations relating to Plaintiff Pacific Alliance Asia Opportunity Fund L.P.'s Fourth Set of Requests for the Production of Documents, dated November 6, 2020 ("Document Requests"), and Mr. Kwok's responses and objections thereto, please allow the following to memorialize the state of our discussions to date as well as to supplement and/or amend Mr. Kwok's responses where necessary.

1.  Mr. Kwok continues to stand by his objection to the definition of "Family Member" used throughout Plaintiff's Document Requests. Specifically, Mr. Kwok objects to the definition of "Family Member" as it is overbroad, unduly burdensome, exceeds the scope of CPLR §5229 disclosure, and exceeds the scope of this Court's October 15, 2020 Decision and Order (Dkt. No. 630) ("Order"), which authorizes discovery on the Sherry-Netherland residence, the Lady May yacht, and "other assets that Mr. Kwok may own, whether directly or indirectly." Mr. Kwok further objects to the definition of "Family Member" to the extent it seeks to bring into its definition individual third parties whom he does not control.

2.  Mr. Kwok continues to stand by his objection to the defined Time Period used throughout Plaintiff's Document Requests. Specifically, Plaintiff has defined the relevant time period as follows: "Unless otherwise specified, the applicable time period for each Interrogatory is January 1, 2008, up to and including the date of production (the "Time Period")." Mr. Kwok objects to the "Time Period" as it is overbroad, unduly burdensome, exceeds the scope of CPLR §5229 disclosure, and exceeds the scope of this

Edward Moss
February 1, 2021
Page 2

Court's Order, which authorizes discovery on the Sherry-Netherland residence, the Lady
May yacht, and "other assets that Mr. Kwok may own, whether directly or indirectly."
The relevant Time Period for purposes of this disclosure is October 15, 2020 (the date of
the CPLR §5229 proceedings on the record) through the present date in order to identify
any assets that Mr. Kwok "may own, whether directly or indirectly" to satisfy a
judgment.

3. Document Requests 8: As we have reported to you, Mr. Kwok responds that there are no
documents or communications in his possession, custody, or control with Stephenson
Wong, Kingdom Rich, or a Registered BVI Agent. It is our understanding that in
response to this disclosure, PAX has revised Document Request 8 to seek *documents and
communications with William Je regarding any of Mr. Kwok's assets, investments, bank
accounts, equities, stakes, or holdings*. Mr. Kwok is checking to see whether he has
documents or communications responsive to your revised request.

4. Document Request 10: We believe that there are no further issues to discuss or address
as PAX has been unable to provide a basis for its belief that Mr. Kwok has an ownership
interest in the accounts listed in (c) through (i).

5. Document Request 12: Without waiving Mr. Kwok's objection to the Time Period
defined by Plaintiff in its Document Requests, Mr. Kwok will produce his 2019 tax
returns to Plaintiff.

6. Document Request 13: Without waiving Mr. Kwok's objection to the Time Period
defined by Plaintiff in its Document Requests, Mr. Kwok will produce the Genever entity
2019 tax returns to Plaintiff.

7. Document Request 15: It is our understanding that PAX is seeking any assets/financial
disclosures that would have been made in connection with Mr. Kwok's application for
asylum. We have previously referred you to Form I-589, the Application for Asylum and
for Withholding of Removal, which does not request any information relating to an
applicant's assets. Please also see www.uscis.gov/policy-manual/volume-8-part-g-
chapter-3, which, as has been explained to us by immigration counsel, specifically
excludes asylum applicants from the public charge ground of inadmissibility. Mr. Kwok
responds that no asset/financial information has been provided by him in connection with
his application for asylum.

8. Document Request 16: It is our understanding that PAX would accept the "*source of all
payments*" made by Mr. Kwok in lieu of a document production. Mr. Kwok responds
that his expenses during the relevant time period have been paid for by Golden Spring
(New York) Ltd.

9. Document Requests 17: We will await a list of proposed electronic search terms from
PAX.

Edward Moss
February 1, 2021
Page 3

10. Document Request 18: We are confirming that Mr. Kwok does not have responsive
    Bravo Luck and/or Genever documents in his possession, custody, or control.  If he does
    have responsive documents in his possession, custody, or control, then they will be
    produced to the extent that they are not duplicative of the documents already produced in
    this action.

11. Document Requests 19-22: We are confirming that Mr. Kwok does not have responsive
    Bravo Luck and/or Genever documents in his possession, custody, or control.  If he does
    have responsive documents in his possession, custody, or control, then they will be
    produced to the extent that they are not duplicative of the documents already produced in
    this action.

12. With respect to Document Request 21, could you please provide copies of the trust
    agreement(s) referenced in that request?  We are told that Mr. Kwok only has a copy of
    the trust agreement and it is our understanding that it has already been produced to PAX.

13. Document Request 31: We hereby amend the response to this request in accordance with
    Mr. Kwok's response to PAX's interrogatory number 29 seeking this same disclosure.[1]
    As discussed, documents responsive to this request have been previously produced in this
    litigation by The Sherry-Netherland, Inc. and any further information would need to be
    sought directly from Golden Spring (New York) Ltd. and/or Bravo Luck.  Mr. Kwok has
    located the loan agreement with Itakura Nan Nan and he will produce it.

14. Document Request 35: Mr. Kwok responds that this information is not in his possession,
    custody, or control, and will need to be obtained directly from the Genever entities.  We
    note that at least one Genever entity has disclosed its debts in its bankruptcy petition.
    The documents previously produced in this action by The Sherry-Netherland also provide
    relevant and responsive documents.

15. Document Request 36: Mr. Kwok responds that he does not have responsive documents
    in his custody, possession, or control, and maintains, as we have discussed, that the only
    entities listed in this request which he has an interest in are: Genever Holdings
    Corporation; Genever Holdings LLC; and Shiny Times Holdings, Ltd.[2]

I will be in touch when I have additional information.

Sincerely,

/s/ Melissa M. Carvalho

---

[1] Mr. Kwok owes Itakura Nan Nan $27,000.00. The following are creditors of Genever Holdings, LLC: The Sherry-
Netherland - $891,262.06; Bravo Luck Limited - $67,5000,000.00; Golden Spring (New York) Ltd. - $1,800,000.00;
and Qiang Guo - $5,000,000.00.

[2] Shiny Times was seized by the Chinese government in 2017.

Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 136 of 269

Edward Moss
February 1, 2021
Page 4


Melissa M. Carvalho

# EXHIBIT 28

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM    INDEX NO. 652077/2017
NYSCEF DOC. NO. 833    Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 138 of
269    RECEIVED NYSCEF: 06/01/2021

1

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NEW YORK : CIVIL TERM : PART 61
 2    -------------------------------------------X
      PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

 3
                           Plaintiff,
 4
                                                  INDEX NO:
                      -against-                    652077/2017
 5
      KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI,
 6    a/k/a GUO WENGUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a
      HAOYUN GUO, GENEVER HOLDINGS CORPORATION, and GENEVER HOLDINGS
 7    LLC,

 8                         Defendants.
      -------------------------------------------X
 9                      MICROSOFT TEAMS
                        May 27, 2021
10
      B E F O R E:
11
                      THE HONORABLE BARRY OSTRAGER,
12                         J U S T I C E

13    A P P E A R A N C E S:

14        O'MELVENY & MYERS LLP
          Attorney for the Plaintiff
15        Times Square Tower
          New York, New York  10036
16        BY:  EDWARD MOSS, ESQ.
               STUART SARNOFF, ESQ.
17
          BAKER HOSTETLER, LLP
18        Attorney for the Defendant
          45 Rockefeller Plaza
19        New York, New York  10111
          BY:  MELISSA CARVALHO, ESQ.
20             JOHN SIEGAL, ESQ.

21        LAWALL & MITCHELL, LLC
          Attorney for the Defendant GENEVER
22        162 E. 64th Street
          New York, New York  10065
23        BY:  AARON A. MITCHELL, ESQ.

24

25
```

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM          INDEX NO. 652077/2017
NYSCEF DOC. NO. 833    Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 139 of   RECEIVED NYSCEF: 06/01/2021
269

2

```
 1        YANKWITT LLP
          Attorney for the Defendant
 2        140 Grand Street, Suite 705
          New York, New York  NY
 3        BY:  DANIEL ALTER ESQ.

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21                                        Karen Mangano, CSR
                                          Senior Court Reporter
22

