**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

-------------------------------------------------------------------X
                           :

In re:                          :   Chapter 11
                           :

   Ho Wan Kwok,             :   Case No. 22-50073 (JAM)
                           :

                           :   Date: April 13, 2022
           Debtor.[1]      :   Time: 10:00 AM (ET)
                           :
-------------------------------------------------------------------X

### DEBTOR'S REPLY IN SUPPORT OF APPLICATION OF THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF BROWN RUDNICK LLP AS COUNSEL FOR THE DEBTOR

Mr. Ho Wan Kwok (the "Debtor"), through his undersigned proposed counsel, hereby files this reply in support of the *Application of the Debtor for Entry of an Order Authorizing the Employment and Retention of Brown Rudnick LLP as Counsel for the Debtor*, dated March 15, 2022 [Dkt. No. 86] (the "BR Application"). In support hereof, the Debtor respectfully states as follows:

### **REPLY**

1.    The Debtor received four objections to the BR Application:

(i)    An objection filed by the United States Trustee ("U.S. Trustee") [Dkt. No. 159] (the "UST Obj.");

(ii)    A limited objection filed by the Official Committee of Unsecured Creditors (the "Committee") [Dkt. No. 164] (the "Committee Obj.");

---

1   Although the Debtor's legal name is Ho Wan Kwok, he is also known by the following names: Guo Wengui; Miles Guo; and Miles Kwok.

(iii)     A joinder in the Committee's limited objection filed by Rui Ma, Weican Meng, and Zheng Wu (the "<u>Individual Objectors</u>") [Dkt. No. 178] (the "<u>Individual Objectors Obj.</u>"); and

(iv)     A limited objection filed by Pacific Alliance Asia Opportunity Fund, L.P. ("<u>PAX</u>," and, collectively, with the U.S. Trustee, the Committee, and the Individual Objectors, the "<u>Objectors</u>") [Dkt. No. 169] (the "<u>PAX Obj.</u>").

2.     The Objectors do not object to Brown Rudnick's retention on the basis of the firm's qualifications to serve as general bankruptcy counsel, nor do any of the Objectors allege that Brown Rudnick "holds or represents an interest adverse to the estate" or is not "disinterested," the requirements for approval under 11 U.S.C. § 327(a).

3.     Rather, the Objectors raise arguments that can be generally categorized into four groups:

(a)     <u>**Disclosures/Connections**</u>:  The U.S. Trustee raises objections respecting Brown Rudnick's disclosures set forth in the BR Application and the *Affidavit of William R. Baldiga in Support of Application of the Debtor for Entry of an Order Authorizing the Employment and Retention of Brown Rudnick LLP as Counsel for the Debtor*, dated March 30, 2022 [Dkt. No. 142] (the "<u>Baldiga Initial Aff.</u>," and the engagement agreement annexed thereto, the "<u>Engagement Agreement</u>").  UST Obj. ¶¶ 13-19, at 10-11.  The Individual Objectors separately state that they are evaluating issues respecting Brown Rudnick's prior representation of entities affiliated with Mr. Zheng Wu, and state that they reserve rights in this regard. Individual Objectors Obj. ¶ 2.

(b)     <u>**Specific Terms of Engagement Agreement/Retention Order**</u>:  The U.S. Trustee raises objections regarding certain proposed terms of Brown Rudnick's retention, specifically, (i) Brown Rudnick's right to charge 9% interest on unpaid fees under the engagement agreement; (ii) Brown Rudnick's ability to seek expense reimbursements that purportedly may exceed amounts permitted under the local bankruptcy rules; (iii) the conflict waiver under Brown Rudnick's standard engagement agreement; and (iv) the jurisdictional clause under Brown Rudnick's standard engagement agreement.  UST Obj. ¶¶ 9, 10, 12, at 2, 10-11.

(c)     <u>**Choice of Law**</u>:  The U.S. Trustee objects to the Engagement Agreement's choice of law provision agreed to between the Debtor and Brown Rudnick.

2

(d)     **Retainer**:  The Objectors object to the retainer being held by Brown Rudnick pursuant to the Engagement Agreement (the "Retainer").  The Committee alleges that the Retainer is excessive and that $675,000 of the Retainer should be transferred to the estate.  Committee Obj. ¶¶ 1, 11-28.  The Individual Objectors suggest that there should be an investigation into whether any portion of the Retainer should be transferred to the estate.  Individual Objectors Obj. ¶ 1.  The U.S. Trustee objects to the Retainer to the extent that it is not permitted to fall below $250,000.  UST Obj. at 3, 11.  PAX contends that the Retainer is estate property. PAX Obj. ¶¶ 1-3.[2]

(e)     **Miscellaneous Compensation Objections**:  The Committee objects to Brown Rudnick's standard hourly rates disclosed in the BR Application, and the allowance of fees related to non-working travel.  Committee Obj. ¶¶ 2, 29-33.  The Individual Objectors separately indicate concerns over whether Brown Rudnick can "cost-effectively" represent the Debtor.  Individual Objectors Obj. ¶ 1.

4.      With respect to the first two categories of objections (disclosures/connections and specific terms of engagement), the Debtor offers the following responses, which he believes adequately resolves those objections.

(a)     **Disclosures/Connections**: Attached hereto as **Exhibit B** is the *Supplemental Affidavit of William R. Baldiga in Support of Application of the Debtor for Entry of an Order Authorizing the Employment and Retention of Brown Rudnick LLP as Counsel for the Debtor* ("Baldiga Supp. Aff."), which addresses the various disclosure questions raised by the U.S. Trustee and the Individual Objectors.  As set forth in the attached and in the BR Application and Baldiga Initial Affidavit, Brown Rudnick satisfies both the "adverse interest" and the "disinterestedness" requirements under Bankruptcy Code Section 327(a) and can, therefore, serve as the Debtor's general bankruptcy counsel in this case.  The Debtor specifically notes that, as set forth in the Baldiga Supplemental Affidavit, Brown Rudnick is free to be adverse to Verdolino & Lowey, P.C. and Mr. Craig Jalbert on any matters in this case to the extent that any adversity were to arise.  Baldiga Supp. Aff. ¶¶ 5, 8.

---

[2]     PAX also suggests that the payment of the Retainer to Brown Rudnick may have violated a prepetition injunction issued against the Debtor.  PAX Obj. ¶¶ 2-3.  PAX's suggestion is incorrect.  The injunction cited by PAX, issued in October 2020, related specifically to any interest that the Debtor had in "(1) the Residence at the SherryNetherland Hotel and (2) the yacht, 'the Lady May'".  See Dkt No. 57-2, Exh. 3.  The transcript of the hearing on the injunction, attached hereto as **Exhibit A**, further clarifies the scope of the injunction and the fact that the payment of the Retainer did not fall within its ambit.  See Exhibit A attached hereto, at 23:9-24.

(b)     **<u>Specific Terms of Engagement Agreement/Retention Order</u>**:  To resolve the second category of objections, Brown Rudnick will agree to include the following terms in the order approving Brown Rudnick's retention:

(i)     Notwithstanding anything set forth in the Engagement Agreement to the contrary, Brown Rudnick agrees to waive its right to charge 9% interest on fees unpaid after 30 days.

(ii)    Notwithstanding anything set forth in the Engagement Agreement to the contrary, Brown Rudnick will comply with Appendix D to the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court for the District of Connecticut and 11 U.S.C. § 330 with respect to any request for the reimbursement of expenses.

(iii)   For the avoidance of doubt, during the course of Brown Rudnick's engagement as counsel to the Debtor, Brown Rudnick will not represent any entity on any matter in which such entity's interest is adverse to the estate.

(iv)    Notwithstanding anything set forth in the Engagement Agreement to the contrary, Brown Rudnick agrees that its engagement by the Debtor is subject to the Bankruptcy Court's jurisdiction, including as it relates to the allowance of any fees or other compensation due and owing in respect of the engagement.

5.     Further, to address the U.S. Trustee's objection to the requirement that the Retainer balance not be permitted to fall below $250,000, the retention order will be revised to include that, notwithstanding anything set forth in the Engagement Agreement to the contrary, Brown Rudnick agrees to waive the requirement that the Retainer be replenished.

6.     Attached hereto as **Exhibits C-1** and **C-2**, respectively, are: (i) a revised proposed order approving Brown Rudnick's retention; and (ii) a redline to the original as-filed version of the proposed order showing the foregoing revisions.

7.     The Debtor offers the following responses to the remaining objections raised by the Objectors.

## I.    New York Law Governs The Engagement Agreement.

8.    The U.S. Trustee requests that Connecticut law govern the Engagement Agreement. No other Objector has challenged the choice of law provision under the Engagement Agreement.

9.    The Engagement Agreement contains a clear and unambiguous choice of law provision, which states that the Engagement Agreement "shall be governed by and construed in accordance with the laws of the State of New York".  Engagement Agreement at 3.

10.    Connecticut jurisprudence respects and gives full force and effect to this express choice of law provision.  Fieger v. Pitney Bowes Credit Corp., 251 F.3d 386, 393 (2d Cir. 2001) ("Connecticut law 'give[s] effect to an express choice of law by the parties to a contract provided that it was made in good faith.'") (quoting Elgar v. Elgar, 238 Conn. 839, 848 (Conn. 1996); Valley Juice Ltd., Inc. v. Evian Waters of France, Inc., 87 F.3d 604, 608-09 (2d Cir. 1996) ("Contract clauses which require the application of the laws of other states upon breach or dispute are recognized as proper in Connecticut.") (quoting Syncsort v. Indata Servs., 541 A.2d 543, 545 (Conn. App. 1988); Elgar, 238 Conn. at 850 ("parties to a contract generally are allowed to select the law that will govern their contract") (quoting 1 Restatement (Second), Conflicts of Law § 187); Bank of Am., N.A. v. Klein, No. 3:10-CV-987 JBA WIG, 2012 WL 5286962, at *3 (D. Conn. Oct. 23, 2012) (same).

11.    There is no factual or legal reason that supports the objection and would require the prepetition agreement of the parties to be disrupted.

## II.    Under New York Law, The Retainer Is Not Property Of The Estate.

12.    New York law recognizes three types of retainers:

(i)    A "classic retainer," in which "money is paid by the client to the attorney to secure the lawyer's availability over a prescribed period of time";

(ii)     A "security retainer," in which "the attorney holds the money solely to secure the ability of the client to pay for the services the client expects the lawyer to render in the future"; and

(iii)    An "advance payment retainer," in which "[t]he client pays the attorney in advance for all or some of the legal services which the attorney is expected to provide on behalf of the client."

