# __EXHIBIT PAX 14__

Transcript of the April 8, 2022 Deposition of Craig Jalbert

```
1
2              UNITED STATES BANKRUPTCY COURT
                   DISTRICT OF CONNECTICUT
3                   BRIDGEPORT DIVISION
       ------------------------------------------X
4      IN RE:
5                                   Chapter 11
       HO WAN KWOK,
6                         Case No. 22-50073(JAM)
7
           Debtor.
8
       ------------------------------------------X
9
10              DATE: April 8, 2022
11              TIME: 10:17 A.M.
12
13
14       VIDEO-RECORDED DEPOSITION OF CRAIG
15     JALBERT of VERDOLINO & LOWEY, P.C., in the
16     above entitled matter, at the above date
17     and time, held at the offices of O'Melveny
18     & Myers LLP, 7 Times Square, New York, New
19     York 10036, by Lenaya Lynch, a Notary
20     Public and Shorthand Reporter of the State
21     of New York.
22
23
24
25
                                        Page 1
```

PAX-014-001

```
 1
 2  A P P E A R A N C E S:
 3  O'MELVENY & MYERS LLP
    Attorneys for PACIFIC ALLIANCE ASIA
 4  OPPORTUNITY FUND LLP
    7 Times Square, 30th Floor
 5  New York, New York 10036
    BY: LAURA ARONSSON, ESQ.
 6   DAVID HARBACH, ESQ.
    MaKENZIE B. RUSSO, ESQ.
 7
 8
    BROWN RUDNICK LLP
 9  Attorneys for HO WAN KWOK
    7 Times Square
10  New York, New York 10036
    BY: KENNETH J. AULET, ESQ.
11
12
    PULLMAN & COMLEY LLC
13  Attorneys for CREDITOR'S COMMITTEE
    850 Main Street
14  PO Box 7006
    Bridgeport, Connecticut 06601
15  BY: IRVE J. GOLDMAN, ESQ.
16
17  COHN, BIRNBAUM, SHEA P.C.
    Attorney for GOLDEN SPRING
18  100 Pearl Street, Suite 12
    New Haven, Connecticut 06103
19  BY: TIMOTHY MILTENBERGER, ESQ. via
    Teleconference
20
21
    ALSO PRESENT:
22
    JON DIFILIPPO, Legal Videographer
23
24        *    *    *
25
```
Page 2

```
 1          C. JALBERT
 2  York.  My name is Jonathan DiFilippo
 3  from the firm Veritext and I am the
 4  videographer.  The Court Reporter is
 5  Lenaya Lynch from the firm, Veritext.
 6  I'm not authorized to administer an
 7  oath.  I'm not related to any party
 8  in this action nor am I financially
 9  interested in the outcome.
10       Counsel and all present in the
11  room and everyone attending remotely
12  will now state their appearances and
13  affiliations for the record.  If
14  there are any objections to the
15  proceeding, please state them at the
16  time of your appearance beginning
17  with the noticing attorney.
18       MS. ARONSSON:  Laura Aronsson,
19  O'Melveny and Myers for Pacific
20  Alliance Asia Opportunity Fund LP.
21       MR. HARBACH:  David Harbach
22  with O'Melveny and Myers for the same
23  client.
24       MS. RUSSO:  Makenzie Russo with
25  O'Melveny and Myers for the same
```
Page 4

```
 1          C. JALBERT
 2       THE VIDEOGRAPHER:  Good
 3  morning.  We are going on the record
 4  at 10:17 a.m. on April 22nd -- I'm
 5  sorry, April 8th, 2022.  Please note
 6  that the microphones are sensitive
 7  and may pick up whispering, private
 8  conversations and cellular
 9  interference.  Please turn off all
10  cell phones or place them away from
11  the microphone as they can interfere
12  with the deposition audio.  Audio and
13  video recording will continue to take
14  place unless all parties agree to go
15  off the record.
16       This is Media Unit 1 of the
17  video-recorded deposition of Craig
18  Jalbert in the matter of re: Ho Wan
19  Kwok filed in the United States
20  Bankruptcy Court, District of
21  Connecticut, Bridgeport Division,
22  Case Number 22-50073.
23       This deposition is being held
24  at O'Melveny and Myers LLP, located
25  at Times Square Tower, New York, New
```
Page 3

```
 1          C. JALBERT
 2  client.
 3       MR. AULET:  Kenneth Aulet of
 4  Brown Rudnick, proposed counsel for
 5  the debtor, Ho Wan Kwok.
 6       MR. GOLDMAN:  Irve Goldman,
 7  Pullman and Comley, proposed counsel
 8  for the Creditor's Committee.
 9       THE VIDEOGRAPHER:  Will the
10  Court Reporter please swear in the
11  Witness?
12       MR. AULET:  There's one person
13  on the line.
14       MR. MILTENBERGER:  Are we done
15  with the people in person?  Timothy
16  Miltenberger for Golden Spring, NY
17  Limited.
18       THE VIDEOGRAPHER:  Will the
19  Court Reporter please swear in the
20  Witness?
21  C R A I G   J A L B E R T, called as a
22  witness, having been first duly sworn by a
23  Notary Public of the State of New York, was
24  examined and testified as follows:
25  EXAMINATION BY
```
Page 5

2 (Pages 2 - 5)

PAX-014-002

C. JALBERT

MS. ARONSSON:

Q. Please state your name for the record.

A. Craig Jalbert, J-A-L-B-E-R-T.

Q. What is your address?

A. Home address? The business address is 124 Washington Street, Suite 101, Foxboro, Massachusetts 02035.

Q. Good morning. We previously met on the record. On the record, my name is Laura Aronsson and I'm an attorney at O'Melveny and Myers for Pacific Alliance Asia Opportunity Fund. Mr. Jalbert, have you ever testified in court before?

A. Yes.

Q. In what case -- or I'll start how many times?

A. 50, 60, 70 something.

MR. GOLDMAN: Before we get too far into things, can I just ask -- this is a notice of deposition relating to what contested matter? There are a number of motions before the Court. The notice of deposition

Page 6

C. JALBERT

A. Yes.

Q. Do you understand that means that you're swearing that all of your answers are truthful?

A. Yes.

Q. And that you are subject to the penalty of perjury?

A. Yes.

Q. The Videographer is recording everything on camera and the Court Reporter is preparing a written record of what we discuss here today and will later produce a copy of that transcript. Do you understand?

A. Yes.

Q. Unlike normal conversation, it is important that we not talk over one another. Please wait for me to finish my question before you answer. I'll try to do the same for you. Do you understand?

A. Yes.

Q. Your answers need to be audible. A shake of the head is insufficient as are statements like uh-huh.

Page 8

C. JALBERT

doesn't indicate which of the matters it relates to.

MS. ARONSSON: Sure. So we have -- we served a 30(b)6 notice of deposition which I'll mark as an exhibit so that we're all on the same page but it relates to the retention of Verdolino and Lowey.

MR. GOLDMAN: All right. I just wasn't sure because it's not identified on the notice.

MS. ARONSSON: Thank you.

Q. Sorry. You said 50 or 60 times?

A. 70, 80, I don't know. I have not kept -- I've got a list of ten years that goes back 40 or 50 and I've been doing it for 30. So no idea.

Q. Well, we can talk about some of the broad categories of experience you have later but let's start just to go over a few procedures that I'm sure you're familiar with. Do you understand that you're testifying under oath today?

Page 7

C. JALBERT

Do you understand?

A. Understood.

Q. If you do not understand my question, please ask me to repeat. Otherwise, I'll assume that you do understand the question. Is that okay?

A. Yes.

Q. If you need a break, just let me know and we can take one but if there's a question pending, please answer it before we break. Are you represented by Counsel today?

A. I think so.

Q. Who do you understand to be representing you?

A. Ken Aulet.

Q. If your attorney objects to a question, you should still answer it unless you don't understand the question or Counsel instructs you not to answer. Do you understand?

A. Yes.

Q. Are you suffering from any condition that would impair your ability to

Page 9

3 (Pages 6 - 9)

PAX-014-003

C. JALBERT

1   C. JALBERT
2 testify accurately or truthfully?
3    A.   No.
4    Q.   Are you taking any medications
5 that might interfere with your ability to
6 give accurate or truthful testimony?
7    A.   No.
8    Q.   Is there any reason why you
9 cannot testify truthfully and accurately
10 today?
11    A.   No.
12       MS. ARONSSON:  Tab one.  The
13    Court Reporter is going to be marking
14    what will be Jalbert Exhibit 1.
15       (Whereupon, Notice of
16    Deposition was marked as Jalbert
17    Exhibit 1 for identification as of
18    this date by the Reporter.)
19    Q.   All right, Mr. Jalbert.  Do you
20 recognize this document?
21    A.   I do.
22    Q.   What is it?
23    A.   Pacific Alliance Asia
24 Opportunity Fund LLP's Notice of Deposition
25 of Verdolino and Lowey PC pursuant to Rule

Page 10

1   C. JALBERT
2 been designated to testify about each topic
3 listed here?
4       MR. AULET:  Objection.
5    A.   Yes.
6       MR. AULET:  He's been
7    designated as per our responses and
8    objections.
9       MS. ARONSSON:  Thank you.
10    Q.   Are you familiar with these
11 subject areas?
12    A.   Yes.
13    Q.   Do you understand that you are
14 required to testify as to Verdolino and
15 Lowey's knowledge about these topics, not
16 just your own?
17    A.   Yes.
18    Q.   Do you understand that you were
19 required to obtain all of the knowledge and
20 information necessary to allow you to fully
21 and honestly testify concerning each of
22 these topics upon Verdolino and Lowey's
23 behalf?
24       MR. AULET:  Same objection as
25    before.

Page 12

1   C. JALBERT
2 30(b)(6) of the Federal Rules of Civil
3 Procedure.
4    Q.   Is it your understanding that
5 you are testifying today in connection with
6 in re: Ho Wan Kwok?
7    A.   Yes.
8    Q.   Can you please turn to Page 6
9 --
10    A.   Excuse me, I just forgot to get
11 my glasses.
12       MS. ARONSSON:  Can we go off
13    the record for one minute?
14       THE VIDEOGRAPHER:  The time is
15    10:24 a.m. and we are off the record.
16       (Whereupon, an off-the-record
17    discussion was held.)
18       THE VIDEOGRAPHER:  The time is
19    10:24 a.m. and we're back on the
20    record.  You may proceed.
21    Q.   Can you turn to Page 6 to the
22 heading Rule 30(b)(6) deposition topics?
23 You see that?
24    A.   Yes.
25    Q.   Do you understand that you have

Page 11

1   C. JALBERT
2    A.   I did the best I could.
3    Q.   What, if anything, did you do
4 to prepare for this deposition?
5    A.   I spoke with attorney Ben
6 Silverberg, with Counsel, Ken Aulet, I
7 spoke with my colleagues, Matthew Flynn and
8 Mary Jo Schindler.  I reviewed a
9 significant amount of documents, some filed
10 with the Court, some prepared internally.
11 Reviewed e-mails.  Covered as much as I
12 could.
13    Q.   Did you collect the documents
14 that you prepared or were they provided to
15 you by Counsel?
16    A.   The documents that -- are you
17 asking for the documents that we sent to
18 O'Melveny?
19    Q.   I'm asking -- taking a step
20 back, just asking about your preparation
21 for today's deposition.
22    A.   I just looked at my own
23 documents and my own e-mails on the
24 Verdolino and Lowey server.
25    Q.   Generally, what were the

Page 13

4 (Pages 10 - 13)

PAX-014-004

C. JALBERT

1 subject matters of those e-mails?
2    A.   It was looking at the -- all of
3 -- not all of them.  Many of my e-mails,
4 the SOFA's -- the statement of financial
5 affairs -- the schedules, the global notes,
6 the global notes and specific notes, most
7 of the pleadings to employ professionals,
8 particularly ours, the motion for the DIP
9 financing, many of the objections, not all
10 of them.  I'm trying to think if there's
11 anything else.  I can't think of anything
12 off the top beyond that --
13    Q.   Thank you.  That's helpful.  So
14 you mentioned that you spoke to your
15 attorneys, Ben and Ken?
16    A.   Yes.
17    Q.   When did you speak to them?
18    A.   Well, we were delayed a little
19 bit so I had a few minutes this morning
20 with Ken.  I spoke with Ben briefly last
21 night.  Again, this morning on -- unrelated
22 to the deposition and I had previously
23 spoken to Ken probably one or two times
24 over the last few days, give or take.

Page 14

C. JALBERT

1    Q.   Anyone else besides the people
2 that we've talked about?
3    A.   Regarding the -- just regarding
4 the deposition?
5    Q.   Yes.
6    A.   No.
7    Q.   You haven't spoke to the
8 debtor?
9    A.   About the deposition?
10    Q.   About the deposition.
11    A.   No.
12    Q.   Have you ever met the debtor?
13    A.   Yes.
14    Q.   When did you meet the debtor?
15    A.   The continued meeting of 342 --
16 or 341 meeting which was I think Wednesday,
17 the first time I met him.
18    Q.   Is that the only time you met
19 the debtor?
20    A.   Yes.
21    Q.   Outside of the 341 proceeding,
22 did you interact with the debtor?
23    A.   No.
24    Q.   I just want to cover a little

Page 16

C. JALBERT

1    Q.   Were each of these interactions
2 over the phone?
3    A.   Until today, yes.
4    Q.   About how long did you spend
5 preparing with your attorneys in connection
6 with your preparation for this deposition?
7    A.   I would have to hazard a guess.
8 I don't have my time records in front of
9 me.
10    Q.   Like two hours, ten hours?
11    A.   My guess is in the two to four
12 hour range.  No more than that.
13    Q.   Did you speak to anyone else
14 other than the folks that you mentioned at
15 Verdolino and Lowey and your attorneys
16 regarding this deposition?
17    A.   Our IT person, Tim McDonald who
18 assisted in the search -- the electronic
19 search of e-mails and records and worked
20 with the Brown Rudnick IT person to send
21 everything over.  Aside from having him try
22 and get the records, we didn't have any
23 discussion of the case facts and
24 circumstances or anything.

Page 15

C. JALBERT

1 bit of your background.  Can you talk about
2 your educational history since high school?
3    A.   I graduated from Western
4 Connecticut High School in 1979.  I went to
5 Boston College.  Graduated Boston College
6 with a bachelor of science and degree in
7 accountancy in 1983.  I went to work for
8 Arthur Andersen from June of '83 till
9 August 31 of '87.  On September 1 of 1987,
10 I started at the precursor of what is now
11 Verdolino and Lowey and I've been there in
12 the 35 years since and during that time, I
13 I've gone to many, many, many professional
14 CPE type courses of all sorts of flavors.
15    Q.   What do you mean by CPE?
16    A.   A continuing professional
17 education.
18    Q.   Is that a required procedure
19 for any type of certification that you
20 have?
21    A.   It's -- some of it is required
22 for my certification as a certified
23 insolvency restructuring advisor.  The rest
24 are just to maintain my professional

Page 17

5 (Pages 14 - 17)

C. JALBERT

1   C. JALBERT
2   capabilities and stay on top of various
3   issues as the years have gone on.
4      Q.   So you mentioned certified
5   insolvency instructor?
6      A.   Certified insolvency
7   restructuring advisor. CIRA.
8      Q.   So this is a professional
9   certification?
10     A.   Yes.
11     Q.   Do you hold any other
12  professional certifications besides the
13  CIA?
14     A.   CIRA, no.
15     Q.   CIRA. I think you said you had
16  a accountant degree from Boston College?
17     A.   Yes.
18     Q.   Do you hold any other graduate
19  or any graduate degrees?
20     A.   No.
21     Q.   Are you currently employed at
22  Verdolino and Lowey?
23     A.   Yes.
24     Q.   Generally, what services does
25  Verdolino and Lowey offer its clients?

Page 18

1   C. JALBERT
2   responsible for this?
3      A.   Well, my partner and various
4   staff.
5      Q.   What's his name?
6      A.   Keith Lowey.
7      Q.   Is that department involved in
8   this matter before us?
9      A.   No.
10     Q.   Is Verdolino and Lowey always
11  engaged by the debtor in the bankruptcy
12  context?
13     A.   No.
14     Q.   What other scenarios is
15  Verdolino and Lowey engaged under?
16     A.   We've been engaged by trustees,
17  post confirmation fiduciaries, whatever
18  they may be called; you said debtors,
19  creditors' committee, creditors, secured
20  lenders. I think we've probably
21  represented, over the years, most every
22  kind of party and interest to a bankruptcy
23  that there is.
24     Q.   Turning to your experience
25  specifically, what experience do you have

Page 20

1   C. JALBERT
2      A.   There were three or four -- I
3   guess four major buckets. The first and
4   biggest is the insolvency arena,
5   underperforming businesses and individuals.
6   That includes litigation support and
7   everything related to it. We have a
8   full-time 13 or 14 people I think it is
9   that work in taxation and we also do what
10  I'll call high net worth babysitting. We
11  have -- and I don't do any of this work.
12  My partner and others do it but we have
13  very wealthy clients that don't pay their
14  own bills, that have multiple residences.
15  Everything comes to us. We act as a family
16  office for a whole -- for a number of
17  people and the last thing we do is federal
18  election reporting for federal congress
19  people and senators and presidential.
20     Q.   Thank you.
21     A.   Did I say we have tax
22  department -- yes, tax department. That's
23  the four.
24     Q.   You mentioned the high net
25  worth baby sitting. Who, at Verdolino, is

Page 19

1   C. JALBERT
2   in Chapter 11 cases?
3      A.   I've been in over 500 Chapter
4   11 cases. We've been committee financial
5   advisor, committee accountants, debtor
6   financial advisor, debtor accountants,
7   accountants on behalf of secured lenders,
8   accountants on behalf of individual
9   creditors. Trying to think -- I mean
10  again, we've done -- we've represented
11  pretty much every constituency so over
12  time, I've done -- I've represented every
13  reasonable constituency in a bankruptcy I
14  can remember.
15     Q.   What is your title at Verdolino
16  and Lowey?
17     A.   Principal.
18     Q.   We talked about the four
19  buckets. Generally, what are your
20  responsibilities with respect to Verdolino
21  and Lowey services?
22     A.   Just for the most part, the
23  first -- all of my time not spent running
24  my own firm is in the bankruptcy insolvency
25  and the like that spreads over a little bit

Page 21

6 (Pages 18 - 21)

PAX-014-006

C. JALBERT

1    to taxation. I don't run the department or
2    anything but I certainly interact and then
3    litigation support and the like, you know,
4    the types of things you would do in the
5    context of a bankruptcy.
6        Q.   What is meant by litigation
7    support, generally?
8        A.   Well, it can be pretty broad
9    but for us, it's -- whether it be business
10    litigation or bankruptcy litigation, to the
11    extent that there are areas that whoever
12    the law firm -- we've also been appointed
13    by judges, anyone that's looking or
14    interested in obtaining financial
15    information in a form that they're looking
16    for, which could be anything, we would
17    provide it. That would include doing
18    expert reports, expert testimony and work
19    at just advising lawyers as they approach
20    areas in accounting and auditing and the
21    like.
22        Q.   You mentioned here that you're
23    a principal at Verdolino and Lowey?
24        A.   Yes.

Page 22

C. JALBERT

1    generally regarding the engagement?
2        A.   There was a little bit with
3    Steven Pohl and with -- I believe it was
4    Ben Silverberg.
5        Q.   Anyone else at Brown Rudnick?
6        A.   I don't remember.
7        Q.   Besides Brown Rudnick, did you
8    speak to anyone else regarding the
9    potential engagement?
10        A.   I probably mentioned something
11    to my -- my own staff to clear conflicts
12    and I think I had someone help me prepare
13    some -- I shouldn't say prepare, they're
14    already prepared. Send some individual
15    information about myself and the firm.
16        Q.   Did Verdolino and Lowey speak
17    to anyone else besides Brown Rudnick in
18    connection with the engagement?
19        MR. AULET: Objection. You can
20    answer.
21        A.   At the time we're being
22    engaged?
23        Q.   Yes.
24        A.   No.

Page 24

C. JALBERT

1        Q.   What other roles have you held?
2        A.   I've been a principal since I
3    started.
4        Q.   Turning to the engagement here,
5    who contacted Verdolino and Lowey about
6    this engagement?
7        A.   Well, it was contacted me
8    personally and it was an attorney, Steven
9    Pohl at Brown Rudnick.
10        Q.   Sorry, I missed what you said.
11        MR. HARBACH: Spell that name.
12        Q.   Can you spell that name,
13    please?
14        A.   The name was Steven Pohl. Last
15    name P-O-H-L at Brown Rudnick.
16        Q.   Mr. Pohl reached out to who at
17    Verdolino and Lowey?
18        A.   Me.
19        Q.   You. Do you recall when that
20    was?
21        A.   Somewhere around March 1, 2 or
22    3.
23        Q.   After Steven Pohl reached out,
24    who did Verdolino and Lowey speak to

Page 23

C. JALBERT

1        Q.   Who are the main points of
2    contact between -- who are the main
3    contacts for -- strike that. Who do you
4    generally speak to regarding this
5    engagement besides internal folks at
6    Verdolino and Lowey?
7        A.   Mostly the attorneys at Brown
8    Rudnick.
9        Q.   Do you speak to anyone else?
10        A.   I've been on phone calls with
11    other lawyers but I've not initiated
12    anything.
13        Q.   Which other lawyers have you
14    been on phone calls with?
15        A.   The other debtor lawyers that
16    I'm aware of are an Aaron Mitchell and a
17    Melissa Francis.
18        Q.   Who do you understand Aaron
19    Mitchell to be?
20        A.   Counsel to Mr. Kwok, the
21    debtor.
22        Q.   You mentioned Melissa Francis?
23        A.   Also counsel to Mr. Kwok.
24        Q.   Besides Aaron Mitchell and

Page 25

7 (Pages 22 - 25)

C. JALBERT

1  C. JALBERT
2  Melissa Francis, do you speak to anyone
3  else outside of Verdolino and Lowey
4  regarding this engagement?
5      A.   And outside of Brown Rudnick?
6      Q.   Outside of Brown Rudnick, yes.
7      A.   No one.
8      Q.   What about -- what about do you
9  communicate via e-mail with anyone besides
10 Aaron Mitchell, Melissa Francis and Brown
11 Rudnick regarding this engagement?
12     A.   I've been on -- I've been CC'd
13 on an e-mail and authored one e-mail to
14 someone outside that group.
15     Q.   Who is that person?
16         MR. AULET:  Objection.  This is
17     the person that we have stated their
18     identity won't be revealed per Golden
19     Springs request.
20         MS. ARONSSON:  Are you
21     instructing the Witness not to
22     answer?
23         MR. AULET:  I am instructing
24     him not to answer.
25         MS. ARONSSON:  Can you just

Page 26

1  C. JALBERT
2  state --
3         MR. GOLDMAN:  Can you repeat
4     the question?
5         (Whereupon, the referred-to
6     question was read back by the
7     Reporter.)
8         THE WITNESS:  That should have
9     been e-mails.  I authored one but I
10    was CC'd on e-mails.
11     Q.   I understand Mr. Aulet is
12 instructing you not to answer.
13         MS. ARONSSON:  Mr. Aulet, do
14     you mind just providing a more
15     detailed objection?
16         MR. AULET:  Sure.  Based on my
17     conversations with Golden Spring, my
18     understanding is that Golden Spring
19     believes that revealing that
20     individual's name would potentially
21     expose them to harassment and based
22     on my review of the documents at
23     issue, the person's identity is not
24     relevant to the issues at hand in
25     this deposition.

Page 27

1  C. JALBERT
2      Q.   So I'll just go on record to
3  say that we dispute that contention.
4         MR. GOLDMAN:  As do we.  Who
5     are you -- who do you fear harassment
6     from?  Do you fear harassment from?
7         MR. AULET:  So Mr. -- Golden
8     Spring's attorney is on the phone and
9     that question is probably best
10    directed to Golden Springs but my
11    understanding is that -- please, he
12    would like to answer.
13        MR. MILTENBERGER:  Tim
14    Miltenberger from Golden Springs.
15    I'm assuming what the Witness is
16    testifying to is the identity of a
17    Golden Spring employee which isn't
18    clear to me from the record but
19    apparently the people at the
20    deposition reached that conclusion.
21    We don't see any relevance in
22    revealing the name of the employees
23    of Golden Spring based on the
24    objection that's filed to the DIP
25    financing motion and we think that

Page 28

1  C. JALBERT
2  the privacy rights of our employees
3  are paramount to any information that
4  might be gathered from knowing the
5  name of -- rank and file employees of
6  Golden Spring and we oppose
7  disclosing that information.
8         MR. GOLDMAN:  That's up to the
9     Judge.  It's a totally inappropriate
10    instruction to direct the Witness not
11    to answer.  The Witness can answer
12    and you can get a ruling from the
13    Judge as to whether the answer should
14    be stricken or protected or subject
15    to a protective order.  It's totally
16    inappropriate to direct the Witness
17    not to answer.
18        MS. ARONSSON:  I noted our
19    dispute with Mr. Aulet and I'll just
20    note our dispute with Mr.
21    Miltenberger's reasoning behind the
22    objection here.
23        MR. MILTENBERGER:  Thank you.
24     Q.   Turning back to the folks we
25 were just talking about, you mentioned

Page 29

8 (Pages 26 - 29)

C. JALBERT

1       C. JALBERT
2 Melissa Francis. Did she represent to you
3 that she was Mr. Kwok's counsel?
4     A.    No.
5     Q.    How did you learn about what
6 Ms. Melissa Francis -- who Mr. -- strike
7 that. How did you learn who Ms. Francis'
8 client was?
9     A.    From Brown Rudnick.
10     Q.    We've talked about the folks at
11 Verdolino that you communicate with this
12 engagement. Do you know of anyone else
13 that Verdolino and Lowey communicates with
14 regarding this engagement besides the folks
15 that we've talked about?
16     A.    I don't think there were others
17 but it is possible that one of my
18 colleagues met Flynn. Might have had
19 e-mail contact. You're aware -- because I
20 think you objected to -- there's a large
21 number of ordinary course professionals.
22 We needed to get information about
23 liabilities to them for the schedules.
24 There might have been some information and
25 stuff because we needed -- it's possible

Page 30

1       C. JALBERT
2 sure I wasn't missing anything.
3     Q.    Besides the attorneys at Brown
4 Rudnick, did you circulate drafts of that
5 engagement letter to anyone else?
6     A.    I don't recall anyone else
7 being on it but I'm pretty sure they then
8 did circulate it with -- at a minimum, Ms.
9 Melissa Francis and probably Aaron Mitchell
10 as well.
11      MS. ARONSSON: Tab 11. The
12     Court Reporter is going to hand you
13     what is being marked as Jalbert
14     Exhibit 2. This document -- for the
15     record, this document bears the Bates
16     Number Kwok 00001646.
17      (Whereupon, E-mail Chain was
18     marked as Jalbert Exhibit 2 for
19     identification as of this date by the
20     Reporter.)
21     Q.    Before we get to the exhibit,
22 what is a post-petition retainer?
23     A.    My understanding would be a
24 retainer paid to whoever, after the filing
25 of a bankruptcy, intended to be a retainer.

Page 32

1       C. JALBERT
2 that he spoke with them but I think really
3 what he did is he got all the information
4 from Aaron Mitchell and Melissa Francis. I
5 don't think he went outside of that but
6 it's possible.
7     Q.    Do you know where Aaron
8 Mitchell and Melissa Francis retrieved
9 their information from?
10     A.    No.
11     Q.    Did you ask them where they
12 retrieved their information from?
13     A.    No.
14     Q.    Who negotiated -- who, from
15 Verdolino and Lowey, negotiated the
16 engagement letter?
17     A.    It would be me. I don't know
18 that I would call it a negotiation but it
19 was me that drafted it and prepared it and
20 sent it to Brown Rudnick.
21     Q.    Anyone else involved in
22 drafting that engagement letter?
23     A.    Well, from a QPC perspective,
24 I'm sure I had one of my colleagues, Mary
25 Jo Schindler take a look at it just to make

Page 31

1       C. JALBERT
2     Q.    Can you please turn to Page 2
3 of this document? Take a minute. At the
4 top of Page 2, Mr. Silverberg says that
5 there's no post-petition retainer expected.
6 Do you see that?
7     A.    Yes.
8     Q.    Do you recall whether you had a
9 preference about receiving a post-petition
10 retainer?
11     A.    Well, every professional would
12 rather have a retainer but frankly, under
13 the circumstances, it wasn't expected.
14     Q.    Starting with your preference,
15 why would you prefer to have a
16 post-petition retainer?
17     A.    Security against the payment of
18 the fees.
19     Q.    Do you know whether you
20 received a post-petition retainer in
21 connection with this case?
22     A.    I do.
23     Q.    Did you?
24     A.    No.
25     Q.    And why not?

Page 33

9 (Pages 30 - 33)

C. JALBERT

1       C. JALBERT
2    A.  I didn't ask for one.
3    Q.  Turning back to the e-mail, Mr.
4  Silverberg writes, "big Q is whether it's
5  us retaining you or the client.  I would
6  think you're retained by the client as his
7  financial advisor".  Do you recall that
8  being a question in connection with this
9  engagement?
10      MR. AULET:  Objection to form.
11    A.  I don't think I understand your
12  question.  I can read the statement and
13  understand but I don't know what you're
14  asking.
15    Q.  He says, "big Q", do you
16  understand that to be a big question?
17    A.  I understand it might be a
18  question in his mind.  I don't know that he
19  intended it to be a question for me or for
20  himself and then he answered it.
21      MS. ARONSSON:  Makenzie, can
22    you hand me Tab 12?
23      THE VIDEOGRAPHER:  Mr. Jalbert,
24    would you mind moving the water
25    bottle?  It's coming up in the frame.

Page 34

1       C. JALBERT
2    A.  Yep.
3    Q.  Did you ask for a post-petition
4  retainer in connection with this
5  engagement?
6    A.  No.
7    Q.  Do you know if Verdolino and
8  Lowey asked for a post-petition retainer in
9  connection with this engagement?
10    A.  I do.
11    Q.  What's the answer?
12    A.  No.
13    Q.  You also write, "but I think if
14  we are going to hold the cash, we will need
15  to be employed by the debtor".  So does
16  that refresh your recollection about
17  whether it was a question about who was
18  retaining Verdolino and Lowey?
19    A.  I don't think I had a question
20  in my mind.  I just responded with a
21  comment that supported his previous comment
22  where he said I would think you're retained
23  by the client as his financial advisor.
24    Q.  Generally, can you explain your
25  view in connection with the question

Page 36

1       C. JALBERT
2  I apologize.  Thank you.
3      THE WITNESS:  Sorry about that.
4      THE VIDEOGRAPHER:  I appreciate
5    that.
6      MS. ARONSSON:  The Court
7    Reporter is going to mark what is
8    going to be Jalbert Exhibit 3.  This
9    document is Bates stamped Kwok
10    00001649.
11      (Whereupon, E-mail Chain was
12    marked as Jalbert Exhibit 3 for
13    identification as of this date by the
14    Reporter.)
15    Q.  Please take a look at this
16  document.
17    A.  Okay.
18    Q.  You're responding to Mr.
19  Silverberg's e-mail that we were just
20  speaking about with the big Q is whether
21  it's us retaining you or the client.
22    A.  Okay.
23    Q.  Turning to your response, you
24  note, "I'd like a post-petition retainer if
25  possible".  Do you see that?

Page 35

1       C. JALBERT
2  Mr. Silverberg poses about who was
3  retaining Verdolino and Lowey?
4    A.  Well, I was pretty sure when he
5  wrote I would think you're going to be
6  retained by the client as his financial
7  advisor, that's -- I made a gratuitous
8  comment or not a gratuitous comment.  I
9  made an assenting comment basically saying
10  I think if we're going to hold the cash, we
11  need to be employed by the debtor.  So
12  concurring with the decision or the thought
13  that he had.
14    Q.  What is the basis for the
15  understanding that you just explained?
16      MR. AULET:  Objection to form.
17    A.  Of what part?
18    Q.  Where, turning to your e-mail,
19  "if we are going to hold the cash, we'll
20  need to be employed by the debtor".  What's
21  the basis of that statement?
22    A.  Well, my professional judgment.
23  If me, as a principal of Verdolino and
24  Lowey, was going to be the signer on a
25  debtor in possession bank account, it would

Page 37

10 (Pages 34 - 37)

PAX-014-010

C. JALBERT

1        C. JALBERT
2 make all the sense in the world that that
3 debtor in possession was my client. So I'm
4 concurring effectively with the
5 determination that Mr. Silverberg made in
6 the previous e-mail to this chain.
7    Q.   Thank you. Just for my own
8 understanding, what is the difference
9 between being employed by the debtor versus
10 Brown Rudnick?
11    A.   Well, if I was employed by
12 Brown Rudnick, I'm not sure I'd go
13 through -- I'm not sure I would have to go
14 through the employment process for the
15 bankruptcy. Would I file a motion to be
16 employed? I don't know. I don't know the
17 answer to that question. It's not
18 something that I thought of beyond this.
19 So -- but if I was right and there wouldn't
20 be an opportunity to file a motion to
21 employ Verdolino and Lowey on behalf of the
22 debtor, I don't know how we would then
23 allow me to be a signatory on the debtor's
24 account.
25    Q.   Thank you. That's helpful.

Page 38

1        C. JALBERT
2 Did you rely on Brown Rudnick in connection
3 with that determination of who would be
4 retaining Verdolino and Lowey?
5      MR. AULET: Objection to form.
6    A.   Well, Mr. Silverberg writes in
7 his e-mail, "I would think you're retained
8 by the client as his financial advisor" and
9 the next e-mail, same day, when I got
10 around to it at 6:49 p.m. -- so five hours
11 had elapsed -- I basically concurred with
12 his determination. Who made the decision,
13 I don't know. It's semantics but I think
14 it was clear from this point on, that we
15 were going to be retained by the debtor and
16 not Brown Rudnick.
17    Q.   Is Verdolino and Lowey ever
18 retained by a law firm in connection with
19 bankruptcy proceedings?
20    A.   We're frequently retained by
21 lawyers in proceedings. I think even
22 including in bankruptcy proceedings for the
23 purposes of the privilege.
24    Q.   What do you mean by for
25 purposes of the privilege?

