# EXHIBIT PAX 20

Complaint, *Ace Decade Holdings Limited v. USB AG*, Index No. 653316/2015 (N.Y. Sup. Ct.), dated October 5, 2015

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF   New York

----------------------------------------

Ace Decade Holdings Limited

                                    Plaintiff(s),

                    -against-

UBS AG

                                    Defendant(s).

----------------------------------------

Index No.

*Summons*

Date Index No. Purchased:   October 5, 2015

To the above named Defendant(s)

UBS AG
1285 Avenue of the Americas
New York, New York 10019

    You are hereby summoned to answer the complaint in this action and to serve
a copy of your answer, or, if the complaint is not served with this summons, to serve
a notice of appearance, on the Plaintiff's attorney within 20 days after the service of
this summons, exclusive of the day of service (or within 30 days after the service is
complete if this summons is not personally delivered to you within the State of New
York); and in case of your failure to appear or answer, judgment will be taken against
you by default for the relief demanded in the complaint.

    The basis of venue is   N.Y. C.P.L.R. § 503
which is   proper because Plaintiff's principal place of business is in New York City and both parties reside in New York County.

Dated:   New York, New York

        October 5, 2015

                        Boies Schiller & Flexner LLP

                        by  _David Boies_
                            David Boies
                        **Attorneys for Plaintiff**
                            Ace Decade Holdings Limited
                            333 Main Street
                            Armonk, New York 10504

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------x

ACE DECADE HOLDINGS LIMITED,                                 :
                                                             :
                                        Plaintiff,           :          INDEX NO. _____
                                                             :
                        -against-                            :          COMPLAINT
                                                             :
UBS AG,                                                      :          JURY TRIAL DEMANDED
                                                             :
                                        Defendant.           :
--------------------------------------------------------------x

      Plaintiff Ace Decade Holdings Limited ("Ace Decade"), by its undersigned counsel, for

its complaint against UBS AG ("UBS"), alleges, upon knowledge as to itself and its own acts

taking place in its presence, and upon information and belief as to all other matters, as follows:

### NATURE OF THIS ACTION

      1.     This action arises out of UBS's advice to Ace Decade to invest US $500 million

in shares of a company through an intermediary entity, Haixia Huifu Asset Investment and Fund

Management Co., Ltd. ("Haixia"), and related misrepresentations and deception of Ace Decade

by UBS.

      2.     UBS recommended Haixia to Ace Decade as a qualified, independent entity that

would pursue Ace Decade's best interests, concealing, as UBS knew, that the intermediary was

controlled by UBS's joint venture partner and was motivated to act in UBS's interest to the

detriment of Ace Decade.

      3.     Upon UBS's advice, Ace Decade invested less of its own funds than it had

originally planned to invest and borrowed US $775 million from UBS to finance the purchase of

PAX-020-002

additional shares. UBS charged Ace Decade $40 million in fees, in addition to interest, in connection with this loan.

4.    As UBS planned, Haixia arranged for UBS to provide the financing for the loan and negotiated with UBS a one-sided financing commitment letter (the "Financing Letter") with terms that were highly favorable to UBS, including certain margin call provisions that were much more favorable to UBS and much more onerous to Haixia (and hence, to Ace Decade) than the margin call provisions UBS represented to Ace Decade would be in the final Financing Letter.

5.    UBS had earlier told Ace Decade that the margin call provisions in any final Financing Letter would give Ace Decade ample time to meet any margin calls, and further that UBS would work cooperatively with Ace Decade in the event of any margin call.

6.    In July 2015, when the margin call triggers set forth in the Financing Letter were reached as a result of volatility in the stock market, UBS made a margin call on the loan and gave Haixia (and hence, Ace Decade) less than 24 hours to make a prepayment of $200 million.

7.    Ace Decade informed UBS a few hours before the deadline that it could meet the margin call but would need a little more time. However, UBS informed Ace Decade that it had already begun its efforts to sell off Ace Decade's Shares—10% of which it sold to itself—at a 20% discount. UBS acted as it did because the sale would make UBS substantial profits that it could not gain from allowing Ace Decade to meet the margin call, including a $29 million fee for prepayment of the loan.

8.    As a result of UBS's actions, Ace Decade lost its $500 million investment.

9.    This action seeks compensation for the damages caused by UBS's conduct and/or disgorgement of UBS's unjust enrichment.

