UNITED STATES BANKRUPTY COURT

DISTRICT OF CONNECTICUT

BRIDGEPORT DIVISION

```
-------------------------x
In Re:                   :    Case No. 21-50081
                         :
    HO WAN KWOK,         :    Chapter 11
            Debtor.  :
-------------------------x    March 1, 2022
```

Brien McMahon Federal Bldg.
915 Lafayette Street
Bridgeport, Connecticut


MOTION TO EXTEND TIME TO FILE SCHEDULES


(Transcription from Electronic Recording)


Held Before:

THE HON. JULIE A. MANNING
United States Bankruptcy Judge




Transcription Services of
FALZARANO COURT REPORTERS, LLC
4 Somerset Lane
Simsbury, CT  06070
860.651.0258
www.falzaranocourtreporters.com

A P P E A R A N C E S (via telephone):

For the Debtor:

        BROWN RUDNICK, LLP
        Seven Times Square
        New York, New York 10036
        212-209-4800
           BY:  BENNETT SILVERBERG, ESQ.

        BROWN RUDNICK, LLP
        185 Asylum Street
        Hartford, Connecticut 06103
        860-509-6500
           BY:  DYLAN KLETTER, ESQ.

For Pacific Alliance Asia Opportunity Fund, LP (PAX):

        O'MELVENY & MYERS, LLP
        Times Square Tower
        7 Times Square
        New York, New York 10036
        212-326-2000
           BY:  STUART M. SARNOFF, ESQ.
              AISLING MURRAY, ESQ.

        O'MELVENY & MYERS, LLP
        1625 Eye Street, NW
        Washington, DC 20006
        202-383-5300
           BY:  PETER FRIEDMAN, ESQ.
              DAVID HARBACH, II., ESQ.

        ROBINSON & COLE
        280 Trumbull Street
        Hartford, Connecticut 06103
        860-275-8275
           BY:  PATRICK BIRNEY, ESQ.

For the Creditor Logan Cheng:

        RANDAZZA LEGAL GROUP, PLLC
        100 Pearl Street - 14th Floor
        Hartford, Connecticut 06103
        702-420-2001
           BY:  JAY M. WOLMAN, ESQ.
            (Via videoconference)

For the U.S. Trustee:

OFFICE OF THE UNITED STATES TRUSTEE
The Giaimo Federal Building
150 Court Street - Room 302
New Haven, Connecticut 06510
203-773-2210
        BY:  HOLLY L. CLAIBORN, ESQ.

```
 1              (Proceedings commenced at 4:04 p.m.)

 2

 3              COURTROOM DEPUTY:  Number 22-50073, Ho Wan Kwok.

 4              THE COURT:  Okay.  Good afternoon.  If we could

 5   have appearances for the record starting with the Debtor's

 6   counsel please.

 7              MR. SILVERBERG:  Good afternoon, your Honor.

 8   It's Bennett Silverberg of Brown Rudnick.  I'm joined by

 9   my sponsoring attorney, Dylan Kletter.

10              THE COURT:  Good afternoon to both of you.  And

11   I think, Attorney Silverberg, there may have been an order

12   entered allowing your admission pro hac vice is it?

13              MR. SILVERBERG:  Yes, yes, your Honor, and we

14   thank you for that.

15              THE COURT:  Okay.  Thank you.

16              MR. BIRNEY:  Good afternoon, your Honor.

17   Patrick Birney, Robinson & Cole on behalf of Pacific

18   Alliance Asia Opportunity Fund, LP or PAX.  With me in the

19   courtroom, your honor, to my right is Attorney Peter

20   Friedman, to my left is Attorney Stuart Sarnoff.

21              THE COURT:  Good afternoon.

22              MR. BIRNEY:  And couple of other folks, Attorney

23   David Harbach and Aisling Murray all from O'Melveny.

24              Your Honor, the motions for pro hac vice have

25   been filed and granted by your Honor and Mr. Friedman will
```

1  be taking over with lead argument today.

2          THE COURT:  Okay.  Thank you.  Thank you all.

3  Welcome everyone.

4          Go ahead, Attorney Claiborn.

5          MS. CLAIBORN:  Good afternoon, your Honor.

6  Holley Claiborn for the U.S. Trustee.

7          THE COURT:  Good afternoon.

8          Attorney Wolman?

9          MR. WOLMAN:  Good afternoon, your Honor.  Jay

10  Wolman of Randazza Legal Group, for the creditor Logan

11  Cheng.

12          THE COURT:  Good afternoon.  Okay.

13          MR. WOLMAN:  Thank you very much, your Honor,

14  for permitting me to appear remotely.

15          THE COURT:  Yes.  As I noted -- oh, I forgot to

16  put the camera on, sorry, Attorney Wolman.  We're doing

17  different kinds of hearings today so I don't even know if

18  you can -- if that works, but in any event it's there.

19          As I noted, you know, this was an expedited

20  hearing so you're allowed to participate today remotely.

21  We are back in court, there are a number of us in the

22  courtroom but people are masked and apparently, you know,

23  comfortable with distancing and so we'll proceed today.

24          Now, before we talk about anything specifically

25  I got a message that there's an interpreter here today for

1  the Debtor.

2          MR. SILVERBERG:  Yes, your Honor.

3          THE COURT:  And before we talk anything about

4  that I just want to -- do other counsel understand that

5  the Debtor has an interpreter today?

6          MR. FRIEDMAN:  Yes, your Honor.  Peter Friedberg

7  from O'Melveny & Myers on behalf of PAX.  We do

8  understand.  We do understand.

9          THE COURT:  Okay.  And do you have an opposition

10  to the interpreter?

11          MR. FRIEDMAN:  No, your Honor.  I have no

12  opposition to the interpreter.

13          THE COURT:  Okay.  And you believe the

14  interpreter is qualified to interpret whatever the Debtor

15  is saying?

16          MR. FRIEDMAN:  I don't have any basis one way or

17  another, your Honor.

18          THE COURT:  Okay.  I understand from the Office

19  of the United States Trustee's pleadings that were filed I

20  think yesterday, I think I'm correct, that there was an

21  interpreter for the Debtor at the initial Debtor interview

22  that your office conducted; is that correct?

23          MS. CLAIBORN:  Yes, your Honor.  The U.S.

24  Trustee used the services of an interpreter over the

25  telephone and then the Debtor had his own personal

1    interpreter who was present physically with the Debtor.

2         THE COURT:  So is the gentleman that's here

3    today -- I shouldn't even say, I assume it's a gentleman

4    because I'm looking in the back of the courtroom, but is

5    the gentleman here today the same gentleman that was with

6    the Debtor during the initial Debtor interview?

7         MR. SILVERBERG:  No, your Honor.  The

8    interpreter's name is John Lao.

9         THE COURT:  Okay.  Okay.  I just need to

10   understand at some point if Mr. Lao is going to be

11   interpreting anything that the Debtor says I want to

12   understand Mr. Lao's qualifications, if we get to that

13   point, okay?  We obviously were not prepared to have an

14   interpreter but that's not necessarily a problem.  All I'm

15   suggesting to you is I don't want there -- I'm not going

16   to have a hearing continue and be held if there's going to

17   be any controversy over the interpreter.  That's my point,

18   okay?

19        MR. SILVERBERG:  Yes, your Honor.

20        THE COURT:  Okay.  Thank you.

21        All right.  Now --

22        MS. MURRAY:  Judge, I'm sorry, we didn't pick up

23   what Attorney Claiborn is saying -- said before, I'm

24   sorry.  She's a little far from the mic.

25        THE COURT:  Yeah, it's not your fault, Attorney

1  Claiborn.  The problem is with all of us with masks and,

2  you know, distancing, and sometimes we might have to ask

3  you to talk a little more loudly.

4           MS. CLAIBORN:  I'll do my best to speak louder.

5           THE COURT:  Thank you.  Even just that angle

6  unfortunately picks up your voice better in the

7  microphone.  And as I think you're all aware our record is

8  audio, so we have to be very careful about the microphones

9  and if there's times when I ask you or someone asks you to

10 repeat yourself it's because we need to make sure we have

11 a clear record.  Okay?

