UNITED STATES BANKRUPTCY COURT

DISTRICT OF CONNECTICUT

BRIDGEPORT DIVISION

```
--------------------------x
In Re:                    :  Case No. 21-50073
                          :
    HO WAN KWOK,          :  Chapter 11
              Debtor.  :
--------------------------x  March 23, 2022
```

Brien McMahon Federal Bldg.
915 Lafayette Street
Bridgeport, Connecticut

PRELIMINARY HEARING

(Transcription from Electronic Recording)

Held Before:

THE HON. JULIE A. MANNING
United States Bankruptcy Judge

Transcription Services of
FALZARANO COURT REPORTERS, LLC
4 Somerset Lane
Simsbury, CT  06070
860.651.0258
www.falzaranocourtreporters.com

A P P E A R A N C E S:

    For the Debtor:

            BROWN RUDNICK, LLP
            Seven Times Square
            New York, New York 10036
            212-209-4800
                    BY:  BENNETT SILVERBERG, ESQ.

            BROWN RUDNICK, LLP
            185 Asylum Street
            Hartford, Connecticut 06103
            860-509-6500
                    BY:  WILLIAM BALDIGA, ESQ.

    For Pacific Alliance Asia Opportunity Fund, LP
(PAX):

            O'MELVENY & MYERS, LLP
            Times Square Tower
            7 Times Square
            New York, New York 10036
            212-326-2000
                    BY:  STUART M. SARNOFF, ESQ.
                         DIANA PEREZ, ESQ.

            O'MELVENY & MYERS, LLP
            1625 Eye Street, NW
            Washington, DC 20006
            202-383-5300
                    BY:  PETER FRIEDMAN, ESQ.

            ROBINSON & COLE
            280 Trumbull Street
            Hartford, Connecticut 06103
            860-275-8275
                    BY:  PATRICK BIRNEY, ESQ.

    For Golden Spring New York, Limited, Proposed
    DIP Lender:

            COHN BIRNBAUM & SHEA P.C.
            100 Pearl Street
            Hartford, CT 06103
            860 493 2200
                    BY: SCOTT ROSEN, ESQ.

A P P E A R A N C E S (cont.):

<u>For the U.S. Trustee</u>:

        OFFICE OF THE UNITED STATES TRUSTEE
        The Giaimo Federal Building
        150 Court Street - Room 302
        New Haven, Connecticut 06510
        203-773-2210
            BY:  HOLLEY CLAIBORN, ESQ.

<u>For Rui Ma, et al.</u>:

        CALLARI PARTNERS
        1 Rockefeller Plaza #10
        New York, NY 10020
        (212) 202-3055
            BY:  CAROLLYNN CALLARI, ESQ.

        MCELROY DEUTSCH MULVANEY & CARPENTER
        1300 Mount Kemble Ave,
        Morristown, New Jersey, 07960
        (860) 241-2637
            BY:  PETER ZARELLA, ESQ.

1          (Proceedings commenced at 2:12 p.m.)

2

3          THE CLERK:  Case number 22-50073 Ho Wan

4     Kwok.

5          THE COURT:  Okay.  Good afternoon.  If

6     we could have appearances for the record,

7     starring with the debtor's counsel, please.

8          Good afternoon, your Honor.  William

9     Baldiga of Brown Rudnick for the debtor with

10    my partner Ben Silverberg.

11         THE COURT:  Good afternoon.

12         MR. SILVERBERG:  Good afternoon.

13         MR. ROSEN:  Good afternoon, your Honor.

14    Scott Rosen for Golden Spring New York,

15    Limited, the proposed DIP lender.

16         THE COURT:  Okay.  Let me stop you

17    right there.  Did you -- I -- is there a

18    motion for DIP financing that's been filed?

19         MR. BALDIGA:  Not on for today, your

20    Honor.  It was just filed this morning.

21         THE COURT:  Okay.  Well, that's why I

22    don't know what's going on.

23         MR. BALDIGA:  Nobody leaked today.

24         THE COURT:  Attorney Rosen, did you --

25    I'm sure you did, but I'm asking, did you

1          file a notice of appearance?

2               MR. ROSEN:  I was just retained and I

3          will be filing a notice of appearance.

4               THE COURT:  Okay.  Thank you.

5               MR. ROSEN:  Got by tomorrow morning.

6               THE COURT:  Thank you.

7               Okay.  Go ahead, counsel.

8               MR. FRIEDMAN:  Good afternoon, your

9          Honor.  It's Peter Friedman from O'Melveny

10         Meyers on behalf of PAX and I'm joined by

11         Diana Perez and Stuart Sarnoff of O'Melveny

12         and Meyers.

13              And good afternoon, Mr. Birney.

14              THE COURT:  Good afternoon.

15              MR. BIRNEY:  (Indiscernible) Birney of

16         Robinson Cole.

17              THE COURT:  Good afternoon.

18              MS. CLAIBORN:  Good afternoon, your

19         Honor.

20              THE COURT:  A couple of -- oh, I'm

21         sorry.  Go ahead Attorney Claiborn.

22              MS. CLAIBORN:  Sorry, we ran out of

23         seats.  So.

24              THE COURT:  That's okay.

25              MS. CLAIBORN:  Holley Claiborn for the

```
 1        U.S. Trustee.
 2             THE COURT:  You want another chair from
 3        over here?
 4             MS. CLAIBORN:  That's okay.  I'm good
 5        with the bench.
 6             THE COURT:  Okay.
 7             Go ahead, counsel.
 8             If you could just come forward because
 9        you need to -- our record is only audio, so
10        you have to speak into a microphone.
11             MS. CLAIBORN:  You want me to come back
12        up?
13             THE COURT:  Sure, you can come --
14        whatever you're comfortable.
15             MS. CLAIBORN:  As long as you --
16        however you're going to hear me best.
17             MS. CALLARI:  Good afternoon, your
18        Honor.  Carollynn Callari with Callari
19        Partners on behalf of Rui Ma and certain
20        other creditors.  You have, thankfully,
21        approved my pro hoc vice at entry 89.  I am
22        here with the sponsoring counsel.  Kristen
23        Mayhew was unable to be here, but her
24        colleague Peter Zarella from McElroy Deutsch
25        is here with me.
```

1              THE COURT:  Okay.  Thank you very much.

2         And, you know, you don't have to sit

3    all the way back there.  I mean, you can sit

4    closer.  Whatever you might desire, okay?  I

5    know we're trying to maintain social

6    distancing as well, but whatever you're

7    comfortable with.  Sorry if there aren't

8    enough chairs.

9              MS. CLAIBORN:  Okay.  Thank you.

10             THE COURT:  Okay.  A couple of

11   housekeeping matters before we start on

12   anything today.  So and these are just

13   things that are just how the District of

14   Connecticut works, which maybe is different

15   from some of your experiences in other

16   districts, but we don't take phone calls

17   about questions for things on the calendar.

18        If you have a question about something

19   on the calendar, you, you take that

20   question, you put it in an email to the

21   appropriate courtroom deputy box, and then

22   that courtroom deputy will either respond or

23   not respond depending upon your question.

24        If your question is how's the judge

25   going to rule?  I would think that you're

1          not going to get a response.  If your

2          question is what time do I have to be there?

3          You'll probably get a response, but you

4          should know that regardless.

5               We don't take phone calls.  In the

6          past, there have been -- counsel have taken

7          advantage of that situation and to a point

8          where other people felt that those counsel

9          and those parties were being treated with --

10          disparately -- or with more of an in, for

11          lack of a better term.  And so we don't do

12          that here in Connecticut.  So I just want to

13          give everybody notice of that.

14               Also, I think, you know, there's a lot

15          going on in this case, which I understand

16          and that's fine.  We've got a lot of

17          different motions that have been filed.

18          Obviously, I didn't know -- I've been in

19          court all day, so I wouldn't know that there

20          was a DIP financing motion filed.

21               But we don't need people to submit any

22          binders or any information of exhibits or

23          anything unless you're asked to do so, okay?

24          Because we do everything, we essentially do

25          everything paperless.  And when we have

 1          hearings and exhibits are required, the

 2          parties to file those exhibits on the

 3          docket, and we use the docket to put

 4          together the exhibits, essentially.  Unless,

 5          I say, but you know what, I know you did

 6          that, but I still need you to do X, Y, and X

 7          and then that's what you'll do.  Okay?

 8              But we do not need any paper unless we

 9          ask for it.  Everything is on the computer,

10          okay?  So those are just minor housekeeping

11          issues.

12              I do believe, although I could be

13          completely wrong, that most of the motions

14          for admission of visiting counsel have been

15          granted in this case.  So I don't think

16          there's any outstanding motions from any of

17          the parties here, but if there is an

18          outstanding motion, would someone bring it

19          to my attention right now?

20              UNIDENTIFIED MALE VOICE:  Your Honor,

21          outstanding for PAX, your Honor.

22              THE COURT:  Okay.  Thank you.  And for

23          debtor?

24              MR. BALDIGA:  We're good, your Honor.

25          Thank you.

1           THE COURT:  Okay.  Okay.  All right.

2      that's helpful.

3           Then I don't -- oh, yes.  There was one

4      other housekeeping matter for the debtor.

5      We had asked during the last hearing, which

6      I don't have my note in front of me, but it

7      was a few weeks ago obviously.  To supply a

8      list of names of people that were referred

9      to in what -- a presentation that counsel

10     made, debtor's counsel made during that

11     hearing.  And I don't think we've received

12     that list.

13          And I know that the person in the back

14     is interpreting, but that's a little -- you

15     got to try to be a little softer because all

16     I can hear is you, unfortunately.  And I

17     won't be able to hear the lawyers, okay?

18          We need that information because our

19     record is only audio.  We don't have

20     stenographers.  There aren't enough funds in

21     a budget given to the judiciary for

22     bankruptcy courts to have a stenograph.  If

23     you all want to bring in a stenographer,

24     you're more than welcome to.  I mean, you

25     have to pay for it and you need to tell the

1    Court in advance if you're interested in

2    doing that.  But otherwise, our official

3    record -- and that wouldn't be an official

4    record even if you had a stenographer.  Our

5    official record is the audio.

6        And therefore, when there's any kinds

7    of issues with regard to not just peoples'

8    names, but a name of a building or whatever

9    and it's not clear, we're going to need the

10   parties to submit that information to the

11   courtroom deputy.  Otherwise, our record

12   won't be clear.  And that is obviously of

13   utmost importance to the Court that the

14   record be clear.  Okay?

15       So those are the housekeeping matters I

16   have.  Does anyone have any housekeeping

17   matters before we start talking about the

18   case today?

19       Okay.  Hearing none, then we have two

20   matters on today's calendar.  The first is

21   the Chapter 11 case management conference

22   that our court in the District of

23   Connecticut has in every Chapter 11 case and

24   then there also is the motion of PAX that

25   was filed and an expedited hearing was

1        granted on that, preliminary expedited

2        hearing on the motion of PAX for the entry

3        of an order confirming the inapplicability

4        of the automatic stay or in the alternative,

5        for relief from the stay.

6            I have looked at a number of the briefs

7        and the replies and then the responses and

8        the replies on that issue and we'll talk

9        about that when we get to it.

10            I would make an assumption that I

11        probably shouldn't make, but I will make the

12        assumption that given the -- given that

13        there has been apparently, and I'm not

14        suggesting I understand every of it -- every

15        bit of it because there's no way I could at

16        this point.  But given that there appears to

17        be protracted litigation between the

18        creditors and the debtor, I would assume

19        that there has been no discussions and

20        certainly no resolution of the motion that's

21        been filed by PAX.  Am I correct on that

22        assumption?

23            Yes.  I got heads nodding.

24            MR. FREIDMAN:  Your Honor, Peter

25        Freidman.  As it relates to the debtor,

 1              that's correct.  We have reached an

 2              agreement with the creditors who filed

 3              conditional statements on language with

 4              respect to a proposed order.

 5                   THE COURT:  Okay.

 6                   MR. FREIDMAN:  We suggest we were able

 7              to do moments before the hearing, which if

 8              the motion is granted, we will circulate to

 9              everybody before an order is settled.  But

10              we have not had discussions or -- with

11              respect to the specific motion that was

12              filed.

13                   THE COURT:  Okay.  That's fair.  I

14              just, just asking the question.  Because

15              what I think I saw and we're not going to --

16              we're going to address a few things first

17              before we really address your motion,

18              counsel.

19                   But the -- what I believe I saw -- and

20              I just would like you to tell me if I'm

21              wrong or right, okay, which all I'm asking

22              you to do at this point.  Was, that there

23              was a statement I think or, you know, not a

24              -- it was a sentence in the paragraph or two

25              or maybe it was in more than one place,

```
 1             where I believe PAX said that you would

 2             agree to relief from the automatic stay for

 3             the limited purpose of getting the ship, for

 4             lack of a better term -- I'm not sure if

 5             that's the proper term -- into the

 6             jurisdiction of the United States and

 7             specifically into the New York Court's

 8             jurisdiction.  Am I correct that that's what

 9             your papers say?

10                  MR. FREIDMAN:  Yes, your Honor.

11                  THE COURT:  Okay.  That, that's what I

12             wanted to make sure I was reading that

13             properly, okay?  Because as I'm sure you

14             know, I've had a lot of things to read and

15             that's fine.  I have no problem with that.

16             But, you know, this case, there's obviously

17             there's a lot of different interests at

18             stake on -- in many different, and many

19             different stakeholders.

20                  So go ahead, counsel.  I'm sorry.

21                  MR. FREIDMAN:  Just, your Honor, or if

22             the debtor refuses to do that, for an

23             appropriate court to, you know, impose

24             other, other nonmonetary sanctions.

25                  THE COURT:  Okay.  Thank you, Attorney
```

1        Freidman.

2            All right.  So just give me -- so

3        Attorney Baldiga or Attorney Silverberg,

4        which of the two of you are going to make a

5        presentation in connection with the Chapter

6        11 case management conference?

7            MR. BALDIGA:  I will, your Honor.

8            THE COURT:  Okay.  Fine.  Thank you.

9        So as I'm sure you reviewed, we have an

10       order that in the District of Connecticut

11       Bankruptcy Court that we issue in all

12       Chapter 11 cases, where we expect the debtor

13       and the debtor's here.  I see him, correct?

14           MR. BALDIGA:  Yes, your Honor.

15           THE COURT:  Okay.

16           MR. BALDIGA:  If I could introduce --

17           THE COURT:  Sure.

18           MR. BALDIGA:  Ho Wan Kwok, the debtor

19       --

20           THE COURT:  Yes.

21           MR. BALDIGA:  And you were right, your

22       Honor.  That -- he has his interpreter with

23       him.  I think she's been quieter since your

24       --

25           THE COURT:  Yes, she has and I

1          appreciate that.  Thank you. This room is

2          odd.  Sometimes the people in the back I can

3          hear better than the people in the front.  I

4          don't know why, but I didn't, you know, I

5          don't really have any control over that.

