UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

In Re                          *   Case No. 22-50073 (JAM)
                               *
     HO WAN KWOK,              *   Bridgeport, Connecticut
                               *   April 27, 2022
               Debtor.         *
                               *
* * * * * * * * * * * * * * *   *


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For the Debtor:              WILLIAM R. BALDIGA, ESQ.
                             BENNETT S. SILVERBERG, ESQ.
                             KENNETH AULET, ESQ.
                             JEFFREY L. JONAS, ESQ.
                             Brown Rudnick, LLP
                             Seven Times Square
                             New York, NY  10036


For the Creditor, Pacific    PETER FRIEDMAN, ESQ.
 Alliance Asia Opportunity   LAURA S. ARONSSON, ESQ.
 Fund L.P.:                  DAVID V. HARBACH, II, ESQ.
                             O'Melveny & Myers LLP
                             Times Square Tower
                             7 Times Square
                             New York, NY  10036

                             PATRICK M. BIRNEY, ESQ.
                             Robinson & Cole LLP
                             280 Trumbull Street
                             Hartford, CT  06103


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

APPEARANCES Cont'd:


For the U.S. Trustee:          HOLLEY L. CLAIBORN, ESQ.
                               Office of the United States
                                 Trustee
                               The Giaimo Federal Building
                               150 Court Street, Room 302
                               New Haven, CT  06510


For Golden Spring              TIMOTHY MILTENBERGER, ESQ.
 (New York), Interested        Cohn Birnbaum & Shea, P.C.
  Party:                       100 Pearl Street
                               Hartford, CT  06103


For HK International Funds      STEPHEN M. KINDSETH, ESQ.
 Investments (USA) Limited,    AARON A. ROMNEY, ESQ.
 LLC, Interested Party:        Zeisler & Zeisler
                               10 Middle Street
                               Bridgeport, CT  06604


Proposed counsel for the       IRVE GOLDMAN, ESQ.
 Creditors Committee:          JOHN KAPLAN, ESQ.
                               Pullman & Comley
                               850 Main Street
                               Bridgeport, CT  06601


For Rui Ma, Zheng Wu and       KRISTEN MAYHEW, ESQ.
 Weican Meng, Creditors:       McElroy, Deutsch, Mulvaney &
                                 Carpenter
                               30 Jeliff Lane
                               Southport, CT  06890

1          (Proceedings commenced at 9:46 a.m.)

2               THE CLERK:  Case No. 22-50073, Ho Wan Kwok.

3               THE COURT:  Good morning.  If we could have

4     appearances for the record, starting with the debtor's

5     counsel, please.

6               MR. BALDIGA:  Good morning, Your Honor.  William

7     Baldiga, Brown Rudnick, for the debtor.  With me, my

8     colleagues, Ben Silverberg, Ken Aulet, and Jeff Jonas.

9     Thank you.

10              THE COURT:  Good morning.

11              MR. JONAS:  Good morning.

12              THE CLERK:  I'm sorry.  I heard Bennett

13    Silverberg, but there was someone else I didn't --

14              MR. BALDIGA:  Ben Silverberg, Kenneth Aulet.

15              THE CLERK:  Thank you.

16              MR. BALDIGA:  And I believe his motion pro hac was

17    allowed a week or two ago.

18              MR. AULET:  Yesterday.

19              THE COURT:  I think just the other day.

20              MR. BALDIGA:  Yesterday.  I'm sorry.

21              THE COURT:  Just the other day, yes.

22              MR. BALDIGA:  And Jeffrey Jonas.

23              THE COURT:  Good morning.

24              MR. BALDIGA:  Thank you.

25              MR. KINDSETH:  Good morning, Your Honor.  Stephen

4

1    Kindseth, Zeisler & Zeisler.  And with me, my colleague

2    Aaron Romney, representing HK International Funds

3    Investments (USA) Limited, LLC.

4           MR. ROMNEY:  Good morning, Your Honor.

5           THE COURT:  Good morning.

6           MR. MILTENBERGER:  Good morning, Your Honor.

7    Timothy Miltenberger for Golden Spring (New York).

8           THE COURT:  Good morning.

9           MR. FRIEDMAN:  Good morning, Your Honor.  Peter

10   Friedman of O'Melveny & Myers on behalf of Pacific Alliance

11   Group.  I'm here with my colleagues Laura Aronsson, who's

12   had a pro hac entered, and David Harbach, who is back there,

13   but will be joining us at the bar.

14          THE COURT:  Good morning.

15          MR. FRIEDMAN:  And Mr. Birney is here as well from

16   the Robinson & Cole firm.

17          MR. BIRNEY:  Good morning, Your Honor.

18          THE COURT:  Good morning.

19          MR. GOLDMAN:  Good morning, Your Honor.  Irve

20   Goldman, Pullman & Comley, with my colleague, Jonathan

21   Kaplan.  Our application is pending to represent the

22   Official Committee of Unsecured Creditors.

23          THE COURT:  Good morning.

24          MR. KAPLAN:  Good morning.

25          MS. CLAIBORN:  Good morning, Your Honor.  Holley

1    Claiborn for the U.S. Trustee.

2            THE COURT:  Good morning.

3            MS. MAYHEW:  Good morning, Your Honor.  Kristin

4    Mayhew, McElroy, Deutsche, Mulvaney & Carpenter, on behalf

5    of creditors Rui Ma and Zheng Wu.

6            THE COURT:  Good morning.

7            MS. MAYHEW:  Good morning.

8            THE COURT:  Does anyone else wish to note their

9    appearance for today's hearings?

10        (No audible response.)

11           THE COURT:  Okay.  As you all know we scheduled

12   the hearings today.  There are many matters on the calendar,

13   but the two matters that are scheduled for an evidentiary

14   hearing today are the application to employ Verdolino &

15   Lowey, ECF No. 90, and the motion for DIP financing -- I've

16   shortened the titled, but that's what it essentially is --

17   ECF 117.

18           I know there are many other matters on the

19   calendar.  I know you all took a few minutes before we

20   started this morning.  I don't know if there's anything that

21   anyone wants to report to the Court before we begin.

22           MR. BALDIGA:  Yes, Your Honor.  Thank you.  Again,

23   William Baldiga for the debtor.

24           Your Honor, we're delighted to have made great

25   progress not only this morning, but over the course of the

6

1    last two weeks.  And if I could just report briefly, not

2    argue, but just report as to where we are as to each matter?

3          THE COURT:  Sure.  Please, go right ahead.

4          MR. BALDIGA:  As to the motion to lift stay

5    involving the boat, there is a resolution.  You may remember

6    that the owner of the boat, AK International -- HK

7    International, filed a proposed order some time ago.  That

8    order has been negotiated.

9          As you would expect, it's somewhat longer than

10    first submitted, but those -- that's what happens with this

11    things, and the parties need some time to finalize some

12    language over the course of the next -- well, it's being

13    done now, but it's not ready to be handed up -- but they

14    believe that sometime this morning that language will have

15    been reviewed by everyone and that there will be a consent,

16    fully-consented-to order resolving the lift stay motion with

17    the boat being returned and fully resolving it.

18          The $37 million is already at the Zeisler Client

19    Trust Fund Account, so that is no longer a concern, if it

20    ever was.  So great progress in that regard.

21          In no particular order, the Brown Rudnick

22    retention, all objections have been resolved.  I believe

23    that PAX wants to put on the record a reservation of rights,

24    but we'll hear them say whatever they want in that regard.

25          With Verdolino & Lowey, all objections have been

1    resolved other than that of PAX and I guess PAX will decide

2    whether they want to go forward with that.  But all other

3    objections have been resolved.

4            With the fee procedures, interim fee procedures

5    motion, all objections have been resolved.

6            With the --

7            THE COURT:  Hold on.  Let me just -- I'm with --

8            MR. BALDIGA:  I'm sorry, Your Honor.

9            THE COURT:  No, that's okay.  I'm just trying to

10   make sure I'm following you.

11           MR. BALDIGA:  I guess I should be giving docket

12   numbers.

13           THE COURT:  No.  That's okay.  I'm fine with that.

14   I just -- I can figure that out.  Okay.  Go ahead.

15           So the --

16           MR. BALDIGA:  There is --

17           THE COURT:  -- the interim -- the interim

18   procedures has been resolved, is that what you're saying?

19           MR. BALDIGA:  Yes, Your Honor.

20       (Pause.)

21           MR. BALDIGA:  We'll add PAX as a noticed party as

22   part of the resolution.  So we have work to do on the order,

23   but no objections outstanding, just clean up the order.

24           Thank you.

25           With respect to the DIP loan, there is still an

8

1    objection, but I believe only of PAX I believe. I'm sorry.

2    The U.S. Trustee also continues to have an objection. So

3    that appears that we will go forward on --

4           THE COURT: With evidence on that?

5           MR. BALDIGA: -- on presentations today --

6           THE COURT: Okay.

7           MR. BALDIGA: -- including evidence if the parties

8    wish.

9           And then we have the motion to dismiss. And we --

10    we'll need some time with you today to work out the

11    scheduling on that with the Court's calendar and the

12    calendars of other parties, but there's been a lot of

13    discussion around that.

14           There's an open issue as to whether we're going to

15    have the 341 continue during that time, and we'll argue if

16    that is necessary as to how that affects the scheduling and

17    complicates the proceeding, but we may be able to resolve

18    that as well.

19           So I think that's the full agenda, Your Honor,

20    I've addressed briefly.

21           Mr. Kindseth may want to give further detail as to

22    where we are with the boat, but obviously all parties can

23    correct any part of that or make additional comment, but --

24           THE COURT: I have a couple of things --

25           MR. BALDIGA: Of course.

1          THE COURT:  -- before you go.

2          You all go ahead, and then I'll -- maybe you'll

3     answer my questions.

4          MR. BALDIGA:  Okay.  I'll turn it over to others.

5          THE COURT:  Mr. Friedman, what were you going --

6          MR. BALDIGA:  But I'm delighted with the progress,

7     Your Honor.  I reported at the last hearing that there's

8     been an inability to engage with the parties and that has

9     changed dramatically.

10          We've had really good engagement with the

11     committee, with the Office of the United States Trustee,

12     with committee members, and it's good to see the case now

13     proceeding in a good direction with most things that were

14     filed fully resolved and a few things still remaining.  So

15     we feel good that we're heading in the right direction.

16          Now I'll turn it over to other people for whatever

17     questions the Court may have.

18          THE COURT:  Mr. Friedman, go right ahead.  You

19     still have an objection to the DIP motion, but what other

20     objection does your client have?

21          MR. FRIEDMAN:  We also have an objection to the --

22     the retention of a financial advisor in this case, Your

23     Honor, which we will examine the proposed financial advisor

24     who would -- in connection.

25          THE COURT:  Okay.

10

1          MR. FRIEDMAN:  I want to make a couple of

2     comments.  You know, the stay motion is obviously our

3     motion, so I thought I should address the status.

4          THE COURT:  Yes.

5          MR. FRIEDMAN:  We have had extensive discussions

6     with HK.  We've had extensive discussions with the

7     committee.  I do think we are in a place where we have

8     agreed to, in principle, an order.  It is an order that has

9     a lot of belts and suspenders because we obviously, you

10    know, came in to this case with concerns and still have

11    them.

12         It should be -- we should be getting a final draft

13    from counsel for HK shortly I think because we have ironed

14    out the relevant points.

15         I would -- what I would say is once the -- once

16    the order is in your hands -- we obviously have tremendous

17    respect for the Court's time.

18         The date of the stay runs out on Monday, that will

19    be the day ordinarily the Court would have to enter an

20    order.  Out of respect for the Court, if the Court needs

21    more time once it's in the Court's hands, we would agree

22    that there's an extenuating circumstance.  We would not have

23    agreed to that without an agreement.

24         But I'm obviously very sensitive to overloading

25    the Court or trying to jam the Court, which is nobody's

1  intention, so we will provide it to the -- it will be

2  provided to the Court.

3       And when the Court -- if the Court has follow-up

4  questions after that and needs to schedule something, I just

5  want to make it clear to the Court that we will accommodate

6  whatever the Court needs and not try to rush the schedule in

7  any ways to make your life more difficult.

8       THE COURT:  Well, I appreciate that.  And I

9  appreciate the efforts of the parties.  And obviously once I

10  see the order, I will take a look at it --

11       MR. FRIEDMAN:  Okay.

12       THE COURT:  -- and then see if there's any

13  concerns that I have.

14       MR. FRIEDMAN:  Thank you, Your Honor.

15       And then, what I would say, Your Honor, is that's

16  progress.  It's a discrete form of progress.  We still have,

17  you know, a lot of concerns about the case and those have

18  not receded.

19       Mr. Baldiga is correct.  We will just reserve some

20  rights with respect to the Brown Rudnick retention.  We

21  actually think it's important that Mr. Kwok have competent

22  counsel, and Brown Rudnick certainly is competent counsel.

23  And not having them retained would -- A) we heard what you

24  said at the last hearing that they will be retained, and B)

25  whatever form this case takes, they're necessary.

12

1          We do have two other objections.  We will be

2     prosecuting them today.

3          THE COURT:  Okay.  Thank you.

4          Mr. Goldman?

5          MR. GOLDMAN:  Yes, Your Honor.  Thank you.

6          I'd like to put some finer points on the

7     resolution of the committee's objections to the DIP loan and

8     the Verdolino loan, their retention rather.

9          I think it's important that we put the terms of

10    the settlement on the record and advise the Court that we do

11    have it documented.  We had been working on it late into

12    last night and we're finally able to reach final agreement

13    this morning.

14         So if I can report those terms to the Court, I

15    think it would be helpful to the Court and the parties.

16         THE COURT:  Go right ahead.

17         MR. GOLDMAN:  As to the DIP motion, we have agreed

18    that the debtor and Golden Spring will remove as termination

19    events the filing by the debtor of a motion to dismiss or a

20    motion for the appointment of a Chapter 11 trustee or a

21    motion to convert.

22         They will also remove as termination events the

23    termination of exclusivity for the debtor provided that the

24    committee agrees not to seek to terminate exclusivity before

25    the initial 120-day period expires which would be on or

13

1    about June 15th.  So we do agree that we will not seek to

2    terminate that exclusivity before then.

3            THE COURT:  So how are these agreements going to

4    be noted?  Are there going to be -- is there going to be an

5    amended DIP loan agreement, or is this going to be part of

6    the order, or both?

7            MR. GOLDMAN:  Both.

8            THE COURT:  Okay.  Go ahead.

9            MR. GOLDMAN:  Yeah.  They're revisions to both.

10           The termination events reside in the DIP

11   agreement, not the order.  The order just refers to --

12           THE COURT:  Okay.

13           MR. GOLDMAN:  -- the credit agreement.

14           The initial $2 million loan that is -- we would

15   ask the Court to approve on an interim basis -- is going to

16   be paid into our firm's trust account.  We will set up a

17   segregated deposit account that bears interest for that.

18           And I didn't expressly discuss this with the

19   debtor's counsel, but we are going to need a W-9 form filled

20   out by the debtor because the estate will be entitled to the

21   -- whatever interest is on that money.  And that's a bank

22   requirement, not our firm's requirement.  So we'll need that

23   to be filled out if the Court does approve this resolution.

24           And that $2 million will be used to pay the

25   committee's professionals and any examiner that might be

14

1    appointed or the examiner's professionals.  And of course

2    that's without prejudice to the additional loans that are

3    being requested on a final basis.  And I expect we'll be

4    able to work those out as well.

5         The other provision we negotiated and which was of

6    great concern to the committee relates to the termination

7    event that would be based on the appointment of a Chapter 11

8    trustee.  We were highly concerned -- and that was a point

9    of -- one of the points of our objection -- that that tilted

10   the process.

11        And so what we were able to work out is a

12   commitment from the debtor and Golden Spring that the -- of

13   the $500,000 that Golden Spring agreed to make available

14   upon a termination event -- and that would include the

15   appointment of a Chapter 11 trustee -- they would agree to

16   make an addition to all fees of professionals that had been

17   approved up to that date, the date of the appointment of a

18   trustee, an additional $500,000.  Of that, 400 would be

19   dedicated to a -- the fees of a Chapter 11 trustee, his or

20   her professionals, as well as the committee's professionals

21   to the extent they would continue to have a role post-

22   trustee.

23        So the committee was satisfied that if a Chapter

24   11 trustee had to take over, there would be a fund for the

25   trustee to continue on with the investigation and recovery

15

1  of assets.

2       THE COURT:  Is that 500,000 or 400,000 of which

3  you're talking about part of the two million or in addition

4  to the two million?

5       MR. GOLDMAN:  Well, that would be in -- actually

6  in addition to any fees that were accrued up to the date of

7  the appointment of a trustee, so my conception of it was

8  that it would be in addition to the loan.

9       UNIDENTIFIED:  In addition to?

10      MR. GOLDMAN:  In addition to the two million if

11 the trustee appointment occurred during the interim period.

12 Or if it incurred -- if it occurred in the final period, it

13 would be an addition.  That's my understanding.

14      THE COURT:  Okay.  I'm not sure everybody agrees

15 on that side, but we'll see.  That's why I asked the

16 question.

17      (Pause.)

18      MR. BALDIGA:  On that point, if you still have un-

19 incurred amounts in the two million, it wouldn't double

20 count that.

21      MR. GOLDMAN:  I agree with that.

22      MR. BALDIGA:  Okay.  Thank you.

23      MR. GOLDMAN:  Yeah.

24      THE COURT:  Okay.

25      MR. GOLDMAN:  The debtor had requested a finding

1   of good faith in the interim order.

2           And we had no problem with that as long as it was

3   subject to a very strict caveat, and that would be that it

4   would be strictly limited to the extension of the DIP loan

5   and it would not be construed in any way or used to defend

6   against claims that the committee or another estate

7   representative or a creditor might assert against Golden

8   Spring based on theories such as alter ego, veil piercing,

9   fraudulent transfer.

10          In other words, that they couldn't use the good-

11  faith finding to say, here, Your Honor, you've already held

12  that we were a separate entity and we proceeded in good

13  faith with the DIP, so how could you pierce the corporate

14  veil.

15          So that is being accepted out of the good-faith

16  finding and the good-faith finding will only relate to the

17  extension of the interim DIP fees -- DIP funds rather.

18          And there's a similar caveat for the no-waiver

19  provision that is in the current order.  It's in paragraph

20  15.  We'll just make that more explicit to match the caveat

21  I just gave Your Honor about the good-faith finding, that

22  the entry of the order doesn't impair or prejudice in any

23  way the claims that might exist against Golden Spring.

24          And I think that that sums it up.

25          I think there's -- there's one point we agree with

17

1  the debtor on and that's the point that was made in the

2  declaration, that this proceeding should serve as a ground

3  for giving creditors a fair opportunity to investigate what

4  assets the debtor has, to conclusively determine what those

5  assets are, and to use the DIP financing as a means to do

6  that.  That's all in his declaration and that's all being

7  served, we think, if this resolution is approved.

8           THE COURT:  Okay.  Thank you.

9           Mr. Kindseth, did you want to say something?

10          MR. KINDSETH:  Yes.  There is some logistical

11  issues, timing issues, that we have, and so revising the

12  order and having it circulated as soon as possible is very

13  important, so I'd like to be excused to go back to my office

14  to finish the draft order.

15          I'm also --

16          THE COURT:  Of the DIP order?

17          MR. KINDSETH:  Sorry?

18          THE COURT:  Of the DIP order?

19          MR. KINDSETH:  No.  This is concerning the Lady

20  May, the --

21          THE COURT:  Oh, you're -- okay.

22          MR. KINDSETH:  Correct.  My --

23          THE COURT:  Well, there isn't really a -- there

24  isn't really a motion underlying that then, right?

25          I mean --

18

1              MR. KINDSETH:  Actually --

2              THE COURT:  -- you're saying it's the resolution

3      of the relief from stay order?

4              MR. KINDSETH:  Correct.

5              THE COURT:  Okay.  Okay.

6              MR. KINDSETH:  And I can provide Your Honor with a

7      summary of --

8              THE COURT:  No, that's fine.

9              MR. KINDSETH:  Great.

10             THE COURT:  I don't need to see it.

11             MR. KINDSETH:  Perfect.

12             THE COURT:  I mean, I think -- I'll read it --

13             MR. KINDSETH:  Yes.

14             THE COURT:  -- when I see it, right?

15             MR. KINDSETH:  Okay.  Very good.

16             THE COURT:  And so I think that's fine.

17             MR. KINDSETH:  So may I be excused?

18             THE COURT:  Yes.  Yes.  You certainly may.  Thank

19     you.

20             MR. KINDSETH:  Thank you very much, Your Honor.

21             THE COURT:  Okay.  Then the only other thing that

22     I was going to ask questions about was the --

23             The only thing, Mr. Baldiga, you didn't speak

24     about that's on the calendar today, other than the examiner

25     and the dismissal motion which you did speak about in some

19

1    ways, was the proof of claim bar date motion.

2              What's the status of that motion?

3              MR. BALDIGA:  I'm sorry.  I did forget that.

4    That's also fully resolved I believe.  We've agreed to all

5    the requests of the U.S. Trustee in that regard to basically

6    pare down what creditors must do to comply with the bar

7    date.

8              THE COURT:  And what is the bar date proposed to

9    be?

10             MR. BALDIGA:  I don't -- I don't -- it comes out

11   to 52 days after service of the bar date.

12             THE COURT:  Okay.  Well, I'll have to look at that

13   because I'm not sure 52 days is enough time.

14             MR. BALDIGA:  Okay.

15             THE COURT:  I might -- you know, right now, the

16   code, you know, has changed a few times over the last few

17   years, but the least amount of time I think there is after a

18   341 meeting is 70 days, and it's 7 or something, but this is

19   an 11 where --

20             MR. BALDIGA:  Right.

21             THE COURT:  -- there doesn't always have to be a

22   bar date set, right?

23             But if there is, if you ask for one, that's fine,

24   but I don't know if 52 days -- I'll have to look at whatever

25   you propose, but I'm --

20

1          MR. BALDIGA:  Okay.  That's fair enough, Your

2     Honor.

3          THE COURT:  -- I'm suggesting to you that I'm not

4     sure if 52 days will be ample time in this case or any

5     Chapter 11 case quite frankly because of many reasons,

6     including the impact of the ability to object or receive a

7     distribution under a plan.

8          MR. BALDIGA:  I hear that.

9          THE COURT:  So that would be my only concern.  I

10    mean, I don't know what other concerns I might have, but I'm

11    just saying to you 52 days to me seems short.  I'm not

12    saying I'm going to 180 or anything like that, but I think

13    that, you know, I would expect the bar date to be, you know,

14    somewhere at least in the 75-day range.

15          Is that a problem from the management of this

16    case's perspective?

17          MR. BALDIGA:  Well, it depends.  I mean, it's --

18    it's helpful to know what claims there are as we go through

19    a plan process.

20          THE COURT:  I understand that.

21          MR. BALDIGA:  And we're anxious to do a plan

22    process.  We're two months into the case.  And if we give

23    creditors another essentially two months to file claims, it

24    doesn't seem like a big burden, but let's put a date in and

25    get it served, whatever date the Court feels is appropriate,

21

1    it will -- but it will help the plan process along --

2                THE COURT:  And you could certainly --

3                MR. BALDIGA:  -- to know what claims there are.

4                THE COURT:  You know, you can certainly prepare

5    your disclosure statement and plan based on different

6    eventualities, right?

7                MR. BALDIGA:  It's not the disclosure statement as

8    much as the financial transactions that underpin the plan.

9    This is a -- we -- claims, the amount of claims matter.  And

10   to go forward --

11               THE COURT:  I completely agree and that's the

12   point, right?

13               MR. BALDIGA:  Right.

14               THE COURT:  And the -- you don't have a

15   prepackaged Chapter 11, so you have to have time for

16   solicitation and voting, and you have to have people give

17   people an opportunity, meaningful opportunity, to file

18   proofs of claim.

19               MR. BALDIGA:  Yes.  And I know the rules says

20   there's a presumption that 45 days is sufficient, and we

21   accept that it can be more --

22               THE COURT:  What rule?

23               MR. BALDIGA:  Local Rule 3003-1.

24               THE COURT:  Says 45 days for filing -- setting a

25   proof of claim bar date?  Maybe it does.

1          MR. BALDIGA:  Let me take a look at it again.

2          (Pause.)

3          MR. BALDIGA:  But, again, we're not -- we're not

4    even suggesting 45 days, but that's a point of reference I

5    guess.  But if the Court feels that it shouldn't be 45, it

6    should be 52 or 60, then --

7          THE COURT:  I just don't see 45 days as -- or any

8    time frame Local Rule 3001-1.

9          MR. BALDIGA:  I'm sorry.  I misspoke, 3003-1.

10         THE COURT:  Those are creditors whose claims are

11   listed as disputed contingent on liquidating.  That rule

12   applies to creditors with claims that are disputed

13   contingent on liquidated with a notice of a deadline for

14   filing proofs of claims.

15         The purpose of that rule is so that a debtor who

16   files a case and lists in their statements and schedules of

17   affairs all the claims as -- or any claim, it doesn't have

18   to be all -- as disputed or contingent on liquidated.

19         We have a process here in Connecticut where the

20   debtor is required to provide notice to that claimant that

21   their claim is listed as disputed contingent on liquidated,

22   and that if they don't file a proof of claim, that they will

23   not be able to object and they will not receive any

24   distribution under the plan.

25         MR. BALDIGA:  I understand.  I didn't -- I didn't

23

1   say that that rule dictates what we're doing here.

2              THE COURT:  Yeah.

3              MR. BALDIGA:  It provides a reference point as to

4   what -- it's a deadline for certain creditors to get their

5   claims in.  I'm not saying that that dictates what we do.  I

6   am saying that as in pretty much every other Chapter 11 case

7   involving tens of millions of dollars conceivably getting

8   claims, having a deadline on which claims are filed helps to

9   push the case --

10             THE COURT:  I completely agree.  I'm not

11  suggesting there isn't going to be a --

12             MR. BALDIGA:  Okay.  So that's all I'm saying.  So

13  we'll --

14             THE COURT:  I'm not suggesting there isn't going

15  to be a deadline.  I'm just not sure it's going to be 52

16  days.

17             MR. BALDIGA:  And as I said, let's put a day in

18  that you're comfortable with and keep the show moving

19  forward, and we'll do that.

20             THE COURT:  Okay.  Thank you.

21             MR. BALDIGA:  Thank you.

22             THE COURT:  All right.  So, Mr. Friedman, this is

23  your objections to the application to employ Verdolino &

24  Lowey and the -- your clients' -- and the DIP financing

25  order.

24

1          Now, I did see everyone's list of witnesses and

2     exhibits.  And I saw that last night there was a joint

3     exhibit grid with regard to different exhibits.

4          How do you plan on proceeding this morning?  Are

5     you -- are you going -- are we going to start with your

6     objection or is Mr. Baldiga going to start with his -- or

7     his motions?

8          MR. BALDIGA:  I was going to put -- to establish

9     the evidentiary foundation that -- I was going to put Mr.

10    Craig Jalbert on the stand.  That's the witness that PAX

11    intends to cross-examine.  Direct would be very short, but

12    --

13         THE COURT:  That's fine with me if it's fine with

14    Mr. Friedman.

15         MR. BALDIGA:  Okay.

16         THE COURT:  I mean, you two I'm sure have spoken

17    about this, right?

18         MR. FRIEDMAN:  Your Honor, my colleague, Ms.

19    Aronsson, will handle any objections to direct and the

20    cross-examination and we'll make argument after the witness

21    is -- has been relieved.

22         THE COURT:  Okay.  All right.  So, Mr. Baldiga,

23    you may call your first witness.

24         And this -- to be clear on the record, we are now

25    -- is this evidence going to be applicable to both Verdolino

1      & Lowey and the DIP motion or are we just starting with the

2      Verdolino & Lowey application?

3              MR. BALDIGA:  With Verdolino & Lowey.

4              THE COURT:  Okay.  Thank you.

5              MR. BALDIGA:  Mr. Jalbert.

6              THE COURT:  Mr. Jalbert, when you -- when you sit

7      down, just let me know what you can see, okay?  If you have

8      a screen in front of you, you know.

9              I'm just going to say my screen is showing

10     nothing.  Should it be showing at least the calendar?

11             THE CLERK:  No.

12             THE COURT:  Okay.  It shouldn't be showing

13     anything.  Okay.

14             MR. JALBERT:  It is blank, Your Honor.

15             THE COURT:  Can you see anything?

16             MR. JALBERT:  It is blank.

17             THE COURT:  Okay.  Good.  Mine is too.  So then

18     we're on the same page.  But hopefully we'll be on a

19     different page soon.

20             MR. JALBERT:  Good morning.

21             THE COURT:  Good morning.

22         CRAIG JALBERT, WITNESS FOR THE DEBTOR, SWORN

23             THE CLERK:  State your name and business address

24     for the record, please.

25             THE WITNESS:  My name is Craig R. Jalbert, J-A-L-

1    B, as in boy, E, as in Eric, R-T, as in Tom.  I work at

2    Verdolino & Lowey.  Our business address is 124 Washington

3    Street, Foxboro, Massachusetts 02035.

4              THE CLERK:  Thank you.

5              THE COURT:  Good morning, Mr. Jalbert.

6              THE WITNESS:  Good morning, Your Honor.

7              THE COURT:  You okay in there?  You've got what

8    you need?

9              THE WITNESS:  (No audible response.)

10             THE COURT:  Okay.  Thank you.  I don't think we

11   even have any water, but if you do get to a point where you

12   need some, let us know.  Okay?

13             THE WITNESS:  Thank you.  I appreciate it.

14                   DIRECT EXAMINATION

15   BY MR. BALDIGA:

16   Q    Good morning, Mr. Jalbert.

17   A    Good morning.

18   Q    You said in your introduction that you were affiliated

19   with the firm of Verdolino & Lowey?

20   A    Yes.

21   Q    Could you tell the Court what that firm does.

22   A    It's styled as an accounting firm.  Most of our work is

23   specialty work.  Pretty much the only accounting service

24   that we do not provide is the test type services, audits,

25   reviews, compilations, but we do a lot of litigation support

Jalbert - Direct                          27

1    work in insolvency.  We do federal election reporting for

2    federal senators and congressmen and presidential

3    candidates, and we do what we call high-net-worth

4    babysitting and tax preparation.

5    Q    And what is your position in the firm?

6    A    I'm a principal.

7    Q    And were you a co-founder of the firm?

8    A    Well, the firm was started back in 1979.  The Verdolino

9    or Verdolino & Lowey bought half the firm in 1986.  I bought

10   the other half in 1987.  And it's just morphed into

11   Verdolino & Lowey over the years.

12   Q    So you've been with that firm now for?

13   A    Thirty-five years.

14   Q    Thirty-five 35 years.

15        And within Verdolino and -- and what is your title

16   at the firm?

17   A    Principal.

18   Q    And does that mean that you're in charge of at least --

19   co-charge of the firm with someone else?

20   A    Yes.  So I'm not an owner because a CPA can't be an

21   owner, but I am treated as an equal 50 percent partner.  And

22   100 percent of my time not spent running the firm -- and I'm

23   the "managing partner" -- is spent in this insolvency and

24   related issues.

25   Q    So you have experience in insolvency cases?

Jalbert - Direct                                          28

1    A    I do.

2    Q    For how many years?

3    A    Started somewhere in 1988 or 1989.

4    Q    Okay.  And before you joined Verdolino & Lowey, did --

5    what was your schooling, starting with college?

6    A    I graduated in 1983 with a bachelor of science and

7    degree in accountancy from Boston College.  And since then,

8    I've done 35 -- 38 or 39 years of continuing professional

9    education in the accounting and related areas.

10   Q    Okay.  And as you -- I think as you said Verdolino &

11   Lowey is not an auditor, correct?

12   A    Correct.

13   Q    Describe what you have done in bankruptcy cases and in

14   about how many bankruptcy cases over the years?

15   A    I last did my count five or ten years ago, and at that

16   time, I had been in 7,000 Chapter 7's and 500 Chapter 11's.

17   I've been appointed as a Chapter 11 trustee three times.

18   I've been a federal -- state -- federal receiver, a state

19   court receiver, an assignee for the assignment of benefitted

20   creditors in four states.

21        I've done -- I've been a post-confirmation

22   fiduciary -- pick a title -- liquidating supervisor,

23   liquidating manager, whatever, numerous times.  I work with

24   trustees, debtors in possessions, creditors committees,

25   equity committees, secured creditors, unsecured creditors,

Jalbert - Direct                                        29

1    pretty much any constituency to a bankruptcy case over the

2    years we've represented in all of these cases.

3            I think that's all I have off the top of my head.

4    Q    And do yo provide assistance to debtors in connection

5    with plan formulation and negotiation?

6    A    Yes.

7    Q    Do you provide assistance with financial reporting?

8    A    Yes.

9    Q    Here, you know that the debtor obviously is an

10   individual?

11   A    Yes.

12   Q    In fact, Mr. Kwok is in the courtroom, and you've met

13   him on several occasions now?

14   A    Yes.

15   Q    He has lawyers obviously that help him, correct?

16   A    Yes.

17   Q    Other than Brown Rudnick, are they bankruptcy lawyers?

18   A    Not to my knowledge.

19   Q    Okay.  Does he have a financial staff individually that

20   is well versed in bankruptcy reporting?

21   A    No.

22   Q    How do you know that?

23   A    I've been told.  And over the last -- what date are we

24   -- 45 or so days, there's been lots of interaction and all

25   of the information necessary for us to do our work has come

1    through the legal team.

2    Q    Okay.  But you and your staff have more than a little

3    experience with financial reporting in bankruptcy cases,

4    correct?

5    A    Yes.

6    Q    What type of reporting is required in this case?

7    A    Well, there's two pieces of reporting that come to mind

8    initially.  Aide from the schedules and the SOFAs, putting

9    those aside, that's the start of the case, on an ongoing

10   basis, there's the monthly operative reports that are filed

11   nowadays on the docket with additional information supplied

12   to the United States Trustee.

13          It's the United States Trustee's form and rules.

14   And there's also a Form 426 which is related to Rule 2015.3

15   for reporting related to entities -- I think the term is --

16   that are substantially controlled by the debtor.

17   Q    Okay.  And were you involved in the preparation of the

18   first MORs filed in this case?

19   A    Yes.

20   Q    What did you do?  Or when I say you, you and your

21   staff, please.

22   A    We, at Verdolino & Lowey, were -- initiated the

23   preparation.  We used the form that is supplied by the

24   United States Trustee.  It's a PDF that you fill out.  It

25   has lots of instructions.  And we worked with the debtor's

Jalbert - Direct                                    31

1    attorneys in order to obtain the information necessary to

2    prepare the form.  And that has been done for February and

3    March.

4            We needed assistance in getting input from Golden

5    Spring and that was arranged for through counsel.  And we

6    did have initial few emails with Golden Spring to obtain

7    information and most everything has come through counsel.

8    Q    Okay.  With respect to the schedules and statements,

9    were you involved in that process?

