## **EXHIBIT A**

Friedman Declaration

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

| | |
|---|---|
| In re: | Chapter 11 Case No. |
| HO WAN KWOK[1] | 22-50073 (JAM) |
| Debtor. | May 4, 2022 |

**DECLARATION OF PETER FRIEDMAN IN SUPPORT OF**
**PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.'S MOTION TO**
**UNSEAL COURT EXHIBIT 1**

I, Peter Friedman, declare:

1.       I am an attorney admitted to practice law in the State of New York and Washington, D.C. and am a partner at the law firm of O'Melveny & Myers, 7 Times Square, New York, NY 10036, counsel for Pacific Alliance Asia Opportunity Fund L.P. ("PAX"). I respectfully submit this Declaration in support of PAX's Motion to Unseal Court Exhibit 1.

2.       Attached as Exhibit 1 is a true and correct copy of the transcript of the April 27, 2022 hearing before the Honorable Julie A. Manning.

3.       Attached as Exhibit 2 is a true and correct copy of the transcript of the April 8, 2022 deposition of the 30(b)(6) deposition of Verdolino & Lowey ("V&L"), in which Craig Jalbert represented V&L.

4.       Attached as Exhibit 3 is a true and correct copy of the transcript of the March 21, 2022 341 Meeting of Creditors.

5.       Attached as Exhibit 4 is a true and correct copy of Melissa Francis' LinkedIn profile, available at https://www.linkedin.com/in/melissa-francis-52269b5/.

---

[1] The last four digits of the Debtor's taxpayer identification number are 9595.

6.      Attached as Exhibit 5 is a true and correct copy of the transcript of the April 13, 2022 hearing before the Honorable Julie A. Manning.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: May 4, 2022
New York, New York                              _/s/ Peter Friedman___
                                                Peter Friedman

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

In Re                          *    Case No. 22-50073 (JAM)
                               *
      HO WAN KWOK,             *    Bridgeport, Connecticut
                               *    April 27, 2022
              Debtor.          *
                               *
* * * * * * * * * * * * * * *   *


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For the Debtor:                WILLIAM R. BALDIGA, ESQ.
                               BENNETT S. SILVERBERG, ESQ.
                               KENNETH AULET, ESQ.
                               JEFFREY L. JONAS, ESQ.
                               Brown Rudnick, LLP
                               Seven Times Square
                               New York, NY  10036


For the Creditor, Pacific      PETER FRIEDMAN, ESQ.
 Alliance Asia Opportunity     LAURA S. ARONSSON, ESQ.
 Fund L.P.:                    DAVID V. HARBACH, II, ESQ.
                               O'Melveny & Myers LLP
                               Times Square Tower
                               7 Times Square
                               New York, NY  10036

                               PATRICK M. BIRNEY, ESQ.
                               Robinson & Cole LLP
                               280 Trumbull Street
                               Hartford, CT  06103



Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

APPEARANCES Cont'd:

For the U.S. Trustee:          HOLLEY L. CLAIBORN, ESQ.
                               Office of the United States
                                  Trustee
                               The Giaimo Federal Building
                               150 Court Street, Room 302
                               New Haven, CT  06510


For Golden Spring              TIMOTHY MILTENBERGER, ESQ.
 (New York), Interested        Cohn Birnbaum & Shea, P.C.
  Party:                       100 Pearl Street
                               Hartford, CT  06103


For HK International Funds      STEPHEN M. KINDSETH, ESQ.
 Investments (USA) Limited,    AARON A. ROMNEY, ESQ.
 LLC, Interested Party:        Zeisler & Zeisler
                               10 Middle Street
                               Bridgeport, CT  06604


Proposed counsel for the       IRVE GOLDMAN, ESQ.
 Creditors Committee:          JOHN KAPLAN, ESQ.
                               Pullman & Comley
                               850 Main Street
                               Bridgeport, CT  06601


For Rui Ma, Zheng Wu and       KRISTEN MAYHEW, ESQ.
 Weican Meng, Creditors:       McElroy, Deutsch, Mulvaney &
                                Carpenter
                               30 Jeliff Lane
                               Southport, CT  06890

3

1          (Proceedings commenced at 9:46 a.m.)

2              THE CLERK:  Case No. 22-50073, Ho Wan Kwok.

3              THE COURT:  Good morning.  If we could have

4      appearances for the record, starting with the debtor's

5      counsel, please.

6              MR. BALDIGA:  Good morning, Your Honor.  William

7      Baldiga, Brown Rudnick, for the debtor.  With me, my

8      colleagues, Ben Silverberg, Ken Aulet, and Jeff Jonas.

9      Thank you.

10             THE COURT:  Good morning.

11             MR. JONAS:  Good morning.

12             THE CLERK:  I'm sorry.  I heard Bennett

13     Silverberg, but there was someone else I didn't --

14             MR. BALDIGA:  Ben Silverberg, Kenneth Aulet.

15             THE CLERK:  Thank you.

16             MR. BALDIGA:  And I believe his motion pro hac was

17     allowed a week or two ago.

18             MR. AULET:  Yesterday.

19             THE COURT:  I think just the other day.

20             MR. BALDIGA:  Yesterday.  I'm sorry.

21             THE COURT:  Just the other day, yes.

22             MR. BALDIGA:  And Jeffrey Jonas.

23             THE COURT:  Good morning.

24             MR. BALDIGA:  Thank you.

25             MR. KINDSETH:  Good morning, Your Honor.  Stephen

4

1    Kindseth, Zeisler & Zeisler.  And with me, my colleague

2    Aaron Romney, representing HK International Funds

3    Investments (USA) Limited, LLC.

4            MR. ROMNEY:  Good morning, Your Honor.

5            THE COURT:  Good morning.

6            MR. MILTENBERGER:  Good morning, Your Honor.

7    Timothy Miltenberger for Golden Spring (New York).

8            THE COURT:  Good morning.

9            MR. FRIEDMAN:  Good morning, Your Honor.  Peter

10   Friedman of O'Melveny & Myers on behalf of Pacific Alliance

11   Group.  I'm here with my colleagues Laura Aronsson, who's

12   had a pro hac entered, and David Harbach, who is back there,

13   but will be joining us at the bar.

14           THE COURT:  Good morning.

15           MR. FRIEDMAN:  And Mr. Birney is here as well from

16   the Robinson & Cole firm.

17           MR. BIRNEY:  Good morning, Your Honor.

18           THE COURT:  Good morning.

19           MR. GOLDMAN:  Good morning, Your Honor.  Irve

20   Goldman, Pullman & Comley, with my colleague, Jonathan

21   Kaplan.  Our application is pending to represent the

22   Official Committee of Unsecured Creditors.

23           THE COURT:  Good morning.

24           MR. KAPLAN:  Good morning.

25           MS. CLAIBORN:  Good morning, Your Honor.  Holley

1   Claiborn for the U.S. Trustee.

2          THE COURT:  Good morning.

3          MS. MAYHEW:  Good morning, Your Honor.  Kristin

4   Mayhew, McElroy, Deutsche, Mulvaney & Carpenter, on behalf

5   of creditors Rui Ma and Zheng Wu.

6          THE COURT:  Good morning.

7          MS. MAYHEW:  Good morning.

8          THE COURT:  Does anyone else wish to note their

9   appearance for today's hearings?

10      (No audible response.)

11         THE COURT:  Okay.  As you all know we scheduled

12  the hearings today.  There are many matters on the calendar,

13  but the two matters that are scheduled for an evidentiary

14  hearing today are the application to employ Verdolino &

15  Lowey, ECF No. 90, and the motion for DIP financing -- I've

16  shortened the titled, but that's what it essentially is --

17  ECF 117.

18         I know there are many other matters on the

19  calendar.  I know you all took a few minutes before we

20  started this morning.  I don't know if there's anything that

21  anyone wants to report to the Court before we begin.

22         MR. BALDIGA:  Yes, Your Honor.  Thank you.  Again,

23  William Baldiga for the debtor.

24         Your Honor, we're delighted to have made great

25  progress not only this morning, but over the course of the

6

1    last two weeks.  And if I could just report briefly, not

2    argue, but just report as to where we are as to each matter?

3         THE COURT:  Sure.  Please, go right ahead.

4         MR. BALDIGA:  As to the motion to lift stay

5    involving the boat, there is a resolution.  You may remember

6    that the owner of the boat, AK International -- HK

7    International, filed a proposed order some time ago.  That

8    order has been negotiated.

9         As you would expect, it's somewhat longer than

10   first submitted, but those -- that's what happens with this

11   things, and the parties need some time to finalize some

12   language over the course of the next -- well, it's being

13   done now, but it's not ready to be handed up -- but they

14   believe that sometime this morning that language will have

15   been reviewed by everyone and that there will be a consent,

16   fully-consented-to order resolving the lift stay motion with

17   the boat being returned and fully resolving it.

18        The $37 million is already at the Zeisler Client

19   Trust Fund Account, so that is no longer a concern, if it

20   ever was.  So great progress in that regard.

21        In no particular order, the Brown Rudnick

22   retention, all objections have been resolved.  I believe

23   that PAX wants to put on the record a reservation of rights,

24   but we'll hear them say whatever they want in that regard.

25        With Verdolino & Lowey, all objections have been

7

1    resolved other than that of PAX and I guess PAX will decide

2    whether they want to go forward with that.  But all other

3    objections have been resolved.

4              With the fee procedures, interim fee procedures

5    motion, all objections have been resolved.

6              With the --

7              THE COURT:  Hold on.  Let me just -- I'm with --

8              MR. BALDIGA:  I'm sorry, Your Honor.

9              THE COURT:  No, that's okay.  I'm just trying to

10   make sure I'm following you.

11             MR. BALDIGA:  I guess I should be giving docket

12   numbers.

13             THE COURT:  No.  That's okay.  I'm fine with that.

14   I just -- I can figure that out.  Okay.  Go ahead.

15             So the --

16             MR. BALDIGA:  There is --

17             THE COURT:  -- the interim -- the interim

18   procedures has been resolved, is that what you're saying?

19             MR. BALDIGA:  Yes, Your Honor.

20        (Pause.)

21             MR. BALDIGA:  We'll add PAX as a noticed party as

22   part of the resolution.  So we have work to do on the order,

23   but no objections outstanding, just clean up the order.

24             Thank you.

25             With respect to the DIP loan, there is still an

8

1    objection, but I believe only of PAX I believe.  I'm sorry.

2    The U.S. Trustee also continues to have an objection.  So

3    that appears that we will go forward on --

4               THE COURT:  With evidence on that?

5               MR. BALDIGA:  -- on presentations today --

6               THE COURT:  Okay.

7               MR. BALDIGA:  -- including evidence if the parties

8    wish.

9               And then we have the motion to dismiss.  And we --

10   we'll need some time with you today to work out the

11   scheduling on that with the Court's calendar and the

12   calendars of other parties, but there's been a lot of

13   discussion around that.

14              There's an open issue as to whether we're going to

15   have the 341 continue during that time, and we'll argue if

16   that is necessary as to how that affects the scheduling and

17   complicates the proceeding, but we may be able to resolve

18   that as well.

19              So I think that's the full agenda, Your Honor,

20   I've addressed briefly.

21              Mr. Kindseth may want to give further detail as to

22   where we are with the boat, but obviously all parties can

23   correct any part of that or make additional comment, but --

24              THE COURT:  I have a couple of things --

25              MR. BALDIGA:  Of course.

9

1          THE COURT:  -- before you go.

2          You all go ahead, and then I'll -- maybe you'll

3     answer my questions.

4          MR. BALDIGA:  Okay.  I'll turn it over to others.

5          THE COURT:  Mr. Friedman, what were you going --

6          MR. BALDIGA:  But I'm delighted with the progress,

7     Your Honor.  I reported at the last hearing that there's

8     been an inability to engage with the parties and that has

9     changed dramatically.

10          We've had really good engagement with the

11    committee, with the Office of the United States Trustee,

12    with committee members, and it's good to see the case now

13    proceeding in a good direction with most things that were

14    filed fully resolved and a few things still remaining.  So

15    we feel good that we're heading in the right direction.

16          Now I'll turn it over to other people for whatever

17    questions the Court may have.

18          THE COURT:  Mr. Friedman, go right ahead.  You

19    still have an objection to the DIP motion, but what other

20    objection does your client have?

21          MR. FRIEDMAN:  We also have an objection to the --

22    the retention of a financial advisor in this case, Your

23    Honor, which we will examine the proposed financial advisor

24    who would -- in connection.

25          THE COURT:  Okay.

10

1          MR. FRIEDMAN:  I want to make a couple of

2    comments.  You know, the stay motion is obviously our

3    motion, so I thought I should address the status.

4          THE COURT:  Yes.

5          MR. FRIEDMAN:  We have had extensive discussions

6    with HK.  We've had extensive discussions with the

7    committee.  I do think we are in a place where we have

8    agreed to, in principle, an order.  It is an order that has

9    a lot of belts and suspenders because we obviously, you

10   know, came in to this case with concerns and still have

11   them.

12         It should be -- we should be getting a final draft

13   from counsel for HK shortly I think because we have ironed

14   out the relevant points.

15         I would -- what I would say is once the -- once

16   the order is in your hands -- we obviously have tremendous

17   respect for the Court's time.

18         The date of the stay runs out on Monday, that will

19   be the day ordinarily the Court would have to enter an

20   order.  Out of respect for the Court, if the Court needs

21   more time once it's in the Court's hands, we would agree

22   that there's an extenuating circumstance.  We would not have

23   agreed to that without an agreement.

24         But I'm obviously very sensitive to overloading

25   the Court or trying to jam the Court, which is nobody's

1    intention, so we will provide it to the -- it will be

2    provided to the Court.

3         And when the Court -- if the Court has follow-up

4    questions after that and needs to schedule something, I just

5    want to make it clear to the Court that we will accommodate

6    whatever the Court needs and not try to rush the schedule in

7    any ways to make your life more difficult.

8         THE COURT:  Well, I appreciate that.  And I

9    appreciate the efforts of the parties.  And obviously once I

10   see the order, I will take a look at it --

11        MR. FRIEDMAN:  Okay.

12        THE COURT:  -- and then see if there's any

13   concerns that I have.

14        MR. FRIEDMAN:  Thank you, Your Honor.

15        And then, what I would say, Your Honor, is that's

16   progress.  It's a discrete form of progress.  We still have,

17   you know, a lot of concerns about the case and those have

18   not receded.

19        Mr. Baldiga is correct.  We will just reserve some

20   rights with respect to the Brown Rudnick retention.  We

21   actually think it's important that Mr. Kwok have competent

22   counsel, and Brown Rudnick certainly is competent counsel.

23   And not having them retained would -- A) we heard what you

24   said at the last hearing that they will be retained, and B)

25   whatever form this case takes, they're necessary.

12

1          We do have two other objections.  We will be

2     prosecuting them today.

3          THE COURT:  Okay.  Thank you.

4          Mr. Goldman?

5          MR. GOLDMAN:  Yes, Your Honor.  Thank you.

6          I'd like to put some finer points on the

7     resolution of the committee's objections to the DIP loan and

8     the Verdolino loan, their retention rather.

9          I think it's important that we put the terms of

10    the settlement on the record and advise the Court that we do

11    have it documented.  We had been working on it late into

12    last night and we're finally able to reach final agreement

13    this morning.

14         So if I can report those terms to the Court, I

15    think it would be helpful to the Court and the parties.

16         THE COURT:  Go right ahead.

17         MR. GOLDMAN:  As to the DIP motion, we have agreed

18    that the debtor and Golden Spring will remove as termination

19    events the filing by the debtor of a motion to dismiss or a

20    motion for the appointment of a Chapter 11 trustee or a

21    motion to convert.

22         They will also remove as termination events the

23    termination of exclusivity for the debtor provided that the

24    committee agrees not to seek to terminate exclusivity before

25    the initial 120-day period expires which would be on or

13

1   about June 15th.  So we do agree that we will not seek to

2   terminate that exclusivity before then.

3           THE COURT:  So how are these agreements going to

4   be noted?  Are there going to be -- is there going to be an

5   amended DIP loan agreement, or is this going to be part of

6   the order, or both?

7           MR. GOLDMAN:  Both.

8           THE COURT:  Okay.  Go ahead.

9           MR. GOLDMAN:  Yeah.  They're revisions to both.

10          The termination events reside in the DIP

11  agreement, not the order.  The order just refers to --

12          THE COURT:  Okay.

13          MR. GOLDMAN:  -- the credit agreement.

14          The initial $2 million loan that is -- we would

15  ask the Court to approve on an interim basis -- is going to

16  be paid into our firm's trust account.  We will set up a

17  segregated deposit account that bears interest for that.

18          And I didn't expressly discuss this with the

19  debtor's counsel, but we are going to need a W-9 form filled

20  out by the debtor because the estate will be entitled to the

21  -- whatever interest is on that money.  And that's a bank

22  requirement, not our firm's requirement.  So we'll need that

23  to be filled out if the Court does approve this resolution.

24          And that $2 million will be used to pay the

25  committee's professionals and any examiner that might be

1    appointed or the examiner's professionals.  And of course

2    that's without prejudice to the additional loans that are

3    being requested on a final basis.  And I expect we'll be

4    able to work those out as well.

5         The other provision we negotiated and which was of

6    great concern to the committee relates to the termination

7    event that would be based on the appointment of a Chapter 11

8    trustee.  We were highly concerned -- and that was a point

9    of -- one of the points of our objection -- that that tilted

10   the process.

11        And so what we were able to work out is a

12   commitment from the debtor and Golden Spring that the -- of

13   the $500,000 that Golden Spring agreed to make available

14   upon a termination event -- and that would include the

15   appointment of a Chapter 11 trustee -- they would agree to

16   make an addition to all fees of professionals that had been

17   approved up to that date, the date of the appointment of a

18   trustee, an additional $500,000.  Of that, 400 would be

19   dedicated to a -- the fees of a Chapter 11 trustee, his or

20   her professionals, as well as the committee's professionals

21   to the extent they would continue to have a role post-

22   trustee.

23        So the committee was satisfied that if a Chapter

24   11 trustee had to take over, there would be a fund for the

25   trustee to continue on with the investigation and recovery

15

1      of assets.

2              THE COURT:  Is that 500,000 or 400,000 of which

3      you're talking about part of the two million or in addition

4      to the two million?

5              MR. GOLDMAN:  Well, that would be in -- actually

6      in addition to any fees that were accrued up to the date of

7      the appointment of a trustee, so my conception of it was

8      that it would be in addition to the loan.

9              UNIDENTIFIED:  In addition to?

10              MR. GOLDMAN:  In addition to the two million if

11      the trustee appointment occurred during the interim period.

12      Or if it incurred -- if it occurred in the final period, it

13      would be an addition.  That's my understanding.

14              THE COURT:  Okay.  I'm not sure everybody agrees

15      on that side, but we'll see.  That's why I asked the

16      question.

17          (Pause.)

18              MR. BALDIGA:  On that point, if you still have un-

19      incurred amounts in the two million, it wouldn't double

20      count that.

21              MR. GOLDMAN:  I agree with that.

22              MR. BALDIGA:  Okay.  Thank you.

23              MR. GOLDMAN:  Yeah.

24              THE COURT:  Okay.

25              MR. GOLDMAN:  The debtor had requested a finding

16

1    of good faith in the interim order.

2            And we had no problem with that as long as it was

3    subject to a very strict caveat, and that would be that it

4    would be strictly limited to the extension of the DIP loan

5    and it would not be construed in any way or used to defend

6    against claims that the committee or another estate

7    representative or a creditor might assert against Golden

8    Spring based on theories such as alter ego, veil piercing,

9    fraudulent transfer.

10           In other words, that they couldn't use the good-

11   faith finding to say, here, Your Honor, you've already held

12   that we were a separate entity and we proceeded in good

13   faith with the DIP, so how could you pierce the corporate

14   veil.

15           So that is being accepted out of the good-faith

16   finding and the good-faith finding will only relate to the

17   extension of the interim DIP fees -- DIP funds rather.

18           And there's a similar caveat for the no-waiver

19   provision that is in the current order.  It's in paragraph

20   15.  We'll just make that more explicit to match the caveat

21   I just gave Your Honor about the good-faith finding, that

22   the entry of the order doesn't impair or prejudice in any

23   way the claims that might exist against Golden Spring.

24           And I think that that sums it up.

25           I think there's -- there's one point we agree with

17

1    the debtor on and that's the point that was made in the

2    declaration, that this proceeding should serve as a ground

3    for giving creditors a fair opportunity to investigate what

4    assets the debtor has, to conclusively determine what those

5    assets are, and to use the DIP financing as a means to do

6    that.  That's all in his declaration and that's all being

7    served, we think, if this resolution is approved.

8              THE COURT:  Okay.  Thank you.

9              Mr. Kindseth, did you want to say something?

10             MR. KINDSETH:  Yes.  There is some logistical

11   issues, timing issues, that we have, and so revising the

12   order and having it circulated as soon as possible is very

13   important, so I'd like to be excused to go back to my office

14   to finish the draft order.

15             I'm also --

16             THE COURT:  Of the DIP order?

17             MR. KINDSETH:  Sorry?

18             THE COURT:  Of the DIP order?

19             MR. KINDSETH:  No.  This is concerning the Lady

20   May, the --

21             THE COURT:  Oh, you're -- okay.

22             MR. KINDSETH:  Correct.  My --

23             THE COURT:  Well, there isn't really a -- there

24   isn't really a motion underlying that then, right?

25             I mean --

18

1          MR. KINDSETH:  Actually --

2          THE COURT:  -- you're saying it's the resolution

3    of the relief from stay order?

4          MR. KINDSETH:  Correct.

5          THE COURT:  Okay.  Okay.

6          MR. KINDSETH:  And I can provide Your Honor with a

7    summary of --

8          THE COURT:  No, that's fine.

9          MR. KINDSETH:  Great.

10         THE COURT:  I don't need to see it.

11         MR. KINDSETH:  Perfect.

12         THE COURT:  I mean, I think -- I'll read it --

13         MR. KINDSETH:  Yes.

14         THE COURT:  -- when I see it, right?

15         MR. KINDSETH:  Okay.  Very good.

16         THE COURT:  And so I think that's fine.

17         MR. KINDSETH:  So may I be excused?

18         THE COURT:  Yes.  Yes.  You certainly may.  Thank

19   you.

20         MR. KINDSETH:  Thank you very much, Your Honor.

21         THE COURT:  Okay.  Then the only other thing that

22   I was going to ask questions about was the --

23         The only thing, Mr. Baldiga, you didn't speak

24   about that's on the calendar today, other than the examiner

25   and the dismissal motion which you did speak about in some

19

1    ways, was the proof of claim bar date motion.

2              What's the status of that motion?

3              MR. BALDIGA:  I'm sorry.  I did forget that.

4    That's also fully resolved I believe.  We've agreed to all

5    the requests of the U.S. Trustee in that regard to basically

6    pare down what creditors must do to comply with the bar

7    date.

8              THE COURT:  And what is the bar date proposed to

9    be?

10             MR. BALDIGA:  I don't -- I don't -- it comes out

11   to 52 days after service of the bar date.

12             THE COURT:  Okay.  Well, I'll have to look at that

13   because I'm not sure 52 days is enough time.

14             MR. BALDIGA:  Okay.

15             THE COURT:  I might -- you know, right now, the

16   code, you know, has changed a few times over the last few

17   years, but the least amount of time I think there is after a

18   341 meeting is 70 days, and it's 7 or something, but this is

19   an 11 where --

20             MR. BALDIGA:  Right.

21             THE COURT:  -- there doesn't always have to be a

22   bar date set, right?

23             But if there is, if you ask for one, that's fine,

24   but I don't know if 52 days -- I'll have to look at whatever

25   you propose, but I'm --

20

1        MR. BALDIGA:  Okay.  That's fair enough, Your

2   Honor.

3        THE COURT:  -- I'm suggesting to you that I'm not

4   sure if 52 days will be ample time in this case or any

5   Chapter 11 case quite frankly because of many reasons,

6   including the impact of the ability to object or receive a

7   distribution under a plan.

8        MR. BALDIGA:  I hear that.

9        THE COURT:  So that would be my only concern.  I

10  mean, I don't know what other concerns I might have, but I'm

11  just saying to you 52 days to me seems short.  I'm not

12  saying I'm going to 180 or anything like that, but I think

13  that, you know, I would expect the bar date to be, you know,

14  somewhere at least in the 75-day range.

15       Is that a problem from the management of this

16  case's perspective?

17       MR. BALDIGA:  Well, it depends.  I mean, it's --

18  it's helpful to know what claims there are as we go through

19  a plan process.

20       THE COURT:  I understand that.

21       MR. BALDIGA:  And we're anxious to do a plan

22  process.  We're two months into the case.  And if we give

23  creditors another essentially two months to file claims, it

24  doesn't seem like a big burden, but let's put a date in and

25  get it served, whatever date the Court feels is appropriate,

21

1    it will -- but it will help the plan process along --

2              THE COURT:  And you could certainly --

3              MR. BALDIGA:  -- to know what claims there are.

4              THE COURT:  You know, you can certainly prepare

5    your disclosure statement and plan based on different

6    eventualities, right?

7              MR. BALDIGA:  It's not the disclosure statement as

8    much as the financial transactions that underpin the plan.

9    This is a -- we -- claims, the amount of claims matter.  And

10   to go forward --

11             THE COURT:  I completely agree and that's the

12   point, right?

13             MR. BALDIGA:  Right.

14             THE COURT:  And the -- you don't have a

15   prepackaged Chapter 11, so you have to have time for

16   solicitation and voting, and you have to have people give

17   people an opportunity, meaningful opportunity, to file

18   proofs of claim.

19             MR. BALDIGA:  Yes.  And I know the rules says

20   there's a presumption that 45 days is sufficient, and we

21   accept that it can be more --

22             THE COURT:  What rule?

23             MR. BALDIGA:  Local Rule 3003-1.

24             THE COURT:  Says 45 days for filing -- setting a

25   proof of claim bar date?  Maybe it does.

1          MR. BALDIGA:  Let me take a look at it again.

2          (Pause.)

3          MR. BALDIGA:  But, again, we're not -- we're not

4     even suggesting 45 days, but that's a point of reference I

5     guess.  But if the Court feels that it shouldn't be 45, it

6     should be 52 or 60, then --

7          THE COURT:  I just don't see 45 days as -- or any

8     time frame Local Rule 3001-1.

9          MR. BALDIGA:  I'm sorry.  I misspoke, 3003-1.

10         THE COURT:  Those are creditors whose claims are

11    listed as disputed contingent on liquidating.  That rule

12    applies to creditors with claims that are disputed

13    contingent on liquidated with a notice of a deadline for

14    filing proofs of claims.

15         The purpose of that rule is so that a debtor who

16    files a case and lists in their statements and schedules of

17    affairs all the claims as -- or any claim, it doesn't have

18    to be all -- as disputed or contingent on liquidated.

19         We have a process here in Connecticut where the

20    debtor is required to provide notice to that claimant that

21    their claim is listed as disputed contingent on liquidated,

22    and that if they don't file a proof of claim, that they will

23    not be able to object and they will not receive any

24    distribution under the plan.

25         MR. BALDIGA:  I understand.  I didn't -- I didn't

23

1    say that that rule dictates what we're doing here.

2              THE COURT:  Yeah.

3              MR. BALDIGA:  It provides a reference point as to

4    what -- it's a deadline for certain creditors to get their

5    claims in.  I'm not saying that that dictates what we do.  I

6    am saying that as in pretty much every other Chapter 11 case

7    involving tens of millions of dollars conceivably getting

8    claims, having a deadline on which claims are filed helps to

9    push the case --

10             THE COURT:  I completely agree.  I'm not

11   suggesting there isn't going to be a --

12             MR. BALDIGA:  Okay.  So that's all I'm saying.  So

13   we'll --

14             THE COURT:  I'm not suggesting there isn't going

15   to be a deadline.  I'm just not sure it's going to be 52

16   days.

17             MR. BALDIGA:  And as I said, let's put a day in

18   that you're comfortable with and keep the show moving

19   forward, and we'll do that.

20             THE COURT:  Okay.  Thank you.

21             MR. BALDIGA:  Thank you.

22             THE COURT:  All right.  So, Mr. Friedman, this is

23   your objections to the application to employ Verdolino &

24   Lowey and the -- your clients' -- and the DIP financing

25   order.

24

1          Now, I did see everyone's list of witnesses and

2     exhibits.  And I saw that last night there was a joint

3     exhibit grid with regard to different exhibits.

4          How do you plan on proceeding this morning?  Are

5     you -- are you going -- are we going to start with your

6     objection or is Mr. Baldiga going to start with his -- or

7     his motions?

8          MR. BALDIGA:  I was going to put -- to establish

9     the evidentiary foundation that -- I was going to put Mr.

10    Craig Jalbert on the stand.  That's the witness that PAX

11    intends to cross-examine.  Direct would be very short, but

12    --

13         THE COURT:  That's fine with me if it's fine with

14    Mr. Friedman.

15         MR. BALDIGA:  Okay.

16         THE COURT:  I mean, you two I'm sure have spoken

17    about this, right?

18         MR. FRIEDMAN:  Your Honor, my colleague, Ms.

19    Aronsson, will handle any objections to direct and the

20    cross-examination and we'll make argument after the witness

21    is -- has been relieved.

22         THE COURT:  Okay.  All right.  So, Mr. Baldiga,

23    you may call your first witness.

24         And this -- to be clear on the record, we are now

25    -- is this evidence going to be applicable to both Verdolino

1   & Lowey and the DIP motion or are we just starting with the

2   Verdolino & Lowey application?

3         MR. BALDIGA:  With Verdolino & Lowey.

4         THE COURT:  Okay.  Thank you.

5         MR. BALDIGA:  Mr. Jalbert.

6         THE COURT:  Mr. Jalbert, when you -- when you sit

7   down, just let me know what you can see, okay?  If you have

8   a screen in front of you, you know.

9         I'm just going to say my screen is showing

10  nothing.  Should it be showing at least the calendar?

11        THE CLERK:  No.

12        THE COURT:  Okay.  It shouldn't be showing

13  anything.  Okay.

14        MR. JALBERT:  It is blank, Your Honor.

15        THE COURT:  Can you see anything?

16        MR. JALBERT:  It is blank.

17        THE COURT:  Okay.  Good.  Mine is too.  So then

18  we're on the same page.  But hopefully we'll be on a

19  different page soon.

20        MR. JALBERT:  Good morning.

21        THE COURT:  Good morning.

22      CRAIG JALBERT, WITNESS FOR THE DEBTOR, SWORN

23        THE CLERK:  State your name and business address

24  for the record, please.

25        THE WITNESS:  My name is Craig R. Jalbert, J-A-L-

26

1    B, as in boy, E, as in Eric, R-T, as in Tom.  I work at

2    Verdolino & Lowey.  Our business address is 124 Washington

3    Street, Foxboro, Massachusetts 02035.

4         THE CLERK:  Thank you.

5         THE COURT:  Good morning, Mr. Jalbert.

6         THE WITNESS:  Good morning, Your Honor.

7         THE COURT:  You okay in there?  You've got what

8    you need?

9         THE WITNESS:  (No audible response.)

10        THE COURT:  Okay.  Thank you.  I don't think we

11   even have any water, but if you do get to a point where you

12   need some, let us know.  Okay?

13        THE WITNESS:  Thank you.  I appreciate it.

14                  DIRECT EXAMINATION

15   BY MR. BALDIGA:

16   Q    Good morning, Mr. Jalbert.

17   A    Good morning.

18   Q    You said in your introduction that you were affiliated

19   with the firm of Verdolino & Lowey?

20   A    Yes.

21   Q    Could you tell the Court what that firm does.

22   A    It's styled as an accounting firm.  Most of our work is

23   specialty work.  Pretty much the only accounting service

24   that we do not provide is the test type services, audits,

25   reviews, compilations, but we do a lot of litigation support

1    work in insolvency.  We do federal election reporting for

2    federal senators and congressmen and presidential

3    candidates, and we do what we call high-net-worth

4    babysitting and tax preparation.

5    Q    And what is your position in the firm?

6    A    I'm a principal.

7    Q    And were you a co-founder of the firm?

8    A    Well, the firm was started back in 1979.  The Verdolino

9    or Verdolino & Lowey bought half the firm in 1986.  I bought

10   the other half in 1987.  And it's just morphed into

11   Verdolino & Lowey over the years.

12   Q    So you've been with that firm now for?

13   A    Thirty-five years.

14   Q    Thirty-five 35 years.

15        And within Verdolino and -- and what is your title

16   at the firm?

17   A    Principal.

18   Q    And does that mean that you're in charge of at least --

19   co-charge of the firm with someone else?

20   A    Yes.  So I'm not an owner because a CPA can't be an

21   owner, but I am treated as an equal 50 percent partner.  And

22   100 percent of my time not spent running the firm -- and I'm

23   the "managing partner" -- is spent in this insolvency and

24   related issues.

25   Q    So you have experience in insolvency cases?

Jalbert - Direct                                    28

1    A    I do.

2    Q    For how many years?

3    A    Started somewhere in 1988 or 1989.

4    Q    Okay.  And before you joined Verdolino & Lowey, did --

5    what was your schooling, starting with college?

6    A    I graduated in 1983 with a bachelor of science and

7    degree in accountancy from Boston College.  And since then,

8    I've done 35 -- 38 or 39 years of continuing professional

9    education in the accounting and related areas.

10   Q    Okay.  And as you -- I think as you said Verdolino &

11   Lowey is not an auditor, correct?

12   A    Correct.

13   Q    Describe what you have done in bankruptcy cases and in

14   about how many bankruptcy cases over the years?

15   A    I last did my count five or ten years ago, and at that

16   time, I had been in 7,000 Chapter 7's and 500 Chapter 11's.

17   I've been appointed as a Chapter 11 trustee three times.

18   I've been a federal -- state -- federal receiver, a state

19   court receiver, an assignee for the assignment of benefitted

20   creditors in four states.

21        I've done -- I've been a post-confirmation

22   fiduciary -- pick a title -- liquidating supervisor,

23   liquidating manager, whatever, numerous times.  I work with

24   trustees, debtors in possessions, creditors committees,

25   equity committees, secured creditors, unsecured creditors,

1    pretty much any constituency to a bankruptcy case over the

2    years we've represented in all of these cases.

3            I think that's all I have off the top of my head.

4    Q    And do yo provide assistance to debtors in connection

5    with plan formulation and negotiation?

6    A    Yes.

7    Q    Do you provide assistance with financial reporting?

8    A    Yes.

9    Q    Here, you know that the debtor obviously is an

10   individual?

11   A    Yes.

12   Q    In fact, Mr. Kwok is in the courtroom, and you've met

13   him on several occasions now?

14   A    Yes.

15   Q    He has lawyers obviously that help him, correct?

16   A    Yes.

17   Q    Other than Brown Rudnick, are they bankruptcy lawyers?

18   A    Not to my knowledge.

19   Q    Okay.  Does he have a financial staff individually that

20   is well versed in bankruptcy reporting?

21   A    No.

22   Q    How do you know that?

23   A    I've been told.  And over the last -- what date are we

24   -- 45 or so days, there's been lots of interaction and all

25   of the information necessary for us to do our work has come

Jalbert - Direct                                    30

1    through the legal team.

2    Q    Okay.  But you and your staff have more than a little

3    experience with financial reporting in bankruptcy cases,

4    correct?

5    A    Yes.

6    Q    What type of reporting is required in this case?

7    A    Well, there's two pieces of reporting that come to mind

8    initially.  Aide from the schedules and the SOFAs, putting

9    those aside, that's the start of the case, on an ongoing

10   basis, there's the monthly operative reports that are filed

11   nowadays on the docket with additional information supplied

12   to the United States Trustee.

13        It's the United States Trustee's form and rules.

14   And there's also a Form 426 which is related to Rule 2015.3

15   for reporting related to entities -- I think the term is --

16   that are substantially controlled by the debtor.

17   Q    Okay.  And were you involved in the preparation of the

18   first MORs filed in this case?

19   A    Yes.

20   Q    What did you do?  Or when I say you, you and your

21   staff, please.

22   A    We, at Verdolino & Lowey, were -- initiated the

23   preparation.  We used the form that is supplied by the

24   United States Trustee.  It's a PDF that you fill out.  It

25   has lots of instructions.  And we worked with the debtor's

Jalbert - Direct                                    31

1    attorneys in order to obtain the information necessary to

2    prepare the form.  And that has been done for February and

3    March.

4         We needed assistance in getting input from Golden

5    Spring and that was arranged for through counsel.  And we

6    did have initial few emails with Golden Spring to obtain

7    information and most everything has come through counsel.

8    Q    Okay.  With respect to the schedules and statements,

9    were you involved in that process?

10   A    Yes.

11   Q    What did you and your staff do in that regard?

12   A    So in order to file the SOFAs and the schedules,

13   there's an awful lot of historical information necessary, so

14   we participated on numerous telephone calls and emails with

15   the legal team in order to obtain the information.

16        We populated initially the draft forms of both the

17   -- all of the schedules -- and as we all know, there's a

18   number of them -- and the statement of financial affairs.

19        We were -- initially crafted the first draft of

20   what I'll call the specific notes, there were global notes,

21   that were filed as part and parcel to the SOFAs and the

22   schedules.  And the general notes were I believe created and

23   drafted by the attorneys.

24        I did the first pass at trying to file the

25   specific notes that responded to the various particular

1   questions in the SOFAs and the schedules after receiving and

2   obtaining and organizing the information received from the

3   legal team.

4   Q    Were you involved in the establishment by this debtor

5   in possession of the so-called DIP deposit account?

6   A    Yes.

7   Q    What did you do?

8   A    There were only a number of institutions that the

9   United States Trustee's Office has -- permits to be -- to

10  hold funds in a bankruptcy case so we identified that group

11  of banks and we tried to see who would participate.  We have

12  a relationship with three of the banks that frequently do

13  work in bankruptcy.

14          Initially, and no longer, I was going to be the

15  actual signatory, so we went and presented it that way.

16  When that became clear that that was not going to happen, we

17  made arrangements to be able to get debtor in possession to

18  be the sole signatory on the account and to have a bank

19  account that would meet the requirements of the United

20  States Trustee's Office.

21          It's a bank that's done it in other cases in this

22  jurisdiction and others.  It happens to be a bank that we've

23  worked for -- with -- in a number of matters over the last

24  couple of years.

25  Q    What bank is that?

Jalbert - Direct                                      33

1    A    Well, we went with both People's and M&T.  And in the

2    middle of our discussions, they merged.  So we talked from

3    both sides, but eventually it will be in the -- it will be

4    an account in M&T.

5    Q    Okay.  All right.  Did you use your personal experience

6    and relationships to help establish that account?

7    A    Yes.

8    Q    And, again, you are, yourself, your firm and you, will

9    not be a fiduciary, but you're just providing advisory

10   assistance in that regard, correct?

11   A    Correct.

12   Q    And you're not going to act as a fiduciary in this

13   case, correct?

14   A    Correct.

15   Q    So all work is advisory?

16   A    Well --

17   Q    Accounting or --

18   A    Yes.  I don't know what the term would be, but there

19   will be accounting and reporting.  The information coming

20   out of the bank account will have to be reported in the MLR.

21   the debtor doesn't have an accounting staff.  I assume that

22   we will have some role in making sure that checks are

23   written, checks are signed by the debtor.

24        And then the reporting, the committee and others

25   might have.  And the U.S. Trustee might want weekly or

Jalbert - Direct                                           34

1    monthly reporting or bi-weekly reporting.  I don't know what

2    they'll want.  Different cases, people do different things.

3    And of course there will be the monthly reporting through

4    the MLR, so I'm assuming we will assist and facilitate that.

5    Q    And have you had direct -- you and your staff had

6    direct communications with the Office of the United States

7    Trustee regarding reporting in this case?

8    A    Yes.

9    Q    And how has that gone?

10   A    Well, it started out with -- everyone probably knows in

11   June of 2021 the United States Trustee started a requirement

12   with the monthly -- the MLRs are much different beasts than

13   they used to be.  They used to be in a -- all in Excel and

14   you would prepare it and it was fairly simple.

15         It's now done on a -- on a PDF that is -- you can

16   keypunch directly into the PDF.  And once the form is filled

17   and populated with all the information that is required and

18   appropriate for that particular case, you actually hit a

19   button and it uploads the data to the cloud in the United

20   States Trustee's Office.

21         And it sends back a form that is no longer

22   watermarked as draft or whatever the watermark was.  That's

23   then signed by the debtor and filed on the docket.  And any

24   supplemental information goes to the U.S. Trustee separately

25   by email either by my firm or the -- or attorneys.

Jalbert - Direct                                          35

1      Well, when -- since January -- and I have a number

2   of cases undergoing Chapter 11s where this reporting is

3   required -- without any word that came down, the form

4   changed dramatically.  It used to be a straight four or five

5   pages.  All of a sudden it had a whole bunch of other pages

6   and some markings, you know, like when you go to a

7   restaurant and you do the menu button to see what the menu

8   is, this form had those -- those kind of symbols and

9   markings.

10      I didn't know what it was.  No one could figure it

11   out.  And I talked to someone in the accounting side of the

12   U.S. Trustee's Office who happened to be in New York

13   handling this case and he explained to me that that's the

14   way the form is supposed to be which allowed us to then

15   quickly wrap up the form.  And during that, that's when he

16   made a request for additional information on the monthly

17   operating report which we've been providing since then.

18   Q    Did you feel that your 35 years of experience with you

19   and your staff helped to get that done efficiently?

20   A    Of course.

21   Q    Do you think this debtor alone without your office's

22   assistance would have been able to get that done?

23   A    No.

24   Q    How about the instructions and definitions in the

25   schedules and statements, how did your experience affect how

Jalbert - Direct                                36

1    that work was done?

2    A    Well, obviously it was very helpful.  This is a unique

3    case in a number of areas.  One of the uniquenesses -- and

4    at least Your Honor probably knows -- is not a large amount

5    of individual Chapter 11 cases by comparison to corporate or

6    Chapter 7 cases it's a relatively minor amount.  We have

7    done a number of them in the past.  We had -- we've had

8    different types of cases.

9         This one is very unique.  And so as we were going

10   through this, well, we had a lot of historical knowledge and

11   history and basis to understand what the SOFAs and the

12   schedules are looking for, we had to make sure we educated

13   everybody to what the rules were, what the definitions were.

14        Frankly, some times what is on the SOFA or a

15   schedule, the actual question, doesn't entirely and

16   completely relate to what the instructions say.  The

17   definitions can differ a bit.  So we assisted everybody in

18   those -- in those areas.

19        And the attorneys, as well as us, haven't had lots

20   of individual Chapter 11s, so we all made sure that we

21   reviewed those instructions to make sure that we filed and

22   did everything we possibly could, and to be abundantly clear

23   that the attorneys drafted general and specific global notes

24   to accompany the schedules and the SOFAs where there was any

25   issues that needed additional addressing and describing.

Jalbert - Direct                                37

1   Q    Was your experience helpful in that regard?

2   A    Yes.

3   Q    Do you think this debtor could have done that without

4   your assistance?

5   A    No.

6   Q    You mentioned earlier that your firm does not provide

7   auditing services, correct?

8   A    Yes.

9   Q    And while your firm does serve, and while you have

10  served as a fiduciary, you're not serving as a fiduciary

11  here, correct?

12  A    Correct.

13  Q    Do you remember being deposed by PAX --

14  A    Yes.

15  Q    -- a few weeks ago, I guess?

16  A    Yes.

17  Q    Okay.  Did you try to make clear during your testimony

18  that you were not doing auditing or forensic work or

19  verification work here?

20  A    I think -- I think -- I thought I did.  I think the key

21  word that they used was investigate.

22  Q    Okay.

23  A    I didn't investigate anything, and the answer to that

24  question is no.

25  Q    Okay.  So are you being asked to be an examiner in this

Jalbert - Direct                                                      38

1    case?

2    A     No.

3    Q     Are you being asked to be a trustee?

4    A     No.

5    Q     Are you being asked to do an investigation?

6    A     No.

7    Q     But you are being asked to work with the debtor and the

8    debtor's team to provide financial information in a manner

9    required by the bankruptcy code and the rules and the Office

10   of the United States Trustee?

11   A     Among other services, yes.

12   Q     Okay.  But you feel capable to do that?

13   A     Yes.

14   Q     And you feel -- and, again, can the debtor do that

15   without your help?

16   A     No.

17   Q     Okay.

18             MR. BALDIGA:  No other questions, Your Honor.

19   Thank you.

20             THE COURT:  Thank you.

21             Cross-examination, Counsel?

22        (Pause.)

23             MS. ARONSSON:  Good morning.

24             THE WITNESS:  Good morning.

25             MS. ARONSSON:  Laura Aronsson from O'Melveny &

1   Myers.

2            THE COURT:  Good morning.  You may proceed.

3                      CROSS-EXAMINATION

4   BY MS. ARONSSON:

5   Q    Good morning, Mr. Jalbert.  I'd like to discuss the

6   work that V&L has done in this matter to date.  V&L was

7   contacted sometime in February, is that right?

8   A    Late February, early March.

9   Q    After retention, you turned to the SOFAs and the

10  schedules, working on them simultaneously?

11  A    Well, I'm not retained yet, so.

12  Q    After you were contacted?  Thank you.

13  A    After we were contacted, yes.  I think -- aside from

14  drafting an engagement letter and providing background

15  information on the firm, I think our first tasks were to

16  begin working on the SOFAs and the schedules.

17  Q    Did you finish that work?

18  A    So far, yes.

19  Q    Then V&L started preparing the first monthly operating

20  report?

21  A    Yes.

22  Q    This was the report for the second half of February?

23  A    Well, it was a report for the month of February.  But

24  it just so happens the debtor filed on February 15th, so.

25  Q    Since then, the debtor has filed one additional

Jalbert - Cross                                    40

1    operating report?

2    A    The month of March, yes.

3    Q    This was filed on April 20th?

4    A    If you say so.  I know it's around that date.

5    Q    Turning to the work you've performed so far in

6    connection with these categories, I'm going to start with

7    the SOFAs and schedules, you prepared these filings based on

8    the information you received from others?

9    A    Yes.

10   Q    These people included Brown Rudnick, right?

11   A    Yes.

12   Q    Aaron Mitchell?

13   A    Yes.

14   Q    Is that Kwok's personal attorney?

15   A    He's debtor's counsel.  I don't know what you mean by

16   personal attorney.

17   Q    And Melissa Francis?

18   A    Yes.  I did receive information from her.

19   Q    Is that Kwok's personal attorney?

20   A    My understanding is she's -- well, she's part of the

21   bankruptcy team.  I don't know whether she's just his

22   personal attention attorney.

23   Q    Anyone else?

24   A    Yes.  We received a spreadsheet which was I think

25   amended or changed a couple of times from someone from

1    Golden Spring.

2    Q    Was this in connection with the SOFAs and the schedules

3    or the monthly operating report work?

4    A    With the operating report.

5    Q    Okay.  We can turn to that.  Did you communicate with

6    anyone else regarding the SOFAs and the schedules besides

7    Brown Rudnick, Aaron Mitchell and Melissa Francis?

8    A    No.

9    Q    I think I heard you testify on direct Verdolino & Lowey

10   got all of the relevant information from the people we just

11   talked about.  I note -- you didn't do any other independent

12   work or to verify the facts?

13   A    Correct.

14   Q    You didn't do any investigating -- investigation into

15   the ownership interests, if any, of Mr. Kwok in the assets

16   listed in the SOFAs and the schedules?

17   A    Correct.

18   Q    For example, no investigation of Kwok's interest in the

19   Lady May?

20   A    Correct.

21   Q    You did no work to value the items listed in the SOFAs

22   and the schedules, right?

23   A    If you're asking if we did valuation work, no.  But

24   there was questions.  That the answers to those questions

25   was checks issued by the State of New York and I think the

1    federal government that on the face of those checks had a

2    number.  I don't know if you call that valuing, but we read

3    the check and we determined what that number was and put it

4    in the schedules.

5    Q    Verdolino & Lowey has no experience valuing luxury

6    items like the Lady May?

7    A    Correct.

8    Q    You did no investigation into the debtor's income

9    information?

10   A    Correct.

11   Q    You have not spoken to the debtor about any of the

12   filings Verdolino & Lowey has prepared in this matter?

13   A    Correct.

14   Q    Verdolino & Lowey used best case to help prepare the

15   SOFAs and the schedules, right?

16   A    Yes.

17   Q    That's industry software?

18   A    Well, it is.  I don't know what else to do besides

19   bankruptcy, but best case is a -- and I don't know what the

20   real name of the company is, but they manufacture, prepare a

21   software, that provides pretty much every bankruptcy form

22   that I'm aware of that has to be filed in a bankruptcy.

23   Q    V&L simply plugged that information that you received

24   into the software to create the filings?

25   A    Well, first we got the information, understood the

Jalbert - Cross                                                43

1    information, and then, yes, we did keypunch it.

2    Q    You did not review any of the debtor's books and

3    records in connection with the engagement?

4    A    Correct.

5    Q    You do not know where those books and records are kept?

6    A    Correct.

7    Q    You did not ask to review them?

8    A    Correct.

9    Q    Turning to the work in connection with the monthly

10   operating report, again, like with the SOFAs and the

11   schedules, Verdolino relied on information it received from

12   the third parties to assist in the preparation?

13   A    Correct.

14   Q    You mentioned a summary of expenses earlier, is this a

15   summary of expenses you received from someone at Golden

16   Spring breaking down the debtor's monthly expenses?

17   A    Well, they're breaking down the expenses paid on behalf

18   of the debtor, paid by a third party on behalf of the

19   debtor, yes.

20   Q    This was about seven categories?

21   A    About that.

22   Q    To your knowledge, Golden Spring is the debtor's family

23   office in New York City?

24            MR. BALDIGA:  Objection.

25            THE COURT:  What's your basis --

Jalbert - Cross                                              44

1              THE WITNESS:  That's not my understanding.

2              THE COURT:  Hold on a second, sir.

3              What's your objection?

4              MR. BALDIGA:  Well, the witness answered the

5     question, so I'll withdraw the objection, Your Honor.

6              THE COURT:  Okay.  Thank you.

7              THE WITNESS:  I'm sorry.  Ask the question again.

8     BY MS. ARONSSON:

9     Q    To your knowledge, Golden Spring is the debtor's family

10    office in New York City?

11    A    No.  That's not my understanding.

12             MS. ARONSSON:  Okay.  Madam Clerk, can we please

13    pull up PAX Exhibit 14.

14         (Pause.)

15    BY MS. ARONSSON:

16    Q    So just to confirm --

17             THE CLERK:  On the screen --

18             MS. ARONSSON:  Sorry.

19             THE CLERK:  On the screen is Exhibit 14, page 1.

20             MS. ARONSSON:  Thank you.

21             THE CLERK:  PAX Exhibit 14, page 1.

22    BY MS. ARONSSON:

23    Q    So just to confirm --

24    A    No.  That's not what mine says.  Mine says I'm on page

25    171.  Does it -- does it have a whole bunch of --

Jalbert - Cross                                    45

1          THE CLERK:  Yes.

2          THE WITNESS:  -- exhibits all in one PDF?  Okay.

3          THE CLERK:  That's page 1 in Exhibit 14.

4          THE WITNESS:  And if you say it's page 1, it's

5    page 1.

6    BY MS. ARONSSON:

7    Q    So just to confirm, what is your understanding of

8    Golden Spring?

9    A    My understanding is it's the debtor's son's

10   company/family office.

11         MS. ARONSSON:  All right.  You can take those

12   down.  Thank you.

13         THE COURT:  So you're not moving for the admission

14   of Exhibit 14, Counsel?

15         MS. ARONSSON:  No, I'm not.  Thank you.

16         THE COURT:  Okay.  Thank you.

17   BY MS. ARONSSON:

18   Q    You communicated with one person at Golden Spring

19   regarding the information contained in the monthly operating

20   report, right?

21   A    Yes.

22   Q    That provided -- that person provided you certain

23   information relevant to the monthly operating report?

24   A    Yes.

25   Q    Who was that person?

Jalbert - Cross                                    46

1    A    I only know his first name.

2              THE WITNESS:  Am I permitted to say it?

3              MR. BALDIGA:  Objection, Your Honor.  Well, I'll

4    let Golden Spring argue.

5              MR. MILTENBERGER:  Your Honor, this came up at Mr.

6    Jalbert's deposition.  My client's concerned about the

7    harassment, intimidation of its employees.  And unless

8    there's a specific reason why an employee's name needs to be

9    said on the record, we would like the identification of the

10   employees to remain confidential and be kept off of the

11   record.

12             THE COURT:  Well, you'd have to file a motion for

13   that, Counsel, I think.  You know, that's a -- if you want

14   something under seal or confidential, you have to seek that

15   through an appropriate motion.

16             But I think what counsel was asking was -- and

17   maybe I'm wrong, we can play back the recording -- was you

18   were asking about a specific person that was providing

19   information from Golden Spring.  I thought that was the

20   question.

21             MS. ARONSSON:  That's right.

22             THE COURT:  Okay.  You know, don't answer it yet

23   though, sir, okay, because we have to figure out what the --

24   what the issue is here.

25             So what is the need to know the specific person's

Jalbert - Cross                                          47

1    name from Golden Spring?

2              MS. ARONSSON:   Sure.   In connection with this

3    particular motion, the retention of V&L, Pacific Alliance,

4    we sought discovery to understand the purpose of Verdolino &

5    Lowey's retention and why it's in the best interest of the

6    estate.

7              We believe we're entitled to explore that, the way

8    in which Verdolino & Lowey prepared the SOFAs, the

9    schedules, the monthly operating reports, including who

10   provided Verdolino with the underlying facts, and what those

11   facts are, is important to uncovering whether this retention

12   is in the best interest of the estate.

13             THE COURT:   All right.   Well, let me ask you a

14   question if we're -- and I'm not -- I'm not ruling on

15   anything at the moment -- but does -- do you have an

16   opposition to us putting the witness answering the question

17   -- but has the witness already answered this question at the

18   deposition?

19             MS. ARONSSON:   He did not.

20             THE COURT:   Okay.   Was the question asked at the

21   deposition?

22             MS. ARONSSON:   Yes.   And we also sought discovery

23   and we received a redacted email, so that was the root of

24   the question.

25             THE COURT:   I see.   So you received an email from

1    someone at Golden Spring, but it had redacted people's

2    names?

3            MS. ARONSSON:  Correct.

4            THE COURT:  Okay.  And what's your concern,

5    Attorney Miltenberger?

6            MR. MILTENBERGER:  My client's concerned about the

7    privacy of their employees, Your Honor.  And in the proffer

8    by PAX's attorney, I didn't see anything that made it clear

9    that the identity of the person that provided the

10   information to Verdolino & Lowey is important.

11           We don't have any issue with the disclosure of the

12   information that was provided and when that happened.  The

13   only concern that we have is the privacy of our employees

14   and we would ask that the employee name be kept

15   confidential.

16           THE COURT:  Well, wouldn't somebody from Golden

17   Spring have to testify at some point?

18           I mean, what are you going to -- are you going to

19   designate a Rule 30(b) representative or what -- you're not

20   going -- I mean, someone's going to have to, it can't just

21   be the corporate entity.  There has to be an individual at

22   some point.

23           MR. MILTENBERGER:  That's correct, Your Honor.

24   Golden Spring has been examined.  We did have the president

25   of Golden Spring testify and answer all questions.

Jalbert - Cross                                    49

1          THE COURT:  So the person that provided the

2     information to Mr. Jalbert is not the president of Golden

3     Spring, is that the -- is that the issue?

4          MR. MILTENBERGER:  That's the issue, Your Honor.

5     It was a rank and file employee of Golden Spring who was

6     just passing information over to Verdolino & Lowey.

7          And, again, we don't have any objection to inquiry

8     about what that information was or why Verdolino & Lowey

9     wanted it, just as to the identity of the employee to

10     protect that individual's privacy.

11          THE COURT:  Well, you'd have to have sought a

12     protective order I think.

13          But the other way we could handle it is -- I mean,

14     you didn't do that.  What did you do at the deposition when

15     this question was asked?

16          MR. MILTENBERGER:  I objected to it, Your Honor.

17          THE COURT:  Okay.  And did you say that you were

18     going to seek some form of a protective order?

19          MR. MILTENBERGER:  No, Your Honor.  I objected and

20     the questioner moved on.

21          THE COURT:  Okay.

22          MS. ARONSSON:  Your Honor, if I may?

23          THE COURT:  Yes.  Go ahead.

24          MS. ARONSSON:  Two more quick points.  Even if the

25     name were not relevant -- we dispute that it's not relevant

Jalbert - Cross                                    50

1    -- I'm not just aware of any applicable rule that allows the

2    debtor of Golden Spring to redact for relevancy.  That's

3    just not something that I've ever seen happen.

4         I'm also not aware of any rule that allows the

5    debtor to redact otherwise discoverable information, the

6    name and the email address of a person based on the STAG

7    security threat.

8         And I would also point out that, you know, we've

9    seen Golden Spring employees be identified on LinkedIn,

10   which is publicly available.

11        MR. MILTENBERGER:  Your Honor, the argument is is

12   that the probative value of this individual's name is

13   outweighed by the prejudicial effect of disclosing it.

14        THE COURT:  Well, I don't know if that's true.  I

15   understand your argument, but I don't know if that's true.

16        Maybe what we need to do is, you know, set this

17   issue aside for some further discussion and/or -- I mean,

18   what we could do in the short term -- but I don't know if

19   it's acceptable to PAX, it may not be -- is the question

20   could be asked and answered, whatever the answer might be,

21   and we could put that part of the record under seal pending

22   a ruling on the issue, but that's I think the best that we

23   can do right now.

24        I don't have anything in front of me to make an

25   educated evidentiary ruling on this issue, right?

Jalbert - Cross                                        51

1        But if we're going to do that, we have to give the

2   courtroom deputy a moment because we'd have to -- our

3   software, that is, the recording that is the record of the

4   case, does allow us to put certain parts of the record

5   underseal.

6        And I'd have to orally rule that there -- because

7   there is no motion pending, no written motion -- that

8   because there's an objection to a question that is an

9   evidentiary objection in nature, and because I don't have

10  anything in front of me to allow me to make an educated

11  ruling, that I would have to rule at this point that if we

12  want to proceed this way, that the record for this question

13  and answer would be under seal until further order of the

14  Court.

15       Mr. Baldiga?

16       MR. BALDIGA:  Yes, Your Honor.

17       For the debtor, our objection is -- in addition to

18  Mr. Miltenberger's -- just on relevance.

19       You gave PAX an opportunity to say how the name is

20  relevant and there was no reason given.  The name is simply

21  not relevant to anything here.

22       THE COURT:  Okay.  Well, again, I'm not sure I

23  agree with you, but I'm not prepared to rule on that at the

24  moment.

25       MR. BALDIGA:  But there could be at least some

Jalbert - Cross                                        52

1    showing as to why that is relevant.

2            THE COURT:  Well, there is -- I mean, under the

3    Federal Rules of Civil Procedure, discovery is broad,

4    evidence is broad.  She's asking a question about the

5    preparation of the financial information that forms the

6    basis of this Chapter 11 case where -- and Mr. Jalbert has

7    testified quite, you know, admirably about what he's done,

8    what he hasn't done, and what -- how the information has

9    come to him from third parties and not from the debtor

10   directly.

11           So I do think it's relevant.  If that's your -- on

12   that objection, I think it's relevant.

13           MR. BALDIGA:  Okay.

14           THE COURT:  I think that's relevant.

15           But whether or not it should be confidential or

16   protected is a different issue at least from the Court's

17   view.

18           Again, this is an individual Chapter 11 case.  The

19   debtor has duties under the bankruptcy code.  Apparently

20   those -- I shouldn't say -- that's not fair -- let me make

21   sure I say this properly -- from what I've heard today, and

22   that's all I've heard so, the debtor has not directly

23   communicating with the party who is preparing and submitting

24   the financial information that is the basis for this case.

25           If that's the case, which it appears to be --

Jalbert - Cross                                                    53

1    which is fine, but, I mean, there's nothing -- but that

2    doesn't -- that does not preclude then a party from asking

3    who provided the information.  I think it is relevant.

4            And even -- but it may ultimately be not material.

5    I could see that it's relevant, but you could argue at some

6    point possibly that it's immaterial who it is because it was

7    just somebody at Golden Spring.

8            Now, that doesn't mean that the -- that PAX as the

9    objection party -- objecting party shouldn't know who that

10   is because maybe PAX wants to depose that person.

11           Now, you could -- you could object to that and you

12   could file a protective order and motion to quash and all

13   kinds of things, but that doesn't mean it's not relevant

14   under the facts of this case that have been established so

15   far this morning.

16           MR. BALDIGA:  Okay.  My second point, Your Honor,

17   is that before we go through all these other machinations,

18   it's possible that the witness simply doesn't know the name.

19   And perhaps the Court could inquire as to whether we're all

20   just sort of wasting time because the --

21           THE COURT:  I mean, that's a possibility, but --

22           MR. BALDIGA:  Thank you.

23           THE COURT:  -- you know, I think there is a

24   pending question, right?

25           There's a pending objection.

Jalbert - Cross                                    54

1          So Golden Spring is trying to -- not trying, is

2     asserting that the answer to that question is confidential

3     and they don't want it disclosed --

4          MR. BALDIGA:  I understand that fully.

5          THE COURT:  -- even though they haven't filed any

6     documents or anything with this court with regard to this

7     examination.  So why don't I --

8          Well, how would you like to proceed, Counsel?

9          MS. ARONSSON:  Pacific Alliance is happy to

10    proceed under seal as you suggested.

11         I just wanted to also note that we have relevancy

12    arguments, and that Mr. Friedman will address in connection

13    with the DIP objection on this very point.

14         THE COURT:  Well, I just ruled that I think it is

15    relevant.

16         MS. ARONSSON:  Thank you.  Yeah.

17         THE COURT:  Okay?  I think it is relevant.  So,

18    you know.  And Mr. Baldiga may find that objectionable and

19    may, you know, note the objection for the record for appeal

20    purposes, whatever he needs, but I think it is relevant in

21    this case.

22         Under the specific facts and circumstances of this

23    case, I think it's relevant to know who provided the

24    information to the party -- that the financial advisor that

25    is preparing and submitting all the financial information

Jalbert - Cross                                            55

1    that is the basis for this case.

2              So that is the Court's ruling.

3              With regard to the -- placing it under seal, now,

4    if you'd all just give me a minute.

5              I don't want to burden the courtroom deputy, but,

6    how much time do you need to get that set up to turn on the

7    -- to make sure that this question that's been pending --

8    and I'm going to make -- I'm going to ask you to ask it

9    again once we go under seal -- and Mr. Jalbert's answer be

10   placed under seal?

11             THE CLERK:  As soon as you say this is under seal,

12   it's just flipping the buttons.

13             THE COURT:  Okay.  Great.

14             THE CLERK:  (Indiscernible.)

15             THE COURT:  Okay.  Hold on a minute, Mr.

16   Miltenberger.  Just hold on.

17             THE CLERK:  So are you saying put it under --

18             THE COURT:  No, not yet.  I'll tell you.

19             THE CLERK:  Okay.

20             THE COURT:  I'll say when to start.  I just want

21   to hear from -- I still want to hear from counsel for PAX

22   and then I'm going to let Mr. Miltenberger speak again too.

23             THE CLERK:  Okay.

24             THE COURT:  Is there anything further you wanted

25   to add for the record before I let Mr. Miltenberger talk for

Jalbert - Cross                                              56

1   a moment?

2            MS. ARONSSON:  No.  Thank you.

3            THE COURT:  Okay.  Thank you.

4            Mr. Miltenberger?

5            MR. MILTENBERGER:  Your Honor, just to inquire,

6   the public access line would be active during the question

7   and answer?

8            THE COURT:  I guess that's a good point, isn't it,

9   Mr. Miltenberger?

10           THE CLERK:  We would put it in the waiting room,

11  Your Honor.

12           THE COURT:  All right.  So that's what we'd have

13  to do first.  We'd have to put -- we'd have to turn off the

14  phone too, right?  We've got a phone line going, don't we?

15           THE CLERK:  That's the public access line.

16           THE COURT:  Yeah.  But then who else -- is there

17  anybody else beside -- people in the courtroom are all here,

18  so how are we -- how are we going to do that?

19      (Pause.)

20           THE COURT:  We'd have to -- you know what?  We'll

21  have to think about this for a second because we'd have to

22  have everybody be excused from the courtroom, which I don't

23  know how much sense this makes right now.

24           Because if it's under seal, but everybody hears

25  it, then it's not under seal.  Then it becomes public

Jalbert - Cross                              57

1   record.

2          MS. ARONSSON:  Could I just have one moment,

3   please, Your Honor?

4          THE COURT:  Certainly.

5      (Pause.)

6          THE COURT:  Go ahead, Counsel.

7          MS. ARONSSON:  I think we're happy to proceed with

8   this.

9          THE COURT:  Yeah.  The only problem is there is a

10  -- there is a problem, right?

11         We'd have to put everybody that's in the public

12  access line out of the -- out of this session right now.

13         And there's all these people in the courtroom,

14  right?  So how do I deal with that?

15         If it's under seal and everybody's just heard it,

16  then it's not under seal, right?

17         MS. ARONSSON:  Another option, Your Honor, the

18  witness could write the name on a piece of paper and mark it

19  as Court's Exhibit 1.

20         THE COURT:  That would be placed under seal?

21         MS. ARONSSON:  Correct.

22         THE COURT:  Yes.  Okay.  I think that's a good

23  solution.  That's what we're going to do, Attorney

24  Miltenberger, so then we don't have to --

25         But of course Mr. Jalbert probably doesn't have

Jalbert - Cross                                          58

1    any paper or a pen.

2            THE WITNESS:  Your Honor is correct.

3            THE COURT:  Yes.  Thank you.

4            All right.  So, Mr. Jalbert, don't write anything

5    down yet.  I'm going to ask counsel to ask the question

6    again.

7            I'm going to note that there are two objections to

8    the question, one of which was relevance that I've

9    overruled.

10           And one of which is from Golden Spring with regard

11   to confidentiality, which I'm not prepared to rule on at the

12   moment because I don't have anything in front of me to

13   address that in an educated manner.

14           So then I'm going to instruct you to answer the

15   question by writing the answer on the paper and then we'll

16   have to mark that as an exhibit under seal.  Okay?

17           So you're not going to say anything into the

18   microphone.  You're not going to say anything on the record.

19   It's just going to be on that piece of paper.  Okay?

20           THE WITNESS:  Understood, Your Honor.

21           THE COURT:  Okay.  Thank you.

22           All right.  Counsel, if you would please ask your

23   question again that was the subject of two objections.

24   BY MS. ARONSSON:

25   Q    Who is the person from Golden Spring who provided you

Jalbert - Cross                                     59

1    certain information relevant to the monthly operating

2    reports?

3              THE COURT:  Okay.  So that the record is clear,

4    Mr. Baldiga, on behalf of the debtor, has objected to your

5    question, Counsel, on the basis of relevance.

6              I have stated that I believe it is -- your

7    question is relevant given the prior testimony of Mr.

8    Jalbert that the information that he and his office has

9    compiled and filed in this court, the financial information

10   in the statements and schedules of affairs, and the monthly

11   operating reports, were provided to him by third parties,

12   not directly from the debtor, and that one of those third

13   parties was Golden Spring.

14             So I've overruled the objection to relevance.

15             There was a further objection by Mr. Miltenberger,

16   on behalf of Golden Spring, arguing that the disclosure or

17   answer to that question of an individual's name could -- is

18   a -- Golden Spring would like to keep confidential.

19             And I've said that I can't rule on that right now

20   without appropriate paperwork in compliance with the Federal

21   Rules of Civil Procedure.

22             So what we all discussed, and what we're going to

23   do is, Mr. Jalbert is going to write an answer to that

24   question.  He's going to hand you that document.  And then

25   you're going to hand it to the courtroom deputy and it's

Jalbert - Cross                                          60

1    going to be marked as Court's Exhibit 1 under seal.  And it

2    will stay under seal until further order of the Court.

3              Attorney Claiborn?

4              MS. CLAIBORN:  Yes, Your Honor.  If I may just

5    interject --

6              THE COURT:  We can't hear you.  Can you just pull

7    that towards you?

8              MS. CLAIBORN:  Your Honor, the U.S. Trustee has a

9    right to access to everything in the Court's file.

10             THE COURT:  Yes.  You will have that.  Yes.

11             MS. CLAIBORN:  I just wanted to make sure we would

12   have access to the --

13             THE COURT:  It's required that the U.S. Trustee

14   has access to everything under seal.  And I'm sure counsel

15   knows that, so -- but good point to make for the record.

16   And, yes, the United States Trustee's Office will have

17   access to that document.

18             MS. CLAIBORN:  Thank you.

19             THE COURT:  Okay.  Thank you.

20             All right.  So, Mr. Jalbert, could you --

21             THE WITNESS:  Your Honor, if I could just make

22   sure I follow your directions quickly?

23             THE COURT:  Sure.

24             THE WITNESS:  I'm going to write down, as you --

25   as you said.  Am I to fold the piece of paper or just hand

Jalbert - Cross                                                  61

1    it over?

2              THE COURT:  You can just hand it to her.  It's

3    fine.

4              THE WITNESS:  Okay.

5              THE COURT:  Thank you.  You can -- now, whenever

6    you're done writing it down, just let her know, please.  Let

7    counsel know.  And then I'm going to allow her to approach

8    and take that from you.

9              And then she's going to approach the courtroom

10   deputy and hand it to the courtroom deputy who will then

11   mark it as Court's Exhibit 1 under seal.

12             Mr. Baldiga?

13             MR. BALDIGA:  All right, Your Honor.  I'd just

14   like to see it before it's handed up.

15             THE COURT:  Go right ahead.

16             MR. BALDIGA:  Thank you.

17             THE COURT:  The U.S. Trustee, you can show it to

18   the U.S. Trustee after you show it to Mr. Miltenberger too.

19        (Pause.)

20             MR. BALDIGA:  Thank you, Your Honor.

21             THE COURT:  All right.  Thank you.

22             Yes.  Would you approach, please -- and thank you

23   -- and hand that to the courtroom deputy and she will mark

24   that.

25             So we just need a minute to give the courtroom

Jalbert - Cross                                          62

1    deputy time to make that exhibit.

2            And I am indicating on the record it's 11:03 a.m.

3    I'm marking Court's Exhibit 1 under seal until further order

4    of the Court and that is so ordered on the record.  Okay?

5    So we just need a minute if you don't mind.

6        (Pause.)

7        (Mr. Jalbert's written answer to PAX attorney's

8    question marked Court's Exhibit No. 1 under seal.)

9            THE COURT:  One other thing I will mention while

10   the courtroom deputy is marking the exhibit, as I mentioned

11   to all the parties -- and I don't think you were here,

12   Counsel, the last time, but maybe you were and I apologize

13   if you were -- we have another hearing at 12:00 p.m., so we

14   have to take a break at 12:00 p.m.  And that hearing may

15   last a little while, but I don't know that for sure.  So

16   that's all.  I just wanted to let you know that.

17           Obviously, we have not a tremendous amount of time

18   between now and 12:00 p.m., but I wasn't sure if you were

19   here, and I just wanted to remind everyone that we do have

20   to take a break in the hearing today at that point in time.

21           MS. ARONSSON:  Understood.

22           THE COURT:  Okay.  Are we ready to go?  You're all

23   set?

24           THE CLERK:  Yes.

25           THE COURT:  Okay.  Thank you.

Jalbert - Cross                                                    63

1    So go ahead.  Continue your cross-examination,

2    Counsel.

3    BY MS. ARONSSON:

4    Q    Without mentioning the name, you received at least one

5    email from this person at Golden Spring?

6    A    The firm did.  I was cc'd on one or two of them, but I

7    was not the direct.

8    Q    You testified that Melissa Francis was part of the

9    debtor's bankruptcy team, right?

10   A    Yes.

11   Q    Are you aware whether Ms. Francis works at Golden

12   Spring?

13   A    That's my understanding.

14   Q    Turning back to your work in connection with the

15   monthly operating report, do you recall Verdolino & Lowey

16   removing certain line item expenses from the draft expense

17   report that you received from Golden Spring?

18   A    Yes.

19   Q    Is this -- was this in connection with Sherry

20   Netherland expenses?

21   A    Yes.

22   Q    Because the debtor did not live there?

23   A    Correct.

24   Q    Is it your understanding that the debtor still does not

25   reside at the Sherry Netherland?

Jalbert - Cross                                              64

1    A    Yes.

2          MS. ARONSSON:  Madam Clerk, will you please

3    display PAX Exhibit 4.

4          THE CLERK:  On the screen is the Exhibit 4, page 1

5    of PAX Exhibit 4.  On the screen is page 1 of PAX Exhibit 4.

6          MS. ARONSSON:  I'd like to turn to page 14 of PAX

7    Exhibit 4.

8          (Pause.)

9          MS. ARONSSON:  Thank you.

10   BY MS. ARONSSON:

11   Q    Mr. Jalbert, do you recognize this document?

12   A    I do.

13   Q    This is the engagement letter filed in this case?

14   A    I think it was filed as an exhibit to our motion to be

15   employed.

16         MS. ARONSSON:  I'm having a little trouble

17   scrolling.

18         THE COURT:  Is the mouse -- yeah, try the mouse.

19         (Pause.)

20   BY MS. ARONSSON:

21   Q    Looking at these bullet points here, the first one we

22   covered I think.  We talked about the SOFAs and the

23   schedules?

24   A    Yes.

25   Q    Looking at the second bullet point, if retained,

Jalbert - Cross                                    65

1    Verdolino would provided services related to cash flow and

2    budget projections, right?

3    A    Yes.

4    Q    You discussed earlier you set up an account?

5    A    We set up the debtor's account.

6    Q    And you used your relationships to establish this

7    account?

8    A    Yes.

9    Q    If the DIP loan is approved, Verdolino anticipates

10   preparing a budget for committee counsel, financial

11   advisors, and other ordinary course professionals to

12   effectuate disbursements?

13   A    Conceptually.  We'd have to be asked actually to do it,

14   but it's something we could do.

15   Q    Are you aware that no ordinary course professionals

16   have been approved?

17   A    Yes.

18   Q    Are you -- are you aware of any other financial

19   advisors besides yourself involved in this case?

20   A    No.

21   Q    Do you understand the committee would need your help in

22   preparing a budget for its counsel?

23   A    I don't know that they would need my help, but they

24   certainly can ask.

25   Q    Turning to the third bullet point here related to

Jalbert - Cross                                                         66

1    monthly operating reports, we have covered that, right?

2    A    I see the third bullet is being a need to opening and

3    maintaining a DIP.

4    Q    Sorry.  The fourth bullet point.  Thank you.

5    A    Yes.

6    Q    In addition, Verdolino would review the quarterly

7    reports provided by the U.S. Trustee?

8    A    Well, the U.S. Trustee, when they do their quarterly

9    report, it's really a bill based on the disbursements in the

10   preceding calendar quarter.  We would just verify its

11   accuracy.  And in the first quarter, they're never accurate.

12   It's not their fault.  They're making an estimate in

13   advance.

14   Q    This is pretty straightforward, right?

15   A    Well, if you have experience, yes.

16   Q    The fifth bullet relating to estate, federal tax and

17   state income tax, you haven't performed any connection --

18   any work in connection with this item?

19   A    In actual preparation, no.

20   Q    But you would suggest that the debtor and the estate

21   file tax returns?

22   A    I absolutely would, but there's other services related

23   to that too.

24   Q    The estate may come as currently zero?

25   A    Well, I don't know technically whether that's true or

Jalbert - Cross                                    67

1    not because I don't know what -- I don't know exactly,

2    legally, where the boat is.  And when the boat comes in, how

3    it's going to come in and how that's going to impact the

4    debtor, so I don't --

5            THE WITNESS:  I'm talking -- referring to the Lady

6    May, Your Honor, so I don't know what implications that's

7    going to have.  It might have to be reviewed by someone with

8    a tax background.

9    BY MS. ARONSSON:

10   Q    So this assume the Lady May as part of the estate?

11   A    No, I don't assume that.  If someone determined that it

12   was part of the estate, then it would be an issue.  If it's

13   going to be contributed to the estate at some point in time,

14   it's an issue.  I'm not making a declaration of whether it's

15   property or not.  I don't know that.

16   Q    Turning to the sixth bullet, assistance with the

17   reviewing, reconciling, analyzing, and if necessary

18   objecting to proofs of claims, Verdolino has not performed

19   any investigation into the pending litigation claims in this

20   matter, right?

21   A    Correct.

22   Q    Verdolino has no experience analyzing pending

23   litigation claims?

24   A    Correct.

25   Q    Regarding the seventh bullet, we already talked about

1   Verdolino has not reviewed the debtor's books and records?

2   A    Correct.

3   Q    Are you aware that there are 21 professional service

4   providers who have received a pre-petition payment in the 90

5   days before filing?

6   A    Yes.

7   Q    Verdolino has not performed any work in connection with

8   those services?

9   A    Can you -- I'm confused by your question.

10  Q    Has Verdolino prepared -- withdrawn.

11          Has Verdolino performed any work in connection

12  with the 21 pre-petition service providers?

13  A    Besides ensuring that they were disclosed in the proper

14  SOFA schedule, no.

15  Q    This is a pretty straightforward process you described?

16  A    Yes.

17  Q    Regarding the eighth bullet, the assistance with

18  necessary litigation support, Verdolino has not performed

19  any work in connection with this line item, but anticipates

20  potential miscellaneous tasks as requested by counsel?

21  A    Miscellaneous what?

22  Q    Tasks?

23  A    Tasks.  Yes.

24  Q    The final bullet, assistance with plan developments and

25  preparation, including feasibility, you are aware that the

Jalbert - Cross                                          69

1    debtor already filed a plan?

2    A    I am.

3    Q    Verdolino did not do any work in connection with that

4    filing?

5    A    In connection with the original plan, correct.

6    Q    You are aware that the estate purports to have

7    approximately 3,800 in assets other than the litigation

8    claims?

9    A    Correct.

10   Q    Do you know what a best interest test is in connection

11   with the confirmation of a Chapter 11 plan?

12   A    I think so.

13   Q    Do you anticipate you would do a liquidation valuation

14   of the $3,800 in assets for a best interest test analysis?

15   A    Well, we don't know what the assets of the estate are

16   going to be at the time that someone's going to do the best

17   interest test.

18        And when it comes time to do the best interest test, we

19   will not be part of the team that does value those assets to

20   the extent that they're not already reduced to cash.

21        But we would, I'm sure, participate in preparing the

22   analysis that would be the best interest test using

23   information from an expert that is a valuation of whatever

24   the assets that need valuing.

25   Q    The only other potential asset besides the $3800 would

1    be future litigation claims?

2    A    So far.

3    Q    Again, Verdolino has no experience valuing litigation

4    claims?

5    A    Correct.

6    Q    So if the estate consisted only of litigation claims,

7    Verdolino would have a very small role in any plan?

8    A    I don't know you could draw that conclusion.

9    Q    Verdolino billed on an hourly basis, is that right?

10   A    Yes.

11   Q    As a principal, your hourly rate is $515?

12   A    Correct.

13            MS. ARONSSON:  No more questions.

14            THE COURT:  So, Counsel, you're not moving for the

15   admission of PAX Exhibit 4?

16            MS. ARONSSON:  We'll move for the admission of

17   Exhibit 4.  It was filed on the docket as Exhibit 90, Docket

18   No. 90.

19            MR. BALDIGA:  No objection.

20            THE COURT:  Well, it will be -- all the exhibits

21   will ultimately be marked as what you've indicated their

22   numbers are on your list of witnesses and exhibits.

23            So PAX Exhibit 4, there's no objection to,

24   according to the joint grid of the admission of that -- of

25   exhibit in full.

71

1          And so after today's hearing, what the courtroom

2     deputy will do is we'll compile the list of admitted

3     exhibits -- and this would be one of them -- and it will

4     have a -- the Administrative Office of the United States

5     Courts form of sticker on it that essentially says it's been

6     admitted as an exhibit full.  Okay?

7          Mr. Baldiga, did you have an --

8          MR. BALDIGA:  No objection.

9          THE COURT:  Okay.  Good.  Because it said you

10    didn't have one --

11         MR. BALDIGA:  That's right.

12         THE COURT:  -- so I just jumped to that

13    conclusion.

14         MR. BALDIGA:  No.  There was a motion, so I --

15         THE COURT:  Okay.  Thank you.  All right.

16         Nothing further?

17         MS. ARONSSON:  Nothing further.

18         THE COURT:  Okay.

19         MS. ARONSSON:  Thank you.

20         THE COURT:  Any redirect?

21         MR. BALDIGA:  Yes, Your Honor.

22    Thank you.

23                    REDIRECT EXAMINATION

24    BY MR. BALDIGA:

25    Q    Mr. Jalbert, do you speak Mandarin?

1   A   No.

2   Q   Do you understand that the debtor speaks some English?

3   A   Some, yes.

4   Q   But are you able to converse directly with the debtor

5   regarding financial matters?

6   A   I've not tried, but I don't think so.

7   Q   Okay.  You know that the debtor pre the work that you

8   did did not have a checkbook, correct?

9   A   Yes.

10   Q   And that the debtor's needs on a daily basis, security,

11   food and so forth, were provided by the love and goodwill of

12   his son through Golden Spring, correct?

13   A   Yes.

14   Q   You've worked with debtors that have general ledgers?

15   A   Yes.

16   Q   Does this debtor have a general ledger?

17   A   No.

18   Q   Okay.  Does this debtor have a check register?

19   A   No.

20   Q   But it will going forward?

21   A   Yes.

22   Q   Okay.  Has this debtor been subject to audits?

23   A   Not to my knowledge.

24   Q   All right.  Does this debtor keep inventories?

25   A   Again, not to my knowledge.

Jalbert - Redirect                                              73

1    Q    So does this debtor have the type of assets that you

2    would have discussed directly with the debtor, such as

3    equipment, inventories and accounts receivable?

4    A    Not those type of business assets, no.

5    Q    Right.  So in the -- in the ordinary case, where you

6    represent or where you're assisting a corporate debtor, you

7    would sit down and talk to the controller or chief financial

8    officer or someone like that about the various assets that

9    the company has, correct?

10            MS. ARONSSON:  Objection, Your Honor.  He's

11   leading the witness.

12            MR. BALDIGA:  I am, but it's --

13            THE COURT:  I'm going to allow --

14            MR. BALDIGA:  -- foundation I guess.

15            THE COURT:  I'm going --

16            MR. BALDIGA:  And so based --

17            THE COURT:  I'm going to allow it.  Go ahead.

18            THE WITNESS:  Yes.

19   BY MR. BALDIGA:

20   Q    Okay.  And the debtor's assets here are comprised

21   primarily -- other than the clothes on his back -- of two

22   lawsuits, correct?

23   A    Two lawsuits.  And a third possible, I think.

24   Q    Okay.  A possible lawsuit?

25   A    Yes.

Jalbert - Redirect                                          74

1    Q    Okay.  So you understand that the assets, the primary

2    assets, that you were disclosing on the schedules and SOFAs

3    were three litigation claims, two pending and one possible,

4    correct?

5    A    Yes.

6    Q    And you talked about those legal claims with lawyers,

7    correct?

8    A    Yes.

9    Q    Okay.  And do you understand that the debtor's primary

10   debts here are litigation claims against him, correct?

11   A    Yes.

12   Q    PAX for example?

13   A    Yes.

14   Q    And others here in the courtroom and not in the

15   courtroom have 20 or 30 other litigation claims against the

16   debtor?

17   A    Yes.

18   Q    Okay.  And about these legal litigation claims against

19   the debtor, you spoke to the debtor's lawyers or the people

20   who handled his legal claims against him, correct?

21   A    Yes.

22   Q    So did you speak to the people for the debtor who you

23   thought had the most relevant and concrete information

24   regarding the debtor's assets and liabilities?

25   A    Yes.

Jalbert - Redirect/Recross                                    75

1    Q    And did you get the information you thought you needed

2    to do a professional job in this case?

3    A    Yes.

4    Q    And obviously this case is a lot different from a

5    business with inventory and receivables and financial

6    statements and so forth, but did you go through the same

7    process, but here, talking to the people who had the most

8    relevant information?

9    A    Well, I wasn't looking for financial statements and

10   general ledgers and the like.  I was just looking for

11   information.

12   Q    Because the debtor doesn't have any?

13   A    I've never seen an individual debtor have those.

14        MR. BALDIGA:  Okay.  Nothing else, Your Honor.

15   Thank you.

16        THE COURT:  Thank you.

17        Any recross?

18   (Pause.)

19        THE COURT:  Go ahead, Counsel.  I'm sorry.

20        MS. ARONSSON:  Thank you, Your Honor.  Just a few

21   quick questions.

22                          RECROSS-EXAMINATION

23   BY MS. ARONSSON:

24   Q    Could the debtor obtain an interpreter to communicate

25   with Verdolino & Lowey?

Jalbert - Recross                                    76

1    A    Yes.  I'm sure it could.

2    Q    Are you aware that the debtor has an interpreter?

3    A    I am.

4    Q    I just want to ask about the basis for your

5    understanding that Golden Spring provided money out of the

6    love and support of a family member.  What's the basis of

7    your understanding of that knowledge?

8    A    From talking with the legal team.

9              MS. ARONSSON:  Thank you.  Nothing further.

10             THE COURT:  Okay.  Thank you.

11             You can step down, Mr. Jalbert.  Thank you.

12             THE WITNESS:  Thank you, Your Honor.

13             THE COURT:  Thank you very much.

14        (Witness excused.)

15             THE COURT:  Mr. Baldiga, do you have another

16   witness?

17             MR. BALDIGA:  I do not, Your Honor.  Thank you.

18             THE COURT:  Okay.  Thank you.

19             Mr. Friedman?

20             MR. FRIEDMAN:  No, Your Honor.

21             THE COURT:  So both sides are resting other than

22   your arguments?

23             MR. BALDIGA:  Yes, Your Honor.

24             THE COURT:  Okay.

25             MR. FRIEDMAN:  Your Honor, one moment.  We're just

77

1    conferring to see if there's anything else we'd seek to move

2    into evidence.

3          THE COURT:  Okay.  Yes.  That is -- as I think

4    I've told everyone at the last hearing, I'm happy to have --

5    and I appreciate that the parties took the time and complied

6    with the Court order to submit lists of witnesses and

7    exhibits, which you're required to do -- but the Court is

8    not going to look at any exhibits unless they're admitted as

9    full exhibits.

10         And even if they are admitted as full exhibits,

11   I'm not bound to look at anything that you didn't point out

12   to me that was important in your presentation with regard to

13   these issues.  Okay?

14         Does any -- so I'm -- if anyone has anything they

15   want to make sure is in the record, then now would be the

16   time to take care of that issue.

17         (Pause.)

18         MS. ARONSSON:  Thank you, Your Honor.  Nothing

19   further from us.

20         THE COURT:  Okay.  Thank you.

21         Nothing further from the debtor?

22         MR. BALDIGA:  Correct, Your Honor.

23         THE COURT:  Okay.  All right.  So then the

24   application to retain Verdolino & Lowey is ripe for

25   adjudication.  I'm not going to adjudicate it right now.  I

78

1   obviously have to look at what you all just talked about on

2   the record, but I'm sure that it's something that I will be

3   able to do in short order.  Okay?

4           MR. BALDIGA:  Thank you, Your Honor.

5           THE COURT:  All right.  Thank you.

6           Now, with regard to the DIP financing motion.

7   Again, that is a matter that I don't know how long you

8   anticipate the questioning and the evidence to be on the DIP

9   financing motion, so I have a couple of questions.

10           One of the other matters on today's calendar is

11   the application to employ the creditors committee counsel.

12   I didn't see any objections to that application.

13           Is that correct?

14           MS. CLAIBORN:  Your Honor, the U.S. Trustee filed

15   a statement of no objection, but that just asked for two

16   small edits to the order that --

17           THE COURT:  Okay.

18           MS. CLAIBORN:  -- were to include language that

19   was in the supplement filed by Attorney Goldman in support

20   of the application.

21           THE COURT:  So is there a revised order on the

22   docket?

23           MS. CLAIBORN:  I haven't seen one, Your Honor.

24           THE COURT:  Okay.  So I'm asking any party, does

25   any party have an objection to the application to employ

79

```
1    Pullman & Comley as counsel to the Official Committee of

2    Unsecured Creditors, ECF 157?

3              MR. BALDIGA:  Not by the debtor.  We support the

4    application.

5              THE COURT:  Okay.  Thank you.

6              None by Pax?

7              MR. FRIEDMAN:  No, Your Honor.

8              THE COURT:  Okay.  Anyone else wish to be heard on

9    the application to employ Pullman & Comley?

10             Attorney Goldman, you're going to be submitting a

11   new order, is that what Attorney Claiborn is saying?

12             MR. GOLDMAN:  Yes, Your Honor.  As long as it's in

13   my supplemental declaration, then no problem in revising the

14   order to comport with what's in the supplement.

15             THE COURT:  Okay.  How much time would you like to

16   submit that order?

17             You can have as much time -- I mean, I'm going to

18   grant the application subject to the submission of a revised

19   order.

20             MR. GOLDMAN:  Your Honor, I could submit it by

21   tomorrow.

22             THE COURT:  Sure.  I'll give you until Friday,

23   how's that?

24             MR. GOLDMAN:  Thank you.

25             THE COURT:  The 29th.  All right.
```

80

1          Then, the other thing that I didn't mention to Mr.

2     Kindseth -- and I'm going to mention to Mr. Goldman and

3     Attorney Claiborn -- with regard to the monies that we

4     talked about this morning, the $37 million that's at the

5     Zeisler & Zeisler client funds account and the monies that

6     will be held by Attorney Goldman if the DIP loan is

7     approved, bank statements every month have to be submitted

8     at least to the Office of the United States Trustee and

9     among the parties to evidence that those funds are there.

10    Every month.

11         And I'm so ordering that on the record right now.

12    And I can go back to this hearing.  And if someone fails to

13    comply with that, then they'll be in violation of a court

14    order.  We need to ensure that the funds are there in the

15    amount that are supposed to be there.

16         Now, with regard to the $37 million, there

17    shouldn't be any change in that amount other than a gain of

18    some interest hopefully unless and until there's a further

19    order when the boat is returned.  That's my understanding.

20    Mr. Kindseth's working on the order, but that's what --

21    that's the mechanics.

22         MR. BALDIGA:  Yes.  And the order that you see --

23    that you will see, Your Honor, provides that there is a

24    national bank that will be acting as co-agent.

25         So Mr. Kindseth is holding the money just so there

1    wouldn't be any concern in the courtroom today whether the

2    money was really coming or whatever there were -- from the

3    last hearing, we spent way too long on those types of

4    concerns, so no one has to have that concern.  But it's not

5    the permanent solution.  The permanent solution for a month

6    or two is to have the money go into a bank as more

7    customary.

8            THE COURT:  However it works is fine.  I just want

9    evidence --

10           MR. BALDIGA:  Understood.

11           THE COURT:  -- that's submitted to demonstrate

12   that those funds are there.  And it's got to be submitted,

13   you know, every month.

14           And I guess we will figure out -- it might not be

15   as cumbersome with the 37 million if the boat is returned in

16   two months, but with regard to the DIP financing, there's

17   going to be in that order, if there is an order, it's going

18   to say that I need -- the Court -- there has to be evidence

19   supplied of the amount of the funds in the account every

20   month.

21           I know the DIP orders may have some more specifics

22   with regard to what's being paid and drawn down and all

23   that, all those issues, but that was the other thing that I

24   wanted to raise.

25           Now, with regard to the DIP financing evidentiary

82

1    hearing, I'm happy to start right now, but we have to end at

2    noon.

3            So the other thing we can do is you mentioned at

4    the beginning of the hearing that there is some discussion

5    about how we were going to set up the hearing on the motion

6    to dismiss, so I don't -- whatever way you want to proceed,

7    I have no problem.

8            MR. BALDIGA:  Well, this might be a good time just

9    to clear up the Brown Rudnick application, that there's no

10   evidence on that, and that could be taken care of.  I think

11   there's a --

12           THE COURT:  I thought there was --

13           MR. BALDIGA:  -- reservation of rights that wants

14   to be made.

15           THE COURT:  Okay.

16           MR. FRIEDMAN:  Yeah.  I think --

17           THE COURT:  But isn't there an order that you need

18   to fix or did you fix that order yet?  Or you agreed to?

19           MR. FRIEDMAN:  I think the order is on the docket,

20   Your Honor.  We have a very short reservation of rights and

21   then I think we could do the pre-trial -- the pre-motion,

22   you know, conference before noon.  And then we're afternoon

23   to --

24           MR. BALDIGA:  I think that that's right.

25           MR. FRIEDMAN:  Okay.

83

1          MR. BALDIGA:  Yeah.

2          MR. FRIEDMAN:  So --

3          THE COURT:  I didn't hear what you said now.

4          MR. FRIEDMAN:  Sorry, Your Honor.

5          THE COURT:  That's okay.

6          MR. FRIEDMAN:  Peter Friedman from O'Melveny &

7     Myers.

8          We don't have an objection to Brown Rudnick's

9     retention per se.  We just want to make clear that, you

10    know, we do believe that Lamp -- that Mr. Kwok was

11    restrained by Judge -- Justice Ostrager's retraining order

12    pre-petition from transferring his assets.

13         We believe that by encumbering himself with the

14    Lamp loan to pay Brown Rudnick's retainer that he violated

15    that restraining order.

16         Brown Rudnick reads Justice Ostrager's order

17    differently than we do.  We believe that his order was

18    specific as to two assets, but also had a broader, sweeping

19    clause that made it clear that any outside of the ordinary

20    course transaction was prohibited.

21         Brown Rudnick, Mr. Baldiga, has cited to a portion

22    of a transcript that he believes supports his view of the

23    language that was specific as to two assets.

24         We believe that page 24 of that transcript, which

25    was attached to their response, says that Justice Ostrager

84

1    says I want to know if any transaction is going to take

2    place in which Mr. Kwok is the guiding hand that's something

3    other than an ordinary course of business transaction.  So

4    it wasn't so limited.

5         And so we just want to reserve rights that to the

6    extent, you know, there's litigation in the future over

7    whether there was a breach of that and whether there's any

8    damages or there's any liability for anybody who

9    participated in that breach or is tort related to the

10   breach, that nothing in the retention order absolves anybody

11   of liability for that.

12        We have no objection to retention if it's to the

13   reasonable staffing in light of this case.  We just want to

14   make clear that, you know, we believe it was one final act

15   of contempt, one last finger in the eye, right before filing

16   of bankruptcy.

17        And note that we've never received the Lamp

18   Capital loan despite numerous requests to Mr. Lamp's -- I'm

19   sorry -- to Lamp Capital's lawyers.  They've produced

20   nothing.  We'll go back at it.

21        But, you know, the whole circumstances around that

22   episode we believe are very troubling and that's why I

23   wanted to make a reservation of our rights.

24        THE COURT:  And you're going to -- my

25   understanding -- and I didn't look at it, okay -- but

85

1    sometime last night or this morning, there was an order

2    submitted with regard to the Brown Rudnick application?

3         Is that -- is Attorney Friedman in agreement with

4    that or not -- that order?

5         If not, then you both have to talk and tell me

6    when you're going to -- you think you're going to resolve

7    that order.

8         (Pause.)

9         MR. FRIEDMAN:  (Indiscernible.)

10        THE COURT:  Certainly.  Take your time.

11        (Pause.)

12        MR. FRIEDMAN:  So, Your Honor, I think we do have

13   an issue with the order.  We just want a reservation of

14   rights with respect to any party for receipt of those funds.

15        We have no objection to the retention and to their

16   filing fee applications, but we don't think the retention

17   should wipe out the prospect that there might be liability

18   for having received these funds.

19        THE COURT:  So you're going to have to add that

20   reservation of rights language to the order, correct?

21        MR. FRIEDMAN:  Yes.  Unless that reservation is

22   acceptable on the record?

23        MR. BALDIGA:  If I could address it, Your Honor,

24   please.

25        THE COURT:  Sure.

86

1          MR. BALDIGA:  Unless Mr. Goldman wants to argue

2     first.

3          MR. GOLDMAN:  Well, I was just going to say,

4     speaking of reservations, we -- our resolution of the DIP

5     motion -- I should have mentioned this at the outset -- is

6     really based on a resolution of the boat delivery order I'll

7     call it -- which they're working on --

8          THE COURT:  I'm sorry.  I didn't hear you.  Of the

9     what order?

10          MR. GOLDMAN:  The boat delivery.

11          THE COURT:  Okay.  The relief from stay agreed

12     upon order?

13          MR. GOLDMAN:  Correct.  Correct.  Which we're

14     confident they'll be able to do.  It still hasn't been inked

15     so to speak, and so before we actually formally withdraw

16     objections, I would like to see that on the record.

17          THE COURT:  Well, right now we're talking about

18     Brown Rudnick.

19          MR. GOLDMAN:  Well, aren't we -- that is linked to

20     the resolution of the DIP motion.  In other words, we

21     resolve the DIP motion and we also agree to withdraw our

22     objections to all the retentions.

23          Of course the resolution of the DIP motion depends

24     on the resolution of this boat delivery order that we're

25     working on.  So they're all linked together is basically

87

1    what I'm saying.

2            And so I would just appreciate if we could wait

3    until after the lunch break when we are absolutely certain

4    that the boat -- the PAX motion for relief from stay has

5    been resolved and then we can formally withdraw all these

6    objections.  That's all I'm saying.

7            THE COURT:  Okay.  Mr. Baldiga?

8            MR. BALDIGA:  Well, we've been trying to work and

9    have actually been able to work hand in hand with Mr.

10   Goldman on so many things that I don't want to -- I mean, I

11   accept his premise that it would be easier perhaps to know

12   that we are all in accord on the boat order.

13           It won't affect PAX's objection because PAX's

14   position on everything, right, will continue to be the same

15   regardless.

16           So the -- I can address PAX's reservation of

17   rights if the Court so wishes or if the Court wants to wait

18   until after lunch, after the boat issue, to do that, we're

19   happy to do that.  Whatever the Court --

20           THE COURT:  All right.  Why don't we just see what

21   happens after the -- what will -- what should be essentially

22   an agreed-upon order resolving PAX's motion for relief from

23   stay, correct, that's what it is?  That's what Mr. Kindseth

24   is working on?

25           MR. BALDIGA:  Yes.

88

1          THE COURT:  Okay.  So why don't we wait for that.

2          So then the only other issue is the -- the interim

3     professionals, everything, Mr. Goldman, you reserve your

4     rights on everything until -- all right.

5          So let's just start with the DIP financing

6     evidentiary hearing.

7          Or if you -- if all of you would rather take a

8     break and not start, we can do that too.  Whatever works for

9     all of you.

10          MR. FRIEDMAN:  Your Honor, may we do the pre-trial

11     discussion of the dates?

12          THE COURT:  On the motion to dismiss?

13          MR. FRIEDMAN:  Yes.

14          THE COURT:  Well, that's what -- that's what I had

15     said a few minutes ago I thought made some sense.

16          MR. FRIEDMAN:  Yes.  So, Your Honor, we have --

17     obviously pending the Court's schedule, we have -- we've

18     reached out to counsel for other parties this week and we

19     made a proposal.  We got some feedback.  People asked us for

20     a little more time, which we were -- you know, even though I

21     don't think we have a statutory obligation to provide it, we

22     were willing to do that.

23          What we would propose is that there be a -- and I

24     tried to accommodate as many people as I could -- May 16th

25     would the date on which parties need to file oppositions if

89

1    acceptable to the Court.

2            We would ask for the ability to file a reply on

3    May 25th.  We would ask to be able to file a reply on the

4    25th of May.

5            And then we would ask for a hearing on the -- to

6    reserve the 1st, 2nd and 3rd --

7            THE COURT:  All right.  I have a take a look at

8    the calendar.

9            MR. FRIEDMAN:  -- if that works for the Court.

10           THE COURT:  Just let me take a look at the

11   calendar before we go any further.

12       (Pause.)

13           THE COURT:  I have some time on the 1st.

14           MR. FRIEDMAN:  Okay.

15           THE COURT:  But there's a period of time where I'd

16   have to take a break again.  I have time on the 2nd.  And I

17   have at least the morning of the 3rd.

18           MR. FRIEDMAN:  Okay.  That certainly works for us,

19   Your Honor.

20           I would also ask, given the potential complexity,

21   if it would be okay to propose a submission of post-trial

22   findings of fact and conclusions of law for any party the

23   10th.  Or if the hearing lasts longer than the 3rd, you

24   know, seven days after the conclusion of the hearing if the

25   Court believes that would be helpful.

90

1          THE COURT:  I certainly think it could be, so I

2    will tell you at the end of the hearing if I would like

3    that, but I think it's a possibility.  Sure.

4          MR. FRIEDMAN:  And, Your Honor, what I would also

5    propose is that the parties, you know, by the 20 -- Friday

6    the 27th, if this works for the Court, if the Court would

7    like it to be the 26th, that the parties exchange, you know,

8    witness lists and exhibits and provide the Court with a --

9    you know, the appropriate grid if possible by that date as

10   well and listing objections, and that the parties be ordered

11   to meet and confer on all pre-trial procedures in good

12   faith.

13         You know, my understanding is that Mr. -- that Mr.

14   Kwok's counsel believes that this schedule, which we believe

15   is actually a substantial accommodation to people, should be

16   contingent on no more 341 hearings, a cessation of Mr.

17   Kwok's 341 obligations, which is due -- which is expected to

18   continue this Friday -- I don't see why that should be an

19   issue.

20         We certainly are seeking to depose Mr. Kwok again

21   in connection with the -- with the motion to dismiss or

22   motion to appoint a trustee.  We're seeking some other

23   discovery.

24         I'd note that one issue we've had -- and I'm not

25   asking the Court to do anything other than to know about it

91

1    -- is we asked Golden Spring last Thursday if they would

2    express -- if they would accept service of the subpoena on

3    Miles Kwok's son.  We've heard crickets.

4         And so not a surprise, but given the purported

5    centrality of Miles' son to this case and his support of

6    beneficence and love, I guess if they don't want to accept a

7    subpoena, we can try to do it in the Hague.  And if we have

8    to maybe we won't complete on that time, but the Court can

9    draw whatever conclusions it wants to from Mr. Kwok's son's

10   refusal to participate in good faith in discovery.  So that

11   shouldn't take six days to find out from somebody if a

12   subpoena can be accepted.

13        That's our proposed schedule.

14        You know, we hope we don't have discovery disputes

15   to bring to the Court's attention.  If we do, we will.

16   We'll work with Mr. Birney on how to tee those up correctly

17   for you.  And I believe we've provided everybody with copies

18   of the discovery we've served.  If anybody hasn't, please

19   let me know.

20        THE COURT:  Okay.  Thank you.

21        Attorney Claiborn?

22        MS. CLAIBORN:  Thank you, Your Honor.

23        The U.S. Trustee, as you know, has a pending

24   motion for an examiner or in the alternative the appointment

25   of Chapter 11 trustee.

92

1          And the dates that Attorney Friedman has just

2     outlined are fine for the U.S. Trustee.  And I would assume

3     that scheduling is applicable to both PAX's motion and the

4     U.S. Trustee's motion.

5          THE COURT:  Yes.  Except I will be addressing the

6     PAX's motion first.

7          MS. CLAIBORN:  Understood, Your Honor.

8          THE COURT:  Okay.

9          MS. CLAIBORN:  With respect to the point about the

10    341 meeting, that request was just made to me this morning.

11    I haven't had a chance to confer with my office.  I haven't

12    had a chance to confer with counsel for the parties who are

13    here today.  So I don't have an answer as to whether or not

14    the U.S. Trustee is willing to delay that 341 meeting to a

15    different date.

16         THE COURT:  Okay.

17         MR. BALDIGA:  I'm sorry.  I missed what you just

18    said.  I couldn't hear.  I'm sorry.

19         MS. CLAIBORN:  I don't have an answer for you as

20    to the 341 meeting date.

21         THE COURT:  All right.  Anyone else wish to be

22    heard on the scheduling of the motion to dismiss and the --

23    I'm going to reiterate it, but go right ahead.

24         MR. BALDIGA:  Well, the -- I think the debtor is

25    not available the first week of June so, I think,

93

1    unfortunately, like so many other things, we're probably

2    going to have to spend some time over the lunch break to try

3    to pin those dates down.

4         THE COURT:  All right.  Well, why don't you talk

5    about because I'm not sure why the debtor would need to be

6    here on the motion, I mean, unless you're going to call him

7    as a witness.

8         MR. PERLMAN:  We certainly are, but this is news

9    to me because I proposed this schedule to Mr. Aulet before.

10        THE COURT:  Okay.  Well, then I'll let you all

11   talk about it.

12        But I will say one thing in particular, that it's

13   going to be shortly thereafter if it's not those days.  I've

14   already said to Attorney Friedman --

15        MR. BALDIGA:  We understand that.

16        THE COURT:  -- Attorney Friedman the last hearing,

17   and he's agreed, and I don't know if he's expressly

18   consented on the record again today, but under the -- under

19   the code, I have to hold that hearing within 30 days unless

20   the movant, the movant expressly consents to the extension

21   of time, to a continuance for a specific period of time,

22   which Attorney Friedman has done right now, but I don't know

23   if he's going to do it when you have your discussions.  So

24   you're going to have to have your discussions.

25        MR. FRIEDMAN:  Honestly, Your Honor, given that

94

1    the debtor doesn't have a job, doesn't have a business to

2    operate, I can't imagine if there's a justifiable reason for

3    not being here.

4         THE COURT:  Well, I'm going to let you all talk

5    about that.

6         MR. BALDIGA:  I'd appreciate a chance just to talk

7    with the client, Your Honor.

8         THE COURT:  I'm going to let you all talk about

9    that.

10        MR. BALDIGA:  Thank you.

11        THE COURT:  Okay?

12        So let me just again go through what is on our

13   calendar today.  I think it makes complete sense at this

14   point not to start the DIP evidentiary hearing if we're only

15   going to have 15 minutes.

16        Does that make sense to anyone?

17        MR. BALDIGA:  Yes.  Correct.

18        THE COURT:  I think you can take the break and use

19   the time.

20        Now, I don't know, you've all been here in the

21   hallway longer than I've been sitting here, but I assume the

22   conference rooms are unlocked.  There's, you know -- there

23   is a hallway to talk in except there are other agencies so

24   you have to be somewhat quiet if possible.  There's a room

25   back here with vending machines, but it has no tables and

95

1    chairs.  There's a place next door to eat with tables.

2              I mean, you know, I would think that I would be

3    surprised if I'm ready to see you again before one o'clock.

4    Okay?

5              MR. BALDIGA:  Understood.

6              THE COURT:  It may be even a little longer, but I

7    don't think it should be much longer than that.

8              I'm just checking to make sure we have -- we are

9    addressing in one way -- some way, shape or form everything

10   on today's calendar, and I think we have.  Although we need

11   to -- a lot of it is linked to Mr. Kindseth's revisions to

12   that order.

13             So does anyone else wish to be heard before we

14   recess in this case, in the Kwok case?

15        (No audible response.)

16             THE COURT:  No?  Okay.

17             Well, then I'm going to take a recess until 12

18   noon for the other matter.  Again, I would be surprised if I

19   was available to see you before one o'clock.  I think that

20   you should expect one o'clock at the earliest.

21             If you are all talking and you need more time and

22   we are completed with the other hearing, then you can let

23   the courtroom deputy or someone in the clerk's office know,

24   and I will, you know, take that into consideration.

25             But if we are going to have the evidentiary

96

1   hearing this afternoon on the DIP, which I think we are,

2   then I would like to start sooner as opposed to later

3   understanding that you all may be talking about different

4   things.

5           MR. BALDIGA:  Understood.

6           THE COURT:  Okay?

7           MR. BALDIGA:  We'll keep the courtroom deputy

8   posted, Your Honor.

9           THE COURT:  Okay.  Great.

10          MR. BALDIGA:  Thank you.

11          THE COURT:  All right.  All right.  Thank you,

12  all.

13          Then Court is in recess until 12 p.m.

14      (Recess from 11:45 a.m. until 1:10 p.m.)

15          THE CLERK:  Case No. 22-50073, Ho Wan Kwok.

16          THE COURT:  Sorry about that.  We're back on the

17  record after taking a recess in the Kwok case, which we left

18  the court about 11:45 or so a.m.  It's now 11:12 [sic] p.m.

19  and we're back after the morning session where we had some

20  evidence presented in connection with the application of

21  Verdolino & Lowey.

22          And, Attorney Baldiga, are we moving to go forward

23  with the evidentiary hearing on the DIP financing motion?

24          MR. BALDIGA:  Yes, Your Honor.  But before we do,

25  we can report as to the boat, because remember how that

97

1    affected everybody?

2              THE COURT:  Yes.

3              MR. BALDIGA:  It was sort of a --

4              THE COURT:  Oh, Mr. Kindseth is back.

5              MR. BALDIGA:  -- connective string.

6              We do have, and Mr. Kindseth can report, and

7    should, a fully conformed, agreed order as to the boat that

8    resolves the lift stay motion.

9              THE COURT:  Okay.

10             MR. BALDIGA:  And that in turn resolves all

11   objections I believe that the committee has to everything

12   else today.  And so we proceed in full accord.  But he

13   should -- Mr. Goldman should report and Mr. Kindseth should

14   report.

15             And then -- and then I think we do move to the

16   relief from stay.

17             THE COURT:  Okay.  Mr. Goldman and Mr. Friedman?

18             MR. GOLDMAN:  Yeah.  I would --

19             THE COURT:  So everyone's in agreement with this

20   order on the relief from stay?  I mean, that's wonderful if

21   it's true.

22             MR. GOLDMAN:  Yeah.

23             THE COURT:  I just want to make sure that's

24   accurate.

25             MR. FRIEDMAN:  Yes.  We're in agreement, Your

98

1    Honor.  We have reached an agreement.  An order can be

2    submitted.  We're pleased with the outcome.

3         MR. KINDSETH:  Yes.  Just in terms of the

4    logistics, Your Honor, we're actually not going to be in a

5    position to submit it to this court at this moment.  We're

6    submitting it to the escrow agent, U.S. Bank, for their

7    counsel, Shipman & Goodwin, to review it and ensure that

8    they don't have any issue with it.  I'm hoping to hear back

9    later today or tomorrow.

10        Once they're good with it, we're going to fund the

11   escrow, and we will submit the order hopefully Friday or

12   Monday at the very latest.

13        THE COURT:  Okay.  I mean, I think that's fine.

14   And that's -- that's a positive development obviously in the

15   case.

16        So, Attorney Goldman?

17        MR. GOLDMAN:  I was going to say would it be

18   appropriate to put just the basic terms of the order on the

19   record so we -- the Court is aware and we have an enforcable

20   agreement here?

21        MR. KINDSETH:  I'm prepared to do that, Your

22   Honor, if you'd like.

23        THE COURT:  Go right ahead.

24        MR. KINDSETH:  So the proposed, stipulated order

25   provides that my client will return the vessel known as the

99

1   Lady May to the navigable waters of Connecticut by July

2   15th.  That may or may not address the various repairs that

3   are being performed now.

4          We're going to try to complete as much as

5   possible.  The repairs that are not complete will be

6   addressed through a reserve, a repair reserve, a separate

7   one entirely, and there's a process through which that

8   reserve will be established.

9          To secure my client's performance of the delivery,

10  we will be posting $37 million with a third-party escrow

11  agent, U.S. Bank.  We've worked out the terms of an escrow

12  agreement.

13         And subject to final approval by U.S. Bank and the

14  party's signature, we'll be providing bi-monthly progress

15  reports with respect to the location of the yacht, and the

16  repairs, status of arrangements for the delivery of the

17  yacht, and the anticipated delivery date.

18         The way the escrow is going to be handled is that

19  my client will file a certification with this court and

20  there will be a period of time for parties to object to the

21  certification.  The certification, you know -- the

22  certification is pertaining really just to the delivery of

23  the yacht timely to Connecticut.

24         As well as an order to ensure that the yacht stays

25  in Connecticut, we've agreed in that certification that

1    would be certifying that we served the then captain of the

2    vessel as well as the yacht management company with that and

3    we'll be filing the certification of service with the Court

4    as part of that process.

5         We'll also have the repair reserve in place and

6    that is a requirement of the certification.

7         So if those elements, which are described as

8    certification conditions, are met and we certify it, we'll

9    provide 15 days to object.  And if nobody objects, my client

10   will be allowed to provide that HK certification to the

11   escrow agent, which is the triggering event for the return

12   of the $37 million.

13        If there is an objection, then we'll appear before

14   Your Honor.

15        And there's -- depending upon the severity of the

16   default, there are different consequences.  Obviously if the

17   boat's not here, it's the most severe consequence.  The

18   other consequence -- consequences for the other conditions

19   if they're not met, there's remedies in place that are

20   proportionate to the default.

21        My client will maintain insurance and provide

22   proof of insurance.  There's a provision in here requiring

23   my client and agents and representatives and so forth to

24   continue to maintain the boat here in Connecticut and

25   subject to further order of this court.

1           And there is a provision in here that says that if

2      the boat isn't delivered timely and we are unable to

3      establish extenuating circumstances -- and they're

4      delineated very clearly -- then the funds, the 37 million

5      escrow agent will be directed by order of this court to turn

6      over those funds to an account designated by this court to

7      be held in substitution for whatever the estate's rights are

8      in the Lady May, those rights will be against the $37

9      million.

10          And then, as I said, we're establishing the repair

11     reserve in accordance with the process set forth in the

12     order.  And so I believe that is the most salient terms of

13     the agreed-upon order.

14          MR. GOLDMAN:  Yeah.  I appreciate the recitation.

15     The committee is in agreement with those terms and we'll

16     follow it up obviously with the written order.

17          And I'll leave it to PAX.

18          MR. FRIEDMAN:  They're saying, Your Honor, there

19     are also provisions of what happens upon dismissal, if the

20     case is dismissed while the boat is in the jurisdiction or

21     the escrow's jurisdiction.  Those are also in there.

22          I do want to say -- not to mix metaphors -- but

23     the boat is not -- I mean, the boat should never be the tail

24     that wags the dog in this case.  The boat is important

25     because it's an asset.  This is not the end all and be all

1    of what Mr. Kwok has to pay his creditors.

2              I just want to be really clear from our

3    perspective that this is important, but this is just a

4    beginning step in the pursuit of getting paid for people who

5    have substantial judgments against Mr. Kwok.

6              MR. KINDSETH:  It's still progress.

7              THE COURT:  Understood.

8              MR. GOLDMAN:  So with that, Your Honor, the

9    committee can formerly withdraw its objections to the DIP

10   motion as well as the retention applications and lend our

11   support to the interim DIP order that's being advanced for

12   today.

13             I can say with certainty, Your Honor, that it is

14   absolutely critical that the committee have this funding in

15   place in order to function properly and do what it's

16   supposed to do in a case like this, especially in a case

17   with this profile.

18             We're expected to investigate potential assets of

19   this estate.  And I can ensure Your Honor that we have been

20   actively engaged in interviewing financial advisors to

21   assist us in that endeavor and we will be submitting an

22   application shortly to get the Court's approval to retain

23   one who will be highly capable, skilled and experienced in

24   what we need them to do.

25             THE COURT:  Okay.  Thank you.

103

1          Mr. Kindseth, I know you said this already, but I

2     don't think I -- I didn't write it down, so I don't remember

3     -- what date do you think you're going to submit this order

4     to the Court?

5          MR. KINDSETH:  Friday or Monday.

6          THE COURT:  All right.  So I'll give you until

7     Monday.  What is Monday?  May 1st of 2nd?  Oh, it's the 2nd.

8     Is it the 2nd?  Yeah.  It has to be in by Monday.  See,

9     yeah, you have to because -- all right.  Yeah.  On or before

10    May 2nd.  Okay?  All right.

11         But what were you going to say?  I'm sorry.

12         MR. KINDSETH:  May I be excused?  My client

13    doesn't have a stake in the afternoon's proceedings.

14         THE COURT:  You can be excused if everybody else

15    thinks that you don't need to be here.

16         MR. BALDIGA:  Just with the clarification, I think

17    it's assumed in all of the comments of everybody so far, but

18    the stay will continue in force until entry of the order?

19         Okay.  Assuming that it does get submitted on a

20    timely basis?

21         THE COURT:  Yes.

22         MR. BALDIGA:  Okay.  Thank you.

23         THE COURT:  I mean, but it --

24         MR. BALDIGA:  I just wanted the record to be

25    clear.

1          THE COURT:  -- but if it doesn't get timely

2     entered, then there isn't any stay anymore under 362(e)(2),

3     so I would assume you are motivated to get it timely

4     entered.

5          MR. BALDIGA:  Yes.

6          THE COURT:  Okay.  All right.  Thank you.

7          No one else wants -- needs to have Mr. Kindseth

8     here for this afternoon's hearing, is that correct?

9          (No audible response.)

10         THE COURT:  Okay.  Thank you, Mr. Kindseth.

11         MR. KINDSETH:  Thank you, Your Honor.

12         THE COURT:  All right.  So let's go back before we

13    start the evidentiary hearing given the committee's position

14    now of withdrawing its oppositions to certain things.

15         So the application to employ Brown Rudnick, the

16    committee has withdrawn its objection.

17         PAX still wants to reserve its rights, correct?

18         MR. FRIEDMAN:  Yes, Your Honor.  I've conveyed to

19    Mr. Baldiga we have no issue with the order.  Actually

20    looking at the order I don't think the order releases the

21    kind of claims that we want to reserve, and so I'm not going

22    to ask Mr. Baldiga to agree in the order to the language.

23         I just want to note for the Court and for

24    everybody else that that's our position.

25         And, you know, Brown Rudnick has their own

1    position with the order as proposed is fine.

2              THE COURT:  So the order that was submitted --

3              Thank you, Attorney Friedman.

4              So the order that was submitted sometime last

5    night or -- I don't -- I know there was several, but is that

6    the order that you're looking to have entered?

7              MR. BALDIGA:  Yes.  Unless it's -- yes, Your

8    Honor.  And just for the record, we're -- we don't, the

9    debtor doesn't, and Brown Rudnick doesn't agree to anything

10   that's not in the order.  And it's that simple.

11             MS. CLAIBORN:  Your Honor, just to complete the

12   record, I just wanted to let the Court know that the U.S.

13   Trustee has reviewed the order that was uploaded last night

14   and it does resolve the U.S. Trustee's objections.

15             THE COURT:  Thank you.

16             So if I'm correct, that's ECF No. 259 that was

17   filed last night, correct?

18        (No audible response.)

19             THE COURT:  Okay.  If you just give me one minute,

20   please.

21        (Pause.)

22             THE COURT:  All right.  So I haven't looked at ECF

23   259 because it was submitted last night, which is fine.  I'm

24   going to take a look at it right now and then tell you

25   whether I think there's any issues.

1          (Pause.)

2               THE COURT:  The order looks fine to me.  So ECF

3     259 will enter and the application to approve Brown Rudnick

4     as counsel to the debtor is approved -- is granted.

5               MR. BALDIGA:  Thank you, Your Honor.

6               THE COURT:  Okay.  Thank you.

7               So let me just make sure we're getting to

8     everything we need to get to before we get to the

9     evidentiary hearing on the DIP motion.

10          (Pause.)

11               THE COURT:  So the bar date order then, everyone's

12     fine with that other than the Court putting in a bar date?

13               MR. BALDIGA:  I believe so, Your Honor.

14               THE COURT:  Okay.  So I'll take a look at that

15     after today.  That will enter though tomorrow or Friday at

16     the latest.  Okay?

17               MR. BALDIGA:  Thank you.

18               THE COURT:  I would assume -- I shouldn't say

19     that.  I haven't looked at the order, Attorney Baldiga, but

20     is -- who's serving that bar date order?  Are you serving

21     it?  Is the debtor serving it?

22               MR. BALDIGA:  The debtor.

23               THE COURT:  Okay.  Okay.  I'll take a look at

24     that.

25               MR. BALDIGA:  Thank you.

1        THE COURT:  And I think it probably will have no

2   problem other than me possibly changing your bar date for a

3   little bit more time.

4        MR. GOLDMAN:  I just wanted to mention the

5   committee did have a limited objection to that.  And I

6   hadn't been following the variations of the proposed orders,

7   but did they take into account our objections?

8        MR. BALDIGA:  We did.

9        MR. GOLDMAN:  Okay.  All right.

10        THE COURT:  Okay.

11        MR. GOLDMAN:  Thank you.

12        THE COURT:  The motion to establish procedures for

13   entering compensation and reimbursement expenses, is

14   everyone in agreement with that now as well?

15        The committee, you had an objection, did you, or

16   not?

17        MR. GOLDMAN:  I'm sorry, Your Honor.  Could you

18   repeat that.

19        THE COURT:  The motion to establish procedures for

20   interim compensation and reimbursement of expenses.

21        MR. GOLDMAN:  No objection.

22        THE COURT:  Did the U.S. Trustee have an

23   objection?

24        MS. CLAIBORN:  Your Honor, we have been looking on

25   some language.  And I haven't had a chance to review what

108

1    just got uploaded in the last hour.  And subject to me

2    reporting back to Your Honor maybe by the end of today, I'm

3    not -- I think we probably could lose that loop.  I'd just

4    need to read it.

5              THE COURT:  So leave that matter open essentially

6    for now?

7              MS. CLAIBORN:  Yes.

8              MR. BALDIGA:  That's right.  But we all think it's

9    just a matter of looking at language.

10             MS. CLAIBORN:  It's just a matter of me looking at

11   their language.

12             MR. BALDIGA:  We've worked out everything.

13             THE COURT:   So you're going to -- everyone, you

14   know, I will tell you these matters, these motions, I'll

15   look at the language.  But, you know, I know the parties are

16   asking the Court to do something that's -- essentially

17   shorten the time and the procedures that are required by the

18   code for fee applications.  I'm reluctant to do that in a

19   lot of cases for many, many reasons.

20             I'll do it in this case if everyone is in

21   agreement.  But I will tell you if there's -- if I see that

22   there's anything of any concern at any point, I may schedule

23   a status conference and/or vacate any order entered if I

24   think that there's any issue.

25             I mean, you know, what you don't want to have is a

1   situation where everybody believes that we're just seeing

2   how much fees are incurred.  And I'm not saying that that's

3   happening in this case.  I'm saying you want to guard

4   against that.

5        And entry of these types of orders sometimes gives

6   -- give people arguments that that's the major concern.  And

7   I'm not suggesting it is, but all I'm saying is if this

8   enters, and it apparently will subject to some language,

9   that doesn't mean that I'm not going to look at it in the

10  future.

11       MR. BALDIGA:  Of course.  Of course.

12       THE COURT:  And if I think --

13       MR. BALDIGA:  And, Your Honor, you've seen from

14  day one that we're -- we're trying to spend as little as

15  possible, but we need to be responsive to a particular

16  creditor that is not funded from the estate.  And we can't

17  control how many motions with what enthusiasm they bring so

18  we're -- we're trying to keep up and do the right thing and

19  responsibly represent the estate.

20       Mr. Goldman has a lot of work to do himself in

21  that regard as we've already talked about.

22       We've all agreed there has to be an examination

23  before people are comfortable confirming a plan.  The debtor

24  has supported that from day one.  And this motion helps to

25  do that and the DIP helps to do that.  They go hand in hand.

1          THE COURT:  Understood.

2          MR. BALDIGA:  Thank you.

3          THE COURT:  Thank you.

4          MS. CLAIBORN:  Your Honor, if I just could make a

5     quick comment?

6          I wanted to preview for the Court that the order

7     that was uploaded is different than the original proposal.

8     But what it does have is the obligation to file interim fee

9     applications at a 90-day interval.  So there will be an

10    actual --

11         THE COURT:  Okay.

12         MS. CLAIBORN:  -- fee application process --

13         THE COURT:  Okay.

14         MS. CLAIBORN:  -- that's a component of it.

15         But there was also the existing monthly option

16    where the professionals get paid 80 percent of their fees

17    and 100 percent of their expenses upon there being no

18    objection from any of the parties.

19         THE COURT:  Okay.  Thank you.  I appreciate that.

20         So that motion will be granted.

21         But we have to wait and see what -- if there's any

22    minor -- any final comments to the proposed order, Attorney

23    Claiborn, correct?

24         MS. CLAIBORN:  Yes, Your Honor.  Thank you.

25         THE COURT:  Okay.  The only thing -- the only

1   other matter I'd like to discuss before we turn to the

2   evidentiary hearing on the DIP motion is the scheduling on

3   the motion to dismiss.

4           Were you able to discuss that during the break?

5           MR. FRIEDMAN:  We were, Your Honor.  With respect

6   to our motion, we I guess propose to begin -- so we would --

7   oppositions, we would ask to be set for the 11th of May.

8           THE COURT:  All right.  So that's a change, right?

9           MR. FRIEDMAN:  Yes.

10          THE COURT:  So let me just make a note.  Okay?  I

11  just want to make sure I have the right things in my -- on

12  my notes.

13      (Pause.)

14          THE COURT:  May 11th did you say?

15          MR. FRIEDMAN:  Yes, Your Honor.

16          THE COURT:  Okay.

17          MR. FRIEDMAN:  We would ask for our reply to be

18  filed on the 18th, and to commence the hearing on the 25th.

19          THE COURT:  All right.  Let me take a look at

20  that.  I haven't looked at that date obviously.  Hold on.

21      (Pause.)

22          THE COURT:  Okay.  I can commence the hearing on

23  the 25th.  I can even have some time on the 26th, but no

24  time on the 27th.

25          MR. FRIEDMAN:  Okay.  And so, Your Honor, we would

1    ask the 25th and 26th.  We will submit witness statements.

2    I'm sorry.  We will submit exhibits.  We will -- we will

3    meet and confer and propose a schedule for exhibits over --

4    hopefully, Mr. Jonas and I can have some discussions.  We'll

5    submit something by early next week on those, on when we'll

6    submit exhibit lists and witness lists.

7          THE COURT:  Well, I can tell you when you need to

8    submit exhibit lists.

9          MR. FRIEDMAN:  Even better.  Thank you, Your

10   Honor.

11         THE COURT:  I think that will help you.  There's

12   no need to meet.

13         MR. FRIEDMAN:  Yes.

14         THE COURT:  Just give me one second, please.

15       (Pause.)

16         THE COURT:  You'll submit your list of witnesses

17   and exhibits by 12 p.m. on May 20.

18         MR. FRIEDMAN:  Yes, Your Honor.

19         THE COURT:  Right.

20         MR. FRIEDMAN:  I can't anticipate now how long it

21   will take.  We will endeavor to examine Mr. Kwok on the

22   first day.  Because I've been advised there are some dates

23   the following week, if we have to go into the following

24   week, that he's unavailable, so we will endeavor to have him

25   examined on the first day of the hearing.

113

1    THE COURT:  Okay.  Go ahead, Counsel.

2    MR. JONAS:  Good afternoon, Your Honor.  Jeff

3    Jonas from Brown Rudnick.  A pleasure to be before you

4    again.

5    Those are all acceptable, and I appreciate Mr.

6    Friedman's courtesies with respect to Mr. Kwok.

7    THE COURT:  Okay.  Thank you.

8    MR. JONAS:  Thank you.

9    THE COURT:  Attorney Goldman?

10    MR. GOLDMAN:  Your Honor, yes, thank you.

11    I just wanted to mention obviously we are not a

12    formal party to this motion.  Not a movant or respondent,

13    but we do intend to most decidedly oppose this motion and

14    may want to participate in the evidentiary phase as well as

15    discovery.

16    So I just wanted to make clear I think the moving

17    party doesn't have a problem with our formally intervening

18    as a party to the extent that's necessary, but if everybody

19    could be in agreement that we would be treated as a party

20    for discovery and evidentiary hearing purposes, then I don't

21    think it's necessary.

22    MR. FRIEDMAN:  At least, Your Honor, on behalf of

23    PAX, we certainly consent.  We've provided discovery or the

24    discovery we've served is I believe on both the committee

25    and the U.S. Trustee.  We recognize the committee's and the

1    trustee's statutory right as well.  There's overlap with the

2    motion of the U.S. Trustee, so that's certainly fine by us.

3           MS. CLAIBORN:  Your Honor, the dates proposed are

4    fine with the U.S. Trustee.

5           THE COURT:  Okay.  Thank you.

6           Mr. Jonas?

7           MR. JONAS:  Your Honor, not that it's necessary --

8    Jeff Jonas from Brown Rudnick -- but of course we welcome

9    the committee's involvement in connection with the motion to

10   dismiss.

11          THE COURT:  Okay.  All right.  Thank you.  All

12   right.

13          So then what will happen either today or tomorrow

14   is a scheduling order will issue setting forth the dates we

15   just discussed on the record this afternoon.

16          Obviously, those are different from this

17   mornings', and that's fine.  You all indicated that you

18   wanted to talk about the dates at the break, and you did, so

19   a scheduling order will enter with the dates and the times.

20   We'll start at 10 a.m. on the 25th and the 26th.

21          And the scheduling order, Attorney Friedman, will

22   say that the moving party expressly consents to a

23   continuance of the hearing to the specific dates, okay, in

24   accordance with 1112(b)(3).

25          MR. FRIEDMAN:  Yes, Your Honor.

1          THE COURT:  Okay.  Thank you.

2          And the other thing I should note is that the U.S.

3     Trustee's motion for the appointment of an examiner or a

4     trustee will also be continued to those dates, the dates of

5     the motion to dismiss.  Okay?

6          MS. CLAIBORN:  Thank you, Your Honor.

7          THE COURT:  So the only thing left on the

8     calendar, today's calendar, that we have not addressed is

9     the debtor's motion for entry of interim final DIP orders

10    for which we are going to conduct an evidentiary hearing.

11         So, Mr. Jonas, you may proceed.

12         MR. JONAS:  Thank you, Your Honor.  Jeff Jonas

13    from Brown Rudnick on behalf of the debtor.

14         Your Honor, one -- perhaps I should call it

15    housekeeping matter.  I think as you're aware Mr. Kwok has

16    the need of an interpreter.  We have brought an interpreter

17    with us.  Her name is Una Wilkinson.  She's a 19 --

18         THE COURT:  Could you spell her first name for us?

19         MR. JONAS:  Sure.  U-N-A.

20         THE COURT:  Okay.

21         MR. JONAS:  It's pronounced Una.

22         THE COURT:  Okay.

23         MR. JONAS:  But it's U-N-A.  And her last name is

24    Wilkinson, W-I-L-K-I-N-S-O-N.

25         THE COURT:  Thank you.

1            MR. JONAS:  She's a 1995 graduate of the

2    Westminster University in the U.K. with a degree in

3    translation.

4            In terms of her qualifications, the United Court

5    System of New York State, she's a certified interpreter in

6    both Mandarin and Cantonese.  She's on the list of

7    interpreters of the Eastern and Southern District Courts of

8    New York.

9            She's interpreted for the grand jury in multiple

10   trial cases in the Eastern and Southern District Courts,

11   state criminal, New York State Criminal, and New York Civil

12   courts.  She has a long list of notable assignments that I

13   won't go through here, Your Honor, but I did want to provide

14   the Court with some background with respect to Ms.

15   Wilkinson's qualifications.

16           THE COURT:  Okay.  Thank you.

17           MR. JONAS:  Your Honor, my suggestion -- although

18   I've never done this before this way, so what do I know --

19   but perhaps Ms. Wilkinson could sit next to the witness.

20           THE COURT:  Yeah.  The box is very small, but we

21   can move a chair over there.

22           MR. JONAS:  That's what I was thinking, Your

23   Honor.

24           THE COURT:  Okay.  I don't think we could put two

25   people in the box.

1          MR. JONAS:  No.  I don't think so.  But I'm happy

2     to wheel this chair over if you'd --

3          THE COURT:  That would be great.

4          MR. JONAS:  Okay.

5          THE COURT:  Sure.

6          MR. JONAS:  Thank you.

7          THE COURT:  And then does any party have any

8     objection or issue with the qualifications of the

9     interpreter that have just been noted on the record by

10    Attorney Jonas?

11         MR. HARBACH:  Your Honor, David Harbach for

12    Pacific Alliance.

13         We have no quarrel with Ms. Wilkinson's

14    qualifications and no reason to question them.  However, it

15    is also our understanding that Ms. Wilkinson is Mr. Kwok's

16    personal interpreter and that she has worked with him for

17    quite some time.  And we have some concern about bias.

18         And we brought a similarly certified interpreter

19    for use today, one that is -- we hired -- and this is the

20    first time I believe we're using this person.  She's here in

21    the courtroom.  She's also qualified and certified.

22         And the procedure that we had used in the past,

23    Your Honor, is to utilize the neutral interpreter as the

24    primary interpreter.  And then to the extent necessary use

25    Ms. Wilkinson as a check interpreter to the extent there is

118

1    an issue with how something is being interpreted or perhaps

2    a peculiar way how -- in which Mr. Kwok's speaks or

3    something.

4             But that's how we would propose we proceed today.

5             THE COURT:  And have you talked about that with

6    Attorney Jonas?

7             MR. HARBACH:  No, ma'am.

8             THE COURT:  Okay.  All right.

9             Well, Attorney Jonas, what's your response to what

10   we just heard from --

11            MR. JONAS:  Yeah.  My response, Your Honor, is as

12   follows.  First of all, Ms. Wilkinson, I don't think it's

13   fair, and I think she would take some umbrage to any

14   allegation of bias.  That's number one.

15            Number two, she's not Mr. -- I don't know what it

16   means to say she's Mr. Kwok's personal interpreter.  Has she

17   worked with him quite a bit over the years?

18            And he's been involved in a number of litigation

19   matters as you know or as I think the Court's aware, yes,

20   absolutely.

21            But that being said, my suggestion -- and we fully

22   welcome subject to learning a little bit about the

23   qualifications of the -- PAX's interpreter, I suspect we'll

24   have no objection.

25            But what I would suggest, Your Honor, is that Ms.

1    Wilkinson will translate for Mr. Kwok.  I'll ask the

2    questions, she'll translate.  She will translate his

3    answers.

4              And of course I would -- we would welcome what

5    I'll call the check interpreter to the extent there's any

6    issue to raise those.  And we'll do the same, Your Honor.

7              They may have -- if they'd like, they can have

8    their interpreter for the I guess I'll call it the cross and

9    we'll have Ms. Wilkinson check if you will.  That would be

10   my suggestion, Your Honor.

11             THE COURT:  But wouldn't the check essentially

12   just be an objection?  I mean, wouldn't it be?

13             I mean, I'm not -- I haven't had two interpreters

14   at one time.  I've had one interpreter.

15             But I understand the issue that Attorney Harbach

16   raises.  I understand the issue you raise.

17             So in order to try to have the issue proceed,

18   wouldn't it be appropriate for -- for example, if you are

19   going to do a -- conduct a direct examination of the debtor

20   and use Ms. Wilkinson to be translating whatever the debtor

21   is saying in response to your answer?

22             Mr. Harbach, wouldn't it be appropriate to have

23   your translator if she believes it's inaccurate to tell you

24   that and you can object to that and we can address the issue

25   of whether or not that testimony stays part of the record?

1          MR. HARBACH:  That's certainly one way to proceed,

2    Your Honor.  All we're talking about now is who's doing the

3    primary interpretation in the first instance.

4          THE COURT:  Right.

5          MR. HARBACH:  And all I can represent to the Court

6    is that on multiple occasions at the 341, and also at the

7    deposition of other witnesses, Ms. Wilkinson has been on

8    standby as the check interpreter and it has worked just

9    fine.

10          MR. JONAS:  Your Honor, with all due respect, I

11    don't think saying that the 341 worked just fine is a fair

12    representation.  It was a mess.  The level of interpretation

13    at the 341, in my opinion, was not good.  Ms. Wilkinson was

14    required quite a bit to intervene if you will.  We got

15    through it.  But I really -- it did not work, that I can

16    assure you.  And if you were to read the record, I think

17    you'd agree with me.

18          THE COURT:  Well, I don't get the record of the

19    341 meeting --

20          MR. JONAS:  Understood, Your Honor.

21          THE COURT:  -- unless you all decide to get it

22    transcribed and docket it, so I can't speak to that.

23          But the United States Trustee's Office has stood,

24    so I'd like to hear from you, Attorney Claiborn.

25          MS. CLAIBORN:  Your Honor, I wanted to confirm

1    what Attorney Harbach has represented to the Court.

2            And that is that during the course of this case

3    thus far, Ms. Wilkinson has participated on a number of

4    occasions as the personal interpreter to the debtor, and

5    that Ms. Wilkinson did very capably interrupt the

6    proceedings to correct and/or criticize and/or elaborate on

7    the interpretations provided by the interpreter who was the

8    official interpreter for both the meetings.  And that

9    happened during both sections of the 341 meeting.

10           THE COURT:  So we're not talking about that

11   happening though, are we?

12           I mean, I thought you were saying Ms. Wilkinson

13   was going to be the main interpreter.

14           MR. JONAS:  That's what our --

15           THE COURT:  So what happened?  I wasn't at -- I

16   mean, I have no idea what happened at the 341 meeting.

17           You had -- the office had an interpreter?

18           MS. CLAIBORN:  We hired an interpreter.

19           THE COURT:  Okay.  That I didn't understand until

20   just now.  Okay.

21           MS. CLAIBORN:  Correct.

22           THE COURT:  So --

23           MS. CLAIBORN:  So the U.S. Trustee's preference

24   would be that we have an independent corroborated -- I mean

25   -- sorry -- an independent interpreter who has no

122

1    affiliation whatsoever to anything be the primary

2    interpreter.

3            THE COURT:  Okay.  And that person is the person

4    that PAX has brought today?

5            MS. CLAIBORN:  I'm not -- I'm not privy to the

6    qualifications or the interactions between that interpreter

7    and PAX, but I'm sure that Mr. Harbach can address that.

8            THE COURT:  Okay, Mr. Harbach, go ahead.

9            MR. HARBACH:  We have someone who can fill that

10   role here today, Your Honor, and I'm happy to do a brief

11   voir dire of her and allow counsel also to elaborate on her

12   qualifications.  I don't have them committed to memory.

13           THE COURT:  I'm not suggesting you should.  I'm

14   just trying to figure out how to proceed, right?

15           MR. HARBACH:  Yes.  Yes.

16           THE COURT:  That's what -- that's what I'm trying

17   to do.

18           MR. HARBACH:  So the record --

19           THE COURT:  I have obviously no knowledge until

20   you just all told me about what happened at a 341 meeting,

21   right?  The 341 meeting transcript isn't in the record.  The

22   Court doesn't participate in the 341 meetings, so I have no

23   idea about these issues.

24           And as I had said, you know, a few hearings ago,

25   the issue of the interpreter is an important issue.  I

123

1  raised the issue -- I raised it at some point because it is

2  an important issue.

3        So if the parties don't have an agreement as to

4  how this is going to proceed, then unfortunately I'm going

5  to have to determine how that's going to proceed.  And it

6  sounds --

7        The U.S. Trustee's Office, you hired an

8  interpreter from where?

9        MS. CLAIBORN:  Your Honor, the first meeting of

10 creditors I used an interpreter who was provided over the

11 telephone through I think the service is called

12 INTERPRETALK.  And then there's a service that the U.S.

13 Trustee Program provides nationwide.  You're able to call in

14 and get an interpreter in whatever language you need and

15 that interpreter gets placed onto the telephone line and

16 then interprets.

17       So one of the challenges we had with that process

18 was the fact that the telephone line doesn't always lend

19 itself to the best hearing on either end of it.

20       The second 341 meeting was an in-person

21 interpreter who we hired from another third party in an

22 effort to get somebody in person.

23       THE COURT:  Was it in-person?  Yes.

24       MS. CLAIBORN:  It was.

25       THE COURT:  Okay.

124

1          MS. CLAIBORN:  It was an improvement.  I'm sure

2     that no one would tell you that their experience was 100

3     percent awesome, but we tried to accommodate the idea that

4     an in-person was a better product than on the telephone

5     line.

6          THE COURT:  Okay.  Well, it's clear -- as I told

7     all of you I think at a hearing, one or two hearings ago,

8     the Court does not have -- the judiciary is not -- the

9     bankruptcy court anyway is not allowed to spend money to

10    hire an interpreter in a case.  It's not allowed by the

11    United States Judicial Conference, the Administrative

12    Office, and then essentially Congress, so the Court can't

13    hire anybody.  The issue then becomes the parties having to

14    hire people.

15          We've got two people here today, one of whom two

16    parties have said -- have suggested I should say -- might

17    not be the person that the Court wants to use as the primary

18    interpreter.  That's the suggestion.

19          And, Mr. Jonas, you're --

20          I didn't know any of this, right, that there was a

21    problem with the interpretation or at least a perceived

22    problem with the interpretation by parties who are objecting

23    to the DIP financing motion and that financing coming from a

24    third party.  Okay?

25          So it's hard for me to say that -- to agree with

1    what you've just said, Mr. Jonas, when I didn't know that

2    there was a problem.

3           So the issue that I would assume, Mr. Harbach,

4    that you're saying is you want your interpreter to be the

5    primary interpreter?

6           MR. HARBACH:  Yes, Your Honor.  That's right.  And

7    I'll add a couple of other facts for your consideration in

8    making this decision.

9           Number one, that the person who we've arranged to

10   be in court today is from TransPerfect Legal Services.  They

11   provide interpreters like this as a matter of course for all

12   different sorts of languages.  And the person who was

13   assigned, as I said earlier, I don't believe we even knew

14   her identity until today.

15          So the point is the obvious one, that although we

16   are paying for her, she is not in any way affiliated with us

17   or anything, doesn't know anything about this case other

18   than some names that we've given her ahead of time to listen

19   for.

20          The second thing that I should mention is that Ms.

21   Wilkinson also performed the check interpretation role at

22   our deposition of Yvette Wang, who was the Golden Spring

23   30(b)(6) representative.  And at that deposition, the

24   primary interpreter we hired through a similar agency, not

25   TransPerfect, but I believe it was called Veritext, another

126

1   agency, and that interpreter performed extremely well.

2   There were not the same problems, some of which we

3   encountered at the 341 hearing.

4          So I mention all this to say -- and the reason I

5   mentioned the track record of what we've done thus far is to

6   hopefully illuminate for the Court why we obviously

7   erroneously assumed we would do something similar today.

8          So apologies for this rearing its head without any

9   notice to the Court, but that's our position.

10          THE COURT:  Okay.  Thank you.

11          Attorney Jonas?

12          MR. JONAS:  Yes, Your Honor.  Jeff Jonas, Brown

13   Rudnick for the debtor.

14          I'll just add, Your Honor, first of all, I take no

15   offense -- I don't think the Court should either -- with

16   what PAX has had to say.  We heard the Court's instruction

17   that the Court couldn't provide interpreters.  We both went

18   out -- obviously it would have been great if we had spoken,

19   unfortunately we didn't -- but we both went out and hired

20   interpreters.  So that's just the way it is.

21          And, again, I have no reason without further

22   information to question the capabilities of their

23   interpreter.

24          What I would say, Your Honor, in addition to my

25   prior comments, is, as you can imagine, Mandarin is a

1    complicated language I've learned in the few weeks I've had

2    to deal with it.

3         And, yes, Mr. Kwok, there has been -- he's used --

4    and Ms. Wilkinson is familiar with Mr. Kwok, the way he

5    speaks, and I think it would be particularly helpful to him.

6         Obviously this is a critical hearing.  And he's

7    going to be testifying live for the first time in this case.

8    And I think that level, having some level of -- again,

9    without bias -- but simply a level of comfort and

10   understanding as to his tone, his inflection, how he speaks,

11   I think that ultimately will benefit the trier of fact in

12   terms of getting the most accurate translation.

13        I'm not really sure of the relevance of what's

14   happened before.  We're here now.  He's going to testify for

15   the first time.

16        And on that basis, Your Honor, we, again

17   respectfully -- happy to leave it up to the Court if it

18   comes to that -- but respectfully would prefer and suggest

19   that Ms. Wilkinson be the primary interpreter.

20        THE COURT:  Okay.  Thank you.

21        MR. JONAS:  Thank you.

22        THE COURT:  Attorney Harbach, anything else you'd

23   like to add?

24        MR. HARBACH:  No, Your Honor.  Thank you.

25        THE COURT:  Okay.  Thank you.

1          Well, again, under the circumstances of this case

2     and the arguments that have been advanced with regard to the

3     interpreters, and the fact that the United States Trustee's

4     Office has highlighted some concerns it had -- it

5     experienced is a better term -- word -- I suppose at the 341

6     meetings, I think -- well, the Court will rule that the

7     interpreter hired by PAX will be the main interpreter and

8     Ms. Wilkinson can be the check interpreter.

9          But we all have to understand that means there's

10    going to be three people up here, okay, and so we're going

11    to have to figure out a way that I think we're going to have

12    the interpreters understand that the questioning is probably

13    going to have to move a little slowly.

14          MR. JONAS:  Yes.

15          THE COURT:  Okay?  That you're going to ask a

16    question, Mr. Jonas, and then Mr. Harbach will answer -- ask

17    a question on cross-exam, and we're going to have to wait

18    for the debtor to respond, then we're going to have to wait

19    for the -- and this is all fine, I'm just explaining to

20    everyone how it's going to work -- that we're going to have

21    to wait for the interpreter.

22          And I don't remember the person's name that PAX

23    has hired.  What's the interpreter's name?

24          MR. HARBACH:  It's because I haven't put her on

25    the record, Your Honor.

129

1        THE COURT:  Okay.

2        MR. HARBACH:  It's not an issue of memory.

3        THE COURT:  Okay.

4        MR. HARBACH:  To be honest, I do not even know her

5    name.

6        THE COURT:  Okay.

7        MR. HARBACH:  But I know she's in here.

8        THE COURT:  Well, then the interpreter to tell us

9    the answer that Mr. Kwok has given in English.  And then

10   we'll have to wait to see if Ms. Wilkinson has a problem

11   with it.  And if she does, then, you know, we'll have to

12   address it.  I think that's all we can do.  Okay?  I think

13   that's the best we can do given the circumstances of today.

14       MR. JONAS:  Your Honor, one question?

15       THE COURT:  Yes.

16       MR. JONAS:  And I very much appreciate and respect

17   the Court's ruling.  Thank you, Your Honor.

18       Just a suggestion so we understand the ground

19   rules, would it be okay if the lawyers step back a little

20   and --

21       THE COURT:  Yes.

22       MR. JONAS:  Yeah.  And let the -- to the extent --

23       THE COURT:  Absolutely.

24       MR. HARBACH:  -- there's an interpretation by the

25   primary of an answer, to the extent Ms. Wilkinson, she can

1    speak for herself and raise it, I just -- I don't -- I'd

2    prefer we not be on the front lines of it because --

3            THE COURT:  No, I agree.

4            MR. HARBACH:  Okay.

5            THE COURT:  I think you should step back.  And I

6    think we might need another chair too.

7            MR. HARBACH:  Yes.  Yes.

8            THE COURT:  And I don't know if we have another

9    chair readily available at the moment.

10           MR. JONAS:  I can provide mine, Your Honor, for

11   now.

12           THE COURT:  Okay.  You're going to stand the whole

13   time?

14           MR. JONAS:  Yes.  Well, at least for my direct,

15   and then we'll figure it out.

16           THE COURT:  Okay.  All right.

17           MR. JONAS:  I'll take somebody else's chair.

18           THE COURT:  All right.  I think that's fair under

19   the circumstances.

20           And just we'll note for the record that once Mr.

21   Jonas --

22           Someone's bringing in another chair too, so if

23   anybody needs another chair, we'll be all set.

24           Thank you very much.  I don't know if we're going

25   to need it, but that's okay.  I appreciate you doing that,

1   so thank you.

2                   UNIDENTIFIED:  I'll return it if you don't need

3   it.

4                   THE COURT:  Thank you.

5                   So what's -- so everyone's clear, Mr. Jonas is

6   going to start his presentation on behalf of the debtor on

7   the debtor's -- and I keep calling it shorthand -- but a DIP

8   motion, a DIP motion -- and then he will call his first

9   witness, which I'll --

10                  And then we'll have the interpreters come forward.

11  The interpreters are going to have to note their names for

12  the record.  And I'm going to have to make sure that both --

13  every party -- no one is challenging the qualifications of

14  either one of the interpreters.

15                  And then, Mr. Jonas, you'll be able to proceed.

16  Okay?

17                  MR. JONAS:  Absolutely.  Thank you, Your Honor.

18                  THE COURT:  All right.  You can -- you may start,

19  please.

20                  MR. JONAS:  Well, may we call the interpreters,

21  Your Honor?

22                  THE COURT:  Sure.  Absolutely.

23                  MR. JONAS:  And we would obviously ask Ms.

24  Wilkinson to come up and I guess take the second chair,

25  right?

132

1         THE COURT:  Yes.  So, Ms. Wilkinson, are you in

2    the courtroom?

3         MS. WILKINSON:  Yes.

4         THE COURT:  Would you please come forward.

5    (Pause.)

6         THE COURT:  All right.  So one at a time, I'm

7    going to -- the courtroom staff is going to make sure that

8    that microphone can capture at least both the people.

9         Ms. Wilkinson, just because you came first, the

10   courtroom deputy is going to swear you in.  Okay?

11   (The check interpreter is sworn.)

12        THE COURT:  Okay.  Thank you.

13        THE CLERK:  Can you just state your name and a

14   business address for the record, please.

15        THE CHECK INTERPRETER:  Yes.  My name is --

16        THE COURT:  We can't hear you.

17        THE CLERK:  I need Ms. Wilkinson.

18        THE COURT:  We need Ms. Wilkinson's first.  Why

19   don't you come to the microphone.  Yeah.

20        THE CHECK INTERPRETER:  Name, Una, U-N-A,

21   Wilkinson, W-I-L-K-I-N-S-O-N.

22        THE COURT:  Just your business address.

23        THE CHECK INTERPRETER:  My business address is my

24   home.

25        THE COURT:  Okay.

133

1          THE CHECK INTERPRETER:  6818 Juno Street, J-U-N-O,

2    Forest Hills, New York, New York 01375.

3          THE COURT:  Thank you.  Thank you very much.

4          Now, if I could have you come home --  I don't

5    know your name.  I'm sorry.  If you could tell me your name.

6          THE MAIN INTERPRETER:  Sure.  Your Honor, my name

7    is I Ching Ng, the spelling is I-C-H-I-N-G, last name is N-

8    G.

9          THE COURT:  N-G.  Okay.  And could you tell us

10   your business address, please.

11         THE MAIN INTERPRETER:  Sure.  It's 450 Lexington

12   Avenue, Unit 3294, New York, New York 10163.

13         THE COURT:  And the company you work for?

14         THE MAIN INTERPRETER:   Today I'm representing

15   TransPerfect.

16         THE COURT:  TransPerfect.  Okay.

17         THE MAIN INTERPRETER:  Yes.

18         THE COURT:  The courtroom deputy is going to swear

19   you in.  Okay.

20         THE CLERK:  Raise your right hand, please.

21      (The main interpreter is sworn.)

22         THE COURT:  Okay.  Thank you.

23         You can take off your coat.  You know.  You don't

24   have to be -- whatever you're more comfortable in, but I'm

25   going to have you sit right next to the witness chair.  And

134

1   Ms. Wilkinson is going to sit to your right.  Okay?

2            And now, both of you, what I'm going to ask you to

3   do -- you don't know this, but we only -- our record comes

4   through the microphone.  So once the witness, Mr. Kwok,

5   speaks, after he speaks and you interpret, you're going to

6   have to speak into the microphone.

7            And so, Ms. Wilkinson, it might be that you have

8   to come up and stand at this microphone if Mr. Jonas steps

9   (indiscernible) -- because if we can't hear you, we're going

10  to have to stop you.  Don't worry about that, that happens

11  sometimes.  We have -- this is -- our only record is through

12  a microphone.  So if I stop you, it's not because you've

13  done anything wrong, it's because we weren't able to hear or

14  for whatever reason.  Okay?

15           I just want to -- I know you haven't done this

16  before -- or maybe not in this courtroom -- but we can only

17  -- we don't have a transcriber.  We don't.  We have to get

18  everything on the record this way.  And if we don't get it,

19  then we have to stop and make sure it's on the record.

20  Okay?

21           THE CHECK INTERPRETER:  Okay.

22           THE COURT:  So do either of you have any

23  questions?

24           THE MAIN INTERPRETER:  So that means I can use

25  this microphone, right?

1     THE COURT:  Yeah.  You can.  And it will be after

2  -- there's another microphone here too.  Okay.  Great.

3  Okay.  That will be helpful for Ms. Wilkinson too.  Great.

4  Thank you.

5     After Mr. Kwok has answered the question, then,

6  yes, you can -- that's why we turned the microphone a little

7  bit so it will be able to pick up your voice as well.  If

8  for some reason we're wrong and it doesn't pick up your

9  voice, we'll figure out where to get you to stand so we can

10  understand what you're saying as well.

11     THE MAIN INTERPRETER:  Okay.

12     THE COURT:  Okay?  Does that make sense to both of

13  you?

14     (No audible response.)

15     THE COURT:  Okay.  I just want to make sure.  If

16  you have any questions, please let me know before we begin.

17  Okay?  All right.

18     All right.  Hearing no questions, then what else

19  do we need to do?

20     THE CLERK:  I have a note here we're going to have

21  the witness (indiscernible).

22     THE COURT:  I think Mr. Jonas is going to call his

23  witness, so there you go.

24     MR. JONAS:  Yes, Your Honor.  If we're ready, I'm

25  happy to do that.

1          THE COURT:  Yes.  Go right ahead.

2          MR. JONAS:  Thank you.  Your Honor, we would --

3     the debtor would call Ho Wan Kwok to the witness stand.

4          THE COURT:  Okay.  Mr. Kwok, if you'd come

5     forward, please.

6          MR. KWOK:  Good afternoon, Your Honor.

7          THE COURT:  Good afternoon, sir.

8          Now, Mr. Kwok, you can just stand when you get in

9     there, please.  And then you're going to raise your right

10    hand and listen to the courtroom deputy.  She's going --

11         You'll interpret it -- but this is the person who

12    is speaking to you right now.

13         THE CLERK:  I'm sorry.  You know.

14         THE COURT:  It's okay.  It's not a problem.

15         THE CLERK:  Let me just get my notes.  I'm so

16    sorry.

17         THE COURT:  And you can break it down if you would

18    like so that the interpreter can break it down for Mr. Kwok.

19    Okay?

20         THE CLERK:  Okay.

21         THE COURT:  You can say a few words at a time, and

22    that will be  helpful I think for Mr. Kwok to understand as

23    well.

24                    HO WAN KWOK, SWORN

25         THE COURT:  Okay.  Thank you.

1          THE CLERK:  State your name and address for the

2     record, please.

3          THE MAIN INTERPRETER:  The interpreter would like

4     to get a spelling for the address from Mr. Kwok.

5          THE COURT:  The spelling?

6          THE MAIN INTERPRETER:  Yeah.

7          THE COURT:  Yeah.  Go ahead.  You can ask him.

8          THE WITNESS:  The name is Kwok, K-W-O-K.  First

9     name is Ho Wan, H-A -- I'm sorry -- H-O W-A-N.  The address

10    is in Technic(ph) [sic], Connecticut, but I don't know how to

11    spell it.

12         THE COURT:  I didn't hear what you said.  What

13    Connecticut?  I think it's Greenwich, Connecticut.  Is that

14    what you think you heard?

15         THE WITNESS:  The street number is 373, but I

16    don't remember the street name.  That's in Greenwich,

17    Connecticut.

18         THE COURT:  Okay.

19         MR. JONAS:  Your Honor, I believe it's Taconic.

20         THE COURT:  I think it's Taconic, yes.

21         Okay.  Thank you.  Thank you.  All right.

22         You may be seated.

23         THE WITNESS:  Thank you, Your Honor.

24         THE COURT:  Okay.

25         MR. JONAS:  Your Honor, may I -- is the microphone

1    -- I'm just wondering if it will pick up Mr. Kwok?

2              THE COURT:  I think if he just leans a little

3    toward it --

4              MR. JONAS:  Okay.

5              THE COURT:  -- so that we can get both of them.

6              MR. JONAS:  Okay.  Okay.

7              THE COURT:  Okay.

8         (Pause.)

9                        DIRECT EXAMINATION

10   BY MR. JONAS:

11   Q    Good afternoon, Mr. Kwok.  Mr. Kwok, why did you file

12   this Chapter 11 bankruptcy case?

13   A    First of all, I would like to take the opportunity --

14   first of all, I would like to say that I'm very excited

15   today.  This is the first time I get to appear in this case.

16   It's been going on for five years.  And I appreciate this

17   opportunity.  And also excited that I couldn't sleep last

18   night.

19              THE COURT:  Thank you.

20   BY MR. JONAS:

21   Q    I'll just -- I'll repeat my question.  Mr. Kwok, why

22   did you file this Chapter 11 bankruptcy case?

23   A    In early February this year, at the Southern District

24   Court, the judge made a judgment asking me to pay $120

25   million in five days.

1          THE CLERK:  Excuse me, Your Honor.  I need to

2     interrupt to the extent that there's a message that we're

3     not hearing the interpreter.  Although I can hear

4     (indiscernible), we're getting messages that we cannot hear.

5          THE COURT:  Okay.

6          MR. JONAS:  May I make a suggestion, Your Honor?

7          THE COURT:  Sure.

8          MR. JONAS:  I'm not sure that what -- I think all

9     we really need to hear is the interpreter as long as she

10    hears Mr. Kwok.  So my suggestion would be that I can turn

11    the microphone directly to the interpreter and we'll pick up

12    the interpreter since that's really all that's I think

13    important.

14         THE COURT:  I think that makes -- let's try it.

15         MR. JONAS:  Okay.

16         THE COURT:  Okay.

17         MR. JONAS:  We'll try it.

18         THE COURT:  Let's try that.  Okay.

19         MR. JONAS:  Thank you for your patience.

20         THE COURT:  Okay.  No.  Thank you.

21      (Pause.)

22         MR. JONAS:  I just want to -- I don't know where

23    we left off.

24         THE COURT:  Yeah.

25         MR. JONAS:  I can -- I think he was in the middle

Kwok - Direct                                        140

1    of the answer, so shall we start again?

2              THE MAIN INTERPRETER:  If you wouldn't mind.

3              MR. JONAS:  Be happy to.

4              THE COURT:  That would be helpful.  Thank you.

5              MR. JONAS:  Sure.

6    BY MR. JONAS:

7    Q    Let's just go back, Mr. Kwok.  Mr. Kwok, why did you

8    file this Chapter 11 bankruptcy case?

9    A    In February of 2020, the judge at the Southern District

10   Court made a judgment for my case with PAX and the judgment

11   asked me to pay $120 million of fines within five days.

12             THE MAIN INTERPRETER:  Let me clarify the figure

13   with Mr. Kwok.  Okay.  Let me clarify.  That should be 124

14   million.

15             THE COURT:  Okay.  Thank you.

16             THE WITNESS:  Under such circumstances, I had no

17   choice.  And in order to quickly resolve and fairly to

18   resolve the debt issues with my debtors -- I have many

19   debtors -- that's one of the choices I had to make, even

20   though I have no choices, to resolve the issues of the

21   creditors.

22             THE COURT:  Okay.

23             MR. JONAS:  Your Honor, I just want to make sure.

24   I actually think it's working okay.  I just want to make

25   sure the Court's satisfied and --

1          THE COURT:  I can hear.  It's really the courtroom

2     deputy and the recordings that make sure that it's getting

3     picked up.

4          THE CLERK:  Yes.

5          THE COURT:  Okay.

6          MR. JONAS:  But I think also the corrections from

7     Ms. Wilkinson, I think this is -- the system is working.

8          THE COURT:  That's fine.  Yes, I agree.

9          MR. JONAS:  Okay.  Thank you, Your Honor.

10         THE COURT:  Okay.  Thank you.

11    BY MR. JONAS:

12    Q    Were you finished with your answer?  I just want to

13    make sure, Mr. Kwok, as to why you filed this Chapter 11

14    case?

15    A    Yes, I'm done.

16    Q    Okay.  Thank you.  Mr. Kwok, have you taken public

17    positions critical of the Chinese Communist Party or what's

18    commonly referred to as the CCP?

19    A    Yes.

20    Q    And why have you done that?

21    A    During the Tiananmen Square democratic protest in 1989

22    in China, I funded the students.  Because of that, I was

23    arrested and I was jailed for 22 months, and my younger

24    brother was killed.

25         And since my parents were tortured by the CCP, and

1   during my arrest I've witnessed that many student protesters

2   were being killed, and because of that I've sworn that I

3   need to eliminate the Chinese Communist Party.

4   Q    Mr. Kwok, in connection with your activities opposing

5   the CCP, have you done and do you do broadcasts in

6   opposition to the CCP?

7   A    In the past five years, I've made more than 5,000 live

8   broadcasts with thousands of hours of air time to criticize

9   the CCP regarding the corruptions and to expose them to the

10  world.

11          And I also talked about the massacre in

12  (indiscernible) and also in Hong Kong and how they conducted

13  spying activities in the West, in U.S., and human right

14  violations.

15  Q    How many people have watched or viewed your broadcasts?

16  A    I feel tens of millions, hundreds of millions.

17  Q    Does being an outspoken public critic of the CCP put

18  you at risk?

19  A    It has a huge risk.

20  Q    And what are those risks?

21  A    On January 10, 2015, these people behind me, the two

22  people who (indiscernible), and they also paid the lawyer's

23  fee, by the name of Wu Zheng (ph), he spied on me.

24          And my family members were arrested, including my

25  wife, my daughter, and hundreds of my colleagues were

Kwok - Direct                                              143

1    arrested as well, and my family assets were being seized.

2    And they said to me that if I don't collaborate with the

3    Chinese Communist Party they would kill me.

4              THE MAIN INTERPRETER:  The interpreter would like

5    to clarify a few names with the witness.

6              THE COURT:  Sure.  Go right ahead.

7              THE WITNESS:  Bernard Wu, he was the former

8    partner of an investigation company called CGI and he worked

9    with (indiscernible) and also they were involved in this

10   investigation.  And also they were --

11             THE MAIN INTERPRETER:  Let me clarify a term with

12   Mr. --

13             MR. HARBACH:  Your Honor, I realize that

14   interpretation is being clarified, but we'll interpose an

15   objection as to relevance and non-responsiveness.

16             The question, if memory serves, were what are the

17   risks?  And it's not clear at all to me that this answer is

18   responsive to that question or relevant to the purposes of

19   this hearing.

20             THE COURT:  I understand.  I'm going to allow this

21   question and the answer and then we'll move on to the

22   relevant issues for the DIP filings.

23             MR. JONAS:  Your Honor, I couldn't agree more.  I

24   was just trying to provide some background and this was the

25   last question on this topic.

1              THE COURT:  Okay.  Go right -- go right ahead.

2              But may I ask you, the interpreter --

3              THE MAIN INTERPRETER:  Yes.

4              THE COURT:  -- there was a name that you said.  I

5      don't know if I heard you.  Was it Bernard Wu, is that the

6      name?

7              THE MAIN INTERPRETER:  Yes.  Mm-hmm.

8              THE COURT:  All right.  Can we -- can you just

9      spell that for the Court, please.

10             THE MAIN INTERPRETER:  Let me clarify the spelling

11     with Mr. Kwok.

12             THE COURT:  Sure.

13             THE WITNESS:  Bruno Wu.

14             THE COURT:  Bruno.

15             THE WITNESS:  B-R-U-N-O, last name is W-U.

16             THE COURT:  Thank you.

17     BY MR. JONAS:

18     Q    Thank you, Mr. Kwok.

19             THE MAIN INTERPRETER:  Yeah.  I'm sorry.  I

20     haven't finished my translation already.

21             THE COURT:  Okay.  Go ahead.

22             MR. JONAS:  My apologies.

23             THE WITNESS:  And regarding the Puff (ph) case,

24     Bruno Wu Partners was also involved, and also concerning the

25     case with the Department of Justice about trying to get

Kwok - Direct                                              145

1    President Trump to extradite me.

2              And I would like to say that in the past five

3    years I was in dire, extreme risky situation.  There were

4    numerous moments where somebody came to my residence and

5    wanted to harm me.  And I don't want to take the time to

6    elaborate on that.

7              THE COURT:  Okay.

8    BY MR. JONAS:

9    Q    Thank you, Mr. Kwok.  Let's move on.  Do you have the

10   financial ability to satisfy all of the liabilities asserted

11   against you in this case?

12   A    No.

13   Q    Are you aware of allegations that you have the

14   appearance of being a wealthy man?

15   A    Yes.

16   Q    And in this case, you've disclosed that you have very

17   few -- is it true that in this case you've disclosed very

18   few assets?

19   A    Yes.

20   Q    Can you explain that contradiction?

21   A    In 1989, I was arrested during the (indiscernible)

22   movement because I participated in a campaign.  And then I

23   emigrated to Hong Kong in the year 2000.

24             And then from 2015 until now, I have mobilized

25   campaigns to eliminate the Chinese Communist Party,

1    therefore, I'm the notably known number one enemy of the

2    CCP.  And because of that, there's no way I can hold any

3    assets.

4    Q    But, sir, you -- again, I want to come back to my

5    question about the alleged appearance that you have the

6    means to live well and yet you've disclosed very few assets.

7    Where are you -- where are you getting the means to support

8    yourself?

9    A    Right now, I'm in a very special circumstances.  It's

10   very unique.  I'm in the phase of the campaign to eliminate

11   the Chinese Communist Party.

12            And my son and my daughter and my family business

13   have been very successful.  And these are very unique

14   (indiscernible).  And my family loves me and they are

15   supporting me with my living expenses and with the campaign

16   to rejoin that is necessary.

17            And in the past five years, the Chinese Communist

18   Party have conducted multiple investigations against my

19   family, and also publicly scandalized me.  However, they

20   never said -- they never disclosed my assets or cited that I

21   committed any crime.

22   Q    Mr. Kwok, are you familiar with your request for debtor

23   in possession or DIP financing in this case?

24   A    Yes.

25   Q    And who is the proposed DIP lender?

1   A    New York Golden Spring.

2   Q    And let me ask you, what is Golden Spring New York,

3   Limited?

4   A    This is a company owned by my son.  He set up that

5   company to invest in New York, and also to help the family,

6   and also to handle family affairs in the west.

7   Q    Okay.  And did you assist him in setting up Golden

8   Spring?

9   A    Yes.

10  Q    And were any of your funds used to set up Golden

11  Spring?

12  A    I was at one point authorized to transfer funds to help

13  Golden Spring and to transfer funds to J.P. Morgan.

14  Q    But those funds -- strike that.

15       Were those funds yours?

16  A    No.

17  Q    Whose funds were they?

18  A    My son's.

19  Q    Do you own Golden Spring?

20  A    No.

21  Q    Do you control Golden Spring?

22  A    No.

23  Q    Do you work for Golden Spring?

24  A    No.

25  Q    Has Golden Spring lent money to you in the past?

Kwok - Direct                                              148

1    A    Yes.

2    Q    And for what purpose?

3    A    It was because in the past few years there were many

4    lawsuits, numerous lawsuits, from the Chinese Communist

5    Party against me, so I had to get the loan, the borrowings,

6    from New York Golden Spring to pay these lawyers' fees.

7              MR. JONAS:  Your Honor, may I -- I know I'm

8    parched.  May I provide this to Mr. Kwok?  Thank you.  Thank

9    you, Your Honor.

10   BY MR. JONAS:

11   Q    Mr. Kwok, does Golden Spring pay your living expenses?

12   A    Yes.

13   Q    Why?  Why would Golden Spring do that?

14   A    It is because during this time I am in this campaign to

15   eliminate Chinese Communist Party and of course there's no

16   choice.

17             And at the same time, my son loves me very much.

18   I am his only father.  So that's why the company has been to

19   pay the living expenses.

20   Q    And are you familiar with Lamp Capital?

21   A    That is my son's company.

22   Q    And do you work for Lamp Capital?

23   A    No.

24   Q    Do you control Lamp Capital?

25   A    No.

1    Q    Has Lamp Capital lent you money in the past?

2    A    Yes.

3    Q    For what purpose?

4    A    Yes.  To pay one million U.S. dollars to be our law

5    firm to handle my bankruptcy case.

6    Q    Are you aware that certain pleadings have been filed in

7    this case alleging that you have a connection to G Music?

8    A    I am a volunteer for G Music.  I sing many songs about

9    eliminating the Chinese Communist Party for G Music.

10   Q    And are you -- strike that.

11        What is your connection, if any, to Himalayan

12   Exchange?

13   A    I am the advisor and promoter.

14   Q    And what is your connection, if any, to GETTR, G-E-T-T-

15   R?

16   A    I am the advisor and one of their promoters.

17   Q    And is your -- is the activities that you take in

18   connection with these entities all part of your public

19   opposition to the CCP?

20   A    Regarding all these companies that have been mentioned,

21   I work with my (indiscernible) for the purpose of

22   eliminating the Chinese Communist Party, so I sort of the

23   promoter for the cause.

24   Q    Do you get paid from any of these entities?

25   A    No.

1    Q    Do you dispute some of your creditors' claims against

2    you?

3    A    Yes.

4    Q    Prior to this bankruptcy, do you recall being examined

5    under oath in connection with some of the litigations that

6    you're involved with?

7    A    Yes.

8    Q    Do you recall invoking your Fifth Amendment right

9    against self-incrimination in connection with some of those

10   examinations?

11   A    Yes.

12   Q    At your recent 341 meetings, did you assert your Fifth

13   Amendment right at all?

14   A    No.  I did not use it at all.

15   Q    And why is that?

16   A    Because with the bankruptcy case, there's a need for

17   more transparency and fairness.  And also the fact that

18   disclosing more of my financial information can help handle

19   the relationship with various debtors, so I hope the judge

20   -- I'm sorry -- creditors -- and I hope the judge and also

21   all the creditors can know all this information so that we

22   can do it in an open manner.

23   Q    And I want to return to the DIP.  Can you briefly

24   describe how the DIP loan initially was arranged?

25   A    When I learned that the judge at the Southern District

1    Court imposed a fine of 124 million and asked me to pay it

2    off in five days, I asked my lawyer and my son to make

3    contacts to help me to resolve this loan.

4    Q    And was that what resulted ultimately in the DIP loan

5    that's before the Court today?

6    A    Yes.

7    Q    And briefly, what is your understanding of the current

8    proposed terms of the DIP loan?

9    A    Regarding the loan amount, that is an $8 million and an

10   $1 million, the $8 million and the $1 million were being

11   prioritized to fairly to pay all the creditors, and also any

12   fees that incurred for other third parties due to this

13   bankruptcy case, such as the lawyers and other

14   professionals.  And to add onto that -- and the one million

15   is the donation.

16   Q    And do you understand whether the DIP loan can be paid

17   back before creditors or ahead of creditors?  I'm not sure

18   how that translates, but.

19   A    No.  That is not allowed.

20   Q    And do you understand whether the DIP loan can be  used

21   to fund an examiner if an examiner is appointed in this

22   case?

23   A    Yes.  That is feasible.

24   Q    And do you understand whether the DIP loan can be used

25   to pay the creditors committee's professionals in this case?

Kwok - Direct                                                152

1    A    Yes.

2    Q    And do you understand whether the DIP loan can be used

3    to pay the United States Trustee fees that will be due in

4    this case?

5    A    Yes.

6    Q    As you sit here today, do you think it's likely that

7    the DIP loan will be repaid?

8    A    (Indiscernible.)

9    Q    And why would Golden Spring do this?

10            MR. HARBACH:  Objection.  That calls for

11   speculation.

12            THE COURT:  I'll allow it.

13            THE WITNESS:  Regarding Golden Spring, that is a

14   company owned by my son.  And he has only one father.  And

15   our family has gone through many hardships.  And in facing

16   the suppression of the Chinese Communist Party.

17            And also because of his personal considerations

18   and Chinese family values, he wants to safeguard of the

19   interest of the family and me and his mother.  Otherwise, I

20   would have been thrown into jail and been killed.

21   BY MR. JONAS:

22   Q    Do you know if the $9 million of DIP loan proceeds are

23   now available?

24   A    I know that the money has arrived yesterday, but I'm

25   not sure whether it has landed in the escrow account of the

1    lawyer.

2            I know that the money has started to arrive

3    yesterday.  I'm not sure whether it has already reached the

4    escrow account of the counselors.

5    Q    Do you believe that any other party, that is, other

6    than Golden Spring, would provide a DIP loan on better terms

7    than are provided here?

8            MR. HARBACH:  Objection.  Speculative.

9            THE COURT:  I'm going to allow it, and I'll give

10   it whatever weight I think is appropriate.

11           THE WITNESS:  No.

12   BY MR. JONAS:

13   Q    Mr. Kwok, you mentioned an examiner, do you support the

14   appointment of an examiner in this case?

15   A    Yes.

16   Q    And why is that?

17   A    And since the first day of this case until now, this is

18   the only moment that I feel secure, I feel safe, because I

19   have a chance to speak for myself here.

20           And also because my goal to eliminate the Chinese

21   Communist Party, I need the chance to voice, to make noise,

22   and this judicial system provided that platform.

23           And I understand the U.S. legal system and -- so

24   that it will offer a chance to have a fair and transparent

25   and more professional way to resolve my debt issues with the

1    creditors.

2    Q    If the DIP financing is not approved, do you have any

3    other source to pay the costs and expenses of this Chapter

4    11 case?

5    A    No.

6    Q    Have you filed a proposed plan of reorganization?

7    A    Yes.

8    Q    And do you believe having the DIP loan in place is

9    necessary and will facilitate the prosecution or your plan

10   moving forward?

11   A    Yes.

12          MR. JONAS:  Your Honor, I have no further

13   questions right now on direct.

14          I would ask, if it's convenient for the Court at

15   some point, just to take a short break?

16          `I do appreciate Mr. Kwok needs to be instructed

17   not to speak with anyone, and that's fine.  I just want to

18   make sure he and I have an opportunity to take a quick break

19   if we may.

20          THE COURT:  Opposing counsel have an objection to

21   that?

22          MR. HARBACH:  Not at all, Judge.

23          THE COURT:  Okay.  Then if there's no objection,

24   that's fine.

25          So how much time would you like?

1          MR. JONAS:  Oh, just five or ten minutes, Your

2     Honor.

3          THE COURT:  Well, it's ten of three.  Would you

4     like to come back at three?

5          MR. JONAS:  That would be fine.  And I appreciate

6     the courtesy, Your Honor.

7          THE COURT:  Okay.  We're going to take a quick

8     recess until 3 p.m.  Okay?  All right.  All right.  Court is

9     in recess until three.

10        (Recess from 2:47 p.m. until 3 p.m.)

11         THE COURT:  All right.  So we can go back on the

12    record after recess, please.

13         THE CLERK:  Yes. We're still on case Number 22-

14    50073 Ho Wan Kwok.  We are in court after (indiscernible).

15         THE COURT:  Okay.  Mr. Harbach, you ready to

16    proceed?

17         MR. HARBACH:  Yes, Your Honor.  May I inquire?

18         THE COURT:  Yes, please.  Go right ahead.

19                     CROSS-EXAMINATION

20    BY MR. HARBACH:

21    Q    Good afternoon, Mr. Kwok.  I'd like to start by talking

22    about an entity Mr. Jonas asked you about, called GETTR.  Do

23    you know the entity I'm talking about, sir?

24    A    First of all I want to say, good afternoon, sir, and I

25    do know GETTR.

1    Q    Okay.  What is GETTR?

2    A    It's a social media platform.

3    Q    I believe you testified on direct that you were an

4    advisor and promoter to GETTR.  Is that right?

5    A    Yes.

6    Q    When did GETTR launch its platform?

7    A    2021.

8    Q    Does the -- approximately the summer of 2021 sound

9    about right to you?

10   A    I cannot remember.

11   Q    Okay.  How was GETTR funded initially?

12   A    I don't know.

13   Q    Were you involved in donating any money to GETTR?

14   A    No.

15   Q    Did you help raise any money for GETTR from others?

16   A    No.

17   Q    Did your family make any donations or payments to GETTR

18   related to the startup?

19   A    No.

20   Q    What's Himalayan Exchange?

21   A    It's an online company for the trading or the exchange

22   of digital currency.

23   Q    Did you found it?

24   A    No.

25   Q    Were you among those who helped found it?

1    A    No.

2    Q    Okay.  What's Himalaya Coin?

3    A    That is a digital currency on the Himalaya Exchange.

4    Q    So Himalaya Exchange is a platform that supports

5    trading of Himalaya Coin.  Is that fair?

6    A    Yes.

7    Q    Okay.  And do you know about a music video called HCoin

8    to the Moon?

9            THE MAIN INTERPRETER:  I'm sorry, counselor, can

10   you repeat --

11   BY MR. HARBACH:

12   Q    HCoin -- oh, the witness knows.

13   A    I know.

14   Q    Okay.  That was a successful and popular music video,

15   wasn't it?

16   A    Yes.

17   Q    And it features you, does it not?

18   A    I was a small portion of it.

19   Q    You feature prominently in the video, don't you, sir?

20   A    I only spoke -- I only spoke one line.

21   Q    And did you have any role in producing the song?

22   A    I only sang one line.  In fact, this song, HCoin to the

23   Moon, took 30,000 people to complete.

24   Q    Isn't it true that HCoin to the Moon has been a very

25   popular download on iTunes for example?

1    A    What do you mean by a lot or very popular?

2    Q    Wasn't HCoin to the Moon at one point in the top 10

3    downloads on Apple iTunes?

4    A    Yes.

5    Q    Okay.  So it made lots of money.

6    A    I don't know.

7    Q    And I take it then, your testimony will be that you

8    received no money in connection with royalties from that

9    song?

10   A    Yes.

11   Q    You mentioned your invocation of the Fifth Amendment

12   earlier.  Do you recall that testimony?

13   A    Yes.

14   Q    And you understand, do you not, that the purpose of the

15   Fifth Amendment is a protection in circumstances where

16   truthful testimony might incriminate you.

17           MR. JONAS:  Objection, Your Honor.

18           THE COURT:  What basis?

19           MR. JONAS:  He's asking for legal conclusion.  I

20   don't think the witness is --

21           THE COURT:  No, I think he was asking for -- he

22   asked him what his understanding is, so I'll --

23           MR. HARBACH:  Thank you, Your Honor.

24           THE COURT:  -- overrule that objection.

25           THE WITNESS:  No, that's not the case.

1    BY MR. HARBACH:

2    Q    Okay.  What is your understanding of the purpose of

3    invocation of the Fifth Amendment?

4    A    I requested to use the Fifth Amendment under the advice

5    of my counsel.

6    Q    Well, I understand that and believe me, I'm not

7    intending to ask about communications with your counsel

8    about whether you should invoke it or not, that's

9    privileged.

10        But I -- but your counsel made a point of establishing

11   on direct examination that you had evoked the Fifth

12   Amendment in the past but did not do so at the 341 meeting.

13   And you said it was because you wanted to be more

14   transparent.

15             MR. JONAS:  Objection, Your Honor.

16             THE COURT:  On what basis?

17             MR. JONAS:  I don't think there have been

18   questions the last two -- he's -- Mr. Harbach has made

19   statements, but there's been no question in the last two

20   alleged questions.

21             MR. HARBACH:  I'm just pausing for the

22   interpreter, Your Honor, instead of asking one great big

23   long question, I'm leaving time for her to --

24             THE COURT:  I'm not sure it's not a question.  I

25   mean, you're asking him what he said.  I don't -- I'm not

Kwok - Cross - Harbach                                    160

1    sure it's not a question, so I think let's let it go and see

2    how we -- where we get to, okay?

3    BY MR. HARBACH:

4    Q    The question, sir, is, what is your understanding of

5    the reason one would invoke the Fifth Amendment?

6    A    I don't understand this question.

7    Q    Do you understand what -- do you have an understanding

8    of what the Fifth Amendment is?

9    A    I know.

10   Q    Do you know what it means to invoke the Fifth

11   Amendment?

12   A    The U.S. law gives the right to the people to do so.

13   Q    That's absolutely right, and what I'm trying to

14   understand is a right to do what?  What is it -- what is the

15   reason that one might invoke the Fifth Amendment, according

16   to your understanding?

17          MR. JONAS:  Objection, Your Honor.

18          Again, I -- and I respectfully -- I -- I'm not

19   trying to interrupt, but I do need to preserve my objections

20   for the record.  I don't think it's appropriate to ask a

21   witness -- he's now asked, I don't know, 10 questions

22   relating to the Fifth Amendment, his understanding.

23   Obviously, some of that is privileged to the extent his

24   understanding comes from us.

25          THE COURT:  He's not asking for privileged

Kwok - Cross - Harbach                          161

1    information.  He made that clear.  And I think it's a

2    relevant question and I'm overruling your objection.

3              MR. JONAS:  Fair enough.  Thank you.

4              THE COURT:  You did open the door on direct

5    examination to this issue.

6              MR. JONAS:  Understood, Your Honor.

7              THE COURT:  Okay.

8              MR. JONAS:  And that's why I -- at the beginning,

9    I let it go but we're kind of deep into this and I'm not

10   sure where it's going.

11             THE COURT:  I -- but he hasn't gotten an answer

12   yet.

13             MR. JONAS:  Thank you, Your Honor.

14             THE COURT:  Okay.

15   BY MR. HARBACH:

16   Q    Would you like me to repeat the question, sir?

17             THE MAIN INTERPRETER:  Yes.  Yes, please.  This is

18   the interpreter.

19             MR. HARBACH:  Sure.

20   BY MR. HARBACH:

21   Q    What is your understanding of what it means to invoke

22   the Fifth Amendment?

23   A    I listen to my counsel -- I listened to my counsel's

24   advice.

25   Q    Okay.  Well, I think I'll move on.

1    At the very beginning of your examination, when you

2    were asked why you filed this Chapter 11 case, you mentioned

3    that it was because a judge in New York ordered you to pay a

4    $124 million fine in five days.  Do you recall that

5    testimony?

6    A    Yes.

7    Q    And I don't want to go too deep into this, except to

8    say that there was a judgment in place against you because

9    of a decision that was made by the judge against your side

10   of the lawsuit, correct?

11   A    Are you talking about a judgment from the Seventh

12   District of New York?  I know that one.

13   Q    Well, I'm talking about a judgment from the Supreme

14   Court of the State of New York, Justice Barry Ostrager

15   presiding.

16   A    Yes, I know that.

17   Q    Okay.  And so, there were actually -- there are two

18   judgments that have been issued.  One was a partial summary

19   judgment in connection with PAX's breach of contract claim.

20   Do you remember that?

21   A    Are you talking about me breaching the contract?

22   Q    I'm merely trying to illustrate that there are two

23   judgments against you from the New York Supreme Court.  I'm

24   not asking you to admit whether you agree with them or not.

25   I'm just asking if you know of their existence.

1    A    Yes.

2    Q    Okay.  You understand that one of them is a judgment in

3    connection with a contempt finding, right?

4    A    Yes.

5    Q    Okay.  And did you attempt to file an appeal bond in

6    connection with that contempt judgment?

7    A    Yes.

8    Q    How much was it?

9    A    Are you talking about appeal bond?

10    Q    Yes.

11    A    I don't understand what you mean by appeal bond.

12    Q    Do you know what an appeal bond is?

13    A    So are you asking about me -- about the case of

14    contempt of court issued by Justice Ostrager?

15    Q    That is correct.  And my question is, did you file or

16    attempt to file an appeal bond in connection with that

17    judgment?

18    A    My counsel is working on it, but I don't know the

19    details.

20    Q    So as far as you understand, it has not been done yet,

21    to your knowledge.

22    A    We already appealed against a judgment of Justice

23    Ostrager.

24    Q    I understand that.

25              MR. HARBACH:  And I'll move on very shortly, Your

1   Honor.

2   BY MR. HARBACH:

3   Q    Just so we're clear, my question is not about whether

4   you appealed the decision, it's about whether you posted an

5   appeal bond.

6        Now, a moment ago you said that you believed your

7   attorneys were working on it, which is fine.

8   A    Yes.

9   Q    Okay.  And so all I want to establish is that they're

10  working on it.  To your knowledge, it hasn't been done yet,

11  correct?

12  A    My counsel is handling this matter.

13  Q    Understood.  Thank you.

14       One other piece of cleanup from direct.  Mr. Jonas

15  asked you about the risks to you as a result of your

16  opposition to the CCP, and among the things you said was

17  that your family was arrested and that the CCP seized your

18  family's assets.  Do you recall that testimony?

19  A    Yes.

20  Q    Some of those assets were yours as well, correct?

21  A    No.

22  Q    So is it your testimony that the CCP has seized none of

23  your assets?

24  A    Yes.

25  Q    Okay.  Only your family's assets.

1    A    Yes.

2    Q    Because of your conduct.

3    A    Yes.

4    Q    Golden Spring New York was set up in March of 2015,

5    correct?

6    A    Yes.

7    Q    And I believe you said on direct that it's -- it was an

8    investment firm?

9    A    At the time, one of the functions served by this

10   company was to look for investment opportunities in the US

11   for the family.

12   Q    And since March of 2015, how many successful investment

13   opportunities have -- has Golden Spring carried out?

14   A    We had some cases whereby we were almost successful.

15   However, because of Bruno Wu representing the Chinese

16   Communist Party to make phone calls and make threats, so

17   they were in futile.

18   Q    I didn't hear the last word.  They were --

19   A    In futile.

20   Q    They were futile?

21        THE INTERPRETER:  Yeah.

22   BY MR. HARBACH:

23   Q    Okay.  So is the answer to my question that there have

24   been no successful investments by Golden Spring since it was

25   set up in March of 2015?

Kwok - Cross - Harbach                                    166

1    A    I don't know what happened after 2015.

2    Q    Okay.  So is the answer to my question that you have no

3    idea whether Golden Spring has had any successful

4    investments since 2015?

5    A    Yes.

6    Q    This is the company that you say is owned by your son?

7    A    Yes.

8    Q    The son whose love and goodwill has resulted in their

9    generosity to you, according to you?

10   A    Yes.

11   Q    A son with, given that, you're pretty close?

12   A    Yes.

13   Q    You've never asked him about how the business is going

14   or what they're interested in investing in?

15   A    That has to do with his partner, Bruno Wu, who went to

16   London and -- with many people, there were Chinese spies

17   from the Chinese Communist Party and try to kill them.

18        And in 2015, my daughter, my wife were arrested and --

19   because of this -- these issues, and the fact that I'm being

20   chased and was -- and they were attempted -- they attempted

21   to kill me, and therefore they did not want to tell me much

22   about their personal affairs or what happened, and I do

23   respect that.

24   Q    So your answer is, you've never asked him.

25   A    I did.

Kwok - Cross - Harbach                    167

1   Q    And he refused to answer your question.  Is that it?

2   A    Because I was threatened to be killed and because of

3   me, many problems has risen.  Therefore, they did not want

4   to answer that.

5   Q    I didn't hear the tail end of the answer.  I'm sorry.

6   A    Because I was being threatened and because many

7   problems has risen because of me, they did not want to

8   answer that.

9   Q    Out of fear that what, that the Chinese Communist Party

10  would come after their assets?

11  A    It was not just about seizing the assets.  My son in

12  fact was arrested by the Chinese Communist Party before, and

13  he was being threatened to be killed, so he has been in this

14  process.  And also, many of his assets in Hong Kong and in

15  Mainland China have been seized or confiscated by them.

16  Q    And you've testified before, have you not, that you,

17  yourself, do not have any bank accounts, right?

18  A    Yes.

19  Q    And the reason for that, according to you, is because

20  of the Chinese Communist Party, right?

21  A    Yes.

22  Q    And the -- you can't hold on to any assets for the same

23  reason, right?

24  A    As I mentioned in the beginning, because of the 1989

25  incidents, I was arrested for 22 months, and then I became a

1    personality that is anti Communist Party, and then in year

2    2000, I had a Hong Kong passport, and in 2015, I became anti

3    Chinese Communist Party.  Therefore, for these three

4    different stages and because of the political climate at the

5    time, I could not own or hold any assets.

6    Q    Okay.  And let me get to one of the points, hopefully.

7    You seem to have no trouble swearing in very public filings

8    that your son owns Golden Spring New York, right?  Isn't

9    that true, that you have sworn in very public filings that

10   your son is the owner of Golden Spring New York?

11   A    Yes.

12   Q    Okay.  And it's also true, is it not, that Golden

13   Spring has millions of dollars at its disposal?

14   A    I don't know how much money they have.

15   Q    Well, you know they have millions of dollars, right,

16   because you just testified a few minutes ago that they've

17   pledged to give you eight, or the estate, eight.  Right?

18            MR. JONAS:  Objection, Your Honor.  That's

19   actually not accurate.  He -- when he was asked about the

20   terms of the DIP, I believe he said $9 million.

21            THE COURT:  I think he can answer the question.

22            THE WITNESS:  Yes, the testimony I gave earlier

23   stated $9 million.

24   BY MR. HARBACH:

25   Q    And my question to you was, you know, don't you, that

1   Golden Spring has millions of dollars at its disposal?

2   A    Yes.

3   Q    Isn't it true that you owned Golden Spring when it was

4   set up in 2015?

5   A    No.

6   Q    Do you recall on April 6th of this year, at the 341

7   hearing that was held in New Haven, the one that was in

8   person?

9   A    Yes.

10  Q    Do you recall testifying that at one time you held a

11  title at Golden Spring but you couldn't remember what the

12  title was?

13  A    Yes.

14  Q    Is that still the case that sitting here today, you do

15  not remember what the title was?

16  A    Yes.

17  Q    Or when you held it?

18  A    That was in the very beginning in early 2015, when the

19  company just founded.

20  Q    For approximately how long?

21  A    I don't remember.

22  Q    On direct examination you were asked some questions

23  about Golden Springs being set up, and I believe you

24  testified that you assisted your son in setting up Golden

25  Spring.  Is that right?

1    A    Yes.

2    Q    And if we could just take a brief detour and put your

3    son's name on the record.  It is Qiang Guo, is that correct?

4    A    Yes.

5    Q    Okay.  And I'll spell that for the record.  Q-I-A-N-G,

6    last name G-U-O.

7    A    Yes.

8    Q    Thank you.  Now, you also testified on direct that none

9    of your funds were used to set up Golden Spring, right?

10   A    It did not use money that was owned by me.

11   Q    Okay.  It was used by money contained in an account you

12   owned, wasn't it?

13   A    I was authorized to use the account under my name.

14   Q    Do you recall, Mr. Kwok, preparing an affidavit in the

15   case of *Ace Decade Holdings Limited v. UBS AG* in New York

16   State Court in February of 2016?

17   A    I remember.

18        MR. HARBACH:  Madam Clerk, could you please

19   display PAX's Exhibit 18?  Actually, my mistake.  Could we

20   start with PAX's 19, please?  Sorry, Your Honor.

21        THE COURT:  That's okay.

22        THE CLERK:  On the screen is PAX Exhibit 19.

23        MR. HARBACH:  Thank you, ma'am.

24   BY MR. HARBACH:

25   Q    I'd like to go to the next to last page of 19, which is

1      -- looks like it should be 17.  It's the page that -- well,

2      it may be -- it may be a different page number, but it's the

3      page with Mr. Kwok's signature on it.

4            And for the record, Exhibit 19 is the Chinese version

5      of the affidavit I referenced earlier, and so what's on the

6      screen for the witness right now is the signature page for

7      that affidavit, and the question to the witness is whether

8      that is your signature, sir.

9      A    Yes.

10     Q    Okay.

11           MR. HARBACH:  Now, if we could, Madam Clerk,

12     rewind in that document to paragraph 36?

13           And, Your Honor, this is a little cumbersome

14     because of the Chinese, but what PAX intends to offer --

15     well, what PAX intends to do is to question the witness

16     using the version with Chinese characters that he signed,

17     and then we'll offer to the Court, the Chinese version as

18     well as the English translation that is also certified and

19     is a separate exhibit.

20           THE COURT:  Okay.  Thank you.

21     BY MR. HARBACH:

22     Q    So, Mr. Kwok, I'd like you to take a look at paragraph

23     36, please.  And so, could you please read paragraph 36 to

24     yourself and then just let me know when you're finished?

25     A    I'm done.

Kwok - Cross - Harbach                                    172

1    Q    Isn't it true that in this affidavit, in February of

2    2016, you swore that in April 2015, Mr. Wong, W-O-N-G, Ms.

3    Fu, F-U, and Ms. Lam, L-A-M, assisted me with setting up

4    Golden Spring New York by transferring funds from one of my

5    accounts at UBS to Golden Spring New York's JP Morgan Chase

6    Bank account in New York?

7    A    Yes.

8    Q    Okay.  In your affidavit, you didn't say anything about

9    your son setting up Golden Spring New York, did you?

10   A    Yes.

11   Q    Okay.  In fact, isn't it true that you set up Golden

12   Spring with your own money?

13   A    That money was my son's money, but my account was being

14   used to transfer funds to his account.  And that is not my

15   money.

16   Q    How much money was it?

17   A    I cannot remember clearly.  However, after that --

18   well, I cannot remember.

19            MR. HARBACH:  Can I just have one moment, Judge?

20            THE COURT:  Certainly.

21       (Pause)

22            MR. HARBACH:  Thanks for the indulgence, Your

23   Honor.  I hope we've streamlined things a little bit.

24            THE COURT:  That's fine.

25   BY MR. HARBACH:

Kwok - Cross - Harbach                                                173

1    Q    Mr. Kwok, isn't it true that in November or December of

2    2014, you had $1 billion at your disposal?

3    A    Yes.

4    Q    Okay.  That wasn't your son's money, was it?

5    A    That was family's money, including my son's money.

6    Q    Okay.  That was, as you said a moment ago, at your

7    disposal.

8    A    I was authorized to use that money.

9    Q    Did I hear you correctly earlier to say today that you

10   never -- you never worked at Golden Spring New York?

11   A    Yes.

12   Q    Okay.

13   A    As I mentioned earlier, at one point, I did have a

14   title.

15   Q    Okay.  Did you do any work in connection with that

16   title?

17   A    I did get a salary.

18   Q    You got a salary.  How much was the salary?

19   A    $300,000 U.S. dollars.

20   Q    For what time period?

21   A    2015.

22   Q    So for the calendar year 2015, you earned $300,000 from

23   Golden Spring?

24   A    Around that, but I cannot remember clearly.

25   Q    Okay.  For doing what?

1    A    At the time it was to help setting up Golden Spring New

2    York, and also to serve as an advisor to find investment

3    opportunities.

4    Q    Okay.  An advisor to whom?

5    A    Golden Spring.

6    Q    Who at Golden Spring?  Who did you give advice to?

7    A    My son.

8    Q    According to you, the Golden Spring New York has

9    advanced you loans to fund various lawsuits that you're

10   involved in, some $21 million, right?

11   A    Yes.

12   Q    Okay.  Now I'm not -- I'm talking about those loans

13   now, the 21 million.  Okay?  Isn't it true that you

14   requested those loans yourself from your son?

15   A    Yes.

16   Q    Okay.  And what did he say?

17   A    He just loaned it to me.

18   Q    Okay.  Did he say anything about needing to consult

19   with the other directors of Golden Spring?

20   A    That was handled by my son.

21   Q    Did he say anything about needing to convene a vote of

22   the other directors of Golden Spring, a vote of the board,

23   before lending you millions of dollars?

24   A    It was because my son and the family office in Europe,

25   including other family members, would hold meetings to talk

Kwok - Cross - Harbach                               175

1   about that.  So my son would convene meetings to handle that

2   issue, but I don't know the details.

3   Q    My question is what he told you, and I think a moment

4   ago you said he just told you that he would do it.

5   A    That was a long time ago and there are too many

6   details, but he would consult family members and their

7   lawyers, and then they would hold meetings and I don't

8   handle all the nitty gritty details.

9   Q    So is your testimony that when you asked your son for

10  loans to cover your litigation expenses, he told you that he

11  needed to consult with the family first?  Is that your

12  testimony?

13  A    Yes.

14  Q    Okay.  Isn't it true that you don't know how many loans

15  you have had from Golden Spring?

16  A    I know.

17  Q    You know or you don't know?

18  A    I know.

19  Q    Okay.  How many loans have you had from Golden Spring?

20  A    210 million.

21          UNIDENTIFIED SPEAKER:  21 million.

22          THE MAIN INTERPRETER:  I'm sorry.  21 million.

23  BY MR. HARBACH:

24  Q    Yeah.  I'm not asking about the total amount.  I'm

25  asking about the number of loans.

1    A    I cannot remember clearly.

2    Q    Okay.  And you don't know which of the loans were put

3    in writing?

4    A    I remember a few of them.

5    Q    But you don't know which ones or how many?

6    A    I know parts of them related to the litigations, but I

7    cannot remember all of them.  That is impossible.

8    Q    Well, all I'm asking is whether of the -- however many

9    loans there are, do you know how many of them were in

10   writing?

11   A    I believe more than 10 were in writing, but I cannot be

12   sure at all.

13   Q    And isn't it also true that you don't know whether the

14   written agreements were in English or Chinese?

15   A    They must have been all in English.  Some of them have

16   Chinese versions.

17           MR. HARBACH:  Just a -- just a moment, please,

18   Judge.

19           THE COURT:  Certainly.

20       (Pause)

21   BY MR. HARBACH:

22   Q    Do you recall giving testimony at a meeting of

23   creditors on March 21st, 2022, by telephone?

24   A    I remember.

25           MR. HARBACH:  And I'll ask for PAX 17 to be

1   displayed please, Madam Clerk.

2              THE CLERK:  On the screen is Exhibit 17, PAX

3   Exhibit 17.

4              MR. HARBACH:  Thank you, ma'am.

5              I'd like to go to page 73 of the transcript.

6   Maybe I can try and control it myself.

7              THE COURT:  She has to give it to you first.

8              MR. HARBACH:  Oh, okay.

9              THE COURT:  But if you'd rather do that, she's --

10   she can do that for you.

11             THE CLERK:  It's up to you, whatever you -- I just

12   gave you control.

13             MR. HARBACH:  Okay.  I think that will work.

14   Thank you.

15             THE COURT:  Are you having trouble moving it?

16             MR. HARBACH:  I think I've got it.

17             THE COURT:  Okay.  Thank you.

18             MR. HARBACH:  Okay.  So we're in that.  That's

19   behind 30.  Okay.  One off.

20             Okay.  For the record, I'm displaying Page 73 of

21   PAX 17, and I'm going to direct the witness's attention to

22   Lines 4 through 8.

23   BY MR. HARBACH:

24   Q    Mr. Kwok, isn't it true that you were asked this

25   question, were any of the loans that were put in writing in

1    English, and your answer was, I don't remember?  And then

2    you were asked, were any of them in Chinese, and your answer

3    was, I don't remember.  And my question to you is, do you

4    have a different memory of that today?

5    A    I cannot read English so I have to rely on the

6    interpretation.  Of course, my memory today is different

7    from before.

8    Q    Okay.  And if I had you correctly, your memory today is

9    that most of the loans in writing were in English?

10   A    Yes, that's what I remember.

11   Q    Okay.  Now isn't it also true that you did not know the

12   $21 million total amount until lawyers told you that's how

13   much it was?

14   A    What do you mean by that?

15   Q    Well, before lawyers told you that the total was $21

16   million that Lamp -- excuse me, that Golden Spring had

17   loaned you in litigation funding, did you know that that's

18   what the total was?

19   A    I know.

20   Q    Okay.  Let's stick with where we are on the transcript,

21   which is again, PAX's 17 at Page 73.  Directing your

22   attention to Line -- starting at Line 22 of that page.

23        Question: "If you don't know -- " sorry.  Withdrawn.

24        Isn't it true that you were asked this question and you

25   gave this answer?  "If you don't know how many times you

1  took out loans from Golden Spring, not all of which were in

2  writing, how do you know how much you owe them?"

3         MR. HARBACH:  I'll let you interpret the question,

4  then I'll give the answer.

5  BY MR. HARBACH:

6  Q    And your answer was, "My lawyer an the lawyer of Golden

7  Spring, they communicate with each other, tells me the

8  amount they can define is 21 million."

9         Isn't that what you said, sir?

10  A    Well, I cannot read English and through the

11  interpretations earlier, from my recollection, at the time

12  through the counsels I knew that the figure was 21 million.

13  Q    And that's all I'm trying to establish is that your

14  knowledge about the amount, the 21 million, that came from

15  your lawyers, correct?

16  A    I confirmed that with my lawyer.

17  Q    Okay.

18         MR. HARBACH:  Thank you, Your Honor, for your

19  patience.  I have no further questions.

20         THE COURT:  I appreciate that.  Thank you.

21         MR. HARBACH:  Oh, well, I suppose I could do it at

22  the end, but I intended to offer PAX's 17, 18, and 19.

23         THE COURT:  Okay.  Any objection?  Let me look at

24  your list?  PAX's 17, 18, and 19 -- 17 has no objection.

25         MR. HARBACH:  Correct.

1        THE COURT:  It's the transcript of the 341

2    meeting.  So that will be admitted as a full exhibit.

3        With regard -- go ahead.

4        MR. HARBACH:  18 is the ACE Decade affidavit that

5    I used for impeachment purposes.  18 is the English version

6    and 19 is the Chinese version.

7        THE COURT:  Okay.  And does the debtor still have

8    an opposition with regard to the admission of exhibits --

9    PAX Exhibits 18 and 19 in full?

10       MR. JONAS:  Your Honor, we have no objection to

11   obviously the portions that were used, such that Mr. Kwok

12   had an opportunity to respond to them.  We have -- we'll

13   withdraw any objections and have no further objection.

14       THE COURT:  Okay.  So then, Exhibits 17, 18, and

15   19 are admitted as full exhibits.  PAX's Exhibits 17, 18,

16   and 19 are admitted as full exhibits in connection with the

17   evidentiary hearing on the DIP financing motions.

18       MR. HARBACH:  Thank you, Your Honor.

19       THE COURT:  Thank you.

20     (PAX Exhibit Nos. 17 through 19 admitted into

21   evidence.)

22       THE COURT:  Attorney Claiborn?

23       MS. CLAIBORN:  Your Honor, if I could, I have a

24   few questions.

25       THE COURT:  Certainly.  And then, Mr. Jonas, are

1   you going to have some redirect?

2             MR. JONAS:  I doubt it, Your Honor, but --

3             THE COURT:  Okay.

4             MR. JONAS:  -- I'd like to consider that after.

5             THE COURT:  Okay.  That's fine.  Just curious.

6   Thank you.  Go ahead, Attorney Claiborn.

7   BY MS. CLAIBORN:

8   Q     Good afternoon, Mr. Kwok.  Did you negotiate the terms

9   of the debtor in possession loan with your son?

10  A     First of all, I would like to say, good afternoon.  And

11  regarding the exact terms of the loans, it was my lawyer and

12  their lawyers had negotiations.

13  Q     Before you filed your Chapter 11 bankruptcy case, did

14  you ask your son to loan you money to fund your bankruptcy

15  case?

16  A     Yes.

17  Q     And when you asked your son to give you money, did you

18  ask him to loan it to you or to gift it to you?

19  A     It was a loan.

20  Q     And why did you ask for it to be a loan?

21  A     It was because Golden Spring, the company of my son, is

22  also a family company and that money is not just my son's

23  money.

24  Q     Mr. Kwok, do you know the source of the money that

25  Golden Spring is using to loan to the estate if the loan is

Kwok - Cross - Claiborn                              182

1    approved?

2              THE MAIN INTERPRETER:  Okay.  I'm sorry.  Counsel,

3    do you mind repeating the question again?

4    BY MS. CLAIBORN:

5    Q    Do you know what the source is of the money that Golden

6    Spring is going to loan to your bankruptcy estate?

7    A    I don't know.

8    Q    Did you ask?

9    A    Yes, I did.

10   Q    And what was the answer?

11   A    My son asked me not to deal with it.  He would

12   communicate with my lawyer.

13   Q    Do you know whether or not your son told your lawyer

14   what the source of the money would be?

15   A    I don't know.

16   Q    Did you ask your lawyers?

17             MR. JONAS:  Objection, Your Honor.  She's asking

18   for direct communication with counsel.

19             THE COURT:  No, she just asked -- the question

20   was, did he ask his lawyers about the source of the funds.

21   That's -- he can answer that question, just yes or no.

22             MR. JONAS:  Okay.  Thank you, Your Honor.

23             THE WITNESS:  My lawyer did not answer that.

24   BY MS. CLAIBORN:

25   Q    The money that Golden Spring uses to fund your life

Kwok - Cross - Claiborn                          183

1    expenses, your personal living expenses, is that a loan or a

2    gift?

3    A    It's a gift.

4    Q    Why is that a gift and not a loan?

5    A    Because I could not repay it, and regarding supporting

6    my daily living, as his dad, well I had my son when I was

7    18, and from the Eastern culture, that is normal and also

8    the fact that right now I'm being threatened for my life.

9    Q    So why is it that the debtor in possession loan that

10   Golden Spring is not a gift?  Why isn't it just given to you

11   as money as a gift?

12   A    It was because since they loaned me $21 million before,

13   and also including this one, it's a huge sum of money and I

14   wish I could repay that, and that was the result of the

15   communication between his lawyer and my lawyer.

16   Q    If the Court approves the loan from Golden Spring,

17   where will the money be held?

18   A    Where that money would be placed, that would be decided

19   by the judge and my counsel.

20        MS. CLAIBORN:  Thank you.  I don't have any

21   further questions.

22        THE COURT:  Okay.  Thank you.

23        MR. JONAS:  Nothing further, Your Honor.

24        THE COURT:  Okay.  Are you calling any other

25   witness, Mr. Jonas?

184

1          MR. JONAS:  No, we're not, Your Honor.

2          THE COURT:  Okay.  Mr. Kwok, you can step down.

3    Thank you.

4          THE WITNESS:  Certainly, Your Honor.

5          THE COURT:  Thank you.

6          THE WITNESS:  I would like to say that I really

7    appreciate Your Honor to give me the chance to sit here

8    today.

9          THE COURT:  Okay.

10         THE WITNESS:  Because the fact that I cannot speak

11   English, I cause more troubles for you.

12         THE COURT:  Okay.  Thank you.  Thank you.  All

13   right.  Any -- no further witnesses for the debtor, correct?

14         MR. JONAS:  Correct, Your Honor.

15         THE COURT:  Okay.  Witnesses for PAX?  Any further

16   witnesses?

17         MR. HARBACH:  Your Honor, we have no additional

18   witnesses.  We do have one additional exhibit we would offer

19   to the Court, and it's PAX's 15.

20         THE COURT:  Okay.  Take a minute.

21         MR. HARBACH:  It's the deposition transcript of

22   Xiaoping Wang, also know as Yvette Wang.

23         THE COURT:  Okay.

24         MR. HARBACH:  It was the -- sorry.

25         THE COURT:  Go right ahead.

185

1          MR. HARBACH:  I should also say that it was the

2    30(b)(6) deposition of Golden Spring.  She was testifying in

3    that capacity, and I mentioned to counsel during the meet

4    and confer process that I would tender the entire exhibit,

5    and we had marked the entire exhibit, anticipating a

6    possible completeness objection were we to only offer

7    portions.  So that's why we offered the whole thing.

8          But if counsel would prefer that we only offer the

9    precise pieces that we want Your Honor to focus on, I'm

10    prepared to put those in the record, and so, I don't know

11    how the Court wants to proceed.

12          THE COURT:  Okay.  Well, I want to just hear the

13    objection from the debtor first, because apparently the

14    debtor objects to this transcript.

15          MR. JONAS:  Yes, Your Honor.  Jeff Jonas, Brown

16    Rudnick for the Debtor.

17          Your Honor has noted, we have objected.  We

18    continue to object on hearsay grounds.  The witness is, as I

19    understand it, within subpoena power.  They certainly could

20    have brought her here if they intended to have her as a

21    witness at trial.

22          We didn't have any agreement that they would --

23    we'd permit transcripts in place of live testimony.  I think

24    it's inappropriate and it's just not a decision somebody

25    gets to make that we're not going to bring a witness when

186

1    the witness is available and could be brought to trial.  So

2    I'll object.

3         THE COURT:  And where is the witness located?

4         MR. JONAS:  My understanding is the witness is in

5    New York within 100 -- I actually asked the question, Your

6    Honor.  Within -- it might be 60 miles, but I believe it is

7    within 100 miles.  I'm not sure.  I wanted to be prepared in

8    case you asked me, so they certainly could have served a

9    subpoena and she could have been here.

10        We didn't think it's necessary, and having the

11   record come in, I continue to think it's not necessary.  But

12   again, I don't think counsel just gets to make a choice in a

13   case when you're having a trial and a witness is available,

14   to substitute in a transcript.

15        THE COURT:  Okay.  Your -- according to the joint

16   grid, your basis of your exhibit -- excuse me, of the

17   objection was hearsay, but that's not what I'm hearing.  I'm

18   hearing you say they could have brought the witness in and

19   we're not going to allow, under the Federal Civil -- Rules

20   of Civil Procedure, you shouldn't allow the introduction of

21   a transcript when the witness could be here in person.

22        MR. JONAS:  I think that -- may apologies if

23   somehow my vernacular is not correct.  I think that's

24   exactly what hear --

25        THE COURT:  Well, I mean, it could --

1          MR. JONAS:  -- hearsay is, Your Honor.

2          THE COURT:  -- it can and it may and it may not

3     be.  I mean, this is the Rule 30(b)(6) person that you

4     designated to be the 30(6)(b) person, right?  So you could

5     argue it -- we want to be very clear about it.  I mean,

6     hearsay usually is not the testimony of the 30(b)(6)

7     representative.

8          But I understand what you're saying about your

9     issue of why didn't the PAX subpoena and bring this

10    individual to the court.  That's your -- that's your

11    concern, so I'm going to -- I'm going -- not your concern,

12    your objection.  So I am going to ask Mr. Harbach, what is

13    his response to the fact that this witness was not

14    subpoenaed and brought to court today?

15         MR. JONAS:  Your Honor, may I -- I apologize.  I

16    just want to correct the record.

17         THE COURT:  Sure.

18         MR. JONAS:  Not argue.  It's not the --

19    technically, it's not the debtor's 30(b)(6) witness, it's

20    the Golden Spring 30(b)(6) witness.  I just -- just for the

21    record, Your Honor.

22         THE COURT:  Oh, okay.  I misunderstood.  See, I

23    haven't seen anything, so --

24         MR. JONAS:  Understood.

25         THE COURT:  Okay?  So I thought that this was the

1   debtor's 30(b)(6) representative.  So this is --

2          MR. JONAS:  Mr. Kwok is obviously --

3          THE COURT:  -- Golden --

4          MR. JONAS:  -- the debtor and is here.

5          THE COURT:  Well, I understand, but I don't know

6   what happened in your discovery.

7          MR. JONAS:  Understood, Your Honor.

8          THE COURT:  So I -- but I'm glad you corrected the

9   record.  Thank you.  So -- well, wouldn't the appropriate

10  person to be objecting to that be Golden Spring?

11         MR. JONAS:  I don't think so, Your Honor.

12         THE COURT:  Why?

13         MR. JONAS:  It's -- I mean, again, we processed,

14  if you will, the exhibits with counsel.  We raised the

15  objection.  I'm raising the objection here.  It's our trial

16  if you will, on our motion regarding the DIP, and if they

17  want to use a 30(b)(6) witness -- another party, if you

18  will, 30(b)(6) transcript, I think it's inappropriate.

19         THE COURT:  Okay.  Mr. Harbach, what's your

20  response to that, Mr. Harbach?

21         MR. HARBACH:  I'll direct the Court to Rule 32 of

22  the Federal Rules of Civil Procedure.

23         THE COURT:  Because they're not a party?  Is that

24  what you're trying to tell me?

25         MR. HARBACH:  No, to the contrary.  I think they

189

1    are a party.

2              THE COURT:  Okay.  Hold on.  I meant the debtor.

3    See, I didn't know who -- I -- as you all would expect, I

4    would think -- oh yes.  See, I'm sorry.  You can -- I

5    apologize.  Thank you.  I'm sorry.  I don't -- I didn't look

6    at any of your exhibits, you know?  So I don't know what

7    they're about until and unless you introduce them.

8              So, all right.  I'm looking at --

9              MR. HARBACH:  Mr. --

10             THE COURT:  -- 32.

11             MR. HARBACH:  Sure.  And first of all, Mr. Jonas

12   is quite correct, of course.  Ms. Wang was the 30(b)(6)

13   witness designated by Golden Spring.

14             THE COURT:  Okay.

15             MR. HARBACH:  That's correct.

16             THE COURT:  Okay.

17             MR. HARBACH:  So our basis for offering it, as you

18   can see, the 32(a) is captioned using depositions, and so we

19   believe that we satisfy all of A, B, and C, right there in

20   general.  It says that all -- at a hearing or trial, all or

21   part of a deposition may be used against a party on these

22   conditions.

23             A, the party was present or represented at the

24   taking of the deposition, or had reasonable notice of it.

25   Well, the -- I would hope that counsel would be willing to

190

1    accept my proffer that Ms. Wang was represented at the

2    deposition, and indeed, the transcript makes it quite clear

3    that she was, or that Golden Spring was.  So A should be

4    noncontroversial.

5         B, that it is used to the extent it would be

6    admissible under the Federal Rules of Evidence if the

7    deponent were present and testifying.  Well, that's plainly

8    true insofar as it is essentially a sworn out-of-court

9    statement of a live witness.

10        C, you have to satisfy one of these subsections,

11   Rule 32(a)(2) through (8), and where we believe we squarely

12   fall is in 32(a)(3), which is captioned, Deposition of

13   Party, Agent, or Designee.

14        So we think that Golden Spring, by virtue of being

15   a proposed financier for the debtor in possession, and in

16   light of the fact that they are, to quote Section 8B of the

17   agreement, seeking rights, remedies, powers, and privileges,

18   and in addition to that are seeking a good faith finding

19   from the Court, for all of those reasons, we think it's

20   imminently reasonable for the Court to treat Golden Spring

21   as a party, at a minimum for purposes of this rule.

22        I'll just note finally, insofar as the

23   impropriety, leaving aside whether it falls within the

24   rules, is the impropriety of this, of course the debtor had

25   a lawyer present at the deposition of Golden Spring's

191

1    30(b)(6) witness and had an opportunity to cross her; chose

2    not to.  And I'll also note that at one point, Ms. Wang

3    herself was on the debtor's witness list for this very

4    hearing today, and they removed her.

5         So I think that the suggestion that this is

6    improper isn't quite as strong as it otherwise might sound

7    under those circumstances.  But I think candidly, that's all

8    beside the point.  We think that, for the reasons that I

9    said earlier, that the entirety of the transcript is

10   admissible under Rule 32.

11        THE COURT:  Okay.  Thank you.  Any response,

12   Attorney Jonas?

13        MR. JONAS:  Yes, Your Honor.  May I just have one

14   minute?

15        THE COURT:  Yes.

16        MR. JONAS:  Thank you.  Just want to check one

17   thing.

18        (Pause)

19        MR. JONAS:  Your Honor.

20        THE COURT:  Yes.

21        MR. JONAS:  One point I wanted to add on to that

22   is, this is a rule that is incorporated into the contested

23   matter rules under Rules 9014.  So this --

24        THE COURT:  Oh, yes.

25        MR. JONAS:  -- this is also Bankruptcy Rule 7032.

192

1          THE COURT:  Yes.  Yes.  Yep.  Okay.  Thank you.

2          MR. FRIEDMAN:  No objection in that respect, Your

3     Honor.  Just give me one moment, please.

4          MR. JONAS:  Your Honor, Jeff Jonas from Brown

5     Rudnick on behalf of the debtor.

6          Your Honor, I'll renew my objection, just make a

7     couple quick comments.  And let me just say, Your Honor,

8     we're not particularly concerned about the deposition.  That

9     being said, I just, I think we're entitled to have a fair

10    trial, and from our perspective, again, they are not a

11    party.  This was -- this is effectively our motion, the

12    debtor's motion.  We're prosecuting it and we're a party.

13    Certainly, PAX, the objector, is a party, and I think those

14    are the parties for purposes and I think --

15         THE COURT:  Well, Golden Spring is the lender.

16         MR. JONAS:  I understand that, Your Honor.

17         THE COURT:  So how are they not a party to --

18         MR. JONAS:  I don't think they're -- they've put

19    the money up, the money is available, they're the lender.

20         THE COURT:  Right.  But the Court can -- the Court

21    can -- the Court has the obligation to understand what the

22    lender is or is not willing to do, and that may include the

23    testimony of the lender with regard to that issue.  I mean,

24    I've --

25         MR. JONAS:  And let me say, Your Honor --

1    THE COURT:  -- and every other -- and any other

2    contested debtor in possession financing hearing that I've

3    seen, the lender does -- you know, if there's a -- if

4    there's a contested issue, the issue of the lender -- what -

5    - is the lender ready, willing, and able to loan?  Is the --

6    what are the terms and conditions all --

7    MR. JONAS:  Exactly, Your Honor.  The money is

8    here, so --

9    THE COURT:  Well, I don't know that it's here.

10   Where is the proof in the record that's here?

11   MR. JONAS:  Well, you had -- you had testimony

12   from Mr. Kwok.

13   THE COURT:  Well, I had testimony from Mr. Kwok

14   that says he believes it's all here.  He's not sure if it's

15   all here, and -- but he believes it's here.

16   MR. JONAS:  There was no -- it's uncontroverted.

17   THE COURT:  I didn't say it was controverted.  I'm

18   just saying it -- he said he believes it's all here.  I

19   don't --

20   MR. JONAS:  Oh, okay.

21   THE COURT:  -- there's no record in the -- there's

22   no document in the record that says it's here.

23   MR. JONAS:  I don't -- with all due respect, Your

24   Honor, I don't think -- we have put on our case.  We have

25   had a witness.  He has testified.  It was -- he could have

194

1    been crossed.  He wasn't.  It's uncontroverted.  That is a

2    fact.  I don't think -- I appreciate you --

3             THE COURT:  I think it's a fact insofar as what he

4    said.

5             MR. JONAS:  Fair.  Fair enough, Your Honor.

6             THE COURT:  And he said, I believe it's here.  He

7    doesn't know if it's here.

8             MR. JONAS:  I understand, Your Honor.

9             THE COURT:  Okay.

10            MR. JONAS:  And so I -- look, as I said, if the

11   Court feels I need to -- I need to stand on my objection for

12   the record, however, I certainly respect the Court very

13   much.  If the Court feels it's necessary to take in the

14   transcript, my only comment would be, we'd ask the whole

15   transcript come in.

16            We haven't been -- there's nothing been designated

17   to us.  It's a little unfair to designate portions now on

18   the fly.  So if they want to put the transcript in, so be

19   it, Your Honor.  I pre -- I want to -- I don't want to

20   belabor this with the Court, and I want to respect the

21   Court's opinion on that.

22            THE COURT:  I haven't ruled on anything.  I've

23   really just been asking questions at this point.

24            MR. JONAS:  Understood.

25            THE COURT:  Okay?  To understand the parties'

195

1      positions.

2              MR. JONAS:  And our position is, we continue the

3      objection, Your Honor.

4              THE COURT:  Okay.  Thank you.  Mr. Harbach,

5      anything else you want to add?

6              MR. HARBACH:  I don't have anything else to add,

7      Your Honor.  Just let us know how you'd like to proceed.

8              THE COURT:  Okay.  Well, the -- when I'm look --

9      you know, I haven't looked at Rule 32 in the last few weeks

10     so I -- you know, I'm looking at the -- I'm looking at the

11     language of 32.

12             The only part that is a problem for PAX, if it is

13     a problem, is 32(a)(4), because 32(a)(1) -- 32(a)(2) --

14     32(a)(4) could be a problem because it says -- 32(a)(1)(C)

15     says, "And the use is allowed by Rule 32(a)(2) through (8)."

16     So does that mean it's got to be allowed on all eight?  All

17     of those?

18             I mean, I'm looking at this.  I know 7 doesn't

19     apply because there isn't a substitution of a party.

20     Deposition taken in an earlier action doesn't apply because

21     that's not what you're trying to do.  You're not trying to

22     enter a deposition taken in an earlier action.  Using part

23     of the deposition, you may -- that might be fine.

24             Limitations on use, that at this point, no one is

25     arguing that the deposition was taken on short notice or the

1    deponent was unavailable at the time of the deposition.

2    Nobody has a problem with impeachment and other uses, or

3    deposition of a party agent or designee, but the problem is

4    -- I mean, I don't know, I haven't looked in a long time.

5    Does A -- does 32(a)(2) through (8) mean you have to meet

6    all those requirements?  It can't, because all those

7    requirements don't exist all at the same time.

8            MR. HARBACH:  Yeah.  And I think that that is in -

9    - perhaps in starkest relief, Your Honor.  If you look at 2

10   and 4, because 2 says, any party.  Four says -- oh, I'm

11   sorry.  That's a witness whether or not a party.  That's

12   true.

13           Well, in any event, Your Honor, I -- all right.

14   So, Your Honor, PAX concedes that Ms. Wang is not

15   unavailable.

16           THE COURT:  Okay.

17           MR. HARBACH:  So, conceded.

18           THE COURT:  Okay.

19           MR. HARBACH:  Notwithstanding that, if --

20       (Pause)

21           MR. HARBACH:  If you look at -- sorry, I said 2

22   earlier.  If you look at 3, Your Honor, an adverse party may

23   use, for any purpose, the deposition of a party --

24           THE CLERK:  Attorney Harbach, you're a little low.

25           MR. HARBACH:  Oh, sorry.

1          THE CLERK:  We're not picking you up.

2          THE COURT:  Go ahead.

3          MR. HARBACH:  Thank you, Judge.  If you look at

4     32(a)(3), it says, "An adverse party may use, for any

5     purpose, the deposition of a party or anyone who when

6     deposed was the party's 30(b)(6) representative."  And --

7          THE COURT:  It does say that.  I mean, 4 does not

8     say that.

9          MR. HARBACH:  It does.  That's true.

10          THE COURT:  Which is why I asked the question,

11     not knowing that the 30(b)(6) representative wasn't the

12     debtor, but it was the debtor's representative, the Golden

13     Spring, which is when I started the conversation I said, you

14     mean you're opposing a 30(b)(6) representative's deposition,

15     but not knowing that it wasn't the debtor, it was Golden

16     Spring.

17          MR. HARBACH:  Well, I think maybe one observation

18     that helps is that it can't be that Rule 32 is restricted to

19     situations -- to 30(b)(6) depositions.

20          THE COURT:  I agree with you.

21          MR. HARBACH:  And if it --

22          THE COURT:  That's why -- that's why I said, I

23     don't think (a)(1)(C) means that you have to comply -- that

24     the use of it has to comply with every situation in 32(a)(2)

25     through (8).

198

1          MR. HARBACH:  I think -- I agree with you, because

2     otherwise, if 3 were required, then it would effectively

3     restrict the rule to 30(b)(6) situation.

4          Now, I also agree with the Court that, for

5     example, 5, caption limitations on use, I mean, I think that

6     would plainly apply, but --

7          THE COURT:  If that situation was present, but

8     it's not.

9          MR. HARBACH:  If it was -- if it were present,

10    yes.  In other words, you know, 2, 3, and 4, are all

11    permissive.  Those are different means by which a party can

12    do something, and then 5 is limitations, and 6, 7, and 8 are

13    other unique circumstances.

14         THE COURT:  Right.

15         MR. HARBACH:  So I don't think it's necessarily --

16    you have to put blinders on and only look at 2 through 8 and

17    not any of the others, but I do think that 2, 3, and 4

18    cannot all apply at the same time.

19         THE COURT:  Right.  I agree.  They all can't apply

20    at the same time.  It doesn't make sense.  So the debtor's

21    objection to the introduction of PAX Exhibit 15, the

22    30(b)(6) representative of Golden Spring is overruled.

23         MR. JONAS:  Thank you for your consideration, Your

24    Honor.

25         (PAX Exhibit No. 15 admitted into evidence)

199

1          THE COURT:  Thank you.  All right.  So are we now

2    -- what are we -- are we moving to closing arguments based

3    upon the evidence that's submitted?

4          MR. FRIEDMAN:  Yes, Your Honor.  That concludes

5    our evidentiary submission, if I may --

6          THE COURT:  Okay.

7          MR. FRIEDMAN:  -- make some remarks about the DIP?

8          THE COURT:  Yes, please.

9          CLOSING ARGUMENT ON BEHALF OF CREDITOR PAX

10         MR. FRIEDMAN:  Thank you.  So, Your Honor, I have

11   really three areas I want to address.  Sort of, one is big

12   picture, two is some of what you heard today and why you

13   shouldn't believe it, and the third is the order, the

14   proposed order.

15         And to be fair -- I don't know if fair is the

16   right word, but to be clear about the order, I'm going to

17   refer to the current version of the order.  There is an

18   updated version of the order, apparently based on the

19   proposed settlement between the committee and the debtor.

20   I'm going to be --

21         THE COURT:  When you say the current version, do

22   you mean the version attached to the original DIP financing

23   motion?

24         MR. FRIEDMAN:  No, the version that was filed with

25   the Court on -- the redlined version --

1          THE COURT:  Yesterday?

2          MR. FRIEDMAN:  -- that was filed --

3          THE COURT:  Last night?

4          MR. FRIEDMAN:  -- I thought the most recent

5     version of the DIP financing was on the 10th of April.

6          THE COURT:  Oh, okay.  Well, then I would like to

7     get there if you would give me a --

8          MS. CLAIBORN:  I think it's ECF 198.

9          MR. FRIEDMAN:  Yes.

10         THE COURT:  Thank you.

11         MR. FRIEDMAN:  Yes.

12         THE COURT:  And if you would let me get there,

13    then -- give me one moment, then I'll be able to follow you

14    --

15         MR. FRIEDMAN:  Okay.

16         THE COURT:  -- much better than if I'm trying to

17    find it so --

18       (Pause)

19         THE COURT:  So you would like me -- would you like

20    me to be looking at the redlined version of that order?  Is

21    that what you're suggesting, counsel?

22         MR. FRIEDMAN:  Yes, Your Honor, when I get to that

23    point.  That's -- when I get to that portion of my remarks.

24         THE COURT:  Okay.  Let me -- then I think I'm

25    there.

1          MR. FRIEDMAN:  Okay.

2          THE COURT:  I just want to make sure I am there.

3     (Pause)

4          THE COURT:  Okay.  So what I'm looking at, when

5     you get to the point that you were actually asking me to

6     consider the terms and conditions of the order, I'm looking

7     at ECF 198, starting at page 29.  Does that sound right?

8          MR. FRIEDMAN:  Yes, Your Honor.

9          THE COURT:  Okay.  Then go right ahead, please.

10         MR. FRIEDMAN:  Okay.  So, Your Honor, we have here

11    a proposed DIP between Golden Spring and Mr. Kwok.  It was

12    very subtle.  I'm not sure if you heard it.  The record will

13    reflect it.  These are not independent entities.  Mr. Kwok

14    referred today during his testimony, to Golden Spring as

15    "we".  Small word, enormous consequences.

16         Mr. Jalbert also testified that there was a member

17    of Mr. Kwok's legal team, Melissa Francis.  Who is Melissa

18    Francis, he was asked?  Somebody he thinks works for Golden

19    Spring.  There's no separation between these two entities,

20    Your Honor.  This is a sham transaction.

21         And I realize it's appealing.  It looks appealing

22    because in some respects it has some potentially salutary

23    goals, but it doesn't work.  It doesn't make sense.  Who

24    would spend $8 million, maybe $9 to defend $3,850 in assets?

25         Brown Rudnick alone's time today is probably cost

202

1    infinitely more than the $3,850 that Mr. Kwok asserts he has

2    in assets.  So this DIP is designed to do one of two things.

3    Either protect Mr. Kwok's massive assets that he sat there

4    and said he didn't have, or to protect Golden Spring's

5    assets from a variety -- which is a non-debtor, from people

6    coming straight after it, for really being Mr. Kwok's money.

7    Neither one of those is an appropriate use of a debtor in

8    possession financing.

9         This case shouldn't be run for Golden Spring's

10    benefit, and we shouldn't be spending, not just the 9

11    million because it's really not -- 9 million to $3,850

12    vastly understates the amount of assets that have been put

13    into defending Mr. Kwok, because there's also the $21

14    million loan that you heard about, loan, with quotes,  and

15    the million dollars from Lamp.

16         So when you add that up, you have $31 million to

17    protect $3,850.  It doesn't make any sense unless something

18    much more than meets the eye is happening here, and the

19    debtor and Golden Spring are asking this Court to bless a

20    transaction that is furthering that inappropriate scheme.

21         Now, Your Honor, PAX, in its reply brief to our

22    papers, and you heard it sort of from Mr. Kwok today,

23    attempts to blame PAX as -- the debtor attempt to blame PAX

24    as the catalyst of this case, and he needs to, you know,

25    straighten things out because of things PAX did.

1              The debtor's own conduct forced him here today.

2     He, I think effectively conceded that he had never been

3     transparent before.

4              Now, I don't know if what you heard today was

5     transparent, but his testimony today was, I didn't assert

6     the Fifth Amendment today because I wanted to be

7     transparent, which begs the question, because he gave no

8     other answer, why didn't he want to be transparent before?

9     Is that an -- is it appropriate to start borrowing money

10    under a debtor in possession financing because you've been

11    non-transparent in the past and all of a sudden you're going

12    to turn a new leaf over?  I realize some of this has overlap

13    with our dismissal motion, but that's the reason he gave

14    today.  That's not an appropriate use of 364 authority.

15             You heard testimony from Mr. Kwok today, that this

16    needed to be a DIP because he wanted to protect his family

17    resources.

18             Go look at the MORS, they're spending millions of

19    dollars to support Mr. Kwok.  That wasn't a loan, it was a

20    gift.  This is a strategic effort by Golden Spring and Mr.

21    Kwok, to use 364 for nefarious purposes.  This -- as Ms.

22    Claiborn's examatination clearly established, if this is

23    going to be anything, it ought to be a gift just like

24    everything else that's purportedly done for Mr. Kwok is.  We

25    don't believe it, but he should be held, and Golden Spring

204

1    should be held to their pattern of conduct.

2           You heard some, I think what can best be described

3    as far-fetched testimony from Mr. Kwok.  Mr. Kwok said, I

4    never asked my son about where the money from Golden Spring

5    came from.

6           I guess we are meant to believe that Golden Spring

7    is really scared and this Miles son is really scared about

8    telling Mr. Kwok where his money comes from, but not scared

9    about making a very public debtor in possession financing

10   loan for $9 million in a case where the evidence is on the

11   docket.

12          These are public documents where Mr. Kwok filed

13   his declaration that talks about his purported crusade

14   against the CCP.  I mean, this is just not credible

15   testimony that somebody would be afraid.

16          Or Mr. Kwok, as he testified, I won't ask my son

17   for money, Your Honor.  However, I will use my own money and

18   -- or I will be used by my son to manage accounts for his

19   benefit very publically.

20          I put in a declaration in the *Ace Decade* case that

21   said, you know, this is my money, when it's really my son's

22   money, and my son was fine with that.  I just can't ask him

23   where his money comes from.  I don't think you have to

24   believe that, because it's just not credible.  And if that's

25   not credible, I think you begin to unwind the threads of why

1    this entire case isn't credible, but also why this is an

2    inappropriate use of Section 364.

3              Your Honor, I want to turn to the DIP, which is a

4    little bit of a yo-yo from what I understand.  Particularly

5    as it relates -- oh, I should note.  Why did we try to put

6    Ms. Wang's deposition in?  Well, she was a 30(b)(6) witness

7    for Golden Spring, which is asking the Court for a good

8    faith finding.  I'll get to the really confusing part about

9    that in a moment.

10             They're asking the Court for an allowed

11   subordinated claim.  They're asking the Court for things.

12   She was their designated witness.  What did she say?  On

13   page 133, she wasn't involved in the negotiation of a DIP

14   loan, has no knowledge of how the $8 million figure was

15   arrived at.  Unfamiliar with the terms of the DIP loan.

16   Didn't pay attention to the DIP loan agreement until the day

17   before the deposition.

18             The first time she heard where the DIP loan

19   dollars were coming from was the day before the deposition.

20   When I asked her understanding of how the DIP loan was going

21   to be repaid she said, I don't know.  So, Your Honor, this

22   is the designated witness who binds Golden Spring, that

23   knows nothing about this loan.

24             So turning to the order, I don't think there's

25   anything to support the finding in E that there is an

206

1    immediate need for financing.  I certainly don't think that

2    there's anything to support the finding that there's any

3    value to the debtor seeking confirmation of a plan of

4    reorganization under Chapter 11 of the bankruptcy code,

5    given that we've seen, I think the outrageous nature of the

6    plan proposed by the debtor.  There's good cause in Section

7    H on page 4.

8         The entry of this interim order that says, we'll

9    preserve the assets of the debtor's estate for the benefit

10   of creditors.  There's no evidence that that's true.  There

11   are no assets, according to Mr. Kwok, other than $3,850 and

12   certain litigation claims which the DIP loan isn't being

13   used to fund.

14        He says it's in the interest -- it's an exercise

15   of the debtor -- debtor's exercise of the prudent business

16   judgment.  You didn't hear any testimony on that.

17        Your Honor, I think the same issue on the next

18   page, page -- the top 335, good cause, the ability of the

19   debtor to obtain financing is vital to the estate of the

20   debtor and his creditors so that the debtor can maximize the

21   value of his estate and confirm a plan or reorganization.

22        Again, no -- you've, I think, heard what creditors

23   think of this purported plan, and I believe that language

24   should be struck.

25        Then there's stuff I just don't know -- I just

207

1    don't understand, right?  Page 35.  Page 6.  Permitted uses

2    of loan proceeds and cash collateral.  There's no cash

3    collateral under this agreement, unless it's being snuck in

4    somewhere.  I don't know why the loan refers to cash

5    collateral.  There isn't any.  They didn't seek approval of

6    any --

7            THE COURT:  I'm missing where you are at the

8    moment on the cash collateral.  I've followed you all along,

9    but I don't see --

10           MR. FRIEDMAN:  Page 35, it's the -- for the top

11   underlining is Amendments and Modifications.

12           THE COURT:  I see.  Okay.  Yep.

13           MR. FRIEDMAN:  And then permitted uses of loan

14   proceeds and cash collateral.

15           THE COURT:  I see.  I see.

16           MR. FRIEDMAN:  Now maybe it's a typo.  I don't

17   know, but it makes me nervous.  Shouldn't be in there.

18           Sub A, issues with respect to budgets.  I would

19   note that there's never been a budget.

20           Mr. Jalbert basically testified there can't -- he

21   would have no idea how to put together the budget, but if

22   there's going to be a dip, and there's going to be budgets,

23   and there's going to be uses, and accruals, then PAX should

24   get copies of it.

25           Page 36, I think PAX should be added to subsection

208

1    -- what's currently subsection C, that was added after we

2    filed our objection, we should certainly be entitled to

3    receive copies of bank accounts.

4              In E, which was added as well, after we filed an

5    objection, you know, I'm really troubled by the notion in

6    this kind of case that no money can be spent in pursuing

7    money damages or equitable relief from DIP lender.  Not DIP

8    lender in DIP lender's capacity as DIP lender, but DIP

9    lender.  If this case goes forward and Mr. -- you know, and

10   Pullman and Comley as Committee counsel has the right to be

11   pursuing estate actions, then they should be able to use

12   whatever money for whatever purpose they see fit.

13             I have an issue on page 38-C.  This is -- I think

14   is where, in the second sentence, the notwithstanding any

15   language to the contrary contained in this interim DIP

16   order, I think it should be added, or the DIP loan, because

17   the DIP loan can -- should be clear.

18             It says, "The rights of the DIP lender shall be

19   subject and subordinate to the claims of all other creditors

20   of the debtor existing as of the petition date."  Well, what

21   if we seek a substantial contribution motion for our work

22   getting the boat back?  We should be senior to this bogus

23   loan.  It shouldn't be creditors existing as of the petition

24   date.  It should be all creditors, any creditors.

25             And the same -- you know, I think -- so I think

1     there are some other places in paragraph 8, termination of

2     events.  Certainly PAX should get notice of that.

3          At the beck end of that on page 40, in the revised

4     language they said the DIP lender shall provide notice to

5     the U.S. Trustee of its election to charge interest of the

6     default rate.  That's no reason that should just be to the

7     U.S. Trustee, it should be to everyone.

8          And where I really get concerned, Your Honor, is

9     to -- to flip back, and this is where I just have trust

10    issues -- the debtor took out, on page 33, the good faith

11    finding, right?  Now my understanding is, it may be back in.

12    But they took out the good faith finding.

13         So I thought, okay, that's sort of progress.  But

14    then I looked at page 40, and I looked at page -- paragraph

15    10, which has 364(e) baked into it.  It's, by its terms, a

16    good faith provision.

17         So when people ask, you know, why are -- why are

18    you so suspicious, that's one of the reasons we're really

19    suspicious, because you take out a good faith finding but

20    you keep in a 364(e) provision, you're not really taking out

21    the good faith finding.

22         So we -- and then we look at, on page 41, no

23    deemed control.  By consenting to this interim DIP order,

24    the DIP lender shall not be deemed in control of the debtor

25    to be acting as a responsible person, managing agent, or

210

1   owner or operator as such terms are defined in *Circla* (ph)

2   as amended or any similar federal -- similar state or

3   federal statute."

4         How could that be appropriate in a case where the

5   debtor says he doesn't own anything except the suits on his

6   back and a couple of dogs?  It's just overreach and it

7   doesn't make any sense.  And I think it -- it gives us a lot

8   of pause when these things are put into orders.

9         Paragraph 15, no waiver.  Again, I think PAX

10  should be included in the notice parties.  Those are the

11  points that are important to us.  Your Honor, I just want to

12  be clear about something.

13        The fact that I spent so much time on the order, I

14  just don't want the Court to think that we're okay with the

15  order.  I realize the Court will do what it does.  People

16  will put forward arguments as to why maybe this does benefit

17  the estate.  We strongly disagree.  But if the Court's

18  inclined to go in a different direction, we do have very

19  substantial concerns with the order and with the credibility

20  of what you heard today.

21        I have nothing further, Your Honor.

22        THE COURT:  Okay.  Thank you.

23        MR. FRIEDMAN:  Thank you.

24        THE COURT:  Does the debtor wish to respond to the

25  arguments of PAX?

1          MR. JONAS:  I just wondered, Your Honor, whether

2     there were any other parties that wished to be heard.

3          THE COURT:  Oh, that's a good point.  I'm sorry.

4     Attorney Claiborn?

5          CLOSING ARGUMENT ON BEHALF OF THE U.S. TRUSTEE

6          MS. CLAIBORN:  Thank you, Your Honor.  I do have a

7     few comments.

8          I had hoped that after today's testimony I'd have

9     a better understanding of what money is being loaned, where

10    it's coming from, why it's really being loaned, and why

11    can't it be a gift.  Unfortunately, I don't feel any more

12    informed than I did at the beginning of today.

13         There may be a dilution of the events of default

14    that were raised earlier today by Attorney Goldman, and

15    that's progress.  But at the end of the day, I see no reason

16    why this couldn't just be a gift.  The debtor's lifestyle is

17    being funded by Golden Spring.  Why is it different for this

18    loan?  Why couldn't it just be a gift?

19         But there is control mechanism left over that I

20    didn't hear being removed from this suggested order as to

21    how you can use the funds.  To the extent that the funds are

22    being used to help facilitate this Chapter 11, they need to

23    be unrestricted so that anyone who needs to do something

24    with it can do so, and that includes the committee.

25         So hamstringing the committee, as I think the

212

1    order is currently proposed, hamstringing its ability to use

2    it to investigate and/or pursue appropriate actions as a

3    result of investigations, is not something that makes this a

4    loan that's worth giving.

5         The other thing I wanted to say to the Court is

6    that earlier today, Attorney Goldman posited that one of the

7    areas of consensus that prompted the withdrawal of their

8    objection to the loan was that the money -- the first

9    initial traunch of the loan, $2 million, would be held by

10   Pullman and Comley.

11        And I wanted to let the Court know that the U.S.

12   Trustee opposes that, to the extent it's based on a lack of

13   trust of the debtor holding funds, and that in and of itself

14   is demonstratable that this case needs a Chapter 11 trustee.

15        The loan, to the extent the Court approves it,

16   should go to the debtor's funds account, the debtor in

17   possession account, and if that's not comfortable for

18   everybody else in this case, then that speaks volumes.

19        So based on all of what I've heard today, and then

20   the comments I think that Mr. Friedman just eloquently made

21   about concern are well taken, and I think that thus far to

22   date, as of now, the debtor has not met its burden to

23   demonstrate that this is an appropriate loan for the estate

24   to be involved in.

25        THE COURT:  Thank you.  Attorney Goldman.

1   CLOSING ARGUMENT ON BEHALF OF UNSECURED CREDITORS

2         MR. GOLDMAN:  Yes.  Thank you, Your Honor.

3         Just to respond to a few of the points that Mr.

4   Friedman made, and let me just say at the outset that the

5   committee certainly shares the skepticism and, you know,

6   outright disbelief that PAX has as to where these so-called

7   family assets really reside, and who really controls them,

8   which I think cries out for the need for funding for the

9   disinterested committee in this case, and an examiner to do

10  a proper investigation and uncover the rocks that need to be

11  uncovered in this case to get the -- get at the bottom of

12  what these assets are.

13        Now Mr. Friedman referred to the idea that this is

14  designed to protect Golden Spring from parties pursuing it.

15  To the contrary.  There's a specific carve out that we

16  negotiated in the most recent version of the order that

17  provides just the contrary.

18        It states in the new paragraph 16 of the proposed

19  order, that this interim DIP order shall not be construed in

20  any way as a waiver or relinquishment of any rights that the

21  debtor, the DIP lender, the committee, any creditor, or any

22  estate representative may have to bring or be heard on any

23  matter brought before this Court, including without

24  limitation, any claims that may be asserted by the

25  committee, any creditor, or any other estate representative

214

1    against the DIP lender based on any conduct, act, or

2    omission relating to the debtor, other than an extension of

3    the interim DIP loan.

4            And then it goes on to list a litany of examples

5    of what claims could be asserted, notwithstanding the

6    reentry of this order, including veil piercing, substantive

7    consolidation, fraudulent transfer.

8            So there's no protection in this order for Golden

9    Spring against actions that a creditor or an estate -- a

10   representative would bring.

11           I would point out that PAX is the only creditor of

12   this estate that I'm aware of that has a judgment.  And

13   consequently, they have a substantial head start over every

14   other non-insider creditor of this estate, which is why they

15   want this case dismissed, so that they can sail off with the

16   boat and wave in the rearview mirror to the other creditors

17   of this estate.

18           All the other creditors are in the middle of

19   litigation and they aren't certainly close to getting

20   judgments, which is another reason why we need this loan to

21   do a proper investigation for the benefit of all creations,

22   not just the judgment creditors.

23           And PAX, like -- unlike the committee, is funded

24   by a well-healed litigant, whereas the committee obviously

25   has on funding to do anything in this case.

1          So we considered it a win for the estate, this DIP

2     loan, where we are being given the resources to get the

3     tools we need to get to the bottom of where the assets are.

4     And so, the -- so the case isn't -- so the case is used

5     properly.

6          Yes, the debtor only has -- or claims $3,900 in

7     assets and no income, but this bankruptcy case is

8     legitimately used to discover where the assets are and to

9     see if we can negotiation if, once they're encumbered, we

10    can negotiate a plan that's acceptable to the creditor body.

11    So I think that I would urge the Court to grant the DIP loan

12    with the limitations and revisions that we've managed to

13    negotiate with the debtor.

14         As far as holding the funds, I find it anomalous

15    that the U.S. Trustee would rather have the funds held by a

16    debtor who they say should be replaced by a trustee as

17    opposed to Pullman and Comley, which has been a firm that's

18    been around since the early 1900s, and certainly the money

19    is going nowhere.

20         It is the functional equivalent of a retainer and

21    they have no problem with Brown Rudnick holding $1 million

22    in their account.

23         So there -- I would maintain, a complete

24    disconnect between their position about wanting to appoint a

25    trustee for the debtor, yet wanting him to hold the $2

216

1    million.  So I think it's entirely proper for the Court to

2    authorize us to hold money and be subject to all the orders

3    of the Court, the interim compensation procedures, et

4    cetera, and we'll be bound to hold the money in trust until

5    authorized to disburse it by the Court.

6              THE COURT:  Okay.  Thank you.

7              MR. GOLDMAN:  And that's all I have.

8              THE COURT:  Thank you.  Mr. Jonas.

9              MR. JONAS:  Oh, I'm sorry.  Your Honor --

10             THE COURT:  Oh, Mr. Miltenberger.

11             MR. JONAS:  Yeah.  Thank you.

12        CLOSING ARGUMENT ON BEHALF OF GOLDEN SPRING NEW YORK

13             MR. MILTENBERGER:  Thank you, Your Honor.  Timothy

14   Miltenberger for Golden Spring New York.

15             I'd just like to follow up briefly on some of the

16   comments that Attorney Goldman made.  As the Court knows, my

17   client is interested in making a loan for the benefit of the

18   estate.

19             The position of PAX was, as it said earlier,

20   something much more than meets the eye is happening here,

21   and that's not something the Court's going to be able to

22   decide today.

23             And the way it's going to be decided is if there's

24   money available to fund a committee and to fund an examiner

25   so that everybody can understand what has or has not

217

1    happened, and that's what Golden Springs would like to see

2    happen.  That's What the debtor would like to see happen.

3         The big picture, as Attorney Friedman says,

4    clearly points to the fact that a bankruptcy estate with $9

5    million is better than a bankruptcy estate with zero

6    dollars, and that's what this motion is about.  It's not a

7    close call.  Having $9 million is really in the benefit of

8    the estate and all of its creditors.

9         I can report to the Court that as of 3:30

10   yesterday, my client was wiring money to my firm.  It has

11   not yet been received by my firm, but it is in transit.

12   When we have it, we'll make arrangements with the U.S.

13   Trustee and all the parties as to where to warehouse that

14   money after we give $2 million to the committee.

15        THE COURT:  Are you saying that the entire $9

16   million is coming to your firm?

17        MR. MILTENBERGER:  Yes, Your Honor.

18        THE COURT:  Okay.  I just want to be clear,

19   because we've talked to a lot of -- about a lot of different

20   things happening at different points, so -- okay.  Mr.

21   Jonas?

22        CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23        MR. JONAS:  Your Honor, Jeff Jonas from Brown

24   Rudnick on behalf of the debtor.  First let me say, Your

25   Honor, I know it's been a long day, and on behalf of myself

218

1    and the firm and the debtor, I want to thank you.  I think

2    it's been under difficult circumstances.  I actually think

3    it came off pretty well and we thank the Court and the Court

4    staff for accommodating us today.

5           That said, Your Honor, let me make a few remarks.

6    Mr. Kwok filed this case, bankruptcy, to deal with his many

7    alleged creditors, and he wants to do that during the

8    breathing spell that bankruptcy affords.  That's the whole

9    purpose of bankruptcy.

10          Mr. Kwok is here in good faith.  He's not only

11   saying he wants to do that, but let's review the proof of

12   that.  He has arranged an unsecured subordinated $9 million

13   DIP loan to fund this case.  Among other things, that will

14   fund the creditor's committee to do their work.  It will

15   fund U.S. Trustee fees, and it will fund, if appointed,

16   which we support, an independent examiner to investigate the

17   allegations against him.

18          He also has obtained a commitment as set forth in

19   the -- as filed in the proposed plan, to have a boat costing

20   $37 million contributed to creditors as set forth therein.

21   There's been a lot of allegations against Mr. Kwok.  Today,

22   they're just that, allegations.  There will be a time and a

23   place for these allegations to be determined.  In fact, Mr.

24   Kwok, or the DIP lender is paying the cost of determining

25   those allegations, and he welcomes that.

1              There is no basis for the DIP loan, which all

2     creditors as represented by the creditor's committee,

3     support, except for one single creditor, PAX, which has a

4     long history of litigating with Mr. Kwok.  Your Honor, it

5     would truly be a travesty if this debtor, on the basis and

6     the record before this Court, can't go forward with this

7     bankruptcy case, which would be the result if the DIP loan

8     is not approved.

9              Let me respond to a number of the comments that

10    were made.  Mr. Friedman focuses on the alleged $3,000 or so

11    in assets.  Your Honor, there's $400 million, or

12    thereabouts, I think it's 370-something, in claims asserted

13    in this case.  $400 million.  That should be the focus.

14    That's what we're here -- we'll deal with those.  Yes,

15    there's disputes.  That's what bankruptcy is for, to resolve

16    on a financial basis, claims asserted against the debtor.

17             Mr. Kwok referred to -- I want to make one

18    comment, Your Honor, which might be a little unusual, but

19    Mr. Kwok referred to Chinese or Eastern culture, which I've

20    learned during my career is very different than our Western

21    culture.

22             And so, yes, a son may be prepared to lose

23    millions of dollars in order to help and protect his father.

24    And there was also a comment by Mr. Friedman that certain --

25    he said far-fetched testimony about communications between

220

1    Mr. Kwok and his son.  I would suggest, Your Honor, that's

2    easy for Mr. Friedman to say.  His physical safety and his

3    life and the life of his family are not at risk every day.

4         By the way, Your Honor, with respect to the

5    comments Mr. Friedman made on the DIP loan, had he called

6    us, we'd be happy to accommodate many of his changes, which

7    I'm about to do right now, but that didn't happen.  So let

8    me address them.

9         First -- well, first he said there was no

10   immediate need for financing.  I think the evidence is

11   uncontroverted on that by Mr. Kwok.  Without the DIP there

12   will be no creditor's committee to carry out its work, there

13   will be no examiner, or at least funding for an examiner, if

14   and when appointed to carry out its work.

15        The DIP documents, Your Honor, were heavily

16   negotiated with the creditor's committee.  I think -- it's a

17   little bit of a guess, but based on the drafts, and I wasn't

18   in the weeds on it, but I think there were literally

19   hundreds of changes made to accommodate creditor's

20   committee's request.  It was not -- it was in negotiation.

21   It went probably until not that long ago today and into the

22   night or nights, but nevertheless, there were many, many

23   changes, and unfortunately, occasionally there will be a

24   typo when that happens and the cash collateral reference is

25   just that.  It's a typo, it can be removed.

1          In terms of reporting, we're happy to provide PAX

2     with reporting notices, et cetera, that's not a problem.

3     We're happy to, as we've represented, if Mr. Friedman feels

4     there needs to be better language making the loan fully

5     subordinate to all creditors, we're happy to do that.

6          There was a reference to *Circla* not being deemed

7     an owner and having done a few DIPs in my day, I think

8     that's -- I'm guessing that's probably in our form and it

9     just got carried over.  Again, creditor's committee didn't

10    have an objection to it, but we'll remove it.  Not a

11    problem.

12         Let me address the issue the U.S. Trustee made,

13    and others, which is why not a gift.  Your Honor, while the

14    DIP loan may effectively be a gift in that it's unlikely to

15    be repaid, the DIP lender gets to decide on what terms it

16    will advance funds.  Not creditors.  Not the United States

17    Trustee.

18         You know, I have to say it's I think -- I'm not

19    sure anybody has ever seen a DIP where the DIP lender has

20    agreed to be fully subordinate, not be secured.

21    Effectively, doesn't expect to get paid.  Nevertheless, it's

22    their -- they get to determine on what basis.  They

23    determine to do it as a loan.  That's the basis on which

24    we're before the Court.

25         Your Honor, the Committee asked us to -- that it

1    hold the funds, and again, on the basis set forth in the

2    order.  And in an effort -- in the many efforts we took to

3    resolve disputes, which I think is our charge in many

4    bankruptcy cases, an effort to get to an agreement, a

5    consensual resolution, within my opinion, perhaps the most

6    important creditor body in this case, the creditor's

7    committee, we made many concessions.  One of them was, okay,

8    if you want to hold the money, hold the money.  And now

9    we're being criticized for that, and effectively it's being

10   used as a basis for the DIP to not be approved.

11           Again, Your Honor, we are here.  We've agreed to a

12   schedule to move forward on the motion to dismiss.  I think

13   you heard Mr. Kwok.  He intends to be as open as possible.

14           I think sometimes there are translation issues,

15   but nevertheless, I think his testimony was honest today.

16   He intends to continue down that road.  He welcomes the

17   opportunity to have an independent examiner take a look at

18   everything and inform creditors and the Court.  He's going

19   to pay for that, and we welcome that day.  I don't think

20   today, unfounded allegations should be the basis to deny the

21   DIP.

22           And with that, Your Honor, we'd ask that the

23   Court, with the changes which were -- I represented we're

24   happy to make, approve the DIP.  Thank you, Your Honor.

25           THE COURT:  Let me just ask you what version of

223

1    the order you want me to be looking at, because I'm looking

2    at a version of an order that was filed on April 10th.

3                MR. JONAS:  May I just consult, Your Honor?

4                THE COURT:  Yes.

5                MR. ROMNEY:  And again, Your Honor, we would be

6    prepared to make the changes I've mentioned, but let me

7    check.

8                THE COURT:  Just a second, Attorney Friedman,

9    okay?

10               MR. JONAS:  Your Honor, and I think Mr. Goldman

11   can confirm this.  The actual form we would have asked to,

12   even before make -- agreeing to make changes to respond to

13   Mr. Friedman hasn't been filed because we were working on

14   it.

15               THE COURT:  Well, that's what I'm asking.

16               MR. JONAS:  Yeah.

17               THE COURT:  So there's nothing else that I should

18   be looking at right now.

19               MR. JONAS:  No, but we will --

20               THE COURT:  Okay.

21               MR. JONAS:  -- promptly, Your Honor, get that

22   before the Court.

23               THE COURT:  Okay.  Before I let others talk again,

24   I think I may have said this to Attorney Baldiga in the

25   beginning part of this case at a prior hearing.

224

1        You know, there's a lot -- obviously, I understand

2    I think -- not as well as all of you do, but I understand

3    what's happened among the parties, between obviously the

4    debtor and PAX, but with other parties now involved, and one

5    of the things I mentioned early on was when we have interim

6    DIP orders in Connecticut, we often don't make a lot of the

7    findings that you're asking -- at last that's -- that are in

8    the April 10 version of this order, okay, because what we do

9    we enter interim orders is we say, the debtor has

10   demonstrated, or someone has demonstrated, or people agree,

11   or whatever the situation may be, that for a period of time,

12   whatever period of time it is, until we have another hearing

13   and whether that's another interim order or a final order,

14   this is what's going to happen.

15        This much money is going to be loaned, this amount

16   of money could be spent, doesn't necessarily have to be.

17   There's some form of a budget that people all understand

18   what's going to be spent.

19        I understand all the issues about the employment

20   of professionals and this process about getting people paid

21   differently, and I understand what you're saying about

22   funding the committee and paying for an examiner, but I want

23   to be clear, and I tried to be clear at the beginning, so if

24   I wasn't, that's my fault.  I'm not going to enter an order

25   that makes findings that are binding through the end of this

225

1    case when it's an interim order.  That's just not going to

2    happen because it's -- I don't think it's appropriate,

3    right?  I don't think that's appropriate.  That's not what

4    the bankruptcy code says.

5           I understand why people have asked for that on

6    many occasions, have fought for that, and often the Courts

7    have allowed it.  But we're in a unique situation here,

8    right?

9           We have an individual Chapter 11 debtor who has no

10   income, doesn't have a -- well, maybe he does now have a

11   bank account.  I'm sorry.  I'm trying to remember what Mr.

12   Kwok testified about.  And -- but there's going to be $8

13   million that comes in. 9 million, actually.

14          I don't know if that's -- I don't know if that's

15   the way things should proceed at this point, that it may be

16   that the parties should discuss this more incrementally to -

17   - because I am not going to make all these findings.  I

18   don't know why I'd need to make a finding of good cause at

19   this point in time when there -- all we would be doing on an

20   interim basis is -- you know, we're talking about the

21   immediate need for funding.

22          Well, what needs to be funded?  Mr. Kwok's living

23   expenses don't, because that doesn't -- that's not part of

24   this.  So what needs to be funded to keep this estate open?

25   What needs to be funded is the payment of professional fees.

226

1        That's -- I mean, and tell me what else, because I

2   could be missing something and I --

3        MR. JONAS:  That's largely -- that's --

4        MS. CLAIBORN:  Quarterly fees.

5        THE COURT:  I mean  --

6        MR. JONAS:  And U.S. Trustee fees.

7        THE COURT:  Yeah.  But -- okay.  I'd consider that

8   somewhat professional fees, Attorney Claiborn, even though I

9   know they're not, but they're a fee of the estate.  They're

10  an expense of the estate, right?

11        So we have -- we have a lot of issues here.  We

12  have a lot of findings that I'm being made to -- you know, I

13  have to say -- I'd have to say, you met your burden of proof

14  on all that.  I don't know if you want me to do that at this

15  point, number one.

16        Number 2, there's a hearing coming up on a motion

17  to dismiss, which is only -- it's less than a month away,

18  we're going to start that hearing.  Okay?  There's also this

19  issue of the -- in the alternative, the appointment of a

20  trustee, in the alternative, the U.S. Trustee's motion for

21  an appointment of an examiner.

22        I understand, and you've said it and everyone's

23  said it on the debtor's side, that the debtor will pay for

24  the examiner.  But I want to know what is examiner going to

25  -- what power does the examiner have?  It doesn't have any

1   power.  It just has the ability, if there is an examiner, to

2   collect information and prepare a report, right?

3        Not that that's not -- not that that can't be

4   helpful in a case, but I'm not sure that's helpful in this

5   case.  We already know what the examiner is going to find, I

6   think, based upon the testimony of Mr. Kwok and apparently -

7   - and I haven't looked -- as I said, I haven't looked at any

8   of the exhibits which is why I didn't know who the 30(b)(6)

9   representative was.

10       MR. JONAS:  Uh-huh.

11       THE COURT:  But there isn't anything here in this

12  estate, other than the loans that could be made, and the

13  fact that Mr. Kwok can continue to live, so that's a good

14  thing.  We're not worried about the debtor not being able to

15  live, which often is a situation in this cases.  We don't

16  have that issue.

17       But what we do have is we have -- whether or not

18  it's only one creditor, we have a creditor who has asserted

19  certain issues in this case that have to be addressed one

20  way or another, and the long story short is, if we start --

21  when you say there's $400 million in claims  --

22       MR. JONAS:  Yes, Your Honor.

23       THE COURT:  -- I think you said, but isn't half of

24  that PAX's with the judgment and the contempt judgment?  I

25  mean, so that's half -- half of the claims here are --

228

1    belong to one creditor.  And it's an individual Chapter 11

2    case, so that one creditor has a lot of power, which is

3    different than it would be if we were in a corporate Chapter

4    11 case.

5            So what -- all I'm suggesting to you, all of you

6    today, is I don't even know what -- I mean, I do.  I looked

7    at the order Mr. Friedman asked me to look at, and he wants

8    to say something else, and Attorney Claiborn wants to say

9    something else, and of course I'm going to allow that to

10   happen.

11           But if there isn't an agreement on to some kind of

12   form and order, then I'm going to make rulings that may not

13   be what the debtor is looking for, and I don't -- and maybe

14   not be what PAX or the creditor committee is looking for

15   either.

16           But as Mr. -- one thing Mr. Goldman said that is

17   correct is, they're all intertwined, right?  Everything that

18   happened today is intertwined, and to enter orders other

19   than the -- I would say the Brown Rudnick order, which I

20   would say is more what I would say, routine, versus some of

21   the other orders that I'm being asked to enter, including

22   the payment of professionals on an ongoing basis that is

23   allowed to happen in less time than the bankruptcy code

24   provides, then I think there has to be some understanding

25   that there should be some incremental review and analysis of

229

1   what you're asking the Court to do.

2          Now, that may be no problem because you're working

3   on this order, and you may be able to say all those things.

4          But there's a lot of findings I'm being made to

5   find in this order that I'm not sure I'm prepared to make at

6   an interim basis, with everything else that's going on in

7   this case.  I have to look at it that way.  Whether or not

8   you agree with that, and I don't mean you personally, I

9   don't mean the debtor or -- whether or not anybody agrees

10  with it, I mean, I -- you -- absolutely, we can agree to

11  disagree.  But that's what I have to do, right?  I have to

12  think about the case as a whole.

13         I think you parties have made very good progress,

14  and I don't think that every single case has to be

15  consensual.  That's not what I'm saying.  But I'm not sure

16  that I'm going to enter the order that I've looked at that

17  Mr. -- that Friedman has pointed out to me with any kind of

18  binding findings in it, in this case.

19         So while I understand everything everyone has

20  said, or at least I've tried to.  I'm not saying I couldn't

21  have made a mistake, but I've tried to, I'm going to still

22  have to look at whatever you all negotiate.

23         MR. JONAS:  Absolutely.

24         THE COURT:  And I may disagree.  And so, if I

25  disagree, we'll have to have -- you know, we'll have some

230

1    kind of conference and we'll talk about it, but I think that

2    you need to think about that.

3            I did hear -- and, Mr. Friedman, I did hear Mr.

4    Jonas say that a lot of -- not all, but a lot of the issues

5    that you raised, they'll accommodate, which I think is

6    again, progress.  Whether you are all going to come to an

7    agreement completely, I don't know.

8            MR. JONAS:  Your Honor, may I just make two

9    points?

10           THE COURT:  Sure.

11           MR. JONAS:  First, I'll just say this.  As he said

12   about me, Your Honor, I respect Mr. Friedman a great deal,

13   but unfortunately I -- my impression, maybe he'll tell me

14   I'm wrong -- we will never -- there's no way to reach a

15   consensual resolution because there --

16           THE COURT:  On this order, right?

17           MR. JONAS:  On this order, because --

18           THE COURT:  I think that's right.

19           MR. JONAS:  -- they're -- you know, we could give

20   them everything -- all of it specific points, and then he

21   said, well, but I don't want you to lose track, Your Honor,

22   that we're still opposing this.  So that's just number one.

23   We can try, and we'll continue to try.

24           Point number 2, Your Honor, is let me apologize

25   because I do remember you early on talking about findings of

231

1    fact, and we didn't -- maybe we didn't hear you well enough.

2    I certainly hear you now, and we would -- I welcome the

3    opportunity to take up many of the findings.  I have to --

4    obviously, we have to talk to our DIP lender, but let us

5    take those up.

6              I'm guessing we will be able to streamline and

7    eliminate many of them now having heard the Court better,

8    and I hope when we submit -- and obviously, we'll  provide

9    it to all other parties, I hope when we next submit a

10   revised draft, it will be much more something you'd be

11   prepared to sign.  Again, we may need another conference.

12   We're happy to do that, but those are my comments, Your

13   Honor.

14             THE COURT:  Okay.  And that's more than fair, and

15   I -- all I'm suggesting to you is that as, I said a few

16   weeks ago when we were talking about the relief from stay

17   timing and the motion to dismiss timing, that I can't look

18   at this DIP motion as the only motion in the case.  I can't.

19             MR. JONAS:  Uh-huh.

20             THE COURT:  It affects other things.  Mr. Goldman,

21   as I said, I keep pointing to Mr. Goldman, but he was right.

22   They're all intertwined.  And so, I'm happy to hear what you

23   all -- look at what you all come up with.

24             MR. JONAS:  Very good, Your Honor.

25             THE COURT:  Okay?

232

1          MR. JONAS:  Thank you.

2          THE COURT:  All right.  Thank you.  Mr. Friedman?

3          MR. FRIEDMAN:  Thanks, Mr. Jonas.  I appreciate

4     it.

5          MR. JONAS:  Okay.

6          MR. FRIEDMAN:  I always do.  I have three quick

7     things to say.  First, Your Honor, it's true, we can't tell

8     Golden Spring it has to make a loan, but you can.  You can

9     tell them that this proposed -- I'm sorry, that they can't -

10    - it doesn't have to be a gift.  You can.  You don't have to

11    approve this as a loan.

12         The second thing, Your Honor, is yes, PAX has a

13    long history of litigating against Mr. Kwok.  Has a long

14    history of winning its litigation.  It has $268 million in

15    claims.

16         It is the only creditor with a liquidated claim

17    that is non-insider as far as I'm aware.  And the third

18    point is, just like I said, listen to the small word, we.  I

19    would say, at the end of Mr. Jonas's remakes he said, he

20    wants to pay for it.  Right.  He.  Mr. Kwok, which is again,

21    I just think a tell about ultimately where the money is

22    coming from.  Thank you, Your Honor.

23         THE COURT:  Thank you.  Attorney Claiborn?

24         MS. CLAIBORN:  Your Honor, I just wanted to let

25    the Court know that I haven't seen a revised draft of the

233

1   order, so therefore, I don't know whether or not there are

2   other concerns that I would like to bring to the Court's

3   attention.

4            THE COURT:  Yeah, I mean, I think --

5            MS. CLAIBORN:  I might --

6            THE COURT:  -- that Mr. Jonas has made that clear,

7   and that's why I think we're going to have to have another

8   conference most likely, if there isn't an agreement, and I'm

9   not -- I don't believe there will be an agreement, so I

10  think there has to be another conference.

11           MS. CLAIBORN:  Thank you for that opportunity.  I

12  just wanted to let the Court know that I might have some

13  thoughts.

14           THE COURT:  I thank you.  And see, what I normally

15  do, is when we have an interim order, we have a date.  The

16  order goes into effect one day, and it expires on a date in

17  the future, and there's a budget that is connected to that.

18  You know, and it may not be a budget in the sense of a cash

19  collateral budget, you know, but how much money is coming in

20  and what could -- what is authorized to be spent during that

21  period of time, and for what.

22           And then that -- then if you want to talk about

23  transparency, that's transparency.  Everybody knows that X

24  amount was approved.  X amount came in, and then the line

25  items on the -- whatever the -- you don't have to call it a

234

1    budget.  You can call it whatever you want to call it.

2    Authorization for payments during interim DIP loan period,

3    then we know what's going on.  Then no one is questioning

4    what's happening.

5              And then you get approval, Mr. Jonas, for certain

6    things that apply to that interim period, which is better

7    than not getting approval to anything at all.

8              And that, I could do, but I'm not in a position --

9    and I -- when I say I, I mean the bank -- the person who

10   happens to be sitting here as the judge in this case, feels

11   it's inappropriate at this point in time, at this point in

12   time, to make findings that will be binding throughout the

13   case.  So I think I've made that clear.

14             So the issue is, how much time do we need -- are

15   we continuing -- we're not -- the evidence is done with

16   regard to the DIP financing motion.  Are we continuing the

17   hearing solely to work out what essentially is -- are the

18   terms and conditions of an interim DIP financing order which

19   should have, as part of it, a period of time that this

20   financing would be applicable to, and what amounts would

21   come in through the funding, and I want to say to the

22   estate, but we have an issue here of where the funds are

23   going still, and so I won't quite say that, and what amounts

24   are authorized to be paid or accrued against that loan

25   during that period of time.  That's what I think is

1    appropriate under those -- under these circumstances.

2         So what are the parties thoughts.  Are we talking

3    about -- today's what?  Wednesday?  Are we talking about

4    coming back, you know, Friday?  Are we talking about coming

5    back Monday, Tuesday, Wednesday of next week?  What are we

6    talking about?

7         MR. GOLDMAN:  Your Honor, I know for the

8    committee, I was planning to be at the ABS Spring meeting

9    Thursday and Friday, so I would say --

10        THE COURT:  Meaning tomorrow and the next day?

11        MR. GOLDMAN:  Yes.  Yes.  Yes.

12        THE COURT:  Okay.

13        MR. GOLDMAN:  And so, any time next week.  You

14   know, on this budget concept, so I can give some clarity --

15        THE COURT:  Well, it may not -- I said budget

16   isn't exactly the right word, but it's authorized accruals

17   or payments or whatever you want to call it against what's

18   funded, right?  $400,000 comes in.  I'm just pulling a name,

19   it doesn't mean anything.  And during -- for the next four

20   weeks, these amount of monies can be accrued against those

21   dollars for these reasons.

22        MR. GOLDMAN:  So --

23        THE COURT:  I mean, we don't have to worry about

24   funding Mr. Kwok's life.  That's a good thing.  But if

25   everything else is going to be about every -- the parties

236

1    getting paid, then I want to know what it is everybody

2    thinks they're going to get paid for the next four weeks,

3    even if you're not authorized to draw it out yet.

4            MR. GOLDMAN:  Yeah.  And, Your Honor, I think the

5    most we could expect to have is an estimate, really.

6            THE COURT:  I understand that.  I'm not -- oh, I'm

7    not -- a budget is a budget.  It doesn't always meet -- you

8    don't always meet it.  I'm not asking for an accounting

9    that's audited.  I'm asking for -- I want to know.  You

10   know, the order says there's an immediate need for funding.

11   What's the immediate need?  Show me what it is and how much,

12   and what it is for.

13           I mean, this is not -- this is not a case where

14   you have a company that is producing some form of a product

15   that is generating revenue that continues -- that's not what

16   we have.  We all know that.  So there has to be some

17   control, or at least oversight by the Court with regard to

18   these issues, right?  Otherwise, why am I here?  You can all

19   go do this out in the hallway --

20           MR. GOLDMAN:  Yeah.

21           THE COURT:  -- and see how that works out.

22           MR. GOLDMAN:  Well, I'm just --

23           THE COURT:  But that's why I'm here, right?  To

24   make sure that we -- this doesn't go awry, and we also have

25   other motions pending that may -- may completely -- you

237

1   know, who knows, have the case be dismissed in five weeks.

2   I don't know.  That could happen.  I haven't heard any

3   arguments on that yet.  I haven't seen your papers.

4   Nobody's -- nor should you.  You just all agreed today when

5   you're going to file your papers.

6          So I don't know what they're going to say, but I

7   have to -- I have to be -- I think you have to treat it

8   practically and not theoretically.

9          And the practical reality of this case is, from

10  the moment it started, there is opposition and there's

11  strong opposition, and I'm not passing on whether that's

12  warranted or not.  It's a reality.  It's a reality that

13  there is -- there are all kinds of things that happened

14  before this case came here, which is often the case, but I

15  can't ignore that either.  Okay.  I can't ignore that.

16         So all I'm suggesting is, you come up with a

17  period of time that there's this first wave of monies come

18  in, whatever it may be.  And maybe there isn't going to be

19  agreement, and then I'll finally have to decide what it's

20  going to be.  But then -- and you tell me, and the world,

21  because it's going to be public, what the monies are going

22  to be spent on, even if they're not drawn down during that

23  period of time, right?

24         So anyway, I think that's pretty clear.  Maybe

25  it's not.

238

1              MR. GOLDMAN:  So -- no, understood, Your Honor.

2              THE COURT:  Okay.

3              MR. FRIEDMAN:  Your Honor, so we have a

4      theological objection.  It's -- we have practical

5      objections.  I'm going to express, actually, a pretty high

6      degree of confidence that we can work out our practical

7      issues, right?  The DIP issue is theological to us.  We

8      don't believe it should be entered.

9              I also realize bankruptcy exists on your deep

10     rooted beliefs on the one hand, and the nitty-gritty

11     practical on the other.  I will work with Mr. Jonas, Mr.

12     Goldman, Ms. Claiborn, to deal with our practical issues

13     where we can compromise and where we can't, but --

14             THE COURT:  Right.  I have to rule.  I understand.

15             MR. FRIEDMAN:  So --

16             THE COURT:  And I'm happy to do that.

17             MR. FRIEDMAN:  -- so I guess the question I have

18     is, if we need a further hearing, or really it sounds like a

19     conference, I'm in California next week.  Is it doable by

20     Zoom?  I'm going to --

21             THE COURT:  Yes.

22             MR. FRIEDMAN:  Okay.

23             THE COURT:  Yes.

24             MR. FRIEDMAN:  Thank you.

25             THE COURT:  See, and the problem is, I'm looking

239

1    at an order that is now two weeks old, so it's stale.  So

2    I'm not going to just enter an order that somebody presents

3    when there's nobody here to talk to me about it, right?

4              I'm not going to do that.  I -- you know,

5    unfortunately, someone's name has to be on that order and

6    I'm going to read the order before I enter it, and I have to

7    make sure that it complies with the bankruptcy code and

8    rules and all those things.

9              So -- but yes, we can absolutely do it.  I'm not

10   going to drag you all back in here.  We've had the

11   evidentiary hearing, but I do want to see the order before

12   we have a conference, otherwise, I don't think it's a

13   meaningful conference.  Okay.

14             MR. FRIEDMAN:  Yep.  Yep.

15             THE COURT:  So you can even all tell me tomorrow.

16   I mean, you know, I don't -- whatever works for you.  I'm

17   not trying to stand here and say, you need to tell me right

18   now and we have to make a date on all those things.  And I

19   say that, but I should look and see what's on next week,

20   although I don't think it's bad.  I don't -- I could be

21   wrong, though, so let me just -- let me just take a five-

22   second look, okay?

23             Tuesday is not good.  Wednesday is definitely a

24   possibility without question, except for the middle of the

25   day.  Thursday, we have Chapter 13 hearings.  We could do it

1    in the afternoon on Thursday.

2              MR. JONAS:  Your Honor.

3              THE COURT:  Yes.

4              MR. JONAS:  Could I suggest that we just put a

5    placeholder on it?  I think you said Wednesday sounded like

6    the best day.

7              THE COURT:  Other than between --

8              MR. JONAS:  By Zoom, to --

9              THE COURT:  Yeah.

10             MR. JONAS:  -- certainly to accommodate everyone.

11   I think that might make -- and then we'll all work towards

12   that.

13             THE COURT:  Yes.

14             MR. JONAS:  Obviously try and, you know, report to

15   the Court.  Hopefully submit as early in advance, as much in

16   advance of that as possible, submit a form of order, maybe

17   even agreed, who knows, but I think that would be very

18   helpful, Your Honor.

19             THE COURT:  All right.  Well, on -- that's fine,

20   but I'm going to want the order --

21             MR. JONAS:  Yes.

22             THE COURT:  -- if we're going to have a conference

23   on Wednesday, I can do it in the morning or the afternoon,

24   but I can't do it between 12:30 and 2:00 p.m.

25             MR. JONAS:  Your Honor, I think to accommodate Mr.

241

1 Friedman, who's going to --

2          THE COURT:  Oh, you're going to be in California.

3          MR. JONAS:  -- in California --

4          THE COURT:  So --

5          MR. JONAS:  -- the afternoon will be fine.

6          THE COURT:  -- 2:00 p.m.  You want -- you want

7 later than 2:00 p.m.?

8          MR. FRIEDMAN:  2:00 p.m. is perfect.  Thank you,

9 Your Honor.

10          THE COURT:  All right.  So -- and if I'm five or

11 ten minutes late, don't worry about it, I'm -- just have to

12 do something with a school, so I could be five or ten

13 minutes late, and if we are -- if you have to hold on the

14 Zoom call, you'll have to hold on the Zoom call, okay?

15          But I would like -- I would like the order by 2:00

16 p.m. the day before.  I mean, I've got to be able to read

17 it, right?

18          MR. JONAS:  Understood, Your Honor, and thank you

19 for that.

20          THE COURT:  All right.  So then I'll just block

21 off the rest of that afternoon for now, and hopefully we

22 won't take the all -- but if we do, we do.

23          I mean, so the only thing left on the calendar

24 today that wasn't resolved was -- subject to the submission

25 of revised proposed orders or a scheduling order on the

242

1    motion to dismiss was this DIP financing motion, which is

2    117, I believe.

3            Yes, so then, 117 is continued.  The hearing is

4    continued to Wednesday -- to May 4th at 2:00 p.m. remotely,

5    via Zoom, okay?  You'll have to reach out to the courtroom -

6    - there's a courtroom -- what is the address?  I forget.

7    There's an email address that you would have to reach out to

8    to get the Zoom information.  Is that Court Connect?

9    Calendar Connect?

10           THE CLERK:  Calendar.

11           THE COURT:  Calendar Connect.  Did you have a

12   question, Attorney Claiborn?

13           MS. CLAIBORN:  Your Honor, I did promise to report

14   back to the Court on the monthly compensation order --

15           THE COURT:  Yes.

16           MS. CLAIBORN:  -- before we ended today, and I can

17   do that now, which is that I have looked at that and the

18   U.S. Trustee is okay with that order that was uploaded.

19           THE COURT:  And is that on the docket?

20           MS. CLAIBORN:  Yes.

21           THE COURT:  What's the -- what number is that?  Or

22   do you know?  If you don't know, we can look.  I'm just

23   saying, I thought maybe you had it at your disposal.

24           MS. CLAIBORN:  I didn't write it down, but it was

25   docketed earlier today.

243

1          THE COURT:  Okay.

2          UNIDENTIFIED SPEAKER:  Your Honor, it's Docket

3    Number 263.

4          THE COURT:  263.  Okay.  Thank you.  All right.

5    So I'll take a look.  I've got a few of your orders to take

6    a look at.  And, you know, I'm sure they're fine, so we'll -

7    - and if there aren't -- if they aren't for some reason,

8    we'll let you know.

9          But in the meantime, is there anything else that

10   we should be doing today, because I think we've addressed

11   everything, unless I'm forgetting something.

12         MR. JONAS:  Nothing further here, Your Honor.

13         THE COURT:  Okay.  All right.  Well, I do

14   appreciate the cooperation of the parties and the progress

15   that has been made.  I again want to be clear, I'm not

16   suggesting that everything has to be consented to.  That's

17   not how it works.  I understand that.

18         But I still appreciate when things -- some issues,

19   and many issues today were resolved upon agreement, which is

20   helpful, very helpful.  And I appreciate the parties efforts

21   in trying to resolve these matters.

22         I will take a look at all the orders that we

23   discussed on the record today that were submitted either

24   yesterday or today and try to get those entered tomorrow,

25   and then with regard to the DIP financing motion, that's

244

1    continued to next week at 2:00 p.m. remotely.  Okay?

2                 MR. JONAS:  Your Honor, I just, I guess --

3                 THE COURT:  Who am I missing?  Okay.

4                 MR. JONAS:  -- the Verdolino and Lowey submission

5    is like -- I guess you said you were just going to consider

6    the evidence before --

7                 THE COURT:  I took it under advisement.

8                 MR. JONAS:  Thank you, Your Honor.

9                 THE COURT:  So I have to review -- I want to

10   review the evidence that was submitted today, and I will --

11   and it will note on the -- it will note on the docket --

12   should note on the docket that it was taken under

13   advisement.  Okay?

14                MR. JONAS:  Better -- I'm sorry.  Just one quick

15   comment.

16                THE COURT:  Sure.

17                MR. JONAS:  I just looked at my calendar.  I may

18   need to do next -- because I'm before Judge Kaplan in the

19   Johnson and Johnson case in Trenton in the morning, I may

20   have to do it remotely, but since it's Zoom it shouldn't

21   matter, but I --

22                THE COURT:  Shouldn't matter.  That's right.

23                MR. JONAS:  -- just wanted to let you know.  Thank

24   you.

25                THE COURT:  I'm sure Judge Kaplan can find a room

245

1    for you.

2           MR. JONAS:  Yes, I'm sure.  Thank you.

3           THE COURT:  Okay.  Okay.  All right.  Anything

4    further from anyone?

5           All right.  So since we've addressed all the

6    matters in the Kwok case today, court is adjourned.

7       (Proceedings adjourned at 5:34 p.m.)

8           I, CHRISTINE FIORE, court-approved transcriber and

9    certified electronic reporter and transcriber, certify that

10   the foregoing is a correct transcript from the official

11   electronic sound recording of the proceedings in the above-

12   entitled matter.

13

14

15   _____   May 3, 2022

16    Christine Fiore, CERT-410

17      Transcriber

18

19

20

21

22

23

24

25

246

1

2                               INDEX

3

4      WITNESSES              DIRECT   CROSS    REDIRECT   RECROSS

5      FOR THE DEBTOR:

6      Craig R. Jalbert          26     39        71        75

7

8      Ho Wan Kwok              138    155,181

9

10

11     COURT EXHIBITS:                                      ID   Rec'd

12     1   Craig answer to Aronsson question under seal    62

13

14     PAX EXHIBITS:

15     17   Transcript of 341 Meeting                            180

16     18   Ace Decade Affidavit in English                      180

17     19   Ace Decade Affidavit in Chinese                      180

18     15   Wang Deposition Transcript                           198

19

20     CLOSING ARGUMENT:

21     On Behalf of PAX                                          199

22     On Behalf of the United States Trustee                    211

23     On Behalf of the Unsecured Creditors                      213

24     On Behalf of Golden Springs New York                      216

25     On Behalf of the Debtor                                   217

# EXHIBIT 2

1

2   UNITED STATES BANKRUPTCY COURT

    DISTRICT OF CONNECTICUT

3    BRIDGEPORT DIVISION

------------------------------------------X

4 IN RE:

5          Chapter 11

HO WAN KWOK,

6      Case No. 22-50073(JAM)

7

   Debtor.

8

------------------------------------------X

9

10    DATE: April 8, 2022

11    TIME: 10:17 A.M.

12

13

14  VIDEO-RECORDED DEPOSITION OF CRAIG

15 JALBERT of VERDOLINO & LOWEY, P.C., in the

16 above entitled matter, at the above date

17 and time, held at the offices of O'Melveny

18 & Myers LLP, 7 Times Square, New York, New

19 York 10036, by Lenaya Lynch, a Notary

20 Public and Shorthand Reporter of the State

21 of New York.

22

23

24

25

             Page 1

1
2 A P P E A R A N C E S:
3 O'MELVENY & MYERS LLP
   Attorneys for PACIFIC ALLIANCE ASIA
4 OPPORTUNITY FUND LLP
   7 Times Square, 30th Floor
5 New York, New York 10036
   BY: LAURA ARONSSON, ESQ.
6    DAVID HARBACH, ESQ.
     MaKENZIE B. RUSSO, ESQ.
7
8
   BROWN RUDNICK LLP
9  Attorneys for HO WAN KWOK
   7 Times Square
10 New York, New York 10036
   BY: KENNETH J. AULET, ESQ.
11
12
   PULLMAN & COMLEY LLC
13 Attorneys for CREDITOR'S COMMITTEE
   850 Main Street
14 PO Box 7006
   Bridgeport, Connecticut 06601
15 BY: IRVE J. GOLDMAN, ESQ.
16
17 COHN, BIRNBAUM, SHEA P.C.
   Attorney for GOLDEN SPRING
18 100 Pearl Street, Suite 12
   New Haven, Connecticut 06103
19 BY: TIMOTHY MILTENBERGER, ESQ. via
   Teleconference
20
21
   ALSO PRESENT:
22
   JON DIFILIPPO, Legal Videographer
23
24        *     *     *
25

Page 2

---

1           C. JALBERT
2           THE VIDEOGRAPHER:  Good
3    morning.  We are going on the record
4    at 10:17 a.m. on April 22nd -- I'm
5    sorry, April 8th, 2022.  Please note
6    that the microphones are sensitive
7    and may pick up whispering, private
8    conversations and cellular
9    interference.  Please turn off all
10   cell phones or place them away from
11   the microphone as they can interfere
12   with the deposition audio.  Audio and
13   video recording will continue to take
14   place unless all parties agree to go
15   off the record.
16          This is Media Unit 1 of the
17   video-recorded deposition of Craig
18   Jalbert in the matter of re:  Ho Wan
19   Kwok filed in the United States
20   Bankruptcy Court, District of
21   Connecticut, Bridgeport Division,
22   Case Number 22-50073.
23          This deposition is being held
24   at O'Melveny and Myers LLP, located
25   at Times Square Tower, New York, New

Page 3

---

1           C. JALBERT
2    York.  My name is Jonathan DiFilippo
3    from the firm Veritext and I am the
4    videographer.  The Court Reporter is
5    Lenaya Lynch from the firm, Veritext.
6    I'm not authorized to administer an
7    oath.  I'm not related to any party
8    in this action nor am I financially
9    interested in the outcome.
10          Counsel and all present in the
11   room and everyone attending remotely
12   will now state their appearances and
13   affiliations for the record.  If
14   there are any objections to the
15   proceeding, please state them at the
16   time of your appearance beginning
17   with the noticing attorney.
18          MS. ARONSSON:  Laura Aronsson,
19   O'Melveny and Myers for Pacific
20   Alliance Asia Opportunity Fund LP.
21          MR. HARBACH:  David Harbach
22   with O'Melveny and Myers for the same
23   client.
24          MS. RUSSO:  Makenzie Russo with
25   O'Melveny and Myers for the same

Page 4

---

1           C. JALBERT
2    client.
3          MR. AULET:  Kenneth Aulet of
4    Brown Rudnick, proposed counsel for
5    the debtor, Ho Wan Kwok.
6          MR. GOLDMAN:  Irve Goldman,
7    Pullman and Comley, proposed counsel
8    for the Creditor's Committee.
9          THE VIDEOGRAPHER:  Will the
10   Court Reporter please swear in the
11   Witness?
12          MR. AULET:  There's one person
13   on the line.
14          MR. MILTENBERGER:  Are we done
15   with the people in person?  Timothy
16   Miltenberger for Golden Spring, NY
17   Limited.
18          THE VIDEOGRAPHER:  Will the
19   Court Reporter please swear in the
20   Witness?
21 C R A I G   J A L B E R T, called as a
22 witness, having been first duly sworn by a
23 Notary Public of the State of New York, was
24 examined and testified as follows:
25 EXAMINATION BY

Page 5

2 (Pages 2 - 5)

C. JALBERT

1    MS. ARONSSON:
2
3    Q.    Please state your name for the
4    record.
5    A.    Craig Jalbert, J-A-L-B-E-R-T.
6    Q.    What is your address?
7    A.    Home address?  The business
8    address is 124 Washington Street, Suite
9    101, Foxboro, Massachusetts 02035.
10    Q.    Good morning.  We previously
11    met off the record.  On the record, my name
12    is Laura Aronsson and I'm an attorney at
13    O'Melveny and Myers for Pacific Alliance
14    Asia Opportunity Fund.  Mr. Jalbert, have
15    you ever testified in court before?
16    A.    Yes.
17    Q.    In what case -- or I'll start
18    how many times?
19    A.    50, 60, 70 something.
20    MR. GOLDMAN:  Before we get too
21    far into things, can I just ask --
22    this is a notice of deposition
23    relating to what contested matter?
24    There are a number of motions before
25    the Court.  The notice of deposition

Page 6

C. JALBERT

1    doesn't indicate which of the matters
2    it relates to.
3    MS. ARONSSON:  Sure.  So we
4    have -- we served a 30(b)6 notice of
5    deposition which I'll mark as an
6    exhibit so that we're all on the same
7    page but it relates to the retention
8    of Verdolino and Lowey.
9    MR. GOLDMAN:  All right.  I
10    just wasn't sure because it's not
11    identified on the notice.
12    MS. ARONSSON:  Thank you.
13    Q.    Sorry.  You said 50 or 60
14    times?
15    A.    70, 80, I don't know.  I have
16    not kept -- I've got a list of ten years
17    that goes back 40 or 50 and I've been doing
18    it for 30.  So no idea.
19    Q.    Well, we can talk about some of
20    the broad categories of experience you have
21    later but let's start just to go over a few
22    procedures that I'm sure you're familiar
23    with.  Do you understand that you're
24    testifying under oath today?

Page 7

C. JALBERT

1    A.    Yes.
2    Q.    Do you understand that means
3    that you're swearing that all of your
4    answers are truthful?
5    A.    Yes.
6    Q.    And that you are subject to the
7    penalty of perjury?
8    A.    Yes.
9    Q.    The Videographer is recording
10    everything on camera and the Court Reporter
11    is preparing a written record of what we
12    discuss here today and will later produce a
13    copy of that transcript.  Do you
14    understand?
15    A.    Yes.
16    Q.    Unlike normal conversation, it
17    is important that we not talk over one
18    another.  Please wait for me to finish my
19    question before you answer.  I'll try to do
20    the same for you.  Do you understand?
21    A.    Yes.
22    Q.    Your answers need to be
23    audible.  A shake of the head is
24    insufficient as are statements like uh-huh.

Page 8

C. JALBERT

1    Do you understand?
2    A.    Understood.
3    Q.    If you do not understand my
4    question, please ask me to repeat.
5    Otherwise, I'll assume that you do
6    understand the question.  Is that okay?
7    A.    Yes.
8    Q.    If you need a break, just let
9    me know and we can take one but if there's
10    a question pending, please answer it before
11    we break.  Are you represented by Counsel
12    today?
13    A.    I think so.
14    Q.    Who do you understand to be
15    representing you?
16    A.    Ken Aulet.
17    Q.    If your attorney objects to a
18    question, you should still answer it unless
19    you don't understand the question or
20    Counsel instructs you not to answer.  Do
21    you understand?
22    A.    Yes.
23    Q.    Are you suffering from any
24    condition that would impair your ability to

Page 9

3 (Pages 6 - 9)

C. JALBERT

1 testify accurately or truthfully?
2
3    A.   No.
4    Q.   Are you taking any medications
5 that might interfere with your ability to
6 give accurate or truthful testimony?
7    A.   No.
8    Q.   Is there any reason why you
9 cannot testify truthfully and accurately
10 today?
11    A.   No.
12        MS. ARONSSON:  Tab one.  The
13    Court Reporter is going to be marking
14    what will be Jalbert Exhibit 1.
15        (Whereupon, Notice of
16    Deposition was marked as Jalbert
17    Exhibit 1 for identification as of
18    this date by the Reporter.)
19    Q.   All right, Mr. Jalbert.  Do you
20 recognize this document?
21    A.   I do.
22    Q.   What is it?
23    A.   Pacific Alliance Asia
24 Opportunity Fund LLP's Notice of Deposition
25 of Verdolino and Lowey PC pursuant to Rule

Page 10

C. JALBERT

1 been designated to testify about each topic
2 listed here?
3
4        MR. AULET:  Objection.
5    A.   Yes.
6        MR. AULET:  He's been
7    designated as per our responses and
8    objections.
9        MS. ARONSSON:  Thank you.
10    Q.   Are you familiar with these
11 subject areas?
12    A.   Yes.
13    Q.   Do you understand that you are
14 required to testify as to Verdolino and
15 Lowey's knowledge about these topics, not
16 just your own?
17    A.   Yes.
18    Q.   Do you understand that you were
19 required to obtain all of the knowledge and
20 information necessary to allow you to fully
21 and honestly testify concerning each of
22 these topics upon Verdolino and Lowey's
23 behalf?
24        MR. AULET:  Same objection as
25    before.

Page 12

C. JALBERT

1 30(b)(6) of the Federal Rules of Civil
2 Procedure.
3
4    Q.   Is it your understanding that
5 you are testifying today in connection with
6 in re: Ho Wan Kwok?
7    A.   Yes.
8    Q.   Can you please turn to Page 6
9 --
10    A.   Excuse me, I just forgot to get
11 my glasses.
12        MS. ARONSSON:  Can we go off
13    the record for one minute?
14        THE VIDEOGRAPHER:  The time is
15    10:24 a.m. and we are off the record.
16        (Whereupon, an off-the-record
17    discussion was held.)
18        THE VIDEOGRAPHER:  The time is
19    10:24 a.m. and we're back on the
20    record.  You may proceed.
21    Q.   Can you turn to Page 6 to the
22 heading Rule 30(b)(6) deposition topics?
23 You see that?
24    A.   Yes.
25    Q.   Do you understand that you have

Page 11

C. JALBERT

1    A.   I did the best I could.
2
3    Q.   What, if anything, did you do
4 to prepare for this deposition?
5    A.   I spoke with attorney Ben
6 Silverberg, with Counsel, Ken Aulet, I
7 spoke with my colleagues, Matthew Flynn and
8 Mary Jo Schindler.  I reviewed a
9 significant amount of documents, some filed
10 with the Court, some prepared internally.
11 Reviewed e-mails.  Covered as much as I
12 could.
13    Q.   Did you collect the documents
14 that you prepared or were they provided to
15 you by Counsel?
16    A.   The documents that -- are you
17 asking for the documents that we sent to
18 O'Melveny?
19    Q.   I'm asking -- taking a step
20 back, just asking about your preparation
21 for today's deposition.
22    A.   I just looked at my own
23 documents and my own e-mails on the
24 Verdolino and Lowey server.
25    Q.   Generally, what were the

Page 13

C. JALBERT

1    subject matters of those e-mails?
2      A.    It was looking at the -- all of
3    -- not all of them.  Many of my e-mails,
4    the SOFA's -- the statement of financial
5    affairs -- the schedules, the global notes,
6    the global notes and specific notes, most
7    of the pleadings to employ professionals,
8    particularly ours, the motion for the DIP
9    financing, many of the objections, not all
10   of them.  I'm trying to think if there's
11   anything else.  I can't think of anything
12   off the top beyond that --
13     Q.    Thank you.  That's helpful.  So
14   you mentioned that you spoke to your
15   attorneys, Ben and Ken?
16     A.    Yes.
17     Q.    When did you speak to them?
18     A.    Well, we were delayed a little
19   bit so I had a few minutes this morning
20   with Ken.  I spoke with Ben briefly last
21   night.  Again, this morning on -- unrelated
22   to the deposition and I had previously
23   spoken to Ken probably one or two times
24   over the last few days, give or take.

Page 14

C. JALBERT

1      Q.    Were each of these interactions
2    over the phone?
3      A.    Until today, yes.
4      Q.    About how long did you spend
5    preparing with your attorneys in connection
6    with your preparation for this deposition?
7      A.    I would have to hazard a guess.
8    I don't have my time records in front of
9    me.
10     Q.    Like two hours, ten hours?
11     A.    My guess is in the two to four
12   hour range.  No more than that.
13     Q.    Did you speak to anyone else
14   other than the folks that you mentioned at
15   Verdolino and Lowey and your attorneys
16   regarding this deposition?
17     A.    Our IT person, Tim McDonald who
18   assisted in the search -- the electronic
19   search of e-mails and records and worked
20   with the Brown Rudnick IT person to send
21   everything over.  Aside from having him try
22   and get the records, we didn't have any
23   discussion of the case facts and
24   circumstances or anything.

Page 15

C. JALBERT

1      Q.    Anyone else besides the people
2    that we've talked about?
3      A.    Regarding the -- just regarding
4    the deposition?
5      Q.    Yes.
6      A.    No.
7      Q.    You haven't spoke to the
8    debtor?
9      A.    About the deposition?
10     Q.    About the deposition.
11     A.    No.
12     Q.    Have you ever met the debtor?
13     A.    Yes.
14     Q.    When did you meet the debtor?
15     A.    The continued meeting of 342 --
16   or 341 meeting which was I think Wednesday,
17   the first time I met him.
18     Q.    Is that the only time you met
19   the debtor?
20     A.    Yes.
21     Q.    Outside of the 341 proceeding,
22   did you interact with the debtor?
23     A.    No.
24     Q.    I just want to cover a little

Page 16

C. JALBERT

1    bit of your background.  Can you talk about
2    your educational history since high school?
3      A.    I graduated from Western
4    Connecticut High School in 1979.  I went to
5    Boston College.  Graduated Boston College
6    with a bachelor of science and degree in
7    accountancy in 1983.  I went to work for
8    Arthur Andersen from June of '83 till
9    August 31 of '87.  On September 1 of 1987,
10   I started at the precursor of what is now
11   Verdolino and Lowey and I've been there in
12   the 35 years since and during that time, I
13   I've gone to many, many, many professional
14   CPE type courses of all sorts of flavors.
15     Q.    What do you mean by CPE?
16     A.    A continuing professional
17   education.
18     Q.    Is that a required procedure
19   for any type of certification that you
20   have?
21     A.    It's -- some of it is required
22   for my certification as a certified
23   insolvency restructuring advisor.  The rest
24   are just to maintain my professional

Page 17

5 (Pages 14 - 17)

C. JALBERT

1 capabilities and stay on top of various
2 issues as the years have gone on.
3    Q.   So you mentioned certified
4 insolvency instructor?
5    A.   Certified insolvency
6 restructuring advisor. CIRA.
7    Q.   So this is a professional
8 certification?
9    A.   Yes.
10    Q.   Do you hold any other
11 professional certifications besides the
12 CIA?
13    A.   CIRA, no.
14    Q.   CIRA. I think you said you had
15 a accountant degree from Boston College?
16    A.   Yes.
17    Q.   Do you hold any other graduate
18 or any graduate degrees?
19    A.   No.
20    Q.   Are you currently employed at
21 Verdolino and Lowey?
22    A.   Yes.
23    Q.   Generally, what services does
24 Verdolino and Lowey offer its clients?

Page 18

C. JALBERT

1 responsible for this?
2    A.   Well, my partner and various
3 staff.
4    Q.   What's his name?
5    A.   Keith Lowey.
6    Q.   Is that department involved in
7 this matter before us?
8    A.   No.
9    Q.   Is Verdolino and Lowey always
10 engaged by the debtor in the bankruptcy
11 context?
12    A.   No.
13    Q.   What other scenarios is
14 Verdolino and Lowey engaged under?
15    A.   We've been engaged by trustees,
16 post confirmation fiduciaries, whatever
17 they may be called; you said debtors,
18 creditors' committee, creditors, secured
19 lenders. I think we've probably
20 represented, over the years, most every
21 kind of party and interest to a bankruptcy
22 that there is.
23    Q.   Turning to your experience
24 specifically, what experience do you have

Page 20

C. JALBERT

1    A.   There were three or four -- I
2 guess four major buckets. The first and
3 biggest is the insolvency arena,
4 underperforming businesses and individuals.
5 That includes litigation support and
6 everything related to it. We have a
7 full-time 13 or 14 people I think it is
8 that work in taxation and we also do what
9 I'll call high net worth babysitting. We
10 have -- and I don't do any of this work.
11 My partner and others do it but we have
12 very wealthy clients that don't pay their
13 own bills, that have multiple residences.
14 Everything comes to us. We act as a family
15 office for a whole -- for a number of
16 people and the last thing we do is federal
17 election reporting for federal congress
18 people and senators and presidential.
19    Q.   Thank you.
20    A.   Did I say we have tax
21 department -- yes, tax department. That's
22 the four.
23    Q.   You mentioned the high net
24 worth baby sitting. Who, at Verdolino, is

Page 19

C. JALBERT

1 in Chapter 11 cases?
2    A.   I've been in over 500 Chapter
3 11 cases. We've been committee financial
4 advisor, committee accountants, debtor
5 financial advisor, debtor accountants,
6 accountants on behalf of secured lenders,
7 accountants on behalf of individual
8 creditors. Trying to think -- I mean
9 again, we've done -- we've represented
10 pretty much every constituency so over
11 time, I've done -- I've represented every
12 reasonable constituency in a bankruptcy I
13 can remember.
14    Q.   What is your title at Verdolino
15 and Lowey?
16    A.   Principal.
17    Q.   We talked about the four
18 buckets. Generally, what are your
19 responsibilities with respect to Verdolino
20 and Lowey services?
21    A.   Just for the most part, the
22 first -- all of my time not spent running
23 my own firm is in the bankruptcy insolvency
24 and the like that spreads over a little bit

Page 21

6 (Pages 18 - 21)

C. JALBERT

1  to taxation. I don't run the department or
2  anything but I certainly interact and then
3  litigation support and the like, you know,
4  the types of things you would do in the
5  context of a bankruptcy.
6      Q.   What is meant by litigation
7  support, generally?
8      A.   Well, it can be pretty broad
9  but for us, it's -- whether it be business
10  litigation or bankruptcy litigation, to the
11  extent that there are areas that whoever
12  the law firm -- we've also been appointed
13  by judges, anyone that's looking or
14  interested in obtaining financial
15  information in a form that they're looking
16  for, which could be anything, we would
17  provide it. That would include doing
18  expert reports, expert testimony and work
19  at just advising lawyers as they approach
20  areas in accounting and auditing and the
21  like.
22      Q.   You mentioned here that you're
23  a principal at Verdolino and Lowey?
24      A.   Yes.

Page 22

C. JALBERT

1      Q.   What other roles have you held?
2      A.   I've been a principal since I
3  started.
4      Q.   Turning to the engagement here,
5  who contacted Verdolino and Lowey about
6  this engagement?
7      A.   Well, it was contacted me
8  personally and it was an attorney, Steven
9  Pohl at Brown Rudnick.
10      Q.   Sorry, I missed what you said.
11      MR. HARBACH: Spell that name.
12      Q.   Can you spell that name,
13  please?
14      A.   The name was Steven Pohl. Last
15  name P-O-H-L at Brown Rudnick.
16      Q.   Mr. Pohl reached out to who at
17  Verdolino and Lowey?
18      A.   Me.
19      Q.   You. Do you recall when that
20  was?
21      A.   Somewhere around March 1, 2 or
22  3.
23      Q.   After Steven Pohl reached out,
24  who did Verdolino and Lowey speak to

Page 23

C. JALBERT

1  generally regarding the engagement?
2      A.   There was a little bit with
3  Steven Pohl and with -- I believe it was
4  Ben Silverberg.
5      Q.   Anyone else at Brown Rudnick?
6      A.   I don't remember.
7      Q.   Besides Brown Rudnick, did you
8  speak to anyone else regarding the
9  potential engagement?
10      A.   I probably mentioned something
11  to my -- my own staff to clear conflicts
12  and I think I had someone help me prepare
13  some -- I shouldn't say prepare, they're
14  already prepared. Send some individual
15  information about myself and the firm.
16      Q.   Did Verdolino and Lowey speak
17  to anyone else besides Brown Rudnick in
18  connection with the engagement?
19      MR. AULET: Objection. You can
20  answer.
21      A.   At the time we're being
22  engaged?
23      Q.   Yes.
24      A.   No.

Page 24

C. JALBERT

1      Q.   Who are the main points of
2  contact between -- who are the main
3  contacts for -- strike that. Who do you
4  generally speak to regarding this
5  engagement besides internal folks at
6  Verdolino and Lowey?
7      A.   Mostly the attorneys at Brown
8  Rudnick.
9      Q.   Do you speak to anyone else?
10      A.   I've been on phone calls with
11  other lawyers but I've not initiated
12  anything.
13      Q.   Which other lawyers have you
14  been on phone calls with?
15      A.   The other debtor lawyers that
16  I'm aware of are an Aaron Mitchell and a
17  Melissa Francis.
18      Q.   Who do you understand Aaron
19  Mitchell to be?
20      A.   Counsel to Mr. Kwok, the
21  debtor.
22      Q.   You mentioned Melissa Francis?
23      A.   Also counsel to Mr. Kwok.
24      Q.   Besides Aaron Mitchell and

Page 25

7 (Pages 22 - 25)

C. JALBERT

1    Melissa Francis, do you speak to anyone
2    else outside of Verdolino and Lowey
3    regarding this engagement?
4        A.    And outside of Brown Rudnick?
5        Q.    Outside of Brown Rudnick, yes.
6        A.    No one.
7        Q.    What about -- what about do you
8    communicate via e-mail with anyone besides
9    Aaron Mitchell, Melissa Francis and Brown
10   Rudnick regarding this engagement?
11       A.    I've been on -- I've been CC'd
12   on an e-mail and authored one e-mail to
13   someone outside that group.
14       Q.    Who is that person?
15          MR. AULET:  Objection.  This is
16   the person that we have stated their
17   identity won't be revealed per Golden
18   Springs request.
19          MS. ARONSSON:  Are you
20   instructing the Witness not to
21   answer?
22          MR. AULET:  I am instructing
23   him not to answer.
24          MS. ARONSSON:  Can you just

Page 26

C. JALBERT

1    state --
2        MR. GOLDMAN:  Can you repeat
3    the question?
4        (Whereupon, the referred-to
5    question was read back by the
6    Reporter.)
7        THE WITNESS:  That should have
8    been e-mails.  I authored one but I
9    was CC'd on e-mails.
10       Q.    I understand Mr. Aulet is
11   instructing you not to answer.
12       MS. ARONSSON:  Mr. Aulet, do
13   you mind just providing a more
14   detailed objection?
15       MR. AULET:  Sure.  Based on my
16   conversations with Golden Spring, my
17   understanding is that Golden Spring
18   believes that revealing that
19   individual's name would potentially
20   expose them to harassment and based
21   on my review of the documents at
22   issue, the person's identity is not
23   relevant to the issues at hand in
24   this deposition.

Page 27

C. JALBERT

1        Q.    So I'll just go on record to
2    say that we dispute that contention.
3        MR. GOLDMAN:  As do we.  Who
4    are you -- who do you fear harassment
5    from?  Do you fear harassment from?
6        MR. AULET:  So Mr. -- Golden
7    Spring's attorney is on the phone and
8    that question is probably best
9    directed to Golden Springs but my
10   understanding is that -- please, he
11   would like to answer.
12       MR. MILTENBERGER:  Tim
13   Miltenberger from Golden Springs.
14   I'm assuming what the Witness is
15   testifying to is the identity of a
16   Golden Spring employee which isn't
17   clear to me from the record but
18   apparently the people at the
19   deposition reached that conclusion.
20   We don't see any relevance in
21   revealing the name of the employees
22   of Golden Spring based on the
23   objection that's filed to the DIP
24   financing motion and we think that

Page 28

C. JALBERT

1    the privacy rights of our employees
2    are paramount to any information that
3    might be gathered from knowing the
4    name of -- rank and file employees of
5    Golden Spring and we oppose
6    disclosing that information.
7        MR. GOLDMAN:  That's up to the
8    Judge.  It's a totally inappropriate
9    instruction to direct the Witness not
10   to answer.  The Witness can answer
11   and you can get a ruling from the
12   Judge as to whether the answer should
13   be stricken or protected or subject
14   to a protective order.  It's totally
15   inappropriate to direct the Witness
16   not to answer.
17       MS. ARONSSON:  I noted our
18   dispute with Mr. Aulet and I'll just
19   note our dispute with Mr.
20   Miltenberger's reasoning behind the
21   objection here.
22       MR. MILTENBERGER:  Thank you.
23       Q.    Turning back to the folks we
24   were just talking about, you mentioned

Page 29

8 (Pages 26 - 29)

C. JALBERT

1    Melissa Francis. Did she represent to you
2    that she was Mr. Kwok's counsel?
3        A. No.
4        Q. How did you learn about what
5    Ms. Melissa Francis -- who Mr. -- strike
6    that. How did you learn who Ms. Francis'
7    client was?
8        A. From Brown Rudnick.
9        Q. We've talked about the folks at
10   Verdolino that you communicate with this
11   engagement. Do you know of anyone else
12   that Verdolino and Lowey communicates with
13   regarding this engagement besides the folks
14   that we've talked about?
15       A. I don't think there were others
16   but it is possible that one of my
17   colleagues met Flynn. Might have had
18   e-mail contact. You're aware -- because I
19   think you objected to -- there's a large
20   number of ordinary course professionals.
21   We needed to get information about
22   liabilities to them for the schedules.
23   There might have been some information and
24   stuff because we needed -- it's possible

Page 30

C. JALBERT

1    that he spoke with them but I think really
2    what he did is he got all the information
3    from Aaron Mitchell and Melissa Francis. I
4    don't think he went outside of that but
5    it's possible.
6        Q. Do you know where Aaron
7    Mitchell and Melissa Francis retrieved
8    their information from?
9        A. No.
10       Q. Did you ask them where they
11   retrieved their information from?
12       A. No.
13       Q. Who negotiated -- who, from
14   Verdolino and Lowey, negotiated the
15   engagement letter?
16       A. It would be me. I don't know
17   that I would call it a negotiation but it
18   was me that drafted it and prepared it and
19   sent it to Brown Rudnick.
20       Q. Anyone else involved in
21   drafting that engagement letter?
22       A. Well, from a QPC perspective,
23   I'm sure I had one of my colleagues, Mary
24   Jo Schindler take a look at it just to make

Page 31

C. JALBERT

1    sure I wasn't missing anything.
2        Q. Besides the attorneys at Brown
3    Rudnick, did you circulate drafts of that
4    engagement letter to anyone else?
5        A. I don't recall anyone else
6    being on it but I'm pretty sure they then
7    did circulate it with -- at a minimum, Ms.
8    Melissa Francis and probably Aaron Mitchell
9    as well.
10       MS. ARONSSON: Tab 11. The
11       Court Reporter is going to hand you
12       what is being marked as Jalbert
13       Exhibit 2. This document -- for the
14       record, this document bears the Bates
15       Number Kwok 00001646.
16       (Whereupon, E-mail Chain was
17       marked as Jalbert Exhibit 2 for
18       identification as of this date by the
19       Reporter.)
20       Q. Before we get to the exhibit,
21   what is a post-petition retainer?
22       A. My understanding would be a
23   retainer paid to whoever, after the filing
24   of a bankruptcy, intended to be a retainer.

Page 32

C. JALBERT

1        Q. Can you please turn to Page 2
2    of this document? Take a minute. At the
3    top of Page 2, Mr. Silverberg says that
4    there's no post-petition retainer expected.
5    Do you see that?
6        A. Yes.
7        Q. Do you recall whether you had a
8    preference about receiving a post-petition
9    retainer?
10       A. Well, every professional would
11   rather have a retainer but frankly, under
12   the circumstances, it wasn't expected.
13       Q. Starting with your preference,
14   why would you prefer to have a
15   post-petition retainer?
16       A. Security against the payment of
17   the fees.
18       Q. Do you know whether you
19   received a post-petition retainer in
20   connection with this case?
21       A. I do.
22       Q. Did you?
23       A. No.
24       Q. And why not?

Page 33

9 (Pages 30 - 33)

C. JALBERT

1    A.    I didn't ask for one.
2    Q.    Turning back to the e-mail, Mr.
3 Silverberg writes, "big Q is whether it's
4 us retaining you or the client.  I would
5 think you're retained by the client as his
6 financial advisor".  Do you recall that
7 being a question in connection with this
8 engagement?
9        MR. AULET: Objection to form.
10   A.    I don't think I understand your
11 question.  I can read the statement and
12 understand but I don't know what you're
13 asking.
14   Q.    He says, "big Q", do you
15 understand that to be a big question?
16   A.    I understand it might be a
17 question in his mind.  I don't know that he
18 intended it to be a question for me or for
19 himself and then he answered it.
20       MS. ARONSSON: Makenzie, can
21   you hand me Tab 12?
22       THE VIDEOGRAPHER:  Mr. Jalbert,
23   would you mind moving the water
24   bottle?  It's coming up in the frame.

Page 34

C. JALBERT

1    A.    Yep.
2    Q.    Did you ask for a post-petition
3 retainer in connection with this
4 engagement?
5    A.    No.
6    Q.    Do you know if Verdolino and
7 Lowey asked for a post-petition retainer in
8 connection with this engagement?
9    A.    I do.
10   Q.    What's the answer?
11   A.    No.
12   Q.    You also write, "but I think if
13 we are going to hold the cash, we will need
14 to be employed by the debtor".  So does
15 that refresh your recollection about
16 whether it was a question about who was
17 retaining Verdolino and Lowey?
18   A.    I don't think I had a question
19 in my mind.  I just responded with a
20 comment that supported his previous comment
21 where he said I would think you're retained
22 by the client as his financial advisor.
23   Q.    Generally, can you explain your
24 view in connection with the question

Page 36

C. JALBERT

1 I apologize.  Thank you.
2        THE WITNESS:  Sorry about that.
3        THE VIDEOGRAPHER:  I appreciate
4   that.
5        MS. ARONSSON:  The Court
6   Reporter is going to mark what is
7   going to be Jalbert Exhibit 3.  This
8   document is Bates stamped Kwok
9   00001649.
10       (Whereupon, E-mail Chain was
11   marked as Jalbert Exhibit 3 for
12   identification as of this date by the
13   Reporter.)
14   Q.    Please take a look at this
15 document.
16   A.    Okay.
17   Q.    You're responding to Mr.
18 Silverberg's e-mail that we were just
19 speaking about with the big Q is whether
20 it's us retaining you or the client.
21   A.    Okay.
22   Q.    Turning to your response, you
23 note, "I'd like a post-petition retainer if
24 possible".  Do you see that?

Page 35

C. JALBERT

1 Mr. Silverberg poses about who was
2 retaining Verdolino and Lowey?
3    A.    Well, I was pretty sure when he
4 wrote I would think you're going to be
5 retained by the client as his financial
6 advisor, that's -- I made a gratuitous
7 comment or not a gratuitous comment.  I
8 made an assenting comment basically saying
9 I think if we're going to hold the cash, we
10 need to be employed by the debtor.  So
11 concurring with the decision or the thought
12 that he had.
13   Q.    What is the basis for the
14 understanding that you just explained?
15       MR. AULET: Objection to form.
16   A.    Of what part?
17   Q.    Where, turning to your e-mail,
18 "if we are going to hold the cash, we'll
19 need to be employed by the debtor".  What's
20 the basis of that statement?
21   A.    Well, my professional judgment.
22 If me, as a principal of Verdolino and
23 Lowey, was going to be the signer on a
24 debtor in possession bank account, it would

Page 37

10 (Pages 34 - 37)

C. JALBERT

1   make all the sense in the world that that
2   debtor in possession was my client. So I'm
3   concurring effectively with the
4   determination that Mr. Silverberg made in
5   the previous e-mail to this chain.
6       Q.   Thank you. Just for my own
7   understanding, what is the difference
8   between being employed by the debtor versus
9   Brown Rudnick?
10      A.   Well, if I was employed by
11  Brown Rudnick, I'm not sure I'd go
12  through -- I'm not sure I would have to go
13  through the employment process for the
14  bankruptcy. Would I file a motion to be
15  employed? I don't know. I don't know the
16  answer to that question. It's not
17  something that I thought of beyond this.
18  So -- but if I was right and there wouldn't
19  be an opportunity to file a motion to
20  employ Verdolino and Lowey on behalf of the
21  debtor, I don't know how we would then
22  allow me to be a signatory on the debtor's
23  account.
24      Q.   Thank you. That's helpful.

*Page 38*

C. JALBERT

1       A.   Well, frequently in matters,
2   we -- the firm gets brought in and we do
3   whatever work is intended on that
4   particular engagement. Frequently, it's
5   litigation support. If it's intended that
6   we do an investigation, the lawyer's
7   thinking ahead, look, you're going to do an
8   investigation, we think this is what we're
9   going to find. Then we're going to have to
10  get a expert report to file with a
11  particular court. Then we might need you
12  to go through the process of discovery
13  including records, depositions and the like
14  and then we might need you to testify. In
15  those particular cases, as I understand it,
16  there would be privilege up to a certain
17  point, up until the time I'm declared an
18  expert but in other instances, we get
19  brought in as -- as financial advisor to
20  the attorneys. They want us to do an
21  investigation. They want us to uncover
22  whatever need to be uncovered, whatever the
23  allegations are, whatever the issues are
24  but they might be hiring another firm or

*Page 40*

C. JALBERT

1   Did you rely on Brown Rudnick in connection
2   with that determination of who would be
3   retaining Verdolino and Lowey?
4           MR. AULET: Objection to form.
5       A.   Well, Mr. Silverberg writes in
6   his e-mail, "I would think you're retained
7   by the client as his financial advisor" and
8   the next e-mail, same day, when I got
9   around to it at 6:49 p.m. -- so five hours
10  had elapsed -- I basically concurred with
11  his determination. Who made the decision,
12  I don't know. It's semantics but I think
13  it was clear from this point on, that we
14  were going to be retained by the debtor and
15  not Brown Rudnick.
16      Q.   Is Verdolino and Lowey ever
17  retained by a law firm in connection with
18  bankruptcy proceedings?
19      A.   We're frequently retained by
20  lawyers in proceedings. I think even
21  including in bankruptcy proceedings for the
22  purposes of the privilege.
23      Q.   What do you mean by for
24  purposes of the privilege?

*Page 39*

C. JALBERT

1   individual to testify as the expert to keep
2   what knowledge we have as privileged. I
3   don't know that that's relevant here.
4       Q.   Thank you. Turning back to
5   Exhibit 2 --
6           MR. MILTENBERGER: I'm sorry to
7       interrupt. I'm being called away to
8       another matter so I'm going to have
9       to drop off now. The record could
10      just note that I'm leaving the
11      deposition.
12          MR. HARBACH: Thank you, Tim.
13      You're welcome to rejoin anytime.
14          MR. MILTENBERGER: Will do,
15      thanks.
16      Q.   I'm interested in your e-mail
17  at the top where you write, "my feeling is
18  that in an individual case, the FA" --
19  financial advisor -- "duties are markedly
20  different than of an operating business
21  case". Can you explain to me the
22  difference between an individual case
23  versus an operating business case?
24      A.   So operating business cases

*Page 41*

11 (Pages 38 - 41)

C. JALBERT

1        C. JALBERT
2 have their various size and shapes.  They
3 may have affiliated entities, parents,
4 siblings.  It could be multiple debtors.
5 They might have employees in various
6 countries, various states.  They may have
7 payroll taxes un-filed, sales taxes
8 un-filed, depending on the business, bottle
9 deposits un-filed and unkept.  They
10 probably need a lot more work on budgeting
11 and keeping the business operating.  Does
12 it have sufficient cash, what are the 13
13 week budgets, the one year budgets.  Cash
14 collateral where it's -- you've got a
15 secured creditor who is frequently -- maybe
16 not against the debtor but maybe not with
17 it either.  So -- so there's just -- it's a
18 totally different beast.  In this
19 particular case, some individuals have
20 operating real estate or something like
21 that but they rarely have an operating
22 business that's multi country, multi state
23 with employees and all sorts of reporting
24 requirements, compliance requirements.
25     Q.   Is it fair to say the financial
Page 42

1        C. JALBERT
2 advisor duties in connection with an
3 operating business case are more
4 complicated than an individual case?
5     A.   In most, yes.
6     Q.   Turning away from the exhibit,
7 who instructed Verdolino and Lowey on the
8 scope of work in this matter?
9     A.   I don't think anyone instructed
10 us.
11     Q.   Because you drafted the
12 engagement letter?
13     A.   I'm sure there were discussions
14 with counsel.  I don't remember the
15 discussions specifically but this is not
16 the first time I've drafted a retention --
17 at least part of the retention papers.
18 Obviously, I'm not a lawyer.  I don't know
19 all of that goes into retention papers but
20 as to the duties, typically, I have an
21 input as to what the duties are.  I'm sure
22 we took the first stab at it and in review
23 by Brown Rudnick, they might have made some
24 changes.  I don't remember how that went.
25     Q.   In connection with the
Page 43

1        C. JALBERT
2 engagement, no one informed you what needed
3 to be done on this case?
4     A.   Well, we had been party to
5 numerous conversations.  This is not my
6 first bankruptcy.  It's not my 50th
7 bankruptcy.  It's not my 100th bankruptcy.
8 I had a fairly good idea of what the issues
9 were going to be and I took the first pass.
10 I don't recall whether there were changes
11 made after that or not.
12     Q.   Generally, what is the scope of
13 Verdolino and Lowey's work in this case?
14     A.   In this case?
15     Q.   Yes.
16     A.   Well, the retention papers
17 speak for themselves.  So if you want to go
18 line by line, put that in front of me.
19     Q.   Sure.
20     A.   To date, we've been focused
21 on -- first, my recollection is the SOFA's
22 and the schedules pretty much
23 simultaneously.  I mean they were due the
24 same day, same time.  So that was first.
25 Following -- immediately following that, I
Page 44

1        C. JALBERT
2 believe we worked on everybody's engagement
3 papers to get them filed in the Court and
4 then -- probably while the tail end of that
5 was going along, I believe my colleague,
6 Matt Flynn, started preparing the monthly
7 operating report that was due for the end
8 of February, sometime around March 20, 21,
9 22, somewhere around there.  Trying to
10 think if we've done anything -- oh
11 assistance in preparing for -- or
12 participation in preparing, to a small
13 degree, for the debtor to attend the 341
14 meeting.  We attended the first day 341
15 meeting by telephone.  My colleague, Matt
16 Flynn and I, attended the second day of the
17 341 hearing which was this past Wednesday
18 on a -- how do I want to call it -- we
19 didn't bill for our time.  I went as an
20 observer.  We knew we weren't going to be
21 participating but we wanted to be around to
22 see what took place, meet people and then
23 this deposition.
24     Q.   Thank you.  So I think I heard
25 the SOFA's and schedules were the first
Page 45

Veritext Legal Solutions
866 299-5127

C. JALBERT

1    step. You talked about drafting everyone's
2    engagement papers in connection with this
3    matter.
4        A.   Well, drafting our engagement
5    papers. Everyone was focusing on their own
6    and I needed help, because I'm not a
7    lawyer, on mine.
8        Q.   Then you talked about Matt
9    Flynn's responsibilities in connection with
10   the monthly operating report.
11       A.   Yes.
12       Q.   Finally, you talked about
13   preparing for the 341 hearing and attending
14   the 341 hearings?
15       A.   Meeting, yes.
16       Q.   Can you describe a little bit
17   more your responsibilities in connection
18   with those 341 meetings?
19           MR. AULET: I would just
20       caution the Witness not to disclose
21       any work product or conversations
22       with attorneys.
23       A.   On the first day of the 341
24   meeting, it was just thought that we should

Page 46

C. JALBERT

1    participate because it was unclear what was
2    going to arise and they didn't know if it
3    would be something that we would need.
4        Q.   Setting aside your
5    conversations with your attorneys, what --
6    did you have any understanding about what
7    might arise during the first day of the 341
8    hearing that might require your
9    participation?
10       A.   I've attended an awful lot of
11   341 meetings over my career. Anything can
12   happen at a 341 meeting because it's open
13   to every creditor and god only knows what
14   takes place.
15       Q.   Did you anticipate having to
16   participate or ask questions during the
17   341?
18       A.   I think we were asked to be on
19   the phone. I didn't have a participation
20   one way or another.
21           MS. ARONSSON: The Court
22       Reporter is going to hand you what is
23       being marked as Jalbert Exhibit 4.
24           (Whereupon, Debtor's

Page 47

C. JALBERT

1    Application was marked as Jalbert
2    Exhibit 4 for identification as of
3    this date by the Reporter.)
4        MS. ARONSSON: For the record,
5    this is a document entitled Debtors
6    Application for Authorization to
7    Retain and Employ Verdolino and Lowey
8    PC as Financial Advisor. It was
9    filed in this case as Docket 90.
10       Q.   Mr. Jalbert, feel free to look
11   at this document.
12       A.   Is there something you're
13   trying to point me to?
14       Q.   Do you recognize this document?
15       A.   Yes.
16       Q.   What is it?
17       A.   Debtor's Application for
18   Authorization to Retain and Employ
19   Verdolino and Lowey PC as Financial
20   Advisor.
21       Q.   Turning to Page 18 of the
22   document, using the page numbers at the top
23   of the page, what is this document?
24       A.   Affidavit of Craig R. Jalbert

Page 48

C. JALBERT

1    in Support of Debtor's Application for
2    Authorization to Retain and Employ
3    Verdolino and Lowey PC as Financial
4    Advisor.
5        Q.   So you recognize this as your
6    affidavit you filed --
7        A.   I do.
8        Q.   Turning to Page 21, the table
9    -- I'm interested in the table at the
10   bottom of the page.
11       A.   Yes.
12       Q.   Just stepping back I think you
13   mentioned folks at Verdolino who were
14   involved, Matt Flynn -- in this case, Matt
15   Flynn, Mary Jo Schindler and yourself. Is
16   there anyone else involved in this matter
17   at Verdolino and Lowey?
18       A.   I mentioned Tim MacDonald, our
19   IT person who is only involved with --
20   related to the deposition, the search of
21   our e-mails and the server records and
22   everything and getting it ported over to
23   Brown Rudnick to be then sent to you folks.
24       Q.   Anyone else at Verdolino and

Page 49

C. JALBERT

1 Lowey?
2
3    A.    Not that I know of.
4    Q.    Turning to this table, is Matt
5 Flynn also a principal?
6    A.    No.
7    Q.    What is Matt Flynn's role?
8    A.    A manager.
9    Q.    Is Mindy Jo Schindler a
10 principal?
11    A.    No.
12    Q.    What is her role?
13    A.    Manager.
14    Q.    So in connection with this
15 engagement at Verdolino and Lowey, there's
16 one principal, two managers and then the IT
17 person?
18    A.    I believe so, yes.
19    Q.    Do you anticipate other
20 Verdolino and Lowey employees to become
21 involved in this matter?
22    A.    As the case progresses,
23 assuming that we come into the case, yes.
24    Q.    Generally, what are the duties
25 of a principal in connection with a

C. JALBERT

1 bankruptcy case like this?
2
3    A.    I think of it as partner,
4 director, managing director, any of those,
5 the lead person on the case from the firm.
6    Q.    In connection with this matter
7 specifically, what do you expect the
8 principal to be doing?
9    A.    I assisted in preparation of
10 the SOFA's and schedules, the global notes,
11 the specific part of the global notes. I
12 assisted with the monthly operating report.
13 I participated with the first day hearings
14 -- excuse me, first -- not the first day
15 hearing. The first day of the 341 meeting.
16 Responding to inquiries from the various
17 lawyers and supporting staff on whatever
18 roles that they are working on.
19    Q.    What do you expect managers to
20 do in connection with this case?
21    A.    The same -- the same things.
22 Maybe differing amounts, different types.
23 I'm more review. Depending on what it is,
24 they might support me. I might support
25 them. It's like this engagement is no

C. JALBERT

1 different than any other engagement. You
2 don't know what's going to happen in
3 day-to-day and everyone responds as best
4 they can, as efficiently as they can and
5 whatever the issues are that are ongoing
6 and the crises that materialize.
7
8    Q.    What about staff, what sort of
9 role do you anticipate any potential staff
10 to play in this case?
11    A.    It will depend on how it plays
12 out. I don't think it's going to happen
13 but if it did and we became -- I became the
14 sole signer on the debtor in possession
15 bank account, my firm would probably be --
16 the bookkeepers would probably keep records
17 of the disbursements and the receipts.
18 They would assist with reporting. I would
19 probably review it of course. If, at some
20 point in time, we have claim objections, I
21 don't know what the nature of those
22 objections are going to be, I don't know
23 how big and how complicated but some of our
24 staff might be involved in claims. The
25 debtor might have to file an income tax

C. JALBERT

1 return. I'll be advising them that they
2 should file an income tax return for the
3 Estate. So we'll have tax people involved
4 in the preparation of the income taxes and
5 I would have to go down the list of -- and
6 be able to predict exactly what's going to
7 take place but we're very efficient, very
8 accustomed. We know all of our fees are
9 subject to review by every single party and
10 interest. So we're -- we use as reasonably
11 low level as we can on every matter and I
12 can't predict beyond that what's going to
13 come up but that staff and bookkeepers get
14 used for those types of issues.
15
16    Q.    Is it fair to say your answer
17 to my question about staff applies to the
18 bookkeepers, to the role of the
19 bookkeepers?
20    A.    No, bookkeepers and staff.
21    Q.    So the answer that you just
22 gave applies to both of those?
23    A.    You asked what they may do.
24    Q.    Right.
25    A.    They're -- the bookkeepers

14 (Pages 50 - 53)

C. JALBERT

1 aren't going to do reporting but they're
2 going to maintain receipts and
3 disbursements. A staff person would
4 probably work on the form of the -- of a
5 financial statement or whatever report
6 that's going to be issued. The staff are
7 going to work on claims objections. Tax
8 professionals are going to work on tax
9 returns.
10     Q.    Are you finished with your
11 answer?
12     A.    Yes.
13     Q.    You mentioned receipts and
14 disbursements. What sorts of receipts and
15 disbursements do you anticipate in this
16 case?
17     A.    I would imagine if things were
18 to go the way the debtor planned, there was
19 a proposed DIP financing arrangement where
20 money will come into the Estate and then
21 would presumably be used to pay various
22 professionals and United States Trustee
23 fees and whatever other disbursements are
24 required of the debtor as ordered by the

C. JALBERT

1 Court or otherwise generally required to
2 pay Chapter 11 bills as they become due. I
3 think that's it.
4     Q.    The last item is clerical.
5 What sort of duties do you anticipate a
6 clerical member of your team to do in this
7 case?
8     A.    I don't have anything that I
9 have presupposed for them to do in this
10 case.
11     Q.    Turning back in the document to
12 the retention agreement, this is on Page
13 13. We've talked generally about the
14 engagement -- Verdolino and Lowey's
15 engagement in this case. I want to walk
16 through these bullet points on the first
17 page. The first one reads, "assistance
18 with preparation of the statement of
19 financial affairs and the schedules and all
20 support thereto and any amendments". These
21 have been filed, right?
22     A.    Yes.
23     Q.    Who was involved in preparing
24 the SOFA and the schedules?

C. JALBERT

1     A.    From my firm?
2     Q.    Who at V&L?
3     A.    Myself, Matthew Flynn and Mary
4 Jo Schindler.
5     Q.    Who else was involved in
6 preparing these filings?
7     A.    There might have been a
8 technical question for someone related to
9 the best case but I can't think of anything
10 else -- anyone else that had any -- that
11 did work on it.
12     Q.    Did Brown Rudnick work on the
13 SOFA and schedules?
14     A.    You asked me for my firm. Of
15 course they worked on them, as did Melissa,
16 as did -- that's Melissa Francis. As did
17 Aaron Mitchell. So it was clearly not all
18 Verdolino and Lowey. It was -- the whole
19 team was involved in the preparation. I
20 thought you asked me -- and if I
21 misunderstood, I apologize -- you asked
22 who, at Verdolino, did and that was myself,
23 Matt Flynn and Mary Jo Schindler.
24     Q.    Thank you. Yes, I did ask

C. JALBERT

1 Verdolino and Lowey and was then moving on.
2 So you mentioned Melissa Francis, Aaron
3 Mitchell, Brown Rudnick. Generally, anyone
4 else?
5     A.    While I never spoke to them,
6 there must have been the existence of help
7 from individuals that translated documents
8 and words from the various professionals to
9 the debtor and the debtor.
10     Q.    Did you communicate with the
11 debtor about this SOFA and schedules?
12     A.    No.
13     Q.    You mentioned some translated
14 documents. Did you receive those
15 translated documents in connection with
16 your work on the SOFA and schedules?
17     A.    No. I don't read Mandarin.
18     Q.    Did you see any translated
19 documents?
20     A.    I don't recall seeing them.
21         MR. AULET: Objection to form.
22     Q.    Do you know whether Golden
23 Spring was involved in preparing the SOFA
24 and schedules?

C. JALBERT

1   A.   I wouldn't know.
2   Q.   Do you know what Golden Spring
3   is?
4   A.   Yes.
5   Q.   What is it?
6   A.   It's -- as I understand it -- a
7   family office in New York City for the
8   debtor's son. Exactly how it's run, all
9   that, I don't have any information.
10  Q.   Who is the debtor's son?
11  A.   I don't know his name.
12  Debtor's son.
13  Q.   Neither you nor anyone at
14  Verdolino and Lowey met with or
15  communicated with the debtor about the SOFA
16  and schedules?
17  MR. AULET: Objection to form.
18  A.   Correct.
19  Q.   Can you describe what work
20  Verdolino and Lowey did in preparing the
21  SOFA and schedules?
22  A.   We participated with several
23  lengthy phone calls with various people
24  from Brown Rudnick, not all of whom I'm

*Page 58*

C. JALBERT

1   doing in connection with the SOFA and
2   schedule?
3   A.   I don't know that it's
4   anticipated but to the extent facts and
5   circumstances, at some point in time,
6   require a review and possible amendment, I
7   think we would have to participate because
8   we're the ones that know Best Case and have
9   that system but there's nothing
10  anticipated. It's only if that
11  materializes, we would participate.
12  Q.   You've said -- you've mentioned
13  Best Case a couple times. What do you mean
14  by that?
15  A.   It's a software that the
16  industry uses. I think it's the most
17  prominent software that supports the
18  preparation of SOFA's and -- SOFA's and the
19  schedules. I think they're used throughout
20  the industry by most everybody.
21  Q.   So is it fair to say it's like
22  a TurboTax of preparing SOFA's and
23  schedules?
24  A.   Or QuickBooks or -- you know.

*Page 60*

C. JALBERT

1   going to remember were on the phone and
2   also with Melissa Francis and Aaron
3   Mitchell. Aaron Mitchell and Melissa
4   Francis provided significant levels of
5   input of various information. Brown
6   Rudnick had been involved in the case
7   before we were. They already had a large
8   knowledge base so we -- we talked with
9   Brown Rudnick team and Melissa and Aaron on
10  the phone and then numerous e-mails.
11  THE WITNESS: I agree. Hot.
12  MR. HARBACH: Yeah, I tried to
13  keep out the sun.
14  Q.   Did Verdolino and Lowey perform
15  any investigation to verify information
16  obtained from Brown Rudnick, Melissa
17  Francis or Aaron Mitchell?
18  A.   No.
19  Q.   So is it fair to say you took
20  their word regarding the representations
21  contained in the SOFA and the schedule?
22  A.   That's fair.
23  Q.   Is there any outstanding work
24  that Verdolino and Lowey will anticipate

*Page 59*

C. JALBERT

1   Q.   So that software is essentially
2   garbage in, garbage out, right?
3   MR. AULET: Objection.
4   A.   Every software is garbage in,
5   garbage out.
6   Q.   Turning to the second bullet
7   point in the retention agreement, it reads,
8   "assistance with preparation and/or review
9   of cash flow and related budget projections
10  and including advising as to post-filing
11  finances". Do you see that?
12  A.   Yes.
13  Q.   What work has Verdolino and
14  Lowey done in connection with this line
15  item?
16  A.   Nothing.
17  Q.   What work does Verdolino and
18  Lowey anticipate doing in connection with
19  this line item?
20  A.   Anticipate doing this if we're
21  in the case and there's a DIP.
22  Q.   So it includes budget
23  projections. Budget projections for who?
24  A.   I imagine we will try and

*Page 61*

C. JALBERT

1 establish what a budget would be for -- for
2 instance, committee counsel and its
3 financial advisors, debtor's counsel and
4 their financial advisors, the United States
5 Trustees fees. There were a number of
6 firms that were intended to be ordinary
7 course professionals and any other
8 anticipated disbursement in the case that's
9 approved in one way, shape or form by court
10 order.
11     Q.    It also includes review of cash
12 flow. What cash flow?
13     A.    The DIP money.
14     Q.    The debtor has no income,
15 right?
16     A.    To my knowledge, correct.
17     Q.    Have you reviewed the debtor's
18 declaration filed in this case?
19     A.    I certainly reviewed one or two
20 of the drafts of it. I don't know that I
21 saw the final or not. I don't remember.
22     Q.    Are there cash flows coming in
23 from any source at the moment?
24     A.    Into the Estate?

Page 62

C. JALBERT

1     Q.    Yes.
2     A.    Not to my knowledge.
3     Q.    Your knowledge of the debtor's
4 lack of income is based on what you've been
5 told, is that right?
6     A.    Yes.
7     Q.    No independent investigation in
8 connection with his income?
9     A.    Correct.
10     Q.    This line item also references
11 post-filing finances. What is meant by
12 that?
13     A.    He filed on February 15th.
14 Whatever finances, cash receipts, cash
15 disbursements, budgeting from that day
16 forward.
17     Q.    The third line item reads,
18 "opening and maintaining the DIP account
19 and effectuating disbursements when
20 necessary and providing accounting of all
21 cash activity". Is it your understanding
22 there's a DIP loan here?
23     A.    No.
24     Q.    Do you anticipate there being a

Page 63

C. JALBERT

1 DIP loan in this case?
2     A.    Hope so.
3     Q.    Do you have experience with DIP
4 loans?
5     A.    Yes.
6     Q.    How much experience do you
7 have?
8     A.    I don't know how many hundred
9 cases with DIP loans.
10     Q.    What work has Verdolino and
11 Lowey done in connection with this line
12 item?
13         MR. AULET: Objection to form.
14     A.    We're talking about the third
15 one, right, opening and maintaining the DIP
16 account?
17     Q.    Yes.
18     A.    The only thing I did, when
19 asked by Brown Rudnick if I'd be willing,
20 is I consulted with a bank that does --
21 that's on the list of approved financial
22 institutions of the Department of Justice.
23 I checked with that bank, which I use
24 frequently in and out of bankruptcy, to

Page 64

C. JALBERT

1 confirm that they would allow me to be a
2 signer on the DIP account and they
3 responded yes. That's the extent of
4 which I've done on that.
5     Q.    Is that Citizens Bank that
6 you're referencing?
7     A.    Yes.
8     Q.    Has Verdolino and Lowey been
9 involved in the negotiation of the
10 potential DIP loan?
11     A.    No.
12     Q.    Has Verdolino and Lowey been
13 included on any communications regarding
14 the potential DIP loan?
15     A.    I don't know.
16     Q.    Have you personally been
17 involved in any written or oral
18 communications regarding the DIP loan?
19     A.    I don't recall any.
20     Q.    Do you have an understanding as
21 to how the potential DIP loan would be
22 structured?
23     A.    Well, I briefly read the DIP
24 loan at some point in time. I don't have

Page 65

17 (Pages 62 - 65)

C. JALBERT

1    an explicit memory of every -- of the whole
2    thing but I know generally how DIP loans
3    work.
4        Q.    In this case, do you know how
5    the DIP loan would potentially be
6    structured?
7        A.    I would have to be guessing at
8    my memory.
9        Q.    Who, at Verdolino and Lowey,
10    would perform the work in connection with
11    this line item?
12        MR. AULET:  Objection to form.
13    Presupposing that there is a
14        A.    Presupposing that there is a
15    DIP loan?
16        Q.    Yes.
17        A.    It would -- as repeating,
18    obviously, I would be the signatory on the
19    account.  There would be bookkeepers and
20    staff associated with preparing the checks,
21    preparing the reports and reporting to all
22    the parties that be.  Some -- I imagine the
23    committee would want to know -- generally,
24    they would like to know on a weekly or
25    biweekly basis what receipts and

Page 66

C. JALBERT

1    disbursements are, major creditors might
2    feel the same way.  So whatever the --
3    whatever the case is, reporting
4    requirements as they develop, we would take
5    care of that.  I don't know what they would
6    be.  Aside from the minimum requirement,
7    the monthly operating report.
8        Q.    What is Verdolino and Lowey's
9    run rate up until this point?
10        A.    What's a run rate?
11        Q.    How much has Verdolino and
12    Lowey billed to this matter?
13        A.    We've billed zero so far.
14        Q.    How much value does Verdolino
15    anticipate it has already billed in this
16    case?
17        A.    Are you asking for a WIP to
18    date?
19        Q.    What is a WIP to date?
20        A.    Work in process hours?
21        Q.    Yes, please.
22        A.    I have no idea.
23        Q.    Does Verdolino and Lowey have
24    any agreement with anyone regarding who

Page 67

C. JALBERT

1    will pay the fees in the event the DIP loan
2    does not occur?
3        A.    No.
4        Q.    Let's turn to the next line
5    item, "preparation, review and analysis of
6    monthly operating reports and/or quarterly
7    reporting".  Do you see that?
8        A.    Yes.
9        Q.    You referenced earlier a
10    monthly operating report that was recently
11    filed in this case?
12        A.    Yes.
13        Q.    Is that the type of work
14    anticipated in this-- in connection with
15    this line item?
16        A.    Well, going forward, there's
17    going to be a lot more than a monthly
18    operating report because there's going to
19    be -- well, presumably, if there is a DIP
20    and if the case continues, there's going to
21    be receipts and disbursements and even if
22    there aren't, the monthly operating report
23    and the US Trustees Office requires that --
24    the disclosure of all estate professionals

Page 68

C. JALBERT

1    as they accrue throughout the case.  So it
2    didn't happen in the February one because
3    of the scrambling of SOFA's and schedules
4    and 341 meeting and everything else.  Going
5    forward, we're going to have to have a
6    report on a monthly basis and a cumulative
7    basis what everybody's fees are, what the
8    cash in and cash out is and part of the
9    monthly operating report calculates the
10    fees due to the United States Trustee
11    Program and then the monthly operating
12    report, you typically have to also -- you
13    attach to it insurance binders, if things
14    expired.  If they weren't usually --
15    usually, I put them in anyway just to avoid
16    confusion and someone looking for it.  And
17    then complete copies of the bank
18    statements.  The United States Trustees
19    Office also wants balance sheet and P&L and
20    cash flow and what the accounts payable,
21    accounts receivable and all the various --
22    so the first one was filed.  Future ones
23    are going to have a lot more information.
24        Q.    Taking a step back, can you

Page 69

18 (Pages 66 - 69)

C. JALBERT

1    C. JALBERT
2 just explain, generally, what a monthly
3 operating report is in a Chapter 11
4 individual case?
5    A.   It's the same or pretty close
6 to the same I think as the operating report
7 in a commercial case.  It looked like it to
8 me anyway's.  But it's the standard --
9 during the pendency of the case, the
10 operating report, that is required by the
11 US Trustees Program, up until the case is
12 dismissed, converted or confirmed.
13    Q.   So the procedures that you
14 described relating to the work on the
15 monthly operating report, that presupposes
16 the approval of the DIP loan and managing
17 of those funds.  Is that right?
18    A.   Well, the monthly operating
19 report is going to be due irrespective of
20 that.  The -- the accrual of the -- of the
21 fees of committee counsel, us, the
22 accountant advisor, the debtor, debtor
23 committee, others, whoever might be paid by
24 the Estate including th ordinary course.
25 Even if there's not a DIP, that has to be

Page 70

1    C. JALBERT
2 reported in the monthly operating report.
3    Q.   You prepared one monthly
4 operating report to date?
5    A.   In this case?
6    Q.   In this case, is that right?
7    A.   Yes.
8    Q.   Is another monthly operating
9 report in progress?
10    A.   Yes.
11    Q.   Did you also prepare -- scratch
12 that.  Did Verdolino and Lowey also prepare
13 the estimated monthly operating expenses
14 contained in the schedule?
15    A.   To what are you referring to?
16    Q.   We can come back to that.
17    A.   Okay.
18    Q.   Have you or Verdolino and Lowey
19 prepared a quarterly report in this case?
20    A.   The United States Trustee
21 quarterly report?
22    Q.   Yes.
23    A.   No.  We don't prepare that,
24 they do.
25    Q.   What is a quarterly report?

Page 71

1    C. JALBERT
2    A.   The United States Trustee
3 issues bills predicated on the monthly
4 operating report, to what the expenses that
5 meet the definition of a disbursement on
6 account of the U.S. Trustees form, they
7 combine the three months in every calender
8 quarter.  So for us, it will be the
9 February 15th, the February 28th stub
10 period, plus the March 1 to March 31, that
11 MOR.  The sum of those 45 days will be in a
12 bill from the U.S. Trustees Office and,
13 assuming it's correct, would have to be
14 paid before the end of -- I believe this
15 month.
16    Q.   So is it fair to say that
17 Verdolino and Lowey is retained to review
18 the quarterly report?
19    A.   I don't know if it's listed in
20 here specifically but certainly the monthly
21 operating report is the form that is the
22 input to the United States Trustees Office
23 in order to create the bill.  So we know --
24 and it's the fees are statutorily
25 determined based on the level of

Page 72

1    C. JALBERT
2 disbursements.  It's very easy to double
3 check their work.  We would do that and
4 make sure that the number is right.  It's
5 frequently wrong because sometimes they
6 issue the bill before the March statement
7 actually hits.  So they're estimating.
8 They're generally off -- not their fault --
9 in the first quarter because it's not a
10 full quarter.  They don't have a basis for
11 making estimates, whatever the case may be
12 but we would -- we would ensure that the
13 fee paid to the U.S. Trustees is
14 appropriate under the circumstances.
15    Q.   Turning to the next line item,
16 "assistance with preparation and/or review
17 of estate federal and state income tax
18 filings".  What work has Verdolino and
19 Lowey done in connection with this line
20 item?
21    A.   Nothing.
22    Q.   I think you mentioned before
23 that you were going to recommend the filing
24 of income taxes.  Why do you recommend that
25 in this case?

Page 73

19 (Pages 70 - 73)

C. JALBERT

1       C. JALBERT
2    A.   I recommend it in every case.
3 So individual estate tax returns,
4 individual estates is a separate --
5 completely separate and distinct entity
6 from the individual as opposed to in a
7 corporate case, the corporation retains its
8 tax identity.  You continue to file
9 C-corporation returns if they're a
10 C-corporation, S Corp., partnership,
11 whatever the case may be and their year end
12 remains whatever their year end was
13 established pre-petition.  In a bankruptcy
14 estate, the Estate is separate and distinct
15 from the individual.  The individual has to
16 continue to file his own individual income
17 taxes with whatever his individual income
18 that doesn't come into the Estate.  In a
19 Chapter 11 case, virtually all of the
20 debtor's income is supposed to come into
21 the Estate.  So there really shouldn't be a
22 separate one but technically, there could
23 be.  The Estate is -- the Estate return is
24 generally assigned to be December 31,
25 unless you elect otherwise.  There are

Page 74

1       C. JALBERT
2 legally required or not with a 505(b)
3 letter.
4    Q.   Do you anticipate that multiple
5 returns will be filed in this matter if the
6 debtor chooses to file returns.
7    A.   Well, I don't know what the
8 debtor is going to do and again, it has no
9 bearing on the Estate and no bearing on
10 Verdolino and Lowey but the Estate will
11 have to file -- I'll recommend that it file
12 a federal return.  The debtor is a resident
13 of Connecticut so there would be a
14 Connecticut estate tax return and if, for
15 some reason, there was income from another
16 state, we would file from whatever state
17 that that income came.  So I don't know
18 what it's going to be but it's at least
19 going to be Connecticut and the IRS.
20    Q.   I think we covered before, it's
21 your understanding that the debtor has no
22 income in this case?
23    A.   Correct.
24    Q.   What work do you anticipate
25 Verdolino and Lowey will do in connection

Page 76

1       C. JALBERT
2 reasons to elect otherwise but the most
3 important point is in order to get the --
4 the relief that's in the bankruptcy code
5 under Section 505b, in order to get that
6 relief, you have to file a tax return.  So
7 I recommend, even when there's no tax due,
8 that the return gets filed in order to
9 protect all -- everybody in the case to
10 make sure that there is not an issue that
11 gives the various taxing authorities 60
12 days from the date of filing with the
13 505(b) letter to have to elect to audit it.  It's
14 the way that the case can move forward to
15 closure and not have the seven year
16 statute, three year statutes and the like.
17 So I recommend everyone does the 505(b).
18 If they don't elect to audit it in the
19 first 60 days, then they lose the
20 opportunity.  If they select it for audit,
21 then they got another 120 days.  I want --
22 I recommend it in every single case,
23 individual or corporation or partnership or
24 LLC, that the tax returns get filed whether
25 they're necessary or not, whether they're

Page 75

1       C. JALBERT
2 with an individual tax return for the
3 debtor?
4       MR. AULET:  Objection to form.
5    A.   Well, I'd have to guess what's
6 going to take place between February 15 and
7 December 31.  I don't know whether there
8 will be any income or not.  There's
9 litigation going on.  There might be
10 settlements.  I don't know whether there'll
11 be income or not but if there is, there'll
12 be income.  From what source, I don't know
13 and from where, I don't know but at a
14 minimum, there will be disbursements and in
15 a bankruptcy, there's two types of expenses
16 from a tax perspective.  There are
17 administrative expenses like professional
18 fees and there are other types of expenses
19 that are normal to an individual.  Mortgage
20 interest, real estate taxes, whatever the
21 case may be.  They are treated in different
22 ways on the tax return but one of the
23 reasons why you would file a return is the
24 -- for tax purposes in a bankruptcy estate,
25 the fees paid to professionals are

Page 77

20 (Pages 74 - 77)

C. JALBERT
1  C. JALBERT
2  deductible and you can build them up like a
3  deferred tax asset. So to the extent, in
4  the future -- after we spend money on the
5  case, if, in the future, there was a large
6  settlement agreement, you would be able to
7  offset the previous administrative NOL's
8  against the future income --
9      THE COURT REPORTER: The
10     previous administrative --
11     THE WITNESS: N-O -- net
12     operating losses against a future
13     receipt, which is another reason to
14     file the return.
15  Q.   Is it fair to say that the work
16  that Verdolino and Lowey anticipates
17  potentially doing in connection with tax
18  returns depends on whether cash is coming
19  into the debtor or the Estate in the
20  future?
21     MR. AULET: Objection to form.
22  A.   No. You're going to have --
23  you're going to have accrued expenses
24  depending on the -- when the timing of the
25  case and everything, accrued expenses can

Page 78

1  C. JALBERT
2  A.   I have no -- it's not my
3  problem or interest what happens to the
4  debtor, outside of the bankruptcy estate.
5  He's going to have to hire a different
6  accountant to deal with that.
7  Q.   Let's talk about the Estate.
8  A.   If the Estate has tax
9  transactions, as I said, I would recommend
10  the Estate files tax returns on a timely
11  basis and it would include whatever
12  transactional activity that is allowed
13  under the -- both the bankruptcy code and
14  the internal revenue code and I don't know
15  what that's going to be.
16  Q.   Turning to the next line item,
17  it reads, "assistance with reviewing
18  reconciling, analyzing and if necessary,
19  objecting to proofs of claim". What work
20  has Verdolino and Lowey performed in
21  connection with this line item?
22  A.   None.
23  Q.   Just generally, what does --
24  what is a proof of claim?
25  A.   It's a form. There's a form.

Page 80

1  C. JALBERT
2  be deductible. So cash -- clearly, if
3  there were cash, that would -- that would
4  have to be taken care of but depending on
5  how this case goes and the timing, it's
6  entirely possible that some of the accrued
7  expenses would be deductible.
8  Q.   Have you seen the debtor's most
9  recent tax returns?
10  A.   I don't know that I would be
11  able to call them most recent tax returns
12  but I've seen parts. I don't know if it's
13  the whole thing. I don't know if I saw the
14  entire federal and the entire state but I
15  -- I at least saw the New York return and
16  the federal version attached to the New
17  York return which may or may not be the
18  entire federal return for 2019 I think and
19  2020.
20  Q.   If the debtor's income is zero,
21  what do you anticipate deducting from?
22     MR. AULET: Objection.
23  A.   Are we talking about the debtor
24  individually or the Estate?
25  Q.   Let's start with the debtor.

Page 79

1  C. JALBERT
2  There's a bankruptcy form that's a proof of
3  claim. I don't remember what the form
4  number is but it's an opportunity for any
5  alleged creditor to file a claim in either
6  a Chapter 11 or a Chapter 7 case. They can
7  file claims on a secured basis, a priority
8  basis, an administrative basis and I'm sure
9  there's more that I'm missing. I don't
10  think there's a claims objection deadline
11  but at some point in time, in a Chapter 11,
12  there's usually a claims objection
13  deadline. If, however, a creditor has been
14  scheduled on Schedule D, E or F and that
15  number happens to be right, then the
16  creditor does not have to file a claim as I
17  understand it. If they disagree because
18  it's owed more or less -- and rarely do
19  they disagree if they're owed less but if
20  they're owed more, they're allowed to file
21  a proof of claim and establish what they
22  think the amount due to them from the
23  bankruptcy estate would be.
24  Q.   Have you reviewed any of the
25  pending litigation claims in this matter?

Page 81

21 (Pages 78 - 81)

C. JALBERT

1    A.   No.
2    Q.   What experience does Verdolino
3  and Lowey have in analyzing the likelihood
4  of success in pending litigation claims?
5    A.   Absolutely none.
6    Q.   Turning to the next line item,
7  "assistance with reviewing debtor books and
8  records for possible avoidable transactions
9  such as preference and fraudulent transfer
10 claims". Do you see that?
11   A.   Yes.
12   Q.   Can you explain to me,
13 generally, what this means?
14   A.   The bankruptcy code allows a
15 look back period. For preferences, it
16 allows 90 days prior to the filing for
17 preference claims and I'll let lawyers
18 define what that is and insiders and other
19 fraudulent transfers take place between
20 zero days and I've heard it's -- whatever
21 the statute happens to be for whatever the
22 issue might be, one year, two years, four
23 years, whatever the case maybe but it's a
24 search through transactions to see if any

Page 82

C. JALBERT

1  of them might be avoidable and recoverable
2  to the Estate.
3    Q.   What analysis has Verdolino and
4  Lowey performed in connection with this
5  line item?
6        MR. AULET: I would caution the
7        Witness to the extent that there is
8        anything, not to disclose any
9        specifics.
10       MS. ARONSSON: Sorry, what do
11       you mean?
12       MR. AULET: That if he has done
13       any work, it would be covered by the
14       work/product privilege. Not to
15       disclose those specifics.
16   Q.   Setting aside the work/product
17 protection that Brown Rudnick is alleging
18 in connection with this line item, can you
19 answer the question?
20   A.   Well, one of the questions in
21 the SOFA's is payments made in the 90 days
22 prior to bankruptcy. I don't know if
23 that's necessarily a surprise to anybody
24 but that is usually the starting place for

Page 83

C. JALBERT

1  someone to do work on a preference
2  analysis. We certainly participated in
3  preparing that because we filed them.
4    Q.   Do you know how many
5  pre-petition payments were disclosed in
6  this case?
7    A.   No.
8    Q.   Does 21 sound about right?
9    A.   I don't know.
10   Q.   So the line item refers to
11 debtor books and records for possible
12 avoidable transactions. Have you reviewed
13 any debtor books and records in connection
14 with this engagement?
15   A.   No.
16   Q.   Has Verdolino and Lowey
17 reviewed any books and records in
18 connection with this engagement?
19   A.   No.
20   Q.   Is it fair to say that
21 Verdolino and Lowey relies on the
22 assistance of other parties in connection
23 with this line item?
24       MR. AULET: Objection to form.

Page 84

C. JALBERT

1    A.   Are you talking about past
2  tense or future tense?
3    Q.   Past tense.
4    A.   We relied on other individuals
5  for everything that we did from an
6  information perspective.
7        MR. AULET: We've been going
8        for awhile so if you need a break --
9        THE WITNESS: No, let's get the
10       -- let's do it all at once. I would
11       like to get out of here before
12       tonight.
13       MR. GOLDMAN: We are going to
14       break at 12.
15       MR. HARBACH: Yes, sir.
16   Q.   Okay, turning to the next line
17 item, "assistance with any necessary
18 litigation support". I think we covered
19 this previously. Do you have anything to
20 add about potential services in connection
21 with this line item that we haven't already
22 discussed?
23   A.   Not that I can remember.
24   Q.   Has Verdolino and Lowey done

Page 85

1          C. JALBERT
2  any work in connection with this line item
3  to this date?
4      A.   In this case, no.
5      Q.   The next -- turning to the next
6  line item is "assistance with plan
7  development and preparation including
8  feasibility".  What does this mean?
9      A.   Well, in order to have a
10  successful Chapter 11, you have to confirm
11  a plan of reorganization or whatever the
12  title will be when it's prepared and
13  created.  It might even be a joint plan for
14  all I know.  In those plans, there
15  typically is some budgeting because
16  sometimes payments to creditors are paid
17  out over time.  We might assist in
18  preparing the cash flow projections of
19  receipts and disbursements for some future
20  time period and my -- I'm not a lawyer but
21  as I understand it, in order to confirm a
22  Chapter 11, you must prove that the
23  creditors are getting a better return from
24  the Chapter 11 plan than they would have in
25  a Chapter 7 case and that usually requires

Page 86

1          C. JALBERT
2  that you -- well, you're going to have
3  feasibility and you're going to have --
4  what's the other one -- term is slipping my
5  mind -- I can't remember it but it didn't
6  list it anyway's.
7      Q.   The line item says feasibility
8  and I think you mentioned that as well.
9  What does feasibility mean?
10      A.   You -- the projections is
11  usually the evidence with which to allow
12  the Court and other parties in interest to
13  determine what the future cash flows will
14  be and make their own decision based on
15  that as to whether the debtor's plan is
16  financially feasible and the Judge
17  obviously has the final determination but
18  usually everyone puts their two cents in.
19      Q.   What analysis has Verdolino and
20  Lowey done to date in connection with this
21  line item?
22      A.   None.
23      Q.   Would Verdolino and Lowey have
24  a function in developing a plan if the
25  debtor's estate's only source of income or

Page 87

1          C. JALBERT
2  assets is on liquidated litigation claims?
3      MR. AULET:  Objection to form.
4      A.   If we did, it would be awfully
5  small.
6      Q.   Understood.  Are you aware of
7  any draft policies currently being circulated?
8      MR. AULET:  Objection.  He's
9    already testified that he hasn't
10    performed any work on this.  So I
11    don't see what the relevance is to
12    V&L's retention.
13      MS. ARONSSON:  Sure.  I'm
14    curious though about ongoing work in
15    connection with this line item.
16      MR. AULET:  He can answer if
17    he's doing any current work with it.
18      A.   None.
19      Q.   Turning to -- turning to the
20  next line item on the next page, it reads,
21  "general consulting and assistance with any
22  other matters and tasks that may arise and
23  as may be directed by you or the debtor".
24  Is it fair to say this is kind of a
25  catch-all?

Page 88

1          C. JALBERT
2      A.   Yes.  It's a catch-all with the
3  caveat -- this is not my first rodeo -- if,
4  for some reason, there's a discreet task
5  that is going to be required that will be
6  comprehensive and costly, we would file a
7  motion to amend our employment, what would
8  be covered by the employment but as to --
9  you know, for instance, sometimes they get
10  a notice from the IRS that requires 15
11  minutes for someone to respond to.  I know
12  little -- little cats and dogs that happen
13  that don't happen to fit into something
14  else, it's a catch-all for the minutiae.
15  Not intended to be a catch-all for major
16  line items and that's only to protect me.
17      Q.   Understood.  What work or
18  analysis has Verdolino performed in
19  connection with this line item, if any?
20      A.   None that I know of.
21      Q.   Are you familiar with a company
22  called Stretto?
23      A.   Yes.
24      Q.   What do they do?
25      A.   I don't know everything that

Page 89

23 (Pages 86 - 89)

C. JALBERT
1    C. JALBERT
2  they do but they do claims agent work and
3  other bankruptcy-related work. I don't
4  know what their list of services are. I've
5  hired them myself in cases. I think
6  they're still working for me on a case or
7  two right now in a limited basis.
8      Q.   Are you aware that Stretto was
9  involved in this matter?
10     A.   I'm aware that there's a motion
11  to employ them, yes.
12     Q.   Generally, what is your
13  understanding of the scope of work that
14  Stretto would potentially be employed to
15  do?
16     A.   I have not read their motion to
17  employ. No idea what their --
18      MS. ARONSSON: Let's go off the
19  record. Thank you.
20      THE VIDEOGRAPHER: The time is
21  11:53 a.m. and we are off the record.
22      (Whereupon, a brief recess was
23  taken.)
24      THE VIDEOGRAPHER: The time
25  period is 12:22 p.m. We're back on

Page 90

1    C. JALBERT
2  the record.
3      Q.   Just wrapping up the questions
4  related to Exhibit 4. Turning back to the
5  line item about opening and maintaining the
6  DIP account, would you agree that a bank or
7  an escrow agent could open and maintain a
8  DIP account?
9      MR. AULET: Objection to form.
10     A.   I don't have any knowledge of
11  why they couldn't but I'm certainly not an
12  expert.
13     Q.   What about monitoring
14  disbursements and effectuating
15  disbursements?
16     A.   The bank doing it?
17     Q.   Yes.
18     A.   I don't think the bank's going
19  to do it.
20     Q.   Or an escrow agent.
21     A.   An escrow agent would have more
22  obligation, whatever the escrow agreement
23  says. I don't --
24     Q.   But an escrow agent could be
25  employed to perform those duties?

Page 91

1    C. JALBERT
2      MR. AULET: Objection to form.
3      A.   Yes.
4      Q.   You mentioned before that you
5  have worked with Stretto in the past?
6      A.   Well, they're in the same --
7  some of the same -- well, a couple. One or
8  two of the same cases that we're in.
9      Q.   Do you have an understanding as
10  to whether Stretto could open and maintain
11  a DIP account?
12     A.   No.
13     Q.   Do you have an understanding
14  about whether Stretto could monitor
15  disbursements in connection with a DIP
16  account?
17     A.   No.
18     Q.   Turning to the books and
19  records line item, the seventh bullet
20  point, I'm going to ask you to assume that
21  there are 21 professional service providers
22  who have received a pre-petition payment in
23  the 90 days before filing. I'm also going
24  to ask you to assume that Stretto can
25  provide analysis with respect to those

Page 92

1    C. JALBERT
2  payments. Why is it necessary for
3  Verdolino and Lowey to perform these
4  duties?
5      MR. AULET: Objection to form.
6  It calls for speculation.
7      A.   Most everybody that has half a
8  brain can do that. It's not going to be
9  done by me.
10     MS. ARONSSON: The Court
11  Reporter is going to hand you what is
12  being marked as Jalbert Exhibit 5.
13     (Whereupon, Official Form
14  106Sum was marked as Jalbert Exhibit
15  5 for identification as of this date
16  by the Reporter.)
17     MS. ARONSSON: I'll say for the
18  record, this is a document that has
19  been filed as Docket Number 78 in
20  this case.
21     Q.   Do you recognize this document,
22  Mr. Jalbert?
23     A.   Yes.
24     Q.   What is it?
25     A.   The first page is the official

Page 93

24 (Pages 90 - 93)

C. JALBERT

1 form 106Sum which is the summary of assets
2 and liabilities and certain statistical
3 information for the debtor, Ho Wan Kwok.
4    Q.   I think we've discussed earlier
5 that Verdolino and Lowey had a role in
6 preparing the SOFA and schedule.  Is that
7 right?
8    A.   Yes.
9    Q.   Verdolino and Lowey had a role
10 in preparing this document?
11   A.   Yes.
12   Q.   I just want to walk through
13 this at a high level.  The first line item
14 is -- item one relates to property.  What
15 does this line item include?
16   A.   What specific -- A, B or C or
17 all of them?
18   Q.   Sorry, fair question.  1A.
19   A.   Well, it reads "Schedule A/B
20 Property official form 106A/B", question or
21 1A, "copy Line 55.  Total real estate from
22 schedule A/B".
23   Q.   Thank you.  And it reads zero?
24   A.   Correct.
25

Page 94

C. JALBERT

1    Q.   What analysis, if any, did
2 Verdolino and Lowey do to prepare this line
3 item?
4    A.   I worked with the lawyers.
5    Q.   Did you do any independent
6 investigation with respect to the line item
7 1A?
8        MR. AULET:  Objection to form.
9    A.   No.
10   Q.   Turning to 1B, this reads,
11 "total personal property from Schedule A/B"
12 and I think this refers us to Line 36?
13   A.   I would have thought it related
14 to Line 62.
15   Q.   It does and then 62.  Sorry --
16 so 62 refers back to 56 to 61.  Do you see
17 that, that's on Page 7 of the PDF?
18   A.   Lines 56 to 61, is that what
19 you're referring to?
20   Q.   That's right.
21   A.   Yep.
22   Q.   The only item populated in 55
23 to 61 is Item 58?
24   A.   Correct.
25

Page 95

C. JALBERT

1    Q.   Item 58 refers to Line 36?
2    A.   Okay.
3    Q.   So 36, just up the page, the
4 total amount here is 3,850 dollars.  Do you
5 see that?
6    A.   Yes.
7    Q.   So 36 wraps up into one number.
8 Part 4 of this filing, is that fair?
9        MR. AULET:  Objection to form.
10   A.   Well, when you mean this
11 filing, are you talking about Part 4 of
12 Schedule A/B.
13   A.   I am, yes.  Thank you for the
14 clarification.
15   A.   I would agree that Line 36 is
16 the sum of Part 4 which starts at question
17 16.
18   Q.   What analysis, if any, did
19 Verdolino and Lowey perform in connection
20 with these line items?
21   A.   Whatever we did, we did working
22 with the lawyers.
23   Q.   I'm going to ask you to turn to
24 Page 3 of the document.
25

Page 96

C. JALBERT

1        MR. AULET:  Just for
2 clarification, every time you're
3 refer to Page 3, you're referring to
4 the top numbers?
5        MS. ARONSSON:  Yes.  I'm
6 referring to the docket numbering at
7 the top.  Page 3 of 23.
8    Q.   Starting with Part 1 here, did
9 Verdolino and Lowey perform any work in
10 connection with this line item?
11   A.   If we did, we did with counsel.
12   Q.   In Part 2, Item 3 and 4
13 referring to cars, vans, trucks, etcetera,
14 watercraft, aircraft, did Verdolino and
15 Lowey perform any work in connection with
16 this section?
17   A.   All with counsel.
18   Q.   So it's fair to say, when you
19 say you performed work with counsel, you
20 didn't perform any independent
21 investigation?
22   A.   Correct.
23   Q.   Part 3, Items 6 through Items
24 15 refer to personal and household items,
25

Page 97

25 (Pages 94 - 97)

C. JALBERT
1
2 is that right?
3    A.   Yes.
4    Q.   Without walking through each of
5 these, did you perform -- did Verdolino and
6 Lowey perform any work in connection with
7 Items 6 through 14?
8    A.   Nothing -- not with the
9 attorneys.
10    Q.   Just to be clear about your
11 role, were you provided information from
12 counsel and you were responsible for
13 drafting this form or did you rely on
14 counsel to draft this form?
15       MR. AULET:  Objection to form.
16    A.   We keypunched into the forms
17 after consultation obviously.
18    Q.   Did you do anything besides
19 keypunch into the form?
20    A.   We discussed matters with the
21 attorneys.
22    Q.   I'm asking in connection with
23 filing the schedule and the SOFA, when you
24 say you communicated with the attorneys,
25 you're talking about Brown Rudnick?

Page 98

C. JALBERT
1
2    A.   And Melissa Francis and Aaron
3 Mitchell.
4    Q.   Did you communicate or did
5 Verdolino and Lowey communicate with anyone
6 else besides the attorneys at Brown
7 Rudnick, Melissa Francis and Aaron
8 Mitchell?
9    A.   No.
10    Q.   Were you provided any facts or
11 information from any party when punching in
12 these line items?
13    A.   We were informed by facts, lots
14 of them from the attorneys and lots of
15 discussion.
16    Q.   Was it -- scratch that.  The
17 information you received, was it oral?
18    A.   Some was oral and some was in
19 e-mails, I believe, from counsel.
20       MR. HARBACH:  Do you mind if I
21    ask a couple questions?
22       MS. ARONSSON:  Sure.
23       MR. AULET:  I don't have any
24    objection.
25       MR. HARBACH:  Thank you.

Page 99

C. JALBERT
1
2 EXAMINATION BY
3 MR. HARBACH:
4    Q.   For the record, this is David
5 Harbach at O'Melveny, also representing
6 Pax.  I just have a few questions.  Sir, I
7 believe you mentioned earlier that you or
8 Verdolino and Lowey were involved in
9 helping to prepare the notes for the
10 schedules that were filed?  Have I got that
11 right?
12    A.   The specific part of the
13 notes --
14    Q.   Yes, sir.  The specific notes.
15    A.   Not the general --
16    Q.   Understood.
17    A.   Yes, I worked with counsel on
18 that.
19    Q.   The specific notes are --
20 appear at Document Number 77 on the docket
21 and I don't have an extra copy for you but
22 I hope you'll agree that it won't be
23 necessary.  When it comes to questions
24 about things like electronics and household
25 goods and furnishings, which my colleague

Page 100

C. JALBERT
1
2 was just asking you about, the specific
3 notes state, for example, "numerous items
4 fitting the personal and household
5 definition are located at the residence and
6 the apartment" and then it goes onto say,
7 "except as otherwise set forth herein, the
8 debtor has no legal title to the contents
9 of either the residence or the apartment
10 and no court has made any determination
11 that the debtor has any other interests in
12 any such items".  My question for you is
13 was Verdolino and Lowey at all involved in
14 making the assessment of whether any of
15 these household items belonged to the
16 debtor?
17       MR. AULET:  I just lodge an
18    objection to asking him about a
19    document that you're not showing him.
20    You can answer if you can.
21    A.   To be clear, are you asking me
22 if I investigated whether the spatulas and
23 the pots and pans existed and who bought
24 them and how much they were and are they at
25 the house?

Page 101

26 (Pages 98 - 101)

C. JALBERT

1    Q.   All I'm asking is whether
2    Verdolino and Lowey had any role in making
3    the judgment call over whether the
4    household items at the residence or the
5    apartment belonged to Mr. Kwok or was that
6    something that was left to the lawyers?
7        MR. AULET: Objection to form.
8    A.   We did no investigation. I had
9    no personal knowledge not told to me by
10   Aaron Mitchell, Melissa Francis and Brown
11   Rudnick about the ownership of those. So
12   it wasn't my decision and I didn't
13   investigate but I certainly was party to
14   the conversations regarding that.
15   Q.   During those conversations, if
16   one of those people, a lawyer at Brown
17   Rudnick or Melissa -- whose last name I
18   forget --
19   A.   Francis.
20   Q.   Francis, thank you.
21   Represented to you that those items do not
22   belong to Mr. Kwok, you just accepted that
23   at face value?
24   A.   Correct.

Page 102

C. JALBERT

1    MR. HARBACH: Okay, thank you.
2    Thank you, Laura.
3    CONTINUED EXAMINATION
4    BY MS. ARONSSON:
5    Q.   This is Laura Aronsson from
6    O'Melveny. Just turning back to what we
7    were talking about in connection with the
8    schedule. I think David covered this. So
9    when drafting this, how did you decide
10   whether an item like the iPhone referenced
11   in Line Item 7 or the clothes referenced in
12   Line Item 11 or the family dog referenced
13   Item 13 belonged to Kwok as opposed to
14   another person or entity?
15   A.   I was informed by either
16   Melissa Francis or Aaron Mitchell or they
17   informed Brown Rudnick and Brown Rudnick
18   informed us.
19   Q.   Is it fair to say that that
20   chain of events that you just described
21   applies to all of the items identified in
22   this schedule?
23   MR. AULET: Objection to form.
24   A.   I don't know -- we better go

Page 103

C. JALBERT

1    item by item if that's what you want to do.
2    I don't know what you're referring to. You
3    know, you got specific lines you're talking
4    about?
5        Q.   Sure, that's fair. So in
6    connection with any of the assets
7    identified in the schedule as belonging to
8    Mr. Kwok, you solely relied on the chain of
9    events you previously described, Brown
10   Rudnick received information from Melissa
11   Francis and Aaron Mitchell?
12   MR. AULET: Objection to form.
13   A.   No, that's not what I said. I
14   said we heard directly from Melissa Francis
15   or Aaron Mitchell or they informed Brown
16   Rudnick and Brown Rudnick told me that
17   they -- what the answer was from them.
18   There was no one way of communicating. It
19   was fluid situation. We had a very short
20   time to do them but it was not one way or
21   the other. It was, as I said, either and
22   many times the e-mails were with all the
23   attorneys on the e-mail or it was a phone
24   call with a lot of parties and I don't

Page 104

C. JALBERT

1    remember all of the parties but the source
2    of the information was for us, first, Aaron
3    Mitchell and Melissa Francis in no
4    particular order. Now I don't remember who
5    knew more about what than the other or if
6    they passed information onto Brown Rudnick,
7    who then passed it onto us. Obviously,
8    after they did whatever legal analysis they
9    wanted to do.
10   Q.   In preparing these documents,
11   did you ask for any information from Brown
12   Rudnick or Aaron Mitchell or Melissa
13   Francis that you were not given?
14   A.   I don't remember asking a
15   question they didn't answer but I didn't
16   investigate anything.
17   Q.   I want to turn to Page 16 of
18   this document. So at the bottom of the
19   page, to direct your attention there, Part
20   2 reads, "estimate your ongoing monthly
21   expenses". Were you involved in drafting
22   this section?
23   A.   Yes.
24   Q.   What was your role -- or

Page 105

27 (Pages 102 - 105)

C. JALBERT
2 scratch that. What was Verdolino and
3 Lowey's role in connection with this
4 section?
5     A.   We had discussions with the
6 legal team, which is Brown Rudnick team
7 plus Aaron Mitchell, plus Melissa Francis,
8 probably more than one time, probably
9 orally, probably in e-mail and it was a
10 discussion.
11     Q.   Turning to the next page, the
12 estimated monthly operating expenses reads
13 zero. Is that fair?
14     A.   Yes.
15     Q.   Did you anticipate the debtor's
16 monthly operating expenses to remain zero
17 after this point?
18         MR. AULET: Objection to form.
19     A.   It certainly was discussed with
20 the attorneys. I don't think it's a
21 secret. There was lots of discussion
22 yesterday. So my expectation is yes, as to
23 his expenses, his payment of his expenses
24 is going to remain I think zero.
25     Q.   I think you said his -- his

Page 106

C. JALBERT
2 expenses. In your view, what does his
3 expenses cover?
4     A.   There's a whole list of them
5 here. You want to go down them? It looks
6 like about 30 of them. Real estate taxes,
7 property and homeowners and renters'
8 insurance, home maintenance repair and
9 upkeep expenses, home ownership association
10 and condo dues. Don't even know if those
11 are applicable. Electricity, heat and
12 natural gas. Want me to keep going?
13     Q.   So we can just agree that Items
14 4 through 21 would include monthly
15 expenses?
16     A.   Again, as it relates to him
17 paying them, I would agree. My
18 understanding is they're going to remain
19 zero.
20     Q.   So this -- the analysis
21 contained in this document is separate from
22 the monthly operating report, the reports
23 that you, Verdolino, draft in connection
24 with this case?
25     A.   Correct, because the monthly

Page 107

C. JALBERT
2 operating report is a different report and
3 that's a completely different question than
4 what's on here.
5     Q.   Can you explain to me the
6 difference?
7     A.   And I don't remember what
8 question it is, is it like 4 or 5 or 6E or
9 whatever it is, the request is to report
10 the expenses paid by others on the debtor's
11 behalf. That's not what this asks. So in
12 the schedule, we listed some funds and we
13 will, going forward, be listing and
14 reporting, as required by the MOR, the
15 expenses paid by others on behalf of the
16 debtor which is again different from what
17 this asks.
18     Q.   Focusing on what this asks,
19 it's your understanding that the debtor's
20 ongoing monthly expenses is zero?
21         MR. AULET: Objection to form.
22     A.   The debtor's payment of the
23 ongoing expenses is zero.
24     Q.   You did no investigation into
25 whether that is correct?

Page 108

C. JALBERT
2     A.   Correct.
3     Q.   Turning just to the Excel
4 sheets at the end of this document,
5 starting just broadly, was Verdolino and
6 Lowey involved in preparing these
7 documents?
8     A.   Well, we were certainly
9 involved with others, yes.
10     Q.   What -- generally, what work
11 did Verdolino and Lowey do in connection
12 with these documents?
13     A.   Reviewed them for
14 reasonableness, assisted in putting them in
15 a form that would normally be seen in a
16 SOFA and schedule. I think some of this
17 was uploaded into the actual Schedule F
18 because I think Schedule F -- well, maybe
19 it doesn't. I don't know. I don't
20 remember whether this was uploaded or not
21 but it could be. So that -- so it starts
22 with D. So all of these, we worked with
23 the attorneys and that's again, all three,
24 the Brown Rudnick team, Aaron Mitchell and
25 Melissa Francis.

Page 109

28 (Pages 106 - 109)

C. JALBERT

1    Q.   I think you said the phrase
2    reviewed for reasonableness.  What do you
3    mean by that?
4    A.   Well, if we had anything to
5    compare information to, we compared it
6    or -- or if we had a question, we asked a
7    question of the lawyers.  I don't remember
8    off hand what those were.
9    Q.   Can you think generally of any
10   issues that you investigated in connection
11   with preparing these?
12   A.   I'm sure on a couple of them,
13   we wanted the make sure that -- that there
14   wasn't a missing digit or an extra digit so
15   I'm sure someone from my team walked
16   through with someone, probably either
17   Melissa or Aaron, just as a double check
18   that it's what -- what the number on the
19   form was the number that they intended.
20   There wasn't, in there someplace, a human
21   error.
22   Q.   Can you think of anything else
23   specific that you investigated?
24   A.   We did not investigate.

*Page 110*

C. JALBERT

1    MS. ARONSSON:  The Court
2    Reporter is going to hand you what's
3    being marked as Jalbert Exhibit 6.
4    This is a document filed in this case
5    as Docket 77.
6    (Whereupon, Global Notes was
7    marked as Jalbert Exhibit 6 for
8    identification as of this date by the
9    Reporter.)
10   Q.   Do you recognize this document?
11   A.   Yes.
12   Q.   What is it?
13   A.   The Global Notes and Statements
14   of Limitations Methodology and Disclaimers
15   Regarding the Debtor's Schedules of Assets
16   and Liabilities and Statement of Financial
17   Affairs and the debtor is Ho Wan Kwok.
18   Q.   And this is a specific line
19   item that Verdolino and Lowey's proposed
20   retention relates to?
21   MR. AULET:  Objection to form.
22   A.   Can I go back and take a look?
23   I don't know what the global notes are
24   listed or not but these are part and parcel

*Page 111*

C. JALBERT

1    to the SOFA's and schedules.  So it would
2    be part of the first bullet, "assistance
3    with preparation of the statement of
4    financial affairs and schedules and all
5    support thereto and any amendments, if
6    necessary".
7    Q.   What was Verdolino and Lowey's
8    role in preparing this document?
9    A.   Well, we certainly assisted in
10   drafting.  We assisted in reviewing,
11   particularly the specific notes but there
12   was -- there was a lot of back and forth
13   and a lot of work between the Brown Rudnick
14   law firm, Aaron Mitchell, Melissa Francis
15   and Verdolino and Lowey, both -- all three
16   at Verdolino and Lowey, Matt Flynn, Mary Jo
17   Schindler and myself.
18   Q.   Just to understand, what
19   specific work did Verdolino and Lowey do in
20   connection with preparing this document?
21   MR. AULET:  Objection to form.
22   A.   Well, like I said, we had
23   numerous e-mails, we reviewed everything,
24   we made comments.  We might have drafted a

*Page 112*

C. JALBERT

1    paragraph here or a paragraph there.  I
2    think we assisted the group in making sure
3    the references, amongst the notes and
4    amongst the questions and the SOFA's and
5    amongst the schedules to the extent they
6    were interrelated, that the references were
7    appropriate.  We made sure that the
8    writings were the facts as we knew them.
9    Didn't investigate but we had lots of
10   discussions and we made sure that what was
11   represented here was our memories.
12   Q.   Thank you.  Turning to Page 4,
13   Question 1 in the middle of the page, asks
14   "do you own or have any legal or equitable
15   interest in any residence, building, land
16   or similar property".  The answer in Item
17   1, below it, reads, "the debtor has use and
18   occupancy of real estate located at 373
19   Taconic Road, Greenwich, Connecticut".  Do
20   you have any understanding as to why the
21   use and occupancy of certain real estate is
22   relevant to this filing?
23   MR. AULET:  Objection to form.
24   A.   Well, I'm not a lawyer but

*Page 113*

29 (Pages 110 - 113)

C. JALBERT

1 Schedule A is I thought real property that
2 was owned by the debtor. I would have to
3 go back and confirm that but real estate.
4 So it would be -- he's alive. He resides
5 in a residence and I'm presuming this is
6 the appropriate legal description of the
7 facts and circumstances of his living in
8 that residence.
9    Q.   Again, no independent
10 investigations into this?
11    A.   Correct.
12    Q.   Did you perform any evaluation
13 of the residences listed in Question 1?
14    A.   No.
15    Q.   The second bullet refers to an
16 apartment in the Sherry Netherland Hotel?
17    A.   Yes.
18    Q.   Did you draft this section?
19    A.   Did I draft it? I doubt it. I
20 might have reviewed it. I might have had
21 input in something but this is not my
22 language.
23    Q.   Are you aware that the entity
24 holding the legal title to the Sherry

Page 114

C. JALBERT

1 Haven on Wednesday for the 341 meeting but
2 I don't know -- I know it's a valuable car.
3 I don't know what the name is and I don't
4 know who owns them. I know the debtor --
5 just as this says, the debtor has use.
6    Q.   So beyond what this says here
7 and your previous answer, do you have
8 anymore information about the vehicles that
9 the debtor has use of?
10    A.   No.
11    Q.   Did you witness the debtor
12 using any luxury vehicles at any time?
13    A.   I don't know what you mean by
14 using but he got out of one in New Haven on
15 Wednesday.
16    Q.   Do you know what kind of car it
17 was?
18    A.   I don't remember.
19    Q.   Is this -- strike that. Is --
20 is the answer to Question 3 relevant to the
21 preparation of monthly operating reports?
22    A.   Probably, yes.
23    Q.   Why?
24    A.   Because I imagine there's a

Page 116

C. JALBERT

1 Netherland apartment is in bankruptcy?
2    A.   Well, I know there's a Chapter
3 11 going on. Exactly what's in Chapter 11
4 and who owns what, I have not confirmed or
5 made an investigation but generally
6 speaking, I understand that that apartment
7 is somehow in Chapter 11 in New York.
8    Q.   Any involvement in those
9 proceedings in New York?
10    A.   No.
11    Q.   Turning to the next page,
12 Question 3 asks for interests, broadly
13 speaking, in any vehicles. The response
14 reads that "the debtor has use of
15 automobiles including luxury automobiles
16 and motorcycles". Did you do any
17 investigation into this analysis?
18    A.   No.
19    Q.   Do you have any understanding
20 of what vehicles the debtor uses?
21    A.   Only from my memory, the -- he
22 has access to a luxury vehicle and I think
23 there's a vehicle that his security travels
24 in. As a matter of fact, they were in New

Page 115

C. JALBERT

1 cost associated with those vehicles being
2 provided for his use and again, I don't
3 remember exactly what the question is, 4, 5
4 or 6, like E, where the rules say to report
5 expenses made by third-parties on behalf of
6 the debtor. Well, I'm thinking the use of
7 the vehicles -- you know, I don't know if
8 there's a car payment on it, gasoline,
9 insurance, I don't know but something might
10 be in there.
11    Q.   What about the purchase of the
12 vehicle itself whenever it was purchased,
13 is that relevant to the monthly operating
14 report?
15    A.   Well, monthly operating reports
16 are usually a disbursement in a particular
17 time period. I imagine if they've bought
18 one of those cars during the pendency,
19 maybe it shows up. I don't know. On the
20 other hand, you could make an argument that
21 the use of the vehicle is not the same
22 thing as buying the vehicle because maybe
23 other people use it too. So you would have
24 to find a way of allocating the cost.

Page 117

30 (Pages 114 - 117)

C. JALBERT
1
2    Q.   Does that answer apply to the
3  Question 1 about residences as well?
4        MR. AULET:  Objection to form.
5    A.    The debtor resides in a
6  particular residence.  They're -- the only
7  people there that I know of, except for a
8  maid that comes in and security and
9  possibly visits from family.  So I imagine
10  the cost of the residence would be on that
11  so -- that monthly operating report in some
12  amount and I think I -- I was a proponent
13  of 50 percent of that cost would be on
14  behalf of the debtor because the spouse
15  lives there too and I didn't count the kids
16  because they only came to visit the debtor.
17  So I kind of ascribed more to the mother
18  and father and split the cost but there's
19  no home purchase in there.  There's no --
20  again, it's what you pay in that current
21  month.  So I'm assuming they're telling --
22  we're going to be disclosing what is paid
23  in that particular time frame on behalf of
24  the debtor on the various categories, the
25  vehicles, the security, the home --

Page 118

C. JALBERT
1
2    A.   No.
3    Q.   Turning to Page 8, Question 26
4  asks for patents, copyrights, trademarks,
5  etcetera.  The answer refers to
6  unregistered copyrights and other
7  intellectual property interest in music and
8  videos posted to various platforms.  What
9  is this referring to?
10    A.   The whole thing?
11    Q.   Yes.
12    A.   The Question 26 refers to
13  various intellectual property patents,
14  copyrights, trademarks, trade secrets and
15  intellectual property.  The debtor -- I'll
16  just read it to you.  "The debtor has
17  possible unregistered copyrights and other
18  intellectual property interest in music and
19  videos posted to various digital and media
20  platforms such as YouTube, GTV, Twitter"
21  and -- I don't even know, GETTR, whatever
22  that is.  "The debtor ascribes no value to
23  his social media assets and has made no
24  attempts to monetize his social media
25  presence".

Page 120

C. JALBERT
1
2    Q.   Thank you --
3    A.   Food.
4    Q.   Thank you.  Question 4 refers
5  to watercraft, aircraft, motor homes and
6  the answer references previous access to
7  the use of a yacht named the Lady May.  Do
8  you have any -- beyond what's written on
9  this page, do you have any understanding of
10  Mr. Kwok's interest the Lady May?
11    A.    Nothing that's not printed on
12  this page.
13    Q.   Did you do any independent
14  investigation into this?
15    A.   No.
16    Q.   Items 6 and 7, household goods
17  and electronics.  I think we covered that
18  previously.  In connection with Items 6,
19  household goods through Questions 17 on
20  this page -- so just for clarity, it's
21  Questions 6, 7, 8, 9, 11, 17.  Did you do
22  any investigation as to what -- as to
23  whether the items referenced in here belong
24  to Mr. Kwok versus some other third-party
25  or entity?

Page 119

C. JALBERT
1
2    Q.   Beyond what's written on the
3  page, do you have any understanding of what
4  this refers to?
5    A.   No.
6    Q.   The second sentence notes that
7  the debtor ascribes no value to these
8  items, do you see that?
9    A.   Yep.
10    Q.   You performed no valuation of
11  these items in connection with your work?
12    A.   Correct.
13    Q.   Do you know if any valuation
14  was performed?
15    A.   None to my knowledge.
16    Q.   Question 31 asks for interest
17  and insurance policies.  The answer refers
18  to his spouse's health insurance policy
19  which has no cash value.  Do you see that?
20    A.   Yes.
21    Q.   Is it standard practice that a
22  health insurance policy has no cash value?
23    A.   I've never seen a situation
24  where a health insurance policy has a cash
25  value except for to the beneficiary of --

Page 121

31 (Pages 118 - 121)

C. JALBERT
1
2 if you have a health insurance plan, it has
3 a lot of value to you when you go to the
4 hospital and it pays the bills for you.
5 There's not an independent value to a
6 third-party that you can sell.
7     Q.   Do you have any knowledge about
8 the health insurance policy that the debtor
9 has currently?
10    A.   No.
11    Q.   Question 53 asks for property
12 of the kind not listed and the answer
13 refers to his membership at Mar-a-Lago Club
14 in Palm Beach. Is this the type of thing
15 that Verdolino and Lowey would include on a
16 monthly operating report if Mr. Kwok, the
17 debtor, used the membership?
18        MR. AULET: Objection to form.
19    A.   I would have to use conjecture.
20    Q.   Go ahead.
21    A.   Well, the first monthly
22 operating report was filed in February. I
23 don't know whether he went down there or
24 not. I don't know if he went down there in
25 March. If he -- if he went there, I

Page 122

C. JALBERT
1
2 imagine there would be travel expenses. I
3 don't know whether there would be a fee for
4 the golf and maybe he had lunch. So I
5 imagine if he physically went there and
6 used it, there would be -- there might be
7 -- there would be something in the monthly
8 operating report but if he stays where I
9 think he's going to stay, in Greenwich
10 where he's safe, it's not going to be
11 relevant.
12    Q.   What is your basis for thinking
13 he's going to stay where he is in
14 Greenwich?
15    A.   I listened to the 341 meeting
16 yesterday -- excuse me, Wednesday.
17    Q.   Besides the knowledge gathered
18 from that hearing on Wednesday, the 341
19 hearing, do you have any independent
20 knowledge about the debtor's expected
21 travel or location?
22    A.   I have no knowledge whatsoever
23 of where he's going to be at any point in
24 time.
25    Q.   Would you rely on Brown

Page 123

C. JALBERT
1
2 Rudnick, Aaron Mitchell and Melissa Francis
3 to inform you of how he might benefit from
4 things like his like his Mar-a-Lago
5 membership in connection with drafting the
6 monthly operating report?
7     A.   I certainly would listen to
8 counsel on that for sure.
9     Q.   But Verdolino and Lowey
10 wouldn't endeavor to seek out information
11 about these monthly expenses --
12    A.   Well, we're going to seek out
13 and we're going to point to the question
14 and we're going to ask for information
15 that's responsive to that. I don't have
16 access to the information. We don't
17 investigate. I'm not going to keep track
18 of where the debtor goes or doesn't go. So
19 someone would need to tell us the
20 information. We would then review it but
21 I -- I think that Mar-a-Lago thing, at
22 least for the foreseeable future, is not an
23 issue but if it becomes an issue, someone
24 will tell me.
25    Q.   Turning to Page 11, Schedule I,

Page 124

C. JALBERT
1
2 the second to last sentence here and it's
3 that "the debtor plans to amend Form 122B
4 filed on February 15th, 2022 in which
5 debtor erroneously claimed monthly income
6 of $19,488". Do you see that?
7     A.   Yes.
8     Q.   Do you know what that refers
9 to?
10    A.   Yes.
11    Q.   What is it?
12    A.   The debtor inadvertently or
13 accidently -- I don't know what the term
14 would be -- erroneously filed a Form 122B.
15 It included $19,488 dollars which met --
16 the form met for the monthly income, I
17 think the review by the lawyers was that's
18 incorrect and so they -- the debtor filed
19 an amended 122B or at least intended to --
20 I don't know if it's done yet or not --
21 excluding that income.
22    Q.   Did Verdolino and Lowey perform
23 any work in connection with that erroneous
24 inclusion?
25    A.   I'm sure anything we did was in

Page 125

32 (Pages 122 - 125)

C. JALBERT
1    consultation with the lawyers.
2    
3        MR. AULET: Objection to form.
4    Sorry.
5        Q.    Turning to Page 13, Question 16
6    refers to a retainer of 500 thousand for
7    Brown Rudnick and then refers to one
8    million dollars from Lamp Capital. Do you
9    have any knowledge of that transaction
10   outside of what's written on the page?
11       A.    I think there was discussion of
12   it yesterday -- excuse me, on Wednesday at
13   the 341 meeting and I think I saw a draft
14   of Brown Rudnick's retention papers -- I
15   think I did where I thought something was
16   mentioned in there.
17       Q.    Do you recall what that was?
18       A.    No. Something along the lines
19   of what's right here.
20       Q.    Do you know what Lamp Capital
21   LLC is?
22       A.    An entity owned by someone that
23   is not the debtor.
24       Q.    Do you have any idea who it is
25   owned by?

Page 126

C. JALBERT
1        A.    There are actually five of them
2    I think. They're listed in Schedule D. I
3    don't recall whether I actually saw them or
4    not. I think they were briefly described
5    to me at a minimum by lawyers.
6        Q.    Any independent knowledge of
7    those agreements besides --
8        A.    No.
9        Q.    Did Verdolino and Lowey do any
10   other investigation in connection with the
11   assets we've talked about that we didn't
12   cover?
13       A.    No.
14       Q.    Those five litigation
15   agreements we talked about --
16       A.    The litigation funding
17   agreements?
18       Q.    Yes. Thank you. Have you seen
19   them before?
20       A.    Not to my knowledge.
21       MS. ARONSSON: The Court
22       Reporter is going to hand you what's
23       being marked as Jalbert Exhibit 7.
24       This is a document produced in this

Page 128

C. JALBERT
1        A.    Only a guess.
2        Q.    Can you tell me -- I guess you
3    don't need to speculate. Do you have any
4    information that -- about what informs your
5    guess?
6        MR. AULET: Objection to form.
7        A.    My memory was there was a lot
8    being talked about but my memory was
9    something was said during the 341 meeting
10   but it is very -- I was very back of the
11   room, as you know, and it was very hard for
12   me to hear the English version from the
13   interpreter. So I can't be sure but I
14   thought I heard something that discussed
15   who owned Lamp.
16       Q.    Outside of what you heard at
17   the 341 hearing and this other document
18   that you remember seeing, do you have any
19   knowledge about Lamp or its operations?
20       A.    No.
21       Q.    The next item, Question 18
22   refers to a litigation funding agreement
23   dated November 8th, 2021. Have you seen
24   that agreement?

Page 127

C. JALBERT
1    matter with the Bates stamp Kwok
2    00001752.
3        MR. AULET: Just for the
4        record, it's two separate documents
5        so we should make sure --
6        MS. ARONSSON: I'll represent
7        that this is a family of documents,
8        an e-mail and an attachment.
9        (Whereupon, E-mail Chain was
10       marked as Jalbert Exhibit 7 for
11       identification as of this date by the
12       Reporter.)
13       Q.    Mr. Jalbert, I understand
14   you're not on this e-mail. I'm just going
15   to ask you some basic questions about it.
16   This is an e-mail between a redacted
17   person, Aaron Mitchell, Matt Flynn and
18   Melissa Francis. Matt Flynn is your
19   colleague. We've talked about the other
20   folks. The attachment is a summary of
21   living expenses from the period February
22   15th to 28th. First, I'm going to ask who
23   is this e-mail from?
24       MR. AULET: And I will object

Page 129

33 (Pages 126 - 129)

C. JALBERT

1  and direct him the Witness to answer
2  for the same reasons that we
3  discussed previously on the record.
4     MS. ARONSSON:  And we'll
5  continue to dispute the redaction
6  here.
7     Q.   Turning to the attachment, this
8  summary of expenses, this was provided by a
9  person -- the unknown person in the top
10 e-mail, is that right?
11    A.   Yes.
12    Q.   Is it fair to say that this is
13 the starting point for Verdolino's monthly
14 operating report draft?
15    MR. AULET:  Objection to form.
16    A.   As to the one particular
17 question, yes.
18    Q.   Sorry.  What do you mean?
19    A.   This answers one question on
20 the monthly operating report and again, I
21 don't remember off hand exactly which one
22 it is but something, 4, 5, 6E.  The funds
23 paid by third-parties on behalf of the
24 debtor.  This is the first pass.

Page 130

C. JALBERT

1     Q.   Is this the monthly operating
2  report filing that we've been discussing
3  that you've been involved in preparing?
4     A.   Looks like it, yes.
5     Q.   Turning to the filing 120-1,
6  the separate loose page, these line items
7  here, can you just explain broadly what
8  they are at the bottom?  What does the
9  total reflect?
10    MR. AULET:  Objection to form.
11    A.   You're referring to the
12 $109,827.12?
13    Q.   Yes.
14    A.   I'm trying to see who made the
15 payments but inadvertently, the family, on
16 behalf of the debtor, on February 16th, the
17 day after the filing, made these two
18 payments on pre-petition amounts.  So this
19 was, in an abundance of caution, in the 161
20 thousand dollars that was shown on Part 1,
21 Number E, this 109 thousand dollars is
22 included in the 161,323.  So we were -- the
23 lawyers felt it was important to supplement
24 the monthly operating report with that

Page 132

C. JALBERT

1     MS. ARONSSON:  McKenzie, Tab
2  19.
3     THE WITNESS:  Are you done?
4     MS. ARONSSON:  No.
5     MR. AULET:  Should we have the
6  back up marked as a separate exhibit
7  or --
8     MS. ARONSSON:  I typically mark
9  them as one.
10    MR. AULET:  Okay.
11    THE WITNESS:  We'll put them
12 together again and eliminate the blue
13 sheet.
14    (Whereupon, E-mail Chain was
15 marked as Jalbert Exhibit 8 for
16 identification as of this date by the
17 Reporter.)
18    Q.   The Court Reporter is going to
19 hand you what's being marked as Jalbert
20 Exhibit 8.
21    A.   Have you given it to her yet?
22    MS. ARONSSON:  This is a
23 document filed in this case as Docket
24 120 and document 120-1.

Page 131

C. JALBERT

1  information that this was really a
2  pre-petition payment paid post-petition.
3     Q.   Understood.  Thank you.  So the
4  total expenses $161,323 here, if we
5  subtract from that, the total inadvertent
6  payments is $109,827.  What does that
7  amount reflect?
8     A.   The amount of the payments that
9  weren't these two payments that were made
10 in the period from February 15th to
11 February 28th by third-parties on behalf of
12 the debtor.
13    Q.   Would that be reflected in the
14 final version of the living expenses sheet
15 that we looked at on Exhibit Number 7?
16    A.   Yes.
17    MR. AULET:  Objection to form.
18    Q.   Is anything else included in
19 that number, to your knowledge?
20    A.   Well, inadvertently, yes.  We
21 found out that whoever created the form on
22 the security total dollars, whatever the
23 final total dollars were, there was a
24 payment made February 10 pre-petition that

Page 133

34 (Pages 130 - 133)

C. JALBERT

1 was inadvertently included in the payments
2 from February 15th to 28th. So that will
3 be corrected on the next operating report.
4     Q.    So included in this operating
5 report is the two inadvertent payments to
6 the law firms identified on Exhibit 8?
7     A.    Yes, correct.
8     Q.    The monthly operating living
9 expenses that we've talked about and then
10 this other payment that you said would be
11 corrected, is that right?
12     A.    It's included in the 161.
13 We'll be pulling that out when we do the
14 March -- so the way the form works usually
15 is you have payments paid currently and
16 cumulative. We will take that small amount
17 of money out of the cumulative so as to
18 have the correct number going forward.
19     Q.    So is it fair to say that
20 Verdolino and Lowey's role in connection
21 with these inadvertent payments was to kind
22 of double check the amounts included in the
23 monthly operating report?
24     A.    We tried but given the timing

Page 134

C. JALBERT

1 of when the information became available
2 and when the form had to be filed, there
3 was a miscommunication with the preparer of
4 the schedule that will be rectified.
5     Q.    Who's the preparer of the
6 schedule?
7     A.    I can't tell you.
8     Q.    What schedule are you referring
9 to, this document here, the monthly
10 operating report, Exhibit 8?
11     A.    This thing (indicating).
12     Q.    So the number 161 here refers
13 to this spreadsheet in Exhibit 7 as
14 reflected with your edits, with Verdolino
15 and Lowey's edits?
16     A.    The 161 is the sum of the final
17 number from Exhibit 8 plus the 109.
18     Q.    What work did Verdolino and
19 Lowey do in connection with getting to the
20 final numbers?
21     A.    We worked with counsel and
22 Aaron Mitchell and Melissa Francis trying
23 to review -- we didn't have details but we
24 were trying to ask questions and make sure

Page 135

C. JALBERT

1 that the categories were properly described
2 because this is not nearly final. This --
3 there were some errors and we also worked
4 with counsel and others in trying to figure
5 out what the percentage of the monies that
6 were paid in Column C multiplied by a
7 distribution percentage to arrive at the
8 total. We worked with the preparer to make
9 sure that the descriptions on the schedule
10 were accurate. We tried to confirm the
11 numbers were accurate. We couldn't get the
12 information in time to be able to do that
13 but then we looked at the distribution
14 percentages using our judgment in working
15 with the lawyers.
16     Q.    Looking at this draft, living
17 expense chart in Exhibit 7, there are seven
18 line items. Is that right?
19     A.    Yes.
20     Q.    Is it fair to say that
21 Verdolino and Lowey crosschecked the names
22 of the categories to ensure that they
23 accurately depicted the expenses contained
24 in those line items?

Page 136

C. JALBERT

1     A.    We did the best we could, yes.
2     Q.    What more information would
3 have been helpful to help you get to that
4 determination?
5     A.    If we could have seen what
6 the -- what the actual payees and
7 disbursements were, it probably would have
8 helped us with the categorization.
9     Q.    But you didn't receive that?
10     A.    Not -- not at that time, no.
11     Q.    Is the extent of information
12 you received regarding these line items
13 included in this chart here?
14     A.    As of the date that we made
15 available all the -- I'm sure there's an
16 updated version because this doesn't tie to
17 here (indicating) and then we -- long after
18 we produced the information for -- for this
19 deposition, there's been continuing ongoing
20 discussions because we're getting ready to
21 file -- excuse me, the March MOR in April.
22     Q.    We'll turn to the -- what I
23 think is the final version but we talked
24 about the categories, the amount you said

Page 137

35 (Pages 134 - 137)

C. JALBERT
1
2 that, at the time of this filing, you did
3 not have information to be able to verify
4 the amounts attributed to each category.
5 Is that right?
6    A.   Yes.
7    Q.   What information would have
8 been helpful for you to cross check those
9 amounts?
10   A.   Like I said, the name of the
11 payee, a description of what the service
12 was and the amount of the funds.
13   Q.   The percentage distribution,
14 what does that mean?
15   A.   The -- so for instance,
16 security was, in this sheet, $43,655.44.
17 The drafter of this and anyone that he
18 consulted with or she consulted with was 40
19 percent.  Amongst talking with our team and
20 with the lawyer team, we thought that that
21 probably should be one hundred percent
22 because the only reason -- the security is
23 entirely related to Mr. Kwok and his
24 safety.  There wouldn't be security if the
25 wife and the kids or others at the

Page 138

C. JALBERT
1
2 compound, if it weren't for Mr. Kwok.  So
3 we proposed changing and I think that did
4 get changed to a hundred percent.
5    Q.   In revising these percentage
6 distributions, did you rely entirely on
7 information received from Brown Rudnick and
8 Aaron Mitchell and Melissa Francis and this
9 undisclosed person?
10   A.   The first pass was the
11 undisclosed person.  After we got this
12 information from the undisclosed person,
13 most of the discussion was between our
14 firm, my firm and the lawyer -- lawyers.
15 How long is this is going to go?  Because
16 if it's going to go a bit, now I would like
17 to use the restroom.  I'll be fast.
18       MS. ARONSSON:  We can take a
19   break.  We'll go off the record.
20       THE VIDEOGRAPHER:  The time is
21   1:22 p.m.  We're off the record.
22       (Whereupon, a short recess was
23   taken and upon resuming, E-mail Chain
24   was marked as Jalbert Exhibit 9 for
25   identification as of this date by the

Page 139

C. JALBERT
1
2   Reporter.)
3       THE VIDEOGRAPHER:  The time is
4   1:28 p.m.  We're back on the record.
5   You may proceed.
6    Q.   I think you have received
7 what's been marked as Jalbert Exhibit 9.
8 This bears the Bates Kwok 00001684.  Do you
9 recognize this document?
10   A.   Yes.
11   Q.   Turning to the attachment, to
12 your knowledge, is this the final version
13 of the living expenses for the period
14 February 15th to February 28th?
15   A.   I think it is.
16   Q.   I'll represent, if you add
17 $51,495.67 plus the 109 thousand --
18   A.   161.
19   Q.   So we're on the same page, this
20 is the final version?
21   A.   Yes.
22   Q.   Does this final version reflect
23 Verdolino and Lowey's edits on the initial
24 draft provided by an unknown person?
25   A.   Well, it's certainly -- as you

Page 140

C. JALBERT
1
2 can see from the e-mail, we made
3 suggestions but counsel clearly reviewed
4 and assisted with the final decision and
5 I'm sure they also checked with the debtor.
6 I did not.
7    Q.   So just walking through these
8 five suggestions, why did you increase the
9 meals to 50 percent or why did you
10 recommend increasing the meals to 50
11 percent?
12   A.   Because there's a husband and a
13 wife and one hundred percent divided by two
14 is by 50 percent.
15   Q.   Do you have any understanding
16 as to why the draft had allocated the
17 numbers in the way it had in Exhibit 7?
18       MR. AULET:  Objection to form.
19   A.   So I think what the creator of
20 the initial -- my memory is the creator of
21 the initial document took into
22 consideration that occasionally, the
23 debtor's daughter and maybe one or two
24 other people occasionally showed up and so
25 I think they ascribed some of the cost to

Page 141

36 (Pages 138 - 141)

C. JALBERT

1 those people but our feeling in
2 consultation with the attorneys was that
3 the only reason those people are there is
4 they're coming to visit the debtor and
5 that's why they incurred the cost. So I
6 thought they should put 50 percent to the
7 husband and 50 percent to the wife and
8 that's how we got the 50 percent.
9    Q.   Besides what you just described
10 to me, do you have anymore reasons for
11 suggesting the increase of 50 percent?
12    A.   Not that I can remember.
13    Q.   Item 2 is security is increased
14 to 100 and looking at the draft in Exhibit
15 7, it was 40 percent. What was your
16 reasoning for suggesting to increase the
17 security to 100?
18    A.   Again, the only reason there's
19 any security at all is all about the
20 debtor. So in an abundance of caution,
21 we're ascribing that cost, one hundred
22 percent of that cost to the debtor. The
23 wife likely would not have security
24 concerns if she were not married to

Page 142

C. JALBERT

1 to ascribe the one hundred percent of the
2 cost to the debtor is -- means that all
3 that costs -- we could have left it at 30
4 percent and probably made it a callable
5 argument of why it could be 30 percent. We
6 wanted to go with -- I think part of the
7 final reasoning amongst the group was that
8 it's conservative to report all of it on
9 the debtor's behalf because of his safety
10 concerns is -- that was the reasoning.
11    Q.   Thank you. Item 3 is utilities
12 increased to 50 percent and I'll represent
13 Exhibit 7 has it at 30 percent and you
14 ascribe the same explanation as the meals.
15 Is there any other --
16    A.   No, it's the same -- it's the
17 same -- it's the same theme at different
18 percentages for most of these.
19    Q.   Item 4 refers to housekeeping.
20 I believe Verdolino and Lowey recommended
21 changing repair and maintenance to
22 housekeeping?
23    A.   Well, as it turns out, once we
24 were able to speak with someone and get

Page 144

C. JALBERT

1 Mr. Kwok and when the daughter or others
2 sometimes travel, they need security as
3 well. So for whatever reason, their
4 security is all related to the debtor. We
5 suggested going to a hundred percent. It
6 was discussed among the group and everyone
7 agreed to the 100 percent.
8    Q.   What is the basis for your
9 assumption that the primary reason security
10 has been retained is directly related to
11 the debtor?
12    A.   Discussion with Melissa Francis
13 and Aaron Mitchell who confirmed in several
14 phone calls that the debtor is harassed and
15 threatened and otherwise scared for his
16 existence and to the extent the -- I'm told
17 to the extent the family is scared, they're
18 scared because of their relationship to
19 their father.
20    Q.   Is there any other reasoning
21 that you haven't articulated about the
22 basis for your increasing security to one
23 hundred?
24    A.   Well, it is very conservative

Page 143

C. JALBERT

1 some information that's behind the numbers,
2 we found out that that's the cost of the
3 maid for those 15 days or maids or maid
4 service or cleaning service and not
5 maintenance. So it's just a matter of
6 calling it what it was. Had we seen
7 detail, we would have understood that on a
8 more timely basis.
9    Q.   Your reasoning for increasing
10 the allocation from 30 to 50 percent, is it
11 fair to say it's the same reasoning
12 behind --
13    A.   It's a husband and a wife. You
14 know, any other cleaning they do on behalf
15 of anybody else, the only reason they're
16 there is because the Kwok's are there. The
17 debtor and his spouse.
18    Q.   You note at the bottom of the
19 page, "in our opinion, it's best to be more
20 conservative". That's another reasoning
21 behind your --
22    A.   Yes.
23    Q.   -- suggestion to increase the
24 allocations? Is that yes?

Page 145

37 (Pages 142 - 145)

C. JALBERT
1
2    A.   Yes.
3    Q.   I do want to talk about the
4 insurance changed to zero percent from 30
5 percent.
6         MS. ARONSSON:  I think,
7    Makenzie, can you hand me Tab 14?
8    A.   All done?
9    Q.   Yes.  Before I show you the
10 document, do you recall information about
11 the change from 30 percent to zero percent
12 for the insurance line item?
13    A.   I recall talking with my
14 colleague about it after he found out the
15 facts, yes.
16    Q.   What do you remember about that
17 interaction?
18    A.   Well, I think he found out the
19 insurance payment that -- that 13 thousand
20 dollars on Number 9 here was one hundred
21 percent pertaining to the Sherry apartment
22 in New York City where he did not live
23 during this time frame and so to the extent
24 that someone is paying those bills of the
25 Sherry, I think that's the Sherry's problem

Page 146

C. JALBERT
1
2 and not on account of the debtor because as
3 I'm told by the attorneys, everyone's
4 understanding, from the facts is that he's
5 -- he does not have an interest in that
6 real estate.  So he shouldn't have any
7 percentage in the expenses shown on the
8 monthly operating report.
9         (Whereupon, E-mail Chain was
10    marked as Jalbert Exhibit 10 for
11    identification as of this date by the
12    Reporter.)
13    MS. ARONSSON:  The Court
14    Reporter is going to be handing you
15    what's marked as Jalbert Exhibit 10.
16    This is a document produced in this
17    matter with the Bates Kwok 00001691.
18    Q.   I understand you're not on this
19 document but I just want to discuss a
20 couple issues here.  Do you recognize this
21 document?
22    A.   No, but I recognize the
23 subject.
24    MR. HARBACH:  Give him a minute
25    to read it.

Page 147

C. JALBERT
1
2    THE WITNESS:  Okay.
3    Q.   Turning to Page 2, Melissa
4 Francis notes that, "since MK doesn't own
5 the Connecticut property, can you please
6 just explain the applicability of the
7 following entries as his monthly expenses?
8 And what type of insurance is it?"  Do you
9 see that?
10    A.   Yes.
11    Q.   What do you understand Ms.
12 Francis to be asking here?
13    A.   Since the debtor doesn't own
14 the Connecticut property, can you please
15 justify the applicability of the following
16 entries as his monthly expenses and she's
17 asking what type of insurance.
18    Q.   What is your view, if any, on
19 her question?
20    MR. AULET:  Objection to form.
21    A.   I would like to answer them
22 correctly.
23    Q.   You would like to answer the
24 monthly reporting --
25    A.   I'm hoping we answered her

Page 148

C. JALBERT
1
2 questions.  I mean this is going onto the
3 monthly reporting but I'm hoping we
4 answered them correctly.
5    Q.   Substantively, what is your
6 view on her question here?
7    MR. AULET:  Objection to form.
8    A.   I don't want to try and guess
9 what she was thinking.
10    Q.   So you have no understanding --
11 Verdolino and Lowey has no understanding
12 about the question she's asking here?
13    A.   I have my understanding.
14    Q.   Okay.  Turning to the first
15 page, Mr. Flynn responds, "correct, he
16 doesn't own it but he lives in the
17 Connecticut house so these expenses that
18 are paid are benefitting him".  Do you have
19 any understanding of what Mr. Flynn is
20 saying here?
21    A.   That's why he's saying that
22 since he lives there, he aught to be --
23 there should be some level of those
24 expenses ascribed to him in the monthly
25 operating report in that Question 8.

Page 149

38 (Pages 146 - 149)

C. JALBERT

1    Q.   Mr. Flynn continues, "I have a
2    question regarding the insurance as well
3    since this is insurance on the apartment of
4    the Sherry".  Do you understand what issue
5    hes referring to here?
6    A.   Yes.
7    Q.   Can you explain it for me?
8    A.   Well, in the Number 8 -- no,
9    Number 9, the original version of this had
10   insurance.  We didn't know what it was
11   insurance on.  Frankly, when we got it, we
12   assumed it was on the Greenwich residence
13   where the debtor and his spouse actually
14   reside.  We factually found out that it's
15   actually insurance on the Sherry and when
16   we found out it's insurance on the Sherry,
17   since the debtor doesn't live there and
18   doesn't own it, by review of materials from
19   the lawyers, it should be eliminated and
20   that's what we proposed, to eliminate it.
21   Q.   It was ultimately eliminated?
22   A.   Yes.
23   Q.   Mr. Flynn continues "I am not"
24   I am not sure it should be included here?

Page 150

C. JALBERT

1    A.   I don't know.
2    Q.   The original allocation to this
3    line item I think is --
4        MR. HARBACH:  Right here
5        (indicating).
6    Q.   -- at 13 thousand and that's
7    reflected on Page 2. $13,611.  Besides Ms.
8    Francis' e-mail, do you have any
9    independent knowledge of that information?
10       MR. AULET:  Objection to form.
11   A.   No.  It came from Melissa
12   Francis.  I don't know where she got that
13   number from or why.
14   Q.   Did you look into insurance for
15   the Greenwich property?
16   A.   No.
17   Q.   Why not?
18   A.   We asked for someone in the --
19   with the correct knowledge to give us all
20   of the expenses paid cash, check, wire
21   transfer, HCH, any other method, February
22   15th to February 28th on behalf of the
23   debtor.  We didn't leave any -- we didn't
24   ask for -- we didn't leave any

Page 152

C. JALBERT

1    I think that's what he means -- "in this
2    calculation but interested on your thoughts
3    and also asking Craig".  Do you recall him
4    asking your opinion on this?
5    A.   Yes.
6    Q.   Is your opinion the same as
7    Mr. Flynn's here --
8    A.   Yes.
9    Q.   Do you recall speaking with
10   Mr. Flynn about that?
11   A.   I do.
12   Q.   Turning to the top e-mail here
13   on this chain, on Page 1, Mr. Flynn asks,
14   "how much was paid during this period for
15   the Sherry".  Do you see that?
16   A.   Yes.
17   Q.   Do you know the answer to that
18   question?
19   A.   I have no idea.  Also, I don't
20   know why he asked it.
21   Q.   That was going to be my
22   question.  Why would it matter whether --
23   how much it was as to whether it should be
24   included in the monthly operating report?

Page 151

C. JALBERT

1    restrictions.  We just said give us all of
2    that information.  We got a summary chart.
3    You saw it and it wasn't till we started
4    asking questions to understand some of the
5    background and what is behind the numbers
6    that we started making assessments and
7    changing what we think the legal group and
8    us thought it was appropriate.
9    CONTINUED EXAMINATION
10   BY MR. HARBACH:
11   Q.   You said a moment ago that
12   originally, you and your team thought that
13   the 13 -- excuse me, I think you said you
14   assumed that the $13,611 was for the
15   Greenwich property because that's where he
16   was living.  I got that right?
17   A.   Yes, sir.
18   Q.   Then you were told that the
19   13,611 was actually for the Sherry, right?
20   A.   Correct.
21   Q.   And at that point, you did not
22   inquire about was there actually any
23   insurance money paid for the Greenwich
24   property during this period, you didn't ask

Page 153

39 (Pages 150 - 153)

C. JALBERT

1   that question?
2       A.   No, we assumed -- actually,
3   Matt had confirmed this is a list of all
4   the payments made during this time frame.
5   So we had the universe that wasn't another
6   insurance payment and you know, most --
7   many of us have owned homes.  My own
8   empirical knowledge is you typically pay
9   your homeowner's insurance once a year.
10  It's usually -- in the Sherry, this 13
11  thousand dollars might have been just a
12  payment for the year on a 2.5 million
13  dollar entity.  They didn't tell us it was
14  a payment so I didn't ask.
15  CONTINUED EXAMINATION
16  BY MS. ARONSSON:
17      Q.   So I think we've covered the
18  work that you have done in connection with
19  the monthly operating report for the period
20  February 15th to February 28th.  We've been
21  looking at that document.  Is that right?
22      A.   Yes.
23      Q.   Can you think of anything else
24  that we haven't talked about with the work

Page 154

C. JALBERT

1   with the Brown Rudnick firm and Melissa
2   Francis and Aaron Mitchell to determine
3   what the accrual of professional fees.  All
4   professionals, state professionals,
5   committee professionals, debtor
6   professionals, ordinary course -- alleged
7   ordinary course professionals, everybody
8   because we need to record the accrual.  So
9   it's not just -- the operating report is
10  not just asking for what was paid during
11  that period.  It's asking for what's the --
12  the new form is asking what are the unpaid
13  amounts and we couldn't get it in time to
14  get the February one.  So we're going to
15  catch up in this March one, we're going to
16  establish what the February accrual was and
17  we're going to find out what the March
18  accrual was and then we'll have the correct
19  information and it will have to be
20  maintained as we go along and obviously, as
21  time goes on, if things go according to the
22  way the debtor would like, there will be
23  payment on those fees.  So there'll be more
24  accruals and then payments and the same

Page 156

C. JALBERT

1   that you've done, in connection with
2   preparing that document?
3       A.   Off the top of my head, no.
4       Q.   I think you referenced you're
5   preparing the next reporting cycle?
6       A.   Yes.
7       Q.   Can you describe your general
8   process and how that defers, if it does,
9   with your reporting cycle for the February
10  15th to February 28th period?
11      A.   So the monthly operating report
12  is basically presenting information and the
13  two buckets of information that are in the
14  monthly operating report as for this debtor
15  is that Question E, the funds disbursed on
16  his behalf in the 31 day period, March 1 to
17  March 31, we're going to -- we're going to
18  figure out -- we're going to get a list.
19  This time, we're going to get a list so we
20  can see what there was and we can have --
21  we can have more educated discussion with
22  the lawyers about what was paid.  That will
23  be summarized and categorized and put in
24  Schedule E and in addition, we're working

Page 155

C. JALBERT

1   thing is true of the estate professionals
2   and the committee and its professionals.
3   It will be a roll forward of what the
4   liability is and the cash will be reported
5   on Page 1.  It will create liability to the
6   United States Trustee for their fee --
7   their -- their -- it's a fee.  It's not a
8   commission.  Their fee for -- which is
9   entirely predicated on cash disbursements
10  during the time of the monthly operating
11  report.
12      Q.   Do you anticipate -- strike
13  that.  Besides information that you'll
14  receive from Brown Rudnick, from Aaron
15  Mitchell, from Melissa Francis and an
16  unknown person, do you anticipate doing any
17  investigation in connection with future
18  monthly operating reports?
19      MR. AULET:  Objection to form.
20      A.   I don't know what you
21  consider -- I'm not going to -- we're going
22  to get a report from someone.  That report
23  is going to list out all of the payments
24  made during a specific time period.  We're

Page 157

40 (Pages 154 - 157)

C. JALBERT

1    going to review that with our own
2    professional knowledge and with the lawyers
3    to make sure it all makes sense. We might
4    ask questions based on what shows up on the
5    spreadsheet but I'm not going to ask for a
6    copy of the cancelled check, a bank
7    statement or the invoice that was paid. So
8    no investigation of that, just a sanity
9    check or a reasonableness check and confer
10   with counsel to be sure that we understand
11   what's on that sheet and what we're going
12   to report.
13       Q.   So essentially, you'll rely on
14   the rolled up numbers that are provided to
15   you from the individuals we've talked
16   about?
17       A.   Again, except for some queries
18   that we'll make depending on what the
19   information we get. If we get -- if
20   insurance shows up again, we're going to
21   ask insurance on what. If repairs and
22   maintenance shows up again, we're going to
23   confirm it's not the maid. So we'll use
24   some common sense and we'll confer with the

Page 158

C. JALBERT

1    they paid post-petition pre-petition. Here
2    they paid pre-petition, pre-petition but
3    should have been excluded from the monthly
4    operating report. Legitimate charge. It
5    wasn't an overpayment or anything. It just
6    didn't belong reported in the February
7    monthly operating report.
8        Q.   So is it fair to say you later
9    received a more detailed breakdown of these
10   items that was included in this --
11       A.   I believe we got a more
12   detailed -- but it was -- it was
13   significantly past that time. Everything
14   at that time was done by reviewing,
15   talking, Melissa and Aaron talking with
16   whoever and Matt talking to whoever. It
17   was all done by e-mail and orally. We
18   didn't get a spreadsheet of the detail
19   until sometime later, long after it was
20   filed and actually, after the time that we
21   made available our records that we got --
22   the detail listing which is when we figured
23   out oh we got a problem with the monthly
24   operating report. It's just a matter of,

Page 160

C. JALBERT

1    lawyers based on what we see but I won't
2    know what we're going to do until we see
3    what -- and I hope it's soon. What's
4    today, April 8th?
5        Q.   Thank you. Okay, just quickly
6    turning back to Exhibit 8 which is I think
7    the final living expense report for the
8    period February 15th, 2022 to February
9    28th, 2022. I think you had referenced an
10   erroneous amount included in here. Can you
11   just explain again what you meant by that?
12       A.   I don't remember exactly what
13   the number is but on the security line,
14   Line Number 9, the amount referenced her 43
15   thousand dollars. That 43 thousand dollars
16   included a payment of -- my memory is
17   something like 12 or 14 thousand dollars
18   that was paid February 10 and so we got
19   this report, the original one, and didn't
20   know the back -- the background and when
21   they -- when they showed us the background
22   and the list of -- we saw February 10. So
23   we realized we had the opposite mistake of
24   the time with the two professionals where

Page 159

C. JALBERT

1    you know, whoever is preparing these things
2    isn't used to the rules, isn't used to
3    what's got to be displayed -- disclosed and
4    what's not going to be disclosed. We try
5    and give them guidance and they just made a
6    minor error. We'll fix it next month.
7        Q.   Thank you. You can set that
8    aside. Do you recall receiving an inquiry
9    from someone at U.S. DOJ regarding the
10   monthly operating report?
11       A.   I think I actually reached out
12   to them first and my reaching out to them
13   first was -- and that's how -- was -- I
14   don't know if anyone's ever prepared a
15   monthly operating report, is there one
16   here? So the monthly operating report, up
17   until December 31 or January 31 was one,
18   two -- these two pages (indicating), Page 8
19   which is now Page 8 and Page 9 and there
20   might have been one more -- I thought it
21   was five pages. It might have been four.
22   And I filed these monthly operating reports
23   in several cases and it had been driving me
24   crazy for three months that I would -- I

Page 161

41 (Pages 158 - 161)

C. JALBERT

1 would -- the way the monthly operating
2 reports, the bottom, for the first page, it
3 allows you to use save if you're inputting
4 data so that you can review it but it
5 retains a watermark up until the time you
6 hit a button that says send the data out to
7 the United States Trustees website and it
8 does whatever it does and when it did that,
9 it kept on coming back with these extra six
10 pages and this nonsense (indicating). So I
11 actually reached out to the U.S. Trustees
12 Office saying what are we doing wrong.
13 It's midnight and we're trying to get this
14 thing in. He says no, everyone's having the
15 same problem. We've just finally figured
16 out that's what's supposed to happen. So
17 that's when we started talking with him and
18 then when he saw it, he had our e-mail
19 addresses and we -- and he was looking for
20 the support for the 161, I believe is what
21 he was asking for. I don't have it in
22 front of me or if I do, I didn't -- I don't
23 -- but that's my recollection, that's why
24 he reached out was to get -- to get that

Page 162

C. JALBERT

1 and to get the I think accrual of the
2 professional fees going forward.
3    Q.   Did you have a call regarding
4 the monthly operating report and further
5 details on the line items?
6    A.   Not a call. You have whatever
7 e-mails there were. It was very -- I was
8 very limited. My call to him was a general
9 question on my three cases, I'm trying to
10 file these. He was able to answer my
11 question -- my main question. He then,
12 when he saw the monthly operating report,
13 he said hey, I need this and we're going to
14 obviously arrange to do that.
15    Q.   So was it the inquiry from the
16 trustee that prompted Verdolino and Lowey
17 to request additional details and
18 breakdowns of the line items contained in
19 the monthly operating Excel that we've
20 looked at?
21    A.   No. We wanted to do that
22 anyway's. That just -- that gave us more
23 fuel to bring it to them to say hey, we got
24 to get to this. That's something we would

Page 163

C. JALBERT

1 have done anyway's.
2    Q.   We've talked about your
3 experience in Chapter 11 individual
4 bankruptcies before. Reflecting on your
5 experience in these instances, were any --
6 do you have any -- can you cite any case
7 where you've seen such a great disparity
8 between the debtor's punitive assets and
9 the stated liabilities?
10    A.   No. In my individual cases,
11 the 373 million dollars of liabilities is
12 the most I've ever seen.
13    MS. ARONSSON: We don't have
14 anymore questions.
15    MR. AULET: I have nothing.
16    MR. GOLDMAN: I have a few
17 follow-ups. I'll just be a couple
18 hours.
19    THE WITNESS: Beautiful. Do
20 you mind if I go get a bottle of
21 scotch?
22    MR. GOLDMAN: Get me one too.
23 I'm Irve Goldman --
24    THE VIDEOGRAPHER: Can you give

Page 164

C. JALBERT

1 him the microphone, please?
2    MR. AULET: Yes. Can I take us
3 off the record really quick so I can
4 --
5    MR. HARBACH: Sure.
6    THE VIDEOGRAPHER: The time is
7 1:56 p.m. and we are off the record.
8    (Whereupon, an off-the-record
9 discussion was held.)
10    THE VIDEOGRAPHER: The time is
11 1:58 p.m. We're back on the record.
12 You may proceed.
13 EXAMINATION BY
14 MR. GOLDMAN:
15    Q.   Good afternoon. Irve Goldman,
16 Pullman and Comley for the Creditor's
17 Committee. You mentioned you were
18 certified as an insolvency restructuring
19 expert. Did I get that right?
20    A.   Advisor.
21    Q.   Advisor, for how long?
22    A.   Well, the actual designation
23 came in 1999 but in 1999, when I got the
24 designation, I had to spend over four

Page 165

42 (Pages 162 - 165)

C. JALBERT

1 thousand hours and have been in the
2 profession for eight years at that point.
3 So 30 years ago.
4     Q.   Do you typically call on that
5 expertise when you're engaged as a
6 professional in Chapter 11 cases?
7     A.   Certainly some of it, yes.
8     Q.   What aspects of the debtor's
9 financial profile do you view as needing
10 restructuring?
11        MR. AULET:  Objection to form.
12     A.   Needing restructuring, I don't
13 understand your question.
14     Q.   Well, you're a certified
15 insolvency restructuring expert.  You call
16 upon that expertise in your engagements in
17 Chapter 11 cases.  What is it about the
18 debtor's financial profile that you view as
19 in need of restructuring?
20     A.   Well, you know --
21        MR. AULET:  Objection to form.
22     Q.   Do you view it as in need of
23 restructuring?
24     A.   No, I don't.

Page 166

C. JALBERT

1 and I -- and I regret completely that
2 we were brought in as a financial
3 advisor and not an accountant to the
4 debtor.  Most of what you see on that
5 motion to employ is very important
6 stuff in the process of bankruptcy.
7 The schedules, the SOFA's, the -- the
8 monthly operating reports, tax return
9 preparation, analysis of claims and I
10 don't know whether we'll have a role
11 in that or not.  It depends on what
12 the nature of the claim is.  Most of
13 these claims will be legally analyzed
14 but there might be a hundred reasons
15 why someone that filed a claim --
16 there might be an accounting
17 attached, they do want us to
18 investigate.  So we're not brought in
19 to -- just because we think there's
20 going to be a reorganization.
21 Bankruptcy is a process.  There's an
22 awful lot of paper that gets pushed
23 by an awful lot of people.  This
24 particular debtor is -- as I

Page 168

C. JALBERT

1     Q.   You don't?
2     A.   Absolutely not.
3     Q.   So why do you believe he filed
4 Chapter 11 then?
5     A.   Well, the debtor needs
6 restructuring.  I don't think --
7        (Whereupon, a cell phone rang.)
8        THE WITNESS:  Oh, I apologize.
9 That was for me to remind me to do
10 something at 2:00 which I can't
11 remember what I'm supposed to do.
12 Just making sure it wasn't on -- what
13 is that when it comes back on later
14 and it annoys you?  The debtor's
15 restructuring, if you're referring to
16 the questions were brought up -- in
17 an ordinary Chapter 11 case that's a
18 business, there's lots of things to
19 consider if there's a real
20 restructuring.  You've got to
21 restructure the debt, the secure
22 debt.  Maybe mezzanine, unsecured
23 debt.  Maybe work with payables, all
24 sorts of -- that isn't the case here

Page 167

C. JALBERT

1 understand it, is in excess of 70
2 years old.  Doesn't even have an
3 e-mail address.  Doesn't know how to
4 use computers.  Doesn't know
5 technology.  Couldn't possibly do the
6 monthly operating reports himself and
7 virtually, in every case, there's an
8 accountant that does tax returns.
9 There's an accountant that does --
10 that helps with preparing monthly
11 operating reports.  Even when the
12 company has a controller, we still
13 come in in cases where -- so there
14 may not be a reorganization as of
15 right now.  There's going to be a
16 plan someday.  I don't know what role
17 we're going to play but if we need to
18 be -- if the counsel and debtor needs
19 us to play a role, we will but until
20 that day, there's lots of necessary
21 work to do in the ordinary course of
22 the process in the life of a Chapter
23 11 case here.
24     Q.   What you just described were

Page 169

43 (Pages 166 - 169)

C. JALBERT
1   C. JALBERT
2 menial tasks of accounting?
3   A.   I disagree.
4   Q.   No, you disagree?
5   A.   Preparing the SOFA's and
6 preparing the MOR's, you think that's all
7 menial tasks?
8   Q.   All right, I won't argue with
9 you on that.  What is it about this case
10 that you -- you view that is in need of
11 restructuring, if anything?
12   MR. AULET:  Objection to form.
13   A.   Yeah, I don't know what you're
14 trying to ask.
15   Q.   Are there assets that need to
16 be restructured?
17   A.   The only assets I understand
18 are -- I think the lawyers call them
19 litigation assets in the like.
20   Q.   So how would they be
21 restructured or part of a restructuring?
22   MR. AULET:  Objection to form.
23   A.   You're probably asking the
24 wrong guy but if there's ongoing
25 litigation, I suspect there's going to be

Page 170

C. JALBERT
1   C. JALBERT
2 -- you would hope there would be settlement
3 negotiations, there might be mediation,
4 there might be arbitration.  Someone's
5 going to try and liquidate those assets
6 into cash with which to pay the creditors.
7 I don't know whether we'll play a part in
8 that or not.
9   Q.   As part of your -- the scope of
10 your engagement, there is a bullet point
11 that states that you're going to provide
12 assistance --
13   THE COURT REPORTER:  I'm sorry,
14   Counsel.  I need to hear you better.
15   Q.   Provide assistance with
16 reviewing debtor books and records for
17 possibly avoidable transactions such as
18 preference and fraudulent transfer claims.
19 You stated that you did not review any of
20 the debtor's books and records, correct?
21   A.   Currently, so far, yes.
22   Q.   Did you ask for any?
23   A.   No.
24   Q.   Do you intend to?
25   A.   Depends on what role the

Page 171

C. JALBERT
1   C. JALBERT
2 counsel wants us to play and the debtor
3 wants us to play.  If they want us to play
4 part of the role of looking at the
5 pre-petition payments, which we ordinarily
6 do in most of the cases we do, we come up
7 with the list, here it already exists.  We
8 might ask for support to confirm but it's
9 entirely up to the team that's running the
10 case.  We're not running the case.  We're
11 -- we're -- I think we're an important
12 member of the team but we're not -- the
13 accounting firm is not driving the case.
14 The debtor and his counsel is driving the
15 case as is true of every case.
16   Q.   Do you know where the debtor's
17 books and records reside?
18   A.   I do not.
19   Q.   Do you know if the debtor had a
20 pre-petition account?
21   A.   Only from knowledge from
22 lawyers.
23   Q.   Who was the accountant?
24   A.   Accountant?
25   Q.   Yeah, I asked you --

Page 172

C. JALBERT
1   C. JALBERT
2   A.   Oh actually, I take that back.
3 I saw actual tax returns.  There was --
4 every preparer has to list their name on a
5 tax return they prepare.  So there was --
6 someone paid tax returns at least.  What
7 else they did, I don't know.
8   Q.   Okay, what was the name of the
9 accountant?
10   A.   I don't remember.
11   Q.   Have the tax returns been
12 produced to any party in the case thus far?
13   A.   I imagine we produced them
14 because we had them.  They would have come
15 in an e-mail.  So they would have been
16 produced as it relates to this I think.  I
17 think they were but they were very small
18 tax returns prepared by -- I assume a New
19 York or a Connecticut accountant.  I don't
20 know who.
21   Q.   You just don't -- you obviously
22 looked at it, you just don't recall the
23 name of that accountant right now?
24   A.   I don't -- well, yes.  I'm not
25 even sure if I looked at it.  I don't know

Page 173

44 (Pages 170 - 173)

C. JALBERT
1       C. JALBERT
2 if, at the time when we were trying to do
3 everything, we were using those because we
4 needed some of the information on there.
5 We were referred to them by Melissa for
6 certain issues that the lawyers thought
7 were important and we went and took a look
8 at them but I would have looked at
9 something besides the name of the preparer.
10 At the time, it didn't matter.
11      Q.   Have you ever spoken to the
12 debtor?
13      A.   Yes.
14      Q.   When?
15      A.   Wednesday at the 341 hearing to
16 introduce myself.
17      Q.   Is that the only occasion, to
18 your knowledge, that you've spoken to the
19 debtor?
20      A.   I don't speak Mandarin and he
21 apparently doesn't speak English. So I
22 have not spoken to him. Or Chinese. I'm
23 not sure which it is. Excuse me.
24      Q.   You did not receive a
25 post-petition retainer, correct?

Page 174

C. JALBERT
1       C. JALBERT
2 I don't know.
3      Q.   What information, if any, did
4 you rely on in getting comfortable taking
5 this case without a post-petition retainer?
6      A.   I've been doing this for 35
7 years. I'm not sure. I don't remember
8 ever getting a post-petition retainer but
9 my firm works with --
10      (Whereupon, a cellphone rang.)
11      THE WITNESS:  Shit, I'm sorry.
12 Now it's off. We -- we're a
13 practitioner in Massachusetts and we
14 do cases in Delaware, New York,
15 Connecticut, Rhode Island,
16 Massachusetts, New Hampshire,
17 Vermont, Maine. We represent Chapter
18 7 trustees in virtually all of those
19 states. We probably represent and do
20 work for virtually ever Chapter 7
21 trustee in Rhode Island, every
22 Chapter 7 trustee in Massachusetts, a
23 couple in Maine, a couple in New
24 Hampshire and it's not unheard of for
25 us to go and do 50, 60, 70, 80

Page 176

C. JALBERT
1       C. JALBERT
2      A.   Correct.
3      Q.   Are you confident that your
4 fees will be paid?
5      A.   I don't know if I'm confident.
6 I'm hoping.
7      Q.   What source do you believe your
8 fees will be paid, from what source?
9      A.   It will come from the Estate.
10 If we're going to be paid, as I understand
11 it, it will come from the Estate. I don't
12 -- I have not thought of or have any
13 agreement on any other source of payment.
14      Q.   Do you mean the litigation
15 claims or recoveries?
16      A.   I would expect the only people
17 that have a retainer in this case are Brown
18 Rudnick. Everybody else will be looking to
19 be paid -- that is a debtor's professional
20 or a committee professional, professionals
21 that file an application with the Court and
22 the Court allows their retention will be
23 looking to get funds. We're all going to
24 be looking from the same place. What that
25 source is going to be, if it will ever be,

Page 175

C. JALBERT
1       C. JALBERT
2 thousand dollars of work before we
3 even know the case will ever have any
4 money. It's an investment that we
5 make. Now I didn't make an
6 investment in this case. Whatever we
7 incurred -- and I don't know what
8 that is, I'm hoping I'm going to
9 collect it but if I don't, then I'll
10 have a write-off like I've had many,
11 many, many, many times in the past.
12      Q.   Again, I don't think you
13 answered my question.
14      A.   Oh all right --
15      Q.   If you -- if you relied just on
16 your experience in engagements in
17 bankruptcy cases and that's it for taking
18 this case without a pre or post-petition
19 retainer, is that what you mean --
20      A.   I don't understand your
21 question.
22      Q.   What information, if any, did
23 you rely on in taking this case without a
24 pre or post-petition retainer?
25      MR. AULET:  Objection to form.

Page 177

45 (Pages 174 - 177)

C. JALBERT

1
2    A.   I do work with lots and lots of
3 attorneys and when attorneys call up and
4 they ask if we're interested on working on
5 the case, I work on the case.
6    Q.   So you relied on being asked to
7 get involved by Brown Rudnick?
8    A.   Yep.
9    Q.   That's it?
10    A.   Yep, and then after that, it's
11 bankruptcy process.  Whatever happens,
12 happens.
13    Q.   You didn't look at the
14 financial profile of this debtor at all in
15 determining --
16    A.   I think -- I think I knew he
17 had limited assets or no assets and I think
18 I knew he had a lot of litigation ongoing
19 but -- maybe I'm a fool but I only have one
20 other person that I have to answer to and
21 he lets me run my business just like he
22 runs his business and my feeling is when a
23 lawyer calls up and they have a case, then
24 we respond because if I don't respond,
25 maybe the next time he calls another

Page 178

C. JALBERT

1 engagement?
2    A.   Absolutely not.
3    Q.   Have you had any communications
4 with any representative from Golden Hill?
5       MR. HARBACH:  Golden Spring.
6    Q.   Golden Spring.
7    A.   I was on e-mails with someone
8 from -- well, first of all, Melissa Francis
9 has a Golden Spring e-mail address.  She's
10 counsel to the debtor.  I've been informed
11 of that from the beginning.  The only other
12 contact --
13    Q.   She's counsel for the debtor or
14 Golden Spring?
15    A.   Debtor.
16    Q.   Melissa --
17    A.   Francis.
18    Q.   But she has an e-mail address
19 from Golden Spring?
20    A.   Correct.  They were in all of
21 these e-mails that they were putting in
22 front of me.
23    Q.   She's counsel for the debtor is
24 your understanding --

Page 180

C. JALBERT

1 accountant.  So I didn't do all the things
2 that you think a normal person should have
3 done to protect themselves on payment.
4    Q.   Did you rely on any degree on
5 the financial profile of Golden Spring?
6    A.   No.
7    Q.   You didn't do any due diligence
8 on Golden Spring before agreeing to get
9 engaged in this case?
10    A.   I'm pretty sure I didn't know
11 Golden Spring existed by the time I agreed
12 to be in this case.
13    Q.   How about Lamp Capital, did you
14 do any investigation of Lamp Capital?
15    A.   No.
16    Q.   Did you ask any questions about
17 what the financial profile of those two
18 entities was --
19    A.   No.
20    Q.   -- before getting involved?
21    A.   No.
22    Q.   Were you promised that you
23 would be paid from Golden Hill or Lamp
24 Capital before agreeing to take on the

Page 179

C. JALBERT

1    A.   I've been told emphatically by
2 her and by Brown Rudnick that she is
3 counsel to the debtor, as is Aaron
4 Mitchell.  As is Brown Rudnick.
5    Q.   Okay.  Are they part of the
6 application to retain ordinary course
7 professionals, if you know?
8    A.   I don't know that they're going
9 to be paid by the Estate or not.  I don't
10 know what they're -- what they're -- what
11 motions they filed to be paid.  I'm not --
12 I'm not representing them and I'm not
13 asking them.
14    Q.   So back to the question whether
15 you had any communications with Golden
16 Spring --
17    A.   So my colleague, Matt Flynn,
18 had I think one or two phone calls with
19 someone at Golden Spring.  There was a
20 number of e-mails which we looked at in
21 here and you know, 6, 7, 8, 9, whatever,
22 that person is not identified but I did not
23 speak to that person.  I had -- I was on
24 the e-mail exchanges and I wrote exactly

Page 181

46 (Pages 178 - 181)

C. JALBERT

1    one e-mail to that person and actually
2    directed it to Melissa and Aaron when I
3    wrote my e-mail.
4        Q.   Do you know why that person's
5    name is redacted on the exhibit?
6        A.   Yes.
7        Q.   Why?
8        A.   Because you heard Golden
9    Spring's attorney.  They're worried about
10   the safety of their employees given the
11   issues surrounding this case.  I don't know
12   anything about that.  I'm just doing what I
13   told.  I am not disclosing the name.
14       Q.   It was at Golden Spring's
15   counsel's behest that that was redacted is
16   your understanding?
17       A.   Well, I don't know whether it
18   was Golden Spring's counsel or Golden
19   Spring itself.  I don't know -- I don't
20   know who started it.  I just -- in fact, I
21   don't think I knew it until the day before
22   -- the day before, maybe Wednesday is when
23   I found out that -- that -- that the
24   documents were redacted.

Page 182

C. JALBERT

1        Q.   Is it your understanding that,
2    according to the debtor, all of his living
3    expenses, pre-petition, were paid by Golden
4    Spring?
5        A.   Well, they were paid by
6    somebody else.  I can't say emphatically
7    they were paid by Golden Spring.
8        Q.   So whatever that person or
9    entity -- whoever that person or entity
10   was, are the living expenses, post-petition
11   living expenses that were prepared in the
12   various schedules, consistent with what was
13   paid pre-petition?
14       A.   We didn't do an investigation
15   as to what the pre-petition nature of
16   payments or amount of the payments or
17   anything.  So I don't have any -- any
18   comparative information.  That information
19   will be developed as we see the months go
20   by but I think the final -- the final
21   number for 15 days of the expenses for the
22   individual ended up being something like 28
23   or 29 thousand dollars for 15 days.  So
24   multiply that by two 60 thousand dollars

Page 183

C. JALBERT

1    for the month of which two-thirds of that
2    is security.
3        Q.   Is the person or entity that is
4    funding the post-petition living expenses
5    Golden Spring?
6        A.   I don't know.  That's not one
7    of the questions and no one has volunteered
8    that information.  It just says -- the
9    question says is there a third-party making
10   payments on behalf of the debtor
11   post-petition.  We answered that question
12   as best we could.  We'll fix the one error
13   that remains but it did not ask and they
14   did not tell us, to my knowledge, who is
15   making the disbursements.
16       Q.   And you didn't ask?
17       A.   No.  I don't know how it would
18   affect -- it's not in the monthly operating
19   report so it's none of my business I think
20   is what I would have been told.
21       MR. GOLDMAN:  I don't have any
22   further questions.
23       MR. AULET:  I have nothing.
24       THE VIDEOGRAPHER:  Can I take

Page 184

C. JALBERT

1    us off the record for the day?
2        MR. GOLDMAN:  Yes.
3        THE VIDEOGRAPHER:  We're off
4    the record at 2:18 p.m. and this
5    concludes today's testimony given by
6    Craig Jalbert.
7        (Whereupon, at 2:18 P.M., the
8    Examination of this witness was
9    concluded.)
10
11       °      °      °      °
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 185

47 (Pages 182 - 185)

```
 1
 2        D E C L A R A T I O N
 3
 4      I hereby certify that having been
 5  first duly sworn to testify to the truth, I
 6  gave the above testimony.
 7
 8      I FURTHER CERTIFY that the foregoing
 9  transcript is a true and correct transcript
10  of the testimony given by me at the time
11  and place specified hereinbefore.
12
13
14
              _____
15            CRAIG JALBERT
16
17
18  Subscribed and sworn to before me
19  this _____ day of _____ 20___.
20
21
     _____
22     NOTARY PUBLIC
23
24
25
```
Page 186

```
 1
 2        C E R T I F I C A T E
 3
    STATE OF NEW YORK     )
 4             : SS.:
    COUNTY OF KINGS       )
 5
 6      I, LENAYA LYNCH, a Notary Public for
 7  and within the State of New York, do hereby
 8  certify:
 9      That the witness whose examination is
10  hereinbefore set forth was duly sworn and
11  that such examination is a true record of
12  the testimony given by that witness.
13      I further certify that I am not
14  related to any of the parties to this
15  action by blood or by marriage and that I
16  am in no way interested in the outcome of
17  this matter.
18      IN WITNESS WHEREOF, I have hereunto
19  set my h                            022.
20
21       _____
           LENAYA LYNCH
22
23
24
25
```
Page 188

```
 1
 2        E X H I B I T S
 3  JALBERT EXHIBITS
     EXHIBIT   EXHIBIT            PAGE
 4  NUMBER    DESCRIPTION
 5  Exhibit 1  Notice of Deposition      10
 6  Exhibit 2  E-mail Chain       32
 7  Exhibit 3  E-mail Chain       35
 8  Exhibit 4  Debtor's Application    47
 9  Exhibit 5  Official Form 106Sum   93
10  Exhibit 6  Global Notes         111
11  Exhibit 7  E-mail Chain       129
12  Exhibit 8  E-mail Chain       131
13  Exhibit 9  E-mail Chain       139
14  Exhibit 10 E-mail Chain       147
15
     (Exhibits retained by Court Reporter.)
16
17        I N D E X
18  EXAMINATION BY           PAGE
19  MS. ARONSSON         5
     MR. HARBACH          100
20  MS. ARONSSON         103
     MR. HARBACH          153
21  MS. ARONSSON         154
     MR. GOLDMAN          165
22
23
24
25
```
Page 187

Veritext Legal Solutions
866 299-5127

**[& - 373]**

| & |
| --- |
| **&**   1:15,18 2:3,12 |

**0**

**00001646**   32:16
**00001649**   35:10
**00001684**   140:8
**00001691**   147:17
**00001752**   129:3
**02035**   6:9
**06103**   2:18
**06601**   2:14

**1**

**1**   3:16 10:14,17
  17:10 23:22 72:10
  97:9 113:14,18
  114:14 118:3
  132:21 151:14
  155:17 157:6
  187:5
**10**   133:25 147:10
  147:15 159:19,23
  187:5,14
**100**   2:18 142:15,18
  143:8 187:19
**10036**   1:19 2:5,10
**100th**   44:7
**101**   6:9
**103**   187:20
**106a**   94:21
**106sum**   93:14
  94:2 187:9
**109**   132:22 135:18
  140:17
**109,827**   133:7
**109,827.12**   132:13
**10:17**   1:11 3:4
**10:24**   11:15,19
**11**   1:5 21:2,4
  32:11 55:3 70:3
  74:19 81:6,11

86:10,22,24
  103:13 115:4,4,8
  119:21 124:25
  164:4 166:7,18
  167:5,18 169:24
**111**   187:10
**11:53**   90:21
**12**   2:18 34:22
  85:15 159:18
**120**   75:21 131:25
**120-1**   131:25
  132:6
**122b**   125:3,14,19
**124**   6:8
**129**   187:11
**12:22**   90:25
**13**   19:8 42:12
  55:14 103:14
  126:5 146:19
  152:7 153:14
  154:11
**13,611**   152:8
  153:15,20
**131**   187:12
**139**   187:13
**14**   19:8 98:7 146:7
  159:18
**147**   187:14
**15**   77:6 89:10
  97:25 145:4
  183:22,24
**153**   187:20
**154**   187:21
**15th**   63:14 72:9
  125:4 129:23
  133:11 134:3
  140:14 152:23
  154:21 155:11
  159:9
**16**   96:18 105:18
  126:5

**161**   132:20 134:13
  135:13,17 140:18
  162:21
**161,323**   132:23
  133:5
**165**   187:21
**16th**   132:17
**17**   119:19,21
**18**   48:22 127:22
**19**   131:3
**19,488**   125:6,15
**1979**   17:5
**1983**   17:8
**1987**   17:10
**1999**   165:24,24
**1:22**   139:21
**1:28**   140:4
**1:56**   165:8
**1:58**   165:12
**1a**   94:19,22 95:8
**1b**   95:11

**2**

**2**   23:22 32:14,18
  33:2,4 41:6 97:13
  105:21 142:14
  148:3 152:8 187:6
**2.5**   154:13
**20**   45:8 186:19
**2019**   79:18
**2020**   79:19
**2021**   127:24
**2022**   1:10 3:5
  125:4 159:9,10
  188:19
**21**   45:8 49:9 84:9
  92:21 107:14
**22**   45:9
**22-50073**   1:6 3:22
**22nd**   3:4
**23**   97:8

**24350**   188:21
**26**   120:3,12
**28**   183:23
**28th**   72:9 129:23
  133:12 134:3
  140:14 152:23
  154:21 155:11
  159:10
**29**   183:24
**2:00**   167:11
**2:18**   185:5,8

**3**

**3**   23:23 35:8,12
  96:25 97:4,8,13,24
  115:13 116:21
  144:12 187:7
**3,850**   96:5
**30**   7:5,19 11:2,22
  107:6 144:4,6,14
  145:11 146:4,11
  166:4
**30th**   2:4
**31**   17:10 72:10
  74:24 77:7 121:16
  155:17,18 161:18
  161:18
**32**   187:6
**341**   16:17,22 45:13
  45:14,17 46:14,15
  46:19,24 47:8,12
  47:13,18 51:15
  69:5 116:2 123:15
  123:18 126:13
  127:10,18 174:15
**342**   16:16
**35**   17:13 176:6
  187:7
**36**   95:13 96:2,4,8
  96:16
**373**   113:19 164:12

Page 1

[4 - advisor]

| 4 | 61  95:17,19,24 | 93   187:9 | 172:24 173:9,19 |
|---|---|---|---|
| **4**  47:24 48:3 91:4 | **62**  95:15,16,17 | **a** | 173:23 179:2 |
| 96:9,12,17 97:13 | **6:49**  39:10 | **a.m.**  1:11 3:4 | **accountants**  21:5 |
| 107:14 108:8 | **6e**  108:8 130:23 | 11:15,19 90:21 | 21:6,7,8 |
| 113:13 117:4 | **7** | **aaron**  25:17,19,25 | **accounting**  22:21 |
| 119:4 130:23 | | 26:10 31:4,7 32:9 | 63:21 168:17 |
| 144:20 187:8 | **7**  1:18 2:4,9 81:6 | 56:18 57:3 59:3,4 | 170:2 172:13 |
| **40**  7:18 138:18 | 86:25 95:18 | 59:10,18 99:2,7 | **accounts**  69:21,22 |
| 142:16 | 103:12 119:16,21 | 102:11 103:17 | **accrual**  70:20 |
| **43**  159:15,16 | 128:24 129:11 | 104:12,16 105:3 | 156:4,9,17,19 |
| **43,655.44.**  138:16 | 133:16 135:14 | 105:13 106:7 | 163:2 |
| **45**  72:11 | 136:18 141:17 | 109:24 110:18 | **accruals**  156:25 |
| **47**  187:8 | 142:16 144:14 | 112:15 124:2 | **accrue**  69:2 |
| **5** | 176:18,20,22 | 129:18 135:23 | **accrued**  78:23,25 |
| **5**  93:12,15 108:8 | 181:22 187:11 | 139:8 143:14 | 79:6 |
| 117:4 130:23 | **70**  6:19 7:16 169:2 | 156:3 157:15 | **accurate**  10:6 |
| 187:9,19 | 176:25 | 160:16 181:4 | 136:11,12 |
| **50**  6:19 7:14,18 | **7006**  2:14 | 182:3 | **accurately**  10:2,9 |
| 118:13 141:9,10 | **77**  100:20 111:6 | **ability**  9:25 10:5 | 136:24 |
| 141:14 142:7,8,9 | **78**  93:19 | **able**  53:7 78:6 | **accustomed**  53:9 |
| 142:12 144:13 | **8** | 79:11 136:13 | **act**  19:15 |
| 145:11 176:25 | | 138:3 144:25 | **action**  4:8 188:15 |
| **500**  21:3 126:6 | **8**  1:10 119:21 | 163:11 | **activity**  63:22 |
| **505**  75:13,17 76:2 | 120:3 131:16,21 | **absolutely**  82:6 | 80:12 |
| **505b**  75:5 | 134:7 135:11,18 | 167:3 180:3 | **actual**  109:17 |
| **50th**  44:6 | 149:25 150:9 | **abundance**  132:20 | 137:7 165:23 |
| **51,495.67**  140:17 | 159:7 161:19,20 | 142:21 | 173:3 |
| **53**  122:11 | 181:22 187:12 | **accepted**  102:23 | **add**  85:21 140:16 |
| **55**  94:22 95:23 | **80**  7:16 176:25 | **access**  115:23 | **addition**  155:25 |
| **56**  95:17,19 | **83**  17:9 | 119:6 124:16 | **additional**  163:18 |
| **58**  95:24 96:2 | **850**  2:13 | **accidently**  125:13 | **address**  6:6,7,8 |
| **6** | **87**  17:10 | **account**  37:25 | 169:4 180:10,19 |
| **6**  7:5 11:2,8,21,22 | **8th**  3:5 127:24 | 38:24 52:15 63:19 | **addresses**  162:20 |
| 97:24 98:7 111:4 | 159:5 188:19 | 64:17 65:3 66:19 | **administer**  4:6 |
| 111:8 117:5 | **9** | 72:6 91:6,8 92:11 | **administrative** |
| 119:16,18,21 | | 92:16 147:2 | 77:17 78:7,10 |
| 181:22 187:10 | **9**  119:21 139:24 | 172:20 | 81:8 |
| **60**  6:19 7:14 75:11 | 140:7 146:20 | **accountancy**  17:8 | **advising**  22:20 |
| 75:19 176:25 | 150:10 159:15 | **accountant**  18:16 | 53:2 61:11 |
| 183:25 | 161:20 181:22 | 70:22 80:6 168:4 | **advisor**  17:24 18:7 |
| | 187:13 | 169:9,10 172:23 | 21:5,6 34:7 36:23 |
| | **90**  48:10 82:17 | | |
| | 83:22 92:23 | | |

Veritext Legal Solutions
866 299-5127

37:7 39:8 40:20
41:20 43:2 48:9
48:21 49:5 70:22
165:21,22 168:4
**advisors** 62:4,5
**affairs** 14:6 55:20
111:18 112:5
**affect** 184:19
**affidavit** 48:25
49:7
**affiliated** 42:3
**affiliations** 4:13
**afternoon** 165:16
**agent** 90:2 91:7,20
91:21,24
**ago** 153:12 166:4
**agree** 3:14 59:12
91:6 96:16 100:22
107:13,17
**agreed** 143:8
179:12
**agreeing** 179:9,25
**agreement** 55:13
61:8 67:25 78:6
91:22 127:23,25
175:13
**agreements** 128:8
128:16,18
**ahead** 40:8 122:20
**aircraft** 97:15
119:5
**alive** 114:5
**allegations** 40:24
**alleged** 81:5 156:7
**alleging** 83:18
**alliance** 2:3 4:20
6:13 10:23
**allocated** 141:16
**allocating** 117:25
**allocation** 145:11
152:3

**allocations** 145:25
**allow** 12:20 38:23
65:2 87:11
**allowed** 80:12
81:20
**allows** 82:15,17
162:4 175:22
**amend** 89:7 125:3
**amended** 125:19
**amendment** 60:7
**amendments**
55:21 112:6
**amount** 13:9
81:22 96:5 118:12
133:8,9 134:17
137:25 138:12
159:11,15 183:17
**amounts** 51:22
132:19 134:23
138:4,9 156:14
**analysis** 68:6 83:4
84:3 87:19 89:18
92:25 95:2 96:19
105:9 107:20
115:18 168:10
**analyzed** 168:14
**analyzing** 80:18
82:4
**andersen** 17:9
**annoys** 167:15
**answer** 8:20 9:11
9:19,21 24:21
26:22,24 27:12
28:12 29:11,11,13
29:17 36:11 38:17
53:16,21 54:12
83:20 88:16
101:20 104:18
105:16 113:17
116:8,21 118:2
119:6 120:5

121:17 122:12
130:2 148:21,23
151:18 163:11
178:20
**answered** 34:20
148:25 149:4
177:13 184:12
**answers** 8:5,23
130:20
**anticipate** 47:16
50:19 52:9 54:16
55:6 59:25 61:19
61:21 63:25 67:16
76:4,24 79:21
106:15 157:13,17
**anticipated** 60:5
60:11 62:9 68:15
**anticipates** 78:16
**anybody** 83:24
145:16
**anymore** 116:9
142:11 164:15
**anyone's** 161:15
**anytime** 41:14
**anyway** 69:16
**anyway's** 70:8
87:6 163:23 164:2
**apartment** 101:6,9
102:6 114:17
115:2,7 146:21
150:4
**apologize** 35:2
56:22 167:9
**apparently** 28:19
174:21
**appear** 100:20
**appearance** 4:16
**appearances** 4:12
**applicability**
148:6,15

**applicable** 107:11
**application** 48:2,7
48:18 49:2 175:21
181:7 187:8
**applies** 53:17,22
103:22
**apply** 118:2
**appointed** 22:13
**appreciate** 35:4
**approach** 22:20
**appropriate** 73:14
113:8 114:7 153:9
**approval** 70:16
**approved** 62:10
64:22
**april** 1:10 3:4,5
137:22 159:5
188:19
**arbitration** 171:4
**areas** 12:11 22:12
22:21
**arena** 19:4
**argue** 170:8
**argument** 117:21
144:6
**aronsson** 2:5 4:18
4:18 6:2,12 7:4,13
10:12 11:12 12:9
26:20,25 27:13
29:18 32:11 34:21
35:6 47:22 48:5
83:11 88:13 90:18
93:10,17 97:6
99:22 103:5,6
111:2 128:22
129:7 130:5 131:2
131:5,9,23 139:18
146:6 147:13
154:17 164:14
187:19,20,21

arrange 163:15
arrangement 54:20
arrive 136:8
arthur 17:9
articulated 143:22
ascribe 144:2,15
ascribed 118:17 141:25 149:24
ascribes 120:22 121:7
ascribing 142:22
asia 2:3 4:20 6:14 10:23
aside 15:22 47:5 67:7 83:17 161:9
asked 36:8 47:19 53:23 56:15,21,22 64:20 110:7 151:21 152:19 172:25 178:6
asking 13:17,19,20 34:14 67:18 98:22 101:2,18,21 102:2 105:15 148:12,17 149:12 151:4,5 153:5 156:11,12 156:13 162:22 170:23 181:14
asks 108:11,17,18 113:14 115:13 120:4 121:16 122:11 151:14
aspects 166:9
assenting 37:9
assessment 101:14
assessments 153:7
asset 78:3
assets 88:2 94:2 104:7 111:16 120:23 128:12

164:9 170:15,17 170:19 171:5 178:17,17
assigned 74:24
assist 52:18 86:17
assistance 45:11 55:18 61:9 73:16 80:17 82:8 84:23 85:18 86:6 88:21 112:3 171:12,15
assisted 15:19 51:9,12 109:14 112:10,11 113:3 141:4
associated 66:20 117:2
association 107:9
assume 9:6 92:20 92:24 173:18
assumed 150:13 153:15 154:3
assuming 28:15 50:23 72:13 118:21
assumption 143:10
attach 69:14
attached 79:16 168:18
attachment 129:9 129:21 130:8 140:11
attempts 120:24
attend 45:13
attended 45:14,16 47:11
attending 4:11 46:14
attention 105:20
attorney 2:17 4:17 6:12 9:18 13:5

23:9 28:8 182:10
attorneys 2:3,9,13 14:16 15:6,16 25:8 32:3 40:21 46:23 47:6 98:9 98:21,24 99:6,14 104:24 106:20 109:23 142:3 147:3 178:3,3
attributed 138:4
audible 8:24
audio 3:12,12
audit 75:13,18,20
auditing 22:21
aught 149:22
august 17:10
aulet 2:10 5:3,3,12 9:17 12:4,6,24 13:6 24:20 26:16 26:23 27:11,13,16 28:7 29:19 34:10 37:16 39:5 46:20 57:22 58:18 61:4 64:14 66:13 77:4 78:21 79:22 83:7 83:13 84:25 85:8 88:3,8,16 91:9 92:2 93:5 95:9 96:10 97:2 98:15 99:23 101:17 102:8 103:24 104:13 106:18 108:21 111:22 112:22 113:24 118:4 122:18 126:3 127:7 129:4 129:25 130:16 131:6,11 132:11 133:18 141:18 148:20 149:7 152:11 157:20

164:16 165:3 166:12,22 170:12 170:22 177:25 184:24
authored 26:13 27:9
authorities 75:11
authorization 48:7 48:19 49:3
authorized 4:6
automobiles 115:16,16
available 135:2 137:16 160:22
avoid 69:16
avoidable 82:9 83:2 84:13 171:17
aware 25:17 30:19 88:6 90:8,10 114:24
awful 47:11 168:23,24
awfully 88:4
awhile 85:9

**b**

b 2:6 5:21 6:5 7:5 11:2,22 75:13,17 76:2 94:17,20,21 94:23 95:12 96:13 187:2
baby 19:25
babysitting 19:10
bachelor 17:7
back 7:18 11:19 13:20 27:6 29:24 34:3 41:5 49:13 55:12 69:25 71:16 82:16 90:25 91:4 95:17 103:7 111:23 112:13 114:4 127:11

131:7 140:4 159:7
159:21 162:10
165:12 167:14
173:2 181:15
**background** 17:2
153:6 159:21,22
**balance** 69:20
**bank** 37:25 52:15
64:21,24 65:6
69:18 91:6,16
158:7
**bank's** 91:18
**bankruptcies**
164:5
**bankruptcy** 1:2
3:20 20:11,22
21:13,24 22:6,11
32:25 38:15 39:19
39:22 44:6,7,7
51:2 64:25 74:13
75:4 77:15,24
80:4,13 81:2,23
82:15 83:23 90:3
115:2 168:7,22
177:17 178:11
**base** 59:9
**based** 27:16,21
28:23 63:5 72:25
87:14 158:5 159:2
**basic** 129:16
**basically** 37:9
39:11 155:13
**basis** 37:14,21
66:25 69:7,8
73:10 80:11 81:7
81:8,8 90:7
123:12 143:9,23
145:9
**bates** 32:15 35:9
129:2 140:8
147:17

**beach** 122:14
**bearing** 76:9,9
**bears** 32:15 140:8
**beast** 42:18
**beautiful** 164:20
**beginning** 4:16
180:12
**behalf** 12:23 21:7
21:8 38:21 108:11
108:15 117:6
118:14,23 130:24
132:17 133:12
144:10 145:15
152:23 155:17
184:11
**behest** 182:16
**believe** 24:4 45:2,5
50:18 72:14 99:19
100:7 144:21
160:12 162:21
167:4 175:7
**believes** 27:19
**belong** 102:23
119:23 160:7
**belonged** 101:15
102:6 103:14
**belonging** 104:8
**ben** 13:5 14:16,21
24:5
**beneficiary**
121:25
**benefit** 124:3
**benefitting** 149:18
**best** 13:2 28:9 52:4
56:10 60:9,14
137:2 145:20
184:13
**better** 86:23
103:25 171:14
**beyond** 14:13
38:18 53:13 116:7

119:8 121:2
**big** 34:4,15,16
35:20 52:23
**biggest** 19:4
**bill** 45:19 72:12,23
73:6
**billed** 67:13,14,16
**bills** 19:14 55:3
72:3 122:4 146:24
**binders** 69:14
**birnbaum** 2:17
**bit** 14:20 17:2
21:25 24:3 46:17
139:16
**biweekly** 66:25
**blood** 188:15
**blue** 131:13
**bookkeepers**
52:16 53:14,18,19
53:20,25 66:19
**books** 82:8 84:12
84:14,18 92:18
171:16,20 172:17
**boston** 17:6,6
18:16
**bottle** 34:25 42:8
164:21
**bottom** 49:11
105:19 132:9
145:19 162:3
**bought** 101:23
117:18
**box** 2:14
**brain** 93:8
**break** 9:9,12 85:9
85:15 139:19
**breakdown**
160:10
**breakdowns**
163:19

**bridgeport** 1:3
2:14 3:21
**brief** 90:22
**briefly** 14:21
65:24 128:5
**bring** 163:24
**broad** 7:21 22:9
**broadly** 109:5
115:13 132:8
**brought** 40:3,20
167:17 168:3,19
**brown** 2:8 5:4
15:21 23:10,16
24:6,8,18 25:8
26:5,6,10 30:9
31:20 32:3 38:10
38:12 39:2,16
43:23 49:24 56:13
57:4 58:25 59:6
59:10,17 64:20
83:18 98:25 99:6
102:11,17 103:18
103:18 104:10,16
104:17 105:7,12
106:6 109:24
112:14 123:25
126:7,14 139:7
156:2 157:15
175:17 178:7
181:3,5
**buckets** 19:3
21:19 155:14
**budget** 61:10,23
61:24 62:2
**budgeting** 42:10
63:16 86:15
**budgets** 42:13,13
**build** 78:2
**building** 113:16
**bullet** 55:17 61:7
92:19 112:3

[bullet - certain]

114:16 171:10
**business** 6:7 22:10
41:21,24,25 42:8
42:11,22 43:3
167:19 178:21,22
184:20
**businesses** 19:5
**button** 162:7
**buying** 117:23

**c**

**c** 2:2 3:1 4:1 5:1,21
6:1 7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1,9,10
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1,17 95:1

96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1,7
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:2 188:2
188:2
**calculates** 69:10
**calculation** 151:3
**calender** 72:7
**call** 19:10 31:18
45:18 79:11 102:4
104:25 163:4,7,9
166:5,16 170:18
178:3

**callable** 144:5
**called** 5:21 20:18
41:8 89:22
**calling** 145:7
**calls** 25:11,15
58:24 93:6 143:15
178:23,25 181:19
**camera** 8:11
**cancelled** 158:7
**capabilities** 18:2
**capital** 126:8,20
179:14,15,25
**car** 116:3,17 117:9
**care** 67:6 79:4
**career** 47:12
**cars** 97:14 117:19
**case** 1:6 3:22 6:17
15:24 33:21 41:19
41:22,23,24 42:19
43:3,4 44:3,13,14
48:10 49:15 50:22
50:23 51:2,5,20
52:10 54:17 55:8
55:11,16 56:10
59:7 60:9,14
61:22 62:9,19
64:2 66:5 67:4,17
68:12,21 69:2
70:4,7,9,11 71:5,6
71:19 73:11,25
74:2,7,11,19 75:9
75:14,22 76:22
77:21 78:5,25
79:5 81:6 82:24
84:7 86:4,25 90:6
93:20 107:24
111:5 131:24
164:7 167:18,25
169:8,24 170:9
172:10,10,13,15
172:15 173:12

175:17 176:5
177:3,6,18,23
178:5,5,23 179:10
179:13 182:12
**cases** 21:2,4 40:16
41:25 64:10 90:5
92:8 161:24
163:10 164:11
166:7,18 169:14
172:6 176:14
177:17
**cash** 36:14 37:10
37:19 42:12,13
61:10 62:12,13,23
63:15,15,22 69:9,9
69:21 78:18 79:2
79:3 86:18 87:13
121:19,22,24
152:21 157:5,10
171:6
**catch** 88:25 89:2
89:14,15 156:16
**categories** 7:21
118:24 136:2,23
137:25
**categorization**
137:9
**categorized**
155:24
**category** 138:4
**cats** 89:12
**caution** 46:21 83:7
132:20 142:21
**caveat** 89:3
**cc'd** 26:12 27:10
**cell** 3:10 167:8
**cellphone** 176:10
**cellular** 3:8
**cents** 87:18
**certain** 40:17 94:3
113:22 174:6

**certainly** 22:3
62:20 72:20 84:3
91:11 102:14
106:19 109:8
112:10 124:7
140:25 166:8
**certification** 17:20
17:23 18:9
**certifications**
18:12
**certified** 17:23
18:4,6 165:19
166:15
**certify** 186:4,8
188:8,13
**chain** 32:17 35:11
38:6 103:21 104:9
129:10 131:15
139:23 147:9
151:14 187:6,7,11
187:12,13,14
**change** 146:11
**changed** 139:4
146:4
**changes** 43:24
44:10
**changing** 139:3
144:22 153:8
**chapter** 1:5 21:2,3
55:3 70:3 74:19
81:6,6,11 86:10,22
86:24,25 115:3,4,8
164:4 166:7,18
167:5,18 169:23
176:17,20,22
**charge** 160:5
**chart** 136:18
137:14 153:3
**check** 73:3 110:18
134:23 138:8
152:21 158:7,10

158:10
**checked** 64:24
141:5
**checks** 66:20
**chinese** 174:22
**chooses** 76:6
**cia** 18:13
**cira** 18:7,14,15
**circulate** 32:4,8
**circulated** 88:7
**circumstances**
15:25 33:13 60:6
73:14 114:8
**cite** 164:7
**citizens** 65:6
**city** 58:8 146:22
**civil** 11:2
**claim** 52:20 80:19
80:24 81:3,5,16,21
168:13,16
**claimed** 125:5
**claims** 52:24 54:8
81:7,10,12,25 82:5
82:11,18 88:2
90:2 168:10,14
171:18 175:15
**clarification** 96:15
97:3
**clarity** 119:20
**cleaning** 145:5,15
**clear** 24:12 28:18
39:14 98:10
101:21
**clearly** 56:18 79:2
141:3
**clerical** 55:5,7
**client** 4:23 5:2
30:8 34:5,6 35:21
36:23 37:6 38:3
39:8

**clients** 18:25 19:13
**close** 70:5
**closure** 75:15
**clothes** 103:12
**club** 122:13
**code** 75:4 80:13,14
82:15
**cohn** 2:17
**collateral** 42:14
**colleague** 45:5,15
100:25 129:20
146:14 181:18
**colleagues** 13:7
30:18 31:24
**collect** 13:13 177:9
18:16
**college** 17:6,6
**column** 136:7
**combine** 72:7
**come** 50:23 53:14
54:21 71:16 74:18
74:20 169:14
172:6 173:14
175:9,11
**comes** 19:15
100:23 118:8
167:14
**comfortable** 176:4
**coming** 34:25
62:23 78:18 142:5
162:10
**comley** 2:12 5:7
165:17
**comment** 36:21,21
37:8,8,9
**comments** 112:25
**commercial** 70:7
**commission** 157:9
**committee** 2:13
5:8 20:19 21:4,5
62:3 66:23 70:21

70:23 156:6 157:3
165:18 175:20
**common** 158:25
**communicate** 26:9
30:11 57:11 99:4
99:5
**communicated**
58:16 98:24
**communicates**
30:13
**communicating**
104:19
**communications**
65:14,19 180:4
181:16
**company** 89:21
169:13
**comparative**
183:19
**compare** 110:6
**compared** 110:6
**complete** 69:18
**completely** 74:5
108:3 168:2
**compliance** 42:24
**complicated** 43:4
52:23
**compound** 139:2
**comprehensive**
89:6
**computers** 169:5
**concerning** 12:21
**concerns** 142:25
144:11
**concluded** 185:10
**concludes** 185:6
**conclusion** 28:20
**concurred** 39:11
**concurring** 37:12
38:4

[condition - covered]

condition 9:25
condo 107:10
confer 158:10,25
confident 175:3,5
confirm 65:2
  86:10,21 114:4
  136:11 158:24
  172:8
confirmation
  20:17
confirmed 70:12
  115:5 143:14
  154:4
conflicts 24:12
confusion 69:17
congress 19:18
conjecture 122:19
connecticut 1:2
  2:14,18 3:21 17:5
  76:13,14,19
  113:20 148:5,14
  149:17 173:19
  176:15
connection 11:5
  15:6 24:19 33:21
  34:8 36:4,9,25
  39:2,18 43:2,25
  46:3,10,18 50:14
  50:25 51:6,20
  57:16 60:2 61:15
  61:19 63:9 64:12
  66:11 68:15 73:19
  76:25 78:17 80:21
  83:5,19 84:14,19
  84:23 85:21 86:2
  87:20 88:15 89:19
  92:15 96:20 97:11
  97:16 98:6,22
  103:8 104:7 106:3
  107:23 109:11
  110:11 112:21

119:18 121:11
  124:5 125:23
  128:11 134:21
  135:20 154:19
  155:2 157:18
conservative
  143:25 144:9
  145:21
consider 157:22
  167:20
consideration
  141:22
consistent 183:13
constituency
  21:11,13
consultation 98:17
  126:2 142:3
consulted 64:21
  138:18,18
consulting 88:21
contact 25:3 30:19
  180:13
contacted 23:6,8
contacts 25:4
contained 59:22
  71:14 107:21
  136:24 163:19
contention 28:3
contents 101:8
contested 6:23
context 20:12 22:6
continue 3:13 74:8
  74:16 130:6
continued 16:16
  103:4 153:10
  154:16
continues 68:21
  150:2,24
continuing 17:17
  137:20

controller 169:13
conversation 8:17
conversations 3:8
  27:17 44:5 46:22
  47:6 102:15,16
converted 70:12
copies 69:18
copy 8:14 94:22
  100:21 158:7
copyrights 120:4,6
  120:14,17
corp 74:10
corporate 74:7
corporation 74:7
  74:9,10 75:23
correct 58:19
  62:17 63:10 72:13
  76:23 94:25 95:25
  97:23 102:25
  107:25 108:25
  109:2 114:12
  121:12 134:8,19
  149:15 152:20
  153:21 156:19
  171:20 174:25
  175:2 180:21
  186:9
corrected 134:4
  134:12
correctly 148:22
  149:4
cost 117:2,25
  118:10,13,18
  141:25 142:6,22
  142:23 144:3
  145:3
costly 89:6
costs 144:4
counsel 4:10 5:4,7
  9:12,21 13:6,15
  25:21,24 30:3

43:14 62:3,4
  70:21 97:12,18,20
  98:12,14 99:19
  100:17 124:8
  135:22 136:5
  141:3 158:11
  169:19 171:14
  172:2,14 180:11
  180:14,24 181:4
  182:19
counsel's 182:16
count 118:15
countries 42:6
country 42:22
county 188:4
couple 60:14 92:7
  99:21 110:13
  147:20 164:18
  176:23,23
course 30:21
  52:19 56:16 62:8
  70:24 156:7,8
  169:22 181:7
courses 17:15
court 1:2 3:20 4:4
  5:10,19 6:15,25
  8:11 10:13 13:10
  32:12 35:6 40:12
  45:3 47:22 55:2
  62:10 78:9 87:12
  93:10 101:10
  111:2 128:22
  131:19 147:13
  171:13 175:21,22
  187:15
cover 16:25 107:3
  128:13
covered 13:11
  76:20 83:14 85:19
  89:8 103:9 119:17
  154:18

[cpe - description]

cpe  17:15,16
craig  1:14 3:17 6:5
  48:25 151:4 185:7
  186:15
crazy  161:25
create  72:23 157:6
created  86:13
  133:22
creator  141:19,20
creditor  42:15
  47:14 81:5,13,16
creditor's  2:13 5:8
  165:17
creditors  20:19,19
  21:9 67:2 86:16
  86:23 171:6
crises  52:7
cross  138:8
crosschecked
  136:22
cumulative  69:7
  134:17,18
curious  88:14
current  88:17
  118:20
currently  18:21
  88:7 122:9 134:16
  171:21
cycle  155:6,10

**d**

d  81:14 109:22
  128:3 186:2
  187:17
data  162:5,7
date  1:10,16 10:18
  32:19 35:13 44:20
  48:4 67:19,20
  71:4 75:12 86:3
  87:20 93:15 111:9
  129:12 131:17
  137:15 139:25

147:11
dated  127:24
daughter  141:23
  143:2
david  2:6 4:21
  100:4 103:9
day  39:9 44:24
  45:14,16 46:24
  47:8 51:13,14,15
  52:4,4 63:16
  132:18 155:17
  169:21 182:22,23
  185:2 186:19
  188:19
days  14:25 72:11
  75:12,19,21 82:17
  82:21 83:22 92:23
  145:4 183:22,24
deadline  81:10,13
deal  80:6
debt  167:22,23,24
debtor  1:7 5:5
  16:9,13,15,20,23
  20:11 21:5,6
  25:16,22 36:15
  37:11,20,25 38:3,9
  38:22 39:15 42:16
  45:13 52:14,25
  54:19,25 57:10,10
  57:12 58:16 62:15
  70:22,22 76:6,8,12
  76:21 77:3 78:19
  79:23,25 80:4
  82:8 84:12,14
  88:23 94:4 101:8
  101:11,16 108:16
  111:18 113:18
  114:3 115:15,21
  116:5,6,10,12
  117:7 118:5,14,16
  118:24 120:15,16

120:22 121:7
  122:8,17 124:18
  125:3,5,12,18
  126:23 130:25
  132:17 133:13
  141:5 142:5,21,23
  143:5,12,15 144:3
  145:18 147:2
  148:13 150:14,18
  152:24 155:15
  156:6,23 167:6
  168:5,25 169:19
  171:16 172:2,14
  172:19 174:12,19
  178:14 180:11,14
  180:16,24 181:4
  183:3 184:11
debtor's  38:23
  47:25 48:18 49:2
  58:9,11,13 62:4,18
  63:4 74:20 79:8
  79:20 87:15,25
  106:15 108:10,19
  108:22 111:16
  123:20 141:23
  144:10 164:9
  166:9,19 167:15
  171:20 172:16
  175:19 187:8
debtors  20:18 42:4
  48:6
december  74:24
  77:7 161:18
decide  103:10
decision  37:12
  39:12 87:14
  102:13 141:4
declaration  62:19
declared  40:18
deductible  78:2
  79:2,7

deducting  79:21
deferred  78:3
defers  155:9
define  82:19
definition  72:5
  101:5
degree  17:7 18:16
  45:13 179:5
degrees  18:19
delaware  176:14
delayed  14:19
department  19:22
  19:22 20:7 22:2
  64:23
depend  52:11
depending  42:8
  51:23 78:24 79:4
  158:19
depends  78:18
  168:12 171:25
depicted  136:24
deposition  1:14
  3:12,17,23 6:22,25
  7:6 10:16,24
  11:22 13:4,21
  14:23 15:7,17
  16:5,10,11 27:25
  28:20 41:12 45:23
  49:21 137:20
  187:5
depositions  40:14
deposits  42:9
describe  46:17
  58:20 155:8
described  70:14
  103:21 104:10
  128:5 136:2
  142:10 169:25
description  114:7
  138:11 187:4

Veritext Legal Solutions
866 299-5127

[descriptions - due]

descriptions
136:10
designated   12:2,7
designation
165:23,25
detail   145:8
160:19,23
detailed   27:15
160:10,13
details   135:24
163:6,18
determination
38:5 39:3,12
87:17 101:10
137:5
determine   87:13
156:3
determined   72:25
determining
178:15
develop   67:5
developed   183:20
developing   87:24
development   86:7
difference   38:8
41:23 108:6
different   41:21
42:18 51:22 52:2
77:21 80:5 108:2
108:3,16 144:18
differing   51:22
difilippo   2:22 4:2
digit   110:15,15
digital   120:19
diligence   179:8
dip   14:9 28:24
54:20 61:22 62:14
63:19,23 64:2,4,10
64:16 65:3,11,15
65:19,22,24 66:3,6
66:15 68:2,20

70:16,25 91:6,8
92:11,15
direct   29:10,16
105:20 130:2
directed   28:10
88:23 182:3
directly   104:15
143:11
director   51:4,4
disagree   81:17,19
170:3,4
disbursed   155:16
disbursement   62:9
72:5 117:17
disbursements
52:17 54:4,15,16
54:24 63:16,20
67:2 68:22 73:2
77:14 86:19 91:14
91:15 92:15 137:8
157:10 184:16
disclaimers
111:15
disclose   46:21
83:9,16
disclosed   84:6
161:4,5
disclosing   29:7
118:22 182:14
disclosure   68:25
discovery   40:13
discreet   89:4
discuss   8:13
147:19
discussed   85:23
94:5 98:20 106:19
127:15 130:4
143:7
discussing   132:3
discussion   11:17
15:24 99:15

106:10,21 126:11
139:13 143:13
155:22 165:10
discussions   43:13
43:15 106:5
113:11 137:21
dismissed   70:12
disparity   164:8
displayed   161:4
dispute   28:3 29:19
29:20 130:6
distinct   74:5,14
distribution   136:8
136:14 138:13
distributions
139:6
district   1:2 3:20
divided   141:13
division   1:3 3:21
docket   48:10
93:19 97:7 100:20
111:6 131:24
document   10:20
32:14,15 33:3
35:9,16 48:6,12,15
48:23,24 55:12
93:18,21 94:11
96:25 100:20
101:19 105:19
107:21 109:4
111:5,11 112:9,21
127:18 128:25
131:24,25 135:10
140:9 141:21
146:10 147:16,19
147:21 154:22
155:3
documents   13:9
13:13,16,17,23
27:22 57:8,15,16
57:20 105:11

109:7,12 129:5,8
182:25
dog   103:13
dogs   89:12
doing   7:18 22:18
51:8 60:2 61:19
61:21 78:17 88:17
91:16 157:17
162:13 176:6
182:13
doj   161:10
dollar   154:14
dollars   96:5
125:15 126:8
132:21,22 133:23
133:24 146:20
154:12 159:16,16
159:18 164:12
177:2 183:24,25
double   73:2
110:18 134:23
doubt   114:20
draft   88:7 98:14
107:23 114:19,20
126:13 130:15
136:17 140:24
141:16 142:15
drafted   31:19
43:11,16 112:25
drafter   138:17
drafting   31:22
46:2,5 98:13
103:10 105:22
112:11 124:5
drafts   32:4 62:21
driving   161:24
172:13,14
drop   41:10
due   44:23 45:7
55:3 69:11 70:19
75:7 81:22 179:8

Page 10

[dues - exactly]

| | | | |
|---|---|---|---|
| **dues** 107:10 | **effectuating** 63:20 | **engagement** 23:5 | **essentially** 61:2 |
| **duly** 5:22 186:5 | 91:14 | 23:7 24:2,10,19 | 158:14 |
| 188:10 | **efficient** 53:8 | 25:6 26:4,11 | **establish** 62:2 |
| **duties** 41:20 43:2 | **efficiently** 52:5 | 30:12,14 31:16,22 | 81:21 156:17 |
| 43:20,21 50:24 | **eight** 166:3 | 32:5 34:9 36:5,9 | **established** 74:13 |
| 55:6 91:25 93:4 | **either** 42:17 81:5 | 40:5 43:12 44:2 | **estate** 42:20 53:4 |

| **e** | | | |
|---|---|---|---|

| | | | |
|---|---|---|---|
| **e** 2:2,2 5:21 6:5 | 101:9 103:16 | 45:2 46:3,5 50:15 | 54:21 62:25 68:25 |
| 13:11,23 14:2,4 | 104:22 110:17 | 51:25 52:2 55:15 | 70:24 73:17 74:3 |
| 15:20 26:9,13,13 | **elapsed** 39:11 | 55:16 84:15,19 | 74:14,14,18,21,23 |
| 27:9,10 30:19 | **elect** 74:25 75:2,13 | 171:10 180:2 | 74:23 76:9,10,14 |
| 32:17 34:3 35:11 | 75:18 | **engagements** | 77:20,24 78:19 |
| 35:19 37:18 38:6 | **election** 19:18 | 166:17 177:16 | 79:24 80:4,7,8,10 |
| 39:7,9 41:17 | **electricity** 107:11 | **english** 127:13 | 81:23 83:3 94:22 |
| 49:22 59:11 81:14 | **electronic** 15:19 | 174:21 | 107:6 113:19,22 |
| 99:19 104:23,24 | **electronics** 100:24 | **ensure** 73:12 | 114:4 147:6 157:2 |
| 106:9 112:24 | 119:17 | 136:23 | 175:9,11 181:10 |
| 117:5 129:9,10,15 | **eliminate** 131:13 | **entire** 79:14,14,18 | **estate's** 87:25 |
| 129:17,24 130:11 | 150:21 | **entirely** 79:6 | **estates** 74:4 |
| 131:15 132:22 | **eliminated** 150:20 | 138:23 139:6 | **estimate** 105:21 |
| 139:23 141:2 | 150:22 | 157:10 172:9 | **estimated** 71:13 |
| 147:9 151:13 | **emphatically** | **entities** 42:3 | 106:12 |
| 152:9 155:16,25 | 181:2 183:7 | 179:19 | **estimates** 73:11 |
| 160:18 162:19 | **empirical** 154:9 | **entitled** 1:16 48:6 | **estimating** 73:7 |
| 163:8 169:4 | **employ** 14:8 38:21 | **entity** 74:5 103:15 | **etcetera** 97:14 |
| 173:15 180:8,10 | 48:8,19 49:3 | 114:24 119:25 | 120:5 |
| 180:19,22 181:21 | 90:11,17 168:6 | 126:22 154:14 | **evaluation** 114:13 |
| 181:25 182:2,4 | **employed** 18:21 | 183:10,10 184:4 | **event** 68:2 |
| 186:2 187:2,6,7,11 | 36:15 37:11,20 | **entries** 148:7,16 | **events** 103:21 |
| 187:12,13,14,17 | 38:9,11,16 90:14 | **equitable** 113:15 | 104:10 |
| 188:2,2 | 91:25 | **erroneous** 125:23 | **everybody** 60:21 |
| **earlier** 68:10 94:5 | **employee** 28:17 | 159:11 | 75:9 93:7 156:8 |
| 100:7 | **employees** 28:22 | **erroneously** 125:5 | 175:18 |
| **easy** 73:2 | 29:2,5 42:5,23 | 125:14 | **everybody's** 45:2 |
| **edits** 135:15,16 | 50:20 182:11 | **error** 110:22 | 69:8 |
| 140:23 | **employment** 38:14 | 161:7 184:13 | **everyone's** 46:2 |
| **educated** 155:22 | 89:7,8 | **errors** 136:4 | 147:3 162:15 |
| **education** 17:18 | **endeavor** 124:10 | **escrow** 91:7,20,21 | **evidence** 87:11 |
| **educational** 17:3 | **ended** 183:23 | 91:22,24 | **exactly** 53:7 58:9 |
| **effectively** 38:4 | **engaged** 20:11,15 | **esq** 2:5,6,6,10,15 | 115:4 117:4 |
| | 20:16 24:23 166:6 | 2:19 | 130:22 159:13 |
| | 179:10 | | 181:25 |

Veritext Legal Solutions
866 299-5127

[examination - file]

**examination** 5:25
100:2 103:4
153:10 154:16
165:14 185:9
187:18 188:9,11
**examined** 5:24
**example** 101:3
**excel** 109:3 163:20
**excess** 169:2
**exchanges** 181:25
**excluded** 160:4
**excluding** 125:21
**excuse** 11:10
51:14 123:16
126:12 137:22
153:14 174:23
**exhibit** 7:7 10:14
10:17 32:14,18,21
35:8,12 41:6 43:6
47:24 48:3 91:4
93:12,14 111:4,8
128:24 129:11
131:7,16,21
133:16 134:7
135:11,14,18
136:18 139:24
140:7 141:17
142:15 144:14
147:10,15 159:7
182:6 187:3,3,5,6
187:7,8,9,10,11,12
187:13,14
**exhibits** 187:3,15
**existed** 101:23
179:12
**existence** 57:7
143:17
**exists** 172:7
**expect** 51:7,19
175:16

**expectation**
106:22
**expected** 33:5,13
123:20
**expense** 136:18
159:8
**expenses** 71:13
72:4 77:15,17,18
78:23,25 79:7
105:22 106:12,16
106:23,23 107:2,3
107:9,15 108:10
108:15,20,23
117:6 123:2
124:11 129:22
130:9 133:5,15
134:10 136:24
140:13 147:7
148:7,16 149:17
149:24 152:21
183:4,11,12,22
184:5
**experience** 7:21
20:24,25 64:4,7
82:3 164:4,6
177:16
**expert** 22:19,19
40:11,19 41:2
91:12 165:20
166:16
**expertise** 166:6,17
**expired** 69:15
**explain** 36:24
41:22 70:2 82:13
108:5 132:8 148:6
150:8 159:12
**explained** 37:15
**explanation**
144:15
**explicit** 66:2

**expose** 27:21
**extent** 22:12 60:5
65:4 78:3 83:8
113:6 137:12
143:17,18 146:23
**extra** 100:21
110:15 162:10

**f**

**f** 81:14 109:17,18
188:2
**fa** 41:19
**face** 102:24
**fact** 115:25 182:21
**facts** 15:24 60:5
99:10,13 113:9
114:8 146:15
147:4
**factually** 150:15
**fair** 42:25 53:16
59:20,23 60:22
72:16 78:15 84:21
88:24 94:19 96:9
97:19 103:20
104:6 106:13
130:13 134:20
136:21 145:12
160:9
**fairly** 44:8
**familiar** 7:23
12:10 89:21
**family** 19:15 58:8
103:13 118:9
129:8 132:16
143:18
**far** 6:21 67:14
171:21 173:12
**fast** 139:17
**father** 118:18
143:20
**fault** 73:8

**fear** 28:5,6
**feasibility** 86:8
87:3,7,9
**feasible** 87:16
**february** 45:8
63:14 69:3 72:9,9
77:6 122:22 125:4
129:22 132:17
133:11,12,25
134:3 140:14,14
152:22,23 154:21
154:21 155:10,11
156:15,17 159:9,9
159:19,23 160:7
**federal** 11:2 19:17
19:18 73:17 76:12
79:14,16,18
**fee** 73:13 123:3
157:7,8,9
**feel** 48:11 67:3
**feeling** 41:18
142:2 178:22
**fees** 33:18 53:9
54:24 62:6 68:2
69:8,11 70:21
72:24 77:18,25
156:4,24 163:3
175:4,8
**felt** 132:24
**fiduciaries** 20:17
**figure** 136:5
155:19
**figured** 160:23
162:16
**file** 29:5 38:15,20
40:11 52:25 53:3
74:8,16 75:6 76:6
76:11,11,16 77:23
78:14 81:5,7,16,20
89:6 137:22
163:11 175:21

Veritext Legal Solutions
866 299-5127

[filed - francis]

**filed** 3:19 13:9
28:24 42:7,8,9
45:3 48:1,18 49:7
55:22 62:19 63:14
68:12 69:23 75:8
75:24 76:5 84:4
93:19 100:10
111:5 122:22
125:4,14,18
131:24 135:3
160:21 161:23
167:4 168:16
181:12
**files** 80:10
**filing** 32:24 61:11
63:12 73:23 75:12
82:17 92:23 96:9
96:12 98:23
113:23 132:3,6,18
138:2
**filings** 56:7 73:18
**final** 62:22 87:17
133:15,24 135:17
135:21 136:3
137:24 140:12,20
140:22 141:4
144:8 159:8
183:21,21
**finally** 46:13
162:16
**finances** 61:12
63:12,15
**financial** 14:5 21:4
21:6 22:15 34:7
36:23 37:6 39:8
40:20 41:20 42:25
48:9,20 49:4 54:6
55:20 62:4,5
64:22 111:17
112:5 166:10,19
168:3 178:14

179:6,18
**financially** 4:8
87:16
**financing** 14:10
28:25 54:20
**find** 40:10 117:25
156:18
**finish** 8:19
**finished** 54:11
**firm** 4:3,5 21:24
22:13 24:16 39:18
40:3,25 51:5
52:15 56:2,15
112:15 139:14,14
156:2 172:13
176:9
**firms** 62:7 134:7
**first** 5:22 16:18
19:3 21:23 43:16
43:22 44:6,9,21,24
45:14,25 46:24
47:8 51:13,14,14
51:15 55:17,18
69:23 73:9 75:19
89:3 93:25 94:14
105:3 112:3
122:21 129:23
130:25 139:10
149:14 161:13,14
162:3 180:9 186:5
**fit** 89:13
**fitting** 101:4
**five** 39:10 128:2
128:15 141:8
161:22
**fix** 161:7 184:13
**flavors** 17:15
**floor** 2:4
**flow** 61:10 62:13
62:13 69:21 86:18

**flows** 62:23 87:13
**fluid** 104:20
**flynn** 13:7 30:18
45:6,16 49:15,16
50:5 56:4,24
112:17 129:18,19
149:15,19 150:2
150:24 151:11,14
181:18
**flynn's** 46:10 50:7
151:8
**focused** 44:20
**focusing** 46:6
108:18
**folks** 15:15 25:6
29:24 30:10,14
49:14,24 129:21
**follow** 164:18
**following** 44:25,25
148:7,15
**follows** 5:24
**food** 119:3
**fool** 178:19
**foregoing** 186:8
**foreseeable** 124:22
**forget** 102:19
**forgot** 11:10
**form** 22:16 34:10
37:16 39:5 54:5
57:22 58:18 62:10
64:14 66:13 72:6
72:21 77:4 78:21
80:25,25 81:2,3
84:25 88:3 91:9
92:2 93:5,13 94:2
94:21 95:9 96:10
98:13,14,15,19
102:8 103:24
104:13 106:18
108:21 109:15
110:20 111:22

112:22 113:24
118:4 122:18
125:3,14,16 126:3
127:7 130:16
132:11 133:18,22
134:15 135:3
141:18 148:20
149:7 152:11
156:13 157:20
166:12,22 170:12
170:22 177:25
187:9
**forms** 98:16
**forth** 101:7 112:13
188:10
**forward** 63:17
68:17 69:6 75:14
108:13 134:19
157:4 163:3
**found** 133:22
145:3 146:14,18
150:15,17 182:24
**four** 15:12 19:2,3
19:23 21:18 82:23
161:22 165:25
**foxboro** 6:9
**frame** 34:25
118:23 146:23
154:5
**francis** 25:18,23
26:2,10 30:2,6,7
31:4,8 32:9 56:17
57:3 59:3,5,18
99:2,7 102:11,20
102:21 103:17
104:12,15 105:4
105:14 106:7
109:25 112:15
124:2 129:19
135:23 139:8
143:13 148:4,12

[francis - hampshire]

152:9,13 156:3
157:16 180:9,18
**frankly** 33:12
150:12
**fraudulent** 82:10
82:20 171:18
**free** 48:11
**frequently** 39:20
40:2,5 42:15
64:25 73:5
**front** 15:9 44:18
162:23 180:23
**fuel** 163:24
**full** 19:8 73:10
**fully** 12:20
**function** 87:24
**fund** 2:4 4:20 6:14
10:24
**funding** 127:23
128:17 184:5
**funds** 70:17
108:12 130:23
138:12 155:16
175:23
**furnishings**
100:25
**further** 163:5
184:23 186:8
188:13
**future** 69:23 78:4
78:5,8,12,20 85:3
86:19 87:13
124:22 157:18

**g**

**g** 5:21
**garbage** 61:3,3,5,6
**gas** 107:12
**gasoline** 117:9
**gathered** 29:4
123:17

**general** 88:21
100:15 155:8
163:9
**generally** 13:25
18:24 21:19 22:8
24:2 25:5 36:24
44:12 50:24 55:2
55:14 57:4 66:3
66:23 70:2 73:8
74:24 80:23 82:14
90:12 109:10
110:10 115:6
**getting** 49:23
86:23 135:20
137:21 176:4,8
179:21
**gettr** 120:21
**give** 10:6 14:25
147:24 152:20
153:2 161:6
164:25
**given** 105:14
131:22 134:25
182:11 185:6
186:10 188:12
**gives** 75:11
**glasses** 11:11
**global** 14:6,7
51:10,11 111:7,14
111:24 187:10
**go** 3:14 7:22 11:12
28:2 38:12,13
40:13 44:17 53:6
54:19 90:18
103:25 107:5
111:23 114:4
122:3,20 124:18
139:15,16,19
144:7 156:21,22
164:21 176:25
183:20

**god** 47:14
**goes** 7:18 43:19
79:5 101:6 124:18
156:22
**going** 3:3 10:13
32:12 35:7,8
36:14 37:5,10,19
37:24 39:15 40:8
40:10,10 41:9
44:9 45:5,20 47:3
47:23 52:3,12,22
53:7,13 54:2,3,7,8
54:9 59:2 68:17
68:18,19,21 69:5,6
69:24 70:19 73:23
76:8,18,19 77:6,9
78:22,23 80:5,15
85:8,14 87:2,3
89:5 91:18 92:20
92:23 93:8,11
96:24 106:24
107:12,18 108:13
111:3 115:4
118:22 123:9,10
123:13,23 124:12
124:13,14,17
128:23 129:15,23
131:19 134:19
139:15,16 143:6
147:14 149:2
151:22 155:18,18
155:19,20 156:15
156:16,18 157:22
157:22,24 158:2,6
158:12,21,23
159:3 161:5 163:3
163:14 168:21
169:16,18 170:25
171:5,11 175:10
175:23,25 177:8
181:9

**golden** 2:17 5:16
26:18 27:17,18
28:7,10,14,17,23
29:6 57:23 58:3
179:6,9,12,24
180:5,6,7,10,15,20
181:16,20 182:9
182:15,19,19
183:4,8 184:6
**goldman** 2:15 5:6
5:6 6:20 7:10 27:3
28:4 29:8 85:14
164:17,23,24
165:15,16 184:22
185:3 187:21
**golf** 123:4
**good** 3:2 6:10 44:8
165:16
**goods** 100:25
119:16,19
**graduate** 18:18,19
**graduated** 17:4,6
**gratuitous** 37:7,8
**great** 164:8
**greenwich** 113:20
123:9,14 150:13
152:16 153:16,24
**group** 26:14 113:3
143:7 144:8 153:8
**gtv** 120:20
**guess** 15:8,12 19:3
77:5 127:2,3,6
149:8
**guessing** 66:8
**guidance** 161:6
**guy** 170:24

**h**

**h** 23:16 187:2
**half** 93:7
**hampshire** 176:16
176:24

[hand - increase]

**hand** 27:24 32:12
34:22 47:23 93:11
110:9 111:3
117:21 128:23
130:22 131:20
146:7 188:19
**handing** 147:14
**happen** 47:13 52:3
52:12 69:3 89:12
89:13 162:17
**happens** 80:3
81:15 82:22
178:11,12
**harassed** 143:15
**harassment** 27:21
28:5,6
**harbach** 2:6 4:21
4:21 23:12 41:13
59:13 85:16 99:20
99:25 100:3,5
103:2 147:24
152:5 153:11
165:6 180:6
187:19,20
**hard** 127:12
**haven** 2:18 116:2
116:15
**hazard** 15:8
**hch** 152:22
**head** 8:24 155:4
**heading** 11:22
**health** 121:18,22
121:24 122:2,8
**hear** 127:13
171:14
**heard** 45:24 82:21
104:15 127:15,17
182:9
**hearing** 45:17
46:14 47:9 51:15
123:18,19 127:18

174:15
**hearings** 46:15
51:13
**heat** 107:11
**held** 1:17 3:23
11:17 23:2 165:10
**help** 24:13 46:7
57:7 137:4
**helped** 137:9
**helpful** 14:14
38:25 137:4 138:8
**helping** 100:9
**helps** 169:11
**hereinbefore**
186:11 188:10
**hereunto** 188:18
**hey** 163:14,24
**high** 17:3,5 19:10
19:24 94:14
**hill** 179:24 180:5
**hire** 80:5
**hired** 90:5
**hiring** 40:25
**history** 17:3
**hit** 162:7
**hits** 73:7
**ho** 1:5 2:9 3:18 5:5
11:6 94:4 111:18
**hold** 18:11,18
36:14 37:10,19
**holding** 114:25
**home** 6:7 107:8,9
118:19,25
**homeowner's**
154:10
**homeowners**
107:7
**homes** 119:5 154:8
**honestly** 12:21
**hope** 64:3 100:22
159:4 171:2

**hoping** 148:25
149:3 175:6 177:8
**hospital** 122:4
**hot** 59:12
**hotel** 114:17
**hour** 15:13
**hours** 15:11,11
39:10 67:21
164:19 166:2
**house** 101:25
149:17
**household** 97:25
100:24 101:4,15
102:5 119:16,19
**housekeeping**
144:20,23
**huh** 8:25
**human** 110:21
**hundred** 64:9
138:21 139:4
141:13 142:22
143:6,24 144:2
146:20 168:15
**husband** 141:12
142:8 145:14

**i**

**idea** 7:19 44:8
67:23 90:17
126:24 151:20
**identification**
10:17 32:19 35:13
48:3 93:15 111:9
129:12 131:17
139:25 147:11
**identified** 7:12
103:22 104:8
134:7 181:23
**identity** 26:18
27:23 28:16 74:8
**imagine** 54:18
61:25 66:22

116:25 117:18
118:9 123:2,5
173:13
**immediately** 44:25
**impair** 9:25
**important** 8:18
75:3 132:24 168:6
172:11 174:7
**inadvertent** 133:6
134:6,22
**inadvertently**
125:12 132:16
133:21 134:2
**inappropriate**
29:9,16
**include** 22:18
80:11 94:16
107:14 122:15
**included** 65:14
125:15 132:23
133:19 134:2,5,13
134:23 137:14
150:25 151:25
159:11,17 160:11
**includes** 19:6
61:23 62:12
**including** 39:22
40:14 61:11 70:24
86:7 115:16
**inclusion** 125:24
**income** 52:25 53:3
53:5 62:15 63:5,9
73:17,24 74:16,17
74:20 76:15,17,22
77:8,11,12 78:8
79:20 87:25 125:5
125:16,21
**incorrect** 125:18
**increase** 141:8
142:12,17 145:24

[increased - issues]

**increased** 142:14
144:13
**increasing** 141:10
143:23 145:10
**incurred** 142:6
177:7
**independent** 63:8
95:6 97:21 114:10
119:13 122:5
123:19 128:7
152:10
**indicate** 7:2
**indicating** 135:12
137:18 152:6
161:19 162:11
**individual** 21:8
24:15 41:2,19,23
43:4 70:4 74:3,4,6
74:15,15,16,17
75:23 77:2,19
164:4,11 183:23
**individual's** 27:20
**individually** 79:24
**individuals** 19:5
42:19 57:8 85:5
158:16
**industry** 60:17,21
**inform** 124:3
**information** 12:20
22:16 24:16 29:3
29:7 30:22,24
31:3,9,12 58:10
59:6,16 69:24
85:7 94:4 98:11
99:11,17 104:11
105:3,7,12 110:6
116:9 124:10,14
124:16,20 127:5
133:2 135:2
136:13 137:3,12
137:19 138:3,7

139:7,12 145:2
146:10 152:10
153:3 155:13,14
156:20 157:14
158:20 174:4
176:3 177:22
183:19,19 184:9
**informed** 44:2
99:13 103:16,18
103:19 104:16
180:11
**informs** 127:5
**initial** 140:23
141:20,21
**initiated** 25:12
**input** 43:21 59:6
72:22 114:22
**inputting** 162:4
**inquire** 153:23
**inquiries** 51:16
**inquiry** 161:9
163:16
**insiders** 82:19
**insolvency** 17:24
18:5,6 19:4 21:24
165:19 166:16
**instance** 62:3 89:9
138:15
**instances** 40:19
164:6
**institutions** 64:23
**instructed** 43:7,9
**instructing** 26:21
26:23 27:12
**instruction** 29:10
**instructor** 18:5
**instructs** 9:21
**insufficient** 8:25
**insurance** 69:14
107:8 117:10
121:17,18,22,24

122:2,8 146:4,12
146:19 148:8,17
150:3,4,11,12,16
150:17 152:15
153:24 154:7,10
158:21,22
**intellectual** 120:7
120:13,15,18
**intend** 171:24
**intended** 32:25
34:19 40:4,6 62:7
89:15 110:20
125:19
**interact** 16:23
22:3
**interaction** 146:17
**interactions** 15:2
**interest** 20:22
53:11 77:20 80:3
87:12 113:16
119:10 120:7,18
121:16 147:5
**interested** 4:9
22:15 41:17 49:10
151:3 178:4
188:16
**interests** 101:11
115:13
**interfere** 3:11 10:5
**interference** 3:9
**internal** 25:6
80:14
**internally** 13:10
**interpreter** 127:14
**interrelated** 113:7
**interrupt** 41:8
**introduce** 174:16
**investigate** 102:14
105:17 110:25
113:10 124:17
168:19

**investigated**
101:22 110:11,24
**investigation** 40:7
40:9,22 59:16
63:8 95:7 97:22
102:9 108:24
115:6,18 119:14
119:22 128:11
157:18 158:9
179:15 183:15
**investigations**
114:11
**investment** 177:4
177:6
**invoice** 158:8
**involved** 20:7
31:21 49:15,17,20
50:21 52:24 53:4
55:24 56:6,20
57:24 59:7 65:10
65:18 90:9 100:8
101:13 105:22
109:6,9 132:4
178:7 179:21
**involvement** 115:9
**iphone** 103:11
**irrespective** 70:19
**irs** 76:19 89:10
**irve** 2:15 5:6
164:24 165:16
**island** 176:15,21
**issue** 27:23 73:6
75:10 82:23
124:23,23 150:5
**issued** 54:7
**issues** 18:3 27:24
40:24 44:8 52:6
53:15 72:3 110:11
147:20 174:6
182:12

Veritext Legal Solutions
866 299-5127

[item - know]

**item** 55:5 61:16,20
63:11,18 64:13
66:12 68:6,16
73:15,20 80:16,21
82:7 83:6,19
84:11,24 85:18,22
86:2,6 87:7,21
88:15,20 89:19
91:5 92:19 94:14
94:15,16 95:4,7,23
95:24 96:2 97:11
97:13 103:11,12
103:13,14 104:2,2
111:20 113:17
127:22 142:14
144:12,20 146:12
152:4
**items** 89:16 96:21
97:24,24,25 98:7
99:12 101:3,12,15
102:5,22 103:22
107:13 119:16,18
119:23 121:8,11
132:7 136:19,25
137:13 160:11
163:6,19

**j**

**j** 2:10,15 5:21 6:5
**jalbert** 1:15 3:1,18
4:1 5:1 6:1,5,14
7:1 8:1 9:1 10:1
10:14,16,19 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1,13
32:18 33:1 34:1
34:23 35:1,8,12

36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1,24
48:1,2,11,25 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1,12,14,22
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
111:4,8 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1,24 129:1,11
129:14 130:1
131:1,16,20 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1,24 140:1,7
141:1 142:1 143:1
144:1 145:1 146:1
147:1,10,15 148:1

149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1,7 186:15
187:3
**jam** 1:6
**january** 161:18
**jo** 13:8 31:25
49:16 50:9 56:5
56:24 112:17
**joint** 86:13
**jon** 2:22
**jonathan** 4:2
**judge** 29:9,13
87:16
**judges** 22:14
**judgment** 37:22
102:4 136:15
**june** 17:9
**justice** 64:23
**justify** 148:15

**k**

**keep** 41:2 52:16
59:14 107:12
124:17
**keeping** 42:11
**keith** 20:6
**ken** 9:17 13:6
14:16,21,24
**kenneth** 2:10 5:3
**kept** 7:17 162:10

**keypunch** 98:19
**keypunched** 98:16
**kids** 118:15
138:25
**kind** 20:22 88:24
116:17 118:17
122:12 134:22
**kings** 188:4
**knew** 45:20 105:6
113:9 178:16,18
182:22
**know** 7:16 9:10
22:4 30:12 31:7
31:17 33:19 34:13
34:18 36:7 38:16
38:16,22 39:13
41:4 43:18 47:3
50:3 52:3,21,22
53:9 57:23 58:2,3
58:12 60:4,9,25
62:21 64:9 65:16
66:3,5,23,24 67:6
72:19,23 76:7,17
77:7,10,12,13
79:10,12,13 80:14
83:23 84:5,10
86:14 89:9,11,20
89:25 90:4 103:25
104:3,4 107:10
109:19 111:24
115:3 116:3,3,4,5
116:5,14,17 117:8
117:8,10,20 118:7
120:21 121:13
122:23,24 123:3
125:8,13,20
126:20 127:12
145:15 150:11
151:18,21 152:2
152:13 154:7
157:21 159:3,21

[know - llp's]

161:2,15 166:21
168:11 169:4,5,17
170:13 171:7
172:16,19 173:7
173:20,25 175:5
176:2 177:3,7
179:11 181:8,9,11
181:22 182:5,12
182:18,20,21
184:7,18
**knowing** 29:4
**knowledge** 12:15
12:19 41:3 59:9
62:17 63:3,4
91:10 102:10
121:15 122:7
123:17,20,22
126:9 127:20
128:7,21 133:20
140:12 152:10,20
154:9 158:3
172:21 174:18
184:15
**knows** 47:14
**kwok** 1:5 2:9 3:19
5:5 11:6 25:21,24
32:16 35:9 94:4
102:6,23 103:14
104:9 111:18
119:24 122:16
129:2 138:23
139:2 140:8 143:2
147:17
**kwok's** 30:3
119:10 145:17

**l**

**l** 5:21 6:5 23:16
186:2
**lack** 63:5
**lady** 119:7,10

**lago** 122:13 124:4
124:21
**lamp** 126:8,20
127:16,20 179:14
179:15,24
**land** 113:16
**language** 114:23
**large** 30:20 59:8
78:5
**laura** 2:5 4:18
6:12 103:3,6
**law** 22:13 39:18
112:15 134:7
**lawyer** 43:18 46:8
86:20 102:17
113:25 138:20
139:14 178:23
**lawyer's** 40:7
**lawyers** 22:20
25:12,14,16 39:21
51:17 82:18 95:5
96:23 102:7 110:8
125:17 126:2
128:6 132:24
136:16 139:14
150:20 155:23
158:3 159:2
170:18 172:22
174:6
**lead** 51:5
**learn** 30:5,7
**leave** 152:24,25
**leaving** 41:11
**left** 102:7 144:4
**legal** 2:22 101:8
105:9 106:6
113:15 114:7,25
153:8
**legally** 76:2
168:14

**legitimate** 160:5
**lenaya** 1:19 4:5
188:6,21
**lenders** 20:20 21:7
**lengthy** 58:24
**letter** 31:16,22
32:5 43:12 75:13
76:3
**level** 53:12 72:25
94:14 149:23
**levels** 59:5
**liabilities** 30:23
94:3 111:17
164:10,12
**liability** 157:5,6
**life** 169:23
**likelihood** 82:4
**limitations** 111:15
**limited** 5:17 90:7
163:9 178:17
**line** 5:13 44:18,18
61:15,20 63:11,18
64:12 66:12 68:5
68:16 73:15,19
80:16,21 82:7
83:6,19 84:11,24
85:17,22 86:2,6
87:7,21 88:15,20
89:16,19 91:5
92:19 94:14,16,22
95:3,7,13,15 96:2
96:16,21 97:11
99:12 103:12,13
111:19 132:7
136:19,25 137:13
146:12 152:4
159:14,15 163:6
163:19
**lines** 95:19 104:4
126:18

**liquidate** 171:5
**liquidated** 88:2
**list** 7:17 53:6
64:22 87:6 90:4
107:4 154:4
155:19,20 157:24
159:23 172:7
173:4
**listed** 12:3 72:19
108:12 111:25
114:14 122:12
128:3
**listen** 124:7
**listened** 123:15
**listing** 108:13
160:23
**litigation** 19:6
22:4,7,11,11 40:6
77:9 81:25 82:5
85:19 88:2 127:23
128:15,17 170:19
170:25 175:14
178:18
**little** 14:19 16:25
21:25 24:3 46:17
89:12,12
**live** 146:22 150:18
**lives** 118:15
149:16,22
**living** 114:8
129:22 133:15
134:9 136:17
140:13 153:17
159:8 183:3,11,12
184:5
**llc** 2:12 75:24
126:21
**llp** 1:18 2:3,4,8
3:24
**llp's** 10:24

[loan - massachusetts]

**loan** 63:23 64:2
65:11,15,19,22,25
66:6,15 68:2
70:16
**loans** 64:5,10 66:3
**located** 3:24 101:5
113:19
**location** 123:21
**lodge** 101:17
**long** 15:5 137:18
139:15 160:20
165:22
**look** 31:25 35:15
40:8 48:11 82:16
111:23 152:15
174:7 178:13
**looked** 13:22 70:7
133:16 136:14
163:21 173:22,25
174:8 181:21
**looking** 14:3 22:14
22:16 69:17
136:17 142:15
154:22 162:20
172:4 175:18,23
175:24
**looks** 107:5 132:5
**loose** 132:7
**lose** 75:19
**losses** 78:12
**lot** 42:10 47:11
68:18 69:24
104:25 112:13,14
122:3 127:8
168:23,24 178:18
**lots** 99:13,14
106:21 113:10
167:19 169:21
178:2,2
**low** 53:12

**lowey** 1:15 7:9
10:25 13:24 15:16
17:12 18:22,25
20:6,10,15 21:16
21:21 22:24 23:6
23:18,25 24:17
25:7 26:3 30:13
31:15 36:8,18
37:3,24 38:21
39:4,17 43:7 48:8
48:20 49:4,18
50:2,15,20 56:19
57:2 58:15,21
59:15,25 61:15,19
64:12 65:9,13
66:10 67:13,24
71:12,18 72:17
73:19 76:10,25
78:16 80:20 82:4
83:5 84:17,22
85:25 87:20,23
93:3 94:6,10 95:3
96:20 97:10,16
98:6 99:5 100:8
101:13 102:3
109:6,11 112:16
112:17,20 122:15
124:9 125:22
128:10 135:20
136:22 144:21
149:11 163:17
**lowey's** 12:15,22
44:13 55:15 67:9
106:3 111:20
112:8 134:21
135:16 140:23
**lp** 4:20
**lunch** 123:4
**luxury** 115:16,23
116:13

**lynch** 1:19 4:5
188:6,21

**m**

**macdonald** 49:19
**maid** 118:8 145:4
145:4 158:24
**maids** 145:4
**mail** 26:9,13,13
30:19 32:17 34:3
35:11,19 37:18
38:6 39:7,9 41:17
104:24 106:9
129:9,10,15,17,24
130:11 131:15
139:23 141:2
147:9 151:13
152:9 160:18
162:19 169:4
173:15 180:10,19
181:25 182:2,4
187:6,7,11,12,13
187:14
**mails** 13:11,23
14:2,4 15:20 27:9
27:10 49:22 59:11
99:19 104:23
112:24 163:8
180:8,22 181:21
**main** 2:13 25:2,3
163:12
**maine** 176:17,23
**maintain** 17:25
54:3 91:7 92:10
**maintained**
156:21
**maintaining** 63:19
64:16 91:5
**maintenance**
107:8 144:22
145:6 158:23

**major** 19:3 67:2
89:15
**makenzie** 2:6 4:24
34:21 146:7
**making** 73:11
101:14 102:3
113:3 153:7
167:13 184:10,16
**manager** 50:8,13
**managers** 50:16
51:19
**managing** 51:4
70:16
**mandarin** 57:18
174:20
**mar** 122:13 124:4
124:21
**march** 23:22 45:8
72:10,10 73:6
122:25 134:15
137:22 155:17,18
156:16,18
**mark** 7:6 35:7
131:9
**marked** 10:16
32:13,18 35:12
47:24 48:2 93:12
93:14 111:4,8
128:24 129:11
131:7,16,20
139:24 140:7
147:10,15
**markedly** 41:20
**marking** 10:13
**marriage** 188:15
**married** 142:25
**mary** 13:8 31:24
49:16 56:4,24
112:17
**massachusetts** 6:9
176:13,16,22

[materialize - monthly]

materialize 52:7
materializes 60:12
materials 150:19
matt 45:6,15 46:9
  49:15,15 50:4,7
  56:24 112:17
  129:18,19 154:4
  160:17 181:18
matter 1:16 3:18
  6:23 20:8 41:9
  43:8 46:4 49:17
  50:21 51:6 53:12
  67:13 76:5 81:25
  90:9 115:25 129:2
  145:6 147:17
  151:23 160:25
  174:10 188:17
matters 7:2 14:2
  40:2 88:22 98:20
matthew 13:7 56:4
mcdonald 15:18
mckenzie 131:2
meals 141:9,10
  144:15
mean 17:16 21:9
  39:24 44:23 60:14
  83:12 86:8 87:9
  96:11 110:4
  116:14 130:19
  138:14 149:2
  175:14 177:19
means 8:3 82:14
  144:3 151:2
meant 22:7 63:12
  159:12
media 3:16 120:19
  120:23,24
mediation 171:3
medications 10:4
meet 16:15 45:22
  72:5

meeting 16:16,17
  45:14,15 46:16,25
  47:13 51:15 69:5
  116:2 123:15
  126:13 127:10
meetings 46:19
  47:12
melissa 25:18,23
  26:2,10 30:2,6
  31:4,8 32:9 56:16
  56:17 57:3 59:3,4
  59:10,17 99:2,7
  102:11,18 103:17
  104:11,15 105:4
  105:13 106:7
  109:25 110:18
  112:15 124:2
  129:19 135:23
  139:8 143:13
  148:3 152:12
  156:2 157:16
  160:16 174:5
  180:9,17 182:3
member 55:7
  172:12
membership
  122:13,17 124:5
memories 113:12
memory 66:2,9
  115:22 127:8,9
  141:20 159:17
menial 170:2,7
mentioned 14:15
  15:15 18:4 19:24
  22:23 24:11 25:23
  29:25 49:14,19
  54:14 57:3,14
  60:13 73:22 87:8
  92:4 100:7 126:16
  165:18

met 6:11 16:13,18
  16:19 30:18 58:15
  125:15,16
method 152:22
methodology
  111:15
mezzanine 167:23
microphone 3:11
  165:2
microphones 3:6
middle 113:14
midnight 162:14
million 126:8
  154:13 164:12
miltenberger 2:19
  5:14,16 28:13,14
  29:23 41:7,15
miltenberger's
  29:21
mind 27:14 34:18
  34:24 36:20 87:5
  99:20 164:21
mindy 50:9
mine 46:8
minimum 32:8
  67:7 77:14 128:6
minor 161:7
minute 11:13 33:3
  147:24
minutes 14:20
  89:11
minutiae 89:14
miscommunicati...
  135:4
missed 23:11
missing 32:2 81:9
  110:15
mistake 159:24
misunderstood
  56:22

mitchell 25:17,20
  25:25 26:10 31:4
  31:8 32:9 56:18
  57:4 59:4,4,18
  99:3,8 102:11
  103:17 104:12,16
  105:4,13 106:7
  109:24 112:15
  124:2 129:18
  135:23 139:8
  143:14 156:3
  157:16 181:5
mk 148:4
moment 62:24
  153:12
monetize 120:24
money 54:21
  62:14 78:4 134:18
  153:24 177:4
monies 136:6
monitor 92:14
monitoring 91:13
month 72:15
  118:21 161:7
  184:2
monthly 45:6
  46:11 51:12 67:8
  68:7,11,18,23 69:7
  69:10,12 70:2,15
  70:18 71:2,3,8,13
  72:3,20 105:21
  106:12,16 107:14
  107:22,25 108:20
  116:22 117:14,16
  118:11 122:16,21
  123:7 124:6,11
  125:5,16 130:14
  130:21 132:2,25
  134:9,24 135:10
  147:8 148:7,16,24
  149:3,24 151:25

Veritext Legal Solutions
866 299-5127

[monthly - objection]

154:20 155:12,15
157:11,19 160:4,8
160:24 161:11,16
161:17,23 162:2
163:5,13,20 168:9
169:7,11 184:19
**months** 72:7
161:25 183:20
**mor** 72:11 108:14
137:22
**mor's** 170:6
**morning** 3:3 6:10
14:20,22
**mortgage** 77:19
**mother** 118:17
**motion** 14:9 28:25
38:15,20 89:7
90:10,16 168:6
**motions** 6:24
181:12
**motor** 119:5
**motorcycles**
115:17
**move** 75:14
**moving** 34:24 57:2
**multi** 42:22,22
**multiple** 19:14
42:4 76:4
**multiplied** 136:7
**multiply** 183:25
**music** 120:7,18
**myers** 1:18 2:3
3:24 4:19,22,25
6:13

**n**

**n** 2:2 78:11 186:2
187:17
**name** 4:2 6:3,11
20:5 23:12,13,15
23:16 27:20 28:22
29:5 58:12 102:18

116:4 138:10
173:4,8,23 174:9
182:6,14
**named** 119:7
**names** 136:22
**natural** 107:12
**nature** 52:21
168:13 183:16
**nearly** 136:3
**necessarily** 83:24
**necessary** 12:20
63:21 75:25 80:18
85:18 93:2 100:23
112:7 169:21
**need** 8:23 9:9
36:14 37:11,20
40:12,15,23 42:10
47:4 85:9 124:19
127:4 143:3 156:9
163:14 166:20,23
169:18 170:10,15
171:14
**needed** 30:22,25
44:2 46:7 174:4
**needing** 166:10,13
**needs** 167:6
169:19
**negotiated** 31:14
31:15
**negotiation** 31:18
65:10
**negotiations** 171:3
**neither** 58:14
**net** 19:10,24 78:11
**netherland** 114:17
115:2
**never** 57:6 121:23
**new** 1:18,18,21 2:5
2:5,10,10,18 3:25
3:25 5:23 58:8
79:15,16 115:8,10

115:25 116:15
146:22 156:13
173:18 176:14,16
176:23 188:3,7
**night** 14:22
**nol's** 78:7
**nonsense** 162:11
**normal** 8:17 77:19
179:3
**normally** 109:15
**notary** 1:19 5:23
186:22 188:6
**note** 3:5 29:20
35:24 41:11
145:19
**noted** 29:18
**notes** 14:6,7,7
51:10,11 100:9,13
100:14,19 101:3
111:7,14,24
112:12 113:4
121:6 148:4
187:10
**notice** 6:22,25 7:5
7:12 10:15,24
89:10 187:5
**noticing** 4:17
**november** 127:24
**number** 3:22 6:24
19:16 30:21 32:16
62:6 73:4 81:4,15
93:19 96:8 100:20
110:19,20 132:22
133:16,20 134:19
135:13,18 146:20
150:9,10 152:14
159:14,15 181:21
183:22 187:4
**numbering** 97:7
**numbers** 48:23
97:5 135:21

136:12 141:17
145:2 153:6
158:15
**numerous** 44:5
59:11 101:3
112:24
**ny** 5:16

**o**

**o** 23:16 78:11
186:2
**o'melveny** 1:17
2:3 3:24 4:19,22
4:25 6:13 13:18
100:5 103:7
**oath** 4:7 7:25
**object** 129:25
**objected** 30:20
**objecting** 80:19
**objection** 12:4,24
24:20 26:16 27:15
28:24 29:22 34:10
37:16 39:5 57:22
58:18 61:4 64:14
66:13 77:4 78:21
79:22 81:10,12
84:25 88:3,8 91:9
92:2 93:5 95:9
96:10 98:15 99:24
101:18 102:8
103:24 104:13
106:18 108:21
111:22 112:22
113:24 118:4
122:18 126:3
127:7 130:16
132:11 133:18
141:18 148:20
149:7 152:11
157:20 166:12,22
170:12,22 177:25

[objections - paragraph]

**objections** 4:14
12:8 14:10 52:20
52:22 54:8
**objects** 9:18
**obligation** 91:22
**observer** 45:20
**obtain** 12:19
**obtained** 59:17
**obtaining** 22:15
**obviously** 43:18
66:18 87:17 98:17
105:8 156:21
163:15 173:21
**occasion** 174:17
**occasionally**
141:22,24
**occupancy** 113:19
113:22
**occur** 68:3
**offer** 18:25
**office** 19:16 58:8
68:24 69:20 72:12
72:22 162:13
**offices** 1:17
**official** 93:13,25
94:21 187:9
**offset** 78:7
**oh** 45:10 160:24
167:9 173:2
177:14
**okay** 9:7 35:17,22
71:17 85:17 96:3
103:2 131:11
148:2 149:14
159:6 173:8 181:6
**old** 169:3
**once** 85:11 144:24
154:10
**ones** 60:9 69:23
**ongoing** 52:6
88:14 105:21

108:20,23 137:20
170:24 178:18
**open** 47:13 91:7
92:10
**opening** 63:19
64:16 91:5
**operating** 41:21
41:24,25 42:11,20
42:21 43:3 45:7
46:11 51:12 67:8
68:7,11,19,23
69:10,12 70:3,6,10
70:15,18 71:2,4,8
71:13 72:4,21
78:12 106:12,16
107:22 108:2
116:22 117:14,16
118:11 122:16,22
123:8 124:6
130:15,21 132:2
132:25 134:4,5,9
134:24 135:11
147:8 149:25
151:25 154:20
155:12,15 156:10
157:11,19 160:5,8
160:25 161:11,16
161:17,23 162:2
163:5,13,20 168:9
169:7,12 184:19
**operations** 127:20
**opinion** 145:20
151:5,7
**opportunity** 2:4
4:20 6:14 10:24
38:20 75:20 81:4
**oppose** 29:6
**opposed** 74:6
103:14
**opposite** 159:24

**oral** 65:18 99:17
99:18
**orally** 106:9
160:18
**order** 29:15 62:11
72:23 75:3,5,8
86:9,21 105:5
**ordered** 54:25
**ordinarily** 172:5
**ordinary** 30:21
62:7 70:24 156:7
156:8 167:18
169:22 181:7
**original** 150:10
152:3 159:20
**originally** 153:13
**outcome** 4:9
188:16
**outside** 16:22 26:3
26:5,6,14 31:5
80:4 126:10
127:17
**outstanding** 59:24
**overpayment**
160:6
**owed** 81:18,19,20
**owned** 114:3
126:22,25 127:16
154:8
**ownership** 102:12
107:9
**owns** 115:5 116:5

**p**

**p** 2:2,2 23:16
**p&l** 69:20
**p.c.** 1:15 2:17
**p.m.** 39:10 90:25
139:21 140:4
165:8,12 185:5,8
**pacific** 2:3 4:19
6:13 10:23

**page** 7:8 11:8,21
33:2,4 48:22,23,24
49:9,11 55:13,18
88:20 93:25 95:18
96:4,25 97:4,8
105:18,20 106:11
113:13,14 115:12
119:9,12,20 120:3
121:3 124:25
126:5,10 132:7
140:19 145:20
148:3 149:15
151:14 152:8
157:6 161:19,20
161:20 162:3
187:3,18
**pages** 161:19,22
162:11
**paid** 32:24 70:23
72:14 73:13 77:25
86:16 108:10,15
118:22 130:24
133:3 134:16
136:7 149:18
151:15 152:21
153:24 155:23
156:11 158:8
159:19 160:2,3
173:6 175:4,8,10
175:19 179:24
181:10,12 183:4,6
183:8,14
**palm** 122:14
**pans** 101:23
**paper** 168:23
**papers** 43:17,19
44:16 45:3 46:3,6
126:14
**paragraph** 113:2
113:2

Page 22

[paramount - plan]

**paramount** 29:3
**parcel** 111:25
**parents** 42:3
**part** 21:22 37:17
  43:17 51:11 69:9
  96:9,12,17 97:9,13
  97:24 100:12
  105:20 111:25
  112:3 132:21
  144:7 170:21
  171:7,9 172:4
  181:6
**participate** 47:2
  47:17 60:8,12
**participated** 51:13
  58:23 84:3
**participating**
  45:21
**participation**
  45:12 47:10,20
**particular** 40:5,12
  40:16 42:19 105:5
  117:17 118:6,23
  130:17 168:25
**particularly** 14:9
  112:12
**parties** 3:14 66:22
  84:23 87:12
  104:25 105:2
  117:6 130:24
  133:12 188:14
**partner** 19:12
  20:3 51:3
**partnership** 74:10
  75:23
**parts** 79:12
**party** 4:7 20:22
  44:4 53:10 99:11
  102:14 119:24
  122:6 173:12
  184:10

**pass** 44:9 130:25
  139:10
**passed** 105:7,8
**patents** 120:4,13
**pax** 100:6
**pay** 19:13 54:22
  55:3 68:2 118:20
  154:9 171:6
**payable** 69:21
**payables** 167:24
**payee** 138:11
**payees** 137:7
**paying** 107:17
  146:24
**payment** 33:17
  92:22 106:23
  108:22 117:9
  133:3,25 134:11
  146:19 154:7,13
  154:15 156:24
  159:17 175:13
  179:4
**payments** 83:22
  84:6 86:16 93:2
  132:16,19 133:7,9
  133:10 134:2,6,16
  134:22 154:5
  156:25 157:24
  172:5 183:17,17
  184:11
**payroll** 42:7
**pays** 122:4
**pc** 10:25 48:9,20
  49:4
**pdf** 95:18
**pearl** 2:18
**penalty** 8:8
**pendency** 70:9
  117:19
**pending** 9:11
  81:25 82:5

**people** 5:15 16:2
  19:8,17,19 28:19
  45:22 53:4 58:24
  102:17 117:24
  118:7 141:24
  142:2,4 168:24
  175:16
**percent** 118:13
  138:19,21 139:4
  141:9,11,13,14
  142:7,8,9,12,16,23
  143:6,8 144:2,5,6
  144:13,14 145:11
  146:4,5,11,11,21
**percentage** 136:6
  136:8 138:13
  139:5 147:7
**percentages**
  136:15 144:19
**perform** 59:15
  66:11 91:25 93:3
  96:20 97:10,16,21
  98:5,6 114:13
  125:22
**performed** 80:20
  83:5 88:10 89:18
  97:20 121:10,14
**period** 72:10
  82:16 86:20 90:25
  117:18 129:22
  133:11 140:13
  151:15 153:25
  154:20 155:11,17
  156:12 157:25
  159:9
**perjury** 8:8
**person** 5:12,15
  15:18,21 26:15,17
  49:20 50:17 51:5
  54:4 103:15
  129:18 130:10,10

  139:9,11,12
  140:24 157:17
  178:20 179:3
  181:23,24 182:2
  183:9,10 184:4
**person's** 27:23
  182:5
**personal** 95:12
  97:25 101:4
  102:10
**personally** 23:9
  65:17
**perspective** 31:23
  77:16 85:7
**pertaining** 146:21
**petition** 32:22
  33:5,9,16,20 35:24
  36:3,8 74:13 84:6
  92:22 132:19
  133:3,3,25 160:2,2
  160:3,3 172:5,20
  174:25 176:5,8
  177:18,24 183:4
  183:11,14,16
  184:5,12
**phone** 15:3 25:11
  25:15 28:8 47:20
  58:24 59:2,11
  104:24 143:15
  167:8 181:19
**phones** 3:10
**phrase** 110:2
**physically** 123:5
**pick** 3:7
**place** 3:10,14
  45:22 47:15 53:8
  77:6 82:20 83:25
  175:24 186:11
**plan** 86:6,11,13,24
  87:15,24 122:2
  169:17

Veritext Legal Solutions
866 299-5127

[planned - process]

**planned** 54:19
**plans** 86:14 88:7
  125:3
**platforms** 120:8
  120:20
**play** 52:10 169:18
  169:20 171:7
  172:2,3,3
**plays** 52:11
**pleadings** 14:8
**please** 3:5,9 4:15
  5:10,19 6:3 8:19
  9:5,11 11:8 23:14
  28:11 33:2 35:15
  67:22 148:5,14
  165:2
**plus** 72:10 106:7,7
  135:18 140:17
**po** 2:14
**pohl** 23:10,15,17
  23:24 24:4
**point** 39:14 40:18
  48:14 52:20 60:6
  61:8 65:25 67:10
  75:3 81:11 92:20
  106:17 123:23
  124:13 130:14
  153:22 166:3
  171:10
**points** 25:2 55:17
**policies** 121:17
**policy** 121:18,22
  121:24 122:8
**populated** 95:23
**ported** 49:23
**poses** 37:2
**possession** 37:25
  38:3 52:14
**possible** 30:17,25
  31:6 35:25 60:7
  79:6 82:9 84:12

120:17
**possibly** 118:9
  169:6 171:17
**post** 20:17 32:22
  33:5,9,16,20 35:24
  36:3,8 61:11
  63:12 133:3 160:2
  174:25 176:5,8
  177:18,24 183:11
  184:5,12
**posted** 120:8,19
**potential** 24:10
  52:9 65:11,15,22
  85:21
**potentially** 27:20
  66:6 78:17 90:14
**pots** 101:23
**practice** 121:21
**practitioner**
  176:13
**pre** 74:13 84:6
  92:22 132:19
  133:3,25 160:2,3,3
  172:5,20 177:18
  177:24 183:4,14
  183:16
**precursor** 17:11
**predicated** 72:3
  157:10
**predict** 53:7,13
**prefer** 33:15
**preference** 33:9
  33:14 82:10,18
  84:2 171:18
**preferences** 82:16
**preparation** 13:20
  15:7 51:9 53:5
  55:19 56:20 60:19
  61:9 68:6 73:16
  86:7 112:4 116:22
  168:10

**prepare** 13:4
  24:13,14 71:11,12
  71:23 95:3 100:9
  173:5
**prepared** 13:10,14
  24:15 31:19 71:3
  71:19 86:12
  161:15 173:18
  183:12
**preparer** 135:4,6
  136:9 173:4 174:9
**preparing** 8:12
  15:6 45:6,11,12
  46:14 55:24 56:7
  57:24 58:21 60:23
  66:20,21 84:4
  86:18 94:7,11
  105:11 109:6
  110:12 112:9,21
  132:4 155:3,6
  161:2 169:11
  170:5,6
**presence** 120:25
**present** 2:21 4:10
**presenting** 155:13
**presidential** 19:19
**presumably** 54:22
  68:20
**presuming** 114:6
**presupposed**
  55:10
**presupposes** 70:15
**presupposing**
  66:14
**pretty** 21:11 22:9
  32:7 37:4 44:22
  70:5 179:11
**previous** 36:21
  38:6 78:7,10
  116:8 119:6

**previously** 6:10
  14:23 85:20
  104:10 119:18
  130:4
**primary** 143:10
**principal** 21:17
  22:24 23:3 37:23
  50:5,10,16,25 51:8
**printed** 119:11
**prior** 82:17 83:23
**priority** 81:7
**privacy** 29:2
**private** 3:7
**privilege** 39:23,25
  40:17 83:15
**privileged** 41:3
**probably** 14:24
  20:20 24:11 28:9
  32:9 42:10 45:4
  52:15,16,19 54:5
  106:8,8,9 110:17
  116:23 137:8
  138:21 144:5
  170:23 176:19
**problem** 80:3
  146:25 160:24
  162:16
**procedure** 11:3
  17:19
**procedures** 7:23
  70:13
**proceed** 11:20
  140:5 165:13
**proceeding** 4:15
  16:22
**proceedings** 39:19
  39:21,22 115:10
**process** 38:14
  40:13 67:21 155:9
  168:7,22 169:23
  178:11

Page 24

[produce - reasoning]

| | | q | r |
|---|---|---|---|
| **produce** 8:13 | 152:16 153:16,25 | **qpc** 31:23 | **r** 2:2 5:21,21 6:5 |
| **produced** 128:25 | **proponent** 118:12 | **quarter** 72:8 73:9 | 48:25 186:2 188:2 |
| 137:19 147:16 | **proposed** 5:4,7 | 73:10 | **rang** 167:8 176:10 |
| 173:12,13,16 | 54:20 111:20 | **quarterly** 68:7 | **range** 15:13 |
| **product** 46:22 | 139:3 150:21 | 71:19,21,25 72:18 | **rank** 29:5 |
| 83:15,17 | **protect** 75:9 89:16 | **queries** 158:18 | **rarely** 42:21 81:18 |
| **profession** 166:3 | 179:4 | **question** 8:20 9:5 | **rate** 67:10,11 |
| **professional** 17:14 | **protected** 29:14 | 9:7,11,19,20 27:4 | **reached** 23:17,24 |
| 17:17,25 18:8,12 | **protection** 83:18 | 27:6 28:9 34:8,12 | 28:20 161:12 |
| 33:11 37:22 77:17 | **protective** 29:15 | 34:16,18,19 36:17 | 162:12,25 |
| 92:21 156:4 158:3 | **prove** 86:22 | 36:19,25 38:17 | **reaching** 161:13 |
| 163:3 166:7 | **provide** 22:18 | 53:17 56:9 83:20 | **read** 27:6 34:12 |
| 175:19,20 | 92:25 171:11,15 | 94:19,21 96:17 | 57:18 65:24 90:16 |
| **professionals** 14:8 | **provided** 13:14 | 101:12 105:16 | 120:16 147:25 |
| 30:21 54:9,23 | 59:5 98:11 99:10 | 108:3,8 110:7,8 | **reads** 55:18 61:8 |
| 57:9 62:8 68:25 | 117:3 130:9 | 113:14 114:14 | 63:18 80:17 88:20 |
| 77:25 156:5,5,6,7 | 140:24 158:15 | 115:13 116:21 | 94:20,24 95:11 |
| 156:8 157:2,3 | **providers** 92:21 | 117:4 118:3 119:4 | 105:21 106:12 |
| 159:25 175:20 | **providing** 27:14 | 120:3,12 121:16 | 113:18 115:15 |
| 181:8 | 63:21 | 122:11 124:13 | **ready** 137:21 |
| **profile** 166:10,19 | **public** 1:20 5:23 | 126:5 127:22 | **real** 42:20 77:20 |
| 178:14 179:6,18 | 186:22 188:6 | 130:18,20 148:19 | 94:22 107:6 |
| **program** 69:12 | **pulling** 134:14 | 149:6,12,25 150:3 | 113:19,22 114:2,4 |
| 70:11 | **pullman** 2:12 5:7 | 151:19,23 154:2 | 147:6 167:20 |
| **progress** 71:9 | 165:17 | 155:16 163:10,12 | **realized** 159:24 |
| **progresses** 50:22 | **punching** 99:11 | 163:12 166:14 | **really** 31:2 74:21 |
| **projections** 61:10 | **punitive** 164:9 | 177:13,21 181:15 | 133:2 165:4 |
| 61:24,24 86:18 | **purchase** 117:12 | 184:10,12 | **reason** 10:8 76:15 |
| 87:10 | 118:19 | **questions** 47:17 | 78:13 89:4 138:22 |
| **prominent** 60:18 | **purchased** 117:13 | 83:21 91:3 99:21 | 142:4,19 143:4,10 |
| **promised** 179:23 | **purposes** 39:23,25 | 100:6,23 113:5 | 145:16 |
| **prompted** 163:17 | 77:24 | 119:19,21 129:16 | **reasonable** 21:13 |
| **proof** 80:24 81:2 | **pursuant** 10:25 | 135:25 149:2 | **reasonableness** |
| 81:21 | **pushed** 168:23 | 153:5 158:5 | 109:14 110:3 |
| **proofs** 80:19 | **put** 44:18 69:16 | 164:15 167:17 | 158:10 |
| **properly** 136:2 | 131:12 142:7 | 179:17 184:8,23 | **reasonably** 53:11 |
| **property** 94:15,21 | 155:24 | **quick** 165:4 | **reasoning** 29:21 |
| 95:12 107:7 | **puts** 87:18 | **quickbooks** 60:25 | 142:17 143:21 |
| 113:17 114:2 | **putting** 109:14 | **quickly** 159:6 | 144:8,11 145:10 |
| 120:7,13,15,18 | 180:22 | | 145:12,21 |
| 122:11 148:5,14 | | | |

Veritext Legal Solutions
866 299-5127

[reasons - report]

**reasons** 75:2 77:23 130:3 142:11 168:15
**recall** 23:20 32:6 33:8 34:7 44:10 57:21 65:20 126:17 128:4 146:10,13 151:4 151:10 161:9 173:22
**receipt** 78:13
**receipts** 52:17 54:3,14,15 63:15 66:25 68:22 86:19
**receivable** 69:22
**receive** 57:15 137:10 157:15 174:24
**received** 33:20 92:22 99:17 104:11 137:13 139:7 140:6 160:10
**receiving** 33:9 161:9
**recess** 90:22 139:22
**recognize** 10:20 48:15 49:6 93:21 111:11 140:9 147:20,22
**recollection** 36:16 44:21 162:24
**recommend** 73:23 73:24 74:2 75:7 75:17,22 76:11 80:9 141:10
**recommended** 144:21
**reconciling** 80:18

**record** 3:3,15 4:13 6:4,11,11 8:12 11:13,15,16,20 28:2,18 32:15 41:10 48:5 90:19 90:21 91:2 93:18 100:4 129:5 130:4 139:19,21 140:4 156:9 165:4,8,9,12 185:2,5 188:11
**recorded** 1:14 3:17
**recording** 3:13 8:10
**records** 15:9,20,23 40:14 49:22 52:16 82:9 84:12,14,18 92:19 160:22 171:16,20 172:17
**recoverable** 83:2
**recoveries** 175:15
**rectified** 135:5
**redacted** 129:17 182:6,16,25
**redaction** 130:6
**refer** 97:4,25
**referenced** 68:10 103:11,12,13 119:23 155:5 159:10,15
**references** 63:11 113:4,7 119:6
**referencing** 65:7
**referred** 27:5 174:5
**referring** 71:15 95:20 97:4,7,14 104:3 120:9 132:12 135:9 150:6 167:16

**refers** 84:11 95:13 95:17 96:2 114:16 119:4 120:5,12 121:4,17 122:13 125:8 126:6,7 127:23 135:13 144:20
**reflect** 132:10 133:8 140:22
**reflected** 133:14 135:15 152:8
**reflecting** 164:5
**refresh** 36:16
**regarding** 15:17 16:4,4 24:2,9 25:5 26:4,11 30:14 59:21 65:14,19 67:25 102:15 111:16 137:13 150:3 161:10 163:4
**regret** 168:2
**rejoin** 41:14
**related** 4:7 19:7 49:21 56:9 61:10 90:3 91:4 95:14 138:23 143:5,11 188:14
**relates** 7:3,8 94:15 107:16 111:21 173:16
**relating** 6:23 70:14
**relationship** 143:19
**relevance** 28:21 88:11
**relevant** 27:24 41:4 113:23 116:21 117:14 123:11

**relied** 85:5 104:9 177:15 178:6
**relief** 75:4,6
**relies** 84:22
**rely** 39:2 98:13 123:25 139:6 158:14 176:4 177:23 179:5
**remain** 106:16,24 107:18
**remains** 74:12 184:14
**remember** 21:14 24:7 43:14,24 59:2 62:22 81:3 85:24 87:5 105:2 105:5,15 108:7 109:20 110:8 116:19 117:4 127:19 130:22 142:13 146:16 159:13 167:12 173:10 176:7
**remind** 167:10
**remotely** 4:11
**renters** 107:7
**reorganization** 86:11 168:21 169:15
**repair** 107:8 144:22
**repairs** 158:22
**repeat** 9:5 27:3
**repeating** 66:17
**report** 40:11 45:7 46:11 51:12 54:6 67:8 68:11,19,23 69:7,10,13 70:3,6 70:10,15,19 71:2,4 71:9,19,21,25 72:4 72:18,21 107:22

Veritext Legal Solutions
866 299-5127

[report - right]

108:2,2,9 117:5,15
118:11 122:16,22
123:8 124:6
130:15,21 132:3
132:25 134:4,6,24
135:11 144:9
147:8 149:25
151:25 154:20
155:12,15 156:10
157:12,23,23
158:13 159:8,20
160:5,8,25 161:11
161:16,17 163:5
163:13 184:20
**reported** 71:2
157:5 160:7
**reporter** 1:20 4:4
5:10,19 8:11
10:13,18 27:7
32:12,20 35:7,14
47:23 48:4 78:9
93:11,16 111:3,10
128:23 129:13
131:18,19 140:2
147:12,14 171:13
187:15
**reporting** 19:18
42:23 52:18 54:2
66:21 67:4 68:8
108:14 148:24
149:3 155:6,10
**reports** 22:19
66:21 68:7 107:22
116:22 117:16
157:19 161:23
162:3 168:9 169:7
169:12
**represent** 30:2
129:7 140:16
144:13 176:17,19

**representations**
59:21
**representative**
180:5
**represented** 9:12
20:21 21:10,12
102:22 113:12
**representing** 9:16
100:5 181:13
**request** 26:19
108:9 163:18
**require** 47:9 60:7
**required** 12:14,19
17:19,22 54:25
55:2 70:10 76:2
89:5 108:14
**requirement** 67:7
**requirements**
42:24,24 67:5
**requires** 68:24
86:25 89:10
**reside** 150:15
172:17
**residence** 101:5,9
102:5 113:16
114:6,9 118:6,10
150:13
**residences** 19:14
114:14 118:3
**resident** 76:12
**resides** 114:5
118:5
**respect** 21:20
92:25 95:7
**respond** 89:11
178:24,24
**responded** 36:20
65:4
**responding** 35:18
51:16

**responds** 52:4
149:15
**response** 35:23
115:14
**responses** 12:7
**responsibilities**
21:20 46:10,18
**responsible** 20:2
98:12
**responsive** 124:15
**rest** 17:24
**restrictions** 153:2
**restroom** 139:17
**restructure**
167:22
**restructured**
170:16,21
**restructuring**
17:24 18:7 165:19
166:11,13,16,20
166:24 167:7,16
167:21 170:11,21
**resuming** 139:23
**retain** 48:8,19
49:3 181:7
**retained** 34:6
36:22 37:6 39:7
39:15,18,20 72:17
143:11 187:15
**retainer** 32:22,24
32:25 33:5,10,12
33:16,20 35:24
36:4,8 126:6
174:25 175:17
176:5,8 177:19,24
**retaining** 34:5
35:21 36:18 37:3
39:4
**retains** 74:7 162:6
**retention** 7:8
43:16,17,19 44:16

55:13 61:8 88:12
111:21 126:14
175:22
**retrieved** 31:8,12
**return** 53:2,3
74:23 75:6,8
76:12,14 77:2,22
77:23 78:14 79:15
79:17,18 86:23
168:9 173:5
**returns** 54:10 74:3
74:9 75:24 76:5,6
78:18 79:9,11
80:10 169:9 173:3
173:6,11,18
**revealed** 26:18
**revealing** 27:19
28:22
**revenue** 80:14
**review** 27:22
43:22 51:23 52:19
53:10 60:7 61:9
62:12 68:6 72:17
73:16 124:20
125:17 135:24
150:19 158:2
162:5 171:19
**reviewed** 13:8,11
62:18,20 81:24
84:13,18 109:13
110:3 112:24
114:21 141:3
**reviewing** 80:17
82:8 112:11
160:15 171:16
**revising** 139:5
**rhode** 176:15,21
**right** 7:10 10:19
38:19 53:24 55:22
61:3 62:16 63:6
64:16 70:17 71:6

[right - server]

73:4 81:15 84:9
90:7 94:8 95:21
98:2 100:11
126:19 130:11
134:12 136:19
138:5 152:5
153:17,20 154:22
165:20 169:16
170:8 173:23
177:14
**rights**  29:2
**road**  113:20
**rodeo**  89:3
**role**  50:7,12 52:9
53:18 94:6,10
98:11 102:3
105:25 106:3
112:9 134:21
168:11 169:17,20
171:25 172:4
**roles**  23:2 51:18
**roll**  157:4
**rolled**  158:15
**room**  4:11 127:12
**rudnick**  2:8 5:4
15:21 23:10,16
24:6,8,18 25:9
26:5,6,11 30:9
31:20 32:4 38:10
38:12 39:2,16
43:23 49:24 56:13
57:4 58:25 59:7
59:10,17 64:20
83:18 98:25 99:7
102:12,18 103:18
103:18 104:11,17
104:17 105:7,13
106:6 109:24
112:14 124:2
126:7 139:7 156:2
157:15 175:18

178:7 181:3,5
**rudnick's**  126:14
**rule**  10:25 11:22
**rules**  11:2 117:5
161:3
**ruling**  29:12
**run**  22:2 58:9
67:10,11 178:21
**running**  21:23
172:9,10
**runs**  178:22
**russo**  2:6 4:24,24

**s**

**s**  2:2 74:10 187:2
**safe**  123:10
**safety**  138:24
144:10 182:11
**sales**  42:7
**sanity**  158:9
**save**  162:4
**saw**  62:22 79:13
79:15 126:13
128:4 153:4
159:23 162:19
163:13 173:3
**saying**  37:9 149:20
149:21 162:13
**says**  33:4 34:15
87:7 91:23 116:6
116:7 162:7,15
184:9,10
**scared**  143:16,18
143:19
**scenarios**  20:14
**schedule**  59:22
60:3 71:14 81:14
94:7,20,23 95:12
96:13 98:23 103:9
103:23 104:8
108:12 109:16,17
109:18 114:2

124:25 128:3
135:5,7,9 136:10
155:25
**scheduled**  81:14
**schedules**  14:6
30:23 44:22 45:25
51:10 55:20,25
56:14 57:12,17,25
58:17,22 60:20,24
69:4 100:10
111:16 112:2,5
113:6 168:8
183:13
**schindler**  13:8
31:25 49:16 50:9
56:5,24 112:18
**school**  17:3,5
**science**  17:7
**scope**  43:8 44:12
90:13 171:9
**scotch**  164:22
**scrambling**  69:4
**scratch**  71:11
99:16 106:2
**search**  15:19,20
49:21 82:25
**second**  45:16 61:7
114:16 121:6
125:2
**secret**  106:21
**secrets**  120:14
**section**  75:5 97:17
105:23 106:4
114:19
**secure**  167:22
**secured**  20:19
21:7 42:15 81:7
**security**  33:17
115:24 118:8,25
133:23 138:16,22
138:24 142:14,18

142:20,24 143:3,5
143:10,23 159:14
184:3
**see**  11:23 28:21
33:6 35:25 45:22
57:19 61:12 68:8
82:11,25 88:11
95:17 96:6 121:8
121:19 125:6
132:15 141:2
148:9 151:16
155:21 159:2,3
168:5 183:20
**seeing**  57:21
127:19
**seek**  124:10,12
**seen**  79:8,12
109:15 121:23
127:24 128:19
137:6 145:7 164:8
164:13
**select**  75:20
**sell**  122:6
**semantics**  39:13
**senators**  19:19
**send**  15:21 24:15
162:7
**sense**  38:2 158:4
158:25
**sensitive**  3:6
**sent**  13:17 31:20
49:24
**sentence**  121:6
125:2
**separate**  74:4,5,14
74:22 107:21
129:5 131:7 132:7
**september**  17:10
**served**  7:5
**server**  13:24 49:22

Veritext Legal Solutions
866 299-5127

[service - started]

service 92:21 138:11 145:5,5
services 18:24 21:21 85:21 90:4
set 101:7 161:8 188:10,19
setting 47:5 83:17
settlement 78:6 171:2
settlements 77:10
seven 75:15 136:18
seventh 92:19
shake 8:24
shape 62:10
shapes 42:2
shea 2:17
sheet 69:20 131:14 133:15 138:16 158:12
sheets 109:4
sherry 114:17,25 146:21,25 150:5 150:16,17 151:16 153:20 154:11
sherry's 146:25
shit 176:11
short 104:20 139:22
shorthand 1:20
show 146:9
showed 141:24 159:22
showing 101:19
shown 132:21 147:7
shows 117:20 158:5,21,23
siblings 42:4
signatory 38:23 66:18

signature 188:21
signer 37:24 52:14 65:3
significant 13:9 59:5
significantly 160:14
silverberg 13:6 24:5 33:4 34:4 37:2 38:5 39:6
silverberg's 35:19
similar 113:17
simultaneously 44:23
single 53:10 75:22
sir 85:16 100:6,14 153:18
sitting 19:25
situation 104:20 121:23
six 162:10
size 42:2
slipping 87:4
small 45:12 88:5 134:17 173:17
social 120:23,24
sofa 55:25 56:14 57:12,17,24 58:16 58:22 59:22 60:2 94:7 98:23 109:16
sofa's 14:5 44:21 45:25 51:10 60:19 60:19,23 69:4 83:22 112:2 113:5 168:8 170:5
software 60:16,18 61:2,5
sole 52:14
solely 104:9
somebody 183:7

someday 169:17
someone's 171:4
someplace 110:21
son 58:9,11,13
soon 159:4
sorry 3:5 7:14 23:11 35:3 41:7 83:11 94:19 95:16 126:4 130:19 171:13 176:11
sort 52:8 55:6
sorts 17:15 42:23 54:15 167:25
sound 84:9
source 62:24 77:12 87:25 105:2 175:7,8,13,25
spatulas 101:22
speak 14:18 15:14 23:25 24:9,17 25:5,10 26:2 44:17 144:25 174:20,21 181:24
speaking 35:20 115:7,14 151:10
specific 14:7 51:11 94:17 100:12,14 100:19 101:2 104:4 110:24 111:19 112:12,20 157:25
specifically 20:25 43:15 51:7 72:20
specifics 83:10,16
specified 186:11
speculate 127:4
speculation 93:6
spell 23:12,13
spend 15:5 78:4 165:25

spent 21:23
split 118:18
spoke 13:5,7 14:15 14:21 16:8 31:2 57:6
spoken 14:24 174:11,18,22
spouse 118:14 145:18 150:14
spouse's 121:18
spreads 21:25
spreadsheet 135:14 158:6 160:19
spring 2:17 5:16 27:17,18 28:17,23 29:6 57:24 58:3 179:6,9,12 180:6,7 180:10,15,20 181:17,20 182:20 183:5,8 184:6
spring's 28:8 182:10,15,19
springs 26:19 28:10,14
square 1:18 2:4,9 3:25
ss 188:4
stab 43:22
staff 20:4 24:12 51:17 52:8,9,24 53:14,17,20 54:4,7 66:20
stamp 129:2
stamped 35:9
standard 70:8 121:21
start 6:17 7:22 79:25
started 17:11 23:4 45:6 153:4,7

Veritext Legal Solutions
866 299-5127

[started - team]

162:18 182:21
**starting** 33:14
83:25 97:9 109:5
130:14
**starts** 96:17
109:21
**state** 1:20 4:12,15
5:23 6:3 27:2
42:22 73:17 76:16
76:16 79:14 101:3
156:5 188:3,7
**stated** 26:17
164:10 171:19
**statement** 14:5
34:12 37:21 54:6
55:19 73:6 111:17
112:4 158:8
**statements** 8:25
69:19 111:14
**states** 1:2 3:19
42:6 54:23 62:5
69:11,19 71:20
72:2,22 157:7
162:8 171:11
176:19
**statistical** 94:3
**statute** 75:16
82:22
**statutes** 75:16
**statutorily** 72:24
**stay** 18:2 123:9,13
**stays** 123:8
**step** 13:19 46:2
69:25
**stepping** 49:13
**steven** 23:9,15,24
24:4
**street** 2:13,18 6:8
**stretto** 89:22 90:8
90:14 92:5,10,14
92:24

**stricken** 29:14
**strike** 25:4 30:6
116:20 157:13
**structured** 65:23
66:7
**stub** 72:9
**stuff** 30:25 168:7
**subject** 8:7 12:11
14:2 29:14 53:10
147:23
**subscribed** 186:18
**substantively**
149:5
**subtract** 133:6
**success** 82:5
**successful** 86:10
**suffering** 9:24
**sufficient** 42:12
**suggested** 143:6
**suggesting** 142:12
142:17
**suggestion** 145:24
**suggestions** 141:3
141:8
**suite** 2:18 6:8
**sum** 72:11 96:17
135:17
**summarized**
155:24
**summary** 94:2
129:21 130:9
153:3
**sun** 59:14
**supplement**
132:24
**support** 19:6 22:4
22:8 40:6 49:2
51:24,24 55:21
85:19 112:6
162:21 172:8

**supported** 36:21
**supporting** 51:17
**supports** 60:18
**supposed** 74:20
162:17 167:12
**sure** 7:4,11,23
27:16 31:24 32:2
32:7 37:4 38:12
38:13 43:13,21
44:19 73:4 75:10
81:8 88:13 99:22
104:6 110:13,14
110:16 113:3,8,11
124:8 125:25
127:14 129:6
135:25 136:10
137:16 141:5
150:25 158:4,11
165:6 167:13
173:25 174:23
176:7 179:11
**surprise** 83:24
**surrounding**
182:12
**suspect** 170:25
**swear** 5:10,19
**swearing** 8:4
**sworn** 5:22 186:5
186:18 188:10
**system** 60:10

**t**

**t** 5:21 6:5 186:2
187:2 188:2,2
**tab** 10:12 32:11
34:22 131:2 146:7
**table** 49:9,10 50:4
**taconic** 113:20
**tail** 45:4
**take** 3:13 9:10
14:25 31:25 33:3
35:15 53:8 67:5

77:6 82:20 111:23
134:17 139:18
165:3 173:2
179:25 184:25
**taken** 79:4 90:23
139:23
**takes** 47:15
**talk** 7:20 8:18 17:2
80:7 146:3
**talked** 16:3 21:18
30:10,15 46:2,9,13
55:14 59:9 127:9
128:12,16 129:20
134:10 137:24
154:25 158:16
164:3
**talking** 29:25
64:15 79:23 85:2
96:12 98:25 103:8
104:4 138:19
146:13 160:16,16
160:17 162:18
**task** 89:4
**tasks** 88:22 170:2
170:7
**tax** 19:21,22 52:25
53:3,4 54:8,9
73:17 74:3,8 75:6
75:7,24 76:14
77:2,16,22,24 78:3
78:17 79:9,11
80:8,10 168:9
169:9 173:3,5,6,11
173:18
**taxation** 19:9 22:2
**taxes** 42:7,7 53:5
73:24 74:17 77:20
107:6
**taxing** 75:11
**team** 55:7 56:20
59:10 106:6,6

[team - top]

109:24 110:16
138:19,20 153:13
172:9,12
**technical** 56:9
**technically** 74:22
**technology** 169:6
**teleconference**
2:19
**telephone** 45:15
**tell** 124:19,24
127:3 135:8
154:14 184:15
**telling** 118:21
**ten** 7:17 15:11
**tense** 85:3,3,4
**term** 87:4 125:13
**testified** 5:24 6:15
88:9
**testify** 10:2,9 12:2
12:14,21 40:15
41:2 186:5
**testifying** 7:25
11:5 28:16
**testimony** 10:6
22:19 185:6 186:6
186:10 188:12
**th** 70:24
**thank** 7:13 12:9
14:14 19:20 29:23
35:2 38:7,25 41:5
41:13 45:24 56:25
90:19 94:24 96:14
99:25 102:21
103:2,3 113:13
119:2,4 128:19
133:4 144:12
159:6 161:8
**thanks** 41:16
**theme** 144:18
**thereto** 55:21
112:6

**thing** 19:17 64:19
66:3 79:13 117:23
120:10 122:14
124:21 135:12
157:2 162:15
**things** 6:21 22:5
51:21 54:18 69:14
100:24 124:4
156:22 161:2
167:19 179:2
**think** 9:14 14:11
14:12 16:17 18:15
19:8 20:20 21:9
24:13 28:25 30:16
30:20 31:2,5 34:6
34:11 36:13,19,22
37:5,10 39:7,13,21
40:9 43:9 45:10
45:24 47:19 49:13
51:3 52:12 55:4
56:10 60:8,17,20
70:6 73:22 76:20
79:18 81:10,22
85:19 87:8 90:5
91:18 94:5 95:13
103:9 106:20,24
106:25 109:16,18
110:2,10,23 113:3
115:23 118:12
119:17 123:9
124:21 125:17
126:11,13,15
128:3,5 137:24
139:3 140:6,15
141:19,25 144:7
146:6,18,25 151:2
152:4 153:8,14
154:18,24 155:5
159:7,10 161:12
163:2 167:7
168:20 170:6,18

172:11 173:16,17
177:12 178:16,16
178:17 179:3
181:19 182:22
183:21 184:20
**thinking** 40:8
117:7 123:12
149:9
**third** 63:18 64:15
117:6 119:24
122:6 130:24
133:12 184:10
**thirds** 184:2
**thought** 37:12
38:18 46:25 56:21
95:14 114:2
126:15 127:15
138:20 142:7
153:9,13 161:21
174:6 175:12
**thoughts** 151:3
**thousand** 126:6
132:21,22 140:17
146:19 152:7
154:12 159:16,16
159:18 166:2
177:2 183:24,25
**threatened** 143:16
**three** 19:2 72:7
75:16 109:23
112:16 161:25
163:10
**tie** 137:17
**till** 17:9 153:4
**tim** 15:18 28:13
41:13 49:19
**time** 1:11,17 4:16
11:14,18 15:9
16:18,19 17:13
19:8 21:12,23
24:22 40:18 43:16

44:24 45:19 52:20
60:6 65:25 81:11
86:17,20 90:20,24
97:3 104:21 106:8
116:13 117:18
118:23 123:24
136:13 137:11
138:2 139:20
140:3 146:23
154:5 155:20
156:14,22 157:11
157:25 159:25
160:14,15,21
162:6 165:7,11
174:2,10 178:25
179:12 186:10
**timely** 80:10 145:9
**times** 1:18 2:4,9
3:25 6:18 7:15
14:24 60:14
104:23 177:11
**timing** 78:24 79:5
134:25
**timothy** 2:19 5:15
**title** 21:15 86:12
101:8 114:25
**today** 7:25 8:13
9:13 10:10 11:5
15:4 159:5
**today's** 13:21
185:6
**told** 63:6 102:10
104:17 143:17
147:3 153:19
181:2 182:14
184:21
**tonight** 85:13
**top** 14:13 18:2
33:4 41:18 48:23
97:5,8 130:10
151:13 155:4

Page 31

[topic - use]

topic 12:2
topics 11:22 12:15
  12:22
total 94:22 95:12
  96:5 132:10 133:5
  133:6,23,24 136:9
totally 29:9,15
  42:18
tower 3:25
track 124:17
trade 120:14
trademarks 120:4
  120:14
transaction 126:9
transactional
  80:12
transactions 80:9
  82:9,25 84:13
  171:17
transcript 8:14
  186:9,9
transfer 82:10
  152:22 171:18
transfers 82:20
translated 57:8,14
  57:16,19
travel 123:2,21
  143:3
travels 115:24
treated 77:21
tried 59:13 134:25
  136:11
trucks 97:14
true 157:2 172:15
  186:9 188:11
trustee 54:23
  69:11 71:20 72:2
  157:7 163:17
  176:21,22
trustees 20:16
  62:6 68:24 69:19

70:11 72:6,12,22
  73:13 162:8,12
  176:18
truth 186:5
truthful 8:5 10:6
truthfully 10:2,9
try 8:20 15:22
  61:25 149:8 161:5
  171:5
trying 14:11 21:9
  45:9 48:14 132:15
  135:23,25 136:5
  162:14 163:10
  170:14 174:2
turbotax 60:23
turn 3:9 11:8,21
  33:2 68:5 96:24
  105:18 137:23
turning 20:24 23:5
  29:24 34:3 35:23
  37:18 41:5 43:6
  48:22 49:9 50:4
  55:12 61:7 73:15
  80:16 82:7 85:17
  86:5 88:19,19
  91:4 92:18 95:11
  103:7 106:11
  109:3 113:13
  115:12 120:3
  124:25 126:5
  130:8 132:6
  140:11 148:3
  149:14 151:13
  159:7
turns 144:24
twitter 120:20
two 14:24 15:11
  15:12 50:16 62:20
  77:15 82:23 87:18
  90:7 92:8 129:5
  132:18 133:10

134:6 141:13,23
  155:14 159:25
  161:19,19 179:18
  181:19 183:25
  184:2
type 17:15,20
  68:14 122:14
  148:8,17
types 22:5 51:22
  53:15 77:15,18
typically 43:20
  69:13 86:15 131:9
  154:9 166:5

**u**

u.s. 72:6,12 73:13
  161:10 162:12
uh 8:25
ultimately 150:22
un 42:7,8,9
unclear 47:2
uncover 40:22
uncovered 40:23
underperforming
  19:5
understand 7:24
  8:3,15,21 9:2,4,7
  9:15,20,22 11:25
  12:13,18 25:19
  27:11 34:11,13,16
  34:17 40:16 58:7
  81:17 86:21
  112:19 115:7
  129:14 147:18
  148:11 150:5
  153:5 158:11
  166:14 169:2
  170:17 175:10
  177:20
understanding
  11:4 27:18 28:11
  32:23 37:15 38:8

47:7 63:22 65:21
  76:21 90:13 92:9
  92:13 107:18
  108:19 113:21
  115:20 119:9
  121:3 141:15
  147:4 149:10,11
  149:13,19 180:25
  182:17 183:2
understood 9:3
  88:6 89:17 100:16
  133:4 145:8
undisclosed 139:9
  139:11,12
unheard 176:24
unit 3:16
united 1:2 3:19
  54:23 62:5 69:11
  69:19 71:20 72:2
  72:22 157:7 162:8
universe 154:6
unkept 42:9
unknown 130:10
  140:24 157:17
unpaid 156:13
unregistered
  120:6,17
unrelated 14:22
unsecured 167:23
updated 137:17
upkeep 107:9
uploaded 109:17
  109:20
ups 164:18
use 53:11 64:24
  113:18,22 115:15
  116:6,10 117:3,7
  117:22,24 119:7
  122:19 139:17
  158:24 162:4
  169:5

Page 32

[uses - witness]

**uses** 60:17 115:21
**usually** 69:15,16
  81:12 83:25 86:25
  87:11,18 117:17
  134:15 154:11
**utilities** 144:12

**v**

**v&l** 56:3
**v&l's** 88:12
**valuable** 116:3
**valuation** 121:10
  121:13
**value** 67:15
  102:24 120:22
  121:7,19,22,25
  122:3,5
**vans** 97:14
**various** 18:2 20:3
  42:2,5,6 51:16
  54:22 57:9 58:24
  59:6 69:22 75:11
  118:24 120:8,13
  120:19 183:13
**vehicle** 115:23,24
  117:13,22,23
**vehicles** 115:14,21
  116:9,13 117:2,8
  118:25
**verdolino** 1:15 7:9
  10:25 12:14,22
  13:24 15:16 17:12
  18:22,25 19:25
  20:10,15 21:15,20
  22:24 23:6,18,25
  24:17 25:7 26:3
  30:11,13 31:15
  36:7,18 37:3,23
  38:21 39:4,17
  43:7 44:13 48:8
  48:20 49:4,14,18
  49:25 50:15,20

55:15 56:19,23
57:2 58:15,21
59:15,25 61:14,18
64:11 65:9,13
66:10 67:9,12,15
67:24 71:12,18
72:17 73:18 76:10
76:25 78:16 80:20
82:3 83:4 84:17
84:22 85:25 87:19
87:23 89:18 93:3
94:6,10 95:3
96:20 97:10,15
98:5 99:5 100:8
101:13 102:3
106:2 107:23
109:5,11 111:20
112:8,16,17,20
122:15 124:9
125:22 128:10
134:21 135:15,19
136:22 140:23
144:21 149:11
163:17
**verdolino's** 130:14
**verify** 59:16 138:3
**veritext** 4:3,5
**vermont** 176:17
**version** 79:16
  127:13 133:15
  137:17,24 140:12
  140:20,22 150:10
**versus** 38:9 41:24
  119:24
**video** 1:14 3:13,17
**videographer** 2:22
  3:2 4:4 5:9,18
  8:10 11:14,18
  34:23 35:4 90:20
  90:24 139:20
  140:3 164:25

165:7,11 184:25
185:4
**videos** 120:8,19
**view** 36:25 107:2
  148:18 149:6
  166:10,19,23
  170:10
**virtually** 74:19
  169:8 176:18,20
**visit** 118:16 142:5
**visits** 118:9
**volunteered** 184:8

**w**

**wait** 8:19
**walk** 55:16 94:13
**walked** 110:16
**walking** 98:4
  141:7
**wan** 1:5 2:9 3:18
  5:5 11:6 94:4
  111:18
**want** 16:25 40:21
  40:22 44:17 45:18
  55:16 66:23 75:21
  94:13 104:2
  105:18 107:5,12
  146:3 147:19
  149:8 168:18
  172:3
**wanted** 45:21
  105:10 110:14
  144:7 163:22
**wants** 69:20 172:2
  172:3
**washington** 6:8
**water** 34:24
**watercraft** 97:15
  119:5
**watermark** 162:6
**way** 47:21 54:19
  62:10 67:3 75:14

104:19,21 117:25
134:15 141:17
156:23 162:2
188:16
**ways** 77:22
**we've** 16:3 20:16
  20:20 21:4,10,10
  22:13 30:10,15
  44:20 45:10 55:14
  67:14 85:8 94:5
  128:12 129:20
  132:3 134:10
  154:18,21 158:16
  162:16 163:20
  164:3
**wealthy** 19:13
**website** 162:8
**wednesday** 16:17
  45:17 116:2,16
  123:16,18 126:12
  174:15 182:23
**week** 42:13
**weekly** 66:24
**welcome** 41:14
**went** 17:5,8 31:5
  43:24 45:19
  122:23,24,25
  123:5 174:7
**western** 17:4
**whatsoever**
  123:22
**whereof** 188:18
**whispering** 3:7
**wife** 138:25
  141:13 142:8,24
  145:14
**willing** 64:20
**wip** 67:18,20
**wire** 152:21
**witness** 5:11,20,22
  26:21 27:8 28:15

Page 33

[witness - zero]

| | | z |
|---|---|---|

29:10,11,16 35:3
46:21 59:12 78:11
83:8 85:10 116:12
130:2 131:4,12
148:2 164:20
167:9 176:11
185:9 188:9,12,18
**word**  59:21
**words**  57:9
**work**  17:8 19:9,11
22:19 40:4 42:10
43:8 44:13 46:22
54:5,8,9 56:12,13
57:17 58:20 59:24
61:14,18 64:11
66:4,11 67:21
68:14 70:14 73:3
73:18 76:24 78:15
80:19 83:14,15,17
84:2 86:2 88:10
88:14,17 89:17
90:2,3,13 97:10,16
97:20 98:6 109:10
112:14,20 121:11
125:23 135:19
154:19,25 167:24
169:22 176:20
177:2 178:2,5
**worked**  15:20 45:2
56:16 92:5 95:5
100:17 109:22
135:22 136:4,9
**working**  51:18
90:6 96:22 136:15
155:25 178:4
**works**  134:15
176:9
**world**  38:2
**worried**  182:10
**worth**  19:10,25

**wrapping**  91:3
**wraps**  96:8
**write**  36:13 41:18
177:10
**writes**  34:4 39:6
**writings**  113:9
**written**  8:12 65:18
119:8 121:2
126:10
**wrong**  73:5 162:13
170:24
**wrote**  37:5 181:25
182:4

| x |
|---|

**x**  1:3,8 187:2,17

| y |
|---|

**yacht**  119:7
**yeah**  59:13 170:13
172:25
**year**  42:13 74:11
74:12 75:15,16
82:23 154:10,13
**years**  7:17 17:13
18:3 20:21 82:23
82:24 166:3,4
169:3 176:7
**yep**  36:2 95:22
121:9 178:8,10
**yesterday**  106:22
123:16 126:12
**york**  1:18,19,21
2:5,5,10,10 3:25
4:2 5:23 58:8
79:15,17 115:8,10
146:22 173:19
176:14 188:3,7
**youtube**  120:20

**zero**  67:14 79:20
82:21 94:24
106:13,16,24
107:19 108:20,23
146:4,11

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

In Re                          * Chapter 11
                               *
                               *
     HO WAN KWOK,              * Case 22-50073(JAM)
                               *
              Debtor.          *
                               *
* * * * * * * * * * * * * * * *

TRANSCRIPT OF TELEPHONIC

341 MEETING OF CREDITORS

MARCH 21, 2022

Electronically Recorded by the
Office of the United States Trustee

Transcript Prepared By:

Christine Fiore, CERT

Fiore Reporting and Transcription Service, Inc.

4 Research Drive, Suite 402

Shelton, CT  06484

(203)929-9992

Ho Wan Kwok - March 21, 2022

APPEARANCES:


For the Debtor:               WILLIAM R. BALDIGA, ESQ.
                              BEN SILVERBERG, ESQ.
                              URI PINELO, ESQ.
                              Brown Rudnick, LLP
                              Seven Times Square
                              New York, NY  10036


For the U.S. Trustee:         HOLLEY E. CLAIBORN, ESQ.
                              Office of the U.S. Trustee
                              150 State Street
                              New Haven, CT  06510


For Logan Cheng,              JAY MARSHALL WOLMAN, ESQ.
 Creditor:                    Randazza Legal Group
                              100 Pearl Street, 14th Floor
                              Hartford, CT 06103


For Pacific Alliance          DAVID V. HARBACH, II, ESQ.
 Asia Opportunity Fund,       O'Melveny & Myers, LLP
 LP, Creditors:               1625 I Street NW
                              Washington, DC  20006

                              STUART SARNOFF, ESQ.
                              LAURA ARONSSON, ESQ.
                              CRAIG McALLISTER, ESQ.
                              MAKENZIE RUSSO
                              STEVEN WARREN
                              O'Melveny & Myers, LLP
                              Times Square Tower
                              7 Times Square
                              New York, NY  10036


For Bruno Wu, Weican          KAREN WARSHAUER
 Meng and Rui Ma,             McElroy, Deutsch, Mulvaney &
 Creditors:                    Carpenter
                              One State Street
                              Hartford, CT  06103


For Xiaodan Wang,             LILLIAN GRINNELL, ESQ.
 Rong Zhang and Chong         Wolf Haldenstein Adler
 Shen Raphanella,             Freeman & Herz
 Creditors:                   270 Madison Avenue
                              New York, NY  10016

APPEARANCES: (Cont'd)

```
For Samuel Nunberg,        AMY ZAMIR, ESQ.
 Creditor:                 Nesenoff & Miltenberg, LLP
                           363 Seventh Avenue
                           New York, NY  10001


For the Sherry            EMILY KUZNICK, ESQ.
 Netherland, Creditor:    Stroock, Stroock and Lavan
                          180 Maiden Lane
                          New York, NY  10038
```

1          MS. CLAIBORN:  I'm going to repeat myself

2     from the beginning here because I want to make sure

3     it's all on the record and I apologize.

4          I'm going to basically start this meeting

5     over again and we're going to go very quickly and

6     then we'll come back to where I was just about to

7     go.

8          Today is Monday, March 21st, 2022 and we

9     are gathered for the Section 341 meeting in the

10    Chapter 11 case of Ho Wan Kwok, also known as Wengui

11    Gwo and Miles Kwok.

12         My name is Holley Claiborn and I'm a trial

13    attorney in the Office of the United States Trustee

14    and I will be conducting today's meeting.

15         I am recording this meeting and also we

16    have the presence of an interpreter on the line

17    whose name is Bin, B-I-N.

18         And so that I have it on the record, I'm

19    going to ask Bin a third time about her oath.

20         (The interpreter is sworn.)

21         For purposes of speeding this up on the

22    record we have appearances today by Jay Wolman, on

23    behalf of Logan Cheng.  We have the appearance of

24    David Harbach, Stuart Sarnoff, Mia Gonzalez, Laura

1    Aronsson, Craig McAllister and Mackenzie Russo, all

2    on behalf of Pacific Alliance.  And for creditors

3    Rui Ma, Bruno Wu and Weican Meng, we have Karen

4    Warshauer, a paralegal at McElroy.

5              THE INTERPRETER:  Sorry, I cannot get all

6    those names at once.

7              MS. CLAIBORN:  Bin, did you translate all

8    of the names for the Pacific Alliance?

9              THE INTERPRETER:  The names actually just

10   a repeat of the pronunciation.  No translation.

11             MS. CLAIBORN:  Thank you.  Whoever does

12   not have their phone on mute, could you please put

13   it on mute?  Thank you.

14             Okay.  The other appearances, Karen

15   Warshauer, from McElroy, and she represents Bruno

16   Wu, Weican Meng and Rui Ma.

17             Before I go back to the debtor, are there

18   any other creditors on the line who have counsel

19   who'd like to put their appearance on the record?

20             MS. GRINNELL:  Hi --

21             MS. CLAIBORN:  Please wait for the

22   translation.

23             MS. GRINNELL:  (Indiscernible) I'm from

24   the firm Wolf Haldenstein Adler Freeman and Herz and

25   we represent --

1          THE INTERPRETER:  Sorry.  The interpreter

2    cannot hear you clearly.

3          MS. GRINNELL:  I'm sorry. My connection

4    has been kind of off.  Can you hear me now?

5          THE INTERPRETER: Yes.

6          MS. GRINNELL:  Okay.  I'll repeat what I

7    said.

8          My name is Lillian Grinnell.  I'm an

9    attorney at Wolf Haldenstein Adler Freeman and Herz

10   and we represent the creditors, Rong Zhang, Xiaodan

11   Wang, and Chong Sheen Raphanella.

12         THE INTERPRETER:  The names you pronounced

13   I could not get them.

14         MS. GRINNELL:  I'll spell them.

15         I'll start with the creditor's names.  The

16   creditor's names are Rong Zhang, and that's -- the

17   first name is Rong, R-O-N-G, Z-H-A-N-G.

18         The second creditor's name is Xiaodan

19   Wang.  And her first name is spelled X-I-A-O-D-A-N.

20   And her last name is spelled W-A-N-G.

21         And then the third creditor, Chong Shen

22   Raphanella.  And her first name is C-H-O-N-G. And

23   then the second name is S-H-E-N.  And the third name

24   is R-A-P-H-A-N-E-L-L-A.

25         THE INTERPRETER:  I only got Chong Shen

1    and R-A-P-H-A-L.

2              MS. GRINNELL:  I'm sorry.  Are you asking

3    me to spell the third name again?

4              (No response.)

5              Sorry?  I apologize.  My connection is

6    very bad.  Do you need me to spell any of the names

7    again?

8              THE INTERPRETER:  I think I'm okay.  I

9    repeat it to Mr. Kwok already.

10             MS. GRINNELL:  Okay.

11             MS. CLAIBORN:  Are there any other

12   creditors on the line or parties on the line?

13             MS. ZAMIR:  This is Amy Zamir, from

14   Nessenoff & Miltenberg.  I'm spell that.  My last

15   name is Zamir, Z-A-M-I-R.  Nessenoff is N-E-S-S-E-N-

16   O-F-F, and Miltenberg, M-I-L-T-E-N-B-E-R-G.  And we

17   represent creditor Sam Nunberg, N-U-N-B-E-R-G.

18             MS. CLAIBORN:  Is there anyone else who

19   would like to put their appearance on the record.

20             MS. KUZNICK:  Yes.  This is Emily Kuznick,

21   E-M-I-L-Y, and then Kuznick, K-U-Z-N-I-C-K, of

22   Stroock, Stroock and Lavan, that's S-T-R-O-O-C-K,

23   and Stroock, and Lavan is L-A-V-A-N. And we

24   represent the Sherry Netherland.  And for Sherry

25   Netherland it's S-H-E-R-R-Y, and then Netherland, N-

1    E-T-H-E-R-L-A-N-D.

2              THE INTERPRETER:  I'm clarifying what he

3    said.

4              (Interpretation.)

5              THE INTERPRETER:  Let me continue

6    clarifying what was yelled out just now.

7              (Interpretation.)

8              THE INTERPRETER:  I'm sorry.  The

9    interpreter cannot get that.  Nobody picked up my

10   question so I don't know.

11             MS. CLAIBORN:  Thank you, Bin.

12             Any other creditors or parties in interest

13   before I go back to the debtor?

14             MR. HARBACH:  This is David Harbach, from

15   O'Melveny and Myers, representing PACS.  I just

16   wanted to clarify that is it correct that we have

17   not gotten an answer from the debtor about what he

18   just said?

19             I have not heard any interpretation of it

20   and I understand the interpreter was attempting to

21   clarify what was said but the debtor did not

22   respond, as far as I heard, and we'd like to know

23   what he said.

24             MR. BALDIGA:  This is Bill Baldiga.  I'll

25   accept your apologies.  That was not the debtor, but

1    I accept your apology for that inference.

2         MS. CLAIBORN:  I'm going to come back to

3    that a in minute.

4         MR. HARBACH:  Okay.  (Indiscernible)

5    whether I should apologize, but can we inquire then

6    who made the outburst?  The interpreter was

7    attempting to clarify and so are we.  Forgive the

8    inference.

9         THE INTERPRETER:  So I interpreted what

10   you requested.  Just now someone burst out with a

11   few words -- with sentences.  The interpreter did

12   not get those sentences.  So the interpreter tried

13   to clarify who talked and what those words are, but

14   nobody picked up the interpreter's question.

15        MS. CLAIBORN:  This is Holley Claiborn.

16   Could the person who spoke up please answer the

17   interpreter's question and identify themselves?

18        THE INTERPRETER:  Sorry about that.  Just

19   now it was it was just a video tape. It was not

20   someone talked.

21        MR. BALDIGA:  This is Bill Baldiga.  Mr.

22   Kwok -- what Mr. Kwok heard during that outburst was

23   someone playing back an audio of his voice and we do

24   want to know everyone who is on the phone and we

25   would like identified who played that audio clip.

1      Thank you.

2              UNIDENTIFIED:  Sorry, it was me. I played

3      Mr. Kwok's video just now.

4              MS. CLAIBORN:  Could the person who just

5      spoke identify themselves?

6              THE INTERPRETER:  The interpreter needs to

7      clarify.

8              (Interpreter inquires)

9              MR. YAN:  My name is Xingyu Yan. I'm one of

10     Mr. Kwok's creditors.

11             MR. BALDIGA:  Can we have the spelling,

12     please?  Could we obtain the spelling of that name

13     please?

14             MR. YAN:  The spelling is X, for Xray, I, as

15     India, N, as in Nancy, G as in George, Y as in Yes,

16     U as in umbrella.  Last name Y, A as in apple, N as

17     in Nancy.

18             MR. BALDIGA:  Ms. Claiborn, Bill Baldiga

19     again.  Could you please exhaust the names of

20     everyone else on the line, just so we know who is

21     participating, whether or not they intend to ask

22     questions?

23             MS. CLAIBORN:  I'm trying to get there.

24     That was my -- okay.

25             Is anyone else on the line?  If you are on

1    the line, and you could please identify yourself?

2          MR. GREIF:  Hello.  My name is Steven Greif,

3    G-R-E-I-F.

4          MR. WARREN:  Steven Warren of O'Melveny &

5    Myers.

6          MR. JALBERT:  Craig Jalbert of

7    (indiscernible).

8          INDISCERNIBLE:  (Indiscernible)  from

9    Robinson and Cole.

10         INDISCERNIBLE:  (Indiscernible)  from

11   Stroock, Stroock and Lavan.

12         MS. DEERING:  Alexandra Deering of Brown

13   Rudnick.

14         MS. CLAIBORN:  This is Holley Claiborn

15   again. Thank you all for putting your appearances on

16   the record.  And if I could go back to debtor's

17   camp, Mr. Baldiga, could you put your appearance on

18   the record and note everybody who's with you at your

19   location.

20         MR. BALDIGA:  Yes.  We're in our --

21         I'm sorry. I missed what was just said.

22         MS. CLAIBORN:  Mr. Baldiga, could you go

23   ahead, please?  Mr. Baldiga, could you go ahead,

24   please?

25         MR. BALDIGA:  Yes.  Thank you.  We are at

1   our offices at 7 Times Square in New York.

2          And can you please state the name, Mr.

3   Baldiga, of who is present with you?

4          (No response.)

5          MS. CLAIBORN:  Mr. Baldiga, could you please

6   state the names of the people who are with you?

7          MR. BALDIGA:  Ben Silverberg and Uri Pinelo.

8          MS. CLAIBORN:  Okay.  Other names I believe

9   I heard earlier are Una Menye (ph), who is an

10  interpreter, and Attorney Aaron Mitchell.

11         MR. BALDIGA:  That's right.  Yes.

12         Ms. CLAIBORN:  Okay. I'm going to swear in

13  Mr. Kwok and I would ask everyone to put their

14  phones on mute.

15     (The debtor is sworn.)

16         MS. CLAIBORN: Mr. Kwok, as you know, today's

17  meeting is being recorded and there's an

18  interpreter, Bin, who's interpreting my questions

19  and the comments of others and will also be

20  interpreting your answers.

21         Please wait to answer any questions you are

22  asked today until the official interpreter has made

23  a full translation.

24         I ask that you do not communicate with your

25  own interpreter who is present with you before you

1    answer the questions, and should you do so, I will

2    ask the official interpreter to translate that

3    discussion.

4              THE INTERPRETER:  Sorry.  Could you please

5    repeat?

6              MS. CLAIBORN:  Mr. Kwok, I ask that you do

7    not communicate with your own interpreter who is

8    with you today before you answer my questions or the

9    questions of others.

10             THE INTERPRETER:  He could not use his own

11   interpreter.

12             MS. CLAIBORN:  Bin, could you translate that

13   instruction for Mr. Kwok.

14             MR. BALDIGA:  This is Bill Baldiga.

15             To the extent --

16             MS. CLAIBORN:  Mr. Baldiga, could you just

17   wait for Bin to interpret that instruction for me

18   and then you can make your comment.

19             MR. BALDIGA:  Two things.  This is Bill

20   Baldiga.

21             Holley, you've become quite muffled again

22   and second, to the extent that Mr. Kwok needs to

23   talk to his interpreter to better understand what

24   was said or the interpreter in the room with us

25   believes that there was a misinterpretation, we will

1     tell you that so that you do know if there is a

2     further conversation.

3             MS. CLAIBORN:  Thank you.

4                     HO WAN KWOK, Sworn

5     EXAMINATION BY MS. CLAIBORN:

6       Q    Mr. Kwok, can you please explain the reason

7     to file your Chapter 11 bankruptcy case?

8             UNIDENTIFIED:  Sorry?

9       Q    Mr. Kwok, please explain the reasons behind

10    your decision to file your Chapter 11 bankruptcy

11    case?

12            MR. HARBACH:  This is David Harbach.  We're

13    having trouble understanding you again.

14            MS. CLAIBORN:  I apologize.  My phone system

15    is new and I'm yelling into the phone, but unless I

16    put it on speaker phone I won't be able to record

17    it.  Does yelling improve your ability to hear me?

18            MR. HARBACH:  It's very difficult to

19    understand your questions because they're so

20    muffled.  It's not volume, it's diction, if I may be

21    blunt.

22            MS. CLAIBORN:  I will try to speak slowly.

23    Is that any better?

24            MR. BALDIGA:  It seems to be, yes.  Thank

25    you.

1

2      Q    Okay.  We're going to try this again.

3           Mr. Kwok, can you please explain your

4  reasons behind filing your Chapter 11 bankruptcy

5  case?

6      A    I cannot understand you.  I don't know what

7  you mean by filing Chapter 11 of bank.

8      Q    Mr. Kwok, why did you file your bankruptcy

9  case?

10          THE INTERPRETER:  The interpreter would like

11  to clarify the word he said.

12     A    I'm not filing any bankruptcy certificate.

13     Q    Let me try again.

14          Mr. Kwok, you are a Chapter 11 debtor in a

15  bankruptcy proceeding here in the United States.

16          Mr. Kwok, what were the reasons behind your

17  decision to file your bankruptcy case?

18     A    So you're asking me why I'm applying for

19  bankruptcy, right?

20     Q    Yes.

21     A    I filed (indiscernible)  in mid-February in

22  my second trial, or second appearance in Southern

23  District. I was given a fine of $120 million and I

24  was ordered to pay it off within five days.  So

25  without any choices -- so I filed bankruptcy

1    application at Connecticut state and Chapter 11.

2        Q    Mr. Kwok, when was the first time you spoke

3    with a lawyer about filing a bankruptcy case?

4             MR. BALDIGA:   Just the date, or the

5    approximate date.   Not the substance of the advice.

6        A    Approximately 12, 13.

7        Q    Can you please provide the month and the

8    year?

9        A    It was February the 12th of 2002.

10       Q    Did you say 2002 or 2021?

11       A    2022.   February the 12th or 13.

12       Q    Mr. Kwok, I'd ask you to take a look at your

13   bankruptcy petition that was filed with the

14   bankruptcy court at ECF 1.

15            Mr. Kwok, a handwritten signature appears on

16   that petition. Is that your handwritten signature?

17       A    Hold on a second. I'll ask the lawyer to get

18   it and I'll take a look.

19            MR. BALDIGA:   This is Bill Baldiga.   We have

20   with us the petition with the electronic signature

21   as filed.   I don't have in the conference room me

22   the handwritten signature.   If you'd like us to get

23   it, we could get it at a break.

24       Q    Mr. Kwok, can you take a look at the

25   document that your counsel has, which is the

1    bankruptcy petition with your printed name on it and

2    confirm that you signed that document prior to it

3    being filed with the court?

4        A    Please hold on one second.  Let me take a

5    look.

6              MR. BALDIGA:  Could I hear the translation,

7    please.  I want to hear the translation of what you

8    said.

9        (No response.)

10             MR. BALDIGA:  Is the translator still with

11   us?

12             MS. CLAIBORN:  Bin, are you on the line?

13       (No response.)

14             Bin, are you there?

15       (No response.)

16             It seems that Bin has left us so I'm going

17   to put everybody on hold and I'm going to try to

18   reconnect her. I apologize.

19             MR. BALDIGA:  That's okay.  Could we take a

20   short break?

21             MS. CLAIBORN:  It's going to take me a few

22   minutes to do that, so go ahead and we'll reconvene

23   as soon as I can get her on the line.

24             MR. BALDIGA:  Thank you very much.

25       (Off the record.)

1          MS. CLAIBORN:  We are back on the record

2      after a short break due to some technical

3      difficulties.

4      BY MS. CLAIBORN:

5          Q    The pending question was asking Mr. Kwok to

6      confirm that he signed the bankruptcy petition that

7      was filed at ECF 1.

8          A    I have finished looking at it, yes.

9          Q    Mr. Kwok, did you read and understand the

10     bankruptcy petition and information it contains

11     before you signed it?

12         A    Yes, I understood.

13         Q    Mr. Kwok, was the petition translated into

14     another language for you before you signed it?

15         A    Yes, it was translated into Chinese for me.

16         Q    Who translated the bankruptcy petition?

17         A    My lawyer did.

18         Q    Mr. Kwok, I don't think that Mr. Baldiga

19     speaks Chinese.

20              So who was the company or the person that

21     you used to translate the petition for you?

22         A    I don't know.

23         Q    Mr. Kwok, is the information in your

24     bankruptcy petition true and accurate to the best of

25     your knowledge?

1      A     Yes, it is accurate and true.

2      Q     Mr. Kwok, can you please take a look at the

3    declaration and about individual debtor's schedules

4    that was filed with the court docket at ECF No. 79.

5           THE INTERPRETER:  Sorry, could you please

6    repeat?

7      Q     Mr. Kwok, can you please take a look at the

8    declaration about an individual debtor's schedules

9    that was filed with the bankruptcy court at ECF 79.

10          Mr. Kwok, a handwritten signature appears on

11   that declaration. Is that your handwritten

12   signature?

13     A     The document in my hand.  Yes, it was signed

14   by me.

15     Q     And are you looking at ECF no. 79?

16     A     Yes.

17     Q     Mr. Kwok, was the declaration that was filed

18   at ECF 79 translated into another language for you

19   before you signed it?

20     A     Yes.

21     Q     What language was it translated into?

22     A     Chinese.

23     Q     Mr. Kwok, do you know who did the

24   translation of ECF no. 79?

25     A     Yes.

1   Q    And who was that person who translated ECF

2   79 into Chinese for you?

3   A    The lawyer.

4   Q    Can you tell me the name of the lawyer?

5   A    Bill.

6        MR. BALDIGA:  This is Bill Baldiga.  The

7   witness is not distinguishing between what I did

8   personally and what we had commissioned, to help

9   clarify.  I do not obviously do translations myself.

10       MS. CLAIBORN:  Attorney Baldiga, can you

11  tell me the name of the translation person who

12  worked for you or the name of the company?

13       MR. BALDIGA:  I'll have to get that. I don't

14  have it here.

15   Q    Mr. Kwok, did you read and understand the

16  declaration filed at ECF no. 79 before you signed

17  it?

18   A    Yes, understood.

19   Q    Mr. Kwok, can you please take a look at your

20  bankruptcy schedules that were filed with the

21  bankruptcy court at ECF 78.

22       And Mr. Kwok, for purposes of today, when I

23  used the term schedules, either collectively or by a

24  particular schedule, I'm referring to the documents

25  that were filed at ECF 78.

1          Mr. Kwok, were your bankruptcy schedules

2     translated for you?

3          A     Yes, it was translated.

4          Q     Mr. Kwok, were you involved in preparing the

5     responses and the answers to the questions in the

6     schedules?

7          A     Yes, I was.

8          Q     Mr. Kwok, did you read and understand all of

9     the responses and the answers to the questions in

10    the schedules before you signed the declaration that

11    was filed at ECF 79.

12         A     Yes.

13         Q     Mr. Kwok, who assisted you in the

14    preparation of your bankruptcy schedules?

15         A     The lawyer.

16         Q     Mr. Kwok, can you tell me which lawyers

17    helped you?

18         A     Bill.

19         Q     Mr. Kwok, are you referring to Attorney

20    Baldiga?

21         A     Yes.

22         Q     Mr. Kwok, did any other lawyers help you in

23    preparing your bankruptcy schedules?

24         A     Yes.

25         Q     Can you please tell me the names of the

1    other lawyers who assisted you?

2       A    I don't know how to say their names. I

3    cannot read English well.

4          MR. BALDIGA:  This is Bill Baldiga. I'm

5    happy to add that, of course, other of our

6    colleagues here at Brown Rudnick assisted. But I'm

7    not sure Mr. Kwok would have details as to who

8    exactly assisted on what part of it, but you could

9    ask, of course.

10      Q    Mr. Kwok, did any lawyer help you prepare

11   your schedules who is not a lawyer at Brown Rudnick?

12         MR. BALDIGA:  Excuse me. I need to talk with

13   Mr. Kwok for one second. I'm just going to put you

14   on mute for one second.

15         MS. CLAIBORN:  I'd prefer he answer the

16   question before you have your conference, Mr.

17   Baldiga.

18      A    Because the whole bankruptcy application,

19   the whole stuff was arranged by this lawyer.  But I

20   don't know all the other details.

21         MS. CLAIBORN:  Do you want to confer with

22   your client?

23         MR. BALDIGA:  I'll clarify only that Mr.

24   Kwok likely does not know of all of the

25   conversations that we've had with others, but this

1    is the opportunity to exam him, so you can obviously

2    ask that but we don't want to be misleading.

3        Q    Mr. Kwok, aside from Mr. Baldiga and lawyers

4    at Brown Rudnick did you speak with any other

5    lawyers about preparing your bankruptcy schedules?

6        A    Yes.

7        Q    Who did you speak with?

8        A    Another law firm called Ari and my personal

9    lawyer (indiscernible).

10       Q    What is the name of your personal lawyer?

11            MR. BALDIGA:  Could I confer and I might be

12   able to answer that question?

13            MS. CLAIBORN:  Go ahead.

14            MR. BALDIGA:  Could I have a second to

15   confer, please?

16            MS. CLAIBORN:  Yes.

17       (Pause.)

18            MR. BALDIGA:  Thank you.

19       Q    Mr. Kwok, what is the name of your personal

20   lawyer?

21       A    Guy Petrillo and  Ari (indiscernible).

22       Q    Mr. Kwok do I understand correctly that you

23   discussed your bankruptcy schedules with Guy

24   Petrillo and Aaron Mitchell?

25       A    Yes.

Ho Wan Kwok - March 21, 2022

1    Q    Mr. Kwok, did you discuss your bankruptcy

2   schedules with any other lawyers that you haven't

3   yet told me about today?

4    A    I don't remember.

5    Q    Mr. Kwok, are there any errors or omissions

6   in your bankruptcy schedules?

7    A    I don't see anything like that now.

8    Q    Mr. Kwok, is everything in your bankruptcy

9   schedules true and accurate to the best of your

10   knowledge?

11    A    Yes.

12    Q    Mr. Kwok, could you please take a look at

13   your bankruptcy statement of financial affairs that

14   was filed with the court at ECF no. 77.

15         Mr. Kwok, using the numbers at the top of

16   the document can you please go to page 20 where you

17   will find a handwritten signature.

18         THE INTERPRETER: Sorry?

19    Q    Where you will find a handwritten signature.

20         Mr. Kwok, is the handwritten signature on

21   page 20 of the statement of financial affairs your

22   own?

23    A    Yes.

24    Q    Mr. Kwok, was the statement of financial

25   affairs translated for you before you signed it?

1      A    Yes.

2      Q    Mr. Kwok, were you involved in the preparing

3  of the responses and the answers to the questions in

4  the statement of financial affairs?

5      A    Yes.

6      Q    Mr. Kwok, did you read and understand all

7  the responses and answers to the questions in the

8  statement of financial affairs before you signed it?

9      A    I understood all.

10     Q    Mr. Kwok, are there any errors or omissions

11  in your statement of financial affairs?

12     A    No.

13     (No response.)

14     Q    Mr. Kwok, would you please answer the

15  question?

16         MR. BALDIGA:  I'm sorry.  Could you repeat

17  that?  We didn't get the interpretation here in the

18  room for some reason.

19         MS. CLAIBORN:  I'll ask the question again.

20     Q    Are there any errors or omissions in your

21  statement of financial affairs?

22     A    Up to now I haven't found any errors or

23  omissions.

24     Q    Mr. Kwok, is everything in your statement of

25  financial affairs true and accurate to the best of

1    your knowledge?

2        A    Yes.

3        Q    Mr. Kwok, who assisted you in the

4    preparation of your statement of financial affairs?

5        A    My lawyer, Bill, and my financial advisor,

6    Matt.

7        Q    Mr. Kwok, are you referring to Attorney

8    Baldiga?

9        A    Yes.

10       Q    And what is the name -- the full name of the

11   financial advisor?

12       A    I don't know how to spell it.

13            MR. BALDIGA:  It's Matt Flynn and colleagues

14   at Verdolino and Lowey.  But you could --

15       Q    Mr. Kwok, is that correct?

16       A    I'm afraid I will say it wrong, but I will

17   ask for Mr. -- my lawyer Baldiga to clarify for you.

18       Q    We can move on.

19            MR. BALDIGA:  This is Bill Baldiga.

20            Mr. Kwok simply does not know the full name

21   of Matt Flynn or Matt's colleagues at Verlino and

22   Lowey, but I confirm that he is pointing at Matt

23   Flynn next to him when he answers the question.

24            MS. CLAIBORN:  Thank you.

25       Q    Mr. Kwok, did anyone else help you with your

1    statement of financial affairs?

2        A     No.

3        Q     Mr. Kwok, how long have you lived in the

4    United States?

5        A     Nearly seven years.

6              MR. HARBACH:  This is David Harbach.  I

7    didn't get the translation of the answer.

8              MS. CLAIBORN:  Bin, can you please repeat

9    your translation.

10             THE INTERPRETER:  Nearly 7 years.

11       Q     Mr. Kwok, do you still live at the Taconic

12   Road property in Greenwich?

13       A     Yes.

14       Q     Who owns that property in Greenwich?

15       A     My wife.

16       Q     Your bankruptcy documents refer to a company

17   called Greenwich Land, LLC.  Who owns that company?

18       A     My wife.

19       Q     What is your wife's name?

20       A     (Indiscernible)

21             MS. CLAIBORN:  Bin, could you please

22   translate that for me into a spelling?

23             THE INTERPRETER:  Let me just clarify with

24   him which Chinese characters are, then I can spell

25   it for you.

1      A    My wife's name is read at (indiscernible)

2    but she's from -- she's from Hong Kong.  Their

3    spelling is different from Mainland and I don't know

4    how to spell her name.

5      Q    Mr. Kwok, could you just please spell her

6    last name?

7      A    I don't know how to spell.

8      Q    Does anyone else have a membership interest

9    in Greenwich Land LLC aside from your wife?

10     A    I don't know.

11     Q    When was Greenwich Land LLC formed as a

12   company?

13     A    2020.

14     Q    Mr. Kwok, have you ever been a member of

15   Greenwich Land, LLC?

16     A    No.

17     Q    How much did Greenwich Land, LLC pay for the

18   purchase of the Greenwich property on Taconic Road?

19     A    I don't know specifically but approximately

20   5 million.

21     Q    And how was that purchase funded?

22     A    I don't know.

23     Q    Who would know the answer, Mr. Kwok?

24          THE INTERPRETER:  Sorry?

25     Q    Who would know the answer to that, Mr. Kwok?

1        A      My wife knows.

2               MR. HARBACH:  This is David Harbach and I

3        apologize for the interruption.

4               We missed the translation by the number of

5        that Mr. Kwok said approximately this kind of

6        property would cost.  Could that please be repeated?

7               THE INTERPRETER:  Sorry, the interpreter

8        cannot hear you clearly.

9               MS. CLAIBORN:  Mr. Harbach, I will ask your

10       question again.

11              MR. HARBACH:  Thank you.

12       Q      How much was the Taconic Road property in

13       Greenwich purchased for?

14       A      I don't know clearly but approximately 4

15       million to 5 million.

16       Q      When did Greenwich Land LLC purchase the

17       property on Taconic Road in Greenwich?

18       A      I don't know the specific time.

19       Q      Do you know the year?

20       A      2019 or 2020. I don't remember clearly.

21       (Unintelligible background chatter.)

22              MS. CLAIBORN:  Could whoever is speaking

23       identify themselves?

24              MR. BALDIGA:  Excuse me just for one second.

25       We may have a translation issue.  I'm just going to

1    put you on mute for one second.

2         (Pause.)

3              MR. BALDIGA:  This is Bill Baldiga.  We

4    believe that the answer by Mr. Kwok to the date was

5    2019 or 2020, but the translator may have said 2020

6    without a mention of 2019. I obviously don't know.

7    But that's -- if it matters, you could re-ask to be

8    sure that there's clarity around that?

9         Q    Mr. Kwok, when did Greenwich Land LLC

10   purchase the Taconic Road property in Greenwich?

11        A    Maybe it's 2020 or maybe it's 2019. I don't

12   remember clearly.  I don't know.

13        Q    Mr. Kwok, did you sign any documents in

14   connection with the purchase of the Taconic Road

15   Property in Greenwich?

16        A    No.

17        Q    Mr. Kwok, who lives at the Taconic Road

18   property in Greenwich?

19             THE INTERPRETER:  Sorry?  Who --

20        Q    Who lives at the Taconic Road property in

21   Greenwich?

22        A    My wife and I.  Sometimes my daughter who

23   lives in New York will come back.

24        Q    Mr. Kwok, are you currently employed by

25   anyone?

1          THE INTERPRETER:  Are you what?

2     Q    Are you currently employed by anyone or any

3    company?

4     A    No.

5     Q    Mr. Kwok, have you had any employment or any

6    job with an employer since you started living in the

7    United States?

8     A    I don't remember clearly.  I don't remember

9    clearly but approximately in 2015 at Golden Spring I

10   worked for some time.  After I got part of my wages

11   of salary I left and nothing else.

12    Q    What work did you do for Golden Spring in

13   2015?

14    A    I don't remember quite clearly but it seems

15   it (indiscernible)  I was put in charge of

16   developing (indiscernible)  investors. But I don't

17   remember clearly.

18    Q    Mr. Kwok, when did you stop working for

19   Golden Spring?

20         MR. BALDIGA:  Excuse me just one second. I

21   just want to make sure we -- excuse me for one

22   second. I just want to make sure we don't

23   (indiscernible) translation.  We may.

24     (Pause.)

25         MR. BALDIGA:  Our interpreter believes that

1    the response was that if he had a role at Golden

2    Springs, it was to develop investment opportunities

3    not to develop investors.

4       Q     Mr. Kwok, when did you stop working for

5    Golden Spring?

6       A     I don't remember clearly.

7       Q     Mr. Kwok, when you say Golden Spring, are

8    you referring to the company known as Golden Spring,

9    New York, Limited?

10      A     Yes.

11      Q     Mr. Kwok, did you get paid for any of the

12   work that you for Golden Spring?

13      A     Yes.

14      Q     How much were you paid?

15      A     Approximately 200,000. I don't remember

16   specifically.

17      Q     Mr. Kwok, did you receive a paycheck from

18   your work at Golden Spring?

19      A     I should have but I don't remember clearly

20   specifically.

21      Q     Mr. Kwok, did you put the money that you

22   were paid by Golden Spring into a bank account?

23      A     I should have put it into a credit card

24   account at Morgan Stanley.

25      Q     Mr. Kwok, are you saying that you had a bank

1    account at Morgan Stanley?

2        A    Yes, once I had.

3        Q    Do you still have a bank account at Morgan

4    Stanley?

5        A    No.

6        Q    When did you close your accounts at Morgan

7    Stanley?

8        A    Around April, 2017 when (indiscernible)  the

9    Chinese Communist Party stated chasing me and

10   (indiscernible)  me.  So all my bank accounts were

11   closed.

12           MR. BALDIGA:  Hold on.  There's a

13   mistranslation there.

14      (Pause.)

15           MR. BALDIGA:  The prior misstatement or

16   mistranslation was just the interpretation of the

17   word. But here the entire crux of the answer was

18   left out.  And I'm not sure what happened.

19           MS. CLAIBORN:  Maybe I can ask a different

20   question. We can try again.

21           MR. BALDIGA:  No, I think -- no, I think --

22   the answer -- I'm concerned with the accuracy of the

23   translation because there was specific mention of

24   names that were simply not produced in the answer.

25   And I'll guess, Bin, did you not hear the mention of

1    PACS and Bruno Wu, or was there a sound issue, or

2    what happened?

3        (Interpreter translates)

4            MS. CLAIBORN:  Mr. Kwok, did you --

5            MR. KWOK:  So Bruno Wu, (indiscernible)

6    Airlines and also Chinese Communist party, they all

7    chased me and wanted to kill me.  So I

8    (indiscernible)  -- all my bank accounts were

9    closed.

10           PAC, PACS.  (Indiscernible)  all the people

11   are present today at today's meeting.

12           MR. BALDIGA:  Could we have on the record

13   the entirety of what Mr. Kwok said.  That's a very

14   small part of what he said, obviously.  I don't know

15   what he said but that's much shorter.

16       (Interpreter translates)

17           THE INTERPRETER:  The interpreter is asking

18   him to (indiscernible)  every two names so that I

19   can maintain the integrity of his meaning.

20           MR. KWOK:  At today's meeting there are PAC,

21   one of the major creditors.  And also

22   (indiscernible).  And also (indiscernible)  member.

23   All the money that had to be paid went into an

24   account of the Communist Party under the name of

25   Bruno Wu.  So since that day when all the -- all the

1    representatives of the Chinese Communist party -- so

2    when the chasing and killing started I lost all my

3    bank accounts.

4              MR. HARBACH:  This is David Harbach.  Bin,

5    could you please repeat that?

6              THE INTERPRETER:  Sorry?

7              MR. HARBACH:  This is David Harbach.  You

8    just translated an answer that began with since that

9    day.  Can you please repeat the answer in English?

10             THE INTERPRETER:  Since that day all those

11   people who are representatives of Chinese Communist

12   Party, since that day I lost all my bank accounts.

13   BY MS. CLAIBORN:

14       Q    Mr. Kwok, did you have any money in your

15   Morgan Stanley account when you closed it?

16       A    Yes.

17       Q    And where did you move that money to?

18       A    Nobody bothered looking at me again since

19   the account was closed.

20       Q    Mr. Kwok, my question is where did you move

21   the money to?

22             MR. BALDIGA:  This is Bill Baldiga -- I'm

23   sorry.  This is Bill Baldiga.

24             Could you ask if perhaps you're inferring or

25   implying that he moved it as opposed to something

1    happened to it?  Could you ask it in a more neutral

2    way and you may get a more full answer?

3        Q    Mr. Kwok, did you or someone acting on your

4    behalf close the Morgan Stanley account?

5        A    The Communist Party, Bruno Wu and also the

6    (indiscernible).  It was closed by the Communist

7    party.

8        Q    Mr. Kwok, was the Morgan Stanley account in

9    the United States?

10       A    Yes.

11       Q    Mr. Kwok, how does somebody other than you,

12   or someone acting on your behalf close a bank

13   account in your name?

14            THE INTERPRETER:   He wants me to repeat the

15   question, the interpretation of the question.

16       (Interpreter translates again.)

17       A    It's the core control of the Communist

18   Party, like what's happening today. The same thing.

19   (Indiscernible)  happened on me.

20            MR. BALDIGA:  Ms. Claiborn, could I suggest

21   that you ask whether Morgan Stanley closed the

22   account, just so we could be more efficient here?

23       Q    Mr. Kwok, did you close the account at

24   Morgan Stanley?

25            THE INTERPRETER:  Sorry?

1      Q    Mr. Kwok, did you close the account at

2    Morgan Stanley?

3           THE INTERPRETER:  I'm sorry. I still didn't

4    quite get the question actually.

5      Q    Mr. Kwok, did you personally close the

6    account at Morgan Stanley?

7      A    No.

8      Q    Mr. Kwok, did you ask someone at Morgan

9    Stanley to close your account?

10     A    No.

11     Q    Mr. Kwok, how did you find out that your

12   bank account at Morgan Stanley was closed?

13     A    Morgan Stanley notified me that I was on the

14   wanted list of the Chinese government.  So it was

15   Bruno Wu who was representing (indiscernible)  name

16   on the wanted list so the account was closed.

17     Q    Mr. Kwok, when Morgan Stanley closed the

18   account, what happened to the money in the account?

19          MR. HARBACH:  Ms. Claiborn, this is David

20   Harbach. I'm sorry. I missed the second half of that

21   question.  When Morgan Stanley closed the account

22   and then I lost you.

23     Q    I'll repeat my question.

24          Mr. Kwok, when Morgan Stanley closed the

25   bank account, what happened to the money in the bank

1    account?

2      A    The last thing I know was a Chinese speaking

3    person called me telling me that my account was

4    closed because I was under a wanted list of the

5    Chinese government.  And what happened later on I

6    don't know really.

7      Q    Mr. Kwok, how much money was in the --

8           MR. BALDIGA:  This is Bill Baldiga --

9           MS. CLAIBORN:  Yes, Mr. Baldiga?

10          MR. BALDIGA:  This is Bill Baldiga. I think

11   it would be helpful -- I don't want to interrupt

12   your flow of questions, if we took a break pretty

13   soon.  But if you want to finish this line, certain

14   do that.

15          I also want -- there may be some confusion

16   with the Morgan name and so you may want to ask the

17   witness whether it's, in fact, Morgan Stanley or JP

18   Morgan Chase.

19          MR. KWOK:  Now I remember. I think it was JP

20   Morgan Chase.  I just cannot differentiate. I get

21   confused with Morgan Stanley or JP Morgan Chase.

22     Q    Mr. Kwok, was there only one account at

23   whatever it is you're calling it, be it JP Morgan

24   Chase or Morgan Stanley?

25     A    What I remember is I have this only one

Ho Wan Kwok - March 21, 2022                    39

1    account.

2        Q    How much money was in that account

3    approximately when it was closed?

4        A    A few thousand U.S. dollars.

5            MR. HARBACH:  I missed it. Can you repeat

6    the English, please?

7            MS. CLAIBORN:  Bin, can you please repeat

8    the answer?

9        (No response.)

10           MS. CLAIBORN:  Bin, can you please repeat

11   the answer?

12           MR. HARBACH:  This is David Harbach. I

13   missed the translation before the word thousand. I

14   did not hear the number.  Could you please repeat

15   it?

16           THE INTERPRETER:  He said a few thousand

17   U.S. dollars.

18       Q    Mr. Kwok, when you say a few thousand

19   dollars, can you give me an idea of what you mean?

20   Was it under $10,000?

21       A    I don't remember.

22       Q    Mr. Kwok, a few minutes ago you testified

23   that you were working for Golden Spring developing

24   investment opportunities.  Can you explain more?

25           THE INTERPRETER:  Sorry?

1          MS. CLAIBORN:  I wasn't finished with the

2    question. I apologize. I'll try again.

3        Q    Mr. Kwok, a few minutes ago you testified

4    that you were working for Golden Spring developing

5    investment opportunities.  Can you please explain

6    what you mean by that?

7        A    I don't remember.

8        Q    When you were working for Golden Spring,

9    were you working in the United States?

10       A    Yes.

11       Q    When you were working with Golden Spring did

12   you have a job title?

13       A    I don't remember.

14       Q    When you were working for Golden Spring, did

15   you do any other work aside from developing

16   investment opportunities?

17       A    (indiscernible)  Communist Party of China.

18       Q    Can you please explain that?

19       A    Since 2015 up till now I have been spending

20   all my time and my energy on collecting information

21   about corruption and also human rights issues and

22   assassinations of the Community Party.  That's my

23   target and my work.

24       Q    Mr. Kwok, do you currently have any source

25   of income?

```
 1              THE INTERPRETER:  I didn't get you.  Could

 2    you please repeat?

 3         Q    Mr. Kwok, do you currently have a source of

 4    income?

 5         A    No.

 6         Q    Mr. Kwok, have you filed your tax returns

 7    for the year 2021 with the Internal Revenue Service

 8    in the United States?

 9         A    No.

10         Q    Mr. Kwok, have you filed any tax returns in

11    states for the tax year 2021?

12              THE INTERPRETER:  Sorry?

13         Q    Have you filed any tax returns for any

14    states for the tax year 2021?

15         A    No.

16         Q    What tax returns will you need to file for

17    what states for the year 2021?

18         A    Individual tax file in Connecticut.

19         Q    Will you be filing a tax return for the

20    State of New York for the year 2021?

21         A    No.

22         Q    Mr. Kwok, you previously provided to my

23    office tax returns for the years 2019 and 2020.  Are

24    those tax returns the same as the tax returns you

25    filed with the Internal Revenue Service in the State
```

1    of New York?

2            THE INTERPRETER:  Sorry, the date of what?

3            MS. CLAIBORN:  2019 and 2020.

4            THE INTERPRETER:  Yes, I got that.  What's

5    the later part?

6            MS. CLAIBORN:  The State of New York.

7    A    No, I filed them in Connecticut, 2020.

8    Q    Mr. Kwok --

9    A    I in (indiscernible)  for 2019 and 2020.

10   2020 I filed in Connecticut.

11           MR. BALDIGA:  Holley, can we take a break

12   soon?

13           MS. CLAIBORN:  Unfortunately, I'm going to

14   suggest that we can't really take a break because we

15   only have the interpreter until 2:00.  So if we do,

16   it needs to be a very, very short one.

17           MR. BALDIGA:  Okay. Five minutes?

18           MS. CLAIBORN:  Yeah, let me just ask one

19   question before we do that.

20   Q    Mr. Kwok, please confirm that the tax

21   returns that you provided to the United States

22   Trustee for the year 2020 and 2019 were the same as

23   those filed with the taxing authorities?

24           THE INTERPRETER:  The what?  Sorry, the last

25   word.

1           MS. CLAIBORN:  Authorities.

2      Q    Yes --

3           THE INTERPRETER:  Could you please repeat?

4    Sorry.

5      Q    Mr. Kwok, can you please confirm that the

6    tax returns that you provided to the Office of the

7    United States Trustee for the tax years 2019 and

8    2020 are the same as those that you provided to the

9    Internal Revenue Service and to the State of

10   Connecticut and to the State of New York?

11     A    Yes.

12     Q    Mr. Kwok, in your 2020 tax return --

13          MR. BALDIGA:  I want to clarify.  As you

14   know, there were very limited redactions as to

15   Social Security number and maybe a couple of data

16   points. I'm not sure if the witness knows what we

17   did by way of that data protection, but you do. I

18   just wanted to not leave the record ambiguous in

19   that regard.

20          MS. CLAIBORN:  Thank you.

21     Q    Mr. Kwok, your 2020 tax return reports

22   interest income only and no other source of income.

23   Did you have any other source of income in 2020?

24     A    No.

25          MS. CLAIBORN:  Okay. I'm going to take a

1    very short break. It is now 12:30. I would like

2    everyone to reconvene at 12:35. I'm not going to

3    disconnect the call.  I'm just going ask you to all

4    put your phones on hold.

5          We will reconvene at 12:35.  Thank you.

6       (Off the record.)

7          MS. CLAIBORN:  Okay.  We are back on the

8    record after a short break.

9       Q    Mr. Kwok, I would like to talk to you about

10   Golden Spring, New York.

11         Do you currently work for Golden Spring in

12   any capacity?

13      A    No.

14      Q    When was Golden Spring New York Limited

15   formed?

16         THE INTERPRETER:  Sorry?

17      Q    When was Golden Spring New York Limited

18   formed?

19         THE INTERPRETER:  Sorry, I cannot get the

20   later half.  Golden New York what?

21         MS. CLAIBORN:  I'm going to actually just

22   refer to it as Golden Spring.  When I do that I'm

23   referring to Golden Spring New York.

24      Q    When was Golden Spring formed as a company?

25      A    I don't know.

1    Q    The address on the petition is 162 East 64th

2    Street.  Who owns that property?

3              I can ask the question again.

4              The address for Golden Spring is listed as

5    162 East 64th Street in New York.  Who owns that

6    property?

7    A    I don't know.

8    Q    What is the nature of that property at 162

9    East 64th Street?

10   A    I don't know which property you're talking

11   about.

12   Q    The office of Golden Spring --

13             MR. BALDIGA:  I'm not sure that was --

14             MS. CLAIBORN:  Let me just try again.

15             The office of --

16             MR. BALDIGA:  There's a translation issue.

17             Could we confer for one second because

18   obviously there's a misunderstanding.  So could Mr.

19   Kwok talk to his translator because that obviously

20   didn't come through.

21             MS. CLAIBORN:  Let me just -- I would prefer

22   if I try again.  Let me try again, please.

23   Q    The address for Golden Spring on the

24   bankruptcy petition is listed as 162 East 64th

25   Street in New York.

```
1              THE  INTERPRETER:  Is it 54 or 64?  5-4 or 6-

2       4?

3              MS. CLAIBORN:  64.

4              THE  INTERPRETER: So maybe because of the

5       phone I mistook the 6 as 5 so let me correct my

6       mistake and reinterpret again.

7        A     Yes, that's the address of Golden Spring.

8        Q     Does Golden Spring own that building that's

9       located at that address?

10       A     I don't know.

11       Q     Have you ever been to that address?

12       A     Yes.

13       Q     What type of building is it?  What's located

14      there?

15       A     It was a building.

16       Q     Is the building a residential building or a

17      commercial building?

18       A     Business building.

19             MS. CLAIBORN:  I'm sorry, Bin. I didn't hear

20      your translation.

21             THE  INTERPRETER:  A commercial building or

22      business building.

23       Q     Does anyone live at that address?

24       A     I don't know.

25       Q     What type of business does Golden Spring do?
```

1      A    It's a big family business my son works, but

2    I don't know specifically what categories of

3    business it has.

4      Q    Mr. Kwok, when you used the term --

5      A    It is a family office owned by my son.  He

6    has other businesses, but I don't know.

7      Q    Mr. Kwok, when you use the term family

8    business or family office, what do you mean by those

9    terms?

10     A    It's mainly for the whole family, all the

11   family members.  When there is something we

12   (indiscernible)  and help each other.

13     Q    Mr. Kwok, can you explain it in more detail?

14     A    I don't know how to explain.

15     Q    Does Golden Spring have any employees?

16     A    Yes.

17     Q    How many?

18     A    I don't know.

19     Q    Does Golden Spring own any real estate?

20     A    I don't know.

21     Q    Does Golden Spring own any other business?

22     A    I don't know.

23     Q    Does Golden Spring have any bank accounts?

24     A    I don't know.

25     Q    Mr. Kwok, you have previously said in

1    documents filed with the bankruptcy court that

2    Golden Spring pays for you personal living expenses.

3    Can you please explain how they do that?

4       A    I don't know what you mean by they pay me.

5    In what regard?

6       Q    Mr. Kwok, you have previously told the court

7    in your bankruptcy documents that Golden Spring pays

8    for your clothing, your food and your housing.

9            My question is how do they do that?  Do they

10   give you money?  Do they pay other people directly?

11   How does it work?

12      A    Whenever I need any expenses for my basic

13   living I talk to my son and he will tell his office

14   to give to me.

15      Q    Who are the owners of Golden Spring?

16           MR. HARBACH:  This is David Harbach. I

17   missed the end of that question. I talk to my son

18   and he -- that answer.  I heard I talk to my son and

19   he and then I lost it.  Can I please have the

20   English again?

21           THE INTERPRETER:  Sorry, I didn't hear the

22   gentleman?

23           MS. CLAIBORN:  Mr. Harbach is asking Bin if

24   you could repeat the translation of Mr. Kwok's

25   answer about how the money flows from Golden Spring.

1          THE INTERPRETER: I'll repeat the

2    interpretation.

3          When I need expenses for my basic living I

4    tell my son.  My son will tell the office to take --

5     Q    Mr. Kwok, who are the owners of Golden

6    Spring?

7     A    My son.

8     Q    Are there any owners of Golden Spring other

9    than your son?

10    A    No.

11    Q    Mr. Kwok, have you ever owned an interest in

12   Golden Spring?

13    A    No.

14    Q    Who are the officers and directors of Golden

15   Spring?

16         MR. BALDIGA:  This is Bill Baldiga.

17         This is something for which there are very

18   serious physical security concerns and it's not that

19   the debtor would refuse to answer, if he knows.  But

20   not on a line like this where it's open to the

21   public and who else knows.  There are -- hold on.

22         Can I just confer with the witness because

23   we'd like to give you as much as possible, but we

24   don't want to cause severe security issues.

25         So could I just have one minute to confer

1   with the witness?

2          MS. CLAIBORN:  Yes.

3      (Pause.)

4          MR. BALDIGA:  This is Bill Baldiga, again.

5          The witness believes that he may know who

6   the directors and officers are and is prepared to

7   testify as to the best of his knowledge in that

8   regard.  And if we could take it one question at a

9   time we'll go from there.

10          If you could interpret that, because I want

11  to be sure that the witness understands what I just

12  said as well, please.

13          (Interpretation)

14  BY MS. CLAIBORN:

15      Q    Mr. Kwok, as of today, who are the officers

16  of Golden Spring?

17      A    (Indiscernible)

18      Q    I'm going to repeat that name so everyone

19  understands what I thought I heard.  What I heard

20  was Yan Ping, also known as Yvonne Wang.  Is that

21  accurate?

22      A    Yes.

23      Q    Is Yvonne Wang the only officer of Golden

24  Spring?

25      A    I don't know.

1      Q    As of today, who are the directors of Golden

2   Spring?

3      A    I don't know.

4      Q    Mr. Kwok, have you ever been an officer or a

5   direct or Golden Spring?

6      A    I don't remember.

7      Q    Mr. Kwok, who is Max Krazner?

8      A    I don't know. I don't know.

9           THE INTERPRETER:  Could you please repeat

10   the name again?

11      Q    Mr. Kwok, who is Max Krazner?

12     (No response)

13           Mr. Kwok, can you please answer?

14           MR. BALDIGA:  I'm conferring with the

15   witness for one second.  Hold on please?

16           MS. CLAIBORN:  Mr. Baldiga, I would rather

17   he would answer the question before you make a

18   confer.

19     (Pause.)

20           MR. BALDIGA:  Thank you for that

21   opportunity.  The witness could answer.

22      A    He has to double check with you because I

23   cannot read and cannot remember English names well.

24   So just the name, you said Max.  If it's the name

25   Max only I know Max.  But if you add another name to

```
 1    it, I'm not sure. I don't know.

 2        Q    Do you know a Max with respect to Golden

 3    Spring?

 4        A    Yes. I know.

 5        Q    And what is Max's role with Golden Spring?

 6        A    I don't know.

 7        Q    Well, how do you know Max?

 8        A    I don't remember.

 9        Q    Do you know more than one person by the name

10    of Max?

11        A    For me English name is very complicated.

12    Like I can't remember the last name of my lawyer. If

13    you add something else to Max, I don't know.

14        Q    Mr. Kwok, the name Max Krazner is listed as

15    the person to whom the mail for Golden Spring is

16    directed to.  Do you know why that is?

17             THE INTERPRETER:  Sorry?

18        Q    Do you know why that is?

19        A    I only remember there is a Max at Golden

20    Spring. I only know this one thing.

21        Q    And what is Max's job at Golden Spring?

22        A    I'm not sure what role.  I (indiscernible)

23    know he is in charge of finance, but I'm not sure.

24        Q    What does he do for Golden Spring with

25    respect to finances?
```

1      A     I was not involved in the management so I

2   don't know.

3      Q     If Golden Spring gives you money, does it

4   come through Max Krazner's efforts?  Does he help

5   make that happen?

6      A     I don't know.  He didn't give me money in

7   person.

8      Q     Mr. Kwok, when you get money from Golden

9   Spring how do you get money?  Does it come in the

10  form of cash or something else?

11     A     From my son and (indiscernible).

12           MS. CLAIBORN:  I'm sorry, Bin.  I didn't

13  understand your translation.  Can you try that

14  again?

15           THE INTERPRETER:  He said from my son and

16  (indiscernible).

17     Q     My question was how do you get money from

18  your son?  Does it come in the form of cash or some

19  other form?

20     A     I don't understand what you mean by how, the

21  word how.  I never get money directly from them.

22     Q     If you don't get money directly from your

23  son, how do you get the money from your son?  Where

24  does it go?

25     A     I don't use cash and I don't use credit

1    cards.  My son and (indiscernible)  Wan they just

2    pay my expenses for me.  It's impossible for me to

3    get any cash from them. And also I don't have bank

4    account.  Any bank accounts.

5        Q    Mr. Kwok, do you have access to a credit

6    card that was taken out by Golden Spring?

7            MR. BALDIGA:  This is Bill Baldiga. I'm

8    sorry.  I think there was a translation issue with

9    the prior question.  Could you give us a minute to

10   be sure that the witness understood the question

11   correctly?  Hold on for one second.  We're going to

12   put it on mute.

13       (Pause.)

14           MR. BALDIGA:  The witness would like to

15   clarify. I think it came through, but we're not

16   sure, that Golden Spring does not give him cash, but

17   simply pays certain bills for his living expenses.

18   If that's what came through the translation, great.

19   If not, we clarify accordingly.

20       Q    Mr. Kwok, do you have access to a credit

21   card or a debit card provided to you by or through

22   Golden Spring?

23       A    No.

24       Q    Mr. Kwok, are you obligated to pay Golden

25   Spring back for the monies that it pays on your

1    behalf for your living expenses?

2        A    No.  No need.

3            MS. CLAIBORN:  At this time I'd like to open

4    the meeting to creditors, given that we have a

5    limited amount of time for today. I am not done with

6    all my questions.

7            We will need to reconvene on another day,

8    but for purposes of today's examination I'm now

9    going to open it up to creditors who may wish to

10   examine.

11           I would ask that you identify yourself when

12   you speak and to be mindful of the need for

13   interpretation.

14           MR. BALDIGA:  Just to clarify one thing for

15   the record.  You asked previously -- you referred to

16   the petition and asked whether anyone lived at 162

17   East 64th Street.

18           And as we told you informally when we filed

19   the petition there was great concern over the

20   debtor's physical security and so he used that

21   address, but has since, obviously, corrected the

22   record that he lives in the Greenwich house that you

23   asked about earlier today.

24           And so I just didn't want the record to be

25   confusing in that regard.  Thank you.

1          MS. CLAIBORN:  Are there any creditors who

2     wish to inquire or examine of the debtor?

3          MR. HARBACH:  Yes.  This is David Harbach

4     for PACS.  We do have some questions. We do have

5     some questions.  We can start asking the questions

6     now or if there are others who would like to ask

7     questions that's fine.  However you want to proceed.

8     But we obviously will not finish before 2 o'clock

9     either.

10         THE INTERPRETER:  I cannot hear you clearly.

11         MR. HARBACH:  This is David Harbach for PACS

12    and I was just saying that we do have some questions

13    and we are happy to proceed and ask them or if the

14    trustee would like. we can proceed with others

15    asking questions but we will certainly not finish

16    before 2 o'clock either.

17         MR. BALDIGA:  Could that be translated

18    please?

19         THE INTERPRETER:  I was saying I could not

20    get him completely.

21         MS. CLAIBORN:  Mr. Harbach, do you have the

22    ability to pick up a hand held and speak into a hand

23    held device, as opposed to a speaker phone?

24         MR. HARBACH:  Not at this moment, but let me

25    move to see if this is any better.  Can you hear me

1    a little better now?

2            THE INTERPRETER:  Not really.  No, sorry.

3            MR. HARBACH:  Not really.  Well, I'll tell

4    you what.  If you give me -- take a moment, I can

5    try dialing in with a phone.  Just give me a second,

6    okay?

7            MS. CLAIBORN:  Yes.

8            MR. BALDIGA:  Bin, could you translate the

9    dialogue for Mr. Kwok, please, so he knows that.

10       (Interpreter translates)

11           MR. HARBACH:  Hello?

12           MS. CLAIBORN:  Hello.  This is Holley

13   Claiborn.

14           MR. HARBACH:  This is David Harbach and I

15   just wanted to know if you could hear me better.

16           MS. CLAIBORN:  Much better.  Bin, can you

17   hear Mr. Harbach?

18           THE INTERPRETER:  Yes, I can hear him now.

19   Thank you.

20           MS. CLAIBORN:  Go ahead, Mr. Harbach.

21           MR. HARBACH:  I'll repeat what I said once

22   more so that the interpreter can interpret it.

23           I'm David Harbach and I was just saying that

24   PACS does have some questions we would like to ask,

25   but we certainly will not finish by 2 o'clock and so

1    if Ms. Claiborn would like to proceed with giving

2    other creditors an opportunity to ask questions

3    today, it's entirely up to her or we can start now.

4          MR. BALDIGA:  And this is Bill Baldiga. We

5    extended our own translator until 2 o'clock so we

6    certainly encourage whoever wants to ask questions

7    to use the time.

8          MR. WOLMAN:  This is Jay Wolman. I'm happy

9    to ask some questions now.

10          THE INTERPRETER:  Sorry, I didn't get your

11    name.

12          MR. WOLMAN: Jay Wolman, and I represent

13    Logan Chang.

14    EXAMINATION BY MR. WOLMAN:

15    Q    Good afternoon, Mr. Kwok.

16          Do you remember that I took your deposition

17    about a year ago?

18    A    I have too many --

19          THE INTERPRETER:  Someone's always talking

20    in the background.

21    A    I have too many depositions.  I don't

22    remember specifically.

23    Q    That's all right. I asked you a number of

24    questions and you invoked your rights under the

25    Fifth Amendment of the U.S. Constitution.  Do you

1   understand that?

2          THE INTERPRETER:  You and your wife what?

3   Sorry.

4     Q    You invoked your right under the Fifth

5   Amendment of the U.S. Constitution.  Do you remember

6   that?

7          MR. BALDIGA:  We have a translation issue.

8   Hold on for one second, please.

9     (Pause.)

10         MR. BALDIGA:  I think -- our interpreter is

11  hearing this translation.  The question as we

12  understand is do you remember having invoked the

13  Fifth Amendment privilege at a prior deposition.

14  That's what we are hearing.  Could that be

15  interpreter for Mr. Kwok in that way please?

16         THE INTERPRETER:  Sorry, I can I hear the

17  question again.

18         MR. WOLMAN:  Sure.

19    Q    Do you remember at a prior deposition

20  invoking the Fifth Amendment of the U.S.

21  Constitution?

22         THE INTERPRETER:  Sorry, I did not hear you

23  clearly.

24    Q    Do you remember at a prior deposition

25  invoking the Fifth Amendment of the U.S.

1    Constitution?

2              THE INTERPRETER:  At a prior what?  Sorry.

3              MR. WOLMAN:  Deposition.  D-E-P-O-S-I-T-I-O-

4    N.

5              THE INTERPRETER:  Deposition.  Sorry, just

6    one sec.

7              (Pause.)

8              THE INTERPRETER:  Okay.  In the prior

9    deposition what?

10       Q    Do you remember invoking your Fifth

11   Amendment rights?

12             THE INTERPRETER:  Invoking what?

13             MR. WOLMAN:  Can everybody else hear me or

14   is it just the interpreter?

15             MS. CLAIBORN:  This is Holley. I can hear

16   you.

17             MR. HARBACH:  This is David Harbach.  We can

18   hear you fine.

19             MR. BALDIGA:  The debtor can hear you.  It's

20   not a volume issue.

21             MR. WOLMAN:  Is it a diction issue?  I can

22   try to --

23             THE INTERPRETER:  The interpreter just

24   didn't get the word.  (Indiscernible)  rewording.

25             MR. WOLMAN:  I cannot reword that. I need

1    you to hear the words in English and translate them,

2    ma'am.

3              THE INTERPRETER:  Okay.  Could you please

4    speak slowly?

5        Q    Do you remember at a prior deposition

6    invoking your rights under the Fifth, number five

7    that is -- Fifth Amendment, ordinal number -- of the

8    U.S. Constitution?

9              THE INTERPRETER:  Invoke or evoke?

10             MR. WOLMAN:  Invoke, I-N-V-O-K-E.

11             Okay, we still have an issue.

12             UNIDENTIFIED:  Hold on.

13             UNIDENTIFIED:  Did someone just drop out?

14             MS. CLAIBORN:  Bin, are you there?  This is

15   Holley.

16             MR. WOLMAN:  Bin?

17             MS. CLAIBORN:  Bin, are you there?

18             THE INTERPRETER:  Hello.

19             MS. CLAIBORN:  Bin, this is Holley Claiborn.

20             THE INTERPRETER:  Okay. I'm back.

21             MS. CLAIBORN:  Okay.

22             THE INTERPRETER:  I don't know what

23   happened.

24             MS. CLAIBORN:  Go ahead.

25             MR. BALDIGA:  Is the interpreter -- we're

1    not sure what's going on.  Is the interpreter with

2    us or not?

3            THE INTERPRETER:  Yes, the interpreter is

4    here now.

5            MR. BALDIGA:  Okay.  Thank you.

6            My client just said something and I don't

7    know what he said and I don't know whether you were

8    on for what he said.  If you were, I'd like to know

9    -- I'd like you to interpret it.  If not, could you

10   let us confer for a second so we could try to figure

11   that out, because there was a lot of confusion.

12           MR. WOLMAN:  Bill, can you just ask your

13   client to repeat what he just said?

14           MR. BALDIGA:  No --

15           THE INTERPRETER:  The interpreter would like

16   him to repeat what he said because just now all of a

17   sudden I'm not (indiscernible)  all the voices

18   sometimes.

19           I'm asking the gentleman to repeat what he

20   said just now.

21           MR. KWOK: Just now in your question you

22   mentioned that -- you asked me whether my wife used

23   something under the law or under the Constitution.

24   I don't remember that.

25           MR. WOLMAN: I said nothing about his wife.

1          MR. KWOK:  So did you say just now my wife

2     use any kind of law or what?

3          MR. WOLMAN:  No, that was nothing of the

4     sort.

5          MR. BALDIGA:  Could I suggest, Mr. Wolman,

6     maybe you could just go right to whatever you want

7     to ask him instead of what happened a year ago

8     because this is not getting anywhere.

9          MR. WOLMAN:  Well, I'm going to re-ask him

10    every question relative to finances where he invoked

11    the Fifth and I wanted to make sure he had that in

12    his mind as he answers here today.

13         MR. BALDIGA:  Is there a question?

14         MR. WOLMAN:  I want to make sure you're

15    aware of what I'm about to do.

16         At this point, I have no idea, but I am

17    representing to you that is exactly what I'm doing.

18    So I want to make sure your client is appropriately

19    advised.

20    BY MR. WOLMAN:

21    Q    So a year ago -- this is a lengthy one, Bin,

22    so please just write it down, or do what you need to

23    do. Let me finish and then translate.  Do not do

24    that piecemeal.

25         THE INTERPRETER:  Okay.

```
 1              MR. BALDIGA:  I --

 2              MR. WOLMAN:  Hold on. I want the translation

 3    of that and we'll take this in small pieces.  So

 4    Bin, please translate that for the witness because

 5    he has to hear everything.

 6         (Translation.)

 7              THE INTERPRETER:   Yes.

 8              MR. WOLMAN:  Thank you.

 9    BY MR. WOLMAN:

10         Q    A year ago I asked you are you employed.

11    You answered I have always been --

12              THE INTERPRETER:  I asked you what? Sorry.

13         Q    Are you employed?

14              There's a lot of background noise.  Can we

15    knock that off, please.

16              A year ago I asked you are you employed?

17              THE INTERPRETER:  You employed?

18         Q    A year ago I asked you are you employed?

19    Your answer was I have always been a consultant for

20    --

21              THE INTERPRETER:  Sorry.  A year ago I asked

22    you are you employed?  The answer is what?

23         Q    I have always been the consultant for a lot

24    of companies --

25              THE INTERPRETER:  I'm sorry --
```

1    Q    And my current employment is the -- I am in

2    the broadcasting and to take down the Chinese

3    Communist Party.  It is a broadcasting revolution. I

4    then asked you how much do you get paid for that.

5         I'm re-asking that question now.  How much

6    do you get paid for that?

7         THE INTERPRETER:  So I have to do it from

8    the beginning because I didn't get the words when

9    you say a year ago I asked you whether -- are you

10   employed?  Your answer is I didn't get the word

11   after is.

12   Q    Your answer was I always been the consultant

13   for a lot of companies and my current employment is

14   the -- he paused.  I am in the broadcasting --

15        THE INTERPRETER:  Is what?  Sorry?

16   Q    -- and to take down --

17        THE INTERPRETER:  Sorry.

18   Q    I am in the broadcasting and to take down

19   the Chinese Communist Party.  It is a broadcasting

20   revolution.  I then asked you how much do you get --

21        THE INTERPRETER:  Excuse me. I'm not able to

22   --

23        MR. WOLMAN:  Excuse me. I'm not done.  Why

24   not?

25        THE INTERPRETER:  I tried to clarify --

1          MR. WOLMAN:  Why not?

2          THE INTERPRETER:  -- the words that I didn't

3     get.  Yes, I know it's simple but it's too long.  I

4     (indiscernible)  such a long time to do the

5     interpretation. I'm highly concentrating. I have a

6     human brain.

7          MR. WOLMAN:  I'm used to translators writing

8     things down as they go.

9          THE INTERPRETER:  Sorry about that.

10         Let me interpret what I got and then I will

11    ask you the rest.  Is that okay?

12         MR. WOLMAN:  Yes.

13         THE INTERPRETER:  Okay.

14      (Translation)

15         THE INTERPRETER:  Okay.  I --

16    Q    I then asked you how much do you get paid

17    for that and I am asking you now again, because you

18    invoked the Fifth, how much do you get paid for

19    that?

20      (Pause.)

21         MR. BALDIGA:  Okay. The witness is

22    struggling to -- well, is the question are you

23    getting paid for that?  And you can answer that.

24         MR. WOLMAN:  No.  I am literally asking him

25    how much do you get paid for that. He took the

1    Fifth. I'm asking it now again.

2         Q     How much do you get paid for that?

3         A     No money at all.

4         Q     A year ago I asked you what is Golden Spring

5    New York.  You answered it's a company. I then asked

6    you and what is your -- I then asked you and what is

7    your relationship to that company and so I'm asking

8    that question again.  What is your relationship to

9    that company?

10        A     I don't know what you mean by relationship.

11        Q     If you didn't know what I meant by that

12   question, why did you invoke the Fifth last year?

13        MR. BALDIGA:  Objection.  I'm not going to

14   allow the witness to describe the legal advice a

15   year ago as to the Fifth Amendment.

16        He is prepared to answer whatever questions

17   you may have. You are confusing the witness a bit by

18   in each question having three things, some reference

19   to the Fifth Amendment, some conversation from a

20   year ago and a question as to now.

21        But if you were to ask a more simple

22   question, I think this would go much more

23   productively.  That's your choice.

24        MR. WOLMAN:  No.  Your client is an

25   intelligent person who is a big businessman, who is

1      a sophisticated person.  I trust he can handle these

2      simple questions.

3              MR. BALDIGA:  Proceed as you'd like.

4          (Translation interrupted)

5          Q     Last year I asked you --

6              MR. BALDIGA:  Wait.  Hold on.  Mr. Wolman,

7      there's a translation that needs to be done.  Please

8      hold on.  The witness needs to understand what's

9      being said.

10         (Translation)

11             THE INTERPRETER:  Okay.  Go ahead.

12         Q     What is your relationship to Golden Spring?

13         A     I don't understand what you mean by your

14     question?  I don't know how to answer your question.

15         Q     Do you know what the word relationship

16     means?

17         A     Relationship means love of things in China.

18     It could be between husband and wife. It could be

19     between a government relationship, a financial

20     relationship, money and it could be a lot of things.

21     So I don't know which one you mean?  Is it a

22     man/woman relationship or a money relationship or

23     what?

24         Q     Any relationship?  What is it? What is your

25     (indiscernible)  --

1        THE INTERPRETER:  Sorry?  What was your last

2   sentence again, because there was talking.

3        Q    Any relationship, what is yours to Golden

4   Spring?

5        THE INTERPRETER:  Let me do the

6   interpretation first.

7        A    Now the relationship is between -- is he

8   lends me money. I owe money to him.  He helps me.

9        Q    And why does he do this?

10       A    Because I was once a member of the Guo (ph)

11  family.

12       MR. HARBACH:  This is David Harbach.  Could

13  you please repeat that English answer?

14       THE INTERPRETER:  Because I was once a

15  member of Guo family.

16       Q    Does Golden Spring pay the expenses of any

17  other member of the Guo family?

18       A    Yes.

19       Q    Which other members of the Guo family?

20       A    I don't know.

21       Q    A year ago I asked you why does Golden

22  Spring pay Mr. Podhaskie, P-O-D-H-A-S-K-I-E, for

23  services rendered to you in your individual

24  capacity. I'm asking that again now.  Why does

25  Golden Spring pay Mr. Podhaskie for services

1    rendered to you in your individual capacity?

2              MR. BALDIGA:  This is Bill Baldiga.  I

3    understand that Mr. Podhaskie may be a lawyer.  I

4    just need to confer with the client to make sure he

5    doesn't disclose the substance of legal advice.  I'll

6    take one second to do that.

7              MR. WOLMAN:  The question didn't indicate

8    any answer of that sort.

9        (Pause.)

10             MR. BALDIGA:  I'm sorry.  The witness could

11   answer the question.

12             MR. KWOK:  I don't know.

13   Q    Have you ever asked anyone why they pay for

14   him to advise you?

15   A    I don't remember.

16   Q    I asked you last year why did Golden Spring

17   New York pay that judgment on your behalf, and I was

18   referring to the one my client, Mr. Cheng, held

19   against you.

20             I'm asking you again why did Golden Spring

21   New York pay that judgment on your behalf?

22   A    It was money lended.

23   Q    Why did Golden Spring loan you that money?

24   A    I don't have any thing so I borrowed from

25   them.

1    Q     Where did Golden Spring get the money from?

2    A     I don't know.

3    Q     Where does Golden Spring get any money from?

4    A     I don't know.

5    Q     Your son owns Golden Spring, correct?

6    A     Yes.

7    Q     Does your son owe you any money?

8    A     No.

9    Q     How did your son get the money that funds

10   Golden Spring?

11   A     I don't know.

12   Q     Did you ever provide your son with any seed

13   capital?

14   A     No.

15   Q     Have you ever invested in any of your son's

16   businesses?

17   A     No.

18   Q     When did Connecticut become your residence?

19   A     End of February or early March of 2020.

20   Q     Okay.  And you're sure about that here?

21   A     Yes.

22   Q     And was that your primary residence since

23   February, 2020 or March, 2020?

24   A     Yes.

25   Q     A year ago I asked you if you owned any

1     interest in Golden Spring New York. I am asking you

2     that again.  Do you own any interest in Golden

3     Spring New York?

4          A    No.

5          Q    A year ago I asked you are you an officer of

6     Golden Spring New York Limited. I'm asking you

7     again.  Are you an officer of Golden Spring New York

8     Limited?

9          A    No.

10         Q    A year ago I asked you why would Golden

11    Spring pay Attorney Aaron, meaning Aaron Mitchell,

12    on your behalf.

13              I'm asking you again, why would Golden

14    Spring pay Attorney Aaron Mitchell on your behalf?

15              THE INTERPRETER:  He wants me to repeat the

16    interpretation.  I'll do that for him.

17         A    A loan.  A loan or borrowed money.

18         Q    Why did they make you that loan?

19         A    I have been borrowing from them all the time

20    because I was a member of the family.

21         Q    Did you ever have any of your loans from

22    Golden Spring put in writing?

23         A    Some have, some no.

24         Q    Okay.  Which ones have been put in writing?

25         A    I don't remember.

1    Q    How many loans have you had from Golden

2    Spring?

3    A    I don't remember.

4    Q    Were any of the loans that were put in

5    writing in English?

6    A    I don't remember.

7    Q    Were any of them in Chinese?

8    A    I don't remember.

9    Q    Did you ever pledge any security interest in

10   exchange for any of these loans?

11   A    (Indiscernible)  but I don't remember

12   (indiscernible).

13        MR. BALDIGA:  Could you please repeat the

14   answer in English?

15        THE INTERPRETER:  He said (indiscernible)

16   yes, but I don't remember.

17   Q    If you don't remember how much -- if you

18   don't remember how many loans you took out, how are

19   you able to identify how much they -- you owe them

20   on your bankruptcy schedules?

21   A    I didn't quite get you.

22   Q    If you don't know how many times you took

23   out loans from Golden Spring, not all of which were

24   in writing, how do you know how much you owe them?

25   A    My lawyer and the lawyer of Golden Spring

1    they communicate with each other.  Tells me the

2    amount they can define is 21 million.

3        Q    So Golden Spring's lawyers helped prepare

4    your bankruptcy petition?  Is that correct?

5             MR. BALDIGA:  I'm sorry to interrupt.

6    (Indiscernible)  two things.

7        A    No.

8        Q    So how did the information get from Golden

9    Spring to your bankruptcy petition?

10            MR. BALDIGA:  Objection to the question.

11            THE INTERPRETER:  Sorry?

12            MR. BALDIGA:  I object to the question.

13            MR. WOLMAN: I'm just trying to figure out

14   how this information he doesn't know wound up in his

15   bankruptcy petition?

16            MR. BALDIGA:  I think you heard the answer

17   that his lawyer and Golden Spring's lawyer discussed

18   it.  Do you have another question?

19       Q    Yes.  How did you know that number was

20   right?

21            MR. BALDIGA:  Okay.  Let the interpreter go

22   first and then ask another question, please.

23            THE INTERPRETER:  Okay.  Go ahead.

24       Q    How did you know that number was right?

25            THE INTERPRETER:  Sorry?  Number of what?

1    Q    The number that was put into your bankruptcy

2    petition for what you purportedly owe to Golden

3    Spring, how did you know that was right?

4    A    I believe the professionalism of my lawyers.

5    They will review and check all the figures.

6         MS. CLAIBORN:  This is Holley --

7    Q    Do you know the documents that were

8    reviewed?

9         MS. CLAIBORN:  I apologize for interrupting.

10         MR. BALDIGA:  It's now 2 o'clock.

11         MS. CLAIBORN:  I apologize for interrupting.

12    It's Holley Claiborn.

13         MR. WOLMAN:  Yes, thank you for

14    filibustering to use up the time.  Appreciate it.

15         MR. BALDIGA:  I'm sorry. Who was that

16    addressed to?  That's quite an inappropriate

17    comment.

18         MR. WOLMAN:  You. That was me addressing

19    that to you.

20         MS. CLAIBORN:  I'd like to talk about --

21         MR. BALDIGA:  Okay --

22         MS. CLAIBORN:  -- the next date.  I was

23    going to suggest that we reconvene April 4th at

24    10:00 a.m. in person at the U.S. Trustee's Office in

25    New Haven.

1          Mr. BALDIGA:  We'll look at schedules. I can

2     start to do that if you give me a second.

3          MS. CLAIBORN:  Bin, could you please

4     translate that?

5          THE INTERPRETER:  I will double check with

6     you whether you still need me on the line for a

7     second or you want me to log off?

8          MS. CLAIBORN:  If you can continue on just

9     for a second.  We need to pick a new date, so I need

10    you to translate that so the debtor understands.

11         THE INTERPRETER:  Okay.

12         MR. BALDIGA:  I'm sorry.  Was the request --

13    I'm sorry.  Was the request -- I'm just trying to

14    make sure I heard it -- April 4 at 10 o'clock in

15    Bridgeport?

16         MS. CLAIBORN:  April 4, 10 o'clock in New

17    Haven at the U.S. Trustee's Office.

18         MR. BALDIGA:  Okay.  We'll be back to you

19    very quick on that.

20         MS. CLAIBORN:  I actually need an answer on

21    that right now because we need to be able to notify

22    creditors and I want everyone to know before we

23    conclude today.

24         MR. BALDIGA:  Okay. I'll put you on hold.

25         MR. HARBACH:  Ms. Claiborn, this is David

1   Harbach.  I'm afraid that that day will not work for

2   us?

3              MS. CLAIBORN:  Mr. Harbach, is that you?

4              MR. HARBACH:  Yes, ma'am.  And I was just

5   about to say that I can do Wednesday, the 6th, or

6   any day after that.  But I cannot do the 4th or the

7   5th.

8              MS. CLAIBORN:  How about Friday, April 8th?

9              MR. HARBACH:  I can do that.  This is David.

10  I can do that.

11             MR. WOLMAN:  This is Jay Wolman.  I can do

12  that.

13             MS. CLAIBORN:  Attorney Baldiga, can you

14  check on April 8th, please?

15      (Pause.)

16             MR. HARBACH:  Holley, this is Dave Harbach

17  again.  Just anticipating that they're coming back

18  (indiscernible).  I could also do it (indiscernible)

19  for whatever it's worth.  I could also do it on the

20  28th, 29 or 30 of March as well, if that's better.

21             MR. BALDIGA:  This is Bill Baldiga.  The 7th

22  and 8th are Buddhist holidays so for religious

23  reasons Mr. Kwok can't do it those days.  We'll

24  clear the 4th. I'm sure there are some

25  (indiscernible). I'm wondering who could make it.

1          MS. CLAIBORN:  How about March 28th, next

2     Monday?

3          MR. HARBACH:  Holley, I didn't get the

4     second part of what you said about the 28th.

5          MS. CLAIBORN:  I only offered the 28th as a

6     new date.

7          MR. BALDIGA:  This is Bill Baldiga.  28, 29

8     and 30 Mr. Kwok has a medical issue that he

9     (indiscernible)  during those days.

10          MS. CLAIBORN:  How about Friday, April 15th?

11          MR. HARBACH:  This is David Harbach.  That's

12     good by us.

13          MR. BALDIGA:  It's Good Friday.  Good Friday

14     for me and Passover for many.

15          Can I suggest (indiscernible)?

16          MS. CLAIBORN:  I didn't hear your

17     suggestion. I'm sorry.

18          MR. BALDIGA:  I respectfully ask that we go

19     back to April 4.  One lawyer among a dozen and one

20     creditor should not --

21          MR. WOLMAN:  This is Jay Wolman. I already

22     have something for that day as well.

23          MR. BALDIGA:  I know, but there are

24     (indiscernible)  --

25          MR. WOLMAN:  Two lawyers, including myself,

1    who is in the middle of questioning.

2           MR. BALDIGA:  All right. We'll keep looking

3    then.

4           MS. CLAIBORN:  Does April 6th work?

5           MR. WOLMAN:  What was that date?

6           MS. CLAIBORN:  April 6th?

7           MR. HARBACH:  This is David Harbach. I can

8    do April 6th.

9           MR. BALDIGA:  The debtor can as well.

10          UNIDENTIFIED:  As can I.

11          MS. CLAIBORN:  Okay. I'm going to mark April

12   6th 10:00 a.m.  It's in person.  The U.S. Trustee's

13   Office in New Haven.

14          Please allow for time to go through

15   security. I'd like to start at 10:00.

16          MR. BALDIGA:  Could I ask how much time

17   would you reserve on that day, including with the

18   interpreter, just so we can plan?

19          MS. CLAIBORN:  I think you should plan for

20   the whole day but I will have to follow up and get

21   an understanding about an interpreter and I don't

22   have that at my fingertips right now.

23          MR. BALDIGA:  Okay.  Would that be 5

24   o'clock?

25          I guess we can go off the record as we

1    finish this.  It's up to you, obviously.

2          MS. CLAIBORN:  Okay.  I think we're

3    concluded for purposes of Bin's translation services

4    for today.

5          THE INTERPRETER:  Thank you.

6          MS. CLAIBORN:  Thank you very much, Bin.

7          THE INTERPRETER:  Have a nice day.

8          MS. CLAIBORN:  Thank you.

9          I'm going to stop the recording, but we can

10   stay on the line.  I'm going to stop the recording.

11   Thank you.

12      (Meeting adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

Ho Wan Kwok - March 21, 2022                                81

1    I, CHRISTINE FIORE, court-approved transcriber and

2    certified electronic reporter and transcriber,

3    certify that the foregoing is a correct transcript

4    from the official electronic sound recording of the

5    proceedings in the above-entitled matter.

6

7

8    _____    April 5, 2022

9        Christine Fiore, CERT

10        Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                              INDEX

2

3    HO WAN KWOK                                    Page

4    Examination by Ms. Claiborn                    14

5    Examination by Mr. Wolman                      58

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 4

 

Home    My Network    Jobs



## Melissa Francis · 3rd

General Counsel at Golden Spring (New York) Ltd.

- Golden Spring (New York) Ltd.

New York, New York, United States · **Contact info**

**500+** connections

 Message    More

## About

Melissa Francis is a CIPP/US complex commercial litigator with substantial experience handling cross-border matters. Prior to joining Golden Spring (New York) Ltd. as General Counsel, Melissa practiced for a number of years as a litigation partner at two litigation boutiques and for ten years in the New York office of Mayer  ...see more

## Activity

729 followers

**Melissa Francis** commented on a post • 1mo

Huge congrats!

   289 • 110 comments

**Melissa Francis** commented on a post • 2mo

Huge congrats, chica! So proud, but so not surprised!

   123 • 66 comments

 

Home    My Network    Jobs

## Experience

### General Counsel
Golden Spring (New York) Ltd. · Full-time
Sep 2020 - Present · 1 yr 8 mos
New York, New York, United States



### Litigation Partner
Seiden Law Group LLP
Jun 2020 - Sep 2020 · 4 mos
New York, New York, United States



### Partner
Gerard Fox Law
Jul 2017 - Jan 2020 · 2 yrs 7 mos
Greater New York City Area



### Litigation Associate
Mayer Brown LLP
Jul 2007 - Jul 2017 · 10 yrs 1 mo
Greater New York City Area



### Legal Counsel (on secondment from Mayer Brown LLP)
Popular Community Bank
Apr 2013 - Jun 2013 · 3 mos
Greater New York City Area

**Show all 6 experiences →**

## Education



### The George Washington University Law School
Doctor of Law (JD)
2003 - 2006

Activities and societies: International Law Review Journal, Managing Editor



### University of Pennsylvania
BA, Psychology and Russian Literature
1999 - 2003

Grade: Highest Honors

 



**The Certified Information Privacy Professional - United States (CIPP/US)**

IAPP - International Association of Privacy Professionals

Issued May 2020 · No Expiration Date

## Skills

**Litigation** · 19

MAYER BROWN  Endorsed by 3 colleagues at Mayer Brown

**Commercial Litigation** · 14

MAYER BROWN  Endorsed by 2 colleagues at Mayer Brown

**Legal Research** · 7

Show all 15 skills →

## Interests

**Influencers**    Companies    Groups    Schools

 **Mike Bloomberg**  · 3rd

Entrepreneur, philanthropist, UN Secretary-General's Special Envoy for Climate Ambition & Solutions, mayor of NYC, father, grandfather, and data nerd.

2,489,233 followers

+ Follow

 **Richard Branson** 

Founder at Virgin Group

19,729,309 followers

+ Follow

Show all 3 influencers →

 

Home    My Network    Jobs

Civil Rights and Social Action • Disaster and Humanitarian Relief • Human Rights • Social Services

Ad  •••

Learn how to get hundreds of Google reviews and beat the competition



Google Reviews 101: Business Edition

Read Now

## People you may know

**Jen Tran Lau**
Experienced Talent Management Professional

Connect


**Allison Kubela**
Attorney Recruiting and Development Coordinator at O'Melveny & Myers LLP

Connect


**Melissa Clark**
Attorney Recruiting & Development Manager at O'Melveny & Myers LLP

Connect


**Pamela Miller**
Litigation Partner at O'Melveny

Connect


**Dan Innamorati**
Labor & Employment Litigation Attorney at Mitchell Silberberg & Knupp LLP

Connect

 L E A R N I N G

4/7/22, 11:4▢ ▢▢ (2) Melissa Francis | LinkedIn



1,158,728 viewers

**Leading a Marketing Team**

119,347 viewers

**Social Selling with LinkedIn**

53,696 viewers

Show more on LinkedIn Learning

Promoted    •••



API Access to Court Data

Connect your applications with 100+ million state and federal court records

Attorney Needed ASAP

We need more attorneys in your area ASAP. Apply now for membership.

Learn more                    Learn more

# EXHIBIT 5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION


In Re                         *   Case No. 22-50073 (JAM)
                              *
     HO WAN KWOK,             *   Bridgeport, Connecticut
                              *   April 13, 2022
              Debtor.         *
                              *
* * * * * * * * * * * * * * * *


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For the Debtor:                WILLIAM R. BALDIGA, ESQ.
                               ANDREW CARTY, ESQ.
                               Brown Rudnick, LLP
                               Seven Times Square
                               New York, NY  10036

For the Creditor, Pacific      PETER FRIEDMAN, ESQ.
 Alliance Asia Opportunity     LAURA ARONSSON, ESQ.
 Fund L.P.:                    DAVID HARBACH, ESQ.
                               O'Melveny & Myers LLP
                               Times Square Tower
                               7 Times Square
                               New York, NY  10036

                               PATRICK M. BIRNEY, ESQ.
                               Robinson & Cole LLP
                               280 Trumbull Street
                               Hartford, CT  06103


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.


**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

APPEARANCES Cont'd:


For the U.S. Trustee:          HOLLEY L. CLAIBORN, ESQ.
                               Office of the United States
                                  Trustee
                               The Giaimo Federal Building
                               150 Court Street, Room 302
                               New Haven, CT  06510


For Golden Spring              SCOTT D. ROSEN, ESQ.
 (New York), Interested        TIMOTHY MILTENBERGER, ESQ.
 Party:                        Cohn Birnbaum & Shea, P.C.
                               100 Pearl Street
                               Hartford, CT  06103


For HK International Funds      STEPHEN M. KINDSETH, ESQ.
 Investments (USA) Limited,    AARON A. ROMNEY, ESQ
 LLC, Interested Party:        Zeisler & Zeisler
                               10 Middle Street
                               Bridgeport, CT  06604


Proposed counsel for the       IRVE GOLDMAN, ESQ.
 Creditors Committee:          JOHN KAPLAN, ESQ.
                               Pullman & Comley
                               850 Main Street
                               Bridgeport, CT  06601

For Rui Ma, Zheng Wu and       KRISTEN MAYHEW, ESQ.
 Weican Meng, Creditors:       McElroy, Deutsch, Mulvaney &
                                Carpenter
                               30 Jeliff Lane
                               Southport, CT  06890

                               CAROLLYNN H.G. CALLARI, ESQ.
                               Callari Partners, LLC
                               One Rockefeller Plaza, 10th Fl.
                               New York, NY  10020

3

1        (Proceedings commenced at 10:00 a.m.)

2              THE CLERK:  Case No. 22-50073, Ho Wan Kwok.

3              THE COURT:  Good morning.  If we could have

4     appearances for the record, starting with the debtor's

5     counsel, please.

6              MR. BALDIGA:  Good morning, Your Honor.  William

7     Baldiga, Brown Rudnick, for the debtor, with my partner,

8     Andrew Carty.

9              MR. CARTY:  Good morning, Your Honor.

10             THE COURT:  Good morning.

11             MR. ROSEN:  Good morning, Your Honor.  Scott Rosen

12    for Golden Spring, New York Limited, the proposed DIP

13    lender, and with me is my partner, Timothy Miltenberger.

14             MR. MILTENBERGER:  Good morning, Your Honor.

15             THE COURT:  Good morning.

16             MR. KINDSETH:  Good morning, Your Honor.  Stephen

17    Kindseth, Zeisler & Zeisler, and with me Aaron Romney for HK

18    International Funds Investment USA Limited, LLC, the

19    registered owner of the Lady May.

20             THE COURT:  Good morning.

21             Counsel?

22             MR. FRIEDMAN:  Your Honor, Peter Friedman of

23    O'Melveny & Myers on behalf of Pacific Alliance Group.  I'm

24    joined today --

25             THE COURT:  Could you just speak a little louder.

4

1   I'm sorry.

2          MR. FRIEDMAN:  Yes, Your Honor.

3          THE COURT:  Because I couldn't hear you.

4          MR. FRIEDMAN:  Peter Friedman of O'Melveny & Myers

5   on behalf of Pacific Alliance Group.  I'm joined by Mr.

6   Birney of Robinson & Cole.

7          MR. BIRNEY:  Good morning, Your Honor.

8          THE COURT:  Good morning.

9          MR. FRIEDMAN:  And you may also hear from my

10  colleagues, Laura Aronsson of O'Melveny & Meyers and David

11  Harbach of O'Melveny & Meyers.

12         MR. HARBACH:  Good morning, Your Honor.

13         THE COURT:  Good morning.  Good morning.  Thank

14  you.

15         And the reason I asked you to speak up, it's just

16  unfortunately we only have audio for our records, so it

17  happens I sometimes can't hear myself.  So it's not to you

18  individually, it's to all of us.  Because we have the audio

19  is our only record, we have to make sure that the courtroom

20  deputy hears it and that the recording captures it.  Okay?

21         MR. FRIEDMAN:  Thank you.  Thank for the reminder,

22  Your Honor.

23         THE COURT:  Thank you.

24         MS. CLAIBORN:  Good morning, Your Honor.  Holley

25  Claiborn for the U.S. Trustee.

5

1          THE COURT:  Good morning.

2          MR. GOLDMAN:  Good morning, Your Honor.  Irve

3   Goldman, Pullman & Comley.  With me John Kaplan of Pullman &

4   Comley.  We're the counsel for the proposed -- proposed

5   counsel for the Creditors Committee.

6          THE COURT:  Good morning.

7          MS. MAYHEW:  There was no room at the table, Your

8   Honor.  Good morning.  Kristen Mayhew, McElroy, Deutsche,

9   Mulvaney & Carpenter, on behalf of creditors Rui Ma, Zheng

10  Wu and Weican Meng.

11         THE COURT:  Good morning.  I'm sorry there's no

12  room at the table.  Do you -- would you like a chair to be

13  brought so that you're closer?

14         MS. MAYHEW:  I'm okay for right now.  Thank you.

15         THE COURT:  Is there anybody else that's appearing

16  that's in the back of the courtroom?

17         Because we can bring some additional chairs in if

18  necessary.  Okay.

19         THE CLERK:  Your Honor, excuse me.  I did not get

20  the gentleman's name next to Attorney Baldiga.

21         MR. CARTY:  Yes.  Andrew Carty.

22         THE CLERK:  Okay.  Thank you.

23         THE COURT:  And how do you spell your name, sir?

24         MR. CARTY:  C-A-R-T-Y.

25         THE COURT:  And did you file a notice of

6

1   appearance in the case.

2            MR. CARTY:  I did not, Your Honor.  My pro hac

3   vice and my notice of appearance are in process.  My

4   understanding is that they're being filed as we speak

5   (indiscernible).

6            THE COURT:  Okay.  Because I -- I honestly didn't

7   see your name before --

8            MR. CARTY:  Yeah.

9            THE COURT:  -- and that's why I'm glad you raised

10  it, the courtroom deputy raised it.  So, yes, you do need to

11  file those though in our district.

12           MR. CARTY:  Yeah.

13           THE COURT:  And as long as you're representing to

14  me that they're going to be filed today, then that's fine.

15           MR. CARTY:  Yes.

16           THE COURT:  Okay.  Thank you.

17           Okay.  So that's everyone.  All right.

18           As I mentioned, we have several matters on the

19  calendar today.  We have the continued Chapter 11 case

20  management conference which I indicated during our last

21  hearing I may have additional questions, but I may not, and

22  so we'll address that.

23           And then we have, in order of filing, the motion

24  for determination that the stay is inapplicable, or for

25  relief from stay filed by the creditor, which I will refer

7

1    to if the creditor doesn't mind as PAX, P-A-X.  I noticed --

2    I want to make sure that we all indicate for the record any

3    kind of spelling so that there's -- when there's a

4    transcript the transcriber, who is not us -- it has to be a

5    third party outside the court -- will get the names right.

6    And I think in the past they haven't picked up that PAX is

7    P-A-X, so I want to make sure that that is picked up for the

8    transcriber.

9         Then there -- that's ECF 57, the PAX motion for an

10   order confirming the inapplicability of the automatic stay,

11   or in the alternative for relief from stay.

12        The next matter on the calendar is ECF No. 86,

13   which is the application of the debtor to retain Brown

14   Rudnick as counsel to the debtor.

15        The next matter is the debtor's application to

16   retain a financial advisor, ECF 90.

17        The next matter is ECF 102, the motion of the

18   United States Trustee for an order directing the appointment

19   of an examiner, or in the alternative for the appointment of

20   a Chapter 11 Trustee.

21        The next matter, ECF No. 117, is the debtor's

22   motion for entry of an interim and final debtor in

23   possession financing orders.

24        The next matter on today's calender is the motion

25   for order to schedule a status conference in connection with

8

1       a motion to dismiss that was filed by PAX on April 6th.

2               And then the next matter is the order that granted

3       PAX's, in part, PAX's motion for an order to schedule a

4       status conference on the motion to dismiss.

5               So as far as today is concerned, what -- again, I

6       may stop parties at different points if there are spelling

7       issues that we need to make sure we have on the record.

8               What I'm going to do is I'm going to remind

9       everyone this is a continued hearing, preliminary hearing,

10      on the motion for relief from stay.

11              So when we were here last, we talked about the

12      motion for relief from stay.  I heard everyone's arguments

13      on that motion.

14              And then since the last time we were in court,

15      there were more documents filed with regard to the motion

16      for relief from stay.

17              I would assume, although I should not make any

18      assumptions, which is probably not a -- I should not assume,

19      but I have not seen any further documents and any

20      discussions about any kind of resolution on the relief from

21      stay other than motions or statements filed by creditors and

22      the creditors committee -- I think, Mr. Goldman, you can

23      correct me if I'm wrong -- that is in support of the motion

24      for relief from stay.

25              So as -- Mr. Friedman, when we were here last, we

Fiore Reporting and Transcription Service, Inc.

9

1    went through the motion for relief from stay.  Debtor's

2    counsel was able to make his argument in opposition to

3    relief from stay.

4            But now we have Attorney Goldman as proposed

5    counsel on behalf of the committee supporting relief from

6    stay.  And I believe we also have the creditors, Ms. Ma and

7    Ms. Wu, in support -- qualified support I should say -- of

8    the relief from stay.

9            So as far as the PAX parties are concerned, the

10   committee of unsecured creditors is concerned, and the

11   creditors, Ms. Ma and Ms. Wu, are concerned, have you all

12   agreed to a form of an order on relief from stay?

13           MR. FRIEDMAN:  Your Honor, so we had agreed --

14   Peter Friedman from O'Melveny & Myers.

15           We had agreed with the individual creditors.

16   Counsel for the committee has made a proposal which -- to

17   our proposed order, which we're reviewing.

18           THE COURT:  Okay.

19           MR. FRIEDMAN:  I think the biggest probably

20   dispute between us is, you know, sort of the binary issue in

21   the first instance, does the stay apply or not?

22           And we would want an order in the first instance

23   saying the stay doesn't apply.

24           THE COURT:  Okay.

25           MR. FRIEDMAN:  That Mr. Goldman can speak for

10

1    himself, but I understand that that doesn't work for him,

2    but we are -- for his committee, it's nothing personal, it's

3    for his client -- we are -- we'll try to work together to

4    see if we can, you know, to the extent the Court is going to

5    conclude the stay applies, agree on language.  He provided

6    us a markup this morning which we're reviewing.

7              THE COURT:  Okay.

8              MR. FRIEDMAN:  So I'm hopeful that either we would

9    be able to come to something consensual, or if not submit

10   very minor differences on a competing form of order.

11             THE COURT:  Okay.  So your motion, as you are

12   obviously entitled to do, wants this court to make a

13   determination as to whether the stay is applicable, or in

14   the alternative grant relief from the stay if I find that

15   the stay is applicable.

16             So what I think I heard you just say is that you

17   still want the Court to rule.  You do not want the Court at

18   this point -- I think I'm hearing you say -- to adopt the

19   position that Attorney Goldman has suggested, which is don't

20   worry about whether it's applicable or not, just grant

21   relief from the stay?

22             MR. FRIEDMAN:  Yes, Your Honor.  We think that

23   both are appropriate determinations.

24             THE COURT:  Okay.  That's fine.  I just want to

25   understand where everyone -- where everyone stands as of

11

1    this morning.  Okay.  Because obviously a few weeks have

2    gone by since our last hearing.  I don't know what -- I

3    don't need to know what discussions have been had.  I just

4    want to know what the positions are as of today, so what

5    you're asking the Court to do.

6          And what PAX is asking the Court to do is to still

7    make -- is to address the relief in your motion which is

8    whether or not the stay is applicable.  If it's not, if the

9    Court finds that it's not, then that -- then the motion will

10   be granted along those lines.

11         And if the Court finds that it is applicable, then

12   the motion will be granted or denied upon whether or not

13   you're entitled to relief from the stay.

14         MR. FRIEDMAN:  Oversight by me.  I didn't share it

15   with the U.S. Trustee.  We'll do that.

16         THE COURT:  Okay.  Attorney Claiborn, go ahead.

17         MS. CLAIBORN:  Yes.  Thank you, Your Honor.

18   Holley Claiborn for the U.S. Trustee.

19         I didn't make any comments last hearing with

20   respect to the relief from stay motion.  I wanted to do so

21   today.  I wanted to let the Court know that the U.S. Trustee

22   is in favor of relief from stay being granted.  And we would

23   like to see copies of the order, although we may not

24   necessarily weigh in on the debate over the language.

25         THE COURT:  Okay.  So your position is the same as

Fiore Reporting and Transcription Service, Inc.

12

1    the committee's essentially then, the U.S. Trustee's, which

2    is don't spend time in court determining whether or not the

3    stay is applicable or not, just grant relief from the stay?

4            MS. CLAIBORN:  I think in the end I would just

5    like an order granting relief from stay?  Yes.

6            THE COURT:  Okay.  You just have to -- I'm so

7    sorry -- could you --

8            MS. CLAIBORN:  I'm sorry.  In the end, we would

9    like an order granting relief from stay.

10           THE COURT:  Okay.  Thank you.  All right.

11           So, yeah, I'm certainly going to let you speak,

12   Counsel.

13           MR. FRIEDMAN:  Thank you.

14           THE COURT:  One thing that I will note with regard

15   to the relief from stay obviously, as we all know, the 2005

16   amendments to the code changed a lot of things, including

17   time frames.

18           And the -- this is an individual Chapter 11 case.

19   Your motion was filed on March 21st.  So arguably under the

20   code, under 362(e)(2), the stay will expire in 60 days.

21   Even if I don't rule, it will expire unless the Court

22   extends that stay for compelling circumstances -- I believe

23   is the language, but I can pull it out.

24           So today is April 13, and, you know, I mean, we

25   can do a calculator if you do Rule -- if you look at Rule

13

1  9006, and you don't count the day of the filing of the

2  motion and the computation of time, I think we're, you know,

3  we're in May 20 range of when the stay would expire.  Today

4  is April 13th.  So I'm obviously taking that into

5  consideration as well.

6          MR. FRIEDMAN:  Your Honor.

7          THE COURT:  Go ahead.

8          MR. FRIEDMAN:  I believe the motion -- the hearing

9  was the date you said.  The motion was filed on March 2nd.

10          THE COURT:  Oh, I'm sorry.  You're right.  It was

11  the hearing that I just referred to, so I'm wrong.  The 60

12  days is coming up faster than I just stated.  You're right.

13  Thank you.

14          The motion was filed -- actually, yeah, the motion

15  was filed on March 1st.  So if I were to calculate under the

16  -- under the Rule 9006 parameters that says you don't count

17  the first date, you don't count the date of the filing, and

18  then you count the days after -- and if the expiration is --

19  I think it says a Saturday, Sunday or legal holiday, it goes

20  to the next day -- I'm pretty sure that's what it says, but

21  I can go back and look at that -- just give me one second.

22          (Pause.)

23          THE COURT:  So the exact day, if you did the

24  calculation in accordance with Rule 9006, the exact 60th day

25  -- because March has 31 days -- is April 30.  That's a

14

1   Saturday.  So the first working day is May 2nd.

2            Attorney Goldman, did you want to --

3            MR. GOLDMAN:  Yeah.  I just wanted to make a point

4   on this issue, Your Honor.

5            THE COURT:  Can you talk into the microphone

6   because we can't hear you.

7            MR. GOLDMAN:  I just want to make one point on

8   this issue.  If you look at 362(e)(1) --

9            THE COURT:  (e)(1) only applies in a corporate

10  case.  (e)(2) applies in an individual case, and it's 60

11  days.  This is an individual case.

12       (Pause.)

13           MR. GOLDMAN:  Yeah.  Correct.  I just wanted to

14  note that under (e)(1) it was property -- an act against

15  property of the estate.  So to the extent that (e)(2) would

16  also incorporate that concept, I'm not sure this is an act

17  against property of the estate.

18           THE COURT:  Well, (e)(2) incorporates the concept

19  that it's an individual debtor.  That's the distinction.

20  And it's, you know, that's what Congress decided in 2005

21  when they changed the code and added that section to 362.

22           MR. GOLDMAN:  Right.  That does appear to be the

23  case.

24           THE COURT:  That's what -- that's what they

25  decided.  So it's 60 days.

1          In any event, my calculation, Attorney Friedman,

2     if I did it properly, and I think I did under Rule 9006, is

3     -- because I have to worry about this, right?  I mean, I

4     have to worry about the time frames that Congress imposed on

5     what the Court is supposed to do.  And if it doesn't do,

6     what the ramification would be if the Court doesn't act in

7     that time frame.

8          So I believe there's an argument that it would

9     expire on Monday, May 2nd.  Okay?

10          So today is the 13th of April.  And so that's

11     really just a little more than two weeks left in this where

12     the Court either has to rule on your motion.  And if the

13     Court doesn't rule on your motion, then there's no automatic

14     stay in place in favor of the debtor.

15          In any event, I point that out to the parties.

16          Now, obviously counsel for the debtor wants to be

17     heard and I'm going to hear him.  So go right ahead.

18          MR. BALDIGA:  Thank you, Your Honor.  I think

19     relevant to -- William Baldiga, Brown Rudnick, for the

20     debtor.

21          Relevant to everything today, but especially as to

22     the motion, I think it's very important that you hear very

23     significant developments in the case including as to the

24     boat, which is the entire topic of the motion for relief

25     from stay, because there are papers filed on this by Mr.

16

1   Kindseth, but -- so let me give you an update as to what has

2   happened in the case because I think it directly bears on

3   this.

4            In advance of today, Mr. Kwok has sat for two days

5   of examination at the 341 and the continued 341 meeting.

6   You heard previously a great concern that pre-petition he

7   had invoked his Fifth Amendment rights.  Over the two days,

8   there was not a single invocation of that, so every

9   questions has been answered, there's been no issue of that

10  ever since the petition was filed.

11           There has been a lot of discovery taken by people

12  on this side of the courtroom.  We've complied with all of

13  it.  There have been document productions by the debtor, by

14  the DIP lender, the boat owner, Verdolino & Lowey and Brown

15  Rudnick, depositions of Verdolino & Lowey and the DIP

16  lender.  And there was a deposition schedule for Mr. Kwok

17  and PAX decided yesterday it was not needed.

18           So there are no discovery disputes for the Court

19  to resolve, which is -- given the great breadth of all the

20  discovery that has been demanded, I'm pleased to report that

21  we've had great compliance, nothing for you to decide today,

22  and so very good cooperation in that regard, which is how I

23  said the case would be run.

24           MR. FRIEDMAN:  Your Honor.

25           MR. BALDIGA:  On the boat --

17

1          THE COURT:  Just hold on a second, Attorney

2     Friedman.  I just want to -- I'm going to let you respond to

3     whatever counsel is saying, but I'm going to give him the

4     opportunity to speak at the moment.  Okay?  Thank you.

5          MR. BALDIGA:  On the boat, Your Honor, most

6     importantly, we have taken the Court's comments at the prior

7     hearing to great heart.  The owner of the boat, HK

8     International, has retained counsel.  There has been a great

9     deal of work in that regard.

10          And I'll defer to my partner, Mr. Carty, as to

11     debating the law under the underpinnings of the law on the

12     motion for relief, but factually, the owner of the boat has

13     come into this court, including in a proposed order, the day

14     filed, in response, and said we will do exactly what PAX and

15     the state court ordered and which this court implied should

16     be done, which is the boat is on its way back to Bridgeport

17     as soon as it could be safely shipped here.

18          And Mr. Kindseth can address that in more

19     particulars, and he's here to do that, but the boat owner

20     has submitted itself to the jurisdiction of this court

21     unequivocally.

22          The boat is in dry dock with repairs to be made

23     before it can move at all.  Those repairs are being made.

24     The boat can be returned here only shipped on another boat

25     at great expense, but arrangements have been made to do

18

1   exactly that at the soonest possible instant.  It is a

2   considerable exercise.

3           Mr. Kindseth can address that more.

4           We have shared with all the parties over more than

5   a week our hopes and intentions in that regard, tried to get

6   a dialog going as to full satisfaction of the motion,

7   because we think we are fully satisfying the motion, not the

8   debtor so much, but working closely with the owner of the

9   boat to do that.

10          And so the boat is being repaired.  The boat is

11  being shipped back.  It has to come back through Baltimore,

12  but arrangements are being made for it to come literally to

13  Bridgeport.

14          And so we think there's no order that could

15  require more than that because it's being done at the

16  earliest possible time that it could be done.  It's not as

17  simple as, you know, shipping it UPS.

18          And even more significantly -- although this will

19  come in due time -- the boat under the plan we have filed --

20  and we're not here today on confirmation certainly or to

21  solicit votes -- the boat is being contributed to the

22  creditors, lock, stock and barrel.

23          So we've taken the request by PAX that everyone

24  has joined and we've done one better, or two better.  The

25  cost of the repairs are several hundred thousand dollars.

19

1    The cost of shipping the boat -- and you literally have to

2    load it on another boat to bring it over here -- is several

3    hundred thousand dollars.  And then with the repairs made

4    and the boat local here in Bridgeport, it is available to

5    creditors.

6         So we think we've mooted, because PAX has

7    emphasized the only thing they wanted was the boat to be

8    returned to local waters.  They say they don't want to

9    imprison Mr. Kowk.  We have some doubts.  They expressly say

10   this is not about the payment of money.

11        So the boat owner has done -- and we're extremely

12   appreciative of that -- exactly what the state court judge

13   asked, exactly what PAX has asked.

14        And, again, Mr. Kindseth can get into this.

15        And we're happy to put on a factual record at this

16   time or whenever the Court so pleases to support all of

17   that.  And there's no factual record to the contrary.

18        Just in terms of some of the other things that are

19   being done, Mr. Jalpbert, Verdolino & Lowey, the financial

20   advisor to the estate, or proposed, has worked very hard to

21   open -- which is being done literally this week -- DIP bank

22   accounts, which we have some doubt whether they could be

23   opened.  We think now they can be opened with Peoples' Bank,

24   which is obviously an approved depository.

25        So one of the concerns about the U.S. Trustee --

20

1    of the U.S. Trustee's Office that it couldn't be a more

2    routine handling of estate funds, we're obviating that as

3    well.

4          The U.S. Trustee also expressed in formal concern

5    that this is an unusual Chapter 11 estate where there's no

6    money in the estate and no income.

7          The first thing that happens upon approval of the

8    DIP, initial approve of the DIP today, is a million dollars

9    being contributed outright to the estate as a gift as it

10   were so that the estate will be flush with bucks.

11         THE COURT:  A million dollars for what?

12         Because everything I've seen, the million dollars

13   that was your retainer was described as a loan, not a gift.

14         MR. BALDIGA:  But it's subject to repayment, fully

15   subordinate to every other valid claim.

16         THE COURT:  Okay.  I'm just asking.  I'm just

17   asking because I want to -- you know, I've read --

18         MR. BALDIGA:  Yeah.

19         THE COURT:  I've read everybody's papers.

20         MR. BALDIGA:  So it's --

21         THE COURT:  And you say it's a loan, but now

22   you're saying it's a gift.

23         MR. BALDIGA:  Well --

24         THE COURT:  So if -- it's not a gift if it's still

25   subject to repayment.

1          MR. BALDIGA:  As between the debtor and the

2     lender, it's a loan.  As between the debtor and all

3     creditors, not a penny goes back to the lender until every

4     creditor has been fully satisfied.  So it's fully

5     subordinate.  I guess I'll call it a loan.

6          But the money comes in no strings attached.  It's

7     an -- I'm not sure what the legal principle was behind that

8     concern.  In any event, again, we've said let's not argue

9     about a few dollars or whatever.  But a million dollars

10    comes in so that tomorrow the estate can have a million

11    dollars.  Whatever their concerns were, we've mooted.

12         THE COURT:  But that's not the million dollars

13    that was given to your firm?

14         MR. BALDIGA:  No.

15         THE COURT:  This is a different million dollars?

16         MR. BALDIGA:  On top.  On top.

17         THE COURT:  So in addition to the eight million

18    that's the subject of the --

19         MR. BALDIGA:  On top, yes.

20         THE COURT:  Okay.  And didn't the DIP loan say

21    that if relief from the stay is granted they won't loan?

22         MR. BALDIGA:  That's right.

23         THE COURT:  Okay.  So really we're talking about a

24    million dollars then if the Court grants --

25         MR. BALDIGA:  If there's no relief from stay and

22

1    no trustee.

2              THE COURT:  Well, you've just said that relief

3    from the stay should be granted essentially because you're

4    going to do all these things?

5              MR. BALDIGA:  Well, then, Mr. Kwok may be going to

6    jail and there's no --

7              THE COURT:  Well, wait a minute.  We didn't get

8    that far yet.  Hold on.

9              MR. BALDIGA:  Okay.

10             THE COURT:  Hold on.  Let's get -- let's take it a

11   step at a time.

12             What I'm trying to understand is I've -- as I'm

13   sure you have -- spent many hours reading all the papers in

14   this case, right, and that's fine.  Obviously there's

15   excellent lawyering on all sides and people making their

16   arguments very persuasively, but I have to decide what to

17   do, right --

18             MR. BALDIGA:  Of course.

19             THE COURT:  -- so someone's not going to be happy.

20             All that being said, when I read the papers -- and

21   I tried to be -- I tried -- and that's why I say correct me

22   if I'm wrong -- but the monies that were paid to your firm

23   as a retainer are described -- the word loan is used in that

24   context.  The $8 million is obviously a loan.  I mean,

25   otherwise why would you need a court to approve it.

23

1          And my understanding of my read of those documents

2     is that if relief from the stay is granted, there won't be

3     -- no monies will be loaned.

4          And now you're coming here today -- which is fine,

5     I'm just trying to understand everything -- and saying

6     someone -- I don't know who -- who's going to give the

7     million dollars to the estate?

8          MR. BALDIGA:  The DIP lender.

9          THE COURT:  And not -- and not expect any

10    protections from a DIP -- that a DIP lender would want when

11    it makes a loan to a Chapter 11 estate?

12         MR. BALDIGA:  As to that million dollars, none.

13    And it's because, Your Honor, we proposed a most generous

14    DIP that a Chapter 11 case has been known.  We are getting

15    objections of all type of anyway, so we just said let's just

16    make it easy.  We'll put a million dollars in -- or the DIP

17    lender said we'll put a million dollars in, no strings

18    attached, how can anybody be opposed to that?

19         THE COURT:  Okay.  Well, let's talk about that.

20         MR. BALDIGA:  Okay.

21         THE COURT:  So a million dollars comes into this

22    estate from Golden Spring?

23         MR. BALDIGA:  Yes.

24         THE COURT:  And there's no -- it's not a loan,

25    it's a gift.  They're not -- so I don't have to do anything.

1          MR. BALDIGA:  Well, it's under the DIP motion and

2     it is conditioned upon no appointment of a trustee.

3          THE COURT:  Okay.  So there are -- it isn't just

4     no strings attached?  And I'm not saying --

5          MR. BALDIGA:  Well, I -- no.  I'm making it clear

6     --

7          THE COURT:  I'm not saying that that's not

8     appropriate --

9          MR. BALDIGA:  Correct.

10          THE COURT:  -- that you want that.  I want to -- I

11     want to be very clear that I understand what you're asking.

12     Okay?

13          MR. BALDIGA:  Of course.

14          THE COURT:  So the -- the DIP motion doesn't -- at

15     this point doesn't say anything about making a million

16     dollar loan with no strings attached, does it?

17          MR. BALDIGA:  It does in the reply that we filed.

18          THE COURT:  Oh, in the reply.

19          MR. BALDIGA:  Yes.

20          THE COURT:  Okay.  All right.

21          MR. BALDIGA:  And a whole new set of DIP papers --

22          THE COURT:  So that was just filed on Sunday?

23          MR. BALDIGA:  -- were attached that laid that out.

24          THE COURT:  Was that filed on Sunday?  Filed on

25     Sunday or Saturday?

25

1          MR. BALDIGA:  Yes.

2          THE COURT:  Okay.  So then I probably haven't paid

3     as -- I mean, I skimmed it --

4          MR. BALDIGA:  Of course.

5          THE COURT:  -- but I haven't read it fully.

6          MR. BALDIGA:  Pretty -- yeah.

7          THE COURT:  I can assure on that one.  That being

8     said --

9          MR. BALDIGA:  And I just want to chat with the DIP

10    lender for one second, Your Honor, to be sure whether --

11         THE COURT:  Yeah.  Go right ahead.  Go ahead.

12         MR. BALDIGA:  -- the boat is also a condition.

13    But may I have one second, Your Honor?

14         THE COURT:  You certainly may.

15        (Pause.)

16         MR. BALDIGA:  So the two conditions, Your Honor,

17    for the million dollars is no appointment of a trustee and

18    no relief from stay as to the boat.

19         THE COURT:  Okay.  Okay.  So let's assume the

20    million dollars comes into the estate, what's the -- what is

21    the million dollars going to be used for?

22         MR. BALDIGA:  We're not sure.  The debtor has no

23    need to spend it.  It's available for creditors.  It's not

24    for administrative expenses.  We are trying to satisfy

25    entirely a concern, and formal concern, expressed by the

26

1    United States Trustee that this is case isn't funded.  I

2    think it is funded by the DIP, but we are trying to listen

3    and try to respond, and if that concern was raised we're

4    meeting it.

5         THE COURT:  Let me ask you a question about what

6    you just said, because it made me think of something when

7    you said there's no administrative expenses.

8         So on today's calendar are three applications to

9    employ --

10        MR. BALDIGA:  Yes.

11        THE COURT:  -- your firm obviously, the financial

12   advisor, and the claims agent.  So none of those people are

13   going to get paid -- well, you're not going to get paid from

14   the estate because you're getting paid by a third party.

15        MR. BALDIGA:  No.  Well, no.  The debtor borrowed

16   a million-dollar retainer to pay us prepetition.

17        THE COURT:  Yeah.  Where's that loan document by

18   the way?  I don't think I've seen that.

19        Where's the documents that show that the debtor

20   borrowed that money to pay you?  I don't -- I didn't see

21   that in the record anywhere.  Is that in the record?

22        MR. BALDIGA:  No.

23        THE COURT:  Okay.

24        MR. FRIEDMAN:  Your Honor, it's Peter Friedman.

25        We actually asked for it in a discovery request

1    from Lamp Capital and it was never produced.  It's actually

2    incorrect that there are no discovery issues open.  Lamp

3    Capital just gave us three documents in response to our

4    request and didn't produce it.

5             THE COURT:  Okay.

6             MR. FRIEDMAN:  We don't think it exists.

7             THE COURT:  Okay.

8             MR. FRIEDMAN:  They could back date it at some

9    point, but we don't think it exists.

10            THE COURT:  Okay.  Thank you.

11            MR. BALDIGA:  Regardless --

12            THE COURT:  So there is not loan document from

13   Lamp Capital to the debtor where the debtor is the borrower

14   from Lamp Capital, which is my understanding, according to

15   even your declaration I believe, is owned by the son.  Lamp

16   Capital --

17            MR. BALDIGA:  Yes.

18            THE COURT:  -- is owned by the debtor's son.  So

19   there's no documentation that memorializes that loan, is

20   that correct?

21            MR. BALDIGA:  That's right.

22            THE COURT:  Okay.

23            MR. BALDIGA:  And there have been millions of

24   dollars of loans from either Golden Spring or Lamp

25   previously to the debtor -- some have been documented, some

28

1    have not -- but the testimony is all of it is kept

2    meticulously in the books.  And for some have been

3    documented and some have not.

4              THE COURT:  Well, that just -- what you said

5    sounds like a little inconsistent to me.  I'm sorry.  But

6    you just said they've been kept meticulously in the books,

7    but some have been documented and some haven't?

8              MR. BALDIGA:  Some have legal documents --

9              THE COURT:  Okay.

10             MR. BALDIGA:  -- of loan agreements, some do not,

11   but that's consistent with --

12             THE COURT:  But everything's in a ledger is what

13   you're telling me?

14             MR. BALDIGA:  Yes.  And that's been consistent --

15             THE COURT:  And where is that ledger?

16             MR. BALDIGA:  I'm sorry?

17             THE COURT:  Where is that ledger?  Who has that

18   ledger?

19             MR. BALDIGA:  The lenders.

20             THE COURT:  Lamp Capital and Golden Spring?

21             MR. BALDIGA:  Yes.

22             THE COURT:  Okay.  Okay.  So aside -- so let's

23   take it one at a time.  Brown Rudnick's retainer then is --

24   according to what we -- you just said, which is fine, I'm

25   saying it out loud to make sure you're not disagreeing with

29

1    what I think I heard.  Okay?  So just, please, I'm just

2    trying to get it correct.

3             MR. BALDIGA:  Sure.

4             THE COURT:  Lamp Capital loaned to Mr. Kwok a

5    million dollars and that million dollars was given to you I

6    think in two $500,000 payments in February, two or three

7    days before the filing, correct?

8             MR. BALDIGA:  Exactly.

9             THE COURT:  Okay.

10            MR. BALDIGA:  Yes.

11            THE COURT:  There's not a loan document for that.

12            But you still -- why -- so the million dollars is

13   property of the debtor even though you're retaining it.

14   You're holding it as essentially a security deposit to draw

15   down on?

16            MR. BALDIGA:  Yeah.  I think the law, Your Honor,

17   under -- I think the law is that it's actually owned by a

18   firm -- owned by our firm with a residual interest in the

19   estate to the extent that it's unused.

20            THE COURT:  Okay.

21            MR. BALDIGA:  But that -- I'm not sure that

22   matters.

23            THE COURT:  Whether or not that's true, the point

24   is the debtor has an interest in that million dollars?

25            MR. BALDIGA:  Yes.

Fiore Reporting and Transcription Service, Inc.

30

1          THE COURT:  Okay.  Thank you.  Okay.  Got it.

2          So then you would have -- then you -- that's why

3     you have to be retained by the estate because you're going

4     to have to be paid -- you're going to have to have authority

5     to pay yourself?

6          MR. BALDIGA:  Absolutely.

7          THE COURT:  Okay.

8          MR. BALDIGA:  We don't -- we can't --

9          THE COURT:  No.  I know you didn't say anything to

10     the contrary.  I'm just trying -- you have -- as I said at

11     the beginning of the case -- or maybe I haven't made it

12     clear enough -- there's a lot of documents filed in this

13     case in a very short amount of time.  I'm trying to make

14     sure that I'm accurately understanding what's been filed in

15     the case.

16          MR. BALDIGA:  Yes.

17          THE COURT:  My questions are driven to that issue.

18     Do I, as the person that ultimately is having to decide

19     these issues, am I understanding properly what the papers

20     say?  That's my -- that's where I'm coming from.

21          MR. BALDIGA:  You do exactly.  So that our fees,

22     just like Mr. Goldman's fees, are fully subject to the usual

23     fee application and approval process dictated by this court

24     and we don't take money out of the retainer until that

25     happens.

1        And the debt, the $8 million in debt is proposed

2   to cover administrative fees of whoever is entitled by your

3   order to administrative fees in the case, including for an

4   investigation by an examiner, and -- but the million dollars

5   is not -- is set aside not for professional fees so that it

6   funds the estate without having --

7        THE COURT:  Okay.  Okay.

8        MR. BALDIGA:  -- various law firms look to it.

9        THE COURT:  And that's -- that million dollars

10  that you -- that is included in your reply that was filed

11  this weekend that I didn't -- I may not have fully

12  understood until your telling me about it right now is

13  funded by whom?

14       MR. BALDIGA:  Golden Spring.

15       THE COURT:  All right.  So not Lamp.  Lamp is only

16  -- the only lender with regard to the retainer for your

17  firm?

18       MR. BALDIGA:  Yes.

19       THE COURT:  Every other loan that's proposed at

20  this point is coming from Golden Spring, is that correct?

21       MR. BALDIGA:  Yes.  The only lender before this

22  court is Golden Spring.

23       THE COURT:  Okay.  All right.

24       So with regard to the financial advisor and -- the

25  proposed financial advisor and the proposed claims agent,

1   again --

2           MR. BALDIGA:  And we're withdrawing the claims

3   agent motion, Your Honor.

4           THE COURT:  Oh, you are?

5           MR. BALDIGA:  Yes.

6           THE COURT:  Okay.  Okay.  All right.  Then I'll --

7   we'll note that on the record.  Just let us do that.  It

8   will help the courtroom deputy if you just give me a minute.

9           MR. BALDIGA:  Very good.

10           THE COURT:  All right.  So the authorization to

11   retain and employ Stretto, ECF 87, is withdrawn on the

12   record by debtor's counsel?

13           MR. BALDIGA:  Yes.

14           THE COURT:  Okay, 10:38 a.m.  All right.  We'll

15   make a note of that.

16           MR. BALDIGA:  Thank you.

17           THE COURT:  So just -- I don't want -- I don't

18   want to get off track too much on that, but Stretto has been

19   for -- at this point, it seems to me anyway -- so, again,

20   correct me if I'm wrong -- doing what you would have to do

21   as debtor's counsel anyway as far as service.  That's all

22   I've seen them do except for creating that website.

23           Is that the only additional task they've

24   undertaken to this point?

25           MR. BALDIGA:  Stretto?

33

1          THE COURT:  Yes.

2          MR. BALDIGA:  That's the only thing I know of.

3          THE COURT:  Okay.  I know there was some issue --

4     and what I need you to do with regard to Stretto is to make

5     sure that they don't have some kind of a claims register or

6     something already.  I don't think they do, but I'm just

7     saying to you so our clerk's office has it right.

8          Because if Stretto was trying to maintain

9     something, a claims register, an accepted claims that didn't

10    get with the bankruptcy court, we would need to fix that.

11         MR. BALDIGA:  And I'm virtually certain nothing

12    has been implemented of any type --

13         THE COURT:  Okay.

14         MR. BALDIGA:  -- but we will confirm that.

15         THE COURT:  I think you're right, but I need you

16    just to confirm that so that the clerk's -- because then it

17    could be a problem from our clerk's office standpoint.

18         MR. BALDIGA:  Understood.

19         THE COURT:  Okay.  All right.

20         MR. BALDIGA:  And in that regard, Your Honor, we

21    -- it could have been helpful, but like everything else I've

22    said, we're trying to reduce the friction in this case and

23    to do things.  And if people don't want Stretto, then we're

24    withdrawing Stretto.  We would like to build consensus

25    around what we're doing.  And if that's in the way, then

34

1    it's out.

2                THE COURT:  Okay.  I understand.  I just want to

3    make sure that -- I think the reason I had raised the issue

4    was -- at least initially, right -- when we had our first

5    hearing in our Chapter 11 case management conference, the

6    issue of monies coming into the estate had not ripened yet.

7                I mean, in the DIP motion, if it had been filed,

8    had just been filed, and there were the representations in

9    the debtor's statements and schedules of affairs and the

10   qualifications in the statements and schedules of affairs

11   that there was, you know, there is no income, he couldn't

12   open a bank account, there's, you know, there's no business

13   generating any kind of income, that everything that the

14   debtor was being fully supported by his family, which is all

15   fine --

16               MR. BALDIGA:  Yeah.

17               THE COURT:  -- but I think the concern I had was

18   so then why would we want to have an administrative expense

19   that might not be necessary?

20               MR. BALDIGA:  Understood.

21               THE COURT:  So now you've taken care of that with

22   regard to Stretto.

23               MR. BALDIGA:  And we believe are well along the

24   way to having a DIP account where the million dollars just

25   pours into.  And without Verdolino & Lowey that wouldn't

1    have been able to be done because they have good

2    relationships and they speak in a commercial way that banks

3    like.

4           THE COURT:  Okay.  All right.  So tell me what

5    else you want to tell me, if you would please, about the

6    relief from stay.

7           MR. BALDIGA:  Well, I'll let Mr. Carty argue the

8    law, although I think from a factual matter --

9           THE COURT:  Well, I mean, you've already made the

10   argument.

11          MR. BALDIGA:  -- we've mooted the motion.

12          THE COURT:  Wait.  Let me just -- let me --

13          MR. BALDIGA:  Yeah.

14          THE COURT:  You've already made your argument.

15          What I was allowing you to do was to respond to

16   Attorney Friedman's statement where he stated that he still

17   would like this court to rule on the relief that he filed,

18   which is is the stay applicable?  And if the Court finds

19   that it is -- it is applicable, are they entitled to relief

20   from the stay?

21          We've already had that argument --

22          MR. BALDIGA:  Right, we have.

23          THE COURT:  -- but what I'm asking you is, with

24   regard to where we stand today, I think you've actually

25   responded to it already by saying that the DIP loan will not

1    be made if relief from the stay is granted.

2         And then the other condition was what about -- I

3    apologize --

4         MR. BALDIGA:  Appointment of a trustee.

5         THE COURT:  The appointment of a trustee.  Okay.

6    All right.

7         So is there anything else you want to add?

8         MR. BALDIGA:  Well, just in terms of a factual

9    basis, again, just going back to it, we've -- and we are

10   trying to engage with everyone on this side of the

11   courtroom.

12        We've reached out, Mr. Kindseth has reached out,

13   the DIP lender has reached out, on numerous occasions over

14   the last week saying we think we're mooting all of your

15   objections, but can you tell us why you think some more

16   relief is necessary?

17        We can't get a dialog going.  People will run to

18   -- as I said at the last hearing, this will either be a

19   commercial case, in which case you see we're mooting every

20   objection, or it's a case to do harm, in which case we'll

21   continue to be frustrated.

22        And the Court -- I think the Court will continue

23   to be exceptionally frustrated.

24        If there's a -- if there are commercial concerns

25   regarding like about money, which is what bankruptcy is all

1    about, we're going to address those and we're going to get

2    those done as we have with the boat, with the DIP account,

3    with the money coming into the estate with the DIP loans.

4            THE COURT:  Well, okay.

5            MR. BALDIGA:  We cannot -- we cannot, Your Honor,

6    satisfy desires to harm the debtor.  We are finding out, I

7    think, where the concerns are on the other side.  And I do

8    think if we've tried as hard as we can to say factually we

9    have mooted every one of the things you were trying to do

10    except incarcerate the debtor, then I think we're entitled

11    to have that motion be denied.

12            I don't want to get in the way of Mr. Kindseth --

13            THE COURT:  I don't want to hear from Mr. Kindseth

14    yet.

15            MR. BALDIGA:  -- but they are trying to do

16    everything they can.

17            THE COURT:  I still have some more questions.

18            And I will hear from you, Mr. Kindseth, but I want

19    to --

20            MR. KINDSETH:  Okay.  Thank you, Your Honor.

21            THE COURT:  So you say you're mooting it out, but

22    you told me, I think -- and maybe it's more in this reply

23    that I didn't study enough -- that the boat needs to be

24    repaired.  Well, why does the boat need to be repaired?  It

25    seemed to go pretty well over to the other side of the

38

1    world, so --

2                MR. BALDIGA:  It didn't.  It was shipped over.

3                THE COURT:  But --

4                MR. BALDIGA:  And it's -- and Mr. Kindseth's --

5                THE COURT:  It was shipped over by whom?

6                MR. BALDIGA:  -- papers have the details right

7    down to the invoices of the repairs.

8                THE COURT:  Okay.  So then how long is that going

9    to take?

10               MR. BALDIGA:  Mr. Kindseth is better able to

11   address that.

12               THE COURT:  But you need to know that because --

13               MR. BALDIGA:  I do know that, but it --

14               THE COURT:  Okay.  So then what -- how long is

15   that going to take?

16               MR. BALDIGA:  I believe that the date of arrival

17   in Baltimore -- because these ships only cross the Atlantic

18   every once in a while -- May 20th or so.

19               MR. KINDSETH:  June 10th, to Baltimore, Your

20   Honor, is -- and I can speak about our efforts to ship --

21               THE COURT:  June 10th, is that a firm date, or is

22   that a hopeful date?

23               MR. KINDSETH:  It's the shipping date.

24               MR. FRIEDMAN:  Your Honor, I object.  This is all

25   based on a declaration from a witness who's not here.

39

1          THE COURT:  I agree with you, but I'm still going

2     to ask the questions.

3          MR. FRIEDMAN:  He's not here.

4          THE COURT:  I understand your objection.

5          MR. FRIEDMAN:  He cannot be cross-examined, so

6     this is the kind of --

7          THE COURT:  I understand your objection.

8          MR. FRIEDMAN:  And I will provide you with a

9     litany of prior excuses we've heard --

10          THE COURT:  I completely understand your

11     objection, but I'm still going to ask the questions.  Okay?

12          MR. FRIEDMAN:  Thank you.

13          THE COURT:  And, Mr. Kindseth, as I said, it's a -

14     - is it a firm date or is it a hopeful date?

15          MR. KINDSETH:  It's a firm date.

16          THE COURT:  And how do you know that?

17          MR. KINDSETH:  I've been advised, and I --

18          THE COURT:  By whom?

19          MR. KINDSETH:  Late yesterday, by counsel, co-

20     counsel to HK International, and the individual Mei Guo.

21          Your Honor, we're willing to have Your Honor order

22     us to bring the boat back as quickly as possible.

23          THE COURT:  I don't know.  You can be willing to

24     have me to anything you want to do, but that doesn't mean

25     I'm going to do it.

40

1          MR. KINDSETH:  I --

2          THE COURT:  I mean, see, here's the problem.

3   Here's the problem.  It doesn't really matter if you own the

4   boat.  It doesn't matter.  What matters is what interest

5   does this debtor have in this estate and what happened

6   outside of this court before he came here.

7          And what also matters is PAX has now filed a

8   motion to dismiss this case.

9          And so all of these different things that you're

10  all talking about really probably don't matter until we

11  address the motion to dismiss, which as you know, under the

12  2005 amendments to the bankruptcy code, the Court has to do,

13  it's required to.

14         It isn't -- there's no discretion.  Congress

15  decided that the Court shall conduct the hearing within 30

16  days of the filing of the motion, and then rule within 15

17  days after that.  Well, guess what?  That's going to be

18  before June 10th.  That's going to be before June 10th.

19         And so, you know, I understand you're just

20  representing -- and you're vigorously and accurately

21  representing the client -- but first of all, it's aren't --

22  the person isn't here.

23         You filed a document that said all these things

24  where there's nothing in the record to establish it other

25  than I'm supposed to -- and this isn't directed to you,

41

1    Attorney Kindseth, I say this to all lawyers by the way --

2    that I'm supposed to just take the representation as true,

3    which I'm not going to do, and --

4         And I also have another motion now that I have to

5    address, that has to be addressed.

6         And I hear the arguments about mooting everything,

7    but, but, there will be no loan if there's -- relief from

8    the stay is granted or a trustee is appointed.

9         Now, we're talking about trying to get the parties

10   together.  The problem you all have is you -- before 2005,

11   you might have been in a better position in this court, but

12   Congress changed the rules.  I didn't change the rules.  The

13   Court didn't change the rules.  Congress changed the rules.

14   And Congress said this has to happen this way because --

15   because -- we put this in the bankruptcy code because we're

16   concerned about an abuse of the bankruptcy system.  And,

17   therefore, the Court has to address that issue first before

18   it deals with all of these other issues.

19        And so the problem is -- and, Mr. Baldiga's saying

20   -- I believe what Mr. Baldiga is saying, that they're trying

21   to do it, but I don't think people understand your window's

22   this big.  It's not this big.  And the problem that you have

23   is you have a situation where the credibility of what

24   occurred before this court is the problem.

25        You're never going to get together if you don't

42

1    get together now.  And your time frame to do it is very,

2    very, very limited.

3            And Attorney Friedman's objecting to what you're

4    saying because there's no evidence.  Unfortunately, I agree

5    with him.  At this point, I agree with him, right?

6            You've made -- you've given information, and

7    that's fine.  But I don't -- there's nothing in the record.

8    I haven't made any factual finding and I'm not going to make

9    any factual finding unless there's a witness sitting in the

10   box that swears under penalty of perjury that that's the

11   truth.  And that's the problem we have.

12           I know you've come into the situation late, so

13   you're already at a disadvantage, you're already at a

14   disadvantage and I understand that.

15           MR. KINDSETH:  Your Honor, I completely appreciate

16   your points, especially with respect to the motion to

17   dismiss.

18           Breaking down each of the elements that are

19   presented to all of us right now, I think the motion for

20   relief is a more isolated component.  The motion for relief

21   seeks to compel the return of the Lady May.

22           PAX can go to New York State Court and obtain such

23   an order, but it will take time to schedule the hearing.

24   The power of the New York State Court to compel Mr. Kwok is

25   limited.  It's limited to incarceration or fines.

43

1          But PAX is claiming that they're not seeking that

2    position of any fines, and appears as though such imposition

3    of fines would be prejudicial to the creditors in this case

4    and antithetical to this bankruptcy proceeding.

5          So really what PAX wants is to incarcerate Mr.

6    Kwok, which is not a legitimate purpose of the motion for

7    relief.

8          At its essence, the motion for relief seeks to

9    have the Lady May returned.  My client is undisputably the

10   registered owner.  It's in the papers.  This isn't -- this

11   has been acknowledged repeatedly, undisputedly, my client is

12   the registered owner of the yacht and has the contract with

13   the yacht management company.

14         And we're saying to Your Honor let's not have the

15   threat of incarceration over Mr. Kwok dictate these

16   proceedings.  It's not a legitimate bankruptcy purpose.

17         Everybody's concerned about the Lady May.  Let's

18   have an order such that the Lady May comes back to

19   Connecticut.

20         Your Honor, I reached out to the committee, PAX,

21   and the United States Trustee's Office and said we will do

22   whatever you need to do in terms of documentary evidence,

23   speak with the yacht management company directly, we'll do

24   videos of the yacht and provide further documentation, and

25   make sure that the -- you're comfortable with the factual

44

1    situation.  No one engaged.  We provided a (indiscernible)

2    order.

3              THE COURT:  You know what?  I hear what you're

4    saying, and I'm sure you did, okay, but you -- no one --

5    none of us are -- have our blinders on.  Nobody gets along

6    here.  This has been going on for what -- how many years?

7    Okay.

8              MR. KINDSETH:  Right.

9              THE COURT:  And so to come in and say we want to

10   get this done, we want to make this work, you only have this

11   much of a window.  And if you don't -- if you don't make it

12   work now, it's not going to work.  It's probably not going

13   to work.

14             MR. KINDSETH:  I would also inform the --

15             THE COURT:  And the relief from stay, there's

16   nothing in the motion for relief from stay.  And everybody

17   keeps saying this, but I don't agree with it, that says that

18   PAX is going back to state court so they can put Mr. Kwok in

19   jail.  That's not what it says and no one's said that.

20             In fact, counsel stood up and said that he's not

21   going to -- he's not asking for that.  And all of the other

22   parties who have filed joinders, right, have said the same

23   thing.  They want the boat back.

24             Well, why all of a sudden, when you want the boat

25   back, now you're coming in, you're saying you're the

45

1   registered owner, then why didn't you do that when you were

2   in the New York State Court?

3         Why does it take the bankruptcy court to do this?

4         Why didn't you come to the New York State Court

5   and say we're the registered owner, we'll bring the boat

6   back.  You know, who cares if Mr. Kwok has a beneficial

7   interest in it?  It doesn't really matter.  We will do this.

8         And every single step of the way there's pushback

9   to try to diffuse the real issue, which is that boat should

10   have already been in the control of the New York State

11   Court.  And that's Justice Ostrager who wrote that opinion.

12         When that fine was imposed, this debtor

13   voluntarily decided to come to this court, and now says to

14   this court, hey, we're going to work everything out.  But

15   don't do anything with regard to their motion for relief

16   from stay, because if you do, we're not even going to lend.

17   Well, if that's the case, we might as well just all walk out

18   the door right now because there's no point.  There's no

19   point.

20         And so the debtor either has to come to the

21   reality that he has to work a deal with these people or not,

22   because this court -- and I know Mr. Baldiga said, you know,

23   what you decide -- I don't -- I decide what the law says,

24   right, it's what the bankruptcy code says.

25         And the code says that I have to address the

46

1    motion to dismiss now that was filed on April 6th.  So we

2    have to have a hearing.  I have to decide that motion.  And

3    if this case is dismissed, then all of this other stuff

4    doesn't matter.

5         And so it's very unclear -- and, again, you've

6    come into the game -- you've come to here late.  It's not --

7    you take things as you find them.  You're doing the best

8    that you can for your client under the circumstances.

9         But it seems a little hollow to come in now and

10   say we're the registered agent.  We'll get the boat back.

11   But, by the way, hopefully it will be around June 10th.

12        That's not going to work.  It's just not going to

13   work.  It is not sustainable as a matter of law in this

14   court under the bankruptcy code because of the pending

15   motion for relief from stay -- which I also have to decide

16   or there is no stay -- and that expires on May 2nd -- and

17   then the motion to dismiss, which I also have to decide,

18   which, by the way, will be by the middle of May.

19        So getting the boat back by June 10th really

20   doesn't matter because we don't even know if it's going to

21   be back by June 10th.

22        MR. KINDSETH:  I understand, Your Honor.  I guess

23   my response is that it's not the arrival of the boat, it's

24   the entry of the order.  Because the New York State Court

25   could enter an order, and Your Honor can enter an order --

47

1          THE COURT:  I don't agree with you.  Because until

2     the boat's back, it doesn't matter what the order says.  We

3     already -- Mr. Kwok has already done that 17 times in the

4     New York court.

5          MR. KINDSETH:  We could also --

6          THE COURT:  The orders all entered, and they were

7     completely disregarded.  So, you know, you can make that

8     argument, but unfortunately I don't find it persuasive.

9          MR. KINDSETH:  Your Honor could also order us with

10     respect to the current status of the boat, orders that it be

11     kept in place.

12          THE COURT:  To do what?  What difference does it

13     make?

14          MR. KINDSETH:  Because --

15          THE COURT:  If the boat isn't going to be back

16     here until June 10th at the earliest, it doesn't make any

17     difference, and all of us spent a lot of time doing

18     something that makes no difference at the end of the day.

19          MR. KINDSETH:  Because then there's no reason for

20     the motion for relief from the automatic stay to be granted.

21          THE COURT:  Yes, there is.  Of course there is.

22          MR. KINDSETH:  But if the purpose of the motion

23     for relief from the automatic stay to be granted, it's to

24     have the New York State Court order the return of the boat.

25     If we circumvent all of that --

48

1          THE COURT:  I think the New York State Court has

2    already ordered that.

3          MR. KINDSETH:  No.  But a new order would need to

4    enter.  It's not --

5          THE COURT:  Yeah.  So what?

6          MR. KINDSETH:  But it's an order.  So if this

7    court --

8          THE COURT:  So he can just disregard that again?

9          MR. KINDSETH:  But it's my client's boat.  It's

10   not his boat.

11         THE COURT:  It doesn't matter.  Wait a minute, Mr.

12   Kindseth.  If that's true, then we shouldn't all be here,

13   because Mr. Baldiga's talking about the boat, giving the

14   boat to the creditors.

15         MR. KINDSETH:  And we're -- my client's in --

16         THE COURT:  So then it's property of this estate.

17   Whether it's only an equitable interest, it's still property

18   of this estate under the bankruptcy code, correct?

19         MR. KINDSETH:  We dispute that it's property of

20   the estate.  We've brought it --

21         THE COURT:  Well, if you dispute that it's

22   property of the estate, then I don't know what we're doing

23   here.

24         MR. KINDSETH:  But, Your Honor, what's happening

25   is that the debtor, with my client's consent and support,

Fiore Reporting and Transcription Service, Inc.

1     has proposed a plan where my client contributes the boat to

2     fund a plan.

3              THE COURT:  And what -- and how is that going to

4     be enforced?

5              MR. KINDSETH:  We're going to effectuate the

6     transfer to the estate to fund a plan.

7              THE COURT:  When is that going to happen?

8              MR. KINDSETH:  Through the confirmation process.

9              THE COURT:  Yeah.  And that's not going to be for

10    a few more months, and the automatic stay will have already

11    expired and the motion to dismiss will have already been

12    ruled on.

13             MR. KINDSETH:  I understand.

14             THE COURT:  Or an appointment of a trustee or an

15    examiner, whatever the situation may be.

16             MR. KINDSETH:  Well, we're asking you --

17             THE COURT:  So, all those things, what are you

18    going to do?  Your client's then going to work with a

19    trustee or an examiner?  Or then the case gets dismissed,

20    what are you going to do?  You're not going to contribute

21    the boat back in New York.

22             MR. KINDSETH:  No.  Our belief is that the

23    appropriate -- and obviously Your Honor will decide -- but

24    we think the motion for relief should be denied.

25             THE COURT:  Why?

50

1          MR. KINDSETH:  We've already made arrangements to

2     have this --

3               THE COURT:  On what basis?  On what basis?

4               MR. KINDSETH:  Because --

5               THE COURT:  Tell me the basis.

6               MR. KINDSETH:  Because if Your Honor orders the

7     return of the boat, there's no need for relief from the

8     automatic stay to be altered.

9               THE COURT:  Orders the return of the boat from

10    whom?

11              MR. KINDSETH:  From my client.

12              THE COURT:  And how -- how do I have jurisdiction

13    over your client?  Because you filed a notice of appearance?

14              MR. KINDSETH:  No.  We're consenting.  We proposed

15    an order --

16              THE COURT:  So what?  So what if you consent?

17              MR. KINDSETH:  We're consenting --

18              THE COURT:  How do I have jurisdiction?  How do I

19    enforce that order?  Tell me how I enforce that order.

20    Let's say I do exactly what you just said.

21              MR. KINDSETH:  Yeah.

22              THE COURT:  I enter an order and I compel your

23    client to bring the boat to Bridgeport --

24              MR. KINDSETH:  Yes.

25              THE COURT:  -- what if they don't do it?

51

1          MR. KINDSETH:  Well, my client has agents and

2     representatives.  The sole member is Mei Guo.  And the yacht

3     company would be subject to the order as an agent of my

4     client --

5               THE COURT:  To do what?

6               MR. KINDSETH:  To return the boat.

7               THE COURT:  Why don't you just do this.  If you

8     really want to do this, why don't you just post a bond?  Why

9     don't you just post a bond for $134 million?

10              MR. KINDSETH:  I don't know if my client has the

11    funds available to post the bond.

12              THE COURT:  Why don't you have funds available to

13    post the bond?  Or then sell the boat and post the bond?

14    Why don't you get cold hard cash --

15              MR. KINDSETH:  My client --

16              THE COURT:  -- into this estate?

17              MR. KINDSETH:  My client's sole asset is the boat,

18    Your Honor.

19              And, Your Honor, the boat's available in terms of

20    like there's a transponder -- thank you --

21              THE COURT:  Trans.  Yeah.

22              MR. KINDSETH:  -- on the -- you can spot the boat

23    at any time.

24              THE COURT:  It doesn't matter.  It doesn't matter.

25    You can spot the boat at any time.  And somebody, like in

52

1    another case we had in this court, could have the boat go up

2    in flames, okay, before it gets to New York.

3            So they have a right as a creditor to execute on

4    their judgment.  That's what they were attempting to do.

5    The boat was one of the assets to execute on it.

6            Unless and until they have the possessory interest

7    to execute on it, they don't -- they don't have any right in

8    that boat other than an order that the debtor has numerous

9    times ignored.

10           So why would an order of this court make any

11   difference?  It's not going to make any difference.

12           MR. KINDSETH:  Because it's not -- it's not

13   directed to the debtor.

14           THE COURT:  It doesn't --

15           MR. KINDSETH:  It's directed to the owner of the

16   boat, Your Honor.

17           THE COURT:  And who -- and who are you?  Who's

18   your client?  The debtor's son?

19           MR. KINDSETH:  It's HK -- the sole owner of my

20   client is the debtor's daughter, yes.

21           THE COURT:  The debtor's daughter.  Okay.  And

22   where is she?

23           MR. KINDSETH:  I believe in New York City.

24           THE COURT:  Okay.

25           MR. KINDSETH:  Or Greenwich.

53

1          THE COURT:  Okay.  So, again, what's the basis for

2     denying the motion for relief from stay?  They've sought

3     relief from stay under 362(d)(1) for cause.  And maybe

4     sought it under (d)(2) as well.  I don't recall, but I can

5     look.

6          So what's the -- what cause haven't they shown?

7          MR. KINDSETH:  The sole remedy they're seeking is

8     to compel the Lady May to be brought to the United States.

9     And my client is willing to have such a remedy imposed upon

10    it with its consent, subject to this court's jurisdiction,

11    now.

12         THE COURT:  But the boat won't show up until the

13    earliest is June 10th.

14         MR. KINDSETH:  And we are willing and --

15         THE COURT:  And what happens if the boat blows up

16    on the way back from Europe?

17         MR. KINDSETH:  I can find out if there's

18    insurance.

19         Your Honor, what I'm suggesting is that Your Honor

20    continue the motion for relief for two weeks while we answer

21    all of these questions to the satisfaction of the various

22    parties.  Insurance.  Transport.  Shipyard.  Transponder.

23    All that's -- that can be learned.

24         If Your Honor directs the parties to work this

25    isolated issue out, we will.

54

1          THE COURT:  It's not an isolated issue, Mr.

2     Kindseth.

3          MR. KINDSETH:  It's just the --

4          THE COURT:  It's the whole case.

5          MR. KINDSETH:  No.  But it's the Lady May.  The

6     whole case is --

7          THE COURT:  The Lady May -- the whole reason this

8     was filed, this case was filed, was because of the Lady May.

9          MR. KINDSETH:  Right.  And we're asking Your Honor

10    to direct us to work out the details to get the boat here.

11    And that's really what the bankruptcy process is all about.

12         THE COURT:  Where?  Where in the code?  Tell me

13    where that relief is.

14         MR. KINDSETH:  It's when you have divergent

15    interests that have been at war for a long, long time,

16    frequently it takes the bankruptcy reorganization process to

17    force them to work together to reach an --

18         THE COURT:  What are we reorganizing here?

19         MR. KINDSETH:  Well, we're reorganizing a lot of

20    litigation, a lot of claims, and assets that are in dispute.

21    It's --

22         THE COURT:  What asset is in dispute?

23         MR. KINDSETH:  The ownership of the Lady May is in

24    dispute.

25         THE COURT:  Who's disputing that?  Nobody's

55

1    disputing that.  They don't -- PAX doesn't say that the

2    debtor owns it.

3             MR. KINDSETH:  Yes, it is.

4             THE COURT:  No.  They say that Justice Ostrager

5    found that they have -- he has at the very least a

6    beneficial interest in that boat.  That's what they're

7    arguing.

8             And if you're saying there's a dispute over the

9    ownership of the assets of this estate, then, again, that's

10   state court.  Your property rights are determined by state

11   court, not by bankruptcy law.

12            MR. KINDSETH:  But whether the asset's property of

13   the estate is an issue for this bankruptcy court

14   exclusively.

15            THE COURT:  No, it's -- no.  Because if you

16   dispute -- no, it's not.  Because if you -- I'm not going to

17   make a finding of who owns the boat.  Why am I going to do

18   that?

19            I know some adversary proceeding was filed.  I'm

20   not going to make a finding over who owns the boat.  Justice

21   Ostrager already did that.  If you don't like that, then you

22   go fight that back in New York court.

23            This is -- you know, this is -- the bankruptcy

24   court, the code says -- as you know, I'm not telling you

25   anything you don't know -- all legal and equitable interests

56

1    in whatever property, wherever located, right?

2            So if you're coming here and you're now saying

3    that you don't -- that your client asserts that the boat is

4    not property of the estate, then I think we can adjourn this

5    hearing.

6            MR. KINDSETH:  Regardless, Your Honor, we're

7    willing to contribute the boat to fund the plan of

8    reorganization.

9            THE COURT:  You can't it both ways, Mr. Kindseth.

10   Your client can't have it both ways.  Sorry.

11           MR. KINDSETH:  So putting aside that issue, Your

12   Honor, again, the parties are capable of working out an

13   order to bring the boat to here.

14           THE COURT:  What parties?

15           MR. KINDSETH:  All the parties.  The committee,

16   the United States Trustee --

17           THE COURT:  The PAX isn't going to agree with you.

18   And I don't even know if the committee would agree with you.

19           I understand what you're trying to do -- and I'm

20   not suggesting that it's not worth your try -- so let me

21   just explain that.  Okay?

22           But you're asking the Court to do something that

23   doesn't -- isn't going to work.  This court entering an

24   order requiring your client -- who, you know -- and I have

25   no reason to doubt you, but -- that you say is the

57

1    registered owner of the boat to bring it to here, okay,

2    again, what happens if they don't?

3                MR. KINDSETH:  But that's --

4                THE COURT:  So we go down -- we kick the can down

5    the road for another two months and then I find out the

6    boat's not coming back.

7                MR. KINDSETH:  Your Honor, it's no different than

8    the result.

9                THE COURT:  Yes, it is.  Because you're not the

10   debtor, it is different.  Sorry, but it is.  You're not the

11   debtor.

12               MR. KINDSETH:  We're not even --

13               THE COURT:  And what happens in this situation is

14   your client could have done exactly what they are proposing

15   to do right now back in the New York State Court.  Why

16   didn't they do it?

17               MR. KINDSETH:  We weren't a party to that

18   proceeding and --

19               THE COURT:  Well, you're not a party to this

20   proceeding either.  You have -- you joined in.

21               MR. KINDSETH:  You're right.

22               THE COURT:  Nobody asked you to come.

23               MR. KINDSETH:  You're right.  We are welcoming the

24   opportunity to see the reorganization of Mr. Kwok and --

25               THE COURT:  By the way, you've only indicated

58

1    yourself as an interested party.  You're not a creditor.

2    You're not -- you just joined in.  And that's fine.  But

3    you're asking the Court to do something that makes no sense

4    at this point.

5         If people are in agreement, different story.  But

6    guess what?  Everybody on that side of the courtroom is not

7    in agreement with you.  They're not.

8         And I understand you're trying, but it doesn't

9    seem that people understand the urgency of what's going on

10   here, which is this court has no choice but to rule on these

11   motions.

12        I'm not going to continue this for another two

13   weeks.  It's already been -- the motion was filed on March

14   1st.  It's April 13th.  To do what?  To come back in two

15   weeks and hear you all say, no, we don't have an agreement.

16        And then what am I going to do?  It's still -- you

17   still can't answer the question.  And I'm not -- it's not --

18   that's not your fault.  I sound like I'm -- I'm not trying

19   to attack you.

20        What I'm trying to say is what happens when the

21   boat doesn't come back?

22        MR. KINDSETH:  You hold people in contempt.  The

23   same --

24        THE COURT:  Who am I going to hold in contempt?

25        MR. KINDSETH:  Well --

1          THE COURT:  Who am I going to hold in contempt?

2     I'm going to hold the corporation in contempt?

3          MR. KINDSETH:  The individuals --

4          THE COURT:  What am I going to do with that?

5          MR. KINDSETH:  The individuals responsible for --

6          THE COURT:  I'm going to put the corporation in

7     jail?  I'm going to pierce the corporate veil and put the

8     debtor's daughter in jail?

9          MR. KINDSETH:  Your Honor, New York doesn't have

10    any better solution.  And what we're offering --

11         THE COURT:  I think they do.  They made all the

12    findings.

13         MR. KINDSETH:  We're --

14         THE COURT:  They've made all the findings that

15    they need to make.

16         MR. KINDSETH:  But we're consenting to the order.

17    We're submitting ourselves to it.

18         THE COURT:  What order?  Nobody else is -- you're

19    consenting to an order that you created.  I mean, that

20    doesn't really help.  It doesn't help.  I understand your

21    attempt, but it doesn't help.  It doesn't solve the problem

22    at the end of the day.  It doesn't solve the problem.

23         All it does is further delay the issue that's been

24    delayed for apparently four or five years now and with

25    complete disregard to prior court orders.

60

1          I'm not saying your client would disregard it, but

2     it might.  I don't have jurisdiction over you, your client.

3          MR. KINDSETH:  You do if we subject ourselves --

4          THE COURT:  No.  No.  Just because you subject

5     yourself to the jurisdiction of the Court, doesn't mean that

6     the Court has jurisdiction over you.  You didn't file this

7     case.

8          MR. KINDSETH:  Well, the debtor also is claiming a

9     beneficial interest in the yacht and so that is a basis for

10    it to be before this court.

11         THE COURT:  I understand that.  I'm talking about

12    you and your client.  I'm talking about your client.  I'm

13    not talking the boat.

14         MR. KINDSETH:  Well, we have a competing interest

15    in the boat and so the Court has jurisdiction --

16         THE COURT:  Oh, no, you don't.  You just said you

17    were going to give it to the estate --

18         MR. KINDSETH:  Yeah.  But we --

19         THE COURT:  -- so what's your competing interest?

20         MR. KINDSETH:  We haven't given it yet.

21         THE COURT:  Well, that, isn't that the point, you

22    haven't given it yet?

23         MR. KINDSETH:  Right.  It's through the --

24         THE COURT:  So that's going to be three or four

25    months down the road, and you're going to hope this case

61

1    continues for that period of time, and then you're going to

2    have a million dollars in this estate that maybe goes to pay

3    creditors, one of whom has a claim of over $134 million.

4           And then what else?  What's the value of the boat?

5    It has to be repaired.

6           MR. KINDSETH:  At our cost.

7           THE COURT:  And did I -- did I read -- I don't

8    know what I read honestly.  How big is this boat?

9           MR. KINDSETH:  I believe 43 meters.  And we're in

10   current -- 185 feet.  We're incurring the $280,000 of

11   service and repairs, and we're also incurring --

12          THE COURT:  Well, you have to if you are the owner

13   of the boat, that's --

14          MR. KINDSETH:  And we're going to incur the --

15          THE COURT:  You're not doing anything magnanimous.

16          MR. KINDSETH:  And the four hundred and --

17          THE COURT:  I mean, that's what you have to do.

18          MR. KINDSETH:  And the $435,000 necessary to

19   transport by freighter the --

20          THE COURT:  That's your decision.  I'm not --

21          MR. KINDSETH:  Right.

22          THE COURT:  I'm not making you do that.

23          MR. KINDSETH:  Right.

24          THE COURT:  This court's not making you do that.

25   That's your decision.

62

1          MR. KINDSETH:  And we're also going to pay for the

2     docking at the steel point which we've already made

3     provisions for.  I mean, so --

4          THE COURT:  They have deep water dockage there,

5     yes, they do.

6          MR. KINDSETH:  They do, as we know.  And so,

7     again, we're trying to facilitate a solution, Your Honor.

8          THE COURT:  I understand.  And, again, I'm sorry

9     that it sounds like I'm going at you.  I know you're trying

10     to facilitate a solution.  I hear you.

11          MR. KINDSETH:  And candidly --

12          THE COURT:  But my problem is this is your window

13     to facilitate that solution.

14          MR. KINDSETH:  And we can have an order entered

15     promptly.

16          THE COURT:  An order is not the solution I'm

17     afraid -- I don't agree with that.  I agree with your

18     attempt to come to a solution, but the order doesn't do

19     anything.

20          MR. BALDIGA:  Your Honor.

21          THE COURT:  Yeah.

22          MR. BALDIGA:  The solution you did posit was the

23     possibility of a bond, and could we have 15 minutes to

24     explore that with our client?

25          THE COURT:  Well, I'm going to hear from Mr.

63

1    Friedman first, but possibly.

2            MR. BALDIGA:  Okay.  But I --

3            THE COURT:  But we're going to take a break at

4    some point --

5            MR. BALDIGA:  Okay.

6            THE COURT:  -- so there's not question --

7            MR. BALDIGA:  I just wanted to be sure we had the

8    chance to.

9            THE COURT:  Yeah.  I'm not going to adjourn the

10   hearing.  We've got a lot to talk about obviously.

11           MR. FRIEDMAN:  Your Honor.

12           THE COURT:  Go ahead, Mr. Friedman.

13           MR. BALDIGA:  Okay.  Thank you.

14           MR. FRIEDMAN:  I want to make many points.  One is

15   we heard for the first time from I guess debtor's ancillary

16   counsel, or whatever role Mr. Kindseth is playing, that the

17   debtor is claiming a beneficial interest in the boat.

18   That's the first time anybody's ever said that.

19           The debtor has assiduously rejected that it owns

20   the boat, which is part of the problem here, said it in his

21   schedules.  So I don't know whether the issue is a lack of

22   reading the schedules or there's a new position from the

23   debtor.

24           The problem with contempt is exactly what you

25   heard from counsel's mouth, which is HK doesn't have any

64

1    other assets.  So what good is a contempt motion?  The

2    boat's not here.  It was supposed to be here.

3         Your Honor, I want to point out that, although

4    there's no evidence, we are supposed to rely on Mei Guo,

5    who's the daughter who's the owner of HKI.

6         I would remind the Court that there is the opinion

7    from Justice Ostrager that says the find -- the Court finds

8    that Ms. Guo's testimony was not only internally

9    inconsistent and dissimulating, so we're being asked to rely

10   on somebody who's a liar in Justice Ostrager's finding.  She

11   testified at that hearing.

12        HKI was present at that hearing when Justice

13   Ostrager found that the boat -- that the debtor had a

14   beneficial interest in ownership of the property.

15        There are a couple of other issues I want to

16   address for the Court.  The first is the filing that the

17   debtor put in place with respect -- after the last hearing.

18   They asked for and the Court gave permission for the debtor

19   to be heard on a variety of legal issues.

20        THE COURT:  Just on the paragraphs about

21   collateral estoppel and res judicata, yes.

22        MR. FRIEDMAN:  Yes.  Yes.

23        THE COURT:  Go ahead.

24        MR. FRIEDMAN:  I wanted to address those.

25        THE COURT:  Sure.

65

1          MR. FRIEDMAN:  And on Rooker-Feldman.

2          The debtor's first (indiscernible), which I will

3     spell this for the Court, it comes from a case called

4     *VanderKodde vs. Elliott*, that's V-A-N-D-E-R-K-O-D-D-E *vs.*

5     *Elliott,* which they stand -- it's a Sixth Circuit case, 951

6     F.3d. 397.

7          They say remarkably that that case stands for the

8     prospect -- the prospect or the proposition that ancillary

9     proceedings aren't covered by Rooker-Feldman.

10          THE COURT:  Let me stop you for a second.  You're

11     on ECF 141?

12          MR. FRIEDMAN:  Yes.  I think that's their --

13     that's their (indiscernible).

14          THE COURT:  And what page are you on?

15          MR. FRIEDMAN:  I am --

16          THE COURT:  By the way, Counsel, if you want, you

17     can come to the lectern and pull it right up from the

18     docket.  Why don't you pull up ECF 141.  You have to use the

19     mouse unfortunately.  And if you need help, I can help you.

20          MR. FRIEDMAN:  Thank you, Your Honor.  They cite

21     *VanderKodde*.  Is it 141?

22          THE COURT:  Yes.  Before you pull up 141, look at

23     the bottom right-hand corner of that tablet that's in front

24     of you.  See the undo, where it says undo on the --

25          MR. FRIEDMAN:  Yes.  Oh, wait.

66

1          THE COURT:  Hit that a couple of times and the

2     purple will go away.

3          MR. FRIEDMAN:  Sorry, Your Honor.  I am

4     technologically --

5          THE COURT:  On the tablet itself.

6          MR. FRIEDMAN:  On the tablet.

7          THE COURT:  At the bottom, right-hand corner, it

8     says undo, doesn't it?

9          MR. FRIEDMAN:  It says inactivity timer --

10         THE COURT:  Maybe it's the left-hand corner.

11         MR. FRIEDMAN:  Kiosk.

12         THE COURT:  Isn't there an undo thing on that --

13         THE CLERK:  It's paragraph 4.

14         THE COURT:  You got --

15         MR. KINDSETH:  It's paragraph 4, Your Honor.  My

16    colleague advises me.  They cite *VanderKodde.*

17         THE COURT:  Okay.  Take your finger, your thumb,

18    to the bottom, right-hand corner of that -- of that --

19         I'm looking at the courtroom deputy.  Isn't that

20    where the undo button is on that?

21         THE CLERK:  It should be to the right in the

22    border, within the border, not on the actual --

23         THE COURT:  There's a word that says undo on the

24    thing.

25         MR. KINDSETH:  Unfortunately not on our screen.

67

1      THE CLERK:  Maybe their's is a little different.

2      THE COURT:  Can you take a look, please.

3      THE CLERK:  Yeah.

4      THE COURT:  Because I just don't want the purple

5  thing to be there.

6      (Pause.)

7      MR. FRIEDMAN:  Oh, gosh.  I'm sorry.

8      THE COURT:  Okay.  There you go.

9      THE CLERK:  It's okay.

10     THE COURT:  That's fine.

11     MR. FRIEDMAN:  If I showed you a picture, you'd

12  realize how dumb I am, Your Honor.  Apologies.

13     THE COURT:  That's okay.  So just hold on a second

14  for the courtroom deputy to get back to her seat.

15     MR. FRIEDMAN:  Sorry.  I was looking on the --

16     THE COURT:  All right.  So now you're going to

17  paragraph 4?

18     MR. FRIEDMAN:  Yeah.  They cite this -- in

19  footnote 7, they cite the *VanderKodde* case.

20     And they cite it for the idea that it doesn't

21  apply to ancillary proceedings.  You kind of have to read

22  the case, which is always a good idea, to understand what

23  *VanderKodde* said.

24     What *VanderKodde* actually said was that a writ of

25  garnishment wasn't subject to Rooker-Feldman because a write

68

1  of garnishment is the result of an ministerial process in

2  which the clerk of the court has a non-discretionary

3  obligation to issue the writ if the request does not appear

4  -- if the request appears to be correct.  Rooker-Feldman

5  does not apply to ministerial actions by court clerks.

6          I think Justice Ostrager would be surprised to be

7  referred to as a court clerk.

8          I think the other key issue in that case is that

9  -- I want to find it -- exactly where the Court -- ah,

10  Rooker-Feldman applies only when a state court renders a

11  judgment when the Court investigates, declares, and enforces

12  liabilities based on the applications and brought effect

13  which is clearly what Justice Ostrager did.  He made legal

14  conclusions based on 5229 New York CPLR and heard witness

15  testimony from seven different witnesses and issued his

16  February 9th opinion.

17          So *VanderKodde* is not a cite that provides the

18  debtors any help.

19          They also cite the proposition the Rooker-Feldman

20  doctrine cannot apply because New York State Court findings

21  are not final, rather, they are pending appeal.

22          THE COURT:  Where do you see that?  Tell me where

23  that is, Counsel.

24          MR. FRIEDMAN:  On page 2, that's romanette iv.

25          THE COURT:  Okay.  Go ahead.

1          MR. FRIEDMAN:  Not true.

2          THE COURT:  I'm with you.

3          MR. FRIEDMAN:  The committee I think makes --

4     cites a variety of cases for this to make the point very

5     clear in its pleadings.

6          To that, I would add only the additional, the

7     additional cases, *Caldwell vs. Gutman*, 701 F. Supp. 2d 340,

8     and *Butcher vs. Wendt*, 975 F. 3d. 236, Second Circuit.  This

9     court has strongly suggested that Rooker-Feldman applies

10    even when there is a pending appeal, state appeal, of the

11    challenged (indiscernible).

12         THE COURT:  Which you cited in your brief.

13    Haven't you cited both of those cases in your brief?

14         MR. FRIEDMAN:  We did in the first instance, and I

15    don't think they're rebutted or really rebuttable.

16         THE COURT:  Okay.  All right.  Well, that -- I

17    want to make sure that I'm following you on the case law.

18         MR. FRIEDMAN:  Yeah.

19         THE COURT:  Okay.

20         MR. FRIEDMAN:  They also raise an issue of

21    maritime jurisdiction.  This is not the case.  They say, oh,

22    you can't send it back to state court, or really you can't

23    lift the stay to let Justice Ostrager proceed further for a

24    couple of reasons.

25         The first, again, committee counsel rebuts highly

70

1    effectively, you can't use this proceeding to challenge a

2    state court's jurisdiction over a matter.  So even if they

3    were right, which they aren't, that issue would have to be

4    addressed in state court.

5         But under 28 USC 1333, admiralty's jurisdiction is

6    exclusive only as to actions begun and carried out as In Rem

7    proceedings when a vessel itself is treated as the offender

8    and made the defendant by name or description.  That's

9    *Madruga*, M-A-D-R-U-G-A, *vs. Superior Court of California*,

10   346 U.S. 556.

11        You could also look at *Atamanchuck vs.*

12   *Atamanchuck*, that's A-T-A-M-A-N-C-H-U-C-K, 61 F. 2d. --

13   excuse me -- 61 F. Supp. 459, suit In Rem for possession of

14   a vehicle -- a vessel allegedly taken under forged bill of

15   sale.

16        As the Fifth Circuit noted in *St. Paul Fire*, 666

17   F. 2d. 932, the question of ownership of a vessel is

18   ordinarily governed by state law.

19        So I think, Your Honor, from a legal perspective

20   there's nothing new added.

21        Your Honor asked many questions.  Counsel, you

22   know, was sort of impassioned that the boat will be back.

23        Our issue is the boat isn't back, right?  It

24   wasn't back and it hasn't been back.  And it's now -- you

25   know, who knows the exact reason why, but there's such a

71

1    long history of, you know, pardon my bluntness, the debtor

2    and courts being jerked around with respect to the boat and

3    its movements.

4           In Friedman declaration 4, which is when Justice

5    Ostrager origined his decision and order on motion -- before

6    the Court is the motion for contempt -- the Court noted on

7    October 15th there had been an express order of restraint.

8           At that hearing, the order goes on to say, counsel

9    for Kwok specifically asked the Court whether Kwok could

10   move the yacht from the jurisdiction for licensing purposes.

11          By the way, counsel for Kwok asked whether Kwok

12   could move the boat, which actually was an acknowledgment at

13   the time that he did own and control the boat, which he's

14   now denied.

15          The Court denied this request at the time and

16   directed counsel to make a motion if necessary.

17          Plaintiff brings this motion because despite these

18   orders the Lady May has been moved outside of the United

19   States.

20          The Court has reviewed the extensive submissions

21   of the parties in connection with PAX's motion to hold Kwok

22   in contempt.

23          Passing the issue of whether any of Mr. Kwok's

24   attorneys have violated the code of professional conduct, it

25   is clear there has been an intolerable amount of

72

1    gamesmanship, dissembling and deceit in proceedings before

2    this court relating to the whereabouts and ownership of the

3    yacht Lady May.  So this is two years ago almost.

4         The defendant claims that the yacht was removed

5    from the jurisdiction of this court for ordinary course,

6    winter maintenance, not withstanding restraints imposed on

7    the movement of the yacht by the Court.

8         We have a history here.  In connection with that

9    proceeding, Fred Kieslop (ph) -- and I can hand this up as

10   an exhibit -- it's certainly admissible evidence against

11   Kwok because it was a declaration submitted by Mr. Kwok in

12   opposition to plaintiff's -- to PAX's motion that Justice

13   Ostrager was citing -- it was confirmed that in the --

14   paragraph 28 -- and we'll provide copies to everybody --

15   this was -- you know, it's called the Lady May in the

16   immediate term.

17        Paragraph 27.  At this point -- this is in January

18   19th, 2021 -- I reasonably expect that the Lady May's

19   inspections, maintenance and repairs as described above will

20   be completed by the end of February or later.

21        Paragraph 28.  Once those court tasks are

22   completed, the Lady May can proceed to Florida assuming crew

23   member visa status permits.  In the ordinary course, the

24   Lady May would return to New York sometime in May 2021.

25        So there was an ordinary course, and Kwok and his

1    daughter and HKA didn't follow it even at a time when they

2    had been restrained from bringing the boat back.

3         There's also a letter from HKI on February 8th to

4    Justice Ostrager promising that the -- saying at that time

5    the boat was grounded and undergoing necessary repairs.

6    Again, we will provide a copy of that.  And it says

7    presently the boat is grounded and undergoing necessary

8    repairs to its stabilizers.

9         So apparently in February of 2022 it had already

10   been undergoing repairs.  Ms. Gwok (ph) anticipates the boat

11   returning to New York as soon as the repairs and weather

12   allow.  Again, Your Honor, there's just such a long history

13   of broken promises.

14        And the thing I find most puzzling is the idea

15   that if the boat -- if the stay is lifted, the boat won't

16   come back.

17        If the concern is that Mr. Kwok is going to go to

18   prison if the boat isn't returned by him or the registered

19   owner of the boat, in what world, if the stay is lifted or

20   modified or doesn't apply, isn't the boat going to come back

21   as soon as possible?

22        I submit that's a greater reason to bring the boat

23   back in the possibility that in four months this court will

24   have to commence contempt proceedings against Mei Guo/the

25   HKI.

74

1          I think, again, lifting the stay, which we are

2    legally justified in complete between last week and what I

3    just pointed out, to me is the only way to have an

4    opportunity to get the boat back.

5          Your Honor, I do want to make one other point with

6    respect to the colloquy between you and Mr. Baldiga about

7    the one million dollar gift.  It's a Trojan Horse.  Like a

8    million dollars is there, if you read their plan, in order

9    to provide full releases to Golden Spring.  That is their

10   plan contribution as I understand it.

11         And their plan contribution would mean anybody who

12   votes in favor of the plan has to give -- has to give a

13   release, and the debtor would give a release for that

14   million dollars --

15         THE COURT:  I saw -- I've seen the release

16   definitions in the plan.

17         MR. FRIEDMAN:  So it's not a gift.  It's a Trojan

18   Horse to infect this case with the idea that Golden Spring

19   and everybody else in the world, the people who claim

20   ownership interest in the Sherry-Netherland, the people who

21   own -- claim property interest in every other piece of

22   property Mr. Kwok has ever had will get releases.  And so --

23         THE COURT:  Well, they will if there's a plan that

24   gets confirmed.  I've seen the definitions.

25         MR. FRIEDMAN:  Yeah.

1          THE COURT:  I've seen them.

2          MR. FRIEDMAN:  It's not a gift sort of just for

3    the heck of it.  I think -- like I said, it's a Trojan

4    Horse.

5          I do want to add, Your Honor, there are

6    proceedings in front of Judge Garrity with respect to the

7    Sherry-Netherland.  I don't think that the Court should know

8    about -- there's a disclosure statement hearing in May, May

9    24th.  We've been involved.

10          There are proceedings in Bermuda, British Virgin

11   Islands, where there's a dispute over who owns something

12   that belongs to Mr. Kwok.  Mr. Kwok's son continues to

13   pursue those.  We have concerns over the automatic stay with

14   respect to those.

15          I think it would be helpful for everybody to have

16   some guidance as to whether, you know, the debtors are

17   trying to get releases -- how that is intertwined -- because

18   we obviously don't want to be in violation of the automatic

19   stay.  We would assume that Mr. Kwok wouldn't want his

20   children to be either.

21          I think it's more of a status conference issue,

22   but I did want to apprise the Court that that I think has to

23   be in some way dealt with.

24          I don't think I have anything else on the stay

25   other than to say the boat's not back and that's the reason

76

1    that the stay relief should be granted.  The Court should

2    have no confidence that there's any other remedy.

3            I will note, again, jail is, you know, not

4    anybody's preferred option.  It's not going to happen

5    tomorrow.  They filed a remand motion, so we have to, you

6    know, get the case sent -- they filed a removal petition.

7    We filed a remand motion.  We've consented it's being

8    transferred to you.

9            We have a meeting with -- a conference with Judge

10   David Jones in the Southern District of New York Friday

11   about our venue transfer, you know, consent that will have

12   to come back to you.  Hopefully it will go back to state

13   court.

14           We think that should be briefed on a highly-

15   expedited basis when it comes before you, if it comes before

16   you.  If not, we'll ask Judge Jones to have it heard very

17   quickly.  (Indiscernible.)  It's in a DIP default if Judge

18   Jones doesn't transfer the matter  here, another reason

19   which we'll discuss later why the DIP shouldn't be

20   entertained today.

21           But, you know, it's true.  We're not going to be

22   able to get, you know, relief from Justice Ostrager like

23   this.  But it doesn't change the fact the stay should be

24   lifted.

25           And Mr. Kwok should know that he is -- you know,

1    there is a live contempt order against him as the best way

2    of ensuring, you know, his compliance with court orders,

3    otherwise it's just continued flagrant disregard for court

4    orders.  Thank you, Your Honor.

5              THE COURT:  Okay.  Thank you.

6              I'd like to hear from the committee on the relief

7    from stay motion.

8              MR. GOLDMAN:  Thank you, Your Honor.  As you

9    mentioned, we --

10             THE COURT:  And before you start, Attorney

11   Goldman, just -- yeah, do that, number one.

12             Number two, I know your application to employ is

13   pending.  I'm going to -- it hasn't been scheduled for a

14   hearing because that happens in the ordinary course, but I

15   am going to allow you to participate today as proposed

16   counsel to the committee --

17             MR. GOLDMAN:  Thank you.

18             THE COURT:  -- pending your application.  Okay?

19             MR. GOLDMAN:  Thank you, Your Honor.  The

20   committee has qualified support for the motion.  We are

21   concerned, number one, that once the boat is returned, that

22   there are no levies or liens placed against it by PAX.

23   That's an asset.  We consider it an asset of the estate for

24   the benefit of all unsecured creditors.

25             PAX is not a secured creditor so we would want a

78

1       provision in the order to that effect.

2              We also are not in favor of the Court finding the

3       stay to be inapplicable.  That emanates from the risk that

4       PAX will claim that post-petition monetary sanctions

5       continue to accrue, which we believe they do not, and would

6       certainly be against the interest of the unsecured

7       creditors, so we would prefer that the stay be lifted.

8              What we would propose is a more-qualified order

9       that would have the stay lifted immediately with a waiver of

10      the 14-day automatic stay under Bankruptcy Rule 4001 for PAX

11      to initiate whatever it needs to do to tee up a hearing on

12      enforcement remedies in whatever court is appropriate, and

13      that the hearing not take place for a period of 20 to 30

14      days so that the Court's order would be -- in terms of

15      proceeding for remedies -- would be only in effect after 20

16      or 30 days expired without the boat returning.  So that

17      would give --

18              THE COURT:  I don't think I can control what

19      another court does as far as scheduling hearings.

20              MR. GOLDMAN:  But you can qualify the

21      (indiscernible) stay.

22              THE COURT:  Well, then you're asking for some kind

23      of a stay.  You're actually asking for the imposition of a

24      stay then because you're asking for a stay of execution on

25      the order essentially.  You're saying that relief from stay

1    would be granted, but you can't do anything about it for a

2    period of time.

3        MR. GOLDMAN:  Well, we would have no problem with

4    them immediately commencing proceedings to tee up a hearing

5    for enforcement remedies to be considered.

6        All we're suggesting is that the lift stay with

7    respect to actually considering the remedies would not take

8    effect for a period of 20 or 30 days, and it would only take

9    effect if the boat was not returned.  So that would give a

10   small window of opportunity --

11       THE COURT:  Don't you think the boat might be

12   returned in 20 or 30 days?

13       MR. GOLDMAN:  Well, you know, we hear such

14   conflicting positions over time that we think that might

15   just do the trick.  But if it doesn't, then everything would

16   be teed up for the appropriate court to make whatever remedy

17   it deems appropriate.

18       THE COURT:  Well, I think you'd have to talk to

19   Attorney Friedman about what you've just asked, you know, to

20   see -- and I think he alluded to the fact this morning that

21   there were some comments that you had given, but he hasn't

22   had an opportunity to fully review them yet.  So we can talk

23   about that.  Okay?

24       So what else is the committee looking for?

25       MR. GOLDMAN:  In terms of the relief from stay

80

1      motion, that -- that is it.

2            We'd also want a provision making it clear that to

3      the extent that any post-petition filings did accrue, even

4      though our proposed order would stay that, that they would

5      be subordinated to the interests of the unsecured creditors.

6      So that's the other provision that we had proposed in the

7      order that was circulated.

8            One point I'd like to make about the boat, which

9      they say is being contributed under this plan, that too

10     comes with a significant string, that it's called the boat

11     election.

12            THE COURT:  I saw something about that, yes.

13            MR. GOLDMAN:  Yeah.  So under the treatment of

14     unsecured litigation plans, which most of the claims in this

15     case --

16            THE COURT:  Are.

17            MR. GOLDMAN:  -- fall under --

18            THE COURT:  Yeah.

19            MR. GOLDMAN:  -- the creditors have to make a boat

20     election in order to receive any value from the boat.  And

21     that comes --

22            THE COURT:  And I think it also says the boat

23     won't even be transferred until that election is made,

24     right?

25            MR. GOLDMAN:  That's the way I read it.

1          THE COURT:  Okay.

2          MR. GOLDMAN:  But it also comes with a compelled

3    release of --

4          THE COURT:  Yeah.  No.  I saw all of that.  I read

5    all the definitions.  Yeah.

6          MR. GOLDMAN:  -- of the plan-funder and what are

7    called the plan-funder related parties --

8          THE COURT:  Yeah.

9          MR. GOLDMAN:  -- which is basically all of --

10          THE COURT:  Yeah.

11          MR. GOLDMAN:  -- the entities affiliated with

12    Golden Spring.

13          THE COURT:  It's everyone.

14          MR. GOLDMAN:  Yes, it is.

15          THE COURT:  I saw that.  Yeah.  I did see that.

16          MR. GOLDMAN:  So I think really it's a theoric

17    proposal as we view it.

18          THE COURT:  Understood.

19          Attorney Claiborn, is there anything else you want

20    to --

21          Thank you, Attorney Goldman.

22          Is there anything else you wanted to add from the

23    U.S. Trustee's Office's perspective?

24          MS. CLAIBORN:  No, Your Honor.

25          THE COURT:  Okay.  Thank you.

82

1      Attorney Mayhew, your client had a limited -- and

2   your co-counsel's here too -- okay -- either of you have

3   anything else you'd want to add to the record for -- on the

4   relief from stay issue?

5      MS. CALLARI:  Good morning, Your Honor.

6      THE COURT:  Good morning.

7      MS. CALLARI:  For the record, Carollynn Callari

8   with Callari Partners.  My co-counsel, Christine Mayhew,

9   entered an appearance earlier.  Apologies for my tardiness.

10     THE COURT:  That's okay.  Thank you.

11     MS. CALLARI:  So, Your Honor, my client is Rui Ma

12  and a couple of other creditors, individual creditors.  And

13  we had made a statement last time --

14     THE COURT:  Yes.

15     MS. CALLARI:  -- so I'll just reiterate it here,

16  for Your Honor for clarity and the fullness of the record,

17  that I think Attorney Goldman stated our position also

18  accurately.

19     We support the relief from the stay, but we don't

20  think it's automatic.  We think that Your Honor has to grant

21  the relief from the stay and that Your Honor has the power

22  and should fashion the relief so that it provides a balance.

23     It provides PAX with the ability to marshal the

24  assets and to compel the debtor to get this boat back and

25  have the consequences if he does not.

1          But on the other hand PAX does not jump ahead of

2     the other creditors, so that any recoveries in monetary that

3     they may receive is subordinated, and that in the event the

4     yacht is brought back, it's for the benefit of the estate.

5          So we had talked to Attorney Friedman last time he

6     had some language, but we would really echo what Attorney

7     Goldman just said for the committee, Your Honor.  Thank you.

8          THE COURT:  Okay.  Thank you.

9          All right.  Attorney Baldiga, you said you wanted

10    to talk for a moment about a bond issue, what did you want

11    to tell the Court?

12         MR. BALDIGA:  I wanted to be able to confer with

13    our client.

14         THE COURT:  Okay.  What I'm going to do is I'm

15    going to take a recess until 12 p.m.  There are two

16    conference rooms out there.  There's the courtroom.

17    Obviously the record will not be on.

18         If you go out into the hallways, you have to

19    remember there's other agencies in this building, so you

20    have to kind of be quiet.  I mean, you could do it.

21         There's also a room where there's vending

22    machines.  There are no tables and chairs in there, but if

23    you want to break out and talk, or however you want to do

24    it, that's where you have to work.

25         Or you can obviously leave the building and come

84

1   back.  I mean, that's up to you.

2            Do you need more time than noon?

3            MR. BALDIGA:  I don't know.

4            THE COURT:  Do you need more time than noon?  Do

5   you want me to take a longer recess?

6            MR. BALDIGA:  No.  Noon.  Noon.  We'll come back.

7   I think noon is fine.  And if it isn't, I'll come back and

8   tell you exactly that.

9            THE COURT:  Okay.  All right.  And then I think

10  Attorney Friedman and the committee and counsel for the

11  creditors, you should talk about what you -- we were talking

12  about early this morning about the order and see if there's

13  some form of agreement.  And if there isn't, that's fine.  I

14  just want to know.  Okay?

15           And so I'm going -- and if you do need more time,

16  you just let us know.

17           MR. BALDIGA:  Thank you.

18           THE COURT:  Okay?

19           MR. BALDIGA:  Thank you very much, Your Honor.

20           THE COURT:  All right.  So Court --

21           MR. BALDIGA:  And Mr. Kindseth.

22           THE COURT:  Oh, I'm sorry.  Go ahead, Mr.

23  Kindseth.

24           MR. KINDSETH:  Just very briefly.  Your Honor, I'm

25  informed that my client would be willing to post a bond to

85

1     the value --

2               THE COURT:  Well, you all go talk about it.

3               MR. KINDSETH:  I just wanted to inform the Court

4     and all the parties --

5               THE COURT:  Well, you've got to talk to everybody,

6     not --

7               MR. KINDSETH:  We're going to.

8               THE COURT:  You've got to talk to your side and

9     then you've got to talk to the creditors' side.

10              MR. KINDSETH:  Yeah.

11              THE COURT:  Okay?

12              MR. KINDSETH:  We'll post a bond, Your Honor.

13              THE COURT:  So you go -- but obviously the amount

14    is the issue, not the posting.

15              MR. KINDSETH:  Correct.

16              THE COURT:  And so you'll have to see how that

17    goes.

18              MR. KINDSETH:  Thank you.

19              THE COURT:  But court is in recess until 12 p.m.

20         (Recess from 11:34 a.m. to 12:36 p.m.)

21              THE CLERK:  The Honorable Julie Manning presiding.

22              THE COURT:  Please be seated.  Just one second,

23    Mr. Baldiga.

24         (Pause.)

25              THE COURT:  Go ahead.  You may proceed.

86

1          MR. BALDIGA:  Thank you.  Again, for the record,

2    William Baldiga, Brown Rudnick, for the debtor.  Your Honor,

3    first, thank you for the time.

4          THE COURT:  Certainly.

5          MR. BALDIGA:  And Mr. Kindseth was right.  You

6    know, the purpose of Chapter 11 is to allow parties to talk,

7    which we have done to good use -- put that time to good use.

8    A couple of cleanup things before I get to that.

9          I just want to -- there were a lot of aspersions

10   made on the record about people saying this or that.  I just

11   -- I don't want to respond to any of that.

12         I just didn't want the silence on the record to be

13   taken as some sort of indication that we agree with anything

14   that was said.  I'd like to move right beyond that, but just

15   wanted to just make

16   it clear that debating all these points at this point does

17   no good today, especially where we're going.

18         So, Your Honor, we've had good conversations,

19   really, first time in the case.  We talked about a bond.  A

20   bond is very expensive, has a lot of details.

21         The owner of the boat intends and is committed

22   then instead to post cash equal to the cost of the boat,

23   about $37 million.  Obviously it's not here in the courtroom

24   today, but given the holidays, it's committed to do it a

25   week from today.  The cash will not be held by any of us.

1    We propose Mr. Goldman or Mr. Goldman's firm or whatever

2    other third-party agent they think is appropriate.

3         So getting it out of the hands of our literal

4    party in interest, we've had some discussions that law firms

5    are not very good at holding money.  We talked about the

6    possibility of talking to the Court about that.  We are also

7    not a fan of that.

8         I'd like to withdraw the withdrawal of the Stretto

9    motion, not argue it today, but it's a possibility that we

10   may be back to you saying that Stretto is willing to provide

11   that service -- obviously it's an independent third party --

12   and that we might need them after all to do that instead of

13   anything else.  So we have talked about it, but we have had

14   no conversations with Stretto.

15        And I don't think anybody who is in the courtroom

16   is in a position to say we are prepared to hold those funds,

17   but we'll find -- we'll find something and we'll come in

18   with an order about holding those funds.

19        It is the most simple type of arrangement.  The

20   funds will be held, again, by some third party.  And the --

21   when the boat returns in something similar to the same

22   condition that it's in today, then the funds will be

23   returned.  That simple.  The boat then will be held by

24   whoever holds the funds or whatever that equivalent is.

25        There's a lot of details about (indiscernible),

88

1    given that, if there's $37 million in cash sitting around

2    should we all agree that repairs should be done in the most

3    efficient place, and when it will be returned, but frankly

4    at that point there's no equivalent to $37 million in cash

5    to secure the promise to return the boat.

6              I think it's the first thing that everybody in the

7    case has agreed to, that it's hard to beat that.

8              We think it will be before that, but HK has

9    committed to have that wire be sent to whoever is set up to

10   take that wire no later than a week from today.

11             It could be earlier, but, again, we don't have

12   anybody even to accept the wire today so it can't be done

13   today.  And Friday is Good Friday, and Monday in some places

14   is a holiday, but the parties have talked.

15             I'm not sure everybody's in agreement that we

16   would -- with a couple of exceptions -- kick off or push off

17   until a further date set by this court -- not very far away,

18   could be next Wednesday -- the other things that were on the

19   calender -- because I think those dramatically go in one

20   direction or the other depending on -- I mean, if the wire

21   doesn't come in, the Court has given everybody a pretty good

22   sense of where the case is going.  If the wire does come in,

23   then I think we have the makings of one of the better cases

24   I've seen in quite some time.

25             I would like to go forward because we've been at

89

1    this almost two months.  I'd like our retention to be

2    approved today.  I'd like the Verdolino & Lowey retention to

3    be approved today.  I think we've satisfied all the

4    objections, but there could be still some.

5            But other than that, I don't know if anybody else

6    wants to go forward with any other motions given that the

7    facts on the ground will have been dramatically different

8    one way or the other a week from today.

9            THE COURT:  Okay.  I want to hear from everybody.

10           MR. BALDIGA:  Of course.

11           THE COURT:  And that's -- and that's helpful.

12           MR. BALDIGA:  Any questions for me before that?

13           THE COURT:  I just -- I don't -- I think I need to

14   understand who's going to hold the money and how, because I

15   don't -- I mean, what happens in Connecticut sometimes, most

16   of the time, is a firm doesn't have a separate account for

17   monies that come in like this.  And so I heard you say

18   possibly Attorney Goldman --

19           MR. BALDIGA:  Well, the committee's designee is

20   our suggestion.

21           THE COURT:  Well, we -- but what I'm -- it's got

22   to be -- it's got to be in a separate and distinct account

23   with nobody able to do anything with regard to any money in

24   that account without court order or face contempt from this

25   court.

1          And I don't know that putting it in a law firm's

2     account is the right thing to do, because, from what I have

3     seen over the years, it's not necessarily easy for the -- a

4     firm to open up a separate and distinct account for this

5     purpose, that it would be a sub account on an IOLTA account

6     or some cash management or whatever the firm has.  And I

7     don't want it tied to any other thing.  It can be -- it has

8     to be separate and distinct.

9          And so I don't know, Attorney Goldman, if your

10    firm can do that.  I'm not sure I'm inclined to allow that.

11    I don't think the creditors committee should be holding $37

12    million.  I just don't see it.  I think it's got to be an

13    independent third party that holds the funds if everyone's

14    in agreement on that.  I mean, with regard to the funds.  I

15    don't want anybody that has a stake in this case holding

16    that money.

17          MR. GOLDMAN:  Yeah.

18          MR. BALDIGA:  We all agree.

19          MR. GOLDMAN:  Yes.

20          THE COURT:  Okay.

21          MR. GOLDMAN:  Your Honor, we have the same

22    reservations.  We were actually wondering if the Court would

23    have a facility, it would be in the nature of an

24    interpleader really.

25          THE COURT:  It could be.  I'd have to talk to the

1    clerk.  So I have to talk to the clerk.  I don't -- I agree

2    with you it could be, but I would doubt that the bankruptcy

3    court has ever held $37 million in Connecticut in a separate

4    account.  That doesn't mean it couldn't happen, but I'm not

5    -- I'd have to have a conversation with the clerk of the

6    court about that.  We can figure that out.

7            And I'll wait to hear from everybody if

8    everybody's in agreement.

9            All I'm saying is no stakeholder in this case is

10   going to hold the money.  And it's not because of any of

11   you.  We've just -- unfortunately, we've had cases where

12   those funds have been embezzled.  I can't even begin to

13   spend any time on that.

14           MR. BALDIGA:  No.  We're all looking for -- we

15   all, everybody in the courtroom, this is the one thing we

16   all agree on.

17           THE COURT:  Good.

18           MR. BALDIGA:  We have a common solution.  We want

19   this to be the most boring, routine thing.  It could be a

20   bank.  It could be something else.

21           THE COURT:  Yeah.  So we'll figure that out.

22           MR. BALDIGA:  Yeah.

23           THE COURT:  And what my suggestion is is you --

24   tomorrow is Thursday, we have Chapter 13 calendar here

25   tomorrow, but it should be done by 1 p.m., maybe 2 at the

1  latest.

2          We can have a conference that we don't necessarily

3  have to all physically be here if this is the only issue --

4  and we'll see how things go -- to resolve -- but I have to

5  talk to the clerk of court about it, and he's going to have

6  to talk to somebody too.  I mean, he's not going to have the

7  authority to do that without talking to somebody up the

8  flagpole as they say.

9          MR. BALDIGA:  Sure.

10         THE COURT:  Okay.  So we'll see.

11         Attorney Friedman, did you want to say something?

12         MR. FRIEDMAN:  So, Your Honor, a couple of things.

13  The first is --

14         THE COURT:  Can you just speak --

15         MR. FRIEDMAN:  Yeah.  Sorry.  If we --

16         THE COURT:  -- a little bit more into that

17  microphone.  Sorry.

18         MR. FRIEDMAN:  If we do have a hearing tomorrow or

19  a conference, I have a hearing before Judge Beckerman, an

20  STM bankruptcy.

21         THE COURT:  What time?

22         MR. FRIEDMAN:  It's at like 10, and it's -- it's a

23  long, long, multi-party motion to amend a pleading.

24         THE COURT:  Well, we could have it late --

25         MR. FRIEDMAN:  Can I --

93

1          THE COURT:  -- in the day or we -- Friday -- in

2     Connecticut, I don't know if it's true anymore, but Good

3     Friday used to be a legal holiday.  We're not -- we are

4     open.  I mean, I could have a conference on Friday morning,

5     but I don't know if everybody else is open --

6          MR. FRIEDMAN:  I have to be back by --

7          THE COURT:  -- because they may take that as a

8     holiday.

9          MR. FRIEDMAN:  Sorry, Your Honor.  I have to be

10    back in Washington by sundown for Seder.

11         THE COURT:  Okay.

12         MR. FRIEDMAN:  So that would be a little bit of a

13    burden for me unfortunately.

14         THE COURT:  All right.  Well, let's just see what

15    we can figure out this afternoon and we'll go from there.  I

16    just don't -- I don't know the answer to the question about

17    where the money can be held.

18         MR. FRIEDMAN:  Your Honor, obviously the 37

19    million is positive.  You know, a little confusing.  A

20    couple of hours ago we were told HKI had no other assets,

21    but I'm not going to look that gift horse in the mouth

22    today.  I think there are details to be addressed.

23         In the meantime, we are going to continue to work

24    with committee counsel, Attorney -- and their counsel,

25    because we do want to submit our proposed order.  Because if

94

1   the money isn't there, we believe --

2              THE COURT:  I understand.

3              MR. FRIEDMAN:  -- we believe we're entitled to

4   stay relief.  And I feel pretty good we're going to be able

5   to work things out.  We had productive -- we had productive

6   discussions.

7              You know, as to the rest of the matters on for

8   today, you know, we do object to V&L, and we think that

9   should be heard.  I think we have an issue with respect to

10  Brown Rudnick's retention.

11             It's not my motion with respect to the DIP.  We do

12  have, you know, significant concerns with the order as

13  amended.

14             And, you know, with respect to the examiner or

15  trustee, we certainly don't want an examiner appointed

16  today.  We believe there's cause for a trustee.

17             And there's also a status conference with respect

18  to our dismissal motion.

19             I will say, Your Honor, we are prepared to work

20  with other parties to not have a hearing heard the first

21  week of May to let people adequately prepare.  It's a

22  serious motion, right?

23             THE COURT:  On your dismissal motion?

24             MR. FRIEDMAN:  Yes.

25             THE COURT:  So you're consenting -- you'd consent

1    to a specific period of time --

2              MR. FRIEDMAN:  We would, Your Honor.

3              THE COURT:  -- under Rule -- under 1112(b)(3)?

4              MR. FRIEDMAN:  It's a serious motion.

5              THE COURT:  I understand.  And I would have to

6    have -- I was going to ask you that question anyway.

7              MR. FRIEDMAN:  Yeah.

8              THE COURT:  Will you consent to the time -- and we

9    can talk about it more, but the statute says that it has to

10   be within 30 days and then decided within 15 days unless the

11   movant consents to a specific period of time.

12             MR. FRIEDMAN:  We are -- we are reasonable people

13   who want to have this briefed appropriately, discovery as

14   appropriate, and to give people a fair chance to resolve

15   what is a really important issue.

16             We're not -- we don't want to postpone it forever,

17   but we are willing to sit down with committee counsel, the

18   U.S. Trustee, anybody who might oppose the motion, and try

19   to work out a consensual schedule that is not the first week

20   of May.

21             THE COURT:  Okay.

22             MR. FRIEDMAN:  That's sort of what I wanted to

23   express in connection with our status conference, that we

24   are willing to try to work something out and come up with an

25   agreed-to order.  I don't have -- you know, I don't have a

1    yard to give, but I do have, you know, a foot.

2              THE COURT:  Okay.  All right.  Thank you.

3              So with regard to --

4              All right.  Go ahead, Attorney Claiborn.

5              MS. CLAIBORN:  Your Honor, the U.S. Trustee would

6    like to prosecute his motion for the appointment of an

7    examiner today.

8              THE COURT:  Today?

9              MS. CLAIBORN:  Yes.

10             THE COURT:  Okay.  Well, that's not going to

11   happen I'm sorry to say, because I'm not going to address

12   that issue out -- and not -- I'm going to address that issue

13   along with the dismissal issue because that's what dismissal

14   under 1112 contemplates.

15             It contemplates that a case will be converted to

16   Chapter 7 or dismissed, whatever is in the best interest of

17   the creditors, unless the Court decides to appointment a

18   trustee or examiner under 1104(a).

19             So those two, in my opinion -- and I'm sorry that

20   you disagree and that's fine, but those two are tied

21   together in my opinion.  I'm not going to rule on

22   appointment of a trustee or examiner when there's a pending

23   motion to dismiss filed.

24             MS. CLAIBORN:  Your Honor, if I may be heard

25   briefly on that issue.

1          THE COURT:  Sure.  Just can you talk a little bit

2     more into the -- thank you.

3          MS. CLAIBORN:  I think we need better microphones.

4          THE COURT:  You know, that's probably true.

5          MS. CLAIBORN:  Because I'm not a quiet person.

6          The U.S. Trustee thinks it's important that we get

7     some clarity on this case.  And for all of the reasons that

8     you've heard in connection with the last hearing and then

9     further today, there are a lot of questions and there are a

10    lot of need for a lot of answers.

11         With respect, for example, to the comments that

12    were made today earlier by Attorney Baldiga about the

13    debtor's testimony at his 341 meeting and how he did not

14    take the Fifth, that's accurate, but I have to tell you that

15    the number of times that the answer was I don't know or I

16    don't recall was probably in excess of 90 percent of the

17    time.  So functionally we're not --

18         THE COURT:  Well, I'd need to see that transcript,

19    right?  That should be put into the record.

20         MS. CLAIBORN:  It's been ordered, Your Honor.

21         THE COURT:  Okay.

22         MS. CLAIBORN:  So functionally we're not in a

23    better place in terms of the knowledge that we need in this

24    case.  And it's important that this case have an independent

25    party who comes in and takes a look at everything.  That

1    process needs to happen right away.

2        And should the Court embrace the idea of

3    appointing one as soon as the U.S. Trustee can submit their

4    candidate, then that person get on the road to figuring out

5    the many questions and really working towards information

6    that everyone would benefit from, and information that

7    everyone could use for analysis on the eventual hearing that

8    gets set on the trustee motion or the dismissal motion.

9        And that, at this point in time, to do nothing

10   allows the debtor to remain in a place where he has not

11   explained -- and we don't know, and we won't know -- so it's

12   important to this whole process.

13       And the debtor consents to the appointment of an

14   examiner.  We have some concerns we have to work out with

15   the debtor about the form of an order, but the debtor is on

16   board with an examiner.  And we think it's important that we

17   start that process of uncovering and understanding and to

18   start it right now.

19       THE COURT:  Okay.  Thank you.

20       Attorney Friedman, you oppose the appointment of

21   an examiner, correct?

22       MR. FRIEDMAN:  Yes, Your Honor.  I just rest on

23   the reasons in our papers.  I think that an examiner -- once

24   it gets underway, I think, you know, it may incur expenses

25   that are unnecessary.  We think that the Court should

99

1      consider all three remedies together.

2             And, you know, we do think that in the context of

3      the motion for the dismissal, which sounds like it will be

4      essentially co-located with the trustee motion, parties like

5      the committee, or, you know, can serve discovery and in

6      effect begin the investigation, which I agree with with Ms.

7      Claiborn that it does need to happen.

8             But for the reasons we set forth in our papers, we

9      think appointing an examiner today doesn't make sense.

10            THE COURT:  Okay.  Thank you.

11            Attorney Goldman?

12            MR. GOLDMAN:  Yes, Your Honor.  For the committee,

13     we agree with Your Honor's assessment of when the motion

14     should be considered.  We're also in agreement with PAX on

15     the examiner request.

16            The committee is very poised to undertake an

17     investigation beyond even the scope than an examiner would

18     be expected to conduct.  So that relief, we view, would be

19     duplicative and unnecessary, you know, an unnecessary set of

20     professionals in an unnecessary administrative expense.

21            And we would address the trustee motion when it

22     came before Your Honor.  That's the committee's position.

23            THE COURT:  Okay.  Thank you.

24            MS. CLAIBORN:  Sorry, Your Honor.  If I may make

25     one final point I neglected to make earlier?

1          THE COURT:  Sure.

2          MS. CLAIBORN:  Which is that Section 1104(c) uses

3  the word shall as to the Court's obligation with respect to

4  the appointment of an examiner, and the U.S. Trustee has met

5  the subsection (2) which speaks to the amount of the debt.

6  And there has been no dispute from any party in their

7  pleadings or out loud that we have not met the standard.

8          We also think that the appointment of an examiner

9  is appropriate under subsection (1), that speaks to the best

10  interests of the estate and the creditors.

11          THE COURT:  Okay.  Thank you.

12          Attorney Baldiga?

13          MR. BALDIGA:  I agree with Ms. Claiborn.

14          THE COURT:  Okay.

15          MS. BIRNBAUM:  We've thought from the outset that

16  an examiner should be appointed.

17          I'm distressed to hear, again, aspersions put on

18  in a day and a half of testimony, but I guess if you ask

19  certain questions you're going to get an I don't know, the

20  debtor doesn't know.

21          But it seems like we're never going to get beyond

22  this distrust issue without an independent party.

23          And we haven't conditioned -- the DIP lender

24  hasn't conditioned the DIP, which we will go forward on at

25  another time, on the appointment or the -- let me put it

1    more positively -- if an examiner is appointed, the estate's

2    going to pay for it and on monies that is fully subordinate

3    to the payment of all other creditors.  We've got to get

4    beyond this mistrust.

5         And if the examination is done by any other -- by

6    anybody else with a monied interest in the estate, it's just

7    someone's not going to be satisfied.  And the Court has the

8    ability to instruct the appointment of someone who has no

9    other stake in the case.

10        And I disagree terribly with the -- with the --

11   whether the quality of the exam that has been taken for

12   hours and hours and hours, but we've got to get beyond it.

13   And only and examiner gets us there.  Because a trustee

14   obviously has a huge stake.  And a trustee then comes with

15   no funding as opposed to $8 million.

16        And I do agree, a statute is a statute is a

17   statute.  And I -- we've never contested that.  And I don't

18   -- I haven't seen anybody else contest it.  I think it's

19   required.

20        THE COURT:  Where does it say it's required?

21        MR. BALDIGA:  Just the section that Ms. Claiborn

22   was citing where it shall be appointed under subsection (1).

23        THE COURT:  It says -- it doesn't say I must

24   appoint an examiner.  Where does it say that?

25        MS. CLAIBORN:  Subsection 1104(c).

1          THE COURT:  If the Court does not order the

2     appointment of a trustee, that's what the whole section

3     starts out with.

4          MS. CLAIBORN:  That speaks, Your Honor, to the

5     idea that you can't have a trustee at the same time you have

6     an examiner.

7          THE COURT:  Yeah.  But I might order the

8     appointment of a trustee.

9          MS. CLAIBORN:  That may be the case that happens

10    when we get to that place.  What we're saying --

11         THE COURT:  And I -- and I read 1112(b), the

12    dismissal motion has -- takes precedence.  Congress decided

13    that when they made the changes in 2004-'05.  There's time

14    frame associated with when a  hearing on a motion for the

15    appointment of a trustee or examiner must be held.  There's

16    no qualification that the judge has to hold a hearing within

17    a certain amount of time and then decide within a certain

18    amount of time.

19         And the section about dismissal that Congress

20    added in 2005 specifically says -- I think I already read

21    it, but -- it says except as -- in paragraph 2, on request

22    of a party in interest, who PAX is, after notice and a

23    hearing, the Court shall convert a case under this chapter

24    to a case under 7 or dismiss a case under this chapter,

25    whichever is in the best interests of creditors and the

1    estate, for cause unless the Court determines that the

2    appointment of a -- under Section 1104(a) -- of a trustee or

3    examiner is in the best interest.

4         I'm not vowing to do anything with regard to the

5    trustee and examiner.  I need to consider it in the context

6    of a motion to dismiss under 1112(b)(1), which is what I'm

7    doing.  And so, therefore, the matters will be heard

8    together and I'll make a decision.  I might deny everything,

9    but I might not.  I don't know.  I have to see what you all

10   say.

11        And I'm -- there's nothing that I read in the code

12   that says I'm compelled to -- if that was true, then there

13   would be an examiner in every Chapter 11 case.

14        MS. CLAIBORN:  Your Honor, the examiner option

15   comes into play when a party who's appropriate asks for it

16   and you meet the criteria.

17        THE COURT:  I under -- but it doesn't say I must

18   do that.  And by the way, you're ignoring 1112(b)(1) where

19   it says unless the Court determines that a trustee or

20   examiner is in the best interest.

21        MS. CLAIBORN:  Your Honor, 11 --

22        THE COURT:  I haven't made that determination yet.

23        MS. CLAIBORN:  -- 1112 gives the Court a variety

24   of options to handle a variety of situations, and one of

25   these --

1      THE COURT:  No.  It doesn't actually give me an

2  option.  It says shall -- I shall dismiss or convert.

3      MS. CLAIBORN:  No.  It makes the Court take

4  action, but it gives the Court options as to which actions

5  to take.

6      But we're not here under 1112 today.  We're here

7  under 1104, and that independently provides for the

8  opportunity --

9      THE COURT:  Okay.

10      MS. CLAIBORN:  -- to ask the Court to appointment

11  an examiner if you meet the threshold, which the U.S.

12  Trustee has.

13      THE COURT:  I don't agree with your assessment of

14  the statute.  I didn't say you haven't met a threshold.  I

15  haven't reviewed it to determine whether you have or not,

16  but I'm not going to determine that today.  I'm going to

17  determine that along with the motion to dismiss.

18      MS. CLAIBORN:  Thank you.

19      THE COURT:  So, Mr. Baldiga, I don't understand

20  your withdrawal of your withdrawal, because Stretto's not

21  holding the money.

22      MR. BALDIGA:  Okay.  Then --

23      THE COURT:  So I just want that to be very clear.

24      MR. BALDIGA:  Then a trial stands.

25      THE COURT:  They're not in the business of holding

1   $37 million.  That's not their business.

2               MR. BALDIGA:  Then I withdraw the withdrawal of

3   the withdrawal.

4               THE COURT:  Okay.  Okay.  Thank you.  Thank you.

5               All right.  Let's get back to where we are.

6               MR. BALDIGA:  I think we left it as to a possible

7   telephonic conference Friday morning.

8               THE COURT:  Well, I think that Mr. Friedman has a

9   problem with tomorrow though is the problem.

10              MR. BALDIGA:  Oh, Friday morning telephone?

11              THE COURT:  So what we have to do is we have to

12  figure out what your agreement is on the record and then set

13  another hearing with regard to other issues.

14              MR. BALDIGA:  Yes.  Can I --

15              THE COURT:  I need to -- yeah, go ahead.

16              MR. BALDIGA:  -- confer with Mr. Friedman for one

17  second.

18              THE COURT:  Go ahead.  Take your time.

19          (Pause.)

20              MR. BALDIGA:  Mr. Friedman suggested, and it's

21  fine with us, Monday, whether it's in person or by

22  telephone, on the procedural aspects --

23              THE COURT:  Okay.

24              MR. BALDIGA:  -- which will give us all some time

25  to talk to --

106

1          THE COURT:  Okay.  Let me -- let me take a look.

2          MR. BALDIGA:  -- banks and so forth.

3     (Pause.)

4          THE COURT:  Monday, April 18, that's what we're

5     all looking at, correct?

6          MR. BALDIGA:  Yes, Your Honor.

7          THE COURT:  Okay.  And that hearing will be to

8     determine -- let's just step back.

9          When's the wire going to -- transfer supposed to

10    be received?

11         MR. BALDIGA:  No later than a week from today.

12         THE COURT:  So we need to figure out who's going

13    to receive it --

14         MR. BALDIGA:  And that's what the --

15         THE COURT:  -- and that's what we're going to

16    figure out on Monday?

17         MR. BALDIGA:  -- 18th would be devoted to to have

18    the parties report to the Court, I suggest, as to any

19    agreement they have as to the holder of the escrow, as it

20    were.

21         THE COURT:  Okay.

22         MR. BALDIGA:  And if not, if there is no

23    agreement, for the Court to make a ruling, I guess, as to

24    how we accomplish this.

25         THE COURT:  Okay.  What I'm going to do -- that's

1   fine.  What I'm going to do --

2          Go ahead, Mr. Friedman.

3          MR. FRIEDMAN:  So the Court may not know, I live

4   in Washington.  Is it possible to do it via Zoom or is that

5   not acceptable?

6          THE COURT:  It's possible if that's all we're

7   talking about.  If we're going to get into any of these

8   other matters, I've got to have you here because it's too

9   much, you know.  In this case anyway there's -- but that's I

10  think -- I think that's what we should do on the 18th.

11         So let's just step back for a second.

12         MR. BALDIGA:  Good.

13         THE COURT:  I'm going to talk to the clerk of

14  court too and figure out what, if anything, the Court can

15  do.  And then he may reach out to you.  I mean, I don't

16  know.  I guess he'd have to reach out to the debtor's

17  counsel, to counsel for PAX, the United States Trustee's

18  Office, counsel for the committee, counsel for the other

19  creditors that have filed an appearance, and counsel for the

20  -- I mean --

21         MR. BALDIGA:  HK is posting the money, so they're

22  -- they care.

23         THE COURT:  Okay.  They're posting the money.

24  Okay.

25         Everybody.  Everybody that's here today will

1    somehow know what, if anything, the Court can do, hopefully

2    before Monday.  Okay?

3              MR. BALDIGA:  Yes.

4              THE COURT:  Because if it's a solution -- if you

5    all -- if for some reason we can hold the money, which --

6    and there's a solution that works, then maybe we don't --

7    and you all agree, then it's a five-second, everybody says,

8    okay, fine, the wire transfer has to come by Wednesday the

9    20th.

10              At what time?  I mean, we need to set a time.

11              MR. BALDIGA:  Close of business.  Close of

12    business?

13              THE COURT:  5:00 p.m.?

14              MR. BALDIGA:  Sure.

15              THE COURT:  Okay.  5:00 p.m. on April 20.

16              So then the issue becomes when do we continue all

17    these hearings and talk about things?  Because we still

18    haven't -- there's a lot of logistical issues here still

19    that we haven't addressed yet today.  I know you want to

20    have your applications granted.  They have opposition.  You

21    know, I think we need to figure that out.  Okay?

22              MR. BALDIGA:  Thank you.

23              THE COURT:  I don't know that I want to get into

24    right now having an extensive hearing on these applications

25    if the money doesn't come, because the money's either going

109

1    to come -- if there isn't the money, then we're not -- I

2    think we're -- Mr. Friedman's argument is then you rule on

3    the relief from stay and then we set the hearing on the

4    motion to dismiss, right?

5          MR. FRIEDMAN:  But that goes to retention.  The

6    debtor probably needs counsel --

7          THE COURT:  No.  I understand.

8          MR. FRIEDMAN:  -- to argue those.

9          THE COURT:  I do understand, but they have

10   opposition -- there's a whole bunch of opposition --

11         MR. FRIEDMAN:  But they're almost all mooted.

12         THE COURT:  -- about hourly rates, about -- first

13   of all, I can -- I can say one thing that's clear, I'm not

14   granting the ordinary course of business motion.  That's

15   denied.  That will not happen.  This case does not support

16   it.  And unless and until you can show me that it does, it's

17   denied.  It's denied without prejudice.

18         If you can show me there's going to be an income

19   stream and everybody has an agreement and we're going to

20   move toward confirmation, fine, but right now, no.  There's

21   not going to be an ordinary course order in this case.  The

22   case does not support it in any way, shape or form at this

23   point in time.

24         MR. FRIEDMAN:  Okay.

25         THE COURT:  So if we go back to the calendar, of

1    today's calendar, and we look at what's on today's calendar,

2    then the motion for an entry of an order authorizing

3    employment and payment of professionals in the ordinary

4    course, 119, is denied without prejudice for the reasons

5    stated on the record.

6            However, you'd have to file a motion to show me

7    why I should consider that.  And I'd have to see progress in

8    this case that doesn't exist as of this point.

9            So that is going to be denied without prejudice to

10   renewal for the reasons stated on the record, but it's got

11   to be upon a showing of good cause, otherwise I'm not going

12   to do it.  So that's -- we can handle that right now.

13           This is not an operating entity that has an income

14   stream on any regular basis that can support any kind of

15   payments of ordinary course professionals.  And I don't even

16   know -- so I'm not -- that's where we are on that motion.

17   That's denied.

18           With regard to the case management conference that

19   we had, we will note on the record that the management

20   conference was held and no further case management

21   conferences will be scheduled at this time.

22           The Court can schedule one any time the Court

23   feels it's appropriate, and you can always ask for one,

24   under -- a status conference under 105(d), so no further

25   conferences, management conferences, will be scheduled at

1    this time.

2         Then the motion for relief from stay.  We're going

3    to obviously continue that for a very short period of time,

4    because we're going to see whether the money comes in.  So I

5    think we're going to have a hearing on that next Thursday,

6    the 21st.  Okay?  We're going to continue that -- is

7    everybody available on Thursday, the 21st?

8         MR. FRIEDMAN:  Your Honor, I'm --

9         THE COURT:  Or do you want a longer period of

10    time, Attorney Friedman?  It's your motion.

11         MR. FRIEDMAN:  It is my motion.  I'm just -- I

12    have to attend a memorial service on the 21st.

13         THE COURT:  Okay.  Well, if you have to attend a

14    memorial service, that doesn't work.

15         MR. FRIEDMAN:  I can't.

16         THE COURT:  We can't do it on the 20th because we

17    don't know if the money's coming in the 20th.  They have

18    until 5 p.m. for the wire.

19         So then the other issue would be the 22nd.  Now,

20    let me make sure that -- that's a Friday.

21         MR. BALDIGA:  I can't do it that day, Your Honor.

22    I'm sorry.

23         THE COURT:  Okay.  So then let's --

24         MR. BALDIGA:  Any day the next week I can.

25         THE COURT:  It's possible.  Let's take a look.

1    Give me a moment to look.  Okay?

2            MR. BALDIGA:  Of course.

3        (Pause.)

4            THE COURT:  There are some things scheduled, but I

5    have to see whether or not they could be moved.  Well,

6    here's what we can do the following week.  The 27th we have

7    something scheduled at noon.  It's a Wednesday.

8            We could start in the morning of the 27th, and you

9    all have to leave the courtroom for the noon -- well, you

10   don't have to leave the courtroom, but I'm going to take the

11   noon matter -- and then we can go that afternoon as well.

12           Or we can do it on the 28th, which is a Thursday,

13   but I have to leave probably by 4 p.m., so we'd have to --

14   we'd have to stop whatever hearing we're having by 4 p.m.

15           So if you want to talk about that, that's the best

16   I can do for next, the following week.

17       (Pause.)

18           MR. BALDIGA:   So the 27th sounds like for us

19   would be the best.

20           THE COURT:  Okay.  So you want to start at 10

21   a.m., or do you want to start earlier than that, knowing

22   that you're going to have to be out of -- I'm going to have

23   to take this other matter at noon.  And I don't know how

24   long that's going to last.  I don't think it would be more

25   than an hour, but it could be an hour.

1        MR. BALDIGA:  We'll start at whatever time pleases

2    the Court.

3        THE COURT:  Well, why don't we start at 9:30 then.

4        MR. BALDIGA:  Very good.

5        THE COURT:  And then we will --

6        So let's look at the calendar again, today's

7    calendar.  So the motion for relief from stay by PAX, ECF

8    57, is being continued to April 27 at 9:30 a.m.

9        The application for the entry of an order

10   authorizing the employment of Brown Rudnick is being

11   continued to April 27 at 9:30 a.m.  And I suggest the

12   parties continue to talk about that.  They're going to have

13   counsel.  Okay?  They're going to be able to retain counsel.

14   The issues that I see that everyone has, which, you know,

15   have been pointed out, are the hourly rates and the issues

16   of the funds belonging to the debtor.  So I think you need

17   to talk about that.  I understand --

18       MR. BALDIGA:  We've talked about it.

19       THE COURT:  -- you're going to get retained.

20    They're entitled to counsel.  Unless someone can show

21    me that you have some conflict of interest --

22       MR. BALDIGA:  There's non alleged.

23       THE COURT:  Right.  I agree with you.  That's what

24    I said.  Unless someone can show me that, you're going to be

25    retained.  But if you really want me to set your hourly rate

114

1          --

2                    MR. BALDIGA:  I'll accept that, Your Honor.

3                    THE COURT:  Yeah.  If you really want me to set

4          your hourly -- I mean, I don't want to do that.

5                    MR. BALDIGA:  No.

6                    THE COURT:  But, you know --

7                    MR. BALDIGA:  I've always --

8                    THE COURT:  -- but that's what people are saying,

9          right?

10                   MR. BALDIGA:  Well, I think the committee did, but

11         I've always thought the value is determined when a fee

12         application is filed.  But I --

13                   THE COURT:  Yeah.

14                   MR. BALDIGA:  But I --

15                   THE COURT:  And you know what?  That may be the

16         way we handle it.

17                   MR. BALDIGA:  Okay.

18                   THE COURT:  That may be the way we handle it.  It

19         may be that you get approved at all the hourly rates, and

20         then the determination of whether you're actually awarded

21         those fees comes up in the fee application context.

22                   MR. BALDIGA:  But I'm willing to accept what the

23         Court has already said, so then I know the rug won't be

24         slipped out from under us, and we'll continue to talk about

25         the other things.

1              THE COURT:  No.  You're going -- I mean, I think

2    everyone understands the debtor's entitled to retain

3    counsel.  There's no question about that.

4              MR. BALDIGA:  All right.  We appreciate that, Your

5    Honor.

6              THE COURT:  It's just an issue of seeing if you

7    can all come to an agreement.  And if you can't, that's

8    fine.  But I think, you know, the ordinary course issue is

9    denied, so that -- that should be some -- that should give

10   some ability to all of you to talk about the remaining

11   objections you have and see if you have an agreement.

12             And if you don't, then the likelihood is that they

13   will still be retained -- that Brown Rudnick will -- an

14   order will enter allowing the retention of Brown Rudnick at

15   whatever -- you know, maybe I do something with the rates or

16   maybe -- you know, I mean, that's the last thing a judge

17   wants to do, right -- but that says, oh, you can only have

18   one -- you know, whatever, the blended rate is this,

19   whatever.  I, you know, don't like to have to do that.

20             So if you can come to an agreement, that would be

21   helpful.  If you can't, then I will rule.  But you are,

22   Attorney -- your firm is going to be allowed to be retained.

23             MR. BALDIGA:  We appreciate that.

24             THE COURT:  I mean, there's just no reason why it

25   wouldn't happen.  No one has shown anything, any conflict,

1    any adverse interest that would stop that.

2              MR. BALDIGA:  Thank you, Your Honor.

3              THE COURT:  Okay.  Attorney Claiborn, do you

4    disagree?

5              MS. CLAIBORN:  Your Honor, I rise to put a final

6    point on the conflict issue, which is that Brown Rudnick has

7    addressed some of the issues that we raised initially about

8    lack of disclosure, but there is the remaining hanging chad,

9    as it were, with respect to the overall -- I don't know what

10   you're going to -- how you want to call it -- but like the

11   client services portion of retention application which has a

12   bunch of pro forma language in it, some of that pro forma

13   language speaks to conflict waivers.

14             And if one reads it closely it says that the

15   conflicts that may occur in the future are waived.  So the

16   U.S. Trustee would be looking --

17             THE COURT:  Well, if there's a conflict that

18   occurs in the future and somebody brings it to my attention

19   and I think it's a conflict, then I don't care if someone

20   waived it, right?

21             MS. CLAIBORN:  I thought we could just clean that

22   issue up by, you know --

23             THE COURT:  Well, you talk about that.

24             MS. CLAIBORN:  -- removing that.

25             THE COURT:  See what you can come up with.

1          MS. CLAIBORN:  That's what I wanted to raise with

2     the Court.

3          THE COURT:  Right.

4          MR. GOLDMAN:  Your Honor, just for the committee,

5     I just want the Court to lose sight of the fact that we did

6     also raise an issue with the amount of the retainer, which

7     gave us some --

8          THE COURT:  I understand.

9          MR. GOLDMAN:  -- sticker shock.

10          THE COURT:  I understand.  But I'm not sure what

11     the authority is for me to tell them they have to give money

12     back.

13          MR. GOLDMAN:  We can address that --

14          THE COURT:  Okay.

15          MR. GOLDMAN:  -- at the appropriate time.

16          THE COURT:  I mean, I saw your --

17          MR. GOLDMAN:  But their --

18          THE COURT:  I saw you -- I don't remember exactly,

19     but I think you thought that it should be several hundred

20     thousand dollars less than what they have.

21          MR. GOLDMAN:  Correct.

22          THE COURT:  Okay.  Well, think about that and let

23     me know what -- but I don't know what authority I have to

24     make them give back a retainer.  I have the authority to not

25     allow them to draw down -- and Mr. Baldiga's application

1    says he's not going to draw one penny out of that --

2           MR. GOLDMAN:  Yeah.

3           THE COURT:  -- until and unless -- I mean, he drew

4    down prepetition, which he could.  You can all fight about

5    whether or not the money he drew down was too much and how

6    it was $50,000 in a 24-hour period and all of that.  I get

7    all that.

8           But Mr. Baldiga knows he can't draw down one penny

9    of that retainer unless and until there's a court order that

10   allows him to do that.  And he stated that clearly in his

11   application.

12          MR. GOLDMAN:  There's no question, Your Honor.  We

13   think we can show Your Honor has --

14          THE COURT:  Okay.

15          MR. GOLDMAN:  -- the authority to award --

16          THE COURT:  Attorney Friedman?

17          I'm sorry, Attorney Goldman.

18          MR. GOLDMAN:  -- the return of an excessive --

19          THE COURT:  I didn't mean to stop you.

20          MR. GOLDMAN:  That the Court --

21          THE COURT:  Were you done with what you were going

22   to say?  I'm sorry.

23          MR. GOLDMAN:  No.  I was just going to say we

24   think we can show authority for the Court to return the

25   excessive portion of a retainer.

1          THE COURT:  Okay.  All right.  Thank you.

2          Attorney Friedman?

3          MR. FRIEDMAN:  Your Honor, I'm going to actually

4    let you in on a secret, which is I actually really like Mr.

5    Baldiga and Mr. Carty, and particularly Mr. Jonas, who I've

6    worked with many times in the past.

7          I have a great deal of affection for them, so I'm

8    like not excited about having to raise the issue we raised

9    because globally I like it when professionals get paid, but

10   also, you know, these are people who I don't have ill will

11   towards.

12         Our concern is just that the money was transferred

13   by Lamp in violation, we think, of a court order.  They put

14   in a footnote that it wasn't.  We have a response to that

15   and it will be addressed, but like this is not one I'm happy

16   about having to raise.

17         THE COURT:  I understand.

18         MR. FRIEDMAN:  I want to make that point clear.

19         THE COURT:  Thank you.

20         Counsel?

21         MS. CALLARI:  Good morning, Your Honor.  Carollynn

22   Callari again for the creditors.

23         Just, again, everybody's reserving rights.  We

24   understand we're talking about it next time, but just to

25   clarify there was an issue raised again with the retainer,

1   not just the amount, but making sure there wasn't a

2   preference, you know, to see that there was 500,000 and

3   51,000 spent in 24 hours.  Was it -- were there fees

4   services rendered before that that creates a potential

5   preference?

6           I don't think that was clear in the papers that

7   absolutely it was after, so that's one potential issue.

8           And we would like disclosure, so maybe between now

9   and the next hearing, there was one million received and

10  maybe Mr. Baldiga can explain as of today how much of that

11  is remaining, Your Honor.  I think that may go to

12  (indiscernible).

13          THE COURT:  Well, every bit of it should be

14  remaining other than the $51,000, right?

15          MS. CALLARI:  Well, they haven't drawn on it yet,

16  but how much have they accrued against it, Your Honor?

17  Thank you.

18          THE COURT:  Oh, I see what you're saying.  Okay.

19  I misunderstood you.  I'm sorry.  Okay.  All right.

20          So the application to employ is continued until

21  the 27th at 9:30.

22          The application to retain the financial advisors

23  is continued until April 27th at 9:30.

24          The United States Trustee's motion for an order

25  appointing the examiner, or in the alternative a trustee, is

1    continued to 9:30.

2         We're also going to talk about the motion to

3    dismiss that day because we are going to schedule things on

4    that motion to dismiss on the 27th.

5         The DIP motions are continued, which is 117.

6         As I said, 119 is denied without prejudice for a

7    showing in the future if this case can support that.

8         The 186, the motion for order to schedule a status

9    conference, we had the status conference, so we'll note that

10   it was held.

11        And 193 does not need to be carried over because

12   it was just the order granting the status conference.

13        Now, we have a lot of other things we haven't

14   scheduled for hearing yet.

15        Attorney Goldman's application to be employed.

16        The debtor's motion to set a proof of claim bar

17   date.

18        The motion for interim compensation and

19   professional expenses.

20        And the subpoena issue's been resolved I think,

21   right, the motion to extend the time to respond to the

22   subpoena that was filed by Attorney Miltenberger on Golden

23   Spring, that's been resolved, right?

24        MR. BALDIGA:  Yes, Your Honor.

25        THE COURT:  All right.  So 152 doesn't need to be

122

1    set for a hearing because that's been resolved by the

2    parties.

3          So my records seem to indicate -- and you're all

4    going to correct me I'm sure if I'm wrong -- that 146, the

5    motion -- the debtor's motion setting bar dates -- excuse me

6    -- setting bar dates for submitting proofs of claim needs to

7    be scheduled.

8          But, Attorney Baldiga, that -- under Rule 2002, I

9    think we have to give 21-days notice of that motion to

10   everybody of a bar date motion.  I have to look at it, but

11   I'm pretty sure that's true.

12         So I don't think -- I could set an initial hearing

13   on it, but I don't think I can enter an order.  I think I

14   have to give 21-days notice of a bar date.  I don't -- I --

15   the clerk's office or somebody that the Court directs,

16   because otherwise there isn't enough time if someone wants

17   to oppose it.  But maybe I'm wrong, so hold on.

18         MR. BALDIGA:  I agree with you.  I know different

19   courts maybe take different views as to -- we served the

20   motion, so if someone has wanted to file an objection,

21   they've been able to.

22         THE COURT:  Yeah.  But it hasn't been set for a

23   hearing yet, so hold on.

24         MR. BALDIGA:  Right.

25         THE COURT:  I think you might be all right

1    actually.  Maybe we can schedule that for the 27th.  Because

2    it says you have to give 21-days notice by mail of the time

3    that's for filing proofs of claim.  We haven't fixed any

4    time yet.

5              MR. BALDIGA:  Correct.

6              THE COURT:  Okay.  Then you're right.

7              So 146, I'm talking to the courtroom deputy now,

8    146, the motion for setting a bar date, that can be put on

9    the calendar for the 27th as well, okay, at 9:30.

10             The motion -- do you still want to pursue your

11   motion for an order to establish procedures for interim

12   compensation?  Because I think I just denied one very

13   similar to that, so I don't know what the difference between

14   those two motion --

15             MR. BALDIGA:  Well, for the ordinary course

16   professionals, that's a whole separate issue.  The issue for

17   compensation would be --

18             THE COURT:  You want to be able to file your fee

19   applications less than every 120 days?

20             MR. BALDIGA:  Or to be paid provisionally in some

21   lesser amount, and that would apply to the committee as well

22   pending of course -- I mean, every dollar is subject to this

23   court's approval, but it -- the idea of that is usually to

24   put the litigants on more of a level playing field where

25   estate professionals don't go out four or five months and --

1          THE COURT:  Well, I'll set it for a hearing.  I'll

2     set it for a hearing --

3          MR. BALDIGA:  Please.

4          THE COURT:  -- on April 27th at 9:30, 148.

5          MR. BALDIGA:  That would be very appreciated.

6          The only other thing, the Verdolino & Lowey

7     retention, you heard me say before that they've actually

8     been of great assistance.

9          I won't argue it today if the Court doesn't want

10    to, but we need that continued assistance, and they are

11    continuing to do important things for the estate such as

12    setting up the DIP accounts.

13         And I'd like to think that we could get some

14    engagement by the other parties as to that because their

15    work is very important, and we will very much want the

16    debtor to have financial assistance that he otherwise is --

17         If anybody needs a financial person next to them,

18    it's an individual debtor in a case where this many people

19    are involved in matters involving tens of millions of

20    dollars.

21         And I -- it's a very experienced firm that does

22    Chapter 11 day in and day out and hundreds of cases.  And if

23    there is a real reason, like a conflict to keep them out,

24    then I think we'd like to hear it.  If not, I'd like to

25    think parties can rally around it.

1          THE COURT:  Attorney Friedman?

2          MR. FRIEDMAN:  Your Honor, I actually would ask

3     that that hearing be an evidentiary hearing.  We will put on

4     evidence that shows that what Verdolino is doing literally

5     from their own mouth says anyone with half a brain could do

6     it.

7          THE COURT:  I couldn't hear what you said.  I'm

8     sorry.

9          MR. FRIEDMAN:  Sorry.  We will put on evidence

10    that shows that V&L --

11         THE COURT:  Yeah.

12         MR. FRIEDMAN:  -- talk about the services they're

13    providing, it's something that literally anyone with half a

14    brain could do.  That was from our deposition.

15         THE COURT:  So you're opposing the motion?

16         MR. FRIEDMAN:  We are.  Somebody with $3850 we

17    don't think needs a financial advisor.  And we would like it

18    to be an evidentiary hearing.

19         And we'd like -- we'd like the deposition -- I'm

20    sorry -- we'd like the DIP motion to also be an evidentiary

21    hearing.  We intend to cross-examine potentially Mr. Kwok if

22    we need to who is the sole declarant in support of the DIP,

23    and we may want to put on additional evidence.

24         THE COURT:  Well, if we're going to have

25    evidentiary hearings on those two motions, the DIP motion

126

1    and the motion for the appointment of a financial advisor, I

2    don't -- I mean, we could start that the afternoon of the

3    27th.  But I don't -- if we get it -- I mean, we could try.

4    We could try to start it on the 27th, but I'm not saying

5    it's going to be concluded, number one.

6            Number two, if you're -- if you're pursuing that

7    avenue, which is fine, then I'm going to require you to file

8    a list of witnesses and exhibits and file the exhibits that

9    you're going to rely on on the docket.  Okay?

10           MR. FRIEDMAN:  By what date, Your Honor?

11           THE COURT:  I'm going to look at the calendar

12   right now.

13           (Pause.)

14           THE COURT:  Mr. Baldiga, do you anticipate filing

15   a list of witnesses and exhibits?  Because I'm going to make

16   you file them both at the same time.  It's not going to be a

17   back and forth thing.

18           MR. BALDIGA:  No.  It seems like we need to do

19   that, so we will.

20           THE COURT:  Okay.  I think --

21           Is anyone else -- is any other party anticipating

22   calling witnesses or introducing exhibits on the DIP

23   financing motion or the motion for the appointment of a

24   financial advisor?

25           MR. GOLDMAN:  Your Honor, for the committee, Irve

1    Goldman.  We don't anticipate doing that now.  But to the

2    extent we may reassess that, we would be bound obviously by

3    the deadline.

4            THE COURT:  Okay.  All right.  That's fair.  Thank

5    you.

6            MR. FRIEDMAN:  Your Honor, we will try to -- I

7    don't know if it's your practice -- we will meet and confer

8    with Brown Rudnick --

9            THE COURT:  It is my practice to see whether or

10   not you can all agree.

11           MR. FRIEDMAN:  -- to file a joint hopefully.

12           THE COURT:  Yeah.  Yeah.  That would be helpful.

13   And if -- even if you only agree on certain things, that's

14   helpful too.  Okay?

15           MR. FRIEDMAN:  Yes, Your Honor.

16           MR. CARTY:  Your Honor, Andrew Carty from Brown

17   Rudnick.

18           A point of clarification.  On the examiner motion,

19   we had understood that that was going to be continued to the

20   motion to dismiss trial.  Is April 27th a status conference

21   on the examiner motion?

22           THE COURT:  The motion to dismiss and the examiner

23   motion will be addressed on April 27th to the point of

24   scheduling --

25           MR. CARTY:  Yeah.

1        THE COURT:  -- and everything that will be

2    associated with those motions.

3        MR. CARTY:  Okay.

4        THE COURT:  I'm not going to rule on either one of

5    those motions on the 27th.

6        MR. CARTY:  Okay.  Thank you.

7        THE COURT:  Okay.  Thank you.

8        With regard to --

9        I'm sorry, Attorney Claiborn, go ahead.

10       MS. CLAIBORN:  Your Honor, I just wanted to

11   inquire about an objection deadline for the monthly

12   compensation motion?

13       THE COURT:  For the what?

14       MS. CLAIBORN:  For the monthly compensation

15   motion.

16       THE COURT:  Well, when we set a hearing on the

17   27th, that's what the courtroom deputy is going to do,

18   right/  And we have an objection deadline of what?

19       MS. CLAIBORN:  Usually it's a week before.

20       THE COURT:  A week before or the Friday before?

21       THE CLERK:  Usually the week before.  Usually the

22   week before.

23       THE COURT:  Week before, right?  Right.  That's

24   what I thought.

25       This is what I -- on any -- on any motions that

1   are being scheduled today that the courtroom deputy is going

2   to issue notices of hearing on, the objection deadline will

3   be April 20th, a week before.

4           MS. CLAIBORN:  Thank you.

5           THE COURT:  With regard to the --

6           Thank you for asking that question.

7           With regard to the DIP motion and the retention of

8   the financial advisor motion, which we can start that

9   evidentiary hearing at some point on the 27th -- who knows,

10  maybe we'll start it in the morning -- we're going to have

11  to take a break at noon, I'm sorry to say.  I mean, unless

12  that matter gets resolved, which I don't think it will,

13  we're going to have to take that break and then we can

14  continue.

15          And we can even continue it looks like -- let me

16  triple-check that I'm right on this -- but we might even be

17  able to continue on the 28th.  Yes, we could, but I would

18  have to be done by four.

19          What were you going to say, Attorney Goldman?

20          MR. GOLDMAN:  I do have a problem on the 28th,

21  Your Honor.  That's the day the ABI spring meeting begins.

22          THE COURT:  Well, obviously that -- so you're

23  going to be away, is what you're saying?

24          MR. GOLDMAN:  Yes.

25          THE COURT:  Okay.  Well, we'll start on the 27th

130

1     and we'll see what happens.  Understand that we've got some

2     dates that run out by statute, so you all have to talk about

3     that.

4               MR. FRIEDMAN:  Your Honor --

5               THE COURT:  But the list of witnesses and exhibits

6     for the DIP motion and the retention of the financial

7     advisor has to be filed.  And everybody, whoever's filing

8     them, has to file them by 5 p.m. on April 22nd.  I'm not

9     going to issue and order about this by the way.  This is all

10    -- I'm so ordering it on the record.  Okay?

11              But I's sorry, Counsel.  What were you going to

12    say?

13              MR. FRIEDMAN:  Your Honor, for replies on the

14    various motions that are --

15              THE COURT:  We're not having replies.

16              MR. FRIEDMAN:  No replies.

17              THE COURT:  No replies.

18              MR. FRIEDMAN:  Okay.

19              THE COURT:  We're going -- we've got to get -- if

20    I allow a reply on the 27th because of what everybody says,

21    maybe that will happen, but we're not doing replies.  The

22    motions been filed.  The responses are going to need to be

23    filed.  Of the matters we're scheduling today, objection

24    gets filed, there's no replies.  Okay?

25              MR. FRIEDMAN:  Okay, Your Honor.

131

1          THE COURT:  We have a lot of -- I think I know

2     where you all -- I mean, I need to be educated by you all --

3     don't get me wrong -- but I've a pretty good idea of where

4     we're heading on these issues.  We're going to have an

5     evidentiary hearing.  We'll see how that all comes out.

6          So if we go back to today's calendar, I just want

7     to make sure that we've addressed everything on today's

8     calendar.

9          And then we're going to schedule the other matters

10    that we just talked about for the same date and time, the

11    27th at 9:30 a.m.

12         (Pause.)

13         THE COURT:  And then, Attorney Goldman, we're

14    going to set for hearing your application to be employed as

15    well for the 27th at 9:30 a.m.

16         MR. GOLDMAN:  Okay.  That's what I was going to

17    ask.  Thank you, Your Honor.

18         THE COURT:  So I have to go back and make sure I'm

19    not missing anything, but I think that is where things stand

20    as far as matters that have not been -- that have been

21    filed, but not scheduled for a hearing yet.

22         The only other motion that I'm aware of that

23    hasn't been scheduled for hearing is a motion for relief

24    from stay, but it follows the contested matter of a response

25    date that was filed on behalf of the creditor, Ms. Ma, but

1    that's -- the response date for that is the 26th, so we'll

2    see where things stand on the -- if anybody files a response

3    by the 26th, then we'll go from there, because that matter

4    proceeds under our contested matter procedure.

5            So is -- does anyone believe that there's any

6    motion or application that's been filed that hasn't been

7    scheduled for a hearing yet that should be scheduled for a

8    hearing?  Okay.

9            MR. BALDIGA:  Not the debtor, Your Honor.

10            THE COURT:  Okay.  Thank you.  All right.

11            So then what we're going to do is -- I have to go

12    back -- I'm sorry -- so now I forgot what I said.

13            April 18th is where we're going to talk about the

14    mechanism for the funds, correct?  At what time, did I say

15    that?  I don't remember.  I'm sorry.

16            MR. BALDIGA:  I don't think we set a time.

17            THE COURT:  We did not set a time?  But we want to

18    do that by Zoom because -- that was the request, right?

19            MR. BALDIGA:  Yes.

20            MR. FRIEDMAN:  Yes, please, Your Honor.

21            THE COURT:  Okay.  So April 18, why don't we have

22    that conference at noon.  And you'll get the information --

23            The courtroom deputy, what should they do?  Do

24    they contact (indiscernible) connect with that information

25    or do we just email it to them?

1          THE CLERK:  I can just email it to them.

2          THE COURT:  All right.  So the courtroom deputy

3     will email to all of you the Zoom information for the

4     hearing on April 18th at noon, at which we will determine

5     how the funds, the $37 million in cash, to what -- to whom,

6     and where and how it will be wired and received by 5 p.m. on

7     April 20th.  Okay?  That's number one.

8          Then number two is all the matters that were on

9     today's calendar that haven't been resolved by the Court on

10    the record are continued to April 27th at 9:30 a.m.

11         And matters that were not on today's calendar, but

12    that were pending, are now scheduled in court, a notice of

13    hearing will follow with regard to those matters, that we'll

14    also schedule those at -- on April 27th at 9:30 a.m.

15         And that there will be an evidentiary hearing on

16    the debtor in possession financing motion and the retention

17    of the financial advisor motion on the 27th if we have time

18    to get it started, and we probably will, and any party that

19    wishes to call a witness or introduce any exhibits in

20    connection with the evidentiary hearings on the DIP

21    financing motion or the appointment of a financial advisor

22    must file that list of witnesses and exhibits on the docket

23    by 5 p.m. on April 22nd.

24         Now, Mr. Baldiga, what I'd like you to do is note

25    on your exhibits Debtor's 1, Debtor's 2, whatever.  Put a

134

1    label on it.  I don't care if it's an actual sticker or just

2    some label that your copy machine -- and I don't mean -- but

3    I know that some copy machines can make labels, however it

4    is, but your exhibits should be Debtor's 1.

5            PAX, your exhibits should be PAX's 1.

6            If the committee has exhibits, it's Committee 1.

7            Okay?  I just use numbers.  I find that letters

8    are too confusing.  Okay.  Okay.

9            MR. BALDIGA:  We will.  Thank you, Your Honor.

10           THE COURT:  And then you'll docket those on the

11   docket as part of the list of witnesses and exhibits.

12           And then what we'll do is, when we have the

13   evidentiary hearing, what you'll be able to do, all of you,

14   is we'll be able to pull up the exhibit from the docket and

15   then give you control over the exhibit so you can say I want

16   you to go to page 5 of Exhibit -- of PAX Exhibit 2, you

17   know, and then you can -- you'll be able to control it.

18           Now, you might need me to talk -- have either one

19   of you -- do you all know how to -- you know -- I mean, if

20   I've got -- if that's set up with you for Zoom, have you --

21   do you know how to do that?  It's not that hard.  I assure

22   you.  But it does need a little --

23           MR. BALDIGA:  If Mr. Friedman did it, then I would

24   like to think I could.

25           THE COURT:  -- might need a little practice.

1        MR. FRIEDMAN:  I mean, I didn't do it.  So you

2   might be able to one up me.

3        MR. BALDIGA:  I see.  All right.

4        MR. FRIEDMAN:  Your Honor, what we will also do is

5   we will also work to see if we can agree to resolve

6   evidentiary objections.  Or if not, perhaps provide you with

7   a chart of objections --

8        THE COURT:  Yeah.

9        MR. FRIEDMAN:  -- with each other.

10       THE COURT:  Okay.

11       MR. FRIEDMAN:  I think we want to run this in the

12  most professional, least burdensome way for you possible, so

13  we will list objections prior.  We'll do what we all know

14  how to do to litigate effectively.

15       THE COURT:  Yeah.  And I will tell you, even if

16  this looks intimidating, it's really not.  The thing about

17  it that's nice is you'll have the witness and everybody,

18  including all of the people at the table, me, the courtroom

19  deputy, we'll all be looking at the same document at the

20  same time.  Okay?

21       And you can actually -- although Attorney Friedman

22  didn't mean to, you can actually use your finger and circle

23  that thing that you want me to see.  Okay?  I mean, there's

24  -- so there's a lot of utility as a demonstrative tool, and

25  it also ensures that we're all looking at the same document

1    at the same time.

2                MR. BALDIGA:  Very good.

3                THE COURT:  Including the witness, which of course

4    is the important thing.  Okay?

5                MR. BALDIGA:  Yes, Your Honor.

6                THE COURT:  So if you -- we can actually -- and

7    we've done this in the past -- we can actually set up a time

8    before, you know, on the 26th or 25th or whatever might work

9    for you, to just have the clerk of the court and/or our IT

10   people just show you how easy it is to do it so you don't

11   feel -- or you can have somebody come with you, however you

12   decide to do it, however comfortable you are, but I'm

13   telling you it's not -- it may look intimidating, it's not

14   intimidating and it's very, very helpful.

15               The witnesses seem to enjoy it because they feel

16   like it's right in front of them, they're not turning pages,

17   they're -- you know, we're trying to make it easier.

18               Go ahead, Attorney Goldman.

19               MR. GOLDMAN:  How do we sign up for that, Your

20   Honor?

21               THE COURT:  We'll reach out to you and tell you.

22   I mean, we did have for a period of time ongoing regular

23   sessions, but -- and that was mostly because of the pandemic

24   and everything being on Zoom, but we'll set up a time for

25   you all.  And if everybody can't do it, you'll figure out a

1    -- we can do it, it's not a big -- it's not a big issue.  If

2    you can only do it at one time and Mr. Baldiga can only do

3    it at another time, we'll figure it all out.  Okay?

4              MR. GOLDMAN:  Good.

5              THE COURT:  It probably wouldn't take you more

6    than 15 minutes to a half an hour to devote to just make

7    sure you're okay with the presentation.  But I can -- I can

8    assure you it is not as difficult as you may think.

9              All right.  So is there anything else that we

10   should be addressing this afternoon?  I think -- I think

11   we've addressed everything.  I've explained how I want the

12   exhibits to be marked by all of you.

13             Again, it's much easier to have them premarked

14   obviously for identification.  Whether they get admitted or

15   not, we'll see what happens at the hearing.

16             MR. BALDIGA:  Good.  Nothing here, Your Honor.  I

17   think we're making good progress.  Thank you very much for

18   today.

19             THE COURT:  Good.  I'm glad to hear that.

20             Anything, Attorney Friedman?

21             MR. FRIEDMAN:  Just thank you for your patience,

22   Your Honor.

23             THE COURT:  You're welcome.

24             Attorney, Claiborn?

25             MS. CLAIBORN:  No, Your Honor.  Thank you.

138

1          THE COURT:  Attorney Goldman?

2          MR. GOLDMAN:  Nothing from me, Your Honor.

3          THE COURT:  Attorneys Rosen, Kindseth?

4          UNIDENTIFIED:  No, Your Honor.

5          THE COURT:  Okay.

6          UNIDENTIFIED:  Your Honor, just a clarification

7     for counsel.  How does the Court's process work with a court

8     interpreter?

9          THE CLERK:  We can't -- I'm not getting that at

10    all, Your Honor.

11         THE COURT:  We can't hear you at all.  I'm so

12    sorry.

13         UNIDENTIFIED:  Can you please repeat that, Mr.

14    Friedman?

15         MR. FRIEDMAN:  The question was, if Mr. Kwok

16    testifies, how we deal with it?  Does the Court provide an

17    official interpreter?

18         THE COURT:  No.  The Court does not provide an

19    interpreter.  In fact, I've looked into that, not in this

20    case, in other cases.  We're not authorized to employ an

21    interpreter because I don't think that the judiciary allows

22    that funding in the bankruptcy court.  I will triple-check

23    though on that answer -- on that question.

24         But I did look at this in another case and you

25    also have to have the interpreter qualified obviously, so

1   there has to be some qualification that you'll have to deal

2   with, Attorney Baldiga.  You know, you're going to have to

3   deal with that.

4           I will triple-check.  Just like I'm going to

5   triple-check about the funds, I'll triple-check on the

6   interpreter.  But I have looked at that before and my

7   memory, which could be wrong, is that the bankruptcy court,

8   different from the district court and the circuit court,

9   does now have the authority to spend funds to do that.  I'm

10  virtually certain that's true.  And then it would be

11  incumbent upon the party to spend the money.

12          And Kwok -- so what we'd have to do, if Mr. Kwok

13  is going to testify, we'd have to go through a whole, you

14  know, qualification of the interpreter.  Unless you all can

15  agree to that obviously.  Maybe that's something you can

16  agree to in advance who the interpreter is and what the

17  qualifications are and all that.

18          And then, you know, the other thing that you may

19  want to consider, but I don't -- I don't -- you know, this

20  is up to you, this has happened in other cases though, you

21  may want to consider whether you want someone transcribing

22  the testimony and the evidence presentation as well,

23  understanding it's not the official record of the case.

24          The official record of the case is through our

25  audio system.  That's what it is.

1          But other parties have asked to have that happen

2     and we've allowed it just because it would be of assistance

3     to that party.

4          Because otherwise you're going to have to wait to

5     get a transcription.

6          Your transcription might not be official, but at

7     least you'll have something to work with until you get a

8     transcription from the reporter that we have to -- once you

9     request a transcript, we have to -- it gets sent out to a

10    third party who then -- who's an official reporter approved

11    by the Court, but they have to then turn that transcript

12    around.

13         So there's a lot of detail in those issues that

14    you may want to think about.

15         MR. BALDIGA:  Okay.  Thank you, Your Honor.

16         THE COURT:  Okay?  But I will check on that

17    though.  I will triple-check, but I'm almost sure that we do

18    not have the authority to spend those funds for an

19    interpreter.

20         Someone actually asked that in a case where it was

21    a pro se debtor who, you know, did not speak English and

22    unfortunately we could not advance funds to have that person

23    have to have an, you know, have an interpreter.  And

24    ultimately that person was able to get somebody to come in

25    and -- I don't know how, but it happened.  That's all I

1    know.  So I don't know if that really helps anybody, but

2    that's really -- that's the status.

3              And I'm looking at the courtroom deputy.  I think

4    that's right about the interpreter.  Don't you think that's

5    correct?

6              THE CLERK:  Yeah.

7              THE COURT:  And she knows a lot more than I do, so

8    I think she's -- I think that we're not able to do that, but

9    we'll confirm that with everybody on Monday.

10             And the courtroom deputy will send to everyone

11   that's here in the courtroom today a Zoom link for Monday's

12   hearing at noon.

13             And then we'll set out the notices of hearing on

14   the matters that haven't been scheduled yet, but that will

15   be scheduled for April 27th at 9:30 a.m.  And I think that

16   takes care of everything today.

17             Anybody disagree?

18             Okay.  All right.  So that takes care of all the

19   matters in the Kwok case today, so court is adjourned.

20             ALL COUNSEL:  Thank you, Your Honor.

21        (Proceedings adjourned at 1:44 p.m.)

22

23

24

25

142

1            I, CHRISTINE FIORE, court-approved

2    transcriber and certified electronic reporter and

3    transcriber, certify that the foregoing is a correct

4    transcript from the official electronic sound recording of

5    the proceedings in the above-entitled matter.

6

7

8    _____        April 20, 2022

9    Christine Fiore, CERT-410

10       Transcriber