```
                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF CONNECTICUT
                         BRIDGEPORT DIVISION


In Re                              *   Case No. 22-50073(JAM)
                                   *
      HO WAN KWOK,                 *   Bridgeport, Connecticut
                                   *   May 4, 2022
                 Debtor.           *
                                   *
* * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MOTION FOR ENTRY OF INTERIM AND
FINAL DIP ORDERS (I) AUTHORIZING THE DEBTOR TO
OBTAIN UNSECURED, SUBORDINATED POST PETITION FINANCING
AND (II) SCHEDULING INTERIM AND
FINAL HEARINGS, and (III) GRANTING RELATED RELIEF
BEFORE THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For the Debtor:                    BENNETT S. SILVERBERG, ESQ.
                                   JEFFREY L. JONAS, ESQ.
                                   Brown Rudnick, LLP
                                   Seven Times Square
                                   New York, NY  10036


For the Creditor, Pacific          PETER FRIEDMAN, ESQ.
 Alliance Asia Opportunity         O'Melveny & Myers LLP
 Fund L.P.:                        Times Square Tower
                                   7 Times Square
                                   New York, NY  10036

                                   PATRICK M. BIRNEY, ESQ.
                                   Robinson & Cole LLP
                                   280 Trumbull Street
                                   Hartford, CT  06103


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

APPEARANCES Cont'd:


For the U.S. Trustee:          HOLLEY L. CLAIBORN, ESQ.
                               Office of the United States
                                  Trustee
                               The Giaimo Federal Building
                               150 Court Street, Room 302
                               New Haven, CT  06510


For Golden Spring              SCOTT ROSEN, ESQ.
 (New York), Interested        Cohn Birnbaum & Shea, P.C.
  Party:                       100 Pearl Street
                               Hartford, CT  06103


Proposed counsel for the       IRVE GOLDMAN, ESQ.
 Creditors Committee:          JOHN KAPLAN, ESQ.
                               Pullman & Comley
                               850 Main Street
                               Bridgeport, CT  06601


For Rui Ma, Zheng Wu and       KRISTEN MAYHEW, ESQ.
 Weican Meng, Creditors:       McElroy, Deutsch, Mulvaney &
                                Carpenter
                               30 Jeliff Lane
                               Southport, CT  06890


For Logan Cheng, Creditor:     JAY MARSHALL WOLMAN, ESQ.
                               Randazza Legal Group
                               100 Pearl Street
                               Hartford, CT  06103

1          (Proceedings commenced at 2:18 p.m.)

2              THE CLERK:  Case no. 22-50073, Ho Wan Kwok.

3              THE COURT:  Okay.  If we could have appearances

4      for the record, starting with the debtor's counsel, please.

5              MR. JONAS:  Good afternoon, Your Honor.  This is

6      Jeff Jonas from Brown Rudnick on behalf of the debtor and I

7      believe my colleague Ben Silverberg is also on the line as

8      well.

9              MR. SILVERBERG:  Good afternoon, Your Honor.

10             THE COURT: Good afternoon.  And counsel for PAX.

11             MR. FRIEDMAN:  Your Honor, it's Peter Friedman

12     from O'Melveny & Myers on behalf of PAX and I believe Mr.

13     Birney is also here from Robinson and Cole.

14             MR. BIRNEY:  Good afternoon, Your Honor.

15             THE COURT:  Good afternoon to both of you

16             Counsel for the committee.

17             MR. GOLDMAN:  Good morning, Your Honor.  Irve

18     Goldman, Pullman & Comley, for the committee and with me is

19     Jonathan Kaplan.

20             MR. KAPLAN:  Good afternoon, Your Honor.

21             THE COURT:  Good afternoon.

22             Attorney Rosen.

23             MR. ROSEN:  Good afternoon, Your Honor.  Scott

24     Rosen of Cohen, Birnbaum and Shea for Golden Spring New York

25     the proposed DIP lender.

1          With me also is Tim Miltenberger, but he was

2     having some technical issues.  He may join my in my office.

3     He may not be visible on screen.

4          THE COURT:  Okay.  Thank you.

5          Attorney Claiborn.

6          MS. CLAIBORN:  Good afternoon, Your Honor.  Holley

7     Claiborn for the U.S. Trustee.

8          THE COURT:  Good afternoon.

9          Attorney Mayhew.

10         MS. MAYHEW:  Good afternoon, Your Honor.  Kristen

11    Mayhew, on behalf of creditors Rui Ma and Zheng Wu.

12         THE COURT:  Good afternoon.

13         Attorney Wolman.

14         MR. WOLMAN:  Good afternoon, Your Honor.  Jay

15    Wolman of (indiscernible)  for creditor Logan Cheng.

16         MS. MAYHEW:  Good afternoon.

17         THE COURT:  I think that is everyone.  Have I

18    missed anyone who would like to note their appearance for

19    the record?

20       (No response.)

21         THE COURT:  Okay.  Thank you.

22         All right.  So Attorney Jonas and Attorney

23    Silverberg I saw yesterday a notice of filing on the DIP

24    issue, which is the subject of today's continued hearing

25    essentially, which looks to me, although you can please

1    correct me if I'm wrong, that other than some reservation of

2    rights, which are important, by PAX and I think the United

3    States Trustee, that there is an interim order that's agreed

4    to by the parties to obtain the unsecured subordinated post-

5    petition financing.

6            Is that correct?

7            MR. JONAS: Your Honor, it's Jeff Jonas, from Brown

8    Rudnick, for the debtor.

9            I believe -- other parties are certainly on the

10   phone and I don't want to speak for them and they can speak

11   for themselves.

12           I think the actual form of order is agreed to. I

13   believe, however, PAX and perhaps the UST, I don't know if

14   I'd call them comments, but I'd certainly let them speak for

15   themselves.

16           But we believe we submitted an order that

17   accomplishes what it needs to consistent with our prior

18   hearing.

19           THE COURT:  Okay.  Attorney Friedman.

20           MR. FRIEDMAN:  Your Honor, the order is in its

21   form not an order we have objections to anything specific

22   regarding.  We discussed on numerous positions I think a DIP

23   with the budget that was attached of millions and millions

24   of dollars on a case with $3,850 in claimed debtor assets is

25   not a good faith 364 and we stand on that.

1           And if there is to be a DIP order, we believe

2    this is the least offensive one in terms of what we could

3    have negotiated.  But we do object.  We've not withdrawn our

4    objection, Your Honor.

5           THE COURT:  Understood.  Thank you.  Attorney

6    Claiborn.

7           MS. CLAIBORN:  Thank you, Your Honor.

8           The U.S. Trustee is also pursing the objection

9    that we filed earlier in this case.  We think that the

10   funding should not be in the form of a loan, it should be

11   just a gift, and we have opposition to it.

12          In particular, with respect to the form of the

13   order and consistent with what I said at the prior hearing,

14   the U.S. Trustee takes the position that any loan that may

15   be approved by this Court should be disbursed into the

16   debtor in possession fund and funds should be held in that

17   account and should not be held by attorneys.

18          THE COURT:  Okay.  Understood.  Anything further,

19   Attorney Claiborn?

20          MS. CLAIBORN:  No, other than just to revisit the

21   idea that this should not be approved.

22          THE COURT:  Okay.

23          MS. CLAIBORN:  I think I made my point in the last

24   hearing and I just want to reiterate to the Court that we're

25   still in the same position.

1          THE COURT:  Understood.  And obviously, we had an

2     evidentiary hearing on the issue, so this interim order,

3     while the Court appreciates, you know, efforts of parties,

4     is not going to be the final form of order that will enter

5     because I have to make some findings based upon the

6     evidentiary hearing, right?

7          And there is -- you know, there isn't any -- I

8     mean, there is reference to the evidentiary hearing, but in

9     any event.

10         All right.  So does anyone else wish to be heard

11    before I make my comments to the interim order?

12         MR. GOLDMAN:  Yes, Your Honor.  Irve Goldman for

13    the committee.

14         THE COURT:  Go ahead.

15         MR. GOLDMAN:  Excuse me my voice.  The committee

16    views the proposed DIP financing as absolutely essential to

17    the proper administration of this case.

18         Without it the committee would be completely

19    hamstrung to do any type of investigation into the debtor's

20    assets, including causes of action against insiders that

21    really is essential to be done in this case.

22         The terms of the loan are about as salable as you

23    could expect for a DIP loan.  The funding is subordinate

24    with priority to administrative and unsecured claims.  The

25    funds can be used to investigate the potential claims and

1    bring claims against the DIP lender itself.

2            There's an express provision that states the DIP

3    order won't be pursued to waive or relinquish any rights

4    that the committee, the estate, or any creditor has against

5    the DIP lender, and if there's an event of default based on

6    the appointment of the trustee, the professional fee escrow

7    in the amount of $500,000 will be there, $400,000 of which

8    is going to be reserved for a Chapter 11 trustee and

9    (indiscernible) professionals.

