## **<u>EXHIBIT B</u>**

Remand Motion

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK
### MANHATTAN DIVISION

| | |
|---|---|
| PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P., | Chapter 11 |
| Plaintiff, | Case No. 22-01073-dsj |
| v. | |
| KWOK HO WAN, *a/k/a* KWOK HO, *a/k/a* GWO WEN GUI, *a/k/a* GUO WENGUI, *a/k/a* GUO WEN-GUI, *a/k/a* WAN GUE HAOYUN, *a/k/a* MILES KWOK, *a/k/a* HAOYUN GUO, GENEVER HOLDINGS CORPORATION, and GENEVER HOLDINGS LLC, | |
| Defendants. | |

## PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.'S MOTION TO REMAND OR, IN THE ALTERNATIVE, FOR ABSTENTION PURSUANT TO 28 U.S.C. § 1334(C)(1)

TO THE HONORABLE DAVID S. JONES,
UNITED STATES BANKRUPTCY JUDGE:

Pacific Alliance Asia Opportunity Fund L.P. ("PAX") respectfully moves this Court for

an order remanding this action to the Supreme Court of the State of New York – County of New

York: Commercial Division (Justice Ostrager presiding) (the "New York Court") or, in the

alternative, for an order abstaining from determining this action pursuant to 28 U.S.C.

§ 1334(c)(1).

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ............................................................................................................... 3

ARGUMENT .................................................................................................................. 14

    I.     THIS ACTION MUST BE REMANDED BECAUSE THE COURT
          LACKS JURISDICTION UNDER THE ROOKER-FELDMAN
          DOCTRINE. ................................................................................................. 14

    II.    ALTERNATIVELY, THE COURT SHOULD ABSTAIN FROM
          EXERCISING JURISDICTION........................................................................ 20

         A     The Mandatory Abstention Doctrine Precludes the Court From
               Exercising Its Authority Over the New York Action. ............................ 20

         B     Even if Mandatory Abstention Does Not Apply, The Court Should
               Decline to Hear the Action Under the Permissive Abstention
               Doctrine................................................................................................. 27

CONCLUSION............................................................................................................... 33

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*47 E. 34th St. (NY), L.P. v. BridgeStreet Worldwide, Inc.*,
No. 20-CV-9978 (LJL), 2021 WL 2012296 (S.D.N.Y. May 20, 2021) ............................ 29, 30

*Acolyte Elec. Corp. v. City of New York*,
69 B.R. 155 (Bankr. E.D.N.Y. 1986) ................................................................................ 21

*Baker v. Simpson*,
613 F.3d 346 (2d Cir. 2010) ..................................................................... 20, 22, 23, 24

*Balcor/Morristown Ltd. Partnership v. Vector Whippany Associates*,
181 B.R. 781 (D. N.J. 1995) ............................................................................................ 31

*Beard v. Braunstein*,
914 F.2d 434 (3d Cir. 1990) ........................................................................................... 23

*Butner v. United States*,
440 U.S. 48 (1979) .......................................................................................................... 25

*Campbell v. Greisberger*,
80 F.3d 703 (2d Cir. 1996) ............................................................................................. 14

*Catalano v. Comm'r of Internal Revenue*,
279 F.3d 682 (9th Cir. 2002) .......................................................................................... 19

*Cornell v. Burke*,
559 F. App'x 577 (7th Cir. 2014) .................................................................................... 18

*D.C. Court of Appeals v. Feldman*,
460 U.S. 462 (1983) ........................................................................................................ 14

*Del. Tr. Co. v. Wilmington Tr., N.A.*,
534 B.R. 500 (S.D.N.Y. 2015) ......................................................... 21, 23, 26, 28

*Deloitte (Cayman) Corp. Recovery Servs., Ltd. v. Sandalwood Debt Fund A, LP*,
31 929 N.Y.S.2d 199 (Sup. Ct. 2011) ............................................................................. 22

*Holblock v. Albany Cty. Bd. of Elections*,
422 F.3d 77 (2d Cir. 2005) .................................................................... 15, 16, 17

*In re AHT Corp.*,
265 B.R. 379 (Bankr. S.D.N.Y. 2001) ............................................................................. 22

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Ameribuild Const. Mgmt., Inc.*,
  399 B.R. 129 (Bankr. S.D.N.Y. 2009) ........................................................................ 33

*In re Briarpatch Film Corp.*,
  281 B.R. 820 (S.D.N.Y. 2002) ............................................................... 29, 30, 31, 32

*In re CitX Corp.*,
  302 B.R. 144 (Bankr. E.D. Pa. 2003) ........................................................................ 19

*In re Coudert Bros.*,
  No. 11-cv-4949 (PAE), 2011 WL 7678683 (S.D.N.Y. Nov. 23, 2011) ...................... 20, 23, 25

*In re Drauschak*,
  481 B.R. 330 (Bankr. E.D. Pa. 2012) ........................................................................ 32

*In re Eight-115 Associates, LLC*,
  626 B.R. 383 (Bankr. S.D.N.Y. 2021) ................................................................... 21, 22

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
  899 F.3d 13 (1st Cir. 2018) ...................................................................................... 19

*In re Freehand H.J., Inc.*,
  No. 07 0157, 2007 WL 2071877 (Bankr. E.D. Pa. July 17, 2007) ........................... 14

*In re Ivani*,
  308 B.R. 132 (Bankr. E.D.N.Y. 2004) ...................................................................... 18

*In re Knapper*,
  407 F.3d 573 (3d Cir. 2005) ..................................................................................... 17

*In re Kurimsky*,
  No. 21-50021, 2021 WL 4269817 (Bankr. D. Conn. Sept. 20, 2021) ................. 14, 17

*In re Lyondell Chem. Co.*,
  402 B.R. 596 (Bankr. S.D.N.Y. 2009) ................................................................. 20, 30

*In re Millenium Seacarriers, Inc.*,
  419 F.3d 83 (2d Cir. 2005) ....................................................................................... 23

*In re Orion Pictures Corp.*,
  4 F.3d 1095 (2d Cir. 1993) ....................................................................................... 23

*In re Pacheco*,
  616 B.R. 126 (Bankr. D.N.M. 2020) ........................................................................ 14

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*In re Rodriguez*,
No. 18-14694-MKN, 2019 WL 137009 (D. Nev. Jan. 3, 2019)........................................ 28, 32

*In re S.G. Phillips Constructors, Inc.*,
45 F.3d 702 (2d Cir. 1995) .................................................................................................. 21

*In re Salander-O'Reilly Galleries, LLC*,
475 B.R. 9 (S.D.N.Y. 2012).............................................................................................. 22, 23

*In re Stahl*,
526 F. App'x 179 (3d Cir. 2013) ........................................................................................ 18

*In re WorldCom, Inc. Sec. Litig.*,
293 B.R. 308 (S.D.N.Y. 2003)............................................................................................. 28

*In re: Genever Holdings, LLC*,
Case No. 20-12411-jlg (Bankr. S.D.N.Y.).......................................................................... 8

*In re: Ho Wan Kwok*,
Case No. 22-50073 (JAM), Bankr. D. Conn. ..................................................................... 2

*Int'l Distrib. Ctrs, Inc. v. Walsh Trucking Co., Inc.*,
62 B.R. 723 (S.D.N.Y. 1986)............................................................................................... 18

*Juidice v. Vail*,
430 U.S. 327 (1977).............................................................................................................. 18

*Kelleran v. Andrijevic*,
825 F.2d 692 (2d Cir. 1987) ................................................................................................ 30

*KeyBank Nat'l Ass'n v. Franklin Advisers, Inc.*,
600 B.R. 214 (S.D.N.Y. 2019)..................................................................................... passim

*Lothian Cassidy, LLC v. Lothian Exploration & Development II, L.P.*,
487 B.R. 158 (S.D.N.Y. 2013)............................................................................................. 22

*Loudin v. J.P. Morgan Tr. Co.*,
481 B.R. 388 (S.D.W. Va. 2012) ......................................................................................... 19

*M.B. v. Roosevelt Inn LLC*,
2021 WL 5046216 (E.D. Pa. Oct. 27, 2021) ...................................................................... 33

*Marciano v. White*,
431 F. App'x 611 (9th Cir. 2011) ................................................................................... 18, 28

## TABLE OF AUTHORITIES
(continued)

Page(s)

*McKithen v. Brown*,
  626 F.3d 143 (2d Cir. 2010) ....................................................................... 2, 14, 16

*Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*,
  639 F.3d 572 (2d Cir. 2011) ..................................................................... 23, 26, 27

*PAX v. Kwok*,
  Case No. 1:22-cv-02258-MKV (S.D.N.Y.) ....................................................... passim

*PAX v. Kwok*,
  Case No. 2021-00740 (N.Y. App. Div.) .................................................................. 7

*PAX v. Kwok*,
  Case No. 2021-01010 (N.Y. App. Div.) ............................................................... 10

*PAX v. Kwok*,
  Case No. 2022-00609 (N.Y. App. Div.) ............................................................... 12

*PAX v. Kwok*,
  Case No. 22-01073-dsj (Bankr. S.D.N.Y.) ................................................... 1, 3, 13

*PAX. v. Genever Holdings Corp., et al.*,
  Case No. BVICOM2020/0137 (BVI) ...................................................................... 6

*PAX. v. Kwok*,
  Index No. 652077/2017 (N.Y. Sup. Ct.) ........................................................... passim

*Perkins v. Beltway Cap., LLC*,
  773 F. Supp. 2d 553 (E.D. Pa. 2011) ................................................................. 15

*Phifer v. City of New York*,
  289 F.3d 49 (2d Cir. 2002) .................................................................................. 14

*Rahl v. Bande*,
  316 B.R. 127 (S.D.N.Y. 2004) ............................................................................ 28

*Robinson v. HSBC Mortg. Servs., Inc.*,
  No. 15-CV-5480 (VEC), 2017 WL 570935 (S.D.N.Y. Feb. 10, 2017) .............. 15, 16

*Robinson v. Mich. Consol. Gas Co.*,
  918 F.2d 579 (6th Cir. 1990) .............................................................................. 22

*Rooker v. Fidelity Trust Co.*,
  263 U.S. 413 (1923) ............................................................................................ 14

## TABLE OF AUTHORITIES
(continued)

*Rose v. Cty. of York,*
   No. CIV.A. 05-5820, 2007 WL 136682 (E.D. Pa. Jan. 12, 2007) ...................................... 17, 32

*Sindone v. Kelly,*
   439 F.Supp.2d 268 (S.D.N.Y. 2006) ....................................................................... 16

*Sinochem International Co. v. Malaysia International Shipping Corp.,*
   549 U.S. 422 (2007) ................................................................................................ 1

*Stahl v. Twp. of Montclair,*
   No. CV 12-1644 (SRC), 2012 WL 12910637 (D.N.J. July 30, 2012) ................................. 3, 14

*Stern v. Marshall,*
   564 U.S. 462 (2011) .............................................................................................. 22

*Vossbrinck v. Accredited Home Lenders, Inc.,*
   773 F.3d 423 (2d Cir. 2014) .................................................................................. 14

*Worldview Entertainment Holdings Inc. v. Woodrow,*
   611 B.R. 10 (S.D.N.Y. 2019) ............................................................................ 26, 27

**Statutes**

28 U.S.C. § 1334(c)(2) ............................................................................................ 20, 21

28 U.S.C. § 1404(a) ................................................................................................... 1

28 U.S.C. § 1452(b) ................................................................................................. 20

# PRELIMINARY STATEMENT[1]

Kwok's Notice of Removal[2] is the latest in a long series of improper delay tactics designed to avoid paying state court judgments totaling over $250 million and to re-litigate issues already decided by the New York Court.

The underlying dispute is straightforward. In March 2011, Kwok personally guaranteed a debt of more than $46 million owed to PAX.[3] For years, Kwok evaded PAX's collection efforts, and no portion of the guaranteed debt has been repaid. PAX filed this breach-of-contract action against Kwok in New York in 2017 (the "New York Action"). In February 2021, PAX secured a judgment in the New York Action for over $116 million.[4] Currently, two appeals are pending in the New York action: (i) on the merits of the breach of contract judgment and (ii) a final civil contempt order against Kwok for $134 million for failing to return the Lady May yacht—which

---

[1] All exhibit citations are to the exhibits attached to the Declaration of Peter Friedman in Support of PAX's Motion to Remand ("Friedman Decl."). Unless otherwise noted, all emphasis is added and all internal quotations are omitted.

[2] Kwok filed a notice of removal of the New York Action to the United States District Court for the Southern District of New York. Friedman Decl., Ex. 1, Notice of Removal, *PAX v. Kwok*, No. 1:22-cv-02258-MKV (S.D.N.Y.), Dkt. No. 1. Kwok later moved for entry of an order transferring this action pursuant to 28 U.S.C. §§ 1404 and 1412 and Rule 7087 of the Federal Rules of Bankruptcy Procedure. Friedman Decl., Ex. 2, Stipulation Resolving Motion to Transfer Venue, *PAX v. Kwok*, No. 22-01073-dsj (Bankr. S.D.N.Y.), Dkt. No. 7-1. The parties stipulated that a transfer would serve the interests of justice, and would foster the economic and efficient administration of the estate. *See* 28 U.S.C. §§ 1404(a). Friedman Decl., Ex. 2, Stipulation Resolving Motion to Transfer Venue, *PAX v. Kwok*, No. 22-01073-dsj (Bankr. S.D.N.Y.), Dkt. No. 7-1. In so doing, PAX expressly preserved its right to seek timely remand of the New York Action on any proper ground. *Id.* (citing *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-32 (2007) (A district court may properly transfer an action pursuant to 28 U.S.C. § 1404(a), "bypassing questions of subject-matter and personal jurisdiction, when considerations of convenience, fairness, and judicial economy so warrant.")).

[3] Friedman Decl., Ex. 3, Decision & Order on Motion, *PAX. v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 549 at 5–7.

[4] Friedman Decl., Ex. 4, Judgment, *PAX v. Kwok et al.,* Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. 716 at 2.

the New York Court found Kwok "beneficially owns and controls"[5]—to New York in
connection with PAX's post-judgment collection efforts.[6]

Kwok's Notice of Removal—attaching PAX's April 2019 amended complaint in the
New York Action (the "Amended Complaint")[7]—alleges that this Court has original jurisdiction
over the Amended Complaint pursuant to 28 U.S.C. § 1334(b) and 1334(e). This is a
transparently inappropriate attempt to have this Court act as an appellate court over the New
York Court and to allow Kwok to re-litigate issues already fully heard and decided against him
in New York.

The Court should remand the action to the New York Court for lack of subject-matter
jurisdiction or, alternatively, abstain from exercising jurisdiction, for two principal reasons.

*First*, this Court lacks subject-matter jurisdiction over the New York Action under the
*Rooker-Feldman* doctrine. The New York Court already considered and rejected Kwok's
arguments on the same two claims he seeks to remove, which resulted in judgments holding that
Kwok (i) is liable under the 2011 guarantee and (ii) is in contempt of court for 268 days in a
manner that undermined the rule of law. Those judgments are now before the New York
appellate court. Kwok is the textbook "state-court loser[]" seeking improper federal court
appellate review of a state court judgment. *McKithen v. Brown*, 626 F.3d 143, 154 (2d Cir.
2010); *see also Stahl v. Twp. of Montclair*, No. 12-1644 (SRC), 2012 WL 12910637, at *5

---

[5] Friedman Decl., Ex. 5, Decision & Order on Motion, *PAX v. Kwok.,* Index No. 652077/2017
(N.Y. Sup. Ct.), Dkt.. No. 1181 ("Final Contempt Order") at 4.
[6] PAX has a pending request for relief to permit it to seek limited enforcement of the contempt
order. *See In re: Ho Wan Kwok*, No. 22-50073 (JAM), Bankr. D. Conn., Mot. of PAX For Entry
of an Order Confirming the Inapplicability of the Automatic Stay or, in the Alternative, Relief
From the Automatic Stay Pursuant to Section 362(d)(2) of the Bankruptcy Code, Mar. 1, 2022,
Dkt. No. 57.
[7] Friedman Decl., Ex. 6, First Amended Complaint, *PAX v. Kwok*, No. 1:22-cv-02258
(S.D.N.Y.), Dkt. No. 3.

(D.N.J. July 30, 2012) ("the bankruptcy court had no jurisdiction to review the lawfulness of the state court's entry of summary judgment").

*Second*, even if this Court had jurisdiction under 28 U.S.C. § 1334, abstention is appropriate here. The New York Action—a breach-of-contract dispute involving a pre-petition contract and a pre-petition contempt order issued against Kwok for his contumacious behavior— is a "non-core" proceeding under well-established caselaw, and thus mandatory abstention applies. But even if the New York Action were a "core" bankruptcy proceeding, equitable factors nevertheless warrant permissible abstention. For example, the New York Court has fully ruled on the merits—leaving little to nothing for the Court to adjudicate, and Kwok's removal petition is naked forum shopping for the purpose of escaping sanctions for his defiance of the New York Court. It would be an improper disruption of federal-state comity for this Court to assert control over and review contempt proceedings issued by the New York Court.

For these and the other reasons explained below, the New York Action should be remanded.

## **BACKGROUND**

PAX sued Kwok in April 2017 in New York, asserting a breach-of-contract claim under Hong Kong law against Kwok. In April 2019, PAX added a veil-piercing claim against Genever Holdings LLC ("Genever NY") and Genever Holdings Corporation ("Genever BVI," and together with Genever NY, (the "Genever defendants").[8] PAX prevailed on the merits of its breach-of-contract claim in September 2020 and judgment was entered in February 2021.[9] Since then, PAX has been attempting to collect against Kwok by focusing primarily on two high-value

---

[8] *Id.*

[9] Friedman Decl., Ex. 3, Decision & Order on Motion, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 549; Friedman Decl., Ex. 4, Judgment, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 716.

assets:  a luxury apartment in the Sherry-Netherland Hotel in New York City that Kwok owns

through nested shell companies (the "Residence"), and the Lady May yacht.

**Kwok's Breach of Contract**

In 2008, PAX entered into an agreement with a Kwok-controlled entity, Spirit Charter

Investment Limited ("Spirit Charter"), under which PAX provided Spirit Charter with a loan

facility of $30 million.[10]  Kwok simultaneously executed a personal guarantee of Spirit Charter's

loan.[11]  In 2009, Spirit Charter executed a deed ("2009 Deed of Settlement") under which

another Kwok-controlled entity, Shiny Times Holdings Limited ("Shiny Times"), assumed the

debt that Spirit Charter owed PAX.[12]  Kwok again executed a personal guarantee to secure Shiny

Times' repayment obligation.[13]

PAX and Shiny Times entered into a new loan facility in 2011 that superseded the 2009

Deed of Settlement.[14]  Kwok also entered into a new personal guarantee ("2011 Personal

Guarantee"), which superseded the 2009 guarantee.[15]  The 2011 Personal Guarantee provided,

among other things, that Kwok "irrevocably and unconditionally … guarantee[s] to PAX the due

and punctual payment of [Shiny Times'] [o]bligations [under the 2011 Loan Facility] and

agree[s] that promptly on PAX's demand he will pay to PAX all [o]obligations that are due but

unpaid."[16]

---

[10] Friedman Decl., Ex. 3, Decision & Order on Motion, *PAX v. Kwok*, Index No. 652077/2017
(N.Y. Sup. Ct.), Dkt. No. 549 at 1.
[11] *Id.*
[12] *Id.* at 1–2.
[13] *Id.* at 2.
[14] *Id.*
[15] *Id.*
[16] *Id.* at 7.

In April 2013, the parties entered into another deed of settlement ("2013 Deed of Settlement"), under which the outstanding loan amount due to PAX would be settled if PAX received possession of and legal title to three apartments from a different Kwok business entity called Beijing Pangu Investment Inc. ("Beijing Pangu").[17]  Under the 2013 Deed of Settlement, Beijing Pangu was required to satisfy ten conditions precedent in connection with the transfer to PAX of the three apartments, and if any were not satisfied by June 2013, the 2013 Deed of Settlement would terminate, and the 2011 Loan Facility and Personal Guarantee would revert to full force and effect.[18]  PAX and Kwok subsequently executed four extensions to the 2013 Deed of Settlement, the last of which required that all ten conditions precedent be satisfied by June 2015.[19]  Kwok failed to satisfy timely all of the conditions,[20] triggering the revival the 2011 Personal Guarantee.[21]

By the time Kwok executed the final Deed of Settlement extension, and unbeknownst to PAX, Kwok had fled China.  Kwok then purchased the Residence in March 2015 for $67.5 million through an entity called Genever NY (a New York LLC), which is wholly owned by Genever BVI (a British Virgin Islands company).[22]  Kwok is the sole shareholder and director of

---

[17] *Id.* at 4.

[18] *Id.*

[19] *Id.*

[20] *Id.* at 5. Namely, Kwok failed (i) to deliver clean title, (ii) to provide PAX with an invoice for the purchase of the apartments, (iii) to provide PAX with evidence regarding the payment of relevant taxes and charges in connection with the sale and purchase of the apartments, and (iv) to deliver the house ownership certificates of any of the three apartments to PAX.  *Id.* at 5–6.

[21] *Id.* at 5.

[22] Friedman Decl., Ex. 10, Residence Purchase Application, *PAX. v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 256 at SN 0046–47; *see also* Friedman Decl., Ex. 11, Genever NY LLC Agreement, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 252 at SN 0198–206.

Genever BVI.[23]  Also around this time, the Lady May was purchased for €28 million through

Hong Kong Investments Limited ("HK International"), a Hong Kong company that Kwok set up

and funded in 2006 and solely owned and controlled for 8 years before transferring it to a family

business associate for no consideration in October 2014, right before he fled China.[24]  In 2017,

the Lady May was transferred, again for no consideration, to Hong Kong International Funds

Investments (USA) Limited, LLC ("Hong Kong International USA"), a Delaware LLC

technically owned by his daughter, Mei Guo.[25]

In April 2017, after two demand letters by PAX went unanswered by Kwok or his

companies, PAX filed the New York Action.[26]  After approximately three years of proceedings,

the New York Court granted partial summary judgment in PAX's favor on September 15, 2020

on the breach-of-contract claim (the "Summary Judgment Order").[27]  The New York Court

---

[23] Friedman Decl., Ex. 11, Genever BVI Corporate Documents, *PAX v. Kwok*, Index No.
652077/2017 (N.Y. Sup. Ct.), Dkt. No. 252 at SN 0158–163.  In addition to the New York
Action, PAX also initiated ancillary proceedings in the in the British Virgin Island High Court
Commercial Court Division ("BVI Court") in order to prevent a transfer of the a Residence at the
parent level.  Friedman Decl., Ex. 12, Order, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup.
Ct.), Dkt. No. 1089.

[24] Friedman Decl., Ex. 5, Decision & Order on Motion, *PAX v. Kwok*, Index No. 652077/2017
(N.Y. Sup. Ct.), Dkt. No. 1181 at 4.

[25] As an interim measure, Kwok's family business associate transferred the parked title to HK
International to Kwok's daughter for no consideration in June 2017.  *Id.*

[26] Friedman Decl., Ex. 6, First Amended Complaint, *PAX v. Kwok*, No. 1:22-cv-02258
(S.D.N.Y.), Dkt. No. 3.

[27] Friedman Decl., Ex. 3, Decision & Order on Motion, *PAX v. Kwok*, Index No. 652077/2017
(N.Y. Sup. Ct.), Dkt. No. 549 at 7.  It should be noted that the only defense to summary
judgment on the breach-of-contract claim that Kwok even tried to muster was the bogus claim
that the 2011 Personal Guarantee—which Kwok himself proffered in evidence, produced from
his own files, admitted was authentic and relied on for several years in the litigation—somehow
was a forgery.  The New York Court properly determined that Kwok was estopped from raising
that defense at summary judgment or trial, and it is distressing to hear Kwok's bankruptcy
counsel perpetuate that obviously false narrative in presentations before this Court.  Indeed, all
one need look at to understand that Kwok's representation that he did not sign the 2011
Guarantee is perjurious is the contemporaneous email from his then lawyers at Stevenson, Wong
& Co. in Hong Kong to PAX the same morning Kwok executed that guarantee, which provides

ordered PAX to move to establish damages as to the amount due and owing under the 2011

Personal Guarantee, including applicable interest.[28]  On December 18, 2020, the New York

Court awarded PAX "damages of $46,426,489.00 plus contractual interest pursuant to the 2011

Personal Guarantee at a rate of 15% per annum from effective date of December 31, 2010 and at

the statutory rate of 9% per annum from the date of entry of this decision and order."[29]  This

judgment was entered on February 3, 2021 in the amount of $116,402,019.57.[30]

On March 4, 2021, Kwok appealed the Summary Judgment Order.[31]  The appeal was

fully briefed on October 15, 2021 and argued on December 6, 2021.[32]  The appeal is pending in

the New York Appellate Division, First Department, but is stayed due to Kwok's chapter 11

filing.

The New York Court was scheduled to adjudicate PAX's veil-piercing claim against the

Genever defendants in January 2021.[33]  Due to the COVID-19 pandemic, that proceeding was

postponed.  On October 12, 2020, Genever NY filed for chapter 11 bankruptcy in the Bankruptcy

Court for the Southern District of New York, staying PAX's judgment efforts against the

---

"Attached [] find herewith documents signed by Mr. Kwok Ho Wan for your further handling."
*See* Friedman Decl., Ex. 13, at PAX-KWOK-017468.
[28] Friedman Decl., Ex. 3, Decision & Order on Motion, *PAX v. Kwok*, Index No. 652077/2017
(N.Y. Sup. Ct.), Dkt. No. 549 at 8.
[29] Friedman Decl., Ex. 14, Decision & Order on Damages, *Pacific Alliance Asia Opportunity
Fund L.P. v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 685 at 5.
[30] Friedman Decl., Ex. 4, Judgment, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt.
No. 716 at 2.
[31] Friedman Decl., Ex. 15, Notice of Appeal, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup.
Ct.), Dkt. No. 725.
[32] *See* Friedman Decl., Ex. 16, Reply Brief for Defendant-Appellant, *PAX v. Kwok*, No. 2021-
00740 (N.Y. App. Div.), Dkt. No. 16.
[33] Friedman Decl., Ex. 4, Judgment, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt.
No. 716 at 5.

Genever defendants.[34]  The New York Bankruptcy Court later granted stay relief to allow PAX

to prosecute, and Genever NY to defend, the state court action.[35]  As explained below, PAX later

successfully moved for turnover of Kwok's shares of Genever BVI under New York

CPLR§ 5225, although—as he did with regard to the New York Court's order regarding the

yacht—Kwok to date has also entirely flouted that turnover order by failing to take any of the

steps necessary to effect the transfer of his Genever BVI shares to PAX.[36]

### Post-Judgment Asset Discovery

Shortly after the New York Court issued the Summary Judgment Order, PAX moved for

a post-judgment restraining order under CPLR § 5229.[37]  On September 30, 2020, the New York

Court restrained Kwok from, among other things, "interfer[ing] with any property in which he

has an interest."[38]  On October 15, 2020 the New York Court clarified its prior restraining order,

expressly holding Kwok "restrained from making or causing any sale, assignment, transfer, or

interference with any property in which he has an interest, whether directly or indirectly, and

from paying over or otherwise disposing of any debt now due or thereafter coming due to him

---

[34] Friedman Decl., Ex. 17, Voluntary Petition for Non-Individuals Filing for Bankruptcy, *In re: Genever Holdings, LLC*, No. 20-12411-jlg (Bankr. S.D.N.Y.), Dkt. No. 1.

[35] Friedman Decl., Ex. 18, Order Granting Debtor's Second Renewed Motion to Approve the Revised Settlement Agreement, *In re: Genever Holdings, LLC*, No. 20-12411-jlg (Bankr. S.D.N.Y.), Dkt. No. 141.

[36] Friedman Decl., Ex. 19, Decision & Order on Motion, *PAX v. Kwok*, Index No. 652077/2-17 (N.Y. Sup. Ct.), Dkt. No. 904.  PAX subsequently moved for an order of civil contempt. Friedman Decl., Ex. 20, Notice of Motion for Order of Civil Contempt for Failure to Comply with Court's Turnover Order, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1078.  The motion was fully briefed when Kwok filed his chapter 11 petition.  Friedman Decl., Ex. 21, PAX's Reply Mem. of Law in Further Supp. of Mot. for Order of Civil Contempt, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1116.

[37] Friedman Decl., Ex. 22, PAX's CPLR 5229 Mot. and Request for TRO, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 576.

[38] Friedman Decl., Ex. 23, Decision & Order on Motion, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 591.

…."[39]  The New York Court's October 15, 2020 order (the "Restraining Order") identified the

Residence and the Lady May, stating that "[s]pecifically, Mr. Kwok and/or the registered owners

of (1) the Residence at the Sherry-Netherland Hotel and (2) the yacht, 'the Lady May' are

restrained from making or causing any sale, assignment, transfer, or interference with those

assets."[40]  The New York Court also held that PAX was entitled to post-judgment discovery

regarding the Residence, the Lady May, and any other assets that Kwok directly or indirectly

owns.[41]

PAX then undertook a year-long effort to enforce its judgment.  As the New York Court

recognized, "PAX encountered difficulty identifying assets over which Kwok exercised control

because Kwok, who is a self-declared multi-billionaire, had secreted his assets in a maze of

corporate entities and with family members.  This scheme has enabled Kwok to assert that he has

no assets despite his lavish lifestyle …."[42]  PAX's efforts were further thwarted by Kwok's

broad invocation of his Fifth Amendment right in connection with PAX's post-judgment

discovery requests.[43]

### Lady May Contempt Proceedings

Despite the New York Court's restraining orders,[44] Kwok allowed the Lady May to flee

New York on or around October 9, 2021.[45]  PAX filed and the New York Court granted its

---

[39] Friedman Decl., Ex. 24, Decision & Order on Motion, *PAX v. Kwok*, Index No. 652077/2017
(N.Y. Sup. Ct.), Dkt. No. 630 at 1.
[40] *Id.*
[41] *Id.* at 2.
[42]  Friedman Decl., Ex. 5, Decision & Order on Motion, *PAX v. Kwok.,* Index No. 652077/2017
(N.Y. Sup. Ct.), Dkt. No. 1181 at 1.
[43] *Id.* at 2, 9–10.
[44] *See* Friedman Decl., Ex. 23, Decision & Order on Motion, *PAX v. Kwok*, Index No.
652077/2017 (N.Y. Sup. Ct.), Dkt. No. 591; Friedman Decl., Ex. 24, Decision & Order on
Motion, *PAX v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 630.
[45] Friedman Decl., Ex. 25, VESSELFINDER, Voyage Analyzer

motion for a conditional order of civil contempt on March 16, 2021, explaining that "it is clear that there has been an intolerable amount of gamesmanship, dissembling, and deceit in proceedings before this New York Court relating to the whereabouts and ownership of the yacht 'Lady May' .... Rather than catalogue the many 'shell games' defendant Kwok has engaged in with the assistance of counsel who should know better" "[f]or every day the yacht is outside the jurisdiction of this Court after May 15, 2021, defendant Kwok will be fined $500,000."[46]

Kwok appealed the New York Court's order to the First Department, but remained in contempt for 268 days.[47] The First Department affirmed the New York Court's March 16, 2021 order on November 4, 2021,[48] finding that "[t]he motion court acted within its discretion in holding defendant in civil contempt, as plaintiff established by clear and convincing evidence that defendant violated a lawful, clear mandate of the court, of which he had knowledge, and that such violation resulted in prejudice to plaintiff's rights."[49] The First Department held that "the daily fine of $500,000.00 was intended to strongly encourage [Kwok] to purge himself of the contempt, which, despite being permitted to accomplish, he has shown no interest in doing."[50] The First Department also "instructed" the New York Court "to proceed with an evidentiary hearing to resolve a dispute as to ownership and control of the yacht."[51]

---

https://voyage.vesselfinder.com/dcad1f224b32615145e66055d9856504) (last visited Feb. 28, 2022).

[46] Friedman Decl., Ex. 26, Decision & Order on Motion, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 728 at 2.

[47] Friedman Decl., Ex. 27, Notice of Appeal, *PAX v. Kwok*, No. 2021-01010 (N.Y. App. Div.), Dkt. No. 1.

[48] Friedman Decl., Ex. 28, Order, *PAX v. Kwok*, No. 2021-01010 (N.Y. App. Div.), Dkt. No. 17.

[49] *Id.* at 1.

[50] *Id* at 2.

[51] *Id.* Kwok filed a Motion for Leave to Appeal to the Court of Appeals on December 3, 2021, which was denied by the First Department on January 20, 2022. Friedman Decl., Ex. 29, Order, *PAX v. Kwok*, No. 2021-01010 (N.Y. App. Div.), Dkt. No. 22.

That evidentiary hearing was held on February 2, 2022, and the New York Court heard testimony from seven witnesses, including Kwok's daughter, who is the sole member of Hong Kong International USA, the purported owner of the Lady May.[52]  On February 9, 2022, the New York Court issued a final Order of Civil Contempt (the "Final Contempt Order"), noting that the New York Action's "1,180 docket entries" "almost all [] involve defendant Kwok['s] efforts to avoid and deceive his creditors by parking his substantial personal assets with a series of corporations, trusted confidants, and family members."[53]  The New York Court found that "Kwok exercised dominion and control over [] the Lady May"[54] and that "[t]he testimony adduced at the hearing out of the mouths of defendants' witnesses clearly and convincingly demonstrated that Kwok beneficially owns and controls the Lady May and has utter contempt for this Court and the judicial process."[55]

The New York Court concluded that "[a]s of February 7, 2022, the Lady May has remained outside the jurisdiction of the Court for 268 days" and imposed a $134 million fine. Kwok was ordered to remit $134 million to PAX within five business days or the Court would be "prepared to exercise its full authority Judiciary Law § 753," New York's civil contempt provision.[56]

---

[52] Friedman Decl., Ex. 30, Third Interim Decision & Order on Motion, *PAX v. Kwok*, Index. No. 652077/2017 (N. Y. Sup. Ct.), Dkt. No. 1098.

[53] Friedman Decl., Ex. 5, Decision & Order on Motion, *PAX v. Kwok.,* Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1181 at 1.

[54] *Id.* at 2.

[55] *Id.* at 4.

[56] *Id.* at 10; *see also* Friedman Decl., Ex. 31, Decision & Order on Motion, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1182.

On February 14, 2022, Kwok filed a notice of appeal of the Final Contempt Order and requested an emergency interim stay pending appeal.[57]  The Appellate Division, First Department denied Kwok's interim stay request the next day.[58]  On February 15, Kwok filed for bankruptcy.  Notably, Kwok had not filed for bankruptcy when judgment was rendered against him on the underlying breach of contract claim.  Equally notable, Kwok's bankruptcy petition lists $50,001–$100,000 in assets[59]—omitting the valuable Lady May, which remains outside of the United States,[60] unsupervised by any trustworthy fiduciary.

**Genever BVI Turnover Proceedings**

As mentioned above, because they were the sole assets Kwok admitted owning, PAX moved for turnover of Kwok's shares in Genever BVI, the ultimate owner of the Residence, under CPLR § 5225.  On September 22, 2021, the New York Court granted PAX's motion (the "Genever Turnover Order") and, subject to the BVI Court amending an existing restraining order (which it did in early December 2021), required Kwok to "take whatever steps are necessary in the British Virgin Islands to turnover all share certificates with respect to his 100% ownership interest in Genever Holdings Corporation."[61]  Kwok did not appeal the Genever Turnover Order, yet—true to form—flouted that order by failing and refusing to take any steps at all to effect the transfer of his Genever BVI shares to PAX.

---

[57] Ex. 32, Notice of Appeal, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1187.

[58] Friedman Decl., Ex. 33, Summary Statement on Application for Expedited Service and/or Interim Relief, *PAX v. Kwok*, No. 2022-00609 (N.Y. App. Div.), Dkt. No. 5.

[59] Voluntary Chapter 11 Petition, Dkt. No. 1 at 7.

[60] Friedman Decl., Ex. 8, VESSELFINDER, Voyage Analyzer, https://www.vesselfinder.com/?imo=1012359 (last accessed on April 12, 2022).

[61] Friedman Decl., Ex. 19, Decision & Order on Motion, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 904 at 1.

As a result, on January 7, 2022, PAX moved for another order of civil contempt.[62]  The

motion was fully briefed on January 25, 2022.[63]  When Kwok filed his chapter 11 petition,[64] the

New York Court "propose[d] that [PAX] either withdraw the pending contempt motion []

without prejudice to an appropriate application in the Bankruptcy Court and/or without prejudice

to renewal before this Court, if appropriate, upon the conclusion of the bankruptcy

proceedings."[65]  The New York Court explained that "[t]he Court prefers not to keep fully

submitted motions pending for an indefinite time."[66]  PAX subsequently withdrew its motion

without prejudice.[67]

### **Chapter 11 Bankruptcy Filing and Notice of Removal**

Kwok filed for chapter 11 bankruptcy in the District of Connecticut February 15, 2022.[68]

As noted above, on March 18, 2022, Kwok removed the New York Action to the District Court

for the Southern District of New York before Kwok moved to transfer venue with PAX's

consent.[69]

---

[62] Friedman Decl., Ex. 20, Notice of Motion for Order of Civil Contempt for Failure to Comply
with Court's Turnover Order,  *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No.
1078.

[63] Friedman Decl., Ex. 21, PAX's Reply Mem. of Law in Further Supp. of Mot. for Order of
Civil Contempt, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1116.

[64] Friedman Decl., Ex. 34, Suggestion of Bankruptcy, *PAX v. Kwok*, Index No. 652077/2017
(N.Y. Sup. Ct.), Dkt. No. 1190.

[65] Friedman Decl., Ex. 7, Court Notice, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.),
Dkt. No. 1191.

[66] *Id.*

[67] Friedman Decl., Ex. 9, Decision & Order on Voluntary Withdrawal of Contempt Motion, *PAX
v. Kwok,* Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1193.

[68] Voluntary Chapter 11 Petition, Dkt. No. 1.

[69] Friedman Decl., Ex. 1, Notice of Removal, *PAX v. Kwok*, No. 1:22-cv-02258-MKV
(S.D.N.Y.), Dkt. No. 1;  Friedman Decl., Ex. 2, Stipulation Resolving Motion to Transfer Venue,
*PAX v. Kwok*, No. 22-01073-dsj (Bankr. S.D.N.Y.), Dkt. No. 7-1.

## ARGUMENT

**I.    THIS ACTION MUST BE REMANDED BECAUSE THE COURT LACKS JURISDICTION UNDER THE *ROOKER-FELDMAN* DOCTRINE.**

Under the *Rooker-Feldman* doctrine, federal courts lack subject-matter jurisdiction over claims that challenge state-court judgments. *Rooker v. Fid. Tr. Co.*, 263 U.S. 413, 416 (1923); *D.C. Ct. App. v. Feldman*, 460 U.S. 462, 482 (1983); *Phifer v. City of N.Y.*, 289 F.3d 49, 55–56 (2d Cir. 2002). In the Second Circuit, the preclusive nature of *Rooker-Feldman* extends to lower state court judgments, interlocutory decisions, and matters on appeal. *Campbell v. Greisberger*, 80 F.3d 703, 707 (2d Cir. 1996); *McKithen*, 626 F.3d at 154–55 (holding "[t]he proper vehicle for [the Plaintiff] to challenge the state court's interpretation of section 440.30(1–a)(a) was an appeal to the New York Appellate Division"). Bankruptcy courts have acknowledged *Rooker-Feldman*'s "strong public policy grounded in the interest of comity between federal and state courts and the notion of federalism, that federal courts should not unnecessarily interfere with state court proceedings." *In re Pacheco*, 616 B.R. 126, 132–33 (Bankr. D.N.M. 2020). In this context, the doctrine "does not permit [the Bankruptcy Court] to disturb or disregard [a previous j]udgment," and courts have held that "attempts to have it do so are an improper use of the Bankruptcy Court." *In re Kurimsky*, No. 21-50021, 2021 WL 4269817, at *5 (Bankr. D. Conn. Sept. 20, 2021) (Manning, C.J.). *See also Stahl v. Twp. of Montclair*, No. CV 12-1644 (SRC), 2012 WL 12910637, at *5 (D.N.J. July 30, 2012) (holding that "the bankruptcy court had no jurisdiction to review the lawfulness of the state court's entry of summary judgment"). When the federal court lacks subject-matter jurisdiction over removed claims, the case must be remanded. *Vossbrinck v. Accredited Home Lenders, Inc.*, 773 F.3d 423, 427 (2d Cir. 2014); *In re Freehand H.J., Inc.*, No. 07-12172, 2007 WL 2071877, at *1 (Bankr. E.D. Pa. July 17, 2007) ("Because

14

this Court lacks subject-matter jurisdiction pursuant to the *Rooker-Feldman* doctrine, the adversary proceeding will be remanded to the state court.").

In the Second Circuit, *Rooker-Feldman* applies if four requirements are met:  "(i) the federal court plaintiff must have lost in state court, (ii) the plaintiff must complain of injuries caused by a state court judgment, (iii) the plaintiff must invite district court review and rejection of that judgment, and (iv) the state court judgment must have been rendered before the district court proceedings commenced."[70]  *Holblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005).  The first and fourth requirements are procedural, while the second and third are substantive.  *Robinson v. HSBC Mortg. Servs., Inc.*, No. 15-CV-5480 (VEC), 2017 WL 570935, at *3 (S.D.N.Y. Feb. 10, 2017).

Here, the removed New York Action consists of PAX's two-count Amended Complaint, attached to PAX's Notice of Removal.  Kwok's notice also refers to the New York Court's finding that Kwok beneficially owns and controls the Lady May, although it ignores the critical fact that those findings were issued in a contempt proceeding to vindicate the integrity of the New York Court.[71]  Kwok brings no other independent claim.  Kwok accordingly appears to be

---

[70] PAX invokes *Rooker-Feldman* against the losing state court *defendant*, but the same four - factor test applies.  *E.g.*, *Perkins v. Beltway Cap., LLC*, 773 F. Supp. 2d 553, 558 (E.D. Pa. 2011).

[71] Although Kwok's removal notice is required to contain a statement of the facts that purportedly justify his notice to remove, Fed. R. Bankr. P. 9027, in his Objection to PAX's motion to confirm the inapplicability of the stay to the Final Contempt Order, Kwok previewed his intent to attempt to re-litigate the issue of ownership of the Lady May.  He asserted that the Final Contempt Order was "wrongfully issued against him" and that Kwok's interest in the Lady May is "ultimately [to] *be determined*." Objection to Lift Stay, Dkt. No. 83 (Mar. 15, 2022), at ¶¶ 4, 14.  As noted in footnote 24 above, Kwok also continues to assert, disingenuously and against the weight of overwhelming evidence—including Kwok proffering of the very document to the NY Court and admitting and stipulating to its authenticity—that his 2011 Personal Guarantee somehow was a "forgery," Objection to Lift Stay, Dkt. No. 83 at ¶ 12, an argument squarely rejected by the New York Court.  *See* Friedman Decl., Ex. 3, Decision & Order on Motion, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 549 at 3 ("Kwok was

challenging in federal court: (1) the Summary Judgment Order issued on September 15, 2020

(which resulted in a judgment entered against Kwok on February 3, 2021); and (2) the Final

Contempt Order issued on February 9, 2022,[72] requiring Kwok to remit $134 million to PAX and

holding that Kwok "beneficially owns and controls" the Lady May. Both judgments easily

satisfy the four *Rooker-Feldman* requirements.

*First*, Kwok is a "state-court loser" with respect to the two judgments because both were

issued in PAX's favor. *McKithen*, 626 F.3d at 154.

*Second*, Kwok is complaining of "injuries" imposed by the New York Court. *Rooker-

Feldman* is applicable where, as here, "*the state court itself is the decision-maker* whose action

produces the injury." *Sindone v. Kelly*, 439 F. Supp. 2d 268, 272 (S.D.N.Y. 2006); *see, e.g.*,

*Robinson*, 2017 WL 570935, at *3 (holding that "the causal requirement—the second prong—is

satisfied because it is the state court foreclosure judgment that has caused Plaintiff's injury"). In

*Hoblock*, for example, after first noting that the "voters' claims in this case seem at first to

complain only of the [Board of Elections'] refusal to tally their votes rather than of any injury

caused by the state court's judgment," the court clarified that "in refusing to tally the votes, the

Board [was] acting under compulsion of a state-court order." 422 F.3d at 88. Thus, "the state-

court judgment produced the Board's refusal to count the ballots, the very injury of which the

---

judicially estopped from challenging the authenticity of the agreements that Kwok had
previously sponsored as authentic before the Court in this proceeding."). Kwok is bound by
these findings.

[72] On March 1, 2022, PAX moved the bankruptcy court for an order confirming its right to
institute further proceedings to enforce the Final Contempt Order or, in the alternative, relief
from the automatic stay under 11 U.S.C. § 362(d)(1) and Rule 4001of the Federal Rules of
Bankruptcy Procedure to permit enforcement of the Final Contempt Order, except to the extent it
requires Kwok to immediately pay money to PAX. *See In re: Ho Wan Kwok*, No. 22-50073
(JAM), Bankr. D. Conn., PAX's Motion for Entry of an Order Confirming the Inapplicability of
the Automatic Stay or, in the Alternative, Relief from the Automatic Stay, Dkt. No. 57.

voters complain." *Id.* at 89.  Similarly here, Kwok seeks to avoid the New York Court's "power

of compulsion" that entered judgments against him in excess of $250 million and its holding that,

under New York law, Kwok beneficially owns and controls the Lady May.[73]

 **Third**, Kwok plainly seeks direct federal court review and reversal of the two state court

judgments.  Kwok buries the lead in a footnote, acknowledging that removal is a collateral attack

on the Final Contempt Order.  Kwok's footnote provides:  "The New York State Court has

issued orders that contain factual findings with respect to these issues, including determining that

the most relevant purported asset (the Lady May yacht) is within Mr. Kwok's beneficial

ownership"[74]—and then invites this Court to "[re-]determine what is (or is not) property of the

estate."[75]  Kwok's removal attempt is a thinly-veiled gambit at improper federal court review, an

impermissible "end-run around the state court appeals process" and "an impermissible collateral

attack on the contempt charge."  *See Rose v. Cnty. of York,* No. 05-5820, 2007 WL 136682, at *3

(E.D. Pa. Jan. 12, 2007); *In re Kurimsky*, 2021 WL 4269817, at *5 (applying *Rooker-Feldman*

where the prior court held that "Avail-1, LLC *owns the secured debt*," and the bankruptcy court

complaint alleged that it did not) (emphasis added).

 *Rooker-Feldman* does not allow Kwok to seek relief that, if granted, would prevent the

New York Court from enforcing its orders.  *In re Knapper*, 407 F.3d 573, 581 (3d Cir. 2005).

The doctrine accordingly applies especially to state court contempt proceedings, where

federalism concerns are particularly strong.  *Cornell v. Burke*, 559 F. App'x 577, 579 (7th Cir.

2014) ("Because a contempt order qualifies as a state-court judgment, *Rooker-Feldman* divests

---

[73] Friedman Decl., Ex. 5, Decision & Order on Motion, *PAX v. Kwok.,* Index No. 652077/2017
(N.Y. Sup. Ct.), Dkt. No. 1181 at 4.
[74] Friedman Decl., Ex. 1, Notice of Removal, *PAX v. Kwok*, No. 1:22-cv-02258-MKV
(S.D.N.Y.), Dkt. No. 1 at ¶ 7 n.1.
[75] *Id.* at ¶ 5.

the district court of jurisdiction to review it."). The ability of a court to issue contempt orders

and award sanctions "lies at the core of the administration of a State's judicial system."

*Marciano v. White*, 431 F. App'x 611, 614 (9th Cir. 2011) (citing *Juidice v. Vail*, 430 U.S. 327,

335 (1977)). In *In re Ivani*, 308 B.R. 132, 137 (Bankr. E.D.N.Y. 2004), for example, the court

denied the debtor's motion to reverse the New York state court contempt finding under *Rooker-*

*Feldman* because "the [d]ebtor's argument will succeed only if this Court finds that the [state

court] made an incorrect determination and overrules that determination." *See also Int'l Distrib.*

*Ctrs., Inc. v. Walsh Trucking Co., Inc.*, 62 B.R. 723, 729–30 (S.D.N.Y. 1986) (recognizing the

state court's "inherent power to punish the debtor for contumacious conduct against the dignity

of either the state or federal court, is not curtailed by the bankruptcy action"); *see In re Stahl*, 526

F. App'x 179, 180 (3d Cir. 2013) (recognizing that challenge to state court summary judgment

order disguised as a notice of removal pursuant to Fed. Bankr. P. 9027 would be barred by

*Rooker-Feldman*).

   **Fourth**, both of the New York Court's judgments—entered on February 3, 2021 and

February 9, 2022 respectively—were issued before Kwok's February 15, 2022 chapter 11

filing.[76]

   Because the four *Rooker-Feldman* factors are met, this Court lacks subject-matter

jurisdiction over the New York Action.

   Kwok's red-herring assertion that the bankruptcy court has exclusive jurisdiction over the

Lady May, and thus the New York Action, under 28 U.S.C. § 1334(e), is wrong as a matter of

---

[76] Friedman Decl., Ex. 4, Judgment, *PAX v. Kwok*, Index No 652077/2017 (N.Y. Sup. Ct.), Dkt.
No 716; Friedman Decl., Ex. 5, Decision & Order on Motion, *PAX v. Kwok*, Index No
652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1181; Friedman Decl., Ex. 31, Decision & Order on
Motion, *PAX v. Kwok*, Index No 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1182.

law.  While it is correct that the bankruptcy court has exclusive *in rem* jurisdiction "of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate."[77]  28 U.S.C. § 1334(e), the exclusive jurisdiction granted by § 1334(e)(1) "is only in *rem*."  *Loudin v. J.P. Morgan Tr. Co.*, 481 B.R. 388, 394 (S.D. W. Va. 2012) (citing *In re CitX Corp.*, 302 B.R. 144, 161 (Bankr. E.D. Pa. 2003)).  Section 1334(e) does not extend to *in personam* breach-of-contract actions, like this one, that "seek[] to establish personal liability of the debtor on a claim, but [are not] specifically targeted to ownership of, or rights in and to, property of the estate."  *Id.*  In fact, the Final Contempt Order applies to Kwok *personally*; Kwok could have complied with the Order, but has refused to do so.

And of course, any effort to have this case heard in federal court on § 1334(e)(1) grounds would be mooted if the bankruptcy court grants PAX's Motion For Entry of an Order Confirming the Inapplicability of the Automatic Stay or, in the Alternative, Relief From the Automatic Stay Pursuant to Section 362(d)(2) of the Bankruptcy Code.[78]  It is well within this Court's powers to permit the New York Court to oversee actions related to the Lady May.  *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 899 F.3d 13, 22 (1st Cir. 2018) (recognizing that Section 1334(e) does not "limit[] the bankruptcy court's power to allow others to act on the debtor's property," including permitting a non-bankruptcy court to "grant leave to allow a creditor to sell a debtor's property" (citing *Catalano v. Comm'r of Internal Revenue*, 279 F.3d 682, 687 (9th Cir. 2002)).

---

[77] PAX acknowledges that liquidation of the Lady May, which the New York Court found Kwok "beneficially owns and controls," and distribution of resulting proceeds should occur in the chapter 11 process (in the event this case is not dismissed).

[78] *See* PAX's Motion for Entry of an Order Confirming the Inapplicability of the Automatic Stay or, in the Alternative, Relief from the Automatic Stay, Dkt. No. 57.

In sum, Kwok's appropriate avenue to seek relief from the contempt order is in the New York appellate courts. *In re Lyondell Chem. Co.*, 402 B.R. 596, 610 (Bankr. S.D.N.Y. 2009) ("[B]y reason of the *Rooker-Feldman* doctrine, and common sense, New Jersey's appellate courts are the only entities that can decide the legal issues as to whether the judgment against Lyondell was in accordance with New Jersey law."). Because the *Rooker-Feldman* doctrine deprives this Court of subject-matter jurisdiction over all claims and issues decided in the New York Action, this action must be remanded.

## II.  ALTERNATIVELY, THE COURT SHOULD ABSTAIN FROM EXERCISING JURISDICTION.

Even if the Court finds that it has jurisdiction over the New York Action (it should not), the Court should abstain from hearing it. *See* 28 U.S.C. § 1334(c)(2); 28 U.S.C. § 1452(b). Because, *inter alia*, the New York Action is a garden-variety breach-of-contract dispute based on a contract executed over a decade before the chapter 11 petition, it is considered a "non-core" proceeding, *see, e.g.*, *In re Coudert Bros.*, No. 11-cv-4949 (PAE), 2011 WL 7678683, at *5 (S.D.N.Y. Nov. 23, 2011). Accordingly, the doctrine of mandatory abstention precludes the Court from hearing such non-core proceedings. But even if the breach-of-contract claim were a "core" proceeding, equitable factors—including that very few issues remain for the federal court to adjudicate, *see supra* at 14–20, and that Kwok's removal is blatant forum shopping—strongly support remand under the permissive abstention doctrine.

### A  The Mandatory Abstention Doctrine Precludes the Court From Exercising Its Authority Over the New York Action.

Upon determining that a bankruptcy court has jurisdiction over a matter, courts "look to the abstention doctrine to provide guidance as to the proper exercise of that jurisdiction." *Baker v. Simpson*, 613 F.3d 346, 350 (2d Cir. 2010). "The abstention provisions implicate the question whether the bankruptcy court *should* exercise jurisdiction, not whether the court *has* jurisdiction

in the first instance." *In re S.G. Phillips Constructors, Inc.*, 45 F.3d 702, 708 (2d Cir. 1995).

Under the mandatory abstention doctrine, "the district court shall abstain from hearing such

proceeding if an action … can be timely adjudicated, in a State forum of appropriate

jurisdiction." 28 U.S.C. § 1334(c)(2). Where, as here, a case has been removed, remand is

required if six criteria are met:

> (1) a "timely" motion for abstention must have been brought; (2) the action must
> be based upon a state-law claim; (3) the action must be "related to" a bankruptcy
> proceeding, as opposed to "arising under" title 11 or "arising in" a case under title
> 11; (4) the sole federal jurisdictional basis for the action must be Section 1334; (5)
> the action must have been "commenced" in state court; and (6) the action must be
> capable of being "timely adjudicated" in state court.

*Del. Tr. Co. v. Wilmington Tr., N.A.*, 534 B.R. 500, 512 (S.D.N.Y. 2015). The party "arguing in

favor of the Court's retention of jurisdiction"—*i.e.*, Kwok—"bears the burden of showing that

mandatory abstention is not warranted." *In re Eight-115 Associates, LLC*, 626 B.R. 383, 391

(Bankr. S.D.N.Y. 2021). Here, each element is satisfied, and Kwok cannot demonstrate

otherwise.

**First**, the abstention motion is timely. Whether an abstention motion is timely "must be

determined on a case-by-case basis." *Id.* at 392. Courts consider:

> (1) whether the movant moves as soon as possible after he or she should have
> learned the grounds for such a motion, (2) whether the moving party has already
> invoked the substantive process of the federal court on a matter going to the
> merits of the complaint, and in particular, moved for abstention only after
> receiving an unfavorable outcome, and (3) whether the granting of the motion
> would prejudice or delay the rights of others.

*Id.* Here, little time has elapsed since Kwok's removal, which is well within the time courts have

found abstention motions timely. *See Acolyte Elec. Corp. v. City of N.Y.*, 69 B.R. 155, 177

(Bankr. E.D.N.Y. 1986) (motion timely when filed less than two months after filing of adversary

complaint); *see also Robinson v. Mich. Consol. Gas Co.*, 918 F.2d 579, 584 (6th Cir. 1990)

(finding the motion was timely more than eight months after removal). Second, PAX has not

invoked the substantive process of this Court "going to the merits of the complaint," nor is it

moving "only after receiving an unfavorable outcome." *In re Eight-115 Assocs.*, 626 B.R. at

391–92; *cf. In re AHT Corp.*, 265 B.R. 379, 384 (Bankr. S.D.N.Y. 2001) (motion untimely when

made after receiving an adverse ruling on a motion to dismiss). Finally, abstention would not

prejudice or delay Kwok. Accordingly, the motion is timely.

> **Second**, the New York Action is based on PAX's breach-of-contract claim against Kwok,

the type of claim routinely litigated in state court. *E.g.*, *Deloitte (Cayman) Corp. Recovery

Servs., Ltd. v. Sandalwood Debt Fund A, LP*, 929 N.Y.S.2d 199 (Sup. Ct. 2011) (breach-of-

contract claim appropriate for abstention).

> **Third**, the New York Action does not "arise under" or "arise in" Title 11, but merely

"relate[s] to" Kwok's bankruptcy. 28 U.S.C. § 1334 vests district courts with jurisdiction over

"all proceedings arising under title 11, or arising in or related to cases under title 11." *See

generally Stern v. Marshall*, 564 U.S. 462 (2011). These "three types of jurisdiction" "are

colloquially referred to as 'arising under,' 'arising in,' and 'related to' jurisdiction." *Lothian

Cassidy, LLC v. Lothian Expl. & Dev. II, L.P.*, 487 B.R. 158, 161 (S.D.N.Y. 2013). "Arising

under" jurisdiction exists in "any matter under which a claim is made under a provision of title

11." *In re Salander-O'Reilly Galleries, LLC*, 475 B.R. 9, 27 (S.D.N.Y. 2012). "Arising in"

jurisdiction exists in a matter where the claims "are not based on any right expressly created by

title 11, but nevertheless would have no existence outside of the bankruptcy." *Baker*, 613 F.3d at

350–51. Lastly, "related to" jurisdiction exists if the action's "outcome might have any

conceivable effect on the bankrupt estate." *Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.*, 639

F.3d 572, 579 (2d Cir. 2011).[79]

The Second Circuit has explained that "a proceeding that 'arises under' or 'arises in' Title

11 is a 'core' bankruptcy proceeding, but a proceeding that is merely 'related to' a Title 11 case

is not—and in a non-core proceeding, the doctrine of mandatory abstention applies."

*Wilmington Tr.*, 534 B.R. at 512 (quoting *Baker*, 613 F.3d at 350). The determination of whether

a contract action is a core proceeding or a non-core proceeding requires consideration of "(1)

whether [the] contract is *antecedent* to the reorganization petition; and (2) the degree to which

the proceeding is *independent* of the reorganization." *In re Millenium Seacarriers, Inc.*, 419

F.3d 83, 97 (2d Cir. 2005). Claims "for pre-petition contract damages"—such as PAX's breach-

of-contract action against Kwok—are generally "non-core." *See In re Orion Pictures Corp.*, 4

F.3d 1095, 1102 (2d Cir. 1993) (citing *Beard v. Braunstein*, 914 F.2d 434, 443 (3d Cir. 1990));

*see also In re Coudert Bros.*, 2011 WL 7678683, at *5 ("Where a contract sued upon was formed

prior to the bankruptcy petition, it will generally be highly unlikely that a proceeding based on

that contract turns on the bankruptcy laws.").

Neither "arising under" nor "arising in" jurisdiction exists here. First, Kwok does not

suggest that "arising under" jurisdiction exists; he could not, because the proceeding involves a

breach-of-contract claim—not a claim "under a provision of title 11." *In re Salander*, 475 B.R.

at 27; *see also KeyBank Nat'l Ass'n v. Franklin Advisers, Inc.*, 600 B.R. 214, 226 (S.D.N.Y.

2019) (no "arising under" jurisdiction existed where "Plaintiffs assert[ed] state law breach of

contract and related claims, which do not arise under Title 11"). Nor does "arising in"

---

[79] PAX acknowledges "related to" jurisdiction exists here.

jurisdiction exist, because the claims existed "outside of the bankruptcy" for almost five years. *Baker*, 613 F.3d at 350–51.

And Kwok's perfunctory suggestion that the New York Action "arises in" chapter 11 because it involves a determination of Kwok's ownership in the Lady May does not withstand scrutiny.[80]  Kwok appears to argue that because section 541 of the Bankruptcy Code governs what becomes property of the estate, and the New York Court determined as part of its Final Contempt Order that Kwok beneficially owns the Lady May, the New York Action must "arise in" his bankruptcy case.  Not so.  Whether Kwok could be held in contempt for refusing to return property he beneficially owned pre-petition was a legal matter that existed under New York law completely independent of this chapter 11 case, as does his continued contempt.

The New York Action was not, as Kwok claims, one "seeking to determine what is (or is not) the property of Mr. Kwok or his estate."[81]  No "estate" existed when Justice Ostrager decided Kwok's interest in the Lady May.  As a consequence of the New York Action, there has already been a finding that Kwok beneficially owns and controls the Lady May under New York law.  *There is nothing further to litigate on that issue.*  If this case is remanded and the automatic stay modified, Justice Ostrager will not revisit the property issue.  Rather, the only issue the New York Court might address is the consequence of Kwok's continued contumacious behavior.

Moreover, Justice Ostrager's decision does not invoke Section 541 or encroach on any action that might arise under Section 541 in the bankruptcy court.  If there must be a separate proceeding that implicates Section 541, that can occur in Kwok's chapter 11 case, but any potential action regarding the Lady May will be significantly informed by (if not outright

---

[80] Friedman Decl., Ex. 1, Notice of Removal, *PAX v. Kwok*, No. 1:22-cv-02258-MKV (S.D.N.Y.), Dkt. No. 1 at ¶ 6.
[81] *Id.*

24

controlled by) the findings of fact and judgments in the New York Action, as issues regarding property rights in bankruptcy are generally determined by state law. *See Butner v. United States*, 440 U.S. 48, 55 (1979). Indeed, PAX will establish that the doctrines of *res judicata* and collateral estoppel bar Kwok and others who participated in the New York Action from re-litigating claims and issues already decided in that forum. In any event, Kwok already was held liable for contract damages; the court's determination that Kwok beneficially owns and controls the yacht was a prerequisite to the finding that Kwok had violated the court's orders and was in contempt. The underlying cause of action is what matters, and that is based on contract rights that exist "independent of the reorganization." *Cf. KeyBank Nat'l Ass'n*, 600 B.R. at 227 ("arising in" jurisdiction existed over a dispute concerning "a post-petition contract the resolution of which depend[ed] upon the interpretation of bankruptcy court orders"). "Put differently, where, as here, a non-core legal claim has essentially been 'dressed up as a bankruptcy claim,' that label does not justify treating the claim as core." *In re Coudert Bros.*, 2011 WL 7678683, at *4.

*Fourth*, 28 U.S.C. § 1334 is the sole purported federal jurisdictional basis for the New York Action identified in the removal petition. As explained, the New York Action involved contract construction and the application of New York's judgment collection provisions. Moreover, given there is a foreign-based plaintiff (PAX) and a foreign-based defendants, no diversity jurisdiction exists.

*Fifth*, the New York Action was "commenced" in state court.[82]

---

[82] *See.* Friedman Decl., Ex. 6, First Amended Complaint, *PAX v. Kwok*, No. 1:22-cv-02258 (S.D.N.Y.), Dkt. No. 3.

*Sixth*, the New York Action is "capable of being timely adjudicated in state court."
*Wilmington Tr.*, 534 B.R. at 512. Courts evaluate whether an action may be timely adjudicated
in state court by considering four factors: "(1) the backlog of the state court's calendar relative
to the federal court's calendar; (2) the complexity of the issues presented and the respective
expertise of each forum; (3) the status of the title 11 bankruptcy proceeding to which the state
law claims are related; and (4) whether the state court proceeding would prolong the
administration or liquidation of the estate." *Parmalat*, 639 F.3d at 580.

These factors demonstrate that the New York Action is *capable* of being timely
adjudicated in state court, primarily because it *already* has been adjudicated. First, no concern
about backlog of the state court's calendar exists, because the case has been litigated for five
years and Justice Ostrager *already* adjudicated PAX's breach-of-contract claim, and *already*
decided the contempt issue. *See Worldview Ent. Holdings Inc. v. Woodrow*, 611 B.R. 10, 19
(S.D.N.Y. 2019) ("If anything, this factor cuts in favor of abstention because the state court
proceeding has been ongoing for five years."). Second, the "facts in [the] case [were] especially
complex," rendering the state court the more appropriate forum. *Parmalat*, 639 F.3d at 580–81.
Indeed, as Justice Ostrager aptly noted in the Final Contempt Order, the New York Action is a
"2017 case with ***1,180 docket entries*** – almost all of which involve defendant Kwok's efforts to
avoid and deceive his creditors by parking his substantial personal assets with a series of
corporations, trusted confidants, and family members."[83] This factor also favors abstention
because the state court action is a breach-of-contract dispute over which a federal court has no
specialized expertise. *Woodrow*, 611 B.R. at 19. Finally, there is no doubt that any additional

---

[83] Friedman Decl., Ex. 5, Decision & Order on Motion, *PAX v. Kwok*, Index No. 652077/2017
(N.Y. Sup. Ct.), Dkt. No. 1181.

contempt proceedings instituted before Justice Ostrager can and will be adjudicated on a timely basis. Either Kwok will remain in contempt or not; that issue is not complicated.

The third and fourth factors also weigh in favor of state court adjudication. The third factor considers "the status" of the chapter 11 proceeding, asking "whether the litigants in a state proceeding need the state law claims to be quickly resolved as a result of the status of the ongoing title 11 bankruptcy proceeding." *Parmalat*, 639 F.3d at 581. This factor counsels in favor of abstention because "the bankruptcy proceedings began relatively recently in comparison to the state court proceedings." *Woodrow*, 611 B.R. at 19. Finally, state court adjudication would not "prolong the administration or liquidation of the estate," because "[i]t is undisputed that the proceedings in the state court will remain subject to the automatic stay unless and until it is lifted by the bankruptcy court." *Id.* at 19–20. Thus, either the automatic stay will be modified and the New York Action will aid resolution of Kwok's bankruptcy, or the New York Action will remain dormant and not impact proceedings in the bankruptcy court. Accordingly, "there is little chance that the bankruptcy proceedings will be affected or delayed by the state court proceeding." *Id.* at 19.

For each of these reasons, the doctrine of mandatory abstention precludes this Court from hearing the New York Action.

**B**      <u>Even if Mandatory Abstention Does Not Apply, The Court Should Decline to Hear the Action Under the Permissive Abstention Doctrine.</u>

Even if the Court were to find that jurisdiction exists (it does not) and that mandatory abstention does not apply (it should were jurisdiction to exist), the Court nevertheless should abstain under the doctrine of permissive abstention.[84] That doctrine is based on 28 U.S.C. §

---

[84] Alternatively, the Court should remand the case for equitable reasons under 28 U.S.C. § 1452(b), which provides that "[t]he court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground." "In assessing whether to

1334(c)(1), which states, "nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." In deciding whether to abstain on this ground, courts weigh considerations of comity and federalism, judicial economy, and efficiency. *Wilmington Tr.*, 534 B.R. at 512.

It is difficult to think of a case where comity requires remand more than this one: Kwok filed this case to avoid being held accountable for contempt, first via invocation of the automatic stay and now by removal of the New York Action. Kwok earned every bit of his sanction by flagrantly disregarding court orders and affronting the dignity and sanctity of the New York court system. Out of respect for state courts alone, remand should be granted. *Marciano*, 431 F. App'x at 614 (challenge to state court's issuance of sanctions implicates power that "lies at the core of the administration of a State's judicial system"); *see, e.g.*, *In re Rodriguez*, No. 18-14694-MKN, 2019 WL 137009, at *4–5 (D. Nev. Jan. 3, 2019) (permissive abstention appropriate where debtor's removal of state court action "had the effect of depriving the State Court of authority" to enforce its prior order through contempt sanctions).

---

remand a case under 28 U.S.C. § 1452(b), courts consider a similar set of factors as when deciding whether to permissively abstain, including: '(1) whether issues of state law predominate; (2) whether judicial economy would be served by … equitable remand; (3) whether § 1334(b) is the sole basis for exercising federal jurisdiction; (4) whether the proceeding involves non-debtors; (5) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; and (6) the likelihood that the proceeding was commenced in a particular forum because of forum shopping on the part of one of the parties.'" *KeyBank Nat'l Ass'n*, 600 B.R. at 226 (quoting *Rahl v. Bande*, 316 B.R. 127, 135 (S.D.N.Y. 2004)). Because the factors overlap, this Motion addresses permissive abstention under 28 U.S.C. § 1334(c)(1) and equitable remand under 28 U.S.C. § 1452(b) jointly. *In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 334 (S.D.N.Y. 2003) ("The equitable remand analysis ... is essentially the same as the Section 1334(c)(1) abstention analysis.").

28

Courts in the Second Circuit consider multiple factors when determining whether to

permissively abstain:

> (1) the effect or lack thereof on the efficient administration of the estate if a Court
> recommends abstention, (2) the extent to which state law issues predominate over
> bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law,
> (4) the presence of a related proceeding commenced in state court or other non-
> bankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334,
> (6) the degree of relatedness or remoteness of the proceeding to the main
> bankruptcy case, (7) the substance rather than form of an asserted 'core'
> proceeding, (8) the feasibility of severing state law claims from core bankruptcy
> matters to allow judgments to be entered in state court with enforcement left to
> the bankruptcy court, (9) the burden on the court's docket, (10) the likelihood that
> the commencement of the proceeding in a bankruptcy court involves forum
> shopping by one of the parties, (11) the existence of a right to a jury trial, and
> (12) the presence in the proceeding of nondebtor parties.

*47 E. 34th St. (NY), L.P. v. BridgeStreet Worldwide, Inc.*, No. 20-CV-9978 (LJL), 2021 WL

2012296, at *9 (S.D.N.Y. May 20, 2021) (quoting *KeyBank Nat'l Ass'n*, 600 B.R. at 225).

Application of these factors—factors 1, 2, 3, 4, 5, 6, 8, 9, and 10—overwhelmingly

favors permissive abstention.  With respect to factors 2 and 4, not only did state law issues—

including in the context of judgment collection proceedings under Article 52 of the CPLR—

predominate, they were *already decided* by the New York Court.  As explained, Justice Ostrager

already issued (i) the Summary Judgment Order in PAX's favor on its breach of contract claim

and (ii) the Final Contempt Order, holding that Kwok was in contempt of court.[85]  *See supra* at

6–7, 11.  Under these circumstances—for essentially the same reasons that the *Rooker-Feldman*

doctrine applies—principles of comity "virtually require" remand.  *In re Briarpatch Film Corp.*,

281 B.R. 820, 829 (S.D.N.Y. 2002) (equitable remand appropriate because "[s]tate law issues not

only predominated," "they were determined by that Court"); *see also 47 E. 34th St. (NY), L.P.*,

---

[85] Friedman Decl., Ex. 5, Decision & Order on Motion, *PAX v. Kwok*, Index No 652077/2017
(N.Y. Sup. Ct.), Dkt. No. 1181 at 3.

2021 WL 2012296, at *10 (permissive abstention appropriate where "[t]he entirety of the case

[was] ready for summary adjudication," and "that summary adjudication [could] be most

efficiently handled by the state court judge who already ha[d] been presiding over the state law

issues in this case").  This is especially true because "[b]ankruptcy proceedings may not be used

to re-litigate issues already resolved in a court of competent jurisdiction." *Kelleran v.*

*Andrijevic*, 825 F.2d 692, 695 (2d Cir. 1987); *see also In re Lyondell Chem. Co.*, 402 B.R. at 609

(observing that "[u]ntil or unless New Jersey's courts say otherwise," the judgment creditor who

won a judgment in New Jersey state court "now has a claim in this Court in the amount awarded

by the trial court").  For the same reasons, factor 1—efficient administration of the estate—

similarly favors remand:  "[I]t would be highly inefficient for this Court to reconsider matters

which the State court tried and determined." *In re Briarpatch*, 281 B.R. at 831.  The same is true

for factor 3, the difficulty or unsettled nature of the issues. *Briarpatch* is directly on point:

"[T]he question is not whether the issues were difficult or not; the key factor here is that the State

court determined them." *Id.* at 829.

For factor 5, no jurisdictional basis other than 28 U.S.C. § 1334 exists, further

strengthening the case for permissive abstention.  Factors 6—the degree of relatedness—and 8—

the feasibility of severing the New York Action—also favor remand.  The action exists—and has

existed for almost five years—entirely independently of the bankruptcy.  It involves a breach-of-

contract claim based on a pre-petition contract that in no way relates to the bankruptcy. *See 47*

*E. 34th St. (NY), L.P.*, 2021 WL 2012296, at *9 ("simple state law contract case" was not

"directly related to the bankruptcy").  And, unlike cases where courts have found permissive

abstention inappropriate, the New York Action requires no interpretation of orders from the

Bankruptcy Court. *Cf. KeyBank Nat'l Ass'n*, 600 B.R. at 233 (severing the state law claims was

not straight-forward "because they involve issues that require interpreting the Bankruptcy

Court's orders."). With respect to factor 9, remand would place no burden on the state court's

docket, because the state court *already adjudicated* PAX's claim (and the First Department had

already received a fully-briefed appeal on the Summary Judgment Order).

Finally, Kwok's commencement of the bankruptcy proceeding and attempt to remove the

New York Action and transfer it to the bankruptcy court strongly suggest improper forum

shopping (factor 10). Kwok filed his chapter 11 petition just before Justice Ostrager's contempt

sanctions were to take effect, and removed the case shortly thereafter. *See Balcor/Morristown

Ltd. P'ship v. Vector Whippany Assocs.*, 181 B.R. 781, 793 (D.N.J. 1995) (forum shopping likely

where motion for contempt sanctions was "on the eve of decision" when debtor filed removal

petition). *In re AMeribuild Const. Mgmt., Inc.,* 399 B.R. 129, 134–35 (Bankr. S.D.N.Y. 2009)

("There are strong reasons to remand or to abstain" where the timing of removal suggests an

attempt to avoid contempt sanctions); *M.B. v. Roosevelt Inn LLC,* 2021 WL 5046216, at *6 (E.D.

Pa. Oct. 27, 2021) (abstention and remand appropriate where timing of removal "at least

suggests that the defendants might be seeking a better result by shopping around"). Moreover,

Kwok's Notice of Removal offers no description of what the federal court would in fact

adjudicate—likely because the removal is merely a ploy to (i) delay PAX's motion in the

bankruptcy court to confirm the inapplicability of the automatic stay with respect to Justice

Ostrager's Final Contempt Order,[86] and (ii) try to get a second bite at the apple by attempting to

---

[86] Mot. of PAX For Entry of an Order Confirming the Inapplicability of the Automatic Stay or, in the Alternative, Relief From the Automatic Stay Pursuant to Section 362(d)(2) of the Bankruptcy Code, Dkt. No. 57.

re-litigate issues already decided against him by the New York Court.[87]  But, as Judge Gropper

aptly noted in *Briarpatch*, "[b]ankruptcy courts must respect the orders and judgments of State

courts and cannot act as a court of review or appeal as to matters that have been decided by State

courts with jurisdiction.  281 B.R. at 829.  There, the debtor "complain[ed] bitterly about the

State court proceedings," but failed to identify "what motions" "would be available to them

today," "or precisely what they would have th[e] Court accomplish, other than to act as a general

court of review."  *Id.* at 829–30.  In effect, the debtor sought "a judge who [would] take a 'new

look,' which is "an impermissible attempt at forum shopping"—precisely the case here.  *In re*

*Rodriguez*, 2019 WL 137009, at *4 (reasoning that "[t]he specter of forum shopping is

significant" where debtor removed shortly after an "evidentiary hearing was scheduled on a

motion to hold the Debtor … in civil contempt"); *In re Drauschak*, 481 B.R. 330, 347 (Bankr.

E.D. Pa. 2012) (same); *Rose*, 2007 WL 136682, at *3 (barring federal court challenge to state

contempt order as "an impermissible collateral attack on the contempt charge").

　　　Many of the factors relevant to permissive abstention ultimately are tied to the decision in

Kwok's bankruptcy case on PAX's motion to confirm the inapplicability of the automatic stay

or, in the alternative, relief from the automatic stay concerning the Final Contempt Order.

Specifically, if the bankruptcy court determines that the stay does not apply or should be

modified, then—by definition—it will be deciding that remand is warranted and that proceeding

with enforcement of the Final Contempt Order will not interfere with the bankruptcy.

Conversely, if the Court determines that the stay applies to enforcement of the Final Contempt

---

[87] In his Objection to PAX's motion to confirm the inapplicability of the stay to the Final
Contempt Order, Kwok previewed his intent improperly to attempt to re-litigate the issue of
ownership of the Lady May.  *See supra* note 71.

Order, or that it should not be modified, then remand still will not interfere with the bankruptcy, because the automatic stay will remain in effect until the Court says otherwise.

## **CONCLUSION**

For the reasons set forth above, PAX respectfully requests that the Court grant its motion to remand the New York Action to the New York State Supreme Court, Commercial Division. Given the facts and circumstances, PAX requests that the Court waive, to the extent applicable, the 14-day stay of the enforcement of a judgment under Bankruptcy Rule 7062.

Dated: April 13, 2022
      New York, NY

**Pacific Alliance Asia Opportunity Fund L.P.**

*/s/ Peter Friedman*
Peter Friedman (admitted *pro hac vice*)
Stuart M. Sarnoff
**O'MELVENY & MYERS LLP**
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
E-mail: pfriedman@omm.com
       ssarnoff@omm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 13, 2022, a copy of the foregoing was filed electronically through the Court's CM/ECF System.  Notice of this filing will be sent by e-mail to all parties receiving notice by operation of the court's electronic filing system.  Parties in interest may access this filing through the Court's CM/ECF System.

*/s/ Peter Friedman*
Peter Friedman

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P., <br><br> Plaintiff, <br><br> v. <br><br> KWOK HO WAN, *a/k/a* KWOK HO, *a/k/a* GWO WEN GUI, *a/k/a* GUO WENGUI, *a/k/a* GUO WEN-GUI, *a/k/a* WAN GUE HAOYUN, *a/k/a* MILES KWOK, *a/k/a* HAOYUN GUO, GENEVER HOLDINGS CORPORATION, and GENEVER HOLDINGS LLC, <br><br> Defendants. | Chapter 11 <br><br> Case No. 22-01073-dsj |

**DECLARATION OF PETER FRIEDMAN IN SUPPORT OF PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.'S  MOTION TO REMAND OR, IN THE ALTERNATIVE, FOR ABSTENTION PURSUANT TO 28 U.S.C. § 1334(C)(1)**

I, Peter Friedman, declare:

1.      I am an attorney admitted to practice law in the State of New York and Washington, D.C. and am a partner at the law firm of O'Melveny & Myers, 7 Times Square, New York, NY 10036, counsel for Pacific Alliance Asia Opportunity Fund L.P. ("PAX").  I respectfully submit this Declaration in support of PAX's Motion to Remand or, in the Alternative, for Abstention Pursuant to 28 U.S.C. § 1334(C)(1).

2.      Attached as Exhibit 1 is a true and correct copy of the Kwok's March 18, 2022 Notice of Removal of the New York Action to the United States District Court for the Southern District of New York in *PAX v. Kwok*, Case No. 1:22-cv-02258-MKV (S.D.N.Y.), Dkt. No. 1.

3.      Attached as Exhibit 2 is a true and correct copy of the Stipulation Resolving Motion to Transfer Venue in *PAX v. Kwok*, Case No. 22-01073-dsj (Bankr. S.D.N.Y.), Dkt. No.

7-1.

4.      Attached as Exhibit 3 is a true and correct copy of the September 15, 2020

Decision and Order in *PAX. v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 549.

5.      Attached as Exhibit 4 is a true and correct copy of the February 3, 2021 Judgment

in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 716.

6.      Attached as Exhibit 5 is a true and correct copy of the February 9, 2022 Decision

and Order in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1181.

7.      Attached as Exhibit 6 is a true and correct copy of the First Amended Complaint

in *PAX v. Kwok*, Case No. 1:22-cv-02258 (S.D.N.Y.), ECF No. 3.

8.      Attached as Exhibit 7 is a true and correct copy of the February 18, 2022 Court

Notice in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1191.

9.      Attached as Exhibit 8 is a true and correct copy of screenshots from the website

https://www.vesselfinder.com/?imo=1012359 (last accessed on April 12, 2022).

10.     Attached as Exhibit 9 is a true and correct copy of the March 4, 2022 Decision

and Order on Voluntary Withdrawal of Contempt Motion in *PAX v. Kwok*, Index No.

652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1193.

11.     Attached as Exhibit 10 is a true and correct copy of the Executed Contract of Sale

in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 256.

12.     Attached as Exhibit 11 is a true and correct copy of Genever Defendants'

Corporate Documents, filed as Exhibit 5 to PAX's Motion for Pre-Judgment Attachment in *PAX

v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 252.

13.     Attached as Exhibit 12 is a true and correct copy of the December 8, 2021 Order

in *PAX. v. Genever Holdings Corp.*, filed as Exhibit 2 to the Affidavit of Andrew Willins in

Support of PAX's Motion for an Order of Civil Contempt as to Defendant Miles Kwok for his

Failure to Comply with the Court's Turnover Order, in *PAX v. Kwok*, Index No. 652077/2017

(N.Y. Sup. Ct.), Dkt. No. 1089.

14.　Attached as Exhibit 13 is a true and correct copy of a document PAX produced in

*PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. 2020) bearing Bates number PAX-KWOK-

017468.

15.　Attached as Exhibit 14 is a true and correct copy of the December 18, 2020

Decision and Order in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 685.

16.　Attached as Exhibit 15 is a true and correct copy of the March 2, 2021 Notice of

Appeal in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 725.

17.　Attached as Exhibit 16 is a true and correct copy of the October 15, 2021 Reply

Brief for Defendant-Appellant in *PAX v. Kwok*, Case No. 2021-00740 (N.Y. App. Div., First

Dep't), Dkt. No. 16.

18.　Attached as Exhibit 17 is a true and correct copy of the Voluntary Petition for

Non-Individuals Filing for Bankruptcy in *In re: Genever Holdings, LLC*, Case No. 20-12411-jlg

(Bankr. S.D.N.Y.), Dkt. No. 1.

19.　Attached as Exhibit 18 is a true and correct copy of the October 8, 2021 Order

Granting Debtor's Second Renewed Motion to Approve the Revised Settlement Agreement in *In

re Genever Holdings, LLC*, Case No. 20-12411-jlg (Bankr. S.D.N.Y.), ECF 141.

20.　Attached as Exhibit 19 is a true and correct copy of the September 22, 2021

Decision and Order in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 904.

21.　Attached as Exhibit 20 is a true and correct copy of the January 7, 2022 Notice of

Motion for Order of Civil Contempt as to Defendant Miles Kwok for His Failure to Comply

With the Court's Turnover Order in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1078.

22.     Attached as Exhibit 21 is a true and correct copy of the January 24, 2022 Reply Memorandum of Law in Further Support of PAX's Motion for an Order of Civil Contempt as to Defendant Miles Kwok for his Failure to Comply With the Court's September 22, 2021 Turnover Order in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1116.

23.     Attached as Exhibit 22 is a true and correct copy of the Memorandum of Law in Support of PAX's CPLR 5229 Motion and Request for TRO in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 576.

24.     Attached as Exhibit 23 is a true and correct copy of the September 30, 2020 Decision and Order in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 591.

25.     Attached as Exhibit 24 is a true and correct copy of the October 15, 2020 Decision and Order in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 630.

26.     Attached as Exhibit 25 is a true and correct copy of screenshots from VesselFinder "Voyage Analyzer"  https://voyage.vesselfinder.com/dcad1f224b32615145 e66055d9856504 (last accessed on April 12, 2022).

27.     Attached as Exhibit 26 is a true and correct copy of the March 16, 2021 Decision and Order of Conditional Contempt in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 728.

28.     Attached as Exhibit 27 is a true and correct copy of the March 23, 2021 Notice of Appeal in *PAX v. Kwok*, Case No. 2021-01010 (N.Y. App. Div.), Dkt. No. 1.

29.     Attached as Exhibit 28 is a true and correct copy of the November 4, 2021 Order in *PAX v. Kwok*, Case No. 2021-01010 (N.Y. App. Div.), Dkt. No. 17.

30.     Attached as Exhibit 29 is a true and correct copy of the January 20, 2022 Order in *PAX v. Kwok*, Case No. 2021-01010 (N.Y. App. Div.), Dkt. No. 22.

31.     Attached as Exhibit 30 is a true and correct copy of the January 14, 2022 Third Interim Decision and Order on Motion in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1098.

32.     Attached as Exhibit 31 is a true and correct copy of the February 9, 2022 Final Order of Civil Contempt in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1182.

33.      Attached as Exhibit 32 is a true and correct copy of the February 10, 2022 Notice of Appeal in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1187.

34.     Attached as Exhibit 33 is a true and correct copy of the Summary Statement on Application for Expedited Service and/or Interim Relief in *PAX v. Kwok*, Case No. 2022-00609 (N.Y. App. Div.), Dkt. No. 5.

35.     Attached as Exhibit 34 is a true and correct copy of the February 15, 2022 Suggestion of Bankruptcy in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), Dkt. No. 1190.

Dated: April 13, 2022
New York, New York

Respectfully submitted,

*/s/ Peter Friedman*
Peter Friedman
pfriedman@omm.com
O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

*Attorney for Pacific Alliance Asia*
*Opportunity Fund L.P.*

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,<br><br>              Plaintiff,<br><br>    vs.<br><br>KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO, GENEVER: HOLDINGS LLC, and GENEVER HOLDINGS CORPORATION,<br><br>              Defendants. | Civil Action No. |

## NOTICE OF REMOVAL

**TO THE CLERK OF THE ABOVE-ENTITLED COURT**

**PLEASE TAKE NOTICE** that on this date, defendant Ho Wan Kwok ("Mr. Kwok") by and through his undersigned attorneys, files this Notice of Removal pursuant to 28 U.S.C. § 1452 and Fed. R. Bankr. P. 9027, removing this entire action from the Supreme Court of the State of New York, New York County (the "New York State Court") to the United States District Court for the Southern District of New York (the "Court" or the "New York District Court"), the above-captioned case brought by plaintiff Pacific Alliance Asia Opportunity Fund L.P. (the "Plaintiff") in the New York State Court. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and 1334(e).

In support of this Notice of Removal, Mr. Kwok states as follows:

    1.      On April 18, 2017, Plaintiff filed a civil action numbered 652077/2017 (the "Action"). Numerous aspects of the Action are currently on appeal. At present, the Plaintiff in

the Action seeks to enforce an order to compel Mr. Kwok to move a boat (the "Lady May") that

he is alleged to own or control into the jurisdiction of the State of New York, and to otherwise

exercise control over purported assets of Mr. Kwok to satisfy a judgment.  *See Motion of Pacific*

*Alliance Asia Opportunity Fund L.P. For Entry of an Order Confirming The Inapplicability of the*

*Automatic Stay Or, In The Alternative, Relief From The Automatic Stay Pursuant to Section*

*362(d)(2) of the Bankruptcy Code*, Case No. 22-50073, Docket No. 57, at ¶ 12 (Bankr. D. Conn

2022) (noting that plaintiff is seeking in this Action the enforcement of an order "requiring the

return of the Lady May to New York").

2.        On February 15, 2022 (the "Petition Date"), Mr. Kwok ("Mr. Kwok") filed a

voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the District of

Connecticut, Bridgeport Division (the "CT Bankruptcy Court"), and was assigned Case No. 22-

50073 (JAM), (the "Chapter 11 Case").  Accordingly, the time for removal prescribed by 28 U.S.C.

§ 1446(b) and Fed. R. Bankr. P. 9027(a)(2) has not expired.

3.        Under 28 U.S.C. § 1452(a) "[a] party may remove any claim or cause of action in

a civil action . . . to the district court for the district where such civil action is pending, if such

district court has jurisdiction of such claim or action under § 1334 of this Title[.]"

4.        Under 28 U.S.C. § 1334(b), this Court has jurisdiction to hear all civil proceedings

that "aris[e] under title 11, or aris[e] in or [are] related to cases under title 11" of the United States

Code, the Bankruptcy Code.

5.         As of the filing of the Chapter 11 Case, the CT Bankruptcy Court has "exclusive

jurisdiction" over "all the property, wherever located, of the debtor as of the commencement of

such case, and of property of the estate[.]"  28 U.S.C. § 1334(e)  Accordingly, the Civil Action

presently impinges on the exclusive jurisdiction of the CT Bankruptcy Court to determine what is

(or is not) property of the estate, and to exercise jurisdiction over such property. *See In re AE Liquidation, Inc.*, 435 B.R. 894, 904 (Bankr. D. Del. 2010) (determination whether property is property of the estate falls within the bankruptcy court's exclusive jurisdiction); *In re 245 Assocs., LLC*, 188 B.R. 743, 749 fn. 6 (Bankr. S.D.N.Y. 1995), corrected (Nov. 9, 1995) ("The commencement of the bankruptcy case vests the district court with exclusive jurisdiction over property of the debtor and the estate.").

6.      Accordingly, as of the filing of the Chapter 11 Case, any action seeking to determine what is (or is not) the property of Mr. Kwok or his estate is governed by 11 U.S.C. § 541 and, thus, the Action is an action "arising in" the Chapter 11 Case.

7.      This case also is "related to" the Chapter 11 Case because it has a close nexus to the bankruptcy proceedings and seeks to determine issues regarding Mr. Kwok's ownership and/or control (or lack thereof) of property and to exercise control over certain assets that are alleged to be within his ownership or control,[1] as well as actions he is alleged to have taken with respect to his creditors.

8.      The Supreme Court of the State of New York, New York County is within the Southern District of New York, and accordingly removal to the Southern District of New York is proper pursuant to 28 U.S.C. § 1452(a).  Following removal, Mr. Kwok anticipates seeking to transfer venue to the District of Connecticut and referral to the Bankruptcy Court for the District of Connecticut based on the ongoing Chapter 11 Case, rather than seeking referral to a bankruptcy court in the Southern District of New York.

---

[1]     The New York State Court has issued orders that contain factual findings with respect to these issues, including determining that the most relevant purported asset (the Lady May yacht) is within Mr. Kwok's beneficial ownership.  That finding is on appeal and Mr. Kwok does not waive his objections to that factual finding or any others that are on appeal.

9.      Pursuant to 28 U.S.C. § 1446(d) and Fed. R. Bankr. P. 9027(c), a copy of this Notice

of Removal will be filed with the Clerk of the Supreme Court of the State of New York, New York

County, and a copy of this Notice of Removal will be served upon counsel for the Plaintiff.

10.      Pursuant to Fed. R. Bankr. P. 9027(a)(1), Mr. Kwok consents to the entry of a final

order by the Bankruptcy Court with respect to any non-core claim within the meaning of 28 U.S.C.

§ 157(b)(2).

**WHEREFORE**, Mr. Kwok removes the entire action now pending in the Supreme

Court of New York, New York County to this Court.


Dated:  March 18, 2022

**BROWN RUDNICK LLP**

By: */s/ William R. Baldiga*
William R. Baldiga, Esq.
Bennett S. Silverberg, Esq.
Uriel Pinelo, Esq.
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
Email: wbaldiga@brownrudnick.com
Email: bsilverberg@brownrudnick.com
Email: upinelo@brownrudnick.com

*Proposed Counsel for Ho Wan Kwok, Debtor*

# EXHIBIT 2

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK
### MANHATTAN DIVISION

PACIFIC ALLIANCE ASIA
OPPORTUNITY FUND L.P.,

              Plaintiff,

              v.

KWOK HO WAN, a/k/a KWOK HO, a/k/a
GWO WEN GUI, a/k/a GUO WENGUI, a/k/a
GUO WEN GUI, a/k/a WAN GUE
HAOYUN, a/k/a MILES KWOK, a/k/a
HAOYUN GUO, GENEVER HOLDINGS
CORPORATION, and GENEVER
HOLDINGS LLC,

              Defendants.

Adversary Proceeding No. 22-01073-dsj

## STIPULATION RESOLVING
## MOTION TO TRANSFER VENUE

WHEREAS, on April 18, 2017, Plaintiff Pacific Alliance Asia Opportunity Fund L.P.

("PAX") filed the underlying state court action in the Supreme Court of the State of New York –

County of New York: Commercial Division against Defendant Miles Kwok ("Kwok"), *see*

*Pacific Alliance Asia Opportunity Fund L.P. v. Kwok et al.*, Case No. 652077/2017 (Sup. Ct. Ny.

Cnty.), Dkt. No. 1 (the "New York Action"); and

WHEREAS, on February 3, 2021, the New York state court granted partial summary

judgment and entered a judgment in favor of PAX, *see Pacific Alliance Asia Opportunity Fund*

*L.P. v. Kwok et al.*, Case No. 652077/2017 (Sup. Ct. Ny. Cnty.), Dkt. No. 716; and

WHEREAS, on February 9, 2022, the New York state court issued a final order of civil

contempt against Kwok, *see Pacific Alliance Asia Opportunity Fund L.P. v. Kwok et al.*, Case

No. 652077/2017 (Sup. Ct. Ny. Cnty.), Dkt. No. 1181; and

1

WHEREAS, on February 15, 2022, Kwok filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the District of Connecticut, Bridgeport Division (the "CT Bankruptcy Court"), and was assigned Case No. 22-50073 (JAM); and

WHEREAS, on March 18, 2022, Kwok filed a notice of removal of the New York Action to the United States District Court for the Southern District of New York, *see Pacific Alliance Asia Opportunity Fund L.P. v. Kwok et al.*, Case No. 1:22-cv-02258-MKV (S.D.N.Y.), Dkt. No. 1; and

WHEREAS, on March 21, 2022, pursuant to the Amended Standing Order of Reference dated January 31, 2012, the District Court referred the Action to this Court; and

WHEREAS, on March 23, 2022, Kwok moved for entry of an order transferring this action to the CT Bankruptcy Court pursuant to 28 U.S.C. §§ 1404 and 1412 and Rule 7087 of the Federal Rules of Bankruptcy Procedure, *see Pacific Alliance Asia Opportunity Fund L.P. v. Kwok et al.*, Case No. 1:22-01073-dsj (Bankr. S.D.N.Y.), Dkt. No. 4; and

WHEREAS, on March 30, 2022, the Action was reassigned from Judge Martin Glenn to Judge David S. Jones, *see Pacific Alliance Asia Opportunity Fund L.P. v. Kwok et al.*, Case No. 1:22-01073-dsj (Bankr. S.D.N.Y.), Dkt. No. 5;

NOW THEREFORE

IT IS HEREBY STIPULATED AND AGREED, by and between the counsel of record for the respective parties herein, that:

1.      A transfer of the Action to the District Court for the District of Connecticut, Bridgeport Division, for referral to the CT Bankruptcy Court pursuant to 28 U.S.C. § 1404(a) would serve the interests of justice, and would foster the economic and efficient administration of the estate; and

2.    PAX does not waive, and expressly preserves, its right to seek, before the CT

Bankruptcy Court, timely remand of this adversary proceeding on any proper ground, *see, e.g.*,

*Sinochem International Co. v. Malaysia International Shipping Corp.*, 549 U.S. 422, 430-32

(2007) (A district court may properly transfer an action pursuant to 28 U.S.C. § 1404(a),

"bypassing questions of subject-matter and personal jurisdiction, when considerations of

convenience, fairness, and judicial economy so warrant."). Kwok likewise does not waive, and

expressly preserves,  the right to oppose such relief sought by PAX on any proper ground. Kwok

agrees, however, that PAX's consent to Kwok's motion to transfer venue does not constitute

consent to subject-matter jurisdiction or a waiver of PAX's right to seek timely remand. *E.g.*,

*Sinochem International Co.*, 549 U.S. at 430-32.

SO STIPULATED:

| | |
|---|---|
| O'MELVENY & MYERS LLP | BROWN RUDNICK LLP |
| *Attorneys for Plaintiff Pacific Alliance Asia Opportunity Fund* | *Attorneys for Defendant Ho Wan Kwok* |
| By: *Stuart M. Sarnoff* | By: *William R. Baldiga* |
| Stuart M. Sarnoff | William R. Baldiga |

SO ORDERED:
April __, 2022

_____
United States Bankruptcy Judge

# EXHIBIT 3

# SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY

| PRESENT: | **HON. BARRY R. OSTRAGER** | PART | **IAS MOTION 61EFM** |
|---|---|---|---|
| | *Justice* | | |

-----------------------------------------------------------------------X

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

Plaintiff,

- v -

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO, GENEVER HOLDINGS LLC, and GENEVER HOLDINGS CORPORATION,

Defendants.

-----------------------------------------------------------------------X

| INDEX NO. | 652077/2017 |
|---|---|
| **MOTION DATE** | |
| **MOTION SEQ. NO.** | 007 |

**DECISION + ORDER ON MOTION**

HON. BARRY R. OSTRAGER

Before the Court is plaintiff Pacific Alliance Asia Opportunity Fund L.P.'s ("Pacific Alliance") motion for partial summary judgement on Count I of the Amended Complaint against defendant Kwok Ho Wan a/k/a Miles Kwok ("Kwok") and defendant Kwok's cross-motion for reargument on motion 006. The Court heard oral argument via Skype on September 14, 2020. Based on the papers submitted and the arguments made on the record of September 14, 2020, and for the reasons that follow, Pacific Alliance's motion for partial summary judgment is granted, and Kwok's motion for reargument on motion 006 is denied.

**Background**

In 2008, Pacific Alliance entered into an agreement with Spirit Charter Investment Limited ("Spirit"), one of Kwok's business entities, under which Pacific Alliance provided Spirit with a loan facility in the principal amount of $30 million. Kwok executed a personal Guarantee of the loan. In September 2009, Spirit executed a deed under which Shiny Times Holdings Limited ("Shiny Times"), a business listing Kwok as its sole shareholder and director, assumed

the loan debt that Spirit owed to Pacific Alliance. Kwok again executed a personal guarantee in

favor of Pacific Alliance to secure Shiny Times' repayment obligation.

In March 2011, Pacific Alliance and Shiny Times entered into a new loan facility ("2011

Loan Facility") that expressly superseded and replaced the 2009 Deed of Settlement and a 2010

Letter Agreement. Simultaneously, Kwok entered into a new personal guarantee ("2011 Personal

Guarantee") which expressly superseded the 2009 Guarantee.  The 2011 Personal Guarantee is

the operative agreement in this action.

In April 2013, the parties entered into a Deed of Settlement, whereby the outstanding

loan amount would no longer be due and owing to Pacific Alliance if Pacific Alliance purchased

certain apartments from Beijing Pangu Investment Inc. ("Beijing Pangu"), another Kwok

business entity, and Shiny Times' made certain installment payments to Pacific Alliance. Beijing

Pangu was required to satisfy ten conditions precedent in connection with the sale and purchase

of each of the apartments by Pacific Alliance. If any such condition was not satisfied by June of

2013, the Deed of Settlement would be terminated in its entirety. Pacific Alliance and Kwok

subsequently executed four extensions of the Deed of Settlement, changing only the date by

which the conditions precedent needed to be satisfied. The latest Deed of Settlement required

that the conditions precedent be satisfied by June of 2015.

Pacific Alliance seeks summary judgment on Count I of the Amended Complaint which

alleges that Kwok failed to satisfy the conditions precedent by June of 2015 and thus, per the

terms of the agreement, the Deed of Settlement was terminated in its entirety and the 2011

Personal Guarantee again controlled.

The Court recently held, in response to Pacific Alliance's motion for sanctions, that

Kwok was judicially estoppel from challenging the authenticity of documents that Kwok had

previously sponsored in proceedings before this Court. *See* NYSCEF Doc. No. 404. Specifically,

at his November 2019 deposition, Kwok denied having signed several agreements discussed

above, including the 2011 Loan Facility, the 2011 Personal Guarantee, the 2013 Deed of

Settlement, and the four Supplemental Deeds. Kwok testified that the documents were forgeries.

On the motion for contempt, Pacific Alliance argued, and the Court found, that these denials

were inconsistent with the positions Kwok had taken throughout the duration of this 2017 case.

As such, the Court held that Kwok was judicially estopped from challenging the authenticity of

these agreements in opposition to Pacific Alliance's motion for summary judgment or at trial.

**Kwok's Cross-Motion**

Turning first to defendant Kwok's cross-motion for leave to reargue the Court's Decision

and Order dated July 7, 2020 (NYSCEF Doc. No. 404), this motion is denied. As stated above,

the Court held that Kwok was judicially estopped from challenging the authenticity of the

agreements that Kwok had previously sponsored as authentic before the Court in this proceeding.

Kwok argues that the Court misapprehended the law in reaching this holding. This Court rejects

that argument in its entirety.

At the outset of this case, Kwok moved to dismiss this action on *forum non conveniens*

grounds (motion 001). The Court granted Kwok's motion (NYSCEF Doc. No. 102), which

decision was subsequently reversed and remitted by the First Department (NYSCEF Doc. 121).

In making his motion to dismiss, Kwok argued that the contracts at issue were governed by Hong

Kong law. Specifically, Kwok attached to his motion "true and correct" copies of several

agreements among the parties including the 2011 Personal Guarantee (NYSCEF Doc. No. 17)

and the 2013 Deed of Settlement (NYSCEF Doc. No. 18), which he now contests.

3

Kwok now argues that because the thrust of his argument on the motion to dismiss and

the Court's decision related to *forum non conveniens,* (1) he is not actually changing his position

on the authenticity of the documents, and (2) the Court did not actually determine the

authenticity of the documents. This argument is incorrect. Kwok's assertion that the case should

have been dismissed in favor of a resolution in Hong Kong *because the agreements on their face

are governed by Hong Kong law* necessarily required an argument by Kwok, and an acceptance

by the Court, that the agreements were authentic and not forgeries, as Kwok now claims.

Kwok further argues that in any event judicial estoppel cannot apply because there was

no final determination on the merits on the issue of whether the contracts were authentic, because

the First Department reversed this Court's decision on the motion to dismiss. This argument is

not supported by the case law in the First Department. Judicial estoppel is an equitable doctrine

used to prevent a party from changing its position during the same litigation. *See e.g. Nestor v.

Britt*, 270 A.D.2d 192, 193 (2000) ("[u]nder the doctrine of judicial estoppel, or estoppel against

inconsistent positions, a party is precluded from inequitably adopting a position directly contrary

to or inconsistent with an earlier assumed position in the same proceeding."). Indeed, because

judicial estoppel is used to prevent parties from changing their position in the same litigation – a

final determination *cannot* be a prerequisite for judicial estoppel. *See id* (precluding the landlord

from relying on a different lease on appeal than had been relied on at the trial-court level in the

same proceeding).

Additionally, the Court notes that Kwok never pleaded that the documents were forgeries

in either of his Answers, which is an affirmative defense. *See e.g., Proner v. Julien &

Schlesinger, P.C.*, 214 A.D.2d 460, 461 (First Dept. 1995) (granting a motion for leave to amend

the pleadings to add affirmative defense of forgery); *Great Am. Ins. Co. v. Giardino,* 71 A.D.2d

4

836, 836 (Fourth Dept. 1979) (holding that "proof of defendants' handwriting was material in light of their affirmative defense of forgery").

Kwok's recent, uncorroborated assertion that the agreements are forgeries is inconsistent with his prior position in this litigation – and therefore provides an appropriate basis for judicial estoppel. Accordingly, Kwok's cross-motion for reargument is denied, and the agreements previously sponsored by Kwok are accepted as authentic for the purpose of evaluating plaintiff's motion for partial summary judgment.

## Pacific Alliance's Motion

The Court is granting summary judgment in favor of plaintiff Pacific Alliance holding defendant Kwok liable for breach of contract under the 2011 Personal Guarantee. By the plain terms of the 2013 Deed of Settlement, the failure to satisfy the conditions precedent to the settlement by June 30, 2015, would result in reverting to the 2011 Personal Guarantee being in full force and effect. *See* NYSCEF Doc. 461.

> **Clause 3.4:** Reversion of the Facility Letter after 31 July 2013. In the event that all conditions precedent set out in Clause 3.2 for all Apartments have not been satisfied by 31 July 2013 (or such later date agreed by the Parties in writing[— here, 30 June 2015, per the fourth and final supplemental Deed of Settlement]), **then the entire settlement as contemplated under this Deed shall be terminated and the Parties acknowledge that the Facility Letter shall revert and be in full force and effect immediately** after 31 July 2013 (or such later date agreed by the Parties in writing) and Shiny Times shall be obliged to settle the Total Outstanding Amount and any interest accrued thereon in accordance with the terms and conditions of the Facility Letter. (emphasis added).

*See also* NYSCEF Doc. No. 472 "Fourth Supplemental Deed of Settlement" (changing the date to satisfy the conditions precedent to "30 June 2015").

Plaintiff Pacific Alliance has shown, and defendant Kwok has failed to refute, that several of the conditions precedent in the 2013 Deed of Settlement were not fulfilled. Namely, defendant Kwok failed to deliver clean title, failed to provide plaintiff with an invoice for the

purchase of the apartments, failed to provide plaintiff with evidence regarding the payment of all

relevant taxes and charges in connection with the sale and purchase of the apartments, and failed

to deliver the House Ownership Certificates of any of the Apartments to plaintiff. *See* NYSCEF

Doc. No. 461 ¶ 3.2 (e)(g)(h)(i).

Kwok does not dispute that these conditions were never satisfied. Instead, in opposition,

Kwok argues that plaintiff Pacific Alliance failed to mitigate its damages when it allegedly did

not act on an opportunity to potentially seize the three apartments with the aid of Beijing police.

First, even taking Kwok's version of events as true, mitigation speaks to damages, not

liability, and thus these events would not preclude partial summary judgment on liability.

Second, as demonstrated by the documentary evidence sponsored by both parties, the alleged

opportunity to take possession of the three apartments with the aid of police only came up *after*

June 2015, and thus the 2013 Deed of Settlement had already been nullified in its entirety and the

2011 Personal Guarantee was in full force and effect. Third, Kwok has never pleaded, in either

of his Answers, mitigation, which is an affirmative defense. *See e.g. Eskenazi v. Mackoul,* 72

A.D.3d 1012, 1014 (2d Dep't 2010) (referring to "the affirmative defense of failure to mitigate

damages").

Finally, under Hong Kong law, a party is only required to act *reasonably* to mitigate

damages. *See* Affirmation of Vishal Prakash Melwani at ¶17.2 (NYSCEF Doc. No. 535) *and see*

Affirmation of Phillip Loukis Georgiou (NYSCEF Doc. No. 498) at ¶¶ 18.3 and 21. The record

currently indicates that to take advantage of the alleged offer of the Beijing Police, Pacific

Alliance would have needed to pay RMB35m [approximately USD$5.5 million] per unit to get

them released. *See* NYSCEF Doc. No. 519 PAX-KWOK-017288.  The prospect of paying

approximately $16 million for assets that the parties had agreed would be transferred free of

6

charge to settle a debt would likely not have qualified as a *reasonable* opportunity to mitigate damages under Hong Kong law. Nevertheless, the Court reserves decision as to the issue of damages.

Under the 2011 Personal Guarantee

- Kwok "irrevocably and unconditionally. . . guarantee[d] to PAX [Pacific Alliance] the due and punctual payment of [Shiny Times'] [o]bligations [under the 2011 Facility] and agree[d] that promptly on PAX's demand he will pay to PAX all [o]bligations that are due but unpaid";

- Kwok "irrevocably and unconditionally agree[d] (as primary obligor and not only as surety) to indemnify and hold harmless PAX on demand from and against any and all losses incurred by PAX as a result of any [o]bligation [of Shiny Times] being or becoming void, voidable, unenforceable, or ineffective as against Shiny Times for any reason whatsoever . . . .";

- Kwok agreed that his "obligations . . . under this Guarantee shall constitute and be continuing obligations which shall not be released or discharged by any intermediate payment of [Shiny Times'] [o]bligations [under the 2011 Loan Facility] or any of them, shall continue in full force and effect until the unconditional and irrevocable payment and discharge in full of [those o]bligations and are in addition to and independent of, and shall not prejudice or merge with, any other security (or any right of setoff) which PAX may at any time hold in respect of [those o]bligations or any of them;"

- PAX was permitted to seek recourse against Kwok as primary obligor without first enforcing the debt against Shiny Times; and

- Kwok agreed to a catchall waiver of any defenses based on "any other act, event or omission which might operate to discharge, impair or otherwise affect the Guarantor or any of the Obligations or any of the rights, powers, and remedies conferred upon [PAX LP] by this Guarantee or by law."

Kwok does not argue that either he or Shiny Times made any payments under the 2011 Loan Facility or the 2011 Personal Guarantee to satisfy the debt. Accordingly, the Court finds Kwok liable for breach of the 2011 Personal Guarantee.

## Conclusion

The remaining issue in the action – Count II of the Amended Complaint – seeks to hold two of Kwok's companies—Genever Holdings LLC and Genever Holdings Corporation— liable

for Kwok's debt to Pacific Alliance as alter egos. This action was scheduled for a jury trial on

October 5, 2020. Due to the Covid-19 pandemic, the Court is unable to have a jury trial on that

date and the trial is rescheduled for January 15, 2021.

Accordingly, it is hereby,

ORDERED that defendant Kwok's cross-motion for reargument is denied; and it is

further

ORDERED that plaintiff's motion for partial summary judgment on Count I of the

Amended Complaint is granted in favor of Pacific Alliance Asia Opportunity Fund L.P. and

against Kwok Ho Wan, a/k/a Kwok Ho, a/ka, GWO Wen Gui, a/ka/ Gui Wengui, a/ka/ Guo

Wen-Gui, a/ka/ Wan Gue Haoyun a/k/a Miles Kwok a/ka/ Haoyun Guo to the extent of holding

defendant Kwok liable for breach of contract; and it is further

ORDERED that plaintiff shall move no later than October 14, 2020 by notice of motion

returnable in the Submissions Part to establish damages on Count I by presenting affidavits on

personal knowledge and evidence in admissible form as to the principal amount due and owing

under the 2011 Personal Guarantee, the rate of interest applicable under the 2011 Personal

Guarantee, and the date from which interest is accruing, so that the Clerk of Court may calculate

the total amount due and owing as of the date of entry of judgment; and it is further

ORDERED that plaintiff shall simultaneously move for an award of legal fees and

expenses, setting forth the document which plaintiff is relying on and attaching invoices for

services rendered; and it is further

8

ORDERED that the parties appear for a status conference on December 22, 2020 at 10:20

am.

Dated: September 15, 2020

BARRY R. OSTRAGER, J.S.C.

**CHECK ONE:**

| | | | |
|---|---|---|---|
| CASE DISPOSED | | X NON-FINAL DISPOSITION | |
| GRANTED | DENIED | X GRANTED IN PART | OTHER |

**APPLICATION:**    SETTLE ORDER      SUBMIT ORDER

**CHECK IF APPROPRIATE:**    INCLUDES TRANSFER/REASSIGN      FIDUCIARY APPOINTMENT      REFERENCE

9

# EXHIBIT 4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P., | |
| Plaintiff, | |
| v. | |
| KWOK HO WAN, *a/k/a* KWOK HO, *a/k/a* GWO WEN GUI, *a/k/a* GUO WENGUI, *a/k/a* GUO WEN-GUI, *a/k/a* WAN GUE HAOYUN, *a/k/a* MILES KWOK, *a/k/a* HAOYUN GUO, GENEVER HOLDINGS CORPORATION, and GENEVER HOLDINGS LLC, | |
| Defendants. | |

17 652077

Index No. 652077/2017

[~~PROPOSED~~] JUDGMENT

WHEREAS, on April 18, 2017, Plaintiff Pacific Alliance Asia Opportunity Fund L.P., filed a complaint against Defendant Kwok Ho Wan, a/k/a Kwok Ho, a/k/a Gwo Wen Gui, a/k/a Guo Wengui, a/k/a Guo Wen-Gui, a/k/a Wan Gue Haoyun, a/k/a Miles Kwok, a/k/a Haoyun Guo ("Kwok"), alleging a cause of action for breach of contract against Defendant Kwok.

WHEREAS, on April 18, 2019, Plaintiff filed a First Amended Complaint against Kwok, and Genever Holdings LLC, and Genever Holdings Corporation (together with Genever Holdings LLC, the "Genever Defendants"), alleging causes of action for (i) breach of contract against Defendant Kwok and (ii) veil piercing against the Genever Defendants.

WHEREAS, on July 24, 2020, Plaintiff moved for partial summary judgment on its breach of contract claim against Kwok, and the motion was fully briefed and heard before Justice Barry R. Ostrager, who issued a Decision and Order dated September 15, 2020, which was entered in the New York County Clerk's Office on September 16, 2020, granting Plaintiff's motion on Count I of the Amended Complaint for breach of contract, and directed Plaintiff move by Notice of Motion to establish damages on Count I no later than October 14, 2020.

WHEREAS, (i) on September 21, 2020, Plaintiff moved by Notice of Motion to establish

damages, legal fees and expenses; (ii) Plaintiff agreed to temporarily withdraw, without

prejudice and with the Court's permission and the other parties' understanding that it would be

renewed at a later date, the portion of its application relating to legal fees and expenses (i.e.,

enforcement costs); and (iii) the motion was fully briefed and heard before Justice Barry R.

Ostrager, who issued a Decision and Order dated December 18, 2020 (the "Damages Order"),

and entered into the New York County Clerk's office on December 18, 2020, directing the Clerk

of Court to enter judgment in favor of Plaintiff and against Defendant Kwok in the amount of

$46,426,489.00 plus contractual interest at a rate of 15% per annum from effective date of

December 31, 2010 and at the statutory rate of 9% per annum from the date of entry of this

decision and order.

NOW, upon motion of O'Melveny & Myers LLP, attorneys for Plaintiff, it is:

ADJUDGED that Plaintiff Pacific Alliance Asia Opportunity Fund L.P., having a

business address at 33/F, Three Pacific Place, 1 Queen's Road East, Hong Kong, have judgment

against and do recover from Defendant Kwok Ho Wan, residing at 781 Fifth Avenue, 18th Floor,

New York, NY 10022, the amount of _____**$46,426,489.00**_____, plus contractual

interest in the amount of _____**$69,448,939.71**_____, plus post-judgment interest at

the statutory rate of 9% in the amount of _____**$526,590.86**_____, for a total of

**X**  ___**$116,402,019.57**___, and Plaintiff shall have execution thereof.

~~Judgment signed and entered this ___th day of _____, 2021~~

**FILED**
**Feb 03 2021**
**NEW YORK**
**COUNTY CLERK'S OFFICE**

_Milton Adan Tingling._
Clerk

3 rd        Feb.        2021

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PACIFIC ALLIANCE ASIA OPPORTUNITY
FUND L.P.,

        Plaintiff,

    v.

KWOK HO WAN, *a/k/a* KWOK HO, *a/k/a* GWO
WEN GUI, *a/k/a* GUO WENGUI, *a/k/a* GUO
WEN-GUI, *a/k/a* WAN GUE HAOYUN, *a/k/a*
MILES KWOK, *a/k/a* HAOYUN GUO,
GENEVER HOLDINGS CORPORATION, and
GENEVER HOLDINGS LLC,

        Defendants.

Index No. 652077/2017

**AFFIRMATION OF EDWARD MOSS,
ESQ.**



F I L E D
Feb 03 2021
NEW YORK
COUNTY CLERK'S OFFICE

      I, Edward Moss, an attorney duly admitted to practice before the Courts of the

State of New York, hereby affirm, under penalty of perjury, pursuant to the Civil Practice Law

and Rules of the State of New York § 2106, as follows:

    1.    I am a member of the bar of this Court and a partner in the law firm of O'Melveny

& Myers LLP, counsel of record for Plaintiff Pacific Alliance Asia Opportunity Fund L.P.

("PAX") in this matter.

    2.    I am fully familiar with the facts and circumstances in this action. For purposes

of entry of this judgment, I submit this affirmation waiving costs and disbursements.


Dated:   January 25, 2021        By:  */s/ Edward Moss*
        New York, New York             Edward Moss

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
Index No. 652077/2017

---

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND
L.P.,

Plaintiff,

-against-

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN
GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI,
a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK,
a/k/a HAOYUN GUO, GENEVER HOLDINGS
CORPORATION, and GENEVER HOLDINGS LLC,

Defendants.

---

## JUDGMENT

~~[PROPOSED]~~ JUDGMENT

---

### O'MELVENY & MYERS LLP

TIMES SQUARE TOWER
7 TIMES SQUARE
NEW YORK, NEW YORK  10036
(212) 326-2000

Attorneys for Plaintiff Pacific Alliance Asia Opportunity
Fund, L.P.

# EXHIBIT 5

<div align="center">

## SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY

</div>

PRESENT:     **HON. BARRY R. OSTRAGER**          PART          **IAS MOTION 61EFM**

<div align="center"><em>Justice</em></div>

-------------------------------------------------------------------X

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

                      Plaintiff,

           - v -

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO, GENEVER: HOLDINGS LLC, and GENEVER HOLDINGS CORPORATION,

                     Defendants.

-------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 652077/2017 |
| **MOTION DATE** | |
| **MOTION SEQ. NO.** | 019 |

**DECISION + ORDER ON MOTION**

HON. BARRY R. OSTRAGER

     In this 2017 case with 1,180 docket entries – almost all of which involve defendant Kwok Ho Wan's ("Kwok") efforts to avoid and deceive his creditors by parking his substantial personal assets with a series of corporations, trusted confidants, and family members -- this Court is called upon to determine whether the plaintiff, Pacific Alliance Asia Opportunity Fund L.P. ("PAX"), has met the burden of establishing that the Court should enter a final Order of Civil Contempt against Kwok.  For the reasons that follow, this Court is simultaneously issuing a final Order of Civil Contempt.

     PAX secured a judgment against Kwok in the sum of $116,402,019.57 on February 3, 2021 (NYSCEF Doc. No. 716).  Thereafter, PAX undertook a year's long effort to enforce its judgment by first identifying and then attempting to levy upon Kwok's assets in the United States.  PAX encountered difficulty identifying assets over which Kwok exercised control because Kwok, who is a self-declared multi-billionaire, had secreted his assets in a maze of corporate entities and with family members.  This scheme has enabled Kwok to assert that he has no assets despite his lavish lifestyle, which plaintiff has catalogued with material from social

media clippings, photographs and videotapes showing Kwok living large and boasting of his

wealth, expensive homes, private plane, and yacht.  As noted in the transcript of proceedings of

February 2, 2022, this evidence is of little probative value, as the witnesses sponsoring this

evidence have no first-hand knowledge of the authenticity of this "evidence" other than that it is

accessible on various websites.

On February 2, 2022, this Court held an evidentiary hearing at which seven witnesses

submitted direct testimony by affidavit and were made available for cross-examination.  The

hearing followed protracted proceedings by PAX to locate and levy upon assets owned by

defendant Kwok.  Those proceedings established, among other things, that Kwok exercised

dominion and control over a yacht called the Lady May and resulted in a series of orders

restraining Kwok and/or the registered owners of the yacht called Lady May from removing the

Lady May from the Court's jurisdiction.  The first such Order was issued on September 30,

2020, as described in detail *infra,* and was followed by an October 15, 2020 Order that restrained

"Mr. Kwok and/or the registered owners of . . . the yacht, the 'Lady May'" from leaving the

jurisdiction.  (NYSCEF Doc. No. 630).  As detailed *infra*, Kwok spent much of July, August and

September of 2020 on the Lady May.  Contemporaneously with the proceedings resulting in the

September 30 and October 15, 2020 restraining Orders, Kwok and his cohorts made arrangement

for the Lady May to sail to Florida in early October 2020 and, thereafter, to the Bahamas.  On

March 16, 2021, the Court issued a conditional order of civil contempt which directed that if

Kwok failed to return the Lady May to the jurisdiction of this Court by May 31, 2021, he would

be subject to a $500,000.00 fine for each day that the Lady May remained outside the jurisdiction

of this Court.

The Appellate Division, First Department, affirmed this Court's order holding Kwok in

conditional civil contempt, finding that "the daily fine of $500,000.00 was intended to strongly

encourage defendant to purge himself of the contempt, which, despite being permitted to

accomplish, he has shown no interest in doing. . ."  NYSCEF Doc. No. 953, 199 AD3d 423

(2021).  The Appellate Division further held:

> The motion court acted within its discretion in holding defendant in civil contempt, as
> plaintiff established by clear and convincing evidence that defendant violated a lawful,
> clear mandate of the court, of which he had knowledge, and that such violation resulted
> in prejudice to plaintiff's rights (*see El-Dehdan v El-Dehdan*, 26 NY3d 19, 29 [2015];
> Judiciary Law § 753). …  The motion court is instructed to proceed with an evidentiary
> hearing to resolve a dispute as to ownership and control of the yacht, and to assess
> appropriate penalties.

Pursuant to the Appellate Division's Order, this Court scheduled the February 2, 2022

evidentiary hearing to resolve the issue of whether Kwok beneficially owns and controls the

yacht.  Kwok failed to testify at the February 2, 2022 hearing, having previously invoked his

Fifth Amendment right to decline to testify or respond to discovery requests relating to the Lady

May in response to PAX's asset discovery efforts.  PX 27, 28, 29, 30.[1]  This invocation of the

Fifth Amendment notwithstanding, Kwok is an active litigant in multiple fora and he has given

prior testimony in this and other proceedings.

Kwok also filed a complaint in this court captioned *Guo Wengui a/k/a Miles Kwok v*

*Hong Zeng*, 157025/2020, which references a blog post from Freebeacon.com dated September

8, 2017 in which Kwok complains about "several incidents involving *his* 152-foot motor yacht,

Lady May..."  (Complaint ¶ 8, NYSCEF Doc. No. 001) ("the Zeng Complaint").  The Zeng

Complaint describes Kwok as an "outspoken critic of the CCP" who has gone to great "lengths

to expose the rampant corruption within the CCP and the Chinese government."  The

*Washington Post* reported that a former advisor to President Trump, Steve Bannon, was arrested

in 2020 while on board the Lady May, and described Mr. Bannon as a friend and business

---

[1] "PX" refers to Plaintiff's Trial Exhibits.

associate of Kwok, "a vocal online critic of the Chinese government who was once close with that country's intelligence service but is now wanted by authorities in Beijing on charges of fraud, blackmail and bribery." Other news outlets have reported that Mr. Bannon utilized Kwok's private jet on more than one occasion to travel to political rallies.

The testimony adduced at the hearing out of the mouths of defendants' witnesses clearly and convincingly demonstrated that Kwok beneficially owns and controls the Lady May and has utter contempt for this Court and the judicial process.

Kwok once was the sole shareholder of Hong Kong Investments Limited ("HK International"). The testimony adduced at the hearing established that in 2014 Kwok transferred a 100% interest in HK International to one Qu Guo Jiao for no consideration. Ms. Qu was a trusted business associate of the Kwok family. Thereafter, Kwok fled China and on February 23, 2015, HK International purchased the Lady May for £ 28 million GBP. No testimony adduced at the hearing established the source of funds to purchase the Lady May, but the uncontradicted testimony of Kwok's daughter Mei Guo established that Ms. Qu did not provide the funds to purchase the yacht. Tr. 44.[2] Consequently, a reasonable inference is that Kwok provided the funds to HK International which were used to purchase the yacht. It is undisputed that Ms. Qu transferred the ownership of the Lady May to Kwok's daughter, Mei Guo, on or around June 17, 2017, for $1 or no consideration. Tr. 47. According to Ms. Guo's affidavit (NYSCEF Doc. No. 1162), Ms. Guo ultimately transferred ownership of the Lady May to the current title holder HK International Funds Investments (USA) Limited, LLC ("HK USA"). Ms. Guo further avers that she is the sole owner of HK USA, although all of the multi-million dollar annual expenses for the

---

[2] "Tr." refers to the transcript of the evidentiary hearing, efiled at NYSCEF Doc. No. 1179.

Lady May, including fuel, maintenance, and the captain and crew are paid by Golden Spring

(New York) Ltd. ("Golden Spring."), which is allegedly the Kwok family office.

At the hearing Ms. Guo testified that her brother had bought the Lady May for her.  Tr.

46.  The Court cannot credit this testimony as there is no evidence that Ms. Guo's brother was

involved with the corporate transactions leading to Ms. Guo's acquisition of the title to the yacht.

And, indeed, in response to a question from the Court, Ms. Guo acknowledged that her brother

was not involved in any of the transfers that occurred before she acquired the yacht.  Tr. 47.

Other testimony adduced at the hearing established that Kwok was repeatedly on the

yacht every summer and that Ms. Guo was infrequently on the yacht.  Trial Tr. 88:8-20.  The

Lady May's captain testified that Kwok was aboard the yacht for a significant portion of the

months of July, August and September in 2020 and that this was consistent with his usual

practice in the summer.  Trial Tr. 87:24-88:7.  Subsequent to this Court's September 30, 2020

restraining Order, in October 2020 the Lady May was sent to Florida and then the Bahamas for

repairs and was subsequently dispatched to Italy in October 2021, purportedly at the direction of

Golden Spring.  Ms. Guo acknowledged that she was aware of both this Court's September 30,

2020 restraining Order and this Court's subsequent March 16, 2021 Order directing that the Lady

May be returned to the Court's jurisdiction  Tr. 55; 57-60; 62.

Ms. Guo testified that on the one hand, she directed the Lady May's itinerary but, on the

other hand, testified that security for Kwok was such a concern that there would be no

memorialization of any itinerary.  Tr. 52.  She further testified that when her father was on the

yacht unaccompanied by her he had the freedom to choose wherever he wanted to go.  Tr. 50.

The fundamental issue, however, is who directed the yacht to be removed from this Court's

jurisdiction in October 2020.  Ms. Guo claims that in early October 2020 she no longer wished to

use the yacht and relayed that instruction to Golden Spring which, in turn, relayed her directive

to the then captain of the ship, Captain Heaslop.  Tr. 53.

Upon further questioning, Ms. Guo admitted that it was Golden Spring that advised her

that the yacht needed to be moved to a warmer place.  Tr. 55.  Ms. Guo then repeated her

retracted testimony that her brother had given her the yacht, and she stated that her brother is the

sole owner of Golden Spring.  Tr. 56.  This testimony is not credible given that on September 30,

2020 the Court entered a temporary restraining order restraining Kwok

> . . . from making or causing any sale, assignment, transfer, or interference with any
> property in which he has an interest, or from paying over or otherwise disposing of any
> debt now due or thereafter coming due to him, subject to the exceptions set forth in
> CPLR 5222 and in the ordinary course.

NYSCEF Doc. No. 591.  Significantly, Captain Heaslop, the then Captain of the Lady May,

testified that Mr. Kwok told Captain Heaslop that Kwok would no longer be a guest on the Lady

May "a few days" before the Lady May departed for Florida in early October 2020 (and

apparently after the issuance of this Court's September 30, 2020 Order).  Tr. 89.  Captain

Heaslop also contradicted Ms. Guo's testimony that Ms. Guo gave Captain Heaslop instructions

about the yacht's movement.  Tr. 94.

Ms. Guo also acknowledged having subsequently read the Court's March 16, 2021 Order

requiring the Lady May to be returned to the Court's jurisdiction by May 31, 2021 (NYSCEF

Doc. No. 728).  She further acknowledged that she had discussed the Order with her lawyer

(whose services were paid for by Golden Spring) and that she had *ignored* the Order.

Russell Stockil, the Yacht Management Director for Yachtzoo SARL, testified that his

company had a management contract with HK USA dated May 2021 and that he communicated

with HK USA and Golden Spring, but never with Ms. Guo.  Tr. 78.  This was also the testimony

of successor Captain Momchil Ivanov.  Tr. 82.  In short, Ms. Guo's testimony that she owns and

6

controls the Lady May cannot be credited in any respect. Ms. Guo appears to be a woman in her twenties, has introduced no evidence that she exercised dominion and control of the Lady May, and provided no confirmation that she came into possession of the Lady May, other than as a ruse to shield the Lady May from being levied upon by her father's creditors.

The machinations associated with the shell game Kwok has orchestrated with respect to the Lady May are of a piece with every other evasive and contemptuous act Kwok has taken during the five years this litigation has been pending, which is why there are 1,180 docket entries in this case.

The Court has the authority to hold Kwok in civil contempt under Judiciary Law § 753—and "to punish [him], by fine and imprisonment"—where, as here, the Court "expressly find[s] that [Kwok's] actions were calculated to or actually did defeat, impair, impede, or prejudice the rights or remedies of a party to a civil proceeding." *Oppenheimer v. Oscar Shoes, Inc.*, 111 A.D.2d 28, 28 (1st Dep't 1985) (citing N.Y. Judiciary Law § 753). Section 753 sets forth four requirements:

> [T]o find that contempt has occurred in a given case, it must be determined that [1] a lawful order of the court, clearly expressing an unequivocal mandate, was in effect. [2] It must appear, with reasonable certainty, that the order has been disobeyed . . . [3] Moreover, the party to be held in contempt must have had knowledge of the court's order, although it is not necessary that the order actually have been served upon the party . . . [4] Finally, prejudice to the right of a party to the litigation must be demonstrated.

*Fleetwood Fin. v Walter J. Dowd, Inc.*, 2016 WL 11546917, at *2 (N.Y. Sup. Ct. Sept. 14, 2016) (citing *McCormick v Axelrod*, 59 N.Y.2d 574, 583, *amended*, 60 N.Y.2d 652 (1983)). The testimony adduced in this case satisfies each element of this standard. Indeed, the Appellate Division intimated as such. *See Pacific Alliance Asia Opportunity Fund L.P.*, 199 A.D.3d 423 (1st Dep't 2021) ("[PAX has] established by clear and convincing evidence that [Kwok] violated

7

FILED: NEW YORK COUNTY CLERK 02/09/2022 04:33 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 1181
RECEIVED NYSCEF: 02/09/2022
Case 22-50073-jam Doc 434-2 Filed 05/23/22 Entered 05/23/22 23:53:32 Exhibit 80 of
Pg 9 of 11
8 of 10

a lawful, clear mandate of the court, of which he had knowledge, and that such violation resulted in prejudice to plaintiff's rights. . .").

The extent of PAX's ongoing "prejudice" turns on whether PAX has demonstrated that it could ultimately levy on the Lady May to satisfy its now centi-million dollar judgment against Kwok. Under CPLR § 5225, "money or other personal property" is leviable where the debtor holds the requisite "interest." To satisfy this requirement, "[i]t is not necessary that the judgment debtor have legal title to the property; a beneficial interest is sufficient." Weinstein, Korn & Miller, New York Civil Practice: CPLR ¶ 5225.09. "A beneficial interest is '[a] right or expectancy in something . . . as opposed to legal title to that thing.'" *Peterson v. Islamic Rep. of Iran*, 2013 WL 1155576, at *30 (S.D.N.Y. Mar. 13, 2013) (citing Black's Law Dictionary, Interest (9th ed. 2009)). Kwok has much more than a beneficial interest in the Lady May. Not only does Kwok control the yacht, it appears he provided the funds to purchase it and he is the person who principally enjoys the use of the yacht.

The key factor is whether "the property benefitted [the beneficial owner] as if he had received the property directly." *Id*. (quoting *Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*, 609 F.3d 111, 120 (2d Cir. 2010); *see also Gliklad v. Chernoi*, 129 A.D.3d 604 (1st Dep't 2015) (upholding rejection of the judgment debtor's contention that he no longer held an interest in property because he transferred his interest to his daughters); *Colfin Bulls Funding B, LLC v. Ampton Invs., Inc*., 112 N.Y.S.3d 868 (Table), at *2, 6 (N.Y. Sup. Ct. 2018) (granting judgment creditor's turnover motion notwithstanding judgment debtor's assertion that he transferred property to a corporation, because even if true, the evidence showed that he "retained control and/or an interest" in the property).

The evidence clearly and convincingly demonstrates that Kwok holds a beneficial

interest in and controls the Lady May. In the latter connection, the Court takes notice of the

filing of the Zeng case and draws an inference from all the record facts that Kwok has taken

extraordinary steps to shield the yacht from his creditors. Moreover, Kwok's "family office"

funds the yacht's day-to-day operations and maintenance.

The Court finds that Ms. Guo's testimony was not only internally inconsistent and

dissembling, but also significantly undermined by the testimony of Captains Heaslop and Ivanov

and Mr. Stockil, who stated that they have never taken yacht-related direction from Ms. Guo in

the four and-a-half years that she directly or indirectly held title to the yacht.

In addition, it is established New York law that a party's invocation of the Fifth

Amendment in a civil proceeding "may form the basis of an adverse factual inference." *DeBonis

v. Corbisiero*, 155 AD2d 299, 300 (1st Dep't 1989). An adverse inference may be applied

whenever a factual determination is necessary or permitted, including in the context of contempt

motions. *S.E.C. v. Durante*, No. 01 Civ. 9056 (DAB) (AJP), 2013 WL 6800226, at *10

(S.D.N.Y. Dec. 19, 2013), *aff'd*, 641 F. App'x 73 (2d Cir. 2016); *LiButti v. United States*, 107

F.3d 110, 120–25 (2d Cir. 1997).

Similarly, under the missing witness rule, "[a] trier of fact may draw the strongest

inference that the opposing evidence permits against a witness who fails to testify." *Crowder v.

Wells & Wells Equip., Inc.*, 11 A.D.3d 360, 361 (1st Dep't 2004) (applying adverse inference

where defendant who failed to appear "would be knowledgeable about a material issue raised by

the evidence").

PAX is entitled to an adverse inference under both of these avenues. Kwok has invoked

his Fifth Amendment right against self-incrimination in response to PAX's post-judgment

discovery, including in response to requests specifically about the Lady May. While Kwok

9

argues that an adverse inference is not appropriate here because "[o]nly after a threshold showing

that a piece of evidence is authentic is a party obligated to respond to it," this contention fails of

its own weight. PAX has proffered substantial admissible evidence that Kwok has the requisite

beneficial interest in and control of the Lady May.  *See People v. Primo*, 96 N.Y.2d 351, 753

N.E.2d 164 (2001) (explaining that evidence is probative if it "tends to prove the existence or

non-existence of a material fact, *i.e.*, a fact directly at issue in the case").

    As of February 7, 2022, the Lady May has remained outside the jurisdiction of the Court

for 268 days. Based on the daily fine of $500,000 imposed by this Court and affirmed by the

Appellate Division, the resultant fine would amount to $134,000,000.00, which is more than

PAX's outstanding judgment of nearly $120 million and a multiple of the GBP £ 28 million

purchase price of the Lady May.  Nevertheless, if billionaire litigants can simultaneously seek to

use Court process in New York and elsewhere in the United States while knowingly and

intentionally violating Court orders, there is no rule of law.  Kwok must remit $134,000,000.00

to PAX within five business days of the service of this Court's Order with Notice of Entry. The

Court is prepared to exercise its full authority under Judiciary Law § 753 in the event the fine is

not timely paid.

Dated:  February 9, 2022

BARRY R. OSTRAGER, J.S.C.

| CHECK ONE: | | CASE DISPOSED | | | X NON-FINAL DISPOSITION | |
|---|---|---|---|---|---|---|
| | X | GRANTED | | DENIED | GRANTED IN PART | OTHER |
| APPLICATION: | | SETTLE ORDER | | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | REFERENCE |

# EXHIBIT 6

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

PACIFIC ALLIANCE ASIA OPPORTUNITY
FUND L.P.,

               Plaintiff,

               v.

KWOK HO WAN, *a/k/a* KWOK HO, *a/k/a* GWO
WEN GUI, *a/k/a* GUO WENGUI, *a/k/a* GUO
WEN-GUI, *a/k/a* WAN GUE HAOYUN, *a/k/a*
MILES KWOK, *a/k/a* HAOYUN GUO, GENEVER
HOLDINGS LLC, *and* GENEVER HOLDINGS
CORPORATION,

               Defendants.

---

Index No. 652077/2017

Hon. Barry R. Ostrager

Part 61

**FIRST AMENDED COMPLAINT**

## NATURE OF THE ACTION

1.      This is a straightforward breach of contract case.  Kwok Ho Wan, a/k/a Kwok Ho, a/k/a

Gwo Wen Gui, a/k/a Guo Wengui, a/k/a Guo Wen-Gui, a/k/a Wan Gue Haoyun, a/k/a Miles Kwok,

a/k/a Haoyun Guo ("Kwok"), a reported billionaire, and his controlled entities borrowed millions of

dollars from Plaintiff Pacific Alliance Asia Opportunity Fund L.P. ("PAX LP") but have failed to pay

the amount owed to PAX LP under binding written agreements.

2.      In 2008, PAX LP entered into a written agreement with Spirit Charter Investment

Limited ("Spirit Charter"), one of Kwok's business entities, under which PAX LP made available to

Spirit Charter a loan facility in the principal amount of $30 million.  This loan facility was conditioned

on Kwok's execution of a personal guarantee of Spirit Charter's repayment obligations.  Kwok

executed that guarantee, and PAX LP lent $30 million to Spirit Charter on February 4, 2008.

3.      In 2009, another of Kwok's entities, Shiny Times Holdings Limited ("Shiny Times"),

assumed the debt that Spirit Charter owed to PAX LP, which the parties agreed at the time totaled

$45,357,534.25.  Kwok again executed a personal guarantee with respect to that debt.

4.      Then in 2011, PAX LP and Shiny Times entered into a written agreement (the "2011

Facility Letter") that expressly superseded the prior agreements between the parties.  In the 2011

Facility Letter, the parties agreed that Shiny Times owed PAX LP $46,426,489 and would repay that

amount (plus 15% annual interest from December 31, 2010) by June 30, 2012.

5.      That same day, Kwok executed another personal guarantee (that similarly expressly

superseded Kwok's prior personal guarantee) pursuant to which Kwok guaranteed payment of the

amount owed to PAX LP by Shiny Times under the 2011 Facility Letter (the "2011 Personal

Guarantee").

6.      After both Shiny Times and Kwok failed to repay PAX LP, Kwok, Shiny Times, and

Beijing Pangu (another Kwok-controlled entity) negotiated a potential settlement with PAX LP, under

which PAX LP, to settle the debt, was to take ownership of three apartments located in Beijing that were owned by Beijing Pangu. But Kwok and Beijing Pangu failed to meet the specific conditions precedent for the settlement (including, among other ways, failing to transfer title for the apartments to PAX LP), even after PAX LP, through four separate extensions, provided Kwok and Beijing Pangu an additional 23 months to satisfy these conditions.

7.      As the conditions precedent were not satisfied when the last deadline expired at the end of June 2015, the 2011 Facility Letter and the 2011 Personal Guarantee by their express terms reverted to being in full force and effect, and PAX LP then began its pursuit of repayment of the mounting, contractual debt from both Shiny Times and Kwok. Shiny Times, however, had no assets when PAX LP had it liquidated in the British Virgin Islands. And Kwok to this date has refused to repay a penny of his debt. In fact, Kwok has recently denied the very existence of the debt and has stated repeatedly that he should not have to repay it, including on his Twitter account and in a deposition in this very lawsuit.

8.      Two of Kwok's shell companies—Genever Holdings LLC ("Genever NY") and Genever Holdings Corporation ("Genever BVI" and together with Genever NY, the "Genever Defendants")—are liable for his debt to PAX LP because each is Kwok's alter ego. Kwok is the sole shareholder and director of Genever BVI, which in turn is the sole shareholder of Genever NY, through which Kwok purchased a luxury apartment at The Sherry-Netherland Hotel, Inc. (the "Sherry-Netherland" and the apartment the "Residence") in New York in early March 2015 for $67.5 million in cash. Kwok dominates and controls both Genever NY and Genever BVI, neither of which has offices, employees, or any separate existence apart from being the shells through which Kwok purchased the Residence.

2

9.      Kwok purchased the Residence for almost the precise amount of money he owed at the time to PAX LP under the Personal Guarantee.  He formed the Genever Defendants at a time when he knew his debt would be due and owing to PAX LP, and almost immediately thereafter, he purchased the Residence through the Genever Defendants in an attempt to shield that asset from PAX LP.  Kwok has made false statements to both the Sherry-Netherland and this Court about the Genever Defendants in an attempt to further that debt-avoidance effort.  This and other Kwok conduct with respect to the Genever Defendants, detailed below, demonstrates that Kwok has abused the privilege of the corporate form in order to perpetrate a fraud, wrong, or injustice against PAX LP.

10.     PAX LP has taken all necessary and appropriate steps in accordance with its agreements with Shiny Times and Kwok to recover the monies it is owed—now totaling more than $100 million including contractual interest.  To date, however, Shiny Times and Kwok have failed to satisfy even one dollar of their contractual repayment obligations on the outstanding debt.  And as a result of this failure to repay the debt, PAX LP has also incurred "costs, claims losses, [and] expenses (including legal fees)" in connection with enforcing the 2011 Personal Guarantee, which Kwok is obligated to indemnify under the express terms of the 2011 Personal Guarantee.  (*See* Exhibit A § 5.3.)

## JURISDICTION AND VENUE

11.     This Court has personal jurisdiction over Kwok pursuant to New York's general personal jurisdiction statute, C.P.L.R § 301, because he is engaged in a continuous and systematic course of "doing business" in New York, is domiciled in the state, and owns the Residence, located in New York County.

12.     This Court has personal jurisdiction over Genever NY pursuant to C.P.L.R § 301, because it is incorporated in New York and its sole business purpose is to own shares in Kwok's Residence, located in New York County.

13.     This Court has personal jurisdiction over Genever BVI because, as alleged herein, by
virtue of Kwok's domination and control over it to perpetrate a fraud against PAX LP, Genever BVI is
Kwok's alter ego.  Moreover, Genever BVI has engaged in relevant conduct in, and availed itself of
the laws of, New York by becoming the sole shareholder of a New York LLC (Genever NY) and being
the indirect owner of the Residence.  Indeed, Genever BVI's sole business purpose is to own (through
its 100% ownership of Genever NY) the Residence.  Genever BVI is represented by Kwok's counsel
in this litigation (in which that counsel accepted service of and responded to a third-party subpoena to
Genever BVI).  Kwok's counsel also made representations to this Court in this case regarding certain
pledges of Genever BVI's assets.

14.     Venue is proper in this Court under C.P.L.R § 503(a) because Kwok's residence is in
New York County and Genever NY's place of incorporation is New York County.

**PARTIES**

15.     Plaintiff PAX LP is an investment fund organized as an exempted limited partnership
under the laws of the Cayman Islands.

16.     Defendant Kwok is a Chinese national who is domiciled in New York and engages in a
continuous and systematic course of "doing business" in New York.  Kwok is the sole shareholder and
director of Genever BVI.  Kwok resides in the Residence.

17.     Defendant Genever NY is a limited liability company established under the laws of
New York.  Genever NY's sole business purpose is to own shares in the Residence, which is apartment
number 1801 in the Sherry-Netherland.  Genever NY purchased the Residence in 2015 for $67.5
million.

18.     Defendant Genever BVI is a BVI business company established under the laws of the
British Virgin Islands.  Genever BVI's sole business purpose is to own (through its 100% ownership of
Genever NY) the Residence.

4

# STATEMENT OF FACTS

### *The Loan Facility and Kwok's Personal Guarantees to Repay PAX LP*

19.     PAX LP and Kwok have had business dealings since approximately February 4, 2008,

when PAX LP entered into a written agreement (the "2008 Facility Agreement") with Spirit Charter

(attached as Exhibit B), one of Kwok's business entities, under which PAX LP made available to Spirit

Charter a loan facility in the principal amount of $30 million (*see* Exhibit B § 3).  Kwok executed the

2008 Facility Agreement on behalf of Spirit Charter.  The 2008 Facility Agreement specified that

"[PAX LP] shall not be obliged to make the Advance to the Borrower unless it shall first have received

. . . a duly executed Kwok[] Guarantee."  (Exhibit B § 4(d).)  Having received Kwok's guarantee, PAX

LP lent the full $30 million available under the loan facility to Spirit Charter on February 4, 2008.

20.     On March 12, 2008, PAX LP and Spirit Charter amended and restated the 2008 Facility

Agreement ("Amended and Restated 2008 Facility Agreement").  (*See* Exhibit C.)  Kwok executed the

Amended and Restated 2008 Facility Agreement on behalf of Spirit Charter, which acknowledges and

confirms that Spirit Charter "received the US$30,000,000 principal amount of the Original Facility on

4 February 2008."  (Exhibit C § 2.)

21.     By a deed dated September 17, 2009 (the "September 2009 Deed"), Shiny Times, Spirit

Charter, PAX LP, and various other parties agreed that Shiny Times would replace Spirit Charter as

the borrower under the Amended and Restated 2008 Facility Agreement.  (*See* Exhibit D.)  Kwok

executed the September 2009 Deed on behalf of Shiny Times, Spirit Charter, and himself.  The parties

to the September 2009 Deed also agreed that the outstanding amount under the Amended and Restated

2008 Facility Agreement, including accrued and unpaid interest, was $45,357,534.25 as of September

12, 2009.  (*See* Exhibit D at 4.)

5

22.     The September 2009 Deed required Kwok to execute a new personal guarantee in favor of PAX LP to secure Shiny Times's repayment of the approximately $45 million then owed under the Amended and Restated 2008 Facility Agreement.  (*See* Exhibit D § 5.10.)  Kwok executed his personal guarantee on November 18, 2009.  (*See* Exhibit E.)

23.     In 2011, PAX LP, Kwok, and Shiny Times agreed to supersede the foregoing agreements with two contracts executed on March 16, 2011—the 2011 Facility Letter (attached as Exhibit F) and the 2011 Personal Guarantee (attached as Exhibit A).

24.     In the 2011 Facility Letter, the parties agreed that Shiny Times owed PAX LP $46,426,489 as of that date and would repay that amount, with 15% annual interest running from December 31, 2010, by June 30, 2012.  (*See* Exhibit F §§ 3, 5.)

25.     The parties further agreed in the 2011 Facility Letter that any failure by Shiny Times to pay any amount owed to PAX LP under the 2011 Facility Letter would constitute an Event of Default, and that in such event PAX LP could (i) declare the entire loan, accrued and unpaid interest, and any other money payable to be immediately due and payable without further demand or notice or other legal formality of any kind, and/or (ii) declare the 2011 Facility Letter terminated.  (*See* Exhibit F § 13.)

26.     Like the prior agreements between the parties, the 2011 Facility Letter was also expressly conditioned on Kwok's execution of the 2011 Personal Guarantee to fully backstop Shiny Times's payment obligations to PAX LP:

> The Lender [PAX LP] and the Borrower [Shiny Times] agree to enter into this Agreement . . . on the condition that a new personal guarantee of Mr. Kwok (the "Personal Guarantee"), in favour of the Lender is delivered to secure the due and punctual performance of the Borrower to fully repay the [2011 Facility Letter] plus all accrued and unpaid interest in accordance with this Agreement.

(Exhibit F at 1.)

27.     Kwok executed the 2011 Facility Letter on behalf of Shiny Times and on the same day

signed the 2011 Personal Guarantee, under which he agreed to "irrevocably and unconditionally"

guarantee Shiny Times's payment of all amounts owed under the 2011 Facility Letter.  In particular,

Kwok:

(a)     guaranteed to PAX LP the "due and punctual payment" of Shiny Times's
obligations under the 2011 Facility Letter;

(b)     agreed "that promptly on [PAX LP's] demand [Kwok] will pay to [PAX
LP] all [such amounts] that are due but unpaid";

(c)     agreed to "indemnify and hold harmless [PAX LP] on demand from and
against all losses incurred by [PAX LP] as a result of any obligation of
Shiny Times under the 2011 Facility Letter being or becoming void,
voidable, unenforceable or ineffective as against Shiny Times for any
reason whatsoever";

(d)     agreed that PAX LP's demand for payment would constitute *prima facie*
evidence that such payment was due and owing;

(e)     agreed that PAX LP could seek repayment from either Shiny Times or
Kwok; and

(f)     agreed to indemnify PAX LP from "any and all costs, claims losses, [and]
expenses (including legal fees)" incurred as a result of exercising or
enforcing the Personal Guarantee.

(Exhibit A §§ 2.1–2.2, 3.3, and 5.3.)

28.     Kwok also agreed in the 2011 Personal Guarantee to waive defenses, including those

based on the winding up or dissolution of Shiny Times or PAX LP's inability to recover against Shiny

Times "for any reason."  (Exhibit A § 3.4.)  Kwok further agreed to a catchall waiver of defenses based

on "any other act, event or omission which might operate to discharge, impair or otherwise affect the

Guarantor or any of the Obligations or any of the rights, powers, and remedies conferred upon [PAX

LP] by this Guarantee or by law."  (Exhibit A § 3.4(g).)

29.     In short, Kwok personally executed an unambiguous and ironclad guarantee that he

would satisfy Shiny Times's debt to PAX LP.

7

### The Settlement Attempts, Extensions, and Shiny Times's
### Ultimate Failure to Repay PAX LP

30.     Shiny Times did not repay any portion of the loan principal or accrued interest before the June 30, 2012 repayment date set forth in the 2011 Facility Letter, and the parties subsequently structured an attempt to resolve that debt through a settlement agreement—and then several extensions thereof—each of which was styled a "Deed of Settlement."

31.     PAX LP, Shiny Times, and Kwok entered into the Original Deed of Settlement (attached as Exhibit G) along with Beijing Pangu, another Kwok-owned company, on April 19, 2013. Kwok executed the Original Deed of Settlement on behalf of Shiny Times and himself.

32.     The Original Deed of Settlement provided that (i) the total outstanding amount due under the 2011 Facility Letter plus all accrued and unpaid interest was $52 million as of the date of the Original Deed of Settlement, and (ii) that amount would no longer be due and owing upon the occurrence of the following events:

(a)     If PAX LP completed the purchase of three apartments from Beijing Pangu in a series of three separate transactions for approximately $5 million each, for a total of approximately $15 million; and

(b)     If Shiny Times completed three installment payments to PAX LP of approximately $5 million each—one installment payment to be made after each separate apartment purchase—for a total of approximately $15 million.

(*See* Exhibit G §§ 2–3.1.)

33.     Before PAX LP could complete the purchase the three apartments from Beijing Pangu, however, Beijing Pangu was required under the Original Deed of Settlement to satisfy certain express conditions precedent relating to title, taxes, satisfaction of mortgages, and other common aspects of Chinese real estate transactions.  (*See* Exhibit G § 3.2.)  If any of these conditions were not met for any of the three apartments by July 31, 2013, the Original Deed of Settlement provided that "the Facility Letter shall revert and be in full force and effect immediately after such failure and Shiny Times shall

8

be obliged to settle any outstanding Total Outstanding Amount and any interest accrued thereon in

accordance with the terms of the [2011] Facility Letter." (Exhibit G § 4.2.)

34.     If the 2011 Facility Letter were to revert into full force and effect, Kwok's obligations

would also be in full force and effect under the terms of the 2011 Personal Guarantee: "The

obligations of [Kwok] . . . shall continue in full force and effect until the unconditional and irrevocable

payment and discharge in full of" Shiny Times's payment and performance obligations under the 2011

Facility Letter. (Exhibit A § 3.1.)

35.     Kwok and Beijing Pangu failed to satisfy the conditions precedent by July 31, 2013.

36.     Four supplemental deeds of settlement—on December 3, 2013; May 15, 2014; July 11,

2014; and February 10, 2015 (attached as Exhibits H–K)—extended the dates in the Original Deed of

Settlement, including the repayment date and the date for Kwok and Beijing Pangu to satisfy the

conditions precedent.

37.     Each of the supplemental deeds had the same terms as the Original Deed of Settlement.

And the result was the same each time:  Kwok and Beijing Pangu never satisfied several of the

required, express conditions.  Thus, PAX LP was not required to (and in fact could not) complete its

purchase of any of the apartments, and Shiny Times never made any of the three installment payments

it owed to PAX LP under the Original Settlement Deed.

38.     Finally, on March 31, 2015, Shiny Times and PAX LP, together with Worldwide

Opportunity Holdings Limited and Empire Growth Holdings Limited, entered into an Option

Agreement (the "Option Agreement") that provided, among other things, for the potential sale to Kwok

of shares in entities that owned the three Beijing Pangu apartments subject to the Original Deed of

Settlement (*see* Exhibit L § 2), giving Kwok the option to buy back the apartments from PAX LP.

39.     Pursuant to its terms, the Option Agreement was to terminate if certain conditions were

not satisfied: "For the avoidance of doubt, if any of the following conditions to the Option is not

satisfied, this Agreement shall terminate with immediate effect (without prejudice to any rights or

remedies available to PAX LP under the Deed of Settlement)." (Exhibit L § 2.)  As none of the

Option Agreement conditions were satisfied, the Option Agreement similarly was terminated without

relieving Shiny Times of its obligation to pay PAX LP under the 2011 Facility Letter.

40.     Thus, when both the last Deed of Settlement and the Option Agreement expired

unsatisfied on June 30, 2015, the 2011 Facility Letter reverted to being in full force and effect, Kwok's

obligations under the 2011 Personal Guarantee became fully enforceable, and Kwok was (and remains)

independently liable under the 2011 Personal Guarantee for the full amount of Shiny Times's debt

owed to PAX LP under the 2011 Facility Letter.

### Kwok Incorporates the Genever Defendants as Shell Companies that he Completely Dominates and Controls to Fraudulently Purchase the Residence in Order to Shield His Assets from PAX LP

41.     In late January or early February 2015, Kwok's Chinese assets—including the three

Beijing Pangu apartments that were to be transferred to PAX LP in the proposed settlement—were

seized by the Chinese government, and Kwok fled to the United States.

42.     Nevertheless, on February 10, 2015, Kwok signed the fourth and final extension of the

Original Deed of Settlement.  (*See* Exhibit K.)  Unlike PAX LP, Kwok knew at the time that his

Chinese assets, including the three apartments, already had been seized, and thus was aware that he

could ***never*** satisfy the conditions precedent for transferring ownership of the apartments to PAX LP.

Kwok did not inform PAX LP that the apartments had been seized, and instead induced PAX LP to

enter into the fourth and final extension while concealing this important fact.

43.     The new deadline to satisfy the conditions precedent in the fourth and final extension

was June 30, 2015.  Thus, Kwok knew at the time that he executed the February 10, 2015 extension

10

that he would never satisfy the conditions precedent (indeed, he did not) and, therefore, that he had only four months to shield his assets before his more than $70 million debt to PAX LP became due and payable.

44.     Kwok immediately went to work. On February 13, 2015—a mere 72 hours after signing the final settlement extension that Kwok knew he could never satisfy—Kwok formed Genever BVI in the British Virgin Islands and incorporated Genever NY in New York. Kwok did not capitalize either entity. Neither entity opened offices or hired any employees. Kwok is the sole owner of Genever BVI, which is the sole owner of Genever NY. Kwok is the sole director of Genever BVI based on official filings in the BVI.

45.     Between February 13 and March 24, 2015—again, knowing that he would be unable to meet the terms of the settlement agreement and that his debt to PAX LP would come due in June 2015—Kwok entered into negotiations with the Sherry-Netherland to purchase the Residence.

46.     In order to induce the Sherry-Netherland to accept his application, Kwok, through his lawyers, presented financial statements to the Board of the Sherry-Netherland. These financial statements represented that Kwok owned and controlled Beijing Zenith, a Chinese company whose balance sheet showed almost $4 billion in assets. This balance sheet was a critical piece of Kwok's application because it was only one of two assets Kwok ever disclosed.

47.     Significantly, Kwok testified in this case that he not only knew at the time he had his lawyers submit his Sherry-Netherland application that these Beijing Zenith assets already had been frozen by the Chinese government, but also that, at the time of the application, he did not "have any ownership interest in Beijing Zenith" and that he had "no control at all over Beijing Zenith."

48.     A few days later, Kwok, again through counsel, presented to the Sherry-Netherland the financial statements of a second foreign company: Bravo Luck Limited ("Bravo Luck"), which held

over $490 million in a UBS Hong Kong bank account.  While this submission expressly represented that Kwok and his son owned and controlled Bravo Luck, Kwok again testified in this case that he had "no ownership interest in Bravo Luck."

49.     As proposed to the Sherry-Netherland, Kwok intended to and did purchase the Residence through Genever NY, which was wholly-owned by Genever BVI.  The Sherry-Netherland's Executive Vice President testified he had never seen a resident make a purchase through two separate shell companies in his four decades in the industry.  Because the Sherry-Netherland recognized that this structure, coupled with Kwok's failure to disclose any U.S. assets on his application, would make it difficult to collect the monthly fees it would charge to Kwok, the Sherry-Netherland required Kwok to put down the largest security deposit in the Sherry-Netherland's history—five years' worth of his roughly $56,000 in monthly fees.

50.     On the basis of what, according to Kwok's testimony, was false and misleading financial information presented to the Sherry-Netherland and Kwok's agreement to post the approximately $3 million security deposit—and at a time when Kwok's debt to PAX LP was more than $70 million—Kwok and Genever NY obtained the Sherry-Netherland Board's approval to purchase the Residence for approximately $67.5 million in cash on March 24, 2015.

51.     The Contract of Sale and Proprietary Lease Agreement with the Sherry-Netherland are signed by Genever NY.  The Purchase Agreement for the apartment lists "'Miles' Kwok Ho Wan (Genever [NY])" and "Kwok Ho Wan" as the applicant.

52.     Even though Genever NY is listed on the Contract of Sale, Purchase Agreement, and the Proprietary Lease with the Sherry-Netherland, Genever NY was not capitalized and had no assets with which to purchase the Residence.  Instead, Kwok purchased the Residence with funds wired from Bravo Luck.

12

53.    Kwok all but admitted at his deposition that the funds used to purchase the Residence came from Shiny Times.  When asked whether there was a connection between the Genever Defendants and Shiny Times, he testified that Genever BVI and Shiny Times had a "representative relationship . . . like when you purchase house, there will be some agent on behalf."

### *PAX LP Seeks to Enforce Its Contractual Rights and*
### *Collect Amounts Owed, and Kwok and the Genever Defendants*
### *Attempt to Further Shield the Residence in Response*

54.    On October 16, 2015, after the Deeds of Settlement and Option Agreement were terminated and the 2011 Facility Letter reverted to being in full force and effect, PAX LP sent a written notice of demand (the "Notice of Demand") to Kwok's address in Hong Kong, as specified under the terms of the 2011 Personal Guarantee.

55.    The Notice of Demand informed Kwok that "Shiny Times ha[d] failed to repay any part of the sum due" under the 2011 Facility Letter and demanded immediate payment of $71,818,633.44. The Notice of Demand also informed Kwok that legal proceedings might be commenced against him if he did not make immediate payment, and reserved PAX LP's contractual rights under both the 2011 Facility Letter and the 2011 Personal Guarantee.

56.    Kwok never responded to the Notice of Demand.

57.    At around the same time PAX LP sent the Notice of Demand, Kwok and the Genever Defendants listed the Residence for sale.

58.    On February 19, 2016, PAX LP sent a letter to Shiny Times demanding payment of $82,219,404.08 due and owing under the 2011 Facility Letter (the "Shiny Times Demand Letter"), which represented the principal plus contractual interest of 15% per annum calculated up to the date of the Shiny Times Demand Letter.

59.    Shiny Times never responded to the Shiny Times Demand Letter.

13

60.     When Shiny Times did not respond, PAX LP submitted an application to court in the

British Virgin Islands on February 29, 2016, seeking the appointment of joint liquidators to put Shiny

Times, which is a BVI corporation, into liquidation.  The application alleged that (i) Shiny Times had

failed to pay the sum-then-owing of $82,410,197.87, (ii) Shiny Times was unable to pay its debts, and

(iii) Shiny Times was insolvent and should be liquidated.

61.     Shiny Times was in fact placed into liquidation as a result of the BVI proceeding, but it

had no assets.  Thus, PAX LP was unable to collect any of the monies owed to it under the 2011

Facility Letter through the BVI liquidation proceeding (or at all).

62.     In June 2016, a few months after PAX LP had initiated the BVI liquidation proceeding,

Kwok and the Genever Defendants dropped the asking price for the Residence.  That same month,

Kwok attempted to further shield the Residence by trying to restructure the ownership of Genever BVI

and transfer it into a trust in his son's name.

### PAX LP Files this Lawsuit, and Kwok and the
### Genever Defendants Make Clear that They Intend to
### Frustrate any Judgment Entered in Favor of PAX LP

63.     PAX LP filed this lawsuit on April 18, 2017.

64.     About a week later, Kwok tweeted that "I neither have to nor should I repay this amount

of boring money irrelevant to me."

65.     Only after PAX LP filed suit and took discovery related to its motion for a pre-

judgment order of attachment did it learn of all of Kwok's evasive maneuvers discussed above,

including: (i) his formation of the Genever Defendants to shield the Residence from PAX LP; (ii) his

failure to capitalize the Genever Defendants or observe proper corporate formalities; (iii) his

submission of what he himself admitted under oath was false information to the Sherry-Netherland to

induce it to approve the purchase of the Residence while Kwok knew that his similarly sized debt to

PAX LP was immediately due and owing; (iv) his use of an unprecedented nested shell company

structure to protect the Residence from PAX LP; and (v) his apparent use of Shiny Times funds to purchase the Residence.

66.     Kwok's history of lying in an attempt to evade his debt to PAX LP has continued throughout this litigation, including making repeated misrepresentations to the Court and under oath at his deposition. As detailed above and below, those misrepresentations include false statements about the Genever Defendants and their assets. As Kwok made these false statements regarding the Genever Defendants in an attempt to avoid having his Residence attached by the Court at PAX LP's request, the Genever Defendants are integrally involved in Kwok's abuse of the corporate form to perpetrate a fraud, wrong, or injustice against PAX LP.

67.     In May 2015, just two months after purchasing the Residence—and while Kwok knew he would have to repay his debt to PAX LP—Kwok pledged Genever BVI's assets (*i.e.*, the Residence) to an entity named Roscalitar 2, in direct violation of the terms of his and Genever NY's agreements with the Sherry Netherland. Although that pledge was terminated in March 2017, Kwok argued in 2018—in papers submitted to this Court in opposition to PAX LP's attachment request—that the pledge was still effective and should provide a basis for denying the attachment.

68.     Kwok again improperly pledged the Residence in February 2018, after PAX LP had filed this lawsuit, this time to an entity named Blue Capital. And while that pledge was terminated on June 12, 2018, Kwok's counsel inaccurately represented to the Court—at the June 27, 2018 oral argument on PAX LP's attachment motion—that the "lien is still in effect today."

69.     Kwok also suborned a bogus affidavit in support of his opposition to PAX LP's attachment request. Specifically, in May 2018, Kwok had his employee Yan Ping Wang file an affidavit with this Court swearing to supposed facts that Kwok argued should defeat PAX LP's attachment request, including about the ownership of the Residence, the pledges of the Residence, and

the source of the funds Kwok used to purchase the Residence. At her deposition, however, Wang testified that **she knew nothing** about any of these issues. And when the Sherry-Netherland asked Kwok in a letter why he had represented in the Wang affidavit that he had pledged the Residence (which violated his agreements with the Sherry-Netherland), Kwok's counsel denied that the Wang affidavit stated that Kwok had pledged the Residence—even though that is precisely what the Wang affidavit said in no uncertain terms.

70.     Kwok also lied repeatedly about the most basic information regarding the Residence and the Genever Defendants, including their ownership. Wang's affidavit swears that Kwok is the owner of the Residence, but, as noted above, Kwok testified that he did not own it. Kwok also testified that he at no time had any ownership or control over the Genever Defendants, even though the corporate documents for the Genever Defendants make clear that Kwok owns 100% of Genever BVI (which in turn owns 100% of Genever NY) and is its sole director. Moreover, in a complaint filed by Genever NY and Kwok in the Southern District of New York in August 2016, Genever NY and Kwok alleged that "Genever [NY] is owned and operated by Mr. Kwok."[1]

### COUNT I – BREACH OF CONTRACT
#### Against Defendant Kwok

71.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 70 as though fully set forth herein.

72.     The 2011 Personal Guarantee obligates Kwok to repay PAX LP for the loan facility (as amended) that PAX LP made available to Spirit Charter, along with unpaid interest. The current amount due and owing is more than $100 million.

73.     Plaintiff performed under the 2011 Personal Guarantee (and other related agreements).

---

[1] Verified Complaint, *Genever Holdings, LLC and Miles Kwok v. The Sherry-Netherland, Inc., et al.*, Case No. 1:16-cv-06246 (S.D.N.Y. Aug. 5, 2016) (Dkt. No. 1).

74.     Kwok has not repaid any of the money due and owing to PAX LP under the 2011

Personal Guarantee.

75.     As a direct result of Kwok's breach of his payment obligations under the 2011 Personal

Guarantee, Plaintiff continues to suffer the loss of more than $100 million.

<u>COUNT II – VEIL PIERCING</u>
**Against the Genever Defendants**

76.     Plaintiff realleges and incorporates by reference each and every allegation contained in

paragraphs 1 through 75 as though fully set forth herein.

77.     Kwok created the Genever Defendants for the purpose of shielding the Residence from

PAX LP.

78.     In creating the Genever Defendants, Kwok failed to follow proper corporate formalities.

Kwok failed to capitalize either of the Genever Defendants and used funds from a different entity to

purchase the Residence, the only asset held by the Genever Defendants.

79.     At no time has either of the Genever Defendants had any employees, offices, or

business purpose other than owning the Residence and shielding it from Kwok's creditors, including

PAX LP.

80.     Kwok completely dominates the Genever Defendants, which he wholly owns and

controls.  The Genever Defendants are the alter egos of Kwok.

81.     Kwok, through his domination and control of the Genever Defendants, abused the

privilege of doing business in the corporate form to perpetrate a fraud, wrong, or injustice against PAX

LP.

82.     Accordingly, the corporate veil of the Genever Defendants should be pierced, and the

Genever Defendants should be held jointly and severally liable for Kwok's breach of contract.

17

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

        (a)    in the amount greater than $100,000,000 owed as of this date under the 2011 Personal Guarantee ($46,426,489 plus accrued interest) against Kwok and the Genever Defendants as jointly and severally liable as alter egos of Kwok;

        (b)    the reasonable attorneys' fees, costs, and expenses PAX LP has incurred, and will continue to incur, in connection with its enforcement of the 2011 Personal Guarantee against Kwok, and the Genever Defendants as jointly and severally liable as alter egos of Kwok, under the 2011 Personal Guarantee's indemnification clause; and

        (c)    such other and further relief to which PAX LP shows itself justly entitled.

DATED:      New York, New York
           April 18, 2019

                        Respectfully submitted,

                        By: _____

                        O'MELVENY & MYERS LLP
                        Stuart Sarnoff (ssarnoff@omm.com)
                        Edward Moss (emoss@omm.com)
                        7 Times Square
                        New York, NY 10036
                        (212) 326-2000

                        -and-

                        THE SEIDEN GROUP

                        Robert W. Seiden (rseiden@seidenlegal.com)
                        1120 Avenue of the Americas
                        New York, NY 10036
                        (212) 626-6708

                        *Attorneys for Plaintiff*

18

# EXHIBIT 7

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK
## JUDGE OSTRAGER, BARRY R.
## MOTION JUDGE OSTRAGER, BARRY R.



| | |
|---|---|
| **Pacific Alliance Asia Opportunity Fund L.P.** | **Index No.**   **652077/2017** |
| - v. - | **Motion**   **026** |
| **Kwok Ho Wan et al** | |

## COURT NOTICE

Filing on Behalf of - Rose Ann Magaldi, Principal Law Clerk to Justice Ostrager

In light of the bankruptcy filing by Mr. Kwok, the Court proposes that plaintiff either withdraw the pending contempt motion (026) without prejudice to an appropriate application in the Bankruptcy Court and/or without prejudice to renewal before this Court, if appropriate, upon the conclusion of the bankruptcy proceedings. The Court prefers not to keep fully submitted motions pending for an indefinite time. If counsel have an alternative suggestion, the Court will, of course, consider it.

We ask that plaintiff, and any other interested party, efile a letter by March 3, 2022 addressing the issues raised in this Court Notice. Thank you.

DATED 02/18/2022                  FILED By RoseAnn Magaldi

# EXHIBIT 8



This website uses cookies and local storage. By using our services, you agree to our use of cookies and local storage. I agree

**LADY MAY**
Yacht

Details | Track | Add Photo | Add to fleet

**Destination not available**
**ETA: -**

| Speed: | Course: | Draught: |
|---|---|---|
| 0.0 kn | 127.8° | 2.3 m (max 2.3) |
| Status: | Last report: | |
| Moored | Apr 12, 2022 19:33 UTC | |

La Ciotat, France
**ATD: Apr 4, 06:29 UTC**

PORT CALLS

WEATHER

VESSEL PARTICULARS

| Gross Tonnage: | Built: | IMO number: |
|---|---|---|
| 406 | 2014 | 1012359 |
| Deadweight: | Size: | MMSI: |
| 44 | 46 / 9 m | 319059500 |

Search for
1. LIVE SHIP TRACKING
2. CRUISE OFFERS FOR SENIORS
3. REAL-TIME SATELLITE VIEW
4. TRACK YOUR PARCEL
Ad | Advance Simple

Document title: LADY MAY Current position (Yacht, IMO 1012359) - VesselFinder
Capture URL: https://www.vesselfinder.com/?imo=1012359
Capture timestamp (UTC): Tue, 12 Apr 2022 19:52:33 GMT

# EXHIBIT 9

# SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY

| | | | | |
|---|---|---|---|---|
| PRESENT: | **HON. BARRY R. OSTRAGER** | | PART | IAS MOTION 61EFM |
| | *Justice* | | | |

-------------------------------------------------------------------X

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

Plaintiff,

- v -

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO, GENEVER HOLDINGS CORPORATION, and GENEVER HOLDINGS LLC,

Defendants.

| INDEX NO. | 652077/2017 |
|---|---|
| MOTION DATE | |
| MOTION SEQ. NO. | 026 |

**DECISION + ORDER ON MOTION**

-------------------------------------------------------------------X

HON. BARRY R. OSTRAGER

In light of the bankruptcy filing by defendant Ho Wan Kwok (NYSCEF Doc. No. 1190), the Court hereby permits plaintiff Pacific Alliance Asia Opportunity Fund L.P. to withdraw its motion for an Order of Civil Contempt based on Mr. Kwok's alleged noncompliance with this Court's September 22, 2021, Turnover Order (see NYSCEF Doc. No. 1192). A status conference is scheduled for December 6, 2022, at 10:00 a.m. via Microsoft Teams. The Court requests that Mr. Kwok's counsel efile a letter as to the status of the bankruptcy proceedings at least one week before the conference date, along with an updated appearance sheet for Teams.

Dated: March 4, 2022

BARRY R. OSTRAGER, J.S.C.

| CHECK ONE: | ☐ CASE DISPOSED | ☒ NON-FINAL DISPOSITION |
|---|---|---|
| | ☐ GRANTED    ☐ DENIED | ☐ GRANTED IN PART    ☒ OTHER |
| APPLICATION: | ☐ SETTLE ORDER | ☐ SUBMIT ORDER |
| CHECK IF APPROPRIATE: | ☐ INCLUDES TRANSFER/REASSIGN | ☐ FIDUCIARY APPOINTMENT    ☐ REFERENCE |

1 of 1

# EXHIBIT 10

## Susan Hennelly

| | |
|---|---|
| **From:** | Susan Hennelly |
| **Sent:** | Tuesday, March 03, 2015 3:31 PM |
| **To:** | BoardOfDirectors |
| **Subject:** | Sale of Apartment 1801 and Maid's Room 2219 |
| **Attachments:** | Kwok board package.pdf |

We have received a contract for the sale of the 2,950 shares allocated to Apartment 1801 and the 50 shares allocated to Maid's Room 2219 from Sherry 1800s, LLC (Haroche) to Genever Holdings LLC (Miles Kwok).

Attached are copies of the contract of sale, Mr. Kwok's application and several letters of reference.

The purchase price is $67,500,000, plus $2,500,000 for the furnishings. The 2015 maintenance is $55,214 per month plus an additional $936 for the Maid's Room. This is a residential apartment and will be used by Mr. Kwok and his family.

Due to Mr. Kwok's foreign status and purchasing in an LLC, he will be required to sign an occupancy agreement and personally guarantee the lease. He will also be required to provide a security deposit.

This apartment encompasses the entire floor and is approximately 7,300 sq. ft. plus 2,170 sq. ft. of terraces. Attached is a floor plan.

Mr. Kwok has also entered into a contract to purchase Maid's Room 719 which he will purchase simultaneously, if approved.

Michael Horvitz and Fred Seegal have interviewed Miles Kwok and his son, Mileson Kwok. His wife, Hing Chi, was present via Skype.

Very truly yours,

Michael J. Ullman
Executive Vice President
& Chief Operating Officer
The Sherry Netherland Hotel
781 Fifth Avenue
New York, NY 10022
P: 212-231-6811   F: 212-832-4845
For reservations and special offers, go to

1

SN 0027

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
NYSCEF DOC. NO. 256

INDEX NO. 652077/2017
RECEIVED NYSCEF: 11/28/2018

Case 1:16-cv-... Doc 43212 Filed 08/14/22 Entered 08/14/22 23:05:22 Exhibit 10 of
Pg 395 of 32

Executed Contract of Sale

SN 0028

Contract of sale cooperative apartment, 7-2000
Prepared by the Committee on Condominiums and Cooperatives of the Real Property Section of the New York State Bar Association

### CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

## Contract of Sale - Cooperative Apartment

This Contract is made as of February_____, 2015 between the "Seller" and the "Purchaser" identified below.

**1 Certain Definitions and Information**
**1.1 The "Parties" are:**

1.1.1 "Seller": Sherry 1800s, LLC
*Prior names used by Seller:*
*Address: 1233 Rock Rimmon Road, Stamford, CT 06903*

*Tax ID. No.: 20-0780554*

1.1.2 "Purchaser": Genever Holdings LLC

*Address:*

*S.S. No.:*

1.2 The "Attorneys" are *(name, firm name, address and telephone, fax).*
1.2.1 "Seller's Attorney"
Michael J. Jones, Esq.
Ivey, Barnum & O'Mara, LLC
170 Mason Street, Greenwich, CT 06830
Tel: 203-661-6000
Fax: 203-661-7088
mjones@ibolaw.com

1.2.2 "Purchaser's Attorney"
Ira Gilbert, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison, LLP
1285 Avenue of the America
New York, NY 10019-6064
Tel: 212-373-3529
Fax: 212-492-0529
igilbert@paulweiss.com

1.3 The "Escrowee" is *the [Seller's]* Attorney.

1.4 The Managing Agent is *(name, address and telephone, fax):*
*Sherry Netherland Hotel*
*Susan Hennelly*
*781 Fifth Avenue, 1st, New York, NY 10022*
*Tel: 212-231-6811 Fax: 212-832-4845*

1.5 The real estate "Broker(s)" (see ¶ 12) is/are: John Burger, and Kathy Sloane, Brown Harris Stevens and Serena Boardman, Sotheby's 1.6 The name of the cooperative housing corporation ("Corporation") is:
*Sherry Netherland, Inc.*

1.7 The "Unit" number is: **1801, which encompasses the entire \***
1.8 The Unit is located in "Premises" known as: 781 Fifth Avenue, New York, NY
1.9 The "Shares" are the shares of the Corporation allocated to the Units.
**\* 18th Floor, except elevator hallway and including Maid's Room 1519**

1.10 The "Lease" is the Corporation's proprietary lease or occupancy agreement for the Unit, given by the Corporation which expires on
1.11 "Personalty" is the following personal property, to the extent existing in the Unit on the date hereof: the refrigerators, freezers, ranges, ovens, built-in microwave ovens, dishwashers, garbage disposal units, cabinets and counters, lighting fixtures, chandeliers, wall-to-wall carpeting, plumbing and heating fixtures, central air-conditioning and/or window or sleeve units, washing machines, dryers, screens and storm windows, window treatments, switch plates, door hardware, mirrors, built-ins not excluded in ¶ 1.12 and all of the ~~furnishings including but not limited to everyday china, pots, pans, cooking items, flatware, as well as crystal glasses and decanters, etc in the bar area~~ and personal property (except as specifically excluded in 1.12), including but not limited to all items set forth in the series of videos contained in the DVD(the "DVD") delivered by Brown Harris Stevens to Unit 1801 at 2:00 pm of February 20, 2015.

See 1.12 below.
1.12 ~~Specifically excluded from this sale is all personal property not included in ¶ 1.11 and all contents included in the unit with the exception of 13 paintings and drawings, one antique secretary desk on east wall of LR (will be replaced) personal "knick-knacks" such as small boxes, clocks, picture frames, pictures, etc.~~
1.13 The sale [does] [~~does not~~] Include Seller's interest in [~~Storage~~]/ [Servant's Room #1519]/ [~~Parking Space~~] ("Included Interests")
1.14 The "Closing" is the transfer of ownership of the Shares and Lease.
1.15 The date scheduled for Closing is  **no later than 3/6/15** ("Scheduled Closing Date") at 10:00 A.M. (See ¶¶ 9 and 10)
1.16 The "Purchase Price" is: **$67,500,000.00**
1.16.1 The "Contract Deposit" is: **$7,000,000.00**
1.16.2 The "Balance" of the Purchase Price due at Closing is: **$63,000,000.00** (See ¶ 2.2.2)  **See SR18 in Second Rider**
1.17 The monthly "Maintenance" charge is **$57,085.53**  (See ¶ 4)
1.18 The "Assessment", if any, payable to the Corporation, at the date of this Contract is NONE, payable as follows:
1.19 [Purchaser] shall pay the Corporation's flip tax, transfer fee (apart from the transfer agent fee) and/or waiver of option fee ("Flip Tax"), if any.
1.20 ~~Financing Options (Delete two of the following ¶¶ 1.20.1, 1.20.2 or 1.20.3)~~
~~1.20.1 Purchaser may apply for financing in connection with this sale and Purchaser's obligation to purchase under this Contract is contingent upon issuance of a Loan Commitment Letter by the Loan Commitment Date (¶18.1.2).~~
~~1.20.2 Purchaser may apply for financing in connection with this sale but Purchaser's obligation to purchase under this Contract is not contingent upon issuance of a Loan Commitment Letter.~~
~~1.20.3 Purchaser shall not apply for financing in connection with this sale.~~
~~1.21 If ¶ 1.20.1 or 1.20.2 applies, the "Financing Terms" for ¶ 18 are: a loan of $_____ for a term of _____ years or such lesser~~



1.12 – Specifically excluded from this sale are thirteen (13) paintings and drawings; one antique secretary desk on east wall of LR (to be replaced by a piece of furniture that resembles this); personal 'knick knacks' such as small boxes, clocks, picture frames, pictures, etc. (but if 'knick knacks' are in the DVD, they are included); file cabinets in GII's office and contents thereof; all the clothing, framed photographs(except specific frame to be designated by buyer) and the model of the Seller's private yacht located in Seller's office.

SN 0029

Case 1:22-cv-02800-AS Doc 43-10 Filed 09/14/22 Entered 09/14/22 23:05:52 Exhibit 10 of
Pg 593 32

*Contract of sale cooperative agreement, 7-1901*
*Prepared by the Committee on Condominium and Cooperatives of the Real Property Section of the New York State Bar Association*

CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

## Contract of Sale - Cooperative Apartment

This Contract is made as of February **21**, 2015 between the "Seller" and the "Purchaser" identified below.

### 1 Certain Definitions and Information

1.1 The "Parties" are:

1.1.1 "Seller": Sherry 1800s, LLC
*Prior names used by Seller:*
*Address: 1233 Rock Rimmon Road, Stamford, CT 06903*

*Tax ID. No.: 20-0780,154*

1.1.2 "Purchaser": Genover Holdings LLC

*Address:*

*S.S. No.:*

1.2 The "Attorneys" are *(name, firm name, address and telephone, fax).*

1.2.1 "Seller's Attorney"
Michael J. Jones, Esq.
Ivey, Barnum & O'Mara, LLC
170 Mason Street, Greenwich, CT 06830
Tel: 203-661-6900
Fax: 203-661-7088
mjones@ilholow.com

1.2.2 "Purchaser's Attorney"
Ira Gilbert, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison, LLP
1285 Avenue of the America
New York, NY 10019-6064
Tel: 212-373-3529
Fax: 212-492-0529
igilbert@paulwclss.com

1.3 The "Escrowee" is *the [Seller's] Attorney.*

1.4 The Managing Agent is *(name, address and telephone, fax):*
Sherry Netherland Hotel
Susan Hennelly
781 Fifth Avenue, 1", New York, NY 10022
Tel: 212-321-6811 Fax: 212-832-4845

1.5 The real estate "Broker(s)" *(see ¶ 12) is/are:* John Burger, and Kathy Sloane, Brown Harris Stevens and Sorena Boardman, Sotheby's 1.6 The name of the cooperative housing corporation ("Corporation") is:
Sherry Netherland, Inc.

1.7 The "Unit" number is: 1801, which encompasses the entire *

1.8 The Unit is located in "Premises" known as: 781 Fifth Avenue, New York, NY

1.9 The "Shares" are the shares of the Corporation allocated to the Units.
* 18th Floor, except elevator hallway and including Maid's Room 1519

1.10 The "Lease" is the Corporation's proprietary lease or occupancy agreement for the Unit, given by the Corporation which expires on

1.11 "Personalty" is the following personal property, to the extent existing in the Unit on the date hereof: the refrigerators, freezers, ranges, ovens, built-in microwave ovens, dishwashers, garbage disposal units, cabinets and counters, lighting fixtures, chandeliers, wall-to-wall carpeting, plumbing and heating fixtures, central air-conditioning and/or window or sleeve units, washing machines, dryers, screens and storm windows, window treatments, switch plates, door hardware, mirrors, built-ins not excluded in ¶ 1.12 and all of the ~~furnishings including but not limited to everyday chiua pots, pans, cooking items, flatware as well as crystal glasses and decanters etc in the bar area~~ and personal property (except as specifically excluded in 1.12), including but ~~not limited to all items set forth in~~ the series of videos contained in the DVD (the "DVD") delivered by Brown Harris Stevens to Unit 1801 at 2:00 pm on February 20, 2015.

*/See 1.12 below*

1.12 ~~Specifically excluded from this sale is all personal property not included in ¶ 1.11 and all contents included in the unit with the exception of 13 paintings and drawings, one antique secretary desk on east wall of LR (will be replaced) personal "knick-knacks" such as small boxes, clocks, picture frames, pictures, etc.~~

1.13 The sale ~~[does]~~ [does not] include Seller's interest in ~~[Storage]~~ [Servant's Room #1519]/ ~~[Parking Space]~~ ("Included Interests")

1.14 The "Closing" is the transfer of ownership of the Shares and Lease.

1.15 The date scheduled for Closing is **no later than 3/6/15** ("Scheduled Closing Date") at 10:00 A.M. (See ¶ 9 and 10)

1.16 The "Purchase Price" is: $67,500,000.00

1.16.1 The "Contract Deposit" is: $7,000,900.00

1.16.2 The "Balance" of the Purchase Price due at Closing is: $63,000,000.00 (See ¶ 2.2.2) See SR18 in Second Rider

1.17 The monthly "Maintenance" charge is $57,085.53 (See ¶ 4)

1.18 The "Assessment", if any, payable to the Corporation, at the date of this Contract is NONE, payable as follows:

1.19 [Purchaser] shall pay the Corporation's flip tax, transfer fee (apart from the transfer agent fee) and/or waiver of option fee ("Flip Tax"), if any.

1.20 ~~Financing Options (Delete two of the following ¶¶ 1.20.1, 1.20.2 or 1.20.3)~~

1.30.1 ~~Purchaser may apply for financing in connection with this sale and Purchaser's obligation to purchase under this Contract is contingent upon issuance of a Loan Commitment Letter by the Loan Commitment Date (¶13.1.2).~~

1.20.2 ~~Purchaser may apply for financing in connection with this sale but Purchaser's obligation to purchase under this Contract is not contingent upon issuance of a Loan Commitment Letter.~~

1.20.3 ~~Purchaser shall not apply for financing in connection with this sale.~~

1.21 ~~If ¶ 1.20.1 or 1.20.2 applies, the "Financing Terms" for ¶ 18 are: a loan of $ _____ (or a term of _____ years at such lesser~~

* 1.12 – Specifically excluded from this sale are thirteen (13) paintings and drawings; one antique secretary desk on east wall of LR (to be replaced by a piece of furniture that resembles this desk; personal "knick knacks" such as small boxes, clocks, picture frames, pictures, etc. (but if 'knick knacks' are in the DVD, they are included); file cabinets in Gil's office and contents thereof; all the clothing, framed photographs(except specific frame to be designated by buyer) and the model of the Seller's private yacht located in Seller's office.

amount or shorter term as applied for or acceptable to Purchaser;
and the "Loan Commitment Date" for ¶ 18 is _____ calendar
days after the Delivery Date.

1.22 The "Delivery Date" of this Contract is the date on which a fully executed counterpart of this Contract is deemed given to and received by Purchaser or Purchaser's Attorney as provided in ¶ 17.3.

1.23 All "Proposed Occupants" of the Unit are:

1.23.1 persons and relationship to Purchaser:

1.23.2 pets:

1.24 The Contract Deposit shall be held in [a non-] IOLA escrow account. If the account is a non- IOLA account then interest shall be paid to the Party entitled to the Contract Deposit. The Party receiving the interest shall pay any income taxes thereon. The escrow account shall be a segregated bank account at Depository: BNY MELLON

Address: 10 Mason Street, Greenwich, CT 06830 (See ¶ 27)

1.25 This Contract is continued on attached rider(s).

**2 Agreement to Sell and Purchase; Purchase Price; Escrow**

2.1 Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the Seller's Shares, Lease, Personalty and any Included Interests and all other items included in this sale, for the Purchase Price and upon the terms and conditions set forth in this Contract.

2.2 The Purchase Price is payable to Seller by Purchaser as follows:

2.2.1 the Contract Deposit at the time of signing this Contract by Purchaser's good check to the order of Escrowee; and

2.2.2 the Balance at Closing, only by cashier's or official bank check or certified check of Purchaser payable to the direct order of Seller. The check(s) shall be drawn on and payable by a branch of a commercial or savings bank, savings and loan association or trust company located in the same City or County as the Unit. Seller may direct, on reasonable Notice (defined in ¶ 17) prior to Closing, that all or a portion of the Balance shall be made payable to persons other than Seller (see ¶ 17.7).

**3 Personalty**

3.1 Subject to any rights of the Corporation or any holder of a mortgage to which the Lease is subordinate, this sale includes all of the Seller's interest, if any, in the Personalty and the Included Interests.

3.2 No consideration is being paid for the Personalty or for the Included Interests; nothing shall be sold to Purchaser if the Closing does not occur.

3.3 Prior to Closing, Seller shall remove from the Unit all the furniture, furnishings and other property not included in this sale, and repair any damage caused by such removal.

**4 Representations and Covenants**

4.1 Subject to any matter affecting title to the Premises (as to which Seller makes no representations or covenants), Seller represents and covenants that:

4.1.1 Seller is, and shall at Closing be, the sole owner of the Shares, Lease, Personalty and Included Interests, with the full right, power and authority to sell and assign them. Seller shall make timely provision to satisfy existing security interest(s) in the Shares and Lease and have the same delivered at Closing (See ¶10.1);

4.1.2 the Shares were duly issued, fully paid for and are non-assessable;

4.1.3 the Lease is, and will at Closing be, in full force and effect and no notice of default under the Lease is now or will at Closing be in effect;

4.1.4 the Maintenance and Assessments payable as of the date hereof are as specified in ¶ 1.17 and 1.18;

4.1.5 as of this date, Seller neither has actual knowledge nor has received any written notice of any increase in Maintenance or any Assessment which has been adopted by the Board of

Directors of the Corporation and is not reflected in the amounts set forth in ¶¶ 1.17 and 1.18;

4.1.6 Seller has not made any material alterations or additions to the Unit without any required consent of the Corporation or, to Seller's actual knowledge, without compliance with all applicable law. This provision shall not survive Closing.

4.1.7 Seller has not entered into, shall not enter into, and has no actual knowledge of any agreement (other than the Lease) affecting title to the Unit or its use and/or occupancy after Closing, or which would be binding on or adversely affect Purchaser after Closing (e.g. a sublease or alteration agreement);

4.1.8 Seller has been known by no other name for the past 10 years except as set forth in ¶ 1.1.1.

4.1.9 at Closing in accordance with ¶ 15.2:

4.1.9.1 there shall be no judgments outstanding against Seller which have not been bonded against collection out of the Unit ("Judgments");

4.1.9.2 the Shares, Lease, Personalty and any Included Interests shall be free and clear of liens (other than the Corporation's general lien on the Shares for which no monies shall be owed), encumbrances and adverse interests ("Liens");

4.1.9.3 all sums due to the Corporation shall be fully paid by Seller to the end of the payment period immediately preceding the date of Closing;

4.1.9.4 Seller shall not be indebted for labor or material which might give rise to the filing of a notice of mechanic's lien against the Unit or the Premises; and

4.1.9.5 no violations shall be of record which the owner of the Shares and Lease would be obligated to remedy under the Lease.

4.2 Purchaser represents and covenants that:

4.2.1 Purchaser is acquiring the Shares and Lease for residential occupancy of the Unit solely by the Proposed Occupants identified in ¶ 1.23

4.2.2 Purchaser is not, and within the past 7 years has not been, the subject of a bankruptcy proceeding;

4.2.3 if ¶ 1.20.3 applies, Purchaser shall not apply for financing in connection with this purchase.

4.2.4 Each individual comprising Purchaser is over the age of 18 and is purchasing for Purchaser's own account (beneficial and of record);

4.2.5 Purchaser shall not make any representations to the Corporation contrary to the foregoing and shall provide all documents in support thereof required by the Corporation in connection with Purchaser's application for approval of this transaction; and

4.2.6 there are not now and shall not be at Closing any unpaid tax liens or monetary judgments against Purchaser.

4.3 Each Party covenants that its representations and covenants contained in ¶ 4 shall be true and complete at Closing and, except for ¶ 4.1.6, shall survive Closing but any action based thereon must be instituted within one year after Closing.

**5 Corporate Documents**

Purchaser has examined and is satisfied with, or (except as to any matter represented in this Contract by Seller) accepts and assumes the risk of not having examined, the Lease, the Corporation's Certificate of Incorporation, By-laws, House Rules, minutes of shareholders' and directors' meetings, most recent audited financial statement and most recent statement of tax deductions available to the Corporation's shareholders under Internal Revenue Code ("IRC") §216 (or any successor statute).

**6 Required Approval and References**

6.1 This sale is subject to the unconditional consent of the Corporation.

6.2 Purchaser shall in good faith:

6.2.1 submit to the Corporation or the Managing Agent an application with respect to this sale on the form required by the Corporation, containing such data and together with such documents as the Corporation requires, and pay the applicable

SN 0031

fees and charges that the Corporation imposes upon Purchaser. All of the foregoing shall be submitted within 10 business days after the Delivery Date, or, if ¶ 1.20.1 or 1.20.2 applies and the Loan Commitment Letter is required by the Corporation, within 3 business days after the earlier of (i) the Loan Commitment Date (defined in ¶ 1.21) or (ii) the date of receipt of the Loan Commitment Letter (defined in ¶ 18.1.3);

6.2.2 attend (and cause any Proposed Occupant to attend) one or more personal interviews, as requested by the Corporation; and

6.2.3 promptly submit to the Corporation such further references, data and documents reasonably requested by the Corporation.

6.3 Either Party, after learning of the Corporation's decision, shall promptly advise the other Party thereof. If the Corporation has not made a decision on or before the Scheduled Closing Date, the Closing shall be adjourned for 30 business days for the purpose of obtaining such consent. If such consent is not given by such adjourned date, either Party may cancel this Contract by Notice, provided that the Corporation's consent is not issued before such Notice of cancellation is given. If such consent is refused at any time, either Party may cancel this Contract by Notice. In the event of cancellation pursuant to this ¶ 6.3, the Escrowee shall refund the Contract Deposit to Purchaser.

6.4 If such consent is refused, or not given, due to Purchaser's bad faith conduct, Purchaser shall be in default and ¶ 13.1 shall govern.

**7 Condition of Unit and Personalty; Possession**

7.1 Seller makes no representation as to the physical condition or state of repair of the Unit, the Personalty, the Included Interests or the Premises. Purchaser has inspected or waived inspection of the Unit, the Personalty and the Included Interests and shall take the same "as is", as of the date of this Contract, except for reasonable wear and tear. However, at the time of Closing, the appliances shall be in working order and required smoke detector(s) shall be installed and operable.

7.2 At Closing, Seller shall deliver possession of the Unit, Personalty and Included Interests in the condition required by ¶ 7.1, broom-clean, vacant and free of all occupants and rights of possession.

**8 Risk of Loss**

8.1 The provisions of General Obligations Law § 5-1311, as modified herein, shall apply to this transaction as if it were a sale of realty. For purposes of this paragraph, the term "Unit" includes built-in Personalty.

8.2 Destruction shall be deemed "material" under GOL § 5-1311, if the reasonably estimated cost to restore the Unit shall exceed 5% of the Purchase Price.

8.3 In the event of any destruction of the Unit or the Premises, when neither legal title nor the possession of the Unit has been transferred to Purchaser, Seller shall give Notice of the loss to Purchaser ("Loss Notice") by the earlier of the date of Closing or 7 business days after the date of the loss.

8.4 If there is material destruction of the Unit without fault of Purchaser, this Contract shall be deemed canceled in accordance with ¶ 16.3, unless Purchaser elects by Notice to Seller to complete the purchase with an abatement of the Purchase Price; or

8.5 Whether or not there is any destruction of the Unit, if without fault of Purchaser, more than 10% of the units in the Premises are rendered uninhabitable, or reasonable access to the Unit is not available, then Purchaser shall have the right to cancel this Contract in accordance with ¶ 16.3 by Notice to Seller.

8.6 Purchaser's Notice pursuant to ¶ 8.4 or ¶ 8.5 shall be given within 7 business days following the giving of the Loss Notice except that if Seller does not give a Loss Notice, Purchaser's Notice may be given at any time at or prior to Closing.

8.7 In the event of any destruction of the Unit, Purchaser shall not be entitled to an abatement of the Purchase Price (i) that exceeds the reasonably estimated cost of repair and restoration or (ii) for any loss that the Corporation is obliged to repair or restore; but Seller shall assign to Purchaser, without recourse, Seller's claim, if any, against the Corporation with respect to such loss.

**9 Closing Location**

The Closing shall be held at the location designated by the Corporation or, if no such designation is made, at the office of Seller's Attorney.

**10 Closing**

10.1 At Closing, Seller shall deliver or cause to be delivered:

10.1.1 Seller's certificate for the Shares duly endorsed for transfer to Purchaser or accompanied by a separate duly executed stock power to Purchaser, and in either case, with any guarantee of Seller's signature required by the Corporation;

10.1.2 Seller's counterpart original of the Lease, all assignments and assumptions in the chain of title and a duly executed assignment thereof to Purchaser in the form required by the Corporation;

10.1.3 FIRPTA documents required by ¶ 25;

10.1.4 keys to the Unit, building entrance(s), and, if applicable, garage, mailbox, storage unit and any locks in the Unit;

10.1.5 if requested, an assignment to Purchaser of Seller's interest in the Personalty and Included Interests;

10.1.6 any documents and payments to comply with ¶ 15.2

10.1.7 If Seller is unable to deliver the documents required in ¶ 10.1.1 or 10.1.2 then Seller shall deliver or cause to be delivered all documents and payments required by the Corporation for the issuance of a new certificate for the Shares or a new Lease.

10.2 At Closing, Purchaser shall:

10.2.1 pay the Balance in accordance with ¶2.2.2;

10.2.2 execute and deliver to Seller and the Corporation an agreement assuming the Lease, in the form required by the Corporation; and

10.2.3 if requested by the Corporation, execute and deliver counterparts of a new lease substantially the same as the Lease, for the balance of the Lease term, in which case the Lease shall be canceled and surrendered to the Corporation together with Seller's assignment thereof to Purchaser.

10.3 At Closing, the Parties shall complete and execute all documents necessary:

10.3.1 for Internal Revenue Service ("IRS") form 1099-S or other similar requirements;

10.3.2 to comply with smoke detector requirements and any applicable transfer tax filings; and

10.3.3 to transfer Seller's interest, if any, in and to the Personalty and Included Interests.

10.4 Purchaser shall not be obligated to close unless, at Closing, the Corporation delivers:

10.4.1 to Purchaser a new certificate for the Shares in the name of Purchaser; and

10.4.2 a written statement by an officer or authorized agent of the Corporation consenting to the transfer of the Shares and Lease to Purchaser and setting forth the amounts of and payment status of all sums owed by Seller to the Corporation, including Maintenance and any Assessments, and the dates to which each has been paid.

**11 Closing Fees, Taxes and Apportionments**

11.1 At or prior to Closing,

11.1.1 Seller shall pay, if applicable:

11.1.1.1 the cost of stock transfer stamps; and

11.1.1.2 transfer taxes, except as set forth in ¶ 11.1.2.2

11.1.2 Purchaser shall pay, if applicable:

11.1.2.1 any fee imposed by the Corporation relating to Purchaser's financing; and

11.1.2.2 transfer taxes imposed by statute primarily on Purchaser (e.g., the "mansion tax"),

11.2 The Flip Tax, if any, shall be paid by the Party specified in ¶ 1.19.

11.3 Any fee imposed by the Corporation and not specified in this Contract shall be paid by the Party upon whom such fee is expressly imposed by the Corporation, and if no Party is specified by the Corporation, then such fee shall be paid by Seller.

11.4 The Parties shall apportion as of 11:59 P.M. of the day preceding the Closing, the Maintenance, and any other periodic charges due the Corporation (other than Assessments) and STAR Tax Exemption (if the Unit is the beneficiary of same), based on the number of days in the month of Closing.

11.5 Assessments, whether payable in a lump sum or installments, shall not be apportioned, but shall be paid by the Party who is the owner of the Shares on the date specified by the Corporation for payment. Purchaser shall pay any installments payable after Closing provided Seller had the right and elected to pay the Assessment in installments.

11.6 Each Party shall timely pay any transfer taxes for which it is primarily liable pursuant to law by cashier's, official bank, certified or attorney's escrow check. This ¶11.6 shall. survive Closing.

11.7 Any computational errors or omissions shall be corrected within 6 months after Closing. This ¶11.7 shall survive Closing.

**12 Broker**

12.1 Each Party represents that such Party has not dealt with any person acting as a broker, whether licensed or unlicensed, in connection with this transaction other than the Broker(s) named in ¶1.5.

12.2 Seller shall pay the Broker's commission pursuant to a separate agreement The Broker(s) shall not be deemed to be a third-party beneficiary of this Contract.

12.3 This ¶12 shall survive Closing, cancellation or termination of this Contract.

**13 Defaults, Remedies and Indemnities**

13.1 In the event of a default or misrepresentation by Purchaser, Seller's sole and exclusive remedies shall be to cancel this Contract, retain the Contract Deposit as liquidated damages and, if applicable, Seller may enforce the indemnity in ¶ 13.3 as to brokerage commission or sue under ¶ 13.4. Purchaser prefers to limit Purchaser's exposure for actual damages to the amount of the Contract Deposit, which Purchaser agrees constitutes a fair and reasonable amount of compensation for Seller's damages under the circumstances and is not a penalty. The principles of real property law shall apply to this liquidated damages provision.

13.2 In the event of a default or misrepresentation by Seller, Purchaser shall have such remedies as Purchaser is entitled to at law or in equity, including specific performance, because the Unit and possession thereof cannot be duplicated.

13.3 Subject to the provisions of ¶ 4.3, each Party indemnifies and holds harmless the other against and from any claim, judgment, loss, liability, cost or expense resulting from the indemnitor's breach of any of its representations or covenants stated to survive Closing, cancellation or termination of this Contract. Purchaser indemnifies and holds harmless Seller against and from any claim, judgment, loss, liability, cost or expense resulting from the Lease obligations accruing from and after the Closing. Each indemnity includes, without limitation, reasonable attorneys' fees and disbursements, court costs and litigation expenses arising from the defense of any claim and enforcement or collection of a judgment under this indemnity, provided the indemnitee is given Notice and opportunity to defend the claim. This ¶ 13.3 shall survive Closing, cancellation or termination of this Contract.

13.4 In the event any instrument for the payment of the Contract Deposit fails of collection, Seller shall have the right to sue on the uncollected instrument. In addition, such failure of collection shall be a default under this Contract, provided Seller gives Purchaser Notice of such failure of collection and, within 3 business days after Notice is given, Escrowee does not receive from Purchaser an unendorsed good certified check, bank check or immediately available funds in the amount of the uncollected funds. Failure to cure such default shall entitle Seller to the remedies set forth in ¶ 13.1 and to retain all sums as may be collected and/or recovered.

**14 Entire Agreement; Modification**

14.1 All prior oral or written representations, understandings and agreements had between the Parties with respect to the subject matter of this Contract, and with the Escrowee as to ¶ 27, are merged in this Contract, which alone fully and completely expresses the Parties' and Escrowee's agreement. 14.2 The Attorneys may extend in writing any of the time limitations stated in this Contract. Any other provision of this Contract may be changed or waived only in writing signed by the Party or Escrowee to be charged.

**15 Removal of Liens and Judgments**

15.1 Purchaser shall deliver or cause to be delivered to Seller or Seller's Attorney, not less than 10 calendar days prior to the Scheduled Closing Date a Lien and Judgment search, except that Liens or Judgments first disclosed in a continuation search shall be reported to Seller within 2 business days after receipt thereof, but not later than the Closing. Seller shall have the right to adjourn the Closing pursuant to ¶ 16 to remove any such Liens and Judgments. Failure by Purchaser to timely deliver such search or continuation search shall not constitute a waiver of Seller's covenants in ¶4 as to Liens and Judgments. However, if the Closing is adjourned solely by reason of untimely delivery of the Lien and Judgment search, the apportionments under ¶ 11.3 shall be made as of 11:59 P.M. of the day preceding the Scheduled Closing Date in ¶ 1.15.

15.2 Seller, at Seller's expense, shall obtain and deliver to Seller the documents and payments necessary to secure the release, satisfaction, termination and discharge or removal of record of any Liens and Judgments. Seller may use any portion of the Purchase Price for such purposes.

15.3 This ¶ 15 shall survive Closing.

**16 Seller's Inability**

16.1 If Seller shall be unable to transfer the items set forth in ¶ 2.1 in accordance with this Contract for any reason other than Seller's failure to make a required payment or other willful act or omission, then Seller shall have the right to adjourn the Closing for periods not exceeding 60 calendar days in the aggregate, but not extending beyond the expiration of Purchaser's Loan Commitment Letter, if ¶ 1.20.1 or 1.20.2 applies.

16.2 If Seller does not elect to adjourn the Closing or (if adjourned) on the adjourned date of Closing Seller is still unable to perform, then unless Purchaser elects to proceed with the Closing without abatement of the Purchase Price, either Party may cancel this Contract on Notice to the other Party given at any time thereafter.

16.3 In the event of such cancellation, the sole liability of Seller shall be to cause the Contract Deposit to be refunded to Purchaser and to reimburse Purchaser for the actual costs incurred for Purchase's lien and title search, if any.

**17 Notices and Contract Delivery**

17.1 Any notice or demand ("Notice") shall be in writing and delivered either by hand, Overnight delivery or certified or registered mail, return receipt requested, to the Party and simultaneously, in like manner, to such Party's Attorney, if any, and to Escrowee at their respective addresses or to such other address as shall hereafter be designated by Notice given pursuant to this ¶ 17.

17.2 The Contract may be delivered as provided in ¶

17.1 or by ordinary mail.

17.3 The Contract or each Notice shall be deemed given and received:

17.3.1 on the day delivered by hand;

17.3.2 on the business day following the date sent by overnight delivery;

17.3.3 on the 5th business day following the date sent by certified or registered mail; or

17.3.4 as to the Contract only, 3 business days following the date of ordinary mailing.

17.4 A Notice to Escrowee shall be deemed given only upon actual receipt by Escrowee.

17.5 The Attorneys are authorized to give and receive any Notice on behalf of their respective clients.

17.6 Failure or refusal to accept a Notice shall not invalidate the Notice.

17.7 Notice pursuant to ¶¶ 2.2.2 and 13.4 may be delivered by confirmed facsimile to the Party's Attorney and shall be deemed given when transmission is confirmed by sender's facsimile machine.

18 Financing Provisions

~~18.1 The provisions of ¶¶ 18.1 and 18.2 are applicable only if ¶ 1.20.1 or 1.20.2 applies.~~

~~18.1.1 An "Institutional Lender" is any of the following that is authorized under Federal or New York State law to issue a loan secured by the Shares and Lease and is currently extending similarly secured loan commitments in the county in which the Unit is located: a bank, savings bank, savings and loan association, trust company, credit union of which Purchaser is a member, mortgage banker, insurance company or governmental entity.~~

~~18.1.2 A "Loan Commitment Letter" is a written offer from an Institutional Lender to make a loan on the Financing Terms (see ¶ 1.21) at prevailing fixed or adjustable interest rates and on other customary terms generally being offered by Institutional Lenders making cooperative share loans. An offer to make a loan conditional upon obtaining an appraisal satisfactory to the Institutional Lender shall not become a Loan Commitment Letter unless and until such condition is met. An offer conditional upon any factor concerning Purchaser (e.g. sale of current home, payment of outstanding debt, no material adverse change in Purchaser's financial condition, etc.) is a Loan Commitment Letter whether or not such condition is met. Purchaser accepts the risk that, and cannot cancel this Contract if, any condition concerning Purchaser is not met.~~

~~18.2 Purchaser, directly or through a mortgage broker registered pursuant to Article 12-D of the Banking Law, shall diligently and in good faith:~~

~~18.2.1 apply only to an Institutional Lender for a loan on the Financing Terms (see ¶ 1.21) on the form required by the Institutional Lender containing truthful and complete information, and submit such application together with such documents as the Institutional Lender requires, and pay the applicable fees and charges of the Institutional Lender, all of which shall be performed within 5 business days after the Delivery Date;~~

~~18.2.2 promptly submit to the Institutional Lender such further references, data and documents requested by the Institutional Lender; and~~

~~18.2.3 accept a Loan Commitment Letter meeting the Financing Terms and comply with all requirements of such Loan Commitment Letter (or any other loan commitment letter accepted by Purchaser) and of the Institutional Lender in order to close the loan; and~~

~~18.2.4 furnish Seller with a copy of the Loan Commitment Letter promptly after Purchaser's receipt thereof.~~

~~18.2.5 Purchaser is not required to apply to more than one Institutional Lender.~~

~~18.3 If ¶ 1.20.1 applies, then~~

~~18.3.1 provided Purchaser has complied with all applicable provisions of ¶ 18.2 and this ¶ 18.3, Purchaser may cancel this Contract as set forth below, if:~~

~~18.3.1.1 any Institutional Lender denies Purchaser's application in writing prior to the Loan Commitment Date (see ¶ 1.21); or~~

~~18.3.1.2 a Loan Commitment Letter is not issued by the Institutional Lender on or before the Loan Commitment Date; or~~

~~18.3.1.3 any requirement of the Loan Commitment Letter other than one concerning Purchaser is not met (e.g. failure of the Corporation to execute and deliver the Institutional Lender's recognition agreement or other document, financial condition of the Corporation, owner occupancy quota, etc.); or~~

~~18.3.1.4 (i) the Closing is adjourned by Seller or the Corporation for more than 30 business days from the Scheduled Closing Date and (ii) the Loan Commitment Letter expires on a date more than 30 business days after the Scheduled Closing Date and before the new date set for Closing pursuant to this paragraph and (iii) Purchaser is unable in good faith to obtain from the Institutional Lender an extension of the Loan Commitment Letter or a new Loan Commitment Letter on the Financing Terms without paying additional fees to the Institutional Lender, unless Seller agrees, by Notice to Purchaser within 5 business days after receipt of Purchaser's Notice of cancellation on such ground, that Seller will pay such additional fees and Seller pays such fees when due. Purchaser may not object to an adjournment by Seller for up to 30 business days solely because the Loan Commitment Letter would expire before such adjourned Closing date.~~

~~18.3.2 Purchaser shall deliver Notice of cancellation to Seller within 5 business days after the Loan Commitment Date if cancellation is pursuant to ¶18.3.1.1 or 18.3.1.2 and on or prior to the Scheduled Closing Date if cancellation is pursuant to ¶ 18.3.1.3 or 18.3.1.4.~~

~~18.3.3 If cancellation is pursuant to ¶ 18.3.1.1, then Purchaser shall deliver to Seller, together with Purchaser's Notice, a copy of the Institutional Lender's written denial of Purchaser's loan application. If cancellation is pursuant to ¶ 18.3.1.3, then Purchaser shall deliver to Seller together with Purchaser's Notice evidence that a requirement of the Institutional Lender was not met.~~

~~18.3.4 Seller may cancel this Contract by Notice to Purchaser, sent within 5 days after the Loan Commitment Date, if Purchaser shall not have sent by then either (i) Purchaser's Notice of cancellation or (ii) a copy of the Loan Commitment Letter to Seller, which cancellation shall become effective if Purchaser does not deliver a copy of such Loan Commitment Letter to Seller within 10 business days after the Loan Commitment Date.~~

~~18.3.5 Failure by either Purchaser or Seller to deliver Notice of cancellation as required by this ¶ 18.3 shall constitute a waiver of the right to cancel under this ¶18.3.~~

~~18.3.6 If this Contract is canceled by Purchaser pursuant to this ¶ 18.3, then thereafter neither Party shall have any further rights against, or obligations or liabilities to, the other by reason of this Contract, except that the Contract Deposit shall be promptly refunded to Purchaser and no except as set forth in ¶ 13. If this Contract is canceled by Purchaser pursuant to ¶ 18.3.1.4, then Seller shall reimburse Purchaser for any non-refundable financing and inspection expenses and other sums reimbursable pursuant to ¶ 16.~~

~~18.3.7 Purchaser cannot cancel this Contract pursuant to ¶ 18.3.1.4 and cannot obtain a refund of the Contract Deposit if the Institutional Lender fails to fund the loan.~~

18.3.7.1 ~~because a requirement of the Loan Commitment Letter concerning Purchaser is not met (e.g., Purchaser's financial condition or employment status suffers an adverse change; Purchaser fails to satisfy a condition relating to the sale of an existing residence, etc.) or~~

18.3.7.2 ~~due to the expiration of a Loan Commitment Letter issued with an expiration date that is not more than 30 business days after the Scheduled Closing Date.~~

**19 Singular/Plural and Joint/Several**

The use of the singular shall be deemed to include the plural and vice versa, whenever the context so requires. If more than one person constitutes Seller or Purchaser, their obligations as such Party shall be joint and several.

**20 No Survival**

No representation and/or covenant contained herein shall survive Closing except as expressly provided. Payment of the Balance shall constitute a discharge and release by Purchaser of all of Seller's obligations hereunder except those expressly stated to survive Closing.

**21 Inspections**

Purchaser and Purchaser's representatives shall have the right to inspect the Unit within 48 hours prior to Closing, and at other reasonable times upon reasonable request to Seller.

**22 Governing Law and Venue**

This Contract shall be governed by the laws of the State of New York without regard to principles of conflict of laws. Any action or proceeding arising out of this Contract shall be brought in the county or Federal district where the Unit is located and the Parties hereby consent to said venue.

**23 No Assignment by Purchaser; Death of Purchaser**

23.1 Purchaser may not assign this Contract or any of Purchaser's rights hereunder. Any such purported assignment shall be null and void.

23.2 This Contract shall terminate upon the death of al persons comprising Purchaser and the Contract Deposit shall be refunded to the Purchaser. Upon making such refund and reimbursement, neither Party shall have any further liability or claim against the other hereunder, except as set forth in ¶ 12.

**24 Cooperation of Parties**

24.1 The Parties shall each cooperate with the other, the Corporation and Purchaser's Institutional Lender and title company, if any, and obtain execute and deliver such documents as are reasonably necessary to consummate this sale.

24.2 The Parties shall timely file all required documents in connection with all governmental filings that are required by law. Each Party represents to the other that its statements in such filings shall be true and complete. This ¶ 24.2 shall survive Closing.

**25 FIRPTA**

The parties shall comply with IRC §§ 897, 1445 and the regulations thereunder as same may be amended ("FIRPTA"). If applicable, Seller shall execute and deliver to purchaser at Closing a Certification of Non- Foreign Status ("CNS") or deliver a Withholding Certificate from the IRS. If Seller fails to deliver a CNS or a Withholding Certificate, Purchaser shall withhold from the Balance, and remit to the IRS, such sum as may be required by law. Seller hereby waives any right of action against Purchaser on account of such withholding and remittance. This ¶ 25 shall survive Closing.

**26 Additional Requirements**

26.1 Purchaser shall not be obligated to close unless all of the following requirements are satisfied at the time of the Closing:

26.1.1 the Corporation is in good standing;

26.1.2 the Corporation has fee or leasehold title to the Premises, whether or not marketable or insurable; and

26.1.3 there is no pending in rem action, tax certificate/ ien sale or foreclosure action of any underlying mortgage affecting the Premises.

26.2 If any requirement in ¶ 26.1 is not satisfied at the time of the Closing, Purchaser shall give Seller Notice and if the same is not satisfied within a reasonable period of time thereafter, then either Party way cancel this Contract (pursuant to ¶ 16.3) by Notice.

**27 Escrow Terms**

27.1 The Contract Deposit shall be deposited by Escrowee in an escrow account as set forth in ¶ 1.24 and the proceeds held and disbursed in accordance with the terms of this Contract. At Closing, the Contract Deposit shall be paid by Escrowee to Seller. If the Closing does not occur and either Party gives Notice to Escrowee demanding payment of the Contract Deposit, Escrowee shall give prompt Notice to the other Party of such demand. If Escrowee does not receive a Notice of objection to the proposed payment from such other Party within 10 business days after the giving of Escrowee's Notice, Escrowee is hereby authorized and directed to make such payment to the demanding party. If Escrowee does receive such a Notice of objection within said period, or if for any reason Escrowee in good faith elects not to make such payment, Escrowee may continue to hold the Contract Deposit until otherwise directed by a joint Notice by the Parties or a final, non-appealable judgment, order or decree of a court of competent jurisdiction. However, Escrowee shall have the right at any time to deposit the Contract Deposit and the interest thereon, if any, with the clerk of a court in the county as set forth in ¶ 22 and shall give Notice of such deposit to each Party. Upon disposition of the Contract Deposit and interest thereon, if any, in accordance with this ¶ 27, Escrowee shall be released and discharged of all escrow obligations and liabilities.

27.2 The Party whose Attorney is Escrowee shall be liable for loss of the Contract Deposit. If the Escrowee is Seller's attorney, then Purchaser shall be credited with the amount of the contract Deposit at Closing.

27.3 Escrowee will serve without compensation. Escrowee is acting solely as a stakeholder at the Parties' request and for their convenience. Escrowee shall not be liable to either Party for any act or omission unless it involves bad faith, willful disregard of this Contract or gross negligence. In the event of any dispute, Seller and Purchaser shall jointly and severally (with right of contribution) defend (by attorneys elected by Escrowee), indemnify and hold harmless Escrowee from and against any claim, judgment, loss, liability, cost and expenses incurred in connection with the performance of Escrowee's acts or omissions not involving bad faith, willful disregard of this Contract or gross negligence. This indemnity includes, without limitation, reasonable attorneys' fees either paid to retain attorneys or representing the fair value of legal services rendered by Escrowee to itself and disbursements, court costs and litigation expenses.

27.4 Escrowee acknowledges receipt of the Contract Deposit, by check subject to collection.

27.5 Escrowee agrees to the provisions of this ¶ 27.

27.6 If Escrowee is the Attorney for a Party, Escrowee shall be permitted to represent such Party in any dispute or lawsuit.

27.7 This ¶ 27 shall survive Closing, cancellation or termination of this Contract

**28 Margin Headings**

The margin heading do not constitute part of the text of this Contract.

**29 Miscellaneous**

This Contract shall not be binding unless and until Seller delivers a fully executed counterpart of this Contract to Purchaser (or Purchaser's Attorney) pursuant to ¶ 17.2 and 17.3. This Contract shall bind

and inure to the benefit of the Parties hereto and their respective heirs, personal and legal representatives and successors in interest.

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
NYSCEF DOC. NO. 256
INDEX NO. 652077/2017
RECEIVED NYSCEF: 11/28/2018

Case 22-01050-jsj Doc 43-19 Filed 02/14/22 Entered 02/14/22 23:05:52 Exhibit 19 of
Pg 119 of 32

**30 Lead Paint**
If applicable, the complete and fully executed Disclosure of
Information on Lead Based Paint and or Lead-Based Paint
Hazards is attached hereto and made a part hereof.

**In Witness Whereof,** the Parties hereto have duly executed this Contract as of the date first above written.

ESCROW TERMS AGREED TO:

_____
Michael J. Jones ESCROWEE

SELLER:
SHERRY 1800s, LLC

By: _____

_____

_____

PURCHASER:
**GENEVER HOLDINGS LLC**

By: _____

_____

_____

SN 0036

**FIRST RIDER ANNEXED TO AND FORMING A PART OF CONTRACT OF SALE FOR THE 18TH FLOOR KNOWN AS UNIT 1801 AT SHERRY NETHERLAND, INC., 781 FIFTH AVENUE, NEW YORK, NEW YORK, A COOPERATIVE APARTMENT BETWEEN SHERRY 1800s, LLC, AS SELLER, AND GENEVER HOLDINGS LLC, AS PURCHASER, DATED FEBRUARY 21, 2015**

31.     In the event of any conflict between the provision of this Rider or any other Rider, and the provisions of the Contract to which this Rider is attached, the provisions of this Rider shall control.

32.     In addition to the representation made by Purchaser in Paragraph 4 of this Contract, Purchaser, jointly and severally, represents and warrants to Seller that Purchaser knows of no outstanding judgments or tax liens and knows of no threatened lawsuit or claim (including criminal and/or tax proceedings).

33.     Supplementing Paragraph 20, the acceptance of the Shares and the assumption of the Lease by Purchaser and the delivery of possession of the Unit and keys by Seller shall be deemed full performance by Seller of Seller's obligations under this Contract, except any of which that survive Closing, and such acceptance and assumption by Purchaser shall discharge Seller from all terms, conditions, representations and agreements required to be performed by Seller under this Contract, except any of which that survive Closing. No liability on the part of Seller shall survive the Closing except as expressly set forth in this Contract.

34.     In the event that there is any refund on real estate taxes attributable to the time period in which Seller has owned the Unit, such refund shall belong solely to Seller. In this regard, Purchaser shall cooperate with Seller in connection with obtaining such refund and Purchaser agrees to sign any reasonable documentation to assist Seller in obtaining such refund. If such refund is delivered to Purchaser (or credited towards Purchaser's monthly maintenance by the Corporation), Purchaser shall promptly remit such refund to Seller. The Parties acknowledge that the provision of this Paragraph 34 shall survive the Closing

35.     An increase in the maintenance or the imposition of an assessment after the date hereof shall not be deemed a misrepresentation or breach by Seller hereunder. In this regard, any assessment imposed by the Corporation after the date of this Contract, shall be solely the obligation of Purchaser if such assessment is payable on or after the date of Closing,  Seller will send Purchaser a copy of any notices from the Corporation regarding material facts relating to the Corporation including any maintenance increases.

36.     A "Disclosure of Information on Lead-Based Paint and/or Lead Based Paint Hazards" is attached hereto as Exhibit A hereto. Such document may be executed in counterparts. This Contract shall be deemed executed when signed by the parties hereto notwithstanding that the Broker's signature on such Exhibit A have not yet been obtained. Purchaser acknowledges that Purchaser has received the pamphlet Protect Your Home From Lead in Your Home and Purchaser hereby waives the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards in the Unit and/or the Premises. Purchaser acknowledges that Seller has made no representations to Purchaser concerning the presence of lead paint in the Premises except in the Unit and then only to the extent expressly set forth in the attached disclosure form. Notwithstanding any requirements pursuant to any Local Law, Purchaser

SN 0037

accepts the Premises and Unit in their current "as is" condition concerning the presence of lead paint and any hazards related to same.

37.    All representations made by the Seller in the Contract or any Rider thereto are made to the best of Seller's knowledge and belief without independent investigation and shall not survive the closing.

**IN WITNESS WHEREOF**, of the parties hereto have executed this Rider to Contract of Sale as of the date first above written.

**SELLER:**

**SHERRY 1800s, LLC**

By: _____

**PURCHASER:**

**GENEVER HOLDINGS LLC**

By: _____

SN 0038

SECOND RIDER TO CONTRACT OF SALE DATED AS OF FEBRUARY _21_, 2015,
BETWEEN SHERRY 1800S LLC, AS SELLER, AND GENEVER HOLDINGS LLC, AS
PURCHASER, COVERING PREMISES LOCATED AT 781 FIFTH AVENUE, NEW YORK,
NEW YORK, 18TH FLOOR (UNITS 1801, 1804, 1807, 1809, 1811, SERVANT'S ROOM 1519)

SR1.   In case of any inconsistency or conflict between the printed portion of this
Contract or the First Rider, and the provisions of this Second Rider, the provisions of this Second
Rider shall control.

SR2.   Seller shall, promptly after receipt thereof, deliver to Purchaser copies of
any written notices from the Corporation received after the Delivery Date and relating to: (1) any
increase in the amount of the monthly Maintenance as set forth in paragraph 1.17; (2) any
intended or proposed assessment other than the Assessment; (3) any intended or proposed
changes to the "flip tax" or other transfer fee charged by the Corporation or its Managing Agent;
(4) any proposed amendment or modification of the Lease, the Certificate of Incorporation of the
Corporation or the Corporation's By-Laws; (5) any proposed construction or repair work the cost
of which is intended to be borne by the Corporation, its insurers or its shareholders; (6) any
refinancing or other material change with respect to any mortgage affecting the Premises; or (7)
any damage or casualty to the Unit or the Premises.

SR3.   Supplementing paragraph 3.3:  In the event Seller removes any light
fixtures from the Unit, such fixtures will be replaced with standard fixtures, so that no exposed
wiring or bulbs remain in place of the removed fixtures.  Seller shall, at its own expense and
prior to the Closing, remove from the Unit all furniture, furnishings and other personal property
and/or fixtures not included in this transaction and shall repair in a good and workmanlike
manner any material damage caused by such removal.  Any of Seller's personal property not
included in the sale contemplated hereby which is not removed from the Unit prior to the Closing
shall be deemed abandoned property.  Purchaser may (but shall not be obligated to) cause any
such abandoned property to be removed from the Unit at Seller's risk and expense.  The
provisions of this paragraph shall survive the Closing.

SR4.   Notwithstanding the provisions of paragraph 7 or any other provision of
this Contract to the contrary, Seller represents and warrants that the plumbing, heating, electrical
and air conditioning systems and fixtures and all Personalty shall be in working order at the
Closing, to the extent the responsibility of Seller under the Lease.

SR5.   (a)   As a material inducement to Purchaser entering into this Contract,
Seller hereby represents that Seller has obtained all necessary approvals, permits and certificates
from the Corporation and the New York City Department of Buildings for any work done by
Seller to the Unit.  Further, Seller is not obligated to perform any work or expend any monies

SN 0039

2

(other than maintenance) pursuant to any agreement (other than the Lease and other Co-op Documents) with the Corporation that would be binding on Purchaser after Closing.

(b)     Prior to Closing, Seller shall, at its sole cost and expense, cause any and all open permits against the Unit to be closed, discharged, and otherwise paid for, and shall deliver satisfactory proof of same to Purchaser. A Letter of Completion from the NYC Department of Buildings shall be deemed satisfactory proof. Notwithstanding the foregoing, Seller shall not be required to close two open permits that are listed by the New York City Department of Buildings as Job Nos. 101785169 and 101778836, copies of which Jobs are attached hereto. The parties acknowledge the reason for the prior sentence is that the Corporation has stated it will agree in writing to duly close these two open permits. In the event the Corporation does not deliver such written agreement, then Seller may either elect to close these permits, but if it does not, then either party may terminate this Contract.

(c)     Seller shall either (a) deliver to Purchaser a letter of completion from the New York City Department of Buildings evidencing that the Unit has been legally combined, or (b) at Closing, execute and file with the transfer taxes returns an affidavit stating the reasons that the Unit is properly and legally considered to be a single unit with one kitchen and that transfer tax should be paid to New York City at the rate of 1.425%. Seller shall also deliver an indemnity letter to Purchaser indemnifying Purchaser against any costs and damages (including, but not limited to penalties and interest for late payment) resulting from the City's requiring payment at a higher rate of taxation. Notwithstanding the foregoing, if (i) Seller is unable to deliver a letter of completion as set forth above, and (ii) Seller elects to pay the New York City transfer tax at the rate of 1.425% (rather than the so-called "bulk rate" of 2.625%), then Seller's attorneys shall hold in escrow the sum of $840,000 representing the difference between these rates of taxation. Seller's attorneys shall hold such sum for the shorter of (i) two (2) years (representing the current audit period for this tax by the New York City Department of Finance ("DOF"), or (ii) until such time that the Corporation delivers satisfactory written evidence from the New York City Department of Buildings (and/or other appropriate governmental entities) that the Unit has been properly and legally combined. Seller's attorneys shall either release the balance to Seller if it is determined that 1.425% was the appropriate rate of taxation, or pay this sum, plus interest and penalties, if any, in the event it is determined by DOF that 2.625% was the appropriate transfer tax rate.

SR6.     Supplementing paragraph 4.1: "4.1.10. To Seller's knowledge, Seller has not received any written notice of any major repairs or replacements contemplated to the Premises or to the building systems in the Premises (including, without limitation, the heating, plumbing and electrical systems) that could materially affect the Premises or the Unit.

"4.1.11. To Seller's knowledge, there are currently no water leaks into the Unit and there have been no such leaks during the twelve (12)- month period immediately

Doc#: US1:9841154v4

SN 0040

3

preceding the date hereof. In addition, Seller has not been notified during said twelve (12)-
month period of any water leaks elsewhere in the Premises which were purported to emanate
from the Unit."

"4.1.12 During Seller's ownership of the Unit, to Seller's knowledge,
Seller has not been aware of (a) the presence any toxic mold in either the Unit, or (b) any bedbug
infestation in the Unit."

"4.1.13 That to Seller's knowledge, there are no claims, actions, suits or
legal proceedings of any kind pending or threatened (in writing), which affect the Unit, Seller's
ownership of the Unit or which may cause a lien of any kind to be imposed against the Unit or
the Seller."

"4.1.14 To Seller's knowledge, in the last twelve (12) months, that neither
Seller, nor any person acting on behalf of Seller, has made any complaint (in writing, electronic
communication or by telephone) to the Corporation, Managing Agent, superintendent or any
other unit owner or tenant-shareholder at the Premises regarding noise, offensive odors,
offensive conduct, lack of heat or hot water, or any other disturbance or adverse condition
affecting the Unit."

SR7.    All representations, warranties and covenants of Seller set forth in this
Contract shall be true in all material respects as of the Closing, and Purchaser's obligation to
perform under this Contract is expressly conditioned upon there being no breach, inaccuracy or
misrepresentation in any of the same.

SR8.    If the Corporation approves the Purchaser's application but conditions its
consent upon Purchaser complying with requirements outside the scope of the Contract, such as
a demand for the Purchaser to deposit funds into escrow, then Purchaser may elect, in its sole
discretion, to either (i) comply with such conditions and proceed with the Purchase, or (ii)
decline to comply with such conditions. If Purchaser declines to comply, then Purchaser shall
deliver to Seller written notice of same and this Contract shall be deemed canceled, and
Escrowee shall promptly refund the Contract Deposit to Purchaser. Further, Seller acknowledges
and agrees that Purchaser shall only be required to disclose to the Corporation liquid assets of
$420,000,000.00 (more than five times the Purchase Price), with supporting documentation as
may be required by the Corporation as to the aforesaid amount (such as bank statements).
Submission by Purchaser of the foregoing shall be deemed complete for purposes of the
"Financial Statement", "Statement of Assets and Liabilities signed by Purchaser or Accountant"
and supporting "Verification of Assets" which are required by the Corporation as part of its
"Standard Transfer Requirements" Board application. Purchaser may, in its sole discretion,
decline any request by the Corporation to submit any documentation showing liquid assets in
excess of the aforesaid amount, so that in the event the Corporation rejects the Purchaser's

SN 0041

Case 1:20-cv-06501 Doc#4310 Filed 09/14/22 Entered 09/14/22 23:55:52 Exhibit 20 of
Pg 128 of 32

4

application for any reason (other than willful bad faith by Purchaser), this Contract shall be deemed canceled, and Escrowee shall promptly refund the Contract Deposit to Purchaser.

SR9.   Supplementing paragraph 11.1.1.2: Seller's obligation with respect to payment of transfer taxes shall apply to transfer taxes imposed by both the City and the State of New York. Within fourteen (14) days following the Closing, Seller shall furnish to Purchaser's attorney proof of filing of such transfer taxes. Seller shall indemnify and hold Purchaser harmless from and against any and all costs, loss or expenses incurred by Purchaser, including reasonable attorneys' fees and disbursements, by reason of Seller's failure to timely perform its obligations with respect to such transfer taxes. The provisions of this paragraph shall survive the Closing.

SR10.  Supplementing paragraph 13: "13.5 Should either party willfully default in its obligations hereunder, it shall be liable to the other for reasonable attorneys' fees and costs incurred by the other party in enforcing this Contract as determined by a court of competent jurisdiction. In the event that either party purports to cancel this Contract and Seller elects to retain the Contract Deposit as liquidated damages, the prevailing party in any subsequent lawsuit shall recover its reasonable attorneys' fees and costs from the non-prevailing party. The award of such attorneys' fees and costs shall be recoverable as actual compensatory damages in addition to the amount of the Contract Deposit and/or liquidated damages which may be payable by either party."

SR11.  Supplementing paragraph 15.1: Purchaser may also deliver a supplemental list of such Liens at a later date but not subsequent to the Closing if Purchaser becomes aware of the same at such later date.

SR12.  Supplementing paragraph 16: "16.4. Seller shall not be deemed unable to transfer the Lease and the Shares if such inability can be overcome by the payment of a sum of money by Seller not in excess of the Purchase Price less any loan payoff, brokerage commission, transfer taxes and customary closing costs."

SR13.  Seller agrees to deliver to Purchaser, at or prior to the execution of this Contract, to the extent within Seller's actual possession, all drawings and plans of the Unit, including the original floor plans, and all renderings of any proposed or completed renovations therein. In addition, Seller agrees to deliver to Purchaser, at or prior to the Closing and to the extent within Seller's actual possession, originals of all instruction manuals and all guaranties and warranty agreements affecting the Unit or any of the appliances or other personalty included in this sale, the rights under which shall be deemed assigned, to the extent assignable, to Purchaser at the Closing.

SR14.  This Contract may be executed in any number of counterparts. Each such counterpart shall for all purposes be deemed to be an original, and all such counterparts shall

SN 0042

5

together constitute and be but one and the same instrument. Facsimile signatures or scanned signatures sent by e-mail shall bind the parties.

SR15   Seller hereby agrees to cooperate with Purchaser if Purchaser elects to obtain leasehold title insurance or the Eagle 9 UCC Cooperative Interest Insurance Policy in connection with Purchaser's purchase of the Unit, including, without limitation, signing a title affidavit in the form requested by the issuer of the Eagle 9 UCC Cooperative Interest Insurance Policy.

SR16.   If for any reason the Corporation does not permit the Purchaser to purchase the Unit, then Purchaser may assign this Contract to another entity within the control of the Purchaser herein.

SR17.   Each of the parties hereto desire that this Contract and the terms thereof (the "Confidential Aspects") be kept confidential to the greatest extent practicable. Accordingly, each of the parties hereto shall, and shall instruct his or her agents, representatives and contractors to, maintain the confidentiality of the Confidential Aspects. It is understood, however, that the Confidential Aspects may be disclosed: (a) to the professional advisors of each of the parties (for example, without limitation, their attorneys and accountants), and to various other third parties (such as, for example, title insurance companies) who may be involved in aspects of the transactions or are otherwise necessary in order to consummate the transactions contemplated hereby; (b) if required to be disclosed by court order, subpoena, or other government process, or if required by law; (c) with the consent of the parties; or (d) if already in the public domain.

SR18.   Notwithstanding anything contained herein to the contrary, the parties hereby agree that the sum of (a) $67,500,000 is hereby allocated to the Purchase Price for the Unit, and that the additional sum of (b) $2,500,000 is hereby allocated to the Personalty included in the Unit. Accordingly, appropriate New York State and City transfer taxes shall be paid by the respective parties based upon the sum of $67,500,000, and, in addition, Purchaser shall pay the New York State sales tax on the Personalty, which Seller shall collect at Closing.

SR19.   Seller represents it will cause the third party sale of an additional maid's in the Building to Purchaser either prior to or simultaneously with the closing of this transaction. In the event that Purchaser is unable to buy this additional maid's room either prior to or simultaneous with the actual Closing of this transaction, Seller acknowledges that Purchaser may terminate this Contract and receive a full and prompt refund of the Contract Deposit, with interest. It is within the sole discretion of Purchaser whether to exercise or waive this option to terminate. It is also noted that the Brokers listed in this Contract shall pay for the maid's room, including costs and expenses associated therewith (including transfer taxes).

Doc#: US1:9841154v4

SN 0043

6

SR20. In the event that for any reason the parties are unable to close this transaction by March 6, 2015, then Purchaser may terminate this Contract and receive a full refund of the Contract Deposit. It is within the sole discretion of Purchaser whether to exercise or waive this option to terminate.

SR21. Seller shall pay the brokerage commissions based upon the total consideration being paid by Purchaser for both the Unit and Personalty (which is the sum of $70,000,000.00).

SHERRY 1800s LLC, Seller

Name:
Title:

GENEVER HOLDINGS LLC, Purchaser

By: _____
Ira J. Gilbert, Authorized Person

Doc#: US1:9841154v4

SN 0044

 3142—Lead paint disclosure, sale of dwelling.
24 CFR Part 35, 40 CFR Part 745, 9-6-96.

Excelsior, Publisher, NYC 10015

# Disclosure of Information on
# Lead-Based Paint and/or Lead-Based Paint Hazards
## SALES

## Lead Warning Statement

Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

## Seller's Disclosure

(a) Presence of lead-based paint and/or lead-based paint hazards *(Check (i) or (ii) below):*

   (i) ☐ Known lead-based paint and/or lead-based paint hazards are present in the housing *(explain).*

   (ii) ☒ Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the seller *(Check (i) or (ii) below):*

   (i) ☐ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing *(list documents below).*

   (ii) ☒ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

## Purchaser's Acknowledgment *(initial)*

   (c) _____ Purchaser has received copies of all information listed above.
   (d) __X__ Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home.*
   (e) _____ Purchaser has *(check (i) or (ii) below):*

   (i) ☐ received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

   (ii) ☒ waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

## Agent's Acknowledgment *(initial)*

(f) _____ Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

## Certification of Accuracy

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

SELLER Genever W Wyss LLChn    DATE     SELLER for Sherry 1800s LLC    2/18/15 DATE

PURCHASER for J. Lell, authorized rep 2-13-15 DATE     PURCHASER    DATE

AGENT    DATE     AGENT    DATE

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM

NYSCEF DOC. NO. 256

INDEX NO. 652077/2017

RECEIVED NYSCEF: 11/28/2018

Case 2:21-cv-... Doc 43-10 Filed 03/13/22 Entered 03/13/22 23:55:22 Exhibit 29 of

Pg 219 of 32

Purchase Application

Purchase Application

New York    February 26    20 15

Applicant's Name    "Miles" Kwok Ho Wan    (Genever Holdings LLC)
(Name or Names must be entered above in manner that Stock Certificate and other Documents are to be drawn.)

Applicant's Attorney    Ira Gilbert, Esq. (igilbert@paulweiss.com)    Telephone 212-373-3529

Attorney's Firm and Address    Paul, Weiss, Rifkind, Wharton, & Garrison LLP
1285 Avenue of the Americas, New York, NY 10019-6064

Seller's Name    Sherry 1800s, LLC

Seller's Attorney    Michael J. Jones, Esq.    Telephone 203-661-6000

Attorney's Firm and Address    Ivey, Barnum & O'Mara LLC
170 Mason Street, Greenwich, CT 06830

Closing Date and Time    No later than 3/6/15 at 10am    Date of Possession No later than 3/6/15

The undersigned hereby offers to purchase _____3,000_____ shares of the
capital stock of The Sherry-Netherland, Inc. and the accompanying proprietary lease for
Apartment ___1801*___ in the building located at 781 Fifth Avenue, New York, New York, on
the following terms and conditions. * and Maid's room 1519

Purchase Price of Stock $  67,500,000  Present Estimated Proprietary Rental Per
Month $ 57,085.53

Deposit $ 7,000,000   Special conditions, if any: Additional sum of $2,500,000
is allocated to the personal property included in the unit

Financing:    Yes ☐  No ☒    Amount ___None___    Bank _____
( Note: This proposal shall result in no legal obligation until a formal contract of purchase and sale is executed by the
parties concerned )

The undersigned has filled out the information sheet below and understands that this
information is essential in considering this application. It is further understood that this
application, when signed by the undersigned, is to be subject to approval by the Seller or
Authorized Representative and to the Terms and Conditions on the reverse side hereof.

Broker Seller: John Burger, Brown Harris Stevens
and Serena Boardman, Sotheby's          Signature of Purchase Applicant
Purchaser: Kathy Sloane, Brown Harris
Stevens                                 Signature of Purchase Applicant

### Information Regarding Applicant

Home Address: 16A, South Bay Road, Hong Kong    Telephone +852 2160 0888

Business Connection and Position:  President and Owner (Securities and Real Estate Investments)

Business Address: 49/F, Bank of China Tower, No.1    Telephone +852 2160 0888
Garden Road, Central Hong Kong
Names of all persons who will reside in the apartment and if children, state number and their
approximate ages: (1) Kwok Ho Wa, Purchaser (2) Ngok Hing Chi, Wife of Purchaser (3)
Guo Qiang, Son of Purchaser (4) Guo Mei, Daughter of Purchaser (5) Yaz Qinghua,
Sister of Purchaser's Wife

Names of all clubs and society memberships, fraternities and society societies to which
applicant belongs:    Mar-a-Lago Club, Palm Beach, FL
Trump Golf Course, Palm Beach, FL

Schools and colleges attended by husband, wife and children:
Mr. and Mrs. Kwok received their education in China
Guo Qiang (son of Mr. Kwok) attended Bard College

SN 0047

Names of all residents in the building known by the applicant: __None__

Does applicant wish to maintain pets, and if so please specify: __No__

References

Landlord:

Present Landlord or Agent __Own a private residence__
                    Address __16A South Bay Road, Hong Kong__

Approximate Length of Occupancy _____

Previous Landlord or Agent _____
                    Address _____

Address of previous residence and approximate length of occupancy: _____

Financial:

A.   (Bank- Personal Account) __Steven Wong__
          Address __UBS AG 52/F Two International Finance Centre, 8 Finance Street, Central, Hong Kong__

B.   (Business) __Hank Lo, Partner - Stevenson, Wong & Co.__
          Address __Central Tower, 28 Queen's Road, Central, Hong Kong__

C.   Stock Broker, C.P.A., Executor, if any _____
          Address _____

D.   For information regarding source of income contact _____
          Address _____

Personal:

1.   Name __The Rt. Hon. Tony Blair__
          Address __PO Box 60519, London W27JU UK__

2.   Name _____
          Address _____

3.   Name _____
          Address _____

4.   Name _____
          Address _____

Special Remarks:

Please give any additional information which may be pertinent or helpful. _____
Mr. and Mrs. Kwok are very impressed with The Sherry-Netherland and
look forward to making The Sherry-Netherland the principle residence for
their family.

SN 0048

Purchase Application

THE SHERRY·NETHERLAND

New York _____ 20___

Applicant's Name  KWOK Ho Wan
(Name or Names must be entered above in manner that Stock Certificate and other Documents are to be drawn.)

Applicant's Attorney  Ira J. Gilbert Esq.  Telephone (212) 373-3529

Attorney's Firm and Address Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas, New York, N.Y. 10019-6064

Seller's Name _____

Seller's Attorney _____  Telephone _____

Attorney's Firm and Address _____

Closing Date and Time_____  Date of Possession_____

The undersigned hereby offers to purchase _____ shares of the
capital stock of The Sherry-Netherland, Inc. and the accompanying proprietary lease for
Apartment _____ in the building located at 781 Fifth Avenue, New York, New York, on
the following terms and conditions.

Purchase Price of Stock $_____ Present Estimated Proprietary Rental Per
Month $_____

Deposit $ 7,000,000  Special conditions, if any: _____
_____

Financing:   Yes ☐ No ☒  Amount_____ Bank_____
( Note: This proposal shall result in no legal obligation until a formal contract of purchase and sale is executed by the
parties concerned.)

The undersigned has filled out the information sheet below and understands that this
information is essential in considering this application.  It is further understood that this
application, when signed by the undersigned, is to be subject to approval by the Seller or
Authorized Representative and to the Terms and Conditions on the reverse side hereof.

Broker_____

_____
Signature of Purchase Applicant

_____
Signature of Purchase Applicant

## Information Regarding Applicant

Home Address: 10A, South Bay Road, Hong Kong  Telephone +852

Business Connection and Position: _____

Business Address: 49/F, Bank of China Tower, No.1 Garden Road, Central, Hong Kong
Telephone +852 21600808

Names of all persons who will reside in the apartment and if children, state number and their
approximate ages: (1) KWOK Ho Wan (2) NGOK Hing Chi (Ms)
(3) Guo Qiang  (4) Guo Mei (Ms)  (5) Yue Qinghua (Ms)
(1) purchaser; (2) wife of purchaser; (3) Son of purchaser; (4) daughter of purchaser;
(5) Sister of purchaser's wife
Names of all clubs and society memberships, fraternities and honorary societies to which
applicant belongs: Mar-a-Largo Club, the Trump Golf Course
_____
_____

Schools and colleges attended by husband, wife and children: Guo Qiang (son of
Mr. Guo) had attended Bard College.
_____
_____

SN 0049

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
INDEX NO. 652077/2017

NYSCEF DOC. NO. 256

Case 1:22-cv-05867 Doc 43-12 Filed 06/14/22 Entered 06/14/22 23:05:52 Exhibit 18 of

Pg 159 of 32

RECEIVED NYSCEF: 11/28/2018

Personal Letter of Reference

From The Rt Hon Tony Blair

February 2015

Dear Ladies and Gentlemen of the Board of The Sherry Netherland,

It is my great pleasure that I am writing you this letter of reference for Miles Kwok as a potential owner in your building. I have known Miles for seven years and have only the highest respect for him in business and as a friend. I have worked closely with Miles over the years and have always admired his honesty and loyalty.

Miles is dependable, sincere and extremely responsible as an individual; conducting himself with dignity and intelligence. Miles is honest, forthright and has impeccable taste.

I would highly recommend him to your building as I know that Miles would be a wonderful addition as your neighbour at The Sherry Netherland. Miles is a very accomplished man and, in my opinion, would be a most valuable asset to The Sherry Netherland.

Tony Blair

PO Box 60519
London
W2 7JU
www.tonyblairoffice.org

SN 0051

Business Letter of Reference

SN 0052

**Stevenson, Wong & Co.**
史蒂文生黃律師事務所

In association with | AllBright Law Offices | 錦天城律師事務所

| | |
|---|---|
| Partners: | |
| Willy Y.P. Cheng•• | 鄭炎潘 |
| Hank H.F. Lo• | 勞恒晃 |
| Catherine K.G. Po••• | 清景元 |
| Eric C.H. Lui• | 呂志豪 |
| Neville J.J. Watkins•• | 韋健士 |
| Wendy W.S. Lam• | 林頴詩 |
| Lai S. Lam• | 林羅頌 |
| Cornelia W.C. Chu• | 朱寏瀅 |
| Janice L.H. Chin | 陳麗卿 |
| Heidi H.Y. Chui• | 徐凱怡 |
| Erica Y.Y. Cheng | 鄭廷蕊 |

Senior Consultant:
Angus Forsyth•• 霎霎

Consultant:
Sherlynn G. Chan 陳蓮基

• Notary Public of Hong Kong
  香港公證律師
◦ China-Appointed Attesting Officer
  中國委托公証人
♦ Civil Celebrant of Marriages
  婚姻監禮人

Our Ref : EYC/HLO(P)/75450/15

Your Ref :

Reply Fax :

Date : 17 February 2015

**BY POST**

Board of Directors of The Sherry-Netherland
The Sherry-Netherland
781 Fifth Avenue
New York, NY 10022

Dear Board members of The Sherry Netherland,

I am writing this letter of recommendation in support of the application of Mr. Kwok Ho Wan (also known as Miles Kwok) to become a resident shareholder of your cooperative.

I first met Miles when he engaged my law firm in one of his business transactions about seven years ago. I was and am a partner of my firm. We have since established a long-standing relationship. Over the years, my firm has acted for Miles in various business transactions in different areas, including project financing, fund-raising, corporate mergers and acquisitions and acquisition of aircrafts, leisure boats and properties in Hong Kong, China and different parts of the world.

Miles is a successful businessman and a polite, dependable and responsible individual who conducts himself with dignity and intelligence. Putting aside our work relations, Miles has also been a good friend of mine. Personally, I know Miles to be delightful, considerate and respectful. I trust that his personal qualities will definitely make him a good neighbor and responsible steward of your building.

In my opinion, Miles will be a valued addition to your building.

If you wish to contact me personally, please feel free to call me at +852 2533 2552.

Yours faithfully,

**Hank Lo**
Partner
STEVENSON, **WONG & CO.**

香港中環皇后大道中28號
中滙大廈4樓、5樓及1602室
4/F, 5/F & 1602, Central Tower,
28 Queen's Road Central, Hong Kong

電話 Tel: +852 2526 6311
傳真 Fax: +852 2845 0638
電郵 Email: info@sw-hk.com
www.sw-hk.com

香港 廣州 上海 北京 成都 重慶 杭州 南京 深圳 蘇州 太原 青島 廈門
Hong Kong Guangzhou Shanghai Beijing Chengdu Chongqing
Hangzhou Nanjing Shenzhen Suzhou Taiyuan Qingdao Xiamen
Member of Interlaw since 1982

SN 0053

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 256
RECEIVED NYSCEF: 11/28/2018

Case 1:15-cv-... Doc 4321... Filed 08/14/22 Entered 08/14/22 23:05:22 Exhibit 30 of
Pg 298 of 32

18 February 2015

**BY POST**

Board of Directors of The Sherry-Netherland
The Sherry-Netherland
781 Fifth Avenue
New York, NY 10022

Dear Ladies and Gentlemen of the Board of The Sherry Netherland,

It is a great pleasure for me to recommend Kwok Ho Wan, also known as Miles Kwok, to be a shareholder in The Sherry-Netherland, Inc. and a resident in your building. I am a managing director of the Wealth Management and Swiss Bank Department at UBS AG and attach my name card for your kind reference. I have known Miles for about five years since he first began working with UBS AG. Miles has since been working with us in the areas of securities investment and also in financing his various projects in areas such as aircraft acquisitions.

Miles has been a successful and accomplished entrepreneur who has developed and managed a number of companies, both domestically and internationally. Over the years, Miles has earned his credibility in our bank. He is very reliable and always fulfills his repayment obligations. For this reason, our bank is happy to have him as our long-term client.

From a personal standpoint, Miles is a sincere and modest gentleman with a warm heart. He is financially sound but very humble. He is also one of the most intelligent, genuine and respectful people I have ever known.

Based on my long standing relationship with Miles, I do recommend Miles to be a shareholder in your cooperative and a resident in your building. I am sure your community will be pleased to have him and his family join you at The Sherry.

If you have any questions, please do not hesitate to contact me at stephen-kc.wong@ubs.com.

Yours faithfully,

**Stephen Wong**

SN 0054

Financial Letter of Reference

SN 0055

Case 2:25-cv-00073   Doc 43-10   Filed 06/24/22   Entered 06/24/22 23:55:32   Exhibit 10 of
Pg 139 of 32

⊕⊕ UDS

UDS

Hong Kong Branch
52/F Two International Finance Centre
8 Finance Street,
Central, Hong Kong
Tel. +852-2971 8888
Fax +852-2971 8001

Feb. 23, 2015

Board of Directors of the Sherry-Netherland
The Sherry-Netherland
781 Fifth Avenue
New York, NY 10022

Dear Sirs,

### Bank Reference – [Application for Real Estate Investments]

We have been asked to provide a reference letter in connection with Application for Real Estate Investments. We confirm that:

**Kwok Ho Wan**
[client's ID: P746467(7)]

has been a client of ours through a personal investment company since July 2012 and during this time Mr. Kwok Ho Wan has had a satisfactory banking relationship with us. As at 18 Feb, 2015, the funds involved in this banking relationship is not less than USD400, 000,000.

The above information is based on our experience of this banking relationship as at current date and is given in confidence for your private use only, without any responsibility on the part of UBS AG or its employees. This letter may only be used in the business context outlined at the beginning of this letter and does not constitute a guarantee or any other obligation on the part of UBS AG. In particular, we are under no obligation to inform you of any subsequent change of circumstances in this banking relationship.

Yours faithfully,
For and on behalf of
UBS AG Hong Kong Branch

Tommy Cheung
Managing Director

Stephen Wong
Managing Director

**SN 0056**



FIFTH AVENUE

# EXHIBIT 11

# Genever Holdings LLC


## Corporate Documents

SN 0155

# LIABILITY COMPANY AGREEMENT

## OF

## GENEVER HOLDINGS LLC

LIMITED LIABILITY COMPANY AGREEMENT made as of the 17th day of February, 2015 by and among (a) GENEVER HOLDINGS LLC (the "Company"), and (b) the persons identified on Schedule A as members of the Company (hereinafter referred to as the "Members" and each individually, a "Member").

The Members are entering into this Agreement in order to form the Company as a New York limited liability company by organizing the Company in accordance with the New York Limited Liability Company Law, as amended from time to time (the "Act").

The parties hereto desire to set forth the terms and conditions for the operation of the Company. This Agreement sets forth fully the agreements and understandings of the Members in respect of the Company.

NOW, THEREFORE, in consideration of the covenants and agreements hereinafter set forth, the parties hereto agree as follows:

1.  Definitions.

1.1   "Family Group," with respect to any Member, includes (i) with respect to any Member who is an individual, such Member's spouse and descendants, (ii) with respect to any Member that is a trust, any beneficiary of the trust and the spouse and descendants of any beneficiary and (iii) with respect to any Member that is an entity, any beneficial owner of such entity and the spouse and descendants of any such beneficial owner.

1.2   "Membership Interest" means the ownership interest of a Member in the Company. The Membership Interest of each of the Members as of the date hereof is set forth on Schedule A.

1.3   "Property" shall have the meaning set forth in Section 5.

2.  Name. The name of the Company shall be GENEVER HOLDINGS LLC.

3.  Articles; Certificates. The Members, from time to time as such Members deem advisable, may, by written instrument, elect one or more additional natural persons and designate them as "authorized persons" of the Company. The Members or any officer or authorized person shall execute, deliver and file any other articles and/or certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
NYSCEF DOC. NO. 252

INDEX NO. 652077/2017
RECEIVED NYSCEF: 11/28/2018

Case 22-0255000 Doc 4342 Filed 08/14/22 Entered 08/14/22 23:54:52 Exhibit 44 of
Pg 145 of 53

## GENEVER HOLDINGS CORPORATION

## GENEVER HOLDINGS LLC

Designation of Authorized Person

The undersigned, being an Authorized Person of Genever Holdings Corporation, a British Virgin Islands limited company (the "Corporation"), hereby makes the following delegation of authority:

**THE AUTHORIZED PERSON** hereby designates each of Ira Gilbert, Esq. and Steven Simkin, Esq., acting alone or jointly, as an "Authorized Person" of Genever Holdings LLC ( "Genever New York"), a New York limited liability company of which the Corporation is the sole member, and delegates authority to and directs each of them to enter into a purchase agreement with Sherry 1800s LLC, as seller, for the purchase of certificates of stock in The Sherry-Netherland, Inc., a cooperative apartment located at 781 Fifth Avenue, New York City, New York (the "Sherry-Netherland") with respect to UNITS 1801, 1804, 1807, 1809, 1811, and Servant's Room 1519) on terms and conditions as have been discussed among representatives of the Corporation and Genever New York and the director and sole shareholder of the Corporation. This authority is non-delegable by either of Messrs. Gilbert and Simkin.

**Pursuant to this designation of authorized person,** Messrs. Gilbert and Simkin are each authorized to take such other actions and make such revisions to the purchase documents as such person deems advisable or necessary in order to carry out the actions authorized in this designation, the approval of such revised documents being evidence of such authorized person's determination.

Dated as of February 17, 2015

Michael F. O'Connor
Authorized Person

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
NYSCEF DOC. NO. 232

INDEX NO. 652077/2017
RECEIVED NYSCEF: 11/28/2018

Case 0:16-cv-01-mj   Doc 43211   Filed 08/18/22   Entered 08/18/22 23:65:52   Exhibit 15 of
Pg 595 of 53

# British Virgin Islands

# Certificate of Incorporation

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM INDEX NO. 652077/2017

NYSCEF DOC. NO. 252          Case 22-50073  Doc 4321  Filed 05/14/22  Entered 05/14/22 23:55:52  Exhibit 146 of  RECEIVED NYSCEF: 11/28/2018

Pg 691 53

TERRITORY OF THE BRITISH VIRGIN ISLANDS
BVI BUSINESS COMPANIES ACT, 2004



15CB941585

CERTIFICATE OF INCORPORATION
(SECTION 7)

The REGISTRAR of CORPORATE AFFAIRS, of the British Virgin Islands HEREBY CERTIFIES, that pursuant to the BVI Business Companies Act, 2004, all the requirements of the Act in respect of incorporation having been complied with,

**Genever Holdings Corporation**

BVI COMPANY NUMBER: 1862840

is incorporated in the BRITISH VIRGIN ISLANDS as a BVI BUSINESS COMPANY, this 13th day of February, 2015.



*for* **REGISTRAR OF CORPORATE AFFAIRS**
13th day of February, 2015

SN 0159

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 252
Case 1:16-cv-00003   Doc 43211   Filed 08/14/22   Entered 08/14/22 23:55:52   Exhibit 17 of
Pg 190 of 53
RECEIVED NYSCEF: 11/28/2018

# British Virgin Islands

## Share Certificate

SN 0160



Incorporated under the BVI Business Companies Act, 2004

Number of certificate

1

Number of shares

1,000

**Genever Holdings Corporation**

This is to certify that **Ho Wan Kwok** of 49th Floor, Bank of China Tower, No. 1 Garden Road, Central, Hong Kong is the registered holder of **One Thousand (1,000) Ordinary shares** with **USD$0.001 par value** each being fully paid in the above-named company, subject to the Memorandum and Articles of Association of the company.

Given under the seal of the company dated 13 February 2015.

For and on behalf of
Elian First Director (BVI) Limited
**Director**

SN 0161

# British Virgin Islands

# Director Registry

SN 0162

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
NYSCEF DOC. NO. 252

INDEX NO. 652077/2017
RECEIVED NYSCEF: 11/28/2018

Case 1:18-cv-02645 Doc 43211 Filed 08/14/22 Entered 08/14/22 23:55:22 Exhibit 50 of
Pg 109 of 53

Client Register of Directors
OG BVI Live

18. February 2015
Page    1
faull

## Genever Holdings Corporation

### Current Directors

| Formal Name | Mr Ho Wan Kwok | | |
|---|---|---|---|
| Residential Address | 49th Floor | | |
| | Bank of China Tower | Statutory Ref. | |
| | No.1 Garden Road | Occupation | Investor |
| | CENTRAL | Nationality | Chinese |
| | Hong Kong | Date of Birth | 10/05/68 |
| | | Date Appointed | 13/02/15 |
| | | Notes | |

### Former Names
Surname
Forename

### Current Secretary

| Company Name | Elian Secretaries (BVI) Limited | | |
|---|---|---|---|
| Place Of | British Virgin Islands | | |
| Incorporation | | Statutory Ref. | |
| Principal Office | Nemours Chambers | Date Appointed | 13/02/15 |
| | Road Town | Notes | |
| | Tortola VG1110 | | |
| | British Virgin Islands | | |

### Former Names
Previous Name

### Former Directors

| Company Name | Elian First Director (BVI) Limited | | |
|---|---|---|---|
| Place Of | British Virgin Islands | | |
| Incorporation | | Date Appointed | 13/02/15 |
| Principal Office | Nemours Chambers | Date Resigned | 13/02/15 |
| | Road Town | Notes | |
| | Tortola VG1110 | | |
| | British Virgin Islands | | |

### Former Names
Previous Name

SN 0163

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM

INDEX NO. 652077/2017

NYSCEF DOC. NO. 232

RECEIVED NYSCEF: 11/28/2018

Case 1:16-cv-... Doc 43211 Filed 08/18/22 Entered 08/18/22 23:55:52 Exhibit 51 of

Pg 119 of 53

# British Virgin Islands

# Bylaws

SN 0164

No: 1862840



**British Virgin Islands**

**The BVI Business Companies Act 2004**



MEMORANDUM OF ASSOCIATION
ARTICLES OF ASSOCIATION
OF

Genever Holdings Corporation

A BVI BUSINESS COMPANY
INCORPORATED 13 FEBRUARY **2015**

**Elian Fiduciary Services (BVI) Limited**
Nemours Chambers
Road Town, Tortola
British Virgin Islands VG1110

Regulated by the British Virgin Islands Financial Services Commission.



-15520821-2

SN 0165

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
NYSCEF DOC. NO. 252

INDEX NO. 652077/2017
RECEIVED NYSCEF: 11/28/2018

Case 22-cv-05010 Doc 43-11 Filed 09/14/22 Entered 09/14/22 23:55:58 Exhibit 53 of

Pg 199 of 53

Territory of the British Virgin Islands

The BVI Business Companies Act 2004

Memorandum of Association

of

Genever Holdings Corporation

a company limited by Shares

**1    Name**

1.1    The name of the Company is Genever Holdings Corporation.

**2    Status**

2.1    The Company is a company limited by Shares,

**3    Registered office and registered agent**

3.1    The first registered office of the Company is at Nemours Chambers, Road Town, Tortola, British Virgin Islands, the office of the first registered agent.

3.2    The first registered agent of the Company is Elian Fiduciary Services (BVI) Limited of Nemours Chambers, Road Town, Tortola, British Virgin Islands.

3.3    The Company may change its registered office or registered agent by a resolution of directors or a resolution of members. The change shall take effect upon the Registrar registering a notice of change filed under section 92 of the Act.

**4    Capacity and power**

4.1    The Company has, subject to the Act and any other British Virgin Islands legislation for the time being in force, irrespective of corporate benefit:

(a)    full capacity to carry on or undertake any business or activity, do any act or enter into any transaction; and

(b)    for the purposes of 4.1(a), full rights, powers and privileges.

4.2    There are subject to clause 4.1 no limitations on the business that the Company may carry on.

-15520821-2

SN 0166

**5      Number and classes of Shares**

5.1     The Company is authorised to issue a maximum of 50,000 Shares of US$0.001 par value each of a single class.

5.2     The Company may issue fractional Shares and a fractional Share shall have the corresponding fractional rights, obligations and liabilities of a whole Share of the same class or series of Shares.

**6      Designations powers preferences of Shares**

6.1     Each Share in the Company confers upon the Member:

(a)     the right to one vote at a meeting of the Members of the Company or on any Resolution of Members;

(b)     the right to an equal Share in any dividend paid by the Company; and

(c)     the right to an equal Share in the distribution of the surplus assets of the Company on its liquidation.

6.2     The directors may at their discretion by Resolution of Directors redeem, purchase or otherwise acquire all or any of the Shares in the Company subject to Regulation 3 of the Articles.

**7      Variation of rights**

The rights attached to Shares as specified in Clause 6 may only, whether or not the Company is being wound up, be varied with the consent in writing of or by a resolution passed at a meeting by the holders of more than 50 per cent of the issued Shares of that class.

**8      Rights not varied by the issue of Shares pari passu**

The rights conferred upon the holders of the Shares of any class issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the Shares of that class, be deemed to be varied by the creation or issue of further Shares ranking pari passu therewith.

**9      Registered Shares**

9.1     The Company shall issue registered Shares only.

9.2     The Company is not authorised to issue bearer Shares, convert registered Shares to bearer Shares or exchange registered Shares for bearer Shares.

-15520821-2

SN 0167

**10      Transfer of Shares**

10.1     A Share may, subject to the provisions of the Articles, be transferred subject to the prior or subsequent approval of the Company contained in a Resolution of Members or a Resolution of Directors.

10.2     The Members and/or the directors may in their absolute and unfettered discretion refuse to approve any intended transfer of a Share.

**11      Amendment of memorandum and articles**

11.1     The Company may amend its Memorandum or Articles by a Resolution of Members or by a Resolution of Directors, save that no amendment may be made by a Resolution of Directors:

  (a)     to restrict the rights or powers of the Members to amend the Memorandum or Articles;

  (b)     to change the percentage of Members required to pass a Resolution of Members to amend the Memorandum or Articles;

  (c)     in circumstances where the Memorandum or Articles cannot be amended by the Members; or

  (d)     to Clauses 7 or 8 or this Clause 11.

**12      Definitions and interpretation**

12.1     In this Memorandum of Association and the attached Articles of Association, if not inconsistent with the subject or context:

**Act** means the BVI Business Companies Act and includes the regulations made under the Act;

**Articles** means the attached Articles of Association of the Company;

**Chairman of the Board** has the meaning specified in Regulation 13;

**Distribution** in relation to a distribution by the Company means the direct or indirect transfer of an asset, other than Shares, to or for the benefit of a Member in relation to Shares held by a Member, and whether by means of a purchase of an asset, the redemption or other acquisition of Shares, a distribution of indebtedness or otherwise, and includes a dividend;

**Eligible Person** means individuals, corporations, trusts, the estates of deceased individuals, partnerships and unincorporated associations of persons;

**Member** means an Eligible Person whose name is entered in the register of members of the Company as the holder of one or more Shares or fractional Shares;

3

-15520821-2

SN 0168

**Memorandum** means this Memorandum of Association of the Company;

**Resolution of Directors** means either:

(a)     a resolution approved at a duly convened and constituted meeting of directors of the Company or of a committee of directors of the Company by the affirmative vote of a majority of the directors present at the meeting who voted except that where a director is given more than one vote, he shall be counted by the number of votes he casts for the purpose of establishing a majority; or

(b)     a resolution consented to in writing by all directors or by all Members of a committee of directors of the Company, as the case may be;

**Resolution of Members** means either:

(a)     a resolution approved at a duly convened and constituted meeting of the Members of the Company by the affirmative vote of a majority of the votes of the Shares entitled to vote thereon which were present at the meeting and were voted; or

(b)     a resolution consented to in writing by a majority of the votes of Shares entitled to vote thereon;

**Seal** means any seal which has been duly adopted as the common seal of the Company;

**Securities** means Shares and debt obligations of every kind of the Company, and including without limitation options, warrants and rights to acquire Shares or debt obligations;

**Share** means a Share issued or to be issued by the Company;

**Treasury Share** means a Share that was previously issued but was repurchased, redeemed or otherwise acquired by the Company and not cancelled; and

**written** or any term of like import includes information generated, sent, received or stored by electronic, electrical, digital, magnetic, optical, electromagnetic, biometric or photonic means, including electronic data interchange, electronic mail, telegram, telex or telecopy, and "in writing" shall be construed accordingly.

12.2     In the Memorandum and the Articles, unless the context otherwise requires a reference to:

(a)     a Regulation is a reference to a regulation of the Articles;

(b)     a Clause is a reference to a clause of the Memorandum;

(c)     voting by Member is a reference to the casting of the votes attached to the Shares held by the Member voting;

-15520821-2

SN 0169

 

(d)      the Act, the Memorandum or the Articles is a reference to the Act or those documents as amended; and

(e)      the singular includes the plural and vice versa.

12.3     Any words or expressions defined in the Act unless the context otherwise requires bear the same meaning in the Memorandum and Articles unless otherwise defined herein.

12.4     Headings are inserted for convenience only and shall be disregarded in interpreting the Memorandum and Articles.

We, Elian Fiduciary Services (BVI) Limited of Nemours Chambers, Road Town, Tortola, British Virgin Islands, for the purpose of incorporating a BVI business company under the laws of the British Virgin Islands hereby sign this Memorandum of Association.

Dated the 13th day of February, 2015

Incorporator

**Signed for and on behalf of** Elian Fiduciary Services (BVI) Limited of Nemours Chambers, Road Town, Tortola, British Virgin Islands

| | |
|---|---|
| Signature of authorised signatory | Signature of authorised signatory |
| **Charlotte Bailey** | **Susan Palmer** |
| **Print name** | **Print name** |

-15520821-2

SN 0170

Territory of the British Virgin Islands

The BVI Business Companies Act 2004

Articles of Association

of

Genever Holdings Corporation

a company limited by Shares

**1    Registered Shares**

1.1    Every Member is entitled to a certificate signed by a director of the Company or under the Seal specifying the number of Shares held by him and the signature of the director and the Seal may be facsimiles.

1.2    Any Member receiving a certificate shall indemnify and hold the Company and its directors and officers harmless from any loss or liability which it or they may incur by reason of any wrongful or fraudulent use or representation made by any person by virtue of the possession thereof. If a certificate for Shares is worn out or lost it may be renewed on production of the worn out certificate or on satisfactory proof of its loss together with such indemnity as may be required by a Resolution of Directors.

1.3    If several Eligible Persons are registered as joint holders of any Shares, any one of such Eligible Persons may give an effectual receipt for any Distribution.

**2    Shares**

2.1    Shares and other Securities may be issued and option to acquire Shares or other Securities may be granter at such times, to such Eligible Persons, for such consideration and on such terms as the directors may by Resolution of Directors determine.

2.2    Section 46 of the Act does not apply to the Company.

2.3    A Share may be issued for consideration in any form, including money, a promissory note, real property, personal property (including goodwill and know-how) or a contract for future services.

2.4    No Shares may be issued for a consideration other than money, unless a Resolution of Directors has been passed stating:

(a)    the amount to be credited for the issue of the Shares;

(b)    their determination of the reasonable present cash value of the non-money consideration for the issue; and

6                              -15520821-2

SN 0171

(c)    that, in their opinion, the present cash value of the non-money consideration for the issue is not less than the amount to be credited for the issue of the Shares.

(d)    The Company shall keep a register (**register of members**) containing:

(e)    the names and addresses of the persons who hold Shares;

(f)    the number of each class and series of Shares held by each Member;

(g)    the date on which the name of each Member was entered in the register of members; and

(h)    the date on which any Eligible Person ceased to be a Member.

2.5    The register of members may be in any such form as the directors may approve, but if it is in magnetic, electronic or other data storage form, the Company must be able to produce legible evidence of its contents. Until the directors otherwise determine, the magnetic, electronic or other data storage form shall be the original register of members.

2.6    A Share is deemed to be issued when the name of the Member is entered in the register of members.

**3    Forfeiture**

3.1    Shares that are not fully paid on issue are subject to the forfeiture provisions set forth in this Regulation and for this purpose Shares issued for a promissory note or a contract for future services are deemed to be not fully paid.

3.2    A written notice of call specifying the date for payment to be made shall be served on the Member who defaults in making payment in respect of the Shares.

3.3    The written notice of call referred to in Regulation 3.1 shall name a further date not earlier than the expiration of 14 days from the date of service of the notice on or before which the payment required by the notice is to be made and shall contain a statement that in the event of non-payment at or before the time named in the notice the Shares, or any of them, in respect of which payment is not made will be liable to be forfeited.

3.4    Where a written notice of call has been issued pursuant to Regulation 3.2 and the requirements of the notice have not been complied with, the directors may, at any time before tender of payment, forfeit and cancel the Shares to which the notice relates.

3.5    The Company is under no obligation to refund any moneys to the Member whose Shares have been cancelled pursuant to Regulation 3.3 and that Member shall be discharged from any further obligation to the Company.

-15520821-2

SN 0172

Case 1:22-cv-02903 Doc 43211 Filed 05/18/22 Entered 05/18/22 23:54:52 Exhibit 60
Pg 209 of 53

**4    Transfer of Shares**

4.1    Subject to the Memorandum Shares may be transferred by a written instrument of transfer signed by the transferor and containing the name and address of the transferee, which shall be sent to the Company for registration.

4.2    The transfer of a Share is effective when the name of the transferee is entered on the register of members.

4.3    If the directors of the Company are satisfied that an instrument of transfer relating to Shares has been signed but that the instrument has been lost or destroyed, they may resolve by Resolution of Directors:

(a)    to accept such evidence of the transfer of Shares as they consider appropriate; and

(b)    that the transferee's name should be entered in the register of members notwithstanding the absence of the instrument of transfer.

4.4    Subject to the Memorandum, the personal representative of a deceased Member may transfer a Share even though the personal representative is not a Member at the time of the transfer.

**5    Distributions**

5.1    The directors of the Company may, by Resolution of Directors, authorise a distribution at a time and of an amount they think fit if they are satisfied, on reasonable grounds, that, immediately after the distribution, the value of the Company's assets will exceed its liabilities and the Company will be able to pay its debts as they fall due.

5.2    Dividends may be paid in money, Shares, or other property.

5.3    Notice in writing of any dividend that may have been declared shall be given to each Member in accordance with Regulation 21 and all dividends unclaimed for 3 years after notice shall have been given to a Member may be forfeited by Resolution of Directors for the benefit of the Company.

5.4    No dividend shall bear interest as against the Company and no dividend shall be paid on Treasury Shares.

**6    Redemption of Shares and Treasury Shares**

6.1    The Company may purchase, redeem or otherwise acquire and hold its own Shares save that the Company may not purchase, redeem or otherwise acquire its own Shares without the consent of Member whose Shares are to be purchased, redeemed or otherwise acquired unless the Company is permitted by the Act or any other provision in the Memorandum or Articles to purchase, redeem or otherwise acquire the Shares without such consent.

8                                                          -15520821-2

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
INDEX NO. 652077/2017

NYSCEF DOC. NO. 252
RECEIVED NYSCEF: 11/28/2018

Case 1:22-cv-03503 Doc 43-11 Filed 09/14/22 Entered 09/14/22 23:55:52 Exhibit 61 of

Pg 198 of 53

6.2 The purchase redemption or other acquisition by the Company of its own Shares is deemed not to be a distribution where:

6.3 The Company purchases, redeems or otherwise acquires the Shares pursuant to a right of a Member to have his Shares redeemed or to have his Shares exchanged for money or other property of the Company, or

6.4 The Company purchases, redeems or otherwise acquires the Shares by virtue of the provisions of section 179 of the Act.

6.5 Sections 60, 61 and 62 of the Act shall not apply to the Company.

6.6 Shares that the Company purchases, redeems or otherwise acquires pursuant to this Regulation may be cancelled or held as Treasury Shares except to the extent that such Shares are in excess of 50 percent of the issued Shares in which case they shall be cancelled but they shall be available for reissue.

6.7 All rights and obligations attaching to a Treasury Share are suspended and shall not be exercised by the Company while it holds the Share as a Treasury Share.

6.8 Treasury Shares may be disposed of by the Company on such terms and conditions (not otherwise inconsistent with the Memorandum and Articles) as the Company may by Resolution of Directors determine.

6.9 Where Shares are held by another body corporate of which the Company holds, directly or indirectly, Shares having more than 50 percent of the votes in the election of directors of the other body corporate, all rights and obligations attaching to the Shares held by the other body corporate are suspended and shall not be exercised by the other body corporate.

**7      Mortgages and charges of Shares**

7.1 A Member may by an instrument in writing mortgage or charge his Shares.

7.2 There shall be entered in the register of members at the written request of the Member:

(a)     a statement that the Shares held by him are mortgaged or charged;

(b)     the name of the mortgagee or chargee; and

(c)     the date on which the particulars specified in 7.2(a) and 7.2(b) are entered in the register of members.

(d)     Where particulars of a mortgage or charge are entered in the register of members, such particulars may be cancelled:

(e)     with the written consent of the named mortgagee or chargee or anyone authorised to act on his behalf; or

9                                          -15520821-2

SN 0174

(f)     upon evidence satisfactory to the directors of the discharge of the liability secured by the mortgage or charge and the issue of such indemnities as the directors shall consider necessary or desirable.

(g)     Whilst particulars of a mortgage or charge over Shares are entered in the register of members pursuant to this Regulation:

(h)     no transfer of any Share the subject of those particulars shall be effected;

(i)     the Company may not purchase, redeem or otherwise acquire any such Share; and

    (i)     no replacement certificate shall be issued in respect of such Shares,

    (ii)    without the written consent of the named mortgagee or chargee.

## 8      Meetings and consents of Members

8.1     Any director of the Company may convene meetings of the Members at such times and in such manner and places within or outside the British Virgin Islands as the director considers necessary or desirable.

8.2     Upon the written request of Members entitled to exercise 30 per cent or more of the voting rights in respect of the matter for which the meeting is requested the directors shall convene a meeting of Members.

8.3     The director convening a meeting shall give not less than 7 days' written notice of a meeting of Members to:

(a)     those Members whose names on the date the notice is given appear as Members in the register of members of the Company and are entitled to vote at the meeting; and

(b)     the other directors.

8.4     The director convening a meeting of Members may fix as the record date for determining those Members that are entitled to vote at the meeting the date notice is given of the meeting, or such other date as may be specified in the notice, being a date not earlier than the date of the notice.

8.5     A meeting of Members held in contravention of the requirement to give notice is valid if Members holding at least 90 per cent of the total voting rights on all the matters to be considered at the meeting have waived notice of the meeting and, for this purpose, the presence of a Member at the meeting shall constitute waiver in relation to all the Shares which that Member holds.

8.6     The inadvertent failure of a director who convenes a meeting to give notice of a meeting to a Member or another director, or the fact that a Member or another director has not received notice, does not invalidate the meeting.

-15520821-2

SN 0175

8.7   A Member may be represented at a meeting of Members by a proxy who may speak and vote on behalf of the Member.

8.8   The instrument appointing a proxy shall be produced at the place designated for the meeting before the time for holding the meeting at which the person named in such instrument proposes to vote.

8.9   The instrument appointing a proxy shall be in substantially the following form or such other form as the chairman of the meeting shall accept as properly evidencing the wishes of the Member appointing the proxy.

**[Name of Company]**

I/We being a Member of the above Company HEREBY APPOINT [ ] or failing him [ ] of [ ] to be my/our proxy to vote for me/us at the meeting of Members to be held on the [ ] day of [ ], 20[ ] and at any adjournment thereof.

(Any restrictions on voting to be inserted here.)

Signed this [ ] day of [ ], 20[ ].

...................................

Member

8.10   The following applies where Shares are jointly owned:

(a)   if two or more persons hold Shares jointly each of them may be present in person or by proxy at a meeting of Members and may speak as a Member;

(b)   if only one of the joint owners is present in person or by proxy he may vote on behalf of all joint owners; and

(c)   if two or more of the joint owners are present in person or by proxy they must vote as one and in the event of disagreement between any of the joint owners of Shares then the vote of the joint owner whose name appears first (or earliest) in the register of members in respect of the relevant Shares shall be recorded as the vote attributable to the Shares.

8.11   A Member shall be deemed to be present at a meeting of Members if he participates by telephone or other electronic means and all Members participating in the meeting are able to hear each other.

8.12   A meeting of Members is duly constituted if, at the commencement of the meeting, there are present in person or by proxy not less than 50 per cent of the votes of the Shares entitled to vote on Resolutions of Members to be considered at the meeting. If the Company has two or

-15520821-2

SN 0176

more classes of Shares, a meeting may be quorate for some purposes and not for others. A quorum may comprise a single Member or proxy and then such person may pass a Resolution of Members and a certificate signed by such person accompanied where such person holds a proxy by a copy of the proxy instrument shall constitute a valid Resolution of Members.

8.13  If within two hours from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Members, shall be dissolved; in any other case it shall stand adjourned to the next business day in the jurisdiction in which the meeting was to have been held at the same time and place, and if at the adjourned meeting there are present within one hour from the time appointed for the meeting in person or by proxy not less than one third of the votes of the Shares or each class or series of Shares entitled to vote on the matters to be considered by the meeting, those present shall constitute a quorum but otherwise the meeting shall be dissolved.

8.14  At every meeting of Members, the Chairman of the Board shall preside as chairman of the meeting. If there is no Chairman of the Board or if the Chairman of the Board is not present at the meeting, the Members present shall choose one of their number to be the chairman. If the Members are unable to choose a chairman for any reason, then the person representing the greatest number of voting Shares present in person or by proxy at the meeting shall preside as chairman failing which the oldest individual Member or representative of a Member present shall take the chair.

8.15  The chairman may, with the consent of the meeting, adjourn any meeting from time to time, and from place to place.

8.16  At any meeting of the Members the chairman is responsible for deciding in such manner as he considers appropriate whether any resolution proposed has been carried or not and the result of his decision shall be announced to the meeting and recorded in the minutes of the meeting. If the chairman has any doubt as to the outcome of the vote on a proposed resolution, he shall cause a poll to be taken of all votes cast upon such resolution. If the chairman fails to take a poll then any Member present in person or by proxy who disputes the announcement by the chairman of the result of any vote may immediately following such announcement demand that a poll be taken and the chairman shall cause a poll to be taken. If a poll is taken at any meeting, the result shall be announced to the meeting and recorded in the minutes of the meeting.

8.17  Subject to the specific provisions contained in this Regulation for the appointment of representatives of Members other than individuals the right of any individual to speak for or represent a Member shall be determined by the law of the jurisdiction where, and by the documents by which, the Member is constituted or derives its existence. In case of doubt, the directors may in good faith seek legal advice and unless and until a court of competent jurisdiction shall otherwise rule, the directors may rely and act upon such advice without incurring any liability to any Member or the Company.

-15520821-2

SN 0177

8.18    Any Member other than an individual may by resolution of its directors or other governing body authorise such individual as it thinks fit to act as its representative at any meeting of Members or of any class of Members, and the individual so authorised shall be entitled to exercise the same rights on behalf of the Member which he represents as that Member could exercise if it were an individual.

8.19    The chairman of any meeting at which a vote is cast by proxy or on behalf of any Member other than an individual may at the meeting but not thereafter call for a notarially certified copy of such proxy or authority which shall be produced within 7 days of being so requested or the votes cast by such proxy or on behalf of such Member shall be disregarded.

8.20    Directors of the Company may attend and speak at any meeting of Members and at any separate meeting of the holders of any class or series of Shares.

8.21    An action that may be taken by the Members at a meeting may also be taken by a Resolution of Members consented to in writing, without the need for any prior notice. If any Resolution of Members is adopted otherwise than by the unanimous written consent of all Members, a copy of such resolution shall forthwith be sent to all Members not consenting to such resolution. The consent may be in the form of counterparts, each counterpart being signed by one or more Members. If the consent is in one or more counterparts, and the counterparts bear different dates, then the resolution shall take effect on the earliest date upon which Eligible Persons holding a sufficient number of votes of Shares to constitute a Resolution of Members have consented to the resolution by signed counterparts.

**9       Directors**

9.1     The first directors of the Company shall be appointed by the first registered agent within 30 days of the incorporation of the Company, and thereafter, the directors shall be elected by Resolution of Members or by Resolution of Directors for such term as the Members or directors determine.

9.2     No person shall be appointed as a director of the Company unless he has consented in writing to act as a director.

9.3     The minimum number of directors shall be one and there shall be no maximum number of directors.

9.4     Each director holds office for the term, if any, fixed by the Resolution of Members or Resolution of Directors appointing him, or until his earlier death, resignation or removal. If no term is fixed on the appointment of a director, the director serves indefinitely until his earlier death, resignation or removal.

9.5     A director may be removed from office with or without cause by,

        (a)     a Resolution of Members passed at a meeting of Members called for the purposes of removing the director or for purposes including the removal of the director or by a

-15520821-2

SN 0178

written resolution passed by a least seventy five per cent of the Members of the Company entitled to vote; or

(b)    a Resolution of Directors passed at a meeting of directors.

9.6    A director may resign his office by giving written notice of his resignation to the Company and the resignation has effect from the date the notice is received by the Company at the office of its registered agent or from such later date as may be specified in the notice. A director shall resign forthwith as a director if he is, or becomes, disqualified from acting as a director under the Act.

9.7    The directors may at any time appoint any person to be a director either to fill a vacancy or as an addition to the existing directors. Where the directors appoint a person as director to fill a vacancy, the term shall not exceed the term that remained when the person who has ceased to be a director ceased to hold office.

9.8    A vacancy in relation to directors occurs if a director dies or otherwise ceases to hold office prior to the expiration of his term of office.

9.9    The Company shall keep a register of directors containing:

(a)    the names and addresses of the persons who are directors of the Company;

(b)    the date on which each person whose name is entered in the register was appointed as a director of the Company;

(c)    the date on which each person named as a director ceased to be a director of the Company; and

(d)    such other information as may be prescribed by the Act.

9.10    The register of directors may be kept in any such form as the directors may approve, but if it is in magnetic, electronic or other data storage form, the Company must be able to produce legible evidence of its contents. Until a Resolution of Directors determining otherwise is passed, the magnetic, electronic or other data storage shall be the original register of directors.

9.11    The directors may, by a Resolution of Directors, fix the emoluments of directors with respect to services to be rendered in any capacity to the Company.

9.12    A director is not required to hold a Share as a qualification to office.

**10    Powers of directors**

10.1    The business and affairs of the Company shall be managed by, or under the direction or supervision of, the directors of the Company. The directors of the Company have all the powers necessary for managing, and for directing and supervising, the business and affairs of

-15520821-2

SN 0179

the Company. The directors may pay all expenses incurred preliminary to and in connection with the incorporation of the Company and may exercise all such powers of the Company as are not by the Act or by the Memorandum or the Articles required to be exercised by the Members.

10.2    If the Company is the wholly owned subsidiary of a holding company, a director of the Company may, when exercising powers or performing duties as a director, act in a manner which he believes is in the best interests of the holding company even though it may not be in the best interests of the Company.

10.3    If the Company is a subsidiary, but not a wholly owned subsidiary, of a holding company, and the shareholders other than the holding company agree in advance, a director of the Company may, when exercising powers or performing duties as a director in connection with the carrying out of the joint venture, act in a manner which he believes is in the best interests of a Member or some Members even though it may not be in the best interests of the Company.

10.4    If the Company is carrying out a joint venture between shareholders, a director of the Company may, when exercising powers or performing duties as a director, act in a manner which he believes is in the best interests of the holding company even though it may not be in the best interests of the Company.

10.5    Each director shall exercise his powers for a proper purpose and shall not act or agree to the Company acting in a manner that contravenes the Memorandum, the Articles or the Act. Each director, in exercising his powers or performing his duties, shall act honestly and in good faith in what the director believes to be the best interests of the Company.

10.6    Any director which is a body corporate may appoint any individual as its duly authorised representative for the purpose of representing it at meetings of the directors, with respect to the signing of consents or otherwise.

10.7    The continuing directors may act notwithstanding any vacancy in their body.

10.8    The directors may by Resolution of Directors exercise all the powers of the Company to incur indebtedness, liabilities or obligations and to secure indebtedness, liabilities or obligations whether of the Company or of any third party.

10.9    All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for moneys paid to the Company shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as shall from time to time be determined by Resolution of Directors.

10.10   Section 175 of the Act shall not apply to the Company.

-15520821-2

SN 0180

## 11    Proceedings of directors

11.1    Any one director of the Company may call a meeting of the directors by sending a written notice to each other directors.

11.2    The directors of the Company or any committee thereof may meet at such times and in such manner and places within or outside the British Virgin Islands as the notice calling the meeting provides.

11.3    A director is deemed to be present at a meeting of directors if he participates by telephone or other electronic means and all directors participating in the meeting are able to hear each other.

11.4    A director shall be given not less than 3 days' notice of meetings of directors, but a meeting of directors held without 3 days' notice having been given to all directors shall be valid if all the directors entitled to vote at the meeting who do not attend waive notice of the meeting, and for this purpose the presence of a director at a meeting shall constitute waiver by that director. The inadvertent failure to give notice of a meeting to a director, or the fact that a director has not received the notice, does not invalidate the meeting.

11.5    A meeting of directors is duly constituted for all purposes if at the commencement of the meeting there are present in person or by alternate not less than one-half of the total number of directors, unless there are only 2 directors in which case the quorum is 2.

11.6    A director may by a written instrument appoint an alternate who need not be a director and the alternate shall be entitled to attend meetings in the absence of the director who appointed him and to vote or consent in place of the director until the appointment lapses or is terminated.

11.7    If the Company has only one director the provisions herein contained for meetings of directors do not apply and such sole director has full power to represent and act for the Company in all matters as are not by the Act, the Memorandum or the Articles required to be exercised by the Members. In lieu of minutes of a meeting the sole director shall record in writing and sign a note or memorandum of all matters requiring a Resolution of Directors. Such a note or memorandum constitutes sufficient evidence of such resolution for all purposes.

11.8    At meetings of directors at which the Chairman of the Board is present, he shall preside as chairman of the meeting. If there is no Chairman of the Board or if the Chairman of the Board is not present, the directors present shall choose one of their number to be chairman of the meeting. If the directors are unable to choose a chairman for any reason, then the oldest individual Director present (and for this purpose an alternate director shall be deemed to be the same age as the director that he represents) shall take the chair.

11.9    An action that may be taken by the directors or a committee of directors at a meeting may also be taken by a Resolution of Directors or a resolution of a committee of directors

SN 0181

consented to in writing by all directors or by all members of the committee, as the case may be, without the need for any notice. The consent may be in the form of counterparts each counterpart being signed by one or more directors. If the consent is in one or more counterparts, and the counterparts bear different dates, then the resolution shall take effect on the date upon which the last director has consented to the resolution by signed counterparts.

**12      Committees**

12.1     The directors may, by Resolution of Directors, designate one or more committees, each consisting of one or more directors, and delegate one or more of their powers, including the power to affix the Seal, to the committee.

12.2     The directors have no power to delegate to a committee of directors any of the following powers:

    (a)     to amend the Memorandum or the Articles;

    (b)     to designate committees of directors;

    (c)     to delegate powers to a committee of directors;

    (d)     to appoint directors;

    (e)     to appoint an agent;

    (f)     to approve a plan of merger, consolidation or arrangement; or

    (g)     to make a declaration of solvency or to approve a liquidation plan.

12.3     Regulations 12.2(b) and 12.2(c) do not prevent a committee of directors, where authorised by the Resolution of Directors appointing such committee or by a subsequent Resolution of Directors, from appointing a sub-committee and delegating powers exercisable by the committee to the sub-committee.

12.4     The meetings and proceedings of each committee of directors consisting of 2 or more directors shall be governed mutatis mutandis by the provisions of the Articles regulating the proceedings of directors so far as the same are not superseded by any provisions in the Resolution of Directors establishing the committee.

**13      Officers and agents**

13.1     The Company may by Resolution of Directors appoint officers of the Company at such times as may be considered necessary or expedient. Such officers may consist of a Chairman of the Board of Directors, a Chief Executive Officer, one or more vice-presidents, secretaries and treasurers and such other officers as may from time to time be considered necessary or expedient. Any number of offices may be held by the same person.

-15520821-2

SN 0182

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 252
RECEIVED NYSCEF: 11/28/2018

Case 1:16-cv-00073j Doc 43-11 Filed 08/14/22 Entered 08/14/22 23:04:52 Exhibit 10 of
Pg 309 of 53

13.2 The officers shall perform such duties as are prescribed at the time of their appointment subject to any modification in such duties as may be prescribed thereafter by Resolution of Directors. In the absence of any specific prescription of duties it shall be the responsibility of the Chairman of the Board to preside at meetings of directors and Members, the Chief Executive Officer to manage the day to day affairs of the Company, the vice-presidents to act in order of seniority in the absence of the Chief Executive Officer but otherwise to perform such duties as may be delegated to them by the Chief Executive Officer, the secretaries to maintain the register of members, minute books and records (other than financial records) of the Company and to ensure compliance with all procedural requirements imposed on the Company by applicable law, and the treasurer to be responsible for the financial affairs of the Company.

13.3 The emoluments of all officers shall be fixed by Resolution of Directors.

13.4 The officers of the Company shall hold office until their death, resignation or removal. Any officer elected or appointed by the directors may be removed at any time, with or without cause, by Resolution of Directors. Any vacancy occurring in any office of the Company may be filled by Resolution of Directors.

13.5 The directors may, by a Resolution of Directors, appoint any person, including a person who is a director, to be an agent of the Company. An agent of the Company shall have such powers and authority of the directors, including the power and authority to affix the Seal, as are set forth in the Articles or in the Resolution of Directors appointing the agent, except that no agent has any power or authority with respect to the matters specified in Regulation 12.1. The Resolution of Directors appointing an agent may authorise the agent to appoint one or more substitutes or delegates to exercise some or all of the powers conferred on the agent by the Company. The directors may remove an agent appointed by the Company and may revoke or vary a power conferred on him.

## 14 Conflict of Interests

14.1 A director of the Company shall, forthwith after becoming aware of the fact that he is interested in a transaction entered into or to be entered into by the Company, disclose the interest to all other directors of the Company.

14.2 For the purposes of Regulation 14.1, a disclosure to all other directors to the effect that a director is a Member, director or officer of another named entity or has a fiduciary relationship with respect to the entity or a named individual and is to be regarded as interested in any transaction which may, after the date of the entry or disclosure, be entered into with that entity or individual, is a sufficient disclosure of interest in relation to that transaction.

14.3 A director of the Company who is interested in a transaction entered into or to be entered into by the Company may:

(a) vote on a matter relating to the transaction;

18

-15520821-2

SN 0183

(b) attend a meeting of directors at which a matter relating to the transaction arises and be included among the directors present at the meeting for the purposes of a quorum; and

(c) sign a document on behalf of the Company, or do any other thing in his capacity as a director, that relates to the transaction,

and, subject to compliance with the Act shall not, by reason of his office be accountable to the Company for any benefit which he derives from such transaction and no such transaction shall be liable to be avoided on the grounds of any such interest or benefit.

## 15 Indemnification

15.1 Subject to the limitations hereinafter provided the Company shall indemnify against all expenses, including legal fees, and against all judgments, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings any person who:

(a) is or was a party or is threatened to be made a party to any threatened, pending or completed proceedings, whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a director of the Company; or

(b) is or was, at the request of the Company, serving as a director of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise.

15.2 The indemnity in Regulation 15.1 only applies if the person acted honestly and in good faith with a view to the best interests of the Company and, in the case of criminal proceedings, the person had no reasonable cause to believe that their conduct was unlawful.

15.3 The decision of the directors as to whether the person acted honestly and in good faith and with a view to the best interests of the Company and as to whether the person had no reasonable cause to believe that his conduct was unlawful is, in the absence of fraud, sufficient for the purposes of the Articles, unless a question of law is involved.

15.4 The termination of any proceedings by any judgment, order, settlement, conviction or the entering of a nolle prosequi does not, by itself, create a presumption that the person did not act honestly and in good faith and with a view to the best interests of the Company or that the person had reasonable cause to believe that his conduct was unlawful.

15.5 The Company may purchase and maintain insurance in relation to any person who is or was a director, officer or liquidator of the Company, or who at the request of the Company is or was serving as a director, officer or liquidator of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise, against any liability asserted against the person and incurred by the person in that capacity, whether or not the

19

-15520821-2

SN 0184

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 252
RECEIVED NYSCEF: 11/28/2018

Case 1:22-cv-01050-3j   Doc 43-11   Filed 03/14/22   Entered 03/14/22 23:04:58   Exhibit 17 of

Pg 329 of 53

Company has or would have had the power to indemnify the person against the liability as provided in the Articles.

**16      Records**

16.1    The Company shall keep the following documents at the office of its registered agent:

(a)    the Memorandum and the Articles;

(b)    the register of members, or a copy of the register of members;

(c)    the register of directors, or a copy of the register of directors; and

(d)    copies of all notices and other documents filed by the Company with the Registrar of Corporate Affairs in the previous 10 years.

(e)    If the Company maintains only a copy of the register of members or a copy of the register of directors at the office of its registered agent, it shall:

(f)    within 15 days of any change in either register, notify the registered agent in writing of the change; and

(g)    provide the registered agent with a written record of the physical address of the place or places at which the original register of members or the original register of directors is kept.

16.2    The Company shall keep the following records at the office of its registered agent or at such other place or places, within or outside the British Virgin Islands, as the directors may determine:

(a)    minutes of meetings and Resolutions of Members and classes of Members;

(b)    minutes of meetings and Resolutions of Directors and committees of directors; and

(c)    an impression of the Seal, if any.

16.3    Where any original records referred to in this Regulation are maintained other than at the office of the registered agent of the Company, and the place at which the original records is changed, the Company shall provide the registered agent with the physical address of the new location of the records of the Company within 14 days of the change of location.

16.4    The records kept by the Company under this Regulation shall be in written form or either wholly or partly as electronic records complying with the requirements of the Electronic Transactions Act.

20

-15520821-2

SN 0185

**17    Registers of charges**

17.1    The Company shall maintain at the office of its registered agent a register of charges in which there shall be entered the following particulars regarding each mortgage, charge and other encumbrance created by the Company:

   (a)    the date of creation of the charge;

   (b)    a short description of the liability secured by the charge;

   (c)    a short description of the property charged;

   (d)    the name and address of the trustee for the security or, if there is no such trustee, the name and address of the chargee;

   (e)    unless the charge is a security to bearer, the name and address of the holder of the charge; and

   (f)    details of any prohibition or restriction contained in the instrument creating the charge on the power of the Company to create any future charge ranking in priority to or equally with the charge.

**18    Continuation**

The Company may by Resolution of Members or by a Resolution of Directors continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands in the manner provided under those laws.

**19    Seal**

The Company may have more than one Seal and references herein to the Seal shall be references to every Seal which shall have been duly adopted by Resolution of Directors. The directors shall provide for the safe custody of the Seal and for an imprint thereof to be kept at the registered office. Except as otherwise expressly provided herein the Seal when affixed to any written instrument shall be witnessed and attested to by the signature of any one director or other person so authorised from time to time by Resolution of Directors.   Such authorisation may be before or after the Seal is affixed, may be general or specific and may refer to any number of sealings.  The directors may provide for a facsimile of the Seal and of the signature of any director or authorised person which may be reproduced by printing or other means on any instrument and it shall have the same force and validity as if the Seal had been affixed to such instrument and the same had been attested to as hereinbefore described.

21

-15520821-2

SN 0186

**20    Accounts and audit**

20.1    The Company shall keep records that are sufficient to show and explain the Company's transactions and that will, at any time, enable the financial position of the Company to be determined with reasonable accuracy.

20.2    The Company may by Resolution of Members call for the directors to prepare periodically and make available a profit and loss account and a balance sheet.  The profit and loss account and balance sheet shall be drawn up so as to give respectively a true and fair view of the profit and loss of the Company for a financial period and a true and fair view of the assets and liabilities of the Company as at the end of a financial period.

20.3    The Company may by Resolution of Members call for the accounts to be examined by auditors.

20.4    The first auditors shall be appointed by Resolution of Directors; subsequent auditors shall be appointed by a Resolution of Members or a Resolution of Directors.

20.5    The auditors may be Members, but no director or other officer shall be eligible to be an auditor of the Company during their continuance in office.

20.6    The remuneration of the auditors of the Company:

(a)    in the case of auditors appointed by the directors, may be fixed by Resolution of Directors; and

(b)    subject to the foregoing, shall be fixed by Resolution of Members or in such manner as the Company may by Resolution of Members determine.

20.7    The auditors shall examine each profit and loss account and balance sheet required to be laid before a meeting of the Members or otherwise given to Members and shall state in a written report whether or not:

(a)    in their opinion the profit and loss account and balance sheet give a true and fair view respectively of the profit and loss for the period covered by the accounts, and of the assets and liabilities of the Company at the end of that period; and

(b)    all the information and explanations required by the auditors have been obtained.

20.8    The report of the auditors shall be annexed to the accounts and shall be read at the meeting of Members at which the accounts are laid before the Company or shall be otherwise given to the Members.

20.9    Every auditor of the Company shall have a right of access at all times to the books of account and vouchers of the Company, and shall be entitled to require from the directors and officers of the Company such information and explanations as he thinks necessary for the performance of the duties of the auditors.

-15520821-2

SN 0187

20.10 The auditors of the Company shall be entitled to receive notice of, and to attend any meetings of Members at which the Company's profit and loss account and balance sheet are to be presented.

**21    Notices**

21.1  Any notice, information or written statement to be given by the Company to Members may be given by personal service or by mail addressed to each Member at the address shown in the register of members.

21.2  Any summons, notice, order, document, process, information or written statement to be served on the Company may be served by leaving it, or by sending it by registered mail addressed to the Company, at its registered office, or by leaving it with, or by sending it by registered mail to, the registered agent of the Company.

21.3  Service of any summons, notice, order, document, process, information or written statement to be served on the Company may be proved by showing that the summons, notice, order, document, process, information or written statement was delivered to the registered office or the registered agent of the Company or that it was mailed in such time as to admit to its being delivered to the registered office or the registered agent of the Company in the normal course of delivery within the period prescribed for service and was correctly addressed and the postage was prepaid.

**22    Voluntary winding up**

The Company may by a Resolution of Members or by a Resolution of Directors appoint a voluntary liquidator.

We, Elian Fiduciary Services (BVI) Limited of Nemours Chambers, Road Town, Tortola, VG1110, British Virgin Islands, for the purpose of incorporating a BVI business company under the laws of the British Virgin Islands hereby sign these Articles of Association.

Dated the 13th day of February, 2015

Incorporator

**Signed for and on behalf of Elian Fiduciary Services (BVI) Limited** of Nemours Chambers, Road Town, Tortola, British Virgin Islands

_____          _____
Signature of authorised signatory      Signature of authorised signatory

**Charlotte Bailey**                    **Susan Palmer**
Print name                          Print name

23                              -15520821-2

SN 0188

# British Virgin Islands

# Director's Authorization

SN 0189

## AUTHORIZATION TO DATE DIRECTOR'S RESOLUTION

The undersigned is forming a corporation under the laws of the British Virgin Islands, such corporation to be known as Genever Holdings Corporation (the "Company"). In connection with the formation of the Company, the undersigned has executed a Director's Resolution (the "Resolution") nominating certain "Authorized Persons," providing for the formation of a limited liability company under the laws of the State of New York to be known as Genever Holdings LLC (the "LLC"), and further providing for the purchase by the LLC of one or more certificates of stock in a cooperative association, all as set forth in more detail in the Resolution.

The undersigned hereby authorizes, effective as of this 12th day of February 2015, any of Robert B. Barnett, Jerry L. Shulman or Michael F. O'Connor of the law firm of Williams & Connolly LLP to date the Resolution effective on or after the date on which the formation of the Company is complete.


KWOK Ho Wan

SN 0190

### GENEVER HOLDINGS CORPORATION

Written Consent of Sole Director

The undersigned, being the sole director of Genever Holdings Corporation, a British

Virgin Islands limited company (the "Corporation"), acting by written consent without a meeting

pursuant to _____[BVI law], does hereby consent to the adoption of the following

resolutions:

> **RESOLVED,** that Andrea L. Sanft, Esq., is hereby authorized as an "Authorized
> Person" of the Corporation to file a certificate of formation for the formation of a
> New York limited liability company named Genever Holdings LLC ("Genever
> New York") and take such other acts and do such other things as are necessary to
> permit Genever New York to exist and obtain authority to do business in the State
> of New York and New York City. To the extent necessary to complete such
> actions, the Corporation, as the sole member of Genever New York, hereby
> authorizes Ms. Sanft to enter her name as "Authorized Person" for Genever New
> York for the same purpose.

> **RESOLVED, FURTHER,** that Michael F. O'Connor, Esq., is hereby authorized
> to execute a limited liability company agreement for Genever New York as an
> "Authorized Person" with such terms and conditions as Mr. O'Connor deems
> appropriate.

> **RESOLVED, FURTHER,** that Michael F. O'Connor, Esq., is hereby authorized
> as an "Authorized Person" of the Corporation to cause the Corporation's
> subsidiary, Genever New York, to enter into a purchase agreement with Sherry
> 1800s LLC, as seller, for the purchase of certificates of stock in The Sherry-
> Netherland, Inc., a cooperative apartment located at 781 Fifth Avenue, New York
> City, New York (the "Sherry-Netherland") with respect to UNITS 1801, 1804,
> 1807, 1809, 1811, and Servant's Room 1519) on terms and conditions as have
> been discussed among representatives of the Corporation and Genever New York
> and the director and sole shareholder of the Corporation. This authority is
> delegable by Mr. O'Connor who may designate one or more "Authorized
> Persons" of Genever New York for the same purpose.

**RESOLVED, FURTHER,** that Ms. Sanft and Mr. O'Connor are each authorized to take such other actions and make such revisions to documents as such person deems advisable or necessary in order to carry out the actions set forth in these resolutions, the approval of such revised documents being evidence of such authorized person's determination. Each of the Authorized Persons shall act, perform and exercise their sole discretion in the best interest of the Corporation and its shareholder in any respect and the director of the Corporation is and be authorized to change any of the Authorized Persons as he thinks fit

Dated as of February 12, 2015

Ho Wan KWOK

SN 0192

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 252
RECEIVED NYSCEF: 11/28/2018
Case 22-01560-3j    Doc 43-11    Filed 09/14/22    Entered 09/14/22 23:55:32    Exhibit 80 of
Pg 409 of 53

British Virgin Islands/New York

Designation of Authorized Persons

SN 0193

## GENEVER HOLDINGS CORPORATION

## GENEVER HOLDINGS LLC

Designation of Authorized Person

The undersigned, being an Authorized Person of Genever Holdings Corporation, a British Virgin Islands limited company (the "Corporation"), hereby makes the following delegation of authority:

**THE AUTHORIZED PERSON** hereby designates each of Ira Gilbert, Esq. and Steven Simkin, Esq., acting alone or jointly, as an "Authorized Person" of Genever Holdings LLC ( "Genever New York"), a New York limited liability company of which the Corporation is the sole member, and delegates authority to and directs each of them to enter into a purchase agreement with Sherry 1800s LLC, as seller, for the purchase of certificates of stock in The Sherry-Netherland, Inc., a cooperative apartment located at 781 Fifth Avenue, New York City, New York (the "Sherry-Netherland") with respect to UNITS 1801, 1804, 1807, 1809, 1811, and Servant's Room 1519) on terms and conditions as have been discussed among representatives of the Corporation and Genever New York and the director and sole shareholder of the Corporation. This authority is non-delegable by either of Messrs. Gilbert and Simkin.

Pursuant to this designation of authorized person, Messrs. Gilbert and Simkin are each authorized to take such other actions and make such revisions to the purchase documents as such person deems advisable or necessary in order to carry out the actions authorized in this designation, the approval of such revised documents being evidence of such authorized person's determination.

Dated as of February 12, 2015

Michael F. O'Connor
Authorized Person

New York LLC

Evidence of Formation

SN 0195

```
DOSPITECS              CORPORATIONS PUBLIC INQUIRY SYSTEM          02/17/15
                            CURRENT STATUS INFORMATION
 CURR NAME GENEVER HOLDINGS LLC


 NAME ASSMD ********* TYPE 01DA A STATUS A
    EFFECTIVE DATE 02/17/2015      BIENNIAL RPT
 ORIG NAME GENEVER HOLDINGS LLC


 INC. DATE  COUNTY  DURATION    JURISDICTION      FOR. INC.   NFP TYPE
 02/17/2015  NEWY                                   __/__/____
                                                 CORPID 4711112


 Process Name CORPORATION SERVICE COMPANY_____
 Address      80 STATE STREET_____
 City,St,Zip  ALBANY_____ , NY_ 12207  - 2543

 CEO Name     _____
 Address      _____
 City,St,Zip  _____ , __ _____ - ____
 INF101 - PRESS APPROPRIATE FUNCTION KEY FOR DESIRED ACTION
 ===>  _____
 1=CERT SEAL 2=        3=PREVIOUS 4=LIST     5=HISTORY  6=STOCK
 7=          8=        9=NAMES   10=CURR ADD 11=BIEN RPT 12=NAME ENTRY
```

[ Increase Font ] [ Decrease Font ] [ Disconnect ]    AT OFF

SN 0196

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 252
RECEIVED NYSCEF: 11/28/2018

Case 1:16-cv-... Doc 43211 Filed 09/14/22 Entered 09/14/22 23:55:22 Exhibit 84 of
Pg 498 of 53

# New York LLC

# Operating Agreement

SN 0197

# LIABILITY COMPANY AGREEMENT

## OF

### · GENEVER HOLDINGS LLC

LIMITED LIABILITY COMPANY AGREEMENT made as of the _13th_ day of _February_, 2015 by and among (a) GENEVER HOLDINGS LLC (the "Company"), and (b) the persons identified on Schedule A as members of the Company (hereinafter referred to as the "Members" and each individually, a "Member").

The Members are entering into this Agreement in order to form the Company as a New York limited liability company by organizing the Company in accordance with the New York Limited Liability Company Law, as amended from time to time (the "Act").

The parties hereto desire to set forth the terms and conditions for the operation of the Company. This Agreement sets forth fully the agreements and understandings of the Members in respect of the Company.

NOW, THEREFORE, in consideration of the covenants and agreements hereinafter set forth, the parties hereto agree as follows:

1.    Definitions.

1.1    "Family Group," with respect to any Member, includes (i) with respect to any Member who is an individual, such Member's spouse and descendants, (ii) with respect to any Member that is a trust, any beneficiary of the trust and the spouse and descendants of any beneficiary and (iii) with respect to any Member that is an entity, any beneficial owner of such entity and the spouse and descendants of any such beneficial owner.

1.2    "Membership Interest" means the ownership interest of a Member in the Company. The Membership Interest of each of the Members as of the date hereof is set forth on Schedule A.

1.3    "Property" shall have the meaning set forth in Section 5.

2.    Name: The name of the Company shall be GENEVER HOLDINGS LLC.

3.    Articles; Certificates. The Members, from time to time as such Members deem advisable, may, by written instrument, elect one or more additional natural persons and designate them as "authorized persons" of the Company. The Members or any officer or authorized person shall execute, deliver and file any other articles and/or certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

SN 0198

2

4. <u>Term</u>. This Agreement shall be effective as of the filing of the Company's Articles of Organization with the Secretary of State of New York and shall have perpetual existence.

5. <u>Purposes</u>. The purposes of the Company are to acquire, own, hold, manage, operate, maintain, repair, improve, renovate, sell, finance, refinance and otherwise use or deal with the property described on <u>Schedule B</u> hereto, such other real property as the Members shall determine to acquire and any tangible personal property usually located therein or used or of use in connection therewith (collectively, the "Property"); and to engage in any other lawful business or activities for which limited liability companies may be organized under the Act. In furtherance of its purposes, the Members shall have the power and are hereby authorized to take any and all actions and engage in such activities as may be necessary, convenient, advisable or incidental with respect to the conduct of the business of the Company as determined by the Members in their sole discretion (but subject to the further provisions of this Agreement), including, but not limited to, acquiring, maintaining, improving, selling, leasing, and mortgaging real property, and the Members shall have and exercise all of the power and rights conferred upon limited liability companies formed pursuant to the Act.

6. <u>Powers.</u> The Company shall have the power to do all things necessary or desirable in the conduct of its business to the fullest possible extent. <u>Limited Liability</u>. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Members shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member of the Company.

8. <u>Office.</u> The principal office and place of business of the Company shall be located at such place as the Members may from time to time determine.<u>Management</u>. Management of the Company shall be vested in the Members. The Members shall have full, exclusive and complete discretion to manage and control the business and affairs of the Company and to take all such actions as the Members deem necessary or appropriate to accomplish the purposes of the Company as set forth herein.

9.1.1 The Members shall have sole power to bind the Company, except and to the extent that such power is expressly delegated to any other person or entity by the Members, and such delegation shall not cause the Members to cease to have such powers. The Members and/or, to the extent determined by the Members, any officers appointed by the Members in accordance with Section 9.3 shall each have the power and authority to do any and all acts necessary or convenient to or for the furtherance of the purposes of the Company set forth in this Agreement.

9.1.2 If any vote or consent of the Members is required by the Act at a time when there is only one Member, then the vote of such Member shall be considered the vote or consent of the Members. If there is more than one Member, then, unless a greater majority is required by the Act or this Agreement, the vote of Members holding a majority of the Membership Interests in the Company shall be considered the

SN 0199

3

vote or consent of the Members. Any action of the Members may be taken by written consent without a meeting and without prior notice.

       9.2    In addition to the powers granted by law, the Members shall have full power to do everything in administering the Company that the Members may deem advisable, to the full extent that an individual owning property would have and without prior court authority, including the power: To retain so long as the Members may deem advisable and to acquire by purchase or otherwise, any kind of real property or personal property; to sell for cash or on credit (at public or private sale), exchange, mortgage, lease for any period (either as landlord or tenant and including renewals of the term) and modify, extend or cancel leases, grant options or otherwise dispose of or deal with any real or personal property, all without regard to statutory restrictions, in such manner and upon such terms and conditions as they deem advisable without first obtaining a court order; to erect, renovate or alter buildings or otherwise improve and manage buildings and property; demolish buildings; make ordinary and extraordinary repairs; grant easements and make party wall contracts; dedicate roads; subdivide; adjust boundary lines and partition; to distribute in kind or in money or partly in each, even if shares be composed differently; to hold property in the names of nominees or so that it will pass on delivery; to renew, assign, alter, extend, compromise, abandon or release or arbitrate claims asserted by or against the Company; to engage and rely on brokers and investment counsel, accountants, appraisers and other experts and legal counsel and to compensate them; to employ custodians of the assets and bookkeepers and clerks and other assistants; and to borrow money for any purpose.

       9.3    <u>Officers</u>. The Members may, from time to time as they deem advisable, select one or more natural persons and designate them as officers of the Company (the "Officers") and assign titles (including, without limitation, President, Vice President, Secretary, and Treasurer) to any such person. The Members may, by written instrument, delegate to any Officer or any other agent of the Company any of the Members' powers under this Agreement, including, without limitation, the power to bind the Company. Any delegation pursuant to this Section 9.3 may be revoked at any time by the Members. An Officer may be removed with or without cause by the Members. Any Officer may resign at any time by giving written notice to the Members. Any vacancy in any office, due to death, incapacity, resignation or removal, shall be filled by the Members. Officers may be Members or non-Members.

       9.4    <u>Fiduciary Duty of the Members and Officers</u>. In exercising the powers granted by this Agreement and in performing the duties required by this Agreement with respect to the management and operation of the Company, each Member and Officer, pursuant to general principles of law, has a fiduciary duty to act reasonably in (or not opposed to) the best interests of the Company and the Members.

       10.    <u>Other Business</u>. The Members and any person or entity affiliated with any of the Members may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others. None of the Company or the other Members shall have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

SN 0200

Pg 189 of 53

4

11.    Liability and Indemnity.

11.1    To the fullest extent permitted by applicable law, no Member, Officer, employee or agent of the Company ("Covered Person") shall be liable to the Company, any Member or any other person or entity who is a party to or otherwise bound by this Agreement for any liability, loss, damage or claim suffered or incurred by reason of any act or omission performed or omitted by such Covered Person, except that a Covered Person shall be liable for any such liability, loss, damage, cost or claim suffered or incurred by reason of such Covered Person's (a) gross negligence or willful misconduct, (b) violation of any express provision of this Agreement or of the implied contractual covenant of good faith and fair dealing, and/or (c) breach of such Covered Person's duty of loyalty ("Unprotected Acts and Omissions"). Consistent with the preceding sentence, each Covered Person may act or refrain from acting without liability to the Company or to any Member in reliance upon any opinion of any consultant or advisor on any matter which the Covered Person reasonably believes to be within the consultant or advisor's professional competence.

11.2    To the fullest extent permitted by applicable law, and to the extent of its assets, the Company shall indemnify, defend and hold harmless any Covered Person for any liability, loss, damage, cost or claim suffered or incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in connection with the Company, provided, however, that (i) no Covered Person shall be entitled to be indemnified in respect of any such liability, loss, damage, cost or claim suffered or incurred by such Covered Person by reason of such person's Unprotected Acts and Omissions, and (ii) any indemnity under this Section 11.2 shall be provided out of, and to the extent of, Company assets only, and no Member shall have personal liability on account thereof.

11.3    To the fullest extent permitted by law, expenses ((including, without limitation, reasonable attorneys' fees and expenses) incurred in defending any action, suit or proceeding subject to this Section 11 shall be paid or reimbursed by the Company in advance of the final disposition of any proceeding and without any determination as to the Covered Person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred in advance of the final disposition of a proceeding shall be made only upon delivery to the Company of a written affirmation by such person of his good faith belief that he or she has met the standard of conduct necessary for indemnification under this Section and a written undertaking, by or on behalf of such person, to repay all amounts so advanced if it shall ultimately be determined that such person is not entitled to be indemnified.

12.    Registered Agent. The Secretary of State is designated as agent of the limited liability company upon whom process against it may be served. The address within or without this state to which the Secretary of State shall mail a copy of any process against the limited liability company served upon him or her is: c/o Brad Karp, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York 10019-6064.

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 252
RECEIVED NYSCEF: 11/28/2018

Case 1:20-cv-03010 Doc 43211 Filed 09/14/22 Entered 09/14/22 23:55:52 Exhibit 89 of
Pg 490 of 53

5

13. <u>Capital Contributions</u>. The initial Members agree to contribute to the capital of the Company the cash or property described on <u>Schedule A</u>. In exchange for such contribution, each Member shall receive a Membership Interest in the Company in the percentage set forth on <u>Schedule A</u>. The Company shall maintain a separate Capital Account for each Member in accordance with Treasury Regulations promulgated from time to time under Section 704(b) of the Code.

14. <u>Additional Contributions/Member Loans</u>. No Member is required to make any additional capital contributions to the Company. A Member may extend credit to the Company with an affirmative vote of the Members. Member loans shall not constitute Capital Contributions.

15. <u>Allocations</u>.

15.1 <u>Profits and Losses</u>. The Company's profits and losses shall be allocated to the Members pro rata, in accordance with their Membership Interests. The allocations set forth in this section shall have economic effect equivalence within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(i) and, solely for tax purposes, be made in accordance with the Regulations promulgated under Code Section 704(c).

15.2 <u>Use of Property</u>.

15.2.1 If the Property is not being leased to a tenant, the Members and any one or more of any Member's Family Group may use the Property in an equitable fashion to be determined by the Members by a vote of a majority in interest of the Members.

15.2.2 Persons who are neither Members nor members of a Family Group of any Member may use the Property only upon the prior unanimous approval of the Members.

15.2.3 Nothing herein shall preclude any Member from inviting guests to stay at the Property while such Member or members of any Member's Family Group are using the Property in accordance with Section 15.2.1 above.

16. <u>Distributions</u>. Distributions shall be made to the Members at the times and in the aggregate amounts determined by the Members. Such distributions shall be allocated among the Members in the same proportion as their then positive capital account balances. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to any Member on account of its interest in the Company if such distribution would violate the Act or other applicable law.

17. <u>Sale of the Property</u>. Any part or all of the Property may be sold upon the vote of the Members.

6

18.    Assignment of Membership Interests.

18.1    A Member shall have the right to sell, assign, mortgage, pledge, or otherwise voluntarily transfer or encumber any portion or all of such Member's Membership Interest with the consent of a majority in interest of the Members other than the Member requesting such assignment, provided, however, that no such transfer may be made that would cause the Company to violate any rules, regulations, bylaw or other governing arrangements of any cooperative association or other legal person of which the Company is a shareholder or member, and any purported sale, assignment, mortgage, pledge or other transfer or encumbrance not in conformity with this Section 18.1 shall be null and void.

18.2    In addition, any interest as a Member that is held by a custodian for a minor under a Uniform Gifts to Minors Act, Uniform Transfers to Minors Act or any similar act shall be fully transferable and assignable to the minor when the minor reaches the age of termination of such custodianship under the applicable statute. Any interest held by an entity may be fully transferable and assignable to the beneficial owners thereof.

18.3    Any assignee who receives a Membership Interest in accordance with this Section shall be admitted as a Member only upon his, her or its delivery to the Company of a written instrument by which he, she or it approves and adopts all of the provisions of this Agreement, as amended. Such admission shall be deemed effective immediately prior to the transfer, and, in the case of a transfer of all of a transferor Member's Interest in the Company, immediately following such admission, the transferor Member shall cease to be a Member of the Company. In the event of an assignment and admission of a transferee in accordance with this Section 18.3, the Company shall continue without dissolution.

19.    Admission of Additional Members by the Company. One or more additional Members of the Company may be admitted to the Company with the consent of the Members and upon his, her or its delivery to the Company of a written instrument by which he, she or it approves and adopts all of the provisions of this Agreement, as amended.

20.    Withdrawal of a Member. A Member may withdraw from the Company at any time.

21.    Dissolution.

21.1    The Company shall dissolve and its affairs shall be wound up upon the first to occur of the following: (i) upon the unanimous vote of the Members; (ii) any time there are no Members of the Company unless the Company is continued in accordance with this Agreement and the Act; or (iii) as otherwise required in the Act.

21.2    Upon dissolution of the Company, the Members shall (i) wind up the affairs of the Company, (ii) pay all outstanding expenses, real property taxes and other debts and liabilities of the Company (including without limitation to any

SN 0203

Member), (iii) establish any reserves against liabilities or obligations of the Company that the Members deem appropriate and (iv) distribute the remaining assets of the Company to the Members (a) in proportion to their positive capital accounts until such capital accounts reach zero and (b) thereafter in accordance with their respective Membership Interests.

   22. Tax Matters. The Company shall designate a "tax matters partner" in accordance with Section 6231(a)(7) of the Code. In the event that the Company has more than one Member, it shall be treated as a partnership for federal and state income tax purposes. In the event that the Company has a single Member, it shall be treated as a sole proprietorship and a disregarded entity for federal and state income tax purposes.

   23. Amendments. This Agreement may be modified, altered, supplemented or amended from time to time only upon the unanimous written consent of the Members.

   24. Binding Agreement; Successors and Assigns. The Members agree that this Agreement shall be binding upon the parties hereto and their respective successors and permitted assigns and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

   25. Separability of Provisions. Each provision of this Agreement shall be considered separable, and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

   26. Counterparts. This Agreement may be executed in any number of counterparts, including by facsimile or electronic signature, each of which shall be deemed an original of this Agreement.

   27. Entire Agreement. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, and supersedes all prior understandings or agreements between the parties with respect to such subject matter.

   28. Governing Law. This Agreement shall be governed by, and construed under, the laws of the State of New York (without regard to any otherwise applicable conflict of laws principles), all rights and remedies being governed by said laws.

   29. Rule Against Perpetuities. If this Agreement or any covenants or provisions herein would otherwise be unlawful, void or voidable for violation of the Rule Against Perpetuities, then this Agreement, or such covenant or provision, as the case may be, shall terminate twenty-one (21) years after the death of the survivor of all of the descendants of King George V of England living on the date hereof.

   IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

<div align="center"><strong>MEMBER:</strong></div>

SN 0204

8

GENEVER HOLDINGS CORPORATION

By: _____

_Michael O'Connor, Authorized Person_
Name and Title


GENEVER HOLDINGS LLC

By: Genever Holdings Corporation, sole
Member

By: _____
Name and Title

_Michael O'Connor_
_Authorized Person_

SN 0205

## Schedule A

| Member | Membership Interest |
|---|---|
| Genever Holdings Corporation | 100% |
| TOTAL | 100% |

SN 0206