# EXHIBIT PAX 02

Declaration of Ho Wan Kwok In Support of the Chapter 11 Case and Certain Motions

CASE NO. _____ 22-50073 _____

IN RE: Ho Wan Kwok

VS. _____

PAX  **EXHIBIT** _____ 2 _____

DATE _____ IDEN.

DATE  5/25/2022 Admitted in Full  EVID.

BY  P.E.
   Deputy Clerk

AO 386-A

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

---------------------------------------------------------------X
                                       :

In re:                               :    Chapter 11
                                        :

       Ho Wan Kwok,                  :    Case No. 22-50073 (JAM)
                                          :

                                            :

                    Debtor.             :
                                            :
---------------------------------------------------------------X

**DECLARATION OF MR. HO WAN KWOK IN SUPPORT**
**OF THE CHAPTER 11 CASE AND CERTAIN MOTIONS**

I, Ho Wan Kwok, being duly sworn, depose and say:

1.       On February 15, 2022, I commenced the above-captioned Chapter 11 case. I am over the age of 18 and competent to testify.

2.       I submit this Declaration to provide the Bankruptcy Court and all parties-in-interest background information about me and a description of the circumstances leading up to the commencement of my Chapter 11 case. I go into some length in this Declaration to provide context for the nature of the claims against me, my unique financial circumstances, and the reasons I commenced this Chapter 11 case.

3.       As discussed more fully below, I filed this Chapter 11 case to: (a) create a single forum to orderly address the various competing claims asserted against me; (b) afford stakeholders an efficient opportunity to investigate my assets, liabilities, and financial affairs, given what I perceive to be misunderstandings in that regard; (c) establish what assets are estate property and, in turn, available for distribution to holders of allowed claims; and, hopefully (d) reach consensus

with my creditors on a fair and equitable resolution of claims and distribution of assets pursuant to a Chapter 11 plan.

4.    In filing this Chapter 11 case and preparing this Declaration, I am cognizant that the Court may have concerns over Justice Ostrager's February 9 Contempt Order (defined below), adverse statements made about me by PAX (also defined below), and perhaps even the political views that I have expressed publicly.  There are, of course, two or more sides to every story, and this Declaration will offer my views.  For reasons that will become clear, I live in continuous fear of retribution by the Chinese Communist Party (the "CCP") for my outspoken criticism of its corruption and human rights abuses.  Over the years, I have endured relentless attacks through meritless litigation in the United States court system funded by the CCP and its proxies and agents.  My Chapter 11 case can only address the financial harm the CCP seeks to exact upon me and my family.  But, the CCP wants to cause me far more than just financial harm and public embarrassment.  I believe the CCP would have me assassinated at the earliest possible opportunity if imprisoned, extradited, or if my family could no longer provide me with physical security.  I do not suggest that the Court or any party-in-interest now accept my views about the underlying case facts.  To the contrary, this Chapter 11 case is expected to be sufficiently funded by an *unsecured* post-petition loan *with repayment priority below all prepetition creditors* – to allow a fair investigation and stakeholders to present whatever admissible evidence they deem appropriate, as part of the typical Chapter 11 process.  This bankruptcy is, in other words, intended to allow a reasoned vetting of all pertinent demonstrable case facts, without prejudicing any creditor's economic rights – except to the extent that any unsecured creditor hoped to jump ahead in payment priority via a "race to the courthouse" which would be necessarily unfair to some.

5.      This Declaration is in two parts.  Part I provides background information about me, including a summary description of my assets and liabilities.  Part II provides testimonial support for certain motions.

<div align="center"><b><u>PART I – BACKGROUND</u></b></div>

**I.**      <u>**My Background**</u>

6.      I was born in Shandong Province, China.  I currently reside in Greenwich, Connecticut, at 373 Taconic Road, with my wife of 37 years, Hing Chi Ngok.  We moved from an apartment at the Sherry-Netherland in New York to the current address in Connecticut in March 2020.  My wife and I have two adult children.  My son's name is Qiang Guo and he lives in London.  My daughter's name is Mei Guo and she splits her time between New York City and Connecticut.

7.      My family and I grew up poor.  My seven brothers and I worked hard and combined our earnings – mine from a radio repair shop and my brothers' from their own small businesses – to invest in real estate development.  Following the pro-democracy Tiananmen Square protests in 1989, I spent approximately twenty months in jail, where I was tortured, for providing financial support to student protestors.  I was in my early twenties at the time of my arrest.  At the same time, I witnessed the brutality of two policemen – agents of the CCP – as they shot my younger brother and left him to die.  The murder of my brother, and my arrest and torture in prison affected me profoundly.  While in jail, I developed many meaningful personal connections with other prisoners of conscience who had similarly been jailed for supporting the Tiananmen Square pro-democracy movement.  We shared the same passion for pursuing freedom in China and I continued to maintain these relationships after my release from prison in 1991.

8.      In or around 1991, the Chinese government began to loosen certain rules governing society, including rules enabling private citizens to start to achieve a sort of "quasi-private" ownership of real property in China.  While my extended family benefitted from this change, I personally could not due to my prior politically motivated arrest and detention.  Any assets in China listed under my name would likely have been seized by the CCP.  My extended family used the wealth it amassed to support me, which has continued to this day.

9.      My extended family began working with Yuda Property Company ("Yuda"), a company focused on commercial real estate development in the Henan Province of China. Together, the Guo family and Yuda developed the Henan Yuda Hotel and, thereafter, the Yuda International Trade Center in Henan Province's capital city of Zhengzhou.  These were successful ventures that allowed the Guo family to start amassing significant wealth.  My family then developed other properties in China, including the Pangu Plaza – a 7-star hotel, convention center, and residential apartment complex in Beijing.  Americans may recognize the Pangu Plaza as the primary backdrop to the 2008 and 2022 Olympics in Beijing.

10.      The Guo family's fortune continued to grow through diversification, as it invested in finance, technology, and other business sectors.  My son, in particular, played a key role in expanding the family's wealth by establishing and managing investment opportunities, including the introduction of global luxury brands to China and Hong Kong.  My son is, as a result, an independent, successful, and wealthy entrepreneur in his own right.

11.      I left mainland China for Hong Kong in or around 2000, and became a Hong Kong citizen.  While the extended family was continuing to accumulate great wealth in China, under Chinese law, as a citizen of Hong Kong, I could neither keep my Chinese citizenship, nor would I have been permitted to own assets in China.

12. My extended family's financial success did not go unnoticed by the CCP.  In 2002, my extended family acquired large tracts of land in Beijing, which became significantly more valuable when China was named the host country for the 2008 Olympics.  CCP officials attempted to appropriate this land for their own personal benefit, and I reported the attempted seizure to higher-up government officials.  After a lengthy fight, the land was recovered, enabling the development of the Pangu Plaza.

13. In or around 2015, I began to more publicly criticize and expose the CCP's corruption, and the CCP retaliated against me as a result.  On January 10, 2015, Wu Zheng (a/k/a "Bruno Wu") advised me that my brothers, my wife, and my daughter had all been arrested in China.  Brunu Wu is closely associated with top CCP officials and is a registered foreign agent of the CCP; his media companies partnered with Pacific Alliance Group ("PAG") – the parent company of Pacific Alliance Asia Opportunity Fund ("PAX") – on the attempted purchase of a significant Hollywood studio;[1] and he is personally bankrolling (on behalf of the CCP) the litigation efforts of numerous plaintiffs against me.  In early 2015, Brunu Wu, speaking on behalf of senior members of the CCP, called me to relay that my family would be released if I stopped publicly exposing CCP corruption and threatened that, if I did not comply, INTERPOL "Red Notices" would be issued for both me and my son and that I would be killed.  I rejected the CCP's attempt, through Brunu Wu, to silence me and continued to speak out against the CCP.

14. In 2017, I significantly increased my anti-CCP campaign by using social media and U.S.-based news outlets as platforms to expose the corruption of certain high-level CCP officials.

---

[1] Nancy Tartaglione, *Chinese Create $800M Fund To Invest In Global, Local Entertainment*, Deadline, February 6, 2012 (https://deadline.com/2012/02/chinese-create-800m-fund-to-invest-in-entertainment-companies-report-226260/).

My public statements exposing the corruption of the CCP received widespread coverage, in the United States and abroad. In addition to using social media to more readily and pervasively expose CCP corruption, I also provided information to U.S. authorities regarding CCP officials and their crimes. Out of fear for my life, I filed for political asylum protection in the United States in September 2017, and my asylum application remains pending.

15. In retaliation for my whistleblowing, the CCP unleashed a multifaceted campaign to try to gain leverage over, discredit,[2] threaten, and silence me.[3] Those actions, described below, ultimately have driven me into this bankruptcy case. For example, on April 19, 2017, I was scheduled to do an interview with Voice of America ("VOA") during which I planned to expose

---

[2] Stanford University and the Hoover Institute, the NGO Australian Strategic Policy Institute (ASPI), and Alphabet's Google have all separately reported that I have been a primary target of the CCP in its global social media disinformation campaign, driven by CCP agents and thousands of China's state-controlled websites and social media accounts. *See* Carly Miller, Vanessa Molter, Isabella Garca-Camargo, Rene DiResta, David Thiel and Alex Zaheer, *Sockpuppets Spin COVID Yarns: An Analysis of PRC-Attributed June 2020 Twitter takedown, Stanford Internet Observatory*, June 17, 2020 (https://stanford.app.box.com/v/sio-twitter-prc-june-2020); Dr. Jake Wallis, Tom Uren, and Elise Thomas, *Tweeting through the great firewall: Preliminary Analysis of PRC-linked information operations against the Hong Kong protests*, October 2019 (http://ad-aspi.s3.ap-southeast-2.amazonaws.com/2019-12/Tweeting%20through%20the%20great%20fire%20wall.pdf?VersionId=TRGkGXh8FPY5KXLSc_4SfDUy7sMfNkw0) (indicating that the CCP's disinformation campaign against me began in April 2017); Dr. Jake Wallis, Tom Uren, Elise Thomas, Albert Zhang, Dr. Samantha Hoffman, Lin Li, Alex Pascoe and Danielle Cave, *Retweeting through the great firewall: A persistent and undeterred threat actor*, June 2020 (http://ad-aspi.s3.ap-southeast-2.amazonaws.com/2020-06/Retweeting%20through%20the%20great%20firewall_1.pdf?VersionId=ZzW5dlyqlOOgG5m9oHj9DWsjgtXD6TCA) (presenting data reflecting "a persistent, large-scale influence campaign linked to Chinese state actors on Twitter and Facebook . . . [which] largely targeted Chinese-speaking audiences outside of the Chinese mainland (where Twitter is blocked) . . . with the intention of influencing perceptions on . . . Guo Wengui"); Joseph Menn, *Pro-China social media campaign hits new countries, blames U.S. for COVID*, Reuters, September 9, 2021 (https://www.reuters.com/world/pro-china-social-media-campaign-expands-new-countries-blames-us-covid-2021-09-08/) (reporting that security experts at FireEye and Alphabet's Google have observed a coordinated, misinformation campaign on social media in support of Chinese government interests targeting me). As these independent sources confirm, no person in the world has been the target of more attacks by the CCP's social media warfare.

[3] The abusive tactics employed by the CCP against me, as a Chinese dissident living in the United States, are not unqiue. Recently, federal prosecutors alleged that "[a] Chinese spy hired a private investigator to use violence if necessary to end a candidate's run for Congress, instructing him to 'beat him until he cannot run for election.'" *See* Aruna Viswanatha and Kate O'Keeffe, *Chinese Agent Proposed Violent Means to End Dissident's Congress Run, DOJ Says,* Wall Street Journal, March 16, 2022 (https://www.wsj.com/articles/chinese-agents-charged-with-harassing-dissidents-in-u-s-11647455520?mod=article_inline).

the CCP's ownership interest in HNA Group Co. The CCP took a number of actions to try to prevent me and VOA from proceeding with the interview. First, two days before my scheduled VOA interview – and just as Brunu Wu threatened – the CCP had an INTERPOL "Red Notice" based upon fabricated criminal charges issued seeking my arrest and extradition to China. Second, the CCP threatened retaliation against VOA and its reporters in China if VOA proceeded with my interview, asserting that the interview constituted interference in China's internal affairs. Third, the day before the interview, PAX (a subsidiary of PAG) filed a meritless lawsuit against me in New York for breach of contract. I proceeded with the interview, but VOA (succumbing to the pressures of the CCP) ordered it be cut short.

16.     When the CCP's early efforts to silence me failed, it resorted to trying to get me extradited to China, where I would be killed. An FBI investigation revealed that during the summer of 2017, I was the target of lobbying attempts by the CCP in the United States, utilizing a corrupt government official and a number of prominent individuals, including Macao casino owner Steve Wynn, to directly lobby President Trump and his administration to extradite me to China.[4] The CCP's scheme resulted in the federal indictments and guilty pleas of the former Finance Chairman of the Republican National Committee Elliot Broidy (who has since, like Brunu Wu,

---

[4]     *See* Aruna Viswanatha, *Steve Wynn May Face Justice Department Action for Role in China's Push to Expel Businessman*, Wall Street Journal, May 26, 2021 (https://www.wsj.com/articles/justice-department-wants-casino-mogul-steve-wynn-to-register-as-foreign-lobbyist-11622054103).

funded litigation for other parties against me),[5] lobbyist Nicki Lum Davis,[6] and former DOJ official George Higginbotham,[7] all of whom admittedly took payments in exchange for lobbying top U.S. government officials for my extradition. China's campaign included the bribery and corruption of a senior DOJ Headquarters official (George Higginbotham) who was found with almost $75 million in bank accounts that he controlled – making it one of the biggest espionage and corruption scandals in DOJ history. The CCP also targeted me in various other ways starting that same year, including by: hacking the server of the law firm that filed my asylum application in September 2017, extracting my highly sensitive information from that application, and then publicly disseminating it across the internet; bringing and funding (including several through Brunu Wu) numerous spurious litigations against me, some of which remain active today; and detaining, torturing, and imprisoning many of my family members and former colleagues.

---

[5] United States Department of Justice Press Release: Elliott Broidy Pleads Guilty for Back-Channel Lobbying Campaign to Drop 1MDB Investigation and Remove a Chinese Foreign National, October 20, 2020 (https://www.justice.gov/opa/pr/elliott-broidy-pleads-guilty-back-channel-lobbying-campaign-drop-1mdb-investigation-and) (stating that "Broidy also agreed to lobby the Administration and DOJ on behalf of Foreign National A and People's Republic of China (PRC) Minister A, to arrange for the removal and return of PRC National A – a dissident of the PRC living in the United States"; I am "PRC National A"). A copy of the "Criminal Information" as to Elliott Broidy is attached hereto as Exhibit A.

[6] United States Department of Justice Press Release: Hawaii Businesswoman Pleads Guilty to Facilitating Back-Channel Lobbying Campaign to Drop 1MDB Investigation and Remove a Foreign National to China, August 31, 2020 (https://www.justice.gov/opa/pr/hawaii-businesswoman-pleads-guilty-facilitating-back-channel-lobbying-campaign-drop-1mdb) (stating that "Lum Davis and others also agreed to lobby the Administration and Justice Department on behalf of Foreign National A and People's Republic of China (PRC) Minister A, to arrange for the removal and return of PRC National A — a dissident of the PRC living in the United States"; I am "PRC National A"). A copy of the "Criminal Information" as to Nicki Lum Davis is attached hereto as Exhibit B.

[7] United States Department of Justice Press Release: Former Justice Department Employee Pleads Guilty to Conspiracy to Deceive U.S. Banks about Millions of Dollars in Foreign Lobbying Funds, November 30, 2018 (https://www.justice.gov/opa/pr/former-justice-department-employee-pleads-guilty-conspiracy-deceive-us-banks-about-millions) (stating that "Higginbotham further admitted that another purpose of the lobbying campaign was an attempt to persuade high-level U.S. government officials to have a separate foreign national, who was residing in the United States on a temporary visa at the time, removed from the United States and sent back to his country of origin"; I am that "separate foreign national"). A copy of the "Factual Basis for Plea" as to George Higginbotham is attached hereto as Exhibit C.

17.     Since 2017, the CCP has also frozen and seized family assets and purported assets in China and Hong Kong, making it impossible for me even to maintain a bank account.[8]  The CCP has made it its mission to destroy anything I create and to block me from dealing with financial institutions.  I spend much of my time serving as an unpaid informal advisor or spokesperson to various entities, including entities that expose the CCP's corruption and human rights abuses.  My family, and particularly my son, provides for my needs.  Prior to the Petition Date, my son's family office, Golden Spring (New York) Ltd. ("GSNY" or the "Family Office"), purchased, among many other things, my clothing, food, and sundries.  I do not have access to a GSNY credit card or to a GSNY bank account.  My family retains ownership of nearly everything I use, aside from my clothing and mobile phones.  I do not own the Greenwich, Connecticut residence; it is owned by my wife through Greenwich Land, LLC.  I hold the interest in the Sherry-Netherland apartment in trust for my son.

18.     My family has advanced me loans (some documented, others not) to fund my significant litigation costs which allows me to defend myself against the many suits initiated by, or at the behest of, the CCP.  As of the Petition Date, GSNY has extended to me approximately $21 million in loans to pay for my litigation costs.  As discussed below and described in my Statement of Financial Affairs (the "SOFA"), I am a defendant and/or claimant in over 30 lawsuits pending in the United States and abroad.  It is publicly known that the CCP utilizes its proxies to

---

[8]     On October 23, 2018, the High Court of the Hong Kong Special Administrative Region, Court of First Instance (the "HK High Court"), entered the *Restraint Order Prohibiting Disposal of Assets In Hong Kong and Elsewhere* (the "HK Restraint Order"), dated October 18, 2018.  The HK Restraint Order targeted HK$3.7 million of funds on deposit at the Hongkong and Shanghai Banking Corporation Limited (HSBC Bank) allegedly belonging to me.  Billions more of funds and property, including real estate in Hong Kong, of individuals and entities purportedly subject to my "effective control" (according to the HK Restraint Order) were also frozen and/or seized.  The HK Restraint Order prohibits all dispositions of assets by the named "respondents" (which includes me).  Anyone coming into receipt of my assets following entry of the HK Restraint Order is supposedly in violation of it and is subject to fines and imprisonment.

file lawsuits, even in U.S. courts, to coerce individuals sought for political reasons to return to China.[9]  The cost of retaining lawyers, experts, vendors, interpreters, and other professionals in connection with such litigations has been extraordinary.

## II.    My Liabilities

19.    I have, to the best of my knowledge, reflected the current state of my liabilities in my filed Schedules of Assets and Liabilities (the "Schedules") and SOFA.  The Family Office assisted me in preparing these documents, as did Verdolino & Lowey, P.C., an independent financial advisory firm with considerable experience preparing bankruptcy schedules and statements of financial affairs.  As reflected in those documents and described further below, I am named as a defendant in 21 lawsuits and owe considerable amounts for litigation costs.

