# EXHIBIT PAX 26

Transcript of Craig Jalbert Deposition

CASE NO. _____ 22-50073 _____

IN RE: Ho Wan Kwok

VS. _____

PAX   EXHIBIT _____ 26 _____

DATE _____ IDEN.

DATE _5/25/2022 Admitted in Full_ EVID.

BY _P.E._____

**Deputy Clerk**

AO 386-A

1

2          UNITED STATES BANKRUPTCY COURT

              DISTRICT OF CONNECTICUT

3              BRIDGEPORT DIVISION

-------------------------------------------X

4    IN RE:

5                              Chapter 11

     HO WAN KWOK,

6                    Case No. 22-50073(JAM)

7

         Debtor.

8

-------------------------------------------X

9

10              DATE: April 8, 2022

11              TIME: 10:17 A.M.

12

13

14       VIDEO-RECORDED DEPOSITION OF CRAIG

15   JALBERT of VERDOLINO & LOWEY, P.C., in the

16   above entitled matter, at the above date

17   and time, held at the offices of O'Melveny

18   & Myers LLP, 7 Times Square, New York, New

19   York 10036, by Lenaya Lynch, a Notary

20   Public and Shorthand Reporter of the State

21   of New York.

22

23

24

25

                                      Page 1

```
 1
 2  A P P E A R A N C E S:
 3  O'MELVENY & MYERS LLP
       Attorneys for PACIFIC ALLIANCE ASIA
 4     OPPORTUNITY FUND LLP
       7 Times Square, 30th Floor
 5     New York, New York 10036
       BY: LAURA ARONSSON, ESQ.
 6        DAVID HARBACH, ESQ.
          MaKENZIE B. RUSSO, ESQ.
 7
 8
       BROWN RUDNICK LLP
 9     Attorneys for HO WAN KWOK
       7 Times Square
10     New York, New York 10036
       BY: KENNETH J. AULET, ESQ.
11
12
       PULLMAN & COMLEY LLC
13     Attorneys for CREDITOR'S COMMITTEE
       850 Main Street
14     PO Box 7006
       Bridgeport, Connecticut 06601
15     BY: IRVE J. GOLDMAN, ESQ.
16
17  COHN, BIRNBAUM, SHEA P.C.
       Attorney for GOLDEN SPRING
18     100 Pearl Street, Suite 12
       New Haven, Connecticut 06103
19     BY: TIMOTHY MILTENBERGER, ESQ. via
       Teleconference
20
21
       ALSO PRESENT:
22
       JON DIFILIPPO, Legal Videographer
23
24        *     *     *
25
```

```
 1              C. JALBERT
 2        THE VIDEOGRAPHER:  Good
 3   morning.  We are going on the record
 4   at 10:17 a.m. on April 22nd -- I'm
 5   sorry, April 8th, 2022.  Please note
 6   that the microphones are sensitive
 7   and may pick up whispering, private
 8   conversations and cellular
 9   interference.  Please turn off all
10   cell phones or place them away from
11   the microphone as they can interfere
12   with the deposition audio.  Audio and
13   video recording will continue to take
14   place unless all parties agree to go
15   off the record.
16        This is Media Unit 1 of the
17   video-recorded deposition of Craig
18   Jalbert in the matter of re:  Ho Wan
19   Kwok filed in the United States
20   Bankruptcy Court, District of
21   Connecticut, Bridgeport Division,
22   Case Number 22-50073.
23        This deposition is being held
24   at O'Melveny and Myers LLP, located
25   at Times Square Tower, New York, New
```

```
 1              C. JALBERT
 2   York.  My name is Jonathan DiFilippo
 3   from the firm Veritext and I am the
 4   videographer.  The Court Reporter is
 5   Lenaya Lynch from the firm, Veritext.
 6   I'm not authorized to administer an
 7   oath.  I'm not related to any party
 8   in this action nor am I financially
 9   interested in the outcome.
10        Counsel and all present in the
11   room and everyone attending remotely
12   will now state their appearances and
13   affiliations for the record.  If
14   there are any objections to the
15   proceeding, please state them at the
16   time of your appearance beginning
17   with the noticing attorney.
18        MS. ARONSSON:  Laura Aronsson,
19   O'Melveny and Myers for Pacific
20   Alliance Asia Opportunity Fund LP.
21        MR. HARBACH:  David Harbach
22   with O'Melveny and Myers for the same
23   client.
24        MS. RUSSO:  Makenzie Russo with
25   O'Melveny and Myers for the same
```

```
 1              C. JALBERT
 2   client.
 3        MR. AULET:  Kenneth Aulet of
 4   Brown Rudnick, proposed counsel for
 5   the debtor, Ho Wan Kwok.
 6        MR. GOLDMAN:  Irve Goldman,
 7   Pullman and Comley, proposed counsel
 8   for the Creditor's Committee.
 9        THE VIDEOGRAPHER:  Will the
10   Court Reporter please swear in the
11   Witness?
12        MR. AULET:  There's one person
13   on the line.
14        MR. MILTENBERGER:  Are we done
15   with the people in person?  Timothy
16   Miltenberger for Golden Spring, NY
17   Limited.
18        THE VIDEOGRAPHER:  Will the
19   Court Reporter please swear in the
20   Witness?
21   C R A I G   J A L B E R T, called as a
22   witness, having been first duly sworn by a
23   Notary Public of the State of New York, was
24   examined and testified as follows:
25   EXAMINATION BY
```

C. JALBERT

1       C. JALBERT
2  MS. ARONSSON:
3      Q.   Please state your name for the
4  record.
5      A.   Craig Jalbert, J-A-L-B-E-R-T.
6      Q.   What is your address?
7      A.   Home address?  The business
8  address is 124 Washington Street, Suite
9  101, Foxboro, Massachusetts 02035.
10     Q.   Good morning.  We previously
11 met off the record.  On the record, my name
12 is Laura Aronsson and I'm an attorney at
13 O'Melveny and Myers for Pacific Alliance
14 Asia Opportunity Fund.  Mr. Jalbert, have
15 you ever testified in court before?
16     A.   Yes.
17     Q.   In what case -- or I'll start
18 how many times?
19     A.   50, 60, 70 something.
20         MR. GOLDMAN:  Before we get too
21     far into things, can I just ask --
22     this is a notice of deposition
23     relating to what contested matter?
24     There are a number of motions before
25     the Court.  The notice of deposition

Page 6

C. JALBERT

1       C. JALBERT
2      doesn't indicate which of the matters
3      it relates to.
4         MS. ARONSSON:  Sure.  So we
5      have -- we served a 30(b)6 notice of
6      deposition which I'll mark as an
7      exhibit so that we're all on the same
8      page but it relates to the retention
9      of Verdolino and Lowey.
10        MR. GOLDMAN:  All right.  I
11     just wasn't sure because it's not
12     identified on the notice.
13        MS. ARONSSON:  Thank you.
14     Q.   Sorry.  You said 50 or 60
15 times?
16     A.   70, 80, I don't know.  I have
17 not kept -- I've got a list of ten years
18 that goes back 40 or 50 and I've been doing
19 it for 30.  So no idea.
20     Q.   Well, we can talk about some of
21 the broad categories of experience you have
22 later but let's start just to go over a few
23 procedures that I'm sure you're familiar
24 with.  Do you understand that you're
25 testifying under oath today?

Page 7

C. JALBERT

1       C. JALBERT
2      A.   Yes.
3      Q.   Do you understand that means
4  that you're swearing that all of your
5  answers are truthful?
6      A.   Yes.
7      Q.   And that you are subject to the
8  penalty of perjury?
9      A.   Yes.
10     Q.   The Videographer is recording
11 everything on camera and the Court Reporter
12 is preparing a written record of what we
13 discuss here today and will later produce a
14 copy of that transcript.  Do you
15 understand?
16     A.   Yes.
17     Q.   Unlike normal conversation, it
18 is important that we not talk over one
19 another.  Please wait for me to finish my
20 question before you answer.  I'll try to do
21 the same for you.  Do you understand?
22     A.   Yes.
23     Q.   Your answers need to be
24 audible.  A shake of the head is
25 insufficient as are statements like uh-huh.

Page 8

C. JALBERT

1       C. JALBERT
2  Do you understand?
3      A.   Understood.
4      Q.   If you do not understand my
5  question, please ask me to repeat.
6  Otherwise, I'll assume that you do
7  understand the question.  Is that okay?
8      A.   Yes.
9      Q.   If you need a break, just let
10 me know and we can take one but if there's
11 a question pending, please answer it before
12 we break.  Are you represented by Counsel
13 today?
14     A.   I think so.
15     Q.   Who do you understand to be
16 representing you?
17     A.   Ken Aulet.
18     Q.   If your attorney objects to a
19 question, you should still answer it unless
20 you don't understand the question or
21 Counsel instructs you not to answer.  Do
22 you understand?
23     A.   Yes.
24     Q.   Are you suffering from any
25 condition that would impair your ability to

Page 9

3 (Pages 6 - 9)

C. JALBERT
1    C. JALBERT
2 testify accurately or truthfully?
3    A.    No.
4    Q.    Are you taking any medications
5 that might interfere with your ability to
6 give accurate or truthful testimony?
7    A.    No.
8    Q.    Is there any reason why you
9 cannot testify truthfully and accurately
10 today?
11    A.    No.
12        MS. ARONSSON:  Tab one.  The
13    Court Reporter is going to be marking
14    what will be Jalbert Exhibit 1.
15        (Whereupon, Notice of
16    Deposition was marked as Jalbert
17    Exhibit 1 for identification as of
18    this date by the Reporter.)
19    Q.    All right, Mr. Jalbert.  Do you
20 recognize this document?
21    A.    I do.
22    Q.    What is it?
23    A.    Pacific Alliance Asia
24 Opportunity Fund LLP's Notice of Deposition
25 of Verdolino and Lowey PC pursuant to Rule
Page 10

C. JALBERT
1    C. JALBERT
2 been designated to testify about each topic
3 listed here?
4        MR. AULET:  Objection.
5    A.    Yes.
6        MR. AULET:  He's been
7    designated as per our responses and
8    objections.
9        MS. ARONSSON:  Thank you.
10    Q.    Are you familiar with these
11 subject areas?
12    A.    Yes.
13    Q.    Do you understand that you are
14 required to testify as to Verdolino and
15 Lowey's knowledge about these topics, not
16 just your own?
17    A.    Yes.
18    Q.    Do you understand that you were
19 required to obtain all of the knowledge and
20 information necessary to allow you to fully
21 and honestly testify concerning each of
22 these topics upon Verdolino and Lowey's
23 behalf?
24        MR. AULET:  Same objection as
25    before.
Page 12

C. JALBERT
1    C. JALBERT
2 30(b)(6) of the Federal Rules of Civil
3 Procedure.
4    Q.    Is it your understanding that
5 you are testifying today in connection with
6 in re: Ho Wan Kwok?
7    A.    Yes.
8    Q.    Can you please turn to Page 6
9 --
10    A.    Excuse me, I just forgot to get
11 my glasses.
12        MS. ARONSSON:  Can we go off
13    the record for one minute?
14        THE VIDEOGRAPHER:  The time is
15    10:24 a.m. and we are off the record.
16        (Whereupon, an off-the-record
17    discussion was held.)
18        THE VIDEOGRAPHER:  The time is
19    10:24 a.m. and we're back on the
20    record.  You may proceed.
21    Q.    Can you turn to Page 6 to the
22 heading Rule 30(b)(6) deposition topics?
23 You see that?
24    A.    Yes.
25    Q.    Do you understand that you have
Page 11

C. JALBERT
1    C. JALBERT
2    A.    I did the best I could.
3    Q.    What, if anything, did you do
4 to prepare for this deposition?
5    A.    I spoke with attorney Ben
6 Silverberg, with Counsel, Ken Aulet, I
7 spoke with my colleagues, Matthew Flynn and
8 Mary Jo Schindler.  I reviewed a
9 significant amount of documents, some filed
10 with the Court, some prepared internally.
11 Reviewed e-mails.  Covered as much as I
12 could.
13    Q.    Did you collect the documents
14 that you prepared or were they provided to
15 you by Counsel?
16    A.    The documents that -- are you
17 asking for the documents that we sent to
18 O'Melveny?
19    Q.    I'm asking -- taking a step
20 back, just asking about your preparation
21 for today's deposition.
22    A.    I just looked at my own
23 documents and my own e-mails on the
24 Verdolino and Lowey server.
25    Q.    Generally, what were the
Page 13

4 (Pages 10 - 13)

C. JALBERT

1 subject matters of those e-mails?
2    A.   It was looking at the -- all of
3 -- not all of them.  Many of my e-mails,
4 the SOFA's -- the statement of financial
5 affairs -- the schedules, the global notes,
6 the global notes and specific notes, most
7 of the pleadings to employ professionals,
8 particularly ours, the motion for the DIP
9 financing, many of the objections, not all
10 of them.  I'm trying to think if there's
11 anything else.  I can't think of anything
12 off the top beyond that --
13    Q.   Thank you.  That's helpful.  So
14 you mentioned that you spoke to your
15 attorneys, Ben and Ken?
16    A.   Yes.
17    Q.   When did you speak to them?
18    A.   Well, we were delayed a little
19 bit so I had a few minutes this morning
20 with Ken.  I spoke with Ben briefly last
21 night.  Again, this morning on -- unrelated
22 to the deposition and I had previously
23 spoken to Ken probably one or two times
24 over the last few days, give or take.

Page 14

C. JALBERT

1    Q.   Anyone else besides the people
2 that we've talked about?
3    A.   Regarding the -- just regarding
4 the deposition?
5    Q.   Yes.
6    A.   No.
7    Q.   You haven't spoke to the
8 debtor?
9    A.   About the deposition?
10    Q.   About the deposition.
11    A.   No.
12    Q.   Have you ever met the debtor?
13    A.   Yes.
14    Q.   When did you meet the debtor?
15    A.   The continued meeting of 342 --
16 or 341 meeting which was I think Wednesday,
17 the first time I met him.
18    Q.   Is that the only time you met
19 the debtor?
20    A.   Yes.
21    Q.   Outside of the 341 proceeding,
22 did you interact with the debtor?
23    A.   No.
24    Q.   I just want to cover a little

Page 16

C. JALBERT

1    Q.   Were each of these interactions
2 over the phone?
3    A.   Until today, yes.
4    Q.   About how long did you spend
5 preparing with your attorneys in connection
6 with your preparation for this deposition?
7    A.   I would have to hazard a guess.
8 I don't have my time records in front of
9 me.
10    Q.   Like two hours, ten hours?
11    A.   My guess is in the two to four
12 hour range.  No more than that.
13    Q.   Did you speak to anyone else
14 other than the folks that you mentioned at
15 Verdolino and Lowey and your attorneys
16 regarding this deposition?
17    A.   Our IT person, Tim McDonald who
18 assisted in the search -- the electronic
19 search of e-mails and records and worked
20 with the Brown Rudnick IT person to send
21 everything over.  Aside from having him try
22 and get the records, we didn't have any
23 discussion of the case facts and
24 circumstances or anything.

Page 15

C. JALBERT

1 bit of your background.  Can you talk about
2 your educational history since high school?
3    A.   I graduated from Western
4 Connecticut High School in 1979.  I went to
5 Boston College.  Graduated Boston College
6 with a bachelor of science and degree in
7 accountancy in 1983.  I went to work for
8 Arthur Andersen from June of '83 till
9 August 31 of '87.  On September 1 of 1987,
10 I started at the precursor of what is now
11 Verdolino and Lowey and I've been there in
12 the 35 years since and during that time, I
13 I've gone to many, many, many professional
14 CPE type courses of all sorts of flavors.
15    Q.   What do you mean by CPE?
16    A.   A continuing professional
17 education.
18    Q.   Is that a required procedure
19 for any type of certification that you
20 have?
21    A.   It's -- some of it is required
22 for my certification as a certified
23 insolvency restructuring advisor.  The rest
24 are just to maintain my professional

Page 17

5 (Pages 14 - 17)

C. JALBERT

1 capabilities and stay on top of various
2 issues as the years have gone on.
3     Q.    So you mentioned certified
4 insolvency instructor?
5     A.    Certified insolvency
6 restructuring advisor.  CIRA.
7     Q.    So this is a professional
8 certification?
9     A.    Yes.
10     Q.    Do you hold any other
11 professional certifications besides the
12 CIA?
13     A.    CIRA, no.
14     Q.    CIRA.  I think you said you had
15 a accountant degree from Boston College?
16     A.    Yes.
17     Q.    Do you hold any other graduate
18 or any graduate degrees?
19     A.    No.
20     Q.    Are you currently employed at
21 Verdolino and Lowey?
22     A.    Yes.
23     Q.    Generally, what services does
24 Verdolino and Lowey offer its clients?

Page 18

C. JALBERT

1 responsible for this?
2     A.    Well, my partner and various
3 staff.
4     Q.    What's his name?
5     A.    Keith Lowey.
6     Q.    Is that department involved in
7 this matter before us?
8     A.    No.
9     Q.    Is Verdolino and Lowey always
10 engaged by the debtor in the bankruptcy
11 context?
12     A.    No.
13     Q.    What other scenarios is
14 Verdolino and Lowey engaged under?
15     A.    We've been engaged by trustees,
16 post confirmation fiduciaries, whatever
17 they may be called; you said debtors,
18 creditors' committee, creditors, secured
19 lenders.  I think we've probably
20 represented, over the years, most every
21 kind of party and interest to a bankruptcy
22 that there is.
23     Q.    Turning to your experience
24 specifically, what experience do you have

Page 20

C. JALBERT

1     A.    There were three or four -- I
2 guess four major buckets.  The first and
3 biggest is the insolvency arena,
4 underperforming businesses and individuals.
5 That includes litigation support and
6 everything related to it.  We have a
7 full-time 13 or 14 people I think it is
8 that work in taxation and we also do what
9 I'll call high net worth babysitting.  We
10 have -- and I don't do any of this work.
11 My partner and others do it but we have
12 very wealthy clients that don't pay their
13 own bills, that have multiple residences.
14 Everything comes to us.  We act as a family
15 office for a whole -- for a number of
16 people and the last thing we do is federal
17 election reporting for federal congress
18 people and senators and presidential.
19     Q.    Thank you.
20     A.    Did I say we have tax
21 department -- yes, tax department.  That's
22 the four.
23     Q.    You mentioned the high net
24 worth baby sitting.  Who, at Verdolino, is

Page 19

C. JALBERT

1 in Chapter 11 cases?
2     A.    I've been in over 500 Chapter
3 11 cases.  We've been committee financial
4 advisor, committee accountants, debtor
5 financial advisor, debtor accountants,
6 accountants on behalf of secured lenders,
7 accountants on behalf of individual
8 creditors.  Trying to think -- I mean
9 again, we've done -- we've represented
10 pretty much every constituency so over
11 time, I've done -- I've represented every
12 reasonable constituency in a bankruptcy I
13 can remember.
14     Q.    What is your title at Verdolino
15 and Lowey?
16     A.    Principal.
17     Q.    We talked about the four
18 buckets.  Generally, what are your
19 responsibilities with respect to Verdolino
20 and Lowey services?
21     A.    Just for the most part, the
22 first -- all of my time not spent running
23 my own firm is in the bankruptcy insolvency
24 and the like that spreads over a little bit

Page 21

6 (Pages 18 - 21)

C. JALBERT

1 to taxation. I don't run the department or
2 anything but I certainly interact and then
3 litigation support and the like, you know,
4 the types of things you would do in the
5 context of a bankruptcy.
6     Q.    What is meant by litigation
7 support, generally?
8     A.    Well, it can be pretty broad
9 but for us, it's -- whether it be business
10 litigation or bankruptcy litigation, to the
11 extent that there are areas that whoever
12 the law firm -- we've also been appointed
13 by judges, anyone that's looking or
14 interested in obtaining financial
15 information in a form that they're looking
16 for, which could be anything, we would
17 provide it. That would include doing
18 expert reports, expert testimony and work
19 at just advising lawyers as they approach
20 areas in accounting and auditing and the
21 like.
22     Q.    You mentioned here that you're
23 a principal at Verdolino and Lowey?
24     A.    Yes.
25
Page 22

C. JALBERT

1     Q.    What other roles have you held?
2     A.    I've been a principal since I
3 started.
4     Q.    Turning to the engagement here,
5 who contacted Verdolino and Lowey about
6 this engagement?
7     A.    Well, it was contacted me
8 personally and it was an attorney, Steven
9 Pohl at Brown Rudnick.
10    Q.    Sorry, I missed what you said.
11         MR. HARBACH: Spell that name.
12    Q.    Can you spell that name,
13 please?
14    A.    The name was Steven Pohl. Last
15 name P-O-H-L at Brown Rudnick.
16    Q.    Mr. Pohl reached out to who at
17 Verdolino and Lowey?
18    A.    Me.
19    Q.    You. Do you recall when that
20 was?
21    A.    Somewhere around March 1, 2 or
22 3.
23    Q.    After Steven Pohl reached out,
24 who did Verdolino and Lowey speak to
25
Page 23

C. JALBERT

1 generally regarding the engagement?
2     A.    There was a little bit with
3 Steven Pohl and with -- I believe it was
4 Ben Silverberg.
5     Q.    Anyone else at Brown Rudnick?
6     A.    I don't remember.
7     Q.    Besides Brown Rudnick, did you
8 speak to anyone else regarding the
9 potential engagement?
10    A.    I probably mentioned something
11 to my -- my own staff to clear conflicts
12 and I think I had someone help me prepare
13 some -- I shouldn't say prepare, they're
14 already prepared. Send some individual
15 information about myself and the firm.
16    Q.    Did Verdolino and Lowey speak
17 to anyone else besides Brown Rudnick in
18 connection with the engagement?
19         MR. AULET: Objection. You can
20    answer.
21    A.    At the time we're being
22 engaged?
23    Q.    Yes.
24    A.    No.
25
Page 24

C. JALBERT

1     Q.    Who are the main points of
2 contact between -- who are the main
3 contacts for -- strike that. Who do you
4 generally speak to regarding this
5 engagement besides internal folks at
6 Verdolino and Lowey?
7     A.    Mostly the attorneys at Brown
8 Rudnick.
9     Q.    Do you speak to anyone else?
10    A.    I've been on phone calls with
11 other lawyers but I've not initiated
12 anything.
13    Q.    Which other lawyers have you
14 been on phone calls with?
15    A.    The other debtor lawyers that
16 I'm aware of are an Aaron Mitchell and a
17 Melissa Francis.
18    Q.    Who do you understand Aaron
19 Mitchell to be?
20    A.    Counsel to Mr. Kwok, the
21 debtor.
22    Q.    You mentioned Melissa Francis?
23    A.    Also counsel to Mr. Kwok.
24    Q.    Besides Aaron Mitchell and
25
Page 25

7 (Pages 22 - 25)

C. JALBERT

1  C. JALBERT
2  Melissa Francis, do you speak to anyone
3  else outside of Verdolino and Lowey
4  regarding this engagement?
5   A.   And outside of Brown Rudnick?
6   Q.   Outside of Brown Rudnick, yes.
7   A.   No one.
8   Q.   What about -- what about do you
9  communicate via e-mail with anyone besides
10  Aaron Mitchell, Melissa Francis and Brown
11  Rudnick regarding this engagement?
12   A.   I've been on -- I've been CC'd
13  on an e-mail and authored one e-mail to
14  someone outside that group.
15   Q.   Who is that person?
16   MR. AULET:   Objection.  This is
17  the person that we have stated their
18  identity won't be revealed per Golden
19  Springs request.
20   MS. ARONSSON:   Are you
21  instructing the Witness not to
22  answer?
23   MR. AULET:   I am instructing
24  him not to answer.
25   MS. ARONSSON:   Can you just

Page 26

1  C. JALBERT
2  state --
3   MR. GOLDMAN:   Can you repeat
4  the question?
5   (Whereupon, the referred-to
6  question was read back by the
7  Reporter.)
8   THE WITNESS:   That should have
9  been e-mails.  I authored one but I
10  was CC'd on e-mails.
11   Q.   I understand Mr. Aulet is
12  instructing you not to answer.
13   MS. ARONSSON:   Mr. Aulet, do
14  you mind just providing a more
15  detailed objection?
16   MR. AULET:   Sure.  Based on my
17  conversations with Golden Spring, my
18  understanding is that Golden Spring
19  believes that revealing that
20  individual's name would potentially
21  expose them to harassment and based
22  on my review of the documents at
23  issue, the person's identity is not
24  relevant to the issues at hand in
25  this deposition.

Page 27

1  C. JALBERT
2   Q.   So I'll just go on record to
3  say that we dispute that contention.
4   MR. GOLDMAN:   As do we.  Who
5  are you -- who do you fear harassment
6  from?  Do you fear harassment from?
7   MR. AULET:   So Mr. -- Golden
8  Spring's attorney is on the phone and
9  that question is probably best
10  directed to Golden Springs but my
11  understanding is that -- please, he
12  would like to answer.
13   MR. MILTENBERGER:   Tim
14  Miltenberger from Golden Springs.
15  I'm assuming what the Witness is
16  testifying to is the identity of a
17  Golden Spring employee which isn't
18  clear to me from the record but
19  apparently the people at the
20  deposition reached that conclusion.
21  We don't see any relevance in
22  revealing the name of the employees
23  of Golden Spring based on the
24  objection that's filed to the DIP
25  financing motion and we think that

Page 28

1  C. JALBERT
2  the privacy rights of our employees
3  are paramount to any information that
4  might be gathered from knowing the
5  name of -- rank and file employees of
6  Golden Spring and we oppose
7  disclosing that information.
8   MR. GOLDMAN:   That's up to the
9  Judge.  It's a totally inappropriate
10  instruction to direct the Witness not
11  to answer.  The Witness can answer
12  and you can get a ruling from the
13  Judge as to whether the answer should
14  be stricken or protected or subject
15  to a protective order.  It's totally
16  inappropriate to direct the Witness
17  not to answer.
18   MS. ARONSSON:   I noted our
19  dispute with Mr. Aulet and I'll just
20  note our dispute with Mr.
21  Miltenberger's reasoning behind the
22  objection here.
23   MR. MILTENBERGER:   Thank you.
24   Q.   Turning back to the folks we
25  were just talking about, you mentioned

Page 29

8 (Pages 26 - 29)

1         C. JALBERT
2  Melissa Francis.  Did she represent to you
3  that she was Mr. Kwok's counsel?
4      A.   No.
5      Q.   How did you learn about what
6  Ms. Melissa Francis -- who Mr. -- strike
7  that.  How did you learn who Ms. Francis'
8  client was?
9      A.   From Brown Rudnick.
10     Q.   We've talked about the folks at
11 Verdolino that you communicate with this
12 engagement.  Do you know of anyone else
13 that Verdolino and Lowey communicates with
14 regarding this engagement besides the folks
15 that we've talked about?
16     A.   I don't think there were others
17 but it is possible that one of my
18 colleagues met Flynn.  Might have had
19 e-mail contact.  You're aware -- because I
20 think you objected to -- there's a large
21 number of ordinary course professionals.
22 We needed to get information about
23 liabilities to them for the schedules.
24 There might have been some information and
25 stuff because we needed -- it's possible
Page 30

1         C. JALBERT
2  that he spoke with them but I think really
3  what he did is he got all the information
4  from Aaron Mitchell and Melissa Francis.  I
5  don't think he went outside of that but
6  it's possible.
7      Q.   Do you know where Aaron
8  Mitchell and Melissa Francis retrieved
9  their information from?
10     A.   No.
11     Q.   Did you ask them where they
12 retrieved their information from?
13     A.   No.
14     Q.   Who negotiated -- who, from
15 Verdolino and Lowey, negotiated the
16 engagement letter?
17     A.   It would be me.  I don't know
18 that I would call it a negotiation but it
19 was me that drafted it and prepared it and
20 sent it to Brown Rudnick.
21     Q.   Anyone else involved in
22 drafting that engagement letter?
23     A.   Well, from a QPC perspective,
24 I'm sure I had one of my colleagues, Mary
25 Jo Schindler take a look at it just to make
Page 31

1         C. JALBERT
2  sure I wasn't missing anything.
3      Q.   Besides the attorneys at Brown
4  Rudnick, did you circulate drafts of that
5  engagement letter to anyone else?
6      A.   I don't recall anyone else
7  being on it but I'm pretty sure they then
8  did circulate it with -- at a minimum, Ms.
9  Melissa Francis and probably Aaron Mitchell
10 as well.
11        MS. ARONSSON:  Tab 11.  The
12     Court Reporter is going to hand you
13     what is being marked as Jalbert
14     Exhibit 2.  This document -- for the
15     record, this document bears the Bates
16     Number Kwok 00001646.
17        (Whereupon, E-mail Chain was
18     marked as Jalbert Exhibit 2 for
19     identification as of this date by the
20     Reporter.)
21     Q.   Before we get to the exhibit,
22 what is a post-petition retainer?
23     A.   My understanding would be a
24 retainer paid to whoever, after the filing
25 of a bankruptcy, intended to be a retainer.
Page 32

1         C. JALBERT
2      Q.   Can you please turn to Page 2
3  of this document?  Take a minute.  At the
4  top of Page 2, Mr. Silverberg says that
5  there's no post-petition retainer expected.
6  Do you see that?
7      A.   Yes.
8      Q.   Do you recall whether you had a
9  preference about receiving a post-petition
10 retainer?
11     A.   Well, every professional would
12 rather have a retainer but frankly, under
13 the circumstances, it wasn't expected.
14     Q.   Starting with your preference,
15 why would you prefer to have a
16 post-petition retainer?
17     A.   Security against the payment of
18 the fees.
19     Q.   Do you know whether you
20 received a post-petition retainer in
21 connection with this case?
22     A.   I do.
23     Q.   Did you?
24     A.   No.
25     Q.   And why not?
Page 33

9 (Pages 30 - 33)

C. JALBERT

1      A.   I didn't ask for one.
2      Q.   Turning back to the e-mail, Mr.
3  Silverberg writes, "big Q is whether it's
4  us retaining you or the client.  I would
5  think you're retained by the client as his
6  financial advisor".  Do you recall that
7  being a question in connection with this
8  engagement?
9      MR. AULET:  Objection to form.
10     A.   I don't think I understand your
11 question.  I can read the statement and
12 understand but I don't know what you're
13 asking.
14     Q.   He says, "big Q", do you
15 understand that to be a big question?
16     A.   I understand it might be a
17 question in his mind.  I don't know that he
18 intended it to be a question for me or for
19 himself and then he answered it.
20     MS. ARONSSON:  Makenzie, can
21     you hand me Tab 12?
22     THE VIDEOGRAPHER:  Mr. Jalbert,
23     would you mind moving the water
24     bottle?  It's coming up in the frame.

*Page 34*

C. JALBERT

1  I apologize.  Thank you.
2      THE WITNESS:  Sorry about that.
3      THE VIDEOGRAPHER:  I appreciate
4      that.
5      MS. ARONSSON:  The Court
6      Reporter is going to mark what is
7      going to be Jalbert Exhibit 3.  This
8      document is Bates stamped Kwok
9      00001649.
10     (Whereupon, E-mail Chain was
11     marked as Jalbert Exhibit 3 for
12     identification as of this date by the
13     Reporter.)
14     Q.   Please take a look at this
15 document.
16     A.   Okay.
17     Q.   You're responding to Mr.
18 Silverberg's e-mail that we were just
19 speaking about with the big Q is whether
20 it's us retaining you or the client.
21     A.   Okay.
22     Q.   Turning to your response, you
23 note, "I'd like a post-petition retainer if
24 possible".  Do you see that?

