# Exhibit UCC-5

# Sherry Netherlands Purchase Documents

CASE NO. _____ 22-50073

IN RE: Ho Wan Kwok _____

VS. _____

UCC   **EXHIBIT** _____ 5

**DATE** _____ **IDEN.**

**DATE** 5/25/2022 Admitted in Full **EVID.**

**BY** P.E._____

**Deputy Clerk**

AO 386-A

## Susan Hennelly

| | |
|---|---|
| **From:** | Susan Hennelly |
| **Sent:** | Tuesday, March 03, 2015 3:31 PM |
| **To:** | BoardOfDirectors |
| **Subject:** | Sale of Apartment 1801 and Maid's Room 2219 |
| **Attachments:** | Kwok board package.pdf |

We have received a contract for the sale of the 2,950 shares allocated to Apartment 1801 and the 50 shares allocated to Maid's Room 2219 from Sherry 1800s, LLC (Haroche) to Genever Holdings LLC (Miles Kwok).

Attached are copies of the contract of sale, Mr. Kwok's application and several letters of reference.

The purchase price is $67,500,000, plus $2,500,000 for the furnishings. The 2015 maintenance is $55,214 per month plus an additional $936 for the Maid's Room. This is a residential apartment and will be used by Mr. Kwok and his family.

Due to Mr. Kwok's foreign status and purchasing in an LLC, he will be required to sign an occupancy agreement and personally guarantee the lease. He will also be required to provide a security deposit.

This apartment encompasses the entire floor and is approximately 7,300 sq. ft. plus 2,170 sq. ft. of terraces. Attached is a floor plan.

Mr. Kwok has also entered into a contract to purchase Maid's Room 719 which he will purchase simultaneously, if approved.

Michael Horvitz and Fred Seegal have interviewed Miles Kwok and his son, Mileson Kwok. His wife, Hing Chi, was present via Skype.

Very truly yours,

Michael J. Ullman
Executive Vice President
& Chief Operating Officer
The Sherry Netherland Hotel
781 Fifth Avenue
New York, NY 10022
P: 212-231-6811   F: 212-832-4845
For reservations and special offers, go to

1

SN 0027

Executed Contract of Sale

SN 0028

Contract of sale cooperative apartment, 7-2006
Prepared by the Committee on Condominiums and Cooperatives of the Real Property Section of the New York State Bar Association

CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

## Contract of Sale - Cooperative Apartment

This Contract is made as of February_____, 2015 between the "Seller" and the "Purchaser" identified below.

**1 Certain Definitions and Information**
1.1 The "Parties" are:

1.1.1 "Seller": Sherry 1800s, LLC
*Prior names used by Seller:*
*Address: 1233 Rock Rimmon Road, Stamford, CT 06903*

1.1.2 "Purchaser": Genever Holdings LLC

*Address:*

*Tax ID. No.: 20-0780554*

*S.S. No.:*

1.2 The "Attorneys" are *(name, firm name, address and telephone, fax).*

1.2.1 "Seller's Attorney"
Michael J. Jones, Esq.
Ivey, Barnum & O'Mara, LLC
170 Mason Street, Greenwich, CT 06830
Tel: 203-661-6000
Fax: 203-661-7088
mjones@ibolaw.com

1.2.2 "Purchaser's Attorney"
Ira Gilbert, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison, LLP
1285 Avenue of the America
New York, NY 10019-6064
Tel: 212-373-3529
Fax: 212-492-0529
igilbert@paulweiss.com

1.3 The "Escrowee" is *the [Seller's]* Attorney.

1.4 The Managing Agent is *(name, address and telephone, fax):*
*Sherry Netherland Hotel*
*Susan Hennelly*
*781 Fifth Avenue, 1", New York, NY 10022*
*Tel: 212-231-6811 Fax: 212-832-4845*

1.5 The real estate "Broker(s)" (see ¶ 12) is/are: John Burger, and Kathy Sloane, Brown Harris Stevens and Serena Boardman, Sotheby's 1.6 The name of the cooperative housing corporation ("Corporation") is:
Sherry Netherland, Inc.

1.7 The "Unit" number is: **1801, which encompasses the entire \***

1.8 The Unit is located in "Premises" known as: 781 Fifth Avenue, New York, NY
1.9 The "Shares" are the shares of the Corporation allocated to the Units.
\* 18ᵗʰ Floor, except elevator hallway and including Maid's Room 1519

1.10 The "Lease" is the Corporation's proprietary lease or occupancy agreement for the Unit, given by the Corporation which expires on _____
1.11 "Personalty" is the following personal property, to the extent existing in the Unit on the date hereof: the refrigerators, freezers, ranges, ovens, built-in microwave ovens, dishwashers, garbage disposal units, cabinets and counters, lighting fixtures, chandeliers, wall-to-wall carpeting, plumbing and heating fixtures, central air-conditioning and/or window or sleeve units, washing machines, dryers, screens and storm windows, window treatments, switch plates, door hardware, mirrors, built-ins not excluded in ¶ 1.12 and all of the ~~furnishings including but not limited to everyday china pots, pans, cooking items, flatware, as well as crystal glasses and decanters, etc in the bar area~~ and personal property (except as specifically excluded in 1.12), including but not limited to all items set forth in the series of videos contained in the DVD(the "DVD") delivered by Brown Harris Stevens
to Unit 1801 at 2:00 pm of February 20, 2015.

(\*) See 1.12 below

1.12 ~~Specifically excluded from this sale is all personal property not included in ¶ 1.11 and all contents included in the unit with the exception of 13 paintings and drawings, one antique secretary desk on east wall of LR (will be replaced) personal "knick knacks" such as small boxes, clocks, picture frames, pictures, etc.~~

1.13 The sale ~~[does]~~ ~~[does not]~~ Include Seller's interest in ~~[Storage]~~/ [Servant's Room #1519]/ ~~[Parking Space]~~ ("Included Interests")
1.14 The "Closing" is the transfer of ownership of the Shares and Lease.
1.15 The date scheduled for Closing is  no later than 3/6/15 ("Scheduled Closing Date") at 10:00 A.M. (See ¶¶ 9 and 10)
1.16 The "Purchase Price" is: $67,500,000.00
1.16.1 The "Contract Deposit" is: $7,000,000.00
1.16.2 The "Balance" of the Purchase Price due at Closing is: $63,000,000.00 (See ¶ 2.2.2)  See SR18 in Second Rider
1.17 The monthly "Maintenance" charge is $57,085.53  (See ¶ 4)
1.18 The "Assessment", if any, payable to the Corporation, at the date of this Contract is NONE, payable as follows:
1.19 [Purchaser] shall pay the Corporation's flip tax, transfer fee (apart from the transfer agent fee) and/or waiver of option fee ("Flip Tax"), if any.
1.20 ~~Financing Options (Delete two of the following ¶¶ 1.20.1, 1.20.2 or 1.20.3)~~
~~1.20.1 Purchaser may apply for financing in connection with this sale and Purchaser's obligation to purchase under this Contract is contingent upon issuance of a Loan Commitment Letter by the Loan Commitment Date (¶18.1.2).~~
~~1.20.2 Purchaser may apply for financing in connection with this sale but Purchaser's obligation to purchase under this Contract is not contingent upon issuance of a Loan Commitment letter.~~
~~1.20.3 Purchaser shall not apply for financing in connection with this sale.~~
~~1.21 If ¶ 1.20.1 or 1.20.2 applies, the "Financing Terms" for ¶ 18 are: a loan of $ _____ for a term of _____ years or such lease~~

(\*) 1.12 – Specifically excluded from this sale are thirteen (13) paintings and drawings; one antique secretary desk on east wall of LR (to be replaced by a piece of furniture that resembles this); personal 'knick knacks' such as small boxes, clocks, picture frames, pictures, etc. (but if 'knick knacks' are in the DVD, they are included); file cabinets in GII's office and contents thereof; all the clothing, framed photographs(except specific frame to be designated by buyer) and the model of the Seller's private yacht located in Seller's office.

**SN 0029**

Contract of sale cooperative agreement, 7-1801
Prepared by the Committee on Condominiums and Cooperatives of the Real Property Section of the New York State Bar Association

CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

## Contract of Sale - Cooperative Apartment

This Contract is made as of February **21**, 2015 between the "Seller" and the "Purchaser" identified below.

**1 Certain Definitions and Information**

**1.1 The "Parties" are:**

1.1.1 "Seller": Sherry 1800s, LLC
*Prior names used by Seller:*
*Address: 1233 Rock Rimmon Road, Stamford, CT 06903*

*Tax ID. No.: 20-0780,154*

1.1.2 "Purchaser": Genover Holdings LLC

*Address:*

*S.S. No.:*

1.2 The "Attorneys" are *(name, firm name, address and telephone, fax).*

1.2.1 "Seller's Attorney"
Michael J. Jones, Esq.
Ivey, Barnum & O'Mara, LLC
170 Mason Street, Greenwich, CT 06830
Tel: 203-661-6300
Fax: 203-661-7088
mjones@iholow.com

1.2.2 "Purchaser's Attorney"
Ira Gilbert, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison, LLP
1285 Avenue of the America
New York, NY 10019-6064
Tel: 212-373-3529
Fax: 212-492-0529
igilbert@paulweiss.com

1.3 The "Escrowee" is *the [Seller's] Attorney*.

1.4 The Managing Agent is *(name, address and telephone, fax):*
*Sherry Netherland Hotel*
*Susan Hennelly*
*781 Fifth Avenue, 1", New York, NY 10022*
*Tel: 212-231-6811 Fax: 212-832-4845*

1.5 The real estate "Broker(s)" *(see ¶ 12)* is/are: John Burger, and Kathy Sloane, Brown Harris Stevens and Serena Boardman, Sotheby's 1.6 The name of the cooperative housing corporation ("Corporation") is:
Sherry Netherland, Inc.

