UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION


In Re                            *   Case No. 22-50073(JAM)
                                 *
     HO WAN KWOK,                *   Bridgeport, Connecticut
                                 *   May 25, 2022
               Debtor.           *
                                 *
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


          TRANSCRIPT OF MOTION FOR ORDER DIRECTING
       APPOINTMENT OF AN EXAMINER, OR IN THE ALTERNATIVE
        MOTION FOR ORDER DIRECTING THE APPOINTMENT OF A
          CHAPTER 11 TRUSTEE; MOTION TO DISMISS CHAPTER 11
        CASE OR IN THE ALTERNATIVE, PARTIAL JOINDER TO U.S.
     TRUSTEE'S MOTION FOR AN ORDER DIRECTING THE APPOINTMENT
                  OF A CHAPTER 11 TRUSTEE
          BEFORE THE HONORABLE JULIE A. MANNING
               UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:                  BENNETT S. SILVERBERG, ESQ.
                                 JEFFREY L. JONAS, ESQ.
                                 Brown Rudnick, LLP
                                 Seven Times Square
                                 New York, NY  10036


For the Creditor, Pacific        PETER FRIEDMAN, ESQ.
 Alliance Asia Opportunity       LAURA ARONSSON, ESQ.
  Fund L.P.:                     O'Melveny & Myers LLP
                                 Times Square Tower
                                 7 Times Square
                                 New York, NY  10036

                                 PATRICK M. BIRNEY, ESQ.
                                 Robinson & Cole LLP
                                 280 Trumbull Street
                                 Hartford, CT  06103



Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

APPEARANCES Cont'd:

For the U.S. Trustee:              HOLLEY L. CLAIBORN, ESQ.
                                   Office of the United States
                                     Trustee
                                   The Giaimo Federal Building
                                   150 Court Street, Room 302
                                   New Haven, CT  06510


For the Official Committee         IRVE GOLDMAN, ESQ.
 of Unsecured Creditors:           Pullman & Comley
                                   850 Main Street
                                   Bridgeport, CT  06601

For Rui Ma, Zheng Wu and           KRISTIN MAYHEW, ESQ.
 Weican Meng, Creditors:           McElroy, Deutsch, Mulvaney &
                                    Carpenter
                                   30 Jeliff Lane
                                   Southport, CT  06890

                                   CAROLLYNN H.G. CALLARI, ESQ.
                                   Law firm of Callari Partners
                                   One Rockefeller Plaza
                                   New York, NY  10020

1

3

1           (Proceedings commenced at 10:05 p.m.)

2                 THE CLERK:  Case no. 22-50073, Ho Wan Kwok.

3                 THE COURT:  Okay.  Good morning.  If we could have

4     appearances for the record starting with the debtor's

5     counsel, please?

6                 MR. JONAS:  Good morning, Your Honor.  Jeff Jonas

7     from Brown Rudnick.  With me is Ben Silverberg, and Bill

8     Baldiga is sitting behind me for the debtor this morning.

9     Thank you.

10                THE COURT:  Good morning.

11                MR. FRIEDMAN:  Good morning, Your Honor.  Peter

12    Friedman from O'Melveny & Myers, joined by Laura Aronsson on

13    behalf of Pacific Alliance Group.

14                THE COURT:  Good morning.

15                MR. BIRNEY:  Good morning, Your Honor.  Patrick

16    Birney, also on behalf of PAX.

17                THE COURT:  Good morning.

18                MR. GOLDMAN:  Good morning, Your Honor.  Irve

19    Goldman, Pullman and Comley, representing the creditors

20    committee.

21                THE COURT:  Good morning.

22                MS. CLAIBORN:  Good morning, Your Honor.  Holley

23    Claiborn for the U.S. Trustee.

24                THE COURT:  Good morning.

25                MS. MAYHEW:  Good morning, Your Honor.  Kristin

4

1    Mayhew, McElroy, Deutsch, Mulvaney & Carpenter, on behalf of

2    creditors Rui Ma, Zheng Wu, and Weican Meng.  And also with

3    me is Carollynn Callari of Callari Partners.

4              THE COURT:  Good morning to both of you.

5              Is there anyone else whose appearances we need to

6    take this morning?

7              Okay.  All right.  As we all know, this is the

8    hearing today on a motion the dismiss, or in the

9    alternative, for the appointment of a trustee.

10             At our last hearing, heading up to today's

11   hearing, I was told that all the parties have agreed.  And

12   you've confirmed this in your papers, that you consent to a

13   finding that cause exists under 1112(b) to do something, to

14   either dismiss the case, convert the case, or appoint a

15   Chapter 11 trustee.

16             I have looked at your list of witnesses and

17   exhibits, and I have looked at your position papers with

18   regard to dismissal, conversion, or the appointment of a

19   Chapter 11 trustee.  I don't know if there's anything

20   further the parties want to inform the Court about before we

21   start with evidence?  Mr. Jonas?  Mr. Friedman?

22             MR. FRIEDMAN:  No, Your Honor.

23             I think Ms. Aronsson is going to address what we

24   submit in terms of evidence.  I believe Ms. Aronsson and

25   counsel for the committee have agreed on what will be

5

1    admissible, and we've withdrawn some things, so I think I

2    would turn it over to Ms. Aronsson, and then Mr. Goldman to

3    walk through what they've -- each party wants admitted.

4            And then I would ask leave to argue after that's

5    concluded.

6            THE COURT:  Certainly.  Okay.  Ms. Aronsson, did

7    you want to start, please?  Do you want to proceed?

8            MS. ARONSSON:  Sure.  Thank you, Your Honor.

9            THE COURT:  Before you proceed for one second, I

10   have to ask the courtroom deputy, do we need any kind of

11   issue on technology.  You're going to -- are you going to

12   introduce exhibits?

13           MS. ARONSSON:  Yes.

14           THE COURT:  Okay.

15           MS. ARONSSON:  Planning on offering --

16           THE COURT:  Do I need to have this camera on,

17   then, for that?

18           THE CLERK:  (Indiscernible.)

19           THE COURT:  It's on, but do I need to have it

20   actually -- this turned on and open?

21           THE CLERK:  (Indiscernible.)

22           THE COURT:  Because I can't see anything here, so

23   I assume, unfortunately, I have to have this open.

24           THE CLERK:  Well, she's not (indiscernible).

25           THE COURT:  No, but she will be.  So I don't want

6

1    to, you know, stop the process.

2            MS. ARONSSON:  Your Honor, I'm not sure we need to

3    open any evidence right now.

4            THE COURT:  Okay.  All right.  So then we'll take

5    -- when you're ready to do that, will you let me know so I

6    can make sure our technology people -- I'm not doing

7    something wrong, because I probably will be, but I'll try

8    not to.  Okay?

9            MS. ARONSSON:  Will do.

10            THE COURT:  All right.  So, Attorney Aronsson, go

11    right ahead.  You may proceed.

12            MS. ARONSSON:  Thank you, Your Honor.  PAX is

13    offering into evidence the exhibits filed on the docket

14    numbered PAX 1 through PAX 31, except for PAX 7, PAX 8, and

15    PAX 30.

16            THE COURT:  7, 8, and 30 are not being admitted?

17            MS. ARONSSON:  That's correct.

18            THE COURT:  Does anyone have -- have you talked

19    about whether anyone has any oppositions to the introduction

20    of these exhibits?

21            MS. ARONSSON:  So we met and conferred with Mr.

22    Goldman yesterday, and I understand our withdrawal

23    represents our good faith meet and confer.  I understand

24    there might be one disagreement left --

25            THE COURT:  Okay.

1    MS. ARONSSON:  -- based on our conversation this

2    morning.

3    MR. GOLDMAN:  Yes.  That's correct, Your Honor.

4    We just -- I think I would expect brief argument on a set of

5    -- a series of transcripts that they seek to introduce from

6    the New York action.  So that isolates the dispute.

7    THE COURT:  Okay.  Now with regard to the -- so

8    does anyone else wish to be heard on the admission of the

9    exhibits?

10   No one?  Okay.  So, Attorney Aronsson, you are

11   introducing these exhibits in full, correct?

12   MS. ARONSSON:  That's correct.

13   THE COURT:  All right.  Now, I think I may have

14   said this in prior hearings.  I have no problem with you

15   moving for the admission in full of these exhibits.  That

16   doesn't mean I'm going to read every page of them, and so,

17   you know, during this time, you may want to point me to

18   certain things.  But in any event, I've said this.  This is

19   something I say to all, counsel.  This is not unique to this

20   case.  I have no problem and appreciate when the parties

21   work cooperatively with regard to the admission of exhibits,

22   but I'm not -- I just want everyone to know, that does not

23   mean I'm going to read every page.  Okay?

24   MS. ARONSSON:  Understood.

25   THE COURT:  Okay.  Go right ahead.

8

1          MS. ARONSSON:  Would you like to hear argument on

2     the --

3          THE COURT:  Possibly.

4          MS. ARONSSON:  Okay.

5          THE COURT:  Hold on for one second.  So I'm going

6     to then announce on the record that Exhibit -- PAX Exhibit 1

7     through 31, with the exception of Exhibits -- PAX Exhibits

8     7, 8, and 30, are admitted as full exhibits.

9          MR. GOLDMAN:   May I make a qualification?

10          THE COURT:  Yes.

11          MR. GOLDMAN:  There are exhibits -- the exhibits

12     that are in question that are in challenge are Exhibits 18

13     through 22.  Those are the hearing transcripts that they're

14     seeking to introduce from hearings in New York Supreme

15     Court.  So we -- you know, we would -- Your Honor would need

16     to resolve --

17          THE COURT:  All right.  So what's your objection

18     to those --

19          MR. GOLDMAN:  Well, the objection is, they're pure

20     hearsay.  Just because they are from a court proceeding does

21     not make them public records.

22          THE COURT:  Why are they hearsay?

23          MR. GOLDMAN:  Well, they're out-of-court

24     statements.

25          THE COURT:  They're not statements.  They're a

1      record of a hearing, right?

2               MR. GOLDMAN:  Well, they're certainly statements

3      in the record, made by various parties --

4               THE COURT:  Right.

5               MR. GOLDMAN:  -- that counsel and --

6               THE COURT:  And their weight will be given

7      whatever I think is appropriate.  But it's a transcript.

8      Are you -- if you're objecting to the transcript itself,

9      somehow saying it's not official or authenticated --

10              MR. GOLDMAN:  No.  No.

11              THE COURT:  -- then that's a different objection.

12              MR. GOLDMAN:  It's not my objection.

13              THE COURT:  Okay.

14              MR. GOLDMAN:  My objection is, they're clearly

15     hearsay because they are out-of-court statements being

16     submitted for the truth of what's asserted in the

17     statements, and they are not -- they don't come within the

18     public records exception.

19              THE CLERK:  I'm sorry, Your Honor.

20              THE COURT:  Hold on a second, Attorney Goldman.

21     You can't hear?

22              THE CLERK:  I can't hear Attorney Goldman.

23              THE COURT:  We can't hear you very well.

24              MR. GOLDMAN:  I'm sorry.  They are clearly out-of-

25     court statements submitted for the truth of the matters

10

1    asserted.

2              THE COURT:  Aren't they -- aren't they -- they're

3    admissions of parties.  They are the debtor and PAX at a

4    hearing.

5              MR. GOLDMAN:  Well --

6              THE COURT:  And they're being admitted for -- what

7    -- anyway.  Go ahead, Attorney Goldman.  You keep going, but

8    I'm not sure I'm convinced yet.

9              MR. GOLDMAN:  Okay.  You know, to the extent

10   they're seeking to introduce statements by -- from the

11   debtor, the debtor is not opposing --

12             THE CLERK:  I'm sorry, Your Honor.

13             THE COURT:  Hold on a second.  We still can't hear

14   you?

15             THE CLERK:  Yeah.  I'm being told it would be

16   better if Attorney Goldman could come to the lectern.

17             THE COURT:  There's something -- they're not

18   picking you up, Attorney Goldman.

19             MR. GOLDMAN:  Can I go up there?

20             THE COURT:  Yes, please.

21             THE CLERK:  The microphone does not have a light

22   on it.

23             THE COURT:  It's not working for whatever reason,

24   that microphone.

25             MR. GOLDMAN:  Okay.  Okay.

11

```
 1                THE CLERK:  Something is wrong because --
 2                THE COURT:  Okay.  All right.  Yes, if you could
 3      come forward?
 4                MR. GOLDMAN:  Yeah.
 5                THE COURT:  Thank you.
 6                MR. GOLDMAN:  Sure.  Is this better, Your Honor?
 7                THE COURT:  Yes.  Now I -- I believe, right?
 8      Everyone can hear Attorney Goldman?
 9                MR. GOLDMAN:  Yep.
10                THE COURT:  Okay.  Go ahead.
11                THE CLERK:  Yes.
12                MR. GOLDMAN:  So to the extent they want to
13      introduce statements from the debtor's counsel, I don't
14      think the debtor was actually present at any of these
15      hearings.  Counsel was present.  So the debtor is not an
16      opposing party here.  The debtor consents to the relief
17      requested, so in order to be non-hearsay of a party
18      opponent, the statement has to be offered -- it has to be a
19      statement of the opposing party.  The only opposing party
20      here is the committee.  So it doesn't work as non-hearsay of
21      a party opponent.
22                The public record exception does not cover court
23      hearing transcripts.  It states --
24                THE COURT:  Why?
25                MR. GOLDMAN:  -- a record or statement of a public
```

1    office, if it sets out the office's activities, a matter

2    observed while under a legal duty to report.  In a civil

3    case, factual findings from a legally authorized

4    investigation.  A court hearing from another court simply

5    doesn't fit within the elements of the public records

6    exception.  It's designed to admit into evidence reports of

7    agencies of the state and federal government, or

8    departments.

9           THE COURT:  So you're saying a transcript of any

10   hearing ever held that is certified can never be admitted

11   into evidence because every single transcript will be

12   hearsay?

13          MR. GOLDMAN:  It's out of -- it's an out-of-court

14   statement.  It doesn't come within the public records

15   exception, or any other exception that I am aware of, except

16   to the --

17          THE COURT:  So what's the point of a record, then?

18          MR. GOLDMAN:  -- except to the extent that the

19   Court is making factual findings or conclusions of law.

20          THE COURT:  Well, maybe the judge did that in

21   those -- during those hearings.

22          MR. GOLDMAN:  Well, then, you know, Your Honor --

23          THE COURT:  I think he did, didn't he?

24          MR. GOLDMAN:  Well, they -- there are 300 pages of

25   transcripts that --

1           THE COURT:  I understand.

2           MR. GOLDMAN:  So I don't know what --

3           THE COURT:  I'm not going to read all of them, but

4      I know that --

5           MR. GOLDMAN:  I don't know what --

6           THE COURT:  -- there are -- there, in those

7      transcripts, I believe I've seen prior in this case,

8      findings by the court about the voracity of testimony, of

9      certain witnesses, about the judge's findings, about the

10     ownership of the boat.  Things of those nature, which that

11     was his finding.  Those were his findings.

12          MR. GOLDMAN:  I concede that that would be

13     admissible.  I'm talking about, you know, they're seeking to

14     admit the entire --

15          THE COURT:  And as I said already, I'm not going

16     to read the entire transcript.  I -- if counsel wants me to

17     focus on something in the transcript, I will do so.  And

18     then you could have the opportunity to object at that time

19     if it's hearsay.

20          But I'm not sure I'm persuaded at this point.

21     I'll let you -- you know, I'll let you make that argument

22     again if and when counsel points to specific portions of

23     that transcript that she -- that they are asking me to look

24     at.  And if you, at that time, want to renew your hearsay

25     objection, then you can renew that and then I'll rule

14

1    accordingly.

2            MR. GOLDMAN:  Yeah.  Just so Your Honor is -- so

3    I'm clear, I don't have a problem if there are factual

4    findings made, or conclusions of law made by the Court.  It

5    just -- I don't think observations of a court in a

6    transcript would come within the public records exception.

7    That's what I'm saying.

8            THE COURT:  Okay.  All right.  Thank you.

9            MR. GOLDMAN:  Okay.  Thank you, Your Honor.

10           THE COURT:  Counsel, go ahead.

11           MS. ARONSSON:  Thank you.  So just to clarify, in

12   our conversations with Mr. Goldman yesterday, we do intend

13   to use -- to offer these transcripts for Justice Ostrager's

14   findings contained not any testimony about -- of witness

15   that might fall within hearsay.  So I think we're in

16   agreement on that front.

17           THE COURT:  All right.  So what I'm going to do,

18   then, is I'm going to at this time -- again, we'll have to

19   clarify the record.  At this point, PAX Exhibits 1 through

20   6, 9 through 17, and 23 through 29, and 31 are admitted as

21   full exhibits.  18, 19, 20, 21, and 22 still remain possibly

22   subject to objection to the creditor's committee, which the

23   Court will rule on when and if you direct me to some

24   specific portions of the transcript.  Okay?

25           MS. ARONSSON:  Thank you, Your Honor.

15

1          THE COURT:  Okay.  Thank you.

2          (PAX Exhibit Nos. 1-6, 9-17, 23-29, and 31 admitted in

3     full)

4          THE COURT:  Go ahead, Attorney Goldman.

5          MR. GOLDMAN:  Yes.  If it -- Your Honor, for the

6     committee, we would offer into evidence our Exhibits 1

7     through 14, and I believe there aren't any objections to

8     that to be --

9          MR. FRIEDMAN:  There are no objections to that,

10    Your Honor.  It's Peter Friedman.  And we actually also

11    endorse the committee's suggestion that the Court take

12    judicial notice of the record of this case.  I think that

13    was a point that I think both the U.S. Trustee and committee

14    counsel made, and we think that that's a fair point to make,

15    and that the full record of these cases should be taken

16    judicial notice of.

