# <u>Exhibit 2</u>

Anti-SLAPP Special Motion to Dismiss

*Guo v. Cheng*
Eight Judicial District Court for
Clark County, Nevada

**Electronically Filed**
**6/14/2019 4:33 PM**
**Steven D. Grierson**
**CLERK OF THE COURT**

**MDSM**
Marc J. Randazza (NV Bar No. 12265)
Ronald D. Green (NV Bar No. 7360)
LaTeigra C. Cahill (NV Bar No. 14352)
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117
Telephone: 702-420-2001
ecf@randazza.com

Attorneys for Defendant
SHUIYAN CHENG

# EIGHTH JUDICIAL DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| **WENGUI GUO a/k/a MILES KWOK**, | Case No. A-18-779172-C |
| Plaintiff, | Dept. 32 |
| vs. | HEARING REQUESTED |
| **SHUIYAN CHENG a/k/a HUIYAN CHANG; FANG YONG a/k/a MA KE,** | **DEFENDANT SHUIYAN CHENG'S ANTI-SLAPP SPECIAL MOTION TO DISMISS UNDER NRS 41.660** |
| Defendants. | |

Defendant Shuiyan Cheng hereby files his Anti-SLAPP Special Motion to Dismiss Under NRS 41.660.

This Motion is based upon the attached memorandum of points and authorities and attached exhibits, the papers and pleadings on file in this action, and any oral argument permitted by this Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

## 1.0    INTRODUCTION

Plaintiff's lawsuit against Mr. Cheng is a classic SLAPP suit.  Plaintiff prides himself on his status as a public figure and his alleged work as a Chinese dissident. Mr. Cheng published several statements on Twitter criticizing this reputation as unearned and stating that Plaintiff had in fact undermined the political movement he claimed to support.  Instead of responding to Mr. Cheng's speech with speech of his own, Plaintiff instead filed the instant lawsuit in an attempt to stop Mr. Cheng from speaking about him at all.[1]  This is precisely the kind of situation to which the Anti-SLAPP statute is meant to apply.

Mr. Cheng's statements are either true, constitute rhetorical hyperbole or opinion, or at the very least he made them without actual malice.  Plaintiff cannot prevail on any of his claims, and so the Court should dismiss these claims with prejudice and award Mr. Cheng his attorneys' fees and costs incurred in defending himself from these claims.

## 2.0    FACTUAL BACKGROUND

### 2.1    Plaintiff's Reputation as a Public Figure

Plaintiff is a high-profile Chinese political figure who has used social media to "expose[] widespread corruption in the Chinese Communist Party ('CCP'), multiple senior officials of the Chinese Government, and their family members," and has "made an unprecedented impact on the international image and

---

[1]    Plaintiff has a long history of suing his critics instead of participating in the marketplace of ideas to address their criticisms. *See, e.g., Guo v. Yuan*, No. 2:18-cv-02276-SVW-JC (C.D. Cal. 2018); *Guo v. Chen*, No. 2:18-cv-03800-MCA-MAH (D.N.J. 2018); *Guo v. Teng*, 2018 U.S. Dist. LEXIS 134475 (D.N.J. Aug. 9, 2018); *Guo v. Lian*, Index No. 151428/2018 (Sup. Ct. of N.Y., Cty. Of N.Y. 2018); *Guo v. Xing*, Index No. 151430/2018 (Sup. Ct. of N.Y., Cty. Of N.Y. 2018); *Guo v. Xia*, No. 1:18-cv-00174-LO-TCB (E.D. Va. 2018); *Guo v. Yuan*, No. 2:18-cv-02276-SVW-JC (C.D. Cal. Aug. 22, 2018).

credibility of the [CCP]." (Second Amended Complaint ("SAC") at ¶¶ 5-7.) His Twitter account has over 400,000, followers, most of whom are Chinese, and he claims to be "the one man who single-handedly challenged the CCP and exposed the CCP's building of an intelligence network in the United States and other countries." (*Id*. at ¶¶ 8-9.) He became a billionaire real-estate magnate in China, when eventually in 2015 the CCP seized his family's assets and arrested hundreds of his family members and business colleagues. (*See id*. at ¶¶ 75-82.) He claims that his acts of whistle blowing following this seizure are "regarded as one of the biggest political incidents in China since the Tiananmen Square Massacre." (*Id*. at ¶ 86.) It is safe to say that Plaintiff is a public figure in the context of his political activity.

### 2.2    Reporting on Allegations Against Plaintiff

While Plaintiff depicts himself as a noble and forthright warrior for democracy against Chinese censorship, the actual record is mixed, to the say the least. First, Plaintiff is not being honest regarding his origins as a dissident. He claims that he was arrested by the CCP in 1989 during the Tiananmen Square massacre for assisting protesting Chinese students. (*See* SAC at ¶ 43.) However, Mr. Cheng researched this claim and, according to records from the court of Puyang city, Henan province, China, show that he was arrested for a completely unrelated transaction 300 miles away from Tiananmen Square on charges including fraud and resisting arrest when he attacked a police offer after his brother attacked an officer with a knife. (*See* Declaration of Mr. Cheng in support of reply to opposition to Motion to Dismiss, attached as **Exhibit 1**, at ¶ 16 & *Sub-Exhibit 6*.)

There is also a great deal of reporting on accusations of criminal, unethical, and otherwise objectionable activity against Plaintiff. An April 2017 article in the *Wall Street Journal* reported that the CCP had issued an international arrest notice

with Interpol for the Plaintiff.  (*See* Chun Han Wong, "China Says Interpol Arrest Notice Issued for Businessman Guo Wengui," THE WALL STREET JOURNAL (Apr. 20, 2017), attached as **Exhibit 2**.)[2]  In May 2017, *Forbes* reported that Plaintiff was "making largely unsubstantiated accusations" against the CCP, which implied that Plaintiff was "tainted by corruption," and explained that the Interpol arrest notice against Plaintiff was based on allegations of bribery.  (*See* Nathan Vardi, "The Chinese Fugitive Living in a $67 Million Manhattan Apartment," FORBES (May 19, 2017), attached as **Exhibit 3**.)[3]  It also reported on a Chinese reporter suing Plaintiff for defamation based on statements he made in retaliation for the reporter publishing an article accusing Plaintiff of using a sex tape to remove a Beijing deputy mayor so that he could acquire attractive real estate.  (*See id.*)

In June 2017, the *Wall Street Journal* reported on a criminal trial in China against Plaintiff's business subordinates for fabricating documents that allowed one of Plaintiff's companies to obtain a lucrative contract and repeated the claim of Plaintiff using a sex tape against a politician for his own benefit.  (*See* Josh Chin, "China Cranks Up Heat on Exiled Tycoon Guo Wengui," THE WALL STREET JOURNAL (June 10, 2017), attached as **Exhibit 4**.)[4]  The article also reported that one of the subordinates on trial testified that Plaintiff ordered her to fabricate the documents.  (*See id.*)  In a September 2017 article, the *Wall Street Journal* repeated many of the allegations against Plaintiff, including that "Chinese courts

---

[2]   Available at:  https://www.wsj.com/articles/china-says-interpol-arrest-notice-issued-for-businessman-guo-wengui-1492619235?mod=article_inline  (last accessed June 14, 2019).

