**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT BRIDGEPORT DIVISION**

# EXHIBIT LIST FOR DEBTOR, HO WAN KWOK

IN RE:

HO WAN KWOK,
DEBTOR.

CHAPTER 11

CASE No.: 22-50073 (JAM)

ECF No. 598 – Motion for Order Confirming that Chapter 11 Trustee Holds All of Debtor's Economic and Corporate Governance Rights in Debtor-Controlled Entities; Authorizing Chapter 11 Trustee to Act in Any Foreign Country on Behalf of Estate; and Granting Related Relief

HEARING DATE: August 4, 2022

**EXHIBITS SUBMITTED BY:** Debtor, Ho Wan Kwok

**ATTORNEY:** Eric A. Henzy

| EXHIBIT # | DESCRIPTION | ID/FULL | SUBMIT DATE | WITNESS |
|---|---|---|---|---|
| 1 | Global Notes and Statements of Limitations, Methodology, and Disclaimers Regarding the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs | FULL | 8/4/2022 | |
| 2 | Declaration of Mr. Ho Wan Kwok In Support of the Chapter 11 Case and Certain Motions | FULL | 8/4/2022 | |
| 3 | Debtor's Omnibus Second Renewed Motion (i) To Approve Second Amended and Restated Settlement with Bravo Luck and PAX; and (ii) To Hire Melanie L. Cyganowski as an Employee Only to Act as the Sales Officer for the Debtor's Bankruptcy Estate | FULL | 8/4/2022 | |
| 4 | Order Granting Debtor's Second Renewed Motion to Approve the Revised Settlement Agreement | FULL | 8/4/2022 | |
| 5 | Letter from Luc A. Despins, Chapter 11 Trustee to The Honorable Judge James L. Garrity, Jr. dated July 25, 2022 | FULL | 8/42022 | |

APPEAL FILED ON ________________ .
CHECKED EXHIBITS HAVE BEEN SUBMITTED TO DISTRICT COURT ON ________________ .COPIES OF THE EXHIBITS HAVE BEEN RETAINED BY THE BANKRUPTCY COURT

# EXHIBIT 1

CASE NO. 22-50073

IN RE: Ho Wan Kwok

VS.

Debtor EXHIBIT 1

DATE ______ IDEN.

DATE 8/4/2022 Admitted in Full EVID.

BY P.E.

Deputy Clerk

AO 386-A

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| HO WAN KWOK, | : | Case No. 22-50073 (JAM) |
| Debtor. | : | |

## GLOBAL NOTES AND STATEMENTS OF LIMITATIONS, METHODOLOGY, AND DISCLAIMERS REGARDING THE DEBTOR'S SCHEDULES OF ASSETS AND LIABILITIES AND STATEMENT OF FINANCIAL AFFAIRS

Ho Wan Kwok (the "Debtor"), is filing his Schedules of Assets and Liabilities (each, a "Schedule," and, collectively, the "Schedules") and Statement of Financial Affairs (the "SOFA") in the Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court") pursuant to section 521 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

These Global Notes and Statements of Limitations, Methodology, and Disclaimers Regarding the Debtor's Schedules of Assets and Liabilities and SOFA (collectively, the "Global Notes") pertain to, are incorporated by reference in, and comprise an integral part of all of the Schedules and SOFA. The Global Notes are in addition to the specific notes set forth below with respect to particular Schedules and SOFA (the "Specific Notes" and, together with the Global Notes, the "Notes").

The Global Notes should be referred to, and referenced in connection with, any review of the Schedules and SOFA. The Debtor prepared the Schedules and SOFA with the assistance of his advisors and other professionals. The Schedules and SOFA are unaudited and subject to potential adjustment. In preparing the Schedules and SOFA, the Debtor relied on information that was available to him at the time of preparation. The Debtor has made reasonable efforts to ensure that the Schedules and SOFA are as accurate and complete as possible under the circumstances; however, subsequent information or discovery may result in material changes to the Schedules and SOFA and inadvertent errors or omissions may exist.

The Debtor reserves all rights to amend or supplement the Schedules and SOFA from time to time, in all respects, as may be necessary or appropriate, including the right to dispute or otherwise assert offsets or defenses to any claim reflected on the Schedules and SOFA as to amount, liability, classification, or to otherwise subsequently designate any claim as "disputed," "contingent," or "unliquidated." Further, nothing contained in the Schedules, SOFA, or Notes shall constitute a waiver of the Debtor's rights or an admission with respect to his chapter 11 case.

GLOBAL NOTES

1. Description of the Case. On February 15, 2022 (the "Petition Date"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code.

2. Aliases of Debtor. Debtor is known by the following names: Guo Wengui; Miles Guo; Miles Kwok; and Ho Wan Kwok.

3. Basis of Presentation. The Schedules and SOFA do not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles in the United States ("GAAP"). The Schedules and SOFA reflect the Debtor's reasonable efforts to report the assets and liabilities of the Debtor.

4. Reporting Date. Unless otherwise noted, the reported asset values in Schedules A and B align with the asset values as of the Petition Date, and the liability values in Schedules D, E, and F are as of the Petition Date.

5. Accuracy. The financial information disclosed herein was not prepared in accordance with federal or state securities laws or other applicable non-bankruptcy law. Persons and entities trading in or otherwise purchasing, selling, or transferring the claims against the Debtor should evaluate this financial information in light of the purposes and context for which it was prepared. The Debtor is not liable for, and undertakes no responsibility to indicate, variations from securities laws or for any evaluations of the Debtor based on this financial information or any other information.

6. Estimates and Assumptions. The preparation of the Schedules and SOFA required the Debtor to make estimates and assumptions that affected the reported amounts of certain assets and liabilities, the disclosure of certain contingent assets and liabilities and the reported amounts of revenue and expense. Actual results could differ materially from these estimates. In nearly all instances, current market valuations are not maintained by, or readily available to, the Debtor. It would be prohibitively expensive, unduly burdensome, and an inefficient use of resources for the Debtor to obtain current market valuations for all assets. When necessary, the Debtor has indicated that the value of certain assets is "Unknown" or "Undetermined." Amounts ultimately realized may vary materially from the estimated value.

7. Currency. Unless otherwise indicated, all amounts shown in the Schedules and SOFA are in U.S. Dollars.

8. Debtors' Reservation of Rights. Nothing contained in the Schedules, SOFA, or Notes shall constitute a waiver of rights with respect to this chapter 11 case, including, but not limited to, the following:

    a. Any failure to designate a claim listed on the Schedules and SOFA as "disputed," "contingent," or "unliquidated" does not constitute an admission by the Debtor that such amount is not "disputed," "contingent," or "unliquidated." The Debtor reserves the right to dispute and to assert setoff rights, counterclaims, and defenses to any claim reflected on his Schedules as to amount, liability, and classification,

and to otherwise subsequently designate any claim as "disputed," "contingent," or "unliquidated."

b. The listing of a claim on Schedule D as "secured," on Schedule E as "priority," or on Schedule F as "unsecured priority," or the listing of a contract or lease on Schedule G as "executory" or "unexpired" does not constitute an admission by the Debtor of the legal rights of the claimant, or a waiver of the Debtor's rights to recharacterize or reclassify such claim or contract pursuant to a schedule amendment, claim objection or otherwise. Moreover, although the Debtor may have scheduled claims of various creditors as secured claims for informational purposes, no current valuation of the Debtor's assets in which such creditors may have a security interest has been undertaken. The Debtor reserves all rights to dispute and challenge the secured nature or amount of any such creditor's claims or the characterization of the structure of any transaction, or any document or instrument related to such creditor's claims.

c. The claims of individual creditors may not reflect credits, allowances or other adjustments due from such creditors to the Debtor. The Debtor reserves all of his rights with regard to such credits, allowances and other adjustments, including the right to assert claims objections and/or setoffs with respect to the same.

d. Although the Debtor has exercised reasonable efforts to ensure the accuracy of his Schedules and SOFA, they nevertheless may contain errors and omissions. The Debtor hereby reserves all of his rights to dispute the validity, status, and enforceability of any contracts, agreements, and leases set forth on the Schedules and SOFA, and to amend and supplement the Schedules and SOFA as necessary.

e. The Debtor further reserves all of his rights, claims, and causes of action with respect to the contracts and agreements listed on the Schedules and SOFA, including, but not limited to, the right to dispute and challenge the characterization or the structure of any transaction, document, and instrument related to a creditor's claim.

f. Listing a contract or lease on the Schedules and SOFA shall not be deemed an admission that such contract is an executory contract, such lease is an unexpired lease, or that either necessarily is a binding, valid, and enforceable contract. The Debtor hereby expressly reserves the right to assert that any contract listed on the Schedules and SOFA does not constitute an executory contract within the meaning of section 365 of the Bankruptcy Code, as well as the right to assert that any lease so listed does not constitute an unexpired lease within the meaning of section 365 of the Bankruptcy Code.

9. Global Notes Control. In the event that the Schedules or SOFA differ from any of the Global Notes, the Global Notes shall control.

SPECIFIC NOTES

In addition to the foregoing, the following conventions were adopted by the Debtor in the preparation of the Schedules and SOFA:

1. Schedule A/B.

   a. Generally. To the extent a line item pertaining to the Debtor's assets indicates a value of "$0.00," the Debtor notes that such amount is either "unknown" or "undetermined" and such "$0.00" designation does not constitute an admission that assets are, in fact, valued at "$0.00." Because certain assets or liabilities are noted as "$0.00," summary line items in Schedule A/B reflect totals that may be less than the ultimate value of such assets or liabilities.

   b. Question 1 - Do you own or have any legal or equitable interest in any residence, building, land, or similar property?

      i. The Debtor has use and occupancy of real estate located at 373 Taconic Road, Greenwich, CT 06831 (the "Residence"). The Debtor has no legal title to the Residence and no court has made any determination that the Debtor has any other interest, equitable or otherwise, in it. All related costs and expenses associated with the Residence are paid directly by family and family-controlled enterprises. The Residence is owned by Greenwich Land, LLC ("Greenwich Land"). The sole member of Greenwich Land is the Debtor's spouse.

      ii. The Debtor also has access to an apartment located at the Sherry-Netherlands Hotel, 781 Fifth Avenue, New York, NY 10022 (the "Apartment"). The cooperative shares in the Apartment are held by Genever Holdings LLC (the "US SPV"). The membership interests in the US SPV are held by Genever Holdings Corporation (the "BVI Company"). The Debtor holds all of the equity of the BVI Company; however, pursuant to a Declaration of Trust and Agreement, dated as of February 17, 2015 (the "Trust Date"), the Debtor holds such equity in trust for Bravo Luck Limited (the "Apartment Owner"). The Debtor's son owns the equity of the Apartment Owner. On or about the Trust Date, the Apartment Owner funded the US SPV with the purchase price for the Apartment. These funds came from entities owned or controlled by the Debtor's son and not from the Debtor.

      The US SPV commenced its own chapter 11 case before the United States Bankruptcy Court for the Southern District of New York on October 12, 2020 (Case No. 20-12411 (JLG)). The US SPV's disclosure statement with respect to its reorganization plan states that the US SPV "sought Chapter 11 relief . . . in the face of multiple court disputes relating primarily to the beneficial ownership of the Residence as between Bravo Luck Limited . . . and [Pacific Alliance Asia Opportunity Fund LP ("PAX")]." [Docket No.

165]. In litigation seeking to determine the ownership of the Apartment, the Apartment Owner contends that it is the beneficial owner of the Apartment. The ultimate ownership of the Apartment will be resolved outside of the US SPV's chapter 11 case. Before the BVI courts, PAX has sought the turnover of the US SPV's membership interests based upon its judgment (which remains under appeal) against the Debtor.

The Apartment is currently marketed for sale by Sotheby's International Realty under the authority of Melanie L. Cyganowski, Esq., the US SPV's sales officer. For these reasons, the Debtor does not report the value of the Apartment as an asset.

c.  Question 3 – Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not? Cars, vans, trucks, tractors, sport utility vehicles, motorcycles. The Debtor has use of automobiles, including luxury automobiles and motorcycles. The Debtor has no legal title to any vehicle of any type and no court has made any determination that the Debtor has any other interest, equitable or otherwise, in any such vehicle. All costs and expenses associated with such vehicles are provided for directly by family and family-controlled enterprises.

d.  Question 4 – Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not? Watercraft, aircraft, motor homes, ATVs and other recreational vehicles, other vehicles, and accessories. The Debtor previously had access to the use of a yacht named the "Lady May." The Lady May is owned by HK International Funds Investments (USA) Limited, LLC, which is owned by the Debtor's daughter. The Lady May is currently in port in Europe. The Debtor currently has no access to the Lady May and has had no access to the Lady May for over a year.

The ownership and/or control of the Lady May was disputed by the Debtor in the New York State Supreme Court action commenced by PAX against the Debtor in response to sanctions and contempt proceedings initiated by PAX. Following an evidentiary hearing, conducted on February 9, 2021, Justice Barry Ostrager found (the "February 9 Decision"), among other things, that that the evidence established that the Debtor "beneficially owns and controls" the Lady May. The Debtor disagrees with the February 9 Decision and has appealed it. Due to the pending appeal (which is currently stayed), the Debtor does not include the Lady May as an asset of his estate. However, if included as an asset (which the Debtor anticipates will be resolved through this Chapter 11 Case) of his estate, the Lady May may have significant value – in 2015, the sales price for the Lady May was €28 million.

e.  Question 6 – Household goods and furnishings. Numerous items fitting the personal and household items definition are located at the Residence and the Apartment. Except as set forth herein, the Debtor has no legal title to the contents of either the Residence or the Apartment, and no court has made any determination that the Debtor has any other interest, equitable or otherwise, in any such items.

f. Question 7 – Electronics – Televisions, radios, audio, video, etc. Numerous items fitting the electronics items definition are located at the Residence and the Apartment including, but not limited to, computers, cell phones, and broadcasting equipment. Except as set forth herein, the Debtor has no legal title to the contents of either the Residence or the Apartment, and no court has made any determination that the Debtor has any other interest, equitable or otherwise, in any such items.

g. Question 8 – Collectibles of value. Any items at the Residence or the Apartment fitting the definition of this category are the property of family or family-controlled enterprises. Except as set forth herein, the Debtor has no legal title to the contents of either the Residence or the Apartment, and no court has made any determination that the Debtor has any other interest, equitable or otherwise, in such items.

h. Question 9 – Equipment for sports or hobbies. Any items at the Residence or the Apartment fitting the definition of this category are the property of family or family-controlled enterprises. Except as set forth herein, the Debtor has no legal title to the contents of either the Residence or the Apartment, and no court has made any determination that the Debtor has any other interest, equitable or otherwise, in any such items.

i. Question 11 – Clothes. The Debtor owns both business and casual clothing, including suits, shoes and sneakers from various manufacturers, including high-end brands.

j. Question 17 – Deposits of money. On October 23, 2018, the High Court of the Hong Kong Special Administrative Region, Court of First Instance (the "High Court"), entered a Restraint Order Prohibiting Disposal of Assets In Hong Kong and Elsewhere (the "Restraint Order"), dated October 18, 2018. The Restraint Order stated that it would remain in force up to and including April 30, 2019, with the understanding that it would remain in effect pursuant to a further order of the High Court entered on May 3, 2019. The effect of the Restraint Order was to freeze HK$3.7 million of funds alleged to belong to the Debtor. As much as billions more of funds and property, including real estate in Hong Kong, of individuals and entities purportedly subject to the Debtor's "effective control" (according to the Restraint Order) were also frozen and/or seized. Due to the freezing/seizure of these assets, the Debtor does not include them in his estate.

k. Question 18 - Bonds, mutual funds, or publicly traded stocks. Out of an abundance of caution, the Debtor refers you to Schedule B Notes, Question 17.

l. Question 19 – Non-publicly traded stock or interest in incorporated and unincorporated businesses, LLCs, partnerships or joint ventures. The Debtor was the sole shareholder of two controlled foreign corporations: Shiny Times Holdings Ltd. ("Shiny Times") and Well Origin Ltd. ("Well Origin"). For the following reasons, the Debtor ascribes no value to the interests in these entities.

i. In September and October 2017, the Chinese government raided the offices of Shiny Times and seized all accounting corporate records and many personal financial records. Access to the records was not possible after this time. Online access to the bank accounts is frozen and there are no copies or backup of the data available. The Debtor has made all reasonable attempts to obtain the data, but since the seizure, has been unable to obtain financial records for the corporation. Shiny Times has been inactive since that time. The Debtor has not had control of Shiny Times since November 2, 2017.

ii. As to Well Origin, a company incorporated in the British Virgin Islands, in April of 2018, UBS took control of the shares of Well Origin, which it held as collateral, as the result of a default on a loan. After taking the shares of Well Origin and selling its assets, UBS put the company into liquidation in the British Virgin Islands. The Debtor has not had control of Well Origin since December 31, 2017.

As discussed above, in response to Statement Question 1, the Debtor holds the membership interests of the US UPV. The Debtor holds these membership interests in trust for the Apartment Owner.

See also Schedule B Notes, Question 17, related to numerous entities that are subject to the Restraint Order, and SOFA, Question 9, related to Eastern Profit (as defined below).

m. Question 20 – Government and corporate bonds and other negotiable and non-negotiable instruments. The Debtor has received the identified refund checks from the United States Treasury and the State of New York Department of Taxation and Finance. These checks are non-negotiated and may be dishonored if deposited because they were issued more than six months ago.

n. Question 22 – Security deposits and prepayments. In connection with the acquisition of the Apartment, the US SPV provided the cooperative with respect to the Apartment, a security deposit (the "Apartment Security Deposit") of $5 million for the payment of taxes and other maintenance charges. The Apartment Owner funded the Apartment Security Deposit not from assets of the Debtor. Once the US SPV ceased regularly paying its maintenance charges, the cooperative began applying amounts due against the security deposit. On information and belief, approximately $2.065 million of the original Apartment Security Deposit remains. Due to the trust arrangement discussed above, in response to Question 1, the Debtor does not include the value of the remaining Apartment Security Deposit as an asset of his estate.

o. Question 25 – Trusts, equitable or future interests in property and rights or powers exercised for your benefit. See Schedule B Notes, Questions 17, 19 and 22.

p.  Question 26 – Patents, copyrights, trademarks, trade secrets, and other intellectual property. The Debtor has possible unregistered copyrights and other intellectual property interests in music and videos posted to various digital and media platforms, such as YouTube, GTV, Twitter and GETTR. The Debtor ascribes no value to his social media assets and has made no attempts to monetize his social media presence.

q.  Question 30 – Other amounts someone owes you. See SOFA Notes, Part 4, Question 9 for identification of lawsuits to which the Debtor is asserting a claim.

In addition, in certain jurisdictions, the prevailing party to a matter is entitled to reimbursement of its costs. In the case captioned *Kwok Ho Wan, Ace Decade Holdings Limited, and Dawn State Limited v. UBS AG (London Branch)*, pending before the High Court of Justice, Business and Property Courts of England and Wales, Queen's Bench Division, Commercial Court, the Debtor may be entitled to the reimbursement of costs related to a recent jurisdictional dispute alongside the other plaintiffs. The amount awarded by the court to all plaintiffs to the action was £94,292.20. The Debtor's ratable entitlement to this amount is undetermined. Further, the defendant has been granted permission to appeal by the court and a successful appeal may result in the plaintiffs being ordered to repay the amount awarded by the court.

In the case captioned *Wengui Guo v. Baosheng Guo*, pending before the United States District Court for the Eastern District of Virginia, counsel for the Debtor is in receipt of the $12,000 judgment awarded in his favor.

r.  Question 31 – Interests in insurance policies. The Debtor is covered by his spouse's health insurance policy which has no cash value.

s.  Question 33 – Claims against third parties, whether or not a lawsuit has been filed or made a demand for payment. The Debtor is a claimant in certain litigation identified on the SOFA Notes, Part 4, question 9.

t.  Question 37 - Legal or equitable interest in any business-related property. See Schedule B Notes, Questions 17 and 19 above.

u.  Question 39 – Office equipment furnishings or supplies. There is nothing in this category that is not already covered by responses to Schedule B Notes, Questions 6 and 7 above.

v.  Question 42 – Interests in Partnership or Joint Ventures. See Schedule B Notes, Questions 17 and 19.

w.  Question 53 – Property of the kind not already listed. The Debtor is identified as the member for his family's membership at The Mar-a-Lago Club, located in Palm Beach, Florida. The membership has been active since 2015. The Debtor is not responsible for the payment of the membership dues, nor is he entitled to the refund

of any deposits that may have previously been paid upon termination of the membership.

2. Schedule C.

    a. The Debtor does not identify any exempt property at this time. However, the Debtor reserves the right to amend such exemption selection should he be found to own assets in excess of his clothing and his dog during the pendency of the bankruptcy.

3. Schedule D.

    a. Based on the information currently available to the Debtor, the Debtor believes that Schedule D accurately reflects all creditors with secured claims against the Debtor. To the extent the Debtor discovers that any additional secured claims exist, the Debtor may amend Schedule D accordingly to reflect such claims.

    b. The Debtor reserves all of his rights to amend Schedule D to the extent that the Debtor determines that any claims should be reported on Schedule D. Nothing herein shall be construed as an admission by the Debtor of the legal rights of the claimant, deemed a modification or interpretation of the terms of any agreement, or considered a waiver of the Debtor's rights to recharacterize or reclassify any claim or contract.

    c. The Debtor has not included on Schedule D parties that may believe their claims are secured through setoff rights or inchoate statutory lien rights.

    d. Except as otherwise agreed or ordered by the Bankruptcy Court, the Debtor reserves his rights to dispute or challenge the validity, perfection or immunity from avoidance of any lien purported to be granted or perfected in any specific asset of a secured creditor of the Debtor. Moreover, the Debtor reserves all of his rights to dispute or challenge the secured nature of any such creditor's claim or the characterization of the structure of any such transaction or any document or instrument related to such creditor's claim.

    e. The Debtor is party to litigation funding agreements ("Litigation Funding Agreements") wherein the Debtor pledged a security interest in, among other things, certain claims and the proceeds thereof to certain entities owned or controlled by the Debtor's son (each, a "Litigation Funder"). The Debtor does not believe the security interests were perfected.

4. Schedule E/F.

    a. The Debtor has used reasonable efforts to report all unsecured claims against him on Schedule E/F. The claims listed on Schedule E/F arose or were incurred on various dates. In certain instances, the date on which a claim arose is an open issue of fact. Although reasonable efforts have been made to identify the date of incurrence of each claim, the determination of the date that each claim in Schedule E/F was incurred or arose would be unduly burdensome and cost prohibitive.

Therefore, while the Debtor does not provide a date for each claim listed on Schedule E/F, to the best of the Debtor's knowledge, all claims listed on Schedule E/F have arisen or were incurred before the Petition Date.

b.  The Debtor reserves the right to assert that any such claims are contingent, unliquidated and/or disputed, as applicable.

c.  The Debtor reserves the right to assert that any claim listed on Schedule E/F does not constitute a priority claim under section 507 of the Bankruptcy Code and thus constitutes an unsecured nonpriority claim.

d.  The claims of individual creditors may not reflect credits and/or allowances due from creditors to the Debtor. The Debtor reserves all of his rights with respect to any such credits and/or allowances, including the right to assert objections and/or setoffs with respect to same.

e.  Schedule E/F may include pending litigations or legal actions involving the Debtor. These pending litigations or legal actions are also reflected in response to SOFA Question 7. In all instances, the amount that is the subject of the litigation is uncertain or undetermined. The Debtor believes that the amount of any potential claims associated with any such pending litigation is contingent, unliquidated, and disputed. The inclusion of any litigation in the Schedules and/or SOFA or otherwise does not constitute an admission of liability alleged in such litigation.

f.  To the extent they are known, Schedule E/F represents the prepetition amounts owing to counterparties to executory contracts and unexpired leases. Such prepetition amounts, however, may be paid in connection with the assumption or the assumption and assignment of an executory contract or unexpired lease. Additionally, Schedule E/F does not include potential rejection damage claims, if any, of the counterparties to executory contracts and unexpired leases that may be rejected.

5.  Schedule G.

a.  Although the Debtor used reasonable efforts to identify and schedule executory contracts and unexpired leases, inadvertent errors or omissions may have occurred. The Debtor reserves all rights to dispute the validity, status, or enforceability of any contracts, agreements, or leases set forth in Schedule G and to amend or supplement Schedule G as necessary. The contracts, agreements and leases listed therein may have expired or been modified, amended, or supplemented from time to time by various amendments, restatement, waivers, estoppel certificates, letters, memoranda and other documents, instruments, and agreements which may not be listed therein.

b.  The presence of a contract or agreement on Schedule G does not constitute an admission as to the existence, validity or enforceability of the contract or agreement, or that such contract or agreement is an executory contract or unexpired lease, and the omission of a contract or agreement from Schedule G does not

constitute an admission that a contract or agreement does not exist. The Debtor reserves all rights, claims, and causes of action with respect to the contracts and agreements listed on Schedule G, including the rights to dispute or challenge the characterization or the structure of any transaction document or instrument. Certain executory agreements may not have been memorialized in writing and could be subject to dispute.

6. Schedule H.

   a. The Debtor is involved in pending or threatened litigation. These matters may involve multiple plaintiffs and defendants, some or all of whom may assert cross-claims and counter-claims against other parties. Because all such claims are contingent, disputed and/or unliquidated, such claims have been set forth on both Schedules F (and flagged as contingent, liquidated and disputed) and H.

7. Schedule I.

   a. The Debtor has no income that meets any definition of income on Schedule I. The Debtor does receive support funded by family and companies controlled by family for housing, household and living expenses. None of the funding related to housing, household or living expenses is subject to any claim by the funding source and all housing, household and living expense funding is without any agreement or expectation to be repaid. The Debtor plans to amend Form 122B, filed on February 15, 2022 [Docket No. 3], in which the Debtor erroneously claimed monthly income of $19,488.00. Such funds stated were as described herein and are not properly defined or described as income.

8. Schedule J.

   a. Consistent with the reporting on Schedule I, all expenses of any kind including housing, household and living, are funded by third party family members or by companies they control. The Debtor has no expenses for which he is personally liable. The Debtor reserves his right to amend this Schedule in the future should his circumstances change.

9. Specific Notes Regarding the Debtor's Statement of Financial Affairs (SOFA).

   a. SOFA Question 1. The Debtor and his spouse consider themselves married even though they do not have a certificate from China evidencing their marriage. The couple has been living together for over 30 years, file joint tax returns, and have two children together.

   b. SOFA Question 2. The Debtor previously lived at the Apartment from on or about March/April 2015 through September 2015 and then from March/April 2017 through February 2020.

   c. SOFA Question 5. The Debtor has no income that meets any definition of income for this question or on 122B or Schedule I. The debtor does receive support funded

by family and companies controlled by family for housing, household and living expenses. None of the funding related to the housing, household or living expenses is subject to any claim by the funding source and there is no expectation or agreement in place relative to repayment. The Debtor is amending Form 122B, in which the Debtor erroneously claimed monthly income of $19,488.00. Such funds stated are as described herein and are not properly defined or described as income.

d. SOFA Question 6. Professional payments listed in this category were made on behalf of the Debtor by family or companies controlled by family and are subject to the Litigation Funding Agreements. The payments are reported because there is an expectation of repayment from any proceeds contingent upon the resolution of the litigation. In addition, the Debtor does receive support funded by family and companies controlled by family for housing, household and living expenses. None of the funding related to the housing, household or living expenses is subject to any claim by the funding source, and there is no expectation or agreement in place relative to repayment. They are therefore excluded from this list. There were two payments made by the family totaling $109,827.12 that were inadvertently made post-petition, on February 16, 2022. These payments are being treated as gifts.

e. SOFA Question 8. The Debtor borrowed funds from Litigation Funders (see SOFA Question 12, below) to pursue and defend against litigation. In certain instances, entities affiliated with the Debtor's son are party to the litigation. He is not responsible for the costs incurred by such parties to the litigation. To the extent the Litigation Funder inadvertently allocated such third-party costs to the Debtor, the Debtor intends to dispute such liability.

f. SOFA Question 9. The Debtor has made reasonable best efforts to identity all current pending litigation, investigations and other legal actions involving the Debtor. However, certain omissions may have inadvertently occurred. The inclusion of any legal action in this question does not constitute an admission by the Debtor of any liability, the validity of any litigation or the amount of any potential claim that may result from any claims with respect to any legal action and the amount and treatment of any potential claim resulting from any legal action currently pending or that may arise in the future. The Debtor is a party to numerous lawsuits that are currently in various stages, as a plaintiff, defendant, or co-defendant. All litigation costs for the benefit of the Debtor are funded by companies controlled by family or through various Litigation Funding Agreements, all of which are listed on Schedule G.

In ruling that Eastern Profit Corporation Limited ("Eastern Profit") prevailed on its breach of contract claim against Strategic Vision US LLC ("Strategic Vision"), and was thus entitled to collect on its $1 million judgment against Strategic Vision, the United States District Court for the Southern District of New York made a passing remark concerning the Debtor's purported relationship to Eastern Profit, that the company was "in essence, a shell corporation for" the Debtor and his family. For this reason alone, the Debtor schedules this action. Eastern Profit is owned and

controlled by the Debtor's daughter, and the Debtor disputes that he has an interest in the company.

g.  SOFA Question 10. See Schedule B Notes, Questions 17 (assets subject to the Restraint Order) and 19 (Shiny Times Holdings Ltd. and Well Origin Ltd.).

h.  SOFA Question 12. See Schedule B Notes, Questions 1 (the Apartment), 17 (assets subject to the Restraint Order) and 19 (Shiny Times Holdings Ltd. and Well Origin Ltd.).

i.  SOFA Question 16. Prior to the Petition Date, on each of February 14, 2021, and February 15, 2021, Brown Rudnick was paid a retainer of $500,000. The source of $1 million in retainer payments (the "BR Retainer") was Lamp Capital LLC ("Lamp"). Lamp loaned the Debtor $1 million, and the Debtor directed Lamp to remit the proceeds of the loan directly to Brown Rudnick

j.  SOFA Question 18. Within two years of the Debtor's Chapter 11 case, the Debtor entered into Litigation Funding Agreements with Litigation Funders. The most recent Litigation Funding Agreement is dated November 8, 2021. Pursuant to the Litigation Funding Agreements, the Litigation Funder has agreed to advance loans in connection with the Debtor's efforts to collect on judgments or damages he suffered. The Litigation Funding Agreements provide for a grant of a security interest in the Debtor's underlying claims and litigation proceeds to the applicable Litigation Funder.

k.  SOFA Question 22. The Debtor continues to have access to the Apartment. Accordingly, he continues to store certain clothing and personal items there.

l.  SOFA Question 23. See SOFA Notes, Question 12. See Schedules Notes Questions 1, 3, 4, 6, 7, 8, 9, and 11. The Debtor has use of the Residence, various vehicles and numerous items fitting the personal and household items definition, such property being located at the Residence. The Debtor has no legal title to the Residence, the vehicles or its contents, and no court has made any determination that the Debtor has any other interest, equitable or otherwise in any such items.

m.  SOFA Question 27. See Schedule B Notes, Questions 17 and 19.

**Fill in this information to identify your case:**

| | | | |
|---|---|---|---|
| Debtor 1 | Ho Wan Kwok | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 (Spouse if, filing) | | | |
| | First Name | Middle Name | Last Name |

United States Bankruptcy Court for the: DISTRICT OF CONNECTICUT

Case number (if known) 22-50073

☐ Check if this is an amended filing

# Official Form 107
## Statement of Financial Affairs for Individuals Filing for Bankruptcy 4/19

**Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.**

### Part 1: Give Details About Your Marital Status and Where You Lived Before

**1. What is your current marital status?**

☑ Married
☐ Not married

**2. During the last 3 years, have you lived anywhere other than where you live now?**

☐ No
☑ Yes. List all of the places you lived in the last 3 years. Do not include where you live now.

| Debtor 1 Prior Address: | Dates Debtor 1 lived there | Debtor 2 Prior Address: | Dates Debtor 2 lived there |
|---|---|---|---|
| **781 5th Avenue New York, NY 10022** | From-To: **March 2015 to March 2020** | ☐ Same as Debtor 1 | ☐ Same as Debtor 1 From-To: |

**3. Within the last 8 years, did you ever live with a spouse or legal equivalent in a community property state or territory?** (*Community property states and territories* include Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington and Wisconsin.)

☑ No
☐ Yes. Make sure you fill out *Schedule H: Your Codebtors* (Official Form 106H).

### Part 2 Explain the Sources of Your Income

**4. Did you have any income from employment or from operating a business during this year or the two previous calendar years?**
Fill in the total amount of income you received from all jobs and all businesses, including part-time activities.
If you are filing a joint case and you have income that you receive together, list it only once under Debtor 1.

☑ No
☐ Yes. Fill in the details.

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | **Sources of income** Check all that apply. | **Gross income** (before deductions and exclusions) | **Sources of income** Check all that apply. | **Gross income** (before deductions and exclusions) |

Software Copyright (c) 1996-2022 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

5. **Did you receive any other income during this year or the two previous calendar years?**
Include income regardless of whether that income is taxable. Examples of *other income* are alimony; child support; Social Security, unemployment, and other public benefit payments; pensions; rental income; interest; dividends; money collected from lawsuits; royalties; and gambling and lottery winnings. If you are filing a joint case and you have income that you received together, list it only once under Debtor 1.

List each source and the gross income from each source separately. Do not include income that you listed in line 4.

☑ No
☐ Yes. Fill in the details.

| | **Debtor 1** **Sources of income** Describe below. | **Gross income from each source** (before deductions and exclusions) | **Debtor 2** **Sources of income** Describe below. | **Gross income** (before deductions and exclusions) |
|---|---|---|---|---|

## Part 3: List Certain Payments You Made Before You Filed for Bankruptcy

6. **Are either Debtor 1's or Debtor 2's debts primarily consumer debts?**

☑ No. **Neither Debtor 1 nor Debtor 2 has primarily consumer debts.** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $6,825* or more?

