# EXHIBIT B



[Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

# England and Wales Court of Appeal (Civil Division) Decisions

**You are here:** BAILII >> Databases >> England and Wales Court of Appeal (Civil Division) Decisions >> Avonwick Holdings Ltd & Anor v Shlosberg [2016] EWCA Civ 1138 (18 November 2016)
URL: *http://www.bailii.org/ew/cases/EWCA/Civ/2016/1138.html*
Cite as: [2016] WLR(D) 616, [2017] BPIR 1, [2017] 2 WLR 1075, [2016] EWCA Civ 1138

[New search] [Printable RTF version] [View ICLR summary: [2016] WLR(D) 616] [Buy ICLR report: [2017] 2 WLR 1075] [Help]

Neutral Citation Number: [2016] EWCA Civ 1138
Case No: A2/2015/2154 & 2156

IN THE COURT OF APPEAL (CIVIL DIVISION)
ON APPEAL FROM THE HIGH COURT OF JUSTICE
CHANCERY DIVISION, BANKRUPTCY COURT
MR JUSTICE ARNOLD
4387 OF 2014

Royal Courts of Justice
Strand, London, WC2A 2LL
18/11/2016

B e f o r e :

SIR TERENCE ETHERTON, MR
LADY JUSTICE GLOSTER
and
LADY JUSTICE SHARP

_____

Between:
**AVONWICK HOLDINGS LIMITED**

**JEREMY MARK WILLMONT AND EMMA SAYERS
(AS THE JOINT TRUSTEES OF MIKHAIL
SHLOSBERG)**

Appellants

- and -

**MIKHAIL SHLOSBERG**

Respondent

_____

Tom Smith QC and Henry Phillips (instructed by Dechert LLP) for the Appellants
Philip Marshall QC and James Mather (instructed by Enyo Law LLP) for the Respondent
Hearing dates: 25 & 26/10/2016

---

## HTML VERSION OF JUDGMENT

---

Crown Copyright ©

## See also: [2016] EWHC 1001 (Ch)

**Sir Terence Etherton, MR**

1. This appeal arises out of the bankruptcy of the respondent Mikhail Shlosberg. The second appellants, Jeremy Willmont and Emma Sayers, are his trustees in bankruptcy ("the Trustees"). The first appellant, Avonwick Holdings Limited ("Avonwick"), is his largest creditor.

2. The appeal is from an order of Mr Justice Arnold dated 5 May 2016, which was made on the application of Mr Shlosberg. The respondents to the application were Avonwick, the Trustees and Dechert LLP ("Dechert"), who were the solicitors for both Avonwick and the Trustees. The order of Mr Justice Arnold directed that Dechert cease to act for Avonwick in respect of any matter relating to Mr Shlosberg or his affairs.

3. The basis of the order was that Dechert had possessed, seen and reviewed a large quantity of documents, some of which were subject to Mr Shlosberg's legal professional privilege ("privilege"), and which the Trustees wished Avonwick to deploy in proceedings by Avonwick, Webinvest Limited ("Webinvest") and the liquidators of Webinvest in proceedings against Mr Shlosberg, Castle Investment Fund Limited ("Castle"), and the three other defendants for conspiracy ("the conspiracy proceedings").

4. Dechert has not appealed the Judge's injunction but has appealed the Judge's order for costs.

5. The application and this appeal raise, among other things, the issues whether privilege attaching to information and documents of a bankrupt are property which vests in the trustees in bankruptcy and what use may be made of such information and documents by the trustees.

The background

6. As that short introduction indicates, the factual background is complicated. For a full account, reference should be made to the comprehensive judgment of Mr Justice Arnold at [2016] EWHC 1001 (Ch). The following is a highly simplified account sufficient to understand the issues on this appeal. I have gratefully taken it from the Judge's account.

7. Mr Shlosberg is a Russian businessman domiciled in England. He is the beneficial owner of Webinvest. His family are the beneficiaries of a discretionary trust which owns Castle.

8. In 2010 Mr Shlosberg had an investment project relating to Vimetco NV ("Vimetco"), a Dutch company which operated aluminium plants. Vimetco's parent company, Vi Holding NV ("Vi Holding"), was owned or controlled by Vitaliy Machitski. UD$200 million was required for the Vimetco project. That amount was funded as follows.

9. Avonwick loaned US$100 million to Webinvest pursuant a loan agreement signed on 23 April 2010 ("the Avonwick loan"). Mr Shlosberg guaranteed Webinvest's obligations under the Avonwick loan pursuant to a deed of guarantee of the same date ("the Guarantee"). A further US$100 million was loaned by Castle to Webinvest.

10. Webinvest loaned US$200 million ("the Globoid loan") to Mr Machitski's company Globoid Finance Establishment ("Globoid"), which was incorporated in Liechtenstein.

11. Globoid did not repay the Globoid loan on the due date. In turn, Webinvest failed to repay the Avonwick loan.

12. On 15 May 2013 Webinvest commenced an arbitration against Globoid for the recovery of the Globoid loan and interest ("the Globoid arbitration"). The Globoid arbitration was subsequently settled through a series of agreements, and in particular agreements dated 23 and 24 June 2014 ("the Settlement Agreements"). On 16 January 2015 Globoid was placed in liquidation.

13. Avonwick commenced proceedings for repayment of the outstanding sums due under the Avonwick loan and the Guarantee ("the Avonwick proceedings"). Avonwick was represented in those proceedings by Dechert. Webinvest and Mr Shlosberg were represented by Fladgate LLP ("Fladgate").

14. Pursuant to an order for specific disclosure in the Avonwick proceedings, documents relating to the Settlement Agreements were provided to Avonwick by Webinvest and Mr Shlosberg.

