# EXHIBIT C



[Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

# England and Wales High Court (Chancery Division) Decisions

**You are here:** BAILII >> Databases >> England and Wales High Court (Chancery Division) Decisions >> Leeds & Anor v Lemos [2017] EWHC 1825 (Ch) (17 July 2017)
URL: *http://www.bailii.org/ew/cases/EWHC/Ch/2017/1825.html*
Cite as: [2018] 2 WLR 73, [2017] WLR(D) 504, [2018] 1 All ER 313, [2017] BPIR 1223, [2017] EWHC 1825 (Ch), [2018] Ch 81

[New search] [Printable RTF version] [View ICLR summary: [2017] WLR(D) 504] [Buy ICLR report: [2018] 2 WLR 73] [Buy ICLR report: [2018] Ch 81] [Help]

Neutral Citation Number: **[2017] EWHC 1825 (Ch)**

Case No. BR-2015-003947

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**IN THE MATTER OF CHRISTOS PANDELIS LEMOS**
**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**

Rolls Building
Fetter Lane
London EC4A 1NL

17 July 2017

B e f o r e :

**HIS HONOUR JUDGE HODGE QC**
**(Sitting as a Judge of the High Court)**

---

**(1) MICHAEL THOMAS LEEDS AND KEVIN JOHN HELLARD**
**(in their capacity as the joint trustees in bankruptcy of the estate of**
**Mr Christos Pandelis Lemos)**

Applicants

**- and -**

**(1) CHRISTOS PANDELIS LEMOS**
**(2) KALLIOPI LEMOS**
**(3) WITHERS LLP**

Respondents

---

**MS FELICITY TOUBE QC** and **MR TONY BESWETHERICK (Instructed by Gowling WLG (UK) LLP) appeared on behalf of the Applicants**

**MR DAVID LORD QC and MR SEBASTIAN KOKELAAR (Instructed by Richard Slade & Company)
appeared on behalf of the First Respondent
MS MARCIA SHEKERDEMIAN QC (Instructed by TLT LLP) appeared on behalf of the Second
Respondent
The Third Respondent was not represented at the hearing**

_____

### HTML VERSION OF JUDGMENT APPROVED

_____

Crown Copyright ©

1. **JUDGE HODGE QC:** This is my extemporary judgment on the hearing of an application, issued on 12 April 2017, by Mr Michael Thomas Leeds and Mr Kevin John Hellard in their capacity as the trustees in bankruptcy of Mr Christos Pandelis Lemos, case number BR-2015-003947.

2. This application raises fundamental questions as to the true meaning and effect of the decisions of Mr Justice Arnold at first instance in *Shlosberg v Avonwick Holdings Limited* [2016] EWHC 1001 (Chancery), reported at [2016] 3 WLR 1330, and of the Court of Appeal affirming Mr Justice Arnold's decision in the same case, [2016] EWCA Civ 1138, presently reported at [2017] 2 WLR 1075.

3. Those questions in turn require me to determine: (1) whether the principle formulated by Mr Justice Goff in the case of *Crescent Farm (Sidcup) Sports Limited v Sterling Offices Limited* [1972] Chancery 553, and hereafter referred to as the *Crescent Farm* principle, applies in bankruptcy; and (2) whether the second ground for decision of Mr Justice Peter Gibson in *Re Konigsberg* [1989] 1 WLR 1257 is still good law.

4. The application seeks: (1) directions in relation to the use that can be made of certain potentially privileged documents that the trustees in bankruptcy have obtained from the former solicitors of Mr Lemos, who are Withers; and (2) an order pursuant to section 366 (1) of the Insolvency Act 1986 requiring Withers to deliver up any further documents in their possession which relate to Mr Lemos's affairs or for an appropriate member of the firm to submit a witness statement containing an account of such affairs. Withers has confirmed that it is prepared to comply with such an order and therefore Withers are not represented before me and that part of the application is unopposed. It is common ground that the precise terms of the order should be addressed after I have delivered this judgment.

5. Mr Lemos was adjudged bankrupt on 11 March 2015 and he secured his discharge from bankruptcy on 12 March 2017. He is the first respondent to this application. He is represented by Mr David Lord QC, leading Mr Sebastian Kokelaar (of counsel).

6. The second respondent to the application is Mrs Kalliopi Lemos, the wife of the first respondent. She is represented by Ms Marcia Shekerdemian QC.

7. The applicant former trustees in bankruptcy are represented by Ms Felicity Toube QC, leading Mr Tony Beswetherick (also of counsel).

8. The evidence in support of the application is contained within a written statement of Mr Leeds (his ninth) dated 10 April 2017. Evidence in answer is contained in the witness statement of Mr Lemos dated 16 June 2017 (his second) and in the first witness statement of Mrs Lemos dated 9 June 2017. There are also written statements from the two sisters of the second respondent, Koula Mangos, dated 6 June 2017, and Maria Lemou, dated 7 June 2017. Evidence in reply is contained within the tenth witness statement of Mr Leeds dated 29 June 2017. Happily, nothing turns upon the precise terms of the witness evidence.

9. By way of overview, the joint trustees in bankruptcy have in their possession certain documents which they obtained from Withers in the course of the discharge of the trustees' functions. Some of those documents may be subject to legal professional privilege belonging to Mr Lemos either alone or jointly

with his wife. Mrs Lemos has also suggested that some of the documents might be subject to her sole privilege, although she has yet to review the documents to confirm her position in relation to any particular documents. If any document were subject to Mrs Lemos's sole privilege, the trustees accept that they cannot, at least **prima facie** and without more, use those documents free from that privilege. However, it seems unlikely, at least to the trustees, that there will be any such documents.

10. The trustees believe that a number of the Withers documents are likely to be useful as evidence for the purposes of proceedings under section 423 of the Insolvency Act 1986 relating to transactions defrauding creditors. Those proceedings would be to set aside certain transactions entered into by Mr Lemos many years prior to his bankruptcy and relating to the ownership of the house 27 and 27A Bracknell Gardens, London NW3, in which Mr and Mrs Lemos live. Those proceedings, if successful, would result in the recovery of what is said to be an extremely valuable asset for the benefit of Mr Lemos's substantial creditors.

11. In particular, certain of the Withers documents have already been seen by the Court of Appeal in the different context of an application to reinstate relief by way of a freezing injunction that came before the Court of Appeal, the reference to which is *Lemos v Lemos* [2016] EWCA Civ 1181. In that appeal the court concluded, partly as a result of a review of the contents of those documents, and reversing a decision of Mr Justice Cooke, that those documents provided a good arguable case that there should be section 423 relief.

12. At paragraph 22 of their judgment, however, the Court of Appeal, in agreement with the first instance judge, held that there was insufficient evidence, for the purpose of maintaining the freezing injunction, to lead the court to suppose that it had been the common intention on the part of Mr and Mrs Lemos and the trustees that at any relevant time after the transfer of the house in 1994 Mr Lemos should have any beneficial interest in the property. The Court of Appeal recorded that to come to that conclusion would mean that Mr Lemos's declaration of trust, and a trust in favour of the second respondent which followed shortly thereafter, were both shams in which the trustees had participated knowing that the truth was the opposite of what was provided for in the documents.

13. The Court of Appeal found it difficult to accept the argument that the applicant for freezing relief, Joanna Lemos, who is the sister of Mr Lemos, could succeed under this head without alleging that the documentation was a sham. However, as I have indicated, the Court of Appeal did reinstate the freezing injunction on the footing that there was a good arguable case that there should be relief at the instance of Joanna Lemos under section 423 of the 1986 Act.

14. The property, which is said to be worth currently in the order of £16.5 million, is presently registered in the joint names of a Bermudian trustee company and one of its directors. The offshore trustees, together with the two respondents to this application, contend that they hold the property on trust for Mrs Lemos alone.

15. The applicants say that this hearing is not concerned with the merits or otherwise of the section 423 claim but with the prior question of what use the trustees can make of such of the Withers documents which it ultimately turns out are subject to either the sole privilege of Mr Lemos or the joint privilege of himself and his wife.

16. The need for these directions arises because of a dispute between the trustees in bankruptcy, on the one hand, and Mr and Mrs Lemos, on the other, over the former's ability to make use of the Withers documents. The trustees wrote to Mr and Mrs Lemos seeking confirmation that they did not object to the deployment of certain of the Withers documents for the purposes of proceedings relating to the property. In response, (1) Richard Slade & Co, who are the solicitors acting for Mr Lemos, stated that he objected to the use of the documents on the basis that they were privileged and he would not consent to waive such privilege; and (2) TLT LLP, the solicitors acting for Mrs Lemos, wrote in similar terms and further accused the trustees of having acted unlawfully in relation to their use of certain of the documents.

17. During the course of this hearing I have made it clear that in the absence of Joanna Lemos, the judgment creditor who had obtained the freezing injunction and who had deployed certain of the documents in the Court of Appeal, it would not be appropriate for me to decide any questions about the propriety or the present or future use of those documents in the extant section 423 proceedings.

18. In the course of his submissions Mr Lord, acting for Mr Lemos, indicated that whether the actions of the trustees in bankruptcy in passing documents to Joanna Lemos were right or wrong were not matters for the court on the hearing of this application, although he made it clear that Mr Lemos's rights in that respect were reserved.

19. The responses of both respondents place reliance upon the decision of the Court of Appeal in the *Avonwick* case. In this judgment I shall have to consider the true meaning and effect of that judgment and its implications for trustees in bankruptcy.

20. I make it clear that I am only considering the position of a trustee in bankruptcy. I am not concerned with the position of a liquidator of a company.

21. It became apparent during the course of her submissions that Ms Toube, for the applicants, considers that the *Avonwick* case was wrongly decided. She reserves the right to challenge its correctness in a higher court. However, Ms Toube has sought to limit the asserted effect of the *Avonwick* decision. Mr Lord and Ms Shekerdemian resist Ms Toube's efforts, saying that that amounts to a restatement of the effect and implications of the *Avonwick* decision.

22. As for the judgment in that case, Ms Toube points out that Mr and Mrs Lemos appear to contend that the conclusion was that, despite long-standing views to the contrary, trustees in bankruptcy are not permitted to deploy in proceedings such as those relating to the property any documents which are subject to the bankrupt's sole or joint privilege without the consent of the bankrupt and, in the case of any jointly privileged documents, the consent of Mrs Lemos as well. If those propositions are correct, and if the court also has no power to order Mr Lemos to consent to the use of the privileged documents, then it is said that the decision in *Avonwick* would have huge repercussions and serious implications upon the ability of trustees in bankruptcy to discharge their functions to recover assets of the bankrupt's estate, not only in this case but much more widely.

23. Those wider implications are addressed at paragraph 63 of Mr Leeds's ninth witness statement. He there says that the *Avonwick* decision has far-reaching consequences for both him, as a trustee in bankruptcy in this case, and for the insolvency industry as a whole. He says, by way of example, that he is currently working on another bankruptcy matter in which documents have been disclosed to him by the bankrupt's former legal advisers under section 311 of the Act, meaning that he is now privy to information which could assist him in realising the bankrupt's estate for the benefit of creditors. However, if he is unable to use that information in any way that might amount to a waiver of such privilege, he would be severely hampered in fulfilling his tasks.

24. Indeed, he says that if *Avonwick* has the effect contended for by the respondents, then:

(1) He would be unable to disclose details of his investigation to any creditors who are funding the bankruptcy process where such details would reveal information contained in privileged documents. That would naturally lead them to question the status of investigations, the benefit of such investigations and why such creditors should continue funding the process and Mr Leeds's role within it.

(2) When interviewing any third party, he would be unable to refer to any information contained in privileged documents. That would make such an interview process much more difficult and could ultimately render it useless to the bankruptcy process.

(3) Mr Leeds might be also unable to disclose relevant privileged information to third party funders who might otherwise be interested in funding a claim in relation to the bankrupt's estate. Without such

information, which might be key to the basis for a claim, such funders might be likely to lose interest.

(4) If asked to adjudicate on a creditor claim, and Mr Leeds had seen privileged documentation which proved that the credit's claim was wholly or partly without basis, he might be unable to evidence the reasons why he was rejecting that claim, and in defending any appeal against his decision.

(5) If a privileged document revealed an asset in the bankruptcy estate, Mr Leeds would be unable to use that document to further his investigations into that asset, and accordingly that could prevent that asset from being realised for the benefit of the bankrupt's creditors.

25. Accordingly, and given the potential implications of *Avonwick* and the conduct and stance of Mr Lemos to date, Mr Leeds thinks it appropriate to proceed by way of this application.

26. Ms Toube submits that the propositions for which the respondents contend are not correct. Their argument is said to be based upon a misunderstanding of the *Avonwick* decisions. In summary, the trustees say that:

(1) The decisions in *Avonwick* confirm that a bankrupt's privilege in documents that relate to assets of the bankrupt's estate - but not, Ms Toube emphasises, the liabilities of that estate - continue to devolve upon the trustee in bankruptcy.

(2) As a consequence, in relation to those of the Withers documents that relate to Mr Lemos's assets: (a) if they are subject to Mr Lemos's sole privilege, the trustees are entitled to make use of those documents for the purposes of filling their functions, whether in proceedings against Mr Lemos, against Mrs Lemos or against third parties, or otherwise for the purposes of the bankruptcy; (b) if they are subject to Mr and Mrs Lemos's joint privilege, then as the trustees have succeeded to Mr Lemos's interest in the privilege, they stand in his shoes and are entitled to rely upon and deploy the documents in proceedings to which both Mr and Mrs Lemos are a party; and (c) if they are subject to the sole privilege of Mrs Lemos, then **prima facie**, without more, the trustees are not permitted to use the documents.

27. The particular issues on which directions are sought at the instant hearing are categorised by Ms Toube as follows:

(1) The *Avonwick* initial question: Assuming that some or all of the Withers documents are privileged and that such privilege belongs to Mr Lemos (whether solely or jointly with his wife) whether or not the trustees are entitled to deploy such documents without the consent of Mr and/or Mrs Lemos in proceedings against the offshore trustees (in the case of the sole privilege of Mr Lemos) and/or Mrs Lemos (in the case of the sole or joint privilege of Mr Lemos) relating to the property.

(2) The section 363 initial question: Assuming that some or all of the Withers documents are subject to privilege belonging to Mr Lemos (whether solely or jointly with his wife) and assuming also that the trustees are not automatically entitled to use those documents, can Mr Lemos be ordered by virtue of sections 333 and 363 of the 1986 Act to waive his privilege in the documents, such that they can be used by the trustees.

28. For Mr Lemos, Mr Lord submits that the trustees in bankruptcy cannot be allowed to use the documents in any way which would amount to a waiver of Mr Lemos's privilege. He also submits that the trustees in bankruptcy cannot require Mr Lemos to waive his privilege in the documents so as to enable them to be used by the trustees.

29. As a result of the evidence served by the parties, including the stance taken by Mr and Mrs Lemos in correspondence and in their evidence, the application is said to raise a number of other questions, in particular whether: (1) in relation to each particular document within the documents received from Withers, it is in fact **prima facie** privileged; (2) if it is, whether it is subject to the sole privilege of Mr Lemos, the sole privilege of his wife, or the privilege of them jointly; (3) even if a particular document is **prima facie** privileged, whether that privilege has been lost because it falls within the iniquity exception

in the sense that privilege does not attach to it because it came into being as a consequence of Mr or Mrs Lemos seeking or obtaining advice for an iniquitous purpose; and, finally, (4) if the documents are privileged but the court can order Mr Lemos to waive his privilege, whether such an order should be made in relation to any particular document or all of the documents.

30. Those questions are said only to arise after determination of the initial questions and, as a matter of case management and proper use of the court's resources, should only be considered after those initial questions have been determined, and they cannot presently be determined at this hearing because the factual evidence is not complete.

31. For the respondents, it is submitted that if the initial questions are answered in the sense for which the respondents contend, then the proper course is for the court simply to dismiss the present applications, leaving the trustees in bankruptcy to make a future application or applications directed to particular and specified documents which have been the subject of individual scrutiny by the trustees in bankruptcy and the individual respondents.

32. I can summarise the background to the applications before the court by reference to paragraph 18 of Ms Toube's skeleton argument.

