UNITED STATES BANKRUPTCY COURT          **UPDATED**
DISTRICT OF CONNECTICUT                 **7/20/22**
BRIDGEPORT DIVISION


In Re                          *   Case No. 22-50073(JAM)
                               *
    HO WAN KWOK,               *   Bridgeport, Connecticut
                               *   May 25, 2022
            Debtor.            *
                               *
* * * * * * * * * * * * * * *  *


TRANSCRIPT OF MOTION FOR ORDER DIRECTING
APPOINTMENT OF AN EXAMINER, OR IN THE ALTERNATIVE
MOTION FOR ORDER DIRECTING THE APPOINTMENT OF A
CHAPTER 11 TRUSTEE; MOTION TO DISMISS CHAPTER 11
CASE OR IN THE ALTERNATIVE, PARTIAL JOINDER TO U.S.
TRUSTEE'S MOTION FOR AN ORDER DIRECTING THE APPOINTMENT
OF A CHAPTER 11 TRUSTEE
BEFORE THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:                BENNETT S. SILVERBERG, ESQ.
                               JEFFREY L. JONAS, ESQ.
                               Brown Rudnick, LLP
                               Seven Times Square
                               New York, NY  10036


For the Creditor, Pacific      PETER FRIEDMAN, ESQ.
 Alliance Asia Opportunity     LAURA ARONSSON, ESQ.
   Fund L.P.:                   O'Melveny & Myers LLP
                               Times Square Tower
                               7 Times Square
                               New York, NY  10036

                               PATRICK M. BIRNEY, ESQ.
                               Robinson & Cole LLP
                               280 Trumbull Street
                               Hartford, CT  06103



Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

APPEARANCES Cont'd:


For the U.S. Trustee:            HOLLEY L. CLAIBORN, ESQ.
                                 Office of the United States
                                    Trustee
                                 The Giaimo Federal Building
                                 150 Court Street, Room 302
                                 New Haven, CT  06510


For the Official Committee       IRVE GOLDMAN, ESQ.
 of Unsecured Creditors:         Pullman & Comley
                                 850 Main Street
                                 Bridgeport, CT  06601

For Rui Ma, Zheng Wu and         KRISTIN MAYHEW, ESQ.
 Weican Meng, Creditors:         McElroy, Deutsch, Mulvaney &
                                  Carpenter
                                 30 Jeliff Lane
                                 Southport, CT  06890

                                 CAROLLYNN H.G. CALLARI, ESQ.
                                 Law firm of Callari Partners
                                 One Rockefeller Plaza
                                 New York, NY  10020

1

1          (Proceedings commenced at 10:05 A.m.)

2              THE COURTROOM DEPUTY:  Case no. 22-50073, Ho Wan

3      Kwok.

4              THE COURT:  Okay.  Good morning.  If we could have

5      appearances for the record starting with the debtor's

6      counsel, please?

7              MR. JONAS:  Good morning, Your Honor.  Jeff Jonas

8      from Brown Rudnick.  With me is Ben Silverberg, and Bill

9      Baldiga is sitting behind me for the debtor this morning.

10     Thank you.

11             THE COURT:  Good morning.

12             MR. FRIEDMAN:  Good morning, Your Honor.  Peter

13     Friedman from O'Melveny & Myers, joined by Laura Aronsson on

14     behalf of Pacific Alliance Group.

15             THE COURT:  Good morning.

16             MR. BIRNEY:  Good morning, Your Honor.  Patrick

17     Birney, also on behalf of PAX.

18             THE COURT:  Good morning.

19             MR. GOLDMAN:  Good morning, Your Honor.  Irve

20     Goldman, Pullman and Comley, representing the creditors

21     committee.

22             THE COURT:  Good morning.

23             MS. CLAIBORN:  Good morning, Your Honor.  Holley

24     Claiborn for the U.S. Trustee.

25             THE COURT:  Good morning.

4

1          MS. MAYHEW:  Good morning, Your Honor.  Kristin

2     Mayhew, McElroy, Deutsch, Mulvaney & Carpenter, on behalf of

3     creditors Rui Ma, Zheng Wu, and Weican Meng.  And also with

4     me is Carollynn Callari of Callari Partners.

5          THE COURT:  Good morning to both of you.

6          Is there anyone else whose appearances we need to

7     take this morning?

8          Okay.  All right.  As we all know, this is the

9     hearing today on a motion the dismiss, or in the

10    alternative, for the appointment of a trustee.

11         At our last hearing, heading up to today's

12    hearing, I was told that all the parties have agreed.  And

13    you've confirmed this in your papers, that you consent to a

14    finding that cause exists under 1112(b) to do something, to

15    either dismiss the case, convert the case, or appoint a

16    Chapter 11 trustee.

17         I have looked at your list of witnesses and

18    exhibits, and I have looked at your position papers with

19    regard to dismissal, conversion, or the appointment of a

20    Chapter 11 trustee.  I don't know if there's anything

21    further the parties want to inform the Court about before we

22    start with evidence?  Mr. Jonas?  Mr. Friedman?

23         MR. FRIEDMAN:  No, Your Honor.

24         I think Ms. Aronsson is going to address what we

25    submit in terms of evidence.  I believe Ms. Aronsson and

1    counsel for the committee have agreed on what will be

2    admissible, and we've withdrawn some things, so I think I

3    would turn it over to Ms. Aronsson, and then Mr. Goldman to

4    walk through what they've -- each party wants admitted.

5            And then I would ask leave to argue after that's

6    concluded.

7            THE COURT:  Certainly.  Okay.  Ms. Aronsson, did

8    you want to start, please?  Do you want to proceed?

9            MS. ARONSSON:  Sure.  Thank you, Your Honor.

10           THE COURT:  Before you proceed for one second, I

11   have to ask the courtroom deputy, do we need any kind of

12   issue on technology.  You're going to -- are you going to

13   introduce exhibits?

14           MS. ARONSSON:  Yes.

15           THE COURT:  Okay.

16           MS. ARONSSON:  Planning on offering --

17           THE COURT:  Do I need to have this camera on,

18   then, for that?

19           THE COURTROOM DEPUTY:  [Courtroom Deputy speaking]

20           THE COURT:  It's on, but do I need to have it

21   actually -- this turned on and open?

22           THE COURTROOM DEPUTY:  [Courtroom Deputy speaking]

23           THE COURT:  Because I can't see anything here, so

24   I assume, unfortunately, I have to have this open.

25           THE COURTROOM DEPUTY:  [Courtroom Deputy

6

1    speaking].

2            THE COURT:  No, but she will be.  So I don't want

3    to, you know, stop the process.

4            MS. ARONSSON:  Your Honor, I'm not sure we need to

5    open any evidence right now.

6            THE COURT:  Okay.  All right.  So then we'll take

7    -- when you're ready to do that, will you let me know so I

8    can make sure our technology people -- I'm not doing

9    something wrong, because I probably will be, but I'll try

10   not to.  Okay?

11           MS. ARONSSON:  Will do.

12           THE COURT:  All right.  So, Attorney Aronsson, go

13   right ahead.  You may proceed.

14           MS. ARONSSON:  Thank you, Your Honor.  PAX is

15   offering into evidence the exhibits filed on the docket

16   numbered PAX 1 through PAX 31, except for PAX 7, PAX 8, and

17   PAX 30.

18           THE COURT:  7, 8, and 30 are not being admitted?

19           MS. ARONSSON:  That's correct.

20           THE COURT:  Does anyone have -- have you talked

21   about whether anyone has any oppositions to the introduction

22   of these exhibits?

23           MS. ARONSSON:  So we met and conferred with Mr.

24   Goldman yesterday, and I understand our withdrawal

25   represents our good faith meet and confer.  I understand

7

1    there might be one disagreement left --

2              THE COURT:  Okay.

3              MS. ARONSSON:  -- based on our conversation this

4    morning.

5              MR. GOLDMAN:  Yes.  That's correct, Your Honor.

6    We just -- I think I would expect brief argument on a set of

7    -- a series of transcripts that they seek to introduce from

8    the New York action.  So that isolates the dispute.

9              THE COURT:  Okay.  Now with regard to the -- so

10   does anyone else wish to be heard on the admission of the

11   exhibits?

12             No one?  Okay.  So, Attorney Aronsson, you are

13   introducing these exhibits in full, correct?

14             MS. ARONSSON:  That's correct.

15             THE COURT:  All right.  Now, I think I may have

16   said this in prior hearings.  I have no problem with you

17   moving for the admission in full of these exhibits.  That

18   doesn't mean I'm going to read every page of them, and so,

19   you know, during this time, you may want to point me to

20   certain things.  But in any event, I've said this.  This is

21   something I say to all, counsel.  This is not unique to this

22   case.  I have no problem and appreciate when the parties

23   work cooperatively with regard to the admission of exhibits,

24   but I'm not -- I just want everyone to know, that does not

25   mean I'm going to read every page.  Okay?

1           MS. ARONSSON:  Understood.

2           THE COURT:  Okay.  Go right ahead.

3           MS. ARONSSON:  Would you like to hear argument on

4     the --

5           THE COURT:  Possibly.

6           MS. ARONSSON:  Okay.

7           THE COURT:  Hold on for one second.  So I'm going

8     to then announce on the record that Exhibit -- PAX Exhibit 1

9     through 31, with the exception of Exhibits -- PAX Exhibits

10    7, 8, and 30, are admitted as full exhibits.

11          MR. GOLDMAN:  May I make a qualification?

12          THE COURT:  Yes.

13          MR. GOLDMAN:  There are exhibits -- the exhibits

14    that are in question that are in challenge are Exhibits 18

15    through 22.  Those are the hearing transcripts that they're

16    seeking to introduce from hearings in New York Supreme

17    Court.  So we -- you know, we would -- Your Honor would need

18    to resolve --

19          THE COURT:  All right.  So what's your objection

20    to those --

21          MR. GOLDMAN:  Well, the objection is, they're pure

22    hearsay.  Just because they are from a court proceeding does

23    not make them public records.

24          THE COURT:  Why are they hearsay?

25          MR. GOLDMAN:  Well, they're out-of-court

9

1      statements.

2                  THE COURT:  They're not statements.  They're a

3      record of a hearing, right?

4                  MR. GOLDMAN:  Well, they're certainly statements

5      in the record, made by various parties --

6                  THE COURT:  Right.

7                  MR. GOLDMAN:  -- that counsel and --

8                  THE COURT:  And their weight will be given

9      whatever I think is appropriate.  But it's a transcript.

10     Are you -- if you're objecting to the transcript itself,

11     somehow saying it's not official or authenticated --

12                 MR. GOLDMAN:  No.  No.

13                 THE COURT:  -- then that's a different objection.

14                 MR. GOLDMAN:  It's not my objection.

15                 THE COURT:  Okay.

16                 MR. GOLDMAN:  My objection is, they're clearly

17     hearsay because they are out-of-court statements being

18     submitted for the truth of what's asserted in the

19     statements, and they are not -- they don't come within the

20     public records exception.

21                 THE COURTROOM DEPUTY:  I'm sorry, Your Honor.

22                 THE COURT:  Hold on a second, Attorney Goldman.

23     You can't hear?

24                 THE COURTROOM DEPUTY:  I can't hear Attorney

25     Goldman.

10

1          THE COURT:  We can't hear you very well.

2          MR. GOLDMAN:  I'm sorry.  They are clearly out-of-

3     court statements submitted for the truth of the matters

4     asserted.

5          THE COURT:  Aren't they -- aren't they -- they're

6     admissions of parties.  They are the debtor and PAX at a

7     hearing.

8          MR. GOLDMAN:  Well --

9          THE COURT:  And they're being admitted for -- what

10    -- anyway.  Go ahead, Attorney Goldman.  You keep going, but

11    I'm not sure I'm convinced yet.

12         MR. GOLDMAN:  Okay.  You know, to the extent

13    they're seeking to introduce statements by -- from the

14    debtor, the debtor is not opposing --

15         THE COURTROOM DEPUTY:  I'm sorry, Your Honor.

16         THE COURT:  Hold on a second.  We still can't hear

17    you?

18         THE COURTROOM DEPUTY:  Yeah.  I'm being told it

19    would be better if Attorney Goldman could come to the

20    lectern.

21         THE COURT:  There's something -- they're not

22    picking you up, Attorney Goldman.

23         MR. GOLDMAN:  Can I go up there?

24         THE COURT:  Yes, please.

25         THE COURTROOM DEPUTY:  The microphone does not

1    have a light on it.

2              THE COURT:  It's not working for whatever reason,

3    that microphone.

4              MR. GOLDMAN:  Okay.  Okay.

5              THE COURTROOM DEPUTY:  Something is wrong because

6    --

7              THE COURT:  Okay.  All right.  Yes, if you could

8    come forward?

9              MR. GOLDMAN:  Yeah.

10             THE COURT:  Thank you.

11             MR. GOLDMAN:  Sure.  Is this better, Your Honor?

12             THE COURT:  Yes.  Now I -- I believe, right?

13    Everyone can hear Attorney Goldman?

14             MR. GOLDMAN:  Yep.

15             THE COURT:  Okay.  Go ahead.

16             THE COURTROOM DEPUTY:  Yes.

17             MR. GOLDMAN:  So to the extent they want to

18    introduce statements from the debtor's counsel, I don't

19    think the debtor was actually present at any of these

20    hearings.  Counsel was present.  So the debtor is not an

21    opposing party here.  The debtor consents to the relief

22    requested, so in order to be non-hearsay of a party

23    opponent, the statement has to be offered -- it has to be a

24    statement of the opposing party.  The only opposing party

25    here is the committee.  So it doesn't work as non-hearsay of

12

1    a party opponent.

2           The public record exception does not cover court

3    hearing transcripts.  It states --

4           THE COURT:  Why?

5           MR. GOLDMAN:  -- a record or statement of a public

6    office, if it sets out the office's activities, a matter

7    observed while under a legal duty to report.  In a civil

8    case, factual findings from a legally authorized

9    investigation.  A court hearing from another court simply

10   doesn't fit within the elements of the public records

11   exception.  It's designed to admit into evidence reports of

12   agencies of the state and federal government, or

13   departments.

14          THE COURT:  So you're saying a transcript of any

15   hearing ever held that is certified can never be admitted

16   into evidence because every single transcript will be

17   hearsay?

18          MR. GOLDMAN:  It's out of -- it's an out-of-court

19   statement.  It doesn't come within the public records

20   exception, or any other exception that I am aware of, except

21   to the --

22          THE COURT:  So what's the point of a record, then?

23          MR. GOLDMAN:  -- except to the extent that the

24   Court is making factual findings or conclusions of law.

25          THE COURT:  Well, maybe the judge did that in

1    those -- during those hearings.

2            MR. GOLDMAN:  Well, then, you know, Your Honor --

3            THE COURT:  I think he did, didn't he?

4            MR. GOLDMAN:  Well, they -- there are 300 pages of

5    transcripts that --

6            THE COURT:  I understand.

7            MR. GOLDMAN:  So I don't know what --

8            THE COURT:  I'm not going to read all of them, but

9    I know that --

10           MR. GOLDMAN:  I don't know what --

11           THE COURT:  -- there are -- there, in those

12   transcripts, I believe I've seen prior in this case,

13   findings by the court about the veracity of testimony, of

14   certain witnesses, about the judge's findings, about the

15   ownership of the boat.  Things of those nature, which that

16   was his finding.  Those were his findings.

17           MR. GOLDMAN:  I concede that that would be

18   admissible.  I'm talking about, you know, they're seeking to

19   admit the entire --

20           THE COURT:  And as I said already, I'm not going

21   to read the entire transcript.  I -- if counsel wants me to

22   focus on something in the transcript, I will do so.  And

23   then you could have the opportunity to object at that time

24   if it's hearsay.

25           But I'm not sure I'm persuaded at this point.

14

1    I'll let you -- you know, I'll let you make that argument

2    again if and when counsel points to specific portions of

3    that transcript that she -- that they are asking me to look

4    at.  And if you, at that time, want to renew your hearsay

5    objection, then you can renew that and then I'll rule

6    accordingly.

7              MR. GOLDMAN:  Yeah.  Just so Your Honor is -- so

8    I'm clear, I don't have a problem if there are factual

9    findings made, or conclusions of law made by the Court.  It

10   just -- I don't think observations of a court in a

11   transcript would come within the public records exception.

12   That's what I'm saying.

13             THE COURT:  Okay.  All right.  Thank you.

14             MR. GOLDMAN:  Okay.  Thank you, Your Honor.

15             THE COURT:  Counsel, go ahead.

16             MS. ARONSSON:  Thank you.  So just to clarify, in

17   our conversations with Mr. Goldman yesterday, we do intend

18   to use -- to offer these transcripts for Justice Ostrager's

19   findings contained -- not any testimony about -- of witness

20   that might fall within hearsay.  So I think we're in

21   agreement on that front.

22             THE COURT:  All right.  So what I'm going to do,

23   then, is I'm going to at this time -- again, we'll have to

24   clarify the record.  At this point, PAX Exhibits 1 through

25   6, 9 through 17, and 23 through 29, and 31 are admitted as

1  full exhibits.  18, 19, 20, 21, and 22 still remain possibly

2  subject to objection to the creditor's committee, which the

3  Court will rule on when and if you direct me to some

4  specific portions of the transcript.  Okay?

