# **EXHIBIT PAX 01**

Declaration of Dexter White and Appendix 1

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

| | |
|---|---|
| In re: | Chapter 11 Case No. |
| HO WAN KWOK[1] | 22-50073 (JAM) |
| Debtor. | September 23, 2022 |

**DECLARATION OF DEXTER WHITE IN SUPPORT OF PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.'S LIMITED OBJECTION TO HK INTERNATIONAL FUNDS INVESTMENTS (USA) LIMITED, LLC'S MOTION FOR ORDER ESTABLISHING REPAIR RESERVE FOR THE LADY MAY**

I, Dexter White, declare under penalty of perjury that the following is true and correct:

1. I am the President and CEO of Engineering Operations and Certification Services, LLC ("EOCS"), an engineering and operations consultancy based in Connecticut. In this role, I oversee the provision of EOCS's services, which include engineering, design-build processes, program management, operations performance and assessments, facility assessments, improvements and certification, nuclear engineering and compliance, incident investigation, and marine surveys. I have spent the last four decades as a shipbuilder and operating engineer, leading teams to resolve operational problems, through root-cause analysis, mapping, and developing design and operational changes. I have participated in and overseen the testing for seaworthiness, certification, and delivery of hundreds of sea vessels, including 50 U.S. Navy submarines. I hold a bachelor's degree in Business Administration and Shipyard Management from the University of New Haven, and have held a United States Coast Guard Master Captain's License. I am a member of the Association of Certified Marine Surveyors, the International Association of Marine Investigators, the Society of Naval Architects & Marine Engineers, and

---

[1] The last four digits of the Debtor's taxpayer identification number are 9595.

1

the American Society of Naval Engineers.

2. I and my team were retained by counsel for Pacific Alliance Asia Opportunity Fund L.P. ("PAX") to assist in performing an inspection to assess the condition of the Lady May. I submit this Declaration in support of PAX's Limited Objection to HK International Funds Investments (USA) Limited, LLC's ("HK USA") Motion for Order Establishing Repair Reserve for The Lady May (the "Repair Reserve Motion") [ECF No. 728]. I have read the Repair Reserve Motion and the exhibits attached thereto. Unless otherwise indicated below, I have personal knowledge of the matters set forth below, and if called as a witness, I could and would testify competently thereto.

**July 13, 2022 Inspection**

3. On July 13, 2022, at Steelpointe Harbor Marina in Bridgeport, Connecticut, I conducted a visual inspection and took notes and photos of the Lady May's engine room, midship hold, anchor locker, tender stowage, galley and crew quarters, owner and guest accommodations, salon, dining room, bar, bridge, decks, and freeboard above the waterline (the "July Inspection").

4. The July Inspection revealed deficiencies that could incur a significant expense of restoring systems to satisfactory operational standards, including, for example:

    a. A failed starboard diesel engine fuel pump. The fuel pump supplies diesel fuel to the injectors to run the engine. Once replaced, a post-installation test will be needed to confirm the operational status of the engine. Based on this deficiency, issues with the port diesel engine are also possible and will likely require an inspection of the port diesel fuel pump to rule out. The inspection of the starboard engine fuel pump (once removed from the engine) found (i) damage to the gears and (ii) metal shards contaminating the engine's internal parts. Extensive repairs are required to restore the starboard engine before a sea trial can be conducted.

      b.      The starboard stabilizer exhibited a hydraulic noise during operation due to a faulty check valve. A replacement check valve is on order, but a test must be done to verify (i) the noise no longer exists, and (ii) suitable operation of the stabilizer.

      c.      The bow thruster brakes in "bypass" mode. The bow thruster is used to maneuver the ship sideways near piers. The condition requires troubleshooting to determine the root cause and repairs if necessary.

      d.      A damaged paint area (about 3' x 3') at the starboard bow near the anchor, requiring a much larger paint repair area to refinish the hull. Moreover, a structural inspection is necessary to verify the damage is to the paint only.

