<u>**Exhibit D**</u>

**U.K. Complaint**



IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF
ENGLAND AND WALES
COMMERCIAL COURT (QBD)

Claim No. CL-2020-000345

B E T W E E N:-

| | (1) | **KWOK HO WAN** |
|---|---|---|
| | (2) | **ACE DECADE HOLDINGS LIMITED** |
| | (3) | **DAWN STATE LIMITED** |

<u>Claimants</u>

- and -

**UBS AG**

<u>Defendant</u>

---

## PARTICULARS OF CLAIM

---

### PARTIES

1.  The First Claimant ("**Mr Kwok**") is a high net worth individual resident since early 2015 in New York State, USA. Mr Kwok was formerly resident in the People's Republic of China ("**PRC**"), where he was known by his Mandarin language name, Guo Wengui. Mr Kwok is a political opponent of the PRC government, and by the time of the events giving rise to these claims he was already in a hostile relationship with the PRC authorities.

2.  The Second Claimant ("**Ace Decade**") is a private limited company incorporated under the laws of the British Virgin Islands with its registered address at P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, British Virgin Islands. Ace Decade was incorporated on 18 June 2014 and acquired by Mr Kwok on or around 10 November 2014 as part of the preparations for the (then) proposed acquisition of shares in the Chinese company, Haitong Securities Company Limited ("**Haitong**").

3.  The Third Claimant ("**Dawn State**") is also a private limited company incorporated under the laws of the British Virgin Islands with its registered address at P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, British Virgin Islands.

4.     Since 18 September 2015, Dawn State has been owned and controlled by Ace Decade. Prior to 18 September 2015, Dawn State was owned and controlled by the Chinese investment services provider, Haixia Capital Management Company Ltd ("**Haixia**"), through a vehicle called Haixia Capital Investment Fund (Fujian) Limited Partnership ("**Haixia Fund**") which was managed by Haixia Huifu Asset Investment and Fund Management Co. Ltd ("**Haixia Management**"). Dawn State was the vehicle used for the acquisition of shares in Haitong in 2015 (as pleaded in more detail in the body of this Particulars of Claim ("**PoC**"), subject to a contractual right under which Ace Decade could acquire Dawn State after the Haitong share acquisition.

5.     The Defendant ("**UBS**"), is a company incorporated in Switzerland, with its registered office address at Bahnhofstrasse 45, 8001 Zurich, Switzerland. UBS conducts business globally, providing retail and investment banking, wealth management and other financial services. At all relevant times UBS conducted this business through both its Swiss headquarters and also branches located, inter alia, in Hong Kong ("**UBS HK**") and in London ("**UBS London**"), the latter being, by agreement of the parties, designated as the counterparty for all of the contracts relevant to the claims in this action, as pleaded further below. UBS London has at all times held permissions to provide regulated services from the Financial Conduct Authority (Reference Number 186958) and was authorised to act for and enter into contractual agreements as UBS.

6.     As pleaded at paragraphs 32 to 57 below, UBS entered into the contracts relevant to the subject matter of the Claimants' claims through UBS London. In the discussions and negotiations leading to those contracts, UBS was represented primarily by its employee Mr Stephen Wong ("**Mr Wong**"). Mr Wong was at that time a Managing Director in the Wealth Management Division of UBS, based at the offices of UBS HK. Mr Kwok was first introduced to Mr Wong in around 2006 or 2007.

## THE FACTS GIVING RISE TO THE CLAIMS

### Background to the Haitong Investment

7.     In or around Autumn 2013, Mr Kwok was approached by the CEO of Haitong, Mr Wang Kaiguo ("**Mr Wang**"), who was seeking to encourage Mr Kwok to make a substantial equity investment in Haitong. Haitong is a major Chinese securities firm, engaged in the provision of stocks and derivatives brokerage, as well as investment banking, asset management, private equity, alternative investments, and financial leasing services. Haitong is one of the largest and longest established financial services providers in the PRC. Haitong's shares are traded on the Shanghai and Hong Kong Stock Exchanges ("**SSE**" and "**HKEX**" respectively). Haitong's shares trading on the HKEX are known as "**H-Shares**." Following the approach from Mr

Wang, Mr Kwok resolved to invest approximately US$3 billion in H-Shares in order to obtain a major stake in Haitong. This investment was to be made through the issue of new H-Shares by Haitong, and their allotment to companies controlled by Mr Kwok.

**Initial involvement of UBS**

8.    Following the discussions with Mr Wang, Mr Kwok communicated his intention to acquire a substantial stake in Haitong to Mr Hank Lo, a Hong Kong solicitor and partner in the firm Stevenson, Wong & Co ("**Stevenson Wong**"). Mr Kwok retained Stevenson Wong to advise him on the proposed acquisition.

9.    Mr Lo had an established relationship with Mr Wong and UBS, the details of which are not known to Mr Kwok, and it was Mr Lo who first introduced Mr Kwok to Mr Wong in or around 2006-7. By the end of 2013, Mr Wong had cultivated a close personal relationship with Mr Kwok and had successfully induced Mr Kwok to consider and treat him as a trusted adviser and personal friend.

10.   At some point in the fourth quarter of 2013, Mr Lo informed Mr Wong of Mr Kwok's intention to acquire a stake in Haitong. The Claimants do not know when Mr Lo communicated this to Mr Wong. Mr Kwok was not aware that Mr Lo intended to inform Mr Wong or UBS until after the event, although Mr Kwok did not (after the event) object to him doing so.

11.   In or around December 2013, Mr Wong visited Mr Kwok at his residence in Hong Kong. He informed Mr Kwok that UBS had become aware that Haitong would be issuing new H-Shares (the "**Placement Shares**") and that UBS wished to participate as a placing agent. Mr Wong used his mobile telephone to open a call with senior UBS executives, who Mr Kwok understood were based in Switzerland. Mr Kwok cannot now recall the names of the individuals. Those senior UBS executives and Mr Wong told Mr Kwok (the following sub-paragraphs pleading only the gist of what they said):

(1)   UBS wished to become a broker in the sale of the Placement Shares, and wanted Mr Kwok to introduce and commend UBS to Haitong for that role;

(2)   If Mr Kwok assisted UBS in that way, UBS would assist and advise him in acquiring the shares for which it was made broker or placement agent in a way which was advantageous for Mr Kwok;

(3)   Although they knew that Mr Kwok's intention was to acquire the shares for himself, UBS itself or investors with whom UBS had a relations themselves would be interested in

3

purchasing the shares at a substantial uplift on the likely offer price if Mr Kwok was willing to on-sell them.

12. Following this meeting, Mr Kwok resolved to work with UBS and to this end, at some time in early 2014, Mr Kwok told Mr Wang that he intended to invest in the new issue of H-Shares, and asked Mr Wang to include UBS as one of the placees of the Placement Shares.

13. In July or August 2014 Haitong resolved to issue the H-Shares via seven placees, one of which was UBS. Another company advising and assisting Mr Kwok on a separate acquisition of H-Shares, Macquarie Capital Securities Limited ("**Macquarie**"), was to be the placee in respect of three allocations of the Placement Shares. Together, UBS and Macquarie would place around 12% of Haitong's total issued shareholding.

**Mr Wong's initial advisory work**

14. Following this meeting, Mr Kwok entered into discussions with UBS (through Mr Wong) in relation to the structuring of his planned investment (the "**Investment**") in the Placement Shares for which UBS was the placing agent (the "**UBS H-Shares**"). In discussions in and around late March and April 2014, Mr Wong said that he would provide a plan for the "*Haitong project*," including a proposed structure through which Mr Kwok could acquire the UBS H-Shares.

15. As a securities company incorporated and operating in the PRC, Haitong was at all relevant times subject to regulation by the China Securities Regulatory Commission (the "**CSRC**"). The relevant PRC laws required the CSRC to give approval if any person acquired or actually controlled more than 5% shareholdings of the total issued capital of Haitong.

16. It was discussed between Mr Kwok and Mr Wong that Mr Kwok intended to invest in excess of US$3 billion in total, which would considerably exceed this threshold and therefore require approval by the CSRC. The advice which Mr Kwok received from UBS included, in particular, devising a structure for the acquisition of the Placement Shares which would avoid the requirement for CSRC approval in a manner which complied with the relevant PRC laws.

17. In the course of these conversations:

(1) Mr Wong repeatedly told Mr Kwok that he, under the direction of UBS senior executives, would work to advance Mr Kwok's best interests in relation to the acquisition of the Placement Shares, in line with the commitment made in December 2013. From this period until the acquisition of the UBS H-Shares, Mr Kwok frequently repeated and reaffirmed

the assertion that he and UBS were working in Mr Kwok's interests and that Mr Kwok should repose trust in and rely upon Mr Wong and UBS;

(2)  Mr Wong said that he and UBS would devise the structure for the acquisition in a way which was as advantageous as possible for Mr Kwok; and

(3)  Mr Wong held himself and UBS out as having the experience and expertise to devise an advantageous structure for the acquisition for Mr Kwok and advising Mr Kwok (and, subsequently, Ace Decade) with respect to investments in placements such as that for the Placement Shares, the structuring of the investments, and the financing thereof.

18.  In or around June 2014, UBS, through Mr Wong, gave initial advice regarding the structure for the acquisition of the UBS H-Shares. This advice was given orally at meetings in Mr Kwok's office (49/F, Bank of China Tower, No. 1, Garden Road, Hong Kong) and his personal residence in Hong Kong. In summary (the following sub-paragraphs pleading only the gist of UBS' advice), Mr Wong advised Mr Kwok: (1) Not to purchase the UBS H-Shares through a company beneficially owned or controlled by him, as this would require CSRC approval; (2) Instead, to set up a structure (which would be arranged by UBS) under which the UBS H-Shares would be acquired by a company controlled by a third-party intermediary, which acquisition would not require CSRC approval; and (3) To make the investment on a leveraged basis, with acquisition finance from UBS.

