UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

In Re                         *   Case No. 22-50073 (JAM)
                              *
     HO WAN KWOK,             *   Bridgeport, Connecticut
                              *   September 27, 2022
                   Debtor.    *
                              *
* * * * * * * * * * * * * * * *

TRANSCRIPT OF CONTINUED STATUS CONFERENCE AND
APPLICATION TO EMPLOY FILED BY LUC A. DESPINS
ON BEHALF OF LUC A. DESPINS, TRUSTEE
BEFORE THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor,              ERIC HENZY, ESQ.
 HK International and        AARON ROMNEY, ESQ.
 Mei Guo:                    Zeisler & Zeisler, P.C.
                            10 Middle Street, 15th Floor
                            Bridgeport, CT  06604


For the Creditor, Pacific    STUART SARNOFF, ESQ.
 Alliance Asia Opportunity   O'Melveny & Myers LLP
 Fund L.P.:                  Times Square Tower
                            7 Times Square
                            New York, NY  10036

                            ANNECCA SMITH, ESQ.
                            Robinson & Cole
                            28 Trumbull Street
                            Hartford, CT  06103


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

```
APPEARANCES:  (Cont'd)

For the Creditors Committee:   IRVE GOLDMAN, ESQ.
                               Pullman & Comley
                               850 Main Street
                               Bridgeport, CT  06601

For the U.S. Trustee:          HOLLEY CLAIBORN, ESQ.
                               Office of the United States
                                 Trustee
                               The Giaimo Federal Building
                               150 Court Street, Room 302
                               New Haven, CT  06510

For the Chapter 11             NICHOLAS BASSETT, ESQ.
 Trustee:                      Paul Hastings LLP
                               200 Park Avenue
                               New York, NY  10166

Chapter 11 Trustee:            LUC A. DESPINS, ESQ.
                               Paul Hastings LLP
                               200 Park Avenue
                               New York, NY  10166
```

1          (Proceedings commenced at 2:10 p.m.)

2               THE COURTROOM DEPUTY:  Case No. 22-50073, Ho Wan

3     Kwok.

4               THE COURT:  Good afternoon.

5               If we could have appearances for the record,

6     please, starting with the Chapter 11 Trustee.

7               MR. DESPINS:  Luc Despins, Chapter 11 Trustee.

8     Good afternoon, Your Honor.

9               THE COURT:  Good afternoon.

10              MR. LINSEY:  Patrick Linsey, Connecticut counsel

11    for the Chapter 11 Trustee.  Good afternoon, Your Honor.

12              THE COURT:  Good afternoon.

13              MR. GOLDMAN:  Good afternoon, Your Honor.  Irve

14    Goldman, Pullman and Comley, representing the creditors

15    committee.

16              THE COURT:  Good afternoon.

17              MS. SMITH:  Good afternoon, Your Honor.

18              MR. BASSETT:  Good afternoon, Your Honor.

19              THE COURT:  Hold on just a second on the phone.

20              MR. BASSETT:  I apologize.

21              THE COURT:  Yeah.  Hold on.

22              MS. SMITH:  Attorney Annecca Smith, Robinson and

23    Cole, for PAX, and on Zoom is Stuart Sarnoff, of O'Melveny

24    and Myers, also for PAX.

25              THE COURT:  Thank you.  Good afternoon.

1          MR. SARNOFF:  Good afternoon, Your Honor.

2          MR. BASSETT:  And, Your Honor, Nick Bassett, from

3    Paul Hastings, on behalf of the Chapter 11 Trustee, also on

4    Zoom today.  Thank you.

5          THE COURT:  Good afternoon.  Attorney Claiborn?

6          MS. CLAIBORN:  Good afternoon, Your Honor.  Holley

7    Claiborn for the U.S. Trustee.

8          THE COURT:  Good afternoon.

9          Attorney Henzy?

10          MR. HENZY:  Eric Henzy, for the debtor.

11          THE COURT:  Good afternoon.

12          MR. HENZY:  Good afternoon, Your Honor.

13          THE COURT:  Mr. Kindseth and Mr. Romney?

14          MR. KINDSETH:  Good afternoon.  Stephen Kindseth,

15    for the debtor, Ho Wan Kwok, as well as the third party, HK

16    International and Mei Guo.

17          MR. ROMNEY:  Good afternoon, Your Honor.  Aaron

18    Romney Zeisler and Zeisler, for the same parties.

19          THE COURT:  Good afternoon.

20          Mr.  Romney, when you have a chance, maybe you can

21    just get closer to the microphone when you speak.  It's just

22    a little garbled.  You don't have to do it right now, but it

23    just came through a little garbled.  Okay?

24          MR. ROMNEY:  Is that better, Your Honor?

25          THE COURT:  That's a little better, yes.  It's

1    just a -- it just sounds like you're far away.  And so I

2    just want to make sure the courtroom deputy can pick up your

3    voice clearly.  Okay?

4              MR. ROMNEY:  Thank you, Your Honor.

5              THE COURT:  Thank you.

6              All right.  On the calendar, in the Kwok case

7    today, there are three applications to employ and then the

8    continued status conference.

9              Mr. Goldman, I had asked you at a prior hearing

10   about the two applications to employ.  And you asked to just

11   set them for hearing today and that you'd report on how you

12   wanted to proceed with regard to those two applications to

13   employ.  So the applications to employ are ECF 321 and 325.

14             So how are you intending to proceed today?

15             MR. GOLDMAN:  So what I'd like to do, Your Honor,

16   is, since that last hearing, we've had discussions.  I've

17   had discussions with the U.S. Trustee and the trustee to try

18   to work out some language that they could accept for the

19   retention of these two professionals consistent with the

20   idea that, you know, the trustee would have -- would have a

21   say in whatever we wanted them to do, if anything.

22             And so we were able to work out language, as of

23   yesterday, that is acceptable to the U.S. Trustee and the

24   trustee that revises those retention orders.

25             Conceptually what the revisions involve are the

1    idea that the professionals would be retained unqualifiedly

2    for the services they performed in the week or so after they

3    were retained, so from May 3rd.

4              For Coleman, it was May 3rd through May 10th, I

5    believe.  And then he stopped working at our request because

6    that -- at that point in time, we knew that the funding --

7    the DIP motion had been withdrawn, the debtor had consented

8    to dismissal.

9              We thought it was, you know, a prudent course of

10   action to just have those professionals stop working at that

11   time until we knew how the case was going to turn out.

12   For Dundin, it was May 3rd to May 15th that they worked.

13             And so for those two periods the orders would

14   provide that, you know, they were retained and authorized to

15   provide all the services that were identified in the

16   application and the proposed order.

17             But after that, those dates, if the committee

18   wanted the professionals to perform any services, we would

19   first have to consult with the trustee, seek his consent,

20   and if he didn't consent, we would have an opportunity to

21   come to the Court after notice and a hearing to get the

22   approval for those unwanted services, let's say, that the

23   trustee did not consent to.

24             So that really -- those are conceptually the

25   changes.  We've worked out the actual language.  And I can

1   submit the orders, in blackline and redline versions as

2   well, from the original orders, to Your Honor at this point

3   unless any other party had an issue with the -- with what I

4   described.

5              THE COURT:  Okay.  Thank you.  That makes sense to

6   me.

7              Does anyone else wish to be heard on the

8   applications to employ the professionals by the committee

9   that were filed back some time ago, I think in early May?

10  Does anyone else wish to be heard?

11       (No response)

12             Okay.  Hearing nothing then, Attorney Goldman,

13  you'll submit those revised proposed orders.  How much time

14  would you like?

15             MR. GOLDMAN:  By Friday?

16             THE COURT:  That's fine.  Just for the clerk's

17  office, otherwise it will get lost or it could get lost --

18             MR. GOLDMAN:  Sure.

19             THE COURT:  -- so I'd like to have a date --

20             MR. GOLDMAN:  That's plenty of time.

21             THE COURT:  -- so it's easier for the clerk's

22  office.  Okay?

23             So then an order will enter granting the

24  application, and you'll submit that revised, proposed order

25  by Friday, the 30th?

1          MR. GOLDMAN:  Yes.

2          THE COURT:  Okay.  Great.  On both -- on both of

3     these applications?

4          MR. GOLDMAN:  Both the professionals.  Yes.

5          THE COURT:  Okay.

6          MR. GOLDMAN:  Thank you, Your Honor.

7          THE COURT:  Thank you very much.

8          All right.  Then, Mr. Despins, you have an

9     application to employ as well, so go right ahead.

10          MR. DESPINS:  Thank you, Your Honor.  For the

11     record, Luc Despins, Chapter 11 Trustee.

12          It's the retention of Harney's, a British Virgin

13     Island law firm, that we need to use as counsel over there

14     to handle local law issues.  That was filed at docket 807 on

15     August 30th.  And I'm not going to spend a lot of time on

16     this in the sense that there were no objections by anyone.

17          So the important thing from our point of view is

18     they've agreed to wait to get paid until there are funds in

19     the estate.  The same way, you know, subject to the same

20     regime we are, which is a lot of value to us.

21          After we filed this, we disclosed to the U.S.

22     Trustee that their affiliate, which is not a law firm, but

23     it's certainly an affiliate of Harney's, provides director

24     services.  That's the way it works in the BVI.  You hire

25     these professional directors.

1    And the U.S. Trustee's view was that we should

2    file not only a full disclosure of that, which we did, but

3    also amend the application to make sure that it's the

4    retention of Harney's as lawyers, but also the retention of

5    that, you know, director services firm, as under 363.

6    And as I said before, I'm not sure that we agree

7    that's required, but we did it.  Full disclosure is

8    important.  And so we filed this at docket number 855.

9    Their fees are 6,000 -- for the rest of the year,

10   are 6,667.  And they also agreed for their future fees to

11   wait to get paid until there's money in the estate.

12   And, again, as we said, that structure is highly

13   advantageous to us.  No other firm would give us these

14   discounts unless it was a package deal.

15   And for those reasons, we believe it's appropriate

16   to retain them on the terms set forth in the application and

17   the amended application, Your Honor.

18   THE COURT:  Okay.  Thank you.

19   Does anyone wish to be heard on the application to

20   employ Harney Westwood?

