B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| | |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| | |

**PARTY** (Check One Box Only)
☐ Debtor   ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor   ☐ Other
☐ Trustee

**PARTY** (Check One Box Only)
☐ Debtor   ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor   ☐ Other
☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR | BANKRUPTCY CASE NO. | |
| DISTRICT IN WHICH CASE IS PENDING | DIVISION OFFICE | NAME OF JUDGE |

| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
|---|---|---|
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF) |
|---|
| /s/ Patrick R. Linsey |

| DATE | PRINT NAME OF ATTORNEY (OR PLAINTIFF) |
|---|---|

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

-------------------------------------------------------x
                                            :

In re:                              :                  Chapter 11
                                              :

HO WAN KWOK,                 :                  Case No. 22-50073 (JAM)
                                              :

          Debtor.               :
-------------------------------------------------------x
Luc A. Despins, Chapter 11 Trustee,    :
                                              :

                        Plaintiff.    :                 Adv. Proceeding No. [_____]
v.                                          :

Bravo Luck Limited and Qiang Guo,     :

                       Defendants.    :             October __ , 2022
                                              :
-------------------------------------------------------x

**CHAPTER 11 TRUSTEE'S ADVERSARY COMPLAINT AGAINST BRAVO LUCK**
**AND QIANG GUO SEEKING (I) INVALIDATION OF PURPORTED TRUST**
**AGREEMENT IN FAVOR OF BRAVO LUCK AND, (II) IN ALTERNATIVE, RULING**
**THAT DEBTOR EFFECTUATED FRAUDULENT TRANSFER IN FAVOR OF BRAVO**
**LUCK AND QIANG GUO PURSUANT TO SECTION 276 OF NEW YORK DEBTOR**
**AND CREDITOR LAW, MADE APPLICABLE BY SECTION 544**
**OF BANKRUPTCY CODE**

        Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee") appointed in the

chapter 11 case (the "Chapter 11 Case") of Ho Wan Kwok (the "Debtor"), brings this adversary

complaint (the "Complaint") against defendants Bravo Luck Limited ("Bravo Luck") and Qiang

Guo, the Debtor's son (the "Debtor's Son" and, together with Bravo Luck, the "Defendants").[1]

---

[1] Genever Holdings LLC ("Genever US"), controlled by the Trustee through his possession of 100% shares of Genever Holdings Corporation (sole member of Genever US) will file a similar complaint in the Genever Holdings LLC chapter 11 case currently pending in the Southern District of New York [Case No. 20-12411 (JLG)] (the "Genever US Complaint" and the "Genever US Chapter 11 Case"). The Genever US Complaint is being filed out of an abundance of caution because the two-year statute of limitations set forth in section 546(a) of the Bankruptcy Code, which may govern some of the claims asserted in the Genever US Complaint, will expire on October 12, 2022. The Trustee and Genever US have filed a motion to transfer venue of the Genever US Chapter 11 Case to this Court (currently scheduled to be heard by Judge Garrity on October 25, 2022), and it would be the intention of the

## NATURE OF ACTION

1.      The Trustee commences this adversary proceeding to remedy the Debtor's attempt to use subterfuge to keep valuable property out of the reach of creditors.  Genever US (a company whose sole member is Genever Holdings Corporation ("Genever BVI" and, together with Genever US, the "Genever Entities"), of which the Debtor was the sole shareholder prior to the transfer of his interest to the Trustee following the Trustee's appointment) holds title to the Debtor's apartment at the Sherry Netherland Hotel in Manhattan (the "Sherry Netherland Apartment").[2]  The Debtor, however, as part of his overarching strategy of using shell companies to hide his assets and "judgment proof" himself against creditors' claims, has asserted that Bravo Luck, a company purportedly owned by the Debtor's Son, is the true beneficial owner of the Genever Entities pursuant to a purported trust agreement allegedly dated February 17, 2015 (the "Purported Trust Agreement").

2.      As an initial matter, the Purported Trust Agreement is a fraudulent, backdated document as evidenced by voluminous evidence in the record of this Chapter 11 Case, the Genever US Chapter 11 Case, and the prepetition litigation (the "State Court Action") between Pacific Alliance Asia Opportunity Fund L.P. ("PAX") and the Debtor in New York state court (the "State Court").  Most notably, although the Purported Trust Agreement was allegedly executed in 2015, the Debtor did not produce the Purported Trust Agreement until April 2019, over four years after its alleged execution, despite numerous instances in which it would have and should have been disclosed had it existed, such as when PAX sought discovery regarding the

_____

Trustee, if and when such motion is granted, to have the Genever US Complaint and this Complaint consolidated to avoid the duplication of proceedings.

[2] The Debtor's residence at the Sherry Netherland technically consists of multiple units located on the 18th floor that for ease of reference will be referred to collectively as the Sherry Netherland Apartment.

Debtor's ownership of the Sherry Netherland Apartment, and when the Debtor argued the apartment could not be attached by PAX because it was subject to pledges in favor of or was owned by third parties (other than Bravo Luck). Because the Purported Trust Agreement is fraudulent, it is invalid, void, and unenforceable.

3.     In the alternative, even assuming the Purported Trust Agreement is valid, the Debtor used the Purported Trust Agreement to effectuate a transfer with actual intent to hinder, delay or defraud creditors. This fraudulent transfer involved, without limitation, two steps: (1) the February 2015 transfer of equity interests in the Genever Entities to Bravo Luck pursuant to the Purported Trust Agreement and (2) the May 2015 transfer of the Debtor's 50% interest in Bravo Luck to his son, in each case for no consideration paid to the Debtor. The result of these two steps, which together comprise one transaction that began in February 2015 and concluded in May 2015, was the transfer, in exchange for no consideration, of the value of (at the very least) the Sherry Netherland Apartment to Bravo Luck and the Debtor's Son. The Trustee is therefore entitled to a ruling (a) declaring the Purported Trust Agreement invalid, (b) avoiding any conveyance of the Debtor's property (including his interest in the Genever Entities) and the incurrence by the Debtor of any obligations[3] imposed pursuant to the Purported Trust Agreement, and (c) avoiding the Debtor's transfer of 50% of Bravo Luck to the Debtor's Son.

## PARTIES

4.     The Trustee is the chapter 11 trustee in the Chapter 11 Case pursuant to the Court's order entered on July 8, 2022 [Main Case Docket No. 523].

---

[3] *See See* N.Y. Debt. & Cred. Law § 276 (McKinney) ("Every conveyance made ***and every obligation incurred*** with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.") (emphasis added).

5.      Bravo Luck is an entity incorporated in the British Virgin Islands ("BVI") purportedly owned by the Debtor's Son.  Bravo Luck has asserted that, pursuant to the Purported Trust Agreement, it is the beneficial owner of the Sherry Netherland Apartment, title to which is held by Genever US.  Bravo Luck has asserted this beneficial ownership claim (as well as an alternative unsecured claim of approximately $76 million based on Bravo Luck having allegedly paid for the Sherry Netherland Apartment) in its proof of claim filed in the Genever US chapter 11 case [Claim No. 4-1] (the "Bravo Luck Proof of Claim").

6.      The Debtor's Son is the purported owner of Bravo Luck.

## FACTS

### A.      Debtor's Shell Game

7.      As established in the State Court Action, the Debtor's *modus operandi* for years has been to use family members and shell companies to shield his assets from creditors.  The State Court accurately referred to the Debtor's asset protection strategy as a "shell game" numerous times in hearings and written decisions and orders in the State Court Action.

8.      The Debtor's shell game has allowed him to continue, up to this day, to deny having any assets and refuse to pay his debts to creditors while simultaneously (1) enjoying all the benefits of massive wealth, such as yachts, private planes, and luxury cars and lodging; (2) spending millions of dollars on the attorneys' fees necessary to litigate against PAX, the Trustee, and numerous other parties; and (3) engaging in his daily business of peddling disinformation, conspiracy theories, and cryptocurrency schemes.[4]

---

[4] *See, e.g.*, Friedman, Dan. "A Fugitive Chinese Tycoon Met Steve Bannon. Misinformation Mayhem Ensued." *Mother Jones*, March-April 2022, https://www.motherjones.com/politics/2022/02/guo-wengui-miles-guo-gettr-steve-bannon/; Whalen, Jeanne, et al. "Chinese Businessman with Links to Steve Bannon Is Driving Force for a Sprawling Disinformation Network, Researchers Say." *The Washington Post*, 17 May 2021, https://www.washingtonpost.com/technology/2021/05/17/guo-wengui-disinformation-steve-bannon/; Hui, Echo, and Hagar Cohen. "After John Left a Conspiracy-Sharing Group, the Billionaire Founder Told Followers He 'Deserved

9.      The aspect of the Debtor's shell game most critical to this adversary proceeding (i.e., the Debtor's use of Bravo Luck to shield the Sherry Netherland Apartment from creditors), *is only one example* of the Debtor's massive abuse of the corporate form to judgment-proof himself and keep creditors at bay.  The Debtor has, upon information and belief, established numerous, potentially hundreds, of entities (including many, like Bravo Luck, in off-shore jurisdictions such as BVI), that he uses to hold or transfer property so that he can avoid liability and protect assets from creditors.  To the extent the Debtor has caused these entities to acquire assets, the funds used for such acquisitions belonged to Kwok.

10.     Certain of the Debtor's important shell companies include, in addition to Bravo Luck:

a)      **Golden Spring (New York) Ltd ("Golden Spring")**.  Golden Spring is a Delaware entity that pays the Debtor's expenses so the Debtor can live in luxury while claiming to own no assets and earn no income.

(1)     Purportedly owned indirectly by the Debtor's Son,[5] Golden Spring was established and funded by the Debtor through a transfer of funds from one of his bank accounts in Hong Kong to the bank account of Golden Spring in New York in 2015.[6]  There is no evidence in the record regarding how Kwok's son, born in February 1987 and thus 27 or 28 years old in 2015, could have had the independent financial means to establish and fund Golden Spring (or any other entities he is purported to own) himself.[7]

---

to Die'." *ABC News*, 1 Nov. 2020, https://www.abc.net.au/news/2020-11-01/behind-the-scenes-of-the-guo-and-bannon-led-propaganda-machine/12830824/.

[5]  *See, e.g.*, Ex. 1, Wang Dep. Tr. at 18:17-18 (testimony that Golden Spring 100% owned by China Golden Spring (Hong Kong)); 17:3-4 (describing the Debtor's Son as owner of "Golden Spring").

[6]  In a 2016 affidavit filed in the New York Supreme Court in connection with Ace Decade's litigation against UBS, the Debtor stated that Golden Spring was established "by transferring funds from one of my accounts at UBS to Golden Spring New York's JPMorgan Chase bank account in New York."  Ex. 2, Affidavit of Kwok Ho Wan, dated February 5, 2016, in *Ace Decade Holdings Limited vs. UBS AG*, Index No. 653316/2015 (N.Y. Sup. Ct.) at ¶ 36.

[7]  *See* Ex. 104, Copy of Passport.

(2)    A court order issued in Hong Kong on October 18, 2018, titled the Restraint Order Prohibiting Disposal of Assets In Hong Kong and Elsewhere (the "<u>Hong Kong Restraint Order</u>), identified Golden Spring's parent company, China Golden Spring Group (Hong Kong) Limited, as one of a number of entities whose bank accounts were "subject to the effective control of the Debtor."[8]

(3)    The Debtor has testified that Golden Spring has been paying his living expenses since 2015.[9]  Golden Spring has also been paying the fees of the Debtor's counsel and millions of dollars of maintenance fees associated with the Sherry Netherland Apartment, among other payments.

(4)    Golden Spring's president, Yan Ping ("<u>Yvette</u>") Wang ("<u>Ms. Wang</u>") has testified that Golden Spring is the Debtor's "family office."[10]  She has also testified that in her capacity as president of Golden Spring she "serve[d] as an administrator for *the interests of [the Debtor]* and his family."[11]

(5)    At the same deposition, Ms. Wang could not identify a single person who worked at Golden Spring prior to February 2018, except for the Debtor's personal chauffeur, nor could she identify any business purpose of Golden Spring other than that of serving as the Debtor's "family office" and starting the Debtor's social media platform.[12]

(6)    During the State Court Action, Golden Spring's counsel appeared at depositions for the Debtor, and the Debtor's

---

[8] Ex. 3, Hong Kong Restraint Order ¶ 3, Respondent 22.

[9] *See* Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 85:17-19.  *See also* Ex. 5, Letter from Melissa M. Carvalho, dated February 1, 2021 at ¶ 8. ("Mr. Kwok responds that his expenses during the relevant time period have been paid for by Golden Spring (New York) Ltd.").

[10] Ex. 6, Wang Dep. Tr. at 20:10-16 (Q: "What business is Golden Spring Hong Kong in? A: Family office. Q: Whose family? A: The Guo family. Q: Mr. Kwok's family? A: Yes.).

[11] *Id.* at 46:20-23 ("Q: I'm asking you whether or not you serve as an administrator for Mr. Kwok's interests? A: Yes.") (emphasis added).  *See also* Ex. 7, May 15, 2018 Affidavit of Yan Ping Wang in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.) (ECF 182) at ¶ 1. ("I am the President of Golden Spring (New York) Ltd., and in that capacity serve as an administrator for the interests of [the Debtor] and his family.").

[12] *See* Ex. 6, Wang Dep. Tr. at 39:20-40:8.

6

counsel represented Ms. Wang, president of Golden Spring, in connection with her deposition.[13]

(7)     Golden Spring's address at 162 East 64th Street, New York, New York 10065 has been used as the address of the Debtor and numerous affiliated entities, including HK USA (defined below) and Greenwich Land LLC.[14]

(8)     Ms. Wang, president of Golden Spring, is the authorized signatory on official documents filed with courts and administrative agencies by multiple of the Debtor's shell companies.[15]

b)     **Lamp Capital LLC ("Lamp Capital").**  Lamp Capital is a Delaware entity,[16] purportedly owned by the Debtor's son,[17] that also contributes to the payment of the Debtor's expenses so that he can maintain his lifestyle while claiming to own no assets and earn no income.

(1)     Lamp Capital's sole member is Infinity Treasury Management, Inc.,[18] of which the Debtor's Son is the purported sole shareholder, the Debtor's associate Max

---

[13] *See* Ex. 8, Kwok Dep. Tr. at 8:8-9 ("Karin Maistrello, Golden Spring, for Defendant"); Ex. 6, Wang Dep. Tr. At 6:9-11 (Jillian Searles identified by Ms. Wang as her attorney after entering an appearance "for defendant Kwok Ho Wan").

[14] *See, e.g.*, Ex. 9, Limited Liability Company Agreement of HK International Funds Investments (USA) Limited, LLC, dated April 1, 2019; Ex. 106, Greenwich Land LLC Real Property Tax Assessor Record, dated July 15, 2021.

[15] *See e.g.*, Ex. 10, Verified Complaint, *Genever Holdings, LLC v. Sherry-Netherland, Inc.*, 16-cv-06246 (S.D.N.Y. Aug. 5, 2016), ECF No. 1; Ex. 29, Himalaya Coin Certificate of Assumed Name, dated March 14, 2020, at 1 of 2, and Ex. 30, Himalaya Dollar Certificate of Assumed Name, dated March 14, 2020, at 1 of 2.

[16] *See* Ex. 12, Certificate of Incorporation of Lamp Capital LLC, dated Sept. 4, 2020 at 1.

[17] Ex. 4, Tr. of Telephonic 341 Meeting of Creditor, at 50:6-7.

[18] Ex. 13, Limited Liability Company Agreement of Lamp Capital, LLC, dated September 8, 2020.

