```
                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF CONNECTICUT
                          BRIDGEPORT DIVISION

In Re                          *   Case No. 22-50073 (JAM)
                               *
      HO WAN KWOK,             *
                               *
               Debtor.         *
                               *

In Re                          *   Case No. 22-50542 (JAM)
                               *
      GENEVER HOLDINGS         *   Bridgeport, Connecticut
        CORPORATION,           *   October 13, 2022
                               *
               Debtor.         *
                               *
* * * * * * * * * * * * * * *   *
```

TRANSCRIPT OF MOTION FOR ORDER AUTHORIZING
COMPLIANCE WITH RULE 2004 DISCOVERY AND ENFORCING
CONSENT ORDER RED: PRIVILEGES and MOTION FOR
JOINT ADMINISTRATION WITH 22-50542
BEFORE THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

```
For the Debtor,                ERIC A. HENZY, ESQ.
 HK International and          AARON ROMNEY, ESQ.
 Mei Guo:                      Zeisler & Zeisler, P.C.
                               10 Middle Street, 15th Floor
                               Bridgeport, CT  06604


For the Creditors Committee:   IRVE GOLDMAN, ESQ.
                               Pullman & Comley
                               850 Main Street
                               Bridgeport, CT  06601


For the U.S. Trustee:          HOLLEY CLAIBORN, ESQ.
                               Office of the United States
                                 Trustee
                               The Giaimo Federal Building
                               150 Court Street, Room 302
                               New Haven, CT  06510
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

APPEARANCES:   (Cont'd)

| | |
|---|---|
| For the Creditor, Pacific<br> Alliance Asia Opportunity<br> Fund L.P.: | STUART SARNOFF, ESQ.<br>PETER FRIEDMAN, ESQ.<br>LAURA ARONSSON, ESQ.<br>O'Melveny & Myers LLP<br>Times Square Tower<br>7 Times Square<br>New York, NY  10036 |
| | PATRICK BIRNEY, ESQ.<br>Robinson & Cole<br>28 Trumbull Street<br>Hartford, CT  06103 |
| For the Chapter 11<br> Trustee: | NICHOLAS BASSETT, ESQ.<br>G. ALEXANDER BONGARTZ, ESQ.<br>Paul Hastings LLP<br>200 Park Avenue<br>New York, NY  10166 |
| | PATRICK R. LINSEY, ESQ.<br>Neubert Pepe & Monteith, PC<br>195 Church Street<br>New Haven, CT  06510 |
| Chapter 11 Trustee: | LUC A. DESPINS, ESQ.<br>Paul Hastings LLP<br>200 Park Avenue<br>New York, NY  10166 |
| For Verdolino & Lowey,<br> Creditor: | WILLIAM BALDIGA, ESQ.<br>Brown Rudnick<br>Seven Times Square<br>New York, NY  10036 |
| For Logan Cheng, Creditor: | JAY MARSHALL WOLMAN, ESQ.<br>Randazza Legal Group, PLLC<br>100 Pearl Street<br>Hartford, CT  06103 |
| For Baker Hostetler,<br> Interested Party: | LAWRENCE GROSSMAN, ESQ.<br>Green & Sklarz, LLC<br>One Audubon Street<br>New Haven, CT  06511 |
| | ANDREW V. LEYDEN, ESQ.<br>DANIELLE L. MEROLA, ESQ.<br>Baker Hostetler<br>200 South Orange Avenue<br>Suite 2300<br>Orlando, FL  32801 |

1    (Proceedings commenced at 9:35 a.m.)

2            THE COURTROOM DEPUTY:  Case No. 22-50073, Ho Wan

3    Kwok and case no. 2022-50542, Genever Holdings Corporation.

4            THE COURT:  Good morning.

5            We have several people in the courtroom and

6    several people on Zoom.  And I know that when we were here

7    last time I talked about allowing people to make requests to

8    appear via Zoom via email but, unfortunately, it didn't work

9    the way everybody had anticipated it would.  There was going

10   to be just one email, but we ended up getting about six or

11   seven.  The courtroom staff was a little inundated with

12   that.

13           And I think we're just going to have to take this

14   on a hearing by hearing basis about whether or not people

15   are actually going to allowed to appear remotely.

16           One of the things I can let you all know, and you

17   may know or may not know, if you're just here to observe,

18   you can listen to the hearing.  We have a public access line

19   that's on all the time for every hearing that we have in our

20   court in every division of our court.

21           And on the court calendar on our website is the

22   information for the conference call line where you can call

23   that number and listen to the entire hearing.

24           If you're not going to be participating, that may

25   be the best way to proceed.

1          Also, as I think most of your know, within 24

2     hours, and sometimes on the very same day, the audio

3     recording, which is the record in this case, and in every

4     case, is posted on our docket of the case. And so that's

5     another way for parties to listen to what occurred at a

6     hearing, if they're not listening to them via the public

7     access line.

8          So we're going to have to take this on a hearing

9     by hearing basis, but I will say that with regard to the

10    prejudgment remedy hearing scheduled to begin on October

11    31st, everyone will be -- anyone that wants to participate

12    in that hearing must be here in the courtroom and we will

13    not be having remote appearances in that case because we're

14    going to be dealing with evidence and other issues, and

15    unless someone shows good cause why there should be some

16    remote aspect of that hearing, then that hearing will be a

17    fully in-person hearing.

18         There is an order in place in this court signed by

19    Chief Judge Nevins that all hearings are in person and that

20    began back -- almost a year ago that order entered.

21         And so we'll take things on a case by case basis -

22    - on a hearing by hearing basis, I should say. But I don't

23    want people to have the expectation that you can just send

24    an email and appear remotely, because that wasn't even

25    supposed to be the case originally.

1          Obviously, you had to file a request and there

2     were obviously legitimate reasons to appear remotely.

3     Attorney Romney and Attorney Kindseth, for example, recently

4     had a completely legitimate reason to appear remotely.  They

5     both had COVID and so -- but we're at a point now where

6     unless thing change from the rules and the orders entered by

7     the chief judge of the district court and the chief judge of

8     the bankruptcy court, the hearings are in person.  Okay?

9          And we'll do what we can to accommodate some

10    issues, but I just wanted to be clear on that before we

11    began today.

12         Does anyone have any questions about the remote

13    access line, the ability to listen in on the public access

14    line or does anybody not understand that the audio of every

15    hearing in every case in this district is posted on the

16    docket of the case, usually within 24 hours and sometimes

17    the very same day as the hearing?  Does anyone have any

18    questions?

19         Okay.  Then I am going to proceed to take

20    appearances.  Now I'm going to take appearance of everyone,

21    even the people on Zoom.

22         But if you're not -- if you're simply here to

23    observe and not speak, then I -- that's fine. I would just

24    ask you to keep your microphones on mute so that we don't

25    have any disruption to the record.

1          The other information that I've been told during

2     our remote hearings is that it is sometimes difficult for

3     the courtroom staff to pick up the voices of people that are

4     not in the courtroom and that the record sometimes is

5     garbled.

6          And as people who have been involved in this case

7     from the start know, the transcription of the audio often is

8     not accurate.  But it's not because of the transcriber's

9     fault.  It's just because it's audio and sometimes things

10    don't get picked up as well.

11         So we're trying our best to make sure that the

12    record in every case in this district is as clear and

13    accurate as possible.

14         So those are some of the other reasons why the

15    remote hearing appearances are discouraged because the

16    record in our case is only audio.  We don't have -- we're

17    not authorize under Congressional budget issues or the --

18    when funds are spent to spend -- bankruptcy courts are not

19    authorized to have a transcriber in the courtroom.

20         So in any event, I am going to start with taking

21    appearances for the record with the Chapter 11 trustee in

22    the Kwok case, please.

23         MR. DESPINS:  Good morning, Your Honor.  Luc

24    Despins, Chapter 11 Trustee and I'm here with my counsel,

25    Nicholas Bassett and Alex Bongartz, who are both in by Zoom,

1    I believe.  Mr. Linsey is in the courtroom.  Good morning.

2                THE COURT:  Good morning.

3                MR. LINSEY:  Good morning, Your Honor.

4    Connecticut counsel, Patrick Linsey, for the trustee in the

5    Kwok case.  My firm is also proposed counsel for the Genever

6    Holdings Corporation debtor in that case, which has also

7    been called.

8                THE COURT:  Thank you.

9                Then we will move to the creditors committee

10   counsel, please.

11               MR. GOLDMAN:  Good morning, Your Honor.  Irve

12   Goldman, Pullman and Comley, representing the creditors

13   committee in the Ho Wan Kwok case.

14               THE COURT:  Good morning.

15               MR. BIRNEY:  Good morning, Your Honor.  Patrick

16   Birney, Robinson and Cole, on behalf of PAX.  They haven't

17   yet appeared, but this court provided a Zoom link to Stuart

18   Sarnoff and Laura Aronsson, who will be appearing via Zoom.

19               THE COURT:  And I think Attorney Friedman, too.

20               MR. BIRNEY:  Yes.  Of course, Attorney Friedman as

21   well.

22               THE COURT:  I don't know if he's going to be

23   appearing, but I believe that all three were provided with

24   that information.

25               MR. BIRNEY:  Thank you, Your Honor.

1          THE COURT:  Thank you.

2          Okay.  Counsel for Mr. Kwok, please.

3          MR. ROMNEY:    Good morning, Your Honor.  Aaron

4    Romney, Zeisler and Zeisler, for the debtor, Mr. Kwok, as

5    well as HK International and Ms. Mei Guo.  Thank you.

6          THE COURT:  Good morning.

7          MR. HENZY:  Eric Henzy for the same parties.

8          THE COURT:  Good morning.

9          MR. BALDIGA:  Good morning, Your Honor.  William

10   Baldiga, for Brown Rudnick and Verdolino & Lowey.

11         THE COURT:  Good morning.

12         Okay.  Turning to the people on Zoom, the Office

13   of the United States Trustee, please.

14         MS. CLAIBORN:  Good morning, Your Honor.  Holley

15   Claiborn for the U.S. Trustee.

16         THE COURT:  Okay.  Attorney Wolman, for your

17   creditor clients, please.

18         MR. WOLMAN:  Good morning, Your Honor.  Jay Wolman

19   of Randazza Legal Group, for creditor Logan Cheng.

20         THE COURT:  Good morning.  And then I think we

21   have two other attorneys from Florida who -- I know you both

22   have motions pro hac -- oh, where's Mr. Grossman?  Okay.

23   Attorney Grossman, why don't you, as the sponsoring

24   attorney, note your appearance and then we'll talk to the

25   other attorneys, please.

1          MR. GROSSMAN:  Good morning, Your Honor.  Larry

2    Grossman, for Baker Hostetler, and with me are Attorneys

3    Andrew Layden and Danielle Merola.

4          THE COURT:  Okay.  Good morning to all of you.

5    And Mr. Layden and Ms. Merola, I know that the motions for

6    pro hac vice have been filed.

7          It appears -- I haven't looked at everything but

8    it does appear to be in order and so I assume, or presume,

9    which I shouldn't do, I suppose, that those orders will

10   enter today or tomorrow at the latest, okay.

11         I have no -- I don't know if you're planning to

12   say anything today, although the documents that were filed

13   indicate that you might.  But I'm going to hear from people

14   in the courtroom first and then we'll see how things will

15   proceed.  Okay?

16         MR. LAYDEN:   Understood.  Thank you, Your Honor,

17   and thank you for the opportunity to appear remotely.

18         THE COURT:  Thank you.

19         All right.  So on the calendar today are a few

20   matters as we -- as we all know.  What we needed to talk

21   about first is the trustee's motion for an order authorizing

22   compliance with the Rule 2000 [sic] subpoenas and the

23   privileges as they relate to Brown Rudnick and Verdolino &

24   Lowey.

25         I did see a response filed by Mr. Romney where Mr.

1   Romney's response appears to indicate that some progress has

2   been made with regard to the motion, but I obviously don't

3   know where things stand as of this morning.

4          So I don't know if Mr. Bassett is going to address

5   that, Mr. Despins, directly?

6          MR. DESPINS:  Yes.  Yes, Your Honor.

7          I also I wanted to mention that we had filed a

8   reply yesterday, but Mr. Bassett will take the lead.  Thank

9   you, Your Honor.

10          THE COURT:  I did see your reply.  I'm sorry.  I

11   should have noted that for the record as well.  I saw that

12   you filed something, a response, after Mr. Romney filed his

13   response.  So go right ahead.

14          MR. BASSETT:  Good morning, Your Honor.  Again,

15   for the record, Nick Bassett from Paul Hastings on behalf of

16   the Chapter 11 Trustee.

17          So a lot has been filed, as Your Honor just

18   mentioned.  And obviously we also started previewing some of

19   these issues at last week's hearing, so I'll try to be

20   brief, both because I don't want to repeat what's been said,

21   and I also think that, frankly, from the trustee's

22   perspective, the issue before the Court is a fairly simple

23   one.

24          So I'll start by saying that, and I'll get into

25   this a little more in a few moments, but, you know, any

1    progress that has been made is not sufficient for the

2    trustee at this stage and not sufficient to resolve the

3    motion that we filed.

4           So what I'd like to do is just start by giving a

5    brief recap of kind of the time line of events and how we

6    got to where we are.

7           As the Court knows, the trustee was appointed in

8    July with a mandate of conducting a comprehensive

9    investigation into the debtor's assets and affairs.  The

10   trustee filed his 2004 motion on July 28th.  The Court

11   entered 2004 orders on August 16th.

12          The trustee immediately thereafter served

13   subpoenas on Brown Rudnick and the Verdolino firm and that

14   was on August 17th.  The deadline to produce documents in

15   response to those subpoenas was 30 days later on September

16   16th.

17          On September 14th, this court, after a hearing and

18   eventually with the consent of the debtor, entered the

19   privilege order delineating the very narrow category of

20   privilege that the debtor can continue to assert in this

21   case, vis-a-vis the trustee, for documents that may cause

22   him personal harm and also set out a very clear procedure in

23   paragraph 7 of that order for how the debtor may assert that

24   privilege.

25          And what that ordered required was for the

1    debtor's counsel, in this case Zeisler & Zeisler, to produce

2    a privilege log to the trustee within ten days of the

3    deadline to produce documents in response to a given a

4    subpoena.

5           As I said, the deadline to produce documents in

6    response to the subpoenas at issue here was September 16th.

7    The debtor's counsel's deadline to produce a privilege log

8    under the privileges order was, therefore, September 26th.

9           It is now October 13th, nearly three weeks after

10   that deadline.  We still do not have compliance with the

11   subpoena or the privileges order, nor did the debtor move

12   for an extension of time (indiscernible) deadline under the

13   privileges order to provide us a privilege log.

14          And as you mentioned, Your Honor, and as you read

15   in the objection that the debtor filed, the debtor now touts

16   progress that he believes has been made in reviewing the

17   documents.

18          He says that he's received thousands of documents

19   from Brown Rudnick and Verdolino.  He's reviewed those

20   documents and he's claiming privilege over 30 or so odd

21   documents and, you know, adding the suggestion that that's

22   supposed to give us some comfort.  But it really gives us

23   frankly, Your Honor, no comfort at all.

24          First of all, we still have not received a single

25   one of the documents at issue of these thousands of

1  documents that Brown Rudnick has apparently reviewed, or

2  sorry, that the debtor's counsel has apparently reviewed.

3          As he says, he's now asserting privilege over 30

4  or some odd documents which would leave several thousand

5  that he's not asserting privilege over.  We have none of

6  those documents.  We're told they're forthcoming soon, but

7  we've not seen them.

8          We also were told that there are thousands more

9  documents that still need to be reviewed.  And we're told

10  that in a best case scenario we would get all of those

11  documents finally produced to the trustee in maybe another

12  two weeks.

13          The other problem, Your Honor, is we finally got a

14  privilege log which contains by my count approximately ten

15  documents on it, not 33.

16          And I'll get into this more in a moment, but that

17  privilege log I think is just an indication that we are far

18  from the end of the line with resolving disputes concerning

19  the production of documents in response to our subpoena

20  because the privilege log is, frankly -- it's almost absurd

21  in its lack of compliance with the privileges order and the

22  local rule generally.

23          Before I get to that, I just want to emphasize

24  that we're three weeks out from the production deadline.

