```
                 UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF CONNECTICUT
                      BRIDGEPORT DIVISION

In Re                        *   Case No. 22-50073 (JAM)
                             *
HO WAN KWOK, GENEVER HOLDINGS *   Bridgeport, Connecticut
 CORPORATION and GENEVER     *   November 30, 2022
 HOLDINGS, LLC,              *
                             *
              Debtor.        *
                             *
* * * * * * * * * * * * * * *
```

        TRANSCRIPT OF APPLICATION TO EMPLOY NEUBERT, PEPE &
          MONTEITH, P.C. AS DEBTOR GENEVER HOLDINGS LLC's
         CO-COUNSEL; MOTION TO SEAL RE STATEMENT OF CHAPTER 11
          TRUSTEE; MOTION FOR 2004 EXAMINATION OF ADD'L LEGAL
           AND FINANCIAL ADVISORS TO THE DEBTOR, ENTITIES AND
               INDIVIDUALS AFFILIATED W/DEBTOR and RELEVANT
         MEDIA COMPANIES AND BANK (SECOND SUPPLEMENTAL OMNIBUS);
            MOTION OF CHAPTER 11 TRUSTEE FOR ENTRY OF ORDER
        COMPELLING INDIVIDUAL DEBTOR, MEI GUO, HK INTL, HING CHI
       NGOK, GREENWICH LAND LLC, LAMP CAPITAL LLC AND GOLDEN SPRING
              TO COMPLY W/RULE 2004 SUBPOENAS and
                   MOTION FOR PROTECTIVE ORDER
            BEFORE THE HONORABLE JULIE A. MANNING
                UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For the Debtor, HK          AARON ROMNEY, ESQ.
 International and          STEPHEN KINDSETH, ESQ.
 Mei Guo:                   JAMES MORIARTY, ESQ.
                           Zeisler & Zeisler, P.C.
                           10 Middle Street, 15th Floor
                           Bridgeport, CT  06604


For the Chapter 11 Trustee:  AVRAM EMMANUEL LUFT, ESQ.
                           Paul Hastings LLP
                           200 Park Avenue
                           New York, NY  10166



Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

```
APPEARANCES: (Cont'd.)

For the Creditor, Pacific        ANNECCA SMITH, ESQ.
 Alliance Asia Opportunity       Robinson & Cole
 Fund L.P.:                      28 Trumbull Street
                                 Hartford, CT  06103

                                 STUART SARNOFF, ESQ.
                                 O'Melveny & Myers LLP
                                 Times Square Tower
                                 7 Times Square
                                 New York, NY  10036

For the Chapter 11 Trustee:      DOUGLAS G. SKALKA, ESQ.
                                 Neubert, Pepe and Monteith
                                 195 Church Street
                                 New Haven, CT  06510

Chapter 11 Trustee:              LUC A. DESPINS, ESQ.
                                 Paul Hastings LLP
                                 200 Park Avenue
                                 New York, NY  10166

For the U.S. Trustee:            HOLLEY L. CLAIBORN, ESQ.
                                 Office of the United States
                                    Trustee
                                 The Giaimo Federal Building
                                 150 Court Street, Room 302
                                 New Haven, CT  06510

For the Creditors Committee:     IRVE GOLDMAN, ESQ.
                                 Pullman & Comley
                                 850 Main Street
                                 Bridgeport, CT  06601
```

1          (Proceedings commenced at 11:10 a.m.)

2              THE COURTROOM DEPUTY:  Case no. 22-50073, Ho Wan

3     Kwok.

4              THE COURT:  Good morning.  If we could have

5     appearances for the record starting with the Chapter 11

6     Trustee, please.

7              MR. DESPINS:  Good morning, Your Honor.  Luc

8     Despins, Chapter 11 Trustee.

9              THE COURT:  Good morning.

10             MR. LUFT:  Good morning, Your Honor.  Avi Luft, of

11     Paul Hastings, on behalf of the Chapter 11 Trustee.

12             THE COURT:  Good morning.

13             THE COURTROOM DEPUTY:  Sorry, I didn't get your

14     name.  I'm sorry.

15             MR. LUFT:  Sure.  It is Avi, A-V-I, last name

16     Luft, L-U-F-T.

17             THE COURT:  And Attorney Luft has an appearance in

18     the case --

19             THE COURTROOM DEPUTY:  Thank you.

20             THE COURT:  -- I believe.

21             MR. LUFT:  I do, Your Honor.

22             THE COURT:  I think I've seen it.  Thank you.

23             Counsel for PAX?

24             Oh, I'm sorry.  Attorney Skalka, did want to be

25     heard first?

1          MR. SKALKA:  No, Your Honor.

2          Just to be consistent with the trustee's

3    representation, Douglas Skalka, Neubert, Pepe and Monteith,

4    on behalf of -- as local counsel for the trustee, and also

5    here on behalf of Genever Holdings Corporation and Genever

6    Holdings --

7          THE COURT:  I cannot hear you, for whatever

8    reason.

9          MR. SKALKA:  Oh, I'm sorry.

10         Douglas Skalka, Neubert, Pepe and Monteith, as

11   local counsel for the Chapter 11 Trustee, as well as counsel

12   for Genever Holdings Corporation and Genever Holdings, LLC.

13         THE COURT:  Thank you.  Sorry.  For whatever

14   reason that was not picking up your voice, so I apologize,

15   but we just want to make sure we hear everyone properly.

16         MR. SARNOFF:  Stuart Sarnoff, O'Melveny & Myers,

17   on behalf of Creditor PAX.

18         THE COURT:  Good morning.

19         MS. SMITH:  Annecca Smith, Robinson and Cole,

20   Connecticut counsel for PAX.

21         THE COURT:  Good morning.

22         MS. CLAIBORN:  Good morning.  Holley Claiborn for

23   the U.S. Trustee.

24         THE COURT:  Good morning.

25         MR. GOLDMAN:  Good morning, Your Honor.  Irve

1    Goldman, Pullman and Comley, representing the creditors

2    committee.

3              THE COURT:  Good morning.

4              MR. KINDSETH:  Good morning, Your Honor.  Stephen

5    Kindseth, Zeisler & Zeisler, for the debtor, Ho Wan Kwok, as

6    well as Mei Guo and HK International.

7              THE COURT:  Good morning.

8              MR. ROMNEY:  Good morning, Your Honor.  Aaron

9    Romney, Zeisler & Zeisler, also for the debtor, HK

10   International and Mei Guo.

11             THE COURT:  Good morning.

12             MR. MORIARTY:  Good morning, Your Honor.  James

13   Moriarty, Zeisler & Zeisler, for the same parties.

14             THE COURT:  Good morning.

15             Okay.  We have, as I said, I stated, we have five

16   matters on the calendar in the main case and I'd like to

17   take the matters in the order in which they appear in the

18   calendar.

19             Which is, first, Attorney Skalka, the application

20   to employ that was filed in the main case.  So would you

21   please proceed.

22             MR. SKALKA:  Yes.  Good morning, Your Honor.

23   Again, Douglas Skalka, Neubert, Pepe & Monteith, here on my

24   firm's application to be retained as co-counsel in the

25   Genever Holdings, LLC case.

1      My firm has already been retained as local counsel

2  for the Chapter 11 Trustee and is serving as counsel for

3  Genever Holdings Corporation, which is the parent company of

4  Genever Holdings, LLC.

5      As I believe you know, Your Honor, the Genever

6  Holdings, LLC case had been filed in the Southern District

7  of New York and was transferred to this district a few weeks

8  ago.

9      As a result the trustee and the director of

10  Genever Holdings Corporation asked that my firm appear and

11  be retained to serve as counsel with Goldberg Weprin, who

12  had been the New York counsel on behalf of the debtor.

13      I've received no objection to the retention

14  application.

15      My intention is that my firm would mostly likely

16  be serving more of a lead counsel role, but we'll refer to

17  and rely on Goldberg Weprin for some of the history and

18  background that they've had in the case.

19      And as a result, I'd ask that the retention

20  application be approved.

21      THE COURT:  And that was my only question,

22  essentially, upon reviewing the application is how the

23  roles, how the responsibilities would be split between the

24  two firms because you will be co-counsel.

25      But obviously, as you already know, and I'm sure

1    other counsel knows, we have to just do our best to make

2    sure there's not duplication of efforts and things of that

3    nature.

4            But it sounds like what you're telling me is that

5    you firm will be taking a more active role than co-counsel,

6    but co-counsel may be needed to advise or provide you with

7    additional information that you might not have had because

8    it occurred during the case in New York?

9            MR. SKALKA:  That's correct, Your Honor.

10           THE COURT:  Okay.  Thank you.  I appreciate that.

11           Attorney Claiborn?

12           MS. CLAIBORN:  Thank you, Your Honor.  The U.S.

13   Trustee has no objection.

14           THE COURT:  Okay.  Thank you.

15           Does anyone wish to be heard on the application to

16   employ Neubert, Pepe and Monteith as co-counsel to the

17   debtor in the Genever Holdings, LLC case?

18            Okay.  Hearing nothing, then I, as I stated,

19   Attorney Skalka, I've reviewed the application.  I

20   understand the reason why the debtor's seeking to employ

21   your firm as co-counsel.  The application meets with the

22   requirements of the Bankruptcy Code and rules and our local

23   rules.

24           No one has filed a written objection to your

25   motion, excuse me, to your application.  The United States

1    Trustee's Office has filed a statement of no objection.

2    I've reviewed the proposed order.

3              Oh, Attorney Claiborn, is there something you

4    wanted to add?

5              MS. CLAIBORN:  Just to correct the record, Your

6    Honor, I did not file a statement, but I'm here today

7    telling the Court I have no objection.

8              THE COURT:  Thank you for correcting the record.

9              The United States Trustee has stated on the record

10   that it has no objection to the application to employ

11   Neubert, Pepe and Monteith as co-counsel to the debtor in

12   the Genever Holdings, LLC case which is jointly administered

13   obviously with the other two Chapter 11 cases.

14             I have reviewed the proposed order and I have no

15   questions or concerns about the proposed order.

16             Attorney Claiborn, have you reviewed --

17             MS. CLAIBORN:  I have no concerns with that order,

18   Your Honor.

19             THE COURT:  Okay.  Thank you.

20             Then the application is granted and the proposed

21   order can enter.

22             MR. SKALKA:  Thank you, Your Honor.

23             THE COURT:  Thank you.

24             All right.  Now, turning to the motion to seal in

25   the main case, ECF No. 1134, who will be making that

1    argument?

2              MR. DESPINS:  I will, Your Honor.

3              THE COURT:  Okay.  Thank you.

4              MR. DESPINS:  So as Your Honor knows, we had filed

5    a statement, the statement of the trustee, regarding the

6    social media campaign waged by the debtor.

7              We redacted only information that would be

8    damaging to the parties mentioned because we would be

9    reposting, you know, these things, so we redacted links to

10   that, or addresses or names.  For example, with my

11   daughters, we didn't put the names in there.

12             So we think we redacted it to the minimum extent

13   possible and, therefore, anyone can read this and understand

14   clearly what's going on, but they won't have the exact link

15   to go and find it.

16             Of course, Your Honor and the debtor and other

17   parties that, like the U.S. Trustee, I think have access to

18   that so we would ask that the motion be granted.

19             THE COURT:  Okay.  Thank you.

20             Does anyone else wish to be heard on the motion to

21   seal?

22        (No response.)

23             THE COURT:  Okay.  The motion to seal has been

24   pending for more than a week.  And although a hearing was

25   set on the motion to seal on Monday, no one has filed any

1    opposition to the motion to seal.  There is no one

2    participating in this hearing that is opposing the motion to

3    seal.

4           And under the very specific facts and

5    circumstances of this case, the Court thinks, believes and

6    finds that it is appropriate to seal the redacted statement

7    of the Chapter 11 Trustee.

8           So for the reasons stated on the record, the

9    motion to seal will be granted.

10           And, Trustee Despins, a virtual order will enter

11    that's similar to an order that was entered in the related

12    -- in a related adversary proceeding because you've already

13    redacted a substantial portion.

14           I'm sorry.  I should say just the opposite.

15           The statement that you've filed has limited

16    redactions and so I will be granting the sealing of that

17    document and an order will enter along the same lines very

18    similar provisions as in information that was redacted in

19    the adversary proceeding.  Okay?

20           MR. DESPINS:  Thank you, Your Honor.

21           THE COURT:  All right.  Thank you.

22           That will not enter obviously until later today,

23    but it should enter today.

24           With regard to the next matter, the next matter on

25    the calendar is the motion for 2004 Examinations of

1    additional legal and financial advisors to the debtor filed

2    on behalf of the Chapter 11 Trustee.

3              So who will be arguing that motion?

4              MR. SKALKA:  I will, Your Honor, on behalf of the

5    trustee.  Douglas Skalka of Neubert, Pepe and Monteith.

6              Your Honor, this is the trustee's second

7    supplemental omnibus motion for a series of 2004

8    Examinations.  I believe this is the fourth 2004 Examination

9    motion the trustee has filed since his appointment over the

10   summer.

11             This particular motion seeks to examine up to 53

12   examinees, who are described as advisors, related persons,

13   banks, and vendors who the trustee believes has potentially

14   critical information regarding the individual debtor's

15   finances, assets and liabilities.

16             This motion is similar in structure and format to

17   the other 2004 Examination motions sought by the trustee.

18   In the motion, we describe the various examinees, their

19   relationship to the individual debtor, and why the trustee

20   believes these examinees may have information relevant to

21   this case and as part of his investigation in this case.

22             As I believe Your Honor knows, the trustee has had

23   to undertake a very extensive and broad investigation in

24   this case.  He's received very little cooperation from the

25   debtor in connection with his investigation of the debtor's

1    assets and liabilities.  And this motion, again, is

2    consistent with the previous applications for examinations.

3           The application does note that there is some

4    information sought from specifically two of the examinees

5    related to the Lady May, and those two examinees are

6    described in the motion as Apsley and DWF.  It's the

7    trustee's understanding that Apsley was the seller of the

8    Lady May and DWF had represented Apsley in his sale of the

9    Lady May.

10          The actual document requests sought by the trustee

11   are broad as to these two examinees.  They look for

12   documents just like all the other examinees related to the

13   debtor, the related parties, the family members, the

14   entities described in the application, so it is part of --

15   this effort is part of the trustee's investigation.

16          It is not an effort to skirt or go around the --

17   or to be -- to have discovery in connection with the pending

18   adversary proceeding as noted by the objection filed by HK

19   International.

20          There is very limited requests of other examinees

21   that might touch on the Lady May, but those parties, as

22   described, or those examinees, as far as the trustee knows,

23   are not directly related to the Lady May.  They're not

24   defendants or parties in the pending adversary proceeding

25   and, therefore, the debtor, excuse me, the trustee contends

1    that this discovery, this examination, this investigation is

2    proper and is not subject to the prior pending proceeding

3    doctrine that is raised by the objection filed.

4         So for those reasons, the trustee asks that the

5    application be granted and he be allowed to continue with

6    this examination of the examinees described in the

7    application.

8         THE COURT:  Okay.  Thank you.

9         MR. DESPINS:  Your Honor, just a question of

10   process.

11        I received a message saying that the -- I don't

12   know if it's the AT&T line or the line where people can

13   listen in is not open.  I don't know if that's intentional

14   or not.

15        THE COURT:  It is intentional.

16        MR. DESPINS:  Oh, okay.  Thank you.

17        THE COURT:  It's a public hearing.  If people want

18   to listen, they can come to the courtroom.

19        MR. DESPINS:  Thank you.

20        THE COURT:  Okay?

21        I don't have any questions at this point, Attorney

22   Skalka, thank you.

23        MR. SKALKA:  Thank you, Your Honor.

24        THE COURT:  There is an objection, obviously,

25   filed to your -- to this motion on behalf of Mei Guo and HK

1    International, so who's going to be arguing that objection?

2            MR. MORIARTY:  I will, Your Honor.  James

3    Moriarty.  It seems like the lectern is the place to be

4    today.

