# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
### BRIDGEPORT DIVISION

## EXHIBIT LIST FOR Luc Despins, Chapter 11 Trustee

|  |  |
|---|---|
| IN RE:<br><br>HO WAN KWOK,<br>     DEBTOR. | CHAPTER 11<br><br>CASE No.: 22-50073 (JAM)<br><br>**ECF No. 913** Motion of Chapter 11 Trustee for Entry of Order Holding Debtor in Civil Contempt for Failure to Comply with Corporate Governance Rights Order filed by Douglas S. Skalka on behalf of Luc A. Despins, Chapter 11 Trustee<br><br>**HEARING DATE(S):** November 16-18, 2022 |

**EXHIBITS SUBMITTED BY:** Chapter 11 Trustee, Luc Despins

**ATTORNEY:** Nicolas Bassett and Patrick Linsey

| EXHIBIT # | DESCRIPTION | ID/FULL | SUBMIT DATE |
|---|---|---|---|
| 6 | Particular of Claims, *Kwok Ho Wan & Ors. v. UBS*, Cl-2020- 000345, High Court of Justice of England and Wales Queen's Bench Division Commercial Court, dated September 23, 2020 | Full | 11/17/2022 |
| 7 | Transcript of Section 341 Meeting, dated April 6, 2022 | Full | 11/17/2022 |
| 10 | Transcript of Section 341 Meeting, dated March 21, 2022 | Full | 11/17/2022 |
| 13 | Page 3 of the Final Arbitration Award in *Boies Schiller Flexner, LLP v. Miles Kwok* | Full | 11/17/2022 |

| EXHIBIT # | DESCRIPTION | ID/FULL | SUBMIT DATE |
|---|---|---|---|
| 15 | Kwok Affidavit of *Ace Decade Holdings Limited v. USB AG* | Full | 11/17/2022 |
| 27 | **\*SEALED\***<br>Deposition Transcript of Ho Wan Kwok dated Nov. 11, 2021<br>Pages 84-85, Lines 5-5;<br>Page 87, Lines 3-13;<br>Pages 88, Lines 3-14<br>Pages 88-89, Lines 20-2 | Full | 11/18/2022 |
| 28 | **\*SEALED\***<br>Email chain beginning on July 11, 2019 from M. Krasner<br>re: Chateau Ridge property | Full | 11/17/022 |
| 29 | **\*SEALED\***<br>Email chain beginning on November 10, 2016 from K. Sloane<br>re: Sherry Netherland | Full | 11/17/2022 |

| EXHIBIT # | DESCRIPTION | ID/FULL | SUBMIT DATE |
|---|---|---|---|
| 30 | *SEALED*<br>Email from K. Sloane to Y. Wang dated May 12, 2017 | Full | 11/17/2022 |
| 32 | Affidavit of process server for Y. Wang | Full | 11/18/2022 |
| 33 | Email chain beginning on November 3, 2022 from A. Luft re: Subpoena | Full<br>*Limited Purpose* | 11/18/2022 |
| 34 | *SEALED*<br>Email chain beginning on December 8, 2022 from Q. Gao re: NY UBS action | Full | 11/17/2022 |
| 36 | *SEALED*<br>Email chain beginning December 8, 2016 from Q. Gao Re: NY UBS action | Full | 11/17/2022 |
| 37 | *SEALED*<br>Email chain beginning December 8, 2016 from Q. Gao Re: NY UBS action | Full | 11/17/2022 |
| 39 | Deposition Transcript of Ho Wan Kwok in *PAX v. Kwok,* dated October 3, 2018 Page 55, Lines 23-25 | Full | 11/17/2022 |

**Exhibit 6**

CASE NO. _____22-50073_____

IN RE: Ho Wan Kwok

VS. _____

Trustee's EXHIBIT _____6_____

DATE _____ IDEN.

DATE __1/17/2022 Admitted in Full____ EVID.

BY __PE_____

Deputy Clerk

AO 386

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF**
**ENGLAND AND WALES**
**COMMERCIAL COURT (QBD)**

Claim No. CL-2020-000345

B E T W E E N:-

|  |  |  |
|---|---|---|
| (1) | **KWOK HO WAN** | |
| (2) | **ACE DECADE HOLDINGS LIMITED** | |
| (3) | **DAWN STATE LIMITED** | |

<div align="right">

<u>Claimants</u>

</div>

- and -

**UBS AG**

<div align="right">

<u>Defendant</u>

</div>

---

## PARTICULARS OF CLAIM

---

### PARTIES

1.  The First Claimant ("**Mr Kwok**") is a high net worth individual resident since early 2015 in New York State, USA. Mr Kwok was formerly resident in the People's Republic of China ("**PRC**"), where he was known by his Mandarin language name, Guo Wengui. Mr Kwok is a political opponent of the PRC government, and by the time of the events giving rise to these claims he was already in a hostile relationship with the PRC authorities.

2.  The Second Claimant ("**Ace Decade**") is a private limited company incorporated under the laws of the British Virgin Islands with its registered address at P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, British Virgin Islands. Ace Decade was incorporated on 18 June 2014 and acquired by Mr Kwok on or around 10 November 2014 as part of the preparations for the (then) proposed acquisition of shares in the Chinese company, Haitong Securities Company Limited ("**Haitong**").

3.  The Third Claimant ("**Dawn State**") is also a private limited company incorporated under the laws of the British Virgin Islands with its registered address at P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, British Virgin Islands.

4.     Since 18 September 2015, Dawn State has been owned and controlled by Ace Decade. Prior to 18 September 2015, Dawn State was owned and controlled by the Chinese investment services provider, Haixia Capital Management Company Ltd ("**Haixia**"), through a vehicle called Haixia Capital Investment Fund (Fujian) Limited Partnership ("**Haixia Fund**") which was managed by Haixia Huifu Asset Investment and Fund Management Co. Ltd ("**Haixia Management**"). Dawn State was the vehicle used for the acquisition of shares in Haitong in 2015 (as pleaded in more detail in the body of this Particulars of Claim ("**PoC**"), subject to a contractual right under which Ace Decade could acquire Dawn State after the Haitong share acquisition.

5.     The Defendant ("**UBS**"), is a company incorporated in Switzerland, with its registered office address at Bahnhofstrasse 45, 8001 Zurich, Switzerland. UBS conducts business globally, providing retail and investment banking, wealth management and other financial services. At all relevant times UBS conducted this business through both its Swiss headquarters and also branches located, inter alia, in Hong Kong ("**UBS HK**") and in London ("**UBS London**"), the latter being, by agreement of the parties, designated as the counterparty for all of the contracts relevant to the claims in this action, as pleaded further below. UBS London has at all times held permissions to provide regulated services from the Financial Conduct Authority (Reference Number 186958) and was authorised to act for and enter into contractual agreements as UBS.

6.     As pleaded at paragraphs 32 to 57 below, UBS entered into the contracts relevant to the subject matter of the Claimants' claims through UBS London. In the discussions and negotiations leading to those contracts, UBS was represented primarily by its employee Mr Stephen Wong ("**Mr Wong**"). Mr Wong was at that time a Managing Director in the Wealth Management Division of UBS, based at the offices of UBS HK. Mr Kwok was first introduced to Mr Wong in around 2006 or 2007.

**THE FACTS GIVING RISE TO THE CLAIMS**

**Background to the Haitong Investment**

7.     In or around Autumn 2013, Mr Kwok was approached by the CEO of Haitong, Mr Wang Kaiguo ("**Mr Wang**"), who was seeking to encourage Mr Kwok to make a substantial equity investment in Haitong. Haitong is a major Chinese securities firm, engaged in the provision of stocks and derivatives brokerage, as well as investment banking, asset management, private equity, alternative investments, and financial leasing services. Haitong is one of the largest and longest established financial services providers in the PRC. Haitong's shares are traded on the Shanghai and Hong Kong Stock Exchanges ("**SSE**" and "**HKEX**" respectively). Haitong's shares trading on the HKEX are known as "**H-Shares**." Following the approach from Mr

Wang, Mr Kwok resolved to invest approximately US$3 billion in H-Shares in order to obtain a major stake in Haitong. This investment was to be made through the issue of new H-Shares by Haitong, and their allotment to companies controlled by Mr Kwok.

**Initial involvement of UBS**

8.   Following the discussions with Mr Wang, Mr Kwok communicated his intention to acquire a substantial stake in Haitong to Mr Hank Lo, a Hong Kong solicitor and partner in the firm Stevenson, Wong & Co ("**Stevenson Wong**"). Mr Kwok retained Stevenson Wong to advise him on the proposed acquisition.

9.   Mr Lo had an established relationship with Mr Wong and UBS, the details of which are not known to Mr Kwok, and it was Mr Lo who first introduced Mr Kwok to Mr Wong in or around 2006-7. By the end of 2013, Mr Wong had cultivated a close personal relationship with Mr Kwok and had successfully induced Mr Kwok to consider and treat him as a trusted adviser and personal friend.

10.  At some point in the fourth quarter of 2013, Mr Lo informed Mr Wong of Mr Kwok's intention to acquire a stake in Haitong. The Claimants do not know when Mr Lo communicated this to Mr Wong. Mr Kwok was not aware that Mr Lo intended to inform Mr Wong or UBS until after the event, although Mr Kwok did not (after the event) object to him doing so.

11.  In or around December 2013, Mr Wong visited Mr Kwok at his residence in Hong Kong. He informed Mr Kwok that UBS had become aware that Haitong would be issuing new H-Shares (the "**Placement Shares**") and that UBS wished to participate as a placing agent. Mr Wong used his mobile telephone to open a call with senior UBS executives, who Mr Kwok understood were based in Switzerland. Mr Kwok cannot now recall the names of the individuals. Those senior UBS executives and Mr Wong told Mr Kwok (the following sub-paragraphs pleading only the gist of what they said):

(1)   UBS wished to become a broker in the sale of the Placement Shares, and wanted Mr Kwok to introduce and commend UBS to Haitong for that role;

(2)   If Mr Kwok assisted UBS in that way, UBS would assist and advise him in acquiring the shares for which it was made broker or placement agent in a way which was advantageous for Mr Kwok;

(3)   Although they knew that Mr Kwok's intention was to acquire the shares for himself, UBS itself or investors with whom UBS had a relations themselves would be interested in

3

purchasing the shares at a substantial uplift on the likely offer price if Mr Kwok was willing to on-sell them.

12.    Following this meeting, Mr Kwok resolved to work with UBS and to this end, at some time in early 2014, Mr Kwok told Mr Wang that he intended to invest in the new issue of H-Shares, and asked Mr Wang to include UBS as one of the placees of the Placement Shares.

13.    In July or August 2014 Haitong resolved to issue the H-Shares via seven placees, one of which was UBS. Another company advising and assisting Mr Kwok on a separate acquisition of H-Shares, Macquarie Capital Securities Limited ("**Macquarie**"), was to be the placee in respect of three allocations of the Placement Shares. Together, UBS and Macquarie would place around 12% of Haitong's total issued shareholding.

**Mr Wong's initial advisory work**

14.    Following this meeting, Mr Kwok entered into discussions with UBS (through Mr Wong) in relation to the structuring of his planned investment (the "**Investment**") in the Placement Shares for which UBS was the placing agent (the "**UBS H-Shares**"). In discussions in and around late March and April 2014, Mr Wong said that he would provide a plan for the "*Haitong project*," including a proposed structure through which Mr Kwok could acquire the UBS H-Shares.

15.    As a securities company incorporated and operating in the PRC, Haitong was at all relevant times subject to regulation by the China Securities Regulatory Commission (the "**CSRC**"). The relevant PRC laws required the CSRC to give approval if any person acquired or actually controlled more than 5% shareholdings of the total issued capital of Haitong.

16.    It was discussed between Mr Kwok and Mr Wong that Mr Kwok intended to invest in excess of US$3 billion in total, which would considerably exceed this threshold and therefore require approval by the CSRC. The advice which Mr Kwok received from UBS included, in particular, devising a structure for the acquisition of the Placement Shares which would avoid the requirement for CSRC approval in a manner which complied with the relevant PRC laws.

17.    In the course of these conversations:

(1)    Mr Wong repeatedly told Mr Kwok that he, under the direction of UBS senior executives, would work to advance Mr Kwok's best interests in relation to the acquisition of the Placement Shares, in line with the commitment made in December 2013. From this period until the acquisition of the UBS H-Shares, Mr Kwok frequently repeated and reaffirmed

4

the assertion that he and UBS were working in Mr Kwok's interests, and that Mr Kwok should repose trust in and rely upon Mr Wong and UBS;

(2) Mr Wong said that he and UBS would devise the structuring for the acquisition in a way which was as advantageous as possible for Mr Kwok; and

(3) Mr Wong held himself and UBS out as having the experience and expertise to devise an advantageous structure for the acquisition for Mr Kwok and advising Mr Kwok (and, subsequently, Ace Decade) with respect to investments in placements such as that for the Placement Shares, the structuring of the investments, and the financing thereof.

18. In or around June 2014, UBS, through Mr Wong, gave initial advice regarding the structure for the acquisition of the UBS H-Shares. This advice was given orally at meetings in Mr Kwok's office (49/F, Bank of China Tower, No. 1, Garden Road, Hong Kong) and his personal residence in Hong Kong. In summary (the following sub-paragraphs pleading only the gist of UBS' advice), Mr Wong advised Mr Kwok: (1) Not to purchase the UBS H-Shares through a company beneficially owned or controlled by him, as this would require CSRC approval; (2) Instead, to set up a structure (which would be arranged by UBS) under which the UBS H-Shares would be acquired by a company controlled by a third-party intermediary, which acquisition would not require CSRC approval; and (3) To make the investment on a leveraged basis, with acquisition finance from UBS.

19. Mr Kwok was initially reluctant to make a leveraged investment because he did not require bank finance in order to acquire the UBS H-Shares and had intended to make the acquisition using cash. However, Mr Wong advised him that:

(1) If UBS were to proceed with structuring the Investment it would have to be on the basis that the bank would provide margin finance for the purchase of the UBS H-Shares, as this would be how UBS would receive its profit from the transaction;

(2) It was anyway in Mr Kwok's best interests to make a leveraged investment, because it would enable him to obtain the desired number of shares without committing the full amount of his own capital;

(3) Any leveraged finance provided by UBS would in any event be upon the '*best possible terms*';

(4) The terms of any leveraged finance would be consistent with Mr Kwok's requirement that there should be no provisions requiring (i) the provision of additional collateral or (ii) the mandatory repayment of the loan (which were referred to compendiously by both Mr

5

Kwok and Mr Wong as "**margin calls**" without differentiation, as a result of short term price fluctuations of the Placement Shares;

(5) UBS would give Mr Kwok adequate time to meet any other margin calls, so that if Mr Kwok had (as in fact, he did) the ability to fund the whole of the acquisition without loan financing, UBS would not enforce against the security before additional funds could be provided by Mr Kwok;

(6) In illustrating the approach which UBS would take to requests for additional collateral or repayment of the loan in the event of fluctuation in the value of UBS H-Shares, Mr Wong repeatedly (during this period, and thereafter) referred to a previous high value leveraged transaction funded by UBS, under which it had provided funding for the acquisition of a much larger stake in the Chinese insurance company, Ping An (the "**Ping An Deal**"). The details of the information provided by Mr Wong in relation to the Ping An Deal between June 2014 and December 2014 are summarised at paragraph 42 below.

20. To the best of Mr Kwok's recollection, this advice was first given in or around June 2014. However, these matters were the subject of repeated discussion between Mr Wong and Mr Kwok in the summer and autumn of 2014, and thereafter. Mr Kwok cannot be certain as to what representations were made to him by UBS on each specific occasion, but recalls the effect of the advice as a whole.

**Further Structuring Advice**

21. From in or around July 2014 onwards, UBS continued to advise Mr Kwok and (from 10 November 2014) Ace Decade regarding the proposed structure and financing for the acquisition of the UBS H-Shares. In particular, Mr Wong went on further to advise Mr Kwok (and, subsequently, Ace Decade) on the structuring of the acquisition, including further advising in relation to the requirement for approval by the CSRC of acquisitions of Haitong in excess of 5% of the company's share capital; and by advising that Mr Kwok and Ace Decade select Haixia as the intermediary for the Investment.

22. In reliance on this advice, Mr Kwok and Ace Decade selected Haixia to act as intermediary for the acquisition of the UBS H-Shares, and ultimately appointed Haixia for that purpose under a Co-Investment Agreement dated 18 December 2014 (the "**Co-Investment Agreement**").

23. Although Mr Wong had told Mr Kwok and Ace Decade that Haixia was independent of UBS, it is in fact controlled by State Development and Investment Corporation ("**SDIC**"), which is a joint venture partner of UBS, with both co-owning an investment fund called "**UBS SDIC**".

To facilitate the investment in the Placement Shares, on 23 October 2014 Haixia caused the incorporation of Dawn State through its subsidiary Haixia Fund. Dawn State was at all relevant times until its transfer to Ace Decade managed by Mr Lu Bo ("**Mr Lu**"), a senior employee of Haixia who was previously employed by UBS SDIC.

24. Ace Decade was acquired on 10 November 2014 by Mr Kwok for the purpose of acting as the said investment vehicle. On the same day, on the advice of Mr Wong, an employee of Mr Kwok, Ms Yu Yong ("**Ms Yu**") became its nominee shareholder and director.

**Preparation of the December Contracts**

25. In or around late October and early November 2014, UBS (primarily through Mr Wong), Haixia (primarily through Mr Lu) and Ace Decade (primarily through Mr Kwok and Ms Yu) began making preparations to subscribe for the UBS H-Shares.

26. On or around 13 November 2014 there was an initial conference call between Stevenson Wong and Norton Rose Fulbright ("**Norton Rose**"), the lawyers engaged by Haixia to act on the transaction, at which they agreed that Norton Rose would draft a Co-Investment Agreement between Haixia, Dawn State and Ace Decade in relation to the acquisition of the UBS H-Shares.

27. On or around 14 November 2014, Ace Decade and Dawn State entered into a Memorandum of Understanding, pursuant to which Dawn State was to provide services to Ace Decade in return for a non-refundable fee equal to 65 basis points of the total invested capital, subject to a minimum of US$5,000,000.

28. During this period, leading up to the agreement by Dawn State to subscribe for the UBS H-Shares, there were ongoing discussions between Mr Wong and Mr Kwok in relation to the structuring and financing of the acquisition. During those discussions Mr Wong repeated and elaborated on the representations pleaded at paragraph 19 above. The Claimants plead further in relation to these representations at paragraphs 39 to 40, 47 and 78 below.

29. These preparations led to Ace Decade, Dawn State and UBS entering into a series of arrangements designed to allow Ace Decade to participate in the acquisition of UBS H-Shares through Dawn State (together, the "**December Contracts**"). The December Contracts were:

(1) A custody agreement between Dawn State and UBS dated 12 December 2014 (the "**Custody Agreement**");

(2) A Co-Investment Agreement between Ace Decade, Dawn State and Haixia dated 18 December 2014;

(3)    A letter agreement between Haixia Management and Ace Decade dated 18 December 2014 (the "**Letter Agreement**");

(4)    A financing letter entitled "*Project Pipe – Financing Letter*" between Dawn State and UBS London dated 19 December 2014 (the "**Financing Letter**").

30.    The Claimants plead further as to the entry into the December Contracts and their terms at paragraphs 32 to 37 below.

31.    These preparations also led to Dawn State entering into a subscription agreement with Haitong dated 19 December 2014 (the "**Subscription Agreement**"). The Claimants plead further in relation to the execution and terms of the Subscription Agreement at paragraph 44 below.

**The December Contracts**

32.    On or around 12 December 2014, Dawn State and UBS London entered into the Custody Agreement in relation (among other things) to the custody of the UBS H-Shares. The Claimants will refer to the Custody Agreement at trial for its full terms and effect. Subject to that, under the terms of the Custody Agreement, Dawn State agreed that all of the UBS H-Shares (once acquired) would be held with UBS London. The purpose and effect of the Custody Agreement was to ensure that the UBS H-Shares would be available for enforcement by UBS London of its rights under the (then) proposed facility agreement and security agreement to be entered into by Dawn State and UBS London in relation to the provision of finance for the acquisition of the UBS H-Shares. The Custody Agreement was governed by the law of England and Wales, and provided for the exclusive jurisdiction of the English Courts in respect of any disputes.

33.    On or around 18 December 2014, Ace Decade, Dawn State and Haixia entered into the Co-Investment Agreement. The Claimants will refer to the Co-Investment Agreement at trial for its full terms and effect. Subject to that, this agreement provided that:

(1)    Pursuant to this agreement, Haixia agreed to extend to Ace Decade a right to participate in the share subscription in the Target Company (i.e. Haitong) (defined as "*the Project*"), upon receipt by Haixia of US$500 million (the "**Monetary Contribution**"). In addition, it was noted that it was contemplated that Dawn State would arrange for loan financing in an amount of US$750 million, which together with the Monetary Contribution constitutes the "Co-Investment Amount".

(2)    At Clause 1.1, for Haixia Fund to receive a substantial fee for its role in the Project.

8

(3)    At Clause 3, headed "**Nature of the Right**", that Ace Decade would have only a contractual right to participate in the Project, and no immediate proprietary interest in Dawn State or the UBS H-Shares which it acquired.

(4)    At Clause 6.5:

> "*In the event that the Project is not completed for any reasons, in consideration of Haixia Fund and the Company arranging for the Project and the loan financing(s) with commercial banks for the benefit of the Investor:*
>
> *(a) the Investor agrees that the Company and/ or Haixia Fund shall receive an arrangement fee of the higher amount of (i) 0.065% of the Co-investment Amount (i.e. US$1,250 million); and (ii) US$500,000 upon the Company entering into the share subscription agreement(s) in relation to the Project*"

34.    Also, on or around 18 December 2014, Haixia Management and Ace Decade entered into the Letter Agreement. The Claimants will refer to the Letter Agreement at trial for its full terms and effect. Among other things, the Letter Agreement provided as follows:

(1)    Under the heading "*Loan Financing*":

> "*[Ace Decade] acknowledges that [Dawn State] is arranging for loan financing(s) with commercial bank(s) at the request of and for the benefit of [Ace Decade] (the "Financing") pursuant to the relevant financing agreement of the Financing for the Project (the "Financing Letter").*"
>
> "*[Ace Decade] acknowledges that it has reviewed and agreed to the terms and conditions of the Financing as set out in the Financing Letter (including the term sheet), and further covenants and agrees with [Dawn State], Haixia Fund and Haixia Management that it shall be primarily and solely responsible for all the fees, costs, expenses and payments in connection with the Financing […]*"

(2)    Under the heading "*Arrangements for the Transfer*", that at any time after a two-month period after the completion of the Project or the lock-up period under the relevant subscription agreement to be entered into by Dawn State, whichever was longer, on receiving a request from Ace Decade, Haixia Management would procure the transfer of the UBS H-Shares to Ace Decade, or another entity nominated by Ace Decade.

35.    Although the Letter Agreement provided that Ace Decade had reviewed and agreed to the terms and conditions of the Financing as set out in the Financing Letter, the Financing Letter was not in fact fully executed until 20 December 2014. The Claimants plead further at paragraphs 36 to 37 below.

36.    On or around 19 December 2014, Dawn State and UBS London entered into the Financing Letter. By the Financing Letter UBS London agreed to provide the full amount of the loan

9

financing envisioned for the Investment (the "**Facility**"), subject to the subsequent completion of more comprehensive financing documentation, in an amount in HKD equal to the product of 60%, the number of shares, and the initial price, not exceeding US$750 million) as defined in the Term Sheet. The Claimants will refer to the Financing Letter at trial for its full terms and effect. Among other things, the Financing Letter provided as follows:

(1)    Under the heading "**LTV Ratio**"

> *"(c) Pre-utilisation margin*
>
> *[Dawn State] shall deliver such additional H.K. dollar cash to the Secured Account so as to ensure that on the date (the Utilisation Request Date) of the Utilisation Request… the LTV Ratio (calculated with reference to the Aggregate Share Value on the Utilisation Request Date and on a pro forma basis as if the relevant additional HK dollar cash has been delivered to the Secured Account on such date) is equal to or lower than the Initial LTV."*

(2)    Under the heading "**Exclusivity**"

> *"(b) the Borrower will, and will procure that its respective subsidiaries and affiliates will, ensure that no other debt financing shall be incurred, borrowed, syndicated, issued or privately placed in relation to or for the purposes of funding or refinancing any of the funding for or relating to the Acquisition…"*

(3)    Under the heading "**Governing Law**", that the Financing Letter and all associated documents (defined as the "*Financing Commitment Documents*") would be subject to English law and that the English Courts would have jurisdiction in respect of any dispute

37.    The Financing Commitment Documents included an indicative termsheet for the Facility (the "**Indicative Termsheet**"). The Indicative Termsheet did not contain any legally binding commitment to borrow or lend on the terms indicated or any terms. The Indicative Termsheet provided that under the facility agreement to be agreed between the parties, UBS would be entitled in certain circumstances to demand mandatory prepayment or make margin calls in respect of the facility, as follows:

(1)    Under the heading "**Margining Terms**":

> *"LTV Call Trigger: 66.7%, subject to adjustment by the Lender in the event that the Initial LTV is adjusted as described under "Initial LTV" (above).*
> *…*
> *Margin Call: If on any Scheduled Trading Day following the Utilisation Date the LTV is higher that the LTV Call Trigger, the Borrower shall deposit into the Secured Account an amount of HKD cash only so that the LTV is restored to the Initial LTV and shall comply with all obligations described under the "Margin Payment Schedule" below.*
> *…*

*Margin Payment Schedule: Payments in respect of Margin Calls and Margin Releases shall be made by 5:00pm Hong Kong time on the Business Day (the "Margin Payment Date") immediately following the date of the Margin Call request or Margin Call Release, as applicable, provided such request is issued prior to 11:59pm (Hong Kong time)…"*

(2)     Under the heading "**_Other Terms_**":

*"Full Mandatory Prepayment Events: The Lender, at its option, may terminate this Transaction if any of the following events occur after Utilisation Date:*

*(i)     the Closing Price of the Reference Shares on any Scheduled Trading Day is less than 60% of the Initial Price;*

*(ii)    the Closing Price of the Reference Shares on any Scheduled Trading Day is less than (a) 85% of the Closing Price on the previous Scheduled Trading Day; or (b) 75% of the Closing Price on any of the 5 immediately preceding Scheduled Trading Days;*

*…*

*If the Lender gives notice that it is terminating the Transaction following the occurrence of a Full Mandatory Prepayment Event, the Borrower must repay the Facility Amount together with all other amounts due in connection with the Transaction (the "Aggregate Prepayment Amount") in accordance with the following payment schedule:*

*(i)     25% of the Aggregate Payment Amount on the Business Day immediately following such notice;*

*(ii)    25% of the Aggregate Payment Amount on the second Business Day following such notice; and*

*(iii)   the remaining 50% of the Aggregate Prepayment Amount on the third Business Day following such notice."*

*…*

*Makewhole: Upon (i) a Voluntary Prepayment on any date other than a Mutual Break Date or (ii) prepayment or termination in any other circumstances, including following a Full Mandatory Prepayment Event or an Event of Default, a Makewhole Amount is payable by the Borrower to the Lender.*

*The Makewhole Amount is calculated as an amount equal to the Spread applied to the Facility Amount or the prepayment amount, as applicable, for the period from (and including) the date of prepayment or termination, as applicable, to the next occurring Mutual Break Date or, if none, the Maturity Date."*

**UBS's representations prior to execution of the December Contracts**

38.     During the course of the preparation of the December Contracts, in or around December 2014 and before 18 December 2014, Mr Kwok became aware that the terms of the proposed financing for the Investment from UBS included provisions for margin calls and mandatory prepayment (which, again, he referred to compendiously using the term "margin calls"). Mr Kwok cannot now recall whether he saw the Financing Letter and/or Indicative Termsheet, but

his knowledge must in any event have come from a description of the terms by someone else and not from review of the documents, because he did not read English.

39.    Mr Kwok objected to the inclusion of these terms, and raised this with Mr Wong. There was a discussion between them, which took place either in Mr Kwok's residence or his office in Hong Kong. The gist of what Mr Kwok said to Mr Wong was that that he was unhappy about these terms, and he wanted them taken out of any agreements with UBS. Mr Kwok said that he did not want UBS to be able to demand payments or repayment of the loan as a result of short-term fluctuations in the price of the Haitong H-Shares. In response, Mr Wong made further representations and gave advice to Mr Kwok and Ace Decade on behalf of UBS, the effect of which was as follows:

(1)    It was UBS's internal policy that where the bank was providing margin finance, it would have terms allowing it to make margin calls (i.e. to demand payment of margin or mandatory prepayment), and these were standard terms for UBS financing agreements;

(2)    Nonetheless, Mr Wong intended to go back to the bank and try to get the terms removed from the agreements or changed;

(3)    Even if Mr Wong could not get the margin call provisions removed or changed, Mr Kwok (and therefore Ace Decade) should not be concerned about them as:

(a)    Such terms would not be strictly relied upon or executed by UBS in this case, because UBS had a policy which would apply to Ace Decade and Mr Kwok (and therefore, impliedly, to Dawn State as their intermediary) as highly valued customers not to make margin calls (i.e. to demand payment of margin or mandatory prepayment) if prices moved in the short term.

(b)    If it were necessary for UBS to make a margin call (i.e. to demand payment of margin or mandatory prepayment) due to longer term price movements, UBS would work with Ace Decade to allow it to meet any demands and would allow a reasonable time for it to do so, including longer time periods for payment than those in the facility agreement if necessary, and would not sell any of the Shares as a result of any margin call without giving Ace Decade adequate time to pay.

(4)    Mr Wong again referred to the Ping An Deal as demonstrating the approach which UBS would take to requests for additional collateral or repayment of the loan in the event of fluctuation in the value of H-Shares. The details of the information provided by Mr Wong

in relation to the Ping An Deal between June 2014 and December 2014 are summarised at paragraph 42 below.

40.    During the course of conversations and communications during this period (including in the conversations in which he gave the advice and made the representations pleaded in paragraph 39 above), Mr Wong further repeated and reaffirmed the assertion that he and UBS were working to protect and advance Mr Kwok's interests, and that Mr Kwok and Ace Decade should repose trust in and rely upon UBS and in particular Mr Wong. From the context in which these assurances were given, it is to be inferred that they were intended to encourage Mr Kwok and Ace Decade to accept and rely upon the advice and representations pleaded in paragraph 39 above.

41.    As a result of these conversations with Mr Wong, Mr Kwok reasonably believed: (1) that Mr Wong would get the margin call and mandatory prepayment terms removed from the Financing Commitment Documents, and in any event from the eventual facility agreement; and (2) that in any event he need not be concerned about such provisions which would not be relied upon in accordance with their strict terms, but only in accordance with the approach and policy described by Mr Wong. Mr Kwok did not thereafter read the Financing Letter or Indicative Termsheet prior to 19 December 2014 nor was he briefed on their terms. As a result, Mr Kwok was not aware that the margin call and mandatory prepayment provisions were included in these documents until around March 2015, as detailed at paragraph 46 below.

**The Ping An Representations**

42.    As pleaded above, Mr Wong repeatedly referred to the Ping An Deal as an illustration of the approach which UBS would take to requests for additional collateral or repayment of the loan in the event of fluctuation in the value of H-Shares. Mr Wong also referred to the Ping An Deal as an illustration of UBS's expertise in structuring the acquisition of equities in companies incorporated in the PRC. Mr Kwok cannot recall every occasion on which the Ping An deal was discussed, but they included at least:

(1)    The discussions between Mr Wong and Mr Kwok in the summer of 2014 pleaded at paragraphs 19 and 27 above. These discussions were primarily between Mr Wong and Mr Kwok, but two of Mr Kwok's employees (Yang Ying and Lyu Tao) were each present on at least one occasion when Mr Wong made representations regarding the Ping An Deal during this period.

(2)    The discussions between Mr Wong and Mr Kwok in or around December 2014, before 18 December 2014.

43. In the course of those conversations as a whole, Mr Wong (on behalf of UBS) represented the following matters regarding the Ping An Deal:

(1) The Ping An Deal involved the acquisition of shares in a PRC company, namely the insurance company Ping An Insurance.

(2) UBS had advised the buyers of the stake in Ping An (the "**Ping An Stake**") in relation to the structuring of the acquisition and the funding of that acquisition.

(3) UBS had provided loan funding for that acquisition. The value of the Ping An Stake and the loan financing provided by UBS were substantially larger than the value of the UBS H-Shares or the loan financing which UBS was proposing to provide for the acquisition of the UBS H-Shares.

(4) Although the direct purchaser of the Ping An Stake was the Thai conglomerate, CP Group, CP Group was in fact acting as an intermediary for a Chinese businessman, the billionaire Xiao Jianhua ("**Mr Xiao**"). Mr Xiao was at that time the chairman of the Chinese conglomerate, the Tomorrow Group. UBS had advised the CP Group and Mr Xiao as to how to set up the intermediary structure for the acquisition. Like Mr Kwok, Mr Xiao was a very highly valued customer of UBS.

(5) Although the lending arrangements for the acquisition of the Ping An Stake included terms allowing UBS to make margin calls (i.e. to demand payment of margin or mandatory prepayment) on the basis of price fluctuations, and there had been price fluctuations, UBS had not strictly enforced those terms. Instead, UBS had worked with the shareholder and given the shareholder ample time within which either the value of the shares might recover, or the shareholder could arrange the payment of margin. UBS had offered temporary additional financing to make up any shortfall.

(6) As a result, there had never been a prospect that UBS would enforce against the Ping An shareholder's security, or that it would lose any of the Ping An shares which it had acquired.

(7) This was in accordance with UBS's policy for highly valued customers, which would also apply to Mr Kwok and Ace Decade, and UBS intended to give Mr Kwok and Ace Decade the same treatment as the Ping An shareholder in the event that it became entitled to a make a margin call (i.e. to demand payment of margin or mandatory prepayment).

**The Subscription Agreement**

44.    On or around 19 December 2014, Dawn State entered into a subscription agreement with Haitong (the "**Subscription Agreement**"), under which it agreed to purchase the UBS H-Shares (the "**Subscription**"), being 569,427,620 H-Shares, at a price of HK$15.62 per share, totalling HK$8,894,459,424.40 (the "**Subscription Price**"). The Subscription Agreement provided, among other things, that:

(1)    Under Clause 2, the Subscription Price could be increased or reduced by up to HK$1.56 per share on the occurrence of certain conditions regarding an increase or decrease in the trading price of Haitong H-Shares during the period between the Subscription Agreement and Closing

(2)    Closing of the sale and purchase of the UBS H-Shares was subject to the satisfaction of certain conditions set out in Clause 3.1 of the Subscription Agreement (the "**Conditions**").

(3)    Under Clause 8.1, the Subscription Agreement could be terminated by either party if the Conditions had not been fulfilled on or before 30 June 2015.

**UBS's Representations prior to execution of the Lending Documents**

45.    In and around February and March 2015, the lending documents for UBS's financing of the acquisition of the UBS H-Shares by Dawn State (the "**Lending Documents**") were prepared. Although Ace Decade was not a party to any of the Lending Documents (the details of which are pleaded below), drafts of the Lending Documents were provided to Stevenson Wong, the lawyers acting for Ace Decade.

46.    In or around mid-March 2015, Mr Kwok was informed by Ms Yu that the draft agreements contained provisions allowing UBS to make margin calls and to require mandatory repayments in the event of short-term fluctuations in the value of the UBS H-Shares.

47.    In conversations with Mr Wong in around mid-to-late March 2015, Mr Kwok said that he objected to these terms, and repeated that he did not want UBS to be able to demand payments or repayment of the loan as a result of short-term fluctuations in the price of the Haitong H-Shares. Mr Wong, on behalf of UBS: (1) Further repeated and reaffirmed the assertion that he and UBS were working in Mr Kwok's interests, and that Mr Kwok and Ace Decade should repose trust in and rely upon Mr Wong and UBS; and (2) Restated the advice and representations particularised at paragraph 39 above, which are repeated here as particulars of the gist of the advice given and representations made by UBS through Mr Wong in March 2015.

15

48.    Mr Kwok believed these assurances and relied on them, and therefore did not object to the negotiations between Dawn State and UBS on the Lending Documents continuing or make efforts to cause or procure Ace Decade's withdrawal from the Co-Investment Agreement or otherwise prevent the completion of the Investment.

**The Lending Documents**

49.    On 1 April 2015, Dawn State and UBS executed the Lending Documents for UBS's financing of the acquisition of the UBS H-Shares by Dawn State.

50.    The "**Facility Agreement**" was made on behalf of Dawn State and UBS London. The Facility Agreement as agreed was a HK$5,336,675,654.64 term facility. The Claimants will refer to the Facility Agreement at trial for its full terms and effect. Subject to that, the terms of the Facility Agreement included the following provisions:

(1)    Clause 1.1 ("**Definitions**"):

"**"Initial LTV Ratio**" means sixty per cent (60.00%) [...]"

"**"LTV Ratio**" means, on any Scheduled Trading Day, the loan to value ratio (expressed as a percentage) calculated by the following: A/B where: "A" means the aggregate amount in HK Dollars of the Loan outstanding less the Margin Call Balance; and "B" means the Market Value multiplies by the number of Shares subject to the Transaction Security."

"**"Margin Call Trigger**" means sixty-six point seven per cent (66.70%) [...]"

(2)    Clause 7.7 ("**Mandatory Prepayment**"):

"(a)    If the Lender determines that:

(i)    the Market Value of a Share on any Scheduled Trading Day is less than sixty per cent (60%) of the Initial Price;

(ii)    the Market Value of a Share on any Scheduled Trading Day is less than:

(A)    eighty-five per cent (85%) of the Market Value of the Shares on the immediately preceding Scheduled Trading Day; or

(B)    seventy-five per cent (75%) of the Market Value of the Shares on any of the five immediately preceding Scheduled Trading Days;

...

Then (in each case) the Lender may, by notice to the Borrower, cancel the Facility and declare the outstanding Loan, together with accrued interest and all other amounts accrued under the Finance Documents, immediately due and payable, whereupon the Facility will be cancelled and all such outstanding amounts will become immediately due and payable in accordance with paragraph (b) below.

(b)    Any prepayment of the outstanding amounts referred to in paragraph (a) above shall be made in the following amounts and at the following times:

16

(i)    *on the Business Day immediately following delivery of notice by the Lender of such prepayment, twenty-five per cent (25%) of such outstanding amounts;*

(ii)    *on the second Business Day immediately following delivery of notice by the Lender of such prepayment, twenty-five per cent (25%) of such outstanding amounts; and*

(iii)    *on the third Business Day immediately following delivery of notice by the Lender of such prepayment, fifty per cent (50%) of such outstanding amounts.*

(3)    Clause 18.1 ("**Margin Call**"):

> *"If, on any Scheduled Trading Day, the Lender determines that the LTV Ratio is greater than the applicable Margin Call Trigger, the Borrower shall as soon as practicable, and in any case no later than 5:00 p.m. on the Business Day after the date of a Margin Call Notice from the Lender requiring it to do so, deposit or procure to be deposited into the Secured Account such additional HK Dollar amounts in cash, to be charged in favour of the Lender under the Security Agreement, to ensure that the LTV Ratio, after being recalculated by taking into account the additional cash deposited, is equal to or less than the applicable Initial LTV Ratio."*

(4)    Clause 20 sets out 16 events or circumstances which constitute an "**Event of Default**", including: (a) (at Clause 20.1) failure to pay on the due date any amount payable pursuant to a Finance Document; and (b) (at clause 20.2) failure to comply with Clause 18.1.

(5)    Clause 20.17 ("**Acceleration**"):

> *"On and at any time after the occurrence of an Event of Default which is continuing the Lender may, by notice to the Borrower:*
>
> (a)    *cancel the Commitment whereupon they shall immediately be cancelled;*
>
> (b)    *declare that all or part of the Loan, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, whereupon they shall become immediately due and payable;*
>
> (c)    *declare that all or part of the Loan be payable on demand, whereupon they shall immediately become payable on demand by the Lender; and/or*
>
> (d)    *exercise any or all of its rights, remedies, powers or discretions under the Finance Documents."*

(6)    At Clause 32: "*This Agreement, and all non-contractual obligations arising from or in connection with this Agreement, are governed by English law,*" and at Clause 33.1 ("**Jurisdiction**"), for the English Court to have exclusive jurisdiction to settle any dispute arising out of or in connection with any Finance Document.

51.    The "**Security Agreement**" was also made on behalf of Dawn State and UBS London. Under the Security Agreement Dawn State (the "*Chargor*") assigned first ranking security over its rights in or to certain assets, including in particular the UBS H-Shares to UBS. The Security Agreement further provided for the UBS H-Shares to be held by UBS London Branch, acting as Custodian, with the UBS H-Shares to be deposited into a charged account held with UBS on the terms of the Custody Agreement. The Claimants will refer to the Security Agreement at trial for its full terms and effect. Subject to that, the Security Agreement included the following provisions:

(1)    Under Clause 3.1 ("**Assignment by way of security**"), that Dawn State assigned to UBS all its present and future right, title and interest (including those against the Custodian) in or to (*inter alia*) the Custody Agreement, the UBS H-Shares and the account in which they were held (the "*Secured Account*").

(2)    Clause 3.2 ("**Fixed Charge**"), that Dawn State charged in favour of UBS its rights over (*inter alia*) the Secured Account and the UBS-H-Shares.

(3)    Under Clause 8 ("**ENFORCEMENT**"):

(a)    Clause 8.1 ("**When enforceable**"):

*"The Charges shall be immediately enforceable on the occurrence of an Enforcement Event which is continuing, and the powers conferred by the LPA on mortgagees including the power of sale and other powers conferred by Section 101 of the LPA as varied and extended by this Deed shall be immediately exercisable."*

(b)    Clause 8.2 ("**Power of Sale**"):

*"The statutory power of sale, of appointing a receiver and the other statutory powers conferred on mortgagees by Section 101 of the LPA as varied and extended by this Deed shall arise (and the Secured Obligations shall be deemed due and payable for that purpose) on the date of this Deed."*

(4)    Clause 9.3 ("**Financial Collateral Arrangement**"):

*"(a)    The Chargor and the Lender intend that this Deed constitutes a "financial collateral arrangement" (as defined in the Financial Collateral Arrangements (No. 2) Regulations 2003 (the "Regulations") and, as such, the Lender shall have the right:*

*(i)    to use and dispose of any Charged Asset which constitutes "financial collateral" (as defined in the Regulations ("Financial Collateral")), in which case the Lender shall comply with the requirements of the Regulations as to obtaining "equivalent financial collateral" (as defined in the Regulations);*

18

(ii) *to set-off the value of any equivalent financial collateral against, or apply it in discharge of, any Secured Obligations in accordance with the Regulations; and*

(iii) *(at any time after the Charges become enforceable) to appropriate any Charged Asset which constitutes Financial Collateral in or towards satisfaction of the Secured Obligations in accordance with the Regulations.*

(b) *If the Lender is required to value any equivalent financial collateral for the purpose of paragraph (a)(ii) or (a)(iii) above, the value shall be:*

(i) *in the case of cash, its face value at the time of appropriation or set-off; and*

(ii) *in the case of financial instruments or other Financial Collateral, their market value at the time of appropriation, or set-off as determined (after appropriation) by the Lender by reference to a public index or other applicable generally recognised source or such other process as the Lender may select, including a valuation carried out by an independent investment bank, firm of accountants or other valuers appointed by the Lender.*

*as converted, where necessary, into the currency in which the Secured Obligations are denominated at a market rate of exchange prevailing at the time of appropriation or set-off selected by the Lender."*

(5) Clause 9.4 ("**Sale of Charged Assets**"):

*"The Chargor acknowledges and agrees that the Share Collateral or other Charged Assets may decline speedily in value and are of a type customarily sold on a recognised market and therefore upon the enforcement of the Charges the Lender is not required to send any notice of its intention to sell or otherwise dispose of any Share Collateral or any other Charged Assets. Following the occurrence of an Enforcement Event which is continuing, the Lender or any Delegate or any Receiver may, in its sole and absolute discretion, sell Share Collateral or other Charged Assets in a private sale in such manner and under such circumstances as the Lender or Delegate or Receiver may deem necessary or advisable (with the Lender having the right to purchase any or all of the Share Collateral or other Charged Assets to be sold). The Chargor acknowledges that such sale shall be deemed to have been made in a commercially reasonable manner, notwithstanding that any such sale may be for a price less than that which might have been obtained had such Share Collateral or other Charged Assets been otherwise privately or publicly sold."*

52. The "**Facility Agreement Side Letter**" was also made on behalf of Dawn State and UBS London. The Claimants will refer to the Security Agreement at trial for its full terms and effect. Subject to that, the terms of the Security Agreement included provision:

(1) For Dawn State to make a substantial additional payment in respect of any early repayment under the Facility Agreement, as follows:

> *"On the date of any payment, repayment or prepayment of the Loan in whole or in part, the Borrower shall pay the applicable Make-Whole Amount…*
>
> *"**Make-Whole Amount**" means, in respect of the Loan to be repaid or prepaid, the amount of the spread that would have been applicable on the amount of the principal of the Loan repaid or prepaid for the period from the relevant date of repayment or prepayment up to the next occurring Mutual Break Date or, if none, the Final Repayment Date, had that amount so repaid or prepaid remained outstanding up to such Mutual Break Date or the Final Repayment Date, as the case may be."*

(2) And that "*This Facility Agreement Side Letter, and all non-contractual obligations arising from or in connection with this agreement, are governed by English law.*"

53. Also on 1 April 2015, Dawn State provided UBS London (both in its capacity as lender under the Facility Agreement and as Custodian under the Custody Agreement) with a "**Settlement Authorisation**." The Claimants will refer to the Security Agreement at trial for its full terms and effect. Subject to that, under the Settlement Authorisation:

(1) Dawn State authorised UBS London (as lender) to instruct and/or authorise the Custodian (also UBS London) to apply the Monetary Contribution made by Dawn State and Facility Amount advanced by UBS London towards funding the Subscription in accordance with the Subscription Agreement, and to transfer the UBS H-Shares allocated pursuant to the Subscription Agreement to the secured account subject to the Custody Agreement.

(2) It was agreed that the "*Settlement Authorisation, and all non-contractual obligations arising from or in connection with this agreement, are governed by English law.*"

54. The Settlement Authorisation was updated by a document entitled "**Amended and Restated Settlement Authorisation**" following the price uplift pleaded at paragraph 55 below.

**The Price Uplift**

55. On 8 May 2015, Haitong sent a letter to Dawn State and other investors in the new H-Shares announcing that each of the conditions precedent to completing the issuance and sale of the new H-Shares in Haitong had been met and that Closing was expected to take place on 15 May 2015, and that because the trading price of H-Shares over the preceding 30 days had surpassed the agreed threshold, pursuant to Clause 2.2 of the Subscription Agreement the subscription price for the H-Shares was to be increased by HKD 1.56 per share, giving a share price of HKD 17.18 per share.

56.   Dawn State and UBS London therefore entered into an "*Amendment Agreement relating to the Facility Agreement*" on 13 May 2015 (the "**Amendment Agreement**").[1] The Claimants will refer to the Amendment Agreement at trial for its full terms and effect. Subject to that, under the Amendment Agreement:

(1)   At Clause 3.1, it was agreed to increase UBS's lending commitment to HK$6,011,236,393.92 and to increase in the initial LTV ratio to 61.45%, but the Margin Call Trigger remained 66.7%.

(2)   At Clause 6.4, it was agreed that the "*Amendment Agreement, and all non-contractual obligations arising from or in connection with this agreement, are governed by English law.*"

57.   Also on 13 May 2015, Dawn State and UBS London entered into a further security agreement, entitled "**Second Security Agreement**," updating the Security Agreement so as to reflect the amendments made to the Facility Agreement by the Amendment Agreement. The Claimants will refer to the Second Security Agreement at trial for its full terms and effect. The relevant terms of the Second Security Agreement are identical to those pleaded at paragraph 51 above, and those terms are repeated as particulars of the provisions of the Second Security Agreement.

**Completion**

58.   On 13 May 2015, Mr Kwok and Ms Yu authorised the final payment to Dawn State for the cash portion of the subscription price under the Subscription Agreement pursuant to Clause 4.1 of the Co-Investment Agreement. Pursuant to its obligations under the Facility Agreement, this sum was subsequently paid by Dawn State to UBS London as the Subsequent Borrower Contribution.

59.   Also on 13 May 2015 Dawn State made a Utilisation Request to UBS London, in accordance with clause 5 of the Facility Agreement, for the sum of HKD 6,011,236,393.82.

60.   Completion under the Subscription Agreement took place on 15 May 2015, and the UBS H-Shares were transferred to Dawn State. Upon its registration as shareholder, Dawn State immediately deposited the shares in the Secured Account with UBS London pursuant to clause 6.2(a) of the Second Security Agreement. UBS London therefore took assignment of the "**Acquired H-Shares**" by way of security in accordance with the terms of the Second Security Agreement pleaded at paragraphs 51 and 57 above.

---

[1] Amendment Agreement dated 13 May 2015

## Consequences of the Advice and Representations

61.    The particulars of the advice and representations of UBS pleaded at paragraphs 14 to 20,  38 to 43 and 45 to 48 are repeated. Mr Kwok and Ace Decade entered into (and did not withdraw from) the Co-Investment Agreement with Dawn State and caused and permitted Dawn State to enter into the Lending Documents with UBS on the basis of and in reasonable reliance upon the adequacy of that advice and/or accuracy of those representations.

62.    In the absence of those representations:

(1)    If UBS insisted on including the Margin Call and Mandatory Prepayment terms under the Facility Agreement, Mr Kwok and/or Ace Decade would have acquired the UBS H-Shares without using loan financing from UBS;

(2)    Alternatively, Mr Kwok and/or Ace Decade would not have acquired the UBS H-Shares at all;

(3)    Alternatively, if (contrary to the Claimants' case) Mr Kwok and Ace Decade would have acquired the UBS H-Shares through Dawn State using loan financing from UBS and on the same terms, Mr Kwok and Ace Decade would have ensured that Dawn State had sufficient funds available to meet any such margin calls and/or repayments immediately.

63.    The terms of the loan documents are very disadvantageous to Dawn State, and advantageous to UBS London. In particular:

(1)    The Facility Agreement made provision for UBS to have both (a) the right to demand mandatory prepayment pursuant to Clause 7.7 and (b) to make margin calls pursuant to Clause 18.1.

(2)    Under Clause 7.7, UBS was entitled to demand full repayment of the loan because of a 15% single day reduction or a 25% reduction over five days in the value of the UBS H-Shares, irrespective of the absolute value of the Haitong H-Shares, the LTV ratio, or the extent or absence of risk of loss to UBS London as Lender.

(3)    Haitong H-Shares were, as UBS knew (through at least Mr Wong as a result of the discussions in 2014 and 2015, and in any event as a matter of general market knowledge), prone to short term fluctuations in value, and there was therefore a material risk that the entitlement to seek prepayment under Clause 7.7 would be triggered during the term of the Facility Agreement, including in circumstances in which there was not (or not materially) a risk of loss for UBS.

(4)    As UBS knew (at least through Mr Wong) or ought to have known:

(a)    Dawn State was not the ultimate investor or the source of funds for the acquisition of the UBS H-Shares, and would not be the source of funds required to meet any margin call or demand for prepayment. This was a function of the structure for the investment which had been created on the advice of UBS, as pleaded at paragraphs 18 above.

(b)    The time periods allowed for mandatory prepayment pursuant to Clause 7.7 or payment of margin pursuant to Clause 18.1 of the Facility Agreement were not sufficient (or not reasonably likely to be sufficient) to allow the sums in question to be provided to Dawn State and by Dawn State to UBS. In particular, UBS had acknowledged on 19 December 2014, in a letter to Haixia, that it understood that Dawn State could not make payments within 24 hours of a demand being made.

(5)    Accordingly, there was a substantial chance that there would be an Event of Default within Clause 20.1 and/or 20.2 of the Facility Agreement, and that UBS would become entitled to exercise remedies following on an Event of Default pursuant to Clause 20.17.

(6)    Pursuant to the Facility Agreement Side Letter, in the event that UBS exercised its rights to demand prepayment of the loan, Dawn State had agreed to pay UBS the whole of the spread that would have been applicable on the amount of the principal of the Loan repaid or prepaid for the period from the relevant date of repayment or prepayment up to the next occurring Mutual Break Date or, if none, the Final Repayment Date. Such a clause, which is unusual in such arrangements compared to simple "break costs" provisions meant UBS would be financially advantaged by exercising its right to demand mandatory prepayment under Clause 7.7.

**Enforcement by UBS London**

64.    Between around 1 and 6 July 2015, there was a substantial drop in the trading price of Haitong shares, including H-Shares. By letter sent on the evening of 6 July 2015, UBS London served a notice on Dawn State pursuant to which it purported to exercise an entitlement to demand prepayment of the Facility advanced under the Facility Agreement pursuant to Clause 7.7 thereof. In that notice, UBS purported to demand payment of: (1) 25% of the Loan, together with accrued interest and all other amounts accrued under the Finance Documents (the "**Relevant Prepayment Amount**"), being approximately US$200 million, by 5pm the following day; (2) 25% of the Relevant Prepayment Amount, being approximately US$200 million, by 5pm on the second day after the notice was served; and (3) 50% of the Relevant

Prepayment Amount, being approximately US$200 million, by 5pm on the second day after the notice was served.

65. During the morning of 7 July 2015, Ace Decade informed UBS that while it would be able to meet the liability '*quickly*', it could not do so by 5pm that day. Mr Kwok also contacted Mr Wong by telephone to ask for additional time to secure sufficient funds in accordance with UBS's representations and advice particularised at paragraphs 14 to 20, 38 to 43 and 45 to 48 above. Mr Wong stated that no such time would be given, and that UBS London had resolved that the UBS H-Shares would be sold.

66. Dawn State did not pay the sum demanded by 5 pm on 7 July 2015.

67. During the evening of 7 July 2015, UBS London issued a "*Notice of Acceleration Event*" to Dawn State (the '**Notice**').

   (1)  By paragraph 3 of this Notice UBS stated that all of the Loan (including the prepayment amount due today), together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents were immediately due and payable.

   (2)  Also in paragraph 3, UBS gave notice of its right to exercise the power of sale pursuant to Clause 9.4 of "*each Security Document*" (i.e. the Security Agreement and Second Security Agreement).

68. By a further letter of 7 July 2015, UBS asserted that the sum payable totalled HKD 6,289,081,405.43 and comprised: (1) The loan principal (HKD 6,011,236,393.92); (2) Outstanding accrued interest (HKD 44,003,279.72); (3) 'Break costs' (HKD 1,873,883.54);and (4) The 'Make-Whole Amount' (HKD 231,967,848.24).

**Sale of the UBS H-Shares**

69. UBS London has provided limited information regarding how, if at all, it sold or purported to sell the UBS H-Shares. To the best of the Claimants' knowledge and belief:

   (1)  On or about 8 July 2015 UBS London formally transferred 200,000,000 of the UBS H-Shares (from a total of 569,427,620) to Segantii Capital Management Limited ("**Segantii**") in a block trade at an average price of HK$11.12 for a total of HK$2,224,000,000.

   (2)  On or about 10 July 2015, UBS itself purported to acquire absolutely 58,284,114 of the UBS H-Shares for a price which is not known to the Claimants. The Claimants also do not know whether, or if so when and at what price UBS sold those shares to a third party.

(3)    The Claimants do not know the details of any other sales made by UBS pursuant to the
power of sale under Clause 9.4 of the Security Agreements.

70.    A price of HK$11.12 represented an unusually deep discount to the trading price of Haitong
H-Shares, which closed at HK$13.90 per share on 7 July 2015.

71.    On the morning of 8 July 2015, Haitong announced a suspension of trading for its H-Shares,
pending the release of announcements in respect of:

> *"(1) a potential scheme of a repurchase of the shares of the Company which, if
> implemented, is subject to the shareholders' approval and (2) a potential purchase of the
> shares of the Company by the senior management and/or employees of the Company…"*

72.    Accordingly, from the morning of 8 July it was generally known (including, it is to be inferred,
by UBS) both that trading was suspended, and that there was at least likely to be a buy-back of
Haitong's shares. On 9 July 2015, Haitong announced a buy-back of its own shares. On 10 July
2015, Haitong H-Shares recommenced trading. H-Shares opened at HK$14.24 and closed at
HK$15.14.

73.    On 10 July 2015, UBS sent Haixia and its lawyers an email attaching "*a sheet detailing the application
of the proceeds of Enforcement*", although the calculation was stated to be "*in draft form and …subject
to full settlement of the trade.*" This provided that the payment to Dawn State would be calculated
by reference to: (1) "*HK closing price as of 7 July 2015: HKD 13.90*"; (2) "*Block discount (%) 20.0%*";
(3) "*Block placement price: 11.12*"; (4) "*Number of Shares sold (shares): 569,427,620*" i.e. all of Dawn
State's shareholding. UBS did not, then or subsequently, provide details of the actual buyers of
any shares, how many shares were sold to each buyer, the price at which each sale was effected,
when the sale was effected, or the terms of the sale.

**Transfer of Dawn State's Shares**

74.    On 18 September 2015, the entire share capital of Dawn State was transferred by Haixia Fund
to Ace Decade, in accordance with Ace Decade's rights under the Letter Agreement.

**ACE DECADE'S AND MR KWOK'S CLAIMS**

75.    Ace Decade's and Mr Kwok's claims pleaded in the following paragraphs are pleaded on the
basis and assumption that these claims are governed by the law of England and Wales. If it is
asserted on behalf of UBS and/or found by the Court that the governing law of the claims is
the law of Hong Kong, the same claims are pursued in the alternative under the law of Hong
Kong, and the facts and matters pleaded below are relied on as particularising Mr Kwok and
Ace Decades causes of action under Hong Kong law.

**UBS' Duty of Care**

76.    UBS owed duties of care in tort to Ace Decade and to Mr Kwok, comprising (each further or in the alternative):

(1)    A duty to exercise reasonable care and skill to ensure that information provided to or statements of fact made to them or either of them were accurate.

(2)    A duty to exercise reasonable care, skill and judgment in giving advice to them or either of them regarding (*inter alia*): (a) the structuring of the acquisition of the UBS H-Shares; (b) the financing of the acquisition of the UBS H-Shares; (c) the terms and effect of the Financing Documents; (d) the risks associated with those terms; (e) and/or UBS' intended and likely conduct in exercise of those rights.

77.    The facts and matters establishing the assumption of responsibility by UBS include at least the following:

(1)    At all relevant times Mr Wong was an agent of UBS with authority to enter into make representations and give undertakings on behalf of UBS.

(2)    As pleaded at paragraph 9 above, Mr Kwok (as UBS knew, at least through Mr Wong) at all material times treated Mr Wong as a trusted adviser and personal friend, and relied on him as such.

(3)    Paragraphs 11 to 13 above are repeated. As pleaded there, the background to the relationship between UBS and Mr Kwok and Ace Decade was an arrangement whereby Mr Kwok (at the request of UBS) assisted UBS to become the placement agent for the UBS H-Shares, and UBS offered in return to assist and advise him in acquiring the shares for which it was made placement agent on advantageous terms.

(4)    Mr Wong repeatedly held himself and UBS out as acting to protect and advance  Mr Kwok and Ace Decade's best interests in relation to the acquisition of the Placement Shares and the funding thereof, including in respect of all of: (a) the devising of the structure and funding plan for the investment; (b) the provision of information in respect of the structure, funding and merits of the investment; and (c) advising as to the structure, funding and merits of the investment. Paragraphs 17, 40 and 47 above are repeated.

(5)    Mr Wong repeatedly asserted that Mr Kwok and Ace Decade should repose trust in and rely upon Mr Wong and UBS. Paragraphs 17, 40 and 47 above are repeated.

(6)  UBS (through Mr Wong) in fact provided information and gave advice to Mr Kwok and Ace Decade, in circumstances in which it knew and intended that they would rely on that information and advice. Paragraphs 18 to 20, 21 to 23, 24, 28-39 and 47 above are repeated.

(7)  As pleaded at paragraph 17, Mr Wong held himself and UBS out as having the experience and expertise to devise an advantageous structure for the acquisition for Mr Kwok and advising Mr Kwok (and, subsequently, Ace Decade) with respect to investments in placements such as that for the Placement Shares, the structuring of the investments, and the financing thereof.

(8)  In giving information and advice about the policies, intentions and/or likely conduct of UBS as the counterparty under the Lending Documents, Mr Wong and UBS addressed matters which were uniquely within UBS's knowledge, and which (as they knew) Mr Kwok and Ace Decade could not verify independently, and in respect of which Mr Kwok and Ace Decade would have to rely on the matters communicated to them by UBS.

**Breach of duty**

78.  UBS, by Mr Wong acting within the course and scope of his authority as UBS's agent, made false and misleading representations to Ace Decade and/or Mr Kwok prior to the execution of the December Contracts and thereafter prior to the execution of the Lending Documents, as set out above. In particular:

(1)  UBS stated that it had a policy which would apply to Ace Decade and Mr Kwok (and therefore to Dawn State as their intermediary) not to demand payment of margin or mandatory prepayment if prices moved in the short term. Paragraphs 39, 43 and 47 above are repeated. These statements were false and misleading in that (as can be inferred from UBS's actual conduct pleaded at paragraphs 64 to 68 above) UBS (through the decision makers acting for UBS London and/or, insofar as relevant, UBS HK in relation to the entry into and enforcement of rights under the Lending Documents (the "**Decision Makers**")) did not have such a policy and/or did not intend to apply it to Mr Kwok, Ace Decade and/or Dawn State.

(2)  UBS stated that it had a policy which would apply to Ace Decade and Mr Kwok (and therefore to Dawn State as their intermediary) if it were necessary for UBS to make a demand payment of margin or mandatory prepayment, pursuant to which UBS would work with them to allow them to meet any demands and would allow a reasonable time for them to do so, including longer time periods for payment than those in the Facility

27

Agreement if necessary, and would not sell any of the Shares as a result of any margin call without giving Ace Decade adequate time to pay. Paragraphs 39, 43 and 47 above are repeated. These statements were false and misleading in that (as can be inferred from UBS's actual conduct pleaded at paragraphs 64 to 68 above) UBS through its Decision Makers did not have such a policy and/or did not intend to apply it to Mr Kwok, Ace Decade and/or Dawn State.

(3) UBS stated that it intended to treat Ace Decade and Mr Kwok (and therefore to Dawn State as their intermediary) in the manner in which it claimed to have treated the Ping An shareholder. Paragraphs 19, 39, 42 to 43 and 47 above are repeated. These statements were false and misleading in that (as can be inferred from UBS's actual conduct pleaded at paragraphs 64 to 68 above) UBS through its Decision Makers did not have such an intention, but instead intended to exercise all and any rights conferred on them under the Lending Documents in accordance with their terms and/or in the manner most advantageous to UBS.

(4) UBS stated that it had in fact treated the Ping An shareholder in a manner which was in accordance with the supposed policies pleaded at sub-paragraphs (3) and (4) above, and that this evidenced the approach which UBS intended to take and would (or could be expected to) take under the Lending Documents. Paragraphs 19, 39, 42 to 43 and 47 above are repeated. These statements were false and misleading in that:

(a) In conversations between Mr Wong and Mr Kwok in or around the middle of July 2015, Mr Wong indicated that (contrary to his earlier representations) the Ping An shareholder had in fact been the subject of margin calls (i.e. to demands for payment of margin or mandatory prepayment) and had met those demands in accordance with the terms of the relevant Lending Documents. If that is true, it follows that UBS's earlier representations were false and misleading.

(b) Alternatively, if UBS did treat the Ping An shareholder in the manner pleaded at paragraphs 42 to 43 above, UBS's statements were false and misleading in that the treatment of the Ping An shareholder did not evidence the approach which UBS through its Decision Makers intended to take and would (or could be expected to) take under the Lending Documents.

(5) UBS stated that it intended to act and was acting in Mr Kwok and Ace Decade's best interests in relation to the acquisition of the Placement Shares and the funding thereof. Paragraphs 17, 40 and 47 above are repeated. These statements were false and misleading

in that (as can be inferred from UBS's actual conduct pleaded at paragraphs 63 to 68 above) UBS through its Decision Makers did not intend to act in Mr Kwok or Ace Decade's best interest but instead intended to act in its own interests as Dawn State's contractual counterparty regardless of the consequences for Mr Kwok and Ace Decade.

(6) UBS stated that it was providing loan financing for Dawn State (and therefore, in practice, Ace Decade) on advantageous terms, or on "*the best possible terms*." Paragraphs 11 and 19 above are repeated. These statements were false and misleading in that (as can be inferred from the matters pleaded at paragraph 63 above) UBS through its Decision Makers intended to offer them financing which was advantageous to UBS and very disadvantageous to Dawn State, Ace Decade and Mr Kwok.

79. UBS, by Mr Wong acting within the course and scope of his authority as UBS's agent, was negligent in making those false representations in that, at the time of or before he made the representations, Mr Wong had:

<div align="center">PARTICULARS OF NEGLIGENCE</div>

(1) Failed to take reasonable care to ascertain whether UBS, and in particular UBS London, (through the relevant Decision Makers) intended to act and/or was acting in Mr Kwok and/or Ace Decade's best interests.

(2) Failed to take reasonable care to ascertain whether UBS, and in particular UBS London, (through the relevant Decision Makers) would be offering Mr Kwok and/or Ace Decade finance on advantageous terms and/or on the "*best possible terms*".

(3) Failed to take reasonable care to ascertain whether UBS had the policies pleaded at paragraph 78(1) and 78(2) above, and/or whether UBS London (through the relevant Decision Makers) in fact intended to apply those policies to Mr Kwok and/or Ace Decade (and therefore to Dawn State as their intermediary) as pleaded at paragraph 78(3) to 78(6) above.

(4) Failed to take reasonable care to ascertain whether UBS, and in particular UBS London, (through the relevant Decision Makers) in fact intended to treat Mr Kwok and/or Ace Decade in the same way in which it claimed to have treated the Ping An shareholder.

(5) Failed to take reasonable care to ascertain whether UBS had in fact treated the Ping An shareholder in the manner pleaded at paragraphs 42 to 43 above.

(6) Failed to take additional or further reasonable steps to protect Mr Kwok and Ace Decade from suffering loss or damage as a result of the false or misleading representations made by UBS.

80. UBS, by Mr Wong acting within the course and scope of his authority as UBS's agent, gave negligent advice to Ace Decade and/or Mr Kwok, as set out above. As regards the content of the advice given by UBS:

(1) As pleaded at paragraph 19, UBS advised Mr Kwok and Ace Decade that it was in their best interests to make a leveraged investment using loan funding from UBS London, and that any leveraged finance provided by UBS would in any event be on the best possible terms.

(2) As pleaded at paragraphs 39 and 47 UBS advised Mr Kwok and Ace Decade:

(a) that they should not be concerned about the presence of margin call and mandatory prepayment provisions on the terms which appeared in the Facility Agreement; and, therefore

(b) That the loan documents were nonetheless commercially advantageous for Ace Decade. That advice was supported by reference to UBS's representations pleaded at paragraph 78.

81. UBS, by Mr Wong acting within the course and scope of his authority as UBS's agent, was negligent in giving that advice, in that:

PARTICULARS OF NEGLIGENCE

(1) It was not (as must or ought to have been apparent to Mr Wong and UBS) in the interests of Mr Kwok and/or Ace Decade to use loan funding from UBS London to make the Investment, and in any event to do so on the terms of the Lending Documents, including because:

(a) As Mr Kwok had explained to Mr Wong, he and Ace Decade did not require loan funding to make the investment, but could have done so out of their own resources; and

(b) The loan funding from UBS London (in particular, on the terms of the Lending Documents and in circumstances in which the representations pleaded at paragraph 78 above were false) created a risk (and/or an excessive risk) that UBS would

enforce against the UBS H-Shares in the event of a fluctuation in the value of those shares, causing loss to Mr Kwok and Ace Decade.

(2)  UBS ought, taking reasonable care, to have advised Mr Kwok and/or Ace Decade that there was a substantial chance that UBS London would (contrary to the representations pleaded at paragraph 78) enforce its strict rights under Clauses 7.7 and 18 of the Facility Agreement in accordance with their terms, and that it would not proceed in accordance with the policies which were the subject of the representations pleaded at paragraph 78 above. Without prejudice to the generality of the foregoing, having made the representations pleaded at paragraph 98 above, UBS came under a duty to correct any misapprehension, misunderstanding or ill-informed basis on which Mr Kwok and/or Ace Decade were operating.

(3)  UBS ought, taking reasonable care, to have advised Mr Kwok and/or Ace Decade that there was a substantial chance that in the event of any fluctuation in the value of the UBS H-Shares, UBS London would enforce against the UBS H-Shares in accordance with the strict terms of the Financing and Security Agreements.

(4)  UBS ought therefore, taking reasonable care, to have advised that making the Investment subject to the terms of the Lending Documents was not in accordance with Mr Kwok's (and therefore Ace Decade's) express wish that any leveraged investment should only be made on the basis that the provision of additional collateral or repayment of the loan should not be triggered by short term price fluctuations of the Placement Shares.

(5)  The loan funding provided by UBS to Mr Kwok and Ace Decade was (as UBS must or ought to have known) not on advantageous terms (or *a fortiori* on the best possible terms), but was on very disadvantageous terms. Paragraph 63 above is repeated.

(6)  Given the actual policies and intentions of UBS London, Mr Kwok and Ace Decade should (as UBS must or ought to have known) have been concerned about the presence of the mandatory prepayment and margin call terms under Clauses 7.7 and 18.1 of the Facility Agreement, and UBS ought to have advised that these terms posed a substantial risk to the outcome of the Investment.

(7)  UBS failed to reasonable steps to protect the best interests of Mr Kwok and/or Ace Decade by:

(a)  Informing Mr Kwok and/or Ace Decade that the financing proposed UBS was not financing on advantageous terms or '*on the best possible terms*';

(b)   Informing Mr Kwok and/or Ace Decade of the risks associated with the terms of Clauses 7.7 and 18.1 of the Facility Agreement;

(i)   Informing Mr Kwok and Ace Decade as soon as it became aware or suspected that any representation or any advice given to him was false, defective, misleading or incomplete.

(ii)  Taking additional or further reasonable steps to protect Mr Kwok and Ace Decade from suffering loss or damage or otherwise protecting their interest.

**Ace Decade's claim**

82.   Ace Decade brings the primary claim arising from UBS's breaches of duty pleaded above.

83.   Ace Decade reasonably and foreseeably relied upon the representations and/or advice particularised above and the skill and judgment of UBS by (each further or in the alternative):

(1)   Entering into the Co-Investment Agreement as particularised at paragraph 33;

(2)   Not withdrawing from the Co-Investment Agreement or otherwise preventing the completion of the Investment before the completion of the Subscription;

(3)   Causing or permitting Dawn State to enter into the Financing Letter as particularised at paragraph 36 above.

(4)   Not preventing Dawn State from entering into the Lending Documents, and instead procuring that it acquired the UBS H-Shares without loan funding from UBS; and/or

(5)   If (contrary to the Claimants' case) Dawn State would have acquired the UBS H-Shares using loan financing from UBS and on the same terms, not ensuring that Dawn State had immediate access to sufficient funds to meet any such margin calls and/or repayments.

(6)   The Claimants repeat paragraphs 61 and 62 above.

84.   UBS's negligence has caused Ace Decade loss and damage. In particular (each further or in the alternative):

<div align="center">ACE DECADE'S PARTICULARS OF LOSS</div>

(1)   Ace Decade has lost the entirety of its Monetary Contribution, being US$500 million, less the sum of HK$36,621,693.83, being approximately US$4.7 million at the prevailing exchange rate accounted for by UBS to Ace Decade after the sale of the Acquired Shares: US$495,300,000;

(2)    If Ace Decade would have withdrawn from the Investment altogether after the execution of the Co-Investment Agreement (rather than making the investment through Dawn State but funding it from either Mr Kwok and/or Ace Decade's own resources or alternative loan financing), Ace Decade has lost the entirety of its Monetary Contribution, being US$500 million, less the sum of HK$36,621,693.83, being approximately US$4.7 million at the prevailing exchange rate accounted for by UBS to Ace Decade after the sale of the Acquired Shares, and the fee of US$812,500 which would have been payable to Haixia Fund under Clause 6.5 of the Co-Investment Agreement: US$494,487,500;

(3)    Losses representing returns which it would have achieved from investing in the UBS H-Shares, to be quantified on the basis of expert evidence.

**Mr Kwok's Claim**

85.    Mr Kwok's claim is only pursued in the alternative to that of Ace Decade, on the premise that UBS denies and successfully disputes that any of its wrongdoing pleaded above is actionable at the suit of Ace Decade.

86.    Mr Kwok also reasonably and foreseeably relied upon the representations and/or advice particularised above and the skill and judgment of UBS by (each further or in the alternative):

(1)    Causing or permitting Ace Decade to enter into the Co-Investment Agreement as particularised at paragraph 33;

(2)    Not causing Ace Decade to withdraw from the Co-Investment Agreement or otherwise preventing the completion of the Investment before the completion of the Subscription;

(3)    Causing or permitting Dawn State to enter into the Financing Letter as particularised at paragraph 36 above.

(4)    Not preventing Dawn State from entering into the Lending Documents, and instead procuring that it acquired the UBS H-Shares without loan funding from UBS; and/or

(5)    If (contrary to the Claimants' case) Dawn State would have acquired the UBS H-Shares using loan financing from UBS and on the same terms, not ensuring that Dawn State had immediate access to sufficient funds to meet any such margin calls and/or repayments.

(6)    The Claimants repeat paragraphs 61 and 62 above.

87.    UBS's negligence has caused Mr Kwok loss and damage, in the same measure as Ace Decade. Paragraph 84 above is repeated *mutatis mutandis*.

**DAWN STATE'S CLAIM**

**Sale of the Acquired H-Shares**

88.    On 7 July 2015, as a result of an Event of Default, UBS purported to give notice to Dawn State regarding its right to exercise a '*power of sale*' in relation to the Charged Assets (being the UBS H-Shares). Paragraph 67 above is repeated. UBS London's contractual entitlement to sell the UBS H-Shares was found under Clauses 9.3(a)(i) and 9.4 of the Security Agreement.

89.    To the best of the Claimants' knowledge and belief, UBS did thereafter purport to exercise its power of sale and sold all of the UBS H-Shares. Save as pleaded at paragraph 69 above, the Claimants do not know the details of the sales made pursuant to that purported entitlement.

90.    Paragraph 51(3) above is repeated. In selling the UBS H-Shares, UBS was exercising a statutory '*power of sale*' under s.101 of the Law of Property Act 1925 (the "**LPA**") as preserved and modified by clause 8 of the Security Agreements, and was (and is) therefore subject to the duties and obligations imposed upon a mortgagee or chargee exercising such powers at law and in equity.

91.    In the premises, any purported sale(s) of the UBS H-Shares which caused or was/were designed to enable the Acquired Shares to be acquired absolutely by UBS were therefore invalid and of no effect. Any UBS H-Shares purportedly sold to UBS itself will have remained subject to Dawn State's rights and UBS's obligations under the terms of the Lending Documents.

92.    Otherwise (and subject to any provable costs and liabilities of Dawn State were satisfied out of said proceeds or profits) UBS was and remains under an immediate duty to account to Dawn State: (1) for its dealings with the Acquired H-Shares mortgaged to it, charged in its favour or otherwise held by it as Custodian; and/or (2) for any proceeds of said Acquired H-Shares obtained by it as a result of the sales; and (3) for any profits made by it as a result of the sales particularised in paragraph 69 above or other dealings as aforesaid;

93.    Further or alternatively, the aforementioned proceeds and/or profits are held on statutory trusts pursuant to s.105 of the LPA, alternatively on constructive trust, for Dawn State.

94.    Further or alternatively, UBS also owed a duty to exercise reasonable skill and care to obtain a proper price for the Acquired H-Shares when exercising its power of sale. Insofar as any purported sales of the UBS H-Shares were valid, the Claimants believe that UBS failed to act with reasonable skill in making the sales, by reason of the fact that it:

PARTICULARS OF NEGLIGENCE

(1) Failed or failed adequately to consider whether the discount applied to the H-Shares was an inappropriately large discount in the context of block sales on the HKEX;

(2) Failed or failed adequately to consider whether those shares could have been sold with a smaller discount;

(3) Failed or failed adequately to consider the effects of the suspension (or likely suspension) of trading in Haitong shares;

(4) Failed or failed adequately to consider the effects of the share buy-back by Haitong. Paragraphs 72 and 72 above are repeated;

(5) Failed to allow adequate time for the share buy-back to take effect; and

(6) Failed to take additional or further reasonable steps to ensure a proper price was obtained for the Acquired H-Shares.

95.  As a result of UBS's negligence, Dawn State suffered loss comprising the difference between the price for which the shares were sold and the price that could reasonably have been obtained for those shares. The Claimants reserve the right to plead further on provision by UBS of particulars of the sales of the UBS H-Shares which it effected.

**Alternative claim in the event of appropriation by UBS**

96.  UBS did not, on 7 July 2015 or at any time subsequently, take any definitive steps to appropriate the Acquired H-Shares or alternatively to communicate such steps to UBS. As a result, UBS has at no time appropriated the Acquired H-Shares in accordance with clause 9.3(a)(ii) of the Security Agreement or Regulation 17 of the 2003 Regulations.

97.  If, contrary to the Claimants' case, UBS did purport to and did effectively appropriate the Acquired H-Shares pursuant to Regulation 17 of the 2003 Regulations, that appropriation could not have occurred prior to receipt of the notice from UBS to Dawn State of the exercise of the right of appropriation. No such notice was given prior to (if, contrary to the Claimants' case, such notice was ever given) 14 July 2015.

98.  In the event of exercise of a right of appropriation, UBS was at all times and remains under a duty to: (1) Value the UBS H-Shares in a commercially reasonable manner at the time of appropriation; and (2) Properly account for any amount by which that value exceeded Dawn State's liabilities to UBS under the Security Agreements.

99.  UBS's purported credit at a value of HK\$11.12 per share (particularised at paragraph 73 above) could not reflect the commercially reasonable value of the Acquired H-Shares on any relevant

date. In particular (but without limitation) that credit of HK$11.12 per share was purportedly calculated by applying a discount to the closing price on 7 July 2015, and not on any possible date of appropriation.

100. UBS would therefore be under a duty to: (1) satisfy the court that the UBS H-Shares were valued in a commercially reasonable manner at the date of appropriation; and (2) insofar as it cannot do so, account to Dawn State for any amount by which the commercially reasonable value of the UBS H-Shares at the date of appropriation exceeded Dawn State's liabilities to UBS under the Security Agreements.

## RELIEF SOUGHT

101. In the premises, Ace Decade is entitled to:

(1) Damages as pleaded at paragraph 84 above, in the amount of at least US$495,300,000. This sum is equivalent to approximately £402,032,000 as at the date of this Claim based upon the XE.com mid-market rate.

(2) Simple interest on that sum pursuant to s.35A Senior Courts Act 1981 ("**SCA 1981**") at a rate of 8% per annum.

102. Alternatively to paragraph 101 above, Mr Kwok is entitled to:

(1) Damages as pleaded at paragraph 87 above in the amount of at least US$495,300,000. This sum is equivalent to approximately £402,032,000 as at the date of this Claim based upon the XE.com mid-market rate.

(2) Simple interest on that sum pursuant to SCA 1981 s.35A at a rate of 8% per annum.

103. The amounts claimed at paragraphs 101 and 102 above are claimed in US Dollars (US$) as this is the currency in which the Claimant felt those losses.

104. Further, or alternatively, in the premises Dawn State is entitled to:

(1) An order that UBS render an account in common form in relation to the Acquired H-Shares held by it as Custodian. Paragraph 92 above is repeated.

(2) An order that UBS render an account of profits arising from the circumstances particularised in paragraph 92(3) above.

(3) A declaration that any of identifiable profits or proceeds referred to in paragraphs 92 above are held on statutory, alternatively constructive, trusts for Dawn State. Paragraph 93 above is repeated;

(4)   Further or alternatively, damages or equitable compensation for the difference between the sum at which UBS sold the Acquired H-Shares and the value which could have been reasonably obtained for said shares. Paragraph 94 and 95 above are repeated.

(5)   Alternatively, the difference between the amount accounted for by UBS to Dawn State and the commercially reasonable value of assets at the time of appropriation, which is claimed as a debt. Paragraph 100 above is repeated.

(6)   Further, Dawn State is entitled, under the court's equitable jurisdiction and/or SCA 1981 s.35A, to: (a) compound, alternatively simple, interest on the sums specified in sub-paragraphs (1) to (3) above; and (b) simple interest on the sums specified in paragraphs (4) and (5) above at a rate of 8%.

**AND the Claimants claim:**

(1)   Damages as specified above

(2)   Orders as specified above

(3)   A declaration as specified above

(4)   The difference between the sum accounted for by UBS and the commercially reasonable value of the H-Shares as a debt

(5)   Interest as specified above

(6)   Further and other relief

(7)   Costs

<div align="right">

**SA'AD HOSSAIN QC**

**SEBASTIAN ISAAC**

**MATTHEW HOYLE**

</div>

I (the First Claimant) believe that the facts stated in these Particulars of Claim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed:



Name: Kwok Ho Wan

Date: 23 September 2020

The Second Claimant believes that the facts stated in these Particulars of Claim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed:

Name: Yanping (Yvette) Wang

Date: 23 September 2020

The Third Claimant believes that the facts stated in these Particulars of Claim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed:

Name:   Yanping (Yvette) Wang

Date:   23 September 2020

**Exhibit 7**

CASE NO. _____ 22-50073 _____

IN RE: Ho Wan Kwok

VS. _____

Trustee's EXHIBIT _____ 7 _____

DATE _____ IDEN.

DATE __ 11/17/2022 Admitted in Full __ EVID.

BY __ PE _____

Deputy Clerk

AO 386

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

In Re                        * Chapter 11
                             *
                             *
    HO WAN KWOK,             * Case 22-50073(JAM)
                             *
            Debtor.          *
                             *
* * * * * * * * * * * * * * * *

TRANSCRIPT OF CONTINUED

341 MEETING OF CREDITORS

APRIL 6, 2022

Electronically Recorded by the
Office of the United States Trustee

Transcript Prepared By:

Christine Fiore, CERT
Fiore Reporting and Transcription Service, Inc.
4 Research Drive, Suite 402
Shelton, CT  06484
(203)929-9992

Ho Wan Kwok - April 6, 2022

APPEARANCES:


For the Debtor:              WILLIAM R. BALDIGA, ESQ.
                             BEN SILVERBERG, ESQ.
                             Brown Rudnick, LLP
                             Seven Times Square
                             New York, NY  10036


For the U.S. Trustee:        HOLLEY E. CLAIBORN, ESQ.
                             STEVEN MACKEY, ESQ.
                             Office of the U.S. Trustee
                             150 State Street
                             New Haven, CT  06510


For Logan Cheng,             JAY MARSHALL WOLMAN, ESQ.
 Creditor:                   Randazza Legal Group
                             100 Pearl Street, 14th Floor
                             Hartford, CT 06103


For Pacific Alliance         DAVID V. HARBACH, II, ESQ.
 Asia Opportunity Fund,      O'Melveny & Myers, LLP
 LP, Creditors:              1625 I Street NW
                             Washington, DC  20006

                             STUART SARNOFF, ESQ.
                             MAKENZIE RUSSO
                             O'Melveny & Myers, LLP
                             Times Square Tower
                             7 Times Square
                             New York, NY  10036

                             ANNECCA SMITH, ESQ.
                             Robinson and Cole
                             280 Trumbull Street
                             Hartford, CT  06103


For Bruno Wu, Weican         KRISTEN MAYHEW, ESQ.
 Meng and Rui Ma,            McElroy, Deutsch, Mulvaney &
 Creditors:                   Carpenter
                             One State Street
                             Hartford, CT  06103


For the Official             STEVEN STAFSTROM, ESQ.
 Committee of Unsecured      Pullman & Comley
 Creditors:                  850 Main Street
                             Bridgeport, CT  06601

1          MS. CLAIBORN:  Good morning.  Today is

2     Wednesday, April 6th, 2022.  We are gathered for the

3     continued meeting of creditors in the Chapter 11

4     case of Ho Wan Kwok, case no. 22-50073.

5          My name is Holley Claiborn. I'm a trial

6     attorney in the Office of the United States Trustee

7     and I will be conducting today's meeting.  Today's

8     meeting is being recorded on a digital recorder and

9     is also available for parties to participate on the

10    phone.  And there are parties, including the debtor

11    and counsel and other professionals, gathered here

12    in person.

13         Today's meeting is being interpreted, as

14    you can hear and our interpreter today is Jeff and

15    I'm going to ask Jeff to respond to this oath.

16         (The interpreter is sworn.)

17         THE COURT:  On behalf of Mr. Kwok we have

18    William Baldiga and Ben Silverberg.

19         Also on behalf of the debtor we have

20    financial professionals Craig Gelbert and Matthew

21    Flynn.

22         Present here today on behalf of the

23    Committee of Unsecured Creditors is Steven Stafstrom

24    from Pullman and Comley.

1            Mr. Stafstrom is the lawyer for the

2    Official Committee of Unsecured Creditors.

3            Also present today on behalf of PAACS

4    Stuart Sarnoff, David Harbach and MacKenzie Russo.

5    They represent PAACS.

6            On behalf of certain creditors, including

7    Rui Ma, we have Kristen Mayhew.

8            On behalf of creditor, Logan Cheng, we

9    have Jay Wolman.

10           Also on behalf of PAACS we have Annecca

11   Smith, from Robinson and Cole.

12           And then also for the debtor today we have

13   Josh Klein and Aaron Mitchell.

14           Today's meeting will feature me asking

15   questions first, followed by the opportunity for

16   creditors to come up and ask questions.

17           Is anyone on the telephone conference

18   line?

19           MR. MACKEY:  Steven Mackey from the U.S.

20   Trustee's Office is on the conference line.

21           Thank you, Mr. Mackey.  Anyone else

22   besides Mr. Mackey.

23           Hearing none, I'm going to proceed to

24   swearing in Mr. Kwok.

25       (The debtor is sworn.)

1          MS. CLAIBORN:  Mr. Kwok, as you know,

2    today's meeting is being recorded and Mr. Jeff here

3    is our official interpreter for today.

4          Jeff will be interpreting the questions

5    that I ask and your answers, and I ask that you wait

6    until Jeff has made a full translation before you

7    answer my questions.

8    EXAMINATION BY MS. CLAIBORN:

9    Q    Mr. Kwok, we're going to pick up today in

10   an area that we left off in general from the last

11   meeting of creditors that was held back on March

12   21st, 2022.

13         Has anything changed in your employment

14   status since March 21st, 2022?

15   A     No.

16   Q    Has anything changed with respect to your

17   residence?

18   A     No.

19   Q    During the meeting held on March 21st,

20   2022 I asked you about the accuracy of your

21   bankruptcy schedules and your bankruptcy statement

22   of financial affairs.

23   A    No change.

24   Q    Thank you.

25         MS. CLAIBORN:   Jeff, for purposes of my

1    questions I'm going to be following the documents

2    that are in front of you. When I say schedules, it's

3    this document.  And then this document is the

4    statement of financial affairs.  Okay?  And when I

5    refer to an ECF number, it's at the top of the page.

6              THE OFFICIAL INTERPRETER:  ECF number.

7    Okay.

8              MS. CLAIBORN:  Okay?  That should allow

9    you to follow along and start on this page.

10   EXAMINATION BY MS. CLAIBORN:

11       Q    Okay.  Mr. Kwok, I'm going to ask you to

12   make sure you have in front of you, which you appear

13   to do, Schedules A-B through J.

14             THE PRIVATE INTERPRETER:  He has Mandarin

15   translations in front of him.

16   BY MS. CLAIBORN:

17       Q    I see that Mr. Baldiga, who is seated next

18   to you, has English versions.  But in front of you,

19   Mr. Kwok, appear to be translations.  Is that

20   accurate?

21       A    Just on Schedule A-B.

22       Q    Okay.  So, Mr. Kwok, when you're answering

23   my questions today, you're going to be taking a look

24   at your own translated versions of the bankruptcy

25   schedules.

1       A    Okay.

2       Q    Okay.

3            THE PRIVATE INTERPRETER:  Just a minute,

4    Your Honor.

5            MS. CLAIBORN:  Yes.

6            THE PRIVATE INTERPRETER:  I'm having a

7    little difficulty hearing the interpreter when he

8    interprets the witness's answers.

9            MS. CLAIBORN:  Okay.  So, Jack, if you

10   could speak up.  I'm going to move the microphone.

11           THE OFFICIAL INTERPRETER:  Oh, okay.

12           MS. CLAIBORN:  See if that works.

13    BY MS. CLAIBORN:

14       Q    Okay.  Mr. Kwok, starting at Question No.

15   1 on Schedule A-B.  With respect to Schedule A-B at

16   Question No. 1, that asks if you own any legal or

17   equitable interest in any real estate residence or

18   building or similar property.  Your answer to that

19   Question No. 1 was no, Mr. Kwok.  Is that an

20   accurate answer?

21       A    Yes.

22       Q    Mr. Kwok, have you owned any real estate

23   between the year 2018 and your bankruptcy filing in

24   February of 2022?

25           THE OFFICIAL INTERPRETER:  Can you repeat

1    that one?

2     BY MS. CLAIBORN:

3         Q    Have you owned any real estate between the

4    year 2018 and your bankruptcy filing in February

5    2022?

6              THE OFFICIAL INTERPRETER:  Can you repeat

7    that one?  He said he didn't hear that.

8     BY MS. CLAIBORN:

9         Q    Mr. Kwok --

10             MR. BALDIGA:  I'm sorry.  I couldn't hear.

11             THE OFFICIAL INTERPRETER:  He said that he

12   didn't understand the translation.  I just want to

13   make sure I understand first.

14             MS. CLAIBORN:  I'll repeat the question.

15             THE OFFICIAL INTERPRETER:  Yes.

16    BY MS. CLAIBORN:

17        Q    Mr. Kwok, have you owned any real estate

18   between 2018 and February of 2022?

19        A    No.

20        Q    Mr. Kwok, as of the bankruptcy filing in

21   February 2022, did you have any equitable interest

22   in any real estate anywhere in the world?

23        A    No.

24        Q    Mr. Kwok, as of the bankruptcy filing in

25   February 2022, did you have any legal interest in

1    any real estate anywhere in the world?

2         A    No.

3         Q    Mr. Kwok, have you ever owned any real

4    estate in Hong Kong?

5         A    No.

6              THE PRIVATE INTERPRETER:  What was the

7    answer?

8              THE OFFICIAL INTERPRETER:  No.

9     BY MS. CLAIBORN:

10        Q    Mr. Kwok, have you ever owned the property

11   located at 16A South Bay Road, Hong Kong?

12        A    No.

13        Q    Mr. Kwok, do you currently own an

14   apartment at the Sherry Netherland in New York City?

15             THE OFFICIAL INTERPRETER:  I didn't get

16   it.  Can I ask him repeat the -- repeat the answer?

17             MR. BALDIGA:  You have to say -- whatever

18   you're going to say, you have to -- you're talking

19   to everybody, not just Holley, so I need to hear

20   what you're saying.

21             THE OFFICIAL INTERPRETER:  Okay.  I just -

22   - I just want to ask him to repeat -- repeat the

23   answer.

24             MR. BALDIGA:  Okay.

25             THE OFFICIAL INTERPRETER:  Okay?

1          THE WITNESS:  I don't own that real estate

2     in New York, the Sharon -- the Sharons -- at that

3     address I don't remember, and I own -- I own 50

4     percent the stock -- the stock and --

5          THE PRIVATE INTERPRETER:  No.

6          THE OFFICIAL INTERPRETER:  No?

7          THE PRIVATE INTERPRETER:  No.

8          THE OFFICIAL INTERPRETER:  Okay.

9          THE WITNESS:  For the family.

10          MS. CLAIBORN:  Can I ask you not to

11     interrupt?  Can you just wait until the end and then

12     --

13          THE PRIVATE INTERPRETER:  Okay.

14          MS. CLAIBORN:  -- you can express whatever

15     it is you want to say?

16          THE PRIVATE INTERPRETER:  Okay.

17          MS. CLAIBORN:  Can you please just

18     translate Mr. Kwok's answer again?

19          THE OFFICIAL INTERPRETER:  Yeah.  I just

20     want to repeat, make sure -- and I said it right,

21     you know, what he said.

22          THE WITNESS:  So, yeah, he -- he said, I

23     owe -- I own 50 percent of the -- 50 percent, but I

24     don't own the whole real estate, but I just

25     represent the family.

1        BY MS. CLAIBORN:

2            Q    Mr. Kwok, what do you own 50 percent of?

3            A    Bravo Luck, 50 percent of the stock powder

4        -- power.  I don't know.  I don't understand.

5                 THE PRIVATE INTERPRETER:  (Indiscernible.)

6                 THE OFFICIAL INTERPRETER:  He owned -- he

7        said he owns the 50 percent of it.

8                 THE PRIVATE INTERPRETER:  -- we can hear

9        you fine, Holley.

10                MS. CLAIBORN:  Okay.  I'm going to ask --

11       I'm going to --

12                THE PRIVATE INTERPRETER:  I don't know if

13       the microphone is connected to anything.

14                MS. CLAIBORN:  It is.  It is.  Jeff, if

15       you can speak up?

16                THE OFFICIAL INTERPRETER:  Mr. Kwok said

17       he owe -- he owns 50 percent of -- of the stock.  Is

18       it like the stock of the real estate or something?

19       I don't know.  I don't get it.  But you can help if

20       she wants to help.  Do you want him to help a little

21       bit?

22                MS. CLAIBORN:  I'd rather not.

23                THE OFFICIAL INTERPRETER:  Okay.

24                MS. CLAIBORN:  So, I'll just -- I'll ask

25       follow-up questions.

1              THE OFFICIAL INTERPRETER:  Okay.

2              MR. BALDIGA:  All right.  But I need to

3    hear if it's a misinterpretation, so --

4              MS. CLAIBORN:  I'm going to ask a

5    clarifying question, if I could.

6     BY MS. CLAIBORN:

7         Q    Mr. Kwok, do you own 50 percent of a

8    company called Bravo Luck?

9         A    I represent my family to hold 50 percent

10   of the stock.

11        Q    Mr. Kwok, when you use the term --

12             MR. BALDIGA:  Could I hear that back?

13   Could you repeat that?

14             THE OFFICIAL INTERPRETER:  Yeah.  I

15   represent my family to hold 50 percent of the stock

16   of the -- of the company.

17             MR. BALDIGA:  Okay.

18    BY MS. CLAIBORN:

19        Q    Mr. Kwok, when you say family, what do you

20   mean?

21        A    My family is a big family and that

22   includes a lot of people.  My kids and my sister-in-

23   laws, and all people together.  A lot of people.

24        Q    Mr. Kwok, who owns an interest --

25             MR. BALDIGA:  Excuse me.  We do have an

1    interpretation question.

2              THE PRIVATE INTERPRETER:  I just want to

3    ask that, is there supposed to be summary of the

4    (indiscernible) the interpretation?

5              MS. CLAIBORN:  To the best of Mr. Jeff's

6    ability, it should be verbatim.

7              THE PRIVATE INTERPRETER:  Right.  So if

8    Mr. Kwok said, my son, my daughter, my brother, my

9    sister-in-law, my nephew, my niece, many people,

10   then if the interpreter say, well, a lot of my

11   families and my brother, many people, then should it

12   be correct or not?

13             MS. CLAIBORN:  I would prefer that Mr.

14   Jeff translate as literally as possible.  So with

15   that instruction, can we --

16             THE OFFICIAL INTERPRETER:  Yeah.

17             MS. CLAIBORN:  -- do a specific job as

18   best we can going forward?  Thank you.

19             MR. BALDIGA:  Thank you.

20    BY MS. CLAIBORN:

21        Q    So, Mr. Kwok, who owns the company called

22   Bravo Luck?

23        A    My son.

24        Q    And what is your son's name?

25        A    Cheng Wu.

```
 1          Q     How long has your son owned Bravo Luck?

 2          A     I don't remember.

 3                THE PRIVATE INTERPRETER:  Say again,

 4     please.

 5                THE OFFICIAL INTERPRETER:  I don't

 6     remember.

 7      BY MS. CLAIBORN:

 8          Q     So, Mr. Kwok, what do you own 50 percent

 9     of when you explained your ownership interest in the

10     Southern Sherry Netherland?

11                MR. BALDIGA:  Objection.  You may

12     interpret.

13                THE OFFICIAL INTERPRETER:  Can you repeat

14     that one again, Holley?

15      BY MS. CLAIBORN:

16          Q     Mr. Kwok, you testified that you owned 50

17     percent of some company, and that was in response to

18     my question if you owned the Sherry Netherland

19     apartment.  Can you please explain what you meant?

20          A     Sherry is a co-op.  It doesn't have the --

21     it doesn't have the -- it doesn't have the

22     ownership.

23                THE PRIVATE INTERPRETER:  May I, Ms.

24     Holley?

25                MR. BALDIGA:  Yes, of course.
```

1          THE PRIVATE INTERPRETER:  You've got to

2     speak louder.

3          MS. CLAIBORN:  Okay.  I'm going to put

4     ourselves on pause for a second here.

5        (Off the record)

6          MS. CLAIBORN:  All right.  We're back on

7     the record after a short break, and, Mr. Kwok, you

8     remain under oath.

9          Jeff, could you please retranslate?

10          THE OFFICIAL INTERPRETER:  Yeah.

11          MS. CLAIBORN:  The last question.  You

12     want me to ask it again?

13          THE OFFICIAL INTERPRETER:  Yeah.  Would

14     you ask it again?

15          MS. CLAIBORN:  All right.  I'll try it

16     again.

17     BY MS. CLAIBORN:

18      Q    Mr. Kwok, you testified today that you own

19     50 percent of an interest in some company, and that

20     was the answer you gave me in response to my

21     question if you own an apartment at the Sherry

22     Netherland.  Can you please explain your answer?

23          MR. BALDIGA:  Objection.

24          THE WITNESS:  I don't know how to explain

25     it.  He said the Sherry Netherland is a co-op.  I

1    don't have a deed on that property and I just

2    represent my family to own 50 percent of the right.

3              MR. BALDIGA:  Excuse me.  Go ahead.

4              THE PRIVATE INTERPRETER:  Because that --

5    Mr. Kwok did mention the company name Bravo Luck, so

6    Mr. Interpreter did not say the word Bravo Luck, the

7    company that holds the interest of Sherry

8    Netherland, and Mr. Kwok represents the family owns

9    50 percent of Bravo Luck, which is the holding

10   company of owning the Sherry Netherland. The Sherry

11   Netherland is a co-op.

12             MR. BALDIGA:  So I'm going to make a

13   continuing objection to the extent that the

14   interpreter is not providing the exact words used by

15   the witness.  I'm not ascribing any faults or

16   anything, but obviously that's critical to the

17   quality of the testimony and that's necessary.

18             MS. CLAIBORN:  We need --

19             MR. BALDIGA:  We have to use the words

20   used by the witness.

21             MS. CLAIBORN:  I'm sure that Jeff is going

22   to do his best job today to try to translate

23   everything literally.

24             MR. BALDIGA:  Thank you.

25             MS. CLAIBORN:  But please understand that

1    there is a familiarity with terms in this room that

2    Mr. Jeff does not have.  So to the extent that

3    people are answering questions with shorthand

4    versions of company names or just one words, the

5    answer should be as specific as possible --

6              THE OFFICIAL INTERPRETER:  Yeah, I --

7              MS. CLAIBORN:  -- if you could translate

8    that.

9              THE OFFICIAL INTERPRETER:  -- my best but

10   probably that interpreter honestly, Holley, the

11   interpreter probably know the case more, the

12   details.

13             MS. CLAIBORN:  I agree.  Can you just --

14             THE OFFICIAL INTERPRETER:  But if he --

15             MS. CLAIBORN:  -- can you translate what I

16   just said to Mr. Kwok, because I want to make sure

17   --

18             THE OFFICIAL INTERPRETER:  Oh.

19             MS. CLAIBORN:  -- he answers questions in

20   a way that are easily translatable.

21             THE OFFICIAL INTERPRETER:  I just tell him

22   and the answer let -- you know short and clear, but

23   I pretty much understand what he says and --

24             MS. CLAIBORN:  And can you please

25   translate Mr. Kwok's answers or comments to your

1    comments?

2              THE OFFICIAL INTERPRETER:  He said he will

3    try to make it a shorter and clear and -- but he

4    needs to explain the details as much as he can

5    because it's a -- it's related to his lifeline.

6              MS. CLAIBORN:  Mr. Sarnoff?

7              MR. SARNOFF:  Yeah.  I just wanted to make

8    clear that to the extent there is a discrepancy

9    between the interpreter -- the translator, the

10   official translator and Mr. Kwok's interpreter, that

11   the translator is the final arbiter and that unless

12   the translator agrees with the translation

13   difference that the interpreter is putting forth,

14   they have to work that out before we can defer to

15   the -- to Mr. Kwok's personal interpreter as what

16   Mr. Kwok said.

17             MR. BALDIGA:  I don't accept that.

18             MR. SARNOFF:  That's fine.

19             MR. BALDIGA:  That can be your position.

20             MR. SARNOFF:  Okay.  The position has to

21   be that the translator has to agree with the

22   interpreter about what Mr. Kwok said for the record

23   to be accurate.

24             MR. BALDIGA:  That -- I understand your

25   position.

Ho Wan Kwok - April 6, 2022                    19

```
 1              THE OFFICIAL INTERPRETER:  So, Holley, if

 2   I miss anything that his personal interpreter wants

 3   to make up whatever I'm missing, some of the detail

 4   information, and is it okay for her to add on and if

 5   I agree what -- you know, what I'm missing or what

 6   he said, maybe I'm missing some detail information

 7   and some --

 8              MS. CLAIBORN:  I think the better route

 9   for today --

10              THE OFFICIAL INTERPRETER:  Yeah.

11              MS. CLAIBORN:  -- and for purposes of a

12   clear translation and a clear record --

13              THE OFFICIAL INTERPRETER:  Okay.

14              MS. CLAIBORN:  -- is for you, Jeff, to

15   interpret --

16              THE OFFICIAL INTERPRETER:  Uh-huh.

17              MS. CLAIBORN:  -- my questions and to

18   interpret Mr. Kwok's answers.

19              THE OFFICIAL INTERPRETER:  Okay.

20              MS. CLAIBORN:  And if Mr. Kwok thinks,

21   based on your interpretation, that you have not

22   translated properly, then he can testify again and

23   you can try again.

24              But I would like to restrict the

25   interaction that happens between translators and
```

1    between Mr. Kwok's personal translator so that we

2    have an official record where the person asking the

3    question is me, it's being officially translated,

4    and Mr. Kwok is giving the answers, and that also is

5    being officially translated.

6              MR. BALDIGA:  But, Holley, the problem

7    with that is the witness doesn't know whether Jeff's

8    English report is in fact accurate.  You can't leave

9    it up to the witness.  That's why we have a check

10   interpreter.  If he spoke English, then we wouldn't

11   need any interpreters.  He can't do that.

12             MS. CLAIBORN:  I think as a practical

13   matter, Mr. Kwok speaks enough English to know

14   whether or not he's answered his question.

15             MR. BALDIGA:  No, he doesn't.  I object.

16             MS. CLAIBORN:  Well, I -- I think that

17   that has been what I have seen from my own personal

18   experience.

19             That said, we're going to try and do the

20   best we can --

21             MR. BALDIGA:  I agree.

22             MS. CLAIBORN:  -- and we'll see where we

23   go.

24             MR. BALDIGA:  Okay.

25             MS. CLAIBORN:  Okay?

1    BY MS. CLAIBORN:

2        Q    So back to questions and answers.  Mr.

3    Kwok, do you own an interest in Genever Holdings

4    Corporation?

5        A    I just have -- in reality, I don't, but I

6    just held -- I just represent my family to hold some

7    interest.

8        Q    Is anyone authorized to act on behalf of

9    Genever Holdings Corporation aside from you?

10       A    My son.

11       Q    Is there a document that memorializes your

12   ownership interest, whatever it is, in Genever

13   Holdings Corporation?

14           MR. BALDIGA:  Objection.  You -- you may

15   answer.

16           THE WITNESS:  No.

17           THE PRIVATE INTERPRETER:  Ms. Holley, can

18   I -- first of all, the last time that -- when he was

19   saying -- instructing the witness about his

20   testimony, what should it be, I don't think the

21   interpreter -- the official interpreter interpreted

22   your instruction.  He is telling the witness what he

23   should be doing, but not what you were saying.

24           And then, now that the witness is saying

25   that he asked the interpreter twice that -- you were

1    talking about ownership, you were talking about

2    ownership interest.  Now he used twice these words,

3    and then at the end, Mr. Jeff said, yes.  And then,

4    so he answered no, but then the interaction was not

5    interpreted.

6              MS. CLAIBORN:  Mr. Jeff, could you

7    translate?

8              THE OFFICIAL INTERPRETER:  I don't know

9    what she just said.  I don't know.  I didn't

10   understand what she's saying.

11             THE PRIVATE INTERPRETER:  I mean, every

12   word should be interpreted.  The witness -- every

13   word the witness says should be interpreted.  Ms.

14   Holley's words should be interpreted, right?

15             MS. CLAIBORN:  Yes.

16             THE PRIVATE INTERPRETER:  Right.  But he

17   will -- not interpreted Ms. Holley's -- and you did

18   not interpret everything Mr. Kwok said.

19             THE OFFICIAL INTERPRETER:  Okay.  Maybe --

20   maybe we should have her to interpret.  I'm going to

21   excuse myself.  I don't know --

22             MS. CLAIBORN:  I'm going to put the --

23             THE OFFICIAL INTERPRETER:  -- I'm not

24   familiar with --

25             MS. CLAIBORN:  -- I'm going to put the

1    matter on pause for a moment.

2              THE OFFICIAL INTERPRETER:  Yeah, yeah,

3    yeah.

4         (Off the record)

5              MS. CLAIBORN:  All right.  We are back on

6    the record after a short break.

7              Mr. Kwok, you remain under oath.

8     BY MS. CLAIBORN:

9         Q    Mr. Kwok, do you have any United States

10   currency with you today?

11        A    No.

12        Q    When you filed your bankruptcy case, did

13   you have any United States currency?

14        A    No.

15        Q    Mr. Kwok, do you own any foreign currency?

16        A    No.

17        Q    Mr. Kwok, do you own any digital currency?

18        A    No.

19        Q    Mr. Kwok, do you have any financial

20   accounts of any kind in the United States?

21        A    No.

22        Q    Mr. Kwok, do you have any financial

23   accounts of any kind outside of the United States?

24        A    No.

25        Q    On March 21st, you testified you have no

Ho Wan Kwok - April 6, 2022

1   job and no source of income.  Who pays for your

2   household expenses?

3        A     Sometimes my son, sometimes my wife, or

4   sometimes my other family member.

5        Q     Do you have access to any credit cards?

6        A     No.

7        Q     Do you have access to any debit cards

8   attached to a bank account?

9        A     No.

10       Q     How do you pay for groceries?

11       A     My son, my wife, my family members'

12   company pay for.

13       Q     Where does your son live?

14       A     London.

15       Q     How does your son send you money?

16       A     He has a family office in a company, New

17   York.

18       Q     Does the family office give you money?

19       A     They pay the expenses above.

20       Q     What does the term family office mean?

21             MR. BALDIGA:  Objection.  You may answer.

22             THE OFFICIAL INTERPRETER:  Can I ask to --

23   ask him to repeat?

24             MS. CLAIBORN:  Yes.

25             THE OFFICIAL INTERPRETER:  Okay.  Can you

Ho Wan Kwok - April 6, 2022                      25

1    --

2              MR. BALDIGA:  Right.  He also have to

3    interpret for the witness what I say.

4              MS. CLAIBORN:  You haven't said anything

5    yet and he's going to ask him to repeat his answers

6    so then he's going to translate, and then we can

7    have whatever discussion you want to have.

8              THE PRIVATE INTERPRETER:  The counsel

9    raised objection.  The interpreter did not interpret

10   the objection.

11             MS. CLAIBORN:  I can happily repeat the

12   question, but we are not going to get anywhere today

13   in a meaningful fashion if people are interrupting

14   on basic questions.

15             MR. BALDIGA:  No, I didn't interrupt, but

16   --

17             MS. CLAIBORN:  So let me try again.

18             MR. BALDIGA:  Okay.  But hold on.  If I

19   object or if I say anything else, that has to be

20   interpreted.

21             MS. CLAIBORN:  You're not waiting for

22   space to interpret.  So, Mr. Jeff, can you interpret

23   that exchange that just happened?

24             THE OFFICIAL INTERPRETER:  Okay.  I don't

25   know.  It's just too much interruption.

1          MS. CLAIBORN:  Right.

2          THE OFFICIAL INTERPRETER:  Holley, I can't

3   do -- keep doing this.  I just too distracted and I

4   don't know.  It just a simple -- ask the witness

5   just a simple repeat and then --

6          MS. CLAIBORN:  Let me try --

7          THE OFFICIAL INTERPRETER:  -- it gets all

8   these people involved.

9          MS. CLAIBORN:  Correct.  Let me --

10         THE OFFICIAL INTERPRETER:  We're not going

11  anywhere.

12         MS. CLAIBORN:  Let me try the question

13  again.

14   BY MS. CLAIBORN:

15      Q    Mr. Kwok, what do you mean by the term,

16  family office?

17         MR. BALDIGA:  Objection.  You may answer.

18         MS. CLAIBORN:  Mr. Baldiga, that term is

19  all over the papers.  Can you repeat -- translate?

20         THE OFFICIAL INTERPRETER:  No, I'm not

21  going anywhere.  Holley, I just excuse myself.  I'm

22  sorry.  It's -- it's not going --

23         MS. CLAIBORN:  I'm going to put it on

24  pause, please.

25         THE OFFICIAL INTERPRETER:  -- this is too

1    much.

2         (Off the record)

3              MS. CLAIBORN:  We're back on the record

4    after a short break.

5              Mr. Kwok, you remain under oath.  During

6    the break, I spoke with Attorney Baldiga and we have

7    agreed that all objections as to form of the

8    question are reserved.

9              I'm going to go back to my questions.

10   BY MS. CLAIBORN:

11        Q    The question we left off after the break

12   was what do you mean by the term family office?

13        A    They are representing my big family.  It's

14   a company my son, my daughter, my wife, and it's a

15   company representing my family for investment.

16        Q    What is the name of the company?

17        A    Golden Spring Europe.

18        Q    Do you mean Golden Spring New York?

19        A    Roughly the name.

20        Q    Who pays for the meals that you eat?

21        A    Sometimes my wife's company, sometimes my

22   family office, my son's company.

23        Q    Mr. Kwok, when you use the term family

24   office, are you referring to the company known as

25   Golden Spring New York Limited?

1          THE OFFICIAL INTERPRETER:  What's the name

2    of the company?  Can I -- can you repeat it?

3          MS. CLAIBORN:  The name is Golden Spring

4    New York Limited.

5          THE WITNESS:  Yes.

6    BY MS. CLAIBORN:

7      Q    In your bankruptcy case, you filed a

8    report covering your expenses for the month of

9    February.

10          THE OFFICIAL INTERPRETER:  May I repeat

11    again?

12          MS. CLAIBORN:  Maybe I'll try it again.

13          THE OFFICIAL INTERPRETER:  Thank you.

14    BY MS. CLAIBORN:

15      Q    Mr. Kwok, you filed a monthly operating

16    report covering the month of February 2022, and that

17    report shows you spent approximately $160,000.

18          MR. BALDIGA:  Objection.  I object.

19    BY MS. CLAIBORN:

20      Q    Who funded the disbursements of $160,000?

21      A    Some from the Golden Spring family office

22    and the company, some were paid by my wife and my

23    wife's company.

24      Q    What is the name of your wife's company?

25      A    Greenwich, in Connecticut.

1       Q     Are you referring to the company?

2       A     Yes, the company name.

3       Q     What expenses does your wife company,

4    Greenwich, pay for?

5       A     Mostly food, because I live in my wife's

6    house.  We share the cleaning, the expenses because

7    -- and also the garden maintenance expenses.

8             UNIDENTIFIED SPEAKER:  Okay.  Can we take

9    a quick time out so I can speak with my co-counsel?

10   Or with my partner.

11            MR. BALDIGA:  No, let's just wait.

12    BY MS. CLAIBORN:

13      Q     Where does your wife's company, Greenwich,

14   get its money from?

15      A     I don't know.

16      Q     Did your wife's company, Greenwich, pay

17   for any professional expenses?

18      A     I don't know.

19      Q     Is your wife the person who actually makes

20   the payments?

21      A     Yes.

22      Q     Does your wife have a checking account?

23      A     I don't know.

24      Q     Does your wife have a debit card?

25      A     I don't know.

Ho Wan Kwok - April 6, 2022                                30

1          Q      When you eat in a restaurant with your

2     wife, who pays the bill?

3          A      I never went to a restaurant with my wife.

4          Q      Ever?

5          A      I think I was chased by these people and I

6     never went.   Thinks I -- you know, I think I was

7     chased by these people.

8          Q      Does your wife buy groceries?

9          A      Sometimes.

10         Q      How does she pay for them?

11         A      I don't know.

12         Q      Why does Golden Spring New York pay for

13    some of your personal expenses?

14         A      Because I'm one of the family member, and

15    my son is very successful and he loves me very much.

16         Q      Is there any other reason?

17         A      I don't know.

18         Q      What personal living expenses of yours

19    does Golden Spring pay for?

20         A      The expense from security because I was

21    chased by the people in the back, and the

22    transportation, clothing, and some items for living.

23         Q      Who is the person at Golden Spring New

24    York --

25                MS. CLAIBORN:  Wait a minute.  I'm going

1    to ask a full question.

2    BY MS. CLAIBORN:

3        Q    So who is the person at Golden Spring New

4    York who authorizes the payment of your personal

5    living expenses?

6        A    My son.

7        Q    Please explain how your son authorizes

8    those payments.

9        A    I usually communicate with Golden Spring,

10   the company's manager and CEO.

11            THE PRIVATE INTERPRETER:  (Indiscernible)

12   director, not manager.

13            THE OFFICIAL INTERPRETER:  Could you --

14   okay.  Director, not a manager.

15            MR. BALDIGA:  Thank you.

16   BY MS. CLAIBORN:

17       Q    Mr. Kwok, who is the director or manager

18   that you just referred to?

19       A    Wang Yanping.

20       Q    Is Ms. Ping a officer of Golden Spring New

21   York?

22       A    She is a Miss.  She's a lady.

23       Q    Is Ms. Ping a corporate officer of Golden

24   Spring New York?

25       A    Yes.

1       Q       What is her title?

2       A       She is a officer or director.

3       Q       Does she have a position title?

4       A       I don't know.

5       Q       Mr. Kwok, are you a corporate officer of

6   Golden Spring New York?

7       A       Now?

8       Q       Yes.

9       A       No.

10      Q       Mr. Kwok, have you ever been in the past,

11  a corporate officer of Golden Spring New York?

12      A       I seem to hold a title when the company

13  was established in 2015.  I forgot what title was it

14  then.

15      Q       Mr. Kwok, do you own any interest in

16  Golden Spring New York?

17      A       No.

18      Q       In the past, have you ever had any kind of

19  ownership interest in Golden Spring New York?

20      A       No.

21      Q       Were you involved in the formation of

22  Golden Spring New York?

23      A       Yes.

24      Q       What was your role in the formation of

25  Golden Spring New York?

```
 1        A    Consultant and giving advice, suggestions.
 2        Q    Was your son involved in the formation of
 3   Golden Spring New York?
 4        A    He is the main person.  He -- he was the
 5   main person.
 6        Q    When Golden Spring New York was created,
 7   who had the ownership interest in New York -- Golden
 8   New -- Golden Spring New York?
 9        A    My son.
10        Q    Did Golden Spring Hong Kong have any
11   ownership interest in Golden Spring New York?
12        A    I don't know the detail of the interest
13   and because this -- these two combined, it's
14   considered one thing.
15        Q    Is Golden Spring Hong Kong a separate
16   company from Golden Spring New York?
17        A    I don't know.
18        Q    Who owns Golden Spring Hong Kong?
19        A    My son.
20        Q    In 2015, when Golden Spring New York was
21   formed, who owned Golden Spring Hong Kong?
22        A    I don't know.
23        Q    Are you a corporate officer of Golden
24   Spring Hong Kong?
25        A    I don't remember.
```

```
 1        Q    Have you ever been a cooperate officer of
 2   Golden Spring Hong Kong?
 3        A    I don't remember.
 4        Q    Do you have any ownership interest in
 5   Golden Spring Hong Kong?
 6        A    No.
 7        Q    Have you ever in the past, had an
 8   ownership interest in Golden Spring Hong Kong?
 9        A    No.
10        Q    What type of business is Golden Spring New
11   York engaged in?
12        A    I don't know.
13        Q    How does Golden Spring New York generate
14   revenue?
15        A    I don't know.
16             THE PRIVATE INTERPRETER:  Ms. Holley, I
17   don't know if this -- the (indiscernible) he said,
18   how does Golden Spring New York generate revenue,
19   not how does Golden Spring New York making money,
20   right?
21             MS. CLAIBORN:  That was basically my
22   question.
23             THE PRIVATE INTERPRETER:  Yeah, so the
24   interpreter should not say -- interpret it in such a
25   way that Golden Spring New York -- how does Golden
```

1    Spring New York make money, to the -- to the -- to

2    Mr. Kwok.

3            THE OFFICIAL INTERPRETER:  Generate money,

4    yeah.  Generate revenue, generate money.

5            THE PRIVATE INTERPRETER:  No, but you said

6    --

7            MS. CLAIBORN:  I'm happy to ask it

8    specifically.

9    BY MS. CLAIBORN:

10       Q    How does Golden Spring New York make

11    money?

12       A    I don't know.

13       Q    In the year 2015, were you involved in

14    Golden Spring New York's business?

15       A    I don't remember.

16       Q    Have you ever given a gift of money to

17    Golden Spring New York?

18       A    No.

19       Q    Have you ever given any money to Golden

20    Spring New York?

21       A    No.

22       Q    Have you ever transferred any property of

23    any kind to Golden Spring New York?

24       A    No.

25       Q    Have you ever funded Golden Spring New

Ho Wan Kwok - April 6, 2022                        36

1    York in any way?

2         A    No.

3         Q    Have you ever loaned money to Golden

4    Spring New York?

5         A    No.

6         Q    Have you ever invested any of your own

7    money in Golden Spring New York?

8         A    No.

9         Q    What corporate position does Yanping Wang

10   Hold?

11        A    Officer and director.

12        Q    Is Yanping Wang the president of Golden

13   Spring New York?

14        A    Yes.

15        Q    Does Golden Spring New York have any other

16   corporate officers?

17        A    Yes.

18        Q    Who are they?

19        A    I don't remember clearly about their

20   names.

21        Q    Please tell me what you remember.

22        A    What -- I don't remember their names

23   clearly and -- because I don't even remember

24   attorney's names.  I don't want to misleading you,

25   Holley.

1      Q      How many officers does Golden Spring New

2  York have?

3      A      I don't remember.  Oh, I don't know.

4  Sorry.  I don't know.

5      Q      Does Golden Spring New York have any

6  directors?

7      A      Yanping Wang.

8      Q      Is Ms. Wang the only director of Golden

9  Spring New York?

10     A      I don't know.

11     Q      Where does Golden Spring New York get the

12  money that it uses to pay your personal expenses?

13     A      I don't know.

14     Q      Does Golden Spring New York have any

15  employees?

16     A      Yes.

17     Q      How many?

18     A      I don't know.

19     Q      Are you currently involved in any way in

20  the business of Golden Spring New York?

21     A      No.

22     Q      What does Golden Spring New York own?

23     A      I don't know.

24     Q      Golden Spring New York is willing to loan

25  you the sum of $8 million.  Where is it getting that

1      $8 million from?

2          A    I don't know.

3          Q    Are you the person who asked Golden Spring

4      New York to loan you $8 million?

5          A    No.

6          Q    Who asked Golden Spring New York to loan

7      you $8 million?

8          A    My attorney.

9          Q    Which attorney?

10         A    Aaron Mitchell here.

11         Q    Are you referring to Aaron Mitchell?

12         A    Now I remember his name now.

13              UNIDENTIFIED SPEAKER:  Just for the

14     record, I'm not sure Mr. Mitchell has registered an

15     appearance yet.  It would be appropriate if he's

16     going to be here representing the debtor, if he

17     (indiscernible) his appearance.

18              MS. CLAIBORN:  I believe I did read Mr.

19     Mitchell's name earlier today.

20              UNIDENTIFIED SPEAKER:  He hasn't filed --

21              MS. CLAIBORN:  He did sign --

22              UNIDENTIFIED SPEAKER:  -- an appearance in

23     this matter.

24              MS. CLAIBORN:  Thank you.  Can you

25     translate that?

```
 1              THE OFFICIAL INTERPRETER:  I didn't hear
 2     totally clearly.  I know it's some distance.  I
 3     don't --
 4      BY MS. CLAIBORN:
 5          Q    Does Golden Spring New York have any bank
 6     accounts?
 7          A    I don't know.
 8          Q    Do you have access to Golden Spring New
 9     York's financial accounts?
10          A    No.
11          Q    Do you have authority to enter into
12     financial transactions on behalf of Golden Spring
13     New York?
14          A    No.
15              THE PRIVATE INTERPRETER:  No.  No, that's
16     not the question.
17              THE OFFICIAL INTERPRETER:  What was it?
18              MS. CLAIBORN:  I'm happy to repeat the
19     question.
20      BY MS. CLAIBORN:
21          Q    Do you have authority to enter into
22     financial transactions on behalf of Golden Spring
23     New York?  Mr. Kwok, if you don't answer -- if you
24     don't understand my question --
25              THE OFFICIAL INTERPRETER:  He's asking if
```

1        he -- if I was asking if he has the right to use the

2        -- the Golden Spring New York, the accounts for

3        transactions.  You know.

4                MS. CLAIBORN:  That was not my question.

5        BY MS. CLAIBORN:

6            Q    Mr. Kwok, are you authorized to enter into

7        any kind of financial transactions on behalf of

8        Golden Spring New York?

9            A    No.

10               MR. BALDIGA:  Excuse me, the interpreter

11       might have a comment.

12               MS. CLAIBORN:  Can you translate that,

13       please?

14               THE OFFICIAL INTERPRETER:  Yeah.  She said

15       that it's the trading -- trading of the financial

16       trading --

17               THE PRIVATE INTERPRETER:  Transaction.

18               THE OFFICIAL INTERPRETER:  -- transaction

19       to --

20               THE PRIVATE INTERPRETER:  Not trading.

21               THE OFFICIAL INTERPRETER:  He said that,

22       no, he was not -- I was not authorized to do the

23       transactions, financial transactions.

24       BY MS. CLAIBORN:

25           Q    What, if anything, do you currently do for

1    Golden Spring New York?

2         A    No.

3         Q    Is Golden Spring New York funding your

4    son's personal living expenses?

5         A    I don't know.

6         Q    Is Golden Spring New York funding your

7    daughter's personal living expenses?

8         A    I don't know.

9         Q    Do you owe any money to Golden Spring New

10   York?

11        A    Yes.

12        Q    How much?

13        A    Like more than $21 million.

14        Q    How do you owe more than $21 million to

15   Golden Spring New York?

16        A    Because in the past five years and I was

17   sued by a lot of creditors.

18        Q    Did Golden Spring New York --

19             MS. CLAIBORN:  I apologize.

20             THE OFFICIAL INTERPRETER:  I just ask him

21   to repeat.

22             THE WITNESS:  In the past five years, I

23   was chased by Chinese Communist Party.

24             THE OFFICIAL INTERPRETER:  I didn't get

25   it.  Ask -- I'm asking him to repeat it one more

1    time.

2            MR. BALDIGA:  Short -- short answer.

3            THE WITNESS:  In the past five years I was

4    trapped -- trapped by some of the cases from Chinese

5    Communist Party, designed by the Chinese Communist

6    Party, including the case past, that case.  I need

7    to -- need to pay a large amount of legal fees so

8    that's why I got the support from the Golden Spring

9    New York.  This is the main reason I owe $21

10   million.

11           THE PRIVATE INTERPRETER:  Interpreter

12   missed that, the legal -- legal fee.

13           THE OFFICIAL INTERPRETER:  Yeah, I said

14   the legal fee.  I said that.  Did I say legal fee?

15           THE PRIVATE INTERPRETER:  I didn't think

16   so, but as long as you say that.

17    BY MS. CLAIBORN:

18        Q    How much of the $21 million is comprised

19   of legal fees?

20           THE OFFICIAL INTERPRETER:  Can you repeat

21   that one again?

22    BY MS. CLAIBORN:

23        Q    How much of the $21 million --

24           THE OFFICIAL INTERPRETER:  Okay.

25    BY MS. CLAIBORN:

1        Q      -- is comprised of legal fees?

2        A      I think most of it is legal fee.

3        Q      Why is Golden Spring New York paying your

4    legal fees?

5        A      Because the Golden Spring New York is my

6    son and my family's company and they love me very

7    much.  They hope -- they hoping me to live, not be

8    killed by the people behind me.

9        Q      Do you have any written agreement with

10   Golden Spring New York?

11       A      Yes.

12       Q      What legal -- sorry.  What written

13   agreements do you have with Golden Spring New York?

14       A      It's agreement for borrowing -- borrowing

15   money.

16       Q      When did you enter into that agreement to

17   borrow money?

18       A      A few years ago.  I know -- I don't know

19   rough time.

20              THE PRIVATE INTERPRETER:  I don't recall.

21              MS. CLAIBORN:  What --

22              THE OFFICIAL INTERPRETER:  What -- yeah, I

23   don't remember the time.

24    BY MS. CLAIBORN:

25       Q      What are the terms of the legal agreement

1    with Golden Spring New York?  Sorry.  Let me

2    rephrase that.  What are the terms of the written

3    agreement with Golden Spring New York?

4         A    I don't remember.

5              UNIDENTIFIED SPEAKER:  Sorry.  Could you

6    repeat the English, please?

7              MS. CLAIBORN:  Go ahead and say that --

8    repeat.

9              THE OFFICIAL INTERPRETER:  I don't

10   remember.

11    BY MS. CLAIBORN:

12        Q    Are you obligated under that written

13   agreement with Golden Spring New York to pay back

14   all of the money?

15        A    Yes.

16             MR. BALDIGA:  There's more to the

17   question.

18    BY MS. CLAIBORN:

19        Q    That Golden Spring paid to lawyers on your

20   behalf.

21        A    Yes.

22             THE PRIVATE INTERPRETER:  It was only

23   (indiscernible) of a difference in the interpreting.

24   For example, the interpreter did not interpret under

25   the agreement, are you obligated to make them all --

1   to pay back all the money.  All the money that is,

2   you know --

3                MR. BALDIGA:  Okay.

4                THE PRIVATE INTERPRETER:  -- spent on the

5   lawyer.

6                MR. BALDIGA:  Maybe Holley can clarify

7   that.

8                THE PRIVATE INTERPRETER:  Yeah.

9    BY MS. CLAIBORN:

10      Q    I'm going to ask a long question.  I'm

11   going to break it into parts.

12           Mr. Kwok, are you obligated to pay back

13   Golden Spring New York for all of the money that

14   Golden Spring New York paid to lawyers on your

15   behalf?

16      A    Yes.

17      Q    Is that agreement with Golden Spring New

18   York in writing?

19      A    Yes.

20      Q    Is that the same written agreement you

21   mentioned a few minutes ago?

22      A    Yes.

23      Q    Do you have more than one written

24   agreement with Golden Spring New York?

25      A    Yes.

1      Q    What are your other written agreements

2  with Golden Spring New York?

3      A    In the past week, I had a case with Logan

4  Cheng.  The settlement with Logan Cheng, the money

5  from -- for the settlement is the money I borrow

6  from Golden Spring New York.

7      Q    Do you have any other written agreements

8  with Golden Spring New York?

9      A    I don't remember.

10     Q    Does Golden Spring New York have a fee

11  agreement with any of the attorneys who represent

12  you in litigation?

13         Can you -- can you answer, Mr. Kwok?

14         THE OFFICIAL INTERPRETER:  Any agreement

15  with -- can you repeat one more time?

16  BY MS. CLAIBORN:

17     Q    Does Golden Spring New York have a -- any

18  kind of a fee agreement with any of the lawyers who

19  represent Mr. Kwok in litigation?

20     A    I don't know.

21     Q    Mr. Kwok, who represents you in the

22  litigation you filed against UBS in London?

23     A    Attorney -- attorney office in London.

24     Q    What is the name?

25     A    I don't remember completely about the

 1    English name.

 2         Q    Does Golden Spring New York have a fee

 3    agreement with that attorney in London?

 4         A    There should be.

 5              MR. BALDIGA:  I'm sorry.  What was the

 6    answer?

 7              THE OFFICIAL INTERPRETER:  Should have.

 8     BY MS. CLAIBORN:

 9         Q    Do you know if it does have enough -- have

10    a fee agreement?

11         A    I'm not sure.

12         Q    Who is the person at Golden Spring New

13    York who authorized payment of your litigation

14    expenses?

15         A    My son.

16         Q    Does your son have to speak with anyone

17    else in order to use Golden Spring New York money

18    for your benefit?

19         A    Yes.

20         Q    Who does your son need to speak with?

21         A    He needs to talk to my family member,

22    which includes more than 100 family members, and

23    that because they have a fund.

24              THE PRIVATE INTERPRETER:  That -- the

25    number is 181.

1       BY MS. CLAIBORN:

2           Q     Mr. Kwok, if your son wanted to give you

3       $100, would he have to seek authority from someone

4       at Golden Spring New York?

5           A     I don't know.

6           Q     When you say your son has to speak with

7       someone at Golden Spring New York, how many people

8       does he need to speak with?

9           A     I don't know details.

10          Q     With respect to the $8 million that Golden

11      Spring New York is willing to loan you, did your son

12      have to obtain consent of other people at Golden

13      Spring New York for that transaction?

14          A     I don't know.

15          Q     Have you ever been to the office of Golden

16      Spring New York in New York City?

17          A     Yes.

18          Q     How often do you go to the Golden Spring

19      New York office in New York City?

20          A     Not -- not fixed.  Sometimes I go there a

21      few times a month.  Sometimes I haven't -- I haven't

22      gone there for a few months.

23          Q     When was the last time you went to the

24      Golden Spring New York office?

25          A     Yesterday.

Ho Wan Kwok - April 6, 2022                          49

1        Q     Why did you go?

2        A     For preparing today's meeting.

3        Q     Did your son speak with Yanping Wang about

4   the $8 million loan?

5        A     I don't know.

6        Q     Did you negotiate the terms of the $8

7   million loan from Golden Spring New York?

8        A     No.

9        Q     Who was the person who negotiated the $8

10  million loan on your behalf?

11       A     My attorney.

12       Q     Which attorney?

13       A     Aaron Mitchell.

14       Q     Who did Attorney Aaron Mitchell negotiate

15  with at Golden Spring New York?

16             THE OFFICIAL INTERPRETER:  Can you repeat

17  one?

18   BY MS. CLAIBORN:

19       Q     Who did Attorney Aaron Mitchell negotiate

20  with at Golden Spring New York?

21       A     I don't know.  My son.

22       Q     Did you borrow the sum of $1 million from

23  Lamp Capital, LLC in February 2022?

24       A     Yes.

25       Q     Is that loan from Lamp Capital, LLC in

Ho Wan Kwok - April 6, 2022                              50

1    writing?

2        A    No.

3        Q    What are the loan terms of the loan from

4    Lamp Capital?

5        A    I don't know detail.

6        Q    Who are the members of Lamp Capital, LLC?

7        A    My son.

8        Q    Are there any other members of Lamp

9    Capital, LLC?

10       A    I don't know.

11       Q    Who is the managing member of Lamp

12   Capital, LLC?

13       A    I don't know.

14       Q    Who was the person at Lamp Capital who

15   authorized the loan?

16       A    My son.

17       Q    What are the assets of Lamp Capital, LLC?

18       A    I don't know.

19       Q    What does Lamp Capital own?

20       A    I don't know.

21       Q    Have you ever funded Lamp Capital in any

22   way?

23       A    No.

24       Q    Have you ever invested any money in Lamp

25   Capital, LLC?

```
 1        A     No.

 2        Q     Why did Lamp Capital loan you the $1

 3   million and not Golden Spring New York?

 4        A     I don't know.

 5        Q     What is the source of the $1 million that

 6   Lamp Capital loaned to you?

 7        A     I don't know.

 8              MS. CLAIBORN:  Why don't we take a five-

 9   minute break for the restroom?  We'll reconvene

10   actually, at 12:10.

11        (Recess)

12              MS. CLAIBORN:  We are back on the record

13   after a short break.

14              Mr. Kwok, you remain under oath.

15    BY MS. CLAIBORN:

16        Q     Mr. Kwok, were you involved in the

17   selection of the lawyers who represent you in your

18   action in London?

19        A     Yes.

20        Q     Did your counsel in London request a

21   retainer?

22        A     Yes.

23        Q     And did you pay your counsel in London a

24   retainer?

25        A     Yes.
```

1      Q      How much?

2      A      300,000 pound.

3      Q      And when was that 300,000 pound retainer

4    paid?

5      A      Roughly two years ago.

6      Q      Who funded the retainer?

7      A      My son helped to pay -- pay that.

8      Q      Did your son pay all of the retainer?

9      A      Yes.

10     Q      Did your son pay the retainer out of his

11   personal funds?

12     A      Should be from the company, England.

13     Q      What was the name of the company who paid

14   the retainer?

15     A      I don't remember.

16     Q      Did Golden Spring New York pay the

17   retainer to your London counsel?

18     A      I don't remember details because other

19   than the retainer and the other -- a few more

20   payments in -- you know, after.

21     Q      Mr. Kwok, if you wanted to go buy a pair

22   of shoes, how would you pay for a pair of shoes?

23     A      I will ask Golden Spring New York to pay

24   for it.

25     Q      And how would that process work?

```
1         A    And I will talk to the director and E Wa

2    Wang (ph) and ask her to contact -- talk to my son

3    and to pay for the shoes.

4         Q    How does the shoe company get the money?

5    The shoe store.

6         A    I don't know.  Usually, it's E Wa Wang and

7    communicate, because my English ability is not

8    capable to communicate.

9         Q    If you went to a store, tried on shoes,

10   and wanted to take them home from the store, how

11   would you pay for the shoes?

12        A    In the recent few years I basically never

13   bought a pair of shoes.

14        Q    What was the last thing you paid for?

15        A    Recently, I didn't go to buy anything.

16             MR. BALDIGA:  I'm sorry.  Could you repeat

17   that?

18             THE OFFICIAL INTERPRETER:  Recently, I

19   didn't go to buy anything.

20   BY MS. CLAIBORN:

21        Q    My question wasn't recently.  My question

22   was, what was the last thing that you purchased?

23        A    I don't remember.

24        Q    Do you ever eat in a restaurant?

25        A    Recent years, I didn't.
```

1    Q    Before COVID 19, did you eat in

2   restaurants?

3    A    Very rare because I was afraid to be

4   killed by the people behind me, because I was always

5   in the process getting chased.

6    Q    When you ate in a restaurant, were you the

7   person who paid the bill?

8    A    I don't have money to pay, so that's why I

9   don't go there.

10    Q    Mr. Kwok, if you wanted to go buy a cup of

11   coffee, how would you pay for it?

12    A    I never bought a cup of coffee.  I was --

13   I'm afraid the people behind me might poison me in

14   the coffee.

15    Q    Mr. Kwok, if you wanted to buy water,

16   you're out and about and you want to buy water, how

17   would you pay for it?

18    A    Well, since 2107, I don't -- I didn't go

19   out to buy water outside.

20         THE PRIVATE INTERPRETER:  There was a

21   (indiscernible) difference in the nuance.

22         THE OFFICIAL INTERPRETER:  Can you -- can

23   you repeat it -- can you repeat --

24         THE WITNESS:  Since 2017, I never went

25   outside, walk around, and then buy water or coffee.

Ho Wan Kwok - April 6, 2022                     55

1    BY MS. CLAIBORN:

2        Q    Mr. Kwok, do you have any interest in any

3    mutual funds?

4        A    No.

5        Q    Do you own any bonds?

6        A    No.

7        Q    Do you own any publically traded stock in

8    any company?

9        A    No.

10       Q    Do you own any cars?

11       A    No.

12       Q    Do you have access to any cars?

13       A    Yes.

14       Q    And whose cars do you have access to?

15       A    My son's and Golden Springs.

16       Q    Does Golden Spring provide you with a car

17   that's yours to use?

18       A    Yes.

19       Q    What kind of car is that?

20       A    Maybach

21            THE PRIVATE INTERPRETER:  Maybach.

22            THE OFFICIAL INTERPRETER:  Huh?

23            THE PRIVATE INTERPRETER:  Maybach.

24            THE OFFICIAL INTERPRETER:  Maybach?  Okay.

25   I don't know the name of it.

```
 1              THE WITNESS:  Maybach.

 2     BY MS. CLAIBORN:

 3         Q    Mr. Kwok, do you have a driver's license?

 4         A    I have a Hong Kong's driver's license.

 5         Q    Do you drive in the United States?

 6         A    Almost no.

 7         Q    When you do drive, whose car do you drive?

 8         A    Golden Spring's.

 9         Q    Do you keep a car at your Greenwich

10     residence?

11         A    Yes.

12         Q    And what car is that?

13         A    Maybach.

14         Q    Do you own any aircraft?

15         A    No.

16         Q    Have you ever owned any aircraft?

17         A    Before, yes.

18         Q    When did you own aircraft?

19         A    Probably 2010 to 2016.

20         Q    How many air craft did you own?

21         A    One.

22         Q    And what was it?

23         A    Airbus 319.  319.

24         Q    And what happened to the Airbus 319?

25         A    It was confiscated by UBS and the Chinese
```

1    Communist Party.

2         Q    Okay.  Do you own any water craft?

3         A    No.

4         Q    Who owns the yacht known as the Lady May?

5         A    My daughter.

6         Q    Does your daughter own the Lady May in her

7    personal name?

8         A    Should be from a company.

9         Q    And what is the name of the company that

10   owns the Lady May?

11        A    I don't know.

12        Q    Where is the Lady May currently?

13        A    I don't know.

14        Q    Since the bankruptcy filing, have you

15   asked your daughter to return the Lady May to New

16   York?

17        A    I did ask her and asked her to talk to her

18   attorney to return the boat back to New York.

19        Q    When did you have that conversation?

20        A    Last month, after the court date.  After

21   met with you.

22        Q    And what did your daughter say?

23        A    She said that she would talk to her

24   attorney and then talk to my attorney.

25        Q    Did your daughter agree to have the Lady

1    May return to New York?

2        A    She was not willing to talk to me in any

3    detail.  She want -- she wanted to talk to her

4    attorney.

5        Q    Did your daughter say no to your request

6    that she return the Lady May to New York?

7        A    No, he didn't -- she didn't.

8            THE PRIVATE INTERPRETER:  The question was

9    not completely interpreted.

10           THE OFFICIAL INTERPRETER:  I know, but she

11   -- she already -- he already answered and --

12           MR. BALDIGA:  Wait until he finishes.

13           THE WITNESS:  No, he -- no.

14   BY MS. CLAIBORN:

15       Q    Mr. Kwok, do you own or have an interest

16   in any trust?

17       A    No.

18       Q    Are you the beneficiary of any trusts?

19       A    No.

20       Q    This is a long question.  Mr. Kwok, where

21   is the $12,000 check paid to you in connection with

22   your lawsuit against Baosheng Guo?

23       A    It's in attorney's escrow account.

24       Q    What is the name of the attorney who is

25   holding the check?

Ho Wan Kwok - April 6, 2022                          59

1          A    I can't pronounce the attorney's name

2     completely.

3          Q    What is the attorney's first name?

4          A    I cannot -- I'm not able to read out the -

5     - the pronounce his name.

6          Q    Is the attorney who's holding the check

7     the same attorney who represented you in that

8     lawsuit?

9          A    It should be.

10         Q    On your Schedule A-B, you did not disclose

11    that $12,000 check.  Why?

12              MR. BALDIGA:  Wait for a question.  No.

13    Could he interpret that?

14     BY MS. CLAIBORN:

15         Q    Why did you not disclose that $12,000

16    check?

17         A    My attorney thinks because the money is

18    not in my account, so I'm not allowed to -- we're

19    not -- I'm not supposed to disclose that.

20         Q    Okay.  Mr. Kwok, do you have any patents?

21         A    No.

22         Q    Do you have any copyrights?

23         A    No.

24         Q    Do you have any intellectual property of

25    any kind?

```
 1          A     No.

 2                MR. BALDIGA:  Excuse me.  Holley, I'm not

 3    sure if you're going to come back to it, but there

 4    is a reference to the $12,000.

 5                MS. CLAIBORN:  I did see that.

 6                MR. BALDIGA:  Oh, you said he didn't

 7    disclose it.

 8                MS. CLAIBORN:  He did not.  It's not in

 9    response to the questions on Schedule A-B.

10                MR. BALDIGA:  It's right there.

11                MS. CLAIBORN:  We can disagree about

12    whether or not it's disclosed, but it's my position

13    that it's not disclosed.  I understand you might

14    take a different position.

15     BY MS. CLAIBORN:

16          Q     Mr. Kwok, do you own any interest in a

17    company called Ace Decade Holdings Limited?

18          A     Yes.

19          Q     What is the nature of your ownership

20    interest in Ace Decade Holdings Limited?

21          A     So I have the interest and ask for UBS to

22    pay back $500 million.  That kind of interest.

23          Q     Are you the only legal owner of Ace Decade

24    Holdings Limited?

25                THE OFFICIAL INTERPRETER:  Are you the
```

```
 1    only -- can you repeat that question?
 2     BY MS. CLAIBORN:
 3         Q     Are you the only legal owner of Ace
 4    Decades?
 5         A     I am a legal representing owner.
 6         Q     Are there any other owners of Ace Decade?
 7         A     No.
 8         Q     When did you become an owner of Ace Decade
 9    Holdings Limited?
10         A     At the end of 2014.
11         Q     This is a long question.  In your
12    litigation in London against UBS, you are an
13    individual plaintiff.  What is the basis for your
14    claim as an individual plaintiff?
15         A     Because I'm the 100 percent representative
16    for Ace Decade.
17         Q     In the litigation against UBS in London,
18    there is an allegation that Ace Decade gave $500
19    million to Dawn State Limited.  Where did Ace Decade
20    get the $500 million?
21         A     I loan from my family.
22         Q     Did you borrow money from your family and
23    give it to Ace Decade?
24         A     Yes.
25              MS. CLAIBORN:  I don't think that was --
```

```
 1    let's start over, because I don't think that was --
 2    that was --
 3               THE PRIVATE INTERPRETER:  Yeah, I thought
 4    that it was --
 5               MS. CLAIBORN:  -- that was the question,
 6    because it didn't involve Dawn State --
 7               THE PRIVATE INTERPRETER:  Yes.
 8               MS. CLAIBORN:  -- so I'm going to start
 9    over.
10    BY MS. CLAIBORN:
11         Q    Where did you get the money to give to Ace
12    Decade, the 500 million?
13               MR. BALDIGA:  I don't think he said he did
14    that.  I think he said his family did that, but you
15    can ask that, but I --
16               THE WITNESS:  From my family.
17    BY MS. CLAIBORN:
18         Q    Who specifically in your family gave you
19    money that you then gave to Ace Decade?
20         A    John Way (ph).
21         Q    Who is John Way?
22         A    A member from my family.
23         Q    Is he a relative of yours?
24         A    It's my older brother's cousin or --
25               THE PRIVATE INTERPRETER:  Son-in-law.
```

1          THE OFFICIAL INTERPRETER:  Son-in-law?

2    Okay.  Sorry.

3     BY MS. CLAIBORN:

4          Q    On your Schedule A-B, you list a possible

5    malpractice claim against Boise Schiller.  Can you

6    please explain what that is?

7          A    He was the one -- he was the one

8    represented me in New York to have a lawsuit against

9    UBS.  He gave a lot of forced documents to the Court

10   and without my permission.  He also threatened my

11   family.  He also threaten myself after drinking.  He

12   brought a lot of loss to us, including providing any

13   English/Chinese translated documents to me before

14   present them to the -- to the lawyer, or to the

15   judge.  That's why I -- that's why we sue him.

16         Q    Have you hired an attorney to represent

17   you in that malpractice action?

18         A    My son is in the process of dealing with

19   that.

20         Q    Why is your son talking to lawyers about

21   your malpractice claim?

22         A    Because I need to borrow money from him.

23         Q    Has a lawyer been selected?

24         A    Not yet.

25         Q    Mr. Kwok, do you own an interest in any

1    company aside from Ace Decade?

2        A    No, but the -- I own the Bravo Luck, the

3    apartment, only for a few months, some of the

4    interest.  And because the apartment is a co-op, so

5    they used my name to buy the apartment after I --

6    after we bought apartment, and then we returned the

7    stock interest back.

8            UNIDENTIFIED SPEAKER:  I'm sorry.  He must

9    have spoken for 30, 40 seconds.  Clearly said more

10   than that.  Is there a more fulsome translation?

11           THE OFFICIAL INTERPRETER:  Did I miss

12   anything?

13           MS. CLAIBORN:  Let me see if I can follow

14   up.

15    BY MS. CLAIBORN:

16       Q    Mr. Kwok, do you own, currently, an

17   interest in Bravo Luck?

18       A    No.

19       Q    Mr. Kwok, do you own an interest in any

20   limited liability company?

21       A    No.

22       Q    Mr. Kwok, do you own an interest in any

23   partnership?

24       A    I used to own the plane company called the

25   Orange or Shiny Time, but that was before and

```
 1    doesn't exist anymore.
 2         Q    Mr. Kwok, do you currently own an interest
 3    in any partnership?
 4         A    No.
 5         Q    Mr. Kwok, do you currently own an interest
 6    in any joint venture?
 7         A    No.
 8         Q    Other than Ace Decade, do you own an
 9    interest in any other company right now?
10         A    No.  I only owned the Orange and Shiny
11    Time before, but not right now.
12         Q    Does Golden Spring New York have a
13    security interest in any of your litigation?
14         A    I owe them money.
15         Q    Have you granted to Golden Spring New
16    York, any interest in any of your assets, anything
17    that you own?
18         A    No.
19         Q    So if you were to win a lawsuit against
20    Golden Spring -- sorry.  Wrong name.  So if you were
21    to win a lawsuit against UBS, would any of the money
22    that you win have to be paid to Golden Spring?
23         A    Yes.
24         Q    And how much would that be?
25         A    Before it was 2,200 1 million, or --
```

```
 1              THE PRIVATE INTERPRETER:  21 million.

 2              THE WITNESS:  21 million.  21 million and

 3     plus now.  Probably it's about 300 million.  30

 4     million.  Or 30 million.  Yeah.

 5     BY MS. CLAIBORN:

 6         Q    Is there a document that says that any

 7     litigation winnings you receive need to be paid to

 8     Golden Spring?

 9         A    Yes.

10         Q    What is the name of that document?

11              THE OFFICIAL INTERPRETER:  I'm going to

12     ask him to repeat it.

13              I didn't get it.  I just ask him to break

14     it down, then I didn't hear what --

15              THE WITNESS:  I have a case in DC.  There

16     is a attorney office representing me for political

17     asylum and it was attacked by the cyber attack from

18     the Chinese Communists, and so they -- the attorney

19     office was closed, and they gave my personal

20     information to the communist party, and then I sue

21     them.  And that litigation fee, attorney fee, came

22     from Golden Spring New York.

23              I ask for the settlement for 50,000 -- $50

24     million.  If I won that money, I will give the money

25     back to Golden Springs for the money they supported
```

1    me for attorney fees.

2                   THE PRIVATE INTERPRETER:  Mr. Kwok did not

3    say settlement.  Mr. Kwok just say, for a claim, not

4    a settlement.

5                   THE OFFICIAL INTERPRETER:  You're asking

6    for $50 million.  Yeah.  He ask for $50 million for

7    that lawsuit, and if he win -- if he wins the money,

8    then he will return the money back to the Golden

9    Spring New York.

10   BY MS. CLAIBORN:

11        Q    My question was, what was the name of the

12   document under which you would be repaying Golden

13   Spring for your litigation?

14        A    The document is the document I --

15                  THE OFFICIAL INTERPRETER:  Can you repeat

16   that one?

17                  THE WITNESS:  The agreement is -- it's the

18   agreement, I borrowed the money from Golden Spring

19   New York to sue the attorney office.

20   BY MS. CLAIBORN:

21        Q    And what is the name of the agreement?

22        A    I don't remember.

23        Q    Is it a promissory note?

24        A    I don't remember.

25        Q    Is it a contract?

1       A    I don't remember clearly.

2       Q    Who prepared the document?

3       A    Attorney.

4       Q    What was the name of the attorney who

5    prepared the document?

6       A    Melissa.

7       Q    What is Melissa's last name?

8       A    I don't know.

9       Q    Did Melissa the attorney represent you in

10   drafting that document?

11      A    Yes.

12      Q    And who represented Golden Spring in

13   drafting that document?

14      A    I don't know.

15      Q    Did Golden Spring have any attorney?

16      A    Yes.

17      Q    You just don't remember who it was?

18      A    They have a lot of attorneys.

19      Q    Is there more than one written agreement

20   under which you owe money to Golden Spring New York?

21      A    Yes.

22      Q    How many agreements are there?

23      A    Kind of two or three, or three or four.  I

24   don't remember clearly.

25      Q    And does someone keep track of the money

1    that you borrow from Golden Spring New York?

2         A    My attorney will write it down.  We record

3    it.

4         Q    What's the name of that attorney?

5         A    Aaron Mitchell.

6         Q    Did you say Aaron Mitchell?

7         A    Oh, yes.

8         Q    And how does Aaron Mitchell keep track of

9    the monies that you borrow from Golden Spring New

10   York?

11        A    In detail, I don't know.

12        Q    Does anyone who is employed by Golden

13   Spring New York keep track of the money that you

14   borrow from Golden Spring New York?

15        A    I don't know.

16        Q    Have you ever seen a document from

17   Attorney Aaron Mitchell showing how much you owe to

18   Golden Spring New York?

19        A    This is the thing I -- it's something

20   between me and my attorney I shouldn't answer.

21             MR. BALDIGA:  Can I -- I mean --

22             MS. CLAIBORN:  I don't think the question

23   involves --

24             MR. BALDIGA:  You can --

25             MS. CLAIBORN:  -- a privileged answer.

1          MR. BALDIGA:  That's -- give me a second.

2    You could answer that last question yes or no, so if

3    you ask again, I think he will say yes or no, and

4    then we can take it step by step.

5    BY MS. CLAIBORN:

6        Q    Have you ever seen a document prepared by

7    Attorney Mitchell that shows you how much money you

8    have borrowed from Golden Spring?

9          MR. BALDIGA:  Wait.  Wait, my instruction

10   needs to be interpreted.

11          THE OFFICIAL INTERPRETER:  What?

12          MS. CLAIBORN:  Can you --

13          MR. BALDIGA:  You need to instruct --

14          MS. CLAIBORN:  Just please state it and

15   he'll reinterpret.

16          MR. BALDIGA:  Please, tell the witness

17   what -- I am telling the witness he may answer yes

18   or no only.

19          THE WITNESS:  Yes.

20          MS. CLAIBORN:  I have other questions, but

21   given the hour of the day, I thought that we could

22   take a short break and then reconvene with creditors

23   being given the opportunity to ask questions.

24          I suggest we reconvene at 1:15.

25          MR. BALDIGA:  Is that okay?

1          MS. CLAIBORN:  Okay.  Thank you.  We'll

2     reconvene at 1:15.

3          (Recess.)

4          MS. CLAIBORN:  The recording has been

5     reconvened.  We are back in session after a short

6     break and Mr. Kwok, you remain under oath.

7          And that this point, Mr. Wolman has some

8     questions for you, Mr. Kwok.

9     EXAMINATION BY MR. WOLMAN:

10         Q    Good afternoon, Mr. Kwok.

11         On March 21st I was asking you some

12    questions about a prior deposition, specifically

13    about the times you had invoked your rights under

14    the Fifth Amendment of the U.S. Constitution.

15         On April 1st, 2021, were you being

16    investigated for any crime?

17         THE OFFICIAL INTERPRETER:  April 21st?

18         MR. WOLMAN:  April 1st, 2021.

19         THE OFFICIAL INTERPRETER:  Can you repeat

20    that question, sir?

21         Q    Were you being investigated for any crime?

22         A    From SET -- American SET and the

23    investigating GTV and they can communicate with our

24    attorney.

25         Q    Are you referring to the Securities and

1    Exchange Commission?

2        A    Yes.

3        Q    And what exactly were they investigating?

4             MR. BALDIGA:  Objection.

5             I need to ask whether this would reveal

6    privileged information.

7             Would your answer to the last question be

8    information from your attorneys?

9             THE PRIVATE INTERPRETER:  Can I just --

10            THE OFFICIAL INTERPRETER:  She wants to

11   help.

12            THE PRIVATE INTERPRETER:  Because he's not

13   --

14            MS. CLAIBORN:  I think you should just try

15   again. Mr. Baldiga, maybe you can just repeat

16   yourself and Mr. Jack, you can try again.

17            THE OFFICIAL INTERPRETER:  Can you repeat

18   what you want to say?

19            MR. BALDIGA:  Mr. Wolman asked you what

20   you were being investigated for.  Is the information

21   that you know, was that provided to you by your

22   attorneys?

23            THE WITNESS: Yes.

24            MR. BALDIGA:  And to answer the question

25   would you have to divulge what you were told by your

1    attorneys?

2              THE OFFICIAL INTERPRETER: Have to be what?

3    Divulged?

4              MR. BALDIGA:  Would you have to say what

5    you were told by your attorneys?

6              THE WITNESS:  Yes.

7              MR. BALDIGA:  Then I instruct the witness

8    not to answer on the basis of the attorney/client

9    privilege.

10             MR. WOLMAN:  That is not attorney/client

11   information.

12             MR. BALDIGA:  Hold on.  Let it be

13   interpreted.

14             MR. WOLMAN:  Information learned from an

15   attorney that is not specifically a communication

16   for the purpose of giving advice or receiving

17   information is not privileged information.  If your

18   attorneys says the sky is blue, that is not a

19   privileged communication.

20             MR. BALDIGA:  His is arguing with me.

21   There is not question to you.

22             MR. WOLMAN:  Mr. Baldiga, will you

23   continue to instruct your client to improperly

24   invoke the attorney/client privilege?

25             MR. BALDIGA:  I'll instruct on a question

Ho Wan Kwok - April 6, 2022                        74

1    by question basis.

2              MR. WOLMAN:  And this question, will you

3    maintain the instruction?

4              Mr. Kwok, are you refusing to answer my

5    question?

6              THE WITNESS:  Yes.

7              MR. WOLMAN:  And on what basis are you

8    refusing to answer my question?

9              MR. BALDIGA:  On the basis of instruction

10   from counsel on account of attorney/client

11   privilege.

12             THE WITNESS:  Because I can't answer the

13   question because of the privilege between the

14   attorney and me.

15    BY MR. WOLMAN:

16       Q    Have you been formally charged by the

17   Securities and Exchange Commission?

18       A    No.

19       Q    Has the Securities and Exchange Commission

20   closed its investigation of you?

21             MR. BALDIGA:  I have to ask again, you can

22   answer that yes or no, if you know.

23       A    No.

24       Q    Has the Securities and Exchange Commission

25   brought any charges against GTV?

1       A    I don't know.

2       Q    Have you been in the past five years

3  subject to an audit by the U.S. Internal Revenue

4  Service?

5       A    No.

6       Q    In the last five years have you been

7  subject to an audit by the New York State taxing

8  authority?

9       A    No.

10      Q    When did you become a resident of

11  Connecticut?  On what date?

12      A    The beginning of March, 2020, roughly.

13      Q    To be clear, you say you were a resident

14  of Connecticut in March of 2020?

15      A    Yes.

16      Q    So how come in Mr. Cheng, my client's,

17  lawsuit against you you signed a statement under

18  oath indicating that you were a resident of the

19  Sherry Netherlands Hotel?

20           THE OFFICIAL INTERPRETER:  Can you repeat

21  that, counsel?

22      Q    If you were a resident of Connecticut in

23  March of 2020, you signed a statement under oath in

24  Mr. Cheng's lawsuit against you that you resided at

25  the Sherry Netherlands Hotel.

```
 1        A    I don't 100 percent live in Connecticut,

 2   but sometimes I live in New York also.

 3        Q    When did you start living in Connecticut

 4   more than 50 percent of the time?

 5        A    Since March, 2020.

 6        Q    You had some assets you claim seized by

 7   China, correct?

 8        A    It's not mine. It's from my family.  It's

 9   my family's.

10        Q    Have you ever had assets seized by China?

11        A    You're talking about under my name?

12        Q    Yes.

13        A    No.

14        Q    All right.  In 2010, what was your

15   personal net worth?

16        A    No.

17        Q    That wasn't a yes or no question.

18             THE OFFICIAL INTERPRETER:  Can I repeat

19   your question again?

20             MR. WOLMAN:  Yes.

21        Q    In 2010 what was your personal net worth?

22        A    I didn't have any property.

23        Q    Have you ever had property in your name

24   over $1 million and by that I include where you

25   owned an interest in a company that interest,
```

1     therefore, contributes to your work?

2          A    Before 2000, yes.

3          Q    Okay.  What was your net worth in 1999?

4          A    I never calculate in detail.

5          Q    What would you estimate it as?

6          A    Roughly around 100 million.

7          Q    And what happened to that $100 million

8     worth of assets?

9          A    Because in 2000 I got a Hong Kong passport

10    and in China and they don't allow me to have any

11    property, asset.

12         Q    Have you abandoned all claims to whatever

13    assets you had in 1999?

14         A    Yes.

15         Q    Why have you abandoned your claims?

16              THE OFFICIAL INTERPRETER:  Abandoned what?

17         Q    Your claim to those assets?

18         A    Because I was not allowed to have any

19    assets in China.

20         Q    If China changed its policy, would you

21    have any right or ability to get those assets back?

22              MR. BALDIGA:  Objection.  If you know, you

23    can answer.

24         A    I don't know.

25         Q    What was your largest asset in 1999?

 1        A     There was the assets from a hotel, equity

 2   interest of a hotel in China.

 3        Q     And who holds that interest now?

 4        A     Chinese Community Party.

 5        Q     Is it held in the name of the Party?

 6        A     China only has one autocrat government,

 7   the party, and our family's assets were taken --

 8   were seized by them.

 9        Q     How did your son become wealthy enough to

10   fund Golden Spring and Lamp Capital?

11        A     Because he started very early to do

12   investment and also bring brand names to China.

13        Q     Where did he get the money for his

14   investment?

15        A     I don't know.

16        Q     Ms. Claiborn asked you about agreements

17   with Golden Spring and you could not identify who

18   the lawyer was for Golden Spring.  Do you remember

19   that?

20        A     True.

21        Q     I'd like to try to refresh -- to ask you

22   potentially to refresh your memory was it a lawyer

23   named Daniel?

24             THE OFFICIAL INTERPRETER:  He's asking

25   Daniel?

 1          Q     Yes, Daniel Pedolsky.

 2          A     Yes, probably and he used to be Golden

 3     Spring attorney and my personal attorney.

 4          Q     Did you execute a waiver of conflict of

 5     interest with Mr. Pedolsky?

 6                THE OFFICIAL INTERPRETER:  Can you repeat

 7     that?

 8          Q     Did you execute a waiver of conflict of

 9     interest with Attorney Daniel Pedolsky?

10          A     I don't remember.

11          Q     You mentioned two or three -- or three or

12     four agreements with Golden Spring. Can you identify

13     each of those agreements?

14          A     I'm not sure.

15          Q     Can you describe the purpose of each of

16     those agreements?

17          A     That loan from Golden Spring is to have a

18     settlement with Logan Cheng.

19          Q     And did you take out a loan to pay the

20     lawyers to sue Logan Cheng?

21          A     I don't remember.

22          Q     And what were the other agreements, other

23     than with Mr. Cheng?

24          A     From D.C. -- the attorney's office from

25     D.C. collect (indiscernible)  I don't remember the

 1    name.

 2              MR. WOLMAN:  All right.  Thank you and

 3    this time I have to go but thank you.  I'll try to

 4    dial in.

 5              MS. CLAIBORN:  Thank you.

 6              Can I ask whoever is on the line if they

 7    could mute themselves, because they can hear you

 8    typing.

 9              All right.  Who else would like to ask

10    questions?

11              Mr. Harbach.  Go ahead, Mr. Harbach.

12              MR. HARBACH:  Thank you.  For the record,

13    I'm David Harbach with O'Melveny and Meyers and I

14    represent PAACS.

15     EXAMINATION BY MR. HARBACH:

16         Q    Mr. Kwok, I'd like to ask some clarifying

17    questions based on questions that Ms. Claiborn asked

18    you today.

19              Earlier today she asked you if you owned

20    any foreign currency and you said no.  She also

21    asked you if you owned any digital currency and you

22    said no.

23              My question is have you ever ordered or

24    directed the purchase of either foreign currency or

25    digital currency on behalf of any entity?

1              THE OFFICIAL INTERPRETER:  Can you repeat

2       that?

3              MR. HARBACH:  Sure.

4         Q    My question is whether you have ordered or

5       directed the purchase of any foreign currency or any

6       digital currency on behalf of any entity?

7         A    What you mean direct?

8         Q    Have you directed anyone to purchase

9       foreign currency or digital currency?

10        A    No.

11        Q    Ms. Claiborn asked you a couple of

12      questions about access to credit cards and debit

13      cards. And I want to make sure that we have your

14      answer clear, because she asked you not whether you

15      had any credit cards but whether you had any access

16      to credit cards. I want to make sure that you

17      understand the difference.

18             THE OFFICIAL INTERPRETER: He's just asking

19      why you want to represent Ms. Holley's asked

20      questions.

21             MR. HARBACH:  I'm just trying to remind

22      you of a question she asked you earlier today, sir.

23             THE PRIVATE INTERPRETER:  I don't

24      understand the question.

25             MR. BALDIGA:  Mr. Baldiga's right.

1      There's not a question pending.

2           Q    The question is do you understand the

3      difference between having a credit card and having

4      access to a credit card?

5           A    I believe I don't have.

6           Q    You don't understand the difference?

7           A    I don't know much.

8           Q    Okay.  Well, let me give you an example.

9      Let's talk about the Maybach.

10               I believe that you represented to us today

11     that you have access to the Maybach for

12     transportation.  Is that correct?

13          A    Yes.

14          Q    But I believe it's also your position that

15     you do not own the Maybach.  Isn't that right?

16          A    Yes.

17          Q    In other words, your position is the

18     Maybach is not yours, right?

19          A    Yes.

20          Q    Okay.  So I use that example to illustrate

21     the example between owning something and having

22     access to something.  Does that help you?  Do you

23     understand the difference?

24          A    Now I understand you.

25          Q    Okay.  Thank you.  So returning to the

1    question about credit cards and debit cards.  Do you

2    have access to any credit cards or debit cards,

3    whether or not they are yours?

4         A    I don't understand the difference what he

5    means, access like if I use it myself or if I have

6    somebody else use it.

7         Q    Well, let's take those one at a time.

8    Let's begin with using it yourself.  Has any member

9    of your family ever provided you a credit card or a

10   credit card number to use for yourself?

11        A    I never used.

12        Q    The other example you mentioned was

13   perhaps a member of your family using a credit card

14   on your behalf.  Is that something that has

15   happened?

16        A    What do you mean represent me to use?

17        Q    I'm asking about whether to your knowledge

18   any member of your family has ever used a credit

19   card or a debit card to purchase things for you?

20        A    My son, my daughter, my wife.  They all

21   have credit card to buy things for me.

22             THE PRIVATE INTERPRETER:  The witness did

23   not say that, use the credit card to buy things for

24   me.  The witness said that my son, my wife bought

25   things for me.

```
 1              THE OFFICIAL INTERPRETER:  Yeah, they used

 2    their card and they both -- they all have it.  They

 3    all have the cards.  That's what he said.

 4              (Repeats interpretation)

 5              THE OFFICIAL INTERPRETER:  Yes, I did it

 6    right.

 7              THE WITNESS:  And so my wife and my son

 8    and my daughter have their own cards and also other

 9    family members use their cards to buy things for me.

10        Q    Is that ever at your direction?

11        A    No.

12        Q    Never.

13        A    No.

14        Q    Is it at your request?

15        A    No.

16        Q    Is Yan Ping Wang, the same as Yvette Wang?

17        A    Yes.

18        Q    Earlier Ms. Claiborn asked you about

19    Golden Spring Hong Kong.

20              You told her that your son owns it.  Do

21    you recall that?

22        A    Yes.

23        Q    My question for you is since when has your

24    son owned Golden Spring Hong Kong?

25        A    I don't know.
```

1        Q    Has anyone else besides your son ever

2    owned an interest in Golden Spring Hong Kong?

3        A    I don't remember.

4        Q    You also said that you didn't remember

5    whether you were ever a corporate officer of Golden

6    Spring Hong Kong?

7             THE OFFICIAL INTERPRETER:  Can you repeat

8    that one?

9        Q    You also said that you did not remember

10   whether you were ever a corpora officer of Golden

11   Spring Hong Kong?  Does that mean that it is

12   possible that you were and you're just not certain?

13       A    I don't remember.

14       Q    Ms. Claiborn asked you in a few different

15   ways about whether you know how Golden Spring New

16   York is funded or makes money.

17            Since when has Golden Spring been paying

18   your personal living expenses?

19       A    2015.

20       Q    So six or seven years approximately?

21       A    Since 2015 and that there was a person

22   called Bruno Wu from Mainland China and called my

23   family, my son, daughter and wife and so since then

24   I start spending money coming from Golden Spring New

25   York.

```
 1                THE PRIVATE INTERPRETER:  I don't think

 2    the witness says some.

 3                THE OFFICIAL INTERPRETER:  What?

 4                THE PRIVATE INTERPRETER:  I don't think

 5    the witness said some.

 6                THE WITNESS:  Not including the son that

 7    they caught, my wife and daughter and a lot of my

 8    family members, but not my son.

 9        Q    So approximately six or seven years that

10    Golden Spring has been paying your personal

11    expenses.  Is that right?

12        A    Yes.

13        Q    During those six or seven years did you

14    never discuss with any of your family members where

15    the money was coming from?

16        A    Because a lot of my family members were

17    caught by -- were arrested by your client, Bruno Wu,

18    and so I have no communication. I cannot communicate

19    with him.

20                THE PRIVATE INTERPRETER:  Not exactly. The

21    partner of PAACS -- the partner who the counsel was

22    represented, PAACS -- partner of PAACS --

23                THE OFFICIAL INTERPRETER:  I don't know.

24    He didn't mention anything about PAACS.

25                THE WITNESS:  So it's the other attorney
```

1    representing the client, Bruno Wu, arrested a lot of

2    your family members.  Your client's past partner,

3    one of the partners, (indiscernible)  Bruno Wu and

4    arrested a lot of your family members so you can't

5    communicate with them.

6         Q    At any time since 2015 have you been in

7    communication with your daughter, or your wife, or

8    your son?

9         A    Yes.

10        Q    At any time that you've been in

11   communication with any of those three individuals

12   did you ever ask them about where Golden Spring's

13   money was coming from?

14        A    Yes, I asked.

15        Q    And who did you ask?

16        A    I asked all three of them.

17        Q    And what did they say?

18        A    They told me because I was in the position

19   of being chased so don't ask our own financial

20   information.  Don't ask me for anything and we will

21   help you to -- we will help you as much as we can.

22        Q    When was that?

23        A    After 2017.

24        Q    How long after 2017?

25        A    I don't remember.

1          Q     And when you had this conversation with

2    your family were the three of them together or where

3    these separate conversations?

4          A     Separate.

5          Q     And each of the three of them said more or

6    less the same thing?

7          A     Similar.

8          Q     So I want to make sure I have this

9    correct.  You asked each of them where Golden

10   Springs money was coming from and each of them said

11   to you don't ask me about that because -- finish the

12   sentence for me.

13         A     So you are making a story I don't

14   understand.

15         Q     I'm trying to ask you to help me

16   understand.  I'm trying to understand the reason why

17   your family members told you not to ask why your

18   family members told you not to ask about where

19   Golden Spring got the money.

20               MR. BALDIGA:  Let him ask you a question.

21         Q     Please tell me why each of your family

22   members told you not to ask them about where Golden

23   Spring money came from?

24               MR. BALDIGA:  Objection.  If you know.

25               THE OFFICIAL INTERPRETER:  You're asking

1    to object the question?

2              MR. BALDIGA:  I objected.

3              THE OFFICIAL INTERPRETER:  Oh, you

4    objected.

5              MR. BALDIGA:  I permit him to answer if he

6    knows.

7              THE OFFICIAL INTERPRETER:  Okay.

8              THE WITNESS:  My daughter and wife were

9    arrested by his partner and got released 2017 and

10   released to New York.  They were tortured

11   tremendously by communist party.  The person

12   tortured them is this attorney's partner.  They all

13   have their own attorneys.  They told me don't ask me

14   or communicate with me about their own financial and

15   personal information.  Anything you want to do it's

16   better go through attorneys.

17             This is the doctrine, the thing, my family

18   members told them before they came to New York.  I

19   just want to tell you it's the meaning, very similar

20   meanings, but I can't tell you word by word.

21             So I don't want this counsel make any

22   stories about my daughter -- about my daughter's

23   forgery, giving false testimony.  That kind of

24   story.

25             The last time when we were here with Ms.

1    Holley and he was making false lies and saying I'm

2    using my Twitter account and saying that the judge

3    in New York was communist party and I didn't even

4    have a Twitter account.

5              MR. HARBACH:  Just so the record's clear

6    today is the first that I've uttered a word in

7    connection with this litigation in court.  So I

8    don't think you're talking about me, sir.

9              THE WITNESS:  I was saying last time was

10   from attorney in your office.  The prior attorney

11   before you called Andy Morse (ph) and was kicked out

12   by the judge because he was making false claims for

13   five years and was kicked out by the judge.  So the

14   law office was always making false claims.

15             MR. BALDIGA:  Just answer his question

16   because I can't know whether to object unless you're

17   just trying to answer his question.

18             THE WITNESS:  I didn't talk to my family,

19   daughter and wife individually to say the same

20   thing. If I say the same thing, same words, that

21   will be making false story.

22             MR. HARBACH:  I understand.

23             THE WITNESS:  You cannot use your

24   imagination and put it into my head.  This is why

25   the New York South District and the judge was

1   (indiscernible)  by them and they give me the wrong

2   sentencing.

3              UNIDENTIFIED:  Can you say that last --

4              THE WITNESS:  Because of their false

5   claims, so that's why the judge from the south

6   district of New York, the judge, gave me the wrong

7   sentencing.

8              THE PRIVATE INTERPRETER:  And also the

9   interpreter did not interpret fully counsel's

10  instruction to the witness previously about his

11  objection.

12             MS. CLAIBORN:  If you want to repeat it,

13  go ahead.

14             MR. BALDIGA:  I think you just have to

15  listen to these questions and answer just these

16  questions.

17             MR. HARBACH:  Sorry.  Counsel will move to

18  a different topic.

19   BY MR. HARBACH:

20      Q    Mr. Kwok, Ms. Claiborn asked you today

21  about a $21 million debt that you owe to Golden

22  Spring.  She asked you how much of that 21 million

23  was legal fees and your answer was I think most of

24  it.

25         I'd like to know what you meant by most of it.

```
 1    Did you mean $11 million or do you mean close to $21
 2    million.
 3         A    I don't remember.
 4         Q    Do you still believe that most of it was
 5    for legal fees?
 6         A    I don't remember.
 7         Q    You also mentioned the Logan Cheng
 8    settlement and that there was money borrowed from
 9    Golden Spring in connection with that.
10         A    Yes.
11         Q    How much money was that loan for?
12         A    I don't remember exactly.  Probably like
13    200.  Two -- $300,000.
14         Q    What were the terms of that loan from
15    Golden Spring?
16         A    I don't remember.
17         Q    When Ms. Claiborn asked you if you had
18    ever been to Golden Spring's offices in New York,
19    you said yes.
20         What's the address of those offices?
21         A    Yes.
22         Q    What is the address of those offices?
23         A    64th Street, 162.
24         Q    You also mentioned that the last time you
25    were there was yesterday and that the reason you
```

 1    went there was to prepare for today's meeting.

 2              Who did you meet with there?

 3         A    My attorney.

 4         Q    Did you meet with anyone else besides your

 5    attorney to prepare for today's meeting while you

 6    were at the office?

 7         A    I don't know what you mean, the other

 8    people.

 9         Q    Well, did you meet with anyone who works

10    for Golden Spring?

11         A    Yes, I met Yvonne Wang.

12         Q    And this was yesterday?

13         A    Yes, I met her yesterday.

14         Q    Did you ask some questions of her

15    yesterday?

16         A    No.

17         Q    And tell me about your conversation with

18    Ms. Wang?

19         A    What do you mean?

20         Q    Well, I'd like to know what you talked

21    about with her.

22         A    I ask her to arrange the food to eat and

23    the coffee.

24         Q    Is that all?

25         A    And also we talked about how to abolish

1     communist party.

2          Q    I want to make sure I get this right. I

3     think you said --

4               MR. BALDIGA:  Excuse me. Can I hear the

5     last thing again.

6               THE WITNESS:  We talk about how to abolish

7     communist party.

8               MR. BALDIGA:  Thank you.

9          Q    Ms. Wang is an officer of Golden Spring,

10    correct?

11         A    Yes.

12         Q    And you directed her to bring coffee,

13    right?

14         A    No, I didn't direct her. I'm just hoping

15    her to bring some coffee.

16         Q    You were hoping or helping?

17         A    Help.

18         Q    You were helping.  Because my question to

19    you was what you talked about with Ms. Wang.  And I

20    thought you said you asked her to bring some coffee

21    or maybe even told her to bring some coffee.

22         A    No, your attorney office -- you attorney

23    office making and imagining things again.

24         Q    I'll ask the question again.

25              MR. BALDIGA:  Please ask a question. Don't

1    put words in his mouth.

2         Q    What did you discuss with Ms. Wang

3    yesterday?

4         A    Do you want me to talk about in detail? I

5    can talk about this for hours.

6         Q    Well, no, not if the detail concerns how

7    to overthrow the Chinese Communist Party. So I'll be

8    more precise.

9         A    So you don't want us to abolish Chinese

10   Community Party.  Our job is to abolish Chinese

11   Communist Party.

12            MR. BALDIGA:  Just answer the question.

13            THE WITNESS:  You don't have a question.

14   You're just directing something.

15        Q    Sometimes I speak in segments to allow the

16   interpreter to translate.

17            MR. BALDIGA:  I think it would be helpful

18   if you just ask question and then the witness --

19   I'll instruct him to answer your questions.  That

20   would be helpful.

21        Q    Did you discuss with Yvette [sic]

22   yesterday anything related to preparing for the

23   meeting today?

24        A    Yes.

25        Q    What did you discuss?

1        A      I ask her to bring those documents here.

2        Q      Anything else?

3        A      I don't remember.

4        Q      When was Lamp Capital created?

5        A      I don't know.

6        Q      Why was Lamp Capital created?

7        A      I don't know.

8        Q      Who created Lamp Capital?

9        A      My son.

10       Q      How do you know that?

11       A      Because I borrow money from my son to pay

12   attorney fee.

13       Q      The question is how do you know that your

14   son created Lamp Capital?

15       A      Because my son said it.

16       Q      He told you himself.

17       A      Yes.

18       Q      Did he ask for any advice from you about

19   whether to create Lamp Capital?

20       A      No.

21       Q      Did he ask you your opinion on whether he

22   should create Lamp Capital?

23       A      No.

24       Q      Did he tell you why he was creating Lamp

25   Capital?

1       A    No.

2       Q    When you were talking about your

3    malpractice claim against Boise Schiller, you

4    mentioned someone you kept referring to as he. I'd

5    like to know who that person is?

6       A    I don't know what you mean.

7       Q    Yes, that was a bad question. I apologize.

8            You stated that there was someone who gave

9    false documents to the court without your

10   permission.  That this person threatened your

11   family, that this person threatened you after

12   drinking and that this person brought lots of loss

13   to you and your family, including not providing

14   translated documents before presenting them to the

15   judge.

16           My question is who is that person?

17      A    Schiller.  The Attorney Schiller.

18      Q    So Mr. Schiller of the Boise Schiller law

19   firm.  Have I got that right?

20      A    Yes.

21      Q    Thank you. Do you have an understanding of

22   what business Lamp Capital is engaged in, if any?

23      A    No.

24      Q    Different subject.  You said several times

25   today in connection with your answers that the

1     people behind me have done certain things.

2      Who are you talking about?

3          A     One person behind me, there is a boss

4     called Bruno Wu.  He paid the case that -- the rape

5     case from (indiscernible)  rape case.  Also there is

6     a creditor here and that also was paid by Bruno Wu.

7     That attorney fee was paid by Bruno Wu.  And Bruno

8     Wu is also his partner and he invested $800 million.

9     Bruno Wu's partner is also (indiscernible)  previous

10    officer and they were investigating and they

11    combined a partner with them to investigate my case.

12         So April 18, 2017, so this (indiscernible)

13    start suing me, bring the lawsuit.  Within this 24

14    hours Bruno Wu is sending me the red note and they

15    start bringing the lawsuit.

16              MR. HARBACH:  Can I stop --

17              THE WITNESS: The Chinese Communist Party

18    stopped the interview, the VOA interview with me.

19    They happened at the same time.

20              MR. HARBACH:  Or I can let him go.

21              THE WITNESS:  All the documents made by

22    this attorney firm were all false.  They provide a

23    false document to the South District of New York

24    court.  They even false claim on my daughter's

25    yacht.  The boat is mine.  They sought the judge

1    from the South District Court and I file the

2    bankrupt -- personal bankruptcy case twice and the

3    day -- they (indiscernible)  twice including Ms.

4    Holley.  And Ms. Holley was present.

5            The first time when Ms. Holley was present

6    in the court and they false testified saying -- and

7    they said my daughter was giving false testimony for

8    the Sherry bankruptcy case because my daughter never

9    participated in that case.

10           And Ms. Holley was there, was present the

11   second co date and Ms. Holley was there also.  The

12   attorney from the firm was telling the judge and

13   they said that I used the Twitter account to -- and

14   they said on the Twitter and I was saying on the

15   Twitter the south district judge was communist party

16   member.

17           You can see here all the people behind me

18   and one is Bruno Wu and one person paid in many

19   cases --

20           MR. HARBACH:  I'd like to ask another

21   question.

22    BY MR. HARBACH:

23       Q   Are you aware one way or the other whether

24   your bankruptcy counsel, the Brown Rudnick law firm,

25   has ever previously represented Bruno Wu?

1           THE OFFICIAL INTERPRETER:  Can I take a

2     little break?  I just can't concentrate as much.

3     Just too much.  Can I take a break?

4           MS. CLAIBORN:  Can I ask you to ask that

5     question and then we'll take a break?

6           THE OFFICIAL INTERPRETER:  Yes.  Can you

7     repeat that question?

8           MR. HARBACH:  I'd be happy to.

9       Q    Are you aware one way or the other of

10    whether your bankruptcy counsel, the Brown Rudnick

11    law firm, previously represented Bruno Wu?

12          THE OFFICIAL INTERPRETER:  Represent

13    somebody else you said?

14          MR. HARBACH:  Yes.  Bruno Wu.

15      A    No.

16          MS. CLAIBORN:  I'm going to take a short

17    break. We're going to be back here at 2:45.

18      (Break)

19          MS. CLAIBORN:  All right.  We are back on

20    the record after a short break.

21          Mr. Harbach, the floor is yours.

22          MR. HARBACH:  Thank you.

23     BY MR. HARBACH:

24      Q    Ms. Kwok, among the documents in front of

25    you, document 78 filed in this case.

 1              THE OFFICIAL INTERPRETER:  Which document?
 2   This one?
 3              MR. HARBACH:  Yes. My apologies. Counsel
 4   advises me that your copies are not stamped.
 5      Q    I'm talking about your official from 106.
 6   So my question for you starts on page 9, which
 7   contains a heading that says Schedule D, creditors
 8   who have claimed (indiscernible)  by the property.
 9   Are you with me?
10              You checked the box yes.  And were
11   directed to Schedule D, so that's where I would like
12   you to flip to, please.  And it's at page 18.
13              MR. BALDIGA:  What's the title?  He can
14   maybe find it better with the title.
15              MR. HARBACH:  Okay. It's the little chart
16   that is Schedule D, which is a list of creditors
17   with secured claims.
18    BY MR. HARBACH:
19      Q    Mr. Kwok, you'll see that there are five
20   separate entries for Golden Spring New York Limited.
21   The data in each column is identical for all five
22   rows.
23              So my question is why are there five
24   identical entries on this schedule?
25              The question is why are there five

1    identical entries on this schedule?

2         A    I don't know what that means five --

3         Q    Well, each row is exactly the same.  And

4    I'm just asking why there are five rows with the

5    same information?

6         A    I don't know.

7         Q    Among that documents that you filed were

8    some specific notes and one of those notes discusses

9    the residence on Taconic Road.

10             MR. HARBACH:  And for counsel I'm at

11   document 77, page 4.

12             THE OFFICIAL INTERPRETER:  Which page?

13             MR. HARBACH:  Page 4.

14             THE OFFICIAL INTERPRETER:  84?

15             MR. HARBACH:  No, Page 4.

16             THE OFFICIAL INTERPRETER:  Oh, page 4.

17   Okay.

18    BY MR. HARBACH:

19        Q    My question really isn't so much about the

20   exact test as it is the substance.

21        So first question, is it true that all expenses

22   related to the Taconic Road House are paid directly

23   by family and family controlled enterprises?

24        A    Yes.

25        Q    Okay.  Which family members?

1        A    My wife, sometimes by my son.

2        Q    Which family controlled enterprises?

3        A    Which country -- my wife.

4        Q    Your wife's not an enterprise.  I'm trying

5   to ask which family controlled enterprises pay the

6   expenses for the Taconic House?

7        A    Greenwich LLC.

8        Q    Okay.  Incidentally, how do you know that

9   your wife and sometimes you son pay these expenses?

10       A    Because I live there.

11       Q    Do you observe them pay the expenses?

12       A    Yes.

13       Q    Is that ever at your request?

14       A    I don't remember I request anything.

15       Q    Does Greenwich Land LLC -- yes Greenwich

16  Land LLC own any other real estate besides 373

17  Taconic Road?

18       A    I don't know.

19       Q    Do you know anything about the property

20  located at 33 Ferncliff in Cos Cob, Connecticut?

21            THE OFFICIAL INTERPRETER:  Can you repeat

22  that?

23            MR. HARBACH:  Yes.

24       Q    33 Ferncliff in Cos Cob, Connecticut.

25            THE OFFICIAL INTERPRETER:  31, right?

```
 1              MR. HARBACH:  No, 33.

 2         A    Yes, now I remember it. It's also owned by

 3    my wife's company.

 4         Q    That being Greenwich Land?

 5         A    Maybe.

 6         Q    Do you know?

 7         A    I'm not sure.

 8         Q    Have you ever been to 33 Ferncliff?

 9         A    Yes.

10         Q    How recently?

11         A    No.  Not recently.

12         Q    Do you know when Greenwich Land purchased

13    33 Ferncliff?

14         A    I don't remember.

15         Q    Do you know approximately how much money

16    it cost?

17         A    Probably more that $1 million.

18         Q    Does $1.37 million sound about right?

19         A    I'm not sure.

20         Q    And does the approximate purchase date of

21    September, 2019 sound about right to you?

22         A    Not sure.

23         Q    Turning back to 373 Taconic for a moment.

24    How much was that property purchased for?

25         A    Probably 400 to 500,000.
```

```
 1                THE PRIVATE INTERPRETER:  No, no, no.

 2                THE OFFICIAL INTERPRETER:  4 to 5 million.

 3    I'm sorry.

 4         Q    Approximate time of purchase of 373

 5    Taconic, if you know?

 6         A    I don't know.

 7         Q    Have you ever resided at 33 Ferncliff?

 8         A    No.

 9         Q    Do you know whether anyone currently lives

10    there?

11         A    Before there is another comrade maybe, you

12    know, for disjoined Chinese Communist Party and he

13    was to live there.

14         Q    How long ago?

15         A    Probably one to two years ago.

16         Q    DO you remember that person's name?

17         A    Yes.

18         Q    What is it?

19         A    Wong Din Gong (ph).

20         Q    Does anyone currently live there, if you

21    know?

22         A    I don't know.

23         Q    Talking about 373 Taconic, where did the

24    money come from to purchase that property?

25         A    I don't know.
```

1        Q     Do you know whether the house was

2    purchased with cash or financing?

3        A     I don't know.

4        Q     Same questions for 33 Ferncliff.  Do you

5    know where the money came from to purchase that

6    house?

7        A     I heard it was purchased by cash.

8        Q     From whom -- sorry. From whom did you hear

9    that?

10       A     I don't remember.

11       Q     Do you know where that money came from?

12       A     I don't know.

13       Q     Do you know what Saraca Media Group is?

14       A     Saraca?

15       Q     Saraca.

16       A     Saraca Media Group.  I do.

17       Q     What is Sirraca Media Group?

18       A     Just Saraca.  It's a company.

19       Q     What kind of company?

20       A     I'm not sure.

21       Q     Have you ever had any relationship with

22    Saraca personally?

23       A     No.

24       Q     Do you know anything about the type of

25    business that Saraca conducts?

```
 1        A    I remember they are related to GTV Media

 2   platform, or they invested on the GTV Media

 3   platform.

 4        Q    How do you know that?

 5        A    Because I was their consultant, who owned

 6   the consultant.  And also I was the GTV host.  And

 7   also this is one of the input and platform for

 8   disjoined communist party.

 9        Q    When you said you were a consultant a

10   moment ago was that for Saraca or for GTV?

11        A    GTV.

12        Q    Has Saraca ever been -- ever had the 162

13   East 64th Street address associated with it?

14             THE OFFICIAL INTERPRETER:  Which address?

15   Can you repeat that one.

16        Q    Yes.  162 East 64th Street.  The question

17   is whether Saraca has ever been associated with that

18   address?

19        A    I don't know.

20        Q    That is the family office address,

21   correct?

22        A    It's one of them.

23        Q    Where are the other ones?

24        A    I don't know.

25        Q    Are there any others in New York City?
```

Ho Wan Kwok - April 6, 2022                                                108

1        A    I just want to clarify.  Golden Spring is

2    one of the companies in this building, 162.

3        Q    Understood and thank you.

4             We've referred to the family office during

5    your questioning and I just want to be clear.  When

6    we talk about the family office are we referring to

7    that address on East 64th Street?

8        A    Yes.

9        Q    Has GTV ever been associated with the

10   family office address?

11       A    I don't know.

12       Q    Who owns Saraca?

13       A    My son.

14       Q    Since when?

15       A    I don't know.

16       Q    Does Saraca currently exist?

17       A    I don't know.

18       Q    Do you have any idea how many -- do you

19   know anything about the value of Saraca's assets?

20       A    I don't know.

21       Q    Do you know anything about payments Saraca

22   has made to GTV?

23       A    No, I don't know.

24       Q    Has your wife ever told you about any

25   multi-million dollar payments from Saraca to

1    Greenwich Land?

2        A    I don't know.

3        Q    You don't know whether he's ever told you

4    or you don't know about the payments?

5        A    She never told me and I don't even know

6    how much.

7        Q    Do you know a company called Ziba Limited,

8    Z-I-B-A?

9             THE OFFICIAL INTERPRETER:  Ziba, Z-I-B-A?

10            MR. HARBACH:  Yes.

11       A    I don't know.

12       Q    I'm sorry if I've already asked this.

13   What is the relationship, if any, between Saraca and

14   GTV?

15       A    Saraca is the investor for GTV.

16       Q    Do you know how much money Saraca invested

17   in GTV?

18       A    I don't know.

19       Q    When was GTV founded?

20       A    2020.  Maybe 2019.  Not very sure.

21       Q    Do you know the names of any of the

22   officers or directors of Saraca?

23       A    I don't know.

24       Q    Do you know whether Yvette Wang is an

25   officer or director of Saraca?

1        A    I don't know.

2        Q    Do you know someone called Hong Chung

3   Wang?

4        A    Yes.

5        Q    Who is that?

6        A    He's my partner and also comrade for

7   disjoined Communist Party.

8        Q    Is he a friend of yours?

9        A    Friend, comrade and a partner.

10        Q    What do you mean by partner?

11        A    Because we had a business corporation.

12        Q    Tell me about that.

13        A    Well, I don't remember the name of that

14   company.  It's a company for investigating Communist

15   Party in USA doing money laundering and committing

16   crimes.

17        Q    Was it a for profit company?

18        A    I don't know.

19        Q    You don't know?

20        A    I don't know.

21        Q    What was the name of the company?

22        A    I don't remember when getting to English.

23   I don't remember the name.

24        Q    Approximately what time frame where you

25   partners with Hong Chung Wang in this company?

1          A      I don't remember.

2          Q      Within the last three years?

3          A      It must be more than three years ago.

4          Q      More than ten years?

5          A      No.

6          Q      Did Hong Chung Wang ever have any

7    connection to Saraca?

8          A      I don't know.

9          Q      Was he ever an officer or director of

10   Saraca?

11         A      I don't know.

12         Q      What does the G in GTV stand for?

13         A      God.  The Goal, like in -- G-O-A-L.

14         Q      The English word "goal"?

15         A      Yea.  Goal or God.

16         Q      Okay.  How long have you known Hong Chong

17   Wang?

18         A      I don't remember.

19         Q      More than ten years?

20         A      Roughly.

21         Q      And do you still consider him a friend

22   today?

23         A      Yes.

24                MR. HARBACH:  Just a moment, please.

25         Q      There's been many questions today about

1    Golden Spring funding your living expenses.

2        Is it correct that as far as your living

3    expenses are concerned that none of that is expected

4    to be repaid?

5        A    Yes, true.

6        Q    And so those monies are not the subject of

7    any formal agreement, correct?

8        A    No.

9        Q    And those monies essentially then are a

10   gift to you, correct?

11       A    Yes.

12       Q    What's the Rule of Law Foundation?

13       A    What does that mean?

14       Q    The question is what is it?

15           THE OFFICIAL INTERPRETER:  The Rule of Law

16   Foundation?

17           MR. HARBACH:  Yes, sir.

18           THE OFFICIAL INTERPRETER:  I didn't get

19   it.  Can you ask it another way?

20       Q    There's an entity called --

21           THE OFFICIAL INTERPRETER:  Oh.

22       Q    -- the Rule of Law Foundation.

23           THE OFFICIAL INTERPRETER:  Okay.

24           MR. HARBACH:  I'll hopefully save some

25   time by just asking this question instead.

1        Q     Are you familiar with the Rule of Law

2    Foundation?

3        A     Yes.

4        Q     Were you involved in its establishment?

5        A     Yes.

6        Q     Did you contribute any money to it when it

7    was formed?

8        A     Not myself.

9        Q     Did you direct any entity to contribute to

10   the Rule of Law Foundation?

11       A     Suggestion in a direct and suggesting any

12   difference --

13       Q     If there was a suggestion, please tell me

14   it was a suggestion.

15       A     I didn't direct anybody or order anybody.

16   I just always suggest people to make donations for

17   the Foundation.

18             THE PRIVATE INTERPRETER:  As an

19   interpreter, I think that if the witness is asking

20   the interpreter questions, the interpreter should

21   interpret the question asked by the witness instead

22   of answer that question.

23             THE OFFICIAL INTERPRETER:  I can answer

24   anything.

25             THE PRIVATE INTERPRETER:  The witness said

```
 1    are you talking about the (indiscernible)  --

 2              THE OFFICIAL INTERPRETER:  That's why I

 3    relayed the questions to the attorney.

 4              THE PRIVATE INTERPRETER:  You answer him

 5    yes, and then you say that.

 6              THE OFFICIAL INTERPRETER:  Oh, for God's

 7    sake.  I didn't say -- did I miss anything?

 8         (Interpretation.)

 9              THE OFFICIAL INTERPRETER:  Okay.  No

10    question.  He said no question was not answered.

11     BY MR. HARBACH:

12         Q    Did you ever suggested to any of your

13    family members that they donate to the Rule of Law

14    Foundation?

15         A    Yes, I did suggest.

16         Q    Did any of your family members or the

17    family controlled enterprises contribute money to

18    the Rule of Law Foundation?

19         A    Yes.

20         Q    How much money?

21         A    For cash there is one -- over $1 million.

22              From Hong Kong, Japan and Mainland -- in

23    China and all combined it should be more than 30

24    million.

25         Q    And just focusing for the moment on
```

115

1    contributions from your family at your suggestion.

2    Approximately, how much money is that?

3         A    I don't know the details.  Because of

4    security reasons they don't want me to know.

5         Q    Did you say a moment ago that your family

6    contributed over a million dollars?

7         A    One million cash is in New York here.

8         Q    When was that?

9         A    I don't remember.

10        Q    Is the reason -- well, let me ask it this

11   way.  Did you suggest an amount to your family

12   members that they should contribute to the Rule of

13   Law Foundation?

14        A    I want them to donate the more the better.

15        Q    Is that what you told them?

16        A    Yes.

17        Q    Do you know whether the Rule of Law

18   Foundation is associated with the family office

19   address on 64th Street?

20        A    Yes.

21        Q    Did you ever make a $100 million donation

22   to the Rule of Law Foundation in November of 2018?

23             THE OFFICIAL INTERPRETER:  Can you repeat

24   that again?

25        Q    Did you ever make a $100 million donation

```
 1     to the Rule of Law Foundation in November, 2018?

 2         A    No. In the live stream like I want --

 3     tried to collect the funds, in the live stream show.

 4         Q    Did you ever --

 5              MR. BALDIGA:  Wait.  Was that his whole

 6     answer?

 7              THE OFFICIAL INTERPRETER:  Yeah. Something

 8     wrong?

 9              THE PRIVATE INTERPRETER:  Not quite

10     exactly what the witness said.

11              (Indiscernible)  broadcasting is okay.

12     Live stream is okay.  But collect money --

13              THE OFFICIAL INTERPRETER:  Asking for

14     donation, right?

15         (Interpretation)

16              THE PRIVATE INTERPRETER:  Raise --

17              THE WITNESS:  Raising money, raise

18     donations.  Yeah, in the live stream broadcast

19     thing, or whatever, you know, asking for donations

20     to -- you know, to raise funds, to raise money.

21         Q    Did you ever promise to donate $1 billion

22     to the Rule of Law Fund?

23              THE OFFICIAL INTERPRETER:  10 billion you

24     said?

25              MR. HARBACH:  No, sir.  1 billion.
```

1          THE OFFICIAL INTERPRETER:  Oh, one

2     billion.

3          A    I don't remember. I don't remember.

4          Q    Do you mean that it's possible that you

5     made that promise?

6          A    So we could reach that goal if we combine

7     the organizations all over the world.

8          Q    Understand.  And it's a simple question. I

9     just don't know the answer.

10          Did you yourself ever promise to donate $1

11     billion to the Rule of Law fund?

12          A    In the past five years I did the live

13     stream over 5,000 times.  Some of the live stream

14     could have reached four or five hours.  It's hard

15     for me to remember every sentence I said.

16          Q    Well, I understand that, but I'm only

17     asking about one issue.  And it is whether you ever

18     promised publicly, or privately or anyhow to donate

19     $1 billion to the Rule of Law Fund?

20          THE PRIVATE INTERPRETER:  He did not say

21     invest.

22          MR. HARBACH:  Donate

23          THE OFFICIAL INTERPRETER:  Yeah, donate.

24          A    I don't remember.

25          Q    I'll ask this one one more time.

1          Are you saying that it is possible that

2    you made such a promise.  You just can't be sure?

3          A    In front of Ms. Holley I wouldn't say

4    anything is possible but this is a very serious

5    issue.  Now they start the scheme again.

6          Q    Well, this isn't what did you have for

7    breakfast three days ago.  This is did you promise

8    to donate $1 billion and if the answer is you don't

9    know, that's okay.

10              MR. BALDIGA:  I think that's what the

11   answer has been.

12              MR. HARBACH:  No, the answer has been I

13   don't remember.

14              MR. BALDIGA:  Don't remember.

15              MR. HARBACH:  Yes, sir. That's a little

16   different.

17         Q    So the answer might be no, but you're not

18   saying no.  You're saying you don't remember.

19         A    I said it three times, I don't remember.

20              MR. BALDIGA:  There's no question --

21         A    Because in the past five years

22   (indiscernible)  always making these kind of answers

23   for me so that's why the judge from the South

24   District were fooled by you and you started again --

25         Q    I'll move on.

1      A     In the South District court I only met

2   judge 20 seconds. I didn't say one sentence within

3   this five years and I was fined a total about $300

4   million because that's what they did.

5              MR. BALDIGA:  All right. Let's stop it.

6   Let's wait for a question and we'll answer the

7   question.

8              MR. HARBACH:  Bill, I appreciate your

9   patience.  I'll move on.

10             MR. BALDIGA:  Translate what I said,

11   please.

12             THE OFFICIAL INTERPRETER:  Can you repeat

13   that?  Everybody's saying at the time.

14             MR. BALDIGA:  Ask a question and he'll

15   answer a question.

16      Q     Have you made any donations to the Rule of

17   Law Foundation in the last two years?

18      A     Myself, right?

19      Q     Yes, sir.

20      A     No.

21      Q     Have you suggested to any of your family

22   that they make donations to the Rule of Law

23   Foundation within the last two years?

24      A     I don't remember.

25      Q     Would you ever have made a promise to

1    donate $1 billion to the Rule of Law Foundation if

2    you did not actually have that money?

3              MR. BALDIGA:  Objection to form.

4              THE OFFICIAL INTERPRETER:  I didn't get

5    it.  Can you repeat one more time.

6         Q    Would you have ever made a promise to

7    donate $1 billion to the Rule of Law Foundation if

8    you did not actually have that money.

9              MR. BALDIGA:  And I objected.

10              MR. HARBACH:  And then Bill objected.

11              THE OFFICIAL INTERPRETER:  He said are you

12    -- want to sentencing me to death sentence?

13         Q    Approximately how much is the Lady May

14    worth?

15         A    I don't know.

16         Q    Over the years that you have been aboard

17    the Lady May, approximately how many times have you

18    invited friends to join you?

19              THE OFFICIAL INTERPRETER:  Can you repeat

20    that question one more time?

21              MR. HARBACH:  Yes.

22         Q    Over the years that you had been aboard

23    the Lady May, approximately how many times have you

24    invited friends out to join you?

25              MR. BALDIGA:  Hold on.

1           MR. HARBACH:  Sorry, Bill.

2           MR. BALDIGA:  David, you have a deposition

3    on the Lady May issues coming up.  You can choose

4    today or then.  Either one is fine.

5           MR. HARBACH:  That's a fair point.  I'll

6    move on.

7           MR. BALDIGA:  Okay.  No question.

8           MR. HARBACH:  If I could direct counsel's

9    attention again to document 77.  And I want to focus

10   on question 19.

11      Q    Mr. Kwok, let me know when you're read

12   that question. It's no. 19.

13      (Pause.)

14      A    Finished.

15      Q    Okay.  So for the benefit of the record,

16   the question says within ten years before you filed

17   for bankruptcy did you transfer any property to a

18   self settled trust or similar device of which you

19   are a beneficiary?

20      A    No.

21      Q    And that is indeed what you checked on the

22   form.  My question for you is if you turn -- if

23   changed the word you to a family member as the

24   beneficiary, what would the answer be?

25           MR. BALDIGA:  Objection.

1        A     I cannot answer questions with if.

2        Q     I'll ask it a different way.

3              MR. HARBACH:  And, Jack, I'll ask you to

4    bear with me.

5        Q     Within ten years before you filed for

6    bankruptcy did you transfer any property to a self

7    settled trust or similar device of which a member of

8    your family is a beneficiary?

9        A     No.

10       Q     Sticking with that same document going

11   forward to question 27.  Just let me know when

12   you're read it, sir.

13       (Pause.)

14       A     Okay. I'm finished.

15       Q     So you see there you have checked the box

16   next to the word yes.  And then the instructions say

17   check all that apply above and fill in the details

18   below for each business.

19             MR. HARBACH:  Do you see where that is,

20   Jack?

21             THE OFFICIAL INTERPRETER:  I didn't see

22   that.

23             MR. HARBACH:  Next -- Holley can show you.

24       (Pause.)

25             MR. HARBACH:  So I was just pointing out

1    to the witness -- for the benefit of the translator

2    I'll say it again.

3        Q    Next to the box that is checked yes, the

4    instructions say check all that apply above and fill

5    in the details below for each business.  None of the

6    boxes above is checked and that's my question.

7            Which box or boxes should be checked for

8    each of those three entities that you have listed?

9        A    I cannot determine which one.

10       Q    Is that something you would need more time

11   to figure out or you just don't know the answer?

12       A    I could answer one by one.

13       Q    Okay. Let's do that.  Let's start with

14   Genever.

15       A    Which Genever?

16       Q    Well, the one that's listed is Genever

17   Holdings Corporation.

18           Which of those boxes would you check for

19   Genever Holdings Corporation, if any?

20       A    It was one time -- it was a member of LLC.

21   The above don't apply and should transfer to no. 12

22   -- transfer to 12.

23           It used to be an LLC.

24       Q    Are you saying that you would check the

25   box for a member of an LLC but it should be in the

1    past tense?

2          A    Yes.  Used to be.

3          Q    Do any of the other boxes apply to your

4    relationship to Genever Holdings Corporation?

5          A    The last row seems like appropriate for

6    me. I'm not very sure.

7          Q    The last row being an owner of at least

8    five percent of the voting or equity securities of a

9    corporation?

10         A    I owned 50 percent for a very short period

11   of time.

12         Q    Okay.  What about for Shiny Time?

13         A    Shiny Time already went away.

14         Q    I understand.  When it was in existence,

15   which of those boxes was accurate?

16         A    Number one.

17         Q    A sole proprietor?

18         A    Yes.

19         Q    Any of the others?

20         A    Not sure.

21         Q    Okay.  What about for Well Origin Limited?

22         A    It went away.

23         Q    Okay.  Same question though.  Which of

24   those boxes applied when it was in existence?

25         A    Number one.

 1        Q     Any of the others?

 2        A     Not sure.

 3        Q     One last point about this question.

 4              For Genever Holdings Corporation the block

 5     for the dates that the business existed is blank.

 6      Do you know what those dates should be?

 7        A     2015.  Probably March, April to June,

 8     July.

 9        Q     Of which year?

10        A     2015.

11        Q     So from approximately March or April until

12     approximately July all in 2015?

13        A     Yes.

14        Q     Okay.  And is that the entire duration

15     that that corporation existed?

16        A     I was in the company for a few months, for

17     this period of time, a few months and with holding -

18     - in stock holding.  And the company still existed

19     after I left.

20        Q     I understand.  And does it still exist

21     today?

22        A     I believe it still exists.

23        Q     Okay.  In what year did you get married?

24        A     1918 -- or 1985.

25        Q     What year was your son born?

1         A     1986.

2         Q     And how old are you, sir?

3         A     54.

4         Q     How old was your son when your family

5    began working with Uda Property Company?

6         A     11.  Oh, five years -- five years old.

7         Q     And so that would have been in

8    approximately 1991 that your family began working

9    with Uda?

10        A     Yes.

11        Q     When was the Henan Uda Hotel completed?

12        A     In 1997.

13        Q     And what about the Uda International Trade

14   Center.  When was it completed?

15        A     At pretty much the same time.

16        Q     In your declaration in this case you

17   stated that both of those were successful ventures.

18        A     Yes.

19        Q     That allowed your family to start amassing

20   significant wealth.

21        A     Yes.

22        Q     So recognizing that this is in the early

23   '90's how much money approximately did those

24   ventures bring to your family?

25        A     I don't remember.

 1       Q     More than $50 million?

 2             THE OFFICIAL INTERPRETER:  50 or 15?

 3             MR. HARBACH:  5-0.

 4             THE OFFICIAL INTERPRETER:  Oh, okay.

 5       A     I don't remember.

 6       Q     What about the Pengu Plaza?  When was it

 7  completed?

 8       A     July 2008.

 9       Q     So between the early '90's and 2008 what

10  other projects of significant did the Guo family

11  invest in or participate in?

12             THE OFFICIAL INTERPRETER:  Since 1990's to

13  --

14       A     Between the early 1990's and 2008.

15       Q     Do you remember any of them?  Any of the

16  significant ventures?

17       A     Beijing Golden Spring.

18       Q     What was that?

19       A     It's a property company.  Real estate.

20  It's a real estate company.

21       Q     Was this a development company or a --

22  like a buying and selling agency?

23       A     Developing company.

24       Q     When was the Pangu Plaza project started,

25  approximately?

1        A    Roughly 1999.

2        Q    Okay. So let's use that as a point in

3    time.

4             At the beginning of the Pangu Plaza

5    project approximately how much had the family

6    amassed in wealth?

7             THE PRIVATE INTERPRETER:  Ask that

8    question again?

9             MR. HARBACH:  Sure.

10       Q    As of 1999, which was the beginning of the

11   Pangu Plaza project, approximately how much wealth

12   had the family earned or amassed by that time?

13            THE OFFICIAL INTERPRETER:  You're talking

14   about after 1999?

15            MR. HARBACH:  No, I'm talking about as of

16   1999?

17            THE OFFICIAL INTERPRETER:  Oh, as of 1999.

18       Q    How much money had the family made by

19   1999?

20       A    I don't remember.

21       Q    More than $100 million?

22       A    I don't remember.

23       Q    More than $500 million?

24       A    I don't remember.

25       Q    More than a billion dollars?

| | | |
|---|---|---|
| 1 | A | I don't remember. |
| 2 | Q | Were you personally involved in the work |

with Uda Property Company?

|  |  |  |
|---|---|---|
| 4 | A | Yes. |
| 5 | Q | Were you personally involved in the |

development of the Henan Uda Hotel?

|  |  |  |
|---|---|---|
| 7 | A | Yes. |
| 8 | Q | Were you personally involved in the Uda |

International Trade Center in Zhengzhou?

|  |  |  |
|---|---|---|
| 10 | A | Yes. |
| 11 | Q | Were you personally involved in the |

development of the Pengu Plaza?

|  |  |  |
|---|---|---|
| 13 | A | Yes. |
| 14 | Q | Who was in charge of the Beijing Golden |

Spring Real Estate Development firm?

|  |  |  |
|---|---|---|
| 16 | A | A professional group. |
| 17 | Q | Were you a member of that group? |
| 18 | A | At that time I was a consultant. |
| 19 | Q | For Beijing Golden Spring? |
| 20 | A | Yes. |
| 21 | Q | During what time frame was that, |

approximately that you were a consultant for them?

|  |  |  |
|---|---|---|
| 23 | A | After 2000. |
| 24 | Q | After 2000.  Okay. |
| 25 | | MS. CLAIBORN:  Mr. Harbach, I just want to |

1    note that it is 4:18 and I know we've had a long day

2    -- and I wanted to give -- I apologize for

3    interrupting you, first of all.

4              MR. HARBACH:  That's all right.

5              MS. CLAIBORN:  But I wanted to give

6    counsel for the committee a chance to ask a few

7    questions today before we conclude.

8              MR. HARBACH:  Of course.  Sure.

9              MR. STAFSTROM:  I'll be very brief.

10   EXAMINATION BY MR. STAFSTROM:

11       Q    I noticed your hair is very short. I like

12   it.  Have you gotten a haircut recently?

13       A    Yes.  I had a haircut.

14       Q    Where did you get it cut?

15       A    My wife.

16       Q    Oh, your wife.  Okay.

17            Does she always cut your hair?

18       A    After the virus until now.

19       Q    Okay.  All right. I have no further

20   questions then.

21            MS. CLAIBORN:  I'm going to put the

22   recording on pause while we work on selecting a new

23   date.

24       (Off the record.)

25            MS. CLAIBORN:  We're back on the record

Ho Wan Kwok - April 6, 2022                              131

1   after a short break.  We have selected a continuance

2   date of April 29th, beginning at 10:00 a.m.   We are

3   concluded for today.  Thank you.

4            (Meeting adjourned.)

1              I, CHRISTINE FIORE, court-approved

2    transcriber and certified electronic reporter and

3    transcriber, certify that the foregoing is a correct

4    transcript from the official electronic sound

5    recording of the proceedings in the above-entitled

6    matter.

7

8              *Christine Fiore*

9    _____  April 15, 2022

10        Christine Fiore, CERT

11          Transcriber

12

13

14

15

16

17

18

19

20

21

22

23

24

1                              INDEX

2

3                                                          Page

4    Examination by Ms. Claiborn                    6

5    Examination by Mr. Wolman                      71

6    Examination by Mr. Harbach                     80

7    Examination by Mr. Stafstrom                   130

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit 10**

CASE NO. _____ 22-50073 _____

IN RE: Ho Wan Kwok _____

VS. _____

Trustee  EXHIBIT _____ 10 _____

DATE _____ IDEN.

DATE 11/17/2022 _____ EVID.

BY P.E. _____

Deputy Clerk

AO 386

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

In Re                          * Chapter 11
                               *
                               *
    HO WAN KWOK,               * Case 22-50073(JAM)
                               *
              Debtor.          *
                               *
* * * * * * * * * * * * * * * *

TRANSCRIPT OF TELEPHONIC

341 MEETING OF CREDITORS

MARCH 21, 2022

Electronically Recorded by the
Office of the United States Trustee

Transcript Prepared By:

Christine Fiore, CERT
Fiore Reporting and Transcription Service, Inc.
4 Research Drive, Suite 402
Shelton, CT  06484
(203)929-9992

APPEARANCES:

| | |
|---|---|
| For the Debtor: | WILLIAM R. BALDIGA, ESQ.<br>BEN SILVERBERG, ESQ.<br>URI PINELO, ESQ.<br>Brown Rudnick, LLP<br>Seven Times Square<br>New York, NY  10036 |
| For the U.S. Trustee: | HOLLEY E. CLAIBORN, ESQ.<br>Office of the U.S. Trustee<br>150 State Street<br>New Haven, CT  06510 |
| For Logan Cheng,<br> Creditor: | JAY MARSHALL WOLMAN, ESQ.<br>Randazza Legal Group<br>100 Pearl Street, 14th Floor<br>Hartford, CT 06103 |
| For Pacific Alliance<br> Asia Opportunity Fund,<br> LP, Creditors: | DAVID V. HARBACH, II, ESQ.<br>O'Melveny & Myers, LLP<br>1625 I Street NW<br>Washington, DC  20006 |
| | STUART SARNOFF, ESQ.<br>LAURA ARONSSON, ESQ.<br>CRAIG McALLISTER, ESQ.<br>MAKENZIE RUSSO<br>STEVEN WARREN<br>O'Melveny & Myers, LLP<br>Times Square Tower<br>7 Times Square<br>New York, NY  10036 |
| For Bruno Wu, Weican<br> Meng and Rui Ma,<br> Creditors: | KAREN WARSHAUER<br>McElroy, Deutsch, Mulvaney &<br> Carpenter<br>One State Street<br>Hartford, CT  06103 |
| For Xiaodan Wang,<br> Rong Zhang and Chong<br> Shen Raphanella,<br> Creditors: | LILLIAN GRINNELL, ESQ.<br>Wolf Haldenstein Adler<br>Freeman & Herz<br>270 Madison Avenue<br>New York, NY  10016 |

APPEARANCES: (Cont'd)

```
For Samuel Nunberg,       AMY ZAMIR, ESQ.
 Creditor:                Nesenoff & Miltenberg, LLP
                          363 Seventh Avenue
                          New York, NY  10001


For the Sherry           EMILY KUZNICK, ESQ.
 Netherland, Creditor:    Stroock, Stroock and Lavan
                          180 Maiden Lane
                          New York, NY  10038
```

1        MS. CLAIBORN:  I'm going to repeat myself

2   from the beginning here because I want to make sure

3   it's all on the record and I apologize.

4        I'm going to basically start this meeting

5   over again and we're going to go very quickly and

6   then we'll come back to where I was just about to

7   go.

8        Today is Monday, March 21st, 2022 and we

9   are gathered for the Section 341 meeting in the

10  Chapter 11 case of Ho Wan Kwok, also known as Wengui

11  Gwo and Miles Kwok.

12       My name is Holley Claiborn and I'm a trial

13  attorney in the Office of the United States Trustee

14  and I will be conducting today's meeting.

15       I am recording this meeting and also we

16  have the presence of an interpreter on the line

17  whose name is Bin, B-I-N.

18       And so that I have it on the record, I'm

19  going to ask Bin a third time about her oath.

20       (The interpreter is sworn.)

21       For purposes of speeding this up on the

22  record we have appearances today by Jay Wolman, on

23  behalf of Logan Cheng.  We have the appearance of

24  David Harbach, Stuart Sarnoff, Mia Gonzalez, Laura

1    Aronsson, Craig McAllister and Mackenzie Russo, all

2    on behalf of Pacific Alliance.  And for creditors

3    Rui Ma, Bruno Wu and Weican Meng, we have Karen

4    Warshauer, a paralegal at McElroy.

5             THE INTERPRETER:  Sorry, I cannot get all

6    those names at once.

7             MS. CLAIBORN:  Bin, did you translate all

8    of the names for the Pacific Alliance?

9             THE INTERPRETER:  The names actually just

10   a repeat of the pronunciation.  No translation.

11            MS. CLAIBORN:  Thank you.  Whoever does

12   not have their phone on mute, could you please put

13   it on mute?  Thank you.

14            Okay.  The other appearances, Karen

15   Warshauer, from McElroy, and she represents Bruno

16   Wu, Weican Meng and Rui Ma.

17            Before I go back to the debtor, are there

18   any other creditors on the line who have counsel

19   who'd like to put their appearance on the record?

20            MS. GRINNELL:  Hi --

21            MS. CLAIBORN:  Please wait for the

22   translation.

23            MS. GRINNELL:  (Indiscernible) I'm from

24   the firm Wolf Haldenstein Adler Freeman and Herz and

25   we represent --

1          THE INTERPRETER:  Sorry.  The interpreter

2    cannot hear you clearly.

3          MS. GRINNELL:  I'm sorry. My connection

4    has been kind of off.  Can you hear me now?

5          THE INTERPRETER: Yes.

6          MS. GRINNELL:  Okay.  I'll repeat what I

7    said.

8          My name is Lillian Grinnell.  I'm an

9    attorney at Wolf Haldenstein Adler Freeman and Herz

10   and we represent the creditors, Rong Zhang, Xiaodan

11   Wang, and Chong Sheen Raphanella.

12          THE INTERPRETER:  The names you pronounced

13   I could not get them.

14          MS. GRINNELL:  I'll spell them.

15          I'll start with the creditor's names.  The

16   creditor's names are Rong Zhang, and that's -- the

17   first name is Rong, R-O-N-G, Z-H-A-N-G.

18          The second creditor's name is Xiaodan

19   Wang.  And her first name is spelled X-I-A-O-D-A-N.

20   And her last name is spelled W-A-N-G.

21          And then the third creditor, Chong Shen

22   Raphanella.  And her first name is C-H-O-N-G. And

23   then the second name is S-H-E-N.  And the third name

24   is R-A-P-H-A-N-E-L-L-A.

25          THE INTERPRETER:  I only got Chong Shen

1    and R-A-P-H-A-L.

2              MS. GRINNELL:  I'm sorry.  Are you asking

3    me to spell the third name again?

4              (No response.)

5              Sorry?  I apologize.  My connection is

6    very bad.  Do you need me to spell any of the names

7    again?

8              THE INTERPRETER:  I think I'm okay.  I

9    repeat it to Mr. Kwok already.

10             MS. GRINNELL:  Okay.

11             MS. CLAIBORN:  Are there any other

12   creditors on the line or parties on the line?

13             MS. ZAMIR:  This is Amy Zamir, from

14   Nessenoff & Miltenberg.  I'm spell that.  My last

15   name is Zamir, Z-A-M-I-R.  Nessenoff is N-E-S-S-E-N-

16   O-F-F, and Miltenberg, M-I-L-T-E-N-B-E-R-G.  And we

17   represent creditor Sam Nunberg, N-U-N-B-E-R-G.

18             MS. CLAIBORN:  Is there anyone else who

19   would like to put their appearance on the record.

20             MS. KUZNICK:  Yes.  This is Emily Kuznick,

21   E-M-I-L-Y, and then Kuznick, K-U-Z-N-I-C-K, of

22   Stroock, Stroock and Lavan, that's S-T-R-O-O-C-K,

23   and Stroock, and Lavan is L-A-V-A-N. And we

24   represent the Sherry Netherland.  And for Sherry

25   Netherland it's S-H-E-R-R-Y, and then Netherland, N-

```
 1    E-T-H-E-R-L-A-N-D.

 2            THE INTERPRETER:  I'm clarifying what he

 3    said.

 4            (Interpretation.)

 5            THE INTERPRETER:  Let me continue

 6    clarifying what was yelled out just now.

 7            (Interpretation.)

 8            THE INTERPRETER:  I'm sorry.  The

 9    interpreter cannot get that.  Nobody picked up my

10    question so I don't know.

11            MS. CLAIBORN:  Thank you, Bin.

12            Any other creditors or parties in interest

13    before I go back to the debtor?

14            MR. HARBACH:  This is David Harbach, from

15    O'Melveny and Myers, representing PACS.  I just

16    wanted to clarify that is it correct that we have

17    not gotten an answer from the debtor about what he

18    just said?

19            I have not heard any interpretation of it

20    and I understand the interpreter was attempting to

21    clarify what was said but the debtor did not

22    respond, as far as I heard, and we'd like to know

23    what he said.

24            MR. BALDIGA:  This is Bill Baldiga.  I'll

25    accept your apologies.  That was not the debtor, but
```

1    I accept your apology for that inference.

2              MS. CLAIBORN:  I'm going to come back to

3    that a in minute.

4              MR. HARBACH:  Okay.  (Indiscernible)

5    whether I should apologize, but can we inquire then

6    who made the outburst?  The interpreter was

7    attempting to clarify and so are we.  Forgive the

8    inference.

9              THE INTERPRETER:  So I interpreted what

10   you requested.  Just now someone burst out with a

11   few words -- with sentences.  The interpreter did

12   not get those sentences.  So the interpreter tried

13   to clarify who talked and what those words are, but

14   nobody picked up the interpreter's question.

15             MS. CLAIBORN:  This is Holley Claiborn.

16   Could the person who spoke up please answer the

17   interpreter's question and identify themselves?

18             THE INTERPRETER:  Sorry about that.  Just

19   now it was it was just a video tape. It was not

20   someone talked.

21             MR. BALDIGA:  This is Bill Baldiga.  Mr.

22   Kwok -- what Mr. Kwok heard during that outburst was

23   someone playing back an audio of his voice and we do

24   want to know everyone who is on the phone and we

25   would like identified who played that audio clip.

1    Thank you.

2            UNIDENTIFIED:  Sorry, it was me. I played

3    Mr. Kwok's video just now.

4            MS. CLAIBORN:  Could the person who just

5    spoke identify themselves?

6            THE INTERPRETER:  The interpreter needs to

7    clarify.

8            (Interpreter inquires)

9            MR. YAN:  My name is Xingyu Yan. I'm one of

10   Mr. Kwok's creditors.

11           MR. BALDIGA:  Can we have the spelling,

12   please?  Could we obtain the spelling of that name

13   please?

14           MR. YAN:  The spelling is X, for Xray, I, as

15   India, N, as in Nancy, G as in George, Y as in Yes,

16   U as in umbrella.  Last name Y, A as in apple, N as

17   in Nancy.

18           MR. BALDIGA:  Ms. Claiborn, Bill Baldiga

19   again.  Could you please exhaust the names of

20   everyone else on the line, just so we know who is

21   participating, whether or not they intend to ask

22   questions?

23           MS. CLAIBORN:  I'm trying to get there.

24   That was my -- okay.

25           Is anyone else on the line?  If you are on

1    the line, and you could please identify yourself?

2          MR. GREIF:  Hello.  My name is Steven Greif,

3    G-R-E-I-F.

4          MR. WARREN:  Steven Warren of O'Melveny &

5    Myers.

6          MR. JALBERT:  Craig Jalbert of

7    (indiscernible).

8          INDISCERNIBLE:  (Indiscernible)  from

9    Robinson and Cole.

10         INDISCERNIBLE:  (Indiscernible)  from

11   Stroock, Stroock and Lavan.

12         MS. DEERING:  Alexandra Deering of Brown

13   Rudnick.

14         MS. CLAIBORN:  This is Holley Claiborn

15   again. Thank you all for putting your appearances on

16   the record.  And if I could go back to debtor's

17   camp, Mr. Baldiga, could you put your appearance on

18   the record and note everybody who's with you at your

19   location.

20         MR. BALDIGA:  Yes.  We're in our --

21         I'm sorry. I missed what was just said.

22         MS. CLAIBORN:  Mr. Baldiga, could you go

23   ahead, please?  Mr. Baldiga, could you go ahead,

24   please?

25         MR. BALDIGA:  Yes.  Thank you.  We are at

1    our offices at 7 Times Square in New York.

2          And can you please state the name, Mr.

3    Baldiga, of who is present with you?

4          (No response.)

5          MS. CLAIBORN:  Mr. Baldiga, could you please

6    state the names of the people who are with you?

7          MR. BALDIGA:  Ben Silverberg and Uri Pinelo.

8          MS. CLAIBORN:  Okay.  Other names I believe

9    I heard earlier are Una Menye (ph), who is an

10   interpreter, and Attorney Aaron Mitchell.

11         MR. BALDIGA:  That's right.  Yes.

12         Ms. CLAIBORN:  Okay. I'm going to swear in

13   Mr. Kwok and I would ask everyone to put their

14   phones on mute.

15     (The debtor is sworn.)

16         MS. CLAIBORN: Mr. Kwok, as you know, today's

17   meeting is being recorded and there's an

18   interpreter, Bin, who's interpreting my questions

19   and the comments of others and will also be

20   interpreting your answers.

21         Please wait to answer any questions you are

22   asked today until the official interpreter has made

23   a full translation.

24         I ask that you do not communicate with your

25   own interpreter who is present with you before you

1    answer the questions, and should you do so, I will

2    ask the official interpreter to translate that

3    discussion.

4              THE INTERPRETER:  Sorry.  Could you please

5    repeat?

6              MS. CLAIBORN:  Mr. Kwok, I ask that you do

7    not communicate with your own interpreter who is

8    with you today before you answer my questions or the

9    questions of others.

10             THE INTERPRETER:  He could not use his own

11   interpreter.

12             MS. CLAIBORN:  Bin, could you translate that

13   instruction for Mr. Kwok.

14             MR. BALDIGA:  This is Bill Baldiga.

15             To the extent --

16             MS. CLAIBORN:  Mr. Baldiga, could you just

17   wait for Bin to interpret that instruction for me

18   and then you can make your comment.

19             MR. BALDIGA:  Two things.  This is Bill

20   Baldiga.

21             Holley, you've become quite muffled again

22   and second, to the extent that Mr. Kwok needs to

23   talk to his interpreter to better understand what

24   was said or the interpreter in the room with us

25   believes that there was a misinterpretation, we will

1    tell you that so that you do know if there is a

2    further conversation.

3              MS. CLAIBORN:  Thank you.

4                    HO WAN KWOK, Sworn

5    EXAMINATION BY MS. CLAIBORN:

6        Q    Mr. Kwok, can you please explain the reason

7    to file your Chapter 11 bankruptcy case?

8              UNIDENTIFIED:  Sorry?

9        Q    Mr. Kwok, please explain the reasons behind

10   your decision to file your Chapter 11 bankruptcy

11   case?

12             MR. HARBACH:  This is David Harbach.  We're

13   having trouble understanding you again.

14             MS. CLAIBORN:  I apologize.  My phone system

15   is new and I'm yelling into the phone, but unless I

16   put it on speaker phone I won't be able to record

17   it.  Does yelling improve your ability to hear me?

18             MR. HARBACH:  It's very difficult to

19   understand your questions because they're so

20   muffled.  It's not volume, it's diction, if I may be

21   blunt.

22             MS. CLAIBORN:  I will try to speak slowly.

23   Is that any better?

24             MR. BALDIGA:  It seems to be, yes.  Thank

25   you.

1

2      Q     Okay.  We're going to try this again.

3            Mr. Kwok, can you please explain your

4      reasons behind filing your Chapter 11 bankruptcy

5      case?

6      A     I cannot understand you.  I don't know what

7      you mean by filing Chapter 11 of bank.

8      Q     Mr. Kwok, why did you file your bankruptcy

9      case?

10           THE INTERPRETER:  The interpreter would like

11     to clarify the word he said.

12     A     I'm not filing any bankruptcy certificate.

13     Q     Let me try again.

14           Mr. Kwok, you are a Chapter 11 debtor in a

15     bankruptcy proceeding here in the United States.

16           Mr. Kwok, what were the reasons behind your

17     decision to file your bankruptcy case?

18     A     So you're asking me why I'm applying for

19     bankruptcy, right?

20     Q     Yes.

21     A     I filed (indiscernible)  in mid-February in

22     my second trial, or second appearance in Southern

23     District. I was given a fine of $120 million and I

24     was ordered to pay it off within five days.  So

25     without any choices -- so I filed bankruptcy

1   application at Connecticut state and Chapter 11.

2      Q    Mr. Kwok, when was the first time you spoke

3   with a lawyer about filing a bankruptcy case?

4          MR. BALDIGA:  Just the date, or the

5   approximate date.  Not the substance of the advice.

6      A    Approximately 12, 13.

7      Q    Can you please provide the month and the

8   year?

9      A    It was February the 12th of 2002.

10     Q    Did you say 2002 or 2021?

11     A    2022.  February the 12th or 13.

12     Q    Mr. Kwok, I'd ask you to take a look at your

13  bankruptcy petition that was filed with the

14  bankruptcy court at ECF 1.

15         Mr. Kwok, a handwritten signature appears on

16  that petition. Is that your handwritten signature?

17     A    Hold on a second. I'll ask the lawyer to get

18  it and I'll take a look.

19         MR. BALDIGA:  This is Bill Baldiga.  We have

20  with us the petition with the electronic signature

21  as filed.  I don't have in the conference room me

22  the handwritten signature.  If you'd like us to get

23  it, we could get it at a break.

24     Q    Mr. Kwok, can you take a look at the

25  document that your counsel has, which is the

1    bankruptcy petition with your printed name on it and

2    confirm that you signed that document prior to it

3    being filed with the court?

4        A     Please hold on one second.  Let me take a

5    look.

6             MR. BALDIGA:  Could I hear the translation,

7    please.  I want to hear the translation of what you

8    said.

9        (No response.)

10            MR. BALDIGA:  Is the translator still with

11   us?

12            MS. CLAIBORN:  Bin, are you on the line?

13       (No response.)

14            Bin, are you there?

15       (No response.)

16            It seems that Bin has left us so I'm going

17   to put everybody on hold and I'm going to try to

18   reconnect her. I apologize.

19            MR. BALDIGA:  That's okay.  Could we take a

20   short break?

21            MS. CLAIBORN:  It's going to take me a few

22   minutes to do that, so go ahead and we'll reconvene

23   as soon as I can get her on the line.

24            MR. BALDIGA:  Thank you very much.

25       (Off the record.)

1          MS. CLAIBORN:  We are back on the record

2    after a short break due to some technical

3    difficulties.

4    BY MS. CLAIBORN:

5          Q    The pending question was asking Mr. Kwok to

6    confirm that he signed the bankruptcy petition that

7    was filed at ECF 1.

8          A    I have finished looking at it, yes.

9          Q    Mr. Kwok, did you read and understand the

10   bankruptcy petition and information it contains

11   before you signed it?

12         A    Yes, I understood.

13         Q    Mr. Kwok, was the petition translated into

14   another language for you before you signed it?

15         A    Yes, it was translated into Chinese for me.

16         Q    Who translated the bankruptcy petition?

17         A    My lawyer did.

18         Q    Mr. Kwok, I don't think that Mr. Baldiga

19   speaks Chinese.

20              So who was the company or the person that

21   you used to translate the petition for you?

22         A    I don't know.

23         Q    Mr. Kwok, is the information in your

24   bankruptcy petition true and accurate to the best of

25   your knowledge?

1      A    Yes, it is accurate and true.

2      Q    Mr. Kwok, can you please take a look at the

3    declaration and about individual debtor's schedules

4    that was filed with the court docket at ECF No. 79.

5           THE INTERPRETER:   Sorry, could you please

6    repeat?

7      Q    Mr. Kwok, can you please take a look at the

8    declaration about an individual debtor's schedules

9    that was filed with the bankruptcy court at ECF 79.

10          Mr. Kwok, a handwritten signature appears on

11   that declaration. Is that your handwritten

12   signature?

13     A    The document in my hand.  Yes, it was signed

14   by me.

15     Q    And are you looking at ECF no. 79?

16     A    Yes.

17     Q    Mr. Kwok, was the declaration that was filed

18   at ECF 79 translated into another language for you

19   before you signed it?

20     A    Yes.

21     Q    What language was it translated into?

22     A    Chinese.

23     Q    Mr. Kwok, do you know who did the

24   translation of ECF no. 79?

25     A    Yes.

1   Q    And who was that person who translated ECF

2   79 into Chinese for you?

3   A    The lawyer.

4   Q    Can you tell me the name of the lawyer?

5   A    Bill.

6        MR. BALDIGA:  This is Bill Baldiga.  The

7   witness is not distinguishing between what I did

8   personally and what we had commissioned, to help

9   clarify.  I do not obviously do translations myself.

10       MS. CLAIBORN:  Attorney Baldiga, can you

11   tell me the name of the translation person who

12   worked for you or the name of the company?

13       MR. BALDIGA:  I'll have to get that. I don't

14   have it here.

15   Q    Mr. Kwok, did you read and understand the

16   declaration filed at ECF no. 79 before you signed

17   it?

18   A    Yes, understood.

19   Q    Mr. Kwok, can you please take a look at your

20   bankruptcy schedules that were filed with the

21   bankruptcy court at ECF 78.

22       And Mr. Kwok, for purposes of today, when I

23   used the term schedules, either collectively or by a

24   particular schedule, I'm referring to the documents

25   that were filed at ECF 78.

1          Mr. Kwok, were your bankruptcy schedules

2    translated for you?

3        A    Yes, it was translated.

4        Q    Mr. Kwok, were you involved in preparing the

5    responses and the answers to the questions in the

6    schedules?

7        A    Yes, I was.

8        Q    Mr. Kwok, did you read and understand all of

9    the responses and the answers to the questions in

10   the schedules before you signed the declaration that

11   was filed at ECF 79.

12       A    Yes.

13       Q    Mr. Kwok, who assisted you in the

14   preparation of your bankruptcy schedules?

15       A    The lawyer.

16       Q    Mr. Kwok, can you tell me which lawyers

17   helped you?

18       A    Bill.

19       Q    Mr. Kwok, are you referring to Attorney

20   Baldiga?

21       A    Yes.

22       Q    Mr. Kwok, did any other lawyers help you in

23   preparing your bankruptcy schedules?

24       A    Yes.

25       Q    Can you please tell me the names of the

1    other lawyers who assisted you?

2        A    I don't know how to say their names. I

3    cannot read English well.

4            MR. BALDIGA:  This is Bill Baldiga. I'm

5    happy to add that, of course, other of our

6    colleagues here at Brown Rudnick assisted. But I'm

7    not sure Mr. Kwok would have details as to who

8    exactly assisted on what part of it, but you could

9    ask, of course.

10       Q    Mr. Kwok, did any lawyer help you prepare

11   your schedules who is not a lawyer at Brown Rudnick?

12           MR. BALDIGA:  Excuse me. I need to talk with

13   Mr. Kwok for one second. I'm just going to put you

14   on mute for one second.

15           MS. CLAIBORN:  I'd prefer he answer the

16   question before you have your conference, Mr.

17   Baldiga.

18       A    Because the whole bankruptcy application,

19   the whole stuff was arranged by this lawyer.  But I

20   don't know all the other details.

21           MS. CLAIBORN:  Do you want to confer with

22   your client?

23           MR. BALDIGA:  I'll clarify only that Mr.

24   Kwok likely does not know of all of the

25   conversations that we've had with others, but this

1    is the opportunity to exam him, so you can obviously

2    ask that but we don't want to be misleading.

3        Q    Mr. Kwok, aside from Mr. Baldiga and lawyers

4    at Brown Rudnick did you speak with any other

5    lawyers about preparing your bankruptcy schedules?

6        A    Yes.

7        Q    Who did you speak with?

8        A    Another law firm called Ari and my personal

9    lawyer (indiscernible).

10       Q    What is the name of your personal lawyer?

11            MR. BALDIGA:  Could I confer and I might be

12   able to answer that question?

13            MS. CLAIBORN:  Go ahead.

14            MR. BALDIGA:  Could I have a second to

15   confer, please?

16            MS. CLAIBORN:  Yes.

17       (Pause.)

18            MR. BALDIGA:  Thank you.

19       Q    Mr. Kwok, what is the name of your personal

20   lawyer?

21       A    Guy Petrillo and  Ari (indiscernible).

22       Q    Mr. Kwok do I understand correctly that you

23   discussed your bankruptcy schedules with Guy

24   Petrillo and Aaron Mitchell?

25       A    Yes.

1       Q    Mr. Kwok, did you discuss your bankruptcy

2    schedules with any other lawyers that you haven't

3    yet told me about today?

4       A    I don't remember.

5       Q    Mr. Kwok, are there any errors or omissions

6    in your bankruptcy schedules?

7       A    I don't see anything like that now.

8       Q    Mr. Kwok, is everything in your bankruptcy

9    schedules true and accurate to the best of your

10   knowledge?

11      A    Yes.

12      Q    Mr. Kwok, could you please take a look at

13   your bankruptcy statement of financial affairs that

14   was filed with the court at ECF no. 77.

15           Mr. Kwok, using the numbers at the top of

16   the document can you please go to page 20 where you

17   will find a handwritten signature.

18           THE INTERPRETER: Sorry?

19      Q    Where you will find a handwritten signature.

20           Mr. Kwok, is the handwritten signature on

21   page 20 of the statement of financial affairs your

22   own?

23      A    Yes.

24      Q    Mr. Kwok, was the statement of financial

25   affairs translated for you before you signed it?

1        A    Yes.

2        Q    Mr. Kwok, were you involved in the preparing

3    of the responses and the answers to the questions in

4    the statement of financial affairs?

5        A    Yes.

6        Q    Mr. Kwok, did you read and understand all

7    the responses and answers to the questions in the

8    statement of financial affairs before you signed it?

9        A    I understood all.

10       Q    Mr. Kwok, are there any errors or omissions

11   in your statement of financial affairs?

12       A    No.

13       (No response.)

14       Q    Mr. Kwok, would you please answer the

15   question?

16            MR. BALDIGA:  I'm sorry.  Could you repeat

17   that?  We didn't get the interpretation here in the

18   room for some reason.

19            MS. CLAIBORN:  I'll ask the question again.

20       Q    Are there any errors or omissions in your

21   statement of financial affairs?

22       A    Up to now I haven't found any errors or

23   omissions.

24       Q    Mr. Kwok, is everything in your statement of

25   financial affairs true and accurate to the best of

1    your knowledge?

2        A    Yes.

3        Q    Mr. Kwok, who assisted you in the

4    preparation of your statement of financial affairs?

5        A    My lawyer, Bill, and my financial advisor,

6    Matt.

7        Q    Mr. Kwok, are you referring to Attorney

8    Baldiga?

9        A    Yes.

10       Q    And what is the name -- the full name of the

11   financial advisor?

12       A    I don't know how to spell it.

13            MR. BALDIGA:  It's Matt Flynn and colleagues

14   at Verdolino and Lowey.  But you could --

15       Q    Mr. Kwok, is that correct?

16       A    I'm afraid I will say it wrong, but I will

17   ask for Mr. -- my lawyer Baldiga to clarify for you.

18       Q    We can move on.

19            MR. BALDIGA:  This is Bill Baldiga.

20            Mr. Kwok simply does not know the full name

21   of Matt Flynn or Matt's colleagues at Verlino and

22   Lowey, but I confirm that he is pointing at Matt

23   Flynn next to him when he answers the question.

24            MS. CLAIBORN:  Thank you.

25       Q    Mr. Kwok, did anyone else help you with your

1    statement of financial affairs?

2        A    No.

3        Q    Mr. Kwok, how long have you lived in the

4    United States?

5        A    Nearly seven years.

6            MR. HARBACH:  This is David Harbach.  I

7    didn't get the translation of the answer.

8            MS. CLAIBORN:  Bin, can you please repeat

9    your translation.

10           THE INTERPRETER:  Nearly 7 years.

11       Q    Mr. Kwok, do you still live at the Taconic

12   Road property in Greenwich?

13       A    Yes.

14       Q    Who owns that property in Greenwich?

15       A    My wife.

16       Q    Your bankruptcy documents refer to a company

17   called Greenwich Land, LLC.  Who owns that company?

18       A    My wife.

19       Q    What is your wife's name?

20       A    (Indiscernible)

21           MS. CLAIBORN:  Bin, could you please

22   translate that for me into a spelling?

23           THE INTERPRETER:  Let me just clarify with

24   him which Chinese characters are, then I can spell

25   it for you.

1      A    My wife's name is read at (indiscernible)

2   but she's from -- she's from Hong Kong.  Their

3   spelling is different from Mainland and I don't know

4   how to spell her name.

5      Q    Mr. Kwok, could you just please spell her

6   last name?

7      A    I don't know how to spell.

8      Q    Does anyone else have a membership interest

9   in Greenwich Land LLC aside from your wife?

10     A    I don't know.

11     Q    When was Greenwich Land LLC formed as a

12  company?

13     A    2020.

14     Q    Mr. Kwok, have you ever been a member of

15  Greenwich Land, LLC?

16     A    No.

17     Q    How much did Greenwich Land, LLC pay for the

18  purchase of the Greenwich property on Taconic Road?

19     A    I don't know specifically but approximately

20  5 million.

21     Q    And how was that purchase funded?

22     A    I don't know.

23     Q    Who would know the answer, Mr. Kwok?

24          THE INTERPRETER:  Sorry?

25     Q    Who would know the answer to that, Mr. Kwok?

1      A    My wife knows.

2           MR. HARBACH:  This is David Harbach and I

3      apologize for the interruption.

4           We missed the translation by the number of

5      that Mr. Kwok said approximately this kind of

6      property would cost.  Could that please be repeated?

7           THE INTERPRETER:  Sorry, the interpreter

8      cannot hear you clearly.

9           MS. CLAIBORN:  Mr. Harbach, I will ask your

10     question again.

11          MR. HARBACH:  Thank you.

12     Q    How much was the Taconic Road property in

13     Greenwich purchased for?

14     A    I don't know clearly but approximately 4

15     million to 5 million.

16     Q    When did Greenwich Land LLC purchase the

17     property on Taconic Road in Greenwich?

18     A    I don't know the specific time.

19     Q    Do you know the year?

20     A    2019 or 2020. I don't remember clearly.

21     (Unintelligible background chatter.)

22          MS. CLAIBORN:  Could whoever is speaking

23     identify themselves?

24          MR. BALDIGA:  Excuse me just for one second.

25     We may have a translation issue.  I'm just going to

```
 1     put you on mute for one second.

 2         (Pause.)

 3         MR. BALDIGA:  This is Bill Baldiga.  We

 4     believe that the answer by Mr. Kwok to the date was

 5     2019 or 2020, but the translator may have said 2020

 6     without a mention of 2019. I obviously don't know.

 7     But that's -- if it matters, you could re-ask to be

 8     sure that there's clarity around that?

 9     Q     Mr. Kwok, when did Greenwich Land LLC

10     purchase the Taconic Road property in Greenwich?

11     A     Maybe it's 2020 or maybe it's 2019. I don't

12     remember clearly.  I don't know.

13     Q     Mr. Kwok, did you sign any documents in

14     connection with the purchase of the Taconic Road

15     Property in Greenwich?

16     A     No.

17     Q     Mr. Kwok, who lives at the Taconic Road

18     property in Greenwich?

19         THE INTERPRETER:  Sorry?  Who --

20     Q     Who lives at the Taconic Road property in

21     Greenwich?

22     A     My wife and I.  Sometimes my daughter who

23     lives in New York will come back.

24     Q     Mr. Kwok, are you currently employed by

25     anyone?
```

1          THE INTERPRETER:  Are you what?

2     Q    Are you currently employed by anyone or any

3     company?

4     A    No.

5     Q    Mr. Kwok, have you had any employment or any

6     job with an employer since you started living in the

7     United States?

8     A    I don't remember clearly.  I don't remember

9     clearly but approximately in 2015 at Golden Spring I

10    worked for some time.  After I got part of my wages

11    of salary I left and nothing else.

12    Q    What work did you do for Golden Spring in

13    2015?

14    A    I don't remember quite clearly but it seems

15    it (indiscernible)  I was put in charge of

16    developing (indiscernible)  investors. But I don't

17    remember clearly.

18    Q    Mr. Kwok, when did you stop working for

19    Golden Spring?

20         MR. BALDIGA:  Excuse me just one second. I

21    just want to make sure we -- excuse me for one

22    second. I just want to make sure we don't

23    (indiscernible) translation.  We may.

24    (Pause.)

25         MR. BALDIGA:  Our interpreter believes that

1    the response was that if he had a role at Golden

2    Springs, it was to develop investment opportunities

3    not to develop investors.

4        Q    Mr. Kwok, when did you stop working for

5    Golden Spring?

6        A    I don't remember clearly.

7        Q    Mr. Kwok, when you say Golden Spring, are

8    you referring to the company known as Golden Spring,

9    New York, Limited?

10       A    Yes.

11       Q    Mr. Kwok, did you get paid for any of the

12   work that you for Golden Spring?

13       A    Yes.

14       Q    How much were you paid?

15       A    Approximately 200,000. I don't remember

16   specifically.

17       Q    Mr. Kwok, did you receive a paycheck from

18   your work at Golden Spring?

19       A    I should have but I don't remember clearly

20   specifically.

21       Q    Mr. Kwok, did you put the money that you

22   were paid by Golden Spring into a bank account?

23       A    I should have put it into a credit card

24   account at Morgan Stanley.

25       Q    Mr. Kwok, are you saying that you had a bank

1      account at Morgan Stanley?

2          A    Yes, once I had.

3          Q    Do you still have a bank account at Morgan

4      Stanley?

5          A    No.

6          Q    When did you close your accounts at Morgan

7      Stanley?

8          A    Around April, 2017 when (indiscernible)  the

9      Chinese Communist Party stated chasing me and

10     (indiscernible)  me.  So all my bank accounts were

11     closed.

12             MR. BALDIGA:  Hold on.  There's a

13     mistranslation there.

14         (Pause.)

15             MR. BALDIGA:  The prior misstatement or

16     mistranslation was just the interpretation of the

17     word. But here the entire crux of the answer was

18     left out.  And I'm not sure what happened.

19             MS. CLAIBORN:  Maybe I can ask a different

20     question. We can try again.

21             MR. BALDIGA:  No, I think -- no, I think --

22     the answer -- I'm concerned with the accuracy of the

23     translation because there was specific mention of

24     names that were simply not produced in the answer.

25     And I'll guess, Bin, did you not hear the mention of

1   PACS and Bruno Wu, or was there a sound issue, or

2   what happened?

3       (Interpreter translates)

4           MS. CLAIBORN:  Mr. Kwok, did you --

5           MR. KWOK:  So Bruno Wu, (indiscernible)

6   Airlines and also Chinese Communist party, they all

7   chased me and wanted to kill me.  So I

8   (indiscernible)  -- all my bank accounts were

9   closed.

10          PAC, PACS.  (Indiscernible)  all the people

11  are present today at today's meeting.

12          MR. BALDIGA:  Could we have on the record

13  the entirety of what Mr. Kwok said.  That's a very

14  small part of what he said, obviously.  I don't know

15  what he said but that's much shorter.

16      (Interpreter translates)

17          THE INTERPRETER:  The interpreter is asking

18  him to (indiscernible)  every two names so that I

19  can maintain the integrity of his meaning.

20          MR. KWOK:  At today's meeting there are PAC,

21  one of the major creditors.  And also

22  (indiscernible).  And also (indiscernible)  member.

23  All the money that had to be paid went into an

24  account of the Communist Party under the name of

25  Bruno Wu.  So since that day when all the -- all the

1    representatives of the Chinese Communist party -- so

2    when the chasing and killing started I lost all my

3    bank accounts.

4            MR. HARBACH:  This is David Harbach.  Bin,

5    could you please repeat that?

6            THE INTERPRETER:  Sorry?

7            MR. HARBACH:  This is David Harbach.  You

8    just translated an answer that began with since that

9    day.  Can you please repeat the answer in English?

10           THE INTERPRETER:  Since that day all those

11   people who are representatives of Chinese Communist

12   Party, since that day I lost all my bank accounts.

13   BY MS. CLAIBORN:

14       Q    Mr. Kwok, did you have any money in your

15   Morgan Stanley account when you closed it?

16       A    Yes.

17       Q    And where did you move that money to?

18       A    Nobody bothered looking at me again since

19   the account was closed.

20       Q    Mr. Kwok, my question is where did you move

21   the money to?

22           MR. BALDIGA:  This is Bill Baldiga -- I'm

23   sorry.  This is Bill Baldiga.

24           Could you ask if perhaps you're inferring or

25   implying that he moved it as opposed to something

1    happened to it?  Could you ask it in a more neutral

2    way and you may get a more full answer?

3        Q    Mr. Kwok, did you or someone acting on your

4    behalf close the Morgan Stanley account?

5        A    The Communist Party, Bruno Wu and also the

6    (indiscernible).  It was closed by the Communist

7    party.

8        Q    Mr. Kwok, was the Morgan Stanley account in

9    the United States?

10       A    Yes.

11       Q    Mr. Kwok, how does somebody other than you,

12   or someone acting on your behalf close a bank

13   account in your name?

14            THE INTERPRETER:   He wants me to repeat the

15   question, the interpretation of the question.

16       (Interpreter translates again.)

17       A    It's the core control of the Communist

18   Party, like what's happening today. The same thing.

19   (Indiscernible)  happened on me.

20            MR. BALDIGA:  Ms. Claiborn, could I suggest

21   that you ask whether Morgan Stanley closed the

22   account, just so we could be more efficient here?

23       Q    Mr. Kwok, did you close the account at

24   Morgan Stanley?

25            THE INTERPRETER:  Sorry?

1      Q    Mr. Kwok, did you close the account at

2   Morgan Stanley?

3           THE INTERPRETER:  I'm sorry. I still didn't

4   quite get the question actually.

5      Q    Mr. Kwok, did you personally close the

6   account at Morgan Stanley?

7      A    No.

8      Q    Mr. Kwok, did you ask someone at Morgan

9   Stanley to close your account?

10     A    No.

11     Q    Mr. Kwok, how did you find out that your

12  bank account at Morgan Stanley was closed?

13     A    Morgan Stanley notified me that I was on the

14  wanted list of the Chinese government.  So it was

15  Bruno Wu who was representing (indiscernible)  name

16  on the wanted list so the account was closed.

17     Q    Mr. Kwok, when Morgan Stanley closed the

18  account, what happened to the money in the account?

19          MR. HARBACH:  Ms. Claiborn, this is David

20  Harbach. I'm sorry. I missed the second half of that

21  question.  When Morgan Stanley closed the account

22  and then I lost you.

23     Q    I'll repeat my question.

24          Mr. Kwok, when Morgan Stanley closed the

25  bank account, what happened to the money in the bank

1    account?

2        A    The last thing I know was a Chinese speaking

3    person called me telling me that my account was

4    closed because I was under a wanted list of the

5    Chinese government.  And what happened later on I

6    don't know really.

7        Q    Mr. Kwok, how much money was in the --

8             MR. BALDIGA:  This is Bill Baldiga --

9             MS. CLAIBORN:  Yes, Mr. Baldiga?

10            MR. BALDIGA:  This is Bill Baldiga. I think

11   it would be helpful -- I don't want to interrupt

12   your flow of questions, if we took a break pretty

13   soon.  But if you want to finish this line, certain

14   do that.

15            I also want -- there may be some confusion

16   with the Morgan name and so you may want to ask the

17   witness whether it's, in fact, Morgan Stanley or JP

18   Morgan Chase.

19            MR. KWOK:  Now I remember. I think it was JP

20   Morgan Chase.  I just cannot differentiate. I get

21   confused with Morgan Stanley or JP Morgan Chase.

22       Q    Mr. Kwok, was there only one account at

23   whatever it is you're calling it, be it JP Morgan

24   Chase or Morgan Stanley?

25       A    What I remember is I have this only one

 1    account.

 2         Q    How much money was in that account

 3    approximately when it was closed?

 4         A    A few thousand U.S. dollars.

 5              MR. HARBACH:  I missed it. Can you repeat

 6    the English, please?

 7              MS. CLAIBORN:  Bin, can you please repeat

 8    the answer?

 9        (No response.)

10              MS. CLAIBORN:  Bin, can you please repeat

11    the answer?

12              MR. HARBACH:  This is David Harbach. I

13    missed the translation before the word thousand. I

14    did not hear the number.  Could you please repeat

15    it?

16              THE INTERPRETER:  He said a few thousand

17    U.S. dollars.

18         Q    Mr. Kwok, when you say a few thousand

19    dollars, can you give me an idea of what you mean?

20    Was it under $10,000?

21         A    I don't remember.

22         Q    Mr. Kwok, a few minutes ago you testified

23    that you were working for Golden Spring developing

24    investment opportunities.  Can you explain more?

25              THE INTERPRETER:  Sorry?

1          MS. CLAIBORN:  I wasn't finished with the

2     question. I apologize. I'll try again.

3          Q    Mr. Kwok, a few minutes ago you testified

4     that you were working for Golden Spring developing

5     investment opportunities.  Can you please explain

6     what you mean by that?

7          A    I don't remember.

8          Q    When you were working for Golden Spring,

9     were you working in the United States?

10         A    Yes.

11         Q    When you were working with Golden Spring did

12    you have a job title?

13         A    I don't remember.

14         Q    When you were working for Golden Spring, did

15    you do any other work aside from developing

16    investment opportunities?

17         A    (indiscernible)  Communist Party of China.

18         Q    Can you please explain that?

19         A    Since 2015 up till now I have been spending

20    all my time and my energy on collecting information

21    about corruption and also human rights issues and

22    assassinations of the Community Party.  That's my

23    target and my work.

24         Q    Mr. Kwok, do you currently have any source

25    of income?

1          THE INTERPRETER:  I didn't get you.  Could

2    you please repeat?

3      Q    Mr. Kwok, do you currently have a source of

4    income?

5      A    No.

6      Q    Mr. Kwok, have you filed your tax returns

7    for the year 2021 with the Internal Revenue Service

8    in the United States?

9      A    No.

10      Q    Mr. Kwok, have you filed any tax returns in

11    states for the tax year 2021?

12          THE INTERPRETER:  Sorry?

13      Q    Have you filed any tax returns for any

14    states for the tax year 2021?

15      A    No.

16      Q    What tax returns will you need to file for

17    what states for the year 2021?

18      A    Individual tax file in Connecticut.

19      Q    Will you be filing a tax return for the

20    State of New York for the year 2021?

21      A    No.

22      Q    Mr. Kwok, you previously provided to my

23    office tax returns for the years 2019 and 2020.  Are

24    those tax returns the same as the tax returns you

25    filed with the Internal Revenue Service in the State

1    of New York?

2              THE INTERPRETER:  Sorry, the date of what?

3              MS. CLAIBORN:  2019 and 2020.

4              THE INTERPRETER:  Yes, I got that.  What's

5    the later part?

6              MS. CLAIBORN:  The State of New York.

7        A    No, I filed them in Connecticut, 2020.

8        Q    Mr. Kwok --

9        A    I in (indiscernible)  for 2019 and 2020.

10   2020 I filed in Connecticut.

11             MR. BALDIGA:  Holley, can we take a break

12   soon?

13             MS. CLAIBORN:  Unfortunately, I'm going to

14   suggest that we can't really take a break because we

15   only have the interpreter until 2:00.  So if we do,

16   it needs to be a very, very short one.

17             MR. BALDIGA:  Okay. Five minutes?

18             MS. CLAIBORN:  Yeah, let me just ask one

19   question before we do that.

20       Q    Mr. Kwok, please confirm that the tax

21   returns that you provided to the United States

22   Trustee for the year 2020 and 2019 were the same as

23   those filed with the taxing authorities?

24             THE INTERPRETER:  The what?  Sorry, the last

25   word.

1          MS. CLAIBORN:  Authorities.

2     Q    Yes --

3          THE INTERPRETER:  Could you please repeat?

4     Sorry.

5     Q    Mr. Kwok, can you please confirm that the

6     tax returns that you provided to the Office of the

7     United States Trustee for the tax years 2019 and

8     2020 are the same as those that you provided to the

9     Internal Revenue Service and to the State of

10    Connecticut and to the State of New York?

11    A    Yes.

12    Q    Mr. Kwok, in your 2020 tax return --

13         MR. BALDIGA:  I want to clarify.  As you

14    know, there were very limited redactions as to

15    Social Security number and maybe a couple of data

16    points. I'm not sure if the witness knows what we

17    did by way of that data protection, but you do. I

18    just wanted to not leave the record ambiguous in

19    that regard.

20         MS. CLAIBORN:  Thank you.

21    Q    Mr. Kwok, your 2020 tax return reports

22    interest income only and no other source of income.

23    Did you have any other source of income in 2020?

24    A    No.

25         MS. CLAIBORN:  Okay. I'm going to take a

1    very short break. It is now 12:30. I would like

2    everyone to reconvene at 12:35. I'm not going to

3    disconnect the call.  I'm just going ask you to all

4    put your phones on hold.

5          We will reconvene at 12:35.  Thank you.

6       (Off the record.)

7          MS. CLAIBORN:  Okay.  We are back on the

8    record after a short break.

9       Q    Mr. Kwok, I would like to talk to you about

10   Golden Spring, New York.

11         Do you currently work for Golden Spring in

12   any capacity?

13      A    No.

14      Q    When was Golden Spring New York Limited

15   formed?

16         THE INTERPRETER:  Sorry?

17      Q    When was Golden Spring New York Limited

18   formed?

19         THE INTERPRETER:  Sorry, I cannot get the

20   later half.  Golden New York what?

21         MS. CLAIBORN:  I'm going to actually just

22   refer to it as Golden Spring.  When I do that I'm

23   referring to Golden Spring New York.

24      Q    When was Golden Spring formed as a company?

25      A    I don't know.

1     Q     The address on the petition is 162 East 64th

2     Street.  Who owns that property?

3           I can ask the question again.

4           The address for Golden Spring is listed as

5     162 East 64th Street in New York.  Who owns that

6     property?

7     A     I don't know.

8     Q     What is the nature of that property at 162

9     East 64th Street?

10    A     I don't know which property you're talking

11    about.

12    Q     The office of Golden Spring --

13          MR. BALDIGA:  I'm not sure that was --

14          MS. CLAIBORN:  Let me just try again.

15          The office of --

16          MR. BALDIGA:  There's a translation issue.

17          Could we confer for one second because

18    obviously there's a misunderstanding.  So could Mr.

19    Kwok talk to his translator because that obviously

20    didn't come through.

21          MS. CLAIBORN:  Let me just -- I would prefer

22    if I try again.  Let me try again, please.

23    Q     The address for Golden Spring on the

24    bankruptcy petition is listed as 162 East 64th

25    Street in New York.

1              THE INTERPRETER:  Is it 54 or 64?  5-4 or 6-

2      4?

3              MS. CLAIBORN:  64.

4              THE INTERPRETER: So maybe because of the

5      phone I mistook the 6 as 5 so let me correct my

6      mistake and reinterpret again.

7         A    Yes, that's the address of Golden Spring.

8         Q    Does Golden Spring own that building that's

9      located at that address?

10        A    I don't know.

11        Q    Have you ever been to that address?

12        A    Yes.

13        Q    What type of building is it?  What's located

14     there?

15        A    It was a building.

16        Q    Is the building a residential building or a

17     commercial building?

18        A    Business building.

19             MS. CLAIBORN:  I'm sorry, Bin. I didn't hear

20     your translation.

21             THE INTERPRETER:  A commercial building or

22     business building.

23        Q    Does anyone live at that address?

24        A    I don't know.

25        Q    What type of business does Golden Spring do?

1     A    It's a big family business my son works, but

2    I don't know specifically what categories of

3    business it has.

4     Q    Mr. Kwok, when you used the term --

5     A    It is a family office owned by my son.  He

6    has other businesses, but I don't know.

7     Q    Mr. Kwok, when you use the term family

8    business or family office, what do you mean by those

9    terms?

10    A    It's mainly for the whole family, all the

11    family members.  When there is something we

12    (indiscernible)  and help each other.

13    Q    Mr. Kwok, can you explain it in more detail?

14    A    I don't know how to explain.

15    Q    Does Golden Spring have any employees?

16    A    Yes.

17    Q    How many?

18    A    I don't know.

19    Q    Does Golden Spring own any real estate?

20    A    I don't know.

21    Q    Does Golden Spring own any other business?

22    A    I don't know.

23    Q    Does Golden Spring have any bank accounts?

24    A    I don't know.

25    Q    Mr. Kwok, you have previously said in

1    documents filed with the bankruptcy court that

2    Golden Spring pays for you personal living expenses.

3    Can you please explain how they do that?

4        A    I don't know what you mean by they pay me.

5    In what regard?

6        Q    Mr. Kwok, you have previously told the court

7    in your bankruptcy documents that Golden Spring pays

8    for your clothing, your food and your housing.

9            My question is how do they do that?  Do they

10   give you money?  Do they pay other people directly?

11   How does it work?

12       A    Whenever I need any expenses for my basic

13   living I talk to my son and he will tell his office

14   to give to me.

15       Q    Who are the owners of Golden Spring?

16           MR. HARBACH:  This is David Harbach.  I

17   missed the end of that question. I talk to my son

18   and he -- that answer.  I heard I talk to my son and

19   he and then I lost it.  Can I please have the

20   English again?

21           THE INTERPRETER:  Sorry, I didn't hear the

22   gentleman?

23           MS. CLAIBORN:  Mr. Harbach is asking Bin if

24   you could repeat the translation of Mr. Kwok's

25   answer about how the money flows from Golden Spring.

1          THE INTERPRETER: I'll repeat the

2     interpretation.

3          When I need expenses for my basic living I

4     tell my son.  My son will tell the office to take --

5          Q    Mr. Kwok, who are the owners of Golden

6     Spring?

7          A    My son.

8          Q    Are there any owners of Golden Spring other

9     than your son?

10         A    No.

11         Q    Mr. Kwok, have you ever owned an interest in

12    Golden Spring?

13         A    No.

14         Q    Who are the officers and directors of Golden

15    Spring?

16         MR. BALDIGA:  This is Bill Baldiga.

17         This is something for which there are very

18    serious physical security concerns and it's not that

19    the debtor would refuse to answer, if he knows.  But

20    not on a line like this where it's open to the

21    public and who else knows.  There are -- hold on.

22         Can I just confer with the witness because

23    we'd like to give you as much as possible, but we

24    don't want to cause severe security issues.

25         So could I just have one minute to confer

1    with the witness?

2          MS. CLAIBORN:  Yes.

3       (Pause.)

4          MR. BALDIGA:  This is Bill Baldiga, again.

5          The witness believes that he may know who

6    the directors and officers are and is prepared to

7    testify as to the best of his knowledge in that

8    regard.  And if we could take it one question at a

9    time we'll go from there.

10         If you could interpret that, because I want

11   to be sure that the witness understands what I just

12   said as well, please.

13         (Interpretation)

14   BY MS. CLAIBORN:

15     Q    Mr. Kwok, as of today, who are the officers

16   of Golden Spring?

17     A    (Indiscernible)

18     Q    I'm going to repeat that name so everyone

19   understands what I thought I heard.  What I heard

20   was Yan Ping, also known as Yvonne Wang.  Is that

21   accurate?

22     A    Yes.

23     Q    Is Yvonne Wang the only officer of Golden

24   Spring?

25     A    I don't know.

1    Q    As of today, who are the directors of Golden

2   Spring?

3    A    I don't know.

4    Q    Mr. Kwok, have you ever been an officer or a

5   direct or Golden Spring?

6    A    I don't remember.

7    Q    Mr. Kwok, who is Max Krazner?

8    A    I don't know. I don't know.

9         THE INTERPRETER:  Could you please repeat

10  the name again?

11   Q    Mr. Kwok, who is Max Krazner?

12   (No response)

13        Mr. Kwok, can you please answer?

14        MR. BALDIGA:  I'm conferring with the

15  witness for one second.  Hold on please?

16        MS. CLAIBORN:  Mr. Baldiga, I would rather

17  he would answer the question before you make a

18  confer.

19   (Pause.)

20        MR. BALDIGA:  Thank you for that

21  opportunity.  The witness could answer.

22   A    He has to double check with you because I

23  cannot read and cannot remember English names well.

24  So just the name, you said Max.  If it's the name

25  Max only I know Max.  But if you add another name to

 1    it, I'm not sure. I don't know.

 2         Q    Do you know a Max with respect to Golden

 3    Spring?

 4         A    Yes. I know.

 5         Q    And what is Max's role with Golden Spring?

 6         A    I don't know.

 7         Q    Well, how do you know Max?

 8         A    I don't remember.

 9         Q    Do you know more than one person by the name

10    of Max?

11         A    For me English name is very complicated.

12    Like I can't remember the last name of my lawyer. If

13    you add something else to Max, I don't know.

14         Q    Mr. Kwok, the name Max Krazner is listed as

15    the person to whom the mail for Golden Spring is

16    directed to.  Do you know why that is?

17              THE INTERPRETER:  Sorry?

18         Q    Do you know why that is?

19         A    I only remember there is a Max at Golden

20    Spring. I only know this one thing.

21         Q    And what is Max's job at Golden Spring?

22         A    I'm not sure what role.  I (indiscernible)

23    know he is in charge of finance, but I'm not sure.

24         Q    What does he do for Golden Spring with

25    respect to finances?

1      A    I was not involved in the management so I

2   don't know.

3      Q    If Golden Spring gives you money, does it

4   come through Max Krazner's efforts?  Does he help

5   make that happen?

6      A    I don't know.  He didn't give me money in

7   person.

8      Q    Mr. Kwok, when you get money from Golden

9   Spring how do you get money?  Does it come in the

10  form of cash or something else?

11     A    From my son and (indiscernible).

12         MS. CLAIBORN:  I'm sorry, Bin.  I didn't

13  understand your translation.  Can you try that

14  again?

15         THE INTERPRETER:  He said from my son and

16  (indiscernible).

17     Q    My question was how do you get money from

18  your son?  Does it come in the form of cash or some

19  other form?

20     A    I don't understand what you mean by how, the

21  word how.  I never get money directly from them.

22     Q    If you don't get money directly from your

23  son, how do you get the money from your son?  Where

24  does it go?

25     A    I don't use cash and I don't use credit

1    cards.  My son and (indiscernible)  Wan they just

2    pay my expenses for me.  It's impossible for me to

3    get any cash from them. And also I don't have bank

4    account.  Any bank accounts.

5         Q    Mr. Kwok, do you have access to a credit

6    card that was taken out by Golden Spring?

7              MR. BALDIGA:  This is Bill Baldiga. I'm

8    sorry.  I think there was a translation issue with

9    the prior question.  Could you give us a minute to

10   be sure that the witness understood the question

11   correctly?  Hold on for one second.  We're going to

12   put it on mute.

13        (Pause.)

14             MR. BALDIGA:  The witness would like to

15   clarify. I think it came through, but we're not

16   sure, that Golden Spring does not give him cash, but

17   simply pays certain bills for his living expenses.

18   If that's what came through the translation, great.

19   If not, we clarify accordingly.

20        Q    Mr. Kwok, do you have access to a credit

21   card or a debit card provided to you by or through

22   Golden Spring?

23        A    No.

24        Q    Mr. Kwok, are you obligated to pay Golden

25   Spring back for the monies that it pays on your

1    behalf for your living expenses?

2       A    No.  No need.

3            MS. CLAIBORN:  At this time I'd like to open

4    the meeting to creditors, given that we have a

5    limited amount of time for today. I am not done with

6    all my questions.

7            We will need to reconvene on another day,

8    but for purposes of today's examination I'm now

9    going to open it up to creditors who may wish to

10   examine.

11           I would ask that you identify yourself when

12   you speak and to be mindful of the need for

13   interpretation.

14           MR. BALDIGA:  Just to clarify one thing for

15   the record.  You asked previously -- you referred to

16   the petition and asked whether anyone lived at 162

17   East 64th Street.

18           And as we told you informally when we filed

19   the petition there was great concern over the

20   debtor's physical security and so he used that

21   address, but has since, obviously, corrected the

22   record that he lives in the Greenwich house that you

23   asked about earlier today.

24           And so I just didn't want the record to be

25   confusing in that regard.  Thank you.

1          MS. CLAIBORN:  Are there any creditors who

2     wish to inquire or examine of the debtor?

3          MR. HARBACH:  Yes.  This is David Harbach

4     for PACS.  We do have some questions. We do have

5     some questions.  We can start asking the questions

6     now or if there are others who would like to ask

7     questions that's fine.  However you want to proceed.

8     But we obviously will not finish before 2 o'clock

9     either.

10          THE INTERPRETER:  I cannot hear you clearly.

11          MR. HARBACH:  This is David Harbach for PACS

12     and I was just saying that we do have some questions

13     and we are happy to proceed and ask them or if the

14     trustee would like. we can proceed with others

15     asking questions but we will certainly not finish

16     before 2 o'clock either.

17          MR. BALDIGA:  Could that be translated

18     please?

19          THE INTERPRETER:  I was saying I could not

20     get him completely.

21          MS. CLAIBORN:  Mr. Harbach, do you have the

22     ability to pick up a hand held and speak into a hand

23     held device, as opposed to a speaker phone?

24          MR. HARBACH:  Not at this moment, but let me

25     move to see if this is any better.  Can you hear me

1    a little better now?

2                THE INTERPRETER:  Not really.  No, sorry.

3                MR. HARBACH:  Not really.  Well, I'll tell

4    you what.  If you give me -- take a moment, I can

5    try dialing in with a phone.  Just give me a second,

6    okay?

7                MS. CLAIBORN:  Yes.

8                MR. BALDIGA:  Bin, could you translate the

9    dialogue for Mr. Kwok, please, so he knows that.

10        (Interpreter translates)

11               MR. HARBACH:  Hello?

12               MS. CLAIBORN:  Hello.  This is Holley

13   Claiborn.

14               MR. HARBACH:  This is David Harbach and I

15   just wanted to know if you could hear me better.

16               MS. CLAIBORN:  Much better.  Bin, can you

17   hear Mr. Harbach?

18               THE INTERPRETER:  Yes, I can hear him now.

19   Thank you.

20               MS. CLAIBORN:  Go ahead, Mr. Harbach.

21               MR. HARBACH:  I'll repeat what I said once

22   more so that the interpreter can interpret it.

23               I'm David Harbach and I was just saying that

24   PACS does have some questions we would like to ask,

25   but we certainly will not finish by 2 o'clock and so

1    if Ms. Claiborn would like to proceed with giving

2    other creditors an opportunity to ask questions

3    today, it's entirely up to her or we can start now.

4            MR. BALDIGA:  And this is Bill Baldiga. We

5    extended our own translator until 2 o'clock so we

6    certainly encourage whoever wants to ask questions

7    to use the time.

8            MR. WOLMAN:  This is Jay Wolman. I'm happy

9    to ask some questions now.

10           THE INTERPRETER:  Sorry, I didn't get your

11   name.

12           MR. WOLMAN: Jay Wolman, and I represent

13   Logan Chang.

14   EXAMINATION BY MR. WOLMAN:

15    Q    Good afternoon, Mr. Kwok.

16           Do you remember that I took your deposition

17   about a year ago?

18    A    I have too many --

19           THE INTERPRETER:  Someone's always talking

20   in the background.

21    A    I have too many depositions.  I don't

22   remember specifically.

23    Q    That's all right. I asked you a number of

24   questions and you invoked your rights under the

25   Fifth Amendment of the U.S. Constitution.  Do you

1    understand that?

2           THE INTERPRETER:  You and your wife what?

3    Sorry.

4       Q    You invoked your right under the Fifth

5    Amendment of the U.S. Constitution.  Do you remember

6    that?

7           MR. BALDIGA:  We have a translation issue.

8    Hold on for one second, please.

9       (Pause.)

10          MR. BALDIGA:  I think -- our interpreter is

11   hearing this translation.  The question as we

12   understand is do you remember having invoked the

13   Fifth Amendment privilege at a prior deposition.

14   That's what we are hearing.  Could that be

15   interpreter for Mr. Kwok in that way please?

16          THE INTERPRETER:  Sorry, I can I hear the

17   question again.

18          MR. WOLMAN:  Sure.

19      Q    Do you remember at a prior deposition

20   invoking the Fifth Amendment of the U.S.

21   Constitution?

22          THE INTERPRETER:  Sorry, I did not hear you

23   clearly.

24      Q    Do you remember at a prior deposition

25   invoking the Fifth Amendment of the U.S.

1    Constitution?

2            THE INTERPRETER:  At a prior what?  Sorry.

3            MR. WOLMAN:  Deposition.  D-E-P-O-S-I-T-I-O-

4    N.

5            THE INTERPRETER:  Deposition.  Sorry, just

6    one sec.

7            (Pause.)

8            THE INTERPRETER:  Okay.  In the prior

9    deposition what?

10      Q    Do you remember invoking your Fifth

11   Amendment rights?

12           THE INTERPRETER:  Invoking what?

13           MR. WOLMAN:  Can everybody else hear me or

14   is it just the interpreter?

15           MS. CLAIBORN:  This is Holley. I can hear

16   you.

17           MR. HARBACH:  This is David Harbach.  We can

18   hear you fine.

19           MR. BALDIGA:  The debtor can hear you.  It's

20   not a volume issue.

21           MR. WOLMAN:  Is it a diction issue?  I can

22   try to --

23           THE INTERPRETER:  The interpreter just

24   didn't get the word.  (Indiscernible)  rewording.

25           MR. WOLMAN:  I cannot reword that. I need

1    you to hear the words in English and translate them,

2    ma'am.

3            THE INTERPRETER:  Okay.  Could you please

4    speak slowly?

5        Q    Do you remember at a prior deposition

6    invoking your rights under the Fifth, number five

7    that is -- Fifth Amendment, ordinal number -- of the

8    U.S. Constitution?

9            THE INTERPRETER:  Invoke or evoke?

10           MR. WOLMAN:  Invoke, I-N-V-O-K-E.

11           Okay, we still have an issue.

12           UNIDENTIFIED:  Hold on.

13           UNIDENTIFIED:  Did someone just drop out?

14           MS. CLAIBORN:  Bin, are you there?  This is

15   Holley.

16           MR. WOLMAN:  Bin?

17           MS. CLAIBORN:  Bin, are you there?

18           THE INTERPRETER:  Hello.

19           MS. CLAIBORN:  Bin, this is Holley Claiborn.

20           THE INTERPRETER:  Okay. I'm back.

21           MS. CLAIBORN:  Okay.

22           THE INTERPRETER:  I don't know what

23   happened.

24           MS. CLAIBORN:  Go ahead.

25           MR. BALDIGA:  Is the interpreter -- we're

1    not sure what's going on.  Is the interpreter with

2    us or not?

3            THE INTERPRETER:  Yes, the interpreter is

4    here now.

5            MR. BALDIGA:  Okay.  Thank you.

6            My client just said something and I don't

7    know what he said and I don't know whether you were

8    on for what he said.  If you were, I'd like to know

9    -- I'd like you to interpret it.  If not, could you

10   let us confer for a second so we could try to figure

11   that out, because there was a lot of confusion.

12           MR. WOLMAN:  Bill, can you just ask your

13   client to repeat what he just said?

14           MR. BALDIGA:  No --

15           THE INTERPRETER:  The interpreter would like

16   him to repeat what he said because just now all of a

17   sudden I'm not (indiscernible)  all the voices

18   sometimes.

19           I'm asking the gentleman to repeat what he

20   said just now.

21           MR. KWOK: Just now in your question you

22   mentioned that -- you asked me whether my wife used

23   something under the law or under the Constitution.

24   I don't remember that.

25           MR. WOLMAN: I said nothing about his wife.

1          MR. KWOK:  So did you say just now my wife

2     use any kind of law or what?

3          MR. WOLMAN:  No, that was nothing of the

4     sort.

5          MR. BALDIGA:  Could I suggest, Mr. Wolman,

6     maybe you could just go right to whatever you want

7     to ask him instead of what happened a year ago

8     because this is not getting anywhere.

9          MR. WOLMAN:  Well, I'm going to re-ask him

10    every question relative to finances where he invoked

11    the Fifth and I wanted to make sure he had that in

12    his mind as he answers here today.

13         MR. BALDIGA:  Is there a question?

14         MR. WOLMAN:  I want to make sure you're

15    aware of what I'm about to do.

16         At this point, I have no idea, but I am

17    representing to you that is exactly what I'm doing.

18    So I want to make sure your client is appropriately

19    advised.

20    BY MR. WOLMAN:

21    Q    So a year ago -- this is a lengthy one, Bin,

22    so please just write it down, or do what you need to

23    do. Let me finish and then translate.  Do not do

24    that piecemeal.

25         THE INTERPRETER:  Okay.

```
 1              MR. BALDIGA:  I --

 2              MR. WOLMAN:  Hold on. I want the translation

 3    of that and we'll take this in small pieces.  So

 4    Bin, please translate that for the witness because

 5    he has to hear everything.

 6        (Translation.)

 7              THE INTERPRETER:   Yes.

 8              MR. WOLMAN:  Thank you.

 9    BY MR. WOLMAN:

10        Q    A year ago I asked you are you employed.

11    You answered I have always been --

12              THE INTERPRETER:  I asked you what? Sorry.

13        Q    Are you employed?

14              There's a lot of background noise.  Can we

15    knock that off, please.

16              A year ago I asked you are you employed?

17              THE INTERPRETER:  You employed?

18        Q    A year ago I asked you are you employed?

19    Your answer was I have always been a consultant for

20    --

21              THE INTERPRETER:  Sorry.  A year ago I asked

22    you are you employed?  The answer is what?

23        Q    I have always been the consultant for a lot

24    of companies --

25              THE INTERPRETER:  I'm sorry --
```

1    Q    And my current employment is the -- I am in

2    the broadcasting and to take down the Chinese

3    Communist Party.  It is a broadcasting revolution. I

4    then asked you how much do you get paid for that.

5         I'm re-asking that question now.  How much

6    do you get paid for that?

7         THE INTERPRETER:  So I have to do it from

8    the beginning because I didn't get the words when

9    you say a year ago I asked you whether -- are you

10   employed?   Your answer is I didn't get the word

11   after is.

12   Q    Your answer was I always been the consultant

13   for a lot of companies and my current employment is

14   the -- he paused.  I am in the broadcasting --

15        THE INTERPRETER:  Is what?  Sorry?

16   Q    -- and to take down --

17        THE INTERPRETER:  Sorry.

18   Q    I am in the broadcasting and to take down

19   the Chinese Communist Party.  It is a broadcasting

20   revolution.  I then asked you how much do you get --

21        THE INTERPRETER:  Excuse me. I'm not able to

22   --

23        MR. WOLMAN:  Excuse me. I'm not done.  Why

24   not?

25        THE INTERPRETER:  I tried to clarify --

1          MR. WOLMAN:  Why not?

2          THE INTERPRETER:  -- the words that I didn't

3   get.  Yes, I know it's simple but it's too long.  I

4   (indiscernible)  such a long time to do the

5   interpretation. I'm highly concentrating. I have a

6   human brain.

7          MR. WOLMAN:  I'm used to translators writing

8   things down as they go.

9          THE INTERPRETER:  Sorry about that.

10         Let me interpret what I got and then I will

11  ask you the rest.  Is that okay?

12         MR. WOLMAN:  Yes.

13         THE INTERPRETER:  Okay.

14     (Translation)

15         THE INTERPRETER:  Okay.  I --

16   Q    I then asked you how much do you get paid

17  for that and I am asking you now again, because you

18  invoked the Fifth, how much do you get paid for

19  that?

20     (Pause.)

21         MR. BALDIGA:  Okay. The witness is

22  struggling to -- well, is the question are you

23  getting paid for that?  And you can answer that.

24         MR. WOLMAN:  No.  I am literally asking him

25  how much do you get paid for that. He took the

1    Fifth. I'm asking it now again.

2         Q    How much do you get paid for that?

3         A    No money at all.

4         Q    A year ago I asked you what is Golden Spring

5    New York.  You answered it's a company. I then asked

6    you and what is your -- I then asked you and what is

7    your relationship to that company and so I'm asking

8    that question again.  What is your relationship to

9    that company?

10        A    I don't know what you mean by relationship.

11        Q    If you didn't know what I meant by that

12   question, why did you invoke the Fifth last year?

13        MR. BALDIGA:  Objection.  I'm not going to

14   allow the witness to describe the legal advice a

15   year ago as to the Fifth Amendment.

16        He is prepared to answer whatever questions

17   you may have. You are confusing the witness a bit by

18   in each question having three things, some reference

19   to the Fifth Amendment, some conversation from a

20   year ago and a question as to now.

21        But if you were to ask a more simple

22   question, I think this would go much more

23   productively.  That's your choice.

24        MR. WOLMAN:  No.  Your client is an

25   intelligent person who is a big businessman, who is

1       a sophisticated person.  I trust he can handle these

2       simple questions.

3               MR. BALDIGA:  Proceed as you'd like.

4           (Translation interrupted)

5           Q    Last year I asked you --

6               MR. BALDIGA:  Wait.  Hold on.  Mr. Wolman,

7       there's a translation that needs to be done.  Please

8       hold on.  The witness needs to understand what's

9       being said.

10          (Translation)

11              THE INTERPRETER:  Okay.  Go ahead.

12          Q    What is your relationship to Golden Spring?

13          A    I don't understand what you mean by your

14      question?  I don't know how to answer your question.

15          Q    Do you know what the word relationship

16      means?

17          A    Relationship means love of things in China.

18      It could be between husband and wife. It could be

19      between a government relationship, a financial

20      relationship, money and it could be a lot of things.

21      So I don't know which one you mean?  Is it a

22      man/woman relationship or a money relationship or

23      what?

24          Q    Any relationship?  What is it? What is your

25      (indiscernible)  --

1          THE INTERPRETER:  Sorry?  What was your last

2    sentence again, because there was talking.

3      Q    Any relationship, what is yours to Golden

4    Spring?

5          THE INTERPRETER:  Let me do the

6    interpretation first.

7      A    Now the relationship is between -- is he

8    lends me money. I owe money to him.  He helps me.

9      Q    And why does he do this?

10     A    Because I was once a member of the Guo (ph)

11   family.

12         MR. HARBACH:  This is David Harbach.  Could

13   you please repeat that English answer?

14         THE INTERPRETER:  Because I was once a

15   member of Guo family.

16     Q    Does Golden Spring pay the expenses of any

17   other member of the Guo family?

18     A    Yes.

19     Q    Which other members of the Guo family?

20     A    I don't know.

21     Q    A year ago I asked you why does Golden

22   Spring pay Mr. Podhaskie, P-O-D-H-A-S-K-I-E, for

23   services rendered to you in your individual

24   capacity. I'm asking that again now.  Why does

25   Golden Spring pay Mr. Podhaskie for services

1    rendered to you in your individual capacity?

2         MR. BALDIGA:  This is Bill Baldiga. I

3    understand that Mr. Podhaskie may be a lawyer. I

4    just need to confer with the client to make sure he

5    doesn't disclose the substance of legal advice. I'll

6    take one second to do that.

7         MR. WOLMAN:  The question didn't indicate

8    any answer of that sort.

9      (Pause.)

10        MR. BALDIGA:  I'm sorry. The witness could

11   answer the question.

12        MR. KWOK:  I don't know.

13   Q    Have you ever asked anyone why they pay for

14   him to advise you?

15   A    I don't remember.

16   Q    I asked you last year why did Golden Spring

17   New York pay that judgment on your behalf, and I was

18   referring to the one my client, Mr. Cheng, held

19   against you.

20        I'm asking you again why did Golden Spring

21   New York pay that judgment on your behalf?

22   A    It was money lended.

23   Q    Why did Golden Spring loan you that money?

24   A    I don't have any thing so I borrowed from

25   them.

1      Q    Where did Golden Spring get the money from?

2      A    I don't know.

3      Q    Where does Golden Spring get any money from?

4      A    I don't know.

5      Q    Your son owns Golden Spring, correct?

6      A    Yes.

7      Q    Does your son owe you any money?

8      A    No.

9      Q    How did your son get the money that funds

10   Golden Spring?

11     A    I don't know.

12     Q    Did you ever provide your son with any seed

13   capital?

14     A    No.

15     Q    Have you ever invested in any of your son's

16   businesses?

17     A    No.

18     Q    When did Connecticut become your residence?

19     A    End of February or early March of 2020.

20     Q    Okay.  And you're sure about that here?

21     A    Yes.

22     Q    And was that your primary residence since

23   February, 2020 or March, 2020?

24     A    Yes.

25     Q    A year ago I asked you if you owned any

1    interest in Golden Spring New York. I am asking you

2    that again.  Do you own any interest in Golden

3    Spring New York?

4        A    No.

5        Q    A year ago I asked you are you an officer of

6    Golden Spring New York Limited. I'm asking you

7    again.  Are you an officer of Golden Spring New York

8    Limited?

9        A    No.

10       Q    A year ago I asked you why would Golden

11   Spring pay Attorney Aaron, meaning Aaron Mitchell,

12   on your behalf.

13            I'm asking you again, why would Golden

14   Spring pay Attorney Aaron Mitchell on your behalf?

15            THE INTERPRETER:  He wants me to repeat the

16   interpretation.  I'll do that for him.

17       A    A loan.  A loan or borrowed money.

18       Q    Why did they make you that loan?

19       A    I have been borrowing from them all the time

20   because I was a member of the family.

21       Q    Did you ever have any of your loans from

22   Golden Spring put in writing?

23       A    Some have, some no.

24       Q    Okay.  Which ones have been put in writing?

25       A    I don't remember.

1    Q    How many loans have you had from Golden

2    Spring?

3    A    I don't remember.

4    Q    Were any of the loans that were put in

5    writing in English?

6    A    I don't remember.

7    Q    Were any of them in Chinese?

8    A    I don't remember.

9    Q    Did you ever pledge any security interest in

10   exchange for any of these loans?

11   A    (Indiscernible)  but I don't remember

12   (indiscernible).

13       MR. BALDIGA:  Could you please repeat the

14   answer in English?

15       THE INTERPRETER:  He said (indiscernible)

16   yes, but I don't remember.

17   Q    If you don't remember how much -- if you

18   don't remember how many loans you took out, how are

19   you able to identify how much they -- you owe them

20   on your bankruptcy schedules?

21   A    I didn't quite get you.

22   Q    If you don't know how many times you took

23   out loans from Golden Spring, not all of which were

24   in writing, how do you know how much you owe them?

25   A    My lawyer and the lawyer of Golden Spring

1    they communicate with each other.  Tells me the

2    amount they can define is 21 million.

3        Q    So Golden Spring's lawyers helped prepare

4    your bankruptcy petition?  Is that correct?

5             MR. BALDIGA:  I'm sorry to interrupt.

6    (Indiscernible)  two things.

7        A    No.

8        Q    So how did the information get from Golden

9    Spring to your bankruptcy petition?

10            MR. BALDIGA:  Objection to the question.

11            THE INTERPRETER:  Sorry?

12            MR. BALDIGA:  I object to the question.

13            MR. WOLMAN: I'm just trying to figure out

14   how this information he doesn't know wound up in his

15   bankruptcy petition?

16            MR. BALDIGA:  I think you heard the answer

17   that his lawyer and Golden Spring's lawyer discussed

18   it.  Do you have another question?

19       Q    Yes.  How did you know that number was

20   right?

21            MR. BALDIGA:  Okay.  Let the interpreter go

22   first and then ask another question, please.

23            THE INTERPRETER:  Okay.  Go ahead.

24       Q    How did you know that number was right?

25            THE INTERPRETER:  Sorry?  Number of what?

1    Q    The number that was put into your bankruptcy

2    petition for what you purportedly owe to Golden

3    Spring, how did you know that was right?

4    A    I believe the professionalism of my lawyers.

5    They will review and check all the figures.

6         MS. CLAIBORN:  This is Holley --

7    Q    Do you know the documents that were

8    reviewed?

9         MS. CLAIBORN:  I apologize for interrupting.

10        MR. BALDIGA:  It's now 2 o'clock.

11        MS. CLAIBORN:  I apologize for interrupting.

12   It's Holley Claiborn.

13        MR. WOLMAN:  Yes, thank you for

14   filibustering to use up the time.  Appreciate it.

15        MR. BALDIGA:  I'm sorry. Who was that

16   addressed to?  That's quite an inappropriate

17   comment.

18        MR. WOLMAN:  You. That was me addressing

19   that to you.

20        MS. CLAIBORN:  I'd like to talk about --

21        MR. BALDIGA:  Okay --

22        MS. CLAIBORN:  -- the next date.  I was

23   going to suggest that we reconvene April 4th at

24   10:00 a.m. in person at the U.S. Trustee's Office in

25   New Haven.

 1            Mr. BALDIGA:  We'll look at schedules. I can

 2    start to do that if you give me a second.

 3            MS. CLAIBORN:  Bin, could you please

 4    translate that?

 5            THE INTERPRETER:  I will double check with

 6    you whether you still need me on the line for a

 7    second or you want me to log off?

 8            MS. CLAIBORN:  If you can continue on just

 9    for a second.  We need to pick a new date, so I need

10    you to translate that so the debtor understands.

11            THE INTERPRETER:  Okay.

12            MR. BALDIGA:  I'm sorry.  Was the request --

13    I'm sorry.  Was the request -- I'm just trying to

14    make sure I heard it -- April 4 at 10 o'clock in

15    Bridgeport?

16            MS. CLAIBORN:  April 4, 10 o'clock in New

17    Haven at the U.S. Trustee's Office.

18            MR. BALDIGA:  Okay.  We'll be back to you

19    very quick on that.

20            MS. CLAIBORN:  I actually need an answer on

21    that right now because we need to be able to notify

22    creditors and I want everyone to know before we

23    conclude today.

24            MR. BALDIGA:  Okay. I'll put you on hold.

25            MR. HARBACH:  Ms. Claiborn, this is David

1    Harbach.  I'm afraid that that day will not work for

2    us?

3              MS. CLAIBORN:  Mr. Harbach, is that you?

4              MR. HARBACH:  Yes, ma'am.  And I was just

5    about to say that I can do Wednesday, the 6th, or

6    any day after that.  But I cannot do the 4th or the

7    5th.

8              MS. CLAIBORN:  How about Friday, April 8th?

9              MR. HARBACH:  I can do that.  This is David.

10   I can do that.

11             MR. WOLMAN:  This is Jay Wolman.  I can do

12   that.

13             MS. CLAIBORN:  Attorney Baldiga, can you

14   check on April 8th, please?

15      (Pause.)

16             MR. HARBACH:  Holley, this is Dave Harbach

17   again.  Just anticipating that they're coming back

18   (indiscernible).  I could also do it (indiscernible)

19   for whatever it's worth.  I could also do it on the

20   28th, 29 or 30 of March as well, if that's better.

21             MR. BALDIGA:  This is Bill Baldiga.  The 7th

22   and 8th are Buddhist holidays so for religious

23   reasons Mr. Kwok can't do it those days.  We'll

24   clear the 4th. I'm sure there are some

25   (indiscernible). I'm wondering who could make it.

 1            MS. CLAIBORN:  How about March 28th, next

 2     Monday?

 3            MR. HARBACH:  Holley, I didn't get the

 4     second part of what you said about the 28th.

 5            MS. CLAIBORN:  I only offered the 28th as a

 6     new date.

 7            MR. BALDIGA:  This is Bill Baldiga.  28, 29

 8     and 30 Mr. Kwok has a medical issue that he

 9     (indiscernible)  during those days.

10            MS. CLAIBORN:  How about Friday, April 15th?

11            MR. HARBACH:  This is David Harbach.  That's

12     good by us.

13            MR. BALDIGA:  It's Good Friday.  Good Friday

14     for me and Passover for many.

15            Can I suggest (indiscernible)?

16            MS. CLAIBORN:  I didn't hear your

17     suggestion. I'm sorry.

18            MR. BALDIGA:  I respectfully ask that we go

19     back to April 4.  One lawyer among a dozen and one

20     creditor should not --

21            MR. WOLMAN:  This is Jay Wolman. I already

22     have something for that day as well.

23            MR. BALDIGA:  I know, but there are

24     (indiscernible)  --

25            MR. WOLMAN:  Two lawyers, including myself,

1      who is in the middle of questioning.

2             MR. BALDIGA:  All right. We'll keep looking

3      then.

4             MS. CLAIBORN:  Does April 6th work?

5             MR. WOLMAN:  What was that date?

6             MS. CLAIBORN:  April 6th?

7             MR. HARBACH:  This is David Harbach. I can

8      do April 6th.

9             MR. BALDIGA:  The debtor can as well.

10            UNIDENTIFIED:  As can I.

11            MS. CLAIBORN:  Okay. I'm going to mark April

12     6th 10:00 a.m.  It's in person.  The U.S. Trustee's

13     Office in New Haven.

14            Please allow for time to go through

15     security. I'd like to start at 10:00.

16            MR. BALDIGA:  Could I ask how much time

17     would you reserve on that day, including with the

18     interpreter, just so we can plan?

19            MS. CLAIBORN:  I think you should plan for

20     the whole day but I will have to follow up and get

21     an understanding about an interpreter and I don't

22     have that at my fingertips right now.

23            MR. BALDIGA:  Okay.  Would that be 5

24     o'clock?

25            I guess we can go off the record as we

1    finish this.  It's up to you, obviously.

2            MS. CLAIBORN:  Okay.  I think we're

3    concluded for purposes of Bin's translation services

4    for today.

5            THE INTERPRETER:  Thank you.

6            MS. CLAIBORN:  Thank you very much, Bin.

7            THE INTERPRETER:  Have a nice day.

8            MS. CLAIBORN:  Thank you.

9            I'm going to stop the recording, but we can

10   stay on the line.  I'm going to stop the recording.

11   Thank you.

12       (Meeting adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

1    I, CHRISTINE FIORE, court-approved transcriber and

2    certified electronic reporter and transcriber,

3    certify that the foregoing is a correct transcript

4    from the official electronic sound recording of the

5    proceedings in the above-entitled matter.

6

7                    *Christine Fiore*

8    _____  April 5, 2022

9         Christine Fiore, CERT

10         Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX

2

3     HO WAN KWOK                              <u>Page</u>

4     Examination by Ms. Claiborn                14

5     Examination by Mr. Wolman                  58

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit 13**

CASE NO. _____ 22-50073 _____

IN RE: Ho Wan Kwok _____

VS. _____

Trustee's EXHIBIT _____ 13 _____

DATE _____ IDEN.

DATE _ 11/17/2022 Admitted in Full _ EVID.

BY _ PE _____

Deputy Clerk

AO 386

Case 22-50073   Doc 1269   Filed 12/28/22   Entered 12/28/22 14:09:15   Page 261 of
452

**JAMS ARBITRATION NO. 1425025643**

BOIES SCHILLER FLEXNER, LLP,

        Claimant,

    -against-

MILES KWOK, a/k/a GUO WENGUI,

        Respondent.

**FINAL ARBITRATION AWARD**

      The Arbitrator, having conducted an evidentiary hearing on May 25 and 26, 2018,
having heard post-hearing oral argument on August 9, 2018, having entered a Partial Arbitration
Award on September 7, 2018, and having received a subsequent written submission concerning
unpaid interest dated September 14, 2018, hereby enters this Final Arbitration Award:

I.    Introduction

      This proceeding is brought to recover unpaid legal fees. Claimant Boies Schiller
Flexner LLP ("Boies Schiller") seeks to apply a $500.000 retainer and recover the additional
sum of $563,133.83, plus interest. Respondent Miles Kwok, a/k/a "Guo Wengui" ("Kwok"),
denies that he is liable for any unpaid fees. In a counterclaim, Kwok further seeks to recover the
retainer, as well as the costs and fees that he has incurred in connection with this arbitration. For
the reasons set forth below, the Arbitrator finds in favor of Boies Schiller and against Kwok in
the amount of $626,686.44, plus interest on the unpaid bills from September 8, 2018, through the
date of payment at the rate of one percent per month, compounded monthly. Additionally,
Kwok's counterclaim and any other relief sought by either party are denied.

The relationship between Boies Schiller and Kwok evidently began in or around 2015, when Kwok retained the firm to bring suit on his behalf in a state court matter captioned Ace Decade Holdings Limited v. UBS AG ("UBS"). Boies Schiller billed Kwok approximately $1.5 million for that case and was paid in full.

Thereafter, Kwok retained Boies Schiller to defend him in connection with three additional matters: Pacific Alliance Asia Opportunity Fund L.P. v. Kwok ("PAX"); Beijing Zhong Xian Wei Ye Stainless Decoration Center v. Guo ("Beijing"); and HNA Group Co. Ltd. v. Wengui ("HNA") (collectively, the "Three Initial Matters"). This engagement was memorialized in a letter from Joshua Schiller ("Schiller") to Kwok, dated June 23, 2017, that Kwok countersigned ("Engagement Letter").

The Engagement Letter contained several key terms. First, the Engagement Letter stated that Boies Schiller was being retained only for the Three Initial Matters "and such other matters as [Kwok] and [Boies Schiller] may agree in the future in writing." Second, the Engagement Letter provided that its terms "may only be amended pursuant to a further written document signed by both [Kwok] and [Boies Schiller]." Third, pursuant to the Engagement Letter, Boies Schiller agreed to bill Kwok monthly, and Kwok agreed to "review [Boies Schiller's] invoices carefully upon presentation and notify [Boies Schiller] in writing within twenty (20) business days if [Kwok] ha[d] any questions or concerns regarding an invoice." If Kwok failed to raise questions or concerns within that period, the invoice would be "deemed conclusively binding, acceptable, fair and reasonable." If concerns were raised, the Engagement Letter assured Kwok that Boies Schiller would "endeavor to respond promptly to those concerns." Fourth, the Engagement Letter provided that there would be a late payment "fee of 1% per month, compounded monthly," "charged on all sums that are not paid within thirty (30)

2

days after presentation of an invoice." Fifth, Kwok agreed to provide an initial retainer in the amount of $500,000, and that if he failed to pay an invoice within thirty days, Boies Schiller could "in its sole discretion pay the invoice using [that] . . . [a]mount."

The Engagement Letter also contained a provision regarding arbitration, which stated that (except in circumstances not relevant here) any disputes between Kwok and Boies Schiller "arising from or relating to the Engagement" "shall be finally settled by binding confidential arbitration under the JAMS Comprehensive Arbitration Rules and Procedures in force at the time such arbitration is commenced" ("JAMS Rules").

After the Engagement Letter was signed, Boies Schiller also provided legal services to Kwok in connection with two further state court matters: Fan Bingbing v. Kwok ("Bingbing") and Rui Ma v. Kwok ("Rui Ma") (together, the "Two Additional Matters"). The parties did not enter into a separate engagement letter with respect to the Two Additional Matters. Boies Schiller contends – and Kwok denies – that these matters nevertheless are governed by the terms of the original Engagement Letter.

Kwok twice protested Boies Schiller's invoices in writing over the course of the firm's representation of him. On August 27, 2017, Fiona Yu ("Yu"), an attorney in Hong Kong who serves as the director of compliance and legal for certain of Kwok's companies, sent Schiller an email objecting to the amounts the firm had billed during June and July in connection with the Three Initial Matters. Subsequently, on December 18, 2017, Yvette Wong, Kwok's chief of staff, sent Schiller an email alleging that numerous "problems" with the firm's billing were being audited,[1] but no such audit was ever produced.

---

[1]     Those problems were identified as: "Excessive time to complete one same task;" "Excessive staffing;" "Not enough delegation" of ministerial tasks; "Double-billing;" and lack of communication, with Kwok simply receiving a bill after the work was done.

In early September 2017, Kwok transferred the Beijing matter to another firm. He kept the other four cases with Boies Schiller until early December 2017, when he terminated his relationship with the firm. This arbitration ensued.

II.     Procedural History

Boies Schiller filed its Demand for Arbitration and Statement of Claim on January 23, 2018. Thereafter, on or about February 28, 2018, Kwok filed his Response to the Demand and Statement of Counterclaim.

On April 10, 2018, the Arbitrator held a preliminary conference, the results of which were memorialized in a Report of Preliminary Conference and Scheduling Order No. 1 ("Order No. 1"). Order No. 1 provided for the hearing to be held at JAMS on June 6 and 7, 2018, but the hearing subsequently was adjourned to June 25 and 26, 2018.

Five witnesses testified at the hearing: Kwok; David Boies ("Boies") the chairman of Boies Schiller; Kathleen Sloane ("Sloane"), a real estate broker who had prior dealings with both Boies and Kwok; Schiller, a partner at Boies Schiller; and Linda Jinks-Carlson ("Carlson"), Boies' administrative assistant. Boies Schiller called Kwok and Boies; Kwok called Sloane, Schiller, and Carlson.

Following the hearing, both sides submitted post-hearing briefs on July 27, 2018, and reply briefs on August 6, 2018. Thereafter, the Arbitrator heard argument on August 9, 2018.

Order No. 1 provided that the Arbitrator would issue only a "bottom line" award. Kwok's counsel subsequently expressed a preference for a reasoned award. The parties ultimately agreed that the Arbitrator would issue a "brief reasoned decision" to explain the basis

4

for the award, with "brevity in the discretion of the [Arbitrator]."[2]  On September 7, 2018, the

Arbitrator entered a Partial Arbitration Award that constituted that decision.  The award was a

partial award because the Arbitrator was uncertain about Boies Schiller's interest calculations.

For that reason, the Partial Arbitration Award directed the parties to confer by September 14,

2018, in an effort to agree as to the amount of interest owed through September 7, 2018.  The

Partial Arbitration Award further directed the parties to submit letters by September 21, 2018, if

they were unable to agree with respect to the interest owed.

On September 14, 2018, Boies Schiller submitted its interest calculations.  In its

cover letter, Boies Schiller's counsel noted that they had attempted to schedule a meet and confer

with Kwok's counsel, who had informed them that he did not have authority from his client to

engage in those discussions.  Since then, Kwok has made no further submission.  Accordingly,

the interest awarded through September 7, 2018, in this Final Arbitration Award is based on

Boies Schiller's submission.

While I may not have discussed every argument advanced by Kwok in this Final

Arbitration Award, I have considered them all.  Any argument not specifically addressed is

rejected as baseless.

III.    Findings of Fact and Conclusions of Law

A.    Arbitrability

As noted above, in addition to the Three Initial Matters, Boies Schiller seeks to

recover legal fees for the Two Additional Matters.  Kwok contends that the fees owed for these

matters, if any, cannot be decided as part of this proceeding because there is no signed writing

evidencing his intention to be bound by the Engagement Letter with respect to them.  Kwok

---

[2]    Under Rule 24(h) of the JAMS Rules, an award must "consist of a written statement signed by the Arbitrator regarding the disposition of each claim and the relief, if any, as to each claim.  Unless all [p]arties agree otherwise, the [a]ward shall also contain a concise written statement of the reasons for the [a]ward."

5

FILED: NEW YORK COUNTY CLERK 04/24/2019 04:20 PM
INDEX NO. 150001/2019
NYSCEF DOC. NO. 6
RECEIVED NYSCEF: 04/24/2019

Case 22-50073   Doc 1269   Filed 12/28/22   Entered 12/28/22 14:09:15   Page 266 of
452

further maintains that Boies Schiller cannot recover its fees for services rendered in connection with the Two Additional Matters in this arbitration on a quantum meruit basis because he never signed a writing agreeing to resolve any disputes regarding those matters through a JAMS arbitration.

Contrary to these assertions, the Engagement Letter defines the "Engagement" as the Three Additional Matters and "such other matters" as Boies Schiller and Kwok "may agree in the future in writing." There is no requirement that such other matters become part of the Engagement only by means of a signed writing. Here, there is ample written evidence that both parties intended that the Two Additional Matters would become part of the Engagement. Among other things, on September 29, 2017, Schiller sent Kwok and others in Kwok's employ a supplemental legal hold memorandum, in which he noted that Kwok "has retained the law firm of Boies Schiller Flexner LLP to defend him in connection with [four] lawsuits": PAX, HNA, Bingbing, and Rui Ma. This memorandum alone is sufficient to satisfy the requirement that any addition of matters to the scope of the Engagement be evidenced by a writing.[3]

Moreover, the portion of the Engagement Letter requiring that any modification of its terms be evidenced by a "further written document signed by both [Kwok] and [Boies Schiller]" plainly is inapplicable. Boies Schiller is not seeking to modify the terms of the Engagement Letter. Instead, Boies Schiller is merely seeking to apply the terms of the Engagement Letter to two additional matters. This does not constitute an amendment of the Engagement Letter requiring a signed writing.

---

[3]     There are also other writings. For example, on September 16, 2017, Mei Kwok ("Mei"), Kwok's daughter, sent a Boies Schiller attorney an email, in which she reported that she had "most of the things" that were being requested in connection with the Rui Ma matter and urged the attorney to "get our justice, my fat[he]r's justice." Additionally, on October 6, 2017, Mei sent Schiller the summons and complaint in the Bingbing matter.

6

The Arbitrator therefore has jurisdiction over the parties' contractual fee dispute
with respect to all five matters, rendering any claim of quantum meruit irrelevant.

B.    Other Defenses

Kwok asserts several other alleged defenses to Boies Schiller's claimed
entitlement to recover fees, only one of which partially withstands scrutiny.

1.    Fraudulent Inducement

First, Kwok contends, in effect, that he was fraudulently induced to retain Boies
Schiller and pay an initial $500,000 retainer because Boies falsely stated that he personally
would serve as lead counsel. During his testimony, Boies flatly rejected the assertion that he had
made such a commitment. He further testified that when he agrees to serve as lead counsel, Boies
Schiller clients must pay a non-refundable amount, which generally ranges from $1 million to
$15 million. Here, there is no provision in the Engagement Letter calling for the payment of
such a non-refundable fee.

Moreover, to the extent there is a dispute between Kwok and Boies, the evidence
overwhelmingly supports Boies' testimony. Thus, the Engagement Letter was signed by
Schiller, rather than Boies, and Schiller served as the lead attorney in connection with all five
matters. Kwok obviously also knew (or should have known), based upon his review of the Boies
Schiller invoices, that Boies was billing no time to his matters. Indeed, as Kwok himself notes,
there are "only three entries" in which someone at Boies Schiller recorded time spent discussing
Kwok's cases with Boies.

Tellingly, there is not a shred of written evidence that Kwok based his retainer of
Boies Schiller with respect to any of the five matters on an express representation by Boies that
he – rather than Schiller – would serve as lead counsel. Indeed, the written evidence suggests the

opposite. As set forth in further detail below, over the course of Kwok's dealings with Boies Schiller, his staff sent only two emails objecting to Boies Schiller's bills. Neither email raised Boies' failure to bill any time to Kwok's matters as a concern.

In sum, while I have little doubt that Kwok hoped Boies would be heavily involved in his cases, there is no credible evidence that Boies ever made that commitment, or that Kwok's decision to retain the firm for the Three Initial Matters and the Two Additional Matters hinged on Boies' agreement that he would be the lead attorney representing Kwok.

2.     Schiller's Continued Involvement

Although Kwok testified that he did not want Schiller handling his matters, he never sent Boies Schiller a written objection to Schiller's time entries. Kwok nonetheless maintains that both he and Sloane verbally conveyed his concerns about Schiller's continued representation of him to Boies Schiller.

The credible evidence establishes that the first such complaint was communicated in the fall of 2017 by Sloane, who telephoned Carlson while Boies was traveling. This was near the end of the relationship between Boies Schiller and Kwok. Boies testified that he learned of Sloane's call in November. Thereafter, he and Kwok discussed Kwok's request that Schiller no longer serve as lead counsel on his matters. Boies Schiller previously had substituted Schiller for a Mandarin-speaking attorney at Kwok's request. Boies told Kwok that Schiller was an excellent lawyer, and that the firm could not continue to change the lawyers assigned to Kwok's matters. Boies also invited Kwok to transfer his remaining matters to another firm if he did not want to work with Schiller, and indicated that Boies Schiller would cooperate with that process. Kwok apparently decided to terminate his relationship with Boies Schiller shortly after this conversation.

8

Kwok contends that he communicated his desire not to have Schiller represent him much earlier than October or November 2017. It is undisputed, however, that Kwok invited Schiller (and Boies) to a dinner at his apartment in October 2017 to celebrate a victory in connection with PAX. In addition, Kwok met with Schiller at his apartment twice over the Labor Day weekend in 2017 to discuss several of Kwok's cases. If Kwok truly was unhappy with Schiller by then, he presumably would not have arranged to meet with him on those occasions.

Based upon this evidence, I find that Kwok did not affirmatively request that someone other than Schiller handle his matters until late October 2017 at the earliest. Shortly thereafter, in or around early December, Kwok terminated Boies Schiller. At no time, however, did Kwok object in writing to Schiller's billing of time on his matters. He therefore has waived his right to object to the Boies Schiller invoices based on Schiller's participation in his defense.

3.    Block-Billing

Third, during the hearing, Kwok testified that he had objected to Boies Schiller's practice of block-billing its time. Although the subject of block-billing was not raised in either Yu's August 17 or Wong's December 18 email, Kwok testified that he protested that practice in a discussion with Schiller, and that the invoices he received in connection with the five matters giving rise to Boies Schiller's claim differed markedly from those that he had earlier received in connection with the UBS matter. In fact, as even a cursory review shows, the invoices in both UBS and the subsequent matters reflect block-billing. Additionally, neither the Yu nor the Wong email contains so much as a syllable protesting Boies Schiller's practice of block-billing its time spent on Kwok's matters. I therefore find that Kwok's complaint about block-billing is an

9

FILED: NEW YORK COUNTY CLERK 04/24/2019 04:20 PM
INDEX NO. 150001/2019
NYSCEF DOC. NO. 6
RECEIVED NYSCEF: 04/24/2019

Case 22-50073    Doc 1269    Filed 12/28/22    Entered 12/28/22 14:09:15    Page 270 of
452

afterthought, which he has in any event waived by failing to interpose a timely written objection.[4]

### 4.    Other Billing Objections

Finally, Kwok notes that he did interpose written objections to certain of Boies Schiller's invoices for services rendered.[5]  As noted above, the first such objection took the form of an email from Fiona Yu ("Yu") to Schiller dated August 17, 2017.  In response, in an email later the same day, Schiller stated that he would reduce Boies Schiller's July invoice by $50,000 as a "courtesy."[6]  In that email, Schiller also suggested that Kwok might want to use other lawyers for his cases "in order to reduce the costs of . . . litigation."  He further indicated that it would be helpful to receive some instruction with respect to a budget and Kwok's expectations as to the level of work that the firm should perform.  Although Kwok subsequently transferred the Beijing case to another firm, he voiced no further protest concerning the June/July 2017 bills in response to Schiller's email, and neither he nor Yu provided or requested a budget for the four remaining matters.  Having failed to interpose any further timely objection concerning the invoices referenced in the August 17 email, Kwok has waived his right to challenge the time charges now.

---

[4]    Kwok notes that judges frequently criticize the practice of block-billing when presented with fee applications.  Those cases, however, typically arise when a party seeks a fee award pursuant to a statute or rule.  Kwok has not cited a single case in which the tender of block bills to a firm's client was found to be improper.  In fact, as I noted in In re Terrorist Attacks on September 11, 2011, No. 03 MDL 1570 (GBD) (FM), 2015 WL 6666703, at *1 (S.D.N.Y. Oct. 28, 2015), Report & Rec. adopted 2015 WL 9255560 (S.D.N.Y. Dec. 18, 2015), "the practice of block billing . . . may make sense when the only intended reviewer [of the bills] is the firm's client."  Boies testified that his firm does engage in task-based billing upon request, but that Kwok never made such a request.  To the extent that there is a dispute between Kwok and Boies in this regard, I credit Boies' testimony.

[5]    Kwok contends that his failure to protest more of the bills is attributable to Chinese cultural values that stress the importance of enabling a business counterpart to save "face."  Such cultural values clearly cannot trump the Engagement Letter's requirement that any objection to a bill be set forth in a timely writing.

[6]    That month, Boies Schiller billed Kwok approximately $190,000 for the PAX matter and $4,000 for the Beijing matter.

10

FILED: NEW YORK COUNTY CLERK 04/24/2019 04:20 PM

NYSCEF DOC. NO. 6

INDEX NO. 150001/2019

RECEIVED NYSCEF: 04/24/2019

Case 22-50073   Doc 1269   Filed 12/28/22   Entered 12/28/22 14:09:15   Page 271 of
452

The second set of objections was set forth in Wong's email dated December 18, 2017. In that email, Wong represented that "numerous "problems" with the firm's billing were being audited, but it appears that no such audit ever was conducted. By virtue of the Engagement Letter's twenty-day protest period, Wong's December objections could only apply to Boies Schiller's October and November bills.[7]

C.     Reasonableness of the Boies Schiller Invoices

Boies Schiller's invoices for the Three Initial and Two Additional Matters (including disbursements) total $1,063,133.83  Although Boies Schiller evidently has not applied its retainer against that amount, it is undisputed that $500,000 is available for that purpose. Accordingly, in Boies Schiller's view, the amount that remains outstanding after applying the retainer is $563,133.83, plus interest. Boies Schiller, however, gave Kwok a $50,000 credit in August 2017. Although Boies Schiller contends that Kwok is no longer entitled to that accommodation because he failed to pay the June and July invoices after Schiller granted it, there is no indication that the adjustment was contingent on prompt payment. Accordingly, the principal amount that in fact remains unpaid after applying the retainer is $513,133.83.

Kwok contends that Boies Schiller is not entitled to recover $513,133.83, much less $1,063,133.83, because the Boies Schiller invoices are unreasonable.[8]  According to Kwok, a twenty percent haircut is appropriate to account for numerous billing problems, including (but not limited to) excessive time billed for certain tasks, needless duplication of effort, the failure to have simpler work performed by timekeepers with lower billing rates, and hours that were billed under existing matter numbers before new matters were opened. What Kwok fails to accept is

---

[7]     During those months, the time charges for the PAX, Bingbing, HNA, and Rui Ma matters totaled $148,150.

[8]     Kwok does not challenge the reasonableness of the hourly rates of the Boies Schiller timekeepers.

11

that the Engagement Letter required him to raise such concerns in writing within twenty days of his receipt of an invoice. He did not do so with respect to most of Boies Schiller's bills.

Any concerns raised by Yu with respect to of the June and July 2017 invoices were more than adequately addressed by Schiller's $50,000 reduction of the July invoices. Additionally, although Wong raised certain concerns in general terms in her December 2017 email to Schiller, my review of the October and November invoices fails to confirm her allegations of billing irregularities. It also bears mention that, by December, Kwok was waging war on many fronts since he was involved in numerous suits beyond those that are the subject of this proceeding and (perhaps justifiably) considered himself the victim of a litigation onslaught by the People's Republic of China. As a result, Kwok himself chose to pursue a scorched earth policy with respect to at least one of the cases being handled by Boies Schiller and failed to settle another matter that could have been expeditiously resolved. In light of his strategy of defending each suit aggressively, Kwok can scarcely complain that the October and November bills were too high. Indeed, Kwok knew that Boies Schiller's services would be expensive, since the firm had previously billed him approximately $1.5 million in connection with the UBS matter.

To be sure, the Boies Schiller invoices show that the firm spared no expense in the course of defending Kwok in the lawsuits giving rise to this arbitration. Kwok, however, clearly was given a choice at a relatively early stage: he could continue with a firm of Boies Schiller's calibre or he could transfer his matters to less expensive counsel. Having chosen the first of these options, and having opted to litigate aggressively, Kwok cannot now credibly argue that the Boies Schiller bills were unreasonably large. Moreover, Kwok will receive the benefit of Schiller's $50,000 reduction, which represents a nearly five percent haircut from the original bills.

12

In these circumstances, I find that the remaining amount that Boies Schiller seeks to recover is reasonable.[9]

D.    Counterclaim

In his counterclaim, Kwok advances several reasons why Boies Schiller allegedly is not entitled to recover its fees, most of which have already been addressed. His counterclaim also advances two other theories why the Boies Schiller claims allegedly should be denied – in whole or in part – and he should receive a refund of his $500,000 retainer.

First, Kwok suggests in his counterclaim that any services rendered before he signed the Engagement Letter and delivered the retainer cannot be recovered in this forum because they preceded the effective date of his agreement to arbitrate. In his post-trial briefing, Kwok appears to have abandoned this argument. Kwok himself also testified that he would have been "more than happy" to pay for work occurring before he sent Boies Schiller the retainer, provided that the invoices were "correct and accurate." Suffice it to say, even if Kwok had objected to the time entries predating the signing of the Engagement Letter, there is not a scintilla of evidence that the invoices tendered to him for that period inaccurately reflected the Boies Schiller's timekeepers' actual time or were unreasonable. His current protests concerning the time expended before he signed the Engagement Letter therefore are not a basis for a set off.

Second, Kwok contends that Schiller engaged in certain boorish behavior. Perhaps the most egregious example was an incident in late December 2017 when Schiller

---

[9]    Kwok also complains about Boies Schiller's time charges for transitional services in December 2018. Even if he had reduced that complaint to a timely writing, as the Engagement Letter required, the invoices in question make clear that the firm did not churn the time that it expended after learning that the four remaining matters would be moved elsewhere.

In addition, Kwok challenges Boies Schiller's disbursements because the firm failed to provide receipts for the sums sought. The disbursements are relatively modest and appear to have been incurred in the ordinary course of the firm's representation of Kwok. Moreover, there is no indication that Kwok ever requested any supporting documentation. For these reasons, the request to disallow Boies Schiller's expenses lacks merit.

13

participated by telephone in a meeting attended by Boies, Kwok, and others. During that

meeting, Schiller made some intemperate remarks because he did not realize that he was on a

speakerphone. He also is alleged to have acted unprofessionally by placing a series of repeated

phone calls to Sloane. These are not Kwok's only allegations concerning Schiller's allegedly

unprofessional conduct. Although the impropriety of the speakerphone incident is essentially

conceded, during his testimony Schiller disputed Kwok's allegations regarding the other alleged

misbehavior. There is no need to make findings as to whether those other incidents took place

because, even if they did, Kwok has cited no authority, nor am I aware of any, which would

suggest that they provide a basis for Kwok to avoid the payment of fees for services that by and

large were rendered before the alleged misconduct is said to have occurred.

E.    Interest

In its post-hearing briefing, Boies Schiller provided an interest calculation based

upon its recovery of the full amount of its bills. Kwok argues that any interest on the unpaid bills

should be reduced because Boies Schiller could have applied the $500,000 retainer against the

past due bills. Pursuant to the Engagement Letter, however, Boies Schiller had the "sole

discretion" to determine whether to pay an invoice using Kwok's retainer. Here, particularly

because Kwok contends that he owes Boies Schiller no money for its services, it clearly was not

an abuse of discretion for the firm to refrain from applying the retainer against the bills until

Kwok's counterclaim could be resolved.

The Engagement Letter authorizes Boies Schiller to recover interest on all fees

not paid within thirty days after presentation of an invoice at the rate of one percent per month,

compounded monthly. In its initial post-hearing submissions, Boies Schiller presumably

calculated the interest owed with respect to each unpaid invoice on that basis. Those

14

FILED: NEW YORK COUNTY CLERK 04/24/2019 04:20 PM
INDEX NO. 150001/2019
NYSCEF DOC. NO. 6
RECEIVED NYSCEF: 04/24/2019

Case 22-50073    Doc 1269    Filed 12/28/22    Entered 12/28/22 14:09:15    Page 275 of
452

calculations, however, did not address the amount that Kwok would owe for interest after giving

him the benefit of a $50,000 credit against the July invoices. Accordingly, I directed the parties

to confer by September 14, 2018, in an effort to agree with respect to any required adjustments,

failing which they were to submit letters explaining the basis for their calculations by September

21, 2018. As noted above, Boies Schiller made such a further submission, but Kwok declined to

confer with Boies Schiller's counsel about, and has not set forth its position regarding, the

calculation of back interest.

Having reviewed Boies Schiller's letter dated September 14, 2018, and the

accompanying spreadsheet, I conclude that Boies Schiller is entitled to recover interest in the

amount of $113,552.61 through September 7, 2018, and additional interest from that date

forward at the rate of one percent per month, compounded monthly.

F.    Arbitration Costs

In their papers, both sides seek to be awarded the costs of this arbitration. JAMS

Rule 31(a) provides that "[e]ach Party shall pay its pro rata share of JAMS fees and expenses,

unless the Parties agree on a different allocation of fees and expenses." Rule 24(c), however,

allows an arbitrator subsequently to allocate arbitration fees and arbitrator compensation and

expenses, "unless such an allocation is expressly prohibited by the Parties' Agreement." Here,

the engagement letter contains no such prohibition. Nevertheless, in the exercise of discretion,

the Arbitrator declines to allocate the costs of this arbitration in any manner other than an even

split between Boies Schiller and Kwok.

FILED: NEW YORK COUNTY CLERK 04/24/2019 04:20 PM
NYSCEF DOC. NO. 6
INDEX NO. 150001/2019
RECEIVED NYSCEF: 04/24/2019

Case 22-50073    Doc 1269    Filed 12/28/22    Entered 12/28/22 14:09:15    Page 276 of
452

IV.    Award

For the foregoing reasons: (A) Boies Schiller may apply Kwok's $500,000

retainer against his unpaid legal bills; (B) Boies Schiller is entitled to an additional award of

$626,686.44, consisting of $513,133.83 in unpaid legal fees and an additional $113,552.61 in

interest on each of Kwok's unpaid bills through September 7, 2018; (C) Boies Schiller is further

entitled to recover interest on each of Kwok's unpaid bills from September 8, 2018, through the

date of payment at the rate of one percent per month, compounded monthly; and (D) Kwok's

counterclaim and any further relief sought by either party are denied

SO ORDERED.

Dated:    New York, New York
October 6, 2018

Frank Maas
Arbitrator

# SERVICE LIST

**Case Name:** Boies Schiller Flexner, LLP vs. Kwok, Miles aka Guo Wengui

**Reference #:** 1425025643

**Panelist:** Maas, Frank ,

**Hear Type:** Arbitration

**Case Type:** Business/Commercial

---

### Pamela Jarvis

Joseph Hage Aaronson LLC

Pamela Jarvis
485 Lexington Ave.
30th Floor
New York, NY 10017
pjarvis@jha.com

Claimant
Phone: 212-407-1200
Fax: 212-407-1299

**Party Represented:**
Boies Schiller & Flexner LLP

### Gregory P. Joseph

Joseph Hage Aaronson LLC

Gregory P. Joseph
485 Lexington Ave.
30th Floor
New York, NY 10017
gjoseph@jha.com

Claimant
Phone: 212-407-1200
Fax: 212-407-1299

**Party Represented:**
Boies Schiller & Flexner LLP

### Benjamin Margulis

Boies Schiller & Flexner LLP

Benjamin Margulis
575 Lexington Ave.
7th Floor
New York, NY 10022-6102
BMargulis@BSFLLP.com

Claimant
Phone: 212-446-2300
Fax: 212-446-2350

**Party Represented:**
Boies Schiller & Flexner LLP

### Aaron A. Mitchell

Cohen & Howard LLP

Aaron A. Mitchell
766 Shrewsbury Avenue
Suite 301
Tinton Falls, NJ 07724
amitchell@cohenandhoward.com

Respondent
Phone: 732-747-5202

**Party Represented:**
Kwok, Miles aka Guo Wengui

### Joshua Irwin Schiller

Boies Schiller & Flexner LLP

Joshua Irwin Schiller
575 Lexington Ave.
7th Floor
New York, NY 10022-6102
jischiller@bsfllp.com
Assistant's Emails: BMargulis@BSFLLP.com

Claimant
Phone: 212-446-2300
Fax: 212-446-2350

**Party Represented:**
Boies Schiller & Flexner LLP

### Courtney Solomon

Joseph Hage Aaronson LLC

Courtney Solomon
485 Lexington Ave.
30th Floor
New York, NY 10017
csolomon@jha.com

Claimant
Phone: 212-407-1200
Fax: 212-407-1299

**Party Represented:**
Boies Schiller & Flexner LLP

FILED: NEW YORK COUNTY CLERK 04/24/2019 04:20 PM

INDEX NO. 150001/2019

NYSCEF DOC. NO. 6

RECEIVED NYSCEF: 04/24/2019

Case 22-50073    Doc 1269    Filed 12/28/22    Entered 12/28/22 14:09:15    Page 278 of
452

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Boies Schiller Flexner, LLP vs. Kwok, Miles aka Guo Wengui
Reference No. 1425025643

I, Kristen Maccubbin, not a party to the within action, hereby declare that on  November 9, 2018, I

served the attached Final Award on the parties in the within action by Email and by depositing true copies

thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at New York,

NEW YORK, addressed as follows:

Mr. Joshua Irwin Schiller
Benjamin Margulis Esq.
Boies Schiller & Flexner LLP
575 Lexington Ave.
7th Floor
New York, NY   10022-6102
Phone: 212-446-2300
jischiller@bsfllp.com
BMargulis@BSFLLP.com
 Parties Represented:
 Boies Schiller & Flexner LLP

Gregory P. Joseph Esq.
Pamela Jarvis Esq.
Courtney Solomon Esq.
Joseph Hage Aaronson LLC
485 Lexington Ave.
30th Floor
New York, NY   10017
Phone: 212-407-1200
gjoseph@jha.com
pjarvis@jha.com
csolomon@jha.com
 Parties Represented:
 Boies Schiller & Flexner LLP

Aaron A. Mitchell Esq.
Cohen & Howard LLP
766 Shrewsbury Avenue
Suite 301
Tinton Falls, NJ   07724
Phone: 732-747-5202
amitchell@cohenandhoward.com
 Parties Represented:
 Kwok, Miles aka Guo Wengui

I declare under penalty of perjury the foregoing to be true and correct. Executed at New York, NEW

YORK on  November 9, 2018.

Kristen Maccubbin
kmaccubbin@jamsadr.com

**Exhibit 15**

CASE NO. _____2022-50073_____

IN RE: Ho Wan Kwok

VS. _____

Trustee   EXHIBIT _____15_____

DATE _____ IDEN.

DATE _11/17/2022_____ EVID.

BY _P.E._____

Deputy Clerk

AO 386

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------x

ACE DECADE HOLDINGS LIMITED,                    :

                                            :

                    Plaintiff,    :   Index No. 653316/2015 (Bransten, J.)

                                            :

        -v.-              :   Motion Sequence No. 001

                                            :

UBS AG,                                         :

                                            :

              Defendant.   :

------------------------------------------------------------------x

**AFFIDAVIT OF KWOK HO WAN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**

KWOK HO WAN being duly sworn, hereby deposes and says:

1.      I am the employer of Yong Yu, the Director and sole shareholder of Ace Decade

Holdings Limited ("Ace Decade").

2.      I make this Affidavit based upon my personal knowledge.

3.      I first began having discussions with UBS AG ("UBS") about potential

investments in 2010.  I have been a client of UBS since July 2012.

4.      My main contact person at UBS has been Stephen Wong, who is a Managing

Director of the Wealth Management and Swiss Bank Department at UBS.

5.      I met Mr. Wong in May 2010.  Since that time, Mr. Wong has advised me on

numerous matters relating to investments and financing on projects such as aircraft acquisitions.

Over the years, I have depended and relied upon Mr. Wong's and UBS's knowledge and

expertise in making investment and financing decisions.

6.       In addition, I have had an account at UBS since July 2012 for an investment

vehicle that I control.  Since then, I have opened other accounts at UBS for two other investment

vehicles that I control and have obtained financing from UBS for two airplanes.

7.       In early to mid-2014, I began discussions with UBS regarding an investment

opportunity (the "Investment") in an upcoming placement of H-shares (the "Shares") of Haitong

Securities Co., Ltd. ("Haitong").

8.       From 2014, when I first began discussions with UBS, to May 13, 2015, when

Ms. Yu and I authorized the final payment of HK $2 billion (approximately US $260 million) to

enter into this Investment, Mr. Wong and I communicated frequently through telephone calls, in-

person meetings, and electronic messages.  Throughout this period, including after January 9,

2015 when I moved to New York, Mr. Wong made numerous misrepresentations, which I relied

upon in deciding to make this Investment.

9.       UBS was a joint global coordinator and placement agent for the Shares, and held

itself out as knowledgeable and experienced in providing advice on this Investment.

10.       At the outset, Mr. Wong assured me that if UBS got my business, it would protect

my interests and provide the best possible terms for a loan to finance part of the Investment.

Mr. Wong told me that because of the size of the Investment that I was planning to make, senior

executives from UBS globally would participate in structuring the deal.  Mr. Wong told me that

he would serve as my personal contact and as UBS's representative throughout the Investment

but that he would be acting under the instructions of senior executives from UBS offices in the

United States, Switzerland, England, and Hong Kong.

11.      Based on these representations that senior executives at UBS globally would be involved in structuring and overseeing this Investment and that UBS would act in my best interests, I entrusted UBS to act as my advisor for the Investment.

12.      I have read Mr. Wong's affirmation submitted in support of UBS's motion to dismiss Ace Decade's complaint.  In it, he affirmed under penalty of perjury that "[t]he first time I heard of Ace Decade was when I learned of this lawsuit in October 2015."  (Affirmation of Stephen Wong ¶ 3.)  I was astonished when I read this statement because it is false.  To the contrary, Mr. Wong and UBS not only had previously heard of Ace Decade, but also they were the ones who advised me on which of my employees to appoint as sole shareholder and Director of Ace Decade, to utilize Ace Decade to enter into a side agreement with an intermediary entity that would hold legal title to the Shares, and how best to transfer the funds necessary for the Investment from one of my UBS accounts to the Ace Decade account.  In sum, Mr. Wong and UBS knew that the ultimate investor in the Investment was Ace Decade.

13.      UBS advised that because the planned Investment comprised greater than 5% of the outstanding H-shares of Haitong, if I invested through Ace Decade directly, applicable disclosure requirements would require certain filings.

14.      UBS advised that if I invested through an intermediary entity, with the intermediary entity holding legal title to the Shares, no such disclosure would be required.

15.      UBS recommended that I select Haixia Huifu Asset Investment and Fund Management Co., Ltd. ("Haixia") as the intermediary for the Investment.  UBS said that it recommended Haixia because Haixia was best qualified to act for Ace Decade.  UBS further stated that Haixia was independent of UBS and would protect my and Ace Decade's interests. Relying on these representations, I selected Haixia as the intermediary for the Investment.

16.     At no time did UBS disclose that Haixia was controlled by its joint venture partner, State Development & Investment Corp. ("SDIC").  Nor did UBS disclose that Lu Bo, who served as the principal contact between UBS and Haixia, was previously the CFO of the joint venture between UBS and SDIC.  I did not become aware of Haixia's close relationship with UBS until July 21, 2015 (after Ace Decade had made the Investment and after UBS had liquidated the Shares), when Mr. Wong disclosed that relationship during a telephone call, which I took from my office in New York.

17.     Mr. Wong initially said that if we chose Haixia as the intermediary to make the Investment, we would not need to undergo Haixia's Know Your Customer ("KYC") process. However, he later said that we needed to prepare some paperwork to undergo a background examination for Haixia, but he did not explain if this paperwork was for Haixia's KYC process. Mr. Wong asked to review the resumes of some of my employees to assess whose background would most likely satisfy Haixia's requirements so that such employee could be appointed as the Director and sole shareholder of Ace Decade.  He reviewed these resumes and advised that Ms. Yu's resume and background was best suited to satisfy Haixia's requirements and thus, that I should appoint Ms. Yu as the Director and sole shareholder of Ace Decade.  Mr. Wong said that he would provide comments on Ms. Yu's resume and asked her to send it to him.  (*See* Ace Decade Exhibits 3 and 4.)

18.     Mr. Wong subsequently gave comments on Ms. Yu's resume to make it more likely to satisfy Haixia's requirements.

19.     Mr. Wong and I also discussed on multiple occasions potential financing for the Investment.  Mr. Wong stated that Ace Decade should obtain financing for part of the Investment

through UBS rather than another bank because UBS would handle the financing on the most favorable terms to Ace Decade.

20.     During discussions about the loan financing, I told Mr. Wong that Ace Decade would not make the Investment unless the loan documents did not include any provisions that would permit UBS to demand repayment of the loan (a "margin call") based on short term price fluctuations of the Shares and unless UBS represented that it would provide Ace Decade with adequate time (for example, five business days to pay the first 25%, 10 business days to pay the second 25%, and 20 business days to pay the remaining 50%) to meet any margin calls.

21.     Mr. Wong stated on more than one occasion in 2014 that the loan financing documents would be consistent with my requirements, specifically that there was no repayment or margin call trigger based on short term price fluctuations.

22.     Mr. Wong also stated on several occasions in 2014 and 2015 that UBS would work with Ace Decade to allow it to meet any margin calls and UBS would not sell any of the Shares as a result of any margin call without giving Ace Decade adequate time.

23.     Mr. Wong also stated numerous times in 2014 and 2015 that UBS had made a loan to a large shareholder of Ping An Insurance Group ("Ping An"). Mr. Wong explained that the Ping An shareholder's loan was substantially larger than Ace Decade's, but that UBS had never sold off any of the shares owned by that shareholder following a margin call. Mr. Wong stated that when a margin call had been triggered, UBS had worked with the Ping An shareholder to resolve the situation without selling any of his shares. Mr. Wong said repeatedly that UBS would give Ace Decade the same treatment as it gave to the Ping An shareholder and would work cooperatively to allow Ace Decade to meet any margin calls but in any event would not sell the Shares following a margin call without giving Ace Decade adequate time.

24.    Throughout our discussions about the Investment, Mr. Wong repeatedly stated that I could trust him and UBS, and that he and UBS were always working in my best interests.

25.    On December 14, 2014, while discussing the Investment, Mr. Wong told me in a message on WhatsApp (a mobile messaging application for smart phones):  "Once I've promised General Manager Guo, I'll definitely make utmost efforts; I'm only hoping General Manager Guo will trust me."  Later that day, he told me in another message:  "I have no reason not to strive for the best for General Manager Guo!"  (General Manager Guo is what Mr. Wong called me.)

26.    Also on December 14, 2014, Mr. Wong left me a voice message, stating that during the negotiations over the Investment "General Manager Guo's interests must be guaranteed," and that he had involved top UBS management from offices around the world to assist.

27.    On December 15, 2014, Mr. Wong left me a voice message stating that he was working on the terms of the Investment in order to "protect [me]."

28.    On December 19, 2014, Mr. Wong left me a voice message stating:  "General Manager Guo, you can rest absolutely assured, and I will completely protect your interests."

29.    As a result, I believed that Mr. Wong and UBS were acting in Ace Decade's best interests and I trusted that the representations Mr. Wong made about the loan financing documents were true and that UBS would not sell the Shares without working with Ace Decade to allow it to meet any margin calls.

30.    On January 9, 2015, while I was still negotiating the terms of the Investment with UBS, I moved to New York with Ms. Yu and other employees with the intention of expanding my business projects to New York and to find investors interested in investing in Ace Decade.

31.     I first discussed this plan to move to New York to find investors for Ace Decade with Mr. Wong in December 2014.  I subsequently had multiple discussions with Mr. Wong about finding investors for Ace Decade by telephone from New York in March, May, and June 2015.

32.     On February 9, 2015, Ace Decade signed a Memorandum of Understanding (the "MOU"), governed by U.S. law, with China Golden Spring Group (Hong Kong) Limited ("Golden Spring Hong Kong").  The MOU provided that Ace Decade would acquire Haitong Shares and Golden Spring Hong Kong would establish a branch in New York to find investors for projects relating to the Haitong Shares.

33.     In furtherance of the MOU, Golden Spring Hong Kong formed a company called Golden Spring (New York) Ltd. ("Golden Spring New York"), which was incorporated in March 2015 in Delaware and registered to do business in New York.  Golden Spring New York is wholly owned by Golden Spring Hong Kong.

34.     Shortly thereafter, Golden Spring New York signed a lease for part of the 46th Floor of the General Motors Building at 767 Fifth Avenue, New York, NY 10153.  Ms. Yu and I conduct business relating to Ace Decade from our offices at 767 Fifth Avenue.

35.     Not only had I discussed with UBS my plans to move to New York and to operate my business projects out of New York in December 2014, I also asked for UBS's help in setting up my operations in New York.  In March 2015, Mr. Wong and others at UBS, including Agnes Fu and Liz Lam, arranged to transfer funds from one of my accounts at UBS to my personal JPMorgan Chase account in New York.

36.     In April 2015, Mr. Wong, Ms. Fu, and Ms. Lam assisted me with setting up Golden Spring New York by transferring funds from one of my accounts at UBS to Golden Spring New York's JPMorgan Chase bank account in New York.

37.     UBS also submitted reference letters on my behalf in connection with my purchase of an apartment in a New York cooperative building.  In a letter dated February 18, 2015 from Mr. Wong to the building's board of directors, Mr. Wong wrote, "I have known Miles for about five years since he first began working with UBS AG."  (Miles is my English name.) Mr. Wong also stated, "Over the years, Miles has earned his credibility in our bank.  He is very reliable and always fulfills his repayment obligations.  For this reason, our bank is happy to have him as our long-term client."  (Ace Decade Exhibit 1.)

38.     Mr. Wong and Tommy Cheung, also a UBS Managing Director, submitted another reference letter on my behalf to the board of the apartment building on February 23, 2015, stating:  "Kwok Ho Wan has been a client of ours through a personal investment company since July 2012."  (Ace Decade Exhibit 2.)

39.     On March 6, 2015, I purchased an apartment in this building.  I, along with Ms. Yu and other employees and representatives of Ace Decade and Golden Spring New York, have lived in the apartment since the purchase.

40.     During this period of time after I had moved to New York, Mr. Wong and I communicated frequently through telephone calls and voice and instant messages.  Mr. Wong spoke to me by telephone while I was in New York dozens of times and sent numerous electronic messages to me while I was in New York.  Ms. Yu joined me on some of the calls with Mr. Wong.  At a minimum, Mr. Wong spoke to me by telephone while I was in New York on the following dates:

- January 26, 2015 (three calls)

- January 28, 2015 (two calls)

- March 2, 2015

- March 4, 2015 (three calls)

- March 5, 2015

- March 13, 2015

- March 15, 2015

- March 16, 2015 (six calls)

- March 17, 2015 (two calls)

- March 18, 2015 (two calls)

- March 24, 2015

- March 31, 2015

- April 28, 2015 (three calls)

- April 30, 2015 (five calls)

- May 6, 2015 (two calls)

- May 11, 2015 (three calls)

- June 23, 2015 (two calls)

- July 21, 2015

41.     During these calls in 2015, which I participated in from New York, Mr. Wong and I discussed the Investment and the UBS loan on numerous occasions.  On one or more of these calls, Mr. Wong and I also discussed my concerns about the loan, including a margin call trigger based upon the loan-to-value ratio ("LTV ratio"), the size of the loan, the interest rate on

the loan, and the issuance price of the Haitong shares.  Mr. Wong and I also discussed the status of my efforts to seek investors in New York for Ace Decade.

42.    During this period of time in 2015, I did not raise with Mr. Wong again my concerns about repayment triggers conditioned on short term price fluctuations of the Shares because Mr. Wong had previously told me that there were no such triggers.

43.    However, during several of these calls in March, April, and May 2015, Mr. Wong and I discussed the topic of margin calls generally, and specifically the LTV ratio trigger. Mr. Wong said that I did not have to worry because UBS would act in my best interests, that UBS would give Ace Decade adequate time to meet any margin calls, and that UBS would make every effort to work with Ace Decade to allow it to meet any margin calls.  He also reminded me several times during this period that UBS had never sold the shares of the Ping An shareholder following a margin call on its loan, and stated that Ace Decade would receive the same treatment as the Ping An shareholder.

44.    While I was in New York, Mr. Wong also sent me numerous WhatsApp messages about the Investment and the UBS loan.  For example, on March 21 and 22, 2015, Mr. Wong and I exchanged a series of WhatsApp messages in which we discussed the UBS loan for the Investment.  I told Mr. Wong that some of UBS's proposed conditions, such as the margin call trigger based upon the LTV ratio for the UBS loan, were "definitely not okay" and "we would rather not do it than agree to your clauses."  Had I not been relying upon Mr. Wong's prior representations that the loan financing documents did not contain repayment triggers based on short term price fluctuations of the Shares, I would have raised that issue again with Mr. Wong and not focused our discussions solely on the margin call trigger based on the LTV ratio.

45.     Mr. Wong replied that he understood my concerns about potential margin calls,
and told me: "You rest assured!. . . I'm working for General Manager Guo!  Don't worry."  I
relied upon Mr. Wong's representations that he and UBS were looking out for my interests.  All
of these discussions occurred while I was in New York.

46.     On May 8, 2015, Haitong announced that it had obtained the shareholder and
regulatory approvals necessary (in February and May, respectively) to issue the Shares, which
was expected to occur on May 15.  Haitong also announced that because the trading price of
Haitong's shares during the 30 trading days prior had surpassed a pre-agreed threshold, the
subscription price would be increased.

47.     After this announcement, I had several discussions with Mr. Wong, by telephone
and WhatsApp messages, in order to finalize the terms of the Investment.  Among the topics we
discussed were the fact that the loan would have to be increased to reflect the increase in the per
share price of Haitong's shares, the amount of the payment required, the LTV ratio, the interest
rate, and the method by which we should exchange U.S. dollars for the Hong Kong dollars
required for the payment.

48.     During one of our discussions after May 8, Mr. Wong stated yet again that
Ace Decade would receive the same treatment as the Ping An shareholder with respect to any
margin calls.

49.     Relying on these representations, I decided to make the Investment.  I discussed
with Mr. Wong during telephone conversations on May 11 how best to transfer the funds
necessary for the Investment from one of my UBS accounts to the Ace Decade account.
Mr. Wong said that I first needed to exchange the funds from U.S. dollars to Hong Kong dollars
in my UBS account.  He also gave instructions not to transfer the funds from my UBS account

directly to the Ace Decade account, but rather to transfer the funds from my UBS account to an account at another bank and then to transfer the funds from that account to the Ace Decade account.

50.     Relying upon Mr. Wong's advice, I decided to transfer the funds from my UBS account first to an account at China Minsheng Banking Corp., Ltd. Hong Kong Branch  ("China Minsheng Account") and then to transfer the funds from the China Minsheng Account to the Ace Decade account.

51.     On May 11, 2015, Ms. Fu sent an e-mail to Ms. Yu, copying Mr. Wong and Ms. Lam, and asked Ms. Yu to obtain my signature on a payment instruction document that UBS had prepared.  The document contained a request to transfer HK $860 million (approximately US $111 million) from my UBS account to the China Minsheng Account that Mr. Wong had instructed me to use.

52.     In reliance upon Mr. Wong's representations about the Investment and the UBS loan, I signed the document authorizing the wire transfer.

53.     Later that day, Ms. Lam sent an e-mail to Ms. Yu, copying Mr. Wong and Ms. Fu, attaching a confirmation of the outgoing transfer from my UBS account.

54.     Following Mr. Wong's instructions, I then authorized the transfer of the funds from the China Minsheng Account to the Ace Decade account.

55.     After the funds reached the Ace Decade account, on May 13, 2015, Ms. Yu and I authorized a payment of HK $2 billion (approximately US $260 million) from Ace Decade's account to an account held by Dawn State Limited ("Dawn State"), a special purpose vehicle and wholly-owned subsidiary of a Haixia fund, to fund the Investment of the Shares to be issued on May 15.  Prior to this, I had authorized an initial down payment of approximately US $250

million from Ace Decade's account, through Dawn State, to a UBS security account.  That payment would have been returned to Ace Decade had the Investment not been completed.

56.     All of the steps I took to make the Investment, including requesting the wire transfers of approximately HK $860 million (approximately US $111 million) from one of my UBS accounts to the China Minsheng Account and ultimately to the Ace Decade account and authorizing the payment of HK $2 billion (approximately US $260 million) from the Ace Decade account to Dawn State's account on May 13, 2015, occurred from my office or my apartment in New York.

57.     I would not have made the Investment or authorized this payment in May 2015 had I known that UBS had lied that the loan financing documents did not contain repayment triggers based on short term price fluctuations of the Shares and that UBS would refuse to work with Ace Decade to meet any margin calls and would sell off Ace Decade's Shares immediately if a margin call were made.

58.     Under the terms of an agreement between Ace Decade and Haixia, Haixia was required to transfer Dawn State (the entity that held legal title to the Shares) to Ace Decade after July 13, 2015 upon Ace Decade's request.

59.     However, on the morning of July 6, 2015 New York time—just a week before Haixia would have had to transfer Dawn State to Ace Decade—I learned that UBS was demanding that I repay approximately US $200 million in less than 24 hours due to short-term price fluctuation of the Shares.

60.     Had I known that it was possible for UBS to demand payment in such a short period of time and that UBS had lied about providing adequate time to meet any margin calls, I would have ensured that Ace Decade had sufficient funds available to make such payment.

61.     Before UBS's deadline, Ace Decade informed UBS that we could obtain the necessary funds quickly, but not before UBS's deadline.

62.     However, on July 6, 2015, Mr. Wong stated that UBS would not give Ace Decade any additional time.  Mr. Wong stated that UBS had already identified buyers for the Shares and would make a substantial profit by selling the Shares instead of allowing Ace Decade to make the payment.

63.     On July 7th, I sent Mr. Wong a WhatsApp message telling him that UBS's margin call was "illegal."  Mr. Wong did not disagree with me or deny that he had told me that there were no repayment triggers based upon short term price fluctuations of the Shares.  Instead, he said that he had told senior management to cancel the sale of the Shares and said that he would ask UBS to return the Shares to me.  Mr. Wong told me that the Shares were still under UBS's control and he promised to come up with a plan for their repurchase.  Mr. Wong reassured me: "I've always been standing by General Manager Guo."

64.     On July 9th, Mr. Wong stated that the decision to sell the shares was made by UBS executives outside of Hong Kong and China.

65.     On July 17th, I reminded Mr. Wong that he had said on numerous prior occasions that "there would never be" a margin call based on short term price fluctuations of the Shares and the many times he had stated that UBS had not sold off the shares of a large Ping An shareholder following a margin call.

66.     In another message on July 17, I said to Mr. Wong: "I told you, it was since last year that I've come to the U.S. for better opportunities, didn't I?  All the information I sent you from the U.S., my requirements, you know them all. . . .  Under these circumstances, all were

handed over to you, [I] all listened to you.  It was you who introduced Haixia . . . .  It turned out
to be messed up like this now."

67.     Mr. Wong did not deny that he had made these misrepresentations and in fact
replied that he understood.

68.     In another message on July 17, I said to Mr. Wong: "You told me several times
that you UBS would not liquidate assets like that; otherwise how I would trust you."  I also told
him:  "If it weren't for you to tell me that margin call was like Ping An, it would not be like that.
There would be reasonable time to get some assets to deal with it."

69.     On July 17, I also said to Mr. Wong:  "You said UBS signed the agreement with
them [Haixia] to permit UBS to sell all the shares within 24 hours of the margin call.  How was
that signed?  How did they implement that?  It's not fair.  You told me back then that was not the
case."

70.     Mr. Wong replied "I've always been firmly opposing them, but they ignored me
and told me it was an order by the Swiss CEO."  He did not deny my assertion that he had
previously stated that the loan agreement would not permit UBS to sell the Shares within 24
hours of the margin call.

71.     At no point during any of our discussions did Mr. Wong deny that he had stated
that UBS would treat Ace Decade the same as the Ping An shareholder.

72.     At no point during any of our discussions did Mr. Wong deny that he had stated
that the loan documents would not contain repayment triggers based on short-term price
fluctuations of the Shares.

73.     At no point during any of our discussions did Mr. Wong deny that he had stated
that UBS would work with Ace Decade and provide it adequate time to meet any margin call.

74.     At no point during any of our discussions did Mr. Wong deny that UBS had engaged in misconduct.

75.     Mr. Wong told me that on July 7, 2015, UBS sold all of the Shares belonging to Ace Decade at HK $11.12, a 20% discount off the closing price of Haitong stock on July 7.

76.     As a result of losing the Haitong shares, Ace Decade lost New York investors, whom I had met with after I had relocated to New York in 2015 and who had been interested in investing in Ace Decade.  For example, on four occasions in New York in April through June 2015, my representatives and/or I met with a co-founder of a private investment firm based in New York.  The firm expressed significant interest in investing in Ace Decade.  However, following UBS's sale of the Haitong Shares belonging to Ace Decade, Ace Decade lost this potential investor.

I swear that the foregoing is true and correct.

[Signature of Kwok Ho Wan on Chinese version]
Kwok Ho Wan

[Notarization on Chinese version]

CITY OF __Meservey_____ )
                                          )     ss.:
COUNTY OF __Cerro Gordo___ )

I, __Liming Pals____, being duly sworn, depose and say that I am fluent in both the English and

Chinese languages.  I hereby certify that the attached document is an accurate translation of the

Chinese version of "Affidavit of Kwok Ho Wan."


[Name]

Sworn to before me this

**5** day of ~~May 2015~~ February 2016

Pat Fisher
Notary Public

PAT FISHER
COMMISSION NUMBER 720993
MY COMMISSION EXPIRES:
2-19-18

**Exhibit 32**

CASE NO. _____2022-50073_____

IN RE: Ho Wan Kwok

VS. _____

Trustee    EXHIBIT _____32_____

DATE _11/18/2022_____ IDEN.

DATE _____ EVID.

BY _P.E._____

Deputy Clerk

AO 386

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
-------------------------------------------------------X

Case No. 22-50073

In re:
HO WAN KWOK

AFFIDAVIT OF ATTEMPTED SERVICE

       Debtor.
-------------------------------------------------------X

STATE OF NEW YORK  )
                  S.S.:
COUNTY OF NEW YORK)

        MICHAEL MARRA, being duly sworn, deposes and says that he is over the age of eighteen years, is employed by the attorney service, METRO ATTORNEY SERVICE INC., and is not a party to this action.

        That on the 9th day of November, 2022, at approximately 12:39 PM, deponent attempted to serve a true copy of the SUBPOENA TO TESTIFY AT A DEPOSITION IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING) upon Yvette Wang c/o Alex Lipman, Esq., Lipman Law PLLC 45 West 29th Street, Suite 303, New York, New York, but the third floor was vacant and deponent was informed by Antonio, a Porter for the building, that the last tenant moved out two months prior.

        That on the 9th day of November, 2022, at approximately 1:52 PM, deponent attempted to serve a true copy of the SUBPOENA TO TESTIFY AT A DEPOSITION IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING) upon Yvette Wang at 800 5th Avenue, Suite 21F , New York, New York, but deponent was informed by Javier Batista, Concierge, that Yvette Wang did not reside in the building and that the tenant in Suite 21F had been there for some time.

        That on the 9th day of November, 2022, at approximately 2:06 PM, deponent attempted to serve a true copy of the SUBPOENA TO TESTIFY AT A DEPOSITION IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING) upon Yvette Wang at 162 E. 64th Street, New York, New York, but the building was vacant.

_____
MICHAEL MARRA  #2101634

Sworn to before me this
11th day of November, 2022

_____
NOTARY PUBLIC

DOMINIC DELLAPORTE
Notary Public-State of New York
No. 01DE6052212
Qualified in Nassau County
Commission Expires December 11, 2022

**Exhibit 33**

CASE NO. _____ 2022-50073 _____

IN RE: Ho Wan Kwok

VS. _____

Trustee   EXHIBIT _____ 33 _____

DATE _____ IDEN.

DATE 11/18/2022 _____ EVID.

BY P.E. _____

Deputy Clerk

AO 386

| From: | Alex Lipman |
|-------|-------------|
| To: | Luft, Avi E. |
| Cc: | Kosciewicz, Jonathon P.; Bassett, Nicholas |
| Subject: | [EXT] Re: Yvette Wang |
| Date: | Thursday, November 10, 2022 9:24:33 AM |

Hi Avi,

I am not authorized to accept service.

Alex Lipman

Lipman Law PLLC
147 West 25th Street
12th Floor
New York, New York 10001

+1 (212) 401-0070 (office)
+1 (917) 757-9850 (mobile)

alexlipman@lipmanpllc.com
lipmanpllc.com

On Nov 6, 2022, at 21:48, Luft, Avi E. <aviluft@paulhastings.com> wrote:

Alex,

I am writing to follow up on my email below. Has Ms. Wang authorized you to
accept the subpoena on her behalf? If not, can you please provide me with the best
address and time to serve your client in person. The subpoena relates to an
upcoming expedited hearing, so a prompt response from your client is needed.
Please let me know by tomorrow morning how your client would like to proceed.
Thanks.

Avi

[image001.png]<http://www.paulhastings.com/>

Avi E. Luft | Of Counsel | Financial Restructuring Group
Paul Hastings LLP | 200 Park Avenue, New York, NY 10166 | Direct:
+1.212.318.6079 | Main: +1.212.318.6000 | Fax: +1.212.303.7079 |
email<mailto:email> | www.paulhastings.com<http://www.paulhastings.com/>

On Nov 3, 2022, at 12:49 PM, Luft, Avi E. <aviluft@paulhastings.com> wrote:

Alex,

Per your request, I am writing to follow up on our phone call. As I mentioned, I
represent Luc Despins, the Chapter 11 Trustee for Miles Kwok's bankruptcy case
before the Bankruptcy Court in the District of Connecticut. As I mentioned, we
need to serve your client, Ms. Wang with a subpoena and ask if you will be
willing to accept the subpoena on her behalf. I understand that you wish to ask her
if she will be amenable to that, or if she would prefer if we serve her personally.
Please let us know what she advises. Thank you.

Avi

_____

<[http://www.paulhastings.com/](http://www.paulhastings.com/)>
<image001.png>

Avi E. Luft | Of Counsel | Financial Restructuring Group
Paul Hastings LLP | 200 Park Avenue, New York, NY 10166 | Direct:
+1.212.318.6079 | Main: +1.212.318.6000 | Fax: +1.212.303.7079 |
email<mailto:email> | [www.paulhastings.com](http://www.paulhastings.com)<[http://www.paulhastings.com/](http://www.paulhastings.com/)>

****************************************************************
*************************
This message is sent by a law firm and may contain information that is privileged
or confidential. If you received
this transmission in error, please notify the sender by reply e-mail and delete the
message and any attachments.
If you reply to this message, Paul Hastings may collect personal information
including your name, business name
and other contact details, and IP address.  For more information about Paul
Hastingsâ€™ information collection, privacy
and security principles please click HERE. If you have any questions, please
contact [Privacy@paulhastings.com](mailto:Privacy@paulhastings.com).

**Exhibit 39**

CASE NO. _____ 2022-50073 _____

IN RE: Ho Wan Kwok

VS. _____

Trustee  **EXHIBIT** _____ 39 _____

DATE _____ IDEN.

DATE  11/17/2022 _____ EVID.

BY  P.E. _____

Deputy Clerk

AO 386

*PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. vs.*
*KWOK HO WAN*

*MILES KWOK*
*October 3, 2018*



**ELLEN GRAUER**
COURT REPORTING CO. LLC

126 East 56th Street, Fifth Floor  New York, New York 10022
P:  212-750-6434   F:  212-750-1097
www.ellengrauer.com

*Original File 247294.TXT*
*Min-U-Script® with Word Index*

1

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF NEW YORK
    ------------------------------------------------x
3   PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

4                          Plaintiff,

5       -against-

6   KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN
    GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI,
7   a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK,
    a/k/a HAOYUN GUY,

8                          Defendant.
9
    Index No.: 652077/2017
10  ------------------------------------------------x

11

12                      7 Times Square
                        New York, New York
13
                        October 3, 2018
14                      9:39 a.m.

15

16              Videotaped Examination Before Trial

17  of the MILES KWOK, before Kristi Cruz, a Notary

18  Public of the State of New York.

19

20

21

22

23          ELLEN GRAUER COURT REPORTING CO. LLC
               126 East 56th Street, Fifth Floor
24                New York, New York 10022
                        212-750-6434
25                     REF:  247294

```
 1   A P P E A R A N C E S:

 2

 3   O'MELVENY & MYERS LLP

 4   Attorneys for Plaintiff

 5        Times Square Tower

 6        7 Times Square

 7        New York, New York 10036

 8   BY:   EDWARD MOSS, ESQ.

 9        STUART SARNOFF, ESQ.

10        SARA N. PAHLAVAN, ESQ.

11        212.326.2000

12        emoss@omm.com

13        ssarnoff@omm.com

14        spahlavan@omm.com

15

16

17   HODGSON RUSS LLP

18   Attorneys for Defendant

19        605 Third Avenue, Suite 2300

20        New York, New York 10158

21   BY:   MARK A. HARMON, ESQ.

22        JILLIAN MARIE SEARLES, ESQ.

23        212.751.4300

24        mharmon@hodgsonruss.com

25        jsearles@hodgsonruss.com
```

```
 1  A P P E A R A N C E S:  (Cont'd)

 2

 3  ALSO PRESENT:

 4        ELIZABETH YAOYING JIANG, Mandarin Interpreter

 5        DAN MACOM, Videographer

 6        KARIN MAISTRELLO, Golden Spring

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    ------------------- I N D E X -------------------

2    WITNESS                  EXAMINATION BY          PAGE

3    MILES KWOK               MR. MOSS                   8

4

5

6    DIRECTIONS:     PAGE   17, 18, 19, 58, 59, 61,

7                           62, 67, 70, 71, 72, 73,

8                           78, 101, 102, 117, 118,

9                           126, 128, 129

10

11

12   --------------- DOCUMENT REQUESTS ---------------

13   PAGE:     129   Document evidencing agreement

14                   with Zhang Wei relating to the

15                   hotel

16

17

18   --------------- E X H I B I T S ----------------

19   KWOK              DESCRIPTION              FOR I.D.

20   Exhibit 1         Genever Holdings LLC         33

21                     Corporate Documents

22   Exhibit 2         Printout from YouTube        59

23   Exhibit 3         Federal Complaint            69

24   Exhibit 4         Letter with attached         73

25                     financial information
```

```
 1   ------------ E X H I B I T S (Cont'd)------------

 2   KWOK              DESCRIPTION              FOR I.D.

 3   Exhibit 5       UBS Hong Kong statement        82

 4                   for Bravo Luck Limited

 5                   entitled Debit Advice

 6   Exhibit 6       Realtor.com printout           88

 7

 8

 9

10              (EXHIBITS TO BE PRODUCED)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                S T I P U L A T I O N S

 2

 3              IT IS HEREBY STIPULATED AND AGREED

 4         by and between the attorneys for the

 5         respective parties herein, that filing and

 6         sealing be and the same are hereby waived.

 7              IT IS FURTHER STIPULATED AND

 8         AGREED that all objections, except as to

 9         the form of the question, shall be

10         reserved to the time of the trial.

11              IT IS FURTHER STIPULATED AND

12         AGREED that the within deposition may be

13         sworn to and signed before any officer

14         authorized to administer an oath, with

15         the same force and effect as if signed

16         and sworn to before the Court.

17              IT IS FURTHER STIPULATED AND

18         AGREED that a copy of the within

19         deposition shall be furnished to counsel

20         for the Witness.

21

22

23                        - oOo -

24

25
```

```
 1              P R O C E E D I N G S
 2              THE VIDEOGRAPHER:  This is the
 3      videotaped deposition of Mr. Miles Kwok
 4      taken by the plaintiff in the matter of
 5      Pacific Alliance Asia Opportunity Fund LP
 6      versus Kwon, et al., in the Supreme Court
 7      of the State of New York, the County of
 8      New York.  The index number is
 9      652077-2017.
10              This deposition is being held at
11      O'Melveny & Myers on today, October 3,
12      2018.  My name is Dan Macom from Ellen
13      Grauer, a U.S. Legal Support Company, and
14      I'm the video specialist.  The court
15      reporter today is Ms. Kristi Cruz also
16      with Ellen Grauer, a U.S. Legal Support
17      Company.  We're now on the record, and the
18      time is 9:39 a.m.
19              Will counsel now state their
20      appearances for the record and state whom
21      they represent, after which may our court
22      reporter please swear in the witness.
23              MR. MOSS:  Edward Moss from
24      O'Melveny & Myers on behalf of plaintiffs.
25              MR. SARNOFF:  Stuart Sarnoff with
```

```
 1         O'Melveny & Myers on behalf of plaintiff.
 2              MS. PAHLAVAN:  Sara Pahlavan,
 3         O'Melveny & Myers with plaintiffs.
 4              MR. HARMON:  Mark A. Harmon, Hodgson
 5         Russ LLP, for defendant.
 6              MS. SEARLES:  Jillian Searles for
 7         defendant.
 8              MS. MAISTRELLO:  Karin Maistrello,
 9         Golden Spring, for Defendant.
10  E L I Z A B E T H   Y A O Y I N G   J I A N G,
11         the Mandarin Interpreter herein, was duly
12         sworn to interpret the questions from
13         English into Mandarinn and the answers
14         from Mandarin into English to the best of
15         her ability:
16
17  M I L E S   K W O K,
18         the Witness herein, having been duly sworn
19         through the Interpreter, was examined and
20         testified as follows:
21
22  EXAMINATION BY
23  MR. MOSS:
24         Q.   Good morning, Mr. Kwok.  Thank you
25     very much for being here today.  My name is
```

```
 1                           KWOK

 2     Edward Moss, we represent Pacific Alliance

 3     group in this litigation.

 4               Have you ever been deposed before?

 5        A.    One time, one time.

 6        Q.    You understand that you're

 7     testifying under oath?

 8        A.    Yes.

 9        Q.    I will briefly go over the ground

10     rules for the deposition.

11        A.    Yes.

12        Q.    If you do not understand the

13     question, please let me know and I will do my

14     best to ask a better question.  If you answer

15     a question, I will assume that you understood

16     it and you answered it to the best of your

17     ability.  I will wait for you to finish your

18     answers, and please wait for me to finish my

19     questions so we have a clean record.

20               Your lawyers may object to my

21     questions.  I expect they will object to my

22     questions.  You are to please still answer the

23     question unless your lawyer instructs you not

24     to answer.  Do you understand?

25        A.    Completely understand.
```

```
1                         KWOK
2        Q.    Thank you.
3              Is there any reason you cannot
4     testify truthfully today?
5        A.    No.
6        Q.    You understand that you're
7     testifying here both in your personal capacity
8     and as a representative for certain of your --
9     for certain organizations?
10       A.    Yes.
11       Q.    And those organizations are Genever,
12    or Genever -- is it Genever or Genever?
13             MR. HARMON:  Genever, like the city.
14       Q.    You understand you are here
15    testifying on behalf of gin Eva holdings
16    corporation, which is organized in the British
17    Virgin Islands?
18       A.    Yes.
19       Q.    You understand you're also here
20    testifying for Genever Holdings LLC, which is
21    organized in the state of New York?
22       A.    Yes.
23       Q.    And finally, you're here on behalf
24    of Shiny Times Holdings Limited, which is
25    organized in the British Virgin Islands?
```

```
1                          KWOK

2         A.    Yes.

3         Q.    And you understand that we are here

4    to discuss issues relating to my client's

5    request for an attachment of your residence at

6    the Sherry-Netherland and issues relating to

7    the structure of the Genever organizations?

8         A.    I didn't quite understand that.

9              THE INTERPRETER:  This is the

10         interpreter.  If I could ask you to break

11         it down.

12              MR. MOSS:  Sure.

13         Q.    One issue we will be covering today

14    are issues relating to Pacific Alliance Group

15    request for an attachment of the apartment at

16    the Sherry-Netherland.

17         A.    I don't understand.

18         Q.    Do you understand that Pacific

19    Alliance has sued for breach of contract?

20         A.    I more do not understand.

21         Q.    Do not or do?

22              THE INTERPRETER:  Do not.

23         A.    Absolutely completely more do not

24    understand.

25         Q.    You do not understand that Pacific
```

```
 1                        KWOK
 2   Alliance has filed a lawsuit for breach of
 3   contract against you?
 4        A.    Is crazy.  When did I break our
 5   contract?  When did I do that?
 6              MR. HARMON:  There's clearly a
 7        syntax disconnect here on whether the suit
 8        has merit or whether the sought was
 9        brought.
10        Q.    Mr. Kwok, I understand that you
11   dispute the lawsuit.
12        A.    I'm not disputing it.  I'm not
13   disputing it.  I think it's completely crazy.
14   This is completely waste of my time.  This
15   is --
16              THE INTERPRETER:  A curse,
17        profanity.
18              MR. SARNOFF:  Is there a translation
19        of the curse?  We'd like it on the record.
20              THE INTERPRETER:  It's like -- it's
21        like a F affair kind of thing.
22              MR. MOSS:  It's like?  Sorry?
23              THE INTERPRETER:  It's like F --
24        there's not real equivalent, but it is a
25        profanity that he said this affair is a
```

KWOK

1

2      complete F affair or something like that.

3      Q.    Let me try it differently.

4            Are you aware that PAX LP, or

5  Pacific Alliance, is requesting an attachment

6  of Mr. Kwok's residence at the

7  Sherry-Netherland Hotel?

8      A.    I absolutely do not know what

9  they're doing.  It's completely F thing and

10  what relation do I have with them?  What the

11  hell are they doing?

12      Q.    Maybe I will just put on the record

13  that we are here on our attachment motion and

14  issues relating to vail piercing and we are

15  not here to explore merits issues.

16  Mr. Harmon, I assume you agree with that?

17            MR. HARMON:  Mr. Moss, you should

18        ask your questions.  If you go beyond the

19        scope of what I think is appropriate, I'll

20        let you know.  So far so good.

21            MR. MOSS:  I just want to put on the

22        record, Mr. Harmon, and please tell me if

23        you disagree with this, that we have

24        agreed in advance of this deposition that

25        we will not be covering issues relating to

```
1                        KWOK
2        the merits of the underlying litigation.
3        So I'm asking you whether or not you agree
4        to that statement.
5            MR. HARMON:  I'm not here to be
6        deposed.  Mr. Kwok is here to be deposed.
7        You should -- I think we all understand
8        why we're here.  You should ask your
9        questions, and if they go beyond the scope
10       of that to which we have agreed, I'm going
11       to object.
12           MR. MOSS:  I'm trying to confirm why
13       you're here.  You say you understand.
14       Will you confirm that?
15           MR. HARMON:  We're here to take
16       Mr. Kwok's deposition.
17           MR. MOSS:  We are here to take
18       Mr. Kwok's deposition on the attachment
19       and the vail piercing issue.  We are not
20       here on the merits.  If Mr. Harmon
21       disagrees with that, I invite him to say
22       something now.  If not, I will assume he
23       agrees with me.  I will move on, hearing
24       nothing from Mr. Harmon.
25           MR. HARMON:  You should ask your
```

```
1                         KWOK

2        questions.

3   BY MR. MOSS:

4        Q.    Did you do anything to prepare for

5   your deposition today?

6        A.    I don't know what preparation is.

7   What is your standard for preparation?

8        Q.    Did you meet with your counsel to

9   prepare for your deposition?

10       A.    I see my counsel every day.  I have

11  29 cases.  I have to hide from the

12  assassination of the communist.  I don't know

13  what you mean by meeting by preparation.

14       Q.    Did you meet with Mr. Harmon and/or

15  Ms. Searles regarding this deposition today?

16       A.    Yes, yes.

17       Q.    When did you meet with them?

18       A.    Yesterday or the day before.  I

19  think it was the day before.

20       Q.    You met with them in person?

21       A.    Me in person.

22       Q.    Who was present at the meeting?

23       A.    Oh, in and out a lot of people.  You

24  want me to give you everyone's names?

25       Q.    Yes, please.
```

```
 1                    KWOK
 2        A.    Then I have to think about it.  I
 3   just can't temporarily think of them.
 4        Q.    Was Mr. Harmon there?
 5        A.    Of course.
 6        Q.    Was Ms. Searles there?
 7        A.    Yes.
 8        Q.    Were any other lawyers there?
 9        A.    Lawyers?  Yes, there were other
10   lawyers present, but briefly.
11        Q.    Who were the other lawyers who were
12   present?
13        A.    I don't quite remember the name.  I
14   just remember Don.  I don't remember the
15   complete name.
16        Q.    So one other lawyer was present?
17        A.    I think just one.
18        Q.    Was that person from Mr. Harmon's
19   law firm?
20        A.    No.
21        Q.    Was that person an employee of one
22   of your companies?
23        A.    My consulting company.  One of the
24   companies I consult, one of the employees
25   there of the.
```

```
 1                         KWOK
 2        Q.    Was that person there for the entire
 3    meeting?
 4        A.    No.
 5        Q.    Was there any point during the
 6    meeting where there was nobody there besides
 7    you, Mr. Harmon, and Ms. Searles?
 8        A.    No.
 9        Q.    So at all times during that meeting,
10    there was somebody other than you, Mr. Harmon,
11    and Mrs. Searles?
12        A.    Yes.
13        Q.    Please tell me everything you can
14    remember that either Mr. Harmon or Ms. Searles
15    told you during that meeting?
16 DI           MR. HARMON:  Objection.  I direct
17           the witness not to answer.  Privileged.
18              MR. MOSS:  You heard him just
19           testify that there was a third party in
20           the room during the entire time?
21              MR. HARMON:  I'm asserting
22           attorney/client privilege.
23        Q.    Who else was in the room during the
24    meeting yesterday or the day before with
25    Mr. Harmon and Ms. Searles?
```

```
 1                         KWOK
 2        A.      This Ms. Chiling (phonetic).
 3        Q.      Who else?
 4        A.      I need an interpreter.
 5        Q.      Fair enough.  Who else was there?
 6        A.      Yvette Wang would sometimes come in,
 7    sometimes go out.
 8        Q.      Who else was there?
 9        A.      Oh, our colleague our colleagues
10    come in and out and security guards come in
11    and out.
12        Q.      Can you please tell me what you
13    discussed when Yvette Wang was in the room?
14  DI          MR. HARMON:  Objection.
15          Attorney/client privilege.  I direct the
16          witness not to answer.
17        Q.      Can you please tell me what was
18    discussed when your other colleagues were in
19    the room during that meeting?
20        A.      This I can't tell you.  It's all
21    about giving birth.  I don't think you want to
22    hear about that.  Six hours previous to that
23    my colleague just gave birth to a child.
24        Q.      Can you tell me what you discussed
25    with Ms. Searles and Mr. Harmon regarding this
```

```
1                         KWOK
2      case during your meeting when other colleagues
3      were in the room?
4  DI           MR. HARMON:  I direct the witness
5           not to answer.
6           A.    I do not want to answer such a
7      question.
8           Q.    Can you tell me what you discussed
9      with Ms. Searles and Mr. Harmon regarding this
10     case during your meeting when security guards
11     were present in the room?
12 DI           MR. HARMON:  I direct -- I'm
13          directing the witness not to answer.
14          Q.    Mr. Kwok, do you communicate using
15     e-mail?
16          A.    No, no.
17          Q.    How do you communicate other than
18     speaking?  I'm going to withdraw.  That's too
19     broad.  That's a bad question.
20               Do you communicate by text message?
21          A.    Text message?  What is that?  I
22     don't understand.  Text message includes so
23     many things.  There's a thousand methods for
24     text message.  Which kind are you speaking of?
25     I do not understand.
```

```
1                          KWOK
2         Q.    Do you communicate using any type of
3    text message?
4         A.    Text message to communicate?  Yes.
5         Q.    Do you communicate using the
6    WhatsApp application?
7         A.    I do.
8         Q.    What other types of text message do
9    you use?
10        A.    So many.  In China there's over
11   thousands.  If you have to ask me to think of
12   them, I have to sit here for several hours.
13        Q.    So you use several types of text
14   messaging?
15        A.    I don't understand when you say
16   several methods of text messaging.  I don't
17   understand what that means.
18        Q.    Well, you just told me that there
19   were thousands of types of text messaging, and
20   I'm asking you, generally speaking, whether or
21   not you use many different types of text
22   messages.
23        A.    I use three, four kinds.
24        Q.    Were your text messages searched in
25   connection with this litigation?
```

```
 1                        KWOK
 2        A.    I did not use any one for this.  I
 3   did not use any one or anything for this.  I
 4   don't understand what you mean by that.  I
 5   never discuss this litigation.  I think this
 6   is just a crazy case.  I think this is just
 7   scamming.  I think you guys are a bunch of
 8   thugs.  I think you are just mafia.  You're
 9   working for the communists.  You're doing
10   threats and racketeering.  The whole world
11   knows what you're doing.  You're helping the
12   mafia.  You're destroying a good person.  I
13   don't need to pay any attention to you at all.
14        Q.    Let me try it again.
15              Did you provide -- strike that.
16              Do you know whether your lawyers
17   searched any of your text messages to respond
18   or to try to respond to my client's document
19   requests in this case?
20        A.    I don't understand.  I don't
21   understand all the things you're saying.  The
22   question you're asking is completely
23   incomprehensible to me.  I think you're
24   speaking to me separated by the galaxy.  You
25   have created a completely nonexisting case and
```

```
1                            KWOK

2     then you're ask me questions.  I'm completely

3     unable to answer you.

4          Q.    You cannot answer whether or not

5     your text messages were searched in connection

6     with this case?

7          A.    I really do not understand what your

8     meaning is.

9          Q.    You understand that it's possible to

10    run a search in a person's text messages?

11         A.    Of course I know that.  I know that

12    text can be searched.  But as for other

13    searching it or not, is this related?

14         Q.    My question is whether or not your

15    text messages were searched to try to find

16    documents that we asked for in this case.

17         A.    I really don't understand.  My text,

18    because the communist party are trying to

19    assassinate me, my text has many intelligences

20    and security guards.

21              THE INTERPRETER:  I missed the last

22         part of his speech.  I'll just ask him to

23         repeat.

24              THE WITNESS:  Sorry.  It a security

25         reason.  I don't want to die here should
```

```
 1                        KWOK
 2        you poison.
 3               THE INTERPRETER:  I had to ask him
 4        to repeat that.  I said, "What happened to
 5        your text?  You were saying the communist
 6        were trying to assassinate you?"  He said:
 7        A.   Well, my text have to be prepare for
 8   many copies for a lot of people to see it
 9   every day.
10        Q.   So you don't know whether or not
11   your text messages were searched for this
12   case?
13        A.   You know, my text, so many search,
14   so many cases.  But specifically, I really
15   don't understand what you're saying.  I'm
16   really sorry.
17        Q.   That's okay.
18               MR. MOSS:  Let's take a break.
19               THE VIDEOGRAPHER:  We're now off the
20        record.  The time is 10:07 a.m.
21               (Recess was taken.)
22               THE VIDEOGRAPHER:  We're now back on
23        the record.  The time is 10:19 a.m.
24   BY MR. MOSS:
25        Q.   Mr. Kwok, I need to explain a few
```

```
 1                        KWOK
 2      things for the record.  We are here
 3      representing Pacific Alliance, nobody else.
 4      Pacific Alliance has filed a lawsuit against
 5      you, and under the law we are entitled to ask
 6      questions and to get answers from you to those
 7      questions unless you're instructed not to
 8      answer those questions.  We have not gotten
 9      answers to several questions so far and we are
10      going to ask all of our questions, and at the
11      rate we're going, it's going to take a very
12      long time.  And I've tried very hard, I've
13      prepared, to focus my questions so as not to
14      waste your time and not to waste anybody's
15      time.  And if you will answer my questions,
16      this whole thing will be over faster for all
17      of us.
18              MR. HARMON:  I'm sure he's doing his
19          best to answer the questions as he
20          understands them.
21          A.    A lot of your questions won't be so
22      ridiculous.  My attorney has told me to
23      truthfully answer all of your questions.
24          Q.    You have no reason to be, do you,
25      that these two attorneys sitting here,
```

```
 1                        KWOK

 2     Mr. Harmon and Ms. Searles, searched your text

 3     messages in connection with this litigation

 4     against PAX, Pacific Alliance?

 5               MR. HARMON:  Object to the form of

 6        the question.

 7               THE INTERPRETER:  This is

 8        interpreter.  You want me to interpret the

 9        question to him and the objection, as

10        well?

11               MR. MOSS:  Sure.

12               MR. HARMON:  And tell him to answer

13        if he understands the question, please.

14        A.    I do not know.

15        Q.    You have no information to suggest

16     or no recollection that they did, in fact,

17     search your text messages?

18               MR. HARMON:  Object to the form of

19        the question.

20        A.    I do not know.

21        Q.    Did you provide your text messages

22     to Mr. Harmon or Ms. Searles to be searched?

23        A.    I do not know.

24        Q.    You don't know whether or not you

25     gave your phone to Mr. Harmon or Ms. Searles
```

```
                              KWOK
 1
 2      to search your text messages?
 3              MR. HARMON:   Object to the form of
 4          the question.
 5          A.    I do not know.
 6          Q.    Do you know whether or not you gave
 7      a laptop or another computer to Mr. Harmon or
 8      Ms. Searles to search your text messages or
 9      documents?
10          A.    I do not know.
11          Q.    Did you provide any paper documents
12      to Mr. Harmon Ms. Searles to respond to
13      Pacific Alliance's request?
14          A.    No.
15          Q.    Did anyone ever ask you to search
16      your documents to respond to Pacific
17      Alliance's requests?
18          A.    No.
19          Q.    Did anyone ever ask you to search
20      your text messages to respond to Pacific
21      Alliance's requests?
22          A.    No.
23          Q.    Did you ever discuss with anybody
24      searching for documents or text messages to
25      respond to Pacific Alliance's requests?
```

```
 1                        KWOK
 2         A.    No.
 3         Q.    Thank you.
 4         A.    Do you think my responses are fast
 5    enough?
 6         Q.    Mr. Kwok, I get to ask the questions
 7    today.  But I will answer that one.  These
 8    responses are fine.  Thank you.
 9               Do you own a residence at the
10    Sherry-Netherland Hotel?
11         A.    No.
12         Q.    Do you live in a residence at the
13    Sherry-Netherland Hotel?
14         A.    Sometimes.
15         Q.    Who owns that residence?
16         A.    Mr. Zhang Wei.
17               THE INTERPRETER:  Z-H-A-N-G, W-E-I,
18    phonetic spelling.
19         Q.    Who is Zhang Wei?
20         A.    Is a working partner, a fund, a
21    conglomerate fund, a member of that.
22         Q.    Is Zhang Wei a person or an entity?
23         A.    It's a person.
24         Q.    Where does Zhang Wei live?
25         A.    In prison.
```

```
 1                        KWOK
 2      Q.    When did Zhang Wei purchase the
 3   residence?
 4      A.    This residence, it was in 2015.
 5      Q.    Do you have any ownership interest
 6   personally at all in the residence?
 7      A.    No.
 8      Q.    Have you heard of a company
 9   called -- we talked about this earlier --
10   Genever Holdings Corporation?
11      A.    I heard of it.
12      Q.    Does Genever Holdings Corporation
13   own the residence at the Sherry-Netherland
14   Hotel?
15      A.    Yes.
16      Q.    What is Zhang Wei's relationship to
17   Genever Holdings Corporation?
18      A.    Zhang Wei was entrusted by Genever.
19            THE INTERPRETER:  I'll instruct him
20      to say it in parts.
21            I just said because of accuracy, I
22      like to interpret 100 percent, and if he
23      gives me too much information, I will be
24      leaving out information.  So I just asked
25      him to give me in segments.
```

```
                          KWOK
 1
 2      A.     Mr. Zhang Wei was the initial person
 3   who put out the funds.   I and this whole
 4   Genever Corporation was the entrusted party,
 5   and also to represent his investment,
 6   investors.
 7             THE INTERPRETER:  He said is this
 8      okay, I said yes.
 9      Q.    Were you the one who applied to the
10   Sherry-Netherland to live in the apartment?
11             MR. HARMON:  Object to the form of
12      the question.
13      A.    One of them.
14      Q.    Who else applied to live in that
15   apartment at the Sherry-Netherland?
16      A.    I do not know.
17      Q.    You don't know who else applied to
18   live in the same apartment at the
19   Sherry-Netherland --
20             MR. HARMON:  Object to the form of
21      the question.
22             MR. MOSS:  How about if I finish the
23      question and then you can object.
24             MR. HARMON:  I thought you did.
25             MR. MOSS:  Okay.
```

```
 1                        KWOK

 2        Q.    You don't know who else applied to

 3   live in the same apartment at the

 4   Sherry-Netherland that you applied to live in?

 5             MR. HARMON:  Object to the form of

 6        the question.

 7        A.    If he objects, I don't have to

 8   answer it, right?

 9             MR. HARMON:  This one you have to

10        answer if you understand the question.

11        A.    I do not know.

12        Q.    How many other people applied to

13   live in the apartment that you applied to live

14   in at the Sherry-Netherland?

15             MR. HARMON:  Object to the form of

16        the question.

17        A.    I do not know.

18        Q.    Were any of those people that also

19   applied to live at the apartment that you

20   applied to live to at the Sherry-Netherland

21   not members of your family?

22             MR. HARMON:  Object to the form of

23        the question.

24        A.    I do not know.

25        Q.    Do you deal directly with the
```

31

```
 1                          KWOK
 2    representatives of the Sherry-Netherland
 3    represented to the apartment?
 4        A.    I'm one among the people who deal
 5    with them.
 6        Q.    Who else deals with the
 7    Sherry-Netherland on your behalf?
 8        A.    Lawyers, the representative
 9    Mr. Zhang Wei, Zhang Wei's attorney --
10            THE INTERPRETER:   Sorry.
11        Interpreter mistake.
12        A.    Zhang Wei's secretary.
13        Q.    Which lawyers?
14        A.    William Kau, Paul -- I don't know
15    the name.
16        Q.    Paul Weiss?
17        A.    Paul Weiss.  And also Hong Kong and
18    Beijing, and Zhengzhou.
19            THE INTERPRETER:   Z-H-E-N-G-Z-H-O-U.
20        A.    I don't really know it completely.
21    I know also Genever, their own attorneys.  I
22    don't know.
23        Q.    Who are Genever's attorneys?
24        A.    I don't know, I don't know.
25        Q.    Are you the sole shareholder of
```

1                              KWOK

2    Genever?

3         A.     No.

4         Q.     At any point were you the sold

5    shareholder of Genever?

6         A.     The representative document I was.

7    But in actuality, I was assuming the post for

8    somebody else.

9         Q.     Did the Sherry-Netherland know that

10   you were assuming the post for Zhang Wei?

11        A.     I don't know if they know or not.

12        Q.     Did you ever discuss Zhang Wei with

13   the Sherry-Netherland Hotel?

14        A.     Sherry Hotel?

15        Q.     Did you ever discuss Zhang Wei with

16   any representatives of the Sherry-Netherland

17   Hotel?

18        A.     I never discuss anything with

19   Sherry-Netherland.  I can't really speak

20   English.  How do I discuss it?  He or she is

21   not able to understand my Chinese English.

22        Q.     Well, let me try it a different way.

23               In 2015, you personally applied to

24   purchase a residence at the Sherry-Netherland

25   hotel, right?

```
1                          KWOK
2       A.    I -- I -- well, I think it was.
3       Q.    During any of that process, did you
4   or any of your representatives communicate to
5   the Sherry-Netherland hotel that you were
6   purchasing on behalf of someone named Zhang
7   Wei?
8            MR. HARMON:   Object to the form of
9       the question.
10      A.    I do not know.
11      Q.    Genever Holdings Corporation is a
12  corporation that is organized under the laws
13  of the British Virgin Islands; is that right?
14      A.    I don't really know about that.
15      Q.    Were you involved with the formation
16  of Genever Holdings corporation?
17      A.    I do not -- it was all arranged by
18  Mr. Zhang Wei and his attorneys.
19           MR. MOSS:   Let's look at Exhibit 1.
20           (Kwok Exhibit 1, Genever Holdings
21      LLC Corporate Documents, marked for
22      identification, as of this date.)
23  BY MR. MOSS:
24      Q.    Mr. Kwok, I've handed you a document
25   which is a compilation of corporate documents
```

```
 1                        KWOK
 2    relating to Genever Holdings LLC and Genever
 3    Holdings Corporation that were produced from
 4    the files of the Sherry-Netherland Hotel.
 5              MR. HARMON:  Did you mark the
 6         document?
 7              MR. MOSS:  Yeah.  It's Exhibit 1.
 8              MR. SARNOFF:  Kwok 1.
 9              MR. HARMON:  Kwok 1?  Thank you.
10         Q.   Mr. Kwok, I'd like to direct your
11    attention, there are members at the bottom, we
12    call them Bates numbers.  I'd like to direct
13    your attention to SN 0159, please.  Do you see
14    this is the Certificate of Incorporation for
15    Genever Holdings Corporation?
16         A.   I do not understand it.
17         Q.   You cannot read the document?
18         A.   Absolutely not.
19         Q.   Are you aware that Genever Holdings
20    Corporation was formed on or around
21    February 13, 2015?
22         A.   I don't understand what you mean.  I
23    don't really remember this.  I've never seen
24    this document before.
25         Q.   You don't understand what I mean
```

```
 1                         KWOK
 2    when I ask whether or not you're aware that
 3    Genever Holdings Corporation was formed on or
 4    around February 13, 2015?
 5              MR. HARMON:  Object to the form of
 6         the question.
 7         A.    I don't really -- I don't really
 8    know about it.  I don't really remember it.
 9    This is all arranged by attorneys.
10         Q.    Let's look at SN 0161.  Can you read
11    anything on this document?
12         A.    I'm unable to.  I can only look at
13    the Arabic numerals, the one, the zeros.  The
14    others I do not know.
15         Q.    Maybe this will make things easier,
16    Mr. Kwok.  Can you read any English at all?
17         A.    No, I absolutely cannot.
18         Q.    So if I put any document in front of
19    you today, you would not be able to read it?
20         A.    Yes.  I am currently learning
21    English.
22         Q.    Okay.  Well, there will be many
23    fewer documents today than I thought there
24    might be.
25         A.    Oh, really.  I'm sorry about that.
```

```
 1                          KWOK
 2       Q.    That's quite all right.
 3       A.    I've never seen this thing.
 4       Q.    Are you the sole shareholder of
 5  Genever Holdings Corporation?
 6       A.    You know, the way you're putting it,
 7  I don't know.  I'm just agent and they just
 8  asked me to sign and I don't even know what
 9  I'm signing.  For you to say that I owe you 30
10  million, what F that is, I never sign
11  anything.
12       Q.    Are you the sole director of Genever
13  Holdings Corporation?
14             THE INTERPRETER:  This is the
15       interpreter.  Director meaning?
16             MR. MOSS:  Like a board member.
17             THE INTERPRETER:  Board member.
18       Okay.
19       A.    I really don't know.
20       Q.    Do you control Genever Holdings
21  Corporation?
22       A.    Of course I don't control it.
23       Q.    Zhang Wei controls it?
24       A.    Of course.
25       Q.    Does Genever Holdings corporation
```

```
 1                         KWOK
 2   have any assets?
 3         A.     I do not know.
 4         Q.     Have you heard of a company called
 5   Genever Holdings LLC, a New York Limited
 6   Liability Company?
 7         A.     I heard of it.
 8         Q.     Does Genever Holdings corporation
 9   own Genever Holdings LLC?
10         A.     Yes.  Yes.
11         Q.     Does Genever Holdings Corporation
12   have any assets other than Genever Holdings
13   LLC?
14         A.     I do not know.
15         Q.     Does Genever Holdings LLC own the
16   residence at the Sherry-Netherland Hotel?
17         A.     This I don't really know, but I
18   think so.  I can't give you specifics.
19         Q.     So if Genever Holdings Corporation
20   owns Genever Holdings LLC and Genever Holdings
21   LLC owns the residence, then Genever Holdings
22   Corporation ultimately owns the residence.
23              MR. HARMON:  Object to the form of
24         the question.
25         A.     I do not know.
```

```
1                          KWOK
2        Q.     Do you know if Genever Holdings
3   corporation has any ownership interest in the
4   residence at the Sherry-Netherland Hotel?
5               MR. HARMON:   Object to the form of
6        the question.
7        A.     I do not know.
8        Q.     Did Genever Holdings Corporation
9   have any employees?
10       A.     I do not know.
11       Q.     Does Genever Holdings Corporation
12  have offices?
13       A.     I do not know.
14       Q.     Does Genever Holdings Corporation
15  have a phone number?
16       A.     I do not know.
17       Q.     Does Genever Holdings Corporation
18  have a board of directors?
19       A.     I do not know.
20       Q.     Had has there ever been a board
21  meeting of Genever Holdings Corporation?
22       A.     I do not know.
23       Q.     Does Genever Holdings Corporation
24  have any relationship to Shiny Times?
25       A.     I think representative relationship.
```

```
 1                         KWOK
 2    Nothing else.
 3         Q.    What does representative
 4    relationship mean?
 5         A.    I don't really know.  It's like when
 6    you purchase house, there will be some agent
 7    on behalf.  I don't know.  It's all arranged
 8    by the attorneys.
 9         Q.    So Genever Holdings Corporation may
10    be some sort of agent of Shiny Times?
11              MR. HARMON:  Object to the form of
12         the question.
13         A.    I don't really feel that.
14         Q.    Well, you testified that Genever
15    Holdings Corporation had, you think, a
16    representative relationship to Shiny Times,
17    right?
18         A.    I think during the purchase of this
19    residence that there was some sort of
20    relationship, but cannot remember clearly.
21              MR. HARMON:  He wasn't finished with
22         his answer when you started to interpret.
23              THE INTERPRETER:  I'm sorry.  I
24         wanted to --
25              MR. HARMON:  Okay.  So let's just
```

```
 1                         KWOK
 2        make sure he finishes his answer.
 3        A.    Clearly stated, the relationship
 4    between Shiny Times and Genever, I'm not
 5    really sure what that is.
 6        Q.    When you said you think during the
 7    purchase of the residence there was some sort
 8    of relationship between Shiny Times and
 9    Genever, can you explain what that means?
10             MR. HARMON:  Object to the form of
11        the question.
12        A.    I do not know.
13        Q.    You're not sure of the nature of the
14    relationship?
15             MR. HARMON:  Hold on one second,
16        please.
17             Okay.  Please make sure that when I
18        object, you let Mr. Kwok know that I've
19        objected even though I'm not directing him
20        not to answer.
21        A.    I really don't know.
22        Q.    Who would be the person to know the
23    nature of the relationship between Shiny Times
24    and Genever that existed around the purchase
25    of the residence?
```

```
1                           KWOK
2              MR. HARMON:   Object to the form of
3        the question.
4              THE INTERPRETER:   Interpreter,
5        before I said the objection, the --
6        Mr. Kwok said:
7        A.    Mr. Zhang Wei and his attorneys.
8        Q.    Where is Zhang Wei in prison?
9        A.    In prison.
10       Q.    In what country?
11       A.    In China.
12       Q.    You have a son?
13       A.    Yes.
14       Q.    Am I pronouncing it correctly?
15   Mileson?
16       A.    English name is Mileson, but the
17   actual Chinese name is core chow.
18              THE INTERPRETER:   G U O Q I A N G,
19        phonetic spelling.
20       Q.    Is it okay with you if I use the
21   English name?
22       A.    Yes.
23       Q.    Does your son Mileson Kwok have any
24   ownership in Genever Holdings Corporation?
25       A.    I do not know.
```

KWOK

1

2      Q.    Does your son Mileson Kwok have any

3   role with respect to Genever Holdings

4   Corporation?

5      A.    At that time I don't -- I'm not

6   sure, but at that time was one of the

7   representatives.  As for how it was a

8   representative, I don't really know.

9      Q.    When you say at that time, to what

10  time period are you referring, Mr. Kwok?

11     A.    During the purchase of the house.

12     Q.    During sometime in 2015, Mileson

13  Kwok was a representative for Genever Holdings

14  Corporation?

15     A.    I don't remember exact time.

16     Q.    Do you know what type of

17  representative he was for Genever Holdings

18  Corporation?

19     A.    I do not know.  This is something

20  that is affair of Mr. Zhang Wei.

21     Q.    Was Mileson Kwok a shareholder of

22  Genever Holdings Corporation?

23     A.    I do not know.

24     Q.    Was he a director?

25     A.    I'm not sure.  I don't know.

```
 1                          KWOK
 2        Q.    Do you know whether Genever Holdings
 3    Corporation maintains any corporate documents?
 4        A.    I do not know.
 5        Q.    Do you know whether it maintains a
 6    memorandum or articles of association?
 7              THE INTERPRETER:  I'm sorry.  I'll
 8         look up articles of association to make
 9         sure I completely say it right.
10              Sorry.  I don't see the Chinese for
11         it completely, but let me make sure.
12              MR. HARMON:  Even if she finds
13         words, I think it's going to be a
14         problematic translation.
15              THE INTERPRETER:  I'm sorry.  Is
16         there a way you can explain it to me and I
17         could -- because I don't see an equivalent
18         here.
19              MR. MOSS:  You know what?  I'm just
20         going to move on.  That's fine.
21              THE INTERPRETER:  I'm sorry.
22        Q.    Do you know whether or not Genever
23    Holdings Corporation maintains a list of its
24    directors or its members?
25        A.    I do not know.
```

```
 1                        KWOK
 2        Q.    Do you know that Genever Holdings
 3   LLC was formed in February of 2015?
 4        A.    I think so, but I'm not sure.
 5        Q.    Do you know why Genever Holdings LLC
 6   was formed?
 7        A.    Oh, I'm not sure, but I think it was
 8   just for -- to purchase this Sherry.
 9        Q.    To purchase the share in the
10   Sherry-Netherland Hotel?
11              THE INTERPRETER:   I believe he said
12        the name.
13              MR. HARMON:   Sherry.
14        Q.    To purchase the apartment at the
15   Sherry-Netherland Hotel?
16        A.    I'm not sure.   I cannot be definite,
17   but I think it was.   Because specifically it's
18   not possible for me to discuss these
19   documents.   It was all done by attorneys.
20        Q.    Who would know the answers to these
21   questions?
22        A.    Zhang Wei and his attorneys.
23        Q.    Do you have any family relationship
24   to Zhang Wei?
25        A.    Yes.
```

```
 1                          KWOK
 2      Q.    What is that relationship?
 3      A.    In the past, he was our working
 4   partner, a family working partner, invested in
 5   real estate.  And later on he married the
 6   daughter of my elder brother.
 7      Q.    When did he marry the daughter of
 8   your elder brother?
 9      A.    I don't know.  I don't know.
10      Q.    Are they still married?
11      A.    I don't -- I don't really know about
12   that.  Both of them have been arrested.
13      Q.    Did they get married before 2015?
14      A.    That's definite.
15            MR. MOSS:  Let's go off.
16            THE VIDEOGRAPHER:  We're now off the
17   record.  The time is 10:59 a.m.
18            (Recess was taken.)
19            THE VIDEOGRAPHER:  This is Tape 2 of
20      the deposition of Mr. Miles Kwok.  We're
21      now back on the record.  The time is
22      11:18 a.m.
23   BY MR. MOSS:
24      Q.    Mr. Kwok, what was --
25      A.    Hold on.  I have something I needed
```

```
 1                          KWOK
 2   to clarify.  Before I when you were talking,
 3   you were calling it Shiny Times, the company?
 4   Because I understood it to be a different
 5   company, and I work with Mr. Zhang Wei in
 6   China.  The one that you're speaking of, the
 7   one that's like Shiny Times that's in Hong
 8   Kong, this has absolutely no representative
 9   relationship with Mr. Zhang Wei whatsoever.
10        Q.    Mr. Kwok, as a yes/no question, did
11   you discuss your testimony during that last
12   break that we just had, did you discuss your
13   testimony with your lawyers?
14        A.    Discuss?  No.
15        Q.    Mr. Kwok, the testimony was a little
16   bit unclear, so I just want to ask the
17   question again.  Were you the sole shareholder
18   of Genever Holdings Corporation?
19        A.    I really am not sure.
20        Q.    When I was talking -- when you
21   mentioned earlier the one company being a
22   representative of Genever, I was referring to
23   a company called Shiny Times.  What company
24   did you think I was referring to?
25        A.    I thought you were referring to Hong
```

```
 1                     KWOK
 2    Kong, Hong Kong International.
 3              THE INTERPRETER:  This is a loose
 4         translation by interpreter.
 5         Q.    So when I said Shiny Times, you
 6    didn't think I was talking about Shiny Times,
 7    the entity that you're here as a corporate
 8    representative for, you thought I was talking
 9    about a company called Hong Kong International?
10         A.    Yes.
11         Q.    And you didn't discuss that issue
12    with your counsel during the break?
13              MR. HARMON:  Just yes or no.  Okay.
14         Thank you.
15         A.    No.
16         Q.    Did you say earlier, this is another
17    clarification, did Zhang Wei provide the funds
18    to purchase the Sherry-Netherland apartment?
19         A.    Yes.
20         Q.    Did Zhang Wei have any involvement
21    in your Beijing Pangu Plaza apartment project?
22         A.    No.
23         Q.    We were talking about Genever
24    Holdings LLC, which is the New York company.
25    Do you remember that?
```

```
 1                          KWOK

 2        A.     Hmmm.

 3        Q.     Yes?

 4        A.     Yes.

 5        Q.     Thank you.  And the Genever Holdings

 6   LLC owns shares of the Sherry-Netherland and

 7   holds the proprietary lease agreement to the

 8   apartment on the 18th floor, right?

 9        A.     I don't really know.

10        Q.     But generally, do you think of

11   Genever Holdings LLC as the owner of the

12   apartment at the Sherry-Netherland?

13        A.     When you say an English name after

14   you say, I don't remember it.  I just know for

15   this house, the money for which it was

16   purchased was provided by Mr. Zhang Wei.

17        Q.     Does Genever Holdings LLC have any

18   assets?

19        A.     I don't really know.  The names of

20   the companies you're giving me, I'm getting so

21   confused.  I don't understand if it's A, B, or

22   C.  Completely confused.

23        Q.     Does Genever Holdings LLC have any

24   employees?

25        A.     I do not know.
```

```
 1                        KWOK
 2        Q.    Does Genever Holdings LLC have any
 3   offices?
 4        A.    I do not know.
 5        Q.    Does Genever Holdings LLC have a
 6   phone number?
 7        A.    I do not know.
 8        Q.    Does Genever Holdings LLC have any
 9   management?
10        A.    I do not know.
11        Q.    Who would know the answers to these
12   questions about Genever Holdings LLC?
13        A.    Zhang Wei and his attorneys.
14        Q.    Was Paul Weiss his attorney?
15              THE INTERPRETER:  I need him to
16        repeat the name again.
17        A.    I worked for Sherry and have
18   attorneys in China and in Hong Kong.
19        Q.    You know the law firm Paul Weiss?
20   Are you familiar with that firm?
21        A.    I have gone there one time, and from
22   there on I'm familiar with it.
23        Q.    Did they represent Zhang Wei?
24        A.    What was represented at that time as
25   Sherry was to purchase the house and it was
```

```
 1                        KWOK
 2   with the approval of Mr. Zhang Wei.
 3              THE INTERPRETER:  This is the
 4      interpreter.  Let me absolutely make sure
 5      I heard it correctly.  I'll have to ask
 6      him to repeat that.  I'll repeat it back
 7      to him and ask him if that's correct.
 8      A.     Zhang Wei agreed to have Paul Weiss
 9   as representative to purchase this apartment
10   to communicate with the Hong Kong.
11      Q.     So Paul Weiss was representing Zhang
12   Wei in connection with the purchase of the
13   apartment?
14              MR. HARMON:  Object to the form of
15      the question.
16      A.     No, it's incorrect.  Zhang Wei never
17   directly.  Zhang Wei had me become a
18   representative, and then we found this William
19   Connolly and Paul Weiss to represent us, to go
20   to discuss to purchase this Sherry apartment.
21   It was agreed by Mr. Zhang Wei.
22      Q.     So Paul Weiss and Williams &
23   Connolly were representing you?
24      A.     Yes.
25      Q.     Were they also representing Zhang
```

```
 1                          KWOK
 2    Wei?
 3         A.     The truth in the background -- well,
 4    in the background it was Zhang Wei.
 5         Q.     Did Paul Weiss and Williams &
 6    Connolly know that Zhang Wei was in the
 7    background?
 8         A.     I do not remember.
 9         Q.     Who paid Paul Weiss and Williams &
10    Connolly's fees?
11         A.     In the end, it was Mr. Zhang Wei who
12    paid it.
13         Q.     Who signed the engagement letter
14    with Paul Weiss and Williams & Connolly?
15         A.     I do not know.
16         Q.     Does Genever Holdings LLC have any
17    relationship to Shiny Times?
18         A.     No.
19         Q.     Does Genever Holdings LLC have any
20    relationship to Golden Spring?
21         A.     No.
22         Q.     Does your son Mileson Kwok have any
23    ownership in Genever Holdings LLC?
24         A.     Unsure.
25         Q.     Do you know why the structure of
```

```
 1                         KWOK
 2    having a New York LLC owned by a British
 3    Virgin Islands corporation was used to
 4    purchase the Sherry-Netherland residence?
 5         A.    It was out of the investment needs
 6    of Mr. Zhang Wei.
 7         Q.    What do you mean by the investment
 8    needs?
 9         A.    This is how he always did his
10    investments.  I don't know why.
11         Q.    You mean he always structured them
12    through holding companies?
13         A.    I didn't say.  He requested to do it
14    this way.  I don't know why he did.
15         Q.    So my question is a little bit
16    different.  You say, "This is how he always
17    did his investments, and I'm trying to
18    understand what you mean by "this."
19         A.    Did the interpreter say always?  The
20    meaning was it was how he requested in this
21    way and we did it like that.  My gosh.
22    Whatever his decision was, it was his
23    decision.  He was investor, so I listened to
24    him.
25         Q.    Did you have any role in the
```

```
1                         KWOK

2    decision to structure the purchase this way?

3        A.    I play the role of representative.

4        Q.    So is the answer yes or no?

5        A.    Yes.

6        Q.    Why did you structure the purchase

7    in the way of having a New York LLC buy the

8    residence and have a British Virgin Island LLC

9    formed that would hold the New York LLC?

10              MR. HARMON:  Object to the form of

11        the question.

12        A.    This is at the request of Mr. Zhang

13   Wei and his attorneys.

14       Q.    Well, I just asked you if you had a

15   role in the decision to structure the purchase

16   this way and you said yes.

17              MR. HARMON:  Object to the form of

18        the question.

19       Q.    So I'm asking you why did you decide

20   to structure the purchase this way?

21              MR. HARMON:  Object to the form of

22        the question.

23       A.    I don't understand what you're

24   asking me.  Why?

25       Q.    Yes, why?
```

```
 1                         KWOK
 2              MR. HARMON:  Object to the form of
 3         the question.
 4         A.    If the attorney is objecting, I'm
 5    not going to answer it.
 6              MR. HARMON:  He can answer this
 7         question, if he can.
 8         A.    Because I'm occasionally living
 9    here, I could use it, and I'm a representative
10    and this is a good investment for the whole
11    family.
12         Q.    My question was why you structured
13    the purchase through two companies, a New York
14    company and a British Virgin Islands company.
15              MR. HARMON:  Object to the form of
16         the question.
17         A.    I don't really know.
18         Q.    Was it to make sure it was difficult
19    to access by creditors?
20              MR. HARMON:  Object to the form of
21         the question.
22              Please make sure that you interpret
23         my objections.
24              THE INTERPRETER:  I did.
25              MR. HARMON:  Thank you.
```

```
 1                          KWOK
 2        A.    Completely ridiculous.
 3        Q.    In this lawsuit, are you aware that
 4   your lawyers have filed papers on your behalf
 5   with the court?
 6        A.    Of course I do.
 7        Q.    And those papers obviously are in
 8   English, not Chinese, right?
 9        A.    I think so.
10        Q.    And so I take it you're not able to
11   review those papers before they're filed?
12        A.    Of course.
13        Q.    Do you receive a Chinese translation
14   of those papers that are filed with the court
15   before they're filed?
16        A.    No.
17        Q.    Do you do anything to review the
18   papers before they're filed to ensure that
19   they're accurate?
20        A.    I will ask, and the attorneys would
21   talk to me about it orally.  My assistant
22   would also speak to me orally about it.
23        Q.    Who is your assistant?
24        A.    We're together, Eva Wang, Wang Yan
25   Ping.
```

```
 1                      KWOK
 2              THE INTERPRETER:  W-A-N-G, Y-A-N,
 3        P-I-N-G.
 4        Q.    Does she go by Yvette, not Eva?
 5        A.    Yes.
 6        Q.    You said earlier that Zhang Wei was
 7   in jail in China?
 8        A.    Yes.
 9        Q.    When did he go to jail?
10        A.    I have to think about that.  Always
11   in a different disappearance mode.  There have
12   been thousands of people in disappearance
13   mode.  Do not know where they are.
14        Q.    Let me try to help, maybe.  You and
15   Zhang Wei were involved in applying to
16   purchase the Sherry-Netherland residence in or
17   around February/March 2015, right?
18        A.    Zhang Wei and me?  No, I was
19   representing Zhang Wei.
20        Q.    You were representing Zhang Wei in
21   purchasing the apartment in or around February
22   or March 2015?
23        A.    Approximately.  I do not remember
24   exact time.  Just approximate.
25        Q.    I'm just trying to -- I'm just
```

```
 1                      KWOK
 2    trying to refresh you on the timing.
 3        A.    My recollection of time is very
 4    inaccurate.  I do not remember.
 5        Q.    Was Zhang Wei in jail at the time he
 6    was applying to purchase the Sherry-Netherland
 7    Hotel apartment?
 8        A.    No.
 9        Q.    Are you aware that my client has
10    argued to the Court about a YouTube video?
11        A.    Yes.
12        Q.    And you're aware that whoever posted
13    that video has represented that it was a tape
14    of you having a conversation?
15             MR. HARMON:  Object to the form of
16        the question.
17        A.    I don't understand the things you're
18    saying.
19        Q.    Have you ever heard that YouTube
20    video?
21        A.    Me, so many of them, thousands,
22    hundreds of thousands of them.  I don't know
23    which one you're referring to.
24        Q.    I'm referring to the one -- do you
25    understand that I'm referring to the one that
```

```
 1                         KWOK
 2      we talked about earlier, two minutes ago, that
 3      Pacific Alliance argued about to the court in
 4      this case?
 5            A.    I don't know.
 6   Di           MR. HARMON:  This is beyond the
 7           scope of what we believe is appropriate
 8           for attachment discovery, and I'm going to
 9           direct the witness not to answer further
10           questions about it.
11            Q.    Are you aware, Mr. Kwok, that in a
12      brief in this case that was signed by
13      Mr. Harmon and Ms. Searles, they argued on
14      your behalf that Pacific Alliance's assertion
15      that the voices in this YouTube video were not
16      proven?
17   DI           MR. HARMON:  This is beyond the
18           scope of what we believe to be appropriate
19           discovery on attachment, and I'm going to
20           direct the witness not to answer further
21           questions on the subject.
22                THE INTERPRETER:  Interpreter,
23           before I interpreted, he said:
24       A.    Refuse to answer.
25       Q.    Was it your voice on the YouTube
```

```
 1                        KWOK
 2      video?
 3   DI            MR. HARMON:  Same objection.  Same
 4           direction.
 5           A.    Refuse to answer.
 6                 MR. MOSS:  I'm going to mark as --
 7           what exhibit are we?
 8                 Actually, could we just go off the
 9           record for a second?
10                 THE VIDEOGRAPHER:  We're now off the
11           record, the time is 11:43 a.m.
12                 (Discussion held off the record.)
13                 THE VIDEOGRAPHER:  We're now back on
14           the record.  The time is 11:44 a.m.
15                 (Kwok Exhibit 2, Printout from
16           YouTube, marked for identification, as of
17           this date.)
18   BY MR. MOSS:
19           Q.    Mr. Kwok, you've been handed
20      Exhibit 2, which is a printout from YouTube
21      and it's entitled "Guo Wengui (Kwok Miles) is
22      planning to sell his private jet and yacht."
23      I'd just like to put on the record that
24      Pacific Alliance cited to this YouTube video
25      in its attachment motion, and that in
```

```
 1                          KWOK
 2     opposition to its attachment motion Mr. Kwok
 3     filed a brief dated May 16, 2018, and relating
 4     to this issue on page 15, the brief reads as
 5     follows:
 6                    "Yet Frances," who is PAX's
 7     investigator, "offers no proof beyond his own
 8     assertion that the voices are those of Kwok
 9     and his associates or that Kwok or anyone
10     associated with him uploaded the audio
11     recording in question, and there is
12     substantial reason to question both the
13     authenticity of the audio and the motives
14     behind the individual or entity who uploaded
15     it and represented that it was, in fact, Kwok
16     making the statements in question."
17                    Now I'm going play the audio.
18                    (Whereupon, an audio/video is
19          played.)
20                    THE WITNESS:  I refuse to listen.
21          I'm not going to listen.
22          Q.    Sorry, Mr. Kwok, were you covering
23     your ears?
24          A.    This is all communist.  Everything
25     here is all communist.  Unless you prove this
```

```
 1                          KWOK
 2      is not communist, then I will listen.  They
 3      have recorded over a million of tax audios,
 4      videos that are fake.  Unless you could prove
 5      this is real, otherwise I will not listen to
 6      it.  What relationship is this to me?  Unless
 7      you could prove this is what I have said, that
 8      this is my words, my audio, my video, then I
 9      will listen to it.
10           Q.    You refuse to listen to the video?
11   DI          MR. HARMON:  I object on the same
12           basis and direct the witness not to answer
13           the   question.
14           A.    I have a sensation of committing
15      suicide if you're going play that.  This is
16      communist.  Very simple.  There is like a
17      number of place that the communist that have
18      been proven by the FBI to be fake.  So you
19      want me to commit suicide?  Are you here to
20      kill me?  I here seriously declare for all the
21      videos that you would show as outside the
22      parameters that's causing me mental distress,
23      I will reserve my right to sue.  I like my
24      attorney to note I reserve my right of the
25      personal attacks by the other party against
```

```
 1                         KWOK
 2    me, and I like to ask for the authenticity of
 3    this documents with a person's authenticity.
 4    I like to request an investigation of it.  I'm
 5    done.
 6         Q.   So, Mr. Kwok, you will not answer
 7    any questions about the video?
 8  DI         MR. HARMON:  Same objection.  Same
 9         direction.  Beyond the scope of what I
10         believe appropriate to ask in discovery.
11         A.   I believe this is humiliation, these
12    are threats and will need to pay
13    responsibility for these actions.
14              MR. MOSS:  Please let the record
15         reflect that when Mr. Kwok asked me to
16         stop playing the video, I stopped playing
17         the video.  I will not play it anymore.
18              I note that Mr. Harmon has objected
19         to this line of questioning and instructed
20         Mr. Kwok not to answer any questions about
21         this video.
22              I have that right, right,
23    Mr. Harmon?
24              MR. HARMON:  I'm sorry?
25              MR. MOSS:  I got it right?  You're
```

```
 1                          KWOK
 2        instructing --
 3             MR. HARMON:  I thought you said you
 4        I have that right, as opposed to it's my
 5        right to something.
 6             MR. MOSS:  Fair enough.  I'm
 7        correct, you're instructing the witness --
 8             MR. HARMON:  I'm instructing the
 9        witness not to answer the questions for
10        the reasons I've already stated on the
11        record.
12        Q.    What is Golden Spring New York Ltd.?
13        A.    It is Hong Kong Golden Spring, a
14   company that they have expanded in New York.
15        Q.    Who is "they"?
16        A.    Hong Kong Golden Spring.
17        Q.    Who owns Golden Spring New York?
18        A.    Hong Kong Golden Spring owns.
19        Q.    Who owns Hong Kong Golden Spring?
20        A.    Guo Qiang.
21             THE INTERPRETER:  G-U-O, Q-I-A-N-G,
22        phonetic spelling.
23        Q.    Is Guo Qiang a family member of
24   yours?
25        A.    Yes.
```

```
1                           KWOK
2         Q.    What is the relation?
3         A.    My son.
4         Q.    Do you have any ownership interest
5   in Golden Spring Hong Kong?
6         A.    No.
7         Q.    Is Guo Qiang the same son as Mileson
8   or is it a different son?
9         A.    It's the same person.
10        Q.    Do you have any ownership interest
11  in Golden Spring New York?
12        A.    No.
13        Q.    So Golden Spring is owned by your
14  son?
15        A.    My son also represents the family in
16  owning it.
17        Q.    Does the son represent you in owning
18  it?
19        A.    No.
20        Q.    Your son represents other family
21  members in owning it?
22        A.    Yes.
23        Q.    Does your son represent Zhang Wei in
24  owning Golden Spring?
25        A.    Yes.
```

```
 1                        KWOK
 2        Q.   Is your son the sole shareholder of
 3   Golden Spring?
 4             MR. HARMON:  Object to the form of
 5        the question.
 6        A.   I'm not really sure.
 7        Q.   Do you know of any other
 8   shareholders of Golden Spring?
 9             MR. HARMON:  Object to the form of
10        the question.
11        A.   I'm not sure.  I don't know.
12        Q.   Does Golden Spring have any
13   directors?
14             MR. HARMON:  Object to the form of
15        the question.
16        A.   I'm not sure.
17             MR. MOSS:  Mark, what's wrong, you
18        don't like that I'm not using one of the
19        entities?
20             MR. HARMON:  I don't know which
21        entity --
22             MR. MOSS:  Hong Kong or New York?
23             MR. HARMON:  I don't know which one
24        you're talking about, or both.
25        Q.   Do any of the Golden Spring entities
```

```
1                          KWOK
2      have employees?
3           A.    Yes, there are employees.
4           Q.    Are there employees in the New York
5      Golden Spring?
6           A.    Yes.
7           Q.    What business is Golden Spring in?
8           A.    Invest in real estate, media.
9           Q.    What role, if any, do you have for
10     Golden Spring New York?
11          A.    I'm consultant.
12          Q.    What do you do as consultant?
13          A.    Their haven't, give advice.
14          Q.    Does Golden Spring New York have any
15     relationship with Genever Holdings
16     Corporation?
17               MR. HARMON:  Object to the form of
18          the question.  You can answer.
19          A.    No.
20          Q.    Does Golden Spring New York have any
21     relationship with Genever Holdings LLC?
22               MR. HARMON:  Object to the form of
23          the question.
24          A.    No.
25          Q.    Does Golden Spring Hong Kong have a
```

```
 1                        KWOK
 2     relationship with either of the Genever
 3     companies?
 4          A.    No.
 5          Q.    Does Shiny Times New York maintain
 6     its offices at 800 Fifth Avenue?
 7          A.    I do not know.
 8          Q.    Do you know whether or not Shiny
 9     Times has a lease for offices in New York City
10     with a company called Urbana Properties?
11          A.    I do not know.
12          Q.    Do you know whether or not Golden
13     Spring was ever late on any lease payments for
14     its offices?
15          A.    I do not know.
16          Q.    Does Yvette have any role with
17     Golden Spring?
18          A.    CEO.
19          Q.    Any other role?
20          A.    I'm not really sure.
21          Q.    Is she the president?
22          A.    Yes, I think so.
23          Q.    Have certain of your assets been
24     seized by the Chinese government?
25  DI            MR. HARMON:  Again, I think that
```

```
1                        KWOK
2       this is an area that's beyond the scope of
3       discovery and direct the witness not to
4       answer.
5            MR. MOSS:  Have you seen the
6       agreement that we have on the scope of
7       discovery?
8            MR. HARMON:  Yes.  But if you have a
9       question about it, I'm happy to discuss it
10      with you.
11           MR. MOSS:  Sure.  So the agreement
12      on the scope of discovery relates to
13      discovery of Mr. Kwok's New York assets,
14      and I'm asking him a general question
15      about whether or not assets outside the
16      U.S. have been seized by the Chinese
17      government.
18           MR. HARMON:  I understand that.  So
19      there's an agreement regarding asking
20      about New York assets?
21           MR. MOSS:  Right, yes.
22           MR. HARMON:  There's an agreement
23      that was reached about asking about New
24      York assets.  There was no agreement
25      reached one way or the other, and I am
```

```
 1                          KWOK
 2          asserting that the scope of the discovery
 3          does not reach that far and I'm directing
 4          him not to answer.
 5                  MR. MOSS:  Okay.  Perfect.
 6                  Let's mark.
 7                  (Kwok Exhibit 3, Federal Court
 8          Complaint, marked for identification, as
 9          of this date.)
10   BY MR. MOSS:
11          A.    What is this?
12          Q.    Mr. Kwok, Exhibit 3 is a Complaint
13     that was filed in Federal Court in New York
14     City in May of 2018 by you and Pacific
15     Alliance Investment Company and Beijing Zenith
16     Holdings Company against Zheng, Z-H-E-N-G,
17     W-U, a/k/a Bruno Wu.
18          A.    Yes.
19          Q.    Are you aware that you filed a
20     lawsuit against Mr. Wu?
21          A.    Yes.
22          Q.    Did you review this Complaint to
23     make sure that it was accurate?
24                  MR. HARMON:  I'm going to --
25          A.    I refuse to answer.
```

```
 1                          KWOK
 2   DI              MR. HARMON:  I'm going assert the
 3          same objection and the same direction.
 4          Q.    Do you have any doubt that the
 5      information in this complaint that you filed
 6      in federal court is accurate?
 7   DI              MR. HARMON:  Same objection.  Same
 8          direction.
 9          Q.    I'd like to direct your attention to
10      paragraph 56, page 11.  I'm just going to read
11      into the record the allegation that "On or
12      around January 28, 2015, Chinese
13      authorities --
14              MR. HARMON:  Sorry.  Where are you
15          reading from?
16              MR. SARNOFF:  Bottom of page 13.
17              MR. MOSS:  Paragraph 56, page 13.
18              MR. HARMON:  I thought you said 11.
19              MR. MOSS:  I did.  I'm sorry.
20          Q.    "On or around January 28, 2015,
21      Chinese authorities, acting at the direction
22      of Defendant Wu'S co-conspirators, began
23      seizing the plaintiff companies' assets."
24              THE INTERPRETER:  Before I
25          interpreted:
```

```
 1                        KWOK
 2        A.    I refuse to listen.  This is not
 3    related to anything today.  I refuse to read
 4    it or listen to it.
 5  DI            MR. HARMON:  I want to make clear
 6           that it's at my direction, not his choice,
 7           not solely his choice, but also at my
 8           direction.
 9        Q.    Mr. Kwok, are you refusing to answer
10    my questions about this document based on your
11    own choice?
12  DI            MR. HARMON:  I am directing him not
13           to answer the questions --
14               MR. MOSS:  Can you let him get a
15           translation?
16               MR. HARMON:  I am making a statement
17           for the record, please.
18               MR. MOSS:  I know you're trying to
19           testify.
20  DI            MR. HARMON:  I'm not trying to
21           testify.  I'm trying to make an objection
22           for the record.
23               I object for the same reasons we've
24           already discussed and I direct the witness
25           not to answer.
```

```
 1                         KWOK

 2          Q.    So the question is:  Mr. Kwok, are

 3     you refusing to answer my questions about this

 4     document based on your own choice?

 5  DI           MR. HARMON:  Same objection.  Same

 6          direction.

 7          A.    I refuse to answer.

 8                MR. MOSS:  And, Mr. Harmon, you're

 9          instructing him not to answer that

10          question?

11                MR. HARMON:  I am.

12          Q.    Is it true that in or around late

13     January and early February 2015 the Chinese

14     government seized the assets of Beijing Zenith

15     Holdings Company?

16  DI           MR. HARMON:  Same objection.  Same

17          direction.

18          A.    I refuse to answer.

19          Q.    When did you learn about the asset

20     seizures of Zenith?

21  DI           MR. HARMON:  Same objection.  Same

22          direction.

23                THE INTERPRETER:  Interpreter not

24          having interpreted yet.  The response was:

25          A.    I refuse to answer.
```

```
1                          KWOK
2          Q.    When did you learn that the assets
3      of Beijing Pangu were seized by the Chinese
4      government as alleged in this complaint?
5   DI             MR. HARMON:  Same objection.  Same
6             direction.
7          A.    Refusal to answer.
8          Q.    Did you provide financial
9      information from Beijing Zenith Holdings
10     Company Ltd. to the Sherry-Netherland in
11     connection with the application to purchase
12     the apartment in 2015?
13         A.    I do not know.
14         Q.    Did you know --
15             (Kwok Exhibit 4, Letter with
16             attached financial information, marked for
17             identification, as of this date.)
18         A.    What is this thing?
19         Q.    Mr. Kwok, this is a document that's
20     been marked Exhibit 4.  It's a February 27,
21     2015, letter to the board of directors of the
22     Sherry-Netherland regarding the application of
23     Mr. Kwok Ho Wan, Bates stamped SN 0058.  Then
24     there's an attachment and there's also a
25     letter from Williams & Connolly with its own
```

```
 1                        KWOK

 2    attachment.

 3              Mr. Kwok, this letter states, from

 4    Paul Weiss, "We act as local real estate

 5    counsel for Mr. Kwok Ho Wan, an applicant to

 6    become a shareholder tenant at the

 7    Sherry-Netherland."

 8              Were you an applicant to become a

 9    shared tenant at the Sherry-Netherland?

10         A.   I -- I completely don't remember.  I

11    don't even remember me seeing this document.

12    I have not seen it.

13         Q.   So the question is whether or not

14    you were an applicant to become a shareholder

15    or tenant at the Sherry-Netherland in February

16    of 2015.

17         A.   I did not apply.  But this thing I

18    don't remember.  I don't remember seeing this.

19              MR. MOSS:  Sorry.  He said, "I did

20         not apply?"

21              THE INTERPRETER:  I believe so.  I

22         can clarify with him.

23         A.   I know that they have been applying,

24    but I did not see this document.

25         Q.   But you believe you were the
```

```
1                          KWOK
2    applicant?
3         A.    I do not have any ideas about me
4    believing or not.  I don't have these ideas.
5         Q.    To your knowledge, did anyone at
6    Paul Weiss or Williams & Connolly or anyone
7    acting on your behalf or Zhang Wei's behalf
8    tell the Sherry-Netherland that Zhang Wei was
9    involved in this purchase?
10              MR. HARMON:  Asked and answered.  At
11         this time a third time that you've asked
12         that question.  I'll let him answer it
13         again.
14              THE INTERPRETER:  To your knowledge,
15         Paul Weiss, William Connolly, represent to
16         Sherry-Netherland that Zhang Wei was an
17         applicant?  Is that the question?
18         Q.    To your knowledge, did anyone at
19    Paul Weiss or Williams and Connolly or anyone
20    acting on your behalf or Zhang Wei's behalf
21    tell the Sherry-Netherland that Zhang Wei was
22    involved in this purchase?
23              MR. HARMON:  And please make sure
24         you translate my objection to the witness,
25         as well.
```

```
 1                        KWOK
 2        A.    I complete don't -- I don't
 3   remember.
 4        Q.    Did you authorize Paul Weiss and
 5   Williams & Connolly to communicate with the
 6   Sherry-Netherland on your behalf?
 7        A.    I don't remember.
 8        Q.    Do you have any reason to doubt that
 9   you authorized Paul Weiss and Williams and
10   Connolly to communicate with the
11   Sherry-Netherland on your behalf?
12        A.    I don't quite understand what you
13   mean.
14        Q.    Why don't you take a look, please,
15   at SN 0060.  And I will represent, Mr. Kwok,
16   that this is a document that says Consolidated
17   Balance Sheet for December 31, 2014, of
18   Beijing Zenith Holdings Company and that this
19   was provided by Paul Weiss to the
20   Sherry-Netherland.
21        A.    I do not know.
22        Q.    You don't remember that Beijing
23   Zenith Holdings financials was presented to
24   the Sherry-Netherland board in connection with
25   your application?
```

```
1                       KWOK
2        A.    I don't remember.
3        Q.    It's a long time ago.  Do you -- as
4  of 2015, did you have any ownership interest
5  in Beijing Zenith Holdings Company Ltd.?
6        A.    No.
7        Q.    Did Zhang Wei have an ownership
8  interest in Beijing Zenith Holdings Company
9  Ltd.?
10       A.    I do not know.
11       Q.    Do you know why Beijing Zenith
12 Holding Company's financials were submitted to
13 the Sherry-Netherland in connection with your
14 application to purchase?
15       A.    I do not know.
16       Q.    Who owned Beijing Zenith Holdings
17 Company Ltd. as of February 2015?
18       A.    Zhang Wei, the family member or
19 members of Zhang Wei was in dominating control
20 of it.  His wife's older sister controlled
21 about 90 percent.  I'm not sure, but that's
22 approximate.
23       Q.    So Zhang Wei's family members owned
24 Beijing Zenith Holdings?
25       A.    Yes.
```

```
 1                          KWOK
 2          Q.    And you personally had no ownership
 3     interest at all?
 4          A.    Yes.
 5          Q.    And you no control at all over
 6     Beijing Zenith at this time?
 7          A.    Right.
 8          Q.    Do you know why Paul Weiss
 9     represented in the cover letter that Mr. Kwok
10     is the owner and controlling party of China
11     Zenith Holdings Company in that letter?
12          A.    I don't know why he would write it
13     like that.
14          Q.    You never told Paul Weiss that?
15 DI          MR. HARMON:  Object to the form of
16          the question.  Hold on a second.  I'm
17          going to object on attorney/client
18          privilege.
19          A.    Refuse to answer.
20          Q.    That's fine.  Let me try it this
21     way, as a yes/no question:  Do you have any
22     idea how Paul Weiss got the understanding that
23     you, Mr. Kwok, were the owner and controlling
24     party of China Zenith Holdings?
25               MR. HARMON:  Just yes or no.
```

```
                            KWOK
 1
 2      A.      I don't know.
 3              You know, I'm sorry, my leg and my
 4      shoulder, because previously in prison I was
 5      beaten, I'm in great pain.  It was in '89.
 6      Q.      Do you want to take a break?
 7      A.      No, I'm just letting you know when
 8      I'm in pain, I have to move, so please
 9      don't -- you know, I like to just sit there
10      and not move, but then, because the pain, I
11      have to constantly move.  Usually when I'm in
12      the office I'm always standing, I'm not
13      sitting.
14      Q.      As I said earlier, if at any time
15      you need a break for as long as you need, just
16      please tell me and I'm happy to --
17      A.      Thank you, sir.  But you know what?
18      Right now I'd really like to sleep.  I haven't
19      been sleeping for two days.
20      Q.      Me too.
21      A.      You are very successfully abusing me
22      on behalf of CCP.
23      Q.      Mr. Kwok, did you know, at the time
24      this Beijing Zenith Holdings balance sheet was
25      submitted to the Sherry-Netherland that
```

```
1                          KWOK
2    Beijing Zenith Holdings' assets had been
3    frozen by the Chinese government?
4              MR. HARMON:  Object to the form of
5         the question.
6         A.    I refuse to answer.
7              MR. HARMON:  You can answer this one
8         if you understand the question.
9         A.    In that case, I know.  Yes.
10        Q.    Mr. Kwok, I'm now -- I know you
11   can't follow along with me, but I'm now
12   turning to page SN 0063, which had is the
13   Williams Connolly document, and Williams
14   Connolly writes to the board of the
15   Sherry-Netherland that "Mr. Kwok is eager to
16   become a resident at the Sherry, but also
17   feels keenly the need for confidentiality
18   regarding his business and financial affairs."
19             Do you recall that Williams &
20   Connolly made that representation to the
21   Sherry-Netherland on your behalf?
22        A.    I do not know with this letter.
23        Q.    Did you communicate to anyone that
24   there was a strong need to maintain
25   confidentiality around your financials and
```

```
 1                        KWOK
 2    business affairs?
 3         A.    No.
 4         Q.    And are aware that the Williams &
 5    Connolly letter on page SN 0062 also
 6    represented that you, Mr. Kwok, were the one
 7    who was applying to become a shareholder
 8    tenant?
 9         A.    I don't remember.
10         Q.    What is Bravo Luck?
11         A.    I think Bravo Luck -- I think Bravo
12    Luck is a company that is -- has some relation
13    to Mr. Zhang Wei, but I'm not really sure.
14    When you say English, I become confused.
15         Q.    Do you have any relation to Bravo
16    Luck?
17         A.    I really don't know.
18              THE VIDEOGRAPHER:  We're now off the
19         record.  The time is 12:25 p.m.
20              (Luncheon recess taken at 12:25
21         p.m.)
22
23              THE VIDEOGRAPHER:  This marks the
24         beginning of Tape Number 3 in the
25         deposition of Mr. Miles Kwok.  We're now
```

```
1                      KWOK
2        back on the record.  The time is
3        12:57 p.m.
4              (Kwok Exhibit 5, UBS Hong Kong
5        statement for Bravo Luck Limited entitled
6        Debit Advice, marked for identification,
7        as of this date.)
8  BY MR. MOSS:
9        Q.    Good afternoon, Mr. Kwok.
10       A.    Good afternoon everybody.
11       Q.    Thank you.  I have handed you -- the
12   court reporter has handed you Exhibit 5, which
13   is a statement entitled Debit Advice from UBS
14   in Hong Kong for Bravo Luck Limited, and it's
15   Bates stamped Kwok 510, and it was produced by
16   your counsel to us in this case, Mr. Kwok.
17             Bravo Luck Limited is a company
18   owned by Zhang Wei?
19       A.    Yes.
20       Q.    You have no ownership interest in
21   Bravo Luck Limited?
22       A.    I do not remember having any.
23       Q.    You don't remember having any
24   interest in Bravo Luck Limited at any time,
25   right?
```

KWOK

A. I do not remember.

Q. Sitting here today, you believe you never had an interest in Bravo Luck Limited?

A. I really truly don't remember because I can't read this document and I don't remember this Bravo Luck Limited. I'm sorry, I don't know.

Q. This document says that it's in favor of Ivey Barnum & O'Mara LLC. Do you know who that is?

A. What is that? Where is that?

Q. Well, it's in the middle of the document.

A. What is that called? I don't know.

Q. I'll tell you, Mr. Kwok, based on my rudimentary Google searches it's a law firm in Connecticut. Does that refresh your recollection?

A. I really don't know. Where is Connecticut? Is it in Hong Kong?

Q. It's very close to here. It's close to New York.

A. Oh. I don't know.

Q. Is Bravo Luck Limited the entity

```
1                      KWOK
2   from where the funds came to purchase the
3   Sherry-Netherland apartment?
4        A.      It should be so.
5        Q.      And the purchase price in March of
6   2015 was $67.5 million?
7                THE INTERPRETER:  I'm sorry.  I did
8        66.2 million.  The interpreter -- I made a
9        mistake.  The interpreter, I made a
10       mistake in my interpretation.  I believe I
11       said 6 billion and he made correction, oh,
12       67 million.
13       A.      Oh, I don't remember that.
14       Q.      Do you remember approximately how
15   much the apartment was purchased for?
16       A.      I don't really remember.  I just
17   remember that Mr. Zhang Wei had at that time a
18   $100 million budget.  But as for how much that
19   was at that time, I don't remember.
20       Q.      Do you know who sold the
21   Sherry-Netherland apartment?
22       A.      Cathy, Cathy Sloan.
23       Q.      Who spoke with Mr. Sloan to
24   negotiate the purchase price?  Was it -- oh,
25   oh, scholarship.  Cathy Sloan.  Cathy Sloan
```

```
 1                        KWOK
 2   was your real estate broker?
 3        A.    Yes.  Yes.
 4        Q.    And was the apartment purchased from
 5   Gilbert Haroche?
 6        A.    I don't know who that person is.
 7        Q.    Do you know who the owner of the
 8   apartment was before Zhang Wei and you
 9   purchased it?
10             MR. HARMON:  Object to the form of
11        the question.
12        A.    I really can't remember.  I do not
13   know.
14        Q.    Did you negotiate the price, you
15   personally negotiate the price with the
16   seller?
17        A.    No.
18        Q.    Did Zhang Wei negotiate with the
19   seller?
20        A.    I do not know.
21        Q.    Do you know who did negotiate on
22   behalf of the purchaser with the seller?
23        A.    I was one among many.  There was
24   Zhang Wei's attorney and the employee or
25   employees of his office.  Many people.  I was
```

```
 1                        KWOK
 2      the only one who did not speak English.  All
 3      the other ones spoke English.
 4          Q.    When the application was submitted
 5      to the Sherry-Netherland for you to live in
 6      the apartment, did you intend to live in New
 7      York permanently?
 8          A.    No.
 9          Q.    Can did you ever tell anyone at the
10      Sherry-Netherland that you intended to make
11      New York City your home and your family's
12      home?
13          A.    I don't remember.
14          Q.    Did you ever tell anyone at the
15      Sherry-Netherland that you planned to spend
16      about six to nine months at the residence in
17      New York?
18          A.    I don't remember that.
19          Q.    Did you ever tell anyone at the
20      Sherry-Netherland that they needed to review
21      your application very quickly or else you
22      would pull your application and no longer be
23      interested?
24          A.    No.
25          Q.    Did you ever mention anything to the
```

```
 1                          KWOK
 2    Sherry-Netherland regarding Feng Shui?
 3        A.    I don't -- well, definitely I
 4    mention Feng Shui, but I don't remember who I
 5    said it to.  My English competency level is
 6    not enough for me to communicate with anybody.
 7        Q.    Did there come a time when the
 8    apartment was placed on the market to sell?
 9        A.    Oh, I think it was 2016 or 2013
10    because Mr. Zhang Wei, he had been arrested,
11    in prison, was not able to get in touch with
12    him, and so his attorney said that it should
13    be placed onto the market to be sold.  Hold
14    on, hold on.  Oh, because Mr. Zhang Wei, when
15    he was imprisoned, he had come back one time
16    and had said to his attorney to place it on to
17    the market.
18        Q.    Does October of 2015 sound right?
19        A.    This I don't remember.
20        Q.    Who was Zhang Wei's attorney to whom
21    you communicated about this?
22        A.    Hong Kong, Attorney Lao.
23              THE INTERPRETER:  L-A-O.
24        A.    Eric Zheng.
25              THE INTERPRETER:  Z-H-E-N-G.
```

KWOK

2      A.    I don't remember.  And there were
3   two others I don't remember.  I would never
4   have contact with them.  It was just their
5   assistant or assistants.  Their office had
6   contact.
7         Q.    Do you know if Eric and the others
8   were members of a law firm?
9      A.    Yes.
10      Q.    Do you know what law firm?
11      A.    I just remember Steven.  Other than
12   that, I do not remember.
13              MR. MOSS:  Can you mark Exhibit 6,
14         please.
15              (Kwok Exhibit 6, Realtor.com
16         printout, marked for identification, as of
17         this date.)
18   BY MR. MOSS:
19      A.    What is this again?
20      Q.    Mr. Kwok, before we get to that
21   document, does Stevenson, Wong & Company sound
22   like the right law firm?
23      A.    I just think Steven is right.  But
24   what company or law firm, I'm not sure.
25      Q.    So now you have Exhibit 6, and on

```
 1                           KWOK
 2    the first page it says, "Fall in love with the
 3    most popular homes of September."  This is a
 4    document from Realtor.com, and it's dated
 5    October 7, 2015, on the first page.
 6         A.    Yes.
 7         Q.    And it lists the Sherry-Netherland,
 8    18th floor, for $85 million on the second
 9    page.
10         A.    Okay.
11         Q.    Does that refresh your recollection
12    that it was around October 2015 when the
13    apartment was first put up for sale?
14         A.    Yes, around that time.  And I know
15    about this selling price too, and I know why
16    it's that price too.
17         Q.    Why was it that price?
18         A.    Because Mr. Zhang Wei has this
19    mistaken notion --
20              THE INTERPRETER:  This is
21         interpreter.  My mind is not working with
22         numbers, so he's giving the numbers.
23         A.    To purchase the house is 67.5 million,
24    and then pay 6 million in taxes, and also pay
25    3 million in maintenance, the guarantee, and
```

KWOK

1   also spend a few million buying new furniture,
2   and also paintings.  And so when it was sold,
3   everything was added together, said I want
4   this 85.  And then I said to him, this is
5   mistaken, this cannot be sold, you should go
6   back to your original because your 3 million
7   deposit, you'll be able to get it back, and
8   your paintings and your furniture, you could
9   take them away.
10          So I advised him, you know, it's
11  67.5, you just need to add 05, it's 68
12  million, that's okay, and he accepted.  And so
13  it's still more than it was before; it didn't
14  go down.
15  Q.   Was Zhang Wei in prison at this
16  time?
17  A.   Sometimes he would go from prison to
18  a hospital.  In China is called awaiting trial
19  while on bond.  This is something Americans
20  don't understand.  Since 2015 the government
21  has told him not to have contact with Guo Wen
22  Gui.
23          THE INTERPRETER:  G-U-O, W-E-N,
24  G-U-I.

```
 1                        KWOK
 2      A.    I am a challenger to the country and
 3   not to have any contact with me, otherwise he
 4   will never be out of prison again.  So since
 5   then, it's all through attorneys.
 6      Q.    So when you spoke to Zhang Wei about
 7   the purchase price, was -- well, strike that.
 8            When you were instructed to sell the
 9   apartment, did you actually talk to Zhang Wei
10   or only to his lawyers?
11      A.    It was somebody who he had found who
12   passed the word to me, attorney in Beijing,
13   attorney in Beijing Zenith.
14      Q.    An attorney from Beijing Zenith?
15      A.    Yes.  And also in prison now because
16   has spoken to me twice on the telephone and
17   was consequently arrested.  So I suggest to
18   all of you never to go to Beijing; it's too
19   unsafe.
20      Q.    Since October 2015, have you spoken
21   to Zhang Wei?
22      A.    No.
23      Q.    In June of 2016, the price of the --
24   the asking price for the apartment was
25   dropped, lowered from 85 million to 78
```

```
 1                        KWOK
 2   million; is that correct?
 3        A.    No, it's incorrect.  Very clearly
 4   going from 85 to 78, it was an understanding
 5   of the price that made it go down.
 6        Q.    Who made the decision -- well, first
 7   let me just ask, was the asking price lowered
 8   from 85 to 78 in or around June of 2016?
 9        A.    Yes.
10        Q.    Who made that decision?
11        A.    Zhang Wei.
12        Q.    How that was decision communicated
13   to you?
14        A.    The attorney at Zenith communicated
15   that to me.
16        Q.    When?
17        A.    I don't quite remember.  It's just a
18   week within when the decision was made.
19        Q.    What was that attorney's name?
20        A.    Xu Ang Yang.
21              THE INTERPRETER:  X-U, A-N-G,
22        Y-A-N-G.
23        Q.    And what did Xu Ang Yang say to you?
24        A.    He just said that it was Zhang Wei
25   who entrusted him to tell me to lower the
```

```
 1                        KWOK
 2   price to 78.  But that didn't include his
 3   paintings and those furniture.
 4        Q.     Was that conversation on the phone?
 5        A.     No, it is on the Chinese WeChat
 6   software.
 7        Q.     And where was Xu Ang Yang during
 8   that conversation?  In China?
 9        A.     In Beijing.
10        Q.     This year, in April of 2018, the
11   price was lowered again to $68 million; is
12   that right?
13        A.     Yes.
14        Q.     Who made that decision?
15        A.     It was the same.  Mr. Xu Ang Yang,
16   who represented Zhang Wei, passed the word
17   from him, and then he was arrested.
18        Q.     Who is "he"?  Mr. Xu Ang Yang?
19        A.     Yeah, Xu Ang Yang.
20        Q.     Is Ms. Cathy Sloan your broker in
21   connection with the attempted sale of the
22   apartment?
23        A.     It's the representative for this
24   project, yes.
25        Q.     She's representing the seller?
```

```
 1                          KWOK
 2          A.      Yes.
 3          Q.      Has Ms. Sloan ever spoken to Zhang
 4   Wei, as far as you know?
 5          A.      No.
 6          Q.      Does Ms. Sloan know who Zhang Wei
 7   is?
 8          A.      She just knows that it's a family --
 9   she knows that it's a family trust and doesn't
10   know anything else.   I have brought up Zhang
11   Wei with her many times, but I don't think she
12   remembers it.   She's gone to Beijing, she's
13   met with the family, but wrong Cathy will
14   remember that.
15          Q.      Ms. Sloan has gone to Beijing to
16   meet with your family, but you don't think she
17   will remember having gone to Beijing to meet
18   with your family?
19          A.      Yes, many people.
20          Q.      Many people what?
21          A.      Saw her one time, that she will go
22   to Beijing and saw her.
23          Q.      June of 2016, when the price was
24   lowered to 78 million, Ms. Sloan stated
25   publicly that the new price reflects the
```

```
 1                        KWOK
 2    seriousness of the seller.
 3         A.    I don't understand.  I don't know.
 4         Q.    Do you know how Ms. Sloan got the
 5    impression that the seller was serious about
 6    selling the apartment?
 7              MR. HARMON:  Object to the form of
 8         the question.
 9         A.    I don't understand.
10         Q.    When Ms. Sloan refers to the seller,
11    do you have an understanding of who she's
12    referring to?
13              MR. HARMON:  Object to the form of
14         the question.
15         A.    I don't understand your question
16    either.
17         Q.    Do you think Ms. Sloan views you as
18    the seller of the apartment?
19         A.    Absolutely not.
20         Q.    Who does Ms. Sloan believe is the
21    owner of the apartment?
22              MR. HARMON:  Object to the form of
23         the question.
24         A.    Of course she knows it's not me.
25         Q.    Who does she think it is?  If you
```

```
1                          KWOK
2    know.
3              MR. HARMON:  Object to the form of
4         the question.
5         A.    From the first day on, I told her I
6    was only the representative.
7         Q.    Who instructs Ms. Sloan with respect
8    to this apartment?
9         A.    Our attorneys, me, and Mr. Zhang
10   Wei's assistant, I think.  A lot of people.
11        Q.    Which attorneys?
12        A.    Hong Kong attorney, attorneys, and
13   also attorney or attorneys in China through
14   their assistants.
15        Q.    For example, when the decision is
16   made to lower the price, who communicates that
17   to Ms. Sloan?
18        A.    It's just not -- it's not limited to
19   me only.  I can't remember -- I don't think --
20   well, at least a few people.
21        Q.    Did you instruct her to lower the
22   price from 85 to 78?
23        A.    I had, but I was not the only person
24   who had said it.
25        Q.    Did you instruct her to lower the
```

```
 1                            KWOK
 2   price from 78 to 68?
 3        A.     No.
 4        Q.     Who made that instruction to
 5   Ms. Sloan?
 6        A.     It was Mr. Zhang Wei.  Zhang Wei.
 7        Q.     Zhang Wei instructed Ms. Sloan to
 8   drop the price from 78 to 68 this year?
 9        A.     No, it was through me told to Sloan.
10        Q.     So you instructed Ms. Sloan to drop
11   the price from 78 to 68?
12             MR. HARMON:  Object to the form of
13        the question.
14        A.     It was Zhang Wei's attorney, Xu Ang
15   Yang, who told me to tell Cathy Sloan.
16        Q.     Who is William Je, J-E?
17        A.     He's a fund partner.  He's a fund
18   manager and also a financial advisor.
19        Q.     What do you mean by fund partner?
20        A.     I think he has worked with Zhang Wei
21   et al.
22        Q.     Is he your partner?
23        A.     No.
24        Q.     And when you say fund manager, which
25   fund is he managing?
```

```
1                              KWOK
2        A.    He is the fund with Zhang Wei.
3        Q.    When you say financial advisor, to
4    whom does he provide financial advisory
5    services?
6        A.    Zhang Wei and Zhang Wei family.
7        Q.    Does William Je provide any services
8    to you?
9        A.    No.
10       Q.    Where does he live?
11       A.    Home is in Hong Kong.
12       Q.    Does he ever come to New York?
13       A.    I don't know.  You could ask him.
14       Q.    In October -- excuse me.  In April
15   of 2018, did you meet with Ms. Sloan and sign
16   a document authorizing her to lower the price
17   from 78 to 68 million?
18       A.    I think there is such a thing.
19       Q.    You remember?
20       A.    I think there was such a thing, but
21   I can't a hundred percent guarantee it.
22   Because it's in English, I can't read it, but
23   I think I recollect such a thing.
24       Q.    You remember meeting with Ms. Sloan
25   and signing a document around the time the
```

```
 1                         KWOK
 2   price was lowered from 78 to 68 million?
 3               THE INTERPRETER:  Before I
 4        interpreted, he said:
 5        A.   I have this impression, but I don't
 6   remember it.
 7        Q.   Do you remember anything that
 8   happened at that meeting with Ms. Sloan?
 9        A.   I do not.
10        Q.   Whose decision was it to lower the
11   price from 78 to 68 million?
12        A.   Mr. Zhang Wei.
13        Q.   And how was that communicated to
14   you?
15        A.   It was Xu Ang Yang who told me.
16        Q.   Has the apartment been on the market
17   continuously since October of 2015?
18        A.   I think so.
19        Q.   You don't remember ever taking it
20   off the market?
21        A.   I don't remember.
22        Q.   Are there any active discussions now
23   with any purchasers?
24        A.   I don't know.
25        Q.   Who would know that?
```

```
 1                          KWOK
 2        A.     I think Cathy would know that.
 3        Q.     Have any purchasers ever --
 4   potential purchasers ever made offers below
 5   what was then the asking price?
 6        A.     No.
 7        Q.     There have never been any
 8   negotiations where somebody has put in a bid
 9   and you've gone back and forth on price?
10        A.     No.
11        Q.     Has anyone ever made an offer for a
12   certain dollar figure?
13        A.     No.
14        Q.     Did you ever get an offer for
15   $60 million?
16        A.     No.
17        Q.     Did you ever get any offer that
18   Ms. Sloan advised you to consider seriously?
19        A.     I don't remember.
20        Q.     Did you ever tell Ms. Sloan to
21   pursue an aggressive marketing strategy for
22   the apartment?
23        A.     No.
24        Q.     Do you know whether or not you have
25   an obligation to inform the judge, the court
```

```
 1                        KWOK
 2    in our litigation, if there's a contract for
 3    sale or assignment of the apartment?
 4        A.    I do.
 5        Q.    And I take it currently there's no
 6    contract for sale or assignment?
 7        A.    Right, yes.
 8        Q.    Have you ever exchanged drafts of a
 9    contract with any potential purchaser?
10        A.    No.
11        Q.    If there comes to be a contract for
12    sale or assignment of the apartment, would you
13    inform the court?
14  DI          MR. HARMON:  Don't answer that
15          question.
16              You've already elicited from him
17          that he knows of the court order.  It's
18          unnecessary.  Let's move on.
19              MR. MOSS:  Your basis for the
20          instruction is that it's unnecessary?
21              MR. HARMON:  He's already answered
22          that he's aware of the court order and I
23          think we should move on.
24              MR. MOSS:  Well, I appreciate your
25          thoughts, but what is the basis for your
```

```
 1                      KWOK
 2        instruction?
 3             MR. HARMON:  I think it's an
 4        inappropriate question in relation to
 5        whether or not PAX is entitled to an
 6        attachment.  He's aware of the order.
 7             MR. MOSS:  So it's a relevance
 8        objection?
 9             MR. HARMON:  It's beyond the scope.
10        You know it's something that we've been
11        discussing for quite some time.
12        Q.   Mr. Kwok, if there comes to be a
13     contract for sale or assignment of the
14     apartment, will you inform the court?
15  DI          MR. HARMON:  Don't answer the
16        question, Mr. Kwok.
17             THE INTERPRETER:  By interpreter, he
18        said:
19        A.   Refuse to answer.
20        Q.   You're refusing to answer because
21     your counsel instructed you not to answer?
22        A.   Yes.
23             MR. MOSS:  So whether or not
24        Mr. Kwok is going to comply with an order
25        that was issued in connection with the
```

KWOK

2 attachment motion is beyond the scope of

3 discovery on our attachment motion?

4    MR. HARMON:  In discovery, that's

5 right.  That's my position.

6    MR. MOSS:  Okay.  Great.

7  Q. Did there come a time, Mr. Kwok,

8 when you tried to transfer ownership of the

9 residence to your son, Mileson?

10  A. I don't remember that.

11  Q. You don't remember ever instructing

12 Ms. Sloan to have a conversation with the

13 Sherry-Netherland about transferring ownership

14 of the residence to your son Mileson?

15  A. I do not remember.

16  Q. Is there someone named Yong,

17 Y-O-N-G, who worked for you in 2016?

18  A. He not only worked with me, but he

19 worked with Zenith Pangu and Zhang Wei.

20  Q. And is that Yong Yue, Y-U-E, or Yue

21 Yong?

22  A. Yong Yue.

23    THE INTERPRETER:  Yang would be

24 Y-A-N-G, Y-O-N-G.

25  A. It should be Yu.

```
1                         KWOK
2              THE INTERPRETER:  Y-U.
3      Q.    Thank you.  Do you know who Helen
4   Manis is?
5      A.    I don't remember.
6      Q.    If I told you she was a lawyer in
7   England, would that help you?
8      A.    I don't remember.
9      Q.    Have you ever had any discussions
10  with Ms. Manis?
11     A.    No.
12     Q.    Have you ever had any discussions
13  with Yong about trying to transfer the
14  ownership of the apartment to Mileson's name?
15     A.    No.
16     Q.    Does Yong still work for you?
17     A.    We lost him for a year.  Can't find
18  him.  Maybe was also arrested by the Chinese
19  communist.
20     Q.    Was he living in New York at the
21  time or China?
22     A.    It's been over a year.  I don't know
23  where he is.
24     Q.    Do you recall that there was an
25  attempt to restructure the ownership of the
```

```
 1                        KWOK

 2     Genever Holdings so that it would be owned by

 3     a trust of which Mileson was a beneficiary?

 4          A.    I don't -- I don't remember.

 5          Q.    Did you ever have any discussions

 6     with anyone at the Sherry-Netherland about

 7     restructuring so that the apartment would be

 8     owned by a son or a trust beneficially owned

 9     by your son?

10          A.    I never did.

11          Q.    Do you know how Ms. Man is got the

12     impression that the residence was owned by a

13     company that was ultimately beneficially owned

14     by you?

15                MR. HARMON:  Object to the form of

16          the question.

17          A.    I don't really know.

18          Q.    Well, you said, "I don't really

19     know."  Do you have any idea?

20                MR. HARMON:  Object to the form of

21          the question.

22          A.    No.

23          Q.    Do you dispute that the residence is

24     ultimately beneficially owned by you?

25                MR. HARMON:  Object to the form of
```

```
 1                        KWOK
 2        the question.
 3        A.    No.
 4        Q.    So you are the ultimate beneficial
 5   owner of the apartment?
 6              MR. HARMON:  Object to the form of
 7        the question.
 8        A.    No.
 9        Q.    So you do dispute that the residence
10   is ultimately beneficially owned by you?
11              MR. HARMON:  Object to the form of
12        the question.
13        A.    I am not.
14        Q.    You are not the owner?
15        A.    Of course.
16        Q.    Because Zhang Wei is the owner?
17        A.    Yes.  The money was provided by
18   Zhang Wei.  It was not provided by me.
19        Q.    And Zhang Wei -- do you know how
20   Zhang Wei communicates with his lawyers about
21   this issue if he's in prison?
22              MR. HARMON:  Object to the form of
23        the question.
24        A.    I don't know.
25        Q.    Are you aware of whether or not
```

```
 1                        KWOK
 2    Genever Holdings Corporation, the British
 3    Virgin Islands entity, has ever pledged its
 4    assets?
 5              THE INTERPRETER:  Pledged its assets
 6         means put up its assets?
 7              MR. MOSS:  Put a lien on its assets,
 8         or pledge security.
 9              THE INTERPRETER:  Okay.
10    A.    I do not know.
11    Q.    You've never had any discussions
12    about a pledge?
13    A.    I do not know.
14    Q.    Is this the first time that you're
15    hearing about a pledge by Genever Holdings of
16    its assets?
17    A.    No.
18    Q.    You've heard about that before?
19    A.    After you sued us, from there on I
20    heard about that.
21    Q.    Where did you hear about it?
22    A.    Yvette Wang told me.
23    Q.    What did she tell you?
24    A.    She told me about this collateral,
25    this situation.
```

```
1                              KWOK
2          Q.    What did she tell you?
3          A.    That's it.
4          Q.    Who made the decision to pledge
5     Genever Holdings Corporation?
6          A.    Zhang Wei and his team think that.
7          Q.    And do you know why it was pledged?
8          A.    I think his money was borrowed.
9          Q.    By whom?
10         A.    That's why pledged it.  I don't
11    quite were.  I think it's name with R
12    something something.  I can't quite remember.
13         Q.    How about Roscalitar?
14         A.    I don't know.  Too complicated.
15         Q.    Roscalitar 2, does that ring a bell?
16         A.    Maybe call R2, R2.
17         Q.    Who is behind Roscalitar 2, or R2?
18         A.    As far as I know, heard that it was
19    a Middle East fund, but I don't know anything
20    else about that.
21         Q.    Did it have to do with Abu Dhabi?
22         A.    I think it is theirs.
23         Q.    Did you have any dealings with the
24    people at Abu Dhabi relating to Roscalitar 2?
25         A.    Are you asking me personally, me?
```

```
 1                        KWOK
 2        Q.    Yes.
 3        A.    No.
 4        Q.    And you learned all of this through
 5   Yvette?
 6        A.    About the pledge, it was Yvette who
 7   told me, and then my attorney had asked one
 8   time know about this, I said --
 9        Q.    Whoa, whoa --
10             MR. HARMON:  We're going to assert
11        attorney/client privilege on the
12        conversation.
13             MR. MOSS:  I was trying to help you,
14        counsel.
15             MR. HARMON:  Thank you.
16        Q.    I don't want to know what you spoke
17   about.
18             MR. HARMON:  He does, but he's very
19        polite and won't.
20             MR. MOSS:  Fair point.
21        Q.    So you never heard anything about a
22   pledge before Yvette told you about the pledge
23   in connection with our lawsuit?
24        A.    Yes.
25        Q.    But what Yvette told you was that
```

```
 1                          KWOK
 2    Genever Holdings Corporation had been pledged
 3    to Roscalitar 2?
 4         A.    Yes.
 5         Q.    And that included the ownership
 6    interest in the Sherry-Netherland apartment?
 7         A.    Oh, I don't know about that.
 8         Q.    Do you have an understanding that
 9    the ownership interest in the
10    Sherry-Netherland was pledged to Roscalitar 2?
11              MR. HARMON:   Object to the form of
12         the question.
13         A.    I don't really know about that.
14         Q.    Well, do you know what was pledged
15    by Genever Holdings Corporation?
16         A.    I do not know.
17         Q.    Can you identify any asset of the
18    Genever Holdings Corporation other than the
19    apartment that it owns through Genever
20    Holdings LLC?
21         A.    I do not know.
22         Q.    Yvette never told you, when she
23    explained to you about the pledge, that the
24    pledge was for the assets of Genever BVI or
25    Genever Holdings Corporation, which, by virtue
```

```
 1                          KWOK
 2    of its ownership of Genever New York LLC,
 3    include the apartment?
 4              MR. HARMON:  Object to the form of
 5         the question.
 6              THE INTERPRETER:  Interpreter, I
 7         don't think I got everything with all the
 8         names there.  So that was Genever BBC?
 9         A.    Never discussed it in such detail.
10    I'm so confused by the question.  I can't
11    remember what company you're talking about
12    even.
13         Q.    I understand it's confusing.  Did
14    she ever convey to you, in substance, that the
15    apartment had been pledged?
16         A.    When you said it's been pledged, I
17    don't quite understand all that.
18         Q.    Well, you had a conversation with
19    Yvette where she told you about a pledge of
20    Genever Holdings Corporation, right?
21         A.    Yes.
22         Q.    And that was the first time you ever
23    heard about a pledge relating to Genever,
24    right?
25         A.    Yes.
```

```
 1                      KWOK
 2        Q.    And that was in connection with our
 3   lawsuit and our motion for the attachment on
 4   the residence, right?
 5        A.    Yes.
 6        Q.    When you spoke to Yvette about the
 7   pledge, did she communicate to you, in
 8   substance, that the apartment had been
 9   pledged?
10        A.    This?  No.
11        Q.    Do you have any idea why the pledge
12   came up for the first time in response to our
13   motion to attachment apartment, then?
14        A.    I don't understand what you mean.
15        Q.    Do you understand that there were
16   papers filed on your behalf that argue that
17   Pacific Alliance couldn't get a lien or an
18   attachment on the apartment because the
19   apartment had been pledged?
20        A.    Wang Yan Ping --
21              THE INTERPRETER:  W-A-N-G, Y-A-N,
22        P-I-N-G.
23        A.    -- had told me about it.
24        Q.    And that's Yvette?
25        A.    Yes.
```

```
  1                         KWOK
  2       Q.    She told you that your side filed
  3   papers arguing that the apartment had been
  4   pledged already?
  5       A.    Yes.
  6       Q.    And as far as you know, those papers
  7   were accurate?
  8       A.    Yes.
  9       Q.    And Yvette believed that the
 10   apartment had, in fact, been pledged?
 11             MR. HARMON:  Object to the form of
 12        the question.
 13       A.    You can ask Wang Yan Ping those
 14   questions.  I cannot answer on behalf of her.
 15       Q.    That's completely fair.  Let me try
 16   to rephrase it.
 17             Did Yvette communicate to you that
 18   the apartment had been pledged?
 19       A.    Yes.
 20             MR. MOSS:  I'm happy to take a quick
 21        break now, if that's okay with everyone.
 22             MR. HARMON:  That's fine.
 23             THE VIDEOGRAPHER:  We're now off the
 24        record.  The time is 2:02 p.m.
 25             (Recess was taken.)
```

```
1                        KWOK

2              THE VIDEOGRAPHER:  This marks the

3        beginning of Tape Number 4 in the

4        deposition of Mr. Miles Kwok.  We're now

5        back on the record.  The time is 2:28 p.m.

6              I just want to note for the record

7        that the witness is standing for his

8        comfort.

9   BY MR. MOSS:

10       Q.    Mr. Kwok, how old is Zhang Wei?

11       A.    I think around 38 years old.

12       Q.    What did he do for a living before

13    he was imprisoned?

14       A.    Invested in real estate securities.

15       Q.    What types of securities?

16       A.    He just did a lot of these -- he did

17    a lot of these securities related things,

18    selling and purchasing.

19       Q.    What city did he live in?

20       A.    Henan Zhengzhou.

21              THE INTERPRETER:  H-E-N-A-N,

22        Z-H-E-N-G-Z-H-O-U.

23       Q.    And when did he go to prison?

24       A.    It should be around after May of

25    2015.  Around May, June, approximately.  I
```

```
1                         KWOK
2    can't remember too precisely.
3         Q.    Was there any press, publicity
4    around him going to prison?
5         A.    A lot of Chinese press reporting.
6    So many of them.
7         Q.    Including him?
8              MR. HARMON:  I'm sorry?
9              THE INTERPRETER:  I'm sorry?
10        Q.    Including press about him going to
11   prison?
12             THE INTERPRETER:  Including about
13   Zhang Wei going to prison?
14             MR. MOSS:  Yes.
15        A.    Yes.  So in the information we
16   provided to you of the Hong Kong police,
17   Chinese police about their sealing off and
18   also arrest, in that list includes the name of
19   Zhang Wei.
20        Q.    Where was that information provided?
21        A.    This was shown to me about Wang Yan
22   Ping.  Yvette showed it to me.
23        Q.    Do you know whether or not that was
24   something that was filed in the lawsuit with
25   the court?
```

```
 1                      KWOK
 2        A.     No, this is about police, about the
 3   police going after arrest, and because it's in
 4   English and partly in Chinese, and I saw the
 5   part with Zhang Wei's name.
 6        Q.     Was it an article, article in
 7   English?
 8        A.     No, it is not article, it's a
 9   document provided by the police to the Hong
10   Kong company.
11        Q.     What Hong Kong company?
12        A.     Oh, so many companies.  I don't
13   remember.  It definitely includes Hong Kong
14   Zenith -- Hong Kong Golden Spring.
15        Q.     Are you aware of a company called
16   Henan Yuda Real Estate?
17        A.     Can I not answer this question?  I
18   refuse to answer this question because I think
19   this is unrelated to the topic at hand today.
20        Q.     Does Mr. Zhang Wei have an interest
21   in Henan Yuda Real Estate Company?
22             MR. HARMON:  I think I'm going to
23        need you to explain to me, if you want him
24        to answer the question, the relationship
25        of that entity to the attachment
```

```
1                        KWOK
2           proceeding, because otherwise we'll take
3           the position that it's beyond the scope of
4           the attachment discovery and direct the
5           witness not to answer.  But I'm open to
6           having you explain to me its connection.
7                MR. MOSS:  Sure.  So Mr. Kwok, I
8           believe, testified that Zhang Wei lived in
9           the Henan Province.
10               Is that correct?
11               THE WITNESS:  Yes.
12               MR. MOSS:  And for first time we're
13          hearing about somebody named Zhang Wei who
14          apparently owns the apartment, and there's
15          press about a Kwok-controlled Henan Yuda
16          Real Estate Company, and I'm trying to
17          understand the relationship between
18          Mr. Kwok and Zhang Wei.
19   DI          MR. HARMON:  I'll direct the witness
20          not to answer.  I'll stand on the
21          objection.
22          A.    I refuse to answer.
23          Q.    Okay.  Do you and Mr. Zhang Wei both
24     have interests in the Henan Yuda Real Estate
25     Company?
```

```
1                         KWOK
2   DI          MR. HARMON:  I direct the witness
3         not to answer.
4                   THE INTERPRETER:  The interpreter
5         did not interpret, and Mr. Kwok says:
6         A.    I refuse to answer.
7         Q.    Was that company, Henan Yuda Real
8   Estate Company, accused of loan fraud?
9   DI          MR. HARMON:  I direct the witness
10        not to answer.
11        A.    Refuse to answer.
12        Q.    Okay.   Are you aware that in two
13  rounds of attachment briefing relating to the
14  apartment, that in the lawsuit that you filed
15  against the Sherry-Netherland Hotel, that
16  there's never been a reference to Zhang Wei in
17  any document that's been filed on your behalf
18  in any litigation relating to the apartment?
19  Are you aware of that?
20        A.    I don't really know.
21        Q.    Can you point to any document that
22  evidences Zhang Wei's ownership of the
23  apartment?
24        A.    The fund came from Zhang Wei's
25  company.  This is the simplest evidence.  And
```

```
 1                      KWOK
 2    Zhang Wei is the person who borrow from that R
 3    something.
 4         Q.      Is there any other evidence besides
 5    the document showing where the funds came
 6    from, any other document that you can identify
 7    that shows Zhang Wei's ownership of either the
 8    apartment or of either of the Genever
 9    entities?
10              THE INTERPRETER:   This is the
11         interpreter asking for clarification.
12         A.      I, with him, have this agreement to
13    represent him and also have the one for
14    financial arrangement and investment planning.
15         Q.      You have a written agreement with
16    him?
17         A.      Yes.
18         Q.      Do you have a copy of that agreement
19    in your possession?   Let me just clarify --
20         A.      I have original and he has original.
21         Q.      Did you provide that document to
22    your attorneys in connection with responding
23    to our document request in this case?
24         A.      I believe not.
25         Q.      Did you provide it to the
```

```
 1                      KWOK
 2   Sherry-Netherland in connection with applying
 3   for the apartment?
 4        A.      I do not know.
 5        Q.      You said you have an agreement for
 6   investment planning.  Is that a separate
 7   written agreement with Zhang Wei?
 8        A.    No, it's the same.  No, that was 100
 9   million investment all together.
10        Q.    So you have one written document
11   showing your relationship with Zhang Wei?
12        A.    Yes.
13        Q.    Does that agreement actually mention
14   the Sherry-Netherland apartment?
15        A.    Yes.
16        Q.    Why did Zhang Wei, if you know, why
17   was he imprisoned?
18        A.    He was falsely accused by the
19   communist.  It was wrongfully -- it was
20   wrongful.
21        Q.    Did it have to do with you?
22        A.    Of course it did.
23        Q.    So he's a political prisoner in
24   China?
25        A.    Of course.
```

```
                            KWOK
 1
 2        Q.    Is it your testimony that as a
 3    political prisoner in China, that he has
 4    access to speak to his lawyers?
 5        A.    No, impossible.    In China, no
 6    political prisoner can be able to speak to
 7    anyone.    Well, strictly speaking, he was
 8    kidnapped.    He was kidnapped by the
 9    communists.
10        Q.    Have you ever heard of somebody
11    called Guo Qiang, G-U-O, Q-I-A-N-G?
12        A.    As I said to you before, that's my
13    son.
14        Q.    That's Mileson Kwok?
15        A.    Yes.  I only have one son.
16        Q.    Sorry.  Thank you for clarifying.
17              Have you ever heard of a company
18    called Blue Capital?
19        A.    I don't remember that.
20        Q.    You remember we discussed earlier
21    your conversation with Yvette about the
22    pledges, or the pledge of the apartment to
23    Roscalitar 2, or R2?  Remember I asked you
24    questions about that earlier?
25        A.    Yes.
```

```
 1                          KWOK
 2        Q.    Are you aware that the pledge to
 3    Roscalitar was terminated in 2017?
 4        A.    I don't know.
 5        Q.    Who would know that?  Would that be
 6    Yvette?
 7        A.    It would be Zhang Wei's attorneys
 8    and then that something, the R company, I
 9    think they'd know.
10        Q.    So you didn't know that when it was
11    represented to this Court that the apartment
12    was pledged to Roscalitar 2, that at the time
13    of that representation the pledge had actually
14    been terminated?
15              MR. HARMON:  Object to the form of
16        the question.
17        A.    I did not know.
18        Q.    Remember earlier I asked you about
19    the seizing of the Zenith assets and whether
20    or not you knew that the assets were seized?
21        A.    I refuse to answer.
22        Q.    Well, you answered earlier that
23    the -- that you knew that the Zenith assets
24    were seized.  Do you remember that testimony?
25        A.    I refuse to answer it now.
```

```
1                          KWOK
2        Q.    Did you also know that the Beijing
3   Pangu assets were seized?
4        A.    I refuse to answer.
5        Q.    Do you recall that you personally
6   signed an agreement agreeing to the
7   Sherry-Netherland proprietary lease?
8        A.    I think I remember signing it.  But
9   as for the content of that, I don't really
10  know, but I think I did sign that.  But what,
11  in fact, that document was, I do not know.
12       Q.    So you signed something, but you
13  hadn't reviewed it?
14       A.    I do not have the ability to review
15  it.
16       Q.    Did you ever gain an understanding
17  of what you were agreeing to when you signed
18  the agreement with the Sherry-Netherland
19  adopting the proprietary lease?
20       A.    Even to this day I do not
21  understand.
22       Q.    Your lawyers didn't review the
23  document with you before you signed it?
24            MR. HARMON:  I think that would be
25       an attorney/client privileged
```

```
 1                        KWOK
 2      communication.  I take it back, I take it
 3      back --
 4             MR. MOSS:  I think the fact of
 5      reviewing --
 6             MR. HARMON:  The fact --
 7             MR. MOSS:  -- as a yes/no question
 8      is fine.
 9             MR. HARMON:  You could answer the
10      question.
11             THE INTERPRETER:  I'm sorry.
12             MR. HARMON:  You can answer the
13      question.
14      A.    I refuse to answer.  I don't know.
15      Q.    You don't know or you refuse to
16  answer?
17      A.    I -- I don't know.
18      Q.    You don't remember reviewing the
19  document with your lawyers?
20      A.    I don't remember.
21      Q.    Mr. Kwok, you're aware that our
22  client is seeking an attachment of the
23  Sherry-Netherland apartment?
24      A.    I think this is just robbery.  I
25  don't think this is attachment.  I think this
```

```
 1                        KWOK
 2    is just robbers.  I never signed the 30
 3    million agreement, the money was never given
 4    to us, and the Sherry-Netherland is not ours
 5    either and they're just robbers.
 6         Q.    I just want to ask a simple
 7    question.  I know that you dispute everything
 8    in the lawsuit.  I understand that.  My
 9    question is just are you aware that our client
10    has filed papers seeking what we say at least
11    is a request to attach the apartment?
12         A.    I know now.
13         Q.    And my question is:  Is it your
14    position that our client cannot attach the
15    apartment because you don't own it, but rather
16    Zhang Wei does?
17              MR. HARMON:  Object to the form of
18         the question.
19         A.    Yes.
20         Q.    And I know you've testified a lot
21    about how you think that this is an
22    illegitimate lawsuit.  My question is:  If the
23    court finds for our client and orders you to
24    pay a judgment in this lawsuit, money to us,
25    will you pay it?
```

```
 1                        KWOK
 2   DI           MR. HARMON:  Don't answer the
 3           question.  It's beyond the scope of the
 4           attachment proceeding, discovery.
 5           A.    Refuse to answer.
 6                  MR. MOSS:  And of course,
 7           Mr. Harmon, you added discovery after a
 8           second there to your instruction because
 9           it obviously goes to the very heart of the
10           attachment motion.
11                  MR. HARMON:  I completed my
12           sentence.  Thank you.
13           Q.    Mr. Kwok, you testified earlier that
14      you signed the agreement adopting the
15      proprietary lease without knowing what was in
16      that document.  Do you recall that testimony?
17                  MR. HARMON:  Object to the form of
18           the question.
19           A.    Yes, I did say that.
20           Q.    Is it your practice to sign
21      agreements or documents that are in English
22      without knowing what's in them?
23           A.    Yes.
24                  MR. MOSS:  Why don't we go off the
25           record.
```

```
 1                        KWOK
 2              THE VIDEOGRAPHER:  We're now off the
 3         record.  The time is 2:55 p.m.
 4              (Recess was taken.)
 5              THE VIDEOGRAPHER:  We're now back on
 6         the record.  The time is 3:13 p.m.
 7              MS. MAISTRELLO:  He just said if you
 8         could take a photo of me later.
 9              THE WITNESS:  I want to remember you
10         abuse me here.
11              MR. MOSS:  Well, Mr. Kwok, it's all
12         going to end soon.  Just a few more
13         questions.
14              THE WITNESS:  Thank you.
15   BY MR. MOSS:
16         Q.   You remember, we've talked about
17     this lawsuit today, and you understand that my
18     client is suing because they claim that they
19     made a loan to one of your companies and that
20     that loan was never repaid.  You understand
21     that at least that's what we're claiming?
22         A.   I understand with absolute lies.
23     This is defamation, this is --
24              THE INTERPRETER:  I'm blanking on
25         the word.  To get you money from --
```

```
 1                        KWOK

 2              MR. SARNOFF:  Extortion?

 3              THE INTERPRETER:  Yes, thank you.

 4         A.    Extortion.  I'd like for you to

 5    provide me with the truth for the $30 million

 6    loan for the payment, for the loan, to give me

 7    truth on that.

 8         Q.    So that's what I want to try to

 9    understand.  Is it your testimony that my

10    client never actually made the loan?

11 DI            MR. HARMON:  Objection.  Direct the

12            witness not to answer.

13         A.    I refuse --

14            MR. HARMON:  Beyond the scope of

15            attachment discovery at this time.

16            MR. MOSS:  It's in the scope of his

17            testimony.  I'm trying to clarify what

18            he's already said.

19 DI            MR. HARMON:  I understand that.  You

20            asked him a question.  He could have

21            answered yes or no.  He gave you an

22            answer.  So I know you want to follow up

23            on that answer, but the follow-up is

24            beyond the scope of attachment discovery.

25            I direct him not to answer.
```

```
 1                        KWOK
 2          Q.   Mr. Kwok, will you answer the
 3     question of whether or not it's your testimony
 4     that my client -- is it your testimony that my
 5     client never actually made the loan to you?
 6  DI             MR. HARMON:  Same objection.  Same
 7          direction.
 8                 THE INTERPRETER:  Interpreter did
 9          not interpret yet.  The response was:
10          A.   I refuse to answer.
11  RQ             MR. MOSS:  So pending questions from
12          your counsel, I don't have any further
13          questions at this time.
14                 There is, however, one open item,
15          and that is, you testified today about a
16          document evidencing your agreement with
17          Zhang Wei relating to the hotel.  We do
18          not have a copy of that document.  I don't
19          think there's any dispute with your lawyer
20          that we're entitled to a copy of that
21          document if it exists.  We've asked
22          informally during a break for production
23          of that document, but I will now formally
24          put on the record that we're asking for
25          production of that document.  And we will
```

```
 1                        KWOK
 2       keep the deposition open for the limited
 3       purpose of asking questions about that
 4       document if and when it is produced.
 5            And I just want to also note for the
 6       record that I offered your counsel at
 7       about 3:00 today the option of producing
 8       the document today and trying to finish
 9       the deposition today so I didn't have to
10       bring you back here for a second day.  I
11       understand from counsel that that's not
12       possible.  So unfortunately we may have to
13       come back a second day, but hopefully that
14       can be avoided.
15            And I just want to end by thanking
16       you very much for your time and
17       apologizing that you had to sit for so
18       long.  Thank you.
19            THE WITNESS:  I'd like the
20       interpreter to interpret what some of the
21       things I'd like to say.  Can I say some
22       things?
23            MR. MOSS:  Be my guest.
24            THE WITNESS:  I thank you very much
25       for today's planning and this very humane
```

```
 1                      KWOK

 2        seeing each other.  But I want to tell you

 3        what you're doing is helping the CCP in

 4        extorting me, in abusing me.  What I am

 5        seeking to do is to help the Chinese with

 6        their democracy and law, and here, even

 7        though, and I love the democracy in

 8        America, and even though I have here been

 9        treated well, lawfully, but what you're

10        doing actually is helping the CCP.

11             I understand that this is part of

12        your job.  I thank you very much in the

13        humane way you treated me today.  Much

14        better than the CCP.  Thank you.

15             MR. MOSS:  Thank you.  I'm sorry, I

16        just must put one more thing on the

17        record.  I just want to note --

18             I'm sorry, I forget your name.

19             MR. MAISTRELLO:  Karin.

20             MR. MOSS:  That Karin I think may

21        have been taking some video of Mr. Kwok --

22             MS. MAISTRELLO:  Picture.

23             MR. MOSS:  Picture, and I just

24        wanted to note that on this side of the

25        table, we understand that there's a
```

```
1                        KWOK
2        protective order, and we didn't take any
3        pictures or any video other than the
4        official record here.  So if anything ends
5        up anywhere, we didn't do it.
6              THE WITNESS:  Can I show my wife?
7        My wife, my son the picture?
8              MR. SARNOFF:  That's your decision.
9              MR. MOSS:  Why don't we go off the
10       record now.  I think we're finished.
11             MR. HARMON:  I have no questions.
12             THE VIDEOGRAPHER:  This concludes
13       today's deposition of Mr. Miles Kwok.
14       We're now off the record.  The time is
15       3:22 p.m.  Thank you.
16             (Time noted:  3:22 p.m.)
17
18
19
20
21
22
23
24
25
```

```
 1              A C K N O W L E D G M E N T

 2

 3   STATE OF NEW YORK    )

 4                        :SS

 5   COUNTY OF            )

 6

 7          I, MILES KWOK, hereby certify that I

 8   have read the transcript of my testimony taken

 9   under oath in my deposition of October 3, 2018;

10   that the transcript is a true, complete and

11   correct record of my testimony, and that the

12   answers on the record as given by me are true and

13   correct.

14

15

16                    _____

17                         MILES KWOK

18

19

20   Signed and subscribed to before me,

21   this     day of                 , 2018.

22

23

24   _____

25   Notary Public, State of _____
```

C E R T I F I C A T E

STATE OF NEW YORK        )

                        ) SS.:

COUNTY OF SUFFOLK        )


     I, KRISTI CRUZ, a Notary Public within AND

for the State of New York, do hereby certify:

     That MILES KWOK, the witness whose

deposition is hereinbefore set forth, was duly

sworn by me and that such deposition is a true

record of the testimony given by such witness.

     I further certify that I am not related to

any of the parties to this action by blood or

marriage; and that I am in no way interested in

the outcome of this matter.

     IN WITNESS WHEREOF, I have hereunto set my

hand this 8th day of October 2018.




_____

KRISTI CRUZ

```
1              *** ERRATA SHEET ***

2        ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
3              New York, New York 10022
                    212-750-6434
4

5  NAME OF CASE:  PACIFIC ALLIANCE vs. KWOK
   DATE OF DEPOSITION:  OCTOBER 3, 2018
6  NAME OF WITNESS:  MILES KWOK

7  PAGE  LINE  FROM        TO         REASON

8  _____|_____|_____|_____|_____

9  _____|_____|_____|_____|_____

10 _____|_____|_____|_____|_____

11 _____|_____|_____|_____|_____

12 _____|_____|_____|_____|_____

13 _____|_____|_____|_____|_____

14 _____|_____|_____|_____|_____

15 _____|_____|_____|_____|_____

16 _____|_____|_____|_____|_____

17 _____|_____|_____|_____|_____

18 _____|_____|_____|_____|_____

19 _____|_____|_____|_____|_____

20                       _____

21 Subscribed and Sworn before me

22 this _____ day of _____, 2018.

23

24 _____    _____

25 Notary Public              My Commission Expires:
```

## $

**$100 (1)**
84:18
**$30 (1)**
128:5
**$60 (1)**
100:15
**$67.5 (1)**
84:6
**$68 (1)**
93:11
**$85 (1)**
89:8

## A

**a/k/a (1)**
69:17
**ability (3)**
8:15;9:17;123:14
**able (6)**
32:21;35:19;55:10;
87:11;90:8;121:6
**absolute (1)**
127:22
**Absolutely (7)**
11:23;13:8;34:18;
35:17;46:8;50:4;
95:19
**Abu (2)**
108:21,24
**abuse (1)**
127:10
**abusing (2)**
79:21;131:4
**accepted (1)**
90:13
**access (2)**
54:19;121:4
**accuracy (1)**
28:21
**accurate (4)**
55:19;69:23;70:6;
113:7
**accused (2)**
118:8;120:18
**act (1)**
74:4
**acting (3)**
70:21;75:7,20
**actions (1)**
62:13
**active (1)**
99:22
**actual (1)**
41:17
**actuality (1)**
32:7
**Actually (7)**
59:8;91:9;120:13;
122:13;128:10;129:5;

131:10
**add (1)**
90:12
**added (2)**
90:4;126:7
**administer (1)**
6:14
**adopting (2)**
123:19;126:14
**advance (1)**
13:24
**advice (3)**
66:13;82:6,13
**advised (2)**
90:11;100:18
**advisor (2)**
97:18;98:3
**advisory (1)**
98:4
**affair (4)**
12:21,25;13:2;
42:20
**affairs (2)**
80:18;81:2
**afternoon (2)**
82:9,10
**again (8)**
21:14;46:17;49:16;
67:25;75:13;88:19;
91:4;93:11
**against (7)**
12:3;24:4;25:4;
61:25;69:16,20;
118:15
**agent (3)**
36:7;39:6,10
**aggressive (1)**
100:21
**ago (2)**
58:2;77:3
**agree (2)**
13:16;14:3
**AGREED (8)**
6:3,8,12,18;13:24;
14:10;50:8,21
**agreeing (2)**
123:6,17
**agreement (17)**
48:7;68:6,11,19,22,
24;119:12,15,18;
120:5,7,13;123:6,18;
125:3;126:14;129:16
**agreements (1)**
126:21
**agrees (1)**
14:23
**al (2)**
7:6;97:21
**allegation (1)**
70:11
**alleged (1)**
73:4
**Alliance (13)**

7:5;9:2;11:14,19;
12:2;13:5;24:3,4;
25:4;58:3;59:24;
69:15;112:17
**Alliance's (5)**
26:13,17,21,25;
58:14
**along (1)**
80:11
**always (6)**
52:9,11,16,19;
56:10;79:12
**America (1)**
131:8
**Americans (1)**
90:20
**among (2)**
31:4;85:23
**and/or (1)**
15:14
**Ang (8)**
92:20,23;93:7,15,
18,19;97:14;99:15
**A-N-G (1)**
92:21
**answered (5)**
9:16;75:10;101:21;
122:22;128:21
**anymore (1)**
62:17
**apartment (65)**
11:15;29:10,15,18;
30:3,13,19;31:3;
44:14;47:18,21;48:8,
12;50:9,13,20;56:21;
57:7;73:12;84:3,15,
21;85:4,8;86:6;87:8;
89:13;91:9,24;93:22;
95:6,18,21;96:8;
99:16;100:22;101:3,
12;102:14;104:14;
105:7;106:5;110:6,
19;111:3,15;112:8,13,
18,19;113:3,10,18;
117:14;118:14,18,23;
119:8;120:3,14;
121:22;122:11;
124:23;125:11,15
**apologizing (1)**
130:17
**apparently (1)**
117:14
**appearances (1)**
7:20
**applicant (5)**
74:5,8,14;75:2,17
**application (8)**
20:6;73:11,22;
76:25;77:14;86:4,21,
22
**applied (10)**
29:9,14,17;30:2,4,
12,13,19,20;32:23

**apply (2)**
74:17,20
**applying (5)**
56:15;57:6;74:23;
81:7;120:2
**appreciate (1)**
101:24
**appropriate (4)**
13:19;58:7,18;
62:10
**approval (1)**
50:2
**approximate (2)**
56:24;77:22
**Approximately (3)**
56:23;84:14;114:25
**April (2)**
93:10;98:14
**Arabic (1)**
35:13
**area (1)**
68:2
**argue (1)**
112:16
**argued (3)**
57:10;58:3,13
**arguing (1)**
113:3
**around (17)**
34:20;35:4;40:24;
56:17,21;70:12,20;
72:12;80:25;89:12,
14;92:8;98:25;
114:11,24,25;115:4
**arranged (3)**
33:17;35:9;39:7
**arrangement (1)**
119:14
**arrest (2)**
115:18;116:3
**arrested (5)**
45:12;87:10;91:17;
93:17;104:18
**article (3)**
116:6,6,8
**articles (2)**
43:6,8
**Asia (1)**
7:5
**assassinate (2)**
22:19;23:6
**assassination (1)**
15:12
**assert (2)**
70:2;109:10
**asserting (2)**
17:21;69:2
**assertion (2)**
58:14;60:8
**asset (2)**
72:19;110:17
**assets (22)**
37:2,12;48:18;

67:23;68:13,15,20,24;
70:23;72:14;73:2;
80:2;107:4,5,6,7,16;
110:24;122:19,20,23;
123:3
**assignment (2)**
101:3,6,12;102:13
**assistant (4)**
55:21,23;88:5;
96:10
**assistants (2)**
88:5;96:14
**associated (1)**
60:10
**associates (1)**
60:9
**association (2)**
43:6,8
**assume (2)**
9:15;13:16;14:22
**assuming (2)**
32:7,10
**attach (2)**
125:11,14
**attached (1)**
73:16
**attachment (26)**
11:5,15;13:5,13;
14:18;58:8,19;59:25;
60:2;73:24;74:2;
102:6;103:2,3;112:3,
13,18;116:25;117:4;
118:13;124:22,25;
126:4,10;128:15,24
**attacks (1)**
61:25
**attempt (1)**
104:25
**attempted (1)**
93:21
**attention (4)**
21:13;34:11,13;
70:9
**attorney (18)**
24:22;31:9;49:14;
54:4;61:24;85:24;
87:12,16,20,22;91:12,
13,14;92:14;96:12,
13;97:14;109:7
**attorney/client (5)**
17:22;18:15;78:17;
109:11;123:25
**attorneys (21)**
6:4;24:25;31:21,23;
33:18;35:9;39:8;41:7;
44:19,22;49:13,18;
53:13;55:20;91:5;
96:9,11,12,13;119:22;
122:7
**attorney's (1)**
92:19
**audio (4)**
60:10,13,17;61:8

Case 22-50073   Doc 1269   Filed 12/28/22   Entered 12/28/22 14:09:15   Page 441 of
452

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. vs.
KWOK HO WAN

MILES KWOK
October 3, 2018

**audio/video (1)**
60:18
**audios (1)**
61:3
**authenticity (3)**
60:13;62:2,3
**authorities (2)**
70:13,21
**authorize (1)**
76:4
**authorized (2)**
6:14;76:9
**authorizing (1)**
98:16
**Avenue (1)**
67:6
**avoided (1)**
130:14
**awaiting (1)**
90:19
**aware (18)**
13:4;34:19;35:2;
55:3;57:9,12;58:11;
69:19;81:4;101:22;
102:6;106:25;116:15;
118:12,19;122:2;
124:21;125:9
**away (1)**
90:10

**B**

**back (15)**
23:22;45:21;50:6;
59:13;82:2;87:15;
90:7,8;100:9;114:5;
124:2,3;127:5;
130:10,13
**background (3)**
51:3,4,7
**bad (1)**
19:19
**Balance (2)**
76:17;79:24
**Barnum (1)**
83:10
**based (3)**
71:10;72:4;83:16
**basis (3)**
61:12;101:19,25
**Bates (3)**
34:12;73:23;82:15
**BBC (1)**
111:8
**beaten (1)**
79:5
**become (7)**
50:17;74:6,8,14;
80:16;81:7,14
**began (1)**
70:22
**beginning (2)**
81:24;114:3

**behalf (21)**
7:24;8:1;10:15,23;
31:7;33:6;39:7;55:4;
58:14;75:7,7,20,20;
76:6,11;79:22;80:21;
85:22;112:16;113:14;
118:17
**behind (2)**
60:14;108:17
**Beijing (26)**
31:18;47:21;69:15;
72:14;73:3,9;76:18,
22;77:5,8,11,16,24;
78:6;79:24;80:2;
91:12,13,14,18;93:9;
94:12,15,17,22;123:2
**believing (1)**
75:4
**bell (1)**
108:15
**below (1)**
100:4
**beneficial (1)**
106:4
**beneficially (4)**
105:8,13,24;106:10
**beneficiary (1)**
105:3
**besides (2)**
17:6;119:4
**best (4)**
8:14;9:14,16;24:19
**better (2)**
9:14;131:14
**beyond (13)**
13:18;14:9;58:6,17;
60:7;62:9;68:2;102:9;
103:2;117:3;126:3;
128:14,24
**bid (1)**
100:8
**billion (1)**
84:11
**birth (2)**
18:21,23
**bit (2)**
46:16;52:15
**blanking (1)**
127:24
**Blue (1)**
121:18
**board (7)**
36:16,17;38:18,20;
73:21;76:24;80:14
**bond (1)**
90:20
**borrow (1)**
119:2
**borrowed (1)**
108:8
**both (5)**
10:7;45:12;60:12;
65:24;117:23

**bottom (2)**
34:11;70:16
**Bravo (12)**
81:10,11,11,15;
82:5,14,17,21,24;
83:4,7,25
**breach (2)**
11:19;12:2
**break (9)**
11:10;12:4;23:18;
46:12;47:12;79:6,15;
113:21;129:22
**brief (3)**
58:12;60:3,4
**briefing (1)**
118:13
**briefly (2)**
9:9;16:10
**bring (1)**
130:10
**British (7)**
10:16,25;33:13;
52:2;53:8;54:14;
107:2
**broad (1)**
19:19
**broker (2)**
85:2;93:20
**brother (2)**
45:6,8
**brought (2)**
12:9;94:10
**Bruno (1)**
69:17
**budget (1)**
84:18
**bunch (1)**
21:7
**business (3)**
66:7;80:18;81:2
**buy (1)**
53:7
**buying (1)**
90:2
**BVI (1)**
110:24

**C**

**call (2)**
34:12;108:16
**called (10)**
28:9;37:4;46:23;
47:9;67:10;83:15;
90:19;116:15;121:11,
18
**calling (1)**
46:3
**came (4)**
84:2;112:12;
118:24;119:5
**can (30)**
17:13;18:12,17,24;

19:8;22:12;29:23;
35:10,12,16;40:9;
43:16;54:6,7;66:18;
71:14;74:22;80:7;
86:9;88:13;110:17;
113:13;116:17;
118:21;119:6;121:6;
124:12;130:14,21;
132:6
**capacity (1)**
10:7
**Capital (1)**
121:18
**case (13)**
19:2,10;21:6,19,25;
22:6,16;23:12;58:4,
12;80:9;82:16;119:23
**cases (2)**
15:11;23:14
**Cathy (8)**
84:22,22,25,25;
93:20;94:13;97:15;
100:2
**causing (1)**
61:22
**CCP (4)**
79:22;131:3,10,14
**CEO (1)**
67:18
**certain (4)**
10:8,9;67:23;
100:12
**Certificate (1)**
34:14
**certify (1)**
133:7
**challenger (1)**
91:2
**child (1)**
18:23
**Chiling (1)**
18:2
**China (14)**
20:10;41:11;46:6;
49:18;56:7;78:10,24;
90:19;93:8;96:13;
104:21;120:24;121:3,
5
**Chinese (18)**
32:21;41:17;43:10;
55:8,13;67:24;68:16;
70:12,21;72:13;73:3;
80:3;93:5;104:18;
115:5,17;116:4;131:5
**choice (4)**
71:6,7,11;72:4
**chow (1)**
41:17
**cited (1)**
59:24
**city (5)**
10:13;67:9;69:14;
86:11;114:19

**claim (1)**
127:18
**claiming (1)**
127:21
**clarification (2)**
47:17;119:11
**clarify (4)**
46:2;74:22;119:19;
128:17
**clarifying (1)**
121:16
**clean (1)**
9:19
**clear (1)**
71:5
**clearly (4)**
12:6;39:20;40:3;
92:3
**client (9)**
57:9;124:22;125:9,
14,23;127:18;128:10;
129:4,5
**client's (2)**
11:4;21:18
**close (2)**
83:22,22
**co-conspirators (1)**
70:22
**collateral (1)**
107:24
**colleague (2)**
18:9,23
**colleagues (3)**
18:9,18;19:2
**comfort (1)**
114:8
**commit (1)**
61:19
**committing (1)**
61:14
**communicate (14)**
19:14,17,20;20:2,4,
5;33:4;50:10;76:5,10;
80:23;87:6;112:7;
113:17
**communicated (4)**
87:21;92:12,14;
99:13
**communicates (2)**
96:16;106:20
**communication (1)**
124:2
**communist (10)**
15:12;22:18;23:5;
60:24,25;61:2,16,17;
104:19;120:19
**communists (2)**
21:9;121:9
**companies (8)**
16:22,24;48:20;
52:12;54:13;67:3;
116:12;127:19
**companies' (1)**

Case 22-50073   Doc 1269   Filed 12/28/22   Entered 12/28/22 14:09:15   Page 442 of 452

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. vs.
KWOK HO WAN

MILES KWOK
October 3, 2018

70:23
**Company (43)**
7:13,17;16:23;28:8;
37:4,6;46:3,5,21,23,
23;47:9,24;54:14,14;
63:14;67:10;69:15,
16;72:15;73:10;
76:18;77:5,8,17;
78:11;81:12;82:17;
88:21,24;105:13;
111:11;116:10,11,15,
21;117:16,25;118:7,8,
25;121:17;122:8
**Company's (1)**
77:12
**competency (1)**
87:5
**compilation (1)**
33:25
**Complaint (5)**
69:8,12,22;70:5;
73:4
**complete (4)**
13:2;16:15;76:2;
133:10
**completed (1)**
126:11
**Completely (15)**
9:25;11:23;12:13,
14;13:9;21:22,25;
22:2;31:20;43:9,11;
48:22;55:2;74:10;
113:15
**complicated (1)**
108:14
**comply (1)**
102:24
**computer (1)**
26:7
**concludes (1)**
132:12
**confidentiality (2)**
80:17,25
**confirm (2)**
14:12,14
**confused (4)**
48:21,22;81:14;
111:10
**confusing (1)**
111:13
**conglomerate (1)**
27:21
**Connecticut (2)**
83:18,21
**connection (14)**
20:25;22:5;25:3;
50:12;73:11;76:24;
77:13;93:21;102:25;
109:23;112:2;117:6;
119:22;120:2
**Connolly (14)**
50:19,23;51:6,14;
73:25;75:6,15,19;

76:5,10;80:13,14,20;
81:5
**Connolly's (1)**
51:10
**consequently (1)**
91:17
**consider (1)**
100:18
**Consolidated (1)**
76:16
**constantly (1)**
79:11
**consult (1)**
16:24
**consultant (2)**
66:11,12
**consulting (1)**
16:23
**contact (4)**
88:4,6;90:22;91:3
**Cont'd (1)**
3:1
**content (1)**
123:9
**continuously (1)**
99:17
**contract (8)**
11:19;12:3,5;101:2,
6,9,11;102:13
**control (4)**
36:20,22;77:19;
78:5
**controlled (1)**
77:20
**controlling (2)**
78:10,23
**controls (1)**
36:23
**conversation (7)**
57:14;93:4,8;
103:12;109:12;
111:18;121:21
**convey (1)**
111:14
**copies (1)**
23:8
**copy (4)**
6:18;119:18;
129:18,20
**core (1)**
41:17
**Corporate (4)**
33:21,25;43:3;47:7
**corporation (46)**
10:16;28:10,12,17;
29:4;33:11,12,16;
34:3,15,20;35:3;36:5,
13,21,25;37:8,11,19,
22;38:3,8,11,14,17,
21,23;39:9,15;41:24;
42:4,14,18,22;43:3,
23;46:18;52:3;66:16;
107:2;108:5;110:2,

15,18,25;111:20
**correction (1)**
84:11
**correctly (2)**
41:14;50:5
**counsel (12)**
6:19;7:19;15:8,10;
47:12;74:5;82:16;
102:21;109:14;
129:12;130:6,11
**country (2)**
41:10;91:2
**County (2)**
7:7;133:5
**course (11)**
16:5;22:11;36:22,
24;55:6,12;95:24;
106:15;120:22,25;
126:6
**Court (20)**
6:16;7:6,14,21;
55:5,14;57:10;58:3;
69:7,13;70:6;82:12;
100:25;101:13,17,22;
102:14;115:25;
122:11;125:23
**cover (1)**
78:9
**covering (3)**
11:13;13:25;60:22
**crazy (3)**
12:4,13;21:6
**created (1)**
21:25
**creditors (1)**
54:19
**Cruz (1)**
7:15
**currently (2)**
35:20;101:5
**curse (3)**
12:16,19

**D**

**DAN (2)**
3:5;7:12
**date (6)**
33:22;59:17;69:9;
73:17;82:7;88:17
**dated (2)**
60:3;89:4
**daughter (2)**
45:6,7
**day (10)**
15:10,18,19;17:24;
23:9;96:5;123:20;
130:10,13;133:21
**days (1)**
79:19
**deal (2)**
30:25;31:4
**dealings (1)**

108:23
**deals (1)**
31:6
**Debit (2)**
82:6,13
**December (1)**
76:17
**decide (1)**
53:19
**decision (13)**
52:22,23;53:2,15;
92:6,10,12,18;93:14;
96:15;99:10;108:4;
132:8
**declare (1)**
61:20
**defamation (1)**
127:23
**defendant (4)**
8:5,7,9;70:22
**definite (2)**
44:16;45:14
**definitely (2)**
87:3;116:13
**democracy (2)**
131:6,7
**deposed (3)**
9:4;14:6,6
**deposit (1)**
90:8
**deposition (18)**
6:12,19;7:3,10;
9:10;13:24;14:16,18;
15:5,9,15;45:20;
81:25;114:4;130:2,9;
132:13;133:9
**destroying (1)**
21:12
**detail (1)**
111:9
**Dhabi (2)**
108:21,24
**DI (29)**
17:16;18:14;19:4,
12;58:6,17;59:3;
61:11;62:8;67:25;
70:2,7;71:5,12,20;
72:5,16,21;73:5;
78:15;101:14;102:15;
117:19;118:2,9;
126:2;128:11,19;
129:6
**die (1)**
22:25
**different (6)**
20:21;32:22;46:4;
52:16;56:11;64:8
**differently (1)**
13:3
**difficult (1)**
54:18
**direct (18)**
17:16;18:15;19:4,

12;34:10,12;58:9,20;
61:12;68:3;70:9;
71:24;117:4,19;
118:2,9;128:11,25
**directing (4)**
19:13;40:19;69:3;
71:12
**direction (12)**
59:4;62:9;70:3,8,
21;71:6,8;72:6,17,22;
73:6;129:7
**directly (2)**
30:25;50:17
**director (3)**
36:12,15;42:24
**directors (4)**
38:18;43:24;65:13;
73:21
**disagree (1)**
13:23
**disagrees (1)**
14:21
**disappearance (2)**
56:11,12
**disconnect (1)**
12:7
**discovery (15)**
58:8,19;62:10;68:3,
7,12,13;69:2;103:3,4;
117:4;126:4,7;
128:15,24
**discuss (14)**
11:4;21:5;26:23;
32:12,15,18,20;44:18;
46:11,12,14;47:11;
50:20;68:9
**discussed (7)**
18:13,18,24;19:8;
71:24;111:9;121:20
**discussing (1)**
102:11
**Discussion (1)**
59:12
**discussions (5)**
99:22;104:9,12;
105:5;107:11
**dispute (5)**
12:11;105:23;
96:9;125:7;129:19
**disputing (2)**
12:12,13
**distress (1)**
61:22
**document (41)**
21:18;32:6;33:24;
34:6,17,24;35:11,18;
71:10;72:4;73:19;
74:11,24;76:16;
80:13;83:6,9,14;
88:21;89:4;98:16,25;
116:9;118:17,21;
119:5,6,21,23;120:10;
123:11,23;124:19;

Case 22-50073    Doc 1269    Filed 12/28/22    Entered 12/28/22 14:09:15    Page 443 of
452

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. vs.
KWOK HO WAN

MILES KWOK
October 3, 2018

126:16;129:16,18,21,
23,25;130:4,8
**documents (12)**
22:16;26:9,11,16,
24;33:21,25;35:23;
43:3;44:19;62:3;
126:21
**dollar (1)**
100:12
**dominating (1)**
77:19
**Don (1)**
16:14
**done (2)**
44:19;62:5
**doubt (2)**
70:4;76:8
**down (3)**
11:11;90:15;92:5
**drafts (1)**
101:8
**drop (2)**
97:8,10
**dropped (1)**
91:25
**duly (2)**
8:11,18
**during (17)**
17:5,9,15,20,23;
18:19;19:2,10;33:3;
39:18;40:6;42:11,12;
46:11;47:12;93:7;
129:22

---

## E

**eager (1)**
80:15
**earlier (11)**
28:9;46:21;47:16;
56:6;58:2;79:14;
121:20,24;122:18,22;
126:13
**early (1)**
72:13
**ears (1)**
60:23
**easier (1)**
35:15
**East (1)**
108:19
**Edward (2)**
7:23;9:2
**effect (1)**
6:15
**either (6)**
17:14;67:2;95:16;
119:7,8;125:5
**elder (2)**
45:6,8
**elicited (1)**
101:16
**ELIZABETH (1)**

3:4
**Ellen (2)**
7:12,16
**else (14)**
17:23;18:3,5,8;
24:3;29:14,17;30:2;
31:6;32:8;39:2;86:21;
94:10;108:20
**e-mail (1)**
19:15
**employee (2)**
16:21;85:24
**employees (7)**
16:24;38:9;48:24;
66:2,3,4;85:25
**end (3)**
51:11;127:12;
130:15
**ends (1)**
132:4
**engagement (1)**
51:13
**England (1)**
104:7
**English (18)**
8:13,14;32:20,21;
35:16,21;41:16,21;
48:13;55:8;81:14;
86:2,3;87:5;98:22;
116:4,7;126:21
**enough (4)**
18:5;27:5;63:6;
87:6
**ensure (1)**
55:18
**entire (2)**
17:2,20
**entities (3)**
65:19,25;119:9
**entitled (6)**
24:5;59:21;82:5,13;
102:5;129:20
**entity (7)**
27:22;47:7;60:14;
65:21;83:25;107:3;
116:25
**entrusted (3)**
28:18;29:4;92:25
**equivalent (2)**
12:24;43:17
**Eric (2)**
87:24;88:7
**estate (10)**
45:5;66:8;74:4;
85:2;114:14;116:16,
21;117:16,24;118:8
**et (2)**
7:6;97:21
**Eva (3)**
10:15;55:24;56:4
**even (8)**
36:8;40:19;43:12;
74:11;111:12;123:20;

131:6,8
**everybody (1)**
82:10
**everyone (1)**
113:21
**everyone's (1)**
15:24
**evidence (2)**
118:25;119:4
**evidences (1)**
118:22
**evidencing (1)**
129:16
**exact (2)**
42:15;56:24
**EXAMINATION (1)**
8:22
**examined (1)**
8:19
**example (1)**
96:15
**except (1)**
6:8
**exchanged (1)**
101:8
**excuse (1)**
98:14
**Exhibit (15)**
33:19,20;34:7;59:7,
15,20;69:7,12;73:15,
20;82:4,12;88:13,15,
25
**existed (1)**
40:24
**exists (1)**
129:21
**expanded (1)**
63:14
**expect (1)**
9:21
**explain (5)**
23:25;40:9;43:16;
116:23;117:6
**explained (1)**
110:23
**explore (1)**
13:15
**extorting (1)**
131:4
**Extortion (2)**
128:2,4

---

## F

**fact (6)**
25:16;60:15;
113:10;123:11;124:4,
6
**Fair (4)**
18:5;63:6;109:20;
113:15
**fake (2)**
61:4,18

**Fall (1)**
89:2
**falsely (1)**
120:18
**familiar (2)**
49:20,22
**family (15)**
30:21;44:23;45:4;
54:11;63:23;64:15,
20;77:18,23;94:8,9,
13,16,18;98:6
**family's (1)**
86:11
**far (6)**
13:20;24:9;69:3;
94:4;108:18;113:6
**fast (1)**
27:4
**faster (1)**
24:16
**favor (1)**
83:10
**FBI (1)**
61:18
**February (8)**
34:21;35:4;44:3;
56:21;72:13;73:20;
74:15;77:17
**February/March (1)**
56:17
**Federal (3)**
69:7,13;70:6
**feel (1)**
39:13
**feels (1)**
80:17
**fees (1)**
51:10
**Feng (2)**
87:2,4
**few (4)**
23:25;90:2;96:20;
127:12
**fewer (1)**
35:23
**Fifth (1)**
67:6
**figure (1)**
100:12
**filed (17)**
12:2;24:4;55:4,11,
14,15,18;60:3;69:13,
19;70:5;112:16;
113:2;115:24;118:14,
17;125:10
**files (1)**
34:4
**filing (1)**
6:5
**finally (1)**
10:23
**financial (7)**
73:8,16;80:18;

97:18;98:3,4;119:14
**financials (3)**
76:23;77:12;80:25
**find (2)**
22:15;104:17
**finds (2)**
43:12;125:23
**fine (5)**
27:8;43:20;78:20;
113:22;124:8
**finish (4)**
9:17,18;29:22;
130:8
**finished (2)**
39:21;132:10
**finishes (1)**
40:2
**firm (8)**
16:19;49:19,20;
83:17;88:8,10,22,24
**first (9)**
89:2,5,13;92:6;
96:5;107:14;111:22;
112:12;117:12
**floor (2)**
48:8;89:8
**focus (1)**
24:13
**follow (2)**
80:11;128:22
**follows (2)**
8:20;60:5
**follow-up (1)**
128:23
**force (1)**
6:15
**forget (1)**
131:18
**form (49)**
6:9;25:5,18;26:3;
29:11,20;30:5,15,22;
33:8;35:5;37:23;38:5;
39:11;40:10;41:2;
50:14;53:10,17,21;
54:2,15,20;57:15;
65:4,9,14;66:17,22;
78:15;80:4;85:10;
95:7,13,22;96:3;
97:12;105:15,20,25;
106:6,11,22;110:11;
111:4;113:11;122:15;
125:17;126:17
**formally (1)**
129:23
**formation (1)**
33:15
**formed (5)**
34:20;35:3;44:3,6;
53:9
**forth (1)**
100:9
**found (2)**
50:18;91:11

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. vs.
KWOK HO WAN

MILES KWOK
October 3, 2018

**four (1)**
20:23
**Frances (1)**
60:6
**fraud (1)**
118:8
**front (1)**
35:18
**frozen (1)**
80:3
**Fund (11)**
7:5;27:20,21;97:17,
17,19,24,25;98:2;
108:19;118:24
**funds (4)**
29:3;47:17;84:2;
119:5
**furnished (1)**
6:19
**furniture (3)**
90:2,9;93:3
**FURTHER (6)**
6:7,11,17;58:9,20;
129:12

**G**

**gain (1)**
123:16
**galaxy (1)**
21:24
**gave (4)**
18:23;25:25;26:6;
128:21
**general (1)**
68:14
**generally (2)**
20:20;48:10
**Genever (90)**
10:11,12,12,12,13,
20;11:7;28:10,12,17,
18;29:4;31:21;32:2,5;
33:11,16,20;34:2,2,
15,19;35:3;36:5,12,
20,25;37:5,8,9,11,12,
15,19,20,20,21;38:2,
8,11,14,17,21,23;
39:9,14;40:4,9,24;
41:24;42:3,13,17,22;
43:2,22;44:2,5;46:18,
22;47:23;48:5,11,17,
23;49:2,5,8,12;51:16,
19,23;66:15,21;67:2;
105:2;107:2,15;
108:5;110:2,15,18,19,
24,25;111:2,8,20,23;
119:8
**Genever's (1)**
31:23
**Gilbert (1)**
85:5
**gin (1)**
10:15

**given (2)**
125:3;133:12
**gives (1)**
28:23
**giving (3)**
18:21;48:20;89:22
**goes (1)**
126:9
**Golden (26)**
3:6;8:9;51:20;
63:12,13,16,17,18,19;
64:5,11,13,24;65:3,8,
12,25;66:5,7,10,14,
20,25;67:12,17;
116:14
**Good (6)**
8:24;13:20;21:12;
54:10;82:9,10
**Google (1)**
83:17
**gosh (1)**
52:21
**government (6)**
67:24;68:17;72:14;
73:4;80:3;90:21
**Grauer (2)**
7:13,16
**great (2)**
79:5;103:6
**ground (1)**
9:9
**group (2)**
9:3;11:14
**guarantee (2)**
89:25;98:21
**guards (3)**
18:10;19:10;22:20
**guest (1)**
130:23
**Gui (1)**
90:23
**G-U-I (1)**
90:25
**Guo (6)**
59:21;63:20,23;
64:7;90:22;121:11
**G-U-O (3)**
63:21;90:24;121:11
**guys (1)**
21:7

**H**

**hand (1)**
116:19
**handed (4)**
33:24;59:19;82:11,
12
**happened (2)**
23:4;99:8
**happy (3)**
68:9;79:16;113:20
**hard (1)**

24:12
**HARMON (155)**
8:4,4;10:13;12:6;
13:16,17,22;14:5,15,
20,24,25;15:14;16:4;
17:7,10,14,16,21,25;
18:14,25;19:4,9,12;
24:18;25:2,5,12,18,
22,25;26:3,7,12;
29:11,20,24;30:5,9,
15,22;33:8;34:5,9;
35:5;37:23;38:5;
39:11,21,25;40:10,15;
41:2;43:12;44:13;
47:13;50:14;53:10,
17,21;54:2,6,15,20,
25;57:15;58:6,13,17;
59:3;61:11;62:8,18,
23,24;63:3,8;65:4,9,
14,20,23;66:17,22;
67:25;68:8,18,22;
69:24;70:2,7,14,18;
71:5,12,16,20;72:5,8,
11,16,21;73:5;75:10,
23;78:15,25;80:4,7;
85:10;95:7,13,22;
96:3;97:12;101:14,
21;102:3,9,15;103:4;
105:15,20,25;106:6,
11,22;109:10,15,18;
110:11;111:4;113:11,
22;115:8;116:22;
117:19;118:2,9;
122:15;123:24;124:6,
9,12;125:17;126:2,7,
11,17;128:11,14,19;
129:6;132:11
**Harmon's (1)**
16:18
**Haroche (1)**
85:5
**hear (2)**
18:22;107:21
**heard (14)**
17:18;28:8,11;37:4,
7;50:5;57:19;107:18,
20;108:18;109:21;
111:23;121:10,17
**hearing (3)**
14:23;107:15;
117:13
**heart (1)**
126:9
**held (2)**
7:10;59:12
**Helen (1)**
104:3
**hell (1)**
13:11
**help (4)**
56:14;104:7;
109:13;131:5
**helping (3)**

21:11;131:3,10
**Henan (7)**
114:20;116:16,21;
117:9,15,24;118:7
**H-E-N-A-N (1)**
114:21
**HEREBY (3)**
6:3,6;133:7
**herein (3)**
6:5;8:11,18
**hide (1)**
15:11
**Hmmm (1)**
48:2
**Ho (2)**
73:23;74:5
**Hodgson (1)**
8:4
**Hold (6)**
40:15;45:25;53:9;
78:16;87:13,14
**holding (2)**
52:12;77:12
**holdings (83)**
10:15,20,24;28:10,
12,17;33:11,16,20;
34:2,3,15,19;35:3;
36:5,13,20,25;37:5,8,
9,11,12,15,19,20,20,
21;38:2,8,11,14,17,
21,23;39:9,15;41:24;
42:3,13,17,22;43:2,
23;44:2,5;46:18;
47:24;48:5,11,17,23;
49:2,5,8,12;51:16,19,
23;66:15,21;69:16;
72:15;73:9;76:18,23;
77:5,8,16,24;78:11,
24;79:24;105:2;
107:2,15;108:5;
110:2,15,18,20,25;
111:20
**Holdings' (1)**
80:2
**holds (1)**
48:7
**home (3)**
86:11,12;98:11
**homes (1)**
89:3
**Hong (25)**
31:17;46:7,25;47:2,
9;49:18;50:10;63:13,
16,18,19;64:5;65:22;
66:25;82:4,14;83:21;
87:22;96:12;98:11;
115:16;116:9,11,13,
14
**hopefully (1)**
130:13
**hospital (1)**
90:19
**Hotel (17)**

13:7;27:10,13;
28:14;32:13,14,17,25;
33:5;34:4;37:16;38:4;
44:10,15;57:7;
118:15;129:17
**hours (2)**
18:22;20:12
**house (5)**
39:6;42:11;48:15;
49:25;89:23
**humane (1)**
130:25;131:13
**humiliation (1)**
62:11
**hundred (1)**
98:21
**hundreds (1)**
57:22

**I**

**idea (3)**
78:22;105:19;
112:11
**ideas (2)**
75:3,4
**identification (6)**
33:22;59:16;69:8;
73:17;82:6;88:16
**identify (2)**
110:17;119:6
**illegitimate (1)**
125:22
**impossible (1)**
121:5
**impression (3)**
95:5;99:5;105:12
**imprisoned (3)**
87:15;114:13;
120:17
**inaccurate (1)**
57:4
**inappropriate (1)**
102:4
**include (2)**
93:2;111:3
**included (1)**
110:5
**includes (3)**
19:22;115:18;
116:13
**Including (3)**
115:7,10,12
**incomprehensible (1)**
21:23
**Incorporation (1)**
34:14
**incorrect (2)**
50:16;92:3
**index (1)**
7:8
**individual (1)**
60:14

Case 22-50073   Doc 1269   Filed 12/28/22   Entered 12/28/22 14:09:15   Page 445 of
452
PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. vs.
KWOK HO WAN
MILES KWOK
October 3, 2018

**inform (3)**
  100:25;101:13;
  102:14
**informally (1)**
  129:22
**information (8)**
  25:15;28:23,24;
  70:5;73:9,16;115:15,
  20
**initial (1)**
  29:2
**instruct (3)**
  28:19;96:21,25
**instructed (6)**
  24:7;62:19;91:8;
  97:7,10;102:21
**instructing (5)**
  63:2,7,8;72:9;
  103:11
**instruction (4)**
  97:4;101:20;102:2;
  126:8
**instructs (2)**
  9:23;96:7
**intelligences (1)**
  22:19
**intend (1)**
  86:6
**intended (1)**
  86:10
**interest (13)**
  28:5;38:3;64:4,10;
  77:4,8;78:3;82:20,24;
  83:4;110:6,9;116:20
**interested (1)**
  86:23
**interests (1)**
  117:24
**International (2)**
  47:2,9
**interpret (8)**
  8:12;25:8;28:22;
  39:22;54:22;118:5;
  129:9;130:20
**interpretation (1)**
  84:10
**interpreted (4)**
  58:23;70:25;72:24;
  99:4
**Interpreter (79)**
  3:4;8:11,19;11:9,
  10,22;12:16,20,23;
  18:4;22:21;23:3;25:7,
  8;27:17;28:19;29:7;
  31:10,11,19;36:14,15,
  17;39:23;41:4,4,18;
  43:7,15,21;44:11;
  47:3,4;49:15;50:3,4;
  52:19;54:24;56:2;
  58:22,22;63:21;
  70:24;72:23,23;
  74:21;75:14;84:7,8,9;
  87:23,25;89:20,21;

90:24;92:21;99:3;
  102:17,17;103:23;
  104:2;107:5,9;111:6,
  6;112:21;114:21;
  115:9,12;118:4,4;
  119:10,11;124:11;
  127:24;128:3;129:8,
  8;130:20
**into (3)**
  8:13,14;70:11
**Invest (1)**
  66:8
**invested (2)**
  45:4;114:14
**investigation (1)**
  62:4
**investigator (1)**
  60:7
**investment (8)**
  29:5;52:5,7;54:10;
  69:15;119:14;120:6,9
**investments (2)**
  52:10,17
**investor (1)**
  52:23
**investors (1)**
  29:6
**invite (1)**
  14:21
**involved (4)**
  33:15;56:15;75:9,
  22
**involvement (1)**
  47:20
**Island (1)**
  53:8
**Islands (6)**
  10:17,25;33:13;
  52:3;54:14;107:3
**issue (5)**
  11:13;14:19;47:11;
  60:4;106:21
**issued (1)**
  102:25
**issues (6)**
  11:4,6,14;13:14,15,
  25
**item (1)**
  129:14
**Ivey (1)**
  83:10

**J**

**jail (3)**
  56:7,9;57:5
**January (3)**
  70:12,20;72:13
**Je (2)**
  97:16;98:7
**J-E (1)**
  97:16
**jet (1)**

59:22
**JIANG (1)**
  3:4
**Jillian (1)**
  8:6
**job (1)**
  131:12
**judge (1)**
  100:25
**judgment (1)**
  125:24
**June (4)**
  91:23;92:8;94:23;
  114:25

**K**

**KARIN (4)**
  3:6;8:8;131:19,20
**Kau (1)**
  31:14
**keenly (1)**
  80:17
**keep (1)**
  130:2
**kidnapped (2)**
  121:8,8
**kill (1)**
  61:20
**kind (2)**
  12:21;19:24
**kinds (1)**
  20:23
**knew (2)**
  122:20,23
**knowing (2)**
  126:15,22
**knowledge (3)**
  75:5,14,18
**knows (5)**
  21:11;94:8,9;95:24;
  101:17
**Kong (25)**
  31:17;46:8;47:2,2,
  9;49:18;50:10;63:13,
  16,18,19;64:5;65:22;
  66:25;82:4,14;83:21;
  87:22;96:12;98:11;
  115:16;116:10,11,13,
  14
**Kristi (1)**
  7:15
**Kwok (203)**
  7:3;8:24;9:1;10:1;
  11:1;12:1,10;13:1;
  14:1,6;15:1;16:1;
  17:1;18:1;19:1,14;
  20:1;21:1;22:1;23:1,
  25;24:1;25:1;26:1;
  27:1,6;28:1;29:1;
  30:1;31:1;32:1;33:1,
  20,24;34:1,8,9,10;
  35:1,16;36:1;37:1;

38:1;39:1;40:1,18;
  41:1,6,23;42:1,2,10,
  13,21;43:1;44:1;45:1,
  20,24;46:1,10,15;
  47:1;48:1;49:1;50:1;
  51:1,22;52:1;53:1;
  54:1;55:1;56:1;57:1;
  58:1,11;59:1,15,19,
  21;60:1,2,8,9,15,22;
  61:1;62:1,6,15,20;
  63:1;64:1;65:1;66:1;
  67:1;68:1;69:1,7,12;
  70:1;71:1,9;72:1,2;
  73:1,15,19,23;74:1,3,
  5;75:1;76:1,15;77:1;
  78:1,9,23;79:1,23;
  80:1,10,15;81:1,6,25;
  82:1,4,9,15,16;83:1,
  16;84:1;85:1;86:1;
  87:1;88:1,15,20;89:1;
  90:1;91:1;92:1;93:1;
  94:1;95:1;96:1;97:1;
  98:1;99:1;100:1;
  101:1;102:1,12,16,24;
  103:1,7;104:1;105:1;
  106:1;107:1;108:1;
  109:1;110:1;111:1;
  112:1;113:1;114:1,4,
  10;115:1;116:1;
  117:1,7,18;118:1,5;
  119:1;120:1;121:1,
  14;122:1;123:1;
  124:1,21;125:1;
  126:1,13;127:1,11;
  128:1;129:1,2;130:1;
  131:1,21;132:1,13;
  133:7,17
**Kwok-controlled (1)**
  117:15
**Kwok's (4)**
  13:6;14:16,18;
  68:13
**Kwon (1)**
  7:6

**L**

**Lao (1)**
  87:22
**L-A-O (1)**
  87:23
**laptop (1)**
  26:7
**last (2)**
  22:21;46:11
**late (2)**
  67:13;72:12
**later (2)**
  45:5;127:8
**law (2)**
  16:19;24:5;49:19;
  83:17;88:8,10,22,24;
  131:6

**lawfully (1)**
  131:9
**laws (1)**
  33:12
**lawsuit (13)**
  12:2,11;24:4;55:3;
  69:20;109:23;112:3;
  115:24;118:14;125:8,
  22,24;127:17
**lawyer (4)**
  9:23;16:16;104:6;
  129:19
**lawyers (15)**
  9:20;16:8,9,10,11;
  21:16;31:8,13;46:13;
  55:4;91:10;106:20;
  121:4;123:22;124:19
**learn (2)**
  72:19;73:2
**learned (1)**
  109:4
**learning (1)**
  35:20
**lease (6)**
  48:7;67:9,13;123:7,
  19;126:15
**least (3)**
  96:20;125:10;
  127:21
**leaving (1)**
  28:24
**leg (1)**
  79:3
**Legal (2)**
  7:13,16
**letter (9)**
  51:13;73:15,21,25;
  74:3;78:9,11;80:22;
  81:5
**letting (1)**
  79:7
**level (1)**
  87:5
**Liability (1)**
  37:6
**lien (2)**
  107:7;112:17
**lies (1)**
  127:22
**Limited (12)**
  10:24;37:5;82:5,14,
  17,21,24;83:4,7,25;
  96:18;130:2
**line (1)**
  62:19
**list (2)**
  43:23;115:18
**listen (8)**
  60:20,21;61:2,5,9,
  10;71:2,4
**listened (1)**
  52:23
**lists (1)**

Case 22-50073    Doc 1269    Filed 12/28/22    Entered 12/28/22 14:09:15    Page 446 of
PACIFIC ALLIANCE ASIA OPPORTUNITY FUND, L.P. vs.
KWOK HO WAN

452

MILES KWOK
October 3, 2018

89:7
**litigation (7)**
9:3;14:2;20:25;
21:5;25:3;101:2;
118:18
**little (2)**
46:15;52:15
**live (15)**
27:12,24;29:10,14,
18;30:3,4,13,13,19,
20;86:5,6;98:10;
114:19
**lived (1)**
117:8
**living (3)**
54:8;104:20;114:12
**LLC (31)**
10:20;33:21;34:2;
37:5,9,13,15,20,21;
44:3,5;47:24;48:6,11,
17,23;49:2,5,8,12;
51:16,19,23;52:2;
53:7,8,9;66:21;83:10;
110:20;111:2
**LLP (1)**
8:5
**loan (7)**
118:8;127:19,20;
128:6,6,10;129:5
**local (1)**
74:4
**long (4)**
24:12;77:3;79:15;
130:18
**longer (1)**
86:22
**look (5)**
33:19;35:10,12;
43:8;76:14
**loose (1)**
47:3
**lost (1)**
104:17
**lot (8)**
15:23;23:8;24:21;
96:10;114:16,17;
115:5;125:20
**love (2)**
89:2;131:7
**lower (6)**
92:25;96:16,21,25;
98:16;99:10
**lowered (5)**
91:25;92:7;93:11;
94:24;99:2
**LP (2)**
7:5;13:4
**Ltd (5)**
63:12;73:10;77:5,9,
17
**Luck (12)**
81:10,11,12,16;
82:5,14,17,21,24;

83:4,7,25
**Luncheon (1)**
81:20

## M

**MACOM (2)**
3:5;7:12
**mafia (2)**
21:8,12
**maintain (1)**
67:5;80:24
**maintains (3)**
43:3,5,23
**maintenance (1)**
89:25
**MAISTRELLO (6)**
3:6;8:8,8;127:7;
131:19,22
**making (2)**
60:16;71:16
**Man (1)**
105:11
**management (1)**
49:9
**manager (2)**
97:18,24
**managing (1)**
97:25
**Mandarin (3)**
3:4;8:11,14
**Mandarinn (1)**
8:13
**Manis (2)**
104:4,10
**many (17)**
19:23;20:10,21;
22:19;23:8,13,14;
30:12;35:22;57:21;
85:23,25;94:11,19,20;
115:6;116:12
**March (2)**
56:22;84:5
**Mark (6)**
8:4;34:5;59:6;
65:17;69:6;88:13
**marked (7)**
33:21;59:16;69:8;
73:16,20;82:6;88:16
**market (5)**
87:8,13,17;99:16,
20
**marketing (1)**
100:21
**marks (2)**
81:23;114:2
**married (3)**
45:5,10,13
**marry (1)**
45:7
**matter (1)**
7:4
**may (10)**

6:12;7:21;9:20;
39:9;60:3;69:14;
114:24,25;130:12;
131:20
**Maybe (5)**
13:12;35:15;56:14;
104:18;108:16
**mean (11)**
15:13;21:4;34:22,
25;39:4;52:7,11,18;
76:13;97:19;112:14
**meaning (3)**
22:8;36:15;52:20
**means (3)**
20:17;40:9;107:6
**media (1)**
66:8
**meet (6)**
15:8,14,17;94:16,
17;98:15
**meeting (13)**
15:13,22;17:3,6,9,
15,24;18:19;19:2,10;
38:21;98:24;99:8
**member (5)**
27:21;36:16,17;
63:23;77:18
**members (7)**
30:21;34:11;43:24;
64:21;77:19,23;88:8
**memorandum (1)**
43:6
**mental (1)**
61:22
**mention (3)**
86:25;87:4;120:13
**mentioned (1)**
46:21
**merit (1)**
12:8
**merits (3)**
13:15;14:2,20
**message (7)**
19:20,21,22,24;
20:3,4,8
**messages (14)**
20:22,24;21:17;
22:5,10,15;23:11;
25:3,17,21;26:2,8,20,
24
**messaging (3)**
20:14,16,19
**met (2)**
15:20;94:13
**methods (2)**
19:23;20:16
**middle (2)**
83:13;108:19
**might (1)**
35:24
**Miles (8)**
7:3;45:20;59:21;
81:25;114:4;132:13;

133:7,17
**Mileson (12)**
41:15,16,23;42:2,
12,21;51:22;64:7;
103:9,14;105:3;
121:14
**Mileson's (1)**
104:14
**million (24)**
36:10;61:3;84:6,8,
12,18;89:8,23,24,25;
90:2,7,13;91:25;92:2;
93:11;94:24;98:17;
99:2,11;100:15;
120:9;125:3;128:5
**mind (1)**
89:21
**minutes (1)**
58:2
**missed (1)**
22:21
**mistake (3)**
31:11;84:9,10
**mistaken (2)**
89:19;90:6
**mode (2)**
56:11,13
**money (6)**
48:15;106:17;
108:8;125:3,24;
127:25
**months (1)**
86:16
**more (5)**
11:20,23;90:14;
127:12;131:16
**morning (1)**
8:24
**MOSS (71)**
7:23,23;8:23;9:2;
11:12;12:22;13:17,
21;14:12,17;15:3;
17:18;23:18,24;
25:11;29:22,25;
33:19,23;34:7;36:16;
43:19;45:15,23;59:6,
18;62:14,25;63:6;
65:17,22;68:5,11,21;
69:5,10;70:17,19;
71:14,18;72:8;74:19;
82:8;88:13,18;
101:19,24;102:7,23;
103:6;107:7;109:13,
20;113:20;114:9;
115:14;117:7,12;
124:4,7;126:6,24;
127:11,15;128:16;
129:11;130:23;
131:15,20,23;132:9
**most (1)**
89:3
**motion (8)**
13:13;59:25;60:2;

103:2,3;112:3,13;
126:10
**motives (1)**
60:13
**move (7)**
14:23;43:20;79:8,
10,11;101:18,23
**Mrs (1)**
17:11
**much (8)**
8:25;28:23;84:15,
18;130:16,24;131:12,
13
**must (1)**
131:16
**Myers (4)**
7:11,24;8:1,3

## N

**name (17)**
7:12;8:25;16:13,15;
31:15;41:16,17,21;
44:12;48:13;49:16;
92:19;104:14;108:11;
115:18;116:5;131:18
**named (3)**
33:6;103:16;117:13
**names (3)**
15:24;48:19;111:8
**nature (2)**
40:13,23
**need (11)**
18:4;21:13;23:25;
49:15;62:12;79:15,
15;80:17,24;90:12;
116:23
**needed (2)**
45:25;86:20
**needs (2)**
52:5,8
**negotiate (5)**
84:24;85:14,15,18,
21
**negotiations (1)**
100:8
**New (34)**
7:7,8;10:21;37:5;
47:24;52:2;53:7,9;
54:13;63:12,14,17;
64:11;65:22;66:4,10,
14,20;67:5,9;68:13,
20,23;69:13;83:23;
86:6,11,17;90:2;
94:25;98:12;104:20;
111:2;133:3
**nine (1)**
86:16
**nobody (2)**
17:6;24:3
**nonexisting (1)**
21:25
**Notary (1)**

Case 22-50073   Doc 1269   Filed 12/28/22   Entered 12/28/22 14:09:15   Page 447 of
452
PACIFIC ALLIANCE ASIA OPPORTUNITY FUND, L.P. vs.
KWOK HO WAN

MILES KWOK
October 3, 2018

133:25

**note (6)**
61:24;62:18;114:6;
130:5;131:17,24

**noted (1)**
132:16

**notion (1)**
89:19

**number (6)**
7:8;38:15;49:6;
61:17;81:24;114:3

**numbers (3)**
34:12;89:22,22

**numerals (1)**
35:13

## O

**oath (3)**
6:14;9:7;133:9

**object (56)**
9:20,21;14:11;25:5,
18;26:3;29:11,20,23;
30:5,15,22;33:8;35:5;
37:23;38:5;39:11;
40:10,18;41:2;50:14;
53:10,17,21;54:2,15,
20;57:15;61:11;65:4,
9,14;66:17,22;71:23;
78:15,17;80:4;85:10;
95:7,13,22;96:3;
97:12;105:15,20,25;
106:6,11,22;110:11;
111:4;113:11;122:15;
125:17;126:17

**objected (2)**
40:19;62:18

**objecting (1)**
54:4

**Objection (18)**
17:16;18:14;25:9;
41:5;59:3;62:8;70:3,
7;71:21;72:5,16,21;
73:5;75:24;102:8;
117:21;128:11;129:6

**objections (2)**
6:8;54:23

**objects (1)**
30:7

**obligation (1)**
100:25

**obviously (2)**
55:7;126:9

**occasionally (1)**
54:8

**October (8)**
7:11;87:18;89:5,12;
91:20;98:14;99:17;
133:9

**off (14)**
23:19;45:15,16;
59:8,10,12;81:18;
99:20;113:23;115:17;

126:24;127:2;132:9,
14

**offer (3)**
100:11,14,17

**offered (1)**
130:6

**offers (2)**
60:7;100:4

**office (3)**
79:12;85:25;88:5

**officer (1)**
6:13

**offices (5)**
38:12;49:3;67:6,9,
14

**official (1)**
132:4

**old (2)**
114:10,11

**older (1)**
77:20

**O'Mara (1)**
83:10

**O'Melveny (4)**
7:11,24;8:1,3

**One (41)**
9:5,5;11:13;16:16,
17,21,23,24;21:2,3;
27:7;29:9,13;30:9;
31:4;35:13;40:15;
42:6;46:6,7,21;49:21;
57:23,24,25;65:18,23;
68:25;80:7;81:6;
85:23;86:2;87:15;
94:21;109:7;119:13;
120:10;121:15;
127:19;129:14;
131:16

**ones (1)**
86:3

**only (8)**
35:12;86:2;91:10;
96:6,19,23;103:18;
121:15

**onto (1)**
87:13

**oOo (1)**
6:23

**open (3)**
117:5;129:14;130:2

**Opportunity (1)**
7:5

**opposed (1)**
63:4

**opposition (1)**
60:2

**option (1)**
130:7

**orally (2)**
55:21,22

**order (5)**
101:17,22;102:6,
24;132:2

**orders (1)**
125:23

**organizations (3)**
10:9,11;11:7

**organized (4)**
10:16,21,25;33:12

**original (3)**
90:7;119:20,20

**others (3)**
35:14;88:3,7

**otherwise (3)**
61:5;91:3;117:2

**ours (1)**
125:4

**out (8)**
15:23;18:7,10,11;
28:24;29:3;52:5;91:4

**outside (1)**
61:21;68:15

**over (6)**
9:9;20:10;24:16;
61:3;78:5;104:22

**owe (1)**
36:9

**own (10)**
27:9;28:13;31:21;
37:9,15;60:7;71:11;
72:4;73:25;125:15

**owned (12)**
52:2;64:13;77:16,
23;82:18;105:2,8,8,
12,13,24;106:10

**owner (8)**
48:11;78:10,23;
85:7;95:21;106:5,14,
16

**ownership (19)**
28:5;38:3;41:24;
51:23;64:4,10;77:4,7;
78:2;82:20;103:8,13;
104:14,25;110:5,9;
111:2;118:22;119:7

**owning (4)**
64:16,17,21,24

**owns (10)**
27:15;37:20,21,22;
48:6;63:17,18,19;
110:19;117:14

## P

**Pacific (18)**
7:5;9:2;11:14,18,
25;13:5;24:3,4;25:4;
26:13,16,20,25;58:3,
14;59:24;69:14;
112:17

**page (9)**
60:4;70:10,16,17;
80:12;81:5;89:2,5,9

**PAHLAVAN (2)**
8:2,2

**paid (2)**

51:9,12

**pain (3)**
79:5,8,10

**paintings (3)**
90:3,9;93:3

**Pangu (4)**
47:21;73:3;103:19;
123:3

**paper (1)**
26:11

**papers (9)**
55:4,7,11,14,18;
112:16;113:3,6;
125:10

**paragraph (2)**
70:10,17

**parameters (1)**
61:22

**part (3)**
22:22;116:5;131:11

**parties (1)**
6:5

**partly (1)**
116:4

**partner (6)**
27:20;45:4,4;97:17,
19,22

**parts (1)**
28:20

**party (6)**
17:19;22:18;29:4;
61:25;78:10,24

**passed (2)**
91:12;93:16

**past (1)**
45:3

**Paul (22)**
31:14,16,17;49:14,
19;50:8,11,19,22;
51:5,9,14;74:4;75:6,
15,19;76:4,9,19;78:8,
14,22

**PAX (3)**
13:4;25:4;102:5

**PAX's (1)**
60:6

**pay (6)**
21:13;62:12;89:24,
24;125:24,25

**payment (1)**
128:6

**payments (1)**
67:13

**pending (1)**
129:11

**people (12)**
15:23;23:8;30:12,
18;31:4;56:12;85:25;
94:19,20;96:10,20;
108:24

**percent (3)**
28:22;77:21;98:21

**Perfect (1)**

69:5

**period (1)**
42:10

**permanently (1)**
86:7

**person (14)**
15:20,21;16:18,21;
17:2;21:12;27:22,23;
29:2;40:22;64:9;85:6;
96:23;119:2

**personal (2)**
10:7;61:25

**personally (6)**
28:6;32:23;78:2;
85:15;108:25;123:5

**person's (2)**
22:10;62:3

**phone (4)**
25:25;38:15;49:6;
93:4

**phonetic (4)**
18:2;27:18;41:19;
63:22

**photo (1)**
127:8

**Picture (3)**
131:22,23;132:7

**pictures (1)**
132:3

**piercing (2)**
13:14;14:19

**Ping (4)**
55:25;112:20;
113:13;115:22

**P-I-N-G (2)**
56:3;112:22

**place (2)**
61:17;87:16

**placed (2)**
87:8,13

**plaintiff (7)**
7:4;8:1;70:23

**plaintiffs (2)**
7:24;8:3

**planned (1)**
86:15

**planning (4)**
59:22;119:14;
120:6;130:25

**play (4)**
53:3;60:17;61:15;
62:17

**played (1)**
60:19

**playing (2)**
62:16,16

**Plaza (1)**
47:21

**please (21)**
7:22;9:13,18,22;
13:22;15:25;17:13;
18:12,17;25:13;
34:13;40:16,17;

Case 22-50073    Doc 1269    Filed 12/28/22    Entered 12/28/22 14:09:15    Page 448 of
452
PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. vs.
KWOK HO WAN

MILES KWOK
October 3, 2018

54:22;62:14;71:17;
75:23;76:14;79:8,16;
88:14
**pledge (16)**
107:8,12,15;108:4;
109:6,22,22;110:23,
24;111:19,23;112:7,
11;121:22;122:2,13
**pledged (15)**
107:3,5;108:7,10;
110:2,10,14;111:15,
16;112:9,19;113:4,10,
18;122:12
**pledges (1)**
121:22
**pm (9)**
81:19,21;82:3;
113:24;114:5;127:3,
6;132:15,16
**point (4)**
17:5;32:4;109:20;
118:21
**poison (1)**
23:2
**police (5)**
115:16,17;116:2,3,
9
**polite (1)**
109:19
**political (3)**
120:23;121:3,6
**popular (1)**
89:3
**position (3)**
103:5;117:3;125:14
**possession (1)**
119:19
**possible (3)**
22:9;44:18;130:12
**post (2)**
32:7,10
**posted (1)**
57:12
**potential (2)**
100:4;101:9
**practice (1)**
126:20
**precisely (1)**
115:2
**preparation (3)**
15:6,7,13
**prepare (3)**
15:4,9;23:7
**prepared (1)**
24:13
**PRESENT (6)**
3:3;15:22;16:10,12,
16;19:11
**presented (1)**
76:23
**president (1)**
67:21
**press (4)**

115:3,5,10;117:15
**previous (1)**
18:22
**previously (1)**
79:4
**price (26)**
84:5,24;85:14,15;
89:15,16,17;91:7,23,
24;92:5,7;93:2,11;
94:23,25;96:16,22;
97:2,8,11;98:16;99:2,
11;100:5,9
**Printout (1)**
59:15,20;88:16
**prison (14)**
27:25;41:8,9;79:4;
87:11;90:16,18;91:4,
15;106:21;114:23;
115:4,11,13
**prisoner (3)**
120:23;121:3,6
**private (1)**
59:22
**privilege (4)**
17:22;18:15;78:18;
109:11
**Privileged (2)**
17:17;123:25
**problematic (1)**
43:14
**proceeding (2)**
117:2;126:4
**process (1)**
33:3
**produced (3)**
34:3;82:15;130:4
**producing (1)**
130:7
**production (2)**
129:22,25
**profanity (2)**
12:17,25
**project (2)**
47:21;93:24
**pronouncing (1)**
41:14
**proof (1)**
60:7
**Properties (1)**
67:10
**proprietary (4)**
48:7;123:7,19;
126:15
**protective (1)**
132:2
**prove (3)**
60:25;61:4,7
**proven (2)**
58:16;61:18
**provide (10)**
21:15;25:21;26:11;
47:17;73:8;98:4,7;
119:21,25;128:5

**provided (7)**
48:16;76:19;
106:17,18;115:16,20;
116:9
**Province (1)**
117:9
**Public (1)**
133:25
**publicity (1)**
115:3
**publicly (1)**
94:25
**pull (1)**
86:22
**purchase (32)**
28:2;32:24;39:6,18;
40:7,24;42:11;44:8,9,
14;47:18;49:25;50:9,
12,20;52:4;53:2,6,15,
20;54:13;56:16;57:6;
73:11;75:9,22;77:14;
84:2,5,24;89:23;91:7
**purchased (4)**
48:16;84:15;85:4,9
**purchaser (2)**
85:22;101:9
**purchasers (3)**
99:23;100:3,4
**purchasing (5)**
33:6;56:21;114:18
**purpose (1)**
130:3
**pursue (1)**
100:21
**put (11)**
13:12,21;29:3;
35:18;59:23;89:13;
100:8;107:6,7;
129:24;131:16
**putting (1)**
36:6

---

**Q**

---

**Qiang (4)**
63:20,23;64:7;
121:11
**Q-I-A-N-G (2)**
63:21;121:11
**quick (1)**
113:20
**quickly (1)**
86:21
**quite (9)**
11:8;16:13;36:2;
76:12;92:17;102:11;
108:11,12;111:17

---

**R**

---

**R2 (4)**
108:16,16,17;
121:23

**racketeering (1)**
21:10
**rate (1)**
24:11
**rather (1)**
125:15
**reach (1)**
69:3
**reached (2)**
68:23,25
**read (9)**
34:17;35:10,16,19;
70:10;71:3;83:6;
98:22;133:8
**reading (1)**
70:15
**reads (1)**
60:4
**real (12)**
12:24;45:5;61:5;
66:8;74:4;85:2;
114:14;116:16,21;
117:16,24;118:7
**really (38)**
22:7,17;23:14,16;
31:20;32:19;33:14;
34:23;35:7,7,8,25;
36:19;37:17;39:5,13;
40:5,21;42:8;45:11;
46:19;48:9,19;54:17;
65:6;67:20;79:18;
81:13,17;83:5,20;
84:16;85:12;105:17,
18;110:13;118:20;
123:9
**Realtorcom (2)**
88:15;89:4
**reason (5)**
10:3;22:25;24:24;
60:12;76:8
**reasons (2)**
63:10;71:23
**recall (4)**
80:19;104:24;
123:5;126:16
**receive (1)**
55:13
**Recess (5)**
23:21;45:18;81:20;
113:25;127:4
**recollect (1)**
98:23
**recollection (4)**
25:16;57:3;83:19;
89:11
**record (37)**
7:17,20;9:19;12:19;
13:12,22;23:20,23;
24:2;45:17,21;59:9;
11,12,14,23;62:14;
63:11;70:11;71:17,
22;81:19;82:2;
113:24;114:5,6;

126:25;127:3,6;
129:24;130:6;131:17;
132:4,10,14;133:11,
12
**recorded (1)**
61:3
**recording (1)**
60:11
**reference (1)**
118:16
**referring (8)**
42:10;46:22,24,25;
57:23,24,25;95:12
**refers (1)**
95:10
**reflect (1)**
62:15
**reflects (1)**
94:25
**refresh (3)**
57:2;83:18;89:11
**Refusal (1)**
73:7
**Refuse (25)**
58:24;59:5;60:20;
61:10;69:25;71:2,3;
72:7,18,25;78:19;
80:6;102:19;116:18;
117:22;118:6,11;
122:21,25;123:4;
124:14,15;126:5;
128:13;129:10
**refusing (3)**
71:9;72:3;102:20
**regarding (7)**
15:15;18:25;19:9;
68:19;73:22;80:18;
87:2
**related (3)**
22:13;71:3;114:17
**relates (1)**
68:12
**relating (12)**
11:4,6,14;13:14,25;
34:2;60:3;108:24;
111:23;118:13,18;
129:17
**relation (5)**
13:10;64:2;81:12,
15;102:4
**relationship (22)**
28:16;38:24,25;
39:4,16,20;40:3,8,14,
23;44:23;45:2;46:9;
51:17,20;61:6;66:15,
21;67:2;116:24;
117:17;120:11
**relevance (1)**
102:7
**remember (72)**
16:13,14,14;17:14;
34:23;35:8;39:20;
42:15;47:25;48:14;

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND, L.P. vs.
KWOK HO WAN

MILES KWOK
October 3, 2018

51:8;56:23;57:4;
74:10,11,18,18;76:3,
7,22;77:2;81:9;82:22,
23;83:2,5,7;84:13,14,
16,17,19;85:12;86:13,
18;87:4,19;88:2,3,11,
12;92:17;94:14,17;
96:19;98:19,24;99:6,
7,19,21;100:19;
103:10,11,15;104:5,8;
105:4;108:12;111:11;
115:2;116:13;121:19,
20,23;122:18,24;
123:8;124:18,20;
127:9,16
**remembers (1)**
94:12
**repaid (1)**
127:20
**repeat (5)**
22:23;23:4;49:16;
50:6,6
**rephrase (1)**
113:16
**reporter (3)**
7:15,22;82:12
**reporting (1)**
115:5
**represent (10)**
7:21;9:2;29:5;
49:23;50:19;64:17,
23;75:15;76:15;
119:13
**representation (2)**
80:20;122:13
**representative (18)**
10:8;31:8;32:6;
38:25;39:3,16;42:8,
13,17;46:8,22;47:8;
50:9,18;53:3;54:9;
93:23;96:6
**representatives (4)**
31:2;32:16;33:4;
42:7
**represented (8)**
31:3;49:24;57:13;
60:15;78:9;81:6;
93:16;122:11
**representing (7)**
24:3;50:11,23,25;
56:19,20;93:25
**represents (2)**
64:15,20
**request (7)**
11:5,15;26:13;
53:12;62:4;119:23;
125:11
**requested (2)**
52:13,20
**requesting (1)**
13:5
**requests (4)**
21:19;26:17,21,25

**reserve (2)**
61:23,24
**reserved (1)**
6:10
**residence (27)**
11:5;13:6;27:9,12,
15;28:3,4,6,13;32:24;
37:16,21,22;38:4;
39:19;40:7,25;52:4;
53:8;56:16;86:16;
103:9,14;105:12,23;
106:9;112:4
**resident (1)**
80:16
**respect (2)**
42:3;96:7
**respective (1)**
6:5
**respond (6)**
21:17,18;26:12,16,
20,25
**responding (1)**
119:22
**response (3)**
72:24;112:12;129:9
**responses (2)**
27:4,8
**responsibility (1)**
62:13
**restructure (1)**
104:25
**restructuring (1)**
105:7
**review (6)**
55:11,17;69:22;
86:20;123:14,22
**reviewed (1)**
123:13
**reviewing (2)**
124:5,18
**ridiculous (2)**
24:22;55:2
**right (29)**
30:8;32:25;33:13;
36:2;39:17;43:9;48:8;
55:8;56:17;61:23,24;
62:22,22,25;63:4,5;
68:21;78:7;79:18;
82:25;87:18;88:22,
23;93:12;101:7;
103:5;111:20,24;
112:4
**ring (1)**
108:15
**robbers (2)**
125:2,5
**robbery (1)**
124:24
**role (7)**
42:3;52:25;53:3,15;
66:9;67:16,19
**room (6)**
17:20,23;18:13,19;

19:3,11
**Roscalitar (9)**
108:13,15,17,24;
110:3,10;121:23;
122:3,12
**rounds (1)**
118:13
**RQ (1)**
129:11
**rudimentary (1)**
83:17
**rules (1)**
9:10
**run (1)**
22:10
**Russ (1)**
8:5

## S

**sale (6)**
89:13;93:21;101:3,
6,12;102:13
**same (28)**
6:6,15;29:18;30:3;
59:3,3;61:11;62:8,8;
64:7,9;70:3,3,7,7;
71:23;72:5,5,16,16,
21,21;73:5,5;93:15;
120:8;129:6,6
**Sara (1)**
8:2
**SARNOFF (7)**
7:25,25;12:18;34:8;
70:16;128:2;132:8
**Saw (3)**
94:21,22;116:4
**saying (4)**
21:21;23:5,15;
57:18
**scamming (1)**
21:7
**scholarship (1)**
84:25
**scope (16)**
13:19;14:9;58:7,18;
62:9;68:2,6,12;69:2;
102:9;103:2;117:3;
126:3;128:14,16,24
**sealing (2)**
6:6;115:17
**search (7)**
22:10;23:13;25:17;
26:2,8,15,19
**searched (8)**
20:24;21:17;22:5,
12,15;23:11;25:2,22
**searches (1)**
83:17
**searching (2)**
22:13;26:24
**SEARLES (16)**
8:6,6;15:15;16:6;

17:7,11,14,25;18:25;
19:9;25:2,22,25;26:8,
12;58:13
**second (7)**
40:15;59:9;78:16;
89:8;126:8;130:10,13
**secretary (1)**
31:12
**securities (3)**
114:14,15,17
**security (5)**
18:10;19:10;22:20,
24;107:8
**seeing (3)**
74:11,18;131:2
**seeking (3)**
124:22;125:10;
131:5
**segments (1)**
28:25
**seized (7)**
67:24;68:16;72:14;
73:3;122:20,24;123:3
**seizing (2)**
70:23;122:19
**seizures (1)**
72:20
**sell (3)**
59:22;87:8;91:8
**seller (8)**
85:16,19,22;93:25;
95:2,5,10,18
**selling (3)**
89:15;95:6;114:18
**sensation (1)**
61:14
**sentence (1)**
126:12
**separate (1)**
120:6
**separated (1)**
21:24
**September (1)**
89:3
**serious (1)**
95:5
**seriously (2)**
61:20;100:18
**seriousness (1)**
95:2
**services (2)**
98:5,7
**several (4)**
20:12,13,16;24:9
**shall (2)**
6:9,19
**share (1)**
44:9
**shared (1)**
74:9
**shareholder (9)**
31:25;32:5;36:4;
42:21;46:17;65:2;

74:6,14;81:7
**shareholders (1)**
65:8
**shares (1)**
48:6
**Sheet (2)**
76:17;79:24
**Sherry (7)**
32:14;44:8,13;
49:17,25;50:20;80:16
**Sherry-Netherland (66)**
11:6,16;13:7;27:10,
13;28:13;29:10,15,
19;30:4,14,20;31:2,7;
32:9,13,16,19,24;
33:5;34:4;37:16;38:4;
44:10,15;47:18;48:6,
12;52:4;56:16;57:6;
73:10,22;74:7,9,15;
75:8,16,21;76:6,11,
20,24;77:13;79:25;
80:15,21;84:3,21;
86:5,10,15,20;87:2;
89:7;103:13;105:6;
110:6,10;118:15;
120:2,14;123:7,18;
124:23;125:4
**Shiny (15)**
10:24;38:24;39:10,
16;40:4,8,23;46:3,7,
23;47:5,6;51:17;67:5,
8
**shoulder (1)**
79:4
**show (2)**
61:21;132:6
**showed (1)**
115:22
**showing (2)**
119:5;120:11
**shown (1)**
115:21
**shows (1)**
119:7
**Shui (1)**
87:2,4
**side (2)**
113:2;131:24
**sign (5)**
36:8,10;98:15;
123:10;126:20
**signed (11)**
6:13,15;51:13;
58:12;123:6,12,17,23;
125:2;126:14;133:20
**signing (3)**
36:9;98:25;123:8
**simple (2)**
61:16;125:6
**simplest (1)**
118:25
**sister (1)**
77:20

Case 22-50073   Doc 1269   Filed 12/28/22   Entered 12/28/22 14:09:15   Page 450 of
452

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. vs.
KWOK HO WAN

MILES KWOK
October 3, 2018

**sit (3)**
20:12;79:9;130:17
**sitting (3)**
24:25;79:13;83:3
**situation (1)**
107:25
**Six (2)**
18:22;86:16
**sleep (1)**
79:18
**sleeping (1)**
79:19
**Sloan (26)**
84:22,23,25,25;
93:20;94:3,6,15,24;
95:4,10,17,20;96:7,
17;97:5,7,9,10,15;
98:15,24;99:8;
100:18,20;103:12
**SN (6)**
34:13;35:10;73:23;
76:15;80:12;81:5
**software (1)**
93:6
**sold (5)**
32:4;84:20;87:13;
90:3,6
**sole (5)**
31:25;36:4,12;
46:17;65:2
**solely (1)**
71:7
**somebody (6)**
17:10;32:8;91:11;
100:8;117:13;121:10
**someone (2)**
33:6;103:16
**sometime (1)**
42:12
**sometimes (4)**
18:6,7;27:14;90:18
**son (20)**
41:12,23;42:2;
51:22;64:3,7,8,14,15,
17,20,23;65:2;103:9,
14;105:8,9;121:13,
15;132:7
**soon (1)**
127:12
**Sorry (24)**
12:22;22:24;23:16;
31:10;35:25;39:23;
43:7,10,15,21;60:22;
62:24;70:14,19;
74:19;79:3;83:7;84:7;
115:8,9;121:16;
124:11;131:15,18
**sort (3)**
39:10,19;40:7
**sought (1)**
12:8
**sound (2)**
87:18;88:21

**speak (5)**
32:19;55:22;86:2;
121:4,6
**speaking (6)**
19:18,24;20:20;
21:24;46:6;121:7
**specialist (1)**
7:14
**specifically (2)**
23:14;44:17
**specifics (1)**
37:18
**speech (1)**
22:22
**spelling (3)**
27:18;41:19;63:22
**spend (2)**
86:15;90:2
**spoke (5)**
84:23;86:3;91:6;
109:16;112:6
**spoken (3)**
91:16,20;94:3
**Spring (26)**
3:6;8:9;51:20;
63:12,13,16,17,18,19;
64:5,11,13,24;65:3,8,
12,25;66:5,7,10,14,
20,25;67:13,17;
116:14
**SS (1)**
133:4
**stamped (2)**
73:23;82:15
**stand (1)**
117:20
**standard (1)**
15:7
**standing (2)**
79:12;114:7
**started (1)**
39:22
**State (6)**
7:7,19,20;10:21;
133:3,25
**stated (3)**
40:3;63:10;94:24
**statement (4)**
14:4;71:16;82:5,13
**statements (1)**
60:16
**states (1)**
74:3
**Steven (2)**
88:11,23
**Stevenson (1)**
88:21
**still (4)**
9:22;45:10;90:14;
104:16
**STIPULATED (4)**
6:3,7,11,17
**stop (1)**

62:16
**stopped (1)**
62:16
**strategy (1)**
100:21
**strictly (1)**
121:7
**strike (2)**
21:15;91:7
**strong (1)**
80:24
**structure (6)**
11:7;51:25;53:2,6,
15,20
**structured (2)**
52:11;54:12
**Stuart (1)**
7:25
**subject (1)**
58:21
**submitted (3)**
77:12;79:25;86:4
**subscribed (1)**
133:20
**substance (2)**
111:14;112:8
**substantial (1)**
60:12
**successfully (1)**
79:21
**sue (1)**
61:23
**sued (2)**
11:19;107:19
**suggest (2)**
25:15;91:17
**suicide (2)**
61:15,19
**suing (1)**
127:18
**suit (1)**
12:7
**Support (2)**
7:13,16
**Supreme (1)**
7:6
**Sure (29)**
11:12;24:18;25:11;
40:2,5,13,17;42:6,25;
43:9,11;44:4,7,16;
46:19;50:4;54:18,22;
65:6,11,16;67:20;
68:11;69:23;75:23;
77:21;81:13;88:24;
117:7
**swear (1)**
7:22
**sworn (4)**
6:13,16;8:12,18
**syntax (1)**
12:7

**T**

**table (1)**
131:25
**talk (2)**
55:21;91:9
**talked (3)**
28:9;58:2;127:16
**talking (7)**
46:2,20;47:6,8,23;
65:24;111:11
**Tape (4)**
45:19;57:13;81:24;
114:3
**tax (1)**
61:3
**taxes (1)**
89:24
**team (1)**
108:6
**telephone (1)**
91:16
**temporarily (1)**
16:3
**tenant (4)**
74:6,9,15;81:8
**terminated (2)**
122:3,14
**testified (6)**
8:20;39:14;117:8;
125:20;126:13;
129:15
**testify (4)**
10:4;17:19;71:19,
21
**testifying (4)**
9:7;10:7,15,20
**testimony (12)**
46:11,13,15;121:2;
122:24;126:16;128:9,
17;129:3,4;133:8,11
**thanking (1)**
130:15
**theirs (1)**
108:22
**third (2)**
17:19;75:11
**though (3)**
40:19;131:7,8
**thought (6)**
29:24;35:23;46:25;
47:8;63:3;70:18
**thoughts (1)**
101:25
**thousand (1)**
19:23
**thousands (5)**
20:11,19;56:12;
57:21,22
**threats (2)**
21:10;62:12
**three (1)**

20:23
**thugs (1)**
21:8
**Times (17)**
10:24;17:9;38:24;
39:10,16;40:4,8,23;
46:3,7,23;47:5,6;
51:17;67:5,9;94:11
**timing (1)**
57:2
**today (19)**
7:11,15;8:25;10:4;
11:13;15:5,15;27:7;
35:19,23;71:3;83:3;
116:19;127:17;
129:15;130:7,8,9;
131:13
**today's (2)**
130:25;132:13
**together (3)**
55:24;90:4;120:9
**told (19)**
17:15;20:18;24:22;
78:14;90:22;96:5;
97:9,15;99:15;104:6;
107:22,24;109:7,22,
25;110:22;111:19;
112:23;113:2
**topic (1)**
116:19
**touch (1)**
87:11
**transcript (2)**
133:8,10
**transfer (2)**
103:8;104:13
**transferring (1)**
103:13
**translate (1)**
75:24
**translation (5)**
12:18;43:14;47:4;
55:13;71:15
**treated (2)**
131:9,13
**trial (2)**
6:10;90:19
**tried (2)**
24:12;103:8
**true (3)**
72:12;133:10,12
**truly (1)**
83:5
**trust (3)**
94:9;105:3,8
**truth (3)**
51:3;128:5,7
**truthfully (2)**
10:4;24:23
**try (9)**
13:3;21:14,18;
22:15;32:22;56:14;
78:20;113:15;128:8

Case 22-50073    Doc 1269    Filed 12/28/22    Entered 12/28/22 14:09:15    Page 451 of

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. vs.
KWOK HO WAN
452
MILES KWOK

October 3, 2018

**trying (14)**
14:12;22:18;23:6;
52:17;56:25;57:2;
71:18,20,21;104:13;
109:13;117:16;
128:17;130:8
**turning (1)**
80:12
**twice (1)**
91:16
**two (6)**
24:25;54:13;58:2;
79:19;88:3;118:12
**type (2)**
20:2;42:16
**types (5)**
20:8,13,19,21;
114:15

**U**

**UBS (2)**
82:4,13
**ultimate (1)**
106:4
**ultimately (4)**
37:22;105:13,24;
106:10
**unable (2)**
22:3;35:12
**unclear (1)**
46:16
**under (4)**
9:7;24:5;33:12;
133:9
**underlying (1)**
14:2
**understands (2)**
24:20;25:13
**understood (2)**
9:15;46:4
**unfortunately (1)**
130:12
**unless (5)**
9:23;24:7;60:25;
61:4,6
**unnecessary (2)**
101:18,20
**unrelated (1)**
116:19
**unsafe (1)**
91:19
**Unsure (1)**
51:24
**up (7)**
43:8;89:13;94:10;
107:6;112:12;128:22;
132:5
**uploaded (2)**
60:10,14
**Urbana (1)**
67:10
**use (8)**

20:9,13,21,23;21:2,
3;41:20;54:9
**used (1)**
52:3
**using (4)**
19:14;20:2,5;65:18
**Usually (1)**
79:11

**V**

**vail (2)**
13:14;14:19
**versus (1)**
7:6
**video (15)**
7:14;57:10,13,20;
58:15;59:2,24;61:8,
10;62:7,16,17,21;
131:21;132:3
**Videographer (15)**
3:5;7:2;23:19,22;
45:16,19;59:10,13;
81:18,23;113:23;
114:2;127:2,5;132:12
**videos (2)**
61:4,21
**videotaped (1)**
7:3
**views (1)**
95:17
**Virgin (7)**
10:17,25;33:13;
52:3;53:8;54:14;
107:3
**virtue (1)**
110:25
**voice (1)**
58:25
**voices (2)**
58:15;60:8

**W**

**wait (2)**
9:17,18
**waived (1)**
6:6
**Wan (2)**
73:23;74:5
**Wang (8)**
18:6,13;55:24,24;
107:22;112:20;
113:13;115:21
**W-A-N-G (2)**
56:2;112:21
**waste (3)**
12:14;24:14,14
**way (12)**
32:22;36:6;43:16;
52:14,21;53:2,7,16,
20;68:25;78:21;
131:13

**WeChat (1)**
93:5
**week (1)**
92:18
**Wei (98)**
27:16,19,22,24;
28:2,18;29:2;31:9;
32:10,12,15;33:7,18;
36:23;41:7,8;42:20;
44:22,24;46:5,9;
47:17,20;48:16;
49:13,23;50:2,8,12,
16,17,21;51:2,4,6,11;
52:6;53:13;56:6,15,
18,19,20;57:5;64:23;
75:8,16,21;77:7,18,
19;81:13;82:18;
84:17;85:8,18;87:10,
14;89:18;90:16;91:6,
9,21;92:11,24;93:16;
94:4,6,11;97:6,6,7,20;
98:2,6,6;99:12;
103:19;106:16,18,19,
20;108:6;114:10;
115:13,19;116:20;
117:8,13,18,23;
118:16;119:2;120:7,
11,16;125:16;129:17
**W-E-I (1)**
27:17
**Wei's (15)**
28:16;31:9,12;75:7,
20;77:23;85:24;
87:20;96:10;97:14;
116:5;118:22,24;
119:7;122:7
**Weiss (21)**
31:16,17;49:14,19;
50:8,11,19,22;51:5,9,
14;74:4;75:6,15,19;
76:4,9,19;78:8,14,22
**Wen (1)**
90:22
**W-E-N (1)**
90:24
**Wengui (1)**
59:21
**what's (2)**
65:17;126:22
**WhatsApp (1)**
20:6
**whatsoever (1)**
46:9
**Whereupon (1)**
60:18
**Whoa (2)**
109:9,9
**whole (4)**
21:10;24:16;29:3;
54:10
**Whose (1)**
99:10
**wife (2)**

132:6,7
**wife's (1)**
77:20
**William (5)**
31:14;50:18;75:15;
97:16;98:7
**Williams (13)**
50:22;51:5,9,14;
73:25;75:6,19;76:5,9;
80:13,13,19;81:4
**withdraw (1)**
19:18
**within (3)**
6:12,18;92:18
**without (2)**
126:15,22
**Witness (29)**
6:20;7:22;8:18;
17:17;18:16;19:4,13;
22:24;58:9,20;60:20;
61:12;63:7,9;68:3;
71:24;75:24;114:7;
117:5,11,19;118:2,9;
127:9,14;128:12;
130:19,24;132:6
**Wong (1)**
88:21
**word (3)**
91:12;93:16;127:25
**words (2)**
43:13;61:8
**work (2)**
46:5;104:16
**worked (5)**
49:17;97:20;
103:17,18,19
**working (5)**
21:9;27:20;45:3,4;
89:21
**world (1)**
21:10
**write (1)**
78:12
**writes (1)**
80:14
**written (3)**
119:15;120:7,10
**wrong (2)**
65:17;94:13
**wrongful (1)**
120:20
**wrongfully (1)**
120:19
**Wu (2)**
69:17,20
**W-U (1)**
69:17
**Wu'S (1)**
70:22

**X**

**Xu (8)**

92:20,23;93:7,15,
18,19;97:14;99:15
**X-U (1)**
92:21

**Y**

**yacht (1)**
59:22
**Yan (4)**
55:24;112:20;
113:13;115:21
**Y-A-N (2)**
56:2;112:21
**Yang (9)**
92:20,23;93:7,15,
18,19;97:15;99:15;
103:23
**Y-A-N-G (2)**
92:22;103:24
**YAOYING (1)**
3:4
**year (4)**
93:10;97:8;104:17,
22
**years (1)**
114:11
**yes/no (3)**
46:10;78:21;124:7
**Yesterday (2)**
15:18;17:24
**Yong (6)**
103:16,20,21,22;
104:13,16
**Y-O-N-G (2)**
103:17,24
**York (32)**
7:7,8;10:21;37:5;
47:24;52:2;53:7,9;
54:13;63:12,14,17;
64:11;65:22;66:4,10,
14,20;67:5,9;68:13,
20,24;69:13;83:23;
86:7,11,17;98:12;
104:20;111:2;133:3
**YouTube (7)**
57:10,19;58:15,25;
59:16,20,24
**Yu (1)**
103:25
**Y-U (1)**
104:2
**Yuda (5)**
116:16,21;117:15,
24;118:7
**Yue (3)**
103:20,20,22
**Y-U-E (1)**
103:20
**Yvette (18)**
18:6,13;56:4;67:16;
107:22;109:5,6,22,25;
110:22;111:19;112:6,

Case 22-50073 Doc 1269 Filed 12/28/22 Entered 12/28/22 14:09:15 Page 452 of
452

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. vs.
KWOK HO WAN

MILES KWOK
October 3, 2018

24;113:9,17;115:22;
121:21;122:6

**Z**

**Zenith (23)**
69:15;72:14,20;
73:9;76:18,23;77:5,8,
11,16,24;78:6,11,24;
79:24;80:2;91:13,14;
92:14;103:19;116:14;
122:19,23
**zeros (1)**
35:13
**Zhang (113)**
27:16,19,22,24;
28:2,16,18;29:2;31:9,
9,12;32:10,12,15;
33:6,18;36:23;41:7,8;
42:20;44:22,24;46:5,
9;47:17,20;48:16;
49:13,23;50:2,8,11,
16,17,21,25;51:4,6,
11;52:6;53:12;56:6,
15,18,19,20;57:5;
64:23;75:7,8,16,20,
21;77:7,18,19,23;
81:13;82:18;84:17;
85:8,18,24;87:10,14,
20;89:18;90:16;91:6,
9,21;92:11,24;93:16;
94:3,6,10;96:9;97:6,6,
7,14,20;98:2,6,6;
99:12;103:19;106:16,
18,19,20;108:6;
114:10;115:13,19;
116:5,20;117:8,13,18,
23;118:16,22,24;
119:2,7;120:7,11,16;
122:7;125:16;129:17
**Z-H-A-N-G (1)**
27:17
**Zheng (2)**
69:16;87:24
**Z-H-E-N-G (2)**
69:16;87:25
**Zhengzhou (2)**
31:18;114:20
**Z-H-E-N-G-Z-H-O-U (2)**
31:19;114:22

**0**

**0058 (1)**
73:23
**0060 (1)**
76:15
**0062 (1)**
81:5
**0063 (1)**
80:12
**0159 (1)**
34:13

**0161 (1)**
35:10
**05 (1)**
90:12

**1**

**1 (5)**
33:19,20;34:7,8,9
**10:07 (1)**
23:20
**10:19 (1)**
23:23
**10:59 (1)**
45:17
**100 (2)**
28:22;120:8
**11 (2)**
70:10,18
**11:18 (1)**
45:22
**11:43 (1)**
59:11
**11:44 (1)**
59:14
**12:25 (2)**
81:19,20
**12:57 (1)**
82:3
**13 (4)**
34:21;35:4;70:16,
17
**15 (1)**
60:4
**16 (1)**
60:3
**18th (2)**
48:8;89:8

**2**

**2 (10)**
45:19;59:15,20;
108:15,17,24;110:3,
10;121:23;122:12
**2:02 (1)**
113:24
**2:28 (1)**
114:5
**2:55 (1)**
127:3
**2013 (1)**
87:9
**2014 (1)**
76:17
**2015 (25)**
28:4;32:23;34:21;
35:4;42:12;44:3;
45:13;56:17,22;
70:12,20;72:13;
73:12,21;74:16;77:4,
17;84:6;87:18;89:5,
12;90:21;91:20;

99:17;114:25
**2016 (5)**
87:9;91:23;92:8;
94:23;103:17
**2017 (1)**
122:3
**2018 (7)**
7:12;60:3;69:14;
93:10;98:15;133:9,21
**27 (1)**
73:20
**28 (2)**
70:12,20
**29 (1)**
15:11

**3**

**3 (7)**
7:11;69:7,12;81:24;
89:25;90:7;133:9
**3:00 (1)**
130:7
**3:13 (1)**
127:6
**3:22 (2)**
132:15,16
**30 (2)**
36:9;125:2
**31 (1)**
76:17
**38 (1)**
114:11

**4**

**4 (3)**
73:15,20;114:3

**5**

**5 (2)**
82:4,12
**510 (1)**
82:15
**56 (2)**
70:10,17

**6**

**6 (5)**
84:11;88:13,15,25;
89:24
**652077-2017 (1)**
7:9
**66.2 (1)**
84:8
**67 (1)**
84:12
**67.5 (2)**
89:23;90:12
**68 (7)**
90:12;97:2,8,11;

98:17;99:2,11

**7**

**7 (1)**
89:5
**78 (12)**
91:25;92:4,8;93:2;
94:24;96:22;97:2,8,
11;98:17;99:2,11

**8**

**800 (1)**
67:6
**85 (5)**
90:5;91:25;92:4,8;
96:22
**89 (1)**
79:5

**9**

**9:39 (1)**
7:18
**90 (1)**
77:21