## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HO WAN KWOK, et al., | Case No. 22-50073 (JAM) |
| Debtors | (Jointly Administered) |

## DECLARATION OF EUGENE FUNG

I, Eugene Fung, declare as follows:

A.   Introduction

1.     I am a barrister[1] in Hong Kong practising at Temple Chambers, 16/F One Pacific Place, 88 Queensway, Hong Kong. I obtained my Bachelor of Arts degree and my Masters of Law degree from the University of Cambridge in England in 1994 and 1995 respectively. I was called to the Bar in England and Wales (Lincoln's Inn) and in Hong Kong both in 1997. I have been in private practice in Hong Kong for almost 25 years (since 1998) and was appointed Senior Counsel[2] in 2012. My areas of practice focus on the fields of commercial law, trusts and probate, tax, property litigation, professional negligence, and company and insolvency law. Since 2014, I have spent at least five weeks every year sitting as a Deputy High Court Judge or a Recorder of the High Court in the Court of First Instance in Hong Kong. Further information about my background and educational and professional qualifications can be found in my Curriculum Vitae which is appended to this declaration.

---

[1] The legal profession in Hong Kong consists primarily of solicitors and barristers. Barristers are legal practitioners expert in advocacy and specialising in litigation.
[2] In Hong Kong, a person is appointed as a Senior Counsel who (a) has, in the opinion of the Chief Justice, sufficient ability and standing and sufficient knowledge of the law to be accorded that status, (b) has the requisite experience and (c) is practising at the Hong Kong Bar. The title of Senior Counsel is equivalent to that of King's Counsel or Queen's Counsel in the United Kingdom and in some Commonwealth countries. There are around 1,600 barristers currently practising in the Hong Kong Bar, of whom only around 100 are appointed as Senior Counsel.

2.    I have been asked by counsel for UBS AG ("**UBS**" or the "**Bank**") to provide this Declaration (1) regarding the nature, scope and application of bankers' duty of confidentiality under Hong Kong law and the effect of such a duty on the ability of UBS's Hong Kong Branch (the "**Hong Kong branch**") to comply with the subpoena that the Trustee in the above-captioned case served on UBS in the United States of America, pursuant to bankruptcy Rule 2004 (the "**Subpoena**"); and (2) to describe for the Court alternatives that could enable the Trustee to pursue the disclosure he seeks without requiring the Hong Kong branch to violate Hong Kong law.

3.    In preparation for providing this Declaration, I have developed familiarity with the events culminating in the Trustee's filing of the instant motion to compel UBS to produce certain information and documents to the extent that material exists and is in the possession, custody or control of the Hong Kong branch (the "**Motion to Compel**"). In particular, I have reviewed the Subpoena. It is my understanding that, in the Subpoena, the Trustee has requested that UBS produce, among other materials, information and documents in the possession of the Hong Kong branch relating to various entities and individuals, to the extent such information and documents exist. I also have reviewed the Motion to Compel.

B.    Executive Summary

4.    Under Hong Kong law, the Hong Kong branch is treated as a separate legal entity to UBS's head office or any of UBS's branches elsewhere in the world. It is under a contractual duty of confidentiality to its customers in respect of information about the customers' affairs gained by virtue of the banking relationship. This duty may be overridden by a Hong Kong court order (but not a foreign court order) compelling the Hong Kong branch to disclose documents relating to its customers. Complying with the Subpoena will have the effect of rendering UBS being in breach of its duty of confidentiality towards its customer. Further, serious financial and reputational harm may be caused to the Hong Kong branch if the duty of confidentiality is violated. There are, however, two alternatives that the Trustee can pursue to achieve the objective of obtaining information on the Bank's customer without requiring the Hong Kong branch to violate Hong Kong law and without indirectly committing an infringement of the sovereignty of another country, namely (1) making a request to the Hong Kong court under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, and (2) making a request to the Hong Kong court for assistance under the common law principle of modified universalism. These issues will be further elaborated and expanded upon in Sections C to F below.

C.    Bankers' Duty of Confidentiality under Hong Kong Law

C1.   *Background*

5.    As will be seen below, the law currently in Hong Kong on the bank's duty
      of confidentiality is largely derived from English law.   In order to
      understand why English judicial authorities have been and are still referred
      to by the Hong Kong courts as a source of law, the following explanations
      may be helpful.

