Exhibit 5

**1 K. B.**          KING'S BENCH DIVISION.                    461

TOURNIER *v.* NATIONAL PROVINCIAL AND UNION *Nov. 9, 12 ;*
BANK OF ENGLAND.                    *Dec.* 17.

*Banking—Banker and Customer—Implied Contract between—Obligation of
Secrecy—Limitations of.*

> It is an implied term of the contract between a banker and his customer
> that the banker will not divulge to third persons, without the consent
> of the customer express or implied, either the state of the customer's
> account, or any of his transactions with the bank, or any information
> relating to the customer acquired through the keeping of his account,
> unless the banker is compelled to do so by order of a Court, or the cir-
> cumstances give rise to a public duty of disclosure, or the protection of
> the banker's own interests requires it.

> The plaintiff was a customer of the defendant bank. A cheque
> was drawn by another customer of the defendants in favour of the
> plaintiff, who instead of paying it in to his own account indorsed it
> to a third person who had an account at another bank. On the return
> of the cheque to the defendants their manager inquired of the last
> named bank who the person was to whom it had been paid, and was
> told it was a bookmaker. That information the defendants disclosed
> to third persons :—

> *Held* (by Bankes and Atkin L.JJ.), that that disclosure constituted a
> breach of the defendants' duty to the plaintiff, for though the informa-
> tion was acquired not through the plaintiff's account but through that
> of the drawer of the cheque, it was acquired by the defendants during
> the currency of the plaintiff's account and in their character as bankers.

> By Scrutton L.J., contra, that although the disclosure was a breach
> of the defendants' duty to the drawer, it was not a breach of their duty
> to the plaintiff.

APPEAL of the plaintiff from a verdict and judgment in
favour of the defendants at the trial before Avory J. and
a jury.

The plaintiff was a customer of the Moorgate Street branch
of the defendants' bank, and in March, 1922, his account was
overdrawn to the amount of 9*l.* 8*s.* 6*d.*   The defendants pressed
him to pay off the overdraft, and in April, 1922, he entered into
an arrangement with them to pay off 1*l.* a week commencing
on April 17. He paid three instalments, and then ceased
to make any further payments. On June 8, 1922, he entered
the service of a company called Kenyon & Co. under an
agreement for a three months' employment as traveller and

462                    KING'S BENCH DIVISION.                [1924]

C. A.          salesman.  Shortly afterwards a cheque for 45*l.* was drawn
1923           in his favour by a company called Woldingham Traders, Ld.,
TOURNIER       who were also customers of the same branch of the defendants'
*v.*           bank, but the plaintiff did not pay that cheque into his
NATIONAL
PROVINCIAL     account.  The cheque was eventually returned to the defend-
AND UNION      ants for payment by the London City and Midland Bank.
BANK OF        The manager of the defendants' Moorgate Street branch, a
ENGLAND.       Mr. Fennell, then inquired of the London City and Midland
               Bank who their customer was for whom payment of the cheque
               had been collected, and was told he was a bookmaker of the
               name of Lloyd.  Mr. Fennell then rang up Kenyon & Co.
               on the telephone and had a conversation with two directors of
               that company, a Mr. Wells and a Mr. Kenyon.  He asked for
               the plaintiff's private address, and told them that the plaintiff
               was indebted to the bank, and that though several letters
               had been written to him he had not replied.  Mr. Fennell,
               according to his own evidence, added : " Tournier must
               be getting money from somewhere or other ; I have seen a
               cheque coming through the bank payable to Tournier and
               have been informed that one cheque has gone to the credit
               of a bookmaker's account, and if that is the case he ought
               to pay the bank off some of his debt."  In consequence of
               that communication Kenyon & Co. refused to renew the
               plaintiff's employment when the three months' agreement
               expired.
                   The plaintiff brought this action (1.) for slander, and (2.) for
               breach of an implied contract that the defendants would not
               disclose to third persons the state of the plaintiff's account
               or any transactions relating thereto.  The slander alleged
               was twofold : it was alleged in para. 2 that Mr. Fennell
               said over the telephone to Mr. Wells, " I am afraid that
               Mr. Tournier is engaged with bookmakers, as we have been
               able to trace a cheque or cheques passing from Mr. Tournier's
               account to bookmakers " ; and in para. 3 that he said to the
               other director, Mr. Kenyon, "Tournier's account is overdrawn,
               and various promises made by him to give the matter his
               attention have not been fulfilled, cheques passed through
               Tournier's account were for betting men, and we think that

**1 K. B.**          KING'S BENCH DIVISION,                                463

Tournier is betting heavily " ; the innuendo being that the
plaintiff was an undesirable person to be employed by
Kenyon & Co. and a person not fit to conduct their business
or to be entrusted with money. At the trial the actual
words proved in evidence were slightly different from those
above set out in the statement of claim, and also from the
evidence of Mr. Fennell. According to Mr. Wells' evidence
the words spoken to him were, " As we have been able to
trace a cheque or cheques to a bookmaker we are afraid he
is mixed up with bookmakers." Mr. Kenyon said that the
words spoken to him were, " He has made various promises
to look into the matter and has not done so, and various
cheques going through Tournier's account were going to
betting men." On the second head of claim, that for breach
of an implied contract of secrecy, the obligation claimed was
alleged to be an absolute obligation unqualified by any
exceptions. It appeared that in the pass books issued by
the defendants to their customers, including the pass book
of the plaintiff, there was on the first page a statement that
" The officers of the Bank are bound to secrecy as regards
the transactions of its customers."

C. A.

1923

TOURNIER

*v.*

NATIONAL
PROVINCIAL
AND UNION
BANK OF
ENGLAND.

Avory J. left the following questions to the jury :—

1. Were the words complained of in para. 2 or para 3 of
the statement of claim spoken by Mr. Fennell ? Answer No.
The plaintiff's counsel had asked the judge to add to the
question the words, " or words to the like effect," but the
judge had refused.

2. If so, were such words defamatory of the plaintiff, that
is, were they calculated to expose him to hatred, ridicule, or
contempt in the mind of a reasonable man ? Answer No.

3. Has the plaintiff suffered actual damage by the speaking
of such words ? Answer No. On this head the evidence was
that business was not brisk and that Kenyon & Co. would
probably have declined to renew the plaintiff's employment
in any case.

4. Was Mr. Fennell actuated by malice in speaking the
words, that is, was he acting from any indirect motive other
than a desire to do his duty ? Answer No.

464                    KING'S BENCH DIVISION.            [1924]

C. A.
1923

TOURNIER
v.
NATIONAL
PROVINCIAL
AND UNION
BANK OF
ENGLAND.

5. Was the communication with regard to the plaintiff's account at the bank made on a reasonable and proper occasion ?  Answer Yes.

6. What damages ?  None.

Judgment was thereupon entered for the defendants.

The plaintiffs appealed.

