Exhibit 6

A           **F.D.C. Co. Ltd and Others**          Plaintiffs
(Respondents)

AND

B         **The Chase Manhattan Bank, N.A.**       Defendant
(Appellant)

C                 ———
(Court of Appeal)
(Civil Appeal Nos. 65 and 131 of 1984)

D                 ———

Sir Alan Huggins, V.-P., Yang and Silke, JJ.A.
**24th-27th September and 17th October 1984.**

E

    Commercial and business law—banking—obligation of secrecy—injunction to prevent
      disclosure—whether obligation applies to Hong Kong branch of foreign bank—whether
      obligation subject to territorial limits—relationship between obligation and disclosures
      required in ordinary course of business between foreign branch and head office.

F    Courts practice and procedure—whether order of foreign court has extra-territorial effect in
      Hong Kong—principles of comity applicable.

    Conflict of laws—principles of judicial comity applicable to resolve conflict of jurisdiction
      between Hong Kong court and foreign court.

G

     The defendant Bank (the "Bank") has its head office in the U.S.A. and local branches in
Hong Kong. The plaintiffs were two Hong Kong companies and a Panama company. Each of
them held one or more accounts with the Bank in Hong Kong.
     The United States Internal Revenue Service wanted to inspect the Hong Kong bank
H   accounts of the plaintiffs in connection with an investigation into other U.S. taxpayers. The
   I.R.S. served notice on the Bank's U.S. headquarters and obtained court orders for production
of the records. The U.S: Federal District Court imposed daily fines on the Bank when it
refused to comply. When the Bank declined to give an undertaking to the plaintiffs that there
would be no disclosure of the bank records to the I.R.S. the plaintiffs applied for and obtained
I   in Hong Kong interim injunctions against the Bank to restrain disclosure pending trial. The
Bank applied to a High Court Judge to have those injunctions discharged. The application
was refused. The Bank appealed against that refusal.

J

**Held:**

1. The appeals would be dismissed. The interim injunction would not be discharged. The interest in preserving the confidence between the Bank and its customers was not outweighed by other interests to which the law attaches importance.

2. The contracts between the plaintiffs and the Bank were governed by Hong Kong law. The court was concerned here not with the relationship between a foreign bank operating in Hong Kong and its customer, but with the relationship between a bank registered in Hong Kong and a customer in Hong Kong, their relationship being governed by Hong Kong law.

3. There was an implied term imposing an obligation of secrecy upon the Bank, whereby the Bank should not divulge to third persons either the state of the customer's account or any of his transactions with the bank or any information relating to the customer acquired through the keeping of his account unless (1) the disclosure was under compulsion of law, (2) there was a public duty to disclose, (3) the interests of the bank required disclosure or (4) disclosure was made by the express or implied consent of the customer. (*Tournier v. National Provincial and Union Bank of England* [1924]1 KB 461 applied.)

4. The first exception applied only to Hong Kong law and did not include a foreign law.

5. The third exception meant only the interests of ordinary banking practice, such as when it is necessary to sue upon an overdraft or matters of that kind, and not to the case where it would be in the interests of the Bank to disclose because of a financial obligation.

6. Under the laws of Hong Kong all the banks carrying on their banking business in Hong Kong owe the same obligations to their customers irrespective of where their head offices happen to be.

7. All persons opening accounts with banks in Hong Kong, whether local or foreign banks, are entitled to look to the Hong Kong courts to enforce any obligation of secrecy which, by the law of Hong Kong, is implied by virtue of the relationship of customer and banker.

8. The Hong Kong branch of the Bank should for present purposes be considered as a different entity separate from the head office in New York. (*R. v. Grossman* (1981)73 Cr App R 302 followed.)

9. Although the orders of the U.S. courts were in fact addressed to the Bank in New York, they were aimed unashamedly at information which is within the jurisdiction of the Hong Kong courts and they were therefore intended to have extra-territorial effect.

10. The Bank's obligation of secrecy was not subject to territorial limits. The Bank could not publish the plaintiffs' accounts elsewhere either, although as a practical matter the courts of Hong Kong could not restrain production in New York.

11. Anyone opening an account in Hong Kong would anticipate that in the ordinary course of business the records containing the details of that account would be kept entirely within the office or branch at which the account was

Case 22-50073    Doc 1409-6    Filed 01/30/23    Entered 01/30/23 10:03:34    Page

CA
F.D.C. Co. Ltd. v. Chase Manhattan Bank, N.A.                    279
(Sir Alan Huggins, V.-P.)

A    opened. But there might be circumstances (for example a special investigation into a suspected fraud) in which the ordinary course of business would be extended and require that such details be sent to another office of the same bank. If the bank were a foreign bank, that might even involve sending the details out of Hong Kong.

B    12.    The Bank could not avoid its obligation of secrecy by sending details of the plaintiffs' accounts to the head office in New York, arguing that this was not a disclosure to a third person. The Bank would not be allowed to make an internal transfer of information which it would not make in the ordinary course of banking business when that transfer was designed for no other

C    purpose than to bring the information within the jurisdiction of the foreign court. The Hong Kong courts could enjoin the Bank against disclosing information to the U.S. Government in Hong Kong and could restrain a transfer which was nothing more nor less than a device to avoid the enforcement in Hong Kong of the orders of a foreign court.

D    13.    The court would not be influenced by the fact that its order might result in the Bank being in breach of the orders of the U.S. court. The Hong Kong court was not bound to hold back from enforcing the law of Hong Kong at the dictate of a foreign power.

