Exhibit 7

I would accordingly uphold the lessor's submission, affirm the judgment of the deputy judge and dismiss the appeal.                                                                       *a*

**KERR LJ.** I agree; there is nothing I wish to add.

*Appeal dismissed.*

Solicitors: *Richard Southern* (for the sureties); *Slowes* (for the lessor).                     *b*

Diana Brahams    Barrister.

# X AG and others v A bank                                                        *c*

QUEEN'S BENCH DIVISION (COMMERCIAL COURT)
LEGGATT J
24, 25, 26, 27 JANUARY 1983

*Conflict of laws – Contract – Proper law of contract – Swiss company having account with*   *d*
*London branch of New York bank – Relationship between bank and customer commencing in*
*London – Whether proper law of banking contract English law or New York law.*

*Conflict of laws – Foreign order – Enforcement – New York subpoena – Swiss company having*
*account with London branch of American bank – New York court issuing subpoena against bank*
*to produce documents relating to company held by London branch of bank – Production of*   *e*
*documents likely to constitute breach of banking contract and breach of bank's duty of confidentiality*
*– Whether private interest of confidentiality between banker and customer should prevail over*
*duty of disclosure to foreign court – Whether court should restrain bank from disclosing documents.*

*Injunction – Balance of convenience – Bank – Confidential information between bank and customer*
*– Bank seeking to comply with foreign subpoena to produce in foreign court documents belonging*   *f*
*to customer – Disclosure of documents likely to harm customer beyond adequate compensation –*
*Bank fearing it would be liable to proceedings in foreign court for contempt of court if documents*
*not produced – Whether court should grant injunction restraining bank from complying with*
*subpoena.*

The plaintiffs, X, a multinational corporation incorporated under Swiss law and based in   *g*
Switzerland, and Y, an American subsidiary of X incorporated in Switzerland but having
a major branch in New York, were both companies concerned in the marketing of oil,
metals and fertilizers. X conducted its business wholly outside the United States and all
its books and records were kept in Switzerland. Y handled business emanating from and
destined for New York, but its other business was operated from Switzerland. Both
plaintiffs had accounts with the London branch of the defendant, an American bank,   *h*
that branch being used for a major part of the plaintiffs' general banking operations. In
1977 investigations were commenced by the United States Department of Justice into
the crude oil industry as a result of which the investigators wished to produce before a
federal grand jury documents belonging to the plaintiffs. When the plaintiffs refused to
produce certain documents, on the ground that they were not subject to the jurisdiction
of the United States courts, a subpoena was served on the bank to produce all documents   *j*
relating to any accounts maintained by the plaintiffs at the bank's London branch. The
bank declared its intention to comply with the subpoena, whereupon the plaintiffs
sought and were granted injunctions in the High Court to restrain the bank from
producing the documents, on the grounds that if the bank were to produce the
documents it would thereby be in breach of the duty of confidentiality it owed to the

*a*  plaintiffs. An order was then obtained in the New York District Court, ex parte and in camera, requiring the bank to comply with the subpoena. In proceedings by the plaintiffs to continue the injunction, the bank conceded that it was under a duty of confidentiality towards the plaintiffs and that disclosure of the documents under the subpoena would constitute a breach of that duty but it claimed that the subpoena required the production of all bank records over which the bank had control regardless of their location and that if the bank failed to comply with the subpoena it would, as a United States corporation,

*b*  be subject to proceedings for contempt of court in the United States. The bank contended (i) that the proper law of the banking contract was New York law and therefore, since New York law governed both the subpoena and the contract, the order of the New York court relating to the subpoena should prevail over the contract, (ii) that, as a matter of law, an English court would not compel performance of, or enforce, a contract if performance of the contract required the doing of an act which violated the law of the

*c*  place of performance, at least where the person required to do the act was resident in or amenable to the law of the place of performance, and therefore, since the contract was to be performed at least partly in New York, an English court would not compel the bank to perform its contractual obligation of confidentiality to the plaintiffs when to do so violated the law of New York, (iii) that an English court would not prevent a party to a contract from doing an act in the place where the contract was to be performed when

*d*  that party was obliged to do that act by the law of that place, and that as a matter of policy an English court should decline to impede legitimate proceedings in other jurisdictions or orders (such as the subpoena) issued in the course of such proceedings when directed to a person within the jurisdiction of the foreign court, and that the primary effect of the United States order was in New York and only incidentally in London, (iv) that the public policy of respecting the order of a foreign court should prevail over requiring a banker

*e*  to preserve confidentiality in relation to his customer's accounts and dealings, and (v) that in any event the subpoena should prevail over the duty of confidentiality because the bank had a genuine and legitimate interest of its own in obeying a subpoena issued under the law of the country to which it was subject and avoiding the genuine and not unreasonable possibility of being held in contempt of court.

*f*  **Held** – (1) Since instructions in relation to the plaintiffs' bank accounts were received and acted on in London, since the relationship of banker and customer was centred in London and since the plaintiffs had contemplated that their transactions with the bank would be governed by English law, it followed that English law was the proper law of the banking contract between the plaintiffs and the bank, not only because the branch with which the contracts were originally made was in London, but because that was

*g*  where the relationship began and where the contract was made in circumstances such that the contract was to be taken to have had English law as its proper law from its inception (see p 474 *h* to p 475 *b*, post).

(2) It did not follow from the fact that the production of the documents had been ordered to be made in New York pursuant to the subpoena that confidentiality on the part of the bank could be said to have been rendered unlawful in New York, because a

*h*  subpoena requiring disclosure was to be contrasted with legislation or a judgment requiring disclosure, since failure to produce the documents might be excused if an adequate excuse was produced and, furthermore, the subpoena and the subsequent order had been obtained without any form of hearing on the merits or inter partes (see p 475 *g* to *j*, p 476 *a* and p 480 *e f*, post).

(3) In determining whether the injunctions should be continued the court had to

*j*  determine the balance of convenience, having regard to (a) the fact that the order of the New York court would take effect in London in breach of both a private interest, namely a contract between a banker and a customer, and the public interest in maintaining the obligation of confidentiality imposed on banks conducting business in the City of London, (b) the effect of the subpoena of the New York court and the fact that under the United States doctrine of foreign government compulsion the New York court would

