Exhibit 8

62

A

## Nam Tai Electronics Inc

### and

### PricewaterhouseCoopers

B

Li CJ, Bokhary, Chan and Ribeiro PJJ and McHugh NPJ
Final Appeal No 1 of 2007 (Civil)
15, 31 January 2008

*Contract law — breach of confidence — duty of confidentiality — qualifications*  C
*— could be self-defence disclosure by professional confidant where proceedings
instituted against confidant by former client-confider or by third party — whether
could be disclosure where hostile allegation by confider but no proceedings —
term permitting such disclosure could be implied — but generally not proper
response to unparticularised allegation to plunge at once into disclosure of*  D
*confidential information*

*Professions — auditors — plaintiff objected to defendant-auditors being
appointed liquidators of its subsidiary — plaintiff stated that there was conflict
of interest due to defendant's prior due diligence review of subsidiary, conducted*  E
*before plaintiff acquired subsidiary — defendant then specifically responded by
disclosing confidential information that it had made negative recommendation
regarding acquisition — whether defendant-auditor in breach of confidence*

*Contract law — implied terms — confidentiality*

F

P was a public listed company in the US, and D was a well-
known international accounting firm which acted as its auditor.
The relationship between P and D had begun to sour. P agreed
to subscribe for controlling shares in a publicly listed Hong Kong
company (C), pursuant to which D conducted a due diligence  G
review of C. D gave a negative review of C, in which it questioned
the integrity of its management. P took a strong objection to these
criticisms and D resigned as P's auditors. In fact the relationship
between P and D had begun to sour before the due diligence
review. P then proceeded with the acquisition of C (the Acquisition).  H
Subsequently, C went into liquidation and D wished to be appointed
as its liquidator. However, P expressed objections to C's creditors
against D's appointment in terms of a conflict of interest by reason
of its prior involvement in the due diligence (P's allegation). D then
submitted a proposal to be appointed liquidator to C's creditors  I
which stated that it had conducted a due diligence of C for P, and
disclosed the confidential information that it had made a negative
recommendation against the acquisition but that P had nevertheless
gone ahead with it (the negative disclosure). P brought proceedings
against D for breach of its duty of confidentiality to P, which was  J
dismissed at first instance and by the Court of Appeal. P appealed to
the Court of Final Appeal.

A   **Held**, allowing P's appeal and awarding nominal damages of $100 as P suffered no pecuniary loss (*per* Ribeiro PJ, the other Judges agreeing), that:

(1) D was under a duty of confidentiality to P regarding the information imparted to it in the due diligence review and the
B   contents of its report. The duty imposed on P an obligation not to disclose or to make any use of the confidential information or to cause any use to be made of it by others otherwise than for P's benefit, unless with P's consent. Such duty survived the termination of the client relationship. The court was astute to
C   protect a former client's confidences and would restrain conduct on the part of the confidant which exposed the former client to an avoidable risk of disclosure (*Tournier v National Provincial and Union Bank of England* [1924] 1 KB 461, *Bolkiah v KPMG* [1999] 2 AC 222 applied). (See paras.33–34.)

D   (2) There were qualifications to the duty of confidentiality arising out of the parties' contractual relationship, including: (a) disclosure made with P's express or implied consent (the consent qualification); or (b) disclosures properly required by D's interests (the self-interest qualification), the self-interest
E   qualification being the reflection of an implied term permitting the confidant to disclose confidential information where this was necessary for the business efficacy of their ordinary contractual transactions or as a matter of law (*Tournier v National Provincial and Union Bank of England* [1924] 1 KB 461, *FDC Co*
F   *Ltd & Others v Chase Manhattan Bank NA* [1990] 1 HKLR 277 considered). (See paras.35–36, 42–45.)

(3) And it was well established that a professional confidant could make self-defence disclosures in two situations, namely when: (a) legal proceedings; or (b) professional disciplinary
G   proceedings were initiated against the confidant by the client. Disclosure in this situation was justified on the basis of implied waiver reflecting the consent qualification or on the basis of the self-interest qualification. It also now appeared to be accepted that a defensive disclosure might be permitted outside these
H   categories in order for the confidant to defend himself in legal proceedings or disciplinary proceedings initiated by a third party. This situation rested on the self-interest qualification; the consent qualification not applying (*Tournier v National Provincial and Union Bank of England* [1924] 1 KB 461, *Paragon Finance Plc*
I   *& Others v Freshfields* [1999] 1 WLR 1183, *Lillicrap & Another v Nalder & Son* [1993] 1 WLR 94, *Hassneh Insurance Co of Israel & Others v Steurt J Mew* [1993] 2 Lloyd's Rep 243, *R v Institute of Chartered Accountants of England and Wales, ex p Brindle & Others* [1994] BCC 297, *Nederlandse Reassurantie Groep Holding NV v*
J   *Bacon & Woodrow (No 1)* [1995] 1 All ER 976 considered). (See paras.46–54.)

(4)   Dealing with the present case, the Court accepted that a term permitting a defensive disclosure by the confidant when confronted with a hostile allegation made by the confider could in principle be implied as an aspect of the consent or self-interest qualifications in addition to the established situations discussed above (*Esso Australia Resources Ltd v Plowman* (1994–1995) 183 CLR 10 applied). (See para.58.)

(5)   Here, first, such a term would be implied. P and D should be taken to have impliedly agreed that disclosure of otherwise confidential information might be made where this was fairly required for the protection or in furtherance of either party's legitimate interests. (See para.60.)

(6)   Second, D's efforts at securing the appointment as C's liquidator were undertaken as part of its ordinary professional activities and were in pursuit of its legitimate interests. (See para.64.)

(7)   Third, however, the negative disclosure was not fairly required to be made in the protection of such legitimate interests and it therefore constituted a breach of the duty of confidentiality owed to P as a former client. From the perspective of both D and C's creditors, P's allegation, reasonably understood, was of an equivocal character, capable of bearing different meanings, some of which had nothing to do with D making either a positive or negative recommendation, and did not justify the specific response of the negative disclosure. For example, from D's perspective, D's criticisms of C's management in the due diligence, which P had rejected, might well have been seen by P as giving rise to a potential conflict of interest between D's interest in upholding the assessment it had already made in the due diligence and its duty to act as an impartial liquidator. Indeed, an allegation of conflict founded on a perceived impediment to D acting impartially as liquidator because of possible preconceptions regarding past management misdeeds was wholly consistent with D having given a negative, and not a positive, recommendation. So understood, it was a non sequitur to suggest that the negative disclosure was a required response. (See paras.65–76, 72–73.)

(8)   It could not generally be the proper response to an unparticularised adverse allegation for the confidant to plunge at once into a disclosure of confidential information; this would be unacceptably destructive of the law of confidence. It was reasonable to expect him first to consider other options: to demand clarification or to take other steps aimed at challenging the adverse allegation without disseminating confidential information. (See para.81.)

(9)   The equivocal nature of P's allegation also meant that there was no basis for the negative disclosure to come within the compass of any waiver of confidentiality on P's part. (See para.75.)

A **(10)** (*Obiter*) **The negative disclosure might well have been justified as a response if P had falsely alleged that D had positively recommended the Acquisition. (See para.74.)**

B *合約法 —— 洩漏機密 —— 保密責任 —— 限制 —— 假如客戶/告密者或第三方針對專業保密者提起法律程序，則該專業保密者可披露機密資料以作自辯 —— 假如告密者只向保密者提出敵對指控而沒有提起法律程序，該保密者可否披露機密資料 —— 可引入隱含條款以容許此類披露 —— 但一般來說，對於未載有詳情的指控，立即披露機密資料並非恰當的回應方法*

C *專業與專業人士 —— 核數師 —— 原告人反對委任被告人核數師為原告人的附屬公司的清盤人 —— 原告人指稱，由於被告人曾在原告人收購該附屬公司前對該附屬公司進行盡職審查，故此被告人身處利益衝突之境況 —— 被告人於是作出具體回應，披露機密資料，即被告人曾對收購交易提出負面建議 —— 被告人核數師曾否洩漏機密*

