# Exhibit 9

Q.B.

A    A AND OTHERS v. B BANK (GOVERNOR AND COMPANY OF
THE BANK OF ENGLAND INTERVENING)

1991  May 7, 9; 10                                              Hirst J.

*Banking—Deposits—Deposit-taking business—Injunction restraining
disclosure to third parties of documents relating to plaintiffs'
accounts—Bank of England issuing statutory notice ordering
production of documents—Whether notice overriding injunction—
Whether injunction "reasonable excuse" for failing to comply
with notice—Banking Act 1987 (c. 22), s. 39(3)(a)(11)*

In proceedings initiated in New York by the United States Federal Reserve Board the defendant bank was ordered by subpoena duces tecum to produce to a grand jury documents relating to accounts held by the plaintiffs. The plaintiffs obtained an injunction in the High Court prohibiting the bank from producing the documents to the New York court or to third parties. Subsequently the defendant bank was served by the Bank of England with a notice pursuant to section 39(3)(*a*) of the Banking Act 1987[1] requiring it to produce certain classes of documents, including documents covered by the injunction.

On the defendants' application for directions as to whether they were at liberty to comply with the Bank of England's notice notwithstanding the terms of the injunction, or alternatively for variation or discharge of the injunction so as to permit such compliance:—

*Held*, granting the application, that the Act of 1987 placed the Bank of England under a wide public duty to supervise deposit-taking businesses, the fulfilment of which often required it to take urgent action in the interests of those whom the Act was designed to protect; that a notice from the Bank of England under section 39(3)(*a*) of the Act of 1987 requiring production of documents overrode an injunction restraining disclosure of the documents to a third party, and the existence of an injunction did not constitute a reasonable excuse under section 39(11) for failure to comply with the section 39 notice; and that the injunction should not, in any event, be interpreted as prohibiting compliance with the notice; that it was proper for such a notice to specify the documents to which it applied by class rather than individually; and that, accordingly, the defendants should be directed to comply with the notice (post, pp. 324B–D, G, 325F–G, 328A, 329A).

*Reg. v. Inland Revenue Commissioners, Ex parte Taylor (No. 2)* [1989] 3 All E.R. 353, D.C. and *Bank of England v. Riley* [1992] Ch. 475, C.A. applied.

*E.M.I. Records Ltd. v. Spillane* [1986] 1 W.L.R. 967 and *In re An Inquiry under the Company Securities (Insider Dealing) Act 1985* [1988] A.C. 660, H.L.(E.) distinguished.

The following cases are referred to in the judgment:

*Bank of England v. Riley* [1992] Ch. 475; [1992] 2 W.L.R. 840; [1992] 1 All E.R. 769, C.A.
*E.M.I. Records Ltd. v. Spillane* [1986] 1 W.L.R. 967; [1986] 2 All E.R. 1016

---

[1] Banking Act 1987, s. 39(3)(*a*)(11): see post, p. 317E–H.

 *I.T.C. Film Distributors Ltd. v. Video Exchange Ltd.* [1982] Ch. 431; [1982] 3 W.L.R. 125; [1982] 2 All E.R. 241

 *Inquiry under the Company Securities (Insider Dealing) Act 1985, In re An* [1988] A.C. 660; [1988] 2 W.L.R. 33; [1988] 1 All E.R. 203, C.A. and H.L.(E.)

 *Parry-Jones v. Law Society* [1969] 1 Ch. 1; [1968] 2 W.L.R. 397; [1968] 1 All E.R. 177, C.A.

 *Reg. v. Inland Revenue Commissioners, Ex parte Rossminster Ltd.* [1980] A.C. 952; [1980] 2 W.L.R. 1; [1980] 1 All E.R. 80, H.L.(E.)

 *Reg. v. Inland Revenue Commissioners, Ex parte T. C. Coombs & Co.* [1991] 2 A.C. 283; [1991] 2 W.L.R. 682; [1991] 3 All E.R. 623, H.L.(E.)

 *Reg. v. Inland Revenue Commissioners, Ex parte Taylor (No. 2)* [1989] 3 All E.R. 353, D.C.

The following additional cases, supplied by courtesy of counsel, were cited in argument:

 *Attorney-General v. Times Newspapers Ltd.* [1992] 1 A.C. 191; [1991] 2 W.L.R. 994; [1991] 2 All E.R. 398, H.L.(E.)

 *Barclays Bank Plc. (trading as Barclaycard) v. Taylor* [1989] 1 W.L.R. 1066; [1989] 3 All E.R. 563, C.A.

 *Butler v. Board of Trade* [1971] Ch. 680; [1970] 3 W.L.R. 822; [1970] 3 All E.R. 593

 *Galaxia Maritime S.A. v. Mineralimportexport* [1982] 1 W.L.R. 539; [1981] 1 All E.R. 796, C.A.

 *Goddard v. Nationwide Building Society* [1987] Q.B. 670; [1986] 3 W.L.R. 734; [1986] 3 All E.R. 264, C.A.

 *Helliwell v. Piggott-Sims* [1980] F.S.R. 356, C.A.

 *Libyan Arab Foreign Bank v. Bankers Trust Co.* [1989] Q.B. 728; [1989] 3 W.L.R. 314; [1989] 3 All E.R. 252

 *Reg. v. Gaming Board for Great Britain, Ex parte Benaim and Khaida* [1970] 2 Q.B. 417; [1970] 2 W.L.R. 1009; [1970] 2 All E.R. 528, C.A.

 *Reg. v. Harz* [1967] 1 A.C. 760; [1967] 2 W.L.R. 297; [1967] 1 All E.R. 177, H.L.(E.)

 *Reg. v. Lewes Justices, Ex parte Secretary of State for the Home Department* [1973] A.C. 388; [1972] 3 W.L.R. 279; [1972] 2 All E.R. 1057, H.L.(E.)

 *Reg. v. Licensing Authority Established under the Medicines Act 1968, Ex parte Smith Kline & French Laboratories Ltd.* [1990] 1 A.C. 64; [1989] 2 W.L.R. 397; [1989] 1 All E.R. 578, H.L.(E.)