23

24

25
                              KM
```

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM    INDEX NO. 652077/2017
NYSCEF DOC. NO. 833    Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 140 of    RECEIVED NYSCEF: 06/01/2021
269

3

Proceedings

1          THE COURT:  All right.  Mr. Moss, this is your

2     motion.

3          MR. MOSS: Good afternoon, your Honor.

4          We have two requests in our motion.  One is compel

5     discovery in response to a subpoena and the other is to

6     modify the Court's restraining order.  So I thought I would

7     start with the subpoena.

8          Your Honor, this might be the most straightforward

9     issue that I've argued in front of this Court on this case.

10          CPLR 5223 permits a broad range of discovery on any

11     third party to request information that is relevant --

12     relevant to enforcement of a judgment.

13          As the Court knows, we've been forced -- my client

14     has been forced to serve subpoenas on several third parties

15     trying to find Mr. Kwok's assets because he doesn't hold

16     them in his own name.

17          Perhaps the most important subpoena Pacific

18     Alliance served was a subpoena on an entity called Golden

19     Springs.

20          Golden Springs is a so-called family office for

21     Mr. Kwok's family, but in reality, it is just Mr. Kwok's

22     principal front.  It's an entity that he funded entirely

23     with his own money.  It's an entity that pays all of the

24     expenses for his lavish lifestyle.  Every single expense by

25     their own admission.  It pays legal fees for a host of

KM

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM    INDEX NO. 652077/2017
NYSCEF DOC. NO. 833    Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45    Page 141 of
269    RECEIVED NYSCEF: 06/01/2021

4

Proceedings

1    lawsuits for lawyers to represent Mr. Kwok in his individual

2    capacity in cases in which Golden Springs is not even a

3    party.

4            It pays the legal fees of a lawyer who represents

5    the entity that owns the yacht that's stonewalling me in

6    discovery like the others.

7            It pays the maintenance on the Sherry-Netherland

8    apartment.  We know all of this because Mr. Kwok and his

9    lawyers admitted it in court filings and in discovery

10    responses.

11            I just want to put a fine point on it, your Honor.

12    Mr. Kwok has no money or assets according to him, but he

13    says he funded this entire entity and he uses it to pay

14    every single one of his expenses, his living expenses.

15            What are we talking about here, Judge?  How is this

16    discovery possibly not permitted under the CPLR?  How is it

17    not permitted relevant to enforce a judgment?

18            The opposition that they filed, your Honor, it's a

19    frivolous document, and I want to start with what's not in

20    here.  What's not in it is a dispute about any one of the

21    facts that I just covered about Golden Springs.  They ignore

22    all of them.  They can't dispute them because Mr. Kwok and

23    his lawyers admitted them in discovery responses and in

24    Court filings.  So Golden Springs -- one of their arguments

25    is well, we have corporate documents.  We respect the

KM

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM    INDEX NO. 652077/2017
NYSCEF DOC. NO. 833    Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 142 of    RECEIVED NYSCEF: 06/01/2021
269

5

Proceedings

1    corporate forum.  We have employees.  But it doesn't dispute

2    that it only has one business which is to serve Highness

3    Kwok.  It doesn't even say what the business is besides a

4    family office for his business.  They say we have employees

5    that include security.  That's Mr. Kwok's bodyguard who

6    comes to -- who comes with him to my office when I depose

7    him and hands him bottled water because he's afraid that

8    we're agents of the communists and my water at my firm is

9    going to kill him.  I mean, Judge, this is not a real

10   company.  They pay for Mr. Kwok's people.

11        If Tim Cook got sued for something unrelating to

12   his capacity in Apple, Apple doesn't pay those fees.  Apple

13   doesn't pay his maintenance.  This is Mr. Kwok's piggy bank

14   that he set up with his own money.

15        The principal argument that is in Golden Spring's

16   papers is that Golden Springs is a third party and so we

17   should only be entitled to information about assets that it

18   holds for or transactions that it has conducted with Miles

19   Kwok.

20        That's basically like saying it's a bank; right.

21   You get that we subpoena the bank which we've done.  We get

22   Mr. Kwok's information, but we don't get information about

23   the bank itself.  We don't get information about the bank's

24   other customers.  That's a nice argument for a bank, but it

25   completely ignores the context that Golden Springs is not a

KM

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 833
Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 143 of
269
RECEIVED NYSCEF: 06/01/2021

6

Proceedings

1    third party.  It is the entity that holds Mr. Kwok's money,

2    and it is the entity that pays his legal expenses.  So it's

3    assets are his assets.  It's transactions are his

4    transactions.  And it's financial information is his

5    financial information.

6            The suggestion in the papers that Mr. Kwok and Miss

7    Wang and all of his people should be able to pick and choose

8    and determine which information at Golden Springs relates to

9    Mr. Kwok and which doesn't is a recipe for disaster here,

10   Judge.

11           Mr. Kwok denies even being involved with Golden

12   Springs.  He denies being involved with the entity that owns

13   the boat that we all know he owns because he said he owns

14   the boat on YouTube, the boat which, by the way, is still

15   out of the jurisdiction 15 days incurring $500,000 a day.

16           Mr. Kwok is the same guy who denies owning his

17   apartment that Miss Wang says -- told the Court under oath

18   that he owns it.

19           So the limitation that they're trying to put in

20   here, only things relating to Mr. Kwok, that's nonsense in

21   this case, and it's just a recipe for us to get nothing.

22           Golden Springs also argues on the subpoena that we

23   have to prove alterego to get discovery into it's assets.

24   Well, that's just made up.  There is no case to support

25   that.

KM

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM    INDEX NO. 652077/2017
NYSCEF DOC. NO. 833    Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 144 of    RECEIVED NYSCEF: 06/01/2021
269

7

Proceedings

1          5223 is a broad standard.  It's a generous

2     standard.  The Court ordered Miss Wang's information to be

3     produced by the banks.  They're not alteregos.  She's not an

4     alterego.  Of course, we don't have to prove that it's an

5     alterego to get it's information.

6          The Court found that Miss Wang might be hiding Mr.

7     Kwok's assets and gave us access to her financial

8     information.  This is much easier.  He's already said it's

9     his money, and he's using it to pay all of his expenses.  I

10    mean, there's no credible opposition to this motion.

11         Finally, there's some arguments about scope.  You

12    know, I read it a few times.  My subpoena is astounding.

13    It's blunderbuss.  It's a fishing expedition.  It's

14    flagrant.  A lot of adjectives, but no substance.  They

15    don't articulate any burden arguments at all.

16         Usually you say, Judge, well, we ran some search

17    terms, and there are too many hits or this is going to be

18    too burdensome to get because it's on a different server.

19    Nothing.  This is basically just a relevance argument that

20    we're asking for too much.

21         If they want to have a discussion about search

22    terms and custodian and which laptops to collect, we welcome

23    that discussion.  We welcome an actual discussion about

24    burden and scope.  But not just saying, well, we think it's

25    too much without any showing -- any showing at all that

KM

Proceedings

1    there is an actual burden.

2         I want to just end on one particular argument on

3    the subpoena point because I expect Mr. Alter will focus on

4    it.  We ask -- we do.  He's right.  We ask for information

5    about 60 people and entities, no one knowing to be

6    associated with Kwok.

7         Mr. Alter quips in the brief, well, known by whom?

8    Known by whom?  Known by us, Judge.  Known by us based on

9    spending a lot of money and lot of time to dig through

10   public records, court filings, social media accounts because

11   that's the game Mr. Kwok has forced us to play.

12        The reason we have to ask for this information is

13   because Golden Springs is the hub.  We can't spend the rest

14   of our lives chasing 100 entities.  I mean, my grandkids

15   would be doing this.  Golden Springs is the entity that has

16   the information.  It's produced documents relating to Shiny

17   Times, the entity that was involved in the underlying case.

18   It has the documents.  It is the hub of the empire.  If it

19   doesn't have information about a couple of these entities,

20   if we're wrong about one or two, okay, fine.  Then they

21   should run the search and tell us they don't have it and not

22   produce it.  But run the search terms, collect the ESI and

23   provide the documents.

24        THE COURT:  All right, Mr. Moss.  I understand your

25   argument.  I also understand that Mr. Kwok is incurring

KM

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM    INDEX NO. 652077/2017
NYSCEF DOC. NO. 833    Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 146 of    RECEIVED NYSCEF: 06/01/2021
269

9

Proceedings

1    $500,000 a day in contempt penalties.  I understand that Mr.

2    Kwok believes that these court proceedings are a game of

3    evasion that he -- that he wants to play.

4        And let me hear from counsel for Golden Springs.

5        MR. ALTER:  Good afternoon, your Honor.  It's

6    Daniel Alter, and we've just heard a lot of talk but

7    relatively little truth, and I'd like to step back and

8    clarify some issues that were quite muddied.

9        First of all, to correct two specifically

10    inaccurate statements, it's my understanding that Mr. Kwok

11    has never said that he is entirely unrelated or has no

12    connection to Golden Springs.  Quite the opposite.  He said

13    that it is his family office.  So let's be accurate about

14    that.

15        The second thing is that, you know, apparently --

16    they take the position that Mr. Kwok has entirely funded

17    Golden Springs.  Well, I don't see the evidence of that.

18    What I see is a statement in the record that he initially

19    provided capital to Golden Springs, but I see no evidence

20    that he's continued to do so or that the capital there now

21    is his.  Let me step back a moment and talk about this.

22        THE COURT:  Before you do so, Mr. Alter, because

23    rightly or wrongly, Mr. Kwok has exhausted the Court's

24    patience with his antics.

25        It's quite undisputed that Golden Springs has

KM

Proceedings

1   funded seven-figure payments to facilitate Mr. Kwok's

2   lifestyle, and Mr. Kwok leads a rather extravagant

3   lifestyle, purports to have zero assets whatsoever.

4        So the plaintiff is a judgment creditor.  The

5   plaintiff knows that Golden Springs is funding expenses for

6   Mr. Kwok.  Not minor inconsequential expenses.  Major

7   expenses.  And the judgment creditor is entitled to have

8   discovery of the entity that is funding Mr. Kwok's expenses.

9        The judgment creditor is also entitled to an order

10  directing Golden Springs not to transfer, dispose or

11  otherwise dissipate whatever assets Golden Springs has

12  because the best evidence that has been made available to

13  the Court compellingly suggests that any assets that Golden

14  Springs has were provided to Golden Springs by Mr. Kwok.

15       Now if the discovery that the judgment creditor is

16  seeking from Golden Springs disproves that, well, then we

17  have a different situation than the situation we now have.

18       Under the CPLR, a judgment creditor is entitled to

19  discovery of third parties of which in this case may well be

20  alteregos of Mr. Kwok, but it's not necessary for the

21  judgment creditor to establish that Golden Springs is an

22  alterego of Mr. Kwok.

23       MR. ALTER:  You know, your Honor, we haven't --

24  that's not our position. That's the straw man that has been

25  presented.

KM

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM    INDEX NO. 652077/2017
NYSCEF DOC. NO. 833    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    RECEIVED NYSCEF: 06/01/2021
Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 148 of
269

11

Proceedings

1          THE COURT:  Well, be that as it may, unless you can

2     persuade me otherwise, I am granting the judgment creditor's

3     motions in their entirety.

4          As Mr. Moss outlined, he is perfectly prepared to

5     meet and confer and discuss limitations on specific requests

6     that he's made if you can then state to him good cause for

7     that.  But we're past playing games here.

8          MR. ALTER:  Well, your Honor, I'm not here to play

9     games, and if the Court has made it's decision, would it

10     allow me to make my record.

11          THE COURT:  Yes.  Make your record.

12          MR. ALTER: Okay.  Thank you, your Honor.

13          First of all, our argument is not that you have to

14     pierce the corporate veil in order to get third-party

15     discovery under the CPLR for judgment creditors.  It's a

16     relevance argument, and we've already said that there are

17     aspects such as discovery as between Golden Spring and the

18     actual judgment debtor is relevant and appropriate.  So we

19     haven't taken a position that is all out of line with what

20     the law provides.

21          What we have said and what Mr. Moss has proven in

22     his argument is they take the position that Mr. Kwok is

23     Golden Spring and Golden Spring is Mr. Kwok; and therefore,

24     they are entitled to go through the entire file of Golden

25     Spring.

KM

Proceedings

1            Well, you know, your Honor, that's called piercing

2       the corporate veil, and it's our position that if they want

3       documents independent of the judgment debtor where they make

4       no connection or efforts to make a connection whatsoever,

5       then, yes, they do have to pierce the corporate veil, but

6       that isn't the sum total of our argument.

7            Our argument is that the requests are exceedingly

8       overbroad and that they are irrelevant.  And in fact, let's

9       go for a moment to the facts that Mr. Moss says are

10      overwhelming in this case.

11           If you look at the submission that was actually

12      presented on this motion, there is absolutely no facts

13      presented with regard to the 64 nonparties for which they

14      seek discovery having nothing to do with the judgment

15      debtor.  Just -- not even having anything to do with Golden

16      Spring.  They just want discovery to 64 nonparties.

17           Now your Honor, we heard Mr. Moss say that he knows

18      there is a connection.  Well, wouldn't it be enlightening

19      for the Court to know what that connection is before there

20      is a ruling that Golden Spring has to produce documents that

21      otherwise are clearly irrelevant.  So that's why we assert

22      that those documents should not be discovered unless and

23      until Mr. Moss and PAX comes forward with actual proof that

24      there is a connection.  We don't have that.

25           And with regard to the proof, the overwhelming

KM

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM    INDEX NO. 652077/2017
NYSCEF DOC. NO. 833    Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 150 of    RECEIVED NYSCEF: 06/01/2021
269

13

Proceedings

1    proof that Golden Spring is Mr. Kwok and Mr. Kwok is Golden

2    Spring, at least from the record I've seen, your Honor, and

3    I do not call your Honor's history -- historical

4    recollection into question, but what has been presented on

5    this record is Golden Spring initially helped to capitalize

6    a company.  A lot of folks do that.

7        Secondly, Golden Spring pays for attorneys and has

8    contributed to paying for apartment expenses.  Well, okay.

9        Three, employees of Golden Spring have attended

10   family interests that have to do with the Guo family.  Well,

11   it's a family company.  It's a family office.

12       And Golden Spring's parent has apparently produced

13   documents in response to discovery requests.  So yes,

14   there's a connection as Mr. Kwok has said, but there isn't

15   an identity of entity between Mr. Kwok and Golden Spring,

16   and that's why we referred in our papers to the fact that if

17   that is the case, the law is very clear they do need to

18   pierce the corporate veil and they absolutely would need to

19   pierce the corporate veil to get injunction.  Because as we

20   stated, as much as the Court has lost patience, and I

21   understand your Honor's position, the law is clear that an

22   entity as a matter of due process can not be enjoined

23   without actually being a party.

24       And even if an entity were brought into a

25   litigation as a party, the Courts are constrained.  They can

KM

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM
INDEX NO. 652077/2017

NYSCEF DOC. NO. 833
RECEIVED NYSCEF: 06/01/2021

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 151 of
269

14

Proceedings

1    not grant prejudgment asset freezes, and that is exactly

2    what PAX is trying to do now.  They are trying to enjoin

3    Golden Spring from expending any of it's own assets for any

4    purpose, and that is contrary to the law.

5         Now, they argue that your Honor has a power to

6    enforce restraining orders.  Of course you do.  And Golden

7    Spring was served with a restraining order, and Golden

8    Spring acts at it's peril if it transfers any property with

9    which Mr. Kwok -- in which Mr. Kwok has an interest, but a

10   Court's enforcement of a restraining notice is not the

11   tantamount to an injunction.  It's an after-the-fact

12   litigation based upon allegations that there had been a

13   violation of the notice.  They're two entirely separate

14   things.

15        So your Honor, respectfully, there isn't either a

16   jurisdictional basis for the injunction nor is there a

17   compelling factual basis for one because they have the

18   relief that the CPLR has provided for.

19        Now, if the Court is going to go ahead and enter

20   certain orders as your Honor has described, I request a few

21   things, a few clarification points.

22        First of all, we would request the Court post a

23   bond.  Order that PAX post a bond.  They are seeking an

24   injunction against Golden Spring from using any of it's

25   assets.  And pursuant to the CPLR 6312(b), a bond is

KM

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM INDEX NO. 652077/2017

NYSCEF DOC. NO. 833    Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45    Page 152 of    RECEIVED NYSCEF: 06/01/2021
269

15

Proceedings

1    necessary.  It's a necessary element for preliminary relief.

2    So we would ask the Court direct that a bond be posted.

3           We would also ask whether under this jurisdiction,

4    Golden Spring is able to pay lawyers.  Is it able to pay

5    it's employees?

6           Mr. Moss dismisses the fact that the company

7    actually employs 16 employees and seven independent

8    contractors.  Are they not entitled to continue that?  Do

9    they need -- is this injunction going to close Golden

10   Spring?  We need that clarification because Golden Spring

11   does not want to be in violation of your Honor's order.

12          And finally, you know, your Honor, I would request

13   respectfully a stay of the Court's order for a week so that

14   we may seek appellate relief and seek a stay pending appeal.

15          But given that this is, you know, a holiday

16   weekend, we request that the Court stay because again, as I

17   said, Golden Spring does not want to be in violation of this

18   Court's order; but for all the reasons I've stated,

19   honestly, your Honor, the relief requested is a function of

20   facts that Mr. Moss has asserted as judge, jury and

21   executioner.

22          They haven't been presented.  They haven't been

23   adjudicated.  They haven't been formally determined, all of

24   which are necessary for the kind of relief for reaching into

25   Golden Spring and setting aside it's individual identity and

KM

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 153 of 269

16

Proceedings

1    just securing whatever documents it wants and enjoining all

2    of it's assets.  That's necessary under the law.

3              Thank you, your Honor.

4              THE COURT:  All right.  I take your points.

5              Nothing that you've said suggests that Golden

6    Springs hasn't paid seven figures worth of Mr. Kwok's

7    expenses in the immediate recent past.  Nothing that you

8    said alters the fact that Mr. Kwok flaunts the Court's

9    orders at will.

10             You're correct that PAX needs to post a $500,000

11   bond.  You're correct that I should stay these orders until

12   June 1st at five p.m. to enable you to seek appellate

13   relief, and you're correct that Golden Spring may pay it's

14   employees in accordance with a schedule listing the identity

15   of the employees and the amount of their compensation which

16   you'll provide to Mr. Moss.  And I think that addresses your

17   concerns.

18             MR. ALTER:  With one exception, your Honor, and I

19   appreciate the Court's response to those concerns.  The

20   attorneys.  The attorneys that Golden Springs has been

21   permitted here today to pay.

22             THE COURT:  There's no issue.  Just need to

23   identify the attorneys and the fees that you're paying to

24   them.

25             MR. ALTER:  Okay.

KM

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM
NYSCEF DOC. NO. 833

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 154 of
269

INDEX NO. 652077/2017

RECEIVED NYSCEF: 06/01/2021

17

Proceedings

1      THE COURT:  And, you know, I note that Mr. Kwok has

2   apparently no concern for the $500,000 a day sanction for

3   flagrantly violating prior orders of the Court with respect

4   to the boat that Golden Spring's is paying to maintain and

5   transport.  And if my calculation is correct, the total of

6   the contempt sanctions to date is $7.5 million.

7      Mr. Kwok is just not free to live in New York at an

8   ultra-luxurious condominium, the cost of which he's paid for

9   by Golden Springs and ignore the processes of the New York

10  courts.

11     Now does anybody else wish to be heard?

12     MR. MITCHELL:  Your Honor, Aaron Mitchell.  I

13  represent the Genever defendants.  Just one point of

14  clarification.

15     As you're well aware, your Honor, the Genever

16  New York which owns the co-op is in bankruptcy so Golden

17  Spring is not paying the maintenance for that apartment.

18     I believe Mr. Moss is aware as well there was a

19  security deposit paid which the surety is drawing down on

20  which I just want to make that clear for the record.

21     THE COURT:  That is a fair and appropriate

22  clarification.

23     It doesn't alter the fact that prior to the fact

24  that Genever which is another one of Mr. Kwok's many

25  companies was paying for Mr. Kwok's luxury apartment.

KM

Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 155 of 269

18

Proceedings

1          Mr. Moss has been pursuing enforcement of a

2    judgment for years now, and it's been my misfortune to have

3    to have presided over these many, many, many motions and

4    hearings, none of which are producing the results that the

5    Court has ordered because Mr. Kwok directly or indirectly

6    through his companies ignores Court orders.

7          But Golden Springs presumably will comply with the

8    Court's order, and Golden Springs, you know, may seek a stay

9    in the Appellate Division either tomorrow or today or on

10   June 1.  And if the Appellate Division stays the Court's

11   order, then the Court's order will be stayed.

12         Otherwise, the Court expects Golden Springs to

13   comply with the Court's orders subject to PAX's posting of

14   $500,000 bond in the event it's determined that there's any

15   overreach here and subject to Golden Springs being able to

16   pay identified lawyers and identified employees in

17   accordance with the schedule.

18         MR. SARNOFF:  Your Honor, this is Stuart Sarnoff.

19   May I just ask one clarification?

20         THE COURT: Yes.

21         MR. SARNOFF: The obligation of PAX to post a bond,

22   is that specifically in respect of the restraining order

23   part of the -- of your decision today?

24         THE COURT:  Yes.

25         MR. SARNOFF: And separate --  so there is no --

KM

FILED: NEW YORK COUNTY CLERK 06/01/2021 04:48 PM INDEX NO. 652077/2017
NYSCEF DOC. NO. 833    Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45    Page 156 of    RECEIVED NYSCEF: 06/01/2021
269

19

Proceedings

1          THE COURT:  With respect to the restraining order.

2          MR. SARNOFF: So there is no -- there is no stay

3     with respect to the obligation of Golden Spring to comply

4     with the subpoena.  Is that correct?

5          THE COURT:  That's correct.

6          MR. SARNOFF:  Thank you, sir.

7          THE COURT:  Anything else from anybody else?