Ruberto v. DeFilippo, 29 Misc.3d 1236(A), 913 N.Y.S.2d 889, 891 (N.Y. Civ. Ct. 2010) (citing In re McDonald Bros. Const. Inc., 114 B.R. 989, 998 (Bankr. N.D. Ill. 1990); In re Dewey & LeBoeuf LLP, 493 B.R. 421, 428-29 (Bankr. S.D.N.Y. 2013); In re King, 392 B.R. 62, 71 (Bankr. S.D.N.Y. 2008).

13.    With respect to an "advance payment retainer," "ownership of the funds is intended to pass to the attorney at the time of payment in exchange for the promise by the attorney to provide the legal services". Ruberto, 913, N.Y.S.2d at 891; In re Caesars Ent. Operating Co., Inc., 561 B.R. 420, 436 (Bankr. N.D. Ill. 2015) ("An advance payment retainer is a payment in exchange for the commitment to provide future legal services. Like a classic retainer, ownership of an advance payment retainer 'passes to the lawyer immediately upon payment'; unlike a classic retainer, the retainer is an 'advance payment' and so is applied to charges for legal services when rendered."). Thus, funds paid as advance payment retainers "do not become property of the estate". King, 392 B.R. at 7.

14.    To be sure, with respect to an advance payment retainer, "the client retains an interest in that portion of the Retainer that is not yet earned by the lawyer," and "at the conclusion of the representation the lawyer must promptly return any portion of the advance payment retainer that is not earned," but until then, "the advance payment retainer is not client property". Dewey & LeBoeuf, 493 B.R. at 430 (quoting New York State Bar Association Op. No. 816 (Oct. 26, 2007)).

6

15.     Importantly, under New York law, there is a strong presumption that a retainer is an advance payment retainer. Indeed, "absent a 'security retainer' being specifically created in the retainer agreement, New York treats all such legal fee payments as an 'advance payment retainer.'" Ruberto, 913 N.Y.S.2d at 891; Dewey & LeBoeuf, 493 B.R. at 429 ("A retainer is only a security retainer where it is specifically created in the retainer agreement…. Absent an agreement creating a security retainer, 'advance payments may be treated as fees belonging to the attorney upon transfer.'") (quoting King, 392 B.R. at 71).

16.     Consistent with the strong presumption in favor of finding a retainer to be an advance payment retainer, New York law recognizes that, absent an express agreement to treat a fee advancement as client funds (by, for example, depositing such funds in a client trust account), a fee advancement is treated as belonging to the attorney upon transfer. King, 392 B.R. at 71 ("The New York State Bar Association Committee on Professional Ethics, Opinion 570 (1985) states that attorneys may agree with their clients to treat fee advances as client funds by depositing those funds in a client's trust account. Absent such an agreement, an attorney may deposit advance fee payments in its general trust account. In New York, these advance payments may be treated as fees belonging to the attorney upon transfer.") (citing In re D.L.I.C., Inc., 120 B.R. 348, 351 (Bankr. S.D.N.Y. 1990)).

17.     Here, the Retainer constitutes an advance payment retainer and, as such, is not property of the estate. First, the Retainer was paid in advance of legal services that Brown Rudnick was expected to provide to the Debtor. Engagement Agreement at 1-2; Kwok Decl. ¶ 51; Baldiga Initial Aff. ¶¶ 7-8.

18.     Second, the parties intended ownership of the Retainer to pass to Brown Rudnick at the time of payment in exchange for the services that Brown Rudnick promised to provide. The

Debtor directed payment of the Retainer directly to Brown Rudnick and requested that Brown Rudnick apply its future fees and expenses to the Retainer.  Kwok Decl. ¶ 8; Baldiga Initial Aff. ¶¶ 7-8.

19.     Third, the Engagement Agreement does not expressly state that the Retainer will be a "security retainer"; thus, the strong presumption under New York law militates in favor of the Retainer being an advance payment retainer.

20.     Finally, the Engagement Agreement is clear that the Retainer would be maintained in Brown Rudnick's general retainer account, *not* in a client trust account.  Engagement Agreement at 2 ("The Retainer, as well as any future deposits, will be held in the Firm's retainer account.").  Consistent with the express provisions of the Engagement Agreement, the Retainer was not deposited in or transferred to a client trust account.  Baldiga Supp. Aff. ¶ 9(ii).  Rather, the Retainer was initially deposited in Brown Rudnick's general deposit account (along with the firm's other deposits), and then a commensurate amount was transferred from the general deposit account to Brown Rudnick's general retainer account (where it remains to this day, along with the firm's other retainer amounts).  Baldiga Supp. Aff. ¶ 9(iii).

**III.     Alternatively, Brown Rudnick Has A Valid,
            Enforceable, Perfected Security Interest In The Retainer.**

21.     To the extent that the Court were to determine that the Retainer is a "security retainer," rather than an "advance payment retainer," Brown Rudnick nevertheless holds a valid, enforceable, perfected security interest in the Retainer that is senior to any interest of the estate or any other party.

22.     There are three requirements under Article 9 of the Uniform Commercial Code to create a valid and enforceable security interest:

(i)     "value has been given";

    (ii)    the client "has rights in the collateral or the power to transfer rights in the collateral" to the attorney; and

    (iii)    the agreement is evidenced either through a signed security agreement or by transferring possession or control of the collateral to the attorney.  N.Y. U.C.C. § 9-203(b).

23.    Here, all three requirements are satisfied.  <u>First</u>, Brown Rudnick promised to perform the services agreed to under the Engagement Agreement, satisfying the "value has been given" requirement.  Engagement Agreement at 1-2; <u>In re Tuscany Energy, LLC</u>, 561 B.R. 910, 915 (Bankr. S.D. Fla. 2016) ("The Firm holds a valid, enforceable security interest in the Pre–Petition Retainer.  First, value was given by the Firm as the Firm promised to represent the Debtor in this bankruptcy case.").

24.    <u>Second</u>, Lamp Capital LLC ("<u>Lamp</u>") loaned the Retainer amount to the Debtor, who directed Lamp to pay the Retainer to Brown Rudnick, satisfying the "rights in the collateral" requirement.  Kwok Decl. ¶ 51; Baldiga Initial Aff. ¶ 7; <u>Tuscany Energy</u>, 561 B.R. at 915 ("Second, at the time the Debtor paid the Pre-Petition Retainer to the Firm the Debtor owned the funds in its SunTrust Bank account, the source of the Pre-Petition Retainer.").

25.    <u>Third</u>, both the "security agreement" and "possession or control" requirements are met (although only one needs to be satisfied to create a valid security interest).  To the extent that the Court determines that the Engagement Agreement creates a "security retainer" rather than an "advance payment retainer," then the Engagement Agreement satisfies the requirement that there be a signed security agreement.  <u>Tuscany Energy</u>, 561 B.R. at 915 ("Third, the Firm and the Debtor entered into an engagement agreement that specifically addresses the retainer and its use for payment of fees and expenses in this case."); <u>In re Adv. Imaging Techs., Inc.</u>, 306 B.R. 677, 681 (Bankr. W.D. Wash. 2003) ("Under the Employment Agreement, the Debtor agreed that Gray Cary would hold the retainer funds to secure payment for future services rendered to the Debtor.").

26.     Further, Brown Rudnick has possession of and control over the Retainer.  See N.Y. U.C.C. § 9-203(b)(3)(B) and (D) (allowing either possession or control to meet the evidentiary requirement for enforceability); Tuscany Energy, 561 B.R. at 915 ("Also, the Firm is, and has been since November 16, 2015, in possession of the Pre-Petition Retainer by virtue of holding the Pre-Petition Retainer in the Firm's trust account.  All of the requirements for attachment of a security interest under [the U.C.C.] are met.  The Firm's security interest in the Pre–Petition Retainer is perfected by possession"); In re On-Line Servs. Ltd., 324 B.R. 342, 346-47 (B.A.P. 8th Cir. 2005) ("A security retainer involves the attorney holding the client's money as a pledge—a possessory security interest—and the Uniform Commercial Code expressly allows for a possessory security interest in money."); In re North Bay Tractor, Inc., 191 B.R. 186, 187-88 (Bankr. N.D. Cal. 1996) (holding "[t]he attorney's interest in such a retainer is in the nature of a security interest, assuring the attorney of a minimum fee in the case" and stating that requiring the attorney to give up the retainer "would undermine the purpose of retainers...."); In re K & R Mining, Inc., 105 B.R. 394, 398 (Bankr. N.D. Ohio 1989) (finding that "applicant possesses a security interest in the retainer to secure payment of its attorney's fees and expenses").

27.     Brown Rudnick's possession and control over the Retainer perfected the firm's security interest in the Retainer.  See N.Y. U.C.C. § 9-312(b)(1), (3) (security interest in money perfected only by taking possession; security interest in deposit account perfected only by control); In re Shafer Bros. Constr. Inc., 525 B.R. 607, 619 (Bankr. N.D.W. Va. 2015) ("Because Mr. Johnson possessed the $20,000 security retainer in a deposit account that he controlled—his Interest On Lawyer Trust Account ('IOLTA')—he held a perfected security interest in $5,950 thereof to secure the [d]ebtor's payment for services rendered to that point in time.").

28.    Brown Rudnick's perfected security interest in the Retainer is senior to any interest of the estate, any other creditor, or any later-acquired security interest. N.Y. U.C.C. § 9-332; In re EAS Graceland, LLC, Case No. 20-24484, 2021 WL 1941658, at *3 (Bankr. W.D. Tenn. Mar. 4, 2021) ("The Court finds iBorrow has no interest in the Pre-Petition Retainer. 'A transferee of funds from a deposit account takes the funds free of a security interest in the deposit account unless the transferee acts in collusion with the debtor in violating the rights of the secured party.' See Tenn. Code Ann. § 47-9-332. iBorrow has never suggested that the Firm was involved in collusion. Thus, upon payment of the Pre-Petition Retainer to the Firm, iBorrow lost entirely its security interest in such funds. Because iBorrow has no interest in the Pre-Petition Retainer, the Pre-Petition Retainer is not cash collateral. See 11 U.S.C. § 363(a) (non-debtor party must have an interest in the cash, deposit account, or other cash equivalent). The Debtor need not obtain iBorrow's consent for use of the Pre-Petition Retainer. See 11 U.S.C. § 363(c)(2)(A). The Firm is free to apply the Pre-Petition Retainer in payment of fees and expenses approved by this Court.").

29.    The Objectors' contention that the Retainer is excessive under 11 U.S.C. § 329 is not supported by the law or the facts. Almost none of the case law cited by the Committee is remotely applicable to the case at bar. See, e.g., In re Printing Dimensions, Inc., 153 B.R. 715, 719-20 (Bankr. D. Md. 1993) (applying Maryland law, not New York law, and nevertheless observing that "[c]ounsel, however, will not be required to share a prepetition retainer pro rata with other administrative claimants, where either the retainer is treated as security or the retainer is held in trust."); In re Chez, 441 B.R. 724 (Bankr. D. Conn. 2010) (ordering fee disgorgement because compensation was not properly disclosed; declining request for further disgorgement of fees for services rendered); In re Glemaud, No. 11-31697, 2013 WL 4498677, at *4–5 (Bankr. D.