Page 39

1        C. JALBERT
2    A.   Well, frequently in matters,
3 we -- the firm gets brought in and we do
4 whatever work is intended on that
5 particular engagement. Frequently, it's
6 litigation support. If it's intended that
7 we do an investigation, the lawyer's
8 thinking ahead, look, you're going to do an
9 investigation, we think this is what we're
10 going to find. Then we're going to have to
11 get a expert report to file with a
12 particular court. Then we might need you
13 to go through the process of discovery
14 including records, depositions and the like
15 and then we might need you to testify. In
16 those particular cases, as I understand it,
17 there would be privilege up to a certain
18 point, up until the time I'm declared an
19 expert but in other instances, we get
20 brought in as -- as financial advisor to
21 the attorneys. They want us to do an
22 investigation. They want us to uncover
23 whatever need to be uncovered, whatever the
24 allegations are, whatever the issues are
25 but they might be hiring another firm or

Page 40

1        C. JALBERT
2 individual to testify as the expert to keep
3 what knowledge we have as privileged. I
4 don't know that that's relevant here.
5    Q.   Thank you. Turning back to
6 Exhibit 2 --
7      MR. MILTENBERGER: I'm sorry to
8 interrupt. I'm being called away to
9 another matter so I'm going to have
10 to drop off now. The record could
11 just note that I'm leaving the
12 deposition.
13      MR. HARBACH: Thank you, Tim.
14 You're welcome to rejoin anytime.
15      MR. MILTENBERGER: Will do,
16 thanks.
17    Q.   I'm interested in your e-mail
18 at the top where you write, "my feeling is
19 that in an individual case, the FA" --
20 financial advisor -- "duties are markedly
21 different than of an operating business
22 case". Can you explain to me the
23 difference between an individual case
24 versus an operating business case?
25    A.   So operating business cases

Page 41

11 (Pages 38 - 41)

PAX-014-011

C. JALBERT

1    C. JALBERT
2  have their various size and shapes. They
3  may have affiliated entities, parents,
4  siblings. It could be multiple debtors.
5  They might have employees in various
6  countries, various states. They may have
7  payroll taxes un-filed, sales taxes
8  un-filed, depending on the business, bottle
9  deposits un-filed and unkept. They
10 probably need a lot more work on budgeting
11 and keeping the business operating. Does
12 it have sufficient cash, what are the 13
13 week budgets, the one year budgets. Cash
14 collateral where it's -- you've got a
15 secured creditor who is frequently -- maybe
16 not against the debtor but maybe not with
17 it either. So -- so there's just -- it's a
18 totally different beast. In this
19 particular case, some individuals have
20 operating real estate or something like
21 that but they rarely have an operating
22 business that's multi country, multi state
23 with employees and all sorts of reporting
24 requirements, compliance requirements.
25    Q.    Is it fair to say the financial

Page 42

1    C. JALBERT
2  advisor duties in connection with an
3  operating business case are more
4  complicated than an individual case?
5    A.    In most, yes.
6    Q.    Turning away from the exhibit,
7  who instructed Verdolino and Lowey on the
8  scope of work in this matter?
9    A.    I don't think anyone instructed
10 us.
11    Q.    Because you drafted the
12 engagement letter?
13    A.    I'm sure there were discussions
14 with counsel. I don't remember the
15 discussions specifically but this is not
16 the first time I've drafted a retention --
17 at least part of the retention papers.
18 Obviously, I'm not a lawyer. I don't know
19 all of that goes into retention papers but
20 as to the duties, typically, I have an
21 input as to what the duties are. I'm sure
22 we took the first stab at it and in review
23 by Brown Rudnick, they might have made some
24 changes. I don't remember how that went.
25    Q.    In connection with the

Page 43

1    C. JALBERT
2  engagement, no one informed you what needed
3  to be done on this case?
4    A.    Well, we had been party to
5  numerous conversations. This is not my
6  first bankruptcy. It's not my 50th
7  bankruptcy. It's not my 100th bankruptcy.
8  I had a fairly good idea of what the issues
9  were going to be and I took the first pass.
10 I don't recall whether there were changes
11 made after that or not.
12    Q.    Generally, what is the scope of
13 Verdolino and Lowey's work in this case?
14    A.    In this case?
15    Q.    Yes.
16    A.    Well, the retention papers
17 speak for themselves. So if you want to go
18 line by line, put that in front of me.
19    Q.    Sure.
20    A.    To date, we've been focused
21 on -- first, my recollection is the SOFA's
22 and the schedules pretty much
23 simultaneously. I mean they were due the
24 same day, same time. So that was first.
25 Following -- immediately following that, I

Page 44

1    C. JALBERT
2  believe we worked on everybody's engagement
3  papers to get them filed in the Court and
4  then -- probably while the tail end of that
5  was going along, I believe my colleague,
6  Matt Flynn, started preparing the monthly
7  operating report that was due for the end
8  of February, sometime around March 20, 21,
9  22, somewhere around there. Trying to
10 think if we've done anything -- oh
11 assistance in preparing for -- or
12 participation in preparing, to a small
13 degree, for the debtor to attend the 341
14 meeting. We attended the first day 341
15 meeting by telephone. My colleague, Matt
16 Flynn and I, attended the second day of the
17 341 hearing which was this past Wednesday
18 on a -- how do I want to call it -- we
19 didn't bill for our time. I went as an
20 observer. We knew we weren't going to be
21 participating but we wanted to be around to
22 see what took place, meet people and then
23 this deposition.
24    Q.    Thank you. So I think I heard
25 the SOFA's and schedules were the first

Page 45

12 (Pages 42 - 45)

PAX-014-012

C. JALBERT

1    step. You talked about drafting everyone's
2    engagement papers in connection with this
3    matter.
4        A.    Well, drafting our engagement
5    papers. Everyone was focusing on their own
6    and I needed help, because I'm not a
7    lawyer, on mine.
8        Q.    Then you talked about Matt
9    Flynn's responsibilities in connection with
10   the monthly operating report.
11       A.    Yes.
12       Q.    Finally, you talked about
13   preparing for the 341 hearing and attending
14   the 341 hearings?
15       A.    Meeting, yes.
16       Q.    Can you describe a little bit
17   more your responsibilities in connection
18   with those 341 meetings?
19       MR. AULET: I would just
20       caution the Witness not to disclose
21       any work product or conversations
22       with attorneys.
23       A.    On the first day of the 341
24   meeting, it was just thought that we should

Page 46

C. JALBERT

1    participate because it was unclear what was
2    going to arise and they didn't know if it
3    would be something that we would need.
4        Q.    Setting aside your
5    conversations with your attorneys, what --
6    did you have any understanding about what
7    might arise during the first day of the 341
8    hearing that might require your
9    participation?
10       A.    I've attended an awful lot of
11   341 meetings over my career. Anything can
12   happen at a 341 meeting because it's open
13   to every creditor and god only knows what
14   takes place.
15       Q.    Did you anticipate having to
16   participate or ask questions during the
17   341?
18       A.    I think we were asked to be on
19   the phone. I didn't have a participation
20   one way or another.
21       MS. ARONSSON: The Court
22       Reporter is going to hand you what is
23       being marked as Jalbert Exhibit 4.
24       (Whereupon, Debtor's

Page 47

C. JALBERT

1    Application was marked as Jalbert
2    Exhibit 4 for identification as of
3    this date by the Reporter.)
4        MS. ARONSSON: For the record,
5    this is a document entitled Debtors
6    Application for Authorization to
7    Retain and Employ Verdolino and Lowey
8    PC as Financial Advisor. It was
9    filed in this case as Docket 90.
10       Q.    Mr. Jalbert, feel free to look
11   at this document.
12       A.    Is there something you're
13   trying to point me to?
14       Q.    Do you recognize this document?
15       A.    Yes.
16       Q.    What is it?
17       A.    Debtor's Application for
18   Authorization to Retain and Employ
19   Verdolino and Lowey PC as Financial
20   Advisor.
21       Q.    Turning to Page 18 of the
22   document, using the page numbers at the top
23   of the page, what is this document?
24       A.    Affidavit of Craig R. Jalbert

Page 48

C. JALBERT

1    in Support of Debtor's Application for
2    Authorization to Retain and Employ
3    Verdolino and Lowey PC as Financial
4    Advisor.
5        Q.    So you recognize this as your
6    affidavit you filed --
7        A.    I do.
8        Q.    Turning to Page 21, the table
9    -- I'm interested in the table at the
10   bottom of the page.
11       A.    Yes.
12       Q.    Just stepping back I think you
13   mentioned folks at Verdolino who were
14   involved, Matt Flynn -- in this case, Matt
15   Flynn, Mary Jo Schindler and yourself. Is
16   there anyone else involved in this matter
17   at Verdolino and Lowey?
18       A.    I mentioned Tim MacDonald, our
19   IT person who is only involved with --
20   related to the deposition, the search of
21   our e-mails and the server records and
22   everything and getting it ported over to
23   Brown Rudnick to be then sent to you folks.
24       Q.    Anyone else at Verdolino and

Page 49

13 (Pages 46 - 49)

C. JALBERT

1  Lowey?
2  Q. Not that I know of.
3     A. Not that I know of.
4     Q. Turning to this table, is Matt
5  Flynn also a principal?
6     A. No.
7     Q. What is Matt Flynn's role?
8     A. A manager.
9     Q. Is Mindy Jo Schindler a
10 principal?
11    A. No.
12    Q. What is her role?
13    A. Manager.
14    Q. So in connection with this
15 engagement at Verdolino and Lowey, there's
16 one principal, two managers and then the IT
17 person?
18    A. I believe so, yes.
19    Q. Do you anticipate other
20 Verdolino and Lowey employees to become
21 involved in this matter?
22    A. As the case progresses,
23 assuming that we come into the case, yes.
24    Q. Generally, what are the duties
25 of a principal in connection with a

Page 50

C. JALBERT

1  bankruptcy case like this?
2     A. I think of it as partner,
3  director, managing director, any of those,
4  the lead person on the case from the firm.
5     Q. In connection with this matter
6  specifically, what do you expect the
7  principal to be doing?
8     A. I assisted in preparation of
9  the SOFA's and schedules, the global notes,
10 the specific part of the global notes. I
11 assisted with the monthly operating report.
12 I participated with the first day hearings
13 -- excuse me, first -- not the first day
14 hearing. The first day of the 341 meeting.
15 Responding to inquiries from the various
16 lawyers and supporting staff on whatever
17 roles that they are working on.
18    Q. What do you expect managers to
19 do in connection with this case?
20    A. The same -- the same things.
21 Maybe differing amounts, different types.
22 I'm more review. Depending on what it is,
23 they might support me. I might support
24 them. It's like this engagement is no

Page 51

C. JALBERT

1  different than any other engagement. You
2  don't know what's going to happen in
3  day-to-day and everyone responds as best
4  they can, as efficiently as they can and
5  whatever the issues are that are ongoing
6  and the crises that materialize.
7     Q. What about staff, what sort of
8  role do you anticipate any potential staff
9  to play in this case?
10    A. It will depend on how it plays
11 out. I don't think it's going to happen
12 but if it did and we became -- I became the
13 sole signer on the debtor in possession
14 bank account, my firm would probably be --
15 the bookkeepers would probably keep records
16 of the disbursements and the receipts.
17 They would assist with reporting. I would
18 probably review it of course. If, at some
19 point in time, we have claim objections, I
20 don't know what the nature of those
21 objections are going to be, I don't know
22 how big and how complicated but some of our
23 staff might be involved in claims. The
24 debtor might have to file an income tax

Page 52

C. JALBERT

1  return. I'll be advising them that they
2  should file an income tax return for the
3  Estate. So we'll have tax people involved
4  in the preparation of the income taxes and
5  I would have to go down the list of -- and
6  be able to predict exactly what's going to
7  take place but we're very efficient, very
8  accustomed. We know all of our fees are
9  subject to review by every single party and
10 interest. So we're -- we use as reasonably
11 low level as we can on every matter and I
12 can't predict beyond that what's going to
13 come up but that staff and bookkeepers get
14 used for those types of issues.
15    Q. Is it fair to say your answer
16 to my question about staff applies to the
17 bookkeepers, to the role of the
18 bookkeepers?
19    A. No, bookkeepers and staff.
20    Q. So the answer that you just
21 gave applies to both of those?
22    A. You asked what they may do.
23    Q. Right.
24    A. They're -- the bookkeepers

Page 53

14 (Pages 50 - 53)

PAX-014-014

1       C. JALBERT
2 aren't going to do reporting but they're
3 going to maintain receipts and
4 disbursements. A staff person would
5 probably work on the form of the -- of a
6 financial statement or whatever report
7 that's going to be issued. The staff are
8 going to work on claims objections. Tax
9 professionals are going to work on tax
10 returns.
11    Q.   Are you finished with your
12 answer?
13    A.   Yes.
14    Q.   You mentioned receipts and
15 disbursements. What sorts of receipts and
16 disbursements do you anticipate in this
17 case?
18    A.   I would imagine if things were
19 to go the way the debtor planned, there was
20 a proposed DIP financing arrangement where
21 money will come into the Estate and then
22 would presumably be used to pay various
23 professionals and United States Trustee
24 fees and whatever other disbursements are
25 required of the debtor as ordered by the

Page 54

1       C. JALBERT
2 Court or otherwise generally required to
3 pay Chapter 11 bills as they become due. I
4 think that's it.
5    Q.   The last item is clerical.
6 What sort of duties do you anticipate a
7 clerical member of your team to do in this
8 case?
9    A.   I don't have anything that I
10 have presupposed for them to do in this
11 case.
12    Q.   Turning back in the document to
13 the retention agreement, this is on Page
14 13. We've talked generally about the
15 engagement -- Verdolino and Lowey's
16 engagement in this case. I want to walk
17 through these bullet points on the first
18 page. The first one reads, "assistance
19 with preparation of the statement of
20 financial affairs and the schedules and all
21 support thereto and any amendments". These
22 have been filed, right?
23    A.   Yes.
24    Q.   Who was involved in preparing
25 the SOFA and the schedules?

Page 55

1       C. JALBERT
2    A.   From my firm?
3    Q.   Who at V&L?
4    A.   Myself, Matthew Flynn and Mary
5 Jo Schindler.
6    Q.   Who else was involved in
7 preparing these filings?
8    A.   There might have been a
9 technical question for someone related to
10 the best case but I can't think of anything
11 else -- anyone else that had any -- that
12 did work on it.
13    Q.   Did Brown Rudnick work on the
14 SOFA and schedules?
15    A.   You asked me for my firm. Of
16 course they worked on them, as did Melissa,
17 as did -- that's Melissa Francis. As did
18 Aaron Mitchell. So it was clearly not all
19 Verdolino and Lowey. It was -- the whole
20 team was involved in the preparation. I
21 thought you asked me -- and if I
22 misunderstood, I apologize -- you asked
23 who, at Verdolino, did and that was myself,
24 Matt Flynn and Mary Jo Schindler.
25    Q.   Thank you. Yes, I did ask

Page 56

1       C. JALBERT
2 Verdolino and Lowey and was then moving on.
3 So you mentioned Melissa Francis, Aaron
4 Mitchell, Brown Rudnick. Generally, anyone
5 else?
6    A.   While I never spoke to them,
7 there must have been the existence of help
8 from individuals that translated documents
9 and words from the various professionals to
10 the debtor and the debtor.
11    Q.   Did you communicate with the
12 debtor about this SOFA and schedules?
13    A.   No.
14    Q.   You mentioned some translated
15 documents. Did you receive those
16 translated documents in connection with
17 your work on the SOFA and schedules?
18    A.   No. I don't read Mandarin.
19    Q.   Did you see any translated
20 documents?
21    A.   I don't recall seeing them.
22       MR. AULET: Objection to form.
23    Q.   Do you know whether Golden
24 Spring was involved in preparing the SOFA
25 and schedules?

Page 57

15 (Pages 54 - 57)

PAX-014-015

C. JALBERT

1
2    A.    I wouldn't know.
3    Q.    Do you know what Golden Spring
4 is?
5    A.    Yes.
6    Q.    What is it?
7    A.    It's -- as I understand it -- a
8 family office in New York City for the
9 debtor's son. Exactly how it's run, all
10 that, I don't have any information.
11    Q.    Who is the debtor's son?
12    A.    I don't know his name.
13 Debtor's son.
14    Q.    Neither you nor anyone at
15 Verdolino and Lowey met with or
16 communicated with the debtor about the SOFA
17 and schedules?
18        MR. AULET: Objection to form.
19    A.    Correct.
20    Q.    Can you describe what work
21 Verdolino and Lowey did in preparing the
22 SOFA and schedules?
23    A.    We participated with several
24 lengthy phone calls with various people
25 from Brown Rudnick, not all of whom I'm

Page 58

C. JALBERT

1
2 doing in connection with the SOFA and
3 schedule?
4    A.    I don't know that it's
5 anticipated but to the extent facts and
6 circumstances, at some point in time,
7 require a review and possible amendment, I
8 think we would have to participate because
9 we're the ones that know Best Case and have
10 that system but there's nothing
11 anticipated. It's only if that
12 materializes, we would participate.
13    Q.    You've said -- you've mentioned
14 Best Case a couple times. What do you mean
15 by that?
16    A.    It's a software that the
17 industry uses. I think it's the most
18 prominent software that supports the
19 preparation of SOFA's and -- SOFA's and the
20 schedules. I think they're used throughout
21 the industry by most everybody.
22    Q.    So is it fair to say it's like
23 a TurboTax of preparing SOFA's and
24 schedules?
25    A.    Or QuickBooks or -- you know.

Page 60

C. JALBERT

1
2 going to remember were on the phone and
3 also with Melissa Francis and Aaron
4 Mitchell. Aaron Mitchell and Melissa
5 Francis provided significant levels of
6 input of various information. Brown
7 Rudnick had been involved in the case
8 before we were. They already had a large
9 knowledge base so we -- we talked with
10 Brown Rudnick team and Melissa and Aaron on
11 the phone and then numerous e-mails.
12        THE WITNESS: I agree. Hot.
13        MR. HARBACH: Yeah, I tried to
14    keep out the sun.
15    Q.    Did Verdolino and Lowey perform
16 any investigation to verify information
17 obtained from Brown Rudnick, Melissa
18 Francis or Aaron Mitchell?
19    A.    No.
20    Q.    So is it fair to say you took
21 their word regarding the representations
22 contained in the SOFA and the schedule?
23    A.    That's fair.
24    Q.    Is there any outstanding work
25 that Verdolino and Lowey will anticipate

Page 59

C. JALBERT

1
2    Q.    So that software is essentially
3 garbage in, garbage out, right?
4        MR. AULET: Objection.
5    A.    Every software is garbage in,
6 garbage out.
7    Q.    Turning to the second bullet
8 point in the retention agreement, it reads,
9 "assistance with preparation and/or review
10 of cash flow and related budget projections
11 and including advising as to post-filing
12 finances". Do you see that?
13    A.    Yes.
14    Q.    What work has Verdolino and
15 Lowey done in connection with this line
16 item?
17    A.    Nothing.
18    Q.    What work does Verdolino and
19 Lowey anticipate doing in connection with
20 this line item?
21    A.    Anticipate doing this if we're
22 in the case and there's a DIP.
23    Q.    So it includes budget
24 projections. Budget projections for who?
25    A.    I imagine we will try and

Page 61

16 (Pages 58 - 61)

PAX-014-016

C. JALBERT

1      C. JALBERT
2 establish what a budget would be for -- for
3 instance, committee counsel and its
4 financial advisors, debtor's counsel and
5 their financial advisors, the United States
6 Trustees fees. There were a number of
7 firms that were intended to be ordinary
8 course professionals and any other
9 anticipated disbursement in the case that's
10 approved in one way, shape or form by court
11 order.
12    Q.   It also includes review of cash
13 flow. What cash flow?
14    A.   The DIP money.
15    Q.   The debtor has no income,
16 right?
17    A.   To my knowledge, correct.
18    Q.   Have you reviewed the debtor's
19 declaration filed in this case?
20    A.   I certainly reviewed one or two
21 of the drafts of it. I don't know that I
22 saw the final or not. I don't remember.
23    Q.   Are there cash flows coming in
24 from any source at the moment?
25    A.   Into the Estate?

Page 62

1      C. JALBERT
2 DIP loan in this case?
3    A.   Hope so.
4    Q.   Do you have experience with DIP
5 loans?
6    A.   Yes.
7    Q.   How much experience do you
8 have?
9    A.   I don't know how many hundred
10 cases with DIP loans.
11    Q.   What work has Verdolino and
12 Lowey done in connection with this line
13 item?
14      MR. AULET: Objection to form.
15    A.   We're talking about the third
16 one, right, opening and maintaining the DIP
17 account?
18    Q.   Yes.
19    A.   The only thing I did, when
20 asked by Brown Rudnick if I'd be willing,
21 is I consulted with a bank that does --
22 that's on the list of approved financial
23 institutions of the Department of Justice.
24 I checked with that bank, which I use
25 frequently in and out of bankruptcy, to

Page 64

1      C. JALBERT
2    Q.   Yes.
3    A.   Not to my knowledge.
4    Q.   Your knowledge of the debtor's
5 lack of income is based on what you've been
6 told, is that right?
7    A.   Yes.
8    Q.   No independent investigation in
9 connection with his income?
10    A.   Correct.
11    Q.   This line item also references
12 post-filing finances. What is meant by
13 that?
14    A.   He filed on February 15th.
15 Whatever finances, cash receipts, cash
16 disbursements, budgeting from that day
17 forward.
18    Q.   The third line item reads,
19 "opening and maintaining the DIP account
20 and effectuating disbursements when
21 necessary and providing accounting of all
22 cash activity". Is it your understanding
23 there's a DIP loan here?
24    A.   No.
25    Q.   Do you anticipate there being a

Page 63

1      C. JALBERT
2 confirm that they would allow me to be a
3 signer on the DIP account and they
4 responded in yes. That's the extent of
5 which I've done on that.
6    Q.   Is that Citizens Bank that
7 you're referencing?
8    A.   Yes.
9    Q.   Has Verdolino and Lowey been
10 involved in the negotiation of the
11 potential DIP loan?
12    A.   No.
13    Q.   Has Verdolino and Lowey been
14 included on any communications regarding
15 the potential DIP loan?
16    A.   I don't know.
17    Q.   Have you personally been
18 involved in any written or oral
19 communications regarding the DIP loan?
20    A.   I don't recall any.
21    Q.   Do you have an understanding as
22 to how the potential DIP loan would be
23 structured?
24    A.   Well, I briefly read the DIP
25 loan at some point in time. I don't have

Page 65

17 (Pages 62 - 65)

PAX-014-017

C. JALBERT

1  an explicit memory of every -- of the whole
2  thing but I know generally how DIP loans
3  work.
4      Q.    In this case, do you know how
5  the DIP loan would potentially be
6  structured?
7      A.    I would have to be guessing at
8  my memory.
9      Q.    Who, at Verdolino and Lowey,
10  would perform the work in connection with
11  this line item?
12          MR. AULET:  Objection to form.
13      A.    Presupposing that there is a
14  DIP loan?
15      Q.    Yes.
16      A.    It would -- as repeating,
17  obviously, I would be the signatory on the
18  account.  There would be bookkeepers and
19  staff associated with preparing the checks,
20  preparing the reports and reporting to all
21  the parties that be.  Some -- I imagine the
22  committee would want to know -- generally,
23  they would like to know on a weekly or
24  biweekly basis what receipts and

C. JALBERT

1  disbursements are, major creditors might
2  feel the same way.  So whatever the --
3  whatever the case is, reporting
4  requirements as they develop, we would take
5  care of that.  I don't know what they would
6  be.  Aside from the minimum requirement,
7  the monthly operating report.
8      Q.    What is Verdolino and Lowey's
9  run rate up until this point?
10      A.    What's a run rate?
11      Q.    How much has Verdolino and
12  Lowey billed to this matter?
13      A.    We've billed zero so far.
14      Q.    How much value does Verdolino
15  anticipate it has already billed in this
16  case?
17      A.    Are you asking for a WIP to
18  date?
19      Q.    What is a WIP to date?
20      A.    Work in process hours?
21      Q.    Yes, please.
22      A.    I have no idea.
23      Q.    Does Verdolino and Lowey have
24  any agreement with anyone regarding who

C. JALBERT

1  will pay the fees in the event the DIP loan
2  does not occur?
3      A.    No.
4      Q.    Let's turn to the next line
5  item, "preparation, review and analysis of
6  monthly operating reports and/or quarterly
7  reporting".  Do you see that?
8      A.    Yes.
9      Q.    You referenced earlier a
10  monthly operating report that was recently
11  filed in this case?
12      A.    Yes.
13      Q.    Is that the type of work
14  anticipated in this-- in connection with
15  this line item?
16      A.    Well, going forward, there's
17  going to be a lot more than a monthly
18  operating report because there's going to
19  be -- well, presumably, if there is a DIP
20  and if the case continues, there's going to
21  be receipts and disbursements and even if
22  there aren't, the monthly operating report
23  and the US Trustees Office requires that --
24  the disclosure of all estate professionals

C. JALBERT

1  as they accrue throughout the case.  So it
2  didn't happen in the February one because
3  of the scrambling of SOFA's and schedules
4  and 341 meeting and everything else.  Going
5  forward, we're going to have to have a
6  report on a monthly basis and a cumulative
7  basis what everybody's fees are, what the
8  cash in and cash out is and part of the
9  monthly operating report calculates the
10  fees due to the United States Trustee
11  Program and then the monthly operating
12  report, you typically have to also -- you
13  attach to it insurance binders, if things
14  expired.  If they weren't usually --
15  usually, I put them in anyway just to avoid
16  confusion and someone looking for it.  And
17  then complete copies of the bank
18  statements.  The United States Trustees
19  Office also wants balance sheet and P&L and
20  cash flow and what the accounts payable,
21  accounts receivable and all the various --
22  so the first one was filed.  Future ones
23  are going to have a lot more information.
24      Q.    Taking a step back, can you

18 (Pages 66 - 69)

Veritext Legal Solutions
866 299-5127

PAX-014-018

C. JALBERT

1   C. JALBERT
2 just explain, generally, what a monthly
3 operating report is in a Chapter 11
4 individual case?
5     A.   It's the same or pretty close
6 to the same I think as the operating report
7 in a commercial case.  It looked like it to
8 me anyway's.  But it's the standard --
9 during the pendency of the case, the
10 operating report, that is required by the
11 US Trustees Program, up until the case is
12 dismissed, converted or confirmed.
13     Q.   So the procedures that you
14 described relating to the work on the
15 monthly operating report, that presupposes
16 the approval of the DIP loan and managing
17 of those funds.  Is that right?
18     A.   Well, the monthly operating
19 report is going to be due irrespective of
20 that.  The -- the accrual of the -- of the
21 fees of committee counsel, us, the
22 accountant advisor, the debtor, debtor
23 committee, others, whoever might be paid by
24 the Estate including th ordinary course.
25 Even if there's not a DIP, that has to be

Page 70

1   C. JALBERT
2     A.   The United States Trustee
3 issues bills predicated on the monthly
4 operating report, to what the expenses that
5 meet the definition of a disbursement on
6 account of the U.S. Trustees form, they
7 combine the three months in every calender
8 quarter.  So for us, it will be the
9 February 15th, the February 28th stub
10 period, plus the March 1 to March 31, that
11 MOR.  The sum of those 45 days will be in a
12 bill from the U.S. Trustees Office and,
13 assuming it's correct, would have to be
14 paid before the end of -- I believe this
15 month.
16     Q.   So is it fair to say that
17 Verdolino and Lowey is retained to review
18 the quarterly report?
19     A.   I don't know if it's listed in
20 here specifically but certainly the monthly
21 operating report is the form that is the
22 input to the United States Trustees Office
23 in order to create the bill.  So we know --
24 and it's the fees are statutorily
25 determined based on the level of

Page 72

1   C. JALBERT
2 reported in the monthly operating report.
3     Q.   You prepared one monthly
4 operating report to date?
5     A.   In this case?
6     Q.   In this case, is that right?
7     A.   Yes.
8     Q.   Is another monthly operating
9 report in progress?
10     A.   Yes.
11     Q.   Did you also prepare -- scratch
12 that.  Did Verdolino and Lowey also prepare
13 the estimated monthly operating expenses
14 contained in the schedule?
15     A.   To what are you referring to?
16     Q.   We can come back to that.
17     A.   Okay.
18     Q.   Have you or Verdolino and Lowey
19 prepared a quarterly report in this case?
20     A.   The United States Trustee
21 quarterly report?
22     Q.   Yes.
23     A.   No.  We don't prepare that,
24 they do.
25     Q.   What is a quarterly report?

Page 71

1   C. JALBERT
2 disbursements.  It's very easy to double
3 check their work.  We would do that and
4 make sure that the number is right.  It's
5 frequently wrong because sometimes they
6 issue the bill before the March statement
7 actually hits.  So they're estimating.
8 They're generally off -- not their fault --
9 in the first quarter because it's not a
10 full quarter.  They don't have a basis for
11 making estimates, whatever the case may be
12 but we would -- we would ensure that the
13 fee paid to the U.S. Trustees is
14 appropriate under the circumstances.
15     Q.   Turning to the next line item,
16 "assistance with preparation and/or review
17 of estate federal and state income tax
18 filings".  What work has Verdolino and
19 Lowey done in connection with this line
20 item?
21     A.   Nothing.
22     Q.   I think you mentioned before
23 that you were going to recommend the filing
24 of income taxes.  Why do you recommend that
25 in this case?

Page 73

19 (Pages 70 - 73)

PAX-014-019

C. JALBERT

1
2    A.   I recommend it in every case.
3    So individual estate tax returns,
4    individual estates is a separate --
5    completely separate and distinct entity
6    from the individual as opposed to in a
7    corporate case, the corporation retains its
8    tax identity. You continue to file
9    C-corporation returns if they're a
10   C-corporation, S Corp., partnership,
11   whatever the case may be and their year end
12   remains whatever their year end was
13   established pre-petition. In a bankruptcy
14   estate, the Estate is separate and distinct
15   from the individual. The individual has to
16   continue to file his own individual income
17   taxes with whatever his individual income
18   that doesn't come into the Estate. In a
19   Chapter 11 case, virtually all of the
20   debtor's income is supposed to come into
21   the Estate. So there really shouldn't be a
22   separate one but technically, there could
23   be. The Estate is -- the Estate return is
24   generally assigned to be December 31,
25   unless you elect otherwise. There are

Page 74

C. JALBERT

1
2    reasons to elect otherwise but the most
3    important point is in order to get the --
4    the relief that's in the bankruptcy code
5    under Section 505b, in order to get that
6    relief, you have to file a tax return. So
7    I recommend, even when there's no tax due,
8    that the return gets filed in order to
9    protect all -- everybody in the case to
10   make sure that there is not an issue that
11   gives the various taxing authorities 60
12   days from the date of filing with the
13   505(b) letter to elect to audit it. It's
14   the way that the case can move forward to
15   closure and not have the seven year
16   statute, three year statutes and the like.
17   So I recommend everyone does the 505(b).
18   If they don't elect to audit it in the
19   first 60 days, then they lose the
20   opportunity. If they select it for audit,
21   then they got another 120 days. I want --
22   I recommend it in every single case,
23   individual or corporation or partnership or
24   LLC, that the tax returns get filed whether
25   they're necessary or not, whether they're

Page 75

C. JALBERT

1
2    legally required or not with a 505(b)
3    letter.
4    Q.   Do you anticipate that multiple
5    returns will be filed in this matter if the
6    debtor chooses to file returns.
7    A.   Well, I don't know what the
8    debtor is going to do and again, it has no
9    bearing on the Estate and no bearing on
10   Verdolino and Lowey but the Estate will
11   have to file -- I'll recommend that it file
12   a federal return. The debtor is a resident
13   of Connecticut so there would be a
14   Connecticut state tax return and if, for
15   some reason, there was income from another
16   state, we would file from whatever state
17   that that income came. So I don't know
18   what it's going to be but it's at least
19   going to be Connecticut and the IRS.
20   Q.   I think we covered before, it's
21   your understanding that the debtor has no
22   income in this case?
23   A.   Correct.
24   Q.   What work do you anticipate
25   Verdolino and Lowey will do in connection

Page 76

C. JALBERT

1
2    with an individual tax return for the
3    debtor?
4         MR. AULET:   Objection to form.
5    A.   Well, I'd have to guess what's
6    going to take place between February 15 and
7    December 31. I don't know whether there
8    will be any income or not. There's
9    litigation going on. There might be
10   settlements. I don't know whether there'll
11   be income or not but if there is, there'll
12   be income. From what source, I don't know
13   and from where, I don't know but at a
14   minimum, there will be disbursements and in
15   a bankruptcy, there's two types of expenses
16   from a tax perspective. There are
17   administrative expenses like professional
18   fees and there are other types of expenses
19   that are normal to an individual. Mortgage
20   interest, real estate taxes, whatever the
21   case may be. They are treated in different
22   ways on the tax return but one of the
23   reasons why you would file a return is the
24   -- for tax purposes in a bankruptcy estate,
25   the fees paid to professionals are

Page 77

20 (Pages 74 - 77)

PAX-014-020

C. JALBERT

1
2 deductible and you can build them up like a
3 deferred tax asset. So to the extent, in
4 the future -- after we spend money on the
5 case, if, in the future, there was a large
6 settlement agreement, you would be able to
7 offset the previous administrative NOL's
8 against the future income --
9     THE COURT REPORTER: The
10     previous administrative --
11     THE WITNESS: N-O -- net
12     operating losses against a future
13     receipt, which is another reason to
14     file the return.
15     Q.   Is it fair to say that the work
16 that Verdolino and Lowey anticipates
17 potentially doing in connection with tax
18 returns depends on whether cash is coming
19 into the debtor or the Estate in the
20 future?
21     MR. AULET: Objection to form.
22     A.   No. You're going to have --
23 you're going to have accrued expenses
24 depending on the -- when the timing of the
25 case and everything, accrued expenses can

Page 78

C. JALBERT

1
2 be deductible. So cash -- clearly, if
3 there were cash, that would -- that would
4 have to be taken care of but depending on
5 how this case goes and the timing, it's
6 entirely possible that some of the accrued
7 expenses would be deductible.
8     Q.   Have you seen the debtor's most
9 recent tax returns?
10     A.   I don't know that I would be
11 able to call them most recent tax returns
12 but I've seen parts. I don't know if it's
13 the whole thing. I don't know if I saw the
14 entire federal and the entire state but I
15 -- I at least saw the New York return and
16 the federal version attached to the New
17 York return which may or may not be the
18 entire federal return for 2019 I think and
19 2020.
20     Q.   If the debtor's income is zero,
21 what do you anticipate deducting from?
22     MR. AULET: Objection.
23     A.   Are we talking about the debtor
24 individually or the Estate?
25     Q.   Let's start with the debtor.

Page 79

C. JALBERT

1
2     A.   I have no -- it's not my
3 problem or interest what happens to the
4 debtor, outside of the bankruptcy estate.
5 He's going to have to hire a different
6 accountant to deal with that.
7     Q.   Let's talk about the Estate.
8     A.   If the Estate has tax
9 transactions, as I said, I would recommend
10 the Estate files tax returns on a timely
11 basis and it would include whatever
12 transactional activity that is allowed
13 under the -- both the bankruptcy code and
14 the internal revenue code and I don't know
15 what that's going to be.
16     Q.   Turning to the next line item,
17 it reads, "assistance with reviewing
18 reconciling, analyzing and if necessary,
19 objecting to proofs of claim". What work
20 has Verdolino and Lowey performed in
21 connection with this line item?
22     A.   None.
23     Q.   Just generally, what does --
24 what is a proof of claim?
25     A.   It's a form. There's a form.

Page 80

C. JALBERT

1
2 There's a bankruptcy form that's a proof of
3 claim. I don't remember what the form
4 number is but it's an opportunity for any
5 alleged creditor to file a claim in either
6 a Chapter 11 or a Chapter 7 case. They can
7 file claims on a secured basis, a priority
8 basis, an administrative basis and I'm sure
9 there's more that I'm missing. I don't
10 think there's a claims objection deadline
11 but at some point in time, in a Chapter 11,
12 there's usually a claims objection
13 deadline. If, however, a creditor has been
14 scheduled on Schedule D, E or F and that
15 number happens to be right, then the
16 creditor does not have to file a claim as I
17 understand it. If they disagree because
18 it's owed more or less -- and rarely do
19 they disagree if they're owed less but if
20 they're owed more, they're allowed to file
21 a proof of claim and establish what they
22 think the amount due to them from the
23 bankruptcy estate would be.
24     Q.   Have you reviewed any of the
25 pending litigation claims in this matter?

Page 81

21 (Pages 78 - 81)

C. JALBERT

1
2   A.   No.
3   Q.   What experience does Verdolino
4   and Lowey have in analyzing the likelihood
5   of success in pending litigation claims?
6   A.   Absolutely none.
7   Q.   Turning to the next line item,
8   "assistance with reviewing debtor books and
9   records for possible avoidable transactions
10  such as preference and fraudulent transfer
11  claims".  Do you see that?
12  A.   Yes.
13  Q.   Can you explain to me,
14  generally, what this means?
15  A.   The bankruptcy code allows a
16  look back period.  For preferences, it
17  allows 90 days prior to the filing for
18  preference claims and I'll let lawyers
19  define what that is and insiders and other
20  fraudulent transfers take place between
21  zero days and I've heard it's -- whatever
22  the statute happens to be for whatever the
23  issue might be, one year, two years, four
24  years, whatever the case maybe but it's a
25  search through transactions to see if any

Page 82

C. JALBERT

1
2   someone to do work on a preference
3   analysis.  We certainly participated in
4   preparing that because we filed them.
5   Q.   Do you know how many
6   pre-petition payments were disclosed in
7   this case?
8   A.   No.
9   Q.   Does 21 sound about right?
10  A.   I don't know.
11  Q.   So the line item refers to
12  debtor books and records for possible
13  avoidable transactions.  Have you reviewed
14  any debtor books and records in connection
15  with this engagement?
16  A.   No.
17  Q.   Has Verdolino and Lowey
18  reviewed any books and records in
19  connection with this engagement?
20  A.   No.
21  Q.   Is it fair to say that
22  Verdolino and Lowey relies on the
23  assistance of other parties in connection
24  with this line item?
25  MR. AULET:  Objection to form.