-2-

PAX-020-003

## THE PARTIES

10.     Plaintiff Ace Decade is a limited liability investment holding vehicle incorporated in the British Virgin Islands.  Ace Decade's principal place of business is in New York City.

11.     Defendant UBS is a Swiss banking and financial services company.  As described by UBS on its website, one of UBS's "main offices worldwide" is located at 1285 Avenue of the Americas, New York, NY 10019.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to N.Y. C.P.L.R. §§ 301 and 302 because UBS transacted business in New York that gives rise to the claims herein and UBS committed tortious acts within and without the State that caused injury to Ace Decade in New York. Specifically, this action arises in substantial part from representations by UBS to Ace Decade in New York, and from agreements made by Ace Decade in New York.  In addition, UBS (1) regularly does or solicits business, engages in a persistent course of conduct, and derives substantial revenue from services rendered in New York; and (2) expects or reasonably should expect its acts to have consequences in this State and derives substantial revenue from international commerce because one of UBS's principal worldwide offices is based in New York and UBS conducts a substantial portion of its business in New York.

13.     Venue is proper in this Court pursuant to N.Y. C.P.L.R. § 503, because both parties reside in New York County.

## FACTUAL ALLEGATIONS

### I.    Background

14.     In or around May 2014, UBS began discussions with Ace Decade and Ace Decade's agent, Kwok Ho Wan, regarding an investment opportunity (the "Investment") in

-3-

an upcoming placement (the "Placement") of H-shares (the "Shares") of Haitong Securities Co., Ltd. ("Haitong").

15.     H-shares are shares of a company incorporated in the People's Republic of China ("PRC" or "mainland China") that are listed on the Hong Kong Stock Exchange ("HKSE"). H-shares are regulated by Chinese law but are denominated in Hong Kong dollars.

16.     Haitong, a joint stock limited company incorporated in the PRC, is a full-service securities firm. Haitong is one of the largest securities firms in the PRC in terms of total assets, net assets, and total revenue. Haitong's shares have been listed on the Shanghai Stock Exchange since July 2007 and its H-Shares have been listed on the HKSE since April 2012. Haitong has a market capitalization on the HKSE of approximately HK $46.2 billion (approximately US $6 billion) and a market capitalization on the Shanghai Stock Exchange of RMB 178.8 billion (approximately US $27.9 billion).

17.     UBS was one of the joint global coordinators and joint placement agents for the Placement of the Shares.

18.     UBS held itself out to Ace Decade as knowledgeable and experienced in advising investors such as Ace Decade with respect to investments in Placements such as this one.

19.     As a result, Ace Decade agreed to have UBS act as its advisor in connection with the Investment, including advising on, among other things, how best to make the Investment, including the entity to use to purchase the Shares and the means by which to finance the Investment. Ace Decade thus relied on UBS to act as its fiduciary and to advise it with respect to its Investment in the Shares.

20.     Steven Wong, a Managing Director at UBS, served as the primary point of contact to Mr. Kwok. Among other things, Mr. Kwok informed Mr. Wong that (1) he planned to

-4-

invest approximately US $1,000,000,000; (2) he planned to make the Investment through

Ace Decade, a special purpose entity that was directed by his employee, Ms. Yu Yong; and

(3) the ultimate purpose of the Investment was to allow Mr. Kwok to enter into a subsequent

transaction with other investors in mainland China in which they would exchange the acquired

Shares for a controlling interest in shares of another company.

II.    **UBS Advised Mr. Kwok to Make His Investment Through an Intermediary That
        Was Controlled by UBS's Joint Venture Partner Without Disclosing This Conflict
        of Interest.**

21.    UBS advised Mr. Kwok not to purchase the Shares directly through Ace Decade.

Instead, UBS advised Mr. Kwok that because his planned Investment comprised greater than

5% of the outstanding H-shares of Haitong, if Mr. Kwok invested directly through Ace Decade,

applicable disclosure requirements would require certain filings. UBS further advised Mr. Kwok

that if Mr. Kwok and Ace Decade invested through an intermediary entity, whereby Ace Decade

would be the beneficial owner of the Shares, but the intermediary entity would hold legal title to

the Shares, no such disclosure would be required.