12          All right.  So a week or so ago, and I can pull

13 it up, you probably all know it better than I at this

14 point, the Clerk's Office entered a docket entry in this

15 case regarding certain deficiencies with regard to the

16 petition and other documents that are required to be filed

17 in a bankruptcy case by a voluntary debtor.  The amended

18 petition was filed, I saw that, that corrected that

19 deficiency.  There is a -- I understand, you know, the

20 office is thinking that they can sometimes use other

21 people's numbers but we don't allow that and so that was

22 why there was a need for the filing of the amended

23 petition.  So I understand that's been done.

24          I understand there was a notation about a

25 creditor who didn't have an appropriate attention line and

1  that's been corrected as well.  So the Court appreciates

2  that.

3       What the order that I believe the Debtor's

4  counsels are -- not the order but the deficiency notice

5  that the Debtor's counsel is concerned about that resulted

6  in this motion to extend time to file the schedules is

7  because -- and I'm telling you both something I know you

8  already know, this isn't any news to you.  The Bankruptcy

9  Code requires and the rules and schedules and statements

10  be filed within 14 days of the filing of the case.  For as

11  many reasons as all of us in this room know that's an

12  important issue because a case can't be properly

13  administered if a debtor hasn't met its duties, his

14  duties, in this case his duties, of preparing and filing

15  the schedules and statements of affairs.  That's an

16  essential requirement that this Court and I think all

17  courts take very seriously.

18       The deficiency notice said that the case may be

19  dismissed.  It didn't say shall, but I understand the

20  Debtor's counsels desire to then get a hearing quickly

21  held so that you would -- because you don't want to have

22  your case dismissed and I understand that.  So in any

23  event, that was the reason that the motion for an

24  expedited hearing was granted and is set today on the

25  motion to extend time to file the schedules.

1       Now, I understand what you're looking for.

2  You're looking for 60 days.  You know that you've got two

3  written objections to that already.  I can tell you you're

4  not going to get 60 days.  That's not going to happen.

5  But what I want to know is have you had any discussions

6  with counsel for the creditors or the U.S. Trustee's

7  Office about your request and their objections.

8       MR. SILVERBERG:  Yes, your Honor.  As a matter

9  of fact we had our -- I'm not sure if your Honor can hear

10 me.

11      THE COURT:  That's perfect, thank you.

12      MR. SILVERBERG:  Your Honor, we had our initial

13 Debtor interview with Ms. Claiborn in her office

14 yesterday.  It was a 3-hour interview.  At the conclusion

15 of the interview we asked Ms. Claiborn what the Office's

16 position was on the extension request.  She made clear

17 that 60 days was going to be met with an objection and she

18 strongly admonished that we consider requesting an

19 extension that expired in advance of the section 341

20 meeting and creditors sufficient time to review the

21 schedules and statements so that they can ask informed

22 questions at the 341 meeting.

23      Last night after consulting with the client who

24 happens -- sorry, did we make any introduction to our

25 client, Mr. Ho Wan Kwok?

1          MR. KWOK:  Good afternoon, your Honor.

2          THE COURT:  Good afternoon, sir.

3          MR. SILBERBERG:  He goes my Miles.

4          THE COURT:  Good afternoon.  Thank you.  You can

5    have a seat, sir.  Thank you.

6          MR. SILVERBERG:  So yesterday, last evening,

7    sorry, we made a proposal to the U.S. Trustee to extend

8    the deadline to file the schedules and the statements

9    until March 16th, which is the Wednesday before the Monday

10   341 meeting.  The reason why we didn't go exactly a week

11   prior is that we're dealing with some of the logistics of

12   translating the schedules and statements into Mr. Kwok's

13   native Chinese.  So we want to make sure that when he

14   certifies and attests to the accuracy under penalty of

15   perjury that he completely understands in his own language

16   what the schedules and statements are saying so that

17   there's absolutely no question as to what the words are on

18   the page.

19         THE COURT:  I understand.  Okay.  So are you

20   saying that you are prepared -- and I'm going to hear from

21   other parties, but I just want to ask you this question.

22   You are prepared on behalf of the Debtor to agree to an

23   extension of time that would expire on March 16th; is that

24   correct?

25         MR. SILVERBERG:  That is correct, your Honor.

1        THE COURT:  Okay.  All right.  Thank you.  I

2    appreciate that.

3        Now, Attorney Claiborn, you filed the first

4    objection to this motion, you've now heard counsel and his

5    agreement to limit the extension of time if it's granted

6    to March 16th.  What else would you like to add to the

7    record of what other thoughts do you have with regard to

8    the extension request?

9        MS. CLAIBORN:  Your Honor, I think it might be

10   helpful if I could ask the Court to listen to the PAX

11   presentation before the U.S. Trustee.

12       THE COURT:  Oh, that's fine.  Okay.

13       MS. CLAIBORN:  And I make that suggestion

14   because there is a long history of the Debtor and PAX that

15   I think would be informative to the analysis of what kind

16   of an extension of time makes sense for this case.

17       THE COURT:  That's fine.

18       Counsel?

19       MR. SILVERBERG:  And your Honor, if PAX is going

20   to go into a gory detail of what led us here I think -- I

21   have a presentation I can make as well if you want to hear

22   it, otherwise you can hear --

23       THE COURT:  Well, are you suggesting you'd like

24   to make your presentation first; is that what you're

25   saying?  Or do you want to respond to their presentation?

1          MR. SILVERBERG:  I'd like to make our

2    presentation first if that --

3          THE COURT:  And your presentation is going to be

4    about why the case was filed and why you need the

5    extension of time?

6          MR. SILVERBERG:  That is correct.

7          THE COURT:  All right.  I'll let them go first,

8    Counsel, and then I will absolutely hear from you.

9          MR. FRIEDMAN:  Thank you, your Honor.

10         THE COURT:  Go ahead.

11         MR. SILVERBERG:  Do you want me to do it from

12   here or from the podium?

13         THE COURT:  You can do it right from there,

14   Counsel.

15         MR. SILVERBERG:  Perfect.

16         So your Honor, what I was proposing to do is

17   first give a background of Mr. Kwok and then follow it up

18   with the events leading to the commencement of this

19   Chapter 11 case and provide the justification for the

20   extension request.

21         Your Honor, by way of background, Mr. Kwok was

22   born in Shandong Province in China.  He currently resides

23   in Greenwich, Connecticut with his wife of 35 years, Hing

24   Chi.  He has two adult children, together they have a son,

25   Mr. Qiang Guo, and a daughter, Ms. Mei Guo.  The son lives

1  in the United Kingdom, the daughter splits her time

2  between New York City and Connecticut, hopefully more time

3  out of the parents' house now that Covid is receding.

4         He grew up in a large but poor household which

5  inspired his entrepreneurial spirit.  At the age of 13 Mr.

6  Kwok dropped out of middle school and began selling

7  clothing and electronics to help support his family.  In

8  May 1989 was detained and tortured for his support of the

9  Tiananmen Square protest.  While detained for

10  approximately 20 months he created key relationships with

11  political activists, intellectuals, business people and

12  religious leaders.  One of these contacts will later

13  introduce him to a Ms. Ping Xia, a successful business

14  woman and investor from Hong Kong.

15         In 1991 Mr. Kwok began to work with Ms. Xia in

16  Yuda property company, a company which focused on

17  commercial real estate development in the Henan Province

18  of China.  Shortly after its launch Yuda successfully

19  developed and constructed the high end Yuda International

20  Trade Center in Henan Province's capital city of

21  Zhengzhou.  The commercial complex includes what was at

22  the time the tallest skyscraper in Henan Province and

23  China's 5th tallest building.  Upon completion of its

24  construction the complex had a then value of 300 million.

25  The trade center was financially successful and

1   established Mr. Kwok's presence in China's world of real

2   estate developers, particularly in Henan Province where

3   Yuda continued to develop high end residential and

4   commercial projects.

5        Around 2000 building on his success in Henan

6   Province Mr. Kwok shifted his real estate aspirations to

7   the Chinese capital Beijing where he expanded his business

8   to include private financing for his projects in which his

9   six siblings participated.  Through success in Henan

10  Province Mr. Kwok's immediate and extended family members

11  were lifted out of poverty.

12       In Beijing Mr. Kwok helped establish Beijing

13  Morgan Investment Company and Beijing Zenith Holdings

14  Company, a real estate development and investment

15  management consulting company, entities in which Mr.

16  Kwok's and extended family were shareholders and

17  employees.