6          But I appreciate that.  Thank you.

7               MR. BALDIGA:  Let us know if it's

8          distracting and we'll --

9               THE COURT:  And I agree that the

10         interpreter's already speaking a little more

11         softly and I'm not hearing her, so I

12         appreciate that.  Thank you.

13              MR. BALDIGA:  Thank you, your Honor.

14              THE COURT:  Okay.  So in our order

15         scheduling initial Chapter 11 case

16         management conference, we ask a series of

17         questions.  You know, we have a numbered

18         paragraph with 18 things in it, I think.

19         Yeah, 18 things.  That the judge expects the

20         debtor and the debtor's counsel to explain

21         to the Court, just so that the Court can

22         understand what's happening in this Chapter

23         11 case.

24              So the first, the first and I assume

25         you are going to tell me this anyway, the

```
 1            first item on the list is the nature of the

 2            debtor's business and the reasons for the

 3            Chapter 11 filing.

 4                 So I understand this is an individual

 5            case and it may not be a business per se,

 6            but my understanding, and maybe I'm wrong,

 7            is that the individual debtor has been in

 8            business.  I don't know if he is in business

 9            at the time.  And operates and is a member

10            of many -- well, I don't know about.  That's

11            not fair.  What I've heard is that he's a

12            member of different corporate entities and I

13            want to understand that a little better, and

14            then the reason for this Chapter 11 filing.

15            I'd like you to start there, please.

16                 MR. BALDIGA:  Certainly, your Honor.

17            And again for the record, William Baldiga

18            from Brown Rudnick for the debtor.

19                 All right.  Your Honor, I do reference

20            as well because we took seriously the order

21            and we filed at docket 107 Mr. Kwok's

22            declaration, which went into in some detail

23            under oath all, we think all, of the 18

24            questions that are listed.  At least those

25            that relate to this case.  For example,
```

```
1              there is no cash collateral.
2                   So, but all the ones that are
3              referenced.  And the declaration goes into
4              great length to explain why we're here.  I
5              would like to make a presentation to that --
6                   THE COURT:  Sure.
7                   MR. BALDIGA:  -- and to be fully
8              responsive to you, but I think, you know, I
9              would be remiss without referencing that.
10                  THE COURT:  No.  And I know it was
11             filed, counsel.  I do know it was filed and
12             I will tell you that I looked at it, but I
13             didn't read it.  I didn't have the
14             opportunity to read it fully.
15                  MR. BALDIGA:  There's a lot there.  And
16             I think it will take some time to -- there's
17             been a lot of paper filed in the case
18             already from several parties.  But I will
19             step back then and first, the debtor has no
20             business.
21                  THE COURT:  Okay.
22                  MR. BALDIGA:  The debtor is one of a
23             very large family that grew up in China.
24             This debtor in his early 20s was supportive
25             of the protests in Tiananmen Square.
```

1          Watched his brother be shot to death in

2          connection with those protests and from that

3          time on has been a -- was arrested and

4          tortured.  And for a while was able to

5          maintain himself as part of a wide-ranging

6          family business in real estate development

7          and other business in China.

8               After he was released from prison in

9          1991, the family had some significant

10         success, which we lay out in the declaration

11         as to the real estate development.  In fact,

12         the family's business was very successful.

13         Mr. Kwok, however, has been extremely

14         committed to criticism, political speech,

15         which in this country is recognized.  In

16         China, very much not so.

17              He fled to Hong Kong in 2000.  And

18         continued to be very critical of the CCP, of

19         the Chinese Communist Party.  And in fact,

20         on many websites and so forth, is listed as

21         the most vocal critic of the CCP in terms of

22         the CCP's watch list and desires to be

23         silenced.

24              He expanded his criticism in 2015.  His

25         family, his brothers, his wife, his daughter

1        were all arrested.  (Indiscernible) to later

2        closely affiliated with several top CCP

3        officials and a foreign agent, entered into

4        a very significant business transaction with

5        PAX or the parent of PAX.

6            And Mr. Wu called in 2015, called my

7        client, the debtor, to say that his family

8        would be released from prison if he would

9        cease his political speech.  He has not done

10       that.  In 2017, in fact -- and this is all

11       in the declaration -- in all of this, during

12       this time, because he was on all of these

13       political watch lists, he cannot maintain

14       business activities.

15           He cannot even have a bank account.

16       And when he tried to have a bank account,

17       most recently a few years ago, the bank

18       terminated the account.  In 2017, he was

19       arrange -- there was arranged a Voice of

20       American interview to be aired on April 19,

21       2017, in which he was going to be extremely

22       critical of the CCP.  During that week, PAX

23       filed its lawsuits, that is the significant

24       driving effect -- event precipitating this

25       Chapter 11 case.

1            The CCP had Interpol red notice alerts

2       based on fabricated charges seeking his

3       arrest and extradition to China.  And Mr. Wu

4       and others sponsored many of the litigations

5       that you see that are in this -- that are

6       part of the creditor body here.

7            Almost all of that litigation or much

8       of that litigation is sponsored by the same

9       foreign agents who are funding the

10       litigation, admittedly.

11            Since that time, there have been

12       several well-publicized events in this

13       country to target Mr. Kwok.  Mr. Kwok at

14       paragraph 16, believes that if he were

15       extradited to China, he would killed.  He

16       believes that if he were imprisoned here, he

17       would be killed.  For that reason, he has

18       24/7 physical security.

19            Notwithstanding that, we have as

20       exhibits to the declaration, your Honor,

21       three separate criminal proceedings in this

22       country, federal criminal proceedings of, of

23       convictions.  One of a top DOJ lawyer.

24       Another one of Elliott Broidy, who has been

25       a significant political operative for trying

1          to -- he plead guilty and was convicted for

2          lobbying efforts to have Mr. Kwok extradited

3          to China, which Mr. Kwok believes would be

4          for the purposes of his death.

5              And then another separate criminal

6          proceeding with Niki Leondakis, also for

7          lobbying efforts to the Trump administration

8          to have Mr. Kwok extradited and he believes

9          killed.

10             This is not Mr. Kwok's nightmares, but

11         these are criminal informations, guilty

12         pleas and so forth attached to the

13         declaration of public information.

14             This is, your Honor -- and I'll get to

15         the business and financial aspects of these

16         -- I will be the first to acknowledge every

17         individual Chapter 11 case and I've been

18         involved in a few, is unusual by its very

19         nature.  Not many Chapter 11 case are

20         individuals.

21             This case is extraordinarily unusual.

22         I'll be the first to admit, I won't come in

23         here and stand here and pretend anything

24         that this case is -- I've been doing this 38

25         years.  I've never had a case like this.

1          And I was -- I represented the crimes

2          committee in the Mike Tyson case.  And this

3          case is extraordinary even compared to the

4          Mike Tyson case.

5          But extraordinary does not mean

6          improper and we condition taking on this

7          case for Mr. Kwok on the absolute agreement

8          that he would do everything by the book as

9          this Court and should and does expect.  And

10         as we should and do expect.

11         The debtor will toe the line in this

12         courtroom.  As an example, in prior

13         proceedings, the debtor did take the Fifth

14         Amendment protection, from time to time.

15         The debtor understands that while Chapter 11

16         debtors have from time to time exercised

17         their rights, Constitutional rights not to

18         testify, a Chapter 11 case requires

19         extraordinary transparency.

20         The debtor was examined for four hours

21         yesterday by creditors and by the United

22         States Trustee.  There was no exercise of

23         any Fifth Amendment privilege or any other

24         privilege.  Every single question was

25         answered and there will be many more hours

1              of testimony and every question will be

2              continued to answered.

3                   THE COURT:  Is that at the 341 meeting?

4              Is that what --

5                   MR. BALDIGA:  Yes, your Honor.

6                   THE COURT:  Go head.  I'm sorry.  I

7              just want to make sure.

8                   MR. BALDIGA:  No, that's okay.  I, I'm

9              try -- and again, but just to give an

10             example and this won't be the time and place

11             for a full exposition of these issues, but

12             on the theory that there are some things

13             that you just couldn't make up.

14                  But just -- I want the Court to

15             appreciate that we appreciate -- and this

16             debtor appreciates just how unusual this

17             case is and to know that we come before you

18             appreciating the extraordinary burden we

19             have to make this Court feel reasonably

20             comfortable that this case will be conducted

21             again to your full expectations.

22                  But just to give you an example.  A

23             three-person creditor's committee was just

24             formed yesterday.  One member of that

25             committee, Rui Ma, her lawyers, Arkin

1          Solbakken, confirmed by letter dated

2          September 30, 2020, that her fees to sue Mr.

3          Kwok are being paid by a Mr. Zheng Wu, also

4          known as Bruno Wu.

5               THE COURT:  Known as who?  You say also

6          known as who?  I didn't hear you.

7               MR. BALDIGA:  Bruno Wu.

8               THE COURT:  Okay.

9               MR. BALDIGA:  W-U.  And I apologize for

10         not providing to the Court the names from

11         the last hearing.  We will do that this week

12         as to the last hearing, next week.

13              THE COURT:  That'd be, that would be

14         very helpful to the Court.

15              MR. BALDIGA:  Well, I apologize we

16         didn't do that.

17              The second member of the committee, Sam

18         Nunberg.  It had been a personal friend of

19         Bruno Wu, he helped arrange Rui Ma's lawyers

20         for her, Arkin Solbakken.  Mr. Nunberg, a

21         member of the committee is the subject of a

22         publically filed in the United States

23         District Court for the Seventh District of

24         Florida, in case number 1820983 in Mr.

25         Kwok's case against Roger Stone.  That Roger

1        Stone.

2            Roger Stone's statement as later

3        published in the -- by him, in the Wall

4        Street Journal and New York Times.  "I,

5        Roger Stone, retract and apologize as for

6        statements he has made regarding Guo MD,

7        also known as Miles Kwok.  Mr. Stone has

8        publically stated when Mr. Guo has been

9        found guilty and convicted of financial

10       crimes in and the United States -- in the

11       United States and that Mr. Guo has violated

12       U.S. election laws by making political

13       donations to Hilary Clinton and financing a

14       Presidential run by Steven Bannon.

15           All of these statements are not true.

16       I failed to do proper research before making

17       those statement and improperly relied on

18       information conveyed to me by Sam Nunberg,"

19       it's a committee member.  "Between early

20       September 2017 and the fall of 2017, I

21       believed the source of that information was

22       Bruno Wu."

23           So that's, those are -- and Bruno Wu,

24       your Honor, just to complete the picture, in

25       his registration as a foreign agent, he

```
 1              served as a vice chairman and secretary

 2              general of the National Committee on China

 3              U.S. relations as an affiliate of the

 4              Carhartt Institute, a Chinese governmental

 5              think tank -- not a governmental think tank.

 6              Most of the other members of which are

 7              senior CCP officials.

 8                   That's our committee.  The -- I'm not

 9              disparaging the committee.  I'm just saying

10              that in and of itself makes this an

11              extraordinary case.  I will come to later

12              today why we've already reached out to the

13              U.S. Trustee to say that even if the U.S.

14              Trustee had not moved for the appointment of

15              an examiner, we think an examiner is in

16              order.

17                   We don't see how anyone, including the

18              Court, could be comfortable with the amount

19              of transparency demanded for a successful

20              Chapter 11 case without a truly independent

21              examination of this debtor.

22                   Not only do we consent to the

23              appointment of an examiner, we will pay for

24              it.  Mr. Kwok has gone to his family and

25              said if I'm going to have a transparent
```

```
 1              Chapter 11 case, we need to have an examiner
 2              and we need to pay for it.  And his family
 3              has agreed to do that.
 4                  The reason I referenced the DIP motion
 5              earlier on and again, I will put this on the
 6              list of things that I have never seen before
 7              in any other case.  Mr. Kwok's sons' family
 8              office, represented by Mr. Rosen, is
 9              committed to make as $8 million DIP loan
10              fully subordinated to all valid creditor
11              claims.  No security, no administrative
12              priority, not even on par with creditor
13              claims.  So that it doesn't come out in any
14              creditor pocket.
15                  Millions of dollars of that are
16              earmarked for an examiner so that things can
17              be done right.  And so you don't need to
18              just rely on me or Mr. Kwok telling you that
19              we know this and we know that.
20                  So that's one other example of us
21              intending to move this case in the right
22              direction.  We filed -- we needed a couple
23              of extra days.  The burdens of
24              interpretation from back and forth to China
25              when you absolutely insist that everything
```

1          be done perfectly, the interpretation does

2          present a timing challenge, but we filed our

3          schedules, a statement of affairs.

4              Mr. Kwok has engaged very experienced

5          and truly independent counsel and financial

6          advisor, that is none of us have anything to

7          do with Mr. Kwok or any of his creditors or

8          family members or whatever, until shortly

9          before the case.  A few days before the

10         case.  Truly independent.

11             As I said, Mr. Kwok was examined

12         yesterday for more than four hours.  He

13         answered every single question.  And as

14         fully said, you tell me when to come back,

15         I'll do it again.  And we'll I'm sure be

16         examined for several more hours.

17             Again, the interpretation's make it a

18         challenge, but that's -- he's committed to

19         do that.

20             We filed this comprehensive declaration

21         in a individual Chapter 11 case with this

22         extraordinary, that the debtor goes under

23         oath as to everything that has led up to the

24         case.  He's done in a fully transparent way,

25         but he thought that was important.

1          We consent to the appointment of an

2     examiner.  We will provide for the DIP

3     financing to do that.

4          Your Honor, we commit to file a plan in

5     the next 20 days.  Chapter 11 case is all

6     about treatment of creditors and we will do

7     that.  This case will be too expensive to

8     dwindle for months and months and months.

9     We want -- in some ways this case is

10    extraordinary in many ways.  But at the end

11    of the day, every Chapter 11 case is about

12    money or it should be.

13         Mr. Kwok wants to pay his creditors and

14    treat them fairly and is committed to do

15    that.  And the way you do that, we've

16    explained and he accepts, is to file a plan

17    and confirm a plan.  All of this, including

18    today, is to give us a chance to pay our

19    creditors and treat them fairly.

20         We will find out, your Honor, and you

21    will find out whether our -- what our

22    creditors want.  If our creditors want to be

23    paid fairly on their claims and have their

24    claims allowed in fair amounts, then this is

25    going to be a very successful Chapter 11

1        case.

2             If on the other hand, PAX and the other

3        creditors who filed their claims, most of

4        them within a few-week period, around a

5        Voice of America broadcast, all in an effort

6        to silence -- at the same time Mr. Kwok's

7        family was arrested in China, if, if their

8        goal is to have him killed, which Mr. Kwok

9        believes or to otherwise exercise

10       retribution or to silence his political

11       speech, then this is going to be very

12       difficult.

13            But we will have that feeling presented

14       in this Court because a bankruptcy court is

15       the time to reduce all of this to claims, to

16       allowable claims and to satisfy those

17       claims.

18            And you will have an opportunity to

19       evaluate yourself what our creditors, such

20       as PAX really want.  We hope they are going

21       to be commercial.  We have some doubts, but

22       we intend to find out.