10   A    Yes.

11   Q    What did you and your staff do in that regard?

12   A    So in order to file the SOFAs and the schedules,

13   there's an awful lot of historical information necessary, so

14   we participated on numerous telephone calls and emails with

15   the legal team in order to obtain the information.

16           We populated initially the draft forms of both the

17   -- all of the schedules -- and as we all know, there's a

18   number of them -- and the statement of financial affairs.

19           We were -- initially crafted the first draft of

20   what I'll call the specific notes, there were global notes,

21   that were filed as part and parcel to the SOFAs and the

22   schedules.  And the general notes were I believe created and

23   drafted by the attorneys.

24           I did the first pass at trying to file the

25   specific notes that responded to the various particular

1    questions in the SOFAs and the schedules after receiving and

2    obtaining and organizing the information received from the

3    legal team.

4    Q    Were you involved in the establishment by this debtor

5    in possession of the so-called DIP deposit account?

6    A    Yes.

7    Q    What did you do?

8    A    There were only a number of institutions that the

9    United States Trustee's Office has -- permits to be -- to

10   hold funds in a bankruptcy case so we identified that group

11   of banks and we tried to see who would participate.  We have

12   a relationship with three of the banks that frequently do

13   work in bankruptcy.

14          Initially, and no longer, I was going to be the

15   actual signatory, so we went and presented it that way.

16   When that became clear that that was not going to happen, we

17   made arrangements to be able to get debtor in possession to

18   be the sole signatory on the account and to have a bank

19   account that would meet the requirements of the United

20   States Trustee's Office.

21          It's a bank that's done it in other cases in this

22   jurisdiction and others.  It happens to be a bank that we've

23   worked for -- with -- in a number of matters over the last

24   couple of years.

25   Q    What bank is that?

1    A    Well, we went with both People's and M&T.  And in the

2    middle of our discussions, they merged.  So we talked from

3    both sides, but eventually it will be in the -- it will be

4    an account in M&T.

5    Q    Okay.  All right.  Did you use your personal experience

6    and relationships to help establish that account?

7    A    Yes.

8    Q    And, again, you are, yourself, your firm and you, will

9    not be a fiduciary, but you're just providing advisory

10   assistance in that regard, correct?

11   A    Correct.

12   Q    And you're not going to act as a fiduciary in this

13   case, correct?

14   A    Correct.

15   Q    So all work is advisory?

16   A    Well --

17   Q    Accounting or --

18   A    Yes.  I don't know what the term would be, but there

19   will be accounting and reporting.  The information coming

20   out of the bank account will have to be reported in the MLR.

21   the debtor doesn't have an accounting staff.  I assume that

22   we will have some role in making sure that checks are

23   written, checks are signed by the debtor.

24        And then the reporting, the committee and others

25   might have.  And the U.S. Trustee might want weekly or

Jalbert - Direct                                    34

1    monthly reporting or bi-weekly reporting.  I don't know what

2    they'll want.  Different cases, people do different things.

3    And of course there will be the monthly reporting through

4    the MLR, so I'm assuming we will assist and facilitate that.

5    Q    And have you had direct -- you and your staff had

6    direct communications with the Office of the United States

7    Trustee regarding reporting in this case?

8    A    Yes.

9    Q    And how has that gone?

10   A    Well, it started out with -- everyone probably knows in

11   June of 2021 the United States Trustee started a requirement

12   with the monthly -- the MLRs are much different beasts than

13   they used to be.  They used to be in a -- all in Excel and

14   you would prepare it and it was fairly simple.

15        It's now done on a -- on a PDF that is -- you can

16   keypunch directly into the PDF.  And once the form is filled

17   and populated with all the information that is required and

18   appropriate for that particular case, you actually hit a

19   button and it uploads the data to the cloud in the United

20   States Trustee's Office.

21        And it sends back a form that is no longer

22   watermarked as draft or whatever the watermark was.  That's

23   then signed by the debtor and filed on the docket.  And any

24   supplemental information goes to the U.S. Trustee separately

25   by email either by my firm or the -- or attorneys.

1      Well, when -- since January -- and I have a number

2    of cases undergoing Chapter 11s where this reporting is

3    required -- without any word that came down, the form

4    changed dramatically.  It used to be a straight four or five

5    pages.  All of a sudden it had a whole bunch of other pages

6    and some markings, you know, like when you go to a

7    restaurant and you do the menu button to see what the menu

8    is, this form had those -- those kind of symbols and

9    markings.

10     I didn't know what it was.  No one could figure it

11   out.  And I talked to someone in the accounting side of the

12   U.S. Trustee's Office who happened to be in New York

13   handling this case and he explained to me that that's the

14   way the form is supposed to be which allowed us to then

15   quickly wrap up the form.  And during that, that's when he

16   made a request for additional information on the monthly

17   operating report which we've been providing since then.

18   Q    Did you feel that your 35 years of experience with you

19   and your staff helped to get that done efficiently?

20   A    Of course.

21   Q    Do you think this debtor alone without your office's

22   assistance would have been able to get that done?

23   A    No.

24   Q    How about the instructions and definitions in the

25   schedules and statements, how did your experience affect how

1    that work was done?

2    A    Well, obviously it was very helpful.  This is a unique

3    case in a number of areas.  One of the uniquenesses -- and

4    at least Your Honor probably knows -- is not a large amount

5    of individual Chapter 11 cases by comparison to corporate or

6    Chapter 7 cases it's a relatively minor amount.  We have

7    done a number of them in the past.  We had -- we've had

8    different types of cases.

9         This one is very unique.  And so as we were going

10   through this, well, we had a lot of historical knowledge and

11   history and basis to understand what the SOFAs and the

12   schedules are looking for, we had to make sure we educated

13   everybody to what the rules were, what the definitions were.

14        Frankly, some times what is on the SOFA or a

15   schedule, the actual question, doesn't entirely and

16   completely relate to what the instructions say.  The

17   definitions can differ a bit.  So we assisted everybody in

18   those -- in those areas.

19        And the attorneys, as well as us, haven't had lots

20   of individual Chapter 11s, so we all made sure that we

21   reviewed those instructions to make sure that we filed and

22   did everything we possibly could, and to be abundantly clear

23   that the attorneys drafted general and specific global notes

24   to accompany the schedules and the SOFAs where there was any

25   issues that needed additional addressing and describing.

1   Q    Was your experience helpful in that regard?

2   A    Yes.

3   Q    Do you think this debtor could have done that without

4   your assistance?

5   A    No.

6   Q    You mentioned earlier that your firm does not provide

7   auditing services, correct?

8   A    Yes.

9   Q    And while your firm does serve, and while you have

10  served as a fiduciary, you're not serving as a fiduciary

11  here, correct?

12  A    Correct.

13  Q    Do you remember being deposed by PAX --

14  A    Yes.

15  Q    -- a few weeks ago, I guess?

16  A    Yes.

17  Q    Okay.  Did you try to make clear during your testimony

18  that you were not doing auditing or forensic work or

19  verification work here?

20  A    I think -- I think -- I thought I did.  I think the key

21  word that they used was investigate.

22  Q    Okay.

23  A    I didn't investigate anything, and the answer to that

24  question is no.

25  Q    Okay.  So are you being asked to be an examiner in this

Jalbert - Direct                                      38

1    case?

2    A    No.

3    Q    Are you being asked to be a trustee?

4    A    No.

5    Q    Are you being asked to do an investigation?

6    A    No.

7    Q    But you are being asked to work with the debtor and the

8    debtor's team to provide financial information in a manner

9    required by the bankruptcy code and the rules and the Office

10   of the United States Trustee?

11   A    Among other services, yes.

12   Q    Okay.  But you feel capable to do that?

13   A    Yes.

14   Q    And you feel -- and, again, can the debtor do that

15   without your help?

16   A    No.

17   Q    Okay.

18        MR. BALDIGA:  No other questions, Your Honor.

19   Thank you.

20        THE COURT:  Thank you.

21        Cross-examination, Counsel?

22   (Pause.)

23        MS. ARONSSON:  Good morning.

24        THE WITNESS:  Good morning.

25        MS. ARONSSON:  Laura Aronsson from O'Melveny &

Jalbert - Cross                                    39

1    Myers.

2              THE COURT:  Good morning.  You may proceed.

3                        CROSS-EXAMINATION

4    BY MS. ARONSSON:

5    Q    Good morning, Mr. Jalbert.  I'd like to discuss the

6    work that V&L has done in this matter to date.  V&L was

7    contacted sometime in February, is that right?

8    A    Late February, early March.

9    Q    After retention, you turned to the SOFAs and the

10   schedules, working on them simultaneously?

11   A    Well, I'm not retained yet, so.

12   Q    After you were contacted?  Thank you.

13   A    After we were contacted, yes.  I think -- aside from

14   drafting an engagement letter and providing background

15   information on the firm, I think our first tasks were to

16   begin working on the SOFAs and the schedules.

17   Q    Did you finish that work?

18   A    So far, yes.

19   Q    Then V&L started preparing the first monthly operating

20   report?

21   A    Yes.

22   Q    This was the report for the second half of February?

23   A    Well, it was a report for the month of February.  But

24   it just so happens the debtor filed on February 15th, so.

25   Q    Since then, the debtor has filed one additional

1    operating report?

2    A    The month of March, yes.

3    Q    This was filed on April 20th?

4    A    If you say so.  I know it's around that date.

5    Q    Turning to the work you've performed so far in

6    connection with these categories, I'm going to start with

7    the SOFAs and schedules, you prepared these filings based on

8    the information you received from others?

9    A    Yes.

10   Q    These people included Brown Rudnick, right?

11   A    Yes.

12   Q    Aaron Mitchell?

13   A    Yes.

14   Q    Is that Kwok's personal attorney?

15   A    He's debtor's counsel.  I don't know what you mean by

16   personal attorney.

17   Q    And Melissa Francis?

18   A    Yes.  I did receive information from her.

19   Q    Is that Kwok's personal attorney?

20   A    My understanding is she's -- well, she's part of the

21   bankruptcy team.  I don't know whether she's just his

22   personal attention attorney.

23   Q    Anyone else?

24   A    Yes.  We received a spreadsheet which was I think

25   amended or changed a couple of times from someone from

1    Golden Spring.

2    Q    Was this in connection with the SOFAs and the schedules

3    or the monthly operating report work?

4    A    With the operating report.

5    Q    Okay.  We can turn to that.  Did you communicate with

6    anyone else regarding the SOFAs and the schedules besides

7    Brown Rudnick, Aaron Mitchell and Melissa Francis?

8    A    No.

9    Q    I think I heard you testify on direct Verdolino & Lowey

10   got all of the relevant information from the people we just

11   talked about.  I note -- you didn't do any other independent

12   work or to verify the facts?

13   A    Correct.

14   Q    You didn't do any investigating -- investigation into

15   the ownership interests, if any, of Mr. Kwok in the assets

16   listed in the SOFAs and the schedules?

17   A    Correct.

18   Q    For example, no investigation of Kwok's interest in the

19   Lady May?

20   A    Correct.

21   Q    You did no work to value the items listed in the SOFAs

22   and the schedules, right?

23   A    If you're asking if we did valuation work, no.  But

24   there was questions.  That the answers to those questions

25   was checks issued by the State of New York and I think the

Jalbert - Cross                                    42

1  federal government that on the face of those checks had a

2  number.  I don't know if you call that valuing, but we read

3  the check and we determined what that number was and put it

4  in the schedules.

5  Q    Verdolino & Lowey has no experience valuing luxury

6  items like the Lady May?

7  A    Correct.

8  Q    You did no investigation into the debtor's income

9  information?

10  A    Correct.

11  Q    You have not spoken to the debtor about any of the

12  filings Verdolino & Lowey has prepared in this matter?

13  A    Correct.

14  Q    Verdolino & Lowey used best case to help prepare the

15  SOFAs and the schedules, right?

16  A    Yes.

17  Q    That's industry software?

18  A    Well, it is.  I don't know what else to do besides

19  bankruptcy, but best case is a -- and I don't know what the

20  real name of the company is, but they manufacture, prepare a

21  software, that provides pretty much every bankruptcy form

22  that I'm aware of that has to be filed in a bankruptcy.

23  Q    V&L simply plugged that information that you received

24  into the software to create the filings?

25  A    Well, first we got the information, understood the

1    information, and then, yes, we did keypunch it.

2    Q    You did not review any of the debtor's books and

3    records in connection with the engagement?

4    A    Correct.

5    Q    You do not know where those books and records are kept?

6    A    Correct.

7    Q    You did not ask to review them?

8    A    Correct.

9    Q    Turning to the work in connection with the monthly

10   operating report, again, like with the SOFAs and the

11   schedules, Verdolino relied on information it received from

12   the third parties to assist in the preparation?

13   A    Correct.

14   Q    You mentioned a summary of expenses earlier, is this a

15   summary of expenses you received from someone at Golden

16   Spring breaking down the debtor's monthly expenses?

17   A    Well, they're breaking down the expenses paid on behalf

18   of the debtor, paid by a third party on behalf of the

19   debtor, yes.

20   Q    This was about seven categories?

21   A    About that.

22   Q    To your knowledge, Golden Spring is the debtor's family

23   office in New York City?

24             MR. BALDIGA:  Objection.

25             THE COURT:  What's your basis --

Jalbert - Cross                                          44

1           THE WITNESS:  That's not my understanding.

2           THE COURT:  Hold on a second, sir.

3           What's your objection?

4           MR. BALDIGA:  Well, the witness answered the

5      question, so I'll withdraw the objection, Your Honor.

6           THE COURT:  Okay.  Thank you.

7           THE WITNESS:  I'm sorry.  Ask the question again.

8      BY MS. ARONSSON:

9      Q    To your knowledge, Golden Spring is the debtor's family

10     office in New York City?

11     A    No.  That's not my understanding.

12          MS. ARONSSON:  Okay.  Madam Clerk, can we please

13     pull up PAX Exhibit 14.

14          (Pause.)

15     BY MS. ARONSSON:

16     Q    So just to confirm --

17          THE CLERK:  On the screen --

18          MS. ARONSSON:  Sorry.

19          THE CLERK:  On the screen is Exhibit 14, page 1.

20          MS. ARONSSON:  Thank you.

21          THE CLERK:  PAX Exhibit 14, page 1.

22     BY MS. ARONSSON:

23     Q    So just to confirm --

24     A    No.  That's not what mine says.  Mine says I'm on page

25     171.  Does it -- does it have a whole bunch of --

Jalbert - Cross                                      45

1              THE CLERK:  Yes.

2              THE WITNESS:  -- exhibits all in one PDF?  Okay.

3              THE CLERK:  That's page 1 in Exhibit 14.

4              THE WITNESS:  And if you say it's page 1, it's

5      page 1.

6      BY MS. ARONSSON:

7      Q    So just to confirm, what is your understanding of

8      Golden Spring?

9      A    My understanding is it's the debtor's son's

10     company/family office.

11             MS. ARONSSON:  All right.  You can take those

12     down.  Thank you.

13             THE COURT:  So you're not moving for the admission

14     of Exhibit 14, Counsel?

15             MS. ARONSSON:  No, I'm not.  Thank you.

16             THE COURT:  Okay.  Thank you.

17     BY MS. ARONSSON:

18     Q    You communicated with one person at Golden Spring

19     regarding the information contained in the monthly operating

20     report, right?

21     A    Yes.

22     Q    That provided -- that person provided you certain

23     information relevant to the monthly operating report?

24     A    Yes.

25     Q    Who was that person?

Jalbert - Cross                                46

1   A    I only know his first name.

2              THE WITNESS:  Am I permitted to say it?

3              MR. BALDIGA:  Objection, Your Honor.  Well, I'll

4   let Golden Spring argue.

5              MR. MILTENBERGER:  Your Honor, this came up at Mr.

6   Jalbert's deposition.  My client's concerned about the

7   harassment, intimidation of its employees.  And unless

8   there's a specific reason why an employee's name needs to be

9   said on the record, we would like the identification of the

10  employees to remain confidential and be kept off of the

11  record.

12             THE COURT:  Well, you'd have to file a motion for

13  that, Counsel, I think.  You know, that's a -- if you want

14  something under seal or confidential, you have to seek that

15  through an appropriate motion.

16             But I think what counsel was asking was -- and

17  maybe I'm wrong, we can play back the recording -- was you

18  were asking about a specific person that was providing

19  information from Golden Spring.  I thought that was the

20  question.

21             MS. ARONSSON:  That's right.

22             THE COURT:  Okay.  You know, don't answer it yet

23  though, sir, okay, because we have to figure out what the --

24  what the issue is here.

25             So what is the need to know the specific person's

Jalbert - Cross                                47

1   name from Golden Spring?

2               MS. ARONSSON:  Sure.  In connection with this

3   particular motion, the retention of V&L, Pacific Alliance,

4   we sought discovery to understand the purpose of Verdolino &

5   Lowey's retention and why it's in the best interest of the

6   estate.

7               We believe we're entitled to explore that, the way

8   in which Verdolino & Lowey prepared the SOFAs, the

9   schedules, the monthly operating reports, including who

10  provided Verdolino with the underlying facts, and what those

11  facts are, is important to uncovering whether this retention

12  is in the best interest of the estate.

13              THE COURT:  All right.  Well, let me ask you a

14  question if we're -- and I'm not -- I'm not ruling on

15  anything at the moment -- but does -- do you have an

16  opposition to us putting the witness answering the question

17  -- but has the witness already answered this question at the

18  deposition?

19              MS. ARONSSON:  He did not.

20              THE COURT:  Okay.  Was the question asked at the

21  deposition?

22              MS. ARONSSON:  Yes.  And we also sought discovery

23  and we received a redacted email, so that was the root of

24  the question.

25              THE COURT:  I see.  So you received an email from

Jalbert - Cross                              48

1    someone at Golden Spring, but it had redacted people's

2    names?

3            MS. ARONSSON:  Correct.

4            THE COURT:  Okay.  And what's your concern,

5    Attorney Miltenberger?

6            MR. MILTENBERGER:  My client's concerned about the

7    privacy of their employees, Your Honor.  And in the proffer

8    by PAX's attorney, I didn't see anything that made it clear

9    that the identity of the person that provided the

10   information to Verdolino & Lowey is important.

11           We don't have any issue with the disclosure of the

12   information that was provided and when that happened.  The

13   only concern that we have is the privacy of our employees

14   and we would ask that the employee name be kept

15   confidential.

16           THE COURT:  Well, wouldn't somebody from Golden

17   Spring have to testify at some point?

18           I mean, what are you going to -- are you going to

19   designate a Rule 30(b) representative or what -- you're not

20   going -- I mean, someone's going to have to, it can't just

21   be the corporate entity.  There has to be an individual at

22   some point.

23           MR. MILTENBERGER:  That's correct, Your Honor.

24   Golden Spring has been examined.  We did have the president

25   of Golden Spring testify and answer all questions.

1           THE COURT:  So the person that provided the

2   information to Mr. Jalbert is not the president of Golden

3   Spring, is that the -- is that the issue?

4           MR. MILTENBERGER:  That's the issue, Your Honor.

5   It was a rank and file employee of Golden Spring who was

6   just passing information over to Verdolino & Lowey.

7           And, again, we don't have any objection to inquiry

8   about what that information was or why Verdolino & Lowey

9   wanted it, just as to the identity of the employee to

10  protect that individual's privacy.

11          THE COURT:  Well, you'd have to have sought a

12  protective order I think.

13          But the other way we could handle it is -- I mean,

14  you didn't do that.  What did you do at the deposition when

15  this question was asked?

16          MR. MILTENBERGER:  I objected to it, Your Honor.

17          THE COURT:  Okay.  And did you say that you were

18  going to seek some form of a protective order?

19          MR. MILTENBERGER:  No, Your Honor.  I objected and

20  the questioner moved on.

21          THE COURT:  Okay.

22          MS. ARONSSON:  Your Honor, if I may?

23          THE COURT:  Yes.  Go ahead.

24          MS. ARONSSON:  Two more quick points.  Even if the

25  name were not relevant -- we dispute that it's not relevant

Jalbert - Cross                                    50

1    -- I'm not just aware of any applicable rule that allows the

2    debtor of Golden Spring to redact for relevancy.  That's

3    just not something that I've ever seen happen.

4           I'm also not aware of any rule that allows the

5    debtor to redact otherwise discoverable information, the

6    name and the email address of a person based on the STAG

7    security threat.

8           And I would also point out that, you know, we've

9    seen Golden Spring employees be identified on LinkedIn,

10   which is publicly available.

11          MR. MILTENBERGER:  Your Honor, the argument is is

12   that the probative value of this individual's name is

13   outweighed by the prejudicial effect of disclosing it.

14          THE COURT:  Well, I don't know if that's true.  I

15   understand your argument, but I don't know if that's true.

16          Maybe what we need to do is, you know, set this

17   issue aside for some further discussion and/or -- I mean,

18   what we could do in the short term -- but I don't know if

19   it's acceptable to PAX, it may not be -- is the question

20   could be asked and answered, whatever the answer might be,

21   and we could put that part of the record under seal pending

22   a ruling on the issue, but that's I think the best that we

23   can do right now.

24          I don't have anything in front of me to make an

25   educated evidentiary ruling on this issue, right?

Jalbert - Cross                                    51

1      But if we're going to do that, we have to give the

2  courtroom deputy a moment because we'd have to -- our

3  software, that is, the recording that is the record of the

4  case, does allow us to put certain parts of the record

5  underseal.

6      And I'd have to orally rule that there -- because

7  there is no motion pending, no written motion -- that

8  because there's an objection to a question that is an

9  evidentiary objection in nature, and because I don't have

10  anything in front of me to allow me to make an educated

11  ruling, that I would have to rule at this point that if we

12  want to proceed this way, that the record for this question

13  and answer would be under seal until further order of the

14  Court.

15      Mr. Baldiga?

16      MR. BALDIGA:  Yes, Your Honor.

17      For the debtor, our objection is -- in addition to

18  Mr. Miltenberger's -- just on relevance.

19      You gave PAX an opportunity to say how the name is

20  relevant and there was no reason given.  The name is simply

21  not relevant to anything here.

22      THE COURT:  Okay.  Well, again, I'm not sure I

23  agree with you, but I'm not prepared to rule on that at the

24  moment.

25      MR. BALDIGA:  But there could be at least some

Jalbert - Cross                              52

1    showing as to why that is relevant.

2              THE COURT:  Well, there is -- I mean, under the

3    Federal Rules of Civil Procedure, discovery is broad,

4    evidence is broad.  She's asking a question about the

5    preparation of the financial information that forms the

6    basis of this Chapter 11 case where -- and Mr. Jalbert has

7    testified quite, you know, admirably about what he's done,

8    what he hasn't done, and what -- how the information has

9    come to him from third parties and not from the debtor

10   directly.

11             So I do think it's relevant.  If that's your -- on

12   that objection, I think it's relevant.

13             MR. BALDIGA:  Okay.

14             THE COURT:  I think that's relevant.

15             But whether or not it should be confidential or

16   protected is a different issue at least from the Court's

17   view.

18             Again, this is an individual Chapter 11 case.  The

19   debtor has duties under the bankruptcy code.  Apparently

20   those -- I shouldn't say -- that's not fair -- let me make

21   sure I say this properly -- from what I've heard today, and

22   that's all I've heard so, the debtor has not directly

23   communicating with the party who is preparing and submitting

24   the financial information that is the basis for this case.

25             If that's the case, which it appears to be --

Jalbert - Cross                                      53

1   which is fine, but, I mean, there's nothing -- but that

2   doesn't -- that does not preclude then a party from asking

3   who provided the information.  I think it is relevant.

4          And even -- but it may ultimately be not material.

5   I could see that it's relevant, but you could argue at some

6   point possibly that it's immaterial who it is because it was

7   just somebody at Golden Spring.

8          Now, that doesn't mean that the -- that PAX as the

9   objection party -- objecting party shouldn't know who that

10  is because maybe PAX wants to depose that person.

11         Now, you could -- you could object to that and you

12  could file a protective order and motion to quash and all

13  kinds of things, but that doesn't mean it's not relevant

14  under the facts of this case that have been established so

15  far this morning.

16         MR. BALDIGA:  Okay.  My second point, Your Honor,

17  is that before we go through all these other machinations,

18  it's possible that the witness simply doesn't know the name.

19  And perhaps the Court could inquire as to whether we're all

20  just sort of wasting time because the --

21         THE COURT:  I mean, that's a possibility, but --

22         MR. BALDIGA:  Thank you.

23         THE COURT:  -- you know, I think there is a

24  pending question, right?

25         There's a pending objection.

Jalbert - Cross                                          54

1              So Golden Spring is trying to -- not trying, is

2     asserting that the answer to that question is confidential

3     and they don't want it disclosed --

4              MR. BALDIGA:  I understand that fully.

5              THE COURT:  -- even though they haven't filed any

6     documents or anything with this court with regard to this

7     examination.  So why don't I --

8              Well, how would you like to proceed, Counsel?

9              MS. ARONSSON:  Pacific Alliance is happy to

10    proceed under seal as you suggested.

11             I just wanted to also note that we have relevancy

12    arguments, and that Mr. Friedman will address in connection

13    with the DIP objection on this very point.

14             THE COURT:  Well, I just ruled that I think it is

15    relevant.

16             MS. ARONSSON:  Thank you.  Yeah.

17             THE COURT:  Okay?  I think it is relevant.  So,

18    you know.  And Mr. Baldiga may find that objectionable and

19    may, you know, note the objection for the record for appeal

20    purposes, whatever he needs, but I think it is relevant in

21    this case.

22             Under the specific facts and circumstances of this

23    case, I think it's relevant to know who provided the

24    information to the party -- that the financial advisor that

25    is preparing and submitting all the financial information

Jalbert - Cross                                                55

1    that is the basis for this case.

2              So that is the Court's ruling.

3              With regard to the -- placing it under seal, now,

4    if you'd all just give me a minute.

5              I don't want to burden the courtroom deputy, but,

6    how much time do you need to get that set up to turn on the

7    -- to make sure that this question that's been pending --

8    and I'm going to make -- I'm going to ask you to ask it

9    again once we go under seal -- and Mr. Jalbert's answer be

10   placed under seal?

11             THE CLERK:  As soon as you say this is under seal,

12   it's just flipping the buttons.

13             THE COURT:  Okay.  Great.

14             THE CLERK:  (Indiscernible.)

15             THE COURT:  Okay.  Hold on a minute, Mr.

16   Miltenberger.  Just hold on.

17             THE CLERK:  So are you saying put it under --

18             THE COURT:  No, not yet.  I'll tell you.

19             THE CLERK:  Okay.

20             THE COURT:  I'll say when to start.  I just want

21   to hear from -- I still want to hear from counsel for PAX

22   and then I'm going to let Mr. Miltenberger speak again too.

23             THE CLERK:  Okay.

24             THE COURT:  Is there anything further you wanted

25   to add for the record before I let Mr. Miltenberger talk for

Jalbert - Cross                                    56

1    a moment?

2              MS. ARONSSON:  No.  Thank you.

3              THE COURT:  Okay.  Thank you.

4              Mr. Miltenberger?

5              MR. MILTENBERGER:  Your Honor, just to inquire,

6    the public access line would be active during the question

7    and answer?

8              THE COURT:  I guess that's a good point, isn't it,

9    Mr. Miltenberger?

10             THE CLERK:  We would put it in the waiting room,

11   Your Honor.

12             THE COURT:  All right.  So that's what we'd have

13   to do first.  We'd have to put -- we'd have to turn off the

14   phone too, right?  We've got a phone line going, don't we?

15             THE CLERK:  That's the public access line.

16             THE COURT:  Yeah.  But then who else -- is there

17   anybody else beside -- people in the courtroom are all here,

18   so how are we -- how are we going to do that?

19        (Pause.)

20             THE COURT:  We'd have to -- you know what?  We'll

21   have to think about this for a second because we'd have to

22   have everybody be excused from the courtroom, which I don't

23   know how much sense this makes right now.

24             Because if it's under seal, but everybody hears

25   it, then it's not under seal.  Then it becomes public

Jalbert - Cross                          57

1    record.

2            MS. ARONSSON:  Could I just have one moment,

3    please, Your Honor?

4            THE COURT:  Certainly.

5        (Pause.)

6            THE COURT:  Go ahead, Counsel.

7            MS. ARONSSON:  I think we're happy to proceed with

8    this.

9            THE COURT:  Yeah.  The only problem is there is a

10   -- there is a problem, right?

11           We'd have to put everybody that's in the public

12   access line out of the -- out of this session right now.

13           And there's all these people in the courtroom,

14   right?  So how do I deal with that?

15           If it's under seal and everybody's just heard it,

16   then it's not under seal, right?

17           MS. ARONSSON:  Another option, Your Honor, the

18   witness could write the name on a piece of paper and mark it

19   as Court's Exhibit 1.

20           THE COURT:  That would be placed under seal?

21           MS. ARONSSON:  Correct.

22           THE COURT:  Yes.  Okay.  I think that's a good

23   solution.  That's what we're going to do, Attorney

24   Miltenberger, so then we don't have to --

25           But of course Mr. Jalbert probably doesn't have

Jalbert - Cross                                    58

1    any paper or a pen.

2              THE WITNESS:  Your Honor is correct.

3              THE COURT:  Yes.  Thank you.

4              All right.  So, Mr. Jalbert, don't write anything

5    down yet.  I'm going to ask counsel to ask the question

6    again.

7              I'm going to note that there are two objections to

8    the question, one of which was relevance that I've

9    overruled.

10             And one of which is from Golden Spring with regard

11   to confidentiality, which I'm not prepared to rule on at the

12   moment because I don't have anything in front of me to

13   address that in an educated manner.

14             So then I'm going to instruct you to answer the

15   question by writing the answer on the paper and then we'll

16   have to mark that as an exhibit under seal.  Okay?

17             So you're not going to say anything into the

18   microphone.  You're not going to say anything on the record.

19   It's just going to be on that piece of paper.  Okay?

20             THE WITNESS:  Understood, Your Honor.

21             THE COURT:  Okay.  Thank you.

22             All right.  Counsel, if you would please ask your

23   question again that was the subject of two objections.

24   BY MS. ARONSSON:

25   Q    Who is the person from Golden Spring who provided you

1    certain information relevant to the monthly operating

2    reports?

3              THE COURT:  Okay.  So that the record is clear,

4    Mr. Baldiga, on behalf of the debtor, has objected to your

5    question, Counsel, on the basis of relevance.

6              I have stated that I believe it is -- your

7    question is relevant given the prior testimony of Mr.

8    Jalbert that the information that he and his office has

9    compiled and filed in this court, the financial information

10   in the statements and schedules of affairs, and the monthly

11   operating reports, were provided to him by third parties,

12   not directly from the debtor, and that one of those third

13   parties was Golden Spring.

14             So I've overruled the objection to relevance.

15             There was a further objection by Mr. Miltenberger,

16   on behalf of Golden Spring, arguing that the disclosure or

17   answer to that question of an individual's name could -- is

18   a -- Golden Spring would like to keep confidential.

19             And I've said that I can't rule on that right now

20   without appropriate paperwork in compliance with the Federal

21   Rules of Civil Procedure.

22             So what we all discussed, and what we're going to

23   do is, Mr. Jalbert is going to write an answer to that

24   question.  He's going to hand you that document.  And then

25   you're going to hand it to the courtroom deputy and it's

Jalbert - Cross                                    60

1    going to be marked as Court's Exhibit 1 under seal.  And it

2    will stay under seal until further order of the Court.

3              Attorney Claiborn?

4              MS. CLAIBORN:  Yes, Your Honor.  If I may just

5    interject --

6              THE COURT:  We can't hear you.  Can you just pull

7    that towards you?

8              MS. CLAIBORN:  Your Honor, the U.S. Trustee has a

9    right to access to everything in the Court's file.

10             THE COURT:  Yes.  You will have that.  Yes.

11             MS. CLAIBORN:  I just wanted to make sure we would

12   have access to the --

13             THE COURT:  It's required that the U.S. Trustee

14   has access to everything under seal.  And I'm sure counsel

15   knows that, so -- but good point to make for the record.

16   And, yes, the United States Trustee's Office will have

17   access to that document.

18             MS. CLAIBORN:  Thank you.

19             THE COURT:  Okay.  Thank you.

20             All right.  So, Mr. Jalbert, could you --

21             THE WITNESS:  Your Honor, if I could just make

22   sure I follow your directions quickly?

23             THE COURT:  Sure.

24             THE WITNESS:  I'm going to write down, as you --

25   as you said.  Am I to fold the piece of paper or just hand

1    it over?

2              THE COURT:  You can just hand it to her.  It's

3    fine.

4              THE WITNESS:  Okay.

5              THE COURT:  Thank you.  You can -- now, whenever

6    you're done writing it down, just let her know, please.  Let

7    counsel know.  And then I'm going to allow her to approach

8    and take that from you.

9              And then she's going to approach the courtroom

10   deputy and hand it to the courtroom deputy who will then

11   mark it as Court's Exhibit 1 under seal.

12             Mr. Baldiga?

13             MR. BALDIGA:  All right, Your Honor.  I'd just

14   like to see it before it's handed up.

15             THE COURT:  Go right ahead.

16             MR. BALDIGA:  Thank you.

17             THE COURT:  The U.S. Trustee, you can show it to

18   the U.S. Trustee after you show it to Mr. Miltenberger too.

19        (Pause.)

20             MR. BALDIGA:  Thank you, Your Honor.

21             THE COURT:  All right.  Thank you.

22             Yes.  Would you approach, please -- and thank you

23   -- and hand that to the courtroom deputy and she will mark

24   that.

25             So we just need a minute to give the courtroom

Jalbert - Cross                                    62

1    deputy time to make that exhibit.

2            And I am indicating on the record it's 11:03 a.m.

3    I'm marking Court's Exhibit 1 under seal until further order

4    of the Court and that is so ordered on the record.  Okay?

5    So we just need a minute if you don't mind.

6        (Pause.)

7        (Mr. Jalbert's written answer to PAX attorney's

8    question marked Court's Exhibit No. 1 under seal.)

9            THE COURT:  One other thing I will mention while

10   the courtroom deputy is marking the exhibit, as I mentioned

11   to all the parties -- and I don't think you were here,

12   Counsel, the last time, but maybe you were and I apologize

13   if you were -- we have another hearing at 12:00 p.m., so we

14   have to take a break at 12:00 p.m.  And that hearing may

15   last a little while, but I don't know that for sure.  So

16   that's all.  I just wanted to let you know that.

17           Obviously, we have not a tremendous amount of time

18   between now and 12:00 p.m., but I wasn't sure if you were

19   here, and I just wanted to remind everyone that we do have

20   to take a break in the hearing today at that point in time.

21           MS. ARONSSON:  Understood.

22           THE COURT:  Okay.  Are we ready to go?  You're all

23   set?

24           THE CLERK:  Yes.

25           THE COURT:  Okay.  Thank you.

1          So go ahead.  Continue your cross-examination,

2     Counsel.

3     BY MS. ARONSSON:

4     Q    Without mentioning the name, you received at least one

5     email from this person at Golden Spring?

6     A    The firm did.  I was cc'd on one or two of them, but I

7     was not the direct.