10            This is functionally a gift based on these terms,

11    and PAX's position that there should be no DIP loan at all,

12    we view as a litigation tactic.  Refer to its motion to

13    dismiss.

14            Because if there is no DIP funding for

15    professionals, there can be no investigation into the scope

16    and extent of the debtor's assets and causes of actions that

17    might recover assets from the estate so that the essential

18    purpose of this proceeding then seizes to exist, and of

19    course, that opens the gateway to their motion to dismiss.

20            They already have alter ego or veil piercing

21    claims pending in the British Virgin Islands and in New York

22    State Court, which we believe are property of the estate,

23    pursuant to a settlement agreement that was approved in the

24    *Genever Holding* Chapter 11 case in the Southern District of

25    New York prior to the filing of this case, in which PAX was

1    a party.

2              There was a stipulation that they could proceed to

3    litigate the ownership issue of who owns the Sherry

4    Netherlands apartment in New York State Court.  That is a

5    cause of action that belongs to the estate, not to PAX.

6              So if this funding is not approved, all of that

7    really will fall to the wayside and it will open the gateway

8    to this motion to dismiss.  So I would prevail upon the

9    Court to approve some type of DIP order so this case could

10   be administered properly.

11             THE COURT:  Okay.  Thank you.  Does anyone else

12   wish to be heard?

13             MS. CLAIBORN:  Your Honor, if I could just

14   briefly?

15             THE COURT:  Go ahead.  I'm sorry.  I see that you

16   raised your hand.

17             MS. CLAIBORN:  Two comments I wanted to make.

18             THE COURT:  I'm sorry.  I didn't see that before,

19   but I see it now.  Go ahead.

20             MS. CLAIBORN:  Well, first of which I want to

21   clarify a point Attorney Goldman just made.

22             The proposed order that is before the Court at

23   paragraph 5(d) does have a limitation on the use of the

24   proceeds.

25             While the proceeds can be use to investigate

1    causes of action, they cannot be used to prosecute or bring

2    causes of action or positive affirmative actions to recover

3    funds or take other remedies.  So there is a limitation on

4    how the money can be used.

5            And second of all I do want to say that with

6    respect to the Chapter 11 trustee component of this loan,

7    the appointment of a Chapter 11 trustee is an event of

8    default that stops the lending.

9            There is a limited sum of money that is then

10   available to a Chapter 11 trustee, and I understand that to

11   be $400,000, and I just want to put that sort of in scope.

12   That is a very limited amount of money in this overall case,

13   and it is a fraction of the money that the debtor seems to

14   think is out there, if the debtor were to be successful on

15   his claims against UBS.  The sum of the UBS litigation is

16   500 million.

17           So when you put that sort of in context, when you

18   put in context with how much the budget is attached to the

19   order, it shows there's already been accrued to date which

20   is over $1.8 million for Brown Rudnick alone.  400,000 for a

21   Chapter 11 trustee is very small amount and is inadequate, I

22   think, to prosecute this Chapter 11 case.

23           That said, (indiscernible) I acknowledge that, but

24   we still think that this should be a process by which the

25   debtor funds this case and it goes wherever it goes, and the

1     money gets used for whatever appropriate purposes it needs

2     to be used for.

3               MR. GOLDMAN:  Your Honor.

4               MR. FRIEDMAN:  Your Honor, if I may respond to Mr.

5     Goldman's comments?

6               THE COURT:  Yes.  Go ahead.

7               MR. FRIEDMAN:  Your Honor, PAX doesn't apologize

8     for opposing this DIP.  PAX has $268 million, at least, of

9     pre-petition claims.  PAX has been pursuing for five years,

10    assets.  I don't -- the committee is filled with people with

11    contingent unliquidated claims.

12              This case is a sham.  It was filed to prevent

13    enforcement of judgments owed to one creditor, and the

14    millions and millions of dollars are being spent on

15    professional fees in this case are just an attempt to divert

16    PAX and collect what it wants, and the DIP budget shows

17    that.

18              PAX has conducted prepetition investigations.  PAX

19    has proved to Justice Ostrager in his orders, the asset

20    shifting between and among different entities.

21              What Mr. Goldman refers to as a litigation tactic

22    -- if it's a litigation tactic, it's a good faith one, Your

23    Honor, borne by years of bad faith conduct by the debtor.

24              MR. GOLDMAN:  Your Honor, just let me comment,

25    briefly on those comments.

1          THE COURT:  I'm having a little trouble

2     understanding you, Attorney Goldman.  I know you're having

3     trouble speaking, but can you try that again?

4          MR. GOLDMAN:  I'm sorry.  I'll try better.

5          PAX's attempts, however long they've been

6     undertaken, did not elevate this claim in terms of priority

7     over any other creditor --

8          THE COURT:  No one has ever suggested -- I know I

9     keep hearing that argument, but no one has ever suggested

10    that its claim is elevated, not even PAX.  So I don't know

11    why that argument keeps being made.  I really don't.

12         MR. GOLDMAN:  Well --

13         THE COURT:  No one has made that argument.

14         MR. GOLDMAN:  Well, it seems to me the taking a

15    position that because they've litigated for many years and

16    made many efforts to recover on their judgment, that PAX's

17    claim should be accorded some sort of superiority in terms

18    of --

19         THE COURT:  They have not asserted that, Attorney

20    Goldman. They have not -- they have not asserted that.  They

21    said they might make a claim --

22         MR. GOLDMAN:  Well, that's how I --

23         THE COURT:  -- for substantial contribution.  They

24    haven't done that yet, number one.  Number two --

25         MR. GOLDMAN:  Yes.

1      THE COURT:  -- I'm not going to address an issue

2  that's not before the Court.  It's not before the Court --

3      MR. GOLDMAN:  At least I --

4      THE COURT:  -- and there's nothing that PAX has

5  said --

6      MR. GOLDMAN:  I mean --

7      THE COURT:  -- in this court that somehow should

8  elevate them over general unsecured creditors at this point

9  in time.  They haven't said that, so let's move on.

10      We've got to get -- let's talk about the reality

11  of this order.  The reality of this order is I look at a

12  budget where -- and Attorney Jonas, I think you need to talk

13  to me about this.  You've already -- Brown Rudnick has

14  already incurred a million eight in fees for a case that's

15  not even two and a half months old?  Doing what?

16      MR. JONAS:  Your Honor, we -- we've had -- let's

17  see.  Where should I start?  I'll start with --

18      THE COURT:  Well, you can start anywhere you want,

19  but a million eight in fees for two and a half months of a

20  bankruptcy case where a debtor has no money, we've had two

21  hearings that haven't even lasted a day.

22      You know, part of the problem I have is, this

23  interim order for financing just seems to be a mechanism to

24  get all the professionals paid, and that's all it is.

25  What's going to happen here?  What is going to happen in

14

1    this case?

2          You already have a million dollar retainer.  Now

3    you've got -- now your budget says -- and I'm looking at

4    page 60 of 60 of the document that you filed, that you've

5    already incurred through April 30, which was four days ago,

6    a million-eight, almost a million-nine in fees.

7          That seems extremely high to me, and one of the

8    things I will tell you is, I am not sure I'm entering any

9    order on these getting paid outside of the ordinary course

10   of the bankruptcy code every three months, because when you

11   look at this, and you look at this, you try to look at this

12   with an eye of -- with no judgment associated with it, what

13   possibly could have you done from February 15 to April 30

14   that could have incurred fees in this case?

15         This isn't GM or Chrysler.  This isn't a company

16   that's producing goods that are being sold on the market.

17   This is a gentleman who has come in and says he has nothing,

18   yet you've incurred a million-eight, almost a million-nine

19   in fees?  That -- and every month -- every week, you're

20   going to incur a quarter of a million dollars in fees?

21         Well, 330 of the Bankruptcy Code says that the

22   Court has to make determinations as to whether the fees are

23   reasonable, the hourly rate is reasonable, whether there's

24   duplication of efforts, whether this actually benefitted the

25   estate.  All those kind of things.  And if I don't make

those findings, then you're not getting paid a million-eight.

And right now, this loan is for $2 million. So everything but $100,000 is going to use to be paid you? That seems completely inequitable and uncalled for and not supported by the record in this case. I am shocked by the budget, quite frankly.

And that the -- what has -- I had -- the Virtulina and Lowey, what have they done from February 15 to April 30 to incur fees of $150,000? I don't know.

And then they're going to incur fees every week of another $20,000. And then the committee has already incurred fees -- who just got retained a week ago, of 110, and then they're going to retain fees -- or incur fees of $80,000 every week. Wow. That's pretty interesting. In a case that's not -- an individual Chapter 11 case.

If you were telling me that this gentleman had assets all over the world that were going to become part of this estate and liquidated and pay creditors, I might have a different viewpoint.

But right now, I've been told that maybe there will be some distribution to unsecured creditors, and where is that money going to come from?