### A.    PAX Litigation.

20.    PAX, a Hong Kong investment fund – whose parent PAG partnered with CCP agent Brunu Wu's media companies to purchase a Hollywood studio – commenced actions against me in New York and the British Virgin Islands ("BVI").  As I mentioned before, PAX's New York Supreme Court action was filed on April 18, 2017, the day before my VOA interview to expose CCP corruption.  PAX's claim principally concerns collection on a disputed debt.

21.    In 2008, PAX made a $100 million loan (the "PAX Loan") to a Chinese entity called Spirit Carter.  The $100 million loan came in two tranches: (1) a $30 million initial loan secured by a personal guaranty made by me, and (2) a second $70 million dollar loan secured by a 49% interest in the company that owns the land/development that eventually became the Pangu Plaza.

---

[9]    *See* Aruna Viswanatha and Kate O'Keeffe, *China's New Tool to Chase Down Fugitives: American Courts*, Wall Street Journal, July 29, 2020 (https://www.wsj.com/articles/china-corruption-president-xi-communist-party-fugitives-california-lawsuits-us-courts-11596032112).

22.     In 2009, PAX received repayment of $100 million, acknowledged satisfaction of the loan, and further acknowledged that my obligation under the 2008 personal guaranty had been satisfied.  PAX disputes that an "accord and satisfaction" actually occurred, and now asserts claims against me under a subsequent-dated personal guaranty that is a forgery.  Prior to showing me this guaranty, my prior litigation counsel submitted it to the court in support of certain motions.  When I subsequently learned of the document's existence, I stated that I believe it to be a forgery; but the court ruled that, by its prior submission, I no longer had the ability to challenge its authenticity. Consequently, on September 15, 2020, the court entered summary judgement in PAX's favor, without either allowing me to testify or conducting an evidentiary trial before a jury.  The judgment, with interest, amounts to approximately $125 million as of today.  I timely appealed this judgment to the New York Appellate Division, and that appeal remains pending.[10]

23.     A few weeks later (on October 15, 2020), the Court issued a restraining order respecting my assets (the "NYS Restraining Order").  PAX, in enforcement of the judgment, focused primarily on a yacht named the "Lady May," which is described further below.  I do not own the Lady May; it is owned by my daughter.  The boat's maintenance has always been paid for by my son.  Nevertheless, on March 16, 2021, Justice Ostrager directed *me* to return the boat to New York by May 15, 2021 or face a massive daily fine of $500,000 for every day the boat remained outside the jurisdiction.  I did have access to the boat, but I did not have the authority to order it back to New York.  The Lady May never returned to New York and, as of earlier this year, the accrued contempt fine exceeded the amount of the judgment that had been entered in PAX's favor and was five or six times the stated value of the yacht.  I have no ability to pay this fine.

---

[10]   My Schedules include a potential malpractice claim against my historical litigation counsel.

24.     On February 9, 2022, Justice Ostrager issued a *Final Order of Civil Contempt* (the "February 9 Contempt Order") against me.  In the February 9 Contempt Order, Justice Ostrager found that I hold a beneficial interest in and control the Lady May and ordered me to pay a $134 million fine to PAX within five business days or risk incarceration for civil contempt.  I believe that the February 9 Contempt Order was wrongfully issued against me and have separately appealed this order to the Appellate Division.  Regardless, I do not have the means to satisfy the order.  I firmly believe the CCP is orchestrating the PAX case.  The PAX litigation, so far, has been one of the CCP's few successes in its relentless campaign against me, by exposing me to potential imprisonment[11] and forcing me into bankruptcy.

## B.     Securities Litigation.

25.     I am named as a defendant in seven actions related to my promotion of the sale of securities in a company called GTV Media Group, Inc ("GTV") and virtual currency referred to as "G Coin" and "G Dollar."  In addition to two putative investor classes, several individual investors have asserted claims against me related to losses they allegedly suffered following their alleged investments.  The plaintiffs in these actions generally allege that I participated in a scheme to sell unregistered securities to unsophisticated investors in violation of applicable U.S. securities laws.  The complaints, in the aggregate, are seeking more than $100 million in damages from me

---

[11]     On March 1, 2022, PAX filed its *Motion Of Pacific Alliance Asia Opportunity Fund L.P. For Entry Of An Order Confirming The Inapplicability Of The Automatic Stay Or, In The Alternative, Relief From The Automatic Stay Pursuant To Section 362(D)(2) Of The Bankruptcy Code* [Docket No. 57] (the "Lift Stay Motion").  I believe that granting the relief requested by the Lift Stay Motion would cause me significant harm and materially prejudice my estate and its creditors.  As indicated by PAX in the Lift Stay Motion, enforcement of the February 9 Contempt Order could result in my imprisonment in New York, which would materially impair my ability to achieve the objectives of this Chapter 11 case.  Chiefly, if incarcerated, I will be unable to adequately and appropriately administer my estate, participate in this bankruptcy case, negotiate with creditors, appear and be heard before this Court, consult with and direct counsel, investigate and marshal the assets of the estate, or formulate and negotiate a Chapter 11 plan.  Further, I believe that PAX is under the misplaced belief that my family will pay PAX's ransom if I face the risk of incarceration; my family will not.

and various co-defendants, including GTV and its parent entity Saraca Media Group, Inc. ("Saraca"). I believe that those claims are without merit.[12]

### C.    Defamation Claims.

26.     Since 2017, I have maintained a very active social media presence and posted content that is critical of the CCP, its agents, and others within its sphere of influence. Against this backdrop, certain people allegedly identified in my social media content have asserted defamation claims against me. As identified in my SOFA, I am currently named as a defendant in several defamation suits, a number of which are being funded by Brunu Wu, an admitted CCP agent and business partner of PAX's parent company. The plaintiffs in these actions have alleged, in aggregate, substantial damages.

### D.    Litigation Funding Costs.

27.     The costs of my prosecution of claims with monetary relief have been funded through loans provided pursuant to litigation funding agreements (the "Litigation Funding Agreements"). In the instances where I have to defend claims, the Family Office has advanced me loans to cover my litigation costs. In either case, the loan proceeds were directly disbursed to the law firms and service providers retained by me. Through the Petition Date, GSNY has advanced approximately $21 million to me for litigation-related expenses.

28.     In the instances in which a Litigation Funding Agreement is in place, GSNY is entitled to a premium if I am ultimately successful in asserting and recovering on my claim and

---

[12]   These matters related to a certain settled enforcement proceeding. Specifically, in September 2021, GTV and Saraca entered into publicly announced "no admit/no deny" settlements with the SEC regarding the SEC's contention that the GTV offering ran afoul of Section 506 of the 33 Act (the "SEC Entity Settlements"). *In the Matter of GTV Media Corp., et al.*, Admin. Proc. File, File No. 3-20537 (Sept 13, 2021). A parallel settlement involving GTV and Saraca was also reached with the New York State Office of the Attorney General. Assurance of Continuance No. 21-062, *In the Matter of Investigation by Letitia James, Attorney General of the State of New York, of GTV Media Group, Inc., and Saraca Media Group, Inc., Respondents* (Sept 13, 2021).

has asserted a security interest against certain of my litigation recoveries to secure that repayment and return on investment.

## III. **My Assets**

29.     I am advised that, upon the commencement of my Chapter 11 case, an estate was formed consisting of all legal or equitable interests that I have in property as of the filing date, wherever located and by whomever held.  I am also advised that my estate and all property of my estate is subject to the Court's jurisdiction and oversight.  I, of course, accept that.

30.     My assets, to the best of my knowledge, are identified in my Schedules.  These assets are principally clothing, food, and other minor household goods, along with litigation claims.

31.     As noted earlier, my family has long supported me.  My family has furnished me with clothing and other sundries.  Everything else I have access to – including vehicles, my residences (past and current), furniture, artwork, and electronics (except for my mobile phones) – are owned by my family members.  I have use of these assets, with their permission, but I do not have any authority to dispose of any material assets without their permission.

32.     I am also a claimant in several cases pending in the United States, the United Kingdom, and Switzerland.  The particulars of such litigation are disclosed in my Statements of Financial Affairs.  Two pieces of litigation are worthy of note here:

   a.  **UBS Claims**.  Before the Royal Courts of Justice in the United Kingdom, I and certain co-plaintiffs have asserted a claim against UBS AG (London Branch) ("UBS") seeking more than $500 million of damages related to negligent misrepresentation and advice by UBS in connection with my attempt to cause the acquisition of, and acquire certain shares issued by, a Chinese financial institution,

Haitong, back in 2015. As recently as February 9, 2022, I received a favorable ruling establishing the jurisdiction of my claims over UBS before the courts of the United Kingdom – and not Switzerland, as advocated by UBS. Given that UBS disputed jurisdiction, a parallel litigation had to be brought before the Civil Court of Basel City, Conciliation Authority, in Switzerland, to ensure that the litigation could proceed in the event that jurisdiction was found to be lacking in the United Kingdom (it was not found to be lacking). That action in Switzerland is currently stayed pending the outcome of UBS's appeal to the Court of Appeal in the United Kingdom on this jurisdictional issue.

b. **<u>Clark Hill Claims</u>**. In addition, I have asserted claims against Clark Hill PLC and one of its members, Thomas K. Ragland (together, "<u>Clark Hill</u>"). This lawsuit is currently pending in the United States District Court for the District of Columbia. I am seeking $50 million in compensatory damages, and additional punitive damages, against Clark Hill for breach of its duties of legal representation. Specifically, as a result of Clark Hill's failure to adequately protect the highly sensitive information contained in my asylum application, the CCP hacked Clark Hill's server during September 2017, extracted that highly sensitive information, and then disseminated it across the internet. To make matters worse, Clark Hill succumbed to the CCP hackers' threats and withdrew as my immigration counsel. As a result, I have suffered and continue to suffer harm.

33. Two other assets that I do not own warrant special discussion: (a) the Lady May; and (b) an apartment at the Sherry-Netherland in New York City (the "<u>Apartment</u>").

a. **Lady May**.  As mentioned above, I do not own the Lady May, though I did have permission to board and enjoy the vessel.  My daughter, through HK International Funds Investments (USA) Limited, LLC, owns and controls the yacht.  Despite the state court's findings in the February 9 Contempt Order, it was not within my power to direct the Lady May to stay in, or return to, New York.

b. **Sherry-Netherland Apartment**.  Cooperative shares in the Sherry-Netherland apartment are held by Genever Holdings LLC ( "Genever US").[13]  The membership interests in Genever US are, in turn, held by Genever Holdings Corporation ("Genever BVI").  I hold all of the equity of Genever BVI.  However, pursuant to a Declaration of Trust and Agreement, dated February 17, 2015 (the "Trust Date"), I hold such equity in trust for Bravo Luck Limited (the "Apartment Owner").  My son owns the equity of the Apartment Owner.  On or about the Trust Date, the Apartment Owner funded Genever US with the purchase price for the Apartment.  These funds came from entities owned or controlled by my son and not from me.  It also bears noting that any interest I have in Genever BVI has been ordered, by Justice Ostrager, to be turned over to PAX, provided that such a turnover does not interfere with pending litigation in the British Virgin Islands or the Genever US bankruptcy.

34.  As mentioned at the beginning of this Declaration, I believe that Justice Ostrager, PAX, and perhaps others believe I have greater financial wherewithal than is reflected here and in my Schedules and Statements of Financial Affairs.  The wealth they believe is mine, however, actually belongs to my son, daughter, wife, and extended family, not me.  But, as also noted above,

---

[13]  On October 12, 2020, Genever US filed Chapter 11 in the Southern District of New York (Case No. 20-12411).

this bankruptcy will allow parties-in-interest to investigate that assertion and present any countervailing evidence. Importantly, and as discussed below, the adversarial process will be funded in such a way as to avoid harm to any creditor's economic interest in the estate.

### III.   **Proposed DIP Financing**

35.    As set forth in my Schedules, I do not have resources of my own to fund the expenses of this Chapter 11 case. However, my son has expressed a willingness to fund certain costs of this Chapter 11 case. Specifically, GSNY is proposing to lend the estate $8 million (the "DIP Financing") on the terms set forth in the DIP Financing credit agreement (the "DIP Credit Agreement") attached to the motion to approve the DIP Financing. The DIP Financing will be used to pay for, among other things, the costs of the estate's retained professionals (both mine, and the professionals retained by an official committee of unsecured creditors and/or an examiner, if appointed) and the quarterly fees assessed by the Office of the United States Trustee. Of the $8 million budget, up to $4 million would be made available to fund the work of an Official Creditors Committee and/or Examiner.

36.    GSNY is offering to extend this loan on an unsecured basis, with repayment priority subordinated to all allowed general unsecured claims. Stated differently, the DIP Financing is not secured by any assets of the estate, does not require an administrative or priority claim, and will not be repaid from estate assets until all allowed prepetition claims are fully paid. This loan thus costs my creditors nothing and provides a fair opportunity for an investigation into my affairs. I do not believe that any loan provided by another lender would be on superior terms. Accordingly, obtaining this loan is in the best interest of my estate.

37.    I will not be given access to any of the borrowed funds. All of the DIP Financing proceeds will be deposited into a segregated deposit account (the "Debtor Account") established

for the estate's benefit. Craig Jalbert of V&L (as defined below) shall be the sole authorized signatory. Disbursements from the Debtor Account will only be at the direction of V&L, solely to the extent necessary to pay the items set forth in the DIP Budget, and as authorized in the proposed DIP Financing orders, the DIP Financing documents, and other relevant orders of the Court (including orders approving professional fee applications).

38. There is only one "milestone" covenant in the DIP Credit Agreement: Bankruptcy Court final approval of the proposed DIP Financing order within 45 days of the date that the DIP Credit Agreement is approved on an interim basis. *See* DIP Credit Agreement at ¶ 6.01(a). There is only one atypical Event of Default in the DIP Credit Agreement, which is the entry of an order granting PAX relief from the automatic stay to pursue litigation against me outside of this Court. *See* DIP Credit Agreement at ¶ 8.01(e). The only purpose of such litigation would be to seek my incarceration under the February 9 Contempt Order. Obviously, if such relief is granted, then I will not be able to meaningfully direct and participate in an orderly claims resolution and plan process. In such as case, my son – through GSNY – has no interest in continuing to fund the costs of this Chapter 11 case.

## IV. **Objectives of My Chapter 11 Case**

39. My ultimate objective is to arrive at a fully consensual Chapter 11 plan that finally resolves all issues with my creditors. I hope to achieve this outcome through reasoned and reasonable dialogue, after providing creditors a fair opportunity to conduct diligence and present their views through fiduciary representatives paid for by the DIP Financing. I hope that my creditors will be solely motivated to effect repayment of valid claims, and that they will put aside the use of litigation as a means of restricting my free speech and criticisms of political abuse. I

further hope that, if there is thoughtful creditor engagement, my family will be willing to contribute funding to ensure a fair recovery for creditors under a plan.

40.     My assets, as discussed above, are principally litigation claims and I believe those claims have substantial merit and are valuable (perhaps valuable enough to pay all creditors in full).  But, again, all stakeholders will be given a fair opportunity to investigate them.

41.     I understand that my Chapter 11 case will provide a forum to conclusively determine which other assets potentially comprise my bankruptcy estate.  Certain of my creditors have alleged that I own assets that I believe are owned and controlled by my family members or their affiliated entities. I do not believe that the New York Supreme Court, which issued an order regarding my "beneficial" ownership and control of the Lady May, ever determined that I have actual legal title to the vessel or that it is now an asset of my Chapter 11 estate.  These issues will be presented squarely and fairly to this Court for appropriate resolution.

42.     I have been defending myself against litigation brought by purported creditors for years.  As noted above, GSNY – owned and controlled by my son - has lent me millions to fund my defense costs.  This Chapter 11 case will provide a forum to determine, once and for all, the extent of allowed claims against my estate.  Creditors will be afforded an opportunity to assert claims against my Chapter 11 estate, and the process should yield a fair allocation of whatever assets are in the estate across all equally situated creditors (without, for example, PAX jumping ahead of others in the same creditor class).  I will work with my professionals to achieve an appropriate claims reconciliation process.

43.     In the end, I hope for a rational, value-maximizing plan that frees me of litigation and will help facilitate a "fresh start" under the Bankruptcy Code.

## PART II – BASIS FOR RELIEF REQUESTED BY MOTIONS

44.     I have reviewed each of the following motions and the facts set forth in them are true and correct to the best of my knowledge, information, and belief.

45.     **Motion to Approve DIP Financing**. The DIP Financing is necessary to fund the costs associated with the Chapter 11 case and to provide sufficient runway for me, with the aid of my highly capable and experienced advisors, to negotiate and achieve confirmation of a plan of reorganization.

46.     Given that it was the adversarial and litigious relationship with my creditors, most notably PAX, that drove me to seek chapter 11 relief, I requested, and GSNY agreed, that the DIP Financing would be for the benefit of all estate professionals, without imposing any lien or priority rights that could potentially prejudice the interests of my creditors. The DIP Financing is offered on an unsecured basis, subordinated to the rights of my prepetition creditors, and without any administrative or other priority repayment rights. My understanding is that the DIP Loan shall be repaid if and only if all of my other creditors are paid in full. Given these generous terms, I believe that any attempt to obtain financing from another source on competitive or similar terms would be a waste of estate resources and would be futile.

47.     Also, as set forth above and in my Schedules, I anticipate that the proceeds of recoveries or settlements in litigations in which I am a plaintiff will be used to fund a Chapter 11 plan. Without access to the DIP Financing, I will be unable to retain and compensate the counsel currently prosecuting actions on my behalf. Similarly, my liabilities may substantially increase if I am unable to defend, settle, and/or litigate these claims (either within this proceeding or, if stay relief is granted, in other venues).

48.     For these reasons, I believe that the proposed DIP Financing is extended in good faith, does not prejudice any of my creditors' rights or interests, is in the best interests of my estate, and should therefore be approved.

49.     **Application to Retain Stretto, Inc. as Claims and Noticing Agent**. I need a claims and noticing agent to help provide notice to the estate's creditors and parties-in-interest throughout the pendency of the Chapter 11 case. I have chosen Stretto, Inc. ("Stretto") to serve as my claims and noticing agent. Stretto has substantial experience serving as a claims and noticing agent in various chapter 11 cases throughout the United States, including in this District. Stretto has agreed to render consulting services to: (a) serve as the noticing agent to mail notices to the estate's creditors and other parties-in-interest; (b) maintain an electronic platform for filing proofs of claim, plan solicitation, balloting, tabulation of votes, disbursements, and administrative support in preparation of schedules of assets and liabilities and statements of financial affairs; and (c) provide other administrative services, as necessary, with respect to this Chapter 11 case.

50.     **Application to Retain Brown Rudnick LLP as Restructuring Counsel**. I need highly capable and experienced restructuring counsel to advise and help structure my exit from Chapter 11, potentially in the form of a confirmed plan of reorganization.  I have chosen Brown Rudnick LLP ("Brown Rudnick") as my restructuring counsel for the Chapter 11 case.  Brown Rudnick has extensive experience and knowledge in the fields of debtors' and creditors' rights and reorganizations under chapter 11 of the Bankruptcy Code, having represented debtors, official and unofficial committees and other prominent parties in many Chapter 11 cases in this Circuit, this District, and other districts across the country.  Brown Rudnick also has familiarity with my affairs and the legal issues to be contested in the Chapter 11 case, and has agreed to: (a) prepare all necessary motions, responses, answers and other legal papers, including trial preparation as may

be necessary; (b) prepare and take action as necessary for approval of a disclosure statement and confirmation of a plan of reorganization; and (c) perform all other legal services as may be necessary during the pendency of the Chapter 11 case.