*Page 35*

C. JALBERT

1      A.   Yep.
2      Q.   Did you ask for a post-petition
3  retainer in connection with this
4  engagement?
5      A.   No.
6      Q.   Do you know if Verdolino and
7  Lowey asked for a post-petition retainer in
8  connection with this engagement?
9      A.   I do.
10     Q.   What's the answer?
11     A.   No.
12     Q.   You also write, "but I think if
13 we are going to hold the cash, we will need
14 to be employed by the debtor".  So does
15 that refresh your recollection about
16 whether it was a question about who was
17 retaining Verdolino and Lowey?
18     A.   I don't think I had a question
19 in my mind.  I just responded with a
20 comment that supported his previous comment
21 where he said I would think you're retained
22 by the client as his financial advisor.
23     Q.   Generally, can you explain your
24 view in connection with the question

*Page 36*

C. JALBERT

1  Mr. Silverberg poses about who was
2  retaining Verdolino and Lowey?
3      A.   Well, I was pretty sure when he
4  wrote I would think you're going to be
5  retained by the client as his financial
6  advisor, that's -- I made a gratuitous
7  comment or not a gratuitous comment.  I
8  made an assenting comment basically saying
9  I think if we're going to hold the cash, we
10 need to be employed by the debtor.  So
11 concurring with the decision or the thought
12 that he had.
13     Q.   What is the basis for the
14 understanding that you just explained?
15     MR. AULET:  Objection to form.
16     A.   Of what part?
17     Q.   Where, turning to your e-mail,
18 "if we are going to hold the cash, we'll
19 need to be employed by the debtor".  What's
20 the basis of that statement?
21     A.   Well, my professional judgment.
22 If me, as a principal of Verdolino and
23 Lowey, was going to be the signer on a
24 debtor in possession bank account, it would

*Page 37*

C. JALBERT

1    make all the sense in the world that that
2    debtor in possession was my client. So I'm
3    concurring effectively with the
4    determination that Mr. Silverberg made in
5    the previous e-mail to this chain.
6        Q.   Thank you. Just for my own
7    understanding, what is the difference
8    between being employed by the debtor versus
9    Brown Rudnick?
10       A.   Well, if I was employed by
11   Brown Rudnick, I'm not sure I'd go
12   through -- I'm not sure I would have to go
13   through the employment process for the
14   bankruptcy. Would I file a motion to be
15   employed? I don't know. I don't know the
16   answer to that question. It's not
17   something that I thought of beyond this.
18   So -- but if I was right and there wouldn't
19   be an opportunity to file a motion to
20   employ Verdolino and Lowey on behalf of the
21   debtor, I don't know how we would then
22   allow me to be a signatory on the debtor's
23   account.
24       Q.   Thank you. That's helpful.
25                                    Page 38

C. JALBERT

1    Did you rely on Brown Rudnick in connection
2    with that determination of who would be
3    retaining Verdolino and Lowey?
4        MR. AULET: Objection to form.
5        A.   Well, Mr. Silverberg writes in
6    his e-mail, "I would think you're retained
7    by the client as his financial advisor" and
8    the next e-mail, same day, when I got
9    around to it at 6:49 p.m. -- so five hours
10   had elapsed -- I basically concurred with
11   his determination. Who made the decision,
12   I don't know. It's semantics but I think
13   it was clear from this point on, that we
14   were going to be retained by the debtor and
15   not Brown Rudnick.
16       Q.   Is Verdolino and Lowey ever
17   retained by a law firm in connection with
18   bankruptcy proceedings?
19       A.   We're frequently retained by
20   lawyers in proceedings. I think even
21   including in bankruptcy proceedings for the
22   purposes of the privilege.
23       Q.   What do you mean by for
24   purposes of the privilege?
25                                    Page 39

C. JALBERT

1        A.   Well, frequently in matters,
2    we -- the firm gets brought in and we do
3    whatever work is intended on that
4    particular engagement. Frequently, it's
5    litigation support. If it's intended that
6    we do an investigation, the lawyer's
7    thinking ahead, look, you're going to do an
8    investigation, we think this is what we're
9    going to find. Then we're going to have to
10   get a expert report to file with a
11   particular court. Then we might need you
12   to go through the process of discovery
13   including records, depositions and the like
14   and then we might need you to testify. In
15   those particular cases, as I understand it,
16   there would be privilege up to a certain
17   point, up until the time I'm declared an
18   expert but in other instances, we get
19   brought in as -- as financial advisor to
20   the attorneys. They want us to do an
21   investigation. They want us to uncover
22   whatever need to be uncovered, whatever the
23   allegations are, whatever the issues are
24   but they might be hiring another firm or
25                                    Page 40

C. JALBERT

1    individual to testify as the expert to keep
2    what knowledge we have as privileged. I
3    don't know that's relevant here.
4        Q.   Thank you. Turning back to
5    Exhibit 2 --
6        MR. MILTENBERGER: I'm sorry to
7        interrupt. I'm being called away to
8        another matter so I'm going to have
9        to drop off now. The record could
10       just note that I'm leaving the
11       deposition.
12       MR. HARBACH: Thank you, Tim.
13       You're welcome to rejoin anytime.
14       MR. MILTENBERGER: Will do,
15       thanks.
16       Q.   I'm interested in your e-mail
17   at the top where you write, "my feeling is
18   that in an individual case, the FA" --
19   financial advisor -- "duties are markedly
20   different than of an operating business
21   case". Can you explain to me the
22   difference between an individual case
23   versus an operating business case?
24       A.   So operating business cases
25                                    Page 41

C. JALBERT

1  have their various size and shapes. They
2  may have affiliated entities, parents,
3  siblings. It could be multiple debtors.
4  They might have employees in various
5  countries, various states. They may have
6  payroll taxes un-filed, sales taxes
7  un-filed, depending on the business, bottle
8  deposits un-filed and unkept. They
9  probably need a lot more work on budgeting
10 and keeping the business operating. Does
11 it have sufficient cash, what are the 13
12 week budgets, the one year budgets. Cash
13 collateral where it's -- you've got a
14 secured creditor who is frequently -- maybe
15 not against the debtor but maybe not with
16 it either. So -- so there's just -- it's a
17 totally different beast. In this
18 particular case, some individuals have
19 operating real estate or something like
20 that but they rarely have an operating
21 business that's multi country, multi state
22 with employees and all sorts of reporting
23 requirements, compliance requirements.
24     Q.   Is it fair to say the financial

C. JALBERT

1  advisor duties in connection with an
2  operating business case are more
3  complicated than an individual case?
4      A.   In most, yes.
5      Q.   Turning away from the exhibit,
6  who instructed Verdolino and Lowey on the
7  scope of work in this matter?
8      A.   I don't think anyone instructed
9  us.
10     Q.   Because you drafted the
11 engagement letter?
12     A.   I'm sure there were discussions
13 with counsel. I don't remember the
14 discussions specifically but this is not
15 the first time I've drafted a retention --
16 at least part of the retention papers.
17 Obviously, I'm not a lawyer. I don't know
18 all of that goes into retention papers but
19 as to the duties, typically, I have an
20 input as to what the duties are. I'm sure
21 we took the first stab at it and in review
22 by Brown Rudnick, they might have made some
23 changes. I don't remember how that went.
24     Q.   In connection with the

C. JALBERT

1  engagement, no one informed you what needed
2  to be done on this case?
3      A.   Well, we had been party to
4  numerous conversations. This is not my
5  first bankruptcy. It's not my 50th
6  bankruptcy. It's not my 100th bankruptcy.
7  I had a fairly good idea of what the issues
8  were going to be and I took the first pass.
9  I don't recall whether there were changes
10 made after that or not.
11     Q.   Generally, what is the scope of
12 Verdolino and Lowey's work in this case?
13     A.   In this case?
14     Q.   Yes.
15     A.   Well, the retention papers
16 speak for themselves. So if you want to go
17 line by line, put that in front of me.
18     Q.   Sure.
19     A.   To date, we've been focused
20 on -- first, my recollection is the SOFA's
21 and the schedules pretty much
22 simultaneously. I mean they were due the
23 same day, same time. So that was first.
24 Following -- immediately following that, I

C. JALBERT

1  believe we worked on everybody's engagement
2  papers to get them filed in the Court and
3  then -- probably while the tail end of that
4  was going along, I believe my colleague,
5  Matt Flynn, started preparing the monthly
6  operating report that was due for the end
7  of February, sometime around March 20, 21,
8  22, somewhere around there. Trying to
9  think if we've done anything -- oh
10 assistance in preparing for -- or
11 participation in preparing, to a small
12 degree, for the debtor to attend the 341
13 meeting. We attended the first day 341
14 meeting by telephone. My colleague, Matt
15 Flynn and I, attended the second day of the
16 341 hearing which was this past Wednesday
17 on a -- how do I want to call it -- we
18 didn't bill for our time. I went as an
19 observer. We knew we weren't going to be
20 participating but we wanted to be around to
21 see what took place, meet people and then
22 this deposition.
23     Q.   Thank you. So I think I heard
24 the SOFA's and schedules were the first

C. JALBERT

1    step.  You talked about drafting everyone's
2    engagement papers in connection with this
3    matter.
4        A.   Well, drafting our engagement
5    papers.  Everyone was focusing on their own
6    and I needed help, because I'm not a
7    lawyer, on mine.
8        Q.   Then you talked about Matt
9    Flynn's responsibilities in connection with
10   the monthly operating report.
11       A.   Yes.
12       Q.   Finally, you talked about
13   preparing for the 341 hearing and attending
14   the 341 hearings?
15       A.   Meeting, yes.
16       Q.   Can you describe a little bit
17   more your responsibilities in connection
18   with those 341 meetings?
19           MR. AULET:  I would just
20       caution the Witness not to disclose
21       any work product or conversations
22       with attorneys.
23       A.   On the first day of the 341
24   meeting, it was just thought that we should

Page 46

C. JALBERT

1    participate because it was unclear what was
2    going to arise and they didn't know if it
3    would be something that we would need.
4        Q.   Setting aside your
5    conversations with your attorneys, what --
6    did you have any understanding about what
7    might arise during the first day of the 341
8    hearing that might require your
9    participation?
10       A.   I've attended an awful lot of
11   341 meetings over my career.  Anything can
12   happen at a 341 meeting because it's open
13   to every creditor and god only knows what
14   takes place.
15       Q.   Did you anticipate having to
16   participate or ask questions during the
17   341?
18       A.   I think we were asked to be on
19   the phone.  I didn't have a participation
20   one way or another.
21           MS. ARONSSON:  The Court
22       Reporter is going to hand you what is
23       being marked as Jalbert Exhibit 4.
24           (Whereupon, Debtor's

Page 47

C. JALBERT

1    Application was marked as Jalbert
2    Exhibit 4 for identification as of
3    this date by the Reporter.)
4        MS. ARONSSON:  For the record,
5    this is a document entitled Debtors
6    Application for Authorization to
7    Retain and Employ Verdolino and Lowey
8    PC as Financial Advisor.  It was
9    filed in this case as Docket 90.
10       Q.   Mr. Jalbert, feel free to look
11   at this document.
12       A.   Is there something you're
13   trying to point me to?
14       Q.   Do you recognize this document?
15       A.   Yes.
16       Q.   What is it?
17       A.   Debtor's Application for
18   Authorization to Retain and Employ
19   Verdolino and Lowey PC as Financial
20   Advisor.
21       Q.   Turning to Page 18 of the
22   document, using the page numbers at the top
23   of the page, what is this document?
24       A.   Affidavit of Craig R. Jalbert

Page 48

C. JALBERT

1    in Support of Debtor's Application for
2    Authorization to Retain and Employ
3    Verdolino and Lowey PC as Financial
4    Advisor.
5        Q.   So you recognize this as your
6    affidavit you filed --
7        A.   I do.
8        Q.   Turning to Page 21, the table
9    -- I'm interested in the table at the
10   bottom of the page.
11       A.   Yes.
12       Q.   Just stepping back I think you
13   mentioned folks at Verdolino who were
14   involved, Matt Flynn -- in this case, Matt
15   Flynn, Mary Jo Schindler and yourself.  Is
16   there anyone else involved in this matter
17   at Verdolino and Lowey?
18       A.   I mentioned Tim MacDonald, our
19   IT person who is only involved with --
20   related to the deposition, the search of
21   our e-mails and the server records and
22   everything and getting it ported over to
23   Brown Rudnick to be then sent to you folks.
24       Q.   Anyone else at Verdolino and

Page 49

C. JALBERT

1 Lowey?
2 Lowey?
3   A.   Not that I know of.
4   Q.   Turning to this table, is Matt
5 Flynn also a principal?
6   A.   No.
7   Q.   What is Matt Flynn's role?
8   A.   A manager.
9   Q.   Is Mindy Jo Schindler a
10 principal?
11   A.   No.
12   Q.   What is her role?
13   A.   Manager.
14   Q.   So in connection with this
15 engagement at Verdolino and Lowey, there's
16 one principal, two managers and then the IT
17 person?
18   A.   I believe so, yes.
19   Q.   Do you anticipate other
20 Verdolino and Lowey employees to become
21 involved in this matter?
22   A.   As the case progresses,
23 assuming that we come into the case, yes.
24   Q.   Generally, what are the duties
25 of a principal in connection with a

Page 50

C. JALBERT

1 bankruptcy case like this?
2 bankruptcy case like this?
3   A.   I think of it as partner,
4 director, managing director, any of those,
5 the lead person on the case from the firm.
6   Q.   In connection with this matter
7 specifically, what do you expect the
8 principal to be doing?
9   A.   I assisted in preparation of
10 the SOFA's and schedules, the global notes,
11 the specific part of the global notes.  I
12 assisted with the monthly operating report.
13 I participated with the first day hearings
14 -- excuse me, first -- not the first day
15 hearing.  The first day of the 341 meeting.
16 Responding to inquiries from the various
17 lawyers and supporting staff on whatever
18 roles that they are working on.
19   Q.   What do you expect managers to
20 do in connection with this case?
21   A.   The same -- the same things.
22 Maybe differing amounts, different types.
23 I'm more review.  Depending on what it is,
24 they might support me.  I might support
25 them.  It's like this engagement is no

Page 51

C. JALBERT

1 different than any other engagement.  You
2 don't know what's going to happen in
3 day-to-day and everyone responds as best
4 they can, as efficiently as they can and
5 whatever the issues are that are ongoing
6 and the crises that materialize.
7   Q.   What about staff, what sort of
8 role do you anticipate any potential staff
9 to play in this case?
10   A.   It will depend on how it plays
11 out.  I don't think it's going to happen
12 but if it did and we became -- I became the
13 sole signer on the debtor in possession
14 bank account, my firm would probably be --
15 the bookkeepers would probably keep records
16 of the disbursements and the receipts.
17 They would assist with reporting.  I would
18 probably review it of course.  If, at some
19 point in time, we have claim objections, I
20 don't know what the nature of those
21 objections are going to be, I don't know
22 how big and how complicated but some of our
23 staff might be involved in claims.  The
24 debtor might have to file an income tax

Page 52

C. JALBERT

1 return.  I'll be advising them that they
2 should file an income tax return for the
3 Estate.  So we'll have tax people involved
4 in the preparation of the income taxes and
5 I would have to go down the list of -- and
6 be able to predict exactly what's going to
7 take place but we're very efficient, very
8 accustomed.  We know all of our fees are
9 subject to review by every single party and
10 interest.  So we're -- we use as reasonably
11 low level as we can on every matter and I
12 can't predict beyond that what's going to
13 come up but that staff and bookkeepers get
14 used for those types of issues.
15   Q.   Is it fair to say your answer
16 to my question about staff applies to the
17 bookkeepers, to the role of the
18 bookkeepers?
19   A.   No, bookkeepers and staff.
20   Q.   So the answer that you just
21 gave applies to both of those?
22   A.   You asked what they may do.
23   Q.   Right.
24   A.   They're -- the bookkeepers

Page 53

14 (Pages 50 - 53)

C. JALBERT

1 aren't going to do reporting but they're
2 going to maintain receipts and
3 disbursements. A staff person would
4 probably work on the form of the -- of a
5 financial statement or whatever report
6 that's going to be issued. The staff are
7 going to work on claims objections. Tax
8 professionals are going to work on tax
9 returns.
10     Q.    Are you finished with your
11 answer?
12     A.    Yes.
13     Q.    You mentioned receipts and
14 disbursements. What sorts of receipts and
15 disbursements do you anticipate in this
16 case?
17     A.    I would imagine if things were
18 to go the way the debtor planned, there was
19 a proposed DIP financing arrangement where
20 money will come into the Estate and then
21 would presumably be used to pay various
22 professionals and United States Trustee
23 fees and whatever other disbursements are
24 required of the debtor as ordered by the

Page 54

C. JALBERT

1 Court or otherwise generally required to
2 pay Chapter 11 bills as they become due. I
3 think that's it.
4     Q.    The last item is clerical.
5 What sort of duties do you anticipate a
6 clerical member of your team to do in this
7 case?
8     A.    I don't have anything that I
9 have presupposed for them to do in this
10 case.
11     Q.    Turning back in the document to
12 the retention agreement, this is on Page
13 13. We've talked generally about the
14 engagement -- Verdolino and Lowey's
15 engagement in this case. I want to walk
16 through these bullet points on the first
17 page. The first one reads, "assistance
18 with preparation of the statement of
19 financial affairs and the schedules and all
20 support thereto and any amendments". These
21 have been filed, right?
22     A.    Yes.
23     Q.    Who was involved in preparing
24 the SOFA and the schedules?

Page 55

C. JALBERT

1     A.    From my firm?
2     Q.    Who at V&L?
3     A.    Myself, Matthew Flynn and Mary
4 Jo Schindler.
5     Q.    Who else was involved in
6 preparing these filings?
7     A.    There might have been a
8 technical question for someone related to
9 the best case but I can't think of anything
10 else -- anyone else that had any -- that
11 did work on it.
12     Q.    Did Brown Rudnick work on the
13 SOFA and schedules?
14     A.    You asked me for my firm. Of
15 course they worked on them, as did Melissa,
16 as did -- that's Melissa Francis. As did
17 Aaron Mitchell. So it was clearly not all
18 Verdolino and Lowey. It was -- the whole
19 team was involved in the preparation. I
20 thought you asked me -- and if I
21 misunderstood, I apologize -- you asked
22 who, at Verdolino, did and that was myself,
23 Matt Flynn and Mary Jo Schindler.
24     Q.    Thank you. Yes, I did ask

Page 56

C. JALBERT

1 Verdolino and Lowey and was then moving on.
2 So you mentioned Melissa Francis, Aaron
3 Mitchell, Brown Rudnick. Generally, anyone
4 else?
5     A.    While I never spoke to them,
6 there must have been the existence of help
7 from individuals that translated documents
8 and words from the various professionals to
9 the debtor and the debtor.
10     Q.    Did you communicate with the
11 debtor about this SOFA and schedules?
12     A.    No.
13     Q.    You mentioned some translated
14 documents. Did you receive those
15 translated documents in connection with
16 your work on the SOFA and schedules?
17     A.    No. I don't read Mandarin.
18     Q.    Did you see any translated
19 documents?
20     A.    I don't recall seeing them.
21         MR. AULET: Objection to form.
22     Q.    Do you know whether Golden
23 Spring was involved in preparing the SOFA
24 and schedules?

Page 57

15 (Pages 54 - 57)

C. JALBERT

1          C. JALBERT
2    A.  I wouldn't know.
3    Q.  Do you know what Golden Spring
4 is?
5    A.  Yes.
6    Q.  What is it?
7    A.  It's -- as I understand it -- a
8 family office in New York City for the
9 debtor's son.  Exactly how it's run, all
10 that, I don't have any information.
11   Q.  Who is the debtor's son?
12   A.  I don't know his name.
13 Debtor's son.
14   Q.  Neither you nor anyone at
15 Verdolino and Lowey met with or
16 communicated with the debtor about the SOFA
17 and schedules?
18        MR. AULET:  Objection to form.
19   A.  Correct.
20   Q.  Can you describe what work
21 Verdolino and Lowey did in preparing the
22 SOFA and schedules?
23   A.  We participated with several
24 lengthy phone calls with various people
25 from Brown Rudnick, not all of whom I'm

Page 58

C. JALBERT

1          C. JALBERT
2 doing in connection with the SOFA and
3 schedule?
4    A.  I don't know that it's
5 anticipated but to the extent facts and
6 circumstances, at some point in time,
7 require a review and possible amendment, I
8 think we would have to participate because
9 we're the ones that know Best Case and have
10 that system but there's nothing
11 anticipated.  It's only if that
12 materializes, we would participate.
13   Q.  You've said -- you've mentioned
14 Best Case a couple times.  What do you mean
15 by that?
16   A.  It's a software that the
17 industry uses.  I think it's the most
18 prominent software that supports the
19 preparation of SOFA's and -- SOFA's and the
20 schedules.  I think they're used throughout
21 the industry by most everybody.
22   Q.  So is it fair to say it's like
23 a TurboTax of preparing SOFA's and
24 schedules?
25   A.  Or QuickBooks or -- you know.

Page 60

C. JALBERT

1          C. JALBERT
2 going to remember were on the phone and
3 also with Melissa Francis and Aaron
4 Mitchell.  Aaron Mitchell and Melissa
5 Francis provided significant levels of
6 input of various information.  Brown
7 Rudnick had been involved in the case
8 before we were.  They already had a large
9 knowledge base so we -- we talked with
10 Brown Rudnick team and Melissa and Aaron on
11 the phone and then numerous e-mails.
12        THE WITNESS:  I agree.  Hot.
13        MR. HARBACH:  Yeah, I tried to
14    keep out the sun.
15   Q.  Did Verdolino and Lowey perform
16 any investigation to verify information
17 obtained from Brown Rudnick, Melissa
18 Francis or Aaron Mitchell?
19   A.  No.
20   Q.  So is it fair to say you took
21 their word regarding the representations
22 contained in the SOFA and the schedule?
23   A.  That's fair.
24   Q.  Is there any outstanding work
25 that Verdolino and Lowey will anticipate

Page 59

C. JALBERT

1          C. JALBERT
2    Q.  So that software is essentially
3 garbage in, garbage out, right?
4        MR. AULET:  Objection.
5    A.  Every software is garbage in,
6 garbage out.
7    Q.  Turning to the second bullet
8 point in the retention agreement, it reads,
9 "assistance with preparation and/or review
10 of cash flow and related budget projections
11 and including advising as to post-filing
12 finances".  Do you see that?
13   A.  Yes.
14   Q.  What work has Verdolino and
15 Lowey done in connection with this line
16 item?
17   A.  Nothing.
18   Q.  What work does Verdolino and
19 Lowey anticipate doing in connection with
20 this line item?
21   A.  Anticipate doing this if we're
22 in the case and there's a DIP.
23   Q.  So it includes budget
24 projections.  Budget projections for who?
25   A.  I imagine we will try and

Page 61

16 (Pages 58 - 61)

C. JALBERT

1 establish what a budget would be for -- for
2 instance, committee counsel and its
3 financial advisors, debtor's counsel and
4 their financial advisors, the United States
5 Trustees fees. There were a number of
6 firms that were intended to be ordinary
7 course professionals and any other
8 anticipated disbursement in the case that's
9 approved in one way, shape or form by court
10 order.
11    Q.   It also includes review of cash
12 flow. What cash flow?
13    A.   The DIP money.
14    Q.   The debtor has no income,
15 right?
16    A.   To my knowledge, correct.
17    Q.   Have you reviewed the debtor's
18 declaration filed in this case?
19    A.   I certainly reviewed one or two
20 of the drafts of it. I don't know that I
21 saw the final or not. I don't remember.
22    Q.   Are there cash flows coming in
23 from any source at the moment?
24    A.   Into the Estate?

Page 62

C. JALBERT

1    Q.   Yes.
2    A.   Not to my knowledge.
3    Q.   Your knowledge of the debtor's
4 lack of income is based on what you've been
5 told, is that right?
6    A.   Yes.
7    Q.   No independent investigation in
8 connection with his income?
9    A.   Correct.
10    Q.   This line item also references
11 post-filing finances. What is meant by
12 that?
13    A.   He filed on February 15th.
14 Whatever finances, cash receipts, cash
15 disbursements, budgeting from that day
16 forward.
17    Q.   The third line item reads,
18 "opening and maintaining the DIP account
19 and effectuating disbursements when
20 necessary and providing accounting of all
21 cash activity". Is it your understanding
22 there's a DIP loan here?
23    A.   No.
24    Q.   Do you anticipate there being a

Page 63

C. JALBERT

1 DIP loan in this case?
2    A.   Hope so.
3    Q.   Do you have experience with DIP
4 loans?
5    A.   Yes.
6    Q.   How much experience do you
7 have?
8    A.   I don't know how many hundred
9 cases with DIP loans.
10    Q.   What work has Verdolino and
11 Lowey done in connection with this line
12 item?
13         MR. AULET: Objection to form.
14    A.   We're talking about the third
15 one, right, opening and maintaining the DIP
16 account?
17    Q.   Yes.
18    A.   The only thing I did, when
19 asked by Brown Rudnick if I'd be willing,
20 is I consulted with a bank that does --
21 that's on the list of approved financial
22 institutions of the Department of Justice.
23 I checked with that bank, which I use
24 frequently in and out of bankruptcy, to

Page 64

C. JALBERT

1 confirm that they would allow me to be a
2 signer on the DIP account and they
3 responded in yes. That's the extent of
4 which I've done on that.
5    Q.   Is that Citizens Bank that
6 you're referencing?
7    A.   Yes.
8    Q.   Has Verdolino and Lowey been
9 involved in the negotiation of the
10 potential DIP loan?
11    A.   No.
12    Q.   Has Verdolino and Lowey been
13 included on any communications regarding
14 the potential DIP loan?
15    A.   I don't know.
16    Q.   Have you personally been
17 involved in any written or oral
18 communications regarding the DIP loan?
19    A.   I don't recall any.
20    Q.   Do you have an understanding as
21 to how the potential DIP loan would be
22 structured?
23    A.   Well, I briefly read the DIP
24 loan at some point in time. I don't have

Page 65

17 (Pages 62 - 65)

C. JALBERT

1    an explicit memory of every -- of the whole
2    thing but I know generally how DIP loans
3    work.
4       Q.   In this case, do you know how
5    the DIP loan would potentially be
6    structured?
7       A.   I would have to be guessing at
8    my memory.
9       Q.   Who, at Verdolino and Lowey,
10   would perform the work in connection with
11   this line item?
12       MR. AULET:   Objection to form.
13       A.   Presupposing that there is a
14   DIP loan?
15       Q.   Yes.
16       A.   It would -- as repeating,
17   obviously, I would be the signatory on the
18   account.  There would be bookkeepers and
19   staff associated with preparing the checks,
20   preparing the reports and reporting to all
21   the parties that be.  Some -- I imagine the
22   committee would want to know -- generally,
23   they would like to know on a weekly or
24   biweekly basis what receipts and

C. JALBERT

1    will pay the fees in the event the DIP loan
2    does not occur?
3       A.   No.
4       Q.   Let's turn to the next line
5    item, "preparation, review and analysis of
6    monthly operating reports and/or quarterly
7    reporting".  Do you see that?
8       A.   Yes.
9       Q.   You referenced earlier a
10   monthly operating report that was recently
11   filed in this case?
12       A.   Yes.
13       Q.   Is that the type of work
14   anticipated in this-- in connection with
15   this line item?
16       A.   Well, going forward, there's
17   going to be a lot more than a monthly
18   operating report because there's going to
19   be -- well, presumably, if there is a DIP
20   and if the case continues, there's going to
21   be receipts and disbursements and even if
22   there aren't, the monthly operating report
23   and the US Trustees Office requires that --
24   the disclosure of all estate professionals

C. JALBERT

1    disbursements are, major creditors might
2    feel the same way.  So whatever the --
3    whatever the case is, reporting
4    requirements as they develop, we would take
5    care of that.  I don't know what they would
6    be.  Aside from the minimum requirement,
7    the monthly operating report.
8       Q.   What is Verdolino and Lowey's
9    run rate up until this point?
10       A.   What's a run rate?
11       Q.   How much has Verdolino and
12   Lowey billed to this matter?
13       A.   We've billed zero so far.
14       Q.   How much value does Verdolino
15   anticipate it has already billed in this
16   case?
17       A.   Are you asking for a WIP to
18   date?
19       Q.   What is a WIP to date?
20       A.   Work in process hours?
21       Q.   Yes, please.
22       A.   I have no idea.
23       Q.   Does Verdolino and Lowey have
24   any agreement with anyone regarding who

C. JALBERT

1    as they accrue throughout the case.  So it
2    didn't happen in the February one because
3    of the scrambling of SOFA's and schedules
4    and 341 meeting and everything else.  Going
5    forward, we're going to have to have a
6    report on a monthly basis and a cumulative
7    basis what everybody's fees are, what the
8    cash in and cash out is and part of the
9    monthly operating report calculates the
10   fees due to the United States Trustee
11   Program and then the monthly operating
12   report, you typically have to also -- you
13   attach to it insurance binders, if things
14   expired.  If they weren't usually --
15   usually, I put them in anyway just to avoid
16   confusion and someone looking for it.  And
17   then complete copies of the bank
18   statements.  The United States Trustees
19   Office also wants balance sheet and P&L and
20   cash flow and what the accounts payable,
21   accounts receivable and all the various --
22   so the first one was filed.  Future ones
23   are going to have a lot more information.
24       Q.   Taking a step back, can you

C. JALBERT

1  just explain, generally, what a monthly
2  operating report is in a Chapter 11
3  individual case?
4      A.   It's the same or pretty close
5  to the same I think as the operating report
6  in a commercial case.  It looked like it to
7  me anyway's.  But it's the standard --
8  during the pendency of the case, the
9  operating report, that is required by the
10 US Trustees Program, up until the case is
11 dismissed, converted or confirmed.
12     Q.   So the procedures that you
13 described relating to the work on the
14 monthly operating report, that presupposes
15 the approval of the DIP loan and managing
16 of those funds.  Is that right?
17     A.   Well, the monthly operating
18 report is going to be due irrespective of
19 that.  The -- the accrual of the -- of the
20 fees of committee counsel, us, the
21 accountant advisor, the debtor, debtor
22 committee, others, whoever might be paid by
23 the Estate including th ordinary course.
24 Even if there's not a DIP, that has to be

Page 70

C. JALBERT

1      A.   The United States Trustee
2  issues bills predicated on the monthly
3  operating report, to what the expenses that
4  meet the definition of a disbursement on
5  account of the U.S. Trustees form, they
6  combine the three months in every calender
7  quarter.  So for us, it will be the
8  February 15th, the February 28th stub
9  period, plus the March 1 to March 31, that
10 MOR.  The sum of those 45 days will be in a
11 bill from the U.S. Trustees Office and,
12 assuming it's correct, would have to be
13 paid before the end of -- I believe this
14 month.
15     Q.   So is it fair to say that
16 Verdolino and Lowey is retained to review
17 the quarterly report?
18     A.   I don't know if it's listed in
19 here specifically but certainly the monthly
20 operating report is the form that is the
21 input to the United States Trustees Office
22 in order to create the bill.  So we know --
23 and it's the fees are statutorily
24 determined based on the level of

Page 72

C. JALBERT

1  reported in the monthly operating report.
2      Q.   You prepared one monthly
3  operating report to date?
4      A.   In this case?
5      Q.   In this case, is that right?
6      A.   Yes.
7      Q.   Is another monthly operating
8  report in progress?
9      A.   Yes.
10     Q.   Did you also prepare -- scratch
11 that.  Did Verdolino and Lowey also prepare
12 the estimated monthly operating expenses
13 contained in the schedule?
14     A.   To what are you referring to?
15     Q.   We can come back to that.
16     A.   Okay.
17     Q.   Have you or Verdolino and Lowey
18 prepared a quarterly report in this case?
19     A.   The United States Trustee
20 quarterly report?
21     Q.   Yes.
22     A.   No.  We don't prepare that,
23 they do.
24     Q.   What is a quarterly report?

Page 71

C. JALBERT

1  disbursements.  It's very easy to double
2  check their work.  We would do that and
3  make sure that the number is right.  It's
4  frequently wrong because sometimes they
5  issue the bill before the March statement
6  actually hits.  So they're estimating.
7  They're generally off -- not their fault --
8  in the first quarter because it's not a
9  full quarter.  They don't have a basis for
10 making estimates, whatever the case may be
11 but we would -- we would ensure that the
12 fee paid to the U.S. Trustees is
13 appropriate under the circumstances.
14     Q.   Turning to the next line item,
15 "assistance with preparation and/or review
16 of estate federal and state income tax
17 filings".  What work has Verdolino and
18 Lowey done in connection with this line
19 item?
20     A.   Nothing.
21     Q.   I think you mentioned before
22 that you were going to recommend the filing
23 of income taxes.  Why do you recommend that
24 in this case?

Page 73

C. JALBERT

1   A.   I recommend it in every case.
2   So individual estate tax returns,
3   individual estates is a separate --
4   completely separate and distinct entity
5   from the individual as opposed to in a
6   corporate case, the corporation retains its
7   tax identity.  You continue to file
8   C-corporation returns if they're a
9   C-corporation, S Corp., partnership,
10  whatever the case may be and their year end
11  remains whatever their year end was
12  established pre-petition.  In a bankruptcy
13  estate, the Estate is separate and distinct
14  from the individual.  The individual has to
15  continue to file his own individual income
16  taxes with whatever his individual income
17  that doesn't come into the Estate.  In a
18  Chapter 11 case, virtually all of the
19  debtor's income is supposed to come into
20  the Estate.  So there really shouldn't be a
21  separate one but technically, there could
22  be.  The Estate is -- the Estate return is
23  generally assigned to be December 31,
24  unless you elect otherwise.  There are

Page 74

C. JALBERT

1   reasons to elect otherwise but the most
2   important point is in order to get the --
3   the relief that's in the bankruptcy code
4   under Section 505b, in order to get that
5   relief, you have to file a tax return.  So
6   I recommend, even when there's no tax due,
7   that the return gets filed in order to
8   protect all -- everybody in the case to
9   make sure that there is not an issue that
10  gives the various taxing authorities 60
11  days from the date of filing with the
12  505(b) letter to have it to elect to audit it.  It's
13  the way that the case can move forward to
14  closure and not have the seven year
15  statute, three year statutes and the like.
16  So I recommend everyone does the 505(b).
17  If they don't elect to audit it in the
18  first 60 days, then they lose the
19  opportunity.  If they select it for audit,
20  then they got another 120 days.  I want --
21  I recommend it in every single case,
22  individual or corporation or partnership or
23  LLC, that the tax returns get filed whether
24  they're necessary or not, whether they're

Page 75

C. JALBERT

1   legally required or not with a 505(b)
2   letter.
3   Q.   Do you anticipate that multiple
4   returns will be filed in this matter if the
5   debtor chooses to file returns.
6   A.   Well, I don't know what the
7   debtor is going to do and again, it has no
8   bearing on the Estate and no bearing on
9   Verdolino and Lowey but the Estate will
10  have to file -- I'll recommend that it file
11  a federal return.  The debtor is a resident
12  of Connecticut so there would be a
13  Connecticut estate tax return and if, for
14  some reason, there was income from another
15  state, we would file from whatever state
16  that that income came.  So I don't know
17  what it's going to be but it's at least
18  going to be Connecticut and the IRS.
19  Q.   I think we covered before, it's
20  your understanding that the debtor has no
21  income in this case?
22  A.   Correct.
23  Q.   What work do you anticipate
24  Verdolino and Lowey will do in connection

Page 76

C. JALBERT

1   with an individual tax return for the
2   debtor?
3   MR. AULET:  Objection to form.
4   A.   Well, I'd have to guess what's
5   going to take place between February 15 and
6   December 31.  I don't know whether there
7   will be any income or not.  There's
8   litigation going on.  There might be
9   settlements.  I don't know whether there'll
10  be income or not but if there is, there'll
11  be income.  From what source, I don't know
12  and from where, I don't know but at a
13  minimum, there will be disbursements and in
14  a bankruptcy, there's two types of expenses
15  from a tax perspective.  There are
16  administrative expenses like professional
17  fees and there are other types of expenses
18  that are normal to an individual.  Mortgage
19  interest, real estate taxes, whatever the
20  case may be.  They are treated in different
21  ways on the tax return but one of the
22  reasons why you would file a return is the
23  -- for tax purposes in a bankruptcy estate,
24  the fees paid to professionals are

Page 77

20 (Pages 74 - 77)

C. JALBERT

1  deductible and you can build them up like a
2  deferred tax asset. So to the extent, in
3  the future -- after we spend money on the
4  case, if, in the future, there was a large
5  settlement agreement, you would be able to
6  offset the previous administrative NOL's
7  against the future income --
8      THE COURT REPORTER: The
9      previous administrative --
10     THE WITNESS: N-O -- net
11     operating losses against a future
12     receipt, which is another reason to
13     file the return.
14     Q.  Is it fair to say that the work
15  that Verdolino and Lowey anticipates
16  potentially doing in connection with tax
17  returns depends on whether cash is coming
18  into the debtor or the Estate in the
19  future?
20     MR. AULET: Objection to form.
21     A.  No. You're going to have --
22  you're going to have accrued expenses
23  depending on the -- when the timing of the
24  case and everything, accrued expenses can

Page 78

C. JALBERT

1      A.  I have no -- it's not my
2  problem or interest what happens to the
3  debtor, outside of the bankruptcy estate.
4  He's going to have to hire a different
5  accountant to deal with that.
6      Q.  Let's talk about the Estate.
7      A.  If the Estate has tax
8  transactions, as I said, I would recommend
9  the Estate files tax returns on a timely
10  basis and it would include whatever
11  transactional activity that is allowed
12  under the -- both the bankruptcy code and
13  the internal revenue code and I don't know
14  what that's going to be.
15     Q.  Turning to the next line item,
16  it reads, "assistance with reviewing
17  reconciling, analyzing and if necessary,
18  objecting to proofs of claim". What work
19  has Verdolino and Lowey performed in
20  connection with this line item?
21     A.  None.
22     Q.  Just generally, what does --
23  what is a proof of claim?
24     A.  It's a form. There's a form.

Page 80

C. JALBERT

1  be deductible. So cash -- clearly, if
2  there were cash, that would -- that would
3  have to be taken care of but depending on
4  how this case goes and the timing, it's
5  entirely possible that some of the accrued
6  expenses would be deductible.
7      Q.  Have you seen the debtor's most
8  recent tax returns?
9      A.  I don't know that I would be
10  able to call them most recent tax returns
11  but I've seen parts. I don't know if it's
12  the whole thing. I don't know if I saw the
13  entire federal and the entire state but I
14  -- at least saw the New York return and
15  the federal version attached to the New
16  York return which may or may not be the
17  entire federal return for 2019 I think and
18  2020.
19     Q.  If the debtor's income is zero,
20  what do you anticipate deducting from?
21     MR. AULET: Objection.
22     A.  Are we talking about the debtor
23  individually or the Estate?
24     Q.  Let's start with the debtor.

Page 79

C. JALBERT

1  There's a bankruptcy form that's a proof of
2  claim. I don't remember what the form
3  number is but it's an opportunity for any
4  alleged creditor to file a claim in either
5  a Chapter 11 or a Chapter 7 case. They can
6  file claims on a secured basis, a priority
7  basis, an administrative basis and I'm sure
8  there's more that I'm missing. I don't
9  think there's a claims objection deadline
10  but at some point in time, in a Chapter 11,
11  there's usually a claims objection
12  deadline. If, however, a creditor has been
13  scheduled on Schedule D, E or F and that
14  number happens to be right, then the
15  creditor does not have to file a claim as I
16  understand it. If they disagree because
17  it's owed more or less -- and rarely do
18  they disagree if they're owed less but if
19  they're owed more, they're allowed to file
20  a proof of claim and establish what they
21  think the amount due to them from the
22  bankruptcy estate would be.
23     Q.  Have you reviewed any of the
24  pending litigation claims in this matter?

Page 81

21 (Pages 78 - 81)

C. JALBERT

1      A.  No.
2      Q.  What experience does Verdolino
3 and Lowey have in analyzing the likelihood
4 of success in pending litigation claims?
5      A.  Absolutely none.
6      Q.  Turning to the next line item,
7 "assistance with reviewing debtor books and
8 records for possible avoidable transactions
9 such as preference and fraudulent transfer
10 claims".  Do you see that?
11     A.  Yes.
12     Q.  Can you explain to me,
13 generally, what this means?
14     A.  The bankruptcy code allows a
15 look back period.  For preferences, it
16 allows 90 days prior to the filing for
17 preference claims and I'll let lawyers
18 define what that is and insiders and other
19 fraudulent transfers take place between
20 zero days and I've heard it's -- whatever
21 the statute happens to be for whatever the
22 issue might be, one year, two years, four
23 years, whatever the case maybe but it's a
24 search through transactions to see if any

Page 82

C. JALBERT

1 of them might be avoidable and recoverable
2 to the Estate.
3     Q.  What analysis has Verdolino and
4 Lowey performed in connection with this
5 line item?
6     MR. AULET:  I would caution the
7   Witness to the extent that there is
8   anything, not to disclose any
9   specifics.
10   MS. ARONSSON:  Sorry, what do
11  you mean?
12   MR. AULET:  That if he has done
13  any work, it would be covered by the
14  work/product privilege.  Not to
15  disclose those specifics.
16    Q.  Setting aside the work/product
17 protection that Brown Rudnick is alleging
18 in connection with this line item, can you
19 answer the question?
20     A.  Well, one of the questions in
21 the SOFA's is payments made in the 90 days
22 prior to bankruptcy.  I don't know if
23 that's necessarily a surprise to anybody
24 but that is usually the starting place for

Page 83

C. JALBERT

1 someone to do work on a preference
2 analysis.  We certainly participated in
3 preparing that because we filed them.
4     Q.  Do you know how many
5 pre-petition payments were disclosed in
6 this case?
7     A.  No.
8     Q.  Does 21 sound about right?
9     A.  I don't know.
10    Q.  So the line item refers to
11 debtor books and records for possible
12 avoidable transactions.  Have you reviewed
13 any debtor books and records in connection
14 with this engagement?
15    A.  No.
16    Q.  Has Verdolino and Lowey
17 reviewed any books and records in
18 connection with this engagement?
19    A.  No.
20    Q.  Is it fair to say that
21 Verdolino and Lowey relies on the
22 assistance of other parties in connection
23 with this line item?
24    MR. AULET:  Objection to form.