1.7 The "Unit" number is: 1801, which encompasses the entire *

1.8 The Unit is located in "Premises" known as: 781 Fifth Avenue, New York, NY

1.9 The "Shares" are the shares of the Corporation allocated to the Unit.
* 18th Floor, except elevator hallway and including Maid's Room 1519

1.10 The "Lease" is the Corporation's proprietary lease or occupancy agreement for the Unit, given by the Corporation which expires on

1.11 "Personalty" is the following personal property, to the extent existing in the Unit on the date hereof: the refrigerators, freezers, ranges, ovens, built-in microwave ovens, dishwashers, garbage disposal units, cabinets and counters, lighting fixtures, chandeliers, wall-to-wall carpeting, plumbing and heating fixtures, central air-conditioning and/or window or sleeve units, washing machines, dryers, screens and storm windows, window treatments, switch plates, door hardware, mirrors, built-ins not excluded in ¶ 1.12 and all of the ~~furnishings including but not~~ ~~limited to everyday china, pots, pans, cooking items,~~ ~~flatware as well as crystal, glasses and decanters etc in the~~ ~~bar area~~ and personal property (except as specifically excluded in 1.12), including but ~~not limited to all items set forth in~~ the series of videos contained in the DVD (the "DVD") delivered by Brown Harris Stevens to Unit 1801 at 2:00 pm on February 20, 2015.

1.12 *See 1.12 below*

1.12 ~~Specifically excluded from this sale is all personal property~~ ~~not included in ¶ 1.11 and all contents included in the unit~~ ~~with the exception of 13 paintings and drawings, one antique~~ ~~secretary desk on east wall of LR (will be replaced) personal~~ ~~"knick-knacks" such as small boxes, clocks, picture frames,~~ ~~pictures, etc.~~

1.13 The sale [does] [~~does not~~] include Seller's interest in [Storage]/ [Servant's Room #1519]/ [~~Parking Space~~] ("Included Interests")

1.14 The "Closing" is the transfer of ownership of the Shares and Lease.

1.15 The date scheduled for Closing is **no later than 3/6/15** ("Scheduled Closing Date") at 10:00 A.M. (See ¶ 9 and 10)

1.16 The "Purchase Price" is: $67,500,000.00

1.16.1 The "Contract Deposit" is: $7,000,900.00

1.16.2 The "Balance" of the Purchase Price due at Closing is: $63,000,000.00 (See ¶ 2.2.2) **See SR18 in Second Rider**

1.17 The monthly "Maintenance" charge is $57,085.53    (See ¶ 4)

1.18 The "Assessment", if any, payable to the Corporation, at the date of this Contract is NONE, payable as follows:

1.19 [Purchaser] shall pay the Corporation's flip tax, transfer fee (apart from the transfer agent fee) and/or waiver of option fee ("Flip Tax"), if any.

1.20 ~~Financing Options (Delete two of the following ¶¶ 1.20.1,~~ ~~1.20.2 or 1.20.3)~~

~~1.30.1 Purchaser may apply for financing in connection with this~~ ~~sale and Purchaser's obligation to purchase under this Contract is~~ ~~contingent upon issuance of a Loan Commitment Letter by the~~ ~~Loan Commitment Date (¶18.1.2).~~

~~1.20.2 Purchaser may apply for financing in connection with this~~ ~~sale but Purchaser's obligation to purchase under this Contract is~~ ~~not contingent upon issuance of a Loan Commitment Letter.~~

~~1.20.3 Purchaser shall not apply for financing in connection with~~ ~~this sale.~~

~~1.21 If ¶ 1.20.1 or 1.20.2 applies, the "Financing Terms" for ¶18~~ ~~are: a loan of $ _____ (in a form of _____ years or such lesser~~

*1.12 – Specifically excluded from this sale are thirteen (13) paintings and drawings; one antique secretary desk on east wall of LR (to be replaced by a piece of furniture that resembles this desk); personal 'knick knacks' such as small boxes, clocks, picture frames, pictures, etc. (but if 'knick knacks' are in the DVD, they are included); file cabinets in Gil's office and contents thereof; all the clothing, framed photographs (except specific frame to be designated by buyer) and the model of the Seller's private yacht located in Seller's office.

SN 0030

amount or shorter term as applied for or acceptable to Purchaser; and the "Loan Commitment Date" for ¶ 18.1s ─────── calendar days after the Delivery Date.

1.22 The "Delivery Date" of this Contract is the date on which a fully executed counterpart of this Contract is deemed given to and received by Purchaser or Purchaser's Attorney as provided in ¶ 17.3.

1.23 All "Proposed Occupants" of the Unit are:

1.23.1 persons and relationship to Purchaser:

1.23.2 pets:

1.24 The Contract Deposit shall be held in [a non-] IOLA escrow account. If the account is a non- IOLA account then interest shall be paid to the Party entitled to the Contract Deposit. The Party receiving the interest shall pay any income taxes thereon. The escrow account shall be a segregated bank account at Depository: **BNY MELLON**

Address: 10 Mason Street, Greenwich, CT 06830 (See ¶ 27)

1.25 This Contract is continued on attached rider(s).

**2 Agreement to Sell and Purchase; Purchase Price; Escrow**

2.1 Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the Seller's Shares, Lease, Personalty and any Included Interests and all other items included in this sale, for the Purchase Price and upon the terms and conditions set forth in this Contract.

2.2 The Purchase Price is payable to Seller by Purchaser as follows:

2.2.1 the Contract Deposit at the time of signing this Contract by Purchaser's good check to the order of Escrowee; and

2.2.2 the Balance at Closing, only by cashier's or official bank check or certified check of Purchaser payable to the direct order of Seller. The check(s) shall be drawn on and payable by a branch of a commercial or savings bank, savings and loan association or trust company located in the same City or County as the Unit. Seller may direct, on reasonable Notice (defined in ¶ 17) prior to Closing, that all or a portion of the Balance be made payable to persons other than Seller (see ¶ 17.7).

**3 Personalty**

3.1 Subject to any rights of the Corporation or any holder of a mortgage to which the Lease is subordinate, this sale includes all of the Seller's interest, if any, in the Personalty and the Included Interests.

3.2 No consideration is being paid for the Personalty or for the Included Interests; nothing shall be sold to Purchaser if the Closing does not occur.

3.3 Prior to Closing, Seller shall remove from the Unit all the furniture, furnishings and other property not included in this sale, and repair any damage caused by such removal.

**4 Representations and Covenants**

4.1 Subject to any matter affecting title to the Premises (as to which Seller makes no representations or covenants), Seller represents and covenants that:

4.1.1 Seller is, and shall at Closing be, the sole owner of the Shares, Lease, Personalty and Included Interests, with the full right, power and authority to sell and assign them. Seller shall make timely provision to satisfy existing security interest(s) in the Shares and Lease and have the same delivered at Closing (See ¶10.1);

4.1.2 the Shares were duly issued, fully paid for and are non-assessable;

4.1.3 the Lease is, and will at Closing be, in full force and effect and no notice of default under the Lease is now or will at Closing be in effect;

4.1.4 the Maintenance and Assessments payable as of the date hereof are as specified in ¶ 1.17 and 1.18;

4.1.5 as of this date, Seller neither has actual knowledge nor has received any written notice of any increase in Maintenance or any Assessment which has been adopted by the Board of Directors of the Corporation and is not reflected in the amounts set forth in ¶¶ 1.17and 1.18;

4.1.6 Seller has not made any material alterations or additions to the Unit without any required consent of the Corporation or, to Seller's actual knowledge, without compliance with all applicable law. This provision shall not survive Closing.

4.1.7 Seller has not entered into, shall not enter into, and has no actual knowledge of any agreement (other than the Lease) affecting title to the Unit or its use and/or occupancy after Closing, or which would be binding on or adversely affect Purchaser after Closing (e.g. a sublease or alteration agreement);

4.1.8 Seller has been known by no other name for the past 10 years except as set forth in ¶ 1.1.1.

4.1.9 at Closing in accordance with ¶ 15.2:

4.1.9.1 there shall be no judgments outstanding against Seller which have not been bonded against collection out of the Unit ("Judgments");

4.1.9.2 the Shares, Lease, Personalty and any Included Interests shall be free and clear of liens (other than the Corporation's general lien on the Shares for which no monies shall be owed), encumbrances and adverse interests ("Liens");

4.1.9.3 all sums due to the Corporation shall be fully paid by Seller to the end of the payment period immediately preceding the date of Closing;

4.1.9.4 Seller shall not be indebted for labor or material which might give rise to the filing of a notice of mechanic's lien against the Unit or the Premises; and

4.1.9.5 no violations shall be of record which the owner of the Shares and Lease would be obligated to remedy under the Lease.

4.2 Purchaser represents and covenants that:

4.2.1 Purchaser is acquiring the Shares and Lease for residential occupancy of the Unit solely by the Proposed Occupants identified in ¶ 1.23

4.2.2 Purchaser is not, and within the past 7 years has not been, the subject of a bankruptcy proceeding.

4.2.3 if ¶ 1.20.3 applies, Purchaser shall not apply for financing in connection with this purchase.

4.2.4 Each individual comprising Purchaser is over the age of 18 and is purchasing for Purchaser's own account (beneficial and of record);

4.2.5 Purchaser shall not make any representations to the Corporation contrary to the foregoing and shall provide all documents in support thereof required by the Corporation in connection with Purchaser's application for approval of this transaction; and

4.2.6 there are not now and shall not be at Closing any unpaid tax liens or monetary judgments against Purchaser.

4.3 Each Party covenants that its representations and covenants contained in ¶ 4 shall be true and complete at Closing and, except for ¶ 4.1.6, shall survive Closing but any action based thereon must be instituted within one year after Closing.

**5 Corporate Documents**

Purchaser has examined and is satisfied with, or (except as to any matter represented in this Contract by Seller) accepts and assumes the risk of not having examined, the Lease, the Corporation's Certificate of Incorporation, By-laws, House Rules, minutes of shareholders' and directors' meetings, most recent audited financial statement and most recent statement of tax deductions available to the Corporation's shareholders under Internal Revenue Code ("IRC") §216 (or any successor statute).