17         THE COURT:  The -- okay.  Thank you.  Attorney

18    Goldman, I haven't done a cross-reference, but are any of

19    your exhibits the same as PAX's exhibits?

20         MR. GOLDMAN:  I believe there is one, the debtor's

21    declaration.  I think we both have that.  That's our --

22         THE COURT:  Your Exhibit 2?

23         MR. GOLDMAN:  Yes.

24         THE COURT:  All right.  Hold on a second.  And

25    PAX's Exhibit 2.  It's the same number, right?

16

1           MR. GOLDMAN:  Yes.

2           THE COURT:  Okay.  All right.  So you're asking

3     the Court, Attorney Goldman, to admit as full exhibits, the

4     unsecured creditor's committee Exhibits 1 through 14.  Is

5     that correct?

6           MR. GOLDMAN:  Yes, Your Honor.

7           THE COURT:  Okay.  Anyone else wish to be heard on

8     the admission of -- Creditor's Committee Exhibits 1 through

9     14?

10          Okay.  Then those exhibits are all admitted as

11    full exhibits.  And I say to you, Attorney Goldman, as I

12    said to Attorney Aronsson, I'm not going to read every one

13    of those pages.  If there are specific things in those

14    exhibits you want me to focus on, you'll need to focus me on

15    those.  Okay?

16          I mean, it's possible I can read them all, but I'm

17    not bound to read them all.  Okay?

18          MR. GOLDMAN:  No, understood, Your Honor.  I will

19    --

20          THE COURT:  Okay.

21          MR. GOLDMAN:  I will do that.

22          THE COURT:  Okay.

23       (Creditor's Committee Exhibit Nos. 1-14 admitted in

24    full)

25          THE COURT:  All right.  The creditors's, Rui Ma

1    and Zheng Wu and Wiecan Meng joinder, so you have nothing

2    further with regard to your -- any exhibits you're standing

3    with the committee, correct?

4              MS. MAYHEW:  Correct, Your Honor.

5              THE COURT:  Okay.  Thank you.  And the office of

6    the U.S. Trustee, I think the same is -- well, I think your

7    statement said, Attorney Claiborn, but you should definitely

8    correct me if I'm wrong, that you reserve the right to

9    question about any exhibit and question any witness, but

10   that you weren't introducing any evidence yourself.  The

11   office was not introducing any evidence, correct?

12             MS. CLAIBORN:  That's correct, Your Honor.

13             THE COURT:  Okay.  Thank you.

14             Attorney Jonas, I think the same is true of you,

15   except that you basically asked for judicial notice of

16   everything filed in the case, and then any exhibit

17   identified or offered by another party, and any exhibit

18   necessary for rebuttal after impeachment, correct?

19             MR. JONAS:  Correct, Your Honor.

20             THE COURT:  All right.  So you're all set then as

21   well.

22             MR. JONAS:  Yes, Your Honor.

23             THE COURT:  For now.

24             MR. JONAS:  Yes, Your Honor.

25             THE COURT:  Understanding your --

18

1          MR. JONAS:  Thank you.

2          THE COURT:  -- your parameters.

3          MR. JONAS:  Thank you, Your Honor.

4          THE COURT:  Okay.  Thank you.

5          I just need one second, please.

6     (Pause)

7          THE COURT:  Now we had another party file --

8     actually, I don't think they filed anything with regard to

9     the list of witnesses and exhibits, so I think they just

10    filed a statement; another creditor that basically joined

11    the committee's -- yeah, they didn't file anything with

12    listed witnesses and exhibits.

13         So, Attorney Aronsson, you can go right ahead.

14    You may proceed.

15         MR. FRIEDMAN:  Your Honor, it's Peter Friedman.

16         THE COURT:  Okay.  Attorney Friedman.

17         MR. FRIEDMAN:  I'm going to --

18         THE COURT:  Go ahead.

19         MR. FRIEDMAN:  So, Your Honor, it's Peter Friedman

20    from O'Melveny and Myers on behalf of PAX, and I'm going to

21    argue in favor of dismissal of the case.

22         THE COURT:  Okay.

23         MR. FRIEDMAN:  This case was filed in bad faith,

24    specifically for the purpose of evading a contempt judgment

25    that I know the Court has heard about a lot and we'll get

19

1    back to.  I believe in effect, in the UCC Exhibit 2, our

2    Exhibit 2, Mr. Kwok's declaration in Paragraphs 3 and 24, he

3    basically acknowledged that -- and in our view, contempt is

4    the alpha of this case, and it should be the omega, because

5    that was the purpose of this case, to evade that, and that's

6    not a proper purpose for filing a bankruptcy.

7         In his consent, the debtor refers to PAX's

8    unrestrained legal warfare against him as being the reason

9    he consents.  I think this is ironic, given that, as we

10   point out at Docket No. 50, it was Kwok who stated his

11   intention to start an all-out war with PAX immediately

12   before the bankruptcy.  Next thing you know, Kwok files this

13   case on the night before having to face enforcement of

14   Justice Ostrager's contempt sanction.

15        And so what kind of case do we get at that point?

16   A case with no scheduled assets, no business, no employees,

17   no executory contracts to assume, no income, other than a

18   few checks from COVID stimulus.  No real bankruptcy purpose,

19   no change in the way Mr. Kwok lives his life.  Just one more

20   venue to access, and I think that leads to the conclusion

21   that there's really double-barreled bad faith here to avoid

22   a contempt judgment first, and relitigation of PAX's claims,

23   which neither of which is a proper bankruptcy purpose, and

24   the remedy for that should fit the motivations for filing

25   this.

20

1           Your Honor, I want to start by going back to

2    taking the full breadth of Mr. Kwok's gamesmanship in terms

3    of how -- of his efforts to frustrate PAX.  And all of this

4    comes from PAX Exhibit 23 at -- starting at Paragraph 2.

5           PAX loaned Mr. Kwok's compoany $30,000 in 2008.

6    Kwok personally guaranteed that loan.  PAX and Kwok

7    renegotiated the loan in 2011 to consolidate the remaining

8    debt.  And again, Kwok executed a personal guarantee.

9           In April 2013, Kwok agreed to settle his debt by

10   transferring PAX the title to certain apartments in Beijing.

11   That settlement hinged on satisfaction of certain conditions

12   precedent, including delivery of clean title.  PAX extended

13   the deadline for that settlement on many occasions, with a

14   final deadline set for June 30, 2015.

15          Kwok never filled -- fulfilled his conditions

16   precedent.  So Kwok gets sued by PAX in April of 2017 for

17   breach of contract.  A suit, by the way, totally unrelated

18   to any other suit brought by any other plaintiff.  No common

19   nucleus of facts among the claim holders versus PAX.  And I

20   use the term claim holder specifically, because I don't

21   think that these people are -- that a vast majority of

22   people who have asserted proofs of claim are actually

23   creditors.  They hold claims, which is different than being

24   a creditor.  They don't have judgments.

25          On September 15th, 2020, PAX wins summary judgment

1      for its breach of contract case.  The first warning shot

2      that PAX was going to try to -- that was going to be so

3      badly frustrated is when Geneva New York filed for

4      bankruptcy in SDNY shortly after that, part of Mr. Kwok's

5      pattern of trying to frustrate Kwok.

6             Shortly after that, the New York court restrains

7      the Lady May and other -- and the Sherry Netherlands.

8      Exhibit 23, Docket 183.3, October 15th, Justice Ostrager

9      order.

10            The final judgment is entered in February 2021, a

11     year before the bankruptcy case.  At that point, the court

12     enters a judgment of $116 million with the statutory

13     interest rate in New York, making it grow to $127 million by

14     the date of Mr. Kwok's filings.

15            Then there are all of the antics that go on as PAX

16     work -- PAX works to collect its judgment.  As I noted,

17     Justice Ostrager had to seek to -- expressly found, and this

18     is Exhibit -- PAX 18 at page 21.  At the October -- at an

19     October 15th hearing, and if Mr. -- you know, if counsel for

20     the committee wishes to object, I just highlight that this

21     one of the things from the hearing transcript that we

22     believe should be in evidence.

23            The Court believes, as reflected in the September

24     15th, 2020 order, that Mr. Kwok has attempted to mislead the

25     Court.  The court believes that Mr. Kwok as the plaintiff --

22

1   is, as the plaintiff contends, playing a shell game.  This

2   is going to come to an end.  We're not going to have any

3   more shell games.

4           Kwok is -- PAX is forced, as a result of these

5   ongoing shell games, to move for contempt multiple times in

6   the New York State action.

7           On March 16th, 2021, as referenced in PAX Exhibit

8   24, the Court notes, it's clear there's been an intolerable

9   amount of gamesmanship, dismembering, and deceit in

10  proceedings before this Court.  Court goes on to say that

11  rather than catalog the many shell games defendant has

12  engaged in, the Court grants the motion for contempt to the

13  following extent.

14          For every day the yacht is outside the

15  jurisdiction of this Court after May 15th, 2021, defendant

16  will be fined -- Kwok will be fined $500,000.  This doesn't

17  force Mr. Kwok to file bankruptcy, he just continues to

18  thumb his nose, this time not just to the judgment, but an

19  order of a state court.

20          At a July 2021 hearing -- this is PAX Exhibit 21 -

21  - the Court notes that the Court issued an order directing

22  the boat not be removed from the territorial waters of the

23  United States.  That order was disregarded by Mr. Kwok

24  *and/or* entities that he controls.  That is contempt of

25  court.

23

1          THE COURT:  What page are you on, on Exhibit 21

2     there, counsel?

3          MR. FRIEDMAN:  16 to 17.

4          THE COURT:  Thank you.

5          MR. FRIEDMAN:  And going further on Page 19, the

6     Court talks about his -- Justice Ostrager talks about his

7     defiance, Kwok's definance of court orders.

8          Kwok appeals the fine.  The first department

9     affirms and directs the trial court to hold further

10     evidentiary hearings.

11          In the final evidentiary hearing, as this Court

12     notes, that just -- that precipitated the bankruptcy, the

13     Court talks about the 1,180 docket entries.  This is in PAX

14     25.  Almost all of which involve defendant's efforts to

15     avoid and deceive.  Talks about the -- PAX encountering

16     difficulties through assets in a maze of corporate entities.

17          And finally, as the Court notes, and I know this

18     Court has heard it before, but if billionaire litigants can

19     simultaneously seek to use the court process in New York and

20     elsewhere, while knowingly and intentionally violating court

21     orders, there is no rule of law.

22          Mr. Kwok attempted to appeal that, sought an

23     emergency stay of the orders, didn't get it.  Justice

24     Ostrager noted in his opinion -- an order, that there would

25     be other consequences.  I think we -- from what we know in

24

1    testimony, what this Court has heard and I think what can be

2    inferred, Mr. Kwok was obviously, not really worried about

3    the money point.  He was worried about going to jail for

4    being in defiance of a court order, and that's what

5    motivated him to file for bankruptcy.

6         So what happens when the bankruptcy is filed?  I

7    think what the Court can observe from Mr. Kwok's

8    declarations, from the debtor's response to examiner

9    motions, from the debtor's motion to -- opposition to PAX's

10   motion to lift the stay, from the debtor's effort to remove

11   PAX's litigation from state court to federal court.  All of

12   them point to one thing.  This case was then -- was

13   commenced for the improper purpose of relitigation the PAX

14   issue, right?

15        You saw it in declarations that Mr. Kwok

16   maintained that the PAX litigation was founded on forgery,

17   right?  That there was something improper about the judgment

18   that had been obtained.  There were efforts -- you know,

19   that's in Docket No. 83 at Paragraph 12.  Mr. Kwok argues,

20   you know, that the personal guarantee somehow was a forgery.

21   He talks about, I think, wanting to have a reevaluation of

22   what's really his property, which is nothing more than an

23   obvious effort to get the Court to relitigate Justice

24   Ostrager's contempt order.

25        The idea of removing one case -- one case was

1    attempted to be removed, and it's the case that makes no --

2    the least sense to remove.  It's one on which the central

3    issues were already on appeal, but what other purpose would

4    there have been, other than to try to relitigate, and the

5    cases we cite note that that is not a proper purpose for

6    filing a bankruptcy case.

7          I would note, Your Honor, that the only other case

8    that has even been referenced in these proceedings is the

9    claim of creditor Rui Ma, which there is no effort to remove

10   that here.  To the contrary, I believe there was actually a

11   consent stipulation filed to let that case move forward to

12   be adjudicated back in New York State court system.

13         So I think the Court can draw the inference from

14   everything it's seen.  The real purpose of this case was

15   targeted at frustrating PAX and getting a second or third

16   bite at the apple, specifically with respect to PAX.

17         Your Honor, a moment about PAX, and the Court, I

18   think has observed how unusual this case is given the lack

19   of assets, given the lack of operating business, given the

20   lack of a, you know, ongoing income, business, et cetera.

21   And the nature of this case being so honestly focused on

22   fees for professionals and budgets for professionals as

23   opposed to a traditional meaningful restructuring in any

24   way, is that you have PAX that has a claim that is over

25   1,300 times larger than the next judgment claim.  The second

26

1    largest actual, I guess theoretically undisputed claim are

2    claims of insiders, which I think the Court can, you know,

3    not pay much attention to in this context.

4           So given the size of our claim, we want to sort of

5    focus on the aggressive role PAX played, and I think it's

6    really important that it did, in dealing with what happened

7    after this case was filed.

8           The debtor comes in.  The debtor files a plan.  I

9    think a plan that was dead on arrival.  Seeks to borrow

10   money, $8 million.  And PAX opposed that.  Other people

11   didn't.  Other people thought that maybe there was, you

12   know, a pot of gold at the end of the rainbow.  We said from

13   the beginning that the DIP was a sham and the rug definitely

14   got pulled out from under people when Golden Spring decided

15   it wasn't going to fund the case anymore.

16          But just the -- you know, the very nature of

17   trying to pursue a debtor in possession financing, not for

18   the benefit of anybody other than professionals, or to run

19   an investigation, never made sense to us, and nothing about

20   this case ever made sense to us.  We thought that the status

21   Kuo, where creditors were entitled to pursue their rights

22   under state law was really the appropriate mechanism for

23   dealing with this kind of debtor.

24          And we think the cases support that.  For example,

25   in *Sapphire Development Company v. McKay*, from the District

27

1    of Connecticut, the debtor had no business, employees, and

2    was being funded by an affiliate of the debtor's principle

3    that had a history -- and there had been a history of state

4    court judgments, finding the principle had diverted assets,

5    misled courts, et cetera.  And the court dismissed the case

6    and specifically noted that unsecured creditors could go

7    after anybody they wanted to in the state court, just like

8    claim holders here can, and that that was an appropriate

9    exercise of discretion.  I want to emphasize, the Court does

10   have a wider decree -- you know, the cases make very clear,

11   this Court has tremendous discretion in deciding what to do

12   today.

13         The size of PAX's claim, I think is important as

14   we cited in the *Acme Cake Company* case from 495 BR 212, that

15   it's appropriate to dismiss a case where a single creditor

16   with a sufficiently large claim takes the position that

17   dismissal is the best outcome.  Dismissal is in the best

18   interest of creditors because the -- and the state is not

19   affected by the probable result that the largest creditor

20   will execute its judgment and reach the debtor's assets

21   before other unsecured creditors.

22         So there's nothing wrong with PAX asserting the

23   fact that it is the largest creditor and it perceives this

24   is the correct outcome.  Again, all we're doing here is

25   returning the status Kuo.  Whether we'll be able to exercise

1    on our judgment or not, I can't say, but I think returning

2    to the status Kuo is appropriate.

3           *OptInRealBig.com*, 345 BR 277, from Colorado.  The

4    court granted a motion to dismiss where value recoverable

5    for creditors as a whole could be greater outside of

6    bankruptcy, which we think would be the case here, certainly

7    for PAX, as I'll get into later.  The Chapter 7 would impose

8    tremendous costs on PAX if it could even be funded.

9           But the court held there that a creditor -- and

10   here, I would analogize who the court was talking about --

11   to the claim holders who have contingent unliquidated

12   claims, or even the ones who have very small claims, should

13   not be permitted to prolong or sustain a case merely to take

14   advantage of benefits bankruptcy offers to creditors, and

15   that a case could never be dismissed under the bankruptcy

16   code if I think as our opponent suggests, if guaranteeing

17   the bankruptcy code's priority scheme was a precondition of

18   dismissal.

19          So if you could only dismiss cases where it was

20   100 percent certainty that anybody who was at least

21   theoretically similarly situated, you could never dismiss a

22   case.  We don't think that any case law stands for that, and

23   we think actually to the contrary, cases like *OptInRealBig*

24   and *Acme Cake Company* say the contrary.

25          Your Honor, I think in the Region 11, *Evangelical*

29

1    *Alliance of Our Church's* bankruptcy from Kansas, you know,

2    the court noted that not withstanding the presence of other

3    creditors, where bankruptcy was essentially an attempt to

4    thwart a creditor's recovery in state court litigation,

5    would be appropriate to let people seek the remedy to which

6    they're entitled to under applicable non-bankruptcy law,

7    without having to litigate the bankruptcy roadblocks that

8    could be erected otherwise.