[3]   Available at:  https://www.forbes.com/sites/nathanvardi/2017/05/19/the-chinese-fugitive-living-in-a-67-million-manhattan-apartment/#401e1e8c332c (last accessed June 14, 2019).

[4]   Available at:  https://www.wsj.com/articles/china-cranks-up-heat-on-exiled-tycoon-guo-wengui-1497006242?mod=article_inline  (last accessed June 14, 2019).

have jailed and fined a number of Mr. Guo's former associates and subordinates for crimes including fraud and embezzlement.  Chinese media have published articles portraying him as unscrupulous."  (Chun Han Wong and Felicia Schwartz, "China Wants Fugitive Guo Wengui Back – but He's Applied for U.S. Asylum," THE WALL STREET JOURNAL (Sept. 7, 2017), attached as **Exhibit 5**.)[5]

An October 2017 article in the *Wall Street Journal* reported that Plaintiff was using his fortune to defend himself from multiple defamation lawsuits and that a Chinese woman filed a civil suit against Plaintiff, accusing him of raping her while she was working as his personal assistant.  (*See* Cezary Podkul and Chun Han Wong, "Chinese Fugitive Guo Wengui Amasses War Chest to Battle Beijing," THE WALL STREET JOURNAL (Oct. 3, 2017), attached as **Exhibit 6**.)[6]  Later that month, the same paper reported that the CCP said "it is investigating Mr. Guo in at least 19 major criminal cases that involve bribery, kidnapping, fraud, money laundering and rape."  (O'Keefe, Viswanatha, and Podkul, "China's Pursuit of Fugitive Businessman Guo Wengui Kicks Off Manhattan Caper Worthy of Spy Thriller," THE WALL STREET JOURNAL (Oct. 22, 2017), attached as **Exhibit 7**.)[7]

In January 2018, the *New York Times* published a lengthy expose on Plaintiff and questioned his claims of being a whistleblower.  (*See* Lauren Hilgers, "The Mystery of the Exiled Billionaire Whistle-Blower," The New York Times (Jan. 10, 2018), attached as **Exhibit 8**.)[8]  It recounted that Plaintiff fled China in anticipation of

---

[5]   Available at: https://www.wsj.com/articles/fugitive-chinese-businessman-seeks-u-s-asylum-1504805457?mod=article_inline (last accessed June 14, 2019).

[6]   Available at: https://www.wsj.com/articles/chinese-fugitive-amasses-war-chest-to-battle-beijing-1507023004?mod=article_inline (last accessed June 14, 2019).

[7]   Available at: https://www.wsj.com/articles/chinas-hunt-for-guo-wengui-a-fugitive-businessman-kicks-off-manhattan-caper-worthy-of-spy-thriller-1508717977(last accessed June 14, 2019).

[8]   Available at: https://www.nytimes.com/2018/01/10/magazine/the-mystery-of-the-exiled-billionaire-whistleblower.html (last accessed June 14, 2019).

corruption charges against him that swept up business and political partners, as well as the accusations of corruption, bribery, and rape that surfaced around 2017, and noted that "[m]ost of Guo's accusations [against the CCP] have proved nearly impossible to verify." (*See id*.)   It notes that, according to a university professor specializing in Chinese governance, people should not take Plaintiff's claims at face value, and many Chinese political dissidents view him with skepticism due to the fact that he exiled himself to avoid corruption charges instead of persecution. (*See id*.) It explains that Western media outlets have had difficulty substantiating his claims, and that he has withheld simple biographical details such as his age and date of birth. (*See id*.) It reports that Plaintiff took out and defaulted on loans totaling $89 million, despite claiming never to have taken government loans. (*See id*.) It discusses Plaintiff's friendship with the vice minister of China's equivalent of the CIA and FBI, Ma Jian, who was arrested in 2015 as part of the CCP's crackdown on corruption. (*See id*.)   It notes that details regarding the years leading up to Plaintiff's departure from China are particularly difficult to discern due to a swirl of political scandal and allegations of criminality from all sides. (*See id*.) And it explains that Plaintiff has verifiably fabricated some details of his story[9] and has made ridiculously implausible claims, such as never wearing the same pair of underwear twice. (*See id*.)

Throughout 2018, other media outlets reported on these and similar allegations against Plaintiff, including reporting that many of his claims against the CCP have remained unverified and are often considered sensationalist. (*See* David Barboza, "Steve Bannon and a Fugitive Billionaire Target a Common

---

[9]   Plaintiff additionally lies in his SAC. He claims that Mr. Cheng does not know him personally (SAC at ¶ 110), yet there is photographic evidence that the two met as early as October 2017. (*See* **Exhibit 1** at ¶ 6 and *Sub-Exhibit 2*.)

Enemy: China," THE NEW YORK TIMES (Dec. 4, 2018), attached as **Exhibit 9**;[10] Chris Lau, "Hong King police investigating fugitive Chinese tycoon Guo Wengui over alleged HK$32 billion money laundering conspiracy, court papers reveal," SOUTH CHINA MORNING POST (Aug. 14, 2018), attached as **Exhibit 10**;[11] L. Todd Wood, "Enemies abound for Chinese billionaire Guo Wengui," Washington Times (Dec. 19, 2018), attached as **Exhibit 11**;[12] *and see* **Exhibit 1** at ¶¶ 18-20 and *Sub-Exhibits 9-11*.))  And in October 2018, the Chinese newspaper *Caixin* reported that five senior employees of one of Plaintiff's companies had been found guilty of multiple crimes, and that Plaintiff himself had embezzled over 2 billion yuan from a Chinese company.  (*See* Xiankang, Jinbing, Wei, and Gang, "Fugitive Billionaire Guo Wengui's Company Fined 60 Billion Yuan," Caixin (Oct. 13, 2018), attached as **Exhibit 12**.)[13]

### 2.3    Mr. Cheng's Statements

This lawsuit is based on six statements (known as "tweets") Mr. Cheng posted on his publicly-accessible account on the social media web site Twitter. As an initial matter, there is a problem with the SAC; Mr. Cheng's tweets are in Chinese and the SAC (presumably by design) does not attach or display them, instead relying on Plaintiff's own unverified translations of them.