☐ No. Go to line 7.
☑ Yes List below each creditor to whom you paid a total of $6,825* or more in one or more payments and the total amount you paid that creditor. Do not include payments for domestic support obligations, such as child support and alimony. Also, do not include payments to an attorney for this bankruptcy case.

* Subject to adjustment on 4/01/22 and every 3 years after that for cases filed on or after the date of adjustment.

☐ Yes. **Debtor 1 or Debtor 2 or both have primarily consumer debts.**
During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $600 or more?

☐ No. Go to line 7.
☐ Yes List below each creditor to whom you paid a total of $600 or more and the total amount you paid that creditor. Do not include payments for domestic support obligations, such as child support and alimony. Also, do not include payments to an attorney for this bankruptcy case.

| **Creditor's Name and Address** | **Dates of payment** | **Total amount paid** | **Amount you still owe** | **Was this payment for ...** |
|---|---|---|---|---|
| **See attached schedule # 6** | | **$2,054,671.92** | **$732,212.31** | ☐ Mortgage<br>☐ Car<br>☐ Credit Card<br>☐ Loan Repayment<br>☐ Suppliers or vendors<br>☐ Other___ |

7. **Within 1 year before you filed for bankruptcy, did you make a payment on a debt you owed anyone who was an insider?**
*Insiders* include your relatives; any general partners; relatives of any general partners; partnerships of which you are a general partner; corporations of which you are an officer, director, person in control, or owner of 20% or more of their voting securities; and any managing agent, including one for a business you operate as a sole proprietor. 11 U.S.C. § 101. Include payments for domestic support obligations, such as child support and alimony.

☑ No
☐ Yes. List all payments to an insider.

| **Insider's Name and Address** | **Dates of payment** | **Total amount paid** | **Amount you still owe** | **Reason for this payment** |
|---|---|---|---|---|

8. **Within 1 year before you filed for bankruptcy, did you make any payments or transfer any property on account of a debt that benefited an insider?**
Include payments on debts guaranteed or cosigned by an insider.

☑ No
☐ Yes. List all payments to an insider

| **Insider's Name and Address** | **Dates of payment** | **Total amount paid** | **Amount you still owe** | **Reason for this payment** Include creditor's name |
|---|---|---|---|---|

Software Copyright (c) 1996-2022 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

## Part 4: Identify Legal Actions, Repossessions, and Foreclosures

9. **Within 1 year before you filed for bankruptcy, were you a party in any lawsuit, court action, or administrative proceeding?**
List all such matters, including personal injury cases, small claims actions, divorces, collection suits, paternity actions, support or custody modifications, and contract disputes.

☐ No
☑ Yes. Fill in the details.

| Case title<br>Case number | Nature of the case | Court or agency | Status of the case |
|---|---|---|---|
| **See Attached Schedule # 9** | | | ☐ Pending<br>☐ On appeal<br>☐ Concluded |

10. **Within 1 year before you filed for bankruptcy, was any of your property repossessed, foreclosed, garnished, attached, seized, or levied?**
Check all that apply and fill in the details below.

☑ No. Go to line 11.
☐ Yes. Fill in the information below.

| Creditor Name and Address | Describe the Property<br><br>Explain what happened | Date | Value of the property |
|---|---|---|---|

11. **Within 90 days before you filed for bankruptcy, did any creditor, including a bank or financial institution, set off any amounts from your accounts or refuse to make a payment because you owed a debt?**

☑ No
☐ Yes. Fill in the details.

| Creditor Name and Address | Describe the action the creditor took | Date action was taken | Amount |
|---|---|---|---|

12. **Within 1 year before you filed for bankruptcy, was any of your property in the possession of an assignee for the benefit of creditors, a court-appointed receiver, a custodian, or another official?**

☐ No
☑ Yes

## Part 5: List Certain Gifts and Contributions

13. **Within 2 years before you filed for bankruptcy, did you give any gifts with a total value of more than $600 per person?**

☑ No
☐ Yes. Fill in the details for each gift.

| Gifts with a total value of more than $600 per person<br><br>Person to Whom You Gave the Gift and Address: | Describe the gifts | Dates you gave the gifts | Value |
|---|---|---|---|

14. **Within 2 years before you filed for bankruptcy, did you give any gifts or contributions with a total value of more than $600 to any charity?**

☑ No
☐ Yes. Fill in the details for each gift or contribution.

| Gifts or contributions to charities that total more than $600<br>Charity's Name<br>Address (Number, Street, City, State and ZIP Code) | Describe what you contributed | Dates you contributed | Value |
|---|---|---|---|

Software Copyright (c) 1996-2022 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

## Part 6: List Certain Losses

15. **Within 1 year before you filed for bankruptcy or since you filed for bankruptcy, did you lose anything because of theft, fire, other disaster, or gambling?**

[✓] No
[ ] Yes. Fill in the details.

| Describe the property you lost and how the loss occurred | Describe any insurance coverage for the loss<br>Include the amount that insurance has paid. List pending insurance claims on line 33 of *Schedule A/B: Property.* | Date of your loss | Value of property lost |
|---|---|---|---|

## Part 7: List Certain Payments or Transfers

16. **Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone you consulted about seeking bankruptcy or preparing a bankruptcy petition?**
Include any attorneys, bankruptcy petition preparers, or credit counseling agencies for services required in your bankruptcy.

[ ] No
[✓] Yes. Fill in the details.

| Person Who Was Paid<br>Address<br>Email or website address<br>Person Who Made the Payment, if Not You | Description and value of any property transferred | Date payment or transfer was made | Amount of payment |
|---|---|---|---|
| Brown Rudnick LLP<br>1 Financial Center<br>Boston, MA 02111<br>Lamp Capital LLC | | $500,000 on 2/14/2022<br>$500,000 on 2/15/2022 | $1,000,000.00 |

17. **Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone who promised to help you deal with your creditors or to make payments to your creditors?**
Do not include any payment or transfer that you listed on line 16.

[✓] No
[ ] Yes. Fill in the details.

| Person Who Was Paid<br>Address | Description and value of any property transferred | Date payment or transfer was made | Amount of payment |
|---|---|---|---|

18. **Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?**
Include both outright transfers and transfers made as security (such as the granting of a security interest or mortgage on your property). Do not include gifts and transfers that you have already listed on this statement.

[✓] No
[ ] Yes. Fill in the details.

| Person Who Received Transfer<br>Address<br><br>Person's relationship to you | Description and value of property transferred | Describe any property or payments received or debts paid in exchange | Date transfer was made |
|---|---|---|---|

19. **Within 10 years before you filed for bankruptcy, did you transfer any property to a self-settled trust or similar device of which you are a beneficiary?** (These are often called *asset-protection devices.*)

[✓] No
[ ] Yes. Fill in the details.

| Name of trust | Description and value of the property transferred | Date Transfer was made |
|---|---|---|

Software Copyright (c) 1996-2022 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

## Part 8: List of Certain Financial Accounts, Instruments, Safe Deposit Boxes, and Storage Units

20. Within 1 year before you filed for bankruptcy, were any financial accounts or instruments held in your name, or for your benefit, closed, sold, moved, or transferred?
Include checking, savings, money market, or other financial accounts; certificates of deposit; shares in banks, credit unions, brokerage houses, pension funds, cooperatives, associations, and other financial institutions.

- [x] No
- [ ] Yes. Fill in the details.

| Name of Financial Institution and Address (Number, Street, City, State and ZIP Code) | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|

21. Do you now have, or did you have within 1 year before you filed for bankruptcy, any safe deposit box or other depository for securities, cash, or other valuables?

- [x] No
- [ ] Yes. Fill in the details.

| Name of Financial Institution Address (Number, Street, City, State and ZIP Code) | Who else had access to it? Address (Number, Street, City, State and ZIP Code) | Describe the contents | Do you still have it? |
|---|---|---|---|

22. Have you stored property in a storage unit or place other than your home within 1 year before you filed for bankruptcy?

- [ ] No
- [x] Yes. Fill in the details.

| Name of Storage Facility Address (Number, Street, City, State and ZIP Code) | Who else has or had access to it? Address (Number, Street, City, State and ZIP Code) | Describe the contents | Do you still have it? |
|---|---|---|---|
| The Sherry-Netherland Hotel<br>781 5th Avenue<br>New York, NY 10022 | | Business and Casual Clothes and other household items | [ ] No<br>[x] Yes |

## Part 9: Identify Property You Hold or Control for Someone Else

23. Do you hold or control any property that someone else owns? Include any property you borrowed from, are storing for, or hold in trust for someone.

- [ ] No
- [x] Yes. Fill in the details.

| Owner's Name Address (Number, Street, City, State and ZIP Code) | Where is the property? (Number, Street, City, State and ZIP Code) | Describe the property | Value |
|---|---|---|---|
| Refer to Global Notes Question 23 | | | $0.00 |

## Part 10: Give Details About Environmental Information

For the purpose of Part 10, the following definitions apply:

- [x] *Environmental law* means any federal, state, or local statute or regulation concerning pollution, contamination, releases of hazardous or toxic substances, wastes, or material into the air, land, soil, surface water, groundwater, or other medium, including statutes or regulations controlling the cleanup of these substances, wastes, or material.
- [x] *Site* means any location, facility, or property as defined under any environmental law, whether you now own, operate, or utilize it or used to own, operate, or utilize it, including disposal sites.
- [x] *Hazardous material* means anything an environmental law defines as a hazardous waste, hazardous substance, toxic substance, hazardous material, pollutant, contaminant, or similar term.

Report all notices, releases, and proceedings that you know about, regardless of when they occurred.

Software Copyright (c) 1996-2022 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

24. **Has any governmental unit notified you that you may be liable or potentially liable under or in violation of an environmental law?**

- [x] No
- [ ] Yes. Fill in the details.

| Name of site<br>Address (Number, Street, City, State and ZIP Code) | Governmental unit<br>Address (Number, Street, City, State and ZIP Code) | Environmental law, if you know it | Date of notice |
|---|---|---|---|

25. **Have you notified any governmental unit of any release of hazardous material?**

- [x] No
- [ ] Yes. Fill in the details.

| Name of site<br>Address (Number, Street, City, State and ZIP Code) | Governmental unit<br>Address (Number, Street, City, State and ZIP Code) | Environmental law, if you know it | Date of notice |
|---|---|---|---|

26. **Have you been a party in any judicial or administrative proceeding under any environmental law? Include settlements and orders.**

- [x] No
- [ ] Yes. Fill in the details.

| Case Title<br>Case Number | Court or agency<br>Name<br>Address (Number, Street, City, State and ZIP Code) | Nature of the case | Status of the case |
|---|---|---|---|

**Part 11: Give Details About Your Business or Connections to Any Business**

27. **Within 4 years before you filed for bankruptcy, did you own a business or have any of the following connections to any business?**

- [ ] A sole proprietor or self-employed in a trade, profession, or other activity, either full-time or part-time
- [ ] A member of a limited liability company (LLC) or limited liability partnership (LLP)
- [ ] A partner in a partnership
- [ ] An officer, director, or managing executive of a corporation
- [ ] An owner of at least 5% of the voting or equity securities of a corporation

- [ ] No. None of the above applies. Go to Part 12.
- [x] Yes. Check all that apply above and fill in the details below for each business.

| Business Name<br>Address<br>(Number, Street, City, State and ZIP Code) | Describe the nature of the business<br>Name of accountant or bookkeeper | Employer Identification number<br>Do not include Social Security number or ITIN.<br>Dates business existed |
|---|---|---|
| Genever Holdings Corporation<br>P.O. Box 3170<br>Tortola, British Virgin Islands | Holding Company for Genever Holdings LLC | EIN:<br>From-To |
| Shiny Times Holdings, LTD<br>173 Des Voex Road Cntrl<br>4/F Nan Fung Twr, R411<br>Hong Kong, 9990777 Hong Kong | Investment Vehicle<br>MICHAEL LI & CO. , C/O HENRY WONG 19/F PROSPERITY TOWER, NO 39 QUEENS ROAD CENTRAL HONG KONG | EIN:<br>From-To 12/13/2007 to 12/31/2020 |
| Well Origin Limited<br>173 Des Voex Road Cntrl<br>4/F Nan Fung Twr, R411 | Investment Vehicle<br>MICHAEL LI & CO. , C/O HENRY WONG 19/F PROSPERITY TOWER, NO 39 QUEENS ROAD CENTRAL HONG KONG | EIN:<br>From-To 4/1/2010 to 12/31/2020 |

Software Copyright (c) 1996-2022 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

**28. Within 2 years before you filed for bankruptcy, did you give a financial statement to anyone about your business? Include all financial institutions, creditors, or other parties.**

- [x] **No**
- [ ] **Yes. Fill in the details below.**

**Name** **Date Issued**
**Address**
**(Number, Street, City, State and ZIP Code)**

**Part 12:** Sign Below

**I have read the answers on this *Statement of Financial Affairs* and any attachments, and I declare under penalty of perjury that the answers are true and correct. I understand that making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

Ho Wan Kwok
**Signature of Debtor 1**

**Signature of Debtor 2**

**Date** 3/9/2022

**Date**

**Did you attach additional pages to *Your Statement of Financial Affairs for Individuals Filing for Bankruptcy* (Official Form 107)?**

- [x] No
- [ ] Yes

**Did you pay or agree to pay someone who is not an attorney to help you fill out bankruptcy forms?**

- [x] No
- [ ] Yes. Name of Person ______. Attach the *Bankruptcy Petition Preparer's Notice, Declaration, and Signature* (Official Form 119).

Software Copyright (c) 1996-2022 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

**Ho Wan Kwok**
**Chapter 11; Case No. 22-50073 (JAM)**
**Statement of Financial Affairs- (Question # 6 - During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $600 or more)**

| Creditor Name | Address1 | Address2 | Address3 | City | State | Zip | Dates of Payment Date | Amount | Total Amount Paid | Amount You Still Owe | Reason for Payment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Andrew Sulner/Forensic Document Examinations, LLC | 220 East 57th Street | Suite 200 | | New York | NY | 10022 | 12/20/21 | $ 52,566.25 | $ 52,566.25 | Unknown | Other- Professional Services |
| Baker Hostetler LLP | 45 Rockefeller Plaza | | | New York | NY | 10111 | 12/27/21 | $ 275,000.00 | $ 275,000.00 | $452,294.38 | Other- Professional Services |
| Clayman & Rosenberg LLP | | | | | | | 12/16/21 | $ 116,454.73 | | | |
| Clayman & Rosenberg LLP | | | | | | | 01/11/22 | $ 40,172.34 | | | |
| Clayman & Rosenberg LLP | 305 Madison Avenue | Suite 650 | | New York | NY | 10165 | 02/16/22 | $ 89,508.91 | $ 246,135.98 | $13,899.04 | Other- Professional Services |
| Counsel Press Inc. | 460 West 34th Street | 4th Floor | | New York | NY | 10001 | 01/19/22 | $ 36,729.37 | $ 36,729.37 | Unknown | Other- Professional Services |
| Eric Goldsmith MD, LLC | 420 Madison Avenue | Suite 1201 | | New York | NY | 10017 | 02/09/22 | $ 11,700.00 | $ 11,700.00 | Unknown | Other- Professional Services |
| Forbes Hare | | | | | | | 12/10/21 | $ 27,032.01 | | | |
| Forbes Hare | Qwomar Building, PO Box 4649 | Road Town Tortola VG1110 | British Virgin Islands | | | | 01/28/22 | $ 14,577.01 | $ 41,609.02 | Unknown | Other- Professional Services |
| Ganfer Shore Leeds & Zauderer LLP | | | | | | | 12/07/21 | $ 20,350.18 | | | |
| Ganfer Shore Leeds & Zauderer LLP | | | | | | | 12/31/21 | $ 22,753.02 | | | |
| Ganfer Shore Leeds & Zauderer LLP | 360 Lexington Avenue | | | New York | NY | 10017 | 02/09/22 | $ 14,119.22 | $ 57,222.42 | $60,133.05 | Other- Professional Services |
| Harcus Parker | 7th Floor, Melbourne House | 44-46 Aldwych | London, WC2B 4LL | | | | 02/09/22 | $ 109,780.43 | $ 109,780.43 | Unknown | Other- Professional Services |
| Janover LLC | 100 Quentin Roosevelt Blvd | Suite 516 | | Garden City | NY | 11530 | 12/10/21 | $ 29,164.95 | $ 29,164.95 | Unknown | Other- Professional Services |
| Lawall & Mitchell, LLC | | | | | | | 11/29/21 | $ 1,720.00 | | | |
| Lawall & Mitchell, LLC | 55 Madison Avenue | 4th Floor | | Morristown | NJ | 07960 | 1/18/22 | $ 2,160.00 | $ 3,880.00 | $4,880.00 | Other- Professional Services |
| Petrillo Klein & Boxer LLP | | | | | | | 12/17/21 | $ 65,848.00 | | | |
| Petrillo Klein & Boxer LLP | | | | | | | 01/26/22 | $ 44,490.50 | | | |
| Petrillo Klein & Boxer LLP | 655 Third Avenue | 22nd Floor | | New York | NY | 10017 | 02/03/22 | $ 17,581.00 | $ 127,919.50 | $10,634.50 | Other- Professional Services |
| Roy D. Simon | | | | | | | 01/12/22 | $ 48,708.00 | | | |
| Roy D. Simon | 205 West End Avenue | Suite 8N | | New York | NY | 10023 | 01/16/22 | $ 9,523.20 | $ 58,231.20 | Unknown | Other- Professional Services |
| Schulman Bhattacharya, LLC | | | | | | | 11/17/21 | $ 114,515.42 | | | |
| Schulman Bhattacharya, LLC | | | | | | | 11/19/21 | $ 94,033.12 | | | |
| Schulman Bhattacharya, LLC | | | | | | | 12/20/21 | $ 135,632.31 | | | |
| Schulman Bhattacharya, LLC | 6116 Executive Boulevard | Suite 425 | | Bethesda | MD | 20852 | 02/09/22 | $ 256,061.00 | $ 600,241.85 | $173,987.48 | Other- Professional Services |
| Selas Montbrial Avocats | 10, Rue Cimarosa | 75116 | Paris- France | | | | 02/16/22 | $ 20,318.21 | $ 20,318.21 | $9,120.87 | Other- Professional Services |
| The Casper Firm | | | | | | | 11/17/21 | $ 77,934.00 | | | |
| The Casper Firm | | | | | | | 12/21/21 | $ 141,197.55 | | | |
| The Casper Firm | | | | | | | 01/26/22 | $ 125,663.00 | | | |
| The Casper Firm | 400 E. Pratt Street | Suite 903 | | Baltimore, | MD | 21202 | 02/09/22 | $ 28,013.00 | $ 372,807.55 | Unknown | Other- Professional Services |
| The Francis Firm PLLC | | | | | | | 12/7/21 | $ 10,000.00 | | | |
| The Francis Firm PLLC | | | | | | | 1/11/22 | $ 10,000.00 | | | |
| The Francis Firm PLLC | 33 W 60th Street | Floor 2 | | New York | NY | 10023 | 2/7/22 | $ 10,000.00 | $ 30,000.00 | $2,500.00 | Other- Professional Services |
| U.S. Legal Support, Inc. | | | | | | | 01/12/22 | $ 1,028.75 | | | |
| U.S. Legal Support, Inc. | 200 West Jackson | Suite 600 | | Chicago | IL | 60606 | 02/03/22 | $ 2,034.03 | $ 3,062.78 | $1,638.00 | Other- Professional Services |
| Una Manyee Wilkinson | | | | | | | 12/01/21 | $ 600.00 | | | |
| Una Manyee Wilkinson | | | | | | | 01/12/22 | $ 1,200.00 | | | |
| Una Manyee Wilkinson | 68-18 Juno Street | | | Forest Hills | NY | 11375 | 02/03/22 | $ 1,600.00 | $ 3,400.00 | Unknown | Other- Professional Services |
| Veritext | | | | | | | 12/10/21 | $ 943.00 | | | |
| Veritext | 290 West Mt. Pleasant Ave. | Suite 3200 | | Livingston | NJ | 07039 | 01/12/22 | $ 13,967.00 | $ 14,910.00 | Unknown | Other- Professional Services |
| VX Cerda & Associates | 601 Brickell Key Drive | Suite 700 | | Miami | FL | 33131 | 12/22/21 | $ 3,055.33 | $ 3,055.33 | $3,124.99 | Other- Professional Services |
| William Bradley Wendel | 123 Burleigh Drive | | | Ithaca | NY | 14850 | 01/12/22 | $ 9,503.33 | $ 9,503.33 | Unknown | Other- Professional Services |
| | | | | | | | | | $ 2,054,671.92 | $732,212.31 | |

**Ho Wan Kwok**
**Chapter 11; Case No. 22-50073 (JAM)**
**Statement of Financial Affairs - Question # 9 (Within 1 year before you filed for bankruptcy, were you a party in any lawsuit, court action, or administrative proceeding?)**

| Case Name | Case No. | Nature of Case | Jurisdiction | Court Address | Status |
|---|---|---|---|---|---|
| Pacific Alliance Asia Opportunity Fund L.P. v. Kwok Ho Wan (and other a/k/a names), Genever Holdings Corporation, and Genever Holdings LLC | 652077/2017 | Breach of Contract | NY Sup. | New York County Courthouse<br>60 Centre Street<br>New York, NY 10007 | Active |
| Pacific Alliance Asia Opportunity Fund L.P. v. Genever Holdings Corp., Bravo Luck Ltd., Kwok Ho Wan (and other a/k/a names), and Qiang Guo (and other a/k/a names) | BVIHCM 0137 of 2020 | Collection | Eastern Caribbean Sup. Ct, Virgin Islands, High Court of Justice | | Active |
| Rui Ma v. Guo Wengui a/k/a Miles Kwok and Golden Spring (New York) Ltd | 158140/2017 | Tort | NY Sup. | New York County Courthouse<br>60 Centre Street<br>New York, NY 10007 | Active |
| Guo Wengui (a/k/a Miles Kwok) v. Clark Hill PLC and Thomas Ragland | 1:19-cv-3195-JEB | Tort/Breach of Contract | D.D.C. | 333 Constitution Avenue N.W.<br>Washington D.C. 20001 | Active |
| Kwok Ho Wan, Ace Decade Holdings Limited, and Dawn State Limited v. UBS AG (London Branch) | CL-2020-000345 | Negligence | High Court of Justice, Business and Property Courts of England and Wales, Queen's Bench Division, Commercial Court | | Active |
| Ace Decade Holdings Limited and Kwok Ho Wan v. UBS AG | CL-2020-000345 | Negligence | Civil Court Basel-City, Conciliation Authority | | Active |
| Zheng Wu (a/k/a Bruno Wu) and Yang Lan v. Guo Wengui (a/k/a Miles Kwok) | 152123/2018 | Tort (Defamation) | NY Sup. | New York County Courthouse<br>60 Centre Street<br>New York, NY 10007 | Active |
| Weican ("Watson") Meng and Boxun, Inc. v. Guo Wengui (a/k/a Miles Kwok) | 159636/2017 | Tort (Defamation) | NY Sup. | New York County Courthouse<br>60 Centre Street<br>New York, NY 10007 | Active |
| Xiqui ("Bob") Fu v. Guo Wengui (and other a/k/a names), GTV Media Group, Inc., Saraca Media Group, Inc., Voice of Guo Media, Inc., Lihong Wei Lafrenz (a/k/a Sara Wei), and Dongna Fang | MO:20-CV-257-DC | Tort (Defamation) | W.D. Tex | U.S. District Clerk's Office<br>200 East Wall, Room 222<br>Midland, Texas 79701 | Active |
| Wengui Guo (a/k/a Miles Kwok) v. Jun Chen (a/k/a Jonathan Ho) | No. 18-CV-03800 (MCA)(MAH) | Tort (Defamation) | NJ Dist. | Martin Luther King Building<br>& U.S. Courthouse<br>50 Walnut Street<br>Newark, NJ 07102 | Active |

Ho Wan Kwok
Chapter 11; Case No. 22-50073 (JAM)
Statement of Financial Affairs - Question # 9 (Within 1 year before you filed for bankruptcy, were you a party in any lawsuit, court action, or administrative proceeding?)

| Case Name | Case No. | Nature of Case | Jurisdiction | Court Address | Status |
|---|---|---|---|---|---|
| Samuel Dan Nunberg v. Guo Wengui (a/k/a Miles Kwok) | 150141/2020 | Tort (Defamation) | NY Sup. | New York County Courthouse 60 Centre Street New York, NY 10007 | Active |
| Logan Cheng (f/k/a Shuiyan Cheng) v. Guo Wengui | 1:20-cv-05678-KPF | Anti-SLAPP | SDNY | Thurgood Marshall United States Courthouse 40 Foley Square New York, NY 10007 | Active |
| Liehong Zhuang and Xiao Yan Zhu v. Wengui Guo (and other a/k/a names), Saraca Media Group Inc., ABC Company 1-10, John Doe 1-10 | 654999/2020 | Tort/Breach of Contract | NY Sup. | New York County Courthouse 60 Centre Street New York, NY 10007 | Active |
| Jonathan Young v. Guo Wengui (a/k/a Miles Kwok), Saraca Media Group, Inc., Golden Spring (New York) Ltd, and Rule of Law Foundation III | 154683/2020 | Tort (Defamation) | NY Sup. | New York County Courthouse 60 Centre Street New York, NY 10007 | Active |
| Zhengjun Dong, Wen Lin, Kaixin Hong, and Chenglong Wang v. GTV Media Group, Inc., Saraca Media Group, Inc., and Wengui Guo | 652190/2021 | Putative Class Action (Securities) | NY Sup. | New York County Courthouse 60 Centre Street New York, NY 10007 | Active |
| Rong Zhang, Xiaodan Wang, and Chong Shen Raphanella v. Voice of Guo Media, Inc., GTV Media Group, Inc., Saraca Media Group Inc., Rule of Law Foundation III, Inc., Rule of Law Society IV Inc., Sara Wei (a/k/a Lihong Wei Lafrenz), and Wengui Guo (and other a/k/a names) | CV-21-01079-PHX-SMB | Putative Class Action (Securities; Tort) | AZ Dist. | Sandra Day O'Connor United States Courthouse 401 W. Washington St., Suite 130, SPC 1 Phoenix, AZ 85003-2118 | Active |
| Haihong Wang v. GTV Media Group, Inc., Saraca Media Group, Inc., and Wengui Guo | 3:21-cv-00359-VLB | Securities | D. Conn. | ABRAHAM RIBICOFF FEDERAL BUILDING United States Courthouse 450 Main Street – Room 725 Hartford, Connecticut 06103 | Active |
| June Shi v. GTV Media Group, Inc., Saraca Media Group, Inc., and Wengui Guo | 21-CV-1408 | Securities; Tort | N.D. Ill. | Everett McKinley Dirksen United States Courthouse 219 South Dearborn Street Chicago, IL 60604 | Active |
| Jianhu Yi and Quiju Jia v. GTV Media Group, Inc., Saraca Media Group, Inc., and Wengui Guo | 1:21 Civ 02669 (VM) | Securities | SDNY | Thurgood Marshall United States Courthouse 40 Foley Square New York, NY 10007 | Active |
| Weiguo Sun, Linda He Cheung, Jia Li Wang, Jiamei Lu, Jun Liu, Moa-Fu, Weng, Ruquin Wang, Teli Chen, Weixiang Ge, Shuang Wang, Xingyu Yan, Yan Gao, Yi Li, and Ying Liu. v. GTV Media Group, Inc., Saraca Media Group, Inc., Wengui Guo (a/k/a Ho Wan Kwok), Voice Guo Media, Inc. [sic], and Lihong Wei Lafrenz (and other a/k/a names) | 1:21-cv-04529 | Securities; Tort | SDNY | Thurgood Marshall United States Courthouse 40 Foley Square New York, NY 10007 | Active |

Ho Wan Kwok

Chapter 11; Case No. 22-50073 (JAM)

Statement of Financial Affairs - Question # 9 (Within 1 year before you filed for bankruptcy, were you a party in any lawsuit, court action, or administrative proceeding?)

| Case Name | Case No. | Nature of Case | Jurisdiction | Court Address | Status |
|---|---|---|---|---|---|
| Keyi Zilkie, Huizhen Wang, Chao-Chih Chiu, and Yunxia Wu v. GTV Media Group, Inc., Saraca Media Group, Inc., and Wengui Guo | 652843/2021 | Securities; Tort | NY Sup. | New York County Courthouse<br>60 Centre Street<br>New York, NY 10007 | Active |
| Wengui Guo (a/k/a Miles Kwok) v. Yeliang Xia | 1:18-CV-00174-LO-TCB | Tort (Defamation) | E.D. Va. | Albert V. Bryan U.S. Courthouse<br>401 Courthouse Square<br>Alexandria, VA 22314 | Active |
| Guo v. Hong Zeng | 157025/2020 | Tort (Defamation) | NY Sup. | New York County Courthouse<br>60 Centre Street<br>New York, NY 10007 | Active |
| Guo v. Gao BingChen | VLC-S-S-187450 | Tort (Defamation) | Sup. Court of British Columbia, Vancouver, Canada | | Active |
| Beijing Zhong Xian Wei Ye Stainless Decoration Center, et al. v. Wengui Guo, Beijing Zenith Holdings Co, Beijing Pangu Investment Co., Genever Holdings LLC, and Golden Spring (New York) Ltd. | 653176/2017 | Collection Matter | NY Sup. | New York County Courthouse<br>60 Centre Street<br>New York, NY 10007 | Active |
| The Hong Kong High Court forfeiture proceedings against Guo and numerous individuals & entities | | Asset Seizure | High Court of The Hong Kong Special Administrative Region: Court of First Instance | | Unknown |
| Kwok v. MacDonald | 2019/0048 | | British Virgin Islands | 33 Admin Drive, Wickhams Cay 1, Road Town, Tortola, Virgin Islands (British | Active |
| FAN BINGBING v. GUO WENGUI a/k/a GUO WEN GUI a/k/a GUO WEN-GUI a/k/a GUO HAOYUN a/k/a HAOUN GUO a/k/a WAN GUE HAOYUN a/k/a MILES KWOK a/k/a KWOK HO WAN a/k/a KWOK HO | 156619/2017 | Tort (Defamation) | NY Sup. | New York County Courthouse<br>60 Centre Street<br>New York, NY 10007 | Inactive |
| JIANSHENGXIE and JIEFU ZHENG v. WENGUI GUO a/k/a HAOYUNGUO, a/k/a MILES KWOK, a/k/a HO WANKWOK, a/k/a HO KWOK, a/k/a WEN GUI GWO, a/k/a WAN GUE HAOYUN, a/k/a GUO HAOYUN | 155995/2017 | Tort (Defamation) | NY Sup. | New York County Courthouse<br>60 Centre Street<br>New York, NY 10007 | Inactive |
| WA&HF LLC, RUIZHENG AN V. SARACA MEDIA GROUP, INC. and WENGUI GUO | No. 20-2-12680-2 SEA | Tort/Breach of Contract | WA Sup. Ct | King County Superior Court<br>516 Third Avenue, Room C-203<br>Seattle, WA 98104 | Active (but inactive as to MK) |
| GUO WENGUI a/k/a KWOK HO WAN a/k/a MILES KWOK v. GUO BAOSHENG, YAN ZHAO, and NING YE | 151251/2019 | Tort/Breach of Contract | NY Sup. | New York County Courthouse<br>60 Centre Street<br>New York, NY 10007 | Active |
| KUI CHENG v. G CLUB OPERATIONS LLC and WENGUI GUO A/K/A HO WAN KWOK A/K/A MILES KWOK A/K/A MILES GUO | No. S21-0093J5 | Breach of Contract | Texas small claims court | | Active |

Attachment to SOFA Question # 9

Ho Wan Kwok

Chapter 11; Case No. 22-50073 (JAM)

Statement of Financial Affairs - Question # 9 (Within 1 year before you filed for bankruptcy, were you a party in any lawsuit, court action, or administrative proceeding?)

| Case Name | Case No. | Nature of Case | Jurisdiction | Court Address | Status |
|---|---|---|---|---|---|
| Wengui Guo a/k/a Miles Kwok v. Danyu Lin | No. 2018-CP-03623 | Tort (Defamation) | South Carolina state court | Matthew J. Perry, Jr. U.S. Courthouse 901 Richland Street Columbia, South Carolina 29201 | Resolved within 1 year of bankruptcy filing. |
| Yan Huang v. Wengui Guo | No. 156552/2017 | Tort (Defamation) | NY Sup. | New York County Courthouse 60 Centre Street New York, NY 10007 | Resolved within 1 year of bankruptcy filing. |
| WENGUI GUO V. BAOSEHNG GUO | No. 1:18-cv-1064 | Tort (Defamation/Fraud) | ED Va. | Albert V. Bryan U.S. Courthouse 401 Courthouse Square Alexandria, VA 22314 | Resolved within 1 year of bankruptcy filing. |
| BAIQIAO TANG a/k/a TANG BAIQIAO and JING GENG v. WENGUI GUO a/k/a MILES KWOK a/k/a GUO WEN GUI a/k/a HO WAN KWOK, GOLDEN SPRING (NEW YORK) LTD., RULE OF LAW FOUNDATION III INC., RULE OF LAW SOCIETY IV INC., SARACA MEDIA GROUP, INC. | No. 1:17-cv-09031-JFK | Tort (Defamation/Commercial) | SDNY | Thurgood Marshall United States Courthouse 40 Foley Square New York, NY 10007 | Resolved within 1 year of bankruptcy filing. |

# EXHIBIT 2

CASE NO. 22-50073

IN RE: Ho Wan Kwok

VS.

Debtor EXHIBIT 2

DATE IDEN.

DATE 8/4/2022 Admitted in Full EVID.

BY P.E.

Deputy Clerk

AO 386-A

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Ho Wan Kwok, | Case No. 22-50073 (JAM) |
| Debtor. | |

**DECLARATION OF MR. HO WAN KWOK IN SUPPORT**
**OF THE CHAPTER 11 CASE AND CERTAIN MOTIONS**

I, Ho Wan Kwok, being duly sworn, depose and say:

1. On February 15, 2022, I commenced the above-captioned Chapter 11 case. I am over the age of 18 and competent to testify.