15. Judgment was given for Avonwick in the Avonwick proceedings by Sales J on 6 November 2014 for payment by Webinvest and Mr Shlosberg of US$195,159,649.03 and interest at a daily rate of US$42,774.72.

16. In the course of a subsequent judgment in the Avonwick proceedings, Sales J observed that, even though the documents disclosed in relation to the Settlement Agreements were obscure and incomplete, it seemed that the effective proceeds of a settlement of the Webinvest claim against Globoid in the sum of US$172 million had been transferred to Castle, and not to Webinvest (the owner of the relevant contractual rights against Globoid), in circumstances where Castle proposed to pay on to Webinvest only half that amount to make it available to recovery by Avonwick; and that, on one interpretation of the documents, none of that sum would be available to Webinvest (and hence for Avonwick), leaving Avonwick with nothing against which to execute the judgment that it had obtained.

17. Neither Webinvest nor Mr Shlosberg has paid any sum in respect of the judgment obtained by Avonwick. On Avonwick's petition, a bankruptcy order was made against Mr Shlosberg on 14 January 2015. A winding up order was made against Webinvest on 27 February 2015. The Trustees were appointed on 20 January 2015. Mr Willmont and Michael Finch ("the Liquidators") were appointed as joint liquidators of Webinvest on 24 March 2015. Mr Shlosberg's remains an undischarged bankrupt.

18. The principal creditor of both Mr Shlosberg and Webinvest is Avonwick. In the case of Mr Shlosberg's insolvency, Avonwick's judgment represents at least 95 per cent, if not more, of the debts owed by Mr Shlosberg's estate.

19. Avonwick commenced the conspiracy proceedings against Castle on 19 November 2014. In due course Webinvest and the Liquidators were joined as claimants. Also in due course, Vi Holding, Globoid, Mr Machitski and Mr Shlosberg were added as defendants. It is alleged in the conspiracy proceedings that the Settlement Agreements were part of a scheme put in place to render Webinvest judgment proof in the face of the very substantial claims asserted against it by Avonwick. Avonwick believes that the Settlement Agreements were part of an unlawful conspiracy between Mr Shlosberg, on the one hand, and Mr Machitski/Globoid/Vi Holding, on the other hand, to ensure that the value of Webinvest's main asset would not be available to satisfy Avonwick's claims against Webinvest, but would instead be diverted to Mr Shlosberg or companies owned or controlled by him.

20. Shortly after their appointment the Trustees retained Dechert as their solicitors. Shortly after their appointment the Liquidators also retained Dechert as their solicitors. The responsible partner of Dechert, Adam Silver, confirmed in evidence before the Judge that no information barrier had been put in place

within Dechert between those advising Avonwick and those advising the Trustees and the Liquidators. On the contrary, Mr Silver had personally led the Dechert teams advising all three sets of clients.

21. Fladgate has provided the Trustees with three CDs containing copies of a large quantity of documents ("the Fladgate CDs"). The evidence is that the contents of the Fladgate CDs relate to the following three matters: (a) litigation in the county court regarding an attack on Mr Shlosberg's cat; (b) statutory demands issued by Avonwick against Mr Shlosberg and Webinvest and subsequent applications to restrain Avonwick from petitioning for Mr Shlosberg's bankruptcy and the winding up of Webinvest; and (c) the Avonwick proceedings. We are not concerned on this appeal with the documents in category (a). Some of the documents in categories (b) and (c) ("the Documents") are subject to the joint privilege of Mr Shlosberg and Webinvest. The Fladgate CDs were passed by the Trustees to Dechert, as the Trustees' solicitors, to review. The Trustees wish to permit Avonwick to make use of the contents of the Documents or some of them for the purposes of its claims in the conspiracy proceedings if that would be helpful to sustain those claims.

The application and the judgment of Mr Justice Arnold

22. On 4 December 2015 Mr Shlosberg issued an application against Avonwick, Dechert and the Trustees for an order directing that Dechert cease to act as solicitors for Avonwick and the Trustees. As the Judge explained in his judgment, the application was primarily made in respect of Dechert's position as solicitors for Avonwick, and only secondarily in respect of Dechert's position as solicitors for the Trustees.

23. The Judge handed down a substantial, comprehensive and careful judgment on 5 May 2016. With no disrespect to the Judge, it is necessary only to give the following very brief summary of the judgment sufficient to understand the discussion and my conclusions below.

24. The Judge said (at para. [66]) that the argument of the respondents to the application was that privilege in the Documents had been transferred the Trustees. The Judge reviewed in detail a number of authorities in this jurisdiction, as well as in Canada, Australia and Ireland, and made observations on various commentaries relied upon by the respondents to the application.

25. He said that IA 1986 s.311(1) shows that, in enacting IA 1986, the legislature addressed its mind to the question of privilege. He observed that the sub-section did not provide that the bankrupt's privilege should pass to the trustee but it does appear to be implicit that the trustee can use information contained in documents which he has taken possession of pursuant to section 311(1), including privileged documents, in the discharge of his statutory functions. The Judge observed, however, that there is a difference between using information contained in privileged documents otherwise than for the purpose of proceedings and using it for the purpose of proceedings.

26. The Judge then turned to four particular arguments deployed by the respondents to the application.

27. The Judge rejected (at para. [114]) the first argument of the respondents to the application that, because the Documents had vested in the Trustees as part of Mr Shlosberg's estate pursuant to IA s.306(1), the Trustees had also acquired the benefit of the privilege. He said that, even if the Trustees had acquired title to the Documents, as to which he said it was not necessary for him to reach a conclusion, as a matter of principle the right to exercise privilege cannot depend on ownership of the paper on which the privileged information is recorded.