33. Mr Lemos's sister Joanna issued proceedings against him in the Royal Court in Jersey in December 2014 alleging that she was entitled to recover sums totalling some US$18 million that she had entrusted to Mr Lemos to invest on her behalf, but which she says had been misapplied by him in his failed shipping businesses. Shortly after the issue of those proceedings, Joanna applied for and obtained a without-notice freezing injunction from the English High Court restraining dealings by Mr Lemos with his assets and any dealings by the offshore trustees with the property.

34. Those proceedings were not defended by Mr Lemos, and Joanna obtained judgment in default against him for over US$17.9 million in January 2015. Thereafter, Mr Lemos successfully petitioned for his own bankruptcy; and the present trustees were appointed on 1 April 2015.

35. The offshore trustees successfully applied to lift the freezing injunction restraining them from dealing with the property at a hearing before Mr Justice Cooke in May 2015, but Joanna obtained permission to appeal from that decision and the injunction was reinstated pending the hearing of her appeal. In the interval, Mr Lemos's automatic discharge from bankruptcy was suspended for one year as a consequence of his asserted refusal to cooperate with the trustees.

36. During the course of their investigations, the trustees became aware that Withers had acted for Mr Lemos and, after some delay, they obtained copies of Withers' files. The trustees then provided copies of certain of those documents to Joanna for her to use at the forthcoming hearing of the appeal. That was after Mr Justice Arnold's decision in the *Avonwick* case but before the Court of Appeal's decision on appeal therefrom.

37. Joanna applied for permission to rely upon the documents at the appeal against the order lifting the injunction. The Court of Appeal admitted that new evidence and held, in part in reliance upon it, that there was a good arguable case that the transactions which had resulted ultimately in the property becoming held by the offshore trustees constituted transactions defrauding creditors within the meaning of section 423 of the 1986 Act. It ordered that the injunction obtained by Joanna before Mr Lemos's bankruptcy restraining the sale of the property should remain in place for the benefit of the bankruptcy estate pending the outcome of proceedings under section 423, provided that such proceedings were issued within four weeks, which was done.

38. Those proceedings, which were issued after having first obtained the permission of the court, are being pursued for the benefit of the bankruptcy estate and it is said that any recoveries would be payable to the trustees. Those proceedings remain at an early stage. The offshore trustees have served a holding defence in which they said that they attended to apply for a *Beddoe* order. Instead of doing so, Mrs Lemos was

joined as a defendant to proceedings on her own application. She has now served a defence to the claim, which means that it will now be contested.

39. It is assumed that in the light of Mrs Lemos's joinder to the proceedings, and because they have failed to plead a positive case or to seek a *Beddoe* order, the offshore trustees intend to adopt a neutral stance in relation to the section 423 claim.

40. I have been taken to an order that was made by Deputy Registrar Schaffer on 9 March 2017 which records that the trustees no longer intend to pursue an application for directions as to their conduct of the claim, but instead maintain a neutral position in relation to it, and that they remain parties to the claim only for the purposes of: (a) giving disclosure; (b) providing such assistance to the court as it thinks fit; and (c) being bound by the order of the court upon the final disposal of the claim. It was on that basis that Mrs Lemos was joined as third defendant to the section 423 claim and the offshore trustees were not required to file an amended defence.

41. Mr Lemos is now a discharged bankrupt, although there remain significant debts in the bankruptcy estate and to date there have been very limited recoveries. The trustees have an agreement with Joanna which is said to require them to consent to their substitution as claimants or else to their joinder as co-claimants with her. The ability to use the Withers documents in the possession of the trustees is said to be of significant importance in relation to the section 423 proceedings, whether they are pursued by Joanna or by the trustees.

42. I have been taken through the relevant statutory provisions in some detail. Section 305 (2) of the 1986 Act sets out the general functions of a trustee in bankruptcy. The function is to get in, realise and distribute the bankrupt's estate in accordance with the following provisions of Chapter IV. In the carrying out of that function and in the management of the bankrupt's estate, the trustee is entitled, subject to those provisions, to use his own discretion.

43. Section 313 provides that the trustee may exercise any of the powers specified in Parts 1 and 2 of Schedule 5. Those powers include, by paragraph 2 of Schedule 5, power to bring, institute or defend any action or legal proceedings "relating to the property comprised in the bankrupt's estate"; and, by paragraph 2A, which was added subject to transitional provisions by the Enterprise Act 2002, power "to bring legal proceedings under sections 339, 340 or 423".

44. The applicants assert that the property in Hampstead is an asset of the bankrupt. Mr Lord emphasises the distinction between paragraphs 2 and 2A of Schedule 5 and, in reliance upon that distinction, he argues that the Hampstead property is not "property comprised in the bankrupt's estate".

45. Ms Toube submits that at the heart of a trustee's power is the ability to recover assets of the bankrupt for the benefit of his or her creditors, although she acknowledges that sections 339 and 340 (relating to transactions at an undervalue and preferences) are to be found in Chapter V and not Chapter IV of the Insolvency Act 1986, and that section 423 is to be found in Part XVI of the Insolvency Act.

46. The assets comprising the bankruptcy estate vest in the trustee pursuant to section 306 of the Act. Section 283 identifies those assets which comprise the bankrupt's estate. So far as material, subsection (1) provides that subject as follows, "a bankrupt's estate for the purposes of any of this Group of Parts comprises: (a) all property belonging to or vested in the bankrupt at the commencement of the bankruptcy, and (b) any property which, by virtue of any of the following provisions of this Part, is comprised in that estate or is treated as falling within the preceding paragraph".

47. Ms Toube accepts that section 423 does not fall within "this Part", ie Part IX (Bankruptcy), and therefore an asset the subject of a claim under section 423 cannot be treated as part of a bankrupt's estate by virtue of section 283(1)(b).

48. Subsections (2) and (3) of Section 283 contain exceptions to the general scope of Section 283 (1). Section 283 (4) provides that references in any of this Group of Parts to property, in relation to a bankrupt, include references to any power exercisable by him over or in respect of property except insofar as the power is exercisable over or in respect of property not for the time being comprised in the bankrupt's estate; and a power exercisable over or in respect of property is deemed for the purposes of any of this Group of Parts to vest in the person entitled to exercise it at the time of the transaction or event by virtue of which it is exercisable by that person (whether or not it becomes so exercisable at that time).

49. Section 436 (1) defines "property" widely as including "money, goods, things in action, land and every description of property, wherever situated and also obligations and every description of interest, whether present or future or vested or contingent, arising out of, or incidental to, property."

50. As a result of section 283 (4) and section 436 (1) it is said that the property of the bankrupt which vests in the trustee includes any claims which he has to assets that are properly regarded as comprised in bankrupt's estate.

51. The obligations of a trustee include a duty to take possession of documents and records relating to the bankrupt's affairs, even though subject to privilege belonging to the bankrupt or third parties. That is provided for by section 311 (1), which states that:

"The trustee shall take possession of all books, papers and other records which relate to the bankrupt's estate or affairs and which belong to him or are in his possession or under his control (including any which will be privileged from disclosure in any proceedings)."

52. That obligation is fortified by section 312 which provides (amongst other things) that:

"The bankrupt shall deliver up to the trustee possession of any property, books, papers or other records of which he has possession or control and of which the trustee is required to take possession."

53. That is expressed to be without prejudice to the general duties of the bankrupt under section 333. That section provides, by subsection (1), that:

"The bankrupt shall –

(a) give to the trustee such information as to his affairs,

(b) attend on the trustee as such times, and

(c) do all such other things

as the trustee may for the purposes of carrying out his functions under any of this Group of Parts reasonably require."

54. By subsection (3), subsection (1) applies to a bankrupt even after his discharge; and subsection (4) provides that if the bankrupt without reasonable excuse fails to comply with any obligation imposed by section 333, he is guilty of a contempt of court and liable to be punished accordingly.

55. Section 363 (2) provides that without prejudice to any other provision in that Group of Parts, an undischarged bankrupt or a discharged bankrupt whose estate is still being administered under Chapter IV of that Part shall do all such things as he may be directed to do by the court for the purposes of his bankruptcy or, as the case may be, the administration of that estate."

56. Against that statutory background, it is said to be the trustees' position that: (1) they are able to make use of Mr Lemos's solely privileged documents that relate to his assets in any proceedings, whether against Mr Lemos, Mrs Lemos or third parties or indeed otherwise for the purposes of the bankruptcy, because they

have succeeded to his privilege; and (2) to the extent that any of the Withers documents are subject to Mr and Mrs Lemos's joint privilege, the trustees are able to deploy such documents in proceedings against them, or either of them.

57. There is said to be a fundamental difference between the trustees on the one hand and the individual respondents on the other as to what *Avonwick* decides. As a result, it is said to be necessary to conduct a detailed analysis of that case, both at first instance before Mr Justice Arnold and on appeal.

58. The facts in *Avonwick* are complicated but, in summary, the bankrupt, Mr Shlosberg, had applied for an injunction to restrain a firm of solicitors, Dechert, from continuing to act both for the major creditor in his bankruptcy, Avonwick, and for his trustees in bankruptcy. Despite the bankruptcy, Avonwick was continuing proceedings against Mr Shlosberg alleging conspiracy.

59. The basis for Mr Shlosberg's application was that a large quantity of documents had been provided to Dechert by Mr Shlosberg's former solicitors and had been reviewed by a team at Dechert that was acting both for the trustees in bankruptcy and for Avonwick. It was said by Mr Shlosberg that, as a result, the solicitors for Avonwick, the principal creditor, had seen a large number of documents which were subject to privilege belonging to him. He contended that since the solicitors acting for an adverse party in litigation against him had had sight of privileged documents to which they were not entitled, that that firm should be ordered to cease to act for Avonwick.

60. There were three categories of documents in relation to which issues of privilege arose. The first were category A documents. Those related to an asset of the bankrupt, namely earlier litigation regarding an attack upon Mr Shlosberg's cat, which had resulted in a County Court judgment in Mr Shlosberg's favour prior to his bankruptcy. Those were documents in which Mr Shlosberg had the sole privilege, and they related to an asset in his bankruptcy, namely the benefit of the County Court judgment in Mr Shlosberg's favour.

61. The second category of documents was the category B documents. Those related to liabilities of the bankrupt, namely statutory demands that had been served by Avonwick upon Mr Shlosberg and his company, Webinvest Limited, which demands had been followed by a successful bankruptcy petition against Mr Shlosberg and a successful winding-up petition against Webinvest.

62. The third category was the category C documents. Those related to the same liabilities as those identified in category B, namely a claim brought by Avonwick against Mr Shlosberg and Webinvest in 2014, which claim had resulted in judgment debts which had been the subject matter of the statutory demands and petitions referred to in category B. Both the category B and C documents were documents in which Mr Shlosberg had joint privilege with Webinvest.

63. Mr Justice Arnold held that the trustees acquired the benefit of Mr Shlosberg's privilege in the category A documents because those related to an asset of the bankrupt, namely the County Court judgment debt arising from the attack upon Mr Shlosberg's cat. But he held that the trustees did not acquire the benefit of Mr Shlosberg's joint privilege in relation to the category B and C documents because those related to the liabilities of the bankrupt.

64. Having concluded that the privilege in relation to the category B and C documents had remained with Mr Shlosberg, it followed that Avonwick's solicitors had seen material to which Avonwick was not entitled. On that basis, Mr Justice Arnold held that it was appropriate to injunct Dechert from continuing to act for Avonwick.

65. Ms Toube submits that Mr Justice Arnold's conclusion in relation to the category A documents was the result of his application of authority which is said to be a conventional application, and particularly the principle derived from the decision of Mr Justice Goff in the *Crescent Farm* (case previously cited), which had subsequently been applied by Mr Justice Peter Gibson in the case of *Re Konigsberg* [1989] 1 WLR 1257.

66. In summary, it is said that Mr Justice Arnold's conclusion proceeded by way of the following line of reasoning:

(1) A successor entitled to an asset will acquire the privilege of its predecessors in documents relating to that asset.

(2) It is well established that the trustee is a successor entitled to the asset and therefore requires the privilege of the bankrupt in documents relating to that asset.

(3) As Mr Justice Peter Gibson held in *Re Konigsberg* at 1266D to 1267F, the trustee is no ordinary third party. In him are automatically vested all the assets of the bankrupt divisible among his creditors, including the right to the property of the bankrupt transferred by a settlement voidable under section 42 [now section 339]. A successor entitled to property succeeds to and is entitled to assert the privilege of a predecessor in title (citing *Crescent Farm*) and so stands in the predecessor's shoes to that extent. It would be very odd if the trustee, entitled as he is to, and possessing, the information cannot use it in the performance of his duties in seeking to recover the bankrupt's property.

(4) In *Re Konigsberg* the court therefore held that the bankrupt's wife was not able to preclude her husband's trustee in bankruptcy from relying, in proceedings to challenge the transfer of the matrimonial home into the wife's sole name, upon evidence from the solicitor who had previously acted for the bankrupt and his wife. The court held that joint clients cannot assert privilege against one another, and since the bankrupt's privilege had devolved on to the trustee, it was appropriate to treat the trustee as being in the shoes of the bankrupt for the purposes of privilege in proceedings against the joint client.

(5) Mr Justice Arnold applied the same principles at first instance in *Avonwick* to the category A documents.

67. It is said by Ms Toube:

(1) That the judge's review of the authorities on the devolution of privilege began with *Crescent Farm* and *Re Konigsberg*. Mr Justice Arnold quoted in paragraph 72 the following extract from *Crescent Farm* at 562F to G, which Mr Justice Arnold called the "*Crescent Farm* principle":

"In my judgment it is clearly established that legal professional privilege of a predecessor in title does enure to the benefit of his successor. This is so stated in *Halsbury's Laws of England* … and in my judgment correctly so. The point was first clearly settled in *Minet v Morgan* (1873) 8 Ch App 361. It is unequivocally expressed in the second part of the headnote. The judgment does not say so quite specifically but, in my view, when analysed the case clearly so decided."

(2) At paragraphs 73 to 75, Mr Justice Arnold discussed and quoted from Mr Justice Peter Gibson's decision in *Re Konigsberg*. It was common ground that *Re Konigsberg* was based upon the *Crescent Farm* principle because the privilege related to an asset which had vested in the trustee in bankruptcy: see paragraph 75. The judge returned to this point in paragraph 99 and also in paragraph 106, in which Mr Justice Arnold noted the submission that it was essential for a trustee in bankruptcy to be able to assert or waive the bankrupt's interest: and Mr Justice Arnold pointed out that:

"In this jurisdiction the trustee will often be able to rely upon the *Crescent Farm* principle."

The judge expressly noted the effect of *Re Konigsberg* where the advice related to assets at paragraph 113.

(3) At first instance in *Avonwick* the application of the *Crescent Farm* principle to cases where a trustee in bankruptcy acquires relevant assets as successor to the bankrupt by virtue of the vesting provisions in the Insolvency Act 1986 was, in the submission of Ms Toube, properly conceded by counsel for Mr Shlosberg:

"70. Counsel for Mr Shlosberg accepted that, where title to property passes to a trustees in
bankruptcy as part of the bankrupt's estate, then the benefit of privilege in documents
recording the requesting and the giving of legal advice relating to, or documents created for
the dominant purpose of proceedings concerning, that property passes to the trustee. He
submitted, however, that this principle original applied where there was some property other
than the documents recording the privileged information ... Although he did not concede that
the County Court judgment was property within section 436 (1), he did not advance any
argument to the contrary."

Ms Toube also refers to paragraph 126 where, in dealing with alternative arguments that were advanced on
behalf of the respondents by which they asserted that no property passed in relation to privileged
documents, the judge said that, as counsel for Mr Shlosberg accepted, that was "subject to the operation of
the *Crescent Farm* principle as in the *Konigsberg* case". It is said that at paragraph 132 Mr Justice Arnold
accepted the submission by counsel for Mr Shlosberg.

(4) The judge accordingly held that the *Crescent Farm* principle applied where the trustees in bankruptcy
had acquired the relevant property to which the privileged documents related; see paragraphs 106 and 108.
Mr Justice Arnold therefore accepted the argument that privilege in the category A documents (those
which related to assets of the bankrupt) had vested in the trustee. Since Mr Shlosberg had succeeded in
obtaining judgment in his favour before his bankruptcy, the judgment debt was property within the
bankrupt's estate which passed to the trustees in bankruptcy; and since the trustees were the successors in
title to the property to which the advice related (that is to say the judgment debt), they had obtained the
benefit of the privilege.