5           MS. ARONSSON:  Thank you, Your Honor.

6           THE COURT:  Okay.  Thank you.

7      (PAX Exhibit Nos. 1-6, 9-17, 23-29, and 31 admitted in

8  full)

9           THE COURT:  Go ahead, Attorney Goldman.

10          MR. GOLDMAN:  Yes.  If it -- Your Honor, for the

11  committee, we would offer into evidence our Exhibits 1

12  through 14, and I believe there aren't any objections to

13  that to be --

14          MR. FRIEDMAN:  There are no objections to that,

15  Your Honor.  It's Peter Friedman.  And we actually also

16  endorse the committee's suggestion that the Court take

17  judicial notice of the record of this case.  I think that

18  was a point that I think both the U.S. Trustee and committee

19  counsel made, and we think that that's a fair point to make,

20  and that the full record of these cases should be taken

21  judicial notice of.

22          THE COURT:  The -- okay.  Thank you.  Attorney

23  Goldman, I haven't done a cross-reference, but are any of

24  your exhibits the same as PAX's exhibits?

25          MR. GOLDMAN:  I believe there is one, the debtor's

16

1    declaration.  I think we both have that.  That's our --

2              THE COURT:  Your Exhibit 2?

3              MR. GOLDMAN:  Yes.

4              THE COURT:  All right.  Hold on a second.  And

5    PAX's Exhibit 2.  It's the same number, right?

6              MR. GOLDMAN:  Yes.

7              THE COURT:  Okay.  All right.  So you're asking

8    the Court, Attorney Goldman, to admit as full exhibits, the

9    unsecured creditor's committee Exhibits 1 through 14.  Is

10   that correct?

11             MR. GOLDMAN:  Yes, Your Honor.

12             THE COURT:  Okay.  Anyone else wish to be heard on

13   the admission of -- Creditor's Committee Exhibits 1 through

14   14?

15             Okay.  Then those exhibits are all admitted as

16   full exhibits.  And I say to you, Attorney Goldman, as I

17   said to Attorney Aronsson, I'm not going to read every one

18   of those pages.  If there are specific things in those

19   exhibits you want me to focus on, you'll need to focus me on

20   those.  Okay?

21             I mean, it's possible I can read them all, but I'm

22   not bound to read them all.  Okay?

23             MR. GOLDMAN:  No, understood, Your Honor.  I will

24   --

25             THE COURT:  Okay.

17

1       MR. GOLDMAN:  I will do that.

2       THE COURT:  Okay.

3       (Creditor's Committee Exhibit Nos. 1-14 admitted in

4   full)

5       THE COURT:  All right.  The creditors', Rui Ma and

6   Zheng Wu and Wiecan Meng joinder, so you have nothing

7   further with regard to your -- any exhibits you're standing

8   with the committee, correct?

9       MS. MAYHEW:  Correct, Your Honor.

10      THE COURT:  Okay.  Thank you.  And the office of

11  the U.S. Trustee, I think the same is -- well, I think your

12  statement said, Attorney Claiborn, but you should definitely

13  correct me if I'm wrong, that you reserve the right to

14  question about any exhibit and question any witness, but

15  that you weren't introducing any evidence yourself.  The

16  office was not introducing any evidence, correct?

17      MS. CLAIBORN:  That's correct, Your Honor.

18      THE COURT:  Okay.  Thank you.

19      Attorney Jonas, I think the same is true of you,

20  except that you basically asked for judicial notice of

21  everything filed in the case, and then any exhibit

22  identified or offered by another party, and any exhibit

23  necessary for rebuttal after impeachment, correct?

24      MR. JONAS:  Correct, Your Honor.

25      THE COURT:  All right.  So you're all set then as

1    well.

2         MR. JONAS:  Yes, Your Honor.

3         THE COURT:  For now.

4         MR. JONAS:  Yes, Your Honor.

5         THE COURT:  Understanding your --

6         MR. JONAS:  Thank you.

7         THE COURT:  -- your parameters.

8         MR. JONAS:  Thank you, Your Honor.

9         THE COURT:  Okay.  Thank you.

10        I just need one second, please.

11     (Pause)

12        THE COURT:  Now we had another party file --

13    actually, I don't think they filed anything with regard to

14    the list of witnesses and exhibits, so I think they just

15    filed a statement; another creditor that basically joined

16    the committee's -- yeah, they didn't file anything with

17    listed witnesses and exhibits.

18        So, Attorney Aronsson, you can go right ahead.

19    You may proceed.

20        MR. FRIEDMAN:  Your Honor, it's Peter Friedman.

21        THE COURT:  Okay.  Attorney Friedman.

22        MR. FRIEDMAN:  I'm going to --

23        THE COURT:  Go ahead.

24        MR. FRIEDMAN:  So, Your Honor, it's Peter Friedman

25    from O'Melveny and Myers on behalf of PAX, and I'm going to

1     argue in favor of dismissal of the case.

2              THE COURT:  Okay.

3              MR. FRIEDMAN:  This case was filed in bad faith,

4     specifically for the purpose of evading a contempt judgment

5     that I know the Court has heard about a lot and we'll get

6     back to.  I believe in effect, in the UCC Exhibit 2, our

7     Exhibit 2, Mr. Kwok's declaration in Paragraphs 3 and 24, he

8     basically acknowledged that -- and in our view, contempt is

9     the alpha of this case, and it should be the omega, because

10    that was the purpose of this case, to evade that, and that's

11    not a proper purpose for filing a bankruptcy.

12             In his consent, the debtor refers to PAX's

13    unrestrained legal warfare against him as being the reason

14    he consents.  I think this is ironic, given that, as we

15    point out at Docket No. 50, it was Kwok who stated his

16    intention to start an all-out war with PAX immediately

17    before the bankruptcy.  Next thing you know, Kwok files this

18    case on the night before having to face enforcement of

19    Justice Ostrager's contempt sanction.

20             And so what kind of case do we get at that point?

21    A case with no scheduled assets, no business, no employees,

22    no executory contracts to assume, no income, other than a

23    few checks from COVID stimulus.  No real bankruptcy purpose,

24    no change in the way Mr. Kwok lives his life.  Just one more

25    venue to access, and I think that leads to the conclusion

1    that there's really double-barreled bad faith here to avoid

2    a contempt judgment first, and relitigation of PAX's claims,

3    which neither of which is a proper bankruptcy purpose, and

4    the remedy for that should fit the motivations for filing

5    this.

6            Your Honor, I want to start by going back to

7    taking the full breadth of Mr. Kwok's gamesmanship in terms

8    of how -- of his efforts to frustrate PAX.  And all of this

9    comes from PAX Exhibit 23 at -- starting at Paragraph 2.

10           PAX loaned Mr. Kwok's company $30,000 in 2008.

11    Kwok personally guaranteed that loan.  PAX and Kwok

12    renegotiated the loan in 2011 to consolidate the remaining

13    debt.  And again, Kwok executed a personal guarantee.

14           In April 2013, Kwok agreed to settle his debt by

15    transferring PAX the title to certain apartments in Beijing.

16    That settlement hinged on satisfaction of certain conditions

17    precedent, including delivery of clean title.  PAX extended

18    the deadline for that settlement on many occasions, with a

19    final deadline set for June 30, 2015.

20           Kwok never filled -- fulfilled his conditions

21    precedent.  So Kwok gets sued by PAX in April of 2017 for

22    breach of contract.  A suit, by the way, totally unrelated

23    to any other suit brought by any other plaintiff.  No common

24    nucleus of facts among the claim holders versus PAX.  And I

25    use the term claim holder specifically, because I don't

21

1    think that these people are -- that a vast majority of

2    people who have asserted proofs of claim are actually

3    creditors.  They hold claims, which is different than being

4    a creditor.  They don't have judgments.

5         On September 15th, 2020, PAX wins summary judgment

6    for its breach of contract case.  The first warning shot

7    that PAX was going to try to -- that was going to be so

8    badly frustrated is when Genever New York filed for

9    bankruptcy in SDNY shortly after that, part of Mr. Kwok's

10   pattern of trying to frustrate Kwok.

11        Shortly after that, the New York court restrains

12   the Lady May and other -- and the Sherry Netherland.

13   Exhibit 23, Docket 183.3, October 15th, Justice Ostrager

14   order.

15        The final judgment is entered in February 2021, a

16   year before the bankruptcy case.  At that point, the court

17   enters a judgment of $116 million with the statutory

18   interest rate in New York, making it grow to $127 million by

19   the date of Mr. Kwok's filings.

20        Then there are all of the antics that go on as PAX

21   work -- PAX works to collect its judgment.  As I noted,

22   Justice Ostrager had to seek to -- expressly found, and this

23   is Exhibit -- PAX 18 at page 21.  At the October -- at an

24   October 15th hearing, and if Mr. -- you know, if counsel for

25   the committee wishes to object, I just highlight that this

1    one of the things from the hearing transcript that we

2    believe should be in evidence.

3        The Court believes, as reflected in the September

4    15th, 2020 order, that Mr. Kwok has attempted to mislead the

5    Court.  The court believes that Mr. Kwok as the plaintiff --

6    is, as the plaintiff contends, playing a shell game.  This

7    is going to come to an end.  We're not going to have any

8    more shell games.

9        Kwok is -- PAX is forced, as a result of these

10   ongoing shell games, to move for contempt multiple times in

11   the New York State action.

12       On March 16th, 2021, as referenced in PAX Exhibit

13   24, the Court notes, it's clear there's been an intolerable

14   amount of gamesmanship, dismembering, and deceit in

15   proceedings before this Court.  Court goes on to say that

16   rather than catalog the many shell games defendant has

17   engaged in, the Court grants the motion for contempt to the

18   following extent.

19       For every day the yacht is outside the

20   jurisdiction of this Court after May 15th, 2021, defendant

21   will be fined -- Kwok will be fined $500,000.  This doesn't

22   force Mr. Kwok to file bankruptcy, he just continues to

23   thumb his nose, this time not just to the judgment, but an

24   order of a state court.

25       At a July 2021 hearing -- this is PAX Exhibit 21 -

23

1      - the Court notes that the Court issued an order directing

2      the boat not be removed from the territorial waters of the

3      United States.  That order was disregarded by Mr. Kwok

4      *and/or* entities that he controls.  That is contempt of

5      court.

6              THE COURT:  What page are you on, on Exhibit 21

7      there, counsel?

8              MR. FRIEDMAN:  16 to 17.

9              THE COURT:  Thank you.

10             MR. FRIEDMAN:  And going further on Page 19, the

11     Court talks about his -- Justice Ostrager talks about his

12     defiance, Kwok's definance of court orders.

13             Kwok appeals the fine.  The first department

14     affirms and directs the trial court to hold further

15     evidentiary hearings.

16             In the final evidentiary hearing, as this Court

17     notes, that just -- that precipitated the bankruptcy, the

18     Court talks about the 1,180 docket entries.  This is in PAX

19     25.  Almost all of which involve defendant's efforts to

20     avoid and deceive.  Talks about the -- PAX encountering

21     difficulties through assets in a maze of corporate entities.

22             And finally, as the Court notes, and I know this

23     Court has heard it before, but if billionaire litigants can

24     simultaneously seek to use the court process in New York and

25     elsewhere, while knowingly and intentionally violating court

1      orders, there is no rule of law.

2           Mr. Kwok attempted to appeal that, sought an

3      emergency stay of the orders, didn't get it.  Justice

4      Ostrager noted in his opinion -- an order, that there would

5      be other consequences.  I think we -- from what we know in

6      testimony, what this Court has heard and I think what can be

7      inferred, Mr. Kwok was obviously, not really worried about

8      the money point.  He was worried about going to jail for

9      being in defiance of a court order, and that's what

10     motivated him to file for bankruptcy.

11          So what happens when the bankruptcy is filed?  I

12     think what the Court can observe from Mr. Kwok's

13     declarations, from the debtor's response to examiner

14     motions, from the debtor's motion to -- opposition to PAX's

15     motion to lift the stay, from the debtor's effort to remove

16     PAX's litigation from state court to federal court.  All of

17     them point to one thing.  This case was then -- was

18     commenced for the improper purpose of relitigation the PAX

19     issue, right?

20          You saw it in declarations that Mr. Kwok

21     maintained that the PAX litigation was founded on forgery,

22     right?  That there was something improper about the judgment

23     that had been obtained.  There were efforts -- you know,

24     that's in Docket No. 83 at Paragraph 12.  Mr. Kwok argues,

25     you know, that the personal guarantee somehow was a forgery.

25

He talks about, I think, wanting to have a reevaluation of what's really his property, which is nothing more than an obvious effort to get the Court to relitigate Justice Ostrager's contempt order.

The idea of removing one case -- one case was attempted to be removed, and it's the case that makes no -- the least sense to remove.  It's one on which the central issues were already on appeal, but what other purpose would there have been, other than to try to relitigate, and the cases we cite note that that is not a proper purpose for filing a bankruptcy case.

I would note, Your Honor, that the only other case that has even been referenced in these proceedings is the claim of creditor Rui Ma, which there is no effort to remove that here.  To the contrary, I believe there was actually a consent stipulation filed to let that case move forward to be adjudicated back in New York State court system.

So I think the Court can draw the inference from everything it's seen.  The real purpose of this case was targeted at frustrating PAX and getting a second or third bite at the apple, specifically with respect to PAX.

Your Honor, a moment about PAX, and the Court, I think has observed how unusual this case is given the lack of assets, given the lack of operating business, given the lack of a, you know, ongoing income, business, et cetera.

26

1    And the nature of this case being so honestly focused on

2    fees for professionals and budgets for professionals as

3    opposed to a traditional meaningful restructuring in any

4    way, is that you have PAX that has a claim that is over

5    1,300 times larger than the next judgment claim.  The second

6    largest actual, I guess theoretically undisputed claim are

7    claims of insiders, which I think the Court can, you know,

8    not pay much attention to in this context.

9         So given the size of our claim, we want to sort of

10   focus on the aggressive role PAX played, and I think it's

11   really important that it did, in dealing with what happened

12   after this case was filed.

13        The debtor comes in.  The debtor files a plan.  I

14   think a plan that was dead on arrival.  Seeks to borrow

15   money, $8 million.  And PAX opposed that.  Other people

16   didn't.  Other people thought that maybe there was, you

17   know, a pot of gold at the end of the rainbow.  We said from

18   the beginning that the DIP was a sham and the rug definitely

19   got pulled out from under people when Golden Spring decided

20   it wasn't going to fund the case anymore.

21        But just the -- you know, the very nature of

22   trying to pursue a debtor in possession financing, not for

23   the benefit of anybody other than professionals, or to run

24   an investigation, never made sense to us, and nothing about

25   this case ever made sense to us.  We thought that the status

1      quo, where creditors were entitled to pursue their rights

2      under state law was really the appropriate mechanism for

3      dealing with this kind of debtor.

4           And we think the cases support that.  For example,

5      in *Sapphire Development Company v. McKay*, from the District

6      of Connecticut, the debtor had no business, employees, and

7      was being funded by an affiliate of the debtor's principle

8      that had a history -- and there had been a history of state

9      court judgments, finding the principle had diverted assets,

10     misled courts, et cetera.  And the court dismissed the case

11     and specifically noted that unsecured creditors could go

12     after anybody they wanted to in the state court, just like

13     claim holders here can, and that that was an appropriate

14     exercise of discretion.  I want to emphasize, the Court does

15     have a wider decree -- you know, the cases make very clear,

16     this Court has tremendous discretion in deciding what to do

17     today.

18          The size of PAX's claim, I think is important as

19     we cited in the *Acme Cake Company* case from 495 BR 212, that

20     it's appropriate to dismiss a case where a single creditor

21     with a sufficiently large claim takes the position that

22     dismissal is the best outcome.  Dismissal is in the best

23     interest of creditors because the -- and the state is not

24     affected by the probable result that the largest creditor

25     will execute its judgment and reach the debtor's assets

1    before other unsecured creditors.

2         So there's nothing wrong with PAX asserting the

3    fact that it is the largest creditor and it perceives this

4    is the correct outcome.  Again, all we're doing here is

5    returning the status quo.  Whether we'll be able to exercise

6    on our judgment or not, I can't say, but I think returning

7    to the status quo is appropriate.

8         *OptInRealBig.com*, 345 BR 277, from Colorado.  The

9    court granted a motion to dismiss where value recoverable

10   for creditors as a whole could be greater outside of

11   bankruptcy, which we think would be the case here, certainly

12   for PAX, as I'll get into later.  The Chapter 7 would impose

13   tremendous costs on PAX if it could even be funded.

14        But the court held there that a creditor -- and

15   here, I would analogize who the court was talking about --

16   to the claim holders who have contingent unliquidated

17   claims, or even the ones who have very small claims, should

18   not be permitted to prolong or sustain a case merely to take

19   advantage of benefits bankruptcy offers to creditors, and

20   that a case could never be dismissed under the bankruptcy

21   code if I think as our opponent suggests, if guaranteeing

22   the bankruptcy code's priority scheme was a precondition of

23   dismissal.

24        So if you could only dismiss cases where it was

25   100 percent certainty that anybody who was at least

29

1    theoretically similarly situated, you could never dismiss a

2    case.  We don't think that any case law stands for that, and

3    we think actually to the contrary, cases like *OptInRealBig*

4    and *Acme Cake Company* say the contrary.

5         Your Honor, I think in the *Regional Evangelical*

6    *Alliance of Church's* bankruptcy from Kansas, you know, the

7    court noted that notwithstanding the presence of other

8    creditors, where bankruptcy was essentially an attempt to

9    thwart a creditor's recovery in state court litigation,

10   would be appropriate to let people seek the remedy to which

11   they're entitled to under applicable non-bankruptcy law,

12   without having to litigate the bankruptcy roadblocks that

13   could be erected otherwise.