5.      In addition, 26 valves require testing (i.e., the "Valve Service" described in the Repair Reserve Motion). The Valve Service will require technicians to remove, test, and, reinstall each valve. This testing may reveal the need for additional work (such as removal of interferences or installation of replacement parts) and subsequent retesting.

**August 25, 2022 Dive Inspection**

6.      I also oversaw an August 25, 2022 dive inspection, which was conducted by Harrington Diving & Marine Services (the "Dive Inspection"). The Dive Inspection involved a close visual and physical examination of the entire submerged components of the vessel.

7.      The Dive Inspection found a loose anode bolt at the bow thruster, which caused the anode to rattle. Anodes are metal coupons that are designed to preserve the hull and propeller from corrosion. If the loose bolt is left unaddressed, extended bow-thruster operation could cause the anode to break free, which could in turn damage the bow thruster.

8.      The Dive Inspection also found that the hull of the vessel was covered in sea growth. To fully understand the Lady May's condition, a more detailed inspection is necessary after the vessel is hauled out and the bottom is power washed to clear away the sea growth.

**Costs Unaccounted for in Repair Reserve Motion**

9.      I have reviewed the Repair Reserve Motion and the exhibits filed therewith [ECF

Nos. 728-1 through 728-16]. It is my view that the Repair Reserve Motion omits certain items and factors that render insufficient the proposed $759,836.41 repair reserve (the "Proposed Repair Reserve Amount").

10. **Risk.** The Proposed Repair Reserve Amount does not adequately factor in the risk associated with (i) not having a fully defined scope of repairs, or (ii) prolonged time out of water awaiting repairs. Based on my experience in the marine industry, I am aware there is an accepted risk classification system that provides for risk-factor multipliers to be added to cost estimates, and I consistently rely on this classification system when advising on potential project costs.[2] For example, for a repair project with the lowest level of risk—Class 1—project-cost estimates should be increased by up to 15%. Class 1 repair projects are characterized by (i) a full and detailed understanding of the necessary repairs and deliverables based on a thorough inspection onboard ship, and review of drawings and material lists, and (ii) a low likelihood that new repairs or issues will arise as the repair project progresses. At the other end of the spectrum are Class 5 repair projects, for which project-cost estimates should be increased by up to 100%. Class 5 repair projects are characterized by (i) an incomplete and generalized understanding of the necessary repair projects, and (ii) a high likelihood that new repairs or issues will arise as the repair project progresses. Projects move through the intervening risk classifications based on the level of project detail and the likelihood of discovering new issues. The Lady May repair project represents a Class 5 risk (for which a 100% risk adjustment is appropriate), because (i) the vendor estimates are based on brief, high-level descriptions of the currently identified repairs — not a thorough inspection[3]—and (ii) potential high-risk and -cost issues (e.g., total engine

---

[2] *See* AACE INT'L, COST ESTIMATE CLASSIFICATION SYSTEM – AS APPLIED IN ENGINEERING, PROCUREMENT, AND CONSTRUCTION FOR THE PROCESS INDUSTRIES 3 (Aug. 7, 2020).
[3] Only one vendor (Precision Power) provided a somewhat detailed estimate, but still included a disclaimer excluding the cost of any additional damage found during the repair period.

4

replacement) that have not yet been ruled out.

11. Based on my knowledge and experience, there is currently an unreliable supply chain in the marine industry. Any delay in obtaining necessary parts could extend the time it takes to repair the Lady May, running up costs and increasing risk. Due to these external factors, it is reasonable to assume that the Lady May could be out of the water for repairs for 45 to 150 days or longer, which increases risk of greater expenses. Any lack of available technicians (to remove old parts and install new ones) would increase the risks and costs discussed above. The Proposed Repair Reserve Amount does not adequately account for these risk- and cost-increasing possibilities.