19.  Mr Kwok was initially reluctant to make a leveraged investment because he did not require bank finance in order to acquire the UBS H-Shares and had intended to make the acquisition using cash. However, Mr Wong advised him that:

(1)  If UBS were to proceed with structuring the Investment it would have to be on the basis that the bank would provide margin finance for the purchase of the UBS H-Shares, as this would be how UBS would receive its profit from the transaction;

(2)  It was anyway in Mr Kwok's best interests to make a leveraged investment, because it would enable him to obtain the desired number of shares without committing the full amount of his own capital;

(3)  Any leveraged finance provided by UBS would in any event be upon the '*best possible terms*';

(4)  The terms of any leveraged finance would be consistent with Mr Kwok's requirement that there should be no provisions requiring (i) the provision of additional collateral or (ii) the mandatory repayment of the loan (which were referred to compendiously by both Mr

Kwok and Mr Wong as "**margin calls**" without differentiation, as a result of short term price fluctuations of the Placement Shares;

(5)    UBS would give Mr Kwok adequate time to meet any other margin calls, so that if Mr Kwok had (as in fact, he did) the ability to fund the whole of the acquisition without loan financing, UBS would not enforce against the security before additional funds could be provided by Mr Kwok;

(6)    In illustrating the approach which UBS would take to requests for additional collateral or repayment of the loan in the event of fluctuation in the value of UBS H-Shares, Mr Wong repeatedly (during this period, and thereafter) referred to a previous high value leveraged transaction funded by UBS, under which it had provided funding for the acquisition of a much larger stake in the Chinese insurance company, Ping An (the "**Ping An Deal**"). The details of the information provided by Mr Wong in relation to the Ping An Deal between June 2014 and December 2014 are summarised at paragraph 42 below.

20.    To the best of Mr Kwok's recollection, this advice was first given in or around June 2014. However, these matters were the subject of repeated discussion between Mr Wong and Mr Kwok in the summer and autumn of 2014, and thereafter. Mr Kwok cannot be certain as to what representations were made to him by UBS on each specific occasion, but recalls the effect of the advice as a whole.

**Further Structuring Advice**

21.    From in or around July 2014 onwards, UBS continued to advise Mr Kwok and (from 10 November 2014) Ace Decade regarding the proposed structure and financing for the acquisition of the UBS H-Shares. In particular, Mr Wong went on further to advise Mr Kwok (and, subsequently, Ace Decade) on the structuring of the acquisition, including further advising in relation to the requirement for approval by the CSRC of acquisitions of Haitong in excess of 5% of the company's share capital; and by advising that Mr Kwok and Ace Decade select Haixia as the intermediary for the Investment.

22.    In reliance on this advice, Mr Kwok and Ace Decade selected Haixia to act as intermediary for the acquisition of the UBS H-Shares, and ultimately appointed Haixia for that purpose under a Co-Investment Agreement dated 18 December 2014 (the "**Co-Investment Agreement**").

23.    Although Mr Wong had told Mr Kwok and Ace Decade that Haixia was independent of UBS, it is in fact controlled by State Development and Investment Corporation ("**SDIC**"), which is a joint venture partner of UBS, with both co-owning an investment fund called "**UBS SDIC**".

To facilitate the investment in the Placement Shares, on 23 October 2014 Haixia caused the incorporation of Dawn State through its subsidiary Haixia Fund. Dawn State was at all relevant times until its transfer to Ace Decade managed by Mr Lu Bo ("**Mr Lu**"), a senior employee of Haixia who was previously employed by UBS SDIC.

24. Ace Decade was acquired on 10 November 2014 by Mr Kwok for the purpose of acting as the said investment vehicle. On the same day, on the advice of Mr Wong, an employee of Mr Kwok, Ms Yu Yong ("**Ms Yu**") became its nominee shareholder and director.

**Preparation of the December Contracts**

25. In or around late October and early November 2014, UBS (primarily through Mr Wong), Haixia (primarily through Mr Lu) and Ace Decade (primarily through Mr Kwok and Ms Yu) began making preparations to subscribe for the UBS H-Shares.

26. On or around 13 November 2014 there was an initial conference call between Stevenson Wong and Norton Rose Fulbright ("**Norton Rose**"), the lawyers engaged by Haixia to act on the transaction, at which they agreed that Norton Rose would draft a Co-Investment Agreement between Haixia, Dawn State and Ace Decade in relation to the acquisition of the UBS H-Shares.

27. On or around 14 November 2014, Ace Decade and Dawn State entered into a Memorandum of Understanding, pursuant to which Dawn State was to provide services to Ace Decade in return for a non-refundable fee equal to 65 basis points of the total invested capital, subject to a minimum of US$5,000,000.

28. During this period, leading up to the agreement by Dawn State to subscribe for the UBS H-Shares, there were ongoing discussions between Mr Wong and Mr Kwok in relation to the structuring and financing of the acquisition. During those discussions Mr Wong repeated and elaborated on the representations pleaded at paragraph 19 above. The Claimants plead further in relation to these representations at paragraphs 39 to 40, 47 and 78 below.

29. These preparations led to Ace Decade, Dawn State and UBS entering into a series of arrangements designed to allow Ace Decade to participate in the acquisition of UBS H-Shares through Dawn State (together, the "**December Contracts**"). The December Contracts were:

(1) A custody agreement between Dawn State and UBS dated 12 December 2014 (the "**Custody Agreement**");

(2) A Co-Investment Agreement between Ace Decade, Dawn State and Haixia dated 18 December 2014;

(3)   A letter agreement between Haixia Management and Ace Decade, dated 18 December 2014 (the "**Letter Agreement**");

(4)   A financing letter entitled "*Project Pipe – Financing Letter*" between Dawn State and UBS London dated 19 December 2014 (the "**Financing Letter**").

30.   The Claimants plead further as to the entry into the December Contracts and their terms at paragraphs 32 to 37 below.

31.   These preparations also led to Dawn State entering into a subscription agreement with Haitong dated 19 December 2014 (the "**Subscription Agreement**"). The Claimants plead further in relation to the execution and terms of the Subscription Agreement at paragraph 44 below.

**The December Contracts**

32.   On or around 12 December 2014, Dawn State and UBS London entered into the Custody Agreement in relation (among other things) to the custody of the UBS H-Shares. The Claimants will refer to the Custody Agreement at trial for its full terms and effect. Subject to that, under the terms of the Custody Agreement, Dawn State agreed that all of the UBS H-Shares (once acquired) would be held with UBS London. The purpose and effect of the Custody Agreement was to ensure that the UBS H-Shares would be available for enforcement by UBS London of its rights under the (then) proposed facility agreement and security agreement to be entered into by Dawn State and UBS London in relation to the provision of finance for the acquisition of the UBS H-Shares. The Custody Agreement was governed by the law of England and Wales, and provided for the exclusive jurisdiction of the English Courts in respect of any disputes.

33.   On or around 18 December 2014, Ace Decade, Dawn State and Haixia entered into the Co-Investment Agreement. The Claimants will refer to the Co-Investment Agreement at trial for its full terms and effect. Subject to that, this agreement provided that:

(1)   Pursuant to this agreement, Haixia agreed to extend to Ace Decade a right to participate in the share subscription in the Target Company (i.e. Haitong) (defined as "*the Project*"), upon receipt by Haixia of US$500 million (the "**Monetary Contribution**"). In addition, it was noted that it was contemplated that Dawn State would arrange for loan financing in an amount of US$750 million, which together with the Monetary Contribution constitutes the "Co-Investment Amount".

(2)   At Clause 1.1, for Haixia Fund to receive a substantial fee for its role in the Project.

(3)   At Clause 3, headed "**Nature of the Right**", that Ace Decade would have only a contractual right to participate in the Project, and no immediate proprietary interest in Dawn State or the UBS H-Shares which it acquired.

(4)   At Clause 6.5:

> *"In the event that the Project is not completed for any reasons, in consideration of Haixia Fund and the Company arranging for the Project and the loan financing(s) with commercial banks for the benefit of the Investor:*
>
> *(a) the Investor agrees that the Company and/ or Haixia Fund shall receive an arrangement fee of the higher amount of (i) 0.065% of the Co-investment Amount (i.e. US\$1,250 million); and (ii) US\$500,000 upon the Company entering into the share subscription agreement(s) in relation to the Project"*

34.   Also, on or around 18 December 2014, Haixia Management and Ace Decade entered into the Letter Agreement. The Claimants will refer to the Letter Agreement at trial for its full terms and effect. Among other things, the Letter Agreement provided as follows:

(1)   Under the heading "*Loan Financing*":

> *"[Ace Decade] acknowledges that [Dawn State] is arranging for loan financing(s) with commercial bank(s) at the request of and for the benefit of [Ace Decade] (the "Financing") pursuant to the relevant financing agreement of the Financing for the Project (the "Financing Letter")."*
>
> *"[Ace Decade] acknowledges that it has reviewed and agreed to the terms and conditions of the Financing as set out in the Financing Letter (including the term sheet), and further covenants and agrees with [Dawn State], Haixia Fund and Haixia Management that it shall be primarily and solely responsible for all the fees, costs, expenses and payments in connection with the Financing [...]"*

(2)   Under the heading "*Arrangements for the Transfer*", that at any time after a two-month period after the completion of the Project or the lock-up period under the relevant subscription agreement to be entered into by Dawn State, whichever was longer, on receiving a request from Ace Decade, Haixia Management would procure the transfer of the UBS H-Shares to Ace Decade, or another entity nominated by Ace Decade.

35.   Although the Letter Agreement provided that Ace Decade had reviewed and agreed to the terms and conditions of the Financing as set out in the Financing Letter, the Financing Letter was not in fact fully executed until 20 December 2014. The Claimants plead further at paragraphs 36 to 37 below.