21   MS. CLAIBORN:  Your Honor, Holley Claiborn for the

22   U.S. Trustee.  The U.S. Trustee has no objection.

23   THE COURT:  Okay.  Thank you.

24   Does anyone else wish to be heard on the

25   application to employ Harney Westwood?

1          (No response)

2              THE COURT:  Okay.  Hearing nothing, I --

3              The proposed order that was originally submitted,

4      Trustee Despins, with the application, is there any need

5      that that has to be revised because of the -- of what you

6      talked about with the United States Trustee's Office?

7              MR. DESPINS:  I'm not 100 percent sure.  We

8      probably should.  I should look at that.  Yes.  It's

9      logical.

10             THE COURT:  So why don't we do this.  I will say

11     that the application is granted, subject to the submission

12     of a revised, proposed order.  And then it might be the same

13     order depending upon what the situation is, but you'll

14     submit it.  You'll have to look at it.

15             MR. DESPINS:  Thank you, Your Honor.

16             THE COURT:  All right.  And then how much time

17     would you like to do that?

18             MR. DESPINS:  Just two days is fine, Your Honor.

19             THE COURT:  We'll give you -- we'll give you to

20     Friday.  And if you get it in earlier, you get it in

21     earlier.  Okay?

22             MR. DESPINS:  Thank you.

23             THE COURT:  All right.  So then we -- the final

24     matter on today's calendar is the status conference.

25             And I know that the trustee has an outstanding

1    application for an expedited hearing on the protective order

2    issue that was filed over the weekend.  And I see that the

3    debtor filed an objection to that.

4           I did not rule one way or another because I didn't

5    see it until at some point yesterday.  And then I saw the

6    debtor's objection.  The debtor's objection is asking for

7    some time to review it.

8           Given where we've been in different situations in

9    this case, I assume that the trustee would have no

10   opposition to giving the debtor some time to review the

11   proposed order.

12          And my thought was -- subject to hearing from --

13   and I don't know if Attorney Henzy or Attorney Romney are

14   handling the discovery part of it, that we set it for a

15   hearing next Tuesday and give the debtor an opportunity to

16   file any objection it may have to the order by the -- by

17   noon on Monday.  That was where I was proposing to go with

18   regard to the protective order.

19          So I don't know.  Attorney Henzy or Attorney

20   Romney, which of the two of you are -- or maybe Attorney

21   Kindseth -- I shouldn't say that, I don't know who's

22   handling it, but which of you would like to be heard on

23   that?

24          MR. ROMNEY:  Yes, Your Honor.  Aaron Romney for

25   the debtor.

1        What Your Honor is proposing is all we were

2    looking for.  The protective order was filed over the

3    weekend.  We hadn't seen it.  Some people are out for Jewish

4    holidays.  And all we wanted was an opportunity to review it

5    and discuss it with the trustee's counsel.  Certainly by

6    early next week, I think Your Honor said, Monday, that would

7    be agreeable to either hear that matter or more likely

8    submit an order on Tuesday.

9        THE COURT:  Okay.  So even though the motion for

10   expedited hearing is not on today's calendar, what I will do

11   after this hearing, after our status conference is complete,

12   I will -- we will grant that motion for an expedited

13   hearing.  We will set it for hearing for next Tuesday.

14       And just bear with me for a moment.  I just lost

15   my place.  I'm sorry.

16       (Pause)

17       THE COURT:  We can have the hearing on Tuesday at

18   noon if you'd -- or any time after that.  Whatever anybody

19   would prefer.  It's up to the parties.

20       Would you like noon, Trustee Despins, or later?

21       And what's everybody else's schedules?

22       MR. DESPINS:  Noon is fine, Your Honor.

23       THE COURT:  Okay.  Does that work for everyone

24   else?  Noon next Tuesday?

25       MR. ROMNEY:  Works for me, Your Honor, on behalf

1    of the debtor.

2              THE COURT:  Okay.  So then the motion for an

3    expedited hearing will be granted.  The hearing will be held

4    at noon on October 4th, and the -- any party who wishes to

5    file an objection to the underlying motion regarding the

6    protective order must do so by noon on Monday, October 3rd.

7    Okay?

8              And then the trustee's counsel will serve the

9    order.  But obviously the majority of people will get it

10   electronically and we'll go from there.  Okay?

11             Does that make sense to everyone?

12             MR. DESPINS:  Yes, Your Honor.

13             THE COURT:  Okay.

14             MR. ROMNEY:  Yes.  Thank you.

15             THE COURT:  All right.  So, Mr. Despins, you also

16   had a suggested agenda for today's status conference.  So I

17   have no problem with you proceeding in the manner in which

18   you suggested, so go right ahead.

19             MR. DESPINS:  Okay.  So may I approach, Your

20   Honor.

21             THE COURT:  Yes, please.  Thank you.

22             MR. DESPINS:  And, Your Honor, my understanding is

23   that a PowerPoint presentation was provided.  I know it was

24   presented to Mr. Henzy before the hearing because I was

25   there, but it was supposed to be emailed to Mr. Romney and

1    Mr. Kindseth some time around two o'clock.  I hope they

2    received it from -- I'm not -- I'm not saying then --

3              THE COURT:  I'm just --

4              MR. DESPINS:  It was sent from Mr. Lindsey's firm.

5              THE COURT:  Okay.

6              MR. LINSEY:  They got it, Your Honor.

7              MR. DESPINS:  Okay.

8              MR. ROMNEY:  And obviously I have it, Your Honor.

9              THE COURT:  Okay.  Thank you.

10             MR. ROMNEY:  Thank you.

11             MR. DESPINS:  And I believe that it was sent to

12   Mr. Sarnoff as well.

13             So an update on the HK USA adversary proceeding.

14   On Friday, we filed our answer and counterclaim, fairly

15   extensive counterclaims. So today is not the trial on that

16   obviously.

17             But at the same time, we also asked for

18   prejudgment remedy to maintain the status quo, particularly,

19   but not only, particularly with respect to the $37 million.

20   And we had asked for an expedited hearing on that. That may

21   have gotten lost in the shuffle, but I think to get to the

22   punch line on that, we had asked for a hearing on October

23   7th because that's the hearing scheduled on the Lady May --

24             THE COURT:  Repairs --

25             MR. DESPINS:  -- you know, repairs.

1          THE COURT:  Right.

2          MR. DESPINS:  And the debtor's filed an objection,

3     which we -- that was filed yesterday.

4          And just to put people at ease, we're okay not

5     proceeding on the 7th.  What we need, however, is the status

6     quo, the legal status quo, to be maintained as it is today.

7          So, therefore, if the debtors want more time to

8     deal with the prejudgment attachment motion, that's fine,

9     but then there needs to be an order, hopefully it would be

10    on consent, that would say the following things will not

11    happen.

12         For example, no notice will be given to the bank

13    that holds -- I forget if it's U.S. Bank or UBS, whatever --

14    but that holds the $37 million and things along those lines.

15    And obviously the yacht will not be moved until there's a

16    hearing, whatever that hearing is.

17         THE COURT:  May I -- may I ask you a question?

18    When you say not proceed on October 7th, are you saying not

19    proceed at all with anything on October 7th or just the pre

20    -- your request for a prejudgment --

21         MR. DESPINS:  Just the prejudgment attachment.

22         THE COURT:  Okay.  Okay.  Thank you.  I wasn't

23    sure.  I just wanted to clarify that.

24         MR. DESPINS:  The only thing that's not -- that's

25    unclear about what is the legal status quo other than what I

1    just mentioned is with respect to the debtor's daughter, who

2    is now -- the summons has not issued for some reason by the

3    clerk's office.  But we did name her in the counterclaim as

4    a defendant, but for some reason, the summons has not

5    issued.  But the question is as to --

6              THE COURT:  The clerk's office actually was not

7    open yesterday.  They had a meeting offsite, so that's

8    probably -- when did you file the counterclaim, on Friday

9    afternoon?

10             MR. DESPINS:  Yes.

11             THE COURT:  Yeah.  That's probably why.

12             MR. DESPINS:  To be fair, evening.

13             THE COURT:  But I would assume that you'll get a

14   summons issued.  Well, let's stop for a minute though.

15             MR. DESPINS:  Yeah.

16             THE COURT:  It's your counterclaim, right?

17             MR. DESPINS:  Correct.

18             THE COURT:  So you need a summons issued because

19   you're now the counterclaiming plaintiff?

20             MR. DESPINS:  Correct.

21             THE COURT:  And they need to -- okay, okay.  I

22   haven't --

23             MR. DESPINS:  No.  No.

24             THE COURT:  I know it was filed, but I haven't

25   looked at it very much, so that's fine.

1          MR. DESPINS:  Your Honor, it --

2          THE COURT:  We'll make sure the clerk's office

3     takes care of that.

4          MR. DESPINS:  It's a beast, so I don't -- didn't

5     expect you to have looked at it or digest it by now.

6     There's a lot of meat in there.

7          So what I was saying is, with respect to her, the

8     question is what is the status quo?  Meaning we're not going

9     to be ridiculous here in a sense that we're not interested

10    in personal effects and things like that, but if she has

11    millions of dollars parked somewhere, that money should not

12    be moving until there's a hearing on this.

13         So, you know, -- and I don't know.  I mean,

14    they've -- the Zeisler firm represents her so I don't know

15    if they're aware of her personal financial condition, but we

16    know that the debtor typically has parked a lot of cash and

17    a lot of assets with his family so it's certainly a

18    possibility.

19         But if it's -- if she has none, meaning she has

20    regular stuff like clothes and an apartment and things like

21    that, we're not interested in that.  We're interested in,

22    you know, things that would move the dial in a material way.

23    So, you know, I guess it's up to I guess to the Zeisler firm

24    to let us know their views on that.

25         So we're not looking for a big production over the

1    issue of the scheduling.  We're happy to have a schedule

2    whenever convenient to them as long as there's a clear

3    understanding that nothing is happening with the yacht, the

4    $37 million, and what I would describe as material assets of

5    the new counterclaim defendant, the daughter's -- the

6    debtor's daughter.

7            So moving on -- I'm sure they'll have comments on

8    this later.

9            The next item on the agenda is the update on Ace

10   Decade and Dawn State, Your Honor.  You're familiar with

11   that.  I mean, it's been a month now.  There's an order in

12   place saying they're supposed to give us all these things.