Krasner is director and officer,[19] and the Debtor's associate Daniel Podhaskie is a former director and officer.[20]

(2)     Mr. Podhaskie is or was an authorized signatory for Lamp Capital.[21]

(3)     Corporate filings related to Lamp Capital LLC were handled by Hodgson Russ LLP, counsel to the Debtor in the State Court Action.[22]

(4)     Lamp Capital purportedly "loaned" the Debtor $1 million, which was then remitted directly to Brown Rudnick LLP ("Brown Rudnick"), the Debtor's former bankruptcy counsel, as a retainer.[23]

c)     **Greenwich Land LLC ("Greenwich Land").**  Greenwich Land, a Delaware entity purportedly owned by the Debtor's wife, owns the Debtor's residence on Taconic Road (the "Taconic Road Residence") in Greenwich, Connecticut.

---

[19] *See* Ex. 14, Infinity Treasure Management Unanimous Consent. Mr. Krasner's other roles have included, among others, serving as representative of Greenwich Land in connection with certain property transactions, as incorporator of GTV Media Group, Inc. (a subsidiary of Saraca), and as president, treasurer, and director of the Rule of Law Foundation III Inc., a purported nonprofit entity linked to the Debtor.  *See* Ex. 15, Greenwich Land Warranty Deed, dated April 26, 2022, at 212; Ex. 16, GTV Media Group Certificate of Incorporation, dated April 17, 2020, at 2; Ex. 17, Rule of Law Foundation III Inc. Certificate of Incorporation, dated January 11, 2019, attached Certificate of Correction.

[20] *See* Ex. 14, Infinity Treasure Management Unanimous Consent at 1. Mr. Podhaskie's other roles have included, among others, serving as the Debtor's personal attorney, general counsel to Golden Spring, and corporate representative for purposes of Rule 30(b)(6) with respect to Genever US and Genever BVI (each defined below). *See, e.g.*, Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 79:2-3 (debtor stating that Podhaskie "used to be Golden Spring attorney and my personal attorney."); Ex. 18, Podhaskie Dep. Tr. at 8:8-9:1 (Podhaskie appearing as corporate representative of Genever US and Genever BVI).

[21] *See, e.g.*, Ex. 19, Application for Authority of Lamp Capital LLC, dated Sept. 11, 2020, at 4, filed with the State of New York (signed by Podhaskie).

[22] *Id.* (attached Application for Authority filed by Courtney L. Scanlon of Hodgson Russ LLP).

[23] *See* Application of the Debtor for Entry of an Order Authorizing the Employment and Retention of Brown Rudnick LLP as Counsel for the Debtor, Docket No. 86, at ¶ 17;  Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 49: 22-24.  At his April 6, 2022 Section 341 meeting, the Debtor testified that this loan was not in writing and that he did not know the terms of the loan, why the money had been lent, or what the source of the money was.  *Id.* at 49-51.

      (1)     Greenwich Land was organized in 2019 by a partner at the law firm of Hodgson Russ, which at the time represented the Debtor in the State Court Action.[24]

      (2)     On or about April 26, 2022, in a transfer that was never disclosed to this Court (and despite the restraining notice PAX had served on Greenwich Land in May 2021[25]), Greenwich Land sold a second property, on Ferncliff Road in Cos Cob, Connecticut, which it had previously owned.[26] The authorized signatory for Greenwich Land on the warranty deed in connection with the transfer is Max Krasner, who, as noted above, is an associate of the Debtor with a number of roles at Debtor-affiliated entities.[27]

      (3)     Greenwich Land's address at 162 East 64th Street, New York, New York 10065 has been used as the address of the Debtor and numerous affiliated entities, including Golden Spring and HK USA.[28]

    d)     **HK International Funds Investments (USA) Limited, LLC ("HK USA").**  HK USA is an entity, purportedly owned by the Debtor's daughter, that holds title to the Debtor's 150-foot yacht, the Lady May, thus allowing the Debtor to enjoy the yacht while claiming not to own it.

      (1)     In the State Court Action, the State Court made findings that, among other things, the Lady May was beneficially owned and controlled by the Debtor.

---

[24] Hodgson Russ attorneys also assisted the Debtor with, among other things, the formations of Saraca and Lamp Capital, as well as other corporate filings on behalf of Golden Spring.  *See* Ex. 20, Saraca Media Group Inc. Certificate of Incorporation, dated May 31, 2018 (signed by Courtney Scanlon); Ex. 21, Certificate of Incorporation of Lamp Capital LLC, dated September 4, 2020 (signed by Valerie E. Stevens); Ex. 22, Biennial Statement of Golden Spring, filed October 16, 2018 (signed by Courtney Scanlon).

[25] Ex. 103, Restraining Notice.

[26] Ex. 15, Greenwich Land Warranty Deed, dated April 26, 2022.

[27] *Id.  See* FN 23.  At the Debtor's first 341 meeting, counsel for the United States Trustee, Holley Claiborne, asked the Debtor twice who Mr. Krasner was, and the Debtor first said he did not know, then failed to respond.  Ex. 23, Tr. of Telephonic 341 Meeting of Creditors, dated March 21, 2022 at 51:7-12.  When Ms. Claiborne asked the Debtor to answer the question, the Debtor's counsel Mr. Baldiga conferred with the Debtor despite Ms. Claiborne stating that she "would rather he would answer the question before you make a confer." *Id.* at 13:18.  The Debtor then said he had difficulty with English names and that he did know a "Max" at Golden Spring though not his last name.  *Id.* at 51-52.

[28] *See, e.g.*, Initial Petition (defined below); Ex. 9, Limited Liability Company Agreement of HK International Funds Investments (USA) Limited, LLC, dated April 1, 2019, at 3(a).

(2)    In Adversary Proceeding 22-05003 (the "HK USA Adversary Proceeding"), HK USA has asserted, despite the State Court's findings in the State Court Action (preclusive as to HK USA), that the Lady May is not property of the estate because it is owned by HK USA.

(3)    The Trustee's answer and counterclaims filed in the HK USA Adversary Proceeding assert, among other things, that HK USA is the alter ego of the Debtor and that the Lady May was received by HK USA pursuant to an actual fraudulent transfer effectuated by the Debtor to protect the Lady May from creditors.

(4)    HK USA's expenses (including its legal fees) have been paid for by Golden Spring and Lamp Capital, entities that, as noted above, are purportedly owned by the Debtor's Son and that also pay for the Debtor's attorneys' fees and living expenses.

(5)    HK USA has no income, bank account, directors, officers, or employees.  HK USA has also shared an address with the Debtor and other Debtor-linked entities.  The Debtor and HK USA currently are represented by the same counsel, and, even when the Debtor was represented by separate chapter 11 counsel (Brown Rudnick), the attorneys representing the Debtor, HK USA, and Golden Spring operated as essentially one legal team.[29]

e)    **Eastern Profit Corporation ("Eastern").**  Eastern is a Hong Kong entity, purportedly owned by the Debtor's daughter,[30] that Judge Liman of the U.S. District Court of the Southern District of New York, in his 2021 decision in the case of *Eastern Profit Corp. v. Strategic Vision US LLC* (the "Liman Decision"), found to be, "in essence, a shell corporation" for the Debtor[31] allegedly used to "protect his confidentiality and anonymity."[32]

---

[29] *See, e.g.*, Ex. 24, email from Stephen Kindseth to Russell Stockil, CCing Max Krasner and Aaron Mitchell, dated April 9, 2022; Ex. 25, Email from Stephen Kindseth to Craig Jalbert, CCing Melissa Francis, dated April 17, 2022.

[30] *Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL), 2021 WL 2554631 at *4 (Debtor's Daughter "is now the owner and sole director of Eastern.").

[31] *Id.* at *3.

[32] *Id.* at *23-24 ("During negotiations, [the Debtor] requested that, to protect his confidentiality and anonymity, he would not sign or be a party to the Agreement but that a separate entity would sign and be a party.").

(1)    The subject of the Liman Decision was a January 2018 agreement, purportedly between Eastern and Strategic Vision US LLC (the "Strategic Vision Agreement"), that was signed on behalf of Eastern by Yvette Wang (president of Golden Spring). But Ms. Wang did not sign her own name, instead she forged the signature of another associate of Kwok's, Han Chunguang[33] (upon information and belief, Kwok's driver, bodyguard, and cook),[34] who had purportedly owned Eastern prior to transferring purported ownership of Eastern to Kwok's Daughter for no apparent consideration in 2017.[35]

(2)    Judge Liman observed that, at the time Eastern entered into the Strategic Vision Agreement, Eastern was "essentially a defunct entity" with "no assets other than . . . $80,000 frozen in a Hong Kong bank account," and "no operations and no employees." [36] Further, analogously to HK USA and other shell companies, Eastern's location "was in the offices of [Kwok's] family company in Hong Kong and its sole director was [Kwok's] daughter."[37]

(3)    Judge Liman also found that testimony from Ms. Wang and Mr. Han with respect to Mr. Han's role in connection with the Strategic Agreement was "an after-the fact creation to make it appear that Eastern was an entity, separate from [the Debtor]."[38]

(4)    Judge Liman inferred, with respect to the Strategic Agreement, that "[the Debtor] told Wang to provide the name Eastern to Strategic and to sign Han's name to the Agreement. If there was any conversation between Wang

---

[33] Upon information and belief, Han Chunguang's name is also spelled "Han Changuang."

[34] Han Chunguang's name was spelled (incorrectly, upon information and belief) "Han Changhui" in Judge Liman's published decision. Han Chunguang is listed on the Hong Kong Restraint Order as an individual whose bank accounts were subject to Kwok's control. *See* Ex. 3, Hong Kong Restraint Order ¶ 3, Respondent 25.

[35] Liman Decision at *25 ("Although . . . Han was the ostensible owner of Eastern, it has now been transferred to [the Debtor's Daughter] but Han could not testify that he received anything in exchange. Eastern is a shell for [the Debtor] and his family.") (internal citations omitted). *Id.* at *4 ("Prior to 2017, the owner and sole director of Eastern was an individual named Han [Chunguang] ('Han'). In 2017, Han transferred ownership and control to [the Debtor's Daughter] who was a friend of Han's and who is now the owner and sole director of Eastern.").

[36] *Id.* at *25.

[37] *Id.* at *25-26.

[38] *Id.* at *24-25.

and Han, it was perfunctory, to confirm the arrangement that *[the Debtor] had already made and directed*."[39]

(5)  According to testimony elicited at the hearing held in connection with the Liman Decision, the Debtor introduced Mr. Han (the purported owner of Eastern) as his cook, referring to him as "Little Han,"[40] and introduced Ms. Wang as his servant and assistant.[41]  There was also testimony that Ms. Wang described the Debtor as her "boss."[42]

(6)  The Hong Kong Restraint Order identified Eastern as the purported holder of a bank account that was "subject to the effective control" of the Debtor.[43]

f)  **Saraca Media Group, Inc. ("Saraca")**.  Saraca is a Delaware entity, purportedly owned by the Debtor's Son,[44] that the Debtor has used to engage in, among other things, the sale of purported cryptocurrencies.

(1)  Saraca shares the same address as Golden Spring,[45] and Golden Spring's president, Ms. Wang, is an authorized signatory on Saraca official documents.[46]

---

[39] *Id.* (emphasis added).

[40] Ex. 26, Trial Tr. at 768:4-12, *Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL) (S.D.N.Y) ECF No. 368 (April 22, 2021).

[41] Ex. 27, Trial Tr. at 142:12-19, *Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL) (S.D.N.Y) ECF No. 362 (April 19, 2021) ("Q. Did he introduce [Ms. Wang] in any way -- let me ask you this. What did he introduce her as? A. Well, originally as his assistant. Q. Did he say anything else about what she did for him? A. He said that she did, you know, what personal assistants do and -- but he sent her from the room."). Ex. 28, Trial Tr. at 248-249, *Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL) (S.D.N.Y) ECF No. 362 (April, 19, 2021) ("Q. Did [the Debtor] come to introduce [Ms. Wang] at a particular meeting at some point? A. At the first meeting, he just referred to her as like a servant. In the second meeting, he introduced her as his assistant.").

[42] Ex. 27, Trial Tr. 142-143 ("Okay. Now, I'm going to ask you what Yvette Wang told you about her role. So what did Yvette Wang tell you was her role with respect to this contract?  A. Well, first of all, she said: [the Debtor] is my boss. I am project manager, and I will be handling this project moving forward."); *id.* ("Did she have any name for [the Debtor] or any term she used to describe him?  Yes. She called him chief. She gave him some military ranks. She called him the boss.").

[43] Ex. 3, Hong Kong Restraint Order ¶ 3, Respondent 16.

[44] Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 108:12-13 ("Q: Who owns Saraca? A: My son.").

[45] *See* Ex. 11, Saraca Media Group Inc. OpenGovNY New York State corporate registry search results.

(2)    Saraca is the registered owner with the United States Patent and Trademarks Office of the marks "Miles Kwok," "Miles Guo," and "Guo Wengui."[47]

(3)    In September 2021, the Securities and Exchange Commission ("SEC") issued a cease and desist order ordering that Saraca and its subsidiary GTV Media Group, Inc. ("GTV") cease violations of the securities laws in connection with purported sales of GTV stock and G-Coin and G-Dollar cryptocurrencies, which had "raised approximately $487 million from more than 5,000 individuals."[48]  The Office of the Attorney General of the State of New York took similar action against Saraca and GTV.[49]

(4)    Saraca is also involved in the Debtor's more recent cryptocurrency scheme of promoting and selling "Himalaya Coin" and "Himalaya Dollar" (also known as "H-Coin" or "H-Dollar").

(5)    Saraca registered "Himalaya Coin" and "Himalaya Dollar" as its assumed names in the State of New York, using filings signed by Ms. Wang, ***president of Golden Spring.***[50]

(6)    As of 2019, Saraca's president and director was reportedly Han Chunguang, the same individual alleged to be Kwok's driver, bodyguard, and cook who transferred Eastern Profit

---

[46] *See, e.g.*, Ex. 29, Himalaya Coin Certificate of Assumed Name, dated March 14, 2020, and Ex. 30, Himalaya Dollar Certificate of Assumed Name, dated March 14, 2020.

[47] Ex. 31, United States Patent and Trademark Office Registry Pages for Miles Guo, Miles Kwok, Guo Wengui, and Guo Media.

[48] *See In the Matter of Gtv Media Group, Inc., Saraca Media Group, Inc., and Voice of Guo Media, Inc., Respondents*, Release No. 10979, 2021 WL 4149064, at ¶ 1, 5 (Sept. 13, 2021) (finding that companies that GTV, Saraca, and Voice of Guo Media, Inc. violated the Securities Act in connection with "solicit[ing] thousands of individuals to invest in an offering of GTV common stock" and "solicit[ing] individuals to invest in their offering of a digital asset security that was referred to as either G-Coins or G-Dollars," thus allowing these companies to "collectively raise[] approximately $487 million from more than 5,000 investors, including individuals in the United States, through approximately July 2020").

[49] Ex. 32, Assurance of Discontinuance, Assurance No. 21-062, *In the Matter of Investigation by Letitia James, Attorney General of the State of New York, of GTV Media Group, Inc., and Saraca Media Group, Inc.*

[50] *See* Ex. 29, Himalaya Coin Certificate of Assumed Name; Ex. 30, Himalaya Dollar Certificate of Assumed Name.

Corporation to Kwok's daughter for no apparent consideration in 2017.[51]

g)   **Ace Decade Holdings Limited ("Ace Decade").**  Ace Decade is a BVI entity the Debtor acquired to use as an intermediary entity in connection with the failed 2015 securities transaction that generated the Debtor's lawsuits against UBS.  The Debtor used Ace Decade to avoid disclosure requirements that would have arisen had the Debtor purchased the securities directly.[52]

   (1)   The Debtor acquired Ace Decade in November 10, 2014 and on the same day appointed one of his employees, Yu Yong ("Ms. Yu") as the sole director and nominee shareholder.[53]

   (2)   The Debtor allegedly appointed Ms. Yu to these roles based on the alleged advice of his banker at UBS, who suggested the use of an intermediary entity to avoid disclosure requirements.[54]

   (3)   The Hong Kong Restraint Order identified Ace Decade as the purported holder of a bank account that was "subject to the effective control" of the Debtor.[55]

   (4)   The Debtor stated he owned Ace Decade in his signed complaint filed in the United Kingdom against UBS[56] and at his section 341 meeting of creditors held on April 6,

---

[51] Swan, Jonathan, et al. "Exclusive: Steve Bannon's $1 million deal linked to a Chinee Billionaire," AXIOS, 29 Oct. 2019, https://www.axios.com/2019/10/29/steve-bannon-contract-chinese-billionaire-guo-media ("Guo Media is owned by Saraca Media Group, a company incorporated in Delaware, according to the contracts. Per a March 2019 tax filing, the president and director of Saraca was an individual named Han Chunguang.").