25  And, again, as I said, there has been no motion for an

1   extension of time.

2          The Court needs to enforce its prior orders,

3   including the privileges order.  And that's critically

4   important to maintain a semblance of order in this case and

5   it's important because of the precedential effect that it

6   will have in this case.

7          As the Court knows, there are dozens of other

8   subpoenas that the trustee has served on other parties,

9   including, in particular, other law firms that represent the

10  debtor.  If the debtor and its counsel in response to this

11  subpoena is allowed to drag its feet and completely ignore

12  deadlines and allow weeks to elapse without compliance, then

13  that's exactly what they're going to do in response to every

14  other subpoena.

15         I do want to just address -- well, I'll address

16  the privilege log in a minute, Your Honor, but what I'd also

17  like to do is just kind of anticipate some of what I think

18  you're going to hear and what you've seen in the papers from

19  both the debtor and from Brown Rudnick.

20         Really what it is, Your Honor, is it's a lot of

21  finger pointing as between those two parties.  Brown Rudnick

22  has said that there's been delay in getting the documents

23  because the debtor initially insisted on having Brown

24  Rudnick review the documents for privilege, which Brown

25  Rudnick said was not its responsibility and it was incapable

1    of doing.

2           And then you have the debtor saying that Brown

3    Rudnick has delayed in sending documents to the debtor for

4    review and, therefore, the debtor's hands are tied and

5    there's nothing it can do.

6           And I think the very simple response to all of

7    that from the trustee's perspective is that that's not our

8    problem.

9           The Court entered an order with deadlines and

10   those deadlines have not been complied with.  No one sought

11   an extension.  That is the end of it, period.

12          To the extent that there are issues that Brown

13   Rudnick and the debtor need to iron out among themselves to

14   comply with those deadlines, it's on them to do that, not on

15   the trustee.

16          Now I do want to address the privilege log

17   because, again, I think this is just emblematic of where

18   we're going to be headed and it is part and parcel to

19   everything we've seen in this case from the debtor.

20          We got a privilege log, as I said, last night,

21   Your Honor.  I don't know -- unfortunately, I don't think we

22   have a copy of it.  Is there -- is it possible to do screen

23   sharing on the Zoom, Your Honor?

24          THE COURT:  It is possible to do screen sharing on

25   the Zoom.  Who has the -- do you have it, Mr. Bassett, and

1    you're trying to share your screen, or what are you -- what

2    is --

3              MR. BASSETT:  Well, my colleague, Mr. Bongartz, I

4    think would do that if he can.

5              MR. BONGARTZ:  Yeah.  Right now it says that I'm

6    disabled to share my screen --

7              THE COURT:  Right.

8              MR. BONGARTZ:  -- so I think the host --

9              THE COURT:  Right.  Hold on a second and we'll

10   make you -- we will allow you to do that.  But we're going

11   to have to do that with regard to you, Mr. Bongartz.  Okay?

12   So just be patient for a second --

13             MR. BONGARTZ:  Thank you.

14             THE COURT:  -- and then you can share your screen.

15             So we're giving Mr. Bongartz the ability to share

16   his screen?  I'm looking at the courtroom deputy and others.

17   Right?  Okay.

18             THE COURTROOM DEPUTY:  Yes.

19             MR. BONGARTZ:  Yes.  I have the ability to share

20   now.

21             THE COURT:  Okay.  All right.  So then go ahead

22   and do that, counsel.

23             One of the things -- I wonder if we can -- okay,

24   good, the big screen shows the whole document.  Is that

25   right?  Okay.  I have to make it --

1          MR. BONGARTZ:  All right.  Great.

2          THE COURT:  All right.  So how -- Attorney

3    Bongartz, you want to -- right now at least all I can see is

4    -- maybe if I make my screen bigger I can see more, but I

5    don't know about that.

6          MR. BASSETT:  So, Your Honor, if I may, I think

7    what I'll do is I can guide Mr. Bongartz through it.

8          THE COURT:  Go right ahead.

9          MR. BASSETT:  And I won't spend -- I won't spend

10   too much time.  I just want to highlight a couple of issues.

11         So this is the privilege log, again, that we

12   received from the debtor's counsel last night purporting to

13   withhold documents as privileged under the privilege order.

14         And, as Your Honor knows, the privilege order, as

15   I just discussed, states that the debtor can only withhold

16   documents as privileged to the extent that he thinks they

17   might give rise to personal harm to the debtor, e.g.,

18   related to his potential criminal liability, and that any

19   privilege log would have to include not only the information

20   that you would typically require under the relevant rules,

21   including the local rule, sufficient to allow the other

22   party to identify the claim of privilege, but also

23   information to in this case identify the basis for

24   withholding on the grounds of personal harm.  And I just

25   want to flag a couple of these entries.

1        The first entry, according to this privilege log,

2    is an agreement dated October 19th, 2021 involving Golden

3    Spring New York, the debtor, Ace Decade Holdings and Dawn

4    State, Limited.  The entire description of the subject is

5    litigation funding and the claimed privilege is attorney

6    work product and common interest.

7        There's not even a superficial attempt to comply

8    with the terms of the privilege order.  There's no

9    indication whatsoever how this document could possibly

10   relate to personal harm to the debtor, nor is there any

11   other explanation as to why it's properly being withheld.

12       I'm not going to go through each entry on this

13   log.  I'd like to have Mr. Bongartz maybe scroll to the last

14   one.  As you will see, most of the other entries deal with,

15   you know, similarly cursory descriptions of issues that

16   don't relate to personal harm.

17       The last one, I imagine the assertion is that

18   maybe there is some personal harm here, but the only

19   description we have is that this particular document, which

20   in this case is an email dated May 10th, 2022, relates to

21   the effect of the dismissal of the bankruptcy case on

22   various future rights of the debtor.

23       Again, that is completely non-compliant with the

24   order requiring the debtor to explain why the document being

25   withheld would cause him personal harm.

1          So, Your Honor, we're not moving with respect to

2    these documents today.  That is for, you know, something

3    that I think we're going to have to have the Court address

4    very soon, potentially reviewing documents that are being

5    withheld in camera, but I raise it just to provide context

6    for any assertion that meaningful progress is being made and

7    this is all going to resolve itself if we just give the

8    debtor more time.

9          So, Your Honor, I think given all of this, given

10   where we are, there is no other course of action right now

11   than for the Court to enter an order that requires the

12   immediate production of the files of Brown Rudnick to the

13   trustee, and Verdolino, to the trustee subject to the

14   debtor's ability to exercise its claw back rights.

15         Now, the last point I'll make on that is that the

16   Court has -- sorry, the debtor, in its paper, in it's

17   objection, has said that, well, you know, it sites a case

18   and it makes the argument that if documents are produced to

19   the trustee on the basis, with a claw back right, that the

20   debtor could still be prejudiced because if the trustee sees

21   those documents, you know, you sort of can't unring the

22   bell.

23         But that case and that argument is completely

24   inapplicable here because we're not dealing with a situation

25   where this debtor has the ability to assert all of its

1    ordinary privileges vis-a-vis the trustee.  The trustee

2    rather now owns those privileges.

3            The only narrow area in which the debtor can

4    continue to assert privileges is with respect to personal

5    harm, specifically criminal issues, which the trustee is not

6    investigating.

7            So if there is a -- if there's a document that's

8    disclosed to the trustee that deals with personal harm or

9    criminal liability, that's not going to be prejudicial to

10   the debtor because the trustee is not investigating and not

11   prosecuting criminal liability anyway.  So, again, that's

12   just not an issue.

13           And the solution that we've proposed is a

14   reasonable one.  The Court should order the production of

15   the documents, enforce its prior orders, and to the extent

16   that there are privileged documents, the debtor can claw

17   those back.  Thank you, Your Honor.

18           THE COURT:  Thank you.

19           I was going to hear from the debtor first, Mr.

20   Baldiga, but --

21           MR. BALDIGA:  Mr. Romney and I thought it would be

22   more effective to have us report the facts as to where we

23   are and then he could argue from that.

24           THE COURT:  Are you going to report first then,

25   Attorney Baldiga, is that what you're saying, or Mr.

1    Romney's going to report?

2              MR. BALDIGA:  That I would first by --

3              THE COURT:  Go right ahead then.  Go right ahead.

4              MR. BALDIGA:  Then that's a joint suggestion.

5    Thank you, Your Honor.

6              THE COURT:  You're welcome.

7              MR. BALDIGA:  And I'm not going to argue.  But

8    just as I did at the last hearing, just so that you heard

9    the time line from Mr. Bassett, the other aspect of the time

10   line that's important here is that, you know, until --

11   before the consent order was entered on September 14, we

12   didn't really know what we were going to do.

13             I mean, we retained everything and we grabbed

14   everything, but we had literally millions of responsive

15   documents, or potentially responsive documents, and we

16   started discussions with the -- with debtor's counsel and

17   with Paul Hastings immediately upon entry of the consent

18   order.  I think you saw from the last time, that very day,

19   it was on the first search terms.  That's how you respond,

20   you know, gather emails.

21             The first search terms suggested by Paul Hastings

22   in the week following crashed our system.  We could not even

23   pull -- I mean, it was in the millions, many millions of

24   documents, because some of the terms were so general.  Like,

25   for example, the letter M.  We just could not respond.  Not

1    through any bad faith or improper suggestion or whatever, it

2    was just it took a while as it always does.

3          September 23rd, we had full agreement as to search

4    terms.  Those search terms, this is just on emails produced

5    for review 180 -- this is just on Brown Rudnick -- 189,872

6    documents to be reviewed.

7          THE COURT:  Say that number again, please.

8          MR. BALDIGA:  1,089,072, documents which we got

9    busy on and we have reviewed, at least a first review.

10   There's several levels of review, but -- so those, that's

11   the universe we started with.  It's still enormously large,

12   but we're well on our way.

13         The Verdolino & Lowey documents were produced in

14   their entirety to debtor's counsel last week, I think on

15   Friday, but Mr. Romney can correct me.

16         MR. HENZY:  Just to cut, it was on Thursday.

17         MR. BALDIGA:  Thursday.  I'm sorry.

18         MR. HENZY:  But it was not in a format that we

19   could use so we had to have a vendor convert so that we --

20   the documents in a usable form were in our possession on

21   Friday.

22         MR. BALDIGA:  Again, no --

23         THE COURT:  So just let me understand that for a

24   second.

25         MR. BALDIGA:  Yeah.

1          THE COURT:  I think I did, but.  So Brown Rudnick

2    gave to the debtor's counsel the Verdolino & Lowey documents

3    on Thursday --

4          MR. BALDIGA:  But really Friday because they

5    needed to go through a process to be usable.

6          THE COURT:  Right.  I just want to --

7          MR. BALDIGA:  Yes.

8          THE COURT:  You had -- you were in possession of

9    the -- Brown Rudnick was in possession of the Verdolino &

10   Lowey documents, which were then turned over to the debtor

11   on Thursday, which would have been the 6th I guess of

12   October, and the debtor had to convert them into a usable

13   format, which was accomplished on Friday, October 7th?

14         MR. BALDIGA:  One correction to that, Your Honor.

15         THE COURT:  Yes.

16         MR. BALDIGA:  It did not come through Brown

17   Rudnick.  It went from Verdolino directly to --

18         THE COURT:  Okay.  That's what I was -- I was just

19   --

20         MR. BALDIGA:  Yeah.

21         THE COURT:  Thank you.  That's the clarification I

22   wanted.  Okay.  Thank you.  Go right ahead.

23         MR. BALDIGA:  We were equally dismayed that they

24   didn't -- they weren't in an electronic format, but in

25   native form, technically compliant with the subpoena, but it

1    made review very difficult without the additional work that

2    Zeisler did.

3                 THE COURT:  When native form, do you mean they

4    gave them paper?  Is that what you're telling me?

5                 MR. BALDIGA:  No.  It was electronic, but I

6    believe without Bates numbers.

7                 MR. HENZY:  Yeah.  There were no Bates numbers,

8    that's correct.  We had to go to an outside vendor to get it

9    in usable form --

10                THE COURT:  Okay.

11                MR. HENZY:  -- that we could actually put eyes on

12   it.

13                THE COURT:  Okay.  Thank you.

14                MR. HENZY:  Thank you, Your Honor.

15                THE COURT:  Go right ahead.

16                MR. BALDIGA:  Those have been reviewed.  Last

17   night we were told that there were I think one document that

18   was being -- for which there was a claim of privilege

19   asserted, but that document shows up six times.

20                I could be -- it could not be -- it might not be

21   exactly six, but it's -- the one document is -- shows up

22   multiple times.  And Verdolino & Lowey is, as we speak,

23   taking that document out of that production and sending the

24   entirety directly to Paul Hastings and they've assured us

25   that it will be done today.

1          THE COURT:  All right.  So hold on.  I just want

2     to make sure I've got that all.

3          MR. BALDIGA:  Yeah.

4          THE COURT:  So there's -- in addition to the

5     documents, or as part of the documents that Zeisler &

6     Zeisler has then converted to usable format, you've been

7     told by Zeisler & Zeisler that there's --

8          MR. BALDIGA:  On the privilege log --

9          THE COURT:  Yeah.

10          MR. BALDIGA:  -- there's one document in the

11     Verdolino & Lowey pile of I think almost 20,000 documents

12     one document --

13          MR. HENZY:  I don't know if this will help, Your

14     Honor.  It was 14,258 documents that we received from

15     Verdolino & Lowey.

16          THE COURT:  You're going to have to slow down,

17     okay --

18          MR. HENZY:  Okay.

19          THE COURT:  -- if I'm going to catch up with you.

20     So hold on a second.  Okay?  Let me just finish with -- I

21     appreciate that.  I want to know the number.

22          MR. HENZY:  Okay.

23          THE COURT:  But I just --

24          MR. HENZY:  Yeah.

25          THE COURT:  I just want to follow through with Mr.

1    Baldiga's --

2          MR. BALDIGA:  Sure.  And this -- and these weeds

3    are important.  So --

4          THE COURT:  Yeah, they are.

5          MR. BALDIGA:  -- something more than 14,000

6    documents were provided to Zeisler.  Again, they had them in

7    usable form by Friday.  Yesterday they published the

8    privilege log that you started to see.

9          THE COURT:  So one document on the --

10          MR. BALDIGA:  One document --

11          THE COURT:  -- privilege log is a Verdolino &

12    Lowey document, is that what you're telling me?

13          MR. BALDIGA:  A privilege assertion as to one

14    document, but that document --

15          THE COURT:  Produced by --

16          MR. BALDIGA:  -- shows up multiple times in the

17    Verdolino production.

18          THE COURT:  Okay.  But it's a document produced by

19    Verdolino & Lowey?

20          MR. BALDIGA:  Yes.

21          THE COURT:  Okay.  But there are multiple copies

22    of it in the whole -- in the entire production?

23          MR. BALDIGA:  And that's why they have to go

24    through it now and just make sure that if that one document

25    has to be pulled, it's not pulled in one place and not

1    pulled -- and failed to be pulled in others.  If it's not

2    done already, they assured us it would be done today.

3                THE COURT:  Who's they?  Verdolino?

4                MR. BALDIGA:  Verdolino & Lowey.

5                THE COURT:  Okay.  Sorry.  I just want to make

6    sure that I'm accurate.

7                MR. BALDIGA:  I shouldn't use pronouns in this.

8                THE COURT:  No.  That's okay.  That's not a

9    problem.  I just need to make sure that --

10               MR. BALDIGA:  Yeah.

11               THE COURT:  -- I understand where we are.  So go

12   ahead.

13               MR. BALDIGA:  So the Verdolino production will be

14   made directly to the trustee today of the entirety of the

15   Verdolino & Lowey responsive universe of 14,200 and

16   something documents, with the sole exception of the one

17   document as to which the debtor has asserted a privilege.

18               THE COURT:  Okay.

19               MR. BALDIGA:  I can't speak to the privilege

20   because we weren't involved in the privilege review.