5            THE COURT:  Wherever you're comfortable, Attorney

6    Moriarty.

7            MR. MORIARTY:  Thank you.

8            So, Your Honor, the objection that was filed by

9    Ms. Guo and HK International (USA) is limited, and there are

10   two subpoenas that are included with the 53 subpoenas that

11   the trustee is purporting to serve upon the granting of the

12   motion.  One is to Apsley Yachts, Limited.  And the other

13   one is DWFLOP.  And as just described to the Court, Apsley

14   Yachts, Limited is believed to be the seller of the Lady May

15   in 2015.  And DWFLOP, as set forth in the trustee's motion

16   at page 5, is believed to be an entity that represented the

17   seller in connection with the sale of the Lady May.

18           So the only reason to serve these subpoenas is to

19   obtain information regarding the sale of the Lady May.  And

20   the sale of the Lady May is at issue in the adversary

21   proceeding that has been filed by HK USA --

22           THE COURT:  Well, I don't know if the sale of the

23   Lady May is at issue.  The ownership of the Lady May is at

24   issue.

25           MR. MORIARTY:  Okay.  You are correct, Your Honor.

1    The ownership of the Lady May is at issue.  And what this

2    subpoena is seeking is it's seeking documents related to

3    payments for the Lady May.

4            So where did the money come from?  And that goes

5    directly to the issue of ownership.  They're seeking --

6            THE COURT:  Well, that's not necessarily true.  I

7    don't necessarily agree with you on that.  Apsley Yachts,

8    Limited and DWFLOP are not parties to the adversary

9    proceeding.

10           MR. MORIARTY:  Correct, Your Honor.  They're not

11   parties to the adversary proceeding.

12           But the discovery that is being sought via this

13   2004 Exam goes directly to the matters at issue in that

14   adversary proceeding.

15           The trustee alleges that the money for the boat,

16   for the Lady May, came from the debtor.  It initiated from

17   the debtor.  And they're seeking documents from these

18   entities to determine where payment for the Lady May came

19   from.  That goes directly to the issue in the adversary

20   proceeding.

21           And Ms. Guo and HK are entitled to their

22   protections of the federal rules.

23           THE COURT:  They're not being served with a

24   subpoena so what are they entitled, what protection are they

25   entitled to?

1          MR. MORIARTY:  Well, specifically, Your Honor,

2    Rule 45 would provide for a more narrow scope of a subpoena.

3          THE COURT:  Well, that's a protective order.

4    That's not an issue saying that they can't serve them with a

5    subpoena under Rule 2004.

6          MR. MORIARTY:  The other issue, Your Honor -- and

7    of course Ms. Guo and HK would have to have standing to file

8    the protective order in the first instance.

9          And they do have standing to object here because

10   the trustee is trying to make an end-run around the Federal

11   Rules of Bankruptcy Procedure and the Federal Rules of Civil

12   Procedure by serving a 2004 Exam subpoena which would be far

13   broader than the subpoena that could be served pursuant to

14   the Federal Rules which apply in the adversary proceeding.

15         Also, under Rule 45, the trustee would be required

16   to provide counsel for Ms. Guo and HK USA with any documents

17   that they obtain in response to the subpoenas that they're

18   purporting to serve.

19         And I believe that this issue is going to be

20   before the Court at some point in the near future.  The

21   trustee's position is going to be we're not going to give

22   you those documents because they were obtained pursuant to a

23   Rule 2004 subpoena.  We're conducting an investigation.  And

24   anything we obtain pursuant to Rule 2004 is part of that

25   investigation and, therefore, our work product.

1          Under the Federal Rules of Civil Procedure, they

2    would be required to provide any documents obtained from a

3    third party pursuant to a subpoena to Ms. Guo as a

4    counterclaim defendant and to HK as the plaintiff and a

5    counterclaim defendant in that adversary proceeding.

6          There are other subpoenas.  There's a total of I

7    believe 53.  The two we were just discussing, and then

8    there's 43 additional subpoenas, each of which have a

9    specific request that says all documents regarding the Lady

10   May.

11         Under Rule 45, there would have to be a good faith

12   basis to believe that these parties have documents regarding

13   the Lady May.

14         So really what the objection is, Your Honor, is

15   the Apsley Yachts subpoena and the DWFLOP subpoena should

16   not be served pursuant to Rule 2004.

17         To the extent the trustee wants to obtain

18   discovery from those two entities, it should be done in the

19   adversary proceeding.

20         THE COURT:  So why do you have standing?  Why do

21   your clients have standing to object to a subpoena being

22   issued to Apsley Yachts and DWFLOP?

23         MR. MORIARTY:  Because my clients are a plaintiff

24   in an adversary proceeding and counterclaim defendants in an

25   adversary proceeding.

1          THE COURT:  Okay.  In which Apsley Yachts and

2     DWFLOP are not parties?

3          MR. MORIARTY:  Correct, Your Honor.

4          But, they are seeking -- the trustee is seeking

5     discovery pursuant to Rule 2004.  And the cases are legion

6     that once an adversary --

7          THE COURT:  Show me a case where this fact pattern

8     exists in your cases that are legion with regard to parties

9     that aren't named as defendants or parties in an adversary

10    proceeding.

11         MR. MORIARTY:  Well, Your Honor, I don't know that

12    I can find you a case where a party --

13         THE COURT:  Well, isn't -- isn't that what you'd

14    need to do to support your objection?

15         MR. MORIARTY:  Our objection is supported, Your

16    Honor.

17         What I was going to say is if the trustee was

18    going to serve discovery on the parties to the adversary

19    proceeding it would not be done via subpoena.  It would be

20    done via document requests.

21         THE COURT:  Well, you know, he could serve a

22    subpoena in the adversary proceeding on your parties.  He

23    could absolutely do that.

24         MR. MORIARTY:  I agree with you.  But the normal

25    course would be to do it Rule 34 or 7034.

1          So we cite cases beginning on page 3 of the

2     objection, Your Honor.  And, for example, the *In re Enron*

3     case from the Southern District of New York, the *In re*

4     *Bennett Funding* case from the Northern District of New York.

5          And in the *Bennett* case we have a parenthetical.

6     The well-recognized rule is that once an adversary

7     proceeding or contested matter has been commenced, discovery

8     is made pursuant to Rule 7026 et seq. rather than by --

9          THE COURT:  Right.  And that talks about the

10    parties to that adversary proceeding, Counsel.  Those cases

11    talk about you can't seek a 2004 Examination as to a

12    defendant who you've already made a defendant in an

13    adversary proceeding.

14         MR. MORIARTY:  I understand that, Your Honor, but

15    it goes further.

16         So if you look at --

17         THE COURT:  How does it go further?  Show me how

18    it goes further.

19         MR. MORIARTY:  The *In re SunEdison, Inc.* case

20    which we quote at paragraph 7.

21         THE COURT:  Okay.  All right.  Hold on a second.

22    Let me look at the case while we're talking.

23         (Pause.)

24         THE COURT:  On page 3, you don't have a full cite

25    to *SunEdison*.  You just cite the first page -- the page that

1    you're referring to.

2            MR. MORIARTY:  It's a 572 Bankruptcy, Your Honor.

3    And you are correct.  There's a pinpoint cite to page 490.

4            THE COURT:  At 572 Bankruptcy what?  That's not a

5    full cite.

6            MR. MORIARTY:  I agree with you.  There is a

7    typographical error in the objection.

8            THE COURT:  Okay.

9            MR. MORIARTY:  But it's 490 of 572.

10           THE COURT:  I understand that.  But it's not

11   pulling that case up that way, at least what I'm working on

12   is not.

13       (Pause.)

14           THE COURT:  So you're saying it's at 490?

15           MR. MORIARTY:  Yes, Your Honor.

16           THE COURT:  Okay.  Hold on.

17       (Pause.)

18           THE COURT:  Well, in *SunEdison*, the debtors were

19   seeking a Rule 2004 examination against D.E. Shaw Composite

20   Holdings, Inc. and Shaw objected to that because there was

21   already a case pending against Shaw in state court.  That's

22   not the fact pattern we have here.

23           MR. MORIARTY:  What *SunEdison* says at page 490,

24   Your Honor, is the pending proceeding rule is based on the

25   different safeguards that attend Rule 2004 and civil

1    litigation discovery and reflects a concern that a party to

2    a litigation could circumvent his adversary's rights by

3    using Rule 2004.

4              And the rights that would be circumvented here, as

5    I've described, would be the right that the defendants, the

6    counterclaim defendants, and HK as the plaintiff, would have

7    to obtain any documents that the trustee receives pursuant

8    to a subpoena that is served, which those rights don't exist

9    in a Rule 2004 context, and to get pre-notice, which we do

10   have here, of a document subpoena that's being issued, but

11   also the more narrow scope of the subpoena under Rule 45,

12   and those are the rules that are being safeguarded.

13             THE COURT:  Judge Bernstein says that the pending

14   proceeding rule is based on different safeguards that attend

15   civil litigation discovery.  That's what he says.  But he

16   also says that the principle applies to pending state court

17   litigation and that's what he was addressing in this case,

18   in this *SunEdison* case.

19             This is not the fact pattern you have here.  The

20   parties against whom the debtor is -- the trustee is seeking

21   discovery are not parties in the adversary proceeding.

22             MR. MORIARTY:  I cannot dispute that, Your Honor.

23             THE COURT:  Okay.

24             MR. MORIARTY:  What I do dispute is that there are

25   safeguards.  What I do dispute is that the trustee is trying

1    to circumvent safeguards here.  He is trying to circumvent

2    safeguards and those safeguards are built into Rule 45.

3    These safeguards --

4              THE COURT:  And what in -- what in Rule 45 should

5    I be looking at?

6              MR. MORIARTY:  As I said, Your Honor -- and I

7    believe this is in Rule 45, if it's not, it is at least

8    implied in Rule 45 -- and that is that any documents that

9    are obtained pursuant to a subpoena in a litigation have to

10   be provided to your adversary.

11             THE COURT:  Where does it say that?

12             MR. MORIARTY:  As I said, Your Honor, I don't -- I

13   can't pinpoint it for you, but it as a minimum implied that

14   there is an obligation in litigation if you serve a subpoena

15   that you have to then provide the documents to your

16   adversary.  And Rule 45 --

17             THE COURT:  Honestly, that's -- okay.  I don't see

18   anywhere in your papers or any cites that support that claim

19   that you just made or anything in Rule 45 that I'm looking

20   at that supports that claim.

21             MR. MORIARTY:  Rule 45 has a requirement, Your

22   Honor, that before a document subpoena is served that you

23   have to send your adversary a notice of service.  So you

24   have to tell your adversary I'm going to be serving a

25   document subpoena on this third party.  And the reasons are

1    two-fold:  one, to give the adversary an opportunity to

2    object if there's a basis to object; but also it puts the

3    adversary on notice that discovery is being taken from a

4    third party and that that discovery should then be provided

5    to the adversary.

6            THE COURT:  I don't see where in Rule 45 it says

7    what you just said it says.

8            MR. MORIARTY:  Your Honor, as I said, I can't

9    pinpoint it for you right now, but I know for a fact that it

10   is in there.

11           THE COURT:  Okay.

12           MR. MORIARTY:  That requirement to provide pre-

13   notice is in there.

14           THE COURT:  Notice to other parties before service

15   is in Rule 45(a)(3), which says, if subpoena commands the

16   production of documents, electronically stored information,

17   or other tangible claims, or the inspection of premises

18   before trial, then before it is served on the person to whom

19   it's directed, a notice and a copy of the subpoena must be

20   served on each party.

21           Where does it say you then once you get these

22   documents you have to give them to other parties in the

23   lawsuit?  Where does it say that?

24           MR. MORIARTY:  As I said, Your Honor, I'm not

25   telling you that it specifically says that in Rule 45.

1           THE COURT:  Okay.  All right.

2           MR. MORIARTY:  And I do have --

3           THE COURT:  Anything further?

4           MR. MORIARTY:  -- case law cited in my brief, but

5    it is a rule, and at least implied in Rule 45 that that is

6    required.

7           THE COURT:  Okay.  Anything further?

8           MR. MORIARTY:  No, thank you, Your Honor.

9           THE COURT:  Okay.  Thank you.

10          All right.  I'll take this motion under

11   advisement.

12          So let's move on to the next matter on today's

13   calendar, which is the motion of the Chapter 11 Trustee for

14   the entry of an order compelling the debtor, the individual

15   debtor, Mei Guo, and HK International, to comply with the

16   Rule 2004 Examination.

17          Counsel, would you just state your name for the

18   record, please.

19          MR. LUFT:  Yes, Your Honor.  Avi Luft of Paul

20   Hastings on behalf of the trustee.

21          THE COURT:  Thank you.  Sorry, we just need to do

22   that for the audio portion of the hearing.

23          MR. LUFT:  Absolutely.  And if you -- if I can't

24   be heard, please let me know.

25          THE COURT:  Please.  Please proceed.  Sorry, I

1    thought you were talking to me.  But you're right.  The

2    courtroom deputy will let us know if for some reason we

3    can't be heard.  Thank you.

4          MR. LUFT:  Your Honor, the reason we're here today

5    on this matter is because the trustee, pursuant to the 2004

6    order you entered, served subpoenas on the debtor, his

7    daughter, Mei Guo, the entity that she controls, HK USA,

8    which controls the yacht, as well as Golden Spring and Lamp

9    Capital, two entities that theoretically fund everything

10   that the debtor does, yet we have been almost completely

11   stymied in our attempts to get documents from any of these

12   people. And by that, I want to be very specific.

13         The debtor has produced in total 46 documents.

14   That's his claim, that that's all the documents he has in

15   the world.  We have asked over ten years.  We'll get to

16   that.  He's at least said over eight years, that's what he

17   has.  Of those 46 documents, he's found a government

18   stimulus check, some Genever corporate documents, a tax

19   return, and a litigation -- some litigation funding

20   agreements.

21         There is not a single communication.  There is not

22   a single transfer of money, despite the fact that he claims

23   he earns no money and yet lives like a billionaire.  None of

24   that is in any of his documents.

25         His daughter, who purports to own a $30 million

1    yacht, and is alleged to own entities, including Eastern

2    Profit and HK USA, found 19 total documents over that

3    period.

4            Golden Spring and Lamp Capital, they just didn't

5    respond.  Now, Golden Spring's made two appearances in your

6    court prior to asking to withdraw, yet when we served -- we

7    served both of them and they have just been silent.

8            So while they purport to pay for all the debtor's

9    expenses, including I believe this litigation, as well as

10   other litigations, they will not even respond to the trustee

11   to provide any documents.

12           We are getting nothing despite extraordinary

13   amounts of work, multiple meets and confers, multiple

14   attempts to get these documents.  So that -- and, Your

15   Honor, that's the documents that they say they will produce.

16           So now let's go on to what they say they won't

17   produce.

18           Both the debtor, Ms. Guo, and HK USA have said

19   they refuse to search for any documents related to any

20   assets that are not "the debtors."  And I want to be clear

21   here.  By that they mean assets that the debtor admits are

22   his, which Your Honor knows from looking at his schedules

23   amounts to less than $4,000.

24           So they said, well, 2004 is about looking at

25   assets of the debtor.  Well, he only has less than $4,000,

1    so those are the assets of the debtor.

2              They read out the fact that 2004 talks about

3    documents relating to the assets, the fact that this 2004

4    motion was specifically designed to go look for where his

5    assets really are given the fact that he lives like a

6    billionaire.  Given the fact that the courts have found him

7    to use shell companies to hide himself.  That in the case of

8    the Lady May we already have a New York State Court saying

9    of course he's the beneficial owner and controls the yacht.

10   Right?

11             Yet, they're saying nope, we won't give that.

12   With the exception of the Lady May, we'll make an exception,

13   because the Court there, and in the case of Sherry-

14   Netherland, have already made a judicial finding that he, in

15   fact, owns it.  I don't know.  Maybe after the last week Ace

16   Decade can fall under this purview, although, to date, Your

17   Honor, it does not.  Another asset he would have claimed --

18   does not mind -- no one can get any documents about it.

19             Now, of course, the impact of that is to create a

20   null set.  Right?  If you say that the only -- you only have

21   less than $4,000 of assets, and then you say I'll only look

22   for documents relating to what are "my assets," then not

23   surprisingly you say I have no documents and you have no way

24   to look at this.  That's ridiculous.