      (1)   Before 1 July 1997, English common law and rules of equity were
            in force in Hong Kong.

      (2)   On 1 July 1997, Hong Kong became a Special Administrative
            Region of the People's Republic of China.

            (a)   Article 8 of the Basic Law (the constitutional document for
                  Hong Kong) provides that "*[the] laws previously in Hong
                  Kong, that is, the common law, rules of equity, ordinances,
                  subordinate legislation and customary law shall be
                  maintained, except for any that contravene this Law, and
                  subject to any amendment by the legislature of the Hong Kong
                  Special Administrative Region*".

            (b)   Article 18 of the Basic Law provides that "*[the] laws in force
                  in the Hong Kong Special Administrative Region shall be this
                  Law, the laws previously in force in Hong Kong as provided
                  for in Article 8 of this Law, and the laws enacted by the
                  legislature of the Region.*"

      (3)   Section 7(1) of the Hong Kong Reunification Ordinance provides
            that "*[the] laws previously in force in Hong Kong, that is the
            common law, rules of equity, Ordinances, subsidiary legislation and
            customary law, which have been adopted as the laws of the HKSAR
            [Hong Kong Special Administrative Region], shall continue to
            apply*".

      (4)   Article 84 of the Basic Law permits the Hong Kong courts to refer
            to precedents of other common law jurisdictions.  It provides "*[the]
            courts of the Hong Kong Special Administrative Region shall
            adjudicate cases in accordance with the laws applicable in the*

*Region as prescribed by Article 18 of this Law and may refer to precedents of other common law jurisdictions".*

C2.   *Scope of duty and its application*

6.   Under English and Hong Kong law, a duty of confidence is implied into the contract between certain people, including that between banker and customer. In *Parry-Jones v Law Society* [1969] 1 Ch 1, Lord Justice Diplock at p 9 said:

> *"[a contractual duty of confidence] exists not only between solicitor and client, but, for example, between banker and customer, doctor and patient and accountant and client. Such a duty of confidence is subject to, and overridden by, the duty of any party to that contract to comply with the law of the land."*

7.   The leading authority on the duty of confidence owed by a bank to its customer is the English case of *Tournier v National Provisional and Union Bank of England* [1924] 1 KB 461. In this case, the defendant bank disclosed the state of the plaintiff customer's account to the customer's employers (i.e. a third party). As a result of this disclosure, the customer's contract was not renewed by the employers upon its expiration. The English Court of Appeal held that the bank was guilty of a breach of a duty of confidentiality and awarded damages against it.

(1)   In the judgment, Lord Justice Atkin pointed out that the information, which the bank was bound to treat as confidential, was not restricted to the facts that it learned from the state of the customer's account. Furthermore, the bank's duty remained intact even after the account had been closed or ceased to be active. The bank's duty to maintain confidentiality encompassed *"information obtained from other sources than the customer's actual account, if the occasion upon which the information was obtained arose out of the banking relations of the bank and its customers"* (p 485).

(2)   Because the duty of confidentiality covers information about the customer's affairs gained by virtue of the banking relationship and is not limited to information from or about the account itself, the duty would be infringed if the bank discloses information to third parties whether it has in its possession certain documents of the customers or where such documents may be located.

4

(3)   Lord Justice Bankes said that a bank owes a duty towards its customers not to disclose his affairs and that the duty is a legal one arising out of contract (pp 471-472). The duty of confidentiality is not an absolute duty but a qualified one, and "*the qualifications can be classified under four heads: (a) Where disclosure is under compulsion by law; (b) where there is a duty to the public to disclose; (c) where the interests of the bank require disclosure; and (d) where the disclosure is made by the express or implied consent of the customer*" (p 473).

8.   The principles laid down in the English case of *Tournier* have been fully adopted and followed in Hong Kong.

(1)   In *FDC Co Ltd v The Chase Manhattan Bank NA* [1990] 1 HKLR 277, a bank with headquarters in New York and a branch in Hong Kong found itself caught between, on the one hand, an order of a United States court compelling it to disclose information about accounts maintained with the Hong Kong branch and, on the other, an injunction obtained by the account holders from the Hong Kong court preventing such disclosure. The bank applied in Hong Kong to discharge the injunction but the Court of Appeal (the second highest court in Hong Kong) refused to do so by following the principles in *Tournier* (pp 282F-283F & 290D-H).