*Sir H. Smith K.C.* and *Pitt* for the appellant.  The summing up of the learned judge was defective on both heads of the claim.  On the claim for slander he omitted to ask the jury whether the words proved to have been spoken by Fennell were the same in substance as those pleaded in paras. 2 and 3 of the statement of claim, and though in actions for slander it was formerly essential to prove the actual words pleaded, that strict rule has been relaxed, and " for a long time it has been held to be enough to prove the substance of the words alleged in the declaration": per Lord Coleridge C.J. in *Harris* v. *Warre.* (1)  He refused to ask the jury whether " words to the like effect " had been spoken by Fennell, although in *Dalgleish* v. *Lowther* (2) an interrogatory administered to the defendant in an action of slander asking whether he had spoken the words set out in the statement of claim " or words to that effect " was held by the Court of Appeal to be a proper interrogatory.  On the claim for breach of the implied contract of secrecy also the summing up was defective, as the learned judge asked the jury the question whether the communication with regard to the plaintiff's account was made " on a reasonable and proper occasion," without giving them any direction as to the circumstances in which the occasion would be reasonable or proper.  In *Hardy* v. *Veasey* (3) where the plaintiff, a customer of the defendants' bank, alleged in his amended declaration that the defendants had communicated the state of his account to a third person in breach of their implied promise not to disclose it " except on a reasonable and proper occasion," it is true that no direction was given by the trial judge as to

(1) (1879) 4 C. P. D. 125, 128.        (2) [1899] 2 Q. B. 590.
(3) (1868) L. R. 3 Ex. 107.

**1 K. B.**        KING'S BENCH DIVISION.                        465

what constituted a reasonable and proper occasion, and no
objection was taken by the Court to that omission. But it
was not necessary to do so. The plaintiff had overdrawn his
account, and the third person to whom the defendants men-
tioned the fact was a moneylender from whom they tried to
obtain assistance for the plaintiff, and the only question left
to the jury was whether the communication to the money-
lender was officious and unjustifiable, the judge telling them
that if it was made with an honest intention of getting such
assistance he doubted whether the action was maintainable.
The jury having found for the defendants, the only objection
taken to the summing up was that the latter statement was a
misdirection. The Court held that it was not.

*J. G. Hurst K.C.* and *Morle* for the respondents. On the
claim for slander the judge was right in refusing to add to
the question left to the jury the words " or words to the like
effect." " In libel and slander the very words complained of
are the facts on which the action is grounded. It is not the
fact of the defendant having used defamatory expressions,
but the fact of his having used *those* defamatory expressions
alleged, which is the fact on which the case depends " : per
Lord Coleridge C.J. in *Harris* v. *Warre.* (1) In that case a
statement of claim, which alleged that the defendant had
written letters to the chief constable charging the plaintiff
with having been concerned in a murder, without setting out
the actual contents of the letters, was held bad on demurrer.
That case is quite consistent with *Dalgleish* v. *Lowther.* (2)
In exhibiting interrogatories a plaintiff may ask : " Did
you use [specific words] or words to that effect ? " But
a very different and much more strict standard is to be applied
when it is a matter of correspondence between pleadings and
proof. If the plaintiff's counsel intended to treat the words
proved to have been spoken by Fennell as material he ought
to have asked for an amendment of the claim, but he did not.
In *Ecklin* v. *Little* (3) the words alleged in the statement of
claim were : " I hear the plaintiff is a divorced man ; you

C. A.
1923

TOURNIER
*v.*
NATIONAL
PROVINCIAL
AND UNION
BANK OF
ENGLAND.

(1) 4 C. P. D. 125, 128.            (2) [1899] 2 Q. B. 590.
(3) (1890) 6 Times L. R. 366.

466                KING'S BENCH DIVISION.              [1924]

C. A.      had better inquire." The words proved in evidence were
1923       such that the jury might infer that the defendant was assert-
TOURNIER   ing as a fact that the plaintiff had been divorced, and not
v.         merely that she had heard a rumour to that effect from third
NATIONAL
PROVINCIAL persons. Under those circumstances the Court held that the
AND UNION  plaintiff could not rely on the words proved without an
BANK OF    amendment.
ENGLAND.

With regard to the second head of the plaintiff's claim
that there was a breach of the implied contract of secrecy
it is to be observed that it has never yet been decided that
the duty not to disclose the state of the customer's account
is anything more than a moral one. In *Hardy* v. *Veasey* (1)
the Court expressly said that it was not necessary for them
to decide whether there was a contract or legal duty not to
disclose ; their decision was nothing more than that, if there
was such a duty except on a reasonable and proper occasion,
the circumstances of the case brought it within the exception.
It is clear that a banker is compellable to disclose the state
of the customer's account if ordered to do so by a judge :
*Loyd* v. *Freshfield*. (2) It also seems clear that there are
other exceptions than compulsion of law. In *Tassell* v.
*Cooper* (3), a count which alleged that the plaintiff was a
customer of the defendant bank and that it became the duty
of the defendants not to disclose the particulars of the
plaintiff's account without his authority except to persons
presenting for payment cheques or bills drawn or accepted
by the plaintiff, " unless compellable by due course of law
so to do," was held bad. In *Foster* v. *Bank of London* (4)
the holder of a bill of exchange for 532*l.* accepted by the
plaintiff payable at the defendants' bank on presenting it
for payment was told that the plaintiff's balance was not
sufficient to meet it by 104*l.*, whereupon the holder paid
in 104*l.* to the plaintiff's account and obtained payment of
the bill. In an action against the bank for disclosing the
state of the plaintiff's account Erle C.J. left it as a question
of fact to the jury whether there was such a duty, and the

(1) L. R. 3 Ex. 107.            (3) (1850) 9 C. B. 509.
(2) (1826) 2 C. & P. 325.       (4) (1862) 3 F. & F. 214.

**1 K. B.**        KING'S BENCH DIVISION.        467

jury, having found that there was, gave the plaintiff a verdict
for the amount at which his balance stood before the 104*l.*
was paid in, apparently upon the ground that the act of the
banker was in fraud of the plaintiff's other creditors : see
per Martin B. in *Hardy* v. *Veasey.* (1) In the present case
the plaintiff alleged the banker's duty of non-disclosure
to be not merely a legal duty, but an absolute one without
exceptions. All that Avory J. was called upon to do was
to rule whether the duty as pleaded existed, and he was right
in ruling that it did not. But even if the duty of non-
disclosure is a legal duty, it is subject to the exception that
the banker may do what is necessary for the protection of
his own interests. Here the defendants were in the position
of creditors trying to recover the balance of an overdraft.
The state of the plaintiff's account was a matter in which they
were interested. Their communication of it was on a privi-
leged occasion, and there was no evidence of malice. The
intimation that the plaintiff had been dealing with book-
makers was not a breach of the duty of non-disclosure at all,
for it was based on facts which had no connection with his
account, but which they had learnt from another source.

C. A.

1923

TOURNIER
*v.*
NATIONAL
PROVINCIAL
AND UNION
BANK OF
ENGLAND.