14.    The relevant term implied in a contract between banker and customer can be

E    stated either as a positive covenant to maintain secrecy or as a negative covenant to maintain secrecy or as a negative covenant against disclosure. The effect is the same and the customer is entitled to the appropriate remedy, whether that be expressed as a mandatory injunction or as a restrictive injunction. In either case, the injunction will usually be granted even though

F    no damage is shown.

Appeals dismissed.

L. Hoffman, Q.C. and R. Tong, instructed by Denton Hall Burgin and Warrens, for the plaintiffs.

G    M. Saville, Q.C. and R. Ribeiro instructed by Johnson, Stokes and Master, for the defendant.


*Separate judgments were delivered by members of the Court of Appeal.*

H    **Cases cited in the judgments:**
Attorney General v. Mid-Kent Railway Co. & South Eastern Railway Co. (1867) LR 3 Ch App 100
British Nylon Spinners Ltd. v. Imperial Chemical Industries Ltd. [1953] Ch 19, [1954]3 All ER 88

I    British Steel Corpn. v. Granada Television Ltd. [1981] AC 1096, [1981]3 WLR 774, [1981]1 All ER 417
Comptoir Commercial Anversois and Power, re [1920]1 KB 868
Doherty v. Allman [1878]3 AC 709

Kleinwort, Sons & Co. v. Ungarische Baumwolle Industrie Aktiengesellschaft [1939]2
    KB 678, [1939]3 All ER 38
Lister v. Romford Ice & Cold Storage Co. Ltd. [1957] AC 555, [1957]1 All ER 125
Liverpool City Council v. Irwin [1977] AC 239, [1976]2 WLR 562, [1976]2 All ER 39
R. v. Grossman (1981)73 Cr App R 302
Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers
    (1958)357 US 197
Tournier v. National Provincial and Union Bank of England [1924]1 KB 461
X A.G. v. A Bank [1983]2 All ER 464, [1983]2 Lloyd's Rep 535

**Sir Alan Huggins, V.-P.:**

The plaintiff companies brought actions in which the principal relief sought was an injunction
to restrain the defendant Bank from disclosing details of their accounts with the Bank. They
then applied for, and obtained from the judge in chambers, interim injunctions to restrain
disclosure pending trial. It was against those interim injunctions that the Bank appealed. By
consent of the parties this court has agreed that:

> "1.  The hearings of the motions for an interlocutory injunction and for an order
>      discharging that injunction before Clough, J. be treated as having been the
>      trial of the action.
> 2.   The affidavits sworn on the motions be treated as evidence given at the trial
>      and the interlocutory injunction granted by the judge be treated as a final
>      injunction made at trial."

Two of the plaintiffs are companies incorporated in Hong Kong and the third is a company
registered in Panama.
    The Bank has its head office in the United States of America and maintains local branches
in Hong Kong. Each of the plaintiffs opened one or more accounts with the bank in Hong
Kong. The particulars of those accounts are not material. It is alleged by the plaintiffs that,
by virtue of the relationships of customer and banker which exist between them and the Bank,
the Bank:

> "Owes the plaintiff/s / duty of secrecy and confidence in respect of /the accounts/, or
> transactions thereto, or securities in respect thereof and all documents and
> information arising therefrom or relating thereto".

    The proceedings arose in this way. The Internal Revenue Service of the United States
Government is investigating the tax liability of a Mr. Aldo Gucci and of Gucci Shops
Incorporated. The investigators suspect that those persons are in some way unlawfully
evading the payment of tax and that inspection of the accounts of the plaintiffs would assist
the investigation. Procceedings under the relevant United States' legislation were therefore
taken against the Bank, those proceedings being served upon the head office. As a result the
Bank was ordered to disclose the plaintiffs' accounts and, upon its declining to do so, has in
respect of two of the plaintiffs been ordered to pay daily fines until compliance. When the

Case 22-50073   Doc 1409-6   Filed 01/30/23   Entered 01/30/23 10:03:34   Page

CA          F.D.C. Co. Ltd. v. Chase Manhattan Bank, N.A.          281
                        (Sir Alan Huggins, V.-P.)

A   plaintiffs first heard of the proceedings in the United States, they wrote to the Bank and sought an undertaking that there would be no disclosure. The Bank replied that it was defending the proceedings in the United States and that for the present it did not intend to produce the records demanded. However, the Bank was not prepared to give an undertaking the observance of which might constitute a breach of the United States' law. It was upon receipt
B   of this refusal that the actions were commenced in Hong Kong.

It is not in dispute that the first and fundamental issue to be decided is as to the terms of the several agreements between the plaintiffs and the Bank. As is usual when a company opens a bank account, the plaintiffs passed in respect of each account a resolution in a form prescribed by the Bank. This form was designed merely to set out the authority of the Bank to act upon
C   instructions purporting to emanate from the customer: the parties did not otherwise expressly agree any of the terms upon which they were contracting. For such terms one has to inquire what terms are implied by the domestic law of Hong Kong, it being an agreed fact that the contracts are governed by Hong Kong law. It is common ground that the terms include one imposing an obligation of secrecy upon the Bank, but it is the extent of that obligation which
D   is in issue.