not hold the bank liable in contempt for complying with an injunction issued by a
foreign court (ie the English court) which had jurisdiction over the branch where the
documents were located (ie London) and would treat the English injunction as being an *a*
adequate excuse for the non-production of the documents, (c) the fact that, although the
court would not be 'enforcing' a foreign revenue or penal law if the New York subpoena
was permitted to be enforced in London, nevertheless the mere fact of not impeding the
subpoena would involve a measure of assistance and approbation of the subpoena since,
in particular, it would involve the court tolerating a breach of that obligation of *b*
confidentiality which in the ordinary course it would maintain in the public interest,
and (d) the fact that there was no evidence that delay in producing the documents caused
by continuing the injunctions would be significant. Accordingly, the balance of
convenience was between, on the one hand, impeding the New York court in the exercise
in London of powers which, by English standards, were excessive without in so doing
causing detriment to the bank, and, on the other hand, causing very considerable *c*
commercial harm to the plaintiffs by not continuing the injunctions. In the circumstances
the balance of convenience clearly favoured the plaintiffs and accordingly the injunctions
would be continued (see p 471 *e f*, p 473 *a b d* and *h j*, p 474 *e* to *g*, p 476 *j* to p 477 *b*,
p 478 *c* to *e* and *j* and p 479 *a* to *d* and *j* to p 480 *d* and *f g*, post); *American Cyanamid Co v
Ethicon Ltd* [1975] 1 All ER 504 applied; *Tournier v National Provincial and Union Bank of
England* [1923] All ER Rep 550, *British Nylon Spinners Ltd v Imperial Chemical Industries Ltd*
[1952] 2 All ER 780, *Regazzoni v K C Sethia (1944) Ltd* [1957] 3 All ER 286, *Rio Tinto Zinc *d*
Corp v Westinghouse Electric Corp* [1978] 1 All ER 434 and *British Steel Corp v Granada
Television Ltd* [1981] 1 All ER 417 considered.

**Notes**

For jurisdiction of the court to grant injunctions to restrain enforcement of a foreign
judgment, see 8 Halsbury's Laws (4th edn) para 730, and for cases on the subject, see 11 *e*
Digest (Reissue) 641–642, 1747–1753.

**Cases referred to in judgment**

*American Cyanamid Co v Ethicon Ltd* [1975] 1 All ER 504, [1975] AC 396, [1975] 2 WLR
316, HL.
*British Nylon Spinners Ltd v Imperial Chemical Industries Ltd* [1952] 2 All ER 780, [1953] Ch *f*
19, CA.
*British Steel Corp v Granada Television Ltd* [1981] 1 All ER 417, [1981] AC 1096, [1980] 3
WLR 774, Ch D, CA and HL.
*Cable (Lord), Re, Garratt v Waters* [1976] 3 All ER 417, [1977] 1 WLR 7.
*Kleinwort Sons & Co v Ungarische Baumwolle Industrie AG and Hungarian General Creditbank*
[1939] 3 All ER 38, [1939] 2 KB 678, CA. *g*
*NWL Ltd v Woods, NWL Ltd v Nelson* [1979] 3 All ER 614, [1979] 1 WLR 1294, HL.
*Ralli Bros v Compañia Naviera Sota y Aznar* [1920] 2 KB 287, [1920] All ER Rep 427, CA.
*Regazzoni v K C Sethia (1944) Ltd* [1957] 3 All ER 286, [1958] AC 301, [1957] 3 WLR 752,
HL; *affg* [1956] 2 All ER 487, [1956] 2 QB 490, [1956] 3 WLR 79, CA.
*Rio Tinto Zinc Corp v Westinghouse Electric Corp, RTZ Services Ltd v Westinghouse Electric
Corp* [1978] 1 All ER 434, [1978] AC 547, [1978] 2 WLR 81, HL. *h*
*Tournier v National Provincial and Union Bank of England* [1924] 1 KB 461, [1923] All ER
Rep 550, CA.
*US v First National City Bank* (1968) 396 F 2d 897.

**Interlocutory applications**

By writs issued on 15 and 22 November 1982, the first plaintiffs, X AG, and the second *j*
plaintiffs, Y AG, severally brought actions against the defendants, an American bank,
seeking a declaration that by virtue of the contract between the plaintiffs as customer and
the branch of the defendants as bank, the defendants owed the plaintiffs a duty of secrecy
and confidence in respect of the plaintiffs' accounts with the branch, all transactions
thereon, all securities in respect thereof and all documents and information relating

*a* thereto, and an injunction restraining the defendants by themselves, their servants or agents or otherwise howsoever from passing to the head office of or to any other office or branch of the defendants or to any person any information or documents relating in any way whatsoever to any accounts maintained by the defendants in the name of the plaintiffs in London, any transactions thereon or connected therewith or any securities in respect thereof. By a writ issued on 19 November 1982 the third plaintiffs, Z Inc, sought an injunction in similar terms. On 25 November 1982 Lloyd J granted ex parte the

*b* injunctions sought and on 20 December 1982 they were renewed by Mustill J. The proceedings were adjourned for the hearing of full argument by the parties. The applications were heard in chambers but judgment was given by Leggatt J in open court. The facts are set out in the judgment.

*Peter Cresswell* and *Ali Malek* for the first and second plaintiffs.
*c* *Jonathan Hirst* for the third plaintiffs.
*Andrew Longmore* for the bank.

**LEGGATT J.** There is before me an application in each of three actions. At the request of the parties, this judgment is given in open court. This is another of those cases in this *d* court in which felicity must give way to celerity, in which the urgency of the matter must outweigh the desirability of reserving judgment in deference to the importance which both sides understandably ascribe to it. I shall refer to each of the plaintiffs by initials, arbitrarily selected, that is to say as the 'X company', the 'Y company' and the 'Z company', and the defendants, who are the same in each of the three applications, I shall refer to as 'the bank'. Although I cannot direct, I shall certainly expect that that anonymity will be preserved in any report of this judgment. The bank has its head office in New *e* York and it is with the London branch of the bank that these applications are immediately concerned. The applications in the three actions have been heard together and all applications are in similar form. In short, they raise the question whether injunctions already issued should be continued to trial so as to prevent obedience by the London branch of the bank to subpoenas issued in New York requiring production by the London *f* branch of documents relating to an account of each of the three plaintiffs, who are customers of the bank, two of the plaintiffs being incorporated in Switzerland and one in Panama. The X company was formed under the laws of Switzerland in the early 1970s. It has over 40 offices located in some 30 different countries throughout the world. The Y company, which is a subsidiary of the X company, is also incorporated in Switzerland and has a major branch in New York. The Z company is a company associated with the X company, incorporated in Panama, but having its headquarters, like the X company, *g* in Switzerland. The X company and its subsidiary, the Y company, are concerned in the marketing of crude oil and oil products, ferrous and non-ferrous ores and metals, and also fertilizers. Both the X company and the Z company conduct their business wholly outside the United States; they have no presence there, that is to say no employees nor any business conducted there, and all the books of both companies, together with their *h* records, are kept in Switzerland. The Y company, on the other hand, handles business emanating from and destined for New York, but its other business is operated from its headquarters in Switzerland and, in particular, through use of its London account with the London branch of the bank. Accounts have been maintained by the plaintiffs with the bank for some time now, in the case of the X company since 1975, of the Y company since 1978 and of the Z company since 1980.