D *合約法 —— 隱含條款 —— 保密責任*

原告人是一家在美國上市的公司。被告人是一家有名的國際會計師行，亦擔任原告人的核數師。雙方的關係已開始變壞。原告人同意認講一家香港上市公司（下稱C）的控權股份，被告人於是對C進行盡職審查。被告人在審查報告內對C作出負面評價，質疑C的管理層的誠信。原告人對此等批評表示強烈反對，而被告人辭任原告人的核數師。事實上，雙方的關係在進行上述盡職審查前不久開始轉差。原告人隨後進行對C的收購（下稱"收購交易"）。其後，C進行清盤，而被告人有意獲委任為C的清盤人，但原告人對C的債權人表示反對委任被告人，理由為被告人先前曾參與盡職審查，故此身處利益衝突之境況（下稱"原告人的指稱"）。後來，被告人向C的債權人提交一份清盤建議書，當中不但指出它曾代表原告人對C進行盡職審查，而且披露機密資料，即它曾給予負面評價和表示不贊成收購交易，但原告人繼續進行收購交易（下稱"涉案披露"）。原告人入稟法院，控告被告人違反對原告人的保密責任。原告人經原審後被判敗訴，其上訴亦遭上訴法庭駁回。原告人現上訴至終審法院。

**裁決** —— 上訴得直，而由於原告人沒有蒙受金錢損失，因此判給100元作為象徵式賠償（判詞由常任法官李義作出，其內容得到其餘四位法官贊同）：

H (1) 就被告人在盡職審查過程中獲給予的資料和其報告的內容而言，被告人對原告人負有保密責任。根據該責任，除非得到原告人的同意，否則被告人不得為原告人利益以外的任何目的而使用或促致他人使用相關的機密資料。該責任在保密者與客戶的關係完結後仍然持續。法庭須致力保護前客戶的秘密，並會制止保密者作出任何令前客戶資料承受可避免的被洩露風險的行為（引用 *Tournier v National Provincial and Union Bank of England* [1924] 1 KB 461，*Bolkiah v KPMG* [1999] 2 AC 222）。（見第33至34段）

J (2) 源於與訟各方的合約關係的保密責任，乃受到下列限制：(a)在原告人的明示或隱含的同意下的資料披露（下稱"'同意'限制"）；或(b)為著被告人的利益而需要作出的資料披露（下稱"'自身利益'限制"）。"自身利益"限制體現於隱含條款之中，該條款容許保密

者為確保正常合約交易的商業效力或為符合法律要求而作出必要的　A
資料披露（*Tournier v National Provincial and Union Bank of England*
[1924] 1 KB 461，*FDC Co Ltd & Others v Chase Manhattan Bank
NA* [1990] 1 HKLR 277予以考慮）。（見第35至36、42至45段）

(3)　根據已確立的法律，一名專業保密者可在兩種情況下作出自我保
護性質的資料披露，即當客戶針對該保密者而提起(a)法律程序；　B
或(b)專業紀律程序之時。此等情況下的資料披露，可建基於反
映"同意"限制的隱含豁免，也可建基於"自身利益"限制。此外，
現時看來已獲接受的一點是，法律容許在上述情況以外作出具辯護
性質的資料披露，讓保密者能在由第三方提起的法律程序或紀律程
序中作自辯。這情況乃建基於"自身利益"限制，"同意"限制則不適　C
用（*Tournier v National Provincial and Union Bank of England* [1924]
1 KB 461，*Paragon Finance Plc & Others v Freshfields* [1999] 1 WLR
1183，*Lillicrap & Another v Nalder & Son* [1993] 1 WLR 94，*Hassneh
Insurance Co of Israel & Others v Steurt J Mew* [1993] 2 Lloyd's Rep
243，*R v Institute of Chartered Accountants of England and Wales, ex p*　D
*Brindle & Others* [1994] BCC 297，*Nederlandse Reassurantie Groep
Holding NV v Bacon & Woodrow (No 1)* [1995] 1 All ER 976予以考
慮）。（見第46至54段）

(4)　就處理本案而言，本院接受，除了上文所論及的已確立情況之外，
原則上可作為"同意"限制或"自身利益"限制的一部份而在合約內　E
加入隱含條款，以容許保密者在面對告秘者的敵對指控時披露資料
以保護自己（引用 *Esso Australia Resources Ltd v Plowman* (1994–1995)
183 CLR 10）。（見第58段）

(5)　在本案中，首先，與訟雙方的合約包含上述隱含條款。原告人和被
告人應藉默示方式同意，假如有公平需要保護或促進任何一方　F
的合法利益，則本應是機密的資料亦可予以披露。（見第60段）

(6)　第二，涉案披露是在促進被告人的合法利益的情況下作出的，因為
被告人為了獲委任為C的清盤人而付出的努力，是其日常專業活動
的一部份。（見第64段）

(7)　第三，不過，涉案披露並非是為保護此等合法利益而公平所需，故　G
構成被告人違反其對前客戶所肩負的保密責任。從被告人及C的債
權人的角度去看，原告人的指稱按合理解釋屬於模稜兩可以及可表
示不同的意思，其中一些意思與被告人作出正面或負面建議無關，
不足以支持被告人作出涉案披露作為具體回應。舉例說，從被告人
的角度看，被告人在盡職審查時對C的管理層的批評，或會被拒納　H
該等批評的原告人視為引發潛在的利益衝突，即被告人在維護其
於盡職審查時所作的評估的利益與它不偏不倚地擔任清盤人一職
的責任之間的衝突。事實上，指被告人因可能對C過往管理不善抱
有先入為主的觀念而無法不偏不倚地擔任清盤人的說法，與被告
人曾作出負面而非正面的建議是完全一致的。按此理解，指涉案披　I
露是無可避免的回應，實屬不合前提的論點。（見第65至76、72至
73段）

(8)　一般來說，對於未載有詳情的敵對指控，保密者立即披露機密資料
並非恰當的回應方法。這做法會對關乎保密責任的法律造成無法接
受的破壞。合理的做法是期望保密者先考慮其他選擇：即在不透露　J
機密資料下要求指控者作澄清或採取其他步驟以質疑該敵對指控。
（見第81段）

A  ⑼　原告人的指稱模稜兩可，亦表示沒有基礎支持指涉案披露屬於原告
　　人豁免將資料保密的範圍的説法。（見第75段）
　⑽　（附帶意見）若然原告人曾作虛假指稱，指被告人曾正面地建議進行
　　收購交易，則被告人或有理由以涉案披露作為回應。（見第74段）

B  **Sir John Swaine SC, instructed by Wilkinson & Grist, for the appellant.**
**Mr Joseph Fok SC and Mr Alexander Stock, instructed by Barlow**
**Lyde & Gilbert, for the respondent.**

**Cases cited in the judgment**

C  Benecke v National Australia Bank (1993) 35 NSWLR 110
　Bolkiah v KPMG [1999] 2 AC 222, [1999] 2 WLR 215, [1999] 1 All
　　ER 517
　Contract Corp (Winding Up: Production of Documents), Re (1871–
　　72) LR 7 Ch App 207

D  Esso Australia Resources Ltd v Plowman (1994–1995) 183 CLR 10
　FDC Co Ltd & Others v Chase Manhattan Bank NA [1990] 1 HKLR
　　277, [1985] 2 HKC 470
　Hassneh Insurance Co of Israel & Others v Steurt J Mew [1993] 2
　　Lloyd's Rep 243

E  Lillicrap & Another v Nalder & Son [1993] 1 WLR 94, [1993] 1 All
　　ER 724
　Mann v Carnell (1999) 201 CLR 1
　Nam Tai Electronics Inc v PricewaterhouseCoopers [2005] 2 HKLRD
　　461

F  Nam Tai Electronics Inc v PricewaterhouseCoopers [2006] 4 HKLRD
　　121
　Nederlandse Reassurantie Groep Holding NV v Bacon & Woodrow
　　(No 1) [1995] 1 All ER 976, [1995] 2 Lloyd's Rep 77
　Paragon Finance Plc & Others v Freshfields [1999] 1 WLR 1183

G  R v Institute of Chartered Accountants of England and Wales &
　　Others, ex p Brindle & Others [1994] BCC 297
　Solicitor v Law Society (2006) 9 HKCFAR 175, [2006] 2 HKLRD
　　116
　Sunderland v Barclays Bank Ltd (1937–46) 5 LDAB 163

H  Tournier v National Provincial and Union Bank of England [1924]
　　1 KB 461
　Woodhouse AC Israel Cocoa Ltd SA & Another v Nigerian Produce
　　Marketing Co Ltd [1972] AC 741, [1972] 2 WLR 1090, [1972] 2
　　All ER 271

I
**Cases in List of Authorities not cited in the judgment**
　Arklow Investments Ltd v Maclean [2000] 1 WLR 594
　Barclays Bank Plc v Taylor [1989] 1 WLR 1066, [1989] 3 All ER
　　563