 *Reg. v. Licensing Authority Established under the Medicines Act 1968, Ex parte Smith Kline & French Laboratories Ltd. (No. 2)* [1990] 1 Q.B. 574; [1989] 2 W.L.R. 378; [1989] 2 All E.R. 113, C.A.

 *Reg. v. Sang* [1980] A.C. 402; [1979] 2 W.L.R. 439; [1979] 2 All E.R. 46, C.A.

 *Smith v. East Elloe Rural District Council* [1956] A.C. 736; [1956] 2 W.L.R. 88; [1956] 1 All E.R. 855, H.L.(E.)

 *Tournier v. National Provincial and Union Bank of England* [1924] 1 K.B. 461, C.A.

SUMMONS

 A New York grand jury ordered the defendants, B Bank, to produce certain documents. The plaintiffs, A and others, who were customers of the defendants, obtained an injunction before Morland J. on 13 August 1990 restraining the defendants from delivering up or disclosing to the

A    United States court or to third parties otherwise than in connection with and for the purposes of the business and trading of the plaintiffs, any documents relating to the plaintiffs' accounts with the defendants, and ordering the latter to return to their London branch certain documents which had been removed from the jurisdiction. The Bank of England on 26 April 1991 served a notice on the defendants under section 39(3)(*a*) of the Banking Act 1987 requiring them to produce among others the

B    documents covered by the injunction. By a summons dated 30 April 1991 the defendants applied to the judge in chambers for directions as to whether notwithstanding the order of Morland J. they were at liberty to comply with the notice and, if so, on what terms if any; and, further or alternatively, variation or discharge of that order so as to allow them to comply with the notice. The Bank of England was granted leave to

C    intervene in the plaintiffs' action on 7 May 1991. The summons was heard in chambers but judgment was given in open court at the request of the parties.

The facts are stated in the judgment.

*Michael Beloff Q.C.* and *Ali Malek* for the defendants.
*Trevor Philipson Q.C.* and *Timothy Wormington* for the plaintiffs.

D    *Gordon Langley Q.C.* and *Thomas Keith* for the Bank of England.

*Cur. adv. vult.*

10 May.   HIRST J. read the following judgment.

*Introduction*

E    This is an application by the defendants, B Bank, in relation to an injunction granted by Morland J. on 13 August 1990 in favour of the plaintiffs, A and others, which was in the following terms:

"It is ordered: 1. The [defendants] whether by [themselves, their] servants or agents or otherwise howsoever be restrained until trial or further order from: (a) delivering up or disclosing to the grand

F    jury in the County of New York empanelled in the matter of the *People of the State of New York v. John Doe (B Bank)* or, without the prior consent of the plaintiffs, delivering up or disclosing to any third party otherwise than in connection with and for the purposes of the business and trading of the plaintiffs or any of them, all documents and information contained therein held by [these defendants] at [their] branches in London or elsewhere within this

G    jurisdiction concerning or relating to the plaintiffs' accounts with the [defendants] or any of them or otherwise relating to the business of the plaintiffs or any of them; (b) without the prior written consent of the plaintiffs' solicitors herein, removing from the jurisdiction of this court any of the documents referred to in subclause (a) hereof or any copies thereof. 2. The [defendants] do return forthwith to [their] London branch or branches from which

H    such documents emanated any documents or copies thereof of the type described in paragraph 1(a) of this order which the [defendants have] already removed from the jurisdiction in connection with the said subpoena, and [defendants are] hereby restrained until trial or

further order without the prior written consent of the plaintiffs from delivering up or disclosing such documents to the said grand jury or any other third party."

The background to this injunction, as is apparent from its terms, was that the defendants had been ordered by a subpoena duces tecum issued in New York on 24 July 1990 to produce the documents referred to in the injunction.

On 26 April 1991 the Bank of England, who have entered the action as interveners pursuant to my order made on the first day of the hearing last Tuesday, served on the defendants a notice pursuant to section 39(3)(a) of the Banking Act 1987, requiring them to produce at Threadneedle Street at noon on 9 May 1991 a number of specified documents (comprising all or some of the documents covered by the injunction) and stated to concern or relate to the accounts or related business of seven of the plaintiffs including A, on the ground that they were reasonably required by the Bank of England for the performance of its functions under the Act.

The notice specified various classes of documents related to the acquisition of three United States banks by a U.S. bank holding company. The last paragraph stated:

"The documents specified above relate specifically to photocopies numbering approximately 5,000 pages, which were transported on 22 March 1991 from [a Middle East state] to the London offices of [a London firm of solicitors]."

The present application seeks:

"1. Directions as to whether notwithstanding the order made in these proceedings on 13 August 1990 by Morland J. ('the August 1991 order') the [defendants are] at liberty to comply with the notice served by the Bank of England on 26 April 1991 pursuant to section 39 of the Banking Act 1987 ('the section 39 notice') by the production of the documents set out therein and if so on what terms if any. 2. Further or alternatively an order varying or discharging the August 1991 order so as to permit production by the [defendants] of the documents covered by the section 39 notice."

The summons was issued on 30 April 1991. On the following day I gave directions for expedition, and also for the service of evidence, which was most commendably complied with by all concerned during the intervening five days, which included the May bank holiday weekend.

The defendants are an authorised institution under the Act, and are anxious to comply with the section 39 notice, but are concerned that compliance might breach the terms of the injunction. By and large, apart from one very important exception concerning the question whether the section 39 notice overrides the injunction, the defendants go along with the Bank of England's arguments.

The Bank of England submits that the section 39 notice does indeed override the injunction, on the assumption (which the Bank of England does not accept) that the injunction itself when properly construed precludes the defendants from complying with the section 39 notice.

A  Alternatively, they submit that the injunction should be varied in order to give effect to the mandatory terms of section 39, so as to permit the defendants to comply with the notice.