8          All right.  The Court will enter a memorandum order

9     consistent with the transcript of the proceedings of today.

10    I would strongly urge counsel to order an expedited copy of

11    the transcript of proceedings of today so that in the event

12    Golden Springs seeks a stay from the the Appellate Division,

13    there is a clear record reflecting what the Court has

14    ordered.

15         Have a nice day and a nice weekend.  Everybody stay

16    safe and thank you.

17
      CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF THE
18    ORIGINAL MINUTES TAKEN OF THIS PROCEEDING.

19

20

21                    *Karen Mangano*
                    _____
22                      KAREN MANGANO, CSR
                        Senior Court Reporter
23
      SO ORDERED: June 1, 2021
24

25
      BARRY R. OSTRAGER, J.S.C.

                                      KM

# EXHIBIT 29

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PACIFIC ALLIANCE ASIA OPPORTUNITY
FUND L.P.,

                Plaintiff,

      v.

KWOK HO WAN, *a/k/a* KWOK HO, *a/k/a* GWO
WEN GUI, *a/k/a* GUO WENGUI, *a/k/a* GUO
WEN-GUI, *a/k/a* WAN GUE HAOYUN, *a/k/a*
MILES KWOK, *a/k/a* HAOYUN GUO,
GENEVER HOLDINGS CORPORATION, and
GENEVER HOLDINGS LLC,

                Defendants.

Index No. 652077/2017

Hon. Barry Ostrager

Part 61-

Mot Seq. No. ___

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF PACIFIC ALLIANCE ASIA
OPPORTUNITY FUND L.P.'S MOTION FOR A TURNOVER ORDER AGAINST
DEFENDANT MILES KWOK AND APPOINTMENT OF A RECEIVER**

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 159 of
269

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................... 1

BACKGROUND ............................................................................................. 2

ARGUMENT .................................................................................................. 3

I.     The Court Should Order Kwok to Turn Over His Shares in Genever BVI. ......... 3

II.    The Court Should Direct Kwok to Execute an Instrument of Transfer. ............... 5

      A.     The Court Should Also Direct Kwok to Send the Executed Instrument of Transfer to Intertrust to Ensure that the Register of Members is Updated. ....................................................................... 5

      B.     The Court Should Order Kwok to Execute and Deliver a Corporate Resolution Instructing Intertrust to Update the Register of Members. ....................................................................................... 6

      C.     The Court Should Appoint a Receiver Over Kwok's Shares in Genever BVI. ............................................................................... 7

III.    Kwok's Anticipated "Defenses" Are Specious. ................................................ 8

      A.     Genever NY's Questionable Bankruptcy is Irrelevant to PAX's Requested Relief. ................................................................................ 8

      B.     Kwok's Predictable Pretense that his Son, through Bravo Luck, is the Beneficial Owner of the Genever Entities and the Residence Is Frivolous. ............................................................................................ 9

CONCLUSION ................................................................................................ 10

i

FILED: NEW YORK COUNTY CLERK 06/21/2021 12:05 PM
NYSCEF DOC. NO. 846
INDEX NO. 652077/2017
RECEIVED NYSCEF: 06/21/2021

Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 160 of
269

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*856 Eighth, LLC v. Pizza Pasta Etc., Corp*,
Index No. 2020 161413/2019, WL 3451892 (N.Y. Sup. Ct. June 24, 2020) ........................... 7

*Adelaide Prods., Inc. v. BKN Int'l AG*,
39 A.D.3d 254 (1st Dep't 2007) ...................................................................... 6

*AP MA Funding, LLC v. Wells Fargo Clearing Services, LLC*,
No. 150755/2020, 2020 WL 2219962 (N.Y. Sup. Ct. May 7, 2020) ......................... 5

*Blue Citi LLC v. 5Barz Int'l Inc.*,
No. 16-CV-9027, 2019 WL 6976972 (S.D.N.Y. Dec. 20, 2019) ........................... 9, 10

*Colfin Bulls Funding B, LLC v. Ampton Invs., Inc.*,
No. 151885/2015, 2018 WL 7051063 (N.Y. Sup. Ct. Nov. 26, 2018) ................... 5, 6

*Daum Glob. Holdings Corp. v. Ybrant Digital Ltd.*,
No. 13-CV-3135, 2018 WL 2122816 (S.D.N.Y. May 8, 2018) ............................. 10

*Fresh Meadow Food Servs., LLC v. R.B. 175 Corp.*,
No. 12528/2011, 2011 WL 6989896 (N.Y. Sup. Ct. Oct. 18, 2011) ......................... 9

*Gowen v. Helly Nahmad Gallery, Inc.*,
60 Misc. 3d 963 (N.Y. Sup. Ct. 2018), *aff'd*, 169 A.D.3d 580 (1st Dep't 2019) ...................... 6

*Gryphon Dom. VI, LLC v. APP Int'l Fin. Co.*,
41 A.D.3d 25 (1st Dep't 2007) ...................................................................... 6, 7

*Hotel 71 Mezz Lender LLC v. Falor*,
926 N.E.2d 1202 (N.Y. 2010) ...................................................................... 9

*In re Bray Enterprises, Inc.*,
38 B.R. 75 (Bankr. D. Vt. 1984) ................................................................... 11

*Koehler v. Bank of Bermuda Ltd.*,
12 N.Y.3d 533 (2009) ............................................................................... 5, 6

*Leo v. LD Holdings, Inc.*,
150 A.D.3d 620 (1st Dep't 2017) .................................................................. 6

*LSQ Funding Grp., L.C. v. Werther*,
No. 650390/2017, 2018 WL 3385045 (N.Y. Sup. Ct. July 11, 2018) ................... 7, 8

*Motorola Credit Corp. v. Uzan*,
739 F. Supp. 2d 636 (S.D.N.Y. 2010) ........................................................... 7

*Muhl v. Ardra Ins. Co.*,
246 A.D.2d 413 (1st Dep't 1998) .................................................................. 7

*Ninth Ave. Realty, LLC v. Guenancia*,
No. 102725/10, 2013 WL 9528299 (N.Y. Sup. Ct. Sept. 6, 2013) ......................... 6

*Spotnana, Inc. v. Am. Talent Agency, Inc.*,
No. 09-CV-3698, 2013 WL 227546 (S.D.N.Y. Jan. 22, 2013) ............................. 10

## TABLE OF AUTHORITIES
### (continued)

<div align="right">**Page**</div>

*Udel v. Udel,*
   370 N.Y.S.2d 426 (Civ. Ct. 1975) .......................................................... 9

*United States v. Zitron,*
   No. 80-CV-6535, 1990 WL 13278 (S.D.N.Y. Feb. 2, 1990)...................... 9

**Rules**

CPLR 5201.............................................................................................. 6

CPLR 5225.......................................................................................... *passim*

CPLR 5233.............................................................................................. 9

CPLR 6202.............................................................................................. 6

## PRELIMINARY STATEMENT

Defendant Miles Kwok ("Kwok") has not paid Plaintiff Pacific Alliance Asia
Opportunity Fund L.P. ("PAX") a dime on the more-than-$116 million judgment this Court
entered against him months ago.  To the contrary, as PAX has explained to the Court in prior
submissions, Kwok has gone to great lengths to thwart PAX's ability to enforce the judgment,
including filing a questionable bankruptcy for the New York shell company through which he
holds his Sherry-Netherland Residence (Genever Holdings, LLC or "Genever NY"), keeping his
yacht, the "Lady May," out of this jurisdiction in flagrant contempt of the Court's orders, and
stonewalling—and causing his associates and shell companies to stonewall—PAX's legitimate
collection-related discovery efforts.

As PAX already has demonstrated in great detail, one of Kwok's principal judgment-
thwarting strategies has been to shield his assets in shell companies held by family members and
underlings, all while claiming that he himself is virtually penniless, but at the same time readily
accessing millions of dollars to fund his lavish lifestyle and enormous legal expenses.  Indeed, in
response to PAX's post-judgment discovery requests, Kwok stated—before taking the Fifth
Amendment in connection with a reported federal criminal investigation against him[1]—that the
***only asset of any value he holds is his 100% interest in Defendant Genever Holdings***
***Corporation ("Genever BVI")***, a company registered in the British Virgin Islands.[2]

Under black letter New York Law, PAX is entitled to turnover of Kwok's assets,
including shares held in a foreign business entity like Genever BVI, to enforce (at least part of)
its judgment against Kwok.  Accordingly, as set forth in detail below, PAX brings this motion

---

[1] Dkt. No. 760.
[2] Genever BVI is the 100% parent of supposedly "bankrupt" Genever NY, which in turn owns
the Residence.

1

under CPLR 5225 and 5228 to request that the Court issue an order (i) directing Kwok to turn

over all share certificates with respect to his 100% ownership in Genever BVI; (ii) directing

Kwok to execute an Instrument of Transfer by which he conveys his shares in Genever BVI to

PAX or its designee; (iii) directing Kwok to send the executed Instrument of Transfer to Genever

BVI's registered agent; (iv) directing Kwok to execute and deliver to Genever BVI's registered

agent a corporate resolution instructing that Genever BVI's Register of Members be updated to

reflect the new 100% ownership (to ensure the update occurs in the event that the registered

agent requires instructions to update Genever BVI's Register of Members); and (v) appointing a

receiver over Kwok's Genever BVI shares, including with the power (a) to instruct Genever

BVI's registered agent to update Genever BVI's Register of Members to reflect PAX or a

designee as its sole legal owner, and (b) to exercise voting rights with respect to all of Genever

BVI's shares.

## BACKGROUND

On February 3, 2021, the Clerk of Court entered judgment against Kwok in the amount of

$116,402,019.57 (the "Judgment").  In attempting to enforce the Judgment—which to this day

remains entirely unpaid and is accruing 9% post-judgment interest—PAX served discovery on

Kwok, including an interrogatory asking him to identify "any [a]ssets that have a value greater

than $10,000 in which [he has] an [i]nterest or ha[s] had an [i]nterest since January 1, 2015."[3]

Despite claiming to be a billionaire and managing to fund his luxury Residence and an army of

high-priced lawyers representing him and his related shell businesses in numerous lawsuits,

Kwok identified **only one asset**, responding, "**I am the legal owner of the issued shares of**

**Genever Holdings Corporation.  Genever Holdings Corporation is the sole shareholder of**

---

[3] Dkt. No. 756 at 9.

2

Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 164 of
269

***Genever Holdings, LLC, its only asset.***"[4]  Kwok's post-judgment admission that he owns

Genever BVI is consistent with the evidentiary record that was before this Court on PAX's pre-

judgment attachment motions, which included (i) an affidavit submitted on Kwok's behalf by

Yvette Wang, in which she swore that "Mr. Kwok is the sole shareholder of Genever BVI" and

to which she attached Genever BVI's register of members "confirming that Mr. Kwok is its sole

shareholder";[5] and (ii) documents produced to PAX by the Sherry-Netherland, listing Kwok as

the sole shareholder of Genever BVI, which the Sherry-Netherland received from Kwok in

connection with his application to purchase the Residence.[6]

## ARGUMENT

**I.    The Court Should Order Kwok to Turn Over His Shares in Genever BVI.**

CPLR Article 52 authorizes a judgment creditor to file a motion to compel turnover of a

judgment debtor's assets.  *See Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533, 537 (2009).

CPLR 5225(a) states:

> Upon motion of the judgment creditor . . . where it is shown that the judgment
> debtor is in possession or custody of money or ***other personal property*** in which
> he has an interest, the court shall order that the judgment debtor pay the money, or
> so much of it as is sufficient to satisfy the judgment, to the judgment creditor and,
> if the amount to be so paid is insufficient to satisfy the judgment, to deliver ***any
> other personal property***, or so much of it as is of sufficient value to satisfy the
> judgment, to a designated sheriff. (emphasis added.)

As this Court has recently found, CPLR 5225 "extends to shares of stock, as well as

money." *AP MA Funding, LLC v. Wells Fargo Clearing Services, LLC*, No. 150755/2020, 2020

WL 2219962, at *1 (N.Y. Sup. Ct. May 7, 2020) (Ostrager, J.).  Thus, Kwok's Genever BVI

"corporate shares constitute personal property subject to the enforcement procedures set forth in

---

[4] *Id.*
[5] Dkt. No. 182 at ¶ 4; Dkt. No. 183.
[6] *See, e.g.*, Dkt. No. 289 at SN 0161, SN 0206.

Article 52." *Colfin Bulls Funding B, LLC v. Ampton Invs., Inc.*, No. 151885/2015, 2018 WL 7051063, at *6 (N.Y. Sup. Ct. Nov. 26, 2018); *see also Ninth Ave. Realty, LLC v. Guenancia*, No. 102725/10, 2013 WL 9528299, at *2 (N.Y. Sup. Ct. Sept. 6, 2013). Under CPLR 5225(a), the Genever BVI share "certificates must be turned over even if they are not located in New York at this time," and Kwok "is required to take whatever actions are necessary . . . to have the shares of stock brought to New York so that they can be turned over." *Colfin*, 2018 WL 7051063, at *7 (citing *Gryphon Domestic VI, LLC v. APP Int'l Fin. Co.*, 41 A.D.3d 25, 31 (1st Dep't 2007)); *see also Gowen v. Helly Nahmad Gallery, Inc.*, 60 Misc. 3d 963, 980 (N.Y. Sup. Ct. 2018), *aff'd*, 169 A.D.3d 580 (1st Dep't 2019) ("[A]n overarching principle of New York law [is] that where there is personal jurisdiction over the parties, one party cannot hide its assets outside of New York state so as to render any judgment obtained in New York unenforceable."); *Koehler*, 12 N.Y.3d at 541 ("[A] New York court with personal jurisdiction over a defendant may order him to turn over out-of-state property . . . ."). Intangible assets, such as corporate shares, are subject to turnover under CPLR 5225 because they are both "property which could be assigned or transferred," CPLR 5201, and "property against which a money judgment may be enforced," CPLR 6202.[7]

Turnover is appropriate even though Genever BVI is an out-of-state corporation. *See, e.g.*, *Leo v. LD Holdings, Inc.*, 150 A.D.3d 620, 620 (1st Dep't 2017) (affirming order directing the turnover of shares in out-of-state corporation); *Adelaide Prods., Inc. v. BKN Int'l AG*, 39 A.D.3d 254, 255 (1st Dep't 2007) ("unissued stock certificate [in German company was] subject

---

[7] Failure to abide by a court's turnover order under CPLR 5225 has resulted in the imposition of contempt sanctions. *See Gryphon Domestic VI, LLC v. APP Int'l Fin. Co.*, 58 A.D.3d 498, 499 (1st Dep't 2009) (judgment debtors held in civil contempt for failing to comply with an order requiring them to satisfy a judgment, turn over stock certificates, transfer ownership of its subsidiaries to judgment creditors, and turn over bank accounts to the creditors).

4

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 166 of 269

of [] turnover proceeding" under CPLR 5225); *Motorola Credit Corp. v. Uzan*, 739 F. Supp. 2d 636, 641 (S.D.N.Y. 2010) ("Turnover orders directed against judgment debtors are effective against assets regardless of their location.").

## II.    The Court Should Grant the Additional, Ancillary Relief Necessary to Effectuate the Turnover.

### A.    *The Court Should Direct Kwok to Execute an Instrument of Transfer.*

Under BVI law, the first step in transferring share ownership is for the share owner to execute an "Instrument of Transfer."  (Willins Aff. ¶ 4.)

Under Article 52 of the CPLR, the Court has the power to order Kwok to execute an Instrument of Transfer because it "may order ***any person*** to execute and deliver ***any document*** necessary to effect payment or delivery." CPLR 5225(c); *see also Gryphon*, 41 A.D.3d at 35 (holding "the IAS court . . .  should have ordered [judgment debtor] to execute documents transferring ownership interests" and "judgment debtor should be required to execute appropriate instruments"); *LSQ Funding Grp., L.C. v. Werther*, No. 650390/2017, 2018 WL 3385045, at *2 n.2 (N.Y. Sup. Ct. July 11, 2018) (explaining that the court "clearly has the authority under CPLR § 5225(c) to order [the judgment debtor] to execute a simple [document]"—which would result in the turnover of property to PAX, the judgment creditor);  *Muhl v. Ardra Ins. Co.*, 246 A.D.2d 413, 413 (1st Dep't 1998)  ("An order for execution . . . of documents under CPLR 5225(c) may [] be issued against a party whose debt liability has been established."); *856 Eighth, LLC v. Pizza Pasta Etc., Corp*, Index No. 2020 161413/2019, 2020 WL 3451892, at *5 (N.Y. Sup. Ct. June 24, 2020) (same).  The Court should do so here.

### B.    *The Court Should Also Direct Kwok to Send the Executed Instrument of Transfer to Intertrust to Ensure that the Register Of Members Is Updated.*

Under BVI law, the next step to transferring corporate ownership is updating the corporation's Register of Members, which can be done by the corporation's registered agent—in

5

Genever BVI's case, Intertrust Corporate Services (BVI) Limited ("Intertrust"). (Willins Aff. ¶¶ 5–6.) To accomplish this, the Court should direct Kwok "to have the [executed Instrument of Transfer] sent to" Intertrust, so that it updates Genever BVI's Register of Members to reflect the terms of the transfer. *LSQ Funding*, 2018 WL 3385045 at *2 n.2 (directing judgment debtor to send resignation letter to country club, which would result in the release of a leviable membership deposit). The Court has this power under the CPLR. *See id.*; *see also Gryphon*, 41 A.D.3d at 35 ("The court . . . may use CPLR 5225(c) to order the debtor to execute *and deliver*" documents to third parties to effectuate the turnover of assets.) (citing Weinstein-Korn-Miller, N.Y. Civ. Prac. ¶ 5225.21) (emphasis added).

### C. The Court Should Order Kwok to Execute and Deliver a Corporate Resolution Instructing Intertrust to Update the Register of Members.

Following Kwok's execution and delivery of the Instrument of Transfer, Intertrust may then seek instructions authorizing the updating of the Register of Members to reflect the new ownership. (Willins Aff. ¶ 7.) In that event, Intertrust would accept a corporate resolution signed by Kwok as the sole director of Genever BVI,[8] instructing Intertrust to update the Register of Members according to the Instrument of Transfer. (*Id.*) Under CPLR 5225(c), and for all the reasons stated *supra* in Sections II.A–B, the Court may direct Kwok to execute a corporate resolution and to send that document to Intertrust. PAX respectfully requests that the Court order Kwok to do so in order to account for the possibility that Intertrust will require such an instruction.

---

[8] *See* Dkt. No. 289 at SN 0163 (showing "Mr Ho Wan Kwok" as the only director of Genever BVI).

Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 168 of 269

### D. *The Court Should Appoint a Receiver Over Kwok's Shares in Genever BVI.*

Under CPLR 5225(a), turnover of property (such as corporate shares) to the sheriff "must be made for the sole purpose of a sale to satisfy the judgment." *Udel v. Udel*, 370 N.Y.S.2d 426, 428 (Civ. Ct. 1975) (citing CPLR 5233; N.Y. Civ. Prac., Weinstein-Korn-Miller, Sec. 5225.06). But because of the "lack of marketability" of the Genever BVI shares, and "the difficulty in determining [their] true value, it is unlikely that a turn over [sic] to the sheriff would result in satisfying the judgment." *Udel*, 370 N.Y.S.2d at 428. In cases such as this, CPLR 5228 provides for the appointment of a receiver to collect property—the Genever BVI shares—and to take actions "designed to satisfy the judgment." *See also Fresh Meadow Food Servs., LLC v. R.B. 175 Corp.*, No. 12528/2011, 2011 WL 6989896, at *3 (N.Y. Sup. Ct. Oct. 18, 2011) (A court may "appoint a receiver to administer, collect, improve, lease, repair or sell any real or personal property of the judgment debtor, or to do any other acts designed to satisfy the judgment.").

New York courts consider several factors when determining whether to appoint a receiver for a judgment debtor's assets, including: "(1) alternative remedies available to the creditor; (2) the degree to which receivership will increase the likelihood of satisfaction [of the judgment]; and (3) the risk of fraud or insolvency if a receiver is not appointed." *Hotel 71 Mezz Lender LLC v. Falor*, 926 N.E.2d 1202, 1212 (N.Y. 2010) (quoting *United States v. Zitron*, No. 80-CV-6535, 1990 WL 13278, at *1–2 (S.D.N.Y. Feb. 2, 1990)).

All three factors weigh in PAX's favor. There are few if any alternative remedies available to PAX because Kwok has represented that he has no other assets besides the Genever BVI shares—which have no readily ascertainable market value. *See supra* at 4. A receiver will also increase the likelihood of recovery because, as noted above, Kwok has displayed a "pattern . . . of dodging proper payment and avoiding compliance with the Court's orders." *Blue Citi LLC v. 5Barz Int'l Inc.*, No. 16-CV-9027, 2019 WL 6976972, at *2 (S.D.N.Y. Dec. 20, 2019)

(appointing receiver over, *inter alia*, corporate shares). Moreover, the risk of insolvency is apparent because Kwok claims to have no other assets and has a history of putting his shell companies into (questionable) bankruptcy. *See supra* at 4. The appointment of a receiver is particularly warranted where, as here, the property is "intangible, lacks a ready market, and presents nothing that a sheriff can work with at an auction." *Blue Citi*, 2019 WL 6976972, at *2; *see also Spotnana, Inc. v. Am. Talent Agency, Inc.*, No. 09-CV-3698, 2013 WL 227546, at *6 (S.D.N.Y. Jan. 22, 2013) (explaining that the defendants' "ownership of closely-held entities conducting business internationally" are just the "sort of intangible interests that lack a ready market for which receivership is especially appropriate").

The receiver could be a third party, PAX, or its designee. Under CPLR 5228, "the judgment creditor may itself be appointed receiver." *Daum Glob. Holdings Corp. v. Ybrant Digital Ltd.*, No. 13-CV-3135, 2018 WL 2122816, at *2 (S.D.N.Y. May 8, 2018). In *Daum*, the court issued an order "compelling [the judgment debtor] to turn over [its] stock certificates" to the judgment creditor that had been appointed receiver. *Id.* at *4. The Court should appoint PAX here because PAX is in the best position to take action designed to satisfy the Judgment.

## III.    Kwok's Anticipated "Defenses" Are Specious.

Although this should be an open-and-shut motion, PAX anticipates that Kwok and his shell companies (through different lawyers but all acting at Kwok's direction) will litter the record with arguments that turnover is inappropriate for two principal reasons. Both would be specious.

### A.    *Genever NY's Questionable Bankruptcy is Irrelevant to PAX's Requested Relief.*

PAX expects that Kwok may point to the fact that Genever NY is in bankruptcy, with an automatic stay in place, as a basis to oppose this motion. But even assuming the questionable

bankruptcy of Genever BVI's subsidiary were properly filed and maintained, chapter 11 does not preclude (and is irrelevant to) PAX's entitlement to turnover relief against the **non-debtor** parent BVI company.[9]   The Bankruptcy Code's automatic stay is limited to the **debtor's** estate: "operat[ing] as a stay of any act to obtain property of the estate or of property from the estate." *In re Bray Enterprises, Inc.*, 38 B.R. 75, 78 (Bankr. D. Vt. 1984).   Shares of Genever BVI—the debtor's foreign parent—are not part of the debtor's estate and so are not affected by either the (questionable) Genever NY bankruptcy filing or its related limited automatic stay.

### B.    *Kwok's Predictable Pretense that his Son, through Bravo Luck, is the Beneficial Owner of the Genever Entities and the Residence Is Frivolous.*

Kwok's newly minted fiction (first floated in the recent bankruptcy and BVI proceedings) is that one of his other shell companies that he claims is now 100% owned by his son—Bravo Luck—is the true beneficial owner of Kwok's two Genever shell entities.   But this is just Kwok being Kwok, again suggesting that one of his offspring owns (through, of course, a shell company with no offices, employees, or other business or holdings) assets that are really his. This latest Kwok ploy is as frivolous as all his others.

If necessary, PAX will demonstrate at the appropriate time that (i) Kwok's new position is entirely inconsistent with his clear, repeated judicial admissions and legal arguments in this case over the past four years, and (ii) the belatedly produced, so-called "trust agreement"— which PAX expects Kwok will try to rely on to claim that Bravo Luck beneficially owns

---

[9]  PAX entered into a settlement agreement (pending approval by the court) in the bankruptcy case to address stay relief and a consensual process for the sale of the Residence (with proceeds to be retained in an escrow account), while the non-bankruptcy litigation is resolved.  Nothing in that settlement agreement affects (or limits) PAX's rights to enforce the Judgment against non-debtor third parties here.  PAX reserves all of its rights in the event that the settlement agreement (as submitted for approval) is not approved and/or there is a material change in circumstances with respect to the status of the debtor (Genever NY) or Kwok.

Genever BVI and Genever NY—is a fraudulent, backdated document that is not worth the paper

on which it was printed.  Indeed, the Sherry-Netherland certainly does not believe that Bravo

Luck is the rightful owner of the entities owning the Residence[10] and—critically—***in four years***

***of litigation, Kwok never once dared raise this dishonest argument before this Court***.

It is also possible that Bravo Luck may seek to intervene in this proceeding to try to

oppose this motion (if it even has standing).  If it does so, we expect that Kwok (through Bravo

Luck) will try to make this specious trust deed argument with a straight face.  But to avoid

having to make that argument before this Court, Bravo Luck may first try to argue that the matter

should be decided in the BVI because PAX filed there and the Bravo Luck issue is already teed

up before the BVI court.  That would be the wrong result.  PAX filed the BVI action ***before*** PAX