Conn. 2013) (finding that services provided by lawyer in preparing five consecutive bankruptcy petitions over eighteen-month period did not benefit estates).  And, the one case that is relevant, In re D.L.I.C., Inc., 120 B.R. 348 (Bankr. S.D.N.Y. 1990), actually supports the position that the Retainer is not property of the estate, but rather is an advance payment retainer.

30.    Moreover, the Retainer is reasonable in light of the particular facts and circumstances of this case.  The Retainer was integral to Brown Rudnick's agreement to accept the Debtor's engagement and enter into the Engagement Agreement.  Baldiga Supp. Aff. ¶ 9(i).  Given, among other things, the exigencies of the Debtor's prepetition situation (including the Debtor's potential imminent incarceration), the highly contentious nature of the relationship between the Debtor and certain of his creditors (including PAX, which is represented by its own experienced counsel), the complex issues implicated by the Debtor's bankruptcy case, the Debtor's need for highly skilled and experienced counsel, and the significant fee risk given the Debtor's prepetition financial position, the Retainer was and is reasonable as a form of advance payment for the substantial services that Brown Rudnick agreed and is expected to provide under the Engagement Agreement.  Id.  Brown Rudnick would not have accepted this engagement without the Debtor's agreement to and payment of the Retainer.  Id.

31.    In short, the Debtor required skilled and experienced bankruptcy counsel; such counsel is entitled to obtain financial assurance respecting the engagement (as it would other engagements); and under the circumstances of this case, the Retainer was reasonable.  In re Robotics Resources R2, Inc., 117 B.R. 61, 63 (Bankr. D. Conn. 1990) (in denying request to have retainer returned, stating: "A prerequisite to a successful chapter 11 case is that the debtor have skilled legal counsel.  As the court in In re Martin, 817 F.2d 175, 181 (1st Cir.1987), stated, "[i]t

will sometimes be difficult to obtain competent counsel in anticipation of a bankruptcy proceeding unless the lawyer's financial well being can be assured to some extent.").

32.    The Committee's citations to retainers paid in other Brown Rudnick debtor engagements are irrelevant, and the factual circumstances surrounding those cases are markedly different from here.  Committee Obj. ¶¶ 18-19.  For example, In re Herald Media Holdings, Inc., Case No. 17-12881 (Bankr. D. Del.), involved a debtor with (i) approximately $34 million in operating revenues the year prior to the bankruptcy filing; (ii) approximately $6 million in cash or cash-equivalent assets (accounts receivable) on hand as of the petition date; (iii) a $5 million stalking horse bid for its assets; and (iv) a $500,000 DIP loan, which was approved on an uncontested basis.  Further, Brown Rudnick was paid approximately $269,100 prior to the filing.  Baldiga Supp. Aff. ¶ 10.  And, in In re Dean and DeLuca New York Inc., Case No. 20-10916 (Bankr. S.D.N.Y.), the Debtor (i) paid Brown Rudnick retainers totaling approximately $517,000 prior to the petition date (the debtor paid all bankruptcy advisors total retainers of approximately $750,000), with approximately $374,000 of the retainer balance remaining as of the filing; (ii) had certain cash-generating assets (e.g., franchise agreements that generated $1.5 million in the prior year); (iii) had other tangible assets (property and equipment with a book value of $20 million; registered trademarks with a book value of approximately $50 million); and (iv) obtained approximately $2.4 million in DIP financing.  Baldiga Supp. Aff. ¶ 11.  Suffice it to say, those engagements represented materially different factual circumstances than this case.

## IV.    **Miscellaneous Compensation Objections**.

33.    The Committee takes issues with the hourly rates cited by the Debtor in the BR Application and the potential reimbursement for non-working travel.  The Individual Objectors raise concerns regarding whether Brown Rudnick can "cost-effectively" represent the Debtor.

These objection points are in the nature of fee objections, and are not relevant to the approval of Brown Rudnick's retention pursuant to Bankruptcy Code Section 327(a). To the extent that the Committee or the Individual Objectors wish to press an objection to the allowance of any Brown Rudnick fees, the appropriate context in which to lodge such an objection would be in respect of a request for approval of compensation pursuant to Bankruptcy Code Section 330. To be sure, Brown Rudnick stands by its hourly rate structure, particularly given, among other things, the exigencies of the Debtor's bankruptcy filing, the novel and complex issues implicated by the Debtor's bankruptcy filing, and the skill and experience of the Brown Rudnick attorneys advising the Debtor, and will be prepared to satisfy its burden in respect of the allowance of any requested compensation in due course.

*[Remainder of page intentionally left blank.]*

## <u>CONCLUSION</u>

**WHEREFORE**, the Debtor requests that the Court grant the relief requested in the BR Application, overrule the Objectors' objections, and grant to the Debtor such other or further relief as is appropriate.

Dated:  April 10, 2022

**BROWN RUDNICK LLP**

By: */s/ William R. Baldiga*

Dylan P. Kletter, Esq.
185 Asylum Street
Hartford, Connecticut 06103
Telephone: (860) 509-6500
Facsimile: (860) 509-6501
Email: dkletter@brownrudnick.com

-and-

William R. Baldiga, Esq.
Robert J. Stark, Esq.
Jeffrey L. Jonas, Esq.
Bennett S. Silverberg, Esq.
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
Email: wbaldiga@brownrudnick.com
          rstark@brownrudnick.com
          jjonas@brownrudnick.com
          bsilverberg@brownrudnick.com

*Proposed Counsel for*
*Ho Wan Kwok, Debtor*

# **Exhibit A**

Case 22-50073   Doc 195   Filed 04/10/22   Entered 04/10/22 18:05:39   Page 17 of 60

1

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF NEW YORK:  TRIAL TERM PART 61

3    - - - - - - - - - - - - - - - - - - - - - - - - - - X

4    PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

5                           Plaintiff,

6        - against -

7    KWOK HO WAN, a/k/a KWOK HO a/k/a GWO WEN GUI
     a/k/a GUO WENGUI a/k/a GUO WEN-GUI a/k/a
8    WAN GUE HAOYUN a/k/a MILES KWOK a/k/a HAOYUN GUO,
     GENEVER HOLDINGS CORPORATION and GENEVER HOLDINGS LLC,
9
                          Defendants.
10
     - - - - - - - - - - - - - - - - - - - - - - - - - - X
11   Index No. 652077/2017

12                      October 15, 2020
                        Teams Proceeding
13
     B E F O R E:   THE HONORABLE BARRY R. OSTRAGER, Justice
14
     A P P E A R A N C E S:
15
     O'MELVENY & MYERS LLP
16   Attorneys at Law
     7 Times Square
17   New York, New York 10036
     BY:  STUART SARNOFF, ESQ.
18        EDWARD MOSS, ESQ.

19   BAKER & HOSTETLER LLP
     Attorneys at Law
20   45 Rockefeller Plaza, 14th Floor
     New York, New York 10111
21   BY:  JOHN SIEGAL, ESQ.
          MELISSA CARVALHO, ESQ.
22        ERICA BARROW, ESQ.

23

24

25                  (Appearances continued on next page.)