Page 84

C. JALBERT

1
2   of them might be avoidable and recoverable
3   to the Estate.
4   Q.   What analysis has Verdolino and
5   Lowey performed in connection with this
6   line item?
7   MR. AULET:  I would caution the
8   Witness to the extent that there is
9   anything, not to disclose any
10  specifics.
11  MS. ARONSSON:  Sorry, what do
12  you mean?
13  MR. AULET:  That if he has done
14  any work, it would be covered by the
15  work/product privilege.  Not to
16  disclose those specifics.
17  Q.   Setting aside the work/product
18  protection that Brown Rudnick is alleging
19  in connection with this line item, can you
20  answer the question?
21  A.   Well, one of the questions in
22  the SOFA's is payments made in the 90 days
23  prior to bankruptcy.  I don't know if
24  that's necessarily a surprise to anybody
25  but that is usually the starting place for

Page 83

C. JALBERT

1
2   A.   Are you talking about past
3   tense or future tense?
4   Q.   Past tense.
5   A.   We relied on other individuals
6   for everything that we did from an
7   information perspective.
8   MR. AULET:  We've been going
9   for awhile so if you need a break --
10  THE WITNESS:  No, let's get the
11  -- let's do it all at once.  I would
12  like to get out of here before
13  tonight.
14  MR. GOLDMAN:  We are going to
15  break at 12.
16  MR. HARBACH:  Yes, sir.
17  Q.   Okay, turning to the next line
18  item, "assistance with any necessary
19  litigation support".  I think we covered
20  this previously.  Do you have anything to
21  add about potential services in connection
22  with this line item that we haven't already
23  discussed?
24  A.   Not that I can remember.
25  Q.   Has Verdolino and Lowey done

Page 85

22 (Pages 82 - 85)

C. JALBERT

1    any work in connection with this line item
2    to this date?
3        A.    In this case, no.
4        Q.    The next -- turning to the next
5    line item is "assistance with plan
6    development and preparation including
7    feasibility". What does this mean?
8        A.    Well, in order to have a
9    successful Chapter 11, you have to confirm
10   a plan of reorganization or whatever the
11   title will be when it's prepared and
12   created. It might even be a joint plan for
13   all I know. In those plans, there
14   typically is some budgeting because
15   sometimes payments to creditors are paid
16   out over time. We might assist in
17   preparing the cash flow projections of
18   receipts and disbursements for some future
19   time period and my -- I'm not a lawyer but
20   as I understand it, in order to confirm a
21   Chapter 11, you must prove that the
22   creditors are getting a better return from
23   the Chapter 11 plan than they would have in
24   a Chapter 7 case and that usually requires

Page 86

C. JALBERT

1    that you -- well, you're going to have
2    feasibility and you're going to have --
3    what's the other one -- term is slipping my
4    mind -- I can't remember it but it didn't
5    list it anyway's.
6        Q.    The line item says feasibility
7    and I think you mentioned that as well.
8    What does feasibility mean?
9        A.    You -- the projections is
10   usually the evidence with which to allow
11   the Court and other parties in interest to
12   determine what the future cash flows will
13   be and make their own decision based on
14   that as to whether the debtor's plan is
15   financially feasible and the Judge
16   obviously has the final determination but
17   usually everyone puts their two cents in.
18       Q.    What analysis has Verdolino and
19   Lowey done to date in connection with this
20   line item?
21       A.    None.
22       Q.    Would Verdolino and Lowey have
23   a function in developing a plan if the
24   debtor's estate's only source of income or

Page 87

C. JALBERT

1    assets is on liquidated litigation claims?
2        MR. AULET: Objection to form.
3        A.    If we did, it would be awfully
4    small.
5        Q.    Understood. Are you aware of
6    any draft plans currently being circulated?
7        MR. AULET: Objection. He's
8        already testified that he hasn't
9        performed any work on this. So I
10       don't see what the relevance is to
11       V&L's retention.
12       MS. ARONSSON: Sure. I'm
13       curious though about ongoing work in
14       connection with this line item.
15       MR. AULET: He can answer if
16       he's doing any current work with it.
17       A.    None.
18       Q.    Turning to -- turning to the
19   next line item on the next page, it reads,
20   "general consulting and assistance with any
21   other matters and tasks that may arise and
22   as may be directed by you or the debtor".
23   Is it fair to say this is kind of a
24   catch-all?

Page 88

C. JALBERT

1        A.    Yes. It's a catch-all with the
2    caveat -- this is not my first rodeo -- if,
3    for some reason, there's a discreet task
4    that is going to be required that will be
5    comprehensive and costly, we would file a
6    motion to amend our employment, what would
7    be covered by the employment but as to --
8    you know, for instance, sometimes they get
9    a notice from the IRS that requires 15
10   minutes for someone to respond to. I know
11   little -- little cats and dogs that happen
12   that don't happen to fit into something
13   else, it's a catch-all for the minutiae.
14   Not intended to be a catch-all for major
15   line items and that's only to protect me.
16       Q.    Understood. What work or
17   analysis has Verdolino performed in
18   connection with this line item, if any?
19       A.    None that I know of.
20       Q.    Are you familiar with a company
21   called Stretto?
22       A.    Yes.
23       Q.    What do they do?
24       A.    I don't know everything that

Page 89

23 (Pages 86 - 89)

PAX-014-023

C. JALBERT

1
2 they do but they do claims agent work and
3 other bankruptcy-related work. I don't
4 know what their list of services are. I've
5 hired them myself in cases. I think
6 they're still working for me on a case or
7 two right now in a limited basis.
8     Q.   Are you aware that Stretto was
9 involved in this matter?
10    A.   I'm aware that there's a motion
11 to employ them, yes.
12    Q.   Generally, what is your
13 understanding of the scope of work that
14 Stretto would potentially be employed to
15 do?
16    A.   I have not read their motion to
17 employ. No idea what their --
18        MS. ARONSSON:  Let's go off the
19    record. Thank you.
20        THE VIDEOGRAPHER:  The time is
21    11:53 a.m. and we are off the record.
22        (Whereupon, a brief recess was
23    taken.)
24        THE VIDEOGRAPHER:  The time
25    period is 12:22 p.m. We're back on

Page 90

C. JALBERT

1
2        MR. AULET:  Objection to form.
3    A.   Yes.
4    Q.   You mentioned before that you
5 have worked with Stretto in the past?
6    A.   Well, they're in the same --
7 some of the same -- well, a couple. One or
8 two of the same cases that we're in.
9    Q.   Do you have an understanding as
10 to whether Stretto could open and maintain
11 a DIP account?
12    A.   No.
13    Q.   Do you have an understanding
14 about whether Stretto could monitor
15 disbursements in connection with a DIP
16 account?
17    A.   No.
18    Q.   Turning to the books and
19 records line item, the seventh bullet
20 point, I'm going to ask you to assume that
21 there are 21 professional service providers
22 who have received a pre-petition payment in
23 the 90 days before filing. I'm also going
24 to ask you to assume that Stretto can
25 provide analysis with respect to those

Page 92

C. JALBERT

1
2 the record.
3    Q.   Just wrapping up the questions
4 related to Exhibit 4. Turning back to the
5 line item about opening and maintaining the
6 DIP account, would you agree that a bank or
7 an escrow agent could open and maintain a
8 DIP account?
9        MR. AULET:  Objection to form.
10    A.   I don't have any knowledge of
11 why they couldn't but I'm certainly not an
12 expert.
13    Q.   What about monitoring
14 disbursements and effectuating
15 disbursements?
16    A.   The bank doing it?
17    Q.   Yes.
18    A.   I don't think the bank's going
19 to do it.
20    Q.   Or an escrow agent.
21    A.   An escrow agent would have more
22 obligation, whatever the escrow agreement
23 says. I don't --
24    Q.   But an escrow agent could be
25 employed to perform those duties?

Page 91

C. JALBERT

1
2 payments. Why is it necessary for
3 Verdolino and Lowey to perform these
4 duties?
5        MR. AULET:  Objection to form.
6    It calls for speculation.
7    A.   Most everybody that has half a
8 brain can do that. It's not going to be
9 done by me.
10        MS. ARONSSON:  The Court
11    Reporter is going to hand you what is
12    being marked as Jalbert Exhibit 5.
13        (Whereupon, Official Form
14    106Sum was marked as Jalbert Exhibit
15    5 for identification as of this date
16    by the Reporter.)
17        MS. ARONSSON:  I'll say for the
18    record, this is a document that has
19    been filed as Docket Number 78 in
20    this case.
21    Q.   Do you recognize this document,
22 Mr. Jalbert?
23    A.   Yes.
24    Q.   What is it?
25    A.   The first page is the official

Page 93

24 (Pages 90 - 93)

Veritext Legal Solutions
866 299-5127

PAX-014-024

C. JALBERT

1  form 106Sum which is the summary of assets
2  and liabilities and certain statistical
3  information for the debtor, Ho Wan Kwok.
4     Q.   I think we've discussed earlier
5  that Verdolino and Lowey had a role in
6  preparing the SOFA and schedule.  Is that
7  right?
8     A.   Yes.
9     Q.   Verdolino and Lowey had a role
10  in preparing this document?
11     A.   Yes.
12     Q.   I just want to walk through
13  this at a high level.  The first line item
14  is -- item one relates to property.  What
15  does this line item include?
16     A.   What specific -- A, B or C or
17  all of them?
18     Q.   Sorry, fair question.  1A.
19     A.   Well, it reads "Schedule A/B
20  Property official form 106A/B", question or
21  1A, "copy Line 55.  Total real estate from
22  schedule A/B".
23     Q.   Thank you.  And it reads zero?
24     A.   Correct.

Page 94

C. JALBERT

1     Q.   Item 58 refers to Line 36?
2     A.   Okay.
3     Q.   So 36, just up the page, the
4  total amount here is 3,850 dollars.  Do you
5  see that?
6     A.   Yes.
7     Q.   So 36 wraps up into one number.
8  Part 4 of this filing, is that fair?
9     MR. AULET:  Objection to form.
10     A.   Well, when you mean this
11  filing, are you talking about Part 4 of
12  Schedule A/B.
13     Q.   I am, yes.  Thank you for the
14  clarification.
15     A.   I would agree that Line 36 is
16  the sum of Part 4 which starts at question
17  16.
18     Q.   What analysis, if any, did
19  Verdolino and Lowey perform in connection
20  with these line items?
21     A.   Whatever we did, we did working
22  with the lawyers.
23     Q.   I'm going to ask you to turn to
24  Page 3 of the document.

Page 96

C. JALBERT

1     Q.   What analysis, if any, did
2  Verdolino and Lowey do to prepare this line
3  item?
4     A.   I worked with the lawyers.
5     Q.   Did you do any independent
6  investigation with respect to the line item
7  1A?
8     MR. AULET:  Objection to form.
9     A.   No.
10     Q.   Turning to 1B, this reads,
11  "total personal property from Schedule A/B"
12  and I think this refers us to Line 36?
13     A.   I would have thought it related
14  to Line 62.
15     Q.   It does and then 62.  Sorry --
16  so 62 refers back to 56 to 61.  Do you see
17  that, that's on Page 7 of the PDF?
18     A.   Lines 56 to 61, is that what
19  you're referring to?
20     Q.   That's right.
21     A.   Yep.
22     Q.   The only item populated in 55
23  to 61 is Item 58?
24     A.   Correct.

Page 95

C. JALBERT

1     MR. AULET:  Just for
2  clarification, every time you're
3  refer to Page 3, you're referring to
4  the top numbers?
5     MS. ARONSSON:  Yes.  I'm
6  referring to the docket numbering at
7  the top.  Page 3 of 23.
8     Q.   Starting with Part 1 here, did
9  Verdolino and Lowey perform any work in
10  connection with this line item?
11     A.   If we did, we did with counsel.
12     Q.   In Part 2, Item 3 and 4
13  referring to cars, vans, trucks, etcetera,
14  watercraft, aircraft, did Verdolino and
15  Lowey perform any work in connection with
16  this section?
17     A.   All with counsel.
18     Q.   So it's fair to say, when you
19  say you performed work with counsel, you
20  didn't perform any independent
21  investigation?
22     A.   Correct.
23     Q.   Part 3, Items 6 through Items
24  15 refer to personal and household items,

Page 97

25 (Pages 94 - 97)

PAX-014-025

C. JALBERT

1    is that right?
2    A.   Yes.
3    Q.   Without walking through each of
4    these, did you perform -- did Verdolino and
5    Lowey perform any work in connection with
6    Items 6 through 14?
7    A.   Nothing -- not with the
8    attorneys.
9    Q.   Just to be clear about your
10   role, were you provided information from
11   counsel and you were responsible for
12   drafting this form or did you rely on
13   counsel to draft this form?
14       MR. AULET: Objection to form.
15   A.   We keypunched into the forms
16   after consultation obviously.
17   Q.   Did you do anything besides
18   keypunch into the form?
19   A.   We discussed matters with the
20   attorneys.
21   Q.   I'm asking in connection with
22   filing the schedule and the SOFA, when you
23   say you communicated with the attorneys,
24   you're talking about Brown Rudnick?

Page 98

C. JALBERT

1    A.   And Melissa Francis and Aaron
2    Mitchell.
3    Q.   Did you communicate or did
4    Verdolino and Lowey communicate with anyone
5    else besides the attorneys at Brown
6    Rudnick, Melissa Francis and Aaron
7    Mitchell?
8    A.   No.
9    Q.   Were you provided any facts or
10   information from any party when punching in
11   these line items?
12   A.   We were informed by facts, lots
13   of them from the attorneys and lots of
14   discussion.
15   Q.   Was it -- scratch that. The
16   information you received, was it oral?
17   A.   Some was oral and some was in
18   e-mails, I believe, from counsel.
19       MR. HARBACH: Do you mind if I
20   ask a couple questions?
21       MS. ARONSSON: Sure.
22       MR. AULET: I don't have any
23   objection.
24       MR. HARBACH: Thank you.

Page 99

C. JALBERT

1    EXAMINATION BY
2    MR. HARBACH:
3    Q.   For the record, this is David
4    Harbach at O'Melveny, also representing
5    Pax. I just have a few questions. Sir, I
6    believe you mentioned earlier that you or
7    Verdolino and Lowey were involved in
8    helping to prepare the notes for the
9    schedules that were filed? Have I got that
10   right?
11   A.   The specific part of the
12   notes --
13   Q.   Yes, sir. The specific notes.
14   A.   Not the general --
15   Q.   Understood.
16   A.   Yes, I worked with counsel on
17   that.
18   Q.   The specific notes are --
19   appear at Document Number 77 on the docket
20   and I don't have an extra copy for you but
21   I hope you'll agree that it won't be
22   necessary. When it comes to questions
23   about things like electronics and household
24   goods and furnishings, which my colleague

Page 100

C. JALBERT

1    was just asking you about, the specific
2    notes state, for example, "numerous items
3    fitting the personal and household
4    definition are located at the residence and
5    the apartment" and then it goes onto say,
6    "except as otherwise set forth herein, the
7    debtor has no legal title to the contents
8    of either the residence or the apartment
9    and no court has made any determination
10   that the debtor has any other interests in
11   any such items". My question for you is
12   was Verdolino and Lowey at all involved in
13   making the assessment of whether any of
14   these household items belonged to the
15   debtor?
16       MR. AULET: I just lodge an
17   objection to asking him about a
18   document that you're not showing him.
19   You can answer if you can.
20   A.   To be clear, are you asking me
21   if I investigated whether the spatulas and
22   the pots and pans existed and who bought
23   them and how much they were and are they at
24   the house?

Page 101

26 (Pages 98 - 101)

C. JALBERT

1       C. JALBERT
2    Q.  All I'm asking is whether
3 Verdolino and Lowey had any role in making
4 the judgment call over whether the
5 household items at the residence or the
6 apartment belonged to Mr. Kwok or was that
7 something that was left to the lawyers?
8      MR. AULET: Objection to form.
9    A.  We did no investigation. I had
10 no personal knowledge not told to me by
11 Aaron Mitchell, Melissa Francis and Brown
12 Rudnick about the ownership of those. So
13 it wasn't my decision and I didn't
14 investigate but I certainly was party to
15 the conversations regarding that.
16    Q.  During those conversations, if
17 one of those people, a lawyer at Brown
18 Rudnick or Melissa -- whose last name I
19 forget --
20    A.  Francis.
21    Q.  Francis, thank you.
22 Represented to you that those items do not
23 belong to Mr. Kwok, you just accepted that
24 at face value?
25    A.  Correct.

Page 102

1       C. JALBERT
2 item by item if that's what you want to do.
3 I don't know what you're referring to. You
4 know, you got specific lines you're talking
5 about?
6    Q.  Sure, that's fair. So in
7 connection with any of the assets
8 identified in the schedule as belonging to
9 Mr. Kwok, you solely relied on the chain of
10 events you previously described, Brown
11 Rudnick received information from Melissa
12 Francis and Aaron Mitchell?
13      MR. AULET: Objection to form.
14    A.  No, that's not what I said. I
15 said we heard directly from Melissa Francis
16 or Aaron Mitchell or they informed Brown
17 Rudnick and Brown Rudnick told me that
18 they -- what the answer was from them.
19 There was no one way of communicating. It
20 was fluid situation. We had a very short
21 time to do them but it was not one way or
22 the other. It was, as I said, either and
23 many times the e-mails were with all the
24 attorneys on the e-mail or it was a phone
25 call with a lot of parties and I don't

Page 104

1       C. JALBERT
2      MR. HARBACH: Okay, thank you.
3  Thank you, Laura.
4 CONTINUED EXAMINATION
5 BY MS. ARONSSON:
6    Q.  This is Laura Aronsson from
7 O'Melveny. Just turning back to what we
8 were talking about in connection with the
9 schedule. I think David covered this. So
10 when drafting this, how did you decide
11 whether an item like the iPhone referenced
12 in Line Item 7 or the clothes referenced in
13 Line Item 11 or the family dog referenced
14 Item 13 belonged to Kwok as opposed to
15 another person or entity?
16    A.  I was informed by either
17 Melissa Francis or Aaron Mitchell or they
18 informed Brown Rudnick and Brown Rudnick
19 informed us.
20    Q.  Is it fair to say that that
21 chain of events that you just described
22 applies to all of the items identified in
23 this schedule?
24      MR. AULET: Objection to form.
25    A.  I don't know -- we better go

Page 103

1       C. JALBERT
2 remember all of the parties but the source
3 of the information was for us, first, Aaron
4 Mitchell and Melissa Francis in no
5 particular order. Now I don't remember who
6 knew more about what than the other or if
7 they passed information onto Brown Rudnick,
8 who then passed it onto us. Obviously,
9 after they did whatever legal analysis they
10 wanted to do.
11    Q.  In preparing these documents,
12 did you ask for any information from Brown
13 Rudnick or Aaron Mitchell or Melissa
14 Francis that you were not given?
15    A.  I don't remember asking a
16 question they didn't answer but I didn't
17 investigate anything.
18    Q.  I want to turn to Page 16 of
19 this document. So at the bottom of the
20 page, to direct your attention there, Part
21 2 reads, "estimate your ongoing monthly
22 expenses". Were you involved in drafting
23 this section?
24    A.  Yes.
25    Q.  What was your role -- or

Page 105

27 (Pages 102 - 105)

PAX-014-027

C. JALBERT

1    scratch that. What was Verdolino and
2    Lowey's role in connection with this
3    section?
4        A.    We had discussions with the
5    legal team, which is Brown Rudnick team
6    plus Aaron Mitchell, plus Melissa Francis,
7    probably more than one time, probably
8    orally, probably in e-mail and it was a
9    discussion.
10       Q.    Turning to the next page, the
11   estimated monthly operating expenses reads
12   zero. Is that fair?
13       A.    Yes.
14       Q.    Did you anticipate the debtor's
15   monthly operating expenses to remain zero
16   after this point?
17           MR. AULET: Objection to form.
18       A.    It certainly was discussed with
19   the attorneys. I don't think it's a
20   secret. There was lots of discussion
21   yesterday. So my expectation is yes, as to
22   his expenses, his payment of his expenses
23   is going to remain I think zero.
24       Q.    I think you said his -- his

Page 106

C. JALBERT

1    operating report is a different report and
2    that's a completely different question than
3    what's on here.
4        Q.    Can you explain to me the
5    difference?
6        A.    And I don't remember what
7    question it is, is it like 4 or 5 or 6E or
8    whatever it is, the request is to report
9    the expenses paid by others on the debtor's
10   behalf. That's not what this asks. So in
11   the schedule, we listed some funds and we
12   will, going forward, be listing and
13   reporting, as required by the MOR, the
14   expenses paid by others on behalf of the
15   debtor which is again different from what
16   this asks.
17       Q.    Focusing on what this asks,
18   it's your understanding that the debtor's
19   ongoing monthly expenses is zero?
20           MR. AULET: Objection to form.
21       A.    The debtor's payment of the
22   ongoing expenses is zero.
23       Q.    You did no investigation into
24   whether that is correct?

Page 108

C. JALBERT

1    expenses. In your view, what does his
2    expenses cover?
3        A.    There's a whole list of them
4    here. You want to go down them? It looks
5    like about 30 of them. Real estate taxes,
6    property and homeowners and renters'
7    insurance, home maintenance repair and
8    upkeep expenses, home ownership association
9    and condo dues. Don't even know if those
10   are applicable. Electricity, heat and
11   natural gas. Want me to keep going?
12       Q.    So we can just agree that Items
13   4 through 21 would include monthly
14   expenses?
15       A.    Again, as it relates to him
16   paying them, I would agree. My
17   understanding is they're going to remain
18   zero.
19       Q.    So this -- the analysis
20   contained in this document is separate from
21   the monthly operating report, the reports
22   that you, Verdolino, draft in connection
23   with this case?
24       A.    Correct, because the monthly

Page 107

C. JALBERT

1        A.    Correct.
2        Q.    Turning just to the Excel
3    sheets at the end of this document,
4    starting just broadly, was Verdolino and
5    Lowey involved in preparing these
6    documents?
7        A.    Well, we were certainly
8    involved with others, yes.
9        Q.    What -- generally, what work
10   did Verdolino and Lowey do in connection
11   with these documents?
12       A.    Reviewed them for
13   reasonableness, assisted in putting them in
14   a form that would normally be seen in a
15   SOFA and schedule. I think some of this
16   was uploaded into the actual Schedule F
17   because I think Schedule F -- well, maybe
18   it doesn't. I don't know. I don't
19   remember whether this was uploaded or not
20   but it could be. So that -- so it starts
21   with D. So all of these, we worked with
22   the attorneys and that's again, all three,
23   the Brown Rudnick team, Aaron Mitchell and
24   Melissa Francis.

Page 109

28 (Pages 106 - 109)

PAX-014-028

C. JALBERT

1    Q.   I think you said the phrase
2    reviewed for reasonableness. What do you
3    mean by that?
4        A.   Well, if we had anything to
5    compare information to, we compared it
6    or -- if we had a question, we asked a
7    question of the lawyers. I don't remember
8    off hand what those were.
9        Q.   Can you think generally of any
10   issues that you investigated in connection
11   with preparing these?
12       A.   I'm sure on a couple of them,
13   we wanted the make sure that -- that there
14   wasn't a missing digit or an extra digit so
15   I'm sure someone from my team walked
16   through with someone, probably either
17   Melissa or Aaron, just as a double check
18   that it's what -- what the number on the
19   form was the number that they intended.
20   There wasn't, in there someplace, a human
21   error.
22       Q.   Can you think of anything else
23   specific that you investigated?
24       A.   We did not investigate.

Page 110

C. JALBERT

1        MS. ARONSSON:  The Court
2    Reporter is going to hand you what's
3    being marked as Jalbert Exhibit 6.
4    This is a document filed in this case
5    as Docket 77.
6        (Whereupon, Global Notes was
7    marked as Jalbert Exhibit 6 for
8    identification as of this date by the
9    Reporter.)
10   Q.   Do you recognize this document?
11   A.   Yes.
12   Q.   What is it?
13   A.   The Global Notes and Statements
14   of Limitations Methodology and Disclaimers
15   Regarding the Debtor's Schedules of Assets
16   and Liabilities and Statement of Financial
17   Affairs and the debtor is Ho Wan Kwok.
18   Q.   And this is a specific line
19   item that Verdolino and Lowey's proposed
20   retention relates to?
21       MR. AULET:  Objection to form.
22   A.   Can I go back and take a look?
23   I don't know what the global notes are
24   listed or not but these are part and parcel

Page 111

C. JALBERT

1    to the SOFA's and schedules. So it would
2    be part of the first bullet, "assistance
3    with preparation of the statement of
4    financial affairs and schedules and all
5    support thereto and any amendments, if
6    necessary".
7        Q.   What was Verdolino and Lowey's
8    role in preparing this document?
9        A.   Well, we certainly assisted in
10   drafting. We assisted in reviewing,
11   particularly the specific notes but there
12   was -- there was a lot of back and forth
13   and a lot of work between the Brown Rudnick
14   law firm, Aaron Mitchell, Melissa Francis
15   and Verdolino and Lowey, both -- all three
16   at Verdolino and Lowey, Matt Flynn, Mary Jo
17   Schindler and myself.
18   Q.   Just to understand, what
19   specific work did Verdolino and Lowey do in
20   connection with preparing this document?
21       MR. AULET:  Objection to form.
22   A.   Well, like I said, we had
23   numerous e-mails, we reviewed everything,
24   we made comments. We might have drafted a

Page 112

C. JALBERT

1    paragraph here or a paragraph there. I
2    think we assisted the group in making sure
3    the references, amongst the notes and
4    amongst the questions and the SOFA's and
5    amongst the schedules to the extent they
6    were interrelated, that the references were
7    appropriate. We made sure that the
8    writings were the facts as we knew them.
9    Didn't investigate but we had lots of
10   discussions and we made sure that what was
11   represented here was our memories.
12   Q.   Thank you. Turning to Page 4,
13   Question 1 in the middle of the page, asks
14   "do you own or have any legal or equitable
15   interest in any residence, building, land
16   or similar property". The answer in Item
17   1, below it, reads, "the debtor has use and
18   occupancy of real estate located at 373
19   Taconic Road, Greenwich, Connecticut". Do
20   you have any understanding as to why the
21   use and occupancy of certain real estate is
22   relevant to this filing?
23       MR. AULET:  Objection to form.
24   A.   Well, I'm not a lawyer but

Page 113

29 (Pages 110 - 113)

PAX-014-029

C. JALBERT

1  C. JALBERT
2  Schedule A is I thought real property that
3  was owned by the debtor.  I would have to
4  go back and confirm that but real estate.
5  So it would be -- he's alive.  He resides
6  in a residence and I'm presuming this is
7  the appropriate legal description of the
8  facts and circumstances of his living in
9  that residence.
10     Q.   Again, no independent
11 investigations into this?
12     A.   Correct.
13     Q.   Did you perform any evaluation
14 of the residences listed in Question 1?
15     A.   No.
16     Q.   The second bullet refers to an
17 apartment in the Sherry Netherland Hotel?
18     A.   Yes.
19     Q.   Did you draft this section?
20     A.   Did I draft it?  I doubt it.  I
21 might have reviewed it.  I might have had
22 input in something but this is not my
23 language.
24     Q.   Are you aware that the entity
25 holding the legal title to the Sherry

Page 114

1  C. JALBERT
2  Haven on Wednesday for the 341 meeting but
3  I don't know -- I know it's a valuable car.
4  I don't know what the name is and I don't
5  know who owns them.  I know the debtor --
6  just as this says, the debtor has use.
7     Q.   So beyond what this says here
8  and your previous answer, do you have
9  anymore information about the vehicles that
10 the debtor has use of?
11     A.   No.
12     Q.   Did you witness the debtor
13 using any luxury vehicles at any time?
14     A.   I don't know what you mean by
15 using but he got out of one in New Haven on
16 Wednesday.
17     Q.   Do you know what kind of car it
18 was?
19     A.   I don't remember.
20     Q.   Is this -- strike that.  Is --
21 is the answer to Question 3 relevant to the
22 preparation of monthly operating reports?
23     A.   Probably, yes.
24     Q.   Why?
25     A.   Because I imagine there's a

Page 116

1  C. JALBERT
2  Netherland apartment is in bankruptcy?
3     A.   Well, I know there's a Chapter
4  11 going on.  Exactly what's in Chapter 11
5  and who owns what, I have not confirmed or
6  made an investigation but generally
7  speaking, I understand that that apartment
8  is somehow in Chapter 11 in New York.
9     Q.   Any involvement in those
10 proceedings in New York?
11     A.   No.
12     Q.   Turning to the next page,
13 Question 3 asks for interests, broadly
14 speaking, in any vehicles.  The response
15 reads that "the debtor has use of
16 automobiles including luxury automobiles
17 and motorcycles".  Did you do any
18 investigation into this analysis?
19     A.   No.
20     Q.   Do you have any understanding
21 of what vehicles the debtor uses?
22     A.   Only from my memory, the -- he
23 has access to a luxury vehicle and I think
24 there's a vehicle that his security travels
25 in.  As a matter of fact, they were in New

Page 115

1  C. JALBERT
2  cost associated with those vehicles being
3  provided for his use and again, I don't
4  remember exactly what the question is, 4, 5
5  or 6, like E, where the rules say to report
6  expenses made by third-parties on behalf of
7  the debtor.  Well, I'm thinking the use of
8  the vehicles -- you know, I don't know if
9  there's a car payment on it, gasoline,
10 insurance, I don't know but something might
11 be in there.
12     Q.   What about the purchase of the
13 vehicle itself whenever it was purchased,
14 is that relevant to the monthly operating
15 report?
16     A.   Well, monthly operating reports
17 are usually a disbursement in a particular
18 time period.  I imagine if they've bought
19 one of those cars during the pendency,
20 maybe it shows up.  I don't know.  On the
21 other hand, you could make an argument that
22 the use of the vehicle is not the same
23 thing as buying the vehicle because maybe
24 other people use it too.  So you would have
25 to find a way of allocating the cost.

Page 117

30 (Pages 114 - 117)

PAX-014-030

C. JALBERT

1         C. JALBERT
2   Q.  Does that answer apply to the
3 Question 1 about residences as well?
4     MR. AULET: Objection to form.
5   A.  The debtor resides in a
6 particular residence. They're -- the only
7 people that I know of, except for a
8 maid that comes in and security and
9 possibly visits from family. So I imagine
10 the cost of the residence would be on that
11 so -- that monthly operating report in some
12 amount and I think I -- I was a proponent
13 of 50 percent of that cost would be on
14 behalf of the debtor because the spouse
15 lives there too and I didn't count the kids
16 because they only came to visit the debtor.
17 So I kind of ascribed more to the mother
18 and father and split the cost but there's
19 no home purchase in there. There's no --
20 again, it's what you pay in that current
21 month. So I'm assuming they're telling --
22 we're going to be disclosing what is paid
23 in that particular time frame on behalf of
24 the debtor on the various categories, the
25 vehicles, the security, the home --

Page 118

C. JALBERT

1         C. JALBERT
2   A.  No.
3   Q.  Turning to Page 8, Question 26
4 asks for patents, copyrights, trademarks,
5 etcetera. The answer refers to
6 unregistered copyrights and other
7 intellectual property interest in music and
8 videos posted to various platforms. What
9 is this referring to?
10   A.  The whole thing?
11   Q.  Yes.
12   A.  The Question 26 refers to
13 various intellectual property patents,
14 copyrights, trademarks, trade secrets and
15 intellectual property. The debtor -- I'll
16 just read it to you. "The debtor has
17 possible unregistered copyrights and other
18 intellectual property interest in music and
19 videos posted to various digital and media
20 platforms such as YouTube, GTV, Twitter"
21 and -- I don't even know, GETTR, whatever
22 that is. "The debtor ascribes no value to
23 his social media assets and has made no
24 attempts to monetize his social media
25 presence".

Page 120

C. JALBERT

1         C. JALBERT
2   Q.  Thank you --
3   A.  Food.
4   Q.  Thank you. Question 4 refers
5 to watercraft, aircraft, motor homes and
6 the answer references previous access to
7 the use of a yacht named the Lady May. Do
8 you have any -- beyond what's written on
9 this page, do you have any understanding of
10 Mr. Kwok's interest the Lady May?
11   A.  Nothing that's not printed on
12 this page.
13   Q.  Did you do any independent
14 investigation into this?
15   A.  No.
16   Q.  Items 6 and 7, household goods
17 and electronics. I think we covered that
18 previously. In connection with Items 6,
19 household goods through Questions 17 on
20 this page -- so just for clarity, it's
21 Questions 6, 7, 8, 9, 11, 17. Did you do
22 any investigation as to what -- as to
23 whether the items referenced in here belong
24 to Mr. Kwok versus some other third-party
25 or entity?

Page 119

C. JALBERT

1         C. JALBERT
2   Q.  Beyond what's written on the
3 page, do you have any understanding of what
4 this refers to?
5   A.  No.
6   Q.  The second sentence notes that
7 the debtor ascribes no value to these
8 items, do you see that?
9   A.  Yep.
10   Q.  You performed no valuation of
11 these items in connection with your work?
12   A.  Correct.
13   Q.  Do you know if any valuation
14 was performed?
15   A.  None to my knowledge.
16   Q.  Question 31 asks for interest
17 and insurance policies. The answer refers
18 to his spouse's health insurance policy
19 which has no cash value. Do you see that?
20   A.  Yes.
21   Q.  Is it standard practice that a
22 health insurance policy has no cash value?
23   A.  I've never seen a situation
24 where a health insurance policy has a cash
25 value except for to the beneficiary of --

Page 121

31 (Pages 118 - 121)

PAX-014-031

C. JALBERT

1    if you have a health insurance plan, it has
2    a lot of value to you when you go to the
3    hospital and it pays the bills for you.
4    There's not an independent value to a
5    third-party that you can sell.
6        Q.   Do you have any knowledge about
7    the health insurance policy that the debtor
8    has currently?
9        A.   No.
10       Q.   Question 53 asks for property
11   of the kind not listed and the answer
12   refers to his membership at Mar-a-Lago Club
13   in Palm Beach.  Is this the type of thing
14   that Verdolino and Lowey would include on a
15   monthly operating report if Mr. Kwok, the
16   debtor, used the membership?
17           MR. AULET:  Objection to form.
18       A.   I would have to use conjecture.
19       Q.   Go ahead.
20       A.   Well, the first monthly
21   operating report was filed in February.  I
22   don't know whether he went down there or
23   not.  I don't know if he went down there in
24   March.  If he -- if he went there, I

C. JALBERT

1    imagine there would be travel expenses.  I
2    don't know whether there would be a fee for
3    the golf and maybe he had lunch.  So I
4    imagine if he physically went there and
5    used it, there would be -- there might be
6    -- there would be something in the monthly
7    operating report but if he stays where I
8    think he's going to stay, in Greenwich
9    where he's safe, it's not going to be
10   relevant.
11       Q.   What is your basis for thinking
12   he's going to stay where he is in
13   Greenwich?
14       A.   I listened to the 341 meeting
15   yesterday -- excuse me, Wednesday.
16       Q.   Besides the knowledge gathered
17   from that hearing on Wednesday, the 341
18   hearing, do you have any independent
19   knowledge about the debtor's expected
20   travel or location?
21       A.   I have no knowledge whatsoever
22   of where he's going to be at any point in
23   time.
24       Q.   Would you rely on Brown

C. JALBERT

1    Rudnick, Aaron Mitchell and Melissa Francis
2    to inform you of how he might benefit from
3    things like his his Mar-a-Lago
4    membership in connection with drafting the
5    monthly operating report?
6        A.   I certainly would listen to
7    counsel on that for sure.
8        Q.   But Verdolino and Lowey
9    wouldn't endeavor to seek out information
10   about these monthly expenses --
11       A.   Well, we're going to seek out
12   and we're going to point to the question
13   and we're going to ask for information
14   that's responsive to that.  I don't have
15   access to the information.  We don't
16   investigate.  I'm not going to keep track
17   of where the debtor goes or doesn't go.  So
18   someone would need to tell us the
19   information.  We would then review it but
20   I -- I think that Mar-a-Lago thing, at
21   least for the foreseeable future, is not an
22   issue but if it becomes an issue, someone
23   will tell me.
24       Q.   Turning to Page 11, Schedule I,

C. JALBERT

1    the second to last sentence here and it's
2    that "the debtor plans to amend Form 122B
3    filed on February 15th, 2022 in which
4    debtor erroneously claimed monthly income
5    of $19,488".  Do you see that?
6        A.   Yes.
7        Q.   Do you know what that refers
8    to?
9        A.   Yes.
10       Q.   What is it?
11       A.   The debtor inadvertently or
12   accidently -- I don't know what the term
13   would be -- erroneously filed a Form 122B.
14   It included $19,488 dollars which met --
15   the form met for the monthly income, I
16   think the review by the lawyers was that's
17   incorrect and so they -- the debtor filed
18   an amended 122B or at least intended to --
19   I don't know if it's done yet or not --
20   excluding that income.
21       Q.   Did Verdolino and Lowey perform
22   any work in connection with that erroneous
23   inclusion?
24       A.   I'm sure anything we did was in

32 (Pages 122 - 125)

Veritext Legal Solutions
866 299-5127

PAX-014-032

C. JALBERT

1    C. JALBERT
2 consultation with the lawyers.
3        MR. AULET: Objection to form.
4    Sorry.
5    Q.    Turning to Page 13, Question 16
6 refers to a retainer of 500 thousand for
7 Brown Rudnick and then refers to one
8 million dollars from Lamp Capital. Do you
9 have any knowledge of that transaction
10 outside of what's written on the page?
11    A.    I think there was discussion of
12 it yesterday -- excuse me, on Wednesday at
13 the 341 meeting and I think I saw a draft
14 of Brown Rudnick's retention papers -- I
15 think I did where I thought something was
16 mentioned in there.
17    Q.    Do you recall what that was?
18    A.    No. Something along the lines
19 of what's right here.
20    Q.    Do you know what Lamp Capital
21 LLC is?
22    A.    An entity owned by someone that
23 is not the debtor.
24    Q.    Do you have any idea who it is
25 owned by?