22.    UBS ultimately recommended that Mr. Kwok select Haixia as the intermediary.

UBS represented to Mr. Kwok and Ace Decade that UBS recommended Haixia because Haixia

was the best qualified to act for Mr. Kwok and Ace Decade and that Haixia was independent of

UBS and would protect Mr. Kwok's and Ace Decade's interests. UBS intended that Mr. Kwok

and Ace Decade rely on these representations by UBS. These representations were knowingly

false, and Mr. Kwok and Ace Decade relied on these representations to their detriment. UBS did

not disclose that Haixia was closely affiliated with UBS, including being controlled by its joint

venture partner, State Development & Investment Corp. ("SDIC"). SDIC and UBS in June 2005

had formed China's first joint venture fund management company called UBS SDIC, which was

owned 49% by UBS and 51% by SDIC. UBS also concealed from Mr. Kwok and Ace Decade

-5-

PAX-020-006

that Lu Bo, the principal point of contact between UBS and Haixia, was previously the Chief Financial Officer of UBS SDIC. Ace Decade relied on UBS's misrepresentations to its detriment, including by entrusting Ace Decade's Investment and negotiations with UBS to Haixia, which Ace Decade would not have done if Ace Decade had been aware of the true facts.

23.    In the absence of UBS's false representations, Ace Decade would not have used an intermediary, would not have used Haixia, and would not have agreed to the terms of the Financing Letter entered into between UBS and Haixia.

24.    In November and December 2014, Mr. Kwok, UBS, and Haixia negotiated the terms of Ace Decade's investment in Haitong. UBS advised Mr. Kwok to structure the Investment so that Ace Decade would provide US $500 million to Dawn State Limited ("Dawn State"), a special purpose vehicle and wholly-owned subsidiary of Haixia Industrial Investment Fund (Fu Jian) Limited Partnership Co., a fund managed by Haixia.

25.    Moreover, although Mr. Kwok initially wanted to invest US $1 billion in the Shares without any financing, UBS advised him it would benefit Mr. Kwok and Ace Decade to invest only US $500 million and to obtain a substantial loan to be invested in the purchase of additional shares.

26.    UBS's cohort Haixia arranged for UBS's London Branch to finance the loan. Mr. Kwok and Ace Decade asked UBS whether Dawn State should approach other banks to finance the loan, but UBS represented to them that UBS would handle the financing on the most favorable terms. Because of their reliance on these representations, Mr. Kwok and Ace Decade did not pressure Haixia to seek financing opportunities through other banks.

-6-

III.    **Haixia Negotiated a Loan Financing Agreement With UBS That Contained Terms
That Were Favorable to UBS and Directly at Odds With the Representations UBS
Had Made to Mr. Kwok.**

27.    On December 18, 2014, Ace Decade entered into a Co-Investment Agreement

("Co-Investment Agreement") with Haixia and Dawn State and a letter agreement ("Letter

Agreement") with Haixia.

28.    Pursuant to the Co-Investment Agreement, Ace Decade would provide

Dawn State with US $500 million, which together with US $775 million in loan financing that

Dawn State was to obtain from UBS, would be used to purchase the Shares.  UBS represented to

Mr. Kwok and Ace Decade that it was desirable not to have to disclose Ace Decade's ownership

of the Shares, that Ace Decade's beneficial ownership of the Shares would not have to be

disclosed if Ace Decade had no management or voting rights with respect to Dawn State, and

that for this reason, UBS recommended that Ace Decade have no management or voting rights

with respect to Dawn State or any Shares purchased by Dawn State.  UBS's representation was

knowingly false, including in that UBS planned and intended that Ace Decade surrender its right

to control its investment so that UBS would be able to structure its deal with Haixia and Dawn

State in UBS's interest.

29.    In return for allowing Ace Decade to use its name for the Investment, Haixia

would receive a fee equal to the higher of (a) 0.65% of the total amount invested by Dawn State

and (b) US $5 million, as well as a 0.1% annual management fee on the total amount of Dawn

State investments.

30.    Because, as Haixia and UBS knew, Mr. Kwok's ultimate motive in making the

Investment was to utilize the Shares in a subsequent transaction, Haixia agreed in the Letter

Agreement to transfer (for no additional consideration) 100% of Dawn State to Ace Decade at

any time after 2 months following completion of Dawn State's purchase of the Shares.