18       In 2002 these businesses acquired two parcels

19  spanning approximately 2 million square meters of

20  undeveloped land in northern Beijing.  The value of these

21  parcels increased dramatically after China was named to

22  host country for the 2008 Olympics and the government

23  announced its plans to build the Olympic venue adjacent to

24  these land parcels.

25       The increased value of these parcels spawned Mr.

1    Kwok's longstanding political fight with the Chinese

2    Communist Party.  Deputy Mayor Zhihua attempted to

3    improperly appropriate Morgan Investments property, Mr.

4    Kwok fought back, reporting this corruption to the

5    Government, and after a lengthy fight ultimately recovered

6    Morgan Investments land parcels.

7         Mr. Kwok then oversaw the successful

8    construction and timely completion of the Beijing Pangu

9    Plaza and Jhihuan Plaza.  The Pangu Plaza has become a

10   Beijing landmark adjacent to the Olympic venue.  Mr. Kwok

11   however with his criticism of the CCP's corruption drew a

12   harsh response.  When it became clear his life was in

13   jeopardy he fled to the United States in 2015.  In

14   absentia the CCP froze or seized his assets in China,

15   including assets held by companies in which he held an

16   interest.  The CCP also caused the seizure of his assets

17   elsewhere including Hong Kong and caused Interpol to issue

18   a red notice for his arrest.

19        In September of 2017 he claimed political asylum

20   in the United States and his application remains pending

21   to this day.  He continues his criticism of the CCPs

22   corruption and human rights abuses to this day.  Over the

23   years he has amassed a following on various digital and

24   media platforms such as YouTube, GTV, Twitter and Getter

25   -- I had to look Getter up, I didn't know what it was --

1    where he shares his personal views and opinions concerning

2    the CCP and the need for democracy in China.  He has over

3    one million followers across the various social media

4    platforms.  Notably he has not monetized his social media

5    presence.

6           Mr. Kwok is not employed and he relies on the

7    support of family, principally his son, to cover his daily

8    living expenses.  Through Mr. Kwok's son's family office

9    in Golden Spring New York, his on advances his monthly

10   expenses.  Brown Rudnick's retainer was paid by another

11   entity own by Mr. Kwok's son, Lamp Capital, LLC as set

12   forth our attorney compensation declaration at docket

13   number 54 which was filed shortly before this hearing.

14          THE COURT:  Okay.  I haven't seen that but

15   that's fine.

16          MR. SILVERBERG:  Turning to the PAX litigation,

17   though he left China he didn't leave all his troubles

18   behind.  We suspect the Court will hear quite a bit from

19   PAX's counsel during this case.  We won't get too much

20   into this litigation but a high level interview might help

21   put things into context.

22          PAX, a Hong Kong investment fund commenced

23   actions against Mr. Kwok in New York and BVI.  The New

24   York action commenced in 2017 is before Justice Ostrager

25   in New York Supreme Court.  In the New York action Mr.

1 | Kwok is represented by BakerHostetler.

2 |     These are principally collection actions related
3 | to a 30 million dollar loan made to a Chinese entity
4 | called Spirit Charter back in 2008.  PAX claims that Mr.
5 | Kwok provided a personal guarantee of the PAX debt and
6 | reaffirmed that guarantee multiple times over the years,
7 | most recently in 2011.  Mr. Kwok agrees that he provided a
8 | personal guarantee in 2008 but asserts that the loan was
9 | fully repaid thereafter and that the subsequent documents
10 | are forgeries.  And that's the crux of the dispute, your
11 | Honor.

12 |     Without a hearing Justice Ostrager entered
13 | summary judgment in PAX's favor.  Mr. Kwok has appealed
14 | this judgment to the Appellate Division and the appeal
15 | remains pending though stayed as a result of the
16 | commencement of this case.  In the meantime Pax sought to
17 | enforce a restraining order issued by Justice Ostrager on
18 | Mr. Kwok prohibiting him from transferring or dissipating
19 | assets and moving them outside the jurisdiction of the New
20 | York courts.

21 |     PAX became laser-focused on a yacht name the
22 | Lady May.  PAX wanted the yacht back in New York so that
23 | it could arrest the boat and levy on it.  Mr. Kwok denied
24 | owning the board and asserted that he couldn't order the
25 | boat back to New York.  Justice Ostrager directed Mr. Kwok

1  to return the boat to New York by May 15, 2021 or face a

2  massive daily fine of $500,000 for every day the boat

3  remained outside its jurisdiction.

4          On February 9th Justice Ostrager found that Mr.

5  Kwok beneficially owned and controlled the Lady May,

6  issued a final order of civil contempt against him and

7  ordered him to pay a 134 million dollar fine to PAX within

8  just 5 days or risk jail time.  The February 9th decision

9  is also on appeal to the Appellate Division.

10          Mr. Kwok lacked the means to satisfy the fine.

11  He retained our firm on February 14th and filed for Chapter

12  11 the very next day.  He filed for Chapter 11 not just to

13  obtain the benefit of the automatic stay but to resolve

14  all his claims in a single forum in an orderly manner.  He

15  is hopeful that he can agree with his creditors on the

16  terms of a Chapter 11 plan.  Counsel for PAX is in the

17  same building as our firm, just an elevator bank away.

18          His principal assets are litigation claims.

19  Assuming he prevails on these claims he may be able to

20  fund full recovery to his creditors.  He will also

21  approach his family members for support to fund the plan.

22  All options are on the table.

23          Further, as your Honor noted in the objections,

24  much has been made of supposed shell games and allegations

25  of squirreling assets away.  If the allegations are true,

1   and we say they're not, then the bankruptcy case may be

2   the best thing that could have happened for them.  There

3   may be a Creditors Committee appointed in the case, the

4   U.S. Trustee has solicited creditor interest in the

5   participation.  If one is appointed then they'll have

6   their work to do.

7           Chiefly we suspect they'll investigate the

8   allegations that PAX made in their papers, which brings us

9   to the motion for the request for the extension for the

10  deadlines.  We had very little time to work with Mr. Kwok

11  to prepare his filing, that's why the papers were so

12  skinny, that's why the deficiency notice ended up on the

13  order.  If we had more time we would have made sure that

14  the schedules were filed on time.  Or certainly maybe in

15  advance of the -- contemporaneous with the filing.

16          It was far from ideal circumstances.  We have a

17  considerable amount of work to do on our end to assist Mr.

18  Kwok with the preparation of the schedules and statements.

19  On February 23rd we advised the United States Trustee's

20  Office of Mr. Kwok's intention to seek an extension.  On

21  February 24th as your Honor noted at docket 27 we filed Mr.

22  Kwok's request for an extension of approximately 60 days.

23  The rationale for the extension was the need for us to

24  work with counsel who had been representing Mr. Kwok for

25  years to ensure that litigation-related assets and

 1  liabilities were accurately captured on the schedules and

 2  statements.  Also since Mr. Kwok does not read or write

 3  English he requested a Chinese translation of the official

 4  forms.  Mr. Kwok is also going to retain a service

 5  provider to assist him with the generation of the

 6  schedules and statements.  This morning we began

 7  discussions with Stretto who your Honor may be familiar

 8  with.

 9        As I noted, your Honor, we discussed Mr. Kwok's

10  extension request yesterday afternoon with the U.S.

11  Trustee.  Yesterday two parties filed objections to the

12  extension motion, the U.S. Trustee and PAX.  Both pretty

13  much make the same point, the requested extension was too

14  long and they want to get on with the case.

15        Your Honor, it bears mentioning that even though

16  the requested extended deadline was after the scheduled

17  341 meeting we thought maybe we can work with the U.S.

18  trustee to commence the 341 meeting and adjourn it to make

19  sure that folks had an opportunity to review them and ask

20  informed questions.  We recognize it would be unacceptable

21  to deny the creditors the opportunity to ask informed

22  questions.

23        Mr. Kwok agrees that it's best to work harder to

24  get the schedule statements on file sooner.  The sooner

25  the schedules are on file the soon he can established a

1   bar date for claims, start reconciling them, and see if he

2   can propose a feasible Chapter 11 plan.  And your Honor, I

3   already mentioned the proposal that we extended to the

4   United States Trustee and should we get there I'm prepared

5   to make a short proffer of what Mr. Kwok's testimony would

6   be if he were called to testify.