23            By this Chapter 11 case, Mr. Kwok also

24       admittedly wants to stay out of jail.  If he

25       goes to jail, he believes he will be killed.

```
 1              It is that simple.  His -- he intends to

 2              exercise his life and liberty to be able to

 3              administer this Chapter 11 case.  He would

 4              not be able to do so in jail.

 5                   And when we get to the PAX exact

 6              relief, that they frame in a motion of

 7              relief, it will be ironic I feel to address

 8              exactly what they've asked for, but we'll

 9              come to that in due course.

10                   To go to the issue of Mr. Kwok's

11              business, he can't even have a bank account

12              because of the campaign by the CCP.  No bank

13              will even allow him to have bank account.

14              On a full-time basis, he is a critic in

15              memory of his brother, but also more

16              broadly, of the CCP.  That is his life's

17              work.

18                   He -- all of his expenses, and we go

19              into great detail in the declaration -- are

20              funded by -- his son is independently very

21              wealthy.  And his son through his son's

22              family office, Golden Springs, which happens

23              to be our DIP lender, funds everything, what

24              he eats, what he wears, what he rides in.

25              Mr. Kwok has nothing.  He would be in the
```

1          gutter or worse if he didn't have the

2          generosity of his family.

3               But this is not -- and again, this is

4          what it will take an examiner to show and to

5          come to this Court and to report to you and

6          to everyone else, this is not one of these

7          cases where it's a self-settled Trust or

8          other creditor manipulation.  This is a

9          product of 30 or more years of political

10         speech that has rendered him unable to work

11         and unable to have his own assets.

12              But he is fortunate, indeed, extremely

13         fortunate to have a wealthy family that

14         satisfies his needs without him being able

15         to earn income.  He has no income.

16              And the reasons for the Chapter 11

17         filing, most succinctly put, is to stay

18         alive so he can put these creditor claims

19         behind him through the confirmation of a

20         Chapter 11 plan.

21              THE COURT:  Okay.  I -- a couple of

22         things.  I mean, again, I haven't studied

23         this because --

24              MR. BALDIGA:  Understood.

25              THE COURT:  -- it was filed on Sunday I

1           think, right?

2                  MR. BALDIGA:  Yes.

3                  THE COURT:  Filed on Sunday and it has

4           several attachments to it, which is fine.  I

5           just want to be clear.  I haven't gone

6           through it all.

7                  MR. BALDIGA:  Understood, your Honor.

8                  THE COURT:  I haven't had the

9           opportunity to do that, number one.

10                 Number two, you know, there's a few

11          things that you said there -- and I'm not,

12          I'm just asking questions of you like I did

13          and --

14                 MR. BALDIGA:  Of course.

15                 THE COURT:  -- counsel asking questions

16          and getting answers.  So you have no

17          opposition.  In fact, I think you said you

18          consent to the United States Trustee's

19          motion to appoint an examiner?

20                 MR. BALDIGA:  Yeah, we haven't talked

21          about the order and there was a revised

22          order that I haven't even had to -- been

23          able to read, submitted this morning.

24                 But to the concept of an examination,

25          one, of an examiner, we agree.  We would

```
 1              have asked for it if the United States

 2              Trustee didn't and third, we will pay for

 3              it.  And I say we, our DIP lender will pay

 4              for it.

 5                   THE COURT:  Well, okay.  I'm just

 6              asking questions right now.  We'll get --

 7              I'll have to speak with the United States

 8              Trustee's office in a little bit.

 9              Obviously, the motion's not on today's

10              calendar, but it was filed on I think

11              Saturday.  There's a motion to expedite

12              associated with it.

13                   If what you're telling me is you

14              consent, I guess I need to hear from the

15              creditors and I will, not, not at the

16              moment, but I will ask you.  Because I don't

17              -- I mean, if there's an ability, if there

18              is an ability to agree on something without

19              the need for a hearing and protracted

20              findings and things of that nature, then

21              that would obviously be an avenue that I

22              would like to explore.

23                   MR. BALDIGA:  Of course.

24                   THE COURT:  If, if there is an

25              opposition, we'll have to address that.
```

1          With regard to the DIP financing, I

2     think you said already today that you filed

3     the motion today.  That you're looking --

4     are you, you're looking for expedited relief

5     is what I'm looking at?  I'm seeing some

6     things here.  You're looking that, for that

7     order to enter quickly?

8          MR. BALDIGA:  But not today, of course.

9          THE COURT:  Oh, I'm not suggesting it's

10    going to enter today.  I'm asking you what

11    are you looking for as far as timing and --

12         MR. BALDIGA:  As, as more traditional,

13    a preliminary hearing and then final

14    hearing.  They --

15         THE COURT:  Well, we do things a little

16    differently on the preliminary and final

17    hearing, too.  Now, but it might work in

18    your case if what you've suggested as a road

19    map works because we don't normally in a

20    Chapter 11 case enter a final DIP financing

21    order on -- as quickly as other courts might

22    because we want to see what's happening with

23    the plan.

24         Now, if you file a plan, I think you

25    said, I think I wrote down, 20 days or

1          something?

2              MR. BALDIGA:  Yes.

3              THE COURT:  Then maybe, maybe there

4          would be a final DIP order in a sooner,

5          sooner than a later.  But just to be clear,

6          we don't always enter those final orders as

7          quickly as some other jurisdictions do in

8          the Chapter 11 context because we want to

9          see how the Chapter 11 case is developing.

10         That doesn't mean it couldn't happen.  I'm

11         just giving you a heads up.

12             The same is true with cash collateral.

13         You know, if we have a cash collateral --

14         which I know you're not seeking.  I'm just

15         giving you an example so you understand what

16         the Court's perspective is.  We often enter

17         many interim orders of cash collateral

18         before we ever get to a final because of all

19         the provisions that parties want parties to

20         be bound by, other than themselves in many

21         cases.  So we don't always do that.  Number

22         one.

23             Number two, I know that there's been a

24         committee formed because I saw the document

25         and you just confirmed that.  I would

1    assume, but I could be wrong, that the

2    committee will want to retain counsel and

3    I'll have to deal with that and we'll have

4    to deal with the committee's position, too,

5    on DIP financing in addition to some other

6    issues.

7        So it's not a problem from the Court's

8    perspective, anything you've said.  I'm just

9    giving you -- I'm trying to set your

10   expectations I suppose in some respects.

11       MR. BALDIGA:  And that's very

12   appreciated, your Honor.

13       THE COURT:  Okay.  Which is that we

14   will proceed with whatever we need to

15   proceed with, but we, we don't always go to

16   a final hearing on cash collateral, DIP

17   financing in the same way some other courts

18   do.

19       Does that mean that -- as I said, but

20   that -- it depends upon the facts and

21   circumstances of each case, okay?  And so,

22   so with regard to the DIP financing, I just

23   want to understand what you're looking for a

24   hearing in a week?  Less than a week?  Ten

25   days,?  Two weeks?  What are you looking

1        for?

2                MR. BALDIGA:  Well, I don't have the

3        case calendar in front of me.  There's a

4        hearing I think coming up.  I don't have it.

5                THE COURT:  I'll look.  I can look for

6        you.  Hold on.

7                MR. BALDIGA:  April 12th?

8                MR. SILVERBERG:  Your Honor, they asked

9        for next Monday.  They asked for four and a

10       half days' notice.

11               THE COURT:  Well, that's not going to

12       happen, so don't --

13               MR. FREIDMAN:  That's why I didn't ask

14       for it.

15               MR. BALDIGA:  That's why we --

16               THE COURT:  Okay.  I'm not going to do

17       an $8 million DIP financing hearing from an

18       insider essentially I think is what I heard,

19       in four days.  That's not going to happen,

20       so you don't have to worry about that.  As I

21       just said, we have to wait for the

22       committee.  I've got to see what the

23       committee's position -- none of this going

24       to happen with that urgency.

25               That doesn't mean we can't start

```
1              talking about it.  But I'm not going to, I'm

2              not going to put anybody in that position,

3              including the Court.  Because there isn't

4              any -- I haven't been told --

5                   MR. BALDIGA:  April 12th, I believe --

6                   THE COURT:  April 12th.

7                   MR. BALDIGA:  -- is your --

8                   THE COURT:  Well, here's what -- I will

9              tell you, April 12th we have -- we do.  We

10             have applications, a bunch of retention

11             professional applications on April 12th in

12             the afternoon.  What I'm thinking we're

13             going to end up doing in this case, at least

14             initially, and it might be throughout the

15             whole case, is that we don't schedule the

16             matters on Tuesdays, which is the regular

17             calendar hearings in this Court.

18                  MR. BALDIGA:  Okay.

19                  THE COURT:  But we're going to schedule

20             them on another day.  And so what we may end

21             up doing is taking the matters that are

22             April 12th and moving them to April 13th for

23             example.  And it will just be hearings in

24             this Chapter 11 case that the Court will

25             hear that day, nothing else.  Because
```

1          there's many, many things going on and I

2          think the Court needs to devote the time to

3          that as opposed to having it be -- appear on

4          a regular Tuesday hearings calendar in

5          Bridgeport.

6               So I think that's likely to happen.  Is

7          that -- even the one -- even the matters

8          that appear to be somewhat administeral, but

9          I'm not sure they are, but that's another, I

10          mean, you know, you can, we can all talk

11          about that.

12               I think even the matters around April

13          12th are probably going to be moved --

14               MR. BALDIGA:   Okay.

15               THE COURT:  -- to a date like April

16          13th.

17               MR. BALDIGA:  I'm sure we'll find a

18          good day.

19               THE COURT:  Yeah.  I just don't think

20          it makes sense to think that we're going to

21          be able to address issues in a -- on a

22          Tuesday calendar when, you know, we have to

23          hear other matters.  It just doesn't make

24          sense.

25               MR. BALDIGA:  That's my initial sense

1            of this case as well, your Honor.

2                THE COURT:  Okay.  All right.  So April

3            12th or 13th, might work for you on a

4            preliminary hear on DIP financing; is that

5            correct?

6                MR. BALDIGA:  Yes, your Honor.

7                THE COURT:  All right.  I just want to

8            make a note so I get everybody, I get

9            everyone's thoughts down and then I can try

10           to figure out where we're going from here.

11               All right.  So with regard to the

12           presentation you've made and the debtor's

13           affidavit or declaration I should say, but

14           as I said, I have read it, but I haven't

15           studied it.  I know you've submitted a lot

16           of information.  You've told me a lot of

17           things.

18               The one thing that -- there is,

19           obviously, there's the litigation with PAX.

20           I know a little bit about it just given

21           what's been filed.  But I think the debtor's

22           involved in other litigation, correct?

23               MR. BALDIGA:  Yes, your Honor.

24               THE COURT:  Okay.

25               MR. BALDIGA:  And they are -- the

```
 1              litigation adversaries are the creditor
 2              (indiscernible).
 3                   THE COURT:  Okay.  And so I guess I'll
 4              need to hear about those at some point and
 5              figure out what's going to happen with those
 6              cases that are pending outside of this
 7              bankruptcy court, right?  I mean, we're
 8              going to have to address that at some -- in
 9              some way.
10                   MR. BALDIGA:  Yes.  And there are two
11              plaintiff litigations for which the debtor
12              is plaintiff.
13                   THE COURT:  Okay.
14                   MR. BALDIGA:  And which constitutes
15              assets of the estate.
16                   THE COURT:  Right.
17                   MR. BALDIGA:  And we've disclosed what
18              they are and they hopefully will be one of
19              the sources of one of the means to satisfy
20              creditors.
21                   THE COURT:  Okay.  All right.
22                   MR. BALDIGA:  The adverse litigations,
23              I've described some of them.  Many of them
24              are defamational, called defamation cases.
25              Others -- but they're sponsored --
```

```
 1            ultimately, they all come out of China.

 2            Almost all at about the same time.  All from

 3            a similar funding, including the PAX through

 4            Bruno Wu who's --

 5                 THE COURT:  But they're pending here in

 6            the United States?  All the matters are --

 7                 MR. BALDIGA:  Yes.

 8                 THE COURT:  -- pending in the United

 9            States?

10                 MR. BALDIGA:  I believe all in the

11            United States, yes.  Because Mr. Kwok has

12            been in the United States since I believe

13            2015.

14                 THE COURT:  Right.

15                 MR. BALDIGA:  Or so.

16                 THE COURT:  Okay.  At this moment --

17                 MR. BALDIGA:  He -- one in the BVI.

18            I'm sorry.

19                 THE COURT:  I'm sorry.  Say that again.

20                 MR. BALDIGA:  There's one action in the

21            British Virgin Islands.

22                 THE COURT:  Okay.  Okay.  But how many

23            total are there?  Did I -- am I -- is this

24            like 30 or something did I see?

25                 MR. BALDIGA:  About that, yes.
```

```
 1              THE COURT:  Okay.  All right.  I just
 2       want to make sure I'm reading things
 3       properly.  I'm not missing things.  Okay.
 4       Which I don't think I picked up the British
 5       Virgin Island, but that doesn't mean
 6       anything.  I've been looking and I might not
 7       have seen that.
 8           All right.  Then with regard to this
 9       case management conference, what we often do
10       and I will do in this case because of --
11       there's at least at this point, there's
12       still a lot of moving parts.  I will
13       continue this just in case I have more
14       questions.  I may not.  I may not have any
15       more questions once I really review the
16       declaration of the debtor and all the other
17       questions I may have may come out through
18       other pleadings from other parties,
19       including you.
20           I mean, it may, it may all -- so what
21       we normally do is I'm going to continue this
22       conference to whatever the date is that we
23       all choose and, you know, and I'm going --
24       we'll address that towards the end of the
25       hearing.
```

1          But even if it appears on the calendar,

2     I may come out and say at whatever that next

3     hearing is, I really feel that the

4     conference is concluded and we don't need to

5     schedule any more.  I'm going to address all

6     the issues in the pleadings that are pending

7     on things filed by the debtor or things

8     filed by the creditors.  Creditors'

9     committee, United States Trustee, whatever.

10         So even though I'm continuing this, I

11    am not -- I don't know if that really means

12    I'll ask you anymore -- and obviously if I

13    do and you're not prepared, I'll give you --

14    I mean, we'll figure it out.  It's not a

15    problem.

16         MR. BALDIGA:  We'll try to be prepared,

17    your Honor.  Because we're going to push

18    this case quickly as I said.  And Chapter 11

19    cases get old quickly.  We're going to push

20    this one to a conclusion.

21         THE COURT:  All right.  Well, we'll see

22    how things go.  But that, that's helpful,

23    all right?  I don't normally allow anyone to

24    ask any questions about the case management

25    conference because you're allowed to

1          question the debtor at the 341 meeting,

2          which obviously happened yesterday and it

3          appears the 341 meeting is going -- it's not

4          -- it's not closed.  It's going to be -- the

5          debtor's going to be subject to further

6          questioning.