8     Q    You testified that Melissa Francis was part of the

9     debtor's bankruptcy team, right?

10    A    Yes.

11    Q    Are you aware whether Ms. Francis works at Golden

12    Spring?

13    A    That's my understanding.

14    Q    Turning back to your work in connection with the

15    monthly operating report, do you recall Verdolino & Lowey

16    removing certain line item expenses from the draft expense

17    report that you received from Golden Spring?

18    A    Yes.

19    Q    Is this -- was this in connection with Sherry

20    Netherland expenses?

21    A    Yes.

22    Q    Because the debtor did not live there?

23    A    Correct.

24    Q    Is it your understanding that the debtor still does not

25    reside at the Sherry Netherland?

Jalbert - Cross                                          64

1   A    Yes.

2         MS. ARONSSON:  Madam Clerk, will you please

3   display PAX Exhibit 4.

4         THE CLERK:  On the screen is the Exhibit 4, page 1

5   of PAX Exhibit 4.  On the screen is page 1 of PAX Exhibit 4.

6         MS. ARONSSON:  I'd like to turn to page 14 of PAX

7   Exhibit 4.

8         (Pause.)

9         MS. ARONSSON:  Thank you.

10  BY MS. ARONSSON:

11  Q    Mr. Jalbert, do you recognize this document?

12  A    I do.

13  Q    This is the engagement letter filed in this case?

14  A    I think it was filed as an exhibit to our motion to be

15  employed.

16        MS. ARONSSON:  I'm having a little trouble

17  scrolling.

18        THE COURT:  Is the mouse -- yeah, try the mouse.

19        (Pause.)

20  BY MS. ARONSSON:

21  Q    Looking at these bullet points here, the first one we

22  covered I think.  We talked about the SOFAs and the

23  schedules?

24  A    Yes.

25  Q    Looking at the second bullet point, if retained,

1    Verdolino would provided services related to cash flow and

2    budget projections, right?

3    A    Yes.

4    Q    You discussed earlier you set up an account?

5    A    We set up the debtor's account.

6    Q    And you used your relationships to establish this

7    account?

8    A    Yes.

9    Q    If the DIP loan is approved, Verdolino anticipates

10   preparing a budget for committee counsel, financial

11   advisors, and other ordinary course professionals to

12   effectuate disbursements?

13   A    Conceptually.  We'd have to be asked actually to do it,

14   but it's something we could do.

15   Q    Are you aware that no ordinary course professionals

16   have been approved?

17   A    Yes.

18   Q    Are you -- are you aware of any other financial

19   advisors besides yourself involved in this case?

20   A    No.

21   Q    Do you understand the committee would need your help in

22   preparing a budget for its counsel?

23   A    I don't know that they would need my help, but they

24   certainly can ask.

25   Q    Turning to the third bullet point here related to

1    monthly operating reports, we have covered that, right?

2    A    I see the third bullet is being a need to opening and

3    maintaining a DIP.

4    Q    Sorry.  The fourth bullet point.  Thank you.

5    A    Yes.

6    Q    In addition, Verdolino would review the quarterly

7    reports provided by the U.S. Trustee?

8    A    Well, the U.S. Trustee, when they do their quarterly

9    report, it's really a bill based on the disbursements in the

10   preceding calendar quarter.  We would just verify its

11   accuracy.  And in the first quarter, they're never accurate.

12   It's not their fault.  They're making an estimate in

13   advance.

14   Q    This is pretty straightforward, right?

15   A    Well, if you have experience, yes.

16   Q    The fifth bullet relating to estate, federal tax and

17   state income tax, you haven't performed any connection --

18   any work in connection with this item?

19   A    In actual preparation, no.

20   Q    But you would suggest that the debtor and the estate

21   file tax returns?

22   A    I absolutely would, but there's other services related

23   to that too.

24   Q    The estate may come as currently zero?

25   A    Well, I don't know technically whether that's true or

Jalbert - Cross                                   67

1    not because I don't know what -- I don't know exactly,

2    legally, where the boat is.  And when the boat comes in, how

3    it's going to come in and how that's going to impact the

4    debtor, so I don't --

5              THE WITNESS:  I'm talking -- referring to the Lady

6    May, Your Honor, so I don't know what implications that's

7    going to have.  It might have to be reviewed by someone with

8    a tax background.

9    BY MS. ARONSSON:

10   Q    So this assume the Lady May as part of the estate?

11   A    No, I don't assume that.  If someone determined that it

12   was part of the estate, then it would be an issue.  If it's

13   going to be contributed to the estate at some point in time,

14   it's an issue.  I'm not making a declaration of whether it's

15   property or not.  I don't know that.

16   Q    Turning to the sixth bullet, assistance with the

17   reviewing, reconciling, analyzing, and if necessary

18   objecting to proofs of claims, Verdolino has not performed

19   any investigation into the pending litigation claims in this

20   matter, right?

21   A    Correct.

22   Q    Verdolino has no experience analyzing pending

23   litigation claims?

24   A    Correct.

25   Q    Regarding the seventh bullet, we already talked about

1  Verdolino has not reviewed the debtor's books and records?

2  A    Correct.

3  Q    Are you aware that there are 21 professional service

4  providers who have received a pre-petition payment in the 90

5  days before filing?

6  A    Yes.

7  Q    Verdolino has not performed any work in connection with

8  those services?

9  A    Can you -- I'm confused by your question.

10  Q    Has Verdolino prepared -- withdrawn.

11        Has Verdolino performed any work in connection

12  with the 21 pre-petition service providers?

13  A    Besides ensuring that they were disclosed in the proper

14  SOFA schedule, no.

15  Q    This is a pretty straightforward process you described?

16  A    Yes.

17  Q    Regarding the eighth bullet, the assistance with

18  necessary litigation support, Verdolino has not performed

19  any work in connection with this line item, but anticipates

20  potential miscellaneous tasks as requested by counsel?

21  A    Miscellaneous what?

22  Q    Tasks?

23  A    Tasks.  Yes.

24  Q    The final bullet, assistance with plan developments and

25  preparation, including feasibility, you are aware that the

Jalbert - Cross                                69

1    debtor already filed a plan?

2    A    I am.

3    Q    Verdolino did not do any work in connection with that

4    filing?

5    A    In connection with the original plan, correct.

6    Q    You are aware that the estate purports to have

7    approximately 3,800 in assets other than the litigation

8    claims?

9    A    Correct.

10   Q    Do you know what a best interest test is in connection

11   with the confirmation of a Chapter 11 plan?

12   A    I think so.

13   Q    Do you anticipate you would do a liquidation valuation

14   of the $3,800 in assets for a best interest test analysis?

15   A    Well, we don't know what the assets of the estate are

16   going to be at the time that someone's going to do the best

17   interest test.

18        And when it comes time to do the best interest test, we

19   will not be part of the team that does value those assets to

20   the extent that they're not already reduced to cash.

21        But we would, I'm sure, participate in preparing the

22   analysis that would be the best interest test using

23   information from an expert that is a valuation of whatever

24   the assets that need valuing.

25   Q    The only other potential asset besides the $3800 would

1    be future litigation claims?

2    A    So far.

3    Q    Again, Verdolino has no experience valuing litigation

4    claims?

5    A    Correct.

6    Q    So if the estate consisted only of litigation claims,

7    Verdolino would have a very small role in any plan?

8    A    I don't know you could draw that conclusion.

9    Q    Verdolino billed on an hourly basis, is that right?

10   A    Yes.

11   Q    As a principal, your hourly rate is $515?

12   A    Correct.

13            MS. ARONSSON:  No more questions.

14            THE COURT:  So, Counsel, you're not moving for the

15   admission of PAX Exhibit 4?

16            MS. ARONSSON:  We'll move for the admission of

17   Exhibit 4.  It was filed on the docket as Exhibit 90, Docket

18   No. 90.

19            MR. BALDIGA:  No objection.

20            THE COURT:  Well, it will be -- all the exhibits

21   will ultimately be marked as what you've indicated their

22   numbers are on your list of witnesses and exhibits.

23            So PAX Exhibit 4, there's no objection to,

24   according to the joint grid of the admission of that -- of

25   exhibit in full.

71

1              And so after today's hearing, what the courtroom

2      deputy will do is we'll compile the list of admitted

3      exhibits -- and this would be one of them -- and it will

4      have a -- the Administrative Office of the United States

5      Courts form of sticker on it that essentially says it's been

6      admitted as an exhibit full.  Okay?

7              Mr. Baldiga, did you have an --

8              MR. BALDIGA:  No objection.

9              THE COURT:  Okay.  Good.  Because it said you

10     didn't have one --

11             MR. BALDIGA:  That's right.

12             THE COURT:  -- so I just jumped to that

13     conclusion.

14             MR. BALDIGA:  No.  There was a motion, so I --

15             THE COURT:  Okay.  Thank you.  All right.

16             Nothing further?

17             MS. ARONSSON:  Nothing further.

18             THE COURT:  Okay.

19             MS. ARONSSON:  Thank you.

20             THE COURT:  Any redirect?

21             MR. BALDIGA:  Yes, Your Honor.

22     Thank you.

23                     REDIRECT EXAMINATION

24     BY MR. BALDIGA:

25     Q    Mr. Jalbert, do you speak Mandarin?

Jalbert - Redirect                                                72

1    A    No.

2    Q    Do you understand that the debtor speaks some English?

3    A    Some, yes.

4    Q    But are you able to converse directly with the debtor

5    regarding financial matters?

6    A    I've not tried, but I don't think so.

7    Q    Okay.  You know that the debtor pre the work that you

8    did did not have a checkbook, correct?

9    A    Yes.

10   Q    And that the debtor's needs on a daily basis, security,

11   food and so forth, were provided by the love and goodwill of

12   his son through Golden Spring, correct?

13   A    Yes.

14   Q    You've worked with debtors that have general ledgers?

15   A    Yes.

16   Q    Does this debtor have a general ledger?

17   A    No.

18   Q    Okay.  Does this debtor have a check register?

19   A    No.

20   Q    But it will going forward?

21   A    Yes.

22   Q    Okay.  Has this debtor been subject to audits?

23   A    Not to my knowledge.

24   Q    All right.  Does this debtor keep inventories?

25   A    Again, not to my knowledge.

Jalbert - Redirect                                          73

1    Q    So does this debtor have the type of assets that you

2    would have discussed directly with the debtor, such as

3    equipment, inventories and accounts receivable?

4    A    Not those type of business assets, no.

5    Q    Right.  So in the -- in the ordinary case, where you

6    represent or where you're assisting a corporate debtor, you

7    would sit down and talk to the controller or chief financial

8    officer or someone like that about the various assets that

9    the company has, correct?

10           MS. ARONSSON:  Objection, Your Honor.  He's

11   leading the witness.

12           MR. BALDIGA:  I am, but it's --

13           THE COURT:  I'm going to allow --

14           MR. BALDIGA:  -- foundation I guess.

15           THE COURT:  I'm going --

16           MR. BALDIGA:  And so based --

17           THE COURT:  I'm going to allow it.  Go ahead.

18           THE WITNESS:  Yes.

19   BY MR. BALDIGA:

20   Q    Okay.  And the debtor's assets here are comprised

21   primarily -- other than the clothes on his back -- of two

22   lawsuits, correct?

23   A    Two lawsuits.  And a third possible, I think.

24   Q    Okay.  A possible lawsuit?

25   A    Yes.

Jalbert - Redirect                                      74

1   Q    Okay.  So you understand that the assets, the primary

2   assets, that you were disclosing on the schedules and SOFAs

3   were three litigation claims, two pending and one possible,

4   correct?

5   A    Yes.

6   Q    And you talked about those legal claims with lawyers,

7   correct?

8   A    Yes.

9   Q    Okay.  And do you understand that the debtor's primary

10  debts here are litigation claims against him, correct?

11  A    Yes.

12  Q    PAX for example?

13  A    Yes.

14  Q    And others here in the courtroom and not in the

15  courtroom have 20 or 30 other litigation claims against the

16  debtor?

17  A    Yes.

18  Q    Okay.  And about these legal litigation claims against

19  the debtor, you spoke to the debtor's lawyers or the people

20  who handled his legal claims against him, correct?

21  A    Yes.

22  Q    So did you speak to the people for the debtor who you

23  thought had the most relevant and concrete information

24  regarding the debtor's assets and liabilities?

25  A    Yes.

Jalbert - Redirect/Recross                    75

1   Q    And did you get the information you thought you needed

2   to do a professional job in this case?

3   A    Yes.

4   Q    And obviously this case is a lot different from a

5   business with inventory and receivables and financial

6   statements and so forth, but did you go through the same

7   process, but here, talking to the people who had the most

8   relevant information?

9   A    Well, I wasn't looking for financial statements and

10  general ledgers and the like.  I was just looking for

11  information.

12  Q    Because the debtor doesn't have any?

13  A    I've never seen an individual debtor have those.

14           MR. BALDIGA:  Okay.  Nothing else, Your Honor.

15  Thank you.

16           THE COURT:  Thank you.

17           Any recross?

18      (Pause.)

19           THE COURT:  Go ahead, Counsel.  I'm sorry.

20           MS. ARONSSON:  Thank you, Your Honor.  Just a few

21  quick questions.

22                     RECROSS-EXAMINATION

23  BY MS. ARONSSON:

24  Q    Could the debtor obtain an interpreter to communicate

25  with Verdolino & Lowey?

1    A    Yes.  I'm sure it could.

2    Q    Are you aware that the debtor has an interpreter?

3    A    I am.

4    Q    I just want to ask about the basis for your

5    understanding that Golden Spring provided money out of the

6    love and support of a family member.  What's the basis of

7    your understanding of that knowledge?

8    A    From talking with the legal team.

9              MS. ARONSSON:  Thank you.  Nothing further.

10             THE COURT:  Okay.  Thank you.

11             You can step down, Mr. Jalbert.  Thank you.

12             THE WITNESS:  Thank you, Your Honor.

13             THE COURT:  Thank you very much.

14        (Witness excused.)

15             THE COURT:  Mr. Baldiga, do you have another

16   witness?

17             MR. BALDIGA:  I do not, Your Honor.  Thank you.

18             THE COURT:  Okay.  Thank you.

19             Mr. Friedman?

20             MR. FRIEDMAN:  No, Your Honor.

21             THE COURT:  So both sides are resting other than

22   your arguments?

23             MR. BALDIGA:  Yes, Your Honor.

24             THE COURT:  Okay.

25             MR. FRIEDMAN:  Your Honor, one moment.  We're just

77

1   conferring to see if there's anything else we'd seek to move

2   into evidence.

3   　　　　THE COURT:  Okay.  Yes.  That is -- as I think

4   I've told everyone at the last hearing, I'm happy to have --

5   and I appreciate that the parties took the time and complied

6   with the Court order to submit lists of witnesses and

7   exhibits, which you're required to do -- but the Court is

8   not going to look at any exhibits unless they're admitted as

9   full exhibits.

10  　　　　And even if they are admitted as full exhibits,

11  I'm not bound to look at anything that you didn't point out

12  to me that was important in your presentation with regard to

13  these issues.  Okay?

14  　　　　Does any -- so I'm -- if anyone has anything they

15  want to make sure is in the record, then now would be the

16  time to take care of that issue.

17  　　　　(Pause.)

18  　　　　MS. ARONSSON:  Thank you, Your Honor.  Nothing

19  further from us.

20  　　　　THE COURT:  Okay.  Thank you.

21  　　　　Nothing further from the debtor?

22  　　　　MR. BALDIGA:  Correct, Your Honor.

23  　　　　THE COURT:  Okay.  All right.  So then the

24  application to retain Verdolino & Lowey is ripe for

25  adjudication.  I'm not going to adjudicate it right now.  I

1    obviously have to look at what you all just talked about on

2    the record, but I'm sure that it's something that I will be

3    able to do in short order.  Okay?

4             MR. BALDIGA:  Thank you, Your Honor.

5             THE COURT:  All right.  Thank you.

6             Now, with regard to the DIP financing motion.

7    Again, that is a matter that I don't know how long you

8    anticipate the questioning and the evidence to be on the DIP

9    financing motion, so I have a couple of questions.

10            One of the other matters on today's calendar is

11   the application to employ the creditors committee counsel.

12   I didn't see any objections to that application.

13            Is that correct?

14            MS. CLAIBORN:  Your Honor, the U.S. Trustee filed

15   a statement of no objection, but that just asked for two

16   small edits to the order that --

17            THE COURT:  Okay.

18            MS. CLAIBORN:  -- were to include language that

19   was in the supplement filed by Attorney Goldman in support

20   of the application.

21            THE COURT:  So is there a revised order on the

22   docket?

23            MS. CLAIBORN:  I haven't seen one, Your Honor.

24            THE COURT:  Okay.  So I'm asking any party, does

25   any party have an objection to the application to employ

79

```
 1    Pullman & Comley as counsel to the Official Committee of

 2    Unsecured Creditors, ECF 157?

 3              MR. BALDIGA:  Not by the debtor.  We support the

 4    application.

 5              THE COURT:  Okay.  Thank you.

 6              None by Pax?

 7              MR. FRIEDMAN:  No, Your Honor.

 8              THE COURT:  Okay.  Anyone else wish to be heard on

 9    the application to employ Pullman & Comley?

10              Attorney Goldman, you're going to be submitting a

11    new order, is that what Attorney Claiborn is saying?

12              MR. GOLDMAN:  Yes, Your Honor.  As long as it's in

13    my supplemental declaration, then no problem in revising the

14    order to comport with what's in the supplement.

15              THE COURT:  Okay.  How much time would you like to

16    submit that order?

17              You can have as much time -- I mean, I'm going to

18    grant the application subject to the submission of a revised

19    order.

20              MR. GOLDMAN:  Your Honor, I could submit it by

21    tomorrow.

22              THE COURT:  Sure.  I'll give you until Friday,

23    how's that?

24              MR. GOLDMAN:  Thank you.

25              THE COURT:  The 29th.  All right.
```

80

1         Then, the other thing that I didn't mention to Mr.

2    Kindseth -- and I'm going to mention to Mr. Goldman and

3    Attorney Claiborn -- with regard to the monies that we

4    talked about this morning, the $37 million that's at the

5    Zeisler & Zeisler client funds account and the monies that

6    will be held by Attorney Goldman if the DIP loan is

7    approved, bank statements every month have to be submitted

8    at least to the Office of the United States Trustee and

9    among the parties to evidence that those funds are there.

10   Every month.

11        And I'm so ordering that on the record right now.

12   And I can go back to this hearing.  And if someone fails to

13   comply with that, then they'll be in violation of a court

14   order.  We need to ensure that the funds are there in the

15   amount that are supposed to be there.

16        Now, with regard to the $37 million, there

17   shouldn't be any change in that amount other than a gain of

18   some interest hopefully unless and until there's a further

19   order when the boat is returned.  That's my understanding.

20   Mr. Kindseth's working on the order, but that's what --

21   that's the mechanics.

22        MR. BALDIGA:  Yes.  And the order that you see --

23   that you will see, Your Honor, provides that there is a

24   national bank that will be acting as co-agent.

25        So Mr. Kindseth is holding the money just so there

81

1   wouldn't be any concern in the courtroom today whether the

2   money was really coming or whatever there were -- from the

3   last hearing, we spent way too long on those types of

4   concerns, so no one has to have that concern.  But it's not

5   the permanent solution.  The permanent solution for a month

6   or two is to have the money go into a bank as more

7   customary.

8          THE COURT:  However it works is fine.  I just want

9   evidence --

10          MR. BALDIGA:  Understood.

11          THE COURT:  -- that's submitted to demonstrate

12   that those funds are there.  And it's got to be submitted,

13   you know, every month.

14          And I guess we will figure out -- it might not be

15   as cumbersome with the 37 million if the boat is returned in

16   two months, but with regard to the DIP financing, there's

17   going to be in that order, if there is an order, it's going

18   to say that I need -- the Court -- there has to be evidence

19   supplied of the amount of the funds in the account every

20   month.

21          I know the DIP orders may have some more specifics

22   with regard to what's being paid and drawn down and all

23   that, all those issues, but that was the other thing that I

24   wanted to raise.

25          Now, with regard to the DIP financing evidentiary

82

1   hearing, I'm happy to start right now, but we have to end at

2   noon.

3           So the other thing we can do is you mentioned at

4   the beginning of the hearing that there is some discussion

5   about how we were going to set up the hearing on the motion

6   to dismiss, so I don't -- whatever way you want to proceed,

7   I have no problem.

8           MR. BALDIGA:  Well, this might be a good time just

9   to clear up the Brown Rudnick application, that there's no

10  evidence on that, and that could be taken care of.  I think

11  there's a --

12          THE COURT:  I thought there was --

13          MR. BALDIGA:  -- reservation of rights that wants

14  to be made.

15          THE COURT:  Okay.

16          MR. FRIEDMAN:  Yeah.  I think --

17          THE COURT:  But isn't there an order that you need

18  to fix or did you fix that order yet?  Or you agreed to?

19          MR. FRIEDMAN:  I think the order is on the docket,

20  Your Honor.  We have a very short reservation of rights and

21  then I think we could do the pre-trial -- the pre-motion,

22  you know, conference before noon.  And then we're afternoon

23  to --

24          MR. BALDIGA:  I think that that's right.

25          MR. FRIEDMAN:  Okay.

83

1          MR. BALDIGA:  Yeah.

2          MR. FRIEDMAN:  So --

3          THE COURT:  I didn't hear what you said now.

4          MR. FRIEDMAN:  Sorry, Your Honor.

5          THE COURT:  That's okay.

6          MR. FRIEDMAN:  Peter Friedman from O'Melveny &

7    Myers.

8          We don't have an objection to Brown Rudnick's

9    retention per se.  We just want to make clear that, you

10   know, we do believe that Lamp -- that Mr. Kwok was

11   restrained by Judge -- Justice Ostrager's retraining order

12   pre-petition from transferring his assets.

13         We believe that by encumbering himself with the

14   Lamp loan to pay Brown Rudnick's retainer that he violated

15   that restraining order.

16         Brown Rudnick reads Justice Ostrager's order

17   differently than we do.  We believe that his order was

18   specific as to two assets, but also had a broader, sweeping

19   clause that made it clear that any outside of the ordinary

20   course transaction was prohibited.

21         Brown Rudnick, Mr. Baldiga, has cited to a portion

22   of a transcript that he believes supports his view of the

23   language that was specific as to two assets.

24         We believe that page 24 of that transcript, which

25   was attached to their response, says that Justice Ostrager

84

1    says I want to know if any transaction is going to take

2    place in which Mr. Kwok is the guiding hand that's something

3    other than an ordinary course of business transaction.  So

4    it wasn't so limited.

5         And so we just want to reserve rights that to the

6    extent, you know, there's litigation in the future over

7    whether there was a breach of that and whether there's any

8    damages or there's any liability for anybody who

9    participated in that breach or is tort related to the

10   breach, that nothing in the retention order absolves anybody

11   of liability for that.

12        We have no objection to retention if it's to the

13   reasonable staffing in light of this case.  We just want to

14   make clear that, you know, we believe it was one final act

15   of contempt, one last finger in the eye, right before filing

16   of bankruptcy.

17        And note that we've never received the Lamp

18   Capital loan despite numerous requests to Mr. Lamp's -- I'm

19   sorry -- to Lamp Capital's lawyers.  They've produced

20   nothing.  We'll go back at it.

21        But, you know, the whole circumstances around that

22   episode we believe are very troubling and that's why I

23   wanted to make a reservation of our rights.

24        THE COURT:  And you're going to -- my

25   understanding -- and I didn't look at it, okay -- but

85

1    sometime last night or this morning, there was an order

2    submitted with regard to the Brown Rudnick application?

3           Is that -- is Attorney Friedman in agreement with

4    that or not -- that order?

5           If not, then you both have to talk and tell me

6    when you're going to -- you think you're going to resolve

7    that order.

8           (Pause.)

9           MR. FRIEDMAN:  (Indiscernible.)

10          THE COURT:  Certainly.  Take your time.

11          (Pause.)

12          MR. FRIEDMAN:  So, Your Honor, I think we do have

13   an issue with the order.  We just want a reservation of

14   rights with respect to any party for receipt of those funds.

15          We have no objection to the retention and to their

16   filing fee applications, but we don't think the retention

17   should wipe out the prospect that there might be liability

18   for having received these funds.

19          THE COURT:  So you're going to have to add that

20   reservation of rights language to the order, correct?

21          MR. FRIEDMAN:  Yes.  Unless that reservation is

22   acceptable on the record?

23          MR. BALDIGA:  If I could address it, Your Honor,

24   please.

25          THE COURT:  Sure.

1          MR. BALDIGA:  Unless Mr. Goldman wants to argue

2     first.

3          MR. GOLDMAN:  Well, I was just going to say,

4     speaking of reservations, we -- our resolution of the DIP

5     motion -- I should have mentioned this at the outset -- is

6     really based on a resolution of the boat delivery order I'll

7     call it -- which they're working on --

8          THE COURT:  I'm sorry.  I didn't hear you.  Of the

9     what order?

10         MR. GOLDMAN:  The boat delivery.

11         THE COURT:  Okay.  The relief from stay agreed

12    upon order?

13         MR. GOLDMAN:  Correct.  Correct.  Which we're

14    confident they'll be able to do.  It still hasn't been inked

15    so to speak, and so before we actually formally withdraw

16    objections, I would like to see that on the record.

17         THE COURT:  Well, right now we're talking about

18    Brown Rudnick.

19         MR. GOLDMAN:  Well, aren't we -- that is linked to

20    the resolution of the DIP motion.  In other words, we

21    resolve the DIP motion and we also agree to withdraw our

22    objections to all the retentions.

23         Of course the resolution of the DIP motion depends

24    on the resolution of this boat delivery order that we're

25    working on.  So they're all linked together is basically

1    what I'm saying.

2              And so I would just appreciate if we could wait

3    until after the lunch break when we are absolutely certain

4    that the boat -- the PAX motion for relief from stay has

5    been resolved and then we can formally withdraw all these

6    objections.  That's all I'm saying.

7              THE COURT:  Okay.  Mr. Baldiga?

8              MR. BALDIGA:  Well, we've been trying to work and

9    have actually been able to work hand in hand with Mr.

10   Goldman on so many things that I don't want to -- I mean, I

11   accept his premise that it would be easier perhaps to know

12   that we are all in accord on the boat order.

13             It won't affect PAX's objection because PAX's

14   position on everything, right, will continue to be the same

15   regardless.

16             So the -- I can address PAX's reservation of

17   rights if the Court so wishes or if the Court wants to wait

18   until after lunch, after the boat issue, to do that, we're

19   happy to do that.  Whatever the Court --

20             THE COURT:  All right.  Why don't we just see what

21   happens after the -- what will -- what should be essentially

22   an agreed-upon order resolving PAX's motion for relief from

23   stay, correct, that's what it is?  That's what Mr. Kindseth

24   is working on?

25             MR. BALDIGA:  Yes.

88

1         THE COURT:  Okay.  So why don't we wait for that.

2         So then the only other issue is the -- the interim

3   professionals, everything, Mr. Goldman, you reserve your

4   rights on everything until -- all right.

5         So let's just start with the DIP financing

6   evidentiary hearing.

7         Or if you -- if all of you would rather take a

8   break and not start, we can do that too.  Whatever works for

9   all of you.

10        MR. FRIEDMAN:  Your Honor, may we do the pre-trial

11  discussion of the dates?

12        THE COURT:  On the motion to dismiss?

13        MR. FRIEDMAN:  Yes.

14        THE COURT:  Well, that's what -- that's what I had

15  said a few minutes ago I thought made some sense.

16        MR. FRIEDMAN:  Yes.  So, Your Honor, we have --

17  obviously pending the Court's schedule, we have -- we've

18  reached out to counsel for other parties this week and we

19  made a proposal.  We got some feedback.  People asked us for

20  a little more time, which we were -- you know, even though I

21  don't think we have a statutory obligation to provide it, we

22  were willing to do that.

23        What we would propose is that there be a -- and I

24  tried to accommodate as many people as I could -- May 16th

25  would the date on which parties need to file oppositions if

89

1    acceptable to the Court.

2            We would ask for the ability to file a reply on

3    May 25th.  We would ask to be able to file a reply on the

4    25th of May.

5            And then we would ask for a hearing on the -- to

6    reserve the 1st, 2nd and 3rd --

7            THE COURT:  All right.  I have a take a look at

8    the calendar.

9            MR. FRIEDMAN:  -- if that works for the Court.

10           THE COURT:  Just let me take a look at the

11   calendar before we go any further.

12       (Pause.)

13           THE COURT:  I have some time on the 1st.

14           MR. FRIEDMAN:  Okay.

15           THE COURT:  But there's a period of time where I'd

16   have to take a break again.  I have time on the 2nd.  And I

17   have at least the morning of the 3rd.

18           MR. FRIEDMAN:  Okay.  That certainly works for us,

19   Your Honor.

20           I would also ask, given the potential complexity,

21   if it would be okay to propose a submission of post-trial

22   findings of fact and conclusions of law for any party the

23   10th.  Or if the hearing lasts longer than the 3rd, you

24   know, seven days after the conclusion of the hearing if the

25   Court believes that would be helpful.

90

1          THE COURT:  I certainly think it could be, so I

2     will tell you at the end of the hearing if I would like

3     that, but I think it's a possibility.  Sure.

4          MR. FRIEDMAN:  And, Your Honor, what I would also

5     propose is that the parties, you know, by the 20 -- Friday

6     the 27th, if this works for the Court, if the Court would

7     like it to be the 26th, that the parties exchange, you know,

8     witness lists and exhibits and provide the Court with a --

9     you know, the appropriate grid if possible by that date as

10    well and listing objections, and that the parties be ordered

11    to meet and confer on all pre-trial procedures in good

12    faith.

13         You know, my understanding is that Mr. -- that Mr.

14    Kwok's counsel believes that this schedule, which we believe

15    is actually a substantial accommodation to people, should be

16    contingent on no more 341 hearings, a cessation of Mr.

17    Kwok's 341 obligations, which is due -- which is expected to

18    continue this Friday -- I don't see why that should be an

19    issue.

20         We certainly are seeking to depose Mr. Kwok again

21    in connection with the -- with the motion to dismiss or

22    motion to appoint a trustee.  We're seeking some other

23    discovery.

24         I'd note that one issue we've had -- and I'm not

25    asking the Court to do anything other than to know about it

1    -- is we asked Golden Spring last Thursday if they would

2    express -- if they would accept service of the subpoena on

3    Miles Kwok's son.  We've heard crickets.

4         And so not a surprise, but given the purported

5    centrality of Miles' son to this case and his support of

6    beneficence and love, I guess if they don't want to accept a

7    subpoena, we can try to do it in the Hague.  And if we have

8    to maybe we won't complete on that time, but the Court can

9    draw whatever conclusions it wants to from Mr. Kwok's son's

10   refusal to participate in good faith in discovery.  So that

11   shouldn't take six days to find out from somebody if a

12   subpoena can be accepted.

13        That's our proposed schedule.

14        You know, we hope we don't have discovery disputes

15   to bring to the Court's attention.  If we do, we will.

16   We'll work with Mr. Birney on how to tee those up correctly

17   for you.  And I believe we've provided everybody with copies

18   of the discovery we've served.  If anybody hasn't, please

19   let me know.

20        THE COURT:  Okay.  Thank you.

21        Attorney Claiborn?

22        MS. CLAIBORN:  Thank you, Your Honor.

23        The U.S. Trustee, as you know, has a pending

24   motion for an examiner or in the alternative the appointment

25   of Chapter 11 trustee.

92

1          And the dates that Attorney Friedman has just

2    outlined are fine for the U.S. Trustee.  And I would assume

3    that scheduling is applicable to both PAX's motion and the

4    U.S. Trustee's motion.

5          THE COURT:  Yes.  Except I will be addressing the

6    PAX's motion first.

7          MS. CLAIBORN:  Understood, Your Honor.

8          THE COURT:  Okay.

9          MS. CLAIBORN:  With respect to the point about the

10   341 meeting, that request was just made to me this morning.

11   I haven't had a chance to confer with my office.  I haven't

12   had a chance to confer with counsel for the parties who are

13   here today.  So I don't have an answer as to whether or not

14   the U.S. Trustee is willing to delay that 341 meeting to a

15   different date.

16         THE COURT:  Okay.

17         MR. BALDIGA:  I'm sorry.  I missed what you just

18   said.  I couldn't hear.  I'm sorry.

19         MS. CLAIBORN:  I don't have an answer for you as

20   to the 341 meeting date.

21         THE COURT:  All right.  Anyone else wish to be

22   heard on the scheduling of the motion to dismiss and the --

23   I'm going to reiterate it, but go right ahead.

24         MR. BALDIGA:  Well, the -- I think the debtor is

25   not available the first week of June so, I think,

93

1    unfortunately, like so many other things, we're probably

2    going to have to spend some time over the lunch break to try

3    to pin those dates down.

4           THE COURT:  All right.  Well, why don't you talk

5    about because I'm not sure why the debtor would need to be

6    here on the motion, I mean, unless you're going to call him

7    as a witness.

8           MR. PERLMAN:  We certainly are, but this is news

9    to me because I proposed this schedule to Mr. Aulet before.

10          THE COURT:  Okay.  Well, then I'll let you all

11   talk about it.

12          But I will say one thing in particular, that it's

13   going to be shortly thereafter if it's not those days.  I've

14   already said to Attorney Friedman --

15          MR. BALDIGA:  We understand that.

16          THE COURT:  -- Attorney Friedman the last hearing,

17   and he's agreed, and I don't know if he's expressly

18   consented on the record again today, but under the -- under

19   the code, I have to hold that hearing within 30 days unless

20   the movant, the movant expressly consents to the extension

21   of time, to a continuance for a specific period of time,

22   which Attorney Friedman has done right now, but I don't know

23   if he's going to do it when you have your discussions.  So

24   you're going to have to have your discussions.

25          MR. FRIEDMAN:  Honestly, Your Honor, given that

94

1    the debtor doesn't have a job, doesn't have a business to

2    operate, I can't imagine if there's a justifiable reason for

3    not being here.

4         THE COURT:  Well, I'm going to let you all talk

5    about that.

6         MR. BALDIGA:  I'd appreciate a chance just to talk

7    with the client, Your Honor.

8         THE COURT:  I'm going to let you all talk about

9    that.

10        MR. BALDIGA:  Thank you.

11        THE COURT:  Okay?

12        So let me just again go through what is on our

13   calendar today.  I think it makes complete sense at this

14   point not to start the DIP evidentiary hearing if we're only

15   going to have 15 minutes.

16        Does that make sense to anyone?

17        MR. BALDIGA:  Yes.  Correct.

18        THE COURT:  I think you can take the break and use

19   the time.

20        Now, I don't know, you've all been here in the

21   hallway longer than I've been sitting here, but I assume the

22   conference rooms are unlocked.  There's, you know -- there

23   is a hallway to talk in except there are other agencies so

24   you have to be somewhat quiet if possible.  There's a room

25   back here with vending machines, but it has no tables and

95

1    chairs.  There's a place next door to eat with tables.