Well, the boat, according to the debtor, is an asset of the -- is not an asset of the estate, so I don't

16

1    know what -- he doesn't have any other assets or any other

2    bank accounts.  So who -- why aren't we just taking the $8

3    million and just paying the creditors right now?  I mean, I

4    don't understand it.  This seems to me -- I am not going to

5    have -- allow a Chapter 11 case to run just so professionals

6    can get paid.  Sorry.  That's not how it works.

7         And to -- this isn't that kind of a case.  If you

8    had a different case, if we were in here and we were talking

9    about a company producing chairs that had a business record

10   of producing this amount of chairs and this is what they

11   were doing, they were going to consolidate their businesses,

12   or they were going to sell part of their business, or they

13   were going to take over their business, or they were going

14   to make another plan of how they were going to continue

15   their operations for the next three to five years, we might

16   be talking about something different, but we are now in a

17   case that's not even -- that's barely two months old and

18   you've already incurred $2 million in fees.

19        Well, you're not -- I can tell you right now, it's

20   highly unlikely you're going to be awarded those $2 million

21   in fees.  And I had this discussion at the beginning with

22   Mr. Baldiga about the hourly rate, and I said look, you're

23   going to be retained as counsel, but you have to come to the

24   realities of this case.

25        And so, you're getting a loan from somebody who's

17

1    just saying, okay, yeah, let's pay all these professionals

2    all this money, which by the way, that's what it does, and

3    you don't reference anywhere in your procedures for interim

4    compensation Section 330, which has to be referenced,

5    because that's the only standard under which fees and

6    expenses are allowed.

7          Interim compensation 331 only talks about when you

8    can file your applications for interim compensation.  It

9    doesn't talk about the grounds or the reasoning or the

10   consideration that the Court has to take into account when

11   it determines whether those fees are reasonable and

12   necessary under the circumstances of the case.

13         This isn't a blank check.  I'm not issuing orders

14   with blank checks.  If that's true, why do you need me?  Why

15   don't you just go outside of the court and do all of this

16   outside of the court?

17         Well, you can't do it outside of the court because

18   you've got a creditor who's been after you for a long time,

19   and that's why you want this court.  Understood.  That can

20   be a legitimate reason.

21         But I'm not entering orders that now -- so I don't

22   understand the note on the budget that says there will be

23   $250,000 retainer balance after accrual, Brown Rudnick fees

24   against the retainer.  It doesn't even tell me when that has

25   happened.  Okay?  Your total through 4/30 is 1,874,852.  So

18

1    are you reducing -- you're not -- you're not applying it to

2    the entire retainer?  You're only taking that million-eight

3    from the 2 million?  How does that work?

4            MR. JONAS:  Your Honor, I -- you've asked a lot of

5    questions, so with your permission --

6            THE COURT:  I have.  That's fair.  That's a fair

7    statement, Attorney Jonas.  I have asked a lot of questions.

8            MR. JONAS:  I tried to make notes but let me see

9    if I can respond to all of your questions.  I'll do my best.

10   I apologize if I miss one or two.  I was trying to --

11           THE COURT:  That's fine.

12           MR. JONAS:  -- feverishly write everything down.

13           THE COURT:  I did ask a series of questions, which

14   was unfair.  So do what you can and --

15           MR. JONAS:  No, no --

16           THE COURT:  -- I'll ask whatever I want to ask

17   when --

18           MR. JONAS:  -- no, I --

19           THE COURT:  -- if I don't think you've answered

20   me.

21           MR. JONAS:  I actually enjoy it, Your Honor, so

22   I'll take it on.

23           So let me start at the -- let me start at kind of

24   the end, Your Honor.

25           First, let me say, we appreciate and we understand

1    that all of our fees will be subject to court approval.

2    Every party will have an -- we will have to file fee

3    applications.

4            Every party, and I am sure they'll take advantage

5    of it, will have an opportunity to review our detailed fee

6    statements, object, we will have hearings, so let's -- I

7    don't know that today is the time or the place to make even

8    a preliminary determination as to the appropriateness of our

9    fees.

10           We understand that's going to be looked at very --

11   in a very discerning way and we will take that on when the

12   day comes.  That's number one.

13           I will say, though, in part -- let me just tell

14   you what -- I think you know what's been happening because

15   you can see your docket.

16           We have had -- everything we've tried to do in

17   this case has been opposed, and that's okay.  That's the way

18   the system works.

19           But there's nothing that has been easy.  We've had

20   to fight about, which takes time and therefore, you know,

21   does incur our time and does run up the fees unfortunately,

22   the retentions, which we've fought about but ultimately

23   resolved in large part.

24           There was an -- and again, in a very short order

25   in this case, there was an examiner trustee motion which

1    required briefing and response.

2             The schedules and statement of affairs required

3    some of our attention.  Those have been filed.  There has

4    been numerous depositions in the case, not yet of the debtor

5    but of other parties that required our involvement.

6             There has been two -- in one case, I don't want to

7    say all day but maybe close to it, two 341 meetings, and

8    these are not the, what I call the more standard simple 341

9    meetings, multiple creditor inquiries at the 341 meetings.

10            Hopefully, there is now a DIP in place, or almost

11   a DIP in place that has been fairly contentious.  We had a,

12   I think almost a full day trial on the DIP.  As you know, a

13   trial requires lots of preparation and that took a lot of

14   our time.

15            There -- I think on a good note, we have filed a

16   plan in this case in only the first few weeks and months of

17   the case -- of this case.

18            We have resolved in large part, which took a lot

19   of time and litigation, the boat issue where the boat --

20   there is now an order in place where $37 million in cash has

21   been put up to secure return of the boat.

22            Granted, it resolved the contempt order, at least

23   for the time being, that was issued in New York, but we'll -

24   - not only has the 37 million put up, the boat hopefully to

25   use a euphemism, will be on its way back to Bridgeport in

1    fairly short order.  As you know, the plan contemplates

2    contribution of the boat, which is significant in terms of

3    value.

4         We've also, I think -- I will tell you, leading up

5    to the motion to dismiss, which I think will be a fairly

6    seminal event in this case, either the case is going to

7    survive a motion to dismiss or it's not, obviously, and

8    that's coming up at the end of the month.

9         We've received in the last few days, I believe PAX

10   has notice and it certainly -- I'm not quibbling with it,

11   I'm just reporting -- they have noticed, I think, 10 to 12

12   depositions.  We have a trial in three weeks.  We'll be

13   spending lots of time getting ready for that and sitting at

14   depositions over the weeks to come.

15        We have resolved for a case where there was

16   question about how a creditor's committee, which we welcome

17   and we welcome their participation, the creditor's committee

18   is now supportive of the DIP, and we've put arrangements

19   into place in order to fund the creditor's committee and the

20   work that they have to do.

21        So, Your Honor, I'll just say, I think my quick

22   and off the top of my head recitation, a lot -- yes, there

23   hasn't been that much time in the case, but it has required

24   a lot of time.

25        I think there have been -- I think just -- I mean,

1    justifying that time in some part, in some part, is the

2    results we've achieved despite tremendous opposition on

3    everything from, you know, is the sun outside to all of the

4    other matters that we've gotten through in this case and

5    presented to the Court.

6           I actually think we -- you know, the case is

7    progressing very, very quickly.  We'll see what happens at

8    the end of the month at our trial.

9           But in any event, you know, in terms of the DIP

10   funding professional fees, yes, the DIP in large part --

11   it's not completely -- don't forget, the DIP also provides a

12   million -- effectively, a million dollar gift to the estate.

13   It provides up to -- at least initially, up to $2 million of

14   funding to the creditor's committee and to -- and make

15   funding available for an examiner or possibly a trustee.

16          I think those are very salutatory effects of the

17   DIP, but yes, I'm not going to again quibble with you that

18   the DIP -- there aren't millions of dollars available to

19   fund professional fees, because there's no other -- the

20   debtor has no other source to do it.

21          So yes, the DIP lender, under the terms of the

22   DIP, has agreed that as we've talked about and I think as

23   was presented at trial, in order to help his father and

24   wanting to see his father have a successful resolution with

25   his creditors in a successful Chapter 11 case, yes, Mr.

1    Kwok's son, and through his entities, is prepared to fund

2    the DIP to pay professional fees so that we can hopefully

3    have a successful case.

4            I will say on that, philosophically, Your Honor,

5    and you may be of a different view, and I don't know, I

6    firmly believe that debtors in Chapter 11 are entitled to

7    qualified Chapter 11 counsel.  Sometimes that's very

8    expensive.  I don't think that the rates that O'Melveny is

9    charging are any different than ours, and if creditors --

10           THE COURT:  Yeah, but they're not getting paid

11   from the estate --

12           MR. JONAS:  -- are bringing this --

13           THE COURT:  But they're not getting paid from the

14   estate, Mr. Jonas.  There's a big difference.

15           MR. JONAS:  And, Your Honor, I'll say this.  I

16   don't -- you know, while I don't want to say it's a fiction,

17   but you know, to say that this estate is paying our fees,

18   again, there are no -- subject to the gifts and the boat

19   return and everything else, there are little to no assets in

20   the estate.