51.     Prior to the Petition Date, on each of February 14, 2022 and February 15, 2022, Brown Rudnick was paid a retainer of $500,000.  The source of the $1 million in retainer payments (the "BR Retainer") was Lamp Capital LLC ("Lamp"), which is a company owned by my son. Lamp loaned me $1 million on an unsecured basis, and I directed Lamp to remit the proceeds of the loan directly to Brown Rudnick.  Brown Rudnick applied $51,835.20 in pre-Petition Date fees and disbursements against the BR Retainer, leaving Brown Rudnick with a prepetition BR Retainer Balance of $948,164.80.  Going forward, I have asked Brown Rudnick to apply its allowed fees and disbursements against the BR Retainer until the BR Retainer balance is $250,000, after which Brown Rudnick will seek payment of its allowed fees and expenses from me through the proceeds of the DIP Financing.

52.     **Application to Retain Verdolino & Lowey, P.C. as Financial Advisor**. I need a financial advisory firm to prepare, review, and analyze the necessary financial disclosures mandated under the Bankruptcy Code and the ongoing monthly and quarterly reporting requirements during the pendency of the Chapter 11 case.  I have chosen Verdolino & Lowey, P.C. ("V&L") to serve as my financial advisor.  V&L has extensive experiencing working with distressed individual chapter 11 debtors, and provides tailored services, including, but not limited to, financial advisory, consulting, accounting services, tax, and other related services.  V&L has agreed to render services regarding: (a) the preparation and review of my SOFA and the Schedules and other periodic reporting requirements; (b) the preparation and/or review of cash flow and related budget projections; (c) maintaining the DIP account, and effectuating disbursements when

necessary and providing accounting of all cash activity; (d) claims review and administration; (e) plan of reorganization formulation and review; (f) the rendering of any necessary litigation support; and (g) the providing of general consulting and assistance with any other matters and tasks that may arise during the pendency of the Chapter 11 case.

53.    **Motion to Authorize Employment and Payment of Professionals Utilized in the Ordinary Course**.  I am a named plaintiff or named defendant in numerous cases pending at the state and federal levels in the United States, as well as in foreign jurisdictions.  In connection with these litigations and certain ongoing government investigations, prepetition, I retained various law firms, accountants, and other non-attorney professionals (together, my "Ordinary Course Professionals"), which rendered services in connection with my prepetition litigation and provided other services in a variety of matters unrelated to this Chapter 11 case.  I intend to use the DIP Financing, subject to the Court's approval, to continue employing and compensating these Ordinary Course Professionals because they each have a great deal of knowledge, expertise, and familiarity with my affairs (prepetition) and my pending litigation, much of which has been ongoing for years.

54.    Among the reasons I am seeking emergency interim relief for the DIP Financing is to ensure that the professionals representing me continue working.  Certain professionals may withdraw from representing me unless I am able to assure them that they will be paid for their prepetition and post-Petition Date work.  Such a withdrawal, depending on the status of the case and the services provided by the applicable professional, could cause cause me and my estate clear and irreparable harm.  The UBS, Clark Hill, and other pending litigation claims are assets that I anticipate relying on to help formulate and potentially confirm a plan of reorganization.  Any disruption to my prosecution of these claims would undoubtedly be value destructive.

55.    In sum, without my Ordinary Course Professionals' knowledge, expertise, and familiarity in connection with their prepetition work, my estate will incur substantial additional and unnecessary expenses in educating and retaining replacement professionals necessary to preserve, and potentially continue prosecuting these valuable litigation claims.  Accordingly, I believe that the continued retention of my Ordinary Course Professionals is in the best interests of this estate, my creditors, and other parties-in-interest.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge.

Dated: March 20, 2022
      Greenwich, Connecticut

By: _____

Name:   Ho Wan Kwok

**EXHIBIT A**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **CRIMINAL NO.** |
| | ) | |
| v. | ) | **Count 1:**    **18 U.S.C. § 371** |
| | ) | **(Conspiracy)** |
| **ELLIOTT BROIDY,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## CRIMINAL INFORMATION

The United States of America charges:

### INTRODUCTION

1. At all times relevant to this Information:

2. From no later than March 2017 to at least in or about January 2018, ELLIOTT BROIDY agreed with Nickie Lum Davis and Person A to act as agents of Foreign National A in exchange for millions of dollars which was not disclosed. BROIDY specifically agreed to lobby the Administration of the President of the United States ("Administration") and the United States Department of Justice ("DOJ") to drop or otherwise favorably resolve its matters against Foreign National A for his role in the embezzlement of billions of dollars from 1Malaysia Development Berhad ("1MDB"), a strategic investment and development company wholly owned by the Government of Malaysia. As part of their efforts, BROIDY, Davis, and Person A willfully failed to disclose to the Administration and DOJ officials that BROIDY was acting on behalf of Foreign National A. Ultimately, BROIDY, Davis, and Person A were unsuccessful in their efforts to have the 1MDB matters dropped or otherwise favorably resolved for Foreign National A.

3. During the same approximate period, BROIDY, Davis, and Person A also agreed to lobby the Administration and DOJ to arrange for the removal and return of People's Republic

of China ("PRC") National A—a citizen of the PRC living in the United States—all on behalf of Foreign National A. This involved, among other things, advocating for meetings between PRC Minister A and United States government officials. Here too, BROIDY, Davis, and Person A were ultimately unsuccessful.

4.      To further the interests of Foreign National A, BROIDY, aided by Davis and Person A, attempted to facilitate a meeting between Malaysian Prime Minister A and the President in September 2017, in part to allow Malaysian Prime Minister A to raise the resolution of the 1MDB matter with the President.

5.      BROIDY, Davis, and Person A also met with PRC Minister A in the PRC and agreed that BROIDY, assisted by Davis and Person A, would lobby the Administration to return PRC National A to the PRC. BROIDY, Davis, and Person A, for the express purpose of providing PRC Minister A an opportunity to discuss the removal of PRC National A with high-level United States officials, also agreed to and attempted to facilitate meetings between PRC Minister A and top officials in the Administration, at DOJ, and at the United States Department of Homeland Security ("DHS"), during PRC Minister A's visit to the United States in May 2017.

Criminal Prohibitions on Acting as an Agent of a Foreign Principal or Government

6.      The Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, was and is a disclosure statute that requires any person acting in the United States as "an agent of a foreign principal" to register with the Attorney General in connection with certain types of activities, such as political or public relations efforts or lobbying on behalf of the foreign principal. Such registrations are made to the National Security Division's Foreign Agents Registration Act Unit ("FARA Unit") within DOJ. It is a crime to knowingly and willfully fail to register, and to make

2

false and misleading statements or material omissions in documents submitted to the FARA Unit under the law's provisions.

7. The purpose of FARA is to prevent covert influence by foreign principals. Proper registration under the statute allows the United States government and the American people to evaluate the statements and activities of individuals who are serving as agents of foreign principals. Among other things, a FARA registration reveals the identity of the foreign principal on whose behalf a registrant performs services, the type of services the registrant provides the foreign principal, the source and amount of compensation the registrant receives from the foreign principal, and political campaign contributions made by the registrant while the registrant was acting as an agent of the foreign principal.

## RELEVANT PARTIES & ENTITIES

8. The defendant, ELLIOTT BROIDY, served as Deputy Finance Chair of a national political committee from approximately 2017 to April 2018. BROIDY raised large political contributions from donors, organized political fundraising events, and coordinated fundraising strategies with the campaign of a candidate for the Office of the President of the United States during the 2016 election cycle. In his role as Deputy Finance Chair, BROIDY maintained access to, and contact with, high-ranking officials in the Administration, including the President himself. Over the same period, BROIDY owned and operated several domestic and international businesses.

9. Nickie Mali Lum Davis was and is a United States citizen, businesswoman, and consultant with personal and business relationships with BROIDY and Person A. On August 31, 2020, Davis pleaded guilty in the United States District Court for the District of Hawaii to a one-count Information charging aiding and abetting a violation of FARA.

3

10.     Person A was and is a United States citizen, businessperson, and entertainer with international ties, including ties to Foreign National A.

11.     Foreign National A was a wealthy businessperson living in East Asia who has been charged separately for his role in orchestrating and executing a multi-billion-dollar embezzlement scheme from 1MDB.

12.     Company A was a limited liability company formed by Person A to receive wire transfers from Foreign National A, and was used by Person A to pay BROIDY, Davis, and others for their lobbying efforts.

13.     George Higginbotham was an associate of Person A and was a licensed attorney employed by DOJ. On November 20, 2019, Higginbotham pleaded guilty in the United States District Court for the District of Columbia to a one-count Information charging conspiracy to make false statements to a financial institution.

14.     Law Firm A was a law firm operated by Person C and controlled by BROIDY and Person C.

15.     PRC National A was a citizen of the PRC, living in the United States on a temporary visa. The government of the PRC, including PRC Minister A and the President of the PRC, were seeking the removal of PRC National A from the United States back to the PRC.

16.     In late 2016 through 2019, DOJ was actively investigating transactions of Foreign National A allegedly associated with laundered proceeds of the 1MDB embezzlement scheme. In July 2016, DOJ filed multiple civil forfeiture complaints seeking the forfeiture of millions of dollars in assets allegedly purchased with 1MDB laundered proceeds. On November 1, 2018, DOJ filed a criminal indictment charging Foreign National A and others with conspiring to launder

billions of dollars embezzled from 1MDB and conspiring to violate the Foreign Corrupt Practices

Act by paying bribes to various Malaysian and United Arab Emirates ("UAE") officials.

## COUNT ONE
### 18 U.S.C. § 371
### (Conspiracy to Serve as an Unregistered Agent of a Foreign Principal)

17.    Paragraphs 1 through 16 are realleged and incorporated herein by reference.

18.    From no later than March 2017 to at least in or about January 2018, the defendant,

## ELLIOTT BROIDY,

knowingly conspired with others known and unknown, to:

    a.  knowingly and willfully act as an agent of a foreign principal,
        specifically, Foreign National A with respect to the 1MDB matters and
        the removal of PRC National A, without registering with the Attorney
        General, in violation of 22 U.S.C. §§ 612 and 618.

### Objects of the Conspiracy

19.    It was an object of the conspiracy for BROIDY, Davis, Person A, and Foreign

National A to orchestrate back-channel, unregistered campaigns to lobby the Administration and

DOJ to: (1) end the 1MDB matters or otherwise resolve the matters favorably for Foreign National

A; and (2) remove PRC National A from the United States and send him back to the PRC.

20.    It was an object of the conspiracy for BROIDY, Davis, and Person A to make

millions of dollars by leveraging BROIDY's access to and perceived influence with the President

and his Administration in order to secure payments from Foreign National A.

21.    It was an object of the conspiracy for BROIDY, Davis, and Person A to conceal

BROIDY's contacts with and payments from Foreign National A to maintain BROIDY's

credibility with United States officials and to further the illegal advocacy scheme.

## Manner and Means of the Conspiracy

22.     The manner and means by which BROIDY and others carried out the conspiracy included, but were not limited to, the following:

### International Travel to Meet with Foreign Principals and Government Officials

23.     BROIDY, Davis, Person A, and Higginbotham, in various combinations, traveled to Thailand, Malaysia, and the PRC for the purpose of meeting with Foreign National A, PRC Minister A, and others to negotiate and discuss the arrangement by which BROIDY would lobby the Administration and DOJ—outside of official channels—in exchange for millions of dollars.

### Meetings and Contacts with United States Officials

24.     BROIDY, both directly and through intermediaries, facilitated and attempted to facilitate meetings and other efforts to influence officials at the highest levels of the United States government, including the President and the Attorney General, for the benefit of PRC Minister A and Foreign National A.

25.     BROIDY, both directly and through intermediaries, contacted high-level officials in the United States government to arrange meetings for foreign government officials, including PRC Minister A and the Malaysian Prime Minister A, to provide opportunities for these foreign officials to formally request favorable governmental action, including the favorable resolution of the 1MDB matters and the removal of PRC National A.

### Concealment

26.     BROIDY, Davis, and Person A agreed to conceal BROIDY's agreement to lobby on behalf of Foreign National A, in his individual capacity and as an intermediary for PRC Minister A.  BROIDY, Davis, and Person A did not disclose and agreed not to disclose to United States government officials and the public BROIDY's financial arrangement with and payments from

Foreign National A. In extensive contacts, communications, and documents drafted in furtherance of the conspiracy, BROIDY, Davis, Person A, and Higginbotham were secretive and anonymized references to Foreign National A. Further, BROIDY, Davis, and Person A often used encrypted applications when communicating about Foreign National A and PRC National A to conceal their conduct and connection to Foreign National A. Finally, BROIDY, Davis, and Person A agreed, implicitly or explicitly, not to register under FARA to conceal their arrangement with Foreign National A.

## Overt Acts

27.     In furtherance of the conspiracy, BROIDY and others committed the following overt acts, among others, in the District of Columbia and elsewhere.

**I.     Campaign to Resolve 1MDB Civil Forfeiture Cases**

### A. BROIDY Agrees to Lobby for Foreign National A for $8 Million Retainer

28.     In or about March 2017, Person A contacted Davis in an effort to locate someone with close ties to the Administration to help a foreign client. Davis in turn told BROIDY that she had a possible client in Malaysia who could use help with a forfeiture matter.

29.     On or about March 7, 2017, Person A requested that Davis send him BROIDY's biography describing BROIDY's relationship with high-level officials in the Administration and photographs of BROIDY and the President. On or about March 7, 2017, BROIDY's assistant, at Davis's request, emailed photographs to Davis featuring BROIDY and the President. Person A said that he wanted the photographs so that Person A could highlight for Foreign National A BROIDY's close access to the Administration.

30.     On or about March 8, 2017, Davis texted BROIDY, "Are you in la to meet on the 16th w [Person A] prior to his travel that weekend to Asia?" BROIDY responded, "I think so. Let's speak later."

31.     On or about March 13, 2017, BROIDY met with Davis and Person A to discuss Foreign National A and 1MDB. At the meeting, Person A described his relationship with Foreign National A to BROIDY, and asked if BROIDY could help with the civil forfeiture cases involving Foreign National A. Person A said he would speak with Foreign National A about the possibility of BROIDY helping with the civil forfeiture cases. That same day, BROIDY texted Davis in part, "I'm excited about our business prospects."

32.     On or about March 13, 2017, Davis forwarded to Person A a "Retainer and Fee Agreement – Litigation Services" between Law Firm A and Foreign National A so that Person A could present the agreement to Foreign National A. The "Retainer and Fee Agreement" stipulated that Foreign National A would pay an $8 million retainer fee upfront, and an additional $75 million success fee if the "matter" was resolved within 180 days, or $50 million if the "matter" was resolved within 365 days. The draft agreement included an Exhibit A explaining that the "matter" referred to the 1MDB forfeiture proceedings. BROIDY, Davis, Person A, Law Firm A, and Person C provided no litigation services or legal advice to Foreign National A. The true purpose of the retention agreement was to secure BROIDY's services to lobby the Administration and DOJ on Foreign National A's behalf based on BROIDY's political connections.

33.     Despite their knowledge of the requirement to register as agents of a foreign principal, at no time did BROIDY, Davis, or Person A register with the FARA Unit regarding their work as agents of Foreign National A.

8

### B. BROIDY, Person A, and Davis Meet Foreign National A in Bangkok

34.     In or about April 2017, Davis relayed Person A's request for BROIDY to travel to Bangkok, Thailand to meet with Foreign National A.  BROIDY told Davis to tell Person A that he would go only if he were paid $1 million, and that he wanted to be paid by Person A from "untainted" funds.  BROIDY was assured that Person A would personally pay $1 million in exchange for BROIDY traveling to Bangkok.

35.     On or about April 28, 2017, BROIDY texted Davis advising, "I would like the funds to go to [Law Firm A.]"  That same day, Davis responded, "Ok[.]"

36.     On or about April 29, 2017, BROIDY and Davis exchanged text messages regarding their upcoming meeting with Foreign National A and Person A.  Among those text messages, BROIDY asked in reference to Foreign National A, "Does the principal want us in a particular hotel in either location?"  Davis responded, "Call me when u can talk[.]"

37.     On or about May 1, 2017, Davis emailed BROIDY and his assistant a link to the Shangri-La Hotel in Bangkok, and wrote, in part, "Please send me the hotel confirmation for both Elliott's room and mine once you get it online and I will forward."  That same day, Davis separately emailed Person A telling him to book a room at the Shangri-La Hotel and to send her the confirmation.  Person A responded, "[Foreign National A] is booking our hotel," and later followed up with, "Also send me Elliott's wire info."  Davis replied by providing the wire information for an account in the name of Law Firm A.

38.     On or about May 2, 2017, Davis emailed BROIDY stating in part, "Since u land earlier – [Person A] and I will see you at arrivals. . . . Thanks and bon voyage – here's to the start of an exciting and prosperous adventure!"

39. On or about May 2, 2017, BROIDY, Davis, and Person A arrived in Bangkok. During the trip, BROIDY, Davis, and Person A met with Foreign National A in a hotel suite. BROIDY and Foreign National A spoke about the 1MDB matters. BROIDY agreed to help Foreign National A attempt to resolve the matter. Foreign National A agreed to pay BROIDY an $8 million retainer and wanted BROIDY to contact the Attorney General of the United States to get DOJ to drop the 1MDB matter. BROIDY agreed to lobby the Administration and DOJ for a favorable result for Foreign National A while concealing the fact that he was working on Foreign National A's behalf. During the meeting or shortly thereafter, Davis and BROIDY discussed the possibility of assisting in getting PRC National A removed from the United States. With respect to payment, BROIDY stated that the money should not come directly from Foreign National A and should be "clean." Foreign National A identified a friend who could pay BROIDY and others. BROIDY, Person A, and Davis agreed that the money would first be routed through Person A and then be paid to BROIDY through Law Firm A. BROIDY and Davis agreed that BROIDY would pay Davis a percentage of what BROIDY received. Person A also agreed to pay Davis a percentage of the funds that Person A received. Person A told BROIDY and Davis that Person A's friend, Higginbotham, was verifying the legitimacy of the funds. Higginbotham did not actually perform any such review. BROIDY never met or spoke with Higginbotham.

### C. Person A Receives $8.5 Million from Foreign National A; BROIDY is Paid $6 Million; Davis is Paid $1.7 Million

40. Following the meeting with Foreign National A in Thailand, on or about May 8, 2017, Company A received a wire transfer directed by Foreign National A for approximately $2.8 million from an entity in Hong Kong. That same day, Person A obtained a cashier's check from the Company A account for $702,000 payable to Law Firm A, which was immediately credited to Law Firm A's account. Person A also made a separate wire transfer of $48,000 to Law Firm A

from the Company A account. Also that same day, a third-party company transferred $250,000 to the Law Firm A account at Person A's direction, bringing the total amount deposited into the Law Firm A account to $1 million. Within several days, approximately $900,000 of the $1 million transferred into the Law Firm A account on or about May 8, 2017, was transferred from the Law Firm A account to one of BROIDY's business accounts.