Page 84

C. JALBERT

1     A.  Are you talking about past
2 tense or future tense?
3     Q.  Past tense.
4     A.  We relied on other individuals
5 for everything that we did from an
6 information perspective.
7    MR. AULET:  We've been going
8   for awhile so if you need a break --
9   THE WITNESS:  No, let's get the
10  -- let's do it all at once.  I would
11  like to get out of here before
12  tonight.
13   MR. GOLDMAN:  We are going to
14  break at 12.
15   MR. HARBACH:  Yes, sir.
16    Q.  Okay, turning to the next line
17 item, "assistance with any necessary
18 litigation support".  I think we covered
19 this previously.  Do you have anything to
20 add about potential services in connection
21 with this line item that we haven't already
22 discussed?
23    A.  Not that I can remember.
24    Q.  Has Verdolino and Lowey done

Page 85

C. JALBERT

1 any work in connection with this line item
2 to this date?
3     A.  In this case, no.
4     Q.  The next -- turning to the next
5 line item is "assistance with plan
6 development and preparation including
7 feasibility".  What does this mean?
8     A.  Well, in order to have a
9 successful Chapter 11, you have to confirm
10 a plan of reorganization or whatever the
11 title will be when it's prepared and
12 created.  It might even be a joint plan for
13 all I know.  In those plans, there
14 typically is some budgeting because
15 sometimes payments to creditors are paid
16 out over time.  We might assist in
17 preparing the cash flow projections of
18 receipts and disbursements for some future
19 time period and my -- I'm not a lawyer but
20 as I understand it, in order to confirm a
21 Chapter 11, you must prove that the
22 creditors are getting a better return from
23 the Chapter 11 plan than they would have in
24 a Chapter 7 case and that usually requires

Page 86

C. JALBERT

1 that you -- well, you're going to have
2 feasibility and you're going to have --
3 what's the other one -- term is slipping my
4 mind -- I can't remember it but it didn't
5 list it anyway's.
6     Q.  The line item says feasibility
7 and I think you mentioned that as well.
8 What does feasibility mean?
9     A.  You -- the projections is
10 usually the evidence with which to allow
11 the Court and other parties in interest to
12 determine what the future cash flows will
13 be and make their own decision based on
14 that as to whether the debtor's plan is
15 financially feasible and the Judge
16 obviously has the final determination but
17 usually everyone puts their two cents in.
18     Q.  What analysis has Verdolino and
19 Lowey done to date in connection with this
20 line item?
21     A.  None.
22     Q.  Would Verdolino and Lowey have
23 a function in developing a plan if the
24 debtor's estate's only source of income or

Page 87

C. JALBERT

1 assets is on liquidated litigation claims?
2     MR. AULET:  Objection to form.
3     A.  If we did, it would be awfully
4 small.
5     Q.  Understood.  Are you aware of
6 any draft projections currently being circulated?
7     MR. AULET:  Objection.  He's
8 already testified that he hasn't
9 performed any work on this.  So I
10 don't see what the relevance is to
11 V&L's retention.
12     MS. ARONSSON:  Sure.  I'm
13 curious though about ongoing work in
14 connection with this line item.
15     MR. AULET:  He can answer if
16 he's doing any current work with it.
17     A.  None.
18     Q.  Turning to -- turning to the
19 next line item on the next page, it reads,
20 "general consulting and assistance with any
21 other matters and tasks that may arise and
22 as may be directed by you or the debtor".
23 Is it fair to say this is kind of a
24 catch-all?

Page 88

C. JALBERT

1     A.  Yes.  It's a catch-all with the
2 caveat -- this is not my first rodeo -- if,
3 for some reason, there's a discreet task
4 that is going to be required that will be
5 comprehensive and costly, we would file a
6 motion to amend our employment, what would
7 be covered by the employment but as to --
8 you know, for instance, sometimes they get
9 a notice from the IRS that requires 15
10 minutes for someone to respond to.  I know
11 little -- little cats and dogs that happen
12 that don't happen to fit into something
13 else, it's a catch-all for the minutiae.
14 Not intended to be a catch-all for major
15 line items and that's only to protect me.
16     Q.  Understood.  What work or
17 analysis has Verdolino performed in
18 connection with this line item, if any?
19     A.  None that I know of.
20     Q.  Are you familiar with a company
21 called Stretto?
22     A.  Yes.
23     Q.  What do they do?
24     A.  I don't know everything that

Page 89

C. JALBERT

1      C. JALBERT
2  they do but they do claims agent work and
3  other bankruptcy-related work. I don't
4  know what their list of services are. I've
5  hired them myself in cases. I think
6  they're still working for me on a case or
7  two right now in a limited basis.
8      Q. Are you aware that Stretto was
9  involved in this matter?
10      A. I'm aware that there's a motion
11  to employ them, yes.
12      Q. Generally, what is your
13  understanding of the scope of work that
14  Stretto would potentially be employed to
15  do?
16      A. I have not read their motion to
17  employ. No idea what their --
18      MS. ARONSSON: Let's go off the
19  record. Thank you.
20      THE VIDEOGRAPHER: The time is
21  11:53 a.m. and we are off the record.
22      (Whereupon, a brief recess was
23  taken.)
24      THE VIDEOGRAPHER: The time
25  period is 12:22 p.m. We're back on
Page 90

1      C. JALBERT
2      MR. AULET: Objection to form.
3      A. Yes.
4      Q. You mentioned before that you
5  have worked with Stretto in the past?
6      A. Well, they're in the same --
7  some of the same -- well, a couple. One or
8  two of the same cases that we're in.
9      Q. Do you have an understanding as
10  to whether Stretto could open and maintain
11  a DIP account?
12      A. No.
13      Q. Do you have an understanding
14  about whether Stretto could monitor
15  disbursements in connection with a DIP
16  account?
17      A. No.
18      Q. Turning to the books and
19  records line item, the seventh bullet
20  point, I'm going to ask you to assume that
21  there are 21 professional service providers
22  who have received a pre-petition payment in
23  the 90 days before filing. I'm also going
24  to ask you to assume that Stretto can
25  provide analysis with respect to those
Page 92

1      C. JALBERT
2      the record.
3      Q. Just wrapping up the questions
4  related to Exhibit 4. Turning back to the
5  line item about opening and maintaining the
6  DIP account, would you agree that a bank or
7  an escrow agent could open and maintain a
8  DIP account?
9      MR. AULET: Objection to form.
10      A. I don't have any knowledge of
11  why they couldn't but I'm certainly not an
12  expert.
13      Q. What about monitoring
14  disbursements and effectuating
15  disbursements?
16      A. The bank doing it?
17      Q. Yes.
18      A. I don't think the bank's going
19  to do it.
20      Q. Or an escrow agent.
21      A. An escrow agent would have more
22  obligation, whatever the escrow agreement
23  says. I don't --
24      Q. But an escrow agent could be
25  employed to perform those duties?
Page 91

1      C. JALBERT
2  payments. Why is it necessary for
3  Verdolino and Lowey to perform these
4  duties?
5      MR. AULET: Objection to form.
6  It calls for speculation.
7      A. Most everybody that has half a
8  brain can do that. It's not going to be
9  done by me.
10      MS. ARONSSON: The Court
11  Reporter is going to hand you what is
12  being marked as Jalbert Exhibit 5.
13      (Whereupon, Official Form
14  106Sum was marked as Jalbert Exhibit
15  5 for identification as of this date
16  by the Reporter.)
17      MS. ARONSSON: I'll say for the
18  record, this is a document that has
19  been filed as Docket Number 78 in
20  this case.
21      Q. Do you recognize this document,
22  Mr. Jalbert?
23      A. Yes.
24      Q. What is it?
25      A. The first page is the official
Page 93

24 (Pages 90 - 93)

C. JALBERT
1
2  form 106Sum which is the summary of assets
3  and liabilities and certain statistical
4  information for the debtor, Ho Wan Kwok.
5      Q.   I think we've discussed earlier
6  that Verdolino and Lowey had a role in
7  preparing the SOFA and schedule.  Is that
8  right?
9      A.   Yes.
10     Q.   Verdolino and Lowey had a role
11 in preparing this document?
12     A.   Yes.
13     Q.   I just want to walk through
14 this at a high level.  The first line item
15 is -- item one relates to property.  What
16 does this line item include?
17     A.   What specific -- A, B or C or
18 all of them?
19     Q.   Sorry, fair question.  1A.
20     A.   Well, it reads "Schedule A/B
21 Property official form 106A/B", question or
22 1A, "copy Line 55.  Total real estate from
23 schedule A/B".
24     Q.   Thank you.  And it reads zero?
25     A.   Correct.
Page 94

C. JALBERT
1
2      Q.   What analysis, if any, did
3  Verdolino and Lowey do to prepare this line
4  item?
5      A.   I worked with the lawyers.
6      Q.   Did you do any independent
7  investigation with respect to the line item
8  1A?
9          MR. AULET:  Objection to form.
10     A.   No.
11     Q.   Turning to 1B, this reads,
12 "total personal property from Schedule A/B"
13 and I think this refers us to Line 36?
14     A.   I would have thought it related
15 to Line 62.
16     Q.   It does and then 62.  Sorry --
17 so 62 refers back to 56 to 61.  Do you see
18 that, that's on Page 7 of the PDF?
19     A.   Lines 56 to 61, is that what
20 you're referring to?
21     Q.   That's right.
22     A.   Yep.
23     Q.   The only item populated in 55
24 to 61 is Item 58?
25     A.   Correct.
Page 95

C. JALBERT
1
2      Q.   Item 58 refers to Line 36?
3      A.   Okay.
4      Q.   So 36, just up the page, the
5  total amount here is 3,850 dollars.  Do you
6  see that?
7      A.   Yes.
8      Q.   So 36 wraps up into one number.
9  Part 4 of this filing, is that fair?
10         MR. AULET:  Objection to form.
11     A.   Well, when you mean this
12 filing, are you talking about Part 4 of
13 Schedule A/B.
14     A.   I am, yes.  Thank you for the
15 clarification.
16     A.   I would agree that Line 36 is
17 the sum of Part 4 which starts at question
18 16.
19     Q.   What analysis, if any, did
20 Verdolino and Lowey perform in connection
21 with these line items?
22     A.   Whatever we did, we did working
23 with the lawyers.
24     Q.   I'm going to ask you to turn to
25 Page 3 of the document.
Page 96

C. JALBERT
1
2          MR. AULET:  Just for
3      clarification, every time you're
4      refer to Page 3, you're referring to
5      the top numbers?
6          MS. ARONSSON:  Yes.  I'm
7      referring to the docket numbering at
8      the top.  Page 3 of 23.
9      Q.   Starting with Part 1 here, did
10 Verdolino and Lowey perform any work in
11 connection with this line item?
12     A.   If we did, we did with counsel.
13     Q.   In Part 2, Item 3 and 4
14 referring to cars, vans, trucks, etcetera,
15 watercraft, aircraft, did Verdolino and
16 Lowey perform any work in connection with
17 this section?
18     A.   All with counsel.
19     Q.   So it's fair to say, when you
20 say you performed work with counsel, you
21 didn't perform any independent
22 investigation?
23     A.   Correct.
24     Q.   Part 3, Items 6 through Items
25 15 refer to personal and household items,
Page 97

25 (Pages 94 - 97)

C. JALBERT

1        C. JALBERT
2 is that right?
3    A.   Yes.
4    Q.   Without walking through each of
5 these, did you perform -- did Verdolino and
6 Lowey perform any work in connection with
7 Items 6 through 14?
8    A.   Nothing -- not with the
9 attorneys.
10    Q.   Just to be clear about your
11 role, were you provided information from
12 counsel and you were responsible for
13 drafting this form or did you rely on
14 counsel to draft this form?
15        MR. AULET:  Objection to form.
16    A.   We keypunched into the forms
17 after consultation obviously.
18    Q.   Did you do anything besides
19 keypunch into the form?
20    A.   We discussed matters with the
21 attorneys.
22    Q.   I'm asking in connection with
23 filing the schedule and the SOFA, when you
24 say you communicated with the attorneys,
25 you're talking about Brown Rudnick?

1        C. JALBERT
2 EXAMINATION BY
3 MR. HARBACH:
4    Q.   For the record, this is David
5 Harbach at O'Melveny, also representing
6 Pax.  I just have a few questions.  Sir, I
7 believe you mentioned earlier that you or
8 Verdolino and Lowey were involved in
9 helping to prepare the notes for the
10 schedules that were filed?  Have I got that
11 right?
12    A.   The specific part of the
13 notes --
14    Q.   Yes, sir.  The specific notes.
15    A.   Not the general --
16    Q.   Understood.
17    A.   Yes, I worked with counsel on
18 that.
19    Q.   The specific notes are --
20 appear at Document Number 77 on the docket
21 and I don't have an extra copy for you but
22 I hope you'll agree that it won't be
23 necessary.  When it comes to questions
24 about things like electronics and household
25 goods and furnishings, which my colleague

1        C. JALBERT
2    A.   And Melissa Francis and Aaron
3 Mitchell.
4    Q.   Did you communicate or did
5 Verdolino and Lowey communicate with anyone
6 else besides the attorneys at Brown
7 Rudnick, Melissa Francis and Aaron
8 Mitchell?
9    A.   No.
10    Q.   Were you provided any facts or
11 information from any party when punching in
12 these line items?
13    A.   We were informed by facts, lots
14 of them from the attorneys and lots of
15 discussion.
16    Q.   Was it -- scratch that.  The
17 information you received, was it oral?
18    A.   Some was oral and some was in
19 e-mails, I believe, from counsel.
20        MR. HARBACH:  Do you mind if I
21 ask a couple questions?
22        MS. ARONSSON:  Sure.
23        MR. AULET:  I don't have any
24 objection.
25        MR. HARBACH:  Thank you.

1        C. JALBERT
2 was just asking you about, the specific
3 notes state, for example, "numerous items
4 fitting the personal and household
5 definition are located at the residence and
6 the apartment" and then it goes onto say,
7 "except as otherwise set forth herein, the
8 debtor has no legal title to the contents
9 of either the residence or the apartment
10 and no court has made any determination
11 that the debtor has any other interests in
12 any such items".  My question for you is
13 was Verdolino and Lowey at all involved in
14 making the assessment of whether any of
15 these household items belonged to the
16 debtor?
17        MR. AULET:  I just lodge an
18    objection to asking him about a
19    document that you're not showing him.
20    You can answer if you can.
21    A.   To be clear, are you asking me
22 if I investigated whether the spatulas and
23 the pots and pans existed and who bought
24 them and how much they were and are they at
25 the house?

26 (Pages 98 - 101)

C. JALBERT

1      Q.   All I'm asking is whether
2   Verdolino and Lowey had any role in making
3   the judgment call over whether the
4   household items at the residence or the
5   apartment belonged to Mr. Kwok or was that
6   something that was left to the lawyers?
7         MR. AULET:  Objection to form.
8      A.   We did no investigation.  I had
9   no personal knowledge not told to me by
10  Aaron Mitchell, Melissa Francis and Brown
11  Rudnick about the ownership of those.  So
12  it wasn't my decision and I didn't
13  investigate but I certainly was party to
14  the conversations regarding that.
15     Q.   During those conversations, if
16  one of those people, a lawyer at Brown
17  Rudnick or Melissa -- whose last name I
18  forget --
19     A.   Francis.
20     Q.   Francis, thank you.
21  Represented to you that those items do not
22  belong to Mr. Kwok, you just accepted that
23  at face value?
24     A.   Correct.

Page 102

C. JALBERT

1         MR. HARBACH:  Okay, thank you.
2      Thank you, Laura.
3   CONTINUED EXAMINATION
4   BY MS. ARONSSON:
5      Q.   This is Laura Aronsson from
6   O'Melveny.  Just turning back to what we
7   were talking about in connection with the
8   schedule.  I think David covered this.  So
9   when drafting this, how did you decide
10  whether an item like the iPhone referenced
11  in Line Item 7 or the clothes referenced in
12  Line Item 11 or the family dog referenced
13  Item 13 belonged to Kwok as opposed to
14  another person or entity?
15     A.   I was informed by either
16  Melissa Francis or Aaron Mitchell or they
17  informed Brown Rudnick and Brown Rudnick
18  informed us.
19     Q.   Is it fair to say that that
20  chain of events that you just described
21  applies to all of the items identified in
22  this schedule?
23        MR. AULET:  Objection to form.
24     A.   I don't know -- we better go

Page 103

C. JALBERT

1   item by item if that's what you want to do.
2   I don't know what you're referring to.  You
3   know, you got specific lines you're talking
4   about?
5      Q.   Sure, that's fair.  So in
6   connection with any of the assets
7   identified in the schedule as belonging to
8   Mr. Kwok, you solely relied on the chain of
9   events you previously described, Brown
10  Rudnick received information from Melissa
11  Francis and Aaron Mitchell?
12        MR. AULET:  Objection to form.
13     A.   No, that's not what I said.  I
14  said we heard directly from Melissa Francis
15  or Aaron Mitchell or they informed Brown
16  Rudnick and Brown Rudnick told me that
17  they -- what the answer was from them.
18  There was no one way of communicating.  It
19  was fluid situation.  We had a very short
20  time to do them but it was not one way or
21  the other.  It was, as I said, either and
22  many times the e-mails were with all the
23  attorneys on the e-mail or it was a phone
24  call with a lot of parties and I don't

Page 104

C. JALBERT

1   remember all of the parties but the source
2   of the information was for us, first, Aaron
3   Mitchell and Melissa Francis in no
4   particular order.  Now I don't remember who
5   knew more about what than the other or if
6   they passed information onto Brown Rudnick,
7   who then passed it onto us.  Obviously,
8   after they did whatever legal analysis they
9   wanted to do.
10     Q.   In preparing these documents,
11  did you ask for any information from Brown
12  Rudnick or Aaron Mitchell or Melissa
13  Francis that you were not given?
14     A.   I don't remember asking a
15  question they didn't answer but I didn't
16  investigate anything.
17     Q.   I want to turn to Page 16 of
18  this document.  So at the bottom of the
19  page, to direct your attention there, Part
20  2 reads, "estimate your ongoing monthly
21  expenses".  Were you involved in drafting
22  this section?
23     A.   Yes.
24     Q.   What was your role -- or

Page 105

27 (Pages 102 - 105)

C. JALBERT

1     scratch that.  What was Verdolino and
2     Lowey's role in connection with this
3     section?
4     A.   We had discussions with the
5     legal team, which is Brown Rudnick team
6     plus Aaron Mitchell, plus Melissa Francis,
7     probably more than one time, probably
8     orally, probably in e-mail and it was a
9     discussion.
10    Q.   Turning to the next page, the
11    estimated monthly operating expenses reads
12    zero.  Is that fair?
13    A.   Yes.
14    Q.   Did you anticipate the debtor's
15    monthly operating expenses to remain zero
16    after this point?
17          MR. AULET:  Objection to form.
18    A.   It certainly was discussed with
19    the attorneys.  I don't think it's a
20    secret.  There was lots of discussion
21    yesterday.  So my expectation is yes, as to
22    his expenses, his payment of his expenses
23    is going to remain I think zero.
24    Q.   I think you said his -- his

Page 106

C. JALBERT

1     expenses.  In your view, what does his
2     expenses cover?
3     A.   There's a whole list of them
4     here.  You want to go down them?  It looks
5     like about 30 of them.  Real estate taxes,
6     property and homeowners and renters'
7     insurance, home maintenance repair and
8     upkeep expenses, home ownership association
9     and condo dues.  Don't even know if those
10    are applicable.  Electricity, heat and
11    natural gas.  Want me to keep going?
12    Q.   So we can just agree that Items
13    4 through 21 would include monthly
14    expenses?
15    A.   Again, as it relates to him
16    paying them, I would agree.  My
17    understanding is they're going to remain
18    zero.
19    Q.   So this -- the analysis
20    contained in this document is separate from
21    the monthly operating report, the reports
22    that you, Verdolino, draft in connection
23    with this case?
24    A.   Correct, because the monthly

Page 107

C. JALBERT

1     operating report is a different report and
2     that's a completely different question than
3     what's on here.
4     Q.   Can you explain to me the
5     difference?
6     A.   And I don't remember what
7     question it is, is it like 4 or 5 or 6E or
8     whatever it is, the request is to report
9     the expenses paid by others on the debtor's
10    behalf.  That's not what this asks.  So in
11    the schedule, we listed some funds and we
12    will, going forward, be listing and
13    reporting, as required by the MOR, the
14    expenses paid by others on behalf of the
15    debtor which is again different from what
16    this asks.
17    Q.   Focusing on what this asks,
18    it's your understanding that the debtor's
19    ongoing monthly expenses is zero?
20          MR. AULET:  Objection to form.
21    A.   The debtor's payment of the
22    ongoing expenses is zero.
23    Q.   You did no investigation into
24    whether that is correct?

Page 108

C. JALBERT

1     A.   Correct.
2     Q.   Turning just to the Excel
3     sheets at the end of this document,
4     starting just broadly, was Verdolino and
5     Lowey involved in preparing these
6     documents?
7     A.   Well, we were certainly
8     involved with others, yes.
9     Q.   What -- generally, what work
10    did Verdolino and Lowey do in connection
11    with these documents?
12    A.   Reviewed them for
13    reasonableness, assisted in putting them in
14    a form that would normally be seen in a
15    SOFA and schedule.  I think some of this
16    was uploaded into the actual Schedule F
17    because I think Schedule F -- well, maybe
18    it doesn't.  I don't know.  I don't
19    remember whether this was uploaded or not
20    but it could be.  So that -- so it starts
21    with D.  So all of these, we worked with
22    the attorneys and that's again, all three,
23    the Brown Rudnick team, Aaron Mitchell and
24    Melissa Francis.

Page 109

28 (Pages 106 - 109)

C. JALBERT

1        C. JALBERT
2    Q.  I think you said the phrase
3 reviewed for reasonableness.  What do you
4 mean by that?
5    A.  Well, if we had anything to
6 compare information to, we compared it
7 or -- or if we had a question, we asked a
8 question of the lawyers.  I don't remember
9 off hand what those were.
10    Q.  Can you think generally of any
11 issues that you investigated in connection
12 with preparing these?
13    A.  I'm sure on a couple of them,
14 we wanted the make sure that -- that there
15 wasn't a missing digit or an extra digit so
16 I'm sure someone from my team walked
17 through with someone, probably either
18 Melissa or Aaron, just as a double check
19 that it's what -- what the number on the
20 form was the number that they intended.
21 There wasn't, in there someplace, a human
22 error.
23    Q.  Can you think of anything else
24 specific that you investigated?
25    A.  We did not investigate.

Page 110

1        C. JALBERT
2    MS. ARONSSON:  The Court
3 Reporter is going to hand you what's
4 being marked as Jalbert Exhibit 6.
5 This is a document filed in this case
6 as Docket 77.
7    (Whereupon, Global Notes was
8 marked as Jalbert Exhibit 6 for
9 identification as of this date by the
10 Reporter.)
11    Q.  Do you recognize this document?
12    A.  Yes.
13    Q.  What is it?
14    A.  The Global Notes and Statements
15 of Limitations Methodology and Disclaimers
16 Regarding the Debtor's Schedules of Assets
17 and Liabilities and Statement of Financial
18 Affairs and the debtor is Ho Wan Kwok.
19    Q.  And this is a specific line
20 item that Verdolino and Lowey's proposed
21 retention relates to?
22    MR. AULET:  Objection to form.
23    A.  Can I go back and take a look?
24 I don't know what the global notes are
25 listed or not but these are part and parcel

Page 111

1        C. JALBERT
2 to the SOFA's and schedules.  So it would
3 be part of the first bullet, "assistance
4 with preparation of the statement of
5 financial affairs and schedules and all
6 support thereto and any amendments, if
7 necessary".
8    Q.  What was Verdolino and Lowey's
9 role in preparing this document?
10    A.  Well, we certainly assisted in
11 drafting.  We assisted in reviewing,
12 particularly the specific notes but there
13 was -- there was a lot of back and forth
14 and a lot of work between the Brown Rudnick
15 law firm, Aaron Mitchell, Melissa Francis
16 and Verdolino and Lowey, both -- all three
17 at Verdolino and Lowey, Matt Flynn, Mary Jo
18 Schindler and myself.
19    Q.  Just to understand, what
20 specific work did Verdolino and Lowey do in
21 connection with preparing this document?
22    MR. AULET:  Objection to form.
23    A.  Well, like I said, we had
24 numerous e-mails, we reviewed everything,
25 we made comments.  We might have drafted a

Page 112

1        C. JALBERT
2 paragraph here or a paragraph there.  I
3 think we assisted the group in making sure
4 the references, amongst the notes and
5 amongst the questions and the SOFA's and
6 amongst the schedules to the extent they
7 were interrelated, that the references were
8 appropriate.  We made sure that the
9 writings were the facts as we knew them.
10 Didn't investigate but we had lots of
11 discussions and we made sure that what was
12 represented here was our memories.
13    Q.  Thank you.  Turning to Page 4,
14 Question 1 in the middle of the page, asks
15 "do you own or have any legal or equitable
16 interest in any residence, building, land
17 or similar property".  The answer in Item
18 1, below it, reads, "the debtor has use and
19 occupancy of real estate located at 373
20 Taconic Road, Greenwich, Connecticut".  Do
21 you have any understanding as to why the
22 use and occupancy of certain real estate is
23 relevant to this filing?
24    MR. AULET:  Objection to form.
25    A.  Well, I'm not a lawyer but

Page 113

29 (Pages 110 - 113)

C. JALBERT
1    C. JALBERT
2 Schedule A is I thought real property that
3 was owned by the debtor. I would have to
4 go back and confirm that but real estate.
5 So it would be -- he's alive. He resides
6 in a residence and I'm presuming this is
7 the appropriate legal description of the
8 facts and circumstances of his living in
9 that residence.
10    Q.    Again, no independent
11 investigations into this?
12    A.    Correct.
13    Q.    Did you perform any evaluation
14 of the residences listed in Question 1?
15    A.    No.
16    Q.    The second bullet refers to an
17 apartment in the Sherry Netherland Hotel?
18    A.    Yes.
19    Q.    Did you draft this section?
20    A.    Did I draft it? I doubt it. I
21 might have reviewed it. I might have had
22 input in something but this is not my
23 language.
24    Q.    Are you aware that the entity
25 holding the legal title to the Sherry

Page 114

C. JALBERT
1    C. JALBERT
2 Haven on Wednesday for the 341 meeting but
3 I don't know -- I know it's a valuable car.
4 I don't know what the name is and I don't
5 know who owns them. I know the debtor --
6 just as this says, the debtor has use.
7    Q.    So beyond what this says here
8 and your previous answer, do you have
9 anymore information about the vehicles that
10 the debtor has use of?
11    A.    No.
12    Q.    Did you witness the debtor
13 using any luxury vehicles at any time?
14    A.    I don't know what you mean by
15 using but he got out of one in New Haven on
16 Wednesday.
17    Q.    Do you know what kind of car it
18 was?
19    A.    I don't remember.
20    Q.    Is this -- strike that. Is --
21 is the answer to Question 3 relevant to the
22 preparation of monthly operating reports?
23    A.    Probably, yes.
24    Q.    Why?
25    A.    Because I imagine there's a

Page 116

C. JALBERT
1    C. JALBERT
2 Netherland apartment is in bankruptcy?
3    A.    Well, I know there's a Chapter
4 11 going on. Exactly what's in Chapter 11
5 and who owns what, I have not confirmed or
6 made an investigation but generally
7 speaking, I understand that that apartment
8 is somehow in Chapter 11 in New York.
9    Q.    Any involvement in those
10 proceedings in New York?
11    A.    No.
12    Q.    Turning to the next page,
13 Question 3 asks for interests, broadly
14 speaking, in any vehicles. The response
15 reads that "the debtor has use of
16 automobiles including luxury automobiles
17 and motorcycles". Did you do any
18 investigation into this analysis?
19    A.    No.
20    Q.    Do you have any understanding
21 of what vehicles the debtor uses?
22    A.    Only from my memory, the -- he
23 has access to a luxury vehicle and I think
24 there's a vehicle that his security travels
25 in. As a matter of fact, they were in New

Page 115

C. JALBERT
1    C. JALBERT
2 cost associated with those vehicles being
3 provided for his use and again, I don't
4 remember exactly what the question is, 4, 5
5 or 6, like E, where the rules say to report
6 expenses made by third-parties on behalf of
7 the debtor. Well, I'm thinking the use of
8 the vehicles -- you know, I don't know if
9 there's a car payment on it, gasoline,
10 insurance, I don't know but something might
11 be in there.
12    Q.    What about the purchase of the
13 vehicle itself whenever it was purchased,
14 is that relevant to the monthly operating
15 report?
16    A.    Well, monthly operating reports
17 are usually a disbursement in a particular
18 time period. I imagine if they've bought
19 one of those cars during the pendency,
20 maybe it shows up. I don't know. On the
21 other hand, you could make an argument that
22 the use of the vehicle is not the same
23 thing as buying the vehicle because maybe
24 other people use it too. So you would have
25 to find a way of allocating the cost.

Page 117

30 (Pages 114 - 117)

C. JALBERT

1    Q.   Does that answer apply to the
2  Question 1 about residences as well?
3      MR. AULET:  Objection to form.
4    A.   The debtor resides in a
5  particular residence.  They're -- the only
6  people there that I know of, except for a
7  maid that comes in and security and
8  possibly visits from family.  So I imagine
9  the cost of the residence would be on that
10 so -- that monthly operating report in some
11 amount and I think I -- I was a proponent
12 of 50 percent of that cost would be on
13 behalf of the debtor because the spouse
14 lives there too and I didn't count the kids
15 because they only came to visit the debtor.
16 So I kind of ascribed more to the mother
17 and father and split the cost but there's
18 no home purchase in there.  There's no --
19 again, it's what you pay in that current
20 month.  So I'm assuming they're telling --
21 we're going to be disclosing what is paid
22 in that particular time frame on behalf of
23 the debtor on the various categories, the
24 vehicles, the security, the home --

Page 118

C. JALBERT

1    A.   No.
2    Q.   Turning to Page 8, Question 26
3  asks for patents, copyrights, trademarks,
4  etcetera.  The answer refers to
5  unregistered copyrights and other
6  intellectual property interest in music and
7  videos posted to various platforms.  What
8  is this referring to?
9    A.   The whole thing?
10   Q.   Yes.
11   A.   The Question 26 refers to
12 various intellectual property patents,
13 copyrights, trademarks, trade secrets and
14 intellectual property.  The debtor -- I'll
15 just read it to you.  "The debtor has
16 possible unregistered copyrights and other
17 intellectual property interest in music and
18 videos posted to various digital and media
19 platforms such as YouTube, GTV, Twitter"
20 and -- I don't even know, GETTR, whatever
21 that is.  "The debtor ascribes no value to
22 his social media assets and has made no
23 attempts to monetize his social media
24 presence".

Page 120

C. JALBERT

1    Q.   Thank you --
2    A.   Food.
3    Q.   Thank you.  Question 4 refers
4  to watercraft, aircraft, motor homes and
5  the answer references previous access to
6  the use of a yacht named the Lady May.  Do
7  you have any -- beyond what's written on
8  this page, do you have any understanding of
9  Mr. Kwok's interest the Lady May?
10   A.   Nothing that's not printed on
11 this page.
12   Q.   Did you do any independent
13 investigation into this?
14   A.   No.
15   Q.   Items 6 and 7, household goods
16 and electronics.  I think we covered that
17 previously.  In connection with Items 6,
18 household goods through Questions 17 on
19 this page -- so just for clarity, it's
20 Questions 6, 7, 8, 9, 11, 17.  Did you do
21 any investigation as to what -- as to
22 whether the items referenced in here belong
23 to Mr. Kwok versus some other third-party
24 or entity?

Page 119

C. JALBERT

1    Q.   Beyond what's written on the
2  page, do you have any understanding of what
3  this refers to?
4    A.   No.
5    Q.   The second sentence notes that
6  the debtor ascribes no value to these
7  items, do you see that?
8    A.   Yep.
9    Q.   You performed no valuation of
10 these items in connection with your work?
11   A.   Correct.
12   Q.   Do you know if any valuation
13 was performed?
14   A.   None to my knowledge.
15   Q.   Question 31 asks for interest
16 and insurance policies.  The answer refers
17 to his spouse's health insurance policy
18 which has no cash value.  Do you see that?
19   A.   Yes.
20   Q.   Is it standard practice that a
21 health insurance policy has no cash value?
22   A.   I've never seen a situation
23 where a health insurance policy has a cash
24 value except for to the beneficiary of --

Page 121

31 (Pages 118 - 121)

C. JALBERT

1    C. JALBERT
2 if you have a health insurance plan, it has
3 a lot of value to you when you go to the
4 hospital and it pays the bills for you.
5 There's not an independent value to a
6 third-party that you can sell.
7    Q.   Do you have any knowledge about
8 the health insurance policy that the debtor
9 has currently?
10    A.   No.
11    Q.   Question 53 asks for property
12 of the kind not listed and the answer
13 refers to his membership at Mar-a-Lago Club
14 in Palm Beach. Is this the type of thing
15 that Verdolino and Lowey would include on a
16 monthly operating report if Mr. Kwok, the
17 debtor, used the membership?
18        MR. AULET: Objection to form.
19    A.   I would have to use conjecture.
20    Q.   Go ahead.
21    A.   Well, the first monthly
22 operating report was filed in February. I
23 don't know whether he went down there or
24 not. I don't know if he went down there in
25 March. If he -- if he went there, I

Page 122

1    C. JALBERT
2 imagine there would be travel expenses. I
3 don't know whether there would be a fee for
4 the golf and maybe he had lunch. So I
5 imagine if he physically went there and
6 used it, there would be -- there might be
7 -- there would be something in the monthly
8 operating report but if he stays where I
9 think he's going to stay, in Greenwich
10 where he's safe, it's not going to be
11 relevant.
12    Q.   What is your basis for thinking
13 he's going to stay where he is in
14 Greenwich?
15    A.   I listened to the 341 meeting
16 yesterday -- excuse me, Wednesday.
17    Q.   Besides the knowledge gathered
18 from that hearing on Wednesday, the 341
19 hearing, do you have any independent
20 knowledge about the debtor's expected
21 travel or location?
22    A.   I have no knowledge whatsoever
23 of where he's going to be at any point in
24 time.
25    Q.   Would you rely on Brown

Page 123

1    C. JALBERT
2 Rudnick, Aaron Mitchell and Melissa Francis
3 to inform you of how he might benefit from
4 things like his like his Mar-a-Lago
5 membership in connection with drafting the
6 monthly operating report?
7    A.   I certainly would listen to
8 counsel on that for sure.
9    Q.   But Verdolino and Lowey
10 wouldn't endeavor to seek out information
11 about these monthly expenses --
12    A.   Well, we're going to seek out
13 and we're going to point to the question
14 and we're going to ask for information
15 that's responsive to that. I don't have
16 access to the information. We don't
17 investigate. I'm not going to keep track
18 of where the debtor goes or doesn't go. So
19 someone would need to tell us the
20 information. We would then review it but
21 I -- I think that Mar-a-Lago thing, at
22 least for the foreseeable future, is not an
23 issue but if it becomes an issue, someone
24 will tell me.
25    Q.   Turning to Page 11, Schedule I,

Page 124

1    C. JALBERT
2 the second to last sentence here and it's
3 that "the debtor plans to amend Form 122B
4 filed on February 15th, 2022 in which
5 debtor erroneously claimed monthly income
6 of $19,488". Do you see that?
7    A.   Yes.
8    Q.   Do you know what that refers
9 to?
10    A.   Yes.
11    Q.   What is it?
12    A.   The debtor inadvertently or
13 accidently -- I don't know what the term
14 would be -- erroneously filed a Form 122B.
15 It included $19,488 dollars which met --
16 the form met for the monthly income, I
17 think the review by the lawyers was that's
18 incorrect and so they -- the debtor filed
19 an amended 122B or at least intended to --
20 I don't know if it's done yet or not --
21 excluding that income.
22    Q.   Did Verdolino and Lowey perform
23 any work in connection with that erroneous
24 inclusion?
25    A.   I'm sure anything we did was in

Page 125

32 (Pages 122 - 125)

C. JALBERT

1      consultation with the lawyers.
2          MR. AULET: Objection to form.
3          Sorry.
4      Q.    Turning to Page 13, Question 16
5      refers to a retainer of 500 thousand for
6      Brown Rudnick and then refers to one
7      million dollars from Lamp Capital. Do you
8      have any knowledge of that transaction
9      outside of what's written on the page?
10         A.    I think there was discussion of
11     it yesterday -- excuse me, on Wednesday at
12     the 341 meeting and I think I saw a draft
13     of Brown Rudnick's retention papers -- I
14     think I did where I thought something was
15     mentioned in there.
16         Q.    Do you recall what that was?
17         A.    No. Something along the lines
18     of what's right here.
19         Q.    Do you know what Lamp Capital
20     LLC is?
21         A.    An entity owned by someone that
22     is not the debtor.
23         Q.    Do you have any idea who it is
24     owned by?