**6 Required Approval and References**

6.1 This sale is subject to the unconditional consent of the Corporation.

6.2 Purchaser shall in good faith:

6.2.1 submit to the Corporation or the Managing Agent an application with respect to this sale on the form required by the Corporation, containing such data and together with such documents as the Corporation requires, and pay the applicable

fees and charges that the Corporation imposes upon Purchaser. All of the foregoing shall be submitted within 10 business days after the Delivery Date, or, if ¶ 1.20.1 or 1.20.2 applies and the Loan Commitment Letter is required by the Corporation, within 5 business days after the earlier of (i) the Loan Commitment Date (defined in ¶ 1.21) or (ii) the date of receipt of the Loan Commitment Letter (defined in ¶ 18.1.23);

6.2.2 attend (and cause any Proposed Occupant to attend) one or more personal interviews, as requested by the Corporation; and

6.2.3 promptly submit to the Corporation such further references, data and documents reasonably requested by the Corporation.

6.3 Either Party, after learning of the Corporation's decision, shall promptly advise the other Party thereof. If the Corporation has not made a decision on or before the Scheduled Closing Date, the Closing shall be adjourned for 30 business days for the purpose of obtaining such consent. If such consent is not given by such adjourned date, either Party may cancel this Contract by Notice, provided that the Corporation's consent is not issued before such Notice of cancellation is given. If such consent is refused at any time, either Party may cancel this Contract by Notice. In the event of cancellation pursuant to this ¶ 6.3, the Escrowee shall refund the Contract Deposit to Purchaser.

6.4 If such consent is refused, or not given, due to Purchaser's bad faith conduct, Purchaser shall be in default and ¶ 13.1 shall govern.

**7 Condition of Unit and Personalty; Possession**

7.1 Seller makes no representation as to the physical condition or state of repair of the Unit, the Personalty, the Included Interests or the Premises. Purchaser has inspected or waived inspection of the Unit, the Personalty and the Included Interests and shall take the same "as is", as of the date of this Contract, except for reasonable wear and tear. However, at the time of Closing, the appliances shall be in working order and required smoke detector(s) shall be installed and operable.

7.2 At Closing, Seller shall deliver possession of the Unit, Personalty and Included Interests in the condition required by ¶ 7.1, broom-clean, vacant and free of all occupants and rights of possession.

**8 Risk of Loss**

8.1 The provisions of General Obligations Law § 5-1311, as modified herein, shall apply to this transaction as if it were a sale of realty. For purposes of this paragraph, the term "Unit" includes built-in Personalty.

8.2 Destruction shall be deemed "material" under GOL § 5-1311, if the reasonably estimated cost to restore the Unit shall exceed 5% of the Purchase Price.

8.3 In the event of any destruction of the Unit or the Premises, when neither legal title nor the possession of the Unit has been transferred to Purchaser, Seller shall give Notice of the loss to Purchaser ("Loss Notice") by the earlier of the date of Closing or 7 business days after the date of the loss.

8.4 If there is material destruction of the Unit without fault of Purchaser, this Contract shall be deemed canceled in accordance with ¶ 16.3, unless Purchaser elects by Notice to Seller to complete the purchase with an abatement of the Purchase Price; or

8.5 Whether or not there is any destruction of the Unit, if without fault of Purchaser, more than 10% of the units in the Premises are rendered uninhabitable, or reasonable access to the Unit is not available, then Purchaser shall have the right to cancel this Contract in accordance with ¶ 16.3 by Notice to Seller.

8.6 Purchaser's Notice pursuant to ¶ 8.4 or ¶ 8.5 shall be given within 7 business days following the giving of the Loss Notice except that if Seller does not give a Loss Notice, Purchaser's Notice may be given at any time at or prior to Closing.

8.7 In the event of any destruction of the Unit, Purchaser shall not be entitled to an abatement of the Purchase Price (i) that exceeds the reasonably estimated cost of repair and restoration or (ii) for any loss that the Corporation is obliged to repair or restore; but Seller shall assign to Purchaser, without recourse, Seller's claim, if any, against the Corporation with respect to such loss.

**9 Closing Location**

The Closing shall be held at the location designated by the Corporation or, if no such designation is made, at the office of Seller's Attorney.

**10 Closing**

10.1 At Closing, Seller shall deliver or cause to be delivered:

10.1.1 Seller's certificate for the Shares duly endorsed for transfer to Purchaser or accompanied by a separate duly executed stock power to Purchaser, and in either case, with any guarantee of Seller's signature required by the Corporation;

10.1.2 Seller's counterpart original of the Lease, all assignments and assumptions in the chain of title and a duly executed assignment thereof to Purchaser in the form required by the Corporation;

10.1.3 FIRPTA documents required by ¶ 25;

10.1.4 keys to the Unit, building entrance(s), and, if applicable, garage, mailbox, storage unit and any locks in the Unit;

10.1.5 if requested, an assignment to Purchaser of Seller's interest in the Personalty and Included Interests;

10.1.6 any documents and payments to comply with ¶ 15.2

10.1.7 If Seller is unable to deliver the documents required in ¶ 10.1.1 or 10.1.2 then Seller shall deliver or cause to be delivered all documents and payments required by the Corporation for the issuance of a new certificate for the Shares or a new Lease.

10.2 At Closing, Purchaser shall:

10.2.1 pay the Balance in accordance with ¶2.2.2;

10.2.2 execute and deliver to Seller and the Corporation an agreement assuming the Lease, in the form required by the Corporation; and

10.2.3 if requested by the Corporation, execute and deliver counterparts of a new lease substantially the same as the Lease, for the balance of the Lease term, in which case the Lease shall be canceled and surrendered to the Corporation together with Seller's assignment thereof to Purchaser.

10.3 At Closing, the Parties shall complete and execute all documents necessary:

10.3.1 for Internal Revenue Service ("IRS") form 1099-S or other similar requirements;

10.3.2 to comply with smoke detector requirements and any applicable transfer tax filings; and

10.3.3 to transfer Seller's interest, if any, in and to the Personalty and Included Interests.

10.4 Purchaser shall not be obligated to close unless, at Closing, the Corporation delivers:

10.4.1 to Purchaser a new certificate for the Shares in the name of Purchaser; and

10.4.2 a written statement by an officer or authorized agent of the Corporation consenting to the transfer of the Shares and Lease to Purchaser and setting forth the amounts of and payment status of all sums owed by Seller to the Corporation, including Maintenance and any Assessments, and the dates to which each has been paid.

**11 Closing Fees, Taxes and Apportionments**

11.1 At or prior to Closing,

11.1.1 Seller shall pay, if applicable:

11.1.1.1 the cost of stock transfer stamps; and

11.1.1.2 transfer taxes, except as set forth in ¶ 11.1.2.2

11.1.2 Purchaser shall pay, if applicable:

11.1.2.1 any fee imposed by the Corporation relating to Purchaser's financing; and

SN 0032

11.1.2.2 transfer taxes imposed by statute primarily on Purchaser (e.g., the "mansion tax"),

11.2 The Flip Tax, if any, shall be paid by the Party specified in ¶ 1.19.

11.3 Any fee imposed by the Corporation and not specified in this Contract shall be paid by the Party upon whom such fee is expressly imposed by the Corporation, and if no Party is specified by the Corporation, then such fee shall be paid by Seller.

11.4 The Parties shall apportion as of 11:59 P.M. of the day preceding the Closing, the Maintenance, and any other periodic charges due the Corporation (other than Assessments) and STAR Tax Exemption (if the Unit is the beneficiary of same), based on the number of the days in the month of Closing.

11.5 Assessments, whether payable in a lump sum or installments, shall not be apportioned, but shall be paid by the Party who is the owner of the Shares on the date specified by the Corporation for payment. Purchaser shall pay any installments payable after Closing provided Seller had the right and elected to pay the Assessment in installments.

11.6 Each Party shall timely pay any transfer taxes for which it is primarily liable pursuant to law by cashier's, official bank, certified or attorney's escrow check. This ¶11.6 shall, survive Closing.

11.7 Any computational errors or omissions shall be corrected within 6 months after Closing. This ¶11.7 shall survive Closing.

**12 Broker**

12.1 Each Party represents that such Party has not dealt with any person acting as a broker, whether licensed or unlicensed, in connection with this transaction other than the Broker(s) named in ¶ 1.5.

12.2 Seller shall pay the Broker's commission pursuant to a separate agreement The Broker(s) shall not be deemed to be a third-party beneficiary of this Contract.

12.3 This ¶12 shall survive Closing, cancellation or termination of this Contract.

**13 Defaults, Remedies and Indemnities**

13.1 In the event of a default or misrepresentation by Purchaser, Seller's sole and exclusive remedies shall be to cancel this Contract, retain the Contract Deposit as liquidated damages and, if applicable, Seller may enforce the indemnity in ¶ 13.3 as to brokerage commission or sue under ¶ 13.4. Purchaser prefers to limit Purchaser's exposure for actual damages to the amount of the Contract Deposit, which Purchaser agrees constitutes a fair and reasonable amount of compensation for Seller's damages under the circumstances and is not a penalty. The principles of real property law shall apply to this liquidated damages provision.

13.2 In the event of a default or misrepresentation by Seller, Purchaser shall have such remedies as Purchaser is entitled to at law or in equity, including specific performance, because the Unit and possession thereof cannot be duplicated.

13.3 Subject to the provisions of ¶ 4.3, each Party indemnifies and holds harmless the other against and from any claim, judgment, loss, liability, cost or expense resulting from the indemnitor's breach of any of its representations or covenants stated to survive Closing, cancellation or termination of this Contract. Purchaser indemnifies and holds harmless Seller against and from any claim, judgment, loss, liability, cost or expense resulting from the Lease obligations accruing from and after the Closing. Each indemnity includes, without limitation, reasonable attorneys' fees and disbursements, court costs and litigation expenses arising from the defense of any claim and enforcement or collection of a judgment under this indemnity, provided the indemnitee is given Notice and opportunity to defend the claim. This ¶ 13.3 shall survive Closing, cancellation or termination of this Contract.

13.4 In the event any instrument for the payment of the Contract Deposit fails of collection, Seller shall have the right to sue on the uncollected instrument. In addition, such failure of collection shall be a default under this Contract, provided Seller gives Purchaser Notice of such failure of collection and, within 3 business days after Notice is given, Escrowee does not receive from Purchaser an unendorsed good certified check, bank check or immediately available funds in the amount of the uncollected funds. Failure to cure such default shall entitle Seller to the remedies set forth in ¶ 13.1 and to retain all sums as may be collected and/or recovered.