9            Your Honor, I think we also cited in our

10   opposition to -- I'm sorry.  In our reply brief in support,

11   three cases, *Wally Findlay*, which notes that it's an

12   impermissible use to relitigate bankruptcy cases and where a

13   debtor has taken that position.  It is appropriate to

14   dismiss a case.  And the *Bridge to Life* case from the

15   Eastern District of New York, a case is dismissed because

16   the debtor was attempting to, you know, inject non-

17   bankruptcy laws issued into a Chapter 11 case.  In the *D&G*

18   *Construction: Dean Gonzalez* case, the court held the use of

19   bankruptcy process as a platform to delay the lawful

20   exercise of state law rights and attack final orders of

21   other courts, warrants dismissal.

22           Your Honor, there are like, you know, some of

23   those cases are not extensively reasoned.  I understand.  I

24   think that's true of some of the other cases on the other

25   side, and I'm going to get to their cases, but I think that

1    there's a thru line, that there's nothing to prevent --

2    there's no reason to prevent -- not to return to the status

3    Kuo and let people use whatever state court rights they have

4    in a case like this.

5          And let me say what this case is not.  This is not

6    a mass tort case.  This is not a case where you can say,

7    okay, a debtor did something bad five years ago, and sure

8    some people were hurt before others, but we know -- we know

9    that there will be people who get -- who necessarily are

10   going to get verdicts in the future in their favor because

11   of doctrines like offensive non-mutual collateral estoppel,

12   and we can even come up with a matrix that says, okay, if

13   you had mesothelioma and you're 45, you'll get X.  If you

14   suffered from an opioids injury, you will get Y.  Everybody

15   here has very, very different kinds of claims.

16          So there's -- you know, to the extent that there's

17   a race to the courthouse kind of issue, that's just what

18   state law permits people to do, and PAX has been very, very,

19   very, diligent and vigilant, and that's not improper.

20          I want to talk about the cases that were cited by

21   the other sides, and the first I think -- and there are a

22   couple of thru lines that come through them I think that

23   show pretty meaningful differences.  I think that -- you

24   know, the first is obviously the *Julian* (ph) case.  I think

25   there were obviously powerful reasons for dismissal.  I

1    think, you know, severely differentiating factors are the

2    debtor's conduct throughout that case.

3         Here, this case has been mercifully short, and I

4    think I probably under this much less well than you do or

5    Mr. Birney does or Mr. Goldman does, but I think that there

6    were some suigeneris facts as related to the debtor's

7    counsel there that, you know, it was probably a pretty good

8    thing that the court maintained supervision over that case

9    ultimately.  But I don't -- you know, I think the ultimate

10   outcomes for creditor -- for creditors were not great, and I

11   think whether or not that was an appropriate exercise of

12   discretion there, I don't think informs this case.

13        The *SWJ Management* case from District of

14   Connecticut was one where creditors overwhelmingly sought

15   conversion.  And I want to make clear, as the *Acme Cake*

16   *Company* says, you're not supposed to count noses.  You're

17   supposed to really count dollars, because imagine if 100 and

18   -- you know, PAX has $260 million in judgments.  Imagine if

19   PAX had, you know, sliced its loan up to $261 million

20   affiliate funds and each filed their own creditor claims.

21   And each could be running in here and say, 261 creditors

22   favor dismissal.  I don't think it's a counting of noses.  I

23   think it's a counting of dollars, and PAX's -- you know, the

24   value of PAX's dollars are really what's important.

25        *Premier Golf Properties* is a case heavily relied

1  upon.  That's 564 BR 710.  The Court uses an interesting

2  word there in deciding whether dismissal or conversion is

3  right.  It says the operative question -- it actually says

4  the operative question of the case was whether the uncertain

5  value of the underlying asset, which was a golf course,

6  could be maximized through a going concern bankruptcy sale

7  or foreclosure.  That is nothing like this case.

8       The court relied on the fact that the debtor

9  maintained an operating business, had 60 employees, and

10 $300,000 a month of revenue.  And the dismissal of the case

11 would have resulted in foreclosure and the financial and

12 employment losses that brings.  I might be out of a job if

13 you dismiss this case, Your Honor, but I don't think anybody

14 else is going to be.  I think that, you know, *Premier Golf*

15 *Properties* is very, very, very different.

16      *1121 Pier Village, Team Systems International,*

17 *West Hampton Coach Works, Spear, Babiaff* (ph), all involve

18 situations where no non-debtor party advocated for dismissal

19 over conversion.  And in most cases, dismissal wasn't even

20 discussed unless the debtor preferred that option.

21      The court in *Team Systems,* which is a very

22 thoughtful opinion by Judge Goldblatt, who is near the

23 Delaware bench, specifically noted on multiple occasions

24 that all participating creditors and the U.S. Trustee argue

25 that conversion is better for creditors and the estate than

1    dismissal.  Under that circumstance, of course it wasn't an

2    abuse of discretion for Judge Goldblatt to conclude that

3    dismissal wouldn't make sense and conversion did.  That's

4    just simply not the situation here.

5         *Fleetstar* is heavily relied upon by the Rui Ma

6    creditors.  I think it involves a very, very different

7    situation.  That was an effort to have a structured

8    dismissal, which I think is, if not entire verboten, deeply

9    problematic under *Gevic* (ph).  This is not a structured

10   dismissal.  No one is asking the Court to say, well, you can

11   dismiss the case and get releases if you give some people

12   something and other people nothing, and you know, tough

13   luck.

14        This is a clean dismissal request.  There are some

15   efforts to have people pay fees.  I think we've always said,

16   we don't have problems if other people get paid fees.  We're

17   not going to insist our own fees get paid, but this is

18   really not a structured dismissal kind of case at all.

19        The court explained in *Fleetstar*, even if the

20   debtor's proposed dismissal scheme could pass a practicality

21   test, and the court had some real concerns about the way the

22   structured dismissal was intended to take place, it must be

23   denied because it seeks to alter parties' rights without

24   their consent and lacks many of the code's most important

25   safeguards.

34

1          Here, we're asking to go back to a status Kuo.

2    Nobody is losing a right they have.  You know, the debtor's

3    prepetition creditors aren't being asked to sacrifice

4    anything.  We simply seek a return to status Kuo.

5          The committee also cites to the *Capra* case.  *Capra*

6    is an interesting matter.  I actually think if you sort of

7    give some deep thought to *Capra*, it helps us rather than

8    hurts us.  The big factor in *Capra* the court said a bunch of

9    times, was the egregious misconduct that favored conversion,

10   because the debtor had come to the judge's court and sought

11   bankruptcy protection.  And what did he do?  He failed to --

12   you know, he -- it's really what he -- some of what he

13   didn't do.  He didn't participate meaningfully on the

14   bankruptcy process, and you know, this case hasn't

15   progressed that long, but there certainly have been MORs

16   filed and the debtor has made retention applications.

17   Didn't find -- you know, we don't think what he did made

18   sense, but he did participate in this process.

19          But the key issue there is, the debtor sold both a

20   Bentley and a Rolls Royce while in bankruptcy without

21   complying with Section 363 of the Bankruptcy Code.  That's

22   one of the -- like, on the list of really bad things to do,

23   that's a really bad thing to do.  Right?  You can't

24   simultaneously say, I want to go into bankruptcy, but then

25   not abide by one of the most important protections.

35

1          Obviously, it wasn't ordinary course.  He wasn't an

2     auto dealership.  He was an individual.  And so he violates

3     363, and the court, on numerous times, talk about how bad

4     that is, and goes on to say, I think like the Gestalt of

5     that case is, the court didn't want to permit dismissal

6     because the debtor wouldn't basically face any consequences

7     for what he did.  And so I think the way to think about that

8     case is, if you do something bad before a judge, the judge

9     is going to retain supervision over you.

10         So send this case back to Justice Ostrager.

11    Right?  The really bad things that Kwok did were in front of

12    Justice Ostrager.  So I think if -- if *Capra* -- you know,

13    the teaching of *Capra* is, when people do bad things, judges

14    have the right to supervise them.  The really bad things

15    done here were done in front of Justice Ostrager.  So when

16    this case gets dismissed, you know, we're going to continue

17    to pursue our rights in front of Justice Ostrager, and he

18    can -- he can hold Mr. Kwok accountable for his conduct.

19         Your Honor, the *Rollicks* (ph) case is cited.  It's

20    a very short opinion.  I think one way to look at *Rollicks*

21    is the people who have the largest claim should be paid

22    attention to.  The other critical differentiation is that

23    *Rollicks*, which went for conversion over dismissal, is about

24    a group of creditors that had received prepetition judgment

25    liens who were seeking to dismiss the case to avoid

1    potential avoidance actions against them.  It's just not a

2    factor here.  We don't have any -- there's no preference

3    claim that could be asserted against us because we haven't

4    received debtor property.

5         Your Honor, I just want to take a minute to

6    discuss a couple of other cases that are cited.  *Steve and*

7    *Barry's*, which is also, I think colloquially known as *Steve*

8    *and Barry's*, that's *BHS and B Holdings LLC case* (ph).

9    Committee cites that to say that, you know, if you have an

10   administrative lien in a solvent case, that should weigh in

11   the favor of conversion.

12        A, I think the Court was focused on that because

13   of cause.  B, that case had been running for years.  There

14   was inventory to deal with, there were, you know, liquidated

15   stores.  And C, I think if you read the opinion there's no

16   suggestion that anybody even wanted conversion.  So I guess

17   the could have -- you know, had to evaluate whether it was

18   appropriate, but nobody wanted it, much less the largest

19   creditor.

20        You know, *Mitan v. Duval*, you know, it's a Sixth

21   Circuit case.  There, the largest creditor didn't favor

22   dismissal, only the debtor did.  Those creditors were -- and

23   so, you know, the court wanted to appoint a Chapter 7

24   trustee in order to conduct investigations.  Here, we think

25   every creditor can go forth and do whatever discovery is

1   important and they believe is necessary.

2          A few other things I wanted to just note about the

3   cases, Your Honor.  Your Honor, one other point about the

4   *Capra* case, which is heavily relied upon, is that the

5   parties favoring dismissal, you know, were secured

6   creditors, and the court noted those two creditors are being

7   treated favorably by the debtor and can reasonably expect to

8   keep receiving favorable treatment if the case is dismissed.

9          I don't know what's going to happen between us and

10  the debtor in the future.  And the debtor says in his

11  pleadings, they intend on paying creditors.  I don't know if

12  that will happen.  I assume we'll have to litigate more.  I

13  don't know, but there's certainly no -- you know, there's no

14  history of favorable treatment by the parties who are

15  supporting dismissal here.  Far from it.  We are, to put it

16  lightly, somewhat uncomfortable bedfellows with Kwok in

17  supporting this motion.  So I think that's another

18  differentiation point.

19         Your Honor, I want to make a few points about

20  Exhibit 27, which are the -- you know, the -- it's our --

21  it's the summary of other litigation.

22         THE COURT:  And that's been admitted as a full

23  exhibit with no objections, so go right ahead.  I'm just

24  making a note --

25         MR. FRIEDMAN:  Okay.

1          THE COURT:  -- about that exhibit, because we

2     still have to -- we still at some point are going to have to

3     address the transcript exhibits.  But go right ahead.

4          MR. FRIEDMAN:  Your Honor, you know, that talks

5     about the claims that were listed on Schedule F.

6          Now, there -- let me first say, there have been

7     some proofs of claim that have been filed, and I suspect

8     that we might hear, well, if a proof of claim is filed, it's

9     automatically treated as valid until there are an objection.

10    I think the Court can note, in part from the Exhibit 27, but

11    generally, that that -- it's sort of true that there's been

12    no objection, but all those cases are in active litigation,

13    and so it's a little -- it's not quite right to say that the

14    proof of claim is prima facie valid until there's no --

15    until there's an objection, when you know that those claims

16    have been actively contested in litigation over the years.

17          In any event, one of the things I think is really

18    important about these claim -- litigation claims is, there's

19    one liquidated claim for I think 300 and maybe $96,000.  As

20    you go through the chart, there's $35,648,868 of claims that

21    have been dismissed.  There are $37 million in claims that

22    have been idle for two plus years.  Or thereabout.  I don't

23    want to -- I think it's two plus years.  It's certainly --

24    and you can tell, it's a substantial amount of time.

25          And so, you know, you're really talking a much

1    smaller potential pool of claims.  There's no evidence that

2    any of them have trial dates or had trial dates set, and,

3    you know, we just don't know much about when any of those

4    claims will be heard, and its, we submit, appropriate for

5    the Court to take into account both the qualitative

6    difference, which is we have a judgment and these are all

7    potential future claims that don't have a common nucleus of

8    facts as it relates to our claim.

9        And additionally, Your Honor, I would -- you know,

10   a few other points to note.  Many of the claims are -- at

11   least eight of the claims, as far as we can identify in

12   valve securities violations, which you know, subject to

13   either subordination or disallowance, but you know, I just

14   note that as an issue.  And I think what that leads to is

15   both that PAX' views, I think are entitled to a substantial

16   amount of weight here.  But also, looking at those claims

17   and noting how many of them are defamation claims, and the

18   Rui Ma claim, which is obviously a personal injury type

19   claim, go to point out some of the reasons why this case is

20   spectacularly unsuited to bankruptcy.

21       This Court, I don't think, is necessarily the

22   right forum to have to oversee a dozen plus personal --

23   defamation claims that have no factual relationship in

24   common, that have advanced to some stage in the state court.

25   If the stay is going to be lifted to let them all be

40

1    liquidated, that defeats the purpose of a centralization of

2    forum, or a singular -- single fact finder.

3            There are frankly open questions, as we've cited,

4    as to whether under 28 USC 157B5, this Court can even hear

5    them, or whether those claims have to be heard in the

6    district court.  The Connecticut court has, in *Ice Cream*

7    *Liquidation*, has taken a broader injury of personal injury

8    tort claims that includes any injury which is an invasion of

9    personal rights.  I don't think the Court has to reach a

10   conclusion on any of those, it's not before it, but I think

11   I'm trying to give the Court a taste of why it's problematic

12   and doesn't really serve core bankruptcy functions to have

13   those claims liquidated when there are other options like

14   letting people go back to state court.

15           Obviously, in Chapter 7 -- and to be clear, Your

16   Honor, I understand there's a broader view.  We cited the

17   *Gawker Media* case, because I think it's always incumbent on

18   us to recognize when there are cases that say something

19   different than the view we have.  But I do think District of

20   Connecticut's *Ice Cream Liquidation, Inc.* case is a helpful

21   one to think about in this context.

22           You know, Your Honor, then you get to what's going

23   to happen with all those cases.  Plaintiffs are still going

24   to have -- if they're here.  Plaintiffs are still going to

25   have the costs --

1          THE COURT:  What's going to happen with those

2     cases if the case -- if this case is converted?  Is that

3     your --

4          MR. FRIEDMAN:  Yes, Your Honor.

5          THE COURT:  Yes.  Keep going.

6          MR. FRIEDMAN:  So a trustee is going to have to

7     defend them.  I don't know what the trustee's -- the trustee

8     can't just say, okay, everybody, you know, I'm going to

9     allow your claims.  That's obviously deeply prejudicial to

10    creditors with valid claims.  Trustee is going to have to

11    get paid to do that somehow.  I don't know -- you know, I'll

12    get to that in a moment.  But that requires real cash on the

13    barrel head, not -- you know, not necessarily a creed of

14    litigation funding or contingency fees, right?  That's going

15    to be somebody who has to really dig into the merits of each

16    of those cases.  It may impose a burden on PAX to have to do

17    the same as a party in interest, as the Court knows.  Any

18    creditor, particularly in a 7 can object to the claim of any

19    other creditor.

20          You know, if you don't have a trustee that's

21    really able to defend, that burden will unfairly fall on

22    PAX.  You may also have the debtor participating in the case

23    at that aspect.  I think it -- you know, you really get

24    something that's not well suited to the bankruptcy court,

25    but is appropriate to let these people go -- you know, these

42

1    claimants go back to their state court remedies and continue

2    to pursue whatever cases they've already brought to this

3    point.

4              THE COURT:  Well, in addition to your argument

5    about 157(b)(5), what about 157 -- 28 USC 157(b)(2)(B),

6    which says that personal injury claims and wrongful death

7    claims cannot be estimated --

8              MR. FRIEDMAN:  Yes.

9              THE COURT:  -- or liquidated --

10             MR. FRIEDMAN:  Yes, Your Honor.  Against the

11   compendium.

12             THE COURT:  -- for purposes of distribution in a

13   case under Title 11?

14             MR. FRIEDMAN:  That is the parallel point that I

15   anticipated that somebody might argue, oh, well you can

16   estimate these, and, you know, people's distributions won't

17   be held up for ever.  But again, you're then going outside

18   of this Court to have that done and, you know, you're

19   imposing a substantial burden on the federal court system in

20   Connecticut, when these could be dealt with in the state

21   court system.  Your Honor, I think -- so I think that --

22   that's a pretty critical point.

23             So then we get to, you know, the other features of

24   what this case looks like, absent -- given its current

25   posture.  There's no funding for this case, and we were

43

1    always concerned that there was never going to be the kind

2    of funding that you'd need for this case.  Right?  The only

3    funding was to conduct an investigation, which was, we said

4    from the beginning, was a bridge to nowhere, because what

5    you -- if you were going to do anything, what you needed was

6    a kind of action.  And we -- you know, the kinds of actions

7    we were taking outside of bankruptcy court, and that were

8    helpful.

9         You have here a debtor with no liquid assets, and

10   protracted future disputes.  We know that there's a lawsuit,

11   an adversary proceeding initiated in this court already

12   about setting aside what rights Mr. Kwok has, whether

13   somebody else has rights to the yacht.