---

[10]  Available at: https://www.nytimes.com/2018/12/04/business/stephen-bannon-guo-wengui-china.html (last accessed June 14, 2019).

[11]  Available at: https://www.scmp.com/print/news/hong-kong/hong-kong-law-and-crime/article/2159724/hong-kong-police-investigating-fugitive (last accessed June 14, 2019).

[12]  Available at: https://www.washingtontimes.com/news/2018/dec/19/enemies-abound-for-chinese-billionaire-guo-wengui/ (last accessed June 14, 2019).

[13]  Available at: https://www.caixinglobal.com/2018-10-13/fugitive-billionaire-guo-wenguis-company-fined-60-billion-yuan-101334680.html (last accessed June 14, 2019).

RANDAZZA | LEGAL GROUP

To determine what the statements at issue actually mean, Mr. Cheng retained Anmin Lee, a native speaker of Chinese fluent in English who has performed translations for a national political party in Belize. Upon review of the original tweets in question, he discovered that Plaintiff's translations contain significant flaws and omissions. (*See* Declaration of Anmin Lee ["Lee Decl."], attached as **Exhibit 13**.)[14]

To begin with, the first allegedly defamatory statement identified in the SAC is missing half of the conversation. Mr. Cheng led into this tweet by writing, in regard to news that the CCP had released Plaintiff's family from custody:

> Everyone think about it, which is more likely, the Chinese communist party released Guo's family because:
> 1. Chinese Communist party is afraid of Guo and therefore they released Guo's family.
> 2. Because Guo had done good by exposing information.
> 3. The CCP is releasing Guo's family because some type of deal was made.
> 4. Guo's family were detained to coincide with Guo's exposure of the information, this is done to bolster the credibility of Guo's exposure in the eyes of the masses."

(Lee Decl. at ¶¶ 10-12.)[15]  Mr. Cheng is thus presenting possible explanations for why the CCP decided to release the family of a high-profile political dissident, including the possibility that Plaintiff struck a deal with the CCP.

> The first allegedly defamatory tweet reads as follows:
> Possibility 3 could be right, because Guo and Xi made a deal involving large sums of money. Guo does not resemble a (normal) businessman at all. His great wealth all came from extortions done in collusion with the communists. This time his shady dealings with Xi

---

[14] Mr. Cheng continues to gather information on a regular basis that may impact this Motion. In the event any becomes available, he will supplement this Motion.

[15] Mr. Lee provides a literal translation and a more natural translation for many of the statements at issue. Unless specified otherwise, this Motion refers to the natural translation for each statement.

RANDAZZA | LEGAL GROUP

involve making a deal that's worth a heavenly sum. But this deal is built upon a deal whose price is the sacrifice of the lives and properties belonging to 1.4 billion people. Everyone knows that as Xi will do anything to stay in power, he can casually give away 100 billion, a trillion. It's hard for Guo's wealth to not grow explosively.

(Lee Decl. at ¶¶ 14-16.) Mr. Cheng is thus stating that it is possible Plaintiff struck a deal with the CCP to have his family released, in light of his long-documented shady history with central figures in the CCP and his tremendous unexplained wealth.

The second complained-of tweet is in response to a Twitter user calling into question claims from Plaintiff as to the numbers of viewers on his YouTube channel. (*See* Lee Decl. at ¶¶ 17-18.) The tweet reads: "Guo lies and lies and lies with disregard. The more lying Guo lies, the more absurd the lies, even while he's entangled in numerous lawsuits. He no longer has any regard for the laws of civilized Western countries, you can imagine how much worse he must have acted in China." (Lee Decl. at ¶¶ 19-21.)

The third tweet at issue reads: "Guo acts with impunity because he can. He continuously fabricates large amounts of shameless lies; this is the greatest shame for the whole of our overseas Chinese community. Can it really be that evil has overcome justice, the sky and the earth has flipped itself upside down?" (Lee Decl. at ¶ 22.)

The fourth tweet at issue reads: "We can't even deal with one lying Guo, how can we overthrow the evil Chinese communist party?" (Lee Decl. at ¶¶ 23-25.)

The fifth tweet at issue reads: "Guo confused a bunch of people, snared[16] a bunch of people, attacked and frightened some people, and seriously divided a group of people so they caused harm to each other.  In a short time, he managed to leave the overseas democracy movement in pieces, and they completely lost their ability to do battle."  (Lee Decl. at ¶ 26.).

The sixth tweet at issue reads: "Guo deliberately manufactured large quantities of vulgar lies, and continuously makes enemies, his goal is to divert people's attention, divide and weaken democracy movement's ability to fight, and thus achieve the goal of overseas stability maintenance."  (Lee Decl. at ¶¶ 27-28.)  It is worth noting that a significant portion of the SAC's translation of this tweet is completely inaccurate and is found nowhere in the tweet itself.  (*See* Lee Decl. at ¶ 29.)

## 3.0    LEGAL STANDARDS

Under Nevada's Anti-SLAPP statute, NRS 41.635 *et seq.*, if a lawsuit is brought against a defendant based upon the exercise of his First Amendment rights, the defendant may file a special motion to dismiss.  Evaluating the Anti-SLAPP motion is a two-step process.  The movant bears the burden on the first step, and the non-moving party bears the burden on the second.  *See John v. Douglas County Sch. Dist.*, 125 Nev. 746, 754 (2009).

First, the defendant must show, by a preponderance of the evidence, that the plaintiff's claim is "based upon a good faith communication in furtherance of the right to petition or the right to free speech in direct connection with an issue of public concern."  NRS 41.660(3)(a).  One of the statutory categories of protected speech is "[c]ommunication[s] made in direct connection with an issue

---

[16]  Mr. Lee explains that the character at issue here most likely means '"to snare,' as in 'to lure or tempt someone into harm or error,"' and that the SAC's translation, "cheated on," "is a stretch."  (Lee Decl. at ¶ 26 fn.8.)

1  of public interest in a place open to the public or in a public forum, which is truthful

2  or is made without knowledge of its falsehood."  NRS 41.637(4).

3      Second, once the defendant meets his burden on the first prong, the

4  burden then shifts to the plaintiff, who must make a *prima facie* evidentiary

5  showing that he has a probability of prevailing on his claims.  *See* NRS 41.660(3)(b);

6  *see also John*, 125 Nev. at 754.