2. I submit this Declaration to provide the Bankruptcy Court and all parties-in-interest background information about me and a description of the circumstances leading up to the commencement of my Chapter 11 case. I go into some length in this Declaration to provide context for the nature of the claims against me, my unique financial circumstances, and the reasons I commenced this Chapter 11 case.

3. As discussed more fully below, I filed this Chapter 11 case to: (a) create a single forum to orderly address the various competing claims asserted against me; (b) afford stakeholders an efficient opportunity to investigate my assets, liabilities, and financial affairs, given what I perceive to be misunderstandings in that regard; (c) establish what assets are estate property and, in turn, available for distribution to holders of allowed claims; and, hopefully (d) reach consensus

with my creditors on a fair and equitable resolution of claims and distribution of assets pursuant to a Chapter 11 plan.

4.          In filing this Chapter 11 case and preparing this Declaration, I am cognizant that the Court may have concerns over Justice Ostrager's February 9 Contempt Order (defined below), adverse statements made about me by PAX (also defined below), and perhaps even the political views that I have expressed publicly.  There are, of course, two or more sides to every story, and this Declaration will offer my views.  For reasons that will become clear, I live in continuous fear of retribution by the Chinese Communist Party (the "CCP") for my outspoken criticism of its corruption and human rights abuses.  Over the years, I have endured relentless attacks through meritless litigation in the United States court system funded by the CCP and its proxies and agents. My Chapter 11 case can only address the financial harm the CCP seeks to exact upon me and my family.   But, the CCP wants to cause me far more than just financial harm and public embarrassment.  I believe the CCP would have me assassinated at the earliest possible opportunity if imprisoned, extradited, or if my family could no longer provide me with physical security.  I do not suggest that the Court or any party-in-interest now accept my views about the underlying case facts.  To the contrary, this Chapter 11 case is expected to be sufficiently funded by an *unsecured* post-petition loan *with repayment priority below all prepetition creditors* – to allow a fair investigation and stakeholders to present whatever admissible evidence they deem appropriate, as part of the typical Chapter 11 process.  This bankruptcy is, in other words, intended to allow a reasoned vetting of all pertinent demonstrable case facts, without prejudicing any creditor's economic rights – except to the extent that any unsecured creditor hoped to jump ahead in payment priority via a "race to the courthouse" which would be necessarily unfair to some.

5. This Declaration is in two parts. Part I provides background information about me, including a summary description of my assets and liabilities. Part II provides testimonial support for certain motions.

## PART I – BACKGROUND

### I. My Background

6. I was born in Shandong Province, China. I currently reside in Greenwich, Connecticut, at 373 Taconic Road, with my wife of 37 years, Hing Chi Ngok. We moved from an apartment at the Sherry-Netherland in New York to the current address in Connecticut in March 2020. My wife and I have two adult children. My son's name is Qiang Guo and he lives in London. My daughter's name is Mei Guo and she splits her time between New York City and Connecticut.

7. My family and I grew up poor. My seven brothers and I worked hard and combined our earnings – mine from a radio repair shop and my brothers' from their own small businesses – to invest in real estate development. Following the pro-democracy Tiananmen Square protests in 1989, I spent approximately twenty months in jail, where I was tortured, for providing financial support to student protestors. I was in my early twenties at the time of my arrest. At the same time, I witnessed the brutality of two policemen – agents of the CCP – as they shot my younger brother and left him to die. The murder of my brother, and my arrest and torture in prison affected me profoundly. While in jail, I developed many meaningful personal connections with other prisoners of conscience who had similarly been jailed for supporting the Tiananmen Square pro-democracy movement. We shared the same passion for pursuing freedom in China and I continued to maintain these relationships after my release from prison in 1991.

8.     In or around 1991, the Chinese government began to loosen certain rules governing society, including rules enabling private citizens to start to achieve a sort of "quasi-private" ownership of real property in China.  While my extended family benefitted from this change, I personally could not due to my prior politically motivated arrest and detention.  Any assets in China listed under my name would likely have been seized by the CCP.  My extended family used the wealth it amassed to support me, which has continued to this day.

9.     My extended family began working with Yuda Property Company ("Yuda"), a company focused on commercial real estate development in the Henan Province of China.  Together, the Guo family and Yuda developed the Henan Yuda Hotel and, thereafter, the Yuda International Trade Center in Henan Province's capital city of Zhengzhou.  These were successful ventures that allowed the Guo family to start amassing significant wealth.  My family then developed other properties in China, including the Pangu Plaza – a 7-star hotel, convention center, and residential apartment complex in Beijing.  Americans may recognize the Pangu Plaza as the primary backdrop to the 2008 and 2022 Olympics in Beijing.

10.     The Guo family's fortune continued to grow through diversification, as it invested in finance, technology, and other business sectors.  My son, in particular, played a key role in expanding the family's wealth by establishing and managing investment opportunities, including the introduction of global luxury brands to China and Hong Kong.  My son is, as a result, an independent, successful, and wealthy entrepreneur in his own right.

11.     I left mainland China for Hong Kong in or around 2000, and became a Hong Kong citizen.  While the extended family was continuing to accumulate great wealth in China, under Chinese law, as a citizen of Hong Kong, I could neither keep my Chinese citizenship, nor would I have been permitted to own assets in China.

12. My extended family's financial success did not go unnoticed by the CCP. In 2002, my extended family acquired large tracts of land in Beijing, which became significantly more valuable when China was named the host country for the 2008 Olympics. CCP officials attempted to appropriate this land for their own personal benefit, and I reported the attempted seizure to higher-up government officials. After a lengthy fight, the land was recovered, enabling the development of the Pangu Plaza.

13. In or around 2015, I began to more publicly criticize and expose the CCP's corruption, and the CCP retaliated against me as a result. On January 10, 2015, Wu Zheng (a/k/a "Bruno Wu") advised me that my brothers, my wife, and my daughter had all been arrested in China. Brunu Wu is closely associated with top CCP officials and is a registered foreign agent of the CCP; his media companies partnered with Pacific Alliance Group ("PAG") – the parent company of Pacific Alliance Asia Opportunity Fund ("PAX") – on the attempted purchase of a significant Hollywood studio;[1] and he is personally bankrolling (on behalf of the CCP) the litigation efforts of numerous plaintiffs against me. In early 2015, Brunu Wu, speaking on behalf of senior members of the CCP, called me to relay that my family would be released if I stopped publicly exposing CCP corruption and threatened that, if I did not comply, INTERPOL "Red Notices" would be issued for both me and my son and that I would be killed. I rejected the CCP's attempt, through Brunu Wu, to silence me and continued to speak out against the CCP.

14. In 2017, I significantly increased my anti-CCP campaign by using social media and U.S.-based news outlets as platforms to expose the corruption of certain high-level CCP officials.

---

1 Nancy Tartaglione, *Chinese Create $800M Fund To Invest In Global, Local Entertainment*, Deadline, February 6, 2012 (https://deadline.com/2012/02/chinese-create-800m-fund-to-invest-in-entertainment-companies-report-226260/).

My public statements exposing the corruption of the CCP received widespread coverage, in the United States and abroad. In addition to using social media to more readily and pervasively expose CCP corruption, I also provided information to U.S. authorities regarding CCP officials and their crimes. Out of fear for my life, I filed for political asylum protection in the United States in September 2017, and my asylum application remains pending.

15. In retaliation for my whistleblowing, the CCP unleashed a multifaceted campaign to try to gain leverage over, discredit,[2] threaten, and silence me.[3] Those actions, described below, ultimately have driven me into this bankruptcy case. For example, on April 19, 2017, I was scheduled to do an interview with Voice of America ("VOA") during which I planned to expose

---

[2] Stanford University and the Hoover Institute, the NGO Australian Strategic Policy Institute (ASPI), and Alphabet's Google have all separately reported that I have been a primary target of the CCP in its global social media disinformation campaign, driven by CCP agents and thousands of China's state-controlled websites and social media accounts. *See* Carly Miller, Vanessa Molter, Isabella Garca-Camargo, Rene DiResta, David Thiel and Alex Zaheer, *Sockpuppets Spin COVID Yarns: An Analysis of PRC-Attributed June 2020 Twitter takedown, Stanford Internet Observatory*, June 17, 2020 (https://stanford.app.box.com/v/sio-twitter-prc-june-2020); Dr. Jake Wallis, Tom Uren, and Elise Thomas, *Tweeting through the great firewall: Preliminary Analysis of PRC-linked information operations against the Hong Kong protests*, October 2019 (http://ad-aspi.s3.ap-southeast-2.amazonaws.com/2019-12/Tweeting%20through%20the%20great%20fire%20wall.pdf?VersionId=TRGkGXh8FPY5KXLSc_4SfDUy7sMfNkw0) (indicating that the CCP's disinformation campaign against me began in April 2017); Dr. Jake Wallis, Tom Uren, Elise Thomas, Albert Zhang, Dr. Samantha Hoffman, Lin Li, Alex Pascoe and Danielle Cave, *Retweeting through the great firewall: A persistent and undeterred threat actor*, June 2020 (http://ad-aspi.s3.ap-southeast-2.amazonaws.com/2020-06/Retweeting%20through%20the%20great%20firewall_1.pdf?VersionId=ZzW5dlyqlOOgG5m9oHj9DWsjgtXD6TCA) (presenting data reflecting "a persistent, large-scale influence campaign linked to Chinese state actors on Twitter and Facebook . . . [which] largely targeted Chinese-speaking audiences outside of the Chinese mainland (where Twitter is blocked) . . . with the intention of influencing perceptions on . . . Guo Wengui"); Joseph Menn, *Pro-China social media campaign hits new countries, blames U.S. for COVID*, Reuters, September 9, 2021 (https://www.reuters.com/world/pro-china-social-media-campaign-expands-new-countries-blames-us-covid-2021-09-08/) (reporting that security experts at FireEye and Alphabet's Google have observed a coordinated, misinformation campaign on social media in support of Chinese government interests targeting me). As these independent sources confirm, no person in the world has been the target of more attacks by the CCP's social media warfare.

[3] The abusive tactics employed by the CCP against me, as a Chinese dissident living in the United States, are not unqiue. Recently, federal prosecutors alleged that "[a] Chinese spy hired a private investigator to use violence if necessary to end a candidate's run for Congress, instructing him to 'beat him until he cannot run for election.'" *See* Aruna Viswanatha and Kate O'Keeffe, *Chinese Agent Proposed Violent Means to End Dissident's Congress Run, DOJ Says,* Wall Street Journal, March 16, 2022 (https://www.wsj.com/articles/chinese-agents-charged-with-harassing-dissidents-in-u-s-11647455520?mod=article_inline).

the CCP's ownership interest in HNA Group Co.  The CCP took a number of actions to try to prevent me and VOA from proceeding with the interview.  First, two days before my scheduled VOA interview – and just as Brunu Wu threatened – the CCP had an INTERPOL "Red Notice" based upon fabricated criminal charges issued seeking my arrest and extradition to China.  Second, the CCP threatened retaliation against VOA and its reporters in China if VOA proceeded with my interview, asserting that the interview constituted interference in China's internal affairs.  Third, the day before the interview, PAX (a subsidiary of PAG) filed a meritless lawsuit against me in New York for breach of contract.  I proceeded with the interview, but VOA (succumbing to the pressures of the CCP) ordered it be cut short.

16.     When the CCP's early efforts to silence me failed, it resorted to trying to get me extradited to China, where I would be killed.  An FBI investigation revealed that during the summer of 2017, I was the target of lobbying attempts by the CCP in the United States, utilizing a corrupt government official and a number of prominent individuals, including Macao casino owner Steve Wynn, to directly lobby President Trump and his administration to extradite me to China.[4] The CCP's scheme resulted in the federal indictments and guilty pleas of the former Finance Chairman of the Republican National Committee Elliot Broidy (who has since, like Brunu Wu,

---

[4]    *See* Aruna Viswanatha, *Steve Wynn May Face Justice Department Action for Role in China's Push to Expel Businessman*, Wall Street Journal, May 26, 2021 (https://www.wsj.com/articles/justice-department-wants-casino-mogul-steve-wynn-to-register-as-foreign-lobbyist-11622054103).

funded litigation for other parties against me),[5] lobbyist Nicki Lum Davis,[6] and former DOJ official George Higginbotham,[7] all of whom admittedly took payments in exchange for lobbying top U.S. government officials for my extradition. China's campaign included the bribery and corruption of a senior DOJ Headquarters official (George Higginbotham) who was found with almost $75 million in bank accounts that he controlled – making it one of the biggest espionage and corruption scandals in DOJ history. The CCP also targeted me in various other ways starting that same year, including by: hacking the server of the law firm that filed my asylum application in September 2017, extracting my highly sensitive information from that application, and then publicly disseminating it across the internet; bringing and funding (including several through Brunu Wu) numerous spurious litigations against me, some of which remain active today; and detaining, torturing, and imprisoning many of my family members and former colleagues.

5 United States Department of Justice Press Release: Elliott Broidy Pleads Guilty for Back-Channel Lobbying Campaign to Drop 1MDB Investigation and Remove a Chinese Foreign National, October 20, 2020 (https://www.justice.gov/opa/pr/elliott-broidy-pleads-guilty-back-channel-lobbying-campaign-drop-1mdb-investigation-and) (stating that "Broidy also agreed to lobby the Administration and DOJ on behalf of Foreign National A and People's Republic of China (PRC) Minister A, to arrange for the removal and return of PRC National A – a dissident of the PRC living in the United States"; I am "PRC National A"). A copy of the "Criminal Information" as to Elliott Broidy is attached hereto as Exhibit A.

6 United States Department of Justice Press Release: Hawaii Businesswoman Pleads Guilty to Facilitating Back-Channel Lobbying Campaign to Drop 1MDB Investigation and Remove a Foreign National to China, August 31, 2020 (https://www.justice.gov/opa/pr/hawaii-businesswoman-pleads-guilty-facilitating-back-channel-lobbying-campaign-drop-1mdb) (stating that "Lum Davis and others also agreed to lobby the Administration and Justice Department on behalf of Foreign National A and People's Republic of China (PRC) Minister A, to arrange for the removal and return of PRC National A — a dissident of the PRC living in the United States"; I am "PRC National A"). A copy of the "Criminal Information" as to Nicki Lum Davis is attached hereto as Exhibit B.

7 United States Department of Justice Press Release: Former Justice Department Employee Pleads Guilty to Conspiracy to Deceive U.S. Banks about Millions of Dollars in Foreign Lobbying Funds, November 30, 2018 (https://www.justice.gov/opa/pr/former-justice-department-employee-pleads-guilty-conspiracy-deceive-us-banks-about-millions) (stating that "Higginbotham further admitted that another purpose of the lobbying campaign was an attempt to persuade high-level U.S. government officials to have a separate foreign national, who was residing in the United States on a temporary visa at the time, removed from the United States and sent back to his country of origin"; I am that "separate foreign national"). A copy of the "Factual Basis for Plea" as to George Higginbotham is attached hereto as Exhibit C.

17. Since 2017, the CCP has also frozen and seized family assets and purported assets in China and Hong Kong, making it impossible for me even to maintain a bank account.[8] The CCP has made it its mission to destroy anything I create and to block me from dealing with financial institutions. I spend much of my time serving as an unpaid informal advisor or spokesperson to various entities, including entities that expose the CCP's corruption and human rights abuses. My family, and particularly my son, provides for my needs. Prior to the Petition Date, my son's family office, Golden Spring (New York) Ltd. ("GSNY" or the "Family Office"), purchased, among many other things, my clothing, food, and sundries. I do not have access to a GSNY credit card or to a GSNY bank account. My family retains ownership of nearly everything I use, aside from my clothing and mobile phones. I do not own the Greenwich, Connecticut residence; it is owned by my wife through Greenwich Land, LLC. I hold the interest in the Sherry-Netherland apartment in trust for my son.

18. My family has advanced me loans (some documented, others not) to fund my significant litigation costs which allows me to defend myself against the many suits initiated by, or at the behest of, the CCP. As of the Petition Date, GSNY has extended to me approximately $21 million in loans to pay for my litigation costs. As discussed below and described in my Statement of Financial Affairs (the "SOFA"), I am a defendant and/or claimant in over 30 lawsuits pending in the United States and abroad. It is publicly known that the CCP utilizes its proxies to

---

8 On October 23, 2018, the High Court of the Hong Kong Special Administrative Region, Court of First Instance (the "HK High Court"), entered the *Restraint Order Prohibiting Disposal of Assets In Hong Kong and Elsewhere* (the "HK Restraint Order"), dated October 18, 2018. The HK Restraint Order targeted HK$3.7 million of funds on deposit at the Hongkong and Shanghai Banking Corporation Limited (HSBC Bank) allegedly belonging to me. Billions more of funds and property, including real estate in Hong Kong, of individuals and entities purportedly subject to my "effective control" (according to the HK Restraint Order) were also frozen and/or seized. The HK Restraint Order prohibits all dispositions of assets by the named "respondents" (which includes me). Anyone coming into receipt of my assets following entry of the HK Restraint Order is supposedly in violation of it and is subject to fines and imprisonment.

file lawsuits, even in U.S. courts, to coerce individuals sought for political reasons to return to China.[9] The cost of retaining lawyers, experts, vendors, interpreters, and other professionals in connection with such litigations has been extraordinary.

## II. My Liabilities

19. I have, to the best of my knowledge, reflected the current state of my liabilities in my filed Schedules of Assets and Liabilities (the "Schedules") and SOFA. The Family Office assisted me in preparing these documents, as did Verdolino & Lowey, P.C., an independent financial advisory firm with considerable experience preparing bankruptcy schedules and statements of financial affairs. As reflected in those documents and described further below, I am named as a defendant in 21 lawsuits and owe considerable amounts for litigation costs.

### A. PAX Litigation.

20. PAX, a Hong Kong investment fund – whose parent PAG partnered with CCP agent Brunu Wu's media companies to purchase a Hollywood studio – commenced actions against me in New York and the British Virgin Islands ("BVI"). As I mentioned before, PAX's New York Supreme Court action was filed on April 18, 2017, the day before my VOA interview to expose CCP corruption. PAX's claim principally concerns collection on a disputed debt.

21. In 2008, PAX made a $100 million loan (the "PAX Loan") to a Chinese entity called Spirit Carter. The $100 million loan came in two tranches: (1) a $30 million initial loan secured by a personal guaranty made by me, and (2) a second $70 million dollar loan secured by a 49% interest in the company that owns the land/development that eventually became the Pangu Plaza.

---

[9] *See* Aruna Viswanatha and Kate O'Keeffe, *China's New Tool to Chase Down Fugitives: American Courts*, Wall Street Journal, July 29, 2020 (https://www.wsj.com/articles/china-corruption-president-xi-communist-party-fugitives-california-lawsuits-us-courts-11596032112).

22. In 2009, PAX received repayment of $100 million, acknowledged satisfaction of the loan, and further acknowledged that my obligation under the 2008 personal guaranty had been satisfied. PAX disputes that an "accord and satisfaction" actually occurred, and now asserts claims against me under a subsequent-dated personal guaranty that is a forgery. Prior to showing me this guaranty, my prior litigation counsel submitted it to the court in support of certain motions. When I subsequently learned of the document's existence, I stated that I believe it to be a forgery; but the court ruled that, by its prior submission, I no longer had the ability to challenge its authenticity. Consequently, on September 15, 2020, the court entered summary judgement in PAX's favor, without either allowing me to testify or conducting an evidentiary trial before a jury. The judgment, with interest, amounts to approximately $125 million as of today. I timely appealed this judgment to the New York Appellate Division, and that appeal remains pending.[10]

23. A few weeks later (on October 15, 2020), the Court issued a restraining order respecting my assets (the "NYS Restraining Order"). PAX, in enforcement of the judgment, focused primarily on a yacht named the "Lady May," which is described further below. I do not own the Lady May; it is owned by my daughter. The boat's maintenance has always been paid for by my son. Nevertheless, on March 16, 2021, Justice Ostrager directed *me* to return the boat to New York by May 15, 2021 or face a massive daily fine of $500,000 for every day the boat remained outside the jurisdiction. I did have access to the boat, but I did not have the authority to order it back to New York. The Lady May never returned to New York and, as of earlier this year, the accrued contempt fine exceeded the amount of the judgment that had been entered in PAX's favor and was five or six times the stated value of the yacht. I have no ability to pay this fine.

[10] My Schedules include a potential malpractice claim against my historical litigation counsel.

24. On February 9, 2022, Justice Ostrager issued a *Final Order of Civil Contempt* (the "February 9 Contempt Order") against me. In the February 9 Contempt Order, Justice Ostrager found that I hold a beneficial interest in and control the Lady May and ordered me to pay a $134 million fine to PAX within five business days or risk incarceration for civil contempt. I believe that the February 9 Contempt Order was wrongfully issued against me and have separately appealed this order to the Appellate Division. Regardless, I do not have the means to satisfy the order. I firmly believe the CCP is orchestrating the PAX case. The PAX litigation, so far, has been one of the CCP's few successes in its relentless campaign against me, by exposing me to potential imprisonment[11] and forcing me into bankruptcy.

**B. Securities Litigation.**

25. I am named as a defendant in seven actions related to my promotion of the sale of securities in a company called GTV Media Group, Inc ("GTV") and virtual currency referred to as "G Coin" and "G Dollar." In addition to two putative investor classes, several individual investors have asserted claims against me related to losses they allegedly suffered following their alleged investments. The plaintiffs in these actions generally allege that I participated in a scheme to sell unregistered securities to unsophisticated investors in violation of applicable U.S. securities laws. The complaints, in the aggregate, are seeking more than $100 million in damages from me

[11] On March 1, 2022, PAX filed its *Motion Of Pacific Alliance Asia Opportunity Fund L.P. For Entry Of An Order Confirming The Inapplicability Of The Automatic Stay Or, In The Alternative, Relief From The Automatic Stay Pursuant To Section 362(D)(2) Of The Bankruptcy Code* [Docket No. 57] (the "Lift Stay Motion"). I believe that granting the relief requested by the Lift Stay Motion would cause me significant harm and materially prejudice my estate and its creditors. As indicated by PAX in the Lift Stay Motion, enforcement of the February 9 Contempt Order could result in my imprisonment in New York, which would materially impair my ability to achieve the objectives of this Chapter 11 case. Chiefly, if incarcerated, I will be unable to adequately and appropriately administer my estate, participate in this bankruptcy case, negotiate with creditors, appear and be heard before this Court, consult with and direct counsel, investigate and marshal the assets of the estate, or formulate and negotiate a Chapter 11 plan. Further, I believe that PAX is under the misplaced belief that my family will pay PAX's ransom if I face the risk of incarceration; my family will not.

Case 22-50073 Doc 107 Filed 03/20/22 Entered 03/20/22 15:39:01 Page 13 of 108

and various co-defendants, including GTV and its parent entity Saraca Media Group, Inc. ("Saraca"). I believe that those claims are without merit.[12]

### C. Defamation Claims.

26. Since 2017, I have maintained a very active social media presence and posted content that is critical of the CCP, its agents, and others within its sphere of influence. Against this backdrop, certain people allegedly identified in my social media content have asserted defamation claims against me. As identified in my SOFA, I am currently named as a defendant in several defamation suits, a number of which are being funded by Brunu Wu, an admitted CCP agent and business partner of PAX's parent company. The plaintiffs in these actions have alleged, in aggregate, substantial damages.

### D. Litigation Funding Costs.

27. The costs of my prosecution of claims with monetary relief have been funded through loans provided pursuant to litigation funding agreements (the "Litigation Funding Agreements"). In the instances where I have to defend claims, the Family Office has advanced me loans to cover my litigation costs. In either case, the loan proceeds were directly disbursed to the law firms and service providers retained by me. Through the Petition Date, GSNY has advanced approximately $21 million to me for litigation-related expenses.

28. In the instances in which a Litigation Funding Agreement is in place, GSNY is entitled to a premium if I am ultimately successful in asserting and recovering on my claim and

---

[12] These matters related to a certain settled enforcement proceeding. Specifically, in September 2021, GTV and Saraca entered into publicly announced "no admit/no deny" settlements with the SEC regarding the SEC's contention that the GTV offering ran afoul of Section 506 of the 33 Act (the "SEC Entity Settlements"). *In the Matter of GTV Media Corp., et al.*, Admin. Proc. File, File No. 3-20537 (Sept 13, 2021). A parallel settlement involving GTV and Saraca was also reached with the New York State Office of the Attorney General. Assurance of Continuance No. 21-062, *In the Matter of Investigation by Letitia James, Attorney General of the State of New York, of GTV Media Group, Inc., and Saraca Media Group, Inc., Respondents* (Sept 13, 2021).

has asserted a security interest against certain of my litigation recoveries to secure that repayment and return on investment.

**III. <u>My Assets</u>**

29. I am advised that, upon the commencement of my Chapter 11 case, an estate was formed consisting of all legal or equitable interests that I have in property as of the filing date, wherever located and by whomever held. I am also advised that my estate and all property of my estate is subject to the Court's jurisdiction and oversight. I, of course, accept that.

30. My assets, to the best of my knowledge, are identified in my Schedules. These assets are principally clothing, food, and other minor household goods, along with litigation claims.

31. As noted earlier, my family has long supported me. My family has furnished me with clothing and other sundries. Everything else I have access to – including vehicles, my residences (past and current), furniture, artwork, and electronics (except for my mobile phones) – are owned by my family members. I have use of these assets, with their permission, but I do not have any authority to dispose of any material assets without their permission.

32. I am also a claimant in several cases pending in the United States, the United Kingdom, and Switzerland. The particulars of such litigation are disclosed in my Statements of Financial Affairs. Two pieces of litigation are worthy of note here:

a. **<u>UBS Claims</u>**. Before the Royal Courts of Justice in the United Kingdom, I and certain co-plaintiffs have asserted a claim against UBS AG (London Branch) ("<u>UBS</u>") seeking more than $500 million of damages related to negligent misrepresentation and advice by UBS in connection with my attempt to cause the acquisition of, and acquire certain shares issued by, a Chinese financial institution,

Case 22-50073 Doc 107 Filed 03/30/22 Entered 03/30/22 15:39:01 Page 15 of 108

Haitong, back in 2015. As recently as February 9, 2022, I received a favorable ruling establishing the jurisdiction of my claims over UBS before the courts of the United Kingdom – and not Switzerland, as advocated by UBS. Given that UBS disputed jurisdiction, a parallel litigation had to be brought before the Civil Court of Basel City, Conciliation Authority, in Switzerland, to ensure that the litigation could proceed in the event that jurisdiction was found to be lacking in the United Kingdom (it was not found to be lacking). That action in Switzerland is currently stayed pending the outcome of UBS's appeal to the Court of Appeal in the United Kingdom on this jurisdictional issue.

b. **Clark Hill Claims**. In addition, I have asserted claims against Clark Hill PLC and one of its members, Thomas K. Ragland (together, "Clark Hill"). This lawsuit is currently pending in the United States District Court for the District of Columbia. I am seeking $50 million in compensatory damages, and additional punitive damages, against Clark Hill for breach of its duties of legal representation. Specifically, as a result of Clark Hill's failure to adequately protect the highly sensitive information contained in my asylum application, the CCP hacked Clark Hill's server during September 2017, extracted that highly sensitive information, and then disseminated it across the internet. To make matters worse, Clark Hill succumbed to the CCP hackers' threats and withdrew as my immigration counsel. As a result, I have suffered and continue to suffer harm.

33. Two other assets that I do not own warrant special discussion: (a) the Lady May; and (b) an apartment at the Sherry-Netherland in New York City (the "Apartment").

a. **Lady May**. As mentioned above, I do not own the Lady May, though I did have permission to board and enjoy the vessel. My daughter, through HK International Funds Investments (USA) Limited, LLC, owns and controls the yacht. Despite the state court's findings in the February 9 Contempt Order, it was not within my power to direct the Lady May to stay in, or return to, New York.

b. **Sherry-Netherland Apartment**. Cooperative shares in the Sherry-Netherland apartment are held by Genever Holdings LLC ( "Genever US").[13] The membership interests in Genever US are, in turn, held by Genever Holdings Corporation ("Genever BVI"). I hold all of the equity of Genever BVI. However, pursuant to a Declaration of Trust and Agreement, dated February 17, 2015 (the "Trust Date"), I hold such equity in trust for Bravo Luck Limited (the "Apartment Owner"). My son owns the equity of the Apartment Owner. On or about the Trust Date, the Apartment Owner funded Genever US with the purchase price for the Apartment. These funds came from entities owned or controlled by my son and not from me. It also bears noting that any interest I have in Genever BVI has been ordered, by Justice Ostrager, to be turned over to PAX, provided that such a turnover does not interfere with pending litigation in the British Virgin Islands or the Genever US bankruptcy.

34. As mentioned at the beginning of this Declaration, I believe that Justice Ostrager, PAX, and perhaps others believe I have greater financial wherewithal than is reflected here and in my Schedules and Statements of Financial Affairs. The wealth they believe is mine, however, actually belongs to my son, daughter, wife, and extended family, not me. But, as also noted above,

[13] On October 12, 2020, Genever US filed Chapter 11 in the Southern District of New York (Case No. 20-12411).

Case 22-50073 Doc 107 Filed 03/20/22 Entered 03/20/22 15:39:01 Page 17 of 108

this bankruptcy will allow parties-in-interest to investigate that assertion and present any countervailing evidence. Importantly, and as discussed below, the adversarial process will be funded in such a way as to avoid harm to any creditor's economic interest in the estate.

## III. Proposed DIP Financing

35. As set forth in my Schedules, I do not have resources of my own to fund the expenses of this Chapter 11 case. However, my son has expressed a willingness to fund certain costs of this Chapter 11 case. Specifically, GSNY is proposing to lend the estate $8 million (the "DIP Financing") on the terms set forth in the DIP Financing credit agreement (the "DIP Credit Agreement") attached to the motion to approve the DIP Financing. The DIP Financing will be used to pay for, among other things, the costs of the estate's retained professionals (both mine, and the professionals retained by an official committee of unsecured creditors and/or an examiner, if appointed) and the quarterly fees assessed by the Office of the United States Trustee. Of the $8 million budget, up to $4 million would be made available to fund the work of an Official Creditors Committee and/or Examiner.

36. GSNY is offering to extend this loan on an unsecured basis, with repayment priority subordinated to all allowed general unsecured claims. Stated differently, the DIP Financing is not secured by any assets of the estate, does not require an administrative or priority claim, and will not be repaid from estate assets until all allowed prepetition claims are fully paid. This loan thus costs my creditors nothing and provides a fair opportunity for an investigation into my affairs. I do not believe that any loan provided by another lender would be on superior terms. Accordingly, obtaining this loan is in the best interest of my estate.

37. I will not be given access to any of the borrowed funds. All of the DIP Financing proceeds will be deposited into a segregated deposit account (the "Debtor Account") established

Case 22-50073 Doc 107 Filed 03/30/22 Entered 03/30/22 15:39:01 Page 18 of 108

for the estate's benefit. Craig Jalbert of V&L (as defined below) shall be the sole authorized signatory. Disbursements from the Debtor Account will only be at the direction of V&L, solely to the extent necessary to pay the items set forth in the DIP Budget, and as authorized in the proposed DIP Financing orders, the DIP Financing documents, and other relevant orders of the Court (including orders approving professional fee applications).

38. There is only one "milestone" covenant in the DIP Credit Agreement: Bankruptcy Court final approval of the proposed DIP Financing order within 45 days of the date that the DIP Credit Agreement is approved on an interim basis. *See* DIP Credit Agreement at ¶ 6.01(a). There is only one atypical Event of Default in the DIP Credit Agreement, which is the entry of an order granting PAX relief from the automatic stay to pursue litigation against me outside of this Court. *See* DIP Credit Agreement at ¶ 8.01(e). The only purpose of such litigation would be to seek my incarceration under the February 9 Contempt Order. Obviously, if such relief is granted, then I will not be able to meaningfully direct and participate in an orderly claims resolution and plan process. In such as case, my son – through GSNY – has no interest in continuing to fund the costs of this Chapter 11 case.

## IV. <u>Objectives of My Chapter 11 Case</u>

39. My ultimate objective is to arrive at a fully consensual Chapter 11 plan that finally resolves all issues with my creditors. I hope to achieve this outcome through reasoned and reasonable dialogue, after providing creditors a fair opportunity to conduct diligence and present their views through fiduciary representatives paid for by the DIP Financing. I hope that my creditors will be solely motivated to effect repayment of valid claims, and that they will put aside the use of litigation as a means of restricting my free speech and criticisms of political abuse. I

further hope that, if there is thoughtful creditor engagement, my family will be willing to contribute funding to ensure a fair recovery for creditors under a plan.

40.     My assets, as discussed above, are principally litigation claims and I believe those claims have substantial merit and are valuable (perhaps valuable enough to pay all creditors in full).  But, again, all stakeholders will be given a fair opportunity to investigate them.

41.     I understand that my Chapter 11 case will provide a forum to conclusively determine which other assets potentially comprise my bankruptcy estate.  Certain of my creditors have alleged that I own assets that I believe are owned and controlled by my family members or their affiliated entities. I do not believe that the New York Supreme Court, which issued an order regarding my "beneficial" ownership and control of the Lady May, ever determined that I have actual legal title to the vessel or that it is now an asset of my Chapter 11 estate.  These issues will be presented squarely and fairly to this Court for appropriate resolution.

42.     I have been defending myself against litigation brought by purported creditors for years.  As noted above, GSNY – owned and controlled by my son - has lent me millions to fund my defense costs.  This Chapter 11 case will provide a forum to determine, once and for all, the extent of allowed claims against my estate.  Creditors will be afforded an opportunity to assert claims against my Chapter 11 estate, and the process should yield a fair allocation of whatever assets are in the estate across all equally situated creditors (without, for example, PAX jumping ahead of others in the same creditor class).  I will work with my professionals to achieve an appropriate claims reconciliation process.

43.     In the end, I hope for a rational, value-maximizing plan that frees me of litigation and will help facilitate a "fresh start" under the Bankruptcy Code.

## PART II –BASIS FOR RELIEF REQUESTED BY MOTIONS

44.     I have reviewed each of the following motions and the facts set forth in them are true and correct to the best of my knowledge, information, and belief.