28. The Judge then rejected (at paras. [121] and [125]) the second argument of the respondents to the application that the benefit of the privilege vested in the Trustees because privilege is itself either property within IA 1986 s. 436(1) or a power over, or in respect of, property within IA 1986 s.283(4).

29. The Judge said (at para. [128]) that, if it was necessary to do so, he would hold that privilege is peculiarly personal to the bankrupt and so excluded from IA 1986 s.283(1) and (4).

30. The Judge then addressed the third argument, which was directed at the category (a) material relating to the county court proceedings concerning Mr Shlosberg's cat. On that issue, he found in favour of the respondents to the application.

31. The fourth argument of the respondents to the application was the Documents (viz. those in categories (b) and (c)) had resulted in a judgment against Mr Shlosberg prior to the date of the bankruptcy, and the judgment was an "obligation" within the definition of "property" in IA 1986 s.436(1) and hence property which vested in the Trustees. The Judge rejected that argument at para. [141].

32. The Judge said (at para. [144]) that, having regard to his conclusion with respect to privilege, it was unnecessary to give separate consideration to Mr Shlosberg's claim to confidentiality.

33. The Judge then turned to the question of remedy. He set out (in para. [145]) the various safeguards which the respondents to the application had put in place to protect Mr Shlosberg's confidential information. Mr Shlosberg's contention was that in a situation where a large quantity of documents which were subject to privilege to which he was entitled, albeit jointly with Webinvest /the Liquidators, were not only in the possession of, but had also been reviewed in detail by the solicitors acting for an adverse party in litigation, namely Avonwick, the appropriate remedy was for Dechert to be ordered to cease acting for Avonwick. The contention of the respondents to the application was that Mr Shlosberg would be adequately protected by the safeguards which had been put in place; in the alternative, Mr Shlosberg would be adequately protected by an injunction restraining misuse of the information in question.

34. Having reviewed a number of authorities, and set out eleven factors relevant to the exercise of the court's discretion in the present case, the Judge concluded (at para. [160]) that an injunction should be granted requiring Dechert to cease acting for Avonwick. He said that he did not consider that Mr Shlosberg's rights in respect of the privileged information would be adequately protected by granting an injunction restraining Dechert from using the privileged information unless a strict information barrier were created within Dechert and an entirely new team was assigned to act for Avonwick.

35. The Judge granted permission to appeal the order "on the ground that legal professional privilege devolved from Mr Shlosberg to the [Trustees]".

The appeal

36. Avonwick and the Trustees appeal on five grounds. The first is that the Judge was wrong in law in concluding that the statutory regime in bankruptcy did not have the effect of vesting in the Trustees Mr Shlosberg's right to privilege in respect of the Documents (save in respect of materials relating to matters "peculiarly personal" to Mr Shlosberg). The second is that the Judge was wrong in law in concluding that a trustee in bankruptcy has no power to waive privilege over documents or information obtained from a bankrupt pursuant to his statutory powers. The third is that the Judge was wrong in law in rejecting the alternative argument that the effect of the High Court judgment obtained by Avonwick against Mr Shlosberg was that the Documents related to a liability of Mr Shlosberg which, on his bankruptcy, became a liability of the estate and so constituted property within the meaning of IA 1986 s.436. The fourth ground was that the Judge was wrong as a matter of law in failing to analyse the scope of Mr Shlosberg's right of confidentiality against the Trustees. The fifth ground was that the Judge was wrong to grant an injunction.

37. There is an issue between the parties as to whether the fourth ground falls within the Judge's permission to appeal. It is clear that all or part of the fifth ground does not fall within the scope of that permission. Insofar as Avonwick and the Trustees require permission to appeal, I would grant such permission notwithstanding that the application for such permission is technically out of time. The arguments which Avonwick wishes to advance in respect of both confidentiality and remedy were advanced before the Judge, were contained in the Grounds of Appeal, and are addressed in Avonwick's skeleton arguments on this appeal.

38. Mr Shlosberg has issued a respondent's notice to uphold the Judge's order on an additional ground. It is not necessary to set that out here.

39. Dechert and Avonwick have issued a separate appellant's notice in relation to the Judge's order for costs, in particular insofar as he made an order for costs against Dechert alone rather than against both Dechert and Avonwick. Permission to appeal is required for this appeal. For the reasons given below, I would refuse permission to appeal.

Discussion

The competing policies

40. The issue at the heart of this application and appeal concerns the inter-relationship between two public interest policies: the public interest that the trustees of a bankrupt are able to get in, realise and distribute the bankrupt's estate in accordance with statutory scheme in IA 1986, and the public interest that a person is able to consult their lawyer in confidence in the knowledge that what is told to the lawyer will never be revealed without their consent.

41. It is not necessary to say much more about the first of those policies. It is an obviously vital factor in the economic prosperity and general welfare of the nation that creditors are duly paid and that, when an individual or company becomes insolvent, their assets are got in, realised and distributed among the creditors. IA 1986 s.305(2) provides, in precisely those terms, that "[t]he function of the [bankruptcy] trustee is to get in, realise and distribute the bankrupt's estate in accordance with the following provisions of this Chapter".

42. It is also important that the bankrupt assists the trustee in the discharge of that function, and there are many statutory provisions to secure such co-operation. They include, in section 312, an obligation to deliver up to the trustee possession of any property, books, papers or other records of which the bankrupt has possession or control and of which the trustee is required to take possession, and, in section 333, an obligation to the give to the trustee such information as to his affairs and to attend to the trustee at such times and do all such other things as the trustee may for the purpose of carrying out that statutory function reasonably require.