(5) Although Ms Toube acknowledges that it is fair to say that Mr Justice Arnold expressed a certain
degree of doubt (at paragraph 132 of his judgment) in reaching that conclusion, he nevertheless concluded
that the trustees had acquired the benefit of the bankrupt's privilege with respect to the category A
documents. In other words, it is said that Mr Justice Arnold accepted that the concession made by counsel
for Mr Shlosberg had been rightly made. It was a constant theme of Ms Toube's submissions that the issue
was not one of **abrogation** of privilege, but rather of the **passing** of the privilege with the asset to which it
related; and that the trustees could assert the privilege or waive it as they chose.

68. The judge took a quite different view in relation to the category B and C documents because they related
to liabilities and not to assets of the bankruptcy. It is said by Ms Toube that it is that aspect of the case
which has put the cat among the pigeons in the insolvency world and has caused something of a volcanic
eruption in that field.

69. In relation to the liability documents, Mr Justice Arnold concluded that the privilege had remained with
Mr Shlosberg. He held that Mr Shlosberg's obligations under judgment debts were not property that vested
in his trustees under section 306. Thus, the distinction between the category A documents on the one hand,
where privilege had vested in the trustees, and the category B and C documents, where it had not, was due
to the fact that the latter documents related to advice given in relation to claims against Mr Shlosberg and
which had resulted, in the case of the category C documents at least, in judgments having been obtained
against him rather than in his favour.

70. Whilst the trustees in bankruptcy were successors in title to the judgment that Mr Shlosberg had obtained
prior to his bankruptcy, as this was an asset, and the privilege in the category A documents related to that
property, the property which vested in the trustees did not include Mr Shlosberg's liabilities or obligations.
Accordingly, since the property which vested in the trustees did not encompass judgment debts against the
bankrupt, because they were liabilities of the bankrupt, they were not his successors in title in relation to
those matters.

71. Mr Justice Arnold also rejected an alternative argument that privilege was itself property within the
meaning of the Insolvency Act which vested in a trustee in bankruptcy, as well as the further argument

that if the pieces of paper themselves vested in the trustee, then so too did the privilege in the information contained on that paper.

72. Ms Toube submits that Mr Justice Arnold's first instance decision, at least in relation to privilege in the category A documents, was an orthodox statement of the law and a familiar application of the *Crescent Farm* principle. She submits that the decision in relation to the category B and C documents is more problematic; but she emphasises that that is not the subject of the instant application and that the trustees reserve their right to make submissions on those points in a higher court should that become necessary.

73. It is said that the first instance decision in *Avonwick* held that documents relating to assets, but not the liabilities of the bankrupt, could be obtained and used by the trustee in bankruptcy free from any privilege in favour of the bankrupt. Confirmation that that was the correct analysis of the first instance judgment in *Avonwick*, it is said, can be found in the most recent edition (the fifth) of *Matthews and Malek on Disclosure*. At paragraph 11.07, the editors cite the first instance decision in *Avonwick* in support of the proposition that:

> "The right to exercise privilege in relation to an asset will pass to the successor in title of that asset. But it will not pass to the successor in title *of the documents concerned* merely by reason of a transfer of title to those documents."

Ms Toube submits that that is a correct statement of the proposition for which the first instance decision in *Avonwick* is authority.

74. In the course of her reply, Ms Toube also relied upon a commentary on the first instance decision in *Avonwick* by Ms Shekerdemian. In the course of that commentary, Ms Shekerdemian had stated that the *Crescent Farm* principle did not depend on acquisition by the successor in title of property in the documents recording the privileged information, but on acquisition by the successor in title of some other property to which the legal advice or litigation related.

75. The practical consequence of the judgment was said to be that it was now highly unlikely that a trustee in bankruptcy would easily be able to get his hands on documents over which the bankrupt could have asserted privilege prior to the bankruptcy unless those documents related to, or arose directly out of, property which had vested in the trustee in bankruptcy. According to the commentary, that was manifestly the case in relation to the category A documents. The benefit of the County Court judgment given in the proceedings in which Mr Shlosberg had obtained judgment plainly was property within the meaning of section 436(1) of the 1986 Act because it could be realised and distributed.

76. In her commentary Ms Shekerdemian is said to have attached a distinction to privilege attaching to documents which did not arise out of vested property, but which were nonetheless directly relevant to the bankrupt's financial affairs or other property. Privilege in those documents remained with the bankrupt even though ownership of the pieces of paper would have vested in the trustee in bankruptcy.

77. According to the commentary by Ms Shekerdemian, the touchstone was therefore the nature of the thing that underlay the document. If that thing was property within the meaning of section 436(1), in the sense that it was something realisable or a marketable right, then the trustee in bankruptcy would be able to claim the benefit of any privilege in the document relating to that property, but not otherwise.

78. Ms Shekerdemian's commentary concluded by referring to sections 333 and 336 of the Insolvency Act, and pointing out that they had not been considered by Mr Justice Arnold in his judgment. Whether the operation of those sections would prove to have been modified or tempered as a consequence of the judgment remained to be seen.

79. I observe that that commentary was founded squarely upon Mr Justice Arnold's decision at first instance in *Avonwick* and without the benefit of the subsequent decision of the Court of Appeal and without considering the implications of that later Court of Appeal decision on Mr Justice Arnold's first instance

decision. It was following the judgment at first instance in *Avonwick*, but before the decision on appeal, that the trustees had provided certain of the documents obtained from Withers to Joanna.

80. Ms Toube then went on to consider the Court of Appeal's decision. Both Avonwick and Mr Shlosberg's trustees in bankruptcy were granted permission to appeal against Mr Arnold's decision to restrain Dechert from continuing to act for Avonwick. The scope of the appeal appears from page 1078 of the report in the Weekly Law Reports. In the course of his address, Mr Lord drew attention to the third of the grounds of appeal, which was as follows:

> "The judge had erred in law in rejecting the alternative argument that if, as he had held, the only way in which privilege could be transferred was if it was in respect of legal advice relating to some other property transferred to the joint trustees, then he ought to have concluded that a judgment obtained by the bankrupt against the creditor became on his bankruptcy a liability of the estate constituting 'property' within section 436 of the 1986 Act. In those circumstances, the judge ought to have held that the privilege in any legal material relating to the liability passed to the joint trustees pursuant to the principle in the *Crescent Farm* case."

81. Mr Lord also drew attention to the respondent's notice by which the bankrupt had asked the court to uphold the judge's order on the following different or additional grounds among others:

> "(1) The judge had correctly held that, save in relation to a limited part of the material in issue, the materials in question could not be brought within the *Crescent Farm* principle.
>
> (2) The *Crescent Farm* case was wrongly decided, and was incompatible with the subsequent recognition of legal professional privilege as a fundamental human right. In light of that recognition, the only manner in which rights of privilege could devolve on the trustees in bankruptcy was by way of a statutory derogation either by express words or implication necessarily following from express words. The judge had been correct to decide that the bankrupt had retained his rights of privilege in relevant materials."

82. Mr Lord invited the court to note that at paragraph 61 Sir Terence Etherton, the Master of the Rolls, recorded that counsel had not in oral argument pursued the third ground of appeal concerning the meaning and application in the present case of the word "obligations" in the definition of "property" in section 436 (1).

83. The Court of Appeal proceeded to dismiss the appeal and to uphold Mr Justice Arnold's order. The leading judgment was given by Sir Terence Etherton, the Master of the Rolls, with whom Lady Justice Gloster and Lady Justice Sharp both agreed.

84. Ms Toube submits that the Court of Appeal's decision did not alter the conclusions reached at first instance in *Avonwick* in relation to the privilege attaching to documents relating to the assets of the bankrupt; nor, it is said, did it alter the position in relation to the privilege attaching to documents relating to the bankrupt's liabilities.

85. Ms Toube submits that it is important to note, as is said to be clear from the headnote of the report, that the Court of Appeal was considering waiver of the bankrupt's privilege as against **third parties** and not as between the bankrupt and the trustee. At an early point in its judgment, the Court of Appeal said, at paragraph 21, that it was not concerned on this appeal with the documents in category A. The court noted that the judge had decided in favour of the trustee in relation to that category of documents in paragraph 30. Rather, Ms Toube points out, the argument was about the trustee's challenge to the judge's decision in relation to the category B and C documents, which the Court of Appeal defined at paragraph 21 as "the Documents".

86. Throughout her oral submissions, Ms Toube emphasised that the Court of Appeal was only dealing with the category B and C documents, and not those within category A. She emphasised that the *Crescent Farm* principle was concerned not with the **abrogation** of privilege but with the **passing** of privilege. The Court of Appeal in *Avonwick* was concerned only with the category B and C documents, which related to a claim by Avonwick which would have reduced the amount of the claims in Mr Shlosberg's bankruptcy.

87. Joanna Lemos's claim was one by a creditor to an asset of the bankrupt which would fall into his estate. Mr Justice Arnold's decision, by contrast, was one relating both to a claim to an asset of the bankrupt which would fall within the bankrupt's estate and to a claim by a creditor against the bankrupt. It was that which led Mr Justice Arnold to distinguish between the category A and the category B and C documents; and nothing decided by the Court of Appeal is said to have affected that distinction.

88. Ms Toube submits that because of that, the Court of Appeal cannot be taken to have reached a different view, still less can it be taken to have overturned the decision of Mr Justice Arnold, in relation to the category A documents, nor can it be taken to have disapproved of the application of the *Crescent Farm* principle, or still less to have overruled *Re Konigsberg* by implication, in cases which relate to privilege in documents relating to assets as opposed to liabilities.

89. It is said that the Court of Appeal did not overrule *Re Konigsberg*, but instead distinguished it. Reliance is placed upon the statement of the reporter in the headnote that both *Crescent Farm* and *Konigsberg* were "distinguished". There is no suggestion that they were not followed, still less overruled.

90. The main argument advanced by Avonwick on appeal was that the category B and C documents, and any privilege attaching to the information contained in them, were property which formed part of Mr Shlosberg's estate which vested in the trustees on their appointment: see paragraph 52.

91. Avonwick's alternative argument was that the effect of Section 311 was that, by necessary implication, the trustees were entitled to use the category B and C documents for the purpose of fulfilling their functions. The functions in relation to those documents were said to include the taking of steps that would potentially reduce the claims on the estate by assisting Avonwick in pursuing its claims against third parties and thereby reducing its claim in Mr Shlosberg's bankruptcy: see paragraph 52.

92. The Court of Appeal noted the importance of the policy that trustees in bankruptcy should be able to get in, realise and distribute the bankrupt's estate in accordance with the statutory scheme at paragraphs 40 to 42; but it ultimately concluded that when looking at privilege in relation to documents concerning liabilities of the bankruptcy, this policy was trumped by the competing policy that a litigant should be able to consult a lawyer in privacy.

93. The court did not accept Avonwick's contention that privilege was a species of property that passed to a trustee. It rejected both the argument that privilege was an interest arising out of or incidental to the category B and C documents as a matter of interpretation of section 436(1) and also the alternative argument that privilege was a power exercisable over the documents because Mr Shlosberg could refuse to disclose them and so fell within the meaning of Section 283(4): see paragraphs 57 and 58.

94. Those conclusions, which turned upon the interpretation of particular provisions of the Insolvency Act 1986, are said to say nothing about the *Crescent Farm* principle as it had been applied to documents relating to assets by Mr Justice Arnold. In setting out his reasons, the Master of the Rolls said, at paragraph 63, that he considered it to be clear that:

. "... on the proper interpretation of the relevant provisions of the 1986 Act, privilege is not property of a bankrupt which automatically vests in the trustee in bankruptcy."

95. The Master of the Rolls pointed to the fact that the only provisions relied upon by the trustees were sections 436(1) and 283(4), which did not expressly treat privilege as property of the bankrupt which automatically transferred to the trustee.

96. Ms Toube points out that those sections are not part of the reasoning underlying the *Crescent Farm* principle as it relates to assets. Assets certainly do vest in the trustees in bankruptcy under Section 306; and, as Mr Justice Arnold had held, because the assets passed, so did the privilege in the documents relating to them.

97. Ms Toube submits that the discussion in the Court of Appeal was directed at the argument that privilege is itself a species of asset which vests in a trustee, which argument Mr Justice Arnold had also rejected, rather than the question whether privilege might vest in the trustee if it related to assets that had already vested in the trustee.

98. Having set out the decisions in *Crescent Farm* and *Konigsberg* in paragraphs 59 and 60, the Master of the Rolls considered at paragraph 64 whether *Crescent Farm* and *Re Konigsberg* and other cases affected his reasoning. It is said that he concluded that neither *Crescent Farm* nor *Konigsberg* stood in the way of his conclusion.

99. Again, Ms Toube submits that the issue before the court was whether Avonwick was correct in its argument that privilege itself was property that passed under the Insolvency Act, as distinct from the question whether it passed to the person who succeeded to the asset to which the privilege related, which was not an issue that is said to have been before the Court of Appeal. The Court of Appeal's conclusion was the same as that reached by Mr Justice Arnold, namely that privilege was not itself property.

100. Ms Toube submits that it is significant that the Court of Appeal did not overturn or disapprove of *Crescent Farm*, but merely distinguished it in relation to the issue it was considering, namely the privilege in documents in categories B and C, which related only to liabilities. The Court of Appeal noted at paragraph 64 that *Crescent Farm* was not an insolvency case, and that it turned on its particular facts.

101. Ms Toube says that that is correct: the *Crescent Farm* principle, as accepted by Mr Justice Arnold, is that a person who succeeds to an asset also succeeds to privilege in documents which relate to that asset. It was on the basis that the trustees had succeeded to the County Court judgment, that they acquired the privilege in the category A documents. That analysis, unlike Avonwick's argument in the Court of Appeal in relation to the category B and C documents, did not depend upon a special interpretation of the insolvency legislation.

102. Ms Toube points out that in relation to *Re Konigsberg*, the Court of Appeal was careful to say that it was "not correct on the point presently under consideration": see paragraph 64. She submits that "the point under consideration" was the argument that privilege in the category B and C -- in other words, in the liability - - documents was a species of property caught within the Insolvency Act. She submits that the court was not considering the application of the *Crescent Farm* principle and *Re Konigsberg* to category A-type or asset documents. She submits that the fact that *Re Konigsberg* was not overruled demonstrates that it remains good law insofar as it applies the *Crescent Farm* principle in the context of documents relating to assets.

103. Where the case of *Re Konigsberg* is said by Ms Toube to be in error was in holding that the trustee in bankruptcy stepped into the shoes of the bankrupt in relation to privilege generally. That was and remains the case in relation to asset documents, but it is no longer the case in relation to liability documents.

104. When he came to make his submissions, Mr Lord differed as to the nature of "the point presently under consideration", as to which it was said by the Court of Appeal that *Re Konigsberg* was incorrect. Mr Lord submits that "the point under consideration" which was held not to be correct was that identified at the end of paragraph 60, namely that the privilege was a joint privilege of the bankrupt and his wife as to which the trustee, having stepped into the shoes of the bankrupt, was entitled to say that the privilege could not be maintained against the trustee as joint privilege holder.

105. Ms Toube accepts that the Court of Appeal considered Avonwick's alternative argument that the effect of section 311(1) of the Insolvency Act 1986 was that, by necessary implication, the trustees were entitled to

use the category B and C documents for the purpose of fulfilling their functions. She acknowledges that, in agreement with Mr Justice Arnold's interpretation of section 311(1), the Court of Appeal rejected Avonwick's argument on that point. Both Mr Justice Arnold and the Court of Appeal rejected the view that section 311(1) should be interpreted as giving trustees in bankruptcy a power to waive privilege, which argument is said to have nothing to do with the *Crescent Farm* principle.

106. There is said to have been no discussion of *Crescent Farm* in this part of the judgment. Whilst there was reference to *Re Konigsberg* in this part of the judgment (at paragraph 82), that is said to have been in the context of a discussion of the decision of Mr Stanley Burnton QC, sitting as a deputy High Court judge in *Re Cook* [1989] BPIR 881, during which Sir Terence Etherton MR said that the deputy judge in that case had wrongly relied upon *Re Konigsberg* in concluding that:

> "... the power and the right to waive privilege in relation to the estate and affairs of a bankrupt pass to his or her trustee in the same way that his or her assets and the right to possession of the books, papers and other records of the bankrupt relating to his or her estate and affairs pass to the trustee under section 311."