14        Your Honor, I think we also cited in our

15   opposition to -- I'm sorry.  In our reply brief in support,

16   three cases, *Wally Findlay*, which notes that it's an

17   impermissible use to relitigate bankruptcy cases and where a

18   debtor has taken that position, it is appropriate to dismiss

19   a case.  And the *Bridge to Life* case from the Eastern

20   District of New York, a case is dismissed because the debtor

21   was attempting to, you know, inject non-bankruptcy laws

22   issued into a Chapter 11 case.  In the *D&G Construction:*

23   *Dean Gonzalez* case, the court held the use of bankruptcy

24   process as a platform to delay the lawful exercise of state

25   law rights and attack final orders of other courts, warrants

1    dismissal.

2         Your Honor, there are like, you know, some of

3    those cases are not extensively reasoned.  I understand.  I

4    think that's true of some of the other cases on the other

5    side, and I'm going to get to their cases, but I think that

6    there's a through line, that there's nothing to prevent --

7    there's no reason to prevent -- not to return to the status

8    quo and let people use whatever state court rights they have

9    in a case like this.

10        And let me say what this case is not.  This is not

11   a mass tort case.  This is not a case where you can say,

12   okay, a debtor did something bad five years ago, and sure

13   some people were hurt before others, but we know -- we know

14   that there will be people who get -- who necessarily are

15   going to get verdicts in the future in their favor because

16   of doctrines like offensive non-mutual collateral estoppel,

17   and we can even come up with a matrix that says, okay, if

18   you had mesothelioma and you're 45, you'll get X.  If you

19   suffered from an opioids injury, you will get Y.  Everybody

20   here has very, very different kinds of claims.

21        So there's -- you know, to the extent that there's

22   a race to the courthouse kind of issue, that's just what

23   state law permits people to do, and PAX has been very, very,

24   very, diligent and vigilant, and that's not improper.

25        I want to talk about the cases that were cited by

31

1    the other sides, and the first I think -- and there are a

2    couple of through lines that come through them I think that

3    show pretty meaningful differences.  I think that -- you

4    know, the first is obviously the *Julian* case.  I think there

5    were obviously powerful reasons for dismissal.  I think, you

6    know, severely differentiating factors are the debtor's

7    conduct throughout that case.

8         Here, this case has been mercifully short, and I

9    think I probably understand this much less well than you do

10   or Mr. Birney does or Mr. Goldman does, but I think that

11   there were some sui generis facts as related to the debtor's

12   counsel there that, you know, it was probably a pretty good

13   thing that the court maintained supervision over that case

14   ultimately.  But I don't -- you know, I think the ultimate

15   outcomes for creditor -- for creditors were not great, and I

16   think whether or not that was an appropriate exercise of

17   discretion there, I don't think informs this case.

18        The *SWJ Management* case from District of

19   Connecticut was one where creditors overwhelmingly sought

20   conversion.  And I want to make clear, as the *Acme Cake*

21   *Company* says, you're not supposed to count noses.  You're

22   supposed to really count dollars, because imagine if 100 and

23   -- you know, PAX has $260 million in judgments.  Imagine if

24   PAX had, you know, sliced it's loan up to $261 million

25   affiliate funds and each filed their own creditor claims.

1    And each could be running in here and say, 261 creditors

2    favor dismissal.  I don't think it's a counting of noses.  I

3    think it's a counting of dollars, and PAX's -- you know, the

4    value of PAX's dollars are really what's important.

5         *Premier Golf Properties* is a case heavily relied

6    upon.  That's 564 BR 710.  The Court uses an interesting

7    word there in deciding whether dismissal or conversion is

8    right.  It says the operative question -- it actually says

9    the operative question of the case was whether the uncertain

10   value of the underlying asset, which was a golf course,

11   could be maximized through a going concern bankruptcy sale

12   or foreclosure.  That is nothing like this case.

13        The court relied on the fact that the debtor

14   maintained an operating business, had 60 employees, and

15   $300,000 a month of revenue.  And the dismissal of the case

16   would have resulted in foreclosure and the financial and

17   employment losses that brings.  I might be out of a job if

18   you dismiss this case, Your Honor, but I don't think anybody

19   else is going to be.  I think that, you know, *Premier Golf*

20   *Properties* is very, very, very different.

21        *1121 Pier Village, Team Systems International,*

22   *West Hampton Coach Works, Speer, Babayoff*, all involve

23   situations where no non-debtor party advocated for dismissal

24   over conversion.  And in most cases, dismissal wasn't even

25   discussed unless the debtor preferred that option.

1          The court in *Team Systems,* which is a very

2     thoughtful opinion by Judge Goldblatt, who is near the

3     Delaware bench, specifically noted on multiple occasions

4     that all participating creditors and the U.S. Trustee argue

5     that conversion is better for creditors and the estate than

6     dismissal.  Under that circumstance, of course it wasn't an

7     abuse of discretion for Judge Goldblatt to conclude that

8     dismissal wouldn't make sense and conversion did.  That's

9     just simply not the situation here.

10          *Fleetstar* is heavily relied upon by the Rui Ma

11    creditors.  I think it involves a very, very different

12    situation.  That was an effort to have a structured

13    dismissal, which I think is, if not entire verboten, deeply

14    problematic under *Jevic*.  This is not a structured

15    dismissal.  No one is asking the Court to say, well, you can

16    dismiss the case and get releases if you give some people

17    something and other people nothing, and you know, tough

18    luck.

19          This is a clean dismissal request.  There are some

20    efforts to have people pay fees.  I think we've always said,

21    we don't have problems if other people get paid fees.  We're

22    not going to insist our own fees get paid, but this is

23    really not a structured dismissal kind of case at all.

24          The court explained in *Fleetstar*, even if the

25    debtor's proposed dismissal scheme could pass a practicality

34

1    test, and the court had some real concerns about the way the

2    structured dismissal was intended to take place, it must be

3    denied because it seeks to alter parties' rights without

4    their consent and lacks many of the code's most important

5    safeguards.

6           Here, we're asking to go back to a status quo.

7    Nobody is losing a right they have.  You know, the debtor's

8    prepetition creditors aren't being asked to sacrifice

9    anything.  We simply seek a return to status quo.

10          The committee also cites to the *Capra* case.  *Capra*

11   is an interesting matter.  I actually think if you sort of

12   give some deep thought to *Capra*, it helps us rather than

13   hurts us.  The big factor in *Capra* the court said a bunch of

14   times, was the egregious misconduct that favored conversion,

15   because the debtor had come to the judge's court and sought

16   bankruptcy protection.  And what did he do?  He failed to --

17   you know, he -- it's really what he -- some of what he

18   didn't do.  He didn't participate meaningfully on the

19   bankruptcy process, and you know, this case hasn't

20   progressed that long, but there certainly have been MORs

21   filed and the debtor has made retention applications.

22   Didn't find -- you know, we don't think what he did made

23   sense, but he did participate in this process.

24          But the key issue there is, the debtor sold both a

25   Bentley and a Rolls Royce while in bankruptcy without

35

1    complying with Section 363 of the Bankruptcy Code.  That's

2    one of the -- like, on the list of really bad things to do,

3    that's a really bad thing to do.  Right?  You can't

4    simultaneously say, I want to go into bankruptcy, but then

5    not abide by one of the most important protections.

6        Obviously, it wasn't ordinary course.  He wasn't an

7    auto dealership.  He was an individual.  And so he violates

8    363, and the court, on numerous times, talk about how bad

9    that is, and goes on to say, I think like the gestalt of

10   that case is, the court didn't want to permit dismissal

11   because the debtor wouldn't basically face any consequences

12   for what he did.  And so I think the way to think about that

13   case is, if you do something bad before a judge, the judge

14   is going to retain supervision over you.

15       So send this case back to Justice Ostrager.

16   Right?  The really bad things that Kwok did were in front of

17   Justice Ostrager.  So I think if -- if *Capra* -- you know,

18   the teaching of *Capra* is, when people do bad things, judges

19   have the right to supervise them.  The really bad things

20   done here were done in front of Justice Ostrager.  So when

21   this case gets dismissed, you know, we're going to continue

22   to pursue our rights in front of Justice Ostrager, and he

23   can -- he can hold Mr. Kwok accountable for his conduct.

24       Your Honor, the *Rolick* case is cited.  It's a very

25   short opinion.  I think one way to look at *Rolick* is the

1    people who have the largest claim should be paid attention

2    to.  The other critical differentiation is that *Rolick*,

3    which went for conversion over dismissal, is about a group

4    of creditors that had received prepetition judgment liens

5    who were seeking to dismiss the case to avoid potential

6    avoidance actions against them.  It's just not a factor

7    here.  We don't have any -- there's no preference claim that

8    could be asserted against us because we haven't received

9    debtor property.

10           Your Honor, I just want to take a minute to

11   discuss a couple of other cases that are cited.  *Steve and*

12   *Barry's*, which is also, I think colloquially known as *Steve*

13   *and Barry's*, that's *BH S & B Holdings LLC* case.  Committee

14   cites that to say that, you know, if you have an

15   administrative lien in a solvent case, that should weigh in

16   the favor of conversion.

17           A, I think the Court was focused on that because

18   of cause.  B, that case had been running for years.  There

19   was inventory to deal with, there were, you know, liquidated

20   stores.  And C, I think if you read the opinion there's no

21   suggestion that anybody even wanted conversion.  So I guess

22   the could have -- you know, had to evaluate whether it was

23   appropriate, but nobody wanted it, much less the largest

24   creditor.

25           You know, *Mitan v. Duval*, you know, it's a Sixth

1    Circuit case.  There, the largest creditor didn't favor

2    dismissal, only the debtor did.  Those creditors were -- and

3    so, you know, the court wanted to appoint a Chapter 7

4    trustee in order to conduct investigations.  Here, we think

5    every creditor can go forth and do whatever discovery is

6    important and they believe is necessary.

7         A few other things I wanted to just note about the

8    cases, Your Honor.  Your Honor, one other point about the

9    *Capra* case, which is heavily relied upon, is that the

10   parties favoring dismissal, you know, were secured

11   creditors, and the court noted those two creditors are being

12   treated favorably by the debtor and can reasonably expect to

13   keep receiving favorable treatment if the case is dismissed.

14        I don't know what's going to happen between us and

15   the debtor in the future.  And the debtor says in his

16   pleadings, they intend on paying creditors.  I don't know if

17   that will happen.  I assume we'll have to litigate more.  I

18   don't know, but there's certainly no -- you know, there's no

19   history of favorable treatment by the parties who are

20   supporting dismissal here.  Far from it.  We are, to put it

21   lightly, somewhat uncomfortable bedfellows with Kwok in

22   supporting this motion.  So I think that's another

23   differentiation point.

24        Your Honor, I want to make a few points about

25   Exhibit 27, which are the -- you know, the -- it's our --

1   it's the summary of other litigation.

2        THE COURT:  And that's been admitted as a full

3   exhibit with no objections, so go right ahead.  I'm just

4   making a note --

5        MR. FRIEDMAN:  Okay.

6        THE COURT:  -- about that exhibit, because we

7   still have to -- we still at some point are going to have to

8   address the transcript exhibits.  But go right ahead.

9        MR. FRIEDMAN:  Your Honor, you know, that talks

10  about the claims that were listed on Schedule F.

11       Now, there -- let me first say, there have been

12  some proofs of claim that have been filed, and I suspect

13  that we might hear, well, if a proof of claim is filed, it's

14  automatically treated as valid until there are an objection.

15  I think the Court can note, in part from the Exhibit 27, but

16  generally, that that -- it's sort of true that there's been

17  no objection, but all those cases are in active litigation,

18  and so it's a little -- it's not quite right to say that the

19  proof of claim is prima facie valid until there's no --

20  until there's an objection, when you know that those claims

21  have been actively contested in litigation over the years.

22       In any event, one of the things I think is really

23  important about these claim -- litigation claims is, there's

24  one liquidated claim for I think 300 and maybe $96,000.  As

25  you go through the chart, there's $35,648,868 of claims that

1    have been dismissed.  There are $37 million in claims that

2    have been idle for two plus years.  Or thereabout.  I don't

3    want to -- I think it's two plus years.  It's certainly --

4    and you can tell, it's a substantial amount of time.

5         And so, you know, you're really talking a much

6    smaller potential pool of claims.  There's no evidence that

7    any of them have trial dates or had trial dates set, and,

8    you know, we just don't know much about when any of those

9    claims will be heard, and its, we submit, appropriate for

10    the Court to take into account both the qualitative

11    difference, which is we have a judgment and these are all

12    potential future claims that don't have a common nucleus of

13    facts as it relates to our claim.

14         And additionally, Your Honor, I would -- you know,

15    a few other points to note.  Many of the claims are -- at

16    least eight of the claims, as far as we can identify involve

17    securities violations, which you know, subject to either

18    subordination or disallowance, but you know, I just note

19    that as an issue.  And I think what that leads to is both

20    that PAX's views, I think are entitled to a substantial

21    amount of weight here.  But also, looking at those claims

22    and noting how many of them are defamation claims, and the

23    Rui Ma claim, which is obviously a personal injury type

24    claim, go to point out some of the reasons why this case is

25    spectacularly unsuited to bankruptcy.

40

1          This Court, I don't think, is necessarily the

2    right forum to have to oversee a dozen plus personal --

3    defamation claims that have no factual relationship in

4    common, that have advanced to some stage in the state court.

5    If the stay is going to be lifted to let them all be

6    liquidated, that defeats the purpose of a centralization of

7    forum, or a singular -- single fact finder.

8          There are frankly open questions, as we've cited,

9    as to whether under 28 USC 157(b)(5), this Court can even

10   hear them, or whether those claims have to be heard in the

11   district court.  The Connecticut court has, in *Ice Cream*

12   *Liquidation*, has taken a broader injury of personal injury

13   tort claims that includes any injury which is an invasion of

14   personal rights.  I don't think the Court has to reach a

15   conclusion on any of those, it's not before it, but I think

16   I'm trying to give the Court a taste of why it's problematic

17   and doesn't really serve core bankruptcy functions to have

18   those claims liquidated when there are other options like

19   letting people go back to state court.

20         Obviously, in Chapter 7 -- and to be clear, Your

21   Honor, I understand there's a broader view.  We cited the

22   *Gawker Media* case, because I think it's always incumbent on

23   us to recognize when there are cases that say something

24   different than the view we have.  But I do think District of

25   Connecticut's *Ice Cream Liquidation, Inc.* case is a helpful

1    one to think about in this context.

2            You know, Your Honor, then you get to what's going

3    to happen with all those cases.  Plaintiffs are still going

4    to have -- if they're here.  Plaintiffs are still going to

5    have the costs --

6            THE COURT:  What's going to happen with those

7    cases if the case -- if this case is converted?  Is that

8    your --

9            MR. FRIEDMAN:  Yes, Your Honor.

10           THE COURT:  Yes.  Keep going.

11           MR. FRIEDMAN:  So a trustee is going to have to

12   defend them.  I don't know what the trustee's -- the trustee

13   can't just say, okay, everybody, you know, I'm going to

14   allow your claims.  That's obviously deeply prejudicial to

15   creditors with valid claims.  Trustee is going to have to

16   get paid to do that somehow.  I don't know -- you know, I'll

17   get to that in a moment.  But that requires real cash on the

18   barrel head, not -- you know, not necessarily a creed of

19   litigation funding or contingency fees, right?  That's going

20   to be somebody who has to really dig into the merits of each

21   of those cases.  It may impose a burden on PAX to have to do

22   the same as a party in interest, as the Court knows.  Any

23   creditor, particularly in a 7 can object to the claim of any

24   other creditor.

25           You know, if you don't have a trustee that's

42

1    really able to defend, that burden will unfairly fall on

2    PAX.  You may also have the debtor participating in the case

3    at that aspect.  I think it -- you know, you really get

4    something that's not well suited to the bankruptcy court,

5    but is appropriate to let these people go -- you know, these

6    claimants go back to their state court remedies and continue

7    to pursue whatever cases they've already brought to this

8    point.

9            THE COURT:  Well, in addition to your argument

10   about 157(b)(5), what about 157 -- 28 USC 157(b)(2)(B),

11   which says that personal injury claims and wrongful death

12   claims cannot be estimated --

13           MR. FRIEDMAN:  Yes.

14           THE COURT:  -- or liquidated --

15           MR. FRIEDMAN:  Yes, Your Honor.  Against the

16   compendium.

17           THE COURT:  -- for purposes of distribution in a

18   case under Title 11?

19           MR. FRIEDMAN:  That is the parallel point that I

20   anticipated that somebody might argue, oh, well you can

21   estimate these, and, you know, people's distributions won't

22   be held up for ever.  But again, you're then going outside

23   of this Court to have that done and, you know, you're

24   imposing a substantial burden on the federal court system in

25   Connecticut, when these could be dealt with in the state

43

1    court system.  Your Honor, I think -- so I think that --

2    that's a pretty critical point.

3          So then we get to, you know, the other features of

4    what this case looks like, absent -- given its current

5    posture.  There's no funding for this case, and we were

6    always concerned that there was never going to be the kind

7    of funding that you'd need for this case.  Right?  The only

8    funding was to conduct an investigation, which was, we said

9    from the beginning, was a bridge to nowhere, because what

10   you -- if you were going to do anything, what you needed was

11   a kind of action.  And we -- you know, the kinds of actions

12   we were taking outside of bankruptcy court, and that were

13   helpful.