12. **Repairs**. The Repair Reserve Motion lists four "required" repairs: (i) servicing valves in the hull; (ii) painting a portion of the hull; (iii) replacing the bilge boards; and (iv) repairing the starboard main engine (the "Known Repairs"). (¶ 1.) The Known Repairs are necessary to bring the Lady May to good working order, but they are not sufficient. Critically, the Repair Reserve Motion omits several costly potential repair items/tasks, for example:

   a. Starboard engine replacement parts. Until technicians are able to go into the engine itself and determine the extent of any repairs needed, it is impossible to rule out repairs and/or replacements of other parts of the starboard engine.

   b. Engine-to-shaft alignment. To lift out the engine for repair, the shaft must be disconnected. When the engine is lowered into place on mounts, the shaft is reconnected and checked for proper alignment, including the clearance outboard at the steady bearings near the propeller. If the shaft is not aligned correctly, it creates vibrations that will wear the engine and bearings and may damage the propeller if it contacts the hull.

   c. Unforeseen hull-valve replacement parts. Some valves removed from the ship may not pass testing. When the valve is opened to inspect the cause of failure, some internal parts will likely need replacement (e.g., ball, stem, seats, o-rings, or gaskets). Which parts will need replacement cannot be

5

known until the valve is opened up and inspected.[4]

d.  A fuel pump inspection for the port engine. An inspection of the port fuel pump has not been conducted yet, and could reveal similar wear as the starboard fuel pump. If there is wear, but it is not as severe as the starboard pump, it may only require a new pump, alignment, and changing the lube oil. But if the wear is more severe, then work similar to the starboard engine repairs will be required.

e.  Repairs to the port engine if damage to the fuel pump is found. Given the extent of known damages to the starboard engine, it is possible that the port engine will also require repairs. The extent to which the port engine will need repairs is thus far unknown and will only be assessable if/when the engine is opened up and examined by technicians.

f.  The need for an entirely new engine or set of engines. It is possible that, over the course of conducting repairs, the technicians will determine that, due to extensive manhours and/or repair time and lack of available parts, a whole new set of engines is needed. This option may be a "last resort," but could become the best choice. At this stage, it is too early to rule out the possibility that a new set of engines will be required.

13. **Ancillary Costs**. The Proposed Repair Reserve Amount omits ancillary costs associated with bringing the Lady May to good working order, such as the cost of retaining a crew for the duration of repairs and the cost of certifying the hull and shaft (by Lloyd's Register of Shipping or the American Bureau of Shipping). These certifications attest to the seaworthiness of the vessel and are prerequisites to obtaining insurance. Certification costs vary, but in my experience, they can range from $2,000 to $10,000 per certification.

14. Taking into account (i) industry-accepted risk factors related to delay in sourcing parts, securing technicians, and/or making repairs (i.e., up to 150 days), (ii) unaccounted-for repairs, and (iii) the associated ancillary costs, it is my view that an appropriate amount to put in the repair reserve would be **$3,761,080**.[5]

---

[4] A number of hull valves were scheduled for inspection during the last dry-dock period, but were deferred and not removed for inspection. The valves should be removed, inspected, tested, and repaired as necessary.

[5] A breakdown of the costs and risks underlying this number is attached hereto as Appendix 1.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 23rd day of September, 2022, at Mystic, Connecticut.

_____
Dexter White

# APPENDIX 1

Key

COLUMN LABEL - DESCRIPTION

ORIGINAL    The original estimates collectively forecast a work period after haul-out of 45 with the best effort and a Class 5 Risk factor of 100% due to lack of details
EXTENDED 1    Assumes delays due to additional parts needed up to 90 days
EXTENDED 2    Assumes delays and additional parts needed and new work on the Port Diesel Engine up to 135 days
EXTENDED 3    Assumes delays and additional parts needed and new work to replace both Diesel Engines up to 150 days