36.   On or around 19 December 2014, Dawn State and UBS London entered into the Financing Letter. By the Financing Letter UBS London agreed to provide the full amount of the loan

financing envisioned for the Investment (the "**Facility**"), subject to the subsequent completion of more comprehensive financing documentation, in an amount in HKD equal to the product of 60%, the number of shares, and the initial price, not exceeding US$750 million) as defined in the Term Sheet. The Claimants will refer to the Financing Letter at trial for its full terms and effect. Among other things, the Financing Letter provided as follows:

(1)    Under the heading "*LTV Ratio*"

>  "*(c) Pre-utilisation margin*
>
>  *[Dawn State] shall deliver such additional H.K. dollar cash to the Secured Account so as to ensure that on the date (the Utilisation Request Date) of the Utilisation Request… the LTV Ratio (calculated with reference to the Aggregate Share Value on the Utilisation Request Date and on a pro forma basis as if the relevant additional HK dollar cash has been delivered to the Secured Account on such date) is equal to or lower than the Initial LTV."*

(2)    Under the heading "*Exclusivity*"

>  "*(b) the Borrower will, and will procure that its respective subsidiaries and affiliates will, ensure that no other debt financing shall be incurred, borrowed, syndicated, issued or privately placed in relation to or for the purposes of funding or refinancing any of the funding for or relating to the Acquisition…*"

(3)    Under the heading "**Governing Law**", that the Financing Letter and all associated documents (defined as the "*Financing Commitment Documents*") would be subject to English law and that the English Courts would have jurisdiction in respect of any dispute

37.    The Financing Commitment Documents included an indicative termsheet for the Facility (the "**Indicative Termsheet**"). The Indicative Termsheet did not contain any legally binding commitment to borrow or lend on the terms indicated or any terms. The Indicative Termsheet provided that under the facility agreement to be agreed between the parties, UBS would be entitled in certain circumstances to demand mandatory prepayment or make margin calls in respect of the facility, as follows:

(1)    Under the heading "***Margining Terms**"*:

>  "*LTV Call Trigger: 66.7%, subject to adjustment by the Lender in the event that the Initial LTV is adjusted as described under "Initial LTV" (above).*
>  *…*
>  *Margin Call: If on any Scheduled Trading Day following the Utilisation Date the LTV is higher that the LTV Call Trigger, the Borrower shall deposit into the Secured Account an amount of HKD cash only so that the LTV is restored to the Initial LTV and shall comply with all obligations described under the "Margin Payment Schedule" below.*
>  *…*

*Margin Payment Schedule: Payments in respect of Margin Calls and Margin Releases shall be made by 5:00pm Hong Kong time on the Business Day (the "Margin Payment Date") immediately following the date of the Margin Call request or Margin Call Release, as applicable, provided such request is issued prior to 11:30pm (Hong Kong time)…"*

(2)    Under the heading "***Other Terms***":

*"Full Mandatory Prepayment Events: The Lender, at its option, may terminate this Transaction if any of the following events occur after Utilisation Date:*

(i)    *the Closing Price of the Reference Shares on any Scheduled Trading Day is less than 60% of the Initial Price;*

(ii)    *the Closing Price of the Reference Shares on any Scheduled Trading Day is less than (a) 85% of the Closing Price on the previous Scheduled Trading Day; or (b) 75% of the Closing Price on any of the 5 immediately preceding Scheduled Trading Days;*

…

*If the Lender gives notice that it is terminating the Transaction following the occurrence of a Full Mandatory Prepayment Event, the Borrower must repay the Facility Amount together with all other amounts due in connection with the Transaction (the "Aggregate Prepayment Amount") in accordance with the following payment schedule:*

(i)    *25% of the Aggregate Payment Amount on the Business Day immediately following such notice;*

(ii)    *25% of the Aggregate Payment Amount on the second Business Day following such notice; and*

(iii)    *the remaining 50% of the Aggregate Prepayment Amount on the third Business Day following such notice."*

…

*Makewhole: Upon (i) a Voluntary Prepayment on any date other than a Mutual Break Date or (ii) prepayment or termination in any other circumstances, including following a Full Mandatory Prepayment Event or an Event of Default, a Makewhole Amount is payable by the Borrower to the Lender.*

*The Makewhole Amount is calculated as an amount equal to the Spread applied to the Facility Amount or the prepayment amount, as applicable, for the period from (and including) the date of prepayment or termination, as applicable, to the next occurring Mutual Break Date or, if none, the Maturity Date."*

**UBS's representations prior to execution of the December Contracts**

38.    During the course of the preparation of the December Contracts, in or around December 2014 and before 18 December 2014, Mr Kwok became aware that the terms of the proposed financing for the Investment from UBS included provisions for margin calls and mandatory prepayment (which, again, he referred to compendiously using the term "margin calls"). Mr Kwok cannot now recall whether he saw the Financing Letter and/or Indicative Termsheet, but

his knowledge must in any event have come from a description of the terms by someone else and not from review of the documents, because he did not read English.

39. Mr Kwok objected to the inclusion of these terms, and raised this with Mr Wong. There was a discussion between them, which took place either in Mr Kwok's residence or his office in Hong Kong. The gist of what Mr Kwok said to Mr Wong was that that he was unhappy about these terms, and he wanted them taken out of any agreements with UBS. Mr Kwok said that he did not want UBS to be able to demand payments or repayment of the loan as a result of short-term fluctuations in the price of the Haitong H-Shares. In response, Mr Wong made further representations and gave advice to Mr Kwok and Ace Decade on behalf of UBS, the effect of which was as follows:

(1) It was UBS's internal policy that where the bank was providing margin finance, it would have terms allowing it to make margin calls (i.e. to demand payment of margin or mandatory prepayment), and these were standard terms for UBS financing agreements;

(2) Nonetheless, Mr Wong intended to go back to the bank and try to get the terms removed from the agreements or changed;

(3) Even if Mr Wong could not get the margin call provisions removed or changed, Mr Kwok (and therefore Ace Decade) should not be concerned about them as:

(a) Such terms would not be strictly relied upon or executed by UBS in this case, because UBS had a policy which would apply to Ace Decade and Mr Kwok (and therefore, impliedly, to Dawn State as their intermediary) as highly valued customers not to make margin calls (i.e. to demand payment of margin or mandatory prepayment) if prices moved in the short term.

(b) If it were necessary for UBS to make a margin call (i.e. to demand payment of margin or mandatory prepayment) due to longer term price movements, UBS would work with Ace Decade to allow it to meet any demands and would allow a reasonable time for it to do so, including longer time periods for payment than those in the facility agreement if necessary, and would not sell any of the Shares as a result of any margin call without giving Ace Decade adequate time to pay.

(4) Mr Wong again referred to the Ping An Deal as demonstrating the approach which UBS would take to requests for additional collateral or repayment of the loan in the event of fluctuation in the value of H-Shares. The details of the information provided by Mr Wong

in relation to the Ping An Deal between June 2014 and December 2014 are summarised at paragraph 42 below.

40.   During the course of conversations and communications during this period (including in the conversations in which he gave the advice and made the representations pleaded in paragraph 39 above), Mr Wong further repeated and reaffirmed the assertion that he and UBS were working to protect and advance Mr Kwok's interests, and that Mr Kwok and Ace Decade should repose trust in and rely upon UBS and in particular Mr Wong. From the context in which these assurances were given, it is to be inferred that they were intended to encourage Mr Kwok and Ace Decade to accept and rely upon the advice and representations pleaded in paragraph 39 above.

41.   As a result of these conversations with Mr Wong, Mr Kwok reasonably believed: (1) that Mr Wong would get the margin call and mandatory prepayment terms removed from the Financing Commitment Documents, and in any event from the eventual facility agreement; and (2) that in any event he need not be concerned about such provisions which would not be relied upon in accordance with their strict terms, but only in accordance with the approach and policy described by Mr Wong. Mr Kwok did not thereafter read the Financing Letter or Indicative Termsheet prior to 19 December 2014 nor was he briefed on their terms. As a result, Mr Kwok was not aware that the margin call and mandatory prepayment provisions were included in these documents until around March 2015, as detailed at paragraph 46 below.

**The Ping An Representations**

42.   As pleaded above, Mr Wong repeatedly referred to the Ping An Deal as an illustration of the approach which UBS would take to requests for additional collateral or repayment of the loan in the event of fluctuation in the value of H-Shares. Mr Wong also referred to the Ping An Deal as an illustration of UBS's expertise in structuring the acquisition of equities in companies incorporated in the PRC. Mr Kwok cannot recall every occasion on which the Ping An deal was discussed, but they included at least:

(1)   The discussions between Mr Wong and Mr Kwok in the summer of 2014 pleaded at paragraphs 19 and 27 above. These discussions were primarily between Mr Wong and Mr Kwok, but two of Mr Kwok's employees (Yang Ying and Lyu Tao) were each present on at least one occasion when Mr Wong made representations regarding the Ping An Deal during this period.

(2)   The discussions between Mr Wong and Mr Kwok in or around December 2014, before 18 December 2014.

43.   In the course of those conversations as a whole, Mr Wong (on behalf of UBS) represented the following matters regarding the Ping An Deal:

(1)   The Ping An Deal involved the acquisition of shares in a listed company, namely the insurance company Ping An Insurance.

(2)   UBS had advised the buyers of the stake in Ping An (the "**Ping An Stake**") in relation to the structuring of the acquisition and the funding of that acquisition.

(3)   UBS had provided loan funding for that acquisition. The value of the Ping An Stake and the loan financing provided by UBS were substantially larger than the value of the UBS H-Shares or the loan financing which UBS was proposing to provide for the acquisition of the UBS H-Shares.

(4)   Although the direct purchaser of the Ping An Stake was the Thai conglomerate, CP Group, CP Group was in fact acting as an intermediary for a Chinese businessman, the billionaire Xiao Jianhua ("**Mr Xiao**"). Mr Xiao was at that time the chairman of the Chinese conglomerate, the Tomorrow Group. UBS had advised the CP Group and Mr Xiao as to how to set up the intermediary structure for the acquisition. Like Mr Kwok, Mr Xiao was a very highly valued customer of UBS.