13   They're not.  You know, there was -- I'm not going to be

14   petty about this, but it was first Mr. Henzy and Mr.

15   Kindseth were in New York so they were not available.  Then

16   there's COVID.  Then there's Rosh Hashanah.

17           The point is there's no reason why we don't have

18   the documentation for Ace Decade and Dawn State.  And,

19   again, it's been a month now practically since we've made

20   that request.

21           The order is precise so there's no need for

22   another motion.  The order says you shall provide to the

23   trustee all these corporate documents with respect to

24   entities you own.  And, in fact, we've provided two or three

25   reference points as to why Mr. Kwok owns these two entities.

1    So we hope that this will be addressed today.

2              Now, moving on to the -- on page 7, the Rule 2004

3    discovery.  This is not the appropriate forum to go through

4    that in details, but I want Your Honor to know that we're

5    hitting major roadblocks with the debtor's positions.

6              For example, their view is that they only need to

7    provide us discovery with respect to assets that he

8    acknowledges he owns or that are subject to litigation, for

9    example, the apartment in New York or the yacht.  But other

10   assets that he may own, or we believe he may own, they don't

11   need to provide us discovery on that.  Obviously, that's the

12   whole point of the investigation.  That's one thing.

13             Then they take the position that he has no

14   documents, none.  Okay.  I'm not sure that's possible.  And

15   they say, well, how do we know that?  Well, we've asked him

16   and he says he has none.

17             Well, you don't need to go very far.  There's a

18   video that we referred Your Honor, you know, a long time ago

19   on HBO of the debtor where he goes through is apartment.

20   And on the table there, there are about 12 iPhones.  And

21   he's pointing out that he's using those because the

22   Communist party is always listening to him, but he has 12

23   iPhones.

24             And he stated in the complaint, the UBS complaint

25   that we've given to Your Honor, that he communicated with

1    UBS by WhatsApp, which is an application that people can use

2    on an iPhone or other, you know, intelligent device, so

3    clearly he is using technology.  He's always on the internet

4    every day, you know, issuing all sorts of statements so he

5    is very -- he knows what he's doing.

6          And so the concept that he has no documents is a

7    problem because what he does, and that's exactly the way he

8    operates his business, is that every one, you know, these

9    other shell companies that he controls completely, and he

10   has people that are in charge that are his bodyguard, you

11   know, they're the shareholder, but he's -- they're really

12   what -- if you ask them what they do for a living, he's the

13   bodyguard, he's the chef, he's an assistant that has -- does

14   not have a high school degree, these are the shareholders,

15   and these people have everything. But he's saying, well, you

16   know, they have it, we don't have it.  He controls it.

17   Under the rules he's supposed to produce it.

18          So today is not the motion to compel, but I want

19   to tell you we're spending a lot of time on this.  And

20   you'll hear during the case that the fees generated are very

21   high.  And they are very high because we are -- we're facing

22   roadblock after roadblock on all of this.

23          So that's -- that is, again, today is not the

24   motion to compel, but I want to make sure that Your Honor

25   knows that we're hitting these roadblocks.

1          And then on the privilege -- you know, so there

2     was a consensual order on privilege, so we thought, hmm,

3     that's going to go smoothly.

4          Well, what's happening is that, for example, Brown

5     Rudnick is saying I'm not producing a document until the

6     debtor's counsel tells me it's okay.  Well, they're saying,

7     well, we need to review that.  That's going to take, you

8     know, unlimited -- or there's no deadline provided so we

9     don't have any of those documents.

10         And so, again, that's going to probably be teed up

11    through a motion to compel, but I wanted Your Honor to be

12    aware of it.

13         Now, housekeeping matters.  The first one, we're

14    troubled by this.  There were two houses in Connecticut that

15    were owned by a company called Greenwich Land.  And that

16    entity the debtor testified is owned by his wife.  It's not

17    demeaning in any way, but she has no money.  That money to

18    buy these two houses came from Kwok entities.

19         And what happened pre-bankruptcy is that PAX

20    issued a notice to that company, Greenwich Land, that it was

21    a domestication in Delaware of the order by Judge Ostrager

22    saying you shall not transfer anything.  And that notice was

23    valid for one year.  It was given in May of 2021, so it was

24    good until May 2022.  Well, they sold one of the houses in

25    April 2022.

1          And, you know, obviously we're going to look into

2     this, but, you know, makes us very concerned about -- and it

3     explains a lot about how we're acting in the case that -- if

4     this is happening.

5          Now, that didn't happen on our watch, meaning that

6     happened in April of this year.  There was no trustee in

7     place.  And I'm sure they'll say, well, that's the wife's

8     house so, you know, we're free to sell it, but there was --

9     there was an order preventing the sale of the house as far

10    -- at least the way I understand it, and that house was sold

11    for 2 million plus.

12         Monthly operating report.  Well, the deadline has

13    not passed.

14         The other point is the next status conference we

15    had scheduled one for October 4th, but there's no point in

16    doing that on October 4th because we're going to be here on

17    October 7th. So if Your Honor is okay with that, we would

18    move the next status conference.

19         THE COURT:  I think that makes sense.

20         MR. DESPINS:  But I think, Your Honor --

21         THE COURT:  So you're not having a conference on

22    the 4th?

23         MR. DESPINS:  -- we really need to hear about Ace

24    Decade and we need to hear about the prejudgment attachment

25    because we want to avoid a lot of -- and we're volunteering,

1    you know, on the prejudgment attachment to take much more

2    time than if they want to as long as there's a very tight

3    order that's entered that protects the estate against any

4    dissipation of assets.

5           Thank you, Your Honor.

6           THE COURT:  Thank you.

7           Attorney Henzy?

8           MR. HENZY:  I'm going to just address the Ace

9    Decade issue, Your Honor.

10          The debtor does not admit, in fact, disputes that

11   he owns Ace Decade.  I understand that the trustee has

12   pointed to some things.  I can talk about those things.

13          But there is -- right now there is nothing before

14   the Court.  This is a status conference.  There's no motion

15   that's been filed.  So I don't know.

16          One of my I guess questions with these status

17   conferences is -- they're helpful to the Court, that's

18   obviously what matters, but we get in front of you and talk

19   about these things when there's no motion.  So there's no

20   motion I would argue.

21          I understand there's the corporate governance

22   order, but the corporate governance order assumes that the

23   debtor owns something.  As I said, the debtor disputes that

24   he owns Ace Decade, so I don't --

25          THE COURT:  Well, what do you -- what do you --

1    how do you respond to that issue when your client apparently

2    testified at the 341 meeting that he owned it?

3              MR. HENZY:  So, Your Honor, we are getting a --

4    our own translation of the 341 meeting, but the debtor has

5    reviewed the transcript --

6              THE COURT:  The debtor had a translator at the 341

7    meeting.

8              MR. HENZY:  And, actually, Your Honor --

9              THE COURT:  Yes.

10             MR. HENZY:  -- that 341 meeting, I think there was

11   a lot of back and forth about the translation.  And I, you

12   know, I've got a bunch of stickies in the transcript that's

13   been produced where there was back and forth between

14   translators and where the --

15             THE COURT:  I don't think there were two

16   translators.  There were two translators when we had a

17   hearing in court once.  Were there two translators at the

18   341 meeting?

19             MS. CLAIBORN:  Yes.  Let me just break it into two

20   pieces.

21             THE COURT:  Can you just speak a little bit more

22   into the microphone.  I'm sorry.

23             MS. CLAIBORN:  Yes.

24             THE COURT:  I just couldn't hear you very well.

25             MS. CLAIBORN:  This microphone I think is not very

1    good, so I'll have to get very close to it.

2          THE COURT:  Sorry.

3          MS. CLAIBORN:  At the first 341 meeting, that

4    meeting was held telephonically.  The U.S. Trustee had a

5    translator that was on the telephone from a translation

6    service.  The debtor was appearing I believe from the Brown

7    Rudnick office with his own translator in person with him at

8    that time.

9          So notwithstanding whatever criticisms there may

10   be of the translator provided by the U.S. Trustee's Office,

11   the debtor had his own personal translator with him that

12   day.  And my recollection is that it was Ms. Wilkinson, who

13   is the same translator who appeared before the Court.

14         THE COURT:  And we had two translators that day

15   when Mr. Kwok testified in person in this court to alleviate

16   the claim that there -- that the translation might not be

17   correct.

18         And when there was an issue that came up between

19   the two translators, it was discussed in open court and they

20   agreed to what the language was of the question being asked

21   and the answer being provided.

22         So I understand what you said, but I'll tell you

23   it's going to be interesting for Mr. Kwok, who came into

24   this court and said he wanted to resolve his issues with his

25   creditors, and then testified that he owns Ace and now

1    claims that he doesn't, that he disputes that.  That's going

2    to be a difficult road for him I think.

3              MR. HENZY:  So, Your Honor, just to be clear, the

4    341 that is where the relevant testimony is is the second

5    341.  So I think not --

6              MS. CLAIBORN:  I can speak to that one too if

7    you'd like.

8              MR. HENZY:  Yeah.  That's April 6th.  And, again,

9    I don't know that today's the day, but the --

10             THE COURT:  Well, there is already an order in

11   place, right?  And the trustee's already demanded, asked for

12   that information, and you said at a prior conference that

13   you needed time to review it because you didn't know, and

14   that was fair, you didn't know what the status of Ace and

15   Dawn were, the other two plaintiffs in the action in London.

16             The trustee has now shown you the 341 meeting

17   transcript.  And maybe I'm -- I could be confused about this

18   point, so let me just say that I'm not sure I'm accurate

19   about what I'm going to say, but I thought there was also

20   something in Mr. Kwok's declaration that he filed back in

21   March or April to support the DIP financing motion and the

22   plan.

23             MR. HENZY:  There was not.

24             THE COURT:  Well, I don't think -- I'm not --

25             MR. HENZY:  Not on -- not on Ace Decade.

1          THE COURT:  Okay.  Well, other people seem to be

2     nodding their heads.