[52] Ex. 2, Affidavit of Kwok Ho Wan at ¶¶ 13-14 ("UBS advised that . . . if I invested through Ace Decade directly, applicable disclosure requirements would require certain filings [and] advised that if I invested through an intermediary entity, with the intermediary entity holding legal title to the Shares, no such disclosure would be required.").

[53] Ex. 33, Particular of Claims, *Kwok Ho Wan & Ors. v. UBS*, Cl-2020-000345, ¶ 24, High Court of Justice of England and Wales Queen's Bench Division Commercial Court, dated September 23, 2020 ("UK Complaint").

[54] *Id.* at ¶ 24 ("Ace Decade was acquired on 10 November 2014 by Mr Kwok for the purpose of acting as the said investment vehicle. On the same day, on the advice of Mr Wong, an employee of Mr Kwok, Ms Yu Yong ("Ms Yu") became its nominee shareholder and director.").

[55] Ex. 3, Hong Kong Restraint Order ¶ 3, Respondent 18.

[56] *See* Ex. 33, UK Complaint ¶ 24 ("Ace Decade was *acquired on 10 November 2014 by Mr. Kwok* for the purpose of acting as [an] investment vehicle.") (emphasis added).  *See also id.* ¶ 2 ("Ace Decade was incorporated on 18 June 2014 and *acquired by Mr Kwok* on or around 10 November 2014.") (emphasis added).

2022,[57] only to subsequently reverse course at the September 30, 2022 hearing and dispute, through his counsel, his ownership of Ace Decade, claiming (incredibly) that each of his admissions was the result of a translation error.

h) **Well Origin Limited ("<u>Well Origin</u>").**  Well Origin is a BVI entity owned by the Debtor that was formed as a "special purpose vehicle" to own a private jet, an Airbus 319 (the "<u>Aircraft</u>").[58]

(1)    In 2014, Well Origin entered into a $50 million loan agreement with UBS AG ("<u>UBS</u>") to "refinance the Aircraft purchase price" as well as a related aircraft mortgage agreement.[59]  In addition, the Debtor entered into a related guarantee agreement with UBS.  UBS was also granted a security interest in Well Origin's shares.[60]

(2)    Subsequently, UBS foreclosed on its security interest in the shares of Well Origin, took control of Well Origin, and notified the Debtor that it was going to sell the Aircraft.[61]

(3)    In an action filed in February of 2019, the Debtor sought to enjoin the sale, asserting that he was the "***Aircraft's true beneficial owner***,"[62] and that the Aircraft was "unique," "personal," and "specific to him.[63]  The court rejected the

---

[57] *See* Ex. 4, Tr. of Telephonic 341 Meeting of Creditors at 61:3-10 ("Q Are you [Mr. Kwok] the only legal owner of Ace Decades? A I am a legal representing owner. Q Are there any other owners of Ace Decade? A No. Q When did you become an owner of Ace Decade Holdings Limited? A At the end of 2014."). *See also id.* at 61:11-16; *id.* at 63:25-64:7; *id.* at 65:8-11.

[58] Ex. 34, Petition at ¶ 7, *Kwok How Wan v. UBS AG, et al.*, Index No. 152025/2019 (N.Y. Sup. Ct.) Doc. No. 1. The capacity of a normal airline A319 is approximately 150 passengers.

[59] *Id.* ¶¶14-16.

[60] *Id.* ¶ 15.

[61] *Id.* ¶¶ 22-24.

[62] Ex. 35, Memorandum Of Law In Support Of His Request For A Temporary Restraining Order And Preliminary Injunction at 2, *Kwok v. USB AG et al*, Index No. 152025/2019 (N.Y. Sup. Ct.), NYSCEF Doc. No. 15 (February 25, 2019) ("Moreover, ***the Aircraft's true beneficial owner – Kwok*** – has been an outspoken critic of the Chinese government and Chinese Communist Party ("<u>CCP</u>") and Kwok has personally exposed massive corruption within the CCP that has resulted in the Chinese government and CCP stopping at no expense to seize any property and asset either directly or indirectly related to Kwok."). *See also id.* at 1 ("UBS, in blatant contravention of the terms of the mortgage, is wrongfully trying to sell the Aircraft without properly notifying ***Kwok -- the Aircraft's beneficial owner***, and guarantor on a loan related to the Aircraft -- of the potential sale.').

[63] *Id.* at 2 ("Kwok will suffer irreparable harm if the preliminary injunction is not granted to stay the sale of the aircraft as ***the Aircraft is unique to Kwok*** -- he personally worked with the designer on the outfitting of the Aircraft

15

Debtor's request for an injunction, pointing out that the Debtor was asserting rights under an aircraft mortgage agreement that he had not signed.[64]

(4)     With respect to Well Origin, the Debtor looked past the corporate form and asserted he was the true beneficial owner of the Aircraft because it suited him to do so (given that UBS had taken control of Well Origin).

i)     **Numerous Other Shell Companies**:  It is likely that the entities discussed in this Complaint comprise only a small number of what are reportedly hundreds of shell companies controlled by the Debtor.[65]  The reported existence of such a large number of shell companies is supported by the fact that in the Hong Kong Restraint Order the Debtor was determined to effectively control financial accounts purportedly held by over two dozen entities and individuals, including certain of the entities already mentioned herein, including Bravo Luck and Ace Decade.[66]

11.     In sum, while this Complaint focuses on Bravo Luck, and the Trustee does not herein seek relief against other entities, the Trustee believes that context regarding the Debtor's wide-ranging strategy of using shell companies to shelter assets from creditors will assist the Court in understanding the Trustee's position.[67]  Of course, the Trustee also expressly reserves its rights to pursue actions asserting claims against each of those other entities at the appropriate time.

---

and was comprehensively involved in the Aircraft's particular design and specification"); *Id.* at 6-7 ("If UBS is permitted to move forward with the sale despite their defective notice and without providing Kwok an accounting, Kwok will permanently lose the Aircraft that *is personal and specific to him*, for which money damages cannot and will not suffice.").

[64] Ex. 36, Order at 3, *Kwok v. USB AG et al*, Index No. 152025/2019 (N.Y. Sup. Ct.), NYSCEF Doc. No. 17 (February 26, 2019) ("Petitioner's sole contractual connection to the aircraft is vis-à-vis a written guarantee of the non-party mortgagor's obligations which are collateralized via the aircraft.").

[65] Escobar, Pepe, et al. "Exclusive: The Fugitive Who Tried to Spark a US-China War." The Unz Review, 5 Aug. 2022, https://www.unz.com/pescobar/exclusive-the-fugitive-who-tried-to-spark-a-us-china-war/ ("[The Debtor] set up more than 100 companies in Hong Kong, China, the United Kingdom, the United States, the British Virgin Islands, and the Cayman Islands.").

[66] Ex. 3, Hong Kong Restraint Order ¶ 3.

[67] The Trustee reserves all his rights in connection with potential future alter ego, veil piercing, or substantive consolidation claims against Bravo Luck.

### B.    Purchase of Sherry Netherland Apartment

### i.    Debtor Submits Purchase Application

12.    On February 26, 2015, the Debtor submitted a purchase application (the

"Purchase Application") for the Sherry Netherland Apartment, listing the "applicant" as "'Miles'

Kwok Ho Wan (Genever Holdings LLC)."[68]  The Purchase Application did not reference Bravo

Luck or the Purported Trust Agreement, even though the Purported Trust Agreement had

allegedly been executed by that time.

13.    The Purchase Application (and sale contract submitted together therewith) stated

that closing could occur by no later than 10:00 a.m. on March 6, 2022.[69]

14.    In connection with the Purchase Application, the Debtor and/or others on his

behalf submitted several other documents to the Sherry Netherland, Inc. (the "Sherry

Netherland"), including:

a)    A financial letter of reference, dated February 23, 2015, from Tommy
Cheung and Stephen Wong, Managing Directors at the UBS AG Hong
Kong Branch ("UBS Letter").  The UBS Letter stated that the Debtor "has
been a client of ours through a personal investment company since July
2012 and during this time [the Debtor] has had a satisfactory banking
relationship with us.  At 18 Feb. 2015, the funds involved in this banking
relationship is not less than USD $400,000,000."[70]  Upon information and
belief, the "personal investment company" of the Debtor referenced in this
letter is Bravo Luck.

b)    A letter dated February 25, 2015, from Jerry L. Shulman, an attorney at
the law firm of Williams & Connolly LLP, which then represented the

---

[68] See Ex. 37, Sherry Netherland Purchase Application Materials, at SN 0047.

[69] Ex. 38, Email from Susan Hennelly attaching Contract of Sale, dated March 3, 2015, at SN 0029.  See also Ex. 39,
Minutes of meeting of the Board of Directors of the Sherry Netherland held on March 3, 2015, at 2 ("The contracts'
closing date is set for not later than March 6, 2015 and provide that the purchaser may terminate the contracts if
there is no closing by that date.").

[70] Ex. 40, Letter from UBS AG HK, dated Feb 23, 2015, In re Genever Holdings LLC, Case No. 20-12411-jlg
(Bankr. S.D.N.Y.), ECF No. 14-64 ("the funds involved in this banking relationship is not less than USD400,
000,000").

Debtor (the "Shulman Letter"), and not, upon information and belief, Bravo Luck.  Among other things, the Shulman Letter attached the 2013 financial statements for a company called Beijing Zenith Holdings Co., Ltd. ("Beijing Zenith") and promised that the Sherry Netherland would soon be provided with Beijing Zenith's unaudited 2014 financials and a "certification that (a) Mr. Kwok is the owner and controlling person of the company and (b) the company continues in existence and operation."[71]

c)    A follow-up letter to the Shulman Letter, dated February 27, 2015, from Ira J. Gilbert (the "Gilbert Letter"), an attorney at the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), then acting as "local real estate counsel for Mr. Kwok Ho Wan, an applicant to become a shareholder/tenant at the Sherry Netherland,"[72] and not, upon information and belief, acting as counsel to Bravo Luck.  The Gilbert Letter included as attachments the unaudited 2014 financial statements of Beijing Zenith as well as a document titled "Beijing Zenith Holdings Co., Ltd Declaration of Ownership," which stated that the Debtor "actually owns and controls the company."[73]

d)    Letters of reference, with respect to the Debtor individually, submitted by Tony Blair (the former British prime minister), Hank Lo (a Hong Kong attorney and partner at Stevenson, Wong Co.), and Stephen Wong, of UBS.[74]  Mr. Lo's letter stated that "my firm has acted for Miles [i.e., the Debtor] in various business transactions, including project financing, fund-raising, corporate mergers and acquisitions and acquisition of aircrafts, leisure boats and properties in Hong Kong, China and different parts of the world" and that the Debtor was "dependable and responsible.[75]  Mr. Wong's letter stated, similarly, that the Debtor worked with UBS "in the areas of securities investment and also in financing his various projects in areas such as aircraft acquisitions" and that the Debtor "is very reliable and always fulfills his repayment obligations."[76]

---

[71] Ex. 41, Letter from Jerry L. Shulman, dated February 25, 2015, at 1.

[72] Ex. 42, Letter from Ira J. Gilbert, dated February 27, 2015, at 1.

[73] *Id.* at 2.

[74] Ex. 38, Email from Susan Hennelly at SN 0050-54 (attaching letters of reference from Tony Blair (the former British prime minister), dated February 2015, Hank Lo (a Hong Kong attorney and partner at Stevenson, Wong Co.), dated February 17, 2015, and Stephen Wong (of UBS) dated February 18, 2015).

[75] *Id.* at SN 0053.

[76] *Id.* at SN 0054.

15.     At a meeting of the Board of Directors of the Sherry Netherland held on March 3, 2015, the Board of Directors determined that "the financial information provided by Mr. Kwok was not sufficient for the Board to consider the application and that . . . additional due diligence is required by the Board, including but not limited to obtaining additional financial information regarding Mr. Kwok."[77]

### ii.     Debtor Represents Bravo Luck's Assets Are His Own

16.     In response to the Sherry Netherland's request for additional financial information, the Debtor's counsel in Hong Kong, Stevenson, Wong & Co., submitted a letter to the Sherry-Netherland, dated March 4, 2015, in support of the Debtor's purchase application (the "Stevenson Wong Letter").

17.     The Stevenson Wong Letter stated, among other things, that Bravo Luck was "legally and beneficially owned as to 50% by [the Debtor] and 50% by [the Debtor's Son] respectively" and that the bank account of Bravo Luck at UBS AG ("UBS") with account number 371236 (the "Bravo Luck UBS Account") "is operated by either [the Debtor] or [the Debtor's Son] signing solely and . . . is able to be accessed by either of them signing solely."[78] In other words, regardless of who as a technical legal matter owned Bravo Luck, the Debtor had complete access to the Bravo Luck UBS Account.

18.     The Stevenson Wong Letter included as an attachment a special report from UBS dated March 3, 2015 demonstrating that the Bravo Luck UBS Account held liquid assets with a value of approximately $490 million.

---

[77] Ex. 39, Minutes of meeting of the Board of Directors of the Sherry Netherland, at 2.

[78] Ex. 43, Stevenson Wong Letter, dated March 5, 2015, at 2.

19.     Upon information and belief, the Stevenson Wong Letter post-dates the payment by Bravo Luck of approximately $30 million to purchase the Lady May yacht on February 23, 2015, meaning that immediately prior to February 23, 2015, the Bravo Luck UBS Account held approximately $520 million (the $490 million in the account on March 3, 2015 plus the $30 million used to purchase the Lady May on February 23, 2015).

20.     The Hong Kong Restraint Order identified the Bravo Luck UBS Account as a bank account that, while purportedly held by Bravo Luck, was "subject to the effective control" of the Debtor and the Debtor's Son.[79]  The Hong Kong Restraint Order was issued in 2018, indicating that the Debtor's access to the Bravo Luck UBS Account continued well after his purported transfer of his equity interest in Bravo Luck to the Debtor's Son in May 2015 (discussed further below).

### iii.     Submission of Bravo Luck Financial Information Persuades Sherry Netherland to Approve Debtor's Purchase Application

21.     At the meeting of the board of directors of the Sherry Netherland held on March 4, 2022, the Chairman of the meeting, Michael J Horvitz, reported, according to the minutes of the meeting:

> that since yesterday's meeting, [Horvitz] was in receipt from counsel for Genever Holdings LLC, the prospective purchaser of the 18th Floor and Maid's Rooms 719 and 2219, of a bank statement from UBS showing that the principal owner of the purchaser Miles Guo, also known as, Kwok Ho Wan, also known as Miles Kwok, had a bank account with UBS which contained liquid assets in an amount sufficient to give Mr. Horvitz comfort that Mr. Kwok met the Board's financial standards, together with an opinion of Stevenson, [Wong] & Co., a legal firm in Hong Kong indicating that access to the account was available to either Mr. Kwok Ho Wan or one other person. Based upon these documents, Mr. Horvitz said that he was satisfied that the purchaser had adequate financial resources to become a shareholder of the Corporation assuming the Board's previously discussed

---

[79] Ex. 3, Hong Kong Restraint Order ¶ 3, Respondent 21.

requirement that he place a security deposit with the Corporation equal to five years' annual maintenance for the three units being acquired.[80]

22.    According to the testimony of Michael Ullman, Executive Vice President and Chief Operating Officer of the Sherry Netherland, "[a]ll of the financial information that [the Debtor] presented to The Sherry-Netherland was financial information of companies that he purported to own."[81]

### iv.    Purchase of Sherry Netherland Apartment

23.    On or around March 4, 2015, no less than approximately $63 million of the funds used to purchase the Sherry Netherland Apartment were transferred from the Bravo Luck UBS Account to a representative of the seller.[82]  Upon information and belief, this payment was processed pursuant to a wire transfer form signed by the Debtor.[83]

24.    Upon information and belief, any cash held by Bravo Luck, including the cash used to purchase the Sherry Netherland Apartment, was provided to Bravo Luck by the Debtor or an entity controlled by the Debtor.