21               THE COURT:  Right.

22               MR. BALDIGA:  So I won't go there.

23               As to Brown Rudnick, we have produced to the

24   trustee directly somewhere north of 1,500 documents that

25   were with third parties, not debtor affiliates.  So that has

1    been done.  The debtor gave us clarity last week that those

2    aren't really subject to a possible privilege because they

3    went to people, for example, Mr. Goldman.  And so the

4    trustee has had those.  So that's done.

5                THE COURT:  About 1,500 documents?

6                MR. BALDIGA:  I could be corrected on that.  It's

7    more than 1,500 -- I don't have the exact number.

8                THE COURT:  That's fine.

9                MR. BALDIGA:  In addition, we provided to Zeisler

10   & Zeisler for debtor's review on -- they will correct me,

11   either Thursday or Friday an additional 7,417 documents, I

12   believe.

13               And the remainder of the privilege log that you

14   saw, with the exception of the one Verdolino & Lowey, the

15   rest are assertions of privilege as to Brown Rudnick

16   documents.  The great majority of those similarly are as to

17   one document that shows up more than ten times.

18               THE COURT:  Okay.

19               MR. BALDIGA:  We are in the process of taking out

20   of that production, just like Verdolino is doing, the

21   documents as to which there is an assertion of privilege and

22   today getting all of that to Paul Hastings.

23               THE COURT:  Say what you just -- would you repeat

24   the last sentence?

25               MR. BALDIGA:  Of course.

1          THE COURT:  Yes.

2          MR. BALDIGA:  So we are -- we got the privilege

3    log last night.  The technical people are now going into our

4    documents, pulling out from that the documents as to which

5    there is a privilege assertion.

6          THE COURT:  I see.  Okay.

7          MR. BALDIGA:  The entire remainder is being

8    delivered to Paul Hastings today.

9          THE COURT:  Okay.

10         MR. BALDIGA:  If it's not done already.

11         THE COURT:  Understood.  Understood.  Thank you.

12         MR. BALDIGA:  We're now with both Verdolino &

13   Lowey in that it's solely a matter of technical expertise,

14   not anything else.

15         We have remaining -- of the 189,872 documents, we

16   have remaining 10,100 documents that are possibly

17   responsive, but we believe most of those may not be.  And

18   that -- and I think previewed this a little bit, most of

19   those are internal emails only.

20         And they would include, for example, because I was

21   CEO of the firm during the engagement, the word Kwok shows

22   up on almost all of our financial reports.  Everyone agrees

23   while that is technically responsive because the word Kwok

24   is one of the search terms, no one here needs what we

25   provide to our auditors or others.

1          And we believe a great many of what is left are

2     those types of things, so that number is shrinking quickly.

3          THE COURT:  Are the 10,000 documents you just

4     discussed part of the 189 or in addition?

5          MR. BALDIGA:  Yes.

6          THE COURT:  It's part of.  Okay.

7          MR. BALDIGA:  The 189 is the largest universe.

8          THE COURT:  189,000 is the --

9          MR. BALDIGA:  We shrunk it really considerably.

10         THE COURT:  Okay.

11         MR. BALDIGA:  What's left is more difficult

12    because there are only certain people within the firm that

13    can be authorized to review frankly my emails --

14         THE COURT:  Understood.

15         MR. BALDIGA:  -- to the bank and so forth, there

16    are confidentiality issues.

17         We have committed to Paul Hastings that at the

18    latest we will finish our delivery of what is left to

19    debtor's counsel by one week from today on a rolling basis.

20    A big part of that is going over today or it went last

21    night.  I'm not sure if you did get things last night, but

22    it's we're doing it on a daily basis.  We think that it will

23    be in large part done by Tuesday of next week.

24         There will always be stragglers, but there won't

25    be much, if anything, left after Tuesday.  But they asked

1    for a hard commitment and we said Thursday.  I think that I

2    will have to personally review some universe of hundreds of

3    documents at the end of the thing.  But, again, what gets to

4    my level probably won't be anything that moves the needle on

5    anything here.  So that's -- those are the facts.

6          I think the September 23 date is important to all

7    of the arguments that will be made by others as to the date

8    on which agreement was made as to search terms.  I think you

9    heard at the last hearing trustee's counsel say that we've

10   been tremendously responsive here given the complexity of

11   this.  I share that view.  I think we continue to be.

12         I think the progress made during the last week,

13   real progress on the ground, is not maybe satisfactory to

14   anybody, but it has been very substantial in that just in

15   that week more than half of the universe of documents that

16   -- much more than half -- has been already produced and will

17   be to the trustee today and the remainder will be over the

18   next few days.

19         The other thing that's of significance to us is

20   that -- and, again, not throwing aspersions in any

21   direction, but the debtor's response to the trustee's motion

22   to compel, I know it's not styled as a motion to compel, as

23   to which we said we would support that relief.

24         The debtor has now said, and I think it's the

25   central part of that response, that if Brown Rudnick were to

1    produce directly to the trustee without a privilege review,

2    that would violate our ethical obligations and would be

3    illegal.

4            And we have told Paul Hastings and Zeisler &

5    Zeisler since that.  And we've circulated language to make

6    it clear that if that order enters it has to contain a

7    simple additional sentence to make it clear that the Court

8    is not ordering us to do something that is illegal because

9    we obviously can't do that.

10           But we need the Court to decide whether that's

11   illegal or not because we can't do anything now that there

12   is a flat statement that we would be doing something

13   illegal.  That's a change in circumstance.

14           So we would suggest to the Court, but I'm not

15   going to argue this, that we complete the process that is

16   now well under way.  I agree it doesn't -- the dates here

17   are -- there's a lot of dates being thrown around.

18           The agreements as to search terms on September 23

19   was obviously one week after the deadline to respond.  And

20   the trustee has already said we've been superbly responsive,

21   so it's not like anybody has been flouting any dates on our

22   end.  I think we've worked really well actually with

23   trustee's counsel.  They've been very reasonable in our

24   minds as to us working with search terms and so forth.

25           And I think we've worked very well with debtor's

1    replacement counsel as to all of this.

2            I know they don't agree with each other as to much

3    and that's unfortunate, but that's -- there's nothing we

4    could do about that.  We continue to have three way

5    discussions daily that's produced the progress that I've

6    just reported to you.

7            And I think if we're -- and at the end of the day,

8    you may have some work to do as to the privilege issues, but

9    that our job is to get it all done so that those can land on

10   your desk squarely.  I can't speak to any of that.

11           THE COURT:  Understood.

12           MR. BALDIGA:  So before I leave, and I've given

13   you a lot of numbers and facts, are there questions for me?

14           THE COURT:  Yes.  I have one question at the

15   moment.

16           MR. BALDIGA:  Yes.

17           THE COURT:  The response that was filed by the

18   debtor that you've just referred to that was filed

19   yesterday, and you've referred to the statement that if

20   Brown Rudnick were to directly produce documents to the

21   trustee, it's the position of the debtor that you'd be

22   violating the law.

23           You haven't -- isn't every -- from what you've

24   just told me, at least I think is what I heard, is that

25   you're not producing anything directly to the trustee,

1    you've already produced everything or will be produce

2    everything to the debtor's counsel?

3            MR. BALDIGA:  Well, that's what we've been doing

4    in earnest over the last week.

5            The motion before the Court --

6            THE COURT:  No.  I understand.  But what I'm --

7    what I'm --

8            MR. BALDIGA:  -- is for direct production.

9            THE COURT:  I understand that, but even if I

10   entered that order today for direct production, you've

11   already given everything to Zeisler & Zeisler, haven't you?

12           MR. BALDIGA:  Not quite everything.  That's what I

13   said would be finished --

14           THE COURT:  So what haven't?  The 10,000?

15           MR. BALDIGA:  -- within the next few days.

16           THE COURT:  Just the 10,000, the ones that --

17           MR. BALDIGA:  Yes.

18           THE COURT:  Those documents --

19           MR. BALDIGA:  Yes.

20           THE COURT:  -- that are internal?  Okay.  That

21   you're saying, I think you're saying, that Paul Hastings and

22   the trustee would agree, after you review, are probably not

23   going to be produced anyway because they're internal

24   communications of Brown Rudnick and your business operations

25   that have nothing to do with the -- with the topics under

1    which --

2              MR. BALDIGA:  Not quite.

3              THE COURT:  Okay.

4              MR. BALDIGA:  Most I think are, but there will

5    almost certainly be in that universe things that are

6    responsive that need to be produced.  I can't say that none

7    of those are properly --

8              THE COURT:  Okay.  So the risk -- the risk that

9    exists if I enter an order saying that there's immediate

10   production directly from Brown Rudnick to the trustee

11   relates to those 10,000 documents?

12             MR. BALDIGA:  Yes.

13             THE COURT:  Okay.  That was my question.

14             MR. BALDIGA:  And some -- I just want to be fair,

15   some are going to end up being responsive and should be

16   produced.  Now, whether there's a privilege claim or not, I

17   don't know.

18             THE COURT:  Okay.

19             MR. BALDIGA:  But they're not all going to be just

20   accounting documents.

21             THE COURT:  Okay.  Understood.  But the remaining,

22   the 10,000 documents that you described, and I know we're

23   not talking specific, you know, exact numbers, but as

24   closely as we can get, are part of the 189,000.  And so

25   essentially 179,000 documents have already been given over

1    to the debtor that you intend to produce to the trustee?

2              MR. BALDIGA:  No.  Most of those, upon internal

3    Brown Rudnick review, were determined not to relate to this

4    case or not to be responsive, we've already cleared the

5    decks --

6              THE COURT:  Okay.

7              MR. BALDIGA:  -- of most of those.  It's only

8    about 15 percent or so of that 189,000.  The name Miles, for

9    example, is one of the search terms.  Well, we have other

10   clients named Miles.

11             THE COURT:  Right.

12             MR. BALDIGA:  And so as we go through these,

13   discard, discard, discard, we're down to 10,000.  We need to

14   keep working through those.  We've made huge progress.  It's

15   just -- and I wish I could stand up and say we're done,

16   everything went to Zeisler last night, but we're not.

17             THE COURT:  All right.  So just so that I'm clear

18   though, how many documents have -- has Brown Rudnick turned

19   over to Zeisler & Zeisler?  And I don't -- Mr. Baldiga, I'm

20   not asking you to give me a precise number.  I'm just -- in

21   the range of what we just talked about.

22             MR. BALDIGA:  Yeah.  At least 7,500.

23             THE COURT:  Okay.

24             MR. BALDIGA:  And it could be several thousand

25   more than that.  And I -- literally, there's a pile being

1   delivered as we speak or went last night and I just don't

2   know, but that's a substantial -- that's in the several

3   thousands as well.

4            THE COURT:  Okay.  Thank you.  Attorney Henzy rose

5   when I asked you that question.

6            MR. BALDIGA:  I'm sorry.  He may know better.

7            THE COURT:  Do you have a more precise answer?

8            MR. HENZY:  Yeah.  So, Your Honor, last Thursday,

9   we received from Brown Rudnick 3,263 documents.

10            THE COURT:  Okay.

11            MR. HENZY:  And last night, I'm going to say at

12   probably 7 o'clock, we received an additional 4,100

13   documents.

14            MR. BALDIGA:  So that adds up to about 7,500.

15            MR. HENZY:  I think Mr. Baldiga was pretty close.

16            MR. BALDIGA:  Yeah.   And those are documents,

17   Your Honor, not pages.

18            THE COURT:  Right.

19            MR. BALDIGA:  Often lawyers talk about how many

20   pages --

21            THE COURT:  Right.

22            MR. BALDIGA:  -- but these are actual documents.

23   We haven't even -- given the number of documents, we haven't

24   even tried to calculate pages.  It's not meaningful.

25            THE COURT:  Understood.  Okay.  Then I don't have

1    any other questions at the moment --

2                MR. BALDIGA:  Thank you.

3                THE COURT:  -- Attorney Baldiga.  Thank you very

4    much.

5                Attorney Henzy?

6                MR. HENZY:  One thing I want to just maybe

7    characterize slightly different than Mr. Baldiga is the

8    debtor is not producing anything here.  The subpoenas at

9    issue was not served on the debtor.  They were served on

10   Brown Rudnick and --

11               THE COURT:  I think everybody's clear on that.

12               MR. HENZY:  So the debtor's not producing

13   anything.

14               THE COURT:  I don't think anyone said the debtor

15   was producing.  I said what was given to the debtor --

16               MR. HENZY:  Understood.

17               THE COURT:  -- provided to the debtor.

18               MR. HENZY:  But the phrase directly produce was

19   being used --

20               THE COURT:  With regard to Brown Rudnick.

21               MR. HENZY:  Right.  So Brown Rudnick is producing

22   documents in compliance with the subpoena.

23               THE COURT:  Correct.

24               MR. HENZY:  Right.  Okay.

25               THE COURT:  Correct.

1          MR. HENZY:  All right.  And so I don't think

2     anywhere in our objection we said that by directly producing

3     Brown Rudnick would be doing something illegal.

4          I think what we said was that the order that the

5     trustee's asking for that Brown Rudnick immediately produce

6     all of its documents would put Brown Rudnick in the position

7     of producing documents without having met its professional

8     obligations to review the documents as we all have.

9          As lawyers, you can't produce an attorney, I'm

10    sorry, a client document without putting eyes on the

11    document or doing some sort of analysis about whether or not

12    this document should be produced.

13         So I don't -- weren't saying -- I don't think we

14    said if Brown Rudnick directly produces they'd be doing

15    something illegal.  Again, that may just be a little bit of

16    a different characterization.

17         But I want to be -- Your Honor asked about that,

18    so I want to be clear on that.  Okay?

19         THE COURT:  Well, that's -- I asked about that

20    because that's what Mr. Baldiga said.

21         MR. HENZY:  Yeah.  And --

22         THE COURT:  He had concerns that your reply, the

23    reply filed on behalf of the debtor yesterday, said

24    something different than the previous reply which is that if

25    Brown -- according --

1       I believe I heard you properly, Mr. Baldiga, but

2   if I didn't, please correct me, I think your concern was

3   that the reply said that if BR, Brown Rudnick, was to

4   produce directly to the trustee, these documents that Brown

5   Rudnick would be in violation of the law.  Those were the

6   words that Mr. Baldiga used.

7       Now, you're saying you don't -- that's not what

8   you're -- Attorney Henzy, let me just make sure I'm clear,

9   that the debtor isn't saying that.

10      The debtor's saying that if Brown Rudnick produces

11  documents directly to the trustee that they haven't looked

12  at, they haven't met their obligation, their professional

13  obligation, that's what you just said?

14      MR. HENZY:  Yes.  That's right.

15      THE COURT:  Okay.  And Mr. Baldiga already said

16  he's not producing anything until he looks at it, so I don't

17  think there's a problem.  So why don't we move on.

18      MR. HENZY:  I don't either.  Okay.

19      THE COURT:  Okay.

20      MR. HENZY:  I don't either.  Okay.

21      Just again, to be clear, Your Honor, we received

22  on Thursday 14,258 documents from Verdolino & Lowey which

23  again we had to have a vendor convert to usable form, so we

24  started our review on Friday.

25      We completed that review yesterday and produced a

1    privilege log, which was up on the screen, and have directed

2    to Verdolino & Lowey that they withhold it's actually six

3    documents, but it's the same document.

4           So of the 14,258 documents, the debtor has said

5    you should withhold these six documents, but, again, it's

6    actually the exact same document that just appeared in their

7    file six times.

8           That, Your Honor, is the first document on the

9    privilege log.  And we -- on the subject, we could have been

10   more specific, but it's a litigation -- we say in the

11   subject line it's litigation funding.  It's a litigation

12   funding agreement with respect to the UBS litigation that's

13   going on in the U.K., which that is carved out of the

14   privilege order.

15          And, as Your Honor is aware, that privilege with

16   respect to the U.K. litigation is the subject of appeal

17   that's pending in front of the district court.

18          That's the only document, or documents, plural,

19   again there's six copies, that we said should be withheld.

20          And to go to the, I'll talk about this more, the

21   good faith or lack thereof by the debtor here, our review --

22   we were able to start a review on Friday.  We got through

23   14,258 documents by yesterday and produced a log yesterday

24   and withheld one document.  I think that is pretty good.