25             I sat on these calls.  And I couldn't understand

1    what -- given the fact that we filed a 2004 motion, given

2    the Court's clear instruction, when she appointed the

3    trustee, that she wanted this to be investigated if the

4    debtor was really taking the position that the trustee could

5    not look into assets that may be in the possession of other

6    companies, shell companies, family members and what not.

7            So there's a reference in both of the pleadings

8    regarding a Lady May II example.  And I just want to explain

9    it.  There is no Lady May II to my knowledge, Your Honor.

10   But I did want to understand because they have produced

11   documents about the Lady May.

12           So I said if there was an identical yacht in every

13   way to the Lady May, meaning the debtor would have had all

14   the same facts and circumstances that led Judge Ostrager to

15   find them to be the beneficial owner, right, if you had all

16   that stuff about this Lady May, but also similar to the Lady

17   May, Ms. Guo and HK USA would continue to assert that they

18   own it and thus it's not a "asset of the debtor," would you

19   produce documents about that boat?  And I was told, no, we

20   wouldn't, because that would not be an asset of the debtor.

21   They say that in their papers.

22           So, in short, what we have is a rule that they're

23   creating which says -- and the distinction they make is,

24   well, the actual Lady May Judge Ostrager has actually made a

25   ruling on.  And because there's an actual ruling in that

1    case that says that Mr. Kwok is the beneficial owner, that

2    we'll produce.  But if Judge Ostrager has not made such a

3    ruling, then, in fact, we would not produce information on

4    that asset.

5           Well, that sets up a circumstance, Your Honor,

6    where the trustee would effectively have to prove something

7    is an asset to get discovery or investigation information

8    about the asset which would be necessary to prove it.

9           That's circular and it doesn't work.  That's not

10   how 2004 works, that I have to first prove that something is

11   an asset of the debtor before I can get 2004 investigation

12   on it.  If I could already prove it, Your Honor, I wouldn't

13   need to investigate it.

14          Now, in their papers, in their objection, the

15   debtors then turn and say, well, despite the fact that we've

16   made this objection and we've frustrated you for this

17   period, in fact, the debtor doesn't actually have any

18   documents related to his family or their assets and thus

19   nothing was withheld on that basis.

20          Now, Your Honor, the debtor has told this court

21   multiple times that every expense in his life, of which

22   there are quite a few, are paid for by his family.  His

23   home, his yacht, his luxury cars, they're all paid for by

24   the family, and yet he tells you I wouldn't have a single

25   document related to it.  I wouldn't have a single transfer

1      of dollars to say anything.  It's just not believable.

2           I want to turn now -- similarly, Ms. Guo and HK

3      USA make a similar argument, except Ms. Guo says not only

4      will she not produce any documents related to anyone else in

5      the family or the associated entities, she won't even

6      produce any documents about her assets.

7           And in their objection, interestingly, at

8      paragraph 6, they write that Ms. Guo rightfully refuses to

9      produce these categories of documents because "there is no

10     evidence or even allegation that the debtor has ever

11     transferred an asset or anything of value to Ms. Guo."

12          Now, Your Honor --

13          THE COURT:  Hold on a second.  What document are

14     you looking at, Counsel?

15          MR. LUFT:  I'm looking at their objection, Your

16     Honor, at paragraph 6.

17          THE COURT:  Do you have the document number in

18     front of you?

19          MR. LUFT:  I do, Your Honor.  I believe it is ECF

20     1090.

21          THE COURT:  Okay.  Give me a second, please, so I

22     make sure I'm reading --

23          MR. LUFT:  Of course, Your Honor.

24          THE COURT:  I would like to be able to read

25     exactly what you're reading from.

1          MR. LUFT:  Of course.

2          THE COURT:  Just give me one second, please.

3          MR. LUFT:  And if it's helpful, it's at page 3 of

4     25 of the document.

5          THE COURT:  Thank you.

6        (Pause.)

7          THE COURT:  Sorry.  It's just taking a moment for

8     it to load up.

9          MR. LUFT:  Take your time, Your Honor.  Please

10    tell me when you're ready.

11         THE COURT:  Paragraph 6, page 3.

12         MR. LUFT:  Correct, Your Honor.

13         THE COURT:  Okay.  I'm there.  Go ahead.

14         MR. LUFT:  All right.  They say that she was right

15    not to produce these documents because, "there is no

16    evidence or even allegation that the debtor has ever

17    transferred an asset or anything of value to Ms. Guo."

18         Now, Your Honor, given how often we've talked

19    about the Lady May in this case, I don't know how anyone

20    could assert that there is no allegation, much less

21    evidence, that the debtor ever transferred something to Ms.

22    Guo.  She claims to be the holder of a yacht that a New York

23    court has already found belongs to the debtor.

24         Similarly, another court in New York, the Federal

25    court, Judge Liman, found Eastern Profit, a shell company

1   that the debtor -- that Ms. Guo controls is "In essence, a

2   shell corporation for the debtor."

3          So the idea that there's no evidence that Ms. Guo

4   has any connection to getting assets from the debtor such

5   that there would be no reason to investigate her assets is

6   simply false.

7          In addition, Your Honor, I can tell you that

8   through our investigation we have found that the daughter is

9   the beneficial owner of at least nine BVI entities

10  identified to date.

11         Nothing I know about the debtor -- the daughter,

12  Ms. Guo, has -- suggests any connection as to why she would

13  independently have numerous BVI shell companies.  But

14  certainly it's a question that the debtor [sic] should be

15  allowed to investigate and look into.

16         Yet, under their argument, the debtor -- the

17  trustee would never be allowed to see any documents related

18  to those entities, Eastern Profit, or anything else.

19         Their other argument is to effectively

20  mischaracterize.

21         If one looks at paragraph 47 of their objection --

22         THE COURT:  Same document?

23         MR. LUFT:  Same document, Your Honor, thank you.

24         They take issue with the trustee's request for --

25         THE COURT:  What page are you on?  Just so I'm --

1   I would like to follow you.

2           MR. LUFT:  Of course, Your Honor.  I'm looking at

3   pages 19 to 20.

4           On 19, you could see request number 10, or

5   reproduction of it, where the trustee asks for information

6   regarding gifts, benefits and loans between the debtor, the

7   debtor's estate, the debtor's family and the associated

8   entities.  This of course is key because the debtor in this

9   case claims that all the funds he uses come from gifts and

10  loans.

11          Yet, when we tried to get information on this from

12  Ms. Guo, the answer is, if you turn to the next page on page

13  20, to mischaracterize and say, read literally, request 10

14  would require Ms. Guo to produce every document regarding

15  every gift she has ever given to any person over the past

16  ten years, including thank you cards received by the gifts

17  recipients.

18          Now, of course, the request doesn't ask for any

19  person, Your Honor.  It asks for the people we care about,

20  the debtor, the debtor's estate, the family members and the

21  associated entities.  And I assume she does not receive

22  thank you cards from the shell companies she's involved

23  with.  This is all an attempt to make it seem like these are

24  over-broad and unreasonable requests.

25          Given the fact that two courts have already found

1   Ms. Guo to be involved with entities that are, in fact,

2   false fronts for the debtor there is nothing unreasonable

3   about asking for information she has regarding gifts and

4   loans, the primary way the debtor alleges to subsist, in

5   connection with that.

6          Now, I will note that Ms. Ngok, the debtor's wife,

7   had made a similar objection that is referenced in our

8   papers.  She has withdrawn that objection.  Her counsel has

9   -- withdrew it.  And accordingly that motion to compel need

10  not be acted upon because there is no active issue anymore

11  with regard to Ms. Ngok.

12         At this point, I want to turn to the next issue,

13  Your Honor, as a basis upon which the debtor, Ms. Guo, and

14  HK USA are refusing to produce documents.

15         Specifically, they say they will not produce any

16  files from their advisors and their agents, only documents

17  in their physical possession.

18         Now, they say this despite making very clear, as

19  they state in paragraph 3 in the same document of their

20  objection, that they told us from the outset that the vast

21  majority of responsive documents would be with his

22  professionals.  But they won't search those documents.  And

23  not everyone's a professional.  That means they don't search

24  his secretary, they don't search Ms. Wang, who we've heard

25  about, who writes messages for him, or anyone else.  They

1    say, well, it has to be the debtor's document.

2              Now, that clearly is contrary to the definition of

3    the debtor in the subpoena, which is the debtor, together

4    with any of his employees, agents, counsel, advisors, or

5    anyone else acting on his behalf.

6              In the interest of time, Your Honor, I will not

7    repeat all the law we cite in our brief, but it's very clear

8    that documents under the control of the debtor include those

9    of all those people we just mentioned.

10             You know, if we think of the traditional thing, if

11   you ask your secretary to transcribe a letter for you or to

12   send an email on your behalf, that is still your document.

13   The fact that it may have come from her does not mean it's

14   not yours.

15             Now, particularly in this case where the debtor is

16   telling us that he has virtually no documents on anything

17   and no communications it's critically important that he go

18   to the advisors and the agents who do transmit information

19   on his behalf.

20             Now, there are many emails that we are seeing

21   written by Ms. Wang, Ms. Guo, Ms. Francis, who's an

22   attorney, Mr. Mitchell, were people who are clearly

23   communicating with the debtor and the debtor with them

24   through these individuals.

25             Whether or not he personally has a computer,

1    honestly, is irrelevant.  If he's asking other people to use

2    their computer on his behalf or to send messages to

3    communicate for him, those are his documents and he has to

4    produce them.  Yet, we've been told flat out they won't

5    search them.

6         Now, the answer to that is, well, you guys assume

7    to be doing a good job.  You're sending subpoenas to people.

8    Your Honor, I don't know everyone who is his agent or his

9    advisor.  And, in fact, for a number of this people, I can't

10   find them.  Ms. Wang has evaded service.  Max Krasner has

11   evaded service.  There are a number of them.  And even so I

12   don't know all those people.  And it's not the trustee's

13   responsibility to try to figure out everyone who Mr. Kwok

14   uses to communicate with.

15        He has that information.  He can his requests and

16   go to them and say please make sure we gather all the

17   documents that would be responsive consistent with this

18   request.

19        Now, to the extent one of these people have

20   already been served with a subpoena and they say, you know

21   what, this overlaps with one of the questions I got and I've

22   already produced it, fine.  That is what we've told them.

23   Of course there's no need to produce something twice.

24        But it's Mr. Kwok's obligation to make sure that

25   everything is being searched for.  And it's Mr. Kwok's

1    obligation to make sure that everyone who acts as his agent

2    is doing that.

3         Which brings us to the next topic, Your Honor,

4    which is the quality of the search that was done of Mr.

5    Kwok.

6         If I could ask the Court to turn again in ECF 1090

7    to paragraphs 19 and 20, 19 and 21, there is a recitation by

8    the debtor of the scope of the search that was done.  Again,

9    this is not the trustee's characterization, this is the

10   debtor's description of what was done.

11        What is laid out there very clearly is what was

12   done was they asked the debtor if he had any of these

13   documents and he said, no, not really.  No, I don't have any

14   of those.

15        There was no attempt to look at his phones, to

16   search them, to independently verify, to say there have to

17   be documents.  How do you subsist?  I know you communicate

18   with people.  How was this done?

19        And most notably there is no indication that they

20   ever asked what about all the individuals who you

21   communicate with, communicate through, people that would be

22   aware of my understanding is they communicate through the --

23   with the debtor through individuals.

24        Now, what is included, which I find interesting,

25   is they make two comments that the debtor told them, well,

1    he doesn't have most of these documents because, in fact, he

2    doesn't even know who most of the associated entities are.

3            Now, Your Honor, if we look at the fine list of

4    who those associated entities are, we see names like Ace

5    Decade, Bravo Luck, Eastern Profit, GTV, Himalaya, Saraca,

6    World Law Foundation.

7            THE COURT:  What are you reading from?

8            MR. LUFT:  I'm looking at this subpoena, Your

9    Honor.

10           THE COURT:  Oh, his subpoena.  Okay.  Go ahead.

11   All right.  Thank you.

12           MR. LUFT:  This is a list of the associated

13   entities that the debtor claims that he didn't who most of

14   these entities were.

15           My guess is the Court is quite familiar with most

16   of these names, much less the debtor at this point.

17           And I raise this because -- not just to highlight

18   the fact that I find the debtor's statement implausible that

19   he doesn't know who most of these people are, but because

20   this should have been a warning sign to his counsel that his

21   statements that he has no documents were not credible and

22   required greater -- to look further.

23           The law is clear particularly where you have

24   concerns where there's reason to believe that someone is

25   trying to stymy discovery, that counsel is required to look

1   harder, to search more, and not just take statements at face

2   value.

3            The fact that he could tell them that he doesn't

4   know who most of these entities are when all of us at this

5   point in this case know exactly who they are I think should

6   have setoff alarm bells.  Okay.

7            Similarly, the search for Ms. Guo, which is

8   described in paragraph 22, also consists of us speaking to

9   her.

10           Now, she admits to having emails and texts, yet

11  over eight years claims to only have 19 that are responsive

12  in total.  Again, that should have required a deeper search.

13  It's just not plausible.

14           Now, I'll quickly touch on the fact that they

15  claim that we concede HK USA has no documents because we

16  note that they don't have income, bank accounts, directors,

17  officers and employees.

18           Your Honor, I believe that argument is just non

19  seqitur.

20           First of all, they've actually produced, well, not

21  a lot of documents, significantly more than the living

22  entities of Mr. Kwok and Ms. Guo.

23           In fact, 19 times more than Ms. Guo and eight

24  times more than the debtor despite counsel for the debtor

25  indicating that how could you ever think they'd even have a

1    document given the type of entity they are.

2           But of course they do have documents related to

3    this because they're a shell company that controls the Lady

4    May.  So anything involving the financing of it, the

5    expenses, and whatever else, would be included there.

6           Now, again, in the interest of time, I won't go

7    through the case law that we cite from the circuit regarding

8    why you can't rely on just client reps, the *Zubulake* case

9    being the most prominent of them, but I do want to touch on

10   for a minute the types of documents that are missing, Your

11   Honor, to highlight how no one should really be able to

12   plausibly accept the fact that there are no real -- there

13   are no documents that would be responsive.

14          Missing from the debtor's production are all

15   WhatsApp messages.

16          Now, in the Bravo Luck adversary, at 22-05027,

17   document 3-2, there is a copy of Mr. Kwok's February 5th,

18   2016 declaration in support of Ace Decade's action against

19   UBS.

20          And if one looks at paragraphs 44 through 47, and

21   63 to 69, Mr. Kwok details lengthy WhatsApp messages with

22   UBS in connection with his business transaction with them.

23   Clearly the debtor uses messaging services to conduct

24   business.  And despite their throw away argument, Your

25   Honor, what -- his business with UBS had nothing to do with

1    taking down the CCP.  It related to offering the loans that

2    UBS would have.

3          He's produced no other text messages, despite

4    claiming that he communicates, does all his communications

5    through iPhones.  He's produced no emails or computer files,

6    claiming he doesn't have them, but conveniently ignoring the

7    fact that there are multiple emails that we've seen from

8    other sources where agents of his, like Ms. Wang or Yung Yu,

9    or his lawyers, write messages that clearly state my boss or

10   the director, you know, Mr. Kwok wants you to know, none of

11   those were produced.

12         There are no documents related to any transfers of

13   funds to the debtor, despite the fact that he allegedly

14   subsists only on the charity of others. There are no

15   documents regarding his ongoing work.

16         If one was to look right now, Your Honor, on

17   iTunes and looked up Miles Guo, one could find that they are

18   selling his music.  Same thing on Spotify, Amazon, and I

19   presume other services.  They sell it for money.  That money

20   has to go somewhere.  His music has to get from him to the

21   platform.  That has to create documents.

22         The notion that he does no ongoing business is

23   just belied by what we can just see on the internet.  He's

24   clearly doing it.  No one responds.  They drop a footnote

25   and say, well, he doesn't take any royalties because he's

1    just doing this to take down the CCP.

2              Now, first of all, that doesn't mean that there

3    are no documents that wouldn't be responsive.

4              And I note, Your Honor, to the extent the debtor

5    is earning money or doing work post bankruptcy, it is not

6    his choice to donate the royalties to whoever chooses if

7    that's what's happening.  Those are assets of the estate

8    and, of course, the trustee should be able to investigate

9    that and find it out.