(2)   In particular, Sir Alan Huggins said that the first qualification to the bank's duty of confidentiality (disclosure under compulsion of law) must necessarily be confined to the law within the jurisdiction (i.e. Hong Kong law), and would not include foreign law or a court order of a foreign court (p 283F-H). His Lordship further said (p 283H-I):

> "*The [account holders] contracted with the Bank in Hong Kong and it was intended by both sides that the accounts would be kept in Hong Kong. I adopt the view of the English Court of Appeal in R v Grossman (1981) 73 Cr. App. R. 302 and conclude that the Hong Kong Branch of the Bank should for present purposes be considered as a different entity separate from the head office in New York. Anyone opening an account in Hong Kong would anticipate that in the ordinary course of business the records containing the details of that account would be kept entirely within the office or branch at which the account was opened.*"

5

(3)   It is right to note that the same conclusion was reached in England in relation to the ambit of the disclosure under compulsion of law qualification. In *X AG v A Bank* [1983] 2 All ER 464,[3] a subpoena was issued in the US District Court for the Southern District of New York against an American bank requiring it to produce documents relating to accounts maintained at its London branch by X, a Swiss corporation with no business in the US, and Y, a subsidiary of X which was also incorporated in Switzerland, but had a major office in New York. The subpoena was returnable before a federal grand jury investigating alleged tax evasion. The bank declared its intention to comply with the subpoena. X and Y obtained an injunction in the English High Court restraining the bank from doing so on the ground that it would be in breach of the duty of confidence. An order was then made by the New York District Court requiring the bank to comply with the subpoena. The bank applied to set aside the injunction and Leggatt J refused to do so. The Judge observed that to apply foreign law in relation to banking business conducted in the City of London would be to "*allow a fairly large cuckoo in the domestic nest*" (p 478d-e).

(4)   As can be seen from the above-quoted passage of Sir Alan Huggins's judgment in *FDC*, as a matter of English and Hong Kong law, a Hong Kong branch of an international bank is to be treated as a separate legal entity different from the bank's head office, or any of the bank's branch offices elsewhere in the world.

(5)   The principles in the *Tournier* case have been affirmed by the Court of Final Appeal (the highest court in Hong Kong) in *Nam Tai Electronics Inc v PricewaterhouseCoopers* (2008) 11 HKCFAR 62 at para 35.

## C3.   *Consequences of breaching the duty of confidentiality*

9.   Given that the bank owes a duty of confidentiality under the contract with the customer, a breach of such a duty would entitle the customer to claim against the bank for compensatory damages. Under Hong Kong law, the aim of compensatory damages for breach of contract is to put the plaintiff into as good a position as if the contract had been performed. If a loss has been caused to the customer as a result of the breach of the bank's duty of confidentiality, the bank would be ordered pay damages to the customer

---

[3] This case was also referred to by the Court of Appeal in *FDC Co Ltd v The Chase Manhattan Bank NA.*

for compensation. This was what happened in the *Tournier* case where the account holder successfully obtained damages from the English court (see §7 above).

10. Further, from the Hong Kong and English authorities referred to in §7 above, a customer may be able to obtain an injunction to restrain a bank from breaching its duty of confidentiality and from disclosing information to third parties. An injunction is a court order and a breach of an injunction by the party restrained would constitute contempt of court. A body corporate guilty of contempt of court can be fined and a writ of sequestration would be applied against the property of the corporation under Order 45, rule (5)(i) of the Rules of the High Court. A director or other officer of the body corporate may be included in the application such that his/her property may be sequestrated and that he/she may be committed to prison for contempt.

11. The terms of an injunction may be wide enough to require the bank to return to its local branch any documents already removed from the jurisdiction in connection with any foreign subpoena: see the order recited in *A v B Bank* [1993] QB 311 at 313H-314A.

12. The bankers' duty of confidentiality is enshrined in the Code of Banking Practice ("**Code**") (§8.1) jointly issued by the Hong Kong Association of Banks and the DTC Association (i.e. the industry associations, and endorsed by the Hong Kong Monetary Authority ("**HKMA**") (Hong Kong's central banking institution). The HKMA expects all institutions to comply with the Code and will monitor compliance as part of its regular supervision (§3.1). It is self-evident that a bank which has breached its duty of confidentiality towards its customers will suffer reputational harm and may trigger investigations by the HKMA. Significantly, UBS is a private bank and its customers would naturally expect UBS (including the Hong Kong branch) to keep their affairs confidential. If UBS is known to the private banking market in Hong Kong to disclose customers' confidential information to third parties without a Hong Kong court order, this will seriously diminish its reputation as a private bank and will suffer financial harm in the form of loss of future revenue.