*Cur. adv. vult.*

Dec. 17. The following written judgments were delivered :—

BANKES L.J. In this appeal the plaintiff asks for a new
trial on the ground of misdirection by the learned judge.
The action was founded on statements alleged to have been
made by an acting manager of a branch of the defendant
bank. The plaintiff complained that the statements were
slanderous, and further that they constituted a breach of
the duty owed by the bank to him. The short facts leading
up to the action were as follows : The plaintiff was a
customer of the Finsbury Pavement branch of the defendant
bank. In April, 1922, his account was overdrawn to a small
amount, and on April 8 the plaintiff signed a document
agreeing to pay off the debt by weekly instalments of 1*l.*

(1) L. R. 3 Ex. 107.

2 I 2        2

C. A.

1923

TOURNIER
*v.*
NATIONAL
PROVINCIAL
AND UNION
BANK OF
ENGLAND.

Bankes L.J.

At the time this document was signed the plaintiff was about to enter the employ of a firm of Kenyon & Co., and on the document containing the agreement the plaintiff wrote their name and address. The plaintiff did not pay the weekly instalments as agreed. In July the acting manager of the branch, by name Fennell, got into telephonic communication with Kenyon & Co. for the purpose of ascertaining the plaintiff's private address. The inquiry led to further conversation with two directors of the company, one of the name of Wells, and the other of the name of Kenyon. The plaintiff's complaint in the action was that in the course of that conversation on the telephone Fennell had told Kenyon that the plaintiff's account was overdrawn, that various promises made by him to give the matter his attention had not been fulfilled, that cheques which passed through his account were for betting men, and that the bank thought that he was betting heavily. To Wells Fennell was alleged to have said that he was afraid that the plaintiff was engaged with bookmakers, as the bank had been able to trace a cheque or cheques passing from the plaintiff's account to bookmakers. The innuendo pleaded was that the words complained of meant and were understood to mean that the plaintiff was an undesirable person to be employed by Messrs. Kenyon & Co., and a person not fit to conduct their business or to be entrusted with money. Wells and Kenyon were called as witnesses for the plaintiff, and they deposed to a conversation with Fennell in the terms alleged in the statement of claim. So far therefore as the plaintiff's evidence was concerned there was no necessity for the judge to ask the jury any question other than the one which he did ask them, namely—whether the words complained of were spoken by Fennell. In order to contradict the plaintiff's version of the conversation Fennell was called for the defendants. His account of the conversation was that he rang up Messrs. Kenyon in order to ascertain what the plaintiff's private address was, and whether he was working on salary or commission. He was asked why he made the inquiry, and he then explained that the

**1 K. B.**         KING'S BENCH DIVISION.                    469

C. A.
1923

TOURNIER
v.
NATIONAL
PROVINCIAL
AND UNION
BANK OF
ENGLAND.

Bankes L.J.

plaintiff was indebted to the bank in a small amount, and
that he had not replied to letters. He then went on to say
that the plaintiff must be getting money from some source
or other, that he had seen cheques coming through the
bank payable to the plaintiff, and that he had made it
his business to find out where one cheque had gone to, and
that he had been informed that it had gone to the credit of
a bookmaker's account, and that if that was the case he
thought that the plaintiff ought to have paid off some of his
debt to the bank. It was after and in consequence of this
evidence by Fennell that the plaintiff's counsel pressed
the learned judge to ask the jury whether the words com-
plained of or words to a like effect had been proved, his
object being obviously to obtain a verdict on Fennell's
evidence if the jury accepted his version of the conversation
in preference to that of Wells and Kenyon. The learned
judge refused to adopt this course. The question on this
part of the case is whether he was right in so deciding. The
strictness of the old rule in reference to variance between
proof and pleading in actions of libel and slander has long
ago disappeared. It is still necessary to plead the exact
language complained of, but proof of language substantially
the same as that pleaded is admissible and should be sub-
mitted to the jury. Lord Coleridge C.J. states the present
rule in *Harris* v. *Warre* (1) as follows: " In libel and
slander everything may turn on the form of words, and in
olden days plaintiffs constantly failed from small and even
unimportant variance between the words of the libel or
slander set out in the declaration and the proof of them.
For a long time it has been held to be enough to prove the
substance of the words alleged in the declaration, but if
there was difference between both the form and substance
of the words alleged, and of the words proved, the defendant
was entitled to succeed. In libel and slander the very words
complained of are the facts on which the action is grounded.
It is not the fact of the defendant having used defamatory
expressions, but the fact of his having used *those* defamatory

(1) 4 C. P. D. 125, 128.

470 KING'S BENCH DIVISION. [1924]

C. A.
1923

TOURNIER
*v.*
NATIONAL
PROVINCIAL
AND UNION
BANK OF
ENGLAND.

Bankes L.J.

expressions alleged, which is the fact on which the case depends." There can be no question as to the difference in form between the rival accounts of the conversation. Do they differ in substance ? Every case must depend upon its own circumstances, and no rule can be laid down as to what constitutes a substantial difference. In my opinion there was such a substantial difference between the rival accounts of the conversation that Fennell's version ought not to have been submitted to the jury as proof of the plaintiff's pleaded case without an amendment. Even if that view is not correct I do not think that the learned judge was wrong in refusing to add to his question " or words to the like effect." If Fennell's evidence was to be submitted to the jury at all in proof of the plaintiff's case it should have been done by a series of questions which would have made it quite clear to the jury that when they had to consider whether the words were defamatory they must consider that question in reference only to the version of the conversation which they accepted. I do not take the view that there was any material misdirection by the learned judge on this part of the case ; though had the question depended upon whether the ancient definition of what constitutes a slander is sufficiently wide for a case like the present I should have hesitated before saying that it is. As the other members of the Court think that the order for a new trial should include both branches of the claim I do not differ from them, though I do adhere to my view that an amendment is necessary to enable the plaintiff to do what he attempted unsuccessfully to do at the trial.

The case with regard to the claim for damages for breach of duty raises a very important question, and one on which the learned judge did not, in my opinion, sufficiently direct the jury. The case for the plaintiff as alleged in the statement of claim was that the bank were absolutely pledged to secrecy in regard to the plaintiff's account and business, and all matters incidental thereto, and that it was an implied term of the contract between the plaintiff and the bank that they would not disclose to any one any of the plaintiff's business with the bank or matters arising therefrom, or the nature