On behalf of the plaintiffs Mr. Hoffman has placed great emphasis on the distinction which was drawn in two cases in the House of Lords between terms which are implied in all contracts between persons entering into a special relationship such as that of banker and customer and those which are implied in a particular contract in order to give it business
E   efficacy. The first of these cases was **Lister v. Romford Ice & Cold Storage Co. Ltd.** [1957] AC 555, where one of the issues was whether in a contract of employment between a lorry driver and his master there was an implied term that the driver would be entitled to be indemnified by his master in respect of damages payable by the driver as a result of his negligence where his master was in fact insured or was required by law to be insured or
F   where, as a reasonable and prudent person, his master ought to have been insured. It was held that no such term should be implied. In the course of his speech Lord Simonds said at p. 576:

"... the real question becomes, not what terms can be implied in a contract between two individuals who are assumed to be making a bargain in regard to a particular transaction or course of business; we have to take a wide view, for we are concerned
G   with a general question, which, if not correctly described as a question of status, yet can only be answered by considering the relation in which the drivers of motor-vehicles and their employers generally stand to each other. Just as the duty of care, rightly regarded as a contractual obligation, is imposed on the servant, or the
H   duty not to disclose confidential information (see *Robb v. Green* [1895]2 QB 315; 11 TLR 517, or the duty not to betray secret processes (see *Amber Size and Chemical Co. Ltd. v. Menzel* [1913]2 Ch 239; 29 TLR 590), just as the duty is imposed on the master not to require his servant to do any illegal act, just so the question must be asked and answered whether in the world in which we live today it is a necessary
I   condition of the relation of master and man that the master should, to use a broad colloquialism, look after the whole matter of insurance. If I were to try to apply the familiar tests where the question is whether a term should be implied in a particular contract in order to give it what is called business efficacy, I should lose myself in the attempt to formulate it with the necessary precision. The necessarily vague

evidence given by the parties and the fact that the action is brought without the  A
assent of the employers shows at least *ex post facto* how they regarded the position.
But this is not conclusive; for, as I have said, the solution of the problem does not
rest on the implication of a term in a particular contract of service but upon more
general considerations."

  B

Lord Tucker expressed the same view in these words at p. 594:

"Some contractual terms may be implied by general rules of law. These general
rules, some of which are now statutory, for example, Sale of Goods Act, Bills of
Exchange Act, etc., derive in the main from the common law by which they have  C
become attached in the course of time to certain classes of contractual relationships,
for example, landlord and tenant, innkeeper and guest, contracts of guarantee and
contracts of personal service. Contrasted with such cases as these there are those in
which from their particular circumstances it is necessary to imply a term to give
efficacy to the contract and make it a workable agreement in such manner as the  D
parties would clearly have done if they had applied their minds to the contingency
which has arisen. These are the 'officious bystander' type of case, to use
Mackinnon, L.J.'s well-known words. I do not think the present case really comes in
that category, it seems to me to fall rather within the first class referred to above."

  E

In **Liverpool City Council v. Irwin** [1977] AC 239 it was decided that in contracts of tenancy
relating to flats there was, in the absence of express provision, an implied term that the
landlord would take reasonable care to keep essential means of access in reasonable repair and
usability and that this applied to local authority lettings.

  Mr. Saville argues that this is a very different approach from that adopted in the leading  F
case on the obligation of secrecy imposed on a banker, **Tournier v. National Provincial and
Union Bank of England** [1924]1 KB 461. The plaintiff, a customer of the defendant bank,
received a cheque drawn in his favour by another customer of the same bank. Instead of
having it credited to his own account the plaintiff endorsed it to a third person, who paid it
into his account with another bank. The plaintiff's account was overdrawn and, when the  G
cheque was returned to the defendant bank, the manager inquired of the third person's bank
who the third person was. He was told that the cheque had been paid to a book-maker, and
this information was disclosed to the plaintiff's employers. The question was whether the
defendant bank was in breach of its implied obligation of secrecy. All the Lords Justices were
of opinion that it was an implied term of a contract between a banker and his customer that the  H
bank would not divulge to third persons either the state of the customer's account or any of his
transactions with the bank or any information relating to the customer acquired through the
keeping of his account unless (1) the disclosure was under compulsion of law, (2) there was a
public duty to disclose, (3) interests of the bank required disclosure or (4) disclosure was made
by the express or implied consent of the customer. The majority held that there had been a  I
breach of the defendant's obligation vis-à-vis the plaintiff, whilst Lord Justice Scrutton
thought the only breach was vis-à-vis the drawer of the cheque. However it should be noted
that Lord Justice Bankes at p. 473 said that it was not possible to frame any exhaustive
definition of the duty and warned of the necessity for caution in speaking on a question upon
which there had previously been no authority. Therefore he confined his observations to the  J

A  facts of the particular case. Lord Justice Atkin at p. 486 also spoke of the difficulty of hitting
   upon a formula which would define the maximum of the obligation which had necessarily to
   be implied. He expressed the obligation not to disclose without the customer's consent as
   being:

B          "subject to the qualification that the bank have the right to disclose such information
           when, and to the extent to which it is reasonably necessary for the protection of the
           bank's interests, either as against their customer or as against third parties in respect
           of transactions of the bank for or with their customer, or for protecting the bank, or
           persons interested, or the public, against fraud or crime."

C
   He expressly refrained from giving any final opinion on the practice of bankers to give one
   another information as to the affairs of their respective customers, "except to say ... that if it is
   justified it must be upon the basis of an implied consent of the customer". Nevertheless his
   reference to the practice of bankers seems to me a clear indication that the Lord Justice
D  thought such practice was a material consideration and that could only be on the basis that the
   parties to a banking contract were assumed to know the practice of bankers and would be
   assumed to have agreed to be contracting subject to that practice in the absence of express
   provision to the contrary. As it seems to me there is no material distinction between **Tournier
   v. National Provincial and Union Bank of England** [1924] 1 KB 461 and the later cases, and
E  where one is considering the implication of a term into a contract the basic element is always
   that the parties must necessarily be presumed to have intended to contract on the basis of the
   suggested term. That element will be present both where the term is necessary in order to give
   the contract business efficacy and also where there is some established practice which a
   person entering into that type of contract is presumed to accept.