*j* The relationship enjoyed by the X company with the bank is explained in an affidavit by a gentleman who is, in effect, the company secretary of that plaintiff. He asserts that the company did not, in forming its relationship with the bank, contemplate that United States law would govern the banking relationship for the reason that, since that relationship would be centred in London, it was naturally contemplated that it would be subject to English law. It is a relationship which has grown over the years and the London branch of the bank is used by the X company for a major part of its general

banking affairs, including loans, deposits, letters of credit, guarantees, confirmations, credit references and presentments. All the instructions from the X company emanate from Switzerland or via an English subsidiary of the X company. The X company uses the London branch as its centre for worldwide dollar denominated banking arrangements and that deponent asserts, in common with those who have sworn affidavits on behalf of the other plaintiffs, that the X company would not have placed any business with the London branch of the bank unless it was confident that its business secrets would remain secure in accordance with the stringent standards observed in London. This is of particular consequence in the context of letters of credit, because the documents held in the London branch in relation to letters of credit would contain instructions received from the X company or its London subsidiary and include—

> 'the application for the credit, the terms and conditions upon which it is to be opened and paid, the terms of the underlying transaction, the buyer, the documentary conditions for the transaction, the place of presentment and expiration, and countless other commercial and proprietary items'.

It is said that the London branch files, that is to say the files of the London branch of the bank, also contain not only instructions concerned with general banking matters, investments and business facilities, but multifold data communicated to and shared with the branch in reliance on what the deponent terms 'the sanctity of the professional and confidential relationship between a customer and a bank carrying on business in London'.

In response to this aspect, an affidavit has been sworn by the general manager of the London branch of the bank. After explaining that the plaintiffs are, like many of the bank's customers, large, multinational corporations, whose banking requirements transcend national boundaries, he explains that the bank provides a co-ordinated worldwide service to its customers through its international department, so as to meet the customers' requirements. This deponent says:

> 'However complex and geographically widespread a customer's requirements may be his banking relationship with [the bank] will be subject to overall direction, co-ordination and control from a relationship manager at one location. The relationship manager is usually based at [the New York office of the bank] or at the particular location of [the bank] where the customer has its head office or main management centre.'

He concludes this passage by saying that, so far as the bank is concerned, its banking relationship with the plaintiffs is centred in New York.

With this passage I must, however, contrast the affidavit of the gentleman who appears to be the relevant relationship manager himself. He says that he is a vice-president of the bank presently assigned to the London branch and he declares: 'I am responsible for managing [the bank's] business relationship with numerous commodity customers at' the London branch, including those of the plaintiffs.

It seems to me that, by way of application of the principles described in the first affidavit sworn on behalf of the bank, it is the second deponent who is to be identified as the relationship manager and he at all events is physically present in London for most of the time, as it would appear. Whatever may be said in the affidavit of the first deponent to the effect that the bank's banking relationship with the plaintiffs is centred in New York, it seems to me that it can only be as a matter of internal administration of the bank and then only in a limited sense which does not detract from the fact that the bank maintains its own relationship manager in London.

In the main affidavit sworn on behalf of the bank, namely that of its first deponent, he says in a later passage that the plaintiffs must be fully aware of the worldwide context in which their English dealings are conducted and of their own and the bank's close connections with New York. He then says:

> 'Unlike a domestic U.K. customer of an English bank in London the plaintiffs (with the possible exception of [the Z company]) must, in my belief, have anticipated

*a*  that their dealings with [the bank] would be subjected to the necessary incidents of an overall international relationship having close connections with New York.'

I have some difficulty with that statement. First of all, it appears to me that the reference to the dealings being subject to the necessary incidents of an overall international relationship begs the question of what incidents are to be regarded as necessary, and, second, I am not sure that I understand the meaning of the phrase 'dealings ... would be subjected to the ... incidents of an overall international relationship'.

*b*  This part of the deponent's affidavit concludes by saying that in the much wider context of dealings between the bank and the plaintiffs—

'the bank must, notwithstanding its efforts and obligations to provide a full service to very valued customers, have regard to and comply with the legal obligations of the country in which it is incorporated and in which its head office is based and where its relationship with the plaintiffs is centred.'

*c*

Comment about the relationship between the bank and the plaintiffs I have already made; but it is noteworthy that in that passage there is nothing said about the bank having regard to or complying with the legal obligations of the country in which its branch is situated. Nor, indeed, is there any reference to any regard that might be paid to the welfare of the bank's customers, although it is fair to say, and I say it now, that if

*d*  there may appear in affidavits sworn on behalf of the bank to be a dearth of reference to the bank's concern for the welfare of its customers that may be, having regard to the doctrine which it is said may be material in New York, that the bank must be in a position to show that it has made what are termed 'good faith efforts' to comply with the requirements of the subpoenas served on it and too much concern for the welfare of customers might be misconstrued as a lack of good faith in the efforts being made by the

*e*  bank to do what the subpoenas require it to do.

The subpoenas are apparently the product of an investigation begun in about 1977 in the United States of the crude oil industry by various agencies there. It does not seem that the X company and its associated companies in the first instance were in any way concerned. Certain it is that no charges in consequences of any investigation undertaken over the years have ever been preferred against any of the plaintiffs. At the end of 1981

*f*  the Department of Justice in particular started an inquiry into crude oil trading of the Y company in the United States and one of the plaintiffs, I think the Y company, was served with a subpoena, in pursuance of which some 75,000 documents have been produced to the Department of Justice. But, notwithstanding the production of those documents, there was on 15 April 1982 a subpoena served on the X company, which was thereafter considered by its board. On 1 June 1982 the board, on the advice of Swiss and United

*g*  States lawyers, decided not to comply with that subpoena. The X company believed that it was not and is not subject to the jurisdiction of the United States and that for the best of all reasons: that it is not conducting any business in the United States. Proceedings were therefore instituted to quash this subpoena. On 25 August the United States District Court for the Southern District of New York refused to quash the subpoena and on 13 September the same court held the X company to be in contempt for its failure to comply

*h*  with the subpoena. On 15 October X company's appeal against the findings of the District Court was heard, but a decision on that appeal is still awaited. Meanwhile, on 8 October a subpoena had been served on the bank and it is with that subpoena that I am particularly concerned. It was followed by certain correspondence between those acting for the bank and solicitors for the plaintiffs, and, the bank having declared its intention to comply with the subpoena, injunctions were applied for. On 12 November Staughton J granted

*j*  an ex parte injunction to the X company, restraining the defendants in relation to the X company; on 26 November Lloyd J continued that injunction and granted injunctions in respect of the Y company and the Z company in similar terms; and on 20 December all three injunctions were continued by Mustill J. It seems that on the same day a subpoena was served on the Z company itself, which, for the first time, became directly implicated in the investigation. On 11 January the bank's subpoena or the effect of it was

indorsed by an order made on that day by the United States District Court for the
Southern District of New York.