J  Baron Investments (Holdings) Ltd, Re [2000] 1 BCLC 272
　Cassell & Co Ltd v Broome [1972] AC 1027, [1972] 2 WLR 645,
　　[1972] 1 All ER 801

China Light & Power Co Ltd v Ford [1996] 1 HKLR 7, [1996] 2     A
    HKC 23
Cornelius v De Taranto [2001] EWCA Civ 1511, (2000) 68 BMLR
    62
Duncan v Medical Practitioners Disciplinary Committee [1986] 1
    NZLR 513                                                       B
El Jawhary v Bank of Credit and Commerce International SA (No 1)
    [1993] BCLC 396
Harris v Digital Pulse Pty Ltd (2003) NSWLR 298
Hurt, Re (1988) 80 ALR 236
Indata Equipment Supplies Ltd v ACL Ltd [1998] FSR 248          C
Joint & Several Liquidators of Kong Wah Holdings Ltd v Grande
    Holdings Ltd (2006) 9 HKCFAR 766, [2007] 1 HKLRD 116
Lee Gleeson Pty Ltd v Sterling Estates Pty Ltd (1991) 23 NSWLR
    571
Maxwell Communication Corp Plc, Re [1992] BCC 372, [1992]      D
    BCLC 465
Newcastle Upon Tyne City Council v Allan [2005] ICR 1170, [2005]
    IRLR 505
Recover Ltd, Re [2003] EWHC 536, [2003] 2 BCLC 186
Schuppan, Re [1996] 2 All ER 664, [1997] 1 BCLC 211            E
Webster v James Chapman & Co [1989] 3 All ER 939
Young v Robson Rhodes [1999] 3 All ER 524


**Other materials mentioned in the judgment**
*Chitty on Contracts* (29th ed., 2004) Vol.1, para.22-044         F
*McPherson's Law of Company Liquidation* (2001) p.380
Pattenden, Rosemary, *The Law of Professional-Client Confidentiality:*
    *Regulating the Disclosure of Confidential Personal Information* (2003)
    ch.12.C
Toulson and Phipps, *Confidentiality* (2nd ed., 2006) para.3-171   G


**Li CJ**
1.   I agree with the judgment of Mr Justice Ribeiro PJ.


**Bokhary PJ**                                                    H
2.   Disclosure of matters to which an obligation of confidentiality
attaches can, at least in general, be justified by showing that the
disclosure was fairly required in the pursuit or protection of a legitimate
interest. In the ordinary way, a firm of accountants would be pursuing   I
a legitimate interest when seeking appointment as a liquidator. And
it would ordinarily be protecting that interest when endeavouring to
meet a suggestion that it lacks the requisite impartiality.
3.   The present situation is somewhat out of the ordinary. This is
because the firm had earlier conducted a due diligence review on the     J

A    company of which it later sought to be the liquidator. I proceed on the assumption that the firm was nevertheless pursuing a legitimate interest when seeking appointment as the company's liquidator. But that assumption does not bring the firm success. What it disclosed was that it had recommended against acquisition. Its stance is that such

B    disclosure was made in order to meet its former client's suggestion to the effect that having conducted the due diligence review deprived it of the impartiality that a liquidator must have. But that suggestion did not imply that it had recommended in favour of acquisition. Nor does the question of its impartiality turn on whether its recommendation

C    had been in favour of or against acquisition. For these reasons and those more fully stated by Mr Justice Ribeiro PJ, I do not regard the disclosure as fairly required.

4.   A sum of $100.00 is an appropriate one to represent damages which are nominal but not intended to be derisory. As to the measure

D    of damages and how costs should be dealt with, I agree with my brother Ribeiro. So I, too, would allow the appeal in the terms which he proposes.

**Chan PJ**

E    5.   I agree with the judgment of Mr Justice Ribeiro PJ.

**Ribeiro PJ**

6.   The question which falls to be considered was formulated by the Appeal Committee as follows:

F

In what circumstances, and to what extent, may a duty of confidentiality be relaxed to allow a person subject to that duty to defend himself against an adverse allegation made against him by the person to whom that duty is owed?

G

## *A.   The parties*

7.   The plaintiff (Nam Tai) is a company incorporated in the British

H    Virgin Islands and listed on the NASDAQ, a securities exchange in the United States. Nam Tai manufactures electronic products and supplies them to well known producers of electronic consumer goods. It was founded by Mr Koo Ming Kown (Mr Koo) who is a director of Nam Tai and its senior executive officer.

8.   The defendant, (PWC) is a well-known firm of certified public

I    accountants in Hong Kong. It is associated with a large international network of accountancy firms trading under the same name. From 1989 until November 1998, PWC acted as Nam Tai's auditors. Mr Robert Nield (Mr Nield) was the audit engagement and client

J    relationship partner.

### *B.   The relationship between the parties*

9.   Although the professional relationship between the parties had initially been close and cordial, it deteriorated and came to an end in late 1998. In early 1999, further contentious issues arose between them. For present purposes, there were three material facets to that relationship and its souring.

### *B.1   The audit relationship*

10.   First, it appears that Nam Tai became dissatisfied with PWC as its auditors in the course of the audit for the year ended 31 December 1997. There had been differences between them as to whether a tax refund from the Beijing authorities and whether the full amount of a debt plus interest, owed by a company called Tele-Art Inc ("Tele-Art", discussed further below), could properly be recognized as receivables. Mr Nield's impression was that Mr Koo thought that PWC did not believe the representations Mr Koo had made. He was somewhat surprised by Nam Tai's attitude and recalled that he "was horrified" at how badly the audit clearance meeting on 11 March 1998 had gone. At the end of April 1998, Nam Tai indicated that it was considering a change of auditors. In the circumstances described below, PWC resigned as Nam Tai's auditors on 26 November 1998.

### *B.2   The due diligence review*

11.   The second facet of the relationship involved the due diligence review conducted by PWC in respect of a company called Albatronics (Far East) Co Ltd (Albatronics) on Nam Tai's behalf between September and November 1998. Albatronics was a Hong Kong listed company involved in trading and distributing electronic products, notably products manufactured by Sony, the well-known Japanese consumer electronics company.

12.   On 11 September 1998, Nam Tai had entered into an agreement (the subscription agreement) with Albatronics to take up 700 million new shares in that company for just over HK$70 million in cash, thereby acquiring a controlling interest. Although Albatronics's auditors, Deloitte Touche Tohmatsu, had given it an unqualified audit opinion for the year ended 31 March 1998, it is clear that by September 1998, Albatronics was in serious financial trouble and was being referred to as a "distressed" company. Moreover, the directors had disclosed to Nam Tai that there were significant "unrecorded losses" which, as Nam Tai understood, meant that Albatronics's stated net assets had to be reduced by about HK$250 million. This was reflected in the terms of the subscription agreement which provided that there would be no liability for breach of warranty unless a breach

A     resulted in the company's consolidated net assets as at 31 July 1998 being reduced by more than HK$250 million.

     13.   Mr Koo's evidence was that he believed that injection of the HK$70 million would enable Albatronics to trade itself out of its distressed condition provided that the creditors, consisting of a

B     series of Japanese banks and suppliers including Sony, were prepared to continue providing support. Because Nam Tai had ample surplus cash, Mr Koo was prepared to go ahead with the acquisition without any due diligence review. However, he was, somewhat reluctantly, persuaded that such a review should take place and PWC was given

C     the job.

     14.   The PWC engagement partner for the due diligence review was Mr Neal Stow. Its main objective was to see if there were hidden liabilities exceeding the $250 million already disclosed. The engagement letter dated 18 September 1998 which was signed

D     by Mr Ed Chan, Nam Tai's then Chief Financial Officer, made it clear that the review would be limited in scope, based mainly on internal management information and discussion with key staff of Albatronics.

     15.   On 10 November 1998, PWC delivered its due diligence

E     report. It noted that Albatronics was "technically insolvent" and would be "dependent upon its bankers and Nam Tai to provide continued financial support". It indicated that a write down of net assets by a further HK$22 million beyond an acknowledged requirement for a write down of HK$240 million was needed. Significantly, the report

F     called into question the integrity of Albatronics's management, suggesting that they had deliberately misled the company's auditors, mis-stated its assets in a published circular and indulged in business practices which would be unacceptable for a US listed company subject to the Foreign Corrupt Practices Act. The report questioned

G     the wisdom of proceeding with the acquisition, stating:

> We have not been instructed to advise you either as to the proposed transaction or the terms of the Circular. However, in view of the advice which we understand that you have received from Johnson,

H     > Stokes and Master [a firm of solicitors], you may wish to consider with them and your financial advisors whether or not you wish to continue with the transaction on the current basis and whether or not you should seek to have the terms of the Circular and any announcement corrected.