The plaintiffs join issue with the Bank of England on all these points. In addition, they raise two further issues. (i) The plaintiffs challenge the validity of the section 39 notice, on the footing that it was not issued for the purpose of the Bank exercising its own supervisory

B  functions under the Act, but rather for the purpose of enabling the U.S. Federal Reserve Board to pursue its own inquiries in relation to its own functions as the U.S. regulatory authority; it is also contended that the notice is defective in form. (ii) The plaintiffs contend that variation should be refused on the ground that the information which led the Bank of England to issue the section 39 notice became available to them as a result of a serious contempt of court committed by the defendants

C  in breach of the injunction. The circumstances of the breach (which followed a previous less significant breach) were drawn to the plaintiffs' attention by the defendants' solicitors by letter dated 30 April 1991 as follows:

> "We regret to have to inform you that a further breach has now
D  > come to our attention and we are instructed by our clients to write
> to you about it. A full investigation of the facts is currently being
> carried out, but in the meantime we can inform you of the
> following. It would appear that, separately from the files referred to
> in the correspondence in December 1990, a substantial quantity of
> further files were moved from London to [a Middle East state].
> Among these files, there is documentation concerning the affairs of
E  > your clients. Further, representatives of the U.S. Federal Reserve
> Board have had access to a large quantity of files in [that state] and
> copies of certain of them which have been returned to London, and
> among these files is documentation concerning the affairs of your
> clients."

In support of the connection between this breach and the Bank of
F  England subsequently issuing the section 39 notice, the plaintiffs of course rely upon the reference to the Middle East state in the paragraph quoted above from the notice itself. Both the defendants and the Bank of England, while not expressly acknowledging the link, invite the court to proceed for present purposes on the assumption that without the defendants' breach the Bank of England would not have issued the
G  section 39 notice in its present form. Their submission is, however, that this factor in no way affects the validity of the notice or the propriety of the variation.

*Banking Act 1987*

Section 1(1) provides:

H  > "The Bank of England (in this Act referred to as 'the Bank') shall have the powers conferred on it by this Act and the duty generally to supervise the institutions authorised by it in the exercise of those powers."

Section 3(1) lays down the restriction on acceptance of deposits, which is the cornerstone of the Bank of England's power to regulate banks and other deposit-taking institutions in the United Kingdom:

A

> "Subject to section 4 below, no person shall in the United Kingdom accept a deposit in the course of carrying on (whether there or elsewhere) a business which for the purposes of this Act is a deposit-taking business unless that person is an institution for the time being authorised by the Bank under the following provisions of this Part of this Act."

B

Section 8 lays down procedures for an application. Section 9(1) and (2) provides:

> "(1) The Bank may, on an application duly made in accordance with section 8 above and after being provided with all such information, documents and reports as it may require under that section, grant or refuse the application. (2) The Bank shall not grant an application unless satisfied that the criteria specified in Schedule 3 to this Act are fulfilled with respect to the applicant."

C

Section 11 permits the revocation of an authorisation if, inter alia, it appears that any of the criteria specified in Schedule 3 is not or has not been fulfilled by the institution concerned. Schedule 3 lays down a very wide range of considerations, for example:

D

> "1(2) In determining whether a person is a fit and proper person to hold any particular position, regard shall be had to his probity, to his competence and soundness of judgement for fulfilling the responsibilities of that position, to the diligence with which he is fulfilling or likely to fulfil those responsibilities and to whether the interests of depositors or potential depositors of the institution are, or are likely to be, in any way threatened by his holding that position. (3) Without prejudice to the generality of the foregoing provisions, regard may be had to the previous conduct and activities in business or financial matters of the person in question and, in particular, to any evidence that he has—(a) committed an offence involving fraud or other dishonesty or violence; (b) contravened any provision made by or under any enactment appearing to the Bank to be designed for protecting members of the public against financial loss due to dishonesty, incompetence or malpractice . . . (c) engaged in any business practices appearing to the Bank to be deceitful or oppressive or otherwise improper (whether unlawful or not) or which otherwise reflect discredit on his method of conducting business; (d) engaged in or been associated with any other business practices or otherwise conducted himself in such a way as to cast doubt on his competence and soundness of judgement."

E

F

G

In addition, as one of the "minimum criteria" for authorisation, it is laid down that the business must be conducted in a prudent manner, as follows:

H

> "4(1) The institution conducts, or, in the case of an institution which is not yet carrying on a deposit-taking business, will conduct

A   its business in a prudent manner. (2) An institution shall not be regarded as conducting its business in a prudent manner unless it maintains or, as the case may be, will maintain net assets which, together with other financial resources available to the institution of such nature and amount as are considered appropriate by the Bank, are—(a) of an amount which is commensurate with the nature and scale of the institution's operations; and (b) of an amount

B   and nature sufficient to safeguard the interests of its depositors and potential depositors, having regard to the particular factors mentioned in sub-paragraph (3) below and any other factors appearing to the Bank to be relevant. (3) The particular factors referred to above are—(a) the nature and scale of the institution's operations; and (b) the risks inherent in those operations and, if the institution is a

C   body corporate, in the operations of any other body corporate in the same group so far as capable of affecting the institution."

It is noteworthy, though perhaps it goes without saying, that in order to make the requisite evaluation of prudence, the Bank of England will require information both as to assets (comprising, inter alia, loans to customers) and deposits (comprising, inter alia, money deposited by

D   customers).

Section 39 is sidenoted "Power to obtain information and require production of documents." Subsection (1) empowers the Bank by notice in writing served on an authorised institution to require them to provide to the Bank such information as the Bank may reasonably require for the performance of its functions under the Act. Subsection (3) (of which paragraph (a) is the critical one giving rise to the present notice)

E   provides:

"The Bank may—(a) by notice in writing served on an authorised institution require it to produce, within such time and at such place as may be specified in the notice, such document or documents of such description as may be so specified; (b) authorise an officer, servant or agent of the Bank, on producing evidence of his

F   authority, to require any such institution to provide him forthwith with such information, or to produce to him forthwith such documents, as he may specify, being such information or documents as the Bank may reasonably require for the performance of its functions under this Act."