obtained its judgment against Kwok, and thus turnover was not an option at that time.  Given this

new, post-judgment posture, PAX is now pursuing its statutory turnover rights here, and given

this Court's longstanding familiarity with this case and its unique issues, PAX respectfully

submits that, if it is raised at all, the Bravo Luck issue is appropriate to be heard by this Court.

## CONCLUSION

For the reasons above, PAX respectfully asks the Court to issue an order (i) directing

Kwok to turn over all share certificates with respect to his 100% ownership in Genever BVI; (ii)

directing Kwok to execute an Instrument of Transfer by which he conveys his shares in Genever

BVI to PAX or its designee; (iii) directing Kwok to send the executed Instrument of Transfer to

---

[10]  After Bravo Luck surfaced in the bankruptcy, the Sherry-Netherland submitted a filing
informing the bankruptcy court that "Kwok and his personal attorney represented, among other
things, that ***Kwok was the beneficial owner of the Debtor [Genever NY] and the Debtor's
parent, Genever [BVI]"*** and that the Sherry-Netherland approved the sale "[i]n reliance upon
those representations."  Joinder and Reservation of Rights at ¶ 2, *In re Genever Holdings LLC*,
No. 20-12411-jlg (S.D.N.Y. Jan 27, 2021) (ECF No. 45).  The Sherry-Netherland also called out
Kwok's and Genever NY's related ***"misrepresentations and fraudulent behavior."***  *Id*. at ¶ 4.

Genever BVI's registered agent; (iv) directing Kwok to execute and deliver to the registered

agent a corporate resolution instructing that Genever BVI's Register of Members be updated to

reflect the new 100% ownership); and (v) appointing a receiver over Kwok's Genever BVI

shares, including with the power to instruct the Genever BVI registered agent to update Genever

BVI's Register of Members to reflect PAX or its designee as the sole legal owner and to exercise

voting rights with respect to all of Genever BVI's shares.

DATED: June 21, 2021   Respectfully submitted,
   New York, New York  O'MELVENY & MYERS LLP

         By: */s/ Edward Moss*
         Stuart Sarnoff (ssarnoff@omm.com)
         Edward Moss (emoss@omm.com)
         7 Times Square
         New York, NY 10036
         (212) 326-2000

         *Attorneys for Plaintiff Pacific Alliance*
         *Asia Opportunity Fund L.P.*

## CERTIFICATION OF WORD COUNT

PAX hereby certifies that this document complies with the word count provisions of

Commercial Division Rule 17.  This memorandum of law was prepared using Microsoft Word,

and the total number of words in this memorandum of law, exclusive of the caption, title, and

signature block, is less than 4,200 words.


DATED: June 21, 2021
New York, New York

Respectfully submitted,

O'MELVENY & MYERS LLP

By: */s/ Edward Moss*
Stuart Sarnoff (ssarnoff@omm.com)
Edward Moss (emoss@omm.com)
7 Times Square
New York, NY 10036
(212) 326-2000

*Attorneys for Plaintiff Pacific Alliance
Asia Opportunity Fund L.P.*

12

# EXHIBIT 30

## SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY

PRESENT:     **HON. BARRY R. OSTRAGER**                    PART          **IAS MOTION 61EFM**

*Justice*

-------------------------------------------------------------------------------X

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

| | |
|---|---|
| **INDEX NO.** | 652077/2017 |
| **MOTION DATE** | |
| **MOTION SEQ. NO.** | 018 |

Plaintiff,

- v -

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO, GENEVER HOLDINGS LLC, and GENEVER HOLDINGS CORPORATION,

**DECISION + ORDER ON MOTION**

Defendants.

-------------------------------------------------------------------------------X

HON. BARRY R. OSTRAGER

Before the Court is Motion 018 by PAX for a post-judgment turnover pursuant to CPLR 5255 of Kwok's shares in Genever Holdings Corporation ("Genever BVI") and other relief. In accordance with the transcript of proceedings of September 22, 2021, the motion is granted to the extent of directing Kwok to take the steps necessary to effect the turnover his shares in Genever BVI to PAX. This order is expressly subject to the approval of Justice Adrian Jack who issued a stay in the British Virgin Islands ("BVI") in the related BVI litigation. The Court declines to appoint a receiver at this time.

Accordingly, it is hereby,

ORDERED that Kwok Ho Wan take whatever steps are necessary in the British Virgin Islands to turnover all share certificates with respect to his 100% ownership interest in Genever Holdings Corporation ("Genever BVI"); and it is further

ORDERED that this decision and order is expressly contingent on the approval of Justice Jack in the related proceeding in the British Virgin Islands. Any actions affecting Genever

Holdings LLC, a wholly owned subsidiary of Genever BVI, are subject to the jurisdiction of

Justice Garrity in the Bankruptcy proceeding in the Southern District of New York involving

Genever Holdings LLC, in which PAX is participating.

A status conference is scheduled for November 16, 2021 at 10:00 am.

Dated: September 22, 2021

_____
BARRY R. OSTRAGER, J.S.C.

| CHECK ONE: | | CASE DISPOSED | | | X | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|---|
| | | GRANTED | | DENIED | X | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | | REFERENCE |

2

# EXHIBIT 31

**<u>NOTICE</u>: THE PURPOSE OF THIS PROCEEDING IS TO PUNISH YOU FOR CONTEMPT OF COURT. SUCH PUNISHMENT MAY CONSIST OF A FINE, IMPRISONMENT, OR BOTH ACCORDING TO LAW.**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P., <br><br> Plaintiff, <br><br> v. <br><br> KWOK HO WAN, *a/k/a* KWOK HO, *a/k/a* GWO WEN GUI, *a/k/a* GUO WENGUI, *a/k/a* GUO WEN-GUI, *a/k/a* WAN GUE HAOYUN, *a/k/a* MILES KWOK, *a/k/a* HAOYUN GUO, GENEVER HOLDINGS CORPORATION, and GENEVER HOLDINGS LLC, <br><br> Defendants. | Index No. 652077/2017 <br><br> Hon. Barry R. Ostrager <br><br> Part 61 <br><br> Mot. Seq. No. __ <br><br> **NOTICE OF MOTION FOR ORDER OF CIVIL CONTEMPT AS TO DEFENDANT MILES KWOK FOR HIS FAILURE TO COMPLY WITH THE COURT'S SEPTEMBER 22, 2021 TURNOVER ORDER** |

**PLEASE TAKE NOTICE** that upon the annexed January 7, 2022 Memorandum of Law in Support of Pacific Alliance Asia Opportunity Fund L.P.'s ("PAX") Motion for an Order of Civil Contempt as to Defendant Miles Kwok for his Failure to Comply with the Court's September 22, 2021 Turnover Order, and the Affirmation of Stuart Sarnoff, Esq., dated January 7, 2022, and the exhibits attached thereto, and the Affidavit of Andrew Willins, dated January 7, 2022, and the exhibits attached thereto, PAX will move the Court at the New York County Courthouse located at 60 Centre Street, Room 130, New York, NY 10007, on the 25th day of January, 2022, at 9:30 a.m., or as soon after that as counsel may be heard, for an order, under N.Y. Judiciary Law § 753 and N.Y. CPLR § 5104, (i) finding Defendant Miles Kwok in contempt of Court for disobeying the Court's September 22, 2021 Turnover Order; and (ii) granting such other and further relief as the Court deems just and proper.

INDEX NO. 652077/2017

RECEIVED NYSCEF: 01/07/2022

**PLEASE TAKE FURTHER NOTICE** that, under CPLR 2214(b), answering papers, if

any, are required to be served upon the undersigned at least seven days before the return date of

this motion.

DATED: January 7, 2022          Respectfully submitted,
       New York, New York

O'MELVENY & MEYERS LLP

By: _/s/ Stuart Sarnoff_
Stuart Sarnoff (ssarnoff@omm.com)
7 Times Square
New York, NY 10036
(212) 326-2000

CAHILL GORDON & REINDEL LLP

By: _/s/ Edward Moss_
Edward Moss (emoss@cahill.com)
Lauren Riddell (lriddell@cahill.com)
32 Old Slip
New York, NY 10005
(212) 701-3838

*Attorneys for Plaintiff Pacific Alliance*
*Asia Opportunity Fund L.P.*

2

# EXHIBIT 32

Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 181 of 269

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P., | |
| Plaintiff, | Index No. 652077/2017 |
| v. | Hon. Barry Ostrager |
| KWOK HO WAN, *a/k/a* KWOK HO, *a/k/a* GWO WEN GUI, *a/k/a* GUO WENGUI, *a/k/a* GUO WEN-GUI, *a/k/a* WAN GUE HAOYUN, *a/k/a* MILES KWOK, *a/k/a* HAOYUN GUO, GENEVER HOLDINGS CORPORATION, and GENEVER HOLDINGS LLC, | Part 61 |
| | Motion Seq. No. 26 |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.'S MOTION FOR AN ORDER OF CIVIL CONTEMPT AS TO DEFENDANT MILES KWOK FOR HIS FAILURE TO COMPLY WITH THE COURT'S SEPTEMBER 22, 2021 TURNOVER ORDER**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ......................................................................................................................... 2

    I.    The Turnover Order is an Unequivocal Mandate that Does Not Require
        Bankruptcy Court Approval—and Kwok Knows it................................................ 2

    II.   There is No Impediment to Kwok Initiating Compliance with the Turnover Order.
        ........................................................................................................................ 4

    III.  Kwok's Failure to Comply Prejudices PAX. ........................................................ 5

CONCLUSION ...................................................................................................................... 6

FILED: NEW YORK COUNTY CLERK 01/24/2022 08:58 PM
NYSCEF DOC. NO. 1116
INDEX NO. 652077/2017
RECEIVED NYSCEF: 01/24/2022

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cap. One, N.A. v. Waterfront Realty II LLC.*,
  907 N.Y.S.2d 99, 2010 WL 334851, at *4 (Sup. Ct. 2010)......................................... 4

*In re Bray Enterprises, Inc.*,
  38 B.R. 75, 78 (Bankr. D. Vt. 1984)....................................................................... 3

*McCormick v. Axelrod*, 59 N.Y.2d 574, 587 (1983)..................................................... 6

**Statutes**

New York Judiciary Law § 753 ................................................................................ 6

ii

## PRELIMINARY STATEMENT

In his attempt to avoid a second civil contempt sanction, Kwok has filed another misleading pleading with this Court.

First, Kwok's Opposition[1] falsely argues that the Court conditioned its Turnover Order on PAX obtaining Bankruptcy Court pre-approval—even though, as Kwok knows, this Court did no such thing. In fact, the Court *expressly rejected that argument* both on the record at the September 22, 2021 hearing and in the written Turnover Order itself.

Kwok then takes that misrepresentation to the next level. He claims that even though the Turnover Order's only condition precedent was satisfied on December 6, 2021—when BVI Justice Jack modified his prior orders to enable the Genever BVI share transfer—he nevertheless cannot initiate the turnover process by issuing the Stop Notice to Bravo Luck until PAX similarly obtains Bankruptcy Court pre-approval. That is also wrong. Bankruptcy Court approval is not a condition precedent to Kwok issuing the Stop Notice. In fact, Kwok's compliance with the Turnover Order *does not implicate* the Bankruptcy Court at all. As this Court recognized,[2] Genever BVI is not a party to the New York bankruptcy proceeding and is not encumbered by the automatic stay governing debtor Genever NY. Rather, Kwok has complete control over Genever BVI and is entirely free to issue notice to Bravo Luck (*i.e.*, Kwok's son) at any time; he has just *refused* to do so. Thus, with every passing day, Kwok willfully violates the Turnover Order by failing to "take whatever steps are necessary in the [BVI] to turn[]over all share certificates with respect to his 100% ownership" in Genever BVI.

---

[1] This brief refers to PAX's January 7, 2022 opening brief (Dkt. No. 1079) as the "Motion" or "Mot." and Kwok's January 18, 2022 opposition brief (Dkt. No. 1104) as the "Opposition" or "Opp." Unless otherwise specified, (i) defined terms have the meaning given to them in the Motion, (ii) all emphasis is added, and (iii) all internal citations and quotations are omitted.
[2] *See* Dkt. No. 1086 (Sept. 22, 2021 Hr'g Tr. at 17:12–18).

Finally, Kwok argues that his disregard for the Court's lawful Turnover Order has not prejudiced PAX because there already are other court orders in place—the BVI freeze orders and the Bankruptcy Court automatic stay over Genever NY's assets—that are sufficient to protect PAX's interests.  That is ironic; as this Court well knows, ***court orders provide PAX no protection against Kwok***.  One need only look to the current location of Kwok's "restrained" yacht, the Lady May—floating beyond the Court's jurisdiction off the coast of Italy despite incurring a $500,000 daily fine—as Exhibit A for that proposition.

Kwok has repeatedly demonstrated little regard for this Court's authority.  More than ***six weeks*** have elapsed since Justice Jack cleared the way for Kwok to begin to comply with the Turnover Order, but he has failed and refused to take even the first step.  The Court should once again hold Kwok in civil contempt.

## ARGUMENT

### I.    The Turnover Order is an Unequivocal Mandate that Does Not Require Bankruptcy Court Approval—and Kwok Knows it.

Kwok asserts that because the Turnover Order provides that "[a]ny actions affecting *Genever* [*NY*], a wholly owned subsidiary of *Genever BVI*, are subject to the jurisdiction of [Judge] Garrity in the Bankruptcy proceeding in the Southern District of New York involving *Genever* [*NY*],"[3] PAX is required to obtain the Bankruptcy Court's pre-approval before Kwok is obligated to takes steps to effect turnover of his Genever BVI shares.[4]  This is false, and Kwok knows it; he and the Genever Defendants briefed and argued the same position in connection with PAX's turnover motion and ***this Court rejected it***.

---

[3] Dkt. No. 904 at 1–2.
[4] Opp. at 6–8.

2

The Turnover Order—which Kwok did not appeal—was contingent *only* on Justice Jack

modifying his prior orders in the related BVI action, which Justice Jack did on December 6,

2021.[5]  Kwok knows full well that the Turnover Order's reference to the Bankruptcy Court

actually derives from the Court's consideration and *repudiation* of Kwok's argument that PAX

was seeking to circumvent the bankruptcy proceedings and the automatic stay.[6]  This is because

PAX sought turnover only of Kwok's shares of Genever BVI—a *non-debtor* third party to which

the Bankruptcy Code's automatic stay *does not apply*.[7]  As the Court explained, Kwok's

turnover to PAX of his Genever BVI shares affects Genever BVI, *not Genever NY:*[8]

> It is undisputed that the Sherry Netherland apartment is owned by Genever [NY],
> which is a subsidiary of Genever BVI.  Genever [NY] is involved in bankruptcy
> proceedings in the Southern District of New York ….  And so any action which
> PAX may wish to take with respect to Genever [NY] requires approval of Judge
> Garrity in the New York bankruptcy proceedings involving Genever [NY],
> because Genever [NY] is in bankruptcy.  *All this Court is doing today is*
> *directing … Genever BVI's registered agent to update Genever BVI's registered*
> *members to reflect that PAX, or its designee, is the legal owner of Mr. Kwok's*
> *shares in Genever [] BVI*.[9]

Though one would not know it from Kwok's Opposition, his counsel has in fact

expressly acknowledged—in an October 8, 2021 letter to PAX—that the only hurdle to Kwok

initiating the turnover process was Justice Jack's since-modified freeze orders: "[i]n order to

comply with the Court's Turnover Order," "*Mr. Kwok will be acting in accordance with any*

*subsequent court order issued by Justice Jack* as it relates to any modification of the stay orders

---

[5] *See* Dkt. No. 1089.  Specifically, on December 6, 2021, Justice Jack modified his prior order to
"[p]ermit [Kwok] to transfer the shares registered in his name in [Genever BVI] to [PAX] in
compliance with the Turnover Order," and to "[p]ermit [Genever BVI] (and its Registered
Agent) to update the Register of Members of [Genever BVI] to reflect the transfer by [Kwok] of
the shares registered in his name to [PAX]."

[6] *See* Dkt. No. 874 at 4–6; Dkt. No. 896 at 4–5.

[7] Dkt. No. 899 at 10 (citing *In re Bray Enterprises, Inc.*, 38 B.R. 75, 78 (Bankr. D. Vt. 1984)).

[8] *See* Dkt. No. 904 at 1–2.

[9] Dkt. No. 1086 (Sept. 22, 2021 Hr'g Tr. at 17:2–17).

3

FILED: NEW YORK COUNTY CLERK 01/24/2022 08:58 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 1116
RECEIVED NYSCEF: 01/24/2022

Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 187 of
269

or relating to the shares of Genever BVI."[10]  Tellingly, Kwok's counsel did not claim back in October that Bankruptcy Court pre-approval was also required—because he knew it was not. Making this argument now is just Kwok's latest antic to try to avoid contempt while continuing to flout the Turnover Order.

No matter how many times Kwok tries to suggest otherwise,[11] this Court has already ruled—in the Turnover Order that Kwok did not appeal—that turnover of Kwok's Genever BVI shares to PAX does not require Bankruptcy Court pre-approval.[12]

## II.    There is No Impediment to Kwok Initiating Compliance with the Turnover Order.

Next, Kwok builds on his false "bankruptcy pre-approval requirement" premise by injecting a new, equally flawed argument relating to Bravo Luck's issuance of the December 10, 2021 Stop Notice.  Specifically, Kwok now suggests that he cannot even have Genever BVI (*i.e.,* himself) provide notice to Bravo Luck (*i.e,* his son) until PAX first obtains Bankruptcy Court approval.[13]  This is circular nonsense.  As explained above, the Turnover Order included only *one* condition precedent, and that was fully satisfied in early December when Justice Jack modified his prior BVI orders to enable turnover.[14]

---

[10] *See* Dkt. No. 1081.

[11] Kwok's attempt to relitigate this issue after it was rejected and not appealed is not only improper, but futile.  The Court's decision was correct in September 2021, and remains so today.

[12] In the context of this motion, Kwok's observation that courts "generally defer" to the Bankruptcy Court concerning the applicability of the automatic stay is a non sequitur.  The single case Kwok cites, *Cap. One, N.A. v. Waterfront Realty II LLC.*, addressed whether individual guarantors who filed for bankruptcy protection should have the automatic stay extend to their wholly owned property.  26 Misc.3d 1215(A), 907 N.Y.S.2d 99, 2010 WL 334851, at *4 (Sup. Ct. 2010).  That situation is inapposite here, as Genever BVI is the non-debtor parent company of Genever NY, not its wholly owned property.

[13] *See* Opp. at 8–9.

[14] *See supra* at 3.

4

FILED: NEW YORK COUNTY CLERK 01/24/2022 08:58 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 1116
RECEIVED NYSCEF: 01/24/2022

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 188 of
269

As the sole owner and director of Genever BVI,[15] Kwok unquestionably has the unfettered ability to send the Stop Notice—which he is legally obligated to do under the Turnover Order's express mandate that he "take whatever steps are necessary" in the BVI to effectuate turnover."[16]  Kwok's new suggestion that giving notice would somehow "circumvent the procedural process" "currently underway" in the BVI[17] is baseless, as there is no ongoing BVI proceeding that in any way addresses turnover or inhibits Kwok from beginning to comply with the Turnover Order by issuing notice to Bravo Luck.  Moreover, none of the requisite steps that Kwok must take to effect turnover are contingent in any way on either PAX or the Bankruptcy Court doing anything.  Nevertheless, over six weeks have passed since Bravo Luck (*i.e.*, Kwok's son) issued a Stop Notice, and in the interim Kwok defiantly has not taken ***any steps*** towards compliance with that order.

Enough is enough.  The Court should sanction Kwok's blatant disobedience and gamesmanship.[18]

**III.    Kwok's Failure to Comply Prejudices PAX.**

Finally, Kwok argues that PAX has not been prejudiced by his failure to comply with the Turnover Order because ***judicial orders already exist in the related actions "to maintain the status quo."***[19]

---

[15] Dkt. No. 756 at 9.

[16] Dkt. No. 904 at 1.

[17] Opp. at 9.

[18] To the extent Kwok is suggesting that he hasn't disobeyed the Turnover Order because "it is for Genever BVI to provide the written notice required by the Stop Notice and not Mr. Kwok personally," (Nader Aff. ¶ 4(b), Dkt. No. 1105), that argument doesn't pass the laugh test.  By his own admission (Dkt. No. 756 at 9), Kwok is the only person authorized to instruct Genever BVI to issue the requisite notice.

[19] Opp. at 9–10.

5

Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 189 of 269

The irony likely is not lost on the Court. As PAX has explained,[20] Kwok's disobedience "deprive[s]" PAX of its right to possess property (the shares of Genever BVI) that "can be turned over in satisfaction of a money judgment"—and to which it is entitled."[21] *McCormick v. Axelrod*, 59 N.Y.2d 574, 587 (1983). Possession of the Genever BVI shares is especially critical to PAX in this case, given Kwok's demonstrated practice of secreting his assets beyond PAX's reach in blatant defiance of court orders. The Court need look no farther than to Kwok's fugitive, multimillion-dollar luxury yacht, the Lady May—which for over a year now has remained beyond this Court's jurisdictional reach in defiance of its October 15, 2021 Order—as proof positive that ***valid court orders provide no deterrence to Kwok, and no protection to PAX***.[22] Guarding against this very risk by obtaining physical possession of the Genever BVI shares is what motivated PAX to move for turnover in the first place, and Kwok's refusal to take the steps necessary to effect that share transfer prejudices PAX's rights.

## CONCLUSION

Kwok treats compliance with lawful orders of this Court as optional. That must stop. PAX has established all of the civil contempt elements set forth in New York Judiciary Law § 753. Accordingly, PAX respectfully requests that the Court find Kwok in civil contempt of its September 22, 2021 Turnover Order and impose whatever sanction it believes is warranted to induce Kwok's immediate compliance.

---

[20] Mot. at 7–8.
[21] Dkt. No. 1086 (Sept. 22, 2021 Hr'g Tr. at 16:13–15).
[22] The Marine Traffic Yacht Tracker locates the Lady May off the northern coast of Italy as of January 24, 2022. *See* Jan. 24, 2022 Aff. of Stuart Sarnoff in Further Supp. of PAX's Mot. for an Order of Civil Contempt, Ex. 1.

6

Dated: January 24, 2022                    Respectfully submitted,
      New York, New York


      O'MELVENY & MEYERS LLP

      By: _/s/ Stuart Sarnoff_
      Stuart Sarnoff (ssarnoff@omm.com)
      7 Times Square
      New York, NY 10036
      (212) 326-2000

      *Attorneys for Plaintiff Pacific Alliance Asia*
      *Opportunity Fund L.P.*

FILED: NEW YORK COUNTY CLERK 01/24/2022 08:58 PM
NYSCEF DOC. NO. 1116

INDEX NO. 652077/2017
RECEIVED NYSCEF: 01/24/2022

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 191 of
269

## CERTIFICATION OF WORD COUNT

PAX hereby certifies that this document complies with the word count provisions of

Commercial Division Rule 17.  This memorandum of law was prepared using Microsoft Word,

and the total number of words in this memorandum of law, exclusive of the caption, title, and

signature block, is less than 4,200 words.

DATED: January 24, 2022          Respectfully submitted,
      New York, New York      O'MELVENY & MEYERS LLP

By:  _/s/ Stuart Sarnoff_
Stuart Sarnoff (ssarnoff@omm.com)
7 Times Square
New York, NY 10036
(212) 326-2000

_Attorneys for Plaintiff Pacific Alliance
Asia Opportunity Fund L.P._

# EXHIBIT 33

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK
## JUDGE OSTRAGER, BARRY R.
## MOTION JUDGE OSTRAGER, BARRY R.



| | |
|---|---|
| **Pacific Alliance Asia Opportunity Fund L.P.** | **Index No.**   652077/2017 |
| | **Motion**   026 |
| - v. - | |
| **Kwok Ho Wan et al** | |

## COURT NOTICE

Filing on Behalf of - Rose Ann Magaldi, Principal Law Clerk to Justice Ostrager

In light of the bankruptcy filing by Mr. Kwok, the Court proposes that plaintiff either withdraw the pending contempt motion (026) without prejudice to an appropriate application in the Bankruptcy Court and/or without prejudice to renewal before this Court, if appropriate, upon the conclusion of the bankruptcy proceedings. The Court prefers not to keep fully submitted motions pending for an indefinite time. If counsel have an alternative suggestion, the Court will, of course, consider it.

We ask that plaintiff, and any other interested party, efile a letter by March 3, 2022 addressing the issues raised in this Court Notice. Thank you.

DATED 02/18/2022                                      FILED By RoseAnn Magaldi

# EXHIBIT 34

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

| | |
|---|---|
| Pacific Alliance Asia Opportunity Fund L.P., | Index No. 652077/2017 |
| Plaintiff, | Hon. Barry R. Ostrager |
| v. | |
| KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO, GENEVER HOLDINGS CORPORATION, AND GENEVER HOLDINGS LLC, | |
| Defendants. | |

---

## SUGGESTION OF BANKRUPTCY

**PLEASE TAKE NOTICE** that, on February 15, 2022, Ho Wan Kwok (the "**Debtor**"), a defendant in the above-captioned lawsuit, filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), with the United States Bankruptcy Court for the District of Connecticut (the "**Bankruptcy Court**"). A copy of the Debtor's voluntary petition is attached hereto as **Exhibit A**. The Debtor's chapter 11 case is being administered in the Bankruptcy Court under case number 22-50073.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to section 362(a) of the Bankruptcy Code, the Debtor's filing of his voluntary petition operates as a stay of, among other things: (a) the commencement or continuation of all judicial, administrative, or other actions or proceedings against the Debtor (i) that were or could have been commenced before the commencement of the Debtor's chapter 11 case or (ii) to recover any claims against the Debtor that arose before the commencement of the Debtor's chapter 11 case; (b) the enforcement, against before the commencement of the Debtor's chapter 11 case; or (c) any act to obtain possession of

property of or from the Debtor's bankruptcy estate, or to exercise control over property of the

Debtor's bankruptcy estate.

This Suggestion of Bankruptcy is provided for informational purposes only, and does