                            tav

```
 1    A P P E A R A N C E S:   (Continuing)

 2    LAWALL & MITCHELL LLC
      Attorneys at Law
 3    162 East 64th Street
      New York, New York 10065
 4    BY:  AARON A. MITCHELL, ESQ.

 5

 6

 7

 8                              Terry-Ann Volberg, CSR, CRR
                                Official Court Reporter
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Proceedings

1          THE COURT:  Good morning.

2          There are a few housekeeping matters that I want

3     to address before we discuss the application for a temporary

4     restraining order.

5          If you are not speaking, please mute your

6     microphone so we don't get static.  Thank you.

7          So, as I started to say, there are a few

8     housekeeping matters I want to resolve before we address the

9     application for a temporary restraining order.  We are

10    technically scheduled to discuss plaintiff's application for

11    attorney's fees, and there's in the motion part a motion by

12    the defendant to add an affirmative defense of failure to

13    mitigate damages.  With respect to the latter issue,

14    Mr. Moss, I would like you to stipulate that at trial we

15    will conform the pleadings to the proof adduced at the

16    trial, and because I addressed the mitigation of damage

17    issue in my September 15th decision and order, and because

18    that issue has always been at least peripherally in the

19    case, I would like you to stipulate that that will be one of

20    the issues that will be addressed at the plenary trial, and

21    avoid the necessity of motion practice, and so I would like

22    to mark that motion as withdrawn without prejudice on

23    consent.  Is that acceptable to you?

24          MR. MOSS:  Your Honor, I just -- I just would like

25    to understand, my understanding was that the Court was going

FILED: NEW YORK COUNTY CLERK 10/23/2020 06:21 PM   INDEX NO. 652077/2017
NYSCEF DOC. NO. 637   Case 22-50073   Doc 195   Filed 04/10/22   Entered 04/10/22 18:05:39   Page 20 of 60
RECEIVED NYSCEF: 10/23/2020

4

Proceedings

1    to make a determination on damages.  You had ordered us to

2    put our calculation in.  I thought the mitigation issue had

3    already been decided by the Court on summary judgment, and

4    that there was not going to be a trial on damages, that this

5    was going to be done so that you could get the calculation

6    so that the Clerk of Court could issue the judgment.  That's

7    what was in the order, and so I did not understand that

8    there was going to be a trial, and we do not believe that

9    there are any issues of fact for a trial.

10           THE COURT:  My understanding is that I granted you

11   summary judgment on liability which is why you're privileged

12   to make the 5229 application that you're making today, and

13   we deferred the calculation of damages because there are

14   issues of fact relating to the quantum of damages.  I found

15   that your proof was insufficient for me to grant summary

16   judgment on the issue of damages.  So that's something

17   that's going to be addressed at the hearing which I believe

18   we scheduled for January.

19           MR. MOSS:  So my understanding, your Honor, was

20   that the January trial was on the veil piercing issues --

21           THE COURT:  It is, it is.

22           MR. MOSS:  -- and that the only defense on damages

23   that Mr. Kwok has proffered, your Honor, is mitigation.

24   Mitigation was something that the Court has already rejected

25   as a matter of Hong Kong law on summary judgment.

tav

Case 22-50073   Doc 195   Filed 04/10/22   Entered 04/10/22 18:05:39   Page 21 of 60

Proceedings

1          THE COURT:  I specifically referenced it in the

2      September 15th decision.  Now I referenced it in a manner

3      suggesting that I thought it was a dubious claim, and I

4      still think it's a dubious claim because I don't think it

5      was incumbent upon your client post facto to purchase an

6      apartment from the Communist Chinese Party at what would

7      appear to be an above-market price, and that's what I said

8      in my September 15, 2020, decision.

9          So there's a motion by the defendant to amend his

10      answer to assert a defense of failure to mitigate damages.

11      Whenever we get around to assessing damages, I'm going to

12      hear the defendant on the mitigation issue.  Now if you want

13      him to make a motion, and you want me to decide the motion,

14      there is nothing I can do other than allow him to make the

15      motion, have you respond to the motion, and then decide the

16      motion.  And since any hearing that we have is one at which

17      I'm going to conform the pleadings to the proof that's

18      adduced at trial, I thought as a housekeeping matter we'd

19      have the defendant withdraw that motion without prejudice

20      and for you to be content with that state of play.

21          MR. MOSS:  Okay, that's fine.  If your Honor is

22      going to grant the motion anyway on the motion for leave to

23      amend, we can stipulate to that.

24          We have a pending motion for damages, and they --

25          THE COURT:  Yes.

6

Proceedings

1          MR. MOSS:  So how would your Honor like to resolve

2     the damages issue?

3          THE COURT:  We are going to have a hearing on the

4     damages issue and that hearing is not today.

5          MR. MOSS:  Yes.

6          THE COURT:  So at that hearing whatever the

7     defendant wants to proffer in connection with this

8     mitigation of damage theory which I strongly indicated in my

9     September 15, 2020, decision and order is quite dubious,

10    they will be permitted to adduce whatever evidence they

11    have, if any, on that theory in connection with the damages

12    hearing.

13         Let me ask counsel for the defendant if we can

14    mark the motion to amend the answer as withdrawn without

15    prejudice in light of what is now on the transcript of

16    proceedings of today?

17         MR. SIEGAL:  Yes, John Siegal, Baker Hostetler,

18    for defendant Kwok.

19         We certainly consent to that result, and will

20    serve our Second Amended Answer following today and file it

21    so it's of record and that's the basis on which we will

22    proceed to the hearing.

23         THE COURT:  Fair enough.  It's really not

24    necessary for you to file a Second Amended Complaint, but I

25    think it's very clear on the transcript of the proceedings

Proceedings

1    of today that we are going to have a damages hearing, and at

2    the damages hearing you will be able to adduce whatever

3    testimony you wish or whatever documents you wish to

4    introduce on the mitigation portion claim, and it's really

5    just burdensome to the Court and burdensome to the plaintiff

6    for you to file a Second Amended Complaint and for the

7    plaintiff to have to respond to it.

8            So the record speaks for itself.  I would just

9    like a little cooperation from you and Mr. Moss here.

10           MR. SIEGAL:  Yes, your Honor.  We appreciate the

11   Court allowing us the opportunity to adduce evidence on that

12   issue, and we will be ready at the hearing, and we have had

13   good cooperation with Mr. Moss since we have appeared in the

14   case, and I'm sure we will continue to, and we look forward

15   to that opportunity to try to convince your Honor, who we

16   understand it's dubious, that on full examination there's a

17   mitigation defense here that has a very substantial impact

18   on the damages, so thank you.

19           THE COURT:  All right.

20           We will not have any Second Amended Complaint, and

21   we are not going to have any motions, correct?

22           MR. SIEGAL:  Yes, your Honor, understood.

23           THE COURT:  All right.

24           Now the second housekeeping matter that we have is

25   attorney's fees.  Since there are going to be further

tav

Proceedings

1    proceedings, it doesn't make any sense to address attorney's

2    fees today because there will be more attorney's fees in

3    connection with the two hearings that we are going to have,

4    one on damages and the other that's been previously

5    scheduled for January 15th.

6             So with your consent, Mr. Moss, I would like to

7    adjourn your application for attorney's fees to a more

8    appropriate time.

9             MR. MOSS:  That's fine.  That's fine, your Honor.

10             I guess, you know, the attorney's fees are

11    contract damages just like the principal and interest, and I

12    would propose that we submit our evidence at the hearing or

13    concurrently with the hearing.  I guess we really wouldn't

14    have any witnesses on the attorney's fees other than Mr.

15    Lewis.  I think we should do it at the hearing, your Honor,

16    that would make the most sense to me, at the damages

17    hearing, because they are really part of the damages.

18             THE COURT:  When all proceedings in this case are

19    concluded you will be awarded whatever contractually

20    entitled attorney's fees are due you.  It's just not a today

21    issue, it's an issue that awaits future resolution.  All

22    right.

23             MR. MOSS:  Yes, your Honor.

24             And do we have -- do you have a sense of when you

25    would like to conduct the hearing on damages?

tav

FILED: NEW YORK COUNTY CLERK 10/23/2020 06:21 PM    INDEX NO. 652077/2017
NYSCEF DOC. NO. 637    Case 22-50073   Doc 195   Filed 04/10/22   Entered 04/10/22 18:05:39   Page 25 of 60   RECEIVED NYSCEF: 10/23/2020

9

Proceedings

1              THE COURT:  As soon as I can.

2              Not for anything, you're all aware of the fact

3       that Justice Scarpulla has been elevated to the Appellate

4       Division, Justices Friedman and Sherwood are retiring in the

5       near term, so there are only five Commercial Division judges

6       who are currently in the wheel, and Justice Scarpulla's

7       cases have been reallocated to the five justices who remain

8       in the wheel.  So we are all a little busy now.

9              MR. MOSS:  Yes, your Honor.

10             THE COURT:  You have a January 15th date on your

11      other issue.  We will try and find a convenient time to

12      resolve damages and attorney's fees.

13             So now let's get to the only thing that I want to

14      deal with this morning which is your application under CPLR

15      5229 for a restraining order that extends to Mr. Kwok's

16      assets, and which you believe should be extended to entities

17      that he controls whether they be single purpose LLCs or

18      family members like his son.

19             So I will hear you, Mr. Moss.

20             MR. MOSS:  Thank you.

21             Your Honor, as far as the relief goes under 5229,

22      I don't think Mr. Kwok disputes that we are entitled to some

23      relief.  He does not contest that Pacific Alliance meets the

24      standard.  He does not dispute our contention that he

25      intends to dissipate his assets, a process that has already

FILED: NEW YORK COUNTY CLERK 10/23/2020 06:21 PM          INDEX NO. 652077/2017
NYSCEF DOC. NO. 637    Case 22-50073   Doc 195   Filed 04/10/22   Entered 04/10/22 18:05:39   Page 26 of 60   RECEIVED NYSCEF: 10/23/2020

10

Proceedings

1    begun with this sham bankruptcy proceeding.

2              The Court has suggested that there's a showing

3    necessary beyond the fact of just prevailing on the

4    judgment.  We have submitted that all you need to do is

5    prevail on summary judgment.  The Court suggested that there

6    might be a an additional showing necessary so we did set

7    that forth in our papers.

8              There's a clear and significant risk here that if

9    left unchecked Mr. Kwok will continue to do everything in

10   his power to shield assets and render this judgment

11   uncollectible whether it's committing perjury, whether it's

12   disobeying Court orders or whether it's making this sham

13   bankruptcy petition.  We have been saying this judge for

14   years.  It's why we requested the attachment.  We also knew

15   what was going to happen.  We would win because Mr. Kwok had

16   no legitimate defense, and then Mr. Kwok would evade the

17   judgment, and that he would do whatever he can do to ensure

18   that my client is left holding the bag.

19             So the two issues specifically before the judge on

20   the 5229, there are two arguments that Mr. Kwok makes to

21   sort of limit the relief that we are requesting.  So I will

22   deal with it, what I think is the easier one first.

23             First, Mr. Kwok does not dispute that we are

24   entitled to depose him and to discovery into him, but he

25   argues that the discovery should only be into assets that we

tav

Case 22-50073    Doc 195    Filed 04/10/22    Entered 04/10/22 18:05:39    Page 27 of 60