Page 126

C. JALBERT

1    C. JALBERT
2    A.    Only a guess.
3    Q.    Can you tell me -- I guess you
4 don't need to speculate. Do you have any
5 information that -- about what informs your
6 guess?
7        MR. AULET: Objection to form.
8    A.    My memory was there was a lot
9 being talked about but my memory was
10 something was said during the 341 meeting
11 but it is very -- I was very back of the
12 room, as you know, and it was very hard for
13 me to hear the English version from the
14 interpreter. So I can't be sure but I
15 thought I heard something that discussed
16 who owned Lamp.
17    Q.    Outside of what you heard at
18 the 341 hearing and this other document
19 that you remember seeing, do you have any
20 knowledge about Lamp or its operations?
21    A.    No.
22    Q.    The next item, Question 18
23 refers to a litigation funding agreement
24 dated November 8th, 2021. Have you seen
25 that agreement?

Page 127

C. JALBERT

1    C. JALBERT
2    A.    There are actually five of them
3 I think. They're listed in Schedule D. I
4 don't recall whether I actually saw them or
5 not. I think they were briefly described
6 to me at a minimum by lawyers.
7    Q.    Any independent knowledge of
8 those agreements besides --
9    A.    No.
10    Q.    Did Verdolino and Lowey do any
11 other investigation in connection with the
12 assets we've talked about that we didn't
13 cover?
14    A.    No.
15    Q.    Those five litigation
16 agreements we talked about --
17    A.    The litigation funding
18 agreements?
19    Q.    Yes. Thank you. Have you seen
20 them before?
21    A.    Not to my knowledge.
22        MS. ARONSSON: The Court
23    Reporter is going to hand you what's
24    being marked as Jalbert Exhibit 7.
25    This is a document produced in this

Page 128

C. JALBERT

1    C. JALBERT
2 matter with the Bates stamp Kwok
3 00001752.
4        MR. AULET: Just for the
5    record, it's two separate documents
6    so we should make sure --
7        MS. ARONSSON: I'll represent
8    that this is a family of documents,
9    an e-mail and an attachment.
10        (Whereupon, E-mail Chain was
11    marked as Jalbert Exhibit 7 for
12    identification as of this date by the
13    Reporter.)
14    Q.    Mr. Jalbert, I understand
15 you're not on this e-mail. I'm just going
16 to ask you some basic questions about it.
17 This is an e-mail between a redacted
18 person, Aaron Mitchell, Matt Flynn and
19 Melissa Francis. Matt Flynn is your
20 colleague. We've talked about the other
21 folks. The attachment is a summary of
22 living expenses from the period February
23 15th to 28th. First, I'm going to ask who
24 is this e-mail from?
25        MR. AULET: And I will object

Page 129

33 (Pages 126 - 129)

PAX-014-033

C. JALBERT

1   C. JALBERT
2   and direct him the Witness to answer
3   for the same reasons that we
4   discussed previously on the record.
5        MS. ARONSSON: And we'll
6   continue to dispute the redaction
7   here.
8        Q.   Turning to the attachment, this
9   summary of expenses, this was provided by a
10  person -- the unknown person in the top
11  e-mail, is that right?
12       A.   Yes.
13       Q.   Is it fair to say that this is
14  the starting point for Verdolino's monthly
15  operating report draft?
16       MR. AULET: Objection to form.
17       A.   As to the one particular
18  question, yes.
19       Q.   Sorry. What do you mean?
20       A.   This answers one question on
21  the monthly operating report and again, I
22  don't remember off hand exactly which one
23  it is but something, 4, 5, 6E. The funds
24  paid by third-parties on behalf of the
25  debtor. This is the first pass.

Page 130

1   C. JALBERT
2        Q.   Is this the monthly operating
3   report filing that we've been discussing
4   that you've been involved in preparing?
5        A.   Looks like it, yes.
6        Q.   Turning to the filing 120-1,
7   the separate loose page, these line items
8   here, can you just explain broadly what
9   they are at the bottom? What does the
10  total reflect?
11       MR. AULET: Objection to form.
12       A.   You're referring to the
13  $109,827.12?
14       Q.   Yes.
15       A.   I'm trying to see who made the
16  payments but inadvertently, the family, on
17  behalf of the debtor, on February 16th, the
18  day after the filing, made these two
19  payments on pre-petition amounts. So this
20  was, in an abundance of caution, in the 161
21  thousand dollars that was shown on Part 1,
22  Number E, this 109 thousand dollars is
23  included in the 161,323. So we were -- the
24  lawyers felt it was important to supplement
25  the monthly operating report with that

Page 132

1   C. JALBERT
2        MS. ARONSSON: McKenzie, Tab
3   19.
4        THE WITNESS: Are you done?
5        MS. ARONSSON: No.
6        MR. AULET: Should we have the
7   back up marked as a separate exhibit
8   or --
9        MS. ARONSSON: I typically mark
10  them as one.
11       MR. AULET: Okay.
12       THE WITNESS: We'll put them
13  together again and eliminate the blue
14  sheet.
15       (Whereupon, E-mail Chain was
16  marked as Jalbert Exhibit 8 for
17  identification as of this date by the
18  Reporter.)
19       Q.   The Court Reporter is going to
20  hand you what's being marked as Jalbert
21  Exhibit 8.
22       A.   Have you given it to her yet?
23       MS. ARONSSON: This is a
24  document filed in this case as Docket
25  120 and document 120-1.

Page 131

1   C. JALBERT
2   information that this was really a
3   pre-petition payment paid post-petition.
4        Q.   Understood. Thank you. So the
5   total expenses $161,323 here, if we
6   subtract from that, the total inadvertent
7   payments is $109,827. What does that
8   amount reflect?
9        A.   The amount of the payments that
10  weren't these two payments that were made
11  in the period from February 15th to
12  February 28th by third-parties on behalf of
13  the debtor.
14       Q.   Would that be reflected in the
15  final version of the living expenses sheet
16  that we looked at on Exhibit Number 7?
17       A.   Yes.
18       MR. AULET: Objection to form.
19       Q.   Is anything else included in
20  that number, to your knowledge?
21       A.   Well, inadvertently, yes. We
22  found out that whoever created the form on
23  the security total dollars, whatever the
24  final total dollars were, there was a
25  payment made February 10 pre-petition that

Page 133

34 (Pages 130 - 133)

PAX-014-034

C. JALBERT

1       C. JALBERT
2  was inadvertently included in the payments
3  from February 15th to 28th. So that will
4  be corrected on the next operating report.
5      Q.   So included in this operating
6  report is the two inadvertent payments to
7  the law firms identified on Exhibit 8?
8      A.   Yes, correct.
9      Q.   The monthly operating living
10 expenses that we've talked about and then
11 this other payment that you said would be
12 corrected, is that right?
13     A.   It's included in the 161.
14 We'll be pulling that out when we do the
15 March -- so the way the form works usually
16 is you have payments paid currently and
17 cumulative. We will take that small amount
18 of money out of the cumulative so as to
19 have the correct number going forward.
20     Q.   So is it fair to say that
21 Verdolino and Lowey's role in connection
22 with these inadvertent payments was to kind
23 of double check the amounts included in the
24 monthly operating report?
25     A.   We tried but given the timing

Page 134

1       C. JALBERT
2  that the categories were properly described
3  because this is not nearly final. This --
4  there were some errors and we also worked
5  with counsel and others in trying to figure
6  out what the percentage of the monies that
7  were paid in Column C multiplied by a
8  distribution percentage to arrive at the
9  total. We worked with the preparer to make
10 sure that the descriptions on the schedule
11 were accurate. We tried to confirm the
12 numbers were accurate. We couldn't get the
13 information in time to be able to do that
14 but then we looked at the distribution
15 percentages using our judgment in working
16 with the lawyers.
17     Q.   Looking at this draft, living
18 expense chart in Exhibit 7, there are seven
19 line items. Is that right?
20     A.   Yes.
21     Q.   Is it fair to say that
22 Verdolino and Lowey crosschecked the names
23 of the categories to ensure that they
24 accurately depicted the expenses contained
25 in those line items?

Page 136

1       C. JALBERT
2  of when the information became available
3  and when the form had to be filed, there
4  was a miscommunication with the preparer of
5  the schedule that will be rectified.
6      Q.   Who's the preparer of the
7  schedule?
8      A.   I can't tell you.
9      Q.   What schedule are you referring
10 to, this document here, the monthly
11 operating report, Exhibit 8?
12     A.   This thing (indicating).
13     Q.   So the number 161 here refers
14 to this spreadsheet in Exhibit 7 as
15 reflected with your edits, with Verdolino
16 and Lowey's edits?
17     A.   The 161 is the sum of the final
18 number from Exhibit 8 plus the 109.
19     Q.   What work did Verdolino and
20 Lowey do in connection with getting to the
21 final numbers?
22     A.   We worked with counsel and
23 Aaron Mitchell and Melissa Francis trying
24 to review -- we didn't have details but we
25 were trying to ask questions and make sure

Page 135

1       C. JALBERT
2      A.   We did the best we could, yes.
3      Q.   What more information would
4  have been helpful to help you get to that
5  determination?
6      A.   If we could have seen what
7  the -- what the actual payees and
8  disbursements were, it probably would have
9  helped us with the categorization.
10     Q.   But you didn't receive that?
11     A.   Not -- not at that time, no.
12     Q.   Is the extent of information
13 you received regarding these line items
14 included in this chart here?
15     A.   As of the date that we made
16 available all the -- I'm sure there's an
17 updated version because this doesn't tie to
18 here (indicating) and then we -- long after
19 we produced the information for -- for this
20 deposition, there's been continuing ongoing
21 discussions because we're getting ready to
22 file -- excuse me, the March MOR in April.
23     Q.   We'll turn to the -- what I
24 think is the final version but we talked
25 about the categories, the amount you said

Page 137

35 (Pages 134 - 137)

PAX-014-035

C. JALBERT

1  that, at the time of this filing, you did
2  not have information to be able to verify
3  the amounts attributed to each category.
4  Is that right?
5      A.   Yes.
6      Q.   What information would have
7  been helpful for you to cross check those
8  amounts?
9      A.   Like I said, the name of the
10  payee, a description of what the service
11  was and the amount of the funds.
12      Q.   The percentage distribution,
13  what does that mean?
14      A.   The -- so for instance,
15  security was, in this sheet, $43,655.44.
16  The drafter of this and anyone that he
17  consulted with or she consulted with was 40
18  percent. Amongst talking with our team and
19  with the lawyer team, we thought that that
20  probably should be one hundred percent
21  because the only reason -- the security is
22  entirely related to Mr. Kwok and his
23  safety. There wouldn't be security if the
24  wife and the kids or others at the

Page 138

C. JALBERT

1  compound, if it weren't for Mr. Kwok. So
2  we proposed changing and I think that did
3  get changed to a hundred percent.
4      Q.   In revising these percentage
5  distributions, did you rely entirely on
6  information received from Brown Rudnick and
7  Aaron Mitchell and Melissa Francis and this
8  undisclosed person?
9      A.   The first pass was the
10  undisclosed person. After we got this
11  information from the undisclosed person,
12  most of the discussion was between our
13  firm, my firm and the lawyer -- lawyers.
14  How long is this going to go? Because
15  if it's going to go a bit, now I would like
16  to use the restroom. I'll be fast.
17      MS. ARONSSON: We can take a
18  break. We'll go off the record.
19      THE VIDEOGRAPHER: The time is
20  1:22 p.m. We're off the record.
21      (Whereupon, a short recess was
22  taken and upon resuming, E-mail Chain
23  was marked as Jalbert Exhibit 9 for
24  identification as of this date by the

Page 139

C. JALBERT

1  Reporter.)
2      THE VIDEOGRAPHER: The time is
3  1:28 p.m. We're back on the record.
4  You may proceed.
5      Q.   I think you have received
6  what's been marked as Jalbert Exhibit 9.
7  This bears the Bates Kwok 00001684. Do you
8  recognize this document?
9      A.   Yes.
10      Q.   Turning to the attachment, to
11  your knowledge, is this the final version
12  of the living expenses for the period
13  February 15th to February 28th?
14      A.   I think it is.
15      Q.   I'll represent, if you add
16  $51,495.67 plus the 109 thousand --
17      A.   161.
18      Q.   So we're on the same page, this
19  is the final version?
20      A.   Yes.
21      Q.   Does this final version reflect
22  Verdolino and Lowey's edits on the initial
23  draft provided by an unknown person?
24      A.   Well, it's certainly -- as you

Page 140

C. JALBERT

1  can see from the e-mail, we made
2  suggestions but counsel clearly reviewed
3  and assisted with the final decision and
4  I'm sure they also checked with the debtor.
5  I did not.
6      Q.   So just walking through these
7  five suggestions, why did you increase the
8  meals to 50 percent or why did you
9  recommend increasing the meals to 50
10  percent?
11      A.   Because there's a husband and a
12  wife and one hundred percent divided by two
13  is by 50 percent.
14      Q.   Do you have any understanding
15  as to why the draft had allocated the
16  numbers in the way it had in Exhibit 7?
17      MR. AULET: Objection to form.
18      A.   So I think what the creator of
19  the initial -- my memory is the creator of
20  the initial document took into
21  consideration that occasionally, the
22  debtor's daughter and maybe one or two
23  other people occasionally showed up and so
24  I think they ascribed some of the cost to

Page 141

36 (Pages 138 - 141)

C. JALBERT

1   those people but our feeling in
2   consultation with the attorneys was that
3   the only reason those people are there is
4   they're coming to visit the debtor and
5   that's why they incurred the cost. So I
6   thought they should put 50 percent to the
7   husband and 50 percent to the wife and
8   that's how we got the 50 percent.
9
10      Q.   Besides what you just described
11  to me, do you have anymore reasons for
12  suggesting the increase of 50 percent?
13      A.   Not that I can remember.
14      Q.   Item 2 is security is increased
15  to 100 and looking at the draft in Exhibit
16  7, it was 40 percent. What was your
17  reasoning for suggesting to increase the
18  security to 100?
19      A.   Again, the only reason there's
20  any security at all is all about the
21  debtor. So in an abundance of caution,
22  we're ascribing that cost, one hundred
23  percent of that cost to the debtor. The
24  wife likely would not have security
25  concerns if she were not married to

Page 142

C. JALBERT

1   to ascribe the one hundred percent of the
2   cost to the debtor is -- means that all
3   that costs -- we could have left it at 30
4   percent and probably made it a callable
5   argument of why it could be 30 percent. We
6   wanted to go with -- I think part of the
7   final reasoning amongst the group was that
8   it's conservative to report all of it on
9   the debtor's behalf because of his safety
10  concerns is -- that was the reasoning.
11      Q.   Thank you. Item 3 is utilities
12  increased to 50 percent and I'll represent
13  Exhibit 7 has it at 30 percent and you
14  ascribe the same explanation as the meals.
15  Is there any other --
16      A.   No, it's the same -- it's the
17  same -- it's the same theme at different
18  percentages for most of these.
19      Q.   Item 4 refers to housekeeping.
20  I believe Verdolino and Lowey recommended
21  changing repair and maintenance to
22  housekeeping?
23      A.   Well, as it turns out, once we
24  were able to speak with someone and get

Page 144

C. JALBERT

1   Mr. Kwok and when the daughter or others
2   sometimes travel, they need security as
3   well. So for whatever reason, their
4   security is all related to the debtor. We
5   suggested going to a hundred percent. It
6   was discussed among the group and everyone
7   agreed to the 100 percent.
8       Q.   What is the basis for your
9   assumption that the primary reason security
10  has been retained is directly related to
11  the debtor?
12      A.   Discussion with Melissa Francis
13  and Aaron Mitchell who confirmed in several
14  phone calls that the debtor is harassed and
15  threatened and otherwise scared for his
16  existence and to the extent the -- I'm told
17  to the extent the family is scared, they're
18  scared because of their relationship to
19  their father.
20      Q.   Is there any other reasoning
21  that you haven't articulated about the
22  basis for your increasing security to one
23  hundred?
24      A.   Well, it is very conservative

Page 143

C. JALBERT

1   some information that's behind the numbers,
2   we found out that that's the cost of the
3   maid for those 15 days or maids or maid
4   service or cleaning service and not
5   maintenance. So it's just a matter of
6   calling it what it was. Had we seen
7   detail, we would have understood that on a
8   more timely basis.
9       Q.   Your reasoning for increasing
10  the allocation from 30 to 50 percent, is it
11  fair to say it's the same reasoning
12  behind --
13      A.   It's a husband and a wife. You
14  know, any other cleaning they do on behalf
15  of anybody else, the only reason they're
16  there is because the Kwok's are there. The
17  debtor and his spouse.
18      Q.   You note at the bottom of the
19  page, "in our opinion, it's best to be more
20  conservative". That's another reasoning
21  behind your --
22      A.   Yes.
23      Q.   -- suggestion to increase the
24  allocations? Is that yes?

Page 145

37 (Pages 142 - 145)

PAX-014-037

C. JALBERT

1  A.  Yes.
2  Q.  I do want to talk about the
3  insurance changed to zero percent from 30
4  percent.
5      MS. ARONSSON:  I think,
6  Makenzie, can you hand me Tab 14?
7  A.  All done?
8  Q.  Yes.  Before I show you the
9  document, do you recall information about
10 the change from 30 percent to zero percent
11 for the insurance line item?
12 A.  I recall talking with my
13 colleague about it after he found out the
14 facts, yes.
15 Q.  What do you remember about that
16 interaction?
17 A.  Well, I think he found out the
18 insurance payment that -- that 13 thousand
19 dollars on Number 9 here was one hundred
20 percent pertaining to the Sherry apartment
21 in New York City where he did not live
22 during this time frame and so to the extent
23 that someone is paying those bills of the
24 Sherry, I think that's the Sherry's problem

Page 146

C. JALBERT

1  and not on account of the debtor because as
2  I'm told by the attorneys, everyone's
3  understanding, from the facts is that he's
4  -- he does not have an interest in that
5  real estate.  So he shouldn't have any
6  percentage in the expenses shown on the
7  monthly operating report.
8      (Whereupon, E-mail Chain was
9  marked as Jalbert Exhibit 10 for
10 identification as of this date by the
11 Reporter.)
12 MS. ARONSSON:  The Court
13 Reporter is going to be handing you
14 what's marked as Jalbert Exhibit 10.
15 This is a document produced in this
16 matter with the Bates Kwok 00001691.
17 Q.  I understand you're not on this
18 document but I just want to discuss a
19 couple issues here.  Do you recognize this
20 document?
21 A.  No, but I recognize the
22 subject.
23 MR. HARBACH:  Give him a minute
24 to read it.

Page 147

C. JALBERT

1  THE WITNESS:  Okay.
2  Q.  Turning to Page 2, Melissa
3  Francis notes that, "since MK doesn't own
4  the Connecticut property, can you please
5  just explain the applicability of the
6  following entries as his monthly expenses?
7  And what type of insurance is it?"  Do you
8  see that?
9  A.  Yes.
10 Q.  What do you understand Ms.
11 Francis to be asking here?
12 A.  Since the debtor doesn't own
13 the Connecticut property, can you please
14 justify the applicability of the following
15 entries as his monthly expenses and she's
16 asking what type of insurance.
17 Q.  What is your view, if any, on
18 her question?
19 MR. AULET:  Objection to form.
20 A.  I would like to answer them
21 correctly.
22 Q.  You would like to answer the
23 monthly reporting --
24 A.  I'm hoping we answered her

Page 148

C. JALBERT

1  questions.  I mean this is going onto the
2  monthly reporting but I'm hoping we
3  answered them correctly.
4  Q.  Substantively, what is your
5  view on her question here?
6  MR. AULET:  Objection to form.
7  A.  I don't want to try and guess
8  what she was thinking.
9  Q.  So you have no understanding --
10 Verdolino and Lowey has no understanding
11 about the question she's asking here?
12 A.  I have my understanding.
13 Q.  Okay.  Turning to the first
14 page, Mr. Flynn responds, "correct, he
15 doesn't own it but he lives in the
16 Connecticut house so these expenses that
17 are paid are benefitting him".  Do you have
18 any understanding of what Mr. Flynn is
19 saying here?
20 A.  That's why he's saying that
21 since he lives there, he aught to be --
22 there should be some level of those
23 expenses ascribed to him in the monthly
24 operating report in that Question 8.

Page 149

38 (Pages 146 - 149)

PAX-014-038

C. JALBERT

1
2    Q.    Mr. Flynn continues, "I have a
3    question regarding the insurance as well
4    since this is insurance on the apartment of
5    the Sherry".  Do you understand what issue
6    hes referring to here?
7    A.    Yes.
8    Q.    Can you explain it for me?
9    A.    Well, in the Number 8 -- no,
10   Number 9, the original version of this had
11   insurance.  We didn't know what it was
12   insurance on.  Frankly, when we got it, we
13   assumed it was on the Greenwich residence
14   where the debtor and his spouse actually
15   reside.  We factually found out that it's
16   actually insurance on the Sherry and when
17   we found out it's insurance on the Sherry,
18   since the debtor doesn't live there and
19   doesn't own it, by review of materials from
20   the lawyers, it should be eliminated and
21   that's what we proposed, to eliminate it.
22   Q.    It was ultimately eliminated?
23   A.    Yes.
24   Q.    Mr. Flynn continues "I am not"
25   I am not sure it should be included here?

Page 150

C. JALBERT

1
2    A.    I don't know.
3    Q.    The original allocation to this
4    line item I think is --
5         MR. HARBACH:  Right here
6    (indicating).
7    Q.    -- at 13 thousand and that's
8    reflected on Page 2.  $13,611.  Besides Ms.
9    Francis' e-mail, do you have any
10   independent knowledge of that information?
11        MR. AULET:  Objection to form.
12   A.    No.  It came from Melissa
13   Francis.  I don't know where she got that
14   number from or why.
15   Q.    Did you look into insurance for
16   the Greenwich property?
17   A.    No.
18   Q.    Why not?
19   A.    We asked for someone in the --
20   with the correct knowledge to give us all
21   of the expenses paid cash, check, wire
22   transfer, HCH, any other method, February
23   15th to February 28th on behalf of the
24   debtor.  We didn't leave any -- we didn't
25   ask for -- we didn't leave any

Page 152

C. JALBERT

1
2    I think that's what he means -- "in this
3    calculation but interested on your thoughts
4    and also asking Craig".  Do you recall him
5    asking your opinion on this?
6    A.    Yes.
7    Q.    Is your opinion the same as
8    Mr. Flynn's here --
9    A.    Yes.
10   Q.    Do you recall speaking with
11   Mr. Flynn about that?
12   A.    I do.
13   Q.    Turning to the top e-mail here
14   on this chain, on Page 1, Mr. Flynn asks,
15   "how much was paid during this period for
16   the Sherry".  Do you see that?
17   A.    Yes.
18   Q.    Do you know the answer to that
19   question?
20   A.    I have no idea.  Also, I don't
21   know why he asked it.
22   Q.    That was going to be my
23   question.  Why would it matter whether --
24   how much it was as to whether it should be
25   included in the monthly operating report?

Page 151

C. JALBERT

1
2    restrictions.  We just said give us all of
3    that information.  We got a summary chart.
4    You saw it and it wasn't till we started
5    asking questions to understand some of the
6    background and what is behind the numbers
7    that we started making assessments and
8    changing what we think the legal group and
9    us thought it was appropriate.
10   CONTINUED EXAMINATION
11   BY MR. HARBACH:
12   Q.    You said a moment ago that
13   originally, you and your team thought that
14   the 13 -- excuse me, I think you said you
15   assumed that the $13,611 was for the
16   Greenwich property because that's where he
17   was living.  I got that right?
18   A.    Yes, sir.
19   Q.    Then you were told that the
20   13,611 was actually for the Sherry, right?
21   A.    Correct.
22   Q.    And at that point, you did not
23   inquire about was there actually any
24   insurance money paid for the Greenwich
25   property during this period, you didn't ask

Page 153

39 (Pages 150 - 153)

C. JALBERT

1    that question?
2        A.    No, we assumed -- actually,
3    Matt had confirmed this is a list of all
4    the payments made during this time frame.
5    So we had the universe that wasn't another
6    insurance payment and you know, most --
7    many of us have owned homes.  My own
8    empirical knowledge is you typically pay
9    your homeowner's insurance once a year.
10   It's usually -- in the Sherry, this 13
11   thousand dollars might have been just a
12   payment for the year on a 2.5 million
13   dollar entity.  They didn't tell us it was
14   a payment so I didn't ask.
15   CONTINUED EXAMINATION
16   BY MS. ARONSSON:
17       Q.    So I think we've covered the
18   work that you have done in connection with
19   the monthly operating report for the period
20   February 15th to February 28th.  We've been
21   looking at that document.  Is that right?
22       A.    Yes.
23       Q.    Can you think of anything else
24   that we haven't talked about with the work

Page 154

C. JALBERT

1    that you've done, in connection with
2    preparing that document?
3        A.    Off the top of my head, no.
4        Q.    I think you referenced you're
5    preparing the next reporting cycle?
6        A.    Yes.
7        Q.    Can you describe your general
8    process and how that defers, if it does,
9    with your reporting cycle for the February
10   15th to February 28th period?
11       A.    So the monthly operating report
12   is basically presenting information and the
13   two buckets of information that are in the
14   monthly operating report as for this debtor
15   is that Question E, the funds disbursed on
16   his behalf in the 31 day period, March 1 to
17   March 31, we're going to -- we're going to
18   figure out -- we're going to get a list.
19   This time, we're going to get a list so we
20   can see what there was and we can have --
21   we can have more educated discussion with
22   the lawyers about what was paid.  That will
23   be summarized and categorized and put in
24   Schedule E and in addition, we're working

Page 155

C. JALBERT

1    with the Brown Rudnick firm and Melissa
2    Francis and Aaron Mitchell to determine
3    what the accrual of professional fees.  All
4    professionals, state professionals,
5    committee professionals, debtor
6    professionals, ordinary course -- alleged
7    ordinary course professionals, everybody
8    because we need to record the accrual.  So
9    it's not just -- the operating report is
10   not just asking for what was paid during
11   that period.  It's asking for what's the --
12   the new form is asking what are the unpaid
13   amounts and we couldn't get it in time to
14   get the February one.  So we're going to
15   catch up in this March one, we're going to
16   establish what the February accrual was and
17   we're going to find out what the March
18   accrual was and then we'll have the correct
19   information and it will have to be
20   maintained as we go along and obviously, as
21   time goes on, if things go according to the
22   way the debtor would like, there will be
23   payment on those fees.  So there'll be more
24   accruals and then payments and the same

Page 156

C. JALBERT

1    thing is true of the estate professionals
2    and the committee and its professionals.
3    It will be a roll forward of what the
4    liability is and the cash will be reported
5    on Page 1.  It will create liability to the
6    United States Trustee for their fee --
7    their -- their -- it's a fee.  It's not a
8    commission.  Their fee for -- which is
9    entirely predicated on cash disbursements
10   during the time of the monthly operating
11   report.
12       Q.    Do you anticipate -- strike
13   that.  Besides information that you'll
14   receive from Brown Rudnick, from Aaron
15   Mitchell, from Melissa Francis and an
16   unknown person, do you anticipate doing any
17   investigation in connection with future
18   monthly operating reports?
19       MR. AULET:  Objection to form.
20       A.    I don't know what you
21   consider -- I'm not going to -- we're going
22   to get a report from someone.  That report
23   is going to list out all of the payments
24   made during a specific time period.  We're

Page 157

40 (Pages 154 - 157)

PAX-014-040

C. JALBERT

1     C. JALBERT
2  going to review that with our own
3  professional knowledge and with the lawyers
4  to make sure it all makes sense. We might
5  ask questions based on what shows up on the
6  spreadsheet but I'm not going to ask for a
7  copy of the cancelled check, a bank
8  statement or the invoice that was paid. So
9  no investigation of that, just a sanity
10 check or a reasonableness check and confer
11 with counsel to be sure that we understand
12 what's on that sheet and what we're going
13 to report.
14    Q.   So essentially, you'll rely on
15 the rolled up numbers that are provided to
16 you from the individuals we've talked
17 about?
18    A.   Again, except for some queries
19 that we'll make depending on what the
20 information we get. If we get -- if
21 insurance shows up again, we're going to
22 ask insurance on what. If repairs and
23 maintenance shows up again, we're going to
24 confirm it's not the maid. So we'll use
25 some common sense and we'll confer with the

Page 158

1     C. JALBERT
2  lawyers based on what we see but I won't
3  know what we're going to do until we see
4  what -- and I hope it's soon. What's
5  today, April 8th?
6     Q.   Thank you. Okay, just quickly
7  turning back to Exhibit 8 which is I think
8  the final living expense report for the
9  period February 15th, 2022 to February
10 28th, 2022. I think you had referenced an
11 erroneous amount included in here. Can you
12 just explain again what you meant by that?
13    A.   I don't remember exactly what
14 the number is but on the security line,
15 Line Number 9, the amount referenced her 43
16 thousand dollars. That 43 thousand dollars
17 included a payment of -- my memory is
18 something like 12 or 14 thousand dollars
19 that was paid February 10 and so we got
20 this report, the original one, and didn't
21 know the back -- the background and when
22 they -- when they showed us the background
23 and the list of -- we saw February 10. So
24 we realized we had the opposite mistake of
25 the time with the two professionals where

Page 159

1     C. JALBERT
2  they paid post-petition pre-petition. Here
3  they paid pre-petition, pre-petition but
4  should have been excluded from the monthly
5  operating report. Legitimate charge. It
6  wasn't an overpayment or anything. It just
7  didn't belong reported in the February
8  monthly operating report.
9     Q.   So is it fair to say you later
10 received a more detailed breakdown of these
11 items that was included in this --
12    A.   I believe we got a more
13 detailed -- but it was -- it was
14 significantly past that time. Everything
15 at that time was done by reviewing,
16 talking, Melissa and Aaron talking with
17 whoever and Matt talking to whoever. It
18 was all done by e-mail and orally. We
19 didn't get a spreadsheet of the detail
20 until sometime later, long after it was
21 filed and actually, after the time that we
22 made available our records that we got --
23 the detail listing which is when we figured
24 out oh we got a problem with the monthly
25 operating report. It's just a matter of,

Page 160

1     C. JALBERT
2  you know, whoever is preparing these things
3  isn't used to the rules, isn't used to
4  what's got to be displayed -- disclosed and
5  what's not going to be disclosed. We try
6  and give them guidance and they just made a
7  minor error. We'll fix it next month.
8     Q.   Thank you. You can set that
9  aside. Do you recall receiving an inquiry
10 from someone at U.S. DOJ regarding the
11 monthly operating report?
12    A.   I think I actually reached out
13 to them first and my reaching out to them
14 first was -- and that's how -- was -- I
15 don't know if anyone's ever prepared a
16 monthly operating report, is there one
17 here? So the monthly operating report, up
18 until December 31 or January 31 was one,
19 two -- these two pages (indicating), Page 8
20 which is now Page 8 and Page 9 and there
21 might have been one more -- I thought it
22 was five pages. It might have been four.
23 And I filed these monthly operating reports
24 in several cases and it had been driving me
25 crazy for three months that I would -- I

Page 161

41 (Pages 158 - 161)

PAX-014-041

C. JALBERT

1  would -- the way the monthly operating
2  reports, the bottom, for the first page, it
3  allows you to use save if you're inputting
4  data so that you can review it but it
5  retains a watermark up until the time you
6  hit a button that says send the data out to
7  the United States Trustees website and it
8  does whatever it does and when it did that,
9  it kept on coming back with these extra six
10 pages and this nonsense (indicating). So I
11 actually reached out to the U.S. Trustees
12 Office saying what are we doing wrong.
13 It's midnight and we're trying to get this
14 thing in. He says no, everyone's having the
15 same problem. We've just finally figured
16 out that's what's supposed to happen. So
17 that's when we started talking with him and
18 then when he saw it, he had our e-mail
19 addresses and we -- and he was looking for
20 the support for the 161, I believe is what
21 he was asking for. I don't have it in
22 front of me or if I do, I didn't -- I don't
23 -- but that's my recollection, that's why
24 he reached out was to get -- to get that

Page 162

C. JALBERT

1  have done anyway's.
2  Q.  We've talked about your
3  experience in Chapter 11 individual
4  bankruptcies before. Reflecting on your
5  experience in these instances, were any --
6  do you have any -- can you cite any case
7  where you've seen such a great disparity
8  between the debtor's punitive assets and
9  the stated liabilities?
10 A.  No. In my individual cases,
11 the 373 million dollars of liabilities is
12 the most I've ever seen.
13     MS. ARONSSON: We don't have
14 anymore questions.
15     MR. AULET: I have nothing.
16     MR. AULET: I have a few
17 follow-ups. I'll just be a couple
18 hours.
19     THE WITNESS: Beautiful. Do
20 you mind if I go get a bottle of
21 scotch?
22     MR. GOLDMAN: Get me one too.
23 I'm Irve Goldman --
24     THE VIDEOGRAPHER: Can you give

Page 164

C. JALBERT

1  and to get the I think accrual of the
2  professional fees going forward.
3  Q.  Did you have a call regarding
4  the monthly operating report and further
5  details on the line items?
6  A.  Not a call. You have whatever
7  e-mails there were. It was very -- it was
8  very limited. My call to him was a general
9  question on my three cases, I'm trying to
10 file these. He was able to answer my
11 question -- my main question. He then,
12 when he saw the monthly operating report,
13 he said hey, I need this and we're going to
14 obviously arrange to do that.
15 Q.  So was it the inquiry from the
16 trustee that prompted Verdolino and Lowey
17 to request additional details and
18 breakdowns of the line items contained in
19 the monthly operating Excel that we've
20 looked at?
21 A.  No. We wanted to do that
22 anyway's. That just -- that gave us more
23 fuel to bring it to them to say hey, we got
24 to get to this. That's something we would

Page 163

C. JALBERT

1  him the microphone, please?
2      MR. AULET: Yes. Can I take us
3  off the record really quick so I can
4  --
5      MR. HARBACH: Sure.
6      THE VIDEOGRAPHER: The time is
7  1:56 p.m. and we are off the record.
8      (Whereupon, an off-the-record
9  discussion was held.)
10     THE VIDEOGRAPHER: The time is
11 1:58 p.m. We're back on the record.
12 You may proceed.
13 EXAMINATION BY
14 MR. GOLDMAN:
15 Q.  Good afternoon. Irve Goldman,
16 Pullman and Comley for the Creditor's
17 Committee. You mentioned you were
18 certified as an insolvency restructuring
19 expert. Did I get that right?
20 A.  Advisor.
21 Q.  Advisor, for how long?
22 A.  Well, the actual designation
23 came in 1999 but in 1999, when I got the
24 designation, I had to spend over four

Page 165

42 (Pages 162 - 165)

PAX-014-042

C. JALBERT

1 thousand hours and have been in the
2 profession for eight years at that point.
3 So 30 years ago.
4      Q.   Do you typically call on that
5 expertise when you're engaged as a
6 professional in Chapter 11 cases?
7      A.   Certainly some of it, yes.
8      Q.   What aspects of the debtor's
9 financial profile do you view as needing
10 restructuring?
11          MR. AULET:  Objection to form.
12      A.   Needing restructuring, I don't
13 understand your question.
14      Q.   Well, you're a certified
15 insolvency restructuring expert.  You call
16 upon that expertise in your engagements in
17 Chapter 11 cases.  What is it about the
18 debtor's financial profile that you view as
19 in need of restructuring?
20      A.   Well, you know --
21          MR. AULET:  Objection to form.
22      Q.   Do you view it as in need of
23 restructuring?
24      A.   No, I don't.