PAX-020-008

31.     On December 19, 2014, Dawn State entered into a subscription agreement with Haitong (the "Subscription Agreement") to purchase 569,427,620 Shares at a share price of HK $15.62. Completion of this sale was conditioned on shareholder and regulatory approvals.

32.     During discussions about the loan financing, Mr. Kwok told Mr. Wong that Ace Decade would not enter into the Investment unless the margin call provisions did not include any triggers based on the short term price fluctuation of the Shares and provided Ace Decade with adequate time to meet any margin calls (for example, five business days to pay the first 25%, 10 business days to pay the second 25%, and 20 business days to pay the remaining 50%). Mr. Wong represented to Mr. Kwok that a Financing Letter would be consistent with Mr. Kwok's requirements and further that UBS would work cooperatively with Ace Decade to allow it to meet any margin calls. To reassure Mr. Kwok that his representations were true, Mr. Wong told Mr. Kwok that UBS provided loan financing to a large shareholder of H-shares of Ping An Insurance (Group) Co., and that shareholder's loan was substantially larger than Ace Decade's, but that UBS had never sold off any of the shares owned by that shareholder as a result of a margin call being triggered.

33.     The final Financing Letter between Haixia and UBS was executed on December 19, 2014. Because of UBS's advice, neither Ace Decade nor Mr. Kwok were parties to the Financing Letter. Instead, only Dawn State—the special purpose entity owned and controlled by Haixia, which was itself controlled by UBS's joint venture partner—was a party to the Financing Letter.

34.     UBS concealed from Ace Decade that Haixia, the intermediary through which Ace Decade would be making the Investment, was inextricably tied to UBS, and this conflict of interest warped Haixia's objectivity and incentivized it to agree to terms in the Financing Letter

-8-

that would favor UBS and were directly at odds with the terms that Mr. Kwok had demanded and that UBS had represented it would accept.

35.     The margin call provisions in the final Financing Letter contained terms that UBS had represented to Mr. Kwok would not be included and that Mr. Kwok had said the inclusion of which would be a dealbreaker for Ace Decade's Investment.  Specifically, the provisions gave UBS the right to demand, under certain circumstances, repayment of the entire loan, which together with penalties and a lucrative make-whole premium, would add up to close to US $1 billion, with 25% of the total due in less than 24 hours and the remaining 75% being due in the next two days.

36.     In early January 2015, Mr. Kwok and Ms. Yu moved to New York where they formed a company called Golden Spring (New York) Ltd. ("Golden Spring New York") to seek U.S. investors interested in investing in Chinese companies.  Golden Spring was incorporated in New York in February 2015 and is located at 767 Fifth Avenue, 46th Floor, New York, NY 10153.

37.     Ace Decade and Golden Spring New York entered into an agreement in February, pursuant to which Golden Spring New York would be responsible for managing Ace Decade's investments and seeking U.S. investors interested in investing in Haitong indirectly through Ace Decade.

38.     Mr. Kwok and Ms. Yu have conducted business for Ace Decade and Golden Spring New York out of their New York office since early January 2015.

39.     When Haitong was close to obtaining the necessary shareholder and regulatory approvals necessary to complete the sale, Haixia and UBS began to negotiate the final loan papers.  Because UBS had previously represented to Mr. Kwok that the margin call provisions in

-9-

the Financing Letter had been revised to reflect his comments, Mr. Kwok did not again directly discuss with UBS the margin call provisions in the final Facility Agreement and other associated collateral documents, which Dawn State and UBS entered into on April 1, 2015.

40.     The Facility Agreement provided up to HK $5,336,675,654.64 (approximately US $688.3 million) in loan financing to Dawn State for the purchase of the Shares to be secured by the Shares.

41.     Dawn State and UBS also simultaneously entered into a side letter agreement (the "UBS Side Letter") that provided that if the loans were prepaid, including as a result of a margin call, Dawn State would owe UBS a make-whole premium. The UBS Side Letter and Facility Agreement were signed on the same day, but the make-whole premium is referenced only in the UBS Side Letter.