7           THE COURT:  Okay.  Thank you.

8           Let me just think if I have a -- oh, yes, I do

9   have a question or two.  It's not really a question.  As I

10  mentioned and you all know we have audio for our record.

11  There's some names that you recited during your

12  presentation that I think it would be helpful to get to

13  the Clerk's Office so that the Clerk's Office can make

14  sure they're properly spelled and accounted for in the

15  record in this case.

16          MR. SILVERBERG:  Absolutely, your Honor, and

17  we're happy to provide the English spelling and I guess my

18  phonetic transliteration.

19          THE COURT:  Whatever, whatever, yes, that would

20  be very helpful because we do want the record to be

21  accurate and so I would like you to do that.

22          MR. SILVERBERG:  Absolutely, your Honor.

23          THE COURT:  I'll speak with the courtroom deputy

24  but we could probably have the Clerk of the Court reach

25  out to you, Counsel, and figure out a way to get that

```
 1  information so that we clearly have it for our record and
 2  have it accurate.
 3           MR. SILVERBERG:  It will be our pleasure.
 4           THE COURT:  Okay.  Thank you.  I just want to
 5  think if I had any other though when -- I mean I had other
 6  thoughts but anything I wanted to say when you were
 7  speaking.
 8           With regard to the 341 meeting and whatever
 9  happens here today I think the U.S. Trustee's Office -- I
10  think it would make sense even if your extension is
11  granted to the 16th to not close that 341 meeting after the
12  first meeting.  I think that this is a fluid case with a
13  lot of issues and that's the U.S. Trustee's Office's call
14  but I would urge them to consider, and of course I'm
15  talking to you now, Attorney Claiborn, to consider that
16  the Debtor does not seem to have any issue with that 341
17  meeting taking place more than one day, and I would urge
18  the U.S. Trustee's Office to consider doing that given
19  many issues, including the fact that we're apparently
20  going to have to have an interpreter there and there may
21  or may not be a lot of creditors that have interest and
22  questions but I want to make sure that they're provided
23  with that opportunity.  Keep it timely and with enough
24  notice that when the documents are filed they have enough
25  time to intelligently review them.  Okay?
```

```
 1              So I urge you to -- you would communicate that

 2   with the U.S. Trustee and explain that the Debtor's

 3   counsel has no problem with that.

 4              MS. CLAIBORN:  I will do that, your Honor.

 5   Thank you.

 6              THE COURT:  Okay.  Thank you.

 7              All right.  Counsel for PAX, you may proceed.

 8              MR. FRIEDMAN:  Your Honor, Peter Friedman from

 9   O'Melveny & Myers.  I actually gave -- Mr. Silverberg?

10              MR. SILVERBERG:  Yes.

11              MR. FRIEDMAN:  -- Mr. Silverberg a copy of my

12   declaration.  I have it in binder form.  I actually have

13   two binders if I can hand them up to you.

14              THE COURT:  Sure.

15              MR. FRIEDMAN:  It may be helpful for you, you

16   and your Clerk, we may refer to some things --

17              THE COURT:  Sure.  Thank you.

18              MR. FRIEDMAN:  -- that are in them.  Thank you,

19   your Honor.

20              THE COURT:  Mr. Friedman, you have no problem

21   with me looking at this binder while counsel is speaking.

22              MR. SILVERBERG:  Your Honor, was that --

23              THE COURT:  Did I say the wrong name?

24              MR. SILVERBERG:  That's okay.

25              THE COURT:  I apologize.  I'm looking at two
```

 1  things at the same time.  Yes, you have no problem; is

 2  that correct?

 3          MR. SILVERBERG:  I have no issue, your Honor.

 4          THE COURT:  All right, thank you.  I appreciate

 5  that, Attorney Silverberg.  And Attorney Friedman, go

 6  right ahead.

 7          MR. FRIEDMAN:  Your Honor, Peter Friedman of

 8  from O'Melveny & Myers on behalf of PAX.

 9          So your Honor, there are many, many, many

10  different things that are worth responding to but let me

11  start with just the straightforward issue of what Justice

12  Ostrager found.  Justice Ostrager found that Mr. Kwok

13  couldn't claim that the documents were a forgery because

14  they were inconsistent -- that was inconsistent with

15  everything he had done --

16          THE COURT:  Hold on one second, Attorney --

17          THE INTERPRETER:  (Indiscernible) I cannot

18  possibly translate anything --

19          THE COURT:  Hold on a second, sir.  Just hold on

20  a second, okay?  He has a right to make his presentation

21  and you can listen to it later because we record it and we

22  put it on docket and you can then talk to the Debtor and

23  interpret it if you can't do it simultaneously, but we

24  have to go on with the hearing.

25          THE INTERPRETER:  I understand.  Do you think he

1  can use the mic, at least we can all hear back here?

2          THE COURT:  Can you just pull the microphone a

3  little bit closer to you, Counsel?

4          MR. FRIEDMAN:  Sure, your Honor.  I have serious

5  doubt as to the good faith of that request.

6          THE COURT:  I understand.  I understand, but I'm

7  not --

8          MR. FRIEDMAN:  These are the kinds of antics,

9  your Honor --

10          THE COURT:  I completely understand but we're

11  not -- we're going to proceed.  Okay?

12          MR. FRIEDMAN:  Absolutely, your Honor.

13          THE COURT:  And as is true in every bankruptcy

14  case in Connecticut and in most of the country this

15  recording will be placed on the docket of the case after

16  -- it will be on there by tomorrow morning I think, right?

17  It's pretty -- it's very quick.  It's within 24 hours and

18  anybody can listen to it but -- and it's not your fault

19  but the microphones --

20          MR. FRIEDMAN:  Yes.

21          THE COURT:  -- sometimes work well and sometimes

22  don't, and for whatever reason that one today has not

23  worked well.

24          MR. FRIEDMAN:  Your Honor, should I try that one

25  up there?

1           THE COURT:  Maybe it might be better.  Let's see

2   how we do, okay?  There's been a problem with that

3   microphone today.  I can't tell you why.

4           MR. FRIEDMAN:  So your Honor, Justice Ostrager

5   held, and I believe tab 4 of your binder is the opinion,

6   that Mr. Kwok couldn't claim the documents were forgery

7   for a litany of reasons.  Estoppel, that he had made

8   representations in the past, that he had actually produced

9   those documents.  So the claim is just on its face not a

10  meaningful claim and not one that this Court should

11  ultimately be able to sit in judgment over the reasoned

12  findings of Justice Ostrager.

13          THE COURT:  May I ask you a question about

14  Exhibit 4?

15          MR. FRIEDMAN:  Yes.

16          THE COURT:  The exhibit you just pointed me to.

17  So of course I haven't reviewed anything --

18          MR. FRIEDMAN:  Yes.

19          THE COURT:  -- before today, but I'm looking at

20  Exhibit 4 and it appears that Justice Ostrager issued this

21  -- let me just see what it -- I apologize.  Let me see

22  what it is entitled.  It's a Decision and Order on Motion,

23  that he issued this on September 15, 2020; I'm correct in

24  that?

25          MR. FRIEDMAN:  Yes, your Honor.  This is his

1  summary judgment motion finding that Kwok in fact did owe

2  money to PAX on a personal guarantee.

3       THE COURT:  And then what happened after the

4  summary judgment decision?  Was there an appeal or is this

5  considered interlocutory or what is the situation with

6  regard to this specific ruling that you're appointing me

7  to right now?

8       MR. FRIEDMAN:  So it is on appeal, it is outside

9  of --

10      THE COURT:  It is.  Okay.

11      MR. FRIEDMAN:  So it's not an issue that this

12  Court could review --

13      THE COURT:  Okay.  I just want to make sure I

14  understand because as you can see there's a lot of

15  documents here --

16      MR. FRIEDMAN:  There are.

17      THE COURT:  -- and I just want to make sure and

18  I want to understand the status and I do now.  I

19  understand that he made these findings and that's still on

20  appeal at the moment.

21      MR. FRIEDMAN:  Yes.  But your Honor asks a great

22  question, what happened after that.  Well, what happened

23  after that, the first thing that happened is that Mr. Kwok

24  filed a company called Genever New York for bankruptcy in

25  the Southern District of New York.

1          THE COURT:  And you mention that in your papers

2  so I have that name correct.  I've seen it.