7               MR. BALDIGA:  In two weeks, it will be

8          --

9               THE COURT:  Okay.

10              MR. BALDIGA:  -- yes.

11              THE COURT:  All right.  So then I feel

12         I understand, I have a good understanding I

13         should say.  I'm not saying I have a

14         thorough understanding, but I have a good

15         understanding of where things be.

16              The only thing that I would say that

17         you didn't talk about that -- and we have to

18         talk about because of PAX's motion is, when

19         you talked about filing, the reason for the

20         filing, you said that the debtor filed to

21         save his life.  And I'm not quarreling with

22         that in any way, shape, or form.  But

23         obviously, the PAX litigation has had an

24         impact on that as well, because the timing

25         of the filing and the issue of the decisions

1          out of the New York court had to have

2          impacted what's going on.

3               And so I think that in order to be

4          fully accurate, I guess I don't remember

5          seeing -- let me just take a look cause I

6          could have missed it.  So just give me a

7          second and I'll see if I can find it.

8               Of the 55 paragraphs, I think it was

9          55, we talk about PAX.  In the PAX

10         litigation you talk about, starting at

11         paragraph 20 --

12              MR. BALDIGA:  Yes.

13              THE COURT:  -- and you talk about the

14         loan and you talk about the personal

15         guaranty, and then you talk about the

16         restraining order.  And it says you have --

17         it says, the debtor says he has no ability

18         to pay this fine.  So the problem that I see

19         it with that, for that you're going to have

20         to address at some point, whether it's in

21         connection with this motion to -- for the

22         Court to determine that the State is not

23         apply or that relief from the stay should be

24         granted is for some -- right now you're

25         getting $8 million, your client's getting $8

1          million from a source.

2              Other loans have been made.  You're

3          being -- again, I'm not quarreling with any

4          of it.  Your firm is getting a retainer of a

5          good amount of money.  You say you want to

6          come up with a plan that will be -- that you

7          hope the creditors will accept and as I

8          unfortunately started off this hearing

9          saying, it's clear -- and you know, this

10         happens all the time.  I'm not saying

11         there's anything extraordinary to use your

12         terms, about disputes between a debtor and

13         creditors.

14             But I think that for your client to say

15         he has no ability to pay the fine, might,

16         might be problematic at some point.  I mean,

17         this is, this case was filed and stayed, the

18         actions that were occurring in the New York

19         court, right?

20             MR. BALDIGA:  Yes.

21             THE COURT:  I mean that's clear.

22             MR. BALDIGA:  Yes.

23             THE COURT:  That the, the actions that

24         occurred in the New York court, from what I

25         can see, so just -- again, I'm qualifying

1           this on what I have reviewed, were very

2           extensive and very detailed.  And the

3           judge's findings were very detailed.

4                And as you know, I think you know, I'm

5           not going to litigate that issue that's been

6           litigated in New York.  I mean that's not

7           going to be part of this Chapter 11 case.

8           But I have to listen to creditors who come

9           in and say hey, I got a motion here and I

10          want you to tell -- I want you to find

11          either that the automatic stay does not

12          apply or in the alternative, that we're

13          entitled to relief from the stay.

14               And so that was one of the reasons I

15          asked the question at the beginning of the

16          hearing and one of the reasons I asked

17          counsel for PAX the question, which was --

18          and I'm not sure they would be wholly

19          satisfied, but we're going to start talking

20          about the motion for relief from stay.

21          Well, it's not a -- I call it that, but it's

22          really that's the alternative relief.  The

23          main relief that's being sought is the

24          inapplicability of the stay.  Saying that it

25          doesn't apply cause it fits under (b)(1).

```
1          362(b)(1).

2                So let's just assume I agree with them.

3          Just for the sake of argument here.  I'm not

4          -- I am not ruling right now.  What are you

5          going to do if I do that, number one?  Or

6          what are you going to do if I grant relief

7          from the stay?  Do you, you know, the --

8          what, what I -- how I read their papers and

9          I'm going to give everybody a moment to

10         talk, but what I want you to think about,

11         counsel, because I'm going to turn to PAX

12         and let them present their motion, is what,

13         what are you going to do?

14               As you know, the bankruptcy court is

15         somewhat constrained and required to address

16         an issue regarding the automatic stay,

17         whether it's the inapplicability or the

18         request for relief from the stay on an

19         expedited basis.  Right?  I mean, you know

20         that?  You know that's what the rules

21         provide.  I'm not saying it, it's going to

22         happen today.  I'm not saying that yet.  I

23         haven't said that yet.

24               But what I am saying is you're

25         suggesting some pretty aggressive things and
```

```
1          I don't mean aggressive in a bad way.  I'm

2          talking about, you know, you said you're

3          going to file a plan in 20 days, you got DIP

4          financing of $8 million, you want -- you

5          know, you want a lot of things to happen

6          quickly and I understand that.

7               But then I've got the competing claims

8          of the creditors who, who want a lot of --

9          at least one thing to happen quickly.  They

10         want to go get that boat, right?  Isn't that

11         pretty obvious?  So have you had any

12         discussions about -- I'm not talking about

13         with opposing counsel.  I'm talking about

14         with you, with your client, about trying to

15         -- if you really want to make this work,

16         right, and I'm not suggesting you don't.

17         But if you really want to make this work,

18         don't you think if you're going to get the

19         creditors to be in any way supportive of

20         what happens in this case, don't you think

21         you need to seriously consider what -- and

22         I'm not saying you -- that's not fair.  I'm

23         not saying you haven't seriously considered.

24         So let me just step back.

25              Don't you think you need to address the
```

```
 1              issue of the boat?  Now, here you say, Mr.

 2              Kwok says, "I did have access to the boat,

 3              but I did not have the authority to order it

 4              back to New York."  I don't understand that

 5              sentence.  So can you explain that to me?

 6                   MR. BALDIGA:  Yes.

 7                   THE COURT:  Okay.

 8                   MR. BALDIGA:  Mr. Kwok does not own the

 9              boat.  Never did.

10                   THE COURT:  I don't think anybody -- I

11              don't know if even anybody disputes that.

12                   MR. BALDIGA:  Okay.

13                   THE COURT:  But the, but the New York

14              judge says doesn't matter whether he owns

15              it.  He controls it.

16                   MR. BALDIGA:  He does --

17                   THE COURT:  That's what, that's what he

18              said, right?  I mean, I don't think I read

19              that wrong.  I think the New York -- the

20              judge in New York said he controls it.  He

21              didn't - it, it's if -- so if he controls

22              it, then, then why would he say, "I do not

23              have the authority to order it back to New

24              York"?  How -- so go ahead, explain that to

25              me.  I'm sorry.
```

```
 1              MR. BALDIGA:  Cert -- no, certainly,
 2        your Honor.
 3              And Mr. Kwok does not control the boat.
 4              THE COURT:  Okay.
 5              MR. BALDIGA:  The judge made the
 6        finding that he did.  It doesn't mean that's
 7        right.  It's on appeal.  But it's wrong.
 8        And that's okay.  I mean, sometimes judges
 9        are wrong.
10              THE COURT:  Yup.
11              MR. BALDIGA:  But I'm not disputing
12        that that's what he found.
13              THE COURT:  Okay.
14              MR. BALDIGA:  He found that.
15              THE COURT:  Okay.
16              MR. BALDIGA:  The specific relief that
17        PAX has asked for here, and again, this ties
18        into the earlier presentation and it's -- I
19        don't think it's by coincidence.  Is the
20        enforcement of the State court's February 9
21        contempt order.  That's the specific relief
22        here at paragraph 9.
23              THE COURT:  But I asked counsel at the
24        beginning of the hearing; didn't I?  I asked
25        him, aren't you, aren't you really just
```

1       wanting to get the boat back into the

2       jurisdiction of the, of the New York court?

3              MR. BALDIGA:  But that's not what the

4       papers say.

5              THE COURT:  I understand that's not

6       what the paper said, but that's what I asked

7       him.  I'm trying to figure out a way -- not

8       figure out a way.  I'm trying to suggest to

9       you that it -- we can be here for years

10      fighting about everything.  You know, it's

11      happened before.  It'll happen again.

12             Or we can try to see if there's a way,

13      and you know, I take you at your word that

14      the debtor wants to move forward in a

15      meaningful way to have an -- I can tell you

16      what you said.  I mean I think you said it

17      well.  You want to commit to file a plan in

18      the next 20 days and Mr. Kwok wants to pay

19      his creditors fairly and he wants to have a

20      chance to propose that fair treatment and

21      treat them fairly.  Okay?

22             MR. BALDIGA:  Yes.

23             THE COURT:  So the problem, the problem

24      that exists, that existed when this case was

25      filed, right, that has nothing to do with

1              the bankruptcy itself, was all the findings

2              and all the litigation that went on before

3              this and I understand you're appealing it.

4              I'm not -- you know, you have every right to

5              do all that.

6                  But if, but if you're going to be in

7              this Court and try to get the cooperation of

8              the creditors to get a plan confirmed so Mr.

9              Kwok can, he's, you know, he wants to move

10             on and he wants to save his life is what you

11             said, and I have no real knowledge about all

12             the in-depth facts that you stated, you

13             know, about unfortunate events and things

14             that apparently occurred, but this is a

15             situation where I'm going to have to rule on

16             that motion if there isn't an agreement on

17             that motion, right?

18                  MR. BALDIGA:  Yes.

19                  THE COURT:  I'm going to have to rule

20             on that.  And you might not -- well,

21             somebody's not going to like the way I rule.

22             Whoever it is.  And then there's going to be

23             an appeal of that, too.  Right?  I mean,

24             there will be I would assume.  And so then

25             we're going to be continuing litigation

```
1              that's already been continuing in New York

2              for several years.  I think the case was

3              filed in 2017 I think.  I could be wrong

4              about that.

5                   MR. BALDIGA:  Judge, the week of the

6              Voice of America podcast, yes.

7                   THE COURT:  Okay.  So again, I'm, I'm

8              suggesting to you, to everyone, that sure,

9              we can do that.  We can continue to litigate

10             everything in this Court, but I will have

11             parameters under which that's going to

12             happen and I have under the bankruptcy code

13             and the bankruptcy rules, I have to decide

14             this motion.  And it's going to be fast.  I

15             mean it's going to be sometime soon.

16                  And so, you know, I don't know if

17             that's going to work for you or for the

18             creditors, but I'm going to do that.

19                  And I, you know, what I'm going to do

20             now is I have let and I am happy to have let

21             you talk as long you want.  You're the

22             debtor's counsel.  You should be talking.

23             This is what we need to talk about.  But I'm

24             going to let Attorney Freidman tell me why I

25             should grant his motion in a minute.  He
```

1          hasn't talked yet.  I'm going to let him

2          talk.

3                MR. BALDIGA:  I'm going to -- of

4          course.  Listen is all.

5                THE COURT:  And you'll listen and

6          you'll be able to reply.  This is a

7          preliminary hearing on the motion that PAX

8          has filed.  I can do many things with that.

9          I could, I could order a final hearing

10         tomorrow.  I'm not going to do that, but I'm

11         just saying I could do that.

12               I think you really need -- it is the

13         obvious issue in the room that we have to

14         address.  And, you know, I have no problem

15         in any situation ruling because that's what

16         I'm supposed to do.  And then I have no

17         problem if people appeal because that's why

18         we have courts of appeals.  The judges get

19         it wrong as you said.  Sometimes the judges

20         get it wrong and they need assistance from a

21         higher court to tell them what they did

22         wrong.

23               But I'm going to have to rule.  I have

24         no choice.  I have no choice on a couple of

25         levels including how the bankruptcy code was

1          amended in 2005 that says basically, you

2          know, in 362(e)(2), what I think it is, you

3          know, you got 60 days essentially and then

4          there's no more stay.  It's an individual

5          case.  Unless I make some other kind of

6          findings.  So I'm going to have to do that

7          at some point unless I rule within 60 days,

8          which is also extremely possible.

9              So I just ask you to listen to -- and I

10         know you will -- Attorney Freidman and I ask

11         you both to consider, you know, where things

12         are going to go after today.  I understand

13         -- I've been involved in it when I was a

14         practicing lawyer, I understand when parties

15         don't agree.  I understand it.  You know,

16         but at some point, at some point at the end

17         of the day, I don't know where that's going

18         to get us, but I'm here.  I'll do whatever I

19         can to help you.

20             But there are certain things I have no

21         control over, as you know.  And the relief

22         from stay issue and this motion and the

23         timing that's already started to run, I just

24         think people need to seriously -- and I'm

25         not saying you're not.  It comes -- I don't

```
 1          -- I want to be very careful.  I am not
 2          saying that you're not taking any of this --
 3               MR. BALDIGA:  Of course, we know
 4          exactly what you mean, your Honor.
 5               THE COURT:  -- of course you are.
 6               MR. BALDIGA:  I appreciate the
 7          opportunity at the outset of this hearing to
 8          have given you as much background as I have.
 9          I will accept your invitation to sit for a
10          moment and to listen and I'm sure I'll be
11          back up in a few minutes to talk further as
12          to the boat.  Thank you.
13               THE COURT:   Thank you.  Thank you.
14               Okay, Attorney Freidman, now I am going
15          to proceed with your motion, okay.  We
16          essentially concluded the case management
17          portion of the hearing, even though I'm
18          continuing it till a date that we haven't
19          determined yet, but it will probably be as I
20          discussed, April 13th.
21               But that your motion, I granted your
22          motion to expedite the hearing on your
23          motion for the Court to determine whether
24          the stay even applies and if it does, then
25          for relief from the stay.  So go right
```

1    ahead.

2        MR. FREIDMAN:  Good afternoon, your

3    Honor.  It's Peter Freidman from O'Melveny

4    and Meyers.  I just, I want to make just a

5    couple of preliminary comments, which is I

6    actually don't believe that Mr. Kwok wants

7    to avoid going to jail because if he wanted

8    to avoid going to jail, he would not have

9    violated the U.S. code by submitting a

10   declaration so filled with falsehoods and

11   lies that it's embarrassing.

12       And what you uncover in the course of

13   this case, and I -- unfortunately were

14   repeated from the lectern.  You will find

15   out from this case that Mr. Kwok has had

16   bank accounts.  He's had, you know, people

17   submit letters on his behalf when he

18   purchased an apartment, talking about his

19   long banking relationships.  And that was in

20   2015.