2            I mean, you know, I would think that I would be

3    surprised if I'm ready to see you again before one o'clock.

4    Okay?

5            MR. BALDIGA:  Understood.

6            THE COURT:  It may be even a little longer, but I

7    don't think it should be much longer than that.

8            I'm just checking to make sure we have -- we are

9    addressing in one way -- some way, shape or form everything

10   on today's calendar, and I think we have.  Although we need

11   to -- a lot of it is linked to Mr. Kindseth's revisions to

12   that order.

13           So does anyone else wish to be heard before we

14   recess in this case, in the Kwok case?

15       (No audible response.)

16           THE COURT:  No?  Okay.

17           Well, then I'm going to take a recess until 12

18   noon for the other matter.  Again, I would be surprised if I

19   was available to see you before one o'clock.  I think that

20   you should expect one o'clock at the earliest.

21           If you are all talking and you need more time and

22   we are completed with the other hearing, then you can let

23   the courtroom deputy or someone in the clerk's office know,

24   and I will, you know, take that into consideration.

25           But if we are going to have the evidentiary

96

1    hearing this afternoon on the DIP, which I think we are,

2    then I would like to start sooner as opposed to later

3    understanding that you all may be talking about different

4    things.

5          MR. BALDIGA:  Understood.

6          THE COURT:  Okay?

7          MR. BALDIGA:  We'll keep the courtroom deputy

8    posted, Your Honor.

9          THE COURT:  Okay.  Great.

10         MR. BALDIGA:  Thank you.

11         THE COURT:  All right.  All right.  Thank you,

12   all.

13         Then Court is in recess until 12 p.m.

14      (Recess from 11:45 a.m. until 1:10 p.m.)

15         THE CLERK:  Case No. 22-50073, Ho Wan Kwok.

16         THE COURT:  Sorry about that.  We're back on the

17   record after taking a recess in the Kwok case, which we left

18   the court about 11:45 or so a.m.  It's now 11:12 [sic] p.m.

19   and we're back after the morning session where we had some

20   evidence presented in connection with the application of

21   Verdolino & Lowey.

22         And, Attorney Baldiga, are we moving to go forward

23   with the evidentiary hearing on the DIP financing motion?

24         MR. BALDIGA:  Yes, Your Honor.  But before we do,

25   we can report as to the boat, because remember how that

97

1   affected everybody?

2               THE COURT:  Yes.

3               MR. BALDIGA:  It was sort of a --

4               THE COURT:  Oh, Mr. Kindseth is back.

5               MR. BALDIGA:  -- connective string.

6               We do have, and Mr. Kindseth can report, and

7   should, a fully conformed, agreed order as to the boat that

8   resolves the lift stay motion.

9               THE COURT:  Okay.

10              MR. BALDIGA:  And that in turn resolves all

11  objections I believe that the committee has to everything

12  else today.  And so we proceed in full accord.  But he

13  should -- Mr. Goldman should report and Mr. Kindseth should

14  report.

15              And then -- and then I think we do move to the

16  relief from stay.

17              THE COURT:  Okay.  Mr. Goldman and Mr. Friedman?

18              MR. GOLDMAN:  Yeah.  I would --

19              THE COURT:  So everyone's in agreement with this

20  order on the relief from stay?  I mean, that's wonderful if

21  it's true.

22              MR. GOLDMAN:  Yeah.

23              THE COURT:  I just want to make sure that's

24  accurate.

25              MR. FRIEDMAN:  Yes.  We're in agreement, Your

98

1    Honor.  We have reached an agreement.  An order can be

2    submitted.  We're pleased with the outcome.

3           MR. KINDSETH:  Yes.  Just in terms of the

4    logistics, Your Honor, we're actually not going to be in a

5    position to submit it to this court at this moment.  We're

6    submitting it to the escrow agent, U.S. Bank, for their

7    counsel, Shipman & Goodwin, to review it and ensure that

8    they don't have any issue with it.  I'm hoping to hear back

9    later today or tomorrow.

10          Once they're good with it, we're going to fund the

11   escrow, and we will submit the order hopefully Friday or

12   Monday at the very latest.

13          THE COURT:  Okay.  I mean, I think that's fine.

14   And that's -- that's a positive development obviously in the

15   case.

16          So, Attorney Goldman?

17          MR. GOLDMAN:  I was going to say would it be

18   appropriate to put just the basic terms of the order on the

19   record so we -- the Court is aware and we have an enforcable

20   agreement here?

21          MR. KINDSETH:  I'm prepared to do that, Your

22   Honor, if you'd like.

23          THE COURT:  Go right ahead.

24          MR. KINDSETH:  So the proposed, stipulated order

25   provides that my client will return the vessel known as the

99

1    Lady May to the navigable waters of Connecticut by July

2    15th.  That may or may not address the various repairs that

3    are being performed now.

4            We're going to try to complete as much as

5    possible.  The repairs that are not complete will be

6    addressed through a reserve, a repair reserve, a separate

7    one entirely, and there's a process through which that

8    reserve will be established.

9            To secure my client's performance of the delivery,

10   we will be posting $37 million with a third-party escrow

11   agent, U.S. Bank.  We've worked out the terms of an escrow

12   agreement.

13           And subject to final approval by U.S. Bank and the

14   party's signature, we'll be providing bi-monthly progress

15   reports with respect to the location of the yacht, and the

16   repairs, status of arrangements for the delivery of the

17   yacht, and the anticipated delivery date.

18           The way the escrow is going to be handled is that

19   my client will file a certification with this court and

20   there will be a period of time for parties to object to the

21   certification.  The certification, you know -- the

22   certification is pertaining really just to the delivery of

23   the yacht timely to Connecticut.

24           As well as an order to ensure that the yacht stays

25   in Connecticut, we've agreed in that certification that

1    would be certifying that we served the then captain of the

2    vessel as well as the yacht management company with that and

3    we'll be filing the certification of service with the Court

4    as part of that process.

5         We'll also have the repair reserve in place and

6    that is a requirement of the certification.

7         So if those elements, which are described as

8    certification conditions, are met and we certify it, we'll

9    provide 15 days to object.  And if nobody objects, my client

10   will be allowed to provide that HK certification to the

11   escrow agent, which is the triggering event for the return

12   of the $37 million.

13        If there is an objection, then we'll appear before

14   Your Honor.

15        And there's -- depending upon the severity of the

16   default, there are different consequences.  Obviously if the

17   boat's not here, it's the most severe consequence.  The

18   other consequence -- consequences for the other conditions

19   if they're not met, there's remedies in place that are

20   proportionate to the default.

21        My client will maintain insurance and provide

22   proof of insurance.  There's a provision in here requiring

23   my client and agents and representatives and so forth to

24   continue to maintain the boat here in Connecticut and

25   subject to further order of this court.

1          And there is a provision in here that says that if

2     the boat isn't delivered timely and we are unable to

3     establish extenuating circumstances -- and they're

4     delineated very clearly -- then the funds, the 37 million

5     escrow agent will be directed by order of this court to turn

6     over those funds to an account designated by this court to

7     be held in substitution for whatever the estate's rights are

8     in the Lady May, those rights will be against the $37

9     million.

10          And then, as I said, we're establishing the repair

11    reserve in accordance with the process set forth in the

12    order.  And so I believe that is the most salient terms of

13    the agreed-upon order.

14          MR. GOLDMAN:  Yeah.  I appreciate the recitation.

15    The committee is in agreement with those terms and we'll

16    follow it up obviously with the written order.

17          And I'll leave it to PAX.

18          MR. FRIEDMAN:  They're saying, Your Honor, there

19    are also provisions of what happens upon dismissal, if the

20    case is dismissed while the boat is in the jurisdiction or

21    the escrow's jurisdiction.  Those are also in there.

22          I do want to say -- not to mix metaphors -- but

23    the boat is not -- I mean, the boat should never be the tail

24    that wags the dog in this case.  The boat is important

25    because it's an asset.  This is not the end all and be all

1    of what Mr. Kwok has to pay his creditors.

2              I just want to be really clear from our

3    perspective that this is important, but this is just a

4    beginning step in the pursuit of getting paid for people who

5    have substantial judgments against Mr. Kwok.

6              MR. KINDSETH:  It's still progress.

7              THE COURT:  Understood.

8              MR. GOLDMAN:  So with that, Your Honor, the

9    committee can formerly withdraw its objections to the DIP

10   motion as well as the retention applications and lend our

11   support to the interim DIP order that's being advanced for

12   today.

13             I can say with certainty, Your Honor, that it is

14   absolutely critical that the committee have this funding in

15   place in order to function properly and do what it's

16   supposed to do in a case like this, especially in a case

17   with this profile.

18             We're expected to investigate potential assets of

19   this estate.  And I can ensure Your Honor that we have been

20   actively engaged in interviewing financial advisors to

21   assist us in that endeavor and we will be submitting an

22   application shortly to get the Court's approval to retain

23   one who will be highly capable, skilled and experienced in

24   what we need them to do.

25             THE COURT:  Okay.  Thank you.

1          Mr. Kindseth, I know you said this already, but I

2   don't think I -- I didn't write it down, so I don't remember

3   -- what date do you think you're going to submit this order

4   to the Court?

5          MR. KINDSETH:  Friday or Monday.

6          THE COURT:  All right.  So I'll give you until

7   Monday.  What is Monday?  May 1st of 2nd?  Oh, it's the 2nd.

8   Is it the 2nd?  Yeah.  It has to be in by Monday.  See,

9   yeah, you have to because -- all right.  Yeah.  On or before

10  May 2nd.  Okay?  All right.

11         But what were you going to say?  I'm sorry.

12         MR. KINDSETH:  May I be excused?  My client

13  doesn't have a stake in the afternoon's proceedings.

14         THE COURT:  You can be excused if everybody else

15  thinks that you don't need to be here.

16         MR. BALDIGA:  Just with the clarification, I think

17  it's assumed in all of the comments of everybody so far, but

18  the stay will continue in force until entry of the order?

19         Okay.  Assuming that it does get submitted on a

20  timely basis?

21         THE COURT:  Yes.

22         MR. BALDIGA:  Okay.  Thank you.

23         THE COURT:  I mean, but it --

24         MR. BALDIGA:  I just wanted the record to be

25  clear.

1          THE COURT:  -- but if it doesn't get timely

2     entered, then there isn't any stay anymore under 362(e)(2),

3     so I would assume you are motivated to get it timely

4     entered.

5          MR. BALDIGA:  Yes.

6          THE COURT:  Okay.  All right.  Thank you.

7          No one else wants -- needs to have Mr. Kindseth

8     here for this afternoon's hearing, is that correct?

9          (No audible response.)

10          THE COURT:  Okay.  Thank you, Mr. Kindseth.

11          MR. KINDSETH:  Thank you, Your Honor.

12          THE COURT:  All right.  So let's go back before we

13     start the evidentiary hearing given the committee's position

14     now of withdrawing its oppositions to certain things.

15          So the application to employ Brown Rudnick, the

16     committee has withdrawn its objection.

17          PAX still wants to reserve its rights, correct?

18          MR. FRIEDMAN:  Yes, Your Honor.  I've conveyed to

19     Mr. Baldiga we have no issue with the order.  Actually

20     looking at the order I don't think the order releases the

21     kind of claims that we want to reserve, and so I'm not going

22     to ask Mr. Baldiga to agree in the order to the language.

23          I just want to note for the Court and for

24     everybody else that that's our position.

25          And, you know, Brown Rudnick has their own

1  position with the order as proposed is fine.

2          THE COURT:  So the order that was submitted --

3          Thank you, Attorney Friedman.

4          So the order that was submitted sometime last

5  night or -- I don't -- I know there was several, but is that

6  the order that you're looking to have entered?

7          MR. BALDIGA:  Yes.  Unless it's -- yes, Your

8  Honor.  And just for the record, we're -- we don't, the

9  debtor doesn't, and Brown Rudnick doesn't agree to anything

10  that's not in the order.  And it's that simple.

11          MS. CLAIBORN:  Your Honor, just to complete the

12  record, I just wanted to let the Court know that the U.S.

13  Trustee has reviewed the order that was uploaded last night

14  and it does resolve the U.S. Trustee's objections.

15          THE COURT:  Thank you.

16          So if I'm correct, that's ECF No. 259 that was

17  filed last night, correct?

18      (No audible response.)

19          THE COURT:  Okay.  If you just give me one minute,

20  please.

21      (Pause.)

22          THE COURT:  All right.  So I haven't looked at ECF

23  259 because it was submitted last night, which is fine.  I'm

24  going to take a look at it right now and then tell you

25  whether I think there's any issues.

1          (Pause.)

2                THE COURT:  The order looks fine to me.  So ECF

3     259 will enter and the application to approve Brown Rudnick

4     as counsel to the debtor is approved -- is granted.

5                MR. BALDIGA:  Thank you, Your Honor.

6                THE COURT:  Okay.  Thank you.

7                So let me just make sure we're getting to

8     everything we need to get to before we get to the

9     evidentiary hearing on the DIP motion.

10          (Pause.)

11               THE COURT:  So the bar date order then, everyone's

12     fine with that other than the Court putting in a bar date?

13               MR. BALDIGA:  I believe so, Your Honor.

14               THE COURT:  Okay.  So I'll take a look at that

15     after today.  That will enter though tomorrow or Friday at

16     the latest.  Okay?

17               MR. BALDIGA:  Thank you.

18               THE COURT:  I would assume -- I shouldn't say

19     that.  I haven't looked at the order, Attorney Baldiga, but

20     is -- who's serving that bar date order?  Are you serving

21     it?  Is the debtor serving it?

22               MR. BALDIGA:  The debtor.

23               THE COURT:  Okay.  Okay.  I'll take a look at

24     that.

25               MR. BALDIGA:  Thank you.

1          THE COURT:  And I think it probably will have no

2     problem other than me possibly changing your bar date for a

3     little bit more time.

4          MR. GOLDMAN:  I just wanted to mention the

5     committee did have a limited objection to that.  And I

6     hadn't been following the variations of the proposed orders,

7     but did they take into account our objections?

8          MR. BALDIGA:  We did.

9          MR. GOLDMAN:  Okay.  All right.

10         THE COURT:  Okay.

11         MR. GOLDMAN:  Thank you.

12         THE COURT:  The motion to establish procedures for

13    entering compensation and reimbursement expenses, is

14    everyone in agreement with that now as well?

15         The committee, you had an objection, did you, or

16    not?

17         MR. GOLDMAN:  I'm sorry, Your Honor.  Could you

18    repeat that.

19         THE COURT:  The motion to establish procedures for

20    interim compensation and reimbursement of expenses.

21         MR. GOLDMAN:  No objection.

22         THE COURT:  Did the U.S. Trustee have an

23    objection?

24         MS. CLAIBORN:  Your Honor, we have been looking on

25    some language.  And I haven't had a chance to review what

1    just got uploaded in the last hour.  And subject to me

2    reporting back to Your Honor maybe by the end of today, I'm

3    not -- I think we probably could lose that loop.  I'd just

4    need to read it.

5          THE COURT:  So leave that matter open essentially

6    for now?

7          MS. CLAIBORN:  Yes.

8          MR. BALDIGA:  That's right.  But we all think it's

9    just a matter of looking at language.

10          MS. CLAIBORN:  It's just a matter of me looking at

11    their language.

12          MR. BALDIGA:  We've worked out everything.

13          THE COURT:  So you're going to -- everyone, you

14    know, I will tell you these matters, these motions, I'll

15    look at the language.  But, you know, I know the parties are

16    asking the Court to do something that's -- essentially

17    shorten the time and the procedures that are required by the

18    code for fee applications.  I'm reluctant to do that in a

19    lot of cases for many, many reasons.

20          I'll do it in this case if everyone is in

21    agreement.  But I will tell you if there's -- if I see that

22    there's anything of any concern at any point, I may schedule

23    a status conference and/or vacate any order entered if I

24    think that there's any issue.

25          I mean, you know, what you don't want to have is a

1    situation where everybody believes that we're just seeing

2    how much fees are incurred.  And I'm not saying that that's

3    happening in this case.  I'm saying you want to guard

4    against that.

5         And entry of these types of orders sometimes gives

6    -- give people arguments that that's the major concern.  And

7    I'm not suggesting it is, but all I'm saying is if this

8    enters, and it apparently will subject to some language,

9    that doesn't mean that I'm not going to look at it in the

10   future.

11        MR. BALDIGA:  Of course.  Of course.

12        THE COURT:  And if I think --

13        MR. BALDIGA:  And, Your Honor, you've seen from

14   day one that we're -- we're trying to spend as little as

15   possible, but we need to be responsive to a particular

16   creditor that is not funded from the estate.  And we can't

17   control how many motions with what enthusiasm they bring so

18   we're -- we're trying to keep up and do the right thing and

19   responsibly represent the estate.

20        Mr. Goldman has a lot of work to do himself in

21   that regard as we've already talked about.

22        We've all agreed there has to be an examination

23   before people are comfortable confirming a plan.  The debtor

24   has supported that from day one.  And this motion helps to

25   do that and the DIP helps to do that.  They go hand in hand.

1          THE COURT:  Understood.

2          MR. BALDIGA:  Thank you.

3          THE COURT:  Thank you.

4          MS. CLAIBORN:  Your Honor, if I just could make a

5    quick comment?

6          I wanted to preview for the Court that the order

7    that was uploaded is different than the original proposal.

8    But what it does have is the obligation to file interim fee

9    applications at a 90-day interval.  So there will be an

10   actual --

11         THE COURT:  Okay.

12         MS. CLAIBORN:  -- fee application process --

13         THE COURT:  Okay.

14         MS. CLAIBORN:  -- that's a component of it.

15         But there was also the existing monthly option

16   where the professionals get paid 80 percent of their fees

17   and 100 percent of their expenses upon there being no

18   objection from any of the parties.

19         THE COURT:  Okay.  Thank you.  I appreciate that.

20         So that motion will be granted.

21         But we have to wait and see what -- if there's any

22   minor -- any final comments to the proposed order, Attorney

23   Claiborn, correct?

24         MS. CLAIBORN:  Yes, Your Honor.  Thank you.

25         THE COURT:  Okay.  The only thing -- the only

1    other matter I'd like to discuss before we turn to the

2    evidentiary hearing on the DIP motion is the scheduling on

3    the motion to dismiss.

4          Were you able to discuss that during the break?

5          MR. FRIEDMAN:  We were, Your Honor.  With respect

6    to our motion, we I guess propose to begin -- so we would --

7    oppositions, we would ask to be set for the 11th of May.

8          THE COURT:  All right.  So that's a change, right?

9          MR. FRIEDMAN:  Yes.

10         THE COURT:  So let me just make a note.  Okay?  I

11    just want to make sure I have the right things in my -- on

12    my notes.

13       (Pause.)

14         THE COURT:  May 11th did you say?

15         MR. FRIEDMAN:  Yes, Your Honor.

16         THE COURT:  Okay.

17         MR. FRIEDMAN:  We would ask for our reply to be

18    filed on the 18th, and to commence the hearing on the 25th.

19         THE COURT:  All right.  Let me take a look at

20    that.  I haven't looked at that date obviously.  Hold on.

21       (Pause.)

22         THE COURT:  Okay.  I can commence the hearing on

23    the 25th.  I can even have some time on the 26th, but no

24    time on the 27th.

25         MR. FRIEDMAN:  Okay.  And so, Your Honor, we would

112

1    ask the 25th and 26th.  We will submit witness statements.

2    I'm sorry.  We will submit exhibits.  We will -- we will

3    meet and confer and propose a schedule for exhibits over --

4    hopefully, Mr. Jonas and I can have some discussions.  We'll

5    submit something by early next week on those, on when we'll

6    submit exhibit lists and witness lists.

7             THE COURT:  Well, I can tell you when you need to

8    submit exhibit lists.

9             MR. FRIEDMAN:  Even better.  Thank you, Your

10   Honor.

11            THE COURT:  I think that will help you.  There's

12   no need to meet.

13            MR. FRIEDMAN:  Yes.

14            THE COURT:  Just give me one second, please.

15        (Pause.)

16            THE COURT:  You'll submit your list of witnesses

17   and exhibits by 12 p.m. on May 20.

18            MR. FRIEDMAN:  Yes, Your Honor.

19            THE COURT:  Right.

20            MR. FRIEDMAN:  I can't anticipate now how long it

21   will take.  We will endeavor to examine Mr. Kwok on the

22   first day.  Because I've been advised there are some dates

23   the following week, if we have to go into the following

24   week, that he's unavailable, so we will endeavor to have him

25   examined on the first day of the hearing.

1          THE COURT:  Okay.  Go ahead, Counsel.

2          MR. JONAS:  Good afternoon, Your Honor.  Jeff

3    Jonas from Brown Rudnick.  A pleasure to be before you

4    again.

5          Those are all acceptable, and I appreciate Mr.

6    Friedman's courtesies with respect to Mr. Kwok.

7          THE COURT:  Okay.  Thank you.

8          MR. JONAS:  Thank you.

9          THE COURT:  Attorney Goldman?

10          MR. GOLDMAN:  Your Honor, yes, thank you.

11          I just wanted to mention obviously we are not a

12    formal party to this motion.  Not a movant or respondent,

13    but we do intend to most decidedly oppose this motion and

14    may want to participate in the evidentiary phase as well as

15    discovery.

16          So I just wanted to make clear I think the moving

17    party doesn't have a problem with our formally intervening

18    as a party to the extent that's necessary, but if everybody

19    could be in agreement that we would be treated as a party

20    for discovery and evidentiary hearing purposes, then I don't

21    think it's necessary.

22          MR. FRIEDMAN:  At least, Your Honor, on behalf of

23    PAX, we certainly consent.  We've provided discovery or the

24    discovery we've served is I believe on both the committee

25    and the U.S. Trustee.  We recognize the committee's and the

114

1  trustee's statutory right as well.  There's overlap with the

2  motion of the U.S. Trustee, so that's certainly fine by us.

3          MS. CLAIBORN:  Your Honor, the dates proposed are

4  fine with the U.S. Trustee.

5          THE COURT:  Okay.  Thank you.

6          Mr. Jonas?

7          MR. JONAS:  Your Honor, not that it's necessary --

8  Jeff Jonas from Brown Rudnick -- but of course we welcome

9  the committee's involvement in connection with the motion to

10  dismiss.

11          THE COURT:  Okay.  All right.  Thank you.  All

12  right.

13          So then what will happen either today or tomorrow

14  is a scheduling order will issue setting forth the dates we

15  just discussed on the record this afternoon.

16          Obviously, those are different from this

17  mornings', and that's fine.  You all indicated that you

18  wanted to talk about the dates at the break, and you did, so

19  a scheduling order will enter with the dates and the times.

20  We'll start at 10 a.m. on the 25th and the 26th.

21          And the scheduling order, Attorney Friedman, will

22  say that the moving party expressly consents to a

23  continuance of the hearing to the specific dates, okay, in

24  accordance with 1112(b)(3).

25          MR. FRIEDMAN:  Yes, Your Honor.

1          THE COURT:  Okay.  Thank you.

2          And the other thing I should note is that the U.S.

3   Trustee's motion for the appointment of an examiner or a

4   trustee will also be continued to those dates, the dates of

5   the motion to dismiss.  Okay?

6          MS. CLAIBORN:  Thank you, Your Honor.

7          THE COURT:  So the only thing left on the

8   calendar, today's calendar, that we have not addressed is

9   the debtor's motion for entry of interim final DIP orders

10  for which we are going to conduct an evidentiary hearing.

11         So, Mr. Jonas, you may proceed.

12         MR. JONAS:  Thank you, Your Honor.  Jeff Jonas

13  from Brown Rudnick on behalf of the debtor.

14         Your Honor, one -- perhaps I should call it

15  housekeeping matter.  I think as you're aware Mr. Kwok has

16  the need of an interpreter.  We have brought an interpreter

17  with us.  Her name is Una Wilkinson.  She's a 19 --

18         THE COURT:  Could you spell her first name for us?

19         MR. JONAS:  Sure.  U-N-A.

20         THE COURT:  Okay.

21         MR. JONAS:  It's pronounced Una.

22         THE COURT:  Okay.

23         MR. JONAS:  But it's U-N-A.  And her last name is

24  Wilkinson, W-I-L-K-I-N-S-O-N.

25         THE COURT:  Thank you.

1          MR. JONAS:  She's a 1995 graduate of the

2     Westminster University in the U.K. with a degree in

3     translation.

4          In terms of her qualifications, the United Court

5     System of New York State, she's a certified interpreter in

6     both Mandarin and Cantonese.  She's on the list of

7     interpreters of the Eastern and Southern District Courts of

8     New York.

9          She's interpreted for the grand jury in multiple

10    trial cases in the Eastern and Southern District Courts,

11    state criminal, New York State Criminal, and New York Civil

12    courts.  She has a long list of notable assignments that I

13    won't go through here, Your Honor, but I did want to provide

14    the Court with some background with respect to Ms.

15    Wilkinson's qualifications.

16          THE COURT:  Okay.  Thank you.

17          MR. JONAS:  Your Honor, my suggestion -- although

18    I've never done this before this way, so what do I know --

19    but perhaps Ms. Wilkinson could sit next to the witness.

20          THE COURT:  Yeah.  The box is very small, but we

21    can move a chair over there.

22          MR. JONAS:  That's what I was thinking, Your

23    Honor.

24          THE COURT:  Okay.  I don't think we could put two

25    people in the box.

117

1          MR. JONAS:  No.  I don't think so.  But I'm happy

2     to wheel this chair over if you'd --

3          THE COURT:  That would be great.

4          MR. JONAS:  Okay.

5          THE COURT:  Sure.

6          MR. JONAS:  Thank you.

7          THE COURT:  And then does any party have any

8     objection or issue with the qualifications of the

9     interpreter that have just been noted on the record by

10    Attorney Jonas?

11         MR. HARBACH:  Your Honor, David Harbach for

12    Pacific Alliance.

13         We have no quarrel with Ms. Wilkinson's

14    qualifications and no reason to question them.  However, it

15    is also our understanding that Ms. Wilkinson is Mr. Kwok's

16    personal interpreter and that she has worked with him for

17    quite some time.  And we have some concern about bias.

18         And we brought a similarly certified interpreter

19    for use today, one that is -- we hired -- and this is the

20    first time I believe we're using this person.  She's here in

21    the courtroom.  She's also qualified and certified.

22         And the procedure that we had used in the past,

23    Your Honor, is to utilize the neutral interpreter as the

24    primary interpreter.  And then to the extent necessary use

25    Ms. Wilkinson as a check interpreter to the extent there is

1   an issue with how something is being interpreted or perhaps

2   a peculiar way how -- in which Mr. Kwok's speaks or

3   something.

4           But that's how we would propose we proceed today.

5           THE COURT:  And have you talked about that with

6   Attorney Jonas?

7           MR. HARBACH:  No, ma'am.

8           THE COURT:  Okay.  All right.

9           Well, Attorney Jonas, what's your response to what

10  we just heard from --

11          MR. JONAS:  Yeah.  My response, Your Honor, is as

12  follows.  First of all, Ms. Wilkinson, I don't think it's

13  fair, and I think she would take some umbrage to any

14  allegation of bias.  That's number one.

15          Number two, she's not Mr. -- I don't know what it

16  means to say she's Mr. Kwok's personal interpreter.  Has she

17  worked with him quite a bit over the years?

18          And he's been involved in a number of litigation

19  matters as you know or as I think the Court's aware, yes,

20  absolutely.

21          But that being said, my suggestion -- and we fully

22  welcome subject to learning a little bit about the

23  qualifications of the -- PAX's interpreter, I suspect we'll

24  have no objection.

25          But what I would suggest, Your Honor, is that Ms.

1    Wilkinson will translate for Mr. Kwok.  I'll ask the

2    questions, she'll translate.  She will translate his

3    answers.

4              And of course I would -- we would welcome what

5    I'll call the check interpreter to the extent there's any

6    issue to raise those.  And we'll do the same, Your Honor.

7              They may have -- if they'd like, they can have

8    their interpreter for the I guess I'll call it the cross and

9    we'll have Ms. Wilkinson check if you will.  That would be

10   my suggestion, Your Honor.

11             THE COURT:  But wouldn't the check essentially

12   just be an objection?  I mean, wouldn't it be?

13             I mean, I'm not -- I haven't had two interpreters

14   at one time.  I've had one interpreter.

15             But I understand the issue that Attorney Harbach

16   raises.  I understand the issue you raise.

17             So in order to try to have the issue proceed,

18   wouldn't it be appropriate for -- for example, if you are

19   going to do a -- conduct a direct examination of the debtor

20   and use Ms. Wilkinson to be translating whatever the debtor

21   is saying in response to your answer?

22             Mr. Harbach, wouldn't it be appropriate to have

23   your translator if she believes it's inaccurate to tell you

24   that and you can object to that and we can address the issue

25   of whether or not that testimony stays part of the record?

120

1          MR. HARBACH:  That's certainly one way to proceed,

2     Your Honor.  All we're talking about now is who's doing the

3     primary interpretation in the first instance.

4          THE COURT:  Right.

5          MR. HARBACH:  And all I can represent to the Court

6     is that on multiple occasions at the 341, and also at the

7     deposition of other witnesses, Ms. Wilkinson has been on

8     standby as the check interpreter and it has worked just

9     fine.

10          MR. JONAS:  Your Honor, with all due respect, I

11     don't think saying that the 341 worked just fine is a fair

12     representation.  It was a mess.  The level of interpretation

13     at the 341, in my opinion, was not good.  Ms. Wilkinson was

14     required quite a bit to intervene if you will.  We got

15     through it.  But I really -- it did not work, that I can

16     assure you.  And if you were to read the record, I think

17     you'd agree with me.

18          THE COURT:  Well, I don't get the record of the

19     341 meeting --

20          MR. JONAS:  Understood, Your Honor.

21          THE COURT:  -- unless you all decide to get it

22     transcribed and docket it, so I can't speak to that.

23          But the United States Trustee's Office has stood,

24     so I'd like to hear from you, Attorney Claiborn.

25          MS. CLAIBORN:  Your Honor, I wanted to confirm

1  what Attorney Harbach has represented to the Court.

2          And that is that during the course of this case

3  thus far, Ms. Wilkinson has participated on a number of

4  occasions as the personal interpreter to the debtor, and

5  that Ms. Wilkinson did very capably interrupt the

6  proceedings to correct and/or criticize and/or elaborate on

7  the interpretations provided by the interpreter who was the

8  official interpreter for both the meetings.  And that

9  happened during both sections of the 341 meeting.

10          THE COURT:  So we're not talking about that

11  happening though, are we?

12          I mean, I thought you were saying Ms. Wilkinson

13  was going to be the main interpreter.

14          MR. JONAS:  That's what our --

15          THE COURT:  So what happened?  I wasn't at -- I

16  mean, I have no idea what happened at the 341 meeting.

17          You had -- the office had an interpreter?

18          MS. CLAIBORN:  We hired an interpreter.

19          THE COURT:  Okay.  That I didn't understand until

20  just now.  Okay.

21          MS. CLAIBORN:  Correct.

22          THE COURT:  So --

23          MS. CLAIBORN:  So the U.S. Trustee's preference

24  would be that we have an independent corroborated -- I mean

25  -- sorry -- an independent interpreter who has no

1    affiliation whatsoever to anything be the primary

2    interpreter.

3              THE COURT:  Okay.  And that person is the person

4    that PAX has brought today?

5              MS. CLAIBORN:  I'm not -- I'm not privy to the

6    qualifications or the interactions between that interpreter

7    and PAX, but I'm sure that Mr. Harbach can address that.

8              THE COURT:  Okay, Mr. Harbach, go ahead.

9              MR. HARBACH:  We have someone who can fill that

10   role here today, Your Honor, and I'm happy to do a brief

11   voir dire of her and allow counsel also to elaborate on her

12   qualifications.  I don't have them committed to memory.

13             THE COURT:  I'm not suggesting you should.  I'm

14   just trying to figure out how to proceed, right?

15             MR. HARBACH:  Yes.  Yes.

16             THE COURT:  That's what -- that's what I'm trying

17   to do.

18             MR. HARBACH:  So the record --

19             THE COURT:  I have obviously no knowledge until

20   you just all told me about what happened at a 341 meeting,

21   right?  The 341 meeting transcript isn't in the record.  The

22   Court doesn't participate in the 341 meetings, so I have no

23   idea about these issues.

24             And as I had said, you know, a few hearings ago,

25   the issue of the interpreter is an important issue.  I

123

1    raised the issue -- I raised it at some point because it is

2    an important issue.

3          So if the parties don't have an agreement as to

4    how this is going to proceed, then unfortunately I'm going

5    to have to determine how that's going to proceed.  And it

6    sounds --

7          The U.S. Trustee's Office, you hired an

8    interpreter from where?

9          MS. CLAIBORN:  Your Honor, the first meeting of

10    creditors I used an interpreter who was provided over the

11    telephone through I think the service is called

12    INTERPRETALK.  And then there's a service that the U.S.

13    Trustee Program provides nationwide.  You're able to call in

14    and get an interpreter in whatever language you need and

15    that interpreter gets placed onto the telephone line and

16    then interprets.

17          So one of the challenges we had with that process

18    was the fact that the telephone line doesn't always lend

19    itself to the best hearing on either end of it.

20          The second 341 meeting was an in-person

21    interpreter who we hired from another third party in an

22    effort to get somebody in person.

23          THE COURT:  Was it in-person?  Yes.

24          MS. CLAIBORN:  It was.

25          THE COURT:  Okay.

124

1          MS. CLAIBORN:  It was an improvement.  I'm sure

2     that no one would tell you that their experience was 100

3     percent awesome, but we tried to accommodate the idea that

4     an in-person was a better product than on the telephone

5     line.

6          THE COURT:  Okay.  Well, it's clear -- as I told

7     all of you I think at a hearing, one or two hearings ago,

8     the Court does not have -- the judiciary is not -- the

9     bankruptcy court anyway is not allowed to spend money to

10    hire an interpreter in a case.  It's not allowed by the

11    United States Judicial Conference, the Administrative

12    Office, and then essentially Congress, so the Court can't

13    hire anybody.  The issue then becomes the parties having to

14    hire people.

15          We've got two people here today, one of whom two

16    parties have said -- have suggested I should say -- might

17    not be the person that the Court wants to use as the primary

18    interpreter.  That's the suggestion.

19          And, Mr. Jonas, you're --

20          I didn't know any of this, right, that there was a

21    problem with the interpretation or at least a perceived

22    problem with the interpretation by parties who are objecting

23    to the DIP financing motion and that financing coming from a

24    third party.  Okay?

25          So it's hard for me to say that -- to agree with

125

1    what you've just said, Mr. Jonas, when I didn't know that

2    there was a problem.

3           So the issue that I would assume, Mr. Harbach,

4    that you're saying is you want your interpreter to be the

5    primary interpreter?

6           MR. HARBACH:  Yes, Your Honor.  That's right.  And

7    I'll add a couple of other facts for your consideration in

8    making this decision.