21           The DIP lender is willing to fund, on a

22   subordinated unsecured basis -- we've said this loud and

23   clear, the DIP lender is funding this case, is funding us,

24   is funding the creditor's committee, will fund an examiner,

25   will fund the trustee to some extent --

1      THE COURT:  Is it going to fund a --

2      MR. JONAS:  -- it's from the US --

3      THE COURT:  -- distribution to creditors?

4      MR. JONAS:  Is it -- well, for starters, Your

5  Honor, there's a million dollars coming into the estate as a

6  gift --

7      THE COURT:  Okay.

8      MR. JONAS:  -- under the DIP, number one.

9      THE COURT:  All right.  That's a start.

10     MR. JONAS:  It also --

11     THE COURT:  That's a start, but you have $400

12 million in claims.

13     MR. JONAS:  Your Honor --

14     THE COURT:  So it's going to be --

15     MR. JONAS:  -- Your Honor, if I can --

16     THE COURT:  -- so what do we got there, a cent on

17 the dollar?  Maybe --

18     MR. JONAS:  Well, let me finish -- please, Your

19 Honor, if I --

20     THE COURT:  Sure.  Sure.

21     MR. JONAS:  -- if I can finish?

22     THE COURT:  I'm sorry.  Go ahead.

23     MR. JONAS:  Well, no, that's okay.

24         The structure of this case, which in large part is

25 the DIP, has afforded the filing of a plan that provides for

1    contribution of the boat, which is worth, I don't know, but

2    I think, tens of millions of dollars.  If there was no DIP

3    to pay professionals, there would be no plan, there would be

4    no return of the boat.

5         And so yes, Your Honor, there's an underpinning by

6    which the DIP funds professionals.  That's how you get to a

7    successful -- maybe.  Maybe yes, maybe no, we'll see.

8         But I think the debtor is entitled to, if you

9    will, fight it out, see if we can get through this and come

10   out maybe consensually.  I don't want to give that up, but

11   with a successful plan where there will be a significant

12   distribution of creditors.

13        So we're trying to get there desperately, Your

14   Honor.  I think we need to get through the next month.

15   We've got a lot of work to do.

16        I think if we can -- obviously, we have to see

17   where the motion to dismiss goes, but I think the debtor is

18   entitled, especially on a basis where as -- you know, I know

19   you keep -- I don't want to say struggling, but focusing on

20   the fact that it's not as if creditors are paying for our

21   fees.  They're not.  This is an unsecured subordinated DIP

22   loan.  This is behind creditors.

23        So they're not bearing the burden if you will.  In

24   fact, the DIP is providing counsel to creditors, because the

25   creditor committee counsel is getting paid out of a DIP as

26

1    we are.

2              So I think, Your Honor, respectfully, for all of

3    those reasons -- and we've worked -- by the way, Your Honor,

4    I'll just comment.

5              Notwithstanding Mr. Friedman and the U.S.

6    Trustee's comments, we've worked very hard as you instructed

7    us, to come up with a consensual form of order, and I think

8    we've done that, notwithstanding the principal's objections.

9              And so, you know, we're going to continue to work

10   hard in the face of adversity and try and get to a

11   successful case, but we really do need the DIP to do that,

12   Your Honor.  Thank you.

13             THE COURT:  I understand.

14             MR. FREIDMAN:  Your Honor, may I be heard?

15             THE COURT:  Not yet, Attorney Friedman.  I just

16   have a few more questions for Attorney Jonas and it's fair

17   for Attorney Jonas to say that I asked him about 15

18   questions and there's now way to have answered those because

19   I was issuing concerns without giving him an opportunity to

20   respond.

21             But with regard to the budget the million-eight

22   figure total through 430 that's in your document, page 60 of

23   (indiscernible) on ECF 315, my question is none of the

24   retainer funds, the million dollar retainer that your firm

25   already got will be applied to those amounts, or will they?

27

1          MR. JONAS:  Your Honor, if I could just ask, and I

2     think I told you I'm actually sitting in Judge Kaplan's

3     chambers in Trenton, New Jersey right now. He's been kind

4     enough to allow me to do the Zoom call from here.

5          Could I just ask my partner, Mr. Silverberg, to

6     respond to that? I've been busy preparing for today.

7          MR. SILVERBERG:  Are you able to hear me?

8          THE COURT:  Yes, we can hear you fine.  Thank you.

9          MR. SILVERBERG:  If you're looking at the budget -

10    - the short answer to your question is yes, a portion of the

11    retainer is going to be applied against the million-eight.

12    If you look down about half way down the budget --

13          THE COURT:  $750,000?

14          MR. SILVERBERG:  $668,000 and change of the amount

15    that's being held in retainer will be applied against the

16    million eight.

17          Our retention application provided that we would

18    maintain a floor of $250,000 in retainer during the case.

19          THE COURT:  All right.  So of the million dollar

20    retainer that your firm received then there was monies drawn

21    down on the retainer pre-petition?

22          MR. SILVERBERG:  About $50,000 or so.

23          THE COURT:  Okay.  And so that would leave

24    $950,000 or so -- I'm not asking you to be to the penny. I'm

25    just trying to get an idea here, okay?  So that would leave

28

1    $950,000 in the retainer and then you can only draw down --

2    you have to leave 250.  So that would only give you 700 is

3    what you're saying?

4            MS. CLAIBORN:  Your Honor, if I could interject.

5    I apologize.  But one of the objection components the U.S.

6    Trustee raised was to having a floor and it was my

7    understanding that Brown Rudnick (indiscernible) --

8            MR. SILVERBERG:  I think Ms. Claiborn muted

9    herself.

10           THE COURT:  No, I think I -- Attorney Claiborn

11   muted you mistakenly.  So can you say that -- you said the

12   floor of $250,000 and I pushed the wrong button.  So my

13   mistake.

14           MS. CLAIBORN:  Okay.  I'll try to do a better job

15   with it this time.

16           The application to employ Brown Rudnick did

17   request to have a floor of $250,000 on the retainer.  The

18   U.S. Trustee objected to that.

19           And it was my understanding that Brown Rudnick

20   agreed to resolve that by removing that.  I cannot recall as

21   I sit here today as whether or not that's in the actual

22   order, but that was the understanding.

23           THE COURT:  So you didn't want them to maintain a

24   floor is what you're saying.  You wanted them to draw down -

25   -

29

1          MS. CLAIBORN:  Correct.

2          THE COURT:  -- apply the entire retainer to post-

3     petition fees.

4          MS. CLAIBORN:  Correct.

5          THE COURT:  All right.  So what I'm trying to

6     understand, Attorney Silverberg is -- this is what I'm

7     trying to understand and I probably didn't ask the questions

8     very well because I kept asking a lot of questions.

9          But what I'm trying to understand is this.

10    There's a budget figure of 1,874,852.  Your firm received a

11    retainer of a million dollars.

12         Under this DIP loan two million more is coming

13    into the estate.  And if I enter this order establishing

14    procedures for interim compensation, you're all going to

15    draw down on that more subject to final fee applications

16    that have to be filed by July 15th or something like that,

17    if I even do that.

18         But my point is I need to understand the dollars.

19    If the 2 million comes in right now, and this is what I

20    asked, what's it going to be used -- what's it going to pay?

21         And if you still have -- if you can only draw down

22    $750,000.  Let's just say that I agree with you, on your

23    retainer, then you still have a million one that's due and

24    owning through 430, right?

25         The Pullman and Comley has $110,000 so now we're

1   up to a million two.  And then Virtulina and Lowey has 150

2   so we're up to a million-350.  And so of the 2 million that

3   comes in is 1,350,000 of it going to be paid immediately?

4   And I think the answer is yes, but I need to know that. I

5   need to understand that.

6            MR. SILVERBERG:  I can take this if you want me

7   to.

8            UNIDENTIFIED:  Sure.  Go ahead.

9            MR. SILVERBERG:  Your Honor, the $2 million which

10  is defined as the initial -- the interim DIP loan --

11           THE CLERK:  Excuse me, Your Honor.

12           THE COURT:  Hold on a second, Attorney Silverberg.

13  I think we're having trouble hearing you. Are we having

14  trouble?

15           THE CLERK:  I just wasn't sure who was speaking.

16           THE COURT:  Oh, it's Attorney Silverberg speaking

17  right now.

18           THE CLERK:  Thank you.

19           THE COURT:  Go ahead. I'm sorry.

20           MR. SILVERBERG:  I apologize. I should have

21  announced myself before responding.

22           THE COURT:  That's okay.

23           MR. SILVERBERG:  Your Honor, what's defined in

24  paragraph 2(a) of the interim DIP order is an interim DIP

25  loan of $2 million.  That $2 million is going to Attorney

1  Goldman's either IOLTA trust or other segregated account.

2         That same paragraph provides for additional

3  subsequent DIP borrowing of up $3 million.  So the initial

4  $2 million which was going to Attorney Goldman's account is

5  exclusively to pay committee professional fees.