41.  On or about May 8, 2017, Davis texted BROIDY, "Both wires in [Law Firm A] are from [Person A]. The remaining balance was dropped to your office 20 minutes ago -". Davis then added, "702 total cashier check[.]"

42.  On or about May 17, 2017, Foreign National A caused an international wire to be sent to Company A from a Hong Kong company. That same day, Person A transferred $3 million from Company A to Law Firm A. On or about May 18, 2017, Law Firm A transferred $600,000 to one of BROIDY's business accounts and $900,000 to an account for a business entity associated with Davis. On or about May 18, 2017, Law Firm A transferred $500,000 to one of BROIDY's business accounts. Within approximately one week, Law Firm A transferred an additional $950,000 in two separate transfers to one of BROIDY's business accounts.

43.  On or about May 17, 2017, BROIDY and Davis exchanged text messages regarding the payments from Foreign National A to BROIDY through Person A and BROIDY's payment of a percentage to Davis. Among the text messages, Davis asked, "Did you get it?" BROIDY responded, "Yes. Sent you Wickr[.] Sending wire to you in morning." Wickr is a messaging application that allows for end-to-end encryption and content expiration. BROIDY later added, "Did you get 2nd confirm?" Davis responded, "When Asia opens. . . . Baby steps at least moving forward now." BROIDY responded, "Yes. Hammer them for the next 2 wires." BROIDY later

added in part, "Assuming second 3 is in and confirmation that last 2 is being sent. Please ask [BROIDY's assistant]."

44.     On or about May 25, 2017, Foreign National A caused a third transfer to be made to Company A, this time in the amount of approximately $2.7 million. On or about May 26, 2017, Person A transferred $2 million from Company A to Law Firm A in partial satisfaction of the $8 million retainer to which BROIDY and Foreign National A agreed in return for BROIDY's assistance with the 1MDB civil forfeiture cases. That same day, $600,000 was transferred from Law Firm A's account to a business account associated with Davis. On or about May 26, 2017, Law Firm A transferred $1 million to an account controlled by Person C. In or about early June 2017, Law Firm A transferred $650,000 to one of BROIDY's business accounts.

### D. BROIDY Facilitates and Attempts to Facilitate Meetings for Malaysian Prime Minister A and Efforts to Resolve the 1MDB Cases

45.     On or about June 5, 2017, BROIDY texted Person D, a political consultant and former campaign aide for the President, and requested that Person D work with the Administration to set up a visit for Malaysian Prime Minister A: "Asian country is very motivated re July meeting. Hoping we can confirm date etc asap." Pursuant to a consulting agreement, BROIDY had agreed to pay Person D $25,000 per month for advice and guidance with respect to navigating the Administration.

46.     The same day, BROIDY and Davis exchanged text messages regarding Foreign National A. Among those messages, Davis wrote, "Please call before u go to bed … [Foreign National A] keeps calling for news[.]" BROIDY responded, "Yes. Will call you. I am heading to D.C. Tonight to work on [Foreign National A] and Asian country[.]"

47.     On or about June 15, 2017, at Person A's request, Davis texted BROIDY, "Hey he'd like to speak w you this evening. Are u able?" Davis added, "Principal", which was a reference to Foreign National A. That same day, BROIDY responded, "Yes[.]"

48.     On or about June 17, 2017, BROIDY and Davis discussed Malaysian Prime Minister A. In or about June 2017, BROIDY asked the President if he would play golf with Malaysian Prime Minister A. BROIDY and Davis believed that this would please Foreign National A and would allow Malaysian Prime Minister A to attempt to resolve the 1MDB matter. BROIDY also hoped to secure additional business with the government of Malaysian Prime Minister A and hoped that arranging golf with the President would further his business interests.

49.     On or about June 19, 2017, Davis texted BROIDY a link to an article about the Malaysian Prime Minister A's office criticizing the 1MDB forfeiture action in the United States.

50.     On or about June 29, 2017, BROIDY sent a text message to a high ranking official in the White House in an effort to arrange a golf outing between Malaysian Prime Minister A and the President: "Hi [Person E], As I mentioned, POTUS agreed to play a round of golf in DC or Bedminster in late July or early August with [Malaysian Prime Minister A]. Thank you very much for getting back to me with the date. Also a letter went to the state dept. for a meeting some weeks ago."

51.     On or about June 30, 2017, BROIDY sent another text message to Person E regarding the golf outing: "Hope we can speak this morning on [PRC National A] and golf date with POTUS for [Malaysian Prime Minister A]." Later that day, BROIDY followed up with, "[Person E], as discussed, hoping we can get these items completed today. Please call me anytime."

13

52.     On or about July 3, 2017, BROIDY again texted Person E regarding the golf date for Malaysian Prime Minister A and the President: "Good morning [Person E]. It would be extremely helpful to me if you could confirm the golf date today with POTUS for [Malaysian Prime Minister A.] POTUS told me he is glad to play at Bedminster or DC. After we spoke, I mentioned to [Malaysian Prime Minister A] that he would have the date last week. Thank you very much! Regards, Elliott." Later that day, BROIDY texted Person E again: "[Person E], I'm following up. Please send me the date and time for the [Malaysian Prime Minister A] golf with POTUS. Thank you!"

53.     On or about July 5, 2017, BROIDY exchanged messages with Person E regarding the golf outing. Among other messages, BROIDY texted, "[Person E], just left you a message. It's been a week. Can you send me the date today? Best, Elliott[.]" Person E responded, "It's with the NSC[.] They coordinate and negotiate – I'm sure it will get done[.]"

54.     On or about July 11, 2017, relaying a message from Person A, Davis texted BROIDY, "Wickr[.] It's 5pm ... I think we need to make a move. Date and otherwise. We're getting killed." These messages referred to confirming a date for Malaysian Prime Minister A to play golf with the President and Foreign National A's displeasure because no date had been confirmed. Davis continued, "Please call because we need to strategize – I'm getting inundated[.]" BROIDY responded, "See wikr[.]" The following day, BROIDY texted Davis, "Send me text on wikr. I'm taking off and need to get to WH[.] Taking off. Need now[.]" Davis responded, "Done[.]" BROIDY responded, "Got it. Thx[.] Trying to get [Person F] to do call asap[.]" Person F was then a high-ranking official on the National Security Council.

55.     On or about July 13, 2017, Davis texted BROIDY, "Please call when u can so we can talk- we gotta handle this so pls pls go to D.C. And sit at WH until u get it. I will keep u company if u worry about being lonely!"

56.     On or about July 13, 2017, BROIDY texted Person E again regarding the golf date: "Hi [Person E], It's been 2 weeks. Checking again on date for golf for [Malaysian Prime Minister A] with POTUS. Can you text me date today? Thank you. Best, Elliot[.]" Person E responded, "I'll check now again[.] These things go through a process -". BROIDY responded "Thank you!!" Person E replied, "NSC is on it and coordinating[.]" BROIDY responded, "Can we get date today?" Person E replied, "They're working directly with the Malaysians. NSC is coordinating a date."

57.     On or about July 15, 2017, BROIDY texted Davis, "Working on getting meetings for tomorrow."

58.     On or about July 17, 2017, conveying urgency expressed by Person A on behalf of Foreign National A, Davis texted BROIDY, "[Person E] needs to give u this date now and ask him for update on other thing. We look impotent[.]" This text referred both to setting up a meeting between the President and Malaysian Prime Minister A and to the matter involving PRC National A. BROIDY responded, "Agree. Hammering away[.]"

59.     On or about July 18, 2017, BROIDY and Davis exchanged several text messages about setting up a meeting between the President and Malaysian Prime Minister A. Among the messages, Davis wrote, "Can u check Wikr[.] Really really need that date. It's been crazy for me all day w this. He's panicking[.]" Davis followed up with, "This date is mandatory today- we're getting creamed." According to Person A, Foreign National A was panicking because no meeting had yet been scheduled. BROIDY responded, "Calling [Person E] now[.]" Davis replied in part,

"Call everyone so they know u are raging mad[.] Call [Person G] too. We need this today[.]" Person G was an administrative assistant to the President. BROIDY replied, "Doing it now."

60. On or about July 19, 2017, Davis texted BROIDY in reference to scheduling a date for a meeting between Malaysian Prime Minister A and the President, "Secondly we need this date bad[.]" BROIDY responded the following day, "Please bear with me. Getting some info on mtg[.]"

61. On or about July 21, 2017, BROIDY texted Person E regarding the golf outing: "[Person E], The Malaysians have heard nothing from NSC. POTUS said he would play golf with [Malaysian Prime Minister A] in late July or early August. POTUS said he was happy to do it. You said it would be scheduled in a day or two. We're in the 4th week. I know you are busy and procedures apply but I've been more than patient. Instead of being positive, this is now causing me damage. I would truly appreciate it if you could get back to me today with a date. Thank you! Elliott."

62. On or about July 24, 2017, BROIDY texted Person D, "Received golf date in NJ in Sept. Sat before the UN General Assembly. Finally! Crossed off my list! Thank you also for helping!" Person D responded, "Let's follow through and make sure the date is confirmed by the NSC. Did he tell you who gave him the date?" BROIDY replied, '"Thank you!! Fantastic. Given to [Person H] by [Person E]."

63. On or about July 27, 2017, BROIDY texted Person D, "Just checked again with Malaysians. Their Amb to US and Foreign Minister have heard nothing. Please check asap. Best, Elliott." BROIDY followed up with, "Hi [Person D]- Can you call NSA for me re Malaysians receiving official word. Still no contact from NSC to Malaysian Amb on meeting. Thank you. Best, Elliott." Person D responded, "E- will call again this morning."

64.     On or about July 27, 2017, BROIDY emailed a high-level official from the National Security Council in an attempt to arrange a golf game between Malaysian Prime Minister A and the President.

65.     On or about July 29, 2017, Davis texted BROIDY in reference to the meeting between Malaysian Prime Minister A and the President, "They were told 12 sept is mtg. That's day that un general assembly stars- it's a Tuesday???? No golf??" Davis immediately followed by texting "Wickr[.]" BROIDY responded, "May be two mtgs. Amb should ask. Golf at Bedminster on Sat and tues at WH?"

66.     On or about August 7, 2017, BROIDY sent his assistant an email with the subject, "Malaysia Talking Points *Final*", which contained the purported talking points of Malaysian Prime Minister A intended for an upcoming meeting between the United States Secretary of State and Malaysian Prime Minister A. Davis had received the talking points from Person A—who provided them on behalf of Foreign National A—and Davis relayed them to BROIDY. The talking points mentioned, among other things, BROIDY's ongoing relationship and work with Malaysia, and identified 1MDB as a "[p]riority[.]" The talking points noted the lack of harm caused by 1MDB, and specified that "[t]he involvement of US prosecutors has caused unnecessary tension American [sic], and could cause a negative reaction among Malaysians[.]".

67.     On or about August 7, 2017, BROIDY also sent these talking points to Person D, immediately followed by a message explaining, "Above is attachment from Malaysian PM of his talking points. You can share with [staff assistant who works for the Secretary of State]." BROIDY also sought to obtain details about the timing of a meeting in Malaysia between Malaysian Prime Minister A and the Secretary of State.

17

68.     Later on or about August 7, 2017, BROIDY messaged Person D, "[Secretary of State] is meeting with [Malaysian Prime Minister A] on 8th and deputy PM on 9th. Let's get a plug in my name. They know my name and might not immediately recognize Circinus name. Thank you!" Person D responded, "Definitely important to make this connect. It will not likely be part of the formal meetings but will work to get a plug during their conversations."

69.     On or about August 9, 2017, Foreign National A caused a Hong Kong company to transfer approximately $12.8 million to Company A. Person A then transferred $3 million to Law Firm A. This was the final payment made to BROIDY. In total, BROIDY was paid $9 million. On or about the next day, Law Firm A transferred $900,000 to a business account associated with Davis. In the ensuing days, Law Firm A transferred hundreds of thousands of dollars to accounts belonging to BROIDY

70.     On or about August 10, 2017, BROIDY texted Person D regarding the meeting between Malaysian Prime Minister A and the Secretary of State: "Heard from Malaysia that meetings went very well. They were happy with [Secretary of State]. My name was not mentioned – no plug. ;- . . . ."

71.     On or about August 19, 2017, BROIDY texted Person D, "Any update on Malaysia? Person D responded, "As of now it is going to be in DC. And hard to do golf due to schedule but I am working on it. Might have to go to [Person I] directly on this and use the history of the two of them playing golf." BROIDY responded, "Yes. If you think it would help I could directly call one of [Person I] deputies or [Person I]. Also need to add time to meetings. I would like to discuss details with you. Please let me know what is best." Person I was then a high-ranking official at the White House.

72.     On or about August 31, 2017, BROIDY drafted and sent an email to Person 1 attempting to arrange a golf game between Malaysian Prime Minister A and the President.

73.     On or about September 11, 2017, Davis typed a letter to be sent from BROIDY to the President in anticipation of Malaysian Prime Minister A's meeting with the President and provided the letter to BROIDY.  The letter included several positive developments in the relationship between Malaysia and the United States.  The letter was never provided to the President.

74.     Following BROIDY's repeated efforts to schedule a golf game between the President and Malaysian Prime Minister A, Malaysian Prime Minister A met with the President at the White House on or about September 12, 2017.  Although BROIDY contacted high-ranking officials in the Administration to arrange a golf meeting between the President and Malaysian Prime Minister A in addition to the official meeting, no golf game between Malaysian Prime Minister A and the President took place.

75.     On or about October 6, 2017, BROIDY met with the President at the White House. BROIDY did not raise the 1MDB matters during the meeting but represented to Davis that he had, understanding that Davis would communicate that information to Person A and Foreign National A.

76.     On or about January 5, 2018, BROIDY drafted talking points related to 1MDB to demonstrate to Foreign National A the efforts that BROIDY had undertaken on his behalf.  Among other things, the talking points provided: "1. We are working with the DoJ to counter the previous Administration's case against 1MDB in Malaysia. I have put a strategy in place to contact parties both at DoJ and the NSC to find a resolution to this issue. 2. I am in the process of scheduling a meeting with the assistant attorney general [] who has the oversight for the Malaysia case. She is

a [presidential] appointee and can be helpful. . . . 3. As I informed you earlier, in my discussion with the President, he committed to getting this issue resolved. It is important that I take his lead but will continue to communicate the importance of this issue." These representations were false.

## II.    Campaign to Remove PRC National A from the United States

### A.  BROIDY Travels to China to Meet with PRC Minister A

77.    In or about May 2017, following the trip to Bangkok, BROIDY agreed to travel to Hong Kong to meet again with Foreign National A. Prior to the trip, Davis and BROIDY discussed that it was important to Foreign National A that PRC National A be deported from the United States. The purpose of the trip to Hong Kong was to meet with Foreign National A and a foreign government official of the PRC to discuss PRC National A.

78.    On or about May 15, 2017, Davis emailed BROIDY's assistant regarding travel arrangements and the itinerary for the trip to Hong Kong. The same day, Davis also emailed BROIDY and Person C banking information for Davis's company.

79.    On or about May 18, 2017, BROIDY, Davis, and Person A traveled to Hong Kong and were transported to Shenzhen, China, where they met with Foreign National A and PRC Minister A in a hotel suite. PRC Minister A spoke to BROIDY about PRC National A and his alleged crimes, and stated that the PRC government wanted PRC National A to be returned to the PRC. PRC Minister A asked BROIDY to use his influence with high-ranking United States government officials to advocate for PRC National A's removal and return to the PRC. They also discussed the potential return to the United States of Americans then being held prisoner by the PRC. PRC Minister A also stated that he would be visiting Washington, D.C. soon and was having trouble scheduling meetings with certain high-ranking United States government officials.

20

**B. BROIDY Lobbies Top U.S. Officials for the Removal of PRC National A**

80.     On or about May 20, 2017, during the return trip from China, BROIDY texted Davis, "I'll try to make this a big week for us with [the Attorney General.]"

81.     On or about May 21, 2017, BROIDY texted Person D regarding his meeting with Foreign National A and PRC Minister A: "[Person D]- Just returned. Huge opportunity. Can we meet Monday morning at 9:30 a.m. at [hotel]? Elliott."

82.     On or about May 22, 2017, BROIDY texted Person D, "I will need to meet with [Attorney General] asap. We will discuss." BROIDY followed up with, "I am emailing you a memo. We will discuss." Later the same day, Person D responded, "Have a request into [Attorney General] for mtg."

83.     On or about May 22, 2017, BROIDY sent an email to Person D with the subject, "Opportunity for Significantly Increased Law Enforcement Cooperation between US and China[.]" BROIDY attached to the email a memorandum from BROIDY addressed to the Attorney General, intending that Person D would then provide the memorandum to the Attorney General. The content of the memorandum had been provided to BROIDY by Davis, and the content originated from PRC Minister A and Foreign National A. Upon receipt, BROIDY and Person C revised the memorandum.

84.     In the memorandum, BROIDY mischaracterized the reason for his trip to China and the circumstances leading to his meeting with PRC Minister A. BROIDY did not disclose his contact with Foreign National A and did not disclose Foreign National A's role in setting up the meeting between BROIDY and PRC Minister A. BROIDY also did not disclose the $4 million that he had been paid by Foreign National A. BROIDY also did not disclose that his lobbying

efforts with respect to PRC National A were, at least in part, pursuant to his financial arrangement with Foreign National A and could potentially result in additional payment.

85.     In the memorandum, BROIDY stated, "I was told by [PRC Minister A] that China would like to significantly increase bi-lateral cooperation with the US with respect to law enforcement including cyber security." BROIDY wrote about PRC Minister A's upcoming trip to Washington, D.C., in which PRC Minister A and his delegation planned to meet with several high-ranking United States government officials. BROIDY indicated that it would be productive for the Attorney General to meet with PRC Minister A. BROIDY also noted several items that China, according to PRC Minister A, would be willing to do to improve law enforcement relations between the United States and China. BROIDY then added:

> According to my conversation with [PRC Minister A], the one request China will make is that [PRC National A], who China alleges has conspired with others who have been arrested and charged with violations of numerous criminal laws of China (including kidnapping and significant financial crimes be deported (his Visa ends within the next month or so) or extradited (Interpol has issued a Red Notice with respect to him which is attached for your reference) as soon as possible from the US to China so he can be charged with these violations and go through regular criminal proceedings in China with regard to these allegations.

BROIDY appended an Interpol Red Notice for PRC National A to the memorandum.