C. JALBERT

1          A.    There are actually five of them
2      I think. They're listed in Schedule D. I
3      don't recall whether I actually saw them or
4      not. I think they were briefly described
5      to me at a minimum by lawyers.
6          Q.    Any independent knowledge of
7      those agreements besides --
8          A.    No.
9          Q.    Did Verdolino and Lowey do any
10     other investigation in connection with the
11     assets we've talked about that we didn't
12     cover?
13         A.    No.
14         Q.    Those five litigation
15     agreements we talked about --
16         A.    The litigation funding
17     agreements?
18         Q.    Yes. Thank you. Have you seen
19     them before?
20         A.    Not to my knowledge.
21         MS. ARONSSON: The Court
22     Reporter is going to hand you what's
23     being marked as Jalbert Exhibit 7.
24     This is a document produced in this

C. JALBERT

1          A.    Only a guess.
2          Q.    Can you tell me -- I guess you
3      don't need to speculate. Do you have any
4      information that -- about what informs your
5      guess?
6          MR. AULET: Objection to form.
7          A.    My memory was there was a lot
8      being talked about but my memory was
9      something was said during the 341 meeting
10     but it is very -- I was very back of the
11     room, as you know, and it was very hard for
12     me to hear the English version from the
13     interpreter. So I can't be sure but I
14     thought I heard something that discussed
15     who owned Lamp.
16         Q.    Outside of what you heard at
17     the 341 hearing and this other document
18     that you remember seeing, do you have any
19     knowledge about Lamp or its operations?
20         A.    No.
21         Q.    The next item, Question 18
22     refers to a litigation funding agreement
23     dated November 8th, 2021. Have you seen
24     that agreement?

C. JALBERT

1      matter with the Bates stamp Kwok
2      00001752.
3          MR. AULET: Just for the
4      record, it's two separate documents
5      so we should make sure --
6          MS. ARONSSON: I'll represent
7      that this is a family of documents,
8      an e-mail and an attachment.
9          (Whereupon, E-mail Chain was
10     marked as Jalbert Exhibit 7 for
11     identification as of this date by the
12     Reporter.)
13         Q.    Mr. Jalbert, I understand
14     you're not on this e-mail. I'm just going
15     to ask you some basic questions about it.
16     This is an e-mail between a redacted
17     person, Aaron Mitchell, Matt Flynn and
18     Melissa Francis. Matt Flynn is your
19     colleague. We've talked about the other
20     folks. The attachment is a summary of
21     living expenses from the period February
22     15th to 28th. First, I'm going to ask who
23     is this e-mail from?
24         MR. AULET: And I will object

C. JALBERT

1    and direct him the Witness to answer
2    for the same reasons that we
3    discussed previously on the record.
4    MS. ARONSSON:  And we'll
5    continue to dispute the redaction
6    here.
7    Q.  Turning to the attachment, this
8    summary of expenses, this was provided by a
9    person -- the unknown person in the top
10    e-mail, is that right?
11    A.  Yes.
12    Q.  Is it fair to say that this is
13    the starting point for Verdolino's monthly
14    operating report draft?
15    MR. AULET:  Objection to form.
16    A.  As to the one particular
17    question, yes.
18    Q.  Sorry.  What do you mean?
19    A.  This answers one question on
20    the monthly operating report and again, I
21    don't remember off hand exactly which one
22    it is but something, 4, 5, 6E. The funds
23    paid by third-parties on behalf of the
24    debtor. This is the first pass.

Page 130

C. JALBERT

1    Q.  Is this the monthly operating
2    report filing that we've been discussing
3    that you've been involved in preparing?
4    A.  Looks like it, yes.
5    Q.  Turning to the filing 120-1,
6    the separate loose page, these line items
7    here, can you just explain broadly what
8    they are at the bottom?  What does the
9    total reflect?
10    MR. AULET:  Objection to form.
11    A.  You're referring to the
12    $109,827.12?
13    Q.  Yes.
14    A.  I'm trying to see who made the
15    payments but inadvertently, the family, on
16    behalf of the debtor, on February 16th, the
17    day after the filing, made these two
18    payments on pre-petition amounts.  So this
19    was, in an abundance of caution, in the 161
20    thousand dollars that was shown on Part 1,
21    Number E, this 109 thousand dollars is
22    included in the 161,323. So we were -- the
23    lawyers felt it was important to supplement
24    the monthly operating report with that

Page 132

C. JALBERT

1    MS. ARONSSON:  McKenzie, Tab
2    19.
3    THE WITNESS:  Are you done?
4    MS. ARONSSON:  No.
5    MR. AULET:  Should we have the
6    back up marked as a separate exhibit
7    or --
8    MS. ARONSSON:  I typically mark
9    them as one.
10    MR. AULET:  Okay.
11    THE WITNESS:  We'll put them
12    together again and eliminate the blue
13    sheet.
14    (Whereupon, E-mail Chain was
15    marked as Jalbert Exhibit 8 for
16    identification as of this date by the
17    Reporter.)
18    Q.  The Court Reporter is going to
19    hand you what's being marked as Jalbert
20    Exhibit 8.
21    A.  Have you given it to her yet?
22    MS. ARONSSON:  This is a
23    document filed in this case as Docket
24    120 and document 120-1.

Page 131

C. JALBERT

1    information that this was really a
2    pre-petition payment paid post-petition.
3    Q.  Understood.  Thank you.  So the
4    total expenses $161,323 here, if we
5    subtract from that, the total inadvertent
6    payments is $109,827.  What does that
7    amount reflect?
8    A.  The amount of the payments that
9    weren't these two payments that were made
10    in the period from February 15th to
11    February 28th by third-parties on behalf of
12    the debtor.
13    Q.  Would that be reflected in the
14    final version of the living expenses sheet
15    that we looked at on Exhibit Number 7?
16    A.  Yes.
17    MR. AULET:  Objection to form.
18    Q.  Is anything else included in
19    that number, to your knowledge?
20    A.  Well, inadvertently, yes. We
21    found out that whoever created the form on
22    the security total dollars, whatever the
23    final total dollars were, there was a
24    payment made February 10 pre-petition that

Page 133

34 (Pages 130 - 133)

C. JALBERT

1    was inadvertently included in the payments
2    from February 15th to 28th.  So that will
3    be corrected on the next operating report.
4        Q.    So included in this operating
5    report is the two inadvertent payments to
6    the law firms identified on Exhibit 8?
7        A.    Yes, correct.
8        Q.    The monthly operating living
9    expenses that we've talked about and then
10   this other payment that you said would be
11   corrected, is that right?
12       A.    It's included in the 161.
13   We'll be pulling that out when we do the
14   March -- so the way the form works usually
15   is you have payments paid currently and
16   cumulative.  We will take that small amount
17   of money out of the cumulative so as to
18   have the correct number going forward.
19       Q.    So is it fair to say that
20   Verdolino and Lowey's role in connection
21   with these inadvertent payments was to kind
22   of double check the amounts included in the
23   monthly operating report?
24       A.    We tried but given the timing

Page 134

C. JALBERT

1    of when the information became available
2    and when the form had to be filed, there
3    was a miscommunication with the preparer of
4    the schedule that will be rectified.
5        Q.    Who's the preparer of the
6    schedule?
7        A.    I can't tell you.
8        Q.    What schedule are you referring
9    to, this document here, the monthly
10   operating report, Exhibit 8?
11       A.    This thing (indicating).
12       Q.    So the number 161 here refers
13   to this spreadsheet in Exhibit 7 as
14   reflected with your edits, with Verdolino
15   and Lowey's edits?
16       A.    The 161 is the sum of the final
17   number from Exhibit 8 plus the 109.
18       Q.    What work did Verdolino and
19   Lowey do in connection with getting to the
20   final numbers?
21       A.    We worked with counsel and
22   Aaron Mitchell and Melissa Francis trying
23   to review -- we didn't have details but we
24   were trying to ask questions and make sure

Page 135

C. JALBERT

1    that the categories were properly described
2    because this is not nearly final.  This --
3    there were some errors and we also worked
4    with counsel and others in trying to figure
5    out what the percentage of the monies that
6    were paid in Column C multiplied by a
7    distribution percentage to arrive at the
8    total.  We worked with the preparer to make
9    sure that the descriptions on the schedule
10   were accurate.  We tried to confirm the
11   numbers were accurate.  We couldn't get the
12   information in time to be able to do that
13   but then we looked at the distribution
14   percentages using our judgment in working
15   with the lawyers.
16       Q.    Looking at this draft, living
17   expense chart in Exhibit 7, there are seven
18   line items.  Is that right?
19       A.    Yes.
20       Q.    Is it fair to say that
21   Verdolino and Lowey crosschecked the names
22   of the categories to ensure that they
23   accurately depicted the expenses contained
24   in those line items?

Page 136

C. JALBERT

1        A.    We did the best we could, yes.
2        Q.    What more information would
3    have been helpful to help you get to that
4    determination?
5        A.    If we could have seen what
6    the -- what the actual payees and
7    disbursements were, it probably would have
8    helped us with the categorization.
9        Q.    But you didn't receive that?
10       A.    Not -- not at that time, no.
11       Q.    Is the extent of information
12   you received regarding these line items
13   included in this chart here?
14       A.    As of the date that we made
15   available all the -- I'm sure there's an
16   updated version because this doesn't tie to
17   here (indicating) and then we -- long after
18   we produced the information for -- for this
19   deposition, there's been continuing ongoing
20   discussions because we're getting ready to
21   file -- excuse me, the March MOR in April.
22       Q.    We'll turn to the -- what I
23   think is the final version but we talked
24   about the categories, the amount you said

Page 137

35 (Pages 134 - 137)

C. JALBERT

1 that, at the time of this filing, you did
2 not have information to be able to verify
3 the amounts attributed to each category.
4 Is that right?
5    A.  Yes.
6    Q.  What information would have
7 been helpful for you to cross check those
8 amounts?
9    A.  Like I said, the name of the
10 payee, a description of what the service
11 was and the amount of the funds.
12    Q.  The percentage distribution,
13 what does that mean?
14    A.  The -- so for instance,
15 security was, in this sheet, $43,655.44.
16 The drafter of this and anyone that he
17 consulted with or she consulted with was 40
18 percent.  Amongst talking with our team and
19 with the lawyer team, we thought that that
20 probably should be one hundred percent
21 because the only reason -- the security is
22 entirely related to Mr. Kwok and his
23 safety.  There wouldn't be security if the
24 wife and the kids or others at the

Page 138

C. JALBERT

1 compound, if it weren't for Mr. Kwok.  So
2 we proposed changing and I think that did
3 get changed to a hundred percent.
4    Q.  In revising these percentage
5 distributions, did you rely entirely on
6 information received from Brown Rudnick and
7 Aaron Mitchell and Melissa Francis and this
8 undisclosed person?
9    A.  The first pass was the
10 undisclosed person.  After we got this
11 information from the undisclosed person,
12 most of the discussion was between our
13 firm, my firm and the lawyer -- lawyers.
14 How long is this is going to go?  Because
15 if it's going to go a bit, now I would like
16 to use the restroom.  I'll be fast.
17    MS. ARONSSON:  We can take a
18 break.  We'll go off the record.
19    THE VIDEOGRAPHER:  The time is
20 1:22 p.m. We're off the record.
21    (Whereupon, a short recess was
22 taken and upon resuming, E-mail Chain
23 was marked as Jalbert Exhibit 9 for
24 identification as of this date by the

Page 139

C. JALBERT

1    Reporter.)
2    THE VIDEOGRAPHER:  The time is
3 1:28 p.m. We're back on the record.
4 You may proceed.
5    Q.  I think you have received
6 what's been marked as Jalbert Exhibit 9.
7 This bears the Bates Kwok 00001684.  Do you
8 recognize this document?
9    A.  Yes.
10    Q.  Turning to the attachment, to
11 your knowledge, is this the final version
12 of the living expenses for the period
13 February 15th to February 28th?
14    A.  I think it is.
15    Q.  I'll represent, if you add
16 $51,495.67 plus the 109 thousand --
17    A.  161.
18    Q.  So we're on the same page, this
19 is the final version?
20    A.  Yes.
21    Q.  Does this final version reflect
22 Verdolino and Lowey's edits on the initial
23 draft provided by an unknown person?
24    A.  Well, it's certainly -- as you

Page 140

C. JALBERT

1 can see from the e-mail, we made
2 suggestions but counsel clearly reviewed
3 and assisted with the final decision and
4 I'm sure they also checked with the debtor.
5 I did not.
6    Q.  So just walking through these
7 five suggestions, why did you increase the
8 meals to 50 percent or why did you
9 recommend increasing the meals to 50
10 percent?
11    A.  Because there's a husband and a
12 wife and one hundred percent divided by two
13 is by 50 percent.
14    Q.  Do you have any understanding
15 as to why the draft had allocated the
16 numbers in the way it had in Exhibit 7?
17    MR. AULET:  Objection to form.
18    A.  So I think what the creator of
19 the initial -- my memory is the creator of
20 the initial document took into
21 consideration that occasionally, the
22 debtor's daughter and maybe one or two
23 other people occasionally showed up and so
24 I think they ascribed some of the cost to

Page 141

36 (Pages 138 - 141)

C. JALBERT

1    those people but our feeling in
2    consultation with the attorneys was that
3    the only reason those people are there is
4    they're coming to visit the debtor and
5    that's why they incurred the cost.  So I
6    thought they should put 50 percent to the
7    husband and 50 percent to the wife and
8    that's how we got the 50 percent.
9        Q.   Besides what you just described
10   to me, do you have anymore reasons for
11   suggesting the increase of 50 percent?
12       A.   Not that I can remember.
13       Q.   Item 2 is security is increased
14   to 100 and looking at the draft in Exhibit
15   7, it was 40 percent.  What was your
16   reasoning for suggesting to increase the
17   security to 100?
18       A.   Again, the only reason there's
19   any security at all is all about the
20   debtor.  So in an abundance of caution,
21   we're ascribing that cost, one hundred
22   percent of that cost to the debtor.  The
23   wife likely would not have security
24   concerns if she were not married to

Page 142

C. JALBERT

1    Mr. Kwok and when the daughter or others
2    sometimes travel, they need security as
3    well.  So for whatever reason, their
4    security is all related to the debtor.  We
5    suggested going to a hundred percent.  It
6    was discussed among the group and everyone
7    agreed to the 100 percent.
8        Q.   What is the basis for your
9    assumption that the primary reason security
10   has been retained is directly related to
11   the debtor?
12       A.   Discussion with Melissa Francis
13   and Aaron Mitchell who confirmed in several
14   phone calls that the debtor is harassed and
15   threatened and otherwise scared for his
16   existence and to the extent the -- I'm told
17   to the extent the family is scared, they're
18   scared because of their relationship to
19   their father.
20       Q.   Is there any other reasoning
21   that you haven't articulated about the
22   basis for your increasing security to one
23   hundred?
24       A.   Well, it is very conservative

Page 143

C. JALBERT

1    to ascribe the one hundred percent of the
2    cost to the debtor is -- means that all
3    that costs -- we could have left it at 30
4    percent and probably made it a callable
5    argument of why it could be 30 percent.  We
6    wanted to go with -- I think part of the
7    final reasoning amongst the group was that
8    it's conservative to report all of it on
9    the debtor's behalf because of his safety
10   concerns is -- that was the reasoning.
11       Q.   Thank you.  Item 3 is utilities
12   increased to 50 percent and I'll represent
13   Exhibit 7 has it at 30 percent and you
14   ascribe the same explanation as the meals.
15   Is there any other --
16       A.   No, it's the same -- it's the
17   same -- it's the same theme at different
18   percentages for most of these.
19       Q.   Item 4 refers to housekeeping.
20   I believe Verdolino and Lowey recommended
21   changing repair and maintenance to
22   housekeeping?
23       A.   Well, as it turns out, once we
24   were able to speak with someone and get

Page 144

C. JALBERT

1    some information that's behind the numbers,
2    we found out that that's the cost of the
3    maid for those 15 days or maids or maid
4    service or cleaning service and not
5    maintenance.  So it's just a matter of
6    calling it what it was.  Had we seen
7    detail, we would have understood that on a
8    more timely basis.
9        Q.   Your reasoning for increasing
10   the allocation from 30 to 50 percent, is it
11   fair to say it's the same reasoning
12   behind --
13       A.   It's a husband and a wife.  You
14   know, any other cleaning they do on behalf
15   of anybody else, the only reason they're
16   there is because the Kwok's are there.  The
17   debtor and his spouse.
18       Q.   You note at the bottom of the
19   page, "in our opinion, it's best to be more
20   conservative".  That's another reasoning
21   behind your --
22       A.   Yes.
23       Q.   -- suggestion to increase the
24   allocations?  Is that yes?

Page 145

37 (Pages 142 - 145)

C. JALBERT

1   A.   Yes.
2   Q.   I do want to talk about the
3 insurance changed to zero percent from 30
4 percent.
5      MS. ARONSSON:  I think,
6   Makenzie, can you hand me Tab 14?
7   A.   All done?
8   Q.   Yes.  Before I show you the
9 document, do you recall information about
10 the change from 30 percent to zero percent
11 for the insurance line item?
12   A.   I recall talking with my
13 colleague about it after he found out the
14 facts, yes.
15   Q.   What do you remember about that
16 interaction?
17   A.   Well, I think he found out the
18 insurance payment that -- that 13 thousand
19 dollars on Number 9 here was one hundred
20 percent pertaining to the Sherry apartment
21 in New York City where he did not live
22 during this time frame and so to the extent
23 that someone is paying those bills of the
24 Sherry, I think that's the Sherry's problem

Page 146

C. JALBERT

1 and not on account of the debtor because as
2 I'm told by the attorneys, everyone's
3 understanding, from the facts is that he's
4 -- he does not have an interest in that
5 real estate.  So he shouldn't have any
6 percentage in the expenses shown on the
7 monthly operating report.
8      (Whereupon, E-mail Chain was
9   marked as Jalbert Exhibit 10 for
10   identification as of this date by the
11   Reporter.)
12   MS. ARONSSON:  The Court
13   Reporter is going to be handing you
14   what's marked as Jalbert Exhibit 10.
15   This is a document produced in this
16   matter with the Bates Kwok 00001691.
17   Q.   I understand you're not on this
18 document but I just want to discuss a
19 couple issues here.  Do you recognize this
20 document?
21   A.   No, but I recognize the
22 subject.
23   MR. HARBACH:  Give him a minute
24   to read it.

Page 147

C. JALBERT

1   THE WITNESS:  Okay.
2   Q.   Turning to Page 2, Melissa
3 Francis notes that, "since MK doesn't own
4 the Connecticut property, can you please
5 just explain the applicability of the
6 following entries as his monthly expenses?
7 And what type of insurance is it?"  Do you
8 see that?
9   A.   Yes.
10   Q.   What do you understand Ms.
11 Francis to be asking here?
12   A.   Since the debtor doesn't own
13 the Connecticut property, can you please
14 justify the applicability of the following
15 entries as his monthly expenses and she's
16 asking what type of insurance.
17   Q.   What is your view, if any, on
18 her question?
19   MR. AULET:  Objection to form.
20   A.   I would like to answer them
21 correctly.
22   Q.   You would like to answer the
23 monthly reporting --
24   A.   I'm hoping we answered her

Page 148

C. JALBERT

1 questions.  I mean this is going onto the
2 monthly reporting but I'm hoping we
3 answered them correctly.
4   Q.   Substantively, what is your
5 view on her question here?
6   MR. AULET:  Objection to form.
7   A.   I don't want to try and guess
8 what she was thinking.
9   Q.   So you have no understanding --
10 Verdolino and Lowey has no understanding
11 about the question she's asking here?
12   A.   I have my understanding.
13   Q.   Okay.  Turning to the first
14 page, Mr. Flynn responds, "correct, he
15 doesn't own it but he lives in the
16 Connecticut house so these expenses that
17 are paid are benefitting him".  Do you have
18 any understanding of what Mr. Flynn is
19 saying here?
20   A.   That's why he's saying that
21 since he lives there, he aught to be --
22 there should be some level of those
23 expenses ascribed to him in the monthly
24 operating report in that Question 8.

Page 149

38 (Pages 146 - 149)

C. JALBERT

1 Q. Mr. Flynn continues, "I have a
2 question regarding the insurance as well
3 since this is insurance on the apartment of
4 the Sherry". Do you understand what issue
5 hes referring to here?
6 A. Yes.
7 Q. Can you explain it for me?
8 A. Well, in the Number 8 -- no,
9 Number 9, the original version of this had
10 insurance. We didn't know what it was
11 insurance on. Frankly, when we got it, we
12 assumed it was on the Greenwich residence
13 where the debtor and his spouse actually
14 reside. We factually found out that it's
15 actually insurance on the Sherry and when
16 we found out it's insurance on the Sherry,
17 since the debtor doesn't live there and
18 doesn't own it, by review of materials from
19 the lawyers, it should be eliminated and
20 that's what we proposed, to eliminate it.
21 Q. It was ultimately eliminated?
22 A. Yes.
23 Q. Mr. Flynn continues "I am not"
24 I am not sure it should be included here?

Page 150

C. JALBERT

1 A. I don't know.
2 Q. The original allocation to this
3 line item I think is --
4 MR. HARBACH: Right here
5 (indicating).
6 Q. -- at 13 thousand and that's
7 reflected on Page 2. $13,611. Besides Ms.
8 Francis' e-mail, do you have any
9 independent knowledge of that information?
10 MR. AULET: Objection to form.
11 A. No. It came from Melissa
12 Francis. I don't know where she got that
13 number from or why.
14 Q. Did you look into insurance for
15 the Greenwich property?
16 A. No.
17 Q. Why not?
18 A. We asked for someone in the --
19 with the correct knowledge to give us all
20 of the expenses paid cash, check, wire
21 transfer, HCH, any other method, February
22 15th to February 28th on behalf of the
23 debtor. We didn't leave any -- we didn't
24 ask for -- we didn't leave any

Page 152

C. JALBERT

1 I think that's what he means -- "in this
2 calculation but interested on your thoughts
3 and also asking Craig". Do you recall him
4 asking your opinion on this?
5 A. Yes.
6 Q. Is your opinion the same as
7 Mr. Flynn's here --
8 A. Yes.
9 Q. Do you recall speaking with
10 Mr. Flynn about that?
11 A. I do.
12 Q. Turning to the top e-mail here
13 on this chain, on Page 1, Mr. Flynn asks,
14 "how much was paid during this period for
15 the Sherry". Do you see that?
16 A. I got that right.
17 Q. Do you know the answer to that
18 question?
19 A. I have no idea. Also, I don't
20 know why he asked it.
21 Q. That was going to be my
22 question. Why would it matter whether --
23 how much it was as to whether it should be
24 included in the monthly operating report?

Page 151

C. JALBERT

1 restrictions. We just said give us all of
2 that information. We got a summary chart.
3 You saw it and it wasn't till we started
4 asking questions to understand some of the
5 background and what is behind the numbers
6 that we started making assessments and
7 changing what we think the legal group and
8 us thought it was appropriate.
9 CONTINUED EXAMINATION
10 BY MR. HARBACH:
11 Q. You said a moment ago that
12 originally, you and your team thought that
13 the 13 -- excuse me, I think you said you
14 assumed that the $13,611 was for the
15 Greenwich property because that's where he
16 was living. I got that right?
17 A. Yes, sir.
18 Q. Then you were told that the
19 13,611 was actually for the Sherry, right?
20 A. Correct.
21 Q. And at that point, you did not
22 inquire about was there actually any
23 insurance money paid for the Greenwich
24 property during this period, you didn't ask

Page 153

C. JALBERT

1 that question?
2      A.   No, we assumed -- actually,
3 Matt had confirmed this is a list of all
4 the payments made during this time frame.
5 So we had the universe that wasn't another
6 insurance payment and you know, most --
7 many of us have owned homes.  My own
8 empirical knowledge is you typically pay
9 your homeowner's insurance once a year.
10 It's usually -- in the Sherry, this 13
11 thousand dollars might have been just a
12 payment for the year on a 2.5 million
13 dollar entity.  They didn't tell us it was
14 a payment so I didn't ask.
15 CONTINUED EXAMINATION
16 BY MS. ARONSSON:
17      Q.   So I think we've covered the
18 work that you have done in connection with
19 the monthly operating report for the period
20 February 15th to February 28th.  We've been
21 looking at that document.  Is that right?
22      A.   Yes.
23      Q.   Can you think of anything else
24 that we haven't talked about with the work

C. JALBERT

1 with the Brown Rudnick firm and Melissa
2 Francis and Aaron Mitchell to determine
3 what the accrual of professional fees.  All
4 professionals, state professionals,
5 committee professionals, debtor
6 professionals, ordinary course -- alleged
7 ordinary course professionals, everybody
8 because we need to record the accrual.  So
9 it's not just -- the operating report is
10 not just asking for what was paid during
11 that period.  It's asking for what's the --
12 the new form is asking what are the unpaid
13 amounts and we couldn't get it in time to
14 get the February one.  So we're going to
15 catch up in this March one, we're going to
16 establish what the February accrual was and
17 we're going to find out what the March
18 accrual was and then we'll have the correct
19 information and it will have to be
20 maintained as we go along and obviously, as
21 time goes on, if things go according to the
22 way the debtor would like, there will be
23 payment on those fees.  So there'll be more
24 accruals and then payments and the same

C. JALBERT

1 that you've done, in connection with
2 preparing that document?
3      A.   Off the top of my head, no.
4      Q.   I think you referenced you're
5 preparing the next reporting cycle?
6      A.   Yes.
7      Q.   Can you describe your general
8 process and how that defers, if it does,
9 with your reporting cycle for the February
10 15th to February 28th period?
11      A.   So the monthly operating report
12 is basically presenting information and the
13 two buckets of information that are in the
14 monthly operating report as for this debtor
15 is that Question E, the funds disbursed on
16 his behalf in the 31 day period, March 1 to
17 March 31, we're going to -- we're going to
18 figure out -- we're going to get a list.
19 This time, we're going to get a list so we
20 can see what there was and we can have --
21 we can have more educated discussion with
22 the lawyers about what was paid.  That will
23 be summarized and categorized and put in
24 Schedule E and in addition, we're working

C. JALBERT

1 thing is true of the estate professionals
2 and the committee and its professionals.
3 It will be a roll forward of what the
4 liability is and the cash will be reported
5 on Page 1.  It will create liability to the
6 United States Trustee for their fee --
7 their -- their -- it's a fee.  It's not a
8 commission.  Their fee for -- which is
9 entirely predicated on cash disbursements
10 during the time of the monthly operating
11 report.
12      Q.   Do you anticipate -- strike
13 that.  Besides information that you'll
14 receive from Brown Rudnick, from Aaron
15 Mitchell, from Melissa Francis and an
16 unknown person, do you anticipate doing any
17 investigation in connection with future
18 monthly operating reports?
19      MR. AULET:  Objection to form.
20      A.   I don't know what you
21 consider -- I'm not going to -- we're going
22 to get a report from someone.  That report
23 is going to list out all of the payments
24 made during a specific time period.  We're

C. JALBERT

1  C. JALBERT
2  going to review that with our own
3  professional knowledge and with the lawyers
4  to make sure it all makes sense. We might
5  ask questions based on what shows up on the
6  spreadsheet but I'm not going to ask for a
7  copy of the cancelled check, a bank
8  statement or the invoice that was paid. So
9  no investigation of that, just a sanity
10  check or a reasonableness check and confer
11  with counsel to be sure that we understand
12  what's on that sheet and what we're going
13  to report.
14      Q.    So essentially, you'll rely on
15  the rolled up numbers that are provided to
16  you from the individuals we've talked
17  about?
18      A.    Again, except for some queries
19  that we'll make depending on what the
20  information we get. If we get -- if
21  insurance shows up again, we're going to
22  ask insurance on what. If repairs and
23  maintenance shows up again, we're going to
24  confirm it's not the maid. So we'll use
25  some common sense and we'll confer with the

1  C. JALBERT
2  lawyers based on what we see but I won't
3  know what we're going to do until we see
4  what -- and I hope it's soon. What's
5  today, April 8th?
6      Q.    Thank you. Okay, just quickly
7  turning back to Exhibit 8 which is I think
8  the final living expense report for the
9  period February 15th, 2022 to February
10  28th, 2022. I think you had referenced an
11  erroneous amount included in here. Can you
12  just explain again what you meant by that?
13      A.    I don't remember exactly what
14  the number is but on the security line,
15  Line Number 9, the amount referenced her 43
16  thousand dollars. That 43 thousand dollars
17  included a payment of -- my memory is
18  something like 12 or 14 thousand dollars
19  that was paid February 10 and so we got
20  this report, the original one, and didn't
21  know the back -- the background and when
22  they -- when they showed us the background
23  and the list of -- we saw February 10. So
24  we realized we had the opposite mistake of
25  the time with the two professionals where

1  C. JALBERT
2  they paid post-petition pre-petition. Here
3  they paid pre-petition, pre-petition but
4  should have been excluded from the monthly
5  operating report. Legitimate charge. It
6  wasn't an overpayment or anything. It just
7  didn't belong reported in the February
8  monthly operating report.
9      Q.    So is it fair to say you later
10  received a more detailed breakdown of these
11  items that was included in this --
12      A.    I believe we got a more
13  detailed -- but it was -- it was
14  significantly past that time. Everything
15  at that time was done by reviewing,
16  talking, Melissa and Aaron talking with
17  whoever and Matt talking to whoever. It
18  was all done by e-mail and orally. We
19  didn't get a spreadsheet of the detail
20  until sometime later, long after it was
21  filed and actually, after the time that we
22  made available our records that we got --
23  the detail listing which is when we figured
24  out oh we got a problem with the monthly
25  operating report. It's just a matter of,

1  C. JALBERT
2  you know, whoever is preparing these things
3  isn't used to the rules, isn't used to
4  what's got to be displayed -- disclosed and
5  what's not going to be disclosed. We try
6  and give them guidance and they just made a
7  minor error. We'll fix it next month.
8      Q.    Thank you. You can set that
9  aside. Do you recall receiving an inquiry
10  from someone at U.S. DOJ regarding the
11  monthly operating report?
12      A.    I think I actually reached out
13  to them first and my reaching out to them
14  first was -- and that's how -- was -- I
15  don't know if anyone's ever prepared a
16  monthly operating report, is there one
17  here? So the monthly operating report, up
18  until December 31 or January 31 was one,
19  two -- these two pages (indicating), Page 8
20  which is now Page 8 and Page 9 and there
21  might have been one more -- I thought it
22  was five pages. It might have been four.
23  And I filed these monthly operating reports
24  in several cases and it had been driving me
25  crazy for three months that I would -- I

C. JALBERT

1  would -- the way the monthly operating
2  reports, the bottom, for the first page, it
3  allows you to use save if you're inputting
4  data so that you can review it but it
5  retains a watermark up until the time you
6  hit a button that says send the data out to
7  the United States Trustees website and it
8  does whatever it does and when it did that,
9  it kept on coming back with these extra six
10 pages and this nonsense (indicating). So I
11 actually reached out to the U.S. Trustees
12 Office saying what are we doing wrong.
13 It's midnight and we're trying to get this
14 thing in. He says no, everyone's having the
15 same problem. We've just finally figured
16 out that's what's supposed to happen. So
17 that's when we started talking with him and
18 then when he saw it, he had our e-mail
19 addresses and we -- and he was looking for
20 the support for the 161, I believe is what
21 he was asking for. I don't have it in
22 front of me or if I do, I didn't -- I don't
23 -- but that's my recollection, that's why
24 he reached out was to get -- to get that

Page 162

C. JALBERT

1  and to get the I think accrual of the
2  professional fees going forward.
3     Q.   Did you have a call regarding
4  the monthly operating report and further
5  details on the line items?
6     A.   Not a call. You have whatever
7  e-mails there were. It was very -- I was
8  very limited. My call to him was a general
9  question on my three cases, I'm trying to
10 file these. He was able to answer my
11 question -- my main question. He then,
12 when he saw the monthly operating report,
13 he said hey, I need this and we're going to
14 obviously arrange to do that.
15    Q.   So was it the inquiry from the
16 trustee that prompted Verdolino and Lowey
17 to request additional details and
18 breakdowns of the line items contained in
19 the monthly operating Excel that we've
20 looked at?
21    A.   No. We wanted to do that
22 anyway's. That just -- that gave us more
23 fuel to bring it to them to say hey, we got
24 to get to this. That's something we would

Page 163

C. JALBERT

1  have done anyway's.
2     Q.   We've talked about your
3  experience in Chapter 11 individual
4  bankruptcies before. Reflecting on your
5  experience in these instances, were any --
6  do you have any -- can you cite any case
7  where you've seen such a great disparity
8  between the debtor's punitive assets and
9  the stated liabilities?
10    A.   No. In my individual cases,
11 the 373 million dollars of liabilities is
12 the most I've ever seen.
13    MS. ARONSSON:  We don't have
14 anymore questions.
15    MR. AULET:  I have nothing.
16    MR. GOLDMAN:  I have a few
17 follow-ups. I'll just be a couple
18 hours.
19    THE WITNESS:  Beautiful. Do
20 you mind if I go get a bottle of
21 scotch?
22    MR. GOLDMAN:  Get me one too.
23 I'm Irve Goldman --
24    THE VIDEOGRAPHER:  Can you give

Page 164

C. JALBERT

1  him the microphone, please?
2     MR. AULET:  Yes. Can I take us
3  off the record really quick so I can
4  --
5     MR. HARBACH:  Sure.
6     THE VIDEOGRAPHER:  The time is
7  1:56 p.m. and we are off the record.
8     (Whereupon, an off-the-record
9  discussion was held.)
10    THE VIDEOGRAPHER:  The time is
11 1:58 p.m. We're back on the record.
12 You may proceed.
13 EXAMINATION BY
14 MR. GOLDMAN:
15    Q.   Good afternoon. Irve Goldman,
16 Pullman and Comley for the Creditor's
17 Committee. You mentioned you were
18 certified as an insolvency restructuring
19 expert. Did I get that right?
20    A.   Advisor.
21    Q.   Advisor, for how long?
22    A.   Well, the actual designation
23 came in 1999 but in 1999, when I got the
24 designation, I had to spend over four

Page 165

42 (Pages 162 - 165)

C. JALBERT

1    thousand hours and have been in the
2    profession for eight years at that point.
3    So 30 years ago.
4        Q.    Do you typically call on that
5    expertise when you're engaged as a
6    professional in Chapter 11 cases?
7        A.    Certainly some of it, yes.
8        Q.    What aspects of the debtor's
9    financial profile do you view as needing
10   restructuring?
11           MR. AULET:  Objection to form.
12       A.    Needing restructuring, I don't
13   understand your question.
14       Q.    Well, you're a certified
15   insolvency restructuring expert.  You call
16   upon that expertise in your engagements in
17   Chapter 11 cases.  What is it about the
18   debtor's financial profile that you view as
19   in need of restructuring?
20       A.    Well, you know --
21           MR. AULET:  Objection to form.
22       Q.    Do you view it as in need of
23   restructuring?
24       A.    No, I don't.