**14 Entire Agreement; Modification**

14.1 All prior oral or written representations, understandings and agreements had between the Parties with respect to the subject matter of this Contract, and with the Escrowee as to ¶ 27, are merged in this Contract, which alone fully and completely expresses the Parties' and Escrowee's agreement. 14.2 The Attorneys may extend in writing any of the time limitations stated in this Contract. Any other provision of this Contract may be changed or waived only in writing signed by the Party or Escrowee to be charged.

**15 Removal of Liens and Judgments**

15.1 Purchaser shall deliver or cause to be delivered to Seller or Seller's Attorney, not less than 10 calendar days prior to the Scheduled Closing Date a Lien and Judgment search, except that Liens or Judgments first disclosed in a continuation search shall be reported to Seller within 2 business days after receipt thereof, but not later than the Closing. Seller shall have the right to adjourn the Closing pursuant to ¶ 16 to remove any such Liens and Judgments. Failure by Purchaser to timely deliver such search or continuation search shall not constitute a waiver of Seller's covenants in ¶4 as to Liens and Judgments. However, if the Closing is adjourned solely by reason of untimely delivery of the Lien and Judgment search, the apportionments under ¶ 11.3 shall be made as of 11:59 P.M. of the day preceding the Scheduled Closing Date in ¶ 1.15.

15.2 Seller, at Seller's expense, shall obtain and deliver to the Purchaser the documents and payments necessary to secure the release, satisfaction, termination and discharge or removal of record of any Liens and Judgments. Seller may use any portion of the Purchase Price for such purposes.

15.3 This ¶ 15 shall survive Closing.

**16 Seller's Inability**

16.1 If Seller shall be unable to transfer the items set forth in ¶ 2.1 in accordance with this Contract for any reason other than Seller's failure to make a required payment or other willful act or omission, then Seller shall have the right to adjourn the Closing for periods not exceeding 60 calendar days in the aggregate, but not extending beyond the expiration of Purchaser's Loan Commitment Letter, if ¶ 1.20.1 or 1.20.2 applies.

16.2 If Seller does not elect to adjourn the Closing or (if adjourned) on the adjourned date of Closing Seller is still unable to perform, then unless Purchaser elects to proceed with the Closing without abatement of the Purchase Price, either Party may cancel this Contract on Notice to the other Party given at any time thereafter.

16.3 In the event of such cancellation, the sole liability of Seller shall be to cause the Contract Deposit to be refunded to Purchaser and to reimburse Purchaser for the actual costs incurred for Purchase's lien and title search, if any.

**17 Notices and Contract Delivery**

17.1 Any notice or demand ("Notice") shall be in writing and delivered either by hand, Overnight delivery or certified or registered mail, return receipt requested, to the Party and simultaneously, in like manner, to such Party's Attorney, if any, and to Escrowee at their respective addresses or to such other address as shall hereafter be designated by Notice given pursuant to this ¶ 17.

17.2 The Contract may be delivered as provided in ¶

17.1 or by ordinary mail.

17.3 The Contract or each Notice shall be deemed given and received:

17.3.1 on the day delivered by hand;

17.3.2 on the business day following the date sent by overnight delivery;

17.3.3 on the 5th business day following the date sent by certified or registered mail; or

17.3.4 as to the Contract only, 3 business days following the date of ordinary mailing.

17.4 A Notice to Escrowee shall be deemed given only upon actual receipt by Escrowee.

17.5 The Attorneys are authorized to give and receive any Notice on behalf of their respective clients.

17.6 Failure or refusal to accept a Notice shall not invalidate the Notice.

17.7 Notice pursuant to ¶¶ 2.2.2 and 13.4 may be delivered by confirmed facsimile to the Party's Attorney and shall be deemed given when transmission is confirmed by sender's facsimile machine.

18 Financing Provisions

18.1 The provisions of ¶¶ 18.1 and 18.2 are applicable only if ¶ 1.20.1 or 1.20.2 applies.

18.1.1 An "Institutional Lender" is any of the following that is authorized under Federal or New York State law to issue a loan secured by the Shares and Lease and is currently extending similarly secured loan commitments in the county in which the Unit is located: a bank, savings bank, savings and loan association, trust company, credit union of which Purchaser is a member, mortgage banker, insurance company or governmental entity.

18.1.2 A "Loan Commitment Letter" is a written offer from an Institutional Lender to make a loan on the Financing Terms (see ¶ 1.21) at prevailing fixed or adjustable interest rates and on other customary terms generally being offered by Institutional Lenders making cooperative share loans. An offer to make a loan conditional upon obtaining an appraisal satisfactory to the Institutional Lender shall not become a Loan Commitment Letter unless and until such condition is met. An offer conditional upon any factor concerning Purchaser (e.g. sale of current home, payment of outstanding debt, no material adverse change in Purchaser's financial condition, etc.) is a Loan Commitment Letter whether or not such condition is met. Purchaser accepts the risk that, and cannot cancel this Contract if, any condition concerning Purchaser is not met.

18.2 Purchaser, directly or through a mortgage broker registered pursuant to Article 12-D of the Banking Law, shall diligently and in good faith:

18.2.1 apply only to an Institutional Lender for a loan on the Financing Terms (see ¶ 1.21) on the form required by the Institutional Lender containing truthful and complete information and submit such application together with such documents as the Institutional Lender requires, and pay the applicable fees and charges of the Institutional Lender, all of which shall be performed within 5 business days after the Delivery Date;

18.2.2 promptly submit to the Institutional Lender such further references, data and documents requested by the Institutional Lender; and

18.2.3 accept a Loan Commitment Letter meeting the Financing Terms and comply with all requirements of such Loan Commitment Letter (or any other loan commitment letter accepted by Purchaser) and of the Institutional Lender in order to close the loan; and

18.2.4 furnish Seller with a copy of the Loan Commitment Letter promptly after Purchaser's receipt thereof.

18.2.5 Purchaser is not required to apply to more than one Institutional Lender.

18.3 If ¶ 1.20.1 applies, then

18.3.1 provided Purchaser has complied with all applicable provisions of ¶ 18.2 and this ¶ 18.3, Purchaser may cancel this Contract as set forth below, if:

18.3.1.1 any Institutional Lender denies Purchaser's application in writing prior to the Loan Commitment Date (see ¶ 1.21); or

18.3.1.2 a Loan Commitment Letter is not issued by the Institutional Lender on or before the Loan Commitment Date; or

18.3.1.3 any requirement of the Loan Commitment Letter other than one concerning Purchaser is not met, (e.g. failure of the Corporation to execute and deliver the Institutional Lender's recognition agreement or other document, financial condition of the Corporation, owner occupancy quota, etc.); or

18.3.1.4 (i) the Closing is adjourned by Seller or the Corporation for more than 30 business days from the Scheduled Closing Date and (ii) the Loan Commitment Letter expires on a date more than 30 business days after the Scheduled Closing Date and before the new date set for Closing pursuant to this paragraph and (iii) Purchaser is unable in good faith to obtain from the Institutional Lender an extension of the Loan Commitment Letter or a new Loan Commitment Letter on the Financing Terms without paying additional fees to the Institutional Lender, unless Seller agrees, by Notice to Purchaser within 5 business days after receipt of Purchaser's Notice of cancellation on such ground, that Seller will pay such additional fees and Seller pays such fees when due. Purchaser may not object to an adjournment by Seller for up to 30 business days solely because the Loan Commitment Letter would expire before such adjourned Closing date.

18.3.2 Purchaser shall deliver Notice of cancellation to Seller within 5 business days after the Loan Commitment Date if cancellation is pursuant to ¶18.3.1.1 or 18.3.1.2 and on or prior to the Scheduled Closing Date if cancellation is pursuant to ¶ 18.3.1.3 or 18.3.1.4.

18.3.3 If cancellation is pursuant to ¶ 18.3.1.1, then Purchaser shall deliver to Seller, together with Purchaser's Notice, a copy of the Institutional Lender's written denial of Purchaser's loan application. If cancellation is pursuant to ¶ 18.3.1.3, then Purchaser shall deliver to Seller together with Purchaser's Notice evidence that a requirement of the Institutional Lender was not met.

18.3.4 Seller may cancel this Contract by Notice to Purchaser, sent within 5 days after the Loan Commitment Date, if Purchaser shall not have sent by then either (i) Purchaser's Notice of cancellation or (ii) a copy of the Loan Commitment Letter to Seller, which cancellation shall become effective if Purchaser does not deliver a copy of such Loan Commitment Letter to Seller within 10 business days after the Loan Commitment Date.

18.3.5 Failure by either Purchaser or Seller to deliver Notice of cancellation as required by this ¶ 18.3 shall constitute a waiver of the right to cancel under this ¶18.3.

18.3.6 If this Contract is canceled by Purchaser pursuant to this ¶ 18.3, then thereafter neither Party shall have any further rights against, or obligations or liabilities to, the other by reason of this Contract, except that the Contract Deposit shall be promptly refunded to Purchaser and accept as set forth in ¶ 13. If this Contract is canceled by Purchaser pursuant to ¶ 18.3.1.4, then Seller shall reimburse Purchaser for any non-refundable financing and inspection expenses and other sums reimbursable pursuant to ¶ 6.

18.3.7 Purchaser cannot cancel this Contract pursuant to ¶ 18.3.1.4 and cannot obtain a refund of the Contract Deposit if the Institutional Lender fails to fund the loan.

~~18.3.7.1 because a requirement of the Loan Commitment Letter concerning Purchaser is not met (e.g., Purchaser's financial condition or employment status suffers an adverse change; Purchaser fails to satisfy a condition relating to the sale of an existing residence, etc.) or~~

~~18.3.7.3 due to the expiration of a Loan Commitment Letter issued with an expiration date that is not more than 30 business days after the Scheduled Closing Date.~~

**19 Singular/Plural and Joint/Several**
The use of the singular shall be deemed to include the plural and vice versa, whenever the context so requires. If more than one person constitutes Seller or Purchaser, their obligations as such Party shall be joint and several.

**20 No Survival**
No representation and/or covenant contained herein shall survive Closing except as expressly provided. Payment of the Balance shall constitute a discharge and release by Purchaser of all of Seller's obligations hereunder except those expressly stated to survive Closing.