14        We know that there is extensive litigation over

15   the Sherry Netherland apartment, which would require a

16   debtor -- the debtor -- the Chapter 7 trustee to participate

17   in a New York bankruptcy.  Just to deal with plan issues, et

18   cetera, not even just to get the asset, but objecting to

19   other people's claims that that case is valid that also has

20   British Virgin Island components.  You have to pay counsel

21   in the British Virgin Islands, and there's no money for

22   that.  Right?

23        There would also be litigation presumably, because

24   this is a 7, that you would have fights over discharging

25   claims.  You know, a trustee would have to deal with that,

44

1    or individual creditors would have to pick up the burden.

2           And then, you know -- so what do you wind up with?

3    You wind up with a situation that there are no available

4    funds for a trustee.  There's no property you can liquidate

5    in short order.  There's a couple suits and a dog, but

6    that's it.  There's stuff people could go after, but how do

7    you go after that?

8           Well, you could have litigation funding.  We

9    haven't seen any evidence of litigation funding available.

10   I think it would come at a steep cost.  That cost would be

11   borne largely by PAX, would eat into whatever recoveries PAX

12   was able to obtain.  You know --

13          THE COURT:  Any recoveries any creditor is able to

14   retain.

15          MR. FRIEDMAN:  Absolutely, Your Honor, and I think

16   that would disproportionately fall on us, as would a

17   contingency counsel.  This Court can take, you know, notice

18   from her own experience, contingency counsel is expensive.

19   We know that the committee, prior to dismissal, not only --

20   you know, the dismissal hearing, filed motions to retain

21   fraud examiners and asset tracers, right?  All of which

22   would be, you know, expensive if people are going to take

23   those on the come.  I don't even know if they would.

24   Usually, those kind of people I think submit hourly rates,

25   but there's nothing to pay them.

45

1          And you know, I think there are certainly cases --

2     you know, the *Babiaff* case the committee cites, that

3     dismissal is preferred where there are insufficient funds

4     and a trustee would simply add more costs and burden to the

5     estate.

6          THE COURT:  What case was that, counsel?

7          MR. FRIEDMAN:  The Babiaff, 445 BR 640 -- 64 at

8     Page 82.

9          THE COURT:  I just don't recognize that name.  The

10     other cases that you cited, I recognize, but it's in the

11     committee's brief, you're saying?

12          MR. FRIEDMAN:  I believe so.  And that cites in

13     turn, *Midwest Properties v. Sherwano* (ph).

14          And so, you know, look, we think a trustee would

15     add substantial burdens expense wise, and I'm not sure what

16     -- you know, what the benefit is because in particular, we

17     know state law remedies can be pursued, or can pursue veil

18     piercing if appropriate.  People can pursue state law

19     fraudulent transfer claims on their own if they want to.

20     People can seek restraining orders.  PAX certainly did.  And

21     there's nothing preventing people from using what state law

22     remedies they have.

23          You know, the Rui Ma creditor group says that Non

24     PAX creditors will not receive a quality in distributions if

25     the case is dismissed.  I don't know if that's true or not.

1    I don't -- maybe they'll settle their claims.  I don't know.

2    Right?  There's no guarantees what anybody will get outside

3    of a bankruptcy, but parties should be able to pursue Kwok

4    to their heart's content to recover what they want to.

5            If there's no there there -- and this is just a

6    sort of a frolic and detour -- if there is a there there,

7    nobody's put a cap on how much there might be.  There could

8    well be, potentially, plenty for other people.  We don't --

9    you know, concededly, we don't know, but PAX, I think in

10   particular, given the size of its claim and the effort it's

11   taken so far, shouldn't have been -- shouldn't be prejudiced

12   by this filing, and I think other creditors should be

13   permitted to essentially take advantage of a debtor's bad

14   faith filing.

15           The other parties sort of say, you know, there is

16   a gamesmanship aspect to Kwok's quality -- Kwok's behavior

17   here, and he shouldn't be rewarded for that.  I don't think

18   he is being rewarded.  If this case is dismissed, he's

19   gotten no real benefit from this case other than avoiding a

20   couple of months in front of Justice Ostrager, which he's

21   going to have to go right back to.  He hasn't gotten a

22   benefit.  The only people who have gotten benefits are

23   people who don't have liquidated claims who are stretching

24   PAX out, which has already been stretched out for almost 14

25   years.  I don't think that's equity or fairness, and I don't

47

1    think that's in the interest of the $261 million of creditor

2    claims that PAX has.

3         You know, we think it's actually the other

4    parties, the other claim holders, pushing for remaining in

5    bankruptcy that are advocating for unequal treatment.  They

6    basically want to use the bankruptcy as a collection device,

7    something that the *In Re: Murray* case says, you know,

8    bankruptcy shouldn't be used as a debt collection remedy

9    that's more potent -- a debt collection remedy that's more

10   potent in bankruptcy than the equivalent right under non-

11   bankruptcy law is not something that we should be doing.

12   The court denounced a creditor's use of bankruptcy as a debt

13   collection remedy more potent than the equivalent right

14   under state -- under non-bankruptcy law.

15        It would be other people jumping to the front of

16   the line, given where they stand now, to force PAX to share

17   recoveries while imposing millions of dollars in unnecessary

18   costs.

19        I would note that the debtor makes the point that

20   other creditors are basically hijacking a Chapter 11 case

21   for a pseudo involuntary.  I suspect that they amplify it.

22   It would otherwise be unavailable to them as an avenue for

23   relief.  I will defer to the committee to further develop

24   that argument.  I think it has merit, Your Honor.

25        Your Honor, the committee cites, and I think we

48

1    note that there are factors that *Collier* (ph) talks about.

2    Courts are sort of -- some courts really rely on them, some

3    courts just notice them in passing.  I think what I've

4    discussed today really goes over those factors.  You know,

5    whether creditors receive preferential payments is a factor.

6    Now there's certainly no reason to believe that PAX received

7    any preferential payment.  Would there be a loss of rights

8    granted in the case if it were dismissed rather than

9    converted?

10         The Rui Ma group suggests that the rights to the

11   $37 million escrow would be lost upon dismissal, but the

12   order expressly contemplated what would happen if there is

13   dismissal.  That wasn't a mystery.  Creditors -- you know,

14   the creditors didn't have any particular right to that, and

15   it was expressly bargained for, what might happen in the

16   context of dismissal.  So I don't think anybody is losing a

17   right that they otherwise would have had.

18         Whether the debtor would simply file a further

19   case upon dismissal.  I mean, I guess Kwok could try, having

20   consented to this one and, you know, I don't think that

21   weighs in favor.

22         The ability of a trustee to reach assets for the

23   benefit of creditors.  I think, you know, maybe, but the

24   trustee doesn't have any money to support its efforts right

25   now.  What's deemed low hanging fruit -- first of all, it

1    was Kwok that -- you know, it was PAX that built the tree,

2    but more importantly, there's still a lot of wood to chop to

3    get there on that tree.  And even assuming if funding was

4    available, it would do so at a great cost to creditors,

5    including, I think, specifically PAX.

6         You know, maximizing the estate's value as an

7    economic enterprise, you know, who really knows what the

8    economic enterprise value of this is.  We know it -- I think

9    that mostly comes up in the context of cases like the

10   *Premier Golf* one, where there -- liquidation causes a clear

11   loss -- a crushing loss of value and jobs.

12        Whether the remaining issues would be resolved

13   outside the bankruptcy forum, I think the Court might have

14   already had a colloquy on that issue, and I think the debtor

15   in Rui Ma, for example, we've already said, hey, you've got

16   a case, go back and try to get it dealt with somewhere else.

17        Whether the debtor is engaged in misconduct.  I

18   think here the debtor's misconduct is almost entirely

19   prebankruptcy.  There are some things around the edges that

20   we obviously -- you know, we don't love about the way the

21   debtors conducted the case, but I think they fall within the

22   bounds of bad ideas, not corruption.

23        And you know, I don't think creditors need a

24   Chapter 7 case to protect their interest.  People have their

25   state law remedies fully available to them.

50

1          And then, you know, other factors, single asset

2    plan already confirmed, environmental concerns, I think as

3    we learned from the DIP when we went over the proposed

4    order, there are no circular concerns in this case.  There's

5    no environmental issues.  This isn't a *Midlantic* type of

6    situation.

7          So, Your Honor, those are the reasons we believe

8    dismissal is appropriate, that the case laws support PAX's

9    rationale, and the cases relied upon by other parties really

10   don't get them where they need to be in order for this Court

11   to exercise discretion to convert rather than dismiss.

12         Thank you, Your Honor.

13         THE COURT:  Thank you.  Attorney Jonas?

14       MR. JONAS:  Good morning, Your Honor.  Jeff Jonas,

15   Brown Rudnick on behalf of the debtor, Miles Kwok.

16         Before addressing dismissal of the Chapter 11 case

17   particularly, or alternatives, I think it's important to

18   just step back for a minute and review how we got here, to

19   put it in context, because I do think it's important for the

20   Court today to put things in context and focus on the facts,

21   not the many unsupported allegations, innuendo and argument

22   that will be made, have been made, and will be made by

23   lawyers, so you won't hear any rhetoric or vitriol from me

24   this morning.

25         In this case, you've heard live testimony from two

1     witnesses, Craig Jalbert of Verdolino & Lowey, and from

2     Miles Kwok, the debtor.

3          As Mr. Kwok testified, and as set forth in the

4     declaration he filed, he's an outspoken critic of the

5     Chinese Communist Party or CCP.  Hundreds of millions of

6     people watch his broadcasts in connection with his criticism

7     of the CCP.  He and family members were jailed and tortured

8     in China.  He endured watching his brother being shot and

9     killed.  He continues to be pursued and persecuted by the

10    CCP.

11         This is not fantastical make believe.  Senior U.S.

12    Government officials and business leaders have been

13    criminally charged and pled guilty, including with acting as

14    foreign agents for the CCP in connection with illegally

15    seeking to have Mr. Kwok deported to China so he could be

16    jailed or killed.  These persons include Elliot Broidy and

17    George Higginbotham.

18         Your Honor, last week -- I think we mentioned this

19    in our papers, but to make sure you're aware -- last week,

20    the Department of Justice filed suit against Steve Wynn, a

21    billionaire fund-raiser and former finance chair for the

22    Republican National Committee, based on his acting as an

23    unregistered Chinese agent in seeking Mr. Kwok's

24    extradition.

25         The Justice Department references President Xi

52

1    Jinping, Chinese -- China's supreme leader -- raising the

2    U.S. returning Mr. Kwok to China directly with then

3    President Trump.

4         Mr. Wynn, in an effort to gain support from the

5    Chinese government for his casinos in Macao, had contact

6    with senior officials on the National Security Counsel at

7    the White House, the White House Chief of Staff, and then

8    President Trump seeking to have Mr. Kwok placed on the no-

9    fly list, to have Mr. Kwok's U.S. visa not renewed, and have

10   Mr. Kwok returned to China, again likely to face jail or

11   death.

12        Mr. Kwok believes that some, if not all, of the

13   creditor -- the alleged creditor claims against him are part

14   of the CCP's continuing effort to discredit and silence him.

15        Against that backdrop, Mr. Kwok perseveres.

16   Although he has little to no assets and income, he is

17   supported by the largess of his family.  While his alleged

18   creditors may not like this, there's nothing illegal,

19   improper or wrong about this.

20        In February, facing a New York State Court

21   judgment and order, which he could not pay, Mr. Kwok filed

22   this bankruptcy case.  As he testified, and as set forth in

23   his declaration, he hoped Chapter 11 would help him reach a

24   fair and equitable resolution of alleged creditor claims.

25        His bankruptcy filing and the administration of

53

1    this case since it has -- since it was filed, has been

2    nothing but in good faith and completely transparent.  There

3    is no evidence to the contrary.  I think even Mr. Friedman

4    admitted substantially that.

5         While there may be allegations that Mr. Kwok owns

6    certain assets, whether that be a yacht or a New York City

7    apartment, these allegations remain unproven and

8    undetermined.

9         Since filing this case, Mr. Kwok has filed

10   complete and accurate schedules and statement of affairs.

11   He sat for almost two full days of 341 meetings.  He came

12   before the Court and provided live testimony.

13        He arranged and assisted with the return of the

14   yacht, subject of the New York State Court order, the return

15   of which is presently secured by $37 million in cash.  He

16   obtained $9 million of DIP financing which would have been

17   unsecured and subordinated and included a million dollar

18   gift to the estate.  And he filed a plan of reorganization.

19        The hope was that bankruptcy would afford a forum

20   and opportunity to have a dialog with creditors and alleged

21   creditors in order to reach a consensual resolution, the

22   exact purpose and point of bankruptcy.

23        This bankruptcy filing was not in bad faith and

24   there has been no bad faith since it has been filed.

25        So, Your Honor, turning to dismissal, cause for

54

1   dismissal under Bankruptcy Code Section 1112(b)(1), exists,

2   specifically 1121(b)(4)(A), provides that cause includes

3   substantial or continuing loss to or diminution of the

4   estate and the absence of a reasonable likelihood of

5   rehabilitation.  That is the only existing cause that

6   exists.

7            If you do look at -- I appreciate it's not

8   absolutely exhaustive, but if you look at 1112(b)(4) -- and

9   obviously I've referred to (A) as the cause we think is

10   relevant in this case -- if you look at (B), we don't think

11   any of the other causes are applicable, Your Honor.

12            (B) gross mismanagement of the estate, I've

13   addressed that;

14            (C) failure to maintain appropriate insurance;

15            (D) unauthorized use of cash collateral;

16            (E) failure to comply with an order of the Court;

17            (F) unexcused failure to satisfy timely any filing

18   or reporting requirement;

19            (G) failure to attend the meeting of creditors;

20            (H) failure timely to provide information or

21   attend meetings requested by the United States Trustee;

22            (I) failure timely to pay taxes;

23            (J) failure to file a disclosure statement;

24            (K) failure to pay any fees or charges under

25   certain -- chapter 123 of title 28;

55

1          (L) revocation of an order of confirmation;

2          (M) inability to effectuate substantial

3    consummation of a confirmed plan;

4          (N) material default by the debtor with respect to

5    a confirmed plan;

6          (O) termination of a confirmed plan;

7          And lastly, (P) failure of the debtor to pay any

8    domestic support obligations.

9          So, Your Honor, as I've mentioned, we believe that

10   there is cause.  The relevant and applicable cause is

11   1121(b)(4)(A).

12         THE COURT:  May I just ask you a question on that?

13         MR. JONAS:  Certainly, Your Honor.

14         THE COURT:  I understand -- I understand your

15   recitation of the list, and I understand that you assert

16   that only (4) applies, but are you -- are you contesting the

17   case law that interprets cause includes mean -- does not

18   mean that the list -- it can only fit into the list?

19         MR. JONAS:  No, Your Honor.

20         THE COURT:  Okay.

21         MR. JONAS:  Not at all.

22         THE COURT:  That's all I'm asking.

23         MR. JONAS:  Yes.

24         THE COURT:  Okay.

25         MR. JONAS:  And I think I mentioned, Your Honor,

56

1    that our view is it's -- I appreciate it's not exhaustive.

2                THE COURT:  I thought you said that --

3                MR. JONAS:  Yeah.

4                THE COURT:  -- but I just wanted to make sure for

5    the record.

6                MR. JONAS:  No.  No.  No.  Absolutely, Your Honor.

7                THE COURT:  Okay.

8                MR. JONAS:  But I do think there's a reason that

9    there's specified items there --

10               THE COURT:  I understand.

11               MR. JONAS:  -- and I thought it was important to

12   review that.

13               THE COURT:  No.  I think that's helpful.  Thank

14   you.

15               MR. JONAS:  You're welcome.

16               Your Honor, as for dismissal versus conversion or

17   appointment of a trustee, while a debtor's preference is not

18   dispositive, it should be given some weight.  Here, the

19   debtor and its largest creditor support dismissal.

20               Eleven-twelve (b)(1) provides for the Court to

21   examine which of dismissal, conversion or appointment of a

22   trustee is in the best interest of creditors and the estate.

23               In *SWJ Management*, 551 B.R. 93, 2015 case from the

24   district court here in Connecticut, it was described -- this

25   analysis was described as whether dismissal would,

1    quote/unquote, "Prejudice creditors."

2            In the *Hull* case, 339 B.R. 304, 2006 case from the

3    -- a bankruptcy court case from the Eastern District of New

4    York, the Court addressed what -- in this context what is

5    prejudice to creditors.

6            And it said, quote, "Creditors are not generally

7    prejudiced by dismissal since they will no longer be stayed

8    from resorting to the state courts to enforce and realize

9    upon their claims.  That is, it is the reasonable pre-

10   petition legal expectations and entitlements of a debtor's

11   creditors that should be considered in the context of a

12   debtor's timely motion to dismiss, not the loss of an

13   opportunity to receive a distribution through the bankruptcy

14   process."

15           THE COURT:  Could you just tell me that case

16   again, Counsel.

17           MR. JONAS:  Certainly.

18           THE COURT:  I'm sorry.

19           MR. JONAS:  It's the *Hull* case.  H-U --

20           THE COURT:  *Hull*, H-U-L-L?

21           MR. JONAS:  Yes.  And it's 339 B.R. 304.  It's a

22   2006 case, Eastern District of New York.  A bankruptcy court

23   case.

24           THE COURT:  Thank you.  Thank you.

25           MR. JONAS:  Yes.

58

1          THE COURT:  I just didn't hear what you had said

2     at the beginning.  I apologize.