7      Nevada treats an Anti-SLAPP motion as a species of a motion for summary

8  judgment.  *See Stubbs v. Strickland*, 297 P.3d 326, 329 (Nev. 2013); *see also Coker*

9  *v. Sassone*, 432 P.3d 746, 748-49 (Nev. 2019).  However, it has some additional

10  procedures to avoid the abusive use of discovery, and if the court grants the

11  motion to dismiss, the defendant is entitled to an award of reasonable costs and

12  attorneys' fees, as well as an award of up to $10,000.  *See* NRS 41.670(1)(a)-(b).

13      Due to a relative dearth of case law applying Nevada's Anti-SLAPP statute,

14  Nevada courts look to case law applying California's Anti-SLAPP statute, Cal.

15  Code Civ. Proc. § 425.16, which shares many similarities with Nevada's law.  *See*

16  *John*, 125 Nev. at 756 (stating that "we consider California case law because

17  California's anti-SLAPP statute is similar in purpose and language to Nevada's

18  anti-SLAPP statute"); *see also Shapiro v. Welt*, 389 P.3d 262, 268 (Nev. 2017) (same);

19  *Sassone*, 432 P.3d at 749 n.3 (finding that "California's and Nevada's statutes

20  share a near-identical structure for anti-SLAPP review … Given the similarity in

21  structure, language, and the legislative mandate to adopt California's standard

22  for the requisite burden of proof, reliance on California case law is warranted");

23  *and see* NRS 41.665(2) (defining the plaintiff's *prima facie* evidentiary burden in

24  terms of California law).

25

26

27

RANDAZZA | LEGAL GROUP

**4.0    ARGUMENT**

**4.1    Mr. Cheng Satisfies the First Prong of the Anti-SLAPP Analysis**

As relevant here, the Anti-SLAPP statute protects any "[c]ommunication made in direct connection with an issue of public interest in a place open to the public or in a public forum … which is truthful or is made without knowledge of its falsehood."  NRS 41.637(4).  A defendant therefore must make three showings to satisfy the first prong: (1) the claims are based upon communications made in direct connection with an issue of public interest; (2) the communications were made in a place open to the public or in a public forum; and (3) the communications are truthful or were made without knowledge of their falsehood. All three requirements are met here.  Additionally, the merits of a plaintiff's claims, and the legality of the defendant's actions, are not the focus of the first prong analysis and, if relevant, should only be considered during the second prong analysis. *See Coretronic v. Cozen O'Connor*, 192 Cal. App. 4th 1381, 1388 (2d Dist. 2011); *see also Taus v. Loftus*, 40 Cal. 4th 683, 706-07, 713, 727-299 (2007).

**4.1.1    Plaintiff's Claims are Based Upon Protected Conduct**

"Issue of public interest" is defined broadly as "any issue in which the public is interested."  *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1042 (2008). "The issue need not be 'significant' to be protected by the anti-SLAPP statute – it is enough that it is one in which the public takes an interest."  *Id*.  "Although matters of public interest include legislative and governmental activities, they may also include activities that involve private persona, and entities, **especially when a large, powerful organization may impact the lives of many individuals**." *Church of Scientology v. Wollersheim*, 42 Cal. App. 4th 628, 650 (1996) (emphasis added).  An activity does not need to "meet the lofty standard of pertaining to the heart of self-government" to qualify for Anti-SLAPP protection; "social or even

low-brow topics may suffice." *Hilton v. Hallmark Cards*, 599 F.3d 894 905 (9th Cir. 2009).

The lifestyles and conduct of well-known public figures and even celebrities constitute an issue of public interest. *See Hilton v. Hallmark Cards*, 599 F.3d 894, 908 (9th Cir. 2011) (celebrity Paris Hilton acknowledging that her "privileged lifestyle and her catchphrase ('that's hot') are matters of widespread public interest"). "[T]here is a public interest which attaches to people who, by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities." *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664, 667-68 (1st Dist. 2010). A California court found a suit by a former head football coach was subject to the Anti-SLAPP statute because the plaintiff's "role as a head coach of a local university's football team already made him a public figure, and his employment termination was already a topic of widespread public interest." *McGarry v. University of San Diego*, 154 Cal. App. 4th 97, 110 (4th Dist. 2007). Issues that involve even private conduct by public figures may be of public interest. *See Sipple v. Foundation For Nat. Progress*, 71 Cal. App. 4th 226, 238 (2d Dist. 1999) (finding that lawsuit based on reported allegations against nationally prominent media strategist for political figures, accusing him of physically and verbally abusing his wife, involved a matter of public interest).

As explained in Section 4.2.1.2, *infra*, Plaintiff is unquestionably a public figure. More importantly, Mr. Cheng's statements discuss Plaintiff's involvement in a major political dispute with the CCP, including allegations of criminal corruption by the CCP against Plaintiff. This kind of international political intrigue falls well within the kind of "issue of public interest" the Anti-SLAPP statute contemplates. The court in *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman*, 47 Cal. App. 4th 777, 783-84 (Cal. Ct. App. 1996) found that communications questioning whether

money designated for charity ever reached its final, charitable destination addressed an issue of public interest.  In the years leading up to Mr. Cheng's statements on Twitter, there were numerous reports of the CCP's allegations of criminal conduct, corruption, and extortion against Plaintiff in renowned media outlets such as the *Wall Street Journal* and the *New York Times*.  And by his own account, Plaintiff is *the* preeminent dissident and critic of the CCP.  Mr. Cheng's statements concern these allegations against Plaintiff, the authenticity of his "dissident" status, and his relationship with the CCP.  There is no legitimate question that Mr. Cheng's statements are on an issue of public interest.

Even assuming *arguendo* some of the statements were not on a matter of public concern (which Mr. Cheng denies), they are inextricably linked with statements that are, making Plaintiff's claims a "mixed" cause of action for Anti-SLAPP purposes.  These "mixed cause[s] of action [are] subject to the Anti-SLAPP statute if **at least one of the underlying acts is protected conduct**, unless the allegations of protected conduct are merely incidental to the unprotected activity."  *Lauter v. Anoufrieva*, 642 F. Supp. 2d 1060, 1109 (C.D. Cal. 2008) (emphasis added); *see also Salma v. Capon*, 161 Cal. App. 4th 1275, 1287 (2008) (holding that a cause of action based on both protected and unprotected activity under California's Anti-SLAPP statute is subject to an Anti-SLAPP motion); *Peregrine Funding, Inc. v. Sheppard Mullin*, 133 Cal. App. 4th 658, 675 (2005) (finding that because plaintiffs' claims "are based in significant part on [defendant's] protected petitioning activity," the first anti-SLAPP prong was satisfied").  Taken as a whole, Mr. Cheng's complained-of statements overwhelmingly discuss matters of significant public concern, and so any statements that do not directly speak to such issues still properly fall under the statute's protections.