45.     **Motion to Approve DIP Financing**. The DIP Financing is necessary to fund the costs associated with the Chapter 11 case and to provide sufficient runway for me, with the aid of my highly capable and experienced advisors, to negotiate and achieve confirmation of a plan of reorganization.

46.     Given that it was the adversarial and litigious relationship with my creditors, most notably PAX, that drove me to seek chapter 11 relief, I requested, and GSNY agreed, that the DIP Financing would be for the benefit of all estate professionals, without imposing any lien or priority rights that could potentially prejudice the interests of my creditors.  The DIP Financing is offered on an unsecured basis, subordinated to the rights of my prepetition creditors, and without any administrative or other priority repayment rights.  My understanding is that the DIP Loan shall be repaid if and only if all of my other creditors are paid in full.  Given these generous terms, I believe that any attempt to obtain financing from another source on competitive or similar terms would be a waste of estate resources and would be futile.

47.     Also, as set forth above and in my Schedules, I anticipate that the proceeds of recoveries or settlements in litigations in which I am a plaintiff will be used to fund a Chapter 11 plan.  Without access to the DIP Financing, I will be unable to retain and compensate the counsel currently prosecuting actions on my behalf.  Similarly, my liabilities may substantially increase if I am unable to defend, settle, and/or litigate these claims (either within this proceeding or, if stay relief is granted, in other venues).

48.     For these reasons, I believe that the proposed DIP Financing is extended in good faith, does not prejudice any of my creditors' rights or interests, is in the best interests of my estate, and should therefore be approved.

49.     **Application to Retain Stretto, Inc. as Claims and Noticing Agent**. I need a claims and noticing agent to help provide notice to the estate's creditors and parties-in-interest throughout the pendency of the Chapter 11 case. I have chosen Stretto, Inc. ("Stretto") to serve as my claims and noticing agent. Stretto has substantial experience serving as a claims and noticing agent in various chapter 11 cases throughout the United States, including in this District. Stretto has agreed to render consulting services to: (a) serve as the noticing agent to mail notices to the estate's creditors and other parties-in-interest; (b) maintain an electronic platform for filing proofs of claim, plan solicitation, balloting, tabulation of votes, disbursements, and administrative support in preparation of schedules of assets and liabilities and statements of financial affairs; and (c) provide other administrative services, as necessary, with respect to this Chapter 11 case.

50.     **Application to Retain Brown Rudnick LLP as Restructuring Counsel**. I need highly capable and experienced restructuring counsel to advise and help structure my exit from Chapter 11, potentially in the form of a confirmed plan of reorganization.  I have chosen Brown Rudnick LLP ("Brown Rudnick") as my restructuring counsel for the Chapter 11 case.  Brown Rudnick has extensive experience and knowledge in the fields of debtors' and creditors' rights and reorganizations under chapter 11 of the Bankruptcy Code, having represented debtors, official and unofficial committees and other prominent parties in many Chapter 11 cases in this Circuit, this District, and other districts across the country.  Brown Rudnick also has familiarity with my affairs and the legal issues to be contested in the Chapter 11 case, and has agreed to: (a) prepare all necessary motions, responses, answers and other legal papers, including trial preparation as may

be necessary; (b) prepare and take action as necessary for approval of a disclosure statement and confirmation of a plan of reorganization; and (c) perform all other legal services as may be necessary during the pendency of the Chapter 11 case.

51. Prior to the Petition Date, on each of February 14, 2022 and February 15, 2022, Brown Rudnick was paid a retainer of $500,000. The source of the $1 million in retainer payments (the "BR Retainer") was Lamp Capital LLC ("Lamp"), which is a company owned by my son. Lamp loaned me $1 million on an unsecured basis, and I directed Lamp to remit the proceeds of the loan directly to Brown Rudnick. Brown Rudnick applied $51,835.20 in pre-Petition Date fees and disbursements against the BR Retainer, leaving Brown Rudnick with a prepetition BR Retainer Balance of $948,164.80. Going forward, I have asked Brown Rudnick to apply its allowed fees and disbursements against the BR Retainer until the BR Retainer balance is $250,000, after which Brown Rudnick will seek payment of its allowed fees and expenses from me through the proceeds of the DIP Financing.

52. **Application to Retain Verdolino & Lowey, P.C. as Financial Advisor**. I need a financial advisory firm to prepare, review, and analyze the necessary financial disclosures mandated under the Bankruptcy Code and the ongoing monthly and quarterly reporting requirements during the pendency of the Chapter 11 case. I have chosen Verdolino & Lowey, P.C. ("V&L") to serve as my financial advisor. V&L has extensive experiencing working with distressed individual chapter 11 debtors, and provides tailored services, including, but not limited to, financial advisory, consulting, accounting services, tax, and other related services. V&L has agreed to render services regarding: (a) the preparation and review of my SOFA and the Schedules and other periodic reporting requirements; (b) the preparation and/or review of cash flow and related budget projections; (c) maintaining the DIP account, and effectuating disbursements when

necessary and providing accounting of all cash activity; (d) claims review and administration; (e) plan of reorganization formulation and review; (f) the rendering of any necessary litigation support; and (g) the providing of general consulting and assistance with any other matters and tasks that may arise during the pendency of the Chapter 11 case.

53. **Motion to Authorize Employment and Payment of Professionals Utilized in the Ordinary Course**. I am a named plaintiff or named defendant in numerous cases pending at the state and federal levels in the United States, as well as in foreign jurisdictions. In connection with these litigations and certain ongoing government investigations, prepetition, I retained various law firms, accountants, and other non-attorney professionals (together, my "Ordinary Course Professionals"), which rendered services in connection with my prepetition litigation and provided other services in a variety of matters unrelated to this Chapter 11 case. I intend to use the DIP Financing, subject to the Court's approval, to continue employing and compensating these Ordinary Course Professionals because they each have a great deal of knowledge, expertise, and familiarity with my affairs (prepetition) and my pending litigation, much of which has been ongoing for years.

54. Among the reasons I am seeking emergency interim relief for the DIP Financing is to ensure that the professionals representing me continue working. Certain professionals may withdraw from representing me unless I am able to assure them that they will be paid for their prepetition and post-Petition Date work. Such a withdrawal, depending on the status of the case and the services provided by the applicable professional, could cause cause me and my estate clear and irreparable harm. The UBS, Clark Hill, and other pending litigation claims are assets that I anticipate relying on to help formulate and potentially confirm a plan of reorganization. Any disruption to my prosecution of these claims would undoubtedly be value destructive.

55.    In sum, without my Ordinary Course Professionals' knowledge, expertise, and familiarity in connection with their prepetition work, my estate will incur substantial additional and unnecessary expenses in educating and retaining replacement professionals necessary to preserve, and potentially continue prosecuting these valuable litigation claims.    Accordingly, I believe that the continued retention of my Ordinary Course Professionals is in the best interests of this estate, my creditors, and other parties-in-interest.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: March 20, 2022
Greenwich, Connecticut

By: ____________________
Name: Ho Wan Kwok

**EXHIBIT A**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**ELLIOTT BROIDY,**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CRIMINAL NO.**<br><br>**Count 1:** **18 U.S.C. § 371 (Conspiracy)** |

## CRIMINAL INFORMATION

The United States of America charges:

### INTRODUCTION

1. At all times relevant to this Information:

2. From no later than March 2017 to at least in or about January 2018, ELLIOTT BROIDY agreed with Nickie Lum Davis and Person A to act as agents of Foreign National A in exchange for millions of dollars which was not disclosed. BROIDY specifically agreed to lobby the Administration of the President of the United States ("Administration") and the United States Department of Justice ("DOJ") to drop or otherwise favorably resolve its matters against Foreign National A for his role in the embezzlement of billions of dollars from 1Malaysia Development Berhad ("1MDB"), a strategic investment and development company wholly owned by the Government of Malaysia. As part of their efforts, BROIDY, Davis, and Person A willfully failed to disclose to the Administration and DOJ officials that BROIDY was acting on behalf of Foreign National A. Ultimately, BROIDY, Davis, and Person A were unsuccessful in their efforts to have the 1MDB matters dropped or otherwise favorably resolved for Foreign National A.

3. During the same approximate period, BROIDY, Davis, and Person A also agreed to lobby the Administration and DOJ to arrange for the removal and return of People's Republic

of China ("PRC") National A—a citizen of the PRC living in the United States—all on behalf of Foreign National A. This involved, among other things, advocating for meetings between PRC Minister A and United States government officials. Here too, BROIDY, Davis, and Person A were ultimately unsuccessful.

4. To further the interests of Foreign National A, BROIDY, aided by Davis and Person A, attempted to facilitate a meeting between Malaysian Prime Minister A and the President in September 2017, in part to allow Malaysian Prime Minister A to raise the resolution of the 1MDB matter with the President.

5. BROIDY, Davis, and Person A also met with PRC Minister A in the PRC and agreed that BROIDY, assisted by Davis and Person A, would lobby the Administration to return PRC National A to the PRC. BROIDY, Davis, and Person A, for the express purpose of providing PRC Minister A an opportunity to discuss the removal of PRC National A with high-level United States officials, also agreed to and attempted to facilitate meetings between PRC Minister A and top officials in the Administration, at DOJ, and at the United States Department of Homeland Security ("DHS"), during PRC Minister A's visit to the United States in May 2017.

Criminal Prohibitions on Acting as an Agent of a Foreign Principal or Government

6. The Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, was and is a disclosure statute that requires any person acting in the United States as "an agent of a foreign principal" to register with the Attorney General in connection with certain types of activities, such as political or public relations efforts or lobbying on behalf of the foreign principal. Such registrations are made to the National Security Division's Foreign Agents Registration Act Unit ("FARA Unit") within DOJ. It is a crime to knowingly and willfully fail to register, and to make

false and misleading statements or material omissions in documents submitted to the FARA Unit under the law's provisions.

7. The purpose of FARA is to prevent covert influence by foreign principals. Proper registration under the statute allows the United States government and the American people to evaluate the statements and activities of individuals who are serving as agents of foreign principals. Among other things, a FARA registration reveals the identity of the foreign principal on whose behalf a registrant performs services, the type of services the registrant provides the foreign principal, the source and amount of compensation the registrant receives from the foreign principal, and political campaign contributions made by the registrant while the registrant was acting as an agent of the foreign principal.

**RELEVANT PARTIES & ENTITIES**

8. The defendant, ELLIOTT BROIDY, served as Deputy Finance Chair of a national political committee from approximately 2017 to April 2018. BROIDY raised large political contributions from donors, organized political fundraising events, and coordinated fundraising strategies with the campaign of a candidate for the Office of the President of the United States during the 2016 election cycle. In his role as Deputy Finance Chair, BROIDY maintained access to, and contact with, high-ranking officials in the Administration, including the President himself. Over the same period, BROIDY owned and operated several domestic and international businesses.

9. Nickie Mali Lum Davis was and is a United States citizen, businesswoman, and consultant with personal and business relationships with BROIDY and Person A. On August 31, 2020, Davis pleaded guilty in the United States District Court for the District of Hawaii to a one-count Information charging aiding and abetting a violation of FARA.

10. Person A was and is a United States citizen, businessperson, and entertainer with international ties, including ties to Foreign National A.

11. Foreign National A was a wealthy businessperson living in East Asia who has been charged separately for his role in orchestrating and executing a multi-billion-dollar embezzlement scheme from 1MDB.

12. Company A was a limited liability company formed by Person A to receive wire transfers from Foreign National A, and was used by Person A to pay BROIDY, Davis, and others for their lobbying efforts.

13. George Higginbotham was an associate of Person A and was a licensed attorney employed by DOJ. On November 20, 2019, Higginbotham pleaded guilty in the United States District Court for the District of Columbia to a one-count Information charging conspiracy to make false statements to a financial institution.

14. Law Firm A was a law firm operated by Person C and controlled by BROIDY and Person C.

15. PRC National A was a citizen of the PRC, living in the United States on a temporary visa. The government of the PRC, including PRC Minister A and the President of the PRC, were seeking the removal of PRC National A from the United States back to the PRC.

16. In late 2016 through 2019, DOJ was actively investigating transactions of Foreign National A allegedly associated with laundered proceeds of the 1MDB embezzlement scheme. In July 2016, DOJ filed multiple civil forfeiture complaints seeking the forfeiture of millions of dollars in assets allegedly purchased with 1MDB laundered proceeds. On November 1, 2018, DOJ filed a criminal indictment charging Foreign National A and others with conspiring to launder

billions of dollars embezzled from 1MDB and conspiring to violate the Foreign Corrupt Practices Act by paying bribes to various Malaysian and United Arab Emirates ("UAE") officials.

**COUNT ONE**
**18 U.S.C. § 371**
**(Conspiracy to Serve as an Unregistered Agent of a Foreign Principal)**

17. Paragraphs 1 through 16 are realleged and incorporated herein by reference.

18. From no later than March 2017 to at least in or about January 2018, the defendant,

**ELLIOTT BROIDY,**

knowingly conspired with others known and unknown, to:

a. knowingly and willfully act as an agent of a foreign principal, specifically, Foreign National A with respect to the 1MDB matters and the removal of PRC National A, without registering with the Attorney General, in violation of 22 U.S.C. §§ 612 and 618.

**Objects of the Conspiracy**

19. It was an object of the conspiracy for BROIDY, Davis, Person A, and Foreign National A to orchestrate back-channel, unregistered campaigns to lobby the Administration and DOJ to: (1) end the 1MDB matters or otherwise resolve the matters favorably for Foreign National A; and (2) remove PRC National A from the United States and send him back to the PRC.

20. It was an object of the conspiracy for BROIDY, Davis, and Person A to make millions of dollars by leveraging BROIDY's access to and perceived influence with the President and his Administration in order to secure payments from Foreign National A.

21. It was an object of the conspiracy for BROIDY, Davis, and Person A to conceal BROIDY's contacts with and payments from Foreign National A to maintain BROIDY's credibility with United States officials and to further the illegal advocacy scheme.

<u>**Manner and Means of the Conspiracy**</u>

22. The manner and means by which BROIDY and others carried out the conspiracy included, but were not limited to, the following:

<u>International Travel to Meet with Foreign Principals and Government Officials</u>

23. BROIDY, Davis, Person A, and Higginbotham, in various combinations, traveled to Thailand, Malaysia, and the PRC for the purpose of meeting with Foreign National A, PRC Minister A, and others to negotiate and discuss the arrangement by which BROIDY would lobby the Administration and DOJ—outside of official channels—in exchange for millions of dollars.

<u>Meetings and Contacts with United States Officials</u>

24. BROIDY, both directly and through intermediaries, facilitated and attempted to facilitate meetings and other efforts to influence officials at the highest levels of the United States government, including the President and the Attorney General, for the benefit of PRC Minister A and Foreign National A.

25. BROIDY, both directly and through intermediaries, contacted high-level officials in the United States government to arrange meetings for foreign government officials, including PRC Minister A and the Malaysian Prime Minister A, to provide opportunities for these foreign officials to formally request favorable governmental action, including the favorable resolution of the 1MDB matters and the removal of PRC National A.

<u>Concealment</u>

26. BROIDY, Davis, and Person A agreed to conceal BROIDY's agreement to lobby on behalf of Foreign National A, in his individual capacity and as an intermediary for PRC Minister A. BROIDY, Davis, and Person A did not disclose and agreed not to disclose to United States government officials and the public BROIDY's financial arrangement with and payments from

Foreign National A. In extensive contacts, communications, and documents drafted in furtherance of the conspiracy, BROIDY, Davis, Person A, and Higginbotham were secretive and anonymized references to Foreign National A. Further, BROIDY, Davis, and Person A often used encrypted applications when communicating about Foreign National A and PRC National A to conceal their conduct and connection to Foreign National A. Finally, BROIDY, Davis, and Person A agreed, implicitly or explicitly, not to register under FARA to conceal their arrangement with Foreign National A.

## Overt Acts

27. In furtherance of the conspiracy, BROIDY and others committed the following overt acts, among others, in the District of Columbia and elsewhere.

### I. Campaign to Resolve 1MDB Civil Forfeiture Cases

#### A. BROIDY Agrees to Lobby for Foreign National A for $8 Million Retainer

28. In or about March 2017, Person A contacted Davis in an effort to locate someone with close ties to the Administration to help a foreign client. Davis in turn told BROIDY that she had a possible client in Malaysia who could use help with a forfeiture matter.

29. On or about March 7, 2017, Person A requested that Davis send him BROIDY's biography describing BROIDY's relationship with high-level officials in the Administration and photographs of BROIDY and the President. On or about March 7, 2017, BROIDY's assistant, at Davis's request, emailed photographs to Davis featuring BROIDY and the President. Person A said that he wanted the photographs so that Person A could highlight for Foreign National A BROIDY's close access to the Administration.

30.     On or about March 8, 2017, Davis texted BROIDY, "Are you in la to meet on the 16th w [Person A] prior to his travel that weekend to Asia?" BROIDY responded, "I think so. Let's speak later."

31.     On or about March 13, 2017, BROIDY met with Davis and Person A to discuss Foreign National A and 1MDB. At the meeting, Person A described his relationship with Foreign National A to BROIDY, and asked if BROIDY could help with the civil forfeiture cases involving Foreign National A. Person A said he would speak with Foreign National A about the possibility of BROIDY helping with the civil forfeiture cases. That same day, BROIDY texted Davis in part, "I'm excited about our business prospects."

32.     On or about March 13, 2017, Davis forwarded to Person A a "Retainer and Fee Agreement – Litigation Services" between Law Firm A and Foreign National A so that Person A could present the agreement to Foreign National A. The "Retainer and Fee Agreement" stipulated that Foreign National A would pay an $8 million retainer fee upfront, and an additional $75 million success fee if the "matter" was resolved within 180 days, or $50 million if the "matter" was resolved within 365 days. The draft agreement included an Exhibit A explaining that the "matter" referred to the 1MDB forfeiture proceedings. BROIDY, Davis, Person A, Law Firm A, and Person C provided no litigation services or legal advice to Foreign National A. The true purpose of the retention agreement was to secure BROIDY's services to lobby the Administration and DOJ on Foreign National A's behalf based on BROIDY's political connections.

33.     Despite their knowledge of the requirement to register as agents of a foreign principal, at no time did BROIDY, Davis, or Person A register with the FARA Unit regarding their work as agents of Foreign National A.

**B. BROIDY, Person A, and Davis Meet Foreign National A in Bangkok**

34. In or about April 2017, Davis relayed Person A's request for BROIDY to travel to Bangkok, Thailand to meet with Foreign National A. BROIDY told Davis to tell Person A that he would go only if he were paid $1 million, and that he wanted to be paid by Person A from "untainted" funds. BROIDY was assured that Person A would personally pay $1 million in exchange for BROIDY traveling to Bangkok.

35. On or about April 28, 2017, BROIDY texted Davis advising, "I would like the funds to go to [Law Firm A.]" That same day, Davis responded, "Ok[.]"

36. On or about April 29, 2017, BROIDY and Davis exchanged text messages regarding their upcoming meeting with Foreign National A and Person A. Among those text messages, BROIDY asked in reference to Foreign National A, "Does the principal want us in a particular hotel in either location?" Davis responded, "Call me when u can talk[.]"

37. On or about May 1, 2017, Davis emailed BROIDY and his assistant a link to the Shangri-La Hotel in Bangkok, and wrote, in part, "Please send me the hotel confirmation for both Elliott's room and mine once you get it online and I will forward." That same day, Davis separately emailed Person A telling him to book a room at the Shangri-La Hotel and to send her the confirmation. Person A responded, "[Foreign National A] is booking our hotel," and later followed up with, "Also send me Elliott's wire info." Davis replied by providing the wire information for an account in the name of Law Firm A.

38. On or about May 2, 2017, Davis emailed BROIDY stating in part, "Since u land earlier – [Person A] and I will see you at arrivals. . . . Thanks and bon voyage – here's to the start of an exciting and prosperous adventure!"

39. On or about May 2, 2017, BROIDY, Davis, and Person A arrived in Bangkok. During the trip, BROIDY, Davis, and Person A met with Foreign National A in a hotel suite. BROIDY and Foreign National A spoke about the 1MDB matters. BROIDY agreed to help Foreign National A attempt to resolve the matter. Foreign National A agreed to pay BROIDY an $8 million retainer and wanted BROIDY to contact the Attorney General of the United States to get DOJ to drop the 1MDB matter. BROIDY agreed to lobby the Administration and DOJ for a favorable result for Foreign National A while concealing the fact that he was working on Foreign National A's behalf. During the meeting or shortly thereafter, Davis and BROIDY discussed the possibility of assisting in getting PRC National A removed from the United States. With respect to payment, BROIDY stated that the money should not come directly from Foreign National A and should be "clean." Foreign National A identified a friend who could pay BROIDY and others. BROIDY, Person A, and Davis agreed that the money would first be routed through Person A and then be paid to BROIDY through Law Firm A. BROIDY and Davis agreed that BROIDY would pay Davis a percentage of what BROIDY received. Person A also agreed to pay Davis a percentage of the funds that Person A received. Person A told BROIDY and Davis that Person A's friend, Higginbotham, was verifying the legitimacy of the funds. Higginbotham did not actually perform any such review. BROIDY never met or spoke with Higginbotham.

**C. Person A Receives $8.5 Million from Foreign National A; BROIDY is Paid $6 Million; Davis is Paid $1.7 Million**

40. Following the meeting with Foreign National A in Thailand, on or about May 8, 2017, Company A received a wire transfer directed by Foreign National A for approximately $2.8 million from an entity in Hong Kong. That same day, Person A obtained a cashier's check from the Company A account for $702,000 payable to Law Firm A, which was immediately credited to Law Firm A's account. Person A also made a separate wire transfer of $48,000 to Law Firm A

from the Company A account. Also that same day, a third-party company transferred $250,000 to the Law Firm A account at Person A's direction, bringing the total amount deposited into the Law Firm A account to $1 million. Within several days, approximately $900,000 of the $1 million transferred into the Law Firm A account on or about May 8, 2017, was transferred from the Law Firm A account to one of BROIDY's business accounts.

41.    On or about May 8, 2017, Davis texted BROIDY, "Both wires in [Law Firm A] are from [Person A]. The remaining balance was dropped to your office 20 minutes ago -". Davis then added, "702 total cashier check[.]"

42.    On or about May 17, 2017, Foreign National A caused an international wire to be sent to Company A from a Hong Kong company. That same day, Person A transferred $3 million from Company A to Law Firm A. On or about May 18, 2017, Law Firm A transferred $600,000 to one of BROIDY's business accounts and $900,000 to an account for a business entity associated with Davis. On or about May 18, 2017, Law Firm A transferred $500,000 to one of BROIDY's business accounts. Within approximately one week, Law Firm A transferred an additional $950,000 in two separate transfers to one of BROIDY's business accounts.

43.    On or about May 17, 2017, BROIDY and Davis exchanged text messages regarding the payments from Foreign National A to BROIDY through Person A and BROIDY's payment of a percentage to Davis. Among the text messages, Davis asked, "Did you get it?" BROIDY responded, "Yes. Sent you Wickr[.] Sending wire to you in morning." Wickr is a messaging application that allows for end-to-end encryption and content expiration. BROIDY later added, "Did you get 2nd confirm?" Davis responded, "When Asia opens. . . . Baby steps at least moving forward now." BROIDY responded, "Yes. Hammer them for the next 2 wires." BROIDY later

added in part, "Assuming second 3 is in and confirmation that last 2 is being sent. Please ask [BROIDY's assistant]."

44. On or about May 25, 2017, Foreign National A caused a third transfer to be made to Company A, this time in the amount of approximately $2.7 million. On or about May 26, 2017, Person A transferred $2 million from Company A to Law Firm A in partial satisfaction of the $8 million retainer to which BROIDY and Foreign National A agreed in return for BROIDY's assistance with the 1MDB civil forfeiture cases. That same day, $600,000 was transferred from Law Firm A's account to a business account associated with Davis. On or about May 26, 2017, Law Firm A transferred $1 million to an account controlled by Person C. In or about early June 2017, Law Firm A transferred $650,000 to one of BROIDY's business accounts.

**D. BROIDY Facilitates and Attempts to Facilitate Meetings for Malaysian Prime Minister A and Efforts to Resolve the 1MDB Cases**

45. On or about June 5, 2017, BROIDY texted Person D, a political consultant and former campaign aide for the President, and requested that Person D work with the Administration to set up a visit for Malaysian Prime Minister A: "Asian country is very motivated re July meeting. Hoping we can confirm date etc asap." Pursuant to a consulting agreement, BROIDY had agreed to pay Person D $25,000 per month for advice and guidance with respect to navigating the Administration.

46. The same day, BROIDY and Davis exchanged text messages regarding Foreign National A. Among those messages, Davis wrote, "Please call before u go to bed ... [Foreign National A] keeps calling for news[.]" BROIDY responded, "Yes. Will call you. I am heading to D.C. Tonight to work on [Foreign National A] and Asian country[.]"

47. On or about June 15, 2017, at Person A's request, Davis texted BROIDY, "Hey he'd like to speak w you this evening. Are u able?" Davis added, "Principal", which was a reference to Foreign National A. That same day, BROIDY responded, "Yes[.]"

48. On or about June 17, 2017, BROIDY and Davis discussed Malaysian Prime Minister A. In or about June 2017, BROIDY asked the President if he would play golf with Malaysian Prime Minister A. BROIDY and Davis believed that this would please Foreign National A and would allow Malaysian Prime Minister A to attempt to resolve the 1MDB matter. BROIDY also hoped to secure additional business with the government of Malaysian Prime Minister A and hoped that arranging golf with the President would further his business interests.

49. On or about June 19, 2017, Davis texted BROIDY a link to an article about the Malaysian Prime Minister A's office criticizing the 1MDB forfeiture action in the United States.

50. On or about June 29, 2017, BROIDY sent a text message to a high ranking official in the White House in an effort to arrange a golf outing between Malaysian Prime Minister A and the President: "Hi [Person E], As I mentioned, POTUS agreed to play a round of golf in DC or Bedminster in late July or early August with [Malaysian Prime Minister A]. Thank you very much for getting back to me with the date. Also a letter went to the state dept. for a meeting some weeks ago."

51. On or about June 30, 2017, BROIDY sent another text message to Person E regarding the golf outing: "Hope we can speak this morning on [PRC National A] and golf date with POTUS for [Malaysian Prime Minister A]." Later that day, BROIDY followed up with, "[Person E], as discussed, hoping we can get these items completed today. Please call me anytime."

52. On or about July 3, 2017, BROIDY again texted Person E regarding the golf date for Malaysian Prime Minister A and the President: "Good morning [Person E]. It would be extremely helpful to me if you could confirm the golf date today with POTUS for [Malaysian Prime Minister A.] POTUS told me he is glad to play at Bedminster or DC. After we spoke, I mentioned to [Malaysian Prime Minister A] that he would have the date last week. Thank you very much! Regards, Elliott." Later that day, BROIDY texted Person E again: "[Person E], I'm following up. Please send me the date and time for the [Malaysian Prime Minister A] golf with POTUS. Thank you!"

53. On or about July 5, 2017, BROIDY exchanged messages with Person E regarding the golf outing. Among other messages, BROIDY texted, "[Person E], just left you a message. It's been a week. Can you send me the date today? Best, Elliott[.]" Person E responded, "It's with the NSC[.] They coordinate and negotiate – I'm sure it will get done[.]"

54. On or about July 11, 2017, relaying a message from Person A, Davis texted BROIDY, "Wickr[.] It's 5pm ... I think we need to make a move. Date and otherwise. We're getting killed." These messages referred to confirming a date for Malaysian Prime Minister A to play golf with the President and Foreign National A's displeasure because no date had been confirmed. Davis continued, "Please call because we need to strategize – I'm getting inundated[.]" BROIDY responded, "See wikr[.]" The following day, BROIDY texted Davis, "Send me text on wikr. I'm taking off and need to get to WH[.] Taking off. Need now[.]" Davis responded, "Done[.]" BROIDY responded, "Got it. Thx[.] Trying to get [Person F] to do call asap[.]" Person F was then a high-ranking official on the National Security Council.

55. On or about July 13, 2017, Davis texted BROIDY, "Please call when u can so we can talk- we gotta handle this so pls pls go to D.C. And sit at WH until u get it. I will keep u company if u worry about being lonely!"

56. On or about July 13, 2017, BROIDY texted Person E again regarding the golf date: "Hi [Person E], It's been 2 weeks. Checking again on date for golf for [Malaysian Prime Minister A] with POTUS. Can you text me date today? Thank you. Best, Elliot[.]" Person E responded, "I'll check now again[.] These things go through a process -". BROIDY responded "Thank you!!" Person E replied, "NSC is on it and coordinating[.]" BROIDY responded, "Can we get date today?" Person E replied, "They're working directly with the Malaysians. NSC is coordinating a date."

57. On or about July 15, 2017, BROIDY texted Davis, "Working on getting meetings for tomorrow."

58. On or about July 17, 2017, conveying urgency expressed by Person A on behalf of Foreign National A, Davis texted BROIDY, "[Person E] needs to give u this date now and ask him for update on other thing. We look impotent[.]" This text referred both to setting up a meeting between the President and Malaysian Prime Minister A and to the matter involving PRC National A. BROIDY responded, "Agree. Hammering away[.]"

59. On or about July 18, 2017, BROIDY and Davis exchanged several text messages about setting up a meeting between the President and Malaysian Prime Minister A. Among the messages, Davis wrote, "Can u check Wikr[.] Really really need that date. It's been crazy for me all day w this. He's panicking[.]" Davis followed up with, "This date is mandatory today- we're getting creamed." According to Person A, Foreign National A was panicking because no meeting had yet been scheduled. BROIDY responded, "Calling [Person E] now[.]" Davis replied in part,

Case 22-50073 1:20-cr-00721 Filed 03/20/22 Entered 03/20/22 15:39:21 Page 16 of 143 of 108

"Call everyone so they know u are raging mad[.] Call [Person G] too. We need this today[.]" Person G was an administrative assistant to the President. BROIDY replied, "Doing it now."

60. On or about July 19, 2017, Davis texted BROIDY in reference to scheduling a date for a meeting between Malaysian Prime Minister A and the President, "Secondly we need this date bad[.]" BROIDY responded the following day, "Please bear with me. Getting some info on mtg[.]"

61. On or about July 21, 2017, BROIDY texted Person E regarding the golf outing: "[Person E], The Malaysians have heard nothing from NSC. POTUS said he would play golf with [Malaysian Prime Minister A] in late July or early August. POTUS said he was happy to do it. You said it would be scheduled in a day or two. We're in the 4th week. I know you are busy and procedures apply but I've been more than patient. Instead of being positive, this is now causing me damage. I would truly appreciate it if you could get back to me today with a date. Thank you! Elliott."

62. On or about July 24, 2017, BROIDY texted Person D, "Received golf date in NJ in Sept. Sat before the UN General Assembly. Finally! Crossed off my list! Thank you also for helping!" Person D responded, "Let's follow through and make sure the date is confirmed by the NSC. Did he tell you who gave him the date?" BROIDY replied, ""Thank you!! Fantastic. Given to [Person H] by [Person E]."

63. On or about July 27, 2017, BROIDY texted Person D, "Just checked again with Malaysians. Their Amb to US and Foreign Minister have heard nothing. Please check asap. Best, Elliott." BROIDY followed up with, "Hi [Person D]- Can you call NSA for me re Malaysians receiving official word. Still no contact from NSC to Malaysian Amb on meeting. Thank you. Best, Elliott." Person D responded, "E- will call again this morning."

64. On or about July 27, 2017, BROIDY emailed a high-level official from the National Security Council in an attempt to arrange a golf game between Malaysian Prime Minister A and the President.

65. On or about July 29, 2017, Davis texted BROIDY in reference to the meeting between Malaysian Prime Minister A and the President, "They were told 12 sept is mtg. That's day that un general assembly stars- it's a Tuesday???? No golf??" Davis immediately followed by texting "Wickr[.]" BROIDY responded, "May be two mtgs. Amb should ask. Golf at Bedminster on Sat and tues at WH?"

66. On or about August 7, 2017, BROIDY sent his assistant an email with the subject, "Malaysia Talking Points *Final*", which contained the purported talking points of Malaysian Prime Minister A intended for an upcoming meeting between the United States Secretary of State and Malaysian Prime Minister A. Davis had received the talking points from Person A—who provided them on behalf of Foreign National A—and Davis relayed them to BROIDY. The talking points mentioned, among other things, BROIDY's ongoing relationship and work with Malaysia, and identified 1MDB as a "[p]riority[.]" The talking points noted the lack of harm caused by 1MDB, and specified that "[t]he involvement of US prosecutors has caused unnecessary tension American [sic], and could cause a negative reaction among Malaysians[.]".

67. On or about August 7, 2017, BROIDY also sent these talking points to Person D, immediately followed by a message explaining, "Above is attachment from Malaysian PM of his talking points. You can share with [staff assistant who works for the Secretary of State]." BROIDY also sought to obtain details about the timing of a meeting in Malaysia between Malaysian Prime Minister A and the Secretary of State.

68.    Later on or about August 7, 2017, BROIDY messaged Person D, "[Secretary of State] is meeting with [Malaysian Prime Minister A] on 8th and deputy PM on 9th. Let's get a plug in my name. They know my name and might not immediately recognize Circinus name. Thank you!" Person D responded, "Definitely important to make this connect. It will not likely be part of the formal meetings but will work to get a plug during their conversations."

69.    On or about August 9, 2017, Foreign National A caused a Hong Kong company to transfer approximately $12.8 million to Company A. Person A then transferred $3 million to Law Firm A. This was the final payment made to BROIDY. In total, BROIDY was paid $9 million. On or about the next day, Law Firm A transferred $900,000 to a business account associated with Davis. In the ensuing days, Law Firm A transferred hundreds of thousands of dollars to accounts belonging to BROIDY

70.    On or about August 10, 2017, BROIDY texted Person D regarding the meeting between Malaysian Prime Minister A and the Secretary of State: "Heard from Malaysia that meetings went very well. They were happy with [Secretary of State]. My name was not mentioned – no plug. ;- . . . ."