43. Turning to privilege, there was no criticism by either side before us of the Judge's description of it (in para. [62]) as a right to resist the compulsory disclosure of information, and in particular documents which contain legal advice or were created for the dominant purpose of obtaining information or advice in connection with actual or contemplated litigation. It is, therefore, a negative right.

44. The history of the principle was examined in detail by Lord Taylor CJ in *R v Derby Magistrates' Court ex p. B* [1996] 1 AC 487. In his speech, with which all the other members of the appellate committee of the House of Lords agreed, Lord Taylor (at p. 507D) described privilege as a fundamental condition on which the administration of justice as a whole rests, and (at p. 507H) he acknowledged it is a fundamental human right protected by the European Convention on Human Rights.

45. In that case a person accused of murder wished to obtain from solicitors instructions from, and advice given to, a person who had previously been charged with the crime and who had originally admitted to the police that he was solely responsible for the murder but had later retracted that statement and was subsequently acquitted. It was held by the House of Lords, reversing the decisions below, that the accused was not entitled to a witness summons for the production of that documentation and that the High Court should be directed to quash the decisions of a stipendiary magistrate and a justice of the peace who had issued summonses for the production of such documentation. Lord Taylor said (at p. 508H-409A) that no exception should be made to the absolute nature of privilege, once established.

46. In *R (Morgan Grenfell & Co Ltd) v Special Commissioner of Income Tax* [2002] UKHL 21, [2003] 1 AC 563, Lord Hoffmann, with whom the other members of the appellate committee of the House of Lords

agreed, said (at para. [7]) that it was common ground that legal professional privilege is a fundamental human right long established in the common law and a necessary corollary of the right of any person to obtain skilled advice about the law. He said that such advice cannot be effectively obtained unless the client is able to put all the facts before the adviser without fear that they may afterwards be disclosed and used to his prejudice.

47. Lord Hoffmann said (at para. [8]) that the courts will ordinarily construe general words in a statute as not having been intended to override fundamental human rights, even though capable of having that effect if read literally, and that an intention to override such rights must be expressly stated or appear by necessary implication. He referred (at para. [39]) to the jurisprudence of the European Court of Human Rights that privilege can be invaded only in exceptional circumstances.

48. Lord Hobhouse elaborated on the proper approach to statutory interpretation when considering whether documents are required to be delivered up notwithstanding they are covered by legal professional privilege. He quoted the following passage from the speech of Lord Hoffmann in *R v Secretary of State for the Home Department, Ex p Simms* [2000] 2 AC 115, at 131 as succinctly stating the principle of statutory construction:

> "Parliamentary sovereignty means that Parliament can, if it chooses, legislate contrary to fundamental principles of human rights ... The constraints upon its exercise by Parliament are ultimately political, not legal. But the principle of legality means that Parliament must squarely confront what it is doing and accept the political cost. Fundamental rights cannot be overridden by general or ambiguous words. This is because there is too great a risk that the full implications of their unqualified meaning may have passed unnoticed in the democratic process. In the absence of express language or necessary implication to the contrary, the courts therefore presume that even the most general words were intended to be subject to the basic rights of the individual."

49. Having stated that the principle applies to the right to claim privilege, Lord Hobhouse explained as follows (in para. [45]) what amounts to a necessary implication in this context:

> "A necessary implication is not the same as a reasonable implication as was pointed out by Lord Hutton in *B (A Minor) v Director of Public Prosecutions* [2000] 2 AC 428, 481. A *necessary* implication is one which necessarily follows from the express provisions of the statute construed in their context. It distinguishes between what it would have been sensible or reasonable for Parliament to have included or what Parliament would, if it had thought about it, probably have included and what is clear that the express language of the statute shows that the statute must have included. A necessary implication is a matter of express language and logic not interpretation."

50. The Judge said (at para. [67]) that he did not consider that the principles stated by the House of Lords in the *Morgan Grenfell* case are directly applicable in the present case. I infer (from para. [66]) that was because he took the view the case is about whether privilege in the Documents has been transferred to the Trustees rather than about its abrogation. I do not agree with that analysis. From Mr Shlosberg's perspective, the only question is whether or not the effect of the statutory bankruptcy code is that he has involuntarily been deprived of his fundamental right to assert his privilege in the information contained in the Documents. I see no reason why the principles in the *Derby Magistrates* case, the *Simms* case and the *Morgan Grenfell* case should not apply in answering that question.

Privilege as property

51. Mr Smith's overarching point on the substantive part of the appeal is that the Judge addressed the wrong question: instead of asking whether the benefit of the right of privilege vested in the Trustees, he should have asked whether the Documents were subject to confidentiality in the hands of the Trustees. Avonwick

accepts that they were subject to confidentiality but contends that the proposed deployment of them in the conspiracy proceedings is nevertheless permissible.

52. Avonwick's case is built on the provisions of IA 1986. It contends that the Documents and any privilege attaching to the information contained in them are property forming part of Mr Shlosberg's estate which vested in the Trustees on their appointment pursuant to IA 1986 ss.283 and 306. It contends, in the alternative, that it is a necessary implication of section 311 that the Trustees are entitled to use the documents and the privilege for the purpose of their functions and powers, which include taking steps that would potentially reduce the claims on the estate – as would be the case if Avonwick succeeded in recovering damages in the conspiracy proceedings from all or any of the defendants to those proceedings, other than Mr Shlosberg. That is because any such award of damages to Avonwick in the conspiracy proceedings would to the same extent reduce Avonwick's claim as a creditor of Mr Shlosberg's estate.