107. Ms Toube acknowledges that the Court of Appeal did overrule *Re Cook*. She says that that case cannot stand with the Court of Appeal's decision on this point, which is that privilege is not, of itself, an asset that passes to a trustee.

108. Ms Toube points to the fact that at paragraph 69 the Master of the Rolls said that counsel for Mr Shlosberg had accepted that the trustee could use privileged documentation and information contained in it for the statutory purpose of getting in and realising the bankrupt's estate. Counsel had submitted, and the judge had concluded, however, that the trustee could only use such documentation and information in a way that would not amount to a waiver of privilege.

109. Ms Toube says that that appears to be a reference to paragraphs 105 and 106 of the first instance judgment, in which Mr Justice Arnold had expressed some qualifications about the use that a trustee could make of documents. But she invites this court to note that Mr Justice Arnold concluded paragraph 106 with the reminder that:

> "… in this jurisdiction, the trustee will often be able to rely upon the *Crescent Farm* principle."

110. As a result, Ms Toube submits that the passage relates only to use of documents in relation to liabilities, as opposed to assets, in relation to which the *Crescent Farm* principle still provides the answer.

111. Ms Toube points out that, finally, the Court of Appeal was plainly influenced in reaching its conclusions (at paragraph 85) that it was not the function of a trustee to assist a creditor in pursuing a claim against third parties that would result in the reduction or elimination of that creditor's claim into the bankruptcy estate. Rather, the Court of Appeal emphasised that a trustee's function, in accordance with section 305(2), was to get in, realise and distribute the estate; that is to say, to realise assets. She points out that part of the function of a trustee in bankruptcy is to bring a claim under section 423 of the Insolvency Act.

112. Ms Toube submits that, as a result of *Avonwick* at both levels, it is clear that, on a proper application of the *Crescent Farm* principle, Mr Lemos's sole privilege in documents relating to his assets, although not his liabilities, has passed to the trustees and they can use the documents free of that privilege.

113. Ms Toube also submits (at paragraph 57 of her skeleton argument) that that conclusion is in line also with general principles of privilege and confidentiality. I find it unnecessary to consider that aspect of Ms Toube's submission. In my judgment, this appeal falls to be determined by reference to the principles laid down by the Court of Appeal in *Avonwick* as they are properly to be understood.

114. In the course of her oral submissions, Ms Toube indicated the applicants' agreement to the general statements at paragraph 29 of Mr Lord's skeleton argument and paragraphs 39 to 40 of the skeleton argument of Ms Shekerdemian. Those statements relate to privilege being a fundamental right and how it is to be abrogated. But Ms Toube says that that tells us nothing about the answer to the question in the instant case because this case is not concerned with the **abrogation** of privilege but merely with its **passing** to the trustees in bankruptcy.

115. For all those reasons, Ms Toube submits that where the trustees have obtained documents to which Mr Lemos's sole privilege attaches, on a proper application of the *Crescent Farm* principle, as endorsed in *Re Konigsberg* and also by *Avonwick*, as successors in title to Mr Lemos in relation to all of his assets, any documents containing privileged information in relation to those assets, as opposed to his liabilities, can both be obtained and used by the trustees, including in proceedings against Mr Lemos or Mrs Lemos or against any third parties.

116. Ms Toube submits that even if the trustees are wrong in their reading of *Avonwick* (which she says they are not), there can be no question of Mr Lemos asserting that there is confidentiality in the documents as against the trustees in proceedings brought by them against Mr Lemos. She points out that *Avonwick* was only concerned with the use of documents against third parties. On any view, it remains the case that privileged documents can be used against the bankrupt. Mr Lemos cannot assert privilege as against the trustees; and the trustees were entitled to deploy documents covered by Mr Lemos's sole privilege in proceedings against him.

117. She submits that it would be extraordinary if trustees who had in their possession documents covered by the bankrupt's privilege that supported claims under section 423, as well as claims under sections 339 and 340, were not able to rely upon such documents in transaction avoidance proceedings against third parties. That conclusion is also said to make sense from a practical perspective.

118. She says that if Mr and Mrs Lemos are right, the effect of *Avonwick* would be that the trustees could look at documents relating to assets of the bankrupt, but could not bring claims in which those documents would be relied upon. That would render section 311 of no real practical effect. It is said that trustees in bankruptcy are in enough difficulty as a result of the decision in *Avonwick* relating to liabilities without also tying their hands in recovering assets of the bankrupt as well.

119. In relation to documents subject to the joint privilege of Mr and Mrs Lemos, Ms Toube submits that it is the absence of confidentiality between the parties that means that one party cannot assert privilege against the other. Citing from the decision of Mr Justice Rix in *The Sagheera* [1997] 1 Lloyds Reports 160 at page 165, Ms Toube submits that it follows that if the Withers documents are covered by the joint privilege of Mr and Mrs Lemos, Mrs Lemos cannot assert it either against Mr Lemos or against his successor in title to that privilege, namely the trustees. In the light of *Avonwick*, it is said that privilege in documents relating to the assets pass to the trustees, who stand in Mr Lemos's shoes and can use the documents in any proceedings against both him and Mrs Lemos.

120. Those were Ms Toube's submissions in support of her application.

121. Mr Lord began his submissions, both written and oral, by emphasising certain matters which he said were likely to be uncontroversial (and with which Ms Toube did agree in her oral submissions). They are as follows:

(1) Privilege is a right to resist the compulsory disclosure of information. In the case of legal professional privilege, it applies to documents which contain legal advice or were created for the dominant purpose of obtaining information or advice in connection with the litigation.

(2) Privilege is a fundamental human right which is protected both under Article 6 and Article 8 of the European Convention for the Protection of Human Rights and Fundamental Freedoms.

(3) Although privilege can be abrogated by statute, this requires express words or necessary implication.

(4) In the absence of express language or necessary implication to the contrary, the courts presume that even the most general words were intended to be subject to the basic rights of the individual.

122. Mr Lord submits that the decision of the Court of Appeal in *Avonwick* is binding authority for the following propositions:

(1) That privilege is not property of the bankrupt which automatically vests in his trustee in bankruptcy; see paragraph 63 of the Master of the Rolls' judgment. It is said to follow from this that the decision of Mr Justice Peter Gibson in *Re Konigsberg*, which proceeded on the basis of a concession by counsel that the bankrupt's privilege had devolved on to his trustee, was no longer good law on this point. Reference is made to paragraph 64 of the Master of the Rolls' judgment.

(2) Although the trustee in bankruptcy is entitled under section 311 of the Act to take possession of documents containing information that is privileged to the bankrupt, and to use such documentation and the information contained in it for the statutory purpose of getting in and realising the bankrupt's estate, he cannot do so in a way that would amount to a waiver of privilege without the bankrupt's consent: see paragraph 69 of the Master of the Rolls' judgment.

123. Further, *Avonwick* is also said to be authority for the proposition that the use of privileged documents to assist a third party in a claim against another person falls outside the statutory function of a trustee in bankruptcy as stated in section 305 (2): see paragraphs 84 and 85 of the Master of the Rolls' judgment.

124. In the present case, the trustees are said to seek the court's direction on the question of whether they are entitled to deploy the documents without the consent of Mr and/or Mrs Lemos in proceedings against the trustees of the Kalliopi Lemos 1994 settlement and/or Mrs Lemos relating to the property (and on the assumption that the documents are privileged to Mr Lemos either solely or jointly with his wife). The answer to that question is said plainly to be no. *Avonwick* is said to apply. There is said to be no basis upon which it can be distinguished.

125. It is said that even if *Avonwick* can somehow be distinguished so that Mr Lemos's consent is not required, the trustees would still need Mrs Lemos's consent in the case of documents that are subject to joint privilege. It is said that where privilege is held jointly, it can only be waived by the joint holders acting together. It is said that the trustees have not identified any provision of the Insolvency Act or principle of general law which would entitle them to override joint privilege.

126. In his supplemental skeleton argument, Mr Lord referred to the argument of Ms Toube that, notwithstanding the Court of Appeal's decision in *Avonwick*, a bankrupt's privilege in documents that relate to assets of the estate, but not its liabilities, devolves upon the trustee in bankruptcy under the principle in the *Crescent Farm* case.

127. Mr Lord says that Ms Toube seeks to distinguish between documents relating to assets of the bankruptcy and documents relating to other matters, such as liabilities. This new argument is said to be misconceived. It is based on a distinction between documents relating to assets of the bankrupt and those which relate to his liabilities which simply did not feature in the Master of the Rolls' judgment. There is said to be no justification for it. If there was such a distinction, it is said to be one which the Master of the Rolls would have drawn expressly.

128. Mr Lord pointed to paragraph 5 of the Court of Appeal's judgment as identifying the issue on the appeal: it was whether privilege attaching to information and documents of a bankrupt were property which vested in the trustees in bankruptcy, and what use might be made of such information and documents by the trustees.

129. Mr Lord submits that it is clear that no distinction can be drawn between documents relating to assets and those relating to liabilities. At paragraph 50 of his judgment, the Master of the Rolls is said to have identified the issues before the court. He expressly disagreed with the view taken by Mr Justice Arnold at first instance at paragraphs 67 and 68 that the case was about whether privilege in the documents had been transferred to Mr Shlosberg's trustees, rather than about its abrogation. He went on to say that from Mr Shlosberg's perspective, the only question was whether or not the effect of the statutory bankruptcy code was that he had involuntarily been deprived of his fundamental right to assert his privilege in the information contained in "the Documents". The Master of the Rolls said that he could see no reason why the principles in the *Derby Magistrates* case, the *Simms* case and the *Morgan Grenfell* case should not apply in answering that question. That is a reference to *R v Derby Magistrates' Court ex parte B* [1996] AC 487; *R (Morgan Grenfell & Co Limited) v Special Commissioners of Income Tax* [2002] UKHL 21, [2003] 1 AC 563; and *R v Secretary of State for the Home Department, ex parte Simms* [2000] 2 AC 115. Ms Toube points out that paragraph 50 refers to "the Documents" with a capital letter D, that is to say the category B and C documents, and does not extend to the category A documents.

130. Applying the principles laid down in the three House of Lords authorities cited, which, it is said by Mr Lord, tellingly received no mention in the trustees' skeleton argument, the Court of Appeal said that the effect of the statutory bankruptcy code was not that Mr Shlosberg had been involuntarily deprived of his fundamental right to assert his privilege in the information contained in the documents. Again, Ms Toube says that that statement is expressly limited to the category B and C, and does not extend to the category A, documents.

131. Mr Lord submits that, contrary to what the trustees claim, the Court of Appeal did hold that *Re Konigsberg*, which purported to apply the *Crescent Farm* principle in a bankruptcy context, was wrongly decided. He says that at paragraph 64 the Master of the Rolls noted: (1) that the decision of Mr Justice Peter Gibson in that case was based on a concession by counsel for the wife that the privilege had devolved on to the trustee in bankruptcy; and (2) that it predated the *Derby Magistrates*, the *Simms*, and the *Morgan Grenfell* cases, which were said to set out "the proper approach".

132. In other words, it is said that the Master of the Rolls clearly took the view that Mr Justice Peter Gibson would have reached a different conclusion had he applied the principles laid down in those cases, all of which emphasise the absolute and sacrosanct nature of legal professional privilege, rather than proceeding on the basis of a concession by counsel.

133. The Master of the Rolls concludes (at paragraph 64) by saying that the decision in *Re Konigsberg* is:

"... not correct on the point presently under consideration."

134. "The point under consideration" is said to be that identified at paragraph 50, namely whether the statutory insolvency scheme expressly or impliedly abrogates the bankrupt's privilege. Further, Mr Lord submits that at paragraph 82 the Master of the Rolls disapproved of the decision in *Re Cook* which had applied *Re Konigsberg*. The privileged information in issue in that case was not confined to information relating to liabilities of the bankrupt, but had included information relating to his assets. Mr Lord submits that the unqualified disapproval of *Re Cook* demonstrates that there was no distinction in the mind of the Master of the Rolls between documents relating to assets and those relating to liabilities.

135. It is said that no significance can be attached to the fact that the appeal in *Avonwick* was not concerned with the category A documents; that is to say, those relating to the litigation in the County Court regarding an attack on Mr Shlosberg's cat. That was because there was no appeal against that aspect of Mr Justice Arnold's decision, no doubt because the issue was not regarded as very important. As a result, the Court of Appeal did not need to consider it. Had it considered the issue, Mr Lord submits that the Court of Appeal would doubtless have concluded that Mr Justice Arnold's decision that Mr Shlosberg's trustees had acquired the benefit of his privilege in the category A documents was wrong.

136. Mr Lord submits that the Court of Appeal's judgment makes it clear that Mr Justice Peter Gibson's judgment in the *Konigsberg* case, which was a judgment relating to assets, was wrong. He says that the *Crescent Farm* principle is nothing to the point. That case was not a bankruptcy case. It only says that privilege is not lost or waived when an owner of property voluntarily passes a document to his successor in title to that property. There is nothing in the *Crescent Farm* decision that offends against the fundamental right of privilege or against Articles 6 or 8 or against the judgments in the trilogy of House of Lords cases upon which emphasis was placed by the Master of the Rolls in *Avonwick* and which underlie the heart of the Master of the Rolls' decision.

137. Mr Lord submits that it is, in any event, important to note that Mr Justice Arnold reached his decision on the category A documents purely on the basis of a concession by counsel for Mr Shlosberg. In the light of the Court of Appeal's decision, it can now be seen that that concession was wrongly made. Moreover, at paragraph 132, Mr Justice Arnold is said to have himself expressed doubt about the correctness of the concession. Mr Justice Arnold's reasoning does not involve the distinction which the trustees now seek to draw between privileged information relating to assets and that relating to liabilities.

138. As the Court of Appeal is said to have made clear in *Avonwick*, the issue in the present case turns on an application of the principles laid down in the trilogy of House of Lords decisions in *Derby Magistrates*, *Simms* and *Morgan Grenfell*. Those principles do not provide any justification for drawing a distinction between privileged information which relates to assets and that which relates to liabilities.

139. In the *Derby Magistrates* case, the House of Lords held that legal professional privilege was to be upheld in all cases as the predominant public interest, even where the holder of the privilege ceases to have any recognisable interest in maintaining it. On the facts of that case, the privilege was held to outweigh even the public interest in ensuring that all relevant evidence was available to a defendant accused of murder. Mr Lord says that it is harder to think of a stronger example.

140. At pages 508H to 509A, Lord Taylor of Gosforth CJ said that he was of the opinion that no exception should be allowed to the absolute nature of legal professional privilege once established. A similar observation is to be found in the speech of Lord Lloyd of Berwick.

141. Accordingly, the public interest in ensuring that a trustee in bankruptcy is able to carry out his function of getting in, realising and distributing the bankrupt's assets, as discussed by the Master of the Rolls in *Avonwick* at paragraphs 40 to 42, however great that is, does not justify even a limited exception to the absolute nature of privilege. There is no balancing of interests. In that regard, Ms Toube accepted that a reference to the balancing of interests in her written skeleton argument (at paragraph 50) was an aberration.

142. The *Simms* and the *Morgan Grenfell* cases are said by Mr Lord to make it clear that, whilst legal professional privilege can be abrogated by statute, that requires either express words or necessary implication. In the absence of either of these, the courts presume that even the most general words were intended to be subject to the basic rights of the individual.

143. The Court of Appeal's clear view in *Avonwick* is said to be that none of the relevant provisions in the insolvency legislation can be read as abrogating the bankrupt's privilege. For the same reason, section 283 (4) cannot be construed so as to extend the trustees' right to assert privilege, whether by necessary implication or otherwise. In any event, the right to assert privilege is a negative right to withhold disclosure; it is not a right exercisable over or in respect of property.

144. The trustees seek to get round the effect of these authorities by contending that they are able to rely on the *Crescent Farm* principle, which is said to operate independently from the insolvency legislation. Mr Lord submits that that is misconceived. The Court of Appeal in *Avonwick* distinguished Crescent Farm (at paragraph 64) on the basis that it was not an insolvency case. That is plainly a relevant distinction.