14         You have here a debtor with no liquid assets, and

15   protracted future disputes.  We know that there's a lawsuit,

16   an adversary proceeding initiated in this court already

17   about setting aside what rights Mr. Kwok has, whether

18   somebody else has rights to the yacht.

19         We know that there is extensive litigation over

20   the Sherry Netherland apartment, which would require a

21   debtor -- the debtor -- the Chapter 7 trustee to participate

22   in a New York bankruptcy.  Just to deal with plan issues, et

23   cetera, not even just to get the asset, but objecting to

24   other people's claims that that case is valid that also has

25   British Virgin Island components.  You have to pay counsel

44

1    in the British Virgin Islands, and there's no money for

2    that.  Right?

3            There would also be litigation presumably, because

4    this is a 7, that you would have fights over discharging

5    claims.  You know, a trustee would have to deal with that,

6    or individual creditors would have to pick up the burden.

7            And then, you know -- so what do you wind up with?

8    You wind up with a situation that there are no available

9    funds for a trustee.  There's no property you can liquidate

10   in short order.  There's a couple suits and a dog, but

11   that's it.  There's stuff people could go after, but how do

12   you go after that?

13           Well, you could have litigation funding.  We

14   haven't seen any evidence of litigation funding available.

15   I think it would come at a steep cost.  That cost would be

16   borne largely by PAX, would eat into whatever recoveries PAX

17   was able to obtain.  You know --

18           THE COURT:  Any recoveries any creditor is able to

19   retain.

20           MR. FRIEDMAN:  Absolutely, Your Honor, and I think

21   that would disproportionately fall on us, as would a

22   contingency counsel.  This Court can take, you know, notice

23   from her own experience, contingency counsel is expensive.

24   We know that the committee, prior to dismissal, not only --

25   you know, the dismissal hearing, filed motions to retain

45

1    fraud examiners and asset tracers, right?  All of which

2    would be, you know, expensive if people are going to take

3    those on the come.  I don't even know if they would.

4    Usually, those kind of people I think submit hourly rates,

5    but there's nothing to pay them.

6            And you know, I think there are certainly cases --

7    you know, the *Babayoff* case the committee cites, that

8    dismissal is preferred where there are insufficient funds

9    and a trustee would simply add more costs and burden to the

10   estate.

11           THE COURT:  What case was that, counsel?

12           MR. FRIEDMAN:  The *Babayoff*, 445 BR 640 -- 64 at

13   Page 82.

14           THE COURT:  I just don't recognize that name.  The

15   other cases that you cited, I recognize, but it's in the

16   committee's brief, you're saying?

17           MR. FRIEDMAN:  I believe so.  And that cites in

18   turn, *Midwest Properties of Shawano*.

19           And so, you know, look, we think a trustee would

20   add substantial burdens expense wise, and I'm not sure what

21   -- you know, what the benefit is because in particular, we

22   know state law remedies can be pursued, or can pursue veil

23   piercing if appropriate.  People can pursue state law

24   fraudulent transfer claims on their own if they want to.

25   People can seek restraining orders.  PAX certainly did.  And

46

1    there's nothing preventing people from using what state law

2    remedies they have.

3          You know, the Rui Ma creditor group says that Non

4    PAX creditors will not receive equality in distributions if

5    the case is dismissed.  I don't know if that's true or not.

6    I don't -- maybe they'll settle their claims.  I don't know.

7    Right?  There's no guarantees what anybody will get outside

8    of a bankruptcy, but parties should be able to pursue Kwok

9    to their heart's content to recover what they want to.

10          If there's no there there -- and this is just a

11    sort of a frolic and detour -- if there is a there there,

12    nobody's put a cap on how much there might be.  There could

13    well be, potentially, plenty for other people.  We don't --

14    you know, concededly, we don't know, but PAX, I think in

15    particular, given the size of its claim and the effort it's

16    taken so far, shouldn't have been -- shouldn't be prejudiced

17    by this filing, and I don't think other creditors should be

18    permitted to essentially take advantage of a debtor's bad

19    faith filing.

20          The other parties sort of say, you know, there is

21    a gamesmanship aspect to Kwok's quality -- Kwok's behavior

22    here, and he shouldn't be rewarded for that.  I don't think

23    he is being rewarded.  If this case is dismissed, he's

24    gotten no real benefit from this case other than avoiding a

25    couple of months in front of Justice Ostrager, which he's

47

1    going to have to go right back to.  He hasn't gotten a

2    benefit.  The only people who have gotten benefits are

3    people who don't have liquidated claims who are stretching

4    PAX out, which has already been stretched out for almost 14

5    years.  I don't think that's equity or fairness, and I don't

6    think that's in the interest of the $261 million of creditor

7    claims that PAX has.

8              You know, we think it's actually the other

9    parties, the other claim holders, pushing for remaining in

10   bankruptcy that are advocating for unequal treatment.  They

11   basically want to use the bankruptcy as a collection device,

12   something that the *In Re: Murray* case says, you know,

13   bankruptcy shouldn't be used as a debt collection remedy

14   that's more potent -- a debt collection remedy that's more

15   potent in bankruptcy than the equivalent right under non-

16   bankruptcy law is not something that we should be doing.

17   The court denounced a creditor's use of bankruptcy as a debt

18   collection remedy more potent than the equivalent right

19   under state -- under non-bankruptcy law.

20             It would be other people jumping to the front of

21   the line, given where they stand now, to force PAX to share

22   recoveries while imposing millions of dollars in unnecessary

23   costs.

24             I would note that the debtor makes the point that

25   other creditors are basically hijacking a Chapter 11 case

48

1     for a pseudo involuntary.  I suspect that they amplify it.

2     It would otherwise be unavailable to them as an avenue for

3     relief.  I will defer to the committee to further develop

4     that argument.  I think it has merit, Your Honor.

5          Your Honor, the committee cites, and I think we

6     note that there are factors that *Collier* talks about.

7     Courts are sort of -- some courts really rely on them, some

8     courts just notice them in passing.  I think what I've

9     discussed today really goes over those factors.  You know,

10    whether creditors receive preferential payments is a factor.

11    Now there's certainly no reason to believe that PAX received

12    any preferential payment.  Would there be a loss of rights

13    granted in the case if it were dismissed rather than

14    converted?

15          The Rui Ma group suggests that the rights to the

16    $37 million escrow would be lost upon dismissal, but the

17    order expressly contemplated what would happen if there is

18    dismissal.  That wasn't a mystery.  Creditors -- you know,

19    the creditors didn't have any particular right to that, and

20    it was expressly bargained for, what might happen in the

21    context of dismissal.  So I don't think anybody is losing a

22    right that they otherwise would have had.

23          Whether the debtor would simply file a further

24    case upon dismissal.  I mean, I guess Kwok could try, having

25    consented to this one and, you know, I don't think that

49

1    weighs in favor.

2              The ability of a trustee to reach assets for the

3    benefit of creditors.  I think, you know, maybe, but the

4    trustee doesn't have any money to support its efforts right

5    now.  What's deemed low hanging fruit -- first of all, it

6    was Kwok that -- you know, it was PAX that built the tree,

7    but more importantly, there's still a lot of wood to chop to

8    get there on that tree.  And even assuming if funding was

9    available, it would do so at a great cost to creditors,

10   including, I think, specifically PAX.

11             You know, maximizing the estate's value as an

12   economic enterprise, you know, who really knows what the

13   economic enterprise value of this is.  We know it -- I think

14   that mostly comes up in the context of cases like the

15   *Premier Golf* one, where there -- liquidation causes a clear

16   loss -- a crushing loss of value and jobs.

17             Whether the remaining issues would be resolved

18   outside the bankruptcy forum, I think the Court might have

19   already had a colloquy on that issue, and I think the debtor

20   in Rui Ma, for example, we've already said, hey, you've got

21   a case, go back and try to get it dealt with somewhere else.

22             Whether the debtor is engaged in misconduct.  I

23   think here the debtor's misconduct is almost entirely

24   prebankruptcy.  There are some things around the edges that

25   we obviously -- you know, we don't love about the way the

50

1    debtors conducted the case, but I think they fall within the

2    bounds of bad ideas, not corruption.

3            And you know, I don't think creditors need a

4    Chapter 7 case to protect their interest.  People have their

5    state law remedies fully available to them.

6            And then, you know, other factors, single asset

7    plan already confirmed, environmental concerns, I think as

8    we learned from the DIP when we went over the proposed

9    order, there are no circular concerns in this case.  There's

10   no environmental issues.  This isn't a *Midlantic* type of

11   situation.

12           So, Your Honor, those are the reasons we believe

13   dismissal is appropriate, that the case laws support PAX's

14   rationale, and the cases relied upon by other parties really

15   don't get them where they need to be in order for this Court

16   to exercise discretion to convert rather than dismiss.

17           Thank you, Your Honor.

18           THE COURT:  Thank you.  Attorney Jonas?

19       MR. JONAS:  Good morning, Your Honor.  Jeff Jonas,

20   Brown Rudnick on behalf of the debtor, Miles Kwok.

21           Before addressing dismissal of the Chapter 11 case

22   particularly, or alternatives, I think it's important to

23   just step back for a minute and review how we got here, to

24   put it in context, because I do think it's important for the

25   Court today to put things in context and focus on the facts,

51

1    not the many unsupported allegations, innuendo and argument

2    that will be made, have been made, and will be made by

3    lawyers, so you won't hear any rhetoric or vitriol from me

4    this morning.

5           In this case, you've heard live testimony from two

6    witnesses, Craig Jalbert of Verdolino & Lowey, and from

7    Miles Kwok, the debtor.

8           As Mr. Kwok testified, and as set forth in the

9    declaration he filed, he's an outspoken critic of the

10   Chinese Communist Party or CCP.  Hundreds of millions of

11   people watch his broadcasts in connection with his criticism

12   of the CCP.  He and family members were jailed and tortured

13   in China.  He endured watching his brother being shot and

14   killed.  He continues to be pursued and persecuted by the

15   CCP.

16          This is not fantastical make believe.  Senior U.S.

17   Government officials and business leaders have been

18   criminally charged and pled guilty, including with acting as

19   foreign agents for the CCP in connection with illegally

20   seeking to have Mr. Kwok deported to China so he could be

21   jailed or killed.  These persons include Elliot Broidy and

22   George Higginbotham.

23          Your Honor, last week -- I think we mentioned this

24   in our papers, but to make sure you're aware -- last week,

25   the Department of Justice filed suit against Steve Wynn, a

52

1    billionaire fund-raiser and former finance chair for the

2    Republican National Committee, based on his acting as an

3    unregistered Chinese agent in seeking Mr. Kwok's

4    extradition.

5              The Justice Department references President Xi

6    Jinping, Chinese -- China's supreme leader -- raising the

7    U.S. returning Mr. Kwok to China directly with then

8    President Trump.

9              Mr. Wynn, in an effort to gain support from the

10   Chinese government for his casinos in Macao, had contact

11   with senior officials on the National Security Counsel at

12   the White House, the White House Chief of Staff, and then

13   President Trump seeking to have Mr. Kwok placed on the no-

14   fly list, to have Mr. Kwok's U.S. visa not renewed, and have

15   Mr. Kwok returned to China, again likely to face jail or

16   death.

17             Mr. Kwok believes that some, if not all, of the

18   creditor -- the alleged creditor claims against him are part

19   of the CCP's continuing effort to discredit and silence him.

20             Against that backdrop, Mr. Kwok perseveres.

21   Although he has little to no assets and income, he is

22   supported by the largesse of his family.  While his alleged

23   creditors may not like this, there's nothing illegal,

24   improper or wrong about this.

25             In February, facing a New York State Court

1  judgment and order, which he could not pay, Mr. Kwok filed

2  this bankruptcy case.  As he testified, and as set forth in

3  his declaration, he hoped Chapter 11 would help him reach a

4  fair and equitable resolution of alleged creditor claims.

5         His bankruptcy filing and the administration of

6  this case since it has -- since it was filed, has been

7  nothing but in good faith and completely transparent.  There

8  is no evidence to the contrary.  I think even Mr. Friedman

9  admitted substantially that.

10        While there may be allegations that Mr. Kwok owns

11 certain assets, whether that be a yacht or a New York City

12 apartment, these allegations remain unproven and

13 undetermined.

14        Since filing this case, Mr. Kwok has filed

15 complete and accurate schedules and statement of affairs.

16 He sat for almost two full days of 341 meetings.  He came

17 before the Court and provided live testimony.

18        He arranged and assisted with the return of the

19 yacht, subject of the New York State Court order, the return

20 of which is presently secured by $37 million in cash.  He

21 obtained $9 million of DIP financing which would have been

22 unsecured and subordinated and included a million dollar

23 gift to the estate.  And he filed a plan of reorganization.

24        The hope was that bankruptcy would afford a forum

25 and opportunity to have a dialog with creditors and alleged

54

1     creditors in order to reach a consensual resolution, the

2     exact purpose and point of bankruptcy.

3           This bankruptcy filing was not in bad faith and

4     there has been no bad faith since it has been filed.

5           So, Your Honor, turning to dismissal, cause for

6     dismissal under Bankruptcy Code Section 1112(b)(1), exists,

7     specifically 1121(b)(4)(A), provides that cause includes

8     substantial or continuing loss to or diminution of the

9     estate and the absence of a reasonable likelihood of

10     rehabilitation.  That is the only existing cause that

11     exists.

12           If you do look at -- I appreciate it's not

13     absolutely exhaustive, but if you look at 1112(b)(4) -- and

14     obviously I've referred to (A) as the cause we think is

15     relevant in this case -- if you look at (B), we don't think

16     any of the other causes are applicable, Your Honor.

17           (B) gross mismanagement of the estate, I've

18     addressed that;

19           (C) failure to maintain appropriate insurance;

20           (D) unauthorized use of cash collateral;

21           (E) failure to comply with an order of the Court;

22           (F) unexcused failure to satisfy timely any filing

23     or reporting requirement;

24           (G) failure to attend the meeting of creditors;

25           (H) failure timely to provide information or

55

1    attend meetings requested by the United States Trustee;

2                    (I) failure timely to pay taxes;

3                    (J) failure to file a disclosure statement;

4                    (K) failure to pay any fees or charges under

5    certain -- chapter 123 of title 28;

6                    (L) revocation of an order of confirmation;

7                    (M) inability to effectuate substantial

8    consummation of a confirmed plan;

9                    (N) material default by the debtor with respect to

10   a confirmed plan;

11                   (O) termination of a confirmed plan;

12                   And lastly, (P) failure of the debtor to pay any

13   domestic support obligations.

14                   So, Your Honor, as I've mentioned, we believe that

15   there is cause.  The relevant and applicable cause is

16   1121(b)(4)(A).

17                   THE COURT:  May I just ask you a question on that?

18                   MR. JONAS:  Certainly, Your Honor.

19                   THE COURT:  I understand -- I understand your

20   recitation of the list, and I understand that you assert

21   that only (4) applies, but are you -- are you contesting the

22   case law that interprets cause includes mean -- does not

23   mean that the list -- it can only fit into the list?

24                   MR. JONAS:  No, Your Honor.

25                   THE COURT:  Okay.

56

1          MR. JONAS:  Not at all.

2          THE COURT:  That's all I'm asking.

3          MR. JONAS:  Yes.

4          THE COURT:  Okay.

5          MR. JONAS:  And I think I mentioned, Your Honor,

6     that our view is it's -- I appreciate it's not exhaustive.

7          THE COURT:  I thought you said that --

8          MR. JONAS:  Yeah.

9          THE COURT:  -- but I just wanted to make sure for

10    the record.

11         MR. JONAS:  No.  No.  No.  Absolutely, Your Honor.

12         THE COURT:  Okay.

13         MR. JONAS:  But I do think there's a reason that

14    there's specified items there --

15         THE COURT:  I understand.

16         MR. JONAS:  -- and I thought it was important to

17    review that.

18         THE COURT:  No.  I think that's helpful.  Thank

19    you.

20         MR. JONAS:  You're welcome.

21         Your Honor, as for dismissal versus conversion or

22    appointment of a trustee, while a debtor's preference is not

23    dispositive, it should be given some weight.  Here, the

24    debtor and its largest creditor support dismissal.

25         Eleven-twelve (b)(1) provides for the Court to

57

1    examine which of dismissal, conversion or appointment of a

2    trustee is in the best interest of creditors and the estate.

3            In *SWJ Management*, 551 B.R. 93, 2015 case from the

4    district court here in Connecticut, it was described -- this

5    analysis was described as whether dismissal would,

6    quote/unquote, "Prejudice creditors."

7            In the *Hull* case, 339 B.R. 304, 2006 case from the

8    -- a bankruptcy court case from the Eastern District of New

9    York, the Court addressed what -- in this context what is

10   prejudice to creditors.

11           And it said, quote, "Creditors are not generally

12   prejudiced by dismissal since they will no longer be stayed

13   from resorting to the state courts to enforce and realize

14   upon their claims.  That is, it is the reasonable pre-

15   petition legal expectations and entitlements of a debtor's

16   creditors that should be considered in the context of a

17   debtor's timely motion to dismiss, not the loss of an

18   opportunity to receive a distribution through the bankruptcy

19   process."

20           THE COURT:  Could you just tell me that case

21   again, Counsel.

22           MR. JONAS:  Certainly.

23           THE COURT:  I'm sorry.

24           MR. JONAS:  It's the *Hull* case.  H-U --

25           THE COURT:  *Hull*, H-U-L-L?

58

1          MR. JONAS:  Yes.  And it's 339 B.R. 304.  It's a

2     2006 case, Eastern District of New York.  A bankruptcy court

3     case.