| ITEM | DESCRIPTION | ITEM COST | ORIGINAL | 45 DAYS | EXTENDED 1 | 90 DAYS | EXTENDED 2 | 135 DAYS | EXTENDED 3 | 150 DAYS |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | DRY DOCK OR HAUL-OUT FOR REPAIRS | $ 25,000 | $ 25,000 | 2 | $ 25,000 | 2 | $ 25,000 | 2 | $ 25,000 | 2 |
| 2 | LAYDAYS ON LAND STORAGE | $ 20,385 | $ 20,385 | 45 | $ 40,770 | 90 | $ 61,155 | 135 | $ 81,540 | 150 |
| 3 | ENGINE ROOM RIPOUT OF INTERFERENCES FOR ACCESS | $ 129,000 | $ 129,000 | 14 | $ 129,000 | 14 | $ 258,000 | 14 | $ 258,000 | 14 |
| 4 | ENGINE TAKE DOWN | $ 72,000 | $ 72,000 | 7 | $ 72,000 | 7 | $ 72,000 | 7 | $ 72,000 | 7 |
| 5 | ENGINE UNFORESEEN REPLACEMENT PARTS | $ 30,000 | NA | | $ 30,000 | 7 | $ 30,000 | 7 | $ 3,000 | 7 |
| 6 | ENGINE REASSEMBLY | $ 77,000 | $ 77,000 | 7 | $ 77,000 | 7 | $ 77,000 | 7 | $ 77,000 | 7 |
| 7 | ENGINE TO SHAFT ALIGNMENT | $ 10,000 | $ 10,000 | 3 | $ 10,000 | 3 | $ 10,000 | 3 | $ 10,000 | 3 |
| 8 | ENGINE ROOM INSTALLATION OF INTERFERENCES | $ 129,000 | $ 129,000 | 14 | $ 129,000 | 14 | $ 258,000 | 14 | $ 258,000 | 14 |
| 9 | HULL VALVE REMOVAL | $ 50,000 | $ 50,000 | 14 | $ 50,000 | 14 | $ 50,000 | 14 | $ 50,000 | 14 |
| 10 | HULL VALVE TEST | $ 50,000 | $ 50,000 | 14 | $ 50,000 | 14 | $ 50,000 | 14 | $ 50,000 | 14 |
| 11 | HULL VALVE UNFORESEEN REPLACEMENT PARTS | $ 20,000 | NA | | $ 20,000 | 14 | $ 20,000 | 14 | $ 20,000 | 14 |
| 12 | HULL VALVE REINSTALLATION | $ 60,000 | $ 60,000 | 14 | $ 60,000 | 14 | $ 60,000 | 14 | $ 60,000 | 14 |
| 13 | HULL PAINTING | $ 9,000 | $ 9,000 | 7 | $ 9,000 | 7 | $ 9,000 | 7 | $ 9,000 | 7 |
| 14 | DECK REPAIR | $ 3,000 | $ 3,000 | 7 | $ 3,000 | 7 | $ 3,000 | 7 | $ 3,000 | 7 |
| 16 | PORT ENGINE FUEL PUMP INSPECTION | $ 9,000 | NA | | $ 9,000 | 7 | $ 9,000 | 7 | $ 9,000 | 7 |
| 17 | PORT ENGINE REPAIR | $ 447,000 | NA | | NA | | $ 447,000 | 30 | $ 140,000 | 30 |
| 18 | ABS OR LLOYDS SOCIETY HULL AND SHAFT CERT | $ 5,000 | $ 5,000 | 3 | $ 5,000 | 3 | $ 5,000 | 3 | $ 5,000 | 3 |
| 19 | CREW RETENTION | $ 50,000 | $ 50,000 | 45 | $ 100,000 | 90 | $ 150,000 | 135 | $ 200,000 | 150 |
| 20 | NEW DIESEL ENGINES | $ 550,000 | NA | | NA | | NA | | $ 550,000 | |
| 21 | SUBTOTAL | | $ 689,385 | | $ 818,770 | | $ 1,594,155 | | $1,880,540 | |
| 22 | RISK OF DELAY OF NEW PARTS AND AVAILABLE TECHNICIANS | | $ 689,385 | | $ 818,770 | | $ 1,594,155 | | $1,880,540 | |
| 23 | GRAND TOTAL | | $ 1,378,770 | | $ 1,637,540 | | $ 3,188,310 | | $3,761,080 | |