(5)   Although the lending arrangements for the acquisition of the Ping An Stake included terms allowing UBS to make margin calls (i.e. to demand payment of margin or mandatory prepayment) on the basis of price fluctuations, and there had been price fluctuations, UBS had not strictly enforced those terms. Instead, UBS had worked with the shareholder and given the shareholder ample time within which either the value of the shares might recover, or the shareholder could arrange the payment of margin. UBS had offered temporary additional financing to make up any shortfall.

(6)   As a result, there had never been a prospect that UBS would enforce against the Ping An shareholder's security, or that it would lose any of the Ping An shares which it had acquired.

(7)   This was in accordance with UBS's policy for highly valued customers, which would also apply to Mr Kwok and Ace Decade, and UBS intended to give Mr Kwok and Ace Decade the same treatment as the Ping An shareholder in the event that it became entitled to a make a margin call (i.e. to demand payment of margin or mandatory prepayment).

14

**The Subscription Agreement**

44.   On or around 19 December 2014, Dawn State entered into a subscription agreement with Haitong (the "**Subscription Agreement**"), under which it agreed to purchase the UBS H-Shares (the "**Subscription**"), being 569,427,620 H-Shares, at a price of HK$15.62 per share, totalling HK$8,894,459,424.40 (the "**Subscription Price**"). The Subscription Agreement provided, among other things, that:

(1)   Under Clause 2, the Subscription Price could be increased or reduced by up to HK$1.56 per share on the occurrence of certain conditions regarding an increase or decrease in the trading price of Haitong H-Shares during the period between the Subscription Agreement and Closing

(2)   Closing of the sale and purchase of the UBS H-Shares was subject to the satisfaction of certain conditions set out in Clause 3.1 of the Subscription Agreement (the "**Conditions**").

(3)   Under Clause 8.1, the Subscription Agreement could be terminated by either party if the Conditions had not been fulfilled on or before 30 June 2015.

**UBS's Representations prior to execution of the Lending Documents**

45.   In and around February and March 2015, the lending documents for UBS's financing of the acquisition of the UBS H-Shares by Dawn State (the "**Lending Documents**") were prepared. Although Ace Decade was not a party to any of the Lending Documents (the details of which are pleaded below), drafts of the Lending Documents were provided to Stevenson Wong, the lawyers acting for Ace Decade.

46.   In or around mid-March 2015, Mr Kwok was informed by Ms Yu that the draft agreements contained provisions allowing UBS to make margin calls and to require mandatory repayments in the event of short-term fluctuations in the value of the UBS H-Shares.

47.   In conversations with Mr Wong in around mid-to-late March 2015, Mr Kwok said that he objected to these terms, and repeated that he did not want UBS to be able to demand payments or repayment of the loan as a result of short-term fluctuations in the price of the Haitong H-Shares. Mr Wong, on behalf of UBS: (1) Further repeated and reaffirmed the assertion that he and UBS were working in Mr Kwok's interests, and that Mr Kwok and Ace Decade should repose trust in and rely upon Mr Wong and UBS; and (2) Restated the advice and representations particularised at paragraph 39 above, which are repeated here as particulars of the gist of the advice given and representations made by UBS through Mr Wong in March 2015.

48.     Mr Kwok believed these assurances and relied on them, and therefore did not object to the negotiations between Dawn State and UBS on the Lending Documents continuing or make efforts to cause or procure Ace Decade's withdrawal from the Co-Investment Agreement or otherwise prevent the completion of the Investment.

**The Lending Documents**

49.     On 1 April 2015, Dawn State and UBS executed the Lending Documents for UBS's financing of the acquisition of the UBS H-Shares by Dawn State.

50.     The "**Facility Agreement**" was made on behalf of Dawn State and UBS London. The Facility Agreement as agreed was a HK$5,336,675,654.64 term facility. The Claimants will refer to the Facility Agreement at trial for its full terms and effect. Subject to that, the terms of the Facility Agreement included the following provisions:

(1)     Clause 1.1 ("***Definitions***"):

> "*"**Initial LTV Ratio**" means sixty per cent (60.00%) [...]"*
>
> "*"**LTV Ratio**" means, on any Scheduled Trading Day, the loan to value ratio (expressed as a percentage) calculated by the following: A/B where: "A" means the aggregate amount in HK Dollars of the Loan outstanding less the Margin Call Balance; and "B" means the Market Value multiplies by the number of Shares subject to the Transaction Security.*"
>
> "*"**Margin Call Trigger**" means sixty-six point seven per cent (66.70%) [...]"*

(2)     Clause 7.7 ("***Mandatory Prepayment***"):

> "*(a)      If the Lender determines that:*
>
> > *(i)      the Market Value of a Share on any Scheduled Trading Day is less than sixty per cent (60%) of the Initial Price;*
> >
> > *(ii)     the Market Value of a Share on any Scheduled Trading Day is less than:*
> >
> > > *(A)      eighty-five per cent (85%) of the Market Value of the Shares on the immediately preceding Scheduled Trading Day; or*
> > >
> > > *(B)      seventy-five per cent (75%) of the Market Value of the Shares on any of the five immediately preceding Scheduled Trading Days;*
>
> *…*
>
> *Then (in each case) the Lender may, by notice to the Borrower, cancel the Facility and declare the outstanding Loan, together with accrued interest and all other amounts accrued under the Finance Documents, immediately due and payable, whereupon the Facility will be cancelled and all such outstanding amounts will become immediately due and payable in accordance with paragraph (b) below.*
>
> *(b)      Any prepayment of the outstanding amounts referred to in paragraph (a) above shall be made in the following amounts and at the following times:*

(i)    on the Business Day immediately following delivery of notice by the Lender of such prepayment, twenty-five per cent (25%) of such outstanding amounts;

(ii)    on the second Business Day immediately following delivery of notice by the Lender of such prepayment, twenty-five per cent (25%) of such outstanding amounts; and

(iii)    on the third Business Day immediately following delivery of notice by the Lender of such prepayment, fifty per cent (50%) of such outstanding amounts.

(3)    Clause 18.1 ("**Margin Call**"):

> "If, on any Scheduled Trading Day, the Lender determines that the LTV Ratio is greater than the applicable Margin Call Trigger, the Borrower shall as soon as practicable, and in any case no later than 5:00 p.m. on the Business Day after the date of a Margin Call Notice from the Lender requiring it to do so, deposit or procure to be deposited into the Secured Account such additional HK Dollar amounts in cash, to be charged in favour of the Lender under the Security Agreement, to ensure that the LTV Ratio, after being recalculated by taking into account the additional cash deposited, is equal to or less than the applicable Initial LTV Ratio."

(4)    Clause 20 sets out 16 events or circumstances which constitute an "**Event of Default**", including: (a) (at Clause 20.1) failure to pay on the due date any amount payable pursuant to a Finance Document; and (b) (at clause 20.2) failure to comply with Clause 18.1.

(5)    Clause 20.17 ("**Acceleration**"):

> "On and at any time after the occurrence of an Event of Default which is continuing the Lender may, by notice to the Borrower:

> (a)    cancel the Commitment whereupon they shall immediately be cancelled;

> (b)    declare that all or part of the Loan, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, whereupon they shall become immediately due and payable;

> (c)    declare that all or part of the Loan be payable on demand, whereupon they shall immediately become payable on demand by the Lender; and/or

> (d)    exercise any or all of its rights, remedies, powers or discretions under the Finance Documents."

(6)    At Clause 32: "This Agreement, and all non-contractual obligations arising from or in connection with this Agreement, are governed by English law," and at Clause 33.1 ("**Jurisdiction**"), for the English Court to have exclusive jurisdiction to settle any dispute arising out of or in connection with any Finance Document.

51. The "**Security Agreement**" was also made on behalf of Dawn State and UBS London. Under the Security Agreement Dawn State (the "*Chargor*") assigned first ranking security over its rights in or to certain assets, including in particular the UBS H-Shares to UBS. The Security Agreement further provided for the UBS H-Shares to be held by UBS London Branch, acting as Custodian, with the UBS H-Shares to be deposited into a charged account held with UBS on the terms of the Custody Agreement. The Claimants will refer to the Security Agreement at trial for its full terms and effect. Subject to that, the Security Agreement included the following provisions:

(1) Under Clause 3.1 ("**Assignment by way of security**"), that Dawn State assigned to UBS all its present and future right, title and interest (including those against the Custodian) in or to (*inter alia*) the Custody Agreement, the UBS H-Shares and the account in which they were held (the "*Secured Account*").

(2) Clause 3.2 ("**Fixed Charge**"), that Dawn State charged in favour of UBS its rights over (*inter alia*) the Secured Account and the UBS-H-Shares.