3          MR. HENZY:  Just so -- because there's no -- just

4     so there's no, you know --

5          THE COURT:  Yeah.

6          MR. HENZY:  -- the documents are what they are.

7          In the complaint that was filed in the U.K., it's

8     a -- what I'm going to call the equivalent of a verified

9     complaint, I don't -- I don't think it's what they call it

10    there, but there's a complaint signed by counsel, and then

11    someone on behalf of the plaintiffs, each of the three

12    plaintiffs, signed it to say everything in here is true.

13    And in the complaint it says that Mr. Kwok acquired Ace

14    Decade, I think it was in 2014.

15         THE COURT:  Two thousand, fourteen.

16         MR. HENZY:  Okay.  And I've been told that that

17    statement is not correct.  And counsel in the U.K. --

18         THE COURT:  You've been told by Mr. Kwok that that

19    statement is not correct?

20         MR. HENZY:  Yes.

21         THE COURT:  Okay.  Well, that's interesting.

22         MR. HENZY:  I understand.  I understand.

23         THE COURT:  That's interesting, because he said --

24         MR. HENZY:  Your Honor, I --

25         THE COURT:  -- he said now in more than one

1    jurisdiction that he did own -- does own it.

2          MR. HENZY:  And in other places, as I understand

3    it, he has said that he doesn't.

4          So, again, we're not -- I don't think we can

5    litigate this today, Your Honor.

6          THE COURT:  I'm not trying to litigate it.

7          MR. HENZY:  Okay.

8          THE COURT:  I'm trying to have the debtor respect

9    the terms and conditions of an order that he hasn't

10    appealed.  He didn't appeal the portions of the governance

11    order that said that the Chapter 11 Trustee stepped into his

12    positions as far as governing the entities in which he has

13    an interest or which he is the owner or controller of that

14    entity.

15          And the problem that he has right now is that in

16    this court, in this 341 meeting, a direct question from Ms.

17    Claiborn by the way, Attorney Claiborn -- I mean, I read it.

18    It's more than one question, I think it's two or three --

19    and he said I -- I don't have to say what he said because it

20    says it in the paper -- but it says that he owns and

21    controls it.  That's what he -- he answers the question.

22    And there's no interpreter or anyone somehow saying whatever

23    he said is inaccurate.  He didn't raise an objection.  The

24    interpreter didn't raise an objection.  No one raised an

25    objection.

1          Now, as you know, the Court isn't at 341 meetings.

2     We're not -- and that's fine.  But I've got the

3     representative of the United States Trustee's Office, who

4     conducted these examination of Mr. Kwok two times, and on

5     the second time making -- she, at least from what I can see,

6     was very careful about how she asked the question and he

7     said he owned it.

8          MR. HENZY:  May I be --

9          THE COURT:  That's what he said.

10         MR. HENZY:  Your Honor, may I be heard?

11         THE COURT:  Sure.

12         MR. HENZY:  Thank you.

13         Your Honor, I don't speak Chinese.  I don't read

14    Chinese.  There is an audio of the 341 meeting and the audio

15    has the words on it that it has on it.  And as I understand

16    it, different interpreters will interpret from Chinese to

17    English in different ways.

18         And actually if you look at the transcript of the

19    April 6th 341 meeting, there is repeated interjections by

20    the private interpreter that Mr. Kwok had there disagreeing

21    with the interpretations of the interpreter that the U.S.

22    Trustee had there.  So different.

23         And I'm not -- I'm not -- I don't know what the

24    proper interpretation of the words that came out of Mr.

25    Kwok's mouth at that 341 are.  Again, I don't read Chinese.

1    I don't speak Chinese.  I can't do that.

2              THE COURT:  So how do you communicate with your

3    client?

4              MR. HENZY:  There's always an interpreter there.

5              THE COURT:  So you're -- so Mr. Kwok didn't tell

6    you that he didn't own it, an interpreter told you after Mr.

7    Kwok told the interpreter that he didn't own it?

8              MR. HENZY:  I can only speak to my client through

9    an interpreter, Your Honor.

10             THE COURT:  Okay.  That's what I'm asking.

11             MR. HENZY:  Yeah.  I mean, Mr. Kwok -- just so --

12             THE COURT:  So Mr. Kwok hasn't said to you

13   directly that he doesn't own these entities.  He said -- the

14   interpreter said that he disputes that he owns the entities,

15   that's what the interpreter told you?

16             MR. HENZY:  Your Honor, well, I guess a couple of

17   things.  With all due respect, Your Honor, I think that's

18   kind of an odd question.  I can't --

19             THE COURT:  I don't think it's an odd question.

20             MR. HENZY:  I can't --

21             THE COURT:  You're telling me -- you're saying --

22   you're coming into this court and you're now saying that

23   your client told you something different that's in the

24   record in five different places, but you're telling me he

25   didn't tell you that directly.  He told you that through an

1    interpreter.

2              MR. HENZY:  I don't -- I don't -- he told me that

3    directly.  If I speak to my client through an interpreter, I

4    think I'm speaking directly to my client.

5              THE COURT:  How do you know?  You don't speak

6    Chinese.  You just said that.

7              MR. HENZY:  I do not.  But I --

8              THE COURT:  Okay.

9              MR. HENZY:  I'm not sure what -- frankly, I'm not

10   sure what Your Honor's point is.

11             THE COURT:  My point is how do you know what

12   you're being told is accurate?  You're saying --

13             MR. HENZY:  I guess I --

14             THE COURT:  -- you can't --

15             MR. HENZY:  I guess I --

16             THE COURT:  -- you don't know -- you don't know

17   what's being

18             MR. HENZY:  Well --

19             THE COURT:  You're saying you don't know what Mr.

20   Kwok testified to when there were interpreters is accurate,

21   so how do you know what you're being told is accurate?

22             MR. HENZY:  It could be the interpreter is

23   misinterpreting.  But then the interpreter here could

24   misinterpret.  So, I mean, I don't -- I'm not sure --

25             THE COURT:  That's why we had two interpreters in

1    court that day --

2              MR. HENZY:  Well, this wasn't court.

3              THE COURT:  -- so that there wouldn't be this

4    argument about misinterpretation of someone's statements.

5              MR. HENZY:  Your Honor, I'm really not sure where

6    you're going with this.  I'm not.

7              THE COURT:  I'm not going anywhere.  You're the

8    one who's just come in and said --

9              MR. HENZY:  So I --

10             THE COURT:  -- wait a minute, hold on -- and said

11   Mr. Kwok is disputing that he owns those two entities.

12             MR. HENZY:  That is correct.

13             THE COURT:  Okay.  That's what you said.  And I

14   said how do you know that?  And you said because he told me.

15             MR. HENZY:  That's correct.

16             THE COURT:  And I said did he tell you directly or

17   did he tell you through an interpreter?  And at one point

18   you said through an interpreter and at one point you said

19   through directly, so I don't know how he told you.

20             MR. HENZY:  Okay.

21             THE COURT:  But my point is you said you don't

22   understand Chinese.  I don't think any of us do.  Okay?

23   That's why we have interpreters.

24             And now to come in at this point, months and

25   months and months after a 341 meeting, because the Chapter

1   11 Trustee's trying to investigate the affairs of the

2   debtor, and say now he disputes that, that doesn't seem --

3   that's a hard -- that's hard for the Court to understand.

4          MR. HENZY:  It may be hard for the Court to

5   understand.  And the trustee will I'm sure will file an

6   appropriate motion and we'll have a hearing.

7          THE COURT:  Okay.  Well, we will --

8          MR. HENZY:  Yeah.

9          THE COURT:  -- because then your client will be in

10  violation of a governance order.

11         MR. HENZY:  Based on my client's position that he

12  does not own Ace Decade -- that --

13         THE COURT:  Well, then he's going to have to come

14  in here and testify.

15         MR. HENZY:  He may have to do that.

16         THE COURT:  And show why the interpreter who took

17  the testimony at the 341 meeting was wrong.  And we're going

18  to have to have two interpreters because we're not just

19  going to have Mr. Kwok's interpreter.

20         MR. HENZY:  We may need to have more than two

21  interpreters.  I don't know.  But clearly interpretation is

22  an issue in this case.

23         MS. CLAIBORN:  Your Honor, could I just complete

24  my thought that I didn't finish earlier about the second 341

25  meeting?

1          THE COURT:  Sure.

2          MS. CLAIBORN:  That 341 meeting took place in

3    person at the U.S. Trustee's Office in New Haven.  Mr. Kwok

4    was there.  His same personal interpreter, Ms. Wilkinson,

5    was there.  And the U.S. Trustee had an in-person

6    interpreter.

7          And admittedly the transcript does reflect that

8    there are disputes as to translations, but I would make the

9    point that just as Ms. Wilkinson did when she participated

10   in the hearing before Your Honor, she's quite capable of

11   speaking up when she thinks the translation was inaccurate,

12   mistaken, could be better.  She spoke up an awful lot in

13   both the first 341 meeting and the second 341 meeting.

14         So to the extent that there's now a dispute over

15   this particular section of the transcript, I don't know what

16   it's based on because, as Your Honor noted, my question was

17   simple, his answer was simple, and there is no dispute being

18   raised by the lawyers within that particular subsection.

19         MR. HENZY:  I'm not sure I agree with that

20   completely, Your Honor, but -- and I may be simplifying

21   translation.

22         The words came out of Mr. Kwok's mouth.  And,

23   again, I may just be wrong on this, okay, that there -- it

24   seems to me there's an objective, those words are translated

25   into these words in English.  And either he answered one way

1    or he answered another, I don't know.  There's no way for me

2    to know that.  I can't listen to the audio and say I think

3    this transcript is correct or I think it's in correct.  I

4    can't do that.

5              THE COURT:  But you already did.  You just did.

6    You said he disputes it.

7              MR. HENZY:  I have no way to do that

8    independently.

9              THE COURT:  Okay.  Well, then, you can say

10   whatever you'd like him disputing it, but without any

11   evidence, then I'm just hearing you say he disputes it.

12   Right?  I mean, because he's already testified that he owns

13   it.  He's testified under oath.  He took an oath.

14             MR. HENZY:  And he disagrees that he testified

15   that he owns it.