25.    At the time Bravo Luck paid for the Sherry Netherland Apartment, the Debtor formally held 50% of its shares.

---

[80] Ex. 44, Minutes of meeting of the Board of Directors of the Sherry Netherland held on March 4, 2015, at 1.

[81] Ex. 45, Ullman Dep. Tr. at 60:5-9 ("Q: All of the financial information that [the Debtor] presented to The Sherry-Netherland was financial information of companies that he purported to own? A: Yes").

[82] Ex. 46. BVI Affidavit of Qiang Guo, at ¶ 49, dated December 29, 2021.

[83] Escobar, Pepe, et al. "Exclusive: The Fugitive Who Tried to Spark a US-China War." The Unz Review, 5 Aug. 2022, https://www.unz.com/pescobar/exclusive-the-fugitive-who-tried-to-spark-a-us-china-war/.

26. According to a purported Instrument of Transfer, on May 26, 2015, the Debtor transferred his 50% interest in Bravo Luck to the Debtor's Son in exchange for consideration of one dollar.[84]

27. The sale of the Sherry Netherland Apartment, for a price of $70 million, closed on March 6, 2015. Documents executed in connection with the closing included a Proprietary Lease (the "Lease") with the Sherry Netherland as Lessor and Genever US as Lessee, as well as an Agreement and Consent with Respect to Shares and Proprietary Lease (the "Agreement and Consent") with the Sherry Netherland as Lessor, Genever US as Lessee, and the Debtor as Occupant. Under the Agreement and Consent, the Debtor represented that Genever BVI was sole member of Genever US and agreed to, among other things, be bound by all the obligations of Genever US under the Lease and to deliver a personal guaranty guaranteeing the performance of Genever US thereunder.[85] Such personal guarantee was executed by the Debtor on March 6, 2015 and attached as an exhibit to the Agreement and Consent.[86]

> **v. Counsel Opine on Genever US and Genever BVI's Capacity to Contract and Perform Obligations**

28. In addition, on March 6, 2015, the Debtor's counsel submitted certain additional documents to the Sherry Netherland, including:

> a) A letter from Paul Weiss, describing itself as "special counsel to [Genever US]," opining, based on the review of enumerated Genever US corporate documents and related materials, that, among other things:

---

[84] Ex. 47, Instrument of Transfer, dated May 12, 2015, *See* also Ex. 46, BVI Affidavit of Qiang Guo at ¶ 31 ("The legal ownership of Bravo Luck was changed for a limited period of approximately four months between 26 January 2015 and 12 May 2015, whereby I transferred 50% legal ownership of Bravo Luck to the [Debtor]").

[85] Ex. 48, Agreement and Consent, dated March 6, 2015, at ¶ 3-5.

[86] *Id.* at SN 0298-0300.

       (1)     Genever US had "all the necessary power to execute and deliver" the leases and related transactional documents executed in connection with the sale of the Sherry Netherland Apartment (the "<u>Transactional Documents</u>");

       (2)     Genever US had "all necessary power to execute, deliver and perform its obligations under the Transactional Documents"; and

       (3)     Each Transactional Document constituted "the legal, valid, and binding obligation of [Genever US], enforceable against [Genever US] in accordance with its terms."[87]

    b)    A letter from Ogier, BVI counsel to the Debtor and/or Genever BVI, based on the review of enumerated Genever BVI corporate documents and related materials stating, among other things, that Genever BVI "has the capacity and power to form and hold membership interests in [Genever US], to be [Genever US's] sole member and, as a matter of British Virgin Islands law, to cause [Genever US] to enter into" the Transactional Documents.[88]

29.     Notably, Paul Weiss and Ogier, in preparing these opinion letters, purported to review the key corporate documents, enumerated in their letters, regarding Genever US and Genever BVI, respectively.  Tellingly, despite its purported date of February 17, 2015—that is, before the opinion review period—the Purported Trust Agreement was not among these documents.  Upon information and belief, this was because the Purported Trust Agreement did not exist at that time.

30.     In fact, at no point during the process of purchasing the Sherry Netherland Apartment did the Debtor or anyone else make any reference to the Purported Trust Agreement. Upon information and belief, this was because the Purported Trust Agreement did not exist at that time.

---

[87] Ex. 49, Letter from Paul, Weiss, Rifkind, Warton & Garrison LLP, dated March 6, 2015, at 2.

[88] Ex. 50, Letter from Ogier, dated March 6, 2015, at 3.

31.     Upon information and belief, the Debtor, and not the Debtor's Son, used the Sherry Netherland Apartment as his principal residence from 2015 until shortly prior to the filing of this Complaint.

### C.     Debtor's Intent to Transfer Sherry Netherland Apartment to Son

#### i.     Debtor's Representatives Inquire Regarding Transfer of Sherry Netherland Apartment to Son Through Trust Arrangement

32.     According to the testimony of Mr. Ullman of the Sherry Netherland, in or around June of 2016, the Debtor's real estate agent, Kathy Sloane, met with Mr. Ullman in his office and inquired regarding how the Debtor could transfer ownership of the Sherry Netherland Apartment to the Debtor's Son.[89]  Mr. Ullman responded by explaining that such a transfer would require "go[ing] through the entire process of purchase again and he would have to submit letters of recommendation, updated financials and the whole package that's required to transfer it."[90]

33.     On June 29, 2022, Mr. Ullman received an email from "Yong," one of the Debtor's employees,[91] from the email address "kwokoffice.nyc@gmail.com."  In the email, Yong introduced "our lawyer Helen Manis which I copied in the email to you," noting that communicating with Ms. Manis "may be helpful to process the transfer [to the Debtor's Son]" and requesting "help to reply to her questions that we can process smoothly."[92]

34.     On the same day, Mr. Ullman received an email from attorney Manis in which Ms. Manis stated that the Sherry Netherland Apartment "is currently owned by an LLC that is

---

[89] Ex. 45, Ullman Dep. Tr. at 77:16-23.

[90] *Id.* at 78:18-21.

[91] Upon information and belief, this was Yu Yong, discussed above in relation to the Ace Decade entity.

[92] Ex. 51, Email from Yong, dated June 29, 2016, at SN 0023.

*ultimately beneficially owned by Mr Kwok*."[93]  Ms. Manis then stated that "we want to undertake some restructuring in relation to the property so that the ultimate beneficial ownership will pass to [the Debtor's] son," asking "*if the final result of the restructuring is that the LLC is owned by a trust of which the son is beneficiary, is this acceptable to you?*"[94]

35.     Mr. Ullman responded to Ms. Manis' inquiry on July 7, 2016, explaining that "[i]n order for the Board to consider the requested series of transfers of the apartment to a trust for the benefit of Mr Kwok's son, the Board would have to initially be provided with the items detailed on the attached Board requirements list and the completed attached transfer application."[95]

36.     Upon information and belief, the Debtor's representatives suggested in these June 2016 communications that the Sherry Netherland Apartment be placed in trust for the benefit of the Debtor's Son because the Purported Trust Agreement—which the Debtor now alleges had *already* placed the apartment in trust for the benefit of the Debtor's Son as of February 2015— did not in fact exist at that time.

### ii.    Debtor Again Attempts to Transfer Sherry Netherland Apartment to Son

37.     On June 12, 2017, an individual identifying herself as Yvette Wong[96] stated, in an email to Mr. Ullman regarding a variety of property maintenance issues: "I was told that our contact person to [the] Sherry [Netherland] is my Principle himself [i.e., the Debtor], again for

---

[93] *Id.* at SN 0018 (emphasis added).

[94]  *Id.* at SN 0019 (emphasis added).

[95] Ex. 52, Email from Michael Ullman, dated July 7, 2016, at 1.

[96] Upon information and belief, this Yvette Wong is the same individual as the Yvette Wang described above (whose roles include, among others, that of president of Golden Spring).

the convenience of Family, could we change this person to be my Principle's son?"[97]  Yvette

Wong followed up on this request on June 19, 2017, inquiring "[i]s there any way we can change

[the Debtor's Son] to be the Official contact person?"[98]

38.    Mr. Ullman testified that he believed this request "was an attempt to "circumvent

the [Sherry-Netherland's June 2016] decision . . . that he couldn't transfer the apartment to the

son."[99]

39.    Again, the Debtor's attempt to transfer the Sherry Netherland Apartment to the

Debtor's Son is irreconcilable with his current position that his son already beneficially owned

the apartment pursuant to the Purported Trust Agreement at that time.

**D.    Debtor Asserts Claims Against Sherry Netherland in 2016 Lawsuit**

40.    On August 5, 2016, the Debtor and Genever US commenced an action against the

Sherry Netherland and related defendants by filing a verified complaint (with a verification

signed by Yvette Wong) in the United States District Court for the Southern District of New

York (the "2016 Complaint").[100]  The 2016 Complaint stated, among other things, that:

a)    The Sherry Netherland had committed misconduct in handling certain
building repairs—what the 2016 Complaint referred to as "an incident
involving one of its most prestigious residents [i.e., the Debtor] and one of
its most expensive apartments [i.e., the Sherry Netherland Apartment]."[101]

b)    The Debtor was the "Sole Shareholder of [Genever US],"[102] which was
"owned and operated by [the Debtor]."[103]

---

[97] Ex. 53, Email from Yvette Wong, dated June 12, 2017, at 7.

[98] *Id.* at 1.

[99] Ex. 45, Ullman Dep. Tr. at 92:12-93:3.

[100] Ex. 10, Verified Complaint, *Genever Holdings, LLC v. Sherry-Netherland, Inc.*, 16-cv-06246 (S.D.N.Y. Aug. 5, 2016), ECF No. 1.

[101] *Id.* at ¶ 1.

[102] *Id.* at ¶ 22.

     c)      The Sherry Netherland had unlawfully discriminated against the Debtor based on his Chinese nationality in requiring the funding of a security deposit to cover five years of maintenance fees.[104]

41.     At no point in the 2016 Complaint did the Debtor or anyone else make any reference to the Purported Trust Agreement, despite the Purported Trust Agreement allegedly having been executed on February 17, 2015.  Upon information and belief, the Purported Trust Agreement was never mentioned because it did not in fact exist at that time.

### E.    **Additional Evidence That Bravo Luck Is Controlled by Debtor**

42.     Discovery obtained by PAX from Bravo Luck provides further evidence that Bravo Luck is controlled by the Debtor.  For example:

     a)      Disclosure from Bravo Luck's former BVI registered agent shows that the "client of record" was, prior to mid-2017, Stevenson Wong & Co., the Debtor's long-time Hong Kong lawyers.

     b)      In mid-2017, the client of record for Bravo Luck's BVI registered agent became William Je of Kingdom Rich Limited.[105]  William Je is a close associate of the Debtor and Kingdom Rich Limited is a Kwok shell company purportedly owned by the Debtor's Son[106] that, upon information and belief, once owned a boat called the Lady May II.

     c)      The address used by William Je in his role as client of record of Bravo Luck's BVI registered agent is the same address listed as the Debtor's address on Bravo Luck corporate documents.

     d)      At the trial held in the *Eastern Profit Corp. Ltd.* litigation, one witness testified on April 22, 2021 that the Debtor had introduced her to Mr. Je and described Mr. Je as "my money man."[107]  When the Debtor testified at

---

[103] *Id.* at ¶ 32.

[104] *Id.* at ¶ 124.

[105] Ex. 54, Email from Rexella Hodge, dated May 15, 2020, at 1 ("Until mid-2017, the client of record was Stephenson Wong & Co. Thereafter, the portfolio was managed by Mr. William Je of Kingdom Rich Limited. A copy of email requesting the change is attached.").

[106] Ex. 59, Kingdom Rich Ltd. Annual Return at 8 (listing Qiang Guo as only member).

[107] Ex. 26, Tr. at 774:24-775:1 ("Was he formally introduced to you? A. Yes. Mr. Guo introduced him to me that -- jokingly, that "He's my money man. Anything ask him about money.").

this trial, he invoked the Fifth Amendment multiple times when questioned regarding William Je.[108]

e)    William Je is the sole purported shareholder of a Hong Kong entity called ACA Capital Group Ltd. ("ACA"), an entity that appears to also be controlled by the Debtor, with a number of ACA's directors and officers being well-known associates of the Debtor.[109]

f)    Fiona Yu, ("Ms. Yu"), who, according to her business card was an in-house attorney at ACA Capital Group Ltd. ("ACA"), certified the due diligence ("KYC") materials supplied by the Debtor's Son to Bravo Luck's BVI registered agent.  Ms. Yu also submitted an affidavit in the State Court Action as the "appointed person" for the Debtor.[110]

g)    ACA was originally intended to be the lender of approximately $37 million to HK USA for placement into escrow in connection with the April 2022 stipulation requiring the escrowing of such funds as security to ensure the return of the Lady May to the United States.  ACA was replaced as HK USA's lender by Himalaya International Financial Group Ltd., an entity linked to the Debtor's Himalaya Coin/Himalaya Dollar cryptocurrency operation.

h)    ACA has a history of gifting funds to the Debtor under the guise of purported loans.  In the Liman Decision, Judge Liman found that ACA had given a gift of $1 million to Eastern Profit Corporation, despite the contention that these funds were provided as a loan and the existence of a document that purported to be a loan agreement.[111]  During the related litigation, Strategic Vision US LLC had suggested that the Debtor was the

---

[108] *See id.* 691: 24-25 ("Q. Who is William Je? A. The Fifth Amendment."); *Id.* at 692:24-693:1 (Q: "And [Mr. Je] sends money to places when you ask him to do so, doesn't he? A: The Fifth Amendment. I'm invoking the Fifth Amendment."); *id.* at 695: 5-7 ("And you introduced William Je to close associates as your money man, haven't you? A. The Fifth Amendment.").

[109] *See* Ex. 55, ACA Capital Group Limited Articles of Association, at 2 (identifying Je Kin Ming (alias of William Je) as sole shareholder); Ex. 56, ACA Capital Group Ltd. Change in Particulars of Company Secretary and Director, dated April 1, 2017, at 3 (signed by Fiona Yu); Ex. 57, ACA Capital Group Ltd. Annual Return, dated Jan. 6, 2019, at 4 (listing Karin Maistrello as director).

[110] Ex. 58, Affirmation of Fiona Yu in Support of Defendant's Motion to Dismiss ¶ 1, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 11.

[111] *Eastern Profit Corp. Ltd.*, 2021 WL 2554631, at *41 ("The source of the funds sent by ACA is unknown to the Court and was not the subject of testimony. But regardless of whether those funds are ultimately traceable to [the Debtor] as Strategic suggested or are independent from him, the Court finds that they were a gift on behalf of Eastern (and [the Debtor]) and not provided out of any obligation.").

source of the funds gifted to Eastern, however Judge Liman did not make a finding on that issue.[112]

i)      ACA Capital contributed to the payment of the Debtor's legal fees in connection with the State Court Action.[113]

### F.    PAX's Litigation Against Debtor

#### i.    PAX Claim

43.    As determined by the State Court,[114] during the entire time period relevant to this Complaint, the Debtor was personally indebted to PAX pursuant to a 2011 personal guarantee (the "2011 Personal Guarantee") with respect to amounts owing in connection with a loan made by PAX to one of the Debtor's business entities in 2008 (the "PAX Claim").[115]  Between April 2013 and June 2015, the Debtor and PAX were parties to a Deed of Settlement under which it was contemplated that the PAX Claim would no longer be due and owing if certain conditions occurred.  These conditions did not occur, and the PAX Deed of Settlement was terminated in June of 2015.[116]

44.    On April 18, 2017, PAX filed a complaint in the State Court asserting the Debtor's liability in connection with the PAX Claim under a theory of breach of contract related to the 2011 Personal Guarantee.[117]  On April 18, 2019, PAX amended its complaint to include Genever US and Genever BVI as defendants and to assert that such entities' corporate veils

---

[112] *Id.*

[113] Ex. 60, Letter from Kevin M. Kearney of Hodgson Russ LLP, dated April 7, 2021 at 2, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 766 (Noting that payments to Hodgson Russ were made by Golden Spring as well as ACA Capital and a third Debtor-linked entity, Ziba Limited).