25   Maybe somebody else could have gone faster than we did, but

1    I think that is pretty good.

2            On Thursday, Brown Rudnick produced 3,263

3    documents to us, which again, we got through by yesterday

4    and produced a privilege log last night.

5            Of the documents on the privilege log, some of

6    those are duplicates so there are a total of 11 documents I

7    believe that is -- 10, there's actually 10, one of which is

8    that Verdolino & Lowey document, so there's actually 9

9    documents that we've identified out of the 3,263 documents

10   we received from Brown Rudnick.

11           Within that 9, again, there are -- it's,

12   principally anyway, it's email chains, and it's overlapping

13   so I can't tell you exactly how many discrete documents it

14   is, but it's actually -- in some sense, it's less than 9

15   because there are overlapping emails within those 9

16   documents.

17           All but -- all but one of those documents, Your

18   Honor, and this is made clear in the privilege log, either

19   directly through mention of the UBS action or at least

20   mention of names of counsel who are involved in that action,

21   all but one of those documents relates to the UBS action.

22           So, again, of the 3,263 documents we received,

23   we've withheld, however you define it, 6 or 7, and all but

24   one of those relate to the UBS action.

25           The last, the only document that doesn't relate to

1    the UBS action, is -- it's actually a document that we're

2    going to -- we agree we're going to need to redact, so

3    probably two-thirds of the document we will be able to

4    produce.

5           We were not able to do that in the time frame that

6    we had, but that document will be redacted, and that

7    involves advice, you know, outside of this bankruptcy case,

8    which we believe would be privileged within the meaning of

9    the privilege order.  And we can -- we can fight about that,

10   but that's -- we're making that claim and we may have to

11   deal with it at some point.

12          The 3,263 documents that we received from Brown

13   Rudnick on Thursday we have been told are -- and if there's

14   stray documents that are not in this category, it's not

15   through any, you know, intention by Brown Rudnick to not

16   give us complete information.

17          Again, we're dealing with a tremendous amount of

18   documents and I think they are doing the best they can, but

19   we've been told the 3,263 documents is the universe of

20   documents which I'll call -- I'll say involve external

21   emails.  Go emails between Brown Rudnick and somebody

22   outside of Brown Rudnick, whether -- so principally the

23   debtor or other counsel for the debtor.

24          Because again they've already carved away external

25   communications that involved committee counsel, involved

1    PAX, involved the U.S. Trustee and those documents have

2    already been produced.  That's the 1,500 documents that Mr.

3    Baldiga mentioned.

4            So there's the 1,500 documents already produced.

5    There's this 3,263 of external emails that we've now

6    reviewed.  And as Mr. Baldiga said those will be being

7    produced today or tomorrow.

8            We've been told that the 4,100 pages that we

9    received last night are internal Brown Rudnick emails. So

10   not necessarily the non-responsive, so the management type

11   of documents that Mr. Baldiga mentioned.

12           But it's -- so we have not reviewed these 4,100

13   documents yet, but my general understanding -- again, not to

14   hold Brown Rudnick to anything here, I think they're doing

15   the best they can -- is that these 4,100 documents are

16   internal emails that would be responsive to the subpoena.

17   So it's not management related things internal to Brown

18   Rudnick.  It's actually 4,100 documents relating to this

19   case.

20           We've also been told that a not insignificant

21   portion of those 4,100 documents are things like drafts of

22   pleadings that Brown Rudnick ended up filing with this

23   court.  So the expectation, and frankly the hope, from our

24   perspective is that the review will go fairly quickly.  If a

25   large volume of the documents are draft pleadings, then the

1    debtor would not be making any claim that they -- they

2    should be withheld.

3          Again, Your Honor, I think that in terms of the

4    debtor's good faith, lack of good faith, attempt to obstruct

5    here, I think that us turning around 3,263 documents in less

6    than a week is a reasonable performance.

7          I agree with Mr. Baldiga that a critical date here

8    is the September 23rd agreement between Brown Rudnick and

9    Paul Hastings on search terms.

10         I don't think it's an unreasonable amount of time

11   for Brown Rudnick to have gone through from September 23rd

12   to October 6th, which is when we got our first slug of

13   documents from them, to go from that universe of 189 -- the

14   September 23rd search terms, as Mr. Baldiga said, produced

15   189,000 documents -- for them to go from that 189,000 to the

16   documents that they actually are sending us on a rolling

17   basis, I don't think that's an unreasonable amount of time

18   for Brown Rudnick to have gone through that process.

19         Again, I don't think it's an unreasonable amount

20   of time for us to have reviewed the documents from last

21   Thursday's receipt with respect to the Brown Rudnick

22   documents and then, in effect, receipt from Verdolino &

23   Lowey on Friday, to have gone through those documents and

24   produced a privilege log by yesterday.

25         The trustee's position is that the order --

1    production was due on September 16.  The privilege order

2    entered on September 14.  The production was due on

3    September 16.  And that the debtor was obligated to either

4    produce a privilege log by September 26 or file a motion

5    with this court seeking an extension of time.

6            We couldn't have produced a privilege log until we

7    received the documents and we didn't receive the documents

8    until starting on last Thursday.  And we still -- we

9    received another slug of documents last night.  Obviously,

10   we could not have produced a privilege log with respect to

11   those documents.  And we understand next week there's going

12   to be another slug of documents coming.  Or the debtor

13   should have filed a motion to extend our time to do that.

14           I understand the argument, Your Honor, and my

15   response is that that means that given the dates, given the

16   way that this all worked, our inability to comply with the

17   terms of the order essentially was baked into the order and

18   into the dates that were in the order.

19           And I guess we -- I would say fairly assumed that

20   there would be some normal, I'll call it, responsible

21   approach to producing documents pursuant to the Brown

22   Rudnick subpoena.

23           Again, from the debtor's perspective, we could not

24   have produced a privilege log until we received the

25   documents.  And we have returned -- we have turned those

1    documents around I think very quickly.

2            And, again, given the volume of documents and the

3    really, really small number of documents that we have

4    withheld, we have exercised I'm going to say a pretty light

5    touch here.

6            I mean, there's a grand total of one document that

7    we've said should be not completely withheld, should be

8    redacted based on privilege other than the UBS documents

9    which, again, is the subject of appeal before the district

10   court.

11           One thing again I want to be clear on, Your Honor,

12   is putting aside the UBS documents and putting aside the one

13   document that I'm telling you we be believe needs to be

14   redacted, because our view is that those are either carved

15   out with respect to UBS or with respect to the redaction

16   that we think needs to be made, is actually not responsive

17   to the subpoena.

18           We have not been reviewing -- the word privilege

19   is being used -- we have not been reviewing for privilege.

20           There are going to be thousands of pages of

21   attorney/client privilege documents that are going to be

22   produced to the trustee.  We're not withholding, again,

23   other than the UBS documents, okay, but we're not

24   withholding based on --

25           I'm sorry, we didn't review for privilege.  We

1   reviewed for the personal harm standard that was set out in

2   the privilege order.  And based on that personal harm

3   standard, we've, depending on how you interpret the one

4   document that we're saying should be redacted is

5   interpreted, we are saying that it's either zero or one

6   document should be withheld based on that personal harm

7   standard.

8         Again, out of the three -- the 17,500 documents

9   that we received, it's we're saying either zero or one

10  should be -- should be withheld.

11        Just to reiterate, Your Honor, on the privilege

12  log, which Attorney Bassett says is so deficient, again, all

13  but one of the documents relate to the UBS litigation.  To

14  the extent that is not clear, we can certainly give them a

15  revised privilege log that makes that clear.

16        So there's only -- it's only one other document,

17  which I've actually -- I've described on the record.  And if

18  Attorney Bassett wants us to have more specificity on that,

19  we certainly can do that.  There was no intention with this

20  privilege log to hide anything or to do anything other than

21  what -- that we were required to do.

22        With the remaining documents that -- with the

23  4,100 pages we received last night or with the documents

24  that are still to come -- so I think possibly, I'm not sure,

25  of the 10,000 pages Mr. Baldiga mentioned, I think -- I

1    think anyway we've already received 4,100 of them.  So

2    they're still looking at 6,000 pages.  And he's committed

3    that whatever comes out of that we'll have by a week from

4    today.

5              What we've asked for, or what we would ask for, is

6    that we have a week, so five business days, from receipt to

7    turn those documents around.  With the documents we received

8    last Thursday, we turned it around in less than five

9    business days.  But I don't know exactly when we'll be

10   receiving documents so I don't know what other things may be

11   going on to be able to commit to less than five business

12   days.

13             I join Attorney Baldiga in asking the Court to let

14   this process just finish itself out.  From my perspective,

15   again, I join Attorney Baldiga and I think that given the

16   volume of documents, given the dates that things happened, I

17   actually think we've done pretty well with both Brown

18   Rudnick in terms of going through their files and getting

19   things to us and then us turning them around.

20             Attorney Baldiga is prepared to commit to having

21   all documents to us, maybe there's some stragglers, but

22   essentially all documents to us by a week from today.  And,

23   as I've said, we will commit to having anything we receive

24   turned around five business days or one week from receipt

25   which, again, I think is pretty reasonable.

1      We've already -- I can tell you, we've already

2      started on the 4,100 pages that we received last night and

3      we will turn those around and produce a privilege log to the

4      extent one's necessary by probably Tuesday, Wednesday of

5      next week.

6            So, Your Honor, unless you have questions for me,

7      Mr. Romney may have something to add, but that's all I have.

8            THE COURT:  I do have questions.

9            MR. HENZY:  Thank you.

10           THE COURT:  So I understood your argument about

11     the privilege log, not being able to produce a privilege

12     log, but where in paragraph 7 of the consent order does it

13     say that the debtor's counsel has to review the documents

14     before they're produced in connection with the subpoenas?

15           MR. HENZY:  Sure.  And, Your Honor, from my

16     perspective that has been, I guess, the subject of a lot of

17     the discussion that has gone on between the trustee, Brown

18     Rudnick and us.  And it doesn't say that.  Okay.

19           But Mr. Baldiga can correct me, okay, I think that

20     Brown Rudnick's position has been how do we know what the

21     debtor believes in good faith may cause him or result --

22           THE COURT:  But that's not the issue.  Paragraph 7

23     has nothing to do with Brown Rudnick.

24           It's drafted and was consented to by your client.

25     And it only has to deal with the debtor.  It doesn't have

1    anything to do with any of the other parties who were served

2    with subpoenas.  So it only has to deal with the debtor.

3             So what you're basically saying is paragraph 7 is

4    not workable?

5             MR. HENZY:  No.

6             THE COURT:  But that's what you're saying.

7             MR. HENZY:  No, it's not.

8             THE COURT:  Because -- well --

9             MR. HENZY:  It's not.

10            THE COURT:  But let me finish, please, okay?

11            MR. HENZY:  Okay.  Okay.

12            THE COURT:  Because what you're saying is you want

13   this court to not enter an order compelling the production

14   of documents that should have already been produced because

15   paragraph 7 doesn't say what you think it should say, which

16   is the debtor should be able to review the documents first.

17            MR. HENZY:  No.

18            THE COURT:  That's what you're saying.

19            MR. HENZY:  It's not what I'm --

20            THE COURT:  Then what are you saying?

21            MR. HENZY:  So, again --

22            THE COURT:  No.  I need that question answered.

23            MR. HENZY:  Okay.  Okay.

24            THE COURT:  Because here's the problem.  You

25   consented to this order.

1          MR. HENZY:  Yes.

2          THE COURT:  This was negotiated.  There is nothing

3    in paragraph 7 that says anywhere at any time that the

4    debtor is allowed to review documents before the production

5    of the documents.  Okay?  There's nothing there.  And that's

6    --

7          And, in addition to that, you didn't make any

8    argument about why you didn't file a motion for an extension

9    of time which was, as you said, baked in to that provision

10   that would have given you the right to not have to make

11   these arguments because you could argue, if you had obtained

12   the extension of time, that the trustee would have no right

13   to seek to compel under the Federal Rules of Civil

14   Procedure.  Right?

15         So why didn't you -- why didn't you file a motion

16   for extension of time?

17         MR. HENZY:  Okay.  Those are I think two

18   questions.

19         The first, on the first question, Your Honor, the

20   debtor -- and, again, I don't mean to be putting this on

21   Brown Rudnick, so if I can --

22         THE COURT:  Well, you're not going to put it on

23   Brown Rudnick --

24         MR. HENZY:  Right.  If I can finish --

25         THE COURT:  -- because they're not part of this

1    stipulation.

2              MR. HENZY:  Well, I'm trying to answer your

3    question, Your Honor --

4              THE COURT:  Okay.

5              MR. HENZY:  -- if I can speak.

6              THE COURT:  But they're not part of the

7    stipulation.

8              MR. HENZY:  I'm trying to answer your question,

9    Your Honor.

10             THE COURT:  Okay.

11             MR. HENZY:  Thank you.

12             I don't mean to put this on Brown Rudnick.  Brown

13   Rudnick communicated to us and I believe to the trustee we,

14   Brown Rudnick, can't produce consistent with this paragraph

15   7, because how do we know what the debtor believes would

16   result in personal harm to him.

17             THE COURT:  That's not what Mr. Baldiga said at

18   the last hearing.  He said I'm not going to substitute my

19   judgment for the judgment of the debtor.

20             And Mr. Baldiga said he would agree to the entry

21   of the order that was submitted before the last hearing that

22   would have been direct production to the trustee.

23             MR. HENZY:  Your Honor, I want to try to answer

24   your question.

25             THE COURT:  Okay.

1          MR. HENZY:  Thank you.

2          THE COURT:  Well, I'm trying to follow your answer

3     because --

4          MR. HENZY:  Okay.

5          THE COURT:  -- because you're saying something

6     that's not accurate.  That's not what Mr. Baldiga said.  He

7     stood right in front of me and said I am not in the position

8     to substitute my determination of what the debtor could

9     think is of a good-faith reason that would result in

10    personal harm.  That's what he said.

11         And he also said, all that being said, I agree to

12    the entry of the order that the -- that the trustee has

13    submitted with regard to this motion.

14         MR. HENZY:  May I speak, Your Honor?

15         THE COURT:  Yes.

16         MR. HENZY:  Thank you.

17         I don't think I mischaracterized anything.  What

18    Mr. Baldiga has consistently said to us is just what you

19    said:  I can't substitute my judgment for the judgment of

20    the debtor.  So we need you to look at these documents and

21    tell us what the debtor believes results in personal harm

22    and doesn't believe in personal harm.

23         And Mr. Romney has said this multiple times on the

24    record, we've said it in pleadings, what we said to Brown

25    Rudnick, what we said to the trustee, consistently, going

1    back weeks, it was we're not asking, we're not demanding,

2    we're not telling you we think this is the way it ought to

3    work, that we review the documents.  Okay?

4           Our consistent position has been Brown Rudnick has

5    the subpoena.  Brown Rudnick has a court order.  Brown

6    Rudnick has the Rules of Professional Responsibility.  Brown

7    Rudnick needs to do what Brown Rudnick needs to do.

8           If Brown Rudnick and the trustee agree that what

9    should happen here is that Zeisler & Zeisler is going to

10   review all of these documents, we'll do that.  We're not --

11   again, we didn't demand it, we didn't insist it, we didn't

12   tell anybody that's what this order says has to happen.  I

13   think that --

14          THE COURT:  Well, then, you'd have no objection to

15   me entering the order that's been asked to be entered then,

16   because otherwise you are saying that, you do want to change

17   the process.

18          MR. HENZY:  No, I don't.

19          THE COURT:  You said -- well, you just said you

20   want this to roll out for the next -- let it happen.  That's

21   what you just said.  Don't enter the order, let I happen.

22          MR. HENZY:  So what I've said -- I'll say two

23   things, Your Honor.  Okay?

24          If the order enters, it puts Brown Rudnick, and I

25   believe Mr. Baldiga would agree with this, in a somewhat

1   difficult position because it's now ordered to produce

2   documents, okay, that it potentially is producing documents

3   that it shouldn't be producing.