10             He is working.  He is creating.  He's doing this.

11   We see this with Crypto, with music.  I'm sure other things.

12   We should be -- there have to be documents.  He claims to

13   have no hard copy documents.

14             And just as one example of an entity which surely

15   we would expect to see documents, he produced no documents

16   regarding an entity called Saraca.

17             Now, Your Honor, Saraca owns the trademark to both

18   Miles Guo and Miles Kwok.  They also paid for one of his

19   homes.

20             Now, whether --  I think, if we dig deep enough,

21   if we ever get documents from them, I think we'll find out

22   that of course he controls it, but the fact is, Your Honor -

23   -

24             THE COURT:  Let me ask you a question.

25             MR. LUFT:  Sure.

1          THE COURT:  I don't know that it's in the record

2     the spelling of the name of that entity that you just

3     stated, so I'd ask you to spell that for the courtroom

4     deputy so that the transcript is clear.

5          MR. LUFT:  Of course, Your Honor.

6          THE COURT:  I don't recall if that is in the

7     record, so I'm going to ask you to make sure that it is.

8          MR. LUFT:  And I'm going to just pull it up to

9     make sure I've got it, spell it exactly.

10          THE COURT:  Certainly, take your time.

11          MR. LUFT:  It is Saraca, S-A-R-A-C-A, Media Group,

12     Inc.

13          THE COURT:  Thank you.

14          MR. LUFT:  And, Your Honor, this is an entity

15     which recently entered into a consent judgment with the SEC,

16     along with GTV, and an entity called The Voice of Guo, to

17     return almost half a billion dollars of money to investors

18     who had been defrauded by a crypto scheme.  Now, no

19     documents despite the fact that they even purport to own his

20     name.

21          So, in short, what we have is a refusal to look

22     for any documents in essence because he's saying anything

23     that's with anyone else that's their assets.  I don't have

24     to look.  An argument that I subsist through working through

25     advisors, but I won't pull any of their documents.  And

1    searches which, in fact, are plainly inadequate because they

2    simply just ask this debtor his opinion, and he said, no, I

3    don't have it, as implausible as that is.

4            We have a couple other small matters related.

5    They have cut off the search saying we should only be

6    allowed to find documents after the time he came to the

7    United States.

8            The deadline we've asked for is February 5th,

9    2012, and it's consistent with the outer edge of the statute

10   of limitations regarding fraudulent transfer.

11           It is also important because at least at that time

12   in China I believe the debtor concedes, although who knows,

13   it seems to depend day to day, that at some point he had

14   lots of assets.  And I'd like to be able to say, well, you

15   had lots of assets on this day.  Today you tell me you have

16   less than $4,000 of assets.  I want to follow it and

17   understand what happened to all those assets.

18           But they've cut it off.  I don't think that's

19   appropriate.

20           They have refused to produce the debtor's

21   passport.  We've been very clear why we need it.

22           The debtor claims to have assets all over the

23   world, specifically having given interviews about homes in

24   London and Hong Kong and in other places.  Understanding

25   where he travels to will help us focus our search as to

1    where to look for assets.

2           There is hyperbole in their objection where they

3    say, look, if you're going to do that, then you'd have to

4    put him under 24-hour surveillance to know everywhere he

5    goes.  The trustee has asked for nothing like that, Your

6    Honor.  They've simply asked to see where it is he has

7    traveled to to help find assets.

8           If they want to mark it highly confidential,

9    protected by the protective order Your Honor put in place,

10   of course that's appropriate, we'd have no problem with

11   that.

12          I'll note that with -- one other note on this,

13   with regard to all these objections, to be honest, the fact

14   that I'm even here with a subpoena is a little unnecessary.

15   But if it was not for how the debtor acts -- because under

16   521(a)(4), he should have turned over all documents, records

17   and papers relating to property of the estate to the trustee

18   already.  That also has not happened.

19          Now, before I turn to the defaulting parties and

20   conclude, Your Honor, I do want to raise one objection that

21   Ms. Guo and HK USA have raised that was -- that I believe is

22   related to what was discussed earlier, which is the pending

23   the proceeding, and their argument that the trustee's

24   requests to them are no longer proper under 2004 because of

25   the adversary proceeding.

1          First of all, Your Honor, I believe this argument

2     has been waived.

3          The fact is if one looks at the motion to Ms. Guo

4     and to the 2004 motion to Ms. Guo, and to HK USA in footnote

5     25, the debtor specifically highlighted this issue.  We

6     didn't want any confusion.  We wanted to put it on the table

7     right away why we thought we should still be allowed to have

8     2004 despite the fact they had already filed an adversary

9     before the trustee even being appointed.

10          The debtor made no objection, nor did Ms. Guo, or

11     HK USA, in their paper to the 2004 motion.  The 2004 was

12     ordered.  Honestly, I believe at this point this is

13     effectively a collateral attack on the 2004 order.

14          Now, the only objection they did make was to say

15     we want to be sure that we can object in our objections and

16     responses under the federal rules to whatever doc subpoena

17     you send.  Fine.  There is not a single objection in Ms.

18     Guo's or HK USA's responses and objections related to the

19     pending proceeding.

20          And as Your Honor is well aware, if one does not

21     raise objections to discovery requests in their objections

22     and responses, they are waived.  So the fact that they are

23     doing this now I think that issue has passed.

24          Now, even if it -- they hadn't waived it, Your

25     Honor, I would like to note two points.

1          The first is most of the requests don't relate to

2      the Lady May or HK USA.  They search for documents of other

3      family members, associated individuals, and entities.  There

4      is no reason why the adversary proceeding in any way should

5      impact the search for those documents and accordingly that

6      should be set aside.

7          As to the Lady May and HK USA, to the extent they

8      have not waived the argument, Your Honor, I would argue, in

9      fact, this is a retroactive argument and it is also improper

10     in that way.

11         The subpoenas and the production deadlines passed

12     prior to the filing of the counterclaims in the adversary

13     proceedings.  If they hadn't made improper objections, if

14     they had produced on a timely basis, we would have received

15     2004 prior to filing our counterclaims.

16         Instead, because of their recalcitrance, we were

17     forced to file our counterclaims without those documents.

18         And I don't think they should be awarded for their

19     gamesmanship of effectively waiting so long to a point where

20     a deadline to file our answer and counterclaims had come and

21     thus we had to act to say, well, now I don't have to comply

22     with the appropriate, court-ordered subpoena that came

23     before it.

24         Your Honor, I'll just finish by touching on Golden

25     Spring and Lamp Capital.

1        As I said at the outset, these are the entities

2    that pay for the debtor's lifestyle, his litigation.  Over

3    and over we hear who does this person pay for?  It's Golden

4    Spring.  Oh, it's Lamp Capital who's paying for that.

5    Whoever else, they were all properly served as set out in

6    our papers.  They have just ignored us since.

7        We ask that they be held in contempt, that they be

8    sanctioned for having ignored us, and they should be forced

9    to comply and produce documents to us, Your Honor.

10        Effectively, everyone is pushing off who has the

11    documents saying it's on the debtor.  It's not in my

12    personal possession.  I'm a person.  It's not me.  It must

13    be at the family office.  And then lo and behold, the family

14    office, which of course is a corporation and has no person,

15    says I'm not showing up.

16        This is just a game to frustrate the trustee's

17    investigation, Your Honor.  We're trying to figure out where

18    these assets are so that we can return them to the

19    creditors.  Everything about this is simply an attempt to

20    make sure that that does not happen and it's improper.

21        Thank you, Your Honor.  If you have any questions,

22    I'm happy to answer them.

23        THE COURT:  I don't have any questions at this

24    time.  Thank you.

25        MR. LUFT:  Thank you.

1          THE COURT:  All right.  So there's been an

2     objection filed on behalf of the debtor, HK International,

3     and Mei Guo, is that correct?

4          MR. MORIARTY:  Yes, Your Honor.

5          THE COURT:  All right.  Please proceed.

6          MR. MORIARTY:  Thank you, Your Honor.  James

7     Moriarty for the debtor, Ms. Guo, and HK USA.

8          So let me start by saying that Attorney Luft did a

9     good job, and he certainly has a lot of knowledge.  Where

10    did he obtain that knowledge?  He obtained that knowledge

11    from the documents, the hundreds of thousands of pages of

12    documents, that the trustee has received.  And where has the

13    trustee received those documents?  From the debtor's

14    professionals.

15         We had a meet and confer with the trustee's

16    counsel back in September and we told the trustee's counsel

17    that the debtor was not going to have many documents in his

18    possession, documents would be with his professionals.  And

19    they are.  And the professionals have produced them.

20         And we agreed, and this is at paragraph 43 of the

21    trustee's motion, that if the professionals were producing

22    documents pursuant to subpoenas, that the debtor would not

23    then go to the professionals, ask for the same documents,

24    and produce them again.  And the debtor, through his

25    counsel, has not done that because we agreed that we would

1    not do that.

2              And if Your Honor remembers, specifically with

3    Brown Rudnick and the production of its files, we learned

4    that the trustee's counsel was negotiating with Brown

5    Rudnick regarding search terms that Brown Rudnick would run

6    through its files to obtain documents responsive to the

7    subpoena.

8              And we state in our objection that we believe that

9    the trustee has done that with other of the professionals on

10   whom subpoenas have been served, and the trustee has not

11   stated that that's an incorrect statement, so we have to

12   believe that to be true.

13             So the trustee is serving subpoenas on

14   professionals.  I believe we're up to, that the Court --

15   assuming the Court grants the most recent motion, there will

16   be 113 subpoenas that the trustee has been authorized to

17   issue pursuant to Rule 2004.

18             And the trustee is negotiating, at least with the

19   larger law firms that have represented the debtor, where the

20   vast majority of these documents are going to come from, on

21   search terms, so that the trustee can get exactly what he

22   wants.

23             There is a fundamental difference, Your Honor,

24   between no documents and no documents in the debtor's

25   personal possession.  The debtor does not have documents in

1    his personal possession.  Those documents are with his

2    professionals and they have been produced.

3         And we go into at -- I believe it's paragraphs 19

4    through 22 of the objection what we as counsel did to work

5    with the debtor to determine what documents the debtor might

6    have in his possession that would then be produced.

7         We didn't just ask the debtor if he had documents.

8    He said, no, and we said thank you have a good day.  That

9    did not happen.

10        What happened was we had two meetings with the

11   debtor via video  conference.  We discussed with the debtor

12   the specific categories of documents that were being

13   requested.

14        We did go through the associated entities with the

15   debtor and he did say for many of them he had not heard of

16   them, not all of them.  And Attorney Luft cherry picked some

17   that of course we all would know and the debtor would know.

18        But if you -- if you look at, and I believe it's

19   attached as Exhibit A to the objection, if you look at the

20   definition of associated entities in paragraph 7 of the

21   definitions, I would venture to say that there's north of 50

22   and maybe closer to 75 entities listed there.

23        So the debtor didn't say, and we didn't represent,

24   that the debtor didn't know any of these entities.  What we

25   said is that for many of these entities the debtor had not

1    heard of them and didn't have any responsive documents.

2         And it was the same thing with the associated

3    individuals.  We went through those lists with the debtor to

4    determine whether he had documents in his possession.  We

5    went through with the debtor where responsive documents

6    could be located.

7         Keep in mind that in 2017 offices in Hong Kong

8    that may have had responsive documents were raided by the

9    Chinese government.  The debtor doesn't have access to those

10   documents.

11        The debtor does not use email. That is a

12   representation that has been made to counsel, and the

13   documents that I have reviewed, which are few and far

14   between from what the trustee has, I have not seen anything

15   to indicate that that is not a true statement, and the

16   trustee has not brought to our attention any specific email

17   that the debtor sent or received.

18        The debtor represented that he doesn't use a

19   computer.  I've seen nothing to indicate that that was not a

20   true statement.

21        The debtor doesn't have a server.  We specifically

22   asked him is there a server somewhere that you're aware of

23   that could have electronically stored information?  He said

24   there was not.

25        We asked him where hard copy documents could be

1    maintained?  The debtor does not have an office.  The debtor

2    does not maintain hard copy documents in his house.

3         And we went through this with the debtor for more

4    than two hours on two separate video conferences.  The

5    debtor provided us with the documents that he had in his

6    possession, tax returns and some other documents, and they

7    were produced.

8         The debtor has not gotten in the trustee's way at

9    all as it relates to the trustee's investigation and the

10   trustee's obtaining documents from these professionals and

11   other individuals.

12        The trustee's counsel has not come to us and said

13   this particular professional firm's not cooperating.  We

14   need your help.  If they did, we would do what we could to

15   help them, but that hasn't happened.

16        And we know that the trustee has received and

17   continues to receive hundreds of thousands of pages of

18   documents, a lot of them privileged pursuant to the

19   privilege order.

20        So this isn't a situation where the debtor is not

21   producing any documents.  Documents are being produced.

22        THE COURT:  Well, wait a minute.  You can't say

23   that.  You just said this isn't a situation where the debtor

24   isn't producing documents.  You just said at the beginning

25   that there are no documents to produce.  Just because the

Ho Wan Kwok- November 30, 2022                                              54

1    professionals are producing documents doesn't mean the

2    debtor's producing documents.

3            MR. MORIARTY:  Well, Your Honor, if you assume,

4    and I believe the law that the trustee cited is correct,

5    that if the documents are in the debtor's professionals'

6    possession, then he has access to them, then the debtor is

7    producing documents and he's producing them through his

8    professionals.

9            THE COURT:  No, he's not.  No, he's not.  I don't

10   think that's an accurate statement to make.  The debtor's

11   not producing anything.

12           MR. MORIARTY:  Okay.

13           THE COURT:  The parties that are producing

14   documents are the parties that were subpoenaed which are the

15   professionals.

16           MR. MORIARTY:  Correct, Your Honor.

17           THE COURT:  So I don't think that -- I think you

18   need to move on.  That is not a statement that has accuracy

19   in this case at all.  So go ahead.

20           MR. MORIARTY:  The debtor has produced the

21   documents that he has in his possession.

22           As far as text messages go, we -- during the

23   meetings we talked to the debtor about his use of cell

24   phones, what types of text messages he has.  The debtor was

25   asked to search for responsive documents within his text

1    messages.  The debtor does not read English so the text

2    messages would be in Chinese.

3            THE COURT:  That doesn't mean he doesn't have any.

4            MR. MORIARTY:  Your Honor, we asked him to search

5    for responsive documents in his text messages, identifying

6    to him what categories of documents were being requested,

7    identifying to him the entities, identifying to him the

8    associated individuals.

9            He went back.  He represented to us that he had

10   searched for responsive documents, that his text messages

11   relate to his efforts to take down the Chinese Communist

12   Party which are not responsive.

13           THE COURT:  Okay.  So you didn't look at any of

14   the information that the debtor looked at that would be --

15   whether they were responsive or not.  You just said here are

16   the categories.  Do you have anything that responds to that?

17   And then you took the debtor's statement that he doesn't and

18   you did nothing further. Is that correct?

19           MR. MORIARTY:  We identified for the debtor the

20   categories of documents that were being requested.

21           THE COURT:  Okay.

22           MR. MORIARTY:  We asked the debtor --

23           THE COURT:  Well, didn't the subpoena already

24   identify the categories of documents that were being

25   requested?

1              MR. MORIARTY:  It did, Your Honor.  The debtor

2    does not read English.  And as his counsel, we were trying

3    to assist the debtor and satisfy our obligations to search

4    for responsive documents.

5              THE COURT:  Well, how do you know that he

6    understood what you were telling him?

7              MR. MORIARTY:  There was an interpreter present,

8    Your Honor.

9              THE COURT:  And whose interpreter was that?

10             MR. MORIARTY:  We did not hire the interpreter if

11   that's what you're asking.

12             THE COURT:  That is what I'm asking.

13             MR. MORIARTY:  It was an interpreter that from my

14   knowledge the debtor has used on other occasions.  I have no

15   reason to believe that the interpreter was misinterpreting.

16             THE COURT:  But you have no reason to believe that

17   the interpreter was properly interpreting because you don't

18   know what the interpreter was saying to Mr. Kwok.