13. In paragraph 8 of Section IV (Documents to be Produced) in the Request for Production of Documents appended to the Subpoena, the Trustee requests all documents dated between 1 January 2012 and the present relating to any communications with any regulator from any country, including the Hong Kong Securities and Futures Commission ("**SFC**") and the HKMA relating to any of the 2004 Discovery Targets.

14.   Because of the extreme width of this request, there is every possibility that a disclosure of some of the requested documents will lead to an infringement of two statutory secrecy provisions in Hong Kong.

15.   The Hong Kong branch carries on the business of taking deposits from its customers and is an "authorised institution" under the Banking Ordinance (Chapter 155 of the Laws of Hong Kong) ("**BO**"). All authorised institutions under the BO in Hong Kong are supervised by the HKMA. Further, the Hong Kong branch conducts securities and futures businesses and is therefore required to be registered with the SFC and regulated under the Securities and Futures Ordinance (Chapter 571 of the Laws of Hong Kong) ("**SFO**"). Accordingly, the Hong Kong branch is subject to two regulatory regimes in Hong Kong. In so far as the Hong Kong branch's business of taking deposits is concerned the BO and any statutory secrecy obligations set out under the BO would be relevant. Similarly, in so far as the Hong Kong branch's regulated activities (e.g. the provision of investment banking or asset management services) are concerned, the SFO and any statutory secrecy obligations set out under the SFO would be relevant.

16.   Section 378(1) of the SFO provides:

> *"Subject to subsection (13A), except in the performance of a function under, or for the purpose of carrying into effect or doing anything required or authorized under, any of the relevant provisions, a specified person -*
>
> *(a)   shall preserve and aid in preserving secrecy with regard to any matter coming to his knowledge by virtue of his appointment under any of the relevant provisions, or in the performance of any function under or in carrying into effect any of the relevant provisions, or in the course of assisting any other person in the performance of any function under or in carrying into effect any of the relevant provisions;*
>
> *(b)   shall not communicate any such matter to any other person; and*
>
> *(c)   shall not suffer or permit any other person to have access to any record or document which is in his possession by virtue of the appointment, or the performance of any such*

> *function under or the carrying into effect of any such provisions, or the assistance to the other person in the performance of any such function under or in carrying into effect any such provisions."*

17. A "specified person" for the purpose of section 378 is defined in section 378(15) to mean (a) the SFC; (b) any person who is or was a member, an employee, or a consultant, agent or adviser, of the SFC; or (c) any person who is or was (i) a person appointed under any of the relevant provisions of the SFO, (ii) a person forming any function under or carrying into effect any of the relevant provisions of the SFO; or (iii) a person assisting any other person in the performance of any function under or in carrying into effect any of the relevant provisions of the SFO.

18. Accordingly, the author of the relevant communications between the SFC and UBS could well constitute a "specific person" and accordingly be subject to the statutory secrecy obligations imposed under section 378 of the SFO.

19. Further, section 120(1) of the BO provides:

> *"Except as may be necessary for the exercise of any function under this Ordinance or for carrying into effect the provisions of this Ordinance, every person to whom this subsection applies-*

> *(a)    shall preserve and aid in preserving secrecy with regard to all matters relating to the affairs of any person that may come to his knowledge in the exercise of any function under this Ordinance;*

> *(b)    shall not communicate any such matter to any person other than the person to whom such matter relates; and*

> *(c)    shall not suffer or permit any person to have access to any records in the possession, custody or control of any person to whom this subsection applies."*

20. Section 120(2) of the BO provides:

> *"Subsection (1) shall apply to any person who is or has been—*

> *(a)    a public officer;*

> (b)    *a person authorized by the Monetary Authority;*
>
> (c)    *the Advisor of an authorized institution;*
>
> (d)    *the Manager of an authorized institution;*
>
> (da)   *a person appointed under section 53G(5);*
>
> (e)    *a person appointed under section 117(2); and*
>
> (f)    *a person employed by or assisting a person to whom this subsection applies by virtue of paragraph (b), (c), (d), or (e),*
>
> *who exercises or has exercised any function under this Ordinance."*

21.  As pointed out above, HKMA functions likes a central bank in Hong Kong. Its principal function is to *"promote the general stability and effective working of the banking system"* (section 7(1) of the BO). It is also *"responsible for supervising compliance with the provisions of the [Banking] Ordinance"* (section 7(2) of the BO). Therefore, insofar as there exists any documents between the HKMA and UBS which fall within the description of the request, the author(s) of such documents could well be subject to the statutory secrecy obligations imposed under section 120 of the BO.