**1 K. B.**         KING'S BENCH DIVISION.                    **471**

or state of his account, or any transactions relating thereto.
The learned judge very properly, in my opinion, ruled against
the existence of any such absolute contract. The matter
might have rested there. It did not do so, however, because
in his summing up the learned judge did give a direction to
the jury on the law on the point, and asked them a question
with regard to it. The question was this : " Was the com-
munication with regard to the plaintiff's account at the
bank made on a reasonable and proper occasion ? " and his
direction on this point was as follows : " Fifthly, I shall have
to ask, in view of the other claim for breach of contract,
whether the communication of the state of the plaintiff's
account at the bank, which was made to his employers, was,
under the circumstances, made on a reasonable and proper
occasion ; that is to say, whether there was a reasonable
justification for his making that communication ? I shall
hold, as a matter of law, that there is no such absolute
contract as Sir Harold Smith has contended for between a
banker and his customer. He has contended that there is
an absolute contract that the banker shall not under any
circumstances disclose the state of a customer's account to
another person. I hold, as a matter of law, that there is no
such absolute contract. But, if the banker has made that
disclosure justifiably, that is to say, if, under the circum-
stances of the particular case, it was reasonable and proper
that he should make the communication, then there is no
breach of contract on his part." With all respect to the
learned judge this is not a sufficient explanation of what is
a difficult and hitherto only very partially investigated branch
of the law. The judge no doubt took the form of the question
from the case of *Hardy* v. *Veasey* (1), in which the judges
raised, without deciding them, a number of questions in
relation to the duty of banker towards customer not to dis-
close his affairs, and amongst others the question whether
the duty was a legal or only a moral one, and if legal whether
it arose out of contract or out of tort. At the present day I
think it may be asserted with confidence that the duty is a

C. A.
1923

TOURNIER
*v.*
NATIONAL
PROVINCIAL
AND UNION
BANK OF
ENGLAND.

Bankes L.J.

. (1) L. R. 3 Ex. 107.

.472                     KING'S BENCH DIVISION.              [1924]

C. A.       legal one arising out of contract, and that the duty is not
1923        absolute but qualified. It is not possible to frame any
TOURNIER    exhaustive definition of the duty. The most that can be
v.          done is to classify the qualification, and to indicate its limits.
NATIONAL    For this purpose the case of *Hardy* v. *Veasey* (1) is of no assist-
PROVINCIAL  ance. The plaintiff in his amended declaration in that case
AND UNION
BANK OF     set out a promise on the part of the bank not to disclose the
ENGLAND.    state of his banking account except "on a reasonable and
Bankes L.J. proper occasion." To this the defendants pleaded a denial,
and leave and licence. The disclosure complained of was
made to a moneylender, to whom the defendant's manager
applied with a view of obtaining assistance for the plaintiff.
The learned judge who tried the action stated that the question
for the jury would be "Whether the communication to the
moneylender of the state of the plaintiff's account was an
officious and unjustifiable one?" and he added: "If it was
made with reasonable hope and an honest intention of getting
assistance for the plaintiff I should doubt whether the action
is maintainable." The jury found for the defendants. The
discussion in the Court of Exchequer took place upon an
application for a new trial, and no decision was given except
that there had been no misdirection and no wrong verdict.
The plaintiff by his pleading had confined his complaint to a
disclosure on some occasion other than a reasonable and
proper occasion, and the Chief Baron in his judgment is
only referring to the plaintiff's complaint when he uses those
words. The question was never raised, whether it was a
proper way of ascertaining what the defendants' duty was to
ask a question of the jury in that form. Had that question
been discussed, I cannot think that the Court would have
approved of such a question, partly because it is leaving to
the jury a question which is primarily a question for the
judge, and partly because it leaves the jury entirely without
instruction as to what the circumstances are which they are
entitled to take into consideration in arriving at a conclusion
as to what is reasonable and what is proper. In my opinion
it is necessary in a case like the present to direct the jury what

(1) L. R. 3 Ex. 107.

**1 K. B.**        KING'S BENCH DIVISION.                    **473**

are the limits, and what are the qualifications of the con-
tractual duty of secrecy implied in the relation of banker and
customer. There appears to be no authority on the point.
On principle I think that the qualifications can be classified
under four heads : (*a*) Where disclosure is under compulsion
by law ; (*b*) where there is a duty to the public to disclose ;
(*c*) where the interests of the bank require disclosure ;
(*d*) where the disclosure is made by the express or implied
consent of the customer. An instance of the first class is
the duty to obey an order under the Bankers' Books Evidence
Act. Many instances of the second class might be given.
They may be summed up in the language of Lord Finlay in
*Weld-Blundell* v. *Stephens* (1), where he speaks of cases where
a higher duty than the private duty is involved, as where
" danger to the State or public duty may supersede the
duty of the agent to his principal." A simple instance of
the third class is where a bank issues a writ claiming payment
of an overdraft stating on the face of the writ the amount
of the overdraft. The familiar instance of the last class is
where the customer authorizes a reference to his banker.
It is more difficult to state what the limits of the duty are,
either as to time or as to the nature of the disclosure. I
certainly think that the duty does not cease the moment a
customer closes his account. Information gained during the
currency of the account remains confidential unless released
under circumstances bringing the case within one of the
classes of qualification I have already referred to. Again
the confidence is not confined to the actual state of the
customer's account. It extends to information derived from
the account itself. A more doubtful question, but one vital
to this case, is whether the confidence extends to information
in reference to the customer and his affairs derived not from
the customer's account but from other sources, as, for instance,
from the account of another customer of the customer's bank.

It is very necessary to speak with caution on this question
upon which there is no authority. I desire therefore to
confine my observations to the facts of this particular case.

C. A.

1923

TOURNIER
*v.*
NATIONAL
PROVINCIAL
AND UNION
BANK OF
ENGLAND.
—
Bankes L.J.

(1) [1920] A. C. 956, 965.

C. A.      The information which the branch manager is said to have
1923       disclosed, and which disclosure is said to have constituted
TOURNIER   a breach of duty, came to the bank in the following manner.
   v.      A cheque was drawn by a customer of the bank on their
NATIONAL
PROVINCIAL Moorgate Street branch in favour of the plaintiff. The
AND UNION  cheque was paid in to the account of a customer at the
BANK OF    London City and Midland Bank. When the cheque came
ENGLAND.
           back to the Moorgate Street branch Mr. Fennell's attention
Bankes L.J. was called to the fact that the plaintiff had not paid the
           cheque in to his account, and Mr. Fennell then made inquiries
           of the London City and Midland Bank, the reply to which he
           is said to have committed a breach of his duty in disclosing.
           The privilege of non-disclosure to which a client or a customer
           is entitled may vary according to the exact nature of the
           relationship between the client or the customer and the
           person on whom the duty rests. It need not be the same
           in the case of the counsel, the solicitor, the doctor, and the
           banker, though the underlying principle may be the same.
           The case of the banker and his customer appears to me to be
           one in which the confidential relationship between the parties
           is very marked. The credit of the customer depends very
           largely upon the strict observance of that confidence. I
           cannot think that the duty of non-disclosure is confined to
           information derived from the customer himself or from his
           account. To take a simple illustration. A police officer
           goes to a banker to make an inquiry about a customer of
           the bank. He goes to the bank, because he knows that the
           person about whom he wants information is a customer of
           the bank. The police officer is asked why he wants the
           information. He replies, because the customer is charged
           with a series of frauds. Is the banker entitled to publish
           that information? Surely not. He acquired the informa-
           tion in his character of banker. So in the present case
           Mr. Fennell was put upon inquiry by a cheque drawn in the
           plaintiff's favour upon a customer's account. He acquired
           the information which he is said to have divulged in his
           character as the plaintiff's banker. I use the expression
           " in the character of banker," because I find that expression