F      In **Tournier's** case the English Court of Appeal indicated four qualifications to an
   otherwise absolute obligation of secrecy. Although Mr. Saville contends that the plaintiffs are
   seeking to widen the ambit of the resulting obligation, as it seems to me his argument seeks to
   narrow it. It does so by construing the first qualification (disclosure under compulsion of law)
   as including an order of a foreign court to produce documents which are in Hong Kong. Such
G  a construction was never within the contemplation of the judges in **Tournier's** case and in my
   view a term so construed would not be reasonable. The plaintiffs contracted with the Bank in
   Hong Kong and it was intended by both sides that the accounts would be kept in Hong Kong.
   I adopt the view of the English Court of Appeal in **R. v. Grossman** (1981) 73 Cr App R 302
   and conclude that the Hong Kong branch of the Bank should for present purposes be
H  considered as a different entity separate from the head office in New York. Anyone opening
   an account in Hong Kong would anticipate that in the ordinary course of business the records
   containing the details of that account would be kept entirely within the office or branch at
   which the account was opened. Nevertheless, he would recognize that there might be
   circumstances (for example a special investigation into a suspected fraud) in which the
I  ordinary course of business would be extended and require that such details be sent to another
   office of the same bank. If the bank were a foreign bank, that might even involve sending the
   details out of the Colony, but, as it seems to me, that is the only relevance of the fact that the
   defendant Bank here has its head office in the United States of America. Clearly the
   obligation of secrecy is not subject to territorial limits, thus permitting the Bank to publish the

plaintiff's accounts anywhere but in Hong Kong. Had the Bank in the ordinary course of    A
business sent details of the plaintiffs' accounts to its head office in the United States of
America the Bank could not properly have volunteered information about the accounts to the
United States Government, but Mr. Hoffman concedes that he would then not have been able
properly to ask the courts of Hong Kong to restrain production in New York in the face of the
orders for production made by the United States courts. As things are, the information is not    B
in the United States of America and it is not suggested that the information is needed in the
United States of America in the ordinary course of banking business: it is required by the head
office solely for the purpose of its being disclosed to the United States Government.

Mr. Saville's argument involves the contention that, by sending details of the plaintiffs'
accounts to the head office, the Hong Kong branch would not be disclosing the information to    C
a third person and that there would therefore be no breach in Hong Kong of the duty of
secrecy which could properly be restrained by an injunction of the Hong Kong courts.
Although that argument has a superficial attraction, I do not think it can be right. I think it
would be closing our eyes to the reality of the situation to allow the Bank to make an internal
transfer of information which it would not make in the ordinary course of banking business    D
when that transfer is designed for no other purpose than to bring the information within the
jurisdiction of the foreign court. Although the orders of the United States courts are in fact
addressed to the Bank in New York, they are aimed unashamedly at information which is
within the jurisdiction of the Hong Kong courts and they are therefore intended to have
extra-territorial effect. That is the basis of the Attorney General's intervention in the    E
proceedings in the United States of America, where he has indicated that there are alternative
procedures which would be open to the United States Government and which would not
infringe the sovereignty of the Crown in right of Hong Kong. Mr. Saville argues that orders
are commonly made for discovery of documents lying within other jurisdictions, but that is a
very different thing from ordering production. The Hong Kong courts could enjoin the Bank    F
against disclosing the information to the United States Government in Hong Kong and I am
satisfied that they can restrain a transfer which is nothing more nor less than a device to avoid
the enforcement in Hong Kong of the orders of a foreign court.

It is then argued that in the exercise of our discretion we ought not to issue an injunction
which would place the Bank in the appalling situation that, if it obeyed the injunction, it    G
would be in breach of orders of the courts of its own country. I am not unsympathetic to the
difficulty in which the Bank finds itself, but the question is whether we are to treat that
difficulty as an overriding factor. In so saying I do not overlook the contention of Mr.
Hoffman that in the end the difficulty will be found to be more apparent than real because the
existing orders of the United States courts (which are under appeal) will be held to have been    H
wrongly made. For my part I am not willing to embark upon a review of the judgments upon
which those orders are founded: there is before us evidence of the United States law which is
inconsistent with those judgments, but arguments which might carry weight with me might be
viewed differently by the United States appellate courts. I am content to proceed on the
assumption that the judgments are as correct as they are presently binding. At the same time    I
we are not bound to hold back from enforcing the law of Hong Kong at the dictate of a foreign
power: see **British Nylon Spinners Ltd. v. Imperial Chemical Industries Ltd.** [1953] Ch
19, 27. Like Lord Evershed, M.R. I do not conceive that I am offending in any way the
principles of comity which apply between the two countries. All persons opening accounts
with banks in Hong Kong, whether local or foreign banks, are entitled to look to the Hong    J

A   Kong courts to enforce any obligation of secrecy which, by the law of Hong Kong, is implied by virtue of the relationship of customer and banker. The obligation is implied for the very reason that it is fundamental to that relationship. Mr. Hoffman submits that on the principles stated in **Doherty v. Allman** (1878)3 AC 709 by Lord Cairns, L.C. the plaintiffs are entitled as of right to an injunction. He said at p. 720:

B
    "If parties, for valuable consideration, with their eyes open, contract that a particular thing shall not be done, all that a Court of Equity has to do is to say, by way of injunction, that which the parties have already said by way of covenant, that the thing shall not be done; and in such case the injunction does nothing more than give
C   the sanction of the process of the Court to that which already is the contract between the parties. It is not then a question of the balance of convenience or inconvenience, or of the amount of damage or of injury - it is the specific performance, by the Court, of that negative bargain which the parties have made, with their eyes open, between themselves."