*a*

It is necessary to look in a little more detail at the terms of the subpoena. It is addressed
to the bank, for the attention of 'Any officer or authorised custodian of records', and it
commands the person addressed to attend before what is called the Grand Inquest of the
body of the people of the United States of America for the Southern District of New York
'to testify and give evidence in regard to an alleged violation' of two Titles of the United
States Code, which are specified in the subpoena. I have been told that they relate   *b*
respectively to conspiracy to commit an offence or defraud the United States and to an
attempt to evade or defeat tax. The subpoena requires the person addressed to produce
what is then set out in an extensive rider. The rider reads:

> 'For the period of January 1st 1979 through December 31st 1981 [in other words
> a period of three years] any and all books, records and other documents regarding
> all accounts (including the known accounts listed below) and transactions of the   *c*
> following companies, to include, but not be limited by, all bank statements (with
> debit and credit advices), loan documents, letters of credit (including bills of lading,
> invoices, contracts and other subsidiary documents), correspondence, internal
> memoranda, signatory and/or authorisation documents'

and there are then specified the account of the X company in London, the account of the   *d*
Z company in London and the account of the Y company in London, in each case being,
presumably, the account of that company held by the bank's London branch. The
subpoena concludes by saying in its printed form that 'for failure to attend and produce
the said documents you will be deemed guilty of contempt of court and liable to penalties
of the law'.

The order of the United States District Court, Southern District of New York, which   *e*
was made on 11 January was one expressed to be in the matter of a grand jury subpoena
directed to the bank, a reference no doubt to the subpoena which I have just recited. The
order says that, the bank having been subpoenaed to appear before a federal grand jury
to produce various documents and the bank having failed to produce various records
maintained in its London branch as a result of a restraining order (as it is called) issued
by the High Court of Justice, Queen's Bench Division—   *f*

> 'and upon representation that it is necessary for the better enforcement of said
> Grand Jury subpoena, and the court being satisfied that the production of the
> documents requested by the subpoena is necessary in the best interests of justice and
> the Grand Jury investigation, it is hereby ordered and adjudged that [the bank]
> produce all the documents . . . relating to any accounts [of the X company, the Y
> company and the Z company] maintained in its London, England, branch.'   *g*

I am told that this order was obtained ex parte and in camera and there is no evidence
about what material, if any, was available to the district judge when the order was made.

The predicament in which the bank in consequence finds itself is obvious. The
subpoena is binding on it. United States law obliges the bank to comply with it. It
involves the relevant documents (when I say 'relevant' I mean relevant in the sense of   *h*
being those documents which are identified in the subpoena) being produced to the
court and there is by way of indorsement of the subpoena an express order of the court
also binding on the bank. On the other hand, there are now current in this country
injunctions prohibiting the bank from obeying that subpoena, being a subpoena
supported by the order of a competent court of the United States.

There is no dispute that the bank is subject to a duty of confidentiality. Apparently the   *j*
nature of the duty is no different in New York from the duty to which it is regarded as
subject in London. For convenience, I would describe the duty as arising from an implied
term of the contract governing the relationship of banker and customer and as being
that, subject to certain qualifications which it may be material to consider, a banker shall
not without the consent of the customer disclose to any other person any document or
other information obtained by the banker in the course of that relationship.

There is no dispute that disclosure of the documents to the grand jury would constitute

a  or create a breach of that duty. It would be so, as it appears from the evidence, not merely in the technical sense of the grand jury itself constituting a third person to whom disclosure of confidential documents would constitute a breach of that confidentiality, but also in the far wider and more material sense that, as it would appear, there is in practice no secrecy in relation to matters entrusted to grand juries. I have this on the authority of Mr Marvin Frankel, now advising the plaintiffs in New York, who himself

b  has served as a district judge there and is the author of a book entitled *The Grand Jury: An Institution on Trial* (1977). Apart from the fact that that work refers expressly to leaks which are common of material entrusted to grand juries, Mr Frankel refers in his affidavit to disconcerting matters arising in this very case, because he says that the United States attorney—

c  'sought and obtained the District Court's acceptance of a secret affidavit and documentary exhibits, characterised as decisive against [the X company's] motion to quash [the subpoena served on them, but not shown to the X company's attorneys] on the plea that to do so would reveal the government's theory of the case and identity of co-operating witnesses to the possible prejudice of the government's investigation.'

d  But, says Mr Frankel—

'almost immediately following the argument of an appeal in that case ... newspapers at several places in the United States were publishing supposedly secret information about this very matter and attributing the revelations both to identified "secret" witnesses, and, more importantly, to "government sources"'

e  and he exhibits a copy of an article which in lurid terms contains or purports to contain such revelations.

The other matter which is not in dispute is the nature and the extent of the harm which the plaintiffs would suffer were such breach of confidentiality to occur in this case. The damage which the X company would sustain is described as immediate, irreparable and incalculable, and similar descriptions are given to that which would be suffered by

f  the other plaintiffs in like circumstances.

For the purpose of explaining himself the deponent in relation to the X company takes by way of example letters of credit. He says that for those translations in which the X company—

g  'is the purchaser of commodities, and in which a letter of credit is opened by [the London branch of the bank] for the benefit of [the X company's] supplier, and for those transactions in which [the X company] is the seller, and in which [the London branch of the bank] either confirms a letter of credit opened by [the X company's] customer or collects on a letter of credit under which [the X company] is the beneficiary [the London branch of the bank] receives all of the shipping and title documents including bills of lading and invoices. From these documents the following information may be obtained: (a) the name of [the X company's] supplier

h  or customer; (b) the type of commodity bought or sold; (c) the quantity of the commodity bought or sold; (d) the price at which the commodity was bought or sold; and (e) the relevant shipping information. In many cases it would be possible to determine from such information [the X company's] margin on a particular transaction and, where [the X company] acts as intermediary, to identify the trading parties on both sides of a transaction.'

j  Engaged in various trades, as the X company is, this would have very serious repercussions. For example, it is said that the X company operates in and trades with countries which are in politically sensitive areas of the world, with the result that their governments or their agencies often prefer to trade through an intermediary in order not to reveal the buying and selling strategies for particular commodities or, in some instances, the fact that the governments or their agencies may have entered into such transactions contrary

to some policy which publicly may have been professed on the governments' behalf. Many transactions, it is said on the X company's behalf, are concluded with governments *a* or governmental agencies in countries in which the commodity in question is one of the chief sources of foreign exchange revenue and for that reason alone the details of such transactions are highly confidential. Similarly, damage might well be caused if knowledge of the trading patterns of the X company were to reveal, for example, that there was stockpiling of particular strategic materials by any of the Western customers. There might be revealed a breach of some restriction imposed on particular Middle Eastern, *b* Latin American or Iron Curtain countries on the dealing with other particular countries in respect of certain materials. Finally, and perhaps most obviously, disclosure of information of the character held by the London branch of the bank would put the X company at a severe disadvantage in relation to its competitors in that it would allow what the deponent calls 'a window into the X company's commercial secrets'. The X company's suppliers and customers, its pricing decisions, its margins and its delivery *c* dates would all be liable to become public knowledge and an analysis of such information would obviously enable competitors to tell much, and, as it may be, all that they need to know, about the X company's operating methods, resources and strategy. That those consequences would be liable to occur is not controverted.