I

     16.   Mr Koo was obviously well aware of the financial straits of Albatronics. But he took strong exception to the report's damning criticisms of that company's management. As Mr Nield reported on 26 November 1998, Mr Koo said that he disagreed with the review's

J     findings and asserted that there was "no evidence for saying their directors are thieves".

17.    On the same day, PWC resigned as Nam Tai's auditors. It had decided that it could not remain Nam Tai's auditors without also auditing Albatronics and were unwilling to assume the latter role in view of their concerns about the integrity of that company's management.

18.    Nam Tai's unhappiness with the due diligence report was reflected in a dispute regarding fees with Nam Tai denying Ed Chan's authority to sign the engagement letter. Eventually, PWC accepted payment of HK$500,000 in settlement of its bill for HK$1,245,264.75 with a view to bringing the matter to a close.

## B.3 Litigation over the Tele-Art debt

19.    Thirdly, the differences concerning the Tele-Art debt took on a further dimension when they resulted in litigation. Tele-Art was another BVI company listed on the NASDAQ. It too fell into financial difficulties and was the subject of a judgment debt which Nam Tai acquired as assignee. This was done in the context of some personal animosity between Mr Koo and Mr Elmer Yuen, Tele-Art's founder. Tele-Art's principal asset in mid-1998 was a parcel of Nam Tai shares worth some US$5 million and Nam Tai believed that it could recover in full the acquired debt with interest by setting off those amounts against the Nam Tai shares held by Tele-Art.

20.    On 17 July 1998, the BVI court made an order winding-up Tele-Art on Nam Tai's petition and, at Nam Tai's behest, appointed Mr David Hague (Mr Hague), a PWC partner introduced by Mr Nield, as liquidator. Nam Tai then gave notice of an intended redemption of the shares held by Tele-Art as a set-off against Tele-Art's debt. However, the other principal creditor of Tele-Art was the Bank of China which claimed to have a charge over those shares. Since an issue of priorities had evidently arisen between Nam Tai and the Bank of China, on 23 January 1999, Mr Hague obtained an injunction from the BVI court restraining Nam Tai from proceeding with its notice of redemption until that issue was determined.

21.    Nam Tai countered on 25 February 1999 with an application to remove Mr Hague as Tele-Art's liquidator, alleging that he was biased in the performance of his duties and had a conflict of interest, an allegation firmly denied by Mr Hague. That application was dismissed by the BVI court on 4 September 2000. Nam Tai's appeal was dismissed by the BVI Court of Appeal on 19 January 2001 and, on 20 June 2001, leave to appeal to the Privy Council was refused. However, that was not the end of the litigation since the priorities question still remained to be dealt with and Nam Tai had issued a fresh application for removal of Mr Hague on the ground of misconduct. Further discussion of that litigation is unnecessary.

22.    It is against the background of the foregoing matters that the disclosure complained of was made.

A

## C. *The acquisition and liquidation of Albatronics*

23.   As noted above, after 26 November 1998, Nam Tai was no longer a client of PWC, the relationship having ended with a degree of acrimony, at least as perceived by Nam Tai. Notwithstanding PWC's adverse recommendation, Nam Tai proceeded in December 1998 to

B
complete its acquisition of a controlling interest in Albatronics in accordance with the subscription agreement.

24.   In the following six months or so, an attempt was made to re-structure Albatronics financially. During this process, PWC assumed the role of advising Sony, one of the principal creditors. According

C
to Mr Koo, the needed support of the creditors was not forthcoming so that on 17 June 1999, the board of Albatronics announced that it had resolved to put the company into voluntary liquidation.

D

## D. *The bid for appointment as liquidator of Albatronics and the disclosure*

25.   News of the decision to liquidate Albatronics was keenly received by the large accountancy firms in Hong Kong. On 16 June 1999, the

E
day before the public announcement was made, Mr Colin Farrell, a PWC partner who had been advising Sony on tax matters, sent an e-mail to senior members of the partnership stating:

F
> FYI. A Deloitte financial report on the break-up of the Albatronics group estimated the liquidation fees at HK\$23m, so of potential financial interest.

He added:

G
> The potential perceived problem, I believe, is our old relationship with Nam Tai, the Albatronics group's majority shareholders.

26.   However, the PWC partners who would potentially be involved concluded that acting as liquidator of Albatronics would present no

H
conflict of interest problems, principally on the footing that PWC had never had a professional relationship with Albatronics. This conclusion was reached notwithstanding the recent problems in their relationship with Nam Tai which Mr Farrell had noted and despite their awareness that Nam Tai had expressed objections against their appointment.

I
Conscious of keen competition for the job from the other big firms, PWC launched a vigorous lobbying campaign aimed at convincing the creditors that PWC should be appointed. In doing so, PWC decided to disclose what is acknowledged to have been confidential information concerning the due diligence review it had conducted

J
for Nam Tai, which is what the present case is about.

27.   The disclosure came about as follows. On 28 June 1999, PWC made a presentation to Sumitomo Bank using a document entitled

"Liquidations Capabilities Overview" which was also circulated to    A
the other bank creditors. It stated:

> In September 1998, PWC conducted due diligence for Nam Tai in
> respect of its potential acquisition in Albatronics. We recommended
> that Nam Tai not make the acquisition. Nam Tai did not take our    B
> recommendation and proceeded to invest in Albatronics.

While it was publicly known that PWC had conducted a due
diligence review and that Nam Tai had thereafter proceeded to
make its investment in Albatronics, the fact that PWC had made a    C
recommendation against the acquisition was not in the public domain
and was clearly confidential.

28.    Disclosure of that confidential advice was repeated in identical
terms in a document headed "Liquidation Proposal of Albatronics"
(the Proposal) which was sent to Sony's solicitors on 17 August 1999    D
and distributed to the other creditors. I shall refer to the disclosure
of the confidential recommendation against proceeding with the
acquisition as "the negative disclosure".

29.    PWC's case is that the negative disclosure was justified since
it was made in order to counter Nam Tai's contention that PWC    E
should not be appointed liquidator because PWC would have a
conflict of interest in that role by reason of its prior involvement in
the due diligence review.

## E.   The present proceedings
F

30.   The negative disclosure contained in the Proposal is the basis
of Nam Tai's action against PWC. Initially, the claim was brought on
the basis of malicious falsehood and libel. Those causes of action have
fallen away and the only live claim is one for breach of confidence.    G

31.    As noted above, in answer to Nam Tai's claim, PWC asserts
that the negative disclosure was justified as a defensive response to
Nam Tai's objection to its appointment as liquidator. PWC contends
that a disclosure in such circumstances falls outside the scope of its
duty of confidentiality and that no liability for breach of confidence    H
ensues.

32.    That argument was accepted by Waung J at first instance[1] and
also in the Court of Appeal (Rogers V-P, Le Pichon and Cheung JJA).[2]
Its correctness is challenged on this appeal.
I

J

---
[1]   [2005] 2 HKLRD 461.
[2]   [2006] 4 HKLRD 121.

A    ## F.   *The legal principles*

### F.1   *The duty of confidentiality*

33.   It is common ground that PWC undertook a duty of
confidentiality to Nam Tai regarding the information imparted to it
B    in the due diligence review and in respect of the contents of the due
diligence report.

34.   Such a duty imposed an obligation on PWC not to
communicate the information to a third party and not to misuse the
confidential information, that is to say, not to make any use of it or
C    to cause any use to be made of it by others otherwise than for Nam
Tai's benefit, unless with Nam Tai's consent.[3] It was a duty which
survived termination of the client relationship and continued to bind
PWC to preserve the confidentiality arising during the subsistence
of that relationship.[4] The court is astute to protect a former client's
D    confidences and will restrain conduct on the part of the confidant
which exposes the former client to an avoidable risk of disclosure.[5]

### F.2   *Limits on the scope of the duty of confidentiality*

E    35.   The present appeal concerns the limits of or qualifications to
that duty. In cases like the present, where the duty of confidentiality
arises out of the parties' contractual relationship, the starting-point
is the influential decision of the English Court of Appeal in the
*Tournier* case.[6] In the context of a banker-customer contract, Bankes LJ
F    identified the limits of the duty of confidentiality as follows:

On principle I think that the qualifications can be classified under
four heads: (a) Where disclosure is under compulsion by law;
(b) where there is a duty to the public to disclose; (c) where the
G    interests of the bank require disclosure; (d) where the disclosure is
made by the express or implied consent of the customer.[7]

36.   It is PWC's case that the negative disclosure, being a defensive
response to Mr Koo's allegation that PWC should not be appointed
H    liquidator of Albatronics because it would have a conflict of interest
in that role, fell within either or both of the last two qualifications
on the duty: as a disclosure properly required by PWC's interests or
as one made with Nam Tai's express or implied consent. I shall refer

I

_____

[3]   *Bolkiah v KPMG* [1999] 2 AC 222 at p.235.
[4]   *Ibid*. See also *Tournier v National Provincial and Union Bank of England* [1924] 1 KB 461 at
       pp.473 and 485.
J    [5]   *Bolkiah v KPMG* [1999] 2 AC 222 at p.237.
[6]   *Tournier v National Provincial and Union Bank of England* [1924] 1 KB 461.
[7]   At p.473.

to these two heads of qualification as "the self-interest qualification" and "the consent qualification" respectively.