G   Subsequent subsections empower the bank to take copies of documents obtained, and also to require information from directors and other officers. Subsection (11) provides:

"Any person who without reasonable excuse fails to comply with a requirement imposed on him under this section shall be guilty of an offence and liable on summary conviction to imprisonment for a term not exceeding six months or to a fine not exceeding the fifth

H   level on the standard scale or to both."

Both the plaintiffs and the defendants strongly rely on this subsection on the footing that the injunction constitutes a "reasonable excuse."

Two neighbouring sections of the Act are relied upon by the Bank of England in support of their construction of section 39. By section 38, an authorised institution other than one whose principal place of business is outside the United Kingdom is obliged to make a report to the Bank of England when it has entered into a large transaction, as defined by the section, with consequent large exposure to risk. This of course would involve disclosing a customer's confidential information. Section 40 provides:

> "(1) Any officer, servant or agent of the Bank may, on producing if required evidence of his authority, enter any premises occuped by a person on whom a notice has been served under section 39 above for the purpose of obtaining there the information or documents required by that notice and of exercising the powers conferred by subsection (5) of that section. (2) Any officer, servant or agent of the Bank may, on producing if required evidence of his authority, enter any premises occupied by any person on whom a notice could be served under section 39 above for the purpose of obtaining there such information or documents as are specified in the authority, being information or documents that could have been required by such a notice; but the Bank shall not authorise any person to act under this subsection unless it has reasonable cause to believe that if such a notice were served it would not be complied with or that any documents to which it would relate would be removed, tampered with or destroyed. (3) Any person who intentionally obstructs a person exercising rights conferred by this section shall be guilty of an offence and liable on summary conviction to imprisonment for a term not exceeding six months or to a fine not exceeding the fifth level on the standard scale or to both."

There is, it should be noted, no exception for reasonable excuse in this section.

Section 82 provides:

> "Except as provided by the subsequent provisions of this Part of this Act—(*a*) no person who under or for the purposes of this Act receives information relating to the business or other affairs of any person; and (*b*) no person who obtains any such information directly or indirectly from a person who has received it as aforesaid, shall disclose the information without the consent of the person to whom it relates and (if different) the person from whom it was received as aforesaid."

Section 83 stipulates that section 82 does not preclude the disclosure of information in any case in which disclosure is for the purpose of enabling or assisting the Bank to discharge its functions under the Act.

Section 84 provides that section 82 does not preclude the disclosure by the Bank of information to a numerous class of specified persons, including, most significantly, "for the purpose of enabling or assisting an authority in a country or territory outside the United Kingdom to exercise—(*a*) functions corresponding to those of—(i) the Bank under this Act:" subsection (6)(*a*). Section 86 provides that section 82 also

A   applies to information which has been supplied to the Bank of England for the purpose of its functions under the Act by a relevant supervisory authority in a foreign country.

*The basis for the section 39 notice*

B   This is set out in an affidavit sworn by Mr. Roger Anthony Barnes, who is an assistant director of the Bank of England and the head of the Banking Supervision Division, in which capacity he is the senior official in the division responsible for the supervision of institutions authorised under the Act; it was he who authorised and signed the section 39 notice, after discussion with the officers of the Bank of England immediately responsible for conducting the supervision of the defendants. His evidence is as follows, retaining for convenience the original
C   paragraph numbers:

"5. In reaching my decision that the notice should be served I discussed the matter with the above mentioned persons. I was also aware of certain information recently imparted to the Bank on the subject matter of the investigation of the defendants (to which I referred in my first affidavit) by the Board of Governors of the
D   Federal Reserve System and, in addition, certain information which had been obtained by the Bank in the course of its previous supervision on the [defendants]. All this information is subject to the confidentiality provisions of Part V of the Act of 1987 which restrict its disclosure. The information concerning the board's investigation was also imparted to the Bank expressly on terms that it was highly sensitive and with a request that it be kept confidential.
E   The Bank is in any event concerned that disclosure of the particulars of any of this information would compromise not only the proper conduct of that investigation but also the effectiveness of the Bank's supervision. The Bank is also concerned that disclosure of such information, where the matters at issue are not yet proved, could have a negative effect upon the [defendants].

F   "6. However, given the importance of receiving the information required under the section 39 notice to the Bank's supervision of the [defendants] and in order to support the [defendants'] application, I am able to state in broad terms the grounds of the investigation and the reasons for the Bank's supervisory concern. I have been informed by J. Virgil Mattingly Jr., general counsel of the board, that from information reviewed to date the board believes that the
G   [defendants have] acquired, directly or indirectly, control of one U.S. bank holding company (and its subsidiary banks) and two other U.S. banks in violation of section 3 of the Bank Holding Company Act of 1956, as amended (12 U.S.C. 1842). I am informed and believe that, under this Act, a company may not acquire, directly or indirectly, more than 25 per cent. of the shares of a bank without prior approval of the Board of Governors of the Federal
H   Reserve. I am informed and believe that the [defendants have] never obtained such approval from the Board of Governors.

"7. I am also informed by the general counsel of the board that the [defendants] and [their] agents also appear to have made false and

fraudulent statements to the Board of Governors regarding the ownership and control of the bank holding company and one of the other two banks referred to above in violation of two criminal statutes applicable to false statements made to a U.S. government or bank supervisory agency (18 U.S.C. 1001 and 1005).

"8. If true, these matters are of concern to the Bank as supervisor of the [defendants] and raise questions as to the continued fulfilment of the minimum criteria for authorisation set out in Schedule 3 to the Banking Act 1987, which includes inter alia the requirement that directors, controllers and managers of authorised institutions shall be fit and proper to hold their positions and that the business of the institution will be carried on with integrity and skill and in a prudent manner.

"9. I carefully considered the information before me before deciding to issue the notice. I also had in mind the terms of section 39 of the Act of 1987. I was quite satisfied, in the light of that information and my discussions with the persons referred to in paragraph 4, that the documents the subject of the notice were required and indeed were necessary in order for the Bank to discharge its supervisory functions in respect of the [defendants] under the Act.