not constitute an appearance or intent to appear in this proceeding by the undersigned.


Dated: February 15, 2022
New York, New York

<div style="margin-left:40%">

*/s/ William R. Baldiga*
William R. Baldiga, Esq.
Uriel Pinelo, Esq.
Seven Times Square
New York, NY  10036
wbaldiga@brownrudnick.com
upinelo@brownrudnick.com
Telephone:  (212) 209-4800
Facsimile:  (212) 209-4801

*Proposed Counsel for Debtor*

</div>

# EXHIBIT A

## Debtor's Voluntary Petition

---

**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

District of Connecticut

Case number (*If known*): _____

Chapter you are filing under:
- ☐ Chapter 7
- ☑ Chapter 11
- ☐ Chapter 12
- ☐ Chapter 13

☐ Check if this is an amended filing

## Official Form 101

# Voluntary Petition for Individuals Filing for Bankruptcy 04/20

The bankruptcy forms use *you* and *Debtor 1* to refer to a debtor filing alone. A married couple may file a bankruptcy case together—called a *joint case*—and in joint cases, these forms use *you* to ask for information from both debtors. For example, if a form asks, "Do you own a car," the answer would be *yes* if either debtor owns a car. When information is needed about the spouses separately, the form uses *Debtor 1* and *Debtor 2* to distinguish between them. In joint cases, one of the spouses must report information as *Debtor 1* and the other as *Debtor 2*. The same person must be *Debtor 1* in all of the forms.

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

| Part 1: | Identify Yourself |
|---|---|

| | | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|---|
| 1. | **Your full name**<br><br>Write the name that is on your government-issued picture identification (for example, your driver's license or passport).<br><br>Bring your picture identification to your meeting with the trustee. | Ho Wan<br>First name<br><br>Kwok<br>Middle name<br><br>Last name<br><br>Suffix (Sr., Jr., II, III) | First name<br><br>Middle name<br><br>Last name<br><br>Suffix (Sr., Jr., II, III) |
| 2. | **All other names you have used in the last 8 years**<br><br>Include your married or maiden names. | Miles<br>First name<br><br>Kwok; Guo<br>Middle name<br><br>Last name<br><br>Wengui<br>First name<br><br>Middle name<br><br>Guo<br>Last name | First name<br><br>Middle name<br><br>Last name<br><br>First name<br><br>Middle name<br><br>Last name |
| 3. | **Only the last 4 digits of your Social Security number or federal Individual Taxpayer Identification number (ITIN)** | xxx – xx – _9_ _5_ _9_ _5_<br>OR<br>**9** xx – xx – ____ ____ ____ ____ | xxx – xx – ____ ____ ____ ____<br>OR<br>**9** xx – xx – ____ ____ ____ ____ |

Official Form 101                Voluntary Petition for Individuals Filing for Bankruptcy                page 1

Case 22-11057 Doc 13-4 Filed 02/05/22 Entered 02/05/22 17:05:45 Page 2 of 11

269

| Debtor 1 | Ho Wan | | Kwok | | Case number *(if known)*_____ |
|---|---|---|---|---|---|
| | First Name | Middle Name | Last Name | | |

|  | | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|---|
| **4.** | **Any business names and Employer Identification Numbers (EIN) you have used in the last 8 years**<br><br>Include trade names and *doing business as* names | ☑ I have not used any business names or EINs.<br><br>_____<br>Business name<br><br>_____<br>Business name<br><br>EIN ___ ___ – ___ ___ ___ ___ ___ ___ ___<br><br>EIN ___ ___ – ___ ___ ___ ___ ___ ___ ___ | ☐ I have not used any business names or EINs.<br><br>_____<br>Business name<br><br>_____<br>Business name<br><br>EIN ___ ___ – ___ ___ ___ ___ ___ ___ ___<br><br>EIN ___ ___ – ___ ___ ___ ___ ___ ___ ___ |
| **5.** | **Where you live** | c/o Golden Spring (New York) Ltd.<br>Number     Street<br><br>162 East 64th Street<br><br>New York               NY     10065<br>City                    State   ZIP Code<br><br>New York<br>County<br><br>**If your mailing address is different from the one above, fill it in here.** Note that the court will send any notices to you at this mailing address.<br><br>_____<br>Number     Street<br><br>_____<br>P.O. Box<br><br>_____<br>City                    State   ZIP Code | **If Debtor 2 lives at a different address:**<br><br>_____<br>Number     Street<br><br>_____<br><br>_____<br>City                    State   ZIP Code<br><br>_____<br>County<br><br>**If Debtor 2's mailing address is different from yours, fill it in here.** Note that the court will send any notices to this mailing address.<br><br>_____<br>Number     Street<br><br>_____<br>P.O. Box<br><br>_____<br>City                    State   ZIP Code |
| **6.** | **Why you are choosing *this district* to file for bankruptcy** | *Check one:*<br><br>☑ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.<br><br>☐ I have another reason. Explain.<br>(See 28 U.S.C. § 1408.)<br><br>_____<br>_____<br>_____<br>_____ | *Check one:*<br><br>☐ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.<br><br>☐ I have another reason. Explain.<br>(See 28 U.S.C. § 1408.)<br><br>_____<br>_____<br>_____<br>_____ |

| Debtor 1 | Ho Wan | | Kwok | Case number *(if known)*_____ |
|---|---|---|---|---|
| | First Name | Middle Name | Last Name | |

---

| **Part 2:** | **Tell the Court About Your Bankruptcy Case** |
|---|---|

---

**7.** **The chapter of the Bankruptcy Code you are choosing to file under**

*Check one.* (For a brief description of each, see *Notice Required by 11 U.S.C. § 342(b) for Individuals Filing for Bankruptcy* (Form 2010)). Also, go to the top of page 1 and check the appropriate box.

- ❏ Chapter 7
- ☑ Chapter 11
- ❏ Chapter 12
- ❏ Chapter 13

---

**8.** **How you will pay the fee**

☑ **I will pay the entire fee when I file my petition.** Please check with the clerk's office in your local court for more details about how you may pay. Typically, if you are paying the fee yourself, you may pay with cash, cashier's check, or money order. If your attorney is submitting your payment on your behalf, your attorney may pay with a credit card or check with a pre-printed address.

❏ **I need to pay the fee in installments.** If you choose this option, sign and attach the *Application for Individuals to Pay The Filing Fee in Installments* (Official Form 103A).

❏ **I request that my fee be waived** (You may request this option only if you are filing for Chapter 7. By law, a judge may, but is not required to, waive your fee, and may do so only if your income is less than 150% of the official poverty line that applies to your family size and you are unable to pay the fee in installments). If you choose this option, you must fill out the *Application to Have the Chapter 7 Filing Fee Waived* (Official Form 103B) and file it with your petition.

---

**9.** **Have you filed for bankruptcy within the last 8 years?**

☑ No

❏ Yes. District _____ When _____ Case number _____
MM / DD / YYYY

District _____ When _____ Case number _____
MM / DD / YYYY

District _____ When _____ Case number _____
MM / DD / YYYY

---

**10.** **Are any bankruptcy cases pending or being filed by a spouse who is not filing this case with you, or by a business partner, or by an affiliate?**

☑ No

❏ Yes. Debtor _____ Relationship to you _____

District _____ When _____ Case number, if known_____
MM / DD / YYYY

Debtor _____ Relationship to you _____

District _____ When _____ Case number, if known_____
MM / DD / YYYY

---

**11.** **Do you rent your residence?**

☑ No. Go to line 12.

❏ Yes. Has your landlord obtained an eviction judgment against you?

❏ No. Go to line 12.

❏ Yes. Fill out *Initial Statement About an Eviction Judgment Against You* (Form 101A) and file it as part of this bankruptcy petition.

---

Debtor 1    Ho Wan _____ Kwok _____    Case number (if known) _____
            First Name    Middle Name    Last Name

| Part 3: | Report About Any Businesses You Own as a Sole Proprietor |

**12. Are you a sole proprietor of any full- or part-time business?**

A sole proprietorship is a business you operate as an individual, and is not a separate legal entity such as a corporation, partnership, or LLC.

If you have more than one sole proprietorship, use a separate sheet and attach it to this petition.

☑ No. Go to Part 4.

☐ Yes. Name and location of business

_____
Name of business, if any

_____
Number        Street

_____

_____    _____    _____
City                                 State       ZIP Code

*Check the appropriate box to describe your business:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ None of the above

**13. Are you filing under Chapter 11 of the Bankruptcy Code, and are you a *small business debtor* or a debtor as defined by 11 U.S.C. § 1182(1)?**

For a definition of *small business debtor*, see 11 U.S.C. § 101(51D).

*If you are filing under Chapter 11, the court must know whether you are a small business debtor or a debtor choosing to proceed under Subchapter V so that it can set appropriate deadlines.* If you indicate that you are a small business debtor or you are choosing to proceed under Subchapter V, you must attach your most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ No.   I am not filing under Chapter 11.

☑ No.   I am filing under Chapter 11, but I am NOT a small business debtor according to the definition in the Bankruptcy Code.

☐ Yes. I am filing under Chapter 11, I am a small business debtor according to the definition in the Bankruptcy Code, and I do not choose to proceed under Subchapter V of Chapter 11.

☐ Yes.  I am filing under Chapter 11, I am a debtor according to the definition in § 1182(1) of the Bankruptcy Code, and I choose to proceed under Subchapter V of Chapter 11.

FILED: NEW YORK COUNTY CLERK 02/15/2022 09:12 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 1190
Case 22-50073 Doc 83-4 Filed 04/06/22 Entered 04/06/22 16:52:45 Page 5 of
269
RECEIVED NYSCEF: 02/15/2022

| Debtor 1 | Ho Wan | | Kwok | Case number *(if known)* _____ |
|---|---|---|---|---|
| | First Name | Middle Name | Last Name | |

| **Part 4:** | **Report if You Own or Have Any Hazardous Property or Any Property That Needs Immediate Attention** |
|---|---|

14. **Do you own or have any property that poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety? Or do you own any property that needs immediate attention?**

   *For example, do you own perishable goods, or livestock that must be fed, or a building that needs urgent repairs?*

☑ No

☐ Yes.  What is the hazard?  _____

_____

If immediate attention is needed, why is it needed?  _____

_____

Where is the property?  _____
                        Number          Street

_____

_____
City                              State      ZIP Code

Case 22-22005-shl Doc 13-4 Filed 02/05/22 Entered 02/05/22 17:05:45 Page 9 of 34
269

| Debtor 1 | Ho Wan | | Kwok | Case number *(if known)* _____ |
|---|---|---|---|---|
| | First Name | Middle Name | Last Name | |

**Part 5:    Explain Your Efforts to Receive a Briefing About Credit Counseling**

**15. Tell the court whether you have received a briefing about credit counseling.**

The law requires that you receive a briefing about credit counseling before you file for bankruptcy. You must truthfully check one of the following choices. If you cannot do so, you are not eligible to file.

If you file anyway, the court can dismiss your case, you will lose whatever filing fee you paid, and your creditors can begin collection activities again.

**About Debtor 1:**

*You must check one:*

☑ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**
Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**
Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**
To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.

If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ **I am not required to receive a briefing about credit counseling because of:**

☐ **Incapacity.** I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.** My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

☐ **Active duty.** I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver of credit counseling with the court.

**About Debtor 2 (Spouse Only in a Joint Case):**

*You must check one:*

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**
Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**
Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**
To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.

If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ **I am not required to receive a briefing about credit counseling because of:**

☐ **Incapacity.** I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.** My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

☐ **Active duty.** I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver of credit counseling with the court.

| Debtor 1 | Ho Wan | | Kwok | | Case number *(if known)* _____ |
| | First Name | Middle Name | Last Name | | |

---

**Part 6:**   **Answer These Questions for Reporting Purposes**

**16. What kind of debts do you have?**

**16a. Are your debts primarily consumer debts?** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

☑ No. Go to line 16b.
☐ Yes. Go to line 17.

**16b. Are your debts primarily business debts?** *Business debts* are debts that you incurred to obtain money for a business or investment or through the operation of the business or investment.

☑ No. Go to line 16c.
☐ Yes. Go to line 17.

16c. State the type of debts you owe that are not consumer debts or business debts.
Litigation expenses, claims, and judgments

---

**17. Are you filing under Chapter 7?**

☑ No.   I am not filing under Chapter 7. Go to line 18.

**Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available for distribution to unsecured creditors?**

☐ Yes. I am filing under Chapter 7. Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available to distribute to unsecured creditors?

☐ No
☐ Yes

---

**18. How many creditors do you estimate that you owe?**

☐ 1-49
☑ 50-99
☐ 100-199
☐ 200-999

☐ 1,000-5,000
☐ 5,001-10,000
☐ 10,001-25,000

☐ 25,001-50,000
☐ 50,001-100,000
☐ More than 100,000

---

**19. How much do you estimate your assets to be worth?**

☐ $0-$50,000
☑ $50,001-$100,000
☐ $100,001-$500,000
☐ $500,001-$1 million

☐ $1,000,001-$10 million
☐ $10,000,001-$50 million
☐ $50,000,001-$100 million
☐ $100,000,001-$500 million

☐ $500,000,001-$1 billion
☐ $1,000,000,001-$10 billion
☐ $10,000,000,001-$50 billion
☐ More than $50 billion

---

**20. How much do you estimate your liabilities to be?**

☐ $0-$50,000
☐ $50,001-$100,000
☐ $100,001-$500,000
☐ $500,001-$1 million

☐ $1,000,001-$10 million
☐ $10,000,001-$50 million
☐ $50,000,001-$100 million
☑ $100,000,001-$500 million

☐ $500,000,001-$1 billion
☐ $1,000,000,001-$10 billion
☐ $10,000,000,001-$50 billion
☐ More than $50 billion

---

**Part 7:**   **Sign Below**

**For you**

I have examined this petition, and I declare under penalty of perjury that the information provided is true and correct.

If I have chosen to file under Chapter 7, I am aware that I may proceed, if eligible, under Chapter 7, 11,12, or 13 of title 11, United States Code. I understand the relief available under each chapter, and I choose to proceed under Chapter 7.

If no attorney represents me and I did not pay or agree to pay someone who is not an attorney to help me fill out this document, I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I understand making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

✖ /s/ Ho Wan Kwok _____

Signature of Debtor 1

✖ _____

Signature of Debtor 2

Executed on  02/15/2022
        MM / DD  / YYYY

Executed on  _____
        MM / DD  / YYYY

---

Case 22-50073 Doc 183-4 Filed 04/06/22 Entered 04/06/22 17:05:45 Page 205 of
269

| Debtor 1 | Ho Wan | | Kwok | | Case number *(if known)* |
|----------|--------|--|------|--|-----|
| | First Name | Middle Name | Last Name | | |

---

**For your attorney, if you are represented by one**

**If you are not represented by an attorney, you do not need to file this page.**

I, the attorney for the debtor(s) named in this petition, declare that I have informed the debtor(s) about eligibility to proceed under Chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each chapter for which the person is eligible. I also certify that I have delivered to the debtor(s) the notice required by 11 U.S.C. § 342(b) and, in a case in which § 707(b)(4)(D) applies, certify that I have no knowledge after an inquiry that the information in the schedules filed with the petition is incorrect.

✘ /s/ William R. Baldiga
Signature of Attorney for Debtor

Date  02/15/2022
MM / DD / YYYY

William R. Baldiga
Printed name

Brown Rudnick LLP
Firm name

7 Times Square
Number    Street

New York                     NY        10036
City                         State     ZIP Code

Contact phone (212) 209-4800          Email address wbaldiga@brownrudnick.com

4813846                              NY
Bar number                           State

# EXHIBIT 36

# SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY

PRESENT:     **HON. BARRY R. OSTRAGER**          PART          **IAS MOTION 61EFM**

*Justice*

---------------------------------------------------------------------X

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

| | |
|---|---|
| **INDEX NO.** | 652077/2017 |
| **MOTION DATE** | |
| **MOTION SEQ. NO.** | 012 |

Plaintiff,

- v -

KWOK HO WAN, a/k/a KWOK HO, et al.,

**DECISION + ORDER ON MOTION**

Defendants.

---------------------------------------------------------------------X

HON. BARRY R. OSTRAGER

Before the Court is Motion 012 by Plaintiff Pacific Alliance Asia Opportunity Fund L.P.

("PAX") to hold Defendant Kwok Ho Wan ("Kwok") in contempt. This Court previously issued

three orders restraining Kwok's interest in the yacht called the "Lady May." On September 30,

2020, this Court entered a Temporary Restraining Order (the "TRO") preventing Kwok from,

among other things, "interference with any property in which he has an interest." NYSCEF Doc.

No. 591. In issuing the TRO, the Court noted that "[a]ny violation . . . shall be considered

criminal contempt." *Id.* On October 15, 2020, the Court issued the Order, which granted PAX's

motion under CPLR 5229 and expressly restrained the Lady May:

> Mr. Kwok is restrained from making or causing any sale, assignment, transfer, or
> interference with any property in which he has an interest, whether directly or
> indirectly, and from paying over or otherwise disposing of any debt now due or
> thereafter coming due to him subject to the exceptions set forth in CPLR 5222, in
> accordance with the proceedings on the record of October 15, 2020. Specifically,
> Mr. Kwok and/or the registered owners of (1) the Residence at the Sherry-
> Netherland Hotel and (2) the yacht, "the Lady May" are restrained from making
> or causing any sale, assignment, transfer, or interference with those assets.

NYSCEF Doc. No. 630. Counsel for Kwok specifically asked the Court whether Kwok could move the yacht from the jurisdiction for licensing purposes. The Court denied this request at the time and directed counsel to make a motion if necessary.

Plaintiff brings this motion because, despite these orders, the Lady May has been moved outside of the United States.

The Court has reviewed the extensive submissions of the parties in connection with PAX's motion to hold Kwok in contempt. Passing the issue of whether any of Mr. Kwok's attorneys have violated the Code of Professional Conduct, it is clear that there has been an intolerable amount of gamesmanship, dissembling. and deceit in proceedings before this Court relating to the whereabouts and ownership of the yacht "Lady May."

The defendant claims that the yacht was removed from the jurisdiction of this Court for "ordinary course" "winter maintenance" notwithstanding restraints imposed on the movement of the yacht by the Court. Rather than catalogue the many "shell games" defendant Kwok has engaged in with the assistance of counsel who should know better, the Court grants the motion for contempt to the following extent: For every day that the yacht is outside the jurisdiction of this Court after May 15, 2021, defendant Kwok will be fined $500,000. The other restraints relating to the ownership and control of the yacht remain in place.

2

Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 209 of 269

A status conference remains scheduled for May 4, 2021 at 10:00 am.

Dated: March 16, 2021

BARRY R. OSTRAGER, J.S.C.

| CHECK ONE: | | ☐ CASE DISPOSED | | ☒ NON-FINAL DISPOSITION | |
| --- | --- | --- | --- | --- | --- |
| | ☒ GRANTED | ☐ DENIED | | ☐ GRANTED IN PART | ☐ OTHER |
| APPLICATION: | | ☐ SETTLE ORDER | | ☐ SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | ☐ INCLUDES TRANSFER/REASSIGN | | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE |

3

# EXHIBIT 35

# SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY

PRESENT:   **HON. BARRY R. OSTRAGER**                    PART          IAS MOTION 61EFM

*Justice*

--------------------------------------------------------------------------------X

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

                                  Plaintiff,

|  |  |
|---|---|
| INDEX NO. | 652077/2017 |
| MOTION DATE | |
| MOTION SEQ. NO. | 026 |

- v -

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO, GENEVER HOLDINGS CORPORATION, and GENEVER HOLDINGS LLC,

                                  Defendants.

**DECISION + ORDER ON MOTION**

--------------------------------------------------------------------------------X

HON. BARRY R. OSTRAGER

In light of the bankruptcy filing by defendant Ho Wan Kwok (NYSCEF Doc. No. 1190), the Court hereby permits plaintiff Pacific Alliance Asia Opportunity Fund L.P. to withdraw its motion for an Order of Civil Contempt based on Mr. Kwok's alleged noncompliance with this Court's September 22, 2021, Turnover Order (see NYSCEF Doc. No. 1192). A status conference is scheduled for December 6, 2022, at 10:00 a.m. via Microsoft Teams. The Court requests that Mr. Kwok's counsel efile a letter as to the status of the bankruptcy proceedings at least one week before the conference date, along with an updated appearance sheet for Teams.

Dated:  March 4, 2022

BARRY R. OSTRAGER, J.S.C.

| CHECK ONE: | CASE DISPOSED | | X | NON-FINAL DISPOSITION | |
|---|---|---|---|---|---|
| | GRANTED | DENIED | | GRANTED IN PART | X OTHER |
| APPLICATION: | SETTLE ORDER | | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | REFERENCE |

# EXHIBIT 37

FILED: APPELLATE DIVISION - 1ST DEPT 01/20/2022 09:38 AM

NYSCEF DOC. NO. 22                                                    RECEIVED NYSCEF: 01/20/2022

2021-01010

# Supreme Court of the State of New York

# Appellate Division, First Judicial Department

PRESENT: Hon. Rolando T. Acosta,                    Presiding Justice,
                Dianne T. Renwick
                Tanya R. Kennedy
                Manuel J. Mendez,                    Justices.

| | |
|---|---|
| Pacific Alliance Asia Opportunity Fund, L.P., Plaintiff-Respondent, | Motion No. 2021-04127 |
| | Index No. 652077/17 |
| -against- | Case No. 2021-01010 |
| Kwok Ho Wan, also known as Kwok Ho, etc., Defendant-Appellant, | |
| Genever Holdings LLC, et al., Defendants. | |

Defendant-appellant having moved for leave to appeal to the Court of Appeals from the decision and order of this Court, entered on November 04, 2021 (Appeal No. 14555),

Now, upon reading and filing the papers with respect to the motion, and due deliberation having been had thereon,

It is ordered that the motion is denied.

ENTERED: January 20, 2022

Susanna Molina Rojas
Clerk of the Court

# EXHIBIT 38

# SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY

| PRESENT: | **HON. BARRY R. OSTRAGER** | | PART | **IAS MOTION 61EFM** |
|---|---|---|---|---|
| | | *Justice* | | |

--------------------------------------------------------------------------------X

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

Plaintiff,

- v -

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO, GENEVER: HOLDINGS LLC, and GENEVER HOLDINGS CORPORATION,

Defendants.

| INDEX NO. | 652077/2017 |
|---|---|
| MOTION DATE | |
| MOTION SEQ. NO. | 019 |

**THIRD INTERIM DECISION + ORDER ON MOTION**

--------------------------------------------------------------------------------X

HON. BARRY R. OSTRAGER

By Interim Decision & Order dated July 21, 2021 (NYSCEF Doc. No. 873), the Court determined plaintiff's motion to hold defendant Kwok Ho Wan in civil contempt and the cross-motion by defendant for a stay pending appeal to the extent of holding the motion in abeyance pending a decision by the Appellate Division, First Department, on an appeal calendared for the September Term. The Appellate Division determined the appeal by Decision and Order dated November 4, 2021 (NYSCEF Doc. No. 953). Further argument on the contempt motion was heard on January 14, 2022 and the Court scheduled a hearing on the motion to be held on February 2, 2022 commencing at 9:30 a.m.

Direct testimony will be offered by affidavit. The Court will not consider the affidavit of any person who is not available for cross-examination. The parties will confer and prepare a Joint Exhibit Binder by January 24, 2022. Plaintiff will efile direct testimony affidavits by January 26, 2022. Defendants will efile direct testimony affidavits by January 28, 2022. Hard copies of all documents shall be delivered to Courtroom 232 by noon on January 31, 2022.

The parties are directed to efile on or before January 24, 2022 a letter containing a Joint Appearance Sheet for the February 2, 2022 hearing.

Dated:  January 14, 2022

BARRY R. OSTRAGER, J.S.C.

| | | | |
|---|---|---|---|
| CHECK ONE: | ☐ CASE DISPOSED | ☒ NON-FINAL DISPOSITION | |
| | ☐ GRANTED    ☐ DENIED | ☐ GRANTED IN PART | ☒ OTHER |
| APPLICATION: | ☐ SETTLE ORDER | ☐ SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | ☐ INCLUDES TRANSFER/REASSIGN | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE |

2

# EXHIBIT 39

FILED: NEW YORK COUNTY CLERK 02/09/2022 04:33 PM
NYSCEF DOC. NO: 1182

INDEX NO. 652077/2017
RECEIVED NYSCEF: 02/09/2022

Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 218 of
269

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PACIFIC ALLIANCE ASIA OPPORTUNITY
FUND L.P.,

                                    Plaintiff,

          v.

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO
WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN
GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES
KWOK, a/k/a HAOYUN GUO, GENEVER
HOLDINGS CORPORATION, and GENEVER
HOLDINGS LLC,