11

Proceedings

1    have not sought discovery for, that we have not gotten

2    discovery for.  The only asset related to discovery in this

3    case was during the attachment phase, and Mr. Kwok and his

4    prior counsel vehemently and consistently refused to provide

5    any discovery into any assets other than the

6    Sherry-Netherland residence.  I think we are all in

7    agreement, actually, that all of the other assets are fair

8    game.

9            As for the apartment, the residence, there's no

10   reason to limit the discovery on that.  This is the only

11   asset we have identified that Mr. Kwok has in New York.  It

12   seems to be the largest asset that he has in this country,

13   and it's perhaps the largest asset he has anywhere that has

14   not been frozen by the Chinese government.

15           Now, Mr. Kwok's prior counsel denigrated us, they

16   said we were hysterical, we were afraid of the merits

17   because we kept seeking to attach the apartment.  We knew

18   who we were dealing with and we knew we would end up here,

19   that this asset was our best chance to collect.

20           We are entitled to discovery into that asset.

21   There's no appreciable burden associated with this

22   discovery, and we have not taken any discovery on the

23   apartment for two years.

24           There are new arguments, there are new things to

25   discover.  For example, Mr. Kwok is now claiming in his

tav

FILED: NEW YORK COUNTY CLERK 10/23/2020 06:21 PM    INDEX NO. 652077/2017
NYSCEF DOC. NO. 637    Case 22-50073    Doc 195    Filed 04/10/22    Entered 04/10/22 18:05:39    Page 28 of 60    RECEIVED NYSCEF: 10/23/2020

12

Proceedings

1     bankruptcy petition that there's another company, not just

2     the New York company owned by the BVI company, the two

3     Genever entities, there's a new company, a new shell company

4     called Bravo Luck, and that's really the beneficial owner of

5     the apartment, and that has been paying the expenses, and

6     that is owned wholly by his son.  So his argument in the

7     bankruptcy is not that he has any legitimate creditors, it's

8     that the apartment is held in trust for his son, and his son

9     should take priority over Pacific Alliance.

10          It's all a shell game.  We are entitled to explore

11     that and whatever else had is happening in the last few

12     years.  They put the apartment on the market, and then they

13     took it off the day of the attachment proceeding so that

14     they could argue to you in court, hey, it's not on the

15     market any more, you shouldn't attach it.  We are entitled

16     to that discovery, and that's what CPLR 5229 is intended to

17     give us, giving the judgment creditor precisely the

18     information of who owns the assets, where they are located.

19          The second issue that they raise, your Honor, and

20     that's the one that you started this conversation with, is

21     what should be the scope here, should the restraining order

22     relate only to Mr. Kwok's assets, to Mr. Kwok's assets that

23     he indirectly and directly owns?  What they are trying to

24     say here is that it should only pertain to assets he "owns

25     directly."  That is an exception that would swallow the rule

tav

13

Proceedings

1   because Mr. Kwok does not hold any assets directly. That is

2   his MO. He holds assets through multiple layers of family

3   members, multiple layers of shell companies precisely for

4   this reason so creditors like us can't reach them.

5       Mr. Kwok admitted it in his deposition in another

6   case. He said, he testified under oath, we quote this, "In

7   reality I don't have any assets under the law. I'm

8   penniless." He makes those claims because of the way he

9   structures his holdings like the apartment. I told you, for

10  example, shell company, shell company that he now says his

11  son owns, and this is a company, Bravo Luck, that he says

12  his son owns even though he used to hold it, 50 percent of

13  it, and apparently says now he sold it to his son for a

14  dollar based on documents he didn't produce in this case,

15  backdated, forged documents.

16      This entire thing is a sham, that his 20-something

17  year old son at the time was really the one to pay

18  $70 million for the apartment, he's the rightful owner of

19  the apartment? It's all a game to make sure we are unable

20  to collect.

21      There's also a 30 million-dollar yacht. That one

22  is held by a Hong Kong company.

23      THE COURT: I thought it was $27 million.

24      MR. MOSS: I'm sorry, I was rounding up. I was

25  rounding up.

FILED: NEW YORK COUNTY CLERK 10/23/2020 06:21 PM    INDEX NO. 652077/2017

NYSCEF DOC. NO. 637    Case 22-50073    Doc 195    Filed 04/10/22    Entered 04/10/22 18:05:39    Page 30 of 60    RECEIVED NYSCEF: 10/23/2020

Proceedings

1          There's a 27 million-dollar yacht held by a Hong

2     Kong company, and once we are allowed to take discovery we

3     will find more assets held by more shell companies of which

4     Mr. Kwok or one of his children is the sole owner.

5          Here's the issues:  If they ask you to only enjoin

6     him from dissipating his assets that he holds directly, that

7     would exclude everything, and it would exclude everything

8     even though Mr. Kwok has said that these are his assets.

9          He submitted an affidavit to this Court saying he

10    owned the apartment.  He submitted, he filed a complaint

11    last month in New York saying that the yacht was "his

12    yacht."  These are his assets, and it's permitted by the

13    statute, CPLR 5229, to have a restraining order that applies

14    to assets held directly and indirectly.

15         CPLR 5229 provides that a plaintiff can have

16    prejudgment restraint in the same way it can have

17    post-judgment restraint.  Post-judgment restraint is

18    governed by CPLR 5222, and that says that the restraints

19    apply to property in which he or she, meaning the judgment

20    debtor, "has an interest."  It doesn't say direct interest,

21    it says an interest.  Mr. Kwok has already testified, he's

22    already submitted evidence in this case that he owns the

23    apartment, and he has judicial admissions that he owns the

24    yacht.

25         So their cases that they cite for the proposition

Case 22-50073   Doc 195   Filed 04/10/22   Entered 04/10/22 18:05:39   Page 31 of 60

15

Proceedings

1    that CPLR 5229 and 5222 only apply to direct assets are

2    completely inapposite because none of them involve a

3    situation whereas here the defendant has actually claimed

4    that he owns these assets.

5            THE COURT:  Mr. Moss, I understand your argument.

6            Let me hear from Mr. Siegal.

7            MR. MOSS:  Thank you, your Honor.

8            MS. CARVALHO:  Good morning.  Melissa Carvalho

9    from Baker & Hostetler for Mr. Kwok.

10           I just want to begin by saying we have repeatedly

11   heard this morning Mr. Moss saying "Mr. Kwok's bankruptcy."

12   The bankruptcy petition that was filed was not Mr. Kwok's.

13   We have been made aware of it as the Court has been made

14   aware of it.  On its face it says that it's filed by an

15   entity, one of the entities who has counsel here present

16   today.  So if any questions or issues are arising relating

17   to the bankruptcy, I cannot speak to it, but Mr. Mitchell

18   certainly can.

19           So on CPLR 5229 the relief being sought by

20   plaintiff in the TRO and order to show cause is far broader

21   than that provided under CPLR 5229.  Plaintiff seeks to

22   enjoin and restrain defendant Kwok with respect to "any

23   property in which he has an interest," but CPLR 5229's

24   application is limited to Mr. Kwok, the adverse party.

25           CPLR 5229 specifically states that "the trial

tav

Case 22-50073    Doc 195    Filed 04/10/22    Entered 04/10/22 18:05:39    Page 32 of 60

16
Proceedings

1    judge may order examination of the adverse party and order

2    him restrained with the same effect as if a restraining

3    notice had been served upon him after judgment." Courts

4    have strictly construed the language of CPLR 5229. The

5    adverse party is Mr. Kwok, and the Court's decision and

6    order on summary judgment is limited to him individually.

7         Plaintiffs have spent a lot of time in their reply

8    seeking to continue to poison the well against Mr. Kwok, but

9    that is simply because plaintiff cannot present authority to

10   support its unilateral expansion of CPLR 5229.

11        Plaintiff presented the Court with various

12   categories of cases where CPLR 5229 relief has been granted,

13   but that goes to the Court's discretion to grant this

14   relief. The statute says the Court "may order relief under

15   5229," and we are not disputing that. Yes, a Court can

16   award CPLR 5229 relief in many different fact patterns, but

17   the relief is still limited to what is provided in CPLR

18   5229, and plaintiff has not shown any basis supporting its

19   unilateral expansion of the statute besides it's just what

20   they want.

21        The cases cited by plaintiff, in fact, do not

22   expand the scope of CPLR 5229. The APF case, Gallegos case,

23   Safeco case, Unex case and Leser case all limit the relief

24   to the specific adverse party and not to any "interest" that

25   party may have. In the Eastern District of New York in the

Case 22-50073    Doc 195    Filed 04/10/22    Entered 04/10/22 18:05:39    Page 33 of 60

17

Proceedings

1    Leser v. U.S. Bank case the Court specifically stated,

2    "Plaintiff is correct, however, that the scope of the order

3    should be limited to the restraint on the assets of

4    plaintiff Leser."  USB had originally sought restraints

5    against "plaintiff Leser and any person, company or other

6    entity controlled by him," but then USB conceded during

7    argument that it was only seeking restraint as to plaintiff

8    Leser, and the Court found that appropriate and proper.

9    Nothing plaintiff says can change that.  The statute only

10   provides the relief that it provides.  So let's look at the

11   statute.

12            The statute provides for examination and

13   restraints.  Examination:  Here Mr. Kwok's assets have

14   already been addressed in discovery.  Mr. Kwok has been

15   deposed three times in this matter, on October 3rd, 2018,

16   November 25, 2019, and December 11, 2019.  Mr. Kwok has

17   produced over 14 pages of documents.  Plaintiff has had

18   multiple opportunities to sufficiently examine Mr. Kwok,

19   and, in fact, if you look at plaintiff's second set of

20   document requests attached to my affirmation you see that

21   they were, in fact, targeting assets.

22            Now plaintiff argues that passed discovery is

23   insufficient, but the record shows that there was, in fact,

24   disclosure.  Objections were certainly made based on the

25   scope.  There were questions asked of Mr. Kwok such as,

18

Proceedings

1      "Were any of your assets received by the Chinese

2      government," but by not allowing fishing expeditions that

3      does not mean that discovery was not sufficient.

4                I also note there were disputes in the past, and

5      those discovery disputes have been resolved, but creating

6      confusion by making these broad-sweeping statements, and

7      attaching e-mails without original letters that they are

8      responding to does not change that.

9                Now turning to the second part that the statute

10     allows restraint, but restraint is limited to CPLR 5229 and

11     is distinguishable from the restraint provided under CPLR

12     5222.  The relief sought here pursuant to 5229 is applicable

13     before a judgment has been entered so unlike post-judgment

14     devices which are available against third-parties, the

15     restraining powers under CPLR 5229 can only be used against

16     "the adverse party."  However, at any posture restraint is

17     always limited to property in which Mr. Kwok has a direct

18     and actual interest.  Restraint will not apply to indirect

19     interests including interest held in a corporation, proceeds

20     of property, or even assets of an alter ego until alter ego

21     status has been adjudicated and liability has been

22     determined.

23                Plaintiff also cannot use CPLR 5229 as an end run

24     under the requirements for prejudgment attachment statutes.

25     Here plaintiff's application relies ad nauseam and we have

tav

Case 22-50073   Doc 195   Filed 04/10/22   Entered 04/10/22 18:05:39   Page 35 of 60

19

Proceedings

1    heard his counsel repeat this morning and admit that the

2    sole focus here is on the ownership of the residence at the

3    Sherry.  Plaintiff himself says Mr. Kwok is not the owner of

4    the Sherry.  The Court has acknowledged and stated Mr. Kwok