Page 166

C. JALBERT

1      Q.   You don't?
2      A.   Absolutely not.
3      Q.   So why do you believe he filed
4 Chapter 11 then?
5      A.   Well, the debtor needs
6 restructuring.  I don't think --
7          (Whereupon, a cell phone rang.)
8          THE WITNESS:  Oh, I apologize.
9      That was for me to remind me to do
10      something at 2:00 which I can't
11      remember what I'm supposed to do.
12      Just making sure it wasn't on -- what
13      is that when it comes back on later
14      and it annoys you?  The debtor's
15      restructuring, if you're referring to
16      the questions were brought up -- in
17      an ordinary Chapter 11 case that's a
18      business, there's lots of things to
19      consider if there's a real
20      restructuring.  You've got to
21      restructure the debt, the secure
22      debt.  Maybe mezzanine, unsecured
23      debt.  Maybe work with payables, all
24      sorts of -- that isn't the case here

Page 167

C. JALBERT

1 and I -- and I regret completely that
2 we were brought in as a financial
3 advisor and not an accountant to the
4 debtor.  Most of what you see on that
5 motion to employ is very important
6 stuff in the process of bankruptcy.
7 The schedules, the SOFA's, the -- the
8 monthly operating reports, tax return
9 preparation, analysis of claims and I
10 don't know whether we'll have a role
11 in that or not.  It depends on what
12 the nature of the claim is.  Most of
13 these claims will be legally analyzed
14 but there might be a hundred reasons
15 why someone that filed a claim --
16 there might be an accounting
17 attached, they do want us to
18 investigate.  So we're not brought in
19 to -- just because we think there's
20 going to be a reorganization.
21 Bankruptcy is a process.  There's an
22 awful lot of paper that gets pushed
23 by an awful lot of people.  This
24 particular debtor is -- as I

Page 168

C. JALBERT

1 understand it, is in excess of 70
2 years old.  Doesn't even have an
3 e-mail address.  Doesn't know how to
4 use computers.  Doesn't know
5 technology.  Couldn't possibly do the
6 monthly operating reports himself and
7 virtually, in every case, there's an
8 accountant that does tax returns.
9 There's an accountant that does --
10 that helps with preparing monthly
11 operating reports.  Even when the
12 company has a controller, we still
13 come in in cases where -- so there
14 may not be a reorganization as of
15 right now.  There's going to be a
16 plan someday.  I don't know what role
17 we're going to play but if we need to
18 be -- if the counsel and debtor needs
19 us to play a role, we will but until
20 that day, there's lots of necessary
21 work to do in the ordinary course of
22 the process in the life of a Chapter
23 11 case here.
24      Q.   What you just described were

Page 169

43 (Pages 166 - 169)

C. JALBERT

1    C. JALBERT
2  menial tasks of accounting?
3      A.  I disagree.
4      Q.  No, you disagree?
5      A.  Preparing the SOFA's and
6  preparing the MOR's, you think that's all
7  menial tasks?
8      Q.  All right, I won't argue with
9  you on that.  What is it about this case
10 that you -- you view that is in need of
11 restructuring, if anything?
12         MR. AULET:  Objection to form.
13     A.  Yeah, I don't know what you're
14 trying to ask.
15     Q.  Are there assets that need to
16 be restructured?
17     A.  The only assets I understand
18 are -- I think the lawyers call them
19 litigation assets in the like.
20     Q.  So how would they be
21 restructured or part of a restructuring?
22         MR. AULET:  Objection to form.
23     A.  You're probably asking the
24 wrong guy but if there's ongoing
25 litigation, I suspect there's going to be

Page 170

1    C. JALBERT
2  counsel wants us to play and the debtor
3  wants us to play.  If they want us to play
4  part of the role of looking at the
5  pre-petition payments, which we ordinarily
6  do in most of the cases we do, we come up
7  with the list, here it already exists.  We
8  might ask for support to confirm but it's
9  entirely up to the team that's running the
10 case.  We're not running the case.  We're
11 -- we're -- I think we're an important
12 member of the team but we're not -- the
13 accounting firm is not driving the case.
14 The debtor and his counsel is driving the
15 case as is true of every case.
16     Q.  Do you know where the debtor's
17 books and records reside?
18     A.  I do not.
19     Q.  Do you know if the debtor had a
20 pre-petition account?
21     A.  Only from knowledge from
22 lawyers.
23     Q.  Who was the accountant?
24     A.  Accountant?
25     Q.  Yeah, I asked you --

Page 172

1    C. JALBERT
2  -- you would hope there would be settlement
3  negotiations, there might be mediation,
4  there might be arbitration.  Someone's
5  going to try and liquidate those assets
6  into cash with which to pay the creditors.
7  I don't know whether we'll play a part in
8  that or not.
9      Q.  As part of your -- the scope of
10 your engagement, there is a bullet point
11 that states that you're going to provide
12 assistance --
13         THE COURT REPORTER:  I'm sorry,
14     Counsel.  I need to hear you better.
15     Q.  Provide assistance with
16 reviewing debtor books and records for
17 possibly avoidable transactions such as
18 preference and fraudulent transfer claims.
19 You stated that you did not review any of
20 the debtor's books and records, correct?
21     A.  Currently, so far, yes.
22     Q.  Did you ask for any?
23     A.  No.
24     Q.  Do you intend to?
25     A.  Depends on what role the

Page 171

1    C. JALBERT
2      A.  Oh actually, I take that back.
3  I saw actual tax returns.  There was --
4  every preparer has to list their name on a
5  tax return they prepare.  So there was --
6  someone paid tax returns at least.  What
7  else they did, I don't know.
8      Q.  Okay, what was the name of the
9  accountant?
10     A.  I don't remember.
11     Q.  Have the tax returns been
12 produced to any party in the case thus far?
13     A.  I imagine we produced them
14 because we had them.  They would have come
15 in an e-mail.  So they would have been
16 produced as it relates to this I think.  I
17 think they were but they were very small
18 tax returns prepared by -- I assume a New
19 York or a Connecticut accountant.  I don't
20 know who.
21     Q.  You just don't -- you obviously
22 looked at it, you just don't recall the
23 name of that accountant right now?
24     A.  I don't -- well, yes.  I'm not
25 even sure if I looked at it.  I don't know

Page 173

44 (Pages 170 - 173)

C. JALBERT

1       C. JALBERT
2 if, at the time when we were trying to do
3 everything, we were using those because we
4 needed some of the information on there.
5 We were referred to them by Melissa for
6 certain issues that the lawyers thought
7 were important and we went and took a look
8 at them but I would have looked at
9 something besides the name of the preparer.
10 At the time, it didn't matter.
11     Q.   Have you ever spoken to the
12 debtor?
13     A.   Yes.
14     Q.   When?
15     A.   Wednesday at the 341 hearing to
16 introduce myself.
17     Q.   Is that the only occasion, to
18 your knowledge, that you've spoken to the
19 debtor?
20     A.   I don't speak Mandarin and he
21 apparently doesn't speak English. So I
22 have not spoken to him. Or Chinese. I'm
23 not sure which it is. Excuse me.
24     Q.   You did not receive a
25 post-petition retainer, correct?

Page 174

1       C. JALBERT
2     A.   Correct.
3     Q.   Are you confident that your
4 fees will be paid?
5     A.   I don't know if I'm confident.
6 I'm hoping.
7     Q.   What source do you believe your
8 fees will be paid, from what source?
9     A.   It will come from the Estate.
10 If we're going to be paid, as I understand
11 it, it will come from the Estate. I don't
12 -- I have not thought of or have any
13 agreement on any other source of payment.
14     Q.   Do you mean the litigation
15 claims or recoveries?
16     A.   I would expect the only people
17 that have a retainer in this case are Brown
18 Rudnick. Everybody else will be looking to
19 be paid -- that is a debtor's professional
20 or a committee professional, professionals
21 that file an application with the Court and
22 the Court allows their retention will be
23 looking to get funds. We're all going to
24 be looking from the same place. What that
25 source is going to be, if it will ever be,

Page 175

1       C. JALBERT
2 I don't know.
3     Q.   What information, if any, did
4 you rely on in getting comfortable taking
5 this case without a post-petition retainer?
6     A.   I've been doing this for 35
7 years. I'm not sure. I don't remember
8 ever getting a post-petition retainer but
9 my firm works with --
10     (Whereupon, a cellphone rang.)
11     THE WITNESS:  Shit, I'm sorry.
12 Now it's off. We -- we're a
13 practitioner in Massachusetts and we
14 do cases in Delaware, New York,
15 Connecticut, Rhode Island,
16 Massachusetts, New Hampshire,
17 Vermont, Maine. We represent Chapter
18 7 trustees in virtually all of those
19 states. We probably represent and do
20 work for virtually ever Chapter 7
21 trustee in Rhode Island, every
22 Chapter 7 trustee in Massachusetts, a
23 couple in Maine, a couple in New
24 Hampshire and it's not unheard of for
25 us to go and do 50, 60, 70, 80

Page 176

1       C. JALBERT
2 thousand dollars of work before we
3 even know the case will ever have any
4 money. It's an investment that we
5 make. Now I didn't make an
6 investment in this case. Whatever we
7 incurred -- and I don't know what
8 that is, I'm hoping I'm going to
9 collect it but if I don't, then I'll
10 have a write-off like I've had many,
11 many, many, many times in the past.
12     Q.   Again, I don't think you
13 answered my question.
14     A.   Oh all right --
15     Q.   If you -- if you relied just on
16 your experience in engagements in
17 bankruptcy cases and that's it for taking
18 this case without a pre or post-petition
19 retainer, is that what you mean --
20     A.   I don't understand your
21 question.
22     Q.   What information, if any, did
23 you rely on in taking this case without a
24 pre or post-petition retainer?
25     MR. AULET:  Objection to form.

Page 177

45 (Pages 174 - 177)

C. JALBERT

2    A.   I do work with lots and lots of
3  attorneys and when attorneys call up and
4  they ask if we're interested on working on
5  the case, I work on the case.
6    Q.   So you relied on being asked to
7  get involved by Brown Rudnick?
8    A.   Yep.
9    Q.   That's it?
10   A.   Yep, and then after that, it's
11 bankruptcy process.  Whatever happens,
12 happens.
13   Q.   You didn't look at the
14 financial profile of this debtor at all in
15 determining --
16   A.   I think -- I think I knew he
17 had limited assets or no assets and I think
18 I knew he had a lot of litigation ongoing
19 but -- maybe I'm a fool but I only have one
20 other person that I have to answer to and
21 he lets me run my business just like he
22 runs his business and my feeling is when a
23 lawyer calls up and they have a case, then
24 we respond because if I don't respond,
25 maybe the next time he calls another

Page 178

C. JALBERT

2  accountant.  So I didn't do all the things
3  that you think a normal person should have
4  done to protect themselves on payment.
5    Q.   Did you rely on any degree on
6  the financial profile of Golden Spring?
7    A.   No.
8    Q.   You didn't do any due diligence
9  on Golden Spring before agreeing to get
10 engaged in this case?
11   A.   I'm pretty sure I didn't know
12 Golden Spring existed by the time I agreed
13 to be in this case.
14   Q.   How about Lamp Capital, did you
15 do any investigation of Lamp Capital?
16   A.   No.
17   Q.   Did you ask any questions about
18 what the financial profile of those two
19 entities was --
20   A.   No.
21   Q.   -- before getting involved?
22   A.   No.
23   Q.   Were you promised that you
24 would be paid from Golden Hill or Lamp
25 Capital before agreeing to take on the

Page 179

C. JALBERT

2  engagement?
3    A.   Absolutely not.
4    Q.   Have you had any communications
5  with any representative from Golden Hill?
6      MR. HARBACH:  Golden Spring.
7    Q.   Golden Spring.
8    A.   I was on e-mails with someone
9  from -- well, first of all, Melissa Francis
10 has a Golden Spring e-mail address.  She's
11 counsel to the debtor.  I've been informed
12 of that from the beginning.  The only other
13 contact --
14   Q.   She's counsel for the debtor or
15 Golden Spring?
16   A.   Debtor.
17   Q.   Melissa --
18   A.   Francis.
19   Q.   But she has an e-mail address
20 from Golden Spring?
21   A.   Correct.  They were in all of
22 these e-mails that they were putting in
23 front of me.
24   Q.   She's counsel for the debtor is
25 your understanding --

Page 180

C. JALBERT

2    A.   I've been told emphatically by
3  her and by Brown Rudnick that she is
4  counsel to the debtor, as is Aaron
5  Mitchell.  As is Brown Rudnick.
6    Q.   Okay.  Are they part of the
7  application to retain ordinary course
8  professionals, if you know?
9    A.   I don't know that they're going
10 to be paid by the Estate or not.  I don't
11 know what they're -- what they're -- what
12 motions they filed to be paid.  I'm not --
13 I'm not representing them and I'm not
14 asking them.
15   Q.   So back to the question whether
16 you had any communications with Golden
17 Spring --
18   A.   So my colleague, Matt Flynn,
19 had I think one or two phone calls with
20 someone at Golden Spring.  There was a
21 number of e-mails which we looked at in
22 here and you know, 6, 7, 8, 9, whatever,
23 that person is not identified but I did not
24 speak to that person.  I had -- I was on
25 the e-mail exchanges and I wrote exactly

Page 181

46 (Pages 178 - 181)

PAX-014-046

C. JALBERT

1   one e-mail to that person and actually
2   directed it to Melissa and Aaron when I
3   wrote my e-mail.
4       Q.   Do you know why that person's
5   name is redacted on the exhibit?
6       A.   Yes.
7       Q.   Why?
8       A.   Because you heard Golden
9   Spring's attorney. They're worried about
10  the safety of their employees given the
11  issues surrounding this case. I don't know
12  anything about that. I'm just doing what I
13  told. I am not disclosing the name.
14      Q.   It was at Golden Spring's
15  counsel's behest that that was redacted is
16  your understanding?
17      A.   Well, I don't know whether it
18  was Golden Spring's counsel or Golden
19  Spring itself. I don't know -- I don't
20  know who started it. I just -- in fact, I
21  don't think I knew it until the day before
22  -- the day before, maybe Wednesday is when
23  I found out that -- that -- that the
24  documents were redacted.

Page 182

C. JALBERT

1       Q.   Is it your understanding that,
2   according to the debtor, all of his living
3   expenses, pre-petition, were paid by Golden
4   Spring?
5       A.   Well, they were paid by
6   somebody else. I can't say emphatically
7   they were paid by Golden Spring.
8       Q.   So whatever that person or
9   entity -- whoever that person or entity
10  was, are the living expenses, post-petition
11  living expenses that were prepared in the
12  various schedules, consistent with what was
13  paid pre-petition?
14      A.   We didn't do an investigation
15  as to what the pre-petition nature of
16  payments or amount of the payments or
17  anything. So I don't have any -- any
18  comparative information. That information
19  will be developed as we see the months go
20  by but I think the final -- the final
21  number for 15 days of the expenses for the
22  individual ended up being something like 28
23  or 29 thousand dollars for 15 days. So
24  multiply that by two 60 thousand dollars

Page 183

C. JALBERT

1   for the month of which two-thirds of that
2   is security.
3       Q.   Is the person or entity that is
4   funding the post-petition living expenses
5   Golden Spring?
6       A.   I don't know. That's not one
7   of the questions and no one has volunteered
8   that information. It just says -- the
9   question says is there a third-party making
10  payments on behalf of the debtor
11  post-petition. We answered that question
12  as best we could. We'll fix the one error
13  that remains but it did not ask and they
14  did not tell us, to my knowledge, who is
15  making the disbursements.
16      Q.   And you didn't ask?
17      A.   No. I don't know how it would
18  affect -- it's not in the monthly operating
19  report so it's none of my business I think
20  is what I would have been told.
21          MR. GOLDMAN: I don't have any
22      further questions.
23          MR. AULET: I have nothing.
24          THE VIDEOGRAPHER: Can I take

Page 184

C. JALBERT

1   us off the record for the day?
2           MR. GOLDMAN: Yes.
3           THE VIDEOGRAPHER: We're off
4   the record at 2:18 p.m. and this
5   concludes today's testimony given by
6   Craig Jalbert.
7           (Whereupon, at 2:18 P.M., the
8   Examination of this witness was
9   concluded.)
10
11          °        °        °        °

Page 185

47 (Pages 182 - 185)

PAX-014-047

```
 1
 2        D E C L A R A T I O N
 3
 4     I hereby certify that having been
 5  first duly sworn to testify to the truth, I
 6  gave the above testimony.
 7
 8     I FURTHER CERTIFY that the foregoing
 9  transcript is a true and correct transcript
10  of the testimony given by me at the time
11  and place specified hereinbefore.
12
13
14
           _____
15           CRAIG JALBERT
16
17
18  Subscribed and sworn to before me
19  this _____ day of _____ 20___.
20
21
           _____
22    NOTARY PUBLIC
23
24
25
                                    Page 186
```

```
 1
 2        C E R T I F I C A T E
 3
    STATE OF NEW YORK      )
 4                 : SS.:
    COUNTY OF KINGS        )
 5
 6     I, LENAYA LYNCH, a Notary Public for
 7  and within the State of New York, do hereby
 8  certify:
 9     That the witness whose examination is
10  hereinbefore set forth was duly sworn and
11  that such examination is a true record of
12  the testimony given by that witness.
13     I further certify that I am not
14  related to any of the parties to this
15  action by blood or by marriage and that I
16  am in no way interested in the outcome of
17  this matter.
18     IN WITNESS WHEREOF, I have hereunto
19  set my hand _____ 2022.
20
21          Lenaya Lynch
               LENAYA LYNCH
22
23
24
25
                                    Page 188
```

```
 1
 2        E X H I B I T S
 3  JALBERT EXHIBITS
    EXHIBIT  EXHIBIT             PAGE
 4  NUMBER   DESCRIPTION
 5  Exhibit 1  Notice of Deposition      10
 6  Exhibit 2  E-mail Chain              32
 7  Exhibit 3  E-mail Chain              35
 8  Exhibit 4  Debtor's Application      47
 9  Exhibit 5  Official Form 106Sum      93
10  Exhibit 6  Global Notes             111
11  Exhibit 7  E-mail Chain             129
12  Exhibit 8  E-mail Chain             131
13  Exhibit 9  E-mail Chain             139
14  Exhibit 10 E-mail Chain             147
15
      (Exhibits retained by Court Reporter.)
16
17        I N D E X
18  EXAMINATION BY              PAGE
19  MS. ARONSSON               5
    MR. HARBACH               100
20  MS. ARONSSON              103
    MR. HARBACH              153
21  MS. ARONSSON              154
    MR. GOLDMAN              165
22
23
24
25
                                    Page 187
```

Veritext Legal Solutions
866 299-5127

PAX-014-048

[& - 373]

| & |
| --- |
| **&**  1:15,18 2:3,12 |

**0**

**00001646**  32:16
**00001649**  35:10
**00001684**  140:8
**00001691**  147:17
**00001752**  129:3
**02035**  6:9
**06103**  2:18
**06601**  2:14

**1**

**1**  3:16 10:14,17
  17:10 23:22 72:10
  97:9 113:14,18
  114:14 118:3
  132:21 151:14
  155:17 157:6
  187:5
**10**  133:25 147:10
  147:15 159:19,23
  187:5,14
**100**  2:18 142:15,18
  143:8 187:19
**10036**  1:19 2:5,10
**100th**  44:7
**101**  6:9
**103**  187:20
**106a**  94:21
**106sum**  93:14
  94:2 187:9
**109**  132:22 135:18
  140:17
**109,827**  133:7
**109,827.12**  132:13
**10:17**  1:11 3:4
**10:24**  11:15,19
**11**  1:5 21:2,4
  32:11 55:3 70:3
  74:19 81:6,11

**86**:10,22,24
  103:13 115:4,4,8
  119:21 124:25
  164:4 166:7,18
  167:5,18 169:24
**111**  187:10
**11:53**  90:21
**12**  2:18 34:22
  85:15 159:18
**120**  75:21 131:25
**120-1**  131:25
  132:6
**122b**  125:3,14,19
**124**  6:8
**129**  187:11
**12:22**  90:25
**13**  19:8 42:12
  55:14 103:14
  126:5 146:19
  152:7 153:14
  154:11
**13,611**  152:8
  153:15,20
**131**  187:12
**139**  187:13
**14**  19:8 98:7 146:7
  159:18
**147**  187:14
**15**  77:6 89:10
  97:25 145:4
  183:22,24
**153**  187:20
**154**  187:21
**15th**  63:14 72:9
  125:4 129:23
  133:11 134:3
  140:14 152:23
  154:21 155:11
  159:9
**16**  96:18 105:18
  126:5

**161**  132:20 134:13
  135:13,17 140:18
  162:21
**161,323**  132:23
  133:5
**165**  187:21
**16th**  132:17
**17**  119:19,21
**18**  48:22 127:22
**19**  131:3
**19,488**  125:6,15
**1979**  17:5
**1983**  17:8
**1987**  17:10
**1999**  165:24,24
**1:22**  139:21
**1:28**  140:4
**1:56**  165:8
**1:58**  165:12
**1a**  94:19,22 95:8
**1b**  95:11

**2**

**2**  23:22 32:14,18
  33:2,4 41:6 97:13
  105:21 142:14
  148:3 152:8 187:6
**2.5**  154:13
**20**  45:8 186:19
**2019**  79:18
**2020**  79:19
**2021**  127:24
**2022**  1:10 3:5
  125:4 159:9,10
  188:19
**21**  45:8 49:9 84:9
  92:21 107:14
**22**  45:9
**22-50073**  1:6 3:22
**22nd**  3:4
**23**  97:8

**24350**  188:21
**26**  120:3,12
**28**  183:23
**28th**  72:9 129:23
  133:12 134:3
  140:14 152:23
  154:21 155:11
  159:10
**29**  183:24
**2:00**  167:11
**2:18**  185:5,8

**3**

**3**  23:23 35:8,12
  96:25 97:4,8,13,24
  115:13 116:21
  144:12 187:7
**3,850**  96:5
**30**  7:5,19 11:2,22
  107:6 144:4,6,14
  145:11 146:4,11
  166:4
**30th**  2:4
**31**  17:10 72:10
  74:24 77:7 121:16
  155:17,18 161:18
  161:18
**32**  187:6
**341**  16:17,22 45:13
  45:14,17 46:14,15
  46:19,24 47:8,12
  47:13,18 51:15
  69:5 116:2 123:15
  123:18 126:13
  127:10,18 174:15
**342**  16:16
**35**  17:13 176:6
  187:7
**36**  95:13 96:2,4,8
  96:16
**373**  113:19 164:12

[4 - advisor]

**4**

**4** 47:24 48:3 91:4
96:9,12,17 97:13
107:14 108:8
113:13 117:4
119:4 130:23
144:20 187:8
**40** 7:18 138:18
142:16
**43** 159:15,16
**43,655.44.** 138:16
**45** 72:11
**47** 187:8

**5**

**5** 93:12,15 108:8
117:4 130:23
187:9,19
**50** 6:19 7:14,18
118:13 141:9,10
141:14 142:7,8,9
142:12 144:13
145:11 176:25
**500** 21:3 126:6
**505** 75:13,17 76:2
**505b** 75:5
**50th** 44:6
**51,495.67** 140:17
**53** 122:11
**55** 94:22 95:23
**56** 95:17,19
**58** 95:24 96:2

**6**

**6** 7:5 11:2,8,21,22
97:24 98:7 111:4
111:8 117:5
119:16,18,21
181:22 187:10
**60** 6:19 7:14 75:11
75:19 176:25
183:25

**61** 95:17,19,24
**62** 95:15,16,17
**6:49** 39:10
**6e** 108:8 130:23

**7**

**7** 1:18 2:4,9 81:6
86:25 95:18
103:12 119:16,21
128:24 129:11
133:16 135:14
136:18 141:17
142:16 144:14
176:18,20,22
181:22 187:11
**70** 6:19 7:16 169:2
176:25
**7006** 2:14
**77** 100:20 111:6
**78** 93:19

**8**

**8** 1:10 119:21
120:3 131:16,21
134:7 135:11,18
149:25 150:9
159:7 161:19,20
181:22 187:12
**80** 7:16 176:25
**83** 17:9
**850** 2:13
**87** 17:10
**8th** 3:5 127:24
159:5 188:19

**9**

**9** 119:21 139:24
140:7 146:20
150:10 159:15
161:20 181:22
187:13
**90** 48:10 82:17
83:22 92:23

**93** 187:9

**a**

**a.m.** 1:11 3:4
11:15,19 90:21
**aaron** 25:17,19,25
26:10 31:4,7 32:9
56:18 57:3 59:3,4
59:10,18 99:2,7
102:11 103:17
104:12,16 105:3
105:13 106:7
109:24 110:18
112:15 124:2
129:18 135:23
139:8 143:14
156:3 157:15
160:16 181:4
182:3
**ability** 9:25 10:5
**able** 53:7 78:6
79:11 136:13
138:3 144:25
163:11
**absolutely** 82:6
167:3 180:3
**abundance** 132:20
142:21
**accepted** 102:23
**access** 115:23
119:6 124:16
**accidently** 125:13
**account** 37:25
38:24 52:15 63:19
64:17 65:3 66:19
72:6 91:6,8 92:11
92:16 147:2
172:20
**accountancy** 17:8
**accountant** 18:16
70:22 80:6 168:4
169:9,10 172:23

172:24 173:9,19
173:23 179:2
**accountants** 21:5
21:6,7,8
**accounting** 22:21
63:21 168:17
170:2 172:13
**accounts** 69:21,22
**accrual** 70:20
156:4,9,17,19
163:2
**accruals** 156:25
**accrue** 69:2
**accrued** 78:23,25
79:6
**accurate** 10:6
136:11,12
**accurately** 10:2,9
136:24
**accustomed** 53:9
**act** 19:15
**action** 4:8 188:15
**activity** 63:22
80:12
**actual** 109:17
137:7 165:23
173:3
**add** 85:21 140:16
**addition** 155:25
**additional** 163:18
**address** 6:6,7,8
169:4 180:10,19
**addresses** 162:20
**administer** 4:6
**administrative**
77:17 78:7,10
81:8
**advising** 22:20
53:2 61:11
**advisor** 17:24 18:7
21:5,6 34:7 36:23

[advisor - aronsson]

37:7 39:8 40:20
41:20 43:2 48:9
48:21 49:5 70:22
165:21,22 168:4
**advisors** 62:4,5
**affairs** 14:6 55:20
111:18 112:5
**affect** 184:19
**affidavit** 48:25
49:7
**affiliated** 42:3
**affiliations** 4:13
**afternoon** 165:16
**agent** 90:2 91:7,20
91:21,24
**ago** 153:12 166:4
**agree** 3:14 59:12
91:6 96:16 100:22
107:13,17
**agreed** 143:8
179:12
**agreeing** 179:9,25
**agreement** 55:13
61:8 67:25 78:6
91:22 127:23,25
175:13
**agreements** 128:8
128:16,18
**ahead** 40:8 122:20
**aircraft** 97:15
119:5
**alive** 114:5
**allegations** 40:24
**alleged** 81:5 156:7
**alleging** 83:18
**alliance** 2:3 4:20
6:13 10:23
**allocated** 141:16
**allocating** 117:25
**allocation** 145:11
152:3

**allocations** 145:25
**allow** 12:20 38:23
65:2 87:11
**allowed** 80:12
81:20
**allows** 82:15,17
162:4 175:22
**amend** 89:7 125:3
**amended** 125:19
**amendment** 60:7
**amendments**
55:21 112:6
**amount** 13:9
81:22 96:5 118:12
133:8,9 134:17
137:25 138:12
159:11,15 183:17
**amounts** 51:22
132:19 134:23
138:4,9 156:14
**analysis** 68:6 83:4
84:3 87:19 89:18
92:25 95:2 96:19
105:9 107:20
115:18 168:10
**analyzed** 168:14
**analyzing** 80:18
82:4
**andersen** 17:9
**annoys** 167:15
**answer** 8:20 9:11
9:19,21 24:21
26:22,24 27:12
28:12 29:11,11,13
29:17 36:11 38:17
53:16,21 54:12
83:20 88:16
101:20 104:18
105:16 113:17
116:8,21 118:2
119:6 120:5

121:17 122:12
130:2 148:21,23
151:18 163:11
178:20
**answered** 34:20
148:25 149:4
177:13 184:12
**answers** 8:5,23
130:20
**anticipate** 47:16
50:19 52:9 54:16
55:6 59:25 61:19
61:21 63:25 67:16
76:4,24 79:21
106:15 157:13,17
**anticipated** 60:5
60:11 62:9 68:15
**anticipates** 78:16
**anybody** 83:24
145:16
**anymore** 116:9
142:11 164:15
**anyone's** 161:15
**anytime** 41:14
**anyway** 69:16
**anyway's** 70:8
87:6 163:23 164:2
**apartment** 101:6,9
102:6 114:17
115:2,7 146:21
150:4
**apologize** 35:2
56:22 167:9
**apparently** 28:19
174:21
**appear** 100:20
**appearance** 4:16
**appearances** 4:12
**applicability**
148:6,15

**applicable** 107:11
**application** 48:2,7
48:18 49:2 175:21
181:7 187:8
**applies** 53:17,22
103:22
**apply** 118:2
**appointed** 22:13
**appreciate** 35:4
**approach** 22:20
**appropriate** 73:14
113:8 114:7 153:9
**approval** 70:16
**approved** 62:10
64:22
**april** 1:10 3:4,5
137:22 159:5
188:19
**arbitration** 171:4
**areas** 12:11 22:12
22:21
**arena** 19:4
**argue** 170:8
**argument** 117:21
144:6
**aronsson** 2:5 4:18
4:18 6:2,12 7:4,13
10:12 11:12 12:9
26:20,25 27:13
29:18 32:11 34:21
35:6 47:22 48:5
83:11 88:13 90:18
93:10,17 97:6
99:22 103:5,6
111:2 128:22
129:7 130:5 131:2
131:5,9,23 139:18
146:6 147:13
154:17 164:14
187:19,20,21

**[arrange - back]**

arrange 163:15
arrangement 54:20
arrive 136:8
arthur 17:9
articulated 143:22
ascribe 144:2,15
ascribed 118:17 141:25 149:24
ascribes 120:22 121:7
ascribing 142:22
asia 2:3 4:20 6:14 10:23
aside 15:22 47:5 67:7 83:17 161:9
asked 36:8 47:19 53:23 56:15,21,22 64:20 110:7 151:21 152:19 172:25 178:6
asking 13:17,19,20 34:14 67:18 98:22 101:2,18,21 102:2 105:15 148:12,17 149:12 151:4,5 153:5 156:11,12 156:13 162:22 170:23 181:14
asks 108:11,17,18 113:14 115:13 120:4 121:16 122:11 151:14
aspects 166:9
assenting 37:9
assessment 101:14
assessments 153:7
asset 78:3
assets 88:2 94:2 104:7 111:16 120:23 128:12

164:9 170:15,17 170:19 171:5 178:17,17
assigned 74:24
assist 52:18 86:17
assistance 45:11 55:18 61:9 73:16 80:17 82:8 84:23 85:18 86:6 88:21 112:3 171:12,15
assisted 15:19 51:9,12 109:14 112:10,11 113:3 141:4
associated 66:20 117:2
association 107:9
assume 9:6 92:20 92:24 173:18
assumed 150:13 153:15 154:3
assuming 28:15 50:23 72:13 118:21
assumption 143:10
attach 69:14
attached 79:16 168:18
attachment 129:9 129:21 130:8 140:11
attempts 120:24
attend 45:13
attended 45:14,16 47:11
attending 4:11 46:14
attention 105:20
attorney 2:17 4:17 6:12 9:18 13:5

23:9 28:8 182:10
attorneys 2:3,9,13 14:16 15:6,16 25:8 32:3 40:21 46:23 47:6 98:9 98:21,24 99:6,14 104:24 106:20 109:23 142:3 147:3 178:3,3
attributed 138:4
audible 8:24
audio 3:12,12
audit 75:13,18,20
auditing 22:21
aught 149:22
august 17:10
aulet 2:10 5:3,3,12 9:17 12:4,6,24 13:6 24:20 26:16 26:23 27:11,13,16 28:7 29:19 34:10 37:16 39:5 46:20 57:22 58:18 61:4 64:14 66:13 77:4 78:21 79:22 83:7 83:13 84:25 85:8 88:3,8,16 91:9 92:2 93:5 95:9 96:10 97:2 98:15 99:23 101:17 102:8 103:24 104:13 106:18 108:21 111:22 112:22 113:24 118:4 122:18 126:3 127:7 129:4 129:25 130:16 131:6,11 132:11 133:18 141:18 148:20 149:7 152:11 157:20

164:16 165:3 166:12,22 170:12 170:22 177:25 184:24
authored 26:13 27:9
authorities 75:11
authorization 48:7 48:19 49:3
authorized 4:6
automobiles 115:16,16
available 135:2 137:16 160:22
avoid 69:16
avoidable 82:9 83:2 84:13 171:17
aware 25:17 30:19 88:6 90:8,10 114:24
awful 47:11 168:23,24
awfully 88:4
awhile 85:9

**b**

b 2:6 5:21 6:5 7:5 11:2,22 75:13,17 76:2 94:17,20,21 94:23 95:12 96:13 187:2
baby 19:25
babysitting 19:10
bachelor 17:7
back 7:18 11:19 13:20 27:6 29:24 34:3 41:5 49:13 55:12 69:25 71:16 82:16 90:25 91:4 95:17 103:7 111:23 112:13 114:4 127:11

**[back - bullet]**

131:7 140:4 159:7
159:21 162:10
165:12 167:14
173:2 181:15
**background** 17:2
153:6 159:21,22
**balance** 69:20
**bank** 37:25 52:15
64:21,24 65:6
69:18 91:6,16
158:7
**bank's** 91:18
**bankruptcies**
164:5
**bankruptcy** 1:2
3:20 20:11,22
21:13,24 22:6,11
32:25 38:15 39:19
39:22 44:6,7,7
51:2 64:25 74:13
75:4 77:15,24
80:4,13 81:2,23
82:15 83:23 90:3
115:2 168:7,22
177:17 178:11
**base** 59:9
**based** 27:16,21
28:23 63:5 72:25
87:14 158:5 159:2
**basic** 129:16
**basically** 37:9
39:11 155:13
**basis** 37:14,21
66:25 69:7,8
73:10 80:11 81:7
81:8,8 90:7
123:12 143:9,23
145:9
**bates** 32:15 35:9
129:2 140:8
147:17