42.     On May 8, 2015, Haitong announced that the conditions precedent to completing the issuance and sale of the new H-Shares had been met and that the closing was expected to occur on May 15, 2015. Additionally, per the terms of the Subscription Agreement, because the trading price of Haitong's H-Shares during the 30 trading days prior had surpassed a pre-agreed threshold, the subscription price would be increased by up to HK $1.56.

43.     As a result, Dawn State and UBS entered into an amendment to the Facility Agreement to reflect the increase in the per share price of Haitong's H-Shares and thereby increasing UBS's loan to HK $6,011,236,393.92 (approximately US $775.4 million).

44.     On May 15, 2015, Dawn State completed Ace Decade's Investment.

45.     Pursuant to the Letter Agreement, Ace Decade could have demanded that Haixia transfer to it 100% of Dawn State at any time after July 15, 2015. However, in order to prevent

-10-

Ace Decade from gaining control of Dawn State, UBS liquidated all of Ace Decade's Haitong shares in Dawn State's name just days before Ace Decade could have exercised its right.

**IV.    UBS Sold All 569,427,620 of Ace Decade's Shares Shortly After Giving Notice of the Margin Call.**

46.    In mid-June 2015, China's equities market experienced a sharp downturn and Haitong share prices began to fall along with other stocks in the H-share market.

47.    On July 6, 2015 at 5:22 pm Hong Kong time, Donghai Tan of Haixia sent an email to Ace Decade's counsel Stevenson, Wong & Co. ("Stevenson Wong"), notifying them that the closing price of the Shares had triggered short term fluctuation limits and that UBS would be calling the loan. He informed them that 25% of the loan was due before 5 pm the next day. UBS's margin call was based on the short term fluctuation limits and timing of prepayment provisions in the draft Financing Letter that Ace Decade had rejected and that UBS had represented would not be in the final Financing Letter.

48.    Later that day, at 8:45 pm Hong Kong time, UBS sent Haixia the mandatory prepayment notice, which Haixia forwarded to Stevenson Wong at 9:17 pm Hong Kong time. The notice stated that approximately US $200 million needed to be paid by 5 pm the next day.

49.    Ace Decade, Mr. Kwok, and Ms. Yu learned about the margin call on the morning of July 6 New York time and were told that they had less than 24 hours to arrange for the transfer of US $200 million. This notification was a shock to them because they had relied upon UBS's representations that the margin call provisions did not include a trigger for short term fluctuation limits or a prepayment by 5 pm on the following business day.

50.    On the morning of July 7 Hong Kong time (evening on July 6 New York time), UBS asked Haixia to confirm by 2 pm Hong Kong time whether the required repayment could be made that day so that UBS "can assess the situation and work together on next steps."

-11-

PAX-020-012

51.    Although Ace Decade was stunned by the margin call and the short time to make
a prepayment, it made every effort to meet the call.  At or prior to 2 pm Hong Kong time (2 am
New York time), an employee of Mr. Kwok's informed UBS that Ace Decade could obtain the
funds to meet the margin call quickly but that it could not do so by the 5 pm deadline that day.

52.    Mr. Wong knew that Ace Decade could make the mandatory prepayments and
that Mr. Kwok was impervious to any fluctuations in the share price of Haitong because
his ultimate objective in making the Investment was to enter into a subsequent swap transaction
to exchange the Haitong shares for a controlling interest in shares of another company.

53.    However, contrary to UBS's representations to Mr. Kwok and Ace Decade prior
to entering into the Investment, UBS never had any intention to work cooperatively with
Ace Decade.  By the time that Mr. Wong received the message that Ace Decade could meet the
margin call, senior executives at UBS had already told Mr. Wong that UBS would not give
Ace Decade any additional time to gather the funds.  Mr. Wong told Mr. Kwok and Ace Decade
that UBS had already identified buyers and that UBS would make substantial profits by selling
the shares instead of working with Ace Decade to allow it to make the margin call.

54.    Indeed, UBS profited handsomely from its role in this transaction, receiving 1%
of the facility amount for arranging the loan financing, which amounted to US $7.5 million, and
a facility amendment fee of HK $13,226,681.16 (approximately US $1.76 million) for a total of
US $9.2 million in fees.  UBS would also receive a "make-whole" fee of HK $231,967,848.24
(approximately US $29.9 million), corresponding to the full amount of the spread that would
have been owed on the principal if the loan had not been repaid or prepaid, which gave UBS a
substantial incentive to stringently enforce the one-sided margin call provisions.