3          MR. FRIEDMAN:  Yeah.  So it was very upsetting

4  that that was not listed as an affiliated bankruptcy

5  because Mr. Kwok owns a hundred percent of the equity of a

6  company called Genever, Genever British Virgin Islands,

7  it's Genever Holdings British Virgin Islands, which in

8  turns owns a hundred percent of the equity of a debtor in

9  the Southern District of New York.  That is of course the

10  classic case of an affiliate, it wasn't listed on the

11  petition.  Really troubling, and one of the animating

12  forces behind why we think no extension should be given

13  beyond the 14 days that Congress provides statutorily.

14          That entity in the Southern District of New York

15  is now the subject of -- it's too long to get into,

16  eventually we will be seeking relief from this Court to

17  permit us to pursue -- to vindicate Mr. Kwok's ownership

18  rights of that entity and to object to bogus claims

19  asserted by his family members.  That's been part of his

20  effort to frustrate our efforts to have that judgment

21  satisfied.

22          Your Honor, Congress listed 14 days for a

23  reason.  We think it's important.  I will say of course

24  oftentimes I am in a position of asking for an extension

25  of schedules and to be honest -- and so for filing dates

1    and to be honest I'm not sure I've ever seen anybody

2    object because ordinarily there's a good reason.  It's an

3    operating business, it may have hundreds of subsidiaries,

4    it's an entity that may have to deal on its first couple

5    of days with vendors and creditors and employees and can't

6    pay immediate and prompt attention.  None of that is true

7    here.

8            Mr. Kwok isn't an operating business.  He

9    claimed in his IDI and in his petition he has no assets at

10   all which of course raises the question of how could there

11   possibly be a reorganization purpose here?  How could

12   there be a Chapter 11 purpose?  Given all of his asset

13   shuffling and -- not my word for it, everything you heard

14   from opposing counsel is his word.  I have Justice

15   Ostrager's opinions and those opinions and findings of

16   fact show that Mr. Kwok uses a maze of entities and family

17   members and trusted confidants to shift around assets.

18   That kind of person can't be a fiduciary in a Chapter 11

19   for creditors.  He'll never pursue claims against family

20   members and other related entities.  It raises really

21   serious questions about the purpose of this case.

22           I want to add on top of that, your Honor, there

23   is 134 million dollar contempt fine, and that's just not

24   Justice Ostrager imposing that, that was unanimously

25   affirmed by the Appellate Division in New York State.

1          THE COURT:  I did see that.

2          MR. FRIEDMAN:  It was Mr. Kwok's doing.  He

3   waited 268 days, that's why it got so large.  Mr. Kwok

4   cannot challenge in this court the state court's ruling

5   that Mr. Kwok owns -- has a beneficial interest in the

6   Lady May.  Frankly, any responsible debtor would have

7   already filed a turnover motion to require the person who

8   is in custody of the yacht to return it completely to Mr.

9   Kwok.  That obviously hasn't happened.

10          I will note, your Honor, that later tonight we

11  will be filing a motion asking you to hold the automatic

12  stay does not apply to a civil contempt order against Mr.

13  Kwok, as well as a motion in the alternative asking you to

14  hold that if it does apply that the automatic stay be

15  modified to permit Justice Ostrager to require that -- to

16  the return of the Lady May to New York Harbor.  I'm not

17  asking to be able to levy on it or collect on it right

18  now, but Mr. Kwok should not be permitted to keep such a

19  valuable asset outside of the United States, to be brought

20  here where it can be properly monetized eventually and

21  liquidated.

22          Again, Justice Ostrager's findings I don't

23  believe will ultimately be reviewable by this Court and

24  should not be second guessed because they are part of an

25  order that's already on appeal.  Mr. Kwok lost a motion

1   for an interim stay in New York.  He could not even

2   provide any -- the slightest level of confidence to

3   anybody that he would have a likelihood of success on that

4   appeal.

5          Now, the reason we believe that civil contempt

6   order is not subject to the automatic stay leads to

7   another issue which is we also believe it's going to give

8   raise to 135 million dollar non-dischargeable claim.  We

9   noted that in the footnote.  We will also be commencing an

10  adversary proceeding to hold that debt non-dischargeable

11  which also gives right o the question how could there ever

12  be a feasible Chapter 11 plan when Mr. Kwok will be facing

13  134 million dollar debt if he ever got a discharge.

14         And I think those kinds of issues call into

15  question everything in paragraph 15 of the Debtor's

16  motion.  They talk about retaining counsels and retaining

17  financial advisors and proposing plans using other

18  people's money.

19         I realize, your Honor, that we will have to

20  prove a lot of things to you but we have the evidence,

21  many of those issues have already been established by

22  Justice Ostrager.  This is not a Debtor who comes to you

23  with anything even remotely approaching clean hands.  For

24  the life of me I can't understand how if a judge has held

25  that you have a beneficial ownership in something worth 30

1   million dollars you don't even footnote it in your

2   petition.  It's just astonishing.  It's astonishing that

3   somebody wouldn't list an affiliate as a debtor when

4   there's a specific box.  It's astonishing that the entity

5   Mr. Kwok uses as his family office is listed as the second

6   largest creditor when the instructions specifically say

7   don't list insiders.  A company controlled by his son that

8   funds his living expenses is the paradigmatic example of a

9   non-statutory insider.

10          That petition, your Honor, which was verified,

11  signed under penalty of law is so rife with dishonesty

12  it's astounding.  I would add even what Brown Rudnick

13  filed this afternoon which says that they will be paid

14  based on a loan that as made from Lamp, also Mr. Kwok's

15  family office to Mr. Kwok.  So if you look at the schedule

16  -- the petition, Lamp turns up as a million dollar

17  creditor for that loan.  But even though that loan it's

18  still -- it's at Brown Rudnick as a retainer, it's still

19  Mr. Kwok's property, so I don't know how they could assess

20  or assert that he has zero assets.  He has the $998,000 of

21  assets that he came into the case with under that loan, as

22  a prepetition loan.

23          Again, just the lack of candor to this Court

24  already is what impels us to believe that no quarter

25  should be given.

1    I want to note in our brief we cited virtually

2  everything Justice Ostrager said, but I didn't cite one

3  portion that I think is really important and it comes on

4  page 7 of Justice Ostrager's opinion.

5    THE COURT:  Which opinion would you like me to

6  look at?  I want to make sure --

7    MR. FRIEDMAN:  This is the contempt order, your

8  Honor.

9    THE COURT:  So attached to your objection.

10    MR. FRIEDMAN:  Yes, as well as the U.S.

11  Trustee's.

12    THE COURT:  But it's also in the book here?

13    MR. FRIEDMAN:  Yes.  It's also attached to the

14  U.S. Trustee's objection.  That might be the easiest way

15  to find it.

16    THE COURT:  Okay.  If you give me a second I

17  will locate it.

18    (Pause.)

19    THE COURT:  I think I have it here but let me

20  make sure.  A Decision and Order on Motion dated February

21  9, 2022 that is 10 pages.  Is that correct?

22    MR. FRIEDMAN:  It is, your Honor.

23    THE COURT:  Okay.  Go right ahead.  I have it.

24    MR. FRIEDMAN:  So before I get to the quote I

25  want to point out this came after a live trial and this

1  came after Mr. Kwok's daughter, who counsel referenced,

2  was basically held to be a liar by Justice Ostrager.  When

3  you read the opinion you'll see the lack of credibility

4  that Justice Ostrager referenced with her testimony.  He's

5  not the only judge to do that.  Judge Liman in a case in

6  the Southern District of New York also cast extreme doubt

7  over the credibility of her testimony relating to the

8  interfamily transfer of funds.

9         Your Honor, on page 7 it says the machinations

10  associated with the shell game Kwok has orchestrated with

11  respect to the Lady May are of a piece with every other

12  invasive and contemptuous act Kwok has taken during the 5

13  years this litigation has been pending, which is why there

14  are 1,180 docket entries in this case.

15         I implore your Honor not to let this case turn

16  out like that case.  Kwok has taken so many

17  extraordinarily evasive and dishonest steps that cannot be

18  squared with the good faith requirements to be a Chapter

19  11 debtor.  Congress require disclosures be made within 14

20  days.  The request for 60 days was, to put it mildly,

21  outrageous.