21       You will hear if it ever becomes

22   necessary, enormous testimony about how he

23   held himself out as the owner of the

24   Sheridan Netherlands Apartment despite his

25   denying that in his declaration.

```
1              He lists -- he says in his declaration
2         that the PAX agreement was a forgery.  We've
3         put in a footnote all the reasons we know
4         that to be obviously false.  The pattern of
5         lying hasn't stopped and it's distressing to
6         see it repeated from the lectern.  It's
7         distressing -- Mr. Kwok talked about all the
8         litigation he's been involved with it, much
9         of it for people accusing him -- I don't
10        know if it's true or not -- of being a
11        Chinese spy.  I know he's frequently accused
12        of being a Chinese spy himself and a
13        collaborator with the Chinese Communist
14        Party.  I have no idea.  I don't know if
15        that's true.
16             But he's effectively had his counsel
17        accuse my client of the exact same thing
18        here today with zero basis.  It, it's
19        sanctionable in our view for opposing
20        counsel to stand at a lectern and accuse
21        another party with no basis of conspiring
22        with the Chinese Communist Party.  It's
23        outrageous.
24             Your Honor, I want to make a few other
25        points.  Now, the declaration, which is
```

1          docket number 107, which is his declaration,

2          was submitted on a Saturday.  Your Honor,

3          Mr. Kwok's opposition to our motion was

4          filed Wednesday and referred to it, the

5          declaration.  He didn't file it for four

6          more days.  He filed it then just for the

7          heck of it in support of the motion, but he

8          didn't file until today.

9              It's a litigation by incompetent

10         ambush.  And that gives you a sense when Mr.

11         Baldiga says we're going to, we're going to

12         run this case in an appropriate manner and

13         follow every rule.  It's just not true.

14             And the proof, you saw it in the

15         petition.  You saw it in the schedules.  You

16         see it in the way they conduct this case.

17         So notwithstanding what you heard, I think

18         the actions speak much louder about how this

19         case might go.

20             I do also want to let the Court know we

21         don't consent to appointment of an examiner.

22         We think and examiner is a tremendous waste

23         of time and money.  A trustee should be

24         appointed.  We'll be seeking that relief.

25         Obviously we'll be filing an objection to

1          the examiner motion whenever the Court

2          requires that that be objected to.

3              If the debtor really is going to file a

4          plan within 20 days, we obviously have to

5          get the examiner -- the trustee motion moved

6          very quickly because the interplay between

7          timing for a trustee and timing of a -- of

8          confirmation hearings in a plan.

9              You know, what plan other than I will

10         pay all my creditors in full could make

11         sense here?  I don't know.  You heard yet

12         again this is somebody who doesn't have any

13         money.  It's unclear whose benefit this case

14         is being even run for.  But I don't want to

15         get too far out ahead of where things are

16         going go, so I'm going to come back to this

17         particular motion.

18             Your Honor, you had a colloquy with Mr.

19         Baldiga and sort of asked some questions

20         about what Justice Ostrager actually

21         determined in his hearing, in his, in his

22         sanctions order.  And I think it's worth

23         looking at the sanctions order because it

24         says --

25             THE COURT:  Can you just point me -- is

```
1              that, is it an exhibit -- is it Exhibit A?
2                   MR. FREIDMAN:  It is Exhibit A to the
3              Freidman declaration.
4                   THE COURT:  Okay.  If you give me a
5              second, I'll be able to look at it with you
6              at the same time, okay?
7                   MR. FREIDMAN:  Okay.
8                   (Pause.)
9                   THE COURT:  Okay.  I'll almost there.
10                  (Pause.)
11                  THE COURT:  All right.  I think I'm
12             there.  Let me just check with you, okay, to
13             make sure I'm looking at the right document.
14             So it says, "Supreme Court of the State of
15             New York, New York County," and then at the
16             top there's an index number and a motion
17             sequence number of 19 --
18                  MR. FREIDMAN:  Yes, your Honor.
19                  THE COURT:  Okay.  All right.  Go right
20             ahead then.  I'm with you.
21                  MR. FREIDMAN:  So on page 2, the first
22             full paragraph.  "On February 2nd, 2022,
23             this court held an evidentiary hearing at
24             which seven witnesses submitted direct
25             testimony by affidavit and were made
```

1           available for cross-examination."  I'm going

2           to stop quoting.  Some of those witnesses

3           were, were -- virtually all those witnesses

4           were Mr. Kwok's witnesses.  His family

5           members, people whose testimony he

6           submitted, right?  So when he tells you the

7           judge got it wrong, remember what was in

8           front of Justice Ostrager and all the

9           opportunities they had to litigate this

10          matter.

11              Going back to quoting, "Those

12          proceeding established among other things,

13          that Kwok exercised dominion and control

14          over a yacht called the Lady May."

15              As we go to page 4, "The testimony

16          adduced at the hearing out of the mouths of

17          defendant's witnesses clearly and

18          convincingly demonstrated that Kwok

19          beneficially owns and controls the Lady May

20          and has utter contempt for this court and

21          the judicial process."  Pause there.

22              Your Honor, if we have to get into it

23          at some point later, we'll also show you

24          tweets where Mr. Kwok accused Justice

25          Ostrager of being a CCP agent.  Just to show

1      you how promiscuous he is with that

2      allegation.

3          Then, your Honor, the last page.  I'm

4      sorry, page 8.  "Kwok has much more than a

5      beneficial interest in the Lady May.  Not

6      only does Kwok control the yacht, it appears

7      he provided the funds to purchase it and he

8      is the person who principally enjoys the use

9      of the yacht."  These are all facts that a

10     court of competent jurisdiction has found.

11     They cannot be whether it's under Rooker

12     Feldman or collateral estoppel or race

13     judicata, as this court said they can't be

14     re-evaluated here.

15         Mr. Kwok's claim is that he doesn't

16     have the ability to bring the yacht back

17     should fall on deaf ears.  Because

18     defendants claim all the time I didn't do it

19     after they've been convicted.  It doesn't

20     make it so.  He doesn't get to just say I

21     can't do it when a court has found he can

22     and he has refused to as an act of utter and

23     complete contempt.

24         Mr. Kwok was in contempt of Justice

25     Ostrager's opinion for 268 days.  And

1           Justice Ostrager concluded that if

2           billionaire litigants can simultaneously

3           seek to use the court process in New York

4           and elsewhere in the United States while

5           knowingly and intentionally violating court

6           orders, there is no rule of law.

7                That's what -- by the way, that's what

8           the stakes were in front of Justice Ostrager

9           and how obviously disturbed he was by this

10          pattern of conduct that Mr. Kwok showed.

11               But I read you all of those in order to

12          show, your Honor, but that whatever is in

13          the declaration, whatever factual predicates

14          Mr. Kwok wants to make, whatever loopholes

15          he's looking to escape, simply are not

16          available to him in this Court given the

17          breadth -- frankly, even if the findings of

18          fact were cursory, there would still be

19          collateral estoppel, but they aren't.

20          They're deep and based on extensive

21          testimony.

22               Mr. Kwok's protestation was to the

23          contrary and he can't do it.  If they're

24          addressed, they should be addressed in New

25          York State on appeal and Mr. Kwok tried to

1          get an interim stay of Justice Ostrager's

2          order and interim stay.  He couldn't even

3          get that, much less a false stay pending

4          appeal.  That's how little the New York

5          Court of Appeal -- Appellate Division thought

6          of his, his likelihood of success on the

7          merits.

8              I note when we submitted this in

9          connection with our schedules, Mr. Kwok also

10         put on Getter that if he -- you know, he

11         might consider fleeing the jurisdiction of

12         the United States if the sanctions are

13         (indiscernible) was -- the contempt order

14         was pursued.  Perhaps Mr. Baldiga should be

15         asked whether if the stay is lifted, Mr.

16         Kwok intends on fleeing the United States

17         jurisdiction to avoid the consequences of

18         his contentious behavior.

19             Your Honor, a couple of other points

20         that I wanted to address.  Obviously Kwok --

21         Mr., Mr. Kwok has sought to remove the

22         action to federal court.  Nothing that moots

23         the relief.  First of all, it's an obviously

24         deficient form of removal.  Rooker Feldman

25         provides that mandatory abstention,

1           permissive abstention, are out of play.  But

2           even if remand was appropriate, there's

3           still an action pending now in the Southern

4           District of New York and the Southern

5           District of New York then can have the stay

6           lifted if it's the appropriate forum to

7           order return of the yacht.

8               So the removal while a quasi-clever

9           tactic to try to cause delay does nothing to

10          moot our motion or the relief that could be

11          granted if necessary.  And we would amend

12          our order to say that, whether it's the

13          State court in New York or the federal court

14          if the action's properly been moved, the

15          stay is lifted.

16              Your Honor, I want to make another

17          point.  That -- just address another point

18          that's in Mr. Kwok's papers.  Mr. Kwok says

19          don't lift the stay because if the stay is

20          lifted or the stay is modified I guess to

21          use less colloquial language, the stay --

22          the code doesn't cover about lifting a stay.

23          It talks about modification or termination

24          of a stay.

25              Don't do it because then I won't get a

1          DIP from Golden Spring because my family

2          won't lend me the money under those

3          circumstances.

4               There's an old parable about Lincoln,

5          right?  That Lincoln, Lincoln would describe

6          somebody as, as being like the highway man

7          who comes up to you and says give me your

8          wallet or else I'll shoot you and it will be

9          your fault that I'm a murderer, right?  If

10         Kwok's family won't lend him the money and

11         the case goes off the rails, this case can't

12         be pursued because Kwok won't bring a boat

13         back or because the Court lifts the stay,

14         that's on him.

15              That's not on the creditor body.

16         That's not on this Court.  That's a form of,

17         of a hostage taking that I don't think is

18         appropriate to suggest.  If they don't want

19         to lend the money, so be it under that

20         circumstance.

21              What I would say about that is we

22         should stop and think about it, right?

23         These are the people who Kwok says, you

24         know, fund his lavish lifestyle and have

25         done so for years.  These are the people who

```
 1              are going to help resolve claims against the

 2              estate, are going to provide a lot of

 3              funding to get their dear old dad out of

 4              Chapter 11, not have to face sanctions.

 5                  But if the relief that's granted -- we

 6              ask for is granted, they won't lend money,

 7              which doesn't make sense cause if the relief

 8              that's granted, one of two things is going

 9              to happen.  He's going to stop his

10              contentious behavior, I don't know why, and

11              bring the boat back.  I don't know why that

12              would prevent them from wanting to lend

13              money other than they feel like their

14              favorite toy has been taken away.  Or he'll

15              remain in contempt.

16                  And if he remains in contempt, there's

17              a natural consequence to that behavior.

18              Again, in that circumstance, I guess they're

19              willing, if you take him at his word, to let

20              their dad go to jail and have all the

21              terrible things he claims are going to

22              happen, happen.  That also doesn't really

23              make any sense.

24                  So I want to now turn to the legal

25              bases for a motion.  We've said the stay
```

```
1              doesn't apply because of the exception that

2              has been recognized by virtually every

3              court.  (Indiscernible), we know that a

4              civil contempt order can be exempt from the

5              automatic stays.  I spent a lot of time in

6              their paper saying it's -- it's in a

7              criminal contempt order.  We agree.  It's

8              not.  It's a civil contempt order.

9                   But civil contempt orders are exempt

10             from the automatic stay where they are

11             designed to vindicate the interest of a

12             court or -- and are focused on not

13             compensation -- and to be clear here, the

14             hundred and thirty-four million dollar funds

15             completely separate from the underlying

16             judgment that was rendered in our clients'

17             favor.  But because there's been an assault

18             on the dignity of a court.  And I just -- I

19             want to go back to what I read to you.  If

20             -- Justice Ostrager said, if billionaire

21             litigants can simultaneously seek to use

22             court process in New York and elsewhere in

23             the United States, knowingly and

24             intentionally violating court orders, there

25             is no rule of law.  I think there couldn't
```

1              be a clearer statement about what Justice

2              Ostrager thought, the purpose of the

3              sanction laws.

4                   And it was to, you know, to hold Mr.

5              Kwok in contempt for refusing to abide by

6              court orders and insulting the integrity of

7              the -- indicative of the judicial process.

8                   So I don't -- from that perspective, I

9              think it, you know, then becomes clear that

10             this is the kind of motion, contempt -- a

11             sanctions order that can be held to be --

12             fall within the exception to the automatic

13             stay.

14                  Well, their arguments, for example,

15             they rely on the White case.  I think as we

16             explained in our reply brief, first of all,

17             the White case recognizes as it has to that

18             an exception exists to the automatic stay

19             for civil actions versus for certain civil

20             kinds of contempt motions.  That cases about

21             collection of damages, which we're not

22             trying to seek.  We've been very clear we're

23             not trying to seek damages.  We're not even

24             seeking it necessarily -- we not even

25             seeking imposition of additional fines.

1          What we are seeking is to ensure that the

2          Lady May is returned to New York.

3               Now, the February 9th contempt order

4          specifically does require the return of the

5          Lady May and says to the extent the Lady May

6          is not back, fines continue to accrue.

7          We're not actually asking for fines to

8          continue to accrue.  We're not seeking

9          damages.  We're seeking return of the boat,

10         we're seeking return of the boat for the

11         benefit of all creditors.  We can quite

12         clear and we've clarified it even further in

13         our draft order that the boat will remain

14         subject to further order of this Court.

15              So the kinds of concerns that animated

16         cases like White, where one creditor was

17         seeking to obtain a financial advantage for

18         itself in connection with the contempt

19         motion are not present here in any way.

20              Your Honor, I think  the, you know, the

21         debtor also tries to draw distinction from

22         some of our cases saying that those cases

23         related to post-bankruptcy, post-petition

24         sanctions orders.  And our response to that

25         is the timing may have been different in

1        those cases, but the analytical framework

2        that the Court evaluated.  What's the nature

3        of the sanction?  What is the person seeking

4        to lift the stay hoping to achieve by doing

5        it?  Are they trying to detract from the

6        estate?  Are they trying to agglomerate or

7        accumulate more for themselves?  Are they

8        trying to just harass a debtor?  None of

9        those factors are present here.  We're

10       simply trying to get the debtor to bring

11       back one of its most valuable assets.

12           They say you shouldn't worry about,

13       yeah, why do you need to that?  The boat is

14       subject to worldwide jurisdiction of the

15       bankruptcy court.  First of all, I think

16       it's very clear that Mr. Kwok doesn't

17       respect certain bankruptcy -- any court's

18       orders.

19           Second of all, the asset, even if it's

20       subject to worldwide jurisdiction, could

21       potentially continue to dissipate.  It's

22       being used by I don't know who, but it's

23       always at risk.  And has Mr. Kwok done the

24       basic things that a debtor ought to do?  To

25       assert control over his assets.  Has he

1       filed a turnover motion?  Has he sought to

2       hold his family in contempt for -- with

3       respect to the automatic stay for continuing

4       to exercise control over one of his assets?

5       Of course he hasn't.  What he's continued to

6       try to do is squirrel out of Justice

7       Ostrager's ruling that it's his boat and

8       that he controls it.

9            So the fact that the boat is also

10      subject to worldwide jurisdiction of this

11      Court and frankly, who knows if the Court in

12      somewhere else, wherever the boat is, would

13      acknowledge the validity of that, is of zero

14      comfort to us.

15           Your Honor, the last point I want to

16      make is with respect to the automatic stay.

17      If the automatic stay is held to be

18      applicable.  I think the most important

19      Sonnax factors here is that is that every

20      creditor who's spoken up, our client and the

21      two other creditors, favor this relief.