9           Number one, that the person who we've arranged to

10   be in court today is from TransPerfect Legal Services.  They

11   provide interpreters like this as a matter of course for all

12   different sorts of languages.  And the person who was

13   assigned, as I said earlier, I don't believe we even knew

14   her identity until today.

15          So the point is the obvious one, that although we

16   are paying for her, she is not in any way affiliated with us

17   or anything, doesn't know anything about this case other

18   than some names that we've given her ahead of time to listen

19   for.

20          The second thing that I should mention is that Ms.

21   Wilkinson also performed the check interpretation role at

22   our deposition of Yvette Wang, who was the Golden Spring

23   30(b)(6) representative.  And at that deposition, the

24   primary interpreter we hired through a similar agency, not

25   TransPerfect, but I believe it was called Veritext, another

126

1    agency, and that interpreter performed extremely well.

2    There were not the same problems, some of which we

3    encountered at the 341 hearing.

4            So I mention all this to say -- and the reason I

5    mentioned the track record of what we've done thus far is to

6    hopefully illuminate for the Court why we obviously

7    erroneously assumed we would do something similar today.

8            So apologies for this rearing its head without any

9    notice to the Court, but that's our position.

10           THE COURT:  Okay.  Thank you.

11           Attorney Jonas?

12           MR. JONAS:  Yes, Your Honor.  Jeff Jonas, Brown

13   Rudnick for the debtor.

14           I'll just add, Your Honor, first of all, I take no

15   offense -- I don't think the Court should either -- with

16   what PAX has had to say.  We heard the Court's instruction

17   that the Court couldn't provide interpreters.  We both went

18   out -- obviously it would have been great if we had spoken,

19   unfortunately we didn't -- but we both went out and hired

20   interpreters.  So that's just the way it is.

21           And, again, I have no reason without further

22   information to question the capabilities of their

23   interpreter.

24           What I would say, Your Honor, in addition to my

25   prior comments, is, as you can imagine, Mandarin is a

1    complicated language I've learned in the few weeks I've had

2    to deal with it.

3          And, yes, Mr. Kwok, there has been -- he's used --

4    and Ms. Wilkinson is familiar with Mr. Kwok, the way he

5    speaks, and I think it would be particularly helpful to him.

6          Obviously this is a critical hearing.  And he's

7    going to be testifying live for the first time in this case.

8    And I think that level, having some level of -- again,

9    without bias -- but simply a level of comfort and

10   understanding as to his tone, his inflection, how he speaks,

11   I think that ultimately will benefit the trier of fact in

12   terms of getting the most accurate translation.

13         I'm not really sure of the relevance of what's

14   happened before.  We're here now.  He's going to testify for

15   the first time.

16         And on that basis, Your Honor, we, again

17   respectfully -- happy to leave it up to the Court if it

18   comes to that -- but respectfully would prefer and suggest

19   that Ms. Wilkinson be the primary interpreter.

20         THE COURT:  Okay.  Thank you.

21         MR. JONAS:  Thank you.

22         THE COURT:  Attorney Harbach, anything else you'd

23   like to add?

24         MR. HARBACH:  No, Your Honor.  Thank you.

25         THE COURT:  Okay.  Thank you.

1          Well, again, under the circumstances of this case

2     and the arguments that have been advanced with regard to the

3     interpreters, and the fact that the United States Trustee's

4     Office has highlighted some concerns it had -- it

5     experienced is a better term -- word -- I suppose at the 341

6     meetings, I think -- well, the Court will rule that the

7     interpreter hired by PAX will be the main interpreter and

8     Ms. Wilkinson can be the check interpreter.

9          But we all have to understand that means there's

10    going to be three people up here, okay, and so we're going

11    to have to figure out a way that I think we're going to have

12    the interpreters understand that the questioning is probably

13    going to have to move a little slowly.

14         MR. JONAS:  Yes.

15         THE COURT:  Okay?  That you're going to ask a

16    question, Mr. Jonas, and then Mr. Harbach will answer -- ask

17    a question on cross-exam, and we're going to have to wait

18    for the debtor to respond, then we're going to have to wait

19    for the -- and this is all fine, I'm just explaining to

20    everyone how it's going to work -- that we're going to have

21    to wait for the interpreter.

22         And I don't remember the person's name that PAX

23    has hired.  What's the interpreter's name?

24         MR. HARBACH:  It's because I haven't put her on

25    the record, Your Honor.

1          THE COURT:  Okay.

2          MR. HARBACH:  It's not an issue of memory.

3          THE COURT:  Okay.

4          MR. HARBACH:  To be honest, I do not even know her

5     name.

6          THE COURT:  Okay.

7          MR. HARBACH:  But I know she's in here.

8          THE COURT:  Well, then the interpreter to tell us

9     the answer that Mr. Kwok has given in English.  And then

10    we'll have to wait to see if Ms. Wilkinson has a problem

11    with it.  And if she does, then, you know, we'll have to

12    address it.  I think that's all we can do.  Okay?  I think

13    that's the best we can do given the circumstances of today.

14         MR. JONAS:  Your Honor, one question?

15         THE COURT:  Yes.

16         MR. JONAS:  And I very much appreciate and respect

17    the Court's ruling.  Thank you, Your Honor.

18         Just a suggestion so we understand the ground

19    rules, would it be okay if the lawyers step back a little

20    and --

21         THE COURT:  Yes.

22         MR. JONAS:  Yeah.  And let the -- to the extent --

23         THE COURT:  Absolutely.

24         MR. HARBACH:  -- there's an interpretation by the

25    primary of an answer, to the extent Ms. Wilkinson, she can

1  speak for herself and raise it, I just -- I don't -- I'd

2  prefer we not be on the front lines of it because --

3           THE COURT:  No, I agree.

4           MR. HARBACH:  Okay.

5           THE COURT:  I think you should step back.  And I

6  think we might need another chair too.

7           MR. HARBACH:  Yes.  Yes.

8           THE COURT:  And I don't know if we have another

9  chair readily available at the moment.

10          MR. JONAS:  I can provide mine, Your Honor, for

11  now.

12          THE COURT:  Okay.  You're going to stand the whole

13  time?

14          MR. JONAS:  Yes.  Well, at least for my direct,

15  and then we'll figure it out.

16          THE COURT:  Okay.  All right.

17          MR. JONAS:  I'll take somebody else's chair.

18          THE COURT:  All right.  I think that's fair under

19  the circumstances.

20          And just we'll note for the record that once Mr.

21  Jonas --

22          Someone's bringing in another chair too, so if

23  anybody needs another chair, we'll be all set.

24          Thank you very much.  I don't know if we're going

25  to need it, but that's okay.  I appreciate you doing that,

1   so thank you.

2           UNIDENTIFIED:  I'll return it if you don't need

3   it.

4           THE COURT:  Thank you.

5           So what's -- so everyone's clear, Mr. Jonas is

6   going to start his presentation on behalf of the debtor on

7   the debtor's -- and I keep calling it shorthand -- but a DIP

8   motion, a DIP motion -- and then he will call his first

9   witness, which I'll --

10          And then we'll have the interpreters come forward.

11  The interpreters are going to have to note their names for

12  the record.  And I'm going to have to make sure that both --

13  every party -- no one is challenging the qualifications of

14  either one of the interpreters.

15          And then, Mr. Jonas, you'll be able to proceed.

16  Okay?

17          MR. JONAS:  Absolutely.  Thank you, Your Honor.

18          THE COURT:  All right.  You can -- you may start,

19  please.

20          MR. JONAS:  Well, may we call the interpreters,

21  Your Honor?

22          THE COURT:  Sure.  Absolutely.

23          MR. JONAS:  And we would obviously ask Ms.

24  Wilkinson to come up and I guess take the second chair,

25  right?

1          THE COURT:  Yes.  So, Ms. Wilkinson, are you in

2    the courtroom?

3          MS. WILKINSON:  Yes.

4          THE COURT:  Would you please come forward.

5      (Pause.)

6          THE COURT:  All right.  So one at a time, I'm

7    going to -- the courtroom staff is going to make sure that

8    that microphone can capture at least both the people.

9          Ms. Wilkinson, just because you came first, the

10   courtroom deputy is going to swear you in.  Okay?

11     (The check interpreter is sworn.)

12         THE COURT:  Okay.  Thank you.

13         THE CLERK:  Can you just state your name and a

14   business address for the record, please.

15         THE CHECK INTERPRETER:  Yes.  My name is --

16         THE COURT:  We can't hear you.

17         THE CLERK:  I need Ms. Wilkinson.

18         THE COURT:  We need Ms. Wilkinson's first.  Why

19   don't you come to the microphone.  Yeah.

20         THE CHECK INTERPRETER:  Name, Una, U-N-A,

21   Wilkinson, W-I-L-K-I-N-S-O-N.

22         THE COURT:  Just your business address.

23         THE CHECK INTERPRETER:  My business address is my

24   home.

25         THE COURT:  Okay.

133

1          THE CHECK INTERPRETER:  6818 Juno Street, J-U-N-O,

2     Forest Hills, New York, New York 01375.

3          THE COURT:  Thank you.  Thank you very much.

4          Now, if I could have you come home --  I don't

5     know your name.  I'm sorry.  If you could tell me your name.

6          THE MAIN INTERPRETER:  Sure.  Your Honor, my name

7     is I Ching Ng, the spelling is I-C-H-I-N-G, last name is N-

8     G.

9          THE COURT:  N-G.  Okay.  And could you tell us

10    your business address, please.

11         THE MAIN INTERPRETER:  Sure.  It's 450 Lexington

12    Avenue, Unit 3294, New York, New York 10163.

13         THE COURT:  And the company you work for?

14         THE MAIN INTERPRETER:   Today I'm representing

15    TransPerfect.

16         THE COURT:  TransPerfect.  Okay.

17         THE MAIN INTERPRETER:  Yes.

18         THE COURT:  The courtroom deputy is going to swear

19    you in.  Okay.

20         THE CLERK:  Raise your right hand, please.

21       (The main interpreter is sworn.)

22         THE COURT:  Okay.  Thank you.

23         You can take off your coat.  You know.  You don't

24    have to be -- whatever you're more comfortable in, but I'm

25    going to have you sit right next to the witness chair.  And

1    Ms. Wilkinson is going to sit to your right.  Okay?

2              And now, both of you, what I'm going to ask you to

3    do -- you don't know this, but we only -- our record comes

4    through the microphone.  So once the witness, Mr. Kwok,

5    speaks, after he speaks and you interpret, you're going to

6    have to speak into the microphone.

7              And so, Ms. Wilkinson, it might be that you have

8    to come up and stand at this microphone if Mr. Jonas steps

9    (indiscernible) -- because if we can't hear you, we're going

10   to have to stop you.  Don't worry about that, that happens

11   sometimes.  We have -- this is -- our only record is through

12   a microphone.  So if I stop you, it's not because you've

13   done anything wrong, it's because we weren't able to hear or

14   for whatever reason.  Okay?

15             I just want to -- I know you haven't done this

16   before -- or maybe not in this courtroom -- but we can only

17   -- we don't have a transcriber.  We don't.  We have to get

18   everything on the record this way.  And if we don't get it,

19   then we have to stop and make sure it's on the record.

20   Okay?

21             THE CHECK INTERPRETER:  Okay.

22             THE COURT:  So do either of you have any

23   questions?

24             THE MAIN INTERPRETER:  So that means I can use

25   this microphone, right?

135

1          THE COURT:  Yeah.  You can.  And it will be after

2   -- there's another microphone here too.  Okay.  Great.

3   Okay.  That will be helpful for Ms. Wilkinson too.  Great.

4   Thank you.

5          After Mr. Kwok has answered the question, then,

6   yes, you can -- that's why we turned the microphone a little

7   bit so it will be able to pick up your voice as well.  If

8   for some reason we're wrong and it doesn't pick up your

9   voice, we'll figure out where to get you to stand so we can

10  understand what you're saying as well.

11          THE MAIN INTERPRETER:  Okay.

12          THE COURT:  Okay?  Does that make sense to both of

13  you?

14     (No audible response.)

15          THE COURT:  Okay.  I just want to make sure.  If

16  you have any questions, please let me know before we begin.

17  Okay?  All right.

18          All right.  Hearing no questions, then what else

19  do we need to do?

20          THE CLERK:  I have a note here we're going to have

21  the witness (indiscernible).

22          THE COURT:  I think Mr. Jonas is going to call his

23  witness, so there you go.

24          MR. JONAS:  Yes, Your Honor.  If we're ready, I'm

25  happy to do that.

136

```
1                THE COURT:  Yes.  Go right ahead.

2                MR. JONAS:  Thank you.  Your Honor, we would --

3        the debtor would call Ho Wan Kwok to the witness stand.

4                THE COURT:  Okay.  Mr. Kwok, if you'd come

5        forward, please.

6                MR. KWOK:  Good afternoon, Your Honor.

7                THE COURT:  Good afternoon, sir.

8                Now, Mr. Kwok, you can just stand when you get in

9        there, please.  And then you're going to raise your right

10       hand and listen to the courtroom deputy.  She's going --

11               You'll interpret it -- but this is the person who

12       is speaking to you right now.

13               THE CLERK:  I'm sorry.  You know.

14               THE COURT:  It's okay.  It's not a problem.

15               THE CLERK:  Let me just get my notes.  I'm so

16       sorry.

17               THE COURT:  And you can break it down if you would

18       like so that the interpreter can break it down for Mr. Kwok.

19       Okay?

20               THE CLERK:  Okay.

21               THE COURT:  You can say a few words at a time, and

22       that will be  helpful I think for Mr. Kwok to understand as

23       well.

24                         HO WAN KWOK, SWORN

25               THE COURT:  Okay.  Thank you.
```

1          THE CLERK:  State your name and address for the

2     record, please.

3          THE MAIN INTERPRETER:  The interpreter would like

4     to get a spelling for the address from Mr. Kwok.

5          THE COURT:  The spelling?

6          THE MAIN INTERPRETER:  Yeah.

7          THE COURT:  Yeah.  Go ahead.  You can ask him.

8          THE WITNESS:  The name is Kwok, K-W-O-K.  First

9     name is Ho Wan, H-A -- I'm sorry -- H-O W-A-N.  The address

10    is in Technic(ph) [sic], Connecticut, but I don't know how to

11    spell it.

12         THE COURT:  I didn't hear what you said.  What

13    Connecticut?  I think it's Greenwich, Connecticut.  Is that

14    what you think you heard?

15         THE WITNESS:  The street number is 373, but I

16    don't remember the street name.  That's in Greenwich,

17    Connecticut.

18         THE COURT:  Okay.

19         MR. JONAS:  Your Honor, I believe it's Taconic.

20         THE COURT:  I think it's Taconic, yes.

21         Okay.  Thank you.  Thank you.  All right.

22         You may be seated.

23         THE WITNESS:  Thank you, Your Honor.

24         THE COURT:  Okay.

25         MR. JONAS:  Your Honor, may I -- is the microphone

1    -- I'm just wondering if it will pick up Mr. Kwok?

2            THE COURT:  I think if he just leans a little

3    toward it --

4            MR. JONAS:  Okay.

5            THE COURT:  -- so that we can get both of them.

6            MR. JONAS:  Okay.  Okay.

7            THE COURT:  Okay.

8        (Pause.)

9                        DIRECT EXAMINATION

10   BY MR. JONAS:

11   Q    Good afternoon, Mr. Kwok.  Mr. Kwok, why did you file

12   this Chapter 11 bankruptcy case?

13   A    First of all, I would like to take the opportunity --

14   first of all, I would like to say that I'm very excited

15   today.  This is the first time I get to appear in this case.

16   It's been going on for five years.  And I appreciate this

17   opportunity.  And also excited that I couldn't sleep last

18   night.

19           THE COURT:  Thank you.

20   BY MR. JONAS:

21   Q    I'll just -- I'll repeat my question.  Mr. Kwok, why

22   did you file this Chapter 11 bankruptcy case?

23   A    In early February this year, at the Southern District

24   Court, the judge made a judgment asking me to pay $120

25   million in five days.

1          THE CLERK:  Excuse me, Your Honor.  I need to

2     interrupt to the extent that there's a message that we're

3     not hearing the interpreter.  Although I can hear

4     (indiscernible), we're getting messages that we cannot hear.

5          THE COURT:  Okay.

6          MR. JONAS:  May I make a suggestion, Your Honor?

7          THE COURT:  Sure.

8          MR. JONAS:  I'm not sure that what -- I think all

9     we really need to hear is the interpreter as long as she

10    hears Mr. Kwok.  So my suggestion would be that I can turn

11    the microphone directly to the interpreter and we'll pick up

12    the interpreter since that's really all that's I think

13    important.

14         THE COURT:  I think that makes -- let's try it.

15         MR. JONAS:  Okay.

16         THE COURT:  Okay.

17         MR. JONAS:  We'll try it.

18         THE COURT:  Let's try that.  Okay.

19         MR. JONAS:  Thank you for your patience.

20         THE COURT:  Okay.  No.  Thank you.

21      (Pause.)

22         MR. JONAS:  I just want to -- I don't know where

23    we left off.

24         THE COURT:  Yeah.

25         MR. JONAS:  I can -- I think he was in the middle

1    of the answer, so shall we start again?

2              THE MAIN INTERPRETER:  If you wouldn't mind.

3              MR. JONAS:  Be happy to.

4              THE COURT:  That would be helpful.  Thank you.

5              MR. JONAS:  Sure.

6    BY MR. JONAS:

7    Q    Let's just go back, Mr. Kwok.  Mr. Kwok, why did you

8    file this Chapter 11 bankruptcy case?

9    A    In February of 2020, the judge at the Southern District

10   Court made a judgment for my case with PAX and the judgment

11   asked me to pay $120 million of fines within five days.

12             THE MAIN INTERPRETER:  Let me clarify the figure

13   with Mr. Kwok.  Okay.  Let me clarify.  That should be 124

14   million.

15             THE COURT:  Okay.  Thank you.

16             THE WITNESS:  Under such circumstances, I had no

17   choice.  And in order to quickly resolve and fairly to

18   resolve the debt issues with my debtors -- I have many

19   debtors -- that's one of the choices I had to make, even

20   though I have no choices, to resolve the issues of the

21   creditors.

22             THE COURT:  Okay.

23             MR. JONAS:  Your Honor, I just want to make sure.

24   I actually think it's working okay.  I just want to make

25   sure the Court's satisfied and --

1          THE COURT:  I can hear.  It's really the courtroom

2     deputy and the recordings that make sure that it's getting

3     picked up.

4          THE CLERK:  Yes.

5          THE COURT:  Okay.

6          MR. JONAS:  But I think also the corrections from

7     Ms. Wilkinson, I think this is -- the system is working.

8          THE COURT:  That's fine.  Yes, I agree.

9          MR. JONAS:  Okay.  Thank you, Your Honor.

10          THE COURT:  Okay.  Thank you.

11     BY MR. JONAS:

12     Q    Were you finished with your answer?  I just want to

13     make sure, Mr. Kwok, as to why you filed this Chapter 11

14     case?

15     A    Yes, I'm done.

16     Q    Okay.  Thank you.  Mr. Kwok, have you taken public

17     positions critical of the Chinese Communist Party or what's

18     commonly referred to as the CCP?

19     A    Yes.

20     Q    And why have you done that?

21     A    During the Tiananmen Square democratic protest in 1989

22     in China, I funded the students.  Because of that, I was

23     arrested and I was jailed for 22 months, and my younger

24     brother was killed.

25          And since my parents were tortured by the CCP, and

Kwok - Direct                                    142

1   during my arrest I've witnessed that many student protesters

2   were being killed, and because of that I've sworn that I

3   need to eliminate the Chinese Communist Party.

4   Q    Mr. Kwok, in connection with your activities opposing

5   the CCP, have you done and do you do broadcasts in

6   opposition to the CCP?

7   A    In the past five years, I've made more than 5,000 live

8   broadcasts with thousands of hours of air time to criticize

9   the CCP regarding the corruptions and to expose them to the

10  world.

11           And I also talked about the massacre in

12  (indiscernible) and also in Hong Kong and how they conducted

13  spying activities in the West, in U.S., and human right

14  violations.

15  Q    How many people have watched or viewed your broadcasts?

16  A    I feel tens of millions, hundreds of millions.

17  Q    Does being an outspoken public critic of the CCP put

18  you at risk?

19  A    It has a huge risk.

20  Q    And what are those risks?

21  A    On January 10, 2015, these people behind me, the two

22  people who (indiscernible), and they also paid the lawyer's

23  fee, by the name of Wu Zheng (ph), he spied on me.

24           And my family members were arrested, including my

25  wife, my daughter, and hundreds of my colleagues were

1    arrested as well, and my family assets were being seized.

2    And they said to me that if I don't collaborate with the

3    Chinese Communist Party they would kill me.

4              THE MAIN INTERPRETER:  The interpreter would like

5    to clarify a few names with the witness.

6              THE COURT:  Sure.  Go right ahead.

7              THE WITNESS:  Bernard Wu, he was the former

8    partner of an investigation company called CGI and he worked

9    with (indiscernible) and also they were involved in this

10    investigation.  And also they were --

11             THE MAIN INTERPRETER:  Let me clarify a term with

12    Mr. --

13             MR. HARBACH:  Your Honor, I realize that

14    interpretation is being clarified, but we'll interpose an

15    objection as to relevance and non-responsiveness.

16             The question, if memory serves, were what are the

17    risks?  And it's not clear at all to me that this answer is

18    responsive to that question or relevant to the purposes of

19    this hearing.

20             THE COURT:  I understand.  I'm going to allow this

21    question and the answer and then we'll move on to the

22    relevant issues for the DIP filings.

23             MR. JONAS:  Your Honor, I couldn't agree more.  I

24    was just trying to provide some background and this was the

25    last question on this topic.

1          THE COURT:  Okay.  Go right -- go right ahead.

2          But may I ask you, the interpreter --

3          THE MAIN INTERPRETER:  Yes.

4          THE COURT:  -- there was a name that you said.  I

5    don't know if I heard you.  Was it Bernard Wu, is that the

6    name?

7          THE MAIN INTERPRETER:  Yes.  Mm-hmm.

8          THE COURT:  All right.  Can we -- can you just

9    spell that for the Court, please.

10         THE MAIN INTERPRETER:  Let me clarify the spelling

11   with Mr. Kwok.

12         THE COURT:  Sure.

13         THE WITNESS:  Bruno Wu.

14         THE COURT:  Bruno.

15         THE WITNESS:  B-R-U-N-O, last name is W-U.

16         THE COURT:  Thank you.

17   BY MR. JONAS:

18   Q    Thank you, Mr. Kwok.

19         THE MAIN INTERPRETER:  Yeah.  I'm sorry.  I

20   haven't finished my translation already.

21         THE COURT:  Okay.  Go ahead.

22         MR. JONAS:  My apologies.

23         THE WITNESS:  And regarding the Puff (ph) case,

24   Bruno Wu Partners was also involved, and also concerning the

25   case with the Department of Justice about trying to get

1    President Trump to extradite me.

2              And I would like to say that in the past five

3    years I was in dire, extreme risky situation.  There were

4    numerous moments where somebody came to my residence and

5    wanted to harm me.  And I don't want to take the time to

6    elaborate on that.

7              THE COURT:  Okay.

8    BY MR. JONAS:

9    Q    Thank you, Mr. Kwok.  Let's move on.  Do you have the

10   financial ability to satisfy all of the liabilities asserted

11   against you in this case?

12   A    No.

13   Q    Are you aware of allegations that you have the

14   appearance of being a wealthy man?

15   A    Yes.

16   Q    And in this case, you've disclosed that you have very

17   few -- is it true that in this case you've disclosed very

18   few assets?

19   A    Yes.

20   Q    Can you explain that contradiction?

21   A    In 1989, I was arrested during the (indiscernible)

22   movement because I participated in a campaign.  And then I

23   emigrated to Hong Kong in the year 2000.

24             And then from 2015 until now, I have mobilized

25   campaigns to eliminate the Chinese Communist Party,

1     therefore, I'm the notably known number one enemy of the

2     CCP.  And because of that, there's no way I can hold any

3     assets.

4     Q    But, sir, you -- again, I want to come back to my

5     question about the alleged appearance that you have the

6     means to live well and yet you've disclosed very few assets.

7     Where are you -- where are you getting the means to support

8     yourself?

9     A    Right now, I'm in a very special circumstances.  It's

10    very unique.  I'm in the phase of the campaign to eliminate

11    the Chinese Communist Party.

12          And my son and my daughter and my family business

13    have been very successful.  And these are very unique

14    (indiscernible).  And my family loves me and they are

15    supporting me with my living expenses and with the campaign

16    to rejoin that is necessary.

17          And in the past five years, the Chinese Communist

18    Party have conducted multiple investigations against my

19    family, and also publicly scandalized me.  However, they

20    never said -- they never disclosed my assets or cited that I

21    committed any crime.

22    Q    Mr. Kwok, are you familiar with your request for debtor

23    in possession or DIP financing in this case?

24    A    Yes.

25    Q    And who is the proposed DIP lender?

1   A    New York Golden Spring.

2   Q    And let me ask you, what is Golden Spring New York,

3   Limited?

4   A    This is a company owned by my son.  He set up that

5   company to invest in New York, and also to help the family,

6   and also to handle family affairs in the west.

7   Q    Okay.  And did you assist him in setting up Golden

8   Spring?

9   A    Yes.

10  Q    And were any of your funds used to set up Golden

11  Spring?

12  A    I was at one point authorized to transfer funds to help

13  Golden Spring and to transfer funds to J.P. Morgan.

14  Q    But those funds -- strike that.

15       Were those funds yours?

16  A    No.

17  Q    Whose funds were they?

18  A    My son's.

19  Q    Do you own Golden Spring?

20  A    No.

21  Q    Do you control Golden Spring?

22  A    No.

23  Q    Do you work for Golden Spring?

24  A    No.

25  Q    Has Golden Spring lent money to you in the past?

Kwok - Direct                                                           148

1   A    Yes.

2   Q    And for what purpose?

3   A    It was because in the past few years there were many

4   lawsuits, numerous lawsuits, from the Chinese Communist

5   Party against me, so I had to get the loan, the borrowings,

6   from New York Golden Spring to pay these lawyers' fees.

7           MR. JONAS:  Your Honor, may I -- I know I'm

8   parched.  May I provide this to Mr. Kwok?  Thank you.  Thank

9   you, Your Honor.

10  BY MR. JONAS:

11  Q    Mr. Kwok, does Golden Spring pay your living expenses?

12  A    Yes.

13  Q    Why?  Why would Golden Spring do that?

14  A    It is because during this time I am in this campaign to

15  eliminate Chinese Communist Party and of course there's no

16  choice.

17           And at the same time, my son loves me very much.

18  I am his only father.  So that's why the company has been to

19  pay the living expenses.

20  Q    And are you familiar with Lamp Capital?

21  A    That is my son's company.

22  Q    And do you work for Lamp Capital?

23  A    No.

24  Q    Do you control Lamp Capital?

25  A    No.

Kwok - Direct                                                    149

1    Q    Has Lamp Capital lent you money in the past?

2    A    Yes.

3    Q    For what purpose?

4    A    Yes.  To pay one million U.S. dollars to be our law

5    firm to handle my bankruptcy case.

6    Q    Are you aware that certain pleadings have been filed in

7    this case alleging that you have a connection to G Music?

8    A    I am a volunteer for G Music.  I sing many songs about

9    eliminating the Chinese Communist Party for G Music.

10   Q    And are you -- strike that.

11        What is your connection, if any, to Himalayan

12   Exchange?

13   A    I am the advisor and promoter.

14   Q    And what is your connection, if any, to GETTR, G-E-T-T-

15   R?

16   A    I am the advisor and one of their promoters.

17   Q    And is your -- is the activities that you take in

18   connection with these entities all part of your public

19   opposition to the CCP?

20   A    Regarding all these companies that have been mentioned,

21   I work with my (indiscernible) for the purpose of

22   eliminating the Chinese Communist Party, so I sort of the

23   promoter for the cause.

24   Q    Do you get paid from any of these entities?

25   A    No.

1    Q    Do you dispute some of your creditors' claims against

2    you?

3    A    Yes.

4    Q    Prior to this bankruptcy, do you recall being examined

5    under oath in connection with some of the litigations that

6    you're involved with?

7    A    Yes.

8    Q    Do you recall invoking your Fifth Amendment right

9    against self-incrimination in connection with some of those

10   examinations?

11   A    Yes.

12   Q    At your recent 341 meetings, did you assert your Fifth

13   Amendment right at all?

14   A    No.  I did not use it at all.

15   Q    And why is that?

16   A    Because with the bankruptcy case, there's a need for

17   more transparency and fairness.  And also the fact that

18   disclosing more of my financial information can help handle

19   the relationship with various debtors, so I hope the judge

20   -- I'm sorry -- creditors -- and I hope the judge and also

21   all the creditors can know all this information so that we

22   can do it in an open manner.

23   Q    And I want to return to the DIP.  Can you briefly

24   describe how the DIP loan initially was arranged?

25   A    When I learned that the judge at the Southern District

Kwok - Direct                                         151

1    Court imposed a fine of 124 million and asked me to pay it

2    off in five days, I asked my lawyer and my son to make

3    contacts to help me to resolve this loan.

4    Q    And was that what resulted ultimately in the DIP loan

5    that's before the Court today?

6    A    Yes.

7    Q    And briefly, what is your understanding of the current

8    proposed terms of the DIP loan?

9    A    Regarding the loan amount, that is an $8 million and an

10   $1 million, the $8 million and the $1 million were being

11   prioritized to fairly to pay all the creditors, and also any

12   fees that incurred for other third parties due to this

13   bankruptcy case, such as the lawyers and other

14   professionals.  And to add onto that -- and the one million

15   is the donation.

16   Q    And do you understand whether the DIP loan can be paid

17   back before creditors or ahead of creditors?  I'm not sure

18   how that translates, but.

19   A    No.  That is not allowed.

20   Q    And do you understand whether the DIP loan can be  used

21   to fund an examiner if an examiner is appointed in this

22   case?

23   A    Yes.  That is feasible.

24   Q    And do you understand whether the DIP loan can be used

25   to pay the creditors committee's professionals in this case?

Kwok - Direct                                              152

1    A    Yes.

2    Q    And do you understand whether the DIP loan can be used

3    to pay the United States Trustee fees that will be due in

4    this case?

5    A    Yes.

6    Q    As you sit here today, do you think it's likely that

7    the DIP loan will be repaid?

8    A    (Indiscernible.)

9    Q    And why would Golden Spring do this?

10            MR. HARBACH:  Objection.  That calls for

11   speculation.

12            THE COURT:  I'll allow it.

13            THE WITNESS:  Regarding Golden Spring, that is a

14   company owned by my son.  And he has only one father.  And

15   our family has gone through many hardships.  And in facing

16   the suppression of the Chinese Communist Party.

17            And also because of his personal considerations

18   and Chinese family values, he wants to safeguard of the

19   interest of the family and me and his mother.  Otherwise, I

20   would have been thrown into jail and been killed.

21   BY MR. JONAS:

22   Q    Do you know if the $9 million of DIP loan proceeds are

23   now available?

24   A    I know that the money has arrived yesterday, but I'm

25   not sure whether it has landed in the escrow account of the

```
                      Kwok - Direct                    153
```

1    lawyer.

2         I know that the money has started to arrive

3    yesterday.  I'm not sure whether it has already reached the

4    escrow account of the counselors.

5    Q    Do you believe that any other party, that is, other

6    than Golden Spring, would provide a DIP loan on better terms

7    than are provided here?

8         MR. HARBACH:  Objection.  Speculative.

9         THE COURT:  I'm going to allow it, and I'll give

10   it whatever weight I think is appropriate.

11        THE WITNESS:  No.

12   BY MR. JONAS:

13   Q    Mr. Kwok, you mentioned an examiner, do you support the

14   appointment of an examiner in this case?

15   A    Yes.

16   Q    And why is that?

17   A    And since the first day of this case until now, this is

18   the only moment that I feel secure, I feel safe, because I

19   have a chance to speak for myself here.

20        And also because my goal to eliminate the Chinese

21   Communist Party, I need the chance to voice, to make noise,

22   and this judicial system provided that platform.

23        And I understand the U.S. legal system and -- so

24   that it will offer a chance to have a fair and transparent

25   and more professional way to resolve my debt issues with the

1    creditors.

2    Q    If the DIP financing is not approved, do you have any

3    other source to pay the costs and expenses of this Chapter

4    11 case?

5    A    No.

6    Q    Have you filed a proposed plan of reorganization?

7    A    Yes.

8    Q    And do you believe having the DIP loan in place is

9    necessary and will facilitate the prosecution or your plan

10   moving forward?

11   A    Yes.

12            MR. JONAS:  Your Honor, I have no further

13   questions right now on direct.

14            I would ask, if it's convenient for the Court at

15   some point, just to take a short break?

16            `I do appreciate Mr. Kwok needs to be instructed

17   not to speak with anyone, and that's fine.  I just want to

18   make sure he and I have an opportunity to take a quick break

19   if we may.

20            THE COURT:  Opposing counsel have an objection to

21   that?

22            MR. HARBACH:  Not at all, Judge.

23            THE COURT:  Okay.  Then if there's no objection,

24   that's fine.

25            So how much time would you like?

1          MR. JONAS:  Oh, just five or ten minutes, Your

2    Honor.

3          THE COURT:  Well, it's ten of three.  Would you

4    like to come back at three?

5          MR. JONAS:  That would be fine.  And I appreciate

6    the courtesy, Your Honor.

7          THE COURT:  Okay.  We're going to take a quick

8    recess until 3 p.m.  Okay?  All right.  All right.  Court is

9    in recess until three.

10         (Recess from 2:47 p.m. until 3 p.m.)

11         THE COURT:  All right.  So we can go back on the

12   record after recess, please.

13         THE CLERK:  Yes. We're still on case Number 22-

14   50073 Ho Wan Kwok.  We are in court after (indiscernible).

15         THE COURT:  Okay.  Mr. Harbach, you ready to

16   proceed?

17         MR. HARBACH:  Yes, Your Honor.  May I inquire?

18         THE COURT:  Yes, please.  Go right ahead.

19                        CROSS-EXAMINATION

20   BY MR. HARBACH:

21   Q    Good afternoon, Mr. Kwok.  I'd like to start by talking

22   about an entity Mr. Jonas asked you about, called GETTR.  Do

23   you know the entity I'm talking about, sir?

24   A    First of all I want to say, good afternoon, sir, and I

25   do know GETTR.

1    Q    Okay.  What is GETTR?

2    A    It's a social media platform.

3    Q    I believe you testified on direct that you were an

4    advisor and promoter to GETTR.  Is that right?

5    A    Yes.

6    Q    When did GETTR launch its platform?

7    A    2021.

8    Q    Does the -- approximately the summer of 2021 sound

9    about right to you?

10   A    I cannot remember.

11   Q    Okay.  How was GETTR funded initially?

12   A    I don't know.

13   Q    Were you involved in donating any money to GETTR?

14   A    No.

15   Q    Did you help raise any money for GETTR from others?

16   A    No.

17   Q    Did your family make any donations or payments to GETTR

18   related to the startup?