6         Brown Rudnick's and the other committee -- I'm

7  sorry, the other debtor professional fees are going to be

8  paid from what are referred to as the subsequent DIP draws

9  up to $3 million.

10         So the answer to your specific question is no,

11  Brown Rudnick will not be touching the first $2 million

12  which is drawn on the DIP.

13         THE COURT:  Well, when is the additional $3

14  million coming in, because I thought we were taking this in

15  increments.

16         MR. SILVERBERG:  The initial -- the interim DIP

17  loan provides for the million dollar estate contribution

18  loan, the $2 million that's going --

19         THE COURT:  My reading of it, Attorney Silverberg,

20  but correct me if I'm wrong, that million dollars isn't

21  supposed to be used to pay any professional fees, correct?

22         MR. SILVERBERG:  That is correct. I'm just

23  describing --

24         THE COURT:  No, no. I understand. I need to make

25  sure I understand what's going on so I'm asking the

1    questions.

2           So don't worry about the million dollars because

3    that's not going to be used to pay professional fees. So

4    just put that aside.

5           So you've got $2 million that's going to what you

6    call the UCC account, correct?

7           MR. SILVERBERG:  Correct.

8           THE COURT:  And then when does this other $3

9    million come in?

10          MR. SILVERBERG:  As it's needed over the course of

11   the next month.

12          THE COURT:  But you determine as it's needed if I

13   enter an order allowing for these interim procedures because

14   you would then say I need to get paid a million-8 in fees

15   and if I need to get paid -- and  nobody objects, then I'm

16   just going to get paid that money.  The money's going to

17   come in and I'm going to get paid.  So you determine what's

18   needed, correct?

19          MR. SILVERBERG:  No, Your Honor.  The money is

20   coming into the DIP account to ensure that it's there for

21   payment of the professional fees whenever they're allowed.

22          THE COURT:  Well, that was my -- so then you

23   didn't answer my question because I asked you that

24   specifically.

25          So when is the $3 million coming in and you said

1    when it's needed, but that's not correct. It's coming in now

2    and then it will be drawn down on when you decide it's

3    needed.  Is that the mechanics, because I need to understand

4    the mechanics.

5            MR. SILVERBERG:  Absolutely, Your Honor.

6            So once the DIP is approved, assuming it's

7    approved in its current form, whatever's been incurred by

8    the debtor professionals, which is the million-8 for Brown

9    Rudnick, the 110 for -- sorry, the 150 for Virtulina, less

10   the $700,000 of retainer that will be reserved but not

11   actually applied against fees will be borrowed against the

12   DIP.

13           Then on a weekly basis going forward, as fees are

14   incurred they'll be borrowed by the DIP lender and placed

15   into the DIP account so that they're there for whenever the

16   fees are allowed.

17           THE COURT:  All right. So actually, it's not just

18   those figures in column 1 because it's column 2, 5/1, 2022,

19   because today's 5/4, 2022.

20           So the amount of money that's going to be --

21   you're going to -- the 3 million's going to come in but

22   you're going to draw down a 1,762,000 -- oh, no. I've got to

23   back out the Pullman and Comley fees.

24           So what you're -- so just answer -- I just need to

25   make sure I understand.  Two million's going to the

34

1  unsecured creditor committee's counsel's office to be put in

2  an account, what you call the UCC account.  The 3 million's

3  coming in now too.

4          So we talked about doing this incrementally.  This

5  8 million loan wasn't going to be an 8 million loan.  But

6  essentially it's going to be a 5 million loan right now,

7  right?  That's what you're telling me.

8          MR. SILVERBERG:  It's a total of up to 5 million

9  for professional fees, but the $3 million that is above and

10  beyond the interim DIP loan is not coming in now. Only a

11  portion of that is coming in now to cover what's been

12  accrued and is not covered by --

13          THE COURT:  But where does it say that, counsel?

14  Where does it say that?  It doesn't say that.  That's not

15  what it says.

16          It says that there's $2 million is the interim DIP

17  loan.  This was what it's supposed to be, an interim DIP

18  loan, right, to get us through the next few weeks.

19          We don't need to have this funded to pay

20  professional fees for the next few weeks, especially if

21  there isn't any procedure to allow you all to get paid and

22  that you have to follow the code and get paid every 120

23  days.

24          So this is my point.  The point that I'm having

25  is, the problem that I'm having is the only purpose of this

1    account -- this lending, other than the million dollars that

2    can't be paid for fees at this point is to pay fees.  There

3    is no other purpose.

4              And you're now telling me something different than

5    what your order says.  So why don't you just say the

6    debtor's borrowing $5 million, 2 million of which is going

7    into the UCC account and 3 million of it is going into the

8    debtor account, which is defined in the DIP order, which you

9    don't define in the DIP -- excuse me. Which is defined in

10   the DIP loan documents, but not defined in the DIP order.

11             So you're really authorizing -- you want this

12   order to authorize you to immediately borrow $5 million,

13   correct?

14             MR. JONAS:  Your Honor --

15             MR. SILVERBERG:  Your Honor -- I'm sorry, go

16   ahead, Jeff.

17             MR. JONAS:  Your Honor, let me just back up for

18   one second.  Let me just say I don't want you to have any

19   impression that there's anything improper here because

20   there's not.

21             Let me just explain that when we started this and

22   we entered into a negotiation with the committee, the

23   committee requested and ultimately acknowledged and agreed

24   that $2 million would be effectively borrowed immediately,

25   if you will, carved out for committee professionals and we

1    ultimately agreed to that.

2         So yes, the first $2 million -- and that was not

3    where we started. I'll admit, Your Honor, that was not what

4    we wanted but that's how it happened. The committee, if you

5    will, demanded that and that's fine.  And we agreed.

6         So even though that's not where we started, we had

7    no intention of that right off the top $2 million of our DIP

8    would be carved off and unavailable to any other

9    professional except the committee, but we agreed to that.

10        So just to be clear the first $2 million is carved

11   out and goes to -- effectively goes to the committee.

12        THE COURT:  And where does it say that in the

13   proposed order?  See my problem is it doesn't say that in

14   the proposed order.  That's not what it says.  It just says

15   there's an interim DIP loan of $2 million.  And then it

16   talks about amount set forth in the budget.

17        I specifically asked you all -- to show me what

18   was being loaned and what it was going to be used for to

19   pay.

20        And so now you're saying there's 2 million --

21   first of all, why does $2 million need to be loaned right

22   now?  The committee hasn't even incurred $220,000.

23        MR. JONAS: The committee required that, Your

24   Honor.

25        THE COURT:  Well, that may be, but that doesn't

1    mean that's what they're going to get, is it?

2            MR. JONAS:  Well, Your Honor, we've been trying to

3    reach consensus with as many parties as we could.  The DIP

4    lender acquiesced to that and so that was the way the DIP

5    was structured.

6            THE COURT:  Well, the DIP lender has acquiesced to

7    everything. So that's not really a problem, right?

8            The problem is what is the purpose of this loan

9    and how is it being used.  And I've been asking that

10   question for days.  Every hearing I ask the same question.

11           MR. JONAS:  Your Honor, let me be as clear as I

12   can possibly be.

13           And, again, respectfully, if you don't think the

14   order and the loan documents in the budget are clear, we

15   will certainly -- we can certainly fix that.  We did

16   everything we possibly could to be as clear as possible.  To

17   be as up front with the court as possible.

18           So to be clear, yes, you are correct that between

19   now and let's say the motion to dismiss hearing at the end

20   of May, $5 million could be drawn on the DIP.  Yes, that is

21   correct.  $2 million would go to the committee and up $3

22   million would be available to fund other professionals.

23           And yes, largely that would be Brown Rudnick

24   because as you already identified there would

25   (indiscernible)  a significant amount of fee already, close

38

1    to a million dollars, that's already accrued that needs to

2    be paid.

3            So I don't know that I can be any clearer than

4    that, Your Honor.   But that's what's before you.

5            And let me just say, Your Honor, to just -- just

6    because I'm concerned that somehow there's a thought that

7    some of this is improper. This was -- in my opinion, this

8    was what was before the court when we had our hearing, the

9    form of DIP order and documents that had been filed prior to

10   the hearing we had, this is what they provided.

11           THE COURT:   That may be, but we had a evidentiary

12   hearing at which point the issue was raised of whether or

13   not there was really an emergency need for funding, because

14   that's what your papers said.   That there was an emergency

15   need, an immediate need to fund $8 million.

16           And I said at the end of that hearing I don't see

17   any immediate need to fund $8 million.   And why aren't we

18   taking this in increments.   There is a motion to dismiss

19   pending.

20           Why am I going to enter an order that sets forth

21   all the parties' rights, responsibilities, remedies and

22   boxes them into corners in a case that might be dismissed in

23   a month?