86.     On or about May 23, 2017, BROIDY texted Person D, "Hi [] Is meeting set for tomorrow? Has my memo been sent to [Attorney General]? Please update Thanks Elliott[.]" Person D responded, "Elliott- letter was delivered yesterday. Pls see the final version with changes. Working on mtg for tomorrow but shooting for early afternoon. Will call you later today. I am now on redeye tonight so I can get back to DC early." BROIDY responded, "Great. Thank you []. Also try to determine if his mtg was set or if we can set for thurs or in Alabama on fri or sat." The following day, on or about May 24, 2017, Person D responded, "[W]aiting to hear from

DoJ on mtgs – ours and [PRC Minister A].  let me know when you are free and we can meet up to go over other issues. thanks."

87.  On or about May 24, 2017, Person D texted BROIDY, "Just got a call from [Attorney General] office and he cannot do tonight.  But I got a text back from him directly that said he would call me later."

88.  On or about May 25, 2017, BROIDY texted Person D, "The meetings are at Justice at 10:00 am this morning.  Then FBI and DHS tomorrow.  Perhaps I could tell my contact to get there 10 min early and a brief meeting could occur.  And then have meet with [] one on one to discuss more details.  Please try to see [Attorney General] first thing today.  Really important that we pull it off.  I need to speak with my contact this morning.  Thank you. E[.]"  Person D responded, "E- working on it.  [Attorney General] is not in the office this morning but trying to see what time he is returning. Stand by."  Later the same day, BROIDY texted Person D, "Detail is that the 3 things in my memo are only for [Attorney General].  [PRC Minister A] wants to tell [Attorney General] directly.  Mine is legitimate back channel.  [PRC Minister A]'s boss wants confirmation that [Attorney General] heard the 3 things which really help US[.]"  Later that day, Person D responded, "E- actually just got off the phone with [Attorney General].  Not great news.  Let me know when you are free to talk.  Thanks."

89.  On or about May 26, 2017, referencing meetings for PRC Minister A, BROIDY texted Person D, "10 am head of ICE  11:30 FBI  Perhaps a play at DHS would save situation.  Fly by [Person I].  The three items can be shared."  BROIDY followed up with, "Please call me" and "I'm trying to do damage control and need to speak with you.  Best is pull aside with [Person I]."  Person I was a senior official in DHS at the time.

90.     On or about May 28, 2017, after Davis transcribed correspondence to BROIDY, BROIDY emailed Person D, "transcribed correspondence to and from [the Attorney General] and the Chinese Ambassador to the US." BROIDY noted, "I believe there is an excellent opportunity for [the Attorney General] to further US interests. I added comments below. Can we discuss asap? There is another matter of interest that the AG should be made aware of." Later that same day, BROIDY and Person D exchanged emails to schedule a time to discuss the email and its content.

91.     On or about May 30, 2017, Davis texted BROIDY with respect to PRC Minister A's meeting with United States government officials, "Check Wickr- all clear now for meetings[.]" BROIDY responded, "Yes. All set[.]" Davis replied, "He got his Mtgs reinstated[.]"

92.     In or about May 2017, Davis, at Person A's request, asked BROIDY to meet with PRC Minister A in Washington, D.C.

93.     On or about May 30, 2017, BROIDY met with PRC Minister A at a hotel in Washington, D.C. BROIDY also asked Person D if Person D could help PRC Minister A arrange meetings with high-ranking United States government officials.

94.     On or about May 31, 2017, BROIDY texted Person D:

> I met with the VM last night. He is on a 4 pm flight back this afternoon. The FBI had him meeting with very low level people and had the person he was to meet with meet with Vietnam instead. His superiors told him to come home unless meeting with [Attorney General] or [Person I]. He is happy meeting with [Person I]. . . . So far, he has delivered a pregnant woman and the next 2 will be sent shortly. He will accept 60 Chinese Nationals for deportation but only if he has a proper "short meeting". This is a big win for the admin that can be publicized. It is the result of Mara Largo meeting between the two presidents. Please call me and I will tell you more specifics. Thank you.

95.     Person D responded, "E-got the info. I will call in a few mins." BROIDY replied, "If you get the meeting, can we have the political WH liaison meet the VM at DHS? He can

24

mention my name. Also try to get [Person I] to warm up situation. Mention me as well. Thank you! Fingers crossed."

96.    On or about May 31, 2017, Davis texted BROIDY with respect to PRC Minister A's purported meeting with, Person I, "In principal [Person I] us ok- just a schedule issue?" BROIDY responded, "Just a short notice scheduling issue. Still might hear in next hour or so. There is no issue with [PRC Minister A]." BROIDY later continued, "Please pass along my good wishes to the VM. Wait a little while longer." Davis responded, "Yes, I'm telling him that." BROIDY replied, "Tell him I'm telling WH and [Attorney General] what happened." Davis then texted, "Isn't [Person I] scheduled to be in Haiti this afternoon?" BROIDY responded, "Scheduler did not mention this?? Are you sure? Neither did [Attorney General] people[.]" Davis responded, "It's on the DHS website[.] He's there for the afternoon[.] Just spoke to VM and he sounded like he was crying[.]" BROIDY responded, "Terrible. What a mess. Bottom line not our fault. Normally their Amb would handle. This is a cluster f[*]ck." Davis replied, "Wickr."

97.    On or about June 9, 2017, Davis texted BROIDY a news article titled "china-cranks-up-heat-on-exiled-tycoon-[PRC National A.]"

98.    On or about June 27, 2017, BROIDY texted Person H's spouse regarding the removal of PRC National A. BROIDY knew that Person H, an internationally successful businessman and frequent contributor to political campaigns with close access to the President, had immediate access to and influence with the President and could be effective in seeking the removal of PRC National A. BROIDY texted Person H's spouse, "On another note, I would like to meet with [Person H] tomorrow morning and on important and sensitive matter. Is there a time tomorrow morning that would be convenient or perhaps for lunch? Looking forward to seeing you at the [] Hotel! Regards, Elliott[.]" BROIDY later continued:

> Hi [], [Person H] asked me to send this information to you via text. I have a number of items I will be sending to you regarding the fugitive is [PRC National A]. The first is an Interpol red notice. . . . The highly time sensitive matter is that [PRC National A]'s visa to stay in the US expires on June 30th. It is critically that his new visa application he immediately denied. He must also be placed on the DHS no fly list. . . . This order would need to come from the very top as [PRC National A] is well connected with former FBI who are on his private security detail. [The President of the PRC] mention to [the President] at Mar-A-Lago that he would like [PRC National A] returned. [PRC Minister A] met with me and requested help with regard to [PRC National A]. . . . He promised to return certain US citizens held hostage by China and would accept a very large number of Chinese illegal immigrants for deportation back to China. Finally he offered new assistance with regard to North Korea.

99.     On or about June 28, 2017, BROIDY met with Person H and his spouse at a social gathering. After the meeting, BROIDY exchanged text messages with Person H's spouse regarding PRC National A: "Hi [], it was great to see you and [Person H] tonight! I just heard from [PRC Minister A] again. He would like to know the status of [PRC National A]'s VISA as time is of the essence. -Was the VISA issued already or did we deny it? Can we confirm that [PRC National A] is on the DHS no fly list? [PRC Minister A] is very concerned that [PRC National A] will flee the US this week. I hope we can confirm and move to deportation. This will be an incredible step for our two countries. [PRC Minister A] says they are grateful for your help." Person H's spouse responded, "This is with the highest levels of the state department and the defense department. They are working on this."

100.     On or about June 29, 2017, BROIDY and Davis exchanged text messages regarding PRC National A's visa application. BROIDY texted, "Is rejection or acceptance letter already generated?" Davis responded, "I have no idea." BROIDY replied, "Sorry always generated. In others words each applicant eventually re wives a yes or no in writing[?] Sorry receive a yes or no in writing[?]" Davis responded, "Yes[.] Check Wickr[.]"

101.    On or about June 30, 2017, Davis, in reference to their efforts to facilitate the removal of PRC National A and the potential return of United States citizens held in the PRC, texted BROIDY, "Wickr. You are the man right now. They are going to give you the President's medal of freedom award after what you will accomplish for this country this July 4th[.]" BROIDY responded, "I am going to slam until it's done[.]" Davis replied, "Let's make sure part 1 happens today. And date for m[.] Don't leave that dude until we do it." BROIDY responded, "Agree." Davis continued, "Let him know – if we get the letter confirming the denial today by close of business (as u need workers to generate that letter) then we will get the 2 Americans home by July 4[.] After other phase 2- we can do the 60 take back[.]" BROIDY responded, "Sounds good. [Person H] calling me back shortly. On a call."

102.    On or about June 30, 2017, BROIDY and Davis exchanged several text messages about PRC National A. BROIDY texted, "Heard from [Person H]. He reiterated to POTUS." BROIDY followed up with, "Separately, [Person E] texted me that he got tied up but is on top of it." That same date, Davis replied, "Can we get proof today about revoke?" Davis later specified, "From [Person E]?"

103.    On or about July 1, 2017, BROIDY texted Davis, "Spoke to [Person E] at length. Call me when you can[.]" BROIDY did not speak with Person E but had exchanged text messages with him about PRC National A's visa application. BROIDY did not disclose the true nature of his relationship with PRC Minister A to Person E.

104.    On or about July 2, 2017, BROIDY and Davis exchanged text messages regarding PRC National A and his visa application. Based on public reporting, Davis texted, "There is a call Scheduled for today Sunday with [President of the PRC] about n Korea. He can ask and confirm about package. He can even say he heard from [Person H.]"

27

105.     On or about July 3, 2017, again based on public reporting, Davis texted BROIDY: "[President] leaves D.C. Wednesday for Europe[.]" Davis then followed up: "July 5. Scheduled to meet in person w [President of the PRC][.]"

106.     On or about July 10, 2017, Person A emailed himself copies of the Red Notice for PRC National A, images of PRC National A's passport and identity card, and other documents related to PRC National A and the alleged crimes committed by PRC National A.

107.     In or about July 2017, Person A requested that Higginbotham meet with the PRC Ambassador to the United States at the PRC Embassy in Washington, D.C. The purpose of the meeting was to convey a message to the PRC Ambassador about PRC National A. On or about July 16, 2017, Higginbotham went to the PRC Embassy in Washington, D.C. and met with the Ambassador. During the meeting, Higginbotham told the Ambassador that United States government officials were working on the extradition of PRC National A and that there would be additional information in the future concerning the logistics of the extradition. Following the meeting, Higginbotham reported to Person A what had occurred, and Person A said he would inform Foreign National A. Person A later told Higginbotham that Foreign National A was happy with the meeting and that it had given Foreign National A credibility with the PRC.

108.     On or about July 18, 2017, BROIDY emailed Davis the contact information for Person H. Davis connected multiple calls between PRC Minister A and Person H in furtherance of the lobbying campaign to remove PRC National A.

109.     On or about July 26, 2017, BROIDY and Davis exchanged text messages regarding PRC National A and his removal from the United States to the PRC. Among the messages, Davis wrote, "Really need confirm it was officially transmitted. At this point – he says no[.]" BROIDY

responded, "Asked 3 different people to follow up[.]"  BROIDY later added, "Called [Person E].

Seeing [Person H] in an hour."

110.    On or about July 26, 2017, BROIDY texted Person H to meet at a hotel in

Washington, D.C., to discuss PRC National A: "Hi [Person H], I understand from staff that you're

in DC, as am I, staying at the [hotel].  Would you like to have a cup of coffee today?  Regards,

Elliott."  Later the same day, Person H's spouse texted BROIDY, "Hi Elliot.  Can you text me the

details again of the Chinese man you texted previously thank you[.]"  BROIDY responded, "Hi [],

You are referring to [PRC National A] or [PRC Minister A]? Best, Elliott[.]"  Person H's spouse

replied, "[PRC National A]."  BROIDY then resent the message that he previously sent on June

27.

111.    On or about July 27, 2017, BROIDY and Davis exchanged text messages regarding

PRC National A.  Davis texted BROIDY, "Any word on embassy??"  Davis later added, "Hey any

update about formal notice?"  BROIDY responded, "I'm dealing with people in NSC.  Emailing

directly.  Awaiting response[.]"

112.    On or about August 19, 2017, BROIDY texted Davis several times.  Among those

messages, BROIDY wrote, "Urgent.  Call me.  Good news[.]"  BROIDY later added, "im with

[Person H].  have break thru opportunity[.]"

113.    On or about August 19, 2017, BROIDY met with Person H on Person H's yacht.

During their time together, BROIDY asked Person H about the matter involving PRC National A.

Person H, in BROIDY's presence, then called the President, asking about PRC National A's status

within the United States.

114.  On or about September 13, 2017, BROIDY texted Davis, "Please text me asylum article.  And other article[.]"  That same day, Davis texted BROIDY links to articles about PRC National A.

115.  On or about October 2, 2017, BROIDY texted Davis a link to article about PRC National A.

116.  On or about January 5, 2018, BROIDY texted Davis, "Send me more info on [PRC National A] involved in funding Dem politicians, . . . ASAP[.]"

All in violation of 18 U.S.C. § 371.

## FORFEITURE ALLEGATION

1.  The allegations contained in Count One of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.  Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of Count One, in violation of Title 18, United States Code, Section 371, the defendant, ELLIOTT BROIDY, shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to said violation(s).  Notice is further given that, upon conviction, the United States intends to seek a judgment against BROIDY for a sum of money representing the property described in this paragraph.

3.  If any of the property described above, as a result of any act or omission of the defendant:

      a.  cannot be located upon the exercise of due diligence;
      b.  has been transferred or sold to, or deposited with, a third party;
      c.  has been placed beyond the jurisdiction of the court;
      d.  has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be divided
          without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section

2461(c).

    DATED: September 30 , 2020

    COREY R. AMUNDSON
    Chief, Public Integrity Section
    United States Department of Justice

    */s/John D. Keller*
    By: John D. Keller
    Principal Deputy Chief
    Sean F. Mulryne
    Deputy Director, Election Crimes Branch
    Nicole R. Lockhart
    James C. Mann
    Trial Attorneys
    Public Integrity Section

**EXHIBIT B**

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
Aug 17, 2020, 10:23am
Michelle Rynne, Clerk of Court

KENJI M. PRICE #10523
United States Attorney
District of Hawaii

KENNETH M. SORENSON
Assistant U.S. Attorney
Room 6-100, PJKK Federal Bldg.
300 Ala Moana Boulevard
Honolulu, Hawaii 96850
Telephone: (808) 541-2850
Facsimile: (808) 541-2958
Email: ken.sorenson@usdoj.gov

COREY R. AMUNDSON
Chief, Public Integrity Section
United States Department of Justice

JOHN D. KELLER
Principal Deputy Chief

SEAN F. MULRYNE
Deputy Director, Election Crimes
NICOLE R. LOCKHART
JAMES C. MANN
Trial Attorneys
Public Integrity Section

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CR. NO. **20-00068 JAO** |
| ) | |
| Plaintiff, ) | INFORMATION |
| ) | |
| vs. ) | [18 U.S.C. § 2 and 22 U.S.C. §§ |
| ) | 612 and 618(a)] |
| NICKIE MALI LUM DAVIS, ) | |
| ) | |
| Defendant. ) | |

The United States of America charges:

## INTRODUCTION

1.     At all times relevant to this Information:

2.     From no later than March 2017 to at least in or about January 2018,

NICKIE LUM DAVIS agreed with Persons A and B to act as agents of Foreign

National A in exchange for millions of dollars in undisclosed wire transfers originating from foreign accounts associated with Foreign National A. DAVIS specifically agreed to facilitate Person B's lobbying of the President of the United States ("the President"), his Administration, and the United States Department of Justice ("DOJ") to drop the investigation of Foreign National A for his role in the embezzlement of billions of dollars from 1Malaysia Development Berhad ("1MDB"), a strategic investment and development company wholly owned by the Government of Malaysia. As part of their efforts, the defendant and Person B willfully failed to disclose to the Administration and DOJ officials that Person B was acting on behalf of Foreign National A. Ultimately, DAVIS and Persons A and B were unsuccessful in their efforts to have the 1MDB investigation dropped.

3.　　During the same approximate period, DAVIS also agreed with Persons A and B to aid their efforts to lobby the Administration and the DOJ to arrange for the removal and return of People's Republic of China ("PRC") National A—a dissident of the PRC living in the United States—at the request of Foreign National A and PRC Minister A. Here too, DAVIS and Persons A and B were ultimately unsuccessful.

4.　　To further the interests of Foreign National A, DAVIS aided Person B in facilitating a meeting between Malaysian Prime Minister A and the President in

September 2017, in part to allow Malaysian Prime Minister A to raise the resolution of the 1MDB matter with the President.

5.    DAVIS, Person A, and Person B also met with PRC Minister A in the PRC and agreed that Person B, assisted by DAVIS, would lobby the Administration to return PRC National A to the PRC. DAVIS, Person A, and Person B, for the express purpose of providing PRC Minister A an opportunity to discuss the removal of PRC National A with high-level United States officials, also agreed to and attempted to facilitate meetings between PRC Minister A and top officials at DOJ and the United States Department of Homeland Security ("DHS"), during PRC Minister A's visit to the United States in May 2017.

Criminal Prohibitions on Acting as an Agent of a Foreign Principal or Government

6.    The Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, was and is a disclosure statute that requires any person acting in the United States as "an agent of a foreign principal" to register with the Attorney General in connection with certain types of activities, such as political or public relations efforts or lobbying on behalf of the foreign principal. Such registrations are made to the National Security Division's Foreign Agents Registration Act Unit ("FARA Unit") within DOJ. It is a crime to knowingly and willfully fail to register, and to make false and misleading statements or material omissions in documents submitted to the FARA Unit under the law's provisions.

3

7. The purpose of FARA is to prevent covert influence by foreign principals. Proper registration under the statute allows the U.S. government and the American people to evaluate the statements and activities of individuals who are serving as agents of foreign principals. Among other things, a FARA registration reveals the identity of the foreign principal on whose behalf a registrant performs services, the type of services the registrant provides the foreign principal, the source and amount of compensation the registrant receives from the foreign principal, and political campaign contributions made by the registrant while the registrant was acting as an agent of the foreign principal.

## RELEVANT PARTIES & ENTITIES

8. The defendant, NICKIE MALI LUM DAVIS, was and is a United States citizen, businesswoman, and consultant with personal and business relationships with Persons A and B.

9. Person A was a United States citizen, businessperson, and entertainer with international ties, including ties to Foreign National A.

10. Person B served as Deputy Finance Chair of a national political committee from approximately April 2016 to April 2018. In that capacity, Person B raised large political contributions from donors, organized political fundraising events, and coordinated fundraising strategies with the campaign of a candidate for the Office of the President of the United States during the 2016 election cycle. After

4

the election, Person B continued in his role as Deputy Finance Chair and maintained access to, and contact with, high-ranking officials in the Administration of the President, including the President. Over the same period, Person B owned and operated several domestic and international businesses and worked as a political consultant.

11. Foreign National A was a wealthy businessperson living in East Asia who has been charged separately for his role in orchestrating and executing a multi-billion-dollar embezzlement scheme from 1MDB.

12. Company A was a limited liability company formed by Person A to receive wire transfers from Foreign National A to pay Person B for his lobbying efforts.

13. George Higginbotham was an associate of Person A and was a licensed attorney employed by DOJ. On November 20, 2019, Higginbotham pleaded guilty in the United States District Court for the District of Columbia to a one-count Information charging conspiracy to make false statements to a financial institution.