Page 166

C. JALBERT

1        Q.    You don't?
2        A.    Absolutely not.
3        Q.    So why do you believe he filed
4    Chapter 11 then?
5        A.    Well, the debtor needs
6    restructuring.  I don't think --
7           (Whereupon, a cell phone rang.)
8           THE WITNESS:  Oh, I apologize.
9    That was for me to remind me to do
10   something at 2:00 which I can't
11   remember what I'm supposed to do.
12   Just making sure it wasn't on -- what
13   is that when it comes back on later
14   and it annoys you?  The debtor's
15   restructuring, if you're referring to
16   the questions were brought up -- in
17   an ordinary Chapter 11 case that's a
18   business, there's lots of things to
19   consider if there's a real
20   restructuring.  You've got to
21   restructure the debt, the secure
22   debt.  Maybe mezzanine, unsecured
23   debt.  Maybe work with payables, all
24   sorts of -- that isn't the case here

Page 167

C. JALBERT

1    and I -- and I regret completely that
2    we were brought in as a financial
3    advisor and not an accountant to the
4    debtor.  Most of what you see on that
5    motion to employ is very important
6    stuff in the process of bankruptcy.
7    The schedules, the SOFA's, the -- the
8    monthly operating reports, tax return
9    preparation, analysis of claims and I
10   don't know whether we'll have a role
11   in that or not.  It depends on what
12   the nature of the claim is.  Most of
13   these claims will be legally analyzed
14   but there might be a hundred reasons
15   why someone that filed a claim --
16   there might be an accounting
17   attached, they do want us to
18   investigate.  So we're not brought in
19   to -- just because we think there's
20   going to be a reorganization.
21   Bankruptcy is a process.  There's an
22   awful lot of paper that gets pushed
23   by an awful lot of people.  This
24   particular debtor is -- as I

Page 168

C. JALBERT

1    understand it, is in excess of 70
2    years old.  Doesn't even have an
3    e-mail address.  Doesn't know how to
4    use computers.  Doesn't know
5    technology.  Couldn't possibly do the
6    monthly operating reports himself and
7    virtually, in every case, there's an
8    accountant that does tax returns.
9    There's an accountant that does --
10   that helps with preparing monthly
11   operating reports.  Even when the
12   company has a controller, we still
13   come in in cases where -- so there
14   may not be a reorganization as of
15   right now.  There's going to be a
16   plan someday.  I don't know what role
17   we're going to play but if we need to
18   be -- if the counsel and debtor needs
19   us to play a role, we will but until
20   that day, there's lots of necessary
21   work to do in the ordinary course of
22   the process in the life of a Chapter
23   11 case here.
24       Q.    What you just described were

Page 169

43 (Pages 166 - 169)

C. JALBERT

1  menial tasks of accounting?
2
3      A.   I disagree.
4      Q.   No, you disagree?
5      A.   Preparing the SOFA's and
6  preparing the MOR's, you think that's all
7  menial tasks?
8      Q.   All right, I won't argue with
9  you on that.  What is it about this case
10 that you -- you view that is in need of
11 restructuring, if anything?
12         MR. AULET:  Objection to form.
13     A.   Yeah, I don't know what you're
14 trying to ask.
15     Q.   Are there assets that need to
16 be restructured?
17     A.   The only assets I understand
18 are -- I think the lawyers call them
19 litigation assets in the like.
20     Q.   So how would they be
21 restructured or part of a restructuring?
22         MR. AULET:  Objection to form.
23     A.   You're probably asking the
24 wrong guy but if there's ongoing
25 litigation, I suspect there's going to be

Page 170

C. JALBERT

1
2  counsel wants us to play and the debtor
3  wants us to play.  If they want us to play
4  part of the role of looking at the
5  pre-petition payments, which we ordinarily
6  do in most of the cases we do, we come up
7  with the list, here it already exists.  We
8  might ask for support to confirm but it's
9  entirely up to the team that's running the
10 case.  We're not running the case.  We're
11 -- we're -- I think we're an important
12 member of the team but we're not -- the
13 accounting firm is not driving the case.
14 The debtor and his counsel is driving the
15 case as is true of every case.
16     Q.   Do you know where the debtor's
17 books and records reside?
18     A.   I do not.
19     Q.   Do you know if the debtor had a
20 pre-petition account?
21     A.   Only from knowledge from
22 lawyers.
23     Q.   Who was the accountant?
24     A.   Accountant?
25     Q.   Yeah, I asked you --

Page 172

C. JALBERT

1
2  -- you would hope there would be settlement
3  negotiations, there might be mediation,
4  there might be arbitration.  Someone's
5  going to try and liquidate those assets
6  into cash with which to pay the creditors.
7  I don't know whether we'll play a part in
8  that or not.
9      Q.   As part of your -- the scope of
10 your engagement, there is a bullet point
11 that states that you're going to provide
12 assistance --
13         THE COURT REPORTER:  I'm sorry,
14     Counsel.  I need to hear you better.
15     Q.   Provide assistance with
16 reviewing debtor books and records for
17 possibly avoidable transactions such as
18 preference and fraudulent transfer claims.
19 You stated that you did not review any of
20 the debtor's books and records, correct?
21     A.   Currently, so far, yes.
22     Q.   Did you ask for any?
23     A.   No.
24     Q.   Do you intend to?
25     A.   Depends on what role the

Page 171

C. JALBERT

1
2      A.   Oh actually, I take that back.
3  I saw actual tax returns.  There was --
4  every preparer has to list their name on a
5  tax return they prepare.  So there was --
6  someone paid tax returns at least.  What
7  else they did, I don't know.
8      Q.   Okay, what was the name of the
9  accountant?
10     A.   I don't remember.
11     Q.   Have the tax returns been
12 produced to any party in the case thus far?
13     A.   I imagine we produced them
14 because we had them.  They would have come
15 in an e-mail.  So they would have been
16 produced as it relates to this I think.  I
17 think they were but they were very small
18 tax returns prepared by -- I assume a New
19 York or a Connecticut accountant.  I don't
20 know who.
21     Q.   You just don't -- you obviously
22 looked at it, you just don't recall the
23 name of that accountant right now?
24     A.   I don't -- well, yes.  I'm not
25 even sure if I looked at it.  I don't know

Page 173

44 (Pages 170 - 173)

C. JALBERT

1     C. JALBERT
2 if, at the time when we were trying to do
3 everything, we were using those because we
4 needed some of the information on there.
5 We were referred to them by Melissa for
6 certain issues that the lawyers thought
7 were important and we went and took a look
8 at them but I would have looked at
9 something besides the name of the preparer.
10 At the time, it didn't matter.
11     Q.   Have you ever spoken to the
12 debtor?
13     A.   Yes.
14     Q.   When?
15     A.   Wednesday at the 341 hearing to
16 introduce myself.
17     Q.   Is that the only occasion, to
18 your knowledge, that you've spoken to the
19 debtor?
20     A.   I don't speak Mandarin and he
21 apparently doesn't speak English. So I
22 have not spoken to him. Or Chinese. I'm
23 not sure which it is. Excuse me.
24     Q.   You did not receive a
25 post-petition retainer, correct?

Page 174

1     C. JALBERT
2     A.   Correct.
3     Q.   Are you confident that your
4 fees will be paid?
5     A.   I don't know if I'm confident.
6 I'm hoping.
7     Q.   What source do you believe your
8 fees will be paid, from what source?
9     A.   It will come from the Estate.
10 If we're going to be paid, as I understand
11 it, it will come from the Estate. I don't
12 -- I have not thought of or have any
13 agreement on any other source of payment.
14     Q.   Do you mean the litigation
15 claims or recoveries?
16     A.   I would expect the only people
17 that have a retainer in this case are Brown
18 Rudnick. Everybody else will be looking to
19 be paid -- that is a debtor's professional
20 or a committee professional, professionals
21 that file an application with the Court and
22 the Court allows their retention will be
23 looking to get funds. We're all going to
24 be looking from the same place. What that
25 source is going to be, if it will ever be,

Page 175

1     C. JALBERT
2 I don't know.
3     Q.   What information, if any, did
4 you rely on in getting comfortable taking
5 this case without a post-petition retainer?
6     A.   I've been doing this for 35
7 years. I'm not sure. I don't remember
8 ever getting a post-petition retainer but
9 my firm works with --
10     (Whereupon, a cellphone rang.)
11     THE WITNESS: Shit, I'm sorry.
12 Now it's off. We -- we're a
13 practitioner in Massachusetts and we
14 do cases in Delaware, New York,
15 Connecticut, Rhode Island,
16 Massachusetts, New Hampshire,
17 Vermont, Maine. We represent Chapter
18 7 trustees in virtually all of those
19 states. We probably represent and do
20 work for virtually ever Chapter 7
21 trustee in Rhode Island, every
22 Chapter 7 trustee in Massachusetts, a
23 couple in Maine, a couple in New
24 Hampshire and it's not unheard of for
25 us to go and do 50, 60, 70, 80

Page 176

1     C. JALBERT
2 thousand dollars of work before we
3 even know the case will ever have any
4 money. It's an investment that we
5 make. Now I didn't make an
6 investment in this case. Whatever we
7 incurred -- and I don't know what
8 that is, I'm hoping I'm going to
9 collect it but if I don't, then I'll
10 have a write-off like I've had many,
11 many, many, many times in the past.
12     Q.   Again, I don't think you
13 answered my question.
14     A.   Oh all right --
15     Q.   If you -- if you relied just on
16 your experience in engagements in
17 bankruptcy cases and that's it for taking
18 this case without a pre or post-petition
19 retainer, is that what you mean --
20     A.   I don't understand your
21 question.
22     Q.   What information, if any, did
23 you rely on in taking this case without a
24 pre or post-petition retainer?
25     MR. AULET: Objection to form.

Page 177

45 (Pages 174 - 177)

C. JALBERT

1    A.   I do work with lots and lots of
2 attorneys and when attorneys call up and
3 they ask if we're interested on working on
4 the case, I work on the case.
5    Q.   So you relied on being asked to
6 get involved by Brown Rudnick?
7    A.   Yep.
8    Q.   That's it?
9    A.   Yep, and then after that, it's
10 bankruptcy process.  Whatever happens,
11 happens.
12    Q.   You didn't look at the
13 financial profile of this debtor at all in
14 determining --
15    A.   I think -- I think I knew he
16 had limited assets or no assets and I think
17 I knew he had a lot of litigation ongoing
18 but -- maybe I'm a fool but I only have one
19 other person that I have to answer to and
20 he lets me run my business just like he
21 runs his business and my feeling is when a
22 lawyer calls up and they have a case, then
23 we respond because if I don't respond,
24 maybe the next time he calls another

Page 178

C. JALBERT

1 accountant.  So I didn't do all the things
2 that you think a normal person should have
3 done to protect themselves on payment.
4    Q.   Did you rely on any degree on
5 the financial profile of Golden Spring?
6    A.   No.
7    Q.   You didn't do any due diligence
8 on Golden Spring before agreeing to get
9 engaged in this case?
10    A.   I'm pretty sure I didn't know
11 Golden Spring existed by the time I agreed
12 to be in this case.
13    Q.   How about Lamp Capital, did you
14 do any investigation of Lamp Capital?
15    A.   No.
16    Q.   Did you ask any questions about
17 what the financial profile of those two
18 entities was --
19    A.   No.
20    Q.   -- before getting involved?
21    A.   No.
22    Q.   Were you promised that you
23 would be paid from Golden Hill or Lamp
24 Capital before agreeing to take on the

Page 179

C. JALBERT

1 engagement?
2    A.   Absolutely not.
3    Q.   Have you had any communications
4 with any representative from Golden Hill?
5        MR. HARBACH:  Golden Spring.
6    Q.   Golden Spring.
7    A.   I was on e-mails with someone
8 from -- well, first of all, Melissa Francis
9 has a Golden Spring e-mail address.  She's
10 counsel to the debtor.  I've been informed
11 of that from the beginning.  The only other
12 contact --
13    Q.   She's counsel for the debtor or
14 Golden Spring?
15    A.   Debtor.
16    Q.   Melissa --
17    A.   Francis.
18    Q.   But she has an e-mail address
19 from Golden Spring?
20    A.   Correct.  They were in all of
21 these e-mails that they were putting in
22 front of me.
23    Q.   She's counsel for the debtor is
24 your understanding --

Page 180

C. JALBERT

1    A.   I've been told emphatically by
2 her and by Brown Rudnick that she is
3 counsel to the debtor, as is Aaron
4 Mitchell.  As is Brown Rudnick.
5    Q.   Okay.  Are they part of the
6 application to retain ordinary course
7 professionals, if you know?
8    A.   I don't know that they're going
9 to be paid by the Estate or not.  I don't
10 know what they're -- what they're -- what
11 motions they filed to be paid.  I'm not --
12 I'm not representing them and I'm not
13 asking them.
14    Q.   So back to the question whether
15 you had any communications with Golden
16 Spring --
17    A.   So my colleague, Matt Flynn,
18 had I think one or two phone calls with
19 someone at Golden Spring.  There was a
20 number of e-mails which we looked at in
21 here and you know, 6, 7, 8, 9, whatever,
22 that person is not identified but I did not
23 speak to that person.  I had -- I was on
24 the e-mail exchanges and I wrote exactly

Page 181

46 (Pages 178 - 181)

C. JALBERT

1  one e-mail to that person and actually
2  directed it to Melissa and Aaron when I
3  wrote my e-mail.
4      Q.  Do you know why that person's
5  name is redacted on the exhibit?
6      A.  Yes.
7      Q.  Why?
8      A.  Because you heard Golden
9  Spring's attorney.  They're worried about
10  the safety of their employees given the
11  issues surrounding this case.  I don't know
12  anything about that.  I'm just doing what I
13  told.  I am not disclosing the name.
14      Q.  It was at Golden Spring's
15  counsel's behest that that was redacted is
16  your understanding?
17      A.  Well, I don't know whether it
18  was Golden Spring's counsel or Golden
19  Spring itself.  I don't know -- I don't
20  know who started it.  I just -- in fact, I
21  don't think I knew it until the day before
22  -- the day before, maybe Wednesday is when
23  I found out that -- that -- that the
24  documents were redacted.
25

Page 182

C. JALBERT

1      Q.  Is it your understanding that,
2  according to the debtor, all of his living
3  expenses, pre-petition, were paid by Golden
4  Spring?
5      A.  Well, they were paid by
6  somebody else.  I can't say emphatically
7  they were paid by Golden Spring.
8      Q.  So whatever that person or
9  entity -- whoever that person or entity
10  was, are the living expenses, post-petition
11  living expenses that were prepared in the
12  various schedules, consistent with what was
13  paid pre-petition?
14      A.  We didn't do an investigation
15  as to what the pre-petition nature of
16  payments or amount of the payments or
17  anything.  So I don't have any -- any
18  comparative information.  That information
19  will be developed as we see the months go
20  by but I think the final -- the final
21  number for 15 days of the expenses for the
22  individual ended up being something like 28
23  or 29 thousand dollars for 15 days.  So
24  multiply that by two 60 thousand dollars
25

Page 183

C. JALBERT

1  for the month of which two-thirds of that
2  is security.
3      Q.  Is the person or entity that is
4  funding the post-petition living expenses
5  Golden Spring?
6      A.  I don't know.  That's not one
7  of the questions and no one has volunteered
8  that information.  It just says -- the
9  question says is there a third-party making
10  payments on behalf of the debtor
11  post-petition.  We answered that question
12  as best we could.  We'll fix the one error
13  that remains but it did not ask and they
14  did not tell us, to my knowledge, who is
15  making the disbursements.
16      Q.  And you didn't ask?
17      A.  No.  I don't know how it would
18  affect -- it's not in the monthly operating
19  report so it's none of my business I think
20  is what I would have been told.
21          MR. GOLDMAN:  I don't have any
22      further questions.
23          MR. AULET:  I have nothing.
24          THE VIDEOGRAPHER:  Can you take

Page 184

C. JALBERT

1  us off the record for the day?
2          MR. GOLDMAN:  Yes.
3          THE VIDEOGRAPHER:  We're off
4  the record at 2:18 p.m. and this
5  concludes today's testimony given by
6  Craig Jalbert.
7          (Wherefore, at 2:18 P.M., the
8  Examination of this witness was
9  concluded.)
10
11
12          o          o          o          o
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 185

47 (Pages 182 - 185)

```
1
2          D E C L A R A T I O N
3
4      I hereby certify that having been
5  first duly sworn to testify to the truth, I
6  gave the above testimony.
7
8      I FURTHER CERTIFY that the foregoing
9  transcript is a true and correct transcript
10 of the testimony given by me at the time
11 and place specified hereinbefore.
12
13
14
       _____
15          CRAIG JALBERT
16
17
18 Subscribed and sworn to before me
19 this _____ day of _____ 20____.
20
21
   _____
22     NOTARY PUBLIC
23
24
25
                                    Page 186
```

```
1
2          C E R T I F I C A T E
3
   STATE OF NEW YORK      )
4                  : SS.:
   COUNTY OF KINGS        )
5
6      I, LENAYA LYNCH, a Notary Public for
7  and within the State of New York, do hereby
8  certify:
9      That the witness whose examination is
10 hereinbefore set forth was duly sworn and
11 that such examination is a true record of
12 the testimony given by that witness.
13     I further certify that I am not
14 related to any of the parties to this
15 action by blood or by marriage and that I
16 am in no way interested in the outcome of
17 this matter.
18     IN WITNESS WHEREOF, I have hereunto
19 set my l_____ 2022.
20
21
                LENAYA LYNCH
22
23
24
25
                                    Page 188
```

```
1
2          E X H I B I T S
3  JALBERT EXHIBITS
     EXHIBIT   EXHIBIT              PAGE
4  NUMBER    DESCRIPTION
5  Exhibit 1  Notice of Deposition      10
6  Exhibit 2  E-mail Chain        32
7  Exhibit 3  E-mail Chain        35
8  Exhibit 4  Debtor's Application     47
9  Exhibit 5  Official Form 106Sum    93
10 Exhibit 6  Global Notes        111
11 Exhibit 7  E-mail Chain        129
12 Exhibit 8  E-mail Chain        131
13 Exhibit 9  E-mail Chain        139
14 Exhibit 10 E-mail Chain        147
15
    (Exhibits retained by Court Reporter.)
16
17         I N D E X
18 EXAMINATION BY           PAGE
19 MS. ARONSSON          5
     MR. HARBACH          100
20 MS. ARONSSON          103
     MR. HARBACH          153
21 MS. ARONSSON          154
     MR. GOLDMAN          165
22
23
24
25
                                    Page 187
```

Veritext Legal Solutions
866 299-5127

**[& - 373]**

| & | |
|---|---|
| **&** | 1:15,18 2:3,12 |

**0**

**00001646** 32:16
**00001649** 35:10
**00001684** 140:8
**00001691** 147:17
**00001752** 129:3
**02035** 6:9
**06103** 2:18
**06601** 2:14

**1**

**1** 3:16 10:14,17
17:10 23:22 72:10
97:9 113:14,18
114:14 118:3
132:21 151:14
155:17 157:6
187:5
**10** 133:25 147:10
147:15 159:19,23
187:5,14
**100** 2:18 142:15,18
143:8 187:19
**10036** 1:19 2:5,10
**100th** 44:7
**101** 6:9
**103** 187:20
**106a** 94:21
**106sum** 93:14
94:2 187:9
**109** 132:22 135:18
140:17
**109,827** 133:7
**109,827.12** 132:13
**10:17** 1:11 3:4
**10:24** 11:15,19
**11** 1:5 21:2,4
32:11 55:3 70:3
74:19 81:6,11

**86:10,22,24**
103:13 115:4,4,8
119:21 124:25
164:4 166:7,18
167:5,18 169:24
**111** 187:10
**11:53** 90:21
**12** 2:18 34:22
85:15 159:18
**120** 75:21 131:25
**120-1** 131:25
132:6
**122b** 125:3,14,19
**124** 6:8
**129** 187:11
**12:22** 90:25
**13** 19:8 42:12
55:14 103:14
126:5 146:19
152:7 153:14
154:11
**13,611** 152:8
153:15,20
**131** 187:12
**139** 187:13
**14** 19:8 98:7 146:7
159:18
**147** 187:14
**15** 77:6 89:10
97:25 145:4
183:22,24
**153** 187:20
**154** 187:21
**15th** 63:14 72:9
125:4 129:23
133:11 134:3
140:14 152:23
154:21 155:11
159:9
**16** 96:18 105:18
126:5

**161** 132:20 134:13
135:13,17 140:18
162:21
**161,323** 132:23
133:5
**165** 187:21
**16th** 132:17
**17** 119:19,21
**18** 48:22 127:22
**19** 131:3
**19,488** 125:6,15
**1979** 17:5
**1983** 17:8
**1987** 17:10
**1999** 165:24,24
**1:22** 139:21
**1:28** 140:4
**1:56** 165:8
**1:58** 165:12
**1a** 94:19,22 95:8
**1b** 95:11

**2**

**2** 23:22 32:14,18
33:2,4 41:6 97:13
105:21 142:14
148:3 152:8 187:6
**2.5** 154:13
**20** 45:8 186:19
**2019** 79:18
**2020** 79:19
**2021** 127:24
**2022** 1:10 3:5
125:4 159:9,10
188:19
**21** 45:8 49:9 84:9
92:21 107:14
**22** 45:9
**22-50073** 1:6 3:22
**22nd** 3:4
**23** 97:8

**24350** 188:21
**26** 120:3,12
**28** 183:23
**28th** 72:9 129:23
133:12 134:3
140:14 152:23
154:21 155:11
159:10
**29** 183:24
**2:00** 167:11
**2:18** 185:5,8

**3**

**3** 23:23 35:8,12
96:25 97:4,8,13,24
115:13 116:21
144:12 187:7
**3,850** 96:5
**30** 7:5,19 11:2,22
107:6 144:4,6,14
145:11 146:4,11
166:4
**30th** 2:4
**31** 17:10 72:10
74:24 77:7 121:16
155:17,18 161:18
161:18
**32** 187:6
**341** 16:17,22 45:13
45:14,17 46:14,15
46:19,24 47:8,12
47:13,18 51:15
69:5 116:2 123:15
123:18 126:13
127:10,18 174:15
**342** 16:16
**35** 17:13 176:6
187:7
**36** 95:13 96:2,4,8
96:16
**373** 113:19 164:12

[4 - advisor]

| 4 | 61 95:17,19,24 | 93 187:9 | 172:24 173:9,19 |
|---|---|---|---|

**4**  47:24 48:3 91:4
  96:9,12,17 97:13
  107:14 108:8
  113:13 117:4
  119:4 130:23
  144:20 187:8
**40**  7:18 138:18
  142:16
**43**  159:15,16
**43,655.44.**  138:16
**45**  72:11
**47**  187:8

**5**

**5**  93:12,15 108:8
  117:4 130:23
  187:9,19
**50**  6:19 7:14,18
  118:13 141:9,10
  141:14 142:7,8,9
  142:12 144:13
  145:11 176:25
**500**  21:3 126:6
**505**  75:13,17 76:2
**505b**  75:5
**50th**  44:6
**51,495.67**  140:17
**53**  122:11
**55**  94:22 95:23
**56**  95:17,19
**58**  95:24 96:2

**6**

**6**  7:5 11:2,8,21,22
  97:24 98:7 111:4
  111:8 117:5
  119:16,18,21
  181:22 187:10
**60**  6:19 7:14 75:11
  75:19 176:25
  183:25

**61**  95:17,19,24
**62**  95:15,16,17
**6:49**  39:10
**6e**  108:8 130:23

**7**

**7**  1:18 2:4,9 81:6
  86:25 95:18
  103:12 119:16,21
  128:24 129:11
  133:16 135:14
  136:18 141:17
  142:16 144:14
  176:18,20,22
  181:22 187:11
**70**  6:19 7:16 169:2
  176:25
**7006**  2:14
**77**  100:20 111:6
**78**  93:19

**8**

**8**  1:10 119:21
  120:3 131:16,21
  134:7 135:11,18
  149:25 150:9
  159:7 161:19,20
  181:22 187:12
**80**  7:16 176:25
**83**  17:9
**850**  2:13
**87**  17:10
**8th**  3:5 127:24
  159:5 188:19

**9**

**9**  119:21 139:24
  140:7 146:20
  150:10 159:15
  161:20 181:22
  187:13
**90**  48:10 82:17
  83:22 92:23

**93**  187:9

**a**

**a.m.**  1:11 3:4
  11:15,19 90:21
**aaron**  25:17,19,25
  26:10 31:4,7 32:9
  56:18 57:3 59:3,4
  59:10,18 99:2,7
  102:11 103:17
  104:12,16 105:3
  105:13 106:7
  109:24 110:18
  112:15 124:2
  129:18 135:23
  139:8 143:14
  156:3 157:15
  160:16 181:4
  182:3
**ability**  9:25 10:5
**able**  53:7 78:6
  79:11 136:13
  138:3 144:25
  163:11
**absolutely**  82:6
  167:3 180:3
**abundance**  132:20
  142:21
**accepted**  102:23
**access**  115:23
  119:6 124:16
**accidently**  125:13
**account**  37:25
  38:24 52:15 63:19
  64:17 65:3 66:19
  72:6 91:6,8 92:11
  92:16 147:2
  172:20
**accountancy**  17:8
**accountant**  18:16
  70:22 80:6 168:4
  169:9,10 172:23

172:24 173:9,19
  173:23 179:2
**accountants**  21:5
  21:6,7,8
**accounting**  22:21
  63:21 168:17
  170:2 172:13
**accounts**  69:21,22
**accrual**  70:20
  156:4,9,17,19
  163:2
**accruals**  156:25
**accrue**  69:2
**accrued**  78:23,25
  79:6
**accurate**  10:6
  136:11,12
**accurately**  10:2,9
  136:24
**accustomed**  53:9
**act**  19:15
**action**  4:8 188:15
**activity**  63:22
  80:12
**actual**  109:17
  137:7 165:23
  173:3
**add**  85:21 140:16
**addition**  155:25
**additional**  163:18
**address**  6:6,7,8
  169:4 180:10,19
**addresses**  162:20
**administer**  4:6
**administrative**
  77:17 78:7,10
  81:8
**advising**  22:20
  53:2 61:11
**advisor**  17:24 18:7
  21:5,6 34:7 36:23

[advisor - aronsson]

37:7 39:8 40:20
41:20 43:2 48:9
48:21 49:5 70:22
165:21,22 168:4
**advisors** 62:4,5
**affairs** 14:6 55:20
111:18 112:5
**affect** 184:19
**affidavit** 48:25
49:7
**affiliated** 42:3
**affiliations** 4:13
**afternoon** 165:16
**agent** 90:2 91:7,20
91:21,24
**ago** 153:12 166:4
**agree** 3:14 59:12
91:6 96:16 100:22
107:13,17
**agreed** 143:8
179:12
**agreeing** 179:9,25
**agreement** 55:13
61:8 67:25 78:6
91:22 127:23,25
175:13
**agreements** 128:8
128:16,18
**ahead** 40:8 122:20
**aircraft** 97:15
119:5
**alive** 114:5
**allegations** 40:24
**alleged** 81:5 156:7
**alleging** 83:18
**alliance** 2:3 4:20
6:13 10:23
**allocated** 141:16
**allocating** 117:25
**allocation** 145:11
152:3

**allocations** 145:25
**allow** 12:20 38:23
65:2 87:11
**allowed** 80:12
81:20
**allows** 82:15,17
162:4 175:22
**amend** 89:7 125:3
**amended** 125:19
**amendment** 60:7
**amendments**
55:21 112:6
**amount** 13:9
81:22 96:5 118:12
133:8,9 134:17
137:25 138:12
159:11,15 183:17
**amounts** 51:22
132:19 134:23
138:4,9 156:14
**analysis** 68:6 83:4
84:3 87:19 89:18
92:25 95:2 96:19
105:9 107:20
115:18 168:10
**analyzed** 168:14
**analyzing** 80:18
82:4
**andersen** 17:9
**annoys** 167:15
**answer** 8:20 9:11
9:19,21 24:21
26:22,24 27:12
28:12 29:11,11,13
29:17 36:11 38:17
53:16,21 54:12
83:20 88:16
101:20 104:18
105:16 113:17
116:8,21 118:2
119:6 120:5

121:17 122:12
130:2 148:21,23
151:18 163:11
178:20
**answered** 34:20
148:25 149:4
177:13 184:12
**answers** 8:5,23
130:20
**anticipate** 47:16
50:19 52:9 54:16
55:6 59:25 61:19
61:21 63:25 67:16
76:4,24 79:21
106:15 157:13,17
**anticipated** 60:5
60:11 62:9 68:15
**anticipates** 78:16
**anybody** 83:24
145:16
**anymore** 116:9
142:11 164:15
**anyone's** 161:15
**anytime** 41:14
**anyway** 69:16
**anyway's** 70:8
87:6 163:23 164:2
**apartment** 101:6,9
102:6 114:17
115:2,7 146:21
150:4
**apologize** 35:2
56:22 167:9
**apparently** 28:19
174:21
**appear** 100:20
**appearance** 4:16
**appearances** 4:12
**applicability**
148:6,15

**applicable** 107:11
**application** 48:2,7
48:18 49:2 175:21
181:7 187:8
**applies** 53:17,22
103:22
**apply** 118:2
**appointed** 22:13
**appreciate** 35:4
**approach** 22:20
**appropriate** 73:14
113:8 114:7 153:9
**approval** 70:16
**approved** 62:10
64:22
**april** 1:10 3:4,5
137:22 159:5
188:19
**arbitration** 171:4
**areas** 12:11 22:12
22:21
**arena** 19:4
**argue** 170:8
**argument** 117:21
144:6
**aronsson** 2:5 4:18
4:18 6:2,12 7:4,13
10:12 11:12 12:9
26:20,25 27:13
29:18 32:11 34:21
35:6 47:22 48:5
83:11 88:13 90:18
93:10,17 97:6
99:22 103:5,6
111:2 128:22
129:7 130:5 131:2
131:5,9,23 139:18
146:6 147:13
154:17 164:14
187:19,20,21

**arrange**  163:15
**arrangement**
  54:20
**arrive**  136:8
**arthur**  17:9
**articulated**  143:22
**ascribe**  144:2,15
**ascribed**  118:17
  141:25 149:24
**ascribes**  120:22
  121:7
**ascribing**  142:22
**asia**  2:3 4:20 6:14
  10:23
**aside**  15:22 47:5
  67:7 83:17 161:9
**asked**  36:8 47:19
  53:23 56:15,21,22
  64:20 110:7
  151:21 152:19
  172:25 178:6
**asking**  13:17,19,20
  34:14 67:18 98:22
  101:2,18,21 102:2
  105:15 148:12,17
  149:12 151:4,5
  153:5 156:11,12
  156:13 162:22
  170:23 181:14
**asks**  108:11,17,18
  113:14 115:13
  120:4 121:16
  122:11 151:14
**aspects**  166:9
**assenting**  37:9
**assessment**  101:14
**assessments**  153:7
**asset**  78:3
**assets**  88:2 94:2
  104:7 111:16
  120:23 128:12

164:9 170:15,17
  170:19 171:5
  178:17,17
**assigned**  74:24
**assist**  52:18 86:17
**assistance**  45:11
  55:18 61:9 73:16
  80:17 82:8 84:23
  85:18 86:6 88:21
  112:3 171:12,15
**assisted**  15:19
  51:9,12 109:14
  112:10,11 113:3
  141:4
**associated**  66:20
  117:2
**association**  107:9
**assume**  9:6 92:20
  92:24 173:18
**assumed**  150:13
  153:15 154:3
**assuming**  28:15
  50:23 72:13
  118:21
**assumption**
  143:10
**attach**  69:14
**attached**  79:16
  168:18
**attachment**  129:9
  129:21 130:8
  140:11
**attempts**  120:24
**attend**  45:13
**attended**  45:14,16
  47:11
**attending**  4:11
  46:14
**attention**  105:20
**attorney**  2:17 4:17
  6:12 9:18 13:5

23:9 28:8 182:10
**attorneys**  2:3,9,13
  14:16 15:6,16
  25:8 32:3 40:21
  46:23 47:6 98:9
  98:21,24 99:6,14
  104:24 106:20
  109:23 142:3
  147:3 178:3,3
**attributed**  138:4
**audible**  8:24
**audio**  3:12,12
**audit**  75:13,18,20
**auditing**  22:21
**aught**  149:22
**august**  17:10
**aulet**  2:10 5:3,3,12
  9:17 12:4,6,24
  13:6 24:20 26:16
  26:23 27:11,13,16
  28:7 29:19 34:10
  37:16 39:5 46:20
  57:22 58:18 61:4
  64:14 66:13 77:4
  78:21 79:22 83:7
  83:13 84:25 85:8
  88:3,8,16 91:9
  92:2 93:5 95:9
  96:10 97:2 98:15
  99:23 101:17
  102:8 103:24
  104:13 106:18
  108:21 111:22
  112:22 113:24
  118:4 122:18
  126:3 127:7 129:4
  129:25 130:16
  131:6,11 132:11
  133:18 141:18
  148:20 149:7
  152:11 157:20

164:16 165:3
  166:12,22 170:12
  170:22 177:25
  184:24
**authored**  26:13
  27:9
**authorities**  75:11
**authorization**  48:7
  48:19 49:3
**authorized**  4:6
**automobiles**
  115:16,16
**available**  135:2
  137:16 160:22
**avoid**  69:16
**avoidable**  82:9
  83:2 84:13 171:17
**aware**  25:17 30:19
  88:6 90:8,10
  114:24
**awful**  47:11
  168:23,24
**awfully**  88:4
**awhile**  85:9

**b**

**b**  2:6 5:21 6:5 7:5
  11:2,22 75:13,17
  76:2 94:17,20,21
  94:23 95:12 96:13
  187:2
**baby**  19:25
**babysitting**  19:10
**bachelor**  17:7
**back**  7:18 11:19
  13:20 27:6 29:24
  34:3 41:5 49:13
  55:12 69:25 71:16
  82:16 90:25 91:4
  95:17 103:7
  111:23 112:13
  114:4 127:11

131:7 140:4 159:7
159:21 162:10
165:12 167:14
173:2 181:15
**background** 17:2
153:6 159:21,22
**balance** 69:20
**bank** 37:25 52:15
64:21,24 65:6
69:18 91:6,16
158:7
**bank's** 91:18
**bankruptcies**
164:5
**bankruptcy** 1:2
3:20 20:11,22
21:13,24 22:6,11
32:25 38:15 39:19
39:22 44:6,7,7
51:2 64:25 74:13
75:4 77:15,24
80:4,13 81:2,23
82:15 83:23 90:3
115:2 168:7,22
177:17 178:11
**base** 59:9
**based** 27:16,21
28:23 63:5 72:25
87:14 158:5 159:2
**basic** 129:16
**basically** 37:9
39:11 155:13
**basis** 37:14,21
66:25 69:7,8
73:10 80:11 81:7
81:8,8 90:7
123:12 143:9,23
145:9
**bates** 32:15 35:9
129:2 140:8
147:17

**beach** 122:14
**bearing** 76:9,9
**bears** 32:15 140:8
**beast** 42:18
**beautiful** 164:20
**beginning** 4:16
180:12
**behalf** 12:23 21:7
21:8 38:21 108:11
108:15 117:6
118:14,23 130:24
132:17 133:12
144:10 145:15
152:23 155:17
184:11
**behest** 182:16
**believe** 24:4 45:2,5
50:18 72:14 99:19
100:7 144:21
160:12 162:21
167:4 175:7
**believes** 27:19
**belong** 102:23
119:23 160:7
**belonged** 101:15
102:6 103:14
**belonging** 104:8
**ben** 13:5 14:16,21
24:5
**beneficiary**
121:25
**benefit** 124:3
**benefitting** 149:18
**best** 13:2 28:9 52:4
56:10 60:9,14
137:2 145:20
184:13
**better** 86:23
103:25 171:14
**beyond** 14:13
38:18 53:13 116:7

119:8 121:2
**big** 34:4,15,16
35:20 52:23
**biggest** 19:4
**bill** 45:19 72:12,23
73:6
**billed** 67:13,14,16
**bills** 19:14 55:3
72:3 122:4 146:24
**binders** 69:14
**birnbaum** 2:17
**bit** 14:20 17:2
21:25 24:3 46:17
139:16
**biweekly** 66:25
**blood** 188:15
**blue** 131:13
**bookkeepers**
52:16 53:14,18,19
53:20,25 66:19
**books** 82:8 84:12
84:14,18 92:18
171:16,20 172:17
**boston** 17:6,6
18:16
**bottle** 34:25 42:8
164:21
**bottom** 49:11
105:19 132:9
145:19 162:3
**bought** 101:23
117:18
**box** 2:14
**brain** 93:8
**break** 9:9,12 85:9
85:15 139:19
**breakdown**
160:10
**breakdowns**
163:19