**21 Inspections**
Purchaser and Purchaser's representatives shall have the right to inspect the Unit within 48 hours prior to Closing, and at other reasonable times upon reasonable request to Seller.

**22 Governing Law and Venue**
This Contract shall be governed by the laws of the State of New York without regard to principles of conflict of laws. Any action or proceeding arising out of this Contract shall be brought in the county or Federal district where the Unit is located and the Parties hereby consent to said venue.

**23 No Assignment by Purchaser; Death of Purchaser**
23.1 Purchaser may not assign this Contract or any of Purchaser's rights hereunder. Any such purported assignment shall be null and void.
23.2 This Contract shall terminate upon the death of al. persons comprising Purchaser and the Contract Deposit shall be refunded to the Purchaser. Upon making such refund and reimbursement, neither Party shall have any further liability or claim against the other hereunder, except as set forth in ¶ 12.

**24 Cooperation of Parties**
24.1 The Parties shall each cooperate with the other, the Corporation and Purchaser's Institutional Lender and title company, if any, and obtain execute and deliver such documents as are reasonably necessary to consummate t.is sale.
24.2 The Parties shall timely file all required documents in connection with all governmental filings that are required by law. Each Party represents to the other that its statements in such filings shall be true and complete. This ¶ 24.2 shall survive Closing.

**25 FIRPTA**
The parties shall comply with IRC §§ 897, 1445 and the regulations thereunder as same may be amended ("FIRPTA"). If applicable, Seller shall execute and deliver to purchaser at Closing a Certification of Non- Foreign Status ("CNS") or deliver a Withholding Certificate from the IRS. If Seller fails to deliver a CNS or a Withholding Certificate, Purchaser shall withhold from the Balance, and remit to the IRS, such sum as may be required by law. Seller hereby waives any right of action against Purchaser on account of such withholding and remittance. This ¶ 25 shall survive Closing.

**26 Additional Requirements**
26.1 Purchaser shall not be obligated to close unless all of the following requirements are satisfied at the time of the Closing:
26.1.1 the Corporation is in good standing;
26.1.2 the Corporation has fee or leasehold title to the Premises, whether or not marketable or insurable; and
26.1.3 there is no pending in rem action, tax certificate/ ion sale or foreclosure action of any underlying mortgage affecting the Premises.

26.2 If any requirement in ¶ 26.1 is not satisfied at the time of the Closing, Purchaser shall give Seller Notice and if the same is not satisfied within a reasonable period of time thereafter, then either Party way cancel this Contract (pursuant to ¶ 16.3) by Notice.

**27 Escrow Terms**
27.1 The Contract Deposit shall be deposited by Escrowee in an escrow account as set forth in ¶ 1.24 and the proceeds held and disbursed in accordance with the terms of this Contract. At Closing, the Contract Deposit shall be paid by Escrowee to Seller. If the Closing does not occur and either Party gives Notice to Escrowee demanding payment of the Contract Deposit, Escrowee shall give prompt Notice to the other Party of such demand. If Escrowee does not receive a Notice of objection to the proposed payment from such other Party within 10 business days after the giving of Escrowee's Notice, Escrowee is hereby authorized and directed to make such payment to the demanding party. If Escrowee does receive such a Notice of objection within said period, or if for any reason Escrowee in good faith elects not to make such payment, Escrowee may continue to hold the Contract Deposit until otherwise directed by a joint Notice by the Parties or a final, non-appealable judgment, order or decree of a court of competent jurisdiction. However, Escrowee shall have the right at any time to deposit the Contract Deposit and the interest thereon, if any, with the clerk of a court in the county as set forth in ¶ 22 and shall give Notice of such deposit to each Party. Upon disposition of the Contract Deposit and interest thereon, if any, in accordance with this ¶ 27, Escrowee shall be released and discharged of all escrow obligations and liabilities.
27.2 The Party whose Attorney is Escrowee shall be liable for loss of the Contract Deposit. If the Escrowee is Seller's attorney, then Purchaser shall be credited with the amount of the contract Deposit at Closing.
27.3 Escrowee will serve without compensation. Escrowee is acting solely as a stakeholder at the Parties' request and for their convenience. Escrowee shall not be liable to either Party for any act or omission unless it involves bad faith, willful disregard of this Contract or gross negligence. In the event of any dispute, Seller and Purchaser shall jointly and severally (with right of contribution) defend (by attorneys elected by Escrowee), indemnify and hold harmless Escrowee from and against any claim, judgment, loss, liability, cost and expenses incurred in connection with the performance of Escrowee's acts or omissions not involving bad faith, willful disregard of this Contract or gross negligence. This indemnity includes, without limitation, reasonable attorneys' fees either paid to retain attorneys or representing the fair value of legal services rendered by Escrowee to itself and disbursements, court costs and litigation expenses.
27.4 Escrowee acknowledges receipt of the Contract Deposit, by check subject to collection.
27.5 Escrowee agrees to the provisions of this ¶ 27.
27.6 If Escrowee is the Attorney for a Party, Escrowee shall be permitted to represent such Party in any dispute or lawsuit.
27.7 This ¶ 27 shall survive Closing, cancellation or termination of this Contract

**28 Margin Headings**
The margin heading do not constitute part of the text of this Contract.

**29 Miscellaneous**
This Contract shall not be binding unless and until Seller delivers a fully executed counterpart of this Contract to Purchaser (or Purchaser's Attorney) pursuant to ¶ 17.2 and 17.3. This Contract shall bind
and inure to the benefit of the Parties hereto and their respective heirs, personal and legal representatives and successors in interest.

SN 0035

Case 22-50073    Doc 485-2    Filed 05/06/22    Entered 05/06/22 12:09:48    Page 70 of
132

**30 Lead Paint**
If applicable, the complete and fully executed Disclosure of
Information on Lead Based Paint and or Lead-Based Paint
Hazards is attached hereto and made a part hereof.

**In Witness Whereof,** the Parties hereto have duly executed this Contract as of the date first above written.

ESCROW TERMS AGREED TO:

_____
Michael J. Jones ESCROWEE

SELLER:
**SHERRY 1800s, LLC**

By: _____

PURCHASER:
**GENEVER HOLDINGS LLC**

By: _____

SN 0036

Case 22-50073    Doc 486-3    Filed 08/26/22    Entered 08/26/22 12:09:48    Page 72 of
1324

**FIRST RIDER ANNEXED TO AND FORMING A PART OF CONTRACT OF SALE FOR THE 18TH FLOOR KNOWN AS UNIT 1801 AT SHERRY NETHERLAND, INC., 781 FIFTH AVENUE, NEW YORK, NEW YORK, A COOPERATIVE APARTMENT BETWEEN SHERRY 1800s, LLC, AS SELLER, AND GENEVER HOLDINGS LLC, AS PURCHASER, DATED FEBRUARY 21, 2015**

31.    In the event of any conflict between the provision of this Rider or any other Rider, and the provisions of the Contract to which this Rider is attached, the provisions of this Rider shall control.

32.    In addition to the representation made by Purchaser in Paragraph 4 of this Contract, Purchaser, jointly and severally, represents and warrants to Seller that Purchaser knows of no outstanding judgments or tax liens and knows of no threatened lawsuit or claim (including criminal and/or tax proceedings).

33.    Supplementing Paragraph 20, the acceptance of the Shares and the assumption of the Lease by Purchaser and the delivery of possession of the Unit and keys by Seller shall be deemed full performance by Seller of Seller's obligations under this Contract, except any of which that survive Closing, and such acceptance and assumption by Purchaser shall discharge Seller from all terms, conditions, representations and agreements required to be performed by Seller under this Contract, except any of which that survive Closing. No liability on the part of Seller shall survive the Closing except as expressly set forth in this Contract.

34.    In the event that there is any refund on real estate taxes attributable to the time period in which Seller has owned the Unit, such refund shall belong solely to Seller. In this regard, Purchaser shall cooperate with Seller in connection with obtaining such refund and Purchaser agrees to sign any reasonable documentation to assist Seller in obtaining such refund. If such refund is delivered to Purchaser (or credited towards Purchaser's monthly maintenance by the Corporation), Purchaser shall promptly remit such refund to Seller. The Parties acknowledge that the provision of this Paragraph 34 shall survive the Closing

35.    An increase in the maintenance or the imposition of an assessment after the date hereof shall not be deemed a misrepresentation or breach by Seller hereunder. In this regard, any assessment imposed by the Corporation after the date of this Contract, shall be solely the obligation of Purchaser if such assessment is payable on or after the date of Closing, Seller will send Purchaser a copy of any notices from the Corporation regarding material facts relating to the Corporation including any maintenance increases.

36.    A "Disclosure of Information on Lead-Based Paint and/or Lead Based Paint Hazards" is attached hereto as Exhibit A hereto. Such document may be executed in counterparts. This Contract shall be deemed executed when signed by the parties hereto notwithstanding that the Broker's signature on such Exhibit A have not yet been obtained. Purchaser acknowledges that Purchaser has received the pamphlet Protect Your Home From Lead in Your Home and Purchaser hereby waives the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards in the Unit and/or the Premises. Purchaser acknowledges that Seller has made no representations to Purchaser concerning the presence of lead paint in the Premises except in the Unit and then only to the extent expressly set forth in the attached disclosure form. Notwithstanding any requirements pursuant to any Local Law, Purchaser

accepts the Premises and Unit in their current "as is" condition concerning the presence of lead paint and any hazards related to same.

37.    All representations made by the Seller in the Contract or any Rider thereto are made to the best of Seller's knowledge and belief without independent investigation and shall not survive the closing.

IN WITNESS WHEREOF, of the parties hereto have executed this Rider to Contract of Sale as of the date first above written.

SELLER:

SHERRY 1800s, LLC

By: _____

PURCHASER:

GENEVER HOLDINGS LLC

By: _____

SN 0038

SECOND RIDER TO CONTRACT OF SALE DATED AS OF FEBRUARY 21, 2015,
BETWEEN SHERRY 1800S LLC, AS SELLER, AND GENEVER HOLDINGS LLC, AS
PURCHASER, COVERING PREMISES LOCATED AT 781 FIFTH AVENUE, NEW YORK,
NEW YORK, 18TH FLOOR (UNITS 1801, 1804, 1807, 1809, 1811, SERVANT'S ROOM 1519)

SR1.    In case of any inconsistency or conflict between the printed portion of this
Contract or the First Rider, and the provisions of this Second Rider, the provisions of this Second
Rider shall control.