3          MR. JONAS:  Of course, Your Honor.

4          Your Honor, I'll just, for the record, state we

5     don't believe that 1112(b)(2), which would arguably prohibit

6     conversion or dismissal, is applicable for a number of

7     reasons.  We don't believe there are unusual circumstances

8     establishing that conversion or dismissal is not in the best

9     interest of creditors and the estate.

10         Another requirement there, which we don't believe

11    is applicable, is that we don't think there's a reasonable

12    likelihood that a plan will be confirmed with a reasonable

13    period of time, which is another requirement to -- under

14    1112(b)(2).

15         And 1112(b)(2) is not applicable if the grounds

16    for conversion are dismissal is 1112(b)(4)(A), which, again,

17    I'm taking you through our position that the loss or

18    diminution and the no reasonable likelihood of

19    rehabilitation under 1112(b)(4)(A) is the basis for

20    dismissal.

21         Your Honor, I won't further review PAX's

22    allegations of bad faith.  I think I've addressed those.  I

23    mean, they -- again, just briefly, they've referred I

24    believe in an unsupported manner to -- to misrepresentations

25    in the schedules, to a, quote/unquote, "Bogus DIP loan," to

59

1    the debtor, quote/unquote, "Pulling the plug on the case."

2    I don't think any of those are what happened here.

3          I can tell you the debtor came into this court --

4    as I mentioned earlier -- with the hope that ultimately

5    there would be a reorganization.  That didn't happen.  But

6    nevertheless I think Mr. Friedman said it, he may not have

7    liked it, but he didn't really take issue with the fact that

8    there was bad faith in the case since the case has

9    commenced.

10         And lastly, Your Honor, I'll say, as to the --

11   somehow the bankruptcy filing being improper because the

12   debtor didn't have an ongoing business, I think you said it

13   best in the *Lucarelli* case, Your Honor, 517 B.R. 42, where

14   you said or we've heard quoted, "The plain language of the

15   bankruptcy code permits individual debtors not engaged in

16   business to file for relief under Chapter 11."

17         THE COURT:  I think I cited from the supreme court

18   though for that.

19         MR. JONAS:  You cited a number of cases, Your

20   Honor.

21         THE COURT:  I think it was the --

22         MR. JONAS:  I'm giving you credit for it.

23         THE COURT:  I think it was the supreme court.

24         MR. JONAS:  I think you're right.

25         Your Honor, I just -- I do think it should be

60

1    noted briefly that the alleged claims of the creditors

2    committee members that are here today are, in fact,

3    unliquidated and disputed.

4         Those claims as -- again, Mr. Friedman went

5    through this and I'm not repeating a lot of what I might

6    otherwise have said because I think Mr. Friedman covered it

7    -- those claims would be -- would need to be litigated.

8    Continuation of this bankruptcy case in any form will be in

9    the context of an administratively insolvent case with no

10   funding to support what likely could be years of litigation.

11        Your Honor, in closing, Mr. Kwok has asked me to

12   thank you and your staff for the time and the consideration

13   you've given this case.  Although it may not have been as

14   successful as he would have liked, it has, at least in part,

15   restored his confidence in the judicial system.

16        And that said, Your Honor, respectfully, it is

17   time to move on.  This bankruptcy case should be dismissed.

18   Thank you.

19        THE COURT:  Thank you, Attorney Jonas.

20        Attorney Goldman.

21        MR. GOLDMAN:  Thank you, Your Honor.  Good

22   morning.  Irve Goldman representing the creditors committee.

23        Your Honor, I'd like to start with the observation

24   that whether or not this case was filed in bad faith or

25   other cause exists, as we've stipulated, the question before

61

1    the Court -- the question before the Court -- is not whether

2    the case was filed in bad faith, but is whether conversion,

3    dismissal, or the appointment of a Chapter 11 trustee is in

4    the best interests of creditors.

5          So whether the case was filed in bad faith or

6    other cause exists does not change the standard of what is

7    in the best interests of creditors in this case.

8          And although it would be quite ironic that if the

9    debtor's own bad faith is used to justify a dismissal of

10   this case, it would allow him to avoid the scrutiny of the

11   Chapter 7 process, which would entail a thorough

12   investigation of what PAX claims were his hidden assets,

13   that they were on the cusp of reaching before this case was

14   filed, and he will be rewarded because what will be left

15   will be various creditors that are scattered about in

16   different courts that will be left to their own devices to

17   chase down whatever assets this debtor has after PAX gets

18   done with them as the only judgment creditor in this case.

19         So they certainly do need the protection of the

20   Chapter 11 -- 7 process.

21         In terms of what the standard is under 1112, I'd

22   like to start with the plain language of the statute, which

23   the Supreme Court in the Second Circuit have repeatedly

24   instructed lower courts to focus on in interpreting the

25   bankruptcy code.

62

1      Section 1112(b)(1) provides that once cause is

2  established, the Court is required to convert or dismiss a

3  case, whichever is in the best interest of creditors and the

4  estate, unless the Court determines that the appointment of

5  a Chapter 7 trustee or an examiner is in the best interest

6  of creditors and the estate.

7      THE COURT:  I think you mean a Chapter 11 trustee,

8  but that's fine.

9      MR. GOLDMAN:  Yes.  Yes.  Thank you, Your Honor.

10     THE COURT:  That's fine.  I understand.  I

11 understood what you meant.

12     MR. GOLDMAN:  What PAX -- the way PAX wants the

13 Court to read that statute is as the best interest of

14 creditors according to the amount -- amounts of their

15 claims.  Of course it simply doesn't say that.

16     And I'd like to emphasize that in considering the

17 best interest, the statute uses the plural, creditors, so

18 that the interest of the entire creditor body as a whole

19 have to be considered, not just the interests of a single

20 creditor that has a large claim, and that prior to

21 bankruptcy was on the cusp of reaching -- where all

22 creditors in this case seem to agree are the debtor's known

23 assets right now, and that is the Lady May and the debtor's

24 interest in the Sherry-Netherland apartment.

25     And the term in determining the creditor body, the

63

1    Court can take judicial notice of the proofs of claim that

2    were on file right now as well as the debtor's schedule F.

3              The proofs of claim, as of today, even though

4    there is no bar date, total $71 million, and in some cases

5    are based on allegations of grievous personal harm.

6              For example, the claim of Rui Ma, which is close

7    to the trial stage in the New York Supreme Court, alleges

8    claims of sexual assault, false imprisonment, and

9    intentional affliction of emotion distress over a period of

10   several years.

11             The claim of Bob Fu, based on an action in federal

12   court in Texas, is based on allegations that the debtor

13   promoted acts of violence against Dr. Fu, indeed, encouraged

14   his, quote, "Comrades," end quote, to kill Dr. Fu, and

15   incited harassing protests in front of his house for weeks.

16             The claim of Bruno Wu and Yang Lan is based on a

17   New York Supreme Court action alleging that the debtor used

18   his pervasive social media accounts to personally attack

19   them by claiming, among other things, that Yang Lan had

20   extramarital affairs and used sexual favors to obtain her

21   prominent cultural status in China and was, quote, "Full of

22   sexually transmitted diseases," end quote.  Accused Bruno Wu

23   on repeated occasions of attempted murder and bribery and

24   has threatened violence on social media against both of

25   those creditors.

64

1            To say that these aren't actual creditors that are

2     deserving of the same consideration of their interests, as

3     PAX is, really an offense to those creditors.

4            And as I mentioned, the proof of claim deadline

5     has not even been set.  It is likely based on what was

6     listed on schedule F that we will receive a flood of

7     additional claims so that that $71 million will certainly

8     escalate.

9            Getting back to the plain meaning of the statute,

10    in determining the creditors whose interests must be taken

11    into account, under Section 1112(b)(1), I would refer the

12    Court to Section 101(10A) of the bankruptcy code which

13    defines creditor as, quote, "An entity that has a claim

14    against the debtor," end quote, as of the petition date.

15           And the definition of claim under Section 101(5A),

16    which defines a claim to include a right to payment whether

17    or not it is reduced to judgment unliquidated or disputed.

18           So PAX's contention that these creditors aren't

19    actual creditors is contrary to the plain language of the

20    bankruptcy code, because a creditor is one who holds a claim

21    and a claim could be undisputed, unliquidated and

22    contingent.  So there are creditors, actual creditors, here.

23           And how could a creditors committee been even

24    appointed by the U.S. Trustee if these weren't actual

25    creditors?  And what creditors are they supposed to be

1    representing if there are no other actual creditors?

2        PAX certainly didn't object to the retention of

3    committee professionals based on the fact that there were no

4    actual creditors to defend.

5        So under a plain statutory analysis, creditors

6    such as those who have filed proofs of claim in this case,

7    but have not yet received judgments, are just as much

8    creditors of this estate as is PAX for purposes of

9    evaluating the best interest test under Section 1112(b).

10        If anything, the interests of those creditors who

11    allege grievous personal harm are entitled to equal, if not

12    greater, consideration under the best interest test than is

13    PAX whose actual money judgment -- which is attached to Mr.

14    Friedman's declaration on the motion to dismiss as exhibit 1

15    -- is in the principal amount of just $46 million.

16        They have $70 million of interest at their

17    contractual rate of 15 percent and a $134 million contempt

18    fine is not in compensation of any pecuniary loss.

19        The test that many courts, indeed, most, have

20    applied in determining what is in the best interest of

21    creditors under Section 1112(b)(1), is the course of action

22    that provides the best chance for the largest number of

23    creditors to be paid the largest amount of money in the

24    shortest period of time.

25        Here, that is either conversion or the appointment

1      of a Chapter 11 trustee.  Because in the event of a

2      dismissal, the largest number of creditors will suffer at

3      the hands of one single judgment creditor who will be paid

4      the largest amount of money, in the event of dismissal,

5      while all the other creditors will remain mired in

6      litigation with the debtor.

7              As for the boat, we know that under Judge

8      Ostrager's February 9th, 2022 decision and order, which is

9      our exhibit 1, the debtor has already been found by clear

10     and convincing evidence to beneficially own and control the

11     boat.  That's at page 4 of his decision.

12             When the boat is back, PAX will simply levy on

13     that beneficial interest and ultimately receive a

14     distribution when it is liquidated.

15             As for the Sherry-Netherland apartment -- of

16     course they're poised to do that on the day of dismissal as

17     they have that proceeding before Judge Ostrager.

18             As for the Sherry-Netherland apartment, they're

19     equally poised to realize on that asset in the event of

20     dismissal.

21             In the debtor's declaration, which is UCC exhibit

22     2, he acknowledges owning 100 percent of the membership

23     interest in Geneva Holdings Corp., which is the sole member

24     of the title holder of the Sherry-Netherland apartment,

25     Geneva Holdings, LLC.

67

1          Geneva Holdings, LLC is a debtor under Chapter 11

2     in the Southern District of New York and the debtor claims

3     his interests are held in trust or his son's company, Bravo

4     Luck.  That's at his declaration at paragraph 33(B).

5          By order entered on October 8th, 2021, which is

6     UCC exhibit 3, Judge Garrity approved a settlement agreement

7     between Geneva Holdings, PAX and Bravo Luck.  That

8     settlement agreement, which will appear at UCC exhibit 4,

9     marked ECF 131-1, which is dated September 24th, 2021,

10    granted PAX relief from the automatic stay to continue to

11    prosecute the New York Supreme Court action.  That's at

12    paragraph 7(A) of the settlement agreement, page 7 of 12 of

13    the settlement agreement.

14         Since PAX had already received its money judgment

15    on February 3rd, 2021, the only thing left to try in the New

16    York Supreme Court action are PAX's veil-piercing claims

17    against the Geneva entities.  And they are found in count 2

18    of its first amended complaint, which is UCC exhibit 10.

19    It's page 17 of the complaint.

20         In addition, PAX is the beneficiary of an order

21    requiring Mr. Kwok to turn over his 100 percent ownership

22    interest in Geneva -- the Geneva -- 100 percent owner of

23    Geneva Holdings to PAX.  That's UCC exhibit 6.  The order

24    was entered on September 22nd, 2021.  And PAX had filed a

25    motion for contempt in a New York dated January 7th, 2022

68

1    for Kwok's failure to turn the shares over.  That I believe

2    is exhibit 7 of our exhibits.

3              It's expected that that motion will be refiled or

4    resumed on dismissal.

5              PAX has similar veil-piercing type claims relief

6    pending in the courts of the British Virgin Islands.  UCC

7    exhibit 11 is PAX's amended statement of claim in that

8    court.  In that amended claim, they allege, among other

9    things, that Mr. Kwok used $70 million of his own assets to

10   transfer to Bravo Luck -- that's paragraph 29 of exhibit 11

11   -- that the declaration of trust that Mr. Kwok claims to

12   have with Bravo Luck was a fraud, quote, "Devised to hold

13   his shares in Geneva BVI in trust for Bravo Bravo."

14             Bravo Luck was a fraud -- excuse me -- it was a

15   fraud, quote, "Devised for the sole purpose of concealing an

16   asset of Mr. Kwok from his creditors."  That the trust

17   document should be set aside as a, quote, "Document intended

18   to defraud creditors of Mr. Kwok."  Creditors, plural.

19   That's paragraph 35.  And that Mr. Kwok is the beneficial

20   owner of Bravo Luck and his son is his mere nominee.

21             Under the settlement agreement that Judge Garrity

22   approved, the parties, that is, PAX and Bravo Luck, were

23   also permitted to proceed with the British Virgin Island

24   litigation.

25             So they are very poised to also realize on the

69

1    Sherry-Netherland apartment based on those claims that will

2    be resolved in the British Virgin Islands or in the New York

3    State Court.

4          In terms of what's happening with the apartment in

5    the Geneva Holdings case, Melanie Cyganowski was appointed

6    the sales officer to market and sell the property.  That's

7    at UCC exhibit 8.  And Sotheby's was approved as the broker

8    for the property, UCC exhibit 9, and the property is

9    currently listed on Sotheby's website for $38,500,000.

10          So they are -- PAX is very well positioned to

11    realized on the assets on dismissal ahead of other

12    creditors, who, again, will be left with litigating against

13    Mr. Kwok, and thereafter getting judgments, chasing down

14    whatever assets are left.

15          The additional potential assets we contend would

16    be -- potential assets to recover in a Chapter 7 -- are two

17    Greenwich properties that are owned by Greenwich Land, LLC.

18    UCC exhibits 13 and 14.  The properties are described in

19    those exhibits.

20          In paragraph 17, in Mr. Kwok's declaration, he

21    claims his Greenwich residence, quote, "Is owned by my wife

22    through Greenwich Land, LLC."  That remains to be seen

23    whether that's another one of his concealed assets.  Which

24    of course could be investigated in a Chapter 7, which we

25    were in the process of trying to investigate when the debtor

1  filed his consent to dismissal on May 11th.

2      I'd like to turn now to PAX's argument that the

3  touchstone of what is in the best interest of the estate is

4  the preference of creditors, and that the best interest of

5  creditors must reflect PAX's view as the single largest

6  creditor.

7      The touchstone of the best interest of creditors

8  test is not what the creditors prefer.  It is the course of

9  action that provides the best hope of recovery for the

10  largest number of creditors, and not the course that will

11  afford the most recovery for the most vocal or the largest

12  creditor.

13      Preliminarily, the case authority that PAX cites

14  for that proposition that a single creditor can -- with a

15  large enough claim can suffice for purposes of the best

16  interest test is completely in opposite I think to this case

17  and otherwise doesn't support PAX's theory.

18      In the *Acme Cake* case, which is the case it's

19  relying on, not a single creditor or even the creditors

20  committee itself objected to a dismissal of the case.

21      It was counsel for the creditors committee that

22  had objected to dismissal on the basis that it should not be

23  granted because administrative expenses, including its fees,

24  were not being paid, and a dismissal would violate the

25  priority scheme of the bankruptcy code by allowing the

1    creditor requesting dismissal to be paid ahead of

2    administrative claimants.

3         Of course here that is not what the argument is.

4    The creditors committee who represents the interests of all

5    unsecured creditors is objecting to dismissal.  We are not

6    making this argument, although I do believe the case should

7    be, if Your Honor was inclined to dismiss, it should be

8    conditioned on payment over the fees.

9         The reason we are objecting is because dismissal

10   is not in the best interest of creditors, and that simply

11   was not an argument that was made in the *Acme Cake* case.

12   And in fact --

13        THE COURT:  Can I just ask you a question about

14   that?

15        MR. GOLDMAN:  Yes.

16        THE COURT:  You just said that -- obviously I

17   understand that the committee's position is dismissal is not

18   appropriate at conversion or appointment of trustee is, but

19   you also just said that if the Court was to dismiss you'd

20   want it to be conditioned on the payment of the committee's

21   fees.  And I just want to understand how that would work

22   from your perspective?

23        How would a court condition dismissal on payment

24   of fees in an estate where there's no money?

25        MR. GOLDMAN:  If Mr. Kwok wants a dismissal of the

72

1    case so that he does not have to go through the Chapter 7

2    process and face potential 523 non-dischargeability claims

3    as well as 727 denial of discharge claims, as well as the

4    process of hunting down his hidden assets and collecting

5    them, then just as he found the money to put up to secure

6    the return of the boat, and just as he found the money to

7    propose to fund the case with an $8 million DIP loan, he

8    will find the money if the Court conditions dismissal on

9    payment of the fees.

10             THE COURT:  Have you -- I haven't seen -- but I

11   may have missed this, okay, so just understand -- have you

12   cited any cases that support the authority of the Court to

13   do that, to do what you're suggesting?