### 4.1.2  Mr. Cheng's Statements Were Made in a Public Forum

Mr. Cheng published his statements on the web site <twitter.com>.  Publicly accessible web sites are public forums for Anti-SLAPP purposes.  *See Cole v. Patricia A. Meyer & Associates*, 206 Cal. App. 4th 1095, 1121 (2012).  In fact, the U.S. Supreme Court recognized that social media web sites such as Twitter are paradigmatic modern-day public forums.  *See Packingham v. North Carolina*, 582 U.S. ___, 137 S. Ct. 1730, 1735-37 (2017) (noting that "[s]ocial media users employ these websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought").  There is no question that Mr. Cheng's statements in direct connection with a matter of public interest were made in a place open to the public or a public forum.

### 4.1.3  Mr. Cheng Made His Statements in Good Faith

To be protected under the Anti-SLAPP statute, statements must "truthful or … made without knowledge of [their] falsehood."  NRS 41.637.  Even if a statement is false, the defendant must have made it with *actual knowledge* that it was false; neither negligence nor even reckless disregard for the truth can defeat a defendant's showing under prong one.  Furthermore, by the Anti-SLAPP statute's plan language, the "good faith" analysis is completely unrelated to a defendant's motivations in making a statement.

Plaintiff's only support for the allegation that Mr. Cheng knew his statements were false is the conclusory assertion that he made each statement "with malicious intent and knowing it to be false."  (*See* SAC at ¶¶ 18-23, 112-117.)  This is not at all true.  Rather, as explained in greater detail in Section 4.2.1.1, *infra*, Mr. Cheng's statements are expressions of opinion or rhetorical hyperbole based on widely available information and reporting about accusations against Plaintiff.  For several months prior to Mr. Cheng publishing any of the statements at issue, newspapers like the *Wall Street Journal* and *The New York Times* had published

numerous articles regarding allegations of Plaintiff's criminality, extortion, and embezzlement, whether personally or through his business associates. This reporting, on the whole, permitted the conclusion that Plaintiff fled China on his own initiative to avoid corruption charges after exploiting his ties with prominent CCP members for his personal enrichment, then styled himself as a political dissident to further enrich himself and garner attention. After all, the reporting prior to Mr. Cheng's tweets indicated that most of Plaintiff's claims about the CCP and its members were false or unverifiable.

There is also nothing to suggest that Mr. Cheng made claims of Plaintiff working with the CCP and Xi Jinping knowing they were false. This allegation stemmed from speculation by Mr. Cheng in July 2018 as to the reason for the CCP releasing Plaintiff's family from custody. Plaintiff had positioned himself as a vocal opponent of the CCP threatening to expose corruption at the top levels (yet, by and large, had not verifiably done so), and so it was not likely the CCP was trying to reward Plaintiff for his alleged whistleblowing, that the CCP was afraid of Plaintiff, or that the CCP for some reason wanted to bolster his credibility. To Mr. Cheng, then, that left one possibility: Plaintiff struck a deal with the CCP. Given his extreme wealth, allegedly obtained at least in part by exploiting the Chinese people and China's political system (according to pending criminal allegations and court cases against him and his subordinates), this was the most plausible scenario.

Accordingly, all of the statements at issue are thus opinion or rhetorical hyperbole, and thus cannot be false for purposes of this analysis or were made without knowledge of their falsity. Mr. Cheng satisfies his burden under the first prong of the Anti-SLAPP analysis, and now the burden shifts to Plaintiff to show a probability of prevailing on his claims. He cannot do so.

### 4.2    Plaintiff Cannot Show a Probability of Prevailing on His Claims

NRS 41.660 defines a plaintiff's burden of proof as "the same burden of proof that a plaintiff has been required to meet pursuant to California's anti-Strategic Lawsuit Against Public Participation law as of the effective date of this act." NRS 41.665(2). Plaintiff cannot simply make vague accusations or provide a mere scintilla of evidence to defeat Mr. Cheng's Motion. Rather, to satisfy his evidentiary burden under the second prong of the Anti-SLAPP statute, Plaintiff must present "substantial evidence that would support a judgment of relief made in the plaintiff's favor." *S. Sutter, LLC v. LJ Sutter Partners, L.P.*, 193 Cal. App. 4th 634, 670 (2011); *see also Mendoza v. Wichmann*, 194 Cal. App. 4th 1430, 1449 (2011) holding that "substantial evidence" of lack of probable cause was required to withstand Anti-SLAPP motion on malicious prosecution claim). Plaintiff cannot make this showing as to any of his claims.

### 4.2.1    Plaintiff's Defamation Claims Fail

To establish a cause of action for defamation, a plaintiff must allege: (1) a false and defamatory statement by the defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages. *See Wynn v. Smith*, 117 Nev. 6, 10 (Nev. 2001); *see also Pegasus v. Reno Newspapers, Inc.*, 118 Nev. 706, 718 (2002). A statement is only defamatory if it contains a factual assertion that can be proven false. *See Pope v. Motel 6*, 114 P.3d 277, 282 (Nev. 2005). And, for a public figure, like the plaintiff, to prevail in a defamation action, he must prove by clear and convincing evidence that the statements were made with actual malice. *See Bose Corp. v. Consumers Union, Inc.*, 466 U.S. 485 (1984).

### 4.2.1.1    Mr. Cheng's Statements are Not Actionable

A statement must include a false assertion of fact to be defamatory. "[M]inor inaccuracies do not amount to falsity unless the inaccuracies 'would

have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Pegasus*, 118 Nev. at 715 n.17. If the "gist" or "sting" of a story is true, it is not defamatory even if some details are incorrect. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991).

A statement of opinion cannot be defamatory, as the First Amendment recognizes that there is no such thing as a "false" idea. *See Pegasus v. Reno Newspapers, Inc.*, 118 Nev. 706, 714 (Nev. 2002); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974). Additionally, in Nevada, "a statement is not defamatory if it is an exaggeration or generalization that could be interpreted by a reasonable person as 'mere rhetorical hyperbole.'" *Pegasus*, 118 Nev. at 715 (citing *Wellman v. Fox*, 108 Nev. 83, 88 (Nev. 1992) (finding that "exaggerated statements are permissible in contexts in which the statements would be interpreted by a reasonable person as mere rhetorical hyperbole")); *see also Flowers v. Carville*, 310 F.3d 1118, 1127 (9th Cir. 2002) (finding that references to tabloid articles as "trash," "crap," and "garbage" were not actionable); *and see Phantom Touring v. Affiliated Publ'ns*, 953 F.2d 724, 728, 730-31 (1st Cir. 1992) (finding that theatre review calling a production "a rip-off, a fraud, a scandal, a snake-oil job" was "obviously protected hyperbole" or incapable of being proven false). Politically-charged invective is typically considered an expression of opinion or rhetorical hyperbole, even if the words used might be considered capable of defamatory meaning in different contexts. *See Rosenaur v. Scherer*, 88 Cal. App. 4th 260, 280 (2001) (finding that calling political foe a "thief" and a "liar" was not actionable). "[B]road, unfocused and wholly subjective comment[s]" are protected as opinion and are not actionable. *Fletcher v. San Jose Mercury news*, 216 Cal. App. 3d 172, 191 (1989) (finding that calling someone a "crooked politician" was not actionable).