71.    On or about August 19, 2017, BROIDY texted Person D, "Any update on Malaysia? Person D responded, "As of now it is going to be in DC. And hard to do golf due to schedule but I am working on it. Might have to go to [Person I] directly on this and use the history of the two of them playing golf." BROIDY responded, "Yes. If you think it would help I could directly call one of [Person I] deputies or [Person I]. Also need to add time to meetings. I would like to discuss details with you. Please let me know what is best." Person I was then a high-ranking official at the White House.

72. On or about August 31, 2017, BROIDY drafted and sent an email to Person I attempting to arrange a golf game between Malaysian Prime Minister A and the President.

73. On or about September 11, 2017, Davis typed a letter to be sent from BROIDY to the President in anticipation of Malaysian Prime Minister A's meeting with the President and provided the letter to BROIDY. The letter included several positive developments in the relationship between Malaysia and the United States. The letter was never provided to the President.

74. Following BROIDY's repeated efforts to schedule a golf game between the President and Malaysian Prime Minister A, Malaysian Prime Minister A met with the President at the White House on or about September 12, 2017. Although BROIDY contacted high-ranking officials in the Administration to arrange a golf meeting between the President and Malaysian Prime Minister A in addition to the official meeting, no golf game between Malaysian Prime Minister A and the President took place.

75. On or about October 6, 2017, BROIDY met with the President at the White House. BROIDY did not raise the 1MDB matters during the meeting but represented to Davis that he had, understanding that Davis would communicate that information to Person A and Foreign National A.

76. On or about January 5, 2018, BROIDY drafted talking points related to 1MDB to demonstrate to Foreign National A the efforts that BROIDY had undertaken on his behalf. Among other things, the talking points provided: "1. We are working with the DoJ to counter the previous Administration's case against 1MDB in Malaysia. I have put a strategy in place to contact parties both at DoJ and the NSC to find a resolution to this issue. 2. I am in the process of scheduling a meeting with the assistant attorney general [] who has the oversight for the Malaysia case. She is

a [presidential] appointee and can be helpful. . . . 3. As I informed you earlier, in my discussion with the President, he committed to getting this issue resolved. It is important that I take his lead but will continue to communicate the importance of this issue." These representations were false.

**II. Campaign to Remove PRC National A from the United States**

**A. BROIDY Travels to China to Meet with PRC Minister A**

77. In or about May 2017, following the trip to Bangkok, BROIDY agreed to travel to Hong Kong to meet again with Foreign National A. Prior to the trip, Davis and BROIDY discussed that it was important to Foreign National A that PRC National A be deported from the United States. The purpose of the trip to Hong Kong was to meet with Foreign National A and a foreign government official of the PRC to discuss PRC National A.

78. On or about May 15, 2017, Davis emailed BROIDY's assistant regarding travel arrangements and the itinerary for the trip to Hong Kong. The same day, Davis also emailed BROIDY and Person C banking information for Davis's company.

79. On or about May 18, 2017, BROIDY, Davis, and Person A traveled to Hong Kong and were transported to Shenzhen, China, where they met with Foreign National A and PRC Minister A in a hotel suite. PRC Minister A spoke to BROIDY about PRC National A and his alleged crimes, and stated that the PRC government wanted PRC National A to be returned to the PRC. PRC Minister A asked BROIDY to use his influence with high-ranking United States government officials to advocate for PRC National A's removal and return to the PRC. They also discussed the potential return to the United States of Americans then being held prisoner by the PRC. PRC Minister A also stated that he would be visiting Washington, D.C. soon and was having trouble scheduling meetings with certain high-ranking United States government officials.

**B. BROIDY Lobbies Top U.S. Officials for the Removal of PRC National A**

80.     On or about May 20, 2017, during the return trip from China, BROIDY texted Davis, "I'll try to make this a big week for us with [the Attorney General.]"

81.     On or about May 21, 2017, BROIDY texted Person D regarding his meeting with Foreign National A and PRC Minister A: "[Person D]- Just returned. Huge opportunity. Can we meet Monday morning at 9:30 a.m. at [hotel]? Elliott."

82.     On or about May 22, 2017, BROIDY texted Person D, "I will need to meet with [Attorney General] asap.  We will discuss."  BROIDY followed up with, "I am emailing you a memo.  We will discuss."  Later the same day, Person D responded, "Have a request into [Attorney General] for mtg."

83.     On or about May 22, 2017, BROIDY sent an email to Person D with the subject, "Opportunity for Significantly Increased Law Enforcement Cooperation between US and China[.]"  BROIDY attached to the email a memorandum from BROIDY addressed to the Attorney General, intending that Person D would then provide the memorandum to the Attorney General.  The content of the memorandum had been provided to BROIDY by Davis, and the content originated from PRC Minister A and Foreign National A.  Upon receipt, BROIDY and Person C revised the memorandum.

84.     In the memorandum, BROIDY mischaracterized the reason for his trip to China and the circumstances leading to his meeting with PRC Minister A.  BROIDY did not disclose his contact with Foreign National A and did not disclose Foreign National A's role in setting up the meeting between BROIDY and PRC Minister A.  BROIDY also did not disclose the $4 million that he had been paid by Foreign National A.  BROIDY also did not disclose that his lobbying

efforts with respect to PRC National A were, at least in part, pursuant to his financial arrangement with Foreign National A and could potentially result in additional payment.

85. In the memorandum, BROIDY stated, "I was told by [PRC Minister A] that China would like to significantly increase bi-lateral cooperation with the US with respect to law enforcement including cyber security." BROIDY wrote about PRC Minister A's upcoming trip to Washington, D.C., in which PRC Minister A and his delegation planned to meet with several high-ranking United States government officials. BROIDY indicated that it would be productive for the Attorney General to meet with PRC Minister A. BROIDY also noted several items that China, according to PRC Minister A, would be willing to do to improve law enforcement relations between the United States and China. BROIDY then added:

> According to my conversation with [PRC Minister A], the one request China will make is that [PRC National A], who China alleges has conspired with others who have been arrested and charged with violations of numerous criminal laws of China (including kidnapping and significant financial crimes be deported (his Visa ends within the next month or so) or extradited (Interpol has issued a Red Notice with respect to him which is attached for your reference) as soon as possible from the US to China so he can be charged with these violations and go through regular criminal proceedings in China with regard to these allegations.

BROIDY appended an Interpol Red Notice for PRC National A to the memorandum.

86. On or about May 23, 2017, BROIDY texted Person D, "Hi [] Is meeting set for tomorrow? Has my memo been sent to [Attorney General]? Please update Thanks Elliott[.]" Person D responded, "Elliott- letter was delivered yesterday. Pls see the final version with changes. Working on mtg for tomorrow but shooting for early afternoon. Will call you later today. I am now on redeye tonight so I can get back to DC early." BROIDY responded, "Great. Thank you []. Also try to determine if his mtg was set or if we can set for thurs or in Alabama on fri or sat." The following day, on or about May 24, 2017, Person D responded, "[W]aiting to hear from

DoJ on mtgs – ours and [PRC Minister A]. let me know when you are free and we can meet up to go over other issues. thanks."

87. On or about May 24, 2017, Person D texted BROIDY, "Just got a call from [Attorney General] office and he cannot do tonight. But I got a text back from him directly that said he would call me later."

88. On or about May 25, 2017, BROIDY texted Person D, "The meetings are at Justice at 10:00 am this morning. Then FBI and DHS tomorrow. Perhaps I could tell my contact to get there 10 min early and a brief meeting could occur. And then have meet with [] one on one to discuss more details. Please try to see [Attorney General] first thing today. Really important that we pull it off. I need to speak with my contact this morning. Thank you. E[.]" Person D responded, "E- working on it. [Attorney General] is not in the office this morning but trying to see what time he is returning. Stand by." Later the same day, BROIDY texted Person D, "Detail is that the 3 things in my memo are only for [Attorney General]. [PRC Minister A] wants to tell [Attorney General] directly. Mine is legitimate back channel. [PRC Minister A]'s boss wants confirmation that [Attorney General] heard the 3 things which really help US[.]" Later that day, Person D responded, "E- actually just got off the phone with [Attorney General]. Not great news. Let me know when you are free to talk. Thanks."

89. On or about May 26, 2017, referencing meetings for PRC Minister A, BROIDY texted Person D, "10 am head of ICE 11:30 FBI Perhaps a play at DHS would save situation. Fly by [Person I]. The three items can be shared." BROIDY followed up with, "Please call me" and "I'm trying to do damage control and need to speak with you. Best is pull aside with [Person I]." Person I was a senior official in DHS at the time.

90.     On or about May 28, 2017, after Davis transcribed correspondence to BROIDY, BROIDY emailed Person D, "transcribed correspondence to and from [the Attorney General] and the Chinese Ambassador to the US." BROIDY noted, "I believe there is an excellent opportunity for [the Attorney General] to further US interests. I added comments below. Can we discuss asap? There is another matter of interest that the AG should be made aware of." Later that same day, BROIDY and Person D exchanged emails to schedule a time to discuss the email and its content.

91.     On or about May 30, 2017, Davis texted BROIDY with respect to PRC Minister A's meeting with United States government officials, "Check Wickr- all clear now for meetings[.]" BROIDY responded, "Yes. All set[.]" Davis replied, "He got his Mtgs reinstated[.]"

92.     In or about May 2017, Davis, at Person A's request, asked BROIDY to meet with PRC Minister A in Washington, D.C.

93.     On or about May 30, 2017, BROIDY met with PRC Minister A at a hotel in Washington, D.C. BROIDY also asked Person D if Person D could help PRC Minister A arrange meetings with high-ranking United States government officials.

94.     On or about May 31, 2017, BROIDY texted Person D:

> I met with the VM last night. He is on a 4 pm flight back this afternoon. The FBI had him meeting with very low level people and had the person he was to meet with meet with Vietnam instead. His superiors told him to come home unless meeting with [Attorney General] or [Person I]. He is happy meeting with [Person I]. . . . So far, he has delivered a pregnant woman and the next 2 will be sent shortly. He will accept 60 Chinese Nationals for deportation but only if he has a proper "short meeting". This is a big win for the admin that can be publicized. It is the result of Mara Largo meeting between the two presidents. Please call me and I will tell you more specifics. Thank you.

95.     Person D responded, "E-got the info. I will call in a few mins." BROIDY replied, "If you get the meeting, can we have the political WH liaison meet the VM at DHS? He can

mention my name. Also try to get [Person I] to warm up situation. Mention me as well. Thank you! Fingers crossed."

96. On or about May 31, 2017, Davis texted BROIDY with respect to PRC Minister A's purported meeting with, Person I, "In principal [Person I] us ok- just a schedule issue?" BROIDY responded, "Just a short notice scheduling issue. Still might hear in next hour or so. There is no issue with [PRC Minister A]." BROIDY later continued, "Please pass along my good wishes to the VM. Wait a little while longer." Davis responded, "Yes, I'm telling him that." BROIDY replied, "Tell him I'm telling WH and [Attorney General] what happened." Davis then texted, "Isn't [Person I] scheduled to be in Haiti this afternoon?" BROIDY responded, "Scheduler did not mention this?? Are you sure? Neither did [Attorney General] people[.]" Davis responded, "It's on the DHS website[.] He's there for the afternoon[.] Just spoke to VM and he sounded like he was crying[.]" BROIDY responded, "Terrible. What a mess. Bottom line not our fault. Normally their Amb would handle. This is a cluster f[*]ck." Davis replied, "Wickr."

97. On or about June 9, 2017, Davis texted BROIDY a news article titled "china-cranks-up-heat-on-exiled tycoon-[PRC National A.]"

98. On or about June 27, 2017, BROIDY texted Person H's spouse regarding the removal of PRC National A. BROIDY knew that Person H, an internationally successful businessman and frequent contributor to political campaigns with close access to the President, had immediate access to and influence with the President and could be effective in seeking the removal of PRC National A. BROIDY texted Person H's spouse, "On another note, I would like to meet with [Person H] tomorrow morning and on important and sensitive matter. Is there a time tomorrow morning that would be convenient or perhaps for lunch? Looking forward to seeing you at the [] Hotel! Regards, Elliott[.]" BROIDY later continued:

Case 1:20-cr-10521 Filed 03/20/22 Entered 08/20/22 16:39:01 Page 2 of 152 of 108

> Hi [], [Person H] asked me to send this information to you via text. I have a number of items I will be sending to you regarding the fugitive is [PRC National A]. The first is an Interpol red notice. . . . The highly time sensitive matter is that [PRC National A]'s visa to stay in the US expires on June 30th. It is critically that his new visa application be immediately denied. He must also be placed on the DHS no fly list. . . . This order would need to come from the very top as [PRC National A] is well connected with former FBI who are on his private security detail. [The President of the PRC] mention to [the President] at Mar-A-Lago that he would like [PRC National A] returned. [PRC Minister A] met with me and requested help with regard to [PRC National A]. . . . He promised to return certain US citizens held hostage by China and would accept a very large number of Chinese illegal immigrants for deportation back to China. Finally he offered new assistance with regard to North Korea.

99. On or about June 28, 2017, BROIDY met with Person H and his spouse at a social gathering. After the meeting, BROIDY exchanged text messages with Person H's spouse regarding PRC National A: "Hi [], it was great to see you and [Person H] tonight! I just heard from [PRC Minister A] again. He would like to know the status of [PRC National A]'s VISA as time is of the essence. -Was the VISA issued already or did we deny it? Can we confirm that [PRC National A] is on the DHS no fly list? [PRC Minister A] is very concerned that [PRC National A] will flee the US this week. I hope we can confirm and move to deportation. This will be an incredible step for our two countries. [PRC Minister A] says they are grateful for your help." Person H's spouse responded, "This is with the highest levels of the state department and the defense department. They are working on this."

100. On or about June 29, 2017, BROIDY and Davis exchanged text messages regarding PRC National A's visa application. BROIDY texted, "Is rejection or acceptance letter already generated?" Davis responded, "I have no idea." BROIDY replied, "Sorry always generated. In others words each applicant eventually re wives a yes or no in writing[?] Sorry receive a yes or no in writing[?]" Davis responded, "Yes[.] Check Wickr[.]"

101. On or about June 30, 2017, Davis, in reference to their efforts to facilitate the removal of PRC National A and the potential return of United States citizens held in the PRC, texted BROIDY, "Wickr. You are the man right now. They are going to give you the President's medal of freedom award after what you will accomplish for this country this July 4th[.]" BROIDY responded, "I am going to slam until it's done[.]" Davis replied, "Let's make sure part 1 happens today. And date for m[.] Don't leave that dude until we do it." BROIDY responded, "Agree." Davis continued, "Let him know – if we get the letter confirming the denial today by close of business (as u need workers to generate that letter) then we will get the 2 Americans home by July 4[.] After other phase 2- we can do the 60 take back[.]" BROIDY responded, "Sounds good. [Person H] calling me back shortly. On a call."

102. On or about June 30, 2017, BROIDY and Davis exchanged several text messages about PRC National A. BROIDY texted, "Heard from [Person H]. He reiterated to POTUS." BROIDY followed up with, "Separately, [Person E] texted me that he got tied up but is on top of it." That same date, Davis replied, "Can we get proof today about revoke?" Davis later specified, "From [Person E]?"

103. On or about July 1, 2017, BROIDY texted Davis, "Spoke to [Person E] at length. Call me when you can[.]" BROIDY did not speak with Person E but had exchanged text messages with him about PRC National A's visa application. BROIDY did not disclose the true nature of his relationship with PRC Minister A to Person E.

104. On or about July 2, 2017, BROIDY and Davis exchanged text messages regarding PRC National A and his visa application. Based on public reporting, Davis texted, "There is a call Scheduled for today Sunday with [President of the PRC] about n Korea. He can ask and confirm about package. He can even say he heard from [Person H.]"

105.     On or about July 3, 2017, again based on public reporting, Davis texted BROIDY: "[President] leaves D.C. Wednesday for Europe[.]" Davis then followed up: "July 5. Scheduled to meet in person w [President of the PRC][.]"

106.     On or about July 10, 2017, Person A emailed himself copies of the Red Notice for PRC National A, images of PRC National A's passport and identity card, and other documents related to PRC National A and the alleged crimes committed by PRC National A.

107.     In or about July 2017, Person A requested that Higginbotham meet with the PRC Ambassador to the United States at the PRC Embassy in Washington, D.C. The purpose of the meeting was to convey a message to the PRC Ambassador about PRC National A. On or about July 16, 2017, Higginbotham went to the PRC Embassy in Washington, D.C. and met with the Ambassador.     During the meeting, Higginbotham told the Ambassador that United States government officials were working on the extradition of PRC National A and that there would be additional information in the future concerning the logistics of the extradition.     Following the meeting, Higginbotham reported to Person A what had occurred, and Person A said he would inform Foreign National A. Person A later told Higginbotham that Foreign National A was happy with the meeting and that it had given Foreign National A credibility with the PRC.

108.     On or about July 18, 2017, BROIDY emailed Davis the contact information for Person H. Davis connected multiple calls between PRC Minister A and Person H in furtherance of the lobbying campaign to remove PRC National A.

109.     On or about July 26, 2017, BROIDY and Davis exchanged text messages regarding PRC National A and his removal from the United States to the PRC. Among the messages, Davis wrote, "Really need confirm it was officially transmitted. At this point – he says no[.]" BROIDY

responded, "Asked 3 different people to follow up[.]" BROIDY later added, "Called [Person E]. Seeing [Person H] in an hour."

110. On or about July 26, 2017, BROIDY texted Person H to meet at a hotel in Washington, D.C., to discuss PRC National A: "Hi [Person H], I understand from staff that you're in DC, as am I, staying at the [hotel]. Would you like to have a cup of coffee today? Regards, Elliott." Later the same day, Person H's spouse texted BROIDY, "Hi Elliot. Can you text me the details again of the Chinese man you texted previously thank you[.]" BROIDY responded, "Hi [], You are referring to [PRC National A] or [PRC Minister A]? Best, Elliott[.]" Person H's spouse replied, "[PRC National A]." BROIDY then resent the message that he previously sent on June 27.

111. On or about July 27, 2017, BROIDY and Davis exchanged text messages regarding PRC National A. Davis texted BROIDY, "Any word on embassy??" Davis later added, "Hey any update about formal notice?" BROIDY responded, "I'm dealing with people in NSC. Emailing directly. Awaiting response[.]"

112. On or about August 19, 2017, BROIDY texted Davis several times. Among those messages, BROIDY wrote, "Urgent. Call me. Good news[.]" BROIDY later added, "im with [Person H]. have break thru opportunity[.]"

113. On or about August 19, 2017, BROIDY met with Person H on Person H's yacht. During their time together, BROIDY asked Person H about the matter involving PRC National A. Person H, in BROIDY's presence, then called the President, asking about PRC National A's status within the United States.

114. On or about September 13, 2017, BROIDY texted Davis, "Please text me asylum article. And other article[.]" That same day, Davis texted BROIDY links to articles about PRC National A.

115. On or about October 2, 2017, BROIDY texted Davis a link to article about PRC National A.

116. On or about January 5, 2018, BROIDY texted Davis, "Send me more info on [PRC National A] involved in funding Dem politicians, . . . ASAP[.]"

All in violation of 18 U.S.C. § 371.

**FORFEITURE ALLEGATION**

1. The allegations contained in Count One of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2. Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of Count One, in violation of Title 18, United States Code, Section 371, the defendant, ELLIOTT BROIDY, shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to said violation(s). Notice is further given that, upon conviction, the United States intends to seek a judgment against BROIDY for a sum of money representing the property described in this paragraph.

3. If any of the property described above, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;
b. has been transferred or sold to, or deposited with, a third party;
c. has been placed beyond the jurisdiction of the court;
d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

DATED: September 30, 2020

COREY R. AMUNDSON
Chief, Public Integrity Section
United States Department of Justice

*/s/John D. Keller*
By: John D. Keller
Principal Deputy Chief
Sean F. Mulryne
Deputy Director, Election Crimes Branch
Nicole R. Lockhart
James C. Mann
Trial Attorneys
Public Integrity Section

**EXHIBIT B**

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
Aug 17, 2020, 10:23am
Michelle Rynne, Clerk of Court

KENJI M. PRICE #10523
United States Attorney
District of Hawaii

KENNETH M. SORENSON
Assistant U.S. Attorney
Room 6-100, PJKK Federal Bldg.
300 Ala Moana Boulevard
Honolulu, Hawaii 96850
Telephone: (808) 541-2850
Facsimile: (808) 541-2958
Email: ken.sorenson@usdoj.gov

COREY R. AMUNDSON
Chief, Public Integrity Section
United States Department of Justice

JOHN D. KELLER
Principal Deputy Chief

SEAN F. MULRYNE
Deputy Director, Election Crimes
NICOLE R. LOCKHART
JAMES C. MANN
Trial Attorneys
Public Integrity Section

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. NICKIE MALI LUM DAVIS, Defendant. | ) | CR. NO. **20-00068 JAO** INFORMATION [18 U.S.C. § 2 and 22 U.S.C. §§ 612 and 618(a)] |

The United States of America charges:

## INTRODUCTION

1. At all times relevant to this Information:

2. From no later than March 2017 to at least in or about January 2018, NICKIE LUM DAVIS agreed with Persons A and B to act as agents of Foreign

National A in exchange for millions of dollars in undisclosed wire transfers originating from foreign accounts associated with Foreign National A. DAVIS specifically agreed to facilitate Person B's lobbying of the President of the United States ("the President"), his Administration, and the United States Department of Justice ("DOJ") to drop the investigation of Foreign National A for his role in the embezzlement of billions of dollars from 1Malaysia Development Berhad ("1MDB"), a strategic investment and development company wholly owned by the Government of Malaysia. As part of their efforts, the defendant and Person B willfully failed to disclose to the Administration and DOJ officials that Person B was acting on behalf of Foreign National A. Ultimately, DAVIS and Persons A and B were unsuccessful in their efforts to have the 1MDB investigation dropped.

3. During the same approximate period, DAVIS also agreed with Persons A and B to aid their efforts to lobby the Administration and the DOJ to arrange for the removal and return of People's Republic of China ("PRC") National A—a dissident of the PRC living in the United States—at the request of Foreign National A and PRC Minister A. Here too, DAVIS and Persons A and B were ultimately unsuccessful.

4. To further the interests of Foreign National A, DAVIS aided Person B in facilitating a meeting between Malaysian Prime Minister A and the President in

September 2017, in part to allow Malaysian Prime Minister A to raise the resolution of the 1MDB matter with the President.

5. DAVIS, Person A, and Person B also met with PRC Minister A in the PRC and agreed that Person B, assisted by DAVIS, would lobby the Administration to return PRC National A to the PRC. DAVIS, Person A, and Person B, for the express purpose of providing PRC Minister A an opportunity to discuss the removal of PRC National A with high-level United States officials, also agreed to and attempted to facilitate meetings between PRC Minister A and top officials at DOJ and the United States Department of Homeland Security ("DHS"), during PRC Minister A's visit to the United States in May 2017.

Criminal Prohibitions on Acting as an Agent of a Foreign Principal or Government

6. The Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, was and is a disclosure statute that requires any person acting in the United States as "an agent of a foreign principal" to register with the Attorney General in connection with certain types of activities, such as political or public relations efforts or lobbying on behalf of the foreign principal. Such registrations are made to the National Security Division's Foreign Agents Registration Act Unit ("FARA Unit") within DOJ. It is a crime to knowingly and willfully fail to register, and to make false and misleading statements or material omissions in documents submitted to the FARA Unit under the law's provisions.

7. The purpose of FARA is to prevent covert influence by foreign principals. Proper registration under the statute allows the U.S. government and the American people to evaluate the statements and activities of individuals who are serving as agents of foreign principals. Among other things, a FARA registration reveals the identity of the foreign principal on whose behalf a registrant performs services, the type of services the registrant provides the foreign principal, the source and amount of compensation the registrant receives from the foreign principal, and political campaign contributions made by the registrant while the registrant was acting as an agent of the foreign principal.

**RELEVANT PARTIES & ENTITIES**

8. The defendant, NICKIE MALI LUM DAVIS, was and is a United States citizen, businesswoman, and consultant with personal and business relationships with Persons A and B.

9. Person A was a United States citizen, businessperson, and entertainer with international ties, including ties to Foreign National A.

10. Person B served as Deputy Finance Chair of a national political committee from approximately April 2016 to April 2018. In that capacity, Person B raised large political contributions from donors, organized political fundraising events, and coordinated fundraising strategies with the campaign of a candidate for the Office of the President of the United States during the 2016 election cycle. After

the election, Person B continued in his role as Deputy Finance Chair and maintained access to, and contact with, high-ranking officials in the Administration of the President, including the President. Over the same period, Person B owned and operated several domestic and international businesses and worked as a political consultant.

11. Foreign National A was a wealthy businessperson living in East Asia who has been charged separately for his role in orchestrating and executing a multi-billion-dollar embezzlement scheme from 1MDB.

12. Company A was a limited liability company formed by Person A to receive wire transfers from Foreign National A to pay Person B for his lobbying efforts.

13. George Higginbotham was an associate of Person A and was a licensed attorney employed by DOJ. On November 20, 2019, Higginbotham pleaded guilty in the United States District Court for the District of Columbia to a one-count Information charging conspiracy to make false statements to a financial institution.

14. Law Firm A was a law firm operated by Person B's spouse, Person C.

15. PRC National A was a dissident of the PRC, living in the United States on a temporary visa. The government of the PRC, including PRC Minister A and the President of the PRC, were seeking the removal of PRC National A from the United States back to the PRC.

16. In late 2016 through 2019, DOJ was actively investigating transactions of Foreign National A allegedly associated with laundered proceeds of the 1MDB embezzlement scheme. In July 2016, DOJ filed multiple civil forfeiture complaints seeking the forfeiture of millions of dollars in assets allegedly purchased with 1MDB laundered proceeds. On November 1, 2018, DOJ filed a criminal indictment charging Foreign National A and others with conspiring to launder billions of dollars embezzled from 1MDB and conspiring to violate the Foreign Corrupt Practices Act by paying bribes to various Malaysian and Abu Dhabi officials.

## I. Campaign to Resolve 1MDB Civil Forfeiture Cases

### A. Person B Agrees to Lobby for Foreign National A for $8 Million Retainer

17. In or about March 2017, DAVIS told Person B that she had a possible client in Malaysia who could "use help with the forfeiture."

18. On or about March 5, 2017, at the request of Person B, DAVIS emailed Person B a copy of a civil forfeiture complaint related to 1MDB. That same day, DAVIS emailed Person B a Bloomberg article titled "[Foreign National A] Trusts Ask to File Late Claims in Forfeiture Lawsuits," and texted Person B, "Your email has the court filing[.]" Person B responded, "Thx. Will review." DAVIS replied, "Call me when u can- thank you[.]" Person B responded again, "Yes. 5 min[.]"

19. Person A requested that DAVIS send him Person B's biography describing Person B's relationship with high-level officials in the Administration

and photographs of Person B and the President. On or about March 7, 2017, Person B's assistant, at DAVIS's request, emailed photographs to DAVIS featuring Person B and the President. Person A said that he wanted the photographs so that Person A could highlight Person B's close access to the Administration.

20. On or about March 8, 2017, DAVIS texted Person B, "Are you in la to meet on the 16th w [Person A] prior to his travel that weekend to Asia?" Person B responded, "I think so. Let's speak later." Later that same day, DAVIS sent Person B additional text messages to set up the meeting among Person B, Person A, and DAVIS.

21. At the direction of Person B, on or about March 13, 2017, DAVIS forwarded to Person A a "Retainer and Fee Agreement – Litigation Services" between Law Firm A and Foreign National A. The "Retainer and Fee Agreement" stipulated that Foreign National A would pay an $8 million retainer fee upfront, and an additional $75 million success fee if the "matter" was resolved within 180 days, or $50 million if the "matter" was resolved within 365 days. The draft agreement included an Exhibit A explaining that the "matter" referred to the 1MDB forfeiture proceedings. In actuality, Person A, Person B, Law Firm A, DAVIS, and Person C provided no litigation services or legal advice to Foreign National A. The true purpose of the retention agreement was to secure Person B's services to lobby the

Administration and DOJ on Foreign National A's behalf based on Person B's political connections.

22. On or about March 13, 2017, Person B met with Person A and DAVIS to discuss Foreign National A and his legal issues. At the meeting, Person A described his relationship with Foreign National A to Person B, and asked if Person B could help with the civil forfeiture cases involving Foreign National A. Person A said he would speak with Foreign National A about the possibility of Person B helping with the civil forfeiture cases. That same day, Person B texted DAVIS in part, "I'm excited about our business prospects."

23. On or about March 15, 2017, in reference to Foreign National A, Person B texted DAVIS, "Anything new on . . . [Person A's] Associate?" That same day, DAVIS responded, "[Person A] mtg in person tomorrow w the 'promoter' and they hope to travel within the next few week[.]"

24. On or about March 22, 2017, DAVIS emailed Person B and his assistant about setting up another meeting among Person B, Person A, and DAVIS.

25. At all relevant times, DAVIS, Person A, and Person B were aware of FARA and its prohibition on unregistered representation of foreign principals.

26. Despite their knowledge of the requirement to register as agents of a foreign principal, at no time did DAVIS, Person A, or Person B register with the FARA Unit in DOJ regarding their work as agents of Foreign National A.

**B. Person A, Person B, and DAVIS Meet Foreign National A in Bangkok**

27. In or about April 2017, Person A asked Person B to travel to Bangkok, Thailand to meet with Foreign National A. Person B said he would go only if he were paid $1 million, and that he wanted to be paid by Person A from "untainted" funds.

28. On or about April 28, 2017, Person B texted DAVIS advising, "I would like the funds to go to [Law Firm A.]" That same day, DAVIS responded, "Ok[.]"

29. On or about April 29, 2017, Person B and DAVIS exchanged text messages regarding their upcoming meeting with Foreign National A and Person A. Among those text messages, Person B asked in reference to Foreign National A, "Does the principal want us in a particular hotel in either location?" DAVIS responded, "Call me when u can talk[.]"

30. On or about April 30, 2017, DAVIS emailed Person B's assistant regarding a flight itinerary for travel to Bangkok. In the email, DAVIS wrote in part: "Please call me if you have questions -- It's 2 one way tickets – since we need to leave from a different country[.] We don't need to worry about hotels yet . . . "

31. On or about May 1, 2017, DAVIS emailed Person B and his assistant a link to the Shangri-La Hotel in Bangkok. That same day, DAVIS emailed Person A telling him to book a room at the Shangri-La Hotel and to send her the confirmation. Person A responded, "[Foreign National A] is booking our hotel," and later followed

up with, "Also send me [Person B's] wire info." DAVIS replied by providing the wire information for an account in the name of Law Firm A. The same day, in response to a question from Person B's assistant about whether she should cancel Person B's hotel room reservation, DAVIS emailed Person B's assistant, "Yes all rooms are booked by [Person A] already."

32. On or about May 2, 2017, DAVIS emailed Person B stating in part, "Since u land earlier – [Person A] and I will see you at arrivals. . . . Thanks and bon voyage – here's to the start of an exciting and prosperous adventure!"

33. On or about May 2, 2017, DAVIS, Person A, and Person B arrived in Bangkok. During the trip, DAVIS, Person A, and Person B met with Foreign National A in a hotel suite. Person B and Foreign National A spoke about the 1MDB investigation and civil forfeiture actions. Person B agreed to help Foreign National A attempt to resolve the matter. Foreign National A agreed to pay Person B an $8 million retainer and wanted Person B to contact the Attorney General of the United States to get DOJ to drop the 1MDB matter. Person B agreed to lobby the Administration and DOJ for a favorable result for Foreign National A while concealing the fact that he was working on Foreign National A's behalf. With respect to payment, Person B stated that the money should not come directly from Foreign National A and should be "clean." Foreign National A identified a friend who could pay Person B and others. Person B, Person A, and DAVIS agreed that

the money would first be routed through Person A and then be paid to Person B through Law Firm A. Person B and DAVIS agreed that Person B would pay DAVIS thirty percent of what Person B received. Person A also agreed to pay DAVIS a percentage of the funds that Person A received. Person A told Person B and DAVIS that Person A's friend, Higginbotham, was verifying the legitimacy of the funds. Higginbotham did not actually perform any such review.

### C. Person A Receives $8.5 Million from Foreign National A; Person B is Paid $6 Million; DAVIS is Paid $1.7 Million

34. Following the meeting with Foreign National A in Thailand, on or about May 8, 2017, Company A received a wire transfer directed by Foreign National A for approximately $2.8 million from an entity in Hong Kong. That same day, Person A obtained a cashier's check from the Company A account for $702,000 payable to Law Firm A, which was immediately credited to Law Firm A's account. Person A also made a separate wire transfer of $48,000 to Law Firm A from the Company A account. Also that same day, a third-party company transferred $250,000 to the Law Firm A account at Person A's direction, bringing the total amount deposited into the Law Firm A account to $1 million. Within several days, approximately $900,000 of the $1 million transferred into the Law Firm A account on May 8, 2017 was transferred from the Law Firm A account to one of Person B's business accounts.

35. On or about May 8, 2017, DAVIS texted Person B, "Both wires in [Law Firm A] are from [Person A]. The remaining balance was dropped to your office 20 minutes ago -". DAVIS then added, "702 total cashier check[.]"

36. On or about May 9, 2017, Person A caused Company A to transfer $250,000 to a company controlled by a family member of DAVIS for the benefit of DAVIS.

37. On or about May 17, 2017, Foreign National A caused an international wire to be sent to Company A from a Hong Kong company. That same day, Person A transferred $3 million from Company A to Law Firm A.

38. On or about May 17, 2017, Person B and DAVIS exchanged text messages regarding the payments from Foreign National A to Person B through Person A and Person B's payment of a percentage to DAVIS. Among the text messages, DAVIS asked, "Did you get it?" Person B responded, "Yes. Sent you Wickr[.] Sending wire to you in morning." Wickr is a messaging application that allows for end-to-end encryption and content expiration. Person B later added, "Did you get 2nd confirm?" DAVIS responded, "When Asia opens ... . Baby steps at least moving forward now." Person B responded, "Yes. Hammer them for the next 2 wires." Person B later added in part, "Assuming second 3 is in and confirmation that last 2 is being sent. Please ask [Person B's assistant]."