53. I do not accept that the privilege was property which vested in the Trustees. It has been assumed, for the purpose of the application before the Judge and this appeal, that the Documents belonged to Mr Shlosberg and so would have vested in the Trustees under IA 1986 s. 306. I consider it clear, however, that for the following reasons privilege attaching to the information contained in the Documents was not property forming part of Mr Shlosberg's estate which vested in the Trustees.

54. Property which forms part of a bankrupt's estate for that purpose is defined in IA 1986 ss. 283 and 436. The definition in section 436(1) is as follows:

> *"property"* includes money, goods, things in action, land and every description of property wherever situated and also obligations and every description of interest, whether present or future or vested or contingent, arising out of, or incidental to, property;

55. In *Bristol Airport plc v Powdrill* [1990] 1 Ch 744, at 759D, Sir Nicholas Browne-Wilkinson V-C, with whom the other judges of the court agreed, said that "[i]t is hard to think of a wider definition of property

56. By virtue of section 382(4) the property of the bankrupt which vests in the bankruptcy trustees also includes:

> "any power exercisable by [the bankrupt] over or in respect of property except in so far as the power is exercisable over or in respect of property not for the time being comprised in the bankrupt's estate".

57. Avonwick contends that privilege is an interest arising out of, or incidental to, the Documents within the definition of "property" in section 436(1).

58. Mr Smith submitted, in the alternative, that the privilege formed part of Mr Shlosberg's estate which vested in the Trustees because it was a power exercisable by him over or in respect of the Documents, namely the right to refuse to disclose them, and so fell within the plain meaning of IA 1986 s. 283(4). He contended that the Judge was wrong to reject that argument (in para. [125] of the judgment) on the ground that privilege is not a power which would assist the Trustees to realise the value of the Documents or to distribute the proceeds. Mr Smith argued, again, that this was an impermissible gloss on the statutory provision, and, that, in any event, the right to deploy or waive the privilege would assist the Trustees to get in the property comprised in Mr Shlosberg's estate.

59. Reference was made before the Judge and on this appeal to *Crescent Farm (Sidcup) Sports Ltd v Sterling Offices Ltd* [1972] Ch 553 and to the application of the so-called *Crescent Farm* principle in *Re Konigsberg* [1989] 1 WLR 1257. In the *Crescent Farm* case the plaintiffs, as purchasers, and the first defendants, as sub-purchasers, were parties to a conveyance of land which provided that the purchasers had the option of re-purchasing if, within the following 20 years, the first defendants wanted to sell the land or any part of it. Within that period the first defendants contracted to sell, and then conveyed, the land to the second defendants without any release from the option. In the course of the proceedings for

damages for, among other things, breach of contract and conspiracy, the plaintiffs issued a summons for disclosure from the second defendants of instructions to counsel by the first defendants and the opinion of counsel, which had been sent by the first defendants to the second defendants. Goff J, citing *Minet v Morgan* (1873) 8 Ch.App 361, a number of other cases in which *Minet* was also cited and Halsbury's Laws of England (3rd ed), said (at p. 562) that it was clearly established that privilege of a predecessor in title enures for the benefit of his successor. He said that the second defendants had received the documents as successors in title. Goff J held that the second defendants' claim for privilege should be upheld and the plaintiffs' summons dismissed.

60. In *Re Konigsberg* the trustee in bankruptcy sought a declaration that the transfer of the matrimonial home from the joint ownership of the bankrupt and his wife into the wife's sole name was a voluntary settlement within section 42 of the Bankruptcy Act 1914 and void as against him. The wife claimed that the transfer was a sale. She sought to exclude affidavit evidence of the solicitor instructed jointly on the sale of the matrimonial home which went to the question whether the transaction was a gift or sale. Peter Gibson J refused the wife's application on two grounds. The first was that the wife, by referring in an affidavit to correspondence with the solicitor and by exhibiting a letter from the solicitor, had waived privilege. The second ground was that the trustee in bankruptcy was a successor in title to the bankrupt in respect of all the assets of the bankrupt divisible among his creditors, including the right to property transferred by a settlement voidable under section 42, and, following the *Crescent Farm* case, succeeded to and was entitled to assert the privilege of the bankrupt as a successor in title. It appears (from page 1267B) that counsel for the wife accepted that the relevant privilege of the bankrupt had devolved on the trustee. Peter Gibson J held that, the privilege being a joint privilege of the bankrupt and the wife, and the trustee having stepped into the shoes of the bankrupt, the usual rule applied that one joint holder of the privilege (the wife) could not maintain it against the other joint holder (the trustee).

61. Mr Smith did not, in oral argument, pursue the third ground of appeal concerning the meaning and application in the present case of the word "obligations" in the definition of "property" in IA 1986 s.436(1).

62. In support of his argument that the LLP does not fall within the definition of property in sections 436(1) and 283(4), Mr Marshall referred to *Deloitte & Touche Inc v Bennett Jones Verchere* (2002) 206 DLR (4th) 280, a Canadian decision of the Alberta Court of Appeal, and *R v Dunwoody* [2004] QCA 413, an Australian decision of the Supreme Court of Queensland. In *Deloitte & Touche*, in which the court considered similar Australian statutory provisions to the definition of "property" in IA 1986 s. 436(1) and to the treatment of a power over or in respect of property in IA 1986 s.283(4), all three judges of the Court considered that privilege, and the right to waive it, are not property or a power attaching to property divisible among creditors but a personal right. In *Dunwoody* McMurdo P said (at para. [25]) that privilege is essentially a concept personal to the bankrupt and not property, and can only be removed by statute where there are the clearest words or by necessary implication.