145. *Crescent Farm* involved the sale of land by the first defendant to the second defendant and the voluntary disclosure by the former to the latter of privileged legal advice. All *Crescent Farm* decided was that the second defendant, as successor in title to the land, was able to maintain the privilege in the advice as against a third party, namely the claimant. That is said to be quite different from what happens in the case of a bankruptcy. The assets of the bankrupt vest in the trustee by operation of law pursuant to section 306(1) of the Act. The only question that arises is whether that or any other relevant provision of the Insolvency Act has the effect of involuntarily depriving the bankrupt of his fundamental right of privilege.

146. The decision of the Court of Appeal in *Avonwick* is, according to Mr Lord, binding authority that it does not. Although the trustee has a right to use the privileged material for the purposes of carrying out his statutory function, he cannot do so in a way which waives privilege without the bankrupt's consent.

147. There is therefore said to be no scope for the *Crescent Farm* principle to operate in an insolvency context. The concession made by Mr Shlosberg's counsel before Mr Justice Arnold to the contrary is said to be wrong. Even if there were scope for the application of the *Crescent Farm* principle, that is said to provide no basis for saying that a successor in title can waive the privilege he has inherited from his predecessor without the latter's consent, let alone that he can use the privileged information against him. Privilege is a negative right to restrain production. *Crescent Farm* decides no more than that where a predecessor in title has voluntarily disclosed privileged information about the asset transferred to his successor, such disclosure does not constitute a waiver of privilege.

148. Mr Lord then addresses the nature of the claim under section 423. He submits that the *Crescent Farm* principle only applies to privileged information relating to a specific asset that has been acquired. In order to be able to invoke that principle, the trustees have to identify an asset which is vested in them under section 306(1). In the *Avonwick* case, that was the County Court judgment in relation to the assault upon the cat that had vested in Mr Shlosberg's trustees in bankruptcy.

149. In the present case, it is said that the applicants cannot identify any specific asset to which privilege can attach. It cannot be the Hampstead property itself because that was never vested in Mr Lemos to begin with and it is now vested in the offshore trustees. Nor can the asset be the shares in Panagia, the company which previously owned the property and which were transferred into the settlement, because that company has been dissolved.

150. All there is is a potential claim under section 423 of the Act, which, as matters presently stand, the trustees have not even decided to bring yet. Even if they were to bring such a claim, they would not be able to say that they were bringing it as a successor in title to Mr Lemos. He never had any claim against his wife or the trustees of the settlement prior to being made bankrupt, so the trustees cannot be said to be claiming to stand in his shoes.

151. Furthermore, Mr Lord submits that a claim under section 423 is not concerned with assets which can properly be characterised as forming part of the estate in bankruptcy which it is the trustees' function to get in. That is because:

(1) Section 423 is not part of Chapter IV of Part IX of the Act, so the bringing of a claim under section 423 is no part of the function of a trustee in bankruptcy under section 305 (2). Mr Lord points out that Chapter IV of Part IX comprises sections 305 to 335 and does not even include sections 339 or 340, relating to transactions at an undervalue and preferences in an insolvency context, still less section 423, which is not confined to cases of insolvency.

(2) Rather, section 423 appears in Part XVI of the Act, entitled "Provisions against debt avoidance". A claim under that section can be brought even if there are no insolvency proceedings on foot.

(3) A section 423 claim is not one relating to property comprised within the bankrupt's estate, as is recognised by the contrast in language between paragraphs 2 and 2A of Schedule 5 (previously cited).

Rather, it is a personal claim which may be brought not just by insolvency office-holders but by anyone who is a victim of the transaction: see section 424 (1).

(4) If there are formal insolvency proceedings on foot, a victim needs the court's permission to bring a claim under section 423. If such a claim were concerned with assets that could properly be characterised as forming part of the insolvent's estate, then the section would have required a victim to seek the consent of the office-holder rather than of the court.

(5) The remedy under section 423 (2) is a discretionary one and section 423 (3) prescribes the conditions to be met before the court may grant relief.

(6) The court has wide powers under section 423 (2) and Section 425 with regard to relief. The relief granted on a section 423 claim will not necessarily involve the transfer of assets to the office holder, still less any vesting. Indeed, there is nothing in sections 423 to 425 that require a victim who has successfully sued under section 423 to pass on any recoveries to the office holder.

(7) The language of section 423 is very different from the language of section 42 of the Bankruptcy Act 1914, corresponding to section 339 of the 1986 Act, with which *Re Konigsberg* was concerned.

152. Finally, Mr Lord says, the documents which the trustees wish to deploy on the section 423 claim are clearly not confined to documents relating to particular assets, let alone assets that form part of the estate. Indeed, the trustees' principal focus appears to be on documents relating to the Revenue investigation between 1994 and 2001. Those are said to be documents which relate to liabilities or potential liabilities of the former bankrupt and are therefore caught by the decision of the Court of Appeal in *Avonwick*, even on what is said to be the trustees' erroneous interpretation of that decision.

153. For the second respondent, Ms Shekerdemian adopted Mr Lord's submissions. In relation to *Avonwick*, she developed a further six short points:

(1) Counsel in the Court of Appeal in *Avonwick* was not seeking to draw any distinction between liabilities and assets: see paragraph 58 of the Court of Appeal's judgment.

(2) There is no logical or principled reason to distinguish between liabilities and assets. The trustee in bankruptcy is concerned with both assets and also liabilities.

(3) Section 283 (4) does not assist the applicants. If that subsection were intended to extend to privilege, it would have said so expressly: see the trilogy of House of Lords cases cited and relied upon in *Avonwick* by the Court of Appeal.

(4) By differentiating between liabilities and assets, and by asserting that no privilege attaches to asset documents, the applicants are attacking the Master of the Rolls' conclusion that to deprive a holder of privilege, there must be an express provision or necessary implication in the relevant legislation. That is said to be all the more so when the privilege extends to a third party claim, as is engaged in the present case.

(5) Paragraph 71 of the Court of Appeal's judgment is a statement of general application, not confined in any way to liability documents.

(6) The Court of Appeal made it clear that *Re Konigsberg* was wrong on the point in issue. The point in issue was the second ground of the decision in *Konigsberg*. It is said that the Master of the Rolls so found at paragraph 64 of his judgment. If there were any ambiguity about what was said at paragraph 64, it is said to be resolved in favour of the respondents by the Master of the Rolls' observations at paragraph 82 dealing with the authority of *Re Cook*. That case was expressly said to have been wrong because the deputy judge in that case had been wrong in following Mr Justice Peter Gibson's earlier decision in *Re Konigsberg*.

154. Ms Shekerdemian submitted that the rationale of *Esal (Commodities) Limited (No. 2)* [1990] BCC 708 was explained at paragraph 79 of the Master of the Rolls' judgment. It was concerned with the deployment of material which was subject to a duty of confidence because of the manner in which the material had been obtained, namely by way of application under the statutory provisions in the Insolvency Act. Cases such as *Re Esal* were not concerned with the deployment of material that was subject to a pre-existing duty of confidence arising from legal professional privilege.

155. Ms Shekerdemian addressed the nature of a section 423 claim. She said that it was a claim which was personal to whoever had the standing to bring it and was not exclusive to insolvency office-holders. Assets the subject of a claim only vested in the recipient.

The distinction between such a claim and one to property comprised in the bankrupt's estate already was recognised by the difference in the wording of paragraphs 2 and 2A of Schedule 5 to the 1986 Act. A section 423 claim presupposes that the respondent has already divested himself of assets and not that he still owns them. The remedy was a discretionary one; and there was no entitlement to that remedy even if all of the components of a section 423 claim were made out. There could be no assumption that any section 423 claim would necessarily result in the recovery of an asset that should have been vested in the trustee in bankruptcy.

156. Ms Shekerdemian submitted that no amount of statutory vesting could have the effect of divesting Mr Lemos of his right to assert privilege in privileged documents. She pointed out by reference to passages in the *Derby Magistrates Court* case that legal professional privilege survives even when the holder of that privilege has no continuing recognisable interest in asserting it. Although Lord Nicholls seems to have taken a different view on that aspect of the case, in that respect he was in the minority and the majority took a different view, as was apparent from passages cited to me from the speeches of Lord Taylor and Lord Lloyd.

157. Ms Shekerdemian submitted that the *Derby Magistrates Court* case established that even where an asset was vested in the trustee in bankruptcy, the privilege attaching to communications affecting that asset did not disappear. The only limited qualification to that principle was the inroad made by section 311(1), but that inroad was a very limited one and did not allow a trustee in bankruptcy to deploy privileged documents in a manner which would amount to a waiver of privilege.

158. That analysis was said to be broadly consistent with the judgment of Mr Justice Arnold at first instance at paragraphs 127 to 128, referring back to paragraphs 84 to 87. It was also consistent with the analysis of the Court of Appeal at paragraph 71.

159. In her reply Ms Toube identified five questions which the court had to ask in relation to the effect of the *Avonwick* decision. They were:

(1) What did *Avonwick* decide at first instance about documents relating to assets?

(2) Was its decision in that regard overruled by the Court of Appeal?

(3) As a result of *Avonwick*, does the *Crescent Farm* principle still apply in bankruptcy? In other words, in relation to asset documents, do the trustees in bankruptcy have the privilege and can they waive it?

(4) If there are documents about assets that have passed to the trustees under section 311, can the trustees waive privilege in those documents?

(5) Whether documents relating to the Hampstead property are covered by the *Crescent Farm* principle.

160. Ms Toube invited the court to answer those questions as follows:

161. First, Mr Justice Arnold decided that the *Crescent Farm* principle is that where a successor in title obtains an asset, it also obtains privilege in documents relating to that asset and can assert or waive that privilege as it chooses. Mr Justice Arnold decided that that principle applies in bankruptcy when the successor in title to the assets is the trustee in bankruptcy. The trustee in bankruptcy can therefore assert or waive any privilege held by the bankrupt in category A documents. There was therefore no problem that the solicitors (Dechert) had seen the category A documents.

162. However, Mr Justice Arnold also decided that the *Crescent Farm* principle did not apply to any documents other than those relating to an asset. It was therefore the case that the trustees could not assert or waive any privilege held by the bankrupt in the category B and C documents. There was therefore a problem, because Dechert had seen those documents, and they could not continue to act for Avonwick. There was therefore a difference between the documents relating to assets within category A and the documents relating to liabilities within categories B and C.

163. Secondly, that decision was not overruled by the Court of Appeal in relation to the category A documents. Those documents were not in issue before the Court of Appeal and the Court of Appeal did not consider the *Crescent Farm* principle insofar as it concerned documents which related to an asset.

164. There were only two arguments that were considered by the Court of Appeal. The first was whether, as a matter of interpretation of section 436 of the Insolvency Act, privilege was a freestanding item or species of property. It held that non-asset documents were not property for the purposes of section 436.

165. The second matter that was ruled upon by the Court of Appeal was whether section 311, when properly interpreted, provided by necessary implication that a trustee in bankruptcy could use privileged documents. The Court of Appeal answered that question in the negative.

166. Ms Toube submits that neither of those issues had anything to do with the *Crescent Farm* principle in relation to asset documents. The Court of Appeal said nothing about that, nor did it say anything about the category A documents or about what Mr Justice Arnold had held in relation to them.

167. Ms Toube submitted, on the third question, that the *Crescent Farm* principle did still apply in bankruptcy. She submitted that it had been applied by Mr Justice Arnold at first instance and the Court of Appeal had said nothing about it, still less had the Court of Appeal overruled the application of the *Crescent Farm* principle in bankruptcy cases.

168. As to the fourth question, Ms Toube submitted that the documents that had been provided to the trustees under section 311 could be used by them and they could waive privilege in relation to those documents. So far as the documents related to assets in the bankruptcy, this was a general rule that applied in all bankruptcies by virtue of the *Crescent Farm* principle, including this one.

169. So far as issue 5 was concerned, the relevant documents in the present case related to the Hampstead property and that property constituted an asset in the relevant sense. It was therefore the trustees in bankruptcy who could either assert or waive privilege in the asset documents.

170. Ms Toube submitted that on the *Crescent Farm* principle, privilege enured to the benefit of a trustee in bankruptcy as successor in title to the related asset and it was the trustee in bankruptcy alone who was entitled to waive privilege in relation to the documents. She submitted that the criticisms of Mr Justice Arnold had no validity in relation to privilege attaching to asset documents. Paragraphs 65 to 67 of the Master of the Rolls' judgment were simply dealing with the correct approach to issues of statutory construction. In relation to the category A documents in *Avonwick*, the trustees in bankruptcy must have been able to waive privilege because otherwise Dechert could not properly have seen the category A documents.

171. At paragraph 106 of his judgment at first instance in *Avonwick*, Mr Justice Arnold had directly linked the *Crescent Farm* principle to the ability of a trustee in bankruptcy either to assert or to waive the privilege

of the bankrupt. He had said in terms that it should be borne in mind that in this jurisdiction the trustee would often be able to rely upon the *Crescent Farm* principle.

172. Where a trustee in bankruptcy, as successor in title to an asset, acquired documents in relation to that asset, he acquired the privilege in those documents and could assert or waive that privilege as the trustee chose. That principle applied in bankruptcy and the result was that in *Avonwick* there was no problem that Dechert had seen the category A documents. The true distinction to be drawn is between documents relating to assets and those relating to liabilities.

173. The respondents had to say that the Court of Appeal must have overruled Mr Justice Arnold in relation to the *Crescent Farm* principle and to the category A documents, but that was not a proper analysis of the Court of Appeal's decision. It was very important to look at the context in which the Court of Appeal were saying what they did.

174. It was clear from paragraph 21 that the Court of Appeal was only talking about the category B and C documents. The category A documents and any issues associated with them were not before the Court of Appeal. The Court of Appeal only had to consider the question of liability documents because the category A documents were not before them.

175. Paragraph 52 of the Court of Appeal's judgment made it clear what arguments were being considered and those were the only two issues with which the Court of Appeal was concerned. Paragraphs 51 to 64 dealt with the issue of privilege as property and the argument that it was was rejected at paragraph 63. It was in that context that the Master of the Rolls went on to say what he did at paragraph 64.

176. The second argument was whether section 311 had overridden the right to privilege. That was discussed at paragraphs 65 to 83. However, the applicants in the present case place no reliance on section 311. They were relying instead upon the *Crescent Farm* principle. If privilege passed to the trustee in bankruptcy, as the applicants maintain, then no question of abrogation of privilege, as distinct from its passing, arose at all.

177. What was wrong with *Re Cook* was said to be apparent from Mr Justice Arnold's decision at paragraph 77. The problem with that case was that the deputy judge had not identified any property to which the privileged information related. The criticism fell squarely within the principle that privilege was not in itself property.

178. The observations of the Court of Appeal at paragraph 82 were concerned only with the construction of section 311 and were not addressing documents concerning assets. The last line of paragraph 82 of the Master of the Rolls' judgment was said to make that clear, where he said that the deputy judge had not considered the proper interpretation of section 311 by reference to the correct principles. That was why *Re Cook* was wrongly decided.

179. So, Ms Toube submits, the Court of Appeal did not overrule Mr Justice Arnold. It said nothing about the category A documents.

180. The Court of Appeal had identified and addressed both arguments at paragraph 86, which is to be taken as identifying the parameters of the Court of Appeal's decision. The Court of Appeal did not say that Mr Justice Arnold was wrong in relation to the category A documents. The Court of Appeal did not overrule *Re Konigsberg*. If it had wished to do so, it would have made it clear that it was overruling *Re Konigsberg* on the second point of the decision. Nor did the Court of Appeal say in terms that the concession made by counsel had been wrong. Paragraph 64 of the judgment merely recorded that the concession had been made by counsel.

181. It was said to be clear from, for example, paragraph 71 of the Court of Appeal's judgment that the case was about providing documents to third parties: see also paragraph 77. In the instant case, the court was

concerned with the entitlement of the trustees in bankruptcy to use documents in relation to the bankrupt. The applicants were saying that there was no confidence, and thus no privilege.