4          THE COURT:  Thank you.  Thank you.

5          MR. JONAS:  Yes.

6          THE COURT:  I just didn't hear what you had said

7     at the beginning.  I apologize.

8          MR. JONAS:  Of course, Your Honor.

9          Your Honor, I'll just, for the record, state we

10    don't believe that 1112(b)(2), which would arguably prohibit

11    conversion or dismissal, is applicable for a number of

12    reasons.  We don't believe there are unusual circumstances

13    establishing that conversion or dismissal is not in the best

14    interest of creditors and the estate.

15          Another requirement there, which we don't believe

16    is applicable, is that we don't think there's a reasonable

17    likelihood that a plan will be confirmed with a reasonable

18    period of time, which is another requirement to -- under

19    1112(b)(2).

20          And 1112(b)(2) is not applicable if the grounds

21    for conversion are dismissal is 1112(b)(4)(A), which, again,

22    I'm taking you through our position that the loss or

23    diminution and the no reasonable likelihood of

24    rehabilitation under 1112(b)(4)(A) is the basis for

25    dismissal.

59

1      Your Honor, I won't further review PAX's

2  allegations of bad faith.  I think I've addressed those.  I

3  mean, they -- again, just briefly, they've referred I

4  believe in an unsupported manner to -- to misrepresentations

5  in the schedules, to a, quote/unquote, "Bogus DIP loan," to

6  the debtor, quote/unquote, "Pulling the plug on the case."

7  I don't think any of those are what happened here.

8      I can tell you the debtor came into this court --

9  as I mentioned earlier -- with the hope that ultimately

10  there would be a reorganization.  That didn't happen.  But

11  nevertheless I think Mr. Friedman said it, he may not have

12  liked it, but he didn't really take issue with the fact that

13  there was bad faith in the case since the case has

14  commenced.

15      And lastly, Your Honor, I'll say, as to the --

16  somehow the bankruptcy filing being improper because the

17  debtor didn't have an ongoing business, I think you said it

18  best in the *Lucarelli* case, Your Honor, 517 B.R. 42, where

19  you said or we've heard quoted, "The plain language of the

20  bankruptcy code permits individual debtors not engaged in

21  business to file for relief under Chapter 11."

22      THE COURT:  I think I cited from the supreme court

23  though for that.

24      MR. JONAS:  You cited a number of cases, Your

25  Honor.

60

1          THE COURT:  I think it was the --

2          MR. JONAS:  I'm giving you credit for it.

3          THE COURT:  I think it was the supreme court.

4          MR. JONAS:  I think you're right.

5          Your Honor, I just -- I do think it should be

6     noted briefly that the alleged claims of the creditors

7     committee members that are here today are, in fact,

8     unliquidated and disputed.

9          Those claims as -- again, Mr. Friedman went

10    through this and I'm not repeating a lot of what I might

11    otherwise have said because I think Mr. Friedman covered it

12    -- those claims would be -- would need to be litigated.

13    Continuation of this bankruptcy case in any form will be in

14    the context of an administratively insolvent case with no

15    funding to support what likely could be years of litigation.

16         Your Honor, in closing, Mr. Kwok has asked me to

17    thank you and your staff for the time and the consideration

18    you've given this case.  Although it may not have been as

19    successful as he would have liked, it has, at least in part,

20    restored his confidence in the judicial system.

21         And that said, Your Honor, respectfully, it is

22    time to move on.  This bankruptcy case should be dismissed.

23    Thank you.

24         THE COURT:  Thank you, Attorney Jonas.

25         Attorney Goldman.

61

1           MR. GOLDMAN:   Thank you, Your Honor.   Good

2     morning.   Irve Goldman representing the creditors committee.

3           Your Honor, I'd like to start with the observation

4     that whether or not this case was filed in bad faith or

5     other cause exists, as we've stipulated, the question before

6     the Court -- the question before the Court -- is not whether

7     the case was filed in bad faith, but is whether conversion,

8     dismissal, or the appointment of a Chapter 11 trustee is in

9     the best interests of creditors.

10          So whether the case was filed in bad faith or

11    other cause exists does not change the standard of what is

12    in the best interests of creditors in this case.

13          And although it would be quite ironic that if the

14    debtor's own bad faith is used to justify a dismissal of

15    this case, it would allow him to avoid the scrutiny of the

16    Chapter 7 process, which would entail a thorough

17    investigation of what PAX claims were his hidden assets,

18    that they were on the cusp of reaching before this case was

19    filed, and he will be rewarded because what will be left

20    will be various creditors that are scattered about in

21    different courts that will be left to their own devices to

22    chase down whatever assets this debtor has after PAX gets

23    done with them as the only judgment creditor in this case.

24          So they certainly do need the protection of the

25    Chapter 11 -- 7 process.

62

1          In terms of what the standard is under 1112, I'd

2     like to start with the plain language of the statute, which

3     the Supreme Court in the Second Circuit have repeatedly

4     instructed lower courts to focus on in interpreting the

5     bankruptcy code.

6          Section 1112(b)(1) provides that once cause is

7     established, the Court is required to convert or dismiss a

8     case, whichever is in the best interest of creditors and the

9     estate, unless the Court determines that the appointment of

10    a Chapter 7 trustee or an examiner is in the best interest

11    of creditors and the estate.

12         THE COURT:  I think you mean a Chapter 11 trustee,

13    but that's fine.

14         MR. GOLDMAN:  Yes.  Yes.  Thank you, Your Honor.

15         THE COURT:  That's fine.  I understand.  I

16    understood what you meant.

17         MR. GOLDMAN:  What PAX -- the way PAX wants the

18    Court to read that statute is as the best interest of

19    creditors according to the amount -- amounts of their

20    claims.  Of course it simply doesn't say that.

21         And I'd like to emphasize that in considering the

22    best interest, the statute uses the plural, creditors, so

23    that the interest of the entire creditor body as a whole

24    have to be considered, not just the interests of a single

25    creditor that has a large claim, and that prior to

63

1    bankruptcy was on the cusp of reaching -- where all

2    creditors in this case seem to agree are the debtor's known

3    assets right now, and that is the Lady May and the debtor's

4    interest in the Sherry-Netherland apartment.

5         And the term in determining the creditor body, the

6    Court can take judicial notice of the proofs of claim that

7    were on file right now as well as the debtor's schedule F.

8         The proofs of claim, as of today, even though

9    there is no bar date, total $71 million, and in some cases

10   are based on allegations of grievous personal harm.

11        For example, the claim of Rui Ma, which is close

12   to the trial stage in the New York Supreme Court, alleges

13   claims of sexual assault, false imprisonment, and

14   intentional affliction of emotion distress over a period of

15   several years.

16        The claim of Bob Fu, based on an action in federal

17   court in Texas, is based on allegations that the debtor

18   promoted acts of violence against Dr. Fu, indeed, encouraged

19   his, quote, "Comrades," end quote, to kill Dr. Fu, and

20   incited harassing protests in front of his house for weeks.

21        The claim of Bruno Wu and Yang Lan is based on a

22   New York Supreme Court action alleging that the debtor used

23   his pervasive social media accounts to personally attack

24   them by claiming, among other things, that Yang Lan had

25   extramarital affairs and used sexual favors to obtain her

64

1    prominent cultural status in China and was, quote, "Full of

2    sexually transmitted diseases," end quote.  Accused Bruno Wu

3    on repeated occasions of attempted murder and bribery and

4    has threatened violence on social media against both of

5    those creditors.

6         To say that these aren't actual creditors that are

7    deserving of the same consideration of their interests, as

8    PAX is, really an offense to those creditors.

9         And as I mentioned, the proof of claim deadline

10   has not even been set.  It is likely based on what was

11   listed on schedule F that we will receive a flood of

12   additional claims so that that $71 million will certainly

13   escalate.

14        Getting back to the plain meaning of the statute,

15   in determining the creditors whose interests must be taken

16   into account, under Section 1112(b)(1), I would refer the

17   Court to Section 101(10A) of the bankruptcy code which

18   defines creditor as, quote, "An entity that has a claim

19   against the debtor," end quote, as of the petition date.

20        And the definition of claim under Section 101(5A),

21   which defines a claim to include a right to payment whether

22   or not it is reduced to judgment unliquidated or disputed.

23        So PAX's contention that these creditors aren't

24   actual creditors is contrary to the plain language of the

25   bankruptcy code, because a creditor is one who holds a claim

65

1   and a claim could be undisputed, unliquidated and

2   contingent.  So there are creditors, actual creditors, here.

3          And how could a creditors committee been even

4   appointed by the U.S. Trustee if these weren't actual

5   creditors?  And what creditors are they supposed to be

6   representing if there are no other actual creditors?

7          PAX certainly didn't object to the retention of

8   committee professionals based on the fact that there were no

9   actual creditors to defend.

10          So under a plain statutory analysis, creditors

11   such as those who have filed proofs of claim in this case,

12   but have not yet received judgments, are just as much

13   creditors of this estate as is PAX for purposes of

14   evaluating the best interest test under Section 1112(b).

15          If anything, the interests of those creditors who

16   allege grievous personal harm are entitled to equal, if not

17   greater, consideration under the best interest test than is

18   PAX whose actual money judgment -- which is attached to Mr.

19   Friedman's declaration on the motion to dismiss as exhibit 1

20   -- is in the principal amount of just $46 million.

21          They have $70 million of interest at their

22   contractual rate of 15 percent and a $134 million contempt

23   fine is not in compensation of any pecuniary loss.

24          The test that many courts, indeed, most, have

25   applied in determining what is in the best interest of

66

1    creditors under Section 1112(b)(1), is the course of action

2    that provides the best chance for the largest number of

3    creditors to be paid the largest amount of money in the

4    shortest period of time.

5           Here, that is either conversion or the appointment

6    of a Chapter 11 trustee.  Because in the event of a

7    dismissal, the largest number of creditors will suffer at

8    the hands of one single judgment creditor who will be paid

9    the largest amount of money, in the event of dismissal,

10   while all the other creditors will remain mired in

11   litigation with the debtor.

12          As for the boat, we know that under Judge

13   Ostrager's February 9th, 2022 decision and order, which is

14   our exhibit 1, the debtor has already been found by clear

15   and convincing evidence to beneficially own and control the

16   boat.  That's at page 4 of his decision.

17          When the boat is back, PAX will simply levy on

18   that beneficial interest and ultimately receive a

19   distribution when it is liquidated.

20          As for the Sherry-Netherland apartment -- of

21   course they're poised to do that on the day of dismissal as

22   they have that proceeding before Judge Ostrager.

23          As for the Sherry-Netherland apartment, they're

24   equally poised to realize on that asset in the event of

25   dismissal.

In the debtor's declaration, which is UCC exhibit 2, he acknowledges owning 100 percent of the membership interest in Genever Holdings Corp., which is the sole member of the title holder of the Sherry-Netherland apartment, Genever Holdings, LLC.

Genever Holdings, LLC is a debtor under Chapter 11 in the Southern District of New York and the debtor claims his interests are held in trust or his son's company, Bravo Luck.  That's at his declaration at paragraph 33(B).

By order entered on October 8th, 2021, which is UCC exhibit 3, Judge Garrity approved a settlement agreement between Genever Holdings, PAX and Bravo Luck.  That settlement agreement, which will appear at UCC exhibit 4, marked ECF 131-1, which is dated September 24th, 2021, granted PAX relief from the automatic stay to continue to prosecute the New York Supreme Court action.  That's at paragraph 7(A) of the settlement agreement, page 7 of 12 of the settlement agreement.

Since PAX had already received its money judgment on February 3rd, 2021, the only thing left to try in the New York Supreme Court action are PAX's veil-piercing claims against the Genever entities.  And they are found in count 2 of its first amended complaint, which is UCC exhibit 10. It's page 17 of the complaint.

In addition, PAX is the beneficiary of an order

68

1    requiring Mr. Kwok to turn over his 100 percent ownership

2    interest in Genever -- the Genever -- 100 percent owner of

3    Genever Holdings to PAX.  That's UCC exhibit 6.  The order

4    was entered on September 22nd, 2021.  And PAX had filed a

5    motion for contempt in a New York dated January 7th, 2022

6    for Kwok's failure to turn the shares over.  That I believe

7    is exhibit 7 of our exhibits.

8         It's expected that that motion will be refiled or

9    resumed on dismissal.

10        PAX has similar veil-piercing type claims relief

11   pending in the courts of the British Virgin Islands.  UCC

12   exhibit 11 is PAX's amended statement of claim in that

13   court.  In that amended claim, they allege, among other

14   things, that Mr. Kwok used $70 million of his own assets to

15   transfer to Bravo Luck -- that's paragraph 29 of exhibit 11

16   -- that the declaration of trust that Mr. Kwok claims to

17   have with Bravo Luck was a fraud, quote, "Devised to hold

18   his shares in Genever BVI in trust for Bravo Bravo."

19        Bravo Luck was a fraud -- excuse me -- it was a

20   fraud, quote, "Devised for the sole purpose of concealing an

21   asset of Mr. Kwok from his creditors."  That the trust

22   document should be set aside as a, quote, "Document intended

23   to defraud creditors of Mr. Kwok."  Creditors, plural.

24   That's paragraph 35.  And that Mr. Kwok is the beneficial

25   owner of Bravo Luck and his son is his mere nominee.

1          Under the settlement agreement that Judge Garrity

2     approved, the parties, that is, PAX and Bravo Luck, were

3     also permitted to proceed with the British Virgin Island

4     litigation.

5          So they are very poised to also realize on the

6     Sherry-Netherland apartment based on those claims that will

7     be resolved in the British Virgin Islands or in the New York

8     State Court.

9          In terms of what's happening with the apartment in

10    the Genever Holdings case, Melanie Cyganowski was appointed

11    the sales officer to market and sell the property.  That's

12    at UCC exhibit 8.  And Sotheby's was approved as the broker

13    for the property, UCC exhibit 9, and the property is

14    currently listed on Sotheby's website for $38,500,000.

15         So they are -- PAX is very well positioned to

16    realized on the assets on dismissal ahead of other

17    creditors, who, again, will be left with litigating against

18    Mr. Kwok, and thereafter getting judgments, chasing down

19    whatever assets are left.

20         The additional potential assets we contend would

21    be -- potential assets to recover in a Chapter 7 -- are two

22    Greenwich properties that are owned by Greenwich Land, LLC.

23    UCC exhibits 13 and 14.  The properties are described in

24    those exhibits.

25         In paragraph 17, in Mr. Kwok's declaration, he

70

1   claims his Greenwich residence, quote, "Is owned by my wife

2   through Greenwich Land, LLC."  That remains to be seen

3   whether that's another one of his concealed assets.  Which

4   of course could be investigated in a Chapter 7, which we

5   were in the process of trying to investigate when the debtor

6   filed his consent to dismissal on May 11th.

7         I'd like to turn now to PAX's argument that the

8   touchstone of what is in the best interest of the estate is

9   the preference of creditors, and that the best interest of

10  creditors must reflect PAX's view as the single largest

11  creditor.

12        The touchstone of the best interest of creditors

13  test is not what the creditors prefer.  It is the course of

14  action that provides the best hope of recovery for the

15  largest number of creditors, and not the course that will

16  afford the most recovery for the most vocal or the largest

17  creditor.

18        Preliminarily, the case authority that PAX cites

19  for that proposition that a single creditor can -- with a

20  large enough claim can suffice for purposes of the best

21  interest test is completely in opposite I think to this case

22  and otherwise doesn't support PAX's theory.

23        In the *Acme Cake* case, which is the case it's

24  relying on, not a single creditor or even the creditors

25  committee itself objected to a dismissal of the case.

1          It was counsel for the creditors committee that

2     had objected to dismissal on the basis that it should not be

3     granted because administrative expenses, including its fees,

4     were not being paid, and a dismissal would violate the

5     priority scheme of the bankruptcy code by allowing the

6     creditor requesting dismissal to be paid ahead of

7     administrative claimants.

8          Of course here that is not what the argument is.

9     The creditors committee who represents the interests of all

10    unsecured creditors is objecting to dismissal.  We are not

11    making this argument, although I do believe the case should

12    be, if Your Honor was inclined to dismiss, it should be

13    conditioned on payment over the fees.

14         The reason we are objecting is because dismissal

15    is not in the best interest of creditors, and that simply

16    was not an argument that was made in the *Acme Cake* case.

17    And in fact --

18         THE COURT:  Can I just ask you a question about

19    that?

20         MR. GOLDMAN:  Yes.

21         THE COURT:  You just said that -- obviously I

22    understand that the committee's position is dismissal is not

23    appropriate but conversion or appointment of trustee is, but

24    you also just said that if the Court was to dismiss you'd

25    want it to be conditioned on the payment of the committee's

72

1    fees.  And I just want to understand how that would work

2    from your perspective?

3            How would a court condition dismissal on payment

4    of fees in an estate where there's no money?

5            MR. GOLDMAN:  If Mr. Kwok wants a dismissal of the

6    case so that he does not have to go through the Chapter 7

7    process and face potential 523 non-dischargeability claims

8    as well as 727 denial of discharge claims, as well as the

9    process of hunting down his hidden assets and collecting

10    them, then just as he found the money to put up to secure

11    the return of the boat, and just as he found the money to

12    propose to fund the case with an $8 million DIP loan, he

13    will find the money if the Court conditions dismissal on

14    payment of the fees.

15            THE COURT:  Have you -- I haven't seen -- but I

16    may have missed this, okay, so just understand -- have you

17    cited any cases that support the authority of the Court to

18    do that, to do what you're suggesting?