(3) Under Clause 8 ("**ENFORCEMENT**"):

(a) Clause 8.1 ("**When enforceable**"):

"*The Charges shall be immediately enforceable on the occurrence of an Enforcement Event which is continuing, and the powers conferred by the LPA on mortgagees including the power of sale and other powers conferred by Section 101 of the LPA as varied and extended by this Deed shall be immediately exercisable.*"

(b) Clause 8.2 ("**Power of Sale**"):

"*The statutory power of sale, of appointing a receiver and the other statutory powers conferred on mortgagees by Section 101 of the LPA as varied and extended by this Deed shall arise (and the Secured Obligations shall be deemed due and payable for that purpose) on the date of this Deed.*"

(4) Clause 9.3 ("**Financial Collateral Arrangement**"):

"*(a) The Chargor and the Lender intend that this Deed constitutes a "financial collateral arrangement" (as defined in the Financial Collateral Arrangements (No. 2) Regulations 2003 (the "Regulations") and, as such, the Lender shall have the right:*

*(i) to use and dispose of any Charged Asset which constitutes "financial collateral" (as defined in the Regulations ("Financial Collateral")), in which case the Lender shall comply with the requirements of the Regulations as to obtaining "equivalent financial collateral" (as defined in the Regulations);*

18

(ii)     *to set-off the value of any equivalent financial collateral against, or apply it in discharge of, any Secured Obligations in accordance with the Regulations; and*

(iii)    *(at any time after the Charges become enforceable) to appropriate any Charged Asset which constitutes Financial Collateral in or towards satisfaction of the Secured Obligations in accordance with the Regulations.*

(b)    *If the Lender is required to value any equivalent financial collateral for the purpose of paragraph (a)(ii) or (a)(iii) above, the value shall be:*

(i)     *in the case of cash, its face value at the time of appropriation or set-off; and*

(ii)    *in the case of financial instruments or other Financial Collateral, their market value at the time of appropriation, or set-off as determined (after appropriation) by the Lender by reference to a public index or other applicable generally recognised source or such other process as the Lender may select, including a valuation carried out by an independent investment bank, firm of accountants or other valuers appointed by the Lender.*

*as converted, where necessary, into the currency in which the Secured Obligations are denominated at a market rate of exchange prevailing at the time of appropriation or set-off selected by the Lender."*

(5)    Clause 9.4 ("**Sale of Charged Assets**"):

*"The Chargor acknowledges and agrees that the Share Collateral or other Charged Assets may decline speedily in value and are of a type customarily sold on a recognised market and therefore upon the enforcement of the Charges the Lender is not required to send any notice of its intention to sell or otherwise dispose of any Share Collateral or any other Charged Assets. Following the occurrence of an Enforcement Event which is continuing, the Lender or any Delegate or any Receiver may, in its sole and absolute discretion, sell Share Collateral or other Charged Assets in a private sale in such manner and under such circumstances as the Lender or Delegate or Receiver may deem necessary or advisable (with the Lender having the right to purchase any or all of the Share Collateral or other Charged Assets to be sold). The Chargor acknowledges that such sale shall be deemed to have been made in a commercially reasonable manner, notwithstanding that any such sale may be for a price less than that which might have been obtained had such Share Collateral or other Charged Assets been otherwise privately or publicly sold."*

52.    The "**Facility Agreement Side Letter**" was also made on behalf of Dawn State and UBS London. The Claimants will refer to the Security Agreement at trial for its full terms and effect. Subject to that, the terms of the Security Agreement included provision:

(1)    For Dawn State to make a substantial additional payment in respect of any early repayment under the Facility Agreement, as follows:

> "*On the date of any payment, repayment or prepayment of the Loan in whole or in part, the Borrower shall pay the applicable Make-Whole Amount…*
>
> "***Make-Whole Amount***" *means, in respect of the Loan to be repaid or prepaid, the amount of the spread that would have been applicable on the amount of the principal of the Loan repaid or prepaid for the period from the relevant date of repayment or prepayment up to the next occurring Mutual Break Date or, if none, the Final Repayment Date, had that amount so repaid or prepaid remained outstanding up to such Mutual Break Date or the Final Repayment Date, as the case may be.*"

(2)     And that "*This Facility Agreement Side Letter, and all non-contractual obligations arising from or in connection with this agreement, are governed by English law.*"

53.     Also on 1 April 2015, Dawn State provided UBS London (both in its capacity as lender under the Facility Agreement and as Custodian under the Custody Agreement) with a "**Settlement Authorisation**." The Claimants will refer to the Security Agreement at trial for its full terms and effect. Subject to that, under the Settlement Authorisation:

(1)     Dawn State authorised UBS London (as lender) to instruct and/or authorise the Custodian (also UBS London) to apply the Monetary Contribution made by Dawn State and Facility Amount advanced by UBS London towards funding the Subscription in accordance with the Subscription Agreement, and to transfer the UBS H-Shares allocated pursuant to the Subscription Agreement to the secured account subject to the Custody Agreement.

(2)     It was agreed that the "*Settlement Authorisation, and all non-contractual obligations arising from or in connection with this agreement, are governed by English law.*"

54.     The Settlement Authorisation was updated by a document entitled "**Amended and Restated Settlement Authorisation**" following the price uplift pleaded at paragraph 55 below.

**The Price Uplift**

55.     On 8 May 2015, Haitong sent a letter to Dawn State and other investors in the new H-Shares announcing that each of the conditions precedent to completing the issuance and sale of the new H-Shares in Haitong had been met and that Closing was expected to take place on 15 May 2015, and that because the trading price of H-Shares over the preceding 30 days had surpassed the agreed threshold, pursuant to Clause 2.2 of the Subscription Agreement the subscription price for the H-Shares was to be increased by HKD 1.56 per share, giving a share price of HKD 17.18 per share.

56.    Dawn State and UBS London therefore entered into an "*Amendment Agreement relating to the Facility Agreement*" on 13 May 2015 (the "**Amendment Agreement**").[1] The Claimants will refer to the Amendment Agreement at trial for its full terms and effect. Subject to that, under the Amendment Agreement:

(1)    At Clause 3.1, it was agreed to increase UBS's lending commitment to HK$6,011,236,393.92 and to increase in the initial LTV ratio to 61.45%, but the Margin Call Trigger remained 66.7%.

(2)    At Clause 6.4, it was agreed that the "*Amendment Agreement, and all non-contractual obligations arising from or in connection with this agreement, are governed by English law.*"

57.    Also on 13 May 2015, Dawn State and UBS London entered into a further security agreement, entitled "**Second Security Agreement**," updating the Security Agreement so as to reflect the amendments made to the Facility Agreement by the Amendment Agreement. The Claimants will refer to the Second Security Agreement at trial for its full terms and effect. The relevant terms of the Second Security Agreement are identical to those pleaded at paragraph 51 above, and those terms are repeated as particulars of the provisions of the Second Security Agreement.

**Completion**

58.    On 13 May 2015, Mr Kwok and Ms Yu authorised the final payment to Dawn State for the cash portion of the subscription price under the Subscription Agreement pursuant to Clause 4.1 of the Co-Investment Agreement. Pursuant to its obligations under the Facility Agreement, this sum was subsequently paid by Dawn State to UBS London as the Subsequent Borrower Contribution.

59.    Also on 13 May 2015 Dawn State made a Utilisation Request to UBS London, in accordance with clause 5 of the Facility Agreement, for the sum of HKD 6,011,236,393.82.

60.    Completion under the Subscription Agreement took place on 15 May 2015, and the UBS H-Shares were transferred to Dawn State. Upon its registration as shareholder, Dawn State immediately deposited the shares in the Secured Account with UBS London pursuant to clause 6.2(a) of the Second Security Agreement. UBS London therefore took assignment of the "**Acquired H-Shares**" by way of security in accordance with the terms of the Second Security Agreement pleaded at paragraphs 51 and 57 above.

---

[1] Amendment Agreement dated 13 May 2015

**Consequences of the Advice and Representations**

61.   The particulars of the advice and representations of UBS pleaded at paragraphs 14 to 20,  38 to 43 and 45 to 48 are repeated. Mr Kwok and Ace Decade entered into (and did not withdraw from) the Co-Investment Agreement with Dawn State and caused and permitted Dawn State to enter into the Lending Documents with UBS on the basis of and in reasonable reliance upon the adequacy of that advice and/or accuracy of those representations.

62.   In the absence of those representations:

(1)   If UBS insisted on including the Margin Call and Mandatory Prepayment terms under the Facility Agreement, Mr Kwok and/or Ace Decade would have acquired the UBS H-Shares without using loan financing from UBS;

(2)   Alternatively, Mr Kwok and/or Ace Decade would not have acquired the UBS H-Shares at all;

(3)   Alternatively, if (contrary to the Claimants' case) Mr Kwok and Ace Decade would have acquired the UBS H-Shares through Dawn State using loan financing from UBS and on the same terms, Mr Kwok and Ace Decade would have ensured that Dawn State had sufficient funds available to meet any such margin calls and/or repayments immediately.

63.   The terms of the loan documents are very disadvantageous to Dawn State, and advantageous to UBS London. In particular:

(1)   The Facility Agreement made provision for UBS to have both (a) the right to demand mandatory prepayment pursuant to Clause 7.7 and (b) to make margin calls pursuant to Clause 18.1.

(2)   Under Clause 7.7, UBS was entitled to demand full repayment of the loan because of a 15% single day reduction or a 25% reduction over five days in the value of the UBS H-Shares, irrespective of the absolute value of the Haitong H-Shares, the LTV ratio, or the extent or absence of risk of loss to UBS London as Lender.

(3)   Haitong H-Shares were, as UBS knew (through at least Mr Wong as a result of the discussions in 2014 and 2015, and in any event as a matter of general market knowledge), prone to short term fluctuations in value, and there was therefore a material risk that the entitlement to seek prepayment under Clause 7.7 would be triggered during the term of the Facility Agreement, including in circumstances in which there was not (or not materially) a risk of loss for UBS.

22

(4)    As UBS knew (at least through Mr Wong) or ought to have known:

    (a)    Dawn State was not the ultimate investor or the source of funds for the acquisition of the UBS H-Shares, and would not be the source of funds required to meet any margin call or demand for prepayment. This was a function of the structure for the investment which had been created on the advice of UBS, as pleaded at paragraphs 18 above.

    (b)    The time periods allowed for mandatory prepayment pursuant to Clause 7.7 or payment of margin pursuant to Clause 18.1 of the Facility Agreement were not sufficient (or not reasonably likely to be sufficient) to allow the sums in question to be provided to Dawn State and by Dawn State to UBS. In particular, UBS had acknowledged on 19 December 2014, in a letter to Haixia, that it understood that Dawn State could not make payments within 24 hours of a demand being made.

(5)    Accordingly, there was a substantial chance that there would be an Event of Default within Clause 20.1 and/or 20.2 of the Facility Agreement, and that UBS would become entitled to exercise remedies following on an Event of Default pursuant to Clause 20.17.

(6)    Pursuant to the Facility Agreement Side Letter, in the event that UBS exercised its rights to demand prepayment of the loan, Dawn State had agreed to pay UBS the whole of the spread that would have been applicable on the amount of the principal of the Loan repaid or prepaid for the period from the relevant date of repayment or prepayment up to the next occurring Mutual Break Date or, if none, the Final Repayment Date. Such a clause, which is unusual in such arrangements compared to simple "break costs" provisions meant UBS would be financially advantaged by exercising its right to demand mandatory prepayment under Clause 7.7.