16             THE COURT:  Okay.  Well, okay.

17             MR. HENZY:  Okay.  And I understand --

18             THE COURT:  So what next?  So he -- so then Mr.

19   Despins is going to file a motion --

20             MR. HENZY:  Right.

21             THE COURT:  -- and your client is going to be held

22   -- if that's the dispute, if he's going -- if he's going to

23   say he disputes that testimony without disputing it at the

24   time that he gave the testimony, that's going to, you know,

25   may result in an order he doesn't like.

1          MR. HENZY:  It may, Your Honor.  I think -- I

2    guess what I would ask Your Honor is to withhold judgment

3    until there's actually a record --

4          THE COURT:  I said it may result in an order --

5          MR. HENZY:  -- that's put before you.

6          THE COURT:  -- he might not like.  That's what I

7    said.

8          MR. HENZY:  Okay.  Because, again, I don't think

9    you want me today to go through all the places in this

10   transcript that I marked where there was -- Mr. Baldiga laid

11   down a continuing objection based on the interpretation.

12   Okay?  The parties went off the record and came back on.

13         And on the record, Attorney Claiborn announced all

14   objections to form are being reserved because I -- as I

15   understand what happened is that the progress of the 341 was

16   being so interrupted by the objections, by the interjections

17   from the private interpreter, that to get it on track, there

18   was this all objections are going to be reserved.  I don't

19   know how broad that reservation was intended to be, so I

20   don't know.

21         I know that the transcript is a mess.  There are

22   repeated interjections, even in the place where this is

23   relevant, okay.  And the trustee didn't include the next

24   page, okay.

25         At the bottom of page 61, which is attached to

1    what the trustee filed, you can see:

2              "Ms. Claiborn:  I don't think that was" -- and the

3    next page isn't there.

4              "Let's start over because I don't think that was -

5    - that was" -- the private interpreter says, "yeah.  I

6    thought that it was.

7              Ms. Claiborn:  That was the question because it

8    didn't involve Dawn State.

9              Private Interpreter:  Yes.  So I'm going to start

10   over."

11             And then there's -- then there's a series of

12   questions.  So I don't -- I don't think it's so clear cut.

13             THE COURT:  Okay.

14             MR. HENZY:  Okay.

15             THE COURT:  That's fair.  In that series of

16   questions --

17             MR. HENZY:  And so I would ask Your Honor --

18             THE COURT:  -- does he dispute owning it?

19             MR. HENZY:  Does he dispute owning it?

20             THE COURT:  When you're -- when you're talking

21   about those additional questions that are starting to be

22   asked after page 61, does he dispute when the questions are

23   asked again?

24             MR. HENZY:  Then, actually, it moved on to another

25   topic.

1          THE COURT:  But it was never asked again?

2          MR. HENZY:  It was never asked again.

3          THE COURT:  Okay.

4          MR. HENZY:  Okay.  So I don't think it's so clear-

5     cut.  And, again, I would -- before Your Honor is holding

6     the debtor in contempt, I would ask that you at least --

7          THE COURT:  I haven't done any such thing.

8          MR. HENZY:  -- allow there to be a record made.

9          THE COURT:  I haven't done any such thing.  Okay?

10         MR. HENZY:  Okay.

11         THE COURT:  So I -- but I'm concerned.  I mean, we

12    did -- we've gone through a lot to get to the point of

13    discovery.  And hearing that there's all these problems,

14    including Brown Rudnick, who came in here and said they

15    agreed that the privilege had passed to the trustee and that

16    everything isn't privileged, and now I'm hearing they're not

17    going to turn everything -- anything over until your client

18    gives them approval to do so.

19         MR. HENZY:  Mr. Romney is going to address that,

20    but I think it's actually more complicated than that, Your

21    Honor.

22         THE COURT:  Okay.

23         MR. HENZY:  Okay.

24         MR. DESPINS:  Your Honor, forget the 341.  There's

25    a complaint, a verified complaint, signed not only by Mr.

1    Kwok, but by two other people, one on behalf of Dawn State

2    and another on behalf of the other entity I forget, Ace

3    Decade, that say that what's in the complaint is true.

4         So those people also don't understand.  So we've

5    got three people who don't understand English, they're

6    signing a verified complaint in the U.K. and then they say

7    later, just, you know, sorry, but none of this is true?  It

8    just -- it boggles the mind.

9         And the strategy, Your Honor, he has unlimited

10   resources.  He will make us spend money until the end of

11   time.  And this is just one example of it.  But we'll bring

12   a motion.

13        MR. SARNOFF:  Your Honor, this is Stuart Sarnoff.

14        I don't mean to be glib or inflammatory, but the

15   five years we were litigating with Mr. Kwok, and when we

16   filed a state court complaint against Mr. Kwok, he filed all

17   of his contracts that were relevant to PAX in his motion to

18   dismiss from his own files and argued that these agreements

19   were signed by him in Europe, in Asia, and, therefore, the

20   matter should be (indiscernible) back to Hong Kong and the

21   motion was granted.

22        And if it goes to an appeal that then he signed

23   certificates and requests for admission that these documents

24   were authentic (indiscernible) deposition because it didn't

25   suit him, because he was losing his case, to testify that

1    these are forgeries, that he'd never seen them before.

2           So the fact that he might strategically change his

3    testimony is -- this is not his debut at behavior like this

4    and I think it's important to keep that in mind when you

5    think about the credibility of the arguments that are being

6    put forward now.

7           MR. HENZY:  And I assume we'll get to that when

8    the trustee files a motion, Your Honor, and we'll all have

9    an opportunity to make a record.

10          THE COURT:  Okay.  Mr. Romney, you were going to

11   be heard on some of these discovery disputes.  Is that --

12   Mr. Henzy said you were going to address these?

13          MR. ROMNEY:  Yes.  If Your Honor would like.  I'll

14   take up first the Brown Rudnick (indiscernible)/discovery

15   issues.

16          Can Your Honor hear me okay?  I know there were --

17   you had some problems hearing me (indiscernible) --

18          THE COURT:  It's a little better, but, yes.

19   Anytime, if you don't mind, just kind of leaning in, that

20   would be helpful.

21          MR. ROMNEY:  Yes.  And please let me know if

22   something doesn't come through.

23          As far as the discovery is concerned, there's sort

24   of -- there's a couple of issues there. The debtor

25   (indiscernible) -- I do not agree with the trustee's

1    characterization.  I think we've got a number of instances

2    where during our meet and confers we've had different

3    perceptions of what was being said to the point that I

4    suggested that we start recording these conversations.  The

5    trustee's counsel was not agreeable to that.

6           As far as Brown Rudnick and the privilege order is

7    concerned, the debtor's position is that the Court has

8    entered an order, an order on the consent of the debtor and

9    the trustee. The subpoenas have been served on a number of

10   highly competent professionals, some of which represent the

11   debtor and some of which represent related entities.

12          It's our position that the professionals -- as I

13   said in open  Court as we were debating the entry of that

14   order that these professionals are perfectly capable of

15   looking at this order, looking at the documents in their

16   possession, and making their own independent determination

17   based upon their professional judgment whether a document

18   should be withheld or not under the terms of that order or

19   not.

20          We have not told a single professional to withhold

21   a document or to turn it over directly to us.  What we have

22   said is that the debtor doesn't raise whatever rights the

23   debtor has under that order.

24          We have said to the professionals, who are aware

25   of the terms of the order, that they have been served with a

1    subpoena, they have an obligation to comply with it, and

2    they have a professional obligation to their client, or

3    former client, or whoever their clients are, to withhold

4    privilege under that order if, and only if, there's a basis

5    to do so.

6            In addition, in an effort to be accommodating --

7    and this was an offer, it was not a demand, it was not a

8    direction to counsel or former counsel, we offered, if there

9    are particular documents that professionals are struggling

10   should they be withheld under this or not, we will look at

11   them and we will give the debtor's opinion as the debtor's

12   current counsel whether the documents should be flagged.

13           We have not insisted that anyone do that.  We have

14   offered it solely in an effort to avoid burdening this court

15   further with issues related to that order solely so that

16   there isn't unnecessary delay caused by people who are

17   uncomfortable with how they should be applying this order.

18   That's what we've done.

19           And really it's -- this is with respect to

20   documents that -- in almost all circumstances no longer

21   represents  debtor.  As the trustee has been very adamant,

22   the trustee controls the debtor's pre-petition and pre-

23   appointment -- pre-trustee appointment causes of action,

24   meaning assets of the estate, these professionals are no

25   longer under the debtor's control.

1        All that the debtor and us as his professionals,

2    with his permission, have offered to try and facilitate this

3    process, speed it up, because as I have pointed out to the

4    trustee's counsel, the debtor has no interest in delaying

5    this proceeding.  This is not a state court foreclosure

6    where he's trying to get as much free rent as possible

7    before the bank takes his house.

8        This process is going to take its course.  It's

9    going to be complicated.  And the debtor has directed us to

10   cooperate and we are trying to cooperate.

11       We he have not directed anyone to withhold

12   documents under the terms of that order other than saying

13   look at the order, apply it to the documents you're looking

14   at and provide them or not.

15       As far as what I was what I would refer to as the

16   second part of the discovery issue, and what the debtor does

17   have and doesn't have, the video or movie, whatever it is

18   that the trustee is referring to, was from 2017.  That was

19   five years ago, Your Honor.

20       The WhatsApp messages referred to, I don't have

21   them in front of me, I believe those were things said in

22   2017 as well.  Five years ago.  I don't think it is an

23   unreasonable conclusion or impossibility that somebody,

24   particularly in the debtor's situation, who left Hong Kong

25   years ago, filed an asylum application in 2017, and has been

1    through years of litigation as a result of the hundreds of

2    millions of dollars of judgments, including contempt, that

3    his lifestyle might be different or what he has and doesn't

4    have might be different today near the end of '22 as it did

5    in 2017.

6            Now, should people be required to answer questions

7    that the trustee wants to ask them?  Sure.  They're

8    legitimate questions.  But it's not exactly smoking gun

9    evidence that the debtor had a cell phone in 2017 that he

10   can't locate here in 2022.  It's just not, Your Honor.  And

11   the debtor is being unfairly characterized again and again

12   based upon information that is five years old.

13           As far as what the debtor does and doesn't have, I

14   have had multiple discussions with the debtor through his

15   interpreter where he has repeatedly said that he does not

16   keep records related to any of the businesses that the

17   trustee is asking about.  Whatever there is is in the hands

18   of his former professionals related to these entities.