[114] Ex. 61, Decision and Order, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 549, at 7 ("the Court finds Kwok liable for breach of the 2011 Personal Guarantee.").

[115] *Id.*

[116] *Id.* at 7.

[117] *See* Ex. 62, Complaint, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 2.

should be pierced and that they should be held jointly and severally liable for the Debtor's breach

of contract.

### ii.    PAX's Efforts to Seek Prejudgment Attachment

45.    In 2017 and 2018, PAX filed multiple prejudgment attachment motions in the

State Court in an effort to prevent the Debtor from dissipating his assets, including the Sherry

Netherland Apartment.[118]  As a result of these motions, the State Court entered an order on April

26, 2019, which required Kwok and the Genever Entities to provide PAX written notice of any

contract to sell, assign, transfer, or pledge the Sherry Netherland Apartment.

46.    PAX's first prejudgment attachment motion, filed on July 7, 2017, became moot

upon the State Court's dismissal of the State Court Action on *forum non conveniens* grounds on

September 20, 2017, a decision that was reversed by the Appellate Division on April 4, 2018.

PAX filed a second prejudgment attachment motion on April 24, 2018 (the "Second Prejudgment

Attachment Motion").[119]

### iii.    Debtor Opposes Attachment by Alleging Existence of Pledges

47.    The Debtor's May 16, 2018, opposition to the Second Prejudgment Attachment

Motion argued, among other things, that the Sherry Netherland Apartment could not be subject

to attachment because "pursuant to a pledge and security agreement entered into in or about May

2015 . . . the assets of Genever BVI, which by virtue of its ownership of Genever USA include

---

[118] Ex. 63, Memorandum of Law in Support of Plaintiff Pacific Alliance Asia Opportunity Fund L.P.'S Motion for Pre-Judgment Order of Attachment, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 28 (July 7, 2017), Ex. 64, Memorandum of Law in Support of Plaintiff Pacific Alliance Asia Opportunity Fund L.P.'S Motion for Pre-Judgment Order of Attachment, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 123 (April, 4, 2018), Ex. 65, Pacific Alliance Asia Opportunity Fund L.P.'s Memorandum of Law in Support of its Motion for Pre-Judgment Order of Attachment, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 250 (November 28, 2018).

[119] Ex. 66, Notice of Plaintiff's Motion for Pre-Judgment Order of Attachment, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 122 (April 24, 2018).

the Apartment, were pledged to an entity named Roscalitar 2, an exempted company incorporated in the British Virgin Islands."[120]

48.    The Debtor's May 16, 2018, opposition was supported by an affidavit of Ms. Wang dated May 15, 2018 (the "2018 Wang Affidavit"). In the 2018 Wang Affidavit, Ms. Wang identified herself as president of Golden Spring and "administrator for the interests of [the Debtor] . . . and his family."[121]   The 2018 Wang Affidavit further asserted that the Debtor was "the sole shareholder of Genever BVI" and that "the shares of Genever BVI have been pledged as collateral to a third party Roscalitar 2."[122]   In addition, the 2018 Wang Affidavit acknowledged that the Debtor held an "ownership interest" in the Sherry Netherland Apartment, though it was "not in real property" but was an "ownership interest in certain shares of the Sherry Netherland."[123]

49.    In PAX's reply brief in support of the Second Prejudgment Attachment Motion and at the June 27, 2018 hearing before the State Court, PAX argued that the pledge granted to Roscalitar 2 had been terminated prior to the commencement of the State Court Action. At the hearing, counsel to the Debtor proudly defended the pledge assertion, remarking that "[f]or the purpose of the integrity of the Court and myself and the papers that we submit, I want your Honor to be aware that . . . that lien is still in effect today."[124]   Counsel to the Debtor also

---

[120] Ex. 67, Defendant's Memorandum of Law In Opposition to Plaintiff's Motion for an Order of Pre-Judgment Attachment, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 167 (May 16, 2018).

[121] Ex. 68, Affidavit of Yan Ping Wang at ¶ 1, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 182 (May 15, 2018).

[122] *Id.* at ¶ 5.

[123] *Id.* at ¶ 2.

[124] Ex. 69, Hr. Tr. at 24:21-26, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 199 (June 27, 2018).

submitted to the State Court documents purporting to show the existence of both the Roscalitar 2 pledge granted in 2015 as well as a second pledge in favor of Blue Capital, granted in February of 2018.[125]

50.    PAX subsequently demonstrated (and it was conceded by the Debtor's counsel) that, not only had the Roscalitar 2 pledge been terminated in 2017, but that the Blue Capital pledge had been terminated in June 2018, two weeks prior to the June 27, 2018 hearing.[126]

51.    On June 29, 2018, the State Court issued an order denying the Second Prejudgment Attachment Motion without prejudice, requiring the Debtor to notify PAX regarding any contract of sale or assignment of the Sherry Netherland Apartment, and scheduling a hearing on July 10, 2018 at which the parties would appear and enter into an expedited discovery schedule.[127]

52.    The Debtor did not raise or disclose the Purported Trust Agreement in connection with his opposition to the Second Prejudgment Attachment Motion.  Upon information and belief, this is because the Purported Trust Agreement did not in fact exist at that time.  Indeed, there would have been no need for the Debtor to go through the extensive ruse of alleging that Genever BVI was subject to various liens and/or pledges if, in fact, Genever BVI was beneficially owned by Bravo Luck pursuant to the Purported Trust Agreement.  In addition, such pledges were prohibited by the terms of the Purported Trust Agreement absent the prior written

---

[125] Ex. 70, June 27, 2018 Hearing Pledge Documents, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 231 (November 15, 2018).

[126] Ex. 71, Decision and Order, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 192 (June 29, 2018).

[127] Ex. 72, Hr. Tr. at 25:24-25, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 281 (March 8, 2019).

approval of Bravo Luck, and therefore the pledge-based arguments belie the existence of the Purported Trust Agreement at the time the pledge-based arguments were made.

### iv.    PAX Serves Document Discovery Requests

53.    In connection with discovery on the attachment issue scheduled by the State Court, in July 2018 PAX served the Debtor with document requests that included a number of Requests for Production ("RFPs") with respect to which the Purported Trust Agreement was responsive.  The RFPs included requests for, among other things, all documents and communications relating to the 2015 purchase of the Sherry Netherland Apartment and all documents and communications relating to any transfer of monies or assets from Genever US to any other person or entity.[128]

54.    Document discovery with respect to the prejudgment attachment issue closed in September 2018.

55.    The Purported Trust Agreement was not disclosed during the discovery period. Upon information and belief, this is because the Purported Trust Agreement did not in fact exist during that time period.

### v.    Debtor's October 2018 Deposition

56.    PAX took the Debtor's deposition with respect to the attachment issue on October 3, 2018 (the "October 2018 Deposition").  During the October 2018 Deposition, among other things:

> a)    The Debtor denied holding any ownership interest in the Sherry Netherland Apartment,[129] stating that the Sherry Netherland Apartment was in fact owned by an individual named Zhang Wei, allegedly in prison

---

[128] Ex. 73,  Plaintiff Pacific Alliance Asia Opportunity Fund L.P.'S Second Set of Requests for the Production of Documents to Defendant, at ¶¶ 4, 11, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.) (July 13, 2018).

[129]  Ex. 8, Kwok Dep. Tr. at 28:4-15.

in China.[130]  Upon information and belief, Zhang Wei had never been mentioned before in any document filed in the State Court Action.

b)      The Debtor denied that he controlled Genever Holdings Corporation, alleging that it was controlled by Zhang Wei.[131]

c)      The Debtor took the position that PAX could not attach the Sherry Netherland Apartment because he did own it, but rather Zheng Wei did.[132]

d)      The Debtor claimed to have in his possession a written agreement evidencing Zhang Wei's ownership of the Apartment.[133]  The Debtor's counsel subsequently reported to PAX's counsel that the Debtor did not have this document and would not be producing it. [134]

e)      The Debtor denied that he was the sole shareholder of Genever BVI (contradicting, among other things, the Wang Affidavit).[135]

f)      When asked whether his son had any ownership of Genever BVI, the Debtor stated that he did not know.[136]

g)      When asked whether his son had any role with respect to Genever BVI, the Debtor indicated vaguely that his son was some sort of "representative," but upon further questioning responded that he did not know more because "[t]his is something that is affair of Mr. Zhang Wei."[137]

h)      The Debtor denied having given the Sherry Netherland an expedited deadline by which to accept his purchase application.[138]  In addition, he claimed to not know or not remember numerous facts, such as whether he

---

[130] *Id.* at 27:15-25.  Zhang Wei is listed on the Hong Kong Restraint Order as an individual (like Han Chunguang) whose bank accounts were subject to Kwok's control.  Hong Kong Restraint Order ¶ 3, Respondent 26.

[131] *Id.* at 36:20-24.

[132] *Id.* at 125:13-19.

[133] *Id.* at 119:4-24.

[134] *See* Ex. 105, Email from Edward Moss of O'Melveny & Myers LLP dated October 9, 2018 ("Today in court, Jillian [Searles] told Stuart [Sarnoff] and me that Mr. Kwok does not have the document and therefore you will not be producing it.").

[135] Ex. 8, Kwok Dep. Tr. at 31:25-32:3.

[136] *Id.* at 41:23-25.

[137] *Id.* at 42:19-20.

[138] *Id.* at 86:19-24.

had authorized Paul Weiss and Williams & Connolly to communicate with the Sherry Netherland on his behalf. [139]

    i)    The Debtor denied having any ownership interest Beijing Zenith Holdings Company Ltd. as of 2015, contradicting the letters submitted to the Sherry Netherland on his behalf by Paul Weiss and Williams & Connolly.[140]

    j)    The Debtor claimed not to know whether he had any relationship with Bravo Luck[141] and not to remember whether he had ever held an ownership interest in Bravo Luck.[142]  He also stated that Bravo Luck was owned by Zhang Wei.[143]

    k)    The Debtor was asked repeated questions regarding the inquiries made on Mr. Kwok's behalf in 2016 in connection with the contemplated transfer of the Sherry Netherland Apartment to the Debtor's Son through a trust, generally denying his involvement and/or claiming not to know or remember.[144]

57.    Notably, despite the numerous questions related to the role of Bravo Luck and the Debtor's interest in transferring the Sherry Netherland to his son through a trust, the Debtor never mentioned the Purported Trust Agreement during the October 2018 Deposition.  Upon information and belief, this is because the Purported Trust Agreement did not in fact exist at that time.  Further, there would have been no need for the Debtor to go through yet another extensive ruse—alleging that the Sherry Netherland Apartment was owned by Zhang Wei—if, in fact, such apartment was owned by Bravo Luck pursuant to the Purported Trust Agreement.

---

[139] *Id.* at 76:4-7.

[140] Ex. 8, Kwok Dep. Tr. at 77:3-6, 16-25.

[141] *Id.* at 81:10-17.

[142] *Id.* at 82:20-22.

[143] *Id.* at 82:17-19.

[144] *Id.* at 105:2-22.

### vi.    Appearance of Purported Trust Agreement

58.    On November 15, 2018, PAX filed its third prejudgment attachment motion (the "Third Prejudgment Attachment Motion").[145]  In the Debtor's response dated December 14, 2018, the Debtor noted that he had agreed to produce documents and communications regarding, among other things, the Debtor's relationship with Genever US and Genever BVI.[146]

59.    Then, on April 22, 2019 (a few days before the April 26, 2019 evidentiary hearing on the Third Prejudgment Attachment Motion), the Debtor's counsel sent an email to PAX's counsel stating as follows: "Attached is a document . . . recently obtained by Mr. Kwok, and provided to us, which I am providing to you in accordance with Mr. Kwok's ongoing discovery obligations."[147]  The attached document was the Purported Trust Agreement.

60.    Prior to April 22, 2019, and despite the Purported Trust Agreement being responsive to RFPs issued in July 2018, the Purported Deed of Trust had never surfaced in discovery nor been produced to PAX.

61.    Despite producing the Purported Trust Agreement a few days before the April 26, 2019 evidentiary hearing on the Third Prejudgment Attachment Motion, neither the Debtor's attorneys nor Ms. Wang (the president of the Debtor's "family office" shell company, Golden Spring), who testified at the hearing, referred to or proffered the Purported Trust Agreement in opposing the motion.  Upon information and belief, Kwok's representatives did not raise or

---

[145] Ex. 65, Pacific Alliance Asia Opportunity Fund L.P.'s Memorandum of Law in Support of its Motion for Pre-Judgment Order of Attachment, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 250 (November 28, 2018).

[146] Ex. 74, Defendant's memorandum of Law in Opposition to Plaintiff's Motion for an Order of Pre- Judgment Attachment, at 6, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 268 (December 14, 2018).

[147] Ex. 75, Email from Jillian Searles of Hodgson Russ LLP disclosing Purported Trust Agreement, dated April 22, 2019.

proffer the Purported Trust Agreement in opposing the Third Prejudgment Attachment Motion because they anticipated the State Court would recognize the document as fraudulent.  Indeed, if valid and enforceable, the Purported Trust Agreement could have been a "showstopper" in favor of the Debtor in the State Court Action.

62.    The Purported Trust Agreement bears, on its first page, the date of February 17, 2015, a date over a week prior to the initial submission of the Debtor's purchase application to the Sherry Netherland on February 26, 2015.

63.    The Purported Trust Agreement states, among other things, that the Debtor as "Trustee" "is holding [Genever BVI] and [Genever US] in trust for [Bravo Luck],"[148] and that Bravo Luck "is a beneficial owner of [Genever BVI] and [Genever US]."[149]  The Purported Trust Agreement also contains covenants of the Debtor as Trustee to not allow any assignment of or execution against Genever US and Genever BVI.

64.    The Purported Trust Agreement allegedly bears the signatures of the Debtor (signing on behalf of himself, Genever US, and Genever BVI) and the Debtor's Son, signing on behalf of Bravo Luck.

65.    The Purported Trust Agreement states that Genever US was formed at the address of the Sherry Netherland Apartment, even though as of February 17, 2015, the Sherry Netherland Apartment had not yet been purchased and the Purchase Application had not yet been submitted.[150]

---

[148] *Id.* at Background ¶ (4).

[149] *Id.* at Background ¶ (5).

[150] *Id.* at Intro. ¶ (3)

66.     To the extent the Purported Trust Agreement was in fact executed on February 17, 2015 (which the Trustee disputes), it was executed in anticipation of the acquisition of the Sherry Netherland Apartment and for the purpose of transferring the value of such apartment to the Debtor's Son (through Bravo Luck).[151]  And to the extent the Purported Trust Agreement was executed after March 6, 2015 (i.e., at a time when Genever US already held title to the Sherry Netherland Apartment), it was executed for the purpose of transferring the value of such apartment to the Debtor's Son (through Bravo Luck).

67.     The Purported Trust Agreement contains a choice of law provision stating that it "shall be governed by and construed in accordance with the law of the State of New York" and that the "construction, interpretation, implementation and enforcement of [the Purported Trust Agreement] shall be governed by the laws and regulations of the State of New York."[152]

68.     Upon information and belief, no consideration was paid to the Debtor in connection with the alleged execution of the Purported Trust Agreement.