4            And, again, that's not -- that's not -- you're

5   right, that's not -- the debtor's not part of that.  If you

6   order that, you order that, and whatever the consequences

7   are to Brown Rudnick the consequences are to Brown Rudnick.

8   Okay?

9            So I'm -- I'm not telling you that -- if you enter

10  that order, then that -- it has the consequences that it

11  has.  Okay?

12           I'm not telling you that you should -- that the

13  process should roll out because that's the interpretation of

14  this order.  I'm telling you that because we were asked to

15  do this.  Okay.  I've heard these words come out of Mr.

16  Romney's mouth.  Your Honor, we don't want to do it.  Okay.

17  We haven't wanted to do it.

18           THE COURT:  Then why do you need time to do it?

19           MR. HENZY:  Because Brown Rudnick has said we need

20  the debtor to tell us, under this paragraph 7, whether or

21  not --

22           THE COURT:  No.  I don't think that's --

23           MR. HENZY:  -- there's personal harm involved.

24           THE COURT:  Mr. Baldiga, is that what you've said?

25  You need the debtor to tell you?  Because that's not what I

1   understood your argument to be.  I understood your argument

2   to be we will not substitute our judgment for the debtor.

3            Are you telling me that you've now asked the

4   debtor to review everything before it's produced to the

5   trustee?

6            MR. BALDIGA:  I've said both.

7            THE COURT:  Okay.

8            MR. BALDIGA:  I have said that it is impossible

9   for us, having had no contact with the debtor for months, to

10  substitute our judgment for what the debtor today believes

11  in good -- in his good faith would subject him to personal

12  harm.  I can't -- I wouldn't know where to start.

13           For example, now we know that the debtor has said

14  as to one document in the debtor's belief that is

15  implicated.  I wouldn't have been able to say yay or nay to

16  that.  I just -- I wouldn't know how to go about it.

17           And, yes, we've said from the day we saw this

18  order, we've said to the -- both the trustee and debtor's

19  counsel, how is this -- I mean, we see the order that you

20  worked out.  Great.  How does this work?  We don't know what

21  to do.

22           We could do everything you do in a normal, which

23  we have, in a normal document production.  The privilege is

24  no longer an issue because it's been assigned to the trustee

25  so all the normal considerations have been taken care of.

1          We have this personal harm proviso that is unique

2     to this case, this order.  How would you like to administer

3     it?  And, frankly, that's what's been the subject of dozens

4     of conversations over the month because we know we can't do

5     it.  I didn't put it in there.  Someone has to do it.  We

6     can't.  And we're now being told --

7          THE COURT:  Well, actually, someone doesn't have

8     to do it.  Someone can do it if they decide to do it and

9     they need to go it in good faith.

10          MR. BALDIGA:  But we have the documents.

11          THE COURT:  No.  But I understand that.  But the

12     problem with paragraph 7 is that it says what it says.  And

13     no one, obviously the debtor, didn't take into consideration

14     those issues when they consented to this order, because the

15     order says that debtor's counsel shall within ten days of

16     the applicable production deadline, subject to the right to

17     make a motion in good faith to the court for a reasonable

18     extension of time, which they didn't do, log all such

19     documents in accordance with the requirements of District of

20     Connecticut, Local Civil Rule of Procedure 26(e).  That

21     hasn't been done.

22          MR. BALDIGA:  I can't speak to any of that.

23          THE COURT:  So this order --

24          MR. BALDIGA:  Yeah.

25          THE COURT:  -- this consent order, what's the

1    point of it?  I mean, that's not your question, Mr. Baldiga,

2    sorry.

3        But what I'm saying to you is -- so you've just

4    clarified that you've said both.

5            MR. BALDIGA:  Yes.

6            THE COURT:  You've said that you --

7            MR. BALDIGA:  I will add one --

8            THE COURT:  -- what you said --

9            MR. BALDIGA:  -- one other thing.

10            THE COURT:  Go ahead.

11            MR. BALDIGA:  When I read the order, I had assumed

12    -- it's not stated, you're exactly right, I mean, we've all

13    read this paragraph 7 now a number of times, I had assumed

14    that it was assumed by the parties at least, if not by the

15    Court, that we would be doing what we're doing now.

16            I had assumed that because I couldn't figure out

17    what the parties thought otherwise.  But that's my

18    assumption.  And, again, I wasn't in any of the discussions.

19            It's just picking up the document and reading it

20    and saying, hmm, how the hell is this going to work?  I came

21    to that assumption.  But I could be totally wrong.  It may

22    be what the trustee assumed or not.  I don't know.  It may

23    be what this court assumed or not.  Maybe no one assumed it.

24            But I am still at a loss as to how the debtor was

25    supposed to make a log of documents that were in another

1   firm's possession?

2            THE COURT:  Okay.  I understand that.

3            MR. BALDIGA:  That's all I can add.

4            THE COURT:  All right.  So the -- so, Mr. Henzy,

5   you're saying, and Mr. Baldiga has just confirmed, that he's

6   asked the debtor to go through all the documents, so Brown

7   Rudnick has asked the debtor to go through the documents.

8            So that is different from what the understanding

9   of the court was last -- a week and a half ago.  But that

10  being said, so why didn't you file a motion for extension of

11  time?

12           MR. HENZY:  Your Honor, maybe we or someone else

13  or maybe we should have done that.

14           THE COURT:  Well, that, you're the only that would

15  have done that.

16           MR. HENZY:  Maybe we should have done that, Your

17  Honor.  But, again, given the timing here, the order was

18  entered on the 16th.  And I suppose we literally --

19           THE COURT:  It was entered on the 14th.

20           MR. HENZY:  You're right, Your Honor.  It was

21  entered on the 14th.  And the production deadline was on the

22  16th.

23           THE COURT:  Right.

24           MR. HENZY:  So, I mean --

25           THE COURT:  Which would have given you time to

1     extend the time.

2          MR. HENZY:  Well, literally, we would have been

3     having to file a motion the day after the order entered.

4          THE COURT:  Which wouldn't have been -- which what

5     would be the problem, because you didn't have any documents

6     by then?

7          MR. HENZY:  Your Honor, if that's what people's

8     hats are going to get hung on, that's what they get hung on.

9          THE COURT:  Well, it's not --

10         MR. HENZY:  We didn't -- we didn't --

11         THE COURT:  -- an issue of hats getting hung on.

12    It's provisions of an order that you negotiated with the

13    trustee's counsel that all the parties came and asked this

14    court to approve.  And it was negotiated with regard to the

15    motion that the trustee had filed regarding the 2000 -- it

16    was a resolution of a motion with regard to the 2004

17    Examination.

18         So I understand what you're saying, but it's not

19    persuading me at the moment with regard to why you didn't

20    file a motion for an extension of time.

21         MR. HENZY:  Your Honor, could I have Mr. Romney

22    address that, because he was more in the middle of that than

23    I was?

24         THE COURT:  Yes.

25         MR. ROMNEY:  Thank you, Your Honor.  For the

1    record, Aaron Romney, Zeisler & Zeisler.

2            Your Honor, that order was negotiated in good

3    faith to do exactly the opposite of what the trustee is

4    accusing, to try and expedite this process --

5            THE COURT:  I'm not -- that's not the question.

6            MR. ROMNEY:  -- and help people --

7            THE COURT:  That's not the question.  The question

8    is why didn't you file a motion for an extension of time in

9    accordance with paragraph 7 of the order that you negotiated

10   with the counsel to the trustee?  That's the question that I

11   want answered.  I don't want to hear argument.  I've heard

12   it all.  I know what the parties' positions are.  Why didn't

13   you file a motion for an extension of time?

14           MR. ROMNEY:  The answer to your question, Your

15   Honor, is that the reference to the debtor in the stipulated

16   order that I negotiated was viewed, under my understanding,

17   that an attorney when served with a subpoena with respect to

18   their client, or former client, under the ABA Guidelines 473

19   that I've attached to my objection, that the attorney

20   receiving the subpoena has the obligation to assert the

21   privilege objection on behalf of their client and their

22   former clients.  That was the understanding that the debtor,

23   through me as the debtor's agent, thought was going to

24   happen.  We were trying to work as quickly as possible.

25           And as a non-bankruptcy lawyer, but litigator

1    who's involved in discovery disputes all the time, what we

2    do is we avoid this as practitioners.  We avoid burdening

3    the Court with discovery disputes.  We act in good faith and

4    try and resolve everything.  And that is what the debtor was

5    trying to do.

6              And, yes, I believe that after spending weeks

7    trying to negotiate this order that we would then also work

8    together in good faith to have a practical solution to give

9    the debtor the rights that we negotiated on this order and

10   not make the order a total rubber stamp to allow the trustee

11   everything because we couldn't possibly have time to respond

12   to it.

13             I've never stipulated to an order and then moved

14   for an extension of time the next day.  And if that's --

15             THE COURT:  The order provided for that though,

16   Mr. Romney.  It provided for that.  There would have been no

17   problem had you done that because that's what the order

18   provided for.

19             It said clearly in paragraph 7, the paragraph that

20   we spent the most time talking about in connection with this

21   order, right, we spent the most time talking about that, you

22   could have filed an extension of time.

23             The Federal Rules -- and your ABA, you know, I

24   appreciate that you attached that, but the Federal Rules of

25   Civil Procedure apply and the Federal Rules of Civil

1    Procedure with regard to discovery and subpoenas and your

2    right to seek a protective order and do -- quash the

3    subpoena, do whatever else, that's what applies.  Okay?  Not

4    the ABA rule.

5              What applies is this court has to abide by, as do

6    all the participants, the Federal Rules of Civil Procedure

7    and the Federal Rules of Bankruptcy Procedure and, and a

8    consent order that you negotiated and asked this court to

9    enter.

10             And so all I'm asking is why you didn't file a

11   motion for an extension of time?  Your response seems to be

12   because you didn't think you had to because you just entered

13   into a consent order.  Okay.  If that's your answer, that's

14   your answer.  That's fine.

15             MR. ROMNEY:  Correct.  And my --

16             THE COURT:  And then we can move on.  Then we'll

17   move on.  We don't need to talk about it anymore.  Okay?

18             MR. ROMNEY:  I would also like to add for the

19   record that at the time I was negotiating the order on the

20   debtor's behalf and stipulating to the debtor -- to the

21   order on the debtor's behalf, I was not thinking about the

22   specifics of the 30 or 50 subpoenas that were served on

23   other parties.  We are human beings --

24             THE COURT:  Why should you be thinking about

25   those?  They weren't served on you and your clients?

65

1              MR. ROMNEY:  And that's why I didn't move for an

2      extension with respect to those subpoenas, those subpoenas

3      that we're here --

4              THE COURT:  This document --

5              MR. ROMNEY:  -- talking about today, Your Honor.

6              THE COURT:  This document doesn't relate to those

7      subpoenas, Mr. Romney.  This document only relates to Brown

8      Rudnick and Verdolino & Lowey.  That's the document that you

9      consented to.  This is -- this regards -- this is with

10     regard to Brown Rudnick and Verdolino & Lowey.  That's what

11     it says.  That's what it says.

12             MR. ROMNEY:  I'm sorry.  What is it, Your Honor?

13     Are we talking about the --

14             THE COURT:  I'm talking about paragraph 6, the

15     paragraph right before paragraph 7.

16             MR. ROMNEY:  Paragraph 6 --

17             THE COURT:  That says subject to the terms set

18     forth in paragraph 7.

19             MR. ROMNEY:  Everything in the order is subject to

20     paragraph 7.  That's --

21             THE COURT:  Well, for some reason you thought it

22     was important to add that to the end of paragraph 6 that

23     talks --

24             MR. ROMNEY:  And several other places.

25             THE COURT:  -- that talks only about Brown Rudnick

1    and Verdolino & Lowey.

2            And those are the -- by the way, those are the

3    only parties that filed any timely objections to the

4    subpoena.  No other party.  No other party has filed a

5    motion to quash, a motion for a protective order, no one.

6    So there's -- it doesn't matter.  We're only talking about

7    Brown Rudnick and Verdolino & Lowey.  That's who we're

8    talking about.

9            And paragraph 6 of that order specifically talks

10   about that.  It talks about that.  And it says subject to

11   the terms set forth in paragraph 7.  That's what it talks

12   about.

13           So I don't want to -- I'm not spending any more

14   time on it.  I've got your argument.  Okay?

15           So, Mr. Henzy --

16           MR. ROMNEY:  Thank you, Your Honor.

17           THE COURT:  -- there are two other things that you

18   talked about in the privilege log.

19           You said there's ten documents, one of which is a

20   Verdolino & Lowey document, and the other nine, eight of

21   which relate to the action in London, the UBS action.  And

22   you said those are subject of an appeal.

23           I don't understand that completely because I

24   thought the appeal was with regard to the order that

25   required your client to sign a letter and send it to the

1    trustee which your client didn't do.

2          So how are those other documents that might relate

3    to the UBS litigation part of the subject on appeal?

4          MR. HENZY:  Your Honor, the debtor has not waived

5    privilege with respect to any privileges that he still has

6    in that UBS litigation.  And, again, in paragraph 9 of the

7    privilege order, to just put it colloquially, carves out the

8    UBS litigation from the order.

9          THE COURT:  Okay.  So all you're saying right now

10   is you're claiming that --

11         MR. HENZY:  Yeah.

12         THE COURT:  -- and the Court's going to have to

13   determine that?

14         MR. HENZY:  Yeah.  Yeah.  Yes, Your Honor.

15         THE COURT:  Okay.  That's fine.

16         MR. HENZY:  Yeah.  Yep.

17         THE COURT:  That's the question I'm asking.

18         MR. HENZY:  Yep.  Yep.

19         THE COURT:  All right.  I don't think I have any

20   other questions at the moment.

21         MR. HENZY:  Okay.  Thank you, Your Honor.

22         THE COURT:  Thank you.

23         All right.

24         MR. BASSETT:  Your Honor --

25         THE COURT:  Mr. Bassett?

1          MR. BASSETT:  Sorry.  Yes, Your Honor.  Thank you.

2     May I be heard in response briefly?

3          THE COURT:  Yes.

4          MR. BASSETT:  Again, for the record, Nick Bassett

5     from Paul Hastings on behalf of the trustee.

6          I'm going to I think focus my comments to just a

7     couple of issues.  As far as kind of the big picture, I

8     think frankly, you know, some of the comments that Your

9     Honor just made really address what I was going to say.

10         And to summarize, I think we've heard a lot of

11    discussion both from Attorney Baldiga and Attorney Henzy

12    about the process that the parties are currently engaged in,

13    the number of documents that have been sent to Zeisler &

14    Zeisler for review, timing of when we can expect to receive

15    documents.

16         And I think one of the comments of Attorney Henzy

17    sort of summed it up when he said, you know, all things

18    considered, we've, quote, "Done pretty well."

19         And it's just -- it's hard to put into words how

20    -- how troubling and how sort of hard to understand a

21    comment like that is when basically what counsel is saying

22    is that we've -- we're now going to be over a month after a

23    deadline to produce documents, with no extension motion

24    having been filed, and that is sort of doing pretty well.

25         I mean, that is just not -- it's not acceptable to

1    the trustee.  It's not a way for this case to proceed

2    forward in any kind of organized fashion.  Court orders have

3    to be enforced.

4          I think Your Honor hit the nail on the head.  They

5    had time to file a motion for an extension.  They didn't do

6    so.  Paragraph 7 says what it says.  It should be enforced.

7    That, again, from the trustee's perspective is the end of

8    the analysis.

9          Now, there are two other points that I want to

10   briefly address.

11         One is the issues with the privilege log.  There's

12   been discussions of all the documents listed on the log that

13   relate to, purportedly, the UBS litigation in the U.K. in

14   some capacity.

15         Now, Attorney Henzy is correct that paragraph 9 of

16   the privilege order carves out documents that may be subject

17   to a U.K. privilege.  For example, communications between

18   the debtor and his U.K. counsel about U.K. legal issues that

19   legitimately would be covered by U.K. privilege.  That's

20   something that is just not addressed per paragraph 9 of the

21   privilege order.