19             MR. MORIARTY:  You are correct, Your Honor.  But

20   the only way that I can communicate with Mr. Kwok is through

21   an interpreter, so I have to rely on the interpreter to

22   interpret correctly.

23             THE COURT:  I understand what you're saying.  I

24   understand what you're saying.  But, right -- you're trying

25   -- you're telling me a lot of things for which there's no

1    proof in the record to support what you're saying.

2              You said that there -- that there are documents in

3    the debtor -- that the debtor had in China that were raided.

4    Where's the evidence that produce -- that supports that

5    claim?  There's no statement made by the debtor under oath.

6    There's no information in this record.

7              There's nothing for me to say, other than you tell

8    me that you told him that these were the categories.  He

9    told you he looked and he said there's nothing.  That's what

10   you're asking the Court to rely on as evidence that he

11   complied.

12             MR. MORIARTY:  Your Honor --

13             THE COURT:  And I'm telling that in any case,

14   whether someone understands English or not, that is not

15   sufficient to establish that the individual who is served

16   with a subpoena did everything that they were supposed to

17   do.

18             And normally the lawyer goes through the documents

19   with the party to determine whether or not they're

20   responsive to the subpoena.  You don't rely on the

21   individual, because then you wouldn't have met your

22   obligation as counsel to that party under the Federal Rules

23   of Civil Procedure.

24             MR. MORIARTY:  I disagree with you, Your Honor.

25             THE COURT:  Okay.  Fine.  And tell me what you're

1    relying on to support your disagreement.

2             MR. MORIARTY:  The debtor doesn't use email.

3    There's no evidence --

4             THE COURT:  That's not --

5             MR. MORIARTY:  -- that he does.

6             THE COURT:  That's not -- wait a minute.  Hold on.

7    that's not -- stop.  That's not responsive to what I just

8    asked you.

9             I said tell me what you're relying on to support

10   the position that you didn't have to go through these things

11   with the debtor to determine whether or not that they were

12   -- as counsel to the debtor that they were responsive to the

13   subpoena?  That's the question I asked you.

14            MR. MORIARTY:  The only possible thing that we

15   could have gone through would have been cell phones with

16   text messages in Chinese.  That's the only thing that he had

17   that could have had responsive documents on it.

18            I don't read Chinese so I was relying on my

19   client, on the debtor, to search his phone and provide me

20   with responsive documents.

21            This is not, Your Honor, a *Zubulake* issue.  The

22   debtor doesn't have servers.  He doesn't have IT

23   professionals.  We don't have custodians.

24            THE COURT:  How do you know that?

25            MR. MORIARTY:  He's an individual.

1        THE COURT:  How do you know that, Counsel.

2        MR. MORIARTY:  He's an individual, Your Honor.

3    And we specifically asked him.

4        THE COURT:  That doesn't mean an individual

5    doesn't have a server.

6        MR. MORIARTY:  I asked him that.

7        THE COURT:  Individuals -- you asked him and he

8    told you no, but you don't know that.  All you can report to

9    to the Court is what you asked the defendant -- I mean the

10   debtor in this case, not the defendant in the adversary yet,

11   you asked the -- you asked debtor and he told you no.

12   That's all you can report.

13        What I'm saying to you, Attorney Moriarty, is

14   what's in the record for me to rely on?  All that's in the

15   record that I'm hearing, and that's fine if that's all there

16   is, but all I'm hearing in the record is you asked him the

17   questions, he said, no.

18        MR. MORIARTY:  Your Honor, he is an individual.

19        THE COURT:  I understand that.

20        MR. MORIARTY:  And so --

21        THE COURT:  And there's no difference, no

22   difference, whether you represent an individual or

23   corporation with regard -- show me in the Federal Rules of

24   Civil Procedure where there's a difference between the need

25   to comply with the subpoena between an individual and a

1    corporate entity.

2             MR. MORIARTY:  And that's -- Your Honor, I'm not

3    saying that there is.  What I'm saying is when you get into

4    cases like *Zubulake*, that is an entity.  An entity has IT

5    professionals.  It has custodians.  It has --

6             THE COURT:  Okay.  And I'm saying that's

7    completely irrelevant.  It doesn't matter.

8             MR. MORIARTY:  But it is relevant, Your Honor, to

9    --

10            THE COURT:  An individual could have a server.

11   You have no -- you have no basis to make a statement other

12   than that he tells you doesn't have one.  That's fine.  If

13   that's what -- if that's what you're relying on let's just

14   be clear about it.  You make the record accurate.  The

15   record is that this is what he told you and nothing more.

16            MR. MORIARTY:  Correct.

17            THE COURT:  There was no further investigation as

18   to whether or not that was a true statement.

19            MR. MORIARTY:  There was no further investigation,

20   nor did I feel one was necessary.

21            THE COURT:  Okay.  Thank you.

22            MR. MORIARTY:  All right.  So as far as Ms. Guo

23   goes, what the trustee is seeking from her, and what she's

24   objected to, are documents related to her personal assets,

25   ten years of bank account statements, her tax returns, any

1    credit card statements, or any credit cards that she uses

2    for the past ten years.

3            And when we say that there's no allegation of a

4    transfer, there's no allegation --

5            First of all, there's no proof that the debtor

6    actually ever owned the Lady May.  The Lady May was

7    purchased after HK International was transferred from the

8    debtor.  So the Lady May wasn't transferred from the debtor

9    to Ms. Guo.

10            Regardless, what they're seeking is her bank

11    statements for ten years with no allegation that the debtor

12    ever made a transfer to her which could have somehow wound

13    up in her bank account.  So that's where the objection lies.

14            And what the trustee didn't do here, and what the

15    local rule requires, is to set out the specific request and

16    the specific objection.  So we don't know what specific

17    requests that the trustee is seeking other than the trustee

18    is apparently seeking everything.

19            But as it relates to Ms. Guo -- and HK doesn't

20    have bank accounts, the trustee says that in his motion so I

21    don't think that's disputed -- but what Ms. Guo is objecting

22    to is the disclosure of her personal assets on the grounds,

23    first, that there is no allegation of a transfer to her that

24    would wind up in her bank account, tax returns, thing of

25    that nature.

1        Second, as it relates to Rule 2004, when the Rule

2    2004 subpoena was served on Ms. Guo, she was not a party to

3    the adversary proceeding.  The counterclaim was filed I

4    believe about three weeks after her objections were filed to

5    the 2004 subpoena, so Ms. Guo could not have waived any

6    objection that she has to the trustee seeking discovery via

7    2004 which goes directly to the issues in the adversary

8    proceeding.

9        And keep in mind, Your Honor, that there is a PJR

10   application pending and an application for an injunction

11   pending, and as part of that the trustee is seeking asset

12   discovery from Ms. Guo, but also seeking asset discovery

13   from her via a Rule 2004 subpoena.

14       And the argument we had previously on the motion,

15   Your Honor, stated that, well, these aren't parties.

16       In this case, Ms. Guo and HK are parties to the

17   adversary proceeding and the trustee is seeking to use Rule

18   2004 to obtain information that goes directly to the issues

19   in that adversary proceeding.  And the trustee has filed a

20   60-some page counterclaim with 3100 pages of exhibits.

21       And, again, it was filed after Ms. Guo had served

22   her objections to the Rule 2004 subpoena and after Your

23   Honor had granted the motion to issue it.  So Ms. Guo wasn't

24   even a party to that adversary proceeding at that time.

25       As far as the debtor's passport, full passport --

1          THE COURT:  The debtor or Ms. Guo --

2          MR. MORIARTY:  -- the first page of the --

3          THE COURT:  -- are you talking about right now?  I

4     thought you were talking about Ms. Guo.

5          MR. MORIARTY:  I was.  I moved on, Your Honor.

6          THE COURT:  Okay.

7          MR. MORIARTY:  I apologize.

8          THE COURT:  I just want to make sure I'm following

9     you.

10          MR. MORIARTY:  No, that's okay.

11          THE COURT:  Okay.

12          MR. MORIARTY:  So with the passport, the debtor's

13     passport, the trustee's seeking a full copy of the debtor's

14     passport, the first page of the debtor's passport was

15     produced because it was produced with -- I believe it was

16     either his tax return or it was an application for a

17     taxpayer identification number.

18          And the only basis the trustee has for the

19     entirety of the passport is, well, we need to see where he's

20     gone because maybe there are assets there, which it just --

21     it doesn't follow that regarding if the debtor goes

22     somewhere, therefore, must be assets, we should go

23     investigate.  That's not a good faith basis for the debtor's

24     passport.

25          And then as far as the eight years versus ten

1    years, the trustee's basis for we need ten years of

2    documents is, well, that's the outer limit for the statute

3    of limitations for fraudulent transfer actions.  But under

4    what law?

5            The debtor did not leave Hong Kong until the end

6    of 2014.  And I don't think that's disputed by anybody.

7            THE COURT:  But is it in the record?

8            MR. MORIARTY:  It is in our papers, Your Honor.

9    If you're asking me is there evidence of that fact, no.

10           THE COURT:  I mean, if it's not disputed, I need

11   to know that.  But I can't just find, right, that the debtor

12   didn't, I'm sorry, you just said I think the debtor, I think

13   the words you used, did not leave Hong Kong until 2014.  Is

14   that what you said?

15           MR. MORIARTY:  And by leave -- by leave I mean

16   leave to live somewhere else.

17           THE COURT:  Yeah.  But, I mean, I don't know that.

18   You're just saying that.  And I'm not saying you can't.  If

19   everybody agrees to it, that's fine.  But I don't -- I don't

20   have any evidence of that other than you saying that, right?

21           MR. MORIARTY:  Yes.  But, again, I don't believe

22   that there's any dispute.

23           THE COURT:  Well, then you'll have to --

24           MR. MORIARTY:  Attorney Luft will tell me if there

25   is.

1          THE COURT:  Your parties will figure that out.

2          MR. MORIARTY:  Okay.

3          THE COURT:  Okay.  But, go ahead.

4          MR. MORIARTY:  Thank you, Your Honor.

5          So let's -- just for purposes of my argument,

6     let's assume that that fact is undisputed --

7          THE COURT:  Okay.

8          MR. MORIARTY:  -- what law would apply to any

9     transfers that were made by the debtor prior to him fleeing

10    Hong Kong at the end of 2014?  And would that law even allow

11    a fraudulent transfer claim to be brought more than ten

12    years after the transfer?  The trustee doesn't address that

13    at all.

14         THE COURT:  So are you -- but are you -- are you

15    objecting to 2014 forward?

16         MR. MORIARTY:  No.  We are objecting from 2012 to

17    2014.

18         THE COURT:  Okay.

19         MR. MORIARTY:  What we said was from the time that

20    the debtor fled Hong Kong, which was at the end of 2014

21    going forward --

22         THE COURT:  Okay.

23         MR. MORIARTY:  -- responsive documents would be

24    produced.

25         Can I just have one second, Your Honor?

1          THE COURT:  Sure.

2          MR. MORIARTY:  Thank you.

3      (Pause.)

4          MR. MORIARTY:  Your Honor, unless you have

5   questions, I have nothing further.

6          THE COURT:  Let me just make sure I don't have any

7   questions.

8      (Pause.)

9          THE COURT:  No, I don't have any further questions

10  at this time, Attorney Moriarty.  Thank you.

11          MR. MORIARTY:  While I was waiting for your

12  question, there's one more point --

13          THE COURT:  You found something.  Go ahead.

14          MR. MORIARTY:  -- I wanted to add.

15          And with all due respect to Attorney Luft, and he

16  and I have a good working relationship, we have a

17  fundamental disagreement about this meet and confer and what

18  was said about this hypothetical Lady May II.

19          And as we state in our objection at paragraph 9,

20  if there was a hypothetical Lady May II that was exactly as

21  the Lady May with an order from a court in New York finding

22  what Judge Ostrager found of course, we would produce

23  responsive documents.

24          But, one, that hypothetical Lady May II was

25  hypothetical.  And, two, the hypothetical in the meet and

1    confer was if there was a Lady May II would you produce

2    documents?  Not with all of that surrounding factual

3    information.  And the response was if there was a Lady May

4    II and the debtor didn't have an interest in it, no,

5    responsive documents wouldn't be produced.

6          In other words, we wouldn't produce documents

7    related to somebody else's asset.  So if the debtor had no

8    interest in a hypothetical boat, of course we wouldn't

9    produce documents related to it.  And that was the gist of

10   the meet and confer.

11         And with that, Your Honor, I have nothing further.

12         THE COURT:  Okay.  Thank you.

13         MR. LUFT:  Your Honor, may I?

14         THE COURT:  Yes, you may.

15         MR. LUFT:  Thank you, Your Honor.  Avi Luft of

16   Paul Hastings.

17         THE COURT:  Thank you.

18         MR. LUFT:  So why don't we start where we ended.

19   I'll just -- I'll be very brief on the Lady May II.  I think

20   I discussed this.

21         Mr. Moriarty is 100 percent correct.  We do have a

22   very good relationship.

23         I point you to paragraph 9, again, I'll ask -- I'd

24   suggest the Court read the whole thing.  The answer is, as I

25   said, their rule is you need to have a court find that it is

1    an asset of the debtor for them to be willing to produce

2    documents.  They're clear as day on it.

3         The response was the debtor would not produce

4    documents related to the hypothetical Lady May II if the

5    debtor did not have any interest in the hypothetical Lady

6    May II.

7         Your Honor, as you know, we have an adversary

8    proceeding coming up.

9         To this day, despite Justice -- Judge Ostrager

10   finding that the debtor has beneficial ownership and

11   control, they continue to assert the debtor has no ownership

12   interest in the Lady May.

13        It cannot be the case that we have to have a

14   ruling from a court that we own the asset to start getting

15   2004 on it.  And that's all I'll say about that.

16        I want to deal with a couple odd ends and then

17   I'll go back to the beginning.

18        Specifically the passports, Your Honor, and you'll

19   note I put an S at the end of it, I don't know how many

20   passports Mr. Kwok has.

21        I do believe it is completely relevant to know

22   where he travels to to find his assets.  If they want to

23   mark them highly confidential, that is perfectly fine.  I

24   have no problem with it.

25        But the idea that they don't have to produce it or

1   that we could not get relevant information about where he

2   has assets based on where he travels to is simply

3   implausible.  It is completely reasonable to know where he

4   goes, how he goes.

5          I've been told that he has planes.  You know how I

6   heard that?  Because he told people in an interview I have

7   planes.  You know what's not on his schedule?  Planes.  So

8   knowing where he travels will help me understand how he got

9   there, on what flights.  Maybe there's a plane out there

10  that we haven't found yet.  I'm sure the creditors would

11  like to know that.

12         There's been a question raised with regard to, and

13  I touched on this before, the ten year time period.  This is

14  a new argument that I haven't heard before that, in fact,

15  the reason they're not giving it is because they're not sure

16  how Hong Kong law would treat fraudulent transfers.

17         They present no evidence that Hong Kong law would

18  treat fraudulent transfers any different or that quite

19  frankly Your Honor would be bound if the debtor made

20  fraudulent transfers by Hong Kong law on the issue.

21         But moreover, as I said before, this is not just

22  fraudulent transfers.  There is a date certain when Mr. Kwok

23  was in China where even under his telling of the world most

24  days he had billions of dollars.  Today he has less than

25  4,000.

1        The big mystery of this case is what happened in

2    this intervening period.  I need to know what he had at the

3    start so that I can track where those assets went.  It's not

4    an unreasonable request.  And based on the number of

5    documents they seem to find, it certainly wouldn't be very

6    burdensome.

7        Your Honor asked if we all agreed that he left

8    Hong Kong on the dates he did.  Your Honor, I have no idea

9    when he left Hong Kong.  I know that there have been open

10   disputes in other litigations about when he actually came to

11   the U.S. with the debtor giving dates.

12       I don't know if there's a significant difference

13   between when he left Hong Kong versus when he left mainland

14   China and if that impacts the seizures or anything else.  So

15   I cannot tell you today that I am in agreement and I'm

16   willing to stipulate that he left Hong Kong when he did.  I

17   don't have any evidence of that.

18       I'd like to now turn back to where they started

19   with regard to the idea that the debtor has no obligation to

20   search for documents because the trustee is making diligent

21   efforts to try to get documents from professionals.