E.    Analysis

22.  Bravo Luck Limited (**"Bravo Luck"**) has maintained a banking relationship with the Hong Kong branch. As a matter of Hong Kong law (as summarised in Section C2 above), there is a contract between Bravo Luck and the Hong Kong branch and a duty of confidentiality has been implied into such a contract. The duty of confidentiality requires the Hong Kong branch not to disclose to third parties information relating to Bravo Luck which the Hong Kong branch has acquired through the keeping of Bravo Luck's account(s) with the bank.

23.  The Hong Kong branch's duty of confidentiality to Bravo Luck is subject to the four qualifications mentioned in Section C2 above. However, on the basis of the materials currently made available to me, I am unable to see how the duty of confidentiality can be qualified. In particular, there is no

law in Hong Kong or any Hong Kong court order compelling the Hong Kong branch to disclose any information relating to Bravo Luck. Under Hong Kong law, as mentioned in Section C2 above, the first qualification to the duty of confidentiality does not extend to a court order made by a foreign court.

24.    If the Hong Kong branch breaches its duty of confidentiality by disclosing to third parties information relating to Bravo Luck, Bravo Luck will have a right to commence proceedings against the Hong Kong branch for damages.

25.    Further, Bravo Luck may apply for an injunction to restrain the Hong Kong branch from disclosing any information to any third parties (including the Trustee). If this were to happen, there is little doubt that a Hong Kong court would grant such an injunction following the reasoning of the Court of Appeal's decision in *FDC Co Ltd v The Chase Manhattan Bank NA* (see Section C2 above). As Sir Alan Huggins VP observed in that case, in granting an injunction to restrain the bank from disclosing information pursuant to a foreign court order, the Hong Kong court would not be "*offending in any way the principles of comity which apply between the two countries*" (p 284J). His Lordship observed (pp 284J – 285A):

> "*All persons opening accounts with banks in Hong Kong, whether local or foreign banks, are entitled to look to the Hong Kong courts to enforce any obligation of secrecy which, by the law of Hong Kong, is implied by virtue of the relationship of customer and banker. The obligation is implied for the very reason that it is fundamental to that relationship.*"

26.    As mentioned in Section C3 above, there are serious consequences for failing to comply with an injunction. If the Hong Kong branch discloses any information of Bravo Luck notwithstanding an injunction to restrain it to do so, the Bank may be held to be in contempt of court and its directors or other officials may be committed to prison.

F.    Alternative Options Available to the Trustee to Obtain the Information Sought in the Subpoena

F1.    *The Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters*

27.    The Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters (the "**Convention**") establishes

two methods of cooperation between states parties for the taking of evidence abroad in civil or commercial matters. One of the methods is through the use of letters of request. China and United States are both contracting parties to the Convention. The Chief Secretary of Hong Kong has been designated as the "competent authority" for the purpose of Article 17 of the Convention.[4] The Registrar of the High Court of Hong Kong has been designated "other authority" for the purpose of Article 24 of the Convention.[5]

28.   In dealing with a receipt for evidence from a foreign court, the Hong Kong courts will use the following framework to assess whether the request ought to be granted.

   (1)   First, the court should decide whether it has jurisdiction to make the requested relief under sections 75 and 76 of the Evidence Ordinance (Chapter 8 of the Laws of Hong Kong).

   (2)   Secondly, if the court concludes it has jurisdiction, it must decide whether, as a matter of discretion, it ought to make, limit or refuse the requested relief sought.

   See *Angela Chen v Vivien Chen* (unreported, HCMP 1478/2011, 7 December 2011) §22(v).