**1 K. B.**        KING'S BENCH DIVISION.        475

used by Gurney B. in the case of *Davies* v. *Waters* (1), in
which the question was raised whether a solicitor had acquired
certain information as attorney for a client or as his trustee.
In his judgment Gurney B. says this : " But the objection
here goes further ; for just an hour before the trial, being
possessed of the deed, and possessed of it in the character
of trustee, he takes it to the consultation, and there, in the
character of attorney for the defendant, and for the express
purpose of informing the minds of the counsel for the
defendants, he reads the deed, and by that means acquires
his knowledge of its contents. Can it be doubted that this
is a knowledge acquired in the character of professional
adviser of the party ? If so, it is fit and proper that know-
ledge so acquired should be held sacred." Rolfe B. did not
agree with this view of the facts, but I cite the passage
because it introduces what is, I think, a convenient indication
of the limits of professional or commercial privilege in relation
to non-disclosure. In *Taylor* v. *Blacklow* (2) Vaughan J.,
in speaking of a violation by a solicitor of the professional
privilege, speaks of it as a breach of a great moral duty, and
he adds that " the law is never better employed than in
enforcing the observance of moral duties." In the present
case I think that the information obtained by Mr. Fennell as
the result of his inquiry of the London City and Midland Bank
was covered by the privilege of the customer, and that the
bank are liable for any disclosure of that information which
may have caused damage to the plaintiff unless the bank can
bring the disclosure of the information so derived under one
of the classified qualifications I have already referred to.

It follows from what I have said that in my opinion a
direction to the jury in a case such as the present must inform
the jury of the nature and limits and qualifications of the
duty of the bank as a matter of law, leaving to them only
questions for the purpose of ascertaining their view whether
the communication complained of was or was not made, and
whether it did or did not come within any of the protected
occasions to which I have called attention. For these reasons

C. A.

1923

TOURNIER
*v.*
NATIONAL
PROVINCIAL
AND UNION
BANK OF
ENGLAND.

Bankes L.J.

(1) (1842) 9 M. & W. 608, 613.        (2) (1836) 3 Bing. N. C. 235, 249.

476                    KING'S BENCH DIVISION.              **[1924]**

C. A.
1923

TOURNIER
*v.*
NATIONAL
PROVINCIAL
AND UNION
BANK OF
ENGLAND.

I consider that the appeal must be allowed with costs, the
judgment entered for the defendants set aside, and a new
trial ordered. The costs of the first trial to abide the event
of the new trial.

SCRUTTON L.J. This application for a new trial raises
questions of some general importance, though I can under-
stand the jury who answered all questions against the plaintiff
not taking a favourable view of his case. He had an account
with the defendant bank which, in October, 1921, was over-
drawn about 8*l.* He paid nothing in to this account until
April, 1922, when, being pressed to pay his debt, he agreed to
do so by weekly instalments of a pound. He paid three of
these, but not punctually, and in July, 1922, had not paid
for some time, his overdraft then being 6*l.* or so. Under
these circumstances the bank manager found that cheques
made payable to him were being paid to strangers
at another bank, instead of being used to discharge his
overdraft. He also found that one of these cheques came to
the bank from the account of a betting man. He was
naturally annoyed, and in endeavouring to obtain the
private address of the plaintiff from his employers, he made
statements, the exact terms of which were in dispute, about
the state of the plaintiff's account, and the cheque coming
from a bookmaker's account. On hearing of this the plaintiff
brought an action against the bank (1.) for slander, alleging
as special damage the loss of his situation, (2.) for breach of
contract to keep his account secret. The two causes of
action have different histories and arguments relating to
them, and I deal with them separately.

As to slander, the plaintiff alleged two conversations, one
with Wells, to whom Fennell is alleged to have said : " I am
afraid that Mr. Tournier is engaged with bookmakers, as we
have been able to trace a cheque or cheques passing from
Mr. Tournier's account to bookmakers " ; the other with
Mr. Kenyon, to whom he is alleged to have said : " Tournier's
account is overdrawn, and various promises made by him to
give the matter his attention have not been fulfilled, cheques

**1 K. B.**         KING'S BENCH DIVISION.                477

passed through Tournier's account were for betting men, and we think that Tournier is betting heavily." The witnesses gave evidence substantially as pleaded. The bank manager said he asked the plaintiff's employers for his private address, and whether he was paid by salary or commission, and on being asked why he wanted to know said that the plaintiff was slightly overdrawn, and had not answered the bank's letters, and as the manager had seen cheques payable to the plaintiff coming through another bank account, and found they came from a bookmaker's account, he thought the plaintiff ought to pay up. It will be seen he alleges that he said nothing about cheques passing from Tournier's account to bookmakers, or that Tournier was betting heavily; he did mention the overdraft, and that one cheque payable to Tournier had passed through a bookmaker's account. No application was made by the plaintiff to amend by relying on the words proved by the defendants, but when the judge proposed to ask the jury the question : " Were the words complained of in paragraph 2, or paragraph 3 of the claim, spoken by Mr. Fennell ? " counsel asked him to add " or words to the like effect," which the judge refused. The jury found that the words alleged in the claim were not spoken. They went on to find that they, presumably the words alleged, were not defamatory. On this the judge had directed them that defamatory words were words tending to expose the plaintiff to " hatred, ridicule, and contempt " in the mind of a reasonable man. I do not myself think this ancient formula is sufficient in all cases, for words may damage the reputation of a man as a business man, which no one would connect with hatred, ridicule, or contempt. This misdirection is, however, not raised by the notice of appeal. The jury appear to have thought that to say that a man's account was over-drawn, and that he betted, was no reasonable cause for " hatred, ridicule, and contempt "; whether they would have thought such words damaging to the reputation of a business man I do not know. The more substantial matter is the refusal of the judge to add the words " to the like effect," and his failure to direct the jury that they should

C. A.

1923

TOURNIER
v.
NATIONAL
PROVINCIAL
AND UNION
BANK OF
ENGLAND.

Scrutton L.J.