D
    Mr. Saville replies that the undertaking to maintain secrecy is a positive covenant and not a negative covenant. The relevant term implied in a contract between banker and customer can be stated either as a positive covenant to maintain secrecy or as a negative covenant against disclosure. The effect is the same and the customer is entitled to the appropriate remedy,
E   whether that be expressed as a mandatory injunction or as a restrictive injunction. In either case the injunction will usually be granted, even though no damage is shown, although in special circumstances the court may refuse an injunction and award damages in lieu under the power now granted to it by statute. That is in accordance with the previous Chancery practice stated by Lord Cairns, L.C. in **Attorney General v. Mid-Kent Railway Co. & South**
F   **Eastern Railway Co.** (1867) LR 3 Ch App 100, 103:

    "It is true that in many cases where the injury has been trifling, where there has been improper delay, or where the injury is transitory, this Court has left the complainant to his remedy at law".

G
    I accept that the court has to decide in the particular circumstances of this case whether the interest in preserving the confidence between the Bank and its customers "is outweighed by other interests to which the law attaches importance": **British Steel Corporation v. Granada Television Ltd.** [1981] AC 1096, 1169A. I am not persuaded that it is.
H   I would dismiss the appeal.


    **Yang, J.A.:**

I   I too would dismiss the appeal for the reasons stated in the learned Vice President's judgment. There are just three points I would like to add.
    Firstly, I have no doubt that under the laws of Hong Kong all the banks carrying on their banking business in Hong Kong owe the same obligations to their customers irrespective of where their head offices happen to be. It cannot be the law that a bank with its head office in

New York has a somewhat different relationship with its customers to that of a bank with its    A
head office in say Paris or Tokyo, unless some specific agreement is otherwise reached
between the two parties to govern their respective rights and obligations. A customer opening
an account with any bank in Hong Kong is entitled to assume that the usual rules about
confidentiality as stated in **Tournier's** case apply. He might well have chosen to bank in
Hong Kong rather than somewhere else because of the protection our banking law offers him    B
by insisting that the bank should keep any information about him confidential. There is no
reason for him to suspect that the extent of such confidentiality might vary from bank to bank
depending on where its head office is located. What we are concerned with here is not, as Mr.
Saville put it, the relationship between a foreign bank operating in Hong Kong and its
customer. The relationship under consideration is between a bank registered in Hong Kong    C
and a customer in Hong Kong, their relationship being governed by Hong Kong law.

Secondly, it is worth citing **Kleinwort, Sons & Co. v. Ungarische Baumwolle Industrie
Aktiengesellschaft** [1939]2 KB 678 where du Parcq, L.J. said (at p. 699):

> "I do not say for a moment that a sovereign state may not legislate to control the acts    D
> of its subjects beyond its borders. Of course it may. Nothing can prevent a
> sovereign state from so legislating, and it is a matter with which these Courts have
> no concern. But it is right that it should be understood that, if a sovereign state
> legislates so as to interfere with the acts of its subjects outside its own territory and,
> in a sense, its own jurisdiction, then it cannot expect - and I suppose that no state    E
> would expect - that the courts of another country will enforce that legislation at the
> expense of their own laws. Primarily it is our business to see that English contracts
> are observed and carried out according to English law."

Mr. Hoffman argues that our case is a dispute between Hong Kong courts and United States    F
courts. With respect to him, I do not see the problem quite in that light. The question is
simply one of applying our own law in our own courts.

Thirdly, the facts of **R. v. Grossman** (*supra*) are so apposite that it might be useful to refer
to them at some length, though for the purpose of the present case I need not go further than
repeating the headnote of the report:                                                         G

> "By s. 7 of the Bankers' Books Evidence Act 1879: 'On an application of any party
> to legal· proceedings a court or judge may order that such party be at liberty to
> inspect and take copies of any entries in a banker's book for any of the purposes of
> such proceedings. An order under this section may be made either with or without    H
> summoning the bank or any other party and shall be served on the bank three clear
> days before the same is to be obeyed, unless the court or judge otherwise directs.'
>
> G was charged before a Welsh magistrates' court with offences involving tax
> evasion. The Revenue required evidence that G had deposited money with a
> company, J.B.K., with whom he had connections, in a Manx bank, S.I.B., which held    I
> a numbered account at a branch of an English bank in the Isle of Man. Accordingly,
> the Revenue applied for an order to inspect the relevant entries in the numbered
> account under s. 7 of the Bankers' Books Evidence Act 1879. It was addressed to
> the London headquarters of the English bank and S.I.B. were informed of that fact.
> S.I.B. obtained an injunction in the Isle of Man restraining the English bank from    J