A review of the evidence in this case must include reference in particular to the expert evidence sworn on each side. *d*

The bank relies on an affidavit of an attorney who is a member of a New York law firm, Mr Connick. After asserting that the federal grand jury subpoena requires the production of all bank records over which the bank has control, regardless of their location, and citing authority for that proposition, the deponent states:

'[Should the bank] fail to comply with the subpoena it would be subject to *e* proceedings under the Federal Rule of Criminal Procedure 17(g) which reads: "Failure by any person without adequate excuse to obey a subpoena served upon him may be deemed a contempt of the court from which the subpoena issued" . . .'

He then refers to the leading case of *US v First National City Bank* (1968) 396 F 2d 897, in which the United States Court of Appeals for the Second Circuit dealt with the question of a New York bank's obligation to comply with a grand jury subpoena. He remarks *f* that, after balancing certain factors, the court ordered compliance with this subpoena 'despite the apparently conflicting law of the nation where the records were kept, West Germany', and he says that a recent decision of the United States District Court for the Southern District of New York has affirmed the validity of that case with respect to process issued by United States government investigators. The case in which that affirmation was made was one in which the court ordered a Swiss bank to comply with *g* informational demands of the Securities and Exchange Commission, despite the possibility of criminal prosecution in Switzerland for such compliance. Conservatively, the deponent remarks that there are some factual differences between those two cases and the present, and he says that, for that reason, as well as the uncertainty of the outcome of the balancing test, it is impossible to predict with certainty what the United States attorney or the federal courts would do should the High Court continue the outstanding *h* injunctions against the bank in this matter. However, he says that it is 'entirely possible' that a bank officer in New York would be summoned to appear before the United States District Court and directed to produce the documents, that on the basis of the balancing test the District Court would not recognise the High Court's injunction as an adequate excuse for failure to produce such documents, and that if thereafter the bank refused to produce the documents the District Court would imprison the bank officer and impose *j* a daily fine on the bank until the documents were produced. He does, however, end his affidavit by saying:

'Should the High Court continue the outstanding injunctions [the bank] would have no choice but to oppose vigorously any contempt proceeding in New York and to incur additional substantial legal expenses toward that end.'

*a*  I am bound to say that had the matter ended there I should have been left in very great doubt whether the bank stood in any real jeopardy in New York. Although it might have understandable apprehension so long as the subpoena remained outstanding and not complied with, my feeling would stem quite simply from the fact that no suggestion is made how the prohibition of this court on the production of relevant documents would not constitute an adequate excuse for failure by the person to whom the subpoena was addressed to produce the documents in question.

*b*  But the matter does not end there, because a substantial affidavit has been sworn on behalf of the plaintiffs by Professor Lowenfeld, Professor of Law at the Law School of New York University. He is a person of the greatest academic distinction and one of the leading authorities in the particular field of law with which this case is concerned. He is, indeed, an associate reporter of the American Law Institute's current revision of the Restatement of the Foreign Relations Law of the United States. His principal responsibility
*c*  in that capacity is for Part IV of the Restatement, concerning jurisdiction and judgments, and including in particular the sections concerning resolution of conflicting exercises of jurisdiction, which are the subject of the present dispute.

The professor says that he believes it highly unlikely that a United States bank or its officers would be held in contempt for conduct in compliance with the order of a British court in the circumstances stated, that is an injunction restraining the transfer or
*d*  disclosure of records kept in London in respect of a bank account maintained by a non-American corporation at the bank's London branch. He declares himself quite certain 'that no United States court has ever held a bank or other party in contempt in such circumstances', assuming, as he does, that there is no suggestion of wrongdoing by the bank either in transferring overseas records ordinarily kept in New York or in any way assisting the depositor in a scheme of concealment or non-disclosure.

*e*  After reciting the basic rule in the event of conflict between commands of the courts of different jurisdictions, which apparently is that no one is to be put in the position of fearing punishment irrespective of whether he does or does not do an act, the professor cites authority for that proposition.

The authorities include one which it behoves me to mention and that is *British Nylon Spinners Ltd v Imperial Chemical Industries Ltd* [1952] 2 All ER 780, [1953] Ch 19. That
*f*  case is of general importance in this matter for the comments of Evershed MR where he said ([1952] 2 All ER 780 at 783–784, [1953] Ch 19 at 27):

> '. . . the courts of this country will, in the natural course, pay great respect and attention to the superior courts of the United States of America, but I conceive that it is none the less the proper province of English courts, when their jurisdiction is invoked, not to refrain from exercising that jurisdiction if they think that it is their
*g*  duty so to do for the protection of rights which are peculiarly subject to their protection. In so saying, I do not conceive that I am offending in any way against the principles of comity . . .'

Looking at that case, it is convenient also to mention the comment of Denning LJ ([1952] 2 All ER 780 at 784, [1953] Ch 19 at 28): 'The writ of the United States does not
*h*  run in this country, and, if due regard is had to the comity of nations, it will not seek to run here.'

There is, as would appear from the professor's affidavit, a doctrine in the United States, or at any rate in New York, known as the doctrine of foreign government compulsion, which depends, as he explains, on a prohibition in one state conflicting with a command in another. The professor considers the case mentioned in Mr Connick's affidavit, *US v*
*j*  *First National City Bank* (1968) 396 F 2d 897. He describes how the District Court held that the defence based on German law in that case was speculative, based at most on possible exposure to civil liability or loss of standing in the financial community, and that on appeal the district judge's holding was affirmed, with the court pointing out in detail the distinction between the Swiss bank secrecy law, which was a mandatory law, backed by criminal sanction, and German law, for breach of which there was at most a civil liability.

The professor then proceeds to consider the special rules concerning the discovery of documents. He says that it has been the pattern, although not followed in all cases, for United States courts faced with discovery requests or subpoenas calling for the production of documents located abroad to issue an order to produce and, if a foreign prohibition against production is asserted, to order the party before the court to make a good faith effort to secure release or waiver from the prohibition, but, if no release from the prohibition has been obtained, to dismiss petitions for contempt.

Certain authorities for that proposition are considered, including the other recent case in the United States District Court referred to by Mr Connick, on which the professor comments that the bank there in question was held to have failed to make a good faith effort to comply with the request for production. In addition, the government of the state where the records were kept had not acted to prevent the bank from complying with the subpoena; or, in other words, in that case the bank was not subject to an injunction in the manner that the bank in the present case is. The professor expresses some doubt whether that case was properly decided and summarises the matter by reference to his current draft of para 420 of the Restatement of Foreign Relations Law, which deals specifically with requests for disclosure and foreign government compulsion. Sub-paragraph (2) of that paragraph reads, so far as is material:

'(a) the person to whom the order is directed may be required by the court to make a good faith effort to secure permission from the foreign authorities to make the information available; (b) the court may not ordinarily impose the sanction of contempt, dismissal, or default on the party that has failed to comply with the order for production, except in cases of deliberate concealment or removal of information or of failure to make a good faith effort in accordance with paragraph (a).'

It has been explained that the restatement is intended to be declaratory of existing law in the United States.

In those circumstances, the professor summarises his conclusion by saying that an injunction by a foreign court having jurisdiction over the branch where the documents are located—

'would, I believe, come within the foreign compulsion defence, provided (a) the bank at all times acted in good faith as defined; and (b) disobedience of the injunction would subject the branch and its officers to serious sanction.'