*F.3  The consent qualification generally*

37.  Subject to presently inapplicable exceptions, a party may obviously waive a right enjoyed under a contract. The consent qualification is an example of such a waiver. The waiver may be express or implied from the conduct of the confider. It is a question of fact whether, viewed objectively, the confider has consented to disclosure and the duty of confidentiality has been waived.

38.  In *Sunderland v Barclays Bank Ltd*,[8] for instance, it was held that the conduct of the customer in handing the telephone to her husband who then demanded an explanation for the bank's dishonouring of the customer's cheque justified the bank manager in thinking that she had impliedly consented to the bank informing her husband of its reason for doing so, waiving confidentiality.

39.  In *Mann v Carnell*,[9] a case involving legal professional privilege, the question of fact was approached by asking whether the conduct of the client was inconsistent with maintaining the confidentiality of the privileged communication. In their joint judgment, the majority in the High Court of Australia stated:[10]

> Legal professional privilege exists to protect the confidentiality of communications between lawyer and client. It is the client who is entitled to the benefit of such confidentiality, and who may relinquish that entitlement. It is inconsistency between the conduct of the client and maintenance of the confidentiality which effects a waiver of the privilege.

Stressing the objective nature of this approach, their Honours added:

> Waiver may be express or implied. Disputes as to implied waiver usually arise from the need to decide whether particular conduct is inconsistent with the maintenance of the confidentiality which the privilege is intended to protect. When an affirmative answer is given to such a question, it is sometimes said that waiver is 'imputed by operation of law'. This means that the law recognises the inconsistency and determines its consequences, even though such consequences may not reflect the subjective intention of the party who has lost the privilege.[11]

---

[8]  (1937–46) 5 LDAB 163.

[9]  (1999) 201 CLR 1.

[10]  Gleeson, Gaudron, Gummow and Callinan JJ at p.13.

[11]  *Ibid*, citing *Benecke v National Australia Bank* (1993) 35 NSWLR 110.

A   40.   I would add that in cases of implied waiver the conduct must clearly convey the meaning of the waiver relied on. As is pointed out by the editors of *Chitty on Contracts*,[12] cases of waiver are analogous to cases of promissory estoppel where it is well-established that clear and unequivocal conduct founding the estoppel is required. In *Woodhouse*
B   *AC Israel Cocoa Ltd SA & Another v Nigerian Produce Marketing Co Ltd*,[13] Lord Pearson drew the parallel in the following terms:

      This is not an appropriate case for a general examination of the principle which is sometimes known as "promissory estoppel",
C     though it is far removed from the familiar kind of estoppel by representation of fact and seems, at any rate in a case of this kind, to be more like a waiver of contractual rights. In a case of this kind the alleged "representation" or promise or assurance ought to be reasonably clear and definite both as to the terms of the contract
D     which is being waived and as to the duration of the waiver. It may be that the "representation" or promise or assurance has to have at least as much precision as would be needed for a variation of the contract.

E   41.   A disclosure made on the basis of a waiver is not permitted to exceed the scope of the waiver established. Thus, in *Lillicrap & Another v Nalder & Son*,[14] a case involving a suit against solicitors, Dillon LJ pointed out that the client's waiver generally "can only extend to matters which are relevant to an issue in the proceedings
F   and, privilege apart, admissible in evidence. There is no waiver for a roving search into anything else in which the solicitor or any other solicitor may have happened to have acted for the clients." Similarly, in *Paragon Finance Plc & Others v Freshfields*,[15] a client suing its former solicitors for negligence in the handling of a transaction was held to
G   have waived confidentiality regarding that firm, but not in respect of the solicitors subsequently instructed to pursue and settle the client's claims arising out of that transaction against a third party.

H   *F.4   The self-interest qualification generally*

    42.   As explained in *Tournier* and subsequent cases, the self-interest qualification is the reflection of an implied term permitting the confidant to disclose confidential information where such disclosure is necessary for the business efficacy of their ordinary contractual
I   transactions.

---

J   [12] *Chitty on Contracts* (29th ed., 2004) Vol.1, para.22-044.
    [13] [1972] AC 741 at p.762.
    [14] [1993] 1 WLR 94 at p.99.
    [15] [1999] 1 WLR 1183.

A

43. Thus, in *Tournier*, Bankes LJ gave as an example of the self-interest qualification's operation, a disclosure "where a bank issues a writ claiming payment of an overdraft stating on the face of the writ the amount of the overdraft".[16] Scrutton LJ also referred to the bank "collecting or suing for an overdraft" and to making disclosure in its own interests "to an extent reasonable and proper for carrying on the business of the account, as in giving a reason for declining to honour cheques drawn or bills accepted by the customer, when there are insufficient assets".[17]

B

44. So viewed, the self-interest qualification is of limited scope. This was the approach of the Court of Appeal in *FDC Co Ltd & Others v Chase Manhattan Bank NA*,[18] where a bank with headquarters in New York and a branch in Hong Kong found itself sandwiched between, on the one hand, an order of a United States court compelling it to disclose information about accounts maintained by customers with the Hong Kong branch and, on the other, an injunction issued by the Hong Kong court preventing such disclosure. Faced with the prospect of severe penalties if it failed to comply with the New York order, the bank would have considered it very much in its own interests to make the disclosure. But, as Huggins V-P pointed out, the information was not needed in the United States of America "in the ordinary course of banking business" but "solely for the purpose of its being disclosed to the United States' Government"[19] so that the self-interest qualification, understood in the narrow sense discussed above, was held to be inapplicable. Silke JA put it as follows:

C

D

E

F

> While I fully accept that the financial implication of this and of the foreign proceedings, on the face of it, would suggest that it would be in the interests of the Bank to disclose and therefore to excuse them under a *Tournier* exception from the performance of their obligation, I do not read that exception to be in reality such cover. It must mean in the interests of ordinary banking practice, such as when they find it necessary to sue upon an overdraft or matters of that kind. The issues here are very much wider than those narrow interests of the Bank as I see them to be.[20]

G

45. However, developments in the law indicate that the self-interest qualification is now more liberally applied and regarded as extending beyond the narrow confines described above. In particular, as discussed

H

I

—————————
[16] *Tournier v National Provincial and Union Bank of England* [1924] 1 KB 461 at p.473.
[17] At p.481.
[18] [1990] 1 HKLR 277.
[19] At p.284.
[20] [1990] 1 HKLR 277 at p.292.

J

A in the section which follows, it has been held to encompass a "self-defence exception" (to adopt the expression used by Professor Rosemary Pattenden in her valuable textbook discussion[21]) based upon a broader view of the requirements of business efficacy or of the terms which may be implied as a matter of law in the confidentiality

B context.

### F.5 *Disclosure in self-defence: litigation and disciplinary proceedings*

C 46. It is well-established that a professional confidant is entitled to make a defensive disclosure in two situations. The first of these is where legal proceedings are brought against him by the client (by which term I include a former client), for example, in an action for professional negligence. The legal basis of this exception was explained

D in *Paragon Finance Plc & Others v Freshfields*[22] by Lord Bingham of Cornhill CJ in the following terms:

E When a client sues a solicitor who has formerly acted for him, complaining that the solicitor has acted negligently, he invites the court to adjudicate on questions directly arising from the confidential relationship which formerly subsisted between them. Since court proceedings are public, the client brings that formerly confidential relationship into the public domain. He thereby waives any right to claim the protection of legal professional privilege in

F relation to any communication between them so far as necessary for the just determination of his claim; or, putting the same proposition in different terms, he releases the solicitor to that extent from the obligation of confidence by which he was formerly bound. This is an implication of law, the rationale of which is plain. A party cannot

G deliberately subject a relationship to public scrutiny and at the same time seek to preserve its confidentiality. He cannot pick and choose, disclosing such incidents of the relationship as strengthen his claim for damages and concealing from forensic scrutiny such incidents as weaken it. He cannot attack his former solicitor and deny the

H solicitor the use of materials relevant to his defence.