"10. I was also satisfied that it was reasonable for the Bank to require the production of these documents. I am informed by the general counsel of the board that on the information available it appears that 'A' entered into nominee arrangements with the defendant whereby the [defendants] gained control of (or the ability to control) all of the stock of the two other banks referred to in paragraph 6 above. The documents relating to 'A' which are the subject of the notice are therefore directly relevant to any determination regarding the possible offences identified in paragraphs 6 and 7 above as well as to the consideration of what if any action should be taken by the Bank in respect of the [defendants'] authorisation if such offences are proved.

"11. I do not know whether and if so on what basis any challenge may be made to the notice. I understand, however, that it may be suggested that the Bank issued the notice not because it required the documents for the performance of its functions under the Act but simply to provide a conduit for information to the Board and without regard to the Bank's own functions. If that suggestion is made it is not true for the reasons stated above.

"12. I would acknowledge that: (i) I was aware that the Board was seeking production of the documents the subject of the notice from the [defendants] for the purpose of its supervisory functions over the [defendants], and (ii) if the Bank had not received the information about the subject matter of that investigation the Bank would not have issued the notice. However, I reached my decision on the basis to which I have deposed in paragraphs 8, 9 and 10 above.

"13. I would add that it is of importance to the Bank for the purposes of its own domestic supervision and in order to safeguard the interests of depositors that: (a) it is aware of any serious

A   breaches of local law in any other jurisdictions in which an authorised institution conducts its business and of any steps taken by overseas supervisors in the event of such breaches; and (b) where, because of the multi-national nature of an institution, the Bank is in part dependent upon overseas supervision, that supervision is conducted in an effective manner. The Bank, in pursuance of its functions under the Act of 1987, is concerned that it should be able
B   to assist overseas supervisors for the purposes set out above."

*Does section 39 override the injunction?*

This is the main issue of principle which I have to decide, and is one on which the defendants side with the plaintiffs against the submission
C   on the part of the Bank of England that the answer to this question is in the affirmative.

Mr. Beloff submitted that there is no basis for the implication of a term to create an exception to the prohibition contained in the injunction to the effect of "otherwise than pursuant to a section 39 notice." The concept of an implied term, with its inevitable uncertainties, is inconsistent with the nature of an injunction, breach of which may give
D   rise to the sanctions attendant upon contempt of court. Parliament could by legislation have provided for the revocation or variation of an injunction, but did not do so in section 39. Section 39 is not itself a legislative provision, so the issue is whether Parliament intended by the legislation conferring such powers on the Bank of England that a section 39 notice should revoke or vary an injunction, or permit a party
E   subject to the injunction to act in apparent breach thereof without attracting the sanctions of contempt of court. It would be surprising, Mr. Beloff submitted, if Parliament had given the Bank of England the right to issue notices calling for the immediate production of documents which ipso facto overrode court orders, and constitutionally anomalous to allow an executive order to override a judicial order, since it would deny the court an opportunity to balance competing interests; the court
F   should be slow to conclude that it was excluded from this arena.

Mr. Beloff further submitted that section 39(11) was a pointer in the opposite direction, and that a court order provided a classic instance of a "reasonable excuse" within that subsection.

In this context Mr. Beloff relied on the decision of the House of Lords in *In re An Inquiry under the Company Securities (Insider Dealing)*
G   *Act 1985* [1988] A.C. 660, where the question arose whether a journalist had a reasonable excuse under section 178 of the Financial Services Act 1986 to refuse to answer questions put to him by inspectors, having regard to the terms of section 10 of the Contempt of Court Act 1981, which provides:

"No court may require a person to disclose, nor is any person guilty of contempt of court for refusing to disclose, the source of
H   information contained in a publication for which he is responsible, unless it be established to the satisfaction of the court that disclosure is necessary in the interests of justice or national security or for the prevention of disorder or crime."

Lord Griffiths, in the leading judgment, stated, at p. 702:  A

> "The parties to this appeal are rightly agreed that whether or not Mr. Warner has a 'reasonable excuse' to refuse to answer the inspectors' questions depends upon whether he is entitled to rely upon the public interest in protecting his source and that the test to be applied must be the same whether that question arises in judicial proceedings or in the course of an inquiry such as this. The only head of public interest upon which the inspectors rely is the prevention of crime, and so the question to be answered is whether on the material before it the court should have been satisfied that disclosure of Mr. Warner's sources is 'necessary . . . for the prevention of . . . crime' within the meaning of section 10." B

Mr. Beloff submitted that, by parity of reasoning, the same words in section 39(11) should be given a wide meaning, and not the somewhat narrow interpretation sought by Mr. Langley relying on *Bank of England v. Riley* [1992] Ch. 475.  C

It was submitted that the Bank of England would not be prejudiced by having to make an application for the variation of a court order in the same manner as any other third party seeking a variation which affects its rights of interests.  D

Finally, Mr. Beloff placed strong reliance on the decision of Sir Nicolas Browne-Wilkinson V.-C. in *E.M.I. Records Ltd. v Spillane* [1986] 1 W.L.R. 967, which concerned the position of a solicitor, who held a document disclosed on discovery by the opposite party in litigation subject to the usual implied undertaking, when confronted by a notice from the Customs and Excise to produce the document to them pursuant to their wide powers under the VAT legislation. The Vice-Chancellor held that, the opposite party not in fact consenting, the solicitor could not disclose the document to the Customs and Excise without committing a contempt of court unless the undertaking was varied by the court: see p. 976G.  E

Mr. Langley on behalf of the Bank of England submitted that the basis of the injunction was the relationship of confidence subsisting between the Bank and its customer, and that it was well established that the duty of confidence was overridden by the duty to comply with the law, as shown by *Reg. v. Inland Revenue Commissioners, Ex parte Taylor (No. 2)* [1989] 3 All E.R. 353 in which it was held by the Divisional Court (Glidewell L.J. and Tucker J.) that where the Inland Revenue gave notice to a professional man under section 20 of the Taxes Management Act 1970 requiring the delivery of documents, the professional man was obliged to comply, even though the documents might disclose not only his own affairs but also those of his clients; particular attention was directed to a quotation from the judgment of Diplock L.J. in *Parry-Jones v. Law Society* [1969] 1 Ch. 1, 9, which is quoted in *Taylor's* case [1989] 3 All E.R. 353, 360:  F  G