                                    Defendants.

Index No: 652077/2017

Hon. Barry R. Ostrager

[PROPOSED] FINAL ORDER
OF CIVIL CONTEMPT

Motion Sequence No. 19

WHEREAS this Court's conditional order of civil contempt, dated March 16, 2021,

directed that if Defendant Kwok Ho Wan ("Kwok") failed to return the Lady May yacht (the

"Lady May") to the jurisdiction of this Court by May 15, 2021, he would be subject to a

$500,000 fine for each day that the Lady May remained outside the jurisdiction;

WHEREAS the Lady May was not returned to the jurisdiction by May 15, 2021;

WHEREAS on November 4, 2021, the Appellate Division's First Department affirmed

this Court's order holding Kwok in conditional civil contempt, finding that "the daily fine of

$500,000 was intended to strongly encourage defendant to purge himself of the contempt, which,

despite being permitted two months to accomplish, he has shown no interest in doing," and

instructing this Court to proceed with an evidentiary hearing to resolve a dispute as to ownership

and control of the yacht, and to assess appropriate penalties;

WHEREAS Kwok to date has failed to return the Lady May to the jurisdiction;

FILED: NEW YORK COUNTY CLERK 02/09/2022 04:33 PM
NYSCEF DOC. NO. 1182

INDEX NO. 652077/2017

RECEIVED NYSCEF: 02/09/2022

Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 219 of
269

WHEREAS the evidentiary hearing specified by the First Department's November 4, 2021 Order was held on February 2, 2022;

WHEREAS both Kwok and the registered title holder of the Lady May, HK International Funds Investments (USA) Limited, LLC, ~~were present~~ *appeared* at the hearing, *by counsel* proffered evidence and were represented by counsel; and

WHEREAS, based on the evidence adduced at the hearing, the Court determines that PAX has clearly and convincingly established that Kwok has a beneficial interest in and control over the Lady May, *as set forth in the Court's February 9, 2022 Decision and Order.*

Accordingly, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1. Kwok has violated New York Judiciary Law § 753 and is civil contempt of this Court's orders.

2. Kwok is directed to tender immediate payment to PAX in the amount of $134,000,000, representing $500,000 for each day between May 15, 2021 and February 7, 2022.

3. The amount due to PAX shall continue to accrue at the rate of $500,000 per day until Kwok returns the Lady May to the jurisdiction, which additional accrual shall begin ten business days from the ~~the date~~ *service* of this Order, *with Notice of Entry.*

4. Payment of the amount set forth in paragraph 2 above shall be made to PAX within five business days of the ~~date~~ *service* of this Order, *with Notice of Entry.*

5. The Court shall exercise its full authority under New York Judiciary Law § 753 in the event the fine is not timely paid to PAX.

It is SO ORDERED this ___9th___ day of ___February___, 2022.

_____
BARRY R. OSTRAGER, J.S.C.
**BARRY R. OSTRAGER**
JSC.

2

# EXHIBIT 40

INDEX NO. 652077/2017
RECEIVED NYSCEF: 02/10/2022
2022-00609

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND
L.P.,

|  |  |
|---|---|
| Plaintiff, | Index No. 652077/2017 |
| | Hon. Barry Ostrager |
| - against - | |
| | **NOTICE OF APPEAL** |
| KWOK HO WAN, et al., | |
| Defendants. | |

**PLEASE TAKE NOTICE**, that Defendant Kwok Ho Wan ("Mr. Kwok"), hereby appeals to the Appellate Division, First Judicial Department, from the Decision and Order of the Supreme Court of the State of New York, County of New York (Ostrager, J.), dated February 9, 2022, and entered in the office of the New York County Clerk on February 9, 2022 (NYSCEF Doc. No. 1181), and from each and every part thereof.

Dated: New York, New York          Respectfully submitted,
       February 10, 2022
                                   BAKER & HOSTETLER LLP

                                   By:  _/s/ John Siegal_____
                                          John Siegal
                                          Melissa Carvalho
                                   45 Rockefeller Plaza
                                   New York, New York 10111
                                   212-589-1400
                                   jsiegal@bakerlaw.com
                                   mcarvalho@bakerlaw.com

                                   *Attorneys for Defendant Kwok Ho Wan*

To:    Clerk of the County of New York (via NYSCEF)
       All counsel of Record (via NYSCEF)

1

# Supreme Court of the State of New York
# Appellate Division: First    Judicial Department

Informational Statement (Pursuant to 22 NYCRR 1250.3 [a]) - Civil

| Case Title: Set forth the title of the case as it appears on the summons, notice of petition or order to show cause by which the matter was or is to be commenced, or as amended. | For Court of Original Instance |
|---|---|
| PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P<br><br>- against -<br><br>KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO, GENEVER HOLDINGS LLC, and GENEVER HOLDINGSCORPORATION | Date Notice of Appeal Filed<br><br>For Appellate Division |

| Case Type | | Filing Type | |
|---|---|---|---|
| ■ Civil Action | ☐ CPLR article 78 Proceeding | ■ Appeal | ☐ Transferred Proceeding |
| ☐ CPLR article 75 Arbitration | ☐ Special Proceeding Other | ☐ Original Proceedings | ☐ CPLR Article 78 |
| | ☐ Habeas Corpus Proceeding | ☐ CPLR Article 78 | ■ Executive Law § 298 |
| | | ☐ Eminent Domain | ☐ CPLR 5704 Review |
| | | ☐ Labor Law 220 or 220-b | |
| | | ☐ Public Officers Law § 36 | |
| | | ☐ Real Property Tax Law § 1278 | |

**Nature of Suit:** Check up to three of the following categories which best reflect the nature of the case.

| | | | |
|---|---|---|---|
| ☐ Administrative Review | ■ Business Relationships | ■ Commercial | ■ Contracts |
| ☐ Declaratory Judgment | ☐ Domestic Relations | ☐ Election Law | ☐ Estate Matters |
| ☐ Family Court | ☐ Mortgage Foreclosure | ☐ Miscellaneous | ☐ Prisoner Discipline & Parole |
| ☐ Real Property (other than foreclosure) | ☐ Statutory | ☐ Taxation | ☐ Torts |

Informational Statement - Civil

| Appeal | |
|---|---|
| Paper Appealed From (Check one only): | If an appeal has been taken from more than one order or judgment by the filing of this notice of appeal, please indicate the below information for each such order or judgment appealed from on a separate sheet of paper. |

| | | | |
|---|---|---|---|
| ☐ Amended Decree | ☐ Determination | ☐ Order | ☐ Resettled Order |
| ☐ Amended Judgement | ☐ Finding | ☒ Order & Judgment | ☐ Ruling |
| ☐ Amended Order | ☐ Interlocutory Decree | ☐ Partial Decree | ☐ Other (specify): |
| ☒ Decision | ☐ Interlocutory Judgment | ☐ Resettled Decree | |
| ☐ Decree | ☐ Judgment | ☐ Resettled Judgment | |

| Court: Supreme Court | County: New York |
|---|---|
| Dated: 02/09/2022 | Entered: 02/09/2022 |
| Judge (name in full): Hon. Barry Ostrager | Index No.: 652077/2017 |
| Stage: ☐ Interlocutory ☒ Final ☐ Post-Final | Trial: ☐ Yes ☒ No   If Yes: ☐ Jury ☐ Non-Jury |

| Prior Unperfected Appeal and Related Case Information |
|---|

Are any appeals arising in the same action or proceeding currently pending in the court?   ☒ Yes ☐ No
If Yes, please set forth the Appellate Division Case Number assigned to each such appeal.
2021-00740
Where appropriate, indicate whether there is any related action or proceeding now in any court of this or any other jurisdiction, and if so, the status of the case:

| Original Proceeding |
|---|

| Commenced by:  ☐ Order to Show Cause ☐ Notice of Petition ☐ Writ of Habeas Corpus | Date Filed: |
|---|---|
| Statute authorizing commencement of proceeding in the Appellate Division: | |

| Proceeding Transferred Pursuant to CPLR 7804(g) |
|---|

| Court: Choose Court | County: Choose County |
|---|---|
| Judge (name in full): | Order of Transfer Date: |

| CPLR 5704 Review of Ex Parte Order: |
|---|

| Court: Choose Court | County: Choose County |
|---|---|
| Judge (name in full): | Dated: |

| Description of Appeal, Proceeding or Application and Statement of Issues |
|---|

Description: If an appeal, briefly describe the paper appealed from. If the appeal is from an order, specify the relief requested and whether the motion was granted or denied. If an original proceeding commenced in this court or transferred pursuant to CPLR 7804(g), briefly describe the object of proceeding. If an application under CPLR 5704, briefly describe the nature of the ex parte order to be reviewed.

Defendant-Appellant Kwok Ho Wan is appealing the Decision and Orders in this action entered February 9, 2022 granting a final order of contempt pursuant to Judiciary Law § 753.

Informational Statement - Civil

**Issues:** Specify the issues proposed to be raised on the appeal, proceeding, or application for CPLR 5704 review, the grounds for reversal, or modification to be advanced and the specific relief sought on appeal.

Without limiting the arguments that may be presented on appeal, Defendant-Appellant Kwok Ho Wan states: that the Decision and Orders were in error, should be reversed in their entirety, and the contempt proceedings must be dismissed. The Supreme Court Decision and Orders, inter alia, granted a final order of contempt that was not legally or factually supported by the record.  Even if the contempt finding was proper (it was not), the nature and the amount of the fine imposed was disproportionate, excessive, unauthorized by law, an abuse of discretion, and in violation of Defendant-Appellant's constitutional rights under the federal and state Constitutions.

## Party Information

**Instructions:** Fill in the name of each party to the action or proceeding, one name per line. If this form is to be filed for an appeal, indicate the status of the party in the court of original instance and his, her, or its status in this court, if any. If this form is to be filed for a proceeding commenced in this court, fill in only the party's name and his, her, or its status in this court.

| No. | Party Name | Original Status | Appellate Division Status |
|---|---|---|---|
| 1 | Pacific Alliance Asia Opportunity Fund L.P. | Plaintiff | Respondent |
| 2 | Kwok Ho Wan | Defendant | Appellant |
| 3 | Genever Holdings LLC | Defendant | None |
| 4 | Genever Holdings Corporation | Defendant | None |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |

Informational Statement - Civil

## Attorney Information

Instructions:  Fill in the names of the attorneys or firms for the respective parties.  If this form is to be filed with the notice of petition or order to show cause by which a special proceeding is to be commenced in the Appellate Division, only the name of the attorney for the petitioner need be provided.  In the event that a litigant represents herself or himself, the box marked "Pro Se" must be checked and the appropriate information for that litigant must be supplied in the spaces provided.

| Attorney/Firm Name: Stuart Sarnoff, O'Melveny & Myers LLP | | | |
|---|---|---|---|
| Address: 7 Times Square | | | |
| City: New York | State: New York | Zip: 10036 | Telephone No: 212-326-2000 |
| E-mail Address: ssarnoff@omm.com | | | |
| Attorney Type: ☒ Retained   ☐ Assigned   ☐ Government   ☐ Pro Se   ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): 1 | | | |

| Attorney/Firm Name: John Siegal, Baker & Hostetler LLP | | | |
|---|---|---|---|
| Address: 45 Rockefeller Center | | | |
| City: New York | State: New York | Zip: 10111 | Telephone No: 212-589-1400 |
| E-mail Address: jsiegal@baker1aw.com | | | |
| Attorney Type: ☒ Retained   ☐ Assigned   ☐ Government   ☐ Pro Se   ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): 2 | | | |

| Attorney/Firm Name: Aaron Mitchell, Lawall & Mitchell, LLC | | | |
|---|---|---|---|
| Address: 99 Church Street, 4th floor | | | |
| City: White Plains | State: New York | Zip: 10601 | Telephone No: 973-285-3280 |
| E-mail Address: aaron@lrnesq.com | | | |
| Attorney Type: ☒ Retained   ☐ Assigned   ☐ Government   ☐ Pro Se   ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): 3, 4 | | | |

| Attorney/Firm Name: | | | |
|---|---|---|---|
| Address: | | | |
| City: | State: | Zip: | Telephone No: |
| E-mail Address: | | | |
| Attorney Type: ☐ Retained   ☐ Assigned   ☐ Government   ☐ Pro Se   ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): | | | |

| Attorney/Firm Name: | | | |
|---|---|---|---|
| Address: | | | |
| City: | State: | Zip: | Telephone No: |
| E-mail Address: | | | |
| Attorney Type: ☐ Retained   ☐ Assigned   ☐ Government   ☐ Pro Se   ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): | | | |

| Attorney/Firm Name: | | | |
|---|---|---|---|
| Address: | | | |
| City: | State: | Zip: | Telephone No: |
| E-mail Address: | | | |
| Attorney Type: ☐ Retained   ☐ Assigned   ☐ Government   ☐ Pro Se   ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): | | | |

Informational Statement - Civil

# SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY

| | | |
|---|---|---|
| PRESENT: | **HON. BARRY R. OSTRAGER** | **PART**    **IAS MOTION 61EFM** |
| | *Justice* | |

--------------------------------------------------------------------X

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

                                   Plaintiff,

- v -

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO, GENEVER: HOLDINGS LLC, and GENEVER HOLDINGS CORPORATION,

                                   Defendants.

| | |
|---|---|
| **INDEX NO.** | 652077/2017 |
| **MOTION DATE** | |
| **MOTION SEQ. NO.** | 019 |

**DECISION + ORDER ON MOTION**

--------------------------------------------------------------------X

HON. BARRY R. OSTRAGER

In this 2017 case with 1,180 docket entries – almost all of which involve defendant Kwok Ho Wan's ("Kwok") efforts to avoid and deceive his creditors by parking his substantial personal assets with a series of corporations, trusted confidants, and family members -- this Court is called upon to determine whether the plaintiff, Pacific Alliance Asia Opportunity Fund L.P. ("PAX"), has met the burden of establishing that the Court should enter a final Order of Civil Contempt against Kwok. For the reasons that follow, this Court is simultaneously issuing a final Order of Civil Contempt.

PAX secured a judgment against Kwok in the sum of $116,402,019.57 on February 3, 2021 (NYSCEF Doc. No. 716). Thereafter, PAX undertook a year's long effort to enforce its judgment by first identifying and then attempting to levy upon Kwok's assets in the United States. PAX encountered difficulty identifying assets over which Kwok exercised control because Kwok, who is a self-declared multi-billionaire, had secreted his assets in a maze of corporate entities and with family members. This scheme has enabled Kwok to assert that he has no assets despite his lavish lifestyle, which plaintiff has catalogued with material from social

media clippings, photographs and videotapes showing Kwok living large and boasting of his

wealth, expensive homes, private plane, and yacht.  As noted in the transcript of proceedings of

February 2, 2022, this evidence is of little probative value, as the witnesses sponsoring this

evidence have no first-hand knowledge of the authenticity of this "evidence" other than that it is

accessible on various websites.

On February 2, 2022, this Court held an evidentiary hearing at which seven witnesses

submitted direct testimony by affidavit and were made available for cross-examination.  The

hearing followed protracted proceedings by PAX to locate and levy upon assets owned by

defendant Kwok.  Those proceedings established, among other things, that Kwok exercised

dominion and control over a yacht called the Lady May and resulted in a series of orders

restraining Kwok and/or the registered owners of the yacht called Lady May from removing the

Lady May from the Court's jurisdiction.  The first such Order was issued on September 30,

2020, as described in detail *infra,* and was followed by an October 15, 2020 Order that restrained

"Mr. Kwok and/or the registered owners of . . . the yacht, the 'Lady May'" from leaving the

jurisdiction.  (NYSCEF Doc. No. 630).  As detailed *infra*, Kwok spent much of July, August and

September of 2020 on the Lady May.  Contemporaneously with the proceedings resulting in the

September 30 and October 15, 2020 restraining Orders, Kwok and his cohorts made arrangement

for the Lady May to sail to Florida in early October 2020 and, thereafter, to the Bahamas.  On

March 16, 2021, the Court issued a conditional order of civil contempt which directed that if

Kwok failed to return the Lady May to the jurisdiction of this Court by May 31, 2021, he would

be subject to a $500,000.00 fine for each day that the Lady May remained outside the jurisdiction

of this Court.

The Appellate Division, First Department, affirmed this Court's order holding Kwok in

conditional civil contempt, finding that "the daily fine of $500,000.00 was intended to strongly

FILED: NEW YORK COUNTY CLERK 02/09/2022 04:33 PM
NYSCEF DOC. NO. 1181

INDEX NO. 652077/2017
RECEIVED NYSCEF: 02/09/2022

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 228 of
269

encourage defendant to purge himself of the contempt, which, despite being permitted to

accomplish, he has shown no interest in doing. . .”  NYSCEF Doc. No. 953, 199 AD3d 423

(2021).  The Appellate Division further held:

> The motion court acted within its discretion in holding defendant in civil contempt, as plaintiff established by clear and convincing evidence that defendant violated a lawful, clear mandate of the court, of which he had knowledge, and that such violation resulted in prejudice to plaintiff's rights (*see El-Dehdan v El-Dehdan*, 26 NY3d 19, 29 [2015]; Judiciary Law § 753). …  The motion court is instructed to proceed with an evidentiary hearing to resolve a dispute as to ownership and control of the yacht, and to assess appropriate penalties.

Pursuant to the Appellate Division's Order, this Court scheduled the February 2, 2022

evidentiary hearing to resolve the issue of whether Kwok beneficially owns and controls the

yacht.  Kwok failed to testify at the February 2, 2022 hearing, having previously invoked his

Fifth Amendment right to decline to testify or respond to discovery requests relating to the Lady

May in response to PAX's asset discovery efforts.  PX 27, 28, 29, 30.[1]  This invocation of the

Fifth Amendment notwithstanding, Kwok is an active litigant in multiple fora and he has given

prior testimony in this and other proceedings.

Kwok also filed a complaint in this court captioned *Guo Wengui a/k/a Miles Kwok v*

*Hong Zeng*, 157025/2020, which references a blog post from Freebeacon.com dated September

8, 2017 in which Kwok complains about "several incidents involving *his* 152-foot motor yacht,

Lady May..."  (Complaint ¶ 8, NYSCEF Doc. No. 001) ("the Zeng Complaint").  The Zeng

Complaint describes Kwok as an "outspoken critic of the CCP" who has gone to great "lengths

to expose the rampant corruption within the CCP and the Chinese government."  The

*Washington Post* reported that a former advisor to President Trump, Steve Bannon, was arrested

in 2020 while on board the Lady May, and described Mr. Bannon as a friend and business

---

[1] "PX" refers to Plaintiff's Trial Exhibits.

associate of Kwok, "a vocal online critic of the Chinese government who was once close with that country's intelligence service but is now wanted by authorities in Beijing on charges of fraud, blackmail and bribery." Other news outlets have reported that Mr. Bannon utilized Kwok's private jet on more than one occasion to travel to political rallies.

The testimony adduced at the hearing out of the mouths of defendants' witnesses clearly and convincingly demonstrated that Kwok beneficially owns and controls the Lady May and has utter contempt for this Court and the judicial process.

Kwok once was the sole shareholder of Hong Kong Investments Limited ("HK International"). The testimony adduced at the hearing established that in 2014 Kwok transferred a 100% interest in HK International to one Qu Guo Jiao for no consideration. Ms. Qu was a trusted business associate of the Kwok family. Thereafter, Kwok fled China and on February 23, 2015, HK International purchased the Lady May for £ 28 million GBP. No testimony adduced at the hearing established the source of funds to purchase the Lady May, but the uncontradicted testimony of Kwok's daughter Mei Guo established that Ms. Qu did not provide the funds to purchase the yacht. Tr. 44.[2] Consequently, a reasonable inference is that Kwok provided the funds to HK International which were used to purchase the yacht. It is undisputed that Ms. Qu transferred the ownership of the Lady May to Kwok's daughter, Mei Guo, on or around June 17, 2017, for $1 or no consideration. Tr. 47. According to Ms. Guo's affidavit (NYSCEF Doc. No. 1162), Ms. Guo ultimately transferred ownership of the Lady May to the current title holder HK International Funds Investments (USA) Limited, LLC ("HK USA"). Ms. Guo further avers that she is the sole owner of HK USA, although all of the multi-million dollar annual expenses for the

---

[2] "Tr." refers to the transcript of the evidentiary hearing, efiled at NYSCEF Doc. No. 1179.

Lady May, including fuel, maintenance, and the captain and crew are paid by Golden Spring

(New York) Ltd. ("Golden Spring."), which is allegedly the Kwok family office.

At the hearing Ms. Guo testified that her brother had bought the Lady May for her.  Tr.

46.  The Court cannot credit this testimony as there is no evidence that Ms. Guo's brother was

involved with the corporate transactions leading to Ms. Guo's acquisition of the title to the yacht.

And, indeed, in response to a question from the Court, Ms. Guo acknowledged that her brother

was not involved in any of the transfers that occurred before she acquired the yacht.  Tr. 47.

Other testimony adduced at the hearing established that Kwok was repeatedly on the

yacht every summer and that Ms. Guo was infrequently on the yacht.  Trial Tr. 88:8-20.  The

Lady May's captain testified that Kwok was aboard the yacht for a significant portion of the

months of July, August and September in 2020 and that this was consistent with his usual

practice in the summer.  Trial Tr. 87:24-88:7.  Subsequent to this Court's September 30, 2020

restraining Order, in October 2020 the Lady May was sent to Florida and then the Bahamas for

repairs and was subsequently dispatched to Italy in October 2021, purportedly at the direction of

Golden Spring.  Ms. Guo acknowledged that she was aware of both this Court's September 30,

2020 restraining Order and this Court's subsequent March 16, 2021 Order directing that the Lady

May be returned to the Court's jurisdiction  Tr. 55; 57-60; 62.

Ms. Guo testified that on the one hand, she directed the Lady May's itinerary but, on the

other hand, testified that security for Kwok was such a concern that there would be no

memorialization of any itinerary.  Tr. 52.  She further testified that when her father was on the

yacht unaccompanied by her he had the freedom to choose wherever he wanted to go.  Tr. 50.

The fundamental issue, however, is who directed the yacht to be removed from this Court's

jurisdiction in October 2020.  Ms. Guo claims that in early October 2020 she no longer wished to

use the yacht and relayed that instruction to Golden Spring which, in turn, relayed her directive

to the then captain of the ship, Captain Heaslop. Tr. 53.

Upon further questioning, Ms. Guo admitted that it was Golden Spring that advised her

that the yacht needed to be moved to a warmer place. Tr. 55. Ms. Guo then repeated her

retracted testimony that her brother had given her the yacht, and she stated that her brother is the

sole owner of Golden Spring. Tr. 56. This testimony is not credible given that on September 30,

2020 the Court entered a temporary restraining order restraining Kwok

> . . . from making or causing any sale, assignment, transfer, or interference with any
> property in which he has an interest, or from paying over or otherwise disposing of any
> debt now due or thereafter coming due to him, subject to the exceptions set forth in
> CPLR 5222 and in the ordinary course.

NYSCEF Doc. No. 591. Significantly, Captain Heaslop, the then Captain of the Lady May,

testified that Mr. Kwok told Captain Heaslop that Kwok would no longer be a guest on the Lady

May "a few days" before the Lady May departed for Florida in early October 2020 (and

apparently after the issuance of this Court's September 30, 2020 Order). Tr. 89. Captain

Heaslop also contradicted Ms. Guo's testimony that Ms. Guo gave Captain Heaslop instructions

about the yacht's movement. Tr. 94.

Ms. Guo also acknowledged having subsequently read the Court's March 16, 2021 Order

requiring the Lady May to be returned to the Court's jurisdiction by May 31, 2021 (NYSCEF

Doc. No. 728). She further acknowledged that she had discussed the Order with her lawyer

(whose services were paid for by Golden Spring) and that she had *ignored* the Order.

Russell Stockil, the Yacht Management Director for Yachtzoo SARL, testified that his

company had a management contract with HK USA dated May 2021 and that he communicated

with HK USA and Golden Spring, but never with Ms. Guo. Tr. 78. This was also the testimony

of successor Captain Momchil Ivanov. Tr. 82. In short, Ms. Guo's testimony that she owns and

controls the Lady May cannot be credited in any respect. Ms. Guo appears to be a woman in her twenties, has introduced no evidence that she exercised dominion and control of the Lady May, and provided no confirmation that she came into possession of the Lady May, other than as a ruse to shield the Lady May from being levied upon by her father's creditors.

The machinations associated with the shell game Kwok has orchestrated with respect to the Lady May are of a piece with every other evasive and contemptuous act Kwok has taken during the five years this litigation has been pending, which is why there are 1,180 docket entries in this case.

The Court has the authority to hold Kwok in civil contempt under Judiciary Law § 753—and "to punish [him], by fine and imprisonment"—where, as here, the Court "expressly find[s] that [Kwok's] actions were calculated to or actually did defeat, impair, impede, or prejudice the rights or remedies of a party to a civil proceeding." *Oppenheimer v. Oscar Shoes, Inc.*, 111 A.D.2d 28, 28 (1st Dep't 1985) (citing N.Y. Judiciary Law § 753). Section 753 sets forth four requirements:

> [T]o find that contempt has occurred in a given case, it must be determined that [1] a lawful order of the court, clearly expressing an unequivocal mandate, was in effect. [2] It must appear, with reasonable certainty, that the order has been disobeyed . . . [3] Moreover, the party to be held in contempt must have had knowledge of the court's order, although it is not necessary that the order actually have been served upon the party . . . [4] Finally, prejudice to the right of a party to the litigation must be demonstrated.

*Fleetwood Fin. v Walter J. Dowd, Inc.*, 2016 WL 11546917, at *2 (N.Y. Sup. Ct. Sept. 14, 2016) (citing *McCormick v Axelrod*, 59 N.Y.2d 574, 583, *amended*, 60 N.Y.2d 652 (1983)). The testimony adduced in this case satisfies each element of this standard. Indeed, the Appellate Division intimated as such. *See Pacific Alliance Asia Opportunity Fund L.P.*, 199 A.D.3d 423 (1st Dep't 2021) ("[PAX has] established by clear and convincing evidence that [Kwok] violated

a lawful, clear mandate of the court, of which he had knowledge, and that such violation resulted in prejudice to plaintiff's rights. . .").

The extent of PAX's ongoing "prejudice" turns on whether PAX has demonstrated that it could ultimately levy on the Lady May to satisfy its now centi-million dollar judgment against Kwok. Under CPLR § 5225, "money or other personal property" is leviable where the debtor holds the requisite "interest." To satisfy this requirement, "[i]t is not necessary that the judgment debtor have legal title to the property; a beneficial interest is sufficient." Weinstein, Korn & Miller, New York Civil Practice: CPLR ¶ 5225.09. "A beneficial interest is '[a] right or expectancy in something . . . as opposed to legal title to that thing.'" *Peterson v. Islamic Rep. of Iran*, 2013 WL 1155576, at *30 (S.D.N.Y. Mar. 13, 2013) (citing Black's Law Dictionary, Interest (9th ed. 2009)). Kwok has much more than a beneficial interest in the Lady May. Not only does Kwok control the yacht, it appears he provided the funds to purchase it and he is the person who principally enjoys the use of the yacht.

The key factor is whether "the property benefitted [the beneficial owner] as if he had received the property directly." *Id*. (quoting *Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*, 609 F.3d 111, 120 (2d Cir. 2010); *see also Gliklad v. Chernoi*, 129 A.D.3d 604 (1st Dep't 2015) (upholding rejection of the judgment debtor's contention that he no longer held an interest in property because he transferred his interest to his daughters); *Colfin Bulls Funding B, LLC v. Ampton Invs., Inc*., 112 N.Y.S.3d 868 (Table), at *2, 6 (N.Y. Sup. Ct. 2018) (granting judgment creditor's turnover motion notwithstanding judgment debtor's assertion that he transferred property to a corporation, because even if true, the evidence showed that he "retained control and/or an interest" in the property).

The evidence clearly and convincingly demonstrates that Kwok holds a beneficial interest in and controls the Lady May.  In the latter connection, the Court takes notice of the filing of the Zeng case and draws an inference from all the record facts that Kwok has taken extraordinary steps to shield the yacht from his creditors.  Moreover, Kwok's "family office" funds the yacht's day-to-day operations and maintenance.

The Court finds that Ms. Guo's testimony was not only internally inconsistent and dissembling, but also significantly undermined by the testimony of Captains Heaslop and Ivanov and Mr. Stockil, who stated that they have never taken yacht-related direction from Ms. Guo in the four and-a-half years that she directly or indirectly held title to the yacht.

In addition, it is established New York law that a party's invocation of the Fifth Amendment in a civil proceeding "may form the basis of an adverse factual inference." *DeBonis v. Corbisiero*, 155 AD2d 299, 300 (1st Dep't 1989). An adverse inference may be applied whenever a factual determination is necessary or permitted, including in the context of contempt motions.  *S.E.C. v. Durante*, No. 01 Civ. 9056 (DAB) (AJP), 2013 WL 6800226, at *10 (S.D.N.Y. Dec. 19, 2013), *aff'd*, 641 F. App'x 73 (2d Cir. 2016); *LiButti v. United States*, 107 F.3d 110, 120–25 (2d Cir. 1997).

Similarly, under the missing witness rule, "[a] trier of fact may draw the strongest inference that the opposing evidence permits against a witness who fails to testify." *Crowder v. Wells & Wells Equip., Inc.*, 11 A.D.3d 360, 361 (1st Dep't 2004) (applying adverse inference where defendant who failed to appear "would be knowledgeable about a material issue raised by the evidence").

PAX is entitled to an adverse inference under both of these avenues. Kwok has invoked his Fifth Amendment right against self-incrimination in response to PAX's post-judgment discovery, including in response to requests specifically about the Lady May. While Kwok

argues that an adverse inference is not appropriate here because "[o]nly after a threshold showing

that a piece of evidence is authentic is a party obligated to respond to it," this contention fails of

its own weight. PAX has proffered substantial admissible evidence that Kwok has the requisite

beneficial interest in and control of the Lady May.  *See People v. Primo*, 96 N.Y.2d 351, 753

N.E.2d 164 (2001) (explaining that evidence is probative if it "tends to prove the existence or

non-existence of a material fact, *i.e.*, a fact directly at issue in the case").

      As of February 7, 2022, the Lady May has remained outside the jurisdiction of the Court

for 268 days. Based on the daily fine of $500,000 imposed by this Court and affirmed by the

Appellate Division, the resultant fine would amount to $134,000,000.00, which is more than

PAX's outstanding judgment of nearly $120 million and a multiple of the GBP £ 28 million

purchase price of the Lady May.  Nevertheless, if billionaire litigants can simultaneously seek to

use Court process in New York and elsewhere in the United States while knowingly and

intentionally violating Court orders, there is no rule of law.  Kwok must remit $134,000,000.00

to PAX within five business days of the service of this Court's Order with Notice of Entry. The

Court is prepared to exercise its full authority under Judiciary Law § 753 in the event the fine is

not timely paid.

Dated:  February 9, 2022

*Barry Ostrager*

BARRY R. OSTRAGER, J.S.C.

| CHECK ONE: | ☐ CASE DISPOSED | | ☒ NON-FINAL DISPOSITION | |
|---|---|---|---|---|
| | ☒ GRANTED | ☐ DENIED | ☐ GRANTED IN PART | ☐ OTHER |
| APPLICATION: | ☐ SETTLE ORDER | | ☐ SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | ☐ INCLUDES TRANSFER/REASSIGN | | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE |

# EXHIBIT 41

FILED: APPELLATE DIVISION - 1ST DEPT 02/15/2022 03:13 PM
FILED: APPELLATE DIVISION - 1ST DEPT 02/14/2022 02:37 PM
NYSCEF DOC. NO. 3                                      RECEIVED NYSCEF: 02/14/2022

2022-00609
2022-00609
RECEIVED NYSCEF: 02/15/2022

## SUMMARY STATEMENT ON APPLICATION FOR
## EXPEDITED SERVICE AND/OR INTERIM RELIEF
### (SUBMITTED BY MOVING PARTY)

Date: February 14, 2022                          Case # 2022-00609;2022-00610

Title of Matter: Pacific Alliance Asia Opportunity Fund L.P.          Index/Indict/Docket # 652077/2017

v. Kwok Ho Wan, a/k/a, et al.

Appeal by **Defendant** from   Order ☑ Judgment ☐ Decree ☐ of   Supreme ☑ Surrogate's ☐ Family ☐   County New York

Court entered on Feb. 9 ,20 2022

Name of Judge Barry R. Ostrager

Notice of Appeal filed on Feb. 10 ,20 22

If from administrative determination, state agency _____

Nature of action or proceeding Breach of Contract

Provisions of ☑ order ☐ judgment ☐ decree   appealed from All

This application by appellant respondent is for a stay of a contempt order pending appeal.

Defendant-Appellant seeks a stay prior to February 16, 2022, by which date he has been ordered to pay a $134,000,000 contempt fine to Plaintiff.

If applying for a stay, state reason why requested The $134,000,000 contempt fine is excessive, disproportionate, and unconstitutional, and the motion court has invoked the prospect of imprisonment if it is not paid within five business days, i.e. by February 16, 2022.

Has any undertaking been posted No.              If "yes", state amount and type _____

Has application been made to court below for this relief No.   If "yes", state Disposition _____

Has there been any prior application here in this court _____   If "yes", state dates and nature _____

Has adversary been advised of this application Yes.   Does he/she consent No.

| <u>Attorney for Movant</u> | <u>Attorney for Opposition</u> |
|---|---|
| Name  Ira Brad Matetsky and Jason T. Cohen | O'Melvany & Myers LLP |
| Address  360 Lexington Avenue | 7 Times Square |
| New York, New York 10017 | New York, New York 10036 |
| | 212-326-2000 |
| Tel. No.  212-365-3391 (cell); 2120922-9149 (office) | New York |
| Email  imatetsky@ganfershore.com | |
| Appearing by  Ira B. Matetsky | Stuart Sarnoff (ssarnoff@omm.com); 212-326-2293 |
| Jason T. Cohen (jcohen@ganfershore.com); 646-250-4141 | Anton Metlitsky (ametlitsky@omm.com); 212-316-2291 |
| Mark C. Zauderer (mzauderer@ganfershore.com); 917-331-7762 | |

--------------------------------------------------------------------
**(Do not write below this line)**

<u>DISPOSITION</u>

Appellant's application for a stay is denied.

_____

February 15, 2022

Justice  BEP                                      Date

Motion Date  2/28/22        Opposition  2/23        Reply  2/28  10am

EXPEDITE  ✓        PHONE ATTORNEYS _____        DECISION BY _____

ALL PAPERS TO BE SERVED PERSONALLY.        _____
                                                                                        Court Attorney

"Revised 10/19"

# EXHIBIT 42



This website uses cookies and local storage. By using our services, you agree to our use of cookies and local storage. I agree

**LADY MAY**
Yacht

Details | Track | Add Photo | Add to fleet

**Destination not available**
**ETA: -**

| Speed: | Course: | Draught: |
|---|---|---|
| **0.0 kn** | **91.9°** | **2.3 m (max 2.3)** |
| Status: | Last report: | |
| **Moored** | **Apr 6, 2022 03:51 UTC** | |

La Ciotat, France
**ATD: Apr 4, 06:29 UTC**

PORT CALLS

WEATHER

VESSEL PARTICULARS

| Gross Tonnage: | Built: | IMO number: |
|---|---|---|
| **406** | **2014** | **1012359** |
| Deadweight: | Size: | MMSI: |
| **44** | **46 / 9 m** | **319059500** |

Ship Motion Forecasting
We promise improvement. Could we show you our intuitive software and algorithms?
Openen

Document title: LADY MAY Current position (Yacht, IMO 1012359) - VesselFinder
Capture URL: https://www.vesselfinder.com/?imo=1012359
Capture timestamp (UTC): Wed, 06 Apr 2022 15:38:05 GMT

# EXHIBIT 43

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF NEW YORK:  TRIAL TERM PART 61

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - X

4    PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

5                          Plaintiff,

6         - against -

7    KWOK HO WAN, a/k/a KWOK HO a/k/a GWO WEN GUI
     a/k/a GUO WENGUI a/k/a GUO WEN-GUI a/k/a
8    WAN GUE HAOYUN a/k/a MILES KWOK a/k/a HAOYUN GUO,
     GENEVER HOLDINGS CORPORATION and GENEVER HOLDINGS LLC,
9
                          Defendants.
10
     - - - - - - - - - - - - - - - - - - - - - - - - - - - X
11   Index No. 652077/2017

12                      October 15, 2020
                        Teams Proceeding
13
     B E F O R E:   THE HONORABLE BARRY R. OSTRAGER, Justice
14
     A P P E A R A N C E S:
15
     O'MELVENY & MYERS LLP
16   Attorneys at Law
     7 Times Square
17   New York, New York 10036
     BY:  STUART SARNOFF, ESQ.
18        EDWARD MOSS, ESQ.

19   BAKER & HOSTETLER LLP
     Attorneys at Law
20   45 Rockefeller Plaza, 14th Floor
     New York, New York 10111
21   BY:  JOHN SIEGAL, ESQ.
          MELISSA CARVALHO, ESQ.
22        ERICA BARROW, ESQ.

23

24

25                 (Appearances continued on next page.)

                         tav

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 243 of
269

2

1   A P P E A R A N C E S:  (Continuing)

2   LAWALL & MITCHELL LLC
    Attorneys at Law
3   162 East 64th Street
    New York, New York 10065
4   BY:  AARON A. MITCHELL, ESQ.

5

6

7

8                              Terry-Ann Volberg, CSR, CRR
                               Official Court Reporter
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FILED: NEW YORK COUNTY CLERK 11/10/2020 02:41 PM
NYSCEF DOC. NO. 647
INDEX NO. 652077/2017
RECEIVED NYSCEF: 11/10/2020
Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 244 of
269

3

Proceedings

1          THE COURT:  Good morning.

2          There are a few housekeeping matters that I want

3     to address before we discuss the application for a temporary

4     restraining order.

5          If you are not speaking, please mute your

6     microphone so we don't get static.  Thank you.

7          So, as I started to say, there are a few

8     housekeeping matters I want to resolve before we address the

9     application for a temporary restraining order.  We are

10    technically scheduled to discuss plaintiff's application for

11    attorney's fees, and there's in the motion part a motion by

12    the defendant to add an affirmative defense of failure to

13    mitigate damages.  With respect to the latter issue,

14    Mr. Moss, I would like you to stipulate that at trial we

15    will conform the pleadings to the proof adduced at the

16    trial, and because I addressed the mitigation of damage

17    issue in my September 15th decision and order, and because

18    that issue has always been at least peripherally in the

19    case, I would like you to stipulate that that will be one of

20    the issues that will be addressed at the plenary trial, and

21    avoid the necessity of motion practice, and so I would like

22    to mark that motion as withdrawn without prejudice on

23    consent.  Is that acceptable to you?

24          MR. MOSS:  Your Honor, I just -- I just would like

25    to understand, my understanding was that the Court was going

FILED: NEW YORK COUNTY CLERK 11/10/2020 02:41 PM       INDEX NO. 652077/2017
NYSCEF DOC. NO. 647       Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45       Page 245 of
                                                      269       RECEIVED NYSCEF: 11/10/2020

4

Proceedings

1    to make a determination on damages.  You had ordered us to

2    put our calculation in.  I thought the mitigation issue had

3    already been decided by the Court on summary judgment, and

4    that there was not going to be a trial on damages, that this

5    was going to be done so that you could get the calculation

6    so that the Clerk of Court could issue the judgment.  That's

7    what was in the order, and so I did not understand that

8    there was going to be a trial, and we do not believe that

9    there are any issues of fact for a trial.

10           THE COURT:  My understanding is that I granted you

11   summary judgment on liability which is why you're privileged

12   to make the 5229 application that you're making today, and

13   we deferred the calculation of damages because there are

14   issues of fact relating to the quantum of damages.  I found

15   that your proof was insufficient for me to grant summary

16   judgment on the issue of damages.  So that's something

17   that's going to be addressed at the hearing which I believe

18   we scheduled for January.

19           MR. MOSS:  So my understanding, your Honor, was

20   that the January trial was on the veil piercing issues --

21           THE COURT:  It is, it is.

22           MR. MOSS:  -- and that the only defense on damages

23   that Mr. Kwok has proffered, your Honor, is mitigation.

24   Mitigation was something that the Court has already rejected

25   as a matter of Hong Kong law on summary judgment.

tav

5

Proceedings

1           THE COURT:  I specifically referenced it in the

2     September 15th decision.  Now I referenced it in a manner

3     suggesting that I thought it was a dubious claim, and I

4     still think it's a dubious claim because I don't think it

5     was incumbent upon your client post facto to purchase an

6     apartment from the Communist Chinese Party at what would

7     appear to be an above-market price, and that's what I said

8     in my September 15, 2020, decision.

9           So there's a motion by the defendant to amend his

10    answer to assert a defense of failure to mitigate damages.

11    Whenever we get around to assessing damages, I'm going to

12    hear the defendant on the mitigation issue.  Now if you want

13    him to make a motion, and you want me to decide the motion,

14    there is nothing I can do other than allow him to make the

15    motion, have you respond to the motion, and then decide the

16    motion.  And since any hearing that we have is one at which

17    I'm going to conform the pleadings to the proof that's

18    adduced at trial, I thought as a housekeeping matter we'd

19    have the defendant withdraw that motion without prejudice

20    and for you to be content with that state of play.

21          MR. MOSS:  Okay, that's fine.  If your Honor is

22    going to grant the motion anyway on the motion for leave to

23    amend, we can stipulate to that.

24          We have a pending motion for damages, and they --

25          THE COURT:  Yes.

tav

FILED: NEW YORK COUNTY CLERK 11/10/2020 02:41 PM    INDEX NO. 652077/2017
NYSCEF DOC. NO. 647    Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 247 of
269    RECEIVED NYSCEF: 11/10/2020

6

Proceedings

1         MR. MOSS:  So how would your Honor like to resolve

2    the damages issue?

3         THE COURT:  We are going to have a hearing on the

4    damages issue and that hearing is not today.

5         MR. MOSS:  Yes.

6         THE COURT:  So at that hearing whatever the

7    defendant wants to proffer in connection with this

8    mitigation of damage theory which I strongly indicated in my

9    September 15, 2020, decision and order is quite dubious,

10   they will be permitted to adduce whatever evidence they

11   have, if any, on that theory in connection with the damages

12   hearing.

13        Let me ask counsel for the defendant if we can

14   mark the motion to amend the answer as withdrawn without

15   prejudice in light of what is now on the transcript of

16   proceedings of today?

17        MR. SIEGAL:  Yes, John Siegal, Baker Hostetler,

18   for defendant Kwok.

19        We certainly consent to that result, and will

20   serve our Second Amended Answer following today and file it

21   so it's of record and that's the basis on which we will

22   proceed to the hearing.

23        THE COURT:  Fair enough.  It's really not

24   necessary for you to file a Second Amended Complaint, but I

25   think it's very clear on the transcript of the proceedings

tav

FILED: NEW YORK COUNTY CLERK 11/10/2020 02:41 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 647
RECEIVED NYSCEF: 11/10/2020

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 248 of
269

7

Proceedings

1    of today that we are going to have a damages hearing, and at

2    the damages hearing you will be able to adduce whatever

3    testimony you wish or whatever documents you wish to

4    introduce on the mitigation portion claim, and it's really

5    just burdensome to the Court and burdensome to the plaintiff

6    for you to file a Second Amended Complaint and for the

7    plaintiff to have to respond to it.

8          So the record speaks for itself.  I would just

9    like a little cooperation from you and Mr. Moss here.

10          MR. SIEGAL:  Yes, your Honor.  We appreciate the

11   Court allowing us the opportunity to adduce evidence on that

12   issue, and we will be ready at the hearing, and we have had

13   good cooperation with Mr. Moss since we have appeared in the

14   case, and I'm sure we will continue to, and we look forward

15   to that opportunity to try to convince your Honor, who we

16   understand it's dubious, that on full examination there's a

17   mitigation defense here that has a very substantial impact

18   on the damages, so thank you.

19          THE COURT:  All right.

20          We will not have any Second Amended Complaint, and

21   we are not going to have any motions, correct?

22          MR. SIEGAL:  Yes, your Honor, understood.

23          THE COURT:  All right.

24          Now the second housekeeping matter that we have is

25   attorney's fees.  Since there are going to be further

Proceedings

1    proceedings, it doesn't make any sense to address attorney's

2    fees today because there will be more attorney's fees in

3    connection with the two hearings that we are going to have,

4    one on damages and the other that's been previously

5    scheduled for January 15th.

6              So with your consent, Mr. Moss, I would like to

7    adjourn your application for attorney's fees to a more

8    appropriate time.

9              MR. MOSS:  That's fine.  That's fine, your Honor.

10             I guess, you know, the attorney's fees are

11   contract damages just like the principal and interest, and I

12   would propose that we submit our evidence at the hearing or

13   concurrently with the hearing.  I guess we really wouldn't

14   have any witnesses on the attorney's fees other than Mr.

15   Lewis.  I think we should do it at the hearing, your Honor,

16   that would make the most sense to me, at the damages

17   hearing, because they are really part of the damages.

18             THE COURT:  When all proceedings in this case are

19   concluded you will be awarded whatever contractually

20   entitled attorney's fees are due you.  It's just not a today

21   issue, it's an issue that awaits future resolution.  All

22   right.

23             MR. MOSS:  Yes, your Honor.

24             And do we have -- do you have a sense of when you

25   would like to conduct the hearing on damages?

tav

Proceedings

1          THE COURT:  As soon as I can.

2          Not for anything, you're all aware of the fact

3     that Justice Scarpulla has been elevated to the Appellate

4     Division, Justices Friedman and Sherwood are retiring in the

5     near term, so there are only five Commercial Division judges

6     who are currently in the wheel, and Justice Scarpulla's

7     cases have been reallocated to the five justices who remain

8     in the wheel.  So we are all a little busy now.

9          MR. MOSS:  Yes, your Honor.

10          THE COURT:  You have a January 15th date on your

11     other issue.  We will try and find a convenient time to

12     resolve damages and attorney's fees.

13          So now let's get to the only thing that I want to

14     deal with this morning which is your application under CPLR

15     5229 for a restraining order that extends to Mr. Kwok's

16     assets, and which you believe should be extended to entities

17     that he controls whether they be single purpose LLCs or

18     family members like his son.

19          So I will hear you, Mr. Moss.

20          MR. MOSS:  Thank you.

21          Your Honor, as far as the relief goes under 5229,

22     I don't think Mr. Kwok disputes that we are entitled to some

23     relief.  He does not contest that Pacific Alliance meets the

24     standard.  He does not dispute our contention that he

25     intends to dissipate his assets, a process that has already

Proceedings

1     begun with this sham bankruptcy proceeding.

2              The Court has suggested that there's a showing

3     necessary beyond the fact of just prevailing on the

4     judgment.  We have submitted that all you need to do is

5     prevail on summary judgment.  The Court suggested that there

6     might be a an additional showing necessary so we did set

7     that forth in our papers.

8              There's a clear and significant risk here that if

9     left unchecked Mr. Kwok will continue to do everything in

10    his power to shield assets and render this judgment

11    uncollectible whether it's committing perjury, whether it's

12    disobeying Court orders or whether it's making this sham

13    bankruptcy petition.  We have been saying this judge for

14    years.  It's why we requested the attachment.  We also knew

15    what was going to happen.  We would win because Mr. Kwok had

16    no legitimate defense, and then Mr. Kwok would evade the

17    judgment, and that he would do whatever he can do to ensure

18    that my client is left holding the bag.

19             So the two issues specifically before the judge on

20    the 5229, there are two arguments that Mr. Kwok makes to

21    sort of limit the relief that we are requesting.  So I will

22    deal with it, what I think is the easier one first.

23             First, Mr. Kwok does not dispute that we are

24    entitled to depose him and to discovery into him, but he

25    argues that the discovery should only be into assets that we

11

Proceedings

1     have not sought discovery for, that we have not gotten

2     discovery for.  The only asset related to discovery in this

3     case was during the attachment phase, and Mr. Kwok and his

4     prior counsel vehemently and consistently refused to provide

5     any discovery into any assets other than the

6     Sherry-Netherland residence.  I think we are all in

7     agreement, actually, that all of the other assets are fair

8     game.

9             As for the apartment, the residence, there's no

10    reason to limit the discovery on that.  This is the only

11    asset we have identified that Mr. Kwok has in New York.  It

12    seems to be the largest asset that he has in this country,

13    and it's perhaps the largest asset he has anywhere that has

14    not been frozen by the Chinese government.

15            Now, Mr. Kwok's prior counsel denigrated us, they

16    said we were hysterical, we were afraid of the merits

17    because we kept seeking to attach the apartment.  We knew

18    who we were dealing with and we knew we would end up here,

19    that this asset was our best chance to collect.

20            We are entitled to discovery into that asset.