5    is not the owner of the Sherry.  And even though Mr. Kwok

6    does not have a direct interest in the residence at the

7    Sherry, he agreed on consent to a court order where he would

8    provide plaintiff with immediate written notice of any

9    contract to sell, assign, pledge or transfer any assets of

10   the respective defendant entity to any third-party.  So

11   plaintiff has received broader relief on subsequent than it

12   would have been entitled on this instant publication under

13   CPLR 5229 so, therefore, there's no concern with respect to

14   dissipation of the Sherry.

15        Now plaintiff argues that Mr. Kwok is trying to

16   weaken the relief that they are seeking, but in actuality we

17   are adhering to the statute and the powers that the Court

18   has given under the statute.  Plaintiff is relying on

19   statements allegedly made by Mr. Kwok regarding his

20   ownership of assets.  Mr. Kwok can say anything he wants to,

21   ownership is a factual legal issue.  If he does not own it,

22   he does not own it, period.  That is not enough to give you

23   broader relief under CPLR 5229.

24        Discovery has been conducted.  The plaintiff's

25   focus here is solely on the Sherry, as we have repeatedly

tav

Proceedings

1    heard this morning.  Any further examination is a waste of

2    time and money.  The subject is already -- the Sherry is

3    already subject to an order and it's restrained.

4              None of plaintiff's arguments change the

5    application of CPLR 5229 here.  That's it.

6              Now importantly relief under 5229 rests within the

7    sound discretion of the Court, absolutely, but Mr. Kwok has

8    already been examined, and any further examination should be

9    limited to assets and topics not previously addressed in

10    discovery.  Redundant and duplicative discovery are not

11    authorized under CPLR 5229.

12              And the transfer of the Sherry, as we have already

13    mentioned several times, it's already been restricted, and

14    any further restraints should be denied.  We have a consent

15    order in place that Mr. Kwok has agreed to, and Mr. Kwok

16    does not have a direct interest in the residence at the

17    Sherry.

18              So Mr. Kwok requests that this Court vacate the

19    TRO, deny plaintiff's motion for CPLR 5229 relief as it far

20    exceeds the scope of CPLR 5229.  Mr. Kwok has already been

21    examined, and his assets have already been discovered and

22    restrained by this Court, but should this Court be inclined

23    to grant plaintiff's relief under CPLR 5229, Mr. Kwok would

24    request that this Court use its discretion to modify such

25    relief to Mr. Kwok's assets in his individual capacity as

Case 22-50073    Doc 195    Filed 04/10/22    Entered 04/10/22 18:05:39    Page 37 of 60

Proceedings

1    the "adverse party," and Mr. Kwok's assets not previously

2    the subject of prior discovery and court orders relating to

3    a transfer.

4         Thank you, your Honor.

5         THE COURT:  Okay.  Does anybody from Genever want

6    to say anything?

7         MR. MITCHELL:  No, your Honor.  I think that was

8    well said.  I join Ms. Carvalho in her argument.

9         THE COURT:  All right.

10        Look, this is a 2017 case.  We've had multiple

11   motions relating to Mr. Kwok's assets.  The Court believes,

12   as reflected in the September 15, 2020, order that Mr. Kwok

13   has attempted to mislead the Court.  The Court believes that

14   Mr. Kwok is, as the plaintiff contends, playing a shell game

15   with his assets, and has violated if not the letter of court

16   orders, the spirit of court orders.  This is going to come

17   to an end on or shortly after January 15, 2021, when we have

18   the trial on the alter ego issue, but between now and the

19   commencement of the January 15, 2021, trial Mr. Kwok and any

20   entities that he directly or indirectly controls are

21   restrained from alienating or transferring any property that

22   Mr. Kwok has a direct or indirect interest including most

23   specifically the apartment at the Sherry-Netherland Hotel

24   which was the subject of 2018 discovery and a consent order

25   to which counsel for Mr. Kwok referenced, and also the yacht

22

Proceedings

1    which Mr. Kwok has at various times claimed ownership of.

2    So the net result is that I exercise my discretion under

3    CPLR 5229 to restrain any further transfers of the

4    Sherry-Netherland apartment which Mr. Kwok once owned, and

5    the 27 million-dollar yacht which Mr. Kwok once claimed to

6    have owned.

7        So we are not going to have any more shell games.

8    Wherever these assets are held, they are going to remain

9    held where they presently reside, and if it's determined

10   that the entities that are presently listed as the owners of

11   the assets are the alter ego of Mr. Kwok or are wholly

12   dominated and controlled by Mr. Kwok, those assets will be

13   made available to satisfy any judgment that the plaintiff

14   recovers.

15       In the interim, between now and the January 15,

16   2021 trial on the alter ego issues, the plaintiff can

17   conduct discovery of any of the entities that claim to own

18   the Sherry-Netherland apartment or the yacht, and counsel

19   for Genever and counsel for Mr. Kwok are directed to

20   forthwith provide counsel for the plaintiff with information

21   identifying the record owners of those two assets.

22       That's the order of the Court.

23       MS. CARVALHO:  Your Honor, could I ask for some

24   clarification?

25       We understand the order of the Court today,

tav

Case 22-50073   Doc 195   Filed 04/10/22   Entered 04/10/22 18:05:39   Page 39 of 60

Proceedings

1       however, I am confused where it comes to indirect ownership

2       because, I'm just thinking off the top of my head here,

3       there could be entities that will be restrained from

4       conducting regular and ordinary business, and to what extent

5       can someone decide that something would be an indirect

6       interest and prevent ordinary transfers?  I mean, I don't

7       know how far this goes with other independent autonomous

8       companies.

9               THE COURT:  It goes this far:  There is no

10      ordinary course transfer of a 70 million-dollar apartment at

11      the Sherry-Netherland.  There is no ordinary course transfer

12      of a 27 million-dollar yacht.  If Mr. Kwok wants to get a

13      haircut or if Mr. Kwok wants to buy a newspaper or if

14      Mr. Kwok wants to take a vacation in the middle of the

15      coronavirus pandemic, that would be ordinary course, but I

16      think everybody on this Microsoft Teams platform understands

17      that there's been a lot of moving around of these two assets

18      that have an aggregate value of at least $75 million, and

19      the plaintiff is entitled to ascertain the entity that

20      presently has title to these assets, how those entities came

21      to have title to those assets, and any intermediate

22      transfers that were made between the time Mr. Kwok was the

23      record owner of these assets and the time that the present

24      record owner came into possession of these assets.

25              MS. CARVALHO:  Understood.

24

Proceedings

1          So the assets specifically are the Sherry and the

2     yacht, but the position, just to make sure I understand it,

3     is that with respect to other autonomous corporations, they

4     can continue in the ordinary course, there's no ceasing or

5     stopping of business for other legally autonomous entities.

6          THE COURT:  It's not clear to me what other

7     business and what other entities Mr. Kwok has formed.  The

8     intent here which is very clear and specific is that in this

9     2017 case in which there's been a great deal of

10     gamesmanship, a great deal of dissembling, and some flagrant

11     disregard of court orders, I want to know if any transaction

12     is going to take place in which Mr. Kwok is the guiding hand

13     that's something other than an ordinary course of business

14     transaction.

15          MS. CARVALHO:  Okay.  I think we understand.

16          Thank you, your Honor.

17          MR. MOSS:  Your Honor, if I may, just two points.

18          Number one, in terms of the assets, we know that

19     there are also shell companies in Connecticut that own

20     Greenwich real estate that he just bought for like

21     $7 million.  I think the most efficient -- and we don't know

22     what we don't know.  I think the most efficient way to

23     proceed would be for us to be able to serve some sort of

24     interrogatory at the outset, what are the assets and what

25     are the entities that hold them, and then we can proceed to

25
Proceedings

1    depose Mr. Kwok and those entities if they are entities or

2    Mr. Kwok as the 30(b)(6) for those entities. I want to do

3    this efficiently and with minimal burden, and rather than

4    just asking him questions that he is going to say he does

5    not know the answer to, I think the most efficient way would

6    be to try to use written discovery to get a list of what the

7    actual assets are.

8          THE COURT: Look, I'm not going to tell you how to

9    practice law. You have the transcript of today's

10   proceedings. I think I've made it very clear what you can

11   do.

12         You can conduct discovery of any assets -- you can

13   conduct discovery of any entity that you have a good faith

14   basis for believing Mr. Kwok directly or indirectly

15   controls. It can be written discovery, it can be oral

16   discovery. I'm not going to play schoolyard monitor while

17   you jockey back and forth with discovery disputes about the

18   scope of what you can do. I think Mr. Kwok's counsel and I

19   think Genever's counsel full understand what is reflected in

20   the transcript of proceedings. We are dealing with a

21   telescoped period of time here.

22         There's a restraining order that's been entered

23   with respect to two specific assets, and only two specific

24   assets, and there's an alter ego trial that's scheduled for

25   January 15, 2021, and there's a damages hearing that's going

FILED: NEW YORK COUNTY CLERK 10/23/2020 06:21 PM     INDEX NO. 652077/2017
NYSCEF DOC. NO. 637     Case 22-50073   Doc 195   Filed 04/10/22   Entered 04/10/22 18:05:39     Page 42 of 60
                                                                    RECEIVED NYSCEF: 10/23/2020

26

Proceedings

1      to take place sometime before or in conjunction with the

2      alter ego trial.

3              Again, this is a 2017 case, and it's occupied a

4      considerable amount of the Court's time.  It's resulted in

5      several written decisions.  While orders of the Court are

6      either flaunted or exceedingly liberally interpreted, and

7      while intentional or unintentional misstatements that have

8      misled the Court have been made to the Court, we are going

9      to have closure in this case in January of 2021.

10             So the court reporter will give you her e-mail

11     address.  You will order a copy of the transcript.  I can't

12     be any clearer than I've been on this transcript.

13             If any party or any counsel disregards the orders

14     of the Court, there will be serious sanctions.

15             Are we all clear?

16             MR. MOSS:  Yes.

17             Your Honor, may I just -- one question on the

18     damages motion.

19             We filed our motion, they opposed.  I understand

20     the Court is going to have a hearing as soon as possible on

21     this issue.  May we reply because there are some things we

22     would like to put before the Court given that they have

23     opposed and we have not yet replied?

24             THE COURT:  If you wish.  I have explained to you

25     that I am backed up with trials and motions.  I have carved

FILED: NEW YORK COUNTY CLERK 10/23/2020 06:21 PM          INDEX NO. 652077/2017

NYSCEF DOC. NO. 637     Case 22-50073   Doc 195   Filed 04/10/22   Entered 04/10/22 18:05:39   Page 43 of 60   RECEIVED NYSCEF: 10/23/2020

27

Proceedings

1     out a January 15th date.  That's chiseled in stone.  We will

2     have the alter ego trial on January 15, 2021, if we can get

3     to the damages hearing before, then we will, but there's not

4     a lot of time between now and January 15th, and you,

5     Mr. Moss, are probably going to be quite busy.

6              MR. MOSS:  Yes, your Honor.

7              MR. MITCHELL:  Your Honor, one last question

8     regarding the order here today just because, as you're

9     aware, Genever New York has filed bankruptcy.  I doubt that

10    any assets within the bankruptcy estate would be sold or

11    anything between now and January 15th, but I want to make

12    sure that myself particularly or any party to the action