**beach** 122:14
**bearing** 76:9,9
**bears** 32:15 140:8
**beast** 42:18
**beautiful** 164:20
**beginning** 4:16
180:12
**behalf** 12:23 21:7
21:8 38:21 108:11
108:15 117:6
118:14,23 130:24
132:17 133:12
144:10 145:15
152:23 155:17
184:11
**behest** 182:16
**believe** 24:4 45:2,5
50:18 72:14 99:19
100:7 144:21
160:12 162:21
167:4 175:7
**believes** 27:19
**belong** 102:23
119:23 160:7
**belonged** 101:15
102:6 103:14
**belonging** 104:8
**ben** 13:5 14:16,21
24:5
**beneficiary**
121:25
**benefit** 124:3
**benefitting** 149:18
**best** 13:2 28:9 52:4
56:10 60:9,14
137:2 145:20
184:13
**better** 86:23
103:25 171:14
**beyond** 14:13
38:18 53:13 116:7

119:8 121:2
**big** 34:4,15,16
35:20 52:23
**biggest** 19:4
**bill** 45:19 72:12,23
73:6
**billed** 67:13,14,16
**bills** 19:14 55:3
72:3 122:4 146:24
**binders** 69:14
**birnbaum** 2:17
**bit** 14:20 17:2
21:25 24:3 46:17
139:16
**biweekly** 66:25
**blood** 188:15
**blue** 131:13
**bookkeepers**
52:16 53:14,18,19
53:20,25 66:19
**books** 82:8 84:12
84:14,18 92:18
171:16,20 172:17
**boston** 17:6,6
18:16
**bottle** 34:25 42:8
164:21
**bottom** 49:11
105:19 132:9
145:19 162:3
**bought** 101:23
117:18
**box** 2:14
**brain** 93:8
**break** 9:9,12 85:9
85:15 139:19
**breakdown**
160:10
**breakdowns**
163:19

**bridgeport** 1:3
2:14 3:21
**brief** 90:22
**briefly** 14:21
65:24 128:5
**bring** 163:24
**broad** 7:21 22:9
**broadly** 109:5
115:13 132:8
**brought** 40:3,20
167:17 168:3,19
**brown** 2:8 5:4
15:21 23:10,16
24:6,8,18 25:8
26:5,6,10 30:9
31:20 32:3 38:10
38:12 39:2,16
43:23 49:24 56:13
57:4 58:25 59:6
59:10,17 64:20
83:18 98:25 99:6
102:11,17 103:18
103:18 104:10,16
104:17 105:7,12
106:6 109:24
112:14 123:25
126:7,14 139:7
156:2 157:15
175:17 178:7
181:3,5
**buckets** 19:3
21:19 155:14
**budget** 61:10,23
61:24 62:2
**budgeting** 42:10
63:16 86:15
**budgets** 42:13,13
**build** 78:2
**building** 113:16
**bullet** 55:17 61:7
92:19 112:3

Veritext Legal Solutions
866 299-5127

PAX-014-053

[bullet - certain]

114:16 171:10
**business** 6:7 22:10
41:21,24,25 42:8
42:11,22 43:3
167:19 178:21,22
184:20
**businesses** 19:5
**button** 162:7
**buying** 117:23

**c**

**c** 2:2 3:1 4:1 5:1,21
6:1 7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1,9,10
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1,17 95:1

96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1,7
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:2 188:2
188:2
**calculates** 69:10
**calculation** 151:3
**calender** 72:7
**call** 19:10 31:18
45:18 79:11 102:4
104:25 163:4,7,9
166:5,16 170:18
178:3

**callable** 144:5
**called** 5:21 20:18
41:8 89:22
**calling** 145:7
**calls** 25:11,15
58:24 93:6 143:15
178:23,25 181:19
**camera** 8:11
**cancelled** 158:7
**capabilities** 18:2
**capital** 126:8,20
179:14,15,25
**car** 116:3,17 117:9
**care** 67:6 79:4
**career** 47:12
**cars** 97:14 117:19
**case** 1:6 3:22 6:17
15:24 33:21 41:19
41:22,23,24 42:19
43:3,4 44:3,13,14
48:10 49:15 50:22
50:23 51:2,5,20
52:10 54:17 55:8
55:11,16 56:10
59:7 60:9,14
61:22 62:9,19
64:2 66:5 67:4,17
68:12,21 69:2
70:4,7,9,11 71:5,6
71:19 73:11,25
74:2,7,11,19 75:9
75:14,22 76:22
77:21 78:5,25
79:5 81:6 82:24
84:7 86:4,25 90:6
93:20 107:24
111:5 131:24
164:7 167:18,25
169:8,24 170:9
172:10,10,13,15
172:15 173:12

175:17 176:5
177:3,6,18,23
178:5,5,23 179:10
179:13 182:12
**cases** 21:2,4 40:16
41:25 64:10 90:5
92:8 161:24
163:10 164:11
166:7,18 169:14
172:6 176:14
177:17
**cash** 36:14 37:10
37:19 42:12,13
61:10 62:12,13,23
63:15,15,22 69:9,9
69:21 78:18 79:2
79:3 86:18 87:13
121:19,22,24
152:21 157:5,10
171:6
**catch** 88:25 89:2
89:14,15 156:16
**categories** 7:21
118:24 136:2,23
137:25
**categorization**
137:9
**categorized**
155:24
**category** 138:4
**cats** 89:12
**caution** 46:21 83:7
132:20 142:21
**caveat** 89:3
**cc'd** 26:12 27:10
**cell** 3:10 167:8
**cellphone** 176:10
**cellular** 3:8
**cents** 87:18
**certain** 40:17 94:3
113:22 174:6

Page 6

PAX-014-054

[certainly - concurring]

certainly  22:3
  62:20 72:20 84:3
  91:11 102:14
  106:19 109:8
  112:10 124:7
  140:25 166:8
certification  17:20
  17:23 18:9
certifications
  18:12
certified  17:23
  18:4,6 165:19
  166:15
certify  186:4,8
  188:8,13
chain  32:17 35:11
  38:6 103:21 104:9
  129:10 131:15
  139:23 147:9
  151:14 187:6,7,11
  187:12,13,14
change  146:11
changed  139:4
  146:4
changes  43:24
  44:10
changing  139:3
  144:22 153:8
chapter  1:5 21:2,3
  55:3 70:3 74:19
  81:6,6,11 86:10,22
  86:24,25 115:3,4,8
  164:4 166:7,18
  167:5,18 169:23
  176:17,20,22
charge  160:5
chart  136:18
  137:14 153:3
check  73:3 110:18
  134:23 138:8
  152:21 158:7,10

158:10
checked  64:24
  141:5
checks  66:20
chinese  174:22
chooses  76:6
cia  18:13
cira  18:7,14,15
circulate  32:4,8
circulated  88:7
circumstances
  15:25 33:13 60:6
  73:14 114:8
cite  164:7
citizens  65:6
city  58:8 146:22
civil  11:2
claim  52:20 80:19
  80:24 81:3,5,16,21
  168:13,16
claimed  125:5
claims  52:24 54:8
  81:7,10,12,25 82:5
  82:11,18 88:2
  90:2 168:10,14
  171:18 175:15
clarification  96:15
  97:3
clarity  119:20
cleaning  145:5,15
clear  24:12 28:18
  39:14 98:10
  101:21
clearly  56:18 79:2
  141:3
clerical  55:5,7
client  4:23 5:2
  30:8 34:5,6 35:21
  36:23 37:6 38:3
  39:8

clients  18:25 19:13
close  70:5
closure  75:15
clothes  103:12
club  122:13
code  75:4 80:13,14
  82:15
cohn  2:17
collateral  42:14
colleague  45:5,15
  100:25 129:20
  146:14 181:18
colleagues  13:7
  30:18 31:24
collect  13:13 177:9
college  17:6,6
  18:16
column  136:7
combine  72:7
come  50:23 53:14
  54:21 71:16 74:18
  74:20 169:14
  172:6 173:14
  175:9,11
comes  19:15
  100:23 118:8
  167:14
comfortable  176:4
coming  34:25
  62:23 78:18 142:5
  162:10
comley  2:12 5:7
  165:17
comment  36:21,21
  37:8,8,9
comments  112:25
commercial  70:7
commission  157:9
committee  2:13
  5:8 20:19 21:4,5
  62:3 66:23 70:21

70:23 156:6 157:3
  165:18 175:20
common  158:25
communicate  26:9
  30:11 57:11 99:4
  99:5
communicated
  58:16 98:24
communicates
  30:13
communicating
  104:19
communications
  65:14,19 180:4
  181:21
company  89:21
  169:13
comparative
  183:19
compare  110:6
compared  110:6
complete  69:18
completely  74:5
  108:3 168:2
compliance  42:24
complicated  43:4
  52:23
compound  139:2
comprehensive
  89:6
computers  169:5
concerning  12:21
concerns  142:25
  144:11
concluded  185:10
concludes  185:6
conclusion  28:20
concurred  39:11
concurring  37:12
  38:4

**[condition - covered]**

condition  9:25
condo  107:10
confer  158:10,25
confident  175:3,5
confirm  65:2
  86:10,21 114:4
  136:11 158:24
  172:8
confirmation
  20:17
confirmed  70:12
  115:5 143:14
  154:4
conflicts  24:12
confusion  69:17
congress  19:18
conjecture  122:19
connecticut  1:2
  2:14,18 3:21 17:5
  76:13,14,19
  113:20 148:5,14
  149:17 173:19
  176:15
connection  11:5
  15:6 24:19 33:21
  34:8 36:4,9,25
  39:2,18 43:2,25
  46:3,10,18 50:14
  50:25 51:6,20
  57:16 60:2 61:15
  61:19 63:9 64:12
  66:11 68:15 73:19
  76:25 78:17 80:21
  83:5,19 84:14,19
  84:23 85:21 86:2
  87:20 88:15 89:19
  92:15 96:20 97:11
  97:16 98:6,22
  103:8 104:7 106:3
  107:23 109:11
  110:11 112:21

119:18 121:11
124:5 125:23
128:11 134:21
135:20 154:19
155:2 157:18
conservative
  143:25 144:9
  145:21
consider  157:22
  167:20
consideration
  141:22
consistent  183:13
constituency
  21:11,13
consultation  98:17
  126:2 142:3
consulted  64:21
  138:18,18
consulting  88:21
contact  25:3 30:19
  180:13
contacted  23:6,8
contacts  25:4
contained  59:22
  71:14 107:21
  136:24 163:19
contention  28:3
contents  101:8
contested  6:23
context  20:12 22:6
continue  3:13 74:8
  74:16 130:6
continued  16:16
  103:4 153:10
  154:16
continues  68:21
  150:2,24
continuing  17:17
  137:20

controller  169:13
conversation  8:17
conversations  3:8
  27:17 44:5 46:22
  47:6 102:15,16
converted  70:12
copies  69:18
copy  8:14 94:22
  100:21 158:7
copyrights  120:4,6
  120:14,17
corp  74:10
corporate  74:7
corporation  74:7
  74:9,10 75:23
correct  58:19
  62:17 63:10 72:13
  76:23 94:25 95:25
  97:23 102:25
  107:25 108:25
  109:2 114:12
  121:12 134:8,19
  149:15 152:20
  153:21 156:19
  171:20 174:25
  175:2 180:21
  186:9
corrected  134:4
  134:12
correctly  148:22
  149:4
cost  117:2,25
  118:10,13,18
  141:25 142:6,22
  142:23 144:3
  145:3
costly  89:6
costs  144:4
counsel  4:10 5:4,7
  9:12,21 13:6,15
  25:21,24 30:3

43:14 62:3,4
70:21 97:12,18,20
98:12,14 99:19
100:17 124:8
135:22 136:5
141:3 158:11
169:19 171:14
172:2,14 180:11
180:14,24 181:4
182:19
counsel's  182:16
count  118:15
countries  42:6
country  42:22
county  188:4
couple  60:14 92:7
  99:21 110:13
  147:20 164:18
  176:23,23
course  30:21
  52:19 56:16 62:8
  70:24 156:7,8
  169:22 181:7
courses  17:15
court  1:2 3:20 4:4
  5:10,19 6:15,25
  8:11 10:13 13:10
  32:12 35:6 40:12
  45:3 47:22 55:2
  62:10 78:9 87:12
  93:10 101:10
  111:2 128:22
  131:19 147:13
  171:13 175:21,22
  187:15
cover  16:25 107:3
  128:13
covered  13:11
  76:20 83:14 85:19
  89:8 103:9 119:17
  154:18

**[cpe - description]**

**cpe** 17:15,16
**craig** 1:14 3:17 6:5
48:25 151:4 185:7
186:15
**crazy** 161:25
**create** 72:23 157:6
**created** 86:13
133:22
**creator** 141:19,20
**creditor** 42:15
47:14 81:5,13,16
**creditor's** 2:13 5:8
165:17
**creditors** 20:19,19
21:9 67:2 86:16
86:23 171:6
**crises** 52:7
**cross** 138:8
**crosschecked**
136:22
**cumulative** 69:7
134:17,18
**curious** 88:14
**current** 88:17
118:20
**currently** 18:21
88:7 122:9 134:16
171:21
**cycle** 155:6,10

**d**

**d** 81:14 109:22
128:3 186:2
187:17
**data** 162:5,7
**date** 1:10,16 10:18
32:19 35:13 44:20
48:4 67:19,20
71:4 75:12 86:3
87:20 93:15 111:9
129:12 131:17
137:15 139:25

147:11
**dated** 127:24
**daughter** 141:23
143:2
**david** 2:6 4:21
100:4 103:9
**day** 39:9 44:24
45:14,16 46:24
47:8 51:13,14,15
52:4,4 63:16
132:18 155:17
169:21 182:22,23
185:2 186:19
188:19
**days** 14:25 72:11
75:12,19,21 82:17
82:21 83:22 92:23
145:4 183:22,24
**deadline** 81:10,13
**deal** 80:6
**debt** 167:22,23,24
**debtor** 1:7 5:5
16:9,13,15,20,23
20:11 21:5,6
25:16,22 36:15
37:11,20,25 38:3,9
38:22 39:15 42:16
45:13 52:14,25
54:19,25 57:10,10
57:12 58:16 62:15
70:22,22 76:6,8,12
76:21 77:3 78:19
79:23,25 80:4
82:8 84:12,14
88:23 94:4 101:8
101:11,16 108:16
111:18 113:18
114:3 115:15,21
116:5,6,10,12
117:7 118:5,14,16
118:24 120:15,16

120:22 121:7
122:8,17 124:18
125:3,5,12,18
126:23 130:25
132:17 133:13
141:5 142:5,21,23
143:5,12,15 144:3
145:18 147:2
148:13 150:14,18
152:24 155:15
156:6,23 167:6
168:5,25 169:19
171:16 172:2,14
172:19 174:12,19
178:14 180:11,14
180:16,24 181:4
183:3 184:11
**debtor's** 38:23
47:25 48:18 49:2
58:9,11,13 62:4,18
63:4 74:20 79:8
79:20 87:15,25
106:15 108:10,19
108:22 111:16
123:20 141:23
144:10 164:9
166:9,19 167:15
171:20 172:16
175:19 187:8
**debtors** 20:18 42:4
48:6
**december** 74:24
77:7 161:18
**decide** 103:10
**decision** 37:12
39:12 87:14
102:13 141:4
**declaration** 62:19
**declared** 40:18
**deductible** 78:2
79:2,7

**deducting** 79:21
**deferred** 78:3
**defers** 155:9
**define** 82:19
**definition** 72:5
101:5
**degree** 17:7 18:16
45:13 179:5
**degrees** 18:19
**delaware** 176:14
**delayed** 14:19
**department** 19:22
19:22 20:7 22:2
64:23
**depend** 52:11
**depending** 42:8
51:23 78:24 79:4
158:19
**depends** 78:18
168:12 171:25
**depicted** 136:24
**deposition** 1:14
3:12,17,23 6:22,25
7:6 10:16,24
11:22 13:4,21
14:23 15:7,17
16:5,10,11 27:25
28:20 41:12 45:23
49:21 137:20
187:5
**depositions** 40:14
**deposits** 42:9
**describe** 46:17
58:20 155:8
**described** 70:14
103:21 104:10
128:5 136:2
142:10 169:25
**description** 114:7
138:11 187:4

Page 9

PAX-014-057

**[descriptions - due]**

descriptions
136:10
designated 12:2,7
designation
165:23,25
detail 145:8
160:19,23
detailed 27:15
160:10,13
details 135:24
163:6,18
determination
38:5 39:3,12
87:17 101:10
137:5
determine 87:13
156:3
determined 72:25
determining
178:15
develop 67:5
developed 183:20
developing 87:24
development 86:7
difference 38:8
41:23 108:6
different 41:21
42:18 51:22 52:2
77:21 80:5 108:2
108:3,16 144:18
differing 51:22
difilippo 2:22 4:2
digit 110:15,15
digital 120:19
diligence 179:8
dip 14:9 28:24
54:20 61:22 62:14
63:19,23 64:2,4,10
64:16 65:3,11,15
65:19,22,24 66:3,6
66:15 68:2,20

70:16,25 91:6,8
92:11,15
direct 29:10,16
105:20 130:2
directed 28:10
88:23 182:3
directly 104:15
143:11
director 51:4,4
disagree 81:17,19
170:3,4
disbursed 155:16
disbursement 62:9
72:5 117:17
disbursements
52:17 54:4,15,16
54:24 63:16,20
67:2 68:22 73:2
77:14 86:19 91:14
91:15 92:15 137:8
157:10 184:16
disclaimers
111:15
disclose 46:21
83:9,16
disclosed 84:6
161:4,5
disclosing 29:7
118:22 182:14
disclosure 68:25
discovery 40:13
discreet 89:4
discuss 8:13
147:19
discussed 85:23
94:5 98:20 106:19
127:15 130:4
143:7
discussing 132:3
discussion 11:17
15:24 99:15

106:10,21 126:11
139:13 143:13
155:22 165:10
discussions 43:13
43:15 106:5
113:11 137:21
dismissed 70:12
disparity 164:8
displayed 161:4
dispute 28:3 29:19
29:20 130:6
distinct 74:5,14
distribution 136:8
136:14 138:13
distributions
139:6
district 1:2 3:20
divided 141:13
division 1:3 3:21
docket 48:10
93:19 97:7 100:20
111:6 131:24
document 10:20
32:14,15 33:3
35:9,16 48:6,12,15
48:23,24 55:12
93:18,21 94:11
96:25 100:20
101:19 105:19
107:21 109:4
111:5,11 112:9,21
127:18 128:25
131:24,25 135:10
140:9 141:21
146:10 147:16,19
147:21 154:22
155:3
documents 13:9
13:13,16,17,23
27:22 57:8,15,16
57:20 105:11

109:7,12 129:5,8
182:25
dog 103:13
dogs 89:12
doing 7:18 22:18
51:8 60:2 61:19
61:21 78:17 88:17
91:16 157:17
162:13 176:6
182:13
doj 161:10
dollar 154:14
dollars 96:5
125:15 126:8
132:21,22 133:23
133:24 146:20
154:12 159:16,16
159:18 164:12
177:2 183:24,25
double 73:2
110:18 134:23
doubt 114:20
draft 88:7 98:18
107:23 114:19,20
126:13 130:15
136:17 140:24
141:16 142:15
drafted 31:19
43:11,16 112:25
drafter 138:17
drafting 31:22
46:2,5 98:13
103:10 105:22
112:11 124:5
drafts 32:4 62:21
driving 161:24
172:13,14
drop 41:10
due 44:23 45:7
55:3 69:11 70:19
75:7 81:22 179:8

Page 10

PAX-014-058

**[dues - exactly]**

dues  107:10
duly  5:22 186:5
  188:10
duties  41:20 43:2
  43:20,21 50:24
  55:6 91:25 93:4

**e**

e  2:2,2 5:21 6:5
  13:11,23 14:2,4
  15:20 26:9,13,13
  27:9,10 30:19
  32:17 34:3 35:11
  35:19 37:18 38:6
  39:7,9 41:17
  49:22 59:11 81:14
  99:19 104:23,24
  106:9 112:24
  117:5 129:9,10,15
  129:17,24 130:11
  131:15 132:22
  139:23 141:2
  147:9 151:13
  152:9 155:16,25
  160:18 162:19
  163:8 169:4
  173:15 180:8,10
  180:19,22 181:21
  181:25 182:2,4
  186:2 187:2,6,7,11
  187:12,13,14,17
  188:2,2
earlier  68:10 94:5
  100:7
easy  73:2
edits  135:15,16
  140:23
educated  155:22
education  17:18
educational  17:3
effectively  38:4

effectuating  63:20
  91:14
efficient  53:8
efficiently  52:5
eight  166:3
either  42:17 81:5
  101:9 103:16
  104:22 110:17
elapsed  39:11
elect  74:25 75:2,13
  75:18
election  19:18
electricity  107:11
electronic  15:19
electronics  100:24
  119:17
eliminate  131:13
  150:21
eliminated  150:20
  150:22
emphatically
  181:2 183:7
empirical  154:9
employ  14:8 38:21
  48:8,19 49:3
  90:11,17 168:6
employed  18:21
  36:15 37:11,20
  38:9,11,16 90:14
  91:25
employee  28:17
employees  28:22
  29:2,5 42:5,23
  50:20 182:11
employment  38:14
  89:7,8
endeavor  124:10
ended  183:23
engaged  20:11,15
  20:16 24:23 166:6
  179:10

engagement  23:5
  23:7 24:2,10,19
  25:6 26:4,11
  30:12,14 31:16,22
  32:5 34:9 36:5,9
  40:5 43:12 44:2
  45:2 46:3,5 50:15
  51:25 52:2 55:15
  55:16 84:15,19
  171:10 180:2
engagements
  166:17 177:16
english  127:13
  174:21
ensure  73:12
  136:23
entire  79:14,14,18
entirely  79:6
  138:23 139:6
  157:10 172:9
entities  42:3
  179:19
entitled  1:16 48:6
entity  74:5 103:15
  114:24 119:25
  126:22 154:14
  183:10,10 184:4
entries  148:7,16
equitable  113:15
erroneous  125:23
  159:11
erroneously  125:5
  125:14
error  110:22
  161:7 184:13
errors  136:4
escrow  91:7,20,21
  91:22,24
esq  2:5,6,6,10,15
  2:19

essentially  61:2
  158:14
establish  62:2
  81:21 156:17
established  74:13
estate  42:20 53:4
  54:21 62:25 68:25
  70:24 73:17 74:3
  74:14,14,18,21,23
  74:23 76:9,10,14
  77:20,24 78:19
  79:24 80:4,7,8,10
  81:23 83:3 94:22
  107:6 113:19,22
  114:4 147:6 157:2
  175:9,11 181:10
estate's  87:25
estates  74:4
estimate  105:21
estimated  71:13
  106:12
estimates  73:11
estimating  73:7
etcetera  97:14
  120:5
evaluation  114:13
event  68:2
events  103:21
  104:10
everybody  60:21
  75:9 93:7 156:8
  175:18
everybody's  45:2
  69:8
everyone's  46:2
  147:3 162:15
evidence  87:11
exactly  53:7 58:9
  115:4 117:4
  130:22 159:13
  181:25

**[examination - file]**

**examination** 5:25
100:2 103:4
153:10 154:16
165:14 185:9
187:18 188:9,11
**examined** 5:24
**example** 101:3
**excel** 109:3 163:20
**excess** 169:2
**exchanges** 181:25
**excluded** 160:4
**excluding** 125:21
**excuse** 11:10
51:14 123:16
126:12 137:22
153:14 174:23
**exhibit** 7:7 10:14
10:17 32:14,18,21
35:8,12 41:6 43:6
47:24 48:3 91:4
93:12,14 111:4,8
128:24 129:11
131:7,16,21
133:16 134:7
135:11,14,18
136:18 139:24
140:7 141:17
142:15 144:14
147:10,15 159:7
182:6 187:3,3,5,6
187:7,8,9,10,11,12
187:13,14
**exhibits** 187:3,15
**existed** 101:23
179:12
**existence** 57:7
143:17
**exists** 172:7
**expect** 51:7,19
175:16

**expectation**
106:22
**expected** 33:5,13
123:20
**expense** 136:18
159:8
**expenses** 71:13
72:4 77:15,17,18
78:23,25 79:7
105:22 106:12,16
106:23,23 107:2,3
107:9,15 108:10
108:15,20,23
117:6 123:2
124:11 129:22
130:9 133:5,15
134:10 136:24
140:13 147:7
148:7,16 149:17
149:24 152:21
183:4,11,12,22
184:5
**experience** 7:21
20:24,25 64:4,7
82:3 164:4,6
177:16
**expert** 22:19,19
40:11,19 41:2
91:12 165:20
166:16
**expertise** 166:6,17
**expired** 69:15
**explain** 36:24
41:22 70:2 82:13
108:5 132:8 148:6
150:8 159:12
**explained** 37:15
**explanation**
144:15
**explicit** 66:2

**expose** 27:21
**extent** 22:12 60:5
65:4 78:3 83:8
113:6 137:12
143:17,18 146:23
**extra** 100:21
110:15 162:10

**f**

**f** 81:14 109:17,18
188:2
**fa** 41:19
**face** 102:24
**fact** 115:25 182:21
**facts** 15:24 60:5
99:10,13 113:9
114:8 146:15
147:4
**factually** 150:15
**fair** 42:25 53:16
59:20,23 60:22
72:16 78:15 84:21
88:24 94:19 96:9
97:19 103:20
104:6 106:13
130:13 134:20
136:21 145:12
160:9
**fairly** 44:8
**familiar** 7:23
12:10 89:21
**family** 19:15 58:8
103:13 118:9
129:8 132:16
143:18
**far** 6:21 67:14
171:21 173:12
**fast** 139:17
**father** 118:18
143:20
**fault** 73:8

**fear** 28:5,6
**feasibility** 86:8
87:3,7,9
**feasible** 87:16
**february** 45:8
63:14 69:3 72:9,9
77:6 122:22 125:4
129:22 132:17
133:11,12,25
134:3 140:14,14
152:22,23 154:21
154:21 155:10,11
156:15,17 159:9,9
159:19,23 160:7
**federal** 11:2 19:17
19:18 73:17 76:12
79:14,16,18
**fee** 73:13 123:3
157:7,8,9
**feel** 48:11 67:3
**feeling** 41:18
142:2 178:22
**fees** 33:18 53:9
54:24 62:6 68:2
69:8,11 70:21
72:24 77:18,25
156:4,24 163:3
175:4,8
**felt** 132:24
**fiduciaries** 20:17
**figure** 136:5
155:19
**figured** 160:23
162:16
**file** 29:5 38:15,20
40:11 52:25 53:3
74:8,16 75:6 76:6
76:11,11,16 77:23
78:14 81:5,7,16,20
89:6 137:22
163:11 175:21

[filed - francis]

**filed** 3:19 13:9
28:24 42:7,8,9
45:3 48:10 49:7
55:22 62:19 63:14
68:12 69:23 75:8
75:24 76:5 84:4
93:19 100:10
111:5 122:22
125:4,14,18
131:24 135:3
160:21 161:23
167:4 168:16
181:12
**files** 80:10
**filing** 32:24 61:11
63:12 73:23 75:12
82:17 92:23 96:9
96:12 98:23
113:23 132:3,6,18
138:2
**filings** 56:7 73:18
**final** 62:22 87:17
133:15,24 135:17
135:21 136:3
137:24 140:12,20
140:22 141:4
144:8 159:8
183:21,21
**finally** 46:13
162:16
**finances** 61:12
63:12,15
**financial** 14:5 21:4
21:6 22:15 34:7
36:23 37:6 39:8
40:20 41:20 42:25
48:9,20 49:4 54:6
55:20 62:4,5
64:22 111:17
112:5 166:10,19
168:3 178:14

179:6,18
**financially** 4:8
87:16
**financing** 14:10
28:25 54:20
**find** 40:10 117:25
156:18
**finish** 8:19
**finished** 54:11
**firm** 4:3,5 21:24
22:13 24:16 39:18
40:3,25 51:5
52:15 56:2,15
112:15 139:14,14
156:2 172:13
176:9
**firms** 62:7 134:7
**first** 5:22 16:18
19:3 21:23 43:16
43:22 44:6,9,21,24
45:14,25 46:24
47:8 51:13,14,14
51:15 55:17,18
69:23 73:9 75:19
89:3 93:25 94:14
105:3 112:3
122:21 129:23
130:25 139:10
149:14 161:13,14
162:3 180:9 186:5
**fit** 89:13
**fitting** 101:4
**five** 39:10 128:2
128:15 141:8
161:22
**fix** 161:7 184:13
**flavors** 17:15
**floor** 2:4
**flow** 61:10 62:13
62:13 69:21 86:18

**flows** 62:23 87:13
**fluid** 104:20
**flynn** 13:7 30:18
45:6,16 49:15,16
50:5 56:4,24
112:17 129:18,19
149:15,19 150:2
150:24 151:11,14
181:18
**flynn's** 46:10 50:7
151:8
**focused** 44:20
**focusing** 46:6
108:18
**folks** 15:15 25:6
29:24 30:10,14
49:14,24 129:21
**follow** 164:18
**following** 44:25,25
148:7,15
**follows** 5:24
**food** 119:3
**fool** 178:19
**foregoing** 186:8
**foreseeable** 124:22
**forget** 102:19
**forgot** 11:10
**form** 22:16 34:10
37:16 39:5 54:5
57:22 58:18 62:10
64:14 66:13 72:6
72:21 77:4 78:21
80:25,25 81:2,3
84:25 88:3 91:9
92:2 93:5,13 94:2
94:21 95:9 96:10
98:13,14,15,19
102:8 103:24
104:13 106:18
108:21 109:15
110:20 111:22

112:22 113:24
118:4 122:18
125:3,14,16 126:3
127:7 130:16
132:11 133:18,22
134:15 135:3
141:18 148:20
149:7 152:11
156:13 157:20
166:12,22 170:12
170:22 177:25
187:9
**forms** 98:16
**forth** 101:7 112:13
188:10
**forward** 63:17
68:17 69:6 75:14
108:13 134:19
157:4 163:3
**found** 133:22
145:3 146:14,18
150:15,17 182:24
**four** 15:12 19:2,3
19:23 21:18 82:23
161:22 165:25
**foxboro** 6:9
**frame** 34:25
118:23 146:23
154:5
**francis** 25:18,23
26:2,10 30:2,6,7
31:4,8 32:9 56:17
57:3 59:3,5,18
99:2,7 102:11,20
102:21 103:17
104:12,15 105:4
105:14 106:7
109:25 112:15
124:2 129:19
135:23 139:8
143:13 148:4,12

[francis - hampshire]

152:9,13 156:3
157:16 180:9,18
**frankly** 33:12
150:12
**fraudulent** 82:10
82:20 171:18
**free** 48:11
**frequently** 39:20
40:2,5 42:15
64:25 73:5
**front** 15:9 44:18
162:23 180:23
**fuel** 163:24
**full** 19:8 73:10
**fully** 12:20
**function** 87:24
**fund** 2:4 4:20 6:14
10:24
**funding** 127:23
128:17 184:5
**funds** 70:17
108:12 130:23
138:12 155:16
175:23
**furnishings**
100:25
**further** 163:5
184:23 186:8
188:13
**future** 69:23 78:4
78:5,8,12,20 85:3
86:19 87:13
124:22 157:18

**g**

**g** 5:21
**garbage** 61:3,3,5,6
**gas** 107:12
**gasoline** 117:9
**gathered** 29:4
123:17

**general** 88:21
100:15 155:8
163:9
**generally** 13:25
18:24 21:19 22:8
24:2 25:5 36:24
44:12 50:24 55:2
55:14 57:4 66:3
66:23 70:2 73:8
74:24 80:23 82:14
90:12 109:10
110:10 115:6
**getting** 49:23
86:23 135:20
137:21 176:4,8
179:21
**gettr** 120:21
**give** 10:6 14:25
147:24 152:20
153:2 161:6
164:25
**given** 105:14
131:22 134:25
182:11 185:6
186:10 188:12
**gives** 75:11
**glasses** 11:11
**global** 14:6,7
51:10,11 111:7,14
111:24 187:10
**go** 3:14 7:22 11:12
28:2 38:12,13
40:13 44:17 53:6
54:19 90:18
103:25 107:5
111:23 114:4
122:3,20 124:18
139:15,16,19
144:7 156:21,22
164:21 176:25
183:20

**god** 47:14
**goes** 7:18 43:19
79:5 101:6 124:18
156:22
**going** 3:3 10:13
32:12 35:7,8
36:14 37:5,10,19
37:24 39:15 40:8
40:10,10 41:9
44:9 45:5,20 47:3
47:23 52:3,12,22
53:7,13 54:2,3,7,8
54:9 59:2 68:17
68:18,19,21 69:5,6
69:24 70:19 73:23
76:8,18,19 77:6,9
78:22,23 80:5,15
85:8,14 87:2,3
89:5 91:18 92:20
92:23 93:8,11
96:24 106:24
107:12,18 108:13
111:3 115:4
118:22 123:9,10
123:13,23 124:12
124:13,14,17
128:23 129:15,23
131:19 134:19
139:15,16 143:6
147:14 149:2
151:22 155:18,18
155:19,20 156:15
156:16,18 157:22
157:22,24 158:2,6
158:12,21,23
159:3 161:5 163:3
163:14 168:21
169:16,18 170:25
171:5,11 175:10
175:23,25 177:8
181:9

**golden** 2:17 5:16
26:18 27:17,18
28:7,10,14,17,23
29:6 57:23 58:3
179:6,9,12,24
180:5,6,7,10,15,20
181:16,20 182:9
182:15,19,19
183:4,8 184:6
**goldman** 2:15 5:6
5:6 6:20 7:10 27:3
28:4 29:8 85:14
164:17,23,24
165:15,16 184:22
185:3 187:21
**golf** 123:4
**good** 3:2 6:10 44:8
165:16
**goods** 100:25
119:16,19
**graduate** 18:18,19
**graduated** 17:4,6
**gratuitous** 37:7,8
**great** 164:8
**greenwich** 113:20
123:9,14 150:13
152:16 153:16,24
**group** 26:14 113:3
143:7 144:8 153:8
**gtv** 120:20
**guess** 15:8,12 19:3
77:5 127:2,3,6
149:8
**guessing** 66:8
**guidance** 161:6
**guy** 170:24

**h**

**h** 23:16 187:2
**half** 93:7
**hampshire** 176:16
176:24

hand  27:24 32:12
　34:22 47:23 93:11
　110:9 111:3
　117:21 128:23
　130:22 131:20
　146:7 188:19
handing  147:14
happen  47:13 52:3
　52:12 69:3 89:12
　89:13 162:17
happens  80:3
　81:15 82:22
　178:11,12
harassed  143:15
harassment  27:21
　28:5,6
harbach  2:6 4:21
　4:21 23:12 41:13
　59:13 85:16 99:20
　99:25 100:3,5
　103:2 147:24
　152:5 153:11
　165:6 180:6
　187:19,20
hard  127:12
haven  2:18 116:2
　116:15
hazard  15:8
hch  152:22
head  8:24 155:4
heading  11:22
health  121:18,22
　121:24 122:2,8
hear  127:13
　171:14
heard  45:24 82:21
　104:15 127:15,17
　182:9
hearing  45:17
　46:14 47:9 51:15
　123:18,19 127:18