PAX-020-013

55.    Mr. Wong told Mr. Kwok that the decision to immediately execute the block sale

and not cooperate with Ace Decade was ordered by the top management of UBS, including

UBS's CEO.

**V.    UBS Executed Block Trades to Unwind the Haitong Shares and Sold the Shares at a
20% Discount.**

56.    UBS began to offer to sell the Shares on July 7 in the range of HK $11.12-

HK$12.00 per share.

57.    Haitong suspended its trading on the HKSE on July 8, and on July 9 announced a

$3.5 billion stock buyback, saying that it would purchase shares at as much as HK $17.18.

58.    Instead of selling only the shares sufficient to cover the $200 million payment that

UBS demanded to be prepaid on July 8, UBS sold all 569,427,620 shares belonging to

Ace Decade at HK $11.12, a 20% discount off the HK $13.90 closing price of Haitong stock on

July 7, and a 35% discount off the price at which Haitong had offered to purchase back its

shares.

59.    UBS sold 58,284,114 shares of Haitong stock to itself.

60.    UBS also sold 200,000,000 shares of Haitong stock to Segantii Capital

Management Limited ("Segantii"), a fund management company that has close ties to UBS.

In fact, prior to introducing Haixia to Ace Decade, UBS had recommended that Ace Decade use

Segantii as the intermediary entity through which to make its Investment.

61.    Haitong H-shares resumed trading on July 9 and closed at HK $13.82, a 0.6%

drop from its closing price on July 7 and 24.3% higher than the price at which UBS sold the

Shares.

62.    The next day, Haitong shares closed at HK $15.18, a 10% gain from the closing

price the day before and 37% higher than the price at which UBS sold the Shares.

PAX-020-014

63.     Several news agencies reported on the block sale and queried why the sale was done so urgently and at such a discount. Bloomberg reported that "As China fund loses $445 million on Haitong, UBS is a Winner." Reuters reported that "Hong Kong block deals are normally done at a 6-8 percent discount" and "it was not immediately known what prompted Haixia to launch the sale at *unusually* large discount" (emphasis added).

64.     Less than two weeks after UBS had sold the Haitong shares at HK $11.12, UBS's own analysts reaffirmed their 12-month buy rating on Haitong at its then current price of HK $15.34 and set a target price of HK $30, 170% higher than the price at which UBS sold the shares.

**VI.    As a Result of UBS's Actions, Ace Decade Lost Its More Than $495 of Its $500 Million Investment.**

65.     As a result of UBS's block discounted sale of the Haitong shares, UBS recouped only HK $6,325,703,099.27 (approximately US $816.2 million) out of a total investment of US $1.25 billion.

66.     UBS returned to Dawn State HK $36,621,693.83 (approximately US $4.7 million) after deducting the following from the amount it recouped from the block sale: (1) HK $6,011,236,393.92 (approximately US $775.6 million) for the principal amount outstanding of the loan; (2) HK $44,003,279.72 (approximately US $5.7 million) for interest accrued up to the date of the mandatory prepayment notice; (3) HK $1,873,883.54 (approximately US $241.8 thousand) for break costs, and (4) HK $231,967,848.24 (approximately US $29.9 million) for the make-whole premium.

67.     Thus, as a result of UBS's actions, Ace Decade lost approximately US $495.3 million of its initial US $500 million investment.

-14-

PAX-020-015

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Common Law Fraud)

68.    Ace Decade incorporates by reference and realleges each and every allegation contained in ¶¶ 1-67, as though fully set forth herein.

69.    UBS made intentional material misrepresentations of fact and omissions in advising Ace Decade to enter into the Investment.  Among other things, UBS misrepresented that the Financing Letter would not include margin call triggers based on short term price fluctuations and would give Ace Decade adequate time to meet any margin calls, and that UBS would make every effort to work with Ace Decade to allow it to meet margin calls.

70.    UBS also represented that Haixia was the best independent intermediary to protect Ace Decade's interests, but concealed from Ace Decade that Haixia was controlled by UBS's joint venture partner.  Subsequently Haixia and UBS entered into loan financing agreements that contained one-sided terms that were favorable to UBS and detrimental to Ace Decade.  Ace Decade relied on UBS's false and misleading representations to its detriment, including in entering into its agreement with Haixia.