22         We request the Court deny the motion in the

23  entirety, but I'm going to say something else, your Honor.

24  Ultimately I realize that, you know, your job is to

25  balance a variety of factors.  We believe strongly that no

1 | extension should be given.  But if an extension were given

2 | for a few days, until the end of the week because it's

3 | going to be run out today, we of course aren't going to

4 | say he didn't file something by the end of the day today,

5 | the case should be dismissed automatically.

6 | So as passionately as I feel about these issues

7 | which I think you can tell, I would not object to it being

8 | extended, our client would not object to it being extended

9 | until Friday, and we think given the fact that Mr. Kwok

10 | has said in his IDI that he has no assets that part of it

11 | should be easy.  If there are these contingent lawsuits it

12 | seems impossible to believe they aren't known to him

13 | already and they should be scheduled as soon as possible

14 | so that we can frankly dig in.  We may even seek Rule 2004

15 | discovery between his 341 if necessary depending on what's

16 | disclosed in there, but we believe we need a full and fair

17 | chance to continue our pursuit of his assets in order to

18 | take an appropriate 341 examination and, you know, that's

19 | I think -- I don't know if the Court has any questions for

20 | me but those are the key issues that I thought were worth

21 | addressing with respect to our objection.

22 | THE COURT:  I'm not sure I have any questions.

23 | I have looked at your objection, although I will say I

24 | didn't look at it until today and we did have hearings

25 | today.  And so I looked at the United States Trustee's

1  objection yesterday, I had more time when that was filed.

2  I definitely looked at your objection, however I'm

3  intending on looking at it again, as I would the U.S.

4  Trustee's objection, as I will the motion for motion for

5  extension of time.

6        So but I think I was fairly clear at the start

7  of this hearing there will be no extension of time for 60

8  days.  If there's an extension of time it will not be for

9  60 days.  Counsel has stated that he's made an offer to

10  the United States Trustee's Office to go to March 16.

11  You're stating that you would not object if the Court

12  entered an order extending the deadline to March 4th.

13  We're not that far apart in some ways but I understand

14  your position.  If the two of you don't want to talk about

15  that and see if you can agree on something, that's fine.

16  The Court will rule.  I have no problem doing that.

17        But if you want to take time to talk about it we

18  can do that too and you can all -- we can take a 5-minute

19  recess.  We don't have to take a recess, we can do

20  whatever you want.  But right now today the issue is, is

21  there going to be an extension of time granted.  You, the

22  two objecting parties and I think I have been I think

23  clear that I obviously find merit to the objections when I

24  said already there will not be a 60-day extension of time.

25  It's not going to happen.  It's not appropriate.  In very

1  few cases I could ever think that it would be appropriate,

2  and this is not one of them.  Okay?  So that's clear.

3          The United States Trustee's Office seems to be

4  fine with March 16th.  You'd like March 4th.  The 341

5  meeting is what day?

6          MS. CLAIBORN:  Your Honor, I apologize for

7  interrupting the Court.

8          THE COURT:  That's okay.

9          MS. CLAIBORN:  I didn't yet opine as to what the

10  U.S. Trustee's position was with respect to the date --

11          THE COURT:  Oh, I'm sorry.

12          MS. CLAIBORN:  -- and I didn't know whether or

13  not counsel wanted to take the Court up on the opportunity

14  to discuss for a minute before we do that or --

15          THE COURT:  I can take a 5-minute recess.  It

16  won't --

17          MS. CLAIBORN:  I just don't know whether or not

18  the parties were interested in discussing it.

19          THE COURT:  Or yeah, and if there isn't an

20  interest in discussion that's fine too.  I'm not forcing

21  anyone to do anything.  I'm giving you an opportunity if

22  you'd like to take it.  If you don't want to take it,

23  that's fine.  You know, I have no problem with that.

24          MR. SILVERBERG:  Your Honor, if PAX is going to

25  dig in their heels on the 4th that's just not going to be

1  workable from a logistics standpoint so --

2          THE COURT:  And that may be true on the

3  negotiation standpoint but I might order it.  So, you

4  know, that's where we go and that's fine.  You are --

5  every single -- you've all made your positions and I

6  haven't even asked Attorney Wolman what his position might

7  be yet because he is participating in this hearing, but

8  you've made your positions clear.  It's not a complex

9  issue for the Court to decide.  I do want to look back at

10  the papers for a few minutes and I can do that now.  I can

11  take a 5, 10, 15-minute recess, doesn't matter.  And then

12  I can come back and rule today or I can rule tomorrow.

13  It's not complex.  I'm not worried about issuing a ruling,

14  that I can tell you.

15          And so however you'd like to proceed.  I'm

16  trying to give you an opportunity to suggest to me what

17  you think makes some sense.  If you'd like a recess to

18  talk about it, that's fine.  If you don't we can conclude

19  this hearing and I can rule tomorrow or we can take a

20  recess and I can try to come back and rule tonight.  I

21  have no problem with either one of those ways of

22  proceeding.

23          MR. SILVERBERG:  I'm always in deal-making mode

24  so if PAX wants to speak so --

25          THE COURT:  Well, why don't we take -- it's 10

1  of 5:00.  Why don't we --

2          MR. WOLMAN:  Your Honor?

3          THE COURT:  Yes.  Oh, Attorney Wolman.

4          MR. WOLMAN:  Can I be heard?

5          THE COURT:  I'm sorry, go ahead.

6          MR. WOLMAN:  That's all right.  I just wanted to

7  be brief but I feel like this should be heard.  We did not

8  file anything but we do join generally Mr. Cheng in the

9  objections both by the U.S. Trustee and by PAX.

10         A little background.  Mr. Cheng was a victim in

11 Nevada of Mr. Kwok's serial campaign of defamation

12 lawsuits.  Mr. Cheng himself opposes the Chinese Communist

13 Party and he took issue with how Mr. Kwok was addressing

14 that movement as it were, and after Mr. Kwok made a

15 defamatory video about Mr. Cheng my client had a few

16 tweets and then found himself a subject of a SLAPP suit.

17         Now the Court is aware about lawsuits that are

18 called strategic lawsuits against public participation.

19 Nevada has a very strong anti-SLAPP statute and my client

20 litigated --

21         (Alarm in building.)

22         THE COURT:  Hold on a second, Attorney Wolman,

23 hold on a second.  The alarm is going off.  Glen, do you

24 think we need to -- okay.

25         I'm sorry but the alarm is going off in the

1  building.

2          MR. WOLMAN:  Okay.

3          THE COURT:  So you just need to wait one second.

4  I mean you can try to talk -- can you hear, Attorney

5  Wolman, even when the alarm is going or -- the United

6  States Marshal is going to go check right now to see if we

7  need to evacuate.

8          MR. WOLMAN:  If you need to evacuate, your Honor

9  --

10          THE COURT:  Well, I don't know that yet.  I'm

11  waiting to find out.

12          MR. WOLMAN:  I'm fine where I am.

13          THE COURT:  They'll let us know.  If we have to

14  evacuate then I would assume that you'll all have to go

15  back out the front door, okay?  And stand out in the front

16  of the building.  But they'll tell you, someone should

17  tell you.

18          (Pause.)

19          THE COURT:  John, do we need to evacuate?

20          JOHN:  Stay for now.

21          THE COURT:  Stay for now?

22          JOHN:  Stay for now.  We got a problem with the

23  alarm system.  We're rewiring everything.

24          THE COURT:  Okay.

25          JOHN:  If there's anything we'll let you know

1   ASAP.

2         THE COURT:  All right.  Right.  We're in the

3   middle -- John, we're in the middle of a hearing so I'm

4   going to keep talking and people are going to keep

5   talking, okay?  Oh, there, okay.  We'll see.  Okay.

6         JOHN:  The last time (indiscernible).

7         THE COURT:  Is that right?  Not when we were in

8   court through, but yeah.  But okay, thank you so much for

9   checking.  I appreciate that.

10        All right.  Attorney Wolman, why don't you if

11  you could -- and I'm sorry, I don't remember exactly where

12  you left off but you were talking about a defamation suit

13  and some other issues.

14        MR. WOLMAN:  Right  Yes, your Honor.  Mr. Cheng

15  was the victim of Mr. Kwok's serial campaign of litigation

16  in Nevada and we prevailed on an anti-SLAPP motion and the

17  case was dismissed because Mr. Cheng thought Mr. Kwok was

18  unable to show that his case had any merit.