22      They want the asset back.  They don't want

23      it floating out there.  It, it benefits all

24      creditors.  The only one it doesn't benefit

25      are Mr. Kwok and his family members who are

1          not legitimate creditors.

2              I know Mr. Kwok didn't talk about Rui

3          Ma and her creditor claim other than to cast

4          dispersions on her.  I know her counsel is

5          here.  I don't know if she intends on

6          explaining the basis for that claim, but

7          it's a horrifying claim and I'm not

8          surprised counsel didn't go into details

9          about what Mr. Kwok is accused to have done

10         in that case.  Not surprised at all.

11             The other Sonnax factors obviously,

12         sort of, they cut in our favor no matter

13         what, right?  Either, if there's more

14         protracted litigation to go ahead, nobody

15         better to do it than Justice Ostrager.

16         There may be nothing left to do because the

17         order has already been entered.  So it's not

18         like we are dealing with a case that really

19         should be litigated in this forum because it

20         hasn't been address extensively somewhere

21         else.  We know it has.

22             Enforcing to the contempt order won't

23         interfere with this case.  It's going to

24         help this case.  The only way it's going to

25         interfere with this case is if Kwok lets it.

```
 1            If Mr. Kwok won't assert his rights, then it
 2            will interfere with this case to an extent.
 3            But if he does what he's supposed to do,
 4            what he's been ordered to do, it will
 5            enhance this case, not undermine it.
 6                 Your Honor, this isn't a real case in
 7            the context of the other factors, for
 8            example, that are cited in Sonnax.  There's
 9            no operating business.  He has no innocent
10            employees who would be harmed by an
11            injunction.  He has no business to deal with
12            except litigate cases.  That's all he does.
13            And if he won't abide by the court's ruling
14            in New York and is incarcerated, he can be
15            deposed wherever he is in the future, unless
16            he flees the jurisdiction, but again, I
17            don't think fleeing jurisdiction is a basis
18            or the threat that he might flee
19            jurisdiction is a basis for granting -- for
20            denying stay relief.
21                 The two other things I would say, your
22            Honor, is the comparison to Res Cap, is not
23            well taken.  I'm sure this Court is well
24            familiar with the Res Cap case and the $375
25            billion residential mortgage book that had
```

```
 1            to be dealt with that case from over two and

 2            a half million different homeowners.  Not

 3            even apples and oranges.  It's pineapples

 4            and concrete.  How different those are.

 5            There's just nothing in common between this

 6            case and Res Cap.  And the same with Sonnax.

 7            The Sonnax was an operating business.  This

 8            isn't.

 9                And if the Court has any questions,

10            we're -- I don't know if anybody thinks

11            something else escaped my attention or I

12            should raise, but I don't have anything

13            further, your Honor, other than I'd like to

14            rebut any opposition.

15                THE COURT:  I don't have any questions

16            at the moment.  Now, I -- well, that's not

17            true, I do.

18                I set this up as you I'm sure noticed

19            as a preliminary hearing under the

20            Bankruptcy Code and the Rules.  What other

21            information, if any, do I need from you,

22            from your perspective to decide -- I mean

23            your clients' perspective --

24                MR. FREIDMAN:  Sure.

25                THE COURT:  -- obviously, to decide
```

1          this motion?

2              MR. FREIDMAN:  Not a bit.  And I'd go

3          further, your Honor to say that Kwok should

4          be barred from trying to introduce any other

5          evidence and should not be allowed to rely

6          on his declaration to the extent it seeks to

7          reconsider factual matters determined by

8          Justice Ostrager.

9              THE COURT:  Okay.

10             MR. FREIDMAN:  Thank you, your Honor.

11             THE COURT:  I understand your position.

12         And I'm just looking to make sure I don't

13         have any further questions, but I don't

14         think I do.

15             MR. FREIDMAN:  Okay.

16             THE COURT:  At the moment.  No, I don't

17         at the moment, but thank you, Attorney

18         Freidman.

19             MR. FREIDMAN:  Your Honor, I don't know

20         if any of the other creditors --

21             THE COURT:  Yeah, I'm going to ask if

22         anybody else wishes to be heard on PAX's

23         motion.  I'm going to let the debtor respond

24         to -- no, no, come first, counsel.  I'm

25         going to hear from creditors first and then

1          I'll let the debtor respond.

2              And I'll let PAX respond to the debtor

3          and that'll be that.

4              MS. CALLARI:  Hi, good afternoon, your

5          Honor.

6              THE COURT:  Good afternoon.

7              MS. CALLARI:  Carollynn Callari with

8          Callari Partners, again.  I'm here on behalf

9          of Rui Ma.  First I just want to say that I

10         find it -- and I don't know that any of the

11         counsel in this room.  So it's not meant to

12         be professionally, but when your Honor sees

13         the complaint that Rui Ma filed and reads

14         it, you will understand the disgust I feel.

15         And any allegation that the merits of her

16         claim are anything but real and that they're

17         part of some sort of conspiracy.

18             When we get to it, your Honor will see

19         the chronology of the facts of life make

20         their argument impossible.  That her claims

21         are just made up by this other person in

22         part of his scheme to bring down the debtor.

23             So with that, we support PAX's motion

24         as modified.  We agree to additional

25         language.  In our limited statement we

| | |
|---|---|
| 1 | provided a couple of paragraphs that we |
| 2 | thought would be appropriate.  PAX's counsel |
| 3 | has altered them, but it's a similar |
| 4 | concept, which basically means that we |
| 5 | support PAX's efforts to basically natural |
| 6 | assets of this estate and to bring them back |
| 7 | to this estate and then have your Honor |
| 8 | determine what happens with them and what is |
| 9 | the appropriate priority. |
| 10 | And we also noted that this would not |
| 11 | be any advantage to PAX and that any monies |
| 12 | received would be subject to this estate and |
| 13 | not be superior to any of the other |
| 14 | creditors.  That was our main concern that |
| 15 | this would end up, you know, if, if the |
| 16 | monetary damage is continued and they only |
| 17 | went to PAX, that would not be beneficial |
| 18 | and we have clarified that in the order. |
| 19 | So with that clarification and with the |
| 20 | rebuttal to the disparaging remarks on |
| 21 | behalf of Ms. Ma, we support PAX's motion. |
| 22 | Thank you, your Honor. |
| 23 | THE COURT:  Thank you. |
| 24 | Does anyone else wish to be heard |
| 25 | before I let the debtor respond? |

1              Okay.  Seeing no one, go ahead,

2        counsel, you can respond to Attorney

3        Freidman's and attorney for the other

4        creditor, Ms. Cicarelli's (sic) assertions

5        with regard to the motion.

6              MR. BALDIGA:  Thank you, your Honor.

7        Again, William Baldiga for the debtor.

8              Your Honor, I want to first make sure

9        that we're focused on exactly the relief

10       that PAX has asked for because they're

11       arguing -- they filed one motion, we seem to

12       be arguing a different one.  And I want to

13       address the motion they filed.

14             At paragraph 9 on page 7 of their

15       motion.

16             THE COURT:  All right.  Hold on.  Let

17       me catch up with you, okay?

18             MR. BALDIGA:  Okay.

19             THE COURT:  Just give me a second to

20       get where you're talking to so that I'm --

21       paragraph 9, page what?

22             MR. BALDIGA:  Page 7, paragraph 9 of

23       their motion at docket 57.

24             THE COURT:  Just give me a second.  I'm

25       not quite there yet.  The relief requested,

```
1         yes, go ahead.

2              MR. BALDIGA:  Okay.  So I mean, that's

3         -- I think it fairly clear.  I think it's

4         consistent with the rest of the motion, but

5         I thought that was the place that was most

6         succinctly and clearly stated that they wish

7         relief as to the enforcement of Justice

8         Ostrager's February 9th contempt order.

9              So let's turn to that order, which is

10        appended to that motion.  Actually to the

11        attorney declaration.

12             THE COURT:  Yup, I got it.

13             MR. BALDIGA:  Which is that --

14             THE COURT:  Go ahead.  I've got it.

15        Tell me where you want me to look.

16             MR. BALDIGA:  I'm at page 134 -- I'm

17        sorry.

18             THE COURT:  You're on -- no, that's the

19        number of pages --

20             MR. BALDIGA:  Page 16 of --

21             THE COURT:  16 of 134?

22             MR. BALDIGA:  Yes, I believe so.

23             THE COURT:  All right.  Just let me

24        catch up with you.  I'm almost there.

25             (Pause.)
```

```
1              THE COURT:  Okay.  I'm on page 16 of --
2              MR. BALDIGA:  And is that the last page
3         of the, of the order?
4              THE COURT:  It is, yes, it is.
5              MR. BALDIGA:  Okay.
6              THE COURT:  On the version I'm looking
7         at, which is the version that's on the
8         docket, yes.
9              MR. BALDIGA:  Okay.  And so let's read
10        what the, the ruling is, the last sentence
11        obviously.  "Kwok must remit a hundred and
12        thirty-four millions dollars to PAX within
13        five business days."  That seems pretty
14        clear cut, although PAX has clarified today
15        and several places in the motion, they are
16        not seeking monetary relief.  So that's,
17        that's not what they seek.
18             "The Court is prepared to exercise its
19        full authority under judiciary law 753 in
20        the event of the fine is not timely paid."
21        So PAX is saying we're not seeking relief as
22        to the fine.  We're seeking, obviously, the
23        one thing that's left is judiciary law 753,
24        which is the State -- New York State law
25        that entitles the court to imprison for
```

```
 1            contempt.

 2                So when you boil down the motion that

 3            was filed -- I -- it's clear, I'm looking at

 4            the order that they seek to enforce, in the

 5            order that they seek to enforce by the

 6            motion they chose to file, it's not for

 7            return the boat.  It's to pay a hundred and

 8            thirty-four million dollars or go to jail,

 9            period.  That's --

10                THE COURT:  Well, isn't that -- doesn't

11            their reply say something different?  Number

12            one and number two, if they're seeking to

13            enforce it, doesn't your client have the

14            ability to relieve himself of that contempt

15            by doing exactly what the judge ordered him

16            to do and not go to jail?

17                MR. BALDIGA:  Not by this order.

18                THE COURT:  What -- not by what order?

19                MR. BALDIGA:  But not by the order

20            they're seeking to enforce.  They're asking

21            you to allow --

22                THE COURT:  Well, I don't agree with

23            that.  I'm not sure I agree with you,

24            counsel.  Because if I'm a judge and I enter

25            a contempt sanction against a client --
```

```
1              against a party and they come in and they --

2              and the contempt is because, at least my

3              reading, is that because the boat's outside

4              of the jurisdiction and they correct that

5              problem, the judge isn't going to enforce

6              the fine and the contempt order because he

7              would have purged himself of the contempt by

8              getting the boat back into the jurisdiction

9              to which this whole, this whole decision was

10             rendered on.  I mean, that -- the -- if you

11             go -- I'll hear you, but I'm not sure I

12             agree with you on that.

13                  MR. BALDIGA:  I, I'm not --

14                  THE COURT:  Plus they've already just

15             said they don't -- they're not trying to put

16             him in jail.  They're not trying --

17                  MR. BALDIGA:  That's why they're not

18             arguing their motion.

19                  THE COURT:  But you are, you're saying

20             you -- your opposition is you don't want the

21             motion to be granted because they're trying

22             to put him in jail and make him pay the

23             fine.  They've just stated we're not seeking

24             monetary -- we're not seeking payment of the

25             fine.  We're not seeking to put him in jail.
```

```
 1              We want -- and that' s-- I think I asked

 2              this question at the very beginning of

 3              today's hearing, two hours ago.  I said

 4              isn't what -- I said, Attorney Freidman, am

 5              I reading your papers right?  Isn't that

 6              what I said?  I said, I'm reading your

 7              papers right?  Aren't you asking for the

 8              return of the boat to this jurisdiction, to

 9              the United States jurisdiction so that the

10              boat is here and subject to the jurisdiction

11              of the courts?  And Attorney Freidman said

12              yes.

13                  MR. BALDIGA:  In lieu of the fine?

14                  THE COURT:  He just said he's not

15              seeking the fine.  He's not seeking a mone

16              -- at this time.  They're not seeking that.

17              And if we go back and we look at what, at

18              least again, let me step back and say I am

19              nowhere near as familiar with this as all of

20              you are, but the reason there was a contempt

21              order issue is because the boat was supposed

22              to be seized for the judgment and this and

23              the boat then disappeared from New York to

24              wherever it went.  The Bahamas and then it

25              went somewhere else and then it went to
```

1          Italy or wherever.

2               Well, obviously, Justice Ostrager

3          doesn't have the ability to get the boat

4          back from Italy.  I mean, he has an order

5          that somebody may or may not acknowledge in

6          Italy or wherever it is.  I don't think he

7          has -- he doesn't -- his order doesn't allow

8          the boat to be arrested and then under

9          maritime law brought back to -- because it's

10          not a maritime case.  And brought back to

11          the United States under which the

12          jurisdiction of the United States court

13          would be -- would apply.

14               So this -- unless I'm reading something

15          wrong, which is very possible, but I don't

16          think so, the whole reason the contempt

17          proceeding was brought was because the boat

18          was gone.  It's just like anything else, you

19          got an asset you can execute on.  If the

20          asset's gone, you don't -- you can't execute

21          on it.

22               And Judge, Justice Ostrager who I

23          apologize at the beginning of the case

24          today, I didn't state his name because I

25          didn't have in front of me and I didn't want

1          to say it improperly, he said whether --

2          that PAX has met the burden of establishing

3          that the court should enter a final order of

4          civil contempt against Kwok for the reasons

5          that follow, the court is simultaneously

6          issuing the order.

7               And then he goes through this whole

8          thing.  PAX encountered difficulty

9          identifying assets over which Kwok exercised

10          control.  Then the court had a hearing

11          apparently, an evidentiary hearing at which

12          a number of people supporting your client

13          appeared.  And then that judge made

14          determinations, whether you appeal them or

15          not or, you know, is a different story, that

16          Mr. Kwok had dominion and control over that

17          boat and that boat's gone.

18               So that's what the contempt is all

19          about.  Attorney Freidman, am I missing the

20          point here?  I just want to know, am I

21          saying something that is inaccurate with

22          regard to why you were seeking this

23          contempt?

24               MR. FREIDMAN:  You're not, your Honor.

25          Also if you look at page -- if you look at

1    Exhibit 5 of my declaration is the actual

2    order from Justice Ostrager.  In paragraph

3    3, he talks about how fines will continue to

4    accrue until Kwok returns the Lady May to

5    the jurisdiction.

6        THE COURT:  Right.  And he says, he

7    says --

8        MR. FREIDMAN:  So Mr. Baldiga's

9    argument completely falls apart when you

10   look at that.

11       THE COURT:  -- the appellate, the

12   appellate division's first department

13   affirmed this court order on November 4,

14   2021, holding Kwok in conditional civil

15   contempt finding that the daily fine of

16   $500,000 was intended to strongly encourage

17   defendant to purge himself of the contempt.