19   A    No.

20   Q    What's Himalayan Exchange?

21   A    It's an online company for the trading or the exchange

22   of digital currency.

23   Q    Did you found it?

24   A    No.

25   Q    Were you among those who helped found it?

1    A    No.

2    Q    Okay.  What's Himalaya Coin?

3    A    That is a digital currency on the Himalaya Exchange.

4    Q    So Himalaya Exchange is a platform that supports

5    trading of Himalaya Coin.  Is that fair?

6    A    Yes.

7    Q    Okay.  And do you know about a music video called HCoin

8    to the Moon?

9             THE MAIN INTERPRETER:  I'm sorry, counselor, can

10   you repeat --

11   BY MR. HARBACH:

12   Q    HCoin -- oh, the witness knows.

13   A    I know.

14   Q    Okay.  That was a successful and popular music video,

15   wasn't it?

16   A    Yes.

17   Q    And it features you, does it not?

18   A    I was a small portion of it.

19   Q    You feature prominently in the video, don't you, sir?

20   A    I only spoke -- I only spoke one line.

21   Q    And did you have any role in producing the song?

22   A    I only sang one line.  In fact, this song, HCoin to the

23   Moon, took 30,000 people to complete.

24   Q    Isn't it true that HCoin to the Moon has been a very

25   popular download on iTunes for example?

1    A    What do you mean by a lot or very popular?

2    Q    Wasn't HCoin to the Moon at one point in the top 10

3    downloads on Apple iTunes?

4    A    Yes.

5    Q    Okay.  So it made lots of money.

6    A    I don't know.

7    Q    And I take it then, your testimony will be that you

8    received no money in connection with royalties from that

9    song?

10   A    Yes.

11   Q    You mentioned your invocation of the Fifth Amendment

12   earlier.  Do you recall that testimony?

13   A    Yes.

14   Q    And you understand, do you not, that the purpose of the

15   Fifth Amendment is a protection in circumstances where

16   truthful testimony might incriminate you.

17             MR. JONAS:  Objection, Your Honor.

18             THE COURT:  What basis?

19             MR. JONAS:  He's asking for legal conclusion.  I

20   don't think the witness is --

21             THE COURT:  No, I think he was asking for -- he

22   asked him what his understanding is, so I'll --

23             MR. HARBACH:  Thank you, Your Honor.

24             THE COURT:  -- overrule that objection.

25             THE WITNESS:  No, that's not the case.

1    BY MR. HARBACH:

2    Q    Okay.  What is your understanding of the purpose of

3    invocation of the Fifth Amendment?

4    A    I requested to use the Fifth Amendment under the advice

5    of my counsel.

6    Q    Well, I understand that and believe me, I'm not

7    intending to ask about communications with your counsel

8    about whether you should invoke it or not, that's

9    privileged.

10       But I -- but your counsel made a point of establishing

11   on direct examination that you had evoked the Fifth

12   Amendment in the past but did not do so at the 341 meeting.

13   And you said it was because you wanted to be more

14   transparent.

15             MR. JONAS:  Objection, Your Honor.

16             THE COURT:  On what basis?

17             MR. JONAS:  I don't think there have been

18   questions the last two -- he's -- Mr. Harbach has made

19   statements, but there's been no question in the last two

20   alleged questions.

21             MR. HARBACH:  I'm just pausing for the

22   interpreter, Your Honor, instead of asking one great big

23   long question, I'm leaving time for her to --

24             THE COURT:  I'm not sure it's not a question.  I

25   mean, you're asking him what he said.  I don't -- I'm not

1   sure it's not a question, so I think let's let it go and see

2   how we -- where we get to, okay?

3   BY MR. HARBACH:

4   Q    The question, sir, is, what is your understanding of

5   the reason one would invoke the Fifth Amendment?

6   A    I don't understand this question.

7   Q    Do you understand what -- do you have an understanding

8   of what the Fifth Amendment is?

9   A    I know.

10  Q    Do you know what it means to invoke the Fifth

11  Amendment?

12  A    The U.S. law gives the right to the people to do so.

13  Q    That's absolutely right, and what I'm trying to

14  understand is a right to do what?  What is it -- what is the

15  reason that one might invoke the Fifth Amendment, according

16  to your understanding?

17            MR. JONAS:  Objection, Your Honor.

18            Again, I -- and I respectfully -- I -- I'm not

19  trying to interrupt, but I do need to preserve my objections

20  for the record.  I don't think it's appropriate to ask a

21  witness -- he's now asked, I don't know, 10 questions

22  relating to the Fifth Amendment, his understanding.

23  Obviously, some of that is privileged to the extent his

24  understanding comes from us.

25            THE COURT:  He's not asking for privileged

1    information.  He made that clear.  And I think it's a

2    relevant question and I'm overruling your objection.

3            MR. JONAS:  Fair enough.  Thank you.

4            THE COURT:  You did open the door on direct

5    examination to this issue.

6            MR. JONAS:  Understood, Your Honor.

7            THE COURT:  Okay.

8            MR. JONAS:  And that's why I -- at the beginning,

9    I let it go but we're kind of deep into this and I'm not

10   sure where it's going.

11           THE COURT:  I -- but he hasn't gotten an answer

12   yet.

13           MR. JONAS:  Thank you, Your Honor.

14           THE COURT:  Okay.

15   BY MR. HARBACH:

16   Q    Would you like me to repeat the question, sir?

17           THE MAIN INTERPRETER:  Yes.  Yes, please.  This is

18   the interpreter.

19           MR. HARBACH:  Sure.

20   BY MR. HARBACH:

21   Q    What is your understanding of what it means to invoke

22   the Fifth Amendment?

23   A    I listen to my counsel -- I listened to my counsel's

24   advice.

25   Q    Okay.  Well, I think I'll move on.

Kwok - Cross - Harbach                           162

1    At the very beginning of your examination, when you

2    were asked why you filed this Chapter 11 case, you mentioned

3    that it was because a judge in New York ordered you to pay a

4    $124 million fine in five days.  Do you recall that

5    testimony?

6    A    Yes.

7    Q    And I don't want to go too deep into this, except to

8    say that there was a judgment in place against you because

9    of a decision that was made by the judge against your side

10   of the lawsuit, correct?

11   A    Are you talking about a judgment from the Seventh

12   District of New York?  I know that one.

13   Q    Well, I'm talking about a judgment from the Supreme

14   Court of the State of New York, Justice Barry Ostrager

15   presiding.

16   A    Yes, I know that.

17   Q    Okay.  And so, there were actually -- there are two

18   judgments that have been issued.  One was a partial summary

19   judgment in connection with PAX's breach of contract claim.

20   Do you remember that?

21   A    Are you talking about me breaching the contract?

22   Q    I'm merely trying to illustrate that there are two

23   judgments against you from the New York Supreme Court.  I'm

24   not asking you to admit whether you agree with them or not.

25   I'm just asking if you know of their existence.

1    A    Yes.

2    Q    Okay.  You understand that one of them is a judgment in

3    connection with a contempt finding, right?

4    A    Yes.

5    Q    Okay.  And did you attempt to file an appeal bond in

6    connection with that contempt judgment?

7    A    Yes.

8    Q    How much was it?

9    A    Are you talking about appeal bond?

10   Q    Yes.

11   A    I don't understand what you mean by appeal bond.

12   Q    Do you know what an appeal bond is?

13   A    So are you asking about me -- about the case of

14   contempt of court issued by Justice Ostrager?

15   Q    That is correct.  And my question is, did you file or

16   attempt to file an appeal bond in connection with that

17   judgment?

18   A    My counsel is working on it, but I don't know the

19   details.

20   Q    So as far as you understand, it has not been done yet,

21   to your knowledge.

22   A    We already appealed against a judgment of Justice

23   Ostrager.

24   Q    I understand that.

25        MR. HARBACH:  And I'll move on very shortly, Your

1   Honor.

2   BY MR. HARBACH:

3   Q    Just so we're clear, my question is not about whether

4   you appealed the decision, it's about whether you posted an

5   appeal bond.

6        Now, a moment ago you said that you believed your

7   attorneys were working on it, which is fine.

8   A    Yes.

9   Q    Okay.  And so all I want to establish is that they're

10  working on it.  To your knowledge, it hasn't been done yet,

11  correct?

12  A    My counsel is handling this matter.

13  Q    Understood.  Thank you.

14       One other piece of cleanup from direct.  Mr. Jonas

15  asked you about the risks to you as a result of your

16  opposition to the CCP, and among the things you said was

17  that your family was arrested and that the CCP seized your

18  family's assets.  Do you recall that testimony?

19  A    Yes.

20  Q    Some of those assets were yours as well, correct?

21  A    No.

22  Q    So is it your testimony that the CCP has seized none of

23  your assets?

24  A    Yes.

25  Q    Okay.  Only your family's assets.

1    A    Yes.

2    Q    Because of your conduct.

3    A    Yes.

4    Q    Golden Spring New York was set up in March of 2015,

5    correct?

6    A    Yes.

7    Q    And I believe you said on direct that it's -- it was an

8    investment firm?

9    A    At the time, one of the functions served by this

10   company was to look for investment opportunities in the US

11   for the family.

12   Q    And since March of 2015, how many successful investment

13   opportunities have -- has Golden Spring carried out?

14   A    We had some cases whereby we were almost successful.

15   However, because of Bruno Wu representing the Chinese

16   Communist Party to make phone calls and make threats, so

17   they were in futile.

18   Q    I didn't hear the last word.  They were --

19   A    In futile.

20   Q    They were futile?

21        THE INTERPRETER:  Yeah.

22   BY MR. HARBACH:

23   Q    Okay.  So is the answer to my question that there have

24   been no successful investments by Golden Spring since it was

25   set up in March of 2015?

1    A    I don't know what happened after 2015.

2    Q    Okay.  So is the answer to my question that you have no

3    idea whether Golden Spring has had any successful

4    investments since 2015?

5    A    Yes.

6    Q    This is the company that you say is owned by your son?

7    A    Yes.

8    Q    The son whose love and goodwill has resulted in their

9    generosity to you, according to you?

10   A    Yes.

11   Q    A son with, given that, you're pretty close?

12   A    Yes.

13   Q    You've never asked him about how the business is going

14   or what they're interested in investing in?

15   A    That has to do with his partner, Bruno Wu, who went to

16   London and -- with many people, there were Chinese spies

17   from the Chinese Communist Party and try to kill them.

18       And in 2015, my daughter, my wife were arrested and --

19   because of this -- these issues, and the fact that I'm being

20   chased and was -- and they were attempted -- they attempted

21   to kill me, and therefore they did not want to tell me much

22   about their personal affairs or what happened, and I do

23   respect that.

24   Q    So your answer is, you've never asked him.

25   A    I did.

Kwok - Cross - Harbach                                          167

1    Q    And he refused to answer your question.  Is that it?

2    A    Because I was threatened to be killed and because of

3    me, many problems has risen.  Therefore, they did not want

4    to answer that.

5    Q    I didn't hear the tail end of the answer.  I'm sorry.

6    A    Because I was being threatened and because many

7    problems has risen because of me, they did not want to

8    answer that.

9    Q    Out of fear that what, that the Chinese Communist Party

10   would come after their assets?

11   A    It was not just about seizing the assets.  My son in

12   fact was arrested by the Chinese Communist Party before, and

13   he was being threatened to be killed, so he has been in this

14   process.  And also, many of his assets in Hong Kong and in

15   Mainland China have been seized or confiscated by them.

16   Q    And you've testified before, have you not, that you,

17   yourself, do not have any bank accounts, right?

18   A    Yes.

19   Q    And the reason for that, according to you, is because

20   of the Chinese Communist Party, right?

21   A    Yes.

22   Q    And the -- you can't hold on to any assets for the same

23   reason, right?

24   A    As I mentioned in the beginning, because of the 1989

25   incidents, I was arrested for 22 months, and then I became a

Kwok - Cross - Harbach                              168

1    personality that is anti Communist Party, and then in year

2    2000, I had a Hong Kong passport, and in 2015, I became anti

3    Chinese Communist Party.  Therefore, for these three

4    different stages and because of the political climate at the

5    time, I could not own or hold any assets.

6    Q    Okay.  And let me get to one of the points, hopefully.

7    You seem to have no trouble swearing in very public filings

8    that your son owns Golden Spring New York, right?  Isn't

9    that true, that you have sworn in very public filings that

10   your son is the owner of Golden Spring New York?

11   A    Yes.

12   Q    Okay.  And it's also true, is it not, that Golden

13   Spring has millions of dollars at its disposal?

14   A    I don't know how much money they have.

15   Q    Well, you know they have millions of dollars, right,

16   because you just testified a few minutes ago that they've

17   pledged to give you eight, or the estate, eight.  Right?

18        MR. JONAS:  Objection, Your Honor.  That's

19   actually not accurate.  He -- when he was asked about the

20   terms of the DIP, I believe he said $9 million.

21        THE COURT:  I think he can answer the question.

22        THE WITNESS:  Yes, the testimony I gave earlier

23   stated $9 million.

24   BY MR. HARBACH:

25   Q    And my question to you was, you know, don't you, that

Kwok - Cross - Harbach                                        169

1    Golden Spring has millions of dollars at its disposal?

2    A    Yes.

3    Q    Isn't it true that you owned Golden Spring when it was

4    set up in 2015?

5    A    No.

6    Q    Do you recall on April 6th of this year, at the 341

7    hearing that was held in New Haven, the one that was in

8    person?

9    A    Yes.

10   Q    Do you recall testifying that at one time you held a

11   title at Golden Spring but you couldn't remember what the

12   title was?

13   A    Yes.

14   Q    Is that still the case that sitting here today, you do

15   not remember what the title was?

16   A    Yes.

17   Q    Or when you held it?

18   A    That was in the very beginning in early 2015, when the

19   company just founded.

20   Q    For approximately how long?

21   A    I don't remember.

22   Q    On direct examination you were asked some questions

23   about Golden Springs being set up, and I believe you

24   testified that you assisted your son in setting up Golden

25   Spring.  Is that right?

1    A    Yes.

2    Q    And if we could just take a brief detour and put your

3    son's name on the record.  It is Qiang Guo, is that correct?

4    A    Yes.

5    Q    Okay.  And I'll spell that for the record.  Q-I-A-N-G,

6    last name G-U-O.

7    A    Yes.

8    Q    Thank you.  Now, you also testified on direct that none

9    of your funds were used to set up Golden Spring, right?

10   A    It did not use money that was owned by me.

11   Q    Okay.  It was used by money contained in an account you

12   owned, wasn't it?

13   A    I was authorized to use the account under my name.

14   Q    Do you recall, Mr. Kwok, preparing an affidavit in the

15   case of *Ace Decade Holdings Limited v. UBS AG* in New York

16   State Court in February of 2016?

17   A    I remember.

18            MR. HARBACH:  Madam Clerk, could you please

19   display PAX's Exhibit 18?  Actually, my mistake.  Could we

20   start with PAX's 19, please?  Sorry, Your Honor.

21            THE COURT:  That's okay.

22            THE CLERK:  On the screen is PAX Exhibit 19.

23            MR. HARBACH:  Thank you, ma'am.

24   BY MR. HARBACH:

25   Q    I'd like to go to the next to last page of 19, which is

1    -- looks like it should be 17.  It's the page that -- well,

2    it may be -- it may be a different page number, but it's the

3    page with Mr. Kwok's signature on it.

4         And for the record, Exhibit 19 is the Chinese version

5    of the affidavit I referenced earlier, and so what's on the

6    screen for the witness right now is the signature page for

7    that affidavit, and the question to the witness is whether

8    that is your signature, sir.

9    A    Yes.

10   Q    Okay.

11        MR. HARBACH:  Now, if we could, Madam Clerk,

12   rewind in that document to paragraph 36?

13        And, Your Honor, this is a little cumbersome

14   because of the Chinese, but what PAX intends to offer --

15   well, what PAX intends to do is to question the witness

16   using the version with Chinese characters that he signed,

17   and then we'll offer to the Court, the Chinese version as

18   well as the English translation that is also certified and

19   is a separate exhibit.

20        THE COURT:  Okay.  Thank you.

21   BY MR. HARBACH:

22   Q    So, Mr. Kwok, I'd like you to take a look at paragraph

23   36, please.  And so, could you please read paragraph 36 to

24   yourself and then just let me know when you're finished?

25   A    I'm done.

Kwok - Cross - Harbach                                    172

1   Q    Isn't it true that in this affidavit, in February of

2   2016, you swore that in April 2015, Mr. Wong, W-O-N-G, Ms.

3   Fu, F-U, and Ms. Lam, L-A-M, assisted me with setting up

4   Golden Spring New York by transferring funds from one of my

5   accounts at UBS to Golden Spring New York's JP Morgan Chase

6   Bank account in New York?

7   A    Yes.

8   Q    Okay.  In your affidavit, you didn't say anything about

9   your son setting up Golden Spring New York, did you?

10  A    Yes.

11  Q    Okay.  In fact, isn't it true that you set up Golden

12  Spring with your own money?

13  A    That money was my son's money, but my account was being

14  used to transfer funds to his account.  And that is not my

15  money.

16  Q    How much money was it?

17  A    I cannot remember clearly.  However, after that --

18  well, I cannot remember.

19            MR. HARBACH:  Can I just have one moment, Judge?

20            THE COURT:  Certainly.

21       (Pause)

22            MR. HARBACH:  Thanks for the indulgence, Your

23  Honor.  I hope we've streamlined things a little bit.

24            THE COURT:  That's fine.

25  BY MR. HARBACH:

1    Q    Mr. Kwok, isn't it true that in November or December of

2    2014, you had $1 billion at your disposal?

3    A    Yes.

4    Q    Okay.  That wasn't your son's money, was it?

5    A    That was family's money, including my son's money.

6    Q    Okay.  That was, as you said a moment ago, at your

7    disposal.

8    A    I was authorized to use that money.

9    Q    Did I hear you correctly earlier to say today that you

10   never -- you never worked at Golden Spring New York?

11   A    Yes.

12   Q    Okay.

13   A    As I mentioned earlier, at one point, I did have a

14   title.

15   Q    Okay.  Did you do any work in connection with that

16   title?

17   A    I did get a salary.

18   Q    You got a salary.  How much was the salary?

19   A    $300,000 U.S. dollars.

20   Q    For what time period?

21   A    2015.

22   Q    So for the calendar year 2015, you earned $300,000 from

23   Golden Spring?

24   A    Around that, but I cannot remember clearly.

25   Q    Okay.  For doing what?

1    A    At the time it was to help setting up Golden Spring New

2    York, and also to serve as an advisor to find investment

3    opportunities.

4    Q    Okay.  An advisor to whom?

5    A    Golden Spring.

6    Q    Who at Golden Spring?  Who did you give advice to?

7    A    My son.

8    Q    According to you, the Golden Spring New York has

9    advanced you loans to fund various lawsuits that you're

10   involved in, some $21 million, right?

11   A    Yes.

12   Q    Okay.  Now I'm not -- I'm talking about those loans

13   now, the 21 million.  Okay?  Isn't it true that you

14   requested those loans yourself from your son?

15   A    Yes.

16   Q    Okay.  And what did he say?

17   A    He just loaned it to me.

18   Q    Okay.  Did he say anything about needing to consult

19   with the other directors of Golden Spring?

20   A    That was handled by my son.

21   Q    Did he say anything about needing to convene a vote of

22   the other directors of Golden Spring, a vote of the board,

23   before lending you millions of dollars?

24   A    It was because my son and the family office in Europe,

25   including other family members, would hold meetings to talk

1    about that.  So my son would convene meetings to handle that

2    issue, but I don't know the details.

3    Q    My question is what he told you, and I think a moment

4    ago you said he just told you that he would do it.

5    A    That was a long time ago and there are too many

6    details, but he would consult family members and their

7    lawyers, and then they would hold meetings and I don't

8    handle all the nitty gritty details.

9    Q    So is your testimony that when you asked your son for

10   loans to cover your litigation expenses, he told you that he

11   needed to consult with the family first?  Is that your

12   testimony?

13   A    Yes.

14   Q    Okay.  Isn't it true that you don't know how many loans

15   you have had from Golden Spring?

16   A    I know.

17   Q    You know or you don't know?

18   A    I know.

19   Q    Okay.  How many loans have you had from Golden Spring?

20   A    210 million.

21             UNIDENTIFIED SPEAKER:  21 million.

22             THE MAIN INTERPRETER:  I'm sorry.  21 million.

23   BY MR. HARBACH:

24   Q    Yeah.  I'm not asking about the total amount.  I'm

25   asking about the number of loans.

1    A     I cannot remember clearly.

2    Q     Okay.  And you don't know which of the loans were put

3    in writing?

4    A     I remember a few of them.

5    Q     But you don't know which ones or how many?

6    A     I know parts of them related to the litigations, but I

7    cannot remember all of them.  That is impossible.

8    Q     Well, all I'm asking is whether of the -- however many

9    loans there are, do you know how many of them were in

10   writing?

11   A     I believe more than 10 were in writing, but I cannot be

12   sure at all.

13   Q     And isn't it also true that you don't know whether the

14   written agreements were in English or Chinese?

15   A     They must have been all in English.  Some of them have

16   Chinese versions.

17          MR. HARBACH:  Just a -- just a moment, please,

18   Judge.

19          THE COURT:  Certainly.

20      (Pause)

21   BY MR. HARBACH:

22   Q     Do you recall giving testimony at a meeting of

23   creditors on March 21st, 2022, by telephone?

24   A     I remember.

25          MR. HARBACH:  And I'll ask for PAX 17 to be

1    displayed please, Madam Clerk.

2              THE CLERK:  On the screen is Exhibit 17, PAX

3    Exhibit 17.

4              MR. HARBACH:  Thank you, ma'am.

5              I'd like to go to page 73 of the transcript.

6    Maybe I can try and control it myself.

7              THE COURT:  She has to give it to you first.

8              MR. HARBACH:  Oh, okay.

9              THE COURT:  But if you'd rather do that, she's --

10   she can do that for you.

11             THE CLERK:  It's up to you, whatever you -- I just

12   gave you control.

13             MR. HARBACH:  Okay.  I think that will work.

14   Thank you.

15             THE COURT:  Are you having trouble moving it?

16             MR. HARBACH:  I think I've got it.

17             THE COURT:  Okay.  Thank you.

18             MR. HARBACH:  Okay.  So we're in that.  That's

19   behind 30.  Okay.  One off.

20             Okay.  For the record, I'm displaying Page 73 of

21   PAX 17, and I'm going to direct the witness's attention to

22   Lines 4 through 8.

23   BY MR. HARBACH:

24   Q    Mr. Kwok, isn't it true that you were asked this

25   question, were any of the loans that were put in writing in

1    English, and your answer was, I don't remember?  And then

2    you were asked, were any of them in Chinese, and your answer

3    was, I don't remember.  And my question to you is, do you

4    have a different memory of that today?

5    A    I cannot read English so I have to rely on the

6    interpretation.  Of course, my memory today is different

7    from before.

8    Q    Okay.  And if I had you correctly, your memory today is

9    that most of the loans in writing were in English?

10   A    Yes, that's what I remember.

11   Q    Okay.  Now isn't it also true that you did not know the

12   $21 million total amount until lawyers told you that's how

13   much it was?

14   A    What do you mean by that?

15   Q    Well, before lawyers told you that the total was $21

16   million that Lamp -- excuse me, that Golden Spring had

17   loaned you in litigation funding, did you know that that's

18   what the total was?

19   A    I know.

20   Q    Okay.  Let's stick with where we are on the transcript,

21   which is again, PAX's 17 at Page 73.  Directing your

22   attention to Line -- starting at Line 22 of that page.

23        Question: "If you don't know -- " sorry.  Withdrawn.

24        Isn't it true that you were asked this question and you

25   gave this answer?  "If you don't know how many times you

1    took out loans from Golden Spring, not all of which were in

2    writing, how do you know how much you owe them?"

3            MR. HARBACH:  I'll let you interpret the question,

4    then I'll give the answer.

5    BY MR. HARBACH:

6    Q    And your answer was, "My lawyer an the lawyer of Golden

7    Spring, they communicate with each other, tells me the

8    amount they can define is 21 million."

9            Isn't that what you said, sir?

10   A    Well, I cannot read English and through the

11   interpretations earlier, from my recollection, at the time

12   through the counsels I knew that the figure was 21 million.

13   Q    And that's all I'm trying to establish is that your

14   knowledge about the amount, the 21 million, that came from

15   your lawyers, correct?

16   A    I confirmed that with my lawyer.

17   Q    Okay.

18           MR. HARBACH:  Thank you, Your Honor, for your

19   patience.  I have no further questions.

20           THE COURT:  I appreciate that.  Thank you.

21           MR. HARBACH:  Oh, well, I suppose I could do it at

22   the end, but I intended to offer PAX's 17, 18, and 19.

23           THE COURT:  Okay.  Any objection?  Let me look at

24   your list?  PAX's 17, 18, and 19 -- 17 has no objection.

25           MR. HARBACH:  Correct.

1      THE COURT:  It's the transcript of the 341

2  meeting.  So that will be admitted as a full exhibit.

3      With regard -- go ahead.

4      MR. HARBACH:  18 is the ACE Decade affidavit that

5  I used for impeachment purposes.  18 is the English version

6  and 19 is the Chinese version.

7      THE COURT:  Okay.  And does the debtor still have

8  an opposition with regard to the admission of exhibits --

9  PAX Exhibits 18 and 19 in full?

10      MR. JONAS:  Your Honor, we have no objection to

11  obviously the portions that were used, such that Mr. Kwok

12  had an opportunity to respond to them.  We have -- we'll

13  withdraw any objections and have no further objection.

14      THE COURT:  Okay.  So then, Exhibits 17, 18, and

15  19 are admitted as full exhibits.  PAX's Exhibits 17, 18,

16  and 19 are admitted as full exhibits in connection with the

17  evidentiary hearing on the DIP financing motions.

18      MR. HARBACH:  Thank you, Your Honor.

19      THE COURT:  Thank you.

20    (PAX Exhibit Nos. 17 through 19 admitted into

21  evidence.)

22      THE COURT:  Attorney Claiborn?

23      MS. CLAIBORN:  Your Honor, if I could, I have a

24  few questions.

25      THE COURT:  Certainly.  And then, Mr. Jonas, are

Kwok - Cross - Claiborn                                        181

1    you going to have some redirect?

2              MR. JONAS:  I doubt it, Your Honor, but --

3              THE COURT:  Okay.

4              MR. JONAS:  -- I'd like to consider that after.

5              THE COURT:  Okay.  That's fine.  Just curious.

6    Thank you.  Go ahead, Attorney Claiborn.

7    BY MS. CLAIBORN:

8    Q     Good afternoon, Mr. Kwok.  Did you negotiate the terms

9    of the debtor in possession loan with your son?

10   A     First of all, I would like to say, good afternoon.  And

11   regarding the exact terms of the loans, it was my lawyer and

12   their lawyers had negotiations.

13   Q     Before you filed your Chapter 11 bankruptcy case, did

14   you ask your son to loan you money to fund your bankruptcy

15   case?

16   A     Yes.

17   Q     And when you asked your son to give you money, did you

18   ask him to loan it to you or to gift it to you?

19   A     It was a loan.

20   Q     And why did you ask for it to be a loan?

21   A     It was because Golden Spring, the company of my son, is

22   also a family company and that money is not just my son's

23   money.

24   Q     Mr. Kwok, do you know the source of the money that

25   Golden Spring is using to loan to the estate if the loan is

1    approved?

2            THE MAIN INTERPRETER:  Okay.  I'm sorry.  Counsel,

3    do you mind repeating the question again?

4    BY MS. CLAIBORN:

5    Q    Do you know what the source is of the money that Golden

6    Spring is going to loan to your bankruptcy estate?

7    A    I don't know.

8    Q    Did you ask?

9    A    Yes, I did.

10   Q    And what was the answer?

11   A    My son asked me not to deal with it.  He would

12   communicate with my lawyer.

13   Q    Do you know whether or not your son told your lawyer

14   what the source of the money would be?

15   A    I don't know.

16   Q    Did you ask your lawyers?

17           MR. JONAS:  Objection, Your Honor.  She's asking

18   for direct communication with counsel.

19           THE COURT:  No, she just asked -- the question

20   was, did he ask his lawyers about the source of the funds.

21   That's -- he can answer that question, just yes or no.

22           MR. JONAS:  Okay.  Thank you, Your Honor.

23           THE WITNESS:  My lawyer did not answer that.

24   BY MS. CLAIBORN:

25   Q    The money that Golden Spring uses to fund your life

1    expenses, your personal living expenses, is that a loan or a

2    gift?

3    A    It's a gift.

4    Q    Why is that a gift and not a loan?

5    A    Because I could not repay it, and regarding supporting

6    my daily living, as his dad, well I had my son when I was

7    18, and from the Eastern culture, that is normal and also

8    the fact that right now I'm being threatened for my life.

9    Q    So why is it that the debtor in possession loan that

10   Golden Spring is not a gift?  Why isn't it just given to you

11   as money as a gift?

12   A    It was because since they loaned me $21 million before,

13   and also including this one, it's a huge sum of money and I

14   wish I could repay that, and that was the result of the

15   communication between his lawyer and my lawyer.

16   Q    If the Court approves the loan from Golden Spring,

17   where will the money be held?

18   A    Where that money would be placed, that would be decided

19   by the judge and my counsel.

20        MS. CLAIBORN:  Thank you.  I don't have any

21   further questions.

22        THE COURT:  Okay.  Thank you.

23        MR. JONAS:  Nothing further, Your Honor.

24        THE COURT:  Okay.  Are you calling any other

25   witness, Mr. Jonas?

184

1          MR. JONAS:  No, we're not, Your Honor.

2          THE COURT:  Okay.  Mr. Kwok, you can step down.

3    Thank you.

4          THE WITNESS:  Certainly, Your Honor.

5          THE COURT:  Thank you.

6          THE WITNESS:  I would like to say that I really

7    appreciate Your Honor to give me the chance to sit here

8    today.

9          THE COURT:  Okay.

10         THE WITNESS:  Because the fact that I cannot speak

11   English, I cause more troubles for you.

12         THE COURT:  Okay.  Thank you.  Thank you.  All

13   right.  Any -- no further witnesses for the debtor, correct?

14         MR. JONAS:  Correct, Your Honor.

15         THE COURT:  Okay.  Witnesses for PAX?  Any further

16   witnesses?

17         MR. HARBACH:  Your Honor, we have no additional

18   witnesses.  We do have one additional exhibit we would offer

19   to the Court, and it's PAX's 15.

20         THE COURT:  Okay.  Take a minute.

21         MR. HARBACH:  It's the deposition transcript of

22   Xiaoping Wang, also know as Yvette Wang.

23         THE COURT:  Okay.

24         MR. HARBACH:  It was the -- sorry.

25         THE COURT:  Go right ahead.

1          MR. HARBACH:  I should also say that it was the

2     30(b)(6) deposition of Golden Spring.  She was testifying in

3     that capacity, and I mentioned to counsel during the meet

4     and confer process that I would tender the entire exhibit,

5     and we had marked the entire exhibit, anticipating a

6     possible completeness objection were we to only offer

7     portions.  So that's why we offered the whole thing.

8          But if counsel would prefer that we only offer the

9     precise pieces that we want Your Honor to focus on, I'm

10    prepared to put those in the record, and so, I don't know

11    how the Court wants to proceed.

12         THE COURT:  Okay.  Well, I want to just hear the

13    objection from the debtor first, because apparently the

14    debtor objects to this transcript.

15         MR. JONAS:  Yes, Your Honor.  Jeff Jonas, Brown

16    Rudnick for the Debtor.

17         Your Honor has noted, we have objected.  We

18    continue to object on hearsay grounds.  The witness is, as I

19    understand it, within subpoena power.  They certainly could

20    have brought her here if they intended to have her as a

21    witness at trial.

22         We didn't have any agreement that they would --

23    we'd permit transcripts in place of live testimony.  I think

24    it's inappropriate and it's just not a decision somebody

25    gets to make that we're not going to bring a witness when

186

1    the witness is available and could be brought to trial.  So

2    I'll object.

3                    THE COURT:  And where is the witness located?

4                    MR. JONAS:  My understanding is the witness is in

5    New York within 100 -- I actually asked the question, Your

6    Honor.  Within -- it might be 60 miles, but I believe it is

7    within 100 miles.  I'm not sure.  I wanted to be prepared in

8    case you asked me, so they certainly could have served a

9    subpoena and she could have been here.

10                   We didn't think it's necessary, and having the

11   record come in, I continue to think it's not necessary.  But

12   again, I don't think counsel just gets to make a choice in a

13   case when you're having a trial and a witness is available,

14   to substitute in a transcript.

15                   THE COURT:  Okay.  Your -- according to the joint

16   grid, your basis of your exhibit -- excuse me, of the

17   objection was hearsay, but that's not what I'm hearing.  I'm

18   hearing you say they could have brought the witness in and

19   we're not going to allow, under the Federal Civil -- Rules

20   of Civil Procedure, you shouldn't allow the introduction of

21   a transcript when the witness could be here in person.

22                   MR. JONAS:  I think that -- may apologies if

23   somehow my vernacular is not correct.  I think that's

24   exactly what hear --

25                   THE COURT:  Well, I mean, it could --

1          MR. JONAS:  -- hearsay is, Your Honor.

2          THE COURT:  -- it can and it may and it may not

3     be.  I mean, this is the Rule 30(b)(6) person that you

4     designated to be the 30(6)(b) person, right?  So you could

5     argue it -- we want to be very clear about it.  I mean,

6     hearsay usually is not the testimony of the 30(b)(6)

7     representative.

8          But I understand what you're saying about your

9     issue of why didn't the PAX subpoena and bring this

10    individual to the court.  That's your -- that's your

11    concern, so I'm going to -- I'm going -- not your concern,

12    your objection.  So I am going to ask Mr. Harbach, what is

13    his response to the fact that this witness was not

14    subpoenaed and brought to court today?

15         MR. JONAS:  Your Honor, may I -- I apologize.  I

16    just want to correct the record.

17         THE COURT:  Sure.

18         MR. JONAS:  Not argue.  It's not the --

19    technically, it's not the debtor's 30(b)(6) witness, it's

20    the Golden Spring 30(b)(6) witness.  I just -- just for the

21    record, Your Honor.

22         THE COURT:  Oh, okay.  I misunderstood.  See, I

23    haven't seen anything, so --

24         MR. JONAS:  Understood.

25         THE COURT:  Okay?  So I thought that this was the

1    debtor's 30(b)(6) representative.  So this is --

2              MR. JONAS:  Mr. Kwok is obviously --

3              THE COURT:  -- Golden --

4              MR. JONAS:  -- the debtor and is here.

5              THE COURT:  Well, I understand, but I don't know

6    what happened in your discovery.

7              MR. JONAS:  Understood, Your Honor.

8              THE COURT:  So I -- but I'm glad you corrected the

9    record.  Thank you.  So -- well, wouldn't the appropriate

10   person to be objecting to that be Golden Spring?