24           And I also said I would like to see the budget and

25   I would like you to show me specifically what every dollar

1    is that you're borrowing, where it's going to be used to be

2    paid.  And this doesn't do that.

3         Right now this doesn't say that there's going to

4    be a $5 million loan right now.  It doesn't say that.  Nor

5    does the DIP loan document say that.

6         MR. JONAS:  Your Honor, if you look on total DIP -

7    -

8         THE COURT:  And it doesn't say that the 2

9    million's only for the committee, by the way.  I just says

10   that the committee's going to hold it.  That's what it says.

11   It doesn't say it's earmarked for the committee's expenses.

12        And I don't think I would agree to that at this

13   point, because why would they be able to incur $2 million in

14   fees between now and March -- and May 29th when there's a

15   case with no assets and no income.  We keep -- we're like in

16   this circle that we can't get out of.

17        And I'm telling you right now that's a problem

18   that you have counsel.  And I identified that problem from

19   day one of the first hearing in this case. I identified that

20   problem prior to the evidentiary hearing on the DIP.

21        I identified that problem during the DIP and the

22   Virtulina and Lowey evidentiary hearings. I didn't enter

23   orders on specific issues you've already asked the court to

24   do because I have concerns.

25        I have concerns that this case -- sure, you can

1    fund professionals.  Somebody can do that.  But to what end?

2    If there isn't going to be a meaningful distribution to

3    unsecured creditors what's the point of this case?

4         MR. JONAS:  Your Honor, first of all let me say if

5    you look at the budget and you look at the total DIP draws,

6    it's at the bottom of the page.

7         And you look at the date, May 29th, 2022, it shows

8    you that $4,576,631 will be drawn on the DIP by 5/29/22 in

9    all of its gory detail. It shows every dollar that will be -

10   -

11        THE COURT:  I understand.  But that was filed

12   yesterday, Attorney Jonas.  This was not filed before

13   yesterday.  There was no breakdown of these amounts.

14        MR. JONAS:  No, I know because you asked us at the

15   last hearing --

16        THE COURT:  No, I understand that.

17        MR. JONAS:  -- to file a --

18        THE COURT:  I did. I understand I asked you that.

19   But don't -- I didn't know that this is what your plan was.

20   That this is what you were going to do.

21        That you were going to take $2 million of the $8

22   million and give it to the committee and then you were going

23   to draw down these -- I didn't know what any of these dollar

24   amounts were before yesterday when you filed this document.

25        There's nowhere in any document that's been filed

1    in this court that shows until you filed this yesterday that

2    your firm has incurred over a million-8 in fees already.

3    There's nothing there.

4          So how can you -- you can say yes, it's all in its

5    gory details.  That's right.  And you filed it yesterday.

6    There is nothing else in this record that establishes

7    anything that's in this document, this page 60 of 60, that

8    was filed before yesterday.

9          All it was is you had a DIP loan of $8 million.

10   That's what it was.  And it was objected to.  That's why we

11   had an evidentiary hearing.  And the objections raised were

12   that there was no immediate need to fund $8 million into

13   this estate.  And that you hadn't met your burden to show

14   that there was an immediate need for $8 million to be funded

15   into this estate.

16         And so I said why don't we take this in

17   increments?  And I even said this before you ever filed a

18   DIP motion that in Connecticut we file things -- we do

19   things on a -- especially in cases that don't support it,

20   like the fact pattern in this case, we don't enter final

21   orders on DIP financing.  We take things on an interim basis

22   and we see how things go.  We see how the case progresses.

23         Well, the problem that you have in this case is

24   that there's been a pending motion to dismiss for quite some

25   time. And it's going to be scheduled -- it's already

1    scheduled for an evidentiary hearing.

2         So now you want -- aside from that, you want the

3    loan to be $5 million of the $8 million, which is not where

4    I thought you were going to go when I said you know, show me

5    what you need to fund over the next few weeks.  None of you

6    need to be paid over the next few weeks.  You want to be

7    paid and I understand that.  I think that's an

8    understandable desire, okay?

9         But you don't need to be paid to keep this case

10   open.  Tell me why you need to be paid?

11        MR. JONAS:  Because, Your Honor, again, perhaps

12   it's philosophical.  I don't think it is.

13        How -- we do need assurance -- I think debtor's

14   counsel in the face of overwhelming adversity, including ten

15   or 12 depositions being scheduled, including three 341

16   meetings in the course of six weeks.

17        In terms of dealing with an examiner trustee

18   motion. In terms of dealing with the contempt and the return

19   of the boat. In terms of dealing with the DIP motion, in

20   dealing with contested retention I think the debtor is

21   entitled to have counsel and that that counsel is entitled

22   to reasonable assurance that they're going to be paid.

23        And fortunately, we have a DIP lender that is

24   willing on an unsecured subordinated basis to fund those

25   professional fees so the debtor can be --

1      THE COURT:  Right.  An insider of the debtor, not

2  -- this isn't you didn't go out to the market and get a DIP

3  loan.

4      MR. JONAS:  Because no one would could.

5      THE COURT:   This is an insider of the debtor.

6      MR. JONAS:  No one could make  -- no one would

7  make this type of loan, except the --

8      THE COURT:  I agree.  I agree.  And doesn't that

9  highlight part of the problem, Attorney Jonas.  No one would

10  make this loan.

11      MR. JONAS:  No, Your Honor, because -- Your Honor,

12  it's the loan that affords the case an opportunity to be

13  successful.

14      THE COURT:  Successful in what way?  To defeat

15  PAX?

16      MR. JONAS:  In a way that there will be a

17  distribution to legitimate creditors.

18      THE COURT:  Why wouldn't that happen outside of

19  this court, Attorney Jonas?

20      MR. JONAS:  Well, it can when you have creditors

21  that you can negotiate with and reach resolutions.  Here

22  that didn't happen.

23      THE COURT:  Well, Attorney Jonas --

24      MR. JONAS:  That's why sometimes people file --

25      THE COURT:  -- I know you didn't create the facts.

44

1    You took the facts as they were when you took on this case.

2    You've got a million dollar retainer for an individual

3    Chapter 11 case.  That's an assurance that you're going to

4    get paid something.

5              The bankruptcy code doesn't give you assurances

6    that you're going to be paid in full and, in fact, as you

7    know, Section 330 of the code requires the court to

8    scrutinize your fees and expenses for many, many, many

9    reasons.  So you may not get paid.

10             So you're taking that risk.  That's a business

11   risk you decided to take.

12             But when you talk about --

13             MR. JONAS:  But the --

14             THE COURT:  No, but hold on a minute.

15             You can't come in and act like nothing didn't

16   happen before you came to this court. You can't do that.

17   You're not being genuine.

18             This litigation has been going on since I think

19   2017.  Your client was held in contempt of court for not

20   paying a judgment.  You can't expect this court to ignore

21   that an act like it isn't there.

22             And to act like the whole reason we should do

23   everything in this case is because PAX has been exercising

24   its rights and remedies under applicable non-bankruptcy law

25   and they're the horrible people, and your client hasn't done

45

1    anything wrong, that's just not accurate, Attorney Jonas.

2    It's just not accurate no matter how you slice it.  It's

3    just not accurate.

4              And then when I came --

5              MR. JONAS:  Your Honor --

6              THE COURT:  Hold on. When I came and I said to you

7    I'm not going to enter this kind of an order and then you

8    come back and now I'm seeing from the order that filed

9    yesterday that has different dollar amounts in it that I

10   completely anticipated, and wants me to still approve 5

11   million of the 8 million, after I said that I had concerns

12   about what's the need to fund this kind of dollar amount at

13   this time in this case.

14             And you're still asking for it regardless.  And

15   you're saying the only think we're not asking for is $3

16   million.

17             And, by the way, the overwhelming majority of the

18   money that is funding is just going to pay us.  That's what

19   it's about.

20             MR. JONAS:  Your Honor, I'm sorry. I'm a little

21   taken aback, because I've been practicing 35 years and I

22   take my professional responsibilities seriously. I've never

23   been accused, having been before hundreds and hundreds of

24   bankruptcy judges of not being genuine, because I work

25   really hard to always do that.

1           THE COURT:  Well, I'm not -- Mr. Jonas, you just

2     made an argument that this was all about PAX without

3     acknowledging what your client did pre-petition.

4           So you and I can disagree about genuineness but

5     not to bring that into the record in this case and try to

6     act as if your client wasn't in contempt of prior court

7     orders of another court.

8           If you find that that's insulting, I'm sorry.  I'm

9     not trying to insult you. I'm trying to --

10          MR. JONAS:  No, no.  I don't find it insulting,

11    Your Honor.

12          THE COURT:  I'm trying to establish the facts.

13          MR. JONAS:  I find, Your Honor, that bankruptcy

14    was about a fresh start where --

15          THE COURT:  For the honest but unfortunate debtor,

16    Mr. Jonas.  And you've been practicing for 35 years --

17          MR. JONAS:  Yes, Your Honor.

18          THE COURT:  -- and you know that.

19          MR. JONAS:  Yes, Your Honor.  And I was just going

20    to use those words myself.