14. Law Firm A was a law firm operated by Person B's spouse, Person C.

15. PRC National A was a dissident of the PRC, living in the United States on a temporary visa. The government of the PRC, including PRC Minister A and the President of the PRC, were seeking the removal of PRC National A from the United States back to the PRC.

5

16.     In late 2016 through 2019, DOJ was actively investigating transactions of Foreign National A allegedly associated with laundered proceeds of the 1MDB embezzlement scheme. In July 2016, DOJ filed multiple civil forfeiture complaints seeking the forfeiture of millions of dollars in assets allegedly purchased with 1MDB laundered proceeds. On November 1, 2018, DOJ filed a criminal indictment charging Foreign National A and others with conspiring to launder billions of dollars embezzled from 1MDB and conspiring to violate the Foreign Corrupt Practices Act by paying bribes to various Malaysian and Abu Dhabi officials.

## I.     Campaign to Resolve 1MDB Civil Forfeiture Cases

### A.     Person B Agrees to Lobby for Foreign National A for $8 Million Retainer

17.     In or about March 2017, DAVIS told Person B that she had a possible client in Malaysia who could "use help with the forfeiture."

18.     On or about March 5, 2017, at the request of Person B, DAVIS emailed Person B a copy of a civil forfeiture complaint related to 1MDB. That same day, DAVIS emailed Person B a Bloomberg article titled "[Foreign National A] Trusts Ask to File Late Claims in Forfeiture Lawsuits," and texted Person B, "Your email has the court filing[.]" Person B responded, "Thx. Will review." DAVIS replied, "Call me when u can- thank you[.]" Person B responded again, "Yes. 5 min[.]"

19.     Person A requested that DAVIS send him Person B's biography describing Person B's relationship with high-level officials in the Administration

6

and photographs of Person B and the President. On or about March 7, 2017, Person

B's assistant, at DAVIS's request, emailed photographs to DAVIS featuring Person

B and the President. Person A said that he wanted the photographs so that Person A

could highlight Person B's close access to the Administration.

20.    On or about March 8, 2017, DAVIS texted Person B, "Are you in la to

meet on the 16th w [Person A] prior to his travel that weekend to Asia?" Person B

responded, "I think so. Let's speak later." Later that same day, DAVIS sent Person

B additional text messages to set up the meeting among Person B, Person A, and

DAVIS.

21.    At the direction of Person B, on or about March 13, 2017, DAVIS

forwarded to Person A a "Retainer and Fee Agreement – Litigation Services"

between Law Firm A and Foreign National A. The "Retainer and Fee Agreement"

stipulated that Foreign National A would pay an $8 million retainer fee upfront, and

an additional $75 million success fee if the "matter" was resolved within 180 days,

or $50 million if the "matter" was resolved within 365 days. The draft agreement

included an Exhibit A explaining that the "matter" referred to the 1MDB forfeiture

proceedings. In actuality, Person A, Person B, Law Firm A, DAVIS, and Person C

provided no litigation services or legal advice to Foreign National A. The true

purpose of the retention agreement was to secure Person B's services to lobby the

Administration and DOJ on Foreign National A's behalf based on Person B's political connections.

22.     On or about March 13, 2017, Person B met with Person A and DAVIS to discuss Foreign National A and his legal issues. At the meeting, Person A described his relationship with Foreign National A to Person B, and asked if Person B could help with the civil forfeiture cases involving Foreign National A. Person A said he would speak with Foreign National A about the possibility of Person B helping with the civil forfeiture cases. That same day, Person B texted DAVIS in part, "I'm excited about our business prospects."

23.     On or about March 15, 2017, in reference to Foreign National A, Person B texted DAVIS, "Anything new on . . . [Person A's] Associate?" That same day, DAVIS responded, "[Person A] mtg in person tomorrow w the 'promoter' and they hope to travel within the next few week[.]"

24.     On or about March 22, 2017, DAVIS emailed Person B and his assistant about setting up another meeting among Person B, Person A, and DAVIS.

25.     At all relevant times, DAVIS, Person A, and Person B were aware of FARA and its prohibition on unregistered representation of foreign principals.

26.     Despite their knowledge of the requirement to register as agents of a foreign principal, at no time did DAVIS, Person A, or Person B register with the FARA Unit in DOJ regarding their work as agents of Foreign National A.

8

**B.    Person A, Person B, and DAVIS Meet Foreign National A in Bangkok**

27.    In or about April 2017, Person A asked Person B to travel to Bangkok, Thailand to meet with Foreign National A.  Person B said he would go only if he were paid $1 million, and that he wanted to be paid by Person A from "untainted" funds.

28.    On or about April 28, 2017, Person B texted DAVIS advising, "I would like the funds to go to [Law Firm A.]" That same day, DAVIS responded, "Ok[.]"

29.    On or about April 29, 2017, Person B and DAVIS exchanged text messages regarding their upcoming meeting with Foreign National A and Person A. Among those text messages, Person B asked in reference to Foreign National A, "Does the principal want us in a particular hotel in either location?"  DAVIS responded, "Call me when u can talk[.]"

30.    On or about April 30, 2017, DAVIS emailed Person B's assistant regarding a flight itinerary for travel to Bangkok.  In the email, DAVIS wrote in part: "Please call me if you have questions -- It's 2 one way tickets – since we need to leave from a different country[.]  We don't need to worry about hotels yet . . . "

31.    On or about May 1, 2017, DAVIS emailed Person B and his assistant a link to the Shangri-La Hotel in Bangkok.  That same day, DAVIS emailed Person A telling him to book a room at the Shangri-La Hotel and to send her the confirmation. Person A responded, "[Foreign National A] is booking our hotel," and later followed

9

up with, "Also send me [Person B's] wire info." DAVIS replied by providing the wire information for an account in the name of Law Firm A. The same day, in response to a question from Person B's assistant about whether she should cancel Person B's hotel room reservation, DAVIS emailed Person B's assistant, "Yes all rooms are booked by [Person A] already."

32. On or about May 2, 2017, DAVIS emailed Person B stating in part, "Since u land earlier – [Person A] and I will see you at arrivals. . . . Thanks and bon voyage – here's to the start of an exciting and prosperous adventure!"

33. On or about May 2, 2017, DAVIS, Person A, and Person B arrived in Bangkok. During the trip, DAVIS, Person A, and Person B met with Foreign National A in a hotel suite. Person B and Foreign National A spoke about the 1MDB investigation and civil forfeiture actions. Person B agreed to help Foreign National A attempt to resolve the matter. Foreign National A agreed to pay Person B an $8 million retainer and wanted Person B to contact the Attorney General of the United States to get DOJ to drop the 1MDB matter. Person B agreed to lobby the Administration and DOJ for a favorable result for Foreign National A while concealing the fact that he was working on Foreign National A's behalf. With respect to payment, Person B stated that the money should not come directly from Foreign National A and should be "clean." Foreign National A identified a friend who could pay Person B and others. Person B, Person A, and DAVIS agreed that

10

the money would first be routed through Person A and then be paid to Person B through Law Firm A. Person B and DAVIS agreed that Person B would pay DAVIS thirty percent of what Person B received. Person A also agreed to pay DAVIS a percentage of the funds that Person A received. Person A told Person B and DAVIS that Person A's friend, Higginbotham, was verifying the legitimacy of the funds. Higginbotham did not actually perform any such review.

### C. Person A Receives $8.5 Million from Foreign National A; Person B is Paid $6 Million; DAVIS is Paid $1.7 Million

34. Following the meeting with Foreign National A in Thailand, on or about May 8, 2017, Company A received a wire transfer directed by Foreign National A for approximately $2.8 million from an entity in Hong Kong. That same day, Person A obtained a cashier's check from the Company A account for $702,000 payable to Law Firm A, which was immediately credited to Law Firm A's account. Person A also made a separate wire transfer of $48,000 to Law Firm A from the Company A account. Also that same day, a third-party company transferred $250,000 to the Law Firm A account at Person A's direction, bringing the total amount deposited into the Law Firm A account to $1 million. Within several days, approximately $900,000 of the $1 million transferred into the Law Firm A account on May 8, 2017 was transferred from the Law Firm A account to one of Person B's business accounts.

11

35. On or about May 8, 2017, DAVIS texted Person B, "Both wires in [Law Firm A] are from [Person A]. The remaining balance was dropped to your office 20 minutes ago -". DAVIS then added, "702 total cashier check[.]"

36. On or about May 9, 2017, Person A caused Company A to transfer $250,000 to a company controlled by a family member of DAVIS for the benefit of DAVIS.

37. On or about May 17, 2017, Foreign National A caused an international wire to be sent to Company A from a Hong Kong company. That same day, Person A transferred $3 million from Company A to Law Firm A.

38. On or about May 17, 2017, Person B and DAVIS exchanged text messages regarding the payments from Foreign National A to Person B through Person A and Person B's payment of a percentage to DAVIS. Among the text messages, DAVIS asked, "Did you get it?" Person B responded, "Yes. Sent you Wickr[.] Sending wire to you in morning." Wickr is a messaging application that allows for end-to-end encryption and content expiration. Person B later added, "Did you get 2nd confirm?" DAVIS responded, "When Asia opens ... . Baby steps at least moving forward now." Person B responded, "Yes. Hammer them for the next 2 wires." Person B later added in part, "Assuming second 3 is in and confirmation that last 2 is being sent. Please ask [Person B's assistant]."

39.    On or about May 18, 2017, Law Firm A transferred $500,000 to one of Person B's business accounts and $900,000 to a business account controlled by DAVIS.  Within approximately one week, Law Firm A transferred an additional $950,000 in two separate transfers to one of Person B's business accounts.

40.    On or about May 25, 2017, Foreign National A caused a third transfer to be made to Company A, this time in the amount of approximately $2.7 million. On or about May 26, 2017, Person A transferred $2 million from Company A to Law Firm A in partial satisfaction of the $8 million retainer to which Person B and Foreign National A agreed in return for Person B's lobbying the Administration and the DOJ to drop the 1MDB civil forfeiture cases and any related investigations.  That same day, $600,000 was transferred from Law Firm A's account to a business account associated with DAVIS.

### D.    Person B Facilitates Meetings for Malaysian Prime Minister A and Lobbies to Resolve the 1MDB Cases

41.    On or about May 18, 2017, Person B texted Person D, a political consultant and former campaign aide for the President, and requested that Person D work with the Administration to set up a visit for Malaysian Prime Minister A: "Hi [Person D]- Please work on Asian country visit.  Date in July."

42.    On or about June 5, 2017, Person B texted Person D again regarding the visit for Malaysian Prime Minister A:  "Asian country is very motivated re July meeting.  Hoping we can confirm date etc asap."

13

43.   The same day, at the request of Person A, DAVIS sent Person B text messages regarding Foreign National A. Among those messages, DAVIS wrote, based upon information conveyed to her by Person A on behalf of Foreign National A, "Please call before u go to bed in ISRAEL if possible… [Foreign National A] keeps calling for news[.]" Person B responded, "Yes. Will call you. I am heading to D.C. Tonight to work on [Foreign National A] and Asian country[.]"

44.   On or about June 15, 2017, relaying a message from Person A, DAVIS texted Person B, "Hey he'd like to speak w you this evening. Are u able?" DAVIS added, "Principal", which was a reference to Foreign National A. That same day, Person B responded, "Yes[.]"

45.   On or about June 16, 2017, Person B and DAVIS exchanged text messages regarding 1MDB and the seizure of jewelry from a person associated with Foreign National A.

46.   On or about June 17, 2017, Person B and DAVIS discussed Malaysian Prime Minister A. In or about June 2017, Person B asked the President if he would play golf with Malaysian Prime Minister A. Person B said, and DAVIS believed, that this would please Foreign National A and would allow Malaysian Prime Minister A to attempt to resolve the 1MDB matter. Person B also hoped to secure additional business with the government of Malaysian Prime Minister A and hoped that arranging golf with the President would further his business interests.

14

47.     On or about June 19, 2017, DAVIS texted Person B a link to an article about the Malaysian Prime Minister A's office criticizing the 1MDB forfeiture action in the United States.

48.     On or about June 25, 2017, DAVIS texted Person B a link to an article about Malaysian Prime Minister A and the 1MDB forfeiture action involving Foreign National A. That same day, Person B responded, "Weird article. What can we do?" DAVIS replied, "Call pls. Got news[.]" DAVIS followed up stating that she had sent Person B a "What's app request."

49.     On or about June 29, 2017, Person B sent a text message to a high ranking official in the White House in an effort to arrange a golf outing between Malaysian Prime Minister A and the President: "Hi [Person E], As I mentioned, POTUS agreed to play a round of golf in DC or Bedminster in late July or early August with [Malaysian Prime Minister A]. Thank you very much for getting back to me with the date. Also a letter went to the state dept. for a meeting some weeks ago."

50.     On or about June 30, 2017, Person B sent another text message to Person E regarding the golf outing: "Hope we can speak this morning on [PRC National A] and golf date with POTUS for [Malaysian Prime Minister A]." Later that day, Person B followed up with, "[Person E], as discussed, hoping we can get these items completed today. Please call me anytime."

15

51. On or about July 3, 2017, Person B again texted Person E regarding the golf date for Malaysian Prime Minister A and the President: "Good morning [Person E]. It would be extremely helpful to me if you could confirm the golf date today with POTUS for [Malaysian Prime Minister A.] POTUS told me he is glad to play at Bedminster or DC. After we spoke, I mentioned to [Malaysian Prime Minister A] that he would have the date last week. Thank you very much! Regards, []." Later that day, Person B texted Person E again: "[Person E], I'm following up. Please send me the date and time for the [Malaysian Prime Minister A] golf with POTUS. Thank you!"

52. On or about July 4, 2017, DAVIS texted Person B, "Call me asap" and then "Clear your phone – erase messages[.]"

53. On or about July 5, 2017, Person B exchanged messages with Person E regarding the golf outing. Among other messages, Person B texted, "[Person E], just left you a message. It's been a week. Can you send me the date today? Best, []" Person E responded, "It's with the NSC[.] They coordinate and negotiate – I'm sure it will get done[.]"

54. On or about July 11, 2017, relaying a message from Person A, DAVIS texted Person B, "Wickr[.] It's 5pm … I think we need to make a move. Date and otherwise. We're getting killed." These messages referred to confirming a date for Malaysian Prime Minister A to play golf with the President and Foreign National

16

A's displeasure because no date had been confirmed. Relaying urgency from Person A, DAVIS continued, "Please call because we need to strategize – I'm getting inundated[.]" Person B responded, "See wikr[.]" The following day, Person B texted DAVIS, "Send me text on wikr. I'm taking off and need to get to WH[.] Taking off. Need now[.]" DAVIS responded, "Done[.]" Person B responded, "Got it. Thx[.] Trying to get [Person F] to do call asap[.]" Person F was then a high-ranking official on the National Security Council.

55.     On or about July 13, 2017, DAVIS texted Person B, "Please call when u can so we can talk- we gotta handle this so pls pls go to D.C. And sit at WH until u get it. I will keep u company if u worry about being lonely!"

56.     On or about July 13, 2017, Person B texted Person E again regarding the golf date: "Hi [Person E], It's been 2 weeks. Checking again on date for golf for [Malaysian Prime Minister A] with POTUS. Can you text me date today? Thank you. Best, [][.]" Person E responded, "I'll check now again[.] These things go through a process -". Person B responded "Thank you!!" Person E replied, "NSC is on it and coordinating[.]" Person B responded, "Can we get date today?" Person E replied, "They're working directly with [Malaysia.] NSC is coordinating a date."

57.     On or about July 15, 2017, Person B texted DAVIS, "Working on getting meetings for tomorrow."

17

58.    On or about July 17, 2017, conveying urgency expressed by Person A on behalf of Foreign National A, DAVIS texted Person B, "[Person E] needs to give u this date now and ask him for update on other thing.  We look impotent[.]"  This text referred both to setting up a meeting between the President and Malaysian Prime Minister A and to the matter involving PRC National A.  Person B responded, "Agree.  Hammering away[.]"

59.    On or about July 18, 2017, Person B and DAVIS exchanged several text messages about setting up a meeting between the President and Malaysian Prime Minister A.  Among the messages, relaying information from Person A, DAVIS wrote, "Can u check Wikr[.]  Really really need that date.  It's been crazy for me all day w this.  He's panicking[.]"  DAVIS followed up with, "This date is mandatory today- we're getting creamed."  According to Person A, Foreign National A was panicking because no meeting had yet been scheduled.  Person B responded, "Calling [Person E] now[.]"  DAVIS replied in part, "Call everyone so they know u are raging mad[.]  Call [Person G] too.  We need this today[.]"  Person G was an administrative assistant to the President.  Person B replied, "Doing it now."

60.    On or about July 19, 2017, DAVIS texted Person B in reference to scheduling a date for a meeting between Malaysian Prime Minister A and the President, "Secondly we need this date bad[.]"  Person B responded the following day, "Please bear with me.  Getting some info on mtg[.]"

61.     On or about July 21, 2017, Person B texted Person E regarding the golf outing: "[Person E], [Malaysia] have heard nothing from NSC. POTUS said he would play golf with Malaysian Prime Minister A in late July or early August. POTUS said he was happy to do it. You said it would be scheduled in a day or two. We're in the 4th week. I know you are busy and procedures apply but I've been more than patient. Instead of being positive, this is now causing me damage. I would truly appreciate it if you could get back to me today with a date. Thank you! []."

62.     On or about July 24, 2017, Person B texted Person D, "Received golf date in NJ in Sept. Sat before the UN General Assembly. Finally! Crossed off my list! Thank you also for helping!" Person D responded, "Let's follow through and make sure the date is confirmed by the NSC. Did he tell you who gave him the date?" Person B replied, '"Thank you!! Fantastic. Given to [Person H] by [Person E]."

63.     On or about July 27, 2017, Person B texted Person D, "Just checked again with [Malaysia]. Their Amb to US and Foreign Minister have heard nothing. Please check asap. Best, []." Person B followed up with, "Hi [Person D]- Can you call NSA for me re [Malaysia] receiving official word. Still no contact from NSC to [Malaysia] Amb on meeting. Thank you. Best, []" Person D responded, "[] will call again this morning. Talked to [] briefly yesterday ... . Will call shortly."

19

64.     On or about July 29, 2017, relaying information that she received from Person A on behalf of Foreign National A, DAVIS texted Person B in reference to the meeting between Malaysian Prime Minister A and the President, "They were told 12 sept is mtg. That's day that un general assembly stars- it's a Tuesday???? No golf??" DAVIS immediately followed by texting "Wickr[.]" Person B responded, "May be two mtgs. Amb should ask. Golf at Bedminster on Sat and tues at WH?"

65.     On or about August 7, 2017, Person B sent his assistant an email with the subject, "Malaysia Talking Points *Final*," with talking points intended for an upcoming meeting between the Secretary of State of the United States and Malaysian Prime Minister A.  DAVIS received the talking points from Person A—who provided them on behalf of Foreign National A—and relayed them to Person B, knowing that Person B would then provide them to the Secretary of State as background for the meeting.  The talking points mentioned, among other things, Person B's ongoing relationship and work with [Malaysia], and identified 1MDB as a "[p]riority[.]"  The talking points noted the lack of harm caused by 1MDB, and specified that "[t]he involvement of US prosecutors has caused unnecessary tension American [sic], and could cause a negative reaction among Malaysians[.]"