**bridgeport** 1:3
2:14 3:21
**brief** 90:22
**briefly** 14:21
65:24 128:5
**bring** 163:24
**broad** 7:21 22:9
**broadly** 109:5
115:13 132:8
**brought** 40:3,20
167:17 168:3,19
**brown** 2:8 5:4
15:21 23:10,16
24:6,8,18 25:8
26:5,6,10 30:9
31:20 32:3 38:10
38:12 39:2,16
43:23 49:24 56:13
57:4 58:25 59:6
59:10,17 64:20
83:18 98:25 99:6
102:11,17 103:18
103:18 104:10,16
104:17 105:7,12
106:6 109:24
112:14 123:25
126:7,14 139:7
156:2 157:15
175:17 178:7
181:3,5
**buckets** 19:3
21:19 155:14
**budget** 61:10,23
61:24 62:2
**budgeting** 42:10
63:16 86:15
**budgets** 42:13,13
**build** 78:2
**building** 113:16
**bullet** 55:17 61:7
92:19 112:3

[bullet - certain]

114:16 171:10
**business** 6:7 22:10
41:21,24,25 42:8
42:11,22 43:3
167:19 178:21,22
184:20
**businesses** 19:5
**button** 162:7
**buying** 117:23

### c

**c** 2:2 3:1 4:1 5:1,21
6:1 7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1,9,10
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1,17 95:1

96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1,7
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:2 188:2
188:2
**calculates** 69:10
**calculation** 151:3
**calender** 72:7
**call** 19:10 31:18
45:18 79:11 102:4
104:25 163:4,7,9
166:5,16 170:18
178:3

**callable** 144:5
**called** 5:21 20:18
41:8 89:22
**calling** 145:7
**calls** 25:11,15
58:24 93:6 143:15
178:23,25 181:19
**camera** 8:11
**cancelled** 158:7
**capabilities** 18:2
**capital** 126:8,20
179:14,15,25
**car** 116:3,17 117:9
**care** 67:6 79:4
**career** 47:12
**cars** 97:14 117:19
**case** 1:6 3:22 6:17
15:24 33:21 41:19
41:22,23,24 42:19
43:3,4 44:3,13,14
48:10 49:15 50:22
50:23 51:2,5,20
52:10 54:17 55:8
55:11,16 56:10
59:7 60:9,14
61:22 62:9,19
64:2 66:5 67:4,17
68:12,21 69:2
70:4,7,9,11 71:5,6
71:19 73:11,25
74:2,7,11,19 75:9
75:14,22 76:22
77:21 78:5,25
79:5 81:6 82:24
84:7 86:4,25 90:6
93:20 107:24
111:5 131:24
164:7 167:18,25
169:8,24 170:9
172:10,10,13,15
172:15 173:12

175:17 176:5
177:3,6,18,23
178:5,5,23 179:10
179:13 182:12
**cases** 21:2,4 40:16
41:25 64:10 90:5
92:8 161:24
163:10 164:11
166:7,18 169:14
172:6 176:14
177:17
**cash** 36:14 37:10
37:19 42:12,13
61:10 62:12,13,23
63:15,15,22 69:9,9
69:21 78:18 79:2
79:3 86:18 87:13
121:19,22,24
152:21 157:5,10
171:6
**catch** 88:25 89:2
89:14,15 156:16
**categories** 7:21
118:24 136:2,23
137:25
**categorization**
137:9
**categorized**
155:24
**category** 138:4
**cats** 89:12
**caution** 46:21 83:7
132:20 142:21
**caveat** 89:3
**cc'd** 26:12 27:10
**cell** 3:10 167:8
**cellphone** 176:10
**cellular** 3:8
**cents** 87:18
**certain** 40:17 94:3
113:22 174:6

Veritext Legal Solutions
866 299-5127

[certainly - concurring]

certainly 22:3
62:20 72:20 84:3
91:11 102:14
106:19 109:8
112:10 124:7
140:25 166:8
certification 17:20
17:23 18:9
certifications
18:12
certified 17:23
18:4,6 165:19
166:15
certify 186:4,8
188:8,13
chain 32:17 35:11
38:6 103:21 104:9
129:10 131:15
139:23 147:9
151:14 187:6,7,11
187:12,13,14
change 146:11
changed 139:4
146:4
changes 43:24
44:10
changing 139:3
144:22 153:8
chapter 1:5 21:2,3
55:3 70:3 74:19
81:6,6,11 86:10,22
86:24,25 115:3,4,8
164:4 166:7,18
167:5,18 169:23
176:17,20,22
charge 160:5
chart 136:18
137:14 153:3
check 73:3 110:18
134:23 138:8
152:21 158:7,10

158:10
checked 64:24
141:5
checks 66:20
chinese 174:22
chooses 76:6
cia 18:13
cira 18:7,14,15
circulate 32:4,8
circulated 88:7
circumstances
15:25 33:13 60:6
73:14 114:8
cite 164:7
citizens 65:6
city 58:8 146:22
civil 11:2
claim 52:20 80:19
80:24 81:3,5,16,21
168:13,16
claimed 125:5
claims 52:24 54:8
81:7,10,12,25 82:5
82:11,18 88:2
90:2 168:10,14
171:18 175:15
clarification 96:15
97:3
clarity 119:20
cleaning 145:5,15
clear 24:12 28:18
39:14 98:10
101:21
clearly 56:18 79:2
141:3
clerical 55:5,7
client 4:23 5:2
30:8 34:5,6 35:21
36:23 37:6 38:3
39:8

clients 18:25 19:13
close 70:5
closure 75:15
clothes 103:12
club 122:13
code 75:4 80:13,14
82:15
cohn 2:17
collateral 42:14
colleague 45:5,15
100:25 129:20
146:14 181:18
colleagues 13:7
30:18 31:24
collect 13:13 177:9
college 17:6,6
column 136:7
combine 72:7
come 50:23 53:14
54:21 71:16 74:18
74:20 169:14
172:6 173:14
175:9,11
comes 19:15
100:23 118:8
167:14
comfortable 176:4
coming 34:25
62:23 78:18 142:5
162:10
comley 2:12 5:7
165:17
comment 36:21,21
37:8,8,9
comments 112:25
commercial 70:7
commission 157:9
committee 2:13
5:8 20:19 21:4,5
62:3 66:23 70:21

70:23 156:6 157:3
165:18 175:20
common 158:25
communicate 26:9
30:11 57:11 99:4
99:5
communicated
58:16 98:24
communicates
30:13
communicating
104:19
communications
65:14,19 180:4
181:16
company 89:21
169:13
comparative
183:19
compare 110:6
compared 110:6
complete 69:18
completely 74:5
108:3 168:2
compliance 42:24
complicated 43:4
52:23
compound 139:2
comprehensive
89:6
computers 169:5
concerning 12:21
concerns 142:25
144:11
concluded 185:10
concludes 185:6
conclusion 28:20
concurred 39:11
concurring 37:12
38:4

[condition - covered]

condition 9:25
condo 107:10
confer 158:10,25
confident 175:3,5
confirm 65:2
86:10,21 114:4
136:11 158:24
172:8
confirmation
20:17
confirmed 70:12
115:5 143:14
154:4
conflicts 24:12
confusion 69:17
congress 19:18
conjecture 122:19
connecticut 1:2
2:14,18 3:21 17:5
76:13,14,19
113:20 148:5,14
149:17 173:19
176:15
connection 11:5
15:6 24:19 33:21
34:8 36:4,9,25
39:2,18 43:2,25
46:3,10,18 50:14
50:25 51:6,20
57:16 60:2 61:15
61:19 63:9 64:12
66:11 68:15 73:19
76:25 78:17 80:21
83:5,19 84:14,19
84:23 85:21 86:2
87:20 88:15 89:19
92:15 96:20 97:11
97:16 98:6,22
103:8 104:7 106:3
107:23 109:11
110:11 112:21

119:18 121:11
124:5 125:23
128:11 134:21
135:20 154:19
155:2 157:18
conservative
143:25 144:9
145:21
consider 157:22
167:20
consideration
141:22
consistent 183:13
constituency
21:11,13
consultation 98:17
126:2 142:3
consulted 64:21
138:18,18
consulting 88:21
contact 25:3 30:19
180:13
contacted 23:6,8
contacts 25:4
contained 59:22
71:14 107:21
136:24 163:19
contention 28:3
contents 101:8
contested 6:23
context 20:12 22:6
continue 3:13 74:8
74:16 130:6
continued 16:16
103:4 153:10
154:16
continues 68:21
150:2,24
continuing 17:17
137:20

controller 169:13
conversation 8:17
conversations 3:8
27:17 44:5 46:22
47:6 102:15,16
converted 70:12
copies 69:18
copy 8:14 94:22
100:21 158:7
copyrights 120:4,6
120:14,17
corp 74:10
corporate 74:7
corporation 74:7
74:9,10 75:23
correct 58:19
62:17 63:10 72:13
76:23 94:25 95:25
97:23 102:25
107:25 108:25
109:2 114:12
121:12 134:8,19
149:15 152:20
153:21 156:19
171:20 174:25
175:2 180:21
186:9
corrected 134:4
134:12
correctly 148:22
149:4
cost 117:2,25
118:10,13,18
141:25 142:6,22
142:23 144:3
145:3
costly 89:6
costs 144:4
counsel 4:10 5:4,7
9:12,21 13:6,15
25:21,24 30:3

43:14 62:3,4
70:21 97:12,18,20
98:12,14 99:19
100:17 124:8
135:22 136:5
141:3 158:11
169:19 171:14
172:2,14 180:11
180:14,24 181:4
182:19
counsel's 182:16
count 118:15
countries 42:6
country 42:22
county 188:4
couple 60:14 92:7
99:21 110:13
147:20 164:18
176:23,23
course 30:21
52:19 56:16 62:8
70:24 156:7,8
169:22 181:7
courses 17:15
court 1:2 3:20 4:4
5:10,19 6:15,25
8:11 10:13 13:10
32:12 35:6 40:12
45:3 47:22 55:2
62:10 78:9 87:12
93:10 101:10
111:2 128:22
131:19 147:13
171:13 175:21,22
187:15
cover 16:25 107:3
128:13
covered 13:11
76:20 83:14 85:19
89:8 103:9 119:17
154:18

[cpe - description]

cpe  17:15,16
craig  1:14 3:17 6:5
  48:25 151:4 185:7
  186:15
crazy  161:25
create  72:23 157:6
created  86:13
  133:22
creator  141:19,20
creditor  42:15
  47:14 81:5,13,16
creditor's  2:13 5:8
  165:17
creditors  20:19,19
  21:9 67:2 86:16
  86:23 171:6
crises  52:7
cross  138:8
crosschecked
  136:22
cumulative  69:7
  134:17,18
curious  88:14
current  88:17
  118:20
currently  18:21
  88:7 122:9 134:16
  171:21
cycle  155:6,10

d

d  81:14 109:22
  128:3 186:2
  187:17
data  162:5,7
date  1:10,16 10:18
  32:19 35:13 44:20
  48:4 67:19,20
  71:4 75:12 86:3
  87:20 93:15 111:9
  129:12 131:17
  137:15 139:25

147:11
dated  127:24
daughter  141:23
  143:2
david  2:6 4:21
  100:4 103:9
day  39:9 44:24
  45:14,16 46:24
  47:8 51:13,14,15
  52:4,4 63:16
  132:18 155:17
  169:21 182:22,23
  185:2 186:19
  188:19
days  14:25 72:11
  75:12,19,21 82:17
  82:21 83:22 92:23
  145:4 183:22,24
deadline  81:10,13
deal  80:6
debt  167:22,23,24
debtor  1:7 5:5
  16:9,13,15,20,23
  20:11 21:5,6
  25:16,22 36:15
  37:11,20,25 38:3,9
  38:22 39:15 42:16
  45:13 52:14,25
  54:19,25 57:10,10
  57:12 58:16 62:15
  70:22,22 76:6,8,12
  76:21 77:3 78:19
  79:23,25 80:4
  82:8 84:12,14
  88:23 94:4 101:8
  101:11,16 108:16
  111:18 113:18
  114:3 115:15,21
  116:5,6,10,12
  117:7 118:5,14,16
  118:24 120:15,16

120:22 121:7
  122:8,17 124:18
  125:3,5,12,18
  126:23 130:25
  132:17 133:13
  141:5 142:5,21,23
  143:5,12,15 144:3
  145:18 147:2
  148:13 150:14,18
  152:24 155:15
  156:6,23 167:6
  168:5,25 169:19
  171:16 172:2,14
  172:19 174:12,19
  178:14 180:11,14
  180:16,24 181:4
  183:3 184:11
debtor's  38:23
  47:25 48:18 49:2
  58:9,11,13 62:4,18
  63:4 74:20 79:8
  79:20 87:15,25
  106:15 108:10,19
  108:22 111:16
  123:20 141:23
  144:10 164:9
  166:9,19 167:15
  171:20 172:16
  175:19 187:8
debtors  20:18 42:4
  48:6
december  74:24
  77:7 161:18
decide  103:10
decision  37:12
  39:12 87:14
  102:13 141:4
declaration  62:19
declared  40:18
deductible  78:2
  79:2,7

deducting  79:21
deferred  78:3
defers  155:9
define  82:19
definition  72:5
  101:5
degree  17:7 18:16
  45:13 179:5
degrees  18:19
delaware  176:14
delayed  14:19
department  19:22
  19:22 20:7 22:2
  64:23
depend  52:11
depending  42:8
  51:23 78:24 79:4
  158:19
depends  78:18
  168:12 171:25
depicted  136:24
deposition  1:14
  3:12,17,23 6:22,25
  7:6 10:16,24
  11:22 13:4,21
  14:23 15:7,17
  16:5,10,11 27:25
  28:20 41:12 45:23
  49:21 137:20
  187:5
depositions  40:14
deposits  42:9
describe  46:17
  58:20 155:8
described  70:14
  103:21 104:10
  128:5 136:2
  142:10 169:25
description  114:7
  138:11 187:4

Veritext Legal Solutions
866 299-5127

[descriptions - due]

**descriptions**
136:10
**designated** 12:2,7
**designation**
165:23,25
**detail** 145:8
160:19,23
**detailed** 27:15
160:10,13
**details** 135:24
163:6,18
**determination**
38:5 39:3,12
87:17 101:10
137:5
**determine** 87:13
156:3
**determined** 72:25
**determining**
178:15
**develop** 67:5
**developed** 183:20
**developing** 87:24
**development** 86:7
**difference** 38:8
41:23 108:6
**different** 41:21
42:18 51:22 52:2
77:21 80:5 108:2
108:3,16 144:18
**differing** 51:22
**difilippo** 2:22 4:2
**digit** 110:15,15
**digital** 120:19
**diligence** 179:8
**dip** 14:9 28:24
54:20 61:22 62:14
63:19,23 64:2,4,10
64:16 65:3,11,15
65:19,22,24 66:3,6
66:15 68:2,20

**70:16,25 91:6,8**
92:11,15
**direct** 29:10,16
105:20 130:2
**directed** 28:10
88:23 182:3
**directly** 104:15
143:11
**director** 51:4,4
**disagree** 81:17,19
170:3,4
**disbursed** 155:16
**disbursement** 62:9
72:5 117:17
**disbursements**
52:17 54:4,15,16
54:24 63:16,20
67:2 68:22 73:2
77:14 86:19 91:14
91:15 92:15 137:8
157:10 184:16
**disclaimers**
111:15
**disclose** 46:21
83:9,16
**disclosed** 84:6
161:4,5
**disclosing** 29:7
118:22 182:14
**disclosure** 68:25
**discovery** 40:13
**discreet** 89:4
**discuss** 8:13
147:19
**discussed** 85:23
94:5 98:20 106:19
127:15 130:4
143:7
**discussing** 132:3
**discussion** 11:17
15:24 99:15

**106:10,21 126:11**
139:13 143:13
155:22 165:10
**discussions** 43:13
43:15 106:5
113:11 137:21
**dismissed** 70:12
**disparity** 164:8
**displayed** 161:4
**dispute** 28:3 29:19
29:20 130:6
**distinct** 74:5,14
**distribution** 136:8
136:14 138:13
**distributions**
139:6
**district** 1:2 3:20
**divided** 141:13
**division** 1:3 3:21
**docket** 48:10
93:19 97:7 100:20
111:6 131:24
**document** 10:20
32:14,15 33:3
35:9,16 48:6,12,15
48:23,24 55:12
93:18,21 94:11
96:25 100:20
101:19 105:19
107:21 109:4
111:5,11 112:9,21
127:18 128:25
131:24,25 135:10
140:9 141:21
146:10 147:16,19
147:21 154:22
155:3
**documents** 13:9
13:13,16,17,23
27:22 57:8,15,16
57:20 105:11

**109:7,12 129:5,8**
182:25
**dog** 103:13
**dogs** 89:12
**doing** 7:18 22:18
51:8 60:2 61:19
61:21 78:17 88:17
91:16 157:17
162:13 176:6
182:13
**doj** 161:10
**dollar** 154:14
**dollars** 96:5
125:15 126:8
132:21,22 133:23
133:24 146:20
154:12 159:16,16
159:18 164:12
177:2 183:24,25
**double** 73:2
110:18 134:23
**doubt** 114:20
**draft** 88:7 98:14
107:23 114:19,20
126:13 130:15
136:17 140:24
141:16 142:15
**drafted** 31:19
43:11,16 112:25
**drafter** 138:17
**drafting** 31:22
46:2,5 98:13
103:10 105:22
112:11 124:5
**drafts** 32:4 62:21
**driving** 161:24
172:13,14
**drop** 41:10
**due** 44:23 45:7
55:3 69:11 70:19
75:7 81:22 179:8

Page 10

[dues - exactly]

**dues** 107:10
**duly** 5:22 186:5
  188:10
**duties** 41:20 43:2
  43:20,21 50:24
  55:6 91:25 93:4

**e**

**e** 2:2,2 5:21 6:5
  13:11,23 14:2,4
  15:20 26:9,13,13
  27:9,10 30:19
  32:17 34:3 35:11
  35:19 37:18 38:6
  39:7,9 41:17
  49:22 59:11 81:14
  99:19 104:23,24
  106:9 112:24
  117:5 129:9,10,15
  129:17,24 130:11
  131:15 132:22
  139:23 141:2
  147:9 151:13
  152:9 155:16,25
  160:18 162:19
  163:8 169:4
  173:15 180:8,10
  180:19,22 181:21
  181:25 182:2,4
  186:2 187:2,6,7,11
  187:12,13,14,17
  188:2,2
**earlier** 68:10 94:5
  100:7
**easy** 73:2
**edits** 135:15,16
  140:23
**educated** 155:22
**education** 17:18
**educational** 17:3
**effectively** 38:4

**effectuating** 63:20
  91:14
**efficient** 53:8
**efficiently** 52:5
**eight** 166:3
**either** 42:17 81:5
  101:9 103:16
  104:22 110:17
**elapsed** 39:11
**elect** 74:25 75:2,13
  75:18
**election** 19:18
**electricity** 107:11
**electronic** 15:19
**electronics** 100:24
  119:17
**eliminate** 131:13
  150:21
**eliminated** 150:20
  150:22
**emphatically**
  181:2 183:7
**empirical** 154:9
**employ** 14:8 38:21
  48:8,19 49:3
  90:11,17 168:6
**employed** 18:21
  36:15 37:11,20
  38:9,11,16 90:14
  91:25
**employee** 28:17
**employees** 28:22
  29:2,5 42:5,23
  50:20 182:11
**employment** 38:14
  89:7,8
**endeavor** 124:10
**ended** 183:23
**engaged** 20:11,15
  20:16 24:23 166:6
  179:10

**engagement** 23:5
  23:7 24:2,10,19
  25:6 26:4,11
  30:12,14 31:16,22
  32:5 34:9 36:5,9
  40:5 43:12 44:2
  45:2 46:3,5 50:15
  51:25 52:2 55:15
  55:16 84:15,19
  171:10 180:2
**engagements**
  166:17 177:16
**english** 127:13
  174:21
**ensure** 73:12
  136:23
**entire** 79:14,14,18
**entirely** 79:6
  138:23 139:6
  157:10 172:9
**entities** 42:3
  179:19
**entitled** 1:16 48:6
**entity** 74:5 103:15
  114:24 119:25
  126:22 154:14
  183:10,10 184:4
**entries** 148:7,16
**equitable** 113:15
**erroneous** 125:23
  159:11
**erroneously** 125:5
  125:14
**error** 110:22
  161:7 184:13
**errors** 136:4
**escrow** 91:7,20,21
  91:22,24
**esq** 2:5,6,6,10,15
  2:19

**essentially** 61:2
  158:14
**establish** 62:2
  81:21 156:17
**established** 74:13
**estate** 42:20 53:4
  54:21 62:25 68:25
  70:24 73:17 74:3
  74:14,14,18,21,23
  74:23 76:9,10,14
  77:20,24 78:19
  79:24 80:4,7,8,10
  81:23 83:3 94:22
  107:6 113:19,22
  114:4 147:6 157:2
  175:9,11 181:10
**estate's** 87:25
**estates** 74:4
**estimate** 105:21
**estimated** 71:13
  106:12
**estimates** 73:11
**estimating** 73:7
**etcetera** 97:14
  120:5
**evaluation** 114:13
**event** 68:2
**events** 103:21
  104:10
**everybody** 60:21
  75:9 93:7 156:8
  175:18
**everybody's** 45:2
  69:8
**everyone's** 46:2
  147:3 162:15
**evidence** 87:11
**exactly** 53:7 58:9
  115:4 117:4
  130:22 159:13
  181:25

**examination** 5:25
100:2 103:4
153:10 154:16
165:14 185:9
187:18 188:9,11
**examined** 5:24
**example** 101:3
**excel** 109:3 163:20
**excess** 169:2
**exchanges** 181:25
**excluded** 160:4
**excluding** 125:21
**excuse** 11:10
51:14 123:16
126:12 137:22
153:14 174:23
**exhibit** 7:7 10:14
10:17 32:14,18,21
35:8,12 41:6 43:6
47:24 48:3 91:4
93:12,14 111:4,8
128:24 129:11
131:7,16,21
133:16 134:7
135:11,14,18
136:18 139:24
140:7 141:17
142:15 144:14
147:10,15 159:7
182:6 187:3,3,5,6
187:7,8,9,10,11,12
187:13,14
**exhibits** 187:3,15
**existed** 101:23
179:12
**existence** 57:7
143:17
**exists** 172:7
**expect** 51:7,19
175:16

**expectation**
106:22
**expected** 33:5,13
123:20
**expense** 136:18
159:8
**expenses** 71:13
72:4 77:15,17,18
78:23,25 79:7
105:22 106:12,16
106:23,23 107:2,3
107:9,15 108:10
108:15,20,23
117:6 123:2
124:11 129:22
130:9 133:5,15
134:10 136:24
140:13 147:7
148:7,16 149:17
149:24 152:21
183:4,11,12,22
184:5
**experience** 7:21
20:24,25 64:4,7
82:3 164:4,6
177:16
**expert** 22:19,19
40:11,19 41:2
91:12 165:20
166:16
**expertise** 166:6,17
**expired** 69:15
**explain** 36:24
41:22 70:2 82:13
108:5 132:8 148:6
150:8 159:12
**explained** 37:15
**explanation**
144:15
**explicit** 66:2

**expose** 27:21
**extent** 22:12 60:5
65:4 78:3 83:8
113:6 137:12
143:17,18 146:23
**extra** 100:21
110:15 162:10

**f**

**f** 81:14 109:17,18
188:2
**fa** 41:19
**face** 102:24
**fact** 115:25 182:21
**facts** 15:24 60:5
99:10,13 113:9
114:8 146:15
147:4
**factually** 150:15
**fair** 42:25 53:16
59:20,23 60:22
72:16 78:15 84:21
88:24 94:19 96:9
97:19 103:20
104:6 106:13
130:13 134:20
136:21 145:12
160:9
**fairly** 44:8
**familiar** 7:23
12:10 89:21
**family** 19:15 58:8
103:13 118:9
129:8 132:16
143:18
**far** 6:21 67:14
171:21 173:12
**fast** 139:17
**father** 118:18
143:20
**fault** 73:8

**fear** 28:5,6
**feasibility** 86:8
87:3,7,9
**feasible** 87:16
**february** 45:8
63:14 69:3 72:9,9
77:6 122:22 125:4
129:22 132:17
133:11,12,25
134:3 140:14,14
152:22,23 154:21
154:21 155:10,11
156:15,17 159:9,9
159:19,23 160:7
**federal** 11:2 19:17
19:18 73:17 76:12
79:14,16,18
**fee** 73:13 123:3
157:7,8,9
**feel** 48:11 67:3
**feeling** 41:18
142:2 178:22
**fees** 33:18 53:9
54:24 62:6 68:2
69:8,11 70:21
72:24 77:18,25
156:4,24 163:3
175:4,8
**felt** 132:24
**fiduciaries** 20:17
**figure** 136:5
155:19
**figured** 160:23
162:16
**file** 29:5 38:15,20
40:11 52:25 53:3
74:8,16 75:6 76:6
76:11,11,16 77:23
78:14 81:5,7,16,20
89:6 137:22
163:11 175:21

[filed - francis]

**filed** 3:19 13:9
28:24 42:7,8,9
45:3 48:10 49:7
55:22 62:19 63:14
68:12 69:23 75:8
75:24 76:5 84:4
93:19 100:10
111:5 122:22
125:4,14,18
131:24 135:3
160:21 161:23
167:4 168:16
181:12
**files** 80:10
**filing** 32:24 61:11
63:12 73:23 75:12
82:17 92:23 96:9
96:12 98:23
113:23 132:3,6,18
138:2
**filings** 56:7 73:18
**final** 62:22 87:17
133:15,24 135:17
135:21 136:3
137:24 140:12,20
140:22 141:4
144:8 159:8
183:21,21
**finally** 46:13
162:16
**finances** 61:12
63:12,15
**financial** 14:5 21:4
21:6 22:15 34:7
36:23 37:6 39:8
40:20 41:20 42:25
48:9,20 49:4 54:6
55:20 62:4,5
64:22 111:17
112:5 166:10,19
168:3 178:14

179:6,18
**financially** 4:8
87:16
**financing** 14:10
28:25 54:20
**find** 40:10 117:25
156:18
**finish** 8:19
**finished** 54:11
**firm** 4:3,5 21:24
22:13 24:16 39:18
40:3,25 51:5
52:15 56:2,15
112:15 139:14,14
156:2 172:13
176:9
**firms** 62:7 134:7
**first** 5:22 16:18
19:3 21:23 43:16
43:22 44:6,9,21,24
45:14,25 46:24
47:8 51:13,14,14
51:15 55:17,18
69:23 73:9 75:19
89:3 93:25 94:14
105:3 112:3
122:21 129:23
130:25 139:10
149:14 161:13,14
162:3 180:9 186:5
**fit** 89:13
**fitting** 101:4
**five** 39:10 128:2
128:15 141:8
161:22
**fix** 161:7 184:13
**flavors** 17:15
**floor** 2:4
**flow** 61:10 62:13
62:13 69:21 86:18

**flows** 62:23 87:13
**fluid** 104:20
**flynn** 13:7 30:18
45:6,16 49:15,16
50:5 56:4,24
112:17 129:18,19
149:15,19 150:2
150:24 151:11,14
181:18
**flynn's** 46:10 50:7
151:8
**focused** 44:20
**focusing** 46:6
108:18
**folks** 15:15 25:6
29:24 30:10,14
49:14,24 129:21
**follow** 164:18
**following** 44:25,25
148:7,15
**follows** 5:24
**food** 119:3
**fool** 178:19
**foregoing** 186:8
**foreseeable** 124:22
**forget** 102:19
**forgot** 11:10
**form** 22:16 34:10
37:16 39:5 54:5
57:22 58:18 62:10
64:14 66:13 72:6
72:21 77:4 78:21
80:25,25 81:2,3
84:25 88:3 91:9
92:2 93:5,13 94:2
94:21 95:9 96:10
98:13,14,15,19
102:8 103:24
104:13 106:18
108:21 109:15
110:20 111:22

112:22 113:24
118:4 122:18
125:3,14,16 126:3
127:7 130:16
132:11 133:18,22
134:15 135:3
141:18 148:20
149:7 152:11
156:13 157:20
166:12,22 170:12
170:22 177:25
187:9
**forms** 98:16
**forth** 101:7 112:13
188:10
**forward** 63:17
68:17 69:6 75:14
108:13 134:19
157:4 163:3
**found** 133:22
145:3 146:14,18
150:15,17 182:24
**four** 15:12 19:2,3
19:23 21:18 82:23
161:22 165:25
**foxboro** 6:9
**frame** 34:25
118:23 146:23
154:5
**francis** 25:18,23
26:2,10 30:2,6,7
31:4,8 32:9 56:17
57:3 59:3,5,18
99:2,7 102:11,20
102:21 103:17
104:12,15 105:4
105:14 106:7
109:25 112:15
124:2 129:19
135:23 139:8
143:13 148:4,12

152:9,13 156:3
157:16 180:9,18
**frankly** 33:12
150:12
**fraudulent** 82:10
82:20 171:18
**free** 48:11
**frequently** 39:20
40:2,5 42:15
64:25 73:5
**front** 15:9 44:18
162:23 180:23
**fuel** 163:24
**full** 19:8 73:10
**fully** 12:20
**function** 87:24
**fund** 2:4 4:20 6:14
10:24
**funding** 127:23
128:17 184:5
**funds** 70:17
108:12 130:23
138:12 155:16
175:23
**furnishings**
100:25
**further** 163:5
184:23 186:8
188:13
**future** 69:23 78:4
78:5,8,12,20 85:3
86:19 87:13
124:22 157:18

**g**

**g** 5:21
**garbage** 61:3,3,5,6
**gas** 107:12
**gasoline** 117:9
**gathered** 29:4
123:17

**general** 88:21
100:15 155:8
163:9
**generally** 13:25
18:24 21:19 22:8
24:2 25:5 36:24
44:12 50:24 55:2
55:14 57:4 66:3
66:23 70:2 73:8
74:24 80:23 82:14
90:12 109:10
110:10 115:6
**getting** 49:23
86:23 135:20
137:21 176:4,8
179:21
**gettr** 120:21
**give** 10:6 14:25
147:24 152:20
153:2 161:6
164:25
**given** 105:14
131:22 134:25
182:11 185:6
186:10 188:12
**gives** 75:11
**glasses** 11:11
**global** 14:6,7
51:10,11 111:7,14
111:24 187:10
**go** 3:14 7:22 11:12
28:2 38:12,13
40:13 44:17 53:6
54:19 90:18
103:25 107:5
111:23 114:4
122:3,20 124:18
139:15,16,19
144:7 156:21,22
164:21 176:25
183:20

**god** 47:14
**goes** 7:18 43:19
79:5 101:6 124:18
156:22
**going** 3:3 10:13
32:12 35:7,8
36:14 37:5,10,19
37:24 39:15 40:8
40:10,10 41:9
44:9 45:5,20 47:3
47:23 52:3,12,22
53:7,13 54:2,3,7,8
54:9 59:2 68:17
68:18,19,21 69:5,6
69:24 70:19 73:23
76:8,18,19 77:6,9
78:22,23 80:5,15
85:8,14 87:2,3
89:5 91:18 92:20
92:23 93:8,11
96:24 106:24
107:12,18 108:13
111:3 115:4
118:22 123:9,10
123:13,23 124:12
124:13,14,17
128:23 129:15,23
131:19 134:19
139:15,16 143:6
147:14 149:2
151:22 155:18,18
155:19,20 156:15
156:16,18 157:22
157:22,24 158:2,6
158:12,21,23
159:3 161:5 163:3
163:14 168:21
169:16,18 170:25
171:5,11 175:10
175:23,25 177:8
181:9

**golden** 2:17 5:16
26:18 27:17,18
28:7,10,14,17,23
29:6 57:23 58:3
179:6,9,12,24
180:5,6,7,10,15,20
181:16,20 182:9
182:15,19,19
183:4,8 184:6
**goldman** 2:15 5:6
5:6 6:20 7:10 27:3
28:4 29:8 85:14
164:17,23,24
165:15,16 184:22
185:3 187:21
**golf** 123:4
**good** 3:2 6:10 44:8
165:16
**goods** 100:25
119:16,19
**graduate** 18:18,19
**graduated** 17:4,6
**gratuitous** 37:7,8
**great** 164:8
**greenwich** 113:20
123:9,14 150:13
152:16 153:16,24
**group** 26:14 113:3
143:7 144:8 153:8
**gtv** 120:20
**guess** 15:8,12 19:3
77:5 127:2,3,6
149:8
**guessing** 66:8
**guidance** 161:6
**guy** 170:24

**h**

**h** 23:16 187:2
**half** 93:7
**hampshire** 176:16
176:24

[hand - increase]

**hand**  27:24 32:12
  34:22 47:23 93:11
  110:9 111:3
  117:21 128:23
  130:22 131:20
  146:7 188:19
**handing**  147:14
**happen**  47:13 52:3
  52:12 69:3 89:12
  89:13 162:17
**happens**  80:3
  81:15 82:22
  178:11,12
**harassed**  143:15
**harassment**  27:21
  28:5,6
**harbach**  2:6 4:21
  4:21 23:12 41:13
  59:13 85:16 99:20
  99:25 100:3,5
  103:2 147:24
  152:5 153:11
  165:6 180:6
  187:19,20
**hard**  127:12
**haven**  2:18 116:2
  116:15
**hazard**  15:8
**hch**  152:22
**head**  8:24 155:4
**heading**  11:22
**health**  121:18,22
  121:24 122:2,8
**hear**  127:13
  171:14
**heard**  45:24 82:21
  104:15 127:15,17
  182:9
**hearing**  45:17
  46:14 47:9 51:15
  123:18,19 127:18

  174:15
**hearings**  46:15
  51:13
**heat**  107:11
**held**  1:17 3:23
  11:17 23:2 165:10
**help**  24:13 46:7
  57:7 137:4
**helped**  137:9
**helpful**  14:14
  38:25 137:4 138:8
**helping**  100:9
**helps**  169:11
**hereinbefore**
  186:11 188:10
**hereunto**  188:18
**hey**  163:14,24
**high**  17:3,5 19:10
  19:24 94:14
**hill**  179:24 180:5
**hire**  80:5
**hired**  90:5
**hiring**  40:25
**history**  17:3
**hit**  162:7
**hits**  73:7
**ho**  1:5 2:9 3:18 5:5
  11:6 94:4 111:18
**hold**  18:11,18
  36:14 37:10,19
**holding**  114:25
**home**  6:7 107:8,9
  118:19,25
**homeowner's**
  154:10
**homeowners**
  107:7
**homes**  119:5 154:8
**honestly**  12:21
**hope**  64:3 100:22
  159:4 171:2

**hoping**  148:25
  149:3 175:6 177:8
**hospital**  122:4
**hot**  59:12
**hotel**  114:17
**hour**  15:13
**hours**  15:11,11
  39:10 67:21
  164:19 166:2
**house**  101:25
  149:17
**household**  97:25
  100:24 101:4,15
  102:5 119:16,19
**housekeeping**
  144:20,23
**huh**  8:25
**human**  110:21
**hundred**  64:9
  138:21 139:4
  141:13 142:22
  143:6,24 144:2
  146:20 168:15
**husband**  141:12
  142:8 145:14

**i**

**idea**  7:19 44:8
  67:23 90:17
  126:24 151:20
**identification**
  10:17 32:19 35:13
  48:3 93:15 111:9
  129:12 131:17
  139:25 147:11
**identified**  7:12
  103:22 104:8
  134:7 181:23
**identity**  26:18
  27:23 28:16 74:8
**imagine**  54:18
  61:25 66:22

  116:25 117:18
  118:9 123:2,5
  173:13
**immediately**  44:25
**impair**  9:25
**important**  8:18
  75:3 132:24 168:6
  172:11 174:7
**inadvertent**  133:6
  134:6,22
**inadvertently**
  125:12 132:16
  133:21 134:2
**inappropriate**
  29:9,16
**include**  22:18
  80:11 94:16
  107:14 122:15
**included**  65:14
  125:15 132:23
  133:19 134:2,5,13
  134:23 137:14
  150:25 151:25
  159:11,17 160:11
**includes**  19:6
  61:23 62:12
**including**  39:22
  40:14 61:11 70:24
  86:7 115:16
**inclusion**  125:24
**income**  52:25 53:3
  53:5 62:15 63:5,9
  73:17,24 74:16,17
  74:20 76:15,17,22
  77:8,11,12 78:8
  79:20 87:25 125:5
  125:16,21
**incorrect**  125:18
**increase**  141:8
  142:12,17 145:24