SR2.    Seller shall, promptly after receipt thereof, deliver to Purchaser copies of
any written notices from the Corporation received after the Delivery Date and relating to: (1) any
increase in the amount of the monthly Maintenance as set forth in paragraph 1.17; (2) any
intended or proposed assessment other than the Assessment; (3) any intended or proposed
changes to the "flip tax" or other transfer fee charged by the Corporation or its Managing Agent;
(4) any proposed amendment or modification of the Lease, the Certificate of Incorporation of the
Corporation or the Corporation's By-Laws; (5) any proposed construction or repair work the cost
of which is intended to be borne by the Corporation, its insurers or its shareholders; (6) any
refinancing or other material change with respect to any mortgage affecting the Premises; or (7)
any damage or casualty to the Unit or the Premises.

SR3.    Supplementing paragraph 3.3:  In the event Seller removes any light
fixtures from the Unit, such fixtures will be replaced with standard fixtures, so that no exposed
wiring or bulbs remain in place of the removed fixtures.  Seller shall, at its own expense and
prior to the Closing, remove from the Unit all furniture, furnishings and other personal property
and/or fixtures not included in this transaction and shall repair in a good and workmanlike
manner any material damage caused by such removal.  Any of Seller's personal property not
included in the sale contemplated hereby which is not removed from the Unit prior to the Closing
shall be deemed abandoned property.  Purchaser may (but shall not be obligated to) cause any
such abandoned property to be removed from the Unit at Seller's risk and expense.  The
provisions of this paragraph shall survive the Closing.

SR4.    Notwithstanding the provisions of paragraph 7 or any other provision of
this Contract to the contrary, Seller represents and warrants that the plumbing, heating, electrical
and air conditioning systems and fixtures and all Personalty shall be in working order at the
Closing, to the extent the responsibility of Seller under the Lease.

SR5.    (a)    As a material inducement to Purchaser entering into this Contract,
Seller hereby represents that Seller has obtained all necessary approvals, permits and certificates
from the Corporation and the New York City Department of Buildings for any work done by
Seller to the Unit.  Further, Seller is not obligated to perform any work or expend any monies

Doc#: US1:9841154v4

SN 0039

Case 22-50073    Doc 485-2    Filed 06/06/22    Entered 06/06/22 12:09:40    Page 15 of 32

2

(other than maintenance) pursuant to any agreement (other than the Lease and other Co-op Documents) with the Corporation that would be binding on Purchaser after Closing.

(b)     Prior to Closing, Seller shall, at its sole cost and expense, cause any and all open permits against the Unit to be closed, discharged, and otherwise paid for, and shall deliver satisfactory proof of same to Purchaser. A Letter of Completion from the NYC Department of Buildings shall be deemed satisfactory proof. Notwithstanding the foregoing, Seller shall not be required to close two open permits that are listed by the New York City Department of Buildings as Job Nos. 101785169 and 101778836, copies of which Jobs are attached hereto. The parties acknowledge the reason for the prior sentence is that the Corporation has stated it will agree in writing to duly close these two open permits. In the event the Corporation does not deliver such written agreement, then Seller may either elect to close these permits, but if it does not, then either party may terminate this Contract.

(c)     Seller shall either (a) deliver to Purchaser a letter of completion from the New York City Department of Buildings evidencing that the Unit has been legally combined, or (b) at Closing, execute and file with the transfer taxes returns an affidavit stating the reasons that the Unit is properly and legally considered to be a single unit with one kitchen and that transfer tax should be paid to New York City at the rate of 1.425%. Seller shall also deliver an indemnity letter to Purchaser indemnifying Purchaser against any costs and damages (including, but not limited to penalties and interest for late payment) resulting from the City's requiring payment at a higher rate of taxation. Notwithstanding the foregoing, if (i) Seller is unable to deliver a letter of completion as set forth above, and (ii) Seller elects to pay the New York City transfer tax at the rate of 1.425% (rather than the so-called "bulk rate" of 2.625%), then Seller's attorneys shall hold in escrow the sum of $840,000 representing the difference between these rates of taxation. Seller's attorneys shall hold such sum for the shorter of (i) two (2) years (representing the current audit period for this tax by the New York City Department of Finance ("DOF"), or (ii) until such time that the Corporation delivers satisfactory written evidence from the New York City Department of Buildings (and/or other appropriate governmental entities) that the Unit has been properly and legally combined. Seller's attorneys shall either release the balance to Seller if it is determined that 1.425% was the appropriate rate of taxation, or pay this sum, plus interest and penalties, if any, in the event it is determined by DOF that 2.625% was the appropriate transfer tax rate.

SR6.    Supplementing paragraph 4.1: "4.1.10. To Seller's knowledge, Seller has not received any written notice of any major repairs or replacements contemplated to the Premises or to the building systems in the Premises (including, without limitation, the heating, plumbing and electrical systems) that could materially affect the Premises or the Unit.

"4.1.11. To Seller's knowledge, there are currently no water leaks into the Unit and there have been no such leaks during the twelve (12)- month period immediately

Doc#: US1:9841154v4

SN 0040

preceding the date hereof. In addition, Seller has not been notified during said twelve (12)-month period of any water leaks elsewhere in the Premises which were purported to emanate from the Unit."

"4.1.12 During Seller's ownership of the Unit, to Seller's knowledge, Seller has not been aware of (a) the presence any toxic mold in either the Unit, or (b) any bedbug infestation in the Unit."

"4.1.13 That to Seller's knowledge, there are no claims, actions, suits or legal proceedings of any kind pending or threatened (in writing), which affect the Unit, Seller's ownership of the Unit or which may cause a lien of any kind to be imposed against the Unit or the Seller."

"4.1.14 To Seller's knowledge, in the last twelve (12) months, that neither Seller, nor any person acting on behalf of Seller, has made any complaint (in writing, electronic communication or by telephone) to the Corporation, Managing Agent, superintendent or any other unit owner or tenant-shareholder at the Premises regarding noise, offensive odors, offensive conduct, lack of heat or hot water, or any other disturbance or adverse condition affecting the Unit."

SR7. All representations, warranties and covenants of Seller set forth in this Contract shall be true in all material respects as of the Closing, and Purchaser's obligation to perform under this Contract is expressly conditioned upon there being no breach, inaccuracy or misrepresentation in any of the same.

SR8. If the Corporation approves the Purchaser's application but conditions its consent upon Purchaser complying with requirements outside the scope of the Contract, such as a demand for the Purchaser to deposit funds into escrow, then Purchaser may elect, in its sole discretion, to either (i) comply with such conditions and proceed with the Purchase, or (ii) decline to comply with such conditions. If Purchaser declines to comply, then Purchaser shall deliver to Seller written notice of same and this Contract shall be deemed canceled, and Escrowee shall promptly refund the Contract Deposit to Purchaser. Further, Seller acknowledges and agrees that Purchaser shall only be required to disclose to the Corporation liquid assets of $420,000,000.00 (more than five times the Purchase Price), with supporting documentation as may be required by the Corporation as to the aforesaid amount (such as bank statements). Submission by Purchaser of the foregoing shall be deemed complete for purposes of the "Financial Statement", "Statement of Assets and Liabilities signed by Purchaser or Accountant" and supporting "Verification of Assets" which are required by the Corporation as part of its "Standard Transfer Requirements" Board application. Purchaser may, in its sole discretion, decline any request by the Corporation to submit any documentation showing liquid assets in excess of the aforesaid amount, so that in the event the Corporation rejects the Purchaser's

Case 22-50073   Doc 486-2   Filed 06/06/22   Entered 06/06/22 13:03:50   Page 17 of 32

4

application for any reason (other than willful bad faith by Purchaser), this Contract shall be deemed canceled, and Escrowee shall promptly refund the Contract Deposit to Purchaser.

SR9.   Supplementing paragraph 11.1.1.2: Seller's obligation with respect to payment of transfer taxes shall apply to transfer taxes imposed by both the City and the State of New York. Within fourteen (14) days following the Closing, Seller shall furnish to Purchaser's attorney proof of filing of such transfer taxes. Seller shall indemnify and hold Purchaser harmless from and against any and all costs, loss or expenses incurred by Purchaser, including reasonable attorneys' fees and disbursements, by reason of Seller's failure to timely perform its obligations with respect to such transfer taxes. The provisions of this paragraph shall survive the Closing.

SR10.   Supplementing paragraph 13: "13.5  Should either party willfully default in its obligations hereunder, it shall be liable to the other for reasonable attorneys' fees and costs incurred by the other party in enforcing this Contract as determined by a court of competent jurisdiction. In the event that either party purports to cancel this Contract and Seller elects to retain the Contract Deposit as liquidated damages, the prevailing party in any subsequent lawsuit shall recover its reasonable attorneys' fees and costs from the non-prevailing party. The award of such attorneys' fees and costs shall be recoverable as actual compensatory damages in addition to the amount of the Contract Deposit and/or liquidated damages which may be payable by either party."

SR11.   Supplementing paragraph 15.1: Purchaser may also deliver a supplemental list of such Liens at a later date but not subsequent to the Closing if Purchaser becomes aware of the same at such later date.

SR12.   Supplementing paragraph 16: "16.4.  Seller shall not be deemed unable to transfer the Lease and the Shares if such inability can be overcome by the payment of a sum of money by Seller not in excess of the Purchase Price less any loan payoff, brokerage commission, transfer taxes and customary closing costs."

SR13.   Seller agrees to deliver to Purchaser, at or prior to the execution of this Contract, to the extent within Seller's actual possession, all drawings and plans of the Unit, including the original floor plans, and all renderings of any proposed or completed renovations therein. In addition, Seller agrees to deliver to Purchaser, at or prior to the Closing and to the extent within Seller's actual possession, originals of all instruction manuals and all guaranties and warranty agreements affecting the Unit or any of the appliances or other personalty included in this sale, the rights under which shall be deemed assigned, to the extent assignable, to Purchaser at the Closing.