14             MR. GOLDMAN:  There's no direct case that I found,

15   Your Honor.

16             THE COURT:  Okay.  Okay.  I'm just asking the

17   question --

18             MR. GOLDMAN:  No.

19             THE COURT:  -- and so I make sure that I've read

20   your papers properly.

21             Go ahead.  I'm sorry.  I just wanted to ask that

22   when you brought that up.

23             MR. GOLDMAN:  Thank you, Your Honor.

24             Another critical distinguishing feature of *Acme*

25   *Cake* case is that in that case the Court found that

73

1    converting the case or appointing a Chapter 11 trustee,

2    quote, "Would result in the unsecured creditors receiving

3    little distribution, if any."  And that certainly cannot be

4    -- cannot be said here.

5           They did make the -- they actually quoted a

6    decision in a California bankruptcy case -- from a

7    California bankruptcy case -- in saying that, quote, "It is

8    not necessary that the interest of every creditor actually

9    favor conversion.  There is no specific numerosity

10   requirement inherent in section 1112(b).  The interest of a

11   single creditor with a large enough claim will suffice."

12   That is a direct quote from a case called *In re Staff*

13   *Investment*, a California bankruptcy case 146 B.R. 256.

14          If you take a look at that case, it's completely

15   distinguishable from this case.  The single largest

16   unsecured creditor in that case held a deficiency claim of

17   $600,000 on a mortgage against the single asset of the

18   estate.  That was the deficiency component of the claim.  It

19   totaled 95 percent of all unsecured creditors.  And there

20   were only other unsecured claims totaling $21,000.

21          So this single quote from a California bankruptcy

22   case, which really is dicta because no one was making the

23   argument that, you know, the dismissing -- the creditor

24   wanted dismissal would run away with all the assets ahead of

25   the other creditors is really much too thin a read upon

74

1   which to overcome the overwhelming authority that holds that

2   the best interest of creditors under 1112(b) is supposed to

3   consider the interests of the entire creditor body, not a

4   single creditor's parochial interest.

5          And that means considering whether creditors as a

6   whole will do better in Chapter 7.  And that certainly is

7   the case here based on how posed PAX is to recover on what I

8   would call the low-hanging fruit of assets that now exist,

9   that we know at least there are legitimate and very weighty

10   claims to for the estate.

11          PAX is so emboldened by the amount and status of

12   its claim that it proclaims that, quote, "Given the size of

13   Pax's already adjudicated judgments, PAX is entitled to

14   recover first."  That's at its memorandum of Y at 4.  This

15   turns the fundamental policy of equality of distribution

16   among creditors on its head and instead adopts the every

17   creditor for itself rule that exists outside of bankruptcy.

18          But that's not the standard for the best interest

19   of the creditors.

20          We are in a bankruptcy case.  And inherent in that

21   standard is considering what will serve the equality -- what

22   will serve the overriding bankruptcy policy of equality of

23   distribution.

24          Finally, comparing the committee's preference for

25   conversion to an involuntary bankruptcy because the debtor

1    wants a dismissal is a red herring.

2              First, courts have held that a debtor's preference

3    for dismissal is irrelevant under 1112(b) unless it happens

4    to coincide with the creditors' interests.

5              And section 1112(b)(1) mentions only the best

6    interests of creditors and the estate and does not mention

7    the interests of the debtor, such as is mentioned in section

8    305 of the bankruptcy code.  So the omission of the debtor's

9    interest is intentional in 1112(b)(1).

10             Second, the conversion of the case here is

11   authorized, specifically authorized, under section

12   1112(b)(1) if it is in the best interest of creditors.  This

13   standard has nothing to do with the commencement of an

14   involuntary petition under section 303.  They are two

15   completely different standards under entirely different

16   situations, so you cannot analogize what is specifically

17   authorized under 1112(b) with the commencement of an

18   involuntary bankruptcy.

19             The final additional points I'd like to make is

20   that this debtor should not be able to escape the scrutiny

21   of the Chapter 7 process with the prospect of a denial of

22   discharge, particularly under section 727(a)(2), which will

23   provide or which provides grounds for denial of discharge if

24   there is a concealment of assets within the one year of

25   bankruptcy.

76

1          And there are many cases that hold that even

2     though an asset might have been transferred outside the one-

3     year period, if the debtor continues to conceal that

4     interest into the one-year period, that concealment will

5     serve as a ground for denial of discharge under section

6     727(a)(2).

7          If the Court does decide to dismiss the case

8     without conditioning dismissal on the payment of

9     professional fees of the committee, the committee would like

10    to reserve the right to seek a motion to review and disgorge

11    fees of the retainer that was paid to debtor's counsel in

12    the amount of a million dollars.  So I would leave the Court

13    with that, with that request.

14         I would like to respond briefly to some points

15    that both Mr. Friedman and Mr. Jonas made at various times

16    during their arguments, and then I'll sit down.

17         Mr. Friedman mentioned the *Sapphire* case in

18    support of dismissal.  If Your Honor looks at that case,

19    there were very few unsecured creditors in that case.  And,

20    in addition, they had other sources of recovery in the form

21    of a guarantor and other joint -- and/or other joint

22    obligors.  We obviously do not have that here.

23         Mr. Friedman stated that all they were really

24    doing here was returning to the status Kuo.  But returning

25    to the status Kuo means that they will be first in line to

77

1    realize on all the assets, and that's why these creditors

2    need the protection of a Chapter 7 case.

3         Mr. Friedman called into question the personal

4    injury tort claims that exist in this estate.  What would

5    happen in a Chapter 7 case is that a trustee would first

6    look and seek to recover assets of the estate.  And once

7    that process is concluded, a trustee would then turn to the

8    process of reviewing claims and objecting to them if

9    necessary.

10        So you would first have a marshaling of assets to

11   determine what assets exist.  Then there would be a review

12   of the claims.  Which is the trustee's duty to do under

13   section 704(5).  The trustee wouldn't be retaining special

14   counsel to review those claims, so there would be no costs

15   associated with that review.

16        And parties can object to those claims if the

17   claims are thought better off to be resolved in other

18   courts.  A relief from stay could be granted, and the

19   debtor, if the debtor so wished, could defend those claims.

20   It would have no impact on the bankruptcy process itself.

21   It would simply be a process of liquidating those claims in

22   other courts, which is commonly done.

23        If a claim, for example, is on the verge of trial

24   or close to trial, it's not uncommon for the creditor to

25   seek relief from stay in order to liquidate the claim in

78

1    another court and then come back to the bankruptcy court

2    with the amount of their claim.  So that is -- that is a

3    routine process in Chapter 11 -- Chapter 7 cases.

4          As far as funding to litigate the assets that we

5    know do exist, the boat and the apartment, we -- I'm

6    confident that a trustee could get litigation funding.

7          Now, yes, there's no evidence that litigation

8    funding is available today, but this debtor just filed its

9    consent to dismissal on May 11th.

10          You cannot possibly expect the committee or a

11    trustee to chase down litigation funding in a matter of a

12    couple of weeks, which is -- which is all we've had, and

13    present evidence that there's some, you know, binding

14    commitment to provide litigation funding to a party that

15    doesn't even exist yet because the funding would have to be

16    provided to either a Chapter 7 or Chapter 11 trustee.

17          So I think, you know, a trustee should be given an

18    opportunity to do that or to retain special counsel to at

19    least take the litigation on a contingency-fee basis.  And,

20    yes, that will involve collecting a percentage of any

21    recovery, but that's the -- that's common in Chapter 7

22    cases, and it's a negotiable fee.

23          Yes, the boat is worth a lot of money and that

24    will come out of the recovery if special counsel does take

25    it on a contingency-fee basis, but that is no basis to

79

1    conclude that the best interests of every other single

2    creditor, other than PAX, would be served by that process,

3    because they would be served by that process.  The only

4    creditor that would not be served would be PAX.

5              In terms of using bankruptcy as a debt collection

6    device, I mean, bankruptcy is a collective proceeding where

7    a debtor files for bankruptcy and surrenders his non-exempt

8    assets to creditors in exchange for seeking a discharge.

9    That is what bankruptcy is all about, so it very much is a

10   collective proceeding that is used to marshal and liquidate

11   the assets of the estate for the benefit of all creditors

12   equally, and that I submit is what the Court should do here.

13             And that's all I have, Your Honor, unless you have

14   any questions.

15             THE COURT:  I don't have any other questions.

16   Thank you.

17             Attorney Claiborn, do you wish to be heard?

18             I'm sorry.  Go ahead, Attorney Callari.

19             She can come up first.

20             And then Attorney Claiborn can if you'd like to be

21   heard after.

22             MS. CALLARI:  Good afternoon, Your Honor.

23   Carollynn Callari on behalf of certain of the creditors.

24             Your Honor, I'm just really here to support what

25   Attorney Goldman stated.  I think he did a really good job.

1    It makes my job easier.  But I do want to highlight a couple

2    of points.

3            One, just to go to debtor's comments before we get

4    to the actual issue, they tell a very nice story, but they

5    don't complete the story when they give the backdrop that,

6    you know, there's news articles about him, people being

7    investigated for wanting to have him sent back to China.

8    That's not disputed.

9            What's disputed in the back story is why?  And he

10   is wanted back in China to face allegations of corruption,

11   rape, kidnaping and bribery.  That's why he doesn't want to

12   go back there.  So I just wanted to clarify that.

13           With respect to what's really before the Court, it

14   really is, what is in the best interests of the creditors

15   and the estate.

16           And we hear a lot of different stories, but

17   really, when you look at that specific issue, first, on the

18   claims, 101 speaks for itself on the definition of creditors

19   and claims.  We have a lot of creditors here.  A lot of

20   claims here.

21           The case here is not like the claims -- cases

22   cited by PAX, Your Honor.  In those cases, when you're

23   dealing with a large creditor, if you look at them, often

24   it's a secured creditor having 95 to 98 percent of the

25   claims, in a -- you know, in a deficiency type of claim.

81

1          Here, if you break it down, Your Honor, PAX's

2     original claim -- let's bring the Court back -- is $46

3     million.  My client, Rui Ma's claim, is asserted at 20

4     million.  Not much of a difference.  They just got a

5     judgment first.  She shouldn't be prejudiced by that.

6          If you look at the schedule claims, the debtor's

7     scheduled -- although he disputes virtually every claim --

8     he scheduled over approximately $120 million in claims.  And

9     then he also lists dozens of other creditors in unknown

10    amounts.

11         So if you take PAX's 46 million, he's by far --

12    they are by far not a very large creditor compared to

13    others.  If you add in the interest, it's 116 million.  One

14    hundred and sixteen million versus the scheduled -- even

15    though disputed, just because it's disputed doesn't make it

16    a bonafide dispute -- but having said that, 125 to 160

17    million.  We're about 50/50.  It's only when you add in all

18    the contempt charges that their claim really balloons to

19    over 250 million.

20         So, first of all, the size that they keep trying

21    to say that they are this large creditor that should have a

22    say and run this case is just not the same as those other

23    cases that they cite.

24         And we are creditors even if we're not liquidated

25    at this time, Your Honor.

82

1          Second, PAX can't have it both ways when they say

2     Your Honor there's no assets in this case.  It should be

3     dismissed.  What kind of case is it?  There's no creditors,

4     no assets, no operation.  This is an individual Chapter 11.

5     We know there's no operations.  But I don't think any

6     creditor sitting on this side of the table genuinely thinks

7     there are no assets in this case even though they only

8     listed *de minimis* assets on their schedules.

9          And that's why we are here.  This case, as Mr.

10    Goldman said, is to marshal those assets.  And how could it

11    be more efficient than for one fiduciary to marshal the

12    assets for all creditors, rather than each creditor, dozens

13    of them, having to go and undertake what admittedly PAX's

14    counsel has had undertaken for years.

15          But each of us having to undertake veil-piercing

16    and all of these other, you know, litigations and loops we

17    have to go through to get those assets when one fiduciary

18    could marshal the assets.  That is a purpose of bankruptcy.

19    That's an appropriate purpose.  And that's why it should be

20    converted to a 7 to allow that to happen.

21          As far as funding, what Mr. Goldman alluded to is

22    the issue we would have in the two weeks that we've had to

23    try to find the initial funding is we don't have a counter-

24    party yet.  You need to have the Chapter 7 trustee or the

25    Chapter 11 trustee be the counter-party to a funding.  And

83

1    if you just look at the facts here, when you have a low-

2    hanging fruit of a yacht, this is ripe for a contingency

3    type of arrangement.

4            So I don't think the fact that we don't have

5    evidence here today of actual commitment for funding should

6    prevent Your Honor from acknowledging and inferring that

7    funding could be available to a Chapter 7 or a Chapter 11

8    trustee in this situation.

9            And I know that Mr. Friedman's a much better

10   negotiator than his papers when he's talking about a 20 to

11   30 percent contingency fee in this case.

12           I think you could do milestones -- which is the

13   conversations I've been having -- which is you have a

14   certain percentage for the yacht.  And if it takes longer,

15   the percentage goes up.  And then once you get the yacht,

16   maybe that's your funding.  Maybe you don't need to have

17   more.  You know.  You can use those proceeds.

18           So there's ways to have the Chapter 11 -- or in

19   our case we even say a Chapter 7 trustee -- to fund these

20   cases.  And we think that the Chapter -- a Chapter 7 should

21   be given a chance for a fiduciary to look at this, try to

22   marshal all the assets for all the benefit of all the

23   creditors.

24           If in a short period of time it couldn't have

25   funding, there's -- without prejudice to having it dismissed

84

1    then.

2              But to say that our clients should all be

3    prejudiced by the fact that the case should be dismissed now

4    and basically reward the debtor -- he got what he wanted --

5    he filed this go get a breathing spell -- he got a short

6    breathing spell -- and now he doesn't want to have to face

7    all of the burdens of a Chapter -- of a bankruptcy and he

8    shouldn't be rewarded with that.

9              We should be able to have an investigation, which

10    can be funded, and allow all the creditors to share equally

11    in the distributions, Your Honor, because we are real

12    creditors.

13              If, however, Your Honor, by the way finds that she

14    cannot condition dismissal to make sure that parties are not

15    further prejudiced by the egregious conduct of this debtor,

16    I think that weighs even more in favor of conversion.  I

17    think Your Honor probably can condition it.  But if she

18    couldn't, it weighs more in favor of a conversion to 7

19    rather than dismissal.

20              Creditors have expended a significant amount of

21    time and expense in this case.  And now for it to be pulled

22    out -- the rug pulled out from under us because they pulled

23    the funding, that is very inequitable -- as well as the

24    administrative fees, they should be paid if this case is

25    dismissed -- and we would ask Your Honor to retain

85

1    jurisdiction regardless to deal with certain issues as far

2    as -- as Mr. Goldman said -- with respect to retainers and

3    things of that nature if Your Honor does dismiss it.

4         But we do think that conversion to a 7 is viable

5    and it is the -- in the best interest of all the creditors

6    to do that, Your Honor.

7         And we don't think it's prejudicial to PAX

8    because, frankly, if they wanted a say in who the trustee is

9    appointed, they can I think under 702.  They can see who the

10   -- you know, have a say in --

11        THE COURT:  They can all (indiscernible) the

12   trustee, right.

13        MS. CALLARI:  Yeah.

14        THE COURT:  But I have a question or two you.

15        MS. CALLARI:  Yes.  Please.

16        THE COURT:  So assume that I agree with you and I

17   convert this case to a Chapter 7, how is your claim -- your

18   clients' claims going to be liquidated?  Because the trustee

19   can't do it.

20        MS. CALLARI:  Correct, Your Honor.

21        THE COURT:  So then your claim has to still be

22   tried outside this court in the New York Court as do the

23   other personal injury claim claimants' claims.

24        MS. CALLARI:  Yeah.  So certainly with respect to

25   Rui Ma, Your Honor, has that proposed order -- Your Honor

86

1    has had that proposed order and we presumed you were waiting

2    until after this to lift the stay in order to have her

3    proceed in state court.

4          So, yes, for certainly Rui Ma we would anticipate

5    that that would be litigated back in state court.

6          THE COURT:  So what's a trustee going to do with

7    that claim?  I'm trying to --

8          MS. CALLARI:  No.  I understand.

9          THE COURT:  I'm trying to -- what is a Chapter 7

10   trustee going to do with that claim?

11         A Chapter 7 trustee has to wait --

12         MS. CALLARI:  Yeah.

13         THE COURT:  -- until that claim is liquidated,

14   right?

15         And then depending upon what you do, which is

16   completely your clients' rights under applicable non-

17   bankruptcy law, there's a trial, whatever the decision is is

18   the decision.  Somebody may appeal it.  Somebody may not.

19   But let's be honest, it's likely there will be an appeal, so

20   that case could go on for years before that claim is

21   liquidated, correct?

22         MS. CALLARI:  It could.

23         THE COURT:  Yeah.

24         MS. CALLARI:  And it also could be liquidated

25   pretty promptly.

1          THE COURT:  Okay.

2          MS. CALLARI:  We don't know.  So --

3          THE COURT:  But not in this court.

4          MS. CALLARI:  No.  Her claim would have to be

5    liquidated in the state court.  Or generally personally

6    injury claims, Your Honor -- I do think that when you have

7    personal injury claims sometimes a bankruptcy court can set

8    forth a mediation process and --

9          THE COURT:  Not in a -- not under 28 U.S.C. --

10          MS. CALLARI:  Correct.  You can estimate --

11          THE COURT:  -- 156(b)(2)(B) in a Chapter 7 case

12    where the claims are contingent and unliquidated.  The

13    statute is very clear that it's not a court proceeding.