The context of a statement is important in determining whether it is a statement of fact, or merely one of opinion or rhetorical hyperbole.  *See Balzaga v. Fox News Network, LLC*, 173 Cal. App. 4th 1325, 1339 (2009) (finding that "the fact that a statement '[s]tanding alone' could be construed as false is not sufficient to support a defamation claim"); *see also Lewis v. Time, Inc.*, 710 F.2d 549, 553 (9th Cir. 1983) (stating "even apparent statements of fact may assume the character of statements of opinion, and thus be privileged, when made [under] circumstances in which 'an audience may anticipate efforts by the parties to persuade others to their position by use of epithets, fiery rhetoric or hyperbole'") (quoting *Information Control Group v. Genesis One Computer*, 611 F.2d 781, 784 (9th Cir. 1980)).  If a publication containing an allegedly defamatory statement is surrounded by "loose, figurative, or hyperbolic language," then any allegedly defamatory meaning may be negated by the publication's overall tenor.  *See Morningstar, Inc. v. Superior Court*, 23 Cal. App. 4th 676, 689 (1994).

It is particularly important to keep in mind that Mr. Cheng made his statements on an online forum, Twitter, a context in which there is a lesser expectation that statements will be factual.  *See Krinsky v. Doe 6*, 159 Cal. App. 4th 1154, 1173, 1178 (2008) finding that in a chat room setting, anonymous post that corporate officers consisted of a "cockroach," "losers," "boobs," and "crooks" were "crude, satirical hyperbole which … constitute protected opinion"); *see also James v. San Jose Mercury News, Inc.*, 17 Cal. App. 4th 1, 12, 14 (1993) (finding that article describing lawyer as engaging in "sleazy, illegal, and unethical practice" fell into "protected zone of 'imaginative expression' or 'rhetorical hyperbole'").

#### 4.2.1.1.1 Tweet One[17]

The first allegedly defamatory tweet reads as follows:

> Possibility 3 could be right, because Guo and Xi made a deal involving large sums of money.  Guo does not resemble a (normal) businessman at all.  His great wealth all came from extortions done in collusion with the communists.  This time his shady dealings with Xi involve making a deal that's worth a heavenly sum.  But this deal is built upon a deal whose price is the sacrifice of the lives and properties belonging to 1.4 billion people.  Everyone knows that as Xi will do anything to stay in power, he can casually give away 100 billion, a trillion.  It's hard for Guo's wealth to not grow explosively.

(Lee Decl. at ¶¶ 14-16.)  Mr. Cheng is thus stating that it is possible Plaintiff struck a deal with the CCP to have his family released, in light of his shady history with central figures in the CCP and his tremendous wealth.  This is a follow-up to Mr. Cheng speculating as to possible explanations for the CCP releasing Plaintiff's family from custody, and in this tweet, he explains that the most likely explanation for this development is that Plaintiff struck a deal with the CCP.  This aspect of the statement is pure speculation and his immediately preceding tweet allows for multiple other interpretations of the disclosed fact that Plaintiff's family was released by the CCP.  It is thus a statement of opinion incapable of being defamatory.

To the extent Plaintiff contends the statement that he does not resemble a normal businessman and made his money via extortion, this is an expression of opinion or rhetorical hyperbole.  There is a wealth of media coverage, as well as allegations of criminality by the Chinese government, speculating or outright claiming that Plaintiff may be a shady businessman who made his billions by exploiting contacts within the CCP to enrich himself.  While Plaintiff claims he has always kept himself at arms-reach from the CCP, this is far from established and

---

[17]  For a side-by-side comparison of Plaintiff's translation alongside Mr. Lee's translation, see **Exhibit 14**.

there is a sufficient basis in the public record for Mr. Cheng to reasonably believe that he was intimately involved with the CCP at the time of his self-exile.  Unless political corruption is so endemic in China that it is expected, this makes it so that Mr. Cheng understood Plaintiff not to be a normal businessman, and the enormous amount of political scandal and allegations against Plaintiff can accurately be summarized to include allegations of extortion in collusion with the CCP.

As for the claim that Plaintiff is involved in a deal based on a deal at the cost of 1.4 billion people's lives and property, this is precisely the kind of "loose, figurative" language that clues the reader into the fact that Mr. Cheng is not making precise factual allegations, but is instead speaking rhetorically and offering his subjective opinion.  This tweet is thus non-actionable in its entirety.

### 4.2.1.1.2  Tweet Two

The second complained-of tweet is in response to a Twitter user calling into question claims from Plaintiff as to the numbers of viewers on his YouTube channel. (*See* Lee Decl. at ¶¶ 17-18.)  The tweet reads: "Guo lies and lies and lies with disregard.  The more lying Guo lies, the more absurd the lies, even while he's entangled in numerous lawsuits.  He no longer has any regard for the laws of civilized Western countries, you can imagine how much worse he must have acted in China."  (Lee Decl. at ¶¶ 19-21.)

Vaguely calling someone, especially a politically-involved public figure, a "liar" repeatedly is precisely the kind of language courts have found to constitute protected opinion or rhetorical hyperbole.  *See Rosenaur*, 88 Cal. App. 4th at 280; *Fletcher*, 216 Cal. App. 3d at 191; *James*, 17 Cal. App. 4th at 12, 14.  Additionally, while an opinion need not be reasonable to be protected, it was entirely reasonable for Mr. Cheng to think of Plaintiff as a liar.  There was plenty of media coverage by this time that Plaintiff was a defendant in defamation suits, that he

had been accused of dishonesty and fraud, and that his extreme claims against the CCP and its members were unreliable.  This tweet is thus non-actionable in its entirety.

### 4.2.1.1.3  Tweet Three

The third tweet at issue reads: "Guo acts with impunity because he can.  He continuously fabricates large amounts of shameless lies; this is the greatest shame for the whole of our overseas Chinese community.  Can it really be that evil has overcome justice, the sky and the earth has flipped itself upside down?"  (Lee Decl. at ¶ 22.)