39. On or about May 18, 2017, Law Firm A transferred $500,000 to one of Person B's business accounts and $900,000 to a business account controlled by DAVIS. Within approximately one week, Law Firm A transferred an additional $950,000 in two separate transfers to one of Person B's business accounts.

40. On or about May 25, 2017, Foreign National A caused a third transfer to be made to Company A, this time in the amount of approximately $2.7 million. On or about May 26, 2017, Person A transferred $2 million from Company A to Law Firm A in partial satisfaction of the $8 million retainer to which Person B and Foreign National A agreed in return for Person B's lobbying the Administration and the DOJ to drop the 1MDB civil forfeiture cases and any related investigations. That same day, $600,000 was transferred from Law Firm A's account to a business account associated with DAVIS.

**D. Person B Facilitates Meetings for Malaysian Prime Minister A and Lobbies to Resolve the 1MDB Cases**

41. On or about May 18, 2017, Person B texted Person D, a political consultant and former campaign aide for the President, and requested that Person D work with the Administration to set up a visit for Malaysian Prime Minister A: "Hi [Person D]- Please work on Asian country visit. Date in July."

42. On or about June 5, 2017, Person B texted Person D again regarding the visit for Malaysian Prime Minister A: "Asian country is very motivated re July meeting. Hoping we can confirm date etc asap."

43. The same day, at the request of Person A, DAVIS sent Person B text messages regarding Foreign National A. Among those messages, DAVIS wrote, based upon information conveyed to her by Person A on behalf of Foreign National A, "Please call before u go to bed in ISRAEL if possible... [Foreign National A] keeps calling for news[.]" Person B responded, "Yes. Will call you. I am heading to D.C. Tonight to work on [Foreign National A] and Asian country[.]"

44. On or about June 15, 2017, relaying a message from Person A, DAVIS texted Person B, "Hey he'd like to speak w you this evening. Are u able?" DAVIS added, "Principal", which was a reference to Foreign National A. That same day, Person B responded, "Yes[.]"

45. On or about June 16, 2017, Person B and DAVIS exchanged text messages regarding 1MDB and the seizure of jewelry from a person associated with Foreign National A.

46. On or about June 17, 2017, Person B and DAVIS discussed Malaysian Prime Minister A. In or about June 2017, Person B asked the President if he would play golf with Malaysian Prime Minister A. Person B said, and DAVIS believed, that this would please Foreign National A and would allow Malaysian Prime Minister A to attempt to resolve the 1MDB matter. Person B also hoped to secure additional business with the government of Malaysian Prime Minister A and hoped that arranging golf with the President would further his business interests.

47. On or about June 19, 2017, DAVIS texted Person B a link to an article about the Malaysian Prime Minister A's office criticizing the 1MDB forfeiture action in the United States.

48. On or about June 25, 2017, DAVIS texted Person B a link to an article about Malaysian Prime Minister A and the 1MDB forfeiture action involving Foreign National A. That same day, Person B responded, "Weird article. What can we do?" DAVIS replied, "Call pls. Got news[.]" DAVIS followed up stating that she had sent Person B a "What's app request."

49. On or about June 29, 2017, Person B sent a text message to a high ranking official in the White House in an effort to arrange a golf outing between Malaysian Prime Minister A and the President: "Hi [Person E], As I mentioned, POTUS agreed to play a round of golf in DC or Bedminster in late July or early August with [Malaysian Prime Minister A]. Thank you very much for getting back to me with the date. Also a letter went to the state dept. for a meeting some weeks ago."

50. On or about June 30, 2017, Person B sent another text message to Person E regarding the golf outing: "Hope we can speak this morning on [PRC National A] and golf date with POTUS for [Malaysian Prime Minister A]." Later that day, Person B followed up with, "[Person E], as discussed, hoping we can get these items completed today. Please call me anytime."

51. On or about July 3, 2017, Person B again texted Person E regarding the golf date for Malaysian Prime Minister A and the President: "Good morning [Person E]. It would be extremely helpful to me if you could confirm the golf date today with POTUS for [Malaysian Prime Minister A.] POTUS told me he is glad to play at Bedminster or DC. After we spoke, I mentioned to [Malaysian Prime Minister A] that he would have the date last week. Thank you very much! Regards, []." Later that day, Person B texted Person E again: "[Person E], I'm following up. Please send me the date and time for the [Malaysian Prime Minister A] golf with POTUS. Thank you!"

52. On or about July 4, 2017, DAVIS texted Person B, "Call me asap" and then "Clear your phone – erase messages[.]"

53. On or about July 5, 2017, Person B exchanged messages with Person E regarding the golf outing. Among other messages, Person B texted, "[Person E], just left you a message. It's been a week. Can you send me the date today? Best, []" Person E responded, "It's with the NSC[.] They coordinate and negotiate – I'm sure it will get done[.]"

54. On or about July 11, 2017, relaying a message from Person A, DAVIS texted Person B, "Wickr[.] It's 5pm … I think we need to make a move. Date and otherwise. We're getting killed." These messages referred to confirming a date for Malaysian Prime Minister A to play golf with the President and Foreign National

A's displeasure because no date had been confirmed. Relaying urgency from Person A, DAVIS continued, "Please call because we need to strategize – I'm getting inundated[.]" Person B responded, "See wikr[.]" The following day, Person B texted DAVIS, "Send me text on wikr. I'm taking off and need to get to WH[.] Taking off. Need now[.]" DAVIS responded, "Done[.]" Person B responded, "Got it. Thx[.] Trying to get [Person F] to do call asap[.]" Person F was then a high-ranking official on the National Security Council.

55. On or about July 13, 2017, DAVIS texted Person B, "Please call when u can so we can talk- we gotta handle this so pls pls go to D.C. And sit at WH until u get it. I will keep u company if u worry about being lonely!"

56. On or about July 13, 2017, Person B texted Person E again regarding the golf date: "Hi [Person E], It's been 2 weeks. Checking again on date for golf for [Malaysian Prime Minister A] with POTUS. Can you text me date today? Thank you. Best, [][.]" Person E responded, "I'll check now again[.] These things go through a process -". Person B responded "Thank you!!" Person E replied, "NSC is on it and coordinating[.]" Person B responded, "Can we get date today?" Person E replied, "They're working directly with [Malaysia.] NSC is coordinating a date."

57. On or about July 15, 2017, Person B texted DAVIS, "Working on getting meetings for tomorrow."

58. On or about July 17, 2017, conveying urgency expressed by Person A on behalf of Foreign National A, DAVIS texted Person B, "[Person E] needs to give u this date now and ask him for update on other thing. We look impotent[.]" This text referred both to setting up a meeting between the President and Malaysian Prime Minister A and to the matter involving PRC National A. Person B responded, "Agree. Hammering away[.]"

59. On or about July 18, 2017, Person B and DAVIS exchanged several text messages about setting up a meeting between the President and Malaysian Prime Minister A. Among the messages, relaying information from Person A, DAVIS wrote, "Can u check Wikr[.] Really really need that date. It's been crazy for me all day w this. He's panicking[.]" DAVIS followed up with, "This date is mandatory today- we're getting creamed." According to Person A, Foreign National A was panicking because no meeting had yet been scheduled. Person B responded, "Calling [Person E] now[.]" DAVIS replied in part, "Call everyone so they know u are raging mad[.] Call [Person G] too. We need this today[.]" Person G was an administrative assistant to the President. Person B replied, "Doing it now."

60. On or about July 19, 2017, DAVIS texted Person B in reference to scheduling a date for a meeting between Malaysian Prime Minister A and the President, "Secondly we need this date bad[.]" Person B responded the following day, "Please bear with me. Getting some info on mtg[.]"

61. On or about July 21, 2017, Person B texted Person E regarding the golf outing: "[Person E], [Malaysia] have heard nothing from NSC. POTUS said he would play golf with Malaysian Prime Minister A in late July or early August. POTUS said he was happy to do it. You said it would be scheduled in a day or two. We're in the 4th week. I know you are busy and procedures apply but I've been more than patient. Instead of being positive, this is now causing me damage. I would truly appreciate it if you could get back to me today with a date. Thank you! []."

62. On or about July 24, 2017, Person B texted Person D, "Received golf date in NJ in Sept. Sat before the UN General Assembly. Finally! Crossed off my list! Thank you also for helping!" Person D responded, "Let's follow through and make sure the date is confirmed by the NSC. Did he tell you who gave him the date?" Person B replied, ""Thank you!! Fantastic. Given to [Person H] by [Person E]."

63. On or about July 27, 2017, Person B texted Person D, "Just checked again with [Malaysia]. Their Amb to US and Foreign Minister have heard nothing. Please check asap. Best, []." Person B followed up with, "Hi [Person D]- Can you call NSA for me re [Malaysia] receiving official word. Still no contact from NSC to [Malaysia] Amb on meeting. Thank you. Best, []" Person D responded, "[] will call again this morning. Talked to [] briefly yesterday ... . Will call shortly."

64.     On or about July 29, 2017, relaying information that she received from Person A on behalf of Foreign National A, DAVIS texted Person B in reference to the meeting between Malaysian Prime Minister A and the President, "They were told 12 sept is mtg.  That's day that un general assembly stars- it's a Tuesday???? No golf??"  DAVIS immediately followed by texting "Wickr[.]"  Person B responded, "May be two mtgs.  Amb should ask.  Golf at Bedminster on Sat and tues at WH?"

65.     On or about August 7, 2017, Person B sent his assistant an email with the subject, "Malaysia Talking Points *Final*," with talking points intended for an upcoming meeting between the Secretary of State of the United States and Malaysian Prime Minister A.   DAVIS received the talking points from Person A—who provided them on behalf of Foreign National A—and relayed them to Person B, knowing that Person B would then provide them to the Secretary of State as background for the meeting.  The talking points mentioned, among other things, Person B's ongoing relationship and work with [Malaysia], and identified 1MDB as a "[p]riority[.]"  The talking points noted the lack of harm caused by 1MDB, and specified that "[t]he involvement of US prosecutors has caused unnecessary tension American [sic], and could cause a negative reaction among Malaysians[.]"

66.     On or about August 7, 2017, Person B also sent the talking points document to Person D for his review and edits and to obtain details about the timing

of a meeting in Malaysia between Malaysian Prime Minister A and the Secretary of State: "Hi [Person D]; When is [Secretary of State] mtg?; Already 11:00 am Monday in [Malaysia]. Can you expand and send me final version?" Person D responded by sending a revised version of the talking points to Person B and stating, "[]- here is the marked up version I am going to forward to [Secretary of State]'s office. He heads to Bangkok today and then to [Malaysia]. Let me know if you have any other changes. Thanks."

67. Later, on or about August 7, 2017, Person B messaged Person D, "[Secretary of State] is meeting with [Malaysian Prime Minister A] on 8th and deputy PM on 9th. Let's get a plug in my name. They know my name and might not immediately recognize [my company's] name. Thank you!" Person D responded, "Definitely important to make this connect. It will not likely be part of the formal meetings but will work to get a plug during their conversations."

68. Also on or about August 7, 2017, Person A executed an agreement between another of Person A's companies and a representative of Foreign National A providing for "Strategic Communications and Crisis Management" in exchange for approximately EUR 8.4 million to be paid on or before August 16, 2017.

69. On or about August 9, 2017, Foreign National A caused a Hong Kong company to transfer approximately $12.8 million to Company A. Person A then transferred $3 million to Law Firm A. Person A also transferred $833,333 to a

business account controlled by DAVIS.  On or about August 10, 2017, Law Firm A
transferred $900,000 to a business account associated with DAVIS.

70.     On or about August 10, 2017, Person B texted Person D regarding the
meeting between Malaysian Prime Minister A and the Secretary of State:  "Heard
from [Malaysia] that meetings went very well.  They were happy with [Secretary of
State].  My name was not mentioned – no plug. ;- ... ."

71.     On or about August 16, 2017, Person B and DAVIS exchanged text
messages to set up a meeting and a phone call.  Among the messages, DAVIS wrote,
"[Person A] really wants to see u today if possible since u leave Friday[.]"

72.     On or about August 18, 2017, Person B and DAVIS exchanged text
messages setting up a phone call.  Among the messages, DAVIS wrote, "Call me
pls.  [Person A] wants to conference in[.]"

73.     On or about August 19, 2017, Person B texted Person D, "Any update
on [Malaysia]?  Person D responded, "As of now it is going to be in DC.  And hard
to do golf due to schedule but I am working on it.  Might have to go to [Person I]
directly on this and use the history of the two of them playing golf."  Person B
responded, "Yes.  If you think it would help I could directly call one of [Person I]
deputies or [Person I].  Also need to add time to meetings.  I would like to discuss
details with you.  Please let me know what is best."  Person I was then a high-ranking
official at the White House.

74.     On or about August 21, 2017, DAVIS wired $375,000 in funds she received as a commission from Person A, to Person C, the spouse of Person B.

75.     On or about August 24, 2017, Foreign National A directed the transfer of approximately $10 million to Person A's separate company that had entered into the "Strategic Communications and Crisis Management" agreement with a representative of Foreign National A for EUR 8.4 million. Based on the prevailing exchange rate on August 24, 2017, EUR 8.4 million converted to approximately $10 million.

76.     On or about September 11, 2017, DAVIS typed a letter at Person B's direction to be sent from Person B to the President in anticipation of Malaysian Prime Minister A's meeting with the President. The letter included several positive developments in the relationship between Malaysia and the United States. The letter was never provided to the President.

77.     On or about September 12, 2017, Malaysian Prime Minister A met with the President at the White House, due in part to the assistance provided by DAVIS for Person B's efforts to facilitate the meeting. Although Person B contacted high-ranking officials in the Administration to arrange a golf meeting between the President of the United States and Malaysian Prime Minister A in addition to the official meeting, no golf game between Malaysian Prime Minister A and the President took place.

78. On or about October 6, 2017, Person B met with the President at the White House. Person B represented to Person A, DAVIS, and Foreign National A that he raised the 1MDB investigation with the President during the meeting.

79. On or about January 5, 2018, Person B drafted talking points related to 1MDB to demonstrate to Foreign National A the efforts that Person B had undertaken on his behalf. Among other things, the talking points provided: "1. We are working with the DoJ to counter the previous Administration's case against 1MDB in [Malaysia]. I have put a strategy in place to contact parties both at DoJ and the NSC to find a resolution to this issue. 2. I am in the process of scheduling a meeting with the assistant attorney general [] who has the oversight for the [] case. She is a [presidential] appointee and can be helpful .... 3. As I informed you earlier, in my discussion with the President, he committed to getting this issue resolved. It is important that I take his lead but will continue to communicate the importance of this issue." Person B greatly exaggerated his efforts regarding the 1MDB investigation.

80. On or about January 6, 2018, Person B met with Person A, who asked Person B for a loan. Person A told Person B that Person A's friend was "checking on" the money they had received from Foreign National A and "helping to keep it clean."

## II. Campaign to Remove PRC National A from the United States

Case 1:20-cr-00308-ERK Document 1 Filed 08/17/20 Page 25 of 58

## A. Person B Travels to China to Meet with PRC Minister A

81. In or about May 2017, following the trip to Bangkok, Person B agreed to travel to Hong Kong to meet again with Foreign National A. Prior to the trip, DAVIS and Person B discussed that it was important to Foreign National A that PRC National A be deported from the United States. The purpose of the trip to Hong Kong was to meet with Foreign National A and a foreign government official of the PRC to discuss PRC National A.

82. On or about May 15, 2017, DAVIS emailed Person B's assistant regarding travel arrangements and the itinerary for the trip to Hong Kong. The same day, DAVIS also emailed Person B and Person C banking information for DAVIS's company.

83. On or about May 18, 2017, Person A, Person B, and DAVIS traveled to Hong Kong and were transported to Shenzhen, China, where they met with Foreign National A and PRC Minister A in a hotel suite. PRC Minister A spoke to Person B about PRC National A and his alleged crimes and stated that the PRC wanted PRC National A to be returned to the PRC. PRC Minister A asked Person B to use his influence with high-ranking United States government officials to advocate for PRC National A's removal and return to the PRC. PRC Minister A also stated that he would be visiting Washington, D.C. soon and was having trouble scheduling meetings with certain high-ranking United States government officials.

**B. Person B Lobbies Top U.S. Officials for the Removal of PRC National A**

84. On or about May 20, 2017, during the return trip from China, Person B texted DAVIS, "I'll try to make this a big week for us with [the Attorney General.]"

85. On or about May 21, 2017, Person B texted Person D regarding his meeting with Foreign National A and PRC Minister A: "[Person D]- Just returned. Huge opportunity. Can we meet Monday morning at 9:30 a.m. at [hotel]? []."

86. On or about May 22, 2017, Person B texted Person D, "I will need to meet with [Attorney General] asap. We will discuss." Person B followed up with, "I am emailing you a memo. We will discuss." Later the same day, Person D responded, "Have a request into [Attorney General] for mtg."

87. On or about May 22, 2017, Person B sent an email to Person D with the subject, "Opportunity for Significantly Increased Law Enforcement Cooperation between US and [the PRC][.]" Person B attached to the email a memorandum from Person B addressed to the Attorney General, intending that Person D would then provide the memorandum to the Attorney General. The content of the memorandum had been provided to Person B by DAVIS, who received it from Person A during the May 2017 trip to China where the content originated from PRC Minister A and Foreign National A. Upon receipt, Person B and Person C revised the memorandum.

88. In the memorandum, Person B misrepresented the reason for his trip to China and the circumstances leading to his meeting with PRC Minister A. Person B

concealed his contact with Foreign National A and concealed Foreign National A's role in setting up the meeting between Person B and PRC Minister A. Person B also concealed the $4 million that he had been paid by Foreign National A over the two weeks preceding the meeting in Shenzhen with PRC Minister A. Person B also did not disclose that his lobbying efforts with respect to PRC National A were, at least in part, pursuant to his financial arrangement with Foreign National A and could potentially result in additional payment.

89. In the memorandum, Person B stated, "I was told by [PRC Minister A] that [the PRC] would like to significantly increase bi-lateral cooperation with the US with respect to law enforcement including cyber security." Person B wrote about PRC Minister A's upcoming trip to Washington, D.C., in which PRC Minister A and his delegation planned to meet with several high-ranking United States government officials. Person B advocated for the Attorney General to meet with PRC Minister A. Person B also noted several items that the PRC, according to PRC Minister A, would be willing to do to improve law enforcement relations between the United States and the PRC. Person B then added:

> According to my conversation with [PRC Minister A], the one request [the PRC] will make is that [PRC National A], who [the PRC] alleges has conspired with others who have been arrested and charged with violations of numerous criminal laws of [the PRC] (including kidnapping and significant financial crimes be deported (his Visa ends within the next month or so) or extradited (Interpol has issued a Red Notice with respect to him which is attached for your reference) as soon as possible from the US to [the PRC] so he can be charged with these

violations and go through regular criminal proceedings in [the PRC] with regard to these allegations.

Person B appended an Interpol Red Notice for PRC National A to the memorandum.

90. On or about May 23, 2017, Person B texted Person D, "Hi [] Is meeting set for tomorrow? Has my memo been sent to [Attorney General]? Please update Thanks [][.]" Person D responded, "[Person B]- letter was delivered yesterday. Pls see the final version with changes. Working on mtg for tomorrow but shooting for early afternoon. Will call you later today. I am now on redeye tonight so I can get back to DC early." Person B responded, "Great. Thank you []. Also try to determine if his mtg was set or if we can set for thurs or in Alabama on fri or sat." The following day, on or about May 24, 2017, Person D responded, "[W]aiting to hear from DoJ on mtgs – ours and [PRC Minister A]. let me know when you are free and we can meet up to go over other issues. thanks."

91. On or about May 24, 2017, Person D texted Person B, "Just got a call from [Attorney General]'s office and he cannot do tonight. But I got a text back from him directly that said he would call me later."

92. On or about May 25, 2017, Person B texted Person D, "The meetings are at Justice at 10:00 am this morning. Then FBI and DHS tomorrow. Perhaps I could tell my contact to get there 10 min early and a brief meeting could occur. And then have meet with [] one on one to discuss more details. Please try to see [Attorney General] first thing today. Really important that we pull it off. I need to speak with

my contact this morning. Thank you. [ .]" Person D responded, "[ ]- working on it. [Attorney General] is not in the office this morning but trying to see what time he is returning. Stand by." Later the same day, Person B texted Person D, "Detail is that the 3 things in my memo are only for [Attorney General]. [PRC Minister A] wants to tell [Attorney General] directly. Mine is legitimate back channel. [PRC Minister A]'s boss wants confirmation that [Attorney General] heard the 3 things which really help US[.]" Later that day, Person D responded, "[ ]- actually just got off the phone with [Attorney General]. Not great news. Let me know when you are free to talk. Thanks."

93.     On or about May 26, 2017, referencing meetings for PRC Minister A, Person B texted Person D, "10 am head of ICE  11:30 FBI  Perhaps a play at DHS would save situation. Fly by [Person I]. The three items can be shared." Person B followed up with, "Please call me" and "I'm trying to do damage control and need to speak with you. Best is pull aside with [Person I]." Person I was a senior official in DHS at the time.

94.     On or about May 28, 2017, Person B emailed Person D, "transcribed correspondence to and from [the Attorney General] and [the PRC's] Ambassador to the US." Person B noted, "I believe there is an excellent opportunity for [the Attorney General] to further US interests. I added comments below. Can we discuss asap? There is another matter of interest that the AG should be made aware of."

Case 1:20-cr-00308 Doc 1 Filed 03/... Entered ... Page 33 of 108

Later that same day, Person B and Person D exchanged emails to schedule a time to discuss the email and its content.

95. On or about May 30, 2017, relaying information from PRC Minister A and Person A regarding PRC Minister A's meetings with United States Government officials, DAVIS texted, "Check Wickr- all clear now for meetings[.]" Person B responded, "Yes. All set[.]" DAVIS replied, "He got his Mtgs reinstated[.]"

96. In or about May 2017, DAVIS, at Person A's request, asked Person B to meet with PRC Minister A in Washington, D.C.

97. On or about May 30, 2017, Person B met with PRC Minister A at a hotel in Washington, D.C. Person B also asked Person D if Person D could help PRC Minister A arrange meetings with high-ranking United States government officials.

98. On or about May 31, 2017, Person B texted Person D:

> I met with the VM last night. He is on a 4 pm flight back this afternoon. The FBI had him meeting with very low level people and had the person he was to meet with meet with Vietnam instead. His superiors told him to come home unless meeting with [Attorney General] or [Person I]. He is happy meeting with [Person I]. . . . . So far, he has delivered a pregnant woman and the next 2 will be sent shortly. He will accept 60 Chinese Nationals for deportation but only if he has a proper "short meeting". This is a big win for the admin that can be publicized. It is the result of Mara Largo meeting between the two presidents. Please call me and I will tell you more specifics. Thank you.

99. Person D responded, "[]-got the info. I will call in a few mins." Person B replied, "If you get the meeting, can we have the political WH liaison meet the

VM at DHS? He can mention my name. Also try to get [Person I] to warm up situation. Mention me as well. Thank you! Fingers crossed."

100. On or about May 31, 2017, DAVIS texted Person B with respect to PRC Minister A's purported meeting with Person I, "In principal [Person I] us ok- just a schedule issue?" Person B responded, "Just a short notice scheduling issue. Still might hear in next hour or so. There is no issue with [PRC Minister A]." Person B later continued, "Please pass along my good wishes to the VM. Wait a little while longer." DAVIS responded, "Yes, I'm telling him that." Person B replied, "Tell him I'm telling WH and [Attorney General] what happened." DAVIS then texted, "Isn't [Person I] scheduled to be in Haiti this afternoon?" Person B responded, "Scheduler did not mention this?? Are you sure? Neither did [Attorney General']s people[.]" DAVIS responded, "It's on the DHS website[.] He's there for the afternoon[.] Just spoke to VM and he sounded like he was crying[.]" Person B responded, "Terrible. What a mess. Bottom line not our fault. Normally their Amb would handle. This is a cluster f[*]ck." DAVIS replied, "Wickr."

101. On or about June 9, 2017, DAVIS texted Person B a news article titled "[the PRC]-cranks-up-heat-on-exiled tycoon-[PRC National A.]"

102. On or about June 27, 2017, Person B and DAVIS exchanged several text messages regarding PRC National A.

103. On or about June 27, 2017, Person B texted Person H's spouse regarding the removal of PRC National A. Person B knew that Person H, an internationally successful businessman and frequent contributor to political campaigns with close access to the President, had immediate access to and influence with the President and could be effective in seeking the removal of PRC National A. Person B texted Person H's spouse, "On another note, I would like to meet with Person H tomorrow morning and on important and sensitive matter. Is there a time tomorrow morning that would be convenient or perhaps for lunch? Looking forward to seeing you at the [] Hotel! Regards, [][.]" Person B later continued:

> Hi [], [Person H] asked me to send this information to you via text. I have a number of items I will be sending to you regarding the fugitive [PRC National A]. The first is an Interpol red notice. . . . The highly time sensitive matter is that [PRC National A]'s visa to stay in the US expires on June 30th. It is critically that his new visa application he immediately denied. He must also be placed on the DHS no fly list. . . . The order would need to come from the very top as [PRC National A] is well connected with former FBI who are on his private security detail. The President of the PRC mention to [the President] at Mar-A-Lago that he would like [PRC National A] returned. [PRC Minister A] met with me and requested help with regard to [PRC National A]. . . . He promised to return certain US citizens held hostage by [the PRC] and would accept a very large number of [the PRC] illegal immigrants for deportation back to [the PRC]. Finally he offered new assistance with regard to North Korea.

104. On or about June 28, 2017, Person B met with Person H and his spouse at a social gathering. After the meeting, Person B exchanged text messages with Person H's spouse regarding [PRC National A]: "Hi [], it was great to see you and

[Person H] tonight!  I just heard from [PRC Minister A] again.  He would like to know the status of [PRC National A]'s VISA as time is of the essence.  -Was the VISA issued already or did we deny it?  Can we confirm that [PRC National A] is on the DHS no fly list?  [PRC Minister A] is very concerned that [PRC National A] will flee the US this week.  I hope we can confirm and move to deportation.  This will be an incredible step for our two countries.  [PRC Minister A] says they are grateful for your help."  Person H's spouse responded, "This is with the highest levels of the state department and the defense department.  They are working on this."

105.  On or about June 29, 2017, Person B and DAVIS exchanged text messages regarding PRC National A's visa application.  Person B texted, "Is rejection or acceptance letter already generated?"  DAVIS responded, "I have no idea."  Person B replied, "Sorry always generated.  In others words each applicant eventually re wives a yes or no in writing[?]  Sorry receive a yes or no in writing[?]"  DAVIS responded, "Yes[.]  Check Wickr[.]"

106.  On or about June 30, 2017, DAVIS, in reference to their efforts to facilitate the removal of Foreign National B and the potential return of United States citizens held in Country B, texted Person B, "Wickr.  You are the man right now.  They are going to give you the President's medal of freedom award after what you will accomplish for this country this July 4th[.]"  Person B responded, "I am going

to slam until it's done[.]" DAVIS replied, "Let's make sure part 1 happens today. And date for m[.] Don't leave that dude until we do it." Person B responded, "Agree." DAVIS continued, "Let him know – if we get the letter confirming the denial today by close of business (as u need workers to generate that letter) then we will get the 2 Americans home by July 4[.] After other phase 2- we can do the 60 take back[.]" Person B responded, "Sounds good. [Person H] calling me back shortly. On a call."

107. On or about June 30, 2017, Person B and DAVIS exchanged several text messages about PRC National A. Person B texted, "Heard from [Person H]. He reiterated to POTUS." Person B followed up with, "Separately, [Person E] texted me that he got tied up but is on top of it." That same date, DAVIS replied, "Can we get proof today about revoke?" DAVIS later specified, "From [Person E]?"

108. On or about July 1, 2017, Person B texted DAVIS, "Spoke to [Person E] at length. Call me when you can[.]" Person B did not speak with Person E but had exchanged text messages with him about PRC National A's visa application. Similar to the representations Person B made in the memorandum that he prepared for the Attorney General and his communications with Person H, Person B did not disclose the true nature of his relationship with PRC Minister A to Person E.

109. On or about July 2, 2017, Person B and DAVIS exchanged text messages regarding PRC National A and his visa application. Based on public

reporting, DAVIS texted, "There is a call Scheduled for today Sunday with [President of the PRC] about n Korea. He can ask and confirm about package. He can even say he heard from [Person H]."

110. On or about July 3, 2017, again based on public reporting, DAVIS texted Person B: "[President] leaves D.C. Wednesday for Europe[.]" DAVIS then followed up: "July 5. Scheduled to meet in person w [President of the PRC][.]"

111. On or about July 18, 2017, Person B emailed DAVIS the contact information for Person H. DAVIS connected multiple calls between PRC Minister A and Person H in furtherance of the lobbying campaign to remove PRC National A.

112. On or about July 26, 2017, Person B and DAVIS exchanged text messages regarding PRC National A and his removal from the United States to the PRC. Among the messages, DAVIS wrote, "Really need confirm it was officially transmitted. At this point – he says no[.]" Person B responded, "Asked 3 different people to follow up[.]" Person B later added, "Called [Person E]. Seeing [Person H] in an hour."

113. On or about July 26, 2017, Person B texted Person H to meet at a hotel in Washington, D.C., to discuss PRC National A: "Hi [Person H], I understand from staff that you're in DC, as am I, staying at the [hotel]. Would you like to have a cup of coffee today? Regards, []." Later the same day, Person H's spouse texted Person

B, "Hi []. Can you text me the details again of the [the PRC] man you texted previously thank you[.]" Person B responded, "Hi [], You are referring to [PRC National A] or [PRC Minister A]? Best, [][.]" Person H's spouse replied, "[PRC National A]." Person B then resent the message that he previously sent on June 27.

114. On or about July 27, 2017, Person B and DAVIS exchanged text messages regarding PRC National A. DAVIS texted Person B, "Any word on embassy??" DAVIS later added, "Hey any update about formal notice?" Person B responded, "I'm dealing with people in NSC. Emailing directly. Awaiting response[.]"

115. On or about August 19, 2017, Person B texted DAVIS several times. Among those messages, Person B wrote, "Urgent. Call me. Good news[.]" Person B later added, "im with [Person H]. have break thru opportunity[.]"

116. On or about August 19, 2017, Person B met with Person H on Person H's yacht. During their time together, Person B asked Person H about the matter involving PRC National A, and Person H suggested that they call the President. Person B and Person H then called the President, asking about PRC National A's status within the United States.

117. On or about September 13, 2017, Person B texted DAVIS, "Please text me asylum article. And other article[.]" That same day, DAVIS texted Person B links to articles about PRC National A.

118. On or about October 2, 2017, Person B texted DAVIS a link to an article about PRC National A.

119. On or about January 5, 2018, Person B texted DAVIS, "Send me more info on [PRC National A] involved in funding Dem politicians, . . . ASAP[.]"

**COUNT ONE**
**18 U.S.C. § 2 and 22 U.S.C. § 612**
**(Aiding and Abetting & Unregistered Agent of a Foreign Principal)**

120. From in or about no later than May 2017 to at least in or about January 2018, within the District of Hawaii and elsewhere, the defendant, NICKIE MALI LUM DAVIS, knowingly and willfully, without registering with the Attorney General as required by law, aided and abetted Person A and Person B in their actions as agents of a foreign principal, to wit: their execution of a back-channel lobbying campaign to resolve the 1MDB investigation favorably for Foreign National A and to return PRC National A to the PRC, all on behalf of Foreign National A and PRC Minister A and the Government of the PRC.

All in violation of 18 U.S.C. § 2 and 22 U.S.C. §§ 612 and 618(a)(1).

**FORFEITURE ALLEGATION**

121. The allegations contained in Count 1 of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

122. Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of Count 1, in violation of Title 18 United States Code, Section 2, and Title 22, United States Code, Sections 612 and 618(a)(1), the defendant, NICKIE MALI LUM DAVIS, shall forfeit to the United States of America a sum of money representing property, real or personal, which constitutes or is derived from proceeds traceable to said violation(s). Notice is further given that, upon conviction, the United States intends to seek a judgment against DAVIS for this sum of money representing the property described in this paragraph.

123. If any of the property described above, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;
b. has been transferred or sold to, or deposited with, a third party;
c. has been placed beyond the jurisdiction of the court;
d. has been substantially diminished in value; or
e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c)

DATED: August 17, 2020, at Honolulu, Hawaii.

COREY R. AMUNDSON
Chief, Public Integrity Section
United States Department of Justice

*/s/ Kenji M. Price*
KENJI M. PRICE
United States Attorney
District of Hawaii

*/s/ Kenneth M. Sorenson*
KENNETH M. SORENSON
Chief, National Security

*/s/ John D. Keller*
JOHN D. KELLER
Principal Deputy Chief

SEAN F. MULRYNE
NICOLE R. LOCKHART
JAMES C. MANN
Trial Attorneys
Public Integrity Section

United States v. Nickie Mali DAVIS
Information
Cr. No. ______________________

**EXHIBIT C**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,**<br><br>vs.<br><br>**GEORGE HIGGINBOTHAM,**<br><br>**Defendant.** | ) | **Criminal Number:** 18-343 (CKK) |

**FACTUAL BASIS FOR PLEA**

Pursuant to Federal Rule of Criminal Procedure 11, the United States and the defendant, George HIGGINBOTHAM, stipulate and agree that the following facts fairly and accurately describe the defendant's conduct in the offense to which he is pleading guilty. These facts do not constitute all of the facts known to the parties concerning the charged offense and related conduct. This statement is being submitted to demonstrate that sufficient facts exist to establish that the defendant committed the offense to which he is pleading guilty. The defendant knowingly, voluntarily, and truthfully admits the facts set forth below.