63. I consider it is clear that, on the proper interpretation of the relevant provisions of IA 1986, privilege is not property of a bankrupt which automatically vests in the trustee in bankruptcy. Following the *Morgan Grenfell* case and the *Simms* case, the bankrupt can only be deprived of privilege if IA 1986 expressly so provides or it is a necessary implication of the express language of its provisions. The only provisions relied upon by the Trustees in the present case on this aspect are the definition of "property" in section 436(1) and the treatment of a "power over or in respect of property" in section 382(4), in conjunction with the general provisions in sections 283 and 306 for the automatic vesting in the trustee of the bankrupt's property comprised in his estate. All those provisions are in general terms. They do not expressly treat privilege as property of the bankrupt which automatically transfers from the bankrupt to the trustee. Nor is that a necessary implication of the provisions.

64. It is not necessary to consider the Canadian and Australian cases since we are concerned with the interpretation of our own domestic legislation in the form of IA 1986. Neither *Re Rae* nor *Re Hemming* assist since they did not concern privilege. Neither the *Crescent Farm* case nor *Re Konigsberg* stand in the

way of my conclusion. The *Crescent Farm* case was not an insolvency case. Nor was the *Minet* case which was cited as precedent in the *Crescent Farm* case. They turn on their particular facts. In *Re Konigsberg* it was conceded by counsel that the privilege had devolved on the trustee in bankruptcy. More to the point, *Re Konigsberg* predates the *Derby Magistrates* case, the *Simms* case and the *Morgan Grenfell* case, which set out the proper approach, and so, unsurprisingly, Peter Gibson J did not apply the principles in those cases. It is not correct on the point presently under consideration.

IA 1986 s.311

65. IA s.311(1) provides that:

> "The trustee shall take possession of all books, papers and other records which relate to the bankrupt's estate or affairs and which belong to him or are in his possession or under his control (including any which would be privileged from disclosure in any proceedings)."

66. The words in parenthesis were not in the equivalent provision of the predecessor legislation, section 48(1) of the Bankruptcy Act 1914.

67. Avonwick accepts that documents taken into the possession of the trustee in bankruptcy pursuant to section 311(1), are subject to a duty of confidentiality on the part of the trustee. It contends, however, that, by virtue of the express terms of section 311(1) or by necessary implication, information contained in documents obtained from the bankrupt which are subject to privilege can be used by the trustee for the purposes of the trustee's statutory duty and ancillary powers, including deployment in proceedings with third parties which would amount to a waiver of the privilege.

68. Avonwick's contention is that the words in parenthesis in section 311(1) show that Parliament directly addressed the issue of privileged documents held by the bankrupt and, since the trustee is under an obligation to take possession of them, must have intended that such documents can be used by the trustee for the trustee's statutory purposes. Peter Gibson J made a similar observation in *Re Konigsberg* (at page 1267F), as did Pumfrey J in *Surface Technology plc v Young* [2002] FSR 25 at para. [25].

69. The submission has a practical attraction. Indeed, Mr Marshall accepted that the trustee can use privileged documentation and the information contained in it for the statutory purpose of getting in and realising the bankrupt's estate. He submitted, and the Judge concluded, however, that the trustee can only use such documentation and information in a way that would not amount to a waiver of privilege. I agree.

70. The applicable principles are, once again, those stated in the *Derby Magistrates* case, the *Simms* case and the *Morgan Grenfell* case, keeping in focus the status of privilege as a fundamental right. The express terms of section 311(1) describe the duty of the trustee to take possession of the documents mentioned there. It says nothing about their use by the trustee. It is necessarily implicit in section 311(1), however, that the trustee is to take possession of the documents for the overriding function of getting in, realising and distributing the bankrupt's estate. It follows that the trustee must, at the least, be entitled to look at the documents to obtain information relevant to those matters. That is, of itself, a valuable advantage in the fulfilment of the trustee's statutory function.

71. It is not, however, necessarily implicit that the trustee can waive the bankrupt's legal professional privilege in taking steps against third parties for the benefit of the bankrupt's estate, desirable as that might be from the point of view of the creditors. Echoing the words of Lord Hobhouse in the *Morgan Grenfell* case quoted above, the fact that it would have been sensible or reasonable for Parliament to have included such a power does not mean that it is necessarily implicit having regard to the express language of the statute.

72. The absence of any such implication is supported by the background showing the genesis of the words in parenthesis in section 311(1) – "(including any which would be privileged from disclosure in any proceedings)". Paragraphs 908 to 911 of the Report of the Review Committee on Insolvency Law and Practice chaired by Sir Kenneth Cork published in 1982 (Cmnd 8558) ("the Cork Report") addressed the

problem of legal professional privilege in the context of the trustee in bankruptcy wishing to obtain information from a solicitor who acted for the debtor prior to the insolvency and who has information likely to be useful in getting in the property of the debtor and administering the bankrupt's estate.

73. Having observed that the position as regards the ambit of privilege was not clear, the Cork Report stated (in para. 910) that the critical area for the trustee is the investigation of the conduct of the debtor prior to the insolvency and particularly of payments of money or transfers of property which were made by the debtor and have reduced the estate available for the creditors; and that the trustee seeks to establish not merely the facts as to the payment or transfer itself, but all the surrounding circumstances bearing on the debtor's knowledge and intentions.

74. The Cork Report stated (at para. 911) that it was inconsistent with the debtor's obligation to aid in the realisation of his property and the distribution of the proceeds among his creditor to advance a claim to privilege "in order to withhold relevant information from his trustee". It said that the majority of the committee considered that on a private examination the debtor should not enjoy privilege in relation to questions fairly and properly put and relevant to the maximisation of the estate available to creditors. The entire discussion in the Cork Report on this topic, therefore, was around the disclosure of information to the trustee. It did not touch on the subsequent deployment of the documents and information against third parties in a way that would waive the privilege.