182. The *Esal* case did not help the respondents because it was merely concerned with the effect of contractual undertakings given as to the use of documents. The trustees could use the documents as against Mr Lemos and, if right on the effect of the *Avonwick* decision, the trustees in bankruptcy could use documents relating to the bankrupt's assets for any purposes of the bankrupt.

183. Ms Toube submitted that property was an asset and the fact that the claim was made under section 423 made no difference. The Court of Appeal in the *Lemos v Lemos* litigation had held that it was well arguable that Mr Lemos had had an interest in the property in 1994 which he had disposed of for the purpose of putting the Hampstead property beyond the reach of creditors. It was part of the trustee in bankruptcy's functions to bring a section 423 claim.

184. The definition of "property" in section 436 was a very wide one. It extended to contingent and future assets, and therefore extended to a claim under section 423. One of the orders the court could make under section 425 was one requiring the property to be vested in the trustee in bankruptcy. That was similar to the form of relief that could be ordered under section 339 of the Insolvency Act. The making of a claim under section 423 was all part of the trustees' functions and related to an asset in the bankrupt's estate. Although the permission of the court was required by a claimant other than the insolvency office holder where an insolvency had occurred, that was no different from the requirement of leave from the court for a contributory to issue misfeasance proceedings under section 212 of the Act by virtue of subsection (5).

185. Those were the submissions on the principal issue of the meaning and effect of *Avonwick*. It is now just after 1.05. I will resume this judgment at 2.05 and set out my decision on that point, before going on to consider the scope and potential application of section 363. So I will adjourn now until 2.05.

186. **JUDGE HODGE QC:** My decision on the privilege issue.

187. It is important to bear in mind the nature of the application that came before Mr Justice Arnold and the context in which the decision on legal professional privilege arose in the *Avonwick* case and thus the context in which the matter came before the Court of Appeal.

188. The issue was whether the solicitors (Dechert) should be permitted to continue to act for the principal creditor of Mr Shlosberg, as well as for the bankrupt's trustees in bankruptcy. For those purposes, it mattered not whether privilege in documents about the litigation in the County Court regarding the attack on Mr Shlosberg's cat had passed to the trustee in bankruptcy. If Mr Shlosberg was not going to succeed in relation to the category B and C documents, the fact that Dechert had had access to documents concerning a judgment obtained in the County Court for damages for an assault upon Mr Shlosberg's cat was not going to tip the balance the other way.

189. As Ms Toube has pointed out, the Court of Appeal made it clear at paragraph 21 of its judgment that they were not concerned on the appeal with the documents in category A. I therefore cannot regard the Court of Appeal's decision as directly authoritative on documents affecting assets such as those within category A.

190. At paragraph 38 the Master of the Rolls acknowledged that Mr Shlosberg had issued a respondent's notice to uphold the judgment's order on an additional ground. In my introductory observations I referred to the terms of that respondent's notice; but the Master of the Rolls made it clear that it was not necessary to set out the terms of that additional ground in his judgment.

191. I turn first to consider the first instance judgement of Mr Justice Arnold.

192. At paragraphs 65 through to 67, Mr Justice Arnold began by considering the correct approach to statutory construction in the context of the case before him. He said at paragraph 65 that in the *Morgan Grenfell*

case the House of Lords had held that in the light of the nature of privilege, it should not be regarded as being abrogated by a statute unless such abrogation was by express words or necessary implication.

193. At paragraph 66 he made it clear that in the instant case the respondents had not argued that privilege had been abrogated, but rather that it had been transferred to the trustees. Counsel for Mr Shlosberg had submitted that the involuntary transfer of privilege from the person entitled to it to someone else was tantamount to abrogation. But at paragraph 67 Mr Justice Arnold made it clear that he did not consider that the principles stated by the House of Lords in the *Morgan Grenfell* case were directly applicable to the present issue, although he accepted that the court should be cautious before concluding that a statutory provision had the effect of involuntarily transferring privilege from the beneficiary of the privilege to another person in the absence of express words.

194. I am entirely satisfied that the Court of Appeal did not endorse that approach. At paragraph 50 the Master of the Rolls recorded that Mr Justice Arnold had said that he did not consider that the principles stated in the *Morgan Grenfell* case were directly applicable to the present case, from which he inferred that that was because Mr Justice Arnold had taken the view that the case was about whether privilege in the documents had been transferred to the trustees, rather than about its abrogation.

195. The Master of the Rolls made it clear that he did not agree with that analysis. He observed that from Mr Shlosberg's perspective, the only question was whether or not the effect of the statutory bankruptcy code was that he had involuntarily -- and I stress the word "involuntarily" -- been deprived of his fundamental right to assert his privilege in the information contained in the documents. The Master of the Rolls could see no reason why the principles in the *Derby Magistrates Court* case, the *Simms* case and the *Morgan Grenfell* case should not apply in answering that question.

196. I accept the point made by Ms Toube that the reference to "the Documents" referred to the category B and C documents, and not those in category A, but I cannot ignore the Master of the Rolls' rejection of Mr Justice Arnold's approach that the court was not concerned with the abrogation of privilege in the instant case. In my judgment the fact that, from the point of view of the bankrupt, the effect of Ms Toube's submissions is that, in relation to assets documents, the bankrupt is being involuntarily deprived of his fundamental right to assert his privilege in the information contained in the documents is, in my judgment, a factor that must be firmly borne in mind when considering the position in relation to assets documents, such as those which, in the *Avonwick* case, were held to have fallen within category A.

197. Reverting to Mr Justice Arnold's decision, in summarising the respondents' arguments, at paragraph 68 Mr Justice Arnold recorded that, in the case of documents in category A, the proceedings had resulted in a judgment for damages in Mr Shlosberg's favour prior to the bankruptcy and that the judgment debt owed to Mr Shlosberg was property within section 436(1). He then said that, accordingly, the trustees had acquired the benefit of the privilege as successors in in title to that property.

198. That of course was a mere recording of the nature of the relevant argument being advanced for the respondents. One needs to go on to consider what the response to that argument was.

199. That is to be found at paragraph 70 of Mr Justice Arnold's judgment. Counsel for Mr Shlosberg is recorded as having accepted that where title to property passes to a trustee in bankruptcy as part of the bankrupt's estate, then the benefit of privilege in documents recording the requesting and the giving of legal advice relating to or documents created for the dominant purpose of proceedings concerning that property passes to the trustee.

200. Counsel submitted, however, that that principle only applied where there was some property other than the documents recording the privileged information. He submitted that the High Court judgment, which of course was a judgment **against** and not in favour of Mr Shlosberg, was not property within section 436(1). However, Mr Justice Arnold observed that, although he did not concede that the County Court judgment, which was a judgment **in favour of** Mr Shlosberg, was property within section 436(1), he did not advance

any argument to the contrary. So whether or not privilege in the category A documents related to an asset of Mr Shlosberg was not apparently argued before Mr Justice Arnold.

201. At paragraphs 71 through to paragraph 97, Mr Justice Arnold referred to a number of authorities on the devolution of privilege, particularly in the context of bankruptcy, which he considered in chronological order.

202. The first, which was not a bankruptcy case, was the *Crescent Farm* case. He recorded that Mr Justice Goff had held that the second defendant could assert privilege, as it had received the documents as the first defendant's successor in title to the land, and it was immaterial that it had received them prior to completion.

203. All that Mr Justice Goff was doing was to decide a question as to whether the successor in title could **assert** privilege. He did not decide who could **waive** that privilege. He did not need to consider whether waiver could be exercised by the successor alone or whether he also required the consent of the original privilege holder. The case did not concern waiver of privilege but assertion of privilege.

204. Mr Justice Arnold set out Mr Justice Goff's statement of the applicable principle in these terms:

> "… it is clearly established that legal professional privilege of a predecessor in title does enure for the benefit of his successor."

205. There is nothing there about waiver of privilege and who is entitled to do that. Mr Justice Arnold referred to the principle as "the *Crescent Farm* principle".

206. At paragraph 73 Mr Justice Arnold referred to Mr Justice Peter Gibson's decision in the *Konigsberg* case. He quoted the passage from Mr Justice Peter Gibson's judgment at pages 1266 to 1267 in full.

207. At paragraph 75 Mr Justice Arnold recorded that it was common ground that in that passage Mr Justice Peter Gibson had based his decision upon the *Crescent Farm* principle, the relevant property being the husband's interest in the matrimonial home. That was said to have been sufficient to deal with the issue in that case. It did not appear that any argument had been advanced based on the definition of "property" in section 436(1) or based on section 283(4) of the 1986 Act.

208. Mr Justice Arnold then went on to consider the decision in *Re Cook* and he made a number of comments on the reasoning of Mr Burnton QC, the deputy High Court judge. One of his comments was, as Ms Toube has pointed out, that although Mr Burnton had purported to apply the *Konigsberg* case, he had not identified the property to which the privileged information related, appearing to have regarded it as sufficient for that purpose that the privilege related to the bankrupt's financial affairs in general. He also recorded that Mr Burnton appeared to have accepted that privilege related to personal matters would not vest in the trustee.

209. At paragraph 99 Mr Justice Arnold said that it was clearly established that the benefit of privilege in documents recording the requesting or giving of legal advice relating to or created for the predominant purpose of litigation concerning specific property passed together with title to that property. As the *Konigsberg* case showed, that principle applied in the context of a bankruptcy. But he said that one had to be careful when making statements like "a trustee in bankruptcy is a successor in title for this purpose". He said that a trustee certainly could be a successor in title for that purpose, but it did not necessarily follow that a trustee succeeded to the benefit of all privilege to which the bankrupt was entitled.

210. Before turning to consider the respondents' arguments in detail, Mr Justice Arnold made some general observations at paragraphs 103 to 106. He took the starting point to be section 311(1). That showed that in enacting the 1986 Act, the legislature had addressed its mind to the question of privilege. It did not provide that the bankrupt's privilege should pass to its trustee, however. Rather, it provided that privilege

was not a bar to the trustee's exercise of his powers to obtain documents relating to the bankrupt's estate or affairs. If anything, that was said to suggest that the bankrupt might retain his privilege.

211. As counsel for the respondents pointed out, however, the trustee might take possession of documents belonging to a third party. Counsel for the respondents suggested that it followed that the privilege might be that of the third party. Mr Justice Arnold said that that might be so, but the point did not arise in the instant case and it was not necessary to decide whether it was correct.

212. He then went on to deal with the *Konigsberg* case and he said that he agreed with Mr Justice Peter Gibson that it appeared to be implicit in section 311(1) that the trustee could use information contained in documents which he had taken possession of pursuant to section 311(1), including privileged documents, in the discharge of his statutory functions.

213. He disagreed with Mr Justice Pumfrey in another case that it would therefore be anomalous if the trustee could not assert or waive privilege. He agreed with a Canadian judge that there was a difference between using information contained in privileged documents otherwise than for the purpose of proceedings and using it for the purpose of proceedings.

214. That took him on to a more general question, which was the extent to which the trustee needed to be able to assert or waive the bankrupt's privilege in order properly to discharge his duties. Counsel for the respondents was said to have implied, even if he did not expressly submit, that it was essential for the trustee to be able to do that. A comparison with the position in Canada and Australia suggested that that was not so. Then Mr Justice Arnold added this:

> "Furthermore, it should be borne in mind that in this jurisdiction the trustee will often be able to rely upon the *Crescent Farm* principle."

215. In my judgment Mr Justice Arnold did consider that the *Crescent Farm* principle applied in relation to assets documents. However, it is clear that he had some reservations about that principle. At paragraph 108 he said that in his judgment it was clear that the *Crescent Farm* principle did not depend on acquisition by the successor in title of property in the documents recording the privileged information, but on acquisition by the successor in title of some other property to which the legal advice or litigation related. Again, it seems to me that he was there endorsing the *Crescent Farm* principle.

216. At paragraph 126 there was a further apparent endorsement of the *Crescent Farm* principle, referring to the alternative submission of counsel for Mr Shlosberg that even if privilege would otherwise amount to property within section 436(1) or a power over property within section 283(4), it was excluded from the ambit of those provisions by the exception for property which was peculiarly personal to the bankrupt. Mr Justice Arnold referred to counsel's acceptance that that was subject to the operation of the *Crescent Farm* principle "as in the *Konigsberg* case".

217. The position of the category A documents was considered at paragraphs 129 through to 132. Mr Justice Arnold recorded that counsel for the respondents had accepted that the subject-matter of the litigation in the County Court was peculiarly personal to Mr Shlosberg, but he had submitted that the judgment debt in favour of him was not peculiarly personal and was property within section 436(1) which vested in the trustees.

218. At paragraph 132 Mr Justice Arnold said this:

> "Given that the judgment vested in the trustees, counsel for the respondents submitted that it followed, applying the *Crescent Farm* principle, that privilege in the relevant documents also vested in the trustees. I confess to some doubt as to whether this necessarily follows; but since counsel for Mr Shlosberg did not argue to the contrary, I will accept counsel for the respondents' submission."

219. At paragraph 142 Mr Justice Arnold set out his conclusion:

> "… I accept the respondents' third argument, but not the first, second or fourth arguments. Accordingly, I conclude that the trustees acquired the benefit of Mr Shlosberg's privilege with respect to the category A documents, but not the category B or C documents."

220. What I take from that analysis of Mr Justice Arnold's first instance judgment as a whole is this: that Mr Justice Arnold did accept the application of the *Crescent Farm* principle in relation to asset documents, but he did so solely because the contrary was not argued, and with some reservation.

221. Given that the Court of Appeal did not endorse Mr Justice Arnold's view that the involuntary transfer of privilege did not involve an abrogation of privilege, I consider that Mr Justice Arnold's decision, insofar as it was a decision at all and not simply based on the way in which the case was argued before him, is no authority for the application of the *Crescent Farm* principle in personal insolvency cases; that it is no endorsement, on an authoritative basis, of Mr Justice Peter Gibson's approach in *Konigsberg*; and that it is not determinative of the issues I have to decide on the present application.

222. I turn then to the Court of Appeal decision. In the light of the emphasis attached by the Master of the Rolls in the Court of Appeal to the trilogy of House of Lords cases, I remind myself of what was said by Lord Hobhouse in the *Morgan Grenfell* case.

223. At paragraph 44 Lord Hobhouse said that the protection given by the common law to those entitled to claim legal professional privilege is a basic tenet of the common law. Lord Hoffmann said very much the same at paragraph 10 of the same case. That consideration seems to me to underlie the decision of the Court of Appeal in *Avonwick*.

224. The Master of the Rolls considered the *Crescent Farm* principle and *Re Konigsberg* at paragraphs 59 and following. He regarded the *Crescent Farm* case as affirming that it was clearly established that privilege of a predecessor in title enures for the benefit of his successor. Thus a claim for privilege was upheld by Mr Justice Goff in the *Crescent Farm* case.

225. The Master of the Rolls went on to consider the *Konigsberg* case at paragraph 60. He pointed out that Mr Justice Peter Gibson had refused the wife's application to exclude affidavit evidence of the solicitor instructed jointly on the sale of the matrimonial home on two separate grounds.

226. The first was that the wife, by referring in an affidavit to correspondence with the solicitor and by exhibiting a letter from him, had waived privilege. That of itself was sufficient to justify Mr Justice Peter Gibson's decision in the case. There is no suggestion that that aspect of the decision was wrong.

227. The Master of the Rolls then went on to record that the second ground was that the trustee in bankruptcy was a successor in title to the bankrupt in respect of all the assets of the bankrupt divisible among his creditors, including the right to property transferred by a settlement voidable under section 42 (equivalent to section 339 of the 1986 Act) and, following the *Crescent Farm* case, succeeded to and was entitled to assert the privilege of the bankrupt as a successor in title.

228. The Master of the Rolls recorded that it appeared from page 1267B that counsel for the wife had accepted that the relevant privilege of the bankrupt had devolved on the trustee. Mr Justice Peter Gibson held that, the privilege being a joint privilege of the bankrupt and the wife, and the trustee having stepped into the shoes of the bankrupt, the usual rule applied that one joint holder of the privilege, the wife, could not maintain it against the other joint holder, the trustee.