19            MR. GOLDMAN:  There's no direct case that I found,

20    Your Honor.

21            THE COURT:  Okay.  Okay.  I'm just asking the

22    question --

23            MR. GOLDMAN:  No.

24            THE COURT:  -- and so I make sure that I've read

25    your papers properly.

1          Go ahead.  I'm sorry.  I just wanted to ask that

2     when you brought that up.

3          MR. GOLDMAN:  Thank you, Your Honor.

4          Another critical distinguishing feature of *Acme*

5     *Cake* case is that in that case the Court found that

6     converting the case or appointing a Chapter 11 trustee,

7     quote, "Would result in the unsecured creditors receiving

8     little distribution, if any."  And that certainly cannot be

9     -- cannot be said here.

10         They did make the -- they actually quoted a

11    decision in a California bankruptcy case -- from a

12    California bankruptcy case -- in saying that, quote, "It is

13    not necessary that the interest of every creditor actually

14    favor conversion.  There is no specific numerosity

15    requirement inherent in section 1112(b).  The interest of a

16    single creditor with a large enough claim will suffice."

17    That is a direct quote from a case called *In re Staff*

18    *Investment*, a California bankruptcy case 146 B.R. 256.

19         If you take a look at that case, it's completely

20    distinguishable from this case.  The single largest

21    unsecured creditor in that case held a deficiency claim of

22    $600,000 on a mortgage against the single asset of the

23    estate.  That was the deficiency component of the claim.  It

24    totaled 95 percent of all unsecured creditors.  And there

25    were only other unsecured claims totaling $21,000.

74

1          So this single quote from a California bankruptcy

2     case, which really is dicta because no one was making the

3     argument that, you know, the dismissing -- the creditor

4     wanted dismissal would run away with all the assets ahead of

5     the other creditors is really much too thin a read upon

6     which to overcome the overwhelming authority that holds that

7     the best interest of creditors under 1112(b) is supposed to

8     consider the interests of the entire creditor body, not a

9     single creditor's parochial interest.

10          And that means considering whether creditors as a

11    whole will do better in Chapter 7.  And that certainly is

12    the case here based on how posed PAX is to recover on what I

13    would call the low-hanging fruit of assets that now exist,

14    that we know at least there are legitimate and very weighty

15    claims to for the estate.

16          PAX is so emboldened by the amount and status of

17    its claim that it proclaims that, quote, "Given the size of

18    Pax's already adjudicated judgments, PAX is entitled to

19    recover first."  That's at its memorandum of Y at 4.  This

20    turns the fundamental policy of equality of distribution

21    among creditors on its head and instead adopts the every

22    creditor for itself rule that exists outside of bankruptcy.

23          But that's not the standard for the best interest

24    of the creditors.

25          We are in a bankruptcy case.  And inherent in that

1    standard is considering what will serve the equality -- what

2    will serve the overriding bankruptcy policy of equality of

3    distribution.

4            Finally, comparing the committee's preference for

5    conversion to an involuntary bankruptcy because the debtor

6    wants a dismissal is a red herring.

7            First, courts have held that a debtor's preference

8    for dismissal is irrelevant under 1112(b) unless it happens

9    to coincide with the creditors' interests.

10           And section 1112(b)(1) mentions only the best

11   interests of creditors and the estate and does not mention

12   the interests of the debtor, such as is mentioned in section

13   305 of the bankruptcy code.  So the omission of the debtor's

14   interest is intentional in 1112(b)(1).

15           Second, the conversion of the case here is

16   authorized, specifically authorized, under section

17   1112(b)(1) if it is in the best interest of creditors.  This

18   standard has nothing to do with the commencement of an

19   involuntary petition under section 303.  They are two

20   completely different standards under entirely different

21   situations, so you cannot analogize what is specifically

22   authorized under 1112(b) with the commencement of an

23   involuntary bankruptcy.

24           The final additional points I'd like to make is

25   that this debtor should not be able to escape the scrutiny

76

1    of the Chapter 7 process with the prospect of a denial of

2    discharge, particularly under section 727(a)(2), which will

3    provide or which provides grounds for denial of discharge if

4    there is a concealment of assets within the one year of

5    bankruptcy.

6         And there are many cases that hold that even

7    though an asset might have been transferred outside the one-

8    year period, if the debtor continues to conceal that

9    interest into the one-year period, that concealment will

10   serve as a ground for denial of discharge under section

11   727(a)(2).

12        If the Court does decide to dismiss the case

13   without conditioning dismissal on the payment of

14   professional fees of the committee, the committee would like

15   to reserve the right to seek a motion to review and disgorge

16   fees of the retainer that was paid to debtor's counsel in

17   the amount of a million dollars.  So I would leave the Court

18   with that, with that request.

19        I would like to respond briefly to some points

20   that both Mr. Friedman and Mr. Jonas made at various times

21   during their arguments, and then I'll sit down.

22        Mr. Friedman mentioned the *Sapphire* case in

23   support of dismissal.  If Your Honor looks at that case,

24   there were very few unsecured creditors in that case.  And,

25   in addition, they had other sources of recovery in the form

1    of a guarantor and other joint -- and/or other joint

2    obligors.  We obviously do not have that here.

3         Mr. Friedman stated that all they were really

4    doing here was returning to the status quo.  But returning

5    to the status quo means that they will be first in line to

6    realize on all the assets, and that's why these creditors

7    need the protection of a Chapter 7 case.

8         Mr. Friedman called into question the personal

9    injury tort claims that exist in this estate.  What would

10   happen in a Chapter 7 case is that a trustee would first

11   look and seek to recover assets of the estate.  And once

12   that process is concluded, a trustee would then turn to the

13   process of reviewing claims and objecting to them if

14   necessary.

15        So you would first have a marshaling of assets to

16   determine what assets exist.  Then there would be a review

17   of the claims.  Which is the trustee's duty to do under

18   section 704(5).  The trustee wouldn't be retaining special

19   counsel to review those claims, so there would be no costs

20   associated with that review.

21        And parties can object to those claims if the

22   claims are thought better off to be resolved in other

23   courts.  A relief from stay could be granted, and the

24   debtor, if the debtor so wished, could defend those claims.

25   It would have no impact on the bankruptcy process itself.

78

1    It would simply be a process of liquidating those claims in

2    other courts, which is commonly done.

3          If a claim, for example, is on the verge of trial

4    or close to trial, it's not uncommon for the creditor to

5    seek relief from stay in order to liquidate the claim in

6    another court and then come back to the bankruptcy court

7    with the amount of their claim.  So that is -- that is a

8    routine process in Chapter 11 -- Chapter 7 cases.

9          As far as funding to litigate the assets that we

10   know do exist, the boat and the apartment, we -- I'm

11   confident that a trustee could get litigation funding.

12         Now, yes, there's no evidence that litigation

13   funding is available today, but this debtor just filed its

14   consent to dismissal on May 11th.

15         You cannot possibly expect the committee or a

16   trustee to chase down litigation funding in a matter of a

17   couple of weeks, which is -- which is all we've had, and

18   present evidence that there's some, you know, binding

19   commitment to provide litigation funding to a party that

20   doesn't even exist yet because the funding would have to be

21   provided to either a Chapter 7 or Chapter 11 trustee.

22         So I think, you know, a trustee should be given an

23   opportunity to do that or to retain special counsel to at

24   least take the litigation on a contingency-fee basis.  And,

25   yes, that will involve collecting a percentage of any

79

1    recovery, but that's the -- that's common in Chapter 7

2    cases, and it's a negotiable fee.

3            Yes, the boat is worth a lot of money and that

4    will come out of the recovery if special counsel does take

5    it on a contingency-fee basis, but that is no basis to

6    conclude that the best interests of every other single

7    creditor, other than PAX, would be served by that process,

8    because they would be served by that process.  The only

9    creditor that would not be served would be PAX.

10           In terms of using bankruptcy as a debt collection

11   device, I mean, bankruptcy is a collective proceeding where

12   a debtor files for bankruptcy and surrenders his non-exempt

13   assets to creditors in exchange for seeking a discharge.

14   That is what bankruptcy is all about, so it very much is a

15   collective proceeding that is used to marshal and liquidate

16   the assets of the estate for the benefit of all creditors

17   equally, and that I submit is what the Court should do here.

18           And that's all I have, Your Honor, unless you have

19   any questions.

20           THE COURT:  I don't have any other questions.

21   Thank you.

22           Attorney Claiborn, do you wish to be heard?

23           I'm sorry.  Go ahead, Attorney Callari.

24           She can come up first.

25           And then Attorney Claiborn can if you'd like to be

80

1    heard after.

2              MS. CALLARI:  Good afternoon, Your Honor.

3    Carollynn Callari on behalf of certain of the creditors.

4              Your Honor, I'm just really here to support what

5    Attorney Goldman stated.  I think he did a really good job.

6    It makes my job easier.  But I do want to highlight a couple

7    of points.

8              One, just to go to debtor's comments before we get

9    to the actual issue, they tell a very nice story, but they

10   don't complete the story when they give the backdrop that,

11   you know, there's news articles about him, people being

12   investigated for wanting to have him sent back to China.

13   That's not disputed.

14             What's disputed in the back story is why?  And he

15   is wanted back in China to face allegations of corruption,

16   rape, kidnaping and bribery.  That's why he doesn't want to

17   go back there.  So I just wanted to clarify that.

18             With respect to what's really before the Court, it

19   really is, what is in the best interests of the creditors

20   and the estate.

21             And we hear a lot of different stories, but

22   really, when you look at that specific issue, first, on the

23   claims, 101 speaks for itself on the definition of creditors

24   and claims.  We have a lot of creditors here.  A lot of

25   claims here.

81

1          The case here is not like the claims -- cases

2     cited by PAX, Your Honor.  In those cases, when you're

3     dealing with a large creditor, if you look at them, often

4     it's a secured creditor having 95 to 98 percent of the

5     claims, in a -- you know, in a deficiency type of claim.

6          Here, if you break it down, Your Honor, PAX's

7     original claim -- let's bring the Court back -- is $46

8     million.  My client, Rui Ma's claim, is asserted at 20

9     million.  Not much of a difference.  They just got a

10    judgment first.  She shouldn't be prejudiced by that.

11         If you look at the schedule claims, the debtor's

12    scheduled -- although he disputes virtually every claim --

13    he scheduled over approximately $120 million in claims.  And

14    then he also lists dozens of other creditors in unknown

15    amounts.

16         So if you take PAX's 46 million, he's by far --

17    they are by far not a very large creditor compared to

18    others.  If you add in the interest, it's 116 million.  One

19    hundred and sixteen million versus the scheduled -- even

20    though disputed, just because it's disputed doesn't make it

21    a bonafide dispute -- but having said that, 125 to 116

22    million.  We're about 50/50.  It's only when you add in all

23    the contempt charges that their claim really balloons to

24    over 250 million.

25         So, first of all, the size that they keep trying

1   to say that they are this large creditor that should have a

2   say and run this case is just not the same as those other

3   cases that they cite.

4          And we are creditors even if we're not liquidated

5   at this time, Your Honor.

6          Second, PAX can't have it both ways when they say

7   Your Honor there's no assets in this case.  It should be

8   dismissed.  What kind of case is it?  There's no creditors,

9   no assets, no operation.  This is an individual Chapter 11.

10  We know there's no operations.  But I don't think any

11  creditor sitting on this side of the table genuinely thinks

12  there are no assets in this case even though they only

13  listed *de minimis* assets on their schedules.

14         And that's why we are here.  This case, as Mr.

15  Goldman said, is to marshal those assets.  And how could it

16  be more efficient than for one fiduciary to marshal the

17  assets for all creditors, rather than each creditor, dozens

18  of them, having to go and undertake what admittedly PAX's

19  counsel has had undertaken for years.

20         But each of us having to undertake veil-piercing

21  and all of these other, you know, litigations and loops we

22  have to go through to get those assets when one fiduciary

23  could marshal the assets.  That is a purpose of bankruptcy.

24  That's an appropriate purpose.  And that's why it should be

25  converted to a 7 to allow that to happen.

83

1          As far as funding, what Mr. Goldman alluded to is

2     the issue we would have in the two weeks that we've had to

3     try to find the initial funding is we don't have a counter-

4     party yet.  You need to have the Chapter 7 trustee or the

5     Chapter 11 trustee be the counter-party to a funding.  And

6     if you just look at the facts here, when you have a low-

7     hanging fruit of a yacht, this is ripe for a contingency

8     type of arrangement.

9          So I don't think the fact that we don't have

10     evidence here today of actual commitment for funding should

11     prevent Your Honor from acknowledging and inferring that

12     funding could be available to a Chapter 7 or a Chapter 11

13     trustee in this situation.

14          And I know that Mr. Friedman's a much better

15     negotiator than his papers when he's talking about a 20 to

16     30 percent contingency fee in this case.

17          I think you could do milestones -- which is the

18     conversations I've been having -- which is you have a

19     certain percentage for the yacht.  And if it takes longer,

20     the percentage goes up.  And then once you get the yacht,

21     maybe that's your funding.  Maybe you don't need to have

22     more.  You know.  You can use those proceeds.

23          So there's ways to have the Chapter 11 -- or in

24     our case we even say a Chapter 7 trustee -- to fund these

25     cases.  And we think that the Chapter -- a Chapter 7 should

84

1    be given a chance for a fiduciary to look at this, try to

2    marshal all the assets for all the benefit of all the

3    creditors.

4            If in a short period of time it couldn't have

5    funding, there's -- without prejudice to having it dismissed

6    then.

7            But to say that our clients should all be

8    prejudiced by the fact that the case should be dismissed now

9    and basically reward the debtor -- he got what he wanted --

10   he filed this go get a breathing spell -- he got a short

11   breathing spell -- and now he doesn't want to have to face

12   all of the burdens of a Chapter -- of a bankruptcy and he

13   shouldn't be rewarded with that.

14           We should be able to have an investigation, which

15   can be funded, and allow all the creditors to share equally

16   in the distributions, Your Honor, because we are real

17   creditors.

18           If, however, Your Honor, by the way finds that she

19   cannot condition dismissal to make sure that parties are not

20   further prejudiced by the egregious conduct of this debtor,

21   I think that weighs even more in favor of conversion.  I

22   think Your Honor probably can condition it.  But if she

23   couldn't, it weighs more in favor of a conversion to 7

24   rather than dismissal.

25           Creditors have expended a significant amount of

1    time and expense in this case.  And now for it to be pulled

2    out -- the rug pulled out from under us because they pulled

3    the funding, that is very inequitable -- as well as the

4    administrative fees, they should be paid if this case is

5    dismissed -- and we would ask Your Honor to retain

6    jurisdiction regardless to deal with certain issues as far

7    as -- as Mr. Goldman said -- with respect to retainers and

8    things of that nature if Your Honor does dismiss it.

9         But we do think that conversion to a 7 is viable

10   and it is the -- in the best interest of all the creditors

11   to do that, Your Honor.

12        And we don't think it's prejudicial to PAX

13   because, frankly, if they wanted a say in who the trustee is

14   appointed, they can I think under 702.  They can see who the

15   -- you know, have a say in --

16        THE COURT:  They can all elect the trustee, right.

17        MS. CALLARI:  Yeah.

18        THE COURT:  But I have a question or two you.

19        MS. CALLARI:  Yes.  Please.

20        THE COURT:  So assume that I agree with you and I

21   convert this case to a Chapter 7, how is your claim -- your

22   clients' claims going to be liquidated?  Because the trustee

23   can't do it.

24        MS. CALLARI:  Correct, Your Honor.

25        THE COURT:  So then your claim has to still be

1     tried outside this court in the New York Court as do the

2     other personal injury claim claimants' claims.

3         MS. CALLARI:  Yeah.  So certainly with respect to

4     Rui Ma, Your Honor, has that proposed order -- Your Honor

5     has had that proposed order and we presumed you were waiting

6     until after this to lift the stay in order to have her

7     proceed in state court.

8         So, yes, for certainly Rui Ma we would anticipate

9     that that would be litigated back in state court.

10         THE COURT:  So what's a trustee going to do with

11     that claim?  I'm trying to --

12         MS. CALLARI:  No.  I understand.

13         THE COURT:  I'm trying to -- what is a Chapter 7

14     trustee going to do with that claim?

15         A Chapter 7 trustee has to wait --

16         MS. CALLARI:  Yeah.

17         THE COURT:  -- until that claim is liquidated,

18     right?

19         And then depending upon what you do, which is

20     completely your clients' rights under applicable non-

21     bankruptcy law, there's a trial, whatever the decision is is

22     the decision.  Somebody may appeal it.  Somebody may not.

23     But let's be honest, it's likely there will be an appeal, so

24     that case could go on for years before that claim is

25     liquidated, correct?

87

1          MS. CALLARI:  It could.

2          THE COURT:  Yeah.

3          MS. CALLARI:  And it also could be liquidated

4     pretty promptly.

5          THE COURT:  Okay.

6          MS. CALLARI:  We don't know.  So --

7          THE COURT:  But not in this court.

8          MS. CALLARI:  No.  Her claim would have to be

9     liquidated in the state court.  Or generally personally

10    injury claims, Your Honor -- I do think that when you have

11    personal injury claims sometimes a bankruptcy court can set

12    forth a mediation process and --

13         THE COURT:  Not in a -- not under 28 U.S.C. --

14         MS. CALLARI:  Correct.  You can estimate --

15         THE COURT:  -- 157(b)(2)(B) in a Chapter 7 case

16    where the claims are contingent and unliquidated.  The

17    statute is very clear that it's not a core proceeding.