### Enforcement by UBS London

64.    Between around 1 and 6 July 2015, there was a substantial drop in the trading price of Haitong shares, including H-Shares. By letter sent on the evening of 6 July 2015, UBS London served a notice on Dawn State pursuant to which it purported to exercise an entitlement to demand prepayment of the Facility advanced under the Facility Agreement pursuant to Clause 7.7 thereof. In that notice, UBS purported to demand payment of: (1) 25% of the Loan, together with accrued interest and all other amounts accrued under the Finance Documents (the "**Relevant Prepayment Amount**"), being approximately US\$200 million, by 5pm the following day; (2) 25% of the Relevant Prepayment Amount, being approximately US\$200 million, by 5pm on the second day after the notice was served; and (3) 50% of the Relevant

Prepayment Amount, being approximately US$200 million, by 5pm on the second day after the notice was served.

65. During the morning of 7 July 2015, Ace Decade informed UBS that while it would be able to meet the liability '*quickly*', it could not do so by 5pm that day. Mr Kwok also contacted Mr Wong by telephone to ask for additional time to secure sufficient funds in accordance with UBS's representations and advice particularised at paragraphs 14 to 20,  38 to 43 and 45 to 48 above. Mr Wong stated that no such time would be given, and that UBS London had resolved that the UBS H-Shares would be sold.

66. Dawn State did not pay the sum demanded by 5 pm on 7 July 2015.

67. During the evening of 7 July 2015, UBS London issued a "*Notice of Acceleration Event*" to Dawn State (the '**Notice**').

   (1) By paragraph 3 of this Notice UBS stated that all of the Loan (including the prepayment amount due today), together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents were immediately due and payable.

   (2) Also in paragraph 3, UBS gave notice of its right to exercise the power of sale pursuant to Clause 9.4 of "*each Security Document*" (i.e. the Security Agreement and Second Security Agreement).

68. By a further letter of 7 July 2015, UBS asserted that the sum payable totalled HKD 6,289,081,405.43 and comprised: (1) The loan principal (HKD 6,011,236,393.92); (2) Outstanding accrued interest (HKD 44,003,279.72); (3) 'Break costs' (HKD 1,873,883.54);and (4) The 'Make-Whole Amount' (HKD 231,967,848.24).

**Sale of the UBS H-Shares**

69. UBS London has provided limited information regarding how, if at all, it sold or purported to sell the UBS H-Shares. To the best of the Claimants' knowledge and belief:

   (1) On or about 8 July 2015 UBS London formally transferred 200,000,000 of the UBS H-Shares (from a total of 569,427,620) to Segantii Capital Management Limited ("**Segantii**") in a block trade at an average price of HK$11.12 for a total of HK$2,224,000,000.

   (2) On or about 10 July 2015, UBS itself purported to acquire absolutely 58,284,114 of the UBS H-Shares for a price which is not known to the Claimants. The Claimants also do not know whether, or if so when and at what price UBS sold those shares to a third party.

(3)   The Claimants do not know the details of any other sales made by UBS pursuant to the power of sale under Clause 9.4 of the Security Agreements.

70.   A price of HK$11.12 represented an unusually deep discount to the trading price of Haitong H-Shares, which closed at HK$13.90 per share on 7 July 2015.

71.   On the morning of 8 July 2015, Haitong announced a suspension of trading for its H-Shares, pending the release of announcements in respect of:

> *"(1) a potential scheme of a repurchase of the shares of the Company which, if implemented, is subject to the shareholders' approval and (2) a potential purchase of the shares of the Company by the senior management and/or employees of the Company…"*

72.   Accordingly, from the morning of 8 July it was generally known (including, it is to be inferred, by UBS) both that trading was suspended, and that there was at least likely to be a buy-back of Haitong's shares. On 9 July 2015, Haitong announced a buy-back of its own shares. On 10 July 2015, Haitong H-Shares recommenced trading. H-Shares opened at HK$14.24 and closed at HK$15.14.

73.   On 10 July 2015, UBS sent Haixia and its lawyers an email attaching "*a sheet detailing the application of the proceeds of Enforcement*", although the calculation was stated to be "*in draft form and …subject to full settlement of the trade.*" This provided that the payment to Dawn State would be calculated by reference to: (1) "*HK closing price as of 7 July 2015: HKD 13.90*"; (2) "*Block discount (%) 20.0%*"; (3) "*Block placement price: 11.12*"; (4) "*Number of Shares sold (shares): 569,427,620*" i.e. all of Dawn State's shareholding. UBS did not, then or subsequently, provide details of the actual buyers of any shares, how many shares were sold to each buyer, the price at which each sale was effected, when the sale was effected, or the terms of the sale.

**Transfer of Dawn State's Shares**

74.   On 18 September 2015, the entire share capital of Dawn State was transferred by Haixia Fund to Ace Decade, in accordance with Ace Decade's rights under the Letter Agreement.

**ACE DECADE'S AND MR KWOK'S CLAIMS**

75.   Ace Decade's and Mr Kwok's claims pleaded in the following paragraphs are pleaded on the basis and assumption that these claims are governed by the law of England and Wales. If it is asserted on behalf of UBS and/or found by the Court that the governing law of the claims is the law of Hong Kong, the same claims are pursued in the alternative under the law of Hong Kong, and the facts and matters pleaded below are relied on as particularising Mr Kwok and Ace Decades causes of action under Hong Kong law.

**UBS' Duty of Care**

76.   UBS owed duties of care in tort to Ace Decade and to Mr Kwok, comprising (each further or in the alternative):

(1)   A duty to exercise reasonable care and skill to ensure that information provided to or statements of fact made to them or either of them were accurate.

(2)   A duty to exercise reasonable care, skill and judgment in giving advice to them or either of them regarding (*inter alia*): (a) the structuring of the acquisition of the UBS H-Shares; (b) the financing of the acquisition of the UBS H-Shares; (c) the terms and effect of the Financing Documents; (d) the risks associated with those terms; (e) and/or UBS' intended and likely conduct in exercise of those rights.

77.   The facts and matters establishing the assumption of responsibility by UBS include at least the following:

(1)   At all relevant times Mr Wong was an agent of UBS with authority to enter into make representations and give undertakings on behalf of UBS.

(2)   As pleaded at paragraph 9 above, Mr Kwok (as UBS knew, at least through Mr Wong) at all material times treated Mr Wong as a trusted adviser and personal friend, and relied on him as such.

(3)   Paragraphs 11 to 13 above are repeated. As pleaded there, the background to the relationship between UBS and Mr Kwok and Ace Decade was an arrangement whereby Mr Kwok (at the request of UBS) assisted UBS to become the placement agent for the UBS H-Shares, and UBS offered in return to assist and advise him in acquiring the shares for which it was made placement agent on advantageous terms.

(4)   Mr Wong repeatedly held himself and UBS out as acting to protect and advance  Mr Kwok and Ace Decade's best interests in relation to the acquisition of the Placement Shares and the funding thereof, including in respect of all of: (a) the devising of the structure and funding plan for the investment; (b) the provision of information in respect of the structure, funding and merits of the investment; and (c) advising as to the structure, funding and merits of the investment. Paragraphs 17, 40 and 47 above are repeated.

(5)   Mr Wong repeatedly asserted that Mr Kwok and Ace Decade should repose trust in and rely upon Mr Wong and UBS. Paragraphs 17, 40 and 47 above are repeated.

(6)    UBS (through Mr Wong) in fact provided information and gave advice to Mr Kwok and Ace Decade, in circumstances in which it knew and intended that they would rely on that information and advice. Paragraphs 18 to 20, 21 to 23, 24, 28, 39 and 47 above are repeated.

(7)    As pleaded at paragraph 17, Mr Wong held himself and UBS out as having the experience and expertise to devise an advantageous structure for the acquisition for Mr Kwok and advising Mr Kwok (and, subsequently, Ace Decade) with respect to investments in placements such as that for the Placement Shares, the structuring of the investments, and the financing thereof.

(8)    In giving information and advice about the policies, intentions and/or likely conduct of UBS as the counterparty under the Lending Documents, Mr Wong and UBS addressed matters which were uniquely within UBS's knowledge, and which (as they knew) Mr Kwok and Ace Decade could not verify independently, and in respect of which Mr Kwok and Ace Decade would have to rely on the matters communicated to them by UBS.

**Breach of duty**

78.    UBS, by Mr Wong acting within the course and scope of his authority as UBS's agent, made false and misleading representations to Ace Decade and/or Mr Kwok prior to the execution of the December Contracts and thereafter prior to the execution of the Lending Documents, as set out above. In particular:

(1)    UBS stated that it had a policy which would apply to Ace Decade and Mr Kwok (and therefore to Dawn State as their intermediary) not to demand payment of margin or mandatory prepayment if prices moved in the short term. Paragraphs 39, 43 and 47 above are repeated. These statements were false and misleading in that (as can be inferred from UBS's actual conduct pleaded at paragraphs 64 to 68 above) UBS (through the decision makers acting for UBS London and/or, insofar as relevant, UBS HK in relation to the entry into and enforcement of rights under the Lending Documents (the "**Decision Makers**")) did not have such a policy and/or did not intend to apply it to Mr Kwok, Ace Decade and/or Dawn State.

(2)    UBS stated that it had a policy which would apply to Ace Decade and Mr Kwok (and therefore to Dawn State as their intermediary) if it were necessary for UBS to make a demand payment of margin or mandatory prepayment, pursuant to which UBS would work with them to allow them to meet any demands and would allow a reasonable time for them to do so, including longer time periods for payment than those in the Facility

Agreement if necessary, and would not sell any of the Shares as a result of any margin call without giving Ace Decade adequate time to pay. Paragraphs 39, 42 and 47 above are repeated. These statements were false and misleading in that (as can be inferred from UBS's actual conduct pleaded at paragraphs 64 to 68 above) UBS through its Decision Makers did not have such a policy and/or did not intend to apply it to Mr Kwok, Ace Decade and/or Dawn State.