19           He does have two cell phones.  My understanding is

20   those cell phones were disclosed on his petition.  They're

21   not being hidden from anyone.  And his position is not that

22   the cell phones don't exist, but that the information on the

23   cell phones doesn't concern these businesses.  That's what

24   he told us.  That's what we told the trustee's counsel.

25           The trustee's counsel's response, as I understand

1    it, is effectively we don't believe him.  And they don't

2    have to believe him.  It's their job arguably not to, Your

3    Honor.  But to come in there and say that he's lying because

4    they think he is, that's not evidence and that's not the way

5    our judicial system is intended to work.

6              That's all I have on the discovery issues, Your

7    Honor, unless the Court has any questions.

8              THE COURT:  The consent order that you entered

9    into with regard to the privileges states that, and your

10   client agreed to it, that the trustee holds all of the

11   debtor's privileges on a post-petition basis through the

12   point -- through the date of the appointment of a Chapter 11

13   Trustee and that all information with regard to assets of

14   the estate are discoverable.  That's what it says.  That's

15   what he agreed to in the very first paragraph.

16             It's not limited to Rule 2004 Examination motions

17   that have been filed or subpoenas that have been served.

18   The privilege motion was establishing the trustee's rights

19   to proceed with the investigation.

20             Your client's declaration filed on March 20, 2022

21   in this case, when things were moving along in a manner in

22   which he would -- he and Brown Rudnick had proposed, says

23   that the assets of his estate include litigation pending in

24   the United Kingdom, and he lists that on his statements of

25   financial affairs as well, and a litigation in the District

1    -- in the District Court of the District of Columbia, and

2    that those are valuable assets of the estate.

3           The plan that he filed and signed said that he was

4    going to fund the estate with the proceeds from those

5    litigations.  That's what your client has said in this case.

6    Those are admissions of your client in this case.

7           So to find out now that I'm hearing that lawyers

8    for Mr. Kwok aren't going to turn over documents until he

9    gives them permission seems to me to be in violation of the

10   consent order that you've signed onto, number one.

11          Number two, with regard to the issues related to

12   Ace and Delta in -- I think that's the other name -- Delta

13   in London --

14          MR. DESPINS:  Decade.

15          THE COURT:  Decade, excuse me, in London, then

16   those two assets, those two entities, he says he owns.  He's

17   said he's owned.  Mr. Henzy says he disputes that.  Well,

18   he'll have to come in and prove that when he -- that when he

19   testified before his testimony was inaccurate.  He'll have

20   to come in and prove that.

21          And right now Mr. Kwok has agreed that Mr. Despins

22   succeeds to the rights of those two entities in London, that

23   the -- that he has now the privileges -- any privileges with

24   regard to the -- well, first of all, he doesn't even have to

25   agree to that because the *Weintraub* case says that.

1          The United States Supreme Court case of *Weintraub*

2    says that when it relates to the corporate entities, the

3    trustee succeeds to the interest of that corporate entity

4    and the -- and the privilege passes to that corporate

5    entity.

6          So I don't know what it is that is not -- you say

7    he's cooperating.  And he said in his -- in his declaration

8    back on March 10 that -- I'll tell you exactly what he says

9    -- we can go -- we can go to the page.  He says that he

10   wants to give everyone a fair opportunity to investigate his

11   assets.

12         So the trustee has been attempting to do so

13   through the Federal Rules of Civil Procedure.  You and he

14   and others have worked hard on a consent order.  That

15   consent order says that the trustee possesses the privilege

16   on a post-petition basis at the very least with regard to

17   all of the debtor's assets.  That's what it says.  It

18   doesn't say not with regard to the assets I listed in my

19   petition.  It says with regard to all the debtor's assets.

20         So I don't know how there could be --

21         MR. ROMNEY:  Your Honor, could you pull up

22   document 856, please.

23         THE COURT:  Hold on a second.  Hold on a second,

24   Attorney Romney.  Let me finish please.

25         MR. ROMNEY:  I apologize.

1          THE COURT:  So I don't know how there could be an

2     argument made that anyone who's been served with a -- with a

3     subpoena for post-petition information and/or assets related

4     to the administration of the estate, because that's what the

5     order says, can say that they don't have to turn over

6     documents.  I think that that's going to be a very

7     interesting argument.  And they do have -- it's their burden

8     to prove that they should not have to turn over those

9     documents.

10          The Rule 2004 motions were granted.  They then

11     have to seek appropriate relief under the Federal Rules of

12     Civil Procedure.

13          And to hear that -- well, I don't know what's true

14     at this point, but if the prior counsel is saying they're

15     not going to turn over documents until Mr. Kwok approves

16     that, if that's what they're saying, which I don't know if

17     that is, but if that's what they're saying, then that's in

18     violation of the consent order.

19          MR. ROMNEY:  Can I be heard now, Your Honor?

20          THE COURT:  Yes.

21          MR. ROMNEY:  The consent order that entered,

22     document 856, in a number of locations specifically talks

23     about the debtor's right to withhold documents subject to a

24     balancing test, notwithstanding anything therein to the

25     contrary.  As Your Honor knows because --

1           THE COURT:  Tell me where it says that, Attorney

2     Romney.

3           MR. ROMNEY:  The first line of paragraph 7, Your

4     Honor.

5           THE COURT:  What's the document number again, 8?

6           MR. ROMNEY:  856.

7           THE COURT:  856x.  Why don't we pull up 856 and

8     we'll go through it again.

9        (Pause)

10          THE COURT:  So what -- where do you want us to

11    start?

12          MR. ROMNEY:  The particular language, that's most

13    directly to what I was saying was found in a number of

14    places, is the first line of paragraph 7, notwithstanding

15    anything herein to the contrary.

16       (Pause)

17          THE COURT:  He has to -- he has to make a

18    statement that is going to result in personal harm to him if

19    disclosed to the trustee.

20          All of these assets that the trustee is

21    investigating your client already disclosed as assets on the

22    schedules filed in this case in March of this year.  He

23    isn't -- so where is the harm?

24          He put those assets out there.  He said that the

25    claim in London is an asset of the estate that he was going

1      to use to fund the plan in addition to the boat, which was

2      going to be used to fund the plan.

3              So where's the -- how could there be -- how could

4      there be in good faith an allegation of personal harm with

5      regard to the investigation of assets that your client put

6      in play when he -- when he filed his -- filed this case and

7      then filed his statements and schedules of affairs?

8              MR. ROMNEY:  Your Honor, the debtor, to my

9      knowledge, has not directed anyone to withhold any

10     particular document based upon this balancing test.

11             THE COURT:  I'm not talking about that.  That's

12     not my question, Mr. Romney.  You just pointed me to

13     paragraph 7, first line.  That's what you said.  You said

14     look at the language in paragraph 7.

15             So I'm looking at the language in paragraph 7, and

16     it says notwithstanding anything herein to the contrary, to

17     the extent the debtor believes in good faith that particular

18     documents or information that are covered by a trustee

19     privilege and that concern the investigation could result in

20     personal harm to the debtor if disclosed to the trustee.

21             Well, what the trustee is investigating are the

22     claims in London and all of the other claims associated with

23     assets either disclosed or not disclosed by Mr. Kwok.

24             And my question to you about the London litigation

25     is how can that be an issue?  Your client put that out as an

1    asset of the estate and said it was going to be available to

2    fund a plan.  So how could there be any information that he

3    could have -- that someone could have that would somehow

4    personally harm him, number one?

5              Number two, with regard to the administration of

6    the estate and what Brown Rudnick would have, what could

7    your client possibly argue that he believes in good faith

8    would result in personal harm if it was -- if that

9    information was disclosed to the trustee?

10             MR. ROMNEY:  Okay.  So let me take those two in

11   turn.

12             One, with respect to the U.K. matter, one, the

13   U.K. matter was expressly carved out from docket number 856.

14             THE COURT:  It's only carved out to the extent

15   that you believe -- your client believes he might have a

16   privilege.  That's all it is.  It's only with regard to your

17   client.  It's not with regard to Brown Rudnick or anyone

18   else that the trustee is seeking information.

19             It says -- nine says, nothing herein shall be

20   construed to impact one way or another the debtor or the

21   debtor's counsel's rights, whatever they may be, to assert

22   privileges the debtor may have under the laws of the United

23   Kingdom.  That has nothing to do with any of the information

24   that the trustee's seeking from any other party other than

25   the debtor.

1          MR. ROMNEY:  As I said, the debtor has not

2     directed anyone to withhold any information.  What the

3     debtor had said is that they would -- they're asserting

4     their rights under this order to the extent that the debtor

5     has any with respect to a particular document.

6          We have said that it is -- we are not demanding

7     that the debtor review individual documents.  We have said

8     that the debtor -- that the recipients of these subpoenas to

9     look at this order.

10         And it may be with respect to most, if not all of

11    these professionals, that there is no document that should

12    be withheld.  I haven't seen them.  Nobody in my office has

13    seen them.  They're in the hands of the people who were

14    served with these subpoena.  I don't know how to be any more

15    clear that the debtor is not obstructing this investigation.

16     The debtor --

17         THE COURT:  Okay.  Well, then good.  Then there

18    won't be anything filed under paragraph 7 because he won't

19    have a good faith basis to believe that he will be -- he

20    will suffer any personal harm if any of these people turn

21    the documents over to the trustee because he hasn't seen

22    them.

23         MR. ROMNEY:  We have not seen the documents.

24         THE COURT:  So how can he make a good-faith --

25         MR. ROMNEY:  The debtor hasn't seen them.  I think

1   that if they --

2          THE COURT:  So how can he make a good faith claim

3   that they shouldn't be turned over?

4          MR. ROMNEY:  He hasn't because he hasn't seen the

5   documents.  And I think the recipients of these subpoenas --

6          THE COURT:  Well, he's not entitled to see the

7   documents.  They're not being subpoenaed to him.  They're

8   being subpoenaed to other people.

9          MR. ROMNEY:  Okay.  And all that the debtor has

10  said --

11         THE COURT:  And the other people don't have a

12  privilege to assert on behalf of the debtor because the

13  trustee has that privilege.  You consented to that.