### vii.     PAX Prevails on Merits

69.     On September 15, 2020, PAX prevailed on its motion seeking summary judgment on its breach of contract claim against the Debtor.[153]  PAX's veil-piercing claims against Genever US and Genever BVI remained pending.  Notably, the State Court ruled that the Debtor was estopped from challenging the authenticity of key documents underlying the PAX claim, including the 2011 Personal Guarantee (which during a deposition held in late 2019 the Debtor for the first time denied having signed) on the grounds that the Debtor's representative had

---

[151] *Id.* at Background ¶ (3).

[152] *Id.* at Decl. ¶ 4.

[153] *See* Ex. 61, Decision and Order. An appeal of this decision is pending.

submitted these same documents to the State Court in 2017 to support of the Debtor's motion to dismiss the State Court Action on *forum non conveniens* grounds.

70.    On February 3, 2021, the State Court entered an order awarding PAX a judgment in connection with its breach of contract claim in the amount of $116,402,019.57 (the "PAX Judgment").[154]

### viii.    State Court Issues Restraining Orders

71.    On September 25, 2020, PAX filed a motion in the State Court seeking a restraining order pursuant to New York Civil Practice Law & Rule ("CPLR") 5229, alleging, among other things, that the Debtor would "take steps to dissipate his assets or otherwise frustrate the judgment in this case" (the "CPLR Motion").[155]

72.    On September 30, 2020, the State Court entered a temporary restraining order restraining the Debtor from, among other things, "making or causing any sale, assignment, transfer, or interference with any property in which he has an interest."[156]

73.    On October 15, 2020, the State Court held a hearing with respect to PAX's CPLR Motion and the Debtor's opposition thereto.  At the hearing, the State Court stated in comments directed at the Debtor and his counsel:

        a)        "The Court believes . . . that Mr. Kwok has attempted to mislead the Court.  The Court believes that Mr. Kwok is, as the plaintiff contends, playing a shell game with his assets, and has violated if not the letter of court orders, the spirit of court orders."[157]

---

[154] Ex. 76, Judgment, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 716.

[155] Ex. 77, Memorandum of Law in Support of PAX's CPLR 5229 Motion and Request for TRO at 5, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 576.

[156] Ex. 78, Decision and Order on Motion, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 591.

[157] Ex. 79, Tr. at 21:13-16, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 647.

b)      "[W]e are not going to have any more shell games. Wherever these assets are held, they are going to remain and held where they presently reside, and if it's determined that the entities that are presently listed as the owners of the assets are the alter ego of Mr. Kwok or are wholly dominated and controlled by Mr. Kwok, those assets will be made available to satisfy any judgment that the plaintiff recovers."[158]

c)      "The intent here which is very clear and specific is that in this 2017 case in which there's been a great deal of gamesmanship, a great deal of dissembling, and some flagrant disregard of court orders, I want to know if any transaction is going to take place in which Mr. Kwok is the guiding hand that's something other than an ordinary course of business transaction."[159]

d)      "[O]rders of the Court are either flaunted or exceedingly liberally interpreted, and . . . intentional or unintentional misstatements that have misled the Court have been made to the Court."[160]

74.     On the same day, October 15, 2020, the State Court entered an order (the "October 2020 Restraining Order") providing that the Debtor "and/or the registered owners of (1) the Residence at the Sherry Netherland Hotel and (2) the yacht, 'the Lady May' are restrained from making or causing any sale, assignment, transfer, or interference with those assets."[161]

## G.      Genever US Chapter 11 Case

### i.      Filing of Genever US Chapter 11 Petition

75.     On October 12, 2020, shortly before the October 15, 2020 hearing on PAX's CPLR Motion, Genever US commenced the Genever US Chapter 11 Case.

76.     Genever US's chapter 11 petition (the "Genever Petition") was signed by Ms. Wang as an "authorized representative" of Genever US.  The Genever Petition included as an

---

[158] *Id.* at 22:7-14.

[159] *Id.* at 24:8-14.

[160] *Id.* at 26:5-8.

[161] Ex. 80, Decision and Order at 1, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 630 (emphasis added).

attachment the Company Resolutions of Genever US authorizing the filing, signed by the Debtor

on behalf of Genever BVI.  The Company Resolutions contain no signature of the Debtor's Son

or other purported representatives of Bravo Luck.

77.     The list of equity holders filed with the Genever Petition, signed by Ms. Wang,

listed Genever BVI as the only equity holder.

78.     Ms. Wang's declaration filed with the Genever Petition (the "Wang First Day

Declaration") stated that the Purported Trust Agreement "recognizes [Bravo Luck] as the

beneficial owner of" the Sherry Netherland Apartment, and that Bravo Luck "is a company

owned by" the Debtor's Son.[162]  The Wang First Day Declaration also stated that "[c]ontrary to

published reports, [the Debtor] does not have an ownership interest in" the Sherry Netherland

Apartment.  This was also contrary to Ms. Wang's testimony in the 2018 Wang Affidavit, where

she had acknowledged that the Debtor held an "ownership interest" in the Sherry Netherland

Apartment, though it was "not in real property" but was an "ownership interest in certain shares

of the Sherry Netherland."[163]

79.     The Wang First Day Declaration made no mention of the name Zhang Wei,

despite the Debtor's prior assertion during the October 2018 Deposition that an individual named

Zhang Wei owned Bravo Luck.

80.     On January 22, 2021, Genever US filed a declaration of the Debtor in which the

Debtor stated that he had personally funded the $27,000 retainer paid to Genever US's

bankruptcy counsel [Genever Main Case Docket No. 40-2] and that he had "borrowed the

---

[162] Ex. 81, Petition, *In re Genever Holdings LLC*, Case No. 20-12411-jlg (Bankr. S.D.N.Y.), ECF No. 1, Wang First Day Declaration ¶ 4.

[163] Ex. 68, Affidavit of Yan Ping Wang at ¶ 2, PAX v. Kwok, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 182 (May 15, 2018).

monies to fund the payment from an unrelated third party not involved in this case."[164]

### ii.    Bravo Luck's Claim Against Genever US

81.    In connection with filing the Bravo Luck Proof of Claim, executed by the

Debtor's Son on March 5, 2021, Bravo Luck argued as follows:

> Bravo Luck was always intended to be the ultimate owner of the
> Apartment, however, after initial discussions between [the Debtor's Son]
> and/or his agents, [the Debtor's Son] was advised that the Application
> would likely be more successful if an older, more established individual
> was the nominal Applicant. Therefore, [the Debtor] was brought in to be
> the established individual supporting [Genever US's] application for the
> Apartment. Bravo Luck, [the Debtor], the [Genever US] and [Genever
> BVI] . . . entered into [the Purported Trust Agreement] to make clear that
> [the Debtor] as the trustee was holding the Genever Entities and the
> income, profits, and dividends thereof (if any) in trust for Bravo Luck as
> the beneficial owner of the Genever Entities and, thus, the Apartment.[165]

82.    Bravo Luck then asserted that it was "the beneficial owner of the Apartment with

the Apartment being held in trust by [the Debtor] and the Genever Entities for Bravo Luck's

benefit."[166]

83.    In the alternative, Bravo Luck asserted a $76 million unsecured claim, in the

event "a court with jurisdiction over Bravo Luck determines that Bravo Luck does not own the

Apartment by virtue of the Apartment being held in trust by [the Debtor] and the Genever

Entities" based on Bravo Luck's "advancement of funds for the purchase of the Apartment and

any other funds advanced to maintain the Apartment."[167]

---

[164] Ex. 82, "Lar-Dan" Declaration of Kwok Ho WanA/K/A Miles Kwok in Connection With Retention of Goldberg
Weprin Finkel Goldstein LLP, As Counsel for the Debtor, *In re Genever Holdings LLC*, Case No. 20-12411-jlg
(Bankr. S.D.N.Y.), ECF No. 40 (January 22, 2021).

[165] Ex. 83, Proof of Claim, Addendum ¶ 2, *In re Genever Holdings LLC*, Case No. 20-12411-jlg (Bankr. S.D.N.Y.),
Claim 4-1 (March 5, 2021).

[166] *Id.* at ¶ 6.

[167] *Id.* at ¶ 7.

### iii. Genever US Chapter 11 Litigation and Settlement

84. On December 16, 2020, PAX filed a motion seeking relief from the automatic stay to proceed with the State Court Action in connection with Genever US [Genever Main Case Docket No. 13] (the "PAX Relief from Stay Motion").

85. In their objections to the PAX Relief from Stay Motion, Bravo Luck and Genever US both took the position that issues regarding the ownership of the Genever Entities should be decided in previously commenced BVI litigation between PAX, Bravo Luck, and the Genever Entities (the "BVI Litigation").[168]

86. On January 8, 2021, PAX filed a motion seeking the conversion of the Genever US Chapter 11 Case to chapter 7 or, in the alternative, appointment of a chapter 11 trustee [Genever Main Case Docket No. 29] (the "PAX Conversion Motion").

87. On January 27, 2021, Bravo Luck filed its objection to the PAX Conversion Motion (again asserting that Bravo Luck's ownership issues should be resolved in BVI). In addition, the Sherry Netherland filed a joinder to the PAX Conversion Motion, stating, among other things, that:

> When he applied for the requisite approval of the Sherry's Board of Directors of his purchase of the Residence in February and March of 2015, [the Debtor] and his personal attorney represented, among other things, that [the Debtor] was the beneficial owner of [Genever US] and the [Genever US's] parent, Genever Holdings Corporation. In reliance upon those representations—including that [the Debtor] was the beneficial owner of [Genever US], the sole purchaser of the Residence—

---

[168] Ex. 84, Objection of Bravo Luck Limited to Motion of Plaintiff Pacific Alliance Asia Opportunity Fund L.P. to Modify the Automatic Stay to Proceed with State Court Litigation, and Related Relief, *In re Genever Holdings LLC*, Case No. 20-12411-jlg (Bankr. S.D.N.Y.), ECF No. 21 (January 5, 2021), Ex. 85, Debtor's Response and Reservation of Rights with Respect to the Motion of Pacific Alliance Asia Opportunity Fund for Relief from the Automatic Stay, *In re Genever Holdings LLC*, Case No. 20-12411-jlg (Bankr. S.D.N.Y.), ECF No. 22 (January 5, 2021).

the Board of Directors of the Sherry approved the sale of the Residence to the [Genever US].[169]

88.     The Sherry Netherland stated that "[Genever US's] and [the Debtor's] misrepresentations and fraudulent behavior call into question [Genever US's] ability to act as a fiduciary of the estate and maximize the value of the estate."[170]

89.     On February 26, 2021, following negotiations between Genever US, Bravo Luck, and PAX (together, the "Genever Settlement Parties"), the Genever Settlement Parties executed a settlement agreement (as amended, the "Genever Settlement Agreement"), that was eventually approved by Judge Garrity, in amended form, pursuant to an order issued on October 8, 2021 [Genever Main Case Docket No. 141]. The Genever Settlement Agreement provided that the PAX Relief from Stay Motion and PAX Conversion Motion would be resolved and that the Sherry Netherland Apartment would be sold, with such sale to be overseen by a Sales Officer.[171]

90.     The Genever Settlement Agreement also provided for relief from stay to allow PAX to prosecute the State Court Action[172] and that "nothing in this Agreement shall prejudice the rights of any Party, including Bravo Luck and PAX, from proceeding with any and all claims, if any, against anyone, including Bravo Luck, [the Debtor], [the Debtor's Son], or any of

---

[169] Ex. 86, Joinder and Reservation of Rights of The Sherry-Netherland, Inc. with Respect to Pacific Alliance Asia Opportunity Fund L.P.'s Motion for an Order under 11 U.S.C. § 1112(b) Converting the Debtors Case to a Case Under Chapter 7 or, in the Alternative, for an Order under 11 U.S.C. § 1104(a) Appointing a Trustee to Administer the Debtors Estate, at ¶ 2, *In re Genever Holdings LLC*, Case No. 20-12411-jlg (Bankr. S.D.N.Y.), ECF No. 45 (January 27, 2021).

[170] *Id.* at ¶ 4.

[171] Ex. 87, Second Amended Settlement, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 131-1 (September 24, 2021).

[172] *Id.* at ¶ 7.a.

his or its affiliates, and PAX or any of its affiliates, in BVI, State Court, or otherwise, and Bravo

Luck and PAX reserve all rights to oppose such claims in the applicable forum."[173]

91.    As of the date of the filing of this Complaint, the Sales Officer continues to

oversee the sale process contemplated by the Genever Settlement Agreement.

### H.    In State Court Action, PAX Seeks Turnover of Shares of Genever BVI

92.    On June 21, 2021, PAX filed a motion seeking the turnover of the shares of

Genever BVI owned by the Debtor (the "Turnover Motion").[174]  PAX noted in the Turnover

Motion that the Debtor had "belatedly produced" the Purported Trust Agreement,[175] that PAX

would demonstrate at the appropriate moment that the Purported Trust Agreement was a

"fraudulent, backdated document that is not worth the paper on which it was printed,"[176] and that

"*in four years of litigation, Kwok never once dared raise this dishonest argument before this*

*Court.*"[177]

93.    On July 23, 2021, the Debtor filed an objection to the Turnover Motion (the

"Turnover Objection") on the grounds that it was an "end run around" of the contemplated State

Court Action trial on alter ego issues, the Genever US chapter 11 case, and the BVI

---

[173] *Id.* at ¶ 7.b.

[174] Ex. 88, Notice of Plaintiff Pacific Alliance Asia Opportunity Fund L.P.'s Motion for a Turnover Order Against Defendant Miles Kwok and Appointment of a Receiver, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 845 (June 21, 2021), Ex. 89, Memorandum of Law in Support of Plaintiff Pacific Alliance Asia Opportunity Fund L.P.'s Motion for a Turnover Order Against Defendant Miles Kwok and Appointment of a Receiver, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 846 (June 21, 2021).

[175] Ex. 89, Memorandum of Law in Support of Plaintiff Pacific Alliance Asia Opportunity Fund L.P.'S Motion for a Turnover Order Against Defendant Miles Kwok and Appointment of a Receiver, at 9, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 846 (June 21, 2021).

[176] *Id.* at 10.

[177] *Id.* (emphasis in original).

Proceeding.[178]  ***Of note, the Debtor never raised the Purported Trust Agreement in the Turnover Objection.***  Upon information and belief, this is because the Debtor and/or his counsel anticipated that the State Court would recognize the document as fraudulent.

94.      On September 22, 2021, the State Court held a hearing on the Turnover Motion, at which hearing the State Court ruled in favor of PAX based on, among other things, the Debtor's admission, in a December 4, 2020 interrogatory response signed by the Debtor, that the Debtor was "the legal owner of the issued shares of [Genever BVI]."[179]

95.      On the same day, the State Court entered an order granting the Turnover Motion (the "State Court Turnover Order") and ordering the Debtor to "take whatever steps are necessary in the British Virgin Islands to turnover all share certificates with respect to his 100% ownership interest in [Genever BVI]."[180]

96.      The State Court Turnover Order was conditioned on the approval of Justice Adrian Jack of the BVI Court (who had previously issued a stay in the BVI Litigation).[181]  On December 8, 2021, Justice Jack entered an order modifying the stay issued in the BVI Litigation to permit the transfer of the Genever BVI shares to PAX.[182]

---

[178] Ex. 90, Defendant Mr. Kwok Ho Wan's Opposition to Motion for a Turnover Order Against Defendant Miles Kwok and Appointment of a Receiver, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 874 (July 23, 2021)

[179] Ex. 91, Defendant Kwok's Responses and Objections to Plaintiff Pacific Alliance Asia Opportunity Fund L.P.'s Third Set of Interrogatories, at 9, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 756 (April 28, 2021).

[180] Ex. 92, Decision and Order on Motion, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 904 (September 22, 2021).

[181] Ex. 93, Justice Adrian Jack's Order, at 1, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 1089 (January 7, 2022).

[182] *Id.*

97.    Consistent with his pattern of flouting court orders, however, the Debtor never turned over his shares in Genever BVI to PAX.[183]  On January 7, 2022, PAX filed a motion seeking an order of civil contempt against the Debtor based on his failure to comply with the State Court Turnover Order, which motion remained pending as of the commencement of the Debtor's chapter 11 case on February 15, 2022.