22         But what the privilege order does not do is

23   address in any way or carve out in any way U.S. documents

24   that relate to the UBS litigation in the U.K.

25         So to the extent that the debtor had

1    communications with Brown Rudnick about the UBS litigation,

2    documents that somehow, according to the debtor, were

3    relevant to the administration of this estate, hence is

4    sharing them with Brown Rudnick, those documents are not

5    privileged and are not carved out.

6          Also, Your Honor, there was discussion about

7    litigation funding agreements.  Litigation funding

8    agreements are not privileged, period.  Not only are they

9    not privileged, period, but they are directly relevant to

10   the trustee's investigation into the assets and financial

11   affairs of this estate.

12         Who is funding the debtor's litigation and the

13   sources of that funding?  Those issues are centrally

14   relevant to the investigation and there is no privilege that

15   covers those types of agreements.

16         There is also the last document on the privilege

17   log which Attorney Henzy addressed.  I think the way he

18   described it was that that document concerned advice not

19   related to the bankruptcy case and, therefore, needed to be

20   redacted.

21         That explanation does not in any way justify the

22   withholding of this document as privileged.  The fact that

23   it doesn't relate to this case, I'm not sure what that

24   means, that does not give rise to a grounds to withhold the

25   document as privileged.

1          If it is a document that relates to the debtor. It

2     is a document that we're entitled to see unless there is a

3     legitimate claim under paragraph 7 of the privilege order

4     that it would give rise to personal harm if disclosed to the

5     trustee.  And no such assertion in that regard has been

6     made.

7          So, Your Honor, I think in an effort to help

8     ensure that we don't get bogged down with additional issues

9     on the privilege logs that we have yet to receive for the

10    remainder of the documents, and they'll have to come back to

11    the Court, I do think it would be helpful for the Court to,

12    you know, instruct the debtor that any future privilege logs

13    provided to the trustee has to actually comply with the

14    terms of the privilege order, which this one does not.

15         The last -- the last issue I wanted to very

16    briefly address, Your Honor, was certain comments that

17    Attorney Baldiga had made about the review that Brown

18    Rudnick is conducting of these documents.  And perhaps he

19    can provide some clarification, but I want to make sure

20    there's no confusion.

21         Attorney Baldiga had said, you know, there's some

22    discussion of the, quote/unquote, "Internal documents" of

23    Brown Rudnick that are being reviewed and there are some of

24    those documents that they believe would not be responsive to

25    the subpoena and, therefore, would not be produced to

1    Zeisler & Zeisler and, therefore, would not be produced to

2    the trustee.

3            I think I understand that position and don't

4    object to it insofar as it relates to the business of the

5    law firm.  I think he had mentioned, you know,

6    communications with the firm's auditors, its financial

7    affairs, things like that.  I don't take issue with that.

8            But to the extent that there are internal

9    communications among Brown Rudnick attorneys related to Mr.

10   Kwok, related to the debtor, those I think are absolutely

11   responsive to the subpoena and relevant.

12           And to the extent that attorneys at Brown Rudnick

13   are discussing whether they believe something that the

14   debtor just told them, you know, whether they're commenting

15   on something the debtor just told them, those types of

16   communications are certainly responsive and certainly

17   relevant, and I just want to make sure there's no confusion

18   as to whether or not the trustee is getting those documents.

19           Your Honor, I think -- I think that is all I have

20   for now, but I am happy to answer any questions you may

21   have.

22           THE COURT:  Thank you.  I don't have any questions

23   at the moment, but I think Attorney Baldiga wanted to

24   respond to your questions.

25           So go ahead, Attorney Baldiga.

1          MR. BALDIGA:  Just two things very briefly.

2          First, we are in accord exactly as just described

3    as to the scope of the response.  So Mr. Bassett said what I

4    would say and so we are -- we have no disagreement in that

5    regard.

6          THE COURT:  Okay.  Thank you.

7          MR. BALDIGA:  Just secondly in terms of some

8    additional facts, the Court could do with them as you see

9    fit. Just because the debtor is not -- the debtor was not

10   part of any mail chain between our firm and the trustee's

11   counsel as to our responses, on September 9 there was an

12   email exchange where the trustee and Brown Rudnick agreed --

13   I say Brown Rudnick, it applies to Verdolino & Lowey equally

14   -- that in lieu of a formal response to the subpoena we

15   would provide a methodology or protocol for production.

16         On September 13, we made that proposal to the

17   trustee.  On September 20, the response to our proposal

18   suggesting additional protocols was made by the trustee to

19   Brown Rudnick.  And on September 23, we completed the

20   process of agreement to search terms and our search

21   commenced on that day.

22         So it was that -- what I just described, was

23   subject to a very long email chain going back perhaps a

24   dozen of times in lieu of more -- of something more formal.

25   You referred to our formal response which was really a place

1    holder really.  And what --

2              THE COURT:  Well, it may have been a place holder,

3    but it's required by the Federal Rules of Civil Procedure --

4              MR. BALDIGA:  Well, that's why we did it.

5              THE COURT:  -- and that's --

6              MR. BALDIGA:  Yeah.

7              THE COURT:  -- and so then that's why it has --

8    that's why we're even discussing it.  Because you complied

9    with the Federal Rules of Civil Procedure by seeking some

10   kind of protective order or quashing of the subpoena that

11   the Federal Rules of Civil Procedure require.  Otherwise

12   compliance with the subpoena would have already been overdue

13   and subject to an order to holding a party in contempt.

14             So I understand and I appreciate what you told me

15   about the progress of what -- and the continuing obligations

16   and discussions that you had with Paul Hastings, but any

17   party that was served with a subpoena had to have followed

18   the Federal Rules of Civil Procedure.  And if they didn't,

19   then it's too late for them.  You did, so that's why we're

20   talking to you.

21             MR. BALDIGA:  Okay.

22             THE COURT:  Okay?

23             MR. BALDIGA:  All right.  I appreciate that.  I

24   wanted you to have the full picture.  And, you know, again,

25   everything we did with the trustee here I think is well

1    within the norms of how this handled well by all parties,

2    but I wanted the Court to have the full benefit of that.

3              THE COURT:  I appreciate that.

4              MR. BALDIGA:  Thank you.

5              THE COURT:  Thank you.

6              MR. HENZY:  Your Honor, could I make three quick

7    points?

8              THE COURT:  Yes.

9              MR. HENZY:  One, I will be quoting Mr. Bassett on

10   that court orders have to be enforced at a PJR hearing.

11             Second, to Mr. -- the comments Mr. Baldiga just

12   made about their communications with Paul Hastings, if the

13   Court is going to say -- if the Court ends up saying that we

14   didn't file a motion to extend time, that's the end of the

15   analysis, and that's what the Court is going to say.  I will

16   tell you that we were trying to work in good faith with Paul

17   Hastings and with Brown Rudnick to make this production

18   work.

19             So there was numerous emails, numerous telephone

20   conferences, some of which I -- many actually -- probably

21   more than not I was not on, but we were trying to work in

22   good faith to have this production work.

23             And maybe shame on us in the midst of that we

24   should have been filing a formal motion for an extension of

25   time.  I don't remember, again -- I was not on all calls,

1     anyone saying to us, you know, this discussion we're having

2     right now is really pointless because your time to do this

3     has come and gone.

4              Again, the order says what it says, Your Honor.  I

5     don't -- I can read the words and I know what the order

6     says.

7              I was not, and maybe I was, I was not intending to

8     argue, third point, is the privilege log today.  Okay?  I

9     don't think that that's before the Court.

10             THE COURT:  I agree, it's not.

11             MR. HENZY:  And what I was trying to do is explain

12    to the Court what I believe has been the debtor's and my

13    firm's attempt to comply with what we've been asked to do,

14    again, what we've been asked to do, and point out that out

15    of the 17,000 documents that we received last Thursday, you

16    know, we put a grand total of ten on a privilege log, a

17    number of which are duplications.  Okay.

18             So it's not -- I'm not arguing the privilege log

19    today.  I'm saying I think the ten, listing ten items out of

20    17,000 plus is pretty, I think it's --

21             THE COURT:  Well, you're pleading --

22             MR. HENZY:  -- we've done the best we could.

23    Okay.

24             THE COURT:  I forgot to ask you a question about

25    that.  You're pleading, I think I read yesterday said, there

1   were 33 documents.  So what happened to the other 23?

2            MR. HENZY:  So, you know, frankly, Your Honor,

3   I'll put that on -- Mr. Romney did that pleading.  We had a

4   lot going on.  We were trying to work through the documents.

5   And, you know, through yesterday, we were continuing our

6   review of documents and it got down to the list that's on

7   the privilege log.

8            So at the time the pleading was filed -- actually,

9   I think the pleading may have been filed not yesterday.  It

10  was filed on Tuesday.

11           THE COURT:  What's today?  Okay.

12           MR. HENZY:  Today's Thursday.

13           THE COURT:  Tuesday.  Okay.  Sorry.

14           MR. HENZY:  Yeah.  I think at the time the

15  pleading was filed, we may have been working with --

16           THE COURT:  Okay.  I'm just asking --

17           MR. HENZY:  Yeah.  Yeah.

18           THE COURT:  -- do you anticipate having more --

19  well, of the documents that you've already reviewed --

20           MR. HENZY:  We're done.

21           THE COURT:  -- are you saying that those ten are

22  of the -- okay.

23           MR. HENZY:  That's it.

24           THE COURT:  That was the question I forgot to ask.

25           MR. HENZY:  The way the process works is we've

1    sent our log --

2            THE COURT:  I'm not -- I don't --

3            MR. HENZY:  Yeah.

4            THE COURT:  I'm not --

5            MR. HENZY:  Yeah.

6            THE COURT:  -- giving a rubber stamp to the way

7    the process works.

8            My question was of the documents that you've

9    reviewed and this privilege log that is not before the Court

10   today, but I am asking the question, because you've both

11   raised the issue about the privilege log, are you adding any

12   more --

13           MR. HENZY:  No.

14           THE COURT:  -- documents to that privilege log --

15           MR. HENZY:  Not --

16           THE COURT:  -- of what you've reviewed to now?

17           MR. HENZY:  Yes.

18           THE COURT:  That's my question.

19           MR. HENZY:  So the answer is no.

20           THE COURT:  So the answer is no.

21           MR. HENZY:  The answer is no.

22           THE COURT:  Okay.

23           MR. HENZY:  Yes.

24           THE COURT:  All right.

25           MR. HENZY:  Thank you.

1          THE COURT:  Thank you.

2          MR. ROMNEY:  Just for the record, the statement

3     was 33. I don't have it specifically in front of me, but it

4     was many or some of which are duplicates and the explanation

5     for the 33 to 10 is the duplicate.

6          THE COURT:  Yeah.  No.  That's fine.  I just was

7     asking because I saw that number in the pleading.  That's

8     all I'm -- that's -- it was just a question.  That's all it

9     was.  Okay?  All right.

10          MR. ROMNEY:  Your Honor, may I make one additional

11     point that will take less than a minute?  May I?

12          THE COURT:  Okay.  The clock is ticking.

13          MR. ROMNEY:  Thank you.

14          I think you correctly stated Brown Rudnick did

15     what it was supposed to do.  They complied with the Rules of

16     Civil Procedure.  They sought an extension.  And we talked a

17     lot about paragraph 7.  And I agree Brown Rudnick did what

18     it was supposed to do in terms of getting an extension and

19     being reasonable, but --

20          THE COURT:  Well, it wasn't an extension.  They

21     sought a protective order, slash -- I mean, they responded

22     to the subpoena.  They weren't seeking an extension.  They

23     were saying we need some protection here.  That's what they

24     were saying.

25          MR. ROMNEY:  Well, I wasn't aware of them filing

1   for a protective order.  I thought that they were -- what we

2   were discussing was them working with the trustee to

3   establish protocols for what would be done.

4           And the only point I'm making is that Brown

5   Rudnick first got the -- the first tranche of documents to

6   us on the 6th and we produced a privilege -- the debtor

7   produced a privilege log on the 12th, which is less than ten

8   days from when it could have possibly done so.  That's the

9   only point I want to make.

10          THE COURT:  Okay.  And you did it in less than 60

11  seconds, so thank you.

12          MR. ROMNEY:  Thank you, Your Honor.

13          THE COURT:  All right.  I think that we're

14  concluding all the arguments on the trustee's motion and

15  we'll move on to other matters at the moment.  We'll come

16  back to that later.  Okay?

17          So now  with regard to the other matters on the

18  calendar, there are both in the Kwok case and the Genever

19  Holdings Corporation case a motion for joint administration

20  that was scheduled for a hearing today in accordance with a

21  motion to expedite the hearing on the motion for joint

22  administration.

23          So, Mr. Linsey, are you going to be discussing the

24  motion for joint administration?

25          MR. LINSEY:  I am, Your Honor.  And I can discuss

1    that for both of the movants' perspective.

2              Would Your Honor like some brief background about

3    the filing and the --

4              THE COURT:  Sure.

5              MR. LINSEY:  Okay.  So the Genever Holdings

6    Corporation debtor is essentially an intermediate entity in

7    the chain of ownership of the penthouse at the Sherry-

8    Netherland Hotel in New York City.  More specifically, the

9    Kwok debtor as of the petition date owned Genever Holdings

10   Corporation, an entity that was created in the British

11   Virgin Islands.  Genever Holdings Corporation owns Genever

12   Holdings, LLC.  That's a U.S. entity, and that is the owner

13   of the penthouse in New York City.  It is also a Chapter 11

14   Debtor in a case pending in the Southern District of New

15   York.

16             To reduce confusion, what I'll propose to do is

17   call the Genever Holdings Corporation, which is the debtor

18   in your court, Genever BVI and the other one Genever U.S.

19             And there is now pending a motion by the Chapter

20   11 Trustee in the individual debtor, Mr. Kwok's, case to

21   transfer that Genever U.S. case to Your Honor's court.

22             On August 10th, 2022, in the Kwok Chapter 11 case,

23   the Court granted the trustee his corporate governance

24   rights motion and entering it's corporate governance rights

25   order, pursuant to which the Kwok debtor's shares in Genever

1    BVI were transferred to the Chapter 11 Trustee.

2              Last month a new director was appointed for the

3    Genever BVI debtor.  Her name is Claire Abrehart.  She's in

4    the British Virgin Islands.  Ms. Abrehart approved the

5    Genever BVI Chapter 11 filing.  And the basis for the filing

6    is set forth in her declaration,which is attached as part of

7    a petition package and was also filed separately by my

8    office yesterday.

9              Summarizing, very briefly, from that declaration,

10   there is an entity purportedly owned by Mr. Kwok's son

11   called Bravo Luck, Limited.

12             Bravo Luck, Limited has asserted claims in

13   litigation pending in the British Virgin Islands to the

14   effect that Bravo Luck is claiming that it is the beneficial

15   owner of the Sherry-Netherland penthouse in New York City

16   pursuant to a purported trust agreement that is highly

17   dubious both with respect to its provenance and with respect

18   to its legal effect.

19             Bravo Luck has also taken the position in the BVI

20   litigation that the automatic stay in this case does not

21   prevent it from continuing to litigate ownership issues in

22   the BVI.

23             The Chapter 11 --

24             THE COURT:  Let me stop you for a second.

25             MR. LINSEY:  Yes, Your Honor.

1    THE COURT:  When you say the automatic stay in

2  this case, you mean in the Kwok case?

3    MR. LINSEY:  I apologize, Your Honor.  Yes.

4    THE COURT:  Or in the --

5    MR. LINSEY:  I mean in the individual debtor's,

6  Mr. --

7    THE COURT:  Okay.  Thank you.  I just want to be

8  clear for the record.

9    MR. LINSEY:  And I'll try -- when I say the

10  individual debtor, it's clear that I'm referring to Mr. Kwok

11  --

12    THE COURT:  Yes.

13    MR. LINSEY:  -- versus the entity, yes.

14    THE COURT:  Okay.

15    MR. LINSEY:  And they had taken -- this was prior

16  to the Genever BVI petition that was filed two days ago, but

17  after the petition date in the individual debtor's case that

18  the automatic stay in the individual debtor's case did not

19  necessarily stay or require a stay of the litigation in the

20  BVI.

21    Now, the trustee has taken steps to resolve the

22  claims on the position of Bravo Luck, which the trustee

23  strongly disagrees with.