22       First and foremost, what's notable in all of that,

23   and what was not said by Mr. Moriarty at all, was that any

24   of the people who we say work for, he says work with, I

25   don't really care, who take his messages, pass them off,

1    Yvette Wang, Yung Yu, all these people, Max Krasner, who are

2    all over his documents, who sit on his boards, and send

3    messages for him, they're not professionals and they're

4    avoiding service.  I don't know who else they are.

5             Note the debtor's obligation to go find this.  The

6    fact that the trustee is working hard to work around that is

7    not -- does not excuse it.  And to be very clear, we are not

8    working hand in hand with the debtor to coordinate discovery

9    with the professionals.  That is just not a realistic

10   picture of what it is.

11            We are having to go out and get what we can.  We

12   have lots of professionals who when I get on the phone with

13   them tell me I am a third party, this is too burdensome, why

14   don't you get it from the debtor.

15            And I don't try to burden the Court every day with

16   every single discovery dispute that comes up.  And sometimes

17   I have to compromise and sometimes I have to put off.

18            And there are entities like GTV and Saraca who to

19   this date have not produced a single document to us.  I will

20   have another meet and confer with them this week.  It has

21   been going on for months as they give me the round around.

22            And by the way, Your Honor, if you're curious who

23   is the sole board member of GTV and Saraca to my knowledge,

24   it is Aaron Mitchell, the personal attorney of Mr. Kwok.

25            THE COURT:  May I just ask you the entity you just

1    said GTV as in Victor?

2              MR. LUFT:  Correct, Your Honor.

3              THE COURT:  Okay.

4              MR. LUFT:  As in -- G as in Guo, and TV.

5              THE COURT:  Yeah.

6              MR. LUFT:  Same as G-Media, G-Fashion.

7              THE COURT:  Okay.

8              MR. LUFT:  And all these others.  Thank you, Your

9    Honor.

10             THE COURT:  I just want to make sure I heard you

11   properly.

12             MR. LUFT:  Of course.

13             Now, Mr. Moriarty used an interesting phrase.  He

14   said it doesn't mean they're in his personal possession.  I

15   am not aware of any law that says a party's obligation is

16   based on what is in his "Personal possession."  I've seen

17   possession, custody, and most notably control, that's the

18   legal standard.  And as we cite to in our case law, control

19   he certainly has over both his professionals, the people who

20   work for him, any of that.

21             So that doesn't solve it.  The debtor has an

22   obligation.  He has to have his documents searched for and

23   he has to go to all his advisors.

24             I will just note that the idea that I cherry

25   picked entities to say it was unreasonable to not know the

1   associated entities, I will not belabor the Court with

2   reading through the myriad of entities we all know about.

3          But, Your Honor, if you are so inclined, you're

4   welcomed to look at the list, you will notice that you know

5   most of the names, much less the debtor not knowing most of

6   the names, and obviously they were pulled from documents and

7   information we found.

8          There was a point made about email.  Again, the

9   debtor doesn't use email.  What you did not hear is does he

10  have other people send emails on his behalf.  We know they

11  do.

12         If you look at the Brown Rudnick production.  If

13  Brown Rudnick was here, they would tell you, oh, yes, we

14  sent -- any time we wanted to communicate with the debtor

15  because we had to because we were filing a bankruptcy claim

16  we sent the messages through Max Krasner, Melissa Francis,

17  Aaron Mitchell.

18         When he wanted to buy a house he sent the messages

19  back and forth with the real estate agent through Yvette

20  Wang.  I will not get into the documents, but I know Your

21  Honor in a closed session has seen documents involving Ms.

22  Wang acting for her boss sending messages.

23         With regard to the representations that the

24  debtor's has made to Mr. Moriarty -- and I want to be clear,

25  I have the highest opinion of Mr. Moriarty and I believe

1    what he says is true.   Quite frankly, Your Honor, I don't

2    believe the same of the debtor when he says he doesn't know

3    or he doesn't know where something is.

4             I sat through a deposition two weeks ago where he

5    under oath said he doesn't know the address of his house.

6    He doesn't know the name of the security guard who allegedly

7    personally delivered a message to Yvette Wang who despite

8    years of working with he also said I have no idea how to

9    contact her.   He's just not a credible truth teller, Your

10   Honor.   That's just what we have to live with.

11            But to say, well, he told me so I accept it as

12   true, the rules, the law is clear, particularly where you

13   have concerns about the truthfulness of a person, you have

14   to do more.

15            Now, there's comments that if we'd just ask them

16   for help, we'd get it.

17            Quite frankly, Your Honor, unfortunately, that is

18   not the case.   I've asked them to help me serve Ms. Wang,

19   Golden Spring.   We've written to them, said can you give us

20   contact information, can you tell us where to find these

21   people we're not finding, consistent with the debtor's

22   obligation to be cooperative with the trustee, they never

23   say yes.   I never get that information.

24            Now, with regard to his alleged lack of IT acumen,

25   this one, Your Honor, I'll simply leave for a man who spends

1   his entire day posting videos to YouTube, selling music on

2   digital media services, making complex videos, the idea that

3   there is no IT, that there is no servers anywhere, is just

4   not believable.

5          There's a Golden Spring email address that his

6   people use.  We don't know if anyone's looked at that.  And

7   more importantly, no one seems to be asking.

8          With regard to this idea of was their search

9   adequate?

10          Quite frankly, it wasn't.  What I heard was they

11   said, well, we told the debtor what was in the subpoena.

12   That wouldn't be enough.  What I actually heard them say is,

13   well, we read the subpoena to a translator and the

14   translator told the debtor what was in there.  That surely

15   is not enough.

16          I'd like to turn to Ms. Guo for a moment.  This

17   notion that there's no allegation the debtor ever made a

18   transfer to her, I pointed this out, but I can't believe I

19   continue to hear it, she holds the Lady May, Your Honor, a

20   document -- a boat that the Court has already found belongs

21   to the debtor.

22          Judge Liman in the Southern District has already

23   found that Eastern Profit, an entity in her name, is, in

24   fact, just a shell for the debtor.  And we have already

25   found nine BVI entities, shell companies.  Of course there

1    is reason to believe the debtor sends assets and puts assets

2    in her name.  Maybe more than anyone else, we know he does

3    it.

4         Now, with regard to the argument that we didn't --

5    somehow failed the procedural rule that we didn't lay out

6    each specific request to them and they don't know what we're

7    moving to compel on, I think even if you look at their

8    papers, I'll certainly attest to it and I don't think Mr.

9    Moriarty would disagree, we had lengthy meet and confers.

10   Meet and confers were --

11        We made the point of going through every single

12   objection and response and saying I want to understand, this

13   is your final, this is what I find problematic, and I want

14   to understand what your objection is because I'm going to

15   move to compel.  I just don't think it's honest to say that

16   they have no idea what we're moving on.

17        It is true that in the interest of time there were

18   such sweeping issues with regard to their blanket refusals

19   to search for other individuals, their refusal to search for

20   agents, to not look for family members, and to not -- and to

21   take just the debtor's word, that we did organize our motion

22   based around those huge macro issues as opposed to rewriting

23   every single request, I don't think in anyway that prevents

24   them from having adequate notice as exemplified by their

25   lengthy objection.

1          Finally, Your Honor, I do want to turn to the

2    comment that somehow Ms. Guo on a technicality does not fall

3    within the pending proceeding.

4          I noticed that there is no argument that HK USA,

5    even though they made the objection, falls within it.

6          So now they say, well, the real -- they've pivoted

7    and they said, well, it's that Ms. Guo technically wasn't a

8    party.

9          Now, Your Honor, I don't think the waiver argument

10   changes at all.  Earlier today you heard them tell you that

11   they thought that the notice of the adversary proceeding was

12   so large that Apsley and DWF could be covered by this.

13         Ms. Guo is the sole, controlling party of HK USA,

14   who was a party, who did see the -- was on the same omnibus

15   as Ms. Guo which had the same footnote raising this issue

16   and would be identically situated.  But even if she wasn't,

17   she was made a party on September 22nd.

18         At no point did I receive a supplemental

19   objection, response and objection, or any argument that they

20   wanted to do this.  It was not until they filed their

21   objection that they raised this pending proceeding.  I

22   believe it is waived.

23         And, moreover, Your Honor, for the reasons I

24   stated before and won't repeat, even if it's not waived, I

25   don't believe the fact that they've stalled and stalled in

1    doing this in producing their documents gives them a basis

2    to now argue the 2004 should not apply.

3            I believe that addresses all of Mr. Moriarty's

4    comments.  If Your Honor has any questions, I'm happy to

5    answer them.

6            THE COURT:  Thank you.  I don't.  I do not have

7    any questions at this time.

8            MR. LUFT:  Thank you, Your Honor.

9            THE COURT:  Mr. Moriarty, would you like to be

10   heard?

11           MR. MORIARTY:  Yes, Your Honor.  Very briefly.

12           If I could just point out, Your Honor, in the

13   objection that was filed by the debtor, and Ms. Guo, and HK,

14   we do address the *Zubulake* case and the obligations of

15   counsel.  And this is at footnote 3, which I believe begins

16   on page 12.

17           And the *Zubulake* case, I think this is either four

18   or five in the series of cases, does talk about the

19   obligations of counsel to assist clients in locating

20   responsive information and ensuring that it's preserved and

21   then produced.

22           And in that case, the Court made the statement --

23   and this is at page 435.  So it's 229 F.R.D. 422, and it's

24   at 435 -- that it is true that counsel need not supervise

25   every step of the document production process and may rely

1   on their clients in some respects.  And that's what we did

2   here as it relates to the text messages that are in Chinese.

3           As for Attorney Luft's argument, he's discussing a

4   lot of information that I assume was obtained from

5   professional firms.

6           He's representing to the Court that there's email

7   correspondence said on behalf of the debtor from Max

8   Krasner, Aaron Mitchell, and others, none of that is in the

9   record, Your Honor.  That is just a statement of counsel.

10          So I do want to point out that much of Mr. Luft's

11  argument and his representations are simply representations.

12  There's no evidence in the record to support them.

13          Thank you.

14          THE COURT:  Okay.  Thank you.

15          I think I'm fine on argument on this matter at

16  this point.  I'm going to take this matter under advisement.

17          So let's move on to the motion for protective

18  order.

19          Mr. Romney, are you going to argue that matter?

20          MR. ROMNEY:  Yes.  Good afternoon, Your Honor.

21          THE COURT:  Can you just get as close to the

22  microphone as possible, please.

23          MR. ROMNEY:  Yes.

24          THE COURT:  Thank you.

25          MR. ROMNEY:  Can you hear me okay, Your Honor?

1          THE COURT:  Can we hear him okay?

2          THE COURTROOM DEPUTY:  Yes.

3          THE COURT:  Okay.  We'll let you know if we can't.

4     Okay?

5          MR. ROMNEY:  I've never been accused of being too

6     quiet, Your Honor.

7          THE COURT:  Well, I understand.  Nor have I.  But

8     sometimes the microphones don't pick up our voices properly.

9          MR. ROMNEY:  Aaron Romney, Zeisler & Zeisler, on

10    behalf of the debtor.

11         I'm here today arguing the debtor's motion for a

12    protective order concerning the debtor's asylum application.

13         Your Honor, the motion now before the Court

14    concerning the asylum application is quite different from

15    any of the issues that have been before the Court today.

16    And, frankly, quite different than most, if not all, of the

17    issues that have been before the Court throughout the entire

18    course of this bankruptcy proceeding.

19         This motion concerns the right of the debtor to

20    preclude third parties, including the trustee, from

21    accessing his asylum application submitted to the United

22    States Department of Homeland Security.

23         That application contains information that if

24    provided to the wrong people could expose the debtor, his

25    family members and other third parties, to serious personal

1    harm including serious physical injury and possibly worse.

2              Numerous bodies of law, including those issued

3    from this court, protect the debtor's rights concerning the

4    asylum application.

5              We have discussed ad nauseam before this court on

6    multiple dates the consented to order regarding privileges

7    in this case.

8              Paragraph 2 of that order identified information

9    that transferred -- or privileges -- privileged information,

10   that transferred from the debtor to the trustee upon his

11   appointment.

12             It identified two privileges. Attorney-client and

13   work product.  And within that, certainly joint attorney-

14   client privilege and work product, but I would consider

15   those a subset.  Those were the privileges identified in

16   paragraph 2, and those privileges related to defined

17   investigation topics.

18             Paragraph 4 of the stipulated order identified

19   privileges, not so limited as attorney-client and work

20   product, that the debtor retained, and in particular when

21   the information did not concern the investigation topics,

22   which I believe everyone in the room is aware, but the

23   investigation topics generally refer to the assets and

24   financial affairs and liabilities of the debtor.

25             The privilege order also provides in paragraph 7

1    that even if something is presumptively producible to the

2    trustee, or the trustee now controls the privilege, the

3    Court must also undertake a balancing test of is producing

4    this information going -- is the personal harm to the debtor

5    -- the personal harm, is it outweighed by any benefit to the

6    debtor.

7         We had several hearings over that privilege order.

8    I believe it was three.  It might have even been four.

9    Numerous representations were made by the debtor and

10   acknowledged by the Court that the trustee was not seeking

11   the debtor's asylum application.

12        We specifically mentioned the *Clark Hill*

13   litigation that concerns a data breach involving the

14   debtor's asylum application and we specifically put in the

15   privilege order that that litigation did not concern the

16   substance of the asylum application.

17        The Immigration and Nationality Act, codified in

18   Federal Code of Regulations 208.6 and 1208.6, which are

19   substantively identical as far as I can tell, protect the

20   disclosure of asylum applications to anyone unless the head

21   of Homeland Security authorizes it to be released to

22   particularized people for cause or the debtor consents.

23        The trustee has objected on the grounds that this

24   does not apply to private parties.

25        I do not know if Your Honor has had a chance to

1    look at our reply filed just yesterday --

2              THE COURT:  No.

3              MR. ROMNEY:  -- or Exhibit A thereto, but that is

4    a pamphlet prepared by the U.S. Citizenship and Immigration

5    Services, which is a division of the Department of Homeland

6    Security.  It contains both the letter of CFR 208.6,

7    commentary on it and specific Q and A.

8              One of the specific questions cited in my reply, I

9    believe it's question 7, raises the question of whether

10   third parties who receive the asylum application for cause

11   as permitted by the statute, whether they, themselves are

12   bound by the confidentiality provisions of the regulation,

13   and the answer is an unequivocal yes.

14             The fact that Clark Hill has the debtor's asylum

15   application does not make the debtor's asylum application

16   any less privileged or protected under federal law.  It's

17   not the attorney-client privilege.  It's not work product.

18   It is a protection afforded to all asylum applicants by the

19   federal government.

20             Aside from the letter of the privilege order --

21   well, take a step back.

22             One of the things that has come up in today's

23   hearing is what's in the record, what's not in the record,

24   what's a representation of counsel, where is the evidence?

25             Fortunately on this one the evidence is in the

1   transcripts in the proceedings before this court.  I cited

2   some, but not all, of the representations from counsel where

3   they specifically said in response to our concerns that

4   transferring of privileges would result in personal harm.

5   We identified the asylum application among other topics that

6   were particularly sensitive.

7        They repeatedly stated that I was -- I'm

8   paraphrasing -- but essentially raising a red herring

9   because they were not seeking the debtor's asylum

10  application.

11       They made these statements knowing about the *Clark*

12  *Hill* litigation and knowing that it concerned a data breach

13  concerning the asylum application.  They repeatedly said

14  they are not seeking the debtor's asylum application.

15       In response, the Court stated, and this is cited

16  on page 4 of our objection -- I'm sorry, of our motion for

17  protective order, docket number 1063, the Court stated my

18  understanding of that motion was that even though the

19  trustee wants that order he would agree to carve out

20  anything regarding to the asylum issue.  I mean, he was --

21  he's not asserting and never has asserted that he's going to

22  exercise that right.

23       That is the Court's statement relying on the

24  trustee's position before it entered an order that was

25  stipulated to by the parties.

1          Now, the trustee now argues in response to this

2    issue, and now the motion for a protective order, well, we

3    didn't know that it was attached by Clark Hill to a pleading

4    in the *Clark Hill* litigation.