29.   Section 75 of the Evidence Ordinance provides:

   *"Where an application is made to the Court of First Instance for an order for evidence to be obtained in Hong Kong and the court is satisfied—*
   *(a)   that the application is made in pursuance of a request issued by or on behalf of a court or tribunal (the requesting court) exercising jurisdiction in a country or territory outside Hong Kong; and*
   *(b)   that the evidence to which the application relates is to be obtained for the purposes of civil proceedings which either have been instituted before the requesting court or whose institution before that court is contemplated,*

---

[4] https://www.hcch.net/en/states/authorities/details3/?aid=491
[5] https://www.hcch.net/en/states/authorities/details3/?aid=492

*the Court of First Instance shall have the powers conferred on
it by this Part."*

30.   In other words, in order for section 75 to be complied with, there must be
an application to the Hong Kong court for evidence to be obtained; the
applicant must satisfy the court that the evidence to which the application
relates is sought pursuant to a request by or on behalf of a foreign court of
tribunal, and the court must be satisfied that the evidence to which the
application relates is sought for the purpose of civil proceedings which
either have been instituted or where institution is contemplated.

31.   There is a specific provision in section 76(2)(b) of the Evidence Ordinance
to include order for the production of documents.   Production will be
ordered only of specific documents named in the order as likely to be in
the possession, custody or power of the witness, and witnesses will not be
ordered to state what relevant documents they have, nor to produce all
documents relevant to particular issues (section 76(4) of the Evidence
Ordinance).

32.   The overarching principle in response to a request from a foreign court for
evidence is that the Hong Kong courts will ordinarily give effect to a
request so far as it is proper and practicable, and to the extent that is
permissible under Hong Kong law.   The principle reflects judicial and
international comity. In *Re Trioielli* [1995] 2 HKC 785, Barnett J at p 796
G-H said "*[t]his court in the interests of international comity should strive
to give effect to a letter of request if at all possible*".   See also *Angela Chen
v Vivien Chen* (above) §22(iv).

33.   As far as discretion is concerned, Hong Kong courts would ordinarily
exercise its discretion to make the order asked for unless they are satisfied
that the application would be regarded as falling within the description of
frivolous, vexatious or an abuse of process of the court.   It is essentially a
matter for the requesting court whether the evidence requested will be
relevant and admissible, and the Hong Kong courts will give due weight to
the decision made by the foreign court regarding the relevancy of the
requested evidence.   See *Angela Chen v Vivien Chen* (above) §§22(vi),
22(viii), 23 & 24.

34.   The procedure governing the application, which is *ex parte* by affidavit, is
set out in Rules of High Court Order 70, rule 2, which states:

> *"(1) Subject to rule 3 an application for an order under the Ordinance must be made ex parte and must be supported by affidavit.*
>
> *(2) There shall be exhibited to the affidavit the request in pursuance of which the application is made, and if the request is not in the English language, a translation thereof in that language."*

35. Accordingly, the affidavit in support must exhibit a copy of the letter of request. Because the application is made *ex parte* to a Master of the High Court, it will be dealt with on paper. There is no need for any hearing to be fixed and the matter will be disposed of quickly. According to paragraph 14 of Practice Direction[6] 36, judgment for paper applications will be handed down within three months after the close of the parties' submissions. Because of the simple nature of the application, I anticipate that the Master is likely to produce a determination within a month after the receipt of the application.

36. On the basis that the above principles are observed and all the relevant requirements are complied with, it seems to me that the Trustee will not be in difficulty to (1) satisfy the requirements in sections 75 and 76 of the Evidence Ordinance to demonstrate that a Hong Kong court has jurisdiction to deal with a request for documents, and (2) persuade a Hong Kong court to exercise its discretion to grant the application for disclosure of documents, provided that the requests do not infringe any statutory secrecy obligations as mentioned in Section D above.

37. It is right for me to point out that if and when the Trustee obtains an *ex parte* order for disclosure of the requested documents, it would mean that there is effectively a Hong Kong court order requiring the relevant documents to be disclosed. This will constitute the first qualification to the bankers' duty of confidentiality (namely disclosure under compulsion by law) (see section C2 above). It follows that UBS's duty of confidentiality in respect of such documents will be overridden and that UBS will no longer be violating Hong Kong law when it discloses the requested documents pursuant to a Hong Kong order. In fact, the Hong Kong branch would be in contempt of the Hong Kong Court if it did not comply with such an order, once made and served on the Hong Kong branch.

---

[6] Practice Directions are issued by the Hong Kong judiciary to give guidance on the conduct of court proceedings in Hong Kong.