478                    KING'S BENCH DIVISION.          [1924]

C. A.      consider whether the words alleged, or a material and de-
1923       famatory part of them, were in substance uttered.  There is
———        no doubt that precise words must be alleged in the statement
TOURNIER   of claim, and only a century ago the most minute variation
v.
NATIONAL   in proof was ground for non-suiting the plaintiff.  One who
PROVINCIAL
AND UNION  complained of the words: "This is my umbrella, and he
BANK OF    stole it from my back door," and proved: "It is my
ENGLAND.
———        umbrella, and he stole it from my back door" was non-
Scrutton L.J. suited in 1819 by the full Court: *Walters* v. *Mace* (1), it being
           proved that the umbrella was not in the presence of the
           speaker, so that " This " referred to a present umbrella, and
           " It " to an absent one, a different thing.  But I think modern
           practice is, as stated by Lord Coleridge in *Harris* v. *Warre* (2),
           that it is enough to prove the substance of the words alleged,
           or I would add, of a material and defamatory part of them.
           In the case of interrogatories the Court has decided that the
           defendant may be asked whether he spoke the words " or
           words to that effect," meaning, according to Sir Francis
           Jeune, " anything in substance like them," " words which,
           though not exactly the same, are to that effect." (3)  So far
           as the words proved make a materially different allegation,
           amendment is necessary if that allegation is to be relied on;
           but in my view the jury should be directed that if they think
           the defendant used, in substance, the words, or a material and
           defamatory part of the words complained of, they should say
           so, and he is liable.  I have no doubt that in this case part
           of the words alleged are materially different from the
           defendant's admission, but I think the jury should have been
           directed to consider whether or not part of the defendant's
           admission was a material and defamatory part of the words
           complained of.  It is obvious, however, that if the claim
           for slander stood alone the statement about overdraft
           was justified, and the jury obviously did not think, and
           might reasonably not think, the statement about one cheque
           from a bookmaker's account defamatory.  On this part
           of the case, if it stood alone, I should not be disposed

(1) (1819) 2 B. & Al. 756.          (3) *Dalgleish* v. *Lowther* [1899]
(2) 4 C. P. D. 125.                 2 Q. B. 590.

**1 K. B.**        KING'S BENCH DIVISION.                    479

C. A.

1923

TOURNIER
*v.*
NATIONAL
PROVINCIAL
AND UNION
BANK OF
ENGLAND.

Scrutton L.J.

to order a new trial, though I think the summing up was defective.

The other cause of action is of far more public interest. The plaintiff alleged an absolute contract to be implied that the bank should not disclose the plaintiff's account or matters arising therefrom, or any transactions relating thereto, to anybody. The judge directed the jury there was no such absolute contract, and I think he was right. There is clearly no privilege to abstain from answering in a Court of justice questions as to a customer's account : *Loyd* v. *Freshfield* (1), per Abbott C.J. ; and the bank can disclose the state of the account by bringing an action to recover overdraft.

The learned judge left to the jury the question : " Was the communication with regard to the plaintiff's account at the bank made on a reasonable and proper occasion ? " I think he took these words from the judgments of Kelly C.B. and Martin B. in *Hardy* v. *Veasey* (2), though in that case the actual question left to the jury was : Was the communication " an officious and unjustifiable one ? " But having read them the questions, the learned judge, by some unfortunate oversight, omitted to give the jury any direction as to the standard by which reasonableness and propriety were to be considered ; indeed, as the jury had found that the words alleged by the plaintiff were not uttered, it is not clear to what communication the question and answer related.

It is curious that there is so little authority as to the duty to keep customers' or clients' affairs secret, either by banks, counsel, solicitors or doctors. The absence of authority appears to be greatly to the credit of English professional men, who have given so little excuse for its discussion. As to bankers, there is the ruling of Abbott C.J., already referred to, as to the duty to disclose in the law Courts ; there is the opinion of two judges on demurrer in *Tassell* v. *Cooper* (3) in 1850, that a count that a bank had a duty not to disclose the state of a customer's account showed no cause of action ; but here counsel, who was winning on another count,

(1) 2 C. & P. 325, 329.        (2) L. R. 3 Ex. 107.
(3) 9 C. B. 509.

480                    KING'S BENCH DIVISION.              [1924]

C. A.           abandoned the count attacked (1) ; there is the fact that
1923            in 1862, in *Foster* v. *Bank of London* (2), Erle C.J. asked the
TOURNIER        jury whether it was the duty of the bank not to disclose to
*v.*            a person presenting a bill or cheque the exact state of a cus-
NATIONAL
PROVINCIAL      tomer's account as contrasted with a statement of "not
AND UNION
BANK OF         sufficient assets," and on their replying that the duty was
ENGLAND.        as stated said "he knew of no law against that"; and
Scrutton L.J.   lastly, the judgment in 1868 in *Hardy* v. *Veasey* (3) of the
                Court of Exchequer, that if there was a duty not to disclose
                the state of a customer's account it was subject to an excep-
                tion in favour of disclosure reasonable and proper in the
                interests of the customer himself. It is to be noticed that
                in the last case the Court were under the impression that
                there was no reported case in which an action had been
                brought against a solicitor for disclosure of his client's
                affairs ; they had not been referred to *Taylor* v. *Blacklow* (4),
                an action for such disclosure, where all the judges recognized
                such a duty, tracing it back to a passage in Comyn's Digest,
                tit. "Action on the Case for Deceit," A.5. (5) It might be
                possible to rest the duty on the express words in the bank's
                pass book : "The officers of the bank are bound to secrecy
                as regards the affairs of its customers," though even then
                exceptions must be introduced by implication. The contract is
                alleged in the claim as "implied," and according to the decision
                of this Court in *In re Comptoir Commercial Anversois and
                Power* (6), implied terms are a question of law for the Court,
                the jury finding such facts as are necessary or material to
                enable the Court to judge of the implication. The Court
                will only imply terms which must necessarily have been in
                the contemplation of the parties in making the contract.
                Applying this principle to such knowledge of life as a judge is
                allowed to have, I have no doubt that it is an implied term
                of a banker's contract with his customer that the banker shall
                not disclose the account, or transactions relating thereto, of
                his customer except in certain circumstances. This duty

(1) 9 C. B. 532.              (4) 3 Bing. N. C. 235.
(2) 3 F. & F. 214.           (5) 3 Bing. N. C. 248, 249.
(3) L. R. 3 Ex. 107.         (6) [1920] 1 K. B. 868.

**1 K. B.**          KING'S BENCH DIVISION.                    481

equally applies in certain other confidential relations, such as
counsel or solicitor and client, or doctor and patient. The
circumstances in which disclosure is allowed are sometimes
difficult to state, especially in the case of a medical man;
and I do not propose to do more than indicate the exceptions
material to the present case. I think it is clear that the bank
may disclose the customer's account and affairs to an extent
reasonable and proper for its own protection, as in collecting
or suing for an overdraft; or to an extent reasonable and
proper for carrying on the business of the account, as in giving
a reason for declining to honour cheques drawn or bills
accepted by the customer, when there are insufficient assets;
or when ordered to answer questions in the law Courts;
or to prevent frauds or crimes. I doubt whether it is sufficient
excuse for disclosure, in the absence of the customer's consent,
that it was in the interests of the customer, where the
customer can be consulted in reasonable time and his consent
or dissent obtained. I think also, in accordance with well-
known authorities on the duties and privileges of legal
advisers, that the implied legal duty towards the customer
to keep secret his affairs does not apply to knowledge which
the bank acquires before the relation of banker and customer
was in contemplation, or after it ceased; or to knowledge
derived from other sources during the continuance of the
relation. For instance, the banker hears from an entirely
independent source that one of its customers has speculative
dealings in oil, may it disclose that fact to another of its
customers also interested in oil ? As we have only to imply
terms which the parties must necessarily have contemplated,
how can it be said that it is a necessary term that the bank
shall not talk about the customer at all, though the subject
matter of its conversation is not derived from its dealings
with the customer ? This position would be the same as
prevails in the case of legal advisers, as stated in Taylor on
Evidence (1), and supported by the cases of *Brown* v.
*Foster* (2); *Griffith* v. *Davies* (3), as to which see per Alderson B.