A    disclosing or permitting inspection of the numbered account aforesaid. The Revenue
     then decided to apply to the English courts under the Act of 1879 to facilitate the
     proceedings in Wales and sought an order from an English High Court judge
     addressed to the English bank's London address. The application was made *ex parte*
     and the judge granted it, permitting thereby the inspection by the Revenue of the
B    S.I.B. account relating to J.B.K. S.I.B. sought to set aside that order by applying for
     leave to be joined as a party to the proceedings and then appealed to the Court of
     Appeal to have the judge's order set aside.
         Held, that in criminal matters an order can be made under s. 7 of the Bankers'
     Books Evidence Act 1879 for inspection of the account of a bank's customer even
C    though he is not a party to the proceedings; but only in exceptional circumstances. It
     was important that the Court should respect the confidence of a bank account and
     only if the public interest in helping the prosecution outweighed the private interest
     of confidentiality should inspection be ordered. In the instant case as the English
     bank's branch in the Isle of Man was subject to Manx law and regulations it was to
D    be considered as a different entity from its headquarters branch in London; thus it
     should be considered as a foreign bank and, therefore, not subject to the Court's
     jurisdiction. Accordingly, the Court in its discretion, should not order the English
     bank's head office to produce the documents in question, although it could be done.
     The judge's order should be discharged."
E
         It is interesting to note how the English court viewed the English bank in the Isle of Man
     with its head office in London: a situation which might be compared with the position of
     Chase in Hong Kong with its head office in New York.

F
     **Silke, J.A.:**

     On 28th January 1984 there were issued three writs with statement of claim endorsed. The
     first by F.D.C. Co. Ltd. - "F.D.C." - the second by Garpeg Ltd. - "Garpeg" - and the third by
G    Vanguard International Manufacturing Inc. - "Vanguard". I shall refer to these entities
     generally as "the companies". The defendant in each case was Chase Manhattan Bank N.A. -
     "Chase". Each sought, *inter alia*, injunctive relief.
         The injunction sought was in these terms:

H        "An injunction to restrain the defendant whether by itself, its servants or agents or
         otherwise howsoever from producing, passing or divulging or causing to produce,
         pass or divulge to the head office of or to any other office or branch of the defendant
         out of the jurisdiction or to any person including but not limited to the CIR or the
         IRS of the United States Government or otherwise to remove or cause to be removed
I        from the jurisdiction any document, record or information arising from or relating in
         any way whatsoever to the first and second accounts or any of them maintained by
         the defendant in the name of the plaintiff within the jurisdiction, any transactions
         thereon or connected therewith or any securities in respect thereof."

On 30th January 1984 F.D.C. and Garpeg filed summons seeking an interim injunction. On   A
22nd February 1984 Vanguard filed a similar summons. Mayo, J. granted *ex parte* injunctions
in favour of Garpeg and F.D.C. on 30th January, and a further *ex parte* injunction in similar
terms was obtained from Mayo, J. by Vanguard on 14th February.

Garpeg and F.D.C. are both companies incorporated and having their registered office and
place of business in Hong Kong. Vanguard is a company incorporated in Panama and having   B
a registered office and its place of business in Hong Kong. All three are customers of Chase
maintaining various accounts at a Hong Kong branch of that Bank. It is agreed that the banker
customer contracts are governed by Hong Kong law.

The *inter partes* hearing took place before Clough, J., who made an order continuing the
injunctions, until the trial or further order, on 3rd April 1984. He gave his reserved reasons on   C
24th April. Notice of appeal against his orders was filed by Chase on 17th April.

On 30th July Chase, as the result of matters which had taken place in the United States and
to which I shall refer in a moment, applied to Clough, J. for an order discharging the
injunctions on the ground of change of circumstance. On 7th August Clough, J. refused the
application. A notice of appeal was filed on the same day against that refusal.   D

By consent before us, it was agreed:
(1) that the hearings of the motions for interlocutory injunction and for an order
    discharging that injunction before Clough, J. be treated as having been the trial of the
    action.
(2) the affidavits sworn on the motions be treated as evidence given at the trial and the   E
    interlocutory injunction granted by the judge be treated as a final injunction made at
    trial.

This was an eminently sensible course in that there was no further evidence to be adduced
and all relevant matters were before Clough, J. If we were to accede to the course agreed by
counsel, the delay which would be necessitated by a trial and possible subsequent appeal   F
would be obviated. We agreed that we should take this course and that we should treat this
appeal as an appeal from a final order.

These proceedings stem from the investigations of the Internal Revenue Service of the
United States - "I.R.S." - into the affairs of Gucci Shops Inc. and of Mr. Aldo Gucci. The
I.R.S. claim that the three companies in Hong Kong are really the creature of Aldo Gucci and   G
Gucci shops and that they have been used as conduits for income of the Gucci interests in
order to evade United States tax liability. I do not think it necessary to go into the background
of that belief in any detail.

Following on that belief and in order to further its investigations, the I.R.S. issued summons
under the relevant United States legislation to Chase requiring it to produce bank records,   H
documents and information relating to dealings with Gucci and Aldo Gucci. The summons
covers such matters both in the possession of Chase in the United States and in Chase's
possession in its branches or head office in Hong Kong and relates directly to accounts
maintained by the companies with Chase. The dates of those summonses were, in respect of
Garpeg and F.D.C., 19th December 1983 and, of Vanguard, 22nd August 1983.   I

The companies, becoming aware of the possibility of the issue of such summonses, wrote to
Chase seeking an undertaking that Chase would not disclose any information to any agency or
department of the United States Government relating to themselves or their accounts. In
reply, Chase informed the companies that they had no present intention of producing any such   J