I accept that conclusion. It represents, in my judgment, an accurate summary of the law of New York so far as applicable, from which it follows that the bank, having properly pursued its good faith efforts to relieve itself from the consequences of an injunction in this country, ought not to be held liable for contempt in any proceedings brought to that end in New York.

It is convenient to consider the arguments of counsel addressed to me by reference to these matters by following the structure of counsel's argument for the bank. He was content in offering his propositions of English law to assume at the outset that English law is the proper law. Advocate that he is, he left until the end any suggestion that the proper law should be regarded as being anything other than English law. When he came to it he argued that the law of New York should apply to the transaction as a whole for the reason that that was the law with which, so he bravely asserted, the contract has its closest and most real connection in each case.

I unhesitatingly reject that submission. It seems to me, for such reasons as counsel advanced on behalf of the first and second of the plaintiffs, concurred in by counsel for the third of the plaintiffs, that English law is the proper law, not only because the London branch with which the contracts were initially made is in London, but because that is where the relationship started and where the contract was made in circumstances where that contract must be taken to have had a proper law from its inception. Instructions in relation to the account are received and acted on in London. The reality of the matter, as it appears to me, whatever comments to a contrary effect may be made on behalf of the

bank, is that the relationship between banker and customer is in truth centred in London.

a  The plaintiffs all say, and I accept the truth of their assertions, that they contemplated that their transactions with the bank would be governed by English law. For all those reasons, quite apart from the more general description of the contract as being one which has its closest and most real connection with English law, I hold that English law is, indeed, the proper law of the contract.

The first proposition of counsel for the bank was that as a matter of English law an

b  English court will not compel performance of or enforce a contract if performance requires the doing of an act which violates the law of the place of performance, at any rate where the doer is resident in or amenable to the law of the place of performance; nor will an English court prevent a party to a contract from doing an act in the place where the contract is to be performed when he is obliged to do that act by the law of that place.

In pursuing this argument, counsel for the bank contended that the contract cannot

c  be enforced in so far as it requires confidence to be respected in the United States. Thereby he raised the curious concept of confidentiality which no longer was. This seems to me to be a true example, if one were prepared to envisage it, of the curate's egg, that is to say good in parts. The reality of the matter is that once confidence escapes, like air from a punctured tyre, the confidence is no more. But in aid of this argument counsel for the bank relied on *Ralli Bros v Compañia Naviera Sota y Aznar* [1920] 2 KB 287 esp at

d  290, 299, [1920] All ER Rep 427 esp at 431, 435 per Lord Sterndale MR and Scrutton LJ. That was a case involving a contract which was to be performed partially in Spain and it was held pro tanto to be invalid in the event that performance was unlawful in Spain. The argument is that this contract is to be performed, at least in part, in the United States and, as counsel for the bank characterises it, it requires violation of United States law, by which he means the keeping of confidentiality, with the result that the bank should not

e  be restrained from doing the act of disclosure as being one which it is required to do in the place where the contract is to be performed. In aid of this he relied also on *Re Lord Cable, Garratt v Waters* [1976] 3 All ER 417, [1977] 1 WLR 7, in which it was held that where compliance with an injunction would expose the relevant trustees to serious risk of penal consequence the injunction would not issue.

In opposition to this argument counsel for the first and second plaintiffs relied in

f  particular on *Kleinwort Sons & Co v Ungarische Baumwolle Industrie AG and Hungarian General Creditbank* [1939] 3 All ER 38, [1939] 2 KB 678. That was a case in which an English bank opened an acceptance credit for a Hungarian firm. When the credit expired the Hungarian firm refused to pay in London on the ground that under Hungarian legislation it was illegal for them to remit money abroad. But it was held that this was no defence to the bank's claim. English law was the proper law of the contract, the money was payable in London and the Hungarian law could not affect the legality of a

g  contractual promise in fact governed by Hungarian law but not to be performed in Hungary.

In my judgment it does not follow from the fact that the production has been ordered pursuant to a subpoena that secrecy can be said to have been rendered unlawful, especially in circumstances where it is no doubt the argument, even if perhaps it be only a fiction,

h  that security is still preserved in respect of grand jury proceedings. The fact is that confidentiality is not rendered illegal by a subpoena requiring disclosure, which is to be contrasted with some form of legislation to that end; and I have in mind in particular that from the terms of the relevant procedural rule failure to produce the documents may be excused if the excuse be adequate.

Counsel for the first and second plaintiffs remarked that, since a foreign judgment

j  may be a good defence to an action in England when the judgment is in favour of the defendant and finally conclusive on the merits, he could envisage that an argument might be advanced which sought to equate a subpoena with a judgment; and so, indeed, it proved, because counsel for the bank duly contended that, if need be, he would argue that the subpoena operates as a defence, final and conclusive as it is in the absence of challenge.

It seems to me that there is no analogy for present purposes between a judgment and a subpoena and, in particular, there is no suggestion whatever that the obtaining of this subpoena or the order which has subsequently indorsed it has involved any form of hearing on the merits. Certainly it has not as yet involved any form of hearing inter partes.

Next, counsel for the bank argued that as a matter of the policy of English law an English court should decline any invitation to impede legitimate proceedings in other jurisdictions and orders such as the subpoena issued in the course of proceedings, especially where directed to a person within the jurisdiction of the foreign court.

For this he admits that it is difficult to find precise authority. He asserts it as a matter of common sense dictated by international comity, and he seeks to found on the well-established rule of English law that it will not enforce a contract to do something illegal in another country. He relies on *Regazzoni v K C Sethia (1944) Ltd* [1957] 3 All ER 286, [1958] AC 301, which is authority for the proposition that that public policy will avoid at least some contracts which violate the laws of a foreign state. He says that properly regarded it is wrong to think of this subpoena as being extra-territorial in its effect. At that stage he meets *Rio Tinto Zinc Corp v Westinghouse Electric Corp* [1978] 1 All ER 434, [1978] AC 547, much relied on by counsel for the first and second plaintiffs. That was a case, according to counsel for the bank, which merely affords guidance as to the interpretation of the Evidence (Proceedings in Other Jurisdictions) Act 1975 and, having regard to the narrow way in which particular comments were expressed, should be regarded as applicable only to attempts made by means having extra-territorial effect to make United Kingdom companies amenable to the investigation of a foreign court. The case was, indeed, concerned with the use that might be made in this country of letters rogatory and a possible conversion of the letters rogatory into a request for evidence for the purposes of a grand jury investigation. Counsel for the bank says that the primary effect of the United States order in the present case is in New York and only incidentally in London, with the result that it does not represent any invasion of United Kingdom sovereignty and all that is at issue is a matter of private law.