47. A similar approach had been adopted in the earlier case of *Lillicrap & Another v Nalder & Son*,[23] where Dillon LJ approved May J's formulation in the lower court which was as follows:

I

J [21] Rosemary Pattenden, *The Law of Professional-Client Confidentiality* (2003) ch.12.C.
[22] [1999] 1 WLR 1183 at p.1188.
[23] [1993] 1 WLR 94, citing May J at p.99.

A

> A client who sues his solicitor invites the court to adjudicate the dispute and thereby, in my judgment, waives privilege and confidence to the extent that is necessary to enable the court to do so fully and fairly in accordance with the law including the law of evidence.

B

Similarly, Russell LJ stated:

> … by bringing civil proceedings against his solicitor, a client impliedly waives privilege in respect of all matters which are relevant to the suit he pursues and, most particularly, where the disclosure of privileged matters is required to enable justice to be done.[24]

C

48.   And in *Nederlandse Reassurantie Groep Holding NV v Bacon & Woodrow (No 1)*,[25] in a passage approved in the *Paragon* case,[26] Colman J provided the following explanation of the *Lillicrap* decision:

D

> The true analysis of what the courts are doing in such cases of so-called implied waiver of privilege is, in my judgment, to prevent the unfairness which would arise if the plaintiff were entitled to exclude from the court's consideration evidence relevant to a defence by relying upon the privilege arising from the solicitor's duty of confidence. The client is thus precluded from both asserting that the solicitor has acted in breach of duty and thereby caused the client loss and, to make good that claim, opening up the confidential relationship between them and at the same time seeking to enforce against that same solicitor a duty of confidence arising from their professional relationship in circumstances where such enforcement would deprive the solicitor of the means of defending the claim. It is fundamental to this principle that the confidence which privilege would otherwise protect arises by reason of the same professional relationship between the parties to the litigation. The underlying unfairness which the principle aims to avoid arises because the claim is asserted and the professional relationship opened for investigation against the very party whose duty of confidence is the basis of the privilege. It is against the unfairness of both opening the relationship by asserting the claim and seeking to enforce the duty of confidence owed by the defendant that the principle is directed.[27]

E

F

G

H

49.   **The rationale for recognizing a self-defence exception in litigation cases therefore has two aspects. The first involves an application of the doctrine of implied waiver reflecting the consent qualification. The client who brings an action complaining about the**

I

---

[24] At p.101.
[25] [1995] 1 All ER 976.
[26] [1999] 1 WLR 1183 at p.1191.
[27] [1995] 1 All ER 976 at p.986.

J

A  professional's conduct in the course of their confidential relationship
   must know that this entails a public airing of the claim and the defence.
   The client may therefore be taken to have consented to a waiver of
   confidentiality. Secondly, in the cases cited, disclosure of the client's
   confidences has been justified as an implicit requirement of fairness
B  in the specific context of legal proceedings initiated by the confider,
   reflecting recognition of the confidant's entitlement to protect its own
   interests in that context. It may be noted that Lord Bingham CJ in
   the *Paragon* case[28] indicated that the term was an implication of law.
   As we shall see, it has been suggested elsewhere[29] that the implication
C  is made as a matter of business efficacy.

       50.   The second category of cases where a self-defence exception
   is generally recognized involves professional disciplinary proceedings
   initiated against the confidant by the client. *R v Institute of Chartered
   Accountants of England and Wales & Others, ex p Brindle & Others*,[30] is an
D  instance. While Hirst LJ pointed out that the duty of confidentiality
   owed to the client in such circumstances will often be overridden by
   compulsion of law (where the professional body has relevant statutory
   powers[31]) or may be justified as a disclosure in the public interest, his
   Lordship went on to say that, alternatively, the accountants against
E  whom a complaint had been made "would be entitled to produce any
   such documents as were required to further their own defence" by
   virtue of the *Tournier* principles. Although cases involving disciplinary
   proceedings do not appear to have received detailed analysis, it is my
   view that the approach adopted to defensive disclosures in litigation
F  cases is equally applicable in the disciplinary context.

### F.6   *Disclosure in self-defence: litigation and complaints involving third parties*

G  51.   It appears now to be accepted that a confidant who owes a duty
   of confidentiality to his client may be entitled to disclose information
   covered by that duty in order to defend himself in legal proceedings
   brought by a third party. Similarly, it appears to be accepted that such
   disclosure may be permissible in disciplinary proceedings initiated
H  against a professional confidant, not by the client, but by a third party.
   As such proceedings are not brought by the client to whom the duty
   is owed, disclosure in these cases cannot be justified on the basis
   of a waiver by the client. Justification, applying *Tournier* principles,
   rests on the self-interest qualification applied in the context of "self-
I  defence".

---

[28] *Paragon Finance Plc & Others v Freshfields* [1999] 1 WLR 1183 at p.1188.
[29] By Colman J in *Hassneh Insurance Co of Israel & Others v Steurt J Mew* [1993] 2 Lloyd's Rep
J    243.
[30] [1994] BCC 297 at p.312.
[31] As in *Solicitor v Law Society of Hong Kong* (2006) 9 HKCFAR 175.

A

52.   Thus, in *Tournier* itself, Atkin LJ stated:

B

… the bank have the right to disclose such information when, and to the extent to which it is reasonably necessary for the protection of the bank's interests, either as against their customer *or as against third parties* in respect of transactions of the bank for or with their customer …[32] (Italics supplied.)

C

His Lordship accordingly recognized that in the context of the self-interest qualification, the implied term extends to permitting the bank to make such defensive disclosures where the third party's attack arises "in respect of transactions of the bank for or with their customer". The fairness of such a rule is evident since the bank would be claiming the right to defend itself against potential liability to a third party which it attracted by virtue of its having processed the customer's transactions: a course of action to which the customer may be taken impliedly to have agreed.

D

53.   In *Hassneh Insurance Co of Israel & Others v Steurt J Mew*,[33] Colman J held that the principle extends to permitting a disclosure made, not merely in "self-defence", but in the enforcement of the confidant's rights asserted against a third party. *Hassneh Insurance* was a case where a reassurer's disclaimer of liability was upheld against the reassured in confidential arbitration proceedings. In consequence, the reassured sought to bring a claim against the placing brokers and wished to disclose the documents discovered in the arbitration as well as the award and reasons for the award in aid of that claim. The reassurers objected and claimed injunctions against such disclosure. Colman J held that confidentiality of the documents used in the arbitration had to be preserved but that the award and reasons could be used in the subsequent proceedings. Basing himself on *Tournier*, Colman J's reasoning was as follows:[34]

E

F

G

Implicit in all these formulations of the scope of the duty of confidence is that the bank should be able to disclose the information if to withhold it would or might prejudice the bank in the establishment or protection of its own legal rights *vis-à-vis* the customer or third parties. The essence of the matter is that it might need to disclose the information either as the foundation of a defence to a claim by a third party, or as the basis for a cause of action against a third party.

H

In my judgment, a similar qualification must be implied as a matter of business efficacy in the duty of confidence arising under an agreement to arbitrate. If it is reasonably necessary for the

I

---

[32] *Tournier v National Provincial and Union Bank of England* [1924] 1 KB 461 at p.486.

[33] [1993] 2 Lloyd's Rep 243.

[34] At p.249.

J

A    establishment or protection of an arbitrating party's legal rights
     *vis-à-vis* a third party, in the sense which I have described, that the
     award should be disclosed to that third party in order to found a
     defence or as the basis for a cause of action, so to disclose it would
     not be a breach of the duty of confidence.

B

**Colman J therefore justified this extension (in relation to disclosure of
the award and reasons, but not the documents) on the basis of a term
implied as a matter of business efficacy in the arbitration agreement
between the original parties to the dispute. As previously noted,**
C **Lord Bingham CJ's approach in *Paragon* differed in that his Lordship
approached the term as one implied by law.**

     54.   It is unnecessary, and may not be possible in the present state
of the authorities, to attempt to resolve that difference. The present
appeal does not involve claims or complaints by or against third
D parties. However, the "third party" cases are relevant as indicating
that justified disclosures "in self-defence" outside the well-established
categories of litigation or disciplinary proceedings brought by the
client have come to be recognized as justifiable on the basis of the
self-interest qualification.