> "What we are concerned with here is the contractual duty of confidence, generally implied though sometimes expressed, between a solicitor and client. Such a duty exists not only between solicitor and client, but, for example, between banker and customer, doctor  H

A and patient and accountant and client. Such a duty of confidence is subject to, and overridden by, the duty of any party to that contract to comply with the law of the land. If it is the duty of such a party to a contract, whether at common law or under statute, to disclose in defined circumstances confidential information, then he must do so, and any express contract to the contrary would be illegal and void."

B

It was manifest that the powers under section 39 overrode the duty of confidence, in particular having regard to the requirements of Schedule 3, where breach of customers' confidence was inevitable, for example, when disclosing loans or deposits for the purposes of that Schedule; the same applied to disclosure of large exposures under section 38.

C

It was, Mr. Langley submitted, for the very reason that section 39 overrode confidence that the provisions of sections 82 to 84 were incorporated by Parliament, laying down careful guidelines for the preservation of confidence by the recipients of information under the Act, subject to specified exceptions.

Since the Act overrode the duty of confidence, it must also override inter partes orders made on that basis, otherwise the Bank could not properly discharge its public duty of supervision.

D

As to section 39(11) Mr. Langley relied on the decision of the Court of Appeal (Dillon and Ralph Gibson L.JJ.) in *Bank of England v. Riley* [1992] Ch. 475 where the question was whether the defendant was entitled to refuse to answer interrogatories or disclose documents in reliance upon the privilege against self-incrimination, or whether that

E privilege was excluded by section 42 of the Act which entitles the Bank of England, inter alia, to require a person to attend and answer questions where the Bank has reasonable grounds for suspecting that a person is guilty of contravening various sections of the Act. In the course of his judgment, with which Dillon L.J. agreed, Ralph Gibson L.J. approved the conclusion of Morritt J. as follows, at pp. 845–846:

F "The existence of the defence of 'reasonable excuse' in section 42(4) of the Act of 1987, which was not present in any guise in the provisions considered in *Reg. v. Harz; Reg. v. Power* [1967] 1 A.C. 760, could not itself justify construing section 42 as retaining the privilege under the concept of 'reasonable excuse,' which was clearly necessary to cover such matters as physical inability to comply with a requirement for information or documents arising from illness or accidental destruction of papers, etc."

G

Finally, Mr. Langley submitted that there was a strong presumption against the court having made an order which could have the effect of overriding or emasculating section 39, and that it would be wrong to construe the injunction as being inconsistent with powers expressly given by Parliament to the Bank of England.

H

Mr. Philipson supported Mr. Beloff's arguments, and drew particular attention to the very wide powers conferred on the Customs and Excise as shown in *E.M.I. Records Ltd. v. Spillane* [1986] 1 W.L.R. 967, which were nonetheless held by Sir Nicolas Browne-Wilkinson V.-C. not to

override the cross-undertaking; this should apply a fortiori, he submitted, to the injunction in the present case.

Mr. Philipson also submitted that the Bank of England could properly exercise their supervisory powers under the Act without the breaching of customers' confidences, and even went so far as to submit that the Schedule 3 information could be so furnished by clothing details of customers' loans or deposits with anonymity.

In considering these submissions it is very important first to establish the statutory purpose of the Act. This is contained in section 1, which provides that the Bank of England shall have the powers conferred on it by the Act, and also "the duty generally to supervise the institutions authorised by it in the exercise of those powers." The scope of this public duty is extremely wide, since the authorised institutions include, under section 3, all "deposit-taking businesses," of which banks are probably the most important, but by no means the only relevant institutions.

In fulfilling this duty the Bank may often be faced with situations where extremely urgent action is required, and where delay could result in losses to, possibly, very substantial numbers of customers of such institutions, embracing both corporate and private customers, whose interests the Act is designed to protect. I reject the argument put forward both by Mr. Beloff and Mr. Philipson that the Bank of England will suffer no "inconvenience" if they have to apply to vary an injunction before they can set the section 39 process in motion; in most cases they will probably not even know of the existence of an injunction until after the notice is served; and it is idle to suggest that, once this present case is decided, no similar points to those taken here by the plaintiffs will be raised in future. It is noteworthy that, even in the present case, where every effort has been made to accelerate matters, the generous time-limit given by the notice has in fact already been exceeded.

It is manifest, as Mr. Langley submitted, that the fulfilment of the Bank's public duty overrides their duty of confidence to their customers: *Reg. v. Inland Revenue Commissioners, Ex parte Taylor (No. 2)* [1989] 3 All E.R. 353 and the cases there cited. This is shown clearly by Schedule 3, by section 38, and by sections 82 to 84, and Mr. Philipson's argument to the contrary, suggesting that the Schedule 3 information could be clothed in anonymity, carries no weight and is not in accordance with the terms of the Act itself; indeed the identity of a borrower might well be relevant in some cases on the issue of prudence.

Both Mr. Beloff and Mr. Philipson place strong reliance on section 39(11), but in my judgment an injunction does not qualify as a "reasonable excuse" within the terms of that subsection. The situations envisaged by that subsection seem to me well illustrated by *Bank of England v. Riley* [1992] Ch. 475, which was dealing with the same words in another section of the same Act. *In re An Inquiry under the Company Securities (Insider Dealing) Act 1985* [1988] A.C. 660 was dealing with a different statute in an entirely different situation, where the journalist had a statutory right, subject to exceptions, to protect his sources of information, so that it was natural for the court, in evaluating a

A  reasonable excuse under the Financial Services Act 1986, to focus on that statutory right and its exceptions.