21    There's no appreciable burden associated with this

22    discovery, and we have not taken any discovery on the

23    apartment for two years.

24            There are new arguments, there are new things to

25    discover.  For example, Mr. Kwok is now claiming in his

12

Proceedings

1      bankruptcy petition that there's another company, not just

2      the New York company owned by the BVI company, the two

3      Genever entities, there's a new company, a new shell company

4      called Bravo Luck, and that's really the beneficial owner of

5      the apartment, and that has been paying the expenses, and

6      that is owned wholly by his son.  So his argument in the

7      bankruptcy is not that he has any legitimate creditors, it's

8      that the apartment is held in trust for his son, and his son

9      should take priority over Pacific Alliance.

10             It's all a shell game.  We are entitled to explore

11     that and whatever else had is happening in the last few

12     years.  They put the apartment on the market, and then they

13     took it off the day of the attachment proceeding so that

14     they could argue to you in court, hey, it's not on the

15     market any more, you shouldn't attach it.  We are entitled

16     to that discovery, and that's what CPLR 5229 is intended to

17     give us, giving the judgment creditor precisely the

18     information of who owns the assets, where they are located.

19             The second issue that they raise, your Honor, and

20     that's the one that you started this conversation with, is

21     what should be the scope here, should the restraining order

22     relate only to Mr. Kwok's assets, to Mr. Kwok's assets that

23     he indirectly and directly owns?  What they are trying to

24     say here is that it should only pertain to assets he "owns

25     directly."  That is an exception that would swallow the rule

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 254 of
269

13

Proceedings

1    because Mr. Kwok does not hold any assets directly.  That is

2    his MO.  He holds assets through multiple layers of family

3    members, multiple layers of shell companies precisely for

4    this reason so creditors like us can't reach them.

5         Mr. Kwok admitted it in his deposition in another

6    case.  He said, he testified under oath, we quote this, "In

7    reality I don't have any assets under the law.  I'm

8    penniless."  He makes those claims because of the way he

9    structures his holdings like the apartment.  I told you, for

10   example, shell company, shell company that he now says his

11   son owns, and this is a company, Bravo Luck, that he says

12   his son owns even though he used to hold it, 50 percent of

13   it, and apparently says now he sold it to his son for a

14   dollar based on documents he didn't produce in this case,

15   backdated, forged documents.

16        This entire thing is a sham, that his 20-something

17   year old son at the time was really the one to pay

18   $70 million for the apartment, he's the rightful owner of

19   the apartment?  It's all a game to make sure we are unable

20   to collect.

21        There's also a 30 million-dollar yacht.  That one

22   is held by a Hong Kong company.

23        THE COURT:  I thought it was $27 million.

24        MR. MOSS:  I'm sorry, I was rounding up.  I was

25   rounding up.

tav

14

Proceedings

1          There's a 27 million-dollar yacht held by a Hong

2     Kong company, and once we are allowed to take discovery we

3     will find more assets held by more shell companies of which

4     Mr. Kwok or one of his children is the sole owner.

5          Here's the issues:  If they ask you to only enjoin

6     him from dissipating his assets that he holds directly, that

7     would exclude everything, and it would exclude everything

8     even though Mr. Kwok has said that these are his assets.

9          He submitted an affidavit to this Court saying he

10    owned the apartment.  He submitted, he filed a complaint

11    last month in New York saying that the yacht was "his

12    yacht."  These are his assets, and it's permitted by the

13    statute, CPLR 5229, to have a restraining order that applies

14    to assets held directly and indirectly.

15         CPLR 5229 provides that a plaintiff can have

16    prejudgment restraint in the same way it can have

17    post-judgment restraint.  Post-judgment restraint is

18    governed by CPLR 5222, and that says that the restraints

19    apply to property in which he or she, meaning the judgment

20    debtor, "has an interest."  It doesn't say direct interest,

21    it says an interest.  Mr. Kwok has already testified, he's

22    already submitted evidence in this case that he owns the

23    apartment, and he has judicial admissions that he owns the

24    yacht.

25         So their cases that they cite for the proposition

15

Proceedings

1    that CPLR 5229 and 5222 only apply to direct assets are

2    completely inapposite because none of them involve a

3    situation whereas here the defendant has actually claimed

4    that he owns these assets.

5            THE COURT:  Mr. Moss, I understand your argument.

6            Let me hear from Mr. Siegal.

7            MR. MOSS:  Thank you, your Honor.

8            MS. CARVALHO:  Good morning.  Melissa Carvalho

9    from Baker & Hostetler for Mr. Kwok.

10           I just want to begin by saying we have repeatedly

11    heard this morning Mr. Moss saying "Mr. Kwok's bankruptcy."

12    The bankruptcy petition that was filed was not Mr. Kwok's.

13    We have been made aware of it as the Court has been made

14    aware of it.  On its face it says that it's filed by an

15    entity, one of the entities who has counsel here present

16    today.  So if any questions or issues are arising relating

17    to the bankruptcy, I cannot speak to it, but Mr. Mitchell

18    certainly can.

19           So on CPLR 5229 the relief being sought by

20    plaintiff in the TRO and order to show cause is far broader

21    than that provided under CPLR 5229.  Plaintiff seeks to

22    enjoin and restrain defendant Kwok with respect to "any

23    property in which he has an interest," but CPLR 5229's

24    application is limited to Mr. Kwok, the adverse party.

25           CPLR 5229 specifically states that "the trial

tav

16

Proceedings

1        judge may order examination of the adverse party and order

2        him restrained with the same effect as if a restraining

3        notice had been served upon him after judgment." Courts

4        have strictly construed the language of CPLR 5229. The

5        adverse party is Mr. Kwok, and the Court's decision and

6        order on summary judgment is limited to him individually.

7                 Plaintiffs have spent a lot of time in their reply

8        seeking to continue to poison the well against Mr. Kwok, but

9        that is simply because plaintiff cannot present authority to

10       support its unilateral expansion of CPLR 5229.

11                Plaintiff presented the Court with various

12       categories of cases where CPLR 5229 relief has been granted,

13       but that goes to the Court's discretion to grant this

14       relief. The statute says the Court "may order relief under

15       5229," and we are not disputing that. Yes, a Court can

16       award CPLR 5229 relief in many different fact patterns, but

17       the relief is still limited to what is provided in CPLR

18       5229, and plaintiff has not shown any basis supporting its

19       unilateral expansion of the statute besides it's just what

20       they want.

21                The cases cited by plaintiff, in fact, do not

22       expand the scope of CPLR 5229. The APF case, Gallegos case,

23       Safeco case, Unex case and Leser case all limit the relief

24       to the specific adverse party and not to any "interest" that

25       party may have. In the Eastern District of New York in the

17

Proceedings

1       Leser v. U.S. Bank case the Court specifically stated,

2       "Plaintiff is correct, however, that the scope of the order

3       should be limited to the restraint on the assets of

4       plaintiff Leser."  USB had originally sought restraints

5       against "plaintiff Leser and any person, company or other

6       entity controlled by him," but then USB conceded during

7       argument that it was only seeking restraint as to plaintiff

8       Leser, and the Court found that appropriate and proper.

9       Nothing plaintiff says can change that.  The statute only

10      provides the relief that it provides.  So let's look at the

11      statute.

12              The statute provides for examination and

13      restraints.  Examination:  Here Mr. Kwok's assets have

14      already been addressed in discovery.  Mr. Kwok has been

15      deposed three times in this matter, on October 3rd, 2018,

16      November 25, 2019, and December 11, 2019.  Mr. Kwok has

17      produced over 14 pages of documents.  Plaintiff has had

18      multiple opportunities to sufficiently examine Mr. Kwok,

19      and, in fact, if you look at plaintiff's second set of

20      document requests attached to my affirmation you see that

21      they were, in fact, targeting assets.

22              Now plaintiff argues that passed discovery is

23      insufficient, but the record shows that there was, in fact,

24      disclosure.  Objections were certainly made based on the

25      scope.  There were questions asked of Mr. Kwok such as,

18

Proceedings

1    "Were any of your assets received by the Chinese

2    government," but by not allowing fishing expeditions that

3    does not mean that discovery was not sufficient.

4         I also note there were disputes in the past, and

5    those discovery disputes have been resolved, but creating

6    confusion by making these broad-sweeping statements, and

7    attaching e-mails without original letters that they are

8    responding to does not change that.

9         Now turning to the second part that the statute

10   allows restraint, but restraint is limited to CPLR 5229 and

11   is distinguishable from the restraint provided under CPLR

12   5222.  The relief sought here pursuant to 5229 is applicable

13   before a judgment has been entered so unlike post-judgment

14   devices which are available against third-parties, the

15   restraining powers under CPLR 5229 can only be used against

16   "the adverse party."  However, at any posture restraint is

17   always limited to property in which Mr. Kwok has a direct

18   and actual interest.  Restraint will not apply to indirect

19   interests including interest held in a corporation, proceeds

20   of property, or even assets of an alter ego until alter ego

21   status has been adjudicated and liability has been

22   determined.

23        Plaintiff also cannot use CPLR 5229 as an end run

24   under the requirements for prejudgment attachment statutes.

25   Here plaintiff's application relies ad nauseam and we have

tav

19

Proceedings

1    heard his counsel repeat this morning and admit that the

2    sole focus here is on the ownership of the residence at the

3    Sherry.  Plaintiff himself says Mr. Kwok is not the owner of

4    the Sherry.  The Court has acknowledged and stated Mr. Kwok

5    is not the owner of the Sherry.  And even though Mr. Kwok

6    does not have a direct interest in the residence at the

7    Sherry, he agreed on consent to a court order where he would

8    provide plaintiff with immediate written notice of any

9    contract to sell, assign, pledge or transfer any assets of

10   the respective defendant entity to any third-party.  So

11   plaintiff has received broader relief on subsequent than it

12   would have been entitled on this instant publication under

13   CPLR 5229 so, therefore, there's no concern with respect to

14   dissipation of the Sherry.

15          Now plaintiff argues that Mr. Kwok is trying to

16   weaken the relief that they are seeking, but in actuality we

17   are adhering to the statute and the powers that the Court

18   has given under the statute.  Plaintiff is relying on

19   statements allegedly made by Mr. Kwok regarding his

20   ownership of assets.  Mr. Kwok can say anything he wants to,

21   ownership is a factual legal issue.  If he does not own it,

22   he does not own it, period.  That is not enough to give you

23   broader relief under CPLR 5229.

24          Discovery has been conducted.  The plaintiff's

25   focus here is solely on the Sherry, as we have repeatedly

tav

Proceedings

1      heard this morning.  Any further examination is a waste of

2      time and money.  The subject is already -- the Sherry is

3      already subject to an order and it's restrained.

4              None of plaintiff's arguments change the

5      application of CPLR 5229 here.  That's it.

6              Now importantly relief under 5229 rests within the

7      sound discretion of the Court, absolutely, but Mr. Kwok has

8      already been examined, and any further examination should be

9      limited to assets and topics not previously addressed in

10     discovery.  Redundant and duplicative discovery are not

11     authorized under CPLR 5229.

12             And the transfer of the Sherry, as we have already

13     mentioned several times, it's already been restricted, and

14     any further restraints should be denied.  We have a consent

15     order in place that Mr. Kwok has agreed to, and Mr. Kwok

16     does not have a direct interest in the residence at the

17     Sherry.

18             So Mr. Kwok requests that this Court vacate the

19     TRO, deny plaintiff's motion for CPLR 5229 relief as it far

20     exceeds the scope of CPLR 5229.  Mr. Kwok has already been

21     examined, and his assets have already been discovered and

22     restrained by this Court, but should this Court be inclined

23     to grant plaintiff's relief under CPLR 5229, Mr. Kwok would

24     request that this Court use its discretion to modify such

25     relief to Mr. Kwok's assets in his individual capacity as

Proceedings

1          the "adverse party," and Mr. Kwok's assets not previously

2          the subject of prior discovery and court orders relating to

3          a transfer.

4                    Thank you, your Honor.

5                    THE COURT:  Okay.  Does anybody from Genever want

6          to say anything?

7                    MR. MITCHELL:  No, your Honor.  I think that was

8          well said.  I join Ms. Carvalho in her argument.

9                    THE COURT:  All right.

10                   Look, this is a 2017 case.  We've had multiple

11         motions relating to Mr. Kwok's assets.  The Court believes,

12         as reflected in the September 15, 2020, order that Mr. Kwok

13         has attempted to mislead the Court.  The Court believes that

14         Mr. Kwok is, as the plaintiff contends, playing a shell game

15         with his assets, and has violated if not the letter of court

16         orders, the spirit of court orders.  This is going to come

17         to an end on or shortly after January 15, 2021, when we have

18         the trial on the alter ego issue, but between now and the

19         commencement of the January 15, 2021, trial Mr. Kwok and any

20         entities that he directly or indirectly controls are

21         restrained from alienating or transferring any property that

22         Mr. Kwok has a direct or indirect interest including most

23         specifically the apartment at the Sherry-Netherland Hotel

24         which was the subject of 2018 discovery and a consent order

25         to which counsel for Mr. Kwok referenced, and also the yacht

FILED: NEW YORK COUNTY CLERK 11/10/2020 02:41 PM
NYSCEF DOC. NO. 647

INDEX NO. 652077/2017
RECEIVED NYSCEF: 11/10/2020

Case 22-50073    Doc 183-4    Filed 04/06/22    Entered 04/06/22 17:07:45    Page 263 of
269

22

Proceedings

1   which Mr. Kwok has at various times claimed ownership of.

2   So the net result is that I exercise my discretion under

3   CPLR 5229 to restrain any further transfers of the

4   Sherry-Netherland apartment which Mr. Kwok once owned, and

5   the 27 million-dollar yacht which Mr. Kwok once claimed to

6   have owned.

7           So we are not going to have any more shell games.

8   Wherever these assets are held, they are going to remain

9   held where they presently reside, and if it's determined

10  that the entities that are presently listed as the owners of

11  the assets are the alter ego of Mr. Kwok or are wholly

12  dominated and controlled by Mr. Kwok, those assets will be

13  made available to satisfy any judgment that the plaintiff

14  recovers.

15          In the interim, between now and the January 15,

16  2021 trial on the alter ego issues, the plaintiff can

17  conduct discovery of any of the entities that claim to own

18  the Sherry-Netherland apartment or the yacht, and counsel

19  for Genever and counsel for Mr. Kwok are directed to

20  forthwith provide counsel for the plaintiff with information

21  identifying the record owners of those two assets.

22          That's the order of the Court.

23          MS. CARVALHO:  Your Honor, could I ask for some

24  clarification?

25          We understand the order of the Court today,

23

Proceedings

1    however, I am confused where it comes to indirect ownership

2    because, I'm just thinking off the top of my head here,

3    there could be entities that will be restrained from

4    conducting regular and ordinary business, and to what extent

5    can someone decide that something would be an indirect

6    interest and prevent ordinary transfers?  I mean, I don't

7    know how far this goes with other independent autonomous

8    companies.

9              THE COURT:  It goes this far:  There is no

10   ordinary course transfer of a 70 million-dollar apartment at

11   the Sherry-Netherland.  There is no ordinary course transfer

12   of a 27 million-dollar yacht.  If Mr. Kwok wants to get a

13   haircut or if Mr. Kwok wants to buy a newspaper or if

14   Mr. Kwok wants to take a vacation in the middle of the

15   coronavirus pandemic, that would be ordinary course, but I

16   think everybody on this Microsoft Teams platform understands

17   that there's been a lot of moving around of these two assets

18   that have an aggregate value of at least $75 million, and

19   the plaintiff is entitled to ascertain the entity that

20   presently has title to these assets, how those entities came

21   to have title to those assets, and any intermediate

22   transfers that were made between the time Mr. Kwok was the

23   record owner of these assets and the time that the present

24   record owner came into possession of these assets.

25             MS. CARVALHO:  Understood.

tav

FILED: NEW YORK COUNTY CLERK 11/10/2020 02:41 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 647
RECEIVED NYSCEF: 11/10/2020

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 265 of
269

24

Proceedings

1          So the assets specifically are the Sherry and the

2     yacht, but the position, just to make sure I understand it,

3     is that with respect to other autonomous corporations, they

4     can continue in the ordinary course, there's no ceasing or

5     stopping of business for other legally autonomous entities.

6          THE COURT:  It's not clear to me what other

7     business and what other entities Mr. Kwok has formed.  The

8     intent here which is very clear and specific is that in this

9     2017 case in which there's been a great deal of

10    gamesmanship, a great deal of dissembling, and some flagrant

11    disregard of court orders, I want to know if any transaction

12    is going to take place in which Mr. Kwok is the guiding hand

13    that's something other than an ordinary course of business

14    transaction.

15         MS. CARVALHO:  Okay.  I think we understand.

16         Thank you, your Honor.

17         MR. MOSS:  Your Honor, if I may, just two points.

18         Number one, in terms of the assets, we know that

19    there are also shell companies in Connecticut that own

20    Greenwich real estate that he just bought for like

21    $7 million.  I think the most efficient -- and we don't know

22    what we don't know.  I think the most efficient way to

23    proceed would be for us to be able to serve some sort of

24    interrogatory at the outset, what are the assets and what

25    are the entities that hold them, and then we can proceed to

FILED: NEW YORK COUNTY CLERK 11/10/2020 02:41 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 647
RECEIVED NYSCEF: 11/10/2020

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 266 of
269

25

Proceedings

1    depose Mr. Kwok and those entities if they are entities or

2    Mr. Kwok as the 30(b)(6) for those entities.  I want to do

3    this efficiently and with minimal burden, and rather than

4    just asking him questions that he is going to say he does

5    not know the answer to, I think the most efficient way would

6    be to try to use written discovery to get a list of what the

7    actual assets are.

8            THE COURT:  Look, I'm not going to tell you how to

9    practice law.  You have the transcript of today's

10   proceedings.  I think I've made it very clear what you can

11   do.

12           You can conduct discovery of any assets -- you can

13   conduct discovery of any entity that you have a good faith

14   basis for believing Mr. Kwok directly or indirectly

15   controls.  It can be written discovery, it can be oral

16   discovery.  I'm not going to play schoolyard monitor while

17   you jockey back and forth with discovery disputes about the

18   scope of what you can do.  I think Mr. Kwok's counsel and I

19   think Genever's counsel full understand what is reflected in

20   the transcript of proceedings.  We are dealing with a

21   telescoped period of time here.

22           There's a restraining order that's been entered

23   with respect to two specific assets, and only two specific

24   assets, and there's an alter ego trial that's scheduled for

25   January 15, 2021, and there's a damages hearing that's going

FILED: NEW YORK COUNTY CLERK 11/10/2020 02:41 PM
INDEX NO. 652077/2017

NYSCEF DOC. NO. 647
Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 267 of
269
RECEIVED NYSCEF: 11/10/2020

26

Proceedings

1      to take place sometime before or in conjunction with the

2      alter ego trial.

3              Again, this is a 2017 case, and it's occupied a

4      considerable amount of the Court's time.  It's resulted in

5      several written decisions.  While orders of the Court are

6      either flaunted or exceedingly liberally interpreted, and

7      while intentional or unintentional misstatements that have

8      misled the Court have been made to the Court, we are going

9      to have closure in this case in January of 2021.

10              So the court reporter will give you her e-mail

11      address.  You will order a copy of the transcript.  I can't

12      be any clearer than I've been on this transcript.

13              If any party or any counsel disregards the orders

14      of the Court, there will be serious sanctions.

15              Are we all clear?

16              MR. MOSS:  Yes.

17              Your Honor, may I just -- one question on the

18      damages motion.

19              We filed our motion, they opposed.  I understand

20      the Court is going to have a hearing as soon as possible on

21      this issue.  May we reply because there are some things we

22      would like to put before the Court given that they have

23      opposed and we have not yet replied?

24              THE COURT:  If you wish.  I have explained to you

25      that I am backed up with trials and motions.  I have carved

Case 22-50073   Doc 183-4   Filed 04/06/22   Entered 04/06/22 17:07:45   Page 268 of
269

Proceedings

 1    out a January 15th date.  That's chiseled in stone.  We will

 2    have the alter ego trial on January 15, 2021, if we can get

 3    to the damages hearing before, then we will, but there's not

 4    a lot of time between now and January 15th, and you,

 5    Mr. Moss, are probably going to be quite busy.

 6              MR. MOSS:  Yes, your Honor.

 7              MR. MITCHELL:  Your Honor, one last question

 8    regarding the order here today just because, as you're

 9    aware, Genever New York has filed bankruptcy.  I doubt that

10    any assets within the bankruptcy estate would be sold or

11    anything between now and January 15th, but I want to make

12    sure that myself particularly or any party to the action

13    wouldn't draw the ire of a potential sanction for whatever

14    happens in the bankruptcy court.

15              THE COURT:  No, I cannot -- I have no jurisdiction

16    over any entity that's in bankruptcy.  That doesn't mean

17    applications can't be made by Mr. Moss to the bankruptcy

18    court.  It doesn't mean that Mr. Moss can't refer in any

19    proceedings before the bankruptcy court to the transcript of

20    the proceedings here today, but I well understand the

21    automatic stay of the bankruptcy court with respect to

22    entities that have filed for bankruptcy.

23              MR. MITCHELL:  Thank you, your Honor.

24              THE COURT:  All right.

25              Terry, can you give the parties your e-mail

tav

28

Proceedings

1      address from which they can order a copy of the transcript

2      which will be so ordered and e-filed?

3              Thank you very much.

4              Have a nice day everyone.

5              MR. MOSS:  Thank you, your Honor.

6                        * * *

7              C E R T I F I C A T E

8    I, Terry-Ann Volberg, C.S.R., an official court reporter of

9    the State of New York, do hereby certify that the foregoing

10   is a true and accurate transcript of my stenographic notes.

11

12                              _____
                                Terry-Ann Volberg, CSR, CRR
13       SO-ORDERED 11-9-2020    Official Court Reporter

14

15

16         BARRY R. OSTRAGER, J.S.C.

17

18

19

20

21

22

23

24

25