13    wouldn't draw the ire of a potential sanction for whatever

14    happens in the bankruptcy court.

15             THE COURT:  No, I cannot -- I have no jurisdiction

16    over any entity that's in bankruptcy.  That doesn't mean

17    applications can't be made by Mr. Moss to the bankruptcy

18    court.  It doesn't mean that Mr. Moss can't refer in any

19    proceedings before the bankruptcy court to the transcript of

20    the proceedings here today, but I well understand the

21    automatic stay of the bankruptcy court with respect to

22    entities that have filed for bankruptcy.

23             MR. MITCHELL:  Thank you, your Honor.

24             THE COURT:  All right.

25             Terry, can you give the parties your e-mail

tav

FILED: NEW YORK COUNTY CLERK 10/23/2020 06:21 PM        INDEX NO. 652077/2017
NYSCEF DOC. NO. 637                                     RECEIVED NYSCEF: 10/23/2020

Proceedings

1       address from which they can order a copy of the transcript

2       which will be so ordered and e-filed?

3               Thank you very much.

4               Have a nice day everyone.

5               MR. MOSS:  Thank you, your Honor.

6                       * * *

7               C E R T I F I C A T E

8    I, Terry-Ann Volberg, C.S.R., an official court reporter of

9    the State of New York, do hereby certify that the foregoing

10   is a true and accurate transcript of my stenographic notes.

11

12                                 _____

13                                 Terry-Ann Volberg, CSR, CRR
                                   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit B

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

---------------------------------------------------------------X
                                                               :
In re:                                                         :    Chapter 11
                                                               :
     Ho Wan Kwok,                     :    Case No. 22-50073 (JAM)
                                                               :
                                                               :
        Debtor.[1]         :
                                                               :
---------------------------------------------------------------X

**SUPPLEMENTAL AFFIDAVIT OF**
**WILLIAM R. BALDIGA IN SUPPORT OF APPLICATION OF THE DEBTOR**
**FOR ENTRY OF AN ORDER AUTHORIZING THE EMPLOYMENT AND**
**RETENTION OF BROWN RUDNICK LLP AS COUNSEL FOR THE DEBTOR**

     I, William R. Baldiga, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

     1.     I am an attorney admitted to practice law in the State of New York and the Commonwealth of Massachusetts and before the United States District Courts for the Districts of New York and Massachusetts.  I am a member of the firm of Brown Rudnick LLP ("Brown Rudnick"), which maintains its offices at, among other places, Seven Times Square, New York, New York 10036 and One Financial Center, Boston, Massachusetts 02111.

     2.     I submit this declaration (this "Supplemental Declaration") to supplement the disclosures in my declaration dated March 30, 2022 (the "Initial Declaration") [Docket No. 142] (and the engagement agreement annexed thereto, the "Engagement Agreement") and in further support of the *Application of the Debtor for Entry of an Order Authorizing the Employment and*

---

[1]     Although the Debtor's legal name is Ho Wan Kwok, he is also known by the following names: Guo Wengui; Miles Guo; and Miles Kwok.

*Retention of Brown Rudnick LLP as Counsel for the Debtor* (the "Application") [Dkt. No. 86] filed by Mr. Ho Wan Kwok, the debtor and debtor-in-possession (the "Debtor") in the above-captioned Chapter 11 case (the "Chapter 11 Case"). Unless otherwise stated, I have personal knowledge of the facts set forth herein.

3.    Since the filing of the Application and my Initial Declaration, Brown Rudnick has completed its internal identifications of connections between Brown Rudnick and the parties-in-interest in the Debtor's Chapter 11 Case.

4.    Brown Rudnick submits this Supplemental Declaration to expand upon Brown Rudnick's previously disclosed connections to the Debtor and this Chapter 11 Case.

5.    As set forth herein, Brown Rudnick is free to be adverse to Verdolino & Lowey, P.C. and Craig R. Jalbert on any matters in this case to the extent that any adversity were to arise.

6.    The Initial Declaration identified Forbes Hare and the Internal Revenue Service as former clients of Brown Rudnick. Upon further review of Brown Rudnick's accounting records in connection with the preparation of this Supplemental Declaration, I have determined that these entities are not former clients of Brown Rudnick.

7.    In response to issues raised by the United States Trustee regarding the terms of Brown Rudnick's engagement agreement with the Debtor, Brown Rudnick confirms and/or will agree to following:

(i)    Notwithstanding anything set forth in the Engagement Agreement to the contrary, Brown Rudnick agrees to waive its right to charge 9% interest on fees unpaid after 30 days.

(ii)    Notwithstanding anything set forth in the Engagement Agreement to the contrary, Brown Rudnick will comply with Appendix D to the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court for the District of Connecticut and 11 U.S.C. § 330 with respect to any request for the reimbursement of expenses.

2

(iii)    For the avoidance of doubt, during the course of Brown Rudnick's engagement as counsel to the Debtor, Brown Rudnick will not represent any entity on any matter in which such entity's interest is adverse to the estate.

(iv)    Notwithstanding anything set forth in the Engagement Agreement to the contrary, Brown Rudnick agrees that its engagement by the Debtor is subject to the Bankruptcy Court's jurisdiction, including as it relates to the allowance of any fees or other compensation due and owing in respect of the engagement.

(v)    Notwithstanding anything set forth in the Engagement Agreement to the contrary, Brown Rudnick agrees to waive the requirement that the retainer be replenished.

8.    Brown Rudnick makes the following additional supplemental disclosures with respect to parties-in-interest in this Chapter 11 Case:

(i)    **Verdolino & Lowey, P.C. ("V&L")**: V&L is a professional services firm that provides accounting, financial advisory and fiduciary services. V&L and Brown Rudnick are frequently involved on matters on behalf of common clients. Brown Rudnick has not previously represented V&L as a client. Notwithstanding Brown Rudnick's connections with V&L and Mr. Jalbert (as described below), Brown Rudnick may represent the Debtor in matters adverse to V&L. All matters (described below), other than V&L's proposed retention as a financial advisor to the Debtor, are wholly unrelated to the Debtor and his Chapter 11 Case:

a.    *In re Purdue Pharma, L.P.*, Case No. 19-23649 (Bankr. S.D.N.Y.) (Drain, R.): Brown Rudnick is co-counsel to the ad hoc committee of governmental and other contingent litigation claimants (collectively, the "Ad Hoc Committee"); V&L represents the Ad Hoc Committee in connection with certain administrative matters (holding and disbursing funds) relating to the pre-effective date work to get the government creditor opioid trusts functioning. These activities are presently stayed due to the reversal of the plan confirmation order by the District Court for the Southern District of New York.

b.    *In re Patricia Pierce Fitzgerald*, Case No. 19-12051 (Bankr. D. Mass.) (Bostwick, J.): Brown Rudnick serves as counsel to the debtor and V&L serves as the accountant and financial advisor to the Chapter 7 trustee.

c.    *In re HMH Media, Inc.*, Case No. 17-12881 (Bankr. D. Del.) (Silverstein, L.): Brown Rudnick served as co-counsel to the reorganized debtors and Craig R. Jalbert of V&L served as the liquidating trustee. The bankruptcy case was closed in January 2021.

d.    *In re Bulbs and Lamps Corp.*, Case No. 17-13196 (Bankr. D. Mass.) (Panos, C.): Brown Rudnick represented a creditor of the estate and V&L served as the accounting and financial advisor to the Chapter 7 trustee.

e. *In re Cosi, Inc.*, Case No. 16-13704 (Bankr. D. Mass.) (Hoffman, M.): Brown Rudnick served as counsel to the reorganized debtors and Craig R. Jalbert of V&L served as the post-confirmation liquidating trustee. The bankruptcy case was closed in March 2019.

f. *In re FIAC, Inc.*, Case No. 16-12238 (Bankr. D. Del.) (Shannon, B.): Brown Rudnick served as counsel to the Official Committee of Equity Security Holders, and, following confirmation of the Chapter 11 plan and disbandment of the Equity Committee, served as counsel to the liquidating trustee. V&L served as the accountant to the liquidating trustee. The bankruptcy case was closed in November 2018.

g. *In re Corinthian Colleges, Inc.*, Case No. 15-10952 (Bankr. D. Del.) (Carey, K.): Brown Rudnick served as counsel to the Official Committee of Unsecured Creditors. Craig R. Jalbert of V&L was appointed as trustee of the Corinthian Distribution Trust under the confirmed Chapter 11 plan, which occurred after Brown Rudnick's involvement in the matter had terminated.

h. *In re Reed and Barton Corporation*, Case No. 15-10534 (Bankr. D. Mass.) (Hoffman, M.): Brown Rudnick served as counsel to the Official Committee of Unsecured Creditors and V&L served as the debtor's accountant and financial advisor.

i. *In re Lyondell Chemical Company, et al.*, Case No. 09-10023 (Bankr. S.D.N.Y.) (Gerber, R.): Brown Rudnick served as counsel and V&L presently serves as administrator of certain Trusts established pursuant to the confirmed Chapter 11 plan of Lyondell. Brown Rudnick's work on such matters concluded in 2020.

j. *Pro Bono*. Brown Rudnick is counsel and V&L is providing administrative (holding and disbursing funds) and consulting services in connection with a fair housing initiative in Boston, Massachusetts on a *pro bono* basis.

(ii) **Craig R. Jalbert**: In addition to Brown Rudnick's work with Mr. Jalbert's firm, V&L, Brown Rudnick currently represents Mr. Jalbert in his capacity as the court-appointed trustee of the Vernon Tort Claims Trust (the "Vernon Trust"), a trust established pursuant to the Chapter 11 plan of Exide Technologies, LLC, Case No. 13-11482 (Bankr. D. Del.) (Walrath, J.). Additionally, in the Chapter 11 cases of The Northwest Company, LLC, Case No. 20-10990 (Bankr. S.D.N.Y.) (Wiles, M.), Brown Rudnick represents an unsecured creditor that sought the appointment of a Chapter 11 trustee. Mr. Jalbert was appointed as the independent manager of one of the debtor-entities as settlement of such motion, and was subsequently replaced by a Chapter 7 trustee upon conversion of the case. Brown Rudnick served as co-counsel to the Official Committee of Unsecured Creditors appointed in the Chapter 11 cases of F-Squared Investment Management, LLC, Case No. 15-11469 (Bankr. D. Del.) (Silverstein, L.). Brown Rudnick currently serves as co-counsel to the trusts established under the F-Squared Chapter 11 plan, and Mr. Jalbert serves as

4

the trustee of the trusts. All previous connections between Brown Rudnick and Mr. Jalbert are wholly unrelated to the Debtor and his Chapter 11 Case.

(iii) **BakerHostetler LLP:** BakerHostetler LLP currently represents or previously represented clients in matters in which Brown Rudnick currently represents or previously represented a party. These matters are wholly unrelated to the Debtor and his Chapter 11 Case.

(iv) **HarcusParker Limited:** HarcusParker Limited is a former client of Brown Rudnick on matters wholly unrelated to the Debtor and his Chapter 11 Case.

(v) **Internal Revenue Service:** Brown Rudnick currently represents and previously represented clients adverse to the Internal Revenue Service. In addition, the Internal Revenue Service is frequently a creditor in cases in which Brown Rudnick represents an ad hoc or official committee of unsecured creditors or equity holders. These matters are wholly unrelated to the Debtor and his Chapter 11 Case.

(vi) **UBS AG:** Brown Rudnick currently represents and previously represented clients adverse to UBS AG and its affiliates. Certain Brown Rudnick attorneys previously represented UBS AG and its affiliates before joining Brown Rudnick. None of these matters relate to the Debtor or his Chapter 11 Case.

(vii) **United States Bankruptcy Court Judge Julie A. Manning:** Two Brown Rudnick partners have a previous professional and/or social connection to Judge Manning. These two attorneys are not involved in Brown Rudnick's representation of the Debtor.

(viii) **Zheng Wu (a/ka/ Bruno Wu):** Certain entities owned or controlled by Mr. Zheng Wu are former clients of Brown Rudnick on matters wholly unrelated to the Debtor and his Chapter 11 Case. Brown Rudnick was not retained by, nor did the firm represent, Mr. Wu in his individual capacity. Brown Rudnick's engagement concluded approximately five (5) years ago (June 2017). The scope and substance of the engagement were entirely unrelated to this Chapter 11 Case. Pursuant to the engagement agreement, the clients consented to a waiver of existing and future conflicts on matters that were unrelated to the scope of the engagement.