174:15
hearings  46:15
　51:13
heat  107:11
held  1:17 3:23
　11:17 23:2 165:10
help  24:13 46:7
　57:7 137:4
helped  137:9
helpful  14:14
　38:25 137:4 138:8
helping  100:9
helps  169:11
hereinbefore
　186:11 188:10
hereunto  188:18
hey  163:14,24
high  17:3,5 19:10
　19:24 94:14
hill  179:24 180:5
hire  80:5
hired  90:5
hiring  40:25
history  17:3
hit  162:7
hits  73:7
ho  1:5 2:9 3:18 5:5
　11:6 94:4 111:18
hold  18:11,18
　36:14 37:10,19
holding  114:25
home  6:7 107:8,9
　118:19,25
homeowner's
　154:10
homeowners
　107:7
homes  119:5 154:8
honestly  12:21
hope  64:3 100:22
　159:4 171:2

hoping  148:25
　149:3 175:6 177:8
hospital  122:4
hot  59:12
hotel  114:17
hour  15:13
hours  15:11,11
　39:10 67:21
　164:19 166:2
house  101:6
　149:17
household  97:25
　100:24 101:4,15
　102:5 119:16,19
housekeeping
　144:20,23
huh  8:25
human  110:21
hundred  64:9
　138:21 139:4
　141:13 142:22
　143:6,24 144:2
　146:20 168:15
husband  141:12
　142:8 145:14

---

### i

idea  7:19 44:8
　67:23 90:17
　126:24 151:20
identification
　10:17 32:19 35:13
　48:3 93:15 111:9
　129:12 131:17
　139:25 147:11
identified  7:12
　103:22 104:8
　134:7 181:23
identity  26:18
　27:23 28:16 74:8
imagine  54:18
　61:25 66:22

116:25 117:18
　118:9 123:2,5
　173:13
immediately  44:25
impair  9:25
important  8:18
　75:3 132:24 168:6
　172:11 174:7
inadvertent  133:6
　134:6,22
inadvertently
　125:12 132:16
　133:21 134:2
inappropriate
　29:9,16
include  22:18
　80:11 94:16
　107:14 122:15
included  65:14
　125:15 132:23
　133:19 134:2,5,13
　134:23 137:14
　150:25 151:25
　159:11,17 160:11
includes  19:6
　61:23 62:12
including  39:22
　40:14 61:11 70:24
　86:7 115:16
inclusion  125:24
income  52:25 53:3
　53:5 62:15 63:5,9
　73:17,24 74:16,17
　74:20 76:15,17,22
　77:8,11,12 78:8
　79:20 87:25 125:5
　125:16,21
incorrect  125:18
increase  141:8
　142:12,17 145:24

[increased - issues]

increased 142:14 144:13
increasing 141:10 143:23 145:10
incurred 142:6 177:7
independent 63:8 95:6 97:21 114:10 119:13 122:5 123:19 128:7 152:10
indicate 7:2
indicating 135:12 137:18 152:6 161:19 162:11
individual 21:8 24:15 41:2,19,23 43:4 70:4 74:3,4,6 74:15,15,16,17 75:23 77:2,19 164:4,11 183:23
individual's 27:20
individually 79:24
individuals 19:5 42:19 57:8 85:5 158:16
industry 60:17,21
inform 124:3
information 12:20 22:16 24:16 29:3 29:7 30:22,24 31:3,9,12 58:10 59:6,16 69:24 85:7 94:4 98:11 99:11,17 104:11 105:3,7,12 110:6 116:9 124:10,14 124:16,20 127:5 133:2 135:2 136:13 137:3,12 137:19 138:3,7

139:7,12 145:2 146:10 152:10
153:3 155:13,14 156:20 157:14 158:20 174:4 176:3 177:22 183:19,19 184:9
informed 44:2 99:13 103:16,18 103:19 104:16 180:11
informs 127:5
initial 140:23 141:20,21
initiated 25:12
input 43:21 59:6 72:22 114:22
inputting 162:4
inquire 153:23
inquiries 51:16
inquiry 161:9 163:16
insiders 82:19
insolvency 17:24 18:5,6 19:4 21:24 165:19 166:16
instance 62:3 89:9 138:15
instances 40:19 164:6
institutions 64:23
instructed 43:7,9
instructing 26:21 26:23 27:12
instruction 29:10
instructor 18:5
instructs 9:21
insufficient 8:25
insurance 69:14 107:8 117:10 121:17,18,22,24

122:2,8 146:4,12 146:19 148:8,17 150:3,4,11,12,16 150:17 152:15 153:24 154:7,10 158:21,22
intellectual 120:7 120:13,15,18
intend 171:24
intended 32:25 34:19 40:4,6 62:7 89:15 110:20 125:19
interact 16:23 22:3
interaction 146:17
interactions 15:2
interest 20:22 53:11 77:20 80:3 87:12 113:16 119:10 120:7,18 121:16 147:5
interested 4:9 22:15 41:17 49:10 151:3 178:4 188:16
interests 101:11 115:13
interfere 3:11 10:5
interference 3:9
internal 25:6 80:14
internally 13:10
interpreter 127:14
interrelated 113:7
interrupt 41:8
introduce 174:16
investigate 102:14 105:17 110:25 113:10 124:17 168:19

investigated 101:22 110:11,24
investigation 40:7 40:9,22 59:16 63:8 95:7 97:22 102:9 108:24 115:6,18 119:14 119:22 128:11 157:18 158:9 179:15 183:15
investigations 114:11
investment 177:4 177:6
invoice 158:8
involved 20:7 31:21 49:15,17,20 50:21 52:24 53:4 55:24 56:6,20 57:24 59:7 65:10 65:18 90:9 100:8 101:13 105:22 109:6,9 132:4 178:7 179:21
involvement 115:9
iphone 103:11
irrespective 70:19
irs 76:19 89:10
irve 2:15 5:6 164:24 165:16
island 176:15,21
issue 27:23 73:6 75:10 82:23 124:23,23 150:5
issued 54:7
issues 18:3 27:24 40:24 44:8 52:6 53:15 72:3 110:11 147:20 174:6 182:12

**[item - know]**

**item**  55:5 61:16,20
63:11,18 64:13
66:12 68:6,16
73:15,20 80:16,21
82:7 83:6,19
84:11,24 85:18,22
86:2,6 87:7,21
88:15,20 89:19
91:5 92:19 94:14
94:15,16 95:4,7,23
95:24 96:2 97:11
97:13 103:11,12
103:13,14 104:2,2
111:20 113:17
127:22 142:14
144:12,20 146:12
152:4
**items**  89:16 96:21
97:24,24,25 98:7
99:12 101:3,12,15
102:5,22 103:22
107:13 119:16,18
119:23 121:8,11
132:7 136:19,25
137:13 160:11
163:6,19

**j**

**j**  2:10,15 5:21 6:5
**jalbert**  1:15 3:1,18
4:1 5:1 6:1,5,14
7:1 8:1 9:1 10:1
10:14,16,19 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1,13
32:18 33:1 34:1
34:23 35:1,8,12

36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1,24
48:1,2,11,25 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1,12,14,22
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
111:4,8 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1,24 129:1,11
129:14 130:1
131:1,16,20 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1,24 140:1,7
141:1 142:1 143:1
144:1 145:1 146:1
147:1,10,15 148:1

149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1,7 186:15
187:3
**jam**  1:6
**january**  161:18
**jo**  13:8 31:25
49:16 50:9 56:5
56:24 112:17
**joint**  86:13
**jon**  2:22
**jonathan**  4:2
**judge**  29:9,13
87:16
**judges**  22:14
**judgment**  37:22
102:4 136:15
**june**  17:9
**justice**  64:23
**justify**  148:15

**k**

**keep**  41:2 52:16
59:14 107:12
124:17
**keeping**  42:11
**keith**  20:6
**ken**  9:17 13:6
14:16,21,24
**kenneth**  2:10 5:3
**kept**  7:17 162:10

**keypunch**  98:19
**keypunched**  98:16
**kids**  118:15
138:25
**kind**  20:22 88:24
116:17 118:17
122:12 134:22
**kings**  188:4
**knew**  45:20 105:6
113:9 178:16,18
182:22
**know**  7:16 9:10
22:4 30:12 31:7
31:17 33:19 34:13
34:18 36:7 38:16
38:16,22 39:13
41:4 43:18 47:3
50:3 52:3,21,22
53:9 57:23 58:2,3
58:12 60:4,9,25
62:21 64:9 65:16
66:3,5,23,24 67:6
72:19,23 76:7,17
77:7,10,12,13
79:10,12,13 80:14
83:23 84:5,10
86:14 89:9,11,20
89:25 90:4 103:25
104:3,4 107:10
109:19 111:24
115:3 116:3,3,4,5
116:5,14,17 117:8
117:8,10,20 118:7
120:21 121:13
122:23,24 123:3
125:8,13,20
126:20 127:12
145:15 150:11
151:18,21 152:2
152:13 154:7
157:21 159:3,21

**[know - llp's]**

161:2,15 166:21
168:11 169:4,5,17
170:13 171:7
172:16,19 173:7
173:20,25 175:5
176:2 177:3,7
179:11 181:8,9,11
181:22 182:5,12
182:18,20,21
184:7,18
**knowing**  29:4
**knowledge**  12:15
12:19 41:3 59:9
62:17 63:3,4
91:10 102:10
121:15 122:7
123:17,20,22
126:9 127:20
128:7,21 133:20
140:12 152:10,20
154:9 158:3
172:21 174:18
184:15
**knows**  47:14
**kwok**  1:5 2:9 3:19
5:5 11:6 25:21,24
32:16 35:9 94:4
102:6,23 103:14
104:9 111:18
119:24 122:16
129:2 138:23
139:2 140:8 143:2
147:17
**kwok's**  30:3
119:10 145:17

**l**

**l**  5:21 6:5 23:16
186:2
**lack**  63:5
**lady**  119:7,10

**lago**  122:13 124:4
124:21
**lamp**  126:8,20
127:16,20 179:14
179:15,24
**land**  113:16
**language**  114:23
**large**  30:20 59:8
78:5
**laura**  2:5 4:18
6:12 103:3,6
**law**  22:13 39:18
112:15 134:7
**lawyer**  43:18 46:8
86:20 102:17
113:25 138:20
139:14 178:23
**lawyer's**  40:7
**lawyers**  22:20
25:12,14,16 39:21
51:17 82:18 95:5
96:23 102:7 110:8
125:17 126:2
128:6 132:24
136:16 139:14
150:20 155:23
158:3 159:2
170:18 172:22
174:6
**lead**  51:5
**learn**  30:5,7
**leave**  152:24,25
**leaving**  41:11
**left**  102:7 144:4
**legal**  2:22 101:8
105:9 106:6
113:15 114:7,25
153:8
**legally**  76:2
168:14

**legitimate**  160:5
**lenaya**  1:19 4:5
188:6,21
**lenders**  20:20 21:7
**lengthy**  58:24
**letter**  31:16,22
32:5 43:12 75:13
76:3
**level**  53:12 72:25
94:14 149:23
**levels**  59:5
**liabilities**  30:23
94:3 111:17
164:10,12
**liability**  157:5,6
**life**  169:23
**likelihood**  82:4
**limitations**  111:15
**limited**  5:17 90:7
163:9 178:17
**line**  5:13 44:18,18
61:15,20 63:11,18
64:12 66:12 68:5
68:16 73:15,19
80:16,21 82:7
83:6,19 84:11,24
85:17,22 86:2,6
87:7,21 88:15,20
89:16,19 91:5
92:19 94:14,16,22
95:3,7,13,15 96:2
96:16,21 97:11
99:12 103:12,13
111:19 132:7
136:19,25 137:13
146:12 152:4
159:14,15 163:6
163:19
**lines**  95:19 104:4
126:18

**liquidate**  171:5
**liquidated**  88:2
**list**  7:17 53:6
64:22 87:6 90:4
107:4 154:4
155:19,20 157:24
159:23 172:7
173:4
**listed**  12:3 72:19
108:12 111:25
114:14 122:12
128:3
**listen**  124:7
**listened**  123:15
**listing**  108:13
160:23
**litigation**  19:6
22:4,7,11,11 40:6
77:9 81:25 82:5
85:19 88:2 127:23
128:15,17 170:19
170:25 175:14
178:18
**little**  14:19 16:25
21:25 24:3 46:17
89:12,12
**live**  146:22 150:18
**lives**  118:15
149:16,22
**living**  114:8
129:22 133:15
134:9 136:17
140:13 153:17
159:8 183:3,11,12
184:5
**llc**  2:12 75:24
126:21
**llp**  1:18 2:3,4,8
3:24
**llp's**  10:24

**loan** 63:23 64:2
65:11,15,19,22,25
66:6,15 68:2
70:16
**loans** 64:5,10 66:3
**located** 3:24 101:5
113:19
**location** 123:21
**lodge** 101:17
**long** 15:5 137:18
139:15 160:20
165:22
**look** 31:25 35:15
40:8 48:11 82:16
111:23 152:15
174:7 178:13
**looked** 13:22 70:7
133:16 136:14
163:21 173:22,25
174:8 181:21
**looking** 14:3 22:14
22:16 69:17
136:17 142:15
154:22 162:20
172:4 175:18,23
175:24
**looks** 107:5 132:5
**loose** 132:7
**lose** 75:19
**losses** 78:12
**lot** 42:10 47:11
68:18 69:24
104:25 112:13,14
122:3 127:8
168:23,24 178:18
**lots** 99:13,14
106:21 113:10
167:19 169:21
178:2,2
**low** 53:12

**lowey** 1:15 7:9
10:25 13:24 15:16
17:12 18:22,25
20:6,10,15 21:16
21:21 22:24 23:6
23:18,25 24:17
25:7 26:3 30:13
31:15 36:8,18
37:3,24 38:21
39:4,17 43:7 48:8
48:20 49:4,18
50:2,15,20 56:19
57:2 58:15,21
59:15,25 61:15,19
64:12 65:9,13
66:10 67:13,24
71:12,18 72:17
73:19 76:10,25
78:16 80:20 82:4
83:5 84:17,22
85:25 87:20,23
93:3 94:6,10 95:3
96:20 97:10,16
98:6 99:5 100:8
101:13 102:3
109:6,11 112:16
112:17,20 122:15
124:9 125:22
128:10 135:20
136:22 144:21
149:11 163:17
**lowey's** 12:15,22
44:13 55:15 67:9
106:3 111:20
112:8 134:21
135:16 140:23
**lp** 4:20
**lunch** 123:4
**luxury** 115:16,23
116:13

**lynch** 1:19 4:5
188:6,21

**m**

**macdonald** 49:19
**maid** 118:8 145:4
145:4 158:24
**maids** 145:4
**mail** 26:9,13,13
30:19 32:17 34:3
35:11,19 37:18
38:6 39:7,9 41:17
104:24 106:9
129:9,10,15,17,24
130:11 131:15
139:23 141:2
147:9 151:13
152:9 160:18
162:19 169:4
173:15 180:10,19
181:25 182:2,4
187:6,7,11,12,13
187:14
**mails** 13:11,23
14:2,4 15:20 27:9
27:10 49:22 59:11
99:19 104:23
112:24 163:8
180:8,22 181:21
**main** 2:13 25:2,3
163:12
**maine** 176:17,23
**maintain** 17:25
54:3 91:7 92:10
**maintained**
156:21
**maintaining** 63:19
64:16 91:5
**maintenance**
107:8 144:22
145:6 158:23

**major** 19:3 67:2
89:15
**makenzie** 2:6 4:24
34:21 146:7
**making** 73:11
101:14 102:3
113:3 153:7
167:13 184:10,16
**manager** 50:8,13
**managers** 50:16
51:19
**managing** 51:4
70:16
**mandarin** 57:18
174:20
**mar** 122:13 124:4
124:21
**march** 23:22 45:8
72:10,10 73:6
122:25 134:15
137:22 155:17,18
156:16,18
**mark** 7:6 35:7
131:9
**marked** 10:16
32:13,18 35:12
47:24 48:2 93:12
93:14 111:4,8
128:24 129:11
131:7,16,20
139:24 140:7
147:10,15
**markedly** 41:20
**marking** 10:13
**marriage** 188:15
**married** 142:25
**mary** 13:8 31:24
49:16 56:4,24
112:17
**massachusetts** 6:9
176:13,16,22

PAX-014-067

[materialize - monthly]

**materialize** 52:7
**materializes** 60:12
**materials** 150:19
**matt** 45:6,15 46:9
  49:15,15 50:4,7
  56:24 112:17
  129:18,19 154:4
  160:17 181:18
**matter** 1:16 3:18
  6:23 20:8 41:9
  43:8 46:4 49:17
  50:21 51:6 53:12
  67:13 76:5 81:25
  90:9 115:25 129:2
  145:4 147:17
  151:23 160:25
  174:10 188:17
**matters** 7:2 14:2
  40:2 88:22 98:20
**matthew** 13:7 56:4
**mcdonald** 15:18
**mckenzie** 131:2
**meals** 141:9,10
  144:15
**mean** 17:16 21:9
  39:24 44:23 60:14
  83:12 86:8 87:9
  96:11 110:4
  116:14 130:19
  138:14 149:2
  175:14 177:19
**means** 8:3 82:14
  144:3 151:2
**meant** 22:7 63:12
  159:12
**media** 3:16 120:19
  120:23,24
**mediation** 171:3
**medications** 10:4
**meet** 16:15 45:22
  72:5

**meeting** 16:16,17
  45:14,15 46:16,25
  47:13 51:15 69:5
  116:2 123:15
  126:13 127:10
**meetings** 46:19
  47:12
**melissa** 25:18,23
  26:2,10 30:2,6
  31:4,8 32:9 56:16
  56:17 57:3 59:3,4
  59:10,17 99:2,7
  102:11,18 103:17
  104:11,15 105:4
  105:13 106:7
  109:25 110:18
  112:15 124:2
  129:19 135:23
  139:8 143:13
  148:3 152:12
  156:2 157:16
  160:16 174:5
  180:9,17 182:3
**member** 55:7
  172:12
**membership**
  122:13,17 124:5
**memories** 113:12
**memory** 66:2,9
  115:22 127:8,9
  141:20 159:17
**menial** 170:2,7
**mentioned** 14:15
  15:15 18:4 19:24
  22:23 24:11 25:23
  29:25 49:14,19
  54:14 57:3,14
  60:13 73:22 87:8
  92:4 100:7 126:16
  165:18

**met** 6:11 16:13,18
  16:19 30:18 58:15
  125:15,16
**method** 152:22
**methodology**
  111:15
**mezzanine** 167:23
**microphone** 3:11
  165:2
**microphones** 3:6
**middle** 113:14
**midnight** 162:14
**million** 126:8
  154:13 164:12
**miltenberger** 2:19
  5:14,16 28:13,14
  29:23 41:7,15
**miltenberger's**
  29:21
**mind** 27:14 34:18
  34:24 36:20 87:5
  99:20 164:21
**mindy** 50:9
**mine** 46:8
**minimum** 32:8
  67:7 77:14 128:6
**minor** 161:7
**minute** 11:13 33:3
  147:24
**minutes** 14:20
  89:11
**minutiae** 89:14
**miscommunicati...**
  135:4
**missed** 23:11
**missing** 32:2 81:9
  110:15
**mistake** 159:24
**misunderstood**
  56:22

**mitchell** 25:17,20
  25:25 26:10 31:4
  31:8 32:9 56:18
  57:4 59:4,4,18
  99:3,8 102:11
  103:17 104:12,16
  105:4,13 106:7
  109:24 112:15
  124:2 129:18
  135:23 139:8
  143:14 156:3
  157:16 181:5
**mk** 148:4
**moment** 62:24
  153:12
**monetize** 120:24
**money** 54:21
  62:14 78:4 134:18
  153:24 177:4
**monies** 136:6
**monitor** 92:14
**monitoring** 91:13
**month** 72:15
  118:21 161:7
  184:2
**monthly** 45:6
  46:11 51:12 67:8
  68:7,11,18,23 69:7
  69:10,12 70:2,15
  70:18 71:2,3,8,13
  72:3,20 105:21
  106:12,16 107:14
  107:22,25 108:20
  116:22 117:14,16
  118:11 122:16,21
  123:7 124:6,11
  125:5,16 130:14
  130:21 132:2,25
  134:9,24 135:10
  147:8 148:7,16,24
  149:3,24 151:25

Veritext Legal Solutions
866 299-5127

PAX-014-068

**[monthly - objection]**

154:20 155:12,15
157:11,19 160:4,8
160:24 161:11,16
161:17,23 162:2
163:5,13,20 168:9
169:7,11 184:19
**months**  72:7
161:25 183:20
**mor**  72:11 108:14
137:22
**mor's**  170:6
**morning**  3:3 6:10
14:20,22
**mortgage**  77:19
**mother**  118:17
**motion**  14:9 28:25
38:15,20 89:7
90:10,16 168:6
**motions**  6:24
181:12
**motor**  119:5
**motorcycles**
115:17
**move**  75:14
**moving**  34:24 57:2
**multi**  42:22,22
**multiple**  19:14
42:4 76:4
**multiplied**  136:7
**multiply**  183:25
**music**  120:7,18
**myers**  1:18 2:3
3:24 4:19,22,25
6:13

**n**

**n**  2:2 78:11 186:2
187:17
**name**  4:2 6:3,11
20:5 23:12,13,15
23:16 27:20 28:22
29:5 58:12 102:18

116:4 138:10
173:4,8,23 174:9
182:6,14
**named**  119:7
**names**  136:22
**natural**  107:12
**nature**  52:21
168:13 183:16
**nearly**  136:3
**necessarily**  83:24
**necessary**  12:20
63:21 75:25 80:18
85:18 93:2 100:23
112:7 169:21
**need**  8:23 9:9
36:14 37:11,20
40:12,15,23 42:10
47:4 85:9 124:19
127:4 143:3 156:9
163:14 166:20,23
169:18 170:10,15
171:14
**needed**  30:22,25
44:2 46:7 174:4
**needing**  166:10,13
**needs**  167:6
169:19
**negotiated**  31:14
31:15
**negotiation**  31:18
65:10
**negotiations**  171:3
**neither**  58:14
**net**  19:10,24 78:11
**netherland**  114:17
115:2
**never**  57:6 121:23
**new**  1:18,18,21 2:5
2:5,10,10,18 3:25
3:25 5:23 58:8
79:15,16 115:8,10

115:25 116:15
146:22 156:13
173:18 176:14,16
176:23 188:3,7
**night**  14:22
**nol's**  78:7
**nonsense**  162:11
**normal**  8:17 77:19
179:3
**normally**  109:15
**notary**  1:19 5:23
186:22 188:6
**note**  3:5 29:20
35:24 41:11
145:19
**noted**  29:18
**notes**  14:6,7,7
51:10,11 100:9,13
100:14,19 101:3
111:7,14,24
112:12 113:4
121:6 148:4
187:10
**notice**  6:22,25 7:5
7:12 10:15,24
89:10 187:5
**noticing**  4:17
**november**  127:24
**number**  3:22 6:24
19:16 30:21 32:16
62:6 73:4 81:4,15
93:19 96:8 100:20
110:19,20 132:22
133:16,20 134:19
135:13,18 146:20
150:9,10 152:14
159:14,15 181:21
183:22 187:4
**numbering**  97:7
**numbers**  48:23
97:5 135:21

136:12 141:17
145:2 153:6
158:15
**numerous**  44:5
59:11 101:3
112:24
**ny**  5:16

**o**

**o**  23:16 78:11
186:2
**o'melveny**  1:17
2:3 3:24 4:19,22
4:25 6:13 13:18
100:5 103:7
**oath**  4:7 7:25
**object**  129:25
**objected**  30:20
**objecting**  80:19
**objection**  12:4,24
24:20 26:16 27:15
28:24 29:22 34:10
37:16 39:5 57:22
58:18 61:4 64:14
66:13 77:4 78:21
79:22 81:10,12
84:25 88:3,8 91:9
92:2 93:5 95:9
96:10 98:15 99:24
101:18 102:8
103:24 104:13
106:18 108:21
111:22 112:22
113:24 118:4
122:18 126:3
127:7 130:16
132:11 133:18
141:18 148:20
149:7 152:11
157:20 166:12,22
170:12,22 177:25

[objections - paragraph]

objections   4:14
    12:8 14:10 52:20
    52:22 54:8
objects   9:18
obligation   91:22
observer   45:20
obtain   12:19
obtained   59:17
obtaining   22:15
obviously   43:18
    66:18 87:17 98:17
    105:8 156:21
    163:15 173:21
occasion   174:17
occasionally
    141:22,24
occupancy   113:19
    113:22
occur   68:3
offer   18:25
office   19:16 58:8
    68:24 69:20 72:12
    72:22 162:13
offices   1:17
official   93:13,25
    94:21 187:9
offset   78:7
oh   45:10 160:24
    167:9 173:2
    177:14
okay   9:7 35:17,22
    71:17 85:17 96:3
    103:2 131:11
    148:2 149:14
    159:6 173:8 181:6
old   169:3
once   85:11 144:24
    154:10
ones   60:9 69:23
ongoing   52:6
    88:14 105:21

108:20,23 137:20
    170:24 178:18
open   47:13 91:7
    92:10
opening   63:19
    64:16 91:5
operating   41:21
    41:24,25 42:11,20
    42:21 43:3 45:7
    46:11 51:12 67:8
    68:7,11,19,23
    69:10,12 70:3,6,10
    70:15,18 71:2,4,8
    71:13 72:4,21
    78:12 106:12,16
    107:22 108:2
    116:22 117:14,16
    118:11 122:16,22
    123:8 124:6
    130:15,21 132:2
    132:25 134:4,5,9
    134:24 135:11
    147:8 149:25
    151:25 154:20
    155:12,15 156:10
    157:11,19 160:5,8
    160:25 161:11,16
    161:17,23 162:2
    163:5,13,20 168:9
    169:7,12 184:19
operations   127:20
opinion   145:20
    151:5,7
opportunity   2:4
    4:20 6:14 10:24
    38:20 75:20 81:4
oppose   29:6
opposed   74:6
    103:14
opposite   159:24

oral   65:18 99:17
    99:18
orally   106:9
    160:18
order   29:15 62:11
    72:23 75:3,5,8
    86:9,21 105:5
ordered   54:25
ordinarily   172:5
ordinary   30:21
    62:7 70:24 156:7
    156:8 167:18
    169:22 181:7
original   150:10
    152:3 159:20
originally   153:13
outcome   4:9
    188:16
outside   16:22 26:3
    26:5,6,14 31:5
    80:4 126:10
    127:17
outstanding   59:24
overpayment
    160:6
owed   81:18,19,20
owned   114:3
    126:22,25 127:16
    154:8
ownership   102:12
    107:9
owns   115:5 116:5

**p**

p   2:2,2 23:16
p&l   69:20
p.c.   1:15 2:17
p.m.   39:10 90:25
    139:21 140:4
    165:8,12 185:5,8
pacific   2:3 4:19
    6:13 10:23

page   7:8 11:8,21
    33:2,4 48:22,23,24
    49:9,11 55:13,18
    88:20 93:25 95:18
    96:4,25 97:4,8
    105:18,20 106:11
    113:13,14 115:12
    119:9,12,20 120:3
    121:3 124:25
    126:5,10 132:7
    140:19 145:20
    148:3 149:15
    151:14 152:8
    157:6 161:19,20
    161:20 162:3
    187:3,18
pages   161:19,22
    162:11
paid   32:24 70:23
    72:14 73:13 77:25
    86:16 108:10,15
    118:22 130:24
    133:3 134:16
    136:7 149:18
    151:15 152:21
    153:24 155:23
    156:11 158:8
    159:19 160:2,3
    173:6 175:4,8,10
    175:19 179:24
    181:10,12 183:4,6
    183:8,14
palm   122:14
pans   101:23
paper   168:23
papers   43:17,19
    44:16 45:3 46:3,6
    126:14
paragraph   113:2
    113:2

Veritext Legal Solutions
866 299-5127

PAX-014-070

**[paramount - plan]**

| | | | |
|---|---|---|---|
| **paramount** 29:3 | **pass** 44:9 130:25 | **people** 5:15 16:2 | 139:9,11,12 |
| **parcel** 111:25 | 139:10 | 19:8,17,19 28:19 | 140:24 157:17 |
| **parents** 42:3 | **passed** 105:7,8 | 45:22 53:4 58:24 | 178:20 179:3 |
| **part** 21:22 37:17 | **patents** 120:4,13 | 102:17 117:24 | 181:23,24 182:2 |
| 43:17 51:11 69:9 | **pax** 100:6 | 118:7 141:24 | 183:9,10 184:4 |
| 96:9,12,17 97:9,13 | **pay** 19:13 54:22 | 142:2,4 168:24 | **person's** 27:23 |
| 97:24 100:12 | 55:3 68:2 118:20 | 175:16 | 182:5 |
| 105:20 111:25 | 154:9 171:6 | **percent** 118:13 | **personal** 95:12 |
| 112:3 132:21 | **payable** 69:21 | 138:19,21 139:4 | 97:25 101:4 |
| 144:7 170:21 | **payables** 167:24 | 141:9,11,13,14 | 102:10 |
| 171:7,9 172:4 | **payee** 138:11 | 142:7,8,9,12,16,23 | **personally** 23:9 |
| 181:6 | **payees** 137:7 | 143:6,8 144:2,5,6 | 65:17 |
| **participate** 47:2 | **paying** 107:17 | 144:13,14 145:11 | **perspective** 31:23 |
| 47:17 60:8,12 | 146:24 | 146:4,5,11,11,21 | 77:16 85:7 |
| **participated** 51:13 | **payment** 33:17 | **percentage** 136:6 | **pertaining** 146:21 |
| 58:23 84:3 | 92:22 106:23 | 136:8 138:13 | **petition** 32:22 |
| **participating** | 108:22 117:9 | 139:5 147:7 | 33:5,9,16,20 35:24 |
| 45:21 | 133:3,25 134:11 | **percentages** | 36:3,8 74:13 84:6 |
| **participation** | 146:19 154:7,13 | 136:15 144:19 | 92:22 132:19 |
| 45:12 47:10,20 | 154:15 156:24 | **perform** 59:15 | 133:3,3,25 160:2,2 |
| **particular** 40:5,12 | 159:17 175:13 | 66:11 91:25 93:3 | 160:3,3 172:5,20 |
| 40:16 42:19 105:5 | 179:4 | 96:20 97:10,16,21 | 174:25 176:5,8 |
| 117:17 118:6,23 | **payments** 83:22 | 98:5,6 114:13 | 177:18,24 183:4 |
| 130:17 168:25 | 84:6 86:16 93:2 | 125:22 | 183:11,14,16 |
| **particularly** 14:9 | 132:16,19 133:7,9 | **performed** 80:20 | 184:5,12 |
| 112:12 | 133:10 134:2,6,16 | 83:5 88:10 89:18 | **phone** 15:3 25:11 |
| **parties** 3:14 66:22 | 134:22 154:5 | 97:20 121:10,14 | 25:15 28:8 47:20 |
| 84:23 87:12 | 156:25 157:24 | **period** 72:10 | 58:24 59:2,11 |
| 104:25 105:2 | 172:5 183:17,17 | 82:16 86:20 90:25 | 104:24 143:15 |
| 117:6 130:24 | 184:11 | 117:18 129:22 | 167:8 181:19 |
| 133:12 188:14 | **payroll** 42:7 | 133:11 140:13 | **phones** 3:10 |
| **partner** 19:12 | **pays** 122:4 | 151:15 153:25 | **phrase** 110:2 |
| 20:3 51:3 | **pc** 10:25 48:9,20 | 154:20 155:11,17 | **physically** 123:5 |
| **partnership** 74:10 | 49:4 | 156:12 157:25 | **pick** 3:7 |
| 75:23 | **pdf** 95:18 | 159:9 | **place** 3:10,14 |
| **parts** 79:12 | **pearl** 2:18 | **perjury** 8:8 | 45:22 47:15 53:8 |
| **party** 4:7 20:22 | **penalty** 8:8 | **person** 5:12,15 | 77:6 82:20 83:25 |
| 44:4 53:10 99:11 | **pendency** 70:9 | 15:18,21 26:15,17 | 175:24 186:11 |
| 102:14 119:24 | 117:19 | 49:20 50:17 51:5 | **plan** 86:6,11,13,24 |
| 122:6 173:12 | **pending** 9:11 | 54:4 103:15 | 87:15,24 122:2 |
| 184:10 | 81:25 82:5 | 129:18 130:10,10 | 169:17 |

Veritext Legal Solutions
866 299-5127

PAX-014-071

**[planned - process]**

planned  54:19
plans  86:14 88:7
  125:3
platforms  120:8
  120:20
play  52:10 169:18
  169:20 171:7
  172:2,3,3
plays  52:11
pleadings  14:8
please  3:5,9 4:15
  5:10,19 6:3 8:19
  9:5,11 11:8 23:14
  28:11 33:2 35:15
  67:22 148:5,14
  165:2
plus  72:10 106:7,7
  135:18 140:17
po  2:14
pohl  23:10,15,17
  23:24 24:4
point  39:14 40:18
  48:14 52:20 60:6
  61:8 65:25 67:10
  75:3 81:11 92:20
  106:17 123:23
  124:13 130:14
  153:22 166:3
  171:10
points  25:2 55:17
policies  121:17
policy  121:18,22
  121:24 122:8
populated  95:23
ported  49:23
poses  37:2
possession  37:25
  38:3 52:14
possible  30:17,25
  31:6 35:25 60:7
  79:6 82:9 84:12

120:17
possibly  118:9
  169:6 171:17
post  20:17 32:22
  33:5,9,16,20 35:24
  36:3,8 61:11
  63:12 133:3 160:2
  174:25 176:5,8
  177:18,24 183:11
  184:5,12
posted  120:8,19
potential  24:10
  52:9 65:11,15,22
  85:21
potentially  27:20
  66:6 78:17 90:14
pots  101:23
practice  121:21
practitioner
  176:13
pre  74:13 84:6
  92:22 132:19
  133:3,25 160:2,3,3
  172:5,20 177:18
  177:24 183:4,14
  183:16
precursor  17:11
predicated  72:3
  157:10
predict  53:7,13
prefer  33:15
preference  33:9
  33:14 82:10,18
  84:2 171:18
preferences  82:16
preparation  13:20
  15:7 51:9 53:5
  55:19 56:20 60:19
  61:9 68:6 73:16
  86:7 112:4 116:22
  168:10

prepare  13:4
  24:13,14 71:11,12
  71:23 95:3 100:9
  173:5
prepared  13:10,14
  24:15 31:19 71:3
  71:19 86:12
  161:15 173:18
  183:12
preparer  135:4,6
  136:9 173:4 174:9
preparing  8:12
  15:6 45:6,11,12
  46:14 55:24 56:7
  57:24 58:21 60:23
  66:20,21 84:4
  86:18 94:7,11
  105:11 109:6
  110:12 112:9,21
  132:4 155:3,6
  161:2 169:11
  170:5,6
presence  120:25
present  2:21 4:10
presenting  155:13
presidential  19:19
presumably  54:22
  68:20
presuming  114:6
presupposed
  55:10
presupposes  70:15
presupposing
  66:14
pretty  21:11 22:9
  32:7 37:4 44:22
  70:5 179:11
previous  36:21
  38:6 78:7,10
  116:8 119:6

previously  6:10
  14:23 85:20
  104:10 119:18
  130:4
primary  143:10
principal  21:17
  22:24 23:3 37:23
  50:5,10,16,25 51:8
printed  119:11
prior  82:17 83:23
priority  81:7
privacy  29:2
private  3:7
privilege  39:23,25
  40:17 83:15
privileged  41:3
probably  14:24
  20:20 24:11 28:9
  32:9 42:10 45:4
  52:15,16,19 54:5
  106:8,8,9 110:17
  116:23 137:8
  138:21 144:5
  170:23 176:19
problem  80:3
  146:25 160:24
  162:16
procedure  11:3
  17:19
procedures  7:23
  70:13
proceed  11:20
  140:5 165:13
proceeding  4:15
  16:22
proceedings  39:19
  39:21,22 115:10
process  38:14
  40:13 67:21 155:9
  168:7,22 169:23
  178:11