71.    Ace Decade did not have access to the information that UBS, the placement agent for the Shares and the lender for Ace Decade's Investment, had, and Ace Decade was not aware of the conflict of interest between UBS and Haixia.

72.    UBS knew that its representations and omissions were false and misleading and made them with the intent and expectation that Ace Decade would rely on them.

73.    Ace Decade reasonably relied on UBS's misrepresentations and omissions, without which Ace Decade would not have agreed to invest in the Shares through Haixia.

-15-

PAX-020-016

74.    Ace Decade has suffered injury as a direct and proximate result of UBS's conduct, including but not limited to monetary damage.  As a result of the conduct alleged herein, UBS is liable to Ace Decade and Ace Decade is entitled to relief.

## SECOND CAUSE OF ACTION
### (Constructive Fraud)

75.    Ace Decade incorporates by reference and realleges each and every allegation contained in ¶¶ 1-67, as though fully set forth herein.

76.    UBS made intentional material misrepresentations of fact and omissions in advising Ace Decade to enter into the Investment.  Among other things, UBS misrepresented that the Financing Letter would not include margin call triggers based on short term price fluctuations and would give Ace Decade adequate time to meet any margin calls, and that UBS would make every effort to work with Ace Decade to allow it to meet margin calls.

77.    UBS also represented that Haixia was the best independent intermediary to protect Ace Decade's interests, but concealed from Ace Decade that Haixia was controlled by UBS's joint venture partner.  Subsequently Haixia and UBS entered into loan financing agreements that contained one-sided terms that were favorable to UBS and detrimental to Ace Decade.  Ace Decade relied on UBS's false and misleading representations to its detriment, including in entering into its agreement with Haixia.

78.    Ace Decade did not have access to the information that UBS, the placement agent for the Shares and the lender for Ace Decade's Investment, had, and Ace Decade was not aware of the conflict of interest between UBS and Haixia.

79.    UBS acted as an advisor to Ace Decade with respect to its Investment and advised Ace Decade, among other things, to structure the transaction so that its Investment would be

-16-

PAX-020-017

made through Haixia and to obtain financing for a significant part of the Investment. As such, UBS formed a close fiduciary relationship with Ace Decade.

80.     Ace Decade reasonably relied on UBS's misrepresentations and omissions, without which Ace Decade would not have agreed to invest in the Shares through Haixia.

81.     Ace Decade has suffered injury as a direct and proximate result of UBS's conduct, including but not limited to monetary damage. As a result of the conduct alleged herein, UBS is liable to Ace Decade and Ace Decade is entitled to relief.

### THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty)

82.     Ace Decade incorporates by reference and realleges each and every allegation contained in ¶¶ 1-67, as though fully set forth herein.

83.     Ace Decade relied on UBS to act as its fiduciary and to advise it with respect to its Investment in the Shares.

84.     UBS acted as an advisor to Ace Decade with respect to its Investment and advised Ace Decade, among other things, to structure the transaction so that its Investment would be made through Haixia so as to circumvent disclosure requirements and to obtain financing for a significant part of the Investment. As such, UBS formed a close fiduciary relationship with Ace Decade.

85.     UBS held itself out to Ace Decade as knowledgeable and experienced in advising investors such as Ace Decade with respect to investments in Placements such as this one. As a result, Ace Decade placed its trust and confidence in UBS and followed UBS's advice in structuring its Investment and obtaining a loan from UBS.

86.     During the course of the relationship, UBS abused the trust that Ace Decade had placed in UBS by making intentional material misrepresentations of fact and omissions in

-17-

PAX-020-018

advising Ace Decade to enter into the Investment. Among other things, UBS misrepresented that

the Financing Letter would not include margin call triggers based on short term price fluctuations

and would give Ace Decade adequate time to meet any margin calls, and that UBS would make

every effort to work with Ace Decade to allow it to meet margin calls.

87.    UBS also represented that Haixia was the best independent intermediary to

protect Ace Decade's interests, but concealed from Ace Decade that Haixia was controlled by

UBS's joint venture partner. Subsequently Haixia and UBS entered into loan financing

agreements that contained one-sided terms that were favorable to UBS and detrimental to Ace

Decade. Ace Decade relied on UBS's false and misleading representations to its detriment,

including in entering into its agreement with Haixia.