19        The Nevada anti-SLAPP statute has what's called

20  a SLAPPback provision because although it awards

21  attorney's fees for the successful defendant, that is not

22  the end-all and be-all of the victimization of being sued.

23  And so a suit was brought in the Southern District of New

24  York to enforce the judgement of fees because originally

25  Mr. Kwok did not pay until funds came in from Golden

1   Spring New York to pay that judgment and we sued to

2   enforce the judgment and we sued under the SLAPPback

3   theory under the Nevada statute for compensatory damages.

4   And in fact that case has been keyed up for summary

5   judgment with Attorney Gavenman who was representing Mr.

6   Kwok at the time accelerating his reply memorandum to get

7   in just before the bankruptcy petition was filed, and

8   otherwise been (indiscernible).

9          Now, this litigation has been ongoing for quite

10  some time and in fact a year ago I had the opportunity to

11  take Mr. Kwok's deposition and there were actually some

12  interesting things even here today that I was unaware of

13  before such as Mr. Kwok now residing in Connecticut with

14  his wife.  And so these are facts that -- that are facts

15  that come out abut Mr. Kwok that he states but then does

16  not back up that is of concern.

17         His complaints in Nevada listed a litany of

18  things about his background that his counsel here today

19  recited some of, and yet when we sought discovery on in

20  the Southern District of New York because certainly it

21  must have been germane and relevant, he resisted.  He

22  objected.  He refused to back any of that up.  We sought

23  certain discovery as to his financial well-being and he

24  refused.  He resisted and in fact he pleaded the Fifth

25  Amendment in terms of not having to produce that

1   information, and he did so successfully.  Judge Failla

2   felt that the invocation of the Fifth Amendment was well-

3   placed and we were to get an adverse inference as a

4   result.

5          This man holds himself out as a billionaire.

6   That's how he presents himself globally.  In fact, on

7   February 9th the news was all aflutter not only with the

8   sanctions award in the PAX case but with the fact that Mr.

9   Kwok, and spoke specifically about his name, won a venue

10  motion in London on a 500 million dollar claim against

11  UBS, but he is the plaintiff and maybe it's through one of

12  his entities.  We don't know.  And that means the Court

13  should take everything that is said and, you know, Brown

14  Rudnick, I've got no objection to them, they're trying to

15  poke a -- pick a fight, but they are new.  They do not

16  know Mr. Kwok.  And they need to take and this court needs

17  to take everything that he says with a grain of salt.

18         And so I do actually think that March 4th is

19  perhaps too soon because they need to verify for

20  themselves that they are going to be submitting to the

21  Court materials that have previously not been verified and

22  so, you know, that is going to go under their imprimatur

23  and they need to do their due diligence.

24         And so we want to make sure certainly that

25  counsel has time to do that but also strike a balance here

1  that we have time before the 341 meeting to review.  And

2  while we're, you know, listed as a creditor I should note

3  that we put in our motion we believe ourselves actually to

4  be one of the 20 largest creditors but that was not stated

5  in the petition and in fact Golden Spring as PAX noted,

6  the insider, is listed as a creditor and one of the 20

7  largest.

8          So there's already some improprieties in the

9  filings here and we just want to make sure we have enough

10  time.  I would prefer a week before the 341 meeting rather

11  than just a few days because I need to compare to other

12  production certainly that we've received in the New York

13  case and we may have to address a governing proactive

14  order in that case and how it applies here but, you know,

15  we do otherwise join in the objections of the U.S. Trustee

16  and in PAX to that 60-day extension and do request that it

17  be something with at least a week before the 341 meeting.

18          THE COURT:  Okay.  Thank you.

19          All right.  I'm going to take a 10-minute

20  recess.  We'll be back at 5:10 and then I'll hear from the

21  parties if there is anything they would like to report and

22  then I will rule.  So court is in recess.

23          (Recess:  4:58 p.m. to 5:09 p.m.)

24          THE COURT:  Okay.  We took a short recess after

25  Attorney Silverberg and Attorney Friedman, Attorney

1  Claiborn and Attorney Wolman made their statements in

2  connection with the Debtor's motion for extension of the

3  deadline to file documents required by the Bankruptcy Code

4  and Rules.

5        I don't know, Attorney Silverberg, Attorney

6  Friedman if you had any discussions.  I see heads shaking

7  no.

8        MR. SILVERBERG:  Unfortunately -- your Honor,

9  Bennett Silverberg, Brown Rudnick for the Debtor.

10  Unfortunately those discussions were not productive.  We

11  offered to give a couple of days --

12        THE COURT:  That's all right.  I don't need to

13  know.  Thank you.

14        MR. SILVERBERG:  Okay.

15        THE COURT:  That's okay.  I appreciate it but I

16  don't need to know.  I just need to know that there is no

17  agreement.

18        MR. SILVERBERG:  There is no agreement, your

19  Honor.

20        THE COURT:  Okay.  Thank you.

21        Attorney Claiborn?

22        MS. CLAIBORN:  Your Honor, if I could now weigh

23  in on the extension motion and I also wanted to make some

24  other comments to the Court.

25        THE COURT:  Yes.

1            MS. CLAIBORN:  I'll start with the comments.

2            THE COURT:  Hold on just one section, Attorney

3    Claiborn.  Something is echoing here.

4            (Pause.)

5            THE COURT:  I don't know why it's echoing.  I

6    can hear you, Attorney Claiborn, then I can hear you

7    again.

8            MS. CLAIBORN:  Oh, that's great.

9            THE COURT:  So we just want to make sure we can

10   hear you properly.

11           (Pause.)

12           THE COURT:  Yeah, I think we're going to have to

13   proceed.  Will you be able to record or do you need to

14   have that resolved?

15           COURTROOM DEPUTY:  It's still recording but I

16   don't know if it's going to pick up this echo.

17           THE COURT:  I think we'll be okay.  Let's try it

18   anyway, okay?  And then if it's really bad you tell us and

19   we'll stop.  Should we alert anyone in our IT Department?

20           COURTROOM DEPUTY:  Well, I sent a message to

21   Pierre and hopefully to will send a message to Will.

22           THE COURT:  Okay.  All right.  Let's see how

23   this goes --

24           MS. CLAIBORN:  Does it make any difference as to

25   which microphone I use?

1           THE COURT:  No, it's coming from in here

2   unfortunately.  So go right ahead and let's see how we do,

3   okay?

4           MS. CLAIBORN:  Thank you.

5           Your Honor, I wanted to touch briefly on a

6   couple of items, first of which was the petition and the

7   comments that were made by Mr. Kwok's counsel today about

8   his residence in Greenwich, and they were followed by Mr.

9   Wolman's comments about not being aware that Greenwich is

10  a residence.

11          I wanted to point out to the Court that on the

12  petition the Debtor's address in response to the question

13  of where do you live is listed as being Golden Spring.  It

14  does not list his residential address.  We had been under

15  the impression that the Debtor was going to take some

16  steps to protect that information as to where he actually

17  resides due to some concerns that were expressed.  That

18  hasn't yet happened, but I do want to make a connected

19  point which is that yesterday's initial dinner (phonetic)

20  interview covered in brief the topic of where does Mr.

21  Kwok get his mail and the issue about where to send

22  information was broached and the concern expressed was

23  that perhaps the mail wouldn't reach the right place if it

24  went to the Golden Spring address which is the only

25  address that the court has to reach the Debtor.

1          And so I bring that up because I want to make

2    sure that the Debtor does get proper notice in this case

3    of all the appropriate pleadings and that all parties are

4    aware what is the appropriate address to be using to

5    contact the Debtor.

6          The other comment I wanted to make is about the

7    fact that in general based upon the presentations that

8    have been made today and based upon the information that

9    was learned yesterday at the initial dinner interview this

10   case presents an interesting combination of no assets,

11   large debt and a need for an explanation.  The U.S.

12   Trustee at this point in time believes it may be

13   appropriate to seek the appointment of an examiner and I

14   wanted to preview that for the Court.  We have made that

15   comment to the Debtor's counsel and they are aware.

16         And so I wanted to make those couple of points

17   to your Honor and then I want to follow up by saying that

18   with respect to the extension request today the U.S.