18       You know, I've had cases where people

19   have been in jail and they could purge

20   themselves of the contempt and they don't,

21   they don't do it.  And I said, well, I don't

22   know what you want me to do.  I mean, you

23   can either purge yourself of the contempt or

24   you can't.  And the -- or you choose not to.

25   Excuse me, that is the more appropriate --

```
 1                 those are the more appropriate words.

 2                     MR. BALDIGA:  Well, your Honor --

 3                     THE COURT:  Justice Ostrager found,

 4                 whether you agree or not, that -- and it

 5                 wasn't just Justice Ostrager apparently,

 6                 that Mr. Kwok is in control -- has dominion

 7                 and control over this boat.  And I think --

 8                 I started this whole hearing asking this

 9                 question.

10                     So if he has dominion and control over

11                 this boat and he doesn't want to go to jail,

12                 that's what you told me, he doesn't want to

13                 go to jail because he's afraid he'll,

14                 unfortunately he'll -- that will be a very

15                 unfortunate experience for him.  And he

16                 wants to work with all these creditors and

17                 he wants to have a plan that's fair to all

18                 of them, then bring back the boat.

19                     I don't think that -- and that is why I

20                 asked Attorney Freidman that question at the

21                 very beginning of the hearing because I

22                 understand your point about what the motion

23                 says.  Then I read your objection, then I

24                 read their reply.  And my reply -- in my

25                 reading of their reply -- and I shouldn't
```

1        say they, I'm talking about PAX and the

2        debtor.  I should be more careful, but in

3        PAX's reply and I asked -- that's why I

4        asked the question.

5            It seemed to me, yeah, I think you're

6        right in the extent that they're not seeking

7        to impose the monetary fine right now and

8        they're not seeking to have -- I don't know

9        what that section of New York law is, but

10       you just said to me, I guess that is the

11       section of the New York law that you could

12       put somebody in jail for contempt if they

13       don't purge themself of contempt.  I assume

14       that's what that means.

15           But what I'm saying is, it said in the

16       reply, we just want the boat back in our

17       jurisdiction.  And not just for us, for all

18       the creditors of the estate.  And I actually

19       heard from another creditor who said just

20       that.  She's asked that and apparently the

21       PAX's -- PAX and their counsel have agreed

22       that the order if I were to grant the relief

23       requested, would, would say that.  That the

24       boat is not just for -- it's not coming back

25       so PAX can arrest it or put a lien on it or

1           do whatever you can under maritime law,

2           which there's a lot of that.  And the New

3           York judges know how to do that.

4               Then that's not what they're asking.

5           They're asking, they're asking essentially,

6           in my opinion, to go back to the status quo

7           where -- it's not exactly the status quo,

8           but at least have the boat within the

9           jurisdiction of the United State court --

10          courts.

11              That's what they're asking and that's

12          what he said.  So your argument about the

13          fine and the jail, again, the problem with

14          contempt is always the same problem.  If the

15          person who is being held in contempt does

16          not choose to purge himself of that

17          contempt, then that person faces the

18          consequences of that choice.

19              The Court can't do anything about it.

20          I can't make him do anything about it.  If

21          he doesn't do it, then, yeah, maybe he will

22          go to jail.  That's up to the New York court

23          to decide.  But they're not asking that

24          right now.  They're asking him, in my

25          opinion from what I've read, and I'm not

1          ruling today, but they're asking for an

2          incremental step.  That incremental step you

3          might not like and you may still oppose it.

4          Like getting the boat back into New York or

5          the jurisdiction of the United States

6          courts.  But that's what they're asking.

7          And I think that's pretty clear as of today.

8               Now, you know, relief from the stay or

9          any determination that the State doesn't

10         apply, can be incremental.  It doesn't have

11         to be a complete resolution and essentially,

12         that's what PAX is asking.  We're not asking

13         to put him in jail.  By the way, he can

14         avoid being in jail if he does what the

15         court told him he had to do.  He can -- but

16         we're not asking him to be in jail.  We're

17         asking him to get the boat back in the

18         jurisdiction of the United States.

19              If he chooses not to do that, then he

20         chooses not to do that at his own peril.

21         And that's what a contempt order does.  So

22         your argument about what they say in their

23         original motion versus the reply, okay, I

24         understand it.

25              MR. BALDIGA:  That was my whole point,

```
1              your Honor.

2                   THE COURT:  But the reply says that

3              they're not asking for what they said in

4              their original motion.  And what they're

5              asking for in their original motion, what

6              they're asking for now should actually

7              benefit your client, not harm your client.

8                   MR. BALDIGA:  Thank you, your Honor.  I

9              -- of course I'm not arguing that their

10             contempt didn't arise from a failure to have

11             the boat in the New York jurisdiction.  I'm

12             -- of course.  I'm not arguing, actually,

13             with anything that you said.  I was making

14             the point, which you've actually amplified,

15             that the motion as filed is very different

16             from the subsequent papers and especially

17             today's argument and I wanted to make that

18             very clear.

19                  THE COURT:  I understand.  If you're

20             concerned that I didn't understand that, I'm

21             happy -- I understand that.  Are you -- is

22             that all --

23                  MR. BALDIGA:  I'm not longer concerned.

24                  THE COURT:  Okay.  Fine.

25                  MR. BALDIGA:  You've made that
```

1          absolutely clear.

2                THE COURT:  I understand.  I

3          understand.

4                MR. BALDIGA:  And so that's -- I

5          appreciate that.

6                Secondly, and there would be time for

7          further argument on this, I expect.  The

8          Rooker Feldman document -- I'm sorry,

9          doctrine is a bit of a red herring here and

10         we'll be able to with your permission,

11         because we don't have leave to file a sir

12         reply, but I think given a reply, we'd like

13         to brief this.  Rooker Feldman doctrine

14         applies to under the veteran decided case

15         law, final State court judgments in which we

16         don't have, but even more importantly, it

17         applies to final judgments on the merits.

18         It does not apply to supplemental

19         proceedings.  For example, in the --

20               THE COURT:  Well, what about the fact

21         that he held an evidentiary hearing and

22         there were witnesses that and testimony and

23         exhibits introduce -- that wasn't a

24         supplemental proceeding.

25               MR. BALDIGA:  Well, enforce the

1        proceeding --

2            THE COURT:  There was a trial.  There

3        was a trial

4            MR. BALDIGA:  -- it was an enforcement

5        proceeding.

6            THE COURT:  It was a trial; wasn't it?

7            MR. BALDIGA:  I meant by supplemental

8        as to not going to the merits of the

9        underlying dispute, but as to ways to

10       enforce a judgement.  For example, in the

11       VanderKodde case at 951 F3d, 397, which is a

12       Sixth Circuit decision in 2020, the Sixth

13       Circuit held that the Rooker Feldman

14       doctrine simply does not apply to post-

15       judgement garnishment.  That is means to

16       collect the debt.  It just didn't apply.

17       And that's an example of the very limited

18       scope of Rooker Feldman.

19           And that makes sense especially in the

20       context of a bankruptcy proceeding where the

21       Court is dealing with the interest of

22       balancing the interests of the debtor and

23       all creditors.  And how to deploy what may

24       or may not be assets of the estate and to

25       determine whether assets of the estate and

1          to the disposition of those assets.

2              That is much different than a final

3          judgment in a State court as to the amount

4          of a claim.  And given that they just

5          briefed that in the reply and we' haven't

6          had an opportunity to address that, I wanted

7          the Court to know because we all deal with

8          Rooker Feldman, frankly not that often, that

9          there -- they misapplied Rooker Feldman.

10         And that's okay.  We'll have again an

11         opportunity I would hope to address that

12         more fully, including with briefing.

13             I -- so those are the two points, your

14         Honor, that I'm disappointed to hear that

15         perhaps because the debtor supports it.  You

16         would have thought with the earliest part of

17         their argument they would have been all for

18         an examination because they would have

19         thought that a truly independent examiner as

20         opposed to, for example, a trustee that they

21         hope to elect would be the way to -- it's an

22         unfortunate case.  All right.

23             I want to say, your Honor, we are --

24         all sides cast dispersions on the veracity

25         of others and that's all we've heard so far

1           and that's unfortunate.  We thought an

2           examiner would be exactly the mechanism

3           because the one thing about an examiner as

4           opposed to every other role in a Chapter 11

5           case, is that only an examiner has no other

6           allegiances and must be fiercely independent

7           and is not elected or appointed --

8                THE COURT:  Well, let's --

9                MR. BALDIGA:  -- by creditors or chosen

10          by a debtor --

11               THE COURT:  -- examiner is actually

12          appointed just like a Chapter 11 trustee

13          would have to be appointed.  So I'm not sure

14          I agree with that argument.

15               MR. BALDIGA:  Or elected.  Or elected.

16               THE COURT:  Well, but they're --

17          where's the ability to elect a Chapter 11

18          trustee?  There's an ability to elect a

19          trustee in Chapter 7 after the interim

20          trustee is appointed by the 341 meeting, but

21          I don't know that there's an ability to

22          elect a Chapter 11 trustee.

23               MR. BALDIGA:  Well, actually I'm not

24          sure.

25               THE COURT:  I don't think there is.

1           MR. BALDIGA:  But in any event, an

2       examiner seems to be -- and maybe I regret

3       having signaled our support for exactly the

4       relief that the U.S. Trustee thought was

5       most appropriate, just to bring that back,

6       to have PAX oppose it.  But so be it.  And

7       that might be the nature of the case.

8           In any event, your Honor, those are the

9       primary points in opposition.

10          THE COURT:  Okay.  I'm just looking.  I

11      don't think there's an ability to elect --

12          MR. BALDIGA:  No, I may have spoken too

13      quickly.

14          MS. CLAIBORN:  Your Honor?

15          THE COURT:  Yes.

16          MS. CLAIBORN:  Maybe helpful.  There is

17      not.

18          MR. BALDIGA:  Oh, there is.

19          THE COURT:  Where?  There is or is not?

20          MS. CLAIBORN:  Is not.

21          THE COURT:  No, there is not.  There's

22      nothing, there's no ability to elect a

23      Chapter 11 trustee.

24          MR. BALDIGA:  Excuse me.  Just may I

25      have one second, your Honor, to --

1            THE COURT:  Yup.

2            MR. BALDIGA:  -- confer with my

3       partner.

4            (Pause.)

5            MR. BALDIGA:  Okay.  I'm just reading

6       quickly, your Honor.  Section 1104(b)(1).

7       "The election of a trustee shall be

8       conducted in the same way as under Section

9       702."

10           THE COURT:  It says "except as provided

11      in an 11, on the request of a party in

12      interest.  Made not later than 30 days after

13      the court orders the appointment of a

14      trustee.  The United States Trustee shall

15      convene a meeting of creditors for the

16      purpose of electing one" -- yeah.  Which the

17      same thing as what happens in Chapter 7.

18           MR. BALDIGA:  Yeah, that's what, that's

19      what I said.

20           THE COURT:  So, yeah, but the election

21      shall be -- so you're saying if they want to

22      come in with somebody else, they can elect

23      them.  That's what you're saying?

24           MR. BALDIGA:  That was my point.  And

25      an examiner as I understand it, your Honor,

1       is assiduously independent.  And without any

2       right of election or other interference.

3       That's why we have examiners with whatever

4       powers the Court --

5           THE COURT:  Well, not many people have

6       examiners.  I'm not saying that it doesn't

7       -- it's not going to happen.  I'm saying

8       they don't happen as frequently as you're

9       indicating.

10           MR. BALDIGA:  Well, I'm not -- this --

11       I'm not pretending that anything about this

12       case is frequent.  I'm just saying that it

13       would be unfortunate if the debtor were to

14       consent to what would otherwise in pending

15       matters be highly contested matter only to

16       have our consent and be used against us to

17       have the most litigious creditor say, yeah,

18       but we're going to oppose it because that

19       seems too independent.

20           In any event, that's -- but again,

21       they'll litigate this case as they so

22       choose.

23           MS. CLAIBORN:  Your Honor, if I may

24       make one more comment?

25           THE COURT:  Sure.

1          MS. CLAIBORN:  Holley Claiborn for the

2     United States Trustee.

3          THE COURT:  Can you just speak a little

4     bit more into the microphone?  Thank you.

5          MS. CLAIBORN:  Sorry.  Should the order

6     enter from this Court directing the U.S.

7     Trustee to appoint a Chapter 11 trustee, the

8     U.S. Trustee would do so and part of that

9     process is to ask for the input of the

10     parties.  And subsequent to that, the U.S.

11     Trustee makes a determined decision about

12     who to appoint.  And it's after that point,

13     should there be a dispute over the

14     appointment of that particular party as the

15     trustee, that there is a process for an

16     election.

17          THE COURT:  We have 702(c) says, and

18     (b), "Creditors may elect one person to

19     serve as a trustee in the case if election

20     of a trustee is requested by creditors that

21     may vote under subsection (a) of this

22     section."  So you have to have a creditor

23     who holds an allowable, undisputed, fixed,

24     liquidated, unsecured claim of a kind

25     entitled to distribution under and it just

1          talks about Chapter 7, by the way.  It

2          doesn't cite to any Chapter 11 provisions,

3          which is kind of interesting.

4              "It does not have an interest

5          materially adverse other than an equity

6          interest that is not substantial in relation

7          to such creditor's interest as the creditor,

8          to the interest of creditors entitled to

9          such distribution and is not an insider."

10             So it's really kind of interesting

11         because although you're right that you just

12         pointed out 1104(b) says you can elect in

13         the manner set forth in -- provided in

14         subsections (a), (b), and (c) of Section 702

15         of this title, 702 says, "A creditor may

16         vote for a candidate for trustee only if

17         such creditor hold an allowable, undisputed

18         fixed, unliquidated, unsecured claim of a

19         kind entitled to distribution under," and

20         then it only refers to Chapter 7 sections.

21             So if -- I don't know if that really

22         does work.  If it only applies to Chapter 7

23         sections, this isn't going to be a

24         distribution under any of those sections.

25         It's a Chapter 11 case.  So if that's the

1        case, then there isn't an election of a

2        trustee.

3            I don't know the answer.  I'm just

4        saying, it seems inconsistent right now if

5        you read the actual language of the statue.

6        It seems very inconsistent.  Cause you have

7        to do, you have to have all three prongs of

8        (a) in order to elect under (b).  And under

9        702(a), and 702(a) says "entitled to a

10       distribution under Section 726(a)(2), 726

11       (a)(3), 726 (a)(4), 752, 766 or 766 (h) or

12       766(i).

13           MR. BALDIGA:  I think, your Honor, the

14       case law would say that the standards are

15       the same in Chapter 7.

16           THE COURT:  Well, it may or may not.

17       It's not what the statute says.

18           MR. BALDIGA:  I agree, but --

19           THE COURT:  That's not what the statute

20       says.

21           MR. BALDIGA:  In any event, the bigger

22       point was we would like the case to proceed

23       on something other than sort of a war of

24       attrition basis and I thought we had the

25       makings of some good progress in that regard

1          and we would like the Court to see it that

2          way and move the case in that direction.