11             MR. JONAS:  I don't think so, Your Honor.

12             THE COURT:  Why?

13             MR. JONAS:  It's -- I mean, again, we processed,

14   if you will, the exhibits with counsel.  We raised the

15   objection.  I'm raising the objection here.  It's our trial

16   if you will, on our motion regarding the DIP, and if they

17   want to use a 30(b)(6) witness -- another party, if you

18   will, 30(b)(6) transcript, I think it's inappropriate.

19             THE COURT:  Okay.  Mr. Harbach, what's your

20   response to that, Mr. Harbach?

21             MR. HARBACH:  I'll direct the Court to Rule 32 of

22   the Federal Rules of Civil Procedure.

23             THE COURT:  Because they're not a party?  Is that

24   what you're trying to tell me?

25             MR. HARBACH:  No, to the contrary.  I think they

1    are a party.

2           THE COURT:  Okay.  Hold on.  I meant the debtor.

3    See, I didn't know who -- I -- as you all would expect, I

4    would think -- oh yes.  See, I'm sorry.  You can -- I

5    apologize.  Thank you.  I'm sorry.  I don't -- I didn't look

6    at any of your exhibits, you know?  So I don't know what

7    they're about until and unless you introduce them.

8           So, all right.  I'm looking at --

9           MR. HARBACH:  Mr. --

10          THE COURT:  -- 32.

11          MR. HARBACH:  Sure.  And first of all, Mr. Jonas

12   is quite correct, of course.  Ms. Wang was the 30(b)(6)

13   witness designated by Golden Spring.

14          THE COURT:  Okay.

15          MR. HARBACH:  That's correct.

16          THE COURT:  Okay.

17          MR. HARBACH:  So our basis for offering it, as you

18   can see, the 32(a) is captioned using depositions, and so we

19   believe that we satisfy all of A, B, and C, right there in

20   general.  It says that all -- at a hearing or trial, all or

21   part of a deposition may be used against a party on these

22   conditions.

23          A, the party was present or represented at the

24   taking of the deposition, or had reasonable notice of it.

25   Well, the -- I would hope that counsel would be willing to

1   accept my proffer that Ms. Wang was represented at the

2   deposition, and indeed, the transcript makes it quite clear

3   that she was, or that Golden Spring was.  So A should be

4   noncontroversial.

5          B, that it is used to the extent it would be

6   admissible under the Federal Rules of Evidence if the

7   deponent were present and testifying.  Well, that's plainly

8   true insofar as it is essentially a sworn out-of-court

9   statement of a live witness.

10          C, you have to satisfy one of these subsections,

11   Rule 32(a)(2) through (8), and where we believe we squarely

12   fall is in 32(a)(3), which is captioned, Deposition of

13   Party, Agent, or Designee.

14          So we think that Golden Spring, by virtue of being

15   a proposed financier for the debtor in possession, and in

16   light of the fact that they are, to quote Section 8B of the

17   agreement, seeking rights, remedies, powers, and privileges,

18   and in addition to that are seeking a good faith finding

19   from the Court, for all of those reasons, we think it's

20   imminently reasonable for the Court to treat Golden Spring

21   as a party, at a minimum for purposes of this rule.

22          I'll just note finally, insofar as the

23   impropriety, leaving aside whether it falls within the

24   rules, is the impropriety of this, of course the debtor had

25   a lawyer present at the deposition of Golden Spring's

1    30(b)(6) witness and had an opportunity to cross her; chose

2    not to.  And I'll also note that at one point, Ms. Wang

3    herself was on the debtor's witness list for this very

4    hearing today, and they removed her.

5            So I think that the suggestion that this is

6    improper isn't quite as strong as it otherwise might sound

7    under those circumstances.  But I think candidly, that's all

8    beside the point.  We think that, for the reasons that I

9    said earlier, that the entirety of the transcript is

10   admissible under Rule 32.

11           THE COURT:  Okay.  Thank you.  Any response,

12   Attorney Jonas?

13           MR. JONAS:  Yes, Your Honor.  May I just have one

14   minute?

15           THE COURT:  Yes.

16           MR. JONAS:  Thank you.  Just want to check one

17   thing.

18       (Pause)

19           MR. JONAS:  Your Honor.

20           THE COURT:  Yes.

21           MR. JONAS:  One point I wanted to add on to that

22   is, this is a rule that is incorporated into the contested

23   matter rules under Rules 9014.  So this --

24           THE COURT:  Oh, yes.

25           MR. JONAS:  -- this is also Bankruptcy Rule 7032.

1          THE COURT:  Yes.  Yes.  Yep.  Okay.  Thank you.

2          MR. FRIEDMAN:  No objection in that respect, Your

3   Honor.  Just give me one moment, please.

4          MR. JONAS:  Your Honor, Jeff Jonas from Brown

5   Rudnick on behalf of the debtor.

6          Your Honor, I'll renew my objection, just make a

7   couple quick comments.  And let me just say, Your Honor,

8   we're not particularly concerned about the deposition.  That

9   being said, I just, I think we're entitled to have a fair

10  trial, and from our perspective, again, they are not a

11  party.  This was -- this is effectively our motion, the

12  debtor's motion.  We're prosecuting it and we're a party.

13  Certainly, PAX, the objector, is a party, and I think those

14  are the parties for purposes and I think --

15         THE COURT:  Well, Golden Spring is the lender.

16         MR. JONAS:  I understand that, Your Honor.

17         THE COURT:  So how are they not a party to --

18         MR. JONAS:  I don't think they're -- they've put

19  the money up, the money is available, they're the lender.

20         THE COURT:  Right.  But the Court can -- the Court

21  can -- the Court has the obligation to understand what the

22  lender is or is not willing to do, and that may include the

23  testimony of the lender with regard to that issue.  I mean,

24  I've --

25         MR. JONAS:  And let me say, Your Honor --

1       THE COURT:  -- and every other -- and any other

2    contested debtor in possession financing hearing that I've

3    seen, the lender does -- you know, if there's a -- if

4    there's a contested issue, the issue of the lender -- what -

5    - is the lender ready, willing, and able to loan?  Is the --

6    what are the terms and conditions all --

7       MR. JONAS:  Exactly, Your Honor.  The money is

8    here, so --

9       THE COURT:  Well, I don't know that it's here.

10   Where is the proof in the record that's here?

11      MR. JONAS:  Well, you had -- you had testimony

12   from Mr. Kwok.

13      THE COURT:  Well, I had testimony from Mr. Kwok

14   that says he believes it's all here.  He's not sure if it's

15   all here, and -- but he believes it's here.

16      MR. JONAS:  There was no -- it's uncontroverted.

17      THE COURT:  I didn't say it was controverted.  I'm

18   just saying it -- he said he believes it's all here.  I

19   don't --

20      MR. JONAS:  Oh, okay.

21      THE COURT:  -- there's no record in the -- there's

22   no document in the record that says it's here.

23      MR. JONAS:  I don't -- with all due respect, Your

24   Honor, I don't think -- we have put on our case.  We have

25   had a witness.  He has testified.  It was -- he could have

194

1    been crossed.  He wasn't.  It's uncontroverted.  That is a

2    fact.  I don't think -- I appreciate you --

3              THE COURT:  I think it's a fact insofar as what he

4    said.

5              MR. JONAS:  Fair.  Fair enough, Your Honor.

6              THE COURT:  And he said, I believe it's here.  He

7    doesn't know if it's here.

8              MR. JONAS:  I understand, Your Honor.

9              THE COURT:  Okay.

10             MR. JONAS:  And so I -- look, as I said, if the

11   Court feels I need to -- I need to stand on my objection for

12   the record, however, I certainly respect the Court very

13   much.  If the Court feels it's necessary to take in the

14   transcript, my only comment would be, we'd ask the whole

15   transcript come in.

16             We haven't been -- there's nothing been designated

17   to us.  It's a little unfair to designate portions now on

18   the fly.  So if they want to put the transcript in, so be

19   it, Your Honor.  I pre -- I want to -- I don't want to

20   belabor this with the Court, and I want to respect the

21   Court's opinion on that.

22             THE COURT:  I haven't ruled on anything.  I've

23   really just been asking questions at this point.

24             MR. JONAS:  Understood.

25             THE COURT:  Okay?  To understand the parties'

195

1    positions.

2              MR. JONAS:  And our position is, we continue the

3    objection, Your Honor.

4              THE COURT:  Okay.  Thank you.  Mr. Harbach,

5    anything else you want to add?

6              MR. HARBACH:  I don't have anything else to add,

7    Your Honor.  Just let us know how you'd like to proceed.

8              THE COURT:  Okay.  Well, the -- when I'm look --

9    you know, I haven't looked at Rule 32 in the last few weeks

10   so I -- you know, I'm looking at the -- I'm looking at the

11   language of 32.

12             The only part that is a problem for PAX, if it is

13   a problem, is 32(a)(4), because 32(a)(1) -- 32(a)(2) --

14   32(a)(4) could be a problem because it says -- 32(a)(1)(C)

15   says, "And the use is allowed by Rule 32(a)(2) through (8)."

16   So does that mean it's got to be allowed on all eight?  All

17   of those?

18             I mean, I'm looking at this.  I know 7 doesn't

19   apply because there isn't a substitution of a party.

20   Deposition taken in an earlier action doesn't apply because

21   that's not what you're trying to do.  You're not trying to

22   enter a deposition taken in an earlier action.  Using part

23   of the deposition, you may -- that might be fine.

24             Limitations on use, that at this point, no one is

25   arguing that the deposition was taken on short notice or the

1    deponent was unavailable at the time of the deposition.

2    Nobody has a problem with impeachment and other uses, or

3    deposition of a party agent or designee, but the problem is

4    -- I mean, I don't know, I haven't looked in a long time.

5    Does A -- does 32(a)(2) through (8) mean you have to meet

6    all those requirements?  It can't, because all those

7    requirements don't exist all at the same time.

8         MR. HARBACH:  Yeah.  And I think that that is in -

9    - perhaps in starkest relief, Your Honor.  If you look at 2

10   and 4, because 2 says, any party.  Four says -- oh, I'm

11   sorry.  That's a witness whether or not a party.  That's

12   true.

13        Well, in any event, Your Honor, I -- all right.

14   So, Your Honor, PAX concedes that Ms. Wang is not

15   unavailable.

16        THE COURT:  Okay.

17        MR. HARBACH:  So, conceded.

18        THE COURT:  Okay.

19        MR. HARBACH:  Notwithstanding that, if --

20     (Pause)

21        MR. HARBACH:  If you look at -- sorry, I said 2

22   earlier.  If you look at 3, Your Honor, an adverse party may

23   use, for any purpose, the deposition of a party --

24        THE CLERK:  Attorney Harbach, you're a little low.

25        MR. HARBACH:  Oh, sorry.

1          THE CLERK:  We're not picking you up.

2          THE COURT:  Go ahead.

3          MR. HARBACH:  Thank you, Judge.  If you look at

4    32(a)(3), it says, "An adverse party may use, for any

5    purpose, the deposition of a party or anyone who when

6    deposed was the party's 30(b)(6) representative."  And --

7          THE COURT:  It does say that.  I mean, 4 does not

8    say that.

9          MR. HARBACH:  It does.  That's true.

10         THE COURT:  Which is why I asked the question,

11   not knowing that the 30(b)(6) representative wasn't the

12   debtor, but it was the debtor's representative, the Golden

13   Spring, which is when I started the conversation I said, you

14   mean you're opposing a 30(b)(6) representative's deposition,

15   but not knowing that it wasn't the debtor, it was Golden

16   Spring.

17         MR. HARBACH:  Well, I think maybe one observation

18   that helps is that it can't be that Rule 32 is restricted to

19   situations -- to 30(b)(6) depositions.

20         THE COURT:  I agree with you.

21         MR. HARBACH:  And if it --

22         THE COURT:  That's why -- that's why I said, I

23   don't think (a)(1)(C) means that you have to comply -- that

24   the use of it has to comply with every situation in 32(a)(2)

25   through (8).

1      MR. HARBACH:  I think -- I agree with you, because

2   otherwise, if 3 were required, then it would effectively

3   restrict the rule to 30(b)(6) situation.

4           Now, I also agree with the Court that, for

5   example, 5, caption limitations on use, I mean, I think that

6   would plainly apply, but --

7           THE COURT:  If that situation was present, but

8   it's not.

9           MR. HARBACH:  If it was -- if it were present,

10   yes.  In other words, you know, 2, 3, and 4, are all

11   permissive.  Those are different means by which a party can

12   do something, and then 5 is limitations, and 6, 7, and 8 are

13   other unique circumstances.

14           THE COURT:  Right.

15           MR. HARBACH:  So I don't think it's necessarily --

16   you have to put blinders on and only look at 2 through 8 and

17   not any of the others, but I do think that 2, 3, and 4

18   cannot all apply at the same time.

19           THE COURT:  Right.  I agree.  They all can't apply

20   at the same time.  It doesn't make sense.  So the debtor's

21   objection to the introduction of PAX Exhibit 15, the

22   30(b)(6) representative of Golden Spring is overruled.

23           MR. JONAS:  Thank you for your consideration, Your

24   Honor.

25      (PAX Exhibit No. 15 admitted into evidence)

1          THE COURT:  Thank you.  All right.  So are we now

2     -- what are we -- are we moving to closing arguments based

3     upon the evidence that's submitted?

4          MR. FRIEDMAN:  Yes, Your Honor.  That concludes

5     our evidentiary submission, if I may --

6          THE COURT:  Okay.

7          MR. FRIEDMAN:  -- make some remarks about the DIP?

8          THE COURT:  Yes, please.

9          CLOSING ARGUMENT ON BEHALF OF CREDITOR PAX

10          MR. FRIEDMAN:  Thank you.  So, Your Honor, I have

11     really three areas I want to address.  Sort of, one is big

12     picture, two is some of what you heard today and why you

13     shouldn't believe it, and the third is the order, the

14     proposed order.

15          And to be fair -- I don't know if fair is the

16     right word, but to be clear about the order, I'm going to

17     refer to the current version of the order.  There is an

18     updated version of the order, apparently based on the

19     proposed settlement between the committee and the debtor.

20     I'm going to be --

21          THE COURT:  When you say the current version, do

22     you mean the version attached to the original DIP financing

23     motion?

24          MR. FRIEDMAN:  No, the version that was filed with

25     the Court on -- the redlined version --

1          THE COURT:  Yesterday?

2          MR. FRIEDMAN:  -- that was filed --

3          THE COURT:  Last night?

4          MR. FRIEDMAN:  -- I thought the most recent

5     version of the DIP financing was on the 10th of April.

6          THE COURT:  Oh, okay.  Well, then I would like to

7     get there if you would give me a --

8          MS. CLAIBORN:  I think it's ECF 198.

9          MR. FRIEDMAN:  Yes.

10         THE COURT:  Thank you.

11         MR. FRIEDMAN:  Yes.

12         THE COURT:  And if you would let me get there,

13    then -- give me one moment, then I'll be able to follow you

14    --

15         MR. FRIEDMAN:  Okay.

16         THE COURT:  -- much better than if I'm trying to

17    find it so --

18      (Pause)

19         THE COURT:  So you would like me -- would you like

20    me to be looking at the redlined version of that order?  Is

21    that what you're suggesting, counsel?

22         MR. FRIEDMAN:  Yes, Your Honor, when I get to that

23    point.  That's -- when I get to that portion of my remarks.

24         THE COURT:  Okay.  Let me -- then I think I'm

25    there.

1          MR. FRIEDMAN:  Okay.

2          THE COURT:  I just want to make sure I am there.

3     (Pause)

4          THE COURT:  Okay.  So what I'm looking at, when

5     you get to the point that you were actually asking me to

6     consider the terms and conditions of the order, I'm looking

7     at ECF 198, starting at page 29.  Does that sound right?

8          MR. FRIEDMAN:  Yes, Your Honor.

9          THE COURT:  Okay.  Then go right ahead, please.

10          MR. FRIEDMAN:  Okay.  So, Your Honor, we have here

11     a proposed DIP between Golden Spring and Mr. Kwok.  It was

12     very subtle.  I'm not sure if you heard it.  The record will

13     reflect it.  These are not independent entities.  Mr. Kwok

14     referred today during his testimony, to Golden Spring as

15     "we".  Small word, enormous consequences.

16          Mr. Jalbert also testified that there was a member

17     of Mr. Kwok's legal team, Melissa Francis.  Who is Melissa

18     Francis, he was asked?  Somebody he thinks works for Golden

19     Spring.  There's no separation between these two entities,

20     Your Honor.  This is a sham transaction.

21          And I realize it's appealing.  It looks appealing

22     because in some respects it has some potentially salutary

23     goals, but it doesn't work.  It doesn't make sense.  Who

24     would spend $8 million, maybe $9 to defend $3,850 in assets?

25          Brown Rudnick alone's time today is probably cost

202

1    infinitely more than the $3,850 that Mr. Kwok asserts he has

2    in assets.  So this DIP is designed to do one of two things.

3    Either protect Mr. Kwok's massive assets that he sat there

4    and said he didn't have, or to protect Golden Spring's

5    assets from a variety -- which is a non-debtor, from people

6    coming straight after it, for really being Mr. Kwok's money.

7    Neither one of those is an appropriate use of a debtor in

8    possession financing.

9         This case shouldn't be run for Golden Spring's

10   benefit, and we shouldn't be spending, not just the 9

11   million because it's really not -- 9 million to $3,850

12   vastly understates the amount of assets that have been put

13   into defending Mr. Kwok, because there's also the $21

14   million loan that you heard about, loan, with quotes,  and

15   the million dollars from Lamp.

16        So when you add that up, you have $31 million to

17   protect $3,850.  It doesn't make any sense unless something

18   much more than meets the eye is happening here, and the

19   debtor and Golden Spring are asking this Court to bless a

20   transaction that is furthering that inappropriate scheme.

21        Now, Your Honor, PAX, in its reply brief to our

22   papers, and you heard it sort of from Mr. Kwok today,

23   attempts to blame PAX as -- the debtor attempt to blame PAX

24   as the catalyst of this case, and he needs to, you know,

25   straighten things out because of things PAX did.

203

1          The debtor's own conduct forced him here today.

2     He, I think effectively conceded that he had never been

3     transparent before.

4          Now, I don't know if what you heard today was

5     transparent, but his testimony today was, I didn't assert

6     the Fifth Amendment today because I wanted to be

7     transparent, which begs the question, because he gave no

8     other answer, why didn't he want to be transparent before?

9     Is that an -- is it appropriate to start borrowing money

10    under a debtor in possession financing because you've been

11    non-transparent in the past and all of a sudden you're going

12    to turn a new leaf over?  I realize some of this has overlap

13    with our dismissal motion, but that's the reason he gave

14    today.  That's not an appropriate use of 364 authority.

15         You heard testimony from Mr. Kwok today, that this

16    needed to be a DIP because he wanted to protect his family

17    resources.

18         Go look at the MORS, they're spending millions of

19    dollars to support Mr. Kwok.  That wasn't a loan, it was a

20    gift.  This is a strategic effort by Golden Spring and Mr.

21    Kwok, to use 364 for nefarious purposes.  This -- as Ms.

22    Claiborn's examatination clearly established, if this is

23    going to be anything, it ought to be a gift just like

24    everything else that's purportedly done for Mr. Kwok is.  We

25    don't believe it, but he should be held, and Golden Spring

1    should be held to their pattern of conduct.

2    You heard some, I think what can best be described

3    as far-fetched testimony from Mr. Kwok.  Mr. Kwok said, I

4    never asked my son about where the money from Golden Spring

5    came from.

6    I guess we are meant to believe that Golden Spring

7    is really scared and this Miles son is really scared about

8    telling Mr. Kwok where his money comes from, but not scared

9    about making a very public debtor in possession financing

10    loan for $9 million in a case where the evidence is on the

11    docket.

12    These are public documents where Mr. Kwok filed

13    his declaration that talks about his purported crusade

14    against the CCP.  I mean, this is just not credible

15    testimony that somebody would be afraid.

16    Or Mr. Kwok, as he testified, I won't ask my son

17    for money, Your Honor.  However, I will use my own money and

18    -- or I will be used by my son to manage accounts for his

19    benefit very publically.

20    I put in a declaration in the *Ace Decade* case that

21    said, you know, this is my money, when it's really my son's

22    money, and my son was fine with that.  I just can't ask him

23    where his money comes from.  I don't think you have to

24    believe that, because it's just not credible.  And if that's

25    not credible, I think you begin to unwind the threads of why

1    this entire case isn't credible, but also why this is an

2    inappropriate use of Section 364.

3         Your Honor, I want to turn to the DIP, which is a

4    little bit of a yo-yo from what I understand.  Particularly

5    as it relates -- oh, I should note.  Why did we try to put

6    Ms. Wang's deposition in?  Well, she was a 30(b)(6) witness

7    for Golden Spring, which is asking the Court for a good

8    faith finding.  I'll get to the really confusing part about

9    that in a moment.

10        They're asking the Court for an allowed

11   subordinated claim.  They're asking the Court for things.

12   She was their designated witness.  What did she say?  On

13   page 133, she wasn't involved in the negotiation of a DIP

14   loan, has no knowledge of how the $8 million figure was

15   arrived at.  Unfamiliar with the terms of the DIP loan.

16   Didn't pay attention to the DIP loan agreement until the day

17   before the deposition.

18        The first time she heard where the DIP loan

19   dollars were coming from was the day before the deposition.

20   When I asked her understanding of how the DIP loan was going

21   to be repaid she said, I don't know.  So, Your Honor, this

22   is the designated witness who binds Golden Spring, that

23   knows nothing about this loan.

24        So turning to the order, I don't think there's

25   anything to support the finding in E that there is an

1    immediate need for financing.  I certainly don't think that

2    there's anything to support the finding that there's any

3    value to the debtor seeking confirmation of a plan of

4    reorganization under Chapter 11 of the bankruptcy code,

5    given that we've seen, I think the outrageous nature of the

6    plan proposed by the debtor.  There's good cause in Section

7    H on page 4.

8            The entry of this interim order that says, we'll

9    preserve the assets of the debtor's estate for the benefit

10   of creditors.  There's no evidence that that's true.  There

11   are no assets, according to Mr. Kwok, other than $3,850 and

12   certain litigation claims which the DIP loan isn't being

13   used to fund.

14           He says it's in the interest -- it's an exercise

15   of the debtor -- debtor's exercise of the prudent business

16   judgment.  You didn't hear any testimony on that.

17           Your Honor, I think the same issue on the next

18   page, page -- the top 335, good cause, the ability of the

19   debtor to obtain financing is vital to the estate of the

20   debtor and his creditors so that the debtor can maximize the

21   value of his estate and confirm a plan or reorganization.

22           Again, no -- you've, I think, heard what creditors

23   think of this purported plan, and I believe that language

24   should be struck.

25           Then there's stuff I just don't know -- I just

1   don't understand, right?  Page 35.  Page 6.  Permitted uses

2   of loan proceeds and cash collateral.  There's no cash

3   collateral under this agreement, unless it's being snuck in

4   somewhere.  I don't know why the loan refers to cash

5   collateral.  There isn't any.  They didn't seek approval of

6   any --

7            THE COURT:  I'm missing where you are at the

8   moment on the cash collateral.  I've followed you all along,

9   but I don't see --

10           MR. FRIEDMAN:  Page 35, it's the -- for the top

11  underlining is Amendments and Modifications.

12           THE COURT:  I see.  Okay.  Yep.

13           MR. FRIEDMAN:  And then permitted uses of loan

14  proceeds and cash collateral.

15           THE COURT:  I see.  I see.

16           MR. FRIEDMAN:  Now maybe it's a typo.  I don't

17  know, but it makes me nervous.  Shouldn't be in there.

18           Sub A, issues with respect to budgets.  I would

19  note that there's never been a budget.

20           Mr. Jalbert basically testified there can't -- he

21  would have no idea how to put together the budget, but if

22  there's going to be a dip, and there's going to be budgets,

23  and there's going to be uses, and accruals, then PAX should

24  get copies of it.

25           Page 36, I think PAX should be added to subsection

1    -- what's currently subsection C, that was added after we

2    filed our objection, we should certainly be entitled to

3    receive copies of bank accounts.

4            In E, which was added as well, after we filed an

5    objection, you know, I'm really troubled by the notion in

6    this kind of case that no money can be spent in pursuing

7    money damages or equitable relief from DIP lender.  Not DIP

8    lender in DIP lender's capacity as DIP lender, but DIP

9    lender.  If this case goes forward and Mr. -- you know, and

10   Pullman and Comley as Committee counsel has the right to be

11   pursuing estate actions, then they should be able to use

12   whatever money for whatever purpose they see fit.

13           I have an issue on page 38-C.  This is -- I think

14   is where, in the second sentence, the notwithstanding any

15   language to the contrary contained in this interim DIP

16   order, I think it should be added, or the DIP loan, because

17   the DIP loan can -- should be clear.

18           It says, "The rights of the DIP lender shall be

19   subject and subordinate to the claims of all other creditors

20   of the debtor existing as of the petition date."  Well, what

21   if we seek a substantial contribution motion for our work

22   getting the boat back?  We should be senior to this bogus

23   loan.  It shouldn't be creditors existing as of the petition

24   date.  It should be all creditors, any creditors.

25           And the same -- you know, I think -- so I think

1   there are some other places in paragraph 8, termination of

2   events.  Certainly PAX should get notice of that.

3        At the beck end of that on page 40, in the revised

4   language they said the DIP lender shall provide notice to

5   the U.S. Trustee of its election to charge interest of the

6   default rate.  That's no reason that should just be to the

7   U.S. Trustee, it should be to everyone.

8        And where I really get concerned, Your Honor, is

9   to -- to flip back, and this is where I just have trust

10  issues -- the debtor took out, on page 33, the good faith

11  finding, right?  Now my understanding is, it may be back in.

12  But they took out the good faith finding.

13       So I thought, okay, that's sort of progress.  But

14  then I looked at page 40, and I looked at page -- paragraph

15  10, which has 364(e) baked into it.  It's, by its terms, a

16  good faith provision.

17       So when people ask, you know, why are -- why are

18  you so suspicious, that's one of the reasons we're really

19  suspicious, because you take out a good faith finding but

20  you keep in a 364(e) provision, you're not really taking out

21  the good faith finding.

22       So we -- and then we look at, on page 41, no

23  deemed control.  By consenting to this interim DIP order,

24  the DIP lender shall not be deemed in control of the debtor

25  to be acting as a responsible person, managing agent, or

210

1    owner or operator as such terms are defined in *Circla* (ph)

2    as amended or any similar federal -- similar state or

3    federal statute."

4         How could that be appropriate in a case where the

5    debtor says he doesn't own anything except the suits on his

6    back and a couple of dogs?  It's just overreach and it

7    doesn't make any sense.  And I think it -- it gives us a lot

8    of pause when these things are put into orders.

9         Paragraph 15, no waiver.  Again, I think PAX

10   should be included in the notice parties.  Those are the

11   points that are important to us.  Your Honor, I just want to

12   be clear about something.

13        The fact that I spent so much time on the order, I

14   just don't want the Court to think that we're okay with the

15   order.  I realize the Court will do what it does.  People

16   will put forward arguments as to why maybe this does benefit

17   the estate.  We strongly disagree.  But if the Court's

18   inclined to go in a different direction, we do have very

19   substantial concerns with the order and with the credibility

20   of what you heard today.

21        I have nothing further, Your Honor.

22        THE COURT:  Okay.  Thank you.

23        MR. FRIEDMAN:  Thank you.

24        THE COURT:  Does the debtor wish to respond to the

25   arguments of PAX?

1          MR. JONAS:  I just wondered, Your Honor, whether

2     there were any other parties that wished to be heard.

3          THE COURT:  Oh, that's a good point.  I'm sorry.

4     Attorney Claiborn?

5          CLOSING ARGUMENT ON BEHALF OF THE U.S. TRUSTEE

6          MS. CLAIBORN:  Thank you, Your Honor.  I do have a

7     few comments.

8          I had hoped that after today's testimony I'd have

9     a better understanding of what money is being loaned, where

10    it's coming from, why it's really being loaned, and why

11    can't it be a gift.  Unfortunately, I don't feel any more

12    informed than I did at the beginning of today.

13         There may be a dilution of the events of default

14    that were raised earlier today by Attorney Goldman, and

15    that's progress.  But at the end of the day, I see no reason

16    why this couldn't just be a gift.  The debtor's lifestyle is

17    being funded by Golden Spring.  Why is it different for this

18    loan?  Why couldn't it just be a gift?

19         But there is control mechanism left over that I

20    didn't hear being removed from this suggested order as to

21    how you can use the funds.  To the extent that the funds are

22    being used to help facilitate this Chapter 11, they need to

23    be unrestricted so that anyone who needs to do something

24    with it can do so, and that includes the committee.

25         So hamstringing the committee, as I think the

212

1    order is currently proposed, hamstringing its ability to use

2    it to investigate and/or pursue appropriate actions as a

3    result of investigations, is not something that makes this a

4    loan that's worth giving.

5         The other thing I wanted to say to the Court is

6    that earlier today, Attorney Goldman posited that one of the

7    areas of consensus that prompted the withdrawal of their

8    objection to the loan was that the money -- the first

9    initial traunch of the loan, $2 million, would be held by

10   Pullman and Comley.

11        And I wanted to let the Court know that the U.S.

12   Trustee opposes that, to the extent it's based on a lack of

13   trust of the debtor holding funds, and that in and of itself

14   is demonstratable that this case needs a Chapter 11 trustee.

15        The loan, to the extent the Court approves it,

16   should go to the debtor's funds account, the debtor in

17   possession account, and if that's not comfortable for

18   everybody else in this case, then that speaks volumes.

19        So based on all of what I've heard today, and then

20   the comments I think that Mr. Friedman just eloquently made

21   about concern are well taken, and I think that thus far to

22   date, as of now, the debtor has not met its burden to

23   demonstrate that this is an appropriate loan for the estate

24   to be involved in.

25        THE COURT:  Thank you.  Attorney Goldman.

1    CLOSING ARGUMENT ON BEHALF OF UNSECURED CREDITORS

2         MR. GOLDMAN:  Yes.  Thank you, Your Honor.

3         Just to respond to a few of the points that Mr.

4    Friedman made, and let me just say at the outset that the

5    committee certainly shares the skepticism and, you know,

6    outright disbelief that PAX has as to where these so-called

7    family assets really reside, and who really controls them,

8    which I think cries out for the need for funding for the

9    disinterested committee in this case, and an examiner to do

10    a proper investigation and uncover the rocks that need to be

11    uncovered in this case to get the -- get at the bottom of

12    what these assets are.

13         Now Mr. Friedman referred to the idea that this is

14    designed to protect Golden Spring from parties pursuing it.

15    To the contrary.  There's a specific carve out that we

16    negotiated in the most recent version of the order that

17    provides just the contrary.

18         It states in the new paragraph 16 of the proposed

19    order, that this interim DIP order shall not be construed in

20    any way as a waiver or relinquishment of any rights that the

21    debtor, the DIP lender, the committee, any creditor, or any

22    estate representative may have to bring or be heard on any

23    matter brought before this Court, including without

24    limitation, any claims that may be asserted by the

25    committee, any creditor, or any other estate representative

1    against the DIP lender based on any conduct, act, or

2    omission relating to the debtor, other than an extension of

3    the interim DIP loan.

4          And then it goes on to list a litany of examples

5    of what claims could be asserted, notwithstanding the

6    reentry of this order, including veil piercing, substantive

7    consolidation, fraudulent transfer.

8          So there's no protection in this order for Golden

9    Spring against actions that a creditor or an estate -- a

10   representative would bring.

11         I would point out that PAX is the only creditor of

12   this estate that I'm aware of that has a judgment.  And

13   consequently, they have a substantial head start over every

14   other non-insider creditor of this estate, which is why they

15   want this case dismissed, so that they can sail off with the

16   boat and wave in the rearview mirror to the other creditors

17   of this estate.

18         All the other creditors are in the middle of

19   litigation and they aren't certainly close to getting

20   judgments, which is another reason why we need this loan to

21   do a proper investigation for the benefit of all creations,

22   not just the judgment creditors.

23         And PAX, like -- unlike the committee, is funded

24   by a well-healed litigant, whereas the committee obviously

25   has on funding to do anything in this case.

215

1        So we considered it a win for the estate, this DIP

2    loan, where we are being given the resources to get the

3    tools we need to get to the bottom of where the assets are.

4    And so, the -- so the case isn't -- so the case is used

5    properly.

6        Yes, the debtor only has -- or claims $3,900 in

7    assets and no income, but this bankruptcy case is

8    legitimately used to discover where the assets are and to

9    see if we can negotiation if, once they're encumbered, we

10   can negotiate a plan that's acceptable to the creditor body.

11   So I think that I would urge the Court to grant the DIP loan

12   with the limitations and revisions that we've managed to

13   negotiate with the debtor.

14       As far as holding the funds, I find it anomalous

15   that the U.S. Trustee would rather have the funds held by a

16   debtor who they say should be replaced by a trustee as

17   opposed to Pullman and Comley, which has been a firm that's

18   been around since the early 1900s, and certainly the money

19   is going nowhere.

20       It is the functional equivalent of a retainer and

21   they have no problem with Brown Rudnick holding $1 million

22   in their account.

23       So there -- I would maintain, a complete

24   disconnect between their position about wanting to appoint a

25   trustee for the debtor, yet wanting him to hold the $2

216

1    million.  So I think it's entirely proper for the Court to

2    authorize us to hold money and be subject to all the orders

3    of the Court, the interim compensation procedures, et

4    cetera, and we'll be bound to hold the money in trust until

5    authorized to disburse it by the Court.

6              THE COURT:  Okay.  Thank you.

7              MR. GOLDMAN:  And that's all I have.

8              THE COURT:  Thank you.  Mr. Jonas.

9              MR. JONAS:  Oh, I'm sorry.  Your Honor --

10             THE COURT:  Oh, Mr. Miltenberger.

11             MR. JONAS:  Yeah.  Thank you.

12        CLOSING ARGUMENT ON BEHALF OF GOLDEN SPRING NEW YORK

13             MR. MILTENBERGER:  Thank you, Your Honor.  Timothy

14   Miltenberger for Golden Spring New York.

15             I'd just like to follow up briefly on some of the

16   comments that Attorney Goldman made.  As the Court knows, my

17   client is interested in making a loan for the benefit of the

18   estate.

19             The position of PAX was, as it said earlier,

20   something much more than meets the eye is happening here,

21   and that's not something the Court's going to be able to

22   decide today.

23             And the way it's going to be decided is if there's

24   money available to fund a committee and to fund an examiner

25   so that everybody can understand what has or has not

1   happened, and that's what Golden Springs would like to see

2   happen.  That's What the debtor would like to see happen.

3          The big picture, as Attorney Friedman says,

4   clearly points to the fact that a bankruptcy estate with $9

5   million is better than a bankruptcy estate with zero

6   dollars, and that's what this motion is about.  It's not a

7   close call.  Having $9 million is really in the benefit of

8   the estate and all of its creditors.