21          THE COURT:  Yes.

22          MR. JONAS:  And we will find out -- we will find

23    out at the motion to dismiss trial at the end of this month

24    whether or not you believe or find that this is an

25    appropriate bankruptcy case or not.

1          And all I'm saying, Your Honor, is I think we're

2     entitled to have a fair fight about that.  And we've been --

3          THE COURT:  You are going to have a fair fight

4     about that.  That's different --

5          MR. JONAS:  I don't think that -- Your Honor --

6          THE COURT:  -- than whether or not you should be

7     paid all along the way.

8          MR. JONAS:  No.  No, but here's the difference,

9     Your Honor.

10          We are willing -- as debtor's counsel, we are

11     willing to take the risk that our fees will not get approved

12     by Your Honor after objection.  We are willing to take that

13     risk.

14          The risk that I don't think it's fair to ask us to

15     take is that in the face of having a DIP lender who on an

16     unsecured subordinated basis is willing to assure us that

17     money will be there to pay us, subject to court approval, I

18     think that's a different risk that it is not fair to ask us

19     to take.

20          THE COURT:  Where in the bankruptcy code --

21          MR. JONAS:  It's not fair to say to us --

22          THE COURT:  -- do you get support for that, Mr.

23     Jonas, after practicing 35 years.

24          MR. JONAS:  I get support --

25          THE COURT:  I get it because you've been able to

48

1    accomplish it other cases.

2              MR. JONAS:  No.

3              THE COURT:  But those other cases are not like

4    this case.

5              MR. JONAS:  No.  No.  No, Your Honor. I get it

6    because I think we have to take this case in bite size

7    pieces and respectfully I think you're looking at lots of

8    different stuff at one time.

9              We are here on a DIP motion.  We are here on a DIP

10   loan.

11             THE COURT:  Right.

12             MR. JONAS:  We had an evidentiary hearing.

13             The debtor said there's no other way for him -- we

14   put on evidence. I think the -- I don't want to speak for

15   you, but when I walked out of there my belief was you told

16   us -- you didn't make a ruling, but you told us try and get

17   a consensual order in place.

18             My expectation was we had met our burden on a DIP,

19   after the evidentiary hearing.  We went out.  We got a

20   consensual order in place.  And I'm sorry it was yesterday

21   that we got you a detailed budget that you asked us for at

22   the end of the trial.  It did take us a couple of days.  We

23   did our best.  We did submit everything that I think was

24   requested.

25             And so we're here on a DIP that I think we've met

1    our burden. I think we're entitled to have the DIP approved.

2    Never mind the terms of the DIP itself being yes, amazing in

3    the sense that I don't think anybody's ever seen an

4    unsecured, subordinated DIP that is not likely, as Mr. Kwok

5    said on the stand, not likely to be retained.

6         But nevertheless what comes with the DIP is a

7    million dollar DIP.  What comes with the DIP is the

8    underpinnings of the work that's been done, which is the

9    plan.

10        What comes with the DIP is letting us have a fair

11   fight on whether -- on the motion to dismiss.  And, again,

12   we're not -- we understand  -- you know, if you do enter the

13   interim compensation order and we do get partial payment.

14   It's all subject coming back.  We're not going anywhere.  We

15   understand that all of our fees are at risk and subject to

16   approval by the court.  And we accept that risk.

17        All we're asking for is please don't make us take

18   the risk in the face of a DIP on which we've met our burden.

19   Don't ask us to take the payment risk.  We know the debtor

20   can't pay us.  That's a given.

21        So yes, there's another arrangement in place to

22   pay professional fees which cost the estate effectively

23   nothing in light of the fact that it's unsecured and

24   subordinated.

25        And it allows the debtor to see if we can get

1   through the next month and survive a motion to dismiss.  And

2   that's all we're asking for.

3          THE COURT:  But it only works if I approve the

4   interim procedures for compensation.  If not, you can borrow

5   $5 million but you don't get to use one penny of it.

6          Your Honor, yes, we would like -- again, on the

7   interim compensation order, as I'm sure you know and at

8   least in many jurisdictions that is fairly standard

9   practice.  And I think it's standard --

10          THE COURT:  In cases that support it, Attorney

11   Jonas.  In cases where there are --

12          MR. JONAS:  And, Your Honor, this case supports

13   it.  That's what the DIP does.  This case supports interim

14   compensation.

15          THE COURT:  Where's the immediate need for you to

16   be paid when you have a million dollar retainer?

17          MR. JONAS:  Again, it's not the immediate need to

18   be paid.  It's assurance of payment, which is what that

19   does.

20          And yes, Your Honor, I think most bankruptcy

21   judges would agree -- bankruptcy counsel, whether it's a

22   lender's counsel, committee counsel, debtor's counsel, they

23   shouldn't have to work months at end without getting paid.

24          That's why interim compensation orders are common

25   place throughout the country.

51

1        THE COURT:  I disagree with you that they're

2   commonplace throughout the country, number one.  Number two,

3   they're commonplace in big Chapter 11 cases that have

4   operations and that have income and that are going to

5   reorganize, which is not what we have here.  That's not

6   what's happening.

7        And so you can make all the arguments you want to

8   make but Congress decided when you're supposed to get paid.

9   Right?  That's what the code says.  Section 330 and 331 says

10  when you're supposed to get paid.

11       You're now asking the court -- and you're moving

12  under 105. So that shows you don't have the authority under

13  the code to have the court enter an order that does

14  something more than the code provides.  And the Second

15  Circuit said that you can't do that.  You can't use 105 to

16  take a power that doesn't exist in the bankruptcy code to

17  create one. And that's what you're asking the court to do.

18       MR. JONAS:  Your Honor, I'm sitting in Judge

19  Kaplan's chambers in the *LTL* case.  We have an interim

20  compensation order.  I can name all the cases I'm working on

21  right now --

22       THE COURT:  The LTL case -- Attorney Jonas, the

23  *LTL* case is a little bit different than this case, don't you

24  think?

25       MR. JONAS:  No, but you're making the principal

52

1  argument that interim compensation orders -- there's

2  something wrong with interim compensation orders and I'm

3  saying --

4        THE COURT:  I'm saying the Second Circuit might

5  think there is and that's where you are right now. You're in

6  the Second Circuit.  The Second Circuit says you can't use

7  105 to create a power that doesn't exist under the

8  bankruptcy code.  And that's what you're asking the court to

9  do.

10        So does anyone else wish to be heard on the DIP

11  financing?

12        MR. FRIEDMAN:  Your Honor, I just want to make two

13  comments in response to things Mr. Jonas said. It's Peter

14  Friedman. And one observation.

15        One is I think this is a problem of the debtor's

16  making for not having filed a DIP budget at the very outset

17  of the case, which is common to put in 13 week cash flows of

18  every DIP motion.  And that could have been done two months

19  ago when this DIP was filed.

20        Everybody knew from the very beginning that this

21  was going to be a contested DIP.  We noted that from the

22  very outset of the case with respect -- I think in

23  opposition to an extension of schedules.

24        The other two things that are problematic and one

25  I will acknowledge, Your Honor, is not directly before you,

1    but when Mr. Jonas says that Mr. Kwok's son will do anything

2    to resolve this case, I have to tell you his counsel is

3    refusing to accept service of subpoena's for testimony in

4    connection with the dismissal hearing on Golden Spring, on

5    Golden Spring employees, on Mr. Kwok's son, which is not

6    true that Mr. Kwok's son will do anything to resolve this

7    case.

8         He'll do anything to resolve this case if it's in

9    his own very personal interest and if he can manipulate the

10   system.  So it's just not an accurate thing for Mr. Jonas to

11   say.

12        Your Honor, the other point I want to make is that

13   the discussion of the plan -- remember -- and the return of

14   the boat being value and a continuation to his family and

15   that's what the DIP supports.

16        Your Honor, we have an order from Justice Ostrager

17   saying that the person who's purporting returning the boat

18   wasn't telling the truth about the boat ownership.  That Mr.

19   Kwok owns the boat.

20        It's just a plan that says I'll give you a tiny

21   bit of what I owe you in order to get releases from family

22   members.  It's not a meaningful plan. It's not a meaningful

23   plan.

24        And so I don't think the DIP does anything to

25   foster a benefit to creditors. I firmly believe that and you

1    can always believe that.

2            And I think it's just -- everything Mr. Jonas said

3    confirmed our principal objection, and our principal

4    objection is that this is being done either to hide Mr.

5    Kwok's assets and to let professionals do that or

6    alternatively to run a case for somebody's who's not he

7    debtor.  And we just don't think either one of those is

8    acceptable under 364.