66.     On or about August 7, 2017, Person B also sent the talking points document to Person D for his review and edits and to obtain details about the timing

of a meeting in Malaysia between Malaysian Prime Minister A and the Secretary of State: "Hi [Person D]; When is [Secretary of State] mtg?; Already 11:00 am Monday in [Malaysia]. Can you expand and send me final version?" Person D responded by sending a revised version of the talking points to Person B and stating, "[]- here is the marked up version I am going to forward to [Secretary of State]'s office. He heads to Bangkok today and then to [Malaysia]. Let me know if you have any other changes. Thanks."

67. Later, on or about August 7, 2017, Person B messaged Person D, "[Secretary of State] is meeting with [Malaysian Prime Minister A] on 8th and deputy PM on 9th. Let's get a plug in my name. They know my name and might not immediately recognize [my company's] name. Thank you!" Person D responded, "Definitely important to make this connect. It will not likely be part of the formal meetings but will work to get a plug during their conversations."

68. Also on or about August 7, 2017, Person A executed an agreement between another of Person A's companies and a representative of Foreign National A providing for "Strategic Communications and Crisis Management" in exchange for approximately EUR 8.4 million to be paid on or before August 16, 2017.

69. On or about August 9, 2017, Foreign National A caused a Hong Kong company to transfer approximately $12.8 million to Company A. Person A then transferred $3 million to Law Firm A. Person A also transferred $833,333 to a

business account controlled by DAVIS. On or about August 10, 2017, Law Firm A transferred $900,000 to a business account associated with DAVIS.

70. On or about August 10, 2017, Person B texted Person D regarding the meeting between Malaysian Prime Minister A and the Secretary of State: "Heard from [Malaysia] that meetings went very well. They were happy with [Secretary of State]. My name was not mentioned – no plug. ;- ... ."

71. On or about August 16, 2017, Person B and DAVIS exchanged text messages to set up a meeting and a phone call. Among the messages, DAVIS wrote, "[Person A] really wants to see u today if possible since u leave Friday[.]"

72. On or about August 18, 2017, Person B and DAVIS exchanged text messages setting up a phone call. Among the messages, DAVIS wrote, "Call me pls. [Person A] wants to conference in[.]"

73. On or about August 19, 2017, Person B texted Person D, "Any update on [Malaysia]? Person D responded, "As of now it is going to be in DC. And hard to do golf due to schedule but I am working on it. Might have to go to [Person I] directly on this and use the history of the two of them playing golf." Person B responded, "Yes. If you think it would help I could directly call one of [Person I] deputies or [Person I]. Also need to add time to meetings. I would like to discuss details with you. Please let me know what is best." Person I was then a high-ranking official at the White House.

74.     On or about August 21, 2017, DAVIS wired $375,000 in funds she received as a commission from Person A, to Person C, the spouse of Person B.

75.     On or about August 24, 2017, Foreign National A directed the transfer of approximately $10 million to Person A's separate company that had entered into the "Strategic Communications and Crisis Management" agreement with a representative of Foreign National A for EUR 8.4 million. Based on the prevailing exchange rate on August 24, 2017, EUR 8.4 million converted to approximately $10 million.

76.     On or about September 11, 2017, DAVIS typed a letter at Person B's direction to be sent from Person B to the President in anticipation of Malaysian Prime Minister A's meeting with the President. The letter included several positive developments in the relationship between Malaysia and the United States. The letter was never provided to the President.

77.     On or about September 12, 2017, Malaysian Prime Minister A met with the President at the White House, due in part to the assistance provided by DAVIS for Person B's efforts to facilitate the meeting. Although Person B contacted high-ranking officials in the Administration to arrange a golf meeting between the President of the United States and Malaysian Prime Minister A in addition to the official meeting, no golf game between Malaysian Prime Minister A and the President took place.

78.     On or about October 6, 2017, Person B met with the President at the White House. Person B represented to Person A, DAVIS, and Foreign National A that he raised the 1MDB investigation with the President during the meeting.

79.     On or about January 5, 2018, Person B drafted talking points related to 1MDB to demonstrate to Foreign National A the efforts that Person B had undertaken on his behalf. Among other things, the talking points provided: "1. We are working with the DoJ to counter the previous Administration's case against 1MDB in [Malaysia]. I have put a strategy in place to contact parties both at DoJ and the NSC to find a resolution to this issue. 2. I am in the process of scheduling a meeting with the assistant attorney general [] who has the oversight for the [] case. She is a [presidential] appointee and can be helpful ... . 3. As I informed you earlier, in my discussion with the President, he committed to getting this issue resolved. It is important that I take his lead but will continue to communicate the importance of this issue."  Person B greatly exaggerated his efforts regarding the 1MDB investigation.

80.     On or about January 6, 2018, Person B met with Person A, who asked Person B for a loan. Person A told Person B that Person A's friend was "checking on" the money they had received from Foreign National A and "helping to keep it clean."

**II.     Campaign to Remove PRC National A from the United States**

24

### A. Person B Travels to China to Meet with PRC Minister A

81.     In or about May 2017, following the trip to Bangkok, Person B agreed to travel to Hong Kong to meet again with Foreign National A. Prior to the trip, DAVIS and Person B discussed that it was important to Foreign National A that PRC National A be deported from the United States. The purpose of the trip to Hong Kong was to meet with Foreign National A and a foreign government official of the PRC to discuss PRC National A.

82.     On or about May 15, 2017, DAVIS emailed Person B's assistant regarding travel arrangements and the itinerary for the trip to Hong Kong. The same day, DAVIS also emailed Person B and Person C banking information for DAVIS's company.

83.     On or about May 18, 2017, Person A, Person B, and DAVIS traveled to Hong Kong and were transported to Shenzhen, China, where they met with Foreign National A and PRC Minister A in a hotel suite. PRC Minister A spoke to Person B about PRC National A and his alleged crimes and stated that the PRC wanted PRC National A to be returned to the PRC. PRC Minister A asked Person B to use his influence with high-ranking United States government officials to advocate for PRC National A's removal and return to the PRC. PRC Minister A also stated that he would be visiting Washington, D.C. soon and was having trouble scheduling meetings with certain high-ranking United States government officials.

**B.     Person B Lobbies Top U.S. Officials for the Removal of PRC National A**

84.     On or about May 20, 2017, during the return trip from China, Person B texted DAVIS, "I'll try to make this a big week for us with [the Attorney General.]"

85.     On or about May 21, 2017, Person B texted Person D regarding his meeting with Foreign National A and PRC Minister A: "[Person D]- Just returned. Huge opportunity.  Can we meet Monday morning at 9:30 a.m. at [hotel]? []."

86.     On or about May 22, 2017, Person B texted Person D, "I will need to meet with [Attorney General] asap.  We will discuss."  Person B followed up with, "I am emailing you a memo.  We will discuss."  Later the same day, Person D responded, "Have a request into [Attorney General] for mtg."

87.     On or about May 22, 2017, Person B sent an email to Person D with the subject, "Opportunity for Significantly Increased Law Enforcement Cooperation between US and [the PRC][.]"  Person B attached to the email a memorandum from Person B addressed to the Attorney General, intending that Person D would then provide the memorandum to the Attorney General.  The content of the memorandum had been provided to Person B by DAVIS, who received it from Person A during the May 2017 trip to China where the content originated from PRC Minister A and Foreign National A.  Upon receipt, Person B and Person C revised the memorandum.

88.     In the memorandum, Person B misrepresented the reason for his trip to China and the circumstances leading to his meeting with PRC Minister A.  Person B

26

concealed his contact with Foreign National A and concealed Foreign National A's role in setting up the meeting between Person B and PRC Minister A. Person B also concealed the $4 million that he had been paid by Foreign National A over the two weeks preceding the meeting in Shenzhen with PRC Minister A. Person B also did not disclose that his lobbying efforts with respect to PRC National A were, at least in part, pursuant to his financial arrangement with Foreign National A and could potentially result in additional payment.

89. In the memorandum, Person B stated, "I was told by [PRC Minister A] that [the PRC] would like to significantly increase bi-lateral cooperation with the US with respect to law enforcement including cyber security." Person B wrote about PRC Minister A's upcoming trip to Washington, D.C., in which PRC Minister A and his delegation planned to meet with several high-ranking United States government officials. Person B advocated for the Attorney General to meet with PRC Minister A. Person B also noted several items that the PRC, according to PRC Minister A, would be willing to do to improve law enforcement relations between the United States and the PRC. Person B then added:

> According to my conversation with [PRC Minister A], the one request [the PRC] will make is that [PRC National A], who [the PRC] alleges has conspired with others who have been arrested and charged with violations of numerous criminal laws of [the PRC] (including kidnapping and significant financial crimes be deported (his Visa ends within the next month or so) or extradited (Interpol has issued a Red Notice with respect to him which is attached for your reference) as soon as possible from the US to [the PRC] so he can be charged with these

violations and go through regular criminal proceedings in [the PRC] with regard to these allegations.

Person B appended an Interpol Red Notice for PRC National A to the memorandum.

90.     On or about May 23, 2017, Person B texted Person D, "Hi [] Is meeting set for tomorrow? Has my memo been sent to [Attorney General]? Please update Thanks [][.]" Person D responded, "[Person B]- letter was delivered yesterday. Pls see the final version with changes. Working on mtg for tomorrow but shooting for early afternoon. Will call you later today. I am now on redeye tonight so I can get back to DC early." Person B responded, "Great. Thank you []. Also try to determine if his mtg was set or if we can set for thurs or in Alabama on fri or sat." The following day, on or about May 24, 2017, Person D responded, "[W]aiting to hear from DoJ on mtgs – ours and [PRC Minister A]. let me know when you are free and we can meet up to go over other issues. thanks."

91.     On or about May 24, 2017, Person D texted Person B, "Just got a call from [Attorney General]'s office and he cannot do tonight. But I got a text back from him directly that said he would call me later."

92.     On or about May 25, 2017, Person B texted Person D, "The meetings are at Justice at 10:00 am this morning. Then FBI and DHS tomorrow. Perhaps I could tell my contact to get there 10 min early and a brief meeting could occur. And then have meet with [] one on one to discuss more details. Please try to see [Attorney General] first thing today. Really important that we pull it off. I need to speak with

my contact this morning. Thank you. [ .]" Person D responded, "[ ]- working on it. [Attorney General] is not in the office this morning but trying to see what time he is returning. Stand by." Later the same day, Person B texted Person D, "Detail is that the 3 things in my memo are only for [Attorney General]. [PRC Minister A] wants to tell [Attorney General] directly. Mine is legitimate back channel. [PRC Minister A]'s boss wants confirmation that [Attorney General] heard the 3 things which really help US[.]" Later that day, Person D responded, "[ ]- actually just got off the phone with [Attorney General]. Not great news. Let me know when you are free to talk. Thanks."

93.　　On or about May 26, 2017, referencing meetings for PRC Minister A, Person B texted Person D, "10 am head of ICE  11:30 FBI  Perhaps a play at DHS would save situation. Fly by [Person I]. The three items can be shared." Person B followed up with, "Please call me" and "I'm trying to do damage control and need to speak with you. Best is pull aside with [Person I]." Person I was a senior official in DHS at the time.

94.　　On or about May 28, 2017, Person B emailed Person D, "transcribed correspondence to and from [the Attorney General] and [the PRC's] Ambassador to the US." Person B noted, "I believe there is an excellent opportunity for [the Attorney General] to further US interests. I added comments below. Can we discuss asap? There is another matter of interest that the AG should be made aware of."

29

Later that same day, Person B and Person D exchanged emails to schedule a time to discuss the email and its content.

95.    On or about May 30, 2017, relaying information from PRC Minister A and Person A regarding PRC Minister A's meetings with United States Government officials, DAVIS texted, "Check Wickr- all clear now for meetings[.]"  Person B responded, "Yes.  All set[.]"  DAVIS replied, "He got his Mtgs reinstated[.]"

96.    In or about May 2017, DAVIS, at Person A's request, asked Person B to meet with PRC Minister A in Washington, D.C.

97.    On or about May 30, 2017, Person B met with PRC Minister A at a hotel in Washington, D.C.  Person B also asked Person D if Person D could help PRC Minister A arrange meetings with high-ranking United States government officials.

98.    On or about May 31, 2017, Person B texted Person D:

> I met with the VM last night. He is on a 4 pm flight back this afternoon. The FBI had him meeting with very low level people and had the person he was to meet with meet with Vietnam instead. His superiors told him to come home unless meeting with [Attorney General] or [Person I]. He is happy meeting with [Person I]. . . . . So far, he has delivered a pregnant woman and the next 2 will be sent shortly. He will accept 60 Chinese Nationals for deportation but only if he has a proper "short meeting". This is a big win for the admin that can be publicized. It is the result of Mara Largo meeting between the two presidents. Please call me and I will tell you more specifics. Thank you.

99.    Person D responded, "[]-got the info. I will call in a few mins." Person B replied, "If you get the meeting, can we have the political WH liaison meet the

VM at DHS? He can mention my name. Also try to get [Person I] to warm up situation. Mention me as well. Thank you! Fingers crossed."

100. On or about May 31, 2017, DAVIS texted Person B with respect to PRC Minister A's purported meeting with Person I, "In principal [Person I] us ok- just a schedule issue?" Person B responded, "Just a short notice scheduling issue. Still might hear in next hour or so. There is no issue with [PRC Minister A]." Person B later continued, "Please pass along my good wishes to the VM. Wait a little while longer." DAVIS responded, "Yes, I'm telling him that." Person B replied, "Tell him I'm telling WH and [Attorney General] what happened." DAVIS then texted, "Isn't [Person I] scheduled to be in Haiti this afternoon?" Person B responded, "Scheduler did not mention this?? Are you sure? Neither did [Attorney General']s people[.]" DAVIS responded, "It's on the DHS website[.] He's there for the afternoon[.] Just spoke to VM and he sounded like he was crying[.]" Person B responded, "Terrible. What a mess. Bottom line not our fault. Normally their Amb would handle. This is a cluster f[*]ck." DAVIS replied, "Wickr."

101. On or about June 9, 2017, DAVIS texted Person B a news article titled "[the PRC]-cranks-up-heat-on-exiled tycoon-[PRC National A.]"

102. On or about June 27, 2017, Person B and DAVIS exchanged several text messages regarding PRC National A.

103. On or about June 27, 2017, Person B texted Person H's spouse regarding the removal of PRC National A. Person B knew that Person H, an internationally successful businessman and frequent contributor to political campaigns with close access to the President, had immediate access to and influence with the President and could be effective in seeking the removal of PRC National A. Person B texted Person H's spouse, "On another note, I would like to meet with Person H tomorrow morning and on important and sensitive matter. Is there a time tomorrow morning that would be convenient or perhaps for lunch? Looking forward to seeing you at the [] Hotel! Regards, [][.]" Person B later continued:

> Hi [], [Person H] asked me to send this information to you via text. I have a number of items I will be sending to you regarding the fugitive [PRC National A]. The first is an Interpol red notice. . . . The highly time sensitive matter is that [PRC National A]'s visa to stay in the US expires on June 30th. It is critically that his new visa application he immediately denied. He must also be placed on the DHS no fly list. . . . The order would need to come from the very top as [PRC National A] is well connected with former FBI who are on his private security detail. The President of the PRC mention to [the President] at Mar-A-Lago that he would like [PRC National A] returned. [PRC Minister A] met with me and requested help with regard to [PRC National A]. . . . He promised to return certain US citizens held hostage by [the PRC] and would accept a very large number of [the PRC] illegal immigrants for deportation back to [the PRC]. Finally he offered new assistance with regard to North Korea.

104. On or about June 28, 2017, Person B met with Person H and his spouse at a social gathering. After the meeting, Person B exchanged text messages with Person H's spouse regarding [PRC National A]: "Hi [], it was great to see you and

[Person H] tonight! I just heard from [PRC Minister A] again. He would like to know the status of [PRC National A]'s VISA as time is of the essence. -Was the VISA issued already or did we deny it? Can we confirm that [PRC National A] is on the DHS no fly list? [PRC Minister A] is very concerned that [PRC National A] will flee the US this week. I hope we can confirm and move to deportation. This will be an incredible step for our two countries. [PRC Minister A] says they are grateful for your help." Person H's spouse responded, "This is with the highest levels of the state department and the defense department. They are working on this."

105. On or about June 29, 2017, Person B and DAVIS exchanged text messages regarding PRC National A's visa application. Person B texted, "Is rejection or acceptance letter already generated?" DAVIS responded, "I have no idea." Person B replied, "Sorry always generated. In others words each applicant eventually re wives a yes or no in writing[?] Sorry receive a yes or no in writing[?]" DAVIS responded, "Yes[.] Check Wickr[.]"

106. On or about June 30, 2017, DAVIS, in reference to their efforts to facilitate the removal of Foreign National B and the potential return of United States citizens held in Country B, texted Person B, "Wickr. You are the man right now. They are going to give you the President's medal of freedom award after what you will accomplish for this country this July 4th[.]" Person B responded, "I am going

33

to slam until it's done[.]" DAVIS replied, "Let's make sure part 1 happens today. And date for m[.] Don't leave that dude until we do it." Person B responded, "Agree." DAVIS continued, "Let him know – if we get the letter confirming the denial today by close of business (as u need workers to generate that letter) then we will get the 2 Americans home by July 4[.] After other phase 2- we can do the 60 take back[.]" Person B responded, "Sounds good. [Person H] calling me back shortly. On a call."

107. On or about June 30, 2017, Person B and DAVIS exchanged several text messages about PRC National A. Person B texted, "Heard from [Person H]. He reiterated to POTUS." Person B followed up with, "Separately, [Person E] texted me that he got tied up but is on top of it." That same date, DAVIS replied, "Can we get proof today about revoke?" DAVIS later specified, "From [Person E]?"

108. On or about July 1, 2017, Person B texted DAVIS, "Spoke to [Person E] at length. Call me when you can[.]" Person B did not speak with Person E but had exchanged text messages with him about PRC National A's visa application. Similar to the representations Person B made in the memorandum that he prepared for the Attorney General and his communications with Person H, Person B did not disclose the true nature of his relationship with PRC Minister A to Person E.

109. On or about July 2, 2017, Person B and DAVIS exchanged text messages regarding PRC National A and his visa application. Based on public

34

reporting, DAVIS texted, "There is a call Scheduled for today Sunday with [President of the PRC] about n Korea. He can ask and confirm about package. He can even say he heard from [Person H]."

110. On or about July 3, 2017, again based on public reporting, DAVIS texted Person B: "[President] leaves D.C. Wednesday for Europe[.]" DAVIS then followed up: "July 5. Scheduled to meet in person w [President of the PRC][.]"