Veritext Legal Solutions
866 299-5127

**increased** 142:14 144:13

**increasing** 141:10 143:23 145:10

**incurred** 142:6 177:7

**independent** 63:8 95:6 97:21 114:10 119:13 122:5 123:19 128:7 152:10

**indicate** 7:2

**indicating** 135:12 137:18 152:6 161:19 162:11

**individual** 21:8 24:15 41:2,19,23 43:4 70:4 74:3,4,6 74:15,15,16,17 75:23 77:2,19 164:4,11 183:23

**individual's** 27:20

**individually** 79:24

**individuals** 19:5 42:19 57:8 85:5 158:16

**industry** 60:17,21

**inform** 124:3

**information** 12:20 22:16 24:16 29:3 29:7 30:22,24 31:3,9,12 58:10 59:6,16 69:24 85:7 94:4 98:11 99:11,17 104:11 105:3,7,12 110:6 116:9 124:10,14 124:16,20 127:5 133:2 135:2 136:13 137:3,12 137:19 138:3,7

**139**:7,12 145:2 146:10 152:10 153:3 155:13,14 156:20 157:14 158:20 174:4 176:3 177:22 183:19,19 184:9

**informed** 44:2 99:13 103:16,18 103:19 104:16 180:11

**informs** 127:5

**initial** 140:23 141:20,21

**initiated** 25:12

**input** 43:21 59:6 72:22 114:22

**inputting** 162:4

**inquire** 153:23

**inquiries** 51:16

**inquiry** 161:9 163:16

**insiders** 82:19

**insolvency** 17:24 18:5,6 19:4 21:24 165:19 166:16

**instance** 62:3 89:9 138:15

**instances** 40:19 164:6

**institutions** 64:23

**instructed** 43:7,9

**instructing** 26:21 26:23 27:12

**instruction** 29:10

**instructor** 18:5

**instructs** 9:21

**insufficient** 8:25

**insurance** 69:14 107:8 117:10 121:17,18,22,24

**122**:2,8 146:4,12 146:19 148:8,17 150:3,4,11,12,16 150:17 152:15 153:24 154:7,10 158:21,22

**intellectual** 120:7 120:13,15,18

**intend** 171:24

**intended** 32:25 34:19 40:4,6 62:7 89:15 110:20 125:19

**interact** 16:23 22:3

**interaction** 146:17

**interactions** 15:2

**interest** 20:22 53:11 77:20 80:3 87:12 113:16 119:10 120:7,18 121:16 147:5

**interested** 4:9 22:15 41:17 49:10 151:3 178:4 188:16

**interests** 101:11 115:13

**interfere** 3:11 10:5

**interference** 3:9

**internal** 25:6 80:14

**internally** 13:10

**interpreter** 127:14

**interrelated** 113:7

**interrupt** 41:8

**introduce** 174:16

**investigate** 102:14 105:17 110:25 113:10 124:17 168:19

**investigated** 101:22 110:11,24

**investigation** 40:7 40:9,22 59:16 63:8 95:7 97:22 102:9 108:24 115:6,18 119:14 119:22 128:11 157:18 158:9 179:15 183:15

**investigations** 114:11

**investment** 177:4 177:6

**invoice** 158:8

**involved** 20:7 31:21 49:15,17,20 50:21 52:24 53:4 55:24 56:6,20 57:24 59:7 65:10 65:18 90:9 100:8 101:13 105:22 109:6,9 132:4 178:7 179:21

**involvement** 115:9

**iphone** 103:11

**irrespective** 70:19

**irs** 76:19 89:10

**irve** 2:15 5:6 164:24 165:16

**island** 176:15,21

**issue** 27:23 73:6 75:10 82:23 124:23,23 150:5

**issued** 54:7

**issues** 18:3 27:24 40:24 44:8 52:6 53:15 72:3 110:11 147:20 174:6 182:12

**item** 55:5 61:16,20
63:11,18 64:13
66:12 68:6,16
73:15,20 80:16,21
82:7 83:6,19
84:11,24 85:18,22
86:2,6 87:7,21
88:15,20 89:19
91:5 92:19 94:14
94:15,16 95:4,7,23
95:24 96:2 97:11
97:13 103:11,12
103:13,14 104:2,2
111:20 113:17
127:22 142:14
144:12,20 146:12
152:4
**items** 89:16 96:21
97:24,24,25 98:7
99:12 101:3,12,15
102:5,22 103:22
107:13 119:16,18
119:23 121:8,11
132:7 136:19,25
137:13 160:11
163:6,19

**j**

**j** 2:10,15 5:21 6:5
**jalbert** 1:15 3:1,18
4:1 5:1 6:1,5,14
7:1 8:1 9:1 10:1
10:14,16,19 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1,13
32:18 33:1 34:1
34:23 35:1,8,12

36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1,24
48:1,2,11,25 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1,12,14,22
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
111:4,8 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1,24 129:1,11
129:14 130:1
131:1,16,20 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1,24 140:1,7
141:1 142:1 143:1
144:1 145:1 146:1
147:1,10,15 148:1

149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1,7 186:15
187:3
**jam** 1:6
**january** 161:18
**jo** 13:8 31:25
49:16 50:9 56:5
56:24 112:17
**joint** 86:13
**jon** 2:22
**jonathan** 4:2
**judge** 29:9,13
87:16
**judges** 22:14
**judgment** 37:22
102:4 136:15
**june** 17:9
**justice** 64:23
**justify** 148:15

**k**

**keep** 41:2 52:16
59:14 107:12
124:17
**keeping** 42:11
**keith** 20:6
**ken** 9:17 13:6
14:16,21,24
**kenneth** 2:10 5:3
**kept** 7:17 162:10

**keypunch** 98:19
**keypunched** 98:16
**kids** 118:15
138:25
**kind** 20:22 88:24
116:17 118:17
122:12 134:22
**kings** 188:4
**knew** 45:20 105:6
113:9 178:16,18
182:22
**know** 7:16 9:10
22:4 30:12 31:7
31:17 33:19 34:13
34:18 36:7 38:16
38:16,22 39:13
41:4 43:18 47:3
50:3 52:3,21,22
53:9 57:23 58:2,3
58:12 60:4,9,25
62:21 64:9 65:16
66:3,5,23,24 67:6
72:19,23 76:7,17
77:7,10,12,13
79:10,12,13 80:14
83:23 84:5,10
86:14 89:9,11,20
89:25 90:4 103:25
104:3,4 107:10
109:19 111:24
115:3 116:3,3,4,5
116:5,14,17 117:8
117:8,10,20 118:7
120:21 121:13
122:23,24 123:3
125:8,13,20
126:20 127:12
145:15 150:11
151:18,21 152:2
152:13 154:7
157:21 159:3,21

161:2,15 166:21
168:11 169:4,5,17
170:13 171:7
172:16,19 173:7
173:20,25 175:5
176:2 177:3,7
179:11 181:8,9,11
181:22 182:5,12
182:18,20,21
184:7,18
**knowing** 29:4
**knowledge** 12:15
12:19 41:3 59:9
62:17 63:3,4
91:10 102:10
121:15 122:7
123:17,20,22
126:9 127:20
128:7,21 133:20
140:12 152:10,20
154:9 158:3
172:21 174:18
184:15
**knows** 47:14
**kwok** 1:5 2:9 3:19
5:5 11:6 25:21,24
32:16 35:9 94:4
102:6,23 103:14
104:9 111:18
119:24 122:16
129:2 138:23
139:2 140:8 143:2
147:17
**kwok's** 30:3
119:10 145:17

**l**

**l** 5:21 6:5 23:16
186:2
**lack** 63:5
**lady** 119:7,10

**lago** 122:13 124:4
124:21
**lamp** 126:8,20
127:16,20 179:14
179:15,24
**land** 113:16
**language** 114:23
**large** 30:20 59:8
78:5
**laura** 2:5 4:18
6:12 103:3,6
**law** 22:13 39:18
112:15 134:7
**lawyer** 43:18 46:8
86:20 102:17
113:25 138:20
139:14 178:23
**lawyer's** 40:7
**lawyers** 22:20
25:12,14,16 39:21
51:17 82:18 95:5
96:23 102:7 110:8
125:17 126:2
128:6 132:24
136:16 139:14
150:20 155:23
158:3 159:2
170:18 172:22
174:6
**lead** 51:5
**learn** 30:5,7
**leave** 152:24,25
**leaving** 41:11
**left** 102:7 144:4
**legal** 2:22 101:8
105:9 106:6
113:15 114:7,25
153:8
**legally** 76:2
168:14

**legitimate** 160:5
**lenaya** 1:19 4:5
188:6,21
**lenders** 20:20 21:7
**lengthy** 58:24
**letter** 31:16,22
32:5 43:12 75:13
76:3
**level** 53:12 72:25
94:14 149:23
**levels** 59:5
**liabilities** 30:23
94:3 111:17
164:10,12
**liability** 157:5,6
**life** 169:23
**likelihood** 82:4
**limitations** 111:15
**limited** 5:17 90:7
163:9 178:17
**line** 5:13 44:18,18
61:15,20 63:11,18
64:12 66:12 68:5
68:16 73:15,19
80:16,21 82:7
83:6,19 84:11,24
85:17,22 86:2,6
87:7,21 88:15,20
89:16,19 91:5
92:19 94:14,16,22
95:3,7,13,15 96:2
96:16,21 97:11
99:12 103:12,13
111:19 132:7
136:19,25 137:13
146:12 152:4
159:14,15 163:6
163:19
**lines** 95:19 104:4
126:18

**liquidate** 171:5
**liquidated** 88:2
**list** 7:17 53:6
64:22 87:6 90:4
107:4 154:4
155:19,20 157:24
159:23 172:7
173:4
**listed** 12:3 72:19
108:12 111:25
114:14 122:12
128:3
**listen** 124:7
**listened** 123:15
**listing** 108:13
160:23
**litigation** 19:6
22:4,7,11,11 40:6
77:9 81:25 82:5
85:19 88:2 127:23
128:15,17 170:19
170:25 175:14
178:18
**little** 14:19 16:25
21:25 24:3 46:17
89:12,12
**live** 146:22 150:18
**lives** 118:15
149:16,22
**living** 114:8
129:22 133:15
134:9 136:17
140:13 153:17
159:8 183:3,11,12
184:5
**llc** 2:12 75:24
126:21
**llp** 1:18 2:3,4,8
3:24
**llp's** 10:24

**loan** 63:23 64:2 65:11,15,19,22,25 66:6,15 68:2 70:16
**loans** 64:5,10 66:3
**located** 3:24 101:5 113:19
**location** 123:21
**lodge** 101:17
**long** 15:5 137:18 139:15 160:20 165:22
**look** 31:25 35:15 40:8 48:11 82:16 111:23 152:15 174:7 178:13
**looked** 13:22 70:7 133:16 136:14 163:21 173:22,25 174:8 181:21
**looking** 14:3 22:14 22:16 69:17 136:17 142:15 154:22 162:20 172:4 175:18,23 175:24
**looks** 107:5 132:5
**loose** 132:7
**lose** 75:19
**losses** 78:12
**lot** 42:10 47:11 68:18 69:24 104:25 112:13,14 122:3 127:8 168:23,24 178:18
**lots** 99:13,14 106:21 113:10 167:19 169:21 178:2,2
**low** 53:12

**lowey** 1:15 7:9 10:25 13:24 15:16 17:12 18:22,25 20:6,10,15 21:16 21:21 22:24 23:6 23:18,25 24:17 25:7 26:3 30:13 31:15 36:8,18 37:3,24 38:21 39:4,17 43:7 48:8 48:20 49:4,18 50:2,15,20 56:19 57:2 58:15,21 59:15,25 61:15,19 64:12 65:9,13 66:10 67:13,24 71:12,18 72:17 73:19 76:10,25 78:16 80:20 82:4 83:5 84:17,22 85:25 87:20,23 93:3 94:6,10 95:3 96:20 97:10,16 98:6 99:5 100:8 101:13 102:3 109:6,11 112:16 112:17,20 122:15 124:9 125:22 128:10 135:20 136:22 144:21 149:11 163:17
**lowey's** 12:15,22 44:13 55:15 67:9 106:3 111:20 112:8 134:21 135:16 140:23
**lp** 4:20
**lunch** 123:4
**luxury** 115:16,23 116:13

**lynch** 1:19 4:5 188:6,21

**m**

**macdonald** 49:19
**maid** 118:8 145:4 145:4 158:24
**maids** 145:4
**mail** 26:9,13,13 30:19 32:17 34:3 35:11,19 37:18 38:6 39:7,9 41:17 104:24 106:9 129:9,10,15,17,24 130:11 131:15 139:23 141:2 147:9 151:13 152:9 160:18 162:19 169:4 173:15 180:10,19 181:25 182:2,4 187:6,7,11,12,13 187:14
**mails** 13:11,23 14:2,4 15:20 27:9 27:10 49:22 59:11 99:19 104:23 112:24 163:8 180:8,22 181:21
**main** 2:13 25:2,3 163:12
**maine** 176:17,23
**maintain** 17:25 54:3 91:7 92:10
**maintained** 156:21
**maintaining** 63:19 64:16 91:5
**maintenance** 107:8 144:22 145:6 158:23

**major** 19:3 67:2 89:15
**makenzie** 2:6 4:24 34:21 146:7
**making** 73:11 101:14 102:3 113:3 153:7 167:13 184:10,16
**manager** 50:8,13
**managers** 50:16 51:19
**managing** 51:4 70:16
**mandarin** 57:18 174:20
**mar** 122:13 124:4 124:21
**march** 23:22 45:8 72:10,10 73:6 122:25 134:15 137:22 155:17,18 156:16,18
**mark** 7:6 35:7 131:9
**marked** 10:16 32:13,18 35:12 47:24 48:2 93:12 93:14 111:4,8 128:24 129:11 131:7,16,20 139:24 140:7 147:10,15
**markedly** 41:20
**marking** 10:13
**marriage** 188:15
**married** 142:25
**mary** 13:8 31:24 49:16 56:4,24 112:17
**massachusetts** 6:9 176:13,16,22

| | | | |
|---|---|---|---|
| **materialize** 52:7 | **meeting** 16:16,17 | **met** 6:11 16:13,18 | **mitchell** 25:17,20 |
| **materializes** 60:12 | 45:14,15 46:16,25 | 16:19 30:18 58:15 | 25:25 26:10 31:4 |
| **materials** 150:19 | 47:13 51:15 69:5 | 125:15,16 | 31:8 32:9 56:18 |
| **matt** 45:6,15 46:9 | 116:2 123:15 | **method** 152:22 | 57:4 59:4,4,18 |
| 49:15,15 50:4,7 | 126:13 127:10 | **methodology** | 99:3,8 102:11 |
| 56:24 112:17 | **meetings** 46:19 | 111:15 | 103:17 104:12,16 |
| 129:18,19 154:4 | 47:12 | **mezzanine** 167:23 | 105:4,13 106:7 |
| 160:17 181:18 | **melissa** 25:18,23 | **microphone** 3:11 | 109:24 112:15 |
| **matter** 1:16 3:18 | 26:2,10 30:2,6 | 165:2 | 124:2 129:18 |
| 6:23 20:8 41:9 | 31:4,8 32:9 56:16 | **microphones** 3:6 | 135:23 139:8 |
| 43:8 46:4 49:17 | 56:17 57:3 59:3,4 | **middle** 113:14 | 143:14 156:3 |
| 50:21 51:6 53:12 | 59:10,17 99:2,7 | **midnight** 162:14 | 157:16 181:5 |
| 67:13 76:5 81:25 | 102:11,18 103:17 | **million** 126:8 | **mk** 148:4 |
| 90:9 115:25 129:2 | 104:11,15 105:4 | 154:13 164:12 | **moment** 62:24 |
| 145:6 147:17 | 105:13 106:7 | **miltenberger** 2:19 | 153:12 |
| 151:23 160:25 | 109:25 110:18 | 5:14,16 28:13,14 | **monetize** 120:24 |
| 174:10 188:17 | 112:15 124:2 | 29:23 41:7,15 | **money** 54:21 |
| **matters** 7:2 14:2 | 129:19 135:23 | **miltenberger's** | 62:14 78:4 134:18 |
| 40:2 88:22 98:20 | 139:8 143:13 | 29:21 | 153:24 177:4 |
| **matthew** 13:7 56:4 | 148:3 152:12 | **mind** 27:14 34:18 | **monies** 136:6 |
| **mcdonald** 15:18 | 156:2 157:16 | 34:24 36:20 87:5 | **monitor** 92:14 |
| **mckenzie** 131:2 | 160:16 174:5 | 99:20 164:21 | **monitoring** 91:13 |
| **meals** 141:9,10 | 180:9,17 182:3 | **mindy** 50:9 | **month** 72:15 |
| 144:15 | **member** 55:7 | **mine** 46:8 | 118:21 161:7 |
| **mean** 17:16 21:9 | 172:12 | **minimum** 32:8 | 184:2 |
| 39:24 44:23 60:14 | **membership** | 67:7 77:14 128:6 | **monthly** 45:6 |
| 83:12 86:8 87:9 | 122:13,17 124:5 | **minor** 161:7 | 46:11 51:12 67:8 |
| 96:11 110:4 | **memories** 113:12 | **minute** 11:13 33:3 | 68:7,11,18,23 69:7 |
| 116:14 130:19 | **memory** 66:2,9 | 147:24 | 69:10,12 70:2,15 |
| 138:14 149:2 | 115:22 127:8,9 | **minutes** 14:20 | 70:18 71:2,3,8,13 |
| 175:14 177:19 | 141:20 159:17 | 89:11 | 72:3,20 105:21 |
| **means** 8:3 82:14 | **menial** 170:2,7 | **minutiae** 89:14 | 106:12,16 107:14 |
| 144:3 151:2 | **mentioned** 14:15 | **miscommunicati...** | 107:22,25 108:20 |
| **meant** 22:7 63:12 | 15:15 18:4 19:24 | 135:4 | 116:22 117:14,16 |
| 159:12 | 22:23 24:11 25:23 | **missed** 23:11 | 118:11 122:16,21 |
| **media** 3:16 120:19 | 29:25 49:14,19 | **missing** 32:2 81:9 | 123:7 124:6,11 |
| 120:23,24 | 54:14 57:3,14 | 110:15 | 125:5,16 130:14 |
| **mediation** 171:3 | 60:13 73:22 87:8 | **mistake** 159:24 | 130:21 132:2,25 |
| **medications** 10:4 | 92:4 100:7 126:16 | **misunderstood** | 134:9,24 135:10 |
| **meet** 16:15 45:22 | 165:18 | 56:22 | 147:8 148:7,16,24 |
| 72:5 | | | 149:3,24 151:25 |

[monthly - objection]

154:20 155:12,15
157:11,19 160:4,8
160:24 161:11,16
161:17,23 162:2
163:5,13,20 168:9
169:7,11 184:19
**months** 72:7
161:25 183:20
**mor** 72:11 108:14
137:22
**mor's** 170:6
**morning** 3:3 6:10
14:20,22
**mortgage** 77:19
**mother** 118:17
**motion** 14:9 28:25
38:15,20 89:7
90:10,16 168:6
**motions** 6:24
181:12
**motor** 119:5
**motorcycles**
115:17
**move** 75:14
**moving** 34:24 57:2
**multi** 42:22,22
**multiple** 19:14
42:4 76:4
**multiplied** 136:7
**multiply** 183:25
**music** 120:7,18
**myers** 1:18 2:3
3:24 4:19,22,25
6:13

**n**

**n** 2:2 78:11 186:2
187:17
**name** 4:2 6:3,11
20:5 23:12,13,15
23:16 27:20 28:22
29:5 58:12 102:18

116:4 138:10
173:4,8,23 174:9
182:6,14
**named** 119:7
**names** 136:22
**natural** 107:12
**nature** 52:21
168:13 183:16
**nearly** 136:3
**necessarily** 83:24
**necessary** 12:20
63:21 75:25 80:18
85:18 93:2 100:23
112:7 169:21
**need** 8:23 9:9
36:14 37:11,20
40:12,15,23 42:10
47:4 85:9 124:19
127:4 143:3 156:9
163:14 166:20,23
169:18 170:10,15
171:14
**needed** 30:22,25
44:2 46:7 174:4
**needing** 166:10,13
**needs** 167:6
169:19
**negotiated** 31:14
31:15
**negotiation** 31:18
65:10
**negotiations** 171:3
**neither** 58:14
**net** 19:10,24 78:11
**netherland** 114:17
115:2
**never** 57:6 121:23
**new** 1:18,18,21 2:5
2:5,10,10,18 3:25
3:25 5:23 58:8
79:15,16 115:8,10

115:25 116:15
146:22 156:13
173:18 176:14,16
176:23 188:3,7
**night** 14:22
**nol's** 78:7
**nonsense** 162:11
**normal** 8:17 77:19
179:3
**normally** 109:15
**notary** 1:19 5:23
186:22 188:6
**note** 3:5 29:20
35:24 41:11
145:19
**noted** 29:18
**notes** 14:6,7,7
51:10,11 100:9,13
100:14,19 101:3
111:7,14,24
112:12 113:4
121:6 148:4
187:10
**notice** 6:22,25 7:5
7:12 10:15,24
89:10 187:5
**noticing** 4:17
**november** 127:24
**number** 3:22 6:24
19:16 30:21 32:16
62:6 73:4 81:4,15
93:19 96:8 100:20
110:19,20 132:22
133:16,20 134:19
135:13,18 146:20
150:9,10 152:14
159:14,15 181:21
183:22 187:4
**numbering** 97:7
**numbers** 48:23
97:5 135:21

136:12 141:17
145:2 153:6
158:15
**numerous** 44:5
59:11 101:3
112:24
**ny** 5:16

**o**

**o** 23:16 78:11
186:2
**o'melveny** 1:17
2:3 3:24 4:19,22
4:25 6:13 13:18
100:5 103:7
**oath** 4:7 7:25
**object** 129:25
**objected** 30:20
**objecting** 80:19
**objection** 12:4,24
24:20 26:16 27:15
28:24 29:22 34:10
37:16 39:5 57:22
58:18 61:4 64:14
66:13 77:4 78:21
79:22 81:10,12
84:25 88:3,8 91:9
92:2 93:5 95:9
96:10 98:15 99:24
101:18 102:8
103:24 104:13
106:18 108:21
111:22 112:22
113:24 118:4
122:18 126:3
127:7 130:16
132:11 133:18
141:18 148:20
149:7 152:11
157:20 166:12,22
170:12,22 177:25

[objections - paragraph]

**objections** 4:14
12:8 14:10 52:20
52:22 54:8
**objects** 9:18
**obligation** 91:22
**observer** 45:20
**obtain** 12:19
**obtained** 59:17
**obtaining** 22:15
**obviously** 43:18
66:18 87:17 98:17
105:8 156:21
163:15 173:21
**occasion** 174:17
**occasionally**
141:22,24
**occupancy** 113:19
113:22
**occur** 68:3
**offer** 18:25
**office** 19:16 58:8
68:24 69:20 72:12
72:22 162:13
**offices** 1:17
**official** 93:13,25
94:21 187:9
**offset** 78:7
**oh** 45:10 160:24
167:9 173:2
177:14
**okay** 9:7 35:17,22
71:17 85:17 96:3
103:2 131:11
148:2 149:14
159:6 173:8 181:6
**old** 169:3
**once** 85:11 144:24
154:10
**ones** 60:9 69:23
**ongoing** 52:6
88:14 105:21

108:20,23 137:20
170:24 178:18
**open** 47:13 91:7
92:10
**opening** 63:19
64:16 91:5
**operating** 41:21
41:24,25 42:11,20
42:21 43:3 45:7
46:11 51:12 67:8
68:7,11,19,23
69:10,12 70:3,6,10
70:15,18 71:2,4,8
71:13 72:4,21
78:12 106:12,16
107:22 108:2
116:22 117:14,16
118:11 122:16,22
123:8 124:6
130:15,21 132:2
132:25 134:4,5,9
134:24 135:11
147:8 149:25
151:25 154:20
155:12,15 156:10
157:11,19 160:5,8
160:25 161:11,16
161:17,23 162:2
163:5,13,20 168:9
169:7,12 184:19
**operations** 127:20
**opinion** 145:20
151:5,7
**opportunity** 2:4
4:20 6:14 10:24
38:20 75:20 81:4
**oppose** 29:6
**opposed** 74:6
103:14
**opposite** 159:24

**oral** 65:18 99:17
99:18
**orally** 106:9
160:18
**order** 29:15 62:11
72:23 75:3,5,8
86:9,21 105:5
**ordered** 54:25
**ordinarily** 172:5
**ordinary** 30:21
62:7 70:24 156:7
156:8 167:18
169:22 181:7
**original** 150:10
152:3 159:20
**originally** 153:13
**outcome** 4:9
188:16
**outside** 16:22 26:3
26:5,6,14 31:5
80:4 126:10
127:17
**outstanding** 59:24
**overpayment**
160:6
**owed** 81:18,19,20
**owned** 114:3
126:22,25 127:16
154:8
**ownership** 102:12
107:9
**owns** 115:5 116:5

**p**

**p** 2:2,2 23:16
**p&l** 69:20
**p.c.** 1:15 2:17
**p.m.** 39:10 90:25
139:21 140:4
165:8,12 185:5,8
**pacific** 2:3 4:19
6:13 10:23

**page** 7:8 11:8,21
33:2,4 48:22,23,24
49:9,11 55:13,18
88:20 93:25 95:18
96:4,25 97:4,8
105:18,20 106:11
113:13,14 115:12
119:9,12,20 120:3
121:3 124:25
126:5,10 132:7
140:19 145:20
148:3 149:15
151:14 152:8
157:6 161:19,20
161:20 162:3
187:3,18
**pages** 161:19,22
162:11
**paid** 32:24 70:23
72:14 73:13 77:25
86:16 108:10,15
118:22 130:24
133:3 134:16
136:7 149:18
151:15 152:21
153:24 155:23
156:11 158:8
159:19 160:2,3
173:6 175:4,8,10
175:19 179:24
181:10,12 183:4,6
183:8,14
**palm** 122:14
**pans** 101:23
**paper** 168:23
**papers** 43:17,19
44:16 45:3 46:3,6
126:14
**paragraph** 113:2
113:2

Veritext Legal Solutions
866 299-5127

[paramount - plan]

**paramount** 29:3
**parcel** 111:25
**parents** 42:3
**part** 21:22 37:17
 43:17 51:11 69:9
 96:9,12,17 97:9,13
 97:24 100:12
 105:20 111:25
 112:3 132:21
 144:7 170:21
 171:7,9 172:4
 181:6
**participate** 47:2
 47:17 60:8,12
**participated** 51:13
 58:23 84:3
**participating**
 45:21
**participation**
 45:12 47:10,20
**particular** 40:5,12
 40:16 42:19 105:5
 117:17 118:6,23
 130:17 168:25
**particularly** 14:9
 112:12
**parties** 3:14 66:22
 84:23 87:12
 104:25 105:2
 117:6 130:24
 133:12 188:14
**partner** 19:12
 20:3 51:3
**partnership** 74:10
 75:23
**parts** 79:12
**party** 4:7 20:22
 44:4 53:10 99:11
 102:14 119:24
 122:6 173:12
 184:10

**pass** 44:9 130:25
 139:10
**passed** 105:7,8
**patents** 120:4,13
**pax** 100:6
**pay** 19:13 54:22
 55:3 68:2 118:20
 154:9 171:6
**payable** 69:21
**payables** 167:24
**payee** 138:11
**payees** 137:7
**paying** 107:17
 146:24
**payment** 33:17
 92:22 106:23
 108:22 117:9
 133:3,25 134:11
 146:19 154:7,13
 154:15 156:24
 159:17 175:13
 179:4
**payments** 83:22
 84:6 86:16 93:2
 132:16,19 133:7,9
 133:10 134:2,6,16
 134:22 154:5
 156:25 157:24
 172:5 183:17,17
 184:11
**payroll** 42:7
**pays** 122:4
**pc** 10:25 48:9,20
 49:4
**pdf** 95:18
**pearl** 2:18
**penalty** 8:8
**pendency** 70:9
 117:19
**pending** 9:11
 81:25 82:5

**people** 5:15 16:2
 19:8,17,19 28:19
 45:22 53:4 58:24
 102:17 117:24
 118:7 141:24
 142:2,4 168:24
 175:16
**percent** 118:13
 138:19,21 139:4
 141:9,11,13,14
 142:7,8,9,12,16,23
 143:6,8 144:2,5,6
 144:13,14 145:11
 146:4,5,11,11,21
**percentage** 136:6
 136:8 138:13
 139:5 147:7
**percentages**
 136:15 144:19
**perform** 59:15
 66:11 91:25 93:3
 96:20 97:10,16,21
 98:5,6 114:13
 125:22
**performed** 80:20
 83:5 88:10 89:18
 97:20 121:10,14
**period** 72:10
 82:16 86:20 90:25
 117:18 129:22
 133:11 140:13
 151:15 153:25
 154:20 155:11,17
 156:12 157:25
 159:9
**perjury** 8:8
**person** 5:12,15
 15:18,21 26:15,17
 49:20 50:17 51:5
 54:4 103:15
 129:18 130:10,10

 139:9,11,12
 140:24 157:17
 178:20 179:3
 181:23,24 182:2
 183:9,10 184:4
**person's** 27:23
 182:5
**personal** 95:12
 97:25 101:4
 102:10
**personally** 23:9
 65:17
**perspective** 31:23
 77:16 85:7
**pertaining** 146:21
**petition** 32:22
 33:5,9,16,20 35:24
 36:3,8 74:13 84:6
 92:22 132:19
 133:3,3,25 160:2,2
 160:3,3 172:5,20
 174:25 176:5,8
 177:18,24 183:4
 183:11,14,16
 184:5,12
**phone** 15:3 25:11
 25:15 28:8 47:20
 58:24 59:2,11
 104:24 143:15
 167:8 181:19
**phones** 3:10
**phrase** 110:2
**physically** 123:5
**pick** 3:7
**place** 3:10,14
 45:22 47:15 53:8
 77:6 82:20 83:25
 175:24 186:11
**plan** 86:6,11,13,24
 87:15,24 122:2
 169:17

**[planned - process]**

planned 54:19
plans 86:14 88:7
  125:3
platforms 120:8
  120:20
play 52:10 169:18
  169:20 171:7
  172:2,3,3
plays 52:11
pleadings 14:8
please 3:5,9 4:15
  5:10,19 6:3 8:19
  9:5,11 11:8 23:14
  28:11 33:2 35:15
  67:22 148:5,14
  165:2
plus 72:10 106:7,7
  135:18 140:17
po 2:14
pohl 23:10,15,17
  23:24 24:4
point 39:14 40:18
  48:14 52:20 60:6
  61:8 65:25 67:10
  75:3 81:11 92:20
  106:17 123:23
  124:13 130:14
  153:22 166:3
  171:10
points 25:2 55:17
policies 121:17
policy 121:18,22
  121:24 122:8
populated 95:23
ported 49:23
poses 37:2
possession 37:25
  38:3 52:14
possible 30:17,25
  31:6 35:25 60:7
  79:6 82:9 84:12

120:17
possibly 118:9
  169:6 171:17
post 20:17 32:22
  33:5,9,16,20 35:24
  36:3,8 61:11
  63:12 133:3 160:2
  174:25 176:5,8
  177:18,24 183:11
  184:5,12
posted 120:8,19
potential 24:10
  52:9 65:11,15,22
  85:21
potentially 27:20
  66:6 78:17 90:14
pots 101:23
practice 121:21
practitioner
  176:13
pre 74:13 84:6
  92:22 132:19
  133:3,25 160:2,3,3
  172:5,20 177:18
  177:24 183:4,14
  183:16
precursor 17:11
predicated 72:3
  157:10
predict 53:7,13
prefer 33:15
preference 33:9
  33:14 82:10,18
  84:2 171:18
preferences 82:16
preparation 13:20
  15:7 51:9 53:5
  55:19 56:20 60:19
  61:9 68:6 73:16
  86:7 112:4 116:22
  168:10

prepare 13:4
  24:13,14 71:11,12
  71:23 95:3 100:9
  173:5
prepared 13:10,14
  24:15 31:19 71:3
  71:19 86:12
  161:15 173:18
  183:12
preparer 135:4,6
  136:9 173:4 174:9
preparing 8:12
  15:6 45:6,11,12
  46:14 55:24 56:7
  57:24 58:21 60:23
  66:20,21 84:4
  86:18 94:7,11
  105:11 109:6
  110:12 112:9,21
  132:4 155:3,6
  161:2 169:11
  170:5,6
presence 120:25
present 2:21 4:10
presenting 155:13
presidential 19:19
presumably 54:22
  68:20
presuming 114:6
presupposed
  55:10
presupposes 70:15
presupposing
  66:14
pretty 21:11 22:9
  32:7 37:4 44:22
  70:5 179:11
previous 36:21
  38:6 78:7,10
  116:8 119:6

previously 6:10
  14:23 85:20
  104:10 119:18
  130:4
primary 143:10
principal 21:17
  22:24 23:3 37:23
  50:5,10,16,25 51:8
printed 119:11
prior 82:17 83:23
priority 81:7
privacy 29:2
private 3:7
privilege 39:23,25
  40:17 83:15
privileged 41:3
probably 14:24
  20:20 24:11 28:9
  32:9 42:10 45:4
  52:15,16,19 54:5
  106:8,8,9 110:17
  116:23 137:8
  138:21 144:5
  170:23 176:19
problem 80:3
  146:25 160:24
  162:16
procedure 11:3
  17:19
procedures 7:23
  70:13
proceed 11:20
  140:5 165:13
proceeding 4:15
  16:22
proceedings 39:19
  39:21,22 115:10
process 38:14
  40:13 67:21 155:9
  168:7,22 169:23
  178:11

Veritext Legal Solutions
866 299-5127

[produce - reasoning]

| | | q | r |
|---|---|---|---|
| **produce** 8:13 | 152:16 153:16,25 | | |
| **produced** 128:25 | **proponent** 118:12 | **qpc** 31:23 | **r** 2:2 5:21,21 6:5 |
| 137:19 147:16 | **proposed** 5:4,7 | **quarter** 72:8 73:9 | 48:25 186:2 188:2 |
| 173:12,13,16 | 54:20 111:20 | 73:10 | **rang** 167:8 176:10 |
| **product** 46:22 | 139:3 150:21 | **quarterly** 68:7 | **range** 15:13 |
| 83:15,17 | **protect** 75:9 89:16 | 71:19,21,25 72:18 | **rank** 29:5 |
| **profession** 166:3 | 179:4 | **queries** 158:18 | **rarely** 42:21 81:18 |
| **professional** 17:14 | **protected** 29:14 | **question** 8:20 9:5 | **rate** 67:10,11 |
| 17:17,25 18:8,12 | **protection** 83:18 | 9:7,11,19,20 27:4 | **reached** 23:17,24 |
| 33:11 37:22 77:17 | **protective** 29:15 | 27:6 28:9 34:8,12 | 28:20 161:12 |
| 92:21 156:4 158:3 | **prove** 86:22 | 34:16,18,19 36:17 | 162:12,25 |
| 163:3 166:7 | **provide** 22:18 | 36:19,25 38:17 | **reaching** 161:13 |
| 175:19,20 | 92:25 171:11,15 | 53:17 56:9 83:20 | **read** 27:6 34:12 |
| **professionals** 14:8 | **provided** 13:14 | 94:19,21 96:17 | 57:18 65:24 90:16 |
| 30:21 54:9,23 | 59:5 98:11 99:10 | 101:12 105:16 | 120:16 147:25 |
| 57:9 62:8 68:25 | 117:3 130:9 | 108:3,8 110:7,8 | **reads** 55:18 61:8 |
| 77:25 156:5,5,6,7 | 140:24 158:15 | 113:14 114:14 | 63:18 80:17 88:20 |
| 156:8 157:2,3 | **providers** 92:21 | 115:13 116:21 | 94:20,24 95:11 |
| 159:25 175:20 | **providing** 27:14 | 117:4 118:3 119:4 | 105:21 106:12 |
| 181:8 | 63:21 | 120:3,12 121:16 | 113:18 115:15 |
| **profile** 166:10,19 | **public** 1:20 5:23 | 122:11 124:13 | **ready** 137:21 |
| 178:14 179:6,18 | 186:22 188:6 | 126:5 127:22 | **real** 42:20 77:20 |
| **program** 69:12 | **pulling** 134:14 | 130:18,20 148:19 | 94:22 107:6 |
| 70:11 | **pullman** 2:12 5:7 | 149:6,12,25 150:3 | 113:19,22 114:2,4 |
| **progress** 71:9 | 165:17 | 151:19,23 154:2 | 147:6 167:20 |
| **progresses** 50:22 | **punching** 99:11 | 155:16 163:10,12 | **realized** 159:24 |
| **projections** 61:10 | **punitive** 164:9 | 163:12 166:14 | **really** 31:2 74:21 |
| 61:24,24 86:18 | **purchase** 117:12 | 177:13,21 181:15 | 133:2 165:4 |
| 87:10 | 118:19 | 184:10,12 | **reason** 10:8 76:15 |
| **prominent** 60:18 | **purchased** 117:13 | **questions** 47:17 | 78:13 89:4 138:22 |
| **promised** 179:23 | **purposes** 39:23,25 | 83:21 91:3 99:21 | 142:4,19 143:4,10 |
| **prompted** 163:17 | 77:24 | 100:6,23 113:5 | 145:16 |
| **proof** 80:24 81:2 | **pursuant** 10:25 | 119:19,21 129:16 | **reasonable** 21:13 |
| 81:21 | **pushed** 168:23 | 135:25 149:2 | **reasonableness** |
| **proofs** 80:19 | **put** 44:18 69:16 | 153:5 158:5 | 109:14 110:3 |
| **properly** 136:2 | 131:12 142:7 | 164:15 167:17 | 158:10 |
| **property** 94:15,21 | 155:24 | 179:17 184:8,23 | **reasonably** 53:11 |
| 95:12 107:7 | **puts** 87:18 | **quick** 165:4 | **reasoning** 29:21 |
| 113:17 114:2 | **putting** 109:14 | **quickbooks** 60:25 | 142:17 143:21 |
| 120:7,13,15,18 | 180:22 | **quickly** 159:6 | 144:8,11 145:10 |
| 122:11 148:5,14 | | | 145:12,21 |