SR14.   This Contract may be executed in any number of counterparts. Each such counterpart shall for all purposes be deemed to be an original, and all such counterparts shall

Doc#: US1:9841154v4

Case 22-50073 Doc 486-2 Filed 06/06/22 Entered 06/06/22 15:09:48 Page 18 of
32

5

together constitute and be but one and the same instrument. Facsimile signatures or scanned signatures sent by e-mail shall bind the parties.

SR15 Seller hereby agrees to cooperate with Purchaser if Purchaser elects to obtain leasehold title insurance or the Eagle 9 UCC Cooperative Interest Insurance Policy in connection with Purchaser's purchase of the Unit, including, without limitation, signing a title affidavit in the form requested by the issuer of the Eagle 9 UCC Cooperative Interest Insurance Policy.

SR16. If for any reason the Corporation does not permit the Purchaser to purchase the Unit, then Purchaser may assign this Contract to another entity within the control of the Purchaser herein.

SR17. Each of the parties hereto desire that this Contract and the terms thereof (the "Confidential Aspects") be kept confidential to the greatest extent practicable. Accordingly, each of the parties hereto shall, and shall instruct his or her agents, representatives and contractors to, maintain the confidentiality of the Confidential Aspects. It is understood, however, that the Confidential Aspects may be disclosed: (a) to the professional advisors of each of the parties (for example, without limitation, their attorneys and accountants), and to various other third parties (such as, for example, title insurance companies) who may be involved in aspects of the transactions or are otherwise necessary in order to consummate the transactions contemplated hereby; (b) if required to be disclosed by court order, subpoena, or other government process, or if required by law; (c)with the consent of the parties; or (d) if already in the public domain.

SR18. Notwithstanding anything contained herein to the contrary, the parties hereby agree that the sum of (a) $67,500,000 is hereby allocated to the Purchase Price for the Unit, and that the additional sum of (b) $2,500,000 is hereby allocated to the Personalty included in the Unit. Accordingly, appropriate New York State and City transfer taxes shall be paid by the respective parties based upon the sum of $67,500,000, and, in addition, Purchaser shall pay the New York State sales tax on the Personalty, which Seller shall collect at Closing.

SR19. Seller represents it will cause the third party sale of an additional maid's in the Building to Purchaser either prior to or simultaneously with the closing of this transaction. In the event that Purchaser is unable to buy this additional maid's room either prior to or simultaneous with the actual Closing of this transaction, Seller acknowledges that Purchaser may terminate this Contract and receive a full and prompt refund of the Contract Deposit, with interest. It is within the sole discretion of Purchaser whether to exercise or waive this option to terminate. It is also noted that the Brokers listed in this Contract shall pay for the maid's room, including costs and expenses associated therewith (including transfer taxes).

Doc#: US1:9841154v4

SN 0043

6

SR20.  In the event that for any reason the parties are unable to close this transaction by March 6, 2015, then Purchaser may terminate this Contract and receive a full refund of the Contract Deposit.  It is within the sole discretion of Purchaser whether to exercise or waive this option to terminate.

SR21.  Seller shall pay the brokerage commissions based upon the total consideration being paid by Purchaser for both the Unit and Personalty (which is the sum of $70,000,000.00).

SHERRY 1800s LLC, Seller

Name:
Title:

GENEVER HOLDINGS LLC, Purchaser

By:
Ira J. Gilbert, Authorized Person

Doc#: US1:9841154v4

SN 0044

3142—Lead paint disclosure, sale of dwelling.
24 CFR Part 35, 40 CFR Part 745, 9-6-96.

Excelsior, Publisher, NYC 10013

# Disclosure of Information on
# Lead-Based Paint and/or Lead-Based Paint Hazards
### SALES

## Lead Warning Statement

**Every purchaser of any interest in residential** real property on which a residential dwelling was **built prior to 1978 is notified that such property** may present exposure to lead from lead-based paint **that may place young children at risk of developing** lead poisoning. Lead poisoning in young children **may produce permanent neurological damage**, including learning disabilities, reduced intelligence **quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with** any information on lead-based paint hazards from risk assessments or inspections in the seller's **possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspec-tion** for possible lead-based paint hazards is recommended prior to purchase.

## Seller's Disclosure

(a) Presence of lead-based paint and/or lead-based paint hazards *(Check (i) or (ii) below):*

    (i) ☐ Known lead-based paint and/or lead-based paint hazards are present in the housing *(explain).*

    ............................................................................................

    ............................................................................................

    (ii) ☒ Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the seller *(Check (i) or (ii) below):*

    (i) ☐ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing *(list documents below).*

    ............................................................................................

    ............................................................................................

    (ii) ☒ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

## Purchaser's Acknowledgment *(initial)*

(c) _____ Purchaser has received copies of all information listed above.

(d) __X__ Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home.*

(e) _____ Purchaser has *(check (i) or (ii) below):*

    (i) ☐ received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assess-ment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

    (ii) ☒ waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

## Agent's Acknowledgment *(initial)*

(f) _____ Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

## Certification of Accuracy

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

SELLER Genever U Wijesulcha  DATE          SELLER for Sherry 1800r LLC   DATE 2/18/15

X for J Belt, authorized person 2-13-75
PURCHASER                         DATE          PURCHASER                     DATE

AGENT                             DATE          AGENT                         DATE

SN 0045

Purchase Application

SN 0046

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 256
RECEIVED NYSCEF: 11/28/2018

Case 22-50073   Doc 466-2   Filed 05/06/22   Entered 05/06/22 12:09:40   Page 82 of
134

## Purchase Application

New York   February 26   20 15

Applicant's Name   "Miles" Kwok Ho Wan   (Genever Holdings LLC)
(Name or Names must be entered above in manner that Stock Certificate and other Documents are to be drawn.)

Applicant's Attorney   Ira Gilbert, Esq. (igilbert@paulweiss.com)   Telephone 212-373-3529

Attorney's Firm and Address   Paul, Weiss, Rifkind, Wharton, & Garrison LLP
1285 Avenue of the Americas, New York, NY 10019-6064

Seller's Name   Sherry 1800s, LLC

Seller's Attorney   Michael J. Jones, Esq.   Telephone 203-661-6000

Attorney's Firm and Address   Ivey, Barnum & O'Mara LLC
170 Mason Street, Greenwich, CT 06830

Closing Date and Time   No later than 3/6/15 at 10am   Date of Possession No later than 3/6/15

The undersigned hereby offers to purchase _____ 3,000 _____ shares of the capital stock of The Sherry-Netherland, Inc. and the accompanying proprietary lease for Apartment   1801*   in the building located at 781 Fifth Avenue, New York, New York, on the following terms and conditions. * and Maid's room 1519

Purchase Price of Stock $   67,500,000   Present Estimated Proprietary Rental Per Month $ 57,085.53

Deposit $ 7,000,000   Special conditions, if any: Additional sum of $2,500,000 is allocated to the personal property included in the unit

Financing:   Yes ☐   No ☒   Amount   None   Bank
( Note: This proposal shall result in no legal obligation until a formal contract of purchase and sale is executed by the parties concerned )

The undersigned has filled out the information sheet below and understands that this information is essential In considering this application. It is further understood that this application, when signed by the undersigned, is to be subject to approval by the Seller or Authorized Representative and to the Terms and Conditions on the reverse side hereof.

Broker: Seller: John Burger, Brown Harris Stevens
and Serena Boardman, Sotheby's
Purchaser: Kathy Sloane, Brown Harris
Stevens

Signature of Purchase Applicant

Signature of Purchase Applicant

### Information Regarding Applicant

Home Address: 16A, South Bay Road, Hong Kong   Telephone +852 2160 0888

Business Connection and Position:   President and Owner (Securities and Real Estate Investments)

Business Address: 49/F, Bank of China Tower, No.1   Telephone +852 2160 0888
Garden Road, Central Hong Kong

Names of all persons who will reside in the apartment and if children, state number and their approximate ages:(1) Kwok Ho Wa, Purchaser (2) Ngok Hing Chi, Wife of Purchaser (3) Guo Qiang; Son of Purchaser (4) Guo Mei; Daughter of Purchaser (5) Yaz Qinghua; Sister of Purchaser's Wife

Names of all clubs and society memberships, fraternities and honorary societies to which applicant belongs:   Mar-a-Lago Club, Palm Beach, FL
Trump Golf Course, Palm Beach, FL

Schools and colleges attended by husband, wife and children:
Mr. and Mrs. Kwok received their education in China
Guo Qiang (son of Mr. Kwok) attended Bard College

SN 0047

Case 22-50073   Doc 466-2   Filed 05/06/22   Entered 05/06/22 12:09:48   Page 23 of
324

Names of all residents in the building known by the applicant: __None__

Does applicant wish to maintain pets, and if so please specify: __No__

References

Landlord:

Present Landlord or Agent __Own a private residence__

    Address __16A South Bay Road, Hong Kong__

Approximate Length of Occupancy _____

Previous Landlord or Agent _____

    Address _____

Address of previous residence and approximate length of occupancy: _____

Financial:

A.  (Bank- Personal Account) __Steven Wong__

    Address __UBS AG 52/F Two International Finance Centre, 8 Finance Street, Central, Hong Kong__

B.  (Business) __Hank Lo, Partner - Stevenson, Wong & Co.__

    Address __Central Tower, 28 Queen's Road, Central, Hong Kong__

C.  Stock Broker, C.P.A, Executor, if any _____

    Address _____

D.  For information regarding source of income contact _____

    Address _____

Personal:

1.  Name __The Rt. Hon. Tony Blair__

    Address __PO Box 60519, London W27JU UK__

2.  Name _____

    Address _____

3.  Name _____

    Address _____

4.  Name _____

    Address _____

Special Remarks:

Please give any additional information which may be pertinent or helpful. _____

Mr. and Mrs. Kwok are very impressed with The Sherry-Netherland and look forward to making The Sherry-Netherland the principle residence for their family.

Purchase Application

New York _____, 20___

Applicant's Name __KWOK  Ho Wan_____
(Name or Names must be entered above in manner that Stock Certificate and other Documents are to be drawn.)