14          And so one of the problems that we have in this

15    case is that those are the types of claims that the trustee

16    is going to be met with, right?

17          MS. CALLARI:  Correct.

18          THE COURT:  So what's -- so my questions is, so

19    what's the trustee supposed to do?

20          MS. CALLARI:  The trustee --

21          THE COURT:  Keep the case open for years until --

22    and then investigate with no funds?

23          I mean, I hear what you're saying about a funding

24    issue, but why couldn't the committee have funding funders

25    right now?

88

1          They could have the -- the committee could have

2     litigation funding.  Why couldn't they?

3          MS. CALLARI:  They couldn't at this point, because

4     within the last two weeks, to try to get that when you knew

5     your were facing a dismissal and the committee would be

6     disbanded, was not practical.

7          THE COURT:  Okay.  But the dismissal -- I

8     understand what you're saying about the debtor's position on

9     dismissal.  But PAX's position on dismissal has been clear

10    for some time.  In fact, they agreed to extend the hearing

11    period out because the code required that a hearing be --

12    happened within 30 days and it didn't.

13         You know, all I'm saying to you is a Chapter 7

14    case, the Chapter 7 trustee, what's the Chapter 7 trustee

15    got to work with?

16         MS. CALLARI:  So there's two things.

17         One, on your point about the committee, until two

18    weeks ago, the committee had funding from the debtor.  They

19    pulled the funding so we didn't need to go see --

20         THE COURT:  Well, they didn't have funding.  It

21    hadn't been approved yet.  Okay?

22         MS. CALLARI:  This is true.

23         THE COURT:  So no one had funding.

24         MS. CALLARI:  But we anticipated there would be

25    some sort of funding, so we --

89

1          THE COURT:  I understand that.

2          MS. CALLARI:  Right.

3          THE COURT:  But it hadn't been approved yet.  And

4     that's how the process works, right?

5          MS. CALLARI:  Yes.

6          THE COURT:  Just how -- we have to remember how

7     the process works.

8          So they didn't have funding.  There was no funding

9     that was authorized by the Court.  The Court took that

10    funding under advisement.

11         And then the debtor decided -- or I shouldn't say

12    the debtor -- the funder, the loan -- the lender decided to

13    withdraw its funding commitment and the debtor withdrew the

14    motion for the DIP financing.

15         So I understand every thing you're saying, but

16    there's a process the Court has to follow, right?

17         I mean, we talk about litigation funding,

18    contingent special counsel.  Just because people say that

19    can happen doesn't mean it will happen.  The Court still has

20    to approve those applications.  And if those applications

21    aren't approved, then there isn't going to be this plan to

22    go down the way that people have, you know, suggested.

23         The problem is there's a lot of different concerns

24    when -- if and when this case converts to a Chapter 7 as

25    opposed to staying -- staying a Chapter 11.

90

1          So, again, the Court can deny dismissal, could

2     deny conversion, could deny the appointment of a trustee.

3     That's what I'd have to find.

4          Attorney Goldman is correct.

5          And the issue is what are we going to do?

6          And I think I said that I think a week or so ago

7     when you all stipulated that cause exists.  Okay.  Great.

8     That's very helpful to the Court.  And I appreciate that

9     everybody's stipulating that cause exists, but I have to do

10    one of those things, right?

11         So I have to figure out what is the best thing to

12    do in this case.  And the concerns about conversion are

13    many.  Handing this to a Chapter 7 trustee to do what?

14    What's the Chapter 7 trustee going to do?

15         The Chapter 7 trustee has no available assets to

16    do anything.

17         You're talking about possibly getting a litigation

18    funding source.  Okay.  But that has to be approved and it

19    might not be approved.

20         And there has to be a plan.  And if the plan -- I

21    don't mean a plan of reorganization, that's not what I mean.

22    I mean -- I don't mean the word plan as used in the

23    bankruptcy code -- there has to be a way to accomplish what

24    you're trying to accomplish.

25         And a Chapter 7 trustee won't have anything to

1    work with.

2         MS. CALLARI:  Thank you, Your Honor.

3         Either a Chapter 11 or a Chapter 7 trustee, Your

4    Honor, we believe will have funding.  I know it's not here.

5    But to the point was, is that even though Your Honor had not

6    approved it yet, the committee did not have a need to go

7    look for funding before May 11th.  That was the first part.

8    We believed there was funding.

9         THE COURT:  That's fair.

10        MS. CALLARI:  And now a Chapter 11 or a Chapter 7

11   trustee, we are asserting, would be able to receive the

12   necessary funding to go after, for instance, the yacht.  It

13   shouldn't take that much to proceed with that litigation.

14   And if that actually goes the way we think it will, there

15   would be ample funding for this case.

16        THE COURT:  Well, how is a Chapter 7 trustee going

17   to go after the yacht?  Explain that to me.

18        MS. CALLARI:  It can't marshal -- it can marshal

19   assets the way it does in any other case.

20        THE COURT:  But right now there's no finding in

21   this court that the debtor owns the yacht, so how's a

22   Chapter 7 trustee going to marshal the yacht?

23        MS. CALLARI:  Eleven or a -- Chapter 11 or a

24   Chapter 7 would have to have a finding May 1st.

25        THE COURT:  Well, right now, there's an order for

1    relief from stay --

2           MS. CALLARI:  Right.

3           THE COURT:  -- governing what happens with the

4    yacht, right?

5           MS. CALLARI:  Yes.

6           THE COURT:  Which is the yacht has to come back

7    into the jurisdiction.  And then, if it does in a timely

8    manner, then the $37 million goes back to the party that

9    posted the money and then the yacht's there.  Where?  Either

10   in Connecticut or New York depending upon how things are

11   developed.

12          So how's a Chapter 7 trustee going to marshal the

13   yacht?

14          MS. CALLARI:  Just like you would in a Chapter 11.

15   You --

16          THE COURT:  But the debtor doesn't own the yacht

17   in this court.  There's been no findings.  So he'd have to

18   start some cause of action, wouldn't he?

19          MS. CALLARI:  Right.  Yes.

20          THE COURT:  So who's going to pay to do that?

21          MS. CALLARI:  That's where the funding comes in.

22          THE COURT:  And who's -- who's going to defend to

23   do that?

24          And then when the trustee does that, then PAX is

25   going to object and say it's already -- it's already been

93

1    determined in the New York State Court.  So you can't undo

2    the judgment of the New York State Court judge.

3          You can't -- you can't do that.  There's going to

4    be collateral estoppel effects, right?

5           There hasn't been an appeal.  There's all kinds

6    of issues here, right?

7          So, as I said, my issue with -- there's -- I have

8    issues with every path.  Okay?

9          But with regard to the Chapter 7, I don't know

10   what a Chapter 7 trustee is supposed to do or can do.  The

11   Chapter 7 trustee could come here and say they're going to

12   do 18 things, but if they don't have the right to do those

13   things or a funding source to do those things, then there's

14   no point in converting the case to a Chapter 7.

15          MS. CALLARI:  Yeah.  And we --

16          THE COURT:  There's no point.

17          MS. CALLARI:  And we believe that the Chapter 7

18   trustee would -- and, again -- or a Chapter 11 trustee --

19   but either way -- would have the ability to have funding

20   sufficient to have this court adjudicate that it is property

21   of the estate, and that's what we would expect them to do,

22   and do the marshaling first before they deal with actually

23   adjudicating the claims.

24          Which the other litigations are generally going to

25   be stayed, so that reduces costs.  People talk about costs

94

1    --

2              THE COURT:  Well, I don't agree with that.  You

3    don't want yours stayed, right?

4              And other claimants may come in and seek relief

5    from a stay too --

6              MS. CALLARI:  They may.

7              THE COURT:  -- and want their claims adjudicated

8    outside of this court.

9              And so what I'm saying to you is -- I'm just

10   trying to understand -- your client in particular has what

11   is -- apparently no ruling has been made, but what is a

12   personal injury tort claim that under the United States code

13   Congress decided this court can't decide.  Okay.  And *Stern*

14   supports that, right?

15             And even *Wellness* supports that because no one is

16   consenting to this court adjudicating that claim.  Okay?

17             So the -- it can't be adjudicated here.

18             MS. CALLARI:  Correct.

19             THE COURT:  So all the other claims that we talked

20   about -- and I don't -- I don't have the figures in front fo

21   me right now -- but the claims other than PAX's claims I

22   believe -- and you should all correct me -- but more than

23   half of them are personal injury tort claims.  And if

24   they're personal injury tort claims, they cannot be --

25   estimate -- the statute says -- and I think I can recite it

1    -- liquidated or estimated for purposes of distribution in a

2    case under title 11.

3            All Congress decided that a bankruptcy court could

4    do as a court proceeding is estimate claims in connection

5    with a plan in a Chapter 11, 12 or 13 case.  But it says you

6    cannot -- a bankruptcy court cannot liquidate or estimate

7    personal contingent and unliquidated personal injury tort

8    claims and wrongful death claims for purposes of

9    distribution in a case under title 11.

10           So a trustee can't do that.

11           MS. CALLARI:  Right.

12           THE COURT:  I mean, the Chapter 7 trustee can't do

13   that.  He/she's hands are already tied from the start.

14           So then they have to -- then they're going to try

15   to find assets that -- the debtor's going to fight that.  I

16   mean, look at what's going on for the last 15 years or how

17   many years it's been.

18           If you do think the debtor's not going to fight

19   the attempt to have the boat be deemed an asset of the

20   estate, I mean, of course they're going to fight it.  And

21   then anything else you do.

22           And then -- so how much money is there going to be

23   to fund this Chapter 7 estate on claims that are at this

24   point -- at this point -- I'm not saying couldn't change --

25   but at this point they're speculative, right?

96

1        So the concern is that a Chapter 7 trustee, from

2    the Court's view of this case at this point, I don't know

3    how the Chapter 7 trustee can carry out the duties of

4    (indiscernible) code under the facts and circumstances of

5    this case.

6        MS. CALLARI:  Thank you, Your Honor.

7        We do think the funding is -- could be available

8    and we do think that the trustee could marshal the assets

9    while the claims are being litigated and then brought back

10   here to be distributed, the alternative of having it

11   dismissed, and basically having PAX be able to grab it all

12   and each individual creditor have to then adjudicate

13   individually to go after each -- after each asset.  We don't

14   think that's in the best interest of creditors.

15       But I understand Your Honor's concern.  But we do

16   think a conversion or a Chapter 11 is certainly better than

17   a dismissal for the creditors, Your Honor.  Thank you.

18       THE COURT:  Okay.  I appreciate that.  And I'm

19   just asking you the questions --

20       MS. CALLARI:  Yeah.  I appreciate that.

21       THE COURT:  -- specifically because of your

22   clients' claims.

23       MS. CALLARI:  I appreciate that.  Thank you, Your

24   Honor.

25       THE COURT:  All right.  Thank you.

97

1          Attorney Claiborn?

2          MS. CLAIBORN:  Good afternoon, Your Honor.  Holley

3     Claiborn for the U.S. Trustee.

4          THE COURT:  Good afternoon.

5          MS. CLAIBORN:  This case has now devolved to a

6     simple, but difficult place.  Cause has been found under

7     section 1112(b) and it's now the Court's difficult and heavy

8     duty and burden to make a choice.

9          The debtor has admitted that the relief available

10    under 1112(b)(2) is no longer in play, so that puts the

11    choices for a form of relief to the three that we've

12    discussed briefly today, dismissal, conversion, or a Chapter

13    11 trustee.  And each of them admittedly has its own

14    challenges and impact on the constituencies of this case.

15         The U.S. Trustee has no preference for which form

16    of relief the Court should choose.

17         And with respect to the relief of an examiner that

18    was requested in the U.S. Trustee's motion at ECF 102, that

19    relief, provided the Court makes an immediate decision as to

20    dismissal, conversion, or a Chapter 11 trustee, will become

21    moot.

22         I want to make clear to the Court, Your Honor,

23    that is the U.S. Trustee's job to point out that in this

24    particular case, and consistent with all Chapter 11 cases,

25    that should the Court determine a Chapter 11 trustee is the

1    most appropriate relief, that such a trustee should have the

2    powers and the rights bestowed by the code in section 1106,

3    and that there is no authority to limit them or prescribe

4    them or control them.

5         If the Court determines today that dismissal is

6    the most appropriate relief, then this case should be

7    dismissed immediately and not conditioned on any event, and

8    nor should the dismissal be in conjunction with any event.

9         Fee applications for retained professionals can be

10    filed and determined after dismissal.

11         And in the end, Your Honor, I think the most

12    important point -- and it's a hard one -- is that this case

13    needs a swift decision.  But the Court has before it the

14    facts that would enable the Court to make a choice.  And in

15    the end, in urging a swift decision, I want to point out

16    delay negatively affects the creditors and does reward the

17    debtor.  Thank you, Your Honor.

18         THE COURT:  Thank you.

19         Mr. Friedman?

20         MR. FRIEDMAN:  Your Honor, I just want to make

21    some brief rebuttal points.

22         The first is that counsel for the committee and

23    others argue that the debtor would be rewarded by having

24    this case go away.  It's just not true.  People are going to

25    get the debtor's assets one way or the other.

99

1          The second point -- to the extent they exist.

2          The second point is I didn't fully -- I think

3     there was reference to the fact that Chapter 7 could be

4     useful because maybe the -- Mr. Kwok wouldn't get

5     discharges.  Of course, outside of bankruptcy, he doesn't

6     get a discharge either.

7          Another point I wanted to make, Your Honor, I'd

8     ask you to look at exhibit 27 we filed because --

9          THE COURT:  Of your own exhibits?  Of PAX

10    exhibits?

11         MR. FRIEDMAN:  Exhibit 27.  PAX exhibit 27.

12         THE COURT:  Okay.  Give me one second, please, and

13    I will try to get there.

14         MR. FRIEDMAN:  Thank you.

15         THE COURT:  You'll have to give me a minute.  Do

16    you know what page of the document it starts on?  It's

17    document 404.  Do you know what page exhibit 27 starts on,

18    because it's 1500 pages.

19         MR. FRIEDMAN:  My apologies.

20         THE COURT:  Oh, 1,149.

21         MR. FRIEDMAN:  Thank you.

22         THE COURT:  There you go.

23         MR. FRIEDMAN:  That's amazing.

24         THE COURT:  Staff that is --

25         MR. FRIEDMAN:  That's amazing.

1          THE COURT:  That is amazing.

2          MR. FRIEDMAN:  That's amazing.  Thank you.

3          THE COURT:  That is amazing.

4          MR. FRIEDMAN:  Your Honor, this is our summary of

5     claims.

6          And one of the reasons that Mr. -- counsel for the

7     committee, Mr. Goldman, in his thoughtful argument said that

8     the *Sapphire* case could be distinguished is because there

9     people had other -- other people that they could pursue.

10         And I just wanted to observe that when you look at

11    our summary of cases, which is in evidence, many of the

12    defendants -- I'm sorry -- many of the plaintiffs also have

13    other parties that they can go after.

14         If you look on page 2, the last claim, the Kay Ye

15    Zookie Came case (ph), is against GTV, Saraca and Mr. Guo,

16    Miles Gwok.  On the next page, the Zheng Xu Dong case is

17    against GTV, Saraca and Wayne Guo.  The next case is against

18    Voice of Guo and Miles Guo.  And on and on.

19         And in particular, Your Honor, I would note -- and

20    like the Rui Ma allegations, I said it before, earlier in

21    this case, I'm not diminishing at all what happened to her.

22         I would say, if you look at the Rui Ma case, it's

23    not just against Mr. Kwok.  My understanding is that Golden

24    Spring New York is also a defendant in that case.  We know

25    that Golden Spring New York had at least $8 million to fund

1    a DIP.  So there is a co-defendant that can be pursued in

2    that case even if Mr. Kwok doesn't have money.

3         So I just note that there are other pockets of

4    potential availability -- available recoveries, not just Mr.

5    Kwok.

6         Your Honor, there are -- also in Rui Ma's

7    counsel's arguments -- I didn't count them, but there are a

8    lot of if's and could be's about funding -- there's no

9    evidence.

10        You know, people were regrettably, you know, taken

11   in by the debtor's offer of finance or arrangement of

12   potential financing -- which we opposed from the outset --

13   and here we are in a case that we thought never should have

14   been filed that didn't have -- that still doesn't have

15   funding.

16        Counsel tried to argue that we're only owed $46

17   million when we have judgments for more than $260 million.

18        And while it's true I guess that I don't get to

19   call people -- not creditors -- people don't get to also say

20   that PAX isn't owed $261 million because it is.

21        The last point I would make, Your Honor, is simply

22   that we stand by our citations in the cases that we cited --

23   that we filed on Friday and that we referenced today that

24   stand for two propositions:

25        Fundamentally, it's not necessary that the

1    interest of every creditor actually favor conversion.  And

2    the interest of a single creditor can matter.

3        Where that line is drawn -- let's say, you know,

4    one person had 99 percent of the claim, one person had 1,

5    there's no hard and fast rule.

6        But I think the Court can clearly take into

7    account from *Acme*, from *Staff*, which cited the *Goodrich*

8    *Lines* cases, is that the Court's discretion -- which is

9    substantial in this case -- can take into account the

10   disparity in claims and what people are entitled to.

11       And, again, I think, you know, we cited a variety

12   of cases that do stand for the proposition that it's okay to

13   dismiss a case even if one creditor will potentially wind up

14   with a better result.