As with the second statement, non-specifically calling Plaintiff a flagrant liar is not capable of any defamatory meaning.  Furthermore, the tweet contains flowery language, "evil has overcome justice, the sky and the earth has flipped itself upside down," that makes it clear to the reader Mr. Cheng is not made any specific factual allegation.  This tweet is thus non-actionable in its entirety.

### 4.2.1.1.4  Tweet Four

The fourth tweet at issue reads: "We can't even deal with one lying Guo, how can we overthrow the evil Chinese communist party?"  (Lee Decl. at ¶¶ 23-25.)

Again, this tweet consists of Mr. Cheng non-specifically calling Plaintiff a liar.  Calling Plaintiff "lying Guo" is a familiar rhetorical construction in political discussion, as can be found repeatedly by figures such as President Donald J. Trump calling his opponents like "crooked Hillary."  (*See* Lee Decl. at ¶ 24.)  The tweet is thus non-actionable in its entirety.

### 4.2.1.1.5  Tweet Five

The fifth tweet at issue reads: "Guo confused a bunch of people, snared a bunch of people, attacked and frightened some people, and seriously divided a group of people so they caused harm to each other.  In a short time, he managed

1  to leave the overseas democracy movement in pieces, and they completely lost
2  their ability to do battle."  (Lee Decl. at ¶ 26.)

3      There is no factual allegation in this tweet.  Mr. Cheng non-specifically refers
4  to Plaintiff confusing, snaring, attacking, frightening, and dividing people.  These
5  statements do not accuse Plaintiff of any specific actions, however, and are thus
6  no more actionable than statements vaguely accusing someone of being a
7  "crook" or engaging in "sleazy, illegal, and unethical practice."  *See Krinsky*, 159
8  Cal. App. 4th at 1173, 1178; *see also James*, 17 Cal. App. 4th at 12, 14.  Claiming
9  Plaintiff has weaken the overseas democracy movement is a classic statement of
10 opinion, and the language used ("in pieces" and "completely lost their ability to
11 do battle") is classic rhetorical hyperbole.  This tweet is non-actionable in its
12 entirety.

### 4.2.1.1.6  Tweet Six

14     The sixth tweet at issue reads: "Guo deliberately manufactured large
15 quantities of vulgar lies, and continuously makes enemies, his goal is to divert
16 people's attention, divide and weaken democracy movement's ability to fight,
17 and thus achieve the goal of overseas stability maintenance."  (Lee Decl. at
18 ¶¶ 27-28.)

19     As with prior statements "Guo deliberately manufactured large quantities
20 of vulgar lies" is a non-specific statement incapable of defamatory meaning.  The
21 statement that Plaintiff "continuously makes enemies" is not even potentially
22 defamatory because it does not tend to harm Plaintiff's reputation, and in any
23 event is a statement of opinion based on all the reporting that Plaintiff is constantly
24 being sued for defamation, that he is a target of at least some CCP members,
25 and that he has enemies within the Chinese political dissident movement.
26 Mr. Cheng's statement that Plaintiff has weakened the democracy movement is
27 another statement of opinion based on the fact that Plaintiff has made numerous

1   extreme claims of corruption and wrongdoing within the CCP, yet has rarely
2   provided evidence that actually bears these claims out.  A high-profile, fabulously
3   wealthy self-proclaimed political dissident who constantly over-delivers and
4   under-performs would indeed have a tendency to weaken the public's regard
5   for actual, less flamboyant, Chinese dissidents.

### 4.2.1.2   Mr. Cheng Did Not Act with the Requisite Fault

7       Even assuming, *arguendo*, any of Mr. Cheng's statements are false
8   statements of fact, he did not make them with the requisite degree of fault and
9   cannot be liable for them.

### 4.2.1.2.1  Plaintiff is a Public Figure

11      The degree of fault required by a defendant for defamation liability to
12  attach depends upon the target and content of the defendant's speech.  There
13  are three categories of defamation plaintiffs: the general public figure, the limited
14  purpose public figure, and the private individual.  A limited purpose public figure
15  "voluntarily injects himself or is drawn into a particular public controversy and
16  thereby becomes a public figure for a limited range of issues." *Gerz v. Robert*
17  *Welch*, 418 U.S. 323, 351 (1974); *see also Pegasus*, 118 Nev. at 720.  This is a question
18  of law, and a court's determination is based "on whether the person's role in a
19  matter of public concern is voluntary and prominent." *Bongiovi v. Sullivan*, 122
20  Nev. 556, 572 (2006).

21      As explained in Section 2.1, *supra*, Plaintiff claims he is an extremely wealthy,
22  extremely prominent (in fact, *the most* prominent) Chinese political dissident.  And
23  as shown in Section 2.2, *supra*, there has been voluminous coverage in
24  international media of all the controversy surrounding Plaintiff and his reputation,
25  including allegations that he is a liar, a fraud, a criminal, an embezzler, a rapist,
26  that he was in bed with the CCP when he made his billions, and that, at the very
27  least, he is an unreliable source of criticism against the CCP.  If he is not a public

RANDAZZA | LEGAL GROUP

figure for all purposes, Plaintiff is without doubt a public figure in the context of his status as a prominent political dissident and critic of the CCP. He is thus required to show that Mr. Cheng wrote his statements on Twitter with actual malice, which he has no hope of doing.

### 4.2.1.2.2  Mr. Cheng Did Not Act with Actual Malice

"Actual malice" is not ill will towards a plaintiff, but rather a defendant's knowledge that his statements are false, or reckless disregard for their truth or falsity. *Harte-Hanks Comm'n v. Connaughton*, 491 U.S. 657, 666 (1989). "The Supreme Court has repeatedly held that in defamation cases, the phrase 'actual malice' 'has nothing to do with bad motive or ill will.'" *D.A.R.E. Am. v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270 (C.D. Cal. 2000) (quoting *Harte-Hanks*, 491 U.S. at 667 n.7). The definition of knowing falsity is self-evident. To show "reckless disregard," a public figure must prove that the publisher "entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *see also Bose Corp*, 466 U.S. at 511 n.30. Under Nevada law, reckless disregard only exists when the defendant "acted with a 'high degree of awareness of … [the] probable falsity' of the statement or had serious doubt as to the publication's truth." *Pegasus*, 118 Nev. at 719. The question is not "whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Reader's Digest Assn. v. Superior Court*, 690 P.2d 610, 617-18 (Cal. 1984); *see also St. Amant*, 390 U.S. at 731. Moreover, "[a] publisher does not have to investigate personally, but may rely on the investigation and conclusions of reputable sources." *Id*. at 619. Finally, a defamation plaintiff must establish actual malice by **clear and convincing evidence**. *See Bose Corp.*, 466 U.S. at 511. This is a requirement that presents "a heavy burden, far in excess of the preponderance

sufficient for most civil litigation." *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1186-87 (9th Cir. 2001) (internal quotation marks omitted). "The burden of proof by clear and convincing evidence requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind." *Copp v. Paxton*, 52 Cal. Rptr. 2d 831, 846 (Cal. Ct. App. 1996) (internal quotation marks omitted).