The Conspiracy

1. From in or about April 2017 to in or about January 2018, in the District of Columbia and elsewhere, HIGGINBOTHAM and others knowingly conspired to commit the offense of making false statements to a bank by misrepresenting the true source and purpose of transfers of tens of millions of dollars from foreign accounts to various federally insured financial institutions in the United States.

Individuals Involved in the Conspiracy

2. During the conspiracy, HIGGINBOTHAM was a licensed attorney employed by the United States Department of Justice. Co-conspirator A, a longtime associate of HIGGINBOTHAM, was a United States citizen, businessperson, and entertainer. Co-conspirator B, a foreign national and associate of Co-conspirator A, was a wealthy businessperson living in East Asia who was alleged to have orchestrated a multi-billion dollar embezzlement and bribery scheme from 1Malaysia Development Berhad ("1MDB"), a strategic investment and development company wholly owned by the Government of Malaysia.

Source and Purposes of International Fund Transfers

3. In or about July 2016, the United States Department of Justice ("DOJ") filed multiple civil forfeiture complaints seeking the forfeiture of over $1 billion in assets allegedly associated with laundered proceeds from the 1MDB embezzlement and bribery scheme. Co-conspirator B was named in the complaints as one of the primary architects of the embezzlement scheme.

4. In or about March 2017, Co-conspirator A asked HIGGINBOTHAM to assist with identifying someone with political influence who could resolve Co-conspirator B's issues surrounding the 1MDB forfeiture matters and the DOJ's investigation thereof. HIGGINBOTHAM introduced Co-conspirator A to a law firm recruiter, who recommended two different law firms, but Co-conspirator B ultimately selected Person 1, a non-lawyer business owner, political fundraiser, and financier with political connections at high levels of the United States government, to lobby government officials to resolve the 1MDB matters. HIGGINBOTHAM had no involvement in introducing Person 1 to Co-conspirator A or Co-conspirator B.

5. According to Co-conspirator A, Person 1 did not want to be paid directly by Co-conspirator B because he did not want to be linked to Co-conspirator B. At Co-conspirator A's direction, HIGGINBOTHAM worked on various retainer and consulting agreements that provided for payments through pass-through entities to distance Co-conspirator B from Person 1 and anonymized Co-conspirator B in the transaction. According to the written agreements, Co-conspirator B would pay tens of millions of dollars to Person 1 through various intermediaries and entities as compensation for Person 1's efforts to lobby United States government officials to drop all civil and/or criminal matters related to 1MDB. According to Co-conspirator A, as part of the lobbying campaign, Person 1 agreed to try to influence a potential nominee for a federal position that would have authority over the 1MDB civil forfeiture matters. That person ultimately was not nominated.

6. In or about May 2017, Co-conspirator A informed HIGGINBOTHAM that Co-conspirator B had another request separate from the 1MDB matters that was potentially more lucrative than their work on the 1MDB issue: Co-conspirator B wanted Foreign National 1, a former resident of Country Q who was living in the United States on a temporary visa and who had publicly criticized the leadership of Country Q, to be removed from the United States and sent back to Country Q. According to Co-conspirator A, Person 1 and others would use their political connections to lobby United States government officials to have Foreign National 1 removed from the United States.

7. In or about July 2017, Co-conspirator A requested that HIGGINBOTHAM meet with Country Q's ambassador to the United States at Country Q's embassy in Washington, D.C. HIGGINBOTHAM agreed, and on or about July 16, 2017, HIGGINBOTHAM went to Country Q's embassy in Washington, D.C. and met with the ambassador. HIGGINBOTHAM informed

embassy staff and Country Q's ambassador that he was there in his personal capacity and not as a representative of DOJ. At Co-conspirator A's request, HIGGINBOTHAM delivered a specific message during the meeting: United States government officials were working on the matter involving Foreign National 1 and there would be additional information in the future concerning the logistics of returning Foreign National 1 to Country Q. Following the meeting, HIGGINBOTHAM reported to Co-conspirator A what had occurred. Co-conspirator A informed HIGGINBOTHAM that, based on Co-conspirator A's conversations with Co-conspirator B, Co-conspirator B was satisfied with how the embassy meeting went.

8. Between in or about May 2017 and in or about September 2017, tens of millions of dollars were transferred from Foreign Company L, an entity formed in Country Q, to accounts in the name of an entity in the United States controlled by Co-conspirator A. HIGGINBOTHAM understood that, although the money was coming from Foreign Company L, Co-conspirator B exercised control over the funds and the transfers occurred at Co-conspirator B's direction. HIGGINBOTHAM also understood that the purpose of the funds was to pay Person 1 and others to lobby United States government officials to (1) resolve the 1MDB matters, and (2) have Foreign National 1 removed from the United States and sent back to Country Q.

9. To make the international fund transfers appear legitimate, HIGGINBOTHAM worked on various fake loan documents, investment agreements, and consulting contracts at the direction of Co-conspirator A. The documents were in the names of several foreign and domestic shell companies that concealed Co-conspirator B's involvement in the transactions. The purpose in creating the fake documents was to provide a cover story in case the banks or other authorities made inquiries about the true source and purpose of the funds. HIGGINBOTHAM understood that Co-conspirator A and Co-conspirator B were concerned that financial institutions in the United

States would refuse to execute transactions involving any funds identified as being associated with Co-conspirator B.

Meeting with Co-conspirator B in Country Q

10. In or about September 2017, at Co-conspirator A's request, HIGGINBOTHAM travelled to Country Q with Co-conspirator A and others to meet with Co-conspirator B. Over the course of several days, HIGGINBOTHAM met with Co-conspirator B, Co-conspirator A, and others. During these meetings, Co-conspirator B, Co-conspirator A, and others discussed strategies for secretly funneling more of Co-conspirator B's money into the United States to further the lobbying campaign, including coming up with cover stories to explain the movement of money and to conceal the fact that the money was associated with Co-conspirator B. They also discussed the strictness of the United States banking system in the wake of the events of September 11, 2001. Co-conspirator B stated that he wanted to send the money in smaller installments over a longer period of time in order to avoid scrutiny.

11. Eventually, Co-conspirator B came up with a proposal of giving HIGGINBOTHAM power of attorney over the assets of Foreign Company R, another entity formed in Country Q and purportedly owned by an associate of Co-conspirator B. In reality, Co-conspirator B controlled Company R's assets and the associate was simply a nominee for Co-conspirator B. According to Co-conspirator B's proposal, in the event Person 1 and others were successful in having Foreign National 1 removed from the United States, HIGGINBOTHAM (using the power of attorney authority) could sell Company R to Co-conspirator A and others associated with Person 1 and use Company R's assets to compensate those involved in the lobbying campaign. At Co-conspirator B's direction, HIGGINBOTHAM signed various documents while in Country Q purporting to give HIGGINBOTHAM control over Company R and its assets.

12. Upon returning to the United States, HIGGINBOTHAM and Co-conspirator A learned that Person 1 and others involved in the lobbying campaign were dissatisfied with Co-conspirator B's proposal and the fact that the trip to Country Q had not resulted in additional funds being sent to the United States. In or about October 2017, Co-conspirator A and HIGGINBOTHAM agreed that the additional funds that Person 1 and his associates were seeking from Co-conspirator B could instead be deposited into HIGGINBOTHAM's attorney escrow account pending resolution of the issue concerning Foreign National 1.

13. On or about October 23, 2017, approximately $41 million was deposited into HIGGINBOTHAM's escrow account from Foreign Company R, at the direction of Co-conspirator B. HIGGINBOTHAM, at Co-conspirator A's direction, disbursed several million dollars for one of Co-conspirator A's entertainment projects. According to Co-conspirator A, those funds were Co-conspirator A's cut for helping get the money into the United States and acting as an intermediary between Co-conspirator B and the individuals engaged in the lobbying campaign. Virtually all of the remaining funds were placed in a certificate of deposit at Co-conspirator A's request because the individuals engaged in the lobbying campaign wanted the money to be secure. HIGGINBOTHAM believed that the funds would be released in the event the lobbying campaign was successful in having Foreign National 1 removed from the United States.

False Statements to Financial Institutions

14. Between in or about September 2017 and in or about December 2017, in furtherance of the conspiracy, HIGGINBOTHAM made and caused to be made false statements to three federally insured financial institutions in the United States in order to influence the financial institutions' actions in connection with the tens of millions of dollars transferred from Foreign Company L and Foreign Company R to accounts in the United States to finance Co-

conspirator B's lobbying campaign. HIGGINBOTHAM understood that Co-conspirator B's publicly known status as one of the primary architects of the 1MDB embezzlement and bribery scheme created significant barriers to moving Co-conspirator B's money through United States financial institutions. HIGGINBOTHAM, Co-conspirator A, and Co-conspirator B, therefore agreed that Co-conspirator B's connection to the funds sent to the United States for the lobbying campaign would be concealed from United States financial institutions and the true purpose of the funds would be misrepresented to the financial institutions.

15. Between in or about July and September 2017, Financial Institution X, an institution with accounts insured by the Federal Deposit Insurance Corporation (FDIC), sent inquiries to Co-conspirator A, Co-conspirator A's money manager, and HIGGINBOTHAM concerning the source and purpose of the tens of millions of dollars in transfers from Foreign Company L to Co-conspirator A's business accounts at Financial Institution X. On or about September 27, 2017, in order to influence the bank's ongoing due diligence, HIGGINBOTHAM, at Co-conspirator A's direction, sent a detailed written response to Financial Institution X claiming that Foreign Company L was the source of the transfers, and that the purpose of the funds was to finance Co-conspirator A's "entertainment matters," and also to retain a law firm to assist Foreign Company L to "resolve a highly complex civil litigation matter." The letter made no mention of Co-conspirator B or the lobbying campaign to influence the 1MDB matters and have Foreign National 1 removed from the United States. In addition, HIGGINBOTHAM attached one of the fake consulting contracts to his response to Financial Institution X as a cover story for some of the money Co-conspirator B had transferred to Co-conspirator A's business accounts in the United States. On or about September 28, 2017, Financial Institution X informed Co-conspirator A that all of his business accounts would be closed on or before October 28, 2017, and that effective

immediately wires into the accounts would no longer be accepted "due to insufficient information received regarding the source of funds on previous wires." Financial Institution X subsequently issued cashier's checks totaling approximately $37 million for the remaining balance, which were deposited with Financial Institution Y a short time later.

16.　　Financial Institution Y was a broker-dealer registered with the United States Securities and Exchange Commission that had arrangements with federally insured banks for offering certain account services. In or about October 2017, Co-conspirator A and HIGGINBOTHAM opened business accounts with Financial Institution Y that provided separate cash accounts with an affiliate FDIC insured bank, where some of the funds from Foreign Company L (which had previously been with Financial Institution X) were maintained. Between in or about October and November 2017, as part of its due diligence in connection with the account openings, Financial Institution Y repeatedly inquired of Co-conspirator A and HIGGINBOTHAM about the source and purpose of the tens of millions of dollars in Co-conspirator A's business accounts that had previously been with Financial Institution X. In order to influence Financial Institution Y's actions with respect to maintaining the accounts, Co-conspirator A claimed to a representative of Financial Institution Y that the money was from a foreign investor in Co-conspirator A's entertainment projects. In addition, on or about November 6, 2017, at Co-conspirator A's direction, HIGGINBOTHAM responded to the representative's question about whose money was in the accounts by falsely claiming, "The funds originated with [Foreign Company L] (incorporation documents attached) who is an investor in a slate of projects the [sic] are currently under review and subject to further discussion." Neither Co-conspirator A nor HIGGINBOTHAM mentioned Co-conspirator B or the campaign to influence the 1MDB matters and have Foreign National 1 removed from the United States. In or about November 2017,

Financial Institution Y closed Co-conspirator A's business accounts and disbursed the remaining funds, including those from the cash accounts, to Co-conspirator A.

17. In or about December 2017, Financial Institution Z, an FDIC insured bank where HIGGINBOTHAM maintained an attorney escrow account, inquired of HIGGINBOTHAM about the source and purpose of the approximately $41 million deposited into HIGGINBOTHAM's account from Foreign Company R. In order to influence Financial Institution Z's due diligence with respect to the funds, HIGGINBOTHAM responded that the money was an investment from Foreign Company R in music and entertainment projects for one of his clients. HIGGINBOTHAM did not mention Co-conspirator B or the campaign to influence the 1MDB matters and have Foreign National 1 removed from the United States.

18. On or about May 9, 2017, HIGGINBOTHAM submitted a $20,000 invoice to Co-conspirator A for work related, at least in part, to the conduct described above for Co-conspirator A. On or about August 11, 2017, HIGGINBOTHAM submitted a $50,000 invoice to Co-conspirator A and his money manager for work related, at least in part, to the conduct described above for Co-conspirator A. Co-conspirator A paid HIGGINBOTHAM the full amount of both invoices.

ANNALOU TIROL
Acting Chief
Public Integrity Section

By: [signature]
John Keller
Deputy Chief
Ryan Ellersick
James Mann
Sean Mulryne
Nicole Lockhart
Trial Attorneys
Public Integrity Section
1400 New York Ave. NW
Washington, DC 20005
(202) 514-1412

## DEFENDANT'S ACCEPTANCE

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me. It does not include all of the facts known to me regarding this offense. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crime charged. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Factual Basis for Plea fully.

I have read every word of this Factual Basis for Plea or have had it read to me. Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorneys, I agree and stipulate to this Factual Basis for Plea, and declare under penalty of perjury that it is true and correct.

Date: NOVEMBER 19, 2018

George Higginbotham
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Factual Basis for Plea, and have reviewed it with my client fully. I concur in my client's desire to adopt and stipulate to this Factual Basis for Plea as true and accurate.

Date: 11/19/18

Christopher Mead
Lance Robinson
For the Defendant

# EXHIBIT 3

CASE NO. 22-50073

IN RE: Ho Wan Kwok

VS.

Debtor EXHIBIT 3

DATE ______ IDEN.

DATE 8/4/2022 Admitted in Full EVID.

BY P.E.

Deputy Clerk

AO 386-A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re: Chapter 11

Genever Holdings LLC, Case No. 20-12411 (JLG)

Debtor.
-----------------------------------------------------------x

**DEBTOR'S OMNIBUS SECOND RENEWED MOTION (i) TO APPROVE SECOND AMENDED AND RESTATED SETTLEMENT WITH BRAVO LUCK AND PAX; AND (ii) TO HIRE MELANIE L. CYGANOWSKI AS AN EMPLOYEE ONLY TO ACT AS THE SALES OFFICER FOR THE DEBTOR'S BANKRUPTCY ESTATE**

Genever Holdings LLC (the "Debtor"), as and for its omnibus and second renewed motion (the "Renewed Motion") (i) seeking approval pursuant to Bankruptcy Rule 9019(a) of the Second Amended and Restated Settlement with Pacific Alliance Asia Opportunity Fund L.P. ("PAX") and Bravo Luck Limited ("Bravo Luck"), a copy of which is annexed hereto as Exhibit "A" (the "Revised Settlement"); and (ii) to hire Melanie L. Cyganowski ("Ms. Cyganowski") as an employee only to act as the Sales Officer for the Debtor's Bankruptcy Estate pursuant to 11 U.S.C. §§ 105 and 363 in accordance with the attached revised Employment Letter annexed hereto as Exhibit "B" and pursuant to the respective pre-fixed revised Orders approving the Revised Settlement and the corresponding hiring of Ms. Cyganowski, which are being separately noticed for presentment, represents and shows this Court as follows:

**Background**

1. The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on October 12, 2020 and thereafter has continued in possession and management of its assets as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

2. The Debtor's chief asset consists of the 18th floor apartment and auxiliary units in the Sherry Netherland Hotel located at 781 Fifth Avenue, New York, New York 10022 (collectively, the "Residence").

3. The Debtor reached a proposed settlement with Pacific Alliance Asia Opportunity Fund L.P. ("PAX") and Bravo Luck Ltd. ("Bravo Luck") establishing, *inter alia*, a negotiated framework for the sale of the Residence under the stewardship of a Sales Officer to be employed by the Debtor. The parties agreed upon the selection of Melanie Cyganowski to serve in this capacity, and the Debtor previously moved for Bankruptcy Court approval of the proposed settlement and the retention of Melanie Cyganowski as the Sales Officer (See, ECF Nos. 62 and 72).

4. The Office of the U.S. Trustee objected to both motions (ECF Nos. 94 and 103). Thereafter, the parties briefed a number of issues in connection therewith (See, ECF Nos. 76, 81, 83, 95, 96, 97, 99, 104, 105 and 106).

5. On September 1, 2021, the Bankruptcy Court issued a comprehensive decision (the "September 1, 2021 Decision") relating to the Debtor's motions, finding (i) that the settlement comfortably fell within the range of reasonableness and was in the best interests of the Debtor's estate; (ii) that the Debtor had the right under state law to amend its operating agreement to appoint the Sales Officer; and (iii) that the Debtor had the right to employ Ms. Cyganowski as Sales Officer.

6. The Bankruptcy Court, however, found certain issues with Ms. Cyganowski providing any legal advice to the Debtor or utilizing personnel at her firm (Otterbourg P.C.) to assist her without retention of the firm under 11 U.S.C. §327. Accordingly, the Bankruptcy Court initially did not approve either of the motions on this basis. In the main, however, the proposed settlement appeared acceptable to the Court for purposes of Bankruptcy Rule 9019.

7. Following receipt of the September 1, 2021 Decision, the Settling Parties have modified the proposed retention of Ms. Cyganowski to address the foregoing, essentially as follows:

- Ms. Cyganowski shall be hired strictly as an employee of the Debtor and shall not provide any legal advice or counsel to the Debtor.
- The Debtor shall not retain the Otterbourg P.C. law firm to assist Ms. Cyganowski or otherwise.

8. Based upon these modifications, the Settling Parties hereby seek to renew the Debtor's motion for approval of the Revised Settlement with the same corresponding modifications relating to the hiring of Ms. Cyganowski. The Revised Settlement continues to provide an agreed framework for the sale of the Residence under the stewardship of the Sales Officer, who shall direct the sale and marketing process based upon her status as an employee of the Debtor. The Revised Settlement is substantially identical to the prior version of the settlement agreement, but has been modified to remove the provisions outlined in Paragraph 7 above regarding Ms. Cyganowski's status as an employee; (i) that the Otterbourg firm shall not be retained; and (ii) Ms. Cyganowski shall not provide legal advice to the Debtor. Also there were clarifications made regarding the structure of Ms. Cyganowski's indemnity and compensation, plus other non-substantive clean-up. Accordingly, the Debtor has obtained the agreement of the Settling Parties and the Office of the U.S. Trustee to the revised terms, and submits that the Revised Settlement should now be approved by the Court.

**Renewed Retention of Ms. Cyganowski**

9. Ms. Cyganowski is a highly respected and experienced person who can bring a sense of stability and confidence to the position of Sales Officer. Indeed, there is unanimous agreement among the parties that Ms. Cyganowski is an ideal candidate, as her experience and judgment are beyond reproach.

## Scope of Services

10. In keeping with the Court's September 1, 2021 Decision, Ms. Cyganowski will perform the following services as more particular detailed in the renewed settlement agreement solely as an employee of the Debtor[1]:

a. Ms. Cyganowski shall oversee the sale of the Residence through a conventional bankruptcy-type sale process for the Debtor in consultation with Bravo Luck and PAX. Ms. Cyganowski is not a chapter 11 trustee or examiner and is being hired strictly as an employee of the Debtor and Ms. Cyganowski will not render any legal advice or counsel.

b. Ms. Cyganowski shall select the real estate broker ("Broker") on behalf of the Debtor, subject to the right of Bravo and PAX to object. The broker shall have expertise selling luxury residential Manhattan real estate and employed by the Debtor's Bankruptcy Estate. Bravo Luck and PAX shall be allowed to recommend and interview parties to fill the role of Broker in conjunction with Ms. Cyganowski.

c. Ms. Cyganowski shall also oversee the establishment of a marketing program and sales procedures for the Debtor that are designed to maximize value of the Residence. Procedures and the ultimate approval of any sale shall be subject to further application to the Court to be filed by the Debtor's counsel.

11. In sum, Ms. Cyganowski is being hired as an employee and designated sale officer to lead the Debtor's efforts to sell the Residence with delineated functions as set forth in the Renewed Settlement Agreement.

## Ms. Cyganowski's Disinterestedness

12. Although the hiring of Ms. Cyganowski is being done under 11 U.S.C. § 363, she has no disqualifying relationships involving any creditors or parties in interest, and otherwise qualifies as a "disinterested person" within the meaning of Section 101(14) of the Bankruptcy Code to the extent applicable.

13. To the best of the Debtor's knowledge, information, and belief, Ms. Cyganowski: (a) has no prior or current connection with the Debtor, its creditors, any member of the Kwok

family, or other parties in interest; and (b) does not hold any interest adverse to the Debtor, the Debtor's estate, PAX or Bravo Luck.

**Terms of Compensation**

14. As set forth in the renewed Employment Letter, Ms. Cyganowski has requested and will be paid on an hourly basis predicated on a current billing rate of $1,400 per hour. Ms. Cyganowski has agreed that her compensation shall be paid from the sale proceeds generated from the sale of the Residence, and the Debtor shall seek authorization to pay her fees and expense in connection with a future application to sell the Residence. Pending a sale of the Residence, Ms. Cyganowski shall accrue her fees and expenses as an administrative expense claim.

**Basis for Granting Application to Hire Ms. Cyganowski**

15. The legal predicates for Ms. Cyganowski's hiring have already been extensively briefed and analyzed in this Court's September 1, 2021 Decision. Essentially, the Debtor's authority to hire Ms. Cyganowski flows from the Debtor's ability to sell the Residence pursuant to Section 363 of the Bankruptcy Code. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under Section 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted); *see also In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012) (noting that it is "well-settled" that a debtor may use its assets outside the ordinary course where such use "represents the sound exercise of

[1] The Court is respectfully referred to the renewed settlement agreement for a complete recitation of the terms.

business judgment"); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (stating that judicial approval under Section 363 of the Bankruptcy Code requires a showing that the proposed action is fair and equitable, in good faith, and supported by a good business reason). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

16. The decision to hire Ms. Cyganowski, having been made with the approval of the Debtor's major creditors, should be approved and authorized because it is based on a sound exercise of the Debtor's business judgment, and her employment is in the best interest of the Debtor's estate and creditors consistent with the Revised Settlement.

**The Revised Settlement and Revised Order Approving the Debtor's Hiring of Ms. Cyganowski Should Each Be Approved**

17. This Court previously found in its September 1, 2021 decision that the initial settlement was reasonable and met the *Iridium* factors for approval of settlements. As the Court stated:

> The sixth Iridium Factor is not relevant to this matter. The Settlement Agreement falls comfortably within the scope of the remaining factors . . . The Court finds that the Settlement Agreement is fair and equitable and is in the best interests of the Debtor's estate and creditors.

18. However, as noted, the Court declined to approve the settlement because of its concerns relating to Ms. Cyganowski's retention. Since the Revised Settlement fully addresses these concerns, as detailed above, the Debtor respectfully submits that the Revised Settlement should now be approved, together with Ms. Cyganowski's employment.

19.     The final terms of the Revised Settlement (including the revised terms relating to

hiring of Ms. Cyganowski) have been reviewed with the Office of the U.S. Trustee and all

objections have been resolved.  Accordingly, the Debtor is seeking Bankruptcy Court approval

of these motions based upon a Notice of Presentment as authorized during the hearing on

September 22, 2021.  Any other creditor or party in interest having an objection may file the

same prior to the presentment date, which then will be heard on October 20, 2021

     WHEREFORE, the Debtor respectfully prays for the entry of the pre-fixed Orders.

Dated: New York, New York
       September 24, 2021

                              GOLDBERG WEPRIN FINKEL
                              GOLDSTEIN LLP
                              Attorney for the Debtor
                              1501 Broadway, 22nd Floor
                              New York, New York 10036
                              (212) 221-5700


                              By:     /s/ Kevin J. Nash, Esq.

# SECOND AMENDED AND RESTATED SETTLEMENT AGREEMENT

This Second Amended and Restated Settlement Agreement (the "**Settlement Agreement**") is entered into as of September 24, 2021, by and among Genever Holdings, LLC, ("**Debtor**"), Pacific Alliance Asia Opportunity Fund L.P. ("**PAX**") and Bravo Luck Limited ("**Bravo Luck**") (each a "**Party**" and collectively, the "**Parties**").[1]

**W I T N E S E T H:**

WHEREAS, on October 12, 2020, Debtor filed its Chapter 11 Case.

WHEREAS, on December 16, 2020, PAX filed its motion to *Modify the Automatic Stay to Proceed with State Court Action and Related Relief* (the "**Lift Stay Motion**") [Dkts 12-14], which included, *inter alia*, a request to try PAX's veil piercing claims against the Debtor in the State Court Action.

WHEREAS, on January 5, 2021, the Debtor filed a response to the Lift Stay Motion and Bravo Luck also filed its objection thereto [Dkts 21 and 22].

WHEREAS, on January 12, 2021, PAX filed its motion for an *Order Under 11 U.S.C. 1112(b) Converting the Debtor's Case to a Case Under Chapter 7 or, in the Alternative, for an Order Under 11 U.S.C. 1104(a) Appointing a Trustee to Administer the Debtor's Estate* ("**Conversion Motion**") [Dkts 35-37].

WHEREAS, on May 10, 2021, the Debtor filed its opposition to the Conversion Motion [Dkt 84] and on January 27, 2021, Bravo Luck filed its opposition to the Conversion Motion [Dkt 44].

WHEREAS, the Debtor, PAX and Bravo Luck entered in a settlement agreement on February 26, 2021 (the "**Initial Agreement**") to resolve the Lift Stay Motion and Conversion Motion, and to establish procedures for the sale of the Residence through the Chapter 11 Case while preserving the rights of all Parties.

WHEREAS, the Debtor moved (the "**Motion**") for approval of the Initial Agreement entered into on February 26, 2021 pursuant to Bankruptcy Rule 9019(a) [Dkt 62].

WHEREAS, with approval from PAX and Bravo Luck, the Debtor also moved to retain Melanie L. Cyganowski (Ret.) (hereinafter, "**Ms. Cyganowski**") as the Sales Officer for purposes of settlement pursuant to 11 U.S.C. §§105 and 363(b) [Dkt 72] (the "**Motion to Appoint Ms. Cyganowski**").

---

1 Capitalized terms shall have the meaning provided below, or if not otherwise defined, in the Motions.

WHEREAS, in support of the Motion to Appoint Ms. Cyganowski, the Debtor filed the Declaration of Disinterestedness by Melanie L. Cyganowski dated April 12, 2021 [Dkt. 73] (the "**Cyganowski Declaration**").

WHEREAS, the Office of the U.S. Trustee ("**UST**") previously objected to the Initial Agreement, and the Parties thereafter agreed to amend and modify the Initial Agreement to attempt to address the concerns and objections raised by the UST (the "**Amended Settlement**").

WHEREAS, the Bankruptcy Court issued a decision dated September 1, 2021 finding, in the main, that the Amended Settlement met the standards of Bankruptcy Rule 9019(a), but denying the Debtor's motions due to certain issues relating to Ms. Cyganowski also providing legal advice directly to the Debtor or with the assistance of the Otterbourg P.C. law firm without retention under 11 U.S.C. § 327.

WHEREAS, the Parties have again further modified the Amended Settlement as provided herein to address the Court's concerns as set forth in its decision dated September 1, 2021 and to address the objections of the UST in a continuing effort to resolve their differences as described herein without resorting to further litigation, and, as a result of negotiations among the Parties, the Parties have agreed to resolve the Lift Stay Motion and the Conversion Motion, as well as establish procedures for the sale of the Residence through the Chapter 11 Case while preserving the rights of all Parties, as set forth below.

NOW, THEREFORE, for the consideration of the promises and the mutual covenants contained herein, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby CONSENT, AGREE, and STIPULATE as follows:

1. *Definitions*. Capitalized terms used herein but not otherwise defined shall have the following meanings:

a. **"Approval Order"** shall mean the order entered by the Bankruptcy Court granting the Motion and approving this Settlement Agreement.

b. "**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the Southern District of New York.

c. "**BVI**" shall mean the British Virgin Islands.

d. "**BVI Litigation**" shall mean those certain actions filed by PAX in the BVI in 2020 under case No. BVIHCM 2020/0137 against: (i) Genever BVI, (ii) Bravo Luck, (iii) Kwok, and (iv) Guo, seeking, among other things, to enforce (a) the Judgment arising in the State Court Action; and (b) the Defense and Counterclaim filed on January, 14, 2021, by Bravo Luck and Guo against PAX.

e. **"Chapter 11 Case"** shall mean the underlying chapter 11 bankruptcy case captioned *GENEVER HOLDINGS LLC.,* filed by the Debtor in the Bankruptcy Court, case number 20-12411.

      f. "**Effective Date**" shall mean the date on which the Approval Order has been entered by the Bankruptcy Court and is a final order.

g. "**Genever BVI**" shall mean Genever Holdings Corporation, a British Virgin Islands corporation and 100% owner of the Debtor.

h. "**Guo**" shall mean Qiang Guo.

i. "**Kwok**" shall mean Kwok Ho Wan aka Miles Kwok.

j. "**Operating Agreement**" shall mean the Limited Lability Company Agreement of the Debtor dated February 13, 2015, as amended by the Resolution, pursuant to section 23 therein.

k. "**Residence**" shall mean the entire 18th floor apartment and auxiliary units in the Sherry Netherland Hotel located at 781 Fifth Avenue, New York, New York 10022.

l. "**Resolution**" shall mean the corporate resolution previously passed by the Debtor as referenced in the Court's September 1, 2021 decision regarding the hiring of Ms. Cyganowski as an employee to serve as the Debtor's Sales Officer as provided hereunder.

m. "**Sale Motion**" shall mean a motion to be filed by the Debtor seeking approval by the Bankruptcy Court to sell the assets of the Debtor, including but not limited to, the Residence, and for approval of sale procedures in connection with same.

n. "**Sales Officer Hiring Order**" shall mean the separate order entered by the Bankruptcy Court approving the renewed Motion to hire Ms. Cyganowski pursuant to this Settlement Agreement.

o. "**Sherry-Netherland Co-Op Board**" shall mean the cooperative board of the Sherry-Netherland.

2. *Appointment of the Designated Sales Officer*. Debtor hereby (i) exercises it business judgment to hire and appoint Ms. Cyganowski solely as an employee to serve as the Debtor's Sales Officer (the "**SO**") pursuant to Sections 9.3 and 23 of the Operating Agreement and the Resolution and (ii) designates authority to Ms. Cyganowski as SO solely to control and oversee the sale of the Residence as provided hereunder and without subjecting Ms. Cyganowski to any other duties or responsibilities. Ms. Cyganowski's employment, as set forth in this Settlement Agreement, shall be approved by the Bankruptcy Court pursuant to the Sales Officer Hiring Order. Pursuant to the Operating Agreement, Bankruptcy Code Section 363, and this Settlement Agreement, the Debtor may only revoke or terminate Ms. Cyganowski's hiring upon further Order of the Bankruptcy Court. The Parties believe that Ms. Cyganowski has the requisite expertise selling luxury residential Manhattan real estate and co-ops through a bankruptcy process. Ms. Cyganowski is acceptable to the Debtor, Bravo Luck, and PAX. Ms. Cyganowski as SO will oversee and interface with the retained real estate broker as provided below, and shall have the final authority as delegated by the Debtor hereunder and in the

Resolution, subject to Bankruptcy Court approval with right of objection by Bravo Luck and PAX, over the Debtor's decision making, sale process and the selection of (i) Qualified Buyer (defined below) and Qualified Offer (defined below) and (ii) successful and backup offers for the sale of the Residence. In the exercise of such powers, the SO shall consult with the Debtor, Bravo Luck and PAX. The SO is not acting as a lawyer for the Debtor and is not a chapter 11 trustee or examiner but shall have the same type of powers utilized by a trustee in bankruptcy, limited strictly to the terms of employment hereunder and without displacing the Debtor from its role as a debtor in possession.

3.      *Broker*.  The SO shall select the real estate broker(s) (the "**Broker**") to be retained and employed by the Debtor's estate in the SO's business judgment as delegated by the Resolution, in consultation with the Parties, and subject to the right of Bravo Luck and PAX to object. Bravo Luck and PAX shall be allowed to propose/recommend parties to the SO for the role of Broker. Bravo Luck and PAX shall have the right to interview the prospective Brokers. Bravo Luck and PAX shall consult with the Broker and the SO for purposes of establishing the timing and realization of maximum value for the Residence. The Broker will be compensated consistent with market terms, subject to Bankruptcy Court approval with right of objection by Bravo Luck and PAX. The SO will consult Bravo Luck and PAX regarding Broker's compensation. Broker shall be disinterested and free of conflicts, as described below. A draft Broker Agreement and Affidavit of Disinterest shall be provided to Bravo Luck and PAX for review and comment prior to filing by the Debtor, which shall include disclosure of all past and present conflicts, connections, and financial relationships between the Broker, and its representatives, with Miles Kwok, members of Kwok's family and their respective counsel, associates, affiliates and interests, as well as any past connection with Bravo Luck and PAX as well as their respective counsel, associates, affiliates and interests. Broker shall have expertise selling luxury residential Manhattan real estate.

4.      *Marketing Terms*.  The Parties agree to the following terms for the marketing of the Residence, with the specific terms to be established by the SO in consultation with the Debtor and as provided below:

        a.      Floor price to be set by the SO for minimum offers for any sale in consultation with Bravo Luck and PAX.

        b.      The SO may consider imposing limitations on an insider offer or by PAX or an affiliate thereof, in consultation with Bravo Luck and PAX.

        c.      The Broker shall fully disclose all fees, costs and any other direct or indirect compensation to be received by the Broker and its representatives.

        d.      The SO shall coordinate with the Broker in consultation with the Debtor, Bravo Luck and PAX on protocols for sale of the Residence, including staging, marketing strategy and process, identifying prospective buyers, international outreach, setting floor and target sale price, counteroffers, negotiated concessions, etc. and coordination with the Sherry-Netherland, as necessary.

        e.      Other protocols and procedures for sale of the Residence shall be developed by the SO and the Broker in consultation with the Debtor, Bravo Luck and PAX, including duration, minimum sale price, target sale price, and time, place, and

manner of any sale of the Residence.  Notwithstanding anything contained herein to the contrary, the duration of the sale process shall be limited to 180 days from the retention of the Broker, subject to extension upon written agreement of the Debtor, Bravo Luck and PAX, or by further order of the Court for cause shown.

      f.     Parties residing at the Residence shall make the Residence available for showing upon 24 hours advance notice.