75. Lord Lucas of Chilworth, the Under-Secretary of State for Trade and Industry, made it clear in the debate on the Insolvency Bill in the House of Lords in committee on 7 February 1985 that the wording of the clause which in due course became section 311(1) was intended to give effect to the recommendation of the majority in paragraph 911 of the Cork Report.

76. Further, it is relevant on this aspect of the appeal, and works against Avonwick's submission on section 311(1), that the sub-section is not limited to documents which belong to the bankrupt. It extends to documents belonging to others but which are in the bankrupt's possession or under his control. It has not been suggested that the words in parenthesis in section 311(1) do not apply to such third party documents. There can be no argument, however, that section 311(1) necessarily implies that the trustee could deploy those documents in a way which would waive the privilege of those third parties.

77. The following cases were cited by Mr Smith in support of Avonwick's interpretation of section 311(1) as impliedly authorising the trustee to deploy privileged documents and information against third parties in a way that would waive the privilege. I do not consider that any of them assist Avonwick's case.

78. In *Re Esal (Commodities) Ltd* (No 2) [1990] BCC 708 Millett J granted leave for a member of the committee of inspection of a company in liquidation to use documents against a bank in proceedings by him for (among other things) participation by the bank in fraudulent trading by the company. The documents had been obtained by the liquidators pursuant to section 268 of the Companies Act 1948 or the threat of proceedings under that section, and had been supplied by the liquidators to the applicant in his capacity as a member of the committee of inspection. Proceedings had also been commenced by the liquidators against the bank for participation by the bank in fraudulent trading by the company but the court was informed that there was a significant prospect that the proceedings brought by the liquidators would be settled. Millett J considered that the applicant's action was parasitic on the liquidators' proceedings but he was not persuaded that it was strictly within the purposes of section 268. He observed (at page 724C) that it was true that, if the applicant's action succeeded, it would pro tanto reduce a proof in the liquidation but that was not the applicant's purpose and the benefit to the liquidation was purely incidental. He nevertheless gave leave in the light of a number of factors, including that the subject matter of the applicant's action was closely related to the liquidation and that the material was already potentially in the public domain as a result of the pleadings having been served by the liquidators on the bank.

79. In *Re a Company* [1993] BCC 734 Harman J authorised administrative receivers of a company to use documents received by them for the pursuit of claims against a director of the company and a former solicitor for the company and the director. Harman J said (at page 735B):

"The further dealings in this convoluted matter raise serious questions about the propriety of some of the activities that have gone on and, prima facie, point to attempts to avoid payment of debts when due. In those circumstances the duty of confidence imposed upon those who obtain information by the use of sec. 236 of the 1986 Act can, if the court is satisfied that either it is for the purposes of the office which the office-holders who seek to disclose the information hold, or is otherwise justified by the balance of considerations of how justice is properly to be attained, be waived by the court. That I base upon the decision of *Millett* J in *Re Esal (Commodities) Ltd (No. 2)* [1990] BCC 708 …"

80. I cannot see that either of those cases is of any relevance or assistance in resolving the present application and appeal. They concern documents obtained by administrative receivers and liquidators, who are agents of the company. A trustee in bankruptcy is not an agent of the bankrupt. More to the point, there was no consideration in those cases of the particular issue of the use of documents and information subject to privilege and the principles that should apply to their deployment.

81. In *Sutton v GE Capital Commercial Finance Limited* [2004] EWCA Civ 315 the Court of Appeal held that privileged documents, which had been obtained by administrative receivers and were passed by them to the solicitors for another company, which wished to use them in proceedings to enforce a guarantee, had not resulted in the waiver of the rights of the company in administrative receivership to confidence and privilege. That was because the disclosure of the documents to the solicitors was outside the powers of the administrative receivers. Again, I cannot see that this case is of any relevance or assistance. The case concerned administrative receivers and not a trustee in bankruptcy, and there was no need for the court to consider the special status of privileged material because it concluded that the administrative receivers had acted outside their power in any event.

82. In *Re Cook* [1999] BPIR 881 Stanley Burnton QC, sitting as a deputy High Court judge, confirmed that the bankruptcy trustee had power to authorise a solicitor, who had formerly acted for the bankrupt, to provide to the Serious Fraud Office information concerning the bankrupt's affairs, thereby waiving the bankrupt's privilege. Through no fault of the deputy judge, neither the reasoning nor the decision in that case was correct. The deputy judge, not unreasonably relying on *Re Konigsberg*, said (at page 884) that the power and the right to waive privilege in relation to the estate and affairs of a bankrupt pass to his or her trustee in the same way that his or her assets and the right to possession of the books, papers and other records of the bankrupt relating to his or her estate and affairs pass to the trustee under section 311. For the reasons I have given, however, the relevant principles are contained, not in *Re Konigsberg*, but in the *Derby Magistrates* case, the *Simms* case and the *Morgan Grenfell* case. Privilege is not property of the bankrupt forming part of the bankrupt's estate which vests in the trustee. The deputy judge did not consider the proper interpretation of section 311 by reference to the correct principles.

83. For all those reasons, the Judge in the present case was correct in his interpretation of section 311(1).

84. There is a further reason why the Trustees could not in any event authorise the deployment of Mr Shlosberg's privilege in the present case in the conspiracy proceedings: such deployment is not within the duty and ancillary powers of the Trustees. Mr Smith submitted that such duty and powers extend to assisting a third party in a claim against another person if that would result in the reduction or elimination of a creditor's claim against the estate, such as would be the position in the present case if Avonwick recovered damages in the conspiracy proceedings against all or any of Castle, Vi Holdings, Globoid and Mr Machitski (and so reducing Avonwick's claim against Mr Shlosberg's estate).