229. At paragraph 63 the Master of the Rolls considered it to be clear that on the proper interpretation of the relevant provisions of the 1986 Act, privilege was not property of a bankrupt which automatically vested in the trustee in bankruptcy. Following the *Morgan Grenfell* and the *Simms* cases, the bankrupt could only be deprived of privilege if the 1986 Act expressly so provided or it was a necessary implication of the

express language of its provisions. He indicated that all the relevant provisions were in general terms and did not expressly treat privilege as property of the bankrupt which automatically transferred from the bankrupt to the trustee, nor was that a necessary implication of the provisions.

230. At paragraph 64 the Master of the Rolls said that *Crescent Farm* and *Re Konigsberg* did not stand in the way of his conclusions. He pointed out that the *Crescent Farm* case was not an insolvency case; in other words, he was saying that *Crescent Farm* did not automatically apply in insolvency. He could also have pointed out that *Crescent Farm* was concerned with **assertion** and not **waiver** of privilege.

231. The Master of the Rolls went on to say that in *Re Konigsberg* it was conceded by counsel that the privilege had devolved on the trustee in bankruptcy. He then added that, more to the point, *Re Konigsberg* predated the *Derby Magistrates Court* case, the *Simms* case and the *Morgan Grenfell* case, which set out the proper approach, and so, unsurprisingly, Mr Justice Peter Gibson had not applied the principles in those cases. It was "not correct on the point presently under consideration".

232. I do not consider that the Master of the Rolls' observation that the *Konigsberg* case was "not correct on the point presently under consideration" was confined to liabilities documents. In my judgment, the "point under consideration" was whether the premise upon which Mr Justice Peter Gibson's decision was founded was correct. That premise was that the trustee in bankruptcy had stepped into the shoes of the privilege held by the bankrupt.

233. In my judgment, what the Master of the Rolls, on a true reading of his judgment, and particularly because of his reference to the trilogy of House of Lords cases, was intending to convey was that merely because the privilege is held by the bankrupt, the trustee does not automatically step into his shoes. That observation is not expressly directed to, and should not be confined as extending only to, liability documents. In my judgment it extends to documents even if they affect assets of the bankrupt.

234. The Master of the Rolls made it clear, at paragraph 70, that the "applicable principles" were those stated in the *Derby Magistrates* case, the *Simms* case and the *Morgan Grenfell* case, keeping in focus the status of privilege as a fundamental right. The express terms of section 311 describe the duty of the trustee to take possession of the documents mentioned there, but it said nothing about their use by the trustee. It was necessarily implicit in section 311 that the trustee was to take possession of the documents, with the overriding function of getting in, realising and distributing the bankrupt's estate. It followed that he must, at the least, be entitled to look at the documents to obtain information relevant to those matters. But the Master of the Rolls went on to say, at paragraph 71, that it was not necessarily implicit that the trustee could waive the bankrupt's legal professional privilege in taking steps against third parties for the benefit of the bankrupt's estate, desirable as that might be from the point of view of the creditors.

235. Echoing the words of Lord Hobhouse in *Morgan Grenfell*, the fact that it would have been sensible or reasonable for Parliament to have included such a power did not mean that it was necessarily implicit, having regard to the express language of the statute.

236. At paragraph 82 the Master of the Rolls made it clear that, for the reasons he had given, the relevant principles were contained not in *Re Konigsberg* but in the *Derby Magistrates* case, the *Simms* case and the *Morgan Grenfell* case. Privilege was not property of the bankrupt which formed part of the bankrupt's estate which vested in the trustee. In *Re Cook* the deputy judge had not considered the proper interpretation of section 311 by reference to correct principles.

237. I do not consider that the Master of the Rolls disapproved of the deputy judge's decision in *Re Cook* merely because he had not identified the property to which the privileged information related. In my judgment the Master of the Rolls' objection to *Re Cook* was more fundamental than that. The deputy judge had failed to have regard to the overarching fundamental human right implicit, and embodied, in the concept of legal professional privilege.

238. I accept that Mr Justice Arnold's decision on the category A documents was not expressly overruled, but that decision was not challenged on appeal to the Court of Appeal. That was because, for the reasons I have indicated, the status and importance of the category A documents was really neither here nor there.

239. I am satisfied that the apparent decision of Mr Justice Arnold was founded on a concession by counsel for the applicant in that case on a matter which was irrelevant to the real issue which arose both on the application and on the appeal. I observe that Mr Justice Arnold himself was lukewarm about the appropriateness of the concession; but since the contrary had not been argued, he did not take issue with it since it did not in any way affect the outcome of the application before him.

240. I am satisfied that insofar as Mr Justice Arnold took the view that *Re Konigsberg* applied in bankruptcy even to assets documents, then that decision is inconsistent with the later observations and reasoning of the Court of Appeal in *Avonwick*, and that it should not be followed.

241. I am satisfied, for the reasons I have given, and in acceptance of the submissions for the respondents, that the Court of Appeal in fact overruled the second ground for Mr Justice Peter Gibson's decision in *Re Konigsberg*.

242. I am satisfied, on a true reading and analysis of the Court of Appeal's decision in *Avonwick*, that the *Crescent Farm* principle has no application in bankruptcy even in relation to assets, as well as to liability, documents. I am satisfied that there should be no distinction between the two classes of documents. I am further supported in that decision by the consideration mentioned by Mr Lord that in some cases it will be difficult to draw a bright-line distinction between the two classes of documents.

243. So turning to Ms Toube's concluding questions, Mr Justice Arnold in *Avonwick*, it seems to me, did not actually decide whether privilege passed with assets to a trustee in bankruptcy. He may have been prepared to accept that it did, on the basis of the *Crescent Farm* principle. But in my judgment, insofar as he did take that view, it is inconsistent with the Court of Appeal's later reasoning and observations because it does not attach sufficient importance to the need to protect legal professional privilege; and the effect of the application of the *Crescent Farm* principle to an involuntary transfer of assets to a trustee in bankruptcy is, as the Master of the Rolls recognised, to amount to an abrogation of the right of privilege.

244. I in no way question the *Crescent Farm* principle in the case of a voluntary passing of property in assets, although I point out that even on that basis, *Crescent Farm* is no authority on the issue of who has the right to waive privilege in such documents, as distinct from asserting it. But I am satisfied that it has no application in the case of the passing of property to a trustee in bankruptcy; and that insofar as Mr Justice Peter Gibson held that it did, *Re Konigsberg* is wrongly decided. The decision itself can be justified on the first of the two grounds, that of waiver of privilege.

245. For the reasons I have given, I am satisfied that if Mr Justice Arnold took the view that privilege passed to a trustee in bankruptcy in asset documents, then that decision has effectively been overruled by the Court of Appeal. I am satisfied that, as a result of the Court of Appeal's decision in *Avonwick*, the *Crescent Farm* principle has no continuing application in bankruptcy cases.

246. Even if I were wrong on that, I would have held that the *Crescent Farm* principle has no application to documents relating to property which is the subject of a section 423 claim. I would have accepted the submissions of the respondents that any recovery on a section 423 claim is not a recovery of property comprised in the bankrupt's estate, even within the very wide definition of "property" in section 436 of the Insolvency Act. But it is unnecessary for me to develop that further, beyond indicating that I accept the respondents' submissions in that regard and their reliance upon the contrast in wording between paragraphs 2 and 2A of the 5th Schedule to the 1986 Act.

247. So I answer the five questions posed by Ms Toube at the end of her oral submissions adversely to the applicants and I accept the respondents' submissions on those matters.

248. That leaves me to consider whether, if the *Crescent Farm* principle does not apply, can sections 333 and 363 of the Insolvency Act be used by the trustees in bankruptcy; and can, as a matter of principle, Mr Lemos be ordered to waive his privilege in any documents that have been released to the trustees in bankruptcy or which are still held by Withers?

249. Ms Toube acknowledged that whether or not the court might order Mr Lemos to waive privilege only arose for consideration if the trustees were wrong, as I have held they are, in their analysis of the law following *Avonwick*. In that event Ms Toube submitted that it was all the more obvious that there must be a power on the part of the Bankruptcy Court to compel Mr Lemos to cooperate so as to further the trustees in the performance of their functions. She acknowledges that that was not a point that was considered in *Avonwick*.

250. As to the court's powers, Ms Toube submits that section 333 imposes an obligation upon a bankrupt to cooperate with his trustees in the fulfilment of their functions to the extent that the trustees may reasonably require. Section 363(2) enables the court with supervisory jurisdiction over the bankruptcy to compel such compliance.

251. Ms Toube submits that as a matter of principle there is no difficulty in the concept that a trustee might reasonably require a bankrupt to agree to waive privilege if, by so doing, he would assist his trustees in pursuing assets for the benefit of the estate. She submits that as a matter of statutory interpretation, it is the necessary implication of section 333 that the bankrupt is obliged to cooperate with a reasonable request to consent to waive privilege so as to assist the trustees in the fulfilment of their function.

252. It follows from the unrestricted terms of section 363 that the court is able to direct the bankrupt to cure such non-cooperation by agreeing to waive his privilege in an appropriate case. Ms Toube points out that, perhaps unsurprisingly, given the conventional understanding before *Avonwick* that a trustee succeeds to a bankrupt's privilege for all purposes, there is no authority on this particular issue, namely the abrogation of the bankrupt's ability to claim privilege so as to prevent his trustee carrying out his functions.

253. But Ms Toube submits that the argument is not without parallel. She points to the fact that in *Bishopsgate Investment Management Limited v Maxwell* [1993] Ch 1, the Court of Appeal held that the power under section 235(2) of the Insolvency Act to require officers and former officers of a company to attend upon an office holder if reasonably required to do so carried with it the implied abrogation of such directors' privilege against self-incrimination. She also points out that the court is able to utilise its powers to give directions to a bankrupt as a means of achieving by an indirect route an outcome which would fulfil the purpose of the statutory insolvency regime.

254. She points, by way of example, to *Ashurst v Pollard* [2000] 2 All ER 772, where Mr Justice Jacob made an *in personam* order by a bankrupt directing him to convey property located in Portugal to his trustees in bankruptcy in circumstances where, as a matter of jurisdiction, any proceedings to require the sale of the property would have had to be brought in the Portuguese court.

255. Ms Toube submits that there is nothing inherently surprising about the existence of such a power. The ability to direct a bankrupt to waive his privilege is the consequence of the interposition of the bankruptcy regime. It is said to be no more -- and arguably much less -- significant than the effect of section 306 in depriving a bankrupt of his assets.

256. Nor is such a power without restriction, since necessarily the trustee would have to establish unreasonable conduct on the bankrupt's part, and it would be for the court supervising the bankruptcy to weigh the competing interests of the creditor with the bankrupt's wish to retain his privilege. Indeed, were the need to seek the court's assistance to arise, it might on occasion only be necessary to direct the bankrupt to agree to a document being shown to a third party on terms that it would be confidential, thereby preserving the waiver of privilege against the rest of the world.

257. Mr Lord, for the first respondent, submits that the reasoning underpinning the Court of Appeal's decision in *Avonwick* applies with equal force to sections 333 and 363. The essence of the Court of Appeal's reasoning in *Avonwick* is that a bankrupt can only be deprived of legal professional privilege if the Act expressly so provides or such deprivation is a necessary implication of the express language of the Act's provisions.

258. Section 333 does not expressly require a bankrupt to waive legal professional privilege if requested to do so by the trustee in bankruptcy and it cannot be said that it follows, as a matter of logic from the express words of section 333, that Parliament intended that the duty to cooperate created by that section could be invoked to compel a bankrupt to renounce his legal professional privilege. Indeed, given the fundamental nature of privilege, it is submitted that it would be highly surprising if that had been Parliament's intention. Accordingly, the court must presume that the general words of the section were intended to be subject to basic rights of the individual, such as privilege.

259. Mr Lord submits that reliance on the Court of Appeal's decision in the *Bishopsgate* case is misconceived. First, the issue for the court in that case was the liquidator's statutory right to obtain information required to manage the company's affairs. The Court of Appeal held that the privilege against self-incrimination could not be invoked to defeat that right.

260. The issue in the present case is said to be different. There can be no dispute that the trustees are entitled to see the privileged information and to use it for the purpose of carrying out their statutory functions, provided, as the Court of Appeal has held in *Avonwick*, that they do not waive legal professional privilege without the bankrupt's consent. The real issue is whether the bankrupt can be compelled to give such consent.

261. Secondly, *Bishopsgate* predates the decisions of the House of Lords in both *Simms* and *Morgan Grenfell* and also the *Derby Magistrates* case.

262. Mr Lord points out that in *Bishopsgate* the Court of Appeal affirmed the decision of Mr Justice Hoffmann, who had regarded himself as bound by an earlier decision of Mr Justice Vinelott and declined to express any views of his own. Mr Lord ventures to suggest that what Lord Hoffmann later said in the course of his speech in *Morgan Grenfell* -- that is to say that the courts would ordinarily construe general words in a statute as not having been intended to override fundamental human rights, even though capable of having that effect if read literally -- leads to the view that had Mr Justice Hoffmann not considered himself bound by earlier authority, his decision might well have been different.

263. Mr Lord also submits that it is clear from the wording of section 333, and of section 363 in aid of it, that the sections only extend to things which are reasonably required for the purposes of carrying out the trustee's functions under any of this Group of Parts. That does not include the bringing of a claim under section 423 or assisting a third party in the bringing of such a claim. That is no part of the trustees' functions under the second Group of Parts, and so the bankrupt is under no duty under section 333(1) to cooperate with such a claim. The fact that the trustee has power to bring such a claim by virtue of section 314 and paragraph 2A of Schedule 5 does not mean that it is one of his statutory functions.

264. Mr Lord further submits that even if the duty imposed by section 333, and the further assistance of the court capable of being invoked under section 363, can be relied upon to override the bankrupt's privilege, it can only do so in exceptional circumstances. That is because the court must construe the section in a manner which compatible with the European Convention for the Protection of Human Rights and Fundamental Freedoms and must take into account the jurisprudence of the European Court of Human Rights.

265. That court has held that local professional privilege can be invaded only in exceptional circumstances. There are said to be no exceptional circumstances here. The trustees in bankruptcy have not identified any that would justify the order that they seek.

266. In any event, it is pointed out that section 333 imposes no duty to cooperate on the second respondent. Even if the former bankrupt could be compelled to waive privilege, such a waiver would be infective in the case of jointly privileged documents.

267. In the course of his oral submissions, Mr Lord submitted that necessity is not a sufficient reason for construing a statute as abrogating privilege. He submitted that since privilege remains with the bankrupt, as I have held, express words would have been required if Parliament had intended that the court could order the bankrupt to waive his privilege.

268. He also submitted that the argument founded upon section 363 is essentially the same as the second ground of appeal in *Avonwick*, which was rejected by the Court of Appeal. He submits that the argument by Ms Toube is inconsistent with the Court of Appeal's overruling of the decision in *Re Cook*. In any event, he submitted that the jurisdiction under section 333 could only be exercised on a document-by-document basis.

269. Mr Lord's overarching point was that, whilst a trustee in bankruptcy was entitled to secure possession of privilege documents, *Avonwick* made it clear that he could not use them in any way that infringed Mr Lemos's privilege in those documents without his consent, and the court should not permit by the back door what could not be secured by direct frontal entry.

270. Ms Shekerdemian submitted that section 363 did not help the trustee in bankruptcy to get a waiver of privilege indirectly in documents to which Mrs Lemos had either sole or even joint privilege. She could not be obliged to produce documents in waiver of her privilege, as had been made clear by the decision in *Re Ouvaroff* [1997] BPIR 712. She submitted that it was difficult to see how section 363 could be used in that way or how it could be used in relation to Mrs Lemos's privileged documents.

271. At my suggestion, the parties put before me the recent decision of the Court of Appeal in the case of *Re Henry, Horton v Henry* [2016] EWCA Civ 989, reported at [2017] 1 WLR 391. That case concerned the bankrupt's unexercised right to receive sums under a pension scheme. One of the issues before the court was whether either the court or the trustee in bankruptcy had power to direct the bankrupt to exercise an election open to him to draw down income under the pension scheme so as to found the jurisdiction in the court to make an income payments order under section 310 of the Insolvency Act.

272. It was held that section 333 of the 1986 Act did not empower the trustee in bankrupt to direct a bankrupt policy holder how to exercise the elections open to him, nor did section 363(2) empower the court to order a bankrupt to do so.