18         And so one of the problems that we have in this

19    case is that those are the types of claims that the trustee

20    is going to be met with, right?

21         MS. CALLARI:  Correct.

22         THE COURT:  So what's -- so my questions is, so

23    what's the trustee supposed to do?

24         MS. CALLARI:  The trustee --

25         THE COURT:  Keep the case open for years until --

88

1    and then investigate with no funds?

2         I mean, I hear what you're saying about a funding

3    issue, but why couldn't the committee have funding funders

4    right now?

5         They could have the -- the committee could have

6    litigation funding.  Why couldn't they?

7         MS. CALLARI:  They couldn't at this point, because

8    within the last two weeks, to try to get that when you knew

9    your were facing a dismissal and the committee would be

10   disbanded, was not practical.

11        THE COURT:  Okay.  But the dismissal -- I

12   understand what you're saying about the debtor's position on

13   dismissal.  But PAX's position on dismissal has been clear

14   for some time.  In fact, they agreed to extend the hearing

15   period out because the code required that a hearing be --

16   happened within 30 days and it didn't.

17        You know, all I'm saying to you is a Chapter 7

18   case, the Chapter 7 trustee, what's the Chapter 7 trustee

19   got to work with?

20        MS. CALLARI:  So there's two things.

21        One, on your point about the committee, until two

22   weeks ago, the committee had funding from the debtor.  They

23   pulled the funding so we didn't need to go see --

24        THE COURT:  Well, they didn't have funding.  It

25   hadn't been approved yet.  Okay?

89

1          MS. CALLARI:  This is true.

2          THE COURT:  So no one had funding.

3          MS. CALLARI:  But we anticipated there would be

4     some sort of funding, so we --

5          THE COURT:  I understand that.

6          MS. CALLARI:  Right.

7          THE COURT:  But it hadn't been approved yet.  And

8     that's how the process works, right?

9          MS. CALLARI:  Yes.

10         THE COURT:  Just how -- we have to remember how

11    the process works.

12         So they didn't have funding.  There was no funding

13    that was authorized by the Court.  The Court took that

14    funding under advisement.

15         And then the debtor decided -- or I shouldn't say

16    the debtor -- the funder, the loan -- the lender decided to

17    withdraw its funding commitment and the debtor withdrew the

18    motion for the DIP financing.

19         So I understand every thing you're saying, but

20    there's a process the Court has to follow, right?

21         I mean, we talk about litigation funding,

22    contingent special counsel.  Just because people say that

23    can happen doesn't mean it will happen.  The Court still has

24    to approve those applications.  And if those applications

25    aren't approved, then there isn't going to be this plan to

90

1    go down the way that people have, you know, suggested.

2        The problem is there's a lot of different concerns

3    when -- if and when this case converts to a Chapter 7 as

4    opposed to staying -- staying a Chapter 11.

5        So, again, the Court can deny dismissal, could

6    deny conversion, could deny the appointment of a trustee.

7    That's what I'd have to find.

8        Attorney Goldman is correct.

9        And the issue is what are we going to do?

10       And I think I said that I think a week or so ago

11   when you all stipulated that cause exists.  Okay.  Great.

12   That's very helpful to the Court.  And I appreciate that

13   everybody's stipulating that cause exists, but I have to do

14   one of those things, right?

15       So I have to figure out what is the best thing to

16   do in this case.  And the concerns about conversion are

17   many.  Handing this to a Chapter 7 trustee to do what?

18   What's the Chapter 7 trustee going to do?

19       The Chapter 7 trustee has no available assets to

20   do anything.

21       You're talking about possibly getting a litigation

22   funding source.  Okay.  But that has to be approved and it

23   might not be approved.

24       And there has to be a plan.  And if the plan -- I

25   don't mean a plan of reorganization, that's not what I mean.

91

1   I mean -- I don't mean the word plan as used in the

2   bankruptcy code -- there has to be a way to accomplish what

3   you're trying to accomplish.

4           And a Chapter 7 trustee won't have anything to

5   work with.

6           MS. CALLARI:  Thank you, Your Honor.

7           Either a Chapter 11 or a Chapter 7 trustee, Your

8   Honor, we believe will have funding.  I know it's not here.

9   But to the point was, is that even though Your Honor had not

10  approved it yet, the committee did not have a need to go

11  look for funding before May 11th.  That was the first part.

12  We believed there was funding.

13          THE COURT:  That's fair.

14          MS. CALLARI:  And now a Chapter 11 or a Chapter 7

15  trustee, we are asserting, would be able to receive the

16  necessary funding to go after, for instance, the yacht.  It

17  shouldn't take that much to proceed with that litigation.

18  And if that actually goes the way we think it will, there

19  would be ample funding for this case.

20          THE COURT:  Well, how is a Chapter 7 trustee going

21  to go after the yacht?  Explain that to me.

22          MS. CALLARI:  It can't marshal -- it can marshal

23  assets the way it does in any other case.

24          THE COURT:  But right now there's no finding in

25  this court that the debtor owns the yacht, so how's a

92

1    Chapter 7 trustee going to marshal the yacht?

2         MS. CALLARI:  Eleven or a -- Chapter 11 or a

3    Chapter 7 would have to have a finding made first.

4         THE COURT:  Well, right now, there's an order for

5    relief from stay --

6         MS. CALLARI:  Right.

7         THE COURT:  -- governing what happens with the

8    yacht, right?

9         MS. CALLARI:  Yes.

10        THE COURT:  Which is the yacht has to come back

11   into the jurisdiction.  And then, if it does in a timely

12   manner, then the $37 million goes back to the party that

13   posted the money and then the yacht's there.  Where?  Either

14   in Connecticut or New York depending upon how things are

15   developed.

16        So how's a Chapter 7 trustee going to marshal the

17   yacht?

18        MS. CALLARI:  Just like you would in a Chapter 11.

19   You --

20        THE COURT:  But the debtor doesn't own the yacht

21   in this court.  There's been no findings.  So he'd have to

22   start some cause of action, wouldn't he?

23        MS. CALLARI:  Right.  Yes.

24        THE COURT:  So who's going to pay to do that?

25        MS. CALLARI:  That's where the funding comes in.

93

1          THE COURT:  And who's -- who's going to defend to

2     do that?

3          And then when the trustee does that, then PAX is

4     going to object and say it's already -- it's already been

5     determined in the New York State Court.  So you can't undo

6     the judgment of the New York State Court judge.

7          You can't -- you can't do that.  There's going to

8     be collateral estoppel effects, right?

9           There hasn't been an appeal.  There's all kinds

10    of issues here, right?

11         So, as I said, my issue with -- there's -- I have

12    issues with every path.  Okay?

13         But with regard to the Chapter 7, I don't know

14    what a Chapter 7 trustee is supposed to do or can do.  The

15    Chapter 7 trustee could come here and say they're going to

16    do 18 things, but if they don't have the right to do those

17    things or a funding source to do those things, then there's

18    no point in converting the case to a Chapter 7.

19         MS. CALLARI:  Yeah.  And we --

20         THE COURT:  There's no point.

21         MS. CALLARI:  And we believe that the Chapter 7

22    trustee would -- and, again -- or a Chapter 11 trustee --

23    but either way -- would have the ability to have funding

24    sufficient to have this court adjudicate that it is property

25    of the estate, and that's what we would expect them to do,

94

1    and do the marshaling first before they deal with actually

2    adjudicating the claims.

3              Which the other litigations are generally going to

4    be stayed, so that reduces costs.  People talk about costs

5    --

6              THE COURT:  Well, I don't agree with that.  You

7    don't want yours stayed, right?

8              And other claimants may come in and seek relief

9    from a stay too --

10              MS. CALLARI:  They may.

11              THE COURT:  -- and want their claims adjudicated

12    outside of this court.

13              And so what I'm saying to you is -- I'm just

14    trying to understand -- your client in particular has what

15    is -- apparently no ruling has been made, but what is a

16    personal injury tort claim that under the United States code

17    Congress decided this court can't decide.  Okay.  And *Stern*

18    supports that, right?

19              And even *Wellness* supports that because no one is

20    consenting to this court adjudicating that claim.  Okay?

21              So the -- it can't be adjudicated here.

22              MS. CALLARI:  Correct.

23              THE COURT:  So all the other claims that we talked

24    about -- and I don't -- I don't have the figures in front of

25    me right now -- but the claims other than PAX's claims I

95

1    believe -- and you should all correct me -- but more than

2    half of them are personal injury tort claims.  And if

3    they're personal injury tort claims, they cannot be --

4    estimate -- the statute says -- and I think I can recite it

5    -- liquidated or estimated for purposes of distribution in a

6    case under title 11.

7              All Congress decided that a bankruptcy court could

8    do as a court proceeding is estimate claims in connection

9    with a plan in a Chapter 11, 12 or 13 case.  But it says you

10   cannot -- a bankruptcy court cannot liquidate or estimate

11   personal contingent and unliquidated personal injury tort

12   claims and wrongful death claims for purposes of

13   distribution in a case under title 11.

14             So a trustee can't do that.

15             MS. CALLARI:  Right.

16             THE COURT:  I mean, the Chapter 7 trustee can't do

17   that.  He/she's hands are already tied from the start.

18             So then they have to -- then they're going to try

19   to find assets that -- the debtor's going to fight that.  I

20   mean, look at what's going on for the last 15 years or how

21   many years it's been.

22             If you do think the debtor's not going to fight

23   the attempt to have the boat be deemed an asset of the

24   estate, I mean, of course they're going to fight it.  And

25   then anything else you do.

96

1          And then -- so how much money is there going to be

2     to fund this Chapter 7 estate on claims that are at this

3     point -- at this point -- I'm not saying couldn't change --

4     but at this point they're speculative, right?

5          So the concern is that a Chapter 7 trustee, from

6     the Court's view of this case at this point, I don't know

7     how the Chapter 7 trustee can carry out the duties that are

8     required under the code under the facts and circumstances of

9     this case.

10          MS. CALLARI:  Thank you, Your Honor.

11          We do think the funding is -- could be available

12     and we do think that the trustee could marshal the assets

13     while the claims are being litigated and then brought back

14     here to be distributed, the alternative of having it

15     dismissed, and basically having PAX be able to grab it all

16     and each individual creditor have to then adjudicate

17     individually to go after each -- after each asset.  We don't

18     think that's in the best interest of creditors.

19          But I understand Your Honor's concern.  But we do

20     think a conversion or a Chapter 11 is certainly better than

21     a dismissal for the creditors, Your Honor.  Thank you.

22          THE COURT:  Okay.  I appreciate that.  And I'm

23     just asking you the questions --

24          MS. CALLARI:  Yeah.  I appreciate that.

25          THE COURT:  -- specifically because of your

97

1  clients' claims.

2          MS. CALLARI:  I appreciate that.  Thank you, Your

3  Honor.

4          THE COURT:  All right.  Thank you.

5          Attorney Claiborn?

6          MS. CLAIBORN:  Good afternoon, Your Honor.  Holley

7  Claiborn for the U.S. Trustee.

8          THE COURT:  Good afternoon.

9          MS. CLAIBORN:  This case has now devolved to a

10  simple, but difficult place.  Cause has been found under

11  section 1112(b) and it's now the Court's difficult and heavy

12  duty and burden to make a choice.

13          The debtor has admitted that the relief available

14  under 1112(b)(2) is no longer in play, so that puts the

15  choices for a form of relief to the three that we've

16  discussed briefly today, dismissal, conversion, or a Chapter

17  11 trustee.  And each of them admittedly has its own

18  challenges and impact on the constituencies of this case.

19          The U.S. Trustee has no preference for which form

20  of relief the Court should choose.

21          And with respect to the relief of an examiner that

22  was requested in the U.S. Trustee's motion at ECF 102, that

23  relief, provided the Court makes an immediate decision as to

24  dismissal, conversion, or a Chapter 11 trustee, will become

25  moot.

98

1           I want to make clear to the Court, Your Honor,

2     that is the U.S. Trustee's job to point out that in this

3     particular case, and consistent with all Chapter 11 cases,

4     that should the Court determine a Chapter 11 trustee is the

5     most appropriate relief, that such a trustee should have the

6     powers and the rights bestowed by the code in section 1106,

7     and that there is no authority to limit them or prescribe

8     them or control them.

9           If the Court determines today that dismissal is

10    the most appropriate relief, then this case should be

11    dismissed immediately and not conditioned on any event, and

12    nor should the dismissal be in conjunction with any event.

13          Fee applications for retained professionals can be

14    filed and determined after dismissal.

15          And in the end, Your Honor, I think the most

16    important point -- and it's a hard one -- is that this case

17    needs a swift decision.  But the Court has before it the

18    facts that would enable the Court to make a choice.  And in

19    the end, in urging a swift decision, I want to point out

20    delay negatively affects the creditors and does reward the

21    debtor.  Thank you, Your Honor.

22          THE COURT:  Thank you.

23          Mr. Friedman?

24          MR. FRIEDMAN:  Your Honor, I just want to make

25    some brief rebuttal points.

99

1          The first is that counsel for the committee and

2     others argue that the debtor would be rewarded by having

3     this case go away.  It's just not true.  People are going to

4     get the debtor's assets one way or the other.

5          The second point -- to the extent they exist.

6          The second point is I didn't fully -- I think

7     there was reference to the fact that Chapter 7 could be

8     useful because maybe the -- Mr. Kwok wouldn't get

9     discharges.  Of course, outside of bankruptcy, he doesn't

10    get a discharge either.

11         Another point I wanted to make, Your Honor, I'd

12    ask you to look at exhibit 27 we filed because --

13         THE COURT:  Of your own exhibits?  Of PAX

14    exhibits?

15         MR. FRIEDMAN:  Exhibit 27.  PAX exhibit 27.

16         THE COURT:  Okay.  Give me one second, please, and

17    I will try to get there.

18         MR. FRIEDMAN:  Thank you.

19         THE COURT:  You'll have to give me a minute.  Do

20    you know what page of the document it starts on?  It's

21    document 404.  Do you know what page exhibit 27 starts on,

22    because it's 1500 pages.

23         MR. FRIEDMAN:  My apologies.

24         THE COURT:  Oh, 1,149.

25         MR. FRIEDMAN:  Thank you.

1          THE COURT:  There you go.

2          MR. FRIEDMAN:  That's amazing.

3          THE COURT:  Staff that is --

4          MR. FRIEDMAN:  That's amazing.

5          THE COURT:  That is amazing.

6          MR. FRIEDMAN:  That's amazing.  Thank you.

7          THE COURT:  That is amazing.

8          MR. FRIEDMAN:  Your Honor, this is our summary of

9    claims.

10          And one of the reasons that Mr. -- counsel for the

11    committee, Mr. Goldman, in his thoughtful argument said that

12    the *Sapphire* case could be distinguished is because there

13    people had other -- other people that they could pursue.

14          And I just wanted to observe that when you look at

15    our summary of cases, which is in evidence, many of the

16    defendants -- I'm sorry -- many of the plaintiffs also have

17    other parties that they can go after.

18          If you look on page 2, the last claim, the *Keyi*

19    *Zilkie* claim is against GTV, Saraca and Mr. Guo, Miles Gwok.

20    On the next page, the Zheng Xu Dong case is against GTV,

21    Saraca and Wayne Guo.  The next case is against Voice of Guo

22    and Miles Guo.  And on and on.

23          And in particular, Your Honor, I would note -- and

24    like the Rui Ma allegations, I said it before, earlier in

25    this case, I'm not diminishing at all what happened to her.

1          I would say, if you look at the Rui Ma case, it's

2     not just against Mr. Kwok.  My understanding is that Golden

3     Spring New York is also a defendant in that case.  We know

4     that Golden Spring New York had at least $8 million to fund

5     a DIP.  So there is a co-defendant that can be pursued in

6     that case even if Mr. Kwok doesn't have money.

7          So I just note that there are other pockets of

8     potential availability -- available recoveries, not just Mr.

9     Kwok.

10         Your Honor, there are -- also in Rui Ma's

11    counsel's arguments -- I didn't count them, but there are a

12    lot of if's and could be's about funding -- there's no

13    evidence.

14         You know, people were regrettably, you know, taken

15    in by the debtor's offer of finance or arrangement of

16    potential financing -- which we opposed from the outset --

17    and here we are in a case that we thought never should have

18    been filed that didn't have -- that still doesn't have

19    funding.

20         Counsel tried to argue that we're only owed $46

21    million when we have judgments for more than $260 million.

22         And while it's true I guess that I don't get to

23    call people -- not creditors -- people don't get to also say

24    that PAX isn't owed $261 million because it is.

25         The last point I would make, Your Honor, is simply

1    that we stand by our citations in the cases that we cited --

2    that we filed on Friday and that we referenced today that

3    stand for two propositions:

4            Fundamentally, it's not necessary that the

5    interest of every creditor actually favor conversion.  And

6    the interest of a single creditor can matter.

7            Where that line is drawn -- let's say, you know,

8    one person had 99 percent of the claim, one person had 1,

9    there's no hard and fast rule.

10            But I think the Court can clearly take into

11    account from *Acme*, from *Staff*, which cited the *Goodrich*

12    *Lines* cases, is that the Court's discretion -- which is

13    substantial in this case -- can take into account the

14    disparity in claims and what people are entitled to.

15            And, again, I think, you know, we cited a variety

16    of cases that do stand for the proposition that it's okay to

17    dismiss a case even if one creditor will potentially wind up

18    with a better result.