(3)     UBS stated that it intended to treat Ace Decade and Mr Kwok (and therefore to Dawn State as their intermediary) in the manner in which it claimed to have treated the Ping An shareholder. Paragraphs 19, 39, 42 to 43 and 47 above are repeated. These statements were false and misleading in that (as can be inferred from UBS's actual conduct pleaded at paragraphs 64 to 68 above) UBS through its Decision Makers did not have such an intention, but instead intended to exercise all and any rights conferred on them under the Lending Documents in accordance with their terms and/or in the manner most advantageous to UBS.

(4)     UBS stated that it had in fact treated the Ping An shareholder in a manner which was in accordance with the supposed policies pleaded at sub-paragraphs (3) and (4) above, and that this evidenced the approach which UBS intended to take and would (or could be expected to) take under the Lending Documents. Paragraphs 19, 39, 42 to 43 and 47 above are repeated. These statements were false and misleading in that:

(a)     In conversations between Mr Wong and Mr Kwok in or around the middle of July 2015, Mr Wong indicated that (contrary to his earlier representations) the Ping An shareholder had in fact been the subject of margin calls (i.e. to demands for payment of margin or mandatory prepayment) and had met those demands in accordance with the terms of the relevant Lending Documents. If that is true, it follows that UBS's earlier representations were false and misleading.

(b)     Alternatively, if UBS did treat the Ping An shareholder in the manner pleaded at paragraphs 42 to 43 above, UBS's statements were false and misleading in that the treatment of the Ping An shareholder did not evidence the approach which UBS through its Decision Makers intended to take and would (or could be expected to) take under the Lending Documents.

(5)     UBS stated that it intended to act and was acting in Mr Kwok and Ace Decade's best interests in relation to the acquisition of the Placement Shares and the funding thereof. Paragraphs 17, 40 and 47 above are repeated. These statements were false and misleading

in that (as can be inferred from UBS's actual conduct pleaded at paragraphs 63 to 68 above) UBS through its Decision Makers did not intend to act in Mr Kwok or Ace Decade's best interest but instead intended to act in its own interests as Dawn State's contractual counterparty regardless of the consequences for Mr Kwok and Ace Decade.

(6)  UBS stated that it was providing loan financing for Dawn State (and therefore, in practice, Ace Decade) on advantageous terms, or on "*the best possible terms*." Paragraphs 11 and 19 above are repeated. These statements were false and misleading in that (as can be inferred from the matters pleaded at paragraph 63 above) UBS through its Decision Makers intended to offer them financing which was advantageous to UBS and very disadvantageous to Dawn State, Ace Decade and Mr Kwok.

79.  UBS, by Mr Wong acting within the course and scope of his authority as UBS's agent, was negligent in making those false representations in that, at the time of or before he made the representations, Mr Wong had:

PARTICULARS OF NEGLIGENCE

(1)  Failed to take reasonable care to ascertain whether UBS, and in particular UBS London, (through the relevant Decision Makers) intended to act and/or was acting in Mr Kwok and/or Ace Decade's best interests.

(2)  Failed to take reasonable care to ascertain whether UBS, and in particular UBS London, (through the relevant Decision Makers) would be offering Mr Kwok and/or Ace Decade finance on advantageous terms and/or on the "*best possible terms*".

(3)  Failed to take reasonable care to ascertain whether UBS had the policies pleaded at paragraph 78(1) and 78(2) above, and/or whether UBS London (through the relevant Decision Makers) in fact intended to apply those policies to Mr Kwok and/or Ace Decade (and therefore to Dawn State as their intermediary) as pleaded at paragraph 78(3) to 78(6) above.

(4)  Failed to take reasonable care to ascertain whether UBS, and in particular UBS London, (through the relevant Decision Makers) in fact intended to treat Mr Kwok and/or Ace Decade in the same way in which it claimed to have treated the Ping An shareholder.

(5)  Failed to take reasonable care to ascertain whether UBS had in fact treated the Ping An shareholder in the manner pleaded at paragraphs 42 to 43 above.

(6)   Failed to take additional or further reasonable steps to protect Mr Kwok and Ace Decade from suffering loss or damage as a result of the false or misleading representations made by UBS.

80.   UBS, by Mr Wong acting within the course and scope of his authority as UBS's agent, gave negligent advice to Ace Decade and/or Mr Kwok, as set out above. As regards the content of the advice given by UBS:

(1)   As pleaded at paragraph 19, UBS advised Mr Kwok and Ace Decade that it was in their best interests to make a leveraged investment using loan funding from UBS London, and that any leveraged finance provided by UBS would in any event be on the best possible terms.

(2)   As pleaded at paragraphs 39 and 47 UBS advised Mr Kwok and Ace Decade:

(a)   that they should not be concerned about the presence of margin call and mandatory prepayment provisions on the terms which appeared in the Facility Agreement; and, therefore

(b)   That the loan documents were nonetheless commercially advantageous for Ace Decade. That advice was supported by reference to UBS's representations pleaded at paragraph 78.

81.   UBS, by Mr Wong acting within the course and scope of his authority as UBS's agent, was negligent in giving that advice, in that:

PARTICULARS OF NEGLIGENCE

(1)   It was not (as must or ought to have been apparent to Mr Wong and UBS) in the interests of Mr Kwok and/or Ace Decade to use loan funding from UBS London to make the Investment, and in any event to do so on the terms of the Lending Documents, including because:

(a)   As Mr Kwok had explained to Mr Wong, he and Ace Decade did not require loan funding to make the investment, but could have done so out of their own resources; and

(b)   The loan funding from UBS London (in particular, on the terms of the Lending Documents and in circumstances in which the representations pleaded at paragraph 78 above were false) created a risk (and/or an excessive risk) that UBS would

enforce against the UBS H-Shares in the event of a fluctuation in the value of those shares, causing loss to Mr Kwok and Ace Decade.

(2) UBS ought, taking reasonable care, to have advised Mr Kwok and/or Ace Decade that there was a substantial chance that UBS London would (contrary to the representations pleaded at paragraph 78) enforce its strict rights under Clauses 7.7 and 18 of the Facility Agreement in accordance with their terms, and that it would not proceed in accordance with the policies which were the subject of the representations pleaded at paragraph 78 above. Without prejudice to the generality of the foregoing, having made the representations pleaded at paragraph 98 above, UBS came under a duty to correct any misapprehension, misunderstanding or ill-informed basis on which Mr Kwok and/or Ace Decade were operating.

(3) UBS ought, taking reasonable care, to have advised Mr Kwok and/or Ace Decade that there was a substantial chance that in the event of any fluctuation in the value of the UBS H-Shares, UBS London would enforce against the UBS H-Shares in accordance with the strict terms of the Financing and Security Agreements.

(4) UBS ought therefore, taking reasonable care, to have advised that making the Investment subject to the terms of the Lending Documents was not in accordance with Mr Kwok's (and therefore Ace Decade's) express wish that any leveraged investment should only be made on the basis that the provision of additional collateral or repayment of the loan should not be triggered by short term price fluctuations of the Placement Shares.

(5) The loan funding provided by UBS to Mr Kwok and Ace Decade was (as UBS must or ought to have known) not on advantageous terms (or *a fortiori* on the best possible terms), but was on very disadvantageous terms. Paragraph 63 above is repeated.

(6) Given the actual policies and intentions of UBS London, Mr Kwok and Ace Decade should (as UBS must or ought to have known) have been concerned about the presence of the mandatory prepayment and margin call terms under Clauses 7.7 and 18.1 of the Facility Agreement, and UBS ought to have advised that these terms posed a substantial risk to the outcome of the Investment.

(7) UBS failed to reasonable steps to protect the best interests of Mr Kwok and/or Ace Decade by:

(a) Informing Mr Kwok and/or Ace Decade that the financing proposed UBS was not financing on advantageous terms or '*on the best possible terms*';

31

(b) Informing Mr Kwok and/or Ace Decade of the risks associated with the terms of Clauses 7.7 and 18.1 of the Facility Agreement;

(i) Informing Mr Kwok and Ace Decade as soon as it became aware or suspected that any representation or any advice given to him was false, defective, misleading or incomplete.

(ii) Taking additional or further reasonable steps to protect Mr Kwok and Ace Decade from suffering loss or damage or otherwise protecting their interest.

**Ace Decade's claim**

82. Ace Decade brings the primary claim arising from UBS's breaches of duty pleaded above.

83. Ace Decade reasonably and foreseeably relied upon the representations and/or advice particularised above and the skill and judgment of UBS by (each further or in the alternative):

(1) Entering into the Co-Investment Agreement as particularised at paragraph 33;

(2) Not withdrawing from the Co-Investment Agreement or otherwise preventing the completion of the Investment before the completion of the Subscription;

(3) Causing or permitting Dawn State to enter into the Financing Letter as particularised at paragraph 36 above.

(4) Not preventing Dawn State from entering into the Lending Documents, and instead procuring that it acquired the UBS H-Shares without loan funding from UBS; and/or

(5) If (contrary to the Claimants' case) Dawn State would have acquired the UBS H-Shares using loan financing from UBS and on the same terms, not ensuring that Dawn State had immediate access to sufficient funds to meet any such margin calls and/or repayments.

(6) The Claimants repeat paragraphs 61 and 62 above.