14         MR. ROMNEY:  Yes, the debtor did.  And, yes, I did

15  as his counsel.  And all that the debtor is saying to anyone

16  who asks is that he reserves his right under this order

17  whatever they may be.

18         And the professionals who receive this subpoena

19  can do what they will with that information, but he's not

20  waiving anything that he has under this order.  He's not

21  required to waive anything that he has under this order.

22  And professionals who are served with this subpoena should

23  comply with these subpoenas in their professional judgment.

24  That's what they should do and that's what we've said.

25         I do not know what else the debtor can be required

1    to do.

2            As I said, if somebody is uncomfortable, somebody

3    has a question, and they would like the debtor's current

4    counsel, meaning me or one of my colleagues, to look at it

5    and specifically say whether the debtor has a good-faith

6    belief with respect to that particular document, we are

7    willing to do that, but we're not demanding that we have a

8    right to compel that.  We're not.

9            The debtor's not required to waive whatever rights

10   the debtor has under this order and that's the only thing

11   the debtor is saying he won't do.

12           THE COURT:  No one's asking him to.  I haven't

13   heard anybody ask him to so I don't even know why you're

14   raising that issue.

15           MR. ROMNEY:  But that's all that the debtor is

16   doing.  The debtor is not obstructing anything.

17           THE COURT:  Okay.  Well, I think we can -- we just

18   need to move on.

19           Mr. Despins, you're just going to have to file

20   motions.  It's the only way things are going to proceed in

21   this case.

22           With the issue on the litigation in London, you

23   know, now that you have the privilege with regard to the two

24   entities unless they can come in and prove otherwise that

25   they don't own it.  He's testified that he owns it.  I'm

1    told today that he disputes that.

2         Well, he'll have to -- just like they're going to

3    make you file all those motions, they're going to have to

4    file those motions and they're going to have to show that

5    there is something inaccurate or he -- with regard to his

6    prior testimony and with regard to the prior declaration he

7    made in this case back in March of -- and with regard to his

8    statements and schedules of affairs, which he signed under

9    penalty of perjury in which he lists -- and with regard to

10   the plan that he signed in which he said that he was going

11   to use the funds from the UBS litigation to help fund the

12   plan for the payment of creditors.

13        So I think that that, you know, we're not going to

14   get any further and we're just going to have to file motions

15   and I'll have to make rulings.  That's unfortunate, but

16   that's where we are.

17        It's a situation where -- and actually with regard

18   to the London litigation, are you still pressing the need

19   for that letter to the counsel?  Now that you have the

20   corporate entity privilege, why do you need the letter

21   anymore?  If you don't need the letter, then the appeal's

22   moot.

23        MR. DESPINS:  Let me come back to Your Honor on

24   this.  I mean, in the sense that I think I have the

25   privilege, I agree with you.  The problem is that they'll

1    say, no, you don't have the privilege.

2              THE COURT:  I understand what you're saying.

3              MR. DESPINS:  So we're going to be in that.  But

4    let me -- that's a fair question that you're raising, so let

5    me -- let me come back to Your Honor on that.

6              But I think at this point what would make sense,

7    because we did file a motion, but it probably got lost in

8    the shuffle there, there's a motion to expedite

9    consideration of the prejudgment attachment.

10             I made a proposal.  Maybe Mr. Kindseth -- actually

11   we made that proposal, not today, we made it yesterday,

12   before they filed their objection, which is that if they

13   agree that the status quo remains, then we don't need to

14   schedule anything for October 7th, anything on the

15   prejudgment attachment.  So I think that that's probably the

16   best thing we could do today because there isn't -- we filed

17   a motion on that.

18             THE COURT:  When they filed an objection, you mean

19   the debtor filed an objection to the PJR application?

20             MR. DESPINS:  No.  To the schedule for the PJR --

21             THE COURT:  Okay.

22             MR. DESPINS:  -- basically raising --

23             THE COURT:  I don't think I -- I thought I saw the

24   objection only related to the protective order.  But I'm

25   wrong, it related to both?

1          MR. DESPINS:  No.  There were separate objections,

2     Your Honor.

3          THE COURT:  Okay.  I didn't see that.

4          MR. DESPINS:  It was filed yesterday afternoon.

5          THE COURT:  All right.  I didn't see that.  Hold

6     on.

7          MR. DESPINS:  Sorry.  That's the problem.  It's in

8     the adversary case, not in the main case.

9          MR. HENZY:  Yes, we did.  We did file an objection

10     to the motion to expedite.

11          THE COURT:  To the PJR?

12          MR. HENZY:  Yeah.

13          THE COURT:  In the adversary?

14          MR. HENZY:  Right.  But Mr. Despins is correct,

15     it's in the adversary, not the main case, yeah.

16          MR. DESPINS:  But it's on the scheduling, not on

17     the merits of the --

18          MR. HENZY:  That's correct, Your Honor.

19          THE COURT:  Okay.  So let me look at that in the

20     adversary, the debtor's objection to the scheduling of the

21     hearing on the PJR, which the trustee was seeking a hearing

22     on October 7th.  Okay.  Here it is.

23          (Pause)

24          THE COURT:  Okay.  So who's going to address the

25     plaintiff's objection to the trustee's motion for an

1    expedited hearing on the prejudgment remedy that the

2    trustee's seeking for October 7th?

3          MR. ROMNEY:  I am, Your Honor.  Aaron Romney for

4    the record.

5          THE COURT:  Could you -- I'm sorry, Mr. Romney.

6    Could you just lean again in a little bit?  I can just hear

7    you better when you lean in.  Thank you.

8          MR. ROMNEY:  Is that better, Your Honor?

9          THE COURT:  Yes, it is.

10          MR. ROMNEY:  Thank you.

11          THE COURT:  So go right ahead.  So you have

12    objected to the hearing being held on October 7th saying you

13    need more time, which, I mean, I understand that, but I

14    understand also that the trustee is saying that they would

15    agree to that if you would agree that there would be

16    essentially a status quo order, a temporary restraining

17    order, restraining everyone from doing anything until

18    there's a hearing on the preliminary injunction on the PJR.

19          MR. ROMNEY:  Your Honor, in the first instance, as

20    far as Ms. Guo is concerned, the trustee has not put forward

21    any evidence that would entitle him to a temporary

22    restraining order or an expedited hearing on the PJR.

23          THE COURT:  Well, he didn't say he put forth any

24    evidence to entitle him to a temporary restraining order.

25    He didn't say that, number one.  I said that's essentially

1    what he's asking, right?  And I didn't -- I don't agree -- I

2    didn't -- I'm not suggesting he has put forth evidence.  He

3    said he made a -- he made a proposal.  You either accept it

4    or you don't.  That's fine.  That's the -- that's where we

5    are.

6             He's asking are you going to agree to maintain the

7    status quo until there's actually a hearing on the

8    preliminary -- on the -- I keep saying preliminary

9    injunction, I'm sorry -- the prejudgment remedy.  And if

10   your answer is no, then your answer is now.  That's fine.

11            MR. ROMNEY:  With regards to Ms. Guo, we're

12   unaware of any basis that the trustee could possibly

13   establish to restrain her individual assets.  And,

14   therefore, no, we will not.

15            With respect to the -- what appears to be the

16   primary focus, and only with an articulated exigent

17   circumstance of the $37 million escrow, the escrow was the

18   subject of a heavily negotiated order between a number of

19   parties, including the debtor, in whose shoes the trustee

20   currently stands.

21            The order specifically required HK International

22   to bring the boat back and outlined a number of terms

23   regarding what the escrow funds that were designed to secure

24   that promise could and could not be used for.

25            Paragraph 12 of that order, which is document 299

1    entered in this case, specifically precludes the parties,

2    including the debtor, to whom the trustee is the successor

3    in interest, from asserting any claims to that escrow fund,

4    including to the enforcement of any judgment or service of

5    any prejudgment remedy or other legal process other than

6    with respect to securing the promise to return the boat or

7    with regard to particularized repairs to the boat, which is

8    what the subject of the repair reserve motion is.

9           To have HK and Ms. Guo, who personally guaranteed

10   the loan of this $37 million that HK then posted, to have

11   them comply with their obligation under this court

12   stipulated order, and then have the trustee say now that the

13   boat is back I want the $37 million too is not only

14   unconscionable, but it is the source of promissory estoppel

15   and collateral estoppel given that it is the subject of a

16   court order.

17          And for that reason, under no circumstances should

18   Ms. Guo or HK be required to defend an evidentiary hearing

19   against a 65-page counterclaim that was briefed with a 40-

20   page memorandum of law and that is supported with 3,000

21   pages of exhibits in two weeks, which two weeks include two

22   Jewish holidays and two weekends, so that the trustee can

23   try and attach funds that a court order expressly precludes

24   the trustee from attaching is simply unconscionable and I

25   don't believe lawful.

1          And for that reason we will not agree to restrain

2    the very funds that have already been agreed shall not be

3    the subject of further restraint.

4          THE COURT:  Okay.  That wasn't the only question

5    though.  It wasn't just with regard to the funds.  So you've

6    said no.  The question was with regard to everything else,

7    not just the funds.

8          I understand your point.  I understand he's

9    seeking a PJR against the funds.  I've seen that.  I haven't

10   read it.  And everything else you've said you'll file in

11   your opposition papers.  You'll do whatever you need to do.

12         MR. ROMNEY:  Right.  And HK, as well Ms. Guo, will

13   need a reasonable time to defend against those allegations.

14         The trustee has not established any cause for an

15   expedited hearing --

16         THE COURT:  Well, that's --

17         MR. ROMNEY:  -- other than that it wants -- he

18   wants to attach these funds that an order precludes him from

19   attaching.

20         MR. DESPINS:  Your Honor, if I may be heard on

21   this?

22         THE COURT:  Yes.

23         MR. DESPINS:  Okay.  So we did establish cause.

24   And yet I know you haven't seen the papers, but the point is

25   that they want the 37 to leave the jurisdiction, go back to

1    essentially Mr. Kwok, but that's a different story, as soon

2    as possible.  That's the issue here.  That's why we're

3    saying there should be a standstill on the $37 million.