### I.    Final Contempt Decision

98.    On February 9, 2022, the State Court issued its decision imposing a $134 million contempt fine upon the Debtor based on the removal of the Lady May from the United States in contravention of the State Court's orders (the "Final Contempt Decision").

99.    While the Final Contempt Decision chiefly concerned issues related to the Lady May, the State Court made a number of factual findings that are relevant to this Complaint. Among other things, the State Court found that:

a)    The Debtor had made "efforts to avoid and deceive his creditors by parking his substantial personal assets with a series of corporations, trusted confidants, and family members."[184]

b)    The Debtor, "who is a self-declared multi-billionaire, had secreted his assets in a maze of corporate entities and with family members."[185]

c)    The Debtor's use of corporate entities to shield assets from creditors was a "scheme" that had "enabled Kwok to assert that he has no assets despite his lavish lifestyle."[186]

---

[183] Eventually, the shares of Genever BVI would be transferred to the Trustee pursuant to this Court's order dated August 10, 2022 [Docket No. 717] (the "Corporate Governance Order"). Ex. 94, Corporate Governance Order, *In re Ho Wan Kwok*, Case No. 22-50073 (JAM), ECF No. 717 (August 10, 2022)

[184] Ex. 95, Final Contempt Decision at 1, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 1181.

[185] *Id.*

[186] *Id.*

d)      "The [Debtor] . . .  has utter contempt for this Court and the judicial process."[187]

e)       "The machinations associated with the shell game Kwok has orchestrated with respect to the Lady May are of a piece with every other evasive and contemptuous act Kwok has taken during the five years this litigation has been pending, which is why there are 1,180 docket entries in this case."[188]

### J.      Debtor Continues His Shell Game in This Chapter 11 Case

100.    In response to the issuance of the Final Contempt Decision, [189] on February 15, 2022 (the "Petition Date"), the Debtor commenced this Chapter 11 Case by filing his chapter 11 petition [Main Case Docket No. 1] (the "Initial Petition") and Official Form 104, titled "For Individual Chapter 11 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims Against You *and Are Not Insiders*" [Main Case Docket No. 4] (the "Top 20 Creditors List") (emphasis added).

101.    Throughout the Chapter 11 Case, the Debtor has continued his shell game of using shell companies and family members to plead poverty while living in the lap of luxury.

102.    In the Debtor's Initial Petition and in his amended chapter 11 petition filed on February 23, 2022 [Main Case Docket No. 19] (the "Amended Petition" and, together with the Initial Petition, the ("Petitions")), the Debtor, among other things, failed to disclose the pending Genever US Chapter 11 Case even though Genever US was his affiliate. [190]  In response to the Petitions' instruction to disclose, "Where you live," the Debtor stated "c/o Golden Spring (New

---

[187] *Id.* at 4.

[188] *Id.* at 7.

[189] *See, e.g.*, Ex. 23, Tr. of Telephonic 341 Meeting of Creditors at 15:21-16:1 ("[I]n mid-February in my second trial . . . I was given a fine of $120 million and I was ordered to pay it off within five days. So without any choices -- so I filed bankruptcy application at Connecticut state and Chapter 11.").  The Debtor has appealed the Final Contempt Decision.

[190] Ex. 96, Amended Petition, at 3 (Petition Item 10), *In re Ho Wan Kwok*, Case No. 22-50073 (JAM), ECF No. 19 (February 23, 2022).

York) Ltd" and inserted Golden Spring's address.[191]  The Debtor also listed shell companies

Golden Spring and Lamp Capital as the only holders of undisputed claims on his Top 20

Creditors List and amended versions thereof [Docket Nos. 10, 20].

### i.    Debtor Denies Holding Assets or Earning Income

103.    On March 9, 2022, the Debtor filed his schedules [Main Case Docket No. 78] (the

"Schedules") and statement of financial affairs [Main Case Docket No. 77] ("SOFA").  These

documents in particular, along with their associated global notes (the "Global Notes") attached to

the SOFA, help encapsulate how the Debtor has played his shell game in this Chapter 11 Case.

Among other things:

> a)    Despite voluminous public evidence of the Debtor's wealth, including
> court documents signed by the Debtor under penalty of perjury,[192] the
> Schedules reported that the total value of the Debtor's property was
> ***$3,850.00***, as compared with scheduled unsecured claims of
> $373,803,498.09, over $250 million of which consisted of the claims of
> PAX, with the remainder including numerous claims related to securities
> fraud, defamation, and sexual assault.

---

[191] *Id.* at 2 (Petition Item 5).

[192] *See* Ex. 33, Particular of Claims at ¶ 1 (describing Debtor as "high net worth individual").  *See also*
Rolfoundation Rule of Law Fund Live 2020/07/22 Mr. Guo Wengui live." YouTube, July 22, 2020,
https://www.youtube.com/watch?v=6d-Jcq0wr7U ("Everyone knows that a while ago, I advised to my family fund
and our collaboration fund, and based on my decision, (we) purchased oil futures. Everyone knows that (we) made
almost less than a little less than $30 billion. At the time I told them, if money is made, 90% (of the profits) belong
to you; if money is lost, all belongs to me. Then all went in and 1 billion barrels (of oil futures) were bought. Now
the 1 billion barrels made a profit of $30 billion, and I made at least $3 billion, right?") (based on informal
translation from Chinese audio); *See* VICE News, "Exiled Chinese Billionaire Uses YouTube to Wage a War on
Corruption, YouTube" (original air date on HBO, Nov. 15, 2017),
https://www.youtube.com/watch?v=LkOsgh5kcgQ (In this video, the Debtor describes various of his assets,
including the Sherry Netherland Apartment ("I buy the apartment"), the Lady May ("my yacht"), the "most
luxurious apartment in London," "two private jets," and "hundreds of race cars".  The Debtor also comments on his
great wealth generally, stating, "I have the wealthy life that everyone in the world dreams about," and "I don't have
any material needs anymore.").

b)     The Debtor scheduled $0.00 of income, stating that: "the Debtor does receive support funded by family and companies controlled by family for housing, household and living expenses. None of the funding related to housing, household or living expenses is subject to any claim by the funding source and all housing, household and living expense funding is without any agreement or expectation to be repaid."

c)     The Debtor scheduled $0.00 of expenses, stating that: "all expenses of any kind including housing, household and living, are funded by third party family members or by companies they control. The Debtor has no expenses for which he is personally liable."

d)     The Debtor scheduled Golden Spring (his "family office") as holder of *secured claims* against the Debtor of an unknown value based on certain litigation funding agreements.  As noted above, the Debtor had previously listed Golden Spring as holder of *unsecured claims* on his Top 20 Creditors List.

e)     In his SOFA, the Debtor listed a number of parties as creditors who had received transfers within the ninety days preceding the Petition Date, thus admitting that the Debtor, and not another party, had paid these creditors.[193]  At the same time, however, in his Global Notes the Debtor took the position that these payments were made by "family or companies controlled by family"[194] and it appears that least some of these payments were made by Golden Spring and/or Lamp Capital, thereby confirming that the Debtor uses these entities as part of his shell game.

f)     The Debtor stated he had "use and occupancy" of the Taconic Road Residence that was owned by Greenwich Land, an LLC whose sole member is the Debtor's spouse.  The Debtor stated that "related costs and expenses associated with the Residence are paid directly by family and family-controlled enterprises."  Relatedly, the Debtor denied holding legal title to any household goods and furnishings, electronics, or collectibles.

---

[193] *See* Ex. 97, Global Notes and Statements of Limitations, Methodology, and Disclaimers Regarding the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs, In re Ho Wan Kwok, Case No. 22-50073 (JAM), ECF No. 77 (March 9, 2022), Page 21 of 25 ("Question # 6 - During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $600 or more").

[194] Notably, the Debtor disclosed payments in the 90-day period before the Petition Date made by his shell companies, but refused to recognize the payments of such shell companies to pay for his living expenses as income. The Debtor's apparent explanation for this discrepancy was that the 90-day payments were subject to certain litigation funding agreements and were "reported because there is an expectation of repayment from any proceeds contingent upon the resolution of the litigation."

g) The Debtor stated he had "access to" the Sherry Netherland Apartment and disclosed his ownership of Genever BVI, Genever BVI's ownership of Genever US, and Genever US's ownership of the apartment.  However, the Debtor took the position that he held his equity in Genever BVI in trust for Bravo Luck, owned by the Debtor's Son, and asserted that Bravo Luck funded the purchase of the apartment using funds that "came from entities owned or controlled by the Debtor's son and not from the Debtor."

h) The Debtor stated he "has use of automobiles, including luxury automobiles and motorcycles" but that he "has no legal title to any vehicle of any type," and that "costs and expenses associated with such vehicles are provided for directly by family and family-controlled enterprises."

i) The Debtor continued to assert that the Lady May was owned by HK USA and refused to schedule the Lady May as an asset on the grounds that he had appealed the Final Contempt Decision.

j) The Debtor stated that the Hong Kong Restraint Order had frozen "HK$3.7 million of funds alleged to belong to the Debtor" and "[a]s much as billions more of funds and property, including real estate in Hong Kong, of individuals and entities purportedly subject to the Debtor's 'effective control.'"  The Debtor stated that "[d]ue to the freezing/seizure of these assets, the Debtor does not include them in his estate," despite the fact that the Hong Kong Restraint Order does not necessarily divest the Debtor of ownership of these assets.

104. Elaborating on the story of the Debtor's alleged individual poverty amidst family opulence, the Debtor stated in his declaration filed on March 20, 2022 that:

> My family, and particularly my son, provides for my needs. Prior to the Petition Date, my son's family office [Golden Spring] purchased, among many other things, my clothing, food, and sundries. I do not have access to a Golden Spring credit card or to a Golden Spring bank account. My family retains ownership of nearly everything I use, aside from my clothing and mobile phones.[195]

105. According to the Debtor, "Justice Ostrager [i.e., the State Court], PAX, and perhaps others believe I have greater financial wherewithal than is reflected here and in my

---

[195] Ex. 98, Declaration of Mr. Ho Wan Kwok in Support of the Chapter 11 Case and Certain Motions, Docket No. 107 at ¶ 17.

Schedules and Statements of Financial Affairs.  The wealth they believe is mine, however, actually belongs to my son, daughter, wife, and extended family, not me."[196]

106.    Kwok also stated in his declaration filed on March 20, 2022 that he held "the interest in the [Sherry Netherland Apartment] in trust for my son."[197]

107.    At his section 341 meeting of creditors, the Debtor stated that Bravo Luck was owned by his son.[198]

108.    Upon information and belief, neither the Debtor's Son nor the Debtor's daughter have ever held gainful employment outside of the Debtor's shell companies.

109.    The Schedules and SOFA list numerous creditors of the Debtor.

### ii.    Shell Game Funds Chapter 11 Case and Lifestyle

110.    Throughout the Chapter 11 Case, the Debtor has continued to play his shell game to ensure that, despite his condition as a chapter 11 debtor claiming no assets or income, he can continue to live a luxurious lifestyle and benefit from expensive legal representation.

111.    For example, Lamp Capital paid the $1 million retainer of the Debtor's initial bankruptcy counsel, Brown Rudnick.[199]  The Debtor's Son then paid the $100,000 retainer of the Debtor's subsequent bankruptcy counsel, Zeisler & Zeisler, **which simultaneously serves as counsel to the Debtor's Daughter and HK USA.**

---

[196] *Id.* at ¶ 34.

[197] *Id.* at ¶ 17.

[198] Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 13:21-23.

[199] This payment was made using the proceeds of a purported $1 million loan from Lamp Capital to the Debtor that were remitted directly from Lamp Capital to Brown Rudnick. *See* Application of the Debtor for Entry of an Order Authorizing the Employment and Retention of Brown Rudnick LLP as Counsel for the Debtor, Docket No. 86, at ¶ 17; Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 49: 22-24.  At his April 6, 2022 Section 341 meeting, the Debtor testified that this loan was not in writing and that he did not know the terms of the loan, why the money had been lent, or what the source of the money was.  *Id.* at 49-51.

112.     Meanwhile, Golden Spring, Lamp Capital, and Greenwich Land have funded the Debtor's extravagant lifestyle.  These expenses from the beginning of the Chapter 11 Case are reflected in the monthly operating reports filed by the Debtor for the reporting periods through July 8, 2022, which report an aggregate amount of $583,655.00 paid by a "third party for the benefit of the estate."

113.     Similarly, the Debtor relied on Golden Spring as lender in connection with an $8 million DIP loan proposed in the Debtor's motion filed on March 22, 2022 [Main Case Docket No. 117].  This loan would have been made to the estate on an unsecured basis, subordinated to the claims of the Debtor's pre-petition creditors, and without any administrative or priority repayment rights.  *Id.*  Nevertheless, the record makes clear that the Debtor intended to use a significant amount of the funds to pay the professional fees of Brown Rudnick, counsel to the official committee of unsecured creditors (the "Committee"), and numerous proposed "ordinary course" professionals that included, among others, the law firm of Melissa Francis, ***Golden Spring's general counsel***.[200]

114.     The Debtor also attempted to use HK USA's only asset, the Lady May, as a bargaining chip to offer to creditors in exchange for broad plan releases.  On April 10, 2022, the Debtor filed a proposed chapter 11 plan [Main Case Docket No. 197] (the "Proposed Plan").  Among other things, the Proposed Plan contemplated that HK USA would donate the Lady May (for no apparent consideration) to a creditor's trust for the benefit of holders of allowed claims, and that broad releases would be extended to the Debtor, Golden Spring and HK USA (together referred to as the "Plan Funders"), and "all individuals and entities affiliated with the Plan

---

[200] *See* Ex. 99, Annex 1 to Motion of Debtor for Entry of an Order Authorizing (I) Employment and Payment of Professionals Utilized in the Ordinary Course, (II) Payment of Prepetition Claims, and (III) Granting Related Relief [Main Case Docket No. 119].

Funders" (i.e., the Debtor's entire network of shell companies and individual family members).[201]

### iii.  Court Orders Appointment of Chapter 11 Trustee

115.    On May 24, 2022, the Court held an evidentiary hearing on the issue of whether to dismiss the Chapter 11 Case or appoint a chapter 11 Trustee, and on June 15, 2022, the Court issued its decision ordering the appointment of a chapter 11 trustee [Main Case Docket No. 465] (the "Trustee Appointment Decision").

116.    In the Trustee Appointment Decision the Court found, among other things, that the "Debtor has demonstrated he can obtain millions of dollars in funds, including the $8,000,000.00 that was the subject of the DIP Motion."[202]

117.    The Court also noted the arguments of creditors that the Debtor had "engaged in multilayer transactions involving complicated corporate structures like Golden Spring, Genever Holdings, Lamp Funding, and HK [USA] that make it difficult to identify and locate the Debtor's assets."[203]  This "complexity of the Debtor's financial affairs and lack of independent managerial oversight in this case warrants the appointment of a Chapter 11 trustee who can investigate, identify, and locate the Debtor's assets for the benefit of creditors and the estate."[204]

---

[201] Ex. 100, Proposed Chapter 11 Plan of Ho Wan Kwok, at Art I.A.74, In re Ho Wan Kwok, Case No. 22-50073 (JAM), ECF No. 197 (defining "Plan Funders" as Golden Spring and HK USA); *Id.* at Art I.A.75 (defining "Plan Funder Related Parties" as ":all individuals and entities affiliated with the Plan Funder"); *Id.* at Art I.A.90 (defining "Released Parties" to include, among others "collectively, the Debtor, the Plan Funders, the Plan Funder Related Parties").

[202] Ex. 101, Memorandum of Decision and Order Denying Motion to Dismiss Without Prejudice and Granting Joinder to Motion for Appointment of Chapter 11 Trustee (June 15, 2022), Docket No. 465, at 13.

[203] *Id.* at 15.

[204] *Id.* at 16.