24    The trustee's commenced adversary proceedings both

25  in this court attendant to the individual debtor's case an

1    in the Southern District of New York to resolve those

2    questions.

3              But what the trustee does not want to be in the

4    position of doing is requiring the Kwok estate to undertake

5    both the distraction and the additional expense of

6    litigation activities in the British Virgin Islands when

7    these are issues that rightly should be decided in this

8    court.

9              So that's sort of the background that led to the

10   decision by the director to file the Genever BVI case, which

11   my office then filed two days ago.

12             The trustee -- before I move on and address the

13   motion, does Your Honor have any questions about any of

14   that?

15             THE COURT:  I do not.  Thank you.

16             MR. LINSEY:  Thank you, Your Honor.

17             And I realize some of it was repeating what Mr.

18   Despins has discussed in prior status conferences.

19             The trustee in Mr. Kwok's case and Genever BVI

20   debtor have jointly filed a motion for joint administration

21   of the Chapter 11 cases pending in Your Honor's court.

22   There's no substantive consolidation sought.  It's purely

23   administrative.  It will promote convenience.  It will

24   reduce expense.

25             The motion and proposed order were served pursuant

1    to Your Honor's order yesterday.  A certificate of service

2    was filed by my office yesterday evening.  We don't believe

3    it's a controversial motion and we would ask that that order

4    enter.

5              THE COURT:  Thank you.

6              Does anyone wish to be heard on the motion for

7    joint administration?

8              MR. HENZY:  Your Honor, other than disagreeing

9    with some of Attorney Lindsey's characterizations on the

10   background, not on the joint administration motion, but on

11   the background overall, which I don't think you'd need or

12   want me to get into on the record because I don't think it's

13   before the Court, but no objection to the joint

14   administration motion, Your Honor.

15             THE COURT:  Thank you.

16             MR. GOLDMAN:  Your Honor, the committee has no

17   objection.  We think it's appropriate inasmuch as it's

18   procedural only and for the benefit of the Court and the

19   parties.

20             THE COURT:  Thank you.

21             Does anyone else wish to be heard?

22             The Office of the United States Trustee?

23             MS. CLAIBORN:  Your Honor, the United States

24   Trustee has no objection to the joint administration motion.

25             THE COURT:  Thank you.

1          Attorney Linsey, do we need to -- and I have seen

2     no written objection.  I understand this was just filed, but

3     there has been no written objection to the motion and there

4     is no one participating in this hearing today that's

5     objecting to the motion for joint administration.

6          Do we need to -- oh, you did it in a footnote I

7     guess on the caption, although I don't see where the

8     footnote is, but the caption of the case then, if we don't

9     spell out both debtors' names and you just put a footnote in

10    it, then we need to make sure -- is that -- so you're going

11    to say that the caption of every pleading in every case --

12    every party that files a pleading in this case should use

13    the caption with the footnote?

14          MR. LINSEY:  Correct, Your Honor.  And if it would

15    make things easier, I can have a word version sent to the

16    courtroom deputy.

17          THE COURT:  Yes.  That would be helpful.  I just

18    -- you know, it doesn't really matter.  I think -- I've seen

19    it different ways where joint administration still refers to

20    the second case, even the case number, but I'll -- we'll

21    look at it.  It's fine.  I just -- because I don't think

22    every party that files a motion is going to use that

23    footnote even though they're supposed to.  We'll figure that

24    out.  Okay?

25          MR. LINSEY:  Understood.  And I don't think it's

1    something we feel strongly about as long as the Court

2    approves a form of caption to go on the case.

3            THE COURT:  Yes.  The caption will be

4    substantially, if not the exact form that you've proposed.

5    I've just seen, as I said, in other cases where the second

6    case caption appears as well and then it just says jointly

7    administered under 22-50073, you know, and all pleadings

8    shall be filed in that case.  Okay?

9            MR. LINSEY:  Understood, Your Honor.

10           THE COURT:  We'll figure it out.  I have no

11   problem with the motion.  It makes sense under the

12   circumstances as presented in the motion for joint

13   administration filed in both of the cases.

14           The motion will be granted in both of the cases.

15   The order will enter in both of the cases.  But that -- it

16   will direct that all future pleadings will be filed only in

17   case number 22-50073.  Okay?  So that motion is granted.

18           MR. LINSEY:  Thank you, Your Honor.

19           THE COURT:  Thank you.

20           Now, with regard to the extension of time to file

21   schedules, would you like to be heard on that motion?

22           MR. LINSEY:  I would, Your Honor.

23           THE COURT:  Go right ahead.

24           MR. LINSEY:  And I will say that that motion was

25   filed by the Genever BVI debtor in the Genever BVI case.  It

1    was served pursuant to the Court's hearing order and a

2    certificate of service was filed yesterday evening.

3           I did have discussions with Ms. Claiborn of the

4    U.S. Trustee's Office about that motion.

5           The motion requests a 45-day extension of time in

6    addition to the 14 days provided under the code to file

7    schedules and a statement of financial affairs.

8           My understanding, and Ms. Claiborn will correct me

9    if she thinks anything I say is wrong or incomplete, is that

10   the U.S. Trustee's Office would be more comfortable with an

11   initial extension of 30 days total to file -- for the

12   Genever BVI debtor to file a schedule and statement of

13   financial affairs.

14          That said, there are discussions that have already

15   started, and I believe productive, with the U.S. Trustee's

16   Office about scheduling and administrative matters in this

17   case.

18          For one thing, Ms. Abrehart, the sole director of

19   the Genever BVI debtor, is located in the British Virgin

20   Islands.  So, for example, we're seeking to have her

21   attendance at the 341 meeting done remotely.  That's not an

22   issue for today, but it is to say there are some sort of

23   intricacies here that don't arise in every case.

24          So I think that what the U.S. Trustee's Office and

25   my office understands is there's going to a continuing

1    dialog about the time frame to file those documents.  And if

2    the Genever BVI debtor believes that further extension is

3    warranted, then we will discuss that with the U.S. Trustee's

4    Office and make an appropriate motion.

5           However, at the present time, all that the Genever

6    BVI debtor would ask for on agreement with the U.S.

7    Trustee's Office is that extension of time to a total of 30

8    days.  And my office will file a proposed order later today

9    reflecting that resolution to the extent that Your Honor is

10   comfortable with it.

11          THE COURT:  Okay.  Thank you.

12          Attorney Claiborn?

13          MS. CLAIBORN:  Thank you, Your Honor.

14          That is a correct statement of the U.S. Trustee's

15   position.  Should the debtor find itself in a position where

16   it needs an additional extension of time, it certainly has

17   the right to ask for that and we can address that situation

18   at that time.

19          And then I wanted to let the Court know that we

20   have scheduled the initial debtor interview consistent with

21   Ms. Abrehart's schedule and we have scheduled the 341

22   meeting for November 7th.

23          THE COURT:  Okay.  Thank you.  I appreciate that.

24          Does anyone else wish to be heard on the motion to

25   extend time to file schedules and financial affairs?

1          MR. FRIEDMAN:  Your Honor, it's Peter Friedman.

2          We agree with the U.S. Trustee's position.  We're

3   glad that the trustee and U.S. Trustee have worked together

4   to design a relatively short order time frame in the initial

5   request.  And to the extent that there are additional

6   requests, we would just ask to be included in the

7   discussions.

8          We're, therefore, happy to seek -- it sounds like

9   this case will -- the Genever case will move forward

10  expeditiously.  We do think it's really important to keep

11  forward momentum in all these cases.

12         THE COURT:  Okay.  Thank you.

13         Anyone else wish to be heard?

14     (No response)

15         THE COURT:  Okay.  Attorney Linsey, so you will

16  submit a revised proposed order, you and Attorney Claiborn,

17  at or before 5:00 p.m. today.  Do you think you'll get it in

18  by 5:00?

19         MR. LINSEY:  Yes, Your Honor.

20         THE COURT:  Okay.  All right.  So then the motion

21  is granted for the reasons stated on the record and the

22  revised proposed order will be submitted at or before 5:00

23  p.m. on October 13.

24         I just have a question about the list of 20

25  largest that was filed with the petition.  Obviously, you

1    need time to figure out if there are other creditors.

2            Do you have any information at this point with

3    regard to any additional creditors other than the list of 20

4    that was filed with the -- and it's just a question, I'm

5    just curious -- other than what was filed with the petition?

6            MR. LINSEY:  There is a creditors' list I believe

7    that was filed as part of the petition that goes beyond the

8    list of 20.

9            THE COURT:  Oh, I might not have seen that then.

10           MR. LINSEY:  So --

11           THE COURT:  Was this just filed the other day?

12   Was this filed on Tuesday or --

13           MR. LINSEY:  It was just filed on Tuesday, Your

14   Honor, so I wouldn't expect that Your Honor had time to go

15   -- it's a stack.

16           THE COURT:  Okay.  That's fine then.

17           MR. LINSEY:  But I'll save --

18           THE COURT:  Thank you.

19           MR. LINSEY:  I'll save Your Honor some time

20   though.  It's roughly equivalent if not entirely equivalent

21   to the debtor's -- rather the individual debtor's creditors

22   as scheduled and as reflected in proofs of claim that were

23   filed in the individual debtor's case.

24           THE COURT:  Okay.

25           MR. LINSEY:  The idea there is that, as PAX has

1    asserted, PAX has asserted that Genever BVI is an alter ego

2    of the debtor, of the individual debtor, and so, therefore,

3    the individual debtor's creditors would also be creditors of

4    the Genever BVI debtor.

5            And, obviously, you know, with respect to noticing

6    creditors, we want to be sure to include everyone so that's

7    what we've done.

8            THE COURT:  Okay.  Thank you.

9            The reason I asked that question, Attorney Romney

10   and Attorney Henzy, with regard to the debtor's schedules

11   that were filed I think on March 9th before you were both

12   involved, the schedules, specifically the schedule of

13   unsecured creditors, has additional names of creditors than

14   the creditor list that was filed with the petition.

15           So you're going to need to amend your list of

16   creditors in the -- in the debtor's case to comply with the

17   -- to list all the parties that are on the schedules.

18           Our local rules say that, but we don't have a

19   process, by the way, in place that allows the debtor to

20   verify that and that it hasn't been done in the debtor's

21   case.

22           So, for example, in the list of -- the list of

23   creditors that was filed with the petition does not have the

24   first three or four people that are listed, and it has more

25   -- I'm just giving you an example, there's more, you'll have

1    to compare them -- that doesn't have the first three or four

2    listed creditors that are on Schedules E and F filed by the

3    debtor on March 9. So you'll have to file an amended list of

4    creditors.

5         And I'm not going to give you a lot of time to do

6    that because we're going to start -- if these cases are

7    jointly administered, everybody's going to have to get

8    served with everything, right, so we want to make sure that

9    service is robust and accurate.

10        So today's the 13th.  Do you think you can file

11   that amended list of creditors by next Wednesday, the 19th?

12        MR. DESPINS:  Actually, Your Honor, I apologize

13   for the interruption.  This is Luc Despins, Chapter 11

14   Trustee.  I can shed some light into the issue that I think

15   would be beneficial for the Court.  And I apologize for

16   interrupting.

17        THE COURT:  Go ahead.

18        MR. DESPINS:  I think that you are right.  The

19   list is different, but that's not an accident.

20        The debtors in the individual case listed

21   affiliates as part of the 20 largest which they were not

22   supposed to do.  I'm not -- I don't want to get into a

23   sidebar over that issue, but the point is that the

24   affiliates are not supposed to be there.

25        So, for example, they listed I think Bravo Luck

1    and other entities like Golden Spring in the 20 largest.

2    And we did not do that, not because we don't like them, but

3    because they don't belong there.  That's the discrepancy,

4    Your Honor.  I wanted to shed some light.

5            So it's not because the list is different.  It's

6    just that they don't belong in 20 largest because they're

7    affiliates of the debtor.  Sorry for the interruption.

8            THE COURT:  But on the actual schedules, Trustee

9    Despins, there are a number of entities that are listed and

10   that are not part of the creditor list that gets sent to --

11   when things are served by the Court and that's what I'm

12   concerned about.

13           MR. DESPINS:  Okay.  Okay.

14           THE COURT:  And it's not just the Schedule F, it's

15   also the Schedule H.  It's the executory contracts, parties

16   to the executory contracts.

17           I don't think that he listed any co-debtors,

18   although I'd need you to check that.  Okay?

19           MR. DESPINS:  Okay.

20           THE COURT:  All I want -- all I'm requiring the

21   debtor to do is to file an amended list of creditors that is

22   in compliance with our local rule that says the list of --

23   the creditor list is supposed to include all of the names.

24           And I've -- I'll read it to you.  I think it says

25   on the schedules and I think it lists all the schedules on

1   the local rule.  It's Local Rule 1000 -- I don't know if

2   it's 7 or 17.  I think it's 7 actually.  Yes, 7.

3          It says a creditor list containing the names and

4   addresses of each individual entity included or to be

5   included in Schedules D, E, F, G and H shall be filed

6   contemporaneously with every petition or within 14 days

7   after the entry.

8          And obviously you've got -- your client, you don't

9   know, you weren't involved, but they got an extension of

10  time on March 9th and they complied with the time frame.

11         But the difference is that the actual creditor

12  list that the clerk's office uses to serve people, when the

13  clerk's office has to serve, is not -- does not match up

14  with the names in the schedules as required by the local

15  rule.

16         So is that -- can you file that by the close of

17  business on October 19th?

18         MR. HENZY:  Well, can I ask a question first, Your

19  Honor?

20         THE COURT:  Sure.

21         MR. HENZY:  And I promise I'm not trying to argue

22  with either you or trustee Despins. I just want to make --

23  I'm a little bit -- I want to make sure I understand what

24  Your Honor is asking because I think anyway Trustee Despins

25  was referring to a discrepancy between the creditor list

1      he's filed with the new Genever BVI case -- and he's shaking

2      his head yes -- and what's filed --

3                THE COURT:  I agree with that.

4                MR. HENZY:  Okay.  And that's --

5                THE COURT:  I'm just talking about the debtor's

6      case.

7                MR. HENZY:  You're -- so I don't --

8                THE COURT:  I'm not talking about Genever Holding,

9      Genever, how are we -- what is the proper pronunciation?

10               MR. HENZY:  I think Genever BVI everybody --

11               THE COURT:  Genever.  Genever.

12               MR. HENZY:  -- understands what -- yeah.

13               THE COURT:  Okay.

14               MR. HENZY:  But --

15               THE COURT:  In a Genever case, I'm not talking

16     about that.

17               MR. HENZY:  So I don't --

18               THE COURT:  I'm speaking specifically with Mr.

19     Kwok and the schedules that he filed on March 9th.

20               MR. HENZY:  That he filed.  Understood.  Okay.

21               Then I would ask for more time, Your Honor.  I

22     wasn't -- we were not involved.  My understanding is that

23     the Verdolino & Lowey firm did a lot of the work getting the

24     schedules done.  I know we now don't have the advantage of

25     having the Verdolino & Lowey people around so I just don't

1    know, because this is the first I've heard of this.

2            THE COURT:  It's not substantial.  We're talking

3    maybe 20, 30 different names.  But I'll give you a week.

4    I'll give you from today and that's it.  It's got to get

5    done.

6            MR. HENZY:  So --

7            THE COURT:  Service.  There are things that have

8    been served in that case that have not been served on

9    parties listed on the debtor's schedules and that's the way

10   it's supposed to be.

11           MR. HENZY:  So --

12           THE COURT:  No.  Today, the 20th.

13           MR. HENZY:  So the 20th.

14           THE COURT:  Thursday, the 20th, that's a week from

15   today.

16           MR. HENZY:  Okay.

17           THE COURT:  An amended list of creditors needs to

18   be filed and uploaded.  You know, you have to upload it so

19   that the clerk's office can use it appropriately for service

20   issues.