5          Frankly, Your Honor, whether they knew it was

6    attached to a pleading is a red herring for a variety of

7    reasons.

8          One, by the time the stipulated privilege order

9    entered, everybody who's been in this room over and over

10   again knew about the *Clark Hill* litigation and what -- the

11   substance of it.  The substance was a data breach involving

12   the debtor's asylum application.

13         The fact that a third party, Clark Hill, chose to

14   attach it to its summary judgment motion does not operate as

15   a waiver by the debtor or change the nature of the issues in

16   that litigation.

17         The issues in that litigation are is Clark Hill

18   responsible for a data breach under any number of legal

19   theories, whether it's malpractice, breach of contract,

20   breach of fiduciary duty, and if so, what are the damages?

21         The damages relate -- the only damage potentially

22   that could conceivably involve the substance of the asylum

23   application is the impact on the debtor, the emotional

24   impact on the debtor, that resulted from the leak of

25   portions of his asylum application into the public domain.

1     Those issues can be explored any number of ways

2     without providing the complete asylum application with no

3     redactions, no anything, to the trustee who's a partner in a

4     firm with I don't know hundreds or thousands of lawyers that

5     would presumably have access to this information, offices

6     all over the world that would have access to this

7     information.

8     The reality is though, Your Honor, a deal was

9     made.  A stipulated order was made.

10     We have had disagreements about the interpretation

11     of that order.  And that's fine.  That's the judicial system

12     of which we've all chosen to become a party and dedicate our

13     professional lives to.  Disagreements are fine.

14     However, what is not fine is making an unambiguous

15     agreement and then unambiguously saying I changed my mind.

16     That's what's being done here.  It's not right.  It's

17     contrary to the law.

18     And unlike the other issues in this case that

19     concern money, money can be made, money can be lost,

20     property can be gained, property can be lost, the asylum

21     application concerns human beings' lives and political

22     persecution.  And whether one believes the allegations or

23     not, the federal government recognizes the sanctity of the

24     information in that application.

25     And for that reason, Your Honor, I'm asking that

1    you grant the protective order, require the trustee to honor

2    the stipulated order that it entered into and protect the

3    information in the debtor's asylum application.

4            Unless the Court has any further questions, I will

5    rely on my papers for any issues I've not addressed today.

6            THE COURT:  I don't have any questions at this

7    time.  Thank you.

8            MR. ROMNEY:  Thank you, Your Honor.

9            MR. LUFT:  Your Honor, may I approach?

10           THE COURT:  Yes, please.

11           MR. LUFT:  Thank you.  Your Honor, Avi Luft, Paul

12   Hastings.

13           I think I'll start with where Mr. Romney ended.

14   He said this isn't about money, it's about people, it's

15   about their lives.

16           Now, I think we should really be honest about why

17   we're here.  We didn't make a request for the asylum

18   application.  We made a request to get the documents in the

19   litigations that the trustee now controls.  The asylum

20   application is an exhibit and central to that litigation.

21           Why is that?  It's not a litigation that Mr.

22   Despins brought.  It's one Mr. Kwok brought for money.  He

23   wanted to sue his counsel for money and he sued them based

24   on the idea that his asylum application was made public.

25   That may have happened.  He may have been harmed by it.  I

1    don't dispute that one way or the other, but that's the

2    claim he brought.

3            And in response,Clark Hill has raised the defense

4    most prominently you weren't harmed because your information

5    in your asylum application was made public, because, in

6    fact, all that information was already public.

7            So in many ways, the crux of the entire dispute

8    that Mr. Kwok brought for money was whether or not that

9    information ,which is now all the parties agree public, was

10   made public by Clark Hill or was previously made public by

11   Mr. Kwok or by other parties.

12           So let's -- I understand it sounds good to save

13   lives and everything else, let's be very clear. Mr. Kwok

14   brought a lawsuit that inherently required discussion of his

15   asylum application for money.  He has never once demanded

16   that Clark Hill turn over his asylum application.

17           He has litigated this entire case in the District

18   of Columbia's District Court knowing not only that Clark

19   Hill has it, but that both sides have hired experts who

20   opine about it, whether the information's there, what harm

21   they have and whatever else.

22           And now the way this came to us is because there

23   is a pending motion for summary judgment against the claim's

24   now facing Mr. Despins now has to defend.  And I can't see

25   that motion because attached to it is, A, the asylum

1   application, B, I'm told, and this is by counsel for Clark

2   Hill, that there was a chart comparing the contents of the

3   asylum --

4                   Yes, Your Honor?

5                   THE COURT:  Can I just ask you a question?

6                   MR. LUFT:  Yes.

7                   THE COURT:  Who filed the motion for summary

8   judgment in that case?

9                   MR. LUFT:  Clark Hill did, Your Honor.

10                  THE COURT:  Okay.  Thank you.  Go ahead.

11                  MR. LUFT:  In response -- in large part as I

12  understand it.  Again, I haven't seen the documents yet, so

13  this is what has been represented to me and counsel for the

14  debtor by counsel for Clark Hill at Jenner & Block, that

15  there is -- it is attached -- that there is some type of

16  chart which compares what's in the asylum application versus

17  what has been found on -- publicly previously on the

18  internet.  My understanding is that's based on an expert's

19  work who --

20                  THE COURT:  And you can't see it because there's

21  an order in the case that everything is under seal or what

22  is the --

23                  MR. LUFT:  Not everything, Your Honor.  It just

24  was filed under seal in a --

25                  THE COURT:  The motion for summary judgment.

1    Okay.  Go ahead.  I'm just trying to understand.  Go ahead.

2           MR. LUFT:  Absolutely, Your Honor.

3           And in a weird quirk that motion, as I understand

4    it, was filed the day before the debtor filed bankruptcy.

5       So there's not even an unredacted copy of that motion.

6    Because when Jenner & Block asked Mr. Kwok's counsel, Ari

7    Casper at the time, to create that, Mr. Casper appealed to

8    the Court and said I don't think I'll get paid for that work

9    so I don't want to do it, and the Court allowed that.

10           So the fact is not only can I not see a complete

11   copy of the papers, I can't see any copy of the papers of a

12   motion for summary judgment that is currently pending

13   against now my client against his claims along with a motion

14   to strike all of what are now my client's, were the

15   debtor's, experts.

16           I have asked to see the summary judgment motion,

17   that motion striking the expert's, the underlying expert

18   reports in the deposition.  These are the core elements of

19   the litigation that have never been disputed.

20           This is not a trivial case.  The debtor in his

21   complaint asserts damages of up to $15 million.  And my

22   understanding even until today is still asserting that this

23   is a multimillion dollar claim that is a potential asset for

24   the creditors.  The trustee needs to be able to see these

25   documents to be able to evaluate the case to defend it, to

1    understand what the value is.

2            Now, the other thing that's important to know,

3    Your Honor, is this asylum application is not privileged.

4    Mr. Romney said so.  It's in the email that we cited.

5    There's no question.  It is not a privileged document.  It

6    was produced to the government years ago.  It's just not

7    privileged.

8            Before I turn to the order though, Your Honor, I

9    do think it is important to understand exactly how central

10   this document is.

11           I heard, Your Honor that you didn't have a chance

12   to see the late filed reply by the debtor.

13           THE COURT:  No, we had court yesterday.

14           MR. LUFT:  Perfectly understandable, Your Honor.

15           I would, if you don't mind, ask the Court to just

16   look at I believe it is document 1174, which is the debtor's

17   reply, and specifically paragraph 5, there is a statement by

18   the debtor.

19           The substance of the entire asylum application is

20   not at issue in the action captioned *Guo Wengui v. Clark*

21   *Hill* or the malpractice action.  That statement that the

22   substance of the asylum application is not at issue in the

23   *Clark Hill* litigation is directly contrary to what counsel

24   for Clark Hill told both counsel for the debtor and counsel

25   for the trustee.

1          If Your Honor turns to our opposition at document

2     1105-1, those are the exhibits, and specifically page 97 of

3     118, I think this is very important.  Your Honor will find

4     an email chain.

5          Vincent Lazar is counsel for Jenner & Block -- is

6     counsel at Jenner & Block, counsel for Clark Hill.  He

7     writes an email responding to Mr. Romney who has told him

8     previously he doesn't think the asylum application has

9     anything to do with the debtor's estate.

10         This is what counsel in the case said about the

11    role of the asylum application.

12         You've directed us to withhold the asylum

13    application from the trustee which you acknowledge is not

14    privileged.  Contrary to your assertion that the asylum

15    application, "has absolutely nothing to do with the debtor's

16    estate."  The core allegation of the debtor's complaint

17    against Clark Hill is that the content of the asylum

18    application was leaked and, therefore, damaged the debtor.

19         One of Clark Hill's primary defenses is that the

20    supposedly leaked information was voluntarily put on the

21    internet or otherwise publicly disclosed by the debtor.

22    Thus the asylum application and the information from the

23    asylum application that was supposedly leaked is fundamental

24    to the *Clark Hill* litigation.

25         He goes on in the next paragraph and says, as

1    noted above, the information in the asylum application is

2    related to and indeed fundamental to the *Clark Hill*

3    litigation and thus appears to fall within the bolded

4    exception.

5           The exception he is referring to, Your Honor, if

6    you look, is in your privileged consent order, paragraph 4,

7    which specifically carved out information, information going

8    to the merits, the litigation merits of the *Clark Hill*

9    litigation.

10          So while there is no citation for Mr. Romney's

11   statement that the substance of the entire asylum

12   application is not at issue, in fact, if we look to the

13   parties who are actually in that case they say it's

14   fundamental to that litigation.

15          And of course it is, Your Honor.  I can't even see

16   the dispositive motion that is pending against my client

17   without this.

18          Now, as I said, if Your Honor is interested, one

19   can look to the complaint and see that debtor specifically

20   raised these very allegations about the information being

21   made public and saying that it directly and proximately

22   caused his harm.

23          And, in fact, if one looks at the Court's decision

24   from the district court with regard to denying Clark Hill's

25   motion to dismiss, they cite those very paragraphs,

1    paragraphs 43 and 44 of the complaint, and state the alleged

2    -- the plaintiff has alleged an actual injury resulting from

3    defendant's conduct.  The hacker then published the

4    confidential material including plaintiff's application for

5    political asylum and passport.

6            Your Honor, this is fundamentally central and it

7    is at issue because Mr. Kwok made a decision that he was

8    willing to put his asylum application at issue in the *Clark*

9    *Hill* litigation in order to pursue money damages from them.

10           Now, also in their reply, at paragraph 5, there is

11   an argument where they say, well, the trustee, if he really

12   wants to know the information in the asylum application as

13   it relates to damages, can gather it from the public sphere.

14   That's their phrase.

15           Now, not only do I think that is completely

16   implausible, it also undermines the entire point of this

17   motion.

18           First, the idea that the trustee should scour the

19   internet to try to find a copy of the asylum application is

20   completely unreasonable.

21           But, moreover, to the extent the debtor believes

22   that that is something that is possible and doable, then why

23   are we here on a protective order if all the trustee has to

24   do is theoretically know where to look on the internet?

25   This is not privileged information.

1    And, in fact, the parties in the *Clark Hill*

2    litigation seem to agree on one thing.  It's no longer even

3    confidential information.  They both agree that it's public.

4    they just disagree when it was made public.  Whether it was

5    before the hack or due to the hack.

6    At this point, Your Honor, I'd like to turn to the

7    consent order and this idea that it's privileged.

8    The privileges consent order relates to privileged

9    documents.  The debtor knows this.  In paragraph 6, in

10   document 1063 of his protective order motion, he writes, the

11   consent order defined the scope of the trustee's and the

12   debtor's respective control of the attorney-client and work

13   product privileges, and set forth certain procedures for

14   disputes concerning the same.

15   That's what the consent order deals with.  It

16   deals with the attorney-client and attorney work client

17   privileges.

18   There is a reference to privileges, but those are

19   privileges.  It's something like the common interest

20   privilege, understood privileges.

21   Instead, what we have here now, given the fact

22   that the debtor's counsel has already conceded these are not

23   privileged documents under attorney-client or work product,

24   they have invented a privilege.

25   Again, Your Honor, I ask you to turn to their

1    reply at ECF 1174, paragraph 4, page 3 of 7 --

2                THE COURT:  Hold on.  You're going to fast.

3                MR. LUFT:  Sorry, Your Honor.  I apologize.

4                THE COURT:  That's okay.

5            (Pause.)

6                THE COURT:  So, I'm looking at their --

7                MR. LUFT:  Their reply, Your Honor.

8                THE COURT:  Yes.  That was filed yesterday --

9                MR. LUFT:  Correct, Your Honor.

10               THE COURT:  -- at 5:03 p.m.  Okay.  Go ahead.

11   What paragraph?

12               MR. LUFT:  Paragraph 4, Your Honor.

13               THE COURT:  Okay.  I'm there.

14               MR. LUFT:  All right.  Although the completed

15   version of the asylum application was not technically

16   protected by the attorney-client privilege, once it was

17   submitted to the government for consideration the asylum

18   application is nonetheless protected from disclosure by

19   federal law and specifically 8 CFR, Section 208.6(a),

20   therefore, it is privileged from disclosure.

21               Now, first of all, there's nothing technical about

22   it, Your Honor.  It is simply not a privileged document.  It

23   has been with the government for years.  And, moreover, it

24   seems to have been disclosed for longer than that.

25               So, instead, they invent a privilege to try to get

1      under the consent order.  They say the fact that there is a

2      federal regulation regarding the confidentiality or the

3      confidential treatment of a document  -- I would argue by

4      the federal government, they would argue by anyone, I don't

5      think it's relevant to the point right now -- makes it

6      privileged.

7              Your Honor enters protective orders all the time.

8      Parties enter into confidentiality agreements all the time.

9      The fact that a document falls under them doesn't make those

10     documents privileged.  It means they're subject, they're

11     confidential, they may even be attorneys' eyes only, but

12     they're not privileged.  They're just subject to a

13     protective order.  There is no privilege with regard to this

14     document.

15             And accordingly all of their arguments with regard

16     to what was said about the consent order, what the consent

17     order says, are really in opposite.

18             THE COURT:  So you'd be agreeable to entering into

19     a protective order with regard to this information with the

20     debtor and the counsel in the case pending in the District

21     of Columbia?

22             MR. LUFT:  In fact, Your Honor, I already have.

23             THE COURT:  Okay.  So then what's the problem?

24             MR. LUFT:  I have signed the protective order.

25     That's my good question, Your Honor.  I signed the

1    protective order, this is in our papers, that is in place in

2    the District of Columbia to be able to see those documents,

3    even though the attorney --

4                THE COURT:  Is the debtor a signatory to that?

5                MR. LUFT:  What's that?

6                THE COURT:  Is the debtor a signatory to that

7    protective order?

8                MR. LUFT:  I believe because he's a party, he's

9    already.

10               THE COURT:  So, Attorney Romney, what -- why isn't

11   the issue resolved with a -- this is a motion for a

12   protective order.  This is your motion.

13               So why isn't there a protective order that can

14   address this whole thing and then we don't have to fight

15   about this whole thing because you can't expect or I don't

16   think that a party could expect a party to a lawsuit to not

17   be able to respond to a motion because it's under seal and

18   subject, it's not privileged, it's a protective -- it's

19   subject -- it's a protective order.

20               The only privilege is, as you've stated, and I

21   think correctly under the privileges order, were attorney-

22   client privilege and work product doctrine.

23               I understand your argument, Attorney Romney, about

24   the asylum application.  But the problem that you have now

25   isn't that the trustee is seeking discovery with regard to

1    the asylum application.  That the trustee has to respond to

2    a motion for summary judgment, right?  So why can't that all

3    just be part of a protective order?  How can the -- you

4    can't stop them from defending a motion for summary

5    judgment.

6              MR. ROMNEY:  I agree with that statement, Your

7    Honor.

8              THE COURT:  Okay.  Well, then good.  And I'll let

9    you all take a break and you can come back and show me your

10   protective order, because I'm not going to -- there isn't a

11   -- what are we arguing about?

12             I understand your points.  I do.  I really do.

13   And I hear you.  But this is an issue that's resolvable.

14             If they breach the protective order, you sue them.

15   That's how it works, right?

16             So let's get to the reality of the situation and

17   make that happen.