*F2.    Seeking recognition and assistance orders from the Hong Kong courts*

38.    There is a general principle of private international law at common law that
bankruptcy (whether personal or corporate) should be unitary and universal.
In *Re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852, Lord
Hoffmann at §6 said:

> *"Despite the absence of statutory provision, some degree of
> international co-operation in corporate insolvency had been
> achieved by judicial practice.   This was based upon what
> English judges have for many years regarded as a general
> principle of private international law, namely that bankruptcy
> (whether personal or corporate) should be unitary and
> universal.   There should be a unitary bankruptcy proceeding in
> the court of the bankrupt's domicile which receives worldwide
> recognition and it should apply universally to all the bankrupt's
> assets."*

39.    Further, at common law, the courts have power to recognise and grant
assistance to foreign insolvency proceedings.  In *Rubin v Eurofinance SA*
[2013] 1 AC 236, Lord Collins said:

> *"29 Fourth, at common law the court has power to recognise
> and grant assistance to foreign insolvency proceedings. The
> common law principle is that assistance may be given to foreign
> office-holders in insolvencies with an international element.
> The underlying principle has been stated in different ways:
> "recognition ... carries with it the active assistance of the
> court": In re African Farms Ltd [1906] TS 373, 377; "This
> court . . . will do its utmost to co-operate with the US
> Bankruptcy Court and avoid any action which might disturb the
> orderly administration of [the company] in Texas under ch 11":
> Banque Indosuez SA v Ferromet Resources Inc [1993] BCLC
> 112, 117.*

> *30 In Credit Suisse Fides Trust v Cuoghi [1998] QB 818, 827,
> Millett LJ said:*

> > *"In other areas of law, such as cross-border insolvency,
> > commercial necessity has encouraged national courts to
> > provide assistance to each other without waiting for such
> > co-operation    to    be    sanctioned    by    international*

> *convention . . . It is becoming widely accepted that comity between the courts of different countries requires mutual respect for the territorial integrity of each other's jurisdiction, but that this should not inhibit a court in one jurisdiction from rendering whatever assistance it properly can to a court in another in respect of assets located or persons resident within the territory of the former."*
>
> *31 The common law assistance cases have been concerned with such matters as the vesting of English assets in a foreign office-holder, or the staying of local proceedings, or orders for examination in support of the foreign proceedings, or orders for the remittal of assets to a foreign liquidation, and have involved cases in which the foreign court was a court of competent jurisdiction in the sense that the bankrupt was domiciled in the foreign country or, if a company, was incorporated there."*

40. The above-quoted passages from *Re HIH* and *Rubin* were approved by Harris J in *Re Global Brand Group Holding Ltd (in liq)* [2022] 3 HKLRD 316 at §§23, 25 and 28.

41. In particular, Harris J fully endorsed the views of Lord Sumption in *Singularis Holdings Ltd v PricewaterhouseCoopers* [2015] AC 1675 and held that under the principle of modified universalism, Hong Kong courts have the power to assist officers of a foreign court of insolvency jurisdiction by ordering the production of information necessary for the performance of the officers' functions. Harris J at §45 said:

> *"It is permissible to grant foreign insolvency office-holders the power to gather information from third parties. Continuing from his explanation quoted in [25] above Lord Sumption explains in Singularis:*
>
> > *[T]here is a power at common law to assist a foreign court of insolvency jurisdiction by ordering the production of information in oral or documentary form which is necessary for the administration of a foreign winding up. In recognising the existence of such a power, the Board would not wish to encourage the promiscuous creation of other common law powers to compel the production of information. The limits of this power are implicit in the reasons for recognising its existence. In*

16

> *the first place, it is available only to assist the officers of a foreign court of insolvency jurisdiction or equivalent public officers. It would not, for example, be available to assist a voluntary winding up, which is essentially a private arrangement and although subject to the directions of the court is not conducted by or on behalf of an officer of the court.   Secondly, it is a power of assistance.   It exists for the purpose of enabling those courts to surmount the problems posed for a world-wide winding up of the company's affairs by the territorial limits of each court's powers.   It is not therefore available to enable them to do something which they could not do even under the law by which they were appointed.   Thirdly, it is available only when it is necessary for the performance of the office-holder's functions.   Fourth, the power is subject to the limitation in In re African Farms Ltd and in HIH and Rubin, that such an order must be consistent with the substantive law and public policy of the assisting court ... It follows that it is not available for purposes which are properly the subject of other schemes for the compulsory provision of information."*

42.   Although there is no relevant legislation in Hong Kong, it is clear from the above that, as a matter of common law, a Hong Kong court can recognise foreign insolvency proceedings and can grant assistance to a foreign insolvency office-holder in the form of an order which must be consistent with justice and public policy of the Hong Kong.