C. A.

1923

TOURNIER
*v.*
NATIONAL
PROVINCIAL
AND UNION
BANK OF
ENGLAND.

Scrutton L.J.

(1) 11th ed., § 930, heads 2 to 5.        (2) (1857) 26 L. J. (Ex.) 249.
          (3) (1833) 5 B. & Ad. 502.

482                    KING'S BENCH DIVISION.               **[1924]**

C. A.
1923
—
TOURNIER
*v.*
NATIONAL
PROVINCIAL
AND UNION
BANK OF
ENGLAND.
—
Scrutton L.J.

in *Davies* v. *Waters* (1); *Lewis* v. *Pennington.* (2)  It appears
to me, therefore, that we cannot imply an obligation to keep
secret information about a customer derived not from that
customer or his account, but from the account of another
customer.  The second customer may complain, but not the
first.  It is not possible to apply this rule to the facts of the
present case so as to avoid a new trial, for we do not know
what words were spoken, or how any statement about cheques
for betting was mixed up with statements about overdraft.  I
hold therefore that if the bank knows something about cus-
tomer A., through customer B.'s account, his duty not to
disclose is one owing to customer B. and not to customer A.

None of these matters, or standards by which the pro-
priety of disclosure should be judged, were explained to the
jury, and it is obvious that some of them were very material
to the facts of this case.  What, if anything, was known or
suspected about betting was known through the account of
another customer, but the suggestion, if made, that the
overdraft was due to betting, might be considered by the
jury as the disclosure of the plaintiff's account, or might not.
I think a new trial should be ordered of this issue, which is
an important one ; and as the treatment of the issue as to
slander was not very satisfactory, I think the new trial should
extend to the whole action, and I therefore do not comment
further on the facts of the case.  The plaintiff must have
the costs of the appeal, and those of the first hearing should
abide the event of the second hearing.  The plaintiff must
consider whether he should apply to amend.

ATKIN L.J.  This is an action brought by the plaintiff
against the defendant bank in respect of words spoken by
the manager of a branch of the bank.  The plaintiff alleges
as causes of action : (A) slander ; (B) breach of an implied
contract not to divulge information concerning the plaintiff's
transactions with the bank.  The second point involves a
question of considerable public importance, and I propose
to consider it first.

(1) 9 M. & W. 608, 611.              (2) (1860) 29 L. J. (Ch.) 670.

**1 K. B.**       KING'S BENCH DIVISION.       483

In *Joachimson* v. *Swiss Bank Corporation* (1) this Court had to consider what were the terms of the contract made between banker and customer in the ordinary course of business when a current account is opened by the bank. All the members of the Court were of opinion that the contract included several implied terms, some of which were then stated, so far as was necessary for the determination of that case, which turned upon the necessity of a demand before the customer could sue the bank for the amount of his credit balance. It is now necessary to consider whether there is any, and if so what, implied term as to an obligation of secrecy on the part of the bank. The question of what terms are to be implied in a contract is a question of law : *In re Comptoir Commercial Anversois and Power* (2) ; and the rules by which the Court should be guided are contained in passages from the judgments of Lord Esher in *Hamlyn* v. *Wood* (3), and of Lord Watson in *Dahl* v. *Nelson, Donkin & Co.* (4), cited by Bankes L.J. (5) The principle is stated by Scrutton L.J. in words substantially to the same effect (6): "The Court," he says, "and not the jury, are the tribunal to find such a term ; they ought not to imply a term merely because it would be a reasonable term to include if the parties had thought about the matter, or because one party, if he had thought about the matter, would not have made the contract unless the term was included; it must be such a necessary term that both parties must have intended that it should be a term of the contract, and have only not expressed it because its necessity was so obvious that it was taken for granted." Is there any term as to secrecy to be implied from the relation of banker and customer ? I have myself no doubt that there is. Assuming that the test is rather stricter than Lord Watson would require, and is not merely what the parties, as fair and reasonable men, would presumably have agreed upon, but what the Court considers they must necessarily

C. A.
1923

TOURNIER
*v.*
NATIONAL
PROVINCIAL
AND UNION
BANK OF
ENGLAND.

Atkin L.J.

(1) [1921] 3 K. B. 110.
(2) [1920] 1 K. B. 868.
(3) [1891] 2 Q. B. 488.
(4) (1881) 6 App. Cas. 38.
(5) [1920] 1 K. B. at pp. 886-7.
(6) Ibid. at pp. 899-900.

C. A.
1923

TOURNIER
v.
NATIONAL
PROVINCIAL
AND UNION
BANK OF
ENGLAND.

Atkin L.J.

have agreed upon, it appears to me that some term as to
secrecy must be implied. The bank find it necessary to bind
their servants to secrecy ; they communicate this fact to all
their customers in their pass-book, and I am satisfied that if
they had been asked whether they were under an obligation
as to secrecy by a prospective customer, without hesitation
they would say yes. The facts in this case as to the course
of business of this bank do not appear to be in any degree
unusual in general banking business. I come to the conclu-
sion that one of the implied terms of the contract is that the
bank enter into a qualified obligation with their customer to
abstain from disclosing information as to his affairs without
his consent. I am confirmed in this conclusion by the admis-
sion of counsel for the bank that they do, in fact, consider
themselves under a legal obligation to maintain secrecy.
Such an obligation could only arise under a contractual
term.

The important point, and one which presents difficulties,
is as to the extent of the obligation. The plaintiff's pleading
alleged the obligation in wide terms as absolute and uncon-
ditional. The learned judge, as I think quite rightly, ruled
that there was no such absolute duty, and the trial then
proceeded without further amendment of the pleadings on
the footing that the plaintiff relied on a breach of the true
contract, whatever it was. The learned judge directed the
jury : " If the banker has made the disclosure justifiably,
that is to say, if, under the circumstances of the particular
case, it was reasonable and proper that he should make the
communication, then there is no breach of contract on his
part." Without any further direction he left to the jury the
question : " Was the communication with regard to the
plaintiff's account at the bank made on a reasonable and
proper occasion ? " The direction and question appear to
follow the direction to the jury given by Byles J. in *Hardy* v.
*Veasey* (1), affirmed by the Court of Exchequer. I think that
the decision in that case was based on the fact that the
formula approved was that adopted by the plaintiff's counsel

(1) L. R. 3 Ex. 107.

in his pleading, and accepted by him as representing the
true issue to be left to the jury. In fact, however, to leave
to the jury what is " justifiable " or " proper " is merely to
tell them that the bank may not divulge information except
on occasions when they may divulge it, and that of what those
occasions are the jury are the judges. This appears to me to
treat as fact what is matter of law, and to afford no guidance
to the jury, leaving the rights and duties as between customer
and banker to vary with the individual views of juries in
each case.