A    records from Hong Kong but could not give an assurance that such records would not be
     produced in the future.
         Proceedings for enforcement and matters ancillary thereto took a somewhat convoluted
     path before the United States courts. It is normal procedure, when persons fail to comply with
     an I.R.S. summons of this nature, that the Attorney General of the United States makes
B    application to a District Court, a Superior Court in the Federal System, for an order enforcing
     the summonses. Such proceedings were begun in the Second Circuit in the New York District
     Court. Both Chase and the companies intervened in those proceedings as they were entitled to
     do.
         On 27th March 1984 Goettel, D.J. made an enforcement order in respect of the F.D.C.
C    account. Chase has appealed this enforcement order.
         On 23rd March 1984 Sweet, D.J. made a similar enforcement order in respect of the Garpeg
     account, cutting down to some extent the width of the I.R.S. summons. Both Garpeg and
     Chase have appealed against this order.
         On 6th July 1984 Sweet, D.J. made an enforcement order in respect of the Vanguard
D    accounts. That order has also been appealed by both Chase and Vanguard.
         On 7th June 1984, subsequent to the *inter partes* hearing on the interlocutory injunctions in
     Hong Kong, the Attorney General of the United States filed motions for contempt orders
     against Chase for its failure to comply with the enforcement orders as to the Garpeg and
     F.D.C. accounts.
E        On 10th July 1984, after a contested *inter partes* hearing, Sweet, D.J. adjudged Chase to be
     in contempt on the Garpeg account summons and fined Chase the sum of US$10,000 per day.
     The order as to the fine has been stayed. It was this contempt order which led to the
     application by Chase before Clough, J. to discharge the injunctions.
         On 16th August 1984, again after a contested *inter partes* hearing, Goettel, D.J. adjudged
F    Chase in contempt for non-compliance with the F.D.C. summons and imposed upon Chase a
     fine of US$5,000 per day. Again, the order has been stayed.
         All the several appeals in the United States are pending and it is worthy of comment that
     the Crown, with the consent of all parties, has submitted an *amicus curiae* brief and it will
     seek to be represented before the United States courts at the hearing of the consolidated
G    appeals - that is the consolidated appeal against the Garpeg and F.D.C. enforcement orders.
         The enforcement orders made by the United States District Court are final and conclusive
     orders. They can only be altered by an appellate court. The contempt orders are also final and
     conclusive though they also may be altered upon appeal.
         It will be seen from this brief resume of matters which occurred prior to the hearing of this
H    appeal that Chase are in a very difficult position. They are caught between the upper
     millstone of the injunctive orders made in Hong Kong and the nether one of the orders made
     in their jurisdiction of domicile. They have involved themselves, and very properly so, in the
     proceedings both in these courts and in the foreign court. They have undoubtedly incurred
     considerable expenses in so doing.
I        The issue here is the scope of the implied contract of confidentiality existing as between a
     banker and a customer. It is not contested that such a term is implicit in the relationship of
     banker and customer and that must be so.
         Chase, represented by Mr. Saville, Q.C. with him Mr. Ribeiro, contends that there could
     never have been in the contemplation of the parties at the time when they entered into the

relationship which exists between them a term so wide so that it would extend confidentiality   A
to documents in the possession of a United States bank in defiance of an order of a United
States Court.

Mr. Saville has, in a very interesting argument, submitted that the test to be applied as to
the existence and scope of such an implied term is the specific one - necessity. He further
submits that even if the term is as wide as that sought by the companies, then the performance   B
by Chase of its obligation has in the United States become unlawful and the Bank is thus
excused. If we are against him on his general propositions he advances the further argument
that the scope of the injunction sought should be narrowed and, further, that in any event this
is not a suitable case for the Court to give injunctive relief to the companies.

Mr. Hoffman, Q.C., with him Mr. Tong, who represents the companies, argues for a   C
general, not a specific, test of that which is the scope of the implied term - the distinction
being between a specific term which the court must be satisfied was necessarily within the
contemplation and intention of the parties at the time of their entry into the contract as
contrasted with a general implied term which is a part of the general law and may or may not
necessarily have been in contemplation. I accept that where such distinction is made different   D
principles apply as to the test of the existence of such a term.

Generally, on an implied term, we have been referred by counsel to **Tournier v. National
Provincial and Union Bank of England** which is the *locus classicus* on the matter. It is only
necessary for me to refer to that portion of the headnote at p. 461 which says:

E

"It is an implied term of the contract between a banker and his customer that the
banker will not divulge to third persons, without the consent of the customer express
or implied, either the state of the customer's account, or any of his transactions with
the bank, or any information relating to the customer acquired through the keeping
of his account, unless the banker is compelled to do so by order of a court, or the   F
circumstances give rise to a public duty of disclosure, or the protection of the
banker's own interests requires it."

And, further, to that which Bankes, L.J. said at p. 471:

G

"At the present day I think it may be asserted with confidence that the duty is a legal
one arising out of contract, and that the duty is not absolute but qualified. It is not
possible to frame any exhaustive definition of the duty. The most that can be done is
to classify the qualification, and to indicate its limits."

H

That succinctly expresses the position.

Mr. Saville has laid great stress upon the actions of the United States courts and the effect
of those actions upon the United States national - Chase being an American bank and
domiciled in that country.

The Second Circuit District Court in New York saw fit to make the orders they did in full   I
knowledge of the Hong Kong proceedings and certainly, in the contempt hearings, with
knowledge of the judgment of Clough, J. I would expressly refrain from entering into that
which was graphically described by Mr. Hoffman as "a game of judicial chicken" as between
these courts and the courts of a foreign jurisdiction. It would be for the United States courts to

J

Case 22-50073   Doc 1409-6   Filed 01/30/23   Entered 01/30/23 10:03:34   Page

CA                           F.D.C. Co. Ltd. v. Chase Manhattan Bank, N.A.                    291
                                            (Silke, J.A.)