Counsel for the first and second plaintiffs contends that the case is what he terms 'vitally relevant'. He says that it shows how a subpoena is to be regarded here and, in particular, by reference to submissions there made by the Attorney General, what the attitude would be of the United Kingdom government. In that case the Attorney General had submitted that the government considers that the wide investigatory procedures under the United States anti-trust legislation against persons outside the United States who are not United States citizens constitutes an infringement of a proper jurisdiction of sovereignty of the United Kingdom.

Both counsel read to me with great emphasis a passage from the speech of Lord Wilberforce where he said ([1978] 1 All ER 434 at 448, [1978] AC 547 at 617):

'The intervention of Her Majesty's Attorney-General establishes that quite apart from the present case, over a number of years and in a number of cases, the policy of Her Majesty's Government has been against recognition of United States investigatory jurisdiction extra-territorially against United Kingdom companies. The courts should in such matters speak with the same voice as the executive ... they have, as I have stated, no difficulty in doing so.'

Counsel for the bank relied on that for its specific application to United Kingdom companies which he said is absent here and counsel for the first and second plaintiffs relied on it as betokening the attitude which Her Majesty's government may be expected to take about the use in this country by the United States of the investigatory jurisdiction of the relevant character. Counsel for the bank concludes his argument under this head by asserting that if the English law issued a subpoena it would expect what he calls 'credence' to be given to its order and that it must be a matter of discretion whether or not that is accorded to it.

It seems to me that the proper use which I should make of the *Westinghouse* case is to

regard it in the circumstances not as definitive either way, but as raising one important

*a* factor which I ought to take account of in determining whether this is a case in which the injunction should be continued. The factor that is involved in the exercise of jurisdiction by the United States court in this case is that its order would take effect in London for the production of documents in breach of what might be termed a private interest in the sense that what is directly involved is a contract between banker and customer. But this indubitably is also a matter of public interest, because it raises issues

*b* of wider concern than those peculiar to the parties before me.

The third proposition of counsel for the bank is that public policy is not defeated by the rule of private law between banker and customer that the banker should preserve confidentiality in relation to the customer's accounts and dealings. He says that it is not uncommon for confidentiality to be displaced in favour of a higher interest. The bank has to do a balancing act to see whether confidence or the order of a foreign court should

*c* take precedence.

It is an argument which he considerably elaborated, starting first with *British Steel Corp v Granada Television Ltd* [1981] 1 All ER 417 at 455, [1981] AC 1096 at 1168–1169, relying in particular on a passage from the speech of Lord Wilberforce where he says:

'... as to information obtained in confidence, and the legal duty, which may

*d* arise, to disclose it to a court of justice, the position is clear. Courts have an inherent wish to respect this confidence, whether it arises between doctor and patient, priest and penitent, banker and customer, between persons giving testimonials to employees, or in other relationships. A relationship of confidence between a journalist and his source is in no different category; nothing in this case involves or will involve any principle that such confidence is not something to be respected.

*e* But in all these cases the court may have to decide, in particular circumstances, that the interest in preserving this confidence is outweighed by other interests to which the law attaches importance. The only question in this appeal is whether the present is such a case.'

Counsel for the bank relies on that passage as showing that there is a process of weighing to be undertaken. Counsel for the first and second plaintiffs, on the other hand,

*f* points out that it expressly relates to information obtained in confidence, and the legal duty which may arise to disclose it to a court of justice and is, therefore, directly within one of those qualifications to which the obligation of confidentiality is normally treated as subject.

The scope of the obligation was reviewed in *Tournier v National Provincial and Union Bank of England* [1924] 1 KB 461, [1923] All ER Rep 550. To understand the argument in

*g* this case it is necessary to read some short passages from the judgments of each of the Lords Justices. First, Bankes LJ considered in a classic passage what the qualifications are of the contractual duty of secrecy implied in the relationship of banker and customer, remarking that there appeared to be no authority on the point. He said ([1924] 1 KB 461 at 473, [1923] All ER Rep 550 at 554):

*h* 'On principle I think that the qualifications can be classified under four heads: (*a*) Where disclosure is under compulsion by law; (*b*) where there is a duty to the public to disclose; (*c*) where the interests of the bank require disclosure; (*d*) where the disclosure is made by the express or implied consent of the customer.'

In referring in particular to examples of the third class, he mentioned the issue by a bank of a writ claiming payment of an overdraft stating on the face of the writ the

*j* amount of the overdraft. In a comparable passage Scrutton LJ gave a similar example (see [1924] 1 KB 461 at 481, [1923] All ER Rep 550 at 558–559), whilst Atkin LJ expressed himself somewhat more widely, saying ([1924] 1 KB 461 at 486, [1923] All ER Rep 550 at 561):

'It is difficult to hit upon a formula which will define the maximum of the

obligation which must necessarily be implied. But I think it safe to say that the
obligation not to disclose information such as I have mentioned is subject to the *a*
qualification that the bank have the right to disclose such information when, and to
the extent to which it is reasonably necessary for the protection of the bank's
interests, either as against their customer or as against third parties in respect of
transactions of the bank for or with their customer, or for protecting the bank, or
persons interested, or the public, against fraud or crime.'

Counsel for the bank remarks that this duty is not absolute. He treats the first three of *b*
Bankes LJ's qualifications or exceptions as only examples of public policy. He says that
the case does not constitute a statute and does not fall to be construed as such, and he says
that what are given by the Lords Justices are no more than indications of occasions when
the confidence is to be displaced. The contention is that an English court will respect the
order of a foreign court. If it finds the order to be in conflict with the private law of
confidentiality the English court will, so it is submitted, proceed with caution to uphold *c*
the order of the foreign court unless there is compelling reason not to do so.

It seems to me that, even if it be right to regard the exercise which has to be undertaken
here ultimately as being a balancing exercise, it must involve an evaluation of the relevant
order of the foreign court. It would be necessary for this court in particular to consider
the nature, scope, quality and effect of the foreign order and to analyse it with some care,
because the fact is that to allow that order to take effect on a bank conducting its business *d*
in the City of London would be, as it would appear, to allow a fairly large cuckoo in the
domestic nest. But I say 'would be necessary' because the balance with which I am
immediately concerned in this interlocutory matter is the balance of convenience and
not the performance of that balancing act which counsel for the bank has in mind.

The balancing act which he urges on me he seeks to support by three arguments. The
first is that it is in the public interest that affairs of multinational companies should be *e*
investigated across borders in a proper case. That must be so, although I would add: with
due regard to the public interest in the preservation of banking confidence.

Second, he says that it is no answer for the plaintiffs to point to internal English
considerations, as he characterises the basis of the argument, for example, in the
*Westinghouse* case [1978] 1 All ER 434, [1978] AC 547, to which I have already referred.
He says that that case and those like it only apply to English internal policy, which may *f*
have to yield to some of the ways in which a foreign court may govern its own procedures.
An English court, so he acknowledges, may have jurisdiction, but in its discretion should
not exercise it against the bank. In that way he is able to dispose of difficulties such as are
raised by an article of Dr Mann ((1964) 111 Hague Recueil 146), where he said:

'In those cases in which the enforcing state asserts a prerogative right and demands *g*
obedience to it abroad, an additional point of some significance is available. The
enforcing state ... cannot achieve respect for its prerogative rights in foreign
countries by proceedings taken there. It is precluded, *a fortiori*, from achieving its
ends indirectly by having orders made in its own territory, which are to take effect
abroad and thus attribute to themselves a power equal to that of an order which the
foreign country could, but refuses, to make. The crux of the matter lies in the fact *h*
that the enforcing state requires compliance with its sovereign commands in foreign
countries where its writ does not run and where it cannot be made to run by
clothing it into the form of judgments of courts, whether they be its own or those
of the foreign country.'