E

## F.7   Disclosure in self-defence: other cases

     55.   Does the self-interest qualification reflected in a self-defence
exception operate in a case like the present? Nam Tai has not initiated
F any litigation or disciplinary proceedings against PWC. It cannot
therefore be taken to have thereby waived confidentiality. Neither is
PWC being sued or being made the subject of a disciplinary complaint
by a third party, whether in connection with any transactions undertaken
with or for Nam Tai or otherwise. Nor is PWC seeking to establish
G its legal rights in litigation or equivalent proceedings against a third
party.
     56.   What PWC asserts is an entitlement to make disclosure in
"self-defence" by virtue of the fact that Nam Tai had communicated to
the creditors its objection against PWC being appointed as liquidator
H of Albatronics, alleging that PWC's prior involvement in the due
diligence review meant that it would have a conflict of interest *qua*
liquidator. The negative disclosure is sought to be justified simply on
the basis that a defensive response to that allegation was fairly required.
Given the principles discernible from the existing authorities, is such
I a self-defence exception capable of arising in such circumstances, and
if so, subject to what conditions?
     57.   Mr Joseph Fok SC,[35] who argued the appeal on PWC's
behalf with conspicuous ability, submits that there is no reason in

J

---
[35] Appearing with Mr Alexander Stock.

principle why such an exception should not arise in the present case. He contends that it can properly be founded on either or both of the consent and self-interest qualifications.

58.   I would accept that a term permitting a defensive disclosure by the confidant when confronted with a hostile allegation made by the confider may in principle be implied as an aspect of the self-interest or consent qualifications in situations other than those established in the cases discussed above.

59.   Mr Fok invited the Court to adopt Brennan J's broad approach in *Esso Australia Resources Ltd v Plowman*.[36] In discussing the *Tournier* principles and the decision in the *Hassneh Insurance* case,[37] his Honour stated:

> I would imply an obligation of confidentiality as a matter of business efficacy but limit the implication by reason of the likelihood that one or other party would have reserved the right to disseminate otherwise confidential material in certain situations.

In particular, Brennan J took one such situation to involve cases "where disclosure of the material is fairly required for the protection of the party's legitimate interests."[38] Mr Fok submitted that such a term, implied in the present case, justifies PWC in making the negative disclosure.

60.   I would accept the implication of such a term in the present case in the context of a claim to make a disclosure in "self-defence". Nam Tai and PWC should be taken to have impliedly agreed (whether as a matter of business efficacy or by implication of law) that disclosure of otherwise confidential information may be made where such disclosure is fairly required for the protection — by which I include furtherance — of either party's legitimate interests. I shall refer to this term as "the defensive disclosure term". That, however, is not the end of the inquiry. As is pointed out in the textbook by Toulson and Phipps:[39]

> What is "fairly required" and what are "legitimate interests" will necessarily depend on the circumstances and nature of the relationship between the confider and confidant.

61.   It can readily be seen that the requirements of the defensive disclosure term are met in the litigation and disciplinary proceedings cases discussed in Sections F.5 and F.6 above. However, each disclosure

---

[36] (1994–1995) 183 CLR 10.

[37] *Hassneh Insurance Co of Israel & Others v Steurt J Mew* [1993] 2 Lloyd's Rep 243.

[38] (1994–1995) 183 CLR 10 at p.36.

[39] *Toulson and Phipps, Confidentiality* (2006) at §3-171.

A  which is said to be a defensive response needs to be individually scrutinized, asking whether it was made for the protection or in furtherance of the party's legitimate interests and whether such disclosure was fairly required.

B

## G. The principles applied

### G.1 Was the negative disclosure made in furtherance of PWC's legitimate interests?

C  62.   Sir John Swaine SC, appearing for Nam Tai, submitted that it was self-evident that PWC was fixed with confidential information gained in the due diligence review which it could not avoid misusing if it were to be appointed liquidator. Accordingly, so the argument ran, PWC could not legitimately seek appointment and therefore
D  could not justify the negative disclosure made in furtherance of its attempts at securing the same.

   63.   I am unable to accept that argument. Whether PWC would have been precluded from acting as liquidator by reason of confidential information acquired in conducting the due diligence review has not
E  been explored. As the creditors decided against appointing PWC in any event, there was never any cause to investigate that question and, in the absence of such investigation, the disqualification of PWC cannot simply be taken as self-evident.

   64.   PWC's efforts at securing appointment as liquidator of
F  Albatronics were undertaken as part of the firm's ordinary professional activities and therefore, in my view, in pursuit of its legitimate interests. The negative disclosure formed part of those efforts and is to be regarded, for the purposes of the defensive disclosure term, as having been made in furtherance of PWC's legitimate interests.

G

### G.2 Was the negative disclosure fairly required?

   65.   It is in relation to this requirement of the defensive disclosure term that PWC encounters difficulties. For PWC to show that the
H  negative disclosure was fairly required as a defensive response to Nam Tai's allegation of conflict of interest, it must first of all establish that, reasonably understood, the negative disclosure was actually *a response* to the allegation. Whether that is made out must be considered both from the perspective of PWC and from the perspective of the creditors
I  to whom Nam Tai communicated the allegation. It must, in other words, have been reasonable for PWC to understand that it was being attacked in a manner which justified its particular response. Equally, for that response consisting of the negative disclosure made to the creditors to be justified, it had to address Nam Tai's allegation as it
J  would reasonably have been understood by the creditors.

   66.   If the negative disclosure constitutes a response to the allegation, it would then be necessary to ask: Was it necessary to

make the negative disclosure or ought PWC reasonably to have    A
taken other steps before resorting to the dissemination of confidential
information? Did the disclosure exceed what was fairly required by
way of self-defence?

### G.2a   From PWC's perspective                                      B
67.   Whether PWC reasonably understood Nam Tai's allegation to
have a meaning which justified the making of the negative disclosure
must be considered in the light of the circumstances of the parties'
relationship, known to them both.

68.   It is of course elementary and was no doubt appreciated as    C
a practical matter by all concerned that a liquidator has a duty to act
impartially. As Sir WM James LJ stated in *Gooch's Case*:[40]

> … it is of the utmost importance that the liquidator should, as the
> officer of the Court, maintain an even and impartial hand between    D
> all the individuals whose interests are involved in the winding-up.
> He should have no leaning for or against any individual whatever.

69.   Nam Tai's allegation of conflict of interest was made against the
background discussed in Sections B.1, B.2 and B.3 above, involving    E
the souring and termination of their audit relationship; Mr Koo's
vehement disagreement with the findings of the due diligence review
concerning the integrity of Albatronics's management; his refusal to
pay the fees in full; and the on-going BVI litigation between Nam
Tai and Mr Hague, a PWC partner. In that context, upon being told    F
that PWC was seeking appointment as liquidator, it would hardly
have been surprising if Nam Tai became concerned about PWC's
ability to act impartially as liquidator *vis-à-vis* itself and it would have
been natural for PWC reasonably to interpret Nam Tai's objection,
expressed in terms of a potential conflict of interest, as reflecting    G
such a concern.

70.   Indeed, there is little doubt that PWC did in fact realise
that such anxiety might well have underlain Nam Tai's allegation of
conflict since it was at pains to address that possible concern in the
Proposal. In the section headed "Independence" it noted that Nam    H
Tai "has raised concerns regarding our ability to act as independent
Liquidators of Albatronics … because of our previous dealing with it."
The Proposal went on to tell the creditors about PWC's resignation
as Nam Tai's auditors, about its conduct of the due diligence review
(in the course of which it made the negative disclosure) and about the    I
fact that there was on-going litigation with Nam Tai in connection
with Tele-Art in the BVI. It asserted that these three matters:

                                                                       J

---

[40] *Re Contract Corp (Winding Up: Production of Documents)* (1871–72) LR 7 Ch App 207 at
p.211. And see the cases cited in *McPherson's Law of Company Liquidation* (2001) at p.380.

A      … do not in any way impair our independence in acting as Liquidator
       of Albatronics. In fact the above confirms our true independence
       in this matter.

B      **71.** It is therefore evident that from PWC's perspective, knowing
       that Nam Tai would have considered some bad blood to exist between
       the parties, Nam Tai's allegation could reasonably be understood as
       expressing its anxiety about PWC's potential lack of impartiality.
       Concern about a possible tendency on PWC's part to prefer the
       interests of others involved in the liquidation over the interests of
C      Nam Tai may well have been expressed in terms of a potential conflict
       of interest.