The terms of section 40 seem to me strongly to support the conclusions reached so far. Section 40(1) allows the Bank of England's officers to enter the premises of a person on whom a section 39 notice has been served for the purpose of obtaining the information or documents required, with no protection of reasonable excuse accorded
B  to the person on whom the notice was served; indeed any obstruction will, under subsection (3), expose that person to the risk of prosecution.

Section 40(2) only applies where there is cause to believe that the notice will not be complied with, or that documents will be mutilated or destroyed, and is therefore, contrary to Mr. Beloff's argument, not available to the Bank of England where no such belief exists, however
C  urgent the case.

Mr. Beloff and Mr. Philipson understandably place strong reliance on *E.M.I. Records Ltd. v. Spillane* [1986] 1 W.L.R. 967, and rightly invite me to pay very careful regard to it. However, Sir Nicolas Browne-Wilkinson V.-C. was dealing with a different statute, which did not concern statutory regulatory powers, and which does not in my judgment have the same considerations of urgency. I do not therefore consider
D  that I should be departing from the Vice-Chancellor's decision by reaching a different conclusion on the present Act.

I bear fully in mind Mr. Philipson's salutary warning, based on statements by Sir Nicolas Browne-Wilkinson V.-C. in *E.M.I. Records Ltd. v. Spillane*, at p. 973, that where the court is considering powers of a draconian nature, which gravely impinge on the citizen's ordinary
E  rights, the court should look jealously at the legislation, and if there is any ambiguity, resolve it in favour of existing legal rights. Here in my judgment there is no such ambiguity.

Nor am I troubled by the suggestion put forward by both Mr. Beloff and Mr. Philipson that a conclusion in favour of the Bank of England on this point will introduce an element of doubt into an area where certainty is important, since authorised institutions will be familiar with
F  the Act, and will have no difficulty in recognising a section 39 notice as an exception.

For all these reasons I have come to the conclusion, and I hold, that section 39 does override the injunction.

I also consider (though this may only be expressing the same conclusion in another way) that, for the reasons given by Mr. Langley,
G  the injunction as at present framed should be interpreted as not prohibiting compliance with the section 39 notice.

*Validity of the section 39 notice*

It is convenient first to consider a jurisdictional point raised by Mr. Beloff, who submitted that the only proper mode of challenge by the plaintiffs to the validity of the notice must be by way of judicial
H  review against the Bank of England, rather than by way of an action against the defendants for injunctive relief, since in a normal case (i.e. one without an injunction) there would be no question of a customer having locus in any court other than by way of judicial review.

    I have no doubt that judicial review is a proper, and perhaps in the ordinary run of cases (where no injunction exists) the proper mode of challenge. However, where, as in the present case, there is an injunction in force, it seems to me that Mr. Langley and Mr. Philipson are right in saying that it is open to the court to consider the issue of validity, since, if the notice were indeed invalid, it could not override the injunction or give grounds for a variation.

    It is common ground that it is a prerequisite of the notice that the documents sought are such as the Bank "may reasonably require for the performance of its functions under this Act."

    Mr. Langley submitted that, under the plain terms of the statute, it was the Bank and the Bank alone who were empowered to make the necessary judgment, with no interposition (as in some other statutes) of a judicial officer, e.g., a commissioner in relation to certain statutory powers of the revenue. Mr. Barnes' affidavit quoted above showed beyond question, he submitted, that the Bank of England had asked themselves the right question (paragraph 9) and that they did indeed require the production of the documents reasonably for the purposes of their own domestic supervision (paragraphs 8, 10 and 13).

    He further submitted that in any event, the Bank were entitled to the benefit of a presumption that the notice was validly issued, and that this presumption could only be displaced by evidence of facts which could not be reconciled with the Bank having the required reasonable opinion. In support of this submission he relied on the recent decision of the House of Lords in *Reg. v. Inland Revenue Commissioners, Ex parte T. C. Coombs & Co.* [1991] 2 A.C. 283, 302F where the House of Lords held, in the words of Lord Lowry, who gave the leading judgment in which the other Lords of Appeal concurred, that

> "the presumption that the inspector [in a revenue case] acted intra vires when giving the notice can only be displaced by evidence which cannot be reconciled with the inspector having the required reasonable opinion."

In reaching this conclusion Lord Lowry cited the classic passage from Lord Diplock's speech in *Reg. v. Inland Revenue Commissioners, Ex parte Rossminster Ltd.* [1980] A.C. 952, 1013:

> "Where Parliament has designated a public officer as decision-maker for a particular class of decisions the High Court, acting as a reviewing court under Order 53, is not a court of appeal. It must proceed on the presumption omnia praesumuntur rite esse acta until that presumption can be displaced by the applicant for review—upon whom the onus lies of doing so. Since no reasons have been given by the decision-maker and no unfavourable inference can be drawn [from] this fact because there is obvious justification for his failure to do so, the presumption that he acted intra vires can only be displaced by evidence of facts which cannot be reconciled with there having been reasonable cause for his belief that the documents might be required as evidence . . ."

    Mr. Philipson, relying on the final paragraph of the notice itself quoted above, and upon a minute textual analysis of Mr. Barnes'

A  affidavit, submitted that it was plain that the real purpose of the Bank of England was to obtain the documents for the Federal Reserve Board, and not for the purpose of exercising its own supervisory function. The statute did not, he submitted, make it part of the functions of the Bank to act as an information-collecting agency for a foreign regulatory authority. Mr. Barnes' affidavit showed no more than that the Bank might exercise their own supervisory function once they had the result
B  of the Federal Reserve Board inquiry in their hands, so that supervision was no more than a secondary purpose which did not qualify.

As to the presumption, Mr. Philipson, while prepared to acknowledge that it would apply to the reasonableness test, submitted that it did not apply when considering whether the Bank of England was acting in performance of its functions.

C  In considering these submission, I am bound to say that I found Mr. Philipson's standpoint unreal in the banking world of the 1990s. Clearly there is a Federal Reserve Board investigation afoot, as Mr. Barnes acknowledges. Clearly this is based, at least in part, on the documents they obtained in the Middle East country; and clearly the inference can be fairly drawn that it was as a result of this information that the Federal Reserve Board alerted the Bank of England.