9.   Brown Rudnick makes the following additional disclosures regarding the retainer

(the "Retainer") under the Engagement Agreement with the Debtor:

(i) The Retainer was integral to Brown Rudnick's agreement to accept the Debtor's engagement and enter into the Engagement Agreement. Given, among other things, the exigencies of the Debtor's prepetition situation (including the Debtor's potential imminent incarceration), the highly contentious nature of the relationship between the Debtor and certain of his creditors (including Pacific Alliance Asia Opportunity Fund, L.P., which is represented by its own experienced counsel), the complex issues implicated by the Debtor's bankruptcy case, the Debtor's need to retain

5

highly skilled and experienced counsel, and the significant fee risk given the Debtor's prepetition financial position, I believe that the Retainer was and is reasonable as a form of advance payment for the substantial services that Brown Rudnick agreed and is expected to provide under the Engagement Agreement. Brown Rudnick would not have accepted this engagement without the Debtor's agreement to and payment of the Retainer.

(ii)     Consistent with the express provisions of the Engagement Agreement, the Retainer was not deposited in or transferred to a client trust account at Brown Rudnick.

(iii)    Rather, the Retainer was initially deposited in Brown Rudnick's general deposit account (along with the firm's other deposits), and then a commensurate amount was transferred from the general deposit account to Brown Rudnick's general retainer account (where it remains to this day, along with the firm's other retainer amounts).

10.     Brown Rudnick served as debtor's bankruptcy counsel to Herald Media Holdings, Inc. I led this engagement on behalf of the firm.  That case involved a debtor with (i) approximately $34 million in operating revenues the year prior to the bankruptcy filing; (ii) over $6 million in assets on hand (mostly cash and accounts receivable) as of the petition date; (iii) a $5 million stalking horse bid for its assets; and (iv) a $500,000 DIP loan, which was approved on an uncontested basis.  Further, Brown Rudnick was paid approximately $269,100 prior to the filing.

11.     Brown Rudnick also served as debtor's bankruptcy counsel to Dean and DeLuca New York Inc.  I led this engagement on behalf of the firm.  In that case, the debtor (i) paid Brown Rudnick retainers totaling approximately $517,000 prior to the petition date (the debtor paid all bankruptcy advisors total retainers of approximately $750,000), with approximately $374,000 of the retainer balance remaining as of the filing; (ii) had certain cash-generating assets (e.g., franchise agreements that generated $1.5 million in the prior year); (iii) had other tangible assets (property and equipment with a book value of $20 million; registered trademarks with a book value of approximately $50 million); and (iv) obtained approximately $2.4 million in DIP financing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: April 10, 2022
      New York, New York

                                                  */s/ William R. Baldiga*
                                                  William R. Baldiga

# Exhibit C-1

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

-------------------------------------------------------------------X
                                            :

In re:                                   :    Chapter 11

        Ho Wan Kwok,               :    Case No. 22-50073 (JAM)
                                             :

                Debtor.           :

-------------------------------------------------------------------X

**ORDER AUTHORIZING RETENTION AND EMPLOYMENT OF BROWN**
**RUDNICK LLP AS COUNSEL TO DEBTOR AND DEBTOR IN POSSESSION**

Upon the application of Mr. Ho Wan Kwok (the "Application"),[1] as debtor and debtor in

possession in the above-captioned Chapter 11 case, pursuant to title 11 of the United States Code,

11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), for authorization to employ Brown

Rudnick LLP ("Brown Rudnick") as his bankruptcy counsel effective as of the Petition Date, as

more fully set forth in the Application; and upon the affidavit and supplemental affidavit of

William R. Baldiga, Esquire, a partner of Brown Rudnick (together, the "Baldiga Affidavits"); and

the Court being satisfied, based on the representations made in the Application and the Baldiga

Affidavits, that Brown Rudnick does not represent or hold any interest adverse to Mr. Kwok or his

Chapter 11 estate as to the matters upon which it is to be engaged and is a "disinterested person"

under 11 U.S.C. § 101(14), as modified by 11 U.S.C. § 1107(b), and that the employment of Brown

Rudnick is necessary to Mr. Kwok and his Chapter 11 estate; and the Court having jurisdiction to

consider the Application and the relief requested therein in accordance with 28 U.S.C. §§ 157 and

1334; and the Court having considered the objections to the Application and the resolution of such

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed in the Application.

objections proposed by the Debtor; and the Court having overruled any further objections not otherwise resolved or withdrawn; and the Court having conducted a hearing on the Application; and the Court having found that adequate notice of the Application was provided to all parties in interest; and after due deliberation and sufficient cause appearing therefore:

**IT IS HEREBY ORDERED THAT:**

1.      The Application is granted and approved.

2.      Pursuant to sections 327(a) and 328(a) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local Rules of Bankruptcy Procedure for the District of Connecticut (the "Local Rules"), the Debtor, is authorized to employ and retain Brown Rudnick as his counsel to perform the services as set forth in the Application and the Baldiga Affidavits, effective as of the Petition Date.

3.      Brown Rudnick shall be compensated in accordance with the procedures set forth in sections 330 and 331 of the Bankruptcy Code and such Bankruptcy Rules, Local Rules and guidelines established by the Office of the United States Trustee as may then be applicable, from time to time, and such other procedures as may be fixed by order of this Court.

4.      Ten business days' notice must be provided by Brown Rudnick to the Debtor, the United States Trustee and the Official Committee of Unsecured Creditors prior to any increases in the rates set forth in the Application, and such notice must be filed with the Court.

5.      Mr. Kwok is authorized and empowered to take all actions necessary to implement the relief granted in this Order.

6.      Notwithstanding anything set forth in the Engagement Agreement to the contrary, Brown Rudnick agrees to waive its right to charge 9% interest on fees unpaid after 30 days.

7.      Notwithstanding anything set forth in the Engagement Agreement to the contrary, Brown Rudnick will comply with Appendix D to the Local Rules and 11 U.S.C. § 330 with respect to any request for the reimbursement of expenses.

8.      For the avoidance of doubt, during the course of Brown Rudnick's engagement as counsel to the Debtor, Brown Rudnick will not represent any entity on any matter in which such entity's interest is adverse to the estate.

9.      Notwithstanding anything set forth in the Engagement Agreement to the contrary, Brown Rudnick agrees that its engagement by the Debtor is subject to the Bankruptcy Court's jurisdiction, including as it relates to the allowance of any fees or other compensation due and owing in respect of the engagement.

10.     Notwithstanding anything set forth in the Engagement Agreement to the contrary, Brown Rudnick agrees to waive the requirement that the retainer under the Engagement Agreement be replenished.

11.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

12.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation and enforcement of this Order.

# Exhibit C-2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

------------------------------------------------------------------X
                                          :

In re:                                :    Chapter 11
                                            :

      Ho Wan Kwok,                 :    Case No. 22-50073 (JAM)
                                            :

                                            :

          Debtor.                     :
                                            :
------------------------------------------------------------------X

**ORDER AUTHORIZING RETENTION AND EMPLOYMENT OF BROWN
RUDNICK LLP AS COUNSEL TO DEBTOR AND DEBTOR IN POSSESSION**

Upon the application of Mr. Ho Wan Kwok (the "Application"),[1] as debtor and debtor in

possession in the above-captioned Chapter 11 case, pursuant to title 11 of the United States

Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), for authorization to employ

Brown Rudnick LLP ("Brown Rudnick ~~LLP~~") as his bankruptcy counsel effective as of the

Petition Date, as more fully set forth in the Application; and upon the ~~annexed~~affidavit and

supplemental affidavit of William R. Baldiga, Esquire, a partner of Brown Rudnick (together, the

"Baldiga ~~Affidavit~~Affidavits"); and the Court being satisfied, based on the representations made

in the Application and the Baldiga ~~Affidavit~~Affidavits, that Brown Rudnick does not represent or

hold any interest adverse to Mr. Kwok or his Chapter 11 estate as to the matters upon which it is

to be engaged and is a "disinterested person" under 11 U.S.C. § 101(14), as modified by 11

U.S.C. § 1107(b), and that the employment of Brown Rudnick is necessary to Mr. Kwok and his

Chapter 11 estate; and the Court having jurisdiction to consider the Application and the relief

requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and the Court having

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed in the Application.

considered the objections to the Application and the resolution of such objections proposed by the Debtor; and the Court having overruled any further objections not otherwise resolved or withdrawn; and the Court having conducted a hearing on the Application; and the Court having found that adequate notice of the Application was provided to all parties in interest; and after due deliberation and sufficient cause appearing therefore:

**IT IS HEREBY ORDERED THAT:**

1.      ~~That the~~The Application is granted and approved.

2.      Pursuant to sections 327(a) and 328(a) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local ~~Bankruptcy~~ Rules of Bankruptcy Procedure for the District of Connecticut (the "Local Rules"), the Debtor, is authorized to employ and retain Brown Rudnick as his counsel to perform the services as set forth in the Application and the Baldiga ~~Affidavit~~Affidavits, effective as of the Petition Date.

3.      Brown Rudnick shall be compensated in accordance with the procedures set forth in sections 330 and 331 of the Bankruptcy Code and such Bankruptcy Rules, Local Rules and guidelines established by the Office of the United States Trustee as may then be applicable, from time to time, and such other procedures as may be fixed by order of this Court.

4.      Ten business days' notice must be provided by Brown Rudnick to the Debtor, the United States Trustee and ~~any official committee~~the Official Committee of Unsecured Creditors prior to any increases in the rates set forth in the Application, and such notice must be filed with the Court.

5.      Mr. Kwok is authorized and empowered to take all actions necessary to implement the relief granted in this Order.

6.      Notwithstanding anything set forth in the Engagement Agreement to the contrary, Brown Rudnick agrees to waive its right to charge 9% interest on fees unpaid after 30 days.

7.      Notwithstanding anything set forth in the Engagement Agreement to the contrary, Brown Rudnick will comply with Appendix D to the Local Rules and 11 U.S.C. § 330 with respect to any request for the reimbursement of expenses.

8.      For the avoidance of doubt, during the course of Brown Rudnick's engagement as counsel to the Debtor, Brown Rudnick will not represent any entity on any matter in which such entity's interest is adverse to the estate.

9.      Notwithstanding anything set forth in the Engagement Agreement to the contrary, Brown Rudnick agrees that its engagement by the Debtor is subject to the Bankruptcy Court's jurisdiction, including as it relates to the allowance of any fees or other compensation due and owing in respect of the engagement.

10.     Notwithstanding anything set forth in the Engagement Agreement to the contrary, Brown Rudnick agrees to waive the requirement that the retainer under the Engagement Agreement be replenished.

11.    6. The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

12.    7. This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation and enforcement of this Order.