PAX-014-072

[produce - reasoning]

| | | q | r |
|---|---|---|---|
| produce 8:13 | 152:16 153:16,25 | qpc 31:23 | r 2:2 5:21,21 6:5 |
| produced 128:25 | proponent 118:12 | quarter 72:8 73:9 | 48:25 186:2 188:2 |
| 137:19 147:16 | proposed 5:4,7 | 73:10 | rang 167:8 176:10 |
| 173:12,13,16 | 54:20 111:20 | quarterly 68:7 | range 15:13 |
| product 46:22 | 139:3 150:21 | 71:19,21,25 72:18 | rank 29:5 |
| 83:15,17 | protect 75:9 89:16 | queries 158:18 | rarely 42:21 81:18 |
| profession 166:3 | 179:4 | question 8:20 9:5 | rate 67:10,11 |
| professional 17:14 | protected 29:14 | 9:7,11,19,20 27:4 | reached 23:17,24 |
| 17:17,25 18:8,12 | protection 83:18 | 27:6 28:9 34:8,12 | 28:20 161:12 |
| 33:11 37:22 77:17 | protective 29:15 | 34:16,18,19 36:17 | 162:12,25 |
| 92:21 156:4 158:3 | prove 86:22 | 36:19,25 38:17 | reaching 161:13 |
| 163:3 166:7 | provide 22:18 | 53:17 56:9 83:20 | read 27:6 34:12 |
| 175:19,20 | 92:25 171:11,15 | 94:19,21 96:17 | 57:18 65:24 90:16 |
| professionals 14:8 | provided 13:14 | 101:12 105:16 | 120:16 147:25 |
| 30:21 54:9,23 | 59:5 98:11 99:10 | 108:3,8 110:7,8 | reads 55:18 61:8 |
| 57:9 62:8 68:25 | 117:3 130:9 | 113:14 114:14 | 63:18 80:17 88:20 |
| 77:25 156:5,5,6,7 | 140:24 158:15 | 115:13 116:21 | 94:20,24 95:11 |
| 156:8 157:2,3 | providers 92:21 | 117:4 118:3 119:4 | 105:21 106:12 |
| 159:25 175:20 | providing 27:14 | 120:3,12 121:16 | 113:18 115:15 |
| 181:8 | 63:21 | 122:11 124:13 | ready 137:21 |
| profile 166:10,19 | public 1:20 5:23 | 126:5 127:22 | real 42:20 77:20 |
| 178:14 179:6,18 | 186:22 188:6 | 130:18,20 148:19 | 94:22 107:6 |
| program 69:12 | pulling 134:14 | 149:6,12,25 150:3 | 113:19,22 114:2,4 |
| 70:11 | pullman 2:12 5:7 | 151:19,23 154:2 | 147:6 167:20 |
| progress 71:9 | 165:17 | 155:16 163:10,12 | realized 159:24 |
| progresses 50:22 | punching 99:11 | 163:12 166:14 | really 31:2 74:21 |
| projections 61:10 | punitive 164:9 | 177:13,21 181:15 | 133:2 165:4 |
| 61:24,24 86:18 | purchase 117:12 | 184:10,12 | reason 10:8 76:15 |
| 87:10 | 118:19 | questions 47:17 | 78:13 89:4 138:22 |
| prominent 60:18 | purchased 117:13 | 83:21 91:3 99:21 | 142:4,19 143:4,10 |
| promised 179:23 | purposes 39:23,25 | 100:6,23 113:5 | 145:16 |
| prompted 163:17 | 77:24 | 119:19,21 129:16 | reasonable 21:13 |
| proof 80:24 81:2 | pursuant 10:25 | 135:25 149:2 | reasonableness |
| 81:21 | pushed 168:23 | 153:5 158:5 | 109:14 110:3 |
| proofs 80:19 | put 44:18 69:16 | 164:15 167:17 | 158:10 |
| properly 136:2 | 131:12 142:7 | 179:17 184:8,23 | reasonably 53:11 |
| property 94:15,21 | 155:24 | quick 165:4 | reasoning 29:21 |
| 95:12 107:7 | puts 87:18 | quickbooks 60:25 | 142:17 143:21 |
| 113:17 114:2 | putting 109:14 | quickly 159:6 | 144:8,11 145:10 |
| 120:7,13,15,18 | 180:22 | | 145:12,21 |
| 122:11 148:5,14 | | | |

Veritext Legal Solutions
866 299-5127

PAX-014-073

**[reasons - report]**

**reasons** 75:2 77:23
130:3 142:11
168:15
**recall** 23:20 32:6
33:8 34:7 44:10
57:21 65:20
126:17 128:4
146:10,13 151:4
151:10 161:9
173:22
**receipt** 78:13
**receipts** 52:17
54:3,14,15 63:15
66:25 68:22 86:19
**receivable** 69:22
**receive** 57:15
137:10 157:15
174:24
**received** 33:20
92:22 99:17
104:11 137:13
139:7 140:6
160:10
**receiving** 33:9
161:9
**recess** 90:22
139:22
**recognize** 10:20
48:15 49:6 93:21
111:11 140:9
147:20,22
**recollection** 36:16
44:21 162:24
**recommend** 73:23
73:24 74:2 75:7
75:17,22 76:11
80:9 141:10
**recommended**
144:21
**reconciling** 80:18

**record** 3:3,15 4:13
6:4,11,11 8:12
11:13,15,16,20
28:2,18 32:15
41:10 48:5 90:19
90:21 91:2 93:18
100:4 129:5 130:4
139:19,21 140:4
156:9 165:4,8,9,12
185:2,5 188:11
**recorded** 1:14
3:17
**recording** 3:13
8:10
**records** 15:9,20,23
40:14 49:22 52:16
82:9 84:12,14,18
92:19 160:22
171:16,20 172:17
**recoverable** 83:2
**recoveries** 175:15
**rectified** 135:5
**redacted** 129:17
182:6,16,25
**redaction** 130:6
**refer** 97:4,25
**referenced** 68:10
103:11,12,13
119:23 155:5
159:10,15
**references** 63:11
113:4,7 119:6
**referencing** 65:7
**referred** 27:5
174:5
**referring** 71:15
95:20 97:4,7,14
104:3 120:9
132:12 135:9
150:6 167:16

**refers** 84:11 95:13
95:17 96:2 114:16
119:4 120:5,12
121:4,17 122:13
125:8 126:6,7
127:23 135:13
144:20
**reflect** 132:10
133:8 140:22
**reflected** 133:14
135:15 152:8
**reflecting** 164:5
**refresh** 36:16
**regarding** 15:17
16:4,4 24:2,9 25:5
26:4,11 30:14
59:21 65:14,19
67:25 102:15
111:16 137:13
150:3 161:10
163:4
**regret** 168:2
**rejoin** 41:14
**related** 4:7 19:7
49:21 56:9 61:10
90:3 91:4 95:14
138:23 143:5,11
188:14
**relates** 7:3,8 94:15
107:16 111:21
173:16
**relating** 6:23
70:14
**relationship**
143:19
**relevance** 28:21
88:11
**relevant** 27:24
41:4 113:23
116:21 117:14
123:11

**relied** 85:5 104:9
177:15 178:6
**relief** 75:4,6
**relies** 84:22
**rely** 39:2 98:13
123:25 139:6
158:14 176:4
177:23 179:5
**remain** 106:16,24
107:18
**remains** 74:12
184:14
**remember** 21:14
24:7 43:14,24
59:2 62:22 81:3
85:24 87:5 105:2
105:5,15 108:7
109:20 110:8
116:19 117:4
127:19 130:22
142:13 146:16
159:13 167:12
173:10 176:7
**remind** 167:10
**remotely** 4:11
**renters** 107:7
**reorganization**
86:11 168:21
169:15
**repair** 107:8
144:22
**repairs** 158:22
**repeat** 9:5 27:3
**repeating** 66:17
**report** 40:11 45:7
46:11 51:12 54:6
67:8 68:11,19,23
69:7,10,13 70:3,6
70:10,15,19 71:2,4
71:9,19,21,25 72:4
72:18,21 107:22

Veritext Legal Solutions
866 299-5127

PAX-014-074

**[report - right]**

108:2,2,9 117:5,15
118:11 122:16,22
123:8 124:6
130:15,21 132:3
132:25 134:4,6,24
135:11 144:9
147:8 149:25
151:25 154:20
155:12,15 156:10
157:12,23,23
158:13 159:8,20
160:5,8,25 161:11
161:16,17 163:5
163:13 184:20
**reported** 71:2
157:5 160:7
**reporter** 1:20 4:4
5:10,19 8:11
10:13,18 27:7
32:12,20 35:7,14
47:23 48:4 78:9
93:11,16 111:3,10
128:23 129:13
131:18,19 140:2
147:12,14 171:13
187:15
**reporting** 19:18
42:23 52:18 54:2
66:21 67:4 68:8
108:14 148:24
149:3 155:6,10
**reports** 22:19
66:21 68:7 107:22
116:22 117:16
157:19 161:23
162:3 168:9 169:7
169:12
**represent** 30:2
129:7 140:16
144:13 176:17,19

**representations**
59:21
**representative**
180:5
**represented** 9:12
20:21 21:10,12
102:22 113:12
**representing** 9:16
100:5 181:13
**request** 26:19
108:9 163:18
**require** 47:9 60:7
**required** 12:14,19
17:19,22 54:25
55:2 70:10 76:2
89:5 108:14
**requirement** 67:7
**requirements**
42:24,24 67:5
**requires** 68:24
86:25 89:10
**reside** 150:15
172:17
**residence** 101:5,9
102:5 113:16
114:6,9 118:6,10
150:13
**residences** 19:14
114:14 118:3
**resident** 76:12
**resides** 114:5
118:5
**respect** 21:20
92:25 95:7
**respond** 89:11
178:24,24
**responded** 36:20
65:4
**responding** 35:18
51:16

**responds** 52:4
149:15
**response** 35:23
115:14
**responses** 12:7
**responsibilities**
21:20 46:10,18
**responsible** 20:2
98:12
**responsive** 124:15
**rest** 17:24
**restrictions** 153:2
**restroom** 139:17
**restructure**
167:22
**restructured**
170:16,21
**restructuring**
17:24 18:7 165:19
166:11,13,16,20
166:24 167:7,16
167:21 170:11,21
**resuming** 139:23
**retain** 48:8,19
49:3 181:7
**retained** 34:6
36:22 37:6 39:7
39:15,18,20 72:17
143:11 187:15
**retainer** 32:22,24
32:25 33:5,10,12
33:16,20 35:24
36:4,8 126:6
174:25 175:17
176:5,8 177:19,24
**retaining** 34:5
35:21 36:18 37:3
39:4
**retains** 74:7 162:6
**retention** 7:8
43:16,17,19 44:16

55:13 61:8 88:12
111:21 126:14
175:22
**retrieved** 31:8,12
**return** 53:2,3
74:23 75:6,8
76:12,14 77:2,22
77:23 78:14 79:15
79:17,18 86:23
168:9 173:5
**returns** 54:10 74:3
74:9 75:24 76:5,6
78:18 79:9,11
80:10 169:9 173:3
173:6,11,18
**revealed** 26:18
**revealing** 27:19
28:22
**revenue** 80:14
**review** 27:22
43:22 51:23 52:19
53:10 60:7 61:9
62:12 68:6 72:17
73:16 124:20
125:17 135:24
150:19 158:2
162:5 171:19
**reviewed** 13:8,11
62:18,20 81:24
84:13,18 109:13
110:3 112:24
114:21 141:3
**reviewing** 80:17
82:8 112:11
160:15 171:16
**revising** 139:5
**rhode** 176:15,21
**right** 7:10 10:19
38:19 53:24 55:22
61:3 62:16 63:6
64:16 70:17 71:6

Veritext Legal Solutions
866 299-5127

PAX-014-075

**[right - server]**

73:4 81:15 84:9
90:7 94:8 95:21
98:2 100:11
126:19 130:11
134:12 136:19
138:5 152:5
153:17,20 154:22
165:20 169:16
170:8 173:23
177:14
**rights** 29:2
**road** 113:20
**rodeo** 89:3
**role** 50:7,12 52:9
53:18 94:6,10
98:11 102:3
105:25 106:3
112:9 134:21
168:11 169:17,20
171:25 172:4
**roles** 23:2 51:18
**roll** 157:4
**rolled** 158:15
**room** 4:11 127:12
**rudnick** 2:8 5:4
15:21 23:10,16
24:6,8,18 25:9
26:5,6,11 30:9
31:20 32:4 38:10
38:12 39:2,16
43:23 49:24 56:13
57:4 58:25 59:7
59:10,17 64:20
83:18 98:25 99:7
102:12,18 103:18
103:18 104:11,17
104:17 105:7,13
106:6 109:24
112:14 124:2
126:7 139:7 156:2
157:15 175:18

178:7 181:3,5
**rudnick's** 126:14
**rule** 10:25 11:22
**rules** 11:2 117:5
161:3
**ruling** 29:12
**run** 22:2 58:9
67:10,11 178:21
**running** 21:23
172:9,10
**runs** 178:22
**russo** 2:6 4:24,24

**s**

**s** 2:2 74:10 187:2
**safe** 123:10
**safety** 138:24
144:10 182:11
**sales** 42:7
**sanity** 158:9
**save** 162:4
**saw** 62:22 79:13
79:15 126:13
128:4 153:4
159:23 162:19
163:13 173:3
**saying** 37:9 149:20
149:21 162:13
**says** 33:4 34:15
87:7 91:23 116:6
116:7 162:7,15
184:9,10
**scared** 143:16,18
143:19
**scenarios** 20:14
**schedule** 59:22
60:3 71:14 81:14
94:7,20,23 95:12
96:13 98:23 103:9
103:23 104:8
108:12 109:16,17
109:18 114:2

124:25 128:3
135:5,7,9 136:10
155:25
**scheduled** 81:14
**schedules** 14:6
30:23 44:22 45:25
51:10 55:20,25
56:14 57:12,17,25
58:17,22 60:20,24
69:4 100:10
111:16 112:2,5
113:6 168:8
183:13
**schindler** 13:8
31:25 49:16 50:9
56:5,24 112:18
**school** 17:3,5
**science** 17:7
**scope** 43:8 44:12
90:13 171:9
**scotch** 164:22
**scrambling** 69:4
**scratch** 71:11
99:16 106:2
**search** 15:19,20
49:21 82:25
**second** 45:16 61:7
114:16 121:6
125:2
**secret** 106:21
**secrets** 120:14
**section** 75:5 97:17
105:23 106:4
114:19
**secure** 167:22
**secured** 20:19
21:7 42:15 81:7
**security** 33:17
115:24 118:8,25
133:23 138:16,22
138:24 142:14,18

142:20,24 143:3,5
143:10,23 159:14
184:3
**see** 11:23 28:21
33:6 35:25 45:22
57:19 61:12 68:8
82:11,25 88:11
95:17 96:6 121:8
121:19 125:6
132:15 141:2
148:9 151:16
155:21 159:2,3
168:5 183:20
**seeing** 57:21
127:19
**seek** 124:10,12
**seen** 79:8,12
109:15 121:23
127:24 128:19
137:6 145:7 164:8
164:13
**select** 75:20
**sell** 122:6
**semantics** 39:13
**senators** 19:19
**send** 15:21 24:15
162:7
**sense** 38:2 158:4
158:25
**sensitive** 3:6
**sent** 13:17 31:20
49:24
**sentence** 121:6
125:2
**separate** 74:4,5,14
74:22 107:21
129:5 131:7 132:7
**september** 17:10
**served** 7:5
**server** 13:24 49:22

Veritext Legal Solutions
866 299-5127

PAX-014-076

**[service - started]**

service  92:21
138:11 145:5,5
services  18:24
21:21 85:21 90:4
set  101:7 161:8
188:10,19
setting  47:5 83:17
settlement  78:6
171:2
settlements  77:10
seven  75:15
136:18
seventh  92:19
shake  8:24
shape  62:10
shapes  42:2
shea  2:17
sheet  69:20 131:14
133:15 138:16
158:12
sheets  109:4
sherry  114:17,25
146:21,25 150:5
150:16,17 151:16
153:20 154:11
sherry's  146:25
shit  176:11
short  104:20
139:22
shorthand  1:20
show  146:9
showed  141:24
159:22
showing  101:19
shown  132:21
147:7
shows  117:20
158:5,21,23
siblings  42:4
signatory  38:23
66:18

signature  188:21
signer  37:24 52:14
65:3
significant  13:9
59:5
significantly
160:14
silverberg  13:6
24:5 33:4 34:4
37:2 38:5 39:6
silverberg's  35:19
similar  113:17
simultaneously
44:23
single  53:10 75:22
sir  85:16 100:6,14
153:18
sitting  19:25
situation  104:20
121:23
six  162:10
size  42:2
slipping  87:4
small  45:12 88:5
134:17 173:17
social  120:23,24
sofa  55:25 56:14
57:12,17,24 58:16
58:22 59:22 60:2
94:7 98:23 109:16
sofa's  14:5 44:21
45:25 51:10 60:19
60:19,23 69:4
83:22 112:2 113:5
168:8 170:5
software  60:16,18
61:2,5
sole  52:14
solely  104:9
somebody  183:7

someday  169:17
someone's  171:4
someplace  110:21
son  58:9,11,13
soon  159:4
sorry  3:5 7:14
23:11 35:3 41:7
83:11 94:19 95:16
126:4 130:19
171:13 176:11
sort  52:8 55:6
sorts  17:15 42:23
54:15 167:25
sound  84:9
source  62:24
77:12 87:25 105:2
175:7,8,13,25
spatulas  101:22
speak  14:18 15:14
23:25 24:9,17
25:5,10 26:2
44:17 144:25
174:20,21 181:24
speaking  35:20
115:7,14 151:10
specific  14:7 51:11
94:17 100:12,14
100:19 101:2
104:4 110:24
111:19 112:12,20
157:25
specifically  20:25
43:15 51:7 72:20
specifics  83:10,16
specified  186:11
speculate  127:4
speculation  93:6
spell  23:12,13
spend  15:5 78:4
165:25

spent  21:23
split  118:18
spoke  13:5,7 14:15
14:21 16:8 31:2
57:6
spoken  14:24
174:11,18,22
spouse  118:14
145:18 150:14
spouse's  121:18
spreads  21:25
spreadsheet
135:14 158:6
160:19
spring  2:17 5:16
27:17,18 28:17,23
29:6 57:24 58:3
179:6,9,12 180:6,7
180:10,15,20
181:17,20 182:20
183:5,8 184:6
spring's  28:8
182:10,15,19
springs  26:19
28:10,14
square  1:18 2:4,9
3:25
ss  188:4
stab  43:22
staff  20:4 24:12
51:17 52:8,9,24
53:14,17,20 54:4,7
66:20
stamp  129:2
stamped  35:9
standard  70:8
121:21
start  6:17 7:22
79:25
started  17:11 23:4
45:6 153:4,7

Veritext Legal Solutions
866 299-5127

PAX-014-077

**[started - team]**

162:18 182:21
**starting**  33:14
83:25 97:9 109:5
130:14
**starts**  96:17
109:21
**state**  1:20 4:12,15
5:23 6:3 27:2
42:22 73:17 76:16
76:16 79:14 101:3
156:5 188:3,7
**stated**  26:17
164:10 171:19
**statement**  14:5
34:12 37:21 54:6
55:19 73:6 111:17
112:4 158:8
**statements**  8:25
69:19 111:14
**states**  1:2 3:19
42:6 54:23 62:5
69:11,19 71:20
72:2,22 157:7
162:8 171:11
176:19
**statistical**  94:3
**statute**  75:16
82:22
**statutes**  75:16
**statutorily**  72:24
**stay**  18:2 123:9,13
**stays**  123:8
**step**  13:19 46:2
69:25
**stepping**  49:13
**steven**  23:9,15,24
24:4
**street**  2:13,18 6:8
**stretto**  89:22 90:8
90:14 92:5,10,14
92:24

**stricken**  29:14
**strike**  25:4 30:6
116:20 157:13
**structured**  65:23
66:7
**stub**  72:9
**stuff**  30:25 168:7
**subject**  8:7 12:11
14:2 29:14 53:10
147:23
**subscribed**  186:18
**substantively**
149:5
**subtract**  133:6
**success**  82:5
**successful**  86:10
**suffering**  9:24
**sufficient**  42:12
**suggested**  143:6
**suggesting**  142:12
142:17
**suggestion**  145:24
**suggestions**  141:3
141:8
**suite**  2:18 6:8
**sum**  72:11 96:17
135:17
**summarized**
155:24
**summary**  94:2
129:21 130:9
153:3
**sun**  59:14
**supplement**
132:24
**support**  19:6 22:4
22:8 40:6 49:2
51:24,24 55:21
85:19 112:6
162:21 172:8

**supported**  36:21
**supporting**  51:17
**supports**  60:18
**supposed**  74:20
162:17 167:12
**sure**  7:4,11,23
27:16 31:24 32:2
32:7 37:4 38:12
38:13 43:13,21
44:19 73:4 75:10
81:8 88:13 99:22
104:6 110:13,14
110:16 113:3,8,11
124:8 125:25
127:14 129:6
135:25 136:10
137:16 141:5
150:25 158:4,11
165:6 167:13
173:25 174:23
176:7 179:11
**surprise**  83:24
**surrounding**
182:12
**suspect**  170:25
**swear**  5:10,19
**swearing**  8:4
**sworn**  5:22 186:5
186:18 188:10
**system**  60:10

**t**

**t**  5:21 6:5 186:2
187:2 188:2,2
**tab**  10:12 32:11
34:22 131:2 146:7
**table**  49:9,10 50:4
**taconic**  113:20
**tail**  45:4
**take**  3:13 9:10
14:25 31:25 33:3
35:15 53:8 67:5

77:6 82:20 111:23
134:17 139:18
165:3 173:2
179:25 184:25
**taken**  79:4 90:23
139:23
**takes**  47:15
**talk**  7:20 8:18 17:2
80:7 146:3
**talked**  16:3 21:18
30:10,15 46:2,9,13
55:14 59:9 127:9
128:12,16 129:20
134:10 137:24
154:25 158:16
164:3
**talking**  29:25
64:15 79:23 85:2
96:12 98:25 103:8
104:4 138:19
146:13 160:16,16
160:17 162:18
**task**  89:4
**tasks**  88:22 170:2
170:7
**tax**  19:21,22 52:25
53:3,4 54:8,9
73:17 74:3,8 75:6
75:7,24 76:14
77:2,16,22,24 78:3
78:17 79:9,11
80:8,10 168:9
169:9 173:3,5,6,11
173:18
**taxation**  19:9 22:2
**taxes**  42:7,7 53:5
73:24 74:17 77:20
107:6
**taxing**  75:11
**team**  55:7 56:20
59:10 106:6,6

Veritext Legal Solutions
866 299-5127

PAX-014-078

**[team - top]**

109:24 110:16
138:19,20 153:13
172:9,12
**technical** 56:9
**technically** 74:22
**technology** 169:6
**teleconference**
2:19
**telephone** 45:15
**tell** 124:19,24
127:3 135:8
154:14 184:15
**telling** 118:21
**ten** 7:17 15:11
**tense** 85:3,3,4
**term** 87:4 125:13
**testified** 5:24 6:15
88:9
**testify** 10:2,9 12:2
12:14,21 40:15
41:2 186:5
**testifying** 7:25
11:5 28:16
**testimony** 10:6
22:19 185:6 186:6
186:10 188:12
**th** 70:24
**thank** 7:13 12:9
14:14 19:20 29:23
35:2 38:7,25 41:5
41:13 45:24 56:25
90:19 94:24 96:14
99:25 102:21
103:2,3 113:13
119:2,4 128:19
133:4 144:12
159:6 161:8
**thanks** 41:16
**theme** 144:18
**thereto** 55:21
112:6

**thing** 19:17 64:19
66:3 79:13 117:23
120:10 122:14
124:21 135:12
157:2 162:15
**things** 6:21 22:5
51:21 54:18 69:14
100:24 124:4
156:22 161:2
167:19 179:2
**think** 9:14 14:11
14:12 16:17 18:15
19:8 20:20 21:9
24:13 28:25 30:16
30:20 31:2,5 34:6
34:11 36:13,19,22
37:5,10 39:7,13,21
40:9 43:9 45:10
45:24 47:19 49:13
51:3 52:12 55:4
56:10 60:8,17,20
70:6 73:22 76:20
79:18 81:10,22
85:19 87:8 90:5
91:18 94:5 95:13
103:9 106:20,24
106:25 109:16,18
110:2,10,23 113:3
115:23 118:12
119:17 123:9
124:21 125:17
126:11,13,15
128:3,5 137:24
139:3 140:6,15
141:19,25 144:7
146:6,18,25 151:2
152:4 153:8,14
154:18,24 155:5
159:7,10 161:12
163:2 167:7
168:20 170:6,18

172:11 173:16,17
177:12 178:16,16
178:17 179:3
181:19 182:22
183:21 184:20
**thinking** 40:8
117:7 123:12
149:9
**third** 63:18 64:15
117:6 119:24
122:6 130:24
133:12 184:10
**thirds** 184:2
**thought** 37:12
38:18 46:25 56:21
95:14 114:2
126:15 127:15
138:20 142:7
153:9,13 161:21
174:6 175:12
**thoughts** 151:3
**thousand** 126:6
132:21,22 140:17
146:19 152:7
154:12 159:16,16
159:18 166:2
177:2 183:24,25
**threatened** 143:16
**three** 19:2 72:7
75:16 109:23
112:16 161:25
163:10
**tie** 137:17
**till** 17:9 153:4
**tim** 15:18 28:13
41:13 49:19
**time** 1:11,17 4:16
11:14,18 15:9
16:18,19 17:13
19:8 21:12,23
24:22 40:18 43:16

44:24 45:19 52:20
60:6 65:25 81:11
86:17,20 90:20,24
97:3 104:21 106:8
116:13 117:18
118:23 123:24
136:13 137:11
138:2 139:20
140:3 146:23
154:5 155:20
156:14,22 157:11
157:25 159:25
160:14,15,21
162:6 165:7,11
174:2,10 178:25
179:12 186:10
**timely** 80:10 145:9
**times** 1:18 2:4,9
3:25 6:18 7:15
14:24 60:14
104:23 177:11
**timing** 78:24 79:5
134:25
**timothy** 2:19 5:15
**title** 21:15 86:12
101:8 114:25
**today** 7:25 8:13
9:13 10:10 11:5
15:4 159:5
**today's** 13:21
185:6
**told** 63:6 102:10
104:17 143:17
147:3 153:19
181:2 182:14
184:21
**tonight** 85:13
**top** 14:13 18:2
33:4 41:18 48:23
97:5,8 130:10
151:13 155:4

Veritext Legal Solutions
866 299-5127

PAX-014-079

**[topic - use]**

topic  12:2
topics  11:22 12:15
    12:22
total  94:22 95:12
    96:5 132:10 133:5
    133:6,23,24 136:9
totally  29:9,15
    42:18
tower  3:25
track  124:17
trade  120:14
trademarks  120:4
    120:14
transaction  126:9
transactional
    80:12
transactions  80:9
    82:9,25 84:13
    171:17
transcript  8:14
    186:9,9
transfer  82:10
    152:22 171:18
transfers  82:20
translated  57:8,14
    57:16,19
travel  123:2,21
    143:3
travels  115:24
treated  77:21
tried  59:13 134:25
    136:11
trucks  97:14
true  157:2 172:15
    186:9 188:11
trustee  54:23
    69:11 71:20 72:2
    157:7 163:17
    176:21,22
trustees  20:16
    62:6 68:24 69:19

70:11 72:6,12,22
    73:13 162:8,12
    176:18
truth  186:5
truthful  8:5 10:6
truthfully  10:2,9
try  8:20 15:22
    61:25 149:8 161:5
    171:5
trying  14:11 21:9
    45:9 48:14 132:15
    135:23,25 136:5
    162:14 163:10
    170:14 174:2
turbotax  60:23
turn  3:9 11:8,21
    33:2 68:5 96:24
    105:18 137:23
turning  20:24 23:5
    29:24 34:3 35:23
    37:18 41:5 43:6
    48:22 49:9 50:4
    55:12 61:7 73:15
    80:16 82:7 85:17
    86:5 88:19,19
    91:4 92:18 95:11
    103:7 106:11
    109:3 113:13
    115:12 120:3
    124:25 126:5
    130:8 132:6
    140:11 148:3
    149:14 151:13
    159:7
turns  144:24
twitter  120:20
two  14:24 15:11
    15:12 50:16 62:20
    77:15 82:23 87:18
    90:7 92:8 129:5
    132:18 133:10

134:6 141:13,23
    155:14 159:25
    161:19,19 179:18
    181:19 183:25
    184:2
type  17:15,20
    68:14 122:14
    148:8,17
types  22:5 51:22
    53:15 77:15,18
typically  43:20
    69:13 86:15 131:9
    154:9 166:5

**u**

u.s.  72:6,12 73:13
    161:10 162:12
uh  8:25
ultimately  150:22
un  42:7,8,9
unclear  47:2
uncover  40:22
uncovered  40:23
underperforming
    19:5
understand  7:24
    8:3,15,21 9:2,4,7
    9:15,20,22 11:25
    12:13,18 25:19
    27:11 34:11,13,16
    34:17 40:16 58:7
    81:17 86:21
    112:19 115:7
    129:14 147:18
    148:11 150:5
    153:5 158:11
    166:14 169:2
    170:17 175:10
    177:20
understanding
    11:4 27:18 28:11
    32:23 37:15 38:8

47:7 63:22 65:21
    76:21 90:13 92:9
    92:13 107:18
    108:19 113:21
    115:20 119:9
    121:3 141:15
    147:4 149:10,11
    149:13,19 180:25
    182:17 183:2
understood  9:3
    88:6 89:17 100:16
    133:4 145:8
undisclosed  139:9
    139:11,12
unheard  176:24
unit  3:16
united  1:2 3:19
    54:23 62:5 69:11
    69:19 71:20 72:2
    72:22 157:7 162:8
universe  154:6
unkept  42:9
unknown  130:10
    140:24 157:17
unpaid  156:13
unregistered
    120:6,17
unrelated  14:22
unsecured  167:23
updated  137:17
upkeep  107:9
uploaded  109:17
    109:20
ups  164:18
use  53:11 64:24
    113:18,22 115:15
    116:6,10 117:3,7
    117:22,24 119:7
    122:19 139:17
    158:24 162:4
    169:5

Veritext Legal Solutions
866 299-5127

PAX-014-080

uses  60:17 115:21
usually  69:15,16
  81:12 83:25 86:25
  87:11,18 117:17
  134:15 154:11
utilities  144:12

**v**

v&l  56:3
v&l's  88:12
valuable  116:3
valuation  121:10
  121:13
value  67:15
  102:24 120:22
  121:7,19,22,25
  122:3,5
vans  97:14
various  18:2 20:3
  42:2,5,6 51:16
  54:22 57:9 58:24
  59:6 69:22 75:11
  118:24 120:8,13
  120:19 183:13
vehicle  115:23,24
  117:13,22,23
vehicles  115:14,21
  116:9,13 117:2,8
  118:25
verdolino  1:15 7:9
  10:25 12:14,22
  13:24 15:16 17:12
  18:22,25 19:25
  20:10,15 21:15,20
  22:24 23:6,18,25
  24:17 25:7 26:3
  30:11,13 31:15
  36:7,18 37:3,23
  38:21 39:4,17
  43:7 44:13 48:8
  48:20 49:4,14,18
  49:25 50:15,20

55:15 56:19,23
57:2 58:15,21
59:15,25 61:14,18
64:1 65:9,13
66:10 67:9,12,15
67:24 71:12,18
72:17 73:18 76:10
76:25 78:16 80:20
82:3 83:4 84:17
84:22 85:25 87:19
87:23 89:18 93:3
94:6,10 95:3
96:20 97:10,15
98:5 99:5 100:8
101:13 102:3
106:2 107:23
109:5,11 111:20
112:8,16,17,20
122:15 124:9
125:22 128:10
134:21 135:15,19
136:22 140:23
144:21 149:11
163:17
verdolino's  130:14
verify  59:16 138:3
veritext  4:3,5
vermont  176:17
version  79:16
  127:13 133:15
  137:17,24 140:12
  140:20,22 150:10
versus  38:9 41:24
  119:24
video  1:14 3:13,17
videographer  2:22
  3:2 4:4 5:9,18
  8:10 11:14,18
  34:23 35:4 90:20
  90:24 139:20
  140:3 164:25

165:7,11 184:25
  185:4
videos  120:8,19
view  36:25 107:2
  148:18 149:6
  166:10,19,23
  170:10
virtually  74:19
  169:8 176:18,20
visit  118:16 142:5
visits  118:9
volunteered  184:8

**w**

wait  8:19
walk  55:16 94:13
walked  110:16
walking  98:4
  141:7
wan  1:5 2:9 3:18
  5:5 11:6 94:4
  111:18
want  16:25 40:21
  40:22 44:17 45:18
  55:16 66:23 75:21
  94:13 104:2
  105:18 107:5,12
  146:3 147:19
  149:8 168:18
  172:3
wanted  45:21
  105:10 110:14
  144:7 163:22
wants  69:20 172:2
  172:3
washington  6:8
water  34:24
watercraft  97:15
  119:5
watermark  162:6
way  47:21 54:19
  62:10 67:3 75:14

104:19,21 117:25
  134:15 141:17
  156:23 162:2
  188:16
ways  77:22
we've  16:3 20:16
  20:20 21:4,10,10
  22:13 30:10,15
  44:20 45:10 55:14
  67:14 85:8 94:5
  128:12 129:20
  132:3 134:10
  154:18,21 158:16
  162:16 163:20
  164:3
wealthy  19:13
website  162:8
wednesday  16:17
  45:17 116:2,16
  123:16,18 126:12
  174:15 182:23
week  42:13
weekly  66:24
welcome  41:14
went  17:5,8 31:5
  43:24 45:19
  122:23,24,25
  123:5 174:7
western  17:4
whatsoever
  123:22
whereof  188:18
whispering  3:7
wife  138:25
  141:13 142:8,24
  145:14
willing  64:20
wip  67:18,20
wire  152:21
witness  5:11,20,22
  26:21 27:8 28:15

PAX-014-081

[witness - zero]

29:10,11,16 35:3
46:21 59:12 78:11
83:8 85:10 116:12
130:2 131:4,12
148:2 164:20
167:9 176:11
185:9 188:9,12,18
**word** 59:21
**words** 57:9
**work** 17:8 19:9,11
22:19 40:4 42:10
43:8 44:13 46:22
54:5,8,9 56:12,13
57:17 58:20 59:24
61:14,18 64:11
66:4,11 67:21
68:14 70:14 73:3
73:18 76:24 78:15
80:19 83:14,15,17
84:2 86:2 88:10
88:14,17 89:17
90:2,3,13 97:10,16
97:20 98:6 109:10
112:14,20 121:11
125:23 135:19
154:19,25 167:24
169:22 176:20
177:2 178:2,5
**worked** 15:20 45:2
56:16 92:5 95:5
100:17 109:22
135:22 136:4,9
**working** 51:18
90:6 96:22 136:15
155:25 178:4
**works** 134:15
176:9
**world** 38:2
**worried** 182:10
**worth** 19:10,25

**wrapping** 91:3
**wraps** 96:8
**write** 36:13 41:18
177:10
**writes** 34:4 39:6
**writings** 113:9
**written** 8:12 65:18
119:8 121:2
126:10
**wrong** 73:5 162:13
170:24
**wrote** 37:5 181:25
182:4

| x |
| --- |

**x** 1:3,8 187:2,17

| y |
| --- |

**yacht** 119:7
**yeah** 59:13 170:13
172:25
**year** 42:13 74:11
74:12 75:15,16
82:23 154:10,13
**years** 7:17 17:13
18:3 20:21 82:23
82:24 166:3,4
169:3 176:7
**yep** 36:2 95:22
121:9 178:8,10
**yesterday** 106:22
123:16 126:12
**york** 1:18,19,21
2:5,5,10,10 3:25
4:2 5:23 58:8
79:15,17 115:8,10
146:22 173:19
176:14 188:3,7
**youtube** 120:20

| z |
| --- |

**zero** 67:14 79:20
82:21 94:24
106:13,16,24
107:19 108:20,23
146:4,11

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.