88.    Ace Decade did not have access to the information that UBS, the placement agent

for the Shares and the lender for Ace Decade's Investment, had, and Ace Decade was not aware

of the conflict of interest between UBS and Haixia.

89.    Ace Decade has suffered injury as a direct and proximate result of UBS's

conduct, including but not limited to monetary damage. As a result of the conduct alleged

herein, UBS is liable to Ace Decade and Ace Decade is entitled to relief.

## FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation)

90.    Ace Decade incorporates by reference and realleges each and every allegation

contained in ¶¶ 1-67, as though fully set forth herein.

91.    UBS made material misrepresentations of fact and omissions in advising

Ace Decade to enter into the Investment that it was negligent in failing to know were false.

Among other things, UBS misrepresented that the Financing Letter would not include margin

call triggers based on short term price fluctuations and would give Ace Decade adequate time to

-18-

PAX-020-019

meet any margin calls, and that UBS would make every effort to work with Ace Decade to allow it to meet margin calls.

92.     UBS also was negligent in representing that Haixia was the best independent intermediary to protect Ace Decade's interests, but concealed from Ace Decade that Haixia was controlled by UBS's joint venture partner.  Subsequently Haixia and UBS entered into loan financing agreements that contained one-sided terms that were favorable to UBS and detrimental to Ace Decade.  Ace Decade relied on UBS's false and misleading representations to its detriment, including in entering into its agreement with Haixia.

93.     UBS had a duty of disclosure to Ace Decade.  UBS acted as an advisor to Ace Decade with respect to its Investment and advised Ace Decade, among other things, to structure the transaction so that its Investment would be made through Haixia and to obtain financing for a significant part of the Investment.  As such, UBS formed a close fiduciary relationship with Ace Decade.

94.     Ace Decade did not have access to the information that UBS, the placement agent for the Shares and the lender for Ace Decade's Investment, had, and Ace Decade was not aware of the conflict of interest between UBS and Haixia.

95.     Ace Decade reasonably relied on UBS's misrepresentations and omissions, without which Ace Decade would not have agreed to invest in the Shares through Haixia.

96.     UBS was aware that Art Decade would rely upon its advice and statements regarding the Investment.

97.     Ace Decade has suffered injury as a direct and proximate result of UBS's conduct, including but not limited to monetary damage.  As a result of the conduct alleged herein, UBS is liable to Ace Decade and Ace Decade is entitled to relief.

-19-

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment)

98.    Ace Decade incorporates by reference and realleges each and every allegation contained in ¶¶ 1-67, as though fully set forth herein.

99.    UBS has been enriched at the expense of Ace Decade through: (a) earning US $9.2 million in fees for its advisory services; (b) earning US $29.9 million from the make-whole premium fee; and (c) selling to itself a large block of Shares at a highly-discounted price.

100.    UBS unjustly retained these ill-gotten gains at Ace Decade's expense.

101.    Because UBS received and unjustly retained at Ace Decade's expense such monetary benefits, UBS is liable to Ace Decade and Ace Decade is entitled to relief.

## PRAYER FOR RELIEF

102.    WHEREFORE, Plaintiff Ace Decade demands judgment in its favor against Defendant UBS as follows:

A.    Awarding damages to Plaintiff in an amount to be determined at trial, for the damages it sustained as a result of UBS's block sale of the Shares;

B.    Pre-judgment and post-judgment interest, together with any and all further costs, disbursements and reasonable attorney's fees and expert fees;

C.    Granting such other relief, including equitable and injunctive relief, as this Court may deem just and proper.

PAX-020-021

Dated: New York, NY
      October 5, 2015

BOIES, SCHILLER & FLEXNER LLP

By:    _David Boies_

David Boies
333 Main Street
Armonk, NY 10504
Tel:  (914) 749-8200
Fax:  (914) 749-8300
Email:  dboies@bsfllp.com

Qian A. Gao
575 Lexington Avenue
New York, NY 10022
Tel:  (212) 446-2300
Fax:  (212) 446-2350
Email:  qgao@bsfllp.com

*Attorneys for Plaintiff Ace Decade
Holdings Limited*

-21-