19   Trustee thinks that the date of -- sorry, March 9th makes

20   the most sense.  It is in between the dates that have been

21   offered by the opposing parties and it does provide over a

22   week of advanced time for parties to take a look at it and

23   digest it and be prepared to conduct a meaningful meeting

24   of creditors.

25         THE COURT:  Okay.  Thank you.

1        Does anyone else wish to be heard?

2        Attorney Silverberg, the issue that was raised

3   about the address is an important one.  The address on the

4   petition is different from the address that you -- well,

5   you didn't give an address but you said that he resided in

6   Greenwich.  If there's a change of address we have a local

7   rule about that and we have a local form and that needs to

8   be completed because obviously notice has and service has

9   to be properly made.

10        So I don't know how you're going to proceed on

11  that but I'm telling you that that is something that I

12  will be paying attention to then because if the Debtor

13  resides in Greenwich that's not what the petition says.

14  So I'm not going to say anything further.  I'm telling you

15  what my thought is on that at the moment, okay?

16        MR. SILVERBERG:  We understand the issue with

17  respect to the New York address.  There was some desire to

18  keep his Greenwich, Connecticut address private given his

19  experiences with the CCP and so on, so I think when we

20  prepared the petition we didn't realize how much that

21  address is already in the public domain.

22        THE COURT:  Okay.

23        MR. SILVERBERG:  We've since learned that there

24  may not be as much sensitivity to that address being out

25  there and once we confirm that with the Debtor we'll

1  complete the appropriate paperwork to amend the address to

2  make sure that he gets those.

3           THE COURT:  Okay.  All right.  Thank you.

4           Does anyone else wish to be heard on the motion

5  for the extension of the deadline to file documents

6  required by the Bankruptcy Code and Rules?  And our local

7  rules as well.

8           Okay.  As I indicated earlier today during the

9  beginning of this hearing over the course of the last few

10 days I've reviewed documents filed in this case including

11 the Debtor's motion to extend the deadline to file

12 schedules or provide required information seeking an

13 extension to May 2nd, 2022, which is ECF number 27.

14          I've also reviewed and again looked at during

15 the recess the objection filed by the -- to that motion

16 filed by the Office of the United States Trustee, ECF

17 number 49, and the objection of PAX, if I may use PAX for

18 short, filed to that motion for extension of time, ECF

19 number 50.

20          I've also listened to the presentations and

21 arguments of Attorney Silverberg, Attorney Friedman,

22 Attorney Claiborn, Attorney Wolman and I've taken those

23 arguments into consideration with regard to the request

24 made by the Debtor.

25          As I've indicated and I know you all know the

1   Bankruptcy Code, in particular section 521 of the

2   Bankruptcy Code requires the Debtor as part of the

3   Debtor's duties to file a series of documents in order to

4   assist and help to complete the administration of a

5   Chapter 11 case.  Those documents are extremely important

6   and they are necessary to provide appropriate notice and

7   information to creditors in order for creditors to have

8   the ability to determine whether or not they would like to

9   have a meaningful questioning of the Debtor at the section

10  341 meeting which the Debtor is required under the

11  Bankruptcy Code not only to attend but to testify at under

12  sections 341, 42, 43 of the Bankruptcy Code.

13          In addition to the code sections that require

14  the Debtors to provide -- excuse me, to perform specific

15  duties as part of the burden of coming before the Court,

16  Federal Rule of Bankruptcy Procedure 1007 requires that

17  definite documents be filed including the statements of

18  financial affairs and schedules of assets, liabilities and

19  other schedules, (a) through (g) and (h) and (i) in the

20  individual case.  And Federal Bankruptcy Procedure 1007(c)

21  says the time for him to do that is with the petition or

22  within 14 days thereafter.  14 days thereafter with regard

23  to this Debtor's case would be today because the case was

24  filed on February 15, and the Court has considered all the

25  requests that the Debtor has made and the arguments

1  advanced in opposition to the request and the Court rules

2  as follows:

3          In accordance with 11 USC Sections 521 and other

4  applicable sections of the Bankruptcy Code that set forth

5  the duties of a Debtor, Federal Rule of Bankruptcy

6  Procedure 1007(c) and our Local Rule of Bankruptcy

7  Procedure 1007-1, the Debtor's motion for extension of

8  time is granted in part.  The Debtor must file all

9  required statements and schedules including all documents

10 required to be filed in accordance with those bankruptcy

11 sections that I've just recited and the Federal Rules of

12 Bankruptcy Procedure and our local bankruptcy rules on or

13 before March 9, 2022.

14          That is the ruling of the Court.  Does anyone

15 have any questions?

16          MR. SILVERBERG:  No, your Honor.  Thank you.

17          THE COURT:  Okay.  That was the only matter that

18 we had to address today.

19          Attorney Birney, did you have something else

20 that you wanted to address with the Court?

21          MR. BIRNEY:  No, your Honor.  Just thank you,

22 it's glad to be back, we're glad to be back in person.

23          THE COURT:  It's nice to be in person.  Yes.

24          Did somebody else have any questions or anything

25 that you wanted to address today?

```
 1            MR. KLETTER:  Oh, your Honor, may I be excused
 2   from future hearings.  Mr. Silverberg can attend any
 3   further --
 4            THE COURT:  Yes.  You've been admitted pro hac,
 5   so yes, you can be excused, Counsel.
 6            MR. KLETTER:  Thank you.
 7            MR. SILVERBERG:  Thank you, your Honor.  The pro
 8   hac --
 9            THE COURT:  Now obviously for service purposes
10   though, service can still be made at the local address and
11   that's service.  Even if you're excused, which is fine.
12            MR. KLETTER:  Yep.
13            THE COURT:  If someone makes service on the
14   Debtor only at your office, your local office address
15   that's still deemed appropriate service under the rules.
16   Okay?
17            MR. KLETTER:  Yes, thank you.
18            THE COURT:  Okay.  The only other thing I would
19   say is as I've ruled the 341 meeting is already set, I've
20   already spoken to Attorney Claiborn about my urging with
21   regard to the 341 meeting, but that is in the hands of the
22   Office of the United States Trustee.  There is nothing
23   further on the calendar today in this case.
24            Did you have something you wanted to add,
25   Attorney Friedman?
```

1          MR. FRIEDMAN:  I did, your Honor, just because

2   I'm unfamiliar with your general practice.  Will you also

3   issue an order or is the transcript so ordered?

4          THE COURT:  I could to -- if you would prefer me

5   to -- what I would normally do if you would like and I'm

6   happy to do it, is I'll just do a virtual order, okay?

7   But that won't get most likely put on the docket until

8   tomorrow morning.  It is so ordered as of right now, 5:23

9   p.m. on March 1st, 2022, okay?

10          MR. FRIEDMAN:  Thank you, your Honor.

11          THE COURT:  And when the virtual order enters it

12   will say as of whatever I just said, 5:23 p.m. on March

13   1st, 2022.  Okay?  And then you at least have something

14   other than the transcript of this hearing.

15          I understand there may be other pleadings filed,

16   parties have mentioned that.  The reason that the Court

17   chose the date that I chose is because I do think it's

18   important to give a meaningful opportunity to creditors to

19   review the information and determine whether or not they

20   want to participate in the 341 meeting which as I often

21   say the section of the Bankruptcy Code 341 is entitled

22   Meeting of Creditors.  And that's its point.  And so that

23   is why I ruled as I have ruled.  And if there's nothing

24   further for the Court to attend to this afternoon unless

25   I'm forgetting something.

1          Okay.  Thank you.  And that's the last matter on

2    todays' calendar so Court is adjourned.

3          ALL:  Thank you, your Honor.

4          (Hearing adjourned at 5:34 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           <u>CERTIFICATE</u>

2

3               I hereby certify that the foregoing 56

4   pages are a complete and accurate transcription to the

5   best of my ability of the electronic recording of the

6   Motion to Extend Time to File Schedules in re:  HO WAN

7   KWOK, Debtor, Case No. 22-50073, held before the Hon.

8   Julie A. Manning, U.S. Bankruptcy Judge, in Bridgeport

9   Connecticut on March 1, 2022.

10

       *Suzanne Benoit*

11  _____

12  Suzanne Benoit, Transcriber          Date: 03/05/2022

13

14

15

16

17

18

19

20

21

22

23