3                    THE COURT:  It's interesting they

4          didn't change the statute because they, they

5          really should have changed the statute.  You

6          know, because it only refers to 7 --

7          sections under Chapter 7.  They should have

8          -- here's a perfect example where you, you

9          know, where the code, that may be exactly

10         your intent that it be the same.  That's not

11         -- if you, if you look at 1104(b), then --

12         and it refers you to subsection (a), (b) and

13         (c) of 702, (a) -- 702(a) only, only

14         addressed Chapter 7 sections.  So it doesn't

15         make any sense.

16                   But anyway, we don't have to decide

17         that today.  I just thought that was

18         interesting.  I mean, I completely

19         understand the election of a trustee under

20         Chapter 7.  I just don't think I've ever

21         seen anyone elected trustee at a 341 meeting

22         after, in a Chapter 11 after they've been

23         appointed by the Office of the United States

24         Trustee.

25                   Have you, Attorney Claiborn?

1       MS. CLAIBORN:  No, your Honor.

2       THE COURT:  Okay.  It really doesn't

3       matter for today's purpose.  I'm sorry I'm

4       diverted attention --

5       MR. BALDIGA:  I agree.

6       THE COURT:  -- but I'm just trying to

7       -- I really have never seen that.

8       But anyway, okay, Attorney Freidman,

9       I'm going to give you the opportunity to

10      respond.

11      MR. FREIDMAN:  Thank you, your Honor.

12      Peter Freidman from O'Melveny and Myers on

13      behalf of PAX.

14      I just -- I want to make a couple of

15      points.  It's disturbing that Mr. Kwok's

16      counsel thinks that the only neutral person

17      in a bankruptcy should be an examiner.  The

18      debtor is supposed to be a neutral fiduciary

19      for all its creditors.  Obviously, that's

20      not going to happen.

21      Your Honor, with respect to the

22      examiner/trustee issue, as we'll get into

23      our objection, examiners are great except

24      they're not because ultimately an examiner

25      is just going to issue a report.  And that

1        report is likely to be hearsay.  An examiner

2        can't pursue causes of action.  It doesn't

3        help.  It doesn't move this case where it

4        needs to go.  And Mr. Kwok just remains in

5        possession with control of the case.

6            As to the actual argument on the motion

7        we're here on, as I mentioned, the order

8        from Justice Ostrager is a two-page order.

9        It's at page 5 -- it's Exhibit 5 to my

10       declaration.  In paragraph 3, he makes it

11       clear that Kwok is under a continuing

12       obligation to return the Lady May to the

13       jurisdiction.  That's what we're trying to

14       enforce.  We are not trying to ask for

15       payment today.  We're not asking for

16       imposition of additional sanctions or

17       contempt fines of $500,000 a day.

18           To be clear, we also are reserving our

19       right to be paid on that hundred and thirty-

20       four million dollar fine, but we're not

21       asking for it to grow.  We're not asking for

22       us to be paid.

23           Your Honor, Rooker Feldman is, is

24       concededly a thorny doctrine.  I think we're

25       right.  If we're not right, do you know

1      anything about collateral estoppel or race

2      judicata after Mr. Kwok had took the Fifth,

3      had an adverse inference draw against him,

4      had his family members -- but you can read

5      what Justice Ostrager said about his

6      daughter.  I don't want to embarrass her.

7      And so those apply in -- you know, those

8      were the decisions that they're collaterally

9      estopped, race judicata applies, that he

10     owns and controls found by clear and

11     convincing evidence.

12          And I don't have anything further.  Oh,

13     I did have a question, if I can ask the

14     Court?

15          THE COURT:  Sure, go ahead.

16          MR. FREIDMAN:  But -- when should we be

17     pre -- do you have a sense of when we should

18     be prepared to file our papers in connection

19     with the U.S. Trustee's exam -- the United

20     States Trustee's motion?

21          THE COURT:  Yeah, I have -- that's a

22     good question.  As I said, I understand that

23     the motion was filed on Saturday and there

24     was a motion to expedite that hearing.  So I

25     am going to address that now.  I think we

1          need to address it now for a number of

2          reasons.  So if you'd give me a second.

3          First thing first.

4               The matters in this case -- I'm looking

5          at the courtroom deputy now, that are

6          scheduled for April 12th at 2:30, we're

7          going -- those are -- and those are all

8          applications to employ professionals at this

9          point.  That's the only thing that's

10         scheduled?  I'm going to reschedule those to

11         April 13th at 10:00 a.m. in this Court,

12         okay?

13              Now with regard to the examiner motion,

14         I just need to hear from the United States

15         Trustee on -- I want to ask her, but I am

16         going to address it now, which will end up

17         answering your question as when you need to

18         file papers in response to it.

19              MR. FREIDMAN:  May I sit, your Honor?

20              THE COURT:  Yes, please.  Go right

21         ahead.

22              So Attorney Claiborn, I know it's not

23         on the calendar yet because -- and I didn't

24         get a chance to look at it until this

25         morning, but I'm going to -- I am going to

1           grant the -- I'm doing this in court, the

2           United States Trustee's motion for an

3           expedited hearing on the appointment of an

4           examiner.  And that hearing will be held on

5           April 13 at 10:00 a.m. along with the other

6           matters.

7                The parties that -- anyone that wishes

8           to oppose that motion for the appointment of

9           an examiner or anyone that wants to file

10          anything, you're all filing it on the same

11          day.  We're not going to get into a replies

12          and -- we all know what the issue is, okay?

13          You're all -- anyone that wants to file

14          anything in support of or in opposition to

15          the motion for the appointment of an

16          examiner must do so by 5:00 p.m. on April

17          6th.

18                The motion -- I'm sorry.

19                Attorney Claiborn, did you want to be

20          heard on that?

21                MS. CLAIBORN:  I was just going to

22          inquire about a deadline for making service.

23                THE COURT:  Oh, you haven't served the

24          motion yet?

25                MS. CLAIBORN:  No, because we were

1           waiting for your Honor to issue an order.

2                   THE COURT:  Okay, sorry.

3                   MS. CLAIBORN:  (Indiscernible -

4           crosstalk).

5                   THE COURT:  I understand.  All right.

6           So then, yes, so then what we're going to do

7           -- what I'm going to do is this order

8           probably isn't going to enter until

9           tomorrow.

10                  MS. CLAIBORN:  That's (indiscernible).

11                  THE COURT:  So your service is going to

12          be required -- well, let's talk for a

13          minute.  Who you serving?  Who are you

14          serving that it -- you know, we'd have to go

15          with the debtor's schedule with these

16          statements, right?  Like what's the creditor

17          list look like?

18                  MS. CLAIBORN:  We have made copies to

19          serve the entire creditor matrix, which is

20          approximately I think 60-something parties.

21                  THE COURT:  60?

22                  MS. CLAIBORN:  60-something.

23                  THE COURT:  Okay.

24                  MS. CLAIBORN:  It's between 60 and 70.

25          I just don't have the exact number.  So

```
 1             those copies are ready --

 2                 THE COURT:  How, how -- I'm asking you

 3             a question, a serious question.  Is it

 4             possible for you to make service by the

 5             close of business on Thursday or would you

 6             rather have Friday?  And if you say Friday,

 7             that's fine with me.

 8                 MS. CLAIBORN:  No, Thursday should be

 9             fine.

10                 THE COURT:  All right.  So then I'm

11             going to have you make service of the --

12             what will be an order granting the expedited

13             hearing and scheduling that hearing for

14             April 13th at 10:00 a.m., setting a deadline

15             to file any responses in support of or as

16             opposed to or opposed to the motion by 5:00

17             p.m. on April 6.  Having you make service of

18             the motion to appoint an examiner by 5:00

19             p.m. on March 24th and then file a

20             certificate of service on the docket of this

21             case demonstrating how service was made by

22             5:00 p.m. on March 29th.

23                 Is that acceptable to the United States

24             Trustee's office?

25                 MS. CLAIBORN:  Yes, your Honor.  And
```

1              I'm assuming that all the dates you've just

2              accounted for that be put forth in an order

3              --

4              THE COURT:  In that order.  The order

5              granting the motion to expedite will have

6              all those dates in them for you and those

7              times.  Okay?

8              MS. CLAIBORN:  We will serve the order

9              and underlying motion.

10             THE COURT:  Okay.  Great.  Thank you.

11             MR. BALDIGA:  In that regard, your

12             Honor, one of the motions that we have filed

13             is to retain service agent Streto (phonetic)

14             and --

15             THE COURT:  Yeah, I don't understand

16             why you need a service agent.  Can you --

17             MR. BALDIGA:  Just for this reason, to

18             take the burden off of other parties if that

19             were --

20             THE COURT:  Well, but it's going to be

21             an administrative expense to the estate.

22             Why are you -- why are we doing that?  Why

23             do we need a service agent?  I'm not saying

24             I'm ruling on it.  I'm asking you a

25             question.  You brought it up so I'm asking

1          you a question.  Why do you need a service

2          agent?

3               MR. BALDIGA:  We, we thought that at

4          the end of day, that would serve to be most

5          efficient, but if the --

6               THE COURT:  Well, I don't know.  Maybe

7          it will, but I want to hear from other

8          people about it, right?

9               MR. BALDIGA:  Okay.

10              THE COURT:  I mean, that -- is that --

11         that's on for hearing on the -- that was

12         originally scheduled for hearing on the

13         12th; isn't it?

14              MR. BALDIGA:  Yes.

15              THE COURT:  So there's an objection

16         deadline with regard to that motion already

17         in place.  There should be.  I haven't

18         looked --

19              MR. BALDIGA:  Yes.

20              THE COURT:  -- at the notice of

21         hearing, but there should be.

22              MR. BALDIGA:  Then I won't volunteer

23         then.

24              THE COURT:  Yeah, I just --

25              MR. BALDIGA:  I'm just trying to

1       accommodate.

2              THE COURT:  All I'm -- look, one thing

3       that in every Chapter, in every case,

4       regardless of Chapter, but certainly in a

5       Chapter 11 case, the Court is concerned

6       about administrative expenses, right?  So we

7       need to figure out whether or not -- if

8       everybody thinks it's good, then I'll

9       probably agree, but I want to make sure

10      everybody thinks it's good.

11             And maybe I will agree.  I don't know.

12      I haven't, I haven't really reviewed it

13      enough to make an educated ruling, but I

14      just throw out there, you know, like all

15      these applications to employ professionals,

16      as you said, this is not a normal Chapter 11

17      case.  It's extraordinary, so I have to

18      watch it and make sure that administrative

19      expenses and things are not handled in a

20      rote manner.  It's going to be decided

21      whether or not it's appropriate under the

22      circumstances of this case.

23             MR. BALDIGA:  Understood, your Honor.

24             THE COURT:  Okay?

25             MR. BALDIGA:  And my -- and just some

1        of the reasoning.  My experience is

2        especially when it comes to tabulating the

3        voting on a plan, having a professional

4        independent, a firm that does that has often

5        proved to be beneficial.  But again,

6        everyone will have a chance to speak to

7        that.

8             THE COURT:  Okay.  Thank you.

9             MR. BALDIGA:  Thank you.

10             THE COURT:  Attorney Freidman?

11             MR. FREIDMAN:  Your Honor, from PAX's

12        perspective, we will meet and confer with

13        Mr. Kwok.

14             THE COURT:  We couldn't hear you,

15        Attorney Freidman.  I'm sorry.  Say that

16        again.

17             MR. FREIDMAN:  From PAX's perspective,

18        we share concerns, but this isn't -- I will

19        call Mr. Baldiga this week and discuss

20        certain (audio skip) retention application.

21        So if we can actually take an issue off of

22        your plate from having to be litigated, we

23        will meet and confer in good faith.

24             THE COURT:  Yeah, I thank you.  I

25        anticipate that the parties will have

1        discussions before the objection deadline

2        and we'll see where we are.  Okay.

3              Attorney Claiborn, I think you wanted

4        to say something else.

5              MS. CLAIBORN:  No, I just was staying

6        to see if the Court had any other questions

7        for me.

8              THE COURT:  No.  But I would -- that

9        order most likely will not get out,

10        obviously right now, but the clerk's office

11        is going to be closing in a little while,

12        until tomorrow.  But it will get out.  It

13        will be issued and you can -- do you want me

14        to recite those dates for you again or do

15        you have them?

16              MS. CLAIBORN:  I wrote them down.

17              THE COURT:  Okay.

18              MS. CLAIBORN:  I'm good.

19              THE COURT:  And then we will go from

20        there.

21              Now with regard to today's matters, the

22        Chapter 11 case management conference, all

23        right, I already indicated that's going to

24        be continued.  So that's going to be

25        continued until April 13th at 10:00 a.m. as

1        well.

2              With regard to the motion -- I'm sorry.

3        I just lost my place.  Just give me -- bear

4        with me for a second.

5              With regard to the motion, Pacific

6        Alliance is your opportunity find for entry

7        of order confirming the inapplicability of

8        the automatic stay or in the alternative

9        relief from the automatic stay, pursuant to

10       Section 362(b)(2) of the bankruptcy code,

11       the hearing -- the preliminary hearing is

12       continued until April 13 at 10:00 a.m.

13             Now, I'm going to do one thing with

14       regard to that.  Hold on one second, please.

15             (Pause.)

16             In PAX's reply to the objection filed

17       by the debtor to this motion, paragraph 8,

18       paragraph 9, paragraph 10, paragraph 11 talk

19       about the Rooker Feldman doctrine and race

20       judicata.  I'm going to give the debtor till

21       a week from -- not a week -- till March 28th

22       at 5:00 p.m. to file a brief no longer than

23       five pages to respond to those specific

24       paragraphs in the reply and that's it.  No

25       more briefing will be allowed in connection

```
1              with this motion.

2                    Anyone have any questions?

3                    MR. BALDIGA:  No, your Honor.

4                    THE COURT:  Okay.  Is there anything

5              further we need to address?  I don't think

6              that there is because there's nothing

7              further on the calendar today.

8                    MR. BALDIGA:  No, your Honor, thank you

9              very much.

10                   THE COURT:  All right.  So then the

11             hearings in the Kwok matter today are

12             concluded.  This is the last matter on

13             today's calendar.  The Court is adjourned.

14                   THE CLERK:  All rise, Court is

15             adjourned.

16                   (Hearing adjourned at 4:22 p.m.)

17                   (End of recording.)

18

19

20

21

22

23

24

25
```

1

2                        <u>CERTIFICATE</u>

3          I hereby certify that foregoing 122 pages

4   are a complete and accurate transcription to the best

5   of my ability of the electronic recording of the

6   CHAPTER 11 PRELIMINARY HEARING in the matter of HO WAN

7   KWOK, Debtor, Case No. 22-50073, held before the Hon.

8   Julie A. Manning, U.S. Bankruptcy Judge, in Bridgeport

9   Connecticut recorded on March 23, 2022.

10  _____

11  Joanne Auger, Transcriber    Date:  March 24, 2022

12

13

14

15