9          I can report to the Court that as of 3:30

10  yesterday, my client was wiring money to my firm.  It has

11  not yet been received by my firm, but it is in transit.

12  When we have it, we'll make arrangements with the U.S.

13  Trustee and all the parties as to where to warehouse that

14  money after we give $2 million to the committee.

15          THE COURT:  Are you saying that the entire $9

16  million is coming to your firm?

17          MR. MILTENBERGER:  Yes, Your Honor.

18          THE COURT:  Okay.  I just want to be clear,

19  because we've talked to a lot of -- about a lot of different

20  things happening at different points, so -- okay.  Mr.

21  Jonas?

22          CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23          MR. JONAS:  Your Honor, Jeff Jonas from Brown

24  Rudnick on behalf of the debtor.  First let me say, Your

25  Honor, I know it's been a long day, and on behalf of myself

218

1    and the firm and the debtor, I want to thank you.  I think

2    it's been under difficult circumstances.  I actually think

3    it came off pretty well and we thank the Court and the Court

4    staff for accommodating us today.

5         That said, Your Honor, let me make a few remarks.

6    Mr. Kwok filed this case, bankruptcy, to deal with his many

7    alleged creditors, and he wants to do that during the

8    breathing spell that bankruptcy affords.  That's the whole

9    purpose of bankruptcy.

10        Mr. Kwok is here in good faith.  He's not only

11   saying he wants to do that, but let's review the proof of

12   that.  He has arranged an unsecured subordinated $9 million

13   DIP loan to fund this case.  Among other things, that will

14   fund the creditor's committee to do their work.  It will

15   fund U.S. Trustee fees, and it will fund, if appointed,

16   which we support, an independent examiner to investigate the

17   allegations against him.

18        He also has obtained a commitment as set forth in

19   the -- as filed in the proposed plan, to have a boat costing

20   $37 million contributed to creditors as set forth therein.

21   There's been a lot of allegations against Mr. Kwok.  Today,

22   they're just that, allegations.  There will be a time and a

23   place for these allegations to be determined.  In fact, Mr.

24   Kwok, or the DIP lender is paying the cost of determining

25   those allegations, and he welcomes that.

219

1          There is no basis for the DIP loan, which all

2     creditors as represented by the creditor's committee,

3     support, except for one single creditor, PAX, which has a

4     long history of litigating with Mr. Kwok.  Your Honor, it

5     would truly be a travesty if this debtor, on the basis and

6     the record before this Court, can't go forward with this

7     bankruptcy case, which would be the result if the DIP loan

8     is not approved.

9          Let me respond to a number of the comments that

10    were made.  Mr. Friedman focuses on the alleged $3,000 or so

11    in assets.  Your Honor, there's $400 million, or

12    thereabouts, I think it's 370-something, in claims asserted

13    in this case.  $400 million.  That should be the focus.

14    That's what we're here -- we'll deal with those.  Yes,

15    there's disputes.  That's what bankruptcy is for, to resolve

16    on a financial basis, claims asserted against the debtor.

17         Mr. Kwok referred to -- I want to make one

18    comment, Your Honor, which might be a little unusual, but

19    Mr. Kwok referred to Chinese or Eastern culture, which I've

20    learned during my career is very different than our Western

21    culture.

22         And so, yes, a son may be prepared to lose

23    millions of dollars in order to help and protect his father.

24    And there was also a comment by Mr. Friedman that certain --

25    he said far-fetched testimony about communications between

220

1    Mr. Kwok and his son.  I would suggest, Your Honor, that's

2    easy for Mr. Friedman to say.  His physical safety and his

3    life and the life of his family are not at risk every day.

4              By the way, Your Honor, with respect to the

5    comments Mr. Friedman made on the DIP loan, had he called

6    us, we'd be happy to accommodate many of his changes, which

7    I'm about to do right now, but that didn't happen.  So let

8    me address them.

9              First -- well, first he said there was no

10   immediate need for financing.  I think the evidence is

11   uncontroverted on that by Mr. Kwok.  Without the DIP there

12   will be no creditor's committee to carry out its work, there

13   will be no examiner, or at least funding for an examiner, if

14   and when appointed to carry out its work.

15             The DIP documents, Your Honor, were heavily

16   negotiated with the creditor's committee.  I think -- it's a

17   little bit of a guess, but based on the drafts, and I wasn't

18   in the weeds on it, but I think there were literally

19   hundreds of changes made to accommodate creditor's

20   committee's request.  It was not -- it was in negotiation.

21   It went probably until not that long ago today and into the

22   night or nights, but nevertheless, there were many, many

23   changes, and unfortunately, occasionally there will be a

24   typo when that happens and the cash collateral reference is

25   just that.  It's a typo, it can be removed.

1          In terms of reporting, we're happy to provide PAX

2      with reporting notices, et cetera, that's not a problem.

3      We're happy to, as we've represented, if Mr. Friedman feels

4      there needs to be better language making the loan fully

5      subordinate to all creditors, we're happy to do that.

6          There was a reference to *Circla* not being deemed

7      an owner and having done a few DIPs in my day, I think

8      that's -- I'm guessing that's probably in our form and it

9      just got carried over.  Again, creditor's committee didn't

10     have an objection to it, but we'll remove it.  Not a

11     problem.

12         Let me address the issue the U.S. Trustee made,

13     and others, which is why not a gift.  Your Honor, while the

14     DIP loan may effectively be a gift in that it's unlikely to

15     be repaid, the DIP lender gets to decide on what terms it

16     will advance funds.  Not creditors.  Not the United States

17     Trustee.

18         You know, I have to say it's I think -- I'm not

19     sure anybody has ever seen a DIP where the DIP lender has

20     agreed to be fully subordinate, not be secured.

21     Effectively, doesn't expect to get paid.  Nevertheless, it's

22     their -- they get to determine on what basis.  They

23     determine to do it as a loan.  That's the basis on which

24     we're before the Court.

25         Your Honor, the Committee asked us to -- that it

1    hold the funds, and again, on the basis set forth in the

2    order.  And in an effort -- in the many efforts we took to

3    resolve disputes, which I think is our charge in many

4    bankruptcy cases, an effort to get to an agreement, a

5    consensual resolution, within my opinion, perhaps the most

6    important creditor body in this case, the creditor's

7    committee, we made many concessions.  One of them was, okay,

8    if you want to hold the money, hold the money.  And now

9    we're being criticized for that, and effectively it's being

10   used as a basis for the DIP to not be approved.

11         Again, Your Honor, we are here.  We've agreed to a

12   schedule to move forward on the motion to dismiss.  I think

13   you heard Mr. Kwok.  He intends to be as open as possible.

14         I think sometimes there are translation issues,

15   but nevertheless, I think his testimony was honest today.

16   He intends to continue down that road.  He welcomes the

17   opportunity to have an independent examiner take a look at

18   everything and inform creditors and the Court.  He's going

19   to pay for that, and we welcome that day.  I don't think

20   today, unfounded allegations should be the basis to deny the

21   DIP.

22         And with that, Your Honor, we'd ask that the

23   Court, with the changes which were -- I represented we're

24   happy to make, approve the DIP.  Thank you, Your Honor.

25         THE COURT:  Let me just ask you what version of

223

1    the order you want me to be looking at, because I'm looking

2    at a version of an order that was filed on April 10th.

3            MR. JONAS:  May I just consult, Your Honor?

4            THE COURT:  Yes.

5            MR. ROMNEY:  And again, Your Honor, we would be

6    prepared to make the changes I've mentioned, but let me

7    check.

8            THE COURT:  Just a second, Attorney Friedman,

9    okay?

10           MR. JONAS:  Your Honor, and I think Mr. Goldman

11   can confirm this.  The actual form we would have asked to,

12   even before make -- agreeing to make changes to respond to

13   Mr. Friedman hasn't been filed because we were working on

14   it.

15           THE COURT:  Well, that's what I'm asking.

16           MR. JONAS:  Yeah.

17           THE COURT:  So there's nothing else that I should

18   be looking at right now.

19           MR. JONAS:  No, but we will --

20           THE COURT:  Okay.

21           MR. JONAS:  -- promptly, Your Honor, get that

22   before the Court.

23           THE COURT:  Okay.  Before I let others talk again,

24   I think I may have said this to Attorney Baldiga in the

25   beginning part of this case at a prior hearing.

224

1    You know, there's a lot -- obviously, I understand

2    I think -- not as well as all of you do, but I understand

3    what's happened among the parties, between obviously the

4    debtor and PAX, but with other parties now involved, and one

5    of the things I mentioned early on was when we have interim

6    DIP orders in Connecticut, we often don't make a lot of the

7    findings that you're asking -- at last that's -- that are in

8    the April 10 version of this order, okay, because what we do

9    we enter interim orders is we say, the debtor has

10   demonstrated, or someone has demonstrated, or people agree,

11   or whatever the situation may be, that for a period of time,

12   whatever period of time it is, until we have another hearing

13   and whether that's another interim order or a final order,

14   this is what's going to happen.

15       This much money is going to be loaned, this amount

16   of money could be spent, doesn't necessarily have to be.

17   There's some form of a budget that people all understand

18   what's going to be spent.

19       I understand all the issues about the employment

20   of professionals and this process about getting people paid

21   differently, and I understand what you're saying about

22   funding the committee and paying for an examiner, but I want

23   to be clear, and I tried to be clear at the beginning, so if

24   I wasn't, that's my fault.  I'm not going to enter an order

25   that makes findings that are binding through the end of this

1   case when it's an interim order.  That's just not going to

2   happen because it's -- I don't think it's appropriate,

3   right?  I don't think that's appropriate.  That's not what

4   the bankruptcy code says.

5          I understand why people have asked for that on

6   many occasions, have fought for that, and often the Courts

7   have allowed it.  But we're in a unique situation here,

8   right?

9          We have an individual Chapter 11 debtor who has no

10   income, doesn't have a -- well, maybe he does now have a

11   bank account.  I'm sorry.  I'm trying to remember what Mr.

12   Kwok testified about.  And -- but there's going to be $8

13   million that comes in. 9 million, actually.

14          I don't know if that's -- I don't know if that's

15   the way things should proceed at this point, that it may be

16   that the parties should discuss this more incrementally to -

17   - because I am not going to make all these findings.  I

18   don't know why I'd need to make a finding of good cause at

19   this point in time when there -- all we would be doing on an

20   interim basis is -- you know, we're talking about the

21   immediate need for funding.

22          Well, what needs to be funded?  Mr. Kwok's living

23   expenses don't, because that doesn't -- that's not part of

24   this.  So what needs to be funded to keep this estate open?

25   What needs to be funded is the payment of professional fees.

1          That's -- I mean, and tell me what else, because I

2     could be missing something and I --

3          MR. JONAS:  That's largely -- that's --

4          MS. CLAIBORN:  Quarterly fees.

5          THE COURT:  I mean  --

6          MR. JONAS:  And U.S. Trustee fees.

7          THE COURT:  Yeah.  But -- okay.  I'd consider that

8     somewhat professional fees, Attorney Claiborn, even though I

9     know they're not, but they're a fee of the estate.  They're

10    an expense of the estate, right?

11         So we have -- we have a lot of issues here.  We

12    have a lot of findings that I'm being made to -- you know, I

13    have to say -- I'd have to say, you met your burden of proof

14    on all that.  I don't know if you want me to do that at this

15    point, number one.

16         Number 2, there's a hearing coming up on a motion

17    to dismiss, which is only -- it's less than a month away,

18    we're going to start that hearing.  Okay?  There's also this

19    issue of the -- in the alternative, the appointment of a

20    trustee, in the alternative, the U.S. Trustee's motion for

21    an appointment of an examiner.

22         I understand, and you've said it and everyone's

23    said it on the debtor's side, that the debtor will pay for

24    the examiner.  But I want to know what is examiner going to

25    -- what power does the examiner have?  It doesn't have any

1    power.  It just has the ability, if there is an examiner, to

2    collect information and prepare a report, right?

3         Not that that's not -- not that that can't be

4    helpful in a case, but I'm not sure that's helpful in this

5    case.  We already know what the examiner is going to find, I

6    think, based upon the testimony of Mr. Kwok and apparently -

7    - and I haven't looked -- as I said, I haven't looked at any

8    of the exhibits which is why I didn't know who the 30(b)(6)

9    representative was.

10         MR. JONAS:  Uh-huh.

11         THE COURT:  But there isn't anything here in this

12    estate, other than the loans that could be made, and the

13    fact that Mr. Kwok can continue to live, so that's a good

14    thing.  We're not worried about the debtor not being able to

15    live, which often is a situation in this cases.  We don't

16    have that issue.

17         But what we do have is we have -- whether or not

18    it's only one creditor, we have a creditor who has asserted

19    certain issues in this case that have to be addressed one

20    way or another, and the long story short is, if we start --

21    when you say there's $400 million in claims  --

22         MR. JONAS:  Yes, Your Honor.

23         THE COURT:  -- I think you said, but isn't half of

24    that PAX's with the judgment and the contempt judgment?  I

25    mean, so that's half -- half of the claims here are --

1    belong to one creditor.  And it's an individual Chapter 11

2    case, so that one creditor has a lot of power, which is

3    different than it would be if we were in a corporate Chapter

4    11 case.

5         So what -- all I'm suggesting to you, all of you

6    today, is I don't even know what -- I mean, I do.  I looked

7    at the order Mr. Friedman asked me to look at, and he wants

8    to say something else, and Attorney Claiborn wants to say

9    something else, and of course I'm going to allow that to

10   happen.

11        But if there isn't an agreement on to some kind of

12   form and order, then I'm going to make rulings that may not

13   be what the debtor is looking for, and I don't -- and maybe

14   not be what PAX or the creditor committee is looking for

15   either.

16        But as Mr. -- one thing Mr. Goldman said that is

17   correct is, they're all intertwined, right?  Everything that

18   happened today is intertwined, and to enter orders other

19   than the -- I would say the Brown Rudnick order, which I

20   would say is more what I would say, routine, versus some of

21   the other orders that I'm being asked to enter, including

22   the payment of professionals on an ongoing basis that is

23   allowed to happen in less time than the bankruptcy code

24   provides, then I think there has to be some understanding

25   that there should be some incremental review and analysis of

1    what you're asking the Court to do.

2           Now, that may be no problem because you're working

3    on this order, and you may be able to say all those things.

4           But there's a lot of findings I'm being made to

5    find in this order that I'm not sure I'm prepared to make at

6    an interim basis, with everything else that's going on in

7    this case.  I have to look at it that way.  Whether or not

8    you agree with that, and I don't mean you personally, I

9    don't mean the debtor or -- whether or not anybody agrees

10   with it, I mean, I -- you -- absolutely, we can agree to

11   disagree.  But that's what I have to do, right?  I have to

12   think about the case as a whole.

13          I think you parties have made very good progress,

14   and I don't think that every single case has to be

15   consensual.  That's not what I'm saying.  But I'm not sure

16   that I'm going to enter the order that I've looked at that

17   Mr. -- that Friedman has pointed out to me with any kind of

18   binding findings in it, in this case.

19          So while I understand everything everyone has

20   said, or at least I've tried to.  I'm not saying I couldn't

21   have made a mistake, but I've tried to, I'm going to still

22   have to look at whatever you all negotiate.

23          MR. JONAS:  Absolutely.

24          THE COURT:  And I may disagree.  And so, if I

25   disagree, we'll have to have -- you know, we'll have some

230

1    kind of conference and we'll talk about it, but I think that

2    you need to think about that.

3           I did hear -- and, Mr. Friedman, I did hear Mr.

4    Jonas say that a lot of -- not all, but a lot of the issues

5    that you raised, they'll accommodate, which I think is

6    again, progress.  Whether you are all going to come to an

7    agreement completely, I don't know.

8           MR. JONAS:  Your Honor, may I just make two

9    points?

10          THE COURT:  Sure.

11          MR. JONAS:  First, I'll just say this.  As he said

12   about me, Your Honor, I respect Mr. Friedman a great deal,

13   but unfortunately I -- my impression, maybe he'll tell me

14   I'm wrong -- we will never -- there's no way to reach a

15   consensual resolution because there --

16          THE COURT:  On this order, right?

17          MR. JONAS:  On this order, because --

18          THE COURT:  I think that's right.

19          MR. JONAS:  -- they're -- you know, we could give

20   them everything -- all of it specific points, and then he

21   said, well, but I don't want you to lose track, Your Honor,

22   that we're still opposing this.  So that's just number one.

23   We can try, and we'll continue to try.

24          Point number 2, Your Honor, is let me apologize

25   because I do remember you early on talking about findings of

231

1    fact, and we didn't -- maybe we didn't hear you well enough.

2    I certainly hear you now, and we would -- I welcome the

3    opportunity to take up many of the findings.  I have to --

4    obviously, we have to talk to our DIP lender, but let us

5    take those up.

6           I'm guessing we will be able to streamline and

7    eliminate many of them now having heard the Court better,

8    and I hope when we submit -- and obviously, we'll  provide

9    it to all other parties, I hope when we next submit a

10   revised draft, it will be much more something you'd be

11   prepared to sign.  Again, we may need another conference.

12   We're happy to do that, but those are my comments, Your

13   Honor.

14           THE COURT:  Okay.  And that's more than fair, and

15   I -- all I'm suggesting to you is that as, I said a few

16   weeks ago when we were talking about the relief from stay

17   timing and the motion to dismiss timing, that I can't look

18   at this DIP motion as the only motion in the case.  I can't.

19           MR. JONAS:  Uh-huh.

20           THE COURT:  It affects other things.  Mr. Goldman,

21   as I said, I keep pointing to Mr. Goldman, but he was right.

22   They're all intertwined.  And so, I'm happy to hear what you

23   all -- look at what you all come up with.

24           MR. JONAS:  Very good, Your Honor.

25           THE COURT:  Okay?

1          MR. JONAS:  Thank you.

2          THE COURT:  All right.  Thank you.  Mr. Friedman?

3          MR. FRIEDMAN:  Thanks, Mr. Jonas.  I appreciate

4     it.

5          MR. JONAS:  Okay.

6          MR. FRIEDMAN:  I always do.  I have three quick

7     things to say.  First, Your Honor, it's true, we can't tell

8     Golden Spring it has to make a loan, but you can.  You can

9     tell them that this proposed -- I'm sorry, that they can't -

10    - it doesn't have to be a gift.  You can.  You don't have to

11    approve this as a loan.

12         The second thing, Your Honor, is yes, PAX has a

13    long history of litigating against Mr. Kwok.  Has a long

14    history of winning its litigation.  It has $268 million in

15    claims.

16         It is the only creditor with a liquidated claim

17    that is non-insider as far as I'm aware.  And the third

18    point is, just like I said, listen to the small word, we.  I

19    would say, at the end of Mr. Jonas's remakes he said, he

20    wants to pay for it.  Right.  He.  Mr. Kwok, which is again,

21    I just think a tell about ultimately where the money is

22    coming from.  Thank you, Your Honor.

23         THE COURT:  Thank you.  Attorney Claiborn?

24         MS. CLAIBORN:  Your Honor, I just wanted to let

25    the Court know that I haven't seen a revised draft of the

233

1    order, so therefore, I don't know whether or not there are

2    other concerns that I would like to bring to the Court's

3    attention.

4              THE COURT:  Yeah, I mean, I think --

5              MS. CLAIBORN:  I might --

6              THE COURT:  -- that Mr. Jonas has made that clear,

7    and that's why I think we're going to have to have another

8    conference most likely, if there isn't an agreement, and I'm

9    not -- I don't believe there will be an agreement, so I

10   think there has to be another conference.

11             MS. CLAIBORN:  Thank you for that opportunity.  I

12   just wanted to let the Court know that I might have some

13   thoughts.

14             THE COURT:  I thank you.  And see, what I normally

15   do, is when we have an interim order, we have a date.  The

16   order goes into effect one day, and it expires on a date in

17   the future, and there's a budget that is connected to that.

18   You know, and it may not be a budget in the sense of a cash

19   collateral budget, you know, but how much money is coming in

20   and what could -- what is authorized to be spent during that

21   period of time, and for what.

22             And then that -- then if you want to talk about

23   transparency, that's transparency.  Everybody knows that X

24   amount was approved.  X amount came in, and then the line

25   items on the -- whatever the -- you don't have to call it a

234

1   budget.  You can call it whatever you want to call it.

2   Authorization for payments during interim DIP loan period,

3   then we know what's going on.  Then no one is questioning

4   what's happening.

5          And then you get approval, Mr. Jonas, for certain

6   things that apply to that interim period, which is better

7   than not getting approval to anything at all.

8          And that, I could do, but I'm not in a position --

9   and I -- when I say I, I mean the bank -- the person who

10  happens to be sitting here as the judge in this case, feels

11  it's inappropriate at this point in time, at this point in

12  time, to make findings that will be binding throughout the

13  case.  So I think I've made that clear.

14         So the issue is, how much time do we need -- are

15  we continuing -- we're not -- the evidence is done with

16  regard to the DIP financing motion.  Are we continuing the

17  hearing solely to work out what essentially is -- are the

18  terms and conditions of an interim DIP financing order which

19  should have, as part of it, a period of time that this

20  financing would be applicable to, and what amounts would

21  come in through the funding, and I want to say to the

22  estate, but we have an issue here of where the funds are

23  going still, and so I won't quite say that, and what amounts

24  are authorized to be paid or accrued against that loan

25  during that period of time.  That's what I think is

1    appropriate under those -- under these circumstances.

2           So what are the parties thoughts.  Are we talking

3    about -- today's what?  Wednesday?  Are we talking about

4    coming back, you know, Friday?  Are we talking about coming

5    back Monday, Tuesday, Wednesday of next week?  What are we

6    talking about?

7           MR. GOLDMAN:  Your Honor, I know for the

8    committee, I was planning to be at the ABS Spring meeting

9    Thursday and Friday, so I would say --

10          THE COURT:  Meaning tomorrow and the next day?

11          MR. GOLDMAN:  Yes.  Yes.  Yes.

12          THE COURT:  Okay.

13          MR. GOLDMAN:  And so, any time next week.  You

14   know, on this budget concept, so I can give some clarity --

15          THE COURT:  Well, it may not -- I said budget

16   isn't exactly the right word, but it's authorized accruals

17   or payments or whatever you want to call it against what's

18   funded, right?  $400,000 comes in.  I'm just pulling a name,

19   it doesn't mean anything.  And during -- for the next four

20   weeks, these amount of monies can be accrued against those

21   dollars for these reasons.

22          MR. GOLDMAN:  So --

23          THE COURT:  I mean, we don't have to worry about

24   funding Mr. Kwok's life.  That's a good thing.  But if

25   everything else is going to be about every -- the parties

236

1    getting paid, then I want to know what it is everybody

2    thinks they're going to get paid for the next four weeks,

3    even if you're not authorized to draw it out yet.

4         MR. GOLDMAN:  Yeah.  And, Your Honor, I think the

5    most we could expect to have is an estimate, really.

6         THE COURT:  I understand that.  I'm not -- oh, I'm

7    not -- a budget is a budget.  It doesn't always meet -- you

8    don't always meet it.  I'm not asking for an accounting

9    that's audited.  I'm asking for -- I want to know.  You

10   know, the order says there's an immediate need for funding.

11   What's the immediate need?  Show me what it is and how much,

12   and what it is for.

13        I mean, this is not -- this is not a case where

14   you have a company that is producing some form of a product

15   that is generating revenue that continues -- that's not what

16   we have.  We all know that.  So there has to be some

17   control, or at least oversight by the Court with regard to

18   these issues, right?  Otherwise, why am I here?  You can all

19   go do this out in the hallway --

20        MR. GOLDMAN:  Yeah.

21        THE COURT:  -- and see how that works out.

22        MR. GOLDMAN:  Well, I'm just --

23        THE COURT:  But that's why I'm here, right?  To

24   make sure that we -- this doesn't go awry, and we also have

25   other motions pending that may -- may completely -- you

1    know, who knows, have the case be dismissed in five weeks.

2    I don't know.  That could happen.  I haven't heard any

3    arguments on that yet.  I haven't seen your papers.

4    Nobody's -- nor should you.  You just all agreed today when

5    you're going to file your papers.

6         So I don't know what they're going to say, but I

7    have to -- I have to be -- I think you have to treat it

8    practically and not theoretically.

9         And the practical reality of this case is, from

10   the moment it started, there is opposition and there's

11   strong opposition, and I'm not passing on whether that's

12   warranted or not.  It's a reality.  It's a reality that

13   there is -- there are all kinds of things that happened

14   before this case came here, which is often the case, but I

15   can't ignore that either.  Okay.  I can't ignore that.

16        So all I'm suggesting is, you come up with a

17   period of time that there's this first wave of monies come

18   in, whatever it may be.  And maybe there isn't going to be

19   agreement, and then I'll finally have to decide what it's

20   going to be.  But then -- and you tell me, and the world,

21   because it's going to be public, what the monies are going

22   to be spent on, even if they're not drawn down during that

23   period of time, right?

24        So anyway, I think that's pretty clear.  Maybe

25   it's not.

238

1          MR. GOLDMAN:  So -- no, understood, Your Honor.

2          THE COURT:  Okay.

3          MR. FRIEDMAN:  Your Honor, so we have a

4   theological objection.  It's -- we have practical

5   objections.  I'm going to express, actually, a pretty high

6   degree of confidence that we can work out our practical

7   issues, right?  The DIP issue is theological to us.  We

8   don't believe it should be entered.

9          I also realize bankruptcy exists on your deep

10  rooted beliefs on the one hand, and the nitty-gritty

11  practical on the other.  I will work with Mr. Jonas, Mr.

12  Goldman, Ms. Claiborn, to deal with our practical issues

13  where we can compromise and where we can't, but --

14         THE COURT:  Right.  I have to rule.  I understand.

15         MR. FRIEDMAN:  So --

16         THE COURT:  And I'm happy to do that.

17         MR. FRIEDMAN:  -- so I guess the question I have

18  is, if we need a further hearing, or really it sounds like a

19  conference, I'm in California next week.  Is it doable by

20  Zoom?  I'm going to --

21         THE COURT:  Yes.

22         MR. FRIEDMAN:  Okay.

23         THE COURT:  Yes.

24         MR. FRIEDMAN:  Thank you.

25         THE COURT:  See, and the problem is, I'm looking

239

1    at an order that is now two weeks old, so it's stale.  So

2    I'm not going to just enter an order that somebody presents

3    when there's nobody here to talk to me about it, right?

4         I'm not going to do that.  I -- you know,

5    unfortunately, someone's name has to be on that order and

6    I'm going to read the order before I enter it, and I have to

7    make sure that it complies with the bankruptcy code and

8    rules and all those things.

9         So -- but yes, we can absolutely do it.  I'm not

10   going to drag you all back in here.  We've had the

11   evidentiary hearing, but I do want to see the order before

12   we have a conference, otherwise, I don't think it's a

13   meaningful conference.  Okay.

14        MR. FRIEDMAN:  Yep.  Yep.

15        THE COURT:  So you can even all tell me tomorrow.

16   I mean, you know, I don't -- whatever works for you.  I'm

17   not trying to stand here and say, you need to tell me right

18   now and we have to make a date on all those things.  And I

19   say that, but I should look and see what's on next week,

20   although I don't think it's bad.  I don't -- I could be

21   wrong, though, so let me just -- let me just take a five-

22   second look, okay?

23        Tuesday is not good.  Wednesday is definitely a

24   possibility without question, except for the middle of the

25   day.  Thursday, we have Chapter 13 hearings.  We could do it

240

1    in the afternoon on Thursday.

2              MR. JONAS:  Your Honor.

3              THE COURT:  Yes.

4              MR. JONAS:  Could I suggest that we just put a

5    placeholder on it?  I think you said Wednesday sounded like

6    the best day.

7              THE COURT:  Other than between --

8              MR. JONAS:  By Zoom, to --

9              THE COURT:  Yeah.

10             MR. JONAS:  -- certainly to accommodate everyone.

11   I think that might make -- and then we'll all work towards

12   that.

13             THE COURT:  Yes.

14             MR. JONAS:  Obviously try and, you know, report to

15   the Court.  Hopefully submit as early in advance, as much in

16   advance of that as possible, submit a form of order, maybe

17   even agreed, who knows, but I think that would be very

18   helpful, Your Honor.

19             THE COURT:  All right.  Well, on -- that's fine,

20   but I'm going to want the order --

21             MR. JONAS:  Yes.

22             THE COURT:  -- if we're going to have a conference

23   on Wednesday, I can do it in the morning or the afternoon,

24   but I can't do it between 12:30 and 2:00 p.m.

25             MR. JONAS:  Your Honor, I think to accommodate Mr.

1    Friedman, who's going to --

2              THE COURT:  Oh, you're going to be in California.

3              MR. JONAS:  -- in California --

4              THE COURT:  So --

5              MR. JONAS:  -- the afternoon will be fine.

6              THE COURT:  -- 2:00 p.m.  You want -- you want

7    later than 2:00 p.m.?

8              MR. FRIEDMAN:  2:00 p.m. is perfect.  Thank you,

9    Your Honor.

10             THE COURT:  All right.  So -- and if I'm five or

11   ten minutes late, don't worry about it, I'm -- just have to

12   do something with a school, so I could be five or ten

13   minutes late, and if we are -- if you have to hold on the

14   Zoom call, you'll have to hold on the Zoom call, okay?

15             But I would like -- I would like the order by 2:00

16   p.m. the day before.  I mean, I've got to be able to read

17   it, right?

18             MR. JONAS:  Understood, Your Honor, and thank you

19   for that.

20             THE COURT:  All right.  So then I'll just block

21   off the rest of that afternoon for now, and hopefully we

22   won't take the all -- but if we do, we do.

23             I mean, so the only thing left on the calendar

24   today that wasn't resolved was -- subject to the submission

25   of revised proposed orders or a scheduling order on the

242

1    motion to dismiss was this DIP financing motion, which is

2    117, I believe.

3               Yes, so then, 117 is continued.  The hearing is

4    continued to Wednesday -- to May 4th at 2:00 p.m. remotely,

5    via Zoom, okay?  You'll have to reach out to the courtroom -

6    - there's a courtroom -- what is the address?  I forget.

7    There's an email address that you would have to reach out to

8    to get the Zoom information.  Is that Court Connect?

9    Calendar Connect?

10              THE CLERK:  Calendar.

11              THE COURT:  Calendar Connect.  Did you have a

12   question, Attorney Claiborn?

13              MS. CLAIBORN:  Your Honor, I did promise to report

14   back to the Court on the monthly compensation order --

15              THE COURT:  Yes.

16              MS. CLAIBORN:  -- before we ended today, and I can

17   do that now, which is that I have looked at that and the

18   U.S. Trustee is okay with that order that was uploaded.

19              THE COURT:  And is that on the docket?

20              MS. CLAIBORN:  Yes.

21              THE COURT:  What's the -- what number is that?  Or

22   do you know?  If you don't know, we can look.  I'm just

23   saying, I thought maybe you had it at your disposal.

24              MS. CLAIBORN:  I didn't write it down, but it was

25   docketed earlier today.

243

1          THE COURT:  Okay.

2          UNIDENTIFIED SPEAKER:  Your Honor, it's Docket

3   Number 263.

4          THE COURT:  263.  Okay.  Thank you.  All right.

5   So I'll take a look.  I've got a few of your orders to take

6   a look at.  And, you know, I'm sure they're fine, so we'll -

7   - and if there aren't -- if they aren't for some reason,

8   we'll let you know.

9          But in the meantime, is there anything else that

10  we should be doing today, because I think we've addressed

11  everything, unless I'm forgetting something.

12         MR. JONAS:  Nothing further here, Your Honor.

13         THE COURT:  Okay.  All right.  Well, I do

14  appreciate the cooperation of the parties and the progress

15  that has been made.  I again want to be clear, I'm not

16  suggesting that everything has to be consented to.  That's

17  not how it works.  I understand that.

18         But I still appreciate when things -- some issues,

19  and many issues today were resolved upon agreement, which is

20  helpful, very helpful.  And I appreciate the parties efforts

21  in trying to resolve these matters.

22         I will take a look at all the orders that we

23  discussed on the record today that were submitted either

24  yesterday or today and try to get those entered tomorrow,

25  and then with regard to the DIP financing motion, that's

244

1    continued to next week at 2:00 p.m. remotely.  Okay?

2              MR. JONAS:  Your Honor, I just, I guess --

3              THE COURT:  Who am I missing?  Okay.

4              MR. JONAS:  -- the Verdolino and Lowey submission

5    is like -- I guess you said you were just going to consider

6    the evidence before --

7              THE COURT:  I took it under advisement.

8              MR. JONAS:  Thank you, Your Honor.

9              THE COURT:  So I have to review -- I want to

10   review the evidence that was submitted today, and I will --

11   and it will note on the -- it will note on the docket --

12   should note on the docket that it was taken under

13   advisement.  Okay?

14             MR. JONAS:  Better -- I'm sorry.  Just one quick

15   comment.

16             THE COURT:  Sure.

17             MR. JONAS:  I just looked at my calendar.  I may

18   need to do next -- because I'm before Judge Kaplan in the

19   Johnson and Johnson case in Trenton in the morning, I may

20   have to do it remotely, but since it's Zoom it shouldn't

21   matter, but I --

22             THE COURT:  Shouldn't matter.  That's right.

23             MR. JONAS:  -- just wanted to let you know.  Thank

24   you.

25             THE COURT:  I'm sure Judge Kaplan can find a room

245

1    for you.

2              MR. JONAS:  Yes, I'm sure.  Thank you.

3              THE COURT:  Okay.  Okay.  All right.  Anything

4    further from anyone?

5              All right.  So since we've addressed all the

6    matters in the Kwok case today, court is adjourned.

7         (Proceedings adjourned at 5:34 p.m.)

8              I, CHRISTINE FIORE, court-approved transcriber and

9    certified electronic reporter and transcriber, certify that

10   the foregoing is a correct transcript from the official

11   electronic sound recording of the proceedings in the above-

12   entitled matter.

13

14   *Christine Fiore*

15   _____        May 3, 2022

16     Christine Fiore, CERT-410

17        Transcriber

18

19

20

21

22

23

24

25

246

INDEX

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE DEBTOR: | | | | |
| Craig R. Jalbert | 26 | 39 | 71 | 75 |
| | | | | |
| Ho Wan Kwok | 138 | 155,181 | | |

| COURT EXHIBITS: | | ID | Rec'd |
|---|---|---|---|
| 1 | Craig answer to Aronsson question under seal | 62 | |

| PAX EXHIBITS: | | |
|---|---|---|
| 17 | Transcript of 341 Meeting | 180 |
| 18 | Ace Decade Affidavit in English | 180 |
| 19 | Ace Decade Affidavit in Chinese | 180 |
| 15 | Wang Deposition Transcript | 198 |

| CLOSING ARGUMENT: | |
|---|---|
| On Behalf of PAX | 199 |
| On Behalf of the United States Trustee | 211 |
| On Behalf of the Unsecured Creditors | 213 |
| On Behalf of Golden Springs New York | 216 |
| On Behalf of the Debtor | 217 |