9            MR. GOLDMAN:  If I may be heard?

10           THE COURT:  Yes.  Go ahead.

11           MR. GOLDMAN:  The committee is not admitting

12   (indiscernible)  hiding of assets but rather to uncover

13   them.  We are very differently situated than debtor's

14   counsel or PAX counsel.  We did receive a retainer pre-

15   petition.  We are not being paid on an ongoing basis.

16           The committee is relying on these funds in order

17   to discharge its duties under the code.  We have other

18   professionals that we are seeking to engage to help us do

19   that. A financial advisor and a fraud investigation

20   consultant, which we'll be seeking to retain.

21           They do need before getting into this case some

22   assurance of payment to do what we need to do here.  And

23   Your Honor's quite right about the 2 million being allocated

24   to committee professionals.

25           Under -- just in terms of being more specific as

55

1     to where that is allocated under Section -- paragraph 6(c)

2     of the proposed order.  It does clarify that the funds from

3     the interim DIP, which is the 2 million, would be available

4     solely for authorized disbursements to committee

5     professionals.

6           So that's where I think that could be

7     (indiscernible).  We're certainly not going to accrue

8     anywhere near that amount of fees until the end of May.

9     We've budgeted $510,000, that includes all the professionals

10    that the committee would like to retain.  The 110,000 that

11    Your Honor sees on this budget for the column due April

12    30th, yes, Your Honor, only signed an order I believe last

13    week or early this week. But it is effective as of the end

14    of March, which is when the application was filed.

15          And we jumped into this case.  There were a number

16    of first day type motions that we had to respond to in a

17    matter of days.  And this is a case of some complexity so we

18    really -- there was a long runway to get up to speed I'll

19    say.

20          And so -- and it was just Mr. Kaplan and me doing

21    the work at substantially lesser rates than we're seeing in

22    this case.

23          So we are trying to be judicious but this case has

24    gone at a frenzied pace.  And it does provide a forum for a

25    possible resolution.  There are viable claims.  Yes, there's

56

1    a million dollar estate contribution loan.  That's a

2    fraction of the amount of claims in this case.

3         There are viable claims out there that PAX is

4    pursuing for alter ego and veil piercing that we believe

5    belong to the estate.  The Sherry Netherland apartment is

6    one of them.  The debtor owns a hundred percent of the

7    equity in that apartment, but claims it's held in trust to

8    his son.

9         That is an asset that we claim belongs to the

10   estate and that should be shared among all creditors.  And

11   this case is the forum in which to determine that.  And so I

12   don't think it's really fair to say that we really -- all we

13   have is a million dollar state contribution loan.

14        There are viable causes of action that we could

15   pursue.  We are still early on in this case.  We haven't

16   even begun our investigation.  We haven't even gotten orders

17   retaining our other professionals to track those assets down

18   and more fully develop them.

19        And I really think without this DIP the case could

20   be a *fait accompli*.  Yes, the creditors that I represent do

21   not have liquidated claims, but they have just as much

22   standing as PAX does, which is also an unsecured creditor,

23   to lay claim to these assets.

24        So the other -- the last point I wanted to make in

25   response to Ms. Claiborn's comment and perhaps somebody can

57

1   clear this up for me.  In the proposed order that was sent

2   to the court yesterday at 12:02.

3           Paragraph 5(d) does not --

4           THE COURT:  What proposed order are you talking

5   about, Attorney Goldman?  Which one?

6           MR. GOLDMAN:  I'm sorry. It was circulated to the

7   deputy clerk yesterday at 12:02. That's the order I'm --

8           THE COURT:  I don't know that I've seen it.  Which

9   order are you talking about?

10           MR. GOLDMAN:  It's the proposed DIP order, Your

11   Honor.

12           THE COURT:  Oh, I have what was filed on the

13   docket at ECF 315 -- the docket number is 315 and it was

14   entered on the docket at 11:32 yesterday morning. Is that

15   what you're talking about?

16           MR. GOLDMAN:  I'm not sure it's the same one, but

17   I wouldn't think they would circulate a different order to

18   the clerk from the one they filed.

19           THE COURT:  I'm looking at what was filed on the

20   docket at 11:23 yesterday -- 11:32, excuse me, yesterday.

21   ECF number 315.

22           MR. GOLDMAN:  Okay.  Maybe it is different.  Maybe

23   this is just a typo or something.

24           But in paragraph 5(d) of the order I'm looking at

25   it doesn't prevent the DIP loan proceeds from pursuing

58

1   claims against the DIP lender except claims in connection

2   with the DIP loan.  Or fees that are incurred to impede

3   their rights in enforcing the DIP order.

4           Those are the only two -- and maybe it's different

5   in the order that you're looking at, but the one I'm looking

6   at that was circulated to the deputy clerk it does not

7   exclude from the funding fees that are incurred to pursue

8   claims against the lender.

9           It has a 5(d) -- it goes from Romanette 1 to

10  Romanette 4 in the order I'm looking at.

11          THE COURT:  In five?

12          MR. GOLDMAN:  Yes, Your Honor.  5(d).

13          THE COURT:  You mean, loan proceeds --

14          MR. GOLDMAN:  Maybe it's different in the one

15  that's filed --

16          THE COURT:  The section called loan proceeds and

17  reporting?  I don't know where you are.  I'm sorry?

18          MR. GOLDMAN:   Yes, loan proceeds and reporting

19  5(d).

20          MR. SILVERBERG:  Your Honor, it's Bennett

21  Silverberg. It's on page 6 of the proposed order, D in the

22  hole.  It goes from numeric 1 to numeric 4 skipping numerics

23  2 and 3 because those were deleted on the version that was

24  initially proposed. So it's just a typo that the 4 in the

25  hole wasn't changed to 2.

1        MR. GOLDMAN:  But my point is, Your Honor --

2        UNIDENTIFIED:  But Attorney Goldman's point that

3   the DIP proceeds can be used to pursue and investigate

4   claims is correct.  And counsel for the DIP lender is

5   probably on the Zoom somewhere and can confirm that point.

6        MR. GOLDMAN:  But also to assert claims, because

7   (indiscernible) prevents the use of the funds to impede the

8   rights -- exercise of rights under the DIP order or to

9   object to the claims on account of the DIP loan.

10       So it doesn't prevent the funds from being used to

11  actually prosecute other claims against the DIP lender is my

12  point.

13       MR. SILVERBERG:  This is again Bennett Silverberg

14  for the debtor.

15       Mr. Goldman is correctly interpreting the proposed

16  order.

17       THE COURT:  I don't even see little Romanettes in

18  part 5 so I don't know what you're talking about.

19       I've got loan proceeds reporting and then I've got

20  an A, and a B, and a C, and a D, and an E and then 6.

21       MR. SILVERBERG:  Paragraph D there's a Romanette 1

22  and a Romanette 4.  Four lines and six lines down in that

23  paragraph D.

24       THE COURT:  Oh, I thought you were saying B, as in

25  boy.  You're saying D, as in dog?

1          MR. SILVERBERG:  As in dog.

2          THE COURT:  Okay.  And your point, Attorney

3   Goldman, is what?  That you can bring claims against the

4   lender unless it's with regard to the monies they loaned. Is

5   that your point?

6          MR. GOLDMAN:  That is correct.  And I was really

7   responding to Ms. Claiborn's point which is not correct,

8   that the claims are available to pursue claims against the

9   DIP lender, other than under the limited circumstances under

10  5(d) romanette 1 and 2.

11         THE COURT:  Oh, okay. So you're saying because

12  Attorney Claiborn said you can't bring any causes of action

13  if you investigated some --

14         MR. GOLDMAN:  Correct.

15         THE COURT:  Okay. I see where you have pointed to

16  and I'm reading it so -- all right. Who else would like to

17  be heard?

18         (No response.)

19         THE COURT:  All right.  Well, hearing nothing

20  further then I'm going to have to review this order in

21  greater detail, given what you've said, and I guess I will

22  rule.  Unless someone else has any other suggestion, I will

23  rule on what I think is appropriate and what I think is not

24  appropriate.

25         MR. JONAS:  Thank you, Your Honor. I appreciate

61

1    your time today.

2              THE COURT:  Okay.  Thank you, all.

3              MR. GOLDMAN:  Thank you, Your Honor.

4              MR. SILVERBERG:  Thank you, Your Honor.

5              MS. CLAIBORN:  Thank you.

6              THE COURT:  All right.  That's the end of the

7    hearing today in the Kwok matter so court is adjourned.

8         (Proceedings adjourned at 3:37 p.m.)

9              I, CHRISTINE FIORE, court-approved transcriber and

10   certified electronic reporter and transcriber, certify that

11   the foregoing is a correct transcript from the official

12   electronic sound recording of the proceedings in the above-

13   entitled matter.

14

15

16   *Christine Fiore*

17

18   _____     May 6, 2022

19      Christine Fiore, CERT

20

21

22

23

24

25