111. On or about July 18, 2017, Person B emailed DAVIS the contact information for Person H. DAVIS connected multiple calls between PRC Minister A and Person H in furtherance of the lobbying campaign to remove PRC National A.

112. On or about July 26, 2017, Person B and DAVIS exchanged text messages regarding PRC National A and his removal from the United States to the PRC. Among the messages, DAVIS wrote, "Really need confirm it was officially transmitted. At this point – he says no[.]" Person B responded, "Asked 3 different people to follow up[.]" Person B later added, "Called [Person E]. Seeing [Person H] in an hour."

113. On or about July 26, 2017, Person B texted Person H to meet at a hotel in Washington, D.C., to discuss PRC National A: "Hi [Person H], I understand from staff that you're in DC, as am I, staying at the [hotel]. Would you like to have a cup of coffee today? Regards, []." Later the same day, Person H's spouse texted Person

35

B, "Hi []. Can you text me the details again of the [the PRC] man you texted previously thank you[.]" Person B responded, "Hi [], You are referring to [PRC National A] or [PRC Minister A]? Best, [][.]" Person H's spouse replied, "[PRC National A]." Person B then resent the message that he previously sent on June 27.

114. On or about July 27, 2017, Person B and DAVIS exchanged text messages regarding PRC National A. DAVIS texted Person B, "Any word on embassy??" DAVIS later added, "Hey any update about formal notice?" Person B responded, "I'm dealing with people in NSC. Emailing directly. Awaiting response[.]"

115. On or about August 19, 2017, Person B texted DAVIS several times. Among those messages, Person B wrote, "Urgent. Call me. Good news[.]" Person B later added, "im with [Person H]. have break thru opportunity[.]"

116. On or about August 19, 2017, Person B met with Person H on Person H's yacht. During their time together, Person B asked Person H about the matter involving PRC National A, and Person H suggested that they call the President. Person B and Person H then called the President, asking about PRC National A's status within the United States.

117. On or about September 13, 2017, Person B texted DAVIS, "Please text me asylum article. And other article[.]" That same day, DAVIS texted Person B links to articles about PRC National A.

118. On or about October 2, 2017, Person B texted DAVIS a link to an article about PRC National A.

119. On or about January 5, 2018, Person B texted DAVIS, "Send me more info on [PRC National A] involved in funding Dem politicians, . . . ASAP[.]"

## COUNT ONE
### 18 U.S.C. § 2 and 22 U.S.C. § 612
### (Aiding and Abetting & Unregistered Agent of a Foreign Principal)

120. From in or about no later than May 2017 to at least in or about January 2018, within the District of Hawaii and elsewhere, the defendant, NICKIE MALI LUM DAVIS, knowingly and willfully, without registering with the Attorney General as required by law, aided and abetted Person A and Person B in their actions as agents of a foreign principal, to wit: their execution of a back-channel lobbying campaign to resolve the 1MDB investigation favorably for Foreign National A and to return PRC National A to the PRC, all on behalf of Foreign National A and PRC Minister A and the Government of the PRC.

All in violation of 18 U.S.C. § 2 and 22 U.S.C. §§ 612 and 618(a)(1).

## FORFEITURE ALLEGATION

121.  The allegations contained in Count 1 of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

122.  Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of Count 1, in violation of Title 18 United States Code, Section 2, and Title 22, United States Code, Sections 612 and 618(a)(1), the defendant, NICKIE MALI LUM DAVIS, shall forfeit to the United States of America a sum of money representing property, real or personal, which constitutes or is derived from proceeds traceable to said violation(s).  Notice is further given that, upon conviction, the United States intends to seek a judgment against DAVIS for this sum of money representing the property described in this paragraph.

123.  If any of the property described above, as a result of any act or omission of the defendant:

- a.  cannot be located upon the exercise of due diligence;
- b.  has been transferred or sold to, or deposited with, a third party;
- c.  has been placed beyond the jurisdiction of the court;
- d.  has been substantially diminished in value; or
- e.  has been commingled with other property which cannot be divided without difficulty,

38

the United States of America shall be entitled to forfeiture of substitute property

pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title

28, United States Code, Section 2461(c)

    DATED: August 17, 2020, at Honolulu, Hawaii.

COREY R. AMUNDSON
Chief, Public Integrity Section
United States Department of Justice

/s/ *Kenji M. Price*
KENJI M. PRICE
United States Attorney
District of Hawaii

/s/ *John D. Keller*
JOHN D. KELLER
Principal Deputy Chief

/s/ *Kenneth M. Sorenson*
KENNETH M. SORENSON
Chief, National Security

SEAN F. MULRYNE
NICOLE R. LOCKHART
JAMES C. MANN
Trial Attorneys
Public Integrity Section

United States v. Nickie Mali DAVIS
Information
Cr. No. _____

39

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,   )
              ) **Criminal Number:** 18-343 (CKK)
    vs.       )
              )
**GEORGE HIGGINBOTHAM,**   )
              )
    Defendant.    )
_____ )

## FACTUAL BASIS FOR PLEA

Pursuant to Federal Rule of Criminal Procedure 11, the United States and the defendant, George HIGGINBOTHAM, stipulate and agree that the following facts fairly and accurately describe the defendant's conduct in the offense to which he is pleading guilty. These facts do not constitute all of the facts known to the parties concerning the charged offense and related conduct. This statement is being submitted to demonstrate that sufficient facts exist to establish that the defendant committed the offense to which he is pleading guilty. The defendant knowingly, voluntarily, and truthfully admits the facts set forth below.

The Conspiracy

1. From in or about April 2017 to in or about January 2018, in the District of Columbia and elsewhere, HIGGINBOTHAM and others knowingly conspired to commit the offense of making false statements to a bank by misrepresenting the true source and purpose of transfers of tens of millions of dollars from foreign accounts to various federally insured financial institutions in the United States.

1

Individuals Involved in the Conspiracy

2.      During the conspiracy, HIGGINBOTHAM was a licensed attorney employed by the United States Department of Justice. Co-conspirator A, a longtime associate of HIGGINBOTHAM, was a United States citizen, businessperson, and entertainer. Co-conspirator B, a foreign national and associate of Co-conspirator A, was a wealthy businessperson living in East Asia who was alleged to have orchestrated a multi-billion dollar embezzlement and bribery scheme from 1Malaysia Development Berhad ("1MDB"), a strategic investment and development company wholly owned by the Government of Malaysia.

Source and Purposes of International Fund Transfers

3.      In or about July 2016, the United States Department of Justice ("DOJ") filed multiple civil forfeiture complaints seeking the forfeiture of over $1 billion in assets allegedly associated with laundered proceeds from the 1MDB embezzlement and bribery scheme. Co-conspirator B was named in the complaints as one of the primary architects of the embezzlement scheme.

4.      In or about March 2017, Co-conspirator A asked HIGGINBOTHAM to assist with identifying someone with political influence who could resolve Co-conspirator B's issues surrounding the 1MDB forfeiture matters and the DOJ's investigation thereof. HIGGINBOTHAM introduced Co-conspirator A to a law firm recruiter, who recommended two different law firms, but Co-conspirator B ultimately selected Person 1, a non-lawyer business owner, political fundraiser, and financier with political connections at high levels of the United States government, to lobby government officials to resolve the 1MDB matters. HIGGINBOTHAM had no involvement in introducing Person 1 to Co-conspirator A or Co-conspirator B.

5.    According to Co-conspirator A, Person 1 did not want to be paid directly by Co-conspirator B because he did not want to be linked to Co-conspirator B. At Co-conspirator A's direction, HIGGINBOTHAM worked on various retainer and consulting agreements that provided for payments through pass-through entities to distance Co-conspirator B from Person 1 and anonymized Co-conspirator B in the transaction. According to the written agreements, Co-conspirator B would pay tens of millions of dollars to Person 1 through various intermediaries and entities as compensation for Person 1's efforts to lobby United States government officials to drop all civil and/or criminal matters related to 1MDB. According to Co-conspirator A, as part of the lobbying campaign, Person 1 agreed to try to influence a potential nominee for a federal position that would have authority over the 1MDB civil forfeiture matters. That person ultimately was not nominated.

6.    In or about May 2017, Co-conspirator A informed HIGGINBOTHAM that Co-conspirator B had another request separate from the 1MDB matters that was potentially more lucrative than their work on the 1MDB issue: Co-conspirator B wanted Foreign National 1, a former resident of Country Q who was living in the United States on a temporary visa and who had publicly criticized the leadership of Country Q, to be removed from the United States and sent back to Country Q. According to Co-conspirator A, Person 1 and others would use their political connections to lobby United States government officials to have Foreign National 1 removed from the United States.

7.    In or about July 2017, Co-conspirator A requested that HIGGINBOTHAM meet with Country Q's ambassador to the United States at Country Q's embassy in Washington, D.C. HIGGINBOTHAM agreed, and on or about July 16, 2017, HIGGINBOTHAM went to Country Q's embassy in Washington, D.C. and met with the ambassador. HIGGINBOTHAM informed

3

embassy staff and Country Q's ambassador that he was there in his personal capacity and not as a representative of DOJ. At Co-conspirator A's request, HIGGINBOTHAM delivered a specific message during the meeting: United States government officials were working on the matter involving Foreign National 1 and there would be additional information in the future concerning the logistics of returning Foreign National 1 to Country Q. Following the meeting, HIGGINBOTHAM reported to Co-conspirator A what had occurred. Co-conspirator A informed HIGGINBOTHAM that, based on Co-conspirator A's conversations with Co-conspirator B, Co-conspirator B was satisfied with how the embassy meeting went.

8.      Between in or about May 2017 and in or about September 2017, tens of millions of dollars were transferred from Foreign Company L, an entity formed in Country Q, to accounts in the name of an entity in the United States controlled by Co-conspirator A. HIGGINBOTHAM understood that, although the money was coming from Foreign Company L, Co-conspirator B exercised control over the funds and the transfers occurred at Co-conspirator B's direction. HIGGINBOTHAM also understood that the purpose of the funds was to pay Person 1 and others to lobby United States government officials to (1) resolve the 1MDB matters, and (2) have Foreign National 1 removed from the United States and sent back to Country Q.

9.      To make the international fund transfers appear legitimate, HIGGINBOTHAM worked on various fake loan documents, investment agreements, and consulting contracts at the direction of Co-conspirator A. The documents were in the names of several foreign and domestic shell companies that concealed Co-conspirator B's involvement in the transactions. The purpose in creating the fake documents was to provide a cover story in case the banks or other authorities made inquiries about the true source and purpose of the funds. HIGGINBOTHAM understood that Co-conspirator A and Co-conspirator B were concerned that financial institutions in the United

4

States would refuse to execute transactions involving any funds identified as being associated with Co-conspirator B.

Meeting with Co-conspirator B in Country Q

10.     In or about September 2017, at Co-conspirator A's request, HIGGINBOTHAM travelled to Country Q with Co-conspirator A and others to meet with Co-conspirator B. Over the course of several days, HIGGINBOTHAM met with Co-conspirator B, Co-conspirator A, and others. During these meetings, Co-conspirator B, Co-conspirator A, and others discussed strategies for secretly funneling more of Co-conspirator B's money into the United States to further the lobbying campaign, including coming up with cover stories to explain the movement of money and to conceal the fact that the money was associated with Co-conspirator B. They also discussed the strictness of the United States banking system in the wake of the events of September 11, 2001. Co-conspirator B stated that he wanted to send the money in smaller installments over a longer period of time in order to avoid scrutiny.

11.     Eventually, Co-conspirator B came up with a proposal of giving HIGGINBOTHAM power of attorney over the assets of Foreign Company R, another entity formed in Country Q and purportedly owned by an associate of Co-conspirator B. In reality, Co-conspirator B controlled Company R's assets and the associate was simply a nominee for Co-conspirator B. According to Co-conspirator B's proposal, in the event Person 1 and others were successful in having Foreign National 1 removed from the United States, HIGGINBOTHAM (using the power of attorney authority) could sell Company R to Co-conspirator A and others associated with Person 1 and use Company R's assets to compensate those involved in the lobbying campaign. At Co-conspirator B's direction, HIGGINBOTHAM signed various documents while in Country Q purporting to give HIGGINBOTHAM control over Company R and its assets.

5

12.     Upon returning to the United States, HIGGINBOTHAM and Co-conspirator A learned that Person 1 and others involved in the lobbying campaign were dissatisfied with Co-conspirator B's proposal and the fact that the trip to Country Q had not resulted in additional funds being sent to the United States. In or about October 2017, Co-conspirator A and HIGGINBOTHAM agreed that the additional funds that Person 1 and his associates were seeking from Co-conspirator B could instead be deposited into HIGGINBOTHAM's attorney escrow account pending resolution of the issue concerning Foreign National 1.

13.     On or about October 23, 2017, approximately $41 million was deposited into HIGGINBOTHAM's escrow account from Foreign Company R, at the direction of Co-conspirator B. HIGGINBOTHAM, at Co-conspirator A's direction, disbursed several million dollars for one of Co-conspirator A's entertainment projects. According to Co-conspirator A, those funds were Co-conspirator A's cut for helping get the money into the United States and acting as an intermediary between Co-conspirator B and the individuals engaged in the lobbying campaign. Virtually all of the remaining funds were placed in a certificate of deposit at Co-conspirator A's request because the individuals engaged in the lobbying campaign wanted the money to be secure. HIGGINBOTHAM believed that the funds would be released in the event the lobbying campaign was successful in having Foreign National 1 removed from the United States.

False Statements to Financial Institutions

14.     Between in or about September 2017 and in or about December 2017, in furtherance of the conspiracy, HIGGINBOTHAM made and caused to be made false statements to three federally insured financial institutions in the United States in order to influence the financial institutions' actions in connection with the tens of millions of dollars transferred from Foreign Company L and Foreign Company R to accounts in the United States to finance Co-

conspirator B's lobbying campaign. HIGGINBOTHAM understood that Co-conspirator B's publicly known status as one of the primary architects of the 1MDB embezzlement and bribery scheme created significant barriers to moving Co-conspirator B's money through United States financial institutions. HIGGINBOTHAM, Co-conspirator A, and Co-conspirator B, therefore agreed that Co-conspirator B's connection to the funds sent to the United States for the lobbying campaign would be concealed from United States financial institutions and the true purpose of the funds would be misrepresented to the financial institutions.

15.    Between in or about July and September 2017, Financial Institution X, an institution with accounts insured by the Federal Deposit Insurance Corporation (FDIC), sent inquiries to Co-conspirator A, Co-conspirator A's money manager, and HIGGINBOTHAM concerning the source and purpose of the tens of millions of dollars in transfers from Foreign Company L to Co-conspirator A's business accounts at Financial Institution X. On or about September 27, 2017, in order to influence the bank's ongoing due diligence, HIGGINBOTHAM, at Co-conspirator A's direction, sent a detailed written response to Financial Institution X claiming that Foreign Company L was the source of the transfers, and that the purpose of the funds was to finance Co-conspirator A's "entertainment matters," and also to retain a law firm to assist Foreign Company L to "resolve a highly complex civil litigation matter." The letter made no mention of Co-conspirator B or the lobbying campaign to influence the 1MDB matters and have Foreign National 1 removed from the United States. In addition, HIGGINBOTHAM attached one of the fake consulting contracts to his response to Financial Institution X as a cover story for some of the money Co-conspirator B had transferred to Co-conspirator A's business accounts in the United States. On or about September 28, 2017, Financial Institution X informed Co-conspirator A that all of his business accounts would be closed on or before October 28, 2017, and that effective

immediately wires into the accounts would no longer be accepted "due to insufficient information received regarding the source of funds on previous wires." Financial Institution X subsequently issued cashier's checks totaling approximately $37 million for the remaining balance, which were deposited with Financial Institution Y a short time later.

16. Financial Institution Y was a broker-dealer registered with the United States Securities and Exchange Commission that had arrangements with federally insured banks for offering certain account services. In or about October 2017, Co-conspirator A and HIGGINBOTHAM opened business accounts with Financial Institution Y that provided separate cash accounts with an affiliate FDIC insured bank, where some of the funds from Foreign Company L (which had previously been with Financial Institution X) were maintained. Between in or about October and November 2017, as part of its due diligence in connection with the account openings, Financial Institution Y repeatedly inquired of Co-conspirator A and HIGGINBOTHAM about the source and purpose of the tens of millions of dollars in Co-conspirator A's business accounts that had previously been with Financial Institution X. In order to influence Financial Institution Y's actions with respect to maintaining the accounts, Co-conspirator A claimed to a representative of Financial Institution Y that the money was from a foreign investor in Co-conspirator A's entertainment projects. In addition, on or about November 6, 2017, at Co-conspirator A's direction, HIGGINBOTHAM responded to the representative's question about whose money was in the accounts by falsely claiming, "The funds originated with [Foreign Company L] (incorporation documents attached) who is an investor in a slate of projects the [sic] are currently under review and subject to further discussion." Neither Co-conspirator A nor HIGGINBOTHAM mentioned Co-conspirator B or the campaign to influence the 1MDB matters and have Foreign National 1 removed from the United States. In or about November 2017,

Financial Institution Y closed Co-conspirator A's business accounts and disbursed the remaining funds, including those from the cash accounts, to Co-conspirator A.

17. In or about December 2017, Financial Institution Z, an FDIC insured bank where HIGGINBOTHAM maintained an attorney escrow account, inquired of HIGGINBOTHAM about the source and purpose of the approximately $41 million deposited into HIGGINBOTHAM's account from Foreign Company R. In order to influence Financial Institution Z's due diligence with respect to the funds, HIGGINBOTHAM responded that the money was an investment from Foreign Company R in music and entertainment projects for one of his clients. HIGGINBOTHAM did not mention Co-conspirator B or the campaign to influence the 1MDB matters and have Foreign National 1 removed from the United States.

18. On or about May 9, 2017, HIGGINBOTHAM submitted a $20,000 invoice to Co-conspirator A for work related, at least in part, to the conduct described above for Co-conspirator A. On or about August 11, 2017, HIGGINBOTHAM submitted a $50,000 invoice to Co-conspirator A and his money manager for work related, at least in part, to the conduct described above for Co-conspirator A. Co-conspirator A paid HIGGINBOTHAM the full amount of both invoices.

<div style="margin-left:40%">

ANNALOU TIROL
Acting Chief
Public Integrity Section

By:

John Keller
Deputy Chief
Ryan Ellersick
James Mann
Sean Mulryne
Nicole Lockhart
Trial Attorneys
Public Integrity Section
1400 New York Ave. NW
Washington, DC 20005
(202) 514-1412

</div>

## DEFENDANT'S ACCEPTANCE

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me. It does not include all of the facts known to me regarding this offense. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crime charged. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Factual Basis for Plea fully.

I have read every word of this Factual Basis for Plea or have had it read to me. Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorneys, I agree and stipulate to this Factual Basis for Plea, and declare under penalty of perjury that it is true and correct.

Date: *NOVEMBER 19, 2018*

George Higginbotham
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Factual Basis for Plea, and have reviewed it with my client fully. I concur in my client's desire to adopt and stipulate to this Factual Basis for Plea as true and accurate.

Date: 11/19/18

Christopher Mead
Lance Robinson
For the Defendant