Veritext Legal Solutions
866 299-5127

[reasons - report]

**reasons** 75:2 77:23 130:3 142:11 168:15
**recall** 23:20 32:6 33:8 34:7 44:10 57:21 65:20 126:17 128:4 146:10,13 151:4 151:10 161:9 173:22
**receipt** 78:13
**receipts** 52:17 54:3,14,15 63:15 66:25 68:22 86:19
**receivable** 69:22
**receive** 57:15 137:10 157:15 174:24
**received** 33:20 92:22 99:17 104:11 137:13 139:7 140:6 160:10
**receiving** 33:9 161:9
**recess** 90:22 139:22
**recognize** 10:20 48:15 49:6 93:21 111:11 140:9 147:20,22
**recollection** 36:16 44:21 162:24
**recommend** 73:23 73:24 74:2 75:7 75:17,22 76:11 80:9 141:10
**recommended** 144:21
**reconciling** 80:18

**record** 3:3,15 4:13 6:4,11,11 8:12 11:13,15,16,20 28:2,18 32:15 41:10 48:5 90:19 90:21 91:2 93:18 100:4 129:5 130:4 139:19,21 140:4 156:9 165:4,8,9,12 185:2,5 188:11
**recorded** 1:14 3:17
**recording** 3:13 8:10
**records** 15:9,20,23 40:14 49:22 52:16 82:9 84:12,14,18 92:19 160:22 171:16,20 172:17
**recoverable** 83:2
**recoveries** 175:15
**rectified** 135:5
**redacted** 129:17 182:6,16,25
**redaction** 130:6
**refer** 97:4,25
**referenced** 68:10 103:11,12,13 119:23 155:5 159:10,15
**references** 63:11 113:4,7 119:6
**referencing** 65:7
**referred** 27:5 174:5
**referring** 71:15 95:20 97:4,7,14 104:3 120:9 132:12 135:9 150:6 167:16

**refers** 84:11 95:13 95:17 96:2 114:16 119:4 120:5,12 121:4,17 122:13 125:8 126:6,7 127:23 135:13 144:20
**reflect** 132:10 133:8 140:22
**reflected** 133:14 135:15 152:8
**reflecting** 164:5
**refresh** 36:16
**regarding** 15:17 16:4,4 24:2,9 25:5 26:4,11 30:14 59:21 65:14,19 67:25 102:15 111:16 137:13 150:3 161:10 163:4
**regret** 168:2
**rejoin** 41:14
**related** 4:7 19:7 49:21 56:9 61:10 90:3 91:4 95:14 138:23 143:5,11 188:14
**relates** 7:3,8 94:15 107:16 111:21 173:16
**relating** 6:23 70:14
**relationship** 143:19
**relevance** 28:21 88:11
**relevant** 27:24 41:4 113:23 116:21 117:14 123:11

**relied** 85:5 104:9 177:15 178:6
**relief** 75:4,6
**relies** 84:22
**rely** 39:2 98:13 123:25 139:6 158:14 176:4 177:23 179:5
**remain** 106:16,24 107:18
**remains** 74:12 184:14
**remember** 21:14 24:7 43:14,24 59:2 62:22 81:3 85:24 87:5 105:2 105:5,15 108:7 109:20 110:8 116:19 117:4 127:19 130:22 142:13 146:16 159:13 167:12 173:10 176:7
**remind** 167:10
**remotely** 4:11
**renters** 107:7
**reorganization** 86:11 168:21 169:15
**repair** 107:8 144:22
**repairs** 158:22
**repeat** 9:5 27:3
**repeating** 66:17
**report** 40:11 45:7 46:11 51:12 54:6 67:8 68:11,19,23 69:7,10,13 70:3,6 70:10,15,19 71:2,4 71:9,19,21,25 72:4 72:18,21 107:22

108:2,2,9 117:5,15
118:11 122:16,22
123:8 124:6
130:15,21 132:3
132:25 134:4,6,24
135:11 144:9
147:8 149:25
151:25 154:20
155:12,15 156:10
157:12,23,23
158:13 159:8,20
160:5,8,25 161:11
161:16,17 163:5
163:13 184:20
**reported** 71:2
157:5 160:7
**reporter** 1:20 4:4
5:10,19 8:11
10:13,18 27:7
32:12,20 35:7,14
47:23 48:4 78:9
93:11,16 111:3,10
128:23 129:13
131:18,19 140:2
147:12,14 171:13
187:15
**reporting** 19:18
42:23 52:18 54:2
66:21 67:4 68:8
108:14 148:24
149:3 155:6,10
**reports** 22:19
66:21 68:7 107:22
116:22 117:16
157:19 161:23
162:3 168:9 169:7
169:12
**represent** 30:2
129:7 140:16
144:13 176:17,19

**representations**
59:21
**representative**
180:5
**represented** 9:12
20:21 21:10,12
102:22 113:12
**representing** 9:16
100:5 181:13
**request** 26:19
108:9 163:18
**require** 47:9 60:7
**required** 12:14,19
17:19,22 54:25
55:2 70:10 76:2
89:5 108:14
**requirement** 67:7
**requirements**
42:24,24 67:5
**requires** 68:24
86:25 89:10
**reside** 150:15
172:17
**residence** 101:5,9
102:5 113:16
114:6,9 118:6,10
150:13
**residences** 19:14
114:14 118:3
**resident** 76:12
**resides** 114:5
118:5
**respect** 21:20
92:25 95:7
**respond** 89:11
178:24,24
**responded** 36:20
65:4
**responding** 35:18
51:16

**responds** 52:4
149:15
**response** 35:23
115:14
**responses** 12:7
**responsibilities**
21:20 46:10,18
**responsible** 20:2
98:12
**responsive** 124:15
**rest** 17:24
**restrictions** 153:2
**restroom** 139:17
**restructure**
167:22
**restructured**
170:16,21
**restructuring**
17:24 18:7 165:19
166:11,13,16,20
166:24 167:7,16
167:21 170:11,21
**resuming** 139:23
**retain** 48:8,19
49:3 181:7
**retained** 34:6
36:22 37:6 39:7
39:15,18,20 72:17
143:11 187:15
**retainer** 32:22,24
32:25 33:5,10,12
33:16,20 35:24
36:4,8 126:6
174:25 175:17
176:5,8 177:19,24
**retaining** 34:5
35:21 36:18 37:3
39:4
**retains** 74:7 162:6
**retention** 7:8
43:16,17,19 44:16

55:13 61:8 88:12
111:21 126:14
175:22
**retrieved** 31:8,12
**return** 53:2,3
74:23 75:6,8
76:12,14 77:2,22
77:23 78:14 79:15
79:17,18 86:23
168:9 173:5
**returns** 54:10 74:3
74:9 75:24 76:5,6
78:18 79:9,11
80:10 169:9 173:3
173:6,11,18
**revealed** 26:18
**revealing** 27:19
28:22
**revenue** 80:14
**review** 27:22
43:22 51:23 52:19
53:10 60:7 61:9
62:12 68:6 72:17
73:16 124:20
125:17 135:24
150:19 158:2
162:5 171:19
**reviewed** 13:8,11
62:18,20 81:24
84:13,18 109:13
110:3 112:24
114:21 141:3
**reviewing** 80:17
82:8 112:11
160:15 171:16
**revising** 139:5
**rhode** 176:15,21
**right** 7:10 10:19
38:19 53:24 55:22
61:3 62:16 63:6
64:16 70:17 71:6

[right - server]

73:4 81:15 84:9
90:7 94:8 95:21
98:2 100:11
126:19 130:11
134:12 136:19
138:5 152:5
153:17,20 154:22
165:20 169:16
170:8 173:23
177:14
**rights** 29:2
**road** 113:20
**rodeo** 89:3
**role** 50:7,12 52:9
53:18 94:6,10
98:11 102:3
105:25 106:3
112:9 134:21
168:11 169:17,20
171:25 172:4
**roles** 23:2 51:18
**roll** 157:4
**rolled** 158:15
**room** 4:11 127:12
**rudnick** 2:8 5:4
15:21 23:10,16
24:6,8,18 25:9
26:5,6,11 30:9
31:20 32:4 38:10
38:12 39:2,16
43:23 49:24 56:13
57:4 58:25 59:7
59:10,17 64:20
83:18 98:25 99:7
102:12,18 103:18
103:18 104:11,17
104:17 105:7,13
106:6 109:24
112:14 124:2
126:7 139:7 156:2
157:15 175:18

178:7 181:3,5
**rudnick's** 126:14
**rule** 10:25 11:22
**rules** 11:2 117:5
161:3
**ruling** 29:12
**run** 22:2 58:9
67:10,11 178:21
**running** 21:23
172:9,10
**runs** 178:22
**russo** 2:6 4:24,24

---

**s**

**s** 2:2 74:10 187:2
**safe** 123:10
**safety** 138:24
144:10 182:11
**sales** 42:7
**sanity** 158:9
**save** 162:4
**saw** 62:22 79:13
79:15 126:13
128:4 153:4
159:23 162:19
163:13 173:3
**saying** 37:9 149:20
149:21 162:13
**says** 33:4 34:15
87:7 91:23 116:6
116:7 162:7,15
184:9,10
**scared** 143:16,18
143:19
**scenarios** 20:14
**schedule** 59:22
60:3 71:14 81:14
94:7,20,23 95:12
96:13 98:23 103:9
103:23 104:8
108:12 109:16,17
109:18 114:2

124:25 128:3
135:5,7,9 136:10
155:25
**scheduled** 81:14
**schedules** 14:6
30:23 44:22 45:25
51:10 55:20,25
56:14 57:12,17,25
58:17,22 60:20,24
69:4 100:10
111:16 112:2,5
113:6 168:8
183:13
**schindler** 13:8
31:25 49:16 50:9
56:5,24 112:18
**school** 17:3,5
**science** 17:7
**scope** 43:8 44:12
90:13 171:9
**scotch** 164:22
**scrambling** 69:4
**scratch** 71:11
99:16 106:2
**search** 15:19,20
49:21 82:25
**second** 45:16 61:7
114:16 121:6
125:2
**secret** 106:21
**secrets** 120:14
**section** 75:5 97:17
105:23 106:4
114:19
**secure** 167:22
**secured** 20:19
21:7 42:15 81:7
**security** 33:17
115:24 118:8,25
133:23 138:16,22
138:24 142:14,18

142:20,24 143:3,5
143:10,23 159:14
184:3
**see** 11:23 28:21
33:6 35:25 45:22
57:19 61:12 68:8
82:11,25 88:11
95:17 96:6 121:8
121:19 125:6
132:15 141:2
148:9 151:16
155:21 159:2,3
168:5 183:20
**seeing** 57:21
127:19
**seek** 124:10,12
**seen** 79:8,12
109:15 121:23
127:24 128:19
137:6 145:7 164:8
164:13
**select** 75:20
**sell** 122:6
**semantics** 39:13
**senators** 19:19
**send** 15:21 24:15
162:7
**sense** 38:2 158:4
158:25
**sensitive** 3:6
**sent** 13:17 31:20
49:24
**sentence** 121:6
125:2
**separate** 74:4,5,14
74:22 107:21
129:5 131:7 132:7
**september** 17:10
**served** 7:5
**server** 13:24 49:22

Page 28

[service - started]

| | | | |
|---|---|---|---|
| **service** 92:21 138:11 145:5,5 | **signature** 188:21 | **someday** 169:17 | **spent** 21:23 |
| **services** 18:24 21:21 85:21 90:4 | **signer** 37:24 52:14 65:3 | **someone's** 171:4 | **split** 118:18 |
| **set** 101:7 161:8 188:10,19 | **significant** 13:9 59:5 | **someplace** 110:21 | **spoke** 13:5,7 14:15 14:21 16:8 31:2 57:6 |
| **setting** 47:5 83:17 | **significantly** 160:14 | **son** 58:9,11,13 | **spoken** 14:24 174:11,18,22 |
| **settlement** 78:6 171:2 | **silverberg** 13:6 24:5 33:4 34:4 37:2 38:5 39:6 | **soon** 159:4 | **spouse** 118:14 145:18 150:14 |
| **settlements** 77:10 | **silverberg's** 35:19 | **sorry** 3:5 7:14 23:11 35:3 41:7 83:11 94:19 95:16 126:4 130:19 171:13 176:11 | **spouse's** 121:18 |
| **seven** 75:15 136:18 | **similar** 113:17 | **sort** 52:8 55:6 | **spreads** 21:25 |
| **seventh** 92:19 | **simultaneously** 44:23 | **sorts** 17:15 42:23 54:15 167:25 | **spreadsheet** 135:14 158:6 160:19 |
| **shake** 8:24 | **single** 53:10 75:22 | **sound** 84:9 | **spring** 2:17 5:16 27:17,18 28:17,23 29:6 57:24 58:3 179:6,9,12 180:6,7 180:10,15,20 181:17,20 182:20 183:5,8 184:6 |
| **shape** 62:10 | **sir** 85:16 100:6,14 153:18 | **source** 62:24 77:12 87:25 105:2 175:7,8,13,25 | |
| **shapes** 42:2 | **sitting** 19:25 | **spatulas** 101:22 | |
| **shea** 2:17 | **situation** 104:20 121:23 | **speak** 14:18 15:14 23:25 24:9,17 25:5,10 26:2 44:17 144:25 174:20,21 181:24 | |
| **sheet** 69:20 131:14 133:15 138:16 158:12 | **six** 162:10 | | **spring's** 28:8 182:10,15,19 |
| **sheets** 109:4 | **size** 42:2 | **speaking** 35:20 115:7,14 151:10 | **springs** 26:19 28:10,14 |
| **sherry** 114:17,25 146:21,25 150:5 150:16,17 151:16 153:20 154:11 | **slipping** 87:4 | **specific** 14:7 51:11 94:17 100:12,14 100:19 101:2 104:4 110:24 111:19 112:12,20 157:25 | **square** 1:18 2:4,9 3:25 |
| | **small** 45:12 88:5 134:17 173:17 | | **ss** 188:4 |
| | **social** 120:23,24 | | **stab** 43:22 |
| **sherry's** 146:25 | **sofa** 55:25 56:14 57:12,17,24 58:16 58:22 59:22 60:2 94:7 98:23 109:16 | | **staff** 20:4 24:12 51:17 52:8,9,24 53:14,17,20 54:4,7 66:20 |
| **shit** 176:11 | | **specifically** 20:25 43:15 51:7 72:20 | |
| **short** 104:20 139:22 | | **specifics** 83:10,16 | **stamp** 129:2 |
| **shorthand** 1:20 | **sofa's** 14:5 44:21 45:25 51:10 60:19 60:19,23 69:4 83:22 112:2 113:5 168:8 170:5 | **specified** 186:11 | **stamped** 35:9 |
| **show** 146:9 | | **speculate** 127:4 | **standard** 70:8 121:21 |
| **showed** 141:24 159:22 | | **speculation** 93:6 | |
| **showing** 101:19 | **software** 60:16,18 61:2,5 | **spell** 23:12,13 | **start** 6:17 7:22 79:25 |
| **shown** 132:21 147:7 | **sole** 52:14 | **spend** 15:5 78:4 165:25 | |
| **shows** 117:20 158:5,21,23 | **solely** 104:9 | | **started** 17:11 23:4 45:6 153:4,7 |
| **siblings** 42:4 | **somebody** 183:7 | | |
| **signatory** 38:23 66:18 | | | |

Veritext Legal Solutions
866 299-5127

162:18 182:21
**starting** 33:14
  83:25 97:9 109:5
  130:14
**starts** 96:17
  109:21
**state** 1:20 4:12,15
  5:23 6:3 27:2
  42:22 73:17 76:16
  76:16 79:14 101:3
  156:5 188:3,7
**stated** 26:17
  164:10 171:19
**statement** 14:5
  34:12 37:21 54:6
  55:19 73:6 111:17
  112:4 158:8
**statements** 8:25
  69:19 111:14
**states** 1:2 3:19
  42:6 54:23 62:5
  69:11,19 71:20
  72:2,22 157:7
  162:8 171:11
  176:19
**statistical** 94:3
**statute** 75:16
  82:22
**statutes** 75:16
**statutorily** 72:24
**stay** 18:2 123:9,13
**stays** 123:8
**step** 13:19 46:2
  69:25
**stepping** 49:13
**steven** 23:9,15,24
  24:4
**street** 2:13,18 6:8
**stretto** 89:22 90:8
  90:14 92:5,10,14
  92:24

**stricken** 29:14
**strike** 25:4 30:6
  116:20 157:13
**structured** 65:23
  66:7
**stub** 72:9
**stuff** 30:25 168:7
**subject** 8:7 12:11
  14:2 29:14 53:10
  147:23
**subscribed** 186:18
**substantively**
  149:5
**subtract** 133:6
**success** 82:5
**successful** 86:10
**suffering** 9:24
**sufficient** 42:12
**suggested** 143:6
**suggesting** 142:12
  142:17
**suggestion** 145:24
**suggestions** 141:3
  141:8
**suite** 2:18 6:8
**sum** 72:11 96:17
  135:17
**summarized**
  155:24
**summary** 94:2
  129:21 130:9
  153:3
**sun** 59:14
**supplement**
  132:24
**support** 19:6 22:4
  22:8 40:6 49:2
  51:24,24 55:21
  85:19 112:6
  162:21 172:8

**supported** 36:21
**supporting** 51:17
**supports** 60:18
**supposed** 74:20
  162:17 167:12
**sure** 7:4,11,23
  27:16 31:24 32:2
  32:7 37:4 38:12
  38:13 43:13,21
  44:19 73:4 75:10
  81:8 88:13 99:22
  104:6 110:13,14
  110:16 113:3,8,11
  124:8 125:25
  127:14 129:6
  135:25 136:10
  137:16 141:5
  150:25 158:4,11
  165:6 167:13
  173:25 174:23
  176:7 179:11
**surprise** 83:24
**surrounding**
  182:12
**suspect** 170:25
**swear** 5:10,19
**swearing** 8:4
**sworn** 5:22 186:5
  186:18 188:10
**system** 60:10

**t**

**t** 5:21 6:5 186:2
  187:2 188:2,2
**tab** 10:12 32:11
  34:22 131:2 146:7
**table** 49:9,10 50:4
**taconic** 113:20
**tail** 45:4
**take** 3:13 9:10
  14:25 31:25 33:3
  35:15 53:8 67:5

77:6 82:20 111:23
  134:17 139:18
  165:3 173:2
  179:25 184:25
**taken** 79:4 90:23
  139:23
**takes** 47:15
**talk** 7:20 8:18 17:2
  80:7 146:3
**talked** 16:3 21:18
  30:10,15 46:2,9,13
  55:14 59:9 127:9
  128:12,16 129:20
  134:10 137:24
  154:25 158:16
  164:3
**talking** 29:25
  64:15 79:23 85:2
  96:12 98:25 103:8
  104:4 138:19
  146:13 160:16,16
  160:17 162:18
**task** 89:4
**tasks** 88:22 170:2
  170:7
**tax** 19:21,22 52:25
  53:3,4 54:8,9
  73:17 74:3,8 75:6
  75:7,24 76:14
  77:2,16,22,24 78:3
  78:17 79:9,11
  80:8,10 168:9
  169:9 173:3,5,6,11
  173:18
**taxation** 19:9 22:2
**taxes** 42:7,7 53:5
  73:24 74:17 77:20
  107:6
**taxing** 75:11
**team** 55:7 56:20
  59:10 106:6,6

[team - top]

109:24 110:16
138:19,20 153:13
172:9,12
**technical** 56:9
**technically** 74:22
**technology** 169:6
**teleconference**
2:19
**telephone** 45:15
**tell** 124:19,24
127:3 135:8
154:14 184:15
**telling** 118:21
**ten** 7:17 15:11
**tense** 85:3,3,4
**term** 87:4 125:13
**testified** 5:24 6:15
88:9
**testify** 10:2,9 12:2
12:14,21 40:15
41:2 186:5
**testifying** 7:25
11:5 28:16
**testimony** 10:6
22:19 185:6 186:6
186:10 188:12
**th** 70:24
**thank** 7:13 12:9
14:14 19:20 29:23
35:2 38:7,25 41:5
41:13 45:24 56:25
90:19 94:24 96:14
99:25 102:21
103:2,3 113:13
119:2,4 128:19
133:4 144:12
159:6 161:8
**thanks** 41:16
**theme** 144:18
**thereto** 55:21
112:6

**thing** 19:17 64:19
66:3 79:13 117:23
120:10 122:14
124:21 135:12
157:2 162:15
**things** 6:21 22:5
51:21 54:18 69:14
100:24 124:4
156:22 161:2
167:19 179:2
**think** 9:14 14:11
14:12 16:17 18:15
19:8 20:20 21:9
24:13 28:25 30:16
30:20 31:2,5 34:6
34:11 36:13,19,22
37:5,10 39:7,13,21
40:9 43:9 45:10
45:24 47:19 49:13
51:3 52:12 55:4
56:10 60:8,17,20
70:6 73:22 76:20
79:18 81:10,22
85:19 87:8 90:5
91:18 94:5 95:13
103:9 106:20,24
106:25 109:16,18
110:2,10,23 113:3
115:23 118:12
119:17 123:9
124:21 125:17
126:11,13,15
128:3,5 137:24
139:3 140:6,15
141:19,25 144:7
146:6,18,25 151:2
152:4 153:8,14
154:18,24 155:5
159:7,10 161:12
163:2 167:7
168:20 170:6,18

172:11 173:16,17
177:12 178:16,16
178:17 179:3
181:19 182:22
183:21 184:20
**thinking** 40:8
117:7 123:12
149:9
**third** 63:18 64:15
117:6 119:24
122:6 130:24
133:12 184:10
**thirds** 184:2
**thought** 37:12
38:18 46:25 56:21
95:14 114:2
126:15 127:15
138:20 142:7
153:9,13 161:21
174:6 175:12
**thoughts** 151:3
**thousand** 126:6
132:21,22 140:17
146:19 152:7
154:12 159:16,16
159:18 166:2
177:2 183:24,25
**threatened** 143:16
**three** 19:2 72:7
75:16 109:23
112:16 161:25
163:10
**tie** 137:17
**till** 17:9 153:4
**tim** 15:18 28:13
41:13 49:19
**time** 1:11,17 4:16
11:14,18 15:9
16:18,19 17:13
19:8 21:12,23
24:22 40:18 43:16

44:24 45:19 52:20
60:6 65:25 81:11
86:17,20 90:20,24
97:3 104:21 106:8
116:13 117:18
118:23 123:24
136:13 137:11
138:2 139:20
140:3 146:23
154:5 155:20
156:14,22 157:11
157:25 159:25
160:14,15,21
162:6 165:7,11
174:2,10 178:25
179:12 186:10
**timely** 80:10 145:9
**times** 1:18 2:4,9
3:25 6:18 7:15
14:24 60:14
104:23 177:11
**timing** 78:24 79:5
134:25
**timothy** 2:19 5:15
**title** 21:15 86:12
101:8 114:25
**today** 7:25 8:13
9:13 10:10 11:5
15:4 159:5
**today's** 13:21
185:6
**told** 63:6 102:10
104:17 143:17
147:3 153:19
181:2 182:14
184:21
**tonight** 85:13
**top** 14:13 18:2
33:4 41:18 48:23
97:5,8 130:10
151:13 155:4

[topic - use]

**topic**  12:2
**topics**  11:22 12:15
  12:22
**total**  94:22 95:12
  96:5 132:10 133:5
  133:6,23,24 136:9
**totally**  29:9,15
  42:18
**tower**  3:25
**track**  124:17
**trade**  120:14
**trademarks**  120:4
  120:14
**transaction**  126:9
**transactional**
  80:12
**transactions**  80:9
  82:9,25 84:13
  171:17
**transcript**  8:14
  186:9,9
**transfer**  82:10
  152:22 171:18
**transfers**  82:20
**translated**  57:8,14
  57:16,19
**travel**  123:2,21
  143:3
**travels**  115:24
**treated**  77:21
**tried**  59:13 134:25
  136:11
**trucks**  97:14
**true**  157:2 172:15
  186:9 188:11
**trustee**  54:23
  69:11 71:20 72:2
  157:7 163:17
  176:21,22
**trustees**  20:16
  62:6 68:24 69:19

70:11 72:6,12,22
  73:13 162:8,12
  176:18
**truth**  186:5
**truthful**  8:5 10:6
**truthfully**  10:2,9
**try**  8:20 15:22
  61:25 149:8 161:5
  171:5
**trying**  14:11 21:9
  45:9 48:14 132:15
  135:23,25 136:5
  162:14 163:10
  170:14 174:2
**turbotax**  60:23
**turn**  3:9 11:8,21
  33:2 68:5 96:24
  105:18 137:23
**turning**  20:24 23:5
  29:24 34:3 35:23
  37:18 41:5 43:6
  48:22 49:9 50:4
  55:12 61:7 73:15
  80:16 82:7 85:17
  86:5 88:19,19
  91:4 92:18 95:11
  103:7 106:11
  109:3 113:13
  115:12 120:3
  124:25 126:5
  130:8 132:6
  140:11 148:3
  149:14 151:13
  159:7
**turns**  144:24
**twitter**  120:20
**two**  14:24 15:11
  15:12 50:16 62:20
  77:15 82:23 87:18
  90:7 92:8 129:5
  132:18 133:10

134:6 141:13,23
  155:14 159:25
  161:19,19 179:18
  181:19 183:25
  184:2
**type**  17:15,20
  68:14 122:14
  148:8,17
**types**  22:5 51:22
  53:15 77:15,18
**typically**  43:20
  69:13 86:15 131:9
  154:9 166:5

**u**

**u.s.**  72:6,12 73:13
  161:10 162:12
**uh**  8:25
**ultimately**  150:22
**un**  42:7,8,9
**unclear**  47:2
**uncover**  40:22
**uncovered**  40:23
**underperforming**
  19:5
**understand**  7:24
  8:3,15,21 9:2,4,7
  9:15,20,22 11:25
  12:13,18 25:19
  27:11 34:11,13,16
  34:17 40:16 58:7
  81:17 86:21
  112:19 115:7
  129:14 147:18
  148:11 150:5
  153:5 158:11
  166:14 169:2
  170:17 175:10
  177:20
**understanding**
  11:4 27:18 28:11
  32:23 37:15 38:8

47:7 63:22 65:21
  76:21 90:13 92:9
  92:13 107:18
  108:19 113:21
  115:20 119:9
  121:3 141:15
  147:4 149:10,11
  149:13,19 180:25
  182:17 183:2
**understood**  9:3
  88:6 89:17 100:16
  133:4 145:8
**undisclosed**  139:9
  139:11,12
**unheard**  176:24
**unit**  3:16
**united**  1:2 3:19
  54:23 62:5 69:11
  69:19 71:20 72:2
  72:22 157:7 162:8
**universe**  154:6
**unkept**  42:9
**unknown**  130:10
  140:24 157:17
**unpaid**  156:13
**unregistered**
  120:6,17
**unrelated**  14:22
**unsecured**  167:23
**updated**  137:17
**upkeep**  107:9
**uploaded**  109:17
  109:20
**ups**  164:18
**use**  53:11 64:24
  113:18,22 115:15
  116:6,10 117:3,7
  117:22,24 119:7
  122:19 139:17
  158:24 162:4
  169:5

Veritext Legal Solutions
866 299-5127

[uses - witness]

| | | | |
|---|---|---|---|
| **uses** 60:17 115:21 | 55:15 56:19,23 | 165:7,11 184:25 | 104:19,21 117:25 |
| **usually** 69:15,16 | 57:2 58:15,21 | 185:4 | 134:15 141:17 |
| 81:12 83:25 86:25 | 59:15,25 61:14,18 | **videos** 120:8,19 | 156:23 162:2 |
| 87:11,18 117:17 | 64:11 65:9,13 | **view** 36:25 107:2 | 188:16 |
| 134:15 154:11 | 66:10 67:9,12,15 | 148:18 149:6 | **ways** 77:22 |
| **utilities** 144:12 | 67:24 71:12,18 | 166:10,19,23 | **we've** 16:3 20:16 |
| | 72:17 73:18 76:10 | 170:10 | 20:20 21:4,10,10 |
| **v** | 76:25 78:16 80:20 | **virtually** 74:19 | 22:13 30:10,15 |
| **v&l** 56:3 | 82:3 83:4 84:17 | 169:8 176:18,20 | 44:20 45:10 55:14 |
| **v&l's** 88:12 | 84:22 85:25 87:19 | **visit** 118:16 142:5 | 67:14 85:8 94:5 |
| **valuable** 116:3 | 87:23 89:18 93:3 | **visits** 118:9 | 128:12 129:20 |
| **valuation** 121:10 | 94:6,10 95:3 | **volunteered** 184:8 | 132:3 134:10 |
| 121:13 | 96:20 97:10,15 | | 154:18,21 158:16 |
| **value** 67:15 | 98:5 99:5 100:8 | **w** | 162:16 163:20 |
| 102:24 120:22 | 101:13 102:3 | **wait** 8:19 | 164:3 |
| 121:7,19,22,25 | 106:2 107:23 | **walk** 55:16 94:13 | **wealthy** 19:13 |
| 122:3,5 | 109:5,11 111:20 | **walked** 110:16 | **website** 162:8 |
| **vans** 97:14 | 112:8,16,17,20 | **walking** 98:4 | **wednesday** 16:17 |
| **various** 18:2 20:3 | 122:15 124:9 | 141:7 | 45:17 116:2,16 |
| 42:2,5,6 51:16 | 125:22 128:10 | **wan** 1:5 2:9 3:18 | 123:16,18 126:12 |
| 54:22 57:9 58:24 | 134:21 135:15,19 | 5:5 11:6 94:4 | 174:15 182:23 |
| 59:6 69:22 75:11 | 136:22 140:23 | 111:18 | **week** 42:13 |
| 118:24 120:8,13 | 144:21 149:11 | **want** 16:25 40:21 | **weekly** 66:24 |
| 120:19 183:13 | 163:17 | 40:22 44:17 45:18 | **welcome** 41:14 |
| **vehicle** 115:23,24 | **verdolino's** 130:14 | 55:16 66:23 75:21 | **went** 17:5,8 31:5 |
| 117:13,22,23 | **verify** 59:16 138:3 | 94:13 104:2 | 43:24 45:19 |
| **vehicles** 115:14,21 | **veritext** 4:3,5 | 105:18 107:5,12 | 122:23,24,25 |
| 116:9,13 117:2,8 | **vermont** 176:17 | 146:3 147:19 | 123:5 174:7 |
| 118:25 | **version** 79:16 | 149:8 168:18 | **western** 17:4 |
| **verdolino** 1:15 7:9 | 127:13 133:15 | 172:3 | **whatsoever** |
| 10:25 12:14,22 | 137:17,24 140:12 | **wanted** 45:21 | 123:22 |
| 13:24 15:16 17:12 | 140:20,22 150:10 | 105:10 110:14 | **whereof** 188:18 |
| 18:22,25 19:25 | **versus** 38:9 41:24 | 144:7 163:22 | **whispering** 3:7 |
| 20:10,15 21:15,20 | 119:24 | **wants** 69:20 172:2 | **wife** 138:25 |
| 22:24 23:6,18,25 | **video** 1:14 3:13,17 | 172:3 | 141:13 142:8,24 |
| 24:17 25:7 26:3 | **videographer** 2:22 | **washington** 6:8 | 145:14 |
| 30:11,13 31:15 | 3:2 4:4 5:9,18 | **water** 34:24 | **willing** 64:20 |
| 36:7,18 37:3,23 | 8:10 11:14,18 | **watercraft** 97:15 | **wip** 67:18,20 |
| 38:21 39:4,17 | 34:23 35:4 90:20 | 119:5 | **wire** 152:21 |
| 43:7 44:13 48:8 | 90:24 139:20 | **watermark** 162:6 | **witness** 5:11,20,22 |
| 48:20 49:4,14,18 | 140:3 164:25 | **way** 47:21 54:19 | 26:21 27:8 28:15 |
| 49:25 50:15,20 | | 62:10 67:3 75:14 | |

Veritext Legal Solutions
866 299-5127

[witness - zero]

| | | **z** |
|---|---|---|
| 29:10,11,16 35:3 | **wrapping** 91:3 | **zero** 67:14 79:20 |
| 46:21 59:12 78:11 | **wraps** 96:8 | 82:21 94:24 |
| 83:8 85:10 116:12 | **write** 36:13 41:18 | 106:13,16,24 |
| 130:2 131:4,12 | 177:10 | 107:19 108:20,23 |
| 148:2 164:20 | **writes** 34:4 39:6 | 146:4,11 |
| 167:9 176:11 | **writings** 113:9 | |
| 185:9 188:9,12,18 | **written** 8:12 65:18 | |
| **word** 59:21 | 119:8 121:2 | |
| **words** 57:9 | 126:10 | |
| **work** 17:8 19:9,11 | **wrong** 73:5 162:13 | |
| 22:19 40:4 42:10 | 170:24 | |
| 43:8 44:13 46:22 | **wrote** 37:5 181:25 | |
| 54:5,8,9 56:12,13 | 182:4 | |

| | **x** |
|---|---|
| 57:17 58:20 59:24 | |
| 61:14,18 64:11 | **x** 1:3,8 187:2,17 |

| | **y** |
|---|---|
| 66:4,11 67:21 | |
| 68:14 70:14 73:3 | **yacht** 119:7 |
| 73:18 76:24 78:15 | **yeah** 59:13 170:13 |
| 80:19 83:14,15,17 | 172:25 |
| 84:2 86:2 88:10 | **year** 42:13 74:11 |
| 88:14,17 89:17 | 74:12 75:15,16 |
| 90:2,3,13 97:10,16 | 82:23 154:10,13 |
| 97:20 98:6 109:10 | **years** 7:17 17:13 |
| 112:14,20 121:11 | 18:3 20:21 82:23 |
| 125:23 135:19 | 82:24 166:3,4 |
| 154:19,25 167:24 | 169:3 176:7 |
| 169:22 176:20 | **yep** 36:2 95:22 |
| 177:2 178:2,5 | 121:9 178:8,10 |
| **worked** 15:20 45:2 | **yesterday** 106:22 |
| 56:16 92:5 95:5 | 123:16 126:12 |
| 100:17 109:22 | **york** 1:18,19,21 |
| 135:22 136:4,9 | 2:5,5,10,10 3:25 |
| **working** 51:18 | 4:2 5:23 58:8 |
| 90:6 96:22 136:15 | 79:15,17 115:8,10 |
| 155:25 178:4 | 146:22 173:19 |
| **works** 134:15 | 176:14 188:3,7 |
| 176:9 | **youtube** 120:20 |
| **world** 38:2 | |
| **worried** 182:10 | |
| **worth** 19:10,25 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.