Applicant's Attorney __Ira J. Gilbert Esq_____ Telephone (212) 373-3529

Attorney's Firm and Address __Paul, Weiss, Rifkind, Wharton & Garrison LLP__
__1285 Avenue of the Americas, New York, N.Y. 10019-6064__

Seller's Name _____

Seller's Attorney _____ Telephone _____

Attorney's Firm and Address _____

Closing Date and Time_____ Date of Possession _____

The undersigned hereby offers to purchase _____ shares of the capital stock of The Sherry-Netherland, Inc. and the accompanying proprietary lease for Apartment _____ in the building located at 781 Fifth Avenue, New York, New York, on the following terms and conditions.

Purchase Price of Stock $_____ Present Estimated Proprietary Rental Per Month $_____

Deposit $__7,000,000__ Special conditions, if any: _____
_____

Financing: Yes ☐ No ☒ Amount _____ Bank _____
( Note: This proposal shall result in no legal obligation until a formal contract of purchase and sale is executed by the parties concerned.)

The undersigned has filled out the information sheet below and understands that this information is essential in considering this application. It is further understood that this application, when signed by the undersigned, is to be subject to approval by the Seller or Authorized Representative and to the Terms and Conditions on the reverse side hereof.

Broker_____

_____
Signature of Purchase Applicant

_____
Signature of Purchase Applicant

Information Regarding Applicant

Home Address: __10A, South Bay Road, Hong Kong__ Telephone __+852__

Business Connection and Position: _____

Business Address: __49/F, Bank of China Tower, No. 1 Garden Road, Central, Hong Kong__ Telephone __+852 2160 0888__

Names of all persons who will reside in the apartment and if children, state number and their approximate ages: (1) KWOK Ho Wan (2) NGOK Hing Chi (Ms) (3) Guo Qiang (4) Guo Mei (Ms) (5) Yue Qinghua (Ms)
(1) purchaser (2) wife of purchaser (3) Son of purchaser (4) daughter of purchaser
(5) sister of purchaser's wife

Names of all clubs and society memberships, fraternities and honorary societies to which applicant belongs: __Mar-a-Largo Club, the Trump Golf Course__

_____
_____

Schools and colleges attended by husband, wife and children: __Guo Qiang (son of Mr. Guo) had attended Bard College.__

_____
_____

SN 0049

Personal Letter of Reference

SN 0050

From The Rt Hon Tony Blair

February 2015

Dear Ladies and Gentlemen of the Board of The Sherry Netherland,

It is my great pleasure that I am writing you this letter of reference for Miles Kwok as a potential owner in your building. I have known Miles for seven years and have only the highest respect for him in business and as a friend. I have worked closely with Miles over the years and have always admired his honesty and loyalty.

Miles is dependable, sincere and extremely responsible as an individual; conducting himself with dignity and intelligence. Miles is honest, forthright and has impeccable taste.

I would highly recommend him to your building as I know that Miles would be a wonderful addition as your neighbour at The Sherry Netherland. Miles is a very accomplished man and, in my opinion, would be a most valuable asset to The Sherry Netherland.

Tony Blair

PO Box 60519
London
W2 7JU
www.tonyblairoffice.org

SN 0051

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM

INDEX NO. 652077/2017

NYSCEF DOC. NO: 256

Case 22-50073   Doc 486-2   Filed 06/26/22   Entered 06/26/22 12:09:40   Page 27 of

RECEIVED NYSCEF: 11/28/2018

132

Business Letter of Reference

SN 0052

## Stevenson, Wong & Co.
## 史蒂文生黃律師事務所

In association with | AllBright Law Offices | 錦天城律師事務所

Partners:
Willy Y.P. Cheng•• 鄭炎潘
Hank H.F. Lo• 勞恒晃
Catherine K.G. Po•• 溥景元
Eric C.H. Lui• 呂志豪
Neville J.J. Watkins•• 韋健士
Wendy W.S. Lam• 林穎詩
Lai S. Lam• 林羅娜
Cornelia W.C. Chu• 朱寒潔
Janice L.H. Chin 陳麗郎
Heidi H.Y. Chui• 徐凱怡
Erica Y.Y. Cheng 鄭廷茵

Senior Consultant:
Angus Forsyth•• 盤麗

Consultant:
Sherlynn G. Chan 陳運基

• Notary Public of Hong Kong
  香港公證師師
◦ China-Appointed Attesting Officer
  中國委托公証人
♦ Civil Celebrant of Marriages
  婚姻監禮人

Our Ref  :  EYC/HLO(P)/75450/15

Your Ref  :

Reply Fax  :

Date  :  17 February 2015

**BY POST**

Board of Directors of The Sherry-Netherland
The Sherry-Netherland
781 Fifth Avenue
New York, NY 10022

Dear Board members of The Sherry Netherland,

I am writing this letter of recommendation in support of the application of Mr. Kwok Ho Wan (also known as Miles Kwok) to become a resident shareholder of your cooperative.

I first met Miles when he engaged my law firm in one of his business transactions about seven years ago. I was and am a partner of my firm. We have since established a long-standing relationship. Over the years, my firm has acted for Miles in various business transactions in different areas, including project financing, fund-raising, corporate mergers and acquisitions and acquisition of aircrafts, leisure boats and properties in Hong Kong, China and different parts of the world.

Miles is a successful businessman and a polite, dependable and responsible individual who conducts himself with dignity and intelligence. Putting aside our work relations, Miles has also been a good friend of mine. Personally, I know Miles to be delightful, considerate and respectful. I trust that his personal qualities will definitely make him a good neighbor and responsible steward of your building.

In my opinion, Miles will be a valued addition to your building.

If you wish to contact me personally, please feel free to call me at +852 2533 2552.

Yours faithfully,

**Hank Lo**
Partner
STEVENSON, **WONG & CO.**

香港中環皇后大道中28號
中匯大廈4樓、5樓及1602室
4/F, 5/F & 1602, Central Tower,
28 Queen's Road Central, Hong Kong

電話 Tel: +852 2526 6311
傳真 Fax: +852 2845 0638
電郵 Email: info@sw-hk.com
www.sw-hk.com

香港 廣州 上海 北京 成都 重慶 杭州 南京 深圳 蘇州 太原 青島 廈門
Hong Kong Guangzhou Shanghai Beijing Chengdu Chongqing
Hangzhou Nanjing Shenzhen Suzhou Taiyuan Qingdao Xiamen
Member of Interlaw since 1982

SN 0053

18 February 2015

**BY POST**

Board of Directors of The Sherry-Netherland
The Sherry-Netherland
781 Fifth Avenue
New York, NY 10022

Dear Ladies and Gentlemen of the Board of The Sherry Netherland,

It is a great pleasure for me to recommend Kwok Ho Wan, also known as Miles Kwok, to be a shareholder in The Sherry-Netherland, Inc. and a resident in your building. I am a managing director of the Wealth Management and Swiss Bank Department at UBS AG and attach my name card for your kind reference.  I have known Miles for about five years since he first began working with UBS AG. Miles has since been working with us in the areas of securities investment and also in financing his various projects in areas such as aircraft acquisitions.

Miles has been a successful and accomplished entrepreneur who has developed and managed a number of companies, both domestically and internationally.  Over the years, Miles has earned his credibility in our bank.  He is very reliable and always fulfills his repayment obligations. For this reason, our bank is happy to have him as our long-term client.

From a personal standpoint, Miles is a sincere and modest gentleman with a warm heart.   He is financially sound but very humble.   He is also one of the most intelligent, genuine and respectful people I have ever known.

Based on my long standing relationship with Miles, I do recommend Miles to be a shareholder in your cooperative and a resident in your building. I am sure your community will be pleased to have him and his family join you at The Sherry.

If you have any questions, please do not hesitate to contact me at stephen-kc.wong@ubs.com.

Yours faithfully,

**Stephen Wong**

Financial Letter of Reference

✿✿ UDS

Hong Kong Branch
52/F Two International Finance Centre
8 Finance Street,
Central, Hong Kong
Tel. +852-2971 8888
Fax +852-2971 8001

Feb. 23, 2015

Board of Directors of the Sherry-Netherland
The Sherry-Netherland
781 Fifth Avenue
New York, NY 10022

Dear Sirs,

### Bank Reference – [Application for Real Estate Investments]

We have been asked to provide a reference letter in connection with Application for Real Estate Investments. We confirm that:

**Kwok Ho Wan**
[client's ID: P746467(7)]

has been a client of ours through a personal investment company since July 2012 and during this time Mr. Kwok Ho Wan has had a satisfactory banking relationship with us. As at 18 Feb, 2015, the funds involved in this banking relationship is not less than USD400, 000,000.

The above information is based on our experience of this banking relationship as at current date and is given in confidence for your private use only, without any responsibility on the part of UBS AG or its employees. This letter may only be used in the business context outlined at the beginning of this letter and does not constitute a guarantee or any other obligation on the part of UBS AG. In particular, we are under no obligation to inform you of any subsequent change of circumstances in this banking relationship.

Yours faithfully,
For and on behalf of
UBS AG Hong Kong Branch

Tommy Cheung
Managing Director

Stephen Wong
Managing Director

FILED: NEW YORK COUNTY CLERK 11/28/2018 12:22 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 256
Case 22-50073   Doc 401-2   Filed 05/26/22   Entered 05/26/22 17:49:50   Page 92 of
132
RECEIVED NYSCEF: 11/28/2018



TERRACE 17'-8" x 29'-3"

MASTER BEDROOM 30'-0" x 16'-1"

PANTRY

BEDROOM 18'1" x 21'-6"

BEDROOM 12'-7" x 15'-3"

BEDROOM 15'-1" x 20'-5"

DRESSING ROOM

WIC

N

DRESSING ROOM

MECH. ROOM

SERVICE ELEV. LOBBY

HALLWAY 41'2" x 6'0"

TERRACE 84'-9" x 10'-6"

DEN 21'-1" x 14'-8"

DRESSING ROOM 10'-6" x 13'-3"

WIC

FOYER

KITCHEN 30'-7" x 16'-8"

LIVING ROOM 31'-4" x 16'-6"

LIBRARY 20'-1" x 16'-8"

STUDY 17'-8" x 14'-3"

DINING ROOM 18'1" x 18'7"

DEN 15'-7" x 17'-0"

TERRACE 10'-6" x 59'-7"

FIFTH AVENUE

SN 0057