15       I can't predict the future.

16       I will say that, with respect to the apartment in

17   the Sherry-Netherland, there is an enormous wood -- amount

18   of wood to chop with respect to PAX having to take on, you

19   know, to continue its undertakings to demonstrate that that

20   trust agreement is bogus.  It's not right there for the

21   picking.  We have work to do.

22       And, you know, we don't know what will happen with

23   other creditors.  Perhaps other creditors will come to

24   arrangements with Mr. Kwok.  We have to take that risk.

25       And so, for those reasons, and the practical

103

1    reasons that we've identified as to why we believe this case

2    is not well suited to a Chapter 7 conversion, we, you know,

3    we believe that dismissal is the right option.

4            I do -- I will say we agree with the U.S. Trustee

5    that if the Court were to conclude that the right path is a

6    Chapter 11 trustee, obviously we strongly support dismissal,

7    but there should be no fetters on any power that a trustee

8    has.

9            And with that, Your Honor, I have nothing further.

10           THE COURT:  Thank you.

11           Mr. Jonas?

12           MR. JONAS:  Your Honor, Jeff Jonas, Brown Rudnick,

13   for the debtor.  I will be brief.  And I'll say I do stand

14   on my previous argument supporting dismissal for cause under

15   1112(b)(1) and (4)(A).

16           I would note in that regard interestingly no one

17   opposing dismissal addressed the arguments I made earlier

18   with respect to the standard being prejudiced to creditors

19   and that prejudice is determined by looking at whether any

20   of their -- those creditors' pre-petition legal expectations

21   are prejudiced, which in this case they are not.

22           I really rise, Your Honor, only to make the record

23   clear that the debtor does refute and refutes the many

24   disparaging comments that have been made about him.  Lawyers

25   here have made many bald, unsupported statements which are

1  not evidence.  And they've come in different forms and

2  flavors, Your Honor.

3       For example, there was a reference to Greenwich

4  Land owning -- in connection with possibly having certain,

5  quote/unquote, "Hidden assets."  Nothing's been proven, Your

6  Honor.  Nothing's been demonstrated.  Just the bald

7  allegation which might as well be that certain neighbors and

8  friends and other family members have assets that are

9  allegedly hidden assets.

10       Secondly, Your Honor -- and these are just by way

11  of some quick examples I noted while presentations were

12  being made -- Ms. Callari referred to certain charges that

13  exist in China.  Again, no evidence, just the bald

14  statement.  It's not evidence.  It shouldn't be given any

15  worth or any voracity at all.

16       Third, litigation funding.  There is zero

17  evidence.  It is utter and complete speculation and

18  conjecture.  There's no evidence before the Court.

19       I'll add my own speculation that the committee --

20  and probably Ms. Callari -- have been running around

21  feverishly over the last few weeks looking for some

22  financing so they could come before the Court and present

23  some evidence.  They have none.  So from that I'll infer

24  that none exists.

25       But nevertheless, I don't want to pile on my own

1    speculation.  I'll just leave it that there is no evidence

2    at all before the Court in that regard.

3              So all of the Court's concerns are -- at least our

4    concerns -- and I think Mr. -- as expressed by other parties

5    that there won't be funding, that's the only evidence that

6    there is.

7              Again, Your Honor, we would urge dismissal.  Thank

8    you, Your Honor.

9              THE COURT:  Thank you.

10             Mr. Goldman?

11             MR. GOLDMAN:  Yes.  Thank you, Your Honor.  Just a

12   few brief points, Your Honor.

13             On this idea of all these claims constituting

14   personal injury or wrongful death claims, which obviously

15   under section 128 U.S.C 157 --

16             THE COURT:  (b)(2)(B).

17             MR. GOLDMAN:  Thank you.

18             -- the Court doesn't have jurisdiction.  It has to

19   be tried in a district court, unless of course relief from

20   --

21             THE COURT:  That's not -- that's not the trial.

22   The trial section is (b)(5).  (b)(2)(B) talks about the

23   estimation or liquidation of contingent --

24             MR. GOLDMAN:  Correct.

25             THE COURT:  -- and disputed personal injury

1    claims.  That's different from --

2              MR. GOLDMAN:  Correct.

3              THE COURT:  -- the trial issue under (b)(5).

4              MR. GOLDMAN:  You're quite correct.

5              So there can't be estimated as well under 502(c)

6    except under Chapter 11.

7              THE COURT:  Or 12 or 13 in a context of a plan.

8              MR. GOLDMAN:  Or 12 or 13.  But certainly that

9    doesn't prevent them from being liquidated upon relief from

10    stay in their court of origin.

11              And certainly the debtor could defend, especially

12    since they are potentially non-dischargeable under section

13    523(a)(6) as willful and malicious injury.  So certainly the

14    debtor would have an interest in doing that.

15              I would also point out that I don't think it's a

16    given that all of these claims, for example, the claims

17    based on defamation, would constitute personal injury tort

18    claims of the type that you can't estimate were of the type

19    that under -- you mentioned (c) --

20              THE COURT:  (b)(2)(B).

21              MR. GOLDMAN:  -- (b)(2)(B), but also (b)(5) --

22              THE COURT:  (b)(5) --

23              MR. GOLDMAN:  Yeah.

24              THE COURT:  -- is where it says the district --

25              MR. GOLDMAN:  Yeah.

1          THE COURT:  -- court has to try those claims.

2          MR. GOLDMAN:  Exactly.

3          THE COURT:  Right.

4          MR. GOLDMAN:  I don't think it's a given that the

5     defamation claims are of the type of claim that fit --

6          THE COURT:  There is all kinds of case law about

7     that.

8          MR. GOLDMAN:  Yes.

9          THE COURT:  And I agree with you.

10          MR. GOLDMAN:  So there is a division of authority.

11     And of course the one (indiscernible) immediate goes the

12     other way.

13          So I don't think, unless Your Honor has a

14     definitive opinion on that, you can conclude that, hey, all

15     of these can't be estimated or that, you know, you don't

16     have jurisdiction to preside over a claims objection.

17          You know, as far as how a Chapter 7 trustee would

18     marshal the yacht, here's how I would envision it.

19          There is a pending adversary proceeding right now

20     that squarely presents the issue of whether this yacht is

21     property of the estate or not.  A Chapter 7 trustee could

22     certainly replace, or it would be proper to replace the

23     debtor, or substitute himself as a party in that adversary

24     proceeding and get special counsel.

25          I am very confident that we could find special

1    counsel that would take this on some sort of contingency

2    fee, which would be negotiable.

3            The trustee would then move to make a dispositive

4    motion based on the preclusive effect of Judge Ostrager's

5    findings, which we believe do have preclusive effect.  Your

6    Honor would then decide whether that does have actual

7    preclusive effect to make the boat property of the estate.

8    That is not an elaborate proceeding and it really -- I would

9    suggest -- has a substantial likelihood of getting done.

10           And if that does happen, we don't even need the

11   litigation funding.

12           So that's the -- that is the lowest hanging fruit.

13           I think, Your Honor, there are a couple options

14   that Your Honor could consider here.

15           Since we've only had a couple of weeks to, for

16   example, look for litigation funding and no time to look for

17   any contingency counsel, you could convert the case with the

18   idea that we would be given time to locate the funding.  And

19   if during that time period nothing could be located or we

20   can't locate special counsel, the case could then be

21   dismissed.

22           And I didn't really mention the third option,

23   which is the Chapter 11 trustee option, which would allow

24   some of these claims to get estimated.

25           You know, the committee is not adverse to the idea

1  of negotiating an equitable division of whatever assets the

2  debtor has with PAX.  We are not unmindful of the efforts

3  that PAX has made in chasing this debtor and getting its

4  judgment.  And I think the committee would -- let me just

5  say -- be reasonable in negotiating a plan with PAX that

6  gives some recognition to their pre-petition efforts.

7          And certainly a creditors' plan of reorganization

8  is achievable in this case.  All it has to provide is the

9  marshaling of the assets.  We would even -- maybe PAX's

10 counsel wants to be the special counsel.  We would have no

11 problem with that.  And the debtor would not retain any

12 interests in property.

13         So a Chapter 11 trustee, where the creditors have

14 an ability to negotiate a plan, I think is also a viable

15 option here.  So I would --

16         THE COURT:  Well, you're the first one that said

17 that.

18         MR. GOLDMAN:  Well, I do think as opposed --

19         THE COURT:  And so no one else has said that.  So

20 if you're --

21         MR. GOLDMAN:  No.

22         THE COURT:  So if you're thinking that that's a

23 possibility, then --

24         MR. GOLDMAN:  I would --

25         THE COURT:  -- are you asking that you have an

1    opportunity to talk to parties about that?  Is that what

2    you're asking?

3         MR. GOLDMAN:  Well, I would love the opportunity

4    to talk to parties about that, except that I'm not sure the

5    discussions would be productive.  Because I think -- I think

6    PAX would prefer Your Honor to rule first on whether

7    dismissal --

8         THE COURT:  Well, I have to rule by the way under

9    the code, so I don't have a choice unless you all decide

10   something different.  I have a -- I have a -- I have no

11   choice.  Once the hearing starts, right, don't I have to

12   rule -- I don't have it in front of me, but I'm sure PAX

13   knows -- I think I have to rule in 15 days or something like

14   that, don't I?  At the conclusion of the hearing.

15        I don't have a lot -- as I said, I don't know, two

16   months ago -- there isn't a big window of opportunity in

17   this case.  I tried to make that -- maybe I didn't do a very

18   good job -- but I tried to make that very clear to all

19   parties that this is not a case where the Court has

20   discretion.

21        Congress made the changes to the code, right?

22        That's what -- I have no choice.  I have no

23   discretion.  I don't.  Yeah.  It says here, Attorney Goldman

24   -- I know you probably know this too -- after the -- the

25   Court shall commence the hearing on the motion

1  (indiscernible) 30 days unless the movant consents to a

2  specific time frame, which the movant did, which is today,

3  right?

4       And then decide the -- and shall -- no discretion,

5  right -- and shall decide the motion not later than 15 days

6  after the commencement of such hearing.

7       So I am where I am, right?

8       There's not a lot I can do unless you all have

9  some other plan.  I don't think you're going to have another

10  plan today.

11       I'm not going to write a decision between today

12  and tomorrow.  That's not going to -- I mean, I just can't.

13  I have other hearings.  We have other things.  But I have to

14  decide within 15 days of today.

15       MR. GOLDMAN:  Understood, Your Honor.

16       I think what -- what I think is going to obstruct

17  or not provide for conducive discussions about a Chapter 11

18  trustee is the fact that PAX would rather Your Honor just

19  rule on dismissal.  And so I'm not -- I don't think I'm

20  going to be able to engage them in a discussion until that

21  ruling comes down.

22       What Your Honor could do though, in ruling on this

23  motion, is to appoint a Chapter 11 trustee and provide an

24  opportunity for a period of time for -- without prejudice --

25  to revisiting that order depending on what happens within

1    the first 30 days of the case or so.

2          In other words, you could still meet your

3    statutory obligations and come back to this issue within a

4    defined period of time to determine whether the case should

5    be dismissed based on what we are able to accomplish when a

6    Chapter 11 trustee is appointed and that would still satisfy

7    the statutory obligation of ruling.

8          THE COURT:  I hope the --

9          MR. GOLDMAN:  But it keeps options open is the

10    point I'm making.

11          THE COURT:  I understand your point.

12          MR. GOLDMAN:  That's all.  That's all I have, Your

13    Honor.

14          THE COURT:  Okay.  Thank you.

15          Does anyone else wish to be heard?

16     (No audible response.)

17          THE COURT:  Okay.  As I just noted for the record,

18    I have to rule on this decision --

19          Oh, is there something else you'd like to add?

20          Oh, yes.  We have to finish the exhibits, right?

21    The exhibits.  The transcripts.

22          Attorney Goldman, there were some references made

23    to some of the transcripts by Attorney Friedman.

24          MR. GOLDMAN:  No.  No objection.

25          THE COURT:  No objection.

1          All right.  So then all of PAX's exhibits are

2    admitted in full except for 7, 8 and 31.  Was that the other

3    one?

4          MS. ARONSSON:  That's right.  Thanks, Your Honor.

5    And I have some references if it would aid the Court for the

6    transcripts.

7          THE COURT:  Yes.  Please.  Go ahead.

8          MS. ARONSSON:  For PAX 18, we would direct the

9    Court to pages 21 to 28.  For PAX 20, we direct the Court to

10   pages 8 to 19.  And for PAX 21, we direct the Court to pages

11   11 to 20.

12         THE COURT:  Okay.  Thank you.

13         MS. ARONSSON:  Thank you.

14         THE COURT:  Attorney Goldman?

15         MR. GOLDMAN:  May I make one further point, Your

16   Honor?

17         THE COURT:  Yes.  They can't hear you though.

18         MR. GOLDMAN:  Okay.

19         THE COURT:  Speak into the --

20         MR. GOLDMAN:  Okay.

21         THE COURT:  You can speak right next to you to

22   Attorney Aronsson.

23         MR. GOLDMAN:  Okay.  I know this may not be a

24   specific factor under 1112(b), but Your Honor knows from the

25   litigation budget that was filed in connection with the DIP

114

1    motion, at the end of April, we had incurred almost $200,000

2    in fees.  That number has obviously escalated.

3          It just would be I think a travesty to the process

4    that a committee is appointed, they retain counsel on the

5    reliance of the process moving forward -- we did our job for

6    the committee -- and now to just dismiss the case with all

7    those fees being unpaid I think is a disservice to the

8    process.

9          THE COURT:  I understand.  Thank you.

10         Does anyone else wish to be heard?

11    (No audible response.)

12         THE COURT:  All right.  So that the record is

13    clear, on April 6th, 2022, the creditor, Pacific Alliance

14    Asia Opportunity Fund, LP, filed a motion to dismiss the

15    case for cause, or in the alternative, a partial joinder to

16    the U.S. Trustee's motion for an order directing the

17    appointment of a Chapter 11 trustee.

18         We have had several hearings in the case at which

19    we've talked about the motion to dismiss.  And we also had a

20    status conference to talk about the motion to dismiss and

21    that status conference was held on April 13, 2022.

22         Following the status conference, and as part of

23    the discussions had at the status conference, the hearing on

24    the motion to dismiss was scheduled to be held today, May

25    25th, 2022, with the consent of the movant, PAX.

1        And we also scheduled a hearing for tomorrow

2   anticipating that we'd have more evidence that might need to

3   be submitted to the Court in connection with the motion to

4   dismiss.

5        At a recent hearing, prior to the hearing on the

6   motion to dismiss, the debtor confirmed through counsel that

7   they were not objecting to the motion to dismiss and

8   consenting to the fact that cause exists under 1112 to

9   dismiss the case.

10       Every other party that has filed a document or a

11  pleading regarding the motion to dismiss has consented to

12  the fact that cause exists.

13       So this court has to make no finding that cause

14  exists.

15       The court only has to make findings with regard to

16  what the cause is and what the ultimate relief will be.

17       And I've stated this on the record before, but I

18  will state it again, that the Court will either dismiss the

19  case, convert the case, or appoint a Chapter 11 trustee, in

20  accordance with the applicable provisions of 1112(b) of the

21  code.

22       I have stated for the record today the exhibits

23  that have been admitted in full in this hearing that have

24  been submitted by PAX and the official committee of

25  unsecured creditors.  No other party has submitted evidence,

116

1    but has joined in those -- in that evidence, which is fine

2    with the Court.

3            I have reviewed the position papers that were

4    filed by all of the parties on Friday, the 20th, regarding

5    those respective positions with regard to the motion to

6    dismiss.

7            And of course have heard all of the parties today

8    make their arguments with regard to the motion to dismiss.

9            As I also indicated, I'm bound by the statute to

10   rule on this motion within 15 days of the commencement of

11   the hearing.

12           The hearing is concluded today there being no

13   further evidence to be submitted or arguments to be made so,

14   therefore, the clock starts to run as far as a decision on

15   this motion to dismiss.

16           I have -- I appreciate all of the arguments that

17   have been made by all of the parties.  They have been

18   thoughtful and thorough.  And you have made your points

19   well.

20           But I do have to make the determination as to

21   which way this case will proceed and I will do so.  And

22   obviously I will do so within 15 days of today.

23           Although I suppose under the Federal Rules of

24   Civil Procedure you don't count today, under 9006, at rule

25   6, you don't count the day -- today -- so I think that's

117

1    correct honestly.

2         But in any event, if you have any other concerns

3    or questions regarding the motion to dismiss, I am generally

4    available for a conference.  But in the meantime, I'm going

5    to be ruling on the motion to dismiss.

6         Okay.  Does anyone have any further questions?

7         (No audible response.)

8         THE COURT:  All right.  Well, I appreciate the

9    efforts of all the parties.

10        I'm taking the motion to dismiss under advisement

11   and I will rule accordingly.

12        And this is the last matter on today's calendar,

13   so court is adjourned.

14        (Proceedings adjourned at 12:51 p.m.)

15        I, CHRISTINE FIORE, court-approved transcriber and

16   certified electronic reporter and transcriber, certify that

17   the foregoing is a correct transcript from the official

18   electronic sound recording of the proceedings in the above-

19   entitled matter.

20

21   *Christine Fiore*

22   _____     April 21, 2022

23    Christine Fiore, CERT-410

24      Transcriber

25

118

INDEX

PAX EXHIBITS:                                          Rec'd

1-6, 9-17, 23-29, 31                                      8


CREDITOR'S COMMITTEE EXHIBITS:

1-14                                                     16