Major newspapers, including the *New York Times* and the *Wall Street Journal*, reported on allegations against Plaintiff starting at least in 2017. These allegations included that Plaintiff fled China to avoid corruption charges which swept up high-profile CCP officials with whom he had close relations; that China had issued an arrest notice with Interpol; that Plaintiff had earned his billions by corruptly working with and influencing Chinese politicians, as well as defrauding investors and other companies; that his business subordinates claimed he instructed them to engage in criminal activity; that he was being investigated for several crimes including fraud and embezzlement; that he raped his former personal assistant; that many of his claims of the CCP's corruption have not been verified and are unverifiable; that he was a divisive figure amongst the Chinese dissident community; and that he was a defendant in multiple defamation lawsuits. (*See* **Exhibits 2-12**.) These were not the ramblings of anonymous madmen on the Internet, but rather respected media outlets and even a foreign government. It was thus eminently reasonable for Mr. Cheng to rely on these reports of allegations against Plaintiff in forming his opinions about Plaintiff and that he was likely not a true advocate against the CCP.

In the face of all this evidence supporting the conclusions Mr. Cheng expressed on Twitter, Plaintiff makes no real attempt to show actual malice. Rather, he only provides a formulaic recitation of actual malice as defined by the

Supreme Court, without a single supporting factual allegation.  This would fail to satisfy Plaintiff's burden even under NRCP 12(b)(5), much less the more stringent burden under the Anti-SLAPP statute.  Plaintiff cannot make any showing that Mr. Cheng knew his statements were false (to the extent he made any factual statements at all) and cannot show that he made any statements with substantial subjective doubt as to their accuracy.  Plaintiff cannot meet his burden under the Anti-SLAPP statute, and his defamation and defamation per se claims must be dismissed.

### 4.2.2  Plaintiff's IIED Claim Fails

To establish a cause of action for intentional infliction of emotional distress, Plaintiff must affirmatively prove: "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress, and (3) actual or proximate causation." *Olivero v. Lowe*, 116 Nev. 395, 398-99 (2000) (citing *Star v. Rabello*, 97 Nev. 124, 125 (1981) (citations omitted).  "Extreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community." *Maduike v. Agency Rent-A-Car*, 114 Nev. 1, 4 (1998).  Harm is only recognized for this tort if "the stress [is] so severe and of such intensity that no reasonable person could be expected to endure it." *Alam v. Reno Hilton Corp.*, 819 F. Supp. 905, 911 (D. Nev. 1993).  Because he is a public figure, Plaintiff must also prove that Mr. Cheng's statements are false and were made with actual malice.  *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988).

Under *Falwell*, Plaintiff's IIED claim fails for the same reasons his defamation claims fail.  Beyond that, however, Plaintiff cannot show any extreme or outrageous conduct, and cannot show severe emotional distress.

RANDAZZA | LEGAL GROUP

The bar for establishing extreme and outrageous conduct is high, and not every statement that one finds personally upsetting may provide the basis for liability. *See Chehade Refai v. Lazaro*, 614 F. Supp. 2d 1103, 1121-22 (D. Nev. 2009); *see also* Restatement (Second) of Torts § 46 cmt. d.  While Plaintiff is not running for public office, his alleged work as a high-profile political dissident against the CCP is comparable to entering the rough-and-tumble jungle of a political fight, where courts have repeatedly found that hurtful statements are not actionable. *See Harte-Hanks*, 491 U.S. at 687 (finding that "[w]hen a candidate enters the political arena, he or she must expect that the debate will sometimes be rough and personal"); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 52 (1st Cir. 2012) (stating that "[c]ampaigning for public office sometimes has the feel of a contact sport, with candidates, political organizations, and others trading rhetorical jabs and sound-bite attacks in hopes of landing a knockout blow at the polls.  It is not for the thin-skinned or the fainthearted"); *Desert Sun Pul'g Co. v. Sup. Ct.*, 97 Cal. App. 3d 49, 54 (Cal. Ct. App. 1979) (stating that "[o]nce an individual decides to enter the political wars, he subjects himself to this kind of treatment[, and] deeply ingrained in our political history is a tradition of free-wheeling-irresponsible, bare knuckled, Pier 6, political brawls").

Mr. Cheng's statements on Twitter are not, by any stretch of the imagination, extreme or outrageous, especially in the context of speaking about the self-avowed most prominent Chinese political dissident on the planet. Mr. Cheng's statements are no harsher than the schoolyard taunt "liar liar, pants on fire," and he goes no further than recounting what Chinese and American media have already reported about Plaintiff.  It is not at all plausible to assert that mild criticisms no worse than what can be found on public fora like Twitter every day are so extreme that civilized society simply cannot tolerate them.  This claim fails.

Even if Mr. Cheng's statements were extreme and outrageous, however, Plaintiff cannot show he suffered severe emotional distress.  For years, Plaintiff has withstood allegations of extreme and monstrous criminal and unethical behavior by international media and the Chinese government, sources with far greater authority and credibility than a man with a few thousand followers on Twitter.  It is laughable for Plaintiff to assert that he could bear the weight of all these allegations, but that a man with little internet presence calling him a liar was enough to break him emotionally.  Plaintiff cannot show severe emotional distress, and thus has no probability of prevailing on this claim.  It must be dismissed.

**5.0    CONCLUSION**

For the foregoing reasons, the Court should dismiss all of Plaintiff's claims with prejudice and award both Mr. Cheng's costs and reasonable attorneys' fees, as well as award him $10,000, to be sought by separate motion.

DATED June 14, 2019.                    Respectfully submitted,

/s/ Marc J. Randazza
_____
Marc J. Randazza (NV Bar No. 12265)
Ronald D. Green (NV Bar No. 7360)
LaTeigra C. Cahill (NV Bar No. 14352)
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117

Attorneys for Defendant
SHUIYAN CHENG

Case No. A-18-779172-C

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 14th day of June 2019, I served a true and correct copy of the foregoing document via the Eighth Judicial District Court's Odyssey electronic filing system.

_/s/ Heather Ebert_
Employee,
Randazza Legal Group