    5.    *Sales Procedures*.  The Parties agree to the following regarding the sale of the Residence:

      a.     The sale shall be in cash payable at closing and shall be subject to higher and better offers.  If more than one Qualified Offer is received, the SO, in consultation with the Debtor, Bravo Luck and PAX, shall schedule an auction at which all Qualified Buyers can participate.

      b.     Selection of the winning Qualified Buyer shall be made by the SO in consultation with the Debtor, the Broker, Bravo Luck and PAX.

      c.     Sale shall be subject to Bankruptcy Court approval of a Sale Motion to be prepared and filed by the Debtor; draft of such motion to be provided to Bravo Luck and PAX for review and approval prior to filing.

      d.     Notwithstanding any other provision of this Settlement Agreement, and subject to applicable law, the sale of the Residence shall be subject to assignment of that certain Proprietary Lease by and between the Sherry-Netherland and the Debtor (the "Proprietary Lease"); all rights and obligations of the parties, whether under the Proprietary Lease or under applicable law, are expressly reserved.

      e.     Bravo Luck and PAX shall have access to the SO and the Broker and shall be kept fully informed regarding the status of the sale process, all offers received, and all material issues relating to the negotiation and eventual sale of the Residence.

      f.     The sale process shall include consultation rights for the Debtor, Bravo Luck and PAX, with the SO to have final authority in the event of any dispute pursuant to the authority granted to Ms. Cyganowski as an officer under Section 9.3 of the Operating Agreement.

      g.     Gross proceeds of sale less customary closing costs and expenses (including fees and expenses of the SO without further order of the Bankruptcy Court and the reasonable fees and expenses of the Broker subject to approval by the Bankruptcy Court upon notice to all Parties), without other deduction, shall be placed in escrow as provided below, subject to release solely with Bankruptcy Court approval on prior notice, including prior notice to Bravo Luck and PAX.  Notwithstanding the foregoing, Ms. Cyganowski shall have no control over, or obligations with regard to, the gross proceeds of the sale or the escrow account, which shall be held by an escrow agent in accordance with this paragraph, and only released upon further order of the Bankruptcy Court upon notice to the Parties.

h.        Gross proceeds of sale, as described above, shall be deposited in a nationally recognized collateralized bank reasonably acceptable to the Debtor, Bravo Luck and PAX and subject to Bankruptcy Court approval.

i.        Sherry-Netherland Co-op Board shall be consulted to confirm process and timing for Board approvals necessary to conduct and complete the sale of the Residence.

6.        *Approval Powers*. The SO shall oversee the sale process, and the Residence shall be initially marketed through the Broker in a commercially reasonable manner consistent with the stature of the Residence in an effort to identity one or more acceptable competing offers (each, a "**Qualified Offer**") from one or more acceptable competing buyers (each, a "**Qualified Buyer**").  An auction may be conducted if the SO determines it would result in a higher and better offer or upon further order of the Bankruptcy Court. The SO shall have the final approval power after prior consultation with the Debtor, Bravo Luck and PAX, and subject to Bankruptcy Court approval with right to object by Bravo Luck and PAX, regarding the marketing and sale of the Residence, including the following:

a.        To decide the sale process, whether through traditional means, private sale, auction, a combination thereof, or other process;

b.        To determine which potential buyers are Qualified Buyers;

c.        To determine which offers are Qualified Offers;

d.        To schedule an auction and determine the auction process, if necessary, including break-up fees, required overbids and other procedures;

e.        To determine which Qualified Offer is the highest and otherwise best offer and which is the next highest and otherwise best offer;

f.        To reject any offer that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Sales Procedures (as set forth in section 5 above) or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of the Debtor and its estate;

g.        To waive any term and condition set forth herein with respect to any potential buyer;

h.        To impose additional terms and conditions with respect to any potential buyer and the successful purchaser;

i.        To extend the deadlines set forth herein;

j.        To, except, as set forth herein, adjourn or cancel any auction and/or sale hearing without further notice;

k.        To modify the Sales Procedures; and/or

l.        To withdraw the Sale Motion at any time with or without prejudice.

7.     *Stay Relief, Maintenance, Fees and Other Terms.*

a.     Stay relief is granted to allow PAX to prosecute, and the Debtor to defend, the state court action currently pending in the New York Supreme Court under Docket No. 652077/2017 (the "**State Court Action**"), with the stay to otherwise remain in place for all other purposes, including relating to enforcement or collection of any judgment entered against the Debtor in the State Court Action, pending further order of the Bankruptcy Court upon further notice to all Parties. Nothing herein shall be construed as an acknowledgment of the appropriate forum outside the bankruptcy court to address any such issues, with all Parties' rights expressly reserved.

b.     Nothing herein shall prejudice the rights of any party, including Bravo Luck and PAX to proceed with the BVI Litigation, provided that PAX, Bravo Luck, Kwok, Guo or any of his or its affiliates reserve the right to assert claims in the Bankruptcy Court relating to its status as a creditor of the Debtor, and PAX reserves all rights to oppose such claims on any grounds. In addition, notwithstanding anything contained herein to the contrary, nothing in this Agreement shall prejudice the rights of any Party, including Bravo Luck and PAX, from proceeding with any and all claims, if any, against anyone, including Bravo Luck, Kwok, Guo, or any of his or its affiliates, and PAX or any of its affiliates, in BVI, State Court, or otherwise, and Bravo Luck and PAX reserve all rights to oppose such claims in the applicable forum.

c.     PAX shall withdraw its Conversion Motion expressly as provided below. PAX will not support or encourage a motion for the appointment of a trustee or conversion by any other party herein. However, notwithstanding anything contained herein to the contrary, to the extent any substantive term of this Settlement Agreement is breached by the Debtor, Bravo Luck, Kwok, Guo, or any of their related entities, there shall be no limitation on PAX's right to renew or file its Conversion Motion, including appointment of a trustee, nor will there be any limitation upon the Debtor's or Bravo Luck's right to oppose such action on any ground, including inter alia, that such breach did not occur. To the extent PAX breaches any substantive term under this Agreement, then PAX shall have no further right to renew or file its Conversion Motion, including appointment of a trustee, provided however, that there shall be no limitations upon PAX's right to seek a Bankruptcy Court declaration that such breach did not occur. Other than as expressly provided for under this Agreement, all Parties' rights and remedies are expressly reserved.

d.     Recommendation and Appointment of the SO: In connection with execution of this Settlement Agreement, the Debtor, Bravo Luck and PAX have previously agreed upon Ms. Cyganowski as the designed SO. In the event that paragraph 27(D)(f) is triggered, then Bravo Luck and PAX shall designate a total of four candidates for consideration as the designed SO, two by Bravo Luck and two by PAX (total of four by all Parties) (the "**List**"). The Parties shall confer to select an agreed SO from such List. If an agreement on selection of an SO cannot be reached by the Parties, then the Bankruptcy Court shall appoint the SO from such List, unless the Court finds an irreconcilable conflict to exist, after which the Office of the United States Trustee, after

consultation with Bravo Luck and PAX, may submit recommendations to the Court for other independent and disinterested persons to serve as SO.

e.     Stay relief is confirmed to allow the Sherry-Netherland to apply all accrued and owing post-petition maintenance fees and assessments as of the date hereof, and thereafter on a monthly basis, from the current security deposit, with the stay to otherwise remain in place for all other purposes.

8.     *Bankruptcy Court Approval.* This Settlement Agreement is subject to approval by the Bankruptcy Court and shall only be effective and binding on and from the Effective Date. The Parties hereby agree to waive the 14-day appeal period with respect to the effect of the Approval Order. The Debtor shall request that the Bankruptcy Court make the Approval Order a final, non-appealable order immediately upon entry. Bravo Luck and PAX have and shall continue to take all reasonable steps to seek approval of the Settlement Agreement and entry of the Approval Order and defend against any objections to this Settlement Agreement or appeals from the Approval Order.

9.     *Conditions Precedent.* The obligations of the Parties set forth in this Settlement Agreement are subject to the occurrence of the Effective Date. If the Bankruptcy Court declines to enter the Approval Order, or if the Approval Order is vacated or reversed on appeal, this Settlement Agreement shall be of no further force or effect, and each of the Parties' respective interests, rights, remedies and defenses shall be restored without prejudice as if this Settlement Agreement had never been formed and concluded/entered.

10.     *Representations and Warranties.* Each Party represents and warrants to the other Parties that: (a) it is authorized to execute and deliver this Settlement Agreement and perform its obligations hereunder; (b) each believes its own best interests are served by settling the matters encompassed by this Settlement Agreement, as provided in this Settlement Agreement; (c) no promise, agreement, inducement, representation, or warranty has been offered to any Party except as expressly provided in this Settlement Agreement; (d) this Settlement Agreement is not in violation of or in conflict with any other agreement of any Party; (e) this Settlement Agreement is executed voluntarily with full knowledge of the consequences and implications of the terms and obligations contained herein; (f) each Party has been represented by counsel of that Party's choice throughout the negotiations that preceded the execution of this Settlement Agreement, and in connection with the preparation and execution of this Settlement Agreement; (g) each Party has carefully and thoroughly reviewed this Settlement Agreement in its entirety and has resolved all questions concerning the meaning, legal nature, and binding effect of this Settlement Agreement with counsel of each Party's choosing; and (h) this Settlement Agreement is contractual and not merely recital, and that each Party has read, understands, and fully agrees to the terms of this Settlement Agreement.

11.     *No Admission of Liability.* Nothing in this Settlement Agreement shall be construed as an admission of liability or fault by any Party, and such liability and fault are expressly denied.

12. *Further Assurances*. Each Party shall execute and deliver any document or instrument reasonably requested by another Party after the date of this Settlement Agreement to effectuate the intent of this Settlement Agreement.

13. *Assignment*. No Party may assign any of its respective benefits, obligations or liabilities under or in respect of this Settlement Agreement without (a) the prior written consent of each other Party, which may be withheld in its absolute discretion, or (b) by order of the Bankruptcy Court.

14. *Successors*. This Agreement shall be binding upon and inure to the benefit of each Party and its respective successors, heirs, estates and personal representatives.

15. *Amendments*. This Agreement may be modified or amended only by a writing signed by a duly authorized representative of each Party hereto.

16. *Integration*. The provisions of this Settlement Agreement are integrated, essential and non-severable terms of this Settlement Agreement.

17. *Counterparts; Facsimile Signatures*. This Settlement Agreement may be executed in counterparts, each such counterpart will constitute an original document and such counterparts, taken together, will constitute one and the same document. Electronically transmitted or facsimile copies shall be deemed to be originals.

18. *Headings*. The headings of this Settlement Agreement are inserted solely as a matter of convenience and for reference and do not define, limit or describe the scope of this Settlement Agreement or the scope or content of any of its provisions.

19. *Governing Law*. This Settlement Agreement shall be governed by and construed in accordance with the Bankruptcy Code.

20. *Continuing Jurisdiction*. The Bankruptcy Court shall retain jurisdiction to resolve any dispute relating to the interpretation or enforcement of this Settlement Agreement.

21. *Entire Agreement*. This Settlement Agreement constitutes the entire agreement and understanding of the Parties regarding this Settlement Agreement and the subject matter thereof.

22. *Dual Construction*. If any provision of this Settlement Agreement may be construed in two or more ways, one of which would render the provision invalid or otherwise voidable or unenforceable and another of which would render the provision valid and enforceable, such provision shall have the meaning that renders it valid and enforceable.

23. *All Parties Drafted the Settlement Agreement*. The rule of construction that provides that ambiguities in a contract shall be construed against the drafter shall not apply to this Settlement Agreement because each Party drafted its terms, and all Parties waive applicability of such rule of construction in interpreting this Settlement Agreement.

24.     *Conferring Benefits.*  Nothing in this Settlement Agreement shall be construed to confer any benefit upon any person or entity, other than the Parties.

25.     *Recitals.*  The recitals are true and correct and are incorporated herein as if set forth at length.

26.     *Time Is of the Essence.*  Time is of the essence in relation to this Settlement Agreement.

27.     *Additional Provisions to address the Concerns and Objections of the UST*

A.     The Debtor is authorized to hire Ms. Cyganowski as an employee to serve as the designated SO under its Operating Agreement as amended and bylaws to carry out the specific duties and obligations set forth in this Settlement Agreement, and has hired Ms. Cyganowski pursuant to the Resolution.

B.     Ms. Cyganowski will be paid on an hourly basis predicated on a current billing rate of $1,400 per hour with all of her compensation to be treated as an administrative expense claim in accordance with Section 503 of the Bankruptcy Code.  The Debtor shall seek authorization to pay Ms. Cyganowski her fees and expenses in connection with an application to sell the Residence.

C.     The rights, duties and obligations of the SO shall be carried out without the necessity for further approvals from the Debtor's member(s) and manager(s) as such approvals have already been given by the Debtor in the exercise of its business judgment; provided, that, the SO shall report periodically to the Debtor's member(s) and manager(s); and approval of the highest and best offer for the sale of the Residence shall be subject to further order of the Bankruptcy Court upon notice.

D.     The Debtor's hiring of Ms. Cyganowski as the SO in accordance with this Settlement Agreement, as approved by the Bankruptcy Court, shall be subject to the following general limitations.

a.     Ms. Cyganowski (and any agent and/or related entity) shall not act in any other capacity (for example, and without limitation, as a lawyer, counsel, financial advisor, examiner, trustee or investor/acquirer) in connection with the Chapter 11 Case.

b.     Solely upon written consent of the Debtor, Bravo Luck and PAX and by written motion to the Bankruptcy Court upon notice, the Debtor may seek to (i) have Ms. Cyganowski assume duties that are different than the functions envisioned in the Settlement Agreement, (ii) materially change the terms of the engagement, (iii) modify the functions provided thereunder, (iv) add new executive officers, or (v) altering or expanding the scope of the engagement (except neither Ms. Cyganowski nor Otterbourg P.C. shall provide legal services to the Debtor).

c.     No principal or employee associated with Ms. Cyganowski shall serve as a director of the Debtor during the pendency of the above-captioned case.

d. From time to time periodically, and at least twenty (20) days in advance of any payment hereunder, the Debtor shall file or cause to be filed with the Bankruptcy Court and provide notice to parties having filed notices of appearance (the UST, Bravo Luck, and PAX) in this Chapter 11 Case, reports of Ms. Cyganowski's earned compensation and expenses.

e. Ms. Cyganowski, and her agents, shall be entitled to advancement and indemnification by the Debtor's estate in like manner as any of the Debtor's officers for all judgments, costs, and expenses, including reasonable legal fees (which shall be paid under the indemnity after court approval as they arise), arising from or related to any and all claims of whatsoever type brought against any of them in their capacity as SO or her agent, except for gross negligence, willful misconduct, fraud, or breach of fiduciary duty determined by a final order no longer subject to appeal. Nothing herein shall limit any defenses of Ms. Cyganowski allowed by law or deprive her of indemnity for any act or omission for which she has a defense. Ms. Cyganowski shall be added to the Debtor's existing liability policy with AIG Property and Consulting Company as an additional insured.

f. In the event of death, incapacity, resignation, or removal, a replacement SO shall be selected through the same process as the initial selection of the SO in accordance with this Settlement Agreement and further order of the Bankruptcy Court.

E. Ms. Cyganowski, in consultation with the Debtor, PAX and Bravo Luck, shall make decisions in accordance with the terms of this Settlement Agreement regarding the sale and marketing of the Residence, utilizing her business judgment and subject to Bankruptcy Court approval of the sale of the Residence pursuant to 11 U.S.C. §363(b) and (f), and 1123. The Debtor has amended the Operating Agreement to and hereby reconfirm (i) the hiring of Ms. Cyganowski as SO to carry out all of the duties and responsibilities as provided herein; (ii) that the Debtor cannot revoke Ms. Cyganowski's hiring and/or authority as SO without Bankruptcy Court approval; and (iii) that in the event of death, incapacity, resignation, or removal, a replacement SO shall be selected in accordance with this Settlement Agreement. Notwithstanding the foregoing, nothing contained herein shall divest the Debtor from its duties as a debtor-in-possession.

F. To the extent there is inconsistency between the terms of this Settlement Agreement, the Motion, the Engagement Letter and the Order approving this Settlement Agreement, the terms of this Settlement Agreement shall govern.

[Signatures on the following page]

Dated: September 24, 2021

Genever Holdings LLC

By: */s/Kevin J. Nash*
Kevin J. Nash
Goldberg Weprin Finkel Goldstein LLP
1501 Broadway, 22nd Floor
New York, NY 10022-5520
212-301-6944
KNash@gwfglaw.com
Attorneys for Debtor, Genever Holdings, LLC

Pacific Alliance Asia Opportunity Fund L.P.

By: */s/ Douglas E. Spelfogel*
Douglas E. Spelfogel
Foley & Lardner LLP
90 Park Avenue
New York, NY 10016-1314
212-682-7474
dspelfogel@foley.com
Attorneys for Pacific Alliance Asia Opportunity Fund L.P.

Bravo Luck Limited

By: */s/ Fran J. Lawall*
Francis J. Lawall
Troutman Pepper Hamilton Sanders LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215-981-4000
Francis.lawall@troutman.com
Attorneys for Bravo Luck Limited



230 Park Avenue
New York, NY 10169
otterbourg.com
212 661 9100

Melanie L. Cyganowski
Member of the Firm
mcyganowski@otterbourg.com
212 905 3677

September 24, 2021

Yanping Wang
Duly Authorized Representative of Genever Holdings LLC
The Sherry-Netherland
781 Fifth Avenue
Unit 1801
New York, New York 10022

Re: Genever Holdings LLC; Case No. 20-12411 (JLG)

Dear Mr. Wang:

On October 12, 2020, Genever Holdings LLC (the "Company") filed for bankruptcy relief with the United States Bankruptcy Court for the Southern District of New York (the "Court"), Case No. 20-12411 (JLG) (the "Bankruptcy Case"). The Company is currently operating as a debtor in possession under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). It is my understanding that on March 5, 2021, the Company filed a motion with the Court to approve a proposed settlement agreement by and among the Company, Pacific Alliance Asia Opportunity Fund L.P. ("PAX") and Bravo Luck Limited ("Bravo Luck") [Dkt. No. 62] (the "First Settlement Motion") and also filed a motion to retain me as a designated Sales Officer on behalf of the Company's bankruptcy estate [Dkt. Nos. 72, 73] (the "First Retention Motion"). On September 1, 2021, the Court denied the First Settlement Motion and the First Retention Motion. [Dkt. No. 123].

In accordance with my discussions with Kevin J. Nash, Esq., bankruptcy counsel for the Company, I have been informed that the Company will be filing a second revised motion seeking approval of a second amended and revised settlement agreement (the "Proposed Settlement") by and among the Company, PAX, and Bravo Luck Limited, and that the Company seeks to hire me as the Sales Officer in connection with the Bankruptcy Case pursuant to a revised employment letter. This letter serves to confirm the revised understanding and agreement (the "Agreement") between the Company and me concerning my employment as the Sales Officer and also serves to set forth the terms and conditions of the employment, including the scope of services to be performed and the structure of compensation for those services.

Description of Services

- In connection with this employment, I will serve as the Sales Officer on behalf of the Company with respect to the proposed sale (the "Proposed Sale") of the Company's ownership interest in the entire 18th floor apartment and auxiliary



units located at The Sherry-Netherland, 781 Fifth Avenue, New York, New York 10022 (the "Residence"), which interest according to the *Debtor's Declaration Pursuant to Local Bankruptcy Rule 1007-2*, dated October 6, 2020 [Dkt. No. 1], is "memorialized by approximately 3,000 shares of Sherry Netherland cooperative stock and corresponding proprietary leases".

- As Sales Officer, I will have the powers and duties set forth in the Proposed Settlement (as approved by the Court), solely to control and oversee the sale of the Residence as provided under the Proposed Settlement without subjecting me to any other duties or responsibilities.

- Solely upon written consent of the Company, Bravo Luck and PAX, and on notice to the Office of the U.S. Trustee with an opportunity to object, the Company may seek to have me assume duties that are different than the functions provided herein, or to expand into other areas or altering or expanding the scope of the employment, which relief shall be sought by motion to modify the retention filed with the Court;

- The Company expressly authorizes the Sales Officer to carry out all such duties and obligations as provided under the Settlement Agreement without further action by the Company.

Cooperation

- The Company shall furnish to me and my agents all information in its possession or control relating to the Residence that the Company believes is relevant to the Proposed Sale of the Residence and shall furnish all information that I shall request in connection with my duties as Sales Officer.

Limitation of Duties

- I do not make any representation or guarantee of the amount of sale proceeds, if any, that could be or will be generated from the sale of the Residence.

- I shall not be responsible, obligated or liable for the payment of any taxes, fees, costs, expenses, maintenance or charges related to the Residence or the Company, and such taxes, fees, costs, expenses, maintenance or charges shall be solely the responsibility, obligation and liability of the Company's bankruptcy estate.



- I (and any agent and/or related entity) shall not act in any other capacity (for example, and without limitation, as a lawyer, counsel, financial advisor, examiner, trustee or investor/acquirer) in connection with the Chapter 11 Case. I shall not provide any legal advice to the Debtor

- The firm of Otterbourg P.C. is not being retained. Otterbourg P.C. makes no representations hereunder and will not incur any obligations hereunder.

<u>Compensation</u>

- My services will be paid on an hourly basis predicated on my current billing rate of $1,400 per hour. The Company shall seek authorization to pay my fees and expenses in connection with an application for the sale of the Residence. In connection with any increases in my rates, I shall file a supplemental declaration with the Court and provide ten business days' notice to the U.S. Trustee prior to any increase in rates. The supplemental declaration shall set forth the requested rate increases, explain the basis for the requested rate increase, and certify that the Company has consented to the requested rate increases.

- Disbursements to be billed to the Company include, but are not limited to, non-local telephone calls, facsimile and other telecommunication charges, transportation, copying, delivery and messenger services, computerized research (billed at the actual cost of such research) if required, and other disbursements.

- All fees and expenses incurred by me will be based upon my actual time charges and disbursements recorded or incurred. For purposes of this employment, such fees and expenses shall accrue pending a sale of the Residence and will be promptly paid from the sale proceeds generated from the sale of the Residence following the filing of an application.

- All fees and expenses incurred and accrued by me will be treated and allowed in this Bankruptcy Case as administrative expenses in accordance with the Bankruptcy Code. A summary of all such charges as accrued, shall be filed with the Court, and provided to any parties having filed notices of appearance and the U.S. Trustee on a periodic basis.

- I (and my agents) shall be entitled to advancement and indemnification by the Company's bankruptcy estate in like manner as any of the Debtor's other officers for all judgments, costs, reasonable expenses, including legal fees (which shall be paid under the indemnity after court approval as they arise), arising from or



related to any and all claims of whatsoever type brought against me in my capacity as Sales Officer, or my agents, except for gross negligence, willful misconduct, fraud, or breach of fiduciary duty determined by a final order no longer subject to appeal. Nothing herein shall limit any defenses allowed by law or deprive me of indemnity for any act or omission for which I have a defense. I shall be added to the Debtor's existing liability policy with AIG Property and Consulting Company as an additional insured.

<u>Term</u>

- The employment will commence effective as of the date on which the Court enters an order approving my employment as Sales Officer on behalf of the Company and shall terminate upon the earlier of (i) the entry of a Court order dismissing the Bankruptcy Case, (ii) the entry of a Court order converting the Company's chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code, and (iii) the entry of a Court order terminating my services as Sales Officer.

<u>Court Approval</u>

- The Company shall use commercially reasonable efforts to obtain prompt approval from the Court of my employment as Sales Officer on behalf of the Company. Such Court approval shall provide for the employment to be effective as of the date on which the Court enters an order approving my employment as Sales Officer and shall incorporate all of the terms herein.

<u>Miscellaneous</u>

- This Agreement, including, without limitation, the construction and interpretation thereof, and all claims, controversies and disputes arising under or relating thereto, shall be governed and construed in accordance with the laws of the State of New York, without regard to principles of conflict of law that would defer to the laws of another jurisdiction. The parties hereto agree to waive trial by jury in any action, proceeding or counterclaim brought by or on behalf of the parties hereto with respect to any matter relating to or arising out of the employment or the performance or non-performance of the Sales Officer hereunder. The parties hereto agree that the Bankruptcy Court shall retain exclusive jurisdiction to hear any dispute arising under this agreement and waive any and all personal rights under the law of any jurisdiction to object on any basis (including, without limitation, inconvenience of forum) to jurisdiction or venue in the Bankruptcy



Court SDNY for any disputes and/or litigation arising in connection with this Agreement.

- This Agreement shall be binding upon the parties hereto, their respective heirs, successors, and assignees, including, without limitation, any Chapter 11 or Chapter 7 Trustee appointed.

On behalf of the Company, please confirm your agreement to this employment letter, by signing a copy of this letter on behalf of the Company and returning it to me. Of course if you have any questions or comments please call me to discuss them.

Very truly yours,

/s/ Melanie L. Cyganowski

AGREED AND ACCEPTED:

/s/ YANPING WANG
Duly Authorized Representative of Genever Holdings LLC

CC: Kevin J. Nash, Esq. (KNash@GWFGLaw.com)

# EXHIBIT 4

CASE NO. 22-50073

IN RE: Ho Wan Kwok

VS.

Debtor EXHIBIT 4

DATE ____________ IDEN.

DATE 8/4/2022 Admitted in Full EVID.

BY P.E.

Deputy Clerk

AO 386-A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| Genever Holdings LLC, | Case No. 20-12411 (JLG) |
| Debtor. | |

-------------------------------------------------------x

**ORDER GRANTING DEBTOR'S SECOND RENEWED MOTION TO APPROVE THE REVISED SETTLEMENT AGREEMENT**

Upon the Debtor's renewed motion (ECF No 131) (the "**Renewed Motion**") of Genever Holdings LLC, (the "**Debtor**") seeking approval of a certain settlement agreement between the Debtor, Pacific Alliance Asia Opportunity Fund L.P. ("**PAX**") and Bravo Luck Limited ( "**Bravo Luck**") (ECF No. 62); and upon the opposition to the Renewed Motion filed by the Office of the U.S. Trustee via a motion for the appointment of an Operating Chapter 11 Trustee (ECF No. 64) (the "**UST Opposition**"); and upon the supplemental responses filed by the Debtor, PAX and Bravo Luck relating to the UST Opposition (ECF Nos. 76, 81, 83, 95, 96, 97, 99, 104, 105 and 106); and a series of hearings having been held before the undersigned; and upon the record compiled at these hearings; and the Court having considered the UST Opposition; and upon the September 1, 2021, decision (the "September 1, 2021 Decision") in which the undersigned determined that the Restated Settlement meets the standards of reasonableness and is supported by the creditors and major stakeholders in the Chapter 11 case, but denied the Renewed Motion due to issues relating to certain aspects of the proposed retention of Melanie L. Cyganowski, Esq. and her firm, Otterbourg, P.C.; and, thereafter, the Settling Parties having agreed to the Second Amended and Revised Settlement Agreement between the Debtor, PAX and Bravo Luck (the "**Revised Settlement Agreement**") which addresses the concerns raised by the Court in its September 1, 2021 Decision as well as the objections of the U.S. Trustee, which no longer has any objections to the Revised

Settlement Agreement and the terms of Melanie L. Cyganowski's employment as Sale Officer for the Debtor; and the Court having agreed to consider final approval of the Renewed Settlement by Notice of Presentment; and based upon the entirety of the record compiled at the various hearings; and good cause appearing therefor; it is hereby

ORDERED as follows:

1. The Renewed Settlement Motion is granted as set forth herein.

2. The Revised Settlement Agreement is approved in all respects and shall become effective immediately upon the entry of this Order.

3. The Debtor's proposed employment of Melanie L. Cyganowski as Sale Officer shall be approved by separate Order to be noticed and entered simultaneously herewith.

4. The UST Motion seeking the appointment of an Operating Trustee is adjourned *sine die*.

5. Stay relief is granted to allow PAX to prosecute, and the Debtor to defend, the state court action currently pending in the New York Supreme Court under Docket No. 652077/2017 (the "**State Court Action**"), with the stay to otherwise remain in place for all other purposes, including relating to enforcement or collection of any judgment entered against the Debtor in the State Court Action, pending further order of the Bankruptcy Court upon further notice to all Parties.

6. The Lift Stay Motion and Conversion Motion filed by PAX are withdrawn as mooted by the approval of the Revised Settlement Agreement.

Dated: New York, New York
October 8, 2021

/s/ *James L. Garrity, Jr.*
Hon. James L. Garrity, Jr.

# EXHIBIT 5

CASE NO. 22-50073

IN RE: Ho Wan Kwok

VS.

Debtor EXHIBIT 5

DATE ________ IDEN.

DATE 8/4/2022 Admitted in Full EVID.

BY P.E.

Deputy Clerk

AO 386-A

PAUL HASTINGS

RECEIVED JUL 27 2022

1 (212) 318-6001
lucdespins@paulhastings.com

July 25, 2022

**VIA EMAIL AND OVERNIGHT MAIL**

The Honorable Judge James L. Garrity, Jr.
United States Bankruptcy Court for the Southern District of New York
One Bowling Green
New York, New York 10004-1408
Email: garrity.chambers@nysb.uscourts.gov

**Re: *In re Genever Holdings LLC*, Case No. 20-12411 (JLG)**

Dear Judge Garrity:

I am writing to you in my capacity as the chapter 11 trustee (the "Trustee") appointed in the chapter 11 case of Mr. Ho Wan Kwok[1] pending before the United States District Court for the Southern District of Connecticut (the "Connecticut Bankruptcy Court"), Case No. 22-50073 (JAM).[2]

As you may already be aware, Mr. Kwok owns all of the equity in Genever Holdings Corporation ("Genever (BVI)"), a British Virgin Island Corporation, which, in turn, wholly owns Genever Holdings LLC ("Genever (US)"), which is a debtor in a chapter 11 case pending before your Honor, Case No. 20-12411 (JLG). Genever (US) is the registered owner of, among other things, an apartment at the Sherry-Netherland building in New York, New York (the "Sherry Netherland Apartment"), which is currently the subject of a marketing and sale process in Genever (US)'s chapter 11 case before your Honor.[3]

As part of my efforts (in my capacity as the Trustee) to identify and collect assets for the benefit of Mr. Kwok's estate, on Saturday, July 23, 2022, I filed the attached motion in the Connecticut Bankruptcy Court seeking entry of an order confirming that the Trustee holds all of Mr. Kwok's economic and governance rights, for the benefit of Mr. Kwok's estate, with respect to all corporate entities owned and/or controlled by Mr. Kwok, including, without limitation, Genever (BVI) (the "Corporate Governance Rights Motion"), as well as requesting related relief. Concurrently with the filing of the Corporate Governance Rights Motion, I also filed a motion requesting expedited consideration of such motion. Today, the Connecticut Bankruptcy Court granted the motion to expedite, setting a hearing on the Corporate Governance Rights Motion for Monday, August 1, 2022.[4]

As made clear in Corporate Governance Rights Motion, the motion is not an attempt to request

> any relief with respect to the chapter 11 case of Genever (US), including any modification of the *Second Amended and Restated Settlement Agreement*,

[1] Although the Debtor's legal name is Ho Wan Kwok, he is also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases.

[2] I was appointed as the Trustee in Mr. Kwok's case by order of the Connecticut Bankruptcy Court, dated July 8, 2022.

[3] The identity of the true owner of the Sherry-Netherland Apartment is presently subject to dispute.

[4] Copies of the Corporate Governance Rights Motion, the related motion to expedite, and the Connecticut Bankruptcy Court's order granting the motion to expedite are enclosed with this letter. For the ease of your review, I have highlighted the relevant sections related to Genever (US)'s chapter 11 case (as discussed further below in this letter) .

PAUL
HASTINGS

> dated as of September 24, 2021 . . . **Nor should the requested relief, if granted, be deemed to authorize the Trustee to take any particular action with respect to Genever (US) in its chapter 11 cases, with respect to which the Trustee will seek relief from the United States Bankruptcy Court for the Southern District of New York . . . , as may be appropriate.**

Corporate Governance Rights Motion at 2 n.3 (emphasis added). Moreover, the proposed order attached as Exhibit A to the Corporate Governance Rights Motion explicitly provides that "[n]othing in this Order shall be deemed to authorize any particular action with respect to Genever Holdings LLC ("Genever (US)") in its chapter 11 case pending before the United States Bankruptcy Court for the Southern District of New York (the "Genever Court")." Corporate Governance Rights Motion, Proposed Order (Ex. A) ¶ 7. The proposed order also made clear that I "shall appear before, and seek guidance from, the Genever Court to the extent the Trustee's exercise of corporate governance rights with respect to Genever (US) would impact its chapter 11 case." *Id.*

Nor is it my intention to interfere with the ongoing sales process in Genever (US)'s chapter 11 case before your Honor. I expressly made that point in the Corporate Governance Rights Motion. *Id.* at 5 n.6.

I understand that your Honor has scheduled a status conference in Genever (US)'s chapter 11 case for August 16, 2022, which I would like to attend, but, unfortunately, I am not available on that date and would ask that the status conference be rescheduled for a date on or after August 22, 2022.

Please let me know if you have any questions regarding any of the foregoing.

Respectfully submitted,

Luc A. Despins
Chapter 11 Trustee

cc: Kevin J. Nash, Goldberg Weprin Finkel Goldstein LLP, Email: kjnash@gwfglaw.com
Francis J. Lawall, Troutman Pepper Hamilton Sanders LLP, Email: Francis.lawall@troutman.com
Melanie L. Cyganowski, Otterbourg P.C., Email: mcyganowski@otterbourg.com

Enclosures