85. I do not agree with that submission of Mr Smith. The statutory function of a bankruptcy trustee, as stated in IA 1986 s.305(2), is to get in, realise and distribute the bankrupt's estate. Deployment of Mr Shlosberg's privilege in the way suggested by Mr Smith would not be for any of those purposes. Mr Smith relied on IA 1986 s.314 and schedule 5, which set out the powers of a trustee in bankruptcy. He relied specifically on the power in paragraph 12 of schedule 5, which is as follows:

"Power to exercise in relation to any property comprised in the bankrupt's estate any powers the capacity to exercise which is vested in him under Parts VIII to XI of this Act."

86. For the reasons I have given, Mr Shlosberg's privilege is neither property which has vested in the Trustees, nor is it something which the Trustees can deploy under section 311(1) in such a way as to waive the privilege. Paragraph 12 of schedule 5 is, therefore, of no application to any proposed deployment in the conspiracy proceedings.

Remedy

87. Avonwick contends on this appeal that, even if the Judge was otherwise correct in his analysis and conclusion on the proper meaning and effect of the relevant provisions of IA 1986, he was wrong to order that Dechert cease to act as solicitors for Avonwick in respect of any matter relating to Mr Shlosberg or his affairs.

88. Avonwick submits that the present situation is one where the court will not generally restrain a solicitor from acting. It says, citing *Re Shuppan* [1996] 2 All ER 664, that there is nothing inherently objectionable about a bankruptcy trustee engaging the same solicitors who are already engaged by a major creditor, and, in particular, there is nothing objectionable about solicitors acting simultaneously for a creditor and a trustee in bankruptcy in circumstances where the major creditor, or even the solicitors themselves, are or may be engaged in litigation with the bankrupt.

89. Avonwick further contends that, where a solicitor becomes possessed of confidential (or even privileged) information belonging to another party to a dispute without having previously acted for that party, in the ordinary course the court will not grant an injunction restraining the solicitor from acting, but will seek to ensure that the solicitor does not use that information unless it determines that there is a real risk of documents being used in breach of confidence. It relies, in support of that proposition, on *Re a Firm of Solicitors* [1997] Ch 1 at 13; *Virgin Media Ltd v BSkyB plc* [2008] 1 WLR 2854 at [21] – [24]; and *Stiedl v Enyo Law* [2011] EWHC 2649 at [44]. It contrasts the position in such a situation with the position where there has been a previous solicitor/client relationship as in as in *Bolkiah v KPMG* [1999] 2 AC 222.

90. Avonwick contends that, having regard to the evidence as to the practical safeguards implemented by Dechert, the Judge ought to have concluded that there is no real risk of documents being used in breach of the Trustees' obligation of confidentiality to Mr Shlosberg and that conflicts of interest are unlikely to arise.

91. Avonwick further contends that, even if all that is wrong, the Judge still ought to have refused to make the order in relation to Dechert because, as the Judge found, the privilege is a joint privilege of Mr Shlosberg and Webinvest. Mr Shlosberg therefore cannot maintain the privilege against Webinvest in the conspiracy proceedings, and Dechert are also retained as Webinvest's solicitors in the conspiracy proceedings and have reviewed or will be entitled to review the privileged material in that capacity.

92. I would also dismiss this part of the appeal. The Judge had a discretion as to what, if any, relief to grant to protect Mr Shlosberg's fundamental right to privilege. He considered the safeguards relied upon by the Trustees and Avonwick and a number of authorities, including *Re A Firm of Solicitors* and the *Stiedl* case. He listed eleven matters which he considered particularly relevant to the exercise of the court's discretion, including the position of Webinvest and the status of Dechert as Webinvest's solicitors. It is not possible, in all the circumstances, to say that his order in respect of Dechert was plainly wrong or outside the ambit of a proper exercise of judicial discretion.

93. I should make it clear, however, that my rejection of the appeal in relation to remedy does not in any way indicate to judges handling the future case management of the conspiracy proceedings what steps, if any, they should take to protect Mr Shlosberg's privilege. The reality that Avonwick is overwhelmingly the majority creditor in the liquidation of Webinvest, that Mr Shlosberg cannot maintain the privilege against Webinvest, that Dechert will continue to act for Webinvest in the conspiracy proceedings, and that the

claim is a claim of conspiracy against all the defendants, will be a relevant backdrop to any case management decisions regarding Mr Shlosberg's privilege.

Costs

94. Finally, I turn to Avonwick's application for permission to appeal against the Judge's order for costs against Dechert alone on the ground that he should have made a joint and several order against both Avonwick and Dechert for payment of Mr Shlosberg's costs of his application.

95. I would refuse permission to appeal on the ground that an appeal on this point has no real prospect of success. The fact that the order deprived Avonwick of the opportunity to set off Mr Shlosberg's substantial unpaid liability to it does not in any way undermine the legitimacy of the Judge's order. It was sufficient justification for the Judge's order that Mr Shlosberg only sought costs against Dechert, and that Dechert had actively and unsuccessfully defended the application. Moreover, even if a joint and several order had been made by the Judge, Mr Shlosberg could still have enforced the order against Dechert alone in respect of its several liability and, had Mr Shlosberg done so, Avonwick would still have been unable to deploy a set off.

Conclusion

96. For all those reasons, I would dismiss this appeal.

**Lady Justice Gloster:**

97. I agree.

**Lady Justice Sharp:**

98. I also agree.

---

BAILII: Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: http://www.bailii.org/ew/cases/EWCA/Civ/2016/1138.html