273. The view of the Court of Appeal was that the first instance judge had been correct to hold that the bankrupt's uncrystallised pension rights did not fall to be assessed as part of his income for the purposes of section 310 and therefore, since the trustee had no power to compel the bankrupt to crystallise any of his pension, the application for an income payments order was refused.

274. Ms Shekerdemian took me to paragraph 38 of the Court of Appeal's judgment (delivered by Lady Justice Gloster). She observed there that it would drive a coach and horses through the protection afforded to a bankrupt's pension rights by the 1986 Act and pension legislation if a trustee were able, in effect, to require a bankrupt to make the entirety of his pension available for satisfaction of his creditors' claims by the simple expedient of a request under section 333 or a court order under section 363 (2), thereby converting excluded property into income for the purposes of an income payments order.

275. By analogy, Ms Shekerdemian submitted that a bankrupt cannot be ordered to waive privilege so as to assist in getting in property where statute had not authorised the trustee in bankruptcy to effect such a waiver. She submitted that it would drive a coach and horses through the Court of Appeal's decision in *Avonwick* and the other cases on privacy and the European Convention for the Protection of Human Rights and Fundamental Freedoms if the court were able, under section 363 to direct a waiver of privilege by a bankrupt, still less a third party, in aid of a request by a trustee in bankruptcy under section 333 to do so.

276. In her reply Ms Toube made it clear that the trustees in bankruptcy were not seeking an order that Mrs Lemos should waive her privilege in documents but merely that Mr Lemos should waive his. She submitted that the court had a discretion to override even a fundamental right. The Court of Appeal had done this in the *Bishopsgate* case in relation to the privilege against self-incrimination and it could do so in relation to privilege generally.

277. *Horton v Henry* was said to be distinguishable as a case about the inability of a trustee in bankruptcy to use the statutory powers under section 333 and section 363(2) to subvert an express provision of the Insolvency Act. But that was not what the applicants were seeking to do in the present case. She invited the court to consider, on a case-by-case basis, whether to use the power under section 363(2) to require Mr Lemos to waive his privilege in specific documents.

278. On this issue, again I prefer the submissions of the respondents to those of the applicants. I accept the submission that privilege is a fundamental human right and that the court has no jurisdiction to direct a bankrupt, still less a third party, to waive privilege in any documents.

279. In my judgment the right to privilege is such a fundamental principle, as recognised by the House of Lords in the trilogy of cases previously cited, and by the Master of the Rolls in *Avonwick*, that only an express power to waive privilege in section 363(2) itself would confer jurisdiction upon the court to order such a waiver.

280. In my judgment, it is a matter going to jurisdiction rather simply than to discretion. But if I am wrong in that, it seems to me that, in principle, a very powerful case indeed would have to be made out before the court should properly order a bankrupt to waive legal professional privilege in relation to documents. As at present advised, I find it difficult, particularly in the light of the *Derby Magistrates' Court* case, to think of any circumstances in which it would be appropriate to make such an order.

281. So what is the consequence of that for the present application? It seems to me that, apart from the terms of an order directed to Withers in relation to any remaining documents, I should simply dismiss the application. It would not be appropriate to stand it over for the court then to embark upon the process of identifying those documents in respect of which there may be no privilege at all or in respect of which the iniquity exception can properly be invoked.

282. In my judgment the appropriate course is to dismiss the balance of the application and to leave to it the trustees in bankruptcy, if they wish to make individual applications in respect of specific identified documents, to do so. This application has been formulated on a generic,, rather than a specific document, basis and in those circumstances it would not be right to allow the trustees in bankruptcy to have a second bite of the cherry within the context of the present application.

**APPROVED JUDGMENT (2)**

283. **JUDGE HODGE QC:** This judgment is supplemental to, and should be read in conjunction with, the somewhat lengthy extemporary judgment I have delivered during the course of today.

284. The first issue I have to consider is what I should do about the form of order. That issue relates to the direction to be contained in the order as to the use, if any, that may be made of the privileged documents in relation to any potential proceedings against the former bankrupt, Mr Lemos.

285. There is an element of unreality to that aspect of the order because, when one looks to the reasons for bringing this application, and the context in which expedition was sought, there is really no suggestion that there will be any proceedings against the former bankrupt alone.

286. The certificate of urgency recorded that the documents the subject of my judgment were relevant to the trustees' investigations into transactions carried out by the former bankrupt which might have amounted to a transaction defrauding creditors within the meaning of section 423 of the Insolvency Act 1986. The particular transactions are said to relate to the manner in which the very substantial matrimonial home of

the first and second respondents came to be settled into an offshore trust and registered in the names of two offshore trustees.

287. Proceedings under section 423 have been issued by the first respondent's sister and judgment creditor who is in fact a major creditor in his bankruptcy. The second respondent, as the first respondent's wife, has been joined to those proceedings as the third defendant and it is she who is going to be actively defending those proceedings, with the first and second defendants, the offshore trustees, apparently adopting a neutral role.

288. It was in the context of those proceedings, and the trustees' own investigations, that it was said to be important that the trustees should obtain clarity as to the treatment and use that might be made of the documents as soon as possible.

289. It was not apparently envisaged that Mr Lemos himself, the former bankrupt, would be a party to any proceedings. Nevertheless, at paragraph 58.2 of Ms Toube's written skeleton in support of the application, she included the submission that, even if the applicants were wrong in their reading of the Court of Appeal decision in *Avonwick* (which it was said they were not) there could be no question of Mr Lemos asserting that there was confidentiality in the documents as against the trustees in proceedings brought by the trustees against Mr Lemos.

290. The point is made that *Avonwick* was only concerned with use of documents against third parties. It was said that on any view it remained the case that privileged documents could be used against the bankrupt. It was said that Mr Lemos could not assert privilege as against the trustees and the trustees were entitled to deploy documents covered by Mr Lemos's privilege in proceedings against him.

291. Thus it was suggested, by way of example, that the trustees would be entitled to rely upon the bankrupt's privileged material in proceedings against the bankrupt for an income payments order or for a suspension of the bankrupt's automatic discharge.

292. Ms Toube accepts that if I include in my order a provision that the trustees are not entitled to make use of the Withers documents in such a way as to waive Mr Lemos's privilege, then that will reflect the way in which the matter was expressed at paragraph 86 of the judgment of the Master of the Rolls, speaking for the Court of Appeal, in *Avonwick*, but it will not provide resolution to that issue. Ms Toube invites the court to provide such resolution.

293. Mr Lord submits that I should not address what is, in reality, a hypothetical issue and that I should simply adopt the formulation to be found in paragraph 86. He says that he would wish to present full and proper submissions on the extent to which my judgment might or might not enable the trustees in bankruptcy to deploy privileged documents in proceedings against Mr Lemos alone because that was an issue which he regarded to be purely hypothetical. He says that he has not addressed submissions to me on that issue and that it is unnecessary for me to decide it.

294. Had it been possible for me to receive submissions on that issue before the end of the Trinity Term and the commencement of the Long Vacation, then I would have wished to address that additional aspect in my judgment, however hypothetical it might be. But because of counsel's pre-existing commitments, it is recognised that it is not realistic for me to hear full submissions on that issue before the end of term.

295. Such submissions could only sensibly be produced in writing once the parties had had an opportunity of considering and digesting the transcript of my extemporary judgment. There is simply not time for that exercise to take place, for written submissions to be formulated, and then for the matter to be brought back before the court, if necessary, for further and consequential oral submissions over the next two weeks.

296. Undesirable though it may be, I will therefore adopt what I regarded as the "fudge" of simply incorporating the Master of the Rolls' formulation in my order and leaving undecided what is, in context,

the hypothetical question of whether the use of documents that are privileged is something that would amount to a waiver of privilege, which is not permissible in accordance with the terms of my judgment.

297. The second outstanding matter is that of costs. Ms Toube accepts that, having brought this application and failed, the trustees in bankruptcy, as applicants, should bear the costs of the individual respondents, Mr and Mrs Lemos. I am not invited summarily to assess those costs, but what I am invited to do is to order a payment on account of costs.

298. CPR 44.2(8) provides that:

> "Where the court orders a party to pay costs subject to detailed assessment, it will order that party to pay a reasonable sum on account of costs, unless there is good reason not to do so."

299. The difficulty is that I have limited material on which to identify and quantify a reasonable sum on account of those costs.

300. For the second respondent, Ms Shekerdemian has produced a summary of costs as of last Friday. It does not include the costs of today. It is not in any way certified or vouched for by the second respondent's solicitors. The total sum is just over £96,000 exclusive of VAT. Ms Shekerdemian invites me to order a payment on account of half of that amount which, with VAT, would amount to some £57,500 or thereabouts.

301. Mr Lord is in an even worse position in that he has no summary of costs at all although, in the light of enquiries from the Bench, he has told me that the fees of himself and his junior for this hearing amount to a total of £45,000.

302. Ms Toube has not produced any statement of the applicants' costs. She says that the applicants had considered there to be no point in doing so because there is an outstanding costs liability against the first respondent of some £7,590-odd.

303. I am enjoined by CPR 44.2(8) to order the paying party to pay a reasonable sum on account of costs unless there is good reason not to do so, and I see no good reason here not to do so. I have to do the best I can on the limited material before me. I should not order the payment of a sum on account of costs that is in excess of the absolute minimum that I consider would be recoverable on a detailed assessment.

304. Bearing in mind the level of the second respondent's costs, the fact that she has retained solicitors in Bristol, whereas the first respondent is using solicitors in Gray's Inn, and the fact that the second respondent has retained only leading counsel, whereas the first respondent has both leading and junior counsel (as do the applicants), and the fact that the costs incurred by the first respondent are likely to exceed those of the second respondent because the first respondent has, unlike the second respondent, undertaken some analysis of the relevant documents, it does seem to me that I can take Ms Shekerdemian's summary of costs as a reliable indication of the minimum amount likely to be claimed by the first respondent.

305. Bearing all of those factors in mind, it seems to me that a reasonable sum on account of costs for each respondent would be the sum of £40,000 plus VAT, making in each case £50,000 in all. Sorry, I think that is slightly under £50,000: I think it is probably £48,000 in all. But in any event, it should be £40,000 plus VAT.

306. In the case of the first respondent, there will need to be a provision for set-off against the outstanding costs liability on his part to the applicants, with only the balance to be paid.

307. The next question I have to decide is whether there should be permission to appeal. By CPR 52.6(1), permission to appeal may only be given where the court considers that the appeal would have a real prospect of success or there is some other compelling reason for the appeal to be heard.

308. Ms Toube has, I think, formulated some nine reasons as to why permission to appeal should be granted. They are as follows:

(1) Insofar as I have found that Mr Justice Arnold in *Avonwick* at first instance did not actually decide that the *Crescent Farm* decision applied in bankruptcy, but proceeded solely on the basis of a concession to that effect by counsel, my judgment was in error.

(2) I erred in concluding that the *Crescent Farm* principle was limited to the assertion of the right of a successor to claim privilege and did not decide that the successor in title was the person entitled to waive privilege. It is said that that was something also decided by Mr Justice Arnold.

(3) I erred in concluding that the *Crescent Farm* principle does not apply in relation to assets in the hands of a trustee in bankruptcy. The distinction between voluntary and involuntary transfer of assets to a successor in title which I drew in my judgment was wrong in law.

(4) It is said that I erred in my conclusion that the Court of Appeal overruled the decision of Mr Justice Arnold in that respect because the issues before the Court of Appeal related only to the questions of whether privilege was "property" in itself and as to the proper construction of section 311(1) of the Insolvency Act.

As to that, my conclusion had been that although Mr Justice Arnold's decision on the category A documents had not been overruled by the Court of Appeal, his decision had been founded upon a concession by counsel for the applicant on a matter which was irrelevant to the real issues on the application and on the appeal, and that that aspect of the decision was inconsistent with both the observations and the reasoning of the Court of Appeal and should no longer be followed, consistently with the Court of Appeal's decision.

(5) It is said that I erred in concluding that Mr Justice Peter Gibson's decision on the second aspect of *Re Konigsberg* was overruled.

(6) It is said that I erred in holding that a claim under section 423 of the Insolvency Act was not an asset comprised in the bankrupt's estate. I should have concluded that such a claim was an asset in the bankrupt's estate and therefore was equivalent to a document in category A in the *Avonwick* case.

(7) It is said that I erred in my conclusion on section 363 of the Insolvency Act. It was necessary for me to consider whether privilege had been overtaken by necessary implication and I did not do so, and my decision on the jurisdictional point was wrong.

If my extemporary judgment did not make it clear, I say now that I considered that privilege had not impliedly been overruled in section 363 of the Insolvency Act.

(8) It is said that I erred in my decision to dismiss the balance of the application. I should not have taken the view that the trustees in bankruptcy were effectively seeking a second bite of the cherry; rather, they were seeking to take a further bite of the original cherry. So far as that is concerned, it seems to me that that was a case management decision which was well within the generous ambit of my discretion.

(9) Finally, it is said that there is some other compelling reason why this appeal should be heard, even if stands no real prospect of success. The matter is one of fundamental importance as to the meaning and effect of the judgments of Mr Justice Arnold and the Court of Appeal. It goes to a matter of fundamental importance to insolvency practitioners in bankruptcy and is central to the duties of a trustee in bankruptcy in collecting in the assets of the estate. That is illustrated by the points made at paragraph 63 of the ninth witness statement of Mr Leeds in support of the application.

309. In summary, it is said that I erred in my conclusions as to the Court of Appeal's decision in *Avonwick* because the Court of Appeal was not considering this question when it decided the two different issues

that were engaged by the appeal. For all of those reasons, I should give permission to appeal under both limbs of CPR 52.6(1).

310. Mr Lord submits that all matters apart from the question of whether documents relevant to a claim under section 423 of the Insolvency Act are asset documents, equivalent to category A documents in *Avonwick*, were covered by the Court of Appeal's decision in that case. Because this court was only concerned with issues of principle, the court should be reluctant to allow an appeal to the Court of Appeal when there is no immediate factual basis founded upon particular specified documents for mounting an appeal.

311. Mr Lord submits that the relevant principles are clear and were clearly established by the Court of Appeal recently in the *Avonwick* case. He submits that it is difficult to think of a more unsuitable case for a first instance court to grant permission to appeal.

312. There is, in addition, the further hurdle for the applicants of considering how the relevant documents relate to an asset in the bankrupt's estate. He submits that all matters raised in this application were raised before the Court of Appeal in *Avonwick* and are governed by its reasons for judgment.

313. Ms Shekerdemian, for the second respondent, adopted all of Mr Lord's submissions and submitted that there is no important issue properly to be considered by the Court of Appeal and no real prospect of success on any appeal.

314. In her brief response, Ms Toube submitted that the respondents have themselves changed their position in relation to the applicable law. This is said to be a very important decision for bankruptcy practitioners; it is necessary to know how the law stands, and I have clearly got the law wrong.

315. Whilst I have heard elaborate argument, well delivered, by all three leading counsel who have addressed me, at the end of the day I have been left in no doubt as to my decision. For the reasons I have given in my extemporary judgment - at perhaps undue length - I do not consider that there is any real prospect of success on the appeal.

316. Whilst there may be aspects of my decision that may be open to argument as to their correctness, in the context in which this decision falls to be considered, namely that of the potential use of privileged documents for the purposes of an application under section 423 of the Insolvency Act, I see no real prospect of the Court of Appeal coming to a different conclusion, even if individual aspects of my judgment may be held to be wrong (although I do not consider that there is a real prospect of that either).

317. So I am not satisfied that an appeal would have a real prospect of success in any material sense or in any sense that would affect the use of the documents in the context in which it is suggested that they may be sought to be used. Nor do I consider that there is any other compelling reason for this appeal to be heard. As Mr Lord submits, the Court of Appeal has recently considered all of these issues in *Avonwick*.

318. If, on an application for permission to appeal from this decision, the Court of Appeal takes the view that the Master of the Rolls' judgment does not provide sufficient clarification, and that further clarification beyond that which I have sought to provide is appropriate and necessary, then it seems to me that it is for the Court of Appeal to give permission to appeal.

319. This is an application that has been heard by me sitting as a judge of the Chancery Division and therefore any appeal lies to the Court of Appeal. Unless an extension is asked for -- and I understand it will be -- the time for appealing is 21 days from today.

320. So for those reasons, permission to appeal is refused.