19            I can't predict the future.

20            I will say that, with respect to the apartment in

21    the Sherry-Netherland, there is an enormous wood -- amount

22    of wood to chop with respect to PAX having to take on, you

23    know, to continue its undertakings to demonstrate that that

24    trust agreement is bogus.  It's not right there for the

25    picking.  We have work to do.

1          And, you know, we don't know what will happen with

2     other creditors.  Perhaps other creditors will come to

3     arrangements with Mr. Kwok.  We have to take that risk.

4          And so, for those reasons, and the practical

5     reasons that we've identified as to why we believe this case

6     is not well suited to a Chapter 7 conversion, we, you know,

7     we believe that dismissal is the right option.

8          I do -- I will say we agree with the U.S. Trustee

9     that if the Court were to conclude that the right path is a

10    Chapter 11 trustee, obviously we strongly support dismissal,

11    but there should be no fetters on any power that a trustee

12    has.

13         And with that, Your Honor, I have nothing further.

14         THE COURT:  Thank you.

15         Mr. Jonas?

16         MR. JONAS:  Your Honor, Jeff Jonas, Brown Rudnick,

17    for the debtor.  I will be brief.  And I'll say I do stand

18    on my previous argument supporting dismissal for cause under

19    1112(b)(1) and (4)(A).

20         I would note in that regard interestingly no one

21    opposing dismissal addressed the arguments I made earlier

22    with respect to the standard being prejudice to creditors

23    and that prejudice is determined by looking at whether any

24    of their -- those creditors' pre-petition legal expectations

25    are prejudiced, which in this case they are not.

1          I really rise, Your Honor, only to make the record

2     clear that the debtor does refute and refutes the many

3     disparaging comments that have been made about him.  Lawyers

4     here have made many bald, unsupported statements which are

5     not evidence.  And they've come in different forms and

6     flavors, Your Honor.

7          For example, there was a reference to Greenwich

8     Land owning -- in connection with possibly having certain,

9     quote/unquote, "Hidden assets."  Nothing's been proven, Your

10    Honor.  Nothing's been demonstrated.  Just the bald

11    allegation which might as well be that certain neighbors and

12    friends and other family members have assets that are

13    allegedly hidden assets.

14         Secondly, Your Honor -- and these are just by way

15    of some quick examples I noted while presentations were

16    being made -- Ms. Callari referred to certain charges that

17    exist in China.  Again, no evidence, just the bald

18    statement.  It's not evidence.  It shouldn't be given any

19    worth or any voracity at all.

20         Third, litigation funding.  There is zero

21    evidence.  It is utter and complete speculation and

22    conjecture.  There's no evidence before the Court.

23         I'll add my own speculation that the committee --

24    and probably Ms. Callari -- have been running around

25    feverishly over the last few weeks looking for some

1    financing so they could come before the Court and present

2    some evidence.  They have none.  So from that I'll infer

3    that none exists.

4         But nevertheless, I don't want to pile on my own

5    speculation.  I'll just leave it that there is no evidence

6    at all before the Court in that regard.

7         So all of the Court's concerns are -- at least our

8    concerns -- and I think Mr. -- as expressed by other parties

9    that there won't be funding, that's the only evidence that

10   there is.

11        Again, Your Honor, we would urge dismissal.  Thank

12   you, Your Honor.

13             THE COURT:  Thank you.

14             Mr. Goldman?

15             MR. GOLDMAN:  Yes.  Thank you, Your Honor.  Just a

16   few brief points, Your Honor.

17        On this idea of all these claims constituting

18   personal injury or wrongful death claims, which obviously

19   under section 128 U.S.C 157 --

20             THE COURT:  (b)(2)(B).

21             MR. GOLDMAN:  Thank you.

22        -- the Court doesn't have jurisdiction.  It has to

23   be tried in a district court, unless of course relief from

24   --

25             THE COURT:  That's not -- that's not the trial.

106

1    The trial section is (b)(5).  (b)(2)(B) talks about the

2    estimation or liquidation of contingent --

3              MR. GOLDMAN:  Correct.

4              THE COURT:  -- and disputed personal injury

5    claims.  That's different from --

6              MR. GOLDMAN:  Correct.

7              THE COURT:  -- the trial issue under (b)(5).

8              MR. GOLDMAN:  You're quite correct.

9              So there can't be estimated as well under 502(c)

10   except under Chapter 11.

11             THE COURT:  Or 12 or 13 in a context of a plan.

12             MR. GOLDMAN:  Or 12 or 13.  But certainly that

13   doesn't prevent them from being liquidated upon relief from

14   stay in their court of origin.

15             And certainly the debtor could defend, especially

16   since they are potentially non-dischargeable under section

17   523(a)(6) as willful and malicious injury.  So certainly the

18   debtor would have an interest in doing that.

19             I would also point out that I don't think it's a

20   given that all of these claims, for example, the claims

21   based on defamation, would constitute personal injury tort

22   claims of the type that you can't estimate were of the type

23   that under -- you mentioned (c) --

24             THE COURT:  (b)(2)(B).

25             MR. GOLDMAN:  -- (b)(2)(B), but also (b)(5) --

1            THE COURT:  (b)(5) --

2            MR. GOLDMAN:  Yeah.

3            THE COURT:  -- is where it says the district --

4            MR. GOLDMAN:  Yeah.

5            THE COURT:  -- court has to try those claims.

6            MR. GOLDMAN:  Exactly.

7            THE COURT:  Right.

8            MR. GOLDMAN:  I don't think it's a given that the

9    defamation claims are of the type of claim that fit --

10           THE COURT:  There is all kinds of case law about

11   that.

12           MR. GOLDMAN:  Yes.

13           THE COURT:  And I agree with you.

14           MR. GOLDMAN:  So there is a division of authority.

15   And of course the one *Gawker Media* goes the other way.

16           So I don't think, unless Your Honor has a

17   definitive opinion on that, you can conclude that, hey, all

18   of these can't be estimated or that, you know, you don't

19   have jurisdiction to preside over a claims objection.

20           You know, as far as how a Chapter 7 trustee would

21   marshal the yacht, here's how I would envision it.

22           There is a pending adversary proceeding right now

23   that squarely presents the issue of whether this yacht is

24   property of the estate or not.  A Chapter 7 trustee could

25   certainly replace, or it would be proper to replace the

1    debtor, or substitute himself as a party in that adversary

2    proceeding and get special counsel.

3            I am very confident that we could find special

4    counsel that would take this on some sort of contingency

5    fee, which would be negotiable.

6            The trustee would then move to make a dispositive

7    motion based on the preclusive effect of Judge Ostrager's

8    findings, which we believe do have preclusive effect.  Your

9    Honor would then decide whether that does have actual

10   preclusive effect to make the boat property of the estate.

11   That is not an elaborate proceeding and it really -- I would

12   suggest -- has a substantial likelihood of getting done.

13           And if that does happen, we don't even need the

14   litigation funding.

15           So that's the -- that is the lowest hanging fruit.

16           I think, Your Honor, there are a couple options

17   that Your Honor could consider here.

18           Since we've only had a couple of weeks to, for

19   example, look for litigation funding and no time to look for

20   any contingency counsel, you could convert the case with the

21   idea that we would be given time to locate the funding.  And

22   if during that time period nothing could be located or we

23   can't locate special counsel, the case could then be

24   dismissed.

25           And I didn't really mention the third option,

1    which is the Chapter 11 trustee option, which would allow

2    some of these claims to get estimated.

3            You know, the committee is not adverse to the idea

4    of negotiating an equitable division of whatever assets the

5    debtor has with PAX.  We are not unmindful of the efforts

6    that PAX has made in chasing this debtor and getting its

7    judgment.  And I think the committee would -- let me just

8    say -- be reasonable in negotiating a plan with PAX that

9    gives some recognition to their pre-petition efforts.

10           And certainly a creditors' plan of reorganization

11   is achievable in this case.  All it has to provide is the

12   marshaling of the assets.  We would even -- maybe PAX's

13   counsel wants to be the special counsel.  We would have no

14   problem with that.  And the debtor would not retain any

15   interests in property.

16           So a Chapter 11 trustee, where the creditors have

17   an ability to negotiate a plan, I think is also a viable

18   option here.  So I would --

19           THE COURT:  Well, you're the first one that said

20   that.

21           MR. GOLDMAN:  Well, I do think as opposed --

22           THE COURT:  And so no one else has said that.  So

23   if you're --

24           MR. GOLDMAN:  No.

25           THE COURT:  So if you're thinking that that's a

1    possibility, then --

2                MR. GOLDMAN:  I would --

3                THE COURT:  -- are you asking that you have an

4    opportunity to talk to parties about that?  Is that what

5    you're asking?

6                MR. GOLDMAN:  Well, I would love the opportunity

7    to talk to parties about that, except that I'm not sure the

8    discussions would be productive.  Because I think -- I think

9    PAX would prefer Your Honor to rule first on whether

10   dismissal --

11               THE COURT:  Well, I have to rule by the way under

12   the code, so I don't have a choice unless you all decide

13   something different.  I have a -- I have a -- I have no

14   choice.  Once the hearing starts, right, don't I have to

15   rule -- I don't have it in front of me, but I'm sure PAX

16   knows -- I think I have to rule in 15 days or something like

17   that, don't I?  At the conclusion of the hearing.

18               I don't have a lot -- as I said, I don't know, two

19   months ago -- there isn't a big window of opportunity in

20   this case.  I tried to make that -- maybe I didn't do a very

21   good job -- but I tried to make that very clear to all

22   parties that this is not a case where the Court has

23   discretion.

24               Congress made the changes to the code, right?

25               That's what -- I have no choice.  I have no

1    discretion.  I don't.  Yeah.  It says here, Attorney Goldman

2    -- I know you probably know this too -- after the -- the

3    Court shall commence the hearing on the motion under 30 days

4    unless the movant consents to a specific time frame, which

5    the movant did, which is today, right?

6            And then decide the -- and shall -- no discretion,

7    right -- and shall decide the motion not later than 15 days

8    after the commencement of such hearing.

9            So I am where I am, right?

10           There's not a lot I can do unless you all have

11   some other plan.  I don't think you're going to have another

12   plan today.

13           I'm not going to write a decision between today

14   and tomorrow.  That's not going to -- I mean, I just can't.

15   I have other hearings.  We have other things.  But I have to

16   decide within 15 days of today.

17           MR. GOLDMAN:  Understood, Your Honor.

18           I think what -- what I think is going to obstruct

19   or not provide for conducive discussions about a Chapter 11

20   trustee is the fact that PAX would rather Your Honor just

21   rule on dismissal.  And so I'm not -- I don't think I'm

22   going to be able to engage them in a discussion until that

23   ruling comes down.

24           What Your Honor could do though, in ruling on this

25   motion, is to appoint a Chapter 11 trustee and provide an

112

1    opportunity for a period of time for -- without prejudice --

2    to revisiting that order depending on what happens within

3    the first 30 days of the case or so.

4          In other words, you could still meet your

5    statutory obligations and come back to this issue within a

6    defined period of time to determine whether the case should

7    be dismissed based on what we are able to accomplish when a

8    Chapter 11 trustee is appointed and that would still satisfy

9    the statutory obligation of ruling.

10         THE COURT:  I hope the --

11         MR. GOLDMAN:  But it keeps options open is the

12   point I'm making.

13         THE COURT:  I understand your point.

14         MR. GOLDMAN:  That's all.  That's all I have, Your

15   Honor.

16         THE COURT:  Okay.  Thank you.

17         Does anyone else wish to be heard?

18      (No audible response.)

19         THE COURT:  Okay.  As I just noted for the record,

20   I have to rule on this decision --

21         Oh, is there something else you'd like to add?

22         Oh, yes.  We have to finish the exhibits, right?

23   The exhibits.  The transcripts.

24         Attorney Goldman, there were some references made

25   to some of the transcripts by Attorney Friedman.

1          MR. GOLDMAN:  No.  No objection.

2          THE COURT:  No objection.

3          All right.  So then all of PAX's exhibits are

4    admitted in full except for 7, 8 and 31.  Was that the other

5    one?

6          MS. ARONSSON:  That's right.  Thanks, Your Honor.

7    And I have some references if it would aid the Court for the

8    transcripts.

9          THE COURT:  Yes.  Please.  Go ahead.

10          MS. ARONSSON:  For PAX 18, we would direct the

11   Court to pages 21 to 28.  For PAX 20, we direct the Court to

12   pages 8 to 19.  And for PAX 21, we direct the Court to pages

13   11 to 20.

14          THE COURT:  Okay.  Thank you.

15          MS. ARONSSON:  Thank you.

16          THE COURT:  Attorney Goldman?

17          MR. GOLDMAN:  May I make one further point, Your

18   Honor?

19          THE COURT:  Yes.  They can't hear you though.

20          MR. GOLDMAN:  Okay.

21          THE COURT:  Speak into the --

22          MR. GOLDMAN:  Okay.

23          THE COURT:  You can speak right next to you to

24   Attorney Aronsson.

25          MR. GOLDMAN:  Okay.  I know this may not be a

1    specific factor under 1112(b), but Your Honor knows from the

2    litigation budget that was filed in connection with the DIP

3    motion, at the end of April, we had incurred almost $200,000

4    in fees.  That number has obviously escalated.

5         It just would be I think a travesty to the process

6    that a committee is appointed, they retain counsel on the

7    reliance of the process moving forward -- we did our job for

8    the committee -- and now to just dismiss the case with all

9    those fees being unpaid I think is a disservice to the

10   process.

11        THE COURT:  I understand.  Thank you.

12        Does anyone else wish to be heard?

13     (No audible response.)

14        THE COURT:  All right.  So that the record is

15   clear, on April 6th, 2022, the creditor, Pacific Alliance

16   Asia Opportunity Fund, LP, filed a motion to dismiss the

17   case for cause, or in the alternative, a partial joinder to

18   the U.S. Trustee's motion for an order directing the

19   appointment of a Chapter 11 trustee.

20        We have had several hearings in the case at which

21   we've talked about the motion to dismiss.  And we also had a

22   status conference to talk about the motion to dismiss and

23   that status conference was held on April 13, 2022.

24        Following the status conference, and as part of

25   the discussions had at the status conference, the hearing on

1    the motion to dismiss was scheduled to be held today, May

2    25th, 2022, with the consent of the movant, PAX.

3         And we also scheduled a hearing for tomorrow

4    anticipating that we'd have more evidence that might need to

5    be submitted to the Court in connection with the motion to

6    dismiss.

7         At a recent hearing, prior to the hearing on the

8    motion to dismiss, the debtor confirmed through counsel that

9    they were not objecting to the motion to dismiss and

10   consenting to the fact that cause exists under 1112 to

11   dismiss the case.

12        Every other party that has filed a document or a

13   pleading regarding the motion to dismiss has consented to

14   the fact that cause exists.

15        So this court has to make no finding that cause

16   exists.

17        The court only has to make findings with regard to

18   what the cause is and what the ultimate relief will be.

19        And I've stated this on the record before, but I

20   will state it again, that the Court will either dismiss the

21   case, convert the case, or appoint a Chapter 11 trustee, in

22   accordance with the applicable provisions of 1112(b) of the

23   code.

24        I have stated for the record today the exhibits

25   that have been admitted in full in this hearing that have

116

1    been submitted by PAX and the official committee of

2    unsecured creditors.  No other party has submitted evidence,

3    but has joined in those -- in that evidence, which is fine

4    with the Court.

5         I have reviewed the position papers that were

6    filed by all of the parties on Friday, the 20th, regarding

7    those respective positions with regard to the motion to

8    dismiss.

9         And of course have heard all of the parties today

10   make their arguments with regard to the motion to dismiss.

11        As I also indicated, I'm bound by the statute to

12   rule on this motion within 15 days of the commencement of

13   the hearing.

14        The hearing is concluded today there being no

15   further evidence to be submitted or arguments to be made so,

16   therefore, the clock starts to run as far as a decision on

17   this motion to dismiss.

18        I have -- I appreciate all of the arguments that

19   have been made by all of the parties.  They have been

20   thoughtful and thorough.  And you have made your points

21   well.

22        But I do have to make the determination as to

23   which way this case will proceed and I will do so.  And

24   obviously I will do so within 15 days of today.

25        Although I suppose under the Federal Rules of

117

1    Civil Procedure you don't count today, under 9006, at rule

2    6, you don't count the day -- today -- so I think that's

3    correct honestly.

4          But in any event, if you have any other concerns

5    or questions regarding the motion to dismiss, I am generally

6    available for a conference.  But in the meantime, I'm going

7    to be ruling on the motion to dismiss.

8          Okay.  Does anyone have any further questions?

9       (No audible response.)

10         THE COURT:  All right.  Well, I appreciate the

11   efforts of all the parties.

12         I'm taking the motion to dismiss under advisement

13   and I will rule accordingly.

14         And this is the last matter on today's calendar,

15   so court is adjourned.

16      (Proceedings adjourned at 12:51 p.m.)

17

18

19

20

21

22

23

24

118

1

2          I, CHRISTINE FIORE, court-approved transcriber and

3     certified electronic reporter and transcriber, certify that

4     the foregoing is a correct transcript from the official

5     electronic sound recording of the proceedings in the above-

6     entitled matter.

7

8     *Christine Fiore*

9     _____          April 21, 2022

10       Christine Fiore, CERT-410

11          Transcriber

12

13

14

15

16

17

18

19

20

21

22

23

24

25

119

1                                  INDEX

2     <u>PAX EXHIBITS</u>:                                      <u>Rec'd</u>

3     1-6, 9-17, 23-29, 31                                    8

4

5     <u>CREDITOR'S COMMITTEE EXHIBITS</u>:

6     1-14                                                    16

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25