84. UBS's negligence has caused Ace Decade loss and damage. In particular (each further or in the alternative):

ACE DECADE'S PARTICULARS OF LOSS

(1) Ace Decade has lost the entirety of its Monetary Contribution, being US$500 million, less the sum of HK$36,621,693.83, being approximately US$4.7 million at the prevailing exchange rate accounted for by UBS to Ace Decade after the sale of the Acquired Shares: US$495,300,000;

(2)   If Ace Decade would have withdrawn from the Investment altogether after the execution of the Co-Investment Agreement (rather than making the investment through Dawn State but funding it from either Mr Kwok and/or Ace Decade's own resources or alternative loan financing), Ace Decade has lost the entirety of its Monetary Contribution, being US$500 million, less the sum of HK$36,621,693.83, being approximately US$4.7 million at the prevailing exchange rate accounted for by UBS to Ace Decade after the sale of the Acquired Shares, and the fee of US$812,500 which would have been payable to Haixia Fund under Clause 6.5 of the Co-Investment Agreement: US$494,487,500;

(3)   Losses representing returns which it would have achieved from investing in the UBS H-Shares, to be quantified on the basis of expert evidence.

**Mr Kwok's Claim**

85.   Mr Kwok's claim is only pursued in the alternative to that of Ace Decade, on the premise that UBS denies and successfully disputes that any of its wrongdoing pleaded above is actionable at the suit of Ace Decade.

86.   Mr Kwok also reasonably and foreseeably relied upon the representations and/or advice particularised above and the skill and judgment of UBS by (each further or in the alternative):

(1)   Causing or permitting Ace Decade to enter into the Co-Investment Agreement as particularised at paragraph 33;

(2)   Not causing Ace Decade to withdraw from the Co-Investment Agreement or otherwise preventing the completion of the Investment before the completion of the Subscription;

(3)   Causing or permitting Dawn State to enter into the Financing Letter as particularised at paragraph 36 above.

(4)   Not preventing Dawn State from entering into the Lending Documents, and instead procuring that it acquired the UBS H-Shares without loan funding from UBS; and/or

(5)   If (contrary to the Claimants' case) Dawn State would have acquired the UBS H-Shares using loan financing from UBS and on the same terms, not ensuring that Dawn State had immediate access to sufficient funds to meet any such margin calls and/or repayments.

(6)   The Claimants repeat paragraphs 61 and 62 above.

87.   UBS's negligence has caused Mr Kwok loss and damage, in the same measure as Ace Decade. Paragraph 84 above is repeated *mutatis mutandis*.

**DAWN STATE'S CLAIM**

**Sale of the Acquired H-Shares**

88.   On 7 July 2015, as a result of an Event of Default, UBS purported to give notice to Dawn State regarding its right to exercise a '*power of sale*' in relation to the Charged Assets (being the UBS H-Shares). Paragraph 67 above is repeated. UBS London's contractual entitlement to sell the UBS H-Shares was found under Clauses 9.3(a)(i) and 9.4 of the Security Agreement.

89.   To the best of the Claimants' knowledge and belief, UBS did thereafter purport to exercise its power of sale and sold all of the UBS H-Shares. Save as pleaded at paragraph 69 above, the Claimants do not know the details of the sales made pursuant to that purported entitlement.

90.   Paragraph 51(3) above is repeated. In selling the UBS H-Shares, UBS was exercising a statutory '*power of sale*' under s.101 of the Law of Property Act 1925 (the "**LPA**") as preserved and modified by clause 8 of the Security Agreements, and was (and is) therefore subject to the duties and obligations imposed upon a mortgagee or chargee exercising such powers at law and in equity.

91.   In the premises, any purported sale(s) of the UBS H-Shares which caused or was/were designed to enable the Acquired Shares to be acquired absolutely by UBS were therefore invalid and of no effect. Any UBS H-Shares purportedly sold to UBS itself will have remained subject to Dawn State's rights and UBS's obligations under the terms of the Lending Documents.

92.   Otherwise (and subject to any provable costs and liabilities of Dawn State were satisfied out of said proceeds or profits) UBS was and remains under an immediate duty to account to Dawn State: (1) for its dealings with the Acquired H-Shares mortgaged to it, charged in its favour or otherwise held by it as Custodian; and/or (2) for any proceeds of said Acquired H-Shares obtained by it as a result of the sales; and (3) for any profits made by it as a result of the sales particularised in paragraph 69 above or other dealings as aforesaid;

93.   Further or alternatively, the aforementioned proceeds and/or profits are held on statutory trusts pursuant to s.105 of the LPA, alternatively on constructive trust, for Dawn State.

94.   Further or alternatively, UBS also owed a duty to exercise reasonable skill and care to obtain a proper price for the Acquired H-Shares when exercising its power of sale. Insofar as any purported sales of the UBS H-Shares were valid, the Claimants believe that UBS failed to act with reasonable skill in making the sales, by reason of the fact that it:

PARTICULARS OF NEGLIGENCE

(1) Failed or failed adequately to consider whether the discount applied to the H-Shares was an inappropriately large discount in the context of block sales on the HKEX;

(2) Failed or failed adequately to consider whether those shares could have been sold with a smaller discount;

(3) Failed or failed adequately to consider the effects of the suspension (or likely suspension) of trading in Haitong shares;

(4) Failed or failed adequately to consider the effects of the share buy-back by Haitong. Paragraphs 72 and 72 above are repeated;

(5) Failed to allow adequate time for the share buy-back to take effect; and

(6) Failed to take additional or further reasonable steps to ensure a proper price was obtained for the Acquired H-Shares.

95. As a result of UBS's negligence, Dawn State suffered loss comprising the difference between the price for which the shares were sold and the price that could reasonably have been obtained for those shares. The Claimants reserve the right to plead further on provision by UBS of particulars of the sales of the UBS H-Shares which it effected.

**Alternative claim in the event of appropriation by UBS**

96. UBS did not, on 7 July 2015 or at any time subsequently, take any definitive steps to appropriate the Acquired H-Shares or alternatively to communicate such steps to UBS. As a result, UBS has at no time appropriated the Acquired H-Shares in accordance with clause 9.3(a)(ii) of the Security Agreement or Regulation 17 of the 2003 Regulations.

97. If, contrary to the Claimants' case, UBS did purport to and did effectively appropriate the Acquired H-Shares pursuant to Regulation 17 of the 2003 Regulations, that appropriation could not have occurred prior to receipt of the notice from UBS to Dawn State of the exercise of the right of appropriation. No such notice was given prior to (if, contrary to the Claimants' case, such notice was ever given) 14 July 2015.

98. In the event of exercise of a right of appropriation, UBS was at all times and remains under a duty to: (1) Value the UBS H-Shares in a commercially reasonable manner at the time of appropriation; and (2) Properly account for any amount by which that value exceeded Dawn State's liabilities to UBS under the Security Agreements.

99. UBS's purported credit at a value of HK$11.12 per share (particularised at paragraph 73 above) could not reflect the commercially reasonable value of the Acquired H-Shares on any relevant

date. In particular (but without limitation) that credit of HK$11.12 per share was purportedly calculated by applying a discount to the closing price on 7 July 2015, and not on any possible date of appropriation.

100.   UBS would therefore be under a duty to: (1) satisfy the court that the UBS H-Shares were valued in a commercially reasonable manner at the date of appropriation; and (2) insofar as it cannot do so, account to Dawn State for any amount by which the commercially reasonable value of the UBS H-Shares at the date of appropriation exceeded Dawn State's liabilities to UBS under the Security Agreements.

**RELIEF SOUGHT**

101.   In the premises, Ace Decade is entitled to:

(1)   Damages as pleaded at paragraph 84 above, in the amount of at least US$495,300,000. This sum is equivalent to approximately £402,032,000 as at the date of this Claim based upon the XE.com mid-market rate.

(2)   Simple interest on that sum pursuant to s.35A Senior Courts Act 1981 ("**SCA 1981**") at a rate of 8% per annum.

102.   Alternatively to paragraph 101 above, Mr Kwok is entitled to:

(1)   Damages as pleaded at paragraph 87 above in the amount of at least US$495,300,000. This sum is equivalent to approximately £402,032,000 as at the date of this Claim based upon the XE.com mid-market rate.

(2)   Simple interest on that sum pursuant to SCA 1981 s.35A at a rate of 8% per annum.

103.   The amounts claimed at paragraphs 101 and 102 above are claimed in US Dollars (US$) as this is the currency in which the Claimant felt those losses.

104.   Further, or alternatively, in the premises Dawn State is entitled to:

(1)   An order that UBS render an account in common form in relation to the Acquired H-Shares held by it as Custodian. Paragraph 92 above is repeated.

(2)   An order that UBS render an account of profits arising from the circumstances particularised in paragraph 92(3) above.

(3)   A declaration that any of identifiable profits or proceeds referred to in paragraphs 92 above are held on statutory, alternatively constructive, trusts for Dawn State. Paragraph 93 above is repeated;

(4)   Further or alternatively, damages or equitable compensation for the difference between the sum at which UBS sold the Acquired H-Shares and the value which could have been reasonably obtained for said shares. Paragraph 94 and 95 above are repeated.

(5)   Alternatively, the difference between the amount accounted for by UBS to Dawn State and the commercially reasonable value of assets at the time of appropriation, which is claimed as a debt. Paragraph 100 above is repeated.

(6)   Further, Dawn State is entitled, under the court's equitable jurisdiction and/or SCA 1981 s.35A, to: (a) compound, alternatively simple, interest on the sums specified in sub-paragraphs (1) to (3) above; and (b) simple interest on the sums specified in paragraphs (4) and (5) above at a rate of 8%.

**AND the Claimants claim:**

(1)  Damages as specified above

(2)  Orders as specified above

(3)  A declaration as specified above

(4)  The difference between the sum accounted for by UBS and the commercially reasonable value of the H-Shares as a debt

(5)  Interest as specified above

(6)  Further and other relief

(7)  Costs

**SA'AD HOSSAIN QC**

**SEBASTIAN ISAAC**

**MATTHEW HOYLE**

I (the First Claimant) believe that the facts stated in these Particulars of Claim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed:



Name: Kwok Ho Wan

Date: 23 September 2020

The Second Claimant believes that the facts stated in these Particulars of Claim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed:

Name: Yanping (Yvette) Wang

Date: 23 September 2020

The Third Claimant believes that the facts stated in these Particulars of Claim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed:

Name:    Yanping (Yvette) Wang

Date:    23 September 2020