4          And as you said, the argument that they just made

5    that the debtor bound the trustee, which was not around at

6    the time.  And, by the way, at this time, there was a motion

7    to appoint a trustee and a motion to dismiss the case and

8    they made very particular provisions regarding what happens

9    in the dismissal but nothing with respect to what happens

10   when there's a trustee.  This is kind of (indiscernible).

11         In DIP financing orders you always put a provision

12   saying if this is binding on a successor trustee, et cetera,

13   et cetera, for the very reason that it's not binding.  And,

14   in fact, that's what they forgot to do here.

15         There was a pending motion.  And if they had asked

16   you at that time, Your Honor, you understand there's a

17   motion pending to appoint a trustee, this will bind the

18   trustee through the reference here to Mr. Kwok, the debtor,

19   you know, I doubt very much Your Honor would have intended

20   to do that.

21         And to be really clear about this, in the

22   discovery disputes the Zeisler firm has taken the position

23   that with respect to documents relating to this stipulation

24   that there was a common interest between Mr. Kwok, the

25   debtor, and HK International, that tells you everything you

1    need to know.

2              There was no -- this is not like when a debtor is

3    at arm's length with another party.  They were together on

4    this stipulation trying to get the boat out of the

5    jurisdiction as soon as possible.  And the $37 million out

6    of the jurisdiction.

7              But the point is you don't have to resolve this

8    now.  They can file their papers saying exactly what Mr.

9    Romney just said and we will deal with it.

10             The point though is if there's going to be race

11   to, you know, release those funds, then we need a hearing

12   sooner.  If there's not going to be a race, then they can

13   have all the time they want.

14             But they can't have it both ways where they say,

15   yes, indeed, he has no right to do that and, therefore, we

16   will do everything we can to take the money out of the

17   Court's jurisdiction, then we need a hearing before that

18   happens.  It's as simple as that.

19             And if they're willing to agree, without any

20   prejudice, but I want to be clear, we would not later argue

21   that because they agreed to this standstill that somehow

22   they're waiving their argument that they just made that the

23   trustee cannot do what it's doing, not at all.

24             This is what we call an administrative freeze to

25   make sure that the Court has the time to review this and

1   that they have the time.  They think they want more time,

2   sure, take more time.

3        But there's no reason right now with -- the

4   position they're taking is that we're going to jam the

5   Court, meaning we're going to say, no, we're not agreeing to

6   anything, including anything regarding the $37 million,

7   because we don't think he has no -- the trustee has a right

8   to that relief.

9        My point is it's totally within their control.

10  It's a self inflicted ruling.

11       I want to be clear, again, them agreeing today

12  that they will not be -- that there will not be any actions

13  taken with respect to $37 million would not be used, could

14  not be used in any way as an argument that somehow they have

15  waived any of the arguments that Mr. Romney has made and any

16  other arguments they want to raise.  So it's really totally

17  within their control.  They cannot --

18       And the argument is simple.  Is the 37 staying or

19  not?  If it's not staying, or some of it is not staying, we

20  need to have a hearing as soon as the money is going to

21  leave the -- before the money leaves the jurisdiction.  It's

22  as simple as that.

23       And to be clear, again, no prejudice to them

24  whatsoever because this is just a -- it's like we're on

25  appeal, you know, we often have an administrative freeze to

1    allow the Court to -- an administrative stay and it allows

2    the Court to review the matter and take its time.  And it's

3    without prejudice to either side's position.  That's all

4    we're proposing.

5            If they're not willing to agree to any of that,

6    fine, then we need a hearing on an expedited basis because

7    we can't let the money leave the jurisdiction.

8            THE COURT:  Okay.  Thank you.

9            MR. DESPINS:  And because, Your Honor, this will

10   be the last 37 million we'll ever see from the debtor very

11   likely.

12           THE COURT:  Mr. Romney, did you want to respond?

13           MR. ROMNEY:  Yes, I did, Your Honor.

14           Your Honor, the trustee sought two extensions to

15   its filing to HK's complaint.  The trustee was appointed I

16   believe on July 15th.  The motion was filed on September

17   24th around 10:00 p.m.

18           If this was such exigent circumstances and not an

19   attempt at sandbagging, for lack of a better word, this

20   motion would have been filed months ago when we were

21   scheduling the hearing on the reserve order.  But the

22   trustee needed multiple extensions of time to respond, one

23   of which was on consent, one of them was over HK's

24   objection, and they received it.

25           Second, the trustee is the successor in interest,

1     as we've been over in numerous contexts in this case,

2     including today, in the context of the trustee's rights with

3     respect to assets and certain privileges.  The trustee is

4     the successor to the debtor.  And that works both ways, Your

5     Honor.  The trustee is the successor to the debtor in

6     possession.  The trustee is bound by the debtor's contracts

7     whether the trustee likes that or not.

8           And this order that the Court entered specifically

9     precludes attachments of the PJR funds.  And there's a very

10    simple reason for that.  The funds wouldn't have been here

11    if it wasn't for this order.  This order is a negotiated

12    order, an agreement, designed to facilitate the return of

13    the Lady May and make sure it's in good working order.

14          The Lady May is back.  There is a hearing

15    scheduled for October 7th to reserve sufficient funds to

16    make sure that it will be in good working order.  But the

17    trustee does not get both.  The order says what it says.

18          And to say that unless we decide that we won't

19    subject the funds to attachments, unless we agree to defend

20    these allegations on 14-day's notice, it's just

21    unconscionable and there's no basis in law for it.

22          If I may have one moment.  Oh, and the trustee

23    said there's no prejudice.  The prejudice is, as we've said

24    multiple times, and I believe has been before the Court

25    before, the interest on this loan from a third party is $1.3

1    million per month.  That's real money that has to be paid to

2    a real third party while this money is sitting in an

3    account.

4           The incentive, yes, is to repay that loan and stop

5    the interest that Ms. Guo has personally guaranteed and HK

6    is incurring.  It is to repay the money to a lender.  It is

7    not to steal the money.

8           And to the extent that the trustee believes that

9    there is cause to actually take this money, notwithstanding

10   what the order says, perhaps the trustee should post a bond

11   to secure the damages that HK and Ms. Guo will incur if

12   these funds are tied up, and it incurs several million

13   dollars of interest.

14          MR. DESPINS:  Your Honor, all these points will be

15   heard.  All these arguments can be heard at the time of the

16   issue of the bonding will be addressed as well.

17          So the point is, you know, the point they're

18   making, because we're going to win, we're going to win, and,

19   therefore, nothing needs to happen.  No.  We've made --

20          If Your Honor has not read the counterclaims, but

21   -- and I'd -- it would be too much to expect you to have

22   done that over the weekend, but it's very precise in terms

23   of allegations regarding the providence of these funds,

24   where these funds came in.

25          This argument, you know, I hesitate to use that

1   term, but we don't want to insult people's intelligence, the

2   fact that a third party would have lent $37 million to an

3   unemployed, 28-year-old, really, who believes that?  That's

4   all Kwok's money.  And I know they did.  That's exactly the

5   way they structure all these enterprises where he has

6   nothing and it has to come from others.  And in this case,

7   it's his daughter.  The daughter doesn't have the funds to

8   pay 500,000.  That will never happen.  The reason that's

9   created is to give the appearance that, in fact, she'll be

10  prejudiced.

11          And there's so many examples in the counterclaims.

12  You'll see there are pages, page after page, of examples of

13  using these shell companies or using family members to hide

14  money from the creditors.  And that's exactly what's

15  happening here.  And the Court, you know, needs to be

16  cognizant of that.

17          But, again, I'm not arguing the math now.  I'm

18  just saying a very simple thing, which is the hearing should

19  be on October 7th or they can have it whenever they want.

20  Again, I'm not asking you to rule on the merits, just a

21  scheduling, or they can have it whenever they want if they

22  agree that nothing happens with the $37 million and the Lady

23  May.  That's all.

24          THE COURT:  Okay.  Thank you.

25          Does anyone else wish to be heard?

1      (No response)

2              THE COURT:  All right.  Is there any other matter

3      we need to address this afternoon?

4              MR. DESPINS:  No, Your Honor.

5              THE COURT:  All right.  I will look at -- I did

6      not schedule a hearing and did not grant the motion for an

7      expedited hearing because I wanted to hear what the parties'

8      positions are.  Now I've heard what the parties' positions

9      are and I will rule accordingly.

10             We also have, I believe, a scheduling order in

11     place with the Lady May reserve, repair reserve, where

12     documents need to be filed before the hearing next week, a

13     list of witnesses and exhibits and things of that nature,

14     correct?  Do we have dates?

15             MR. KINDSETH:  That's correct, Your Honor.

16             THE COURT:  Okay.

17             MR. KINDSETH:  They're due to follow.

18             THE COURT:  So everyone's keeping to that

19     schedule, correct?

20             MR. KINDSETH:  That's correct.  And currently the

21     evidentiary hearing scheduled for October 7th on the repair

22     reserve which Your Honor scheduled I believe more than a

23     month ago for the specific issue of having a hearing on the

24     repair reserve.

25             THE COURT:  Well, because you had asked for an

1    evidentiary hearing and we had a status conference on that

2    issue.

3              MR. KINDSETH:  Correct.

4              THE COURT:  And that's why we needed to schedule

5    it as we scheduled it because you needed an evidentiary

6    hearing, which is fine.

7              MR. KINDSETH:  Correct.  And that's scheduled for

8    October 7th.

9              THE COURT:  Right.  Okay.  Then I will take a look

10   at what has been filed over the last few days and I will

11   issue an order with regard to the -- either granting or

12   denying the motion for an expedited hearing.

13             So is there anything further we need to address

14   today?

15             MR. DESPINS:  Not from the trustee's point of

16   view, Your Honor.  Thank you.

17             THE COURT:  Anyone else?

18             MR. ROMNEY:  No, Your Honor.

19             THE COURT:  Okay.  Then this is our last matter on

20   the calendar today, so court is adjourned.

21             (Proceedings concluded at 3:40 p.m.)

22

23

24

25

1

2          I, CHRISTINE FIORE, Certified Electronic Court

3     Reporter and Transcriber, certify that the foregoing is a

4     correct transcript from the official electronic sound

5     recording of the proceedings in the above-entitled matter.

6

7     *Christine Fiore*

8     _____          October 9, 2022

9          Christine Fiore, CERT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25