### iv.    Debtor Attempts to Frustrate Trustee's Investigation and Administration of Estate to Protect Shell Game From Scrutiny

118.    Since the appointment of the Trustee on July 8, 2022, the Debtor has, despite his duty to cooperate with the Trustee under section 521(a)(3) of the Bankruptcy Code, engaged in a tireless effort to stymie the Trustee's administration of the Debtor's chapter 11 estate and investigation of the Debtor's assets and financial condition.  Among other things, the Debtor has:

a)    Sought relief from the order appointing the Trustee;

b)    Opposed the retention of the Trustee's counsel;

c)    Opposed the Trustee's corporate governance motion;

d)    Opposed the Trustee's discovery efforts; and

e)    Appealed the Court's rulings that denied the Debtor's motion for relief from the order appointing the trustee and granted the Trustee's corporate governance motion.

119.    In sum, since the Trustee's appointment, hundreds of hours have been devoted to dealing with the Debtor's "obstruct[ion] [of] the administration of this estate."[205]   Notably, this obstruction has included the Debtor's opposition, based on the Purported Trust Agreement, to the Trustee's effort to take control of Genever BVI through the corporate governance order approved by this Court on August 10, 2022 [Main Case Docket No. 717], even though the Debtor never raised the Purported Trust Agreement in opposition to PAX's Turnover Motion in the State Action, which similarly sought the surrender of the Debtor's shares of Genever BVI.

---

[205] Ex. 102, Aug. 30, 2022 Tr.at 94:19-95:2 ("[A]ll the arguments that you have made has been to stop the trustee from trying to do what the trustee is going to do. If you don't like what the trustee does, then you can sue him. You can do that. There's a remedy. You have a remedy. You can sue him. But you are now obstructing the administration of this estate that all the other creditors have been waiting to have administered.").

### K.    Claim of IRS

120.    On August 10, 2022, the Internal Revenue Service (the "IRS") filed its initial proof of claim against the Debtor [Claim No. 12-1].  On October 6, 2022, the IRS filed an amended proof of claim against the Debtor [Claim No. 12-2].

## FIRST CLAIM

### (Purported Trust Agreement is Backdated, Fraudulent Document)

121.    The Trustee repeats and realleges the allegations contained in paragraphs 7-120.

122.    Voluminous evidence discussed above demonstrates that the Purported Trust Agreement is a fraudulent, backdated document and is therefore invalid, void, and unenforceable.[206]  Among other things:

a)    The Purported Trust Agreement was allegedly dated February 17, 2015, prior to even the initial submission of the Purchase Application with respect to the Sherry Netherland Apartment, the asset that is the key subject of the Purported Trust Agreement.  Further, the Purported Trust Agreement states the address of Genever US as the Sherry Netherland Apartment, which could not have been the case at that time because the apartment had not yet been acquired.

b)    In June 2016, well more than a year after the Purported Trust Agreement had been allegedly executed, the Debtor's representatives inquired with the Sherry Netherland regarding a transfer of the Sherry Netherland Apartment to the Debtor's son through a trust (i.e., exactly the type of trust arrangement exemplified by the Purported Trust Agreement).  These inquiries would have made no sense if the Purported Trust Agreement had in fact existed.

---

[206] *See e.g.  JPMorgan Chase Bank v. Kalpakis, 30 Misc. 3d 1236(A), 927 N.Y.S.2d 816 (Sup. Ct. 2011), aff'd sub nom. JP Morgan Chase Bank, Nat. Ass'n v. Kalpakis, 91 A.D.3d 722, 937 N.Y.S.2d 105 (2012)* ("It is . . . well settled that deeds and encumbrances that are forged or executed under false pretenses are the result of fraud in the factum (a/k/a fraud in the execution) and are void ab initio.)"; *E & H Partners v. Broadway Nat. Bank*, 39 F. Supp. 2d 275, 286 (S.D.N.Y. 1998) ("Falsified documents are the same as no documents at all."); *Mota v. Imperial Parking Systems*, 08 Civ. 9526, at *30 (S.D.N.Y. Aug. 24, 2010) ("Under [New York] State law and general contract law, a forged signature renders a contract void *ab initio*.") *Gorzkowski v. Mod. Gas Sales, Inc.*, No. 163 MDA 2015, 2015 WL 6871135, at *2 (Pa. Super. Ct. Nov. 6, 2015) ("this court found the backdated stock certificates to be invalid"); *U.S. Bank Nat'l Assn. v. Naifeh*, 1 Cal. App. 5th 767, 778, 205 Cal. Rptr. 3d 120, 128 (2016), *as modified on denial of reh'g* (Aug. 17, 2016)("Substantial evidence supported the conclusion that the recorded documents were void or voidable due to fraud . . . .").

     c)    The Purported Trust Agreement was never once mentioned or raised, by the Debtor or anyone else during the over four years between (i) its alleged execution date on February 17, 2015 and (ii) the date it was disclosed on April 22, 2019, despite numerous instances when it should have logically been disclosed, such as:

        (1)    When the Debtor applied to purchase the Sherry Netherland Apartment.

        (2)    When the Debtor received PAX's requests for production in the State Court Action.

        (3)    When the Debtor repeatedly argued that the Sherry Netherland Apartment could not be attached because it was subject to pledges or was owned by a third party (Zhang Wei).

        (4)    When the Debtor was repeatedly asked questions at his deposition regarding his interest in transferring the Sherry Netherland Apartment to his son.

     d)    There is a voluminous record, including as discussed in this Complaint, regarding the Debtor's use of shell companies to shelter assets from creditors, as well as numerous misrepresentations and false and contradictory statements by Kwok and his representatives.

123.    Therefore, the Trustee seeks a ruling, pursuant to Federal Rule of Bankruptcy Procedure 7001(9), declaring that the Purported Trust Agreement is invalid, void, and unenforceable.

## SECOND CLAIM

### (Avoidance of Actual Fraudulent Transfer)
### (Asserted in the alternative to the First Claim)

124.    The Trustee repeats and realleges the allegations contained in paragraph 7-120.

125.    In the alternative, in the event that the Purported Trust Agreement is ruled to be valid, the Trustee asserts a claim of actual fraudulent transfer against Bravo Luck pursuant to

Section 276 of the New York Debtor and Creditor Law,[207] made applicable by section 544 of the Bankruptcy Code.[208]

126.    The Purported Trust Agreement contains a choice of law clause stating that the Purported Trust Agreement shall be governed by the law of the State of New York.

127.    The analysis of a debtor's intent to hinder, delay, or defraud under New York law is identical to the analysis under section 548 of the Bankruptcy Code.[209]  A claim of actual intent to defraud under section 548(a)(1)(A) of the Bankruptcy Code requires allegations that the debtor-transferor made a transfer or incurred an obligation with "actual intent" to "hinder, delay or defraud" a past or future creditor.[210]

128.    "Because of the difficulty in proving actual intent to hinder, delay, or defraud in making its case, a party can rely on the 'badges of fraud,' which are 'circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent.'"[211]

> Examples of 'badges of fraud' include, *inter alia*: (1) concealing facts and false pretenses; (2) an unconscionable discrepancy in consideration received in

---

[207] This was the New York statute effective on the date of the transfer.

[208] The Trustee seeks the avoidance of, not only any conveyance of property by the Debtor pursuant to the Purported Trust Agreement (in the event it is held to be valid), but also any obligation incurred by the Debtor pursuant to the Purported Trust Agreement.  *See* N.Y. Debt. & Cred. Law § 276 (McKinney) ("Every conveyance made ***and every obligation incurred*** with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.") (emphasis added).

[209] *In re Combes*, 382 B.R. 186, 193-94 (Bankr. E.D.N.Y. 2008) ("The analysis of the debtor's intent to hinder, delay, or defraud under [section] 548 of the Bankruptcy Code and under New York law is identical.").  The debtor-transferor's intent is at issue in such claims, not the transferee's.  *In re LXEng LLC*, 607 B.R. 67, 91 (Bankr. D. Conn. 2019).

[210] *In re Integrity Graphics, Inc.*, 623 B.R. 21, 29-30 (Bankr. D. Conn. 2020).

[211] *In re Jie Xiao*, 608 B.R. 126, 157 (Bankr. D. Conn. 2019); *see also In re Andersen*, 166 B.R. 516, 529 (Bankr. D. Conn. 1994) ("In recognition of that reality, courts have held that fraudulent intent may be inferred from the circumstances surrounding the transfer.  Indirect evidence of fraud may consist of the circumstances of the transfer and the conduct and action of the parties to the alleged fraudulent transfer with respect to the possession, management and control of the premises.") (emphasis added).

exchange for the value of the property transferred; (3) creating a closely-held corporation for property receipt; (4) closeness in relationship between the parties; (5) retaining the property in question for benefit or use; (6) the financial condition of the transferor and transferee both before and after the transfer(s); (7) repeated patterns or cumulative effect of courses of conduct post-insolvency or financial troubles; and (8) the timeline of events. . . The transfer of property to a spouse is a 'classic' badge of fraud. . . . Asset shifting to different corporate entities wholly owned or 'so closely assimilated' by the debtor is an additional badge of fraud.[212]

129.    The facts discussed in this Complaint establish the following sequence of events, assuming the validity of the Purported Trust Agreement and the effective transfer of the Debtor's 50% interest in Bravo Luck to the Debtor's Son on May 26, 2015.

a)    On February 17, 2015, the Debtor, pursuant to the Purported Trust Agreement, effectively transferred his interests in the Genever Entities to Bravo Luck in exchange for no consideration. The Debtor executed the Purported Trust Agreement in anticipation of the acquisition of the Sherry Netherland Apartment and for the purpose of ostensibly allowing his son, through Bravo Luck, to own 100% Genever BVI and, through Genever BVI and Genever US, the Sherry Netherland Apartment.

b)    On March 6, 2015, Genever US acquired the Sherry Netherland Apartment, and, thus, Bravo Luck (at the time owned 50% by the Debtor), as beneficiary under the Purported Trust Agreement, effectively acquired the value of the Sherry Netherland Apartment.

c)    On May 26, 2015, the Debtor transferred his 50% interest in Bravo Luck, the beneficial owner of the Sherry Netherland Apartment (through Genever BVI and Genever US) under the Purported Trust Agreement, to the Debtor's Son for $1.00.

130.    Under this fact pattern, the Debtor transferred to Bravo Luck and the Debtor's Son, the entire value of (at the very least) the Sherry Netherland Apartment, in exchange for no consideration, in two steps.

131.    First, on February 17, 2015, pursuant to the Purported Trust Agreement, the Debtor transferred the entirety of his interest in Genever BVI (and by extension, in Genever US, the contemplated owner of the Sherry Netherland Apartment) to Bravo Luck. As of February 17,

---

[212] *In re Jie Xiao*, 608 B.R. at 157.

2015, the Debtor was a purported 50% shareholder of Bravo Luck, with the Debtor's Son purportedly owning the other 50%. Thus, when the Debtor transferred his interest in Genever BVI to Bravo Luck, he effectively divested himself of 50% of the value of Genever BVI (with the other 50% becoming owned, indirectly, by his son) and retained the remaining 50% of Genever BVI based on his 50% ownership interest in the transferee, Bravo Luck.

132.    Second, on May 26, 2015, the Debtor transferred to the Debtor's Son his 50% interest in Bravo Luck. Because Bravo Luck was at that time the beneficial owner of Genever BVI pursuant to the Purported Trust Agreement (assuming its validity), the value of the Debtor's 50% share of Bravo Luck represented, at the very least, the other 50% of the value of Genever BVI (and, by extension, Genever US) that the Debtor had not yet divested himself of pursuant to the Purported Trust Agreement (again, assuming its validity).

133.    The result of these two steps, which together comprise one transaction that began in February 2015 and concluded in May 2015, was the transfer, in exchange for no consideration, of the value of (at the very least) the Sherry Netherland Apartment to Bravo Luck and the Debtor's Son.

134.    The facts discussed in this Complaint demonstrate numerous of the badges of fraud commonly associated with fraudulent transfers. These include, among others:

    a)    "Concealing facts." The Debtor never disclosed the Purported Trust Agreement until April 2019 and in fact took a series of positions inconsistent with the Purported Trust Agreement, including that he was purchasing the Sherry Netherland Apartment himself.

    b)    "An unconscionable discrepancy in consideration received in exchange for the value of the property transferred." The transactions related to the Purported Trust Agreement resulted in the Debtor transferring at least $70 million in value without receiving any consideration in return.

    c)    "Creating a closely-held corporation for property receipt" and "closeness in relationship between the parties." The Purported Trust Agreement resulted in a transfer to Bravo Luck, an entity controlled by the Debtor.

d)    "Retaining the property in question for benefit or use."  Upon information and belief, the Debtor has used the Sherry Netherland Apartment as his residence since 2015.

135.    The Debtor's fraudulent conduct in this instance is consistent with his *modus operandi*, as found by the State Court, of using shell companies to hold assets out of the reach of creditors:  Bravo Luck is where the Debtor keeps his Manhattan apartment; HK USA is where the Debtor keeps his 150-foot yacht; Greenwich Land is where the Debtor keeps his Connecticut mansion; and so forth.  Meanwhile Golden Spring and Lamp Capital fund the Debtor's enormous living expenses and legal fees.  This is the recipe for the Debtor's life as a "penniless" billionaire.

136.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought in this Complaint by the Trustee in exercise of such creditors' rights.

137.    At all relevant times, the Debtor's creditors would have had no reason to suspect that the Purported Trust Agreement existed or that the Debtor had used the Purported Trust Agreement to effectuate a fraudulent transfer.

138.    Accordingly, assuming that the relief requested in the First Claim is not granted, the Trustee seeks a ruling, pursuant to the Section 276 of the New York Debtor and Creditor Law, sections 544 and 550 of the Bankruptcy Code, and Federal Rule of Bankruptcy Procedure 7001(9), (1) declaring the Purported Trust Agreement invalid, (2) avoiding the transfer of the Debtor's interests in Genever Holdings LLC and Genever Holdings Corporation that occurred pursuant thereto, and (3) avoiding the Debtor's transfer of 50% of Bravo Luck to the Debtor's Son.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, the Trustee respectfully requests that judgment be entered as follows:

1. On the First Claim, an order declaring, pursuant to Federal Rule of Bankruptcy Procedure 7001(9), that the Purported Trust Agreement is invalid, void, and unenforceable;

2. On the Second Claim, an order (1) declaring, pursuant to the Section 276 of the New York Debtor and Creditor Law, sections 544 and 550 of the Bankruptcy Code, and Federal Rule of Bankruptcy Procedure 7001(9), that the Purported Trust Agreement is invalid, (2) avoiding any conveyance of the Debtor's property or any incurrence of an obligation by the Debtor that occurred pursuant to the Purported Trust Agreement, and (3) avoiding the Debtor's transfer of 50% of the equity of Bravo Luck to the Debtor's Son;

3. Reasonable attorneys' fees, costs, and expenses incurred in this action; and

4. Such other and further relief as the Court may deem just, proper, or equitable under the circumstances.


[*Remainder of Page Intentionally Left Blank*]

Dated:    October 11, 2022          LUC A. DESPINS,
          New Haven, Connecticut    CHAPTER 11 TRUSTEE

By: */s/ Patrick R. Linsey*
    Patrick R. Linsey (ct29437)
    NEUBERT, PEPE & MONTEITH, P.C.
    195 Church Street, 13th Floor
    New Haven, Connecticut 06510
    (203) 781-2847
    plinsey@npmlaw.com

      *and*

    Nicholas A. Bassett *(pro hac vice)*
    PAUL HASTINGS LLP
    2050 M Street NW
    Washington, D.C., 20036
    (202) 551-1902
    nicholasbassett@paulhastings.com

      *and*

    Avram E. Luft *(pro hac vice)*
    Douglass Barron (*pro hac vice*)
    PAUL HASTINGS LLP
    200 Park Avenue
    New York, New York 10166
    (212) 318-6079
    aviluft@paulhastings.com

    *Counsel for the Chapter 11 Trustee*