21           MR. HENZY:  Okay.

22           THE COURT:  Okay?

23           MR. HENZY:  I'm going to do the best I can.

24           THE COURT:  It's not substantial.  Okay?

25           MR. HENZY:  I appreciate -- okay.  I just don't --

1    I just, you know --

2          THE COURT:  At least from my review of it.  I

3    looked at it, and I said, oh, it appears that there are

4    parties on these schedules that aren't getting served by the

5    bankruptcy noticing --

6          MR. HENZY:  I see.

7          THE COURT:  -- center when we issue a notice that

8    is required to be issued under Rule 2002.

9          MR. HENZY:  I see, Your Honor.  So just -- and

10   I'll look at it, Your Honor.  So it's there's people who are

11   scheduled who aren't on the matrix, is that --

12         THE COURT:  Correct.  The creditor list we call it

13   --

14         MR. HENZY:  So those people --

15         THE COURT:  -- but the same thing, yes.

16         MR. HENZY:  -- those people need to be put on the

17   creditor list.

18         THE COURT:  That's what -- so you need to amend

19   the -- you need to file an amended creditor list.

20         MR. HENZY:  Okay.

21         THE COURT:  And that, I think, unfortunately,

22   results in like a fee of $32 or something.

23         MR. HENZY:  Okay.  Understood.

24         THE COURT:  Because the -- it is -- but, as you

25   think you know, the bankruptcy noticing center serves who is

1    on the creditor list.  If those people -- if there are

2    people on the schedules that are not on the creditor list,

3    they're not getting served.

4              MR. HENZY:  Your Honor, if this is -- so this is

5    something my firm can do.  That's easy.

6              THE COURT:  Yeah, I think it is.

7              MR. HENZY:  Okay.

8              THE COURT:  I mean, I'm telling you, this is not

9    -- all you're doing is filing an amended creditor list with

10   the names that appear in the schedules that don't already

11   appear on the creditor list.

12             MR. HENZY:  I understand now what --

13             THE COURT:  Okay.

14             MR. HENZY:  -- needs to be done.  And it should --

15             THE COURT:  That's all.  It's just --

16             MR. HENZY:  -- be easily done by the 20th, Your

17   Honor.

18             THE COURT:  It's just, you know, we -- because

19   there's a presumption when a petition is filed and a

20   creditor list is filed and the schedules are filed at the

21   same time that they all have the same information.  In this

22   case -- but that's not necessarily true by the way, but

23   that's the presumption, right?

24             In this case, the schedules weren't filed -- in

25   this case, I'm talking about Mr. Kwok's personal Chapter 11

1    case, the schedules weren't filed until almost a month after

2    -- he got -- they were timely filed.  He got an extension of

3    time.  But when they were filed, no one ensured that the

4    names on the schedules matched the names on the creditor

5    list and they don't.

6              MR. HENZY:  I'm now on the Court's page.  I

7    understand.

8              THE COURT:  Okay.  That's all I'm asking you to

9    do.  Okay?

10             MR. HENZY:  Yeah.  Thank you, Your Honor.

11             THE COURT:  I'm actually ordering you to do it by

12   next Thursday, the 20th.

13             MR. HENZY:  I was taking it as an order, not a

14   request, Your Honor.

15             THE COURT:  Okay.  Thank you.  Thank you.  Okay.

16   All right.

17             The only other thing that I -- it's not on the

18   calendar, but I didn't know if the parties have had any

19   discussions about, is HK International's request for an

20   extension of time to file a responsive pleading to the

21   counterclaim in the adversary proceeding.  They're seeking

22   an extension of time.

23             Mr. Romney, you're seeking an extension of time

24   until November 15 is my understanding of the motion.

25             I have no problem with that extension of time with

1    the understanding that it nowhere -- it has no impact on the

2    commencement and this court conducting the evidentiary

3    hearing on the prejudgment remedy that's scheduled for

4    October 31st, November 1st and November 2nd.

5              MR. ROMNEY:  Aaron Romney for the record on behalf

6    of HK.

7              That's correct.  The intention was to allow HK and

8    the trustee and any other party in interest to focus on the

9    PJR hearing and not a responsive pleading.

10             THE COURT:  Okay.  Does anyone -- thank you.

11             Does anyone have any objection to the HK's motion

12   for extension of time?

13             And if you have had time to talk about it, that's

14   fine, but I want to know the position because I think it can

15   be granted unless someone tells me some reason why it

16   shouldn't be.

17             MR. DESPINS:  The trustee has no objection, Your

18   Honor.

19             THE COURT:  Okay.  Good.  Then we can take care of

20   that matter and we'll enter an order extending the time for

21   HK International to respond to the counterclaim in the

22   adversary proceeding that HK commenced in Mr. Kwok's

23   individual Chapter 11 case.

24             MR. ROMNEY:  Thank you, Your Honor.

25             THE COURT:  Thank you.

1    All right.  So is there anything else we're going

2    to discuss today?

3    I'm obviously going to go -- maybe it's not

4    obvious to you, but I'm going to go back and listen to or

5    review what you all just argued with regard to the trustee's

6    motion for an order of compliance, and I will rule probably,

7    if not by tomorrow, Monday at the latest.

8    Does anyone -- is there any other matter that we

9    need to address today?

10    MR. DESPINS:  Yes, Your Honor.  For the record,

11    Luc Despins, Chapter 11 Trustee.

12    Your Honor, there are a couple of things I wanted

13    to mention.  The first one is Mr. Linsey mentioned that we

14    filed this complaint in the case where I'm the trustee to

15    avoid this trust agreement between the son and Mr. Kwok.

16    And I want to let you know -- and he also

17    mentioned that a similar action was filed in front of Judge

18    Garrity.

19    And I -- and, you know, and that was filed by the

20    debtor in that case, that we control because we now have the

21    shares. And I want to explain the rationale to that because

22    you might say, well, wait a minute, aren't you trying to

23    transfer this case here?

24    And the reason being why we have to file this is

25    because the two-year Section 546 limitation period was

1    expiring on October 12th in that case, because we're

2    alleging that the trust agreement is a fraudulent transfer.

3           And so, therefore, we have no choice but to file

4    that action there even though the venue motion had not been

5    granted yet.

6           So we had to file it there, otherwise we'd be time

7    barred or may have been time barred I should say, and that's

8    why we did that.  And obviously, if we're going to do that,

9    then we filed it in this case as well.

10          There are three entities that are parties, or,

11   sorry -- on our side of the issues, there are three entities

12   that are a party to this trust -- I suppose trust agreement.

13   There's Mr. Kwok, Genever BVI, that's the entity that just

14   filed before Your Honor, and Genever USA that's before Judge

15   Garrity.  So that's why this complaint was filed there

16   because the two years was about to expire.  That's one

17   thing.

18          And, by the way, this is an extensive complaint.

19   We tried to avoid the cost of doing that by contacting Bravo

20   Luck's counsel to say, hey, would you agree to tolling of

21   the two-year period?  They never responded so we had no

22   choice but to file the action.  That's one thing I want to

23   mention.

24          The second one is we filed this motion to expedite

25   the hearing on our motion for contempt regarding Ace Decade

1    and its subsidiary Dawn State.

2            We had suggested the week of the 24th for a

3    hearing on that because, again, we need -- you know, this

4    has been pending now for more than a month.  The argument is

5    that he doesn't own it.  Fine.

6            Let's have an evidentiary hearing on that because

7    we believe he's in contempt of the corporate governance

8    order.  And so we would ask the Court to schedule a hearing

9    on that so that we can get that issue determined.

10           As you know, that relates to the UBS litigation

11   and this could be a back door for us to resolve some issues

12   involving privilege there.  But I don't want to say that

13   it's a full solution.  We don't know that yet.

14           But certainly we believe he owns it and we should

15   get control of these two entities.  And, therefore, we would

16   like the Court, subject obviously to your schedule, to

17   schedule something on that for the week of the 24th of

18   October.  And we filed a motion to seek that.

19           I don't think it's been objected to.  By the way,

20   I'm not saying that they're not objecting.  I'm just saying

21   I don't think it's been objected to formally by the debtor.

22           THE COURT:  Okay.  Thank you.

23           Attorney Henzy?

24           MR. HENZY:  I'm not going to object to that

25   hearing being scheduled.

1        But I -- I would be the person principally

2    handling that and the week of the 24th I cannot do, Your

3    Honor.  I'm going to be in a mediation ordered by Judge

4    Tancredi  and then I have a trial in state court.

5        So, again, I'm not objecting to scheduling, but

6    the week of the 24th, I --

7        THE COURT:  Well, if I schedule it the week of the

8    24th, then you are objecting because --

9        MR. HENZY:  I'm objecting --

10       THE COURT:  -- you can't be there.

11       MR. HENZY:  I'm objecting to it being scheduled

12   the week of the 24th, yes, Your Honor.  Yes.

13       THE COURT:  Trustee Despins, did you hear what

14   Attorney Henzy just said?

15       MR. DESPINS:  Yeah, I did.

16       MR. HENZY:  He doesn't care.

17       THE COURT:  That's not -- I --

18       MR. HENZY:  Oh, no, I think it is fair.  I think

19   it is fair.  He's about -- he might not say that, but I

20   think that's the answer, but that's okay.

21       THE COURT:  Well, he filed a motion for an

22   expedited hearing.  He's asking for it to be set.  And

23   you're telling him that you can't be there that week.  And I

24   don't know what -- I'll have to figure out what to do with

25   that.

Ho Wan Kwok - October 13, 2022                    106

1    MR. DESPINS:  It's been pending for more than a

2    month now.  So, you know, it may be we -- well, I don't know

3    if we can do it next week then.  I don't know.

4         And it cannot be the first week of November

5    because we're going to be fully engulfed in this -- in the,

6    you know, the prejudgment remedy matter.

7         THE COURT:  Attorney Henzy?

8         MR. HENZY:  Next week I'm going to be fully

9    engulfed in potentially reviewing documents which actually I

10   wanted to ask Your Honor a question about.  But I'm not

11   sure, Your Honor, what the hurry is.  But I'm not sure what

12   the hurry --

13        MR. DESPINS:  Your Honor, the hurry is that we're

14   supposed to have control of these entities.  We're being

15   deprived of control -- of access to privilege in relation --

16   for to those entities because that's the same counsel

17   representing Mr. Kwok and those two entities.

18        And so to say there's no rush, I don't know what

19   to say about that.  It's been ten -- we're not rushing,

20   meaning we've asked for this for a while now.

21        And if we are correct that he owns it, the rush is

22   that he's just disregarding this case completely.  So I

23   don't know what to say about the issue of no rush.

24        THE COURT:  Okay.  Anything further, Attorney

25   Henzy?

1          MR. HENZY:  On an unrelated or --

2          THE COURT:  So nothing further on this request

3   that the Court schedule an expedited hearing on the motion

4   for contempt?

5          MR. HENZY:  Your Honor, I cannot do it the week of

6   the 24th.

7          THE COURT:  Okay.

8          MR. HENZY:  And next week I think is too soon.

9   It's now Thursday at 12 o'clock.  And I think it's -- I

10  think it's too soon.

11         Mr. Despins has had the ability since almost day

12  one to get an awful lot of information about the UBS

13  litigation.  It's been his choice.

14         I've offered multiple times to work with counsel

15  in the U.K. to answer questions to provide information that

16  was not going to create privilege issues and he has decided

17  not to take me up on that and I think to take U.K. counsel

18  up on that.

19         So it's not that he's just being prevented from

20  getting any and all information or understanding what's

21  going on in that litigation.

22         I'm not aware, right now, Your Honor -- my

23  understanding is that there is an appeal pending in that

24  litigation and there's not a -- as I understand it, there's

25  not a whole lot that's happening right now because the time

1    for that appeal to happen has been pushed out and that's

2    just sort of, you know, I mean, it's just sort of sitting

3    there.  That's my understanding.

4         So I don't think it's something happening next

5    week or the week after next week or something like that that

6    if Mr. Despins doesn't have some information right now that

7    that's going to be a big problem.

8         So I think next week is too soon.  As I said, I

9    cannot do the week of the 24th.  And so if, you know, the

10   Court's going to schedule a hearing, I would ask that it be

11   sometime after that.

12        MR. FRIEDMAN:  Your Honor, may I be heard?

13        THE COURT:  Yes.

14        MR. FRIEDMAN:  It's Peter Friedman from O'Melveny

15   on behalf of Pax.

16        THE COURT:  Yes.

17        MR. FRIEDMAN:  I just want to point out that we

18   have a party that hid and evaded assets for years before

19   bankruptcy, filed for bankruptcy in February, was a

20   faithless fiduciary to the point where he had a trustee

21   appointed.  It's now been three months since Mr. Despins was

22   appointed and we still have delay.

23        We're the largest creditor in this case.  We are

24   owed more than $250 million.  We need somebody empowered in

25   this case as quickly as possible to have full reign over the

1     debtor's assets to marshal them to our behalf.  PAX is owed

2     an enormous amount of money.

3             We just think further delay on a basic blocking

4     and tackling issue like this is deeply prejudicial to us.

5     So we would strongly, strongly endorse Mr. Despins' position

6     that this go forward as soon as possible.  Thank you, Your

7     Honor.

8             THE COURT:  Thank you.

9             All right.  I will take a look at the motion for

10    an expedited hearing after we conclude today's hearing and

11    will rule on that accordingly.

12            MR. HENZY:  My last question, I guess, Your Honor,

13    and you may tell me it's I've got to do what I've got to do,

14    you know, I received 4,100 documents last night.  I'd rather

15    not and I'd not have one or probably two other people from

16    my office work through the weekend to review those documents

17    if there's going to be an order that says it's pointless.

18            THE COURT:  What do you mean if there's going to

19    be an order that says it's pointless?

20            MR. HENZY:  If you're going to enter an order on -

21    - tomorrow or Monday that says Brown Rudnick is to

22    immediately produce all documents, then --

23            THE COURT:  Wouldn't you still have the right

24    under paragraph 7 to assert whatever privilege you want with

25    regard to those documents?

1          MR. HENZY:  I suppose.  I suppose I can try to

2     claw documents back, so maybe that's the answer, Your Honor.

3     I'm going to need to look at them anyway.

4          THE COURT:  I think that's what the order already

5     provides for actually.

6          MR. HENZY:  That's fine, Your Honor.

7          THE COURT:  I think it does.

8          MR. HENZY:  Understood.

9          THE COURT:  I think that's what it says.

10          MR. HENZY:  Understood.

11          THE COURT:  Okay.  All right.  Anything further

12     from anyone else?

13          MR. DESPINS:  No, Your Honor.

14          THE COURT:  All right.  So I'm going to look at

15     the motion, the trustee's motion, for an order authorizing

16     compliance with the Rule 2004 subpoenas and rule on that, as

17     well as the motion for an expedited hearing on the motion

18     for contempt.

19          And to be clear, I think I have been clear, but

20     just to reiterate, the hearing, the evidentiary hearing,

21     scheduled to begin on October 31st on the application for

22     prejudgment remedy will be an in-person hearing.

23          You already all have the dates for compliance as

24     far as when a list of witnesses and exhibits need to be

25     filed.  And the exhibits need to be in PDF format.

1          And what I would require or request is that the

2     trustee's exhibits, you know, say Trustee Exhibit 1 through

3     whatever.  And if the debtor says, you know, Debtor's or

4     Kwok Exhibit 1.  I just use numbers.  And then I use an

5     identifier of the party.  Okay?  I'd like you to do that on

6     those exhibits.  And I think that's all for today.  Okay?

7          So we have no other matters on the calendar today

8     so court is adjourned.

9          (Proceedings adjourned at 11:59 a.m.)

10    I, CHRISTINE FIORE, Certified Electronic Court Reporter and

11    Transcriber, certify that the foregoing is a correct

12    transcript from the official electronic sound recording of

13    the proceedings in the above-entitled matter.

14

15          *Christine Fiore*

16    _____          October 21, 2022

17        Christine Fiore, CERT

18

19

20

21

22

23

24