18             MR. LUFT:  Your Honor --

19             THE COURT:  And then everybody has what they need

20   to have to fairly and completely deal with the cause of

21   action that's outside of this court.

22             You have the right to make sure that that

23   protective order protects that information as far as that

24   lawsuit is concerned.  I agree with that.

25             But I don't agree that the trustee can't have that

1    information in order to defend that lawsuit.  It doesn't

2    make any sense.

3            And if they -- you know -- and I heard you.  I

4    heard you.  You said, you know, the trustee works at a large

5    law firm.  They've got offices all over the place.  They're

6    going to disclose it to all these people.  If Mr. Despins

7    does that, then he's subject to a lawsuit by your client,

8    right?  And damages and all those things.  That's what the

9    law provides.  That's why there's these sections of the

10   Federal Rules of Civil Procedure.

11           I don't need to rule on this.  You just need to

12   come up with an order that makes it all work.  That's your

13   job.  That's both of your jobs.  And I'm  not saying you're

14   not trying to do that.  But now I'm saying just get it done.

15   Okay?  Because I'm not ruling on this.

16           This is -- the other issues, I have to look at, I

17   have to look at, but this -- and I have to determine based

18   upon the arguments that were made today and all these other

19   matters whether or not -- what I -- what this court can or

20   should do with regard to those matters.

21           But with regard to this issue, this asylum

22   application -- and Mr. Romney, I'm not even going to get

23   into, I don't think I need to, whether the debtor's already

24   disclosed this so that there is no expectation of

25   confidentiality.  I don't need to do that.

1    All I need to do is have you parties come together

2    on a protective order.  They have to be able to see this to

3    respond to summary judgment.  And anything else in that

4    case.  The protective order.  Anything else in that case.

5            All you have to do is go talk to the judge in the

6    District of Columbia.  What do you think the judge is going

7    to say?  The judge is going to say, well, how can they not

8    respond to summary judgment?  How can they not see this if

9    they're now the party to this lawsuit?

10           So go ahead.  I'm sorry.  I know I asked you about

11   12 questions.  I'm trying to get to -- I'm trying to be

12   practical here.  Okay?

13           MR. ROMNEY:  Your Honor, and I appreciate that,

14   and I could maybe on a good day respond to 7 out of 12 off

15   the top of my head.

16           THE COURT:  I'm not asking you to.

17           MR. ROMNEY:  I know.  But, so, I think what I

18   would ask then, and I hear Your Honor, as I have told Avi

19   basically verbatim on this issue before I had been educated

20   on CFR 208.6, I'm an agent and I can only do what I'm

21   authorized to do.  But I think -- I hear what Your Honor is

22   saying.  I think that working this out in the hallway for

23   such a sensitive issue would be overzealous.

24           THE COURT:  Okay.  Okay.

25           MR. ROMNEY:  Could we have a continuance?

1          THE COURT:  Yeah.  I mean, let's talk about that.

2          MR. LUFT:  Your Honor --

3          THE COURT:  I don't know when the summary judgment

4     motion needs to be -- when the response needs to be filed.

5          MR. LUFT:  Your Honor, if I may?

6          First of all, we have -- every month I have to

7     submit something with counsel in that case and tell them

8     where we are.  We have now put off the judge for months --

9          THE COURT:  Yeah.

10         MR. LUFT:  -- telling him effectively I'm waiting

11    to see this document.  I can't do anything.  I don't know

12    how much patience the Court has.  I can --

13         THE COURT:  Well, can I ask why can't the judge

14    order that you can see it?

15         MR. LUFT:  Your Honor, quite frankly, I think we

16    have something in place right now.

17         THE COURT:  No.  But what I'm saying is --

18         MR. LUFT:  No.  I --

19         THE COURT:  -- why can't you just show him what's

20    in place here and say, Judge, I need to be able to see this

21    in order to respond to the summary judgment motion.

22         MR. LUFT:  Because, Your Honor, there's nothing

23    about his case -- Mr. Despins substitutes in under Rule 2012

24    into the case.

25         THE COURT:  Right.

1          MR. LUFT:  He is there.

2          This is only being obstructed, quite frankly,

3   because counsel for the debtor has interjected himself and

4   told counsel for Clark, Jenner & Block, who's counsel for

5   Clark Hill, don't you dare show him that document.

6          THE COURT:  Who's the counsel for the debtor in

7   the D.C. case?

8          MR. LUFT:  It was Ari Casper.  I don't know if he

9   still is.  He's indicated that --

10          THE COURT:  Well, there's got to be somebody that

11   represents the debtor, right?

12          MR. LUFT:  Well, it's been Mr. Casper before.

13   We've gone through this.

14          But, Your Honor, I believe you're on the right --

15   you have the right idea.  And I think, to be honest, we're

16   there.  There is a protective order in the District Court in

17   D.C.  There is a protective order here.

18          If they would like to designate this as highly

19   confidential, of course.  I've said this repeatedly.  We'll

20   abide by whatever designation anyone wants.

21          We have a protective order that is meant to secure

22   these documents.  This document is no different.  It's a

23   sensitive document.

24          To be honest, I will push aside the illusions to

25   the fact that we have offices around the world or that

1    somehow my law firm is not going to act in the upmost

2    professionalism with regard to the document.  I don't think

3    that even merits response.

4          But quite frankly, Your Honor, we have a

5    protective order here, and there happens to be one in the

6    District of Columbia, so I have two orders that the trustee

7    has agreed to abide by.  Okay?

8          So I'm -- if we want to put a third order in, I

9    guess we could.  To be honest, I think it's redundant of

10    what Your Honor already did.  We have an order that clearly

11    would cover how to deal with highly confidential documents.

12          THE COURT:  Okay.  I understand what you're

13    saying.

14          So what I'm going to do is, I'm going to take a

15    recess until 2:30.  You're all going to talk about it.  If

16    you don't decide it today, I might agree to continue this.

17    I'll figure it out.  But I'm not spending any more time on

18    this.  Okay?  It's already -- it is something that you as

19    attorneys in this case must resolve.  And it needs to be

20    resolved.  And it's not efficient -- it's not efficient use

21    of the Court's time to deal with this.  I'm not going to.

22          And I'm going to be very clear, they need to see

23    this document in order to respond and defend this case in

24    the district court.  And if they don't, if that isn't -- if

25    there isn't some agreement reached on that, then I may send

1    -- I don't know what I'll do, but I'll tell you, I don't

2    know that everybody's going to like it -- so I would -- I

3    would suggest that you take the time and get this done.  We

4    have so many other issues that we have to address in this

5    case and these adversary proceedings, this should not be one

6    of them.  Okay?

7              MR. LUFT:  Thank you, Your Honor.

8              THE COURT:  All right.  So court is in recess

9    until 2:30.

10             MR. ROMNEY:  Your Honor, if I may make one --

11             THE COURT:  Court is in recess until 2:30.

12        (Recess from 2:30 p.m. until 2:53 p.m.)

13             THE COURT:  Okay. When we took a recess Mr. Luft

14   was responding to the motion for a protective order and I

15   asked Mr. Luft and Mr. Romney to have some discussions about

16   the motion for a protective order.

17             Is there anything the parties have to report to

18   the court?

19             MR. KINDSETH:  Yes, Your Honor.  If I may, Stephen

20   Kindseth for the debtor, Ho Wan Kwok.

21             THE COURT:  Hold on a second.  You didn't make the

22   argument, so why are you making the reporting? I just asked

23   Mr. Romney and Mr. Luft.

24             MR. KINDSETH:  Because I was the person who

25   reached out to -- attempted to reach the client, attempted

1    to reach immigration counsel and engaged in substantive

2    conversations with the trustee and trustee's counsel and I'd

3    like to report on the progress of those discussions.

4              THE COURT:  Okay.

5              MR. KINDSETH:  First of all, I'd like to express

6    that we heard Your Honor loud and clear with respect to Your

7    Honor's strong indication -- inclination to ensure that the

8    trustee and the trustee's counsel receives a copy of the

9    asylum application to ensure that the trustee can defend and

10   prosecute the litigation and the underlying litigation.

11             With that said, we are in need to work with the

12   existing protective order and the order that had entered in

13   the underlying litigation.

14             But unfortunately, at this point, Your Honor, we

15   were not able to reach our client or reach immigration

16   counsel to get their input and thoughts on the prospect for

17   a supplemental order that addresses Your Honor's concern and

18   the trustee's concern while also ensuring that my client's

19   interests and concerns are addressed as well.

20             Your Honor, the issue was compounded by the fact

21   that we do not have access to the order that entered in the

22   underlying litigation and, therefore, can't --

23             THE COURT:  How could you not have access to it?

24             MR. KINDSETH:  We don't have it right now.

25             THE COURT:  Okay.  That's different.  Stop.

1          MR. KINDSETH:  Sorry.

2          THE COURT:  That's not not having access.

3          MR. KINDSETH:  My apologies.

4          THE COURT:  Okay.

5          MR. KINDSETH:  Within the hour.

6          THE COURT:  Because you're the counsel to Mr.

7    Kwok.

8          MR. KINDSETH:  Within the hour.

9          THE COURT:  That's fine.  That's fair.  But don't

10   tell me you don't have access to it.

11         MR. KINDSETH:  I meant within the hour.

12         THE COURT:  Okay.  That's fair.

13         MR. KINDSETH:  Additionally, we were only able to

14   look at the protective order that entered in this case on

15   our phones, which isn't really conducive to coming up with a

16   supplemental order.

17         I am prepared, Your Honor, based on our

18   recollection of that order, prepared to highly recommend to

19   our client to agree to a supplemental order that limits the

20   scope of people who can view the asylum application.

21         If Your Honor recalls, the privilege order

22   actually enables not just counsel for the trustee and the

23   trustee to receive such documents but, I believe, based on

24   recollection, it can also go to the committee and PAX.

25         And I suspect that that would not be acceptable to

1    my client and, therefore, we would recommend to our client

2    that the scope of individuals who could view the document

3    would be limited do the trustee and the trustee's counsel

4    who are working on this matter and working in the underlying

5    litigation.

6         We have also proposed to the trustee and would

7    recommend to our client that with respect to storing it

8    electronically at Paul Hastings, that it should be of

9    limited access. Again, limited to that same group, counsel

10   who are representing the trustee in this case or in the

11   underlying litigation.

12        So with that said we're asking the court to

13   continue the motion where we will, in fact, make those

14   strong recommendations to our client and convey to our

15   client the court's inclination with respect to the need to

16   share the asylum application with the trustee and the

17   trustee's counsel.

18        We'll ask that the motion be continued to next

19   week, perhaps next Tuesday, so we can look at the underlying

20   order here, looking at the underlying order in the

21   underlying litigation, speak to immigration counsel, speak

22   to our client, you know, through an interpreter and work out

23   that supplemental order.

24        But, again, I am stating on the record what

25   counsel's recommendation will be to our client.

1      THE COURT:  Okay.  Thank you.

2           I just want to be very clear on the record. I

3      don't have concerns.  The way that the parties are

4      characterizing the court, I didn't take a position other

5      than to say you need to solve this problem. You have a

6      protective order in place.

7           There is an action that I'm being told about in

8      the District Court for the District of Columbia in which

9      there's an asylum application that -- and a motion for

10     summary judgment.

11          I don't have an inclination nor do I have a

12     concern. I'm telling you you have your obligations as

13     lawyers to resolve this issue under the Federal Rules of

14     Civil Procedure and under the existing orders.  So I want to

15     be very clear about that.

16          The manipulation of what has been said by this

17     court is not appreciated.  And I'm not talking to you

18     specifically, Attorney Kindseth.

19          But I'm not going to spend any more time on this.

20     That's all I'm going to say. Okay?

21          MR. KINDSETH:  I apologize, Your Honor.

22          THE COURT:  So Attorney Luft, what is your

23     position on continuing this matter until next week?

24          MR. DESPINS:  If I may, Your Honor.  Luc Despins,

25     Trustee.

1          This has been going on for three months.  We

2     believe that it should be adjourned till Friday.  There's a

3     hearing on Friday.  And there's plenty of time to resolve

4     this.  This has been pending for three months.  We've wasted

5     thousands of dollars on this.

6          THE COURT:  Well, when you say pending for three

7     months, it hasn't been pending in this court for three

8     months.

9          MR. DESPINS:  No.  No.  But we've tried not to

10    burden the court.

11         THE COURT:  I just want to be clear that I'm not

12    making -- I'm not misunderstanding something, okay?

13         So, Mr. Kindseth, there is already a protective

14    order in place. I understand what you just said and

15    appreciate what you said that you don't -- that you believe

16    that even if you highly recommend this to your client, that

17    the only agreement will be with regard to the trustee and

18    the trustee's counsel.  That may work, okay?

19         But other parties may object. I don't know what is

20    going to happen.  But it does seem odd to me that you'd need

21    until next Tuesday to resolve this issue when there -- you

22    should be able to talk to your client.

23         What I'm going to do is I'm going to continue it

24    to Friday morning.  I'm going to hear what you have to say.

25         If for some reason you haven't been able to get in

1    touch with your client, then I need -- you're going to have

2    to tell me -- you're going to have to somehow,

3    unfortunately, probably make some kind of affidavit, or put

4    something in the record as to, you know, how you attempted

5    to get in touch with your client.  Your client wouldn't talk

6    to you.  Whatever the situation may be.

7          But I need to have something in the record about

8    that because this is a -- these are serious -- I mean, I

9    know you know that. I'm not suggesting that you think

10    otherwise.

11          But as I've been saying now for the last -- well,

12    I've been saying it for along time, but I've been saying it

13    even more recently, this is a bankruptcy case, right?  This

14    is a bankruptcy case.

15          The trustee was appointed to investigate the

16    affairs of the debtor.  That's what he has to do.

17          If your client doesn't like that, I'm sorry about

18    that, but that is what the trustee has to do.  And

19    everything that happens in this case is at this point

20    governed by that.

21          The trustee was appointed to investigate the

22    affairs of the debtor and that's where we are.

23          So if the debtor doesn't respond to you, then

24    you're going to have to put that in an affidavit that you

25    made three attempts to contact him by telephone, by email,

1   by going to see him in person.  Whatever the situation may

2   be, and that he wouldn't respond to you.

3            I understand that he does not -- well, I shouldn't

4   say that.  He may not be happy with where things are. I

5   don't know.  That's the allegations anyway.  We all know

6   what the allegations are.

7            Then let's have -- let's get it done and figure

8   out whether they're true or not, okay, and then we can all

9   move on. I don't want to spend the next three months, five

10  months, eight months talking about someone's alleging this

11  and someone's alleging that.

12           The job -- this job is to make the facts and apply

13  the law.  That's what I'm supposed to do.  And every day

14  that we don't do that and we have another hearing of another

15  matter in this case where we don't advance the ball, that's

16  not really how it should work.

17           So I'm going to give you until Friday morning at

18  10:00 and then you're going to tell me where things stand.

19  And if you aren't able to communicate with your client, or

20  you are maybe, I may require you to file an affidavit.

21           We're getting to the point now where we're just

22  spinning wheels.  Well, we've been doing that,

23  unfortunately, for a while.  But now things are getting more

24  -- I mean, have gotten more serious and I take those serious

25  issues very seriously.

1        This is a bankruptcy case.  This should be treated

2   as a bankruptcy case and it's gotten completely out of hand.

3   And I just -- we -- all of us have to do our jobs to make

4   sure that doesn't happen, and that includes me and that

5   includes everybody in this room.  We are in a bad place

6   right now and it's not a place that anybody should be in in

7   a bankruptcy case.

8        So that's what I'm going to do. I'm continuing the

9   matter till 10:00 a.m. on Friday and that's the end of that

10  matter for today.

11       Now with regard to the last matter on the calendar

12  we're going to have to call that matter because it's the

13  adversary proceeding.

14     (Proceedings concluded at 3:04 p.m.)

15  I, CHRISTINE FIORE, Certified Electronic Court Reporter and

16  Transcriber, certify that the foregoing is a correct

17  transcript from the official electronic sound recording of

18  the proceedings in the above-entitled matter.

19

20

21  _____        December 9, 2022

22     Christine Fiore, CERT

23        Transcriber

24

25