43.   Procedurally, the Hong Kong court has developed a standard practice on applications for recognition and assistance:

(1)   The insolvency office-holder must first obtain, from the court which appointed him or her, a letter of request addressed to the Hong Kong court.  The letter of request would typically set out the terms of the order to be sought in Hong Kong. The application for the letter of request is effectively an occasion for the appointing court from outside Hong Kong to be satisfied, from the perspective of the law of the appointing court and the facts of the case, that recognition and assistance should be sought and the terms of the proposed order are appropriate.

(2)    Having obtained a letter of request, the insolvency office-holder can then apply to the Court of First Instance by originating summons with affidavit / affirmation evidence, on an "ex parte on paper" basis, for a standard-form order.

(3)    If in addition to the standard-form order, the insolvency office-holder applies for substantive orders affecting a specific party (for example, orders for production of documents), that party should be identified as a respondent and served with the application.

See *Re Pacific Andes Enterprises (BVI) Ltd* (unreported, HCMP 3560/2016, 27 January 2017); *Re Takematsu* [2019] 5 HKC 505.

44.    It is acknowledged that the Hong Kong cases referred to above are all concerned with foreign corporate bankruptcy, as opposed to foreign personal bankruptcy. However, as Lord Hoffmann said in the *HIH* case quoted above, it is a general principle of private international law that bankruptcy (whether personal or corporate) should be unitary and universal. Importantly, such a principle has been approved by the Hong Kong court in *Re Global Brand*. Harris J in *Re Global Brand* said at §26 "*modified universalism is the foundation of the common law power to recognise and assist a foreign insolvency process and that the power may be developed if the development is consistent with modified universalism and is consistent with the applicable domestic legal framework*". In my view, there is no reason why the Hong Kong court will not as a matter of principle recognise and/or assist the Trustee (being the Chapter 11 trustee appointed by the US Bankruptcy Court in the Chapter 11 case of the Individual Debtor) by ordering disclosure of documents in the custody or possession of a party in Hong Kong.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Hong Kong
27 January 2023

Eugene Fung SC

Exhibits:

1.  Eugene Fung's Curriculum Vitae

2.  Basic Law of Hong Kong, Articles 8, 18, 84

3.  Hong Kong Reunification Ordinance, section 7

4.  *Parry-Jones v Law Society* [1969] 1 Ch 1

5.  *Tournier v National Provisional and Union Bank of England* [1924] 1 KB 461

6.  *FDC Co Ltd v The Chase Manhattan Bank NA* [1990] 1 HKLR 277

7.  *X AG v A Bank* [1983] 2 All ER 464

8.  *Nam Tai Electronics Inc v PricewaterhouseCoopers* (2008) 11 HKCFAR 62

9.  *A v B Bank* [1993] QB 311

10. Code of Banking Practice in Hong Kong

11. Banking Ordinance (Chapter 155 of the Laws of Hong Kong), sections 7, 120

12. Securities and Futures Ordinance (Chapter 571 of the Laws of Hong Kong), section 378

13. Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters

14. Evidence Ordinance (Chapter 8 of the Laws of Hong Kong), sections 75, 76

15. *Angela Chen v Vivien Chen* (unreported, HCMP 1478/2011, 7 December 2011)

16. *Re Trioielli* [1995] 2 HKC 785

17. Rules of High Court, Order 45, rule (5) & Order 70, rule 2

18. Practice Direction 36, paragraph 14

19. *Re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852

20. *Rubin v Eurofinance SA* [2013] 1 AC 236

21. *Re Global Brand Group Holding Ltd (in liq)* [2022] 3 HKLRD 316

22. *Singularis Holdings Ltd v PricewaterhouseCoopers* [2015] AC 1675

23. *Re Pacific Andes Enterprises (BVI) Ltd* (unreported, HCMP 3560/2016, 27 January 2017)

24. *Re Takematsu* [2019] 5 HKC 505