C. A.
1923

TOURNIER
v.
NATIONAL
PROVINCIAL
AND UNION
BANK OF
ENGLAND.

Atkin L.J.

The first question is : To what information does the
obligation of secrecy extend ? It clearly goes beyond the
state of the account, that is, whether there is a debit or a
credit balance, and the amount of the balance. It must
extend at least to all the transactions that go through the
account, and to the securities, if any, given in respect of
the account ; and in respect of such matters it must, I think,
extend beyond the period when the account is closed, or
ceases to be an active account. It seems to me inconceivable
that either party would contemplate that once the customer
had closed his account the bank was to be at liberty to divulge
as it pleased the particular transactions which it had con-
ducted for the customer while he was such. I further think
that the obligation extends to information obtained from
other sources than the customer's actual account, if the
occasion upon which the information was obtained arose
out of the banking relations of the bank and its customers—
for example, with a view to assisting the bank in conducting
the customer's business, or in coming to decisions as to its
treatment of its customers. Here, again, counsel for the
bank admitted that the bank treated themselves as under
such an obligation, and this, I think, would be in accord-
ance with ordinary banking practice. In this case, however,
I should not extend the obligation to information as to
the customer obtained after he had ceased to be customer.
Speaking for myself, I find little assistance from con-
sidering the implications that have been found by the
Courts to arise from contracts in other occupations and

486                    KING'S BENCH DIVISION.                [1924]

C. A.
1923

TOURNIER
v.
NATIONAL
PROVINCIAL
AND UNION
BANK OF
ENGLAND.

Atkin L.J.

professions, such as those of solicitors or doctors. The limitation of the implied term must vary with the special circumstances peculiar to each class of occupation. On the other hand, it seems to me clear that there must be important limitations upon the obligation of the bank not to divulge such information as I have mentioned. It is plain that there is no privilege from disclosure enforced in the course of legal proceedings. But the bank is entitled to secure itself in respect of liabilities it incurs to the customer, or the customer to it, and in respect of liabilities to third parties in respect of the transactions it conducts for or with the customer. It is difficult to hit upon a formula which will define the maximum of the obligation which must necessarily be implied. But I think it safe to say that the obligation not to disclose information such as I have mentioned is subject to the qualification that the bank have the right to disclose such information when, and to the extent to which it is reasonably necessary for the protection of the bank's interests, either as against their customer or as against third parties in respect of transactions of the bank for or with their customer, or for protecting the bank, or persons interested, or the public, against fraud or crime. I have already stated the obligation as an obligation not to disclose without the customer's consent. It is an implied term, and may, therefore, be varied by express agreement. In any case the consent may be express or implied, and to the extent to which it is given the bank will be justified in acting. A common example of such consent would be where a customer gives a banker's reference. The extent to which he authorizes information to be given on such a reference must be a question to be determined on the facts of each case. I do not desire to express any final opinion on the practice of bankers to give one another information as to the affairs of their respective customers, except to say it appears to me that if it is justified it must be upon the basis of an implied consent of the customer.

As to the rest of the case based on slander, I think that this issue must also be submitted for a new trial. I do not

**1 K. B.**          KING'S BENCH DIVISION.                         487

think that it is a sufficient direction to a jury on what is
meant by "defamatory" to say, without more, that it
means : Were the words calculated to expose the plaintiff
to hatred, ridicule, or contempt, in the mind of a reasonable
man ? The formula is well known to lawyers, but it is
obvious that suggestions might be made very injurious to a
man's character in business which would not, in the ordinary
sense, excite either hate, ridicule, or contempt—for example,
an imputation of a clever fraud which, however much to be
condemned morally and legally, might yet not excite what a
member of a jury might understand as hatred, or contempt.
Speaking for myself, I also think that it is undesirable where
an issue of privilege is raised to leave a question of express
malice to be decided by the jury before the judge has ruled
whether the occasion is privileged. The judge has to deter-
mine, not only whether the occasion is privileged, but
whether the defendant has gone beyond the privilege which
the occasion creates : *Adam* v. *Ward*. (1) In the words of
Lord Loreburn : " All this is for the judge alone, and the
question of malice, which is for the jury, cannot arise till the
judge has ruled on the whole question of privilege." In
many cases, and I think this is one, the jury cannot form a
correct opinion as to what is express malice until the judge
has ruled whether the circumstances exist, as to legal or
social duty and so forth, on which the legal privilege depends ;
and if the occasion is not privileged, or has been, in fact,
exceeded, the question of express malice is irrelevant ; and I
think it is a disadvantage to the administration of justice
that questions should be asked of the jury unnecessarily
when the final decision may appear to conflict with their
answers. It is also, I think, clear that the plaintiff was
entitled to put before the jury his case that the words proved,
though not the very words pleaded, were words substantially
to the same effect. Whether this be done by amending the
pleading, by framing the question to the jury so as to raise
the point, or by directing the jury that the words pleaded
would be proved by proof of words substantially to the same

C. A.
1923

TOURNIER
*v.*
NATIONAL
PROVINCIAL
AND UNION
BANK OF
ENGLAND.

Atkin L.J.

(1) [1917] A. C. 309, 321.

488                    KING'S BENCH DIVISION.              [1924]

C. A.
1923

TOURNIER
v.
NATIONAL
PROVINCIAL
AND UNION
BANK OF
.ENGLAND.

Atkin L.J.

effect, seems to me immaterial. No slander of any com-
plexity could ever be proved if the ipsissima verba of the
pleading had to be established. There appears to me to be
ample authority in well established every day practice, and
in the decisions upon the form of interrogatories in such
cases, to support the view that I am expressing.

For the above reasons, without expressing an opinion
upon the points raised between the parties at the trial, I
come to the opinion that this appeal must be allowed,
and a new trial ordered.

*Appeal allowed.*

Solicitor for the appellant : *J. R. Cort Bathurst.*
Solicitors for the respondents : *Wilde, Wigston & Sapte.*

J. F. C.

-----

1923
*Dec.* 14, 21.

PRATT *v.* PATRICK AND OTHERS.

[1923. P. 2588.]

*Negligence—Motor Car—Negligent driving by Friend of Owner—Retention
of Control by Owner—Owner's Liability for Injury caused to third Person in
Car.*

The defendant was in his motor car, with him, on his invitation,
being two friends E. and P.  E. drove the car and, owing to his negligence,
it collided with another vehicle, and P. sustained injuries from which
he died. P.'s widow sued the defendant under Lord Campbell's Act
for damages :—
*Held,* that as the defendant was in the car, and there was no evidence
that he had abandoned his right of control, he was liable notwithstanding
that by a casual delegation he had entrusted its actual physical
management and mechanical control to E.
*Samson* v. *Aitchison* [1912] A. C. 844 applied.

FURTHER consideration by Acton J. of action tried at
Birmingham Assizes.

The plaintiff sued under Lord Campbell's Act on behalf
of herself and her four infant children for damages resulting
from the death of her husband in the following circumstances :
On May 17, 1923, the defendant Patrick was being driven in