A  take whatever measures they think fit to grant relief to its own national in its own courts. I
   think it would be quite wrong for us to seek to in any way interfere with their jurisdiction.
       I would make but this one comment. It seems a little strange that: (a) in the light of the
   evidence as to foreign law before us and of the law to which Leggatt, J. made reference in **X**
   **A.G. v. A Bank** [1983]2 All ER 464 (b) in the light of the restatement cited by Sweet, D.J. in
B  his opinion in the contempt proceedings which reads:

           "Section 420(2) :
           If disclosure of information located outside the United States it is prohibited by a
           law or regulation of the State in which the information or prospective witness is
C          located.
           (a)  the person to whom the order is directed may be required by the court to make a
                good faith effort to secure permission from the foreign authorities to make this
                information available;
           (b)  the court may not ordinarily impose the sanction of contempt, dismissal or
D               default on the party that has failed to comply with the order for production,
                except in cases of deliberate concealment or removal of information or of
                failure to make a good faith effort in accordance with paragraph (a) ...."
           *(Restatement (proposed) of Foreign Relations Law of the United States*
           *(Revised)*(Tent. Draft No. 3, 15th March 1982))
E
   adopted or not by the Second Circuit; (c) in the light of the decision of the United States
   Supreme Court in **Societe Internationale Pour Participations Industrielles et**
   **Commerciales, S.A. v. Rogers** (1958)357 US 197, Sweet, D.J. should, in the contempt
   proceedings, have held that because "foreign compulsion" and "good faith" had been raised in
F  the course of the enforcement proceedings, they were not therefore available to Chase as a
   defence in the contempt proceedings.
       Whether the United States courts do or do not wish to place that which appears to be an
   intolerable burden on an American bank operating outside the confines of the United States is
   of course entirely a matter for those courts.
G      It seems to me that our considerations here are in the context of a banker customer
   relationship existing in Hong Kong between customers in Hong Kong and a bank in Hong
   Kong. This is the relevant matter for the purposes of the laws of Hong Kong and in that
   compendious description I include that which is the basis of all law, the common law, and
   such statutes as may exist. Chase is, in this context, a Hong Kong bank.
H      If the documents, the production of which is now sought by the I.R.S., not from the
   taxpayer being investigated but from third parties, had already been within the jurisdiction of
   the American courts then the position might very well be different. But we are called upon to
   make a decision in the context of the facts as they now exist. The documents are in Hong
   Kong and have been here prior to the institution of these proceedings. Whether one tests the
I  implied term by the specific test of Mr. Saville or the general test of Mr. Hoffman, in my
   judgment that confidentiality which would have been, and indeed must have been, in the
   contemplation of the parties at the time when they entered into this contract would have been
   a non-disclosure to third parties in and out of Hong Kong unless one of the exceptions in
   **Tournier** applies.

Mr. Saville has said that the "legal compulsion" exception is the compulsion of American   A
law - the domiciliary law - which would excuse Chase's compliance with its implied
contractual obligations. It is also his contention, though not made with the same strength, that
the interests of the Bank necessitate disclosure.

On the first point, it is implicit in the judgment of my Lord Vice-President that compulsion
of law does, and in particular in the circumstances here must, relate to the compulsion of Hong   B
Kong law and I agree. While I fully accept that the financial implication of this and of the
foreign proceedings, on the face of it, would suggest that it would be in the interests of the
Bank to disclose and therefore to excuse them under a **Tournier** exception from the
performance of their obligation, I do not read that exception to be in reality such cover. It
must mean in the interests of ordinary banking practice, such as when they find it necessary to   C
sue upon an overdraft or matters of that kind. The issues here are very much wider than those
narrow interests of the Bank as I see them to be.

We are not directly concerned and I do not intend to deal with the issue of the enforcement
of foreign revenue proceedings in this jurisdiction. There might well be further argument on
this aspect in other applications and it might well be that such enforcement could be a   D
complete bar. But that is by the way.

In **Tournier**, Scrutton, L.J. at p. 480 referred to **In re Comptoir Commercial Anversois
and Power** [1920]1 KB 868 a decision upon which Mr. Saville relies and said of it:

> "The contract is alleged in the claim as 'implied', and according to the decision of   E
> this Court in *In Re re Comptoir Commercial Anversois and Power*, implied terms are
> a question of law for the Court, the jury finding such facts as are necessary or
> material to enable the Court to judge of the implication. The Court will only imply
> terms which must necessarily have been in the contemplation of the parties in
> making the contract. Applying this principle to such knowledge of life as a judge is   F
> allowed to have, I have no doubt that it is an implied term of a banker's contract
> with his customer that the banker shall not disclose the account, or transactions
> relating thereto, of his customer except in certain circumstances."

I have no doubt at all that in the circumstances of this case such an implied term as I have   G
indicated necessarily exists and I do not think there are any circumstances on the evidence
before us which would dilute it. I equally have no doubt that the terms of the injunction
sought are not too wide. For to allow Chase now to transfer any of the records or documents
sought by the Internal Revenue Service to their Headquarters in the United States whether in
the course of normal banking practice or not, would be to violate the confidentiality which   H
exists as between Chase in Hong Kong and its customers in Hong Kong.

Hong Kong law is the *lex loci solutionis*. The performance of its contract by Chase is in
Hong Kong. There is no order in Hong Kong compelling disclosure, indeed quite to the
contrary.

I am in respectful agreement with the order proposed by my Lord Vice President. I too   I
would dismiss the appeals.

*Appeals dismissed.*

                                                                    M.T.D.         J