I consider that, on a true view, the effect of the foreign order is at any rate one factor *j*
of which I am entitled to take account in exercising my discretion whether or not to
grant or to continue the injunction sought.

Third, counsel for the bank, in contending for the balancing act to be performed by
means of gauging the effect of public policy, says that it is natural that the bank should
wish to obey the law of the United States, especially since it is quite possible in the light

**QBD**                **X AG v A bank (Leggatt J)**                **479**

of the American cases that the bank will be liable for contempt in the United States; and
he made some limited submissions about the American cases designed merely to show
that the bank's fear is not fanciful. But as to that I have considered the evidence of the
American lawyers and it appears to me that the reality of the bank's fear is for present
purposes a matter for my determination.

Counsel for the bank says that it is irrelevant that the subpoena was made in aid of
foreign criminal or revenue matters, because that consideration does not justify any
impediment being made by English courts to the legitimate processes of United States
courts. Although it is true that the English court will not enforce foreign revenue or
penal law, he says that the English court is not being invited to undertake enforcement
in this case, but merely not to impede; and at the heart of many of the submissions of
counsel for the bank is the suggested distinction between enforcement on the one hand
and not impeding on the other. He relies, for example, on *Regazzoni v K C Sethia (1944)
Ltd* [1956] 2 All ER 487, [1956] 2 QB 490, which is authority for the proposition that, if
two people agree to break the laws of a foreign friendly country, the court will not
enforce the agreement, the application being that by implication the parties here, so he
contends, have agreed to keep confidential what has been rendered illegal by the law of
the place of performance.

I think that this submission is attended by a certain unreality. The fact is that the
gamekeeper is invited to turn a blind eye whilst the poacher takes a brace of pheasants,
or three peasants. In this context, it appears to me that not impeding involves a measure
of assistance and, indeed, approbation, because, in particular, it would involve this court
tolerating a breach of that obligation of confidentiality which, as I have pointed out, in
the ordinary course must be maintained in the public interest.

The fourth argument on which counsel for the bank relies is that, if *Tournier v National
Provincial and Union Bank of England* [1924] 1 KB 461, [1923] All ER Rep 550, to which I
have referred, does indeed contain the whole law on the topic without elaboration and
public policy is irrelevant, the subpoena should still prevail over the duty of secrecy,
because the bank has a genuine and legitimate interest of its own to obey the subpoena
since it is issued pursuant to the law of the country to which it is subject and the fear of
being held in contempt is genuine and not unreasonable. Suffice to say that the protection
which the bank seeks appears to me to be different in character from that which was
contemplated in the *Tournier* case, where the circumstances before the court were totally
different.

Counsel for the bank was not content to accept that *American Cyanamid Co v Ethicon Ltd*
[1975] 1 All ER 504 esp at 510, [1975] AC 396 esp at 407–408 per Lord Diplock would
necessarily have effect in this case. Alternatively, if it did take effect, he argued that it
must be with an important cast on it, which he sought to derive from *NWL Ltd v Woods*
[1979] 3 All ER 614 at 625, [1979] 1 WLR 1294 at 1306, where Lord Diplock said:

'. . . there is the risk that if the interlocutory injunction is granted but the plaintiff
fails at the trial the defendant may in the meantime have suffered harm and
inconvenience which is similarly irrecompensable. The nature and degree of harm
and inconvenience that are likely to be sustained in these two events by the
defendant and the plaintiff respectively in consequence of the grant or the refusal of
the injunction are generally sufficiently disproportionate to bring down, by
themselves, the balance on one side or the other . . .'

With an eye to what might occur between this date and the date of trial in the actions
out of which these applications arise, I must proceed to consider the matters rendered
material by the *American Cyanamid* case, with the comment in mind that I have just read
from the later speech of Lord Diplock in the *NWL* case.

These being interlocutory applications, I intend to deal with them strictly in conformity
with the principles enunciated in the *American Cyanamid* case, whilst taking account, as
is implicit in what I have said, of the fact that contempt proceedings, if any be taken, will
probably fall to be dealt with before a trial of the present actions and also of the fact that

production of any documents to which the grand jury may be entitled and which might prove useful to it would be delayed by my continuing the injunctions sought, although there is no evidence that delay of such a period as would be involved in their review of this particular aspect of the investigation, already running for some time, will prove significant. *a*

I can summarise in a sentence the balance of convenience as I see it. On the one hand, there is involved in the continuation of the injunction impeding the exercise by the United States court in London of powers which, by English standards, would be regarded as excessive, without in so doing causing detriment to the bank: on the other hand, the refusal of the injunctions, or the non-continuation of them, would cause potentially very considerable commercial harm to the plaintiffs, which cannot be disputed, by suffering the bank to act for its own purposes in breach of the duty of confidentiality admittedly owed to its customers. *b*

That represents the balance of convenience, against the background that indisputably there is a serious issue to be tried. Damages would not constitute an adequate remedy for the plaintiffs. I am not satisfied that the bank will suffer any detriment, even allowing for the probability that any contempt proceedings that might be brought would be dealt with before the trial of the actions. In those circumstances, it appears to me that the balance of convenience clearly favours the plaintiffs. *c*

If and in so far as it is necessary for me to pay any regard to the merits of the matter at this stage, I am firmly on the side of the plaintiffs. I have considered the position of the plaintiffs separately, but I am not satisfied that the case is so much stronger against the Y company that I should be justified in distinguishing between it and the other plaintiffs. The circumstances in relation to either that company or the others may change and further evidence may put a different complexion on the matter. *d*

I would not leave these applications without remarking that I do not see this as a matter of conflict between jurisdictions. I can fully understand that the United States District Court would wish to see where the line is in practice drawn by the courts of this country; but, having been drawn where it has, I find it hard to believe that the bank is in any danger of being held to be in contempt, since the adequacy of the excuse that it makes for non-production of the documents sought is now obvious indeed. Any sanction imposed now on the bank would look like pressure on this court, whereas, as it seems to me, it is for the New York court to relieve against the dilemma, in which it turns out to have placed its own national, by refraining from holding it in contempt if contempt proceedings are issued. *e* *f*

For those reasons, I shall continue the injunctions now running against the defendants.

*Interlocutory injunctions continued until trial or further order.* *g*

Solicitors: *Allen & Overy* (for the bank); *Simmons & Simmons* (for the first and second plaintiffs); *Norton Rose Botterell & Roche* (for the third plaintiffs).

K Mydeen Esq    Barrister.