       **72.** Moreover, given the damning remarks PWC had made in
       the due diligence report concerning the integrity of the management
       of Albatronics, remarks which Mr Koo had rejected, Nam Tai would
D      naturally have been concerned that, if appointed liquidator, PWC
       would not assume the office with a fresh and open mind, but would
       be inclined to vindicate the condemnatory views it had already
       expressed. This again may well have been seen by Nam Tai as giving
       rise to a potential conflict between PWC's interest in upholding the
E      assessment it had already made in the due diligence exercise and its
       duty to act as an impartial and open-minded liquidator.

       **73.** It is therefore my view that reasonably understood in
       the light of the parties' mutual dealings, the content of Nam Tai's
       allegation was *not* such as to justify a response in the terms of the
F      negative disclosure. The statement that PWC would have a conflict
       of interest if appointed was capable of bearing different meanings,
       some of which had nothing to do with PWC making either a positive
       or negative recommendation regarding Nam Tai's acquisition of
       Albatronics. Indeed, an allegation of conflict founded on a perceived
G      impediment to PWC acting impartially as liquidator because of its
       possible preconceptions regarding past management misdeeds is an
       allegation which is wholly consistent with PWC having given a
       negative, and not a positive, recommendation. So understood, it is
       a *non sequitur* to suggest that the disclosure that PWC had made a
H      negative recommendation was a required response.

       **G.2b    From the creditors' perspective**

       **74.** Nam Tai's conflict of interest allegation was no less equivocal
       from the perspective of the creditors. It was an opaque criticism and
I      would not have suggested any particular objections to the creditors.
       They could reasonably have thought that Nam Tai's objection
       had something to do with PWC having been given confidential
       information for the due diligence review which would impede its
       carrying out the duties of liquidator, or that the objection was related
J      to some dispute which had arisen in the course of the review with
       the same consequence, or they might simply have acknowledged that
       Nam Tai's opposition was founded upon some undisclosed complaint,

A

whether or not justified, to which they were not privy. A complaint of such an equivocal character is incapable of justifying the negative disclosure which specifically addresses PWC's recommendation against acquisition. The negative disclosure might well have been justified as a response if Nam Tai had falsely alleged that PWC had positively recommended acquisition, but no such meaning can be attributed to the objection which Nam Tai in fact raised.

B

75.    Neither does waiver provide a basis for justified disclosure in such circumstances. Its equivocal nature prevents Nam Tai's objection from reasonably being understood to constitute an implied waiver of its right to confidentiality concerning PWC's recommendations in the due diligence report. As previously noted,[41] any waiver must be clear and definite and, for any particular disclosure to be justified, it must fall within the scope of the waiver relied upon. Nam Tai's allegation bears no such clarity and there is no basis for holding that the negative disclosure came within the compass of any waiver of confidentiality on Nam Tai's part.

C

D

76.    Given this conclusion, the question whether the negative disclosure was fairly required to be made in the protection of PWC's legitimate interests must be answered in the negative. It is therefore unnecessary to go on to consider whether PWC ought reasonably to have resorted to other measures before plunging into a disclosure. It should however be obvious that a disclosure of confidential information in the confidant's own interests without the confider's express consent is fraught with danger since reliance on implied consent or upon the self-interest qualification is likely to be susceptible to challenge and subject to a degree of uncertainty.

E

F

### G.3    The view of the courts below

G

77.    I am accordingly, with respect, unable to agree with Waung J's view that that Nam Tai's allegation of conflict necessarily implies a general waiver of confidentiality connected with the work done by PWC in the due diligence review.[42] Nor am I able to accept that the opaque objection "put the due diligence work … into the public domain of the creditors" destroying the confidentiality of the report.[43] While I would agree in principle with his Lordship's statement that "it is only fair that the person who has [the] right of confidence does not abuse it by making an attack,"[44] I do not consider that Nam Tai's objection can reasonably be understood to constitute such abuse.

H

I

---

[41] Section F.3 above.
[42] Judgment §47.
[43] Judgment §49.
[44] Judgment §48.

J

A    78.   In the Court of Appeal, Le Pichon JA (with whom the other
members of the Court agreed) considered this a case where the
negative disclosure was fairly required or necessary as a matter of
self-defence, stating:

B        In order to dispel any notion of conflict arising, PwC was entitled
         to respond and its response had to address the unarticulated and
         therefore unintelligible accusation of conflict of interest. Given
         public knowledge that it had carried out due diligence on behalf of
         Nam Tai, that Nam Tai did make the acquisition of Albatronics and
C        that Albatronics went into deep financial trouble shortly thereafter,
         it required nothing less than the disclosure that PwC had advised
         negatively. Had PwC gone further and disclosed details of its findings,
         Nam Tai might have been in a better position to complain. But
         that did not happen. PwC limited its disclosure to the minimum
D        which was its negative recommendation. In my view, that disclosure
         was "fairly required" or "necessary" to meet the unparticularised
         allegations of conflict made against it.[45]

     79.   With respect to her Ladyship, if Nam Tai's accusation of conflict
E    of interest was "unarticulated and therefore unintelligible", it is hard
to see how the disclosure made by PWC regarding the particular
recommendation made concerning acquisition of Albatronics can
properly be regarded as a defensive response addressing the same. The
proposition may be tested as follows. Suppose Nam Tai had simply said
F    to the creditors: "We have had dealings with PWC in the past and we
object to its appointment as liquidator." Surely it could not be said
that by virtue of the lack of particularity in Nam Tai's objection, PWC
thereby became entitled to make disclosure of whatever confidential
information it happened to believe might meet some unarticulated
G    premise to Nam Tai's statement.
     80.   But that is the effect of the passage cited above. PWC had
evidently worked out for itself that, given knowledge on the part of
the creditors that it had done the due diligence review and that Nam
Tai had thereafter proceeded with the acquisition, it was quite possible
H    or even likely that the creditors would put two and two together
and assume that Nam Tai had made the acquisition on the basis of
a positive recommendation by PWC. If that was their assumption
then PWC could no doubt see that the creditors might object to
its appointment as liquidator for fear of PWC seeking to sustain its
I    positive recommendation and therefore possibly failing to pursue all
available avenues for the recovery of assets. On this line of reasoning,
it was perfectly understandable that PWC would desire to make
the disclosure that it had in fact made a negative recommendation.

J

---
[45] Judgment §23.

However, such thinking represents PWC's own projection of what the     A
creditors might assume and how to dispel any such assumption. It was
not a response to anything said by Nam Tai, reasonably understood.

81.    Mr Fok SC invited the Court to hold that so long as the
negative disclosure represented a defensive response to one of several
contentions possibly underlying Nam Tai's allegation of conflict     B
of interest, such disclosure ought to be regarded as justified. I am
unable to accept that submission. A disclosure must be shown clearly
and objectively to fall within either the consent or self-interest
qualifications if it is to be justified. To permit disclosures on the basis
of what the confidant may believe, without clear objective justification,     C
to underlie an opaque statement made by the confider would be
unacceptably destructive of the protection afforded by the law to
the former client's confidences. It cannot generally be the proper
response to an unparticularised adverse allegation for the confidant
to plunge at once into a disclosure of confidential information. It is     D
reasonable to expect him first to consider other options: to demand
clarification or to take other steps aimed at challenging the adverse
allegation without disseminating confidential information.

                                                                          E

## *H.   Conclusion and relief*

82.    For the foregoing reasons I conclude that PWC's making of the
negative disclosure constituted a breach of the duty of confidentiality
owed to Nam Tai as a former client.                                       F

83.    Sir John Swaine accepts that Nam Tai suffered no pecuniary loss
in consequence and has not sought to support the claim for exemplary
damages set out in Nam Tai's pleadings. In the circumstances, an award
of nominal damages should be made. I would accordingly allow the
appeal and order PWC to pay to Nam Tai the sum of HK$100 by
way of nominal damages. I would direct that the parties be at liberty     G
to file and serve submissions in writing as to the costs in this Court
and below. Such submissions should be filed and served as follows: by
Nam Tai within 21 days of the date of this judgment and by PWC in
response within 21 days thereafter.

                                                                          H

### McHugh NPJ
84.    I agree with the judgment of Mr Justice Ribeiro PJ.


### Li CJ
85.    The Court unanimously allows the appeal and orders PWC to     I
pay to Nam Tai the sum of $100 by way of nominal damages. The
Court makes the directions concerning the filing of submissions as
to costs set out in the concluding paragraph of Mr Justice Ribeiro's
judgment.