D  However, Mr. Philipson seeks in effect to draw a line down the centre of the Atlantic, and to suggest that in some way the supervisory operations of the Federal Reserve Board and those of the Bank of England are separate and unconnected. In fact, in the world of international banking today, supervisory authorities in various countries can, should, and no doubt do regularly co-operate on matters of mutual
E  supervisory concern as sections 84(6) and 86 confirm.

Although Mr. Philipson demurred when the suggestion was put to him, it is palpably clear that his submission amounts to a direct challenge to Mr. Barnes' affidavit, which contains the clearest possible evidence that the Bank of England did indeed require these documents for the purposes of its own supervisory functions; this will of course involve collaboration and co-ordination with the Federal Reserve Board's
F  supervision, on which, as he states expressly in paragraph 13(b), the Bank of England is in part dependent. I accept Mr. Barnes' evidence in its entirety and find that the documents are reasonably required for the performance of the Bank of England's own functions under the Act.

I should add that in any event the Bank of England are in my judgment entitled to the presumption of regularity both as to
G  reasonableness and as to the scope of their functions, and Mr. Philipson has not been able to point to any evidence of fact which cannot be reconciled with them having the required reasonable opinion.

Mr. Philipson also submitted that the notice was defective in form, on the grounds that it specified the documents by class and not individually, and that it contained certain other matter which was alleged to be ambiguous, but which I shall not quote, so as not to imperil
H  anonymity.

This was never a very promising argument, seeing that the notice is addressed to the defendants and not to the plaintiffs, and the defendants themselves have made it clear that they have no difficulty in understanding

it and complying with it. In my judgment it is proper for documents to be specified by class in a section 39 notice, and none of the other objections put forward has any substance.

*Variation of the injunction*

This question only arises if I am wrong on the main point of principle, but I think it proper to consider it nonetheless.

Mr. Philipson addressed an impassioned argument that it would be quite wrong for the court to vary the injunction at the behest of the defendants, seeing that they had flouted Morland J.'s order, as a result of which the documents had come into the hands of the Federal Reserve Board, who had in turn passed the information to the Bank of England; and that it would be the antithesis of justice that the consequence of this misconduct should be the discharge of the very injunction which had been designed to protect the plaintiffs from these consequences. He submitted that the court should not in principle vary the injunction at the behest of the contemner, and thus increase the adverse consequences upon the plaintiffs. In support of this argument he cited *I.T.C. Film Distributors Ltd. v. Video Exchange Ltd.* [1982] Ch. 431, 441 where Warner J. held that where a party to litigation had obtained documents in contempt of court, the court should not countenance the contempt by admitting the evidence.

I can well understand the plaintiffs' sense of indignation at the defendants' breaches of the injunction, and the court will have to consider very carefully all aspects of those breaches when the inevitable contempt proceedings are heard.

However, in the present context, Mr. Philipson's arguments seem to me completely beside the point. The defendants are the recipients of the section 39 notice, not the issuers. As they made clear throughout the case, they are neutral as to the outcome, and their purpose in coming to the court, as the terms of their application expressly show, is to seek directions in the situation which has arisen. Very rightly, Mr. Beloff has presented arguments to the court, which have been of considerable assistance, and which were in favour of the plaintiffs and not of the Bank of England on the main issue of principle. There is therefore no question, in contrast to *I.T.C. Film Distributors Ltd. v. Video Exchange Ltd.*, of the defendants seeking to draw benefit from their own contempt.

There is, needless to say, no suggestion that the Bank of England are in contempt, and, for the same reasons as have led me to conclude that the injunction is overridden, I should have had no hesitation in varying the injunction if it had been necessary to do so. Indeed, for the sake of clarity, and for the avoidance of any doubt, I propose in any event to insert an exception to cover the section 39 notice, and I will hear counsel as to the appropriate wording.

I should add that I shall not accede to Mr. Philipson's invitation to qualify the variation by debarring the Bank of England from communicating the documents to the Federal Reserve Board, since in my view that would frustrate the purposes of section 84(6), and would also impede the proper co-ordination of supervision between the Bank

A  of England and the Federal Reserve Board, in relation to the international activities of the defendants.

*Conclusion*

As a result, I direct the defendants to comply with the section 39 notice, and I will hear counsel as to any other appropriate orders, including of course the wording of the exception to be inserted in the injunction.

Finally, I cannot stress too strongly the importance which should be attached to the Bank of England having, within the limits laid down by the Act and the general law, unfettered and unimpeded scope for the exercise of their most important public duties of regulation under the Act in the interests of the public, who are surely entitled to rely on the Bank of England to exercise those powers with integrity.

*Order accordingly.*

Solicitors: *Stephenson Harwood; Berwin Leighton; Freshfields.*

[Reported by JOHN SPENCER ESQ., Barrister]

[COURT OF APPEAL]

REGINA v. DABHADE

1992 July 7; 29    Stuart-Smith L.J., Leonard and Wright JJ.

*Crime—Double jeopardy—Autrefois acquit—Charge of obtaining property by deception incorrectly framed—Further charge of theft based on same facts—First charge dismissed on prosecution offering no evidence—Whether defendant open to conviction on second charge—Whether same charges in substance—Whether jeopardy of conviction on first charge*

The appellant was given a cheque signed by his employers in blank for the payment of a bill. He completed it by drawing it to "cash" in the sum of £6,000, cashed it and appropriated the money. He was charged under section 15(1) of the Theft Act 1968 with dishonestly obtaining £6,000 from his employers by falsely representing himself as the payee on the cheque. Before the stipendiary magistrate he elected summary trial and pleaded not guilty. On the date set for the hearing a further charge of theft of the same sum was preferred. The magistrate declined jurisdiction on the second charge and committed the appellant for trial to the Crown Court. On the same day, the prosecution offered no evidence on the first charge and the magistrate