Exhibit 10



# The DTC Association

# Code of Banking Practice

December 2021

**TABLE OF CONTENTS**

PART I - INTRODUCTION ........................................................................................................ 1

1. *Status of the Code of Banking Practice* ...................................................................... *1*
2. *General Principles* ....................................................................................................... *1*
3. *Objectives* ..................................................................................................................... *3*
4. *Enquiries* ...................................................................................................................... *3*

PART II - RECOMMENDATIONS ON BANKING PRACTICE ........................................ 4

CHAPTER 1 - RELATIONSHIP BETWEEN INSTITUTIONS AND CUSTOMERS .............................. 4
5. *Terms and Conditions* ................................................................................................. *4*
6. *Fees and Charges* ........................................................................................................ *5*
7. *Debt Recovery Expenses* ............................................................................................. *6*
8. *Collection, Use, Holding and Erasure of Customer Information* ................................ *6*
9. *Personal Referees* ....................................................................................................... *7*
10. *Equal Opportunity* ...................................................................................................... *8*
11. *Bank Marketing* ........................................................................................................... *8*
12. *Annualised Percentage Rates* ................................................................................... *10*
13. *Handling Customer Complaints* ................................................................................ *10*
14. *Modifications to Bank Branch Services* .................................................................... *11*
15. *Management of Banking Activities* ............................................................................ *11*
16. *Notification of Cyberthreats, Fraudulent Activities and other Customer Security Risks* ... *11*
17. *Review of Application and Transaction Information* .................................................. *11*
18. *Provision of Information in Non-paper Based Format* .............................................. *12*

CHAPTER 2 - ACCOUNTS AND LOANS .................................................................................. 13
19. *Opening of Accounts* ................................................................................................. *13*
20. *Closing of Accounts* .................................................................................................. *13*
21. *Operation of Accounts* .............................................................................................. *13*
22. *Rights of Set-off* ........................................................................................................ *15*
23. *Deposit Accounts* ...................................................................................................... *15*
24. *Loans and Overdrafts* ............................................................................................... *16*
25. *Residential Mortgage Lending* .................................................................................. *18*
26. *Other Secured Lending* ............................................................................................. *19*
27. *Guarantees and Third Party Securities* .................................................................... *19*

CHAPTER 3 - CARD SERVICES ............................................................................................. 21
28. *Application* ................................................................................................................ *21*
29. *Issue of Cards* ........................................................................................................... *21*
30. *Terms and Conditions* ............................................................................................... *25*
31. *Fees and Charges* ...................................................................................................... *26*
32. *Interest Rate* .............................................................................................................. *27*
33. *Repayment* ................................................................................................................. *28*
34. *Rights of Set-off* ........................................................................................................ *28*
35. *Security of Cards/PINs* ............................................................................................. *29*
36. *Transaction Records* ................................................................................................. *29*
37. *Unauthorized Transactions* ....................................................................................... *32*
38. *Lost Cards/PINs* ........................................................................................................ *32*
39. *Liability for Loss* ....................................................................................................... *33*
40. *Treatment of Credit Balances* ................................................................................... *33*
41. *Direct Mailing* ........................................................................................................... *33*

CHAPTER 4 - PAYMENT SERVICES ....................................................................................... 34
42. *Cheques* ..................................................................................................................... *34*
43. *Cross-boundary and Local Payments* ....................................................................... *34*
44. *Other Payment Services* ............................................................................................ *36*

CHAPTER 5 - RECOVERY OF LOANS AND ADVANCES .......................................................... 37
45. *Application* ................................................................................................................ *37*

*46. Debt Collection Activities* ....................................................................................................... *37*
*47. Management of Debt Collection Agencies* ............................................................................... *39*

CHAPTER 6 - ELECTRONIC BANKING SERVICES ................................................................................... 40
*48. Disclosure for e-banking Services* ......................................................................................... *40*
*49. Security in relation to e-banking* ............................................................................................ *40*
*50. Reporting of Actual or Suspected Security Incidents* ........................................................... *41*
*51. Liability for Loss* ................................................................................................................... *41*

CHAPTER 7 - STORED VALUE CARDS (OR DEVICES) .......................................................................... 42
*52. Application* ............................................................................................................................. *42*
*53. Issue of Stored Value Cards or Devices (SVCs)* ................................................................... *42*
*54. Terms and Conditions and Fees and Charges* ....................................................................... *42*
*55. Operation of SVCs* ................................................................................................................ *43*
*Annex I - Useful Definitions* ....................................................................................................... *44*
*Annex II - Ban on Double-Cycle Billing* ..................................................................................... *47*
*Annex III - Recommended template on monthly statements* ...................................................... *48*

# PART I - INTRODUCTION

**1.      Status of the Code of Banking Practice**

1.1.      This Code of Banking Practice (Code) is issued jointly by the Hong Kong Association of Banks (HKAB) and the DTC Association (DTCA), i.e., the industry Associations, and endorsed by the Hong Kong Monetary Authority (HKMA).

1.2.      This is a non-statutory Code issued on a voluntary basis.  It is to be observed by authorized institutions (institutions) in dealing with and providing services to their customers.  It covers specifically banking services such as current accounts, savings and other deposit accounts, loans and overdrafts, card services, electronic banking services and stored value card services.  However, the principles of the Code apply to the overall relationship between institutions and their customers in Hong Kong. Institutions' subsidiaries and affiliated companies controlled by them which are not institutions and are not licensed, regulated or supervised by any financial regulators in Hong Kong should also observe the Code where applicable when providing banking services in Hong Kong, such as lending, remittance or gold bullion service.

1.3.      The recommendations set out in this Code are supplementary to and do not supplant any relevant legislation, codes, guidelines or rules applicable to institutions authorized under the Banking Ordinance (Cap.155).

1.4.      HKAB and DTCA expect their respective members to comply with the Code.  HKMA expects all institutions to comply with the Code and will monitor compliance as part of its regular supervision.

1.5.      The Code is subject to review and revision from time to time.  Unless otherwise shown, this revised edition is effective from 10 December 2021.  Institutions should take active steps to comply with the revised provisions as quickly as possible.  They should achieve full compliance within 6 months of the effective date.  The period for full compliance is extended to (i) 12 months for those sections of the Code which require system changes, other than sections 17 and 18; and (ii) 18 months for sections 17 and 18.

**2.      General Principles**

2.1.      Equitable and Fair Treatment of Customers

Institutions should treat all customers equitably, honestly and fairly at all stages of their relationship with the institutions.  Treating consumers fairly should be an integral part of the good governance and corporate culture of all institutions and their authorized agents.  Special attention should be dedicated to the needs of vulnerable groups.

2.2.      Disclosure and Transparency

Institutions and their authorized agents should set out and explain clearly the key features, risks and terms of the products, fees, commissions or charges applicable, and make available the details of these to customers.  Additional disclosures, including appropriate warnings, should be developed to provide information commensurate with the nature and risks of the products and services.  They should also provide information on conflicts of interest associated with the use by institutions of their authorized agents through which any product is sold.  Appropriate information should be provided at all stages of the relationship with the customer.  All financial promotional material should be accurate, honest, understandable and not misleading.  Standardised pre-contractual disclosure practices should be adopted where applicable and practicable to allow comparisons between products and services of the same nature.

Where advice is provided, the advice should be as objective as possible and should in general be based on the customer's profile considering the complexity of the product, the risks associated with it as well as the customer's financial objectives, knowledge, capabilities and experience.  Institutions

should inform customers that it is important to provide institutions with relevant, accurate and available information.

2.3.   Financial Education and Awareness

Recognising that customers have their responsibilities in enhancing financial literacy, institutions should join force with the government, regulatory bodies and other relevant stakeholders to promote financial education and awareness and help existing and future customers to develop the knowledge, skills and confidence appropriately to understand risks, including financial risks and opportunities, make informed choices, know where to go for assistance, and take effective action to improve their own financial well-being.  The provision of broad based financial education and information to deepen consumer financial knowledge and capability should be promoted, especially to vulnerable groups.  Clear information on consumer protection, rights and responsibilities should be easily accessible by customers.

2.4.   Responsible Business Conduct of Institutions and Authorized Agents

Institutions and their authorized agents should have as an objective, to work in the best interest of their customers and be responsible for upholding financial consumer protection.  Institutions should also be responsible and accountable for the actions of their authorized agents and third party service providers.  Depending on the nature of the transaction and based on information primarily provided by customers, institutions should assess the financial capabilities and needs of their customers before offering them a product, advice or service.  Staff (especially those who interact directly with customers) should be properly trained and qualified.  Institutions and their authorized agents should endeavour to avoid conflicts of interest.  When this cannot be avoided, they should ensure proper disclosure, have in place internal mechanisms to manage such conflicts, or decline to provide the product, advice or service.  The remuneration structure for staff of institutions and, where appropriate, their authorized agents should be designed to encourage responsible business conduct, fair treatment of consumers and to avoid conflicts of interest.

2.5.   Protection of Customer Assets against Fraud and Misuse

Institutions should have in place relevant information, control and protection mechanisms to protect customers' deposits, savings, and other similar financial assets appropriately and with a high degree of certainty, including against fraud, misappropriation or other misuses.

2.6.   Protection of Consumer Data and Privacy

Institutions should have in place appropriate control and protection mechanisms to protect customers' financial and personal information.  These mechanisms should comply with all applicable legislation and in particular should define the purposes for which the data may be collected, processed, held, used and disclosed.  The mechanisms should also acknowledge the rights of customers to be informed about data-sharing, to access data and to obtain the prompt correction and/or deletion of inaccurate, or unlawfully collected or processed data.

2.7.   Complaints Handling and Redress

Institutions and, where appropriate, their authorized agents should provide customers with reasonable channels to submit claims, make complaints and seek redress that are accessible, fair, accountable, timely and efficient.  Such channels should not impose unreasonable cost, delays or burdens on customers.

2.8.   Competition

Institutions should allow customers to search, compare and, where appropriate, switch between products and institutions easily and at reasonable and disclosed costs.

**3.     Objectives**

3.1.    The Code is intended -

(a)  to promote good banking practices by setting out the minimum standards which institutions should follow in their dealings with customers;

(b)  to increase transparency in the provision of banking services so as to enhance the understanding of customers of what they can reasonably expect of the services provided by institutions;

(c)  to promote a stronger culture of treating customers fairly which will ensure customers' interests are taken into account by institutions in their business dealings with customers; and

(d)  through the above, to foster customer confidence in the banking system.

3.2.    The above objectives are to be achieved -

(a)  having regard to the need for institutions to conduct business in accordance with prudential standards in order to preserve the stability of the banking system;

(b)  while striking a reasonable balance between customer rights and efficiency of banking operations.

**4.     Enquiries**

4.1.    Enquiries about the Code should be addressed to HKAB or DTCA.  Their current addresses and telephone numbers are as follows -

The Hong Kong Association of Banks
Room 525, Prince's Building
Central
Hong Kong
Tel: 2521 1160 or 2521 1169
Fax: 2868 5035
Website: www.hkab.org.hk

The DTC Association
Unit 1704
17/F Bonham Trade Centre
50 Bonham Strand East
Sheung Wan
Hong Kong
Tel: 2526 4079
Fax: 2523 0180
Website: www.dtca.org.hk

4.2.    The Code can be viewed or downloaded from the websites of HKAB and DTCA.  All institutions will make copies of the Code available to customers or tell them how to get copies.

# PART II - RECOMMENDATIONS ON BANKING PRACTICE

## Chapter 1 - Relationship between Institutions and Customers

**5.      Terms and Conditions**

5.1.    Institutions should make readily available to customers or prospective customers written terms and conditions of a banking service.  Institutions should be prepared to answer any queries of customers or prospective customers relating to terms and conditions.  In cases where the query relates to a service provided by a third party service provider, institutions may, where necessary, refer the query to the relevant third party service provider after obtaining the customer's consent or direct the customer to contact the third party service provider.  Institutions should thereafter provide assistance to the customer if the customer so requests.

5.2.    Institutions should provide written terms and conditions of a banking service to prospective customers upon application of the banking service as far as possible.  Where the provision of written terms and conditions is not practicable at the point of sale, institutions should provide key terms and conditions orally to prospective customers and provide a full set of the terms and conditions to the customers as soon as practicable afterwards.  Where the provision of written or oral terms and conditions is not practicable at the point of sale, institutions should inform prospective customers where they can find the terms and conditions (including providing a link to the institution's website) and advise them to read and understand the terms and conditions before applying for the banking service and provide a full set of terms and conditions as soon as practicable afterwards.

5.3.    The terms and conditions should provide a fair and balanced description of the relationship between the customer and the institution.

5.4.    The terms and conditions should be available in both Chinese and English unless the banking service is governed by law other than that of Hong Kong or there is little or no demand for bilingual information.  Institutions should use plain language and avoid complex legal and technical terms wherever practicable.  Where legal and technical language is used, appropriate explanation should be provided where practicable.  The terms and conditions should be presented in a reasonable layout and font size that is readily readable.

5.5.    The terms and conditions should, where applicable, highlight any fees, charges, penalties and relevant interest rates (or the basis on which these will be determined) and the customer's liabilities and obligations in the use of a banking service.

5.6.    In drawing up terms and conditions for banking services, institutions should have due regard to applicable laws in Hong Kong, including, in particular, the Personal Data (Privacy) Ordinance (Cap. 486) (PDPO), the Control of Exemption Clauses Ordinance (Cap.71), the Unconscionable Contracts Ordinance (Cap. 458), the Supply of Services (Implied Terms) Ordinance (Cap. 457) and any other prevailing consumer protection legislation.

5.7.    The terms and conditions should be consistent with this Code. Institutions should keep terms and conditions under review to ensure they are consistent with this Code.

5.8.    Institutions should advise customers to read and understand the terms and conditions when applying for banking services.  Institutions should allow customers reasonable opportunity to review the terms and conditions before the applications.  Where electronic devices are used in branches or other face-to-face situations to present the terms and conditions, institutions should, upon the request of customers, provide customers with alternative means to review the relevant information.

5.9.    Institutions should give customers 30 days' notice before any variation of the terms and conditions which affects fees and charges and the liabilities or obligations of customers takes effect (see also section 6.3 and 6.4 below).  For all other variation, institutions should give customers reasonable

notice before such variation takes effect. The above requirements do not apply to variations of terms and conditions in respect of cards which are covered under section 30.8 below.

5.10. A notice of any variation of the terms and conditions should show clearly the variation with an explanation in plain language, where appropriate and practicable, and the ways in which the customer may indicate refusal and the consequence. In case the customer decides to terminate the banking service, the institution should not charge any fees for the termination under the following conditions -

(a)    the variation of the terms and conditions is considered key and relevant to the specific banking service;

(b)    the variation in (a) may adversely affect the customer; and

(c)    the customer indicates the decision to terminate the banking service within the notice period before the variation in (a) takes effect.

5.11. Where the variation involves substantial changes to existing terms and conditions or the changes are very complicated, the institution should provide a written summary of the key features of the revised terms and conditions.

5.12. Institutions should issue a full version of the revised terms and conditions to customers if there are sufficient changes to warrant it, regardless of the nature of the changes.

5.13. Where a customer refuses to accept the variation to the terms and conditions and chooses to terminate the banking service within a reasonable period, the institution should repay any annual or other periodic fee for that banking service on a pro rata basis, if the fee can be separately distinguished and unless the amount involved is minimal.

5.14. In addition to the detailed terms and conditions, institutions should make readily available to customers general descriptive information of the key features of the various banking services as indicated in the following chapters of this Code.

5.15. For the avoidance of doubt, sections 5.1 and 5.8 above should apply also to services or products (e.g. insurance, retirement plans and investment products) offered or provided by the institution's third-party service providers notwithstanding that the relevant terms and conditions for the service or product are set out in a separate contract between the service provider and the customer. Institutions should advise their service providers of the requirements in the remainder of this section and request them to observe these requirements as far as possible.

## 6.    Fees and Charges

6.1.    Institutions should make readily available to customers details of the fees and charges payable in connection with the banking services covered by the Code. All fees and charges should be of reasonable amounts. A schedule of the institution's standard fees and charges should be displayed in its principal place of business and branches and should be provided on request. Where institutions provide Internet banking services, such schedule should also be made available on the institutions' website and principal Internet banking platforms.

6.2.    Details of the basis of charges for services not subject to standard fees and charges should be advised at the time the services are offered and on request.

6.3.    Institutions should give at least 30 days' notice to affected customers before any change in the level of fees and charges (including any change in the basis on which fees and charges are determined) takes effect, except for fees and charges relating to cards (see section 30.8 below).

6.4.    Where institutions give a notice pursuant to sections 5.9 or 6.3 above, they should adopt effective means of notification which would provide reasonable assurance that their customers will be

informed of the change and which do not rely unduly on the customers' own initiative. Individual notification to customers (whether by written notice, statement insert, message in an account statement, e-mail or SMS message) is considered as effective in fulfilling this purpose. But where this is not appropriate on grounds of disproportionate costs or likely ineffectiveness (for example, in the case of passbook savings accounts where the latest address of the customer may not be known to the institution), institutions may adopt other means of notification, such as one or more of the following -

(a)    press advertisement;

(b)    prominent display of notice in banking halls;

(c)    display of notice on self-service terminal sites/screens;

(d)    phone-banking message;

(e)    notice posted on the website of the institution; and

(f)    notice posted on the principal Internet banking platforms of the institution.

6.5.    Institutions should not impose administrative charges for handling cash deposits in Hong Kong dollars, except those in large quantities.

6.6.    Institutions should inform customers of the nature and amount of charges debited to their accounts promptly after any such charge is debited unless a prior notice has already been given in accordance with section 6.7 below.

6.7.    Institutions should give 14 days' prior notice to customers when a charge accrues on dormant accounts for the first time, and advise them of what can be done to avoid such charges or where they can obtain such information.

## 7.    Debt Recovery Expenses

7.1.    Any cost indemnity provision contained in the terms and conditions should only provide for the recovery of costs and expenses which are of reasonable amount and were reasonably incurred.

7.2.    At the request of customers, institutions should provide a detailed breakdown of the costs and expenses for which customers are required to indemnify the institution.

## 8.    Collection, Use, Holding and Erasure of Customer Information

8.1.    Institutions should treat their customers' (and former customers') banking affairs as private and confidential.

8.2.    Institutions should at all times comply with the PDPO in the collection, use, holding and erasure of customer information. They should also comply with any relevant codes of practice issued or approved by the Privacy Commissioner for Personal Data giving practical guidance on compliance with the PDPO.

8.3.    On or before collecting customers' personal information, institutions should notify customers as specifically as possible of the classes of person to whom they may wish to make disclosure of customer information and the purpose of such disclosure. Classes of person about which customers should be specifically notified include among others -

(a)  debt collection agencies;

(b)  data processors to which the processing of personal information is to be, or may be, outsourced;

(c) credit reference agencies;

(d) subject to section 8.4 below, persons to whom customers' contact details may be disclosed for marketing purposes including, related companies within the same group and other persons (classified in specific terms, such as co-branding partners of the institution or third party loyalty programme providers which in each case should be shown in application forms/leaflets for the relevant services or products provided to customers); and

(e) such other persons to whom disclosure may be required by applicable laws or regulatory guidelines issued from time to time.

8.4. Institutions should not, without the prescribed consent of their customers, provide bankers' references in respect of a customer. An institution that intends to use customer information for direct marketing purposes shall comply with the PDPO and any relevant codes of practice.

8.5. Where personal information is used by an institution for its own marketing purposes for the first time, the institution should inform the customer that the institution will, without charge to the customer, cease to so use the personal information if the customer so requests.

8.6. Institutions should remind customers at least once every year or by including a standard notice in their marketing materials of the right to make the request referred to in section 8.5 above.

8.7. When a customer objects to the disclosure of the information referred to in section 8.3(d) above or refuses to give the consent or an indication of no objection or withdraws any consent or indication of no objection required under the PDPO, the institution concerned should give effect to such objection, refusal or withdrawal and should not refuse to provide that customer with basic banking services.

8.8. Where personal information is transferred to a third party service provider, for example, as part of an outsourcing arrangement, institutions should satisfy themselves that such information will be treated as confidential and adequately safeguarded by that service provider and adopt contractual or other means to prevent any information transferred to that service provider from being the subject of unauthorized or accidental access, processing, use, erasure or loss or kept longer than is necessary for the purposes stipulated in the outsourcing agreement. Institutions should remain accountable to customers for any complaints arising out of the handling of customer information by service providers and should not attempt to disclaim responsibility for any breach of customer confidentiality by service providers.

## 9. Personal Referees

9.1. Institutions may require applicants for banking services to provide in the application forms for such services the names and particulars of persons who have agreed to act as referees for the applicant.

9.2. The role of referees is confined to providing, on a voluntary basis and upon request by the institution, information about the applicant in respect of the banking service specified in the application form. Referees have no legal or moral obligation to repay to the institution liabilities of a customer unless they have entered into a formal agreement to guarantee the liabilities of that customer.

9.3. Institutions should require applicants for banking services to confirm that they have obtained the prior consent of the referees for their names to be used. If the applicant fails to give such confirmation, institutions should not approach the referees. In such cases, institutions should decide on their own judgement whether to continue to process the application.

9.4. Institutions should not attempt to seek, directly or indirectly, repayment of debt from a customer's referees who are not acting as guarantors. Related to this, institutions should not pass information about referees (or third parties other than debtors or guarantors) to their debt collection agencies. If a referee is to be approached for information to help locate a debtor or guarantor, this should be done, without causing nuisance to the referee, by staff of the institution.

**10.     Equal Opportunity**

10.1.   Institutions should at all times comply with the relevant ordinances for the promotion of equal opportunity and any codes issued under these ordinances in the provision of banking services.

10.2.   In respect of customers with impairment, institutions should adopt a helpful approach to making available to them appropriate means to access banking services.  In particular, institutions are encouraged to install specialised machines or software and to provide physical access to facilitate the provision of banking services to persons with impairment.

10.3.   Institutions should follow the relevant guidelines issued by the industry Associations with respect to the provision of services for customers with impairment or special needs, including but not limited to, "Practical Guideline on Barrier-free Banking Services" and "Guideline on Banking Services for Persons with Intellectual Disabilities", which are available on the website of HKAB.

10.4.   In addition to the statutory requirements, institutions should not discriminate against any customers simply on the ground of family status (for example, single parents), sexuality, age or race in the provision of banking services and in the quality and terms of services provided.

10.5.   Institutions should provide suitable training to front-line staff to raise awareness of the principles and guidelines relating to equal opportunity and the provision of assistance to customers with impairment.

**11.     Bank Marketing**

11.1.   Institutions should exercise care in the use of direct mail and in particular should exercise restraint and be selective -

(a)   where customers are minors; and

(b)   when promoting loans and overdrafts.

11.2.   Institutions should ensure that all advertising and promotional materials are fair and reasonable, do not contain misleading information and comply with all relevant legislation, codes and rules.  Where benefits are subject to conditions, such conditions should be clearly displayed in the advertising materials wherever practicable.  Where there are limitations as to space, e.g. in poster advertisements and television commercials, the advertisement should include reference to the means by which further information may be obtained.  Where digital media or channels are used and to the extent that such media or channels impose limitations on space and the number of characters or other constraints, institutions should consider the appropriateness of using such media or channels as a means of promoting products and services of a complex nature and whose terms, features or risks may not be easy for customers to understand.  Where such media or channels are used for promoting such products and services, institutions should consider the incorporation of images, infographics or other means for conveying necessary information to customers, or include reference to the means by which further information may be obtained.

11.3.   In any marketing process and advertising and promotional material for a banking service, institutions should indicate the interest rate and relevant fees and charges normally incurred in a clear and prominent manner and that full details of the relevant terms and conditions are available on request.  Where reference is made to an interest rate, institutions should also indicate the Annualised Percentage Rate (APR).  To the extent practicable, the advertising and promotional materials should provide a description of the APR, e.g. an APR is a reference rate which includes the basic interest rate and other fees and charges of a product expressed as an annualised rate.  Where the interest rate of a banking product is commonly quoted in terms of an annualised floating rate, institutions are not obliged to quote the corresponding APR but should show any relevant fees and charges normally incurred, such as annual fees, in a clear and prominent manner.

11.4.   Where institutions engage or collaborate with third parties to promote the institution's products or services, institutions are responsible to ensure all promotional activities including advertising and promotional materials published or shared by these third parties during the term of engagement or collaboration are fair and reasonable, do not contain misleading information and comply with sections 11.2 and 11.3.  For the avoidance of doubt, this section does not apply to materials posted or shared on public domain by third parties who are not engaged by or collaborating with the institution to promote its products or services, or where the materials published or shared by the third parties engaged by or collaborating with the institution are reposted or further shared by parties other than such third parties.

11.5.   Institutions should maintain one or more convenient channels for the public to verify the authenticity of marketing and promotional activities and materials of the institutions and third parties engaged by or collaborating with the institutions.  Institutions may determine the specific channel(s) that are appropriate in the circumstances, provided that the channel(s) are convenient to use and the availability of the channel(s) are clear to the public.  Institutions should ensure the channel(s) for verification remain(s) available for a reasonable period of time after the conclusion of the relevant marketing and promotional activities.

11.6.   Institutions should exercise restraint in making unsolicited (that is, cold) calls to customers, taking account of the general principles stated in relevant guidelines of the HKMA pertaining to marketing activities conducted by institutions.

11.7.   When introducing a new or enhanced service or product to customers which involves a cost or potential liability or potential risk of financial loss to them, institutions should not automatically enrol customers into the service or product, i.e. should not enrol them without the prescribed consent of the customers.  In cases where the new or enhanced service or product does not involve an additional cost or potential liability or potential risk of financial loss to customers, institutions should allow a period of at least 14 days for customers to decline acceptance of the service or product, and provide a convenient channel for customers to indicate that they decline acceptance.  Institutions should notify customers explicitly that customers may decline acceptance of the service or product and the channel(s) through which customers may do so.

11.8.   Where a "benefit" is conferred on customers involving no additional cost or potential liability or potential risk of financial loss to the customers, this should not be treated as an "enhanced service or product" in relation to which the requirements under section 11.7 above apply.  In determining what constitutes a "benefit", the following principles should be satisfied -

(a)   it does not involve present or future cost or liability or potential risk of financial loss to the customers;

(b)   it is available to all customers who subscribe to the related service or product and it is not practicable to offer a choice to a particular customer whether to enjoy the "benefit"; and

(c)   to enjoy the "benefit", customers are not required to deviate from the normal usage of the related product or service but may be required to initiate action(s) that fulfils certain condition(s).

11.9.   For the avoidance of doubt, sections 11.7 to 11.8 above do not apply to introduction of enhanced security features by institutions or other similar situations.

11.10.  In distributing insurance products, retirement plans and investment products as agents for third party service providers, institutions should ensure that the following information is provided to customers or prospective customers separately or as part of the relevant marketing materials -

(a)   the institution distributes the product for the third party service provider and the product is a product of the third party service provider but not the institution; and

(b)   in respect of an eligible dispute (as defined in the Terms of Reference for the Financial Dispute Resolution Centre in relation to the Financial Dispute Resolution Scheme) arising between the institution and the customer out of the selling process or processing of the related transaction,

the institution is required to enter into a Financial Dispute Resolution Scheme process with the customer; however any dispute over the contractual terms of the product should be resolved directly between the third party service provider and the customer.

11.11.   While banking services provided by institutions are exempted from the Trade Descriptions Ordinance (Cap.362), in providing banking services and to the extent applicable to those services, institutions should endeavour not to engage in unfair trade practices described in Part 2B of the Trade Descriptions Ordinance, which include misleading omissions, aggressive commercial practices, bait advertising, bait-and-switch, and wrongly accepting payment.


## 12.    Annualised Percentage Rates

12.1.   Institutions should where relevant quote APRs of banking products to facilitate comparison between different charging structures.  Where an interest rate for a product is commonly quoted in terms of an annualised floating rate (e.g. deposits, overdrafts and mortgage loans), institutions are not obliged to quote the corresponding APR, but they should show all relevant fees and charges normally incurred related to the product in a clear and prominent manner.

12.2.   Institutions should be prepared to respond to inquiries from customers concerning APRs and the methods of calculation, and also to advise customers the APRs of specific products.  The method set out in the relevant guidelines issued by the industry Associations should be adopted in the calculation of the APR.

12.3.   While institutions are exempt from the Money Lenders Ordinance (Cap. 163) so that the interest rates they charge are not restricted, they should not charge customers extortionate interest rates.  If the APRs charged by them on regular performing loans or delinquent revolving loans or loans re-priced due to delinquency (which are calculated in accordance with the method set out in the relevant guidelines issued by the industry Associations) or the annualized interest rates charged by them on amount in default or overdue exceed the level which is presumed to be extortionate under the Money Lenders Ordinance, they should be able to justify why such high interest is not unreasonable or unfair.  Unless justified by exceptional monetary conditions, the APRs charged on regular performing loans or delinquent revolving loans or loans re-priced due to delinquency or the annualized interest rates charged on amount in default or overdue should not exceed the legal limit as stated in the Money Lenders Ordinance.  For the avoidance of doubt, fees and charges in fixed amounts should not be included in the calculation of annualized interest rates.  Fees and charges in fixed amounts imposed on loans in default should be reasonable.


## 13.    Handling Customer Complaints

13.1.   Institutions should establish procedures for handling customer complaints in a fair and speedy manner.  The complaint procedures should take into account the following criteria -

(a)   transparency - the applicable procedures should be documented;

(b)   accessibility - the procedures should be easily invoked by customers; and

(c)   effectiveness - the procedures should provide for the speedy resolution of disputes in a fair and equitable manner.

13.2.   Details of how to invoke complaint procedures should be made available to customers and other interested parties such as personal referees and guarantors so that they know what steps to take if they wish to make a complaint.  Institutions are encouraged to make available details of how to invoke complaint procedures in tape recording or in Braille for the visually-impaired.

13.3.   Institutions should ensure that all their staff who deal directly with customers are made aware of the complaint procedures and are able to help customers by giving correct information about these procedures.

13.4.   Institutions should send an acknowledgment to the complainant within 7 days upon receiving a written complaint (where the complaint cannot be resolved within 7 days) and a written response to the complaint within a reasonable period, normally not exceeding 30 days.  Correspondence with the complainant should be sent in Chinese or English in accordance with the language of the complaint.

## 14.    Modifications to Bank Branch Services

14.1.   Before deciding to close, relocate or perform a material change to the scope of services of any bank branch, institutions should give due consideration to, amongst other factors, the community's needs for banking services and the impact on customers in the vicinity, in particular the elderly and those with impairments.  Where a decision is made to close, relocate or perform a material change to the scope of services of a bank branch, the institution should consider implementing appropriate measures to minimise the impact on customers.

14.2.   Institutions should give reasonable notice to customers before closing (including temporary closure where practicable), relocating or materially changing the scope of services of a branch.  The notice should also be prominently displayed on the branch premises, and institutions may consider posting an additional notice in their principal Internet banking platforms, as appropriate.  The notice should contain details of how the institution may continue to provide services to customers and provide contact information in case of enquiries by customers.  The notice period should not be less than 2 months unless it is not practicable for institutions to provide such notice (e.g. because of unforeseen circumstances).  Institutions should however provide a longer period of notice if the branch to be closed provides safe deposit box services.

## 15.    Management of Banking Activities

15.1.   Institutions should have proper arrangements in place for banking activities which take place at bank branches or other locations and which may have high demand to enable such activities to be conducted in a fair and orderly manner while minimising nuisance or inconvenience to customers and the public.

15.2.   Institutions should ensure transparency on the relevant details of such activities and provide adequate information about the arrangement, and any subsequent changes in the arrangement, to customers and/or prospective customers as early as practicable through effective means.

## 16.    Notification of Cyberthreats, Fraudulent Activities and other Customer Security Risks

Institutions that become aware of cyberthreats, frauds, scams, bogus marketing and promotional communications and other customer security risks (collectively "customer security risk events") in relation to the institutions should endeavour to issue warning messages on the customer security risk events concerned to all or the relevant customers as appropriate as soon as practicable if: (a) there is or appears to be a reasonable likelihood that all or the relevant customers would be affected by the customer security risk events; and (b) the institutions have received multiple reports of financial losses caused by the customer security risk events from customers.  The warning messages should target the particular customer security risk events concerned, alert customers of the relevant risks and include suggested measures which the customers should take to protect themselves.

## 17.    Review of Application and Transaction Information

Upon the application by a customer of a product or service, and prior to the execution of a transaction, institutions should provide to and allow a reasonable opportunity for the customer to review the relevant document(s) before the application or the execution, as applicable.  Where electronic devices are used in branches or other face-to-face situations to present the information, institutions should, upon the request of customers, provide customers with alternative means to review the relevant information.

**18.    Provision of Information in Non-paper Based Format**

18.1.    Where information referred to in sections 5.2, 5.10, 5.11, 5.12, 6.3, 13.4, 21.3, 23.5, 24.2, 24.3, 27.1, 27.6, 27.7, 27.8, 30.4, 36.3 or 46.8 is provided in an exclusively non-paper based format, institutions should ensure the information is provided in a format that allows customers to, at the time of provision, directly download and store the information for future reference. Institutions which provide the information to customers in a non-paper based format should so notify the customers in advance explicitly and the customers do not object to it. For section 13.4, such prior notification may not be required if customers' preference for receiving non-paper based information is clear to the institutions. Furthermore, institutions should also cater for the needs of customers for information to be supplied in a paper-based format under special circumstances.

18.2.    Where information referred to in sections 5.2, 5.10, 5.11, 5.12, 6.3 or 30.4 is provided in a non-paper based format which allows customers to directly download and store the information subsequent to the time of provision, institutions should allow the customers to continue to do so within a reasonable specified timeframe and the information must remain unchanged during the specified timeframe. Institutions should clearly inform customers of the specified timeframe within which the information will be available for download and that the customers may not be able to access or download such version of the information subsequent to the expiry of the specified timeframe.

## Chapter 2 - Accounts and Loans

**19.    Opening of Accounts**

19.1.    Institutions should satisfy themselves about the identity of a person seeking to open an account in order to protect their customers, the public and themselves against misuse of the banking system.

19.2.    Institutions should comply with the customer due diligence requirements set out in Schedule 2 of the Anti-Money Laundering and Counter-Terrorist Financing (Financial Institutions) Ordinance (Cap. 615).  The HKMA's Guideline on Anti-Money Laundering and Counter-Terrorist Financing provides guidance in relation to these requirements, which include verifying the customer's identity by reference to documents, data or information provided by a reliable and independent source, such as passports or identity cards.  The residential address, and information relevant to understanding the purpose and intended nature of the business relationship, such as the customer's occupation, should also be obtained.

19.3.    Institutions should provide to customers or prospective customers upon request general descriptive information about the customer due diligence requirements.

**20.    Closing of Accounts**

20.1.    Either the customer or the institution may end any banking relationship at any time subject to any specific terms and conditions relating to the closing of accounts.

20.2.    Institutions should not close a customer's account without first giving at least 30 days' notice or upon the customer's request a longer period of notice where it is practicable to do so.  This will not apply in exceptional circumstances, for example, where the account is being used or is suspected of being used for illegal activities.  Institutions should, where appropriate and not against the law, also consider providing a reason to the customer for closing the account.

**21.    Operation of Accounts**

21.1.    In addition to the detailed terms and conditions, institutions should make readily available to customers general descriptive information about the operation of their accounts.  Such information should include -

(a)  any regular fees;

(b)  any minimum balance requirement, and the charges payable if the balance falls below the prescribed minimum;

(c)  treatment of inactive or dormant accounts (see section 6.7 above);

(d)  the usual time taken for clearing a cheque or a payment instrument credited to the account;

(e)  any rights of set-off claimed by the institution (see section 22 below); and

(f)  the closing of accounts (see section 20 above).

21.2.    Institutions should make readily available to customers of joint accounts general descriptive information about the operation of their accounts.  Such information should include -

(a)  the rights and responsibilities of each customer of the joint account;

    (b)  the implications of the signing arrangements to be specified in the account mandate for the operation of the joint account, particularly that any transactions entered into by the authorized signatory or signatories will be binding on all account holders;

    (c)  the manner in which such authorized signatory or signatories or signing arrangements can be varied;

    (d)  the nature of liability for indebtedness on a joint account; and

    (e)  any rights of set-off claimed by the institution in respect of joint accounts (see section 22 below).

21.3.    Institutions should provide customers with statements of account at monthly intervals unless -

    (a)  a passbook or other record of transactions is provided;

    (b)  there has been no transaction on the account since the last statement; or

    (c)  otherwise agreed with the customer.

    Where institutions do not post or email statements of account to customers but require them to access the information electronically, institutions should advise customers concerned when the statements are available for such access.

21.4.    Institutions may provide statements of account in a non-paper based format to customers where the institutions have explicitly notified the customers at the time of application for the accounts or in advance at any other time that non-paper based statements will be provided and the customers are given an option to receive paper statements instead.  When providing the notice, institutions should also advise the customers of the fees and charges, if any, for choosing to receive or to continue to receive paper statements and the procedures to choose to receive paper statements subsequently.

21.5.    Before closure of bank accounts, institutions should remind the customers to download and store their non-paper based statements of account, if applicable, for record purposes and that the customers will no longer be able to access their statements after closure of the accounts.  Institutions should allow reasonable time for the customers to download and store their non-paper based statements or provide paper statements to the customers upon their request.

21.6.    For retail customers who have opted for statements of account in a non-paper based format for integrated accounts, Hong Kong dollars current accounts and/or Hong Kong dollars savings accounts, institutions should allow the customers to access their non-paper based statements from and store them on the Internet banking platforms for a minimum period of 7 years.  Institutions should, starting with the non-paper based statements made available on their Internet banking platforms as of 31 March 2020, incrementally accumulate non-paper based statements for a cycle period of at least 7 years.  The retrieval period of the statements of other types of accounts should be sufficiently long to allow reasonable access by customers.  Institutions should follow the relevant guidelines issued by the industry Associations from time to time.

21.7.    Institutions should advise customers to examine their statements of account and allow a reasonable period of time of at least 90 days for them to report any unauthorized transactions in the statement. Customers should be warned that the institution would reserve the right to regard the statement as conclusive should they fail to report any unauthorized transactions within the specified period. Institutions should not, however, avail themselves of this right in relation to -

    (a)  unauthorized transactions arising from forgery or fraud by any third party including any employee, agent or servant of the customer and in relation to which the institution has failed to exercise reasonable care and skill;

    (b)  unauthorized transactions arising from forgery or fraud by any employee, agent or servant of the institution; or

      (c)  other unauthorized transactions arising from the default or negligence on the part of the institution or any of its employees, agents or servants.

## 22.    Rights of Set-off

22.1.    The descriptive information made available to customers (see section 21 above) should include clear and prominent notice of any rights of set-off claimed by the institution over credit and debit balances in different accounts of the customer.

22.2.    In particular, it should be made clear to customers of a joint account whether the institution claims the right to set off the credit balance in that account against the debit balance in other accounts which may be held by one or more of the holders of the joint account.

22.3.    Institutions should set out in their terms and conditions the circumstances under which they would exercise their rights of set-off.

22.4.    Institutions should inform the customer promptly after exercising any rights of set-off.

## 23.    Deposit Accounts

23.1.    Institutions should publicize or display in their principal place of business and branches and provide on their websites and principal Internet banking platforms the rates offered on interest-bearing accounts, except where rates are negotiable.

23.2.    Institutions should make readily available to customers the following information on all deposit accounts -

      (a)  the interest rate applicable to their accounts;

      (b)  the basis on which interest will be determined, including where relevant the APR (see section 12 above), whether interest will be paid on a simple or compound basis and the number of days in the year (in both ordinary and leap years) that will be used for the calculation;

      (c)  frequency and timing of interest payments; and

      (d)  the basis on which fees and charges on deposit accounts will be determined.

23.3.    Institutions should provide the following additional information to customers in respect of time deposits -

      (a)  the manner in which payment of interest and principal will be made and the costs associated with different methods of withdrawing such funds (for example, by means of cashier's order);

      (b)  the manner in which funds may be dealt with at maturity (for example, automatic rollover, transfer to savings or current accounts etc.);

      (c)  the interest rate, if any, that will apply on time deposits which have matured but have not been renewed or withdrawn; and

      (d)  the charges and/or forfeiture of interest which may arise from early or partial withdrawal of deposits.

23.4.    If the date of maturity of a time deposit falls on a day which is not a business day, the deposit shall be deemed to mature on the succeeding business day.

23.5.   Institutions should provide customers with a contemporaneous receipt or advice for deposits at call or notice or fixed deposits which should show the date of deposit.  In the case of fixed deposits, the receipt or advice should specify the rate of interest and a single date of maturity.  In the case of call deposits, the receipt or advice should specify the initial rate of interest and the period of notice required to uplift the deposit.

23.6.   Institutions should inform customers of changes in interest rates (other than those which change on a daily basis) and the effective date by notices in the main offices, branches, their websites and principal Internet banking platforms, or on the statements of account, or by advertisements in the press.  For changes to promotional interest rates after customers have placed deposits with institutions (except for those changes of which the customers are already informed at the time of deposit placement), institutions should adopt effective means of notification which would provide reasonable assurance that their customers will be informed of the change and which do not rely unduly on the customers' own initiative.  Individual notification to customers (whether by written notice, message on statement of account, statement insert, e-mail or SMS message) are considered as effective in fulfilling this purpose.

23.7.   Institutions should at all times comply with any relevant regulatory requirements of the HKMA or the Securities and Futures Commission on risk disclosure for structured deposits (e.g. deposits or accounts involving derivatives, such as equity, index, commodity, credit, currency and interest rate-linked deposits).  Institutions should make a risk disclosure statement in advertising and promotional materials relating to structured deposits.  Such statement should include -

(a)   an explicit warning of the risks of dealing in the structured deposits; and

(b)   information on whether the principal, interest or both may be subject to possible loss arising from the structured deposits.


## 24.    Loans and Overdrafts

24.1.   Approval of loans or overdrafts is subject to institutions' credit assessment which should take into account the applicants' ability to repay.  In doing so, institutions may have regard to such factors as -

(a)   prior knowledge of the customer's financial affairs gained from past dealings;

(b)   the customer's income and expenditure;

(c)   the customer's assets and liabilities;

(d)   information obtained from credit reference agencies; and

(e)   other relevant information supplied by the applicant.

24.2.   Institutions should endeavour to ensure that a prospective borrower understands the principal terms and conditions of any borrowing arrangement.  The following information should be provided upon application for a loan or overdraft or, where relevant, in a subsequent offer, and on request -

(a)   the rate of interest for the loan or overdraft, and whether it may be varied over the period of the loan;

(b)   a brief explanation of the basis on which interest will be determined and when it will be payable, including where relevant the APRs (see section 12 above), and the number of days in the year (in both ordinary and leap years) that will be used for the calculation;

(c)   all fees and charges which will apply, and a brief explanation of the basis on which such fees and charges will be determined and when they will be payable;

(d)  the specified period during which the loan offer may be accepted by the prospective borrower;

(e)  details of terms of repayment, including the loan tenor and, where relevant the instalments payable by the customer;

(f)  any overriding right to demand immediate repayment;

(g)  other significant features such as security requirements, late payment charges and the charges or termination fees for early repayment, and a brief description of the basis on which the late payment charges and the charges or termination fees for early repayment will be determined and when they will be payable; and

(h)  the institution's right, in the event of default of the customer, to set off any credit balance in other accounts held by the customer (or in a joint account of the customer) against the amount due to the institution.

24.3.   In addition to the information set out in section 24.2 above, the following information on instalment loans (i.e. loans repayable by equal instalments) should be provided to customers upon application for a loan or in a subsequent offer, and on request -

(a)  where applicable, the loan balance used as the basis for calculating the fees and charges under sections 24.2(c) and 24.2(g) above and the timing when the loan balance is determined; and

(b)  the apportionment of interest and principal for each loan repayment throughout the loan tenor and the method of apportionment.

24.4.   Institutions should, in addition to complying with section 5.2 above, provide a consistent and succinct summary of major terms and conditions to customers in the form of a Key Facts Statement when they apply for loans and overdrafts and on request.  A Key Facts Statement should include information which is of significant concern to customers, such as interest rates, fees and charges, and should follow the standard template provided in the relevant guidelines issued by the industry Associations.

24.5.   For loans with a specified maturity date, institutions should quote the APRs for different tenors which are commonly selected by customers.

24.6.   For loans which are revolving in nature (excluding overdrafts), institutions should quote the APR calculated in accordance with the method set out in the relevant guidelines issued by the industry Associations together with the annual fee.  The APR and the annual fee should be shown with equal prominence whenever interest rates are quoted.

24.7.   Where there is more than one applicable interest rate during the loan period, institutions should quote an APR which takes into account all the applicable interest rates for different parts of the loan period and is calculated in accordance with the method set out in the relevant guidelines issued by the industry Associations.

24.8.   The number of days used as the basis of interest calculation for loans and deposits should be consistent.

24.9.   Where the rate of interest for a loan or an overdraft is based on a reference rate, for example, best lending rate, institutions should notify customers of any changes in the reference rate as soon as practicable, unless such changes have been widely publicized in the media.

24.10.   Institutions should notify customers promptly when accounts without pre-arranged credit facilities are overdrawn and the related fees and charges.

24.11.   If institutions intend to charge a default rate of interest and make other charges in accordance with the relevant terms and conditions when customers overdraw their accounts or exceed an agreed borrowing limit, institutions should advise customers in advance of their right to impose such default interest and charges and inform customers promptly after exercising such right.

24.12.  Institutions should advise customers to inform them as soon as possible of any difficulty in repaying or servicing the loan over the credit period.

## 25.  Residential Mortgage Lending

25.1.  This section applies to any mortgage loan secured on a residential property / car park regardless of the purpose of the loan or the location of the residential property / car park.  In the case of an individual providing (or proposing to provide) a residential property / car park as third party security, section 27 below will apply.

25.2.  Institutions should provide customers and prospective customers with information similar to that in section 24.2 above upon application for a mortgage loan secured on a residential property / car park or, where relevant, in a subsequent offer and on request.  In addition, institutions should warn customers that the mortgage loan is secured on the property in question and that default may result in the institution taking possession of, and selling, the property.

25.3.  In the case of an "All Monies" mortgage (i.e. a mortgage which will secure all amounts payable by the borrowers) executed on or after 4 July 2005 involving more than one borrower, the amount secured under the mortgage should not exceed the amount of money, obligations and liabilities owing or incurred at any time by the co-borrowers jointly.  This does not restrict a co-borrower acting as surety from separately guaranteeing or securing the other's obligations in a transparent manner which complies with the provisions of section 27 below.

25.4.  Institutions should provide customers with revised particulars of instalments payable by the customer after every adjustment of the interest rate.

25.5.  Institutions should inform customers and prospective customers if they have to pay for the legal expense of both the solicitors who represent themselves and the solicitors who represent the institutions to prepare mortgages on properties.

25.6.  Institutions should also inform customers or prospective customers that they have the right to employ separate solicitors for themselves, and the cost implications of doing so.

25.7.  Customers may, from institutions' approved lists, appoint solicitors to represent both themselves and the institutions (unless it is the institution's policy to require separate legal representation) and employ insurers which they think fit to insure the properties against fire or other serious damage.  The coverage of such approved lists should be sufficiently wide to allow customers to make a choice.  In the case of insurers, the approved list should include insurers which are not related to the institution.

25.8.  Institutions should inform customers and prospective customers that they may employ solicitors not on the approved lists of institutions (a) to represent themselves, and, (b) if the institutions' policy so allows to represent both themselves and the institutions, and if they do so, the procedures involved, the nature and amount of the fees and charges levied by the institutions, and the nature of any extra fees that may be charged by the solicitors which are known to the institutions including the costs for the additional work for each solicitor in reviewing the other solicitor's documentation under scenario (a).

25.9.  If it is the institutions' policy to require separate legal representation or to employ only solicitors on the approved lists to represent the institutions, this should be highlighted to customers and prospective customers.  Institutions should also inform customers and prospective customers of the cost implications as a result.

25.10.  Institutions should inform customers and prospective customers that they may employ insurers not on the approved lists of institutions, and if they do so, the procedures involved, any criteria to be fulfilled by the insurers (e.g. any minimum policy cover), any fees charged by the institutions, and any extra costs involved.  Any criteria imposed should be reasonable.

25.11.  Institutions should inform customers or prospective customers upon mortgage applications and renewals of the fire insurance policy on the property that they may choose to take out a fire insurance policy (from an insurer on the approved lists of the institutions or not), or to adopt the master fire insurance policy of the property (where this exists and is acceptable to the institutions).  Institutions should not charge any fee if a customer chooses the master fire insurance policy option.  Institutions may however require customers to take out fire insurance in addition to such master fire insurance policy under reasonable circumstances, and in doing so, institutions should provide the reason to the customers.

25.12.  The amount and the nature of risks to be insured during the term of the loan should be reasonable and should be a matter of mutual agreement between institutions and their customers.  Institutions should provide an option for the customers or prospective customers to choose whether the insured amount should be based on, for example, the original loan value, the current loan value or the cost of reinstating the property, and should inform them if any option involves extra costs or fees (for example, valuation fees).

25.13.  On receipt of a request from customers for discharge of a mortgage, institutions should as soon as reasonably practicable release title deeds and any relevant documents (other than the mortgage itself) to the solicitor representing the customer against the solicitor's undertaking to return the documents on demand as appropriate.  Unless institutions encounter any practical difficulties, this process should normally be completed within 21 days.  If institutions are unable to meet this industry standard, they should promptly inform the customer.

25.14.  Institutions should guard against fraud by persons misrepresenting themselves as the owner(s) of the property by following the relevant guidelines issued by the industry Associations.

## 26.  Other Secured Lending

In the case of a security document other than a residential mortgage involving more than one borrower executed on or after 3 January 2006, the amount secured under the security document should not exceed the amount of money, obligations and liabilities owing or incurred at any time by the co-borrowers jointly.  This does not restrict a co-borrower acting as surety from separately guaranteeing or securing the other's obligations in a transparent manner which complies with the provisions of section 27 below.

## 27.  Guarantees and Third Party Securities

27.1.  Subject to the consent of the borrower as required in section 27.9 below, institutions should provide an individual proposing to give a guarantee or third party security (the surety) with a copy or summary of the contract evidencing the obligations to be guaranteed or secured.

27.2.  Institutions should in writing (in printed form) advise the surety -

(a)  that by giving the guarantee or third party security, the surety might become liable instead of or as well as the borrower;

(b)  whether the guarantee or third party security is unlimited as to amount (that is to say that the institution may agree to extend further facilities to the borrower without the consent of the surety) and, if so, the implications of such liability (for example, that the surety will be liable for all the actual and contingent liabilities of the borrower, whether now or in future including for further facilities extended to the borrower) and if this is not the case, what the limit of the liability will be;

(c)  whether the liabilities under the guarantee or the third party security are payable on demand;

(d)  under what circumstances the surety would be called upon to honour his or her obligations;

(e)  under what circumstances, and the timing within which, it would be possible for the surety to extinguish his or her liability to an institution; and

(f)  that the surety should seek independent legal advice before entering into the guarantee or providing third party security.

27.3.  A clear and prominent notice regarding the provisions in section 27.2 above should be included in or attached to the guarantees and other third party security documentation.

27.4.  Institutions should provide a surety with an option to choose whether the guarantee or third party security should be limited or unlimited in amount (as described in section 27.2(b) above).

27.5.  For the purpose of section 27.4 above, a limited guarantee or third party security may include one which is either -

(a)  limited in amount in respect of principal; or

(b)  unlimited in amount but is limited to secure one or more specific facilities

and may, with the consent of the surety (and only with the consent of the surety), secure additional amounts, further facilities or changed facilities (in the case of (a)) or further or changed facilities (in the case of (b)) beyond those originally secured.

27.6.  Where a guarantee or third party security is unlimited in amount (as described in section 27.2(b) above), institutions should give notice to the surety as soon as reasonably practicable when further facilities are extended to the borrower or when the nature of the facilities extended to the borrower is changed.

27.7.  Institutions should provide the surety with a copy of any formal demand for overdue payment that is sent to the borrower who has failed to settle the overdue amount following a customary reminder.

27.8.  Subject to the consent of the borrower as required in section 27.9 below, institutions should provide, upon request by the surety, a copy of the latest statement of account provided to the borrower, if any.

27.9.  Before accepting a guarantee or a third party security, institutions should obtain the prescribed consent of the borrower to provide the surety with the documents mentioned in sections 27.1, 27.7 and 27.8 above.  If the borrower does not give consent, the institution should inform the surety of this in advance so that he or she can decide whether to provide the guarantee or the security.

## Chapter 3 - Card Services

**28.    Application**

This chapter applies to the provision of card services either directly by institutions or through their subsidiaries or affiliated companies controlled by them.  Except where otherwise specified, this chapter applies to all cards issued by card issuers (see definition of "Cards" in the definition section).

**29.    Issue of Cards**

29.1.    Card issuers should act responsibly in the issue and marketing of credit cards and the setting of credit card limits, in particular to persons (such as full time students) who may not have independent financial means.  Card issuers should in all cases -

(a)    not open a credit card account for customers, or increase any credit limit applicable to such accounts, unless the card issuers consider the ability of the customers' repayment capacity or financial strength.  Card issuers should establish and maintain reasonable written policies and procedures for assessing customers' repayment capacity or financial strength;

(b)    not open credit card accounts for customers who are less than 18 years old, unless the customers have submitted a written application and the card issuers have -

(i)    financial information indicating that the customers have an independent ability to repay the proposed extension of credit in connection with the accounts, or

(ii)    an agreement signed by a cosigner, guarantor, or joint applicant who is at least 18 years old to be jointly liable with the customers for any debt on the accounts, and financial information indicating that such cosigner, guarantor, or joint applicant has the ability to repay such debts.

If a credit card account has been opened pursuant to this section, the card issuers should not increase the credit limit on such account before the customer attains the age of 18 unless the said cosigner, guarantor, or joint account holder who assumed liability at account opening agrees in writing to assume liability on the increase;

(c)    not grant credit limit exceeding HK$10,000 to students in an institution of higher education, unless the student has submitted a written application and has given financial information indicating that the student has an independent ability to repay the proposed extension of credit in connection with the account;

(d)    not offer credit card limit increases in respect of accounts that are in default for more than 60 days or are subject to a debt relief plan; and

(e)    send a communication about offering of an increase in a credit limit to cardholders at least 30 days before the change.  They should explain in clear and simple language how cardholders' limit is changing and what cardholders can do if they wish to reject the new limit.  The communication should reassure cardholders that card issuers will not treat them any differently simply because they have exercised their right to reject a limit increase.

29.2.    Card issuers should issue cards to customers only when -

(a)    in the case of new cards they have been requested by the customers to do so;

(b)    they are issued to replace existing cards upon cardholders' request because the existing cards have been damaged, lost or stolen, or due to suspected security incidents; or

(c)  they are to replace or renew cards that have already been issued under the following conditions (but subject to section 29.12 below) -

    (i)  the credit limit and any other relevant limits and the principal terms and conditions (including annual fees) should remain the same;

    (ii)  no additional new card is issued i.e. the cardholders still get the same number of cards;

    (iii)  the service(s) and privilege(s) with the card remain unchanged or are improved; and

    (iv)  no additional cost, potential liability or potential risk of financial loss to cardholders is involved.

29.3.  Where card issuers intend to replace or renew cards that have already been issued, but the conditions set out in section 29.2(c)(i) to (iv) are not fulfilled, card issuers should obtain consent from cardholders and highlight the key differences between the existing card and the replacement or renewal card before issuing the card.  For the avoidance of doubt -

(a)  where an existing card may be retained by the cardholder, the card issuer should highlight this option to the cardholder, and the replacement or renewal card should be considered as an additional new card and thus the cardholder's consent is required; and

(b)  a card issuer may issue a card to replace a co-branded card or a card the class of which has been terminated, provided that there is an outstanding balance or there are (or appear to be) recurring payment arrangements which can be carried over to the new card on the card account and the card issuer has made reasonable efforts but is unable to contact the cardholder.

29.4.  Card issuers should satisfy themselves about the identity of a person applying for a card and provide the applicant with details of the identification needed.

29.5.  In addition to the detailed terms and conditions, card issuers should make readily available to cardholders general descriptive information on the use of cards.  Such information should include -

(a)  security of the cards/personal identification numbers (PINs) (see section 35 below);

(b)  the procedures for stopping the use of a card or reporting the loss or theft of the card (including a telephone number to which such a report may be made) (see section 38 below);

(c)  the cardholder's liability for the unauthorized use of a card (see section 39 below);

(d)  any credit facilities to which the cardholder may gain access;

(e)  whether the card has more than one function, the types of transaction that may be made and the accounts to which access may be gained using the card;

(f)  any restrictions on the use of the card (including withdrawal and transaction limits);

(g)  the procedures for making complaints against outlets arising from the use of the card;

(h)  how to use the card issuer's error/dispute resolution processes (including the procedure for querying entries on a periodic statement and the chargeback mechanism of the applicable card association);

(i)  the procedures for cancelling recurring payments;

(j)  the method of applying exchange rates and/or levies to transactions in foreign currencies or cross-boundary transactions;

(k)  all fees and charges which will apply, including the annual fee, any charges relating to cash advances (including any handling charge and any additional cash advance fee), any late payment charge, etc. and the basis of determining the relevant fees and charges unless these are outside the control of the card issuer;

(l)  the basis on which interest or finance charges will be determined and when they will be payable, including where relevant the APR (see section 12 above), the length of the interest free period, the timing when interest or finance charges will start to accrue on the outstanding balance arising from the use of credit cards, and the period over which such interest or finance charges will be levied; and

(m)  any rights of set-off claimed by the card issuer (see section 34 below).

29.6.  Card issuers should ensure an application form to initiate any error/dispute resolution process is provided on their websites and principal Internet banking platforms and upon cardholders' requests.

29.7.  Card issuers should provide basic information on the chargeback mechanism of card associations on their websites and principal Internet banking platforms and upon cardholders' requests.  Such information should include but should not be limited to the following -

(a)  a description of the chargeback mechanism, and the related process flow;

(b)  a description of how cardholders can initiate chargeback requests with the card issuers and the procedures involved, including the information that cardholders are required to submit to the card issuers and the reason for submission;

(c)  an explanation of the role of a card issuer;

(d)  the chargeback time limits of different card associations, illustrated by examples of commonly seen scenarios, and that chargeback time limits may vary depending on different factors; and

(e)  other important information which cardholders should be aware of.

29.8.  The relevant frontline staff of card issuers should provide prompt and appropriate assistance to cardholders who dispute or raise chargeback requests on transactions and be able to explain the reason for obtaining any required information from the cardholders.  Card issuers should ensure their requests for information from cardholders are reasonable and practical.  Card issuers should process chargeback requests expeditiously.  When the results of chargeback requests are available, card issuers should promptly communicate and explain to the cardholders the results.

29.9.  When accepting a principal cardholder's instructions to issue a subsidiary credit card, card issuers should -

(a)  give clear and prominent notice to the primary and subsidiary cardholders of their respective liabilities for debts incurred on the credit cards issued; and

(b)  inform both the primary and subsidiary cardholders of the means by which a subsidiary credit card may be cancelled and suspended, including the need to return the subsidiary credit card as soon as possible.  Where the subsidiary credit card is not returned and if requested to do so by the primary cardholder, the card issuer should take prompt action to prevent further use of the subsidiary credit card, in line with the procedures which apply to lost cards.  The card issuer should warn the primary cardholder that he/she may be liable for any payments arising from the use of the subsidiary credit card until it has been returned or until the card issuer is able to implement the procedures which apply to lost cards.  Any related charges arising from such procedures should be made known to the primary cardholder.

29.10.  While card issuers can hold primary cardholders liable for the debts of subsidiary cardholders, they should not hold subsidiary cardholders liable for the debts of the primary cardholders or other subsidiary cardholders.

29.11.   Card issuers should inform cardholders if a card issued by them has more than one function or transaction limit. Card issuers should not add a new function or transaction limit to a card without the prescribed consent of the cardholders. Card issuers should comply with requests from cardholders not to issue PINs where cardholders do not wish to use functions operated by a PIN.

29.12.   Except in the circumstances where a card is issued to replace an existing card upon a cardholder's request because the existing card has been damaged, lost or stolen, or due to a suspected security incident, card issuers should not replace or renew a card without allowing the cardholder at least 30 days from the date of replacement or renewal to cancel the card without having to pay any fee.

29.13.   In cases where top up services to stored value facilities or any autopay instructions linked with the existing credit card will not be rolled over to a replacement or renewal credit card (e.g. where a replacement or renewal credit card bears a number different from the existing credit card), this should be highlighted to the cardholder and the card issuer should remind the cardholder to make appropriate arrangements for any pre-arranged payments through the existing credit card. To enhance cardholder service, upon a cardholder's request for assistance, a card issuer should endeavour to assist the cardholder and provide a list of regular payments and autopay instructions going through the existing credit card account on a best effort basis to help the cardholder in making appropriate arrangements to avoid the risk of missed payments and rejected transactions, and remind the cardholder to review the list.

29.14.   For the convenience of cardholders, there is a period during which the newly issued and the existing card are both valid. Card issuers should advise cardholders as to when the old card will become invalid and how it should be properly disposed of.

29.15.   Card issuers should not levy any annual fees on credit cards (including any principal or subsidiary card) which are not activated by cardholders. In the case of renewal or replacement cards which are not activated, if the accounts have no outstanding balances and no cardholder-initiated activities during the first 18 months from the date of issuance of the cards, card issuers should not levy any annual fees on the credit card accounts.

29.16.   Where credit cards (including any principal or subsidiary card) are not activated by cardholders and the accounts have no outstanding balances and no cardholder-initiated activities for 18 months from the date of issuance of the cards, the card issuers should notify the cardholders of the following -

   (a)   to activate the cards within 30 days of the notification to avoid them being terminated, and the risk of missing any pre-arranged payments; and

   (b)   whether annual fees would be charged after the credit cards are activated, pursuant to the account terms and conditions.

   If the credit cards (including any subsidiary card) remain unactivated 30 days after the notification, the card issuers should take steps to terminate such credit card accounts as soon as reasonably practicable.

29.17.   In the case where there are activated subsidiary cards, and the principal credit cards are not activated by cardholders and the principal and all subsidiary cards have no outstanding balances and no cardholder-initiated activities for 18 months from the date of issuance of the cards, the card issuers should remind the principal cardholders of the following -

   (a)   to activate the principal cards within 30 days of the notification to avoid them being terminated and the risk of missing any pre-arranged payments, or cancel the cards;

   (b)   the list of subsidiary cards and whether they are activated or not, and that the subsidiary cards will also be cancelled if the principal cardholders cancel their cards; and

   (c)   the principal cardholders should make appropriate arrangement for the subsidiary cardholders, if the subsidiary cards are cancelled.

If the principal cards remain unactivated 30 days after the notification despite the reminder, the card issuers should take steps to terminate the principal and subsidiary credit card accounts as soon as reasonably practicable.

29.18.   When card issuers provide over-the-limit facilities to cardholders, card issuers should -

(a)   provide a convenient channel for cardholders to opt out of over-the-limit facilities on credit card application forms and monthly statements.  The opt-out channel should be made available in a prominent and conspicuous manner to draw cardholders' attention to their opt-out right.  In particular, card issuers should provide the opt-out channel on the front of any page of each monthly statement that reflects the imposition of an over-the-limit fee or charge.  For the avoidance of doubt, cardholders can exercise their opt-out right any time, and if cardholders exercise their opt-out right, the card issuer should effect the cardholders' request as soon as practicable;

(b)   when providing the opt-out channels, explain to cardholders what it means if they do not exercise their opt-out right, and disclose the amount of any fees or charges that will be imposed for over-the-limit transactions and any increase in interest rate that may apply if the cardholders exceed the credit limit;

(c)   ensure that the limit of the facility is reasonable and generally does not represent a significant percentage of the credit limit of their credit cards, since the purpose of such over-the-limit facility is to provide convenience to cardholders to cater for the situation where cardholders may occasionally incur an excess over their credit limit.  Where a cardholder constantly exceeds his/her credit limit, card issuers should consider reviewing a cardholder's existing credit limit, and as appropriate, suggest the cardholder applying for a higher credit limit;

(d)   where an over-the-limit transaction takes place, inform the cardholder promptly through SMS, email or other channel offered by card issuers which can reach the cardholder expeditiously, in addition to notification through the cardholder's regular statement.  For a cardholder who has already exceeded his/her limit, this notification is not necessary for subsequent over-the-limit transactions.  For the avoidance of doubt, such notification should be provided if a cardholder repays a limit excess but (i) exceeds the limit again in the same statement cycle, or (ii) exceeds the limit again in the subsequent statement cycle(s);

(e)   not impose more than one over-the-limit fee or charge per billing cycle on the cardholders who have not opted out of the over-the-limit facilities; and

(f)   not impose an over-the-limit fee or charge for a billing cycle if a cardholder exceeds a credit limit solely because of fees or interest charged by the card issuers to the cardholder's account.

## 30.   Terms and Conditions

30.1.   Card issuers should provide customers with clear disclosures of the terms and conditions on or before they open an account.  Card issuers should also provide a full set of terms and conditions at the request of customers (or prospective customers).

30.2.   Card issuers should draw the attention of customers to those major terms and conditions which impose significant liabilities or obligations on their part.  Such terms and conditions should be included in the application forms for card services in accordance with section 30.5 and 30.6.

30.3.   Card issuers should, in addition to complying with section 5.2 above, provide a consistent and succinct summary of major terms and conditions to customers in the form of a Key Facts Statement when they apply for credit cards and on request.  A Key Facts Statement should include information which is of significant concern to customers, such as interest rates, fees and charges.  Card issuers should follow the standard template provided in the relevant guidelines issued by the industry Associations.

30.4.    Card issuers should provide a full set of terms and conditions to customers in writing on or before delivery of the cards to customers.  A Key Facts Statement is not intended to replace a full set of terms and conditions.

30.5.    Card issuers should disclose terms and conditions in plain language (both in English and Chinese). Complex legal and technical terms should be avoided wherever practicable.  Terms and conditions should be presented in a reasonable layout and font size that is readily readable.  Card issuers should meet the "clear and conspicuous" standard, which requires disclosure to be in a reasonably understandable form and readily legible standard.  Institutions using electronic devices in branches or other face-to-face situations to present customers with terms and conditions should also comply with section 5.8 above.

30.6.    The APRs for retail purchase and cash advances and fees and charges should be disclosed prominently and conspicuously in the terms and conditions, and in a font size that is sufficiently larger than that for the other terms and conditions.

30.7.    Card issuers should post their card agreements and terms and conditions online at the card issuers' own websites.

30.8.    Card issuers should provide cardholders with at least 60-day advance notice before any significant change in the terms and conditions takes effect.

## 31.    Fees and Charges

31.1.    Card issuers should allow credit card cardholders to make a payment by any methods, such as mail, electronic, or telephone payments, without incurring any fee, unless such payment is made through a bank counter or a cardholder service representative of the card issuers.

31.2.    Card issuers should not impose an account inactivity fee on a cardholder.

31.3.    Card issuers should not impose a closed account fee on a cardholder, provided that a card issuer may recover the cost of a welcome gift or other benefit already received by the cardholder if the conditions for receiving the gift or benefit as stated in the terms agreed with the cardholder have not been fulfilled by the cardholder.

31.4.    If card issuers impose a fee for violating the terms or other requirements of an account, the fee should be set at a reasonable amount.  Late payment fee should be an amount determined in accordance with the above principle or the amount of minimum payment, whichever is the lower.  In addition, when charging fees on minor breaches involving small amounts, under normal circumstances card issuers should exercise flexibility in waiving or reducing the fees.  Card issuers should also be prepared to respond to enquiries from cardholders regarding the type of violation and the basis for charging the respective fee.

31.5.    Card issuers should not impose more than one fee in case a late payment is triggered by a returned payment.  They can either impose a late payment fee or a returned payment fee.

31.6.    Card issuers which impose any fees or charges on transactions in Hong Kong dollars (or the currency in which the relevant card is issued) incurred outside Hong Kong (such as transactions under dynamic currency conversion) should disclose such charges on their fee schedules.

31.7.    Card issuers should include a reminder in the fee schedule about the arrangement for settling foreign currency transactions in Hong Kong dollars (or the currency in which the card is issued) at a point of sale outside Hong Kong with the following information -

   (a)    the nature of the arrangement in settling foreign currency transactions in Hong Kong dollars (or the currency in which the card is issued);

(b)    that cardholders should request from the merchant at the point of sale outside Hong Kong for details about the exchange rates and applicable fees before entering into such transactions, since the arrangement may involve a cost higher than that required to settle the transaction in the foreign currency; and

(c)    for card issuers which charge a mark-up on these transactions, the mark-up and the charging details if any.

31.8.    Card issuers' relevant frontline staff should explain the general information on fees and charges relating to foreign exchange transactions and dynamic currency conversion transactions upon customers' requests.

## 32.    Interest Rate

32.1.    Card issuers should quote APRs on credit card products (one for retail purchase and one for cash advances), together with the annual card fee, to facilitate comparison between different charging structures. The APRs should be calculated in accordance with the method set out in the relevant guidelines issued by the industry Associations. The APRs and the annual fee should be shown with equal prominence whenever interest rates of credit card products are quoted except on statements of account where the annual fee is not required to be shown.

32.2.    Card issuers should not increase the APR, or impose additional charges, on a credit card if the cardholder has agreed with or is in discussion with the card issuers for a debt relief plan for the account.

32.3.    Card issuers should notify the cardholders at least 60 days before any APR increase (other than due to delinquency or default) or a significant change in account terms, and offer the following two options to settle the outstanding balance -

(a)    where cardholders opt to close the credit card accounts, card issuers should offer the following two options to the cardholders to settle the outstanding balance –

(i)    give the cardholders a reasonable period to repay the balances at the existing APR, with a repayment method not less beneficial to the cardholders than the repayment method before the effective date of the change; and

(ii)    give the cardholders the option to transfer the outstanding balance to an instalment loan at an APR not higher than the existing credit card APR; and

(b)    where cardholders opt to keep the credit card accounts, card issuers should give the cardholders the option to transfer the outstanding balance to an instalment loan at an APR not higher than the existing credit card APR.

For the avoidance of doubt, increase of APR from a promotional rate back to a pre-existing rate upon expiry of the promotional period in accordance with pre-agreed terms is not considered an APR increase for the purpose of this section.

32.4.    On an APR increase due to delinquency or default, card issuers should give an advance notice to cardholders, after the event triggering the rate increase, during which the cardholders can reject the change by closing the credit card accounts. Where cardholders opt to close the credit card accounts before the rate increase takes effect, card issuers should give cardholders a reasonable period to repay the balance at the existing APR. The advance notice can be provided in the form of -

(a)    a customized warning message in a demand letter,

(b)    a customized warning message read to the cardholder over the phone (with tape recording of the cardholder's acknowledgement), or

(c)    a customized warning message in a regular monthly statement.

In the cases of (a) and (b) above, card issuers should not increase the interest rate until at least 30 days after the date of the demand letter or telephone call. In the case of (c) above, card issuers should not increase the interest rate until the start of a new billing cycle after the issuance of the monthly statement containing the customized warning message.

32.5.    For any increase in APR, card issuers should review the account no less frequently than once every 6 months, to determine whether to reduce the APR. When a reduction is indicated by the review, the card issuers must reduce the APR previously increased not later than 60 days after completion of the review. The card issuers' obligation to review ceases to apply if they reduce the APR to a rate equal to or lower than the rate applicable immediately prior to the increase. For the avoidance of doubt, increase of APR from a promotional rate back to a pre-existing rate upon expiry of the promotional period in accordance with pre-agreed terms is not considered an APR increase for the purpose of this section.

32.6.    If card issuers increase an APR that applies to a credit card account, they should give at least one principal reason, in general terms, in the notification letter for the rate increase to the affected cardholders, such as changes in market conditions, delinquency or default.

32.7.    Card issuers should not adopt double-cycle billing, i.e. they should not impose finance charges as a result of the cardholders not repaying the full balance by the due date thus losing a grace period which is defined as a period within which any credit extended may be repaid without incurring a finance charge (see Annex II for an illustrative schematic diagram) -

(a)    on balances for day(s) in billing cycle(s) that precede(s) the most recent billing cycle; or

(b)    on any portion of a balance subject to a grace period that was repaid prior to the expiration of the grace period.

## 33.    Repayment

33.1.    Card issuers should set the minimum periodic payment for a credit card account at an amount no less than all interest and fees and charges (including annual card fees), plus at least 1% of outstanding principal.

33.2.    When cardholders make a payment in excess of the required minimum periodic payment, card issuers should allocate the excess amount in an order that minimizes interest charges to the cardholders. For instance, card issuers should allocate the excess amount first to the monthly instalment balance, then to the balance with the highest APR and any remaining portion to the other balances in descending order based on the applicable APR.

33.3.    Card issuers should allow cardholders to set up an automated payment instruction to pay the card issuers any percentage of the statement balance between minimum payment and full payment on a regular basis. Card issuers should also allow cardholders to alter the automated payment instruction by simple means.

33.4.    If the payment due date in a given month falls on a day on which card issuers do not receive or accept payments, card issuers should treat a payment received the next business day as timely.

## 34.    Rights of Set-off

34.1.    The descriptive information made available to cardholders (see section 29 above) should include clear and prominent notice of any rights of set-off claimed by the card issuer over credit and debit balances in different accounts (including credit card and deposit accounts) of the cardholder.

34.2.    Where subsidiary cards are issued, it should be made clear to the principal cardholder whether the card issuer claims the right to set off the debit balance in the credit card account of any of the principal or subsidiary cardholders against the credit balance in other accounts of the principal cardholder.  It should also be made clear to all subsidiary cardholders whether the card issuer claims the right to set off the debit balance in the credit card account of a subsidiary cardholder against the credit balance in other accounts of that particular subsidiary cardholder.  In accordance with section 29.10 above, card issuers should not set off the debit balance in the credit card accounts of the principal cardholder or other subsidiary cardholders against the credit balance of a subsidiary cardholder.

34.3.    Card issuers should inform cardholders promptly after exercising any rights of set-off.

## 35.    Security of Cards/PINs

35.1.    Card issuers should issue cards and PINs separately and take reasonable steps to satisfy themselves that these have been received by cardholders, whether they are personally collected by cardholders or delivered by mail.  Where cards and PINs are personally collected, card issuers should satisfy themselves as to the identity of the recipient.

35.2.    Card issuers should advise cardholders of the need to take reasonable steps to keep the card safe and the PIN secret to prevent fraud.  In particular, they should advise cardholders -

(a)    that they should destroy the original printed copy of the PIN;

(b)    that they should not allow anyone else to use their card and PIN;

(c)    never to write down the PIN on the card or on anything usually kept with or near it; and

(d)    not to write down or record the PIN without disguising it.

35.3.    When cardholders are provided with an opportunity to select their own PINs, card issuers should advise cardholders that it is not suitable to use easily accessible personal information such as telephone numbers or date of birth.  Card issuers should advise cardholders not to use the PINs for accessing other services (for example, connection to the internet or accessing other websites).

35.4.    Where a card is linked with deposit accounts, card issuers should set limits for cash and debit transactions of the deposit accounts on a per card basis irrespective of the number of deposit accounts with which the card is linked.

35.5.    Card issuers should ensure that transactions made through electronic terminals can be traced and checked, so that any error can be identified and corrected.

35.6.    Cardholders should be advised to refer to the security advice provided by card issuers from time to time.  Moreover, card issuers should regularly review their security advice to ensure that it remains adequate and appropriate as the technology environment changes.

## 36.    Transaction Records

### *At Electronic Terminals*

36.1.    Subject to security requirements, at the time of transactions made through electronic terminals, a printed transaction record containing the following information should be provided -

(a)    the amount of the transaction;

(b)    the account(s) being debited or credited;

(c)  the date and the time of the transaction;

(d)  the type of transaction, for example, deposit, withdrawal or transfer;

(e)  the name of the merchant to whom the payment was made, in the case of a debit or credit card transaction; and

(f)  a number or code that enables the terminal where the transaction was made to be identified.

Such printed records will not be necessary if the cardholder chooses not to require such records.

36.2.    For cash withdrawals through self-service terminals, such printed transaction record will not be necessary if the cardholder chooses not to require such record.

*Periodic Statements*

36.3.    Card issuers should provide cardholders with statements of account by mail or electronically at monthly intervals, unless -

(a)  a passbook or other record of transactions is provided;

(b)  there has been no transaction and no outstanding balance on the account since the last statement; or

(c)  otherwise agreed with the cardholder.

Where card issuers do not post or email statements of account to cardholders but require them to access the information electronically, card issuers should advise cardholders concerned when the statements are available for such access.

36.4.    Where non-paper based statements of account are provided, card issuers should also follow sections 21.4 and 21.5.

36.5.    For cardholders who have opted for statements of account in a non-paper based format, card issuers should allow the cardholders to access their non-paper based statements from and store them on their Internet banking platform for a minimum period of 7 years.  Card issuers should, starting with the non-paper based statements made available on their Internet banking platforms as of 31 March 2020, incrementally accumulate non-paper based statements for a cycle period of at least 7 years.  Card issuers should also follow the relevant guidelines issued by the industry Associations from time to time.

36.6.    Card issuers should provide cardholders with clear statements of the activity on their card accounts. Card issuers should meet the "clear and conspicuous" standard, which requires disclosure to be in a reasonably understandable form and readily legible standard.  The statement should show -

(a)  for each transaction occurring since the previous statement -

(i)    the amount of the transaction;

(ii)   the date the transaction was credited/debited to the account;

(iii)  the type of transaction;

(iv)  the transaction record number or other means by which the account entry can be reconciled with a transaction record; and

(v)   the name of the merchant to whom payment was made, in the case of a debit or credit card;

30

(b) clear information on the cost to the cardholders of using their credit cards, in particular, details of the following by transaction types (examples of transaction types include cash advances and purchases) -

   (i)    fees and charges;

   (ii)   interest charged;

   (iii)  APRs; and

   (iv)   balance subject to interest rate (optional);

(c) for each foreign exchange transaction –

   (i)    the foreign currency amount and the equivalent Hong Kong dollar amount;

   (ii)   the applicable all-inclusive exchange rate for each transaction, which should include the handling fees by both the card issuer and the relevant card association, by dividing the equivalent Hong Kong dollar amount by the foreign currency amount for each transaction; and

   (iii)  a generic disclosure to the effect that the exchange rate applied includes a handling fee expressed as a percentage of the value of the transaction in foreign currency by one of the following methods -

      (1)  under each transaction;

      (2)  immediately after the end of all transaction entries (which may appear on other pages of the statement where there are many transactions); or

      (3)  on the back of the first page of the statement, or any of the remaining page(s) of the statement with an appropriate cross reference which should appear immediately after the end of all transaction entries;

(d) the charges imposed by card issuers on transactions in Hong Kong dollars (or the currency in which the cards are issued) incurred outside Hong Kong, if any (for example transactions under dynamic currency conversion); and

(e) the address or telephone number to be used for enquiries or reporting errors in the statement.

36.7.   Card issuers should provide customised information to credit card cardholders about the period of time (number of months) and total cost (including interest and principal payments) involved in paying a balance in full by making only minimum payments, and the monthly payment amount required and total cost (including interest and principal payments) to pay off the outstanding balance in 36 months. Such information should be provided -

(a) on the statements of account in the form of Annex III, or

(b) by means of a calculator on the card issuers' websites or other convenient means (subject to a notification in the monthly statements to inform the cardholders about the calculator or such other means in the form of the final paragraph of Annex III).

36.8.   Card issuers should mail or deliver periodic statements to credit card cardholders at least 21 days prior to the payment due date.

**37. Unauthorized Transactions**

37.1. Card issuers should advise cardholders to examine their statements of credit card accounts and report any unauthorized transactions in the statement to the card issuers within 60 days from the statement date. Cardholders should be warned that the card issuer would reserve the right to regard the statement as conclusive should they fail to report any unauthorized transactions within the specified period. Card issuers should not, however, avail themselves of this right in relation to -

(a) unauthorized transactions arising from forgery or fraud by any third party including any employee, agent or servant of the cardholder and in relation to which the card issuer has failed to exercise reasonable care and skill;

(b) unauthorized transactions arising from forgery or fraud by any employee, agent or servant of the card issuer; or

(c) other unauthorized transactions arising from the default or negligence on the part of the card issuer or any of its employees, agents or servants.

37.2. Card issuers should, except in circumstances which are beyond their control, complete the investigation within 90 days upon receipt of notice of an unauthorized transaction.

37.3. Where the cardholder reports an unauthorized transaction before the payment due date, the cardholder should have the right to withhold payment of the disputed amount during the investigation period. Card issuers should not impose any interest or finance charges on such disputed amount while it is under investigation or make any adverse credit report against the cardholder. If, however, the report made by the cardholder is subsequently proved to be unfounded, card issuers may reserve the right to re-impose the interest or finance charges on the disputed amount over the whole period, including the investigation period. Card issuers should inform cardholders of any such right reserved.

37.4. Card issuers should promptly make relevant corrections and deliver a correction notice if an unauthorized transaction has taken place; if no unauthorized transaction has occurred, card issuers should explain this to the cardholder and furnish copies of documentary evidence.

**38. Lost Cards/PINs**

38.1. Card issuers should advise cardholders that they must inform the card issuer as soon as reasonably practicable after they find that their cards/PINs have been lost or stolen or when someone else knows their PIN.

38.2. Card issuers should provide an effective and convenient means by which cardholders can notify a lost or stolen card or unauthorized use of a card; facilities such as telephone hot-lines should be available at all times, which will provide for logging and acknowledgement of the notifications from cardholders. Cardholders should be reminded of such means, for example, by including details of the notification facilities in the periodic statements sent to cardholders.

38.3. When such facilities are not made available by card issuers during particular periods, card issuers should be liable for any losses due to non-notification, provided the cardholder notifies the card issuer within a reasonable time after the facilities have become available again.

38.4. Card issuers should act on telephone notification provided that the cardholder can be identified satisfactorily. Card issuers may also ask cardholders to confirm in writing any details given by telephone.

38.5. Card issuers on being advised of a loss, theft or possible misuse of a card/PIN should take action to prevent further use of the card/PIN. Where a principal credit card has been reported lost, the card issuer should explain to the cardholder whether the subsidiary credit card is still valid in such circumstances.

### 39.     Liability for Loss

39.1.    Card issuers will bear the full loss incurred -

(a)   in the event of misuse when the card has not been received by the cardholder;

(b)   for all transactions not authorized by the cardholder after the card issuer has been given adequate notification that the card/PIN has been lost or stolen or when someone else knows the PIN (subject to section 39.4 below);

(c)   when faults have occurred in the terminals, or other systems used, which cause cardholders to suffer direct loss unless the fault was obvious or advised by a message or notice on display; and

(d)   when transactions are made through the use of counterfeit cards.

39.2.    The card issuers' liability should be limited to those amounts wrongly charged to cardholders' accounts and any interest on those amounts.

39.3.    Card issuers should give clear and prominent notice to cardholders that they may have to bear a loss when a card has been used for an unauthorized transaction before the cardholder has told the card issuer that the card/PIN has been lost or stolen or that someone else knows the PIN.  Provided that the cardholder has not acted fraudulently, with gross negligence or has not otherwise failed to inform the card issuer as soon as reasonably practicable after having found that his or her card has been lost or stolen, the cardholder's maximum liability for such card loss should be confined to a limit specified by the card issuer, which should not exceed HK$500.  The application of this limit is confined to loss specifically related to the card account and does not cover cash advances.  Card issuers should give clear and prominent notice of this limit to cardholders.

39.4.    Cardholders should be warned that they will be liable for all losses if they have acted fraudulently. Cardholders may be held liable for all losses if they have acted with gross negligence or have failed to inform the card issuer as soon as reasonably practicable after having found that their cards have been lost or stolen.  Cardholders should be warned that this may apply if they fail to follow the safeguards or meet their obligations set out in sections 35.2 and 38.1 above if such failure has caused the losses.

39.5.    A card issuer which is a party to a shared electronic system should not avoid liability to a cardholder in respect of any loss arising from the use of the card either caused or contributed by another party to the system.

### 40.     Treatment of Credit Balances

Card issuers should refund any credit balance outstanding on a credit card account to the cardholder within 7 working days from the date of receipt of the cardholder's request in accordance with the cardholder's instructions.  Card issuers should not forfeit any unclaimed credit balance at any time.  Such amount should be refunded to any person who can prove a good claim on the credit balance at any future time.

### 41.     Direct Mailing

When card issuers enter into direct mailing agreements with suppliers in the marketing of goods or services to credit cardholders, the agreements should specify the conditions for refunds to cardholders (for example, when the goods are returned by the cardholder to the supplier within a specified period) and the period within which such refunds should be effected.

## Chapter 4 - Payment Services

### 42.      Cheques

42.1.   In addition to the detailed terms and conditions, institutions should make readily available to customers general descriptive information about the use of cheques at the time a current account is opened, including -

(a)   the distinction between "bearer" and "order" cheques;

(b)   the additional protection that is afforded to customers through the use of crossed cheques;

(c)   how a cheque may be made out so as to reduce the risk of unauthorized alteration;

(d)   the procedures for stopping payment on a cheque (including in the event of loss of the cheque), and any fees or charges which may apply to this service;

(e)   how an institution will treat a cheque which is incorrectly completed, altered without authorization, post-dated or out of date, including whether the cheque will be returned and the related fees and charges which may apply;

(f)   how an institution will treat a cheque drawn on an account which has insufficient funds, including that the institution reserves the right to dishonour the cheque, the effects of dishonour and the related fees and charges which may apply; and

(g)   the usual time taken to clear a cheque and any restrictions which apply to use or withdrawal of the relevant funds pending clearance.

42.2.   Institutions should also warn customers to exercise caution in the safekeeping of cheque books. Institutions should advise customers that they should report the loss of any signed cheques, blank cheques or cheque books as soon as possible, so that the cheque may be stopped before it has been presented for payment.  In particular, institutions should advise customers that cheques should not be pre-signed in blank.

### 43.      Cross-boundary and Local Payments

43.1.   Institutions should provide customers wishing to effect outgoing payments with details of the services they offer.  In doing so, they should provide the following types of information -

(a)   a basic description of the appropriate services available and the manner in which these can be used;

(b)   information as to when money sent on the customer's instructions will usually reach its destination;

(c)   the basis on which exchange rates will be applied to the amount remitted;

(d)   details of any commission or charges payable by customers to the institution; and

(e)   in respect of cross-boundary payments, if available, details of other commission or charges which will apply, for example, those levied by the institution's agencies or correspondent banks outside Hong Kong, and whether there is an option for such charges to be paid by the remitting or the recipient party.

43.2.   Institutions should promptly notify the customer if an outgoing payment could not be effected.

43.3.  Institutions should inform customers of their practice regarding when interest payable on incoming payments will begin to accrue (for example, interest will only accrue after the incoming funds are credited to the customer's account).

43.4.  For incoming payments, unless otherwise instructed by the remitting bank, institutions should promptly credit the remitted funds to the beneficiary's account after receipt of the funds is confirmed and any necessary checking is completed.  If institutions are unable to do so, they should notify the beneficiary and provide an appropriate explanation, unless there are strong justifications not to do so (for example, where the identity of the beneficiary cannot be confirmed).

43.5.  In addition to section 43.4 above, except for recurring payments arranged through standing or direct debit instructions, institutions should notify the customers or, where applicable, beneficiaries within a reasonable time upon receipt of the payment.  In doing so, they should provide the following types of information -

(a)  information on the payment, including the remitted amount and, where possible, the name of the remitter;

(b)  the basis on which exchange rates have been or will be applied to the remitted amount, where applicable; and

(c)  details of any commission or charges payable by the customers to the institution, for example, the commission payable if the proceeds are to be paid in cash of the same foreign currency as the remittance received.

For recurring payments arranged through standing or direct debit instructions, institutions should provide information described in (a) to (c) to customers or, where applicable, beneficiaries, within a reasonable time upon receipt of the first payment made pursuant to such instructions.

43.6.  Upon completion of the outgoing or incoming payment, except for recurring payments arranged through standing or direct debit instructions, institutions should provide customers with a transaction record containing information such as the exchange rate applied, where applicable, and any commission or charges levied.  For recurring payments arranged through standing or direct debit instructions, institutions should provide customers with a transaction record containing the same information upon completion of the first outgoing or incoming payment made pursuant to such instructions.

43.7.  Institutions should advise customers of the procedures and any fees and charges for the purchase or collection of foreign currency cheques drawn on accounts outside Hong Kong.

43.8.  Institutions should provide customers with the following information upon customers' requests, to the extent that the institution is in possession of the information at the relevant time -

(a)  the time when an outgoing payment instruction is or will be effected by the institution, received by the beneficiary's institution and received by the beneficiary;

(b)  where an outgoing payment instruction cannot be completed (for example, where incorrect beneficiary details are provided), the time required for the fund to be transferred back to the remitting customer's account;

(c)  the total fees and charges which have been or will be incurred, whether borne by the remitting customer or the beneficiary; and

(d)  the identity of any intermediary institutions and correspondent banks which have been or will be involved, if any, including their fees and charges and processing time.

Where the above information is not (or not yet) available, institutions should explain clearly to customers the limitations and, where available, provide information on how and when such information may be obtained.

**44.    Other Payment Services**

44.1.    Other payment services include automatic payments, standing instructions, or access by customers to their accounts by means of telephone, ATM, computer or mobile device.  Where such services are provided, institutions should, in addition to any terms and conditions which may apply, make readily available general descriptive information about the following -

    (a)  any fees or charges applicable to the services;

    (b)  whether a customer can specify the maximum amount of each payment and the date on which such payments should cease;

    (c)  whether a customer may alter or stop a transaction under a particular payment service; and

    (d)  the deadline for giving instructions to alter or stop a payment, where appropriate.

44.2.    Where customers may gain access to their accounts through telephone banking services, institutions should audio record the oral instructions of customers as part of transaction records.  Such records should be kept for a period that is consistent with the institution's practice for the settlement of disputes of the type of transaction in question.

44.3.    In providing telephone or Internet banking services for transfers of funds to the accounts of third parties other than utility companies, institutions should adopt adequate measures to maintain the security of such transactions, for example, if appropriate, by requiring customers to designate in writing a list of accounts to which funds can be transferred from the customer's account through such services.  For the avoidance of doubt, this section does not apply to ATM services.

44.4.    Institutions should observe the procedures set out in "Handling Procedures for Following up Mis-transfer of Funds Reported by Customers" issued by HKAB and DTCA when handling reports from customers in relation to funds mistakenly transferred to a wrong recipient within Hong Kong.

## Chapter 5 - Recovery of Loans and Advances

**45.     Application**

This chapter applies to debt collection activities of institutions, whether undertaken directly by institutions or through third party debt collection agencies.

**46.     Debt Collection Activities**

46.1.    It is essential that debt collectors, no matter whether they are the staff of the institutions who are assigned the duty of debt collection or the staff of third party debt collection agencies appointed by the institutions to collect debts on their behalf, should act within the law, refrain from action prejudicial to the business, integrity, reputation or goodwill of the institutions for whom they are acting and observe a strict duty of confidentiality in respect of customer information.

46.2.    Debt collectors must not resort to intimidation or violence, either oral or physical, against any person in their debt recovery actions.  In addition, they should not employ harassment or improper debt collection tactics such as the following -

(a)   Harassment tactics

(i)    putting up posters or writing on the walls of the debtor's residence or other actions designed to humiliate the debtor publicly;

(ii)   pestering the debtor with persistent phone calls;

(iii)  making telephone calls at unreasonable hours; and

(iv)  pestering the debtor's referees, family members and friends for information about the debtor's whereabouts.

(b)   Other improper tactics

(i)    using false names to communicate with the debtor;

(ii)   making anonymous calls and sending unidentifiable notes to the debtor;

(iii)  making abusive or threatening remarks to the debtor; and

(iv)  making false or misleading representation with an intent to induce the debtor to make a payment.

46.3.    Institutions and their debt collection agencies should not try to recover debts, directly or indirectly, from third parties including referees, family members or friends of the debtors if these persons have not entered into a formal contractual agreement with the institutions to guarantee the liabilities of the debtors.  Institutions should issue written instructions to their debt collection agencies, or include a clause in the contract with their debt collection agencies, to this effect.

46.4.    Institutions should enter into a formal, contractual relationship with their third party debt collection agencies.  Institutions should specify, either in the contract or by means of written instructions, that the debt collectors employed by the debt collection agencies should, among other things, observe the requirements stated in sections 46.1, 46.2 and 46.3 above.

46.5.    The contract between institutions and their debt collection agencies should make it clear that the relationship between the institution and the debt collection agency is one of principal and agent.  Institutions should remain accountable to customers for any complaints arising out of debt collection by third party debt collection agencies and should not disclaim responsibility for misconduct on the part of the debt collection agencies.  Institutions should specify in their contract with debt collection

agencies that the debt collection agencies should not subcontract the collection of debts to any other third parties.

46.6.   Institutions intending to use third party debt collection agencies should specify in the terms and conditions of credit or card facilities that they may employ third party agencies to collect overdue amounts owed by the customers.   Institutions which reserve the right to require customers to indemnify them, in whole or in part, for the costs and expenses they incur in the debt recovery process should include a warning clause to that effect in the terms and conditions.

46.7.   Institutions should not pass information about referees or third parties other than debtors or guarantors to their debt collection agencies.  If the referee is to be approached for information to help locate the debtor or guarantor, this should be done, without causing nuisance to such third parties, by staff of the institution.

46.8.   Institutions should give the customer advance written notice (sent to the last known address of the customer) of their intention to commission a debt collection agency to collect an overdue amount owed to the institution.  The written notice should include the following information -

(a)   the overdue amount repayable by the customer;

(b)   the length of time the customer has been in default;

(c)   the contact telephone number of the institution's debt recovery unit which is responsible for overseeing the collection of the customer's debt to the institution;

(d)   the extent to which the customer will be liable to reimburse the institution the costs and expenses incurred in the debt recovery process (if the institution requires the customer to indemnify it for such costs and expenses); and

(e)   that the customer should in the first instance report improper debt recovery actions taken by the debt collection agency to the institution.

46.9.   Institutions should not engage more than one debt collection agency to pursue the same debt in one jurisdiction at the same time.

46.10.   Institutions should require their debt collection agencies, when collecting debts, to identify themselves and the institution for whom they are acting.  Institutions should issue authorization documents with no account details to their debt collection agencies which should be presented to the debtor upon request for identification purposes.

46.11.   Institutions should promptly update the amount of repayment(s) made by customers and establish effective communication with their debt collection agencies to update so that the debt collection agencies will stop immediately all recovery actions once the debts are settled in full by the customers.

46.12.   If a customer owes several debts to more than one institution that are being collected by the same debt collection agency, the customer has the right to give instructions to apply repayment to a particular debt.

46.13.   Institutions should stop their debt collection activities on a debtor once they become aware that a bankruptcy order has been issued in relation to the debtor.

46.14.   Where the debt collection process is ongoing, the institution should as far as practicable provide periodic reminders to the customer concerned of the overdue amount repayable by the customer.

**47.    Management of Debt Collection Agencies**

47.1.    Institutions should have proper systems and procedures in place for the selection of third party debt collection agencies and the monitoring of their performance.  These systems and procedures should be subject to regular review and should consist of the following essential elements -

(a)    a review of the background information of the debt collection agency including a company search to identify the owners and directors of the debt collection agency;

(b)    a basic assessment of the financial soundness of the debt collection agency;

(c)    a site visit to ascertain the business address of the debt collection agency;

(d)    an evaluation of the operation of the debt collection agency; and

(e)    in the case of appointing a new debt collection agency, a procedure to obtain references from at least two of the existing clients (preferably authorized institutions) of the agency.

47.2.    Institutions should encourage their debt collection agencies to aspire to the highest professional standards and, where appropriate, to invest in suitable systems and technology.

47.3.    Debt collection agencies should not be given a free hand as to recovery procedures.  Institutions should establish effective procedures to monitor continuously the performance of their debt collection agencies, particularly to ensure compliance with the provisions in sections 46.1, 46.2 and 46.3 above.

47.4.    Institutions should evaluate on a regular basis whether the charges of the debt collection agencies employed by them are reasonable having regard to the prevailing market practices.  They should assess the reasonableness of any charge before passing it on to the customer concerned.

47.5.    Institutions should require debt collection agencies to inform customers that all telephone communication with customers will be tape recorded and the purpose of doing so, and to keep records of all other contacts with customers.  Such records should include information on the debt collector making the contact; the date, time and place of contact; and a report on the contact.  Both the tape and the records should be kept for a minimum of 30 days after the contact is made.

47.6.    Institutions should make unscheduled visits to the agencies to inspect their professionalism, operational integrity, the involvement of suitably trained personnel and the adequacy of resources to cope with the business volumes assigned to them and to ensure agencies' compliance with their contractual undertakings.

47.7.    Institutions should have established procedures to handle complaints received from debtors.  They should carry out a careful and diligent inquiry into the complaint to check whether there is any misconduct on the part of the debt collection agency and whether there is any violation of the requirements contained in this Code.  Institutions should require debt collection agencies to take appropriate remedial actions if necessary.

47.8.    Institutions should maintain a register of complaints about improper actions taken by their debt collection agencies and should respond promptly to the complainants after investigation.

47.9.    Institutions should not delegate authority to debt collection agencies to institute legal proceedings against customers without the institutions' formal approval.

47.10.    Where institutions are aware that their debt collection agencies perform similar functions for other institutions, the sharing of information as to their performance, approach, attitude, behaviour etc. is encouraged.

47.11.    Institutions should bring apparently illegal behaviour by debt collection agencies to the attention of the Police.  Institutions should also consider whether to terminate the relationship with a debt collection agency if they are aware of unacceptable practices of that agency or breaches of its contractual undertakings.

## Chapter 6 - Electronic Banking Services

**48.    Disclosure for e-banking Services**

48.1.    In addition to the detailed terms and conditions, institutions should make readily available to customers general descriptive information relating to the use of e-banking services (see definition of "Electronic Banking (e-banking) Services" in the definition section). In particular, institutions should make clear and prominent disclosure covering the following issues when a customer enters into an agreement for an e-banking service -

(a)    the customer's liability for unauthorized transactions;

(b)    all fees and charges which will apply to the e-banking service;

(c)    relevant statement(s) in relation to protection of customers' personal data as required by the PDPO;

(d)    customer obligations in relation to security for the e-banking service including observing in a timely manner the relevant security measures specified from time to time by the institutions for the protection of customers; and

(e)    means for reporting security incidents or complaints.

48.2.    Institutions should provide, where appropriate, a facility for customers to confirm that they have read such disclosures before they sign up for the service. For example, a confirmation facility may be provided on a web page containing the disclosures to allow customers to declare, by clicking on the facility, that they have read the disclosures therein.

**49.    Security in relation to e-banking**

49.1.    Institutions should warn customers of the obligation to take reasonable steps to keep any device (for example, personal computers, security devices that generate one-time passwords and smart cards that store digital certificates) or secret code (for example, password) used for accessing e-banking services secure and secret.

49.2.    Institutions should issue secret codes and other login information (e.g. login ID) separately and take reasonable steps to satisfy themselves that these have been received by customers, whether they are personally collected by customers or delivered by mail. Where secret codes and login information are personally collected, institutions should satisfy themselves as to the identity of the recipient.

49.3.    Institutions should advise customers of the need to take reasonable steps to keep the device safe and the secret code secret to prevent fraud. In particular, they should advise customers -

(a)    that they should destroy the original printed copy of the secret code;

(b)    that they should not allow anyone else to use their secret code;

(c)    never to write down the secret code on any device for accessing e-banking services or on anything usually kept with or near it; and

(d)    not to write down or record the secret code without disguising it.

49.4.    When customers are provided with an opportunity to select their own secret codes or login information, institutions should advise customers that it is not suitable to use easily accessible personal information such as telephone numbers or date of birth. Institutions should advise customers not to use the secret codes for accessing other services (for example, connection to the internet or accessing other websites).

49.5.  Institutions should ensure that transactions of their e-banking services can be traced and checked as long as they are received by their systems.

49.6.  Customers should be advised to refer to the security advice provided by institutions from time to time. Moreover, institutions should regularly review their security advice to ensure that it remains adequate and appropriate as the technology environment and e-banking services change.

**50.    Reporting of Actual or Suspected Security Incidents**

50.1.  Customers should be advised that they must inform institutions as soon as reasonably practicable after they find or believe that their secret codes or devices, if any, for accessing the e-banking services have been compromised, lost or stolen, or that unauthorized transactions have been conducted over their accounts.

50.2.  Institutions should provide an effective and convenient means by which customers can notify the institution of security incidents; facilities such as a telephone hot-line should be available at all times, which will provide for logging and acknowledgement of notifications from customers.

50.3.  When such facilities are not made available by institutions during particular periods, institutions should be liable for any losses due to non-notification, provided the customer notifies the institution within a reasonable time after the facilities have become available again.

50.4.  Institutions, on being advised of a loss, theft or possible compromise of a secret code or a device, should take action to prevent further use of the secret code or the device.

**51.    Liability for Loss**

51.1.  Unless a customer acts fraudulently or with gross negligence such as failing to safeguard properly his device(s) or secret code(s) for accessing the e-banking service, he should not be responsible for any direct loss suffered by him as a result of unauthorized transactions conducted through his account. This provision does not apply to unauthorized transactions conducted through cards which are covered under section 39 above.

51.2.  Customers should be warned, through clear and prominent notice, that they will be liable for all losses if they have acted fraudulently.  Customers may also be held liable for all losses if they have acted with gross negligence (this may include cases where customers knowingly allow the use by others of their device or secret code) or have failed to inform institutions as soon as reasonably practicable after they find or believe that their secret codes or devices for accessing the e-banking services have been compromised, lost or stolen, or that unauthorized transactions have been conducted over their accounts.  Customers should be warned that this may apply if they fail to follow the safeguards set out in sections 49.1 and 49.3 above if such failure has caused the losses.

## Chapter 7 - Stored Value Cards (or Devices)

**52.**     **Application**

This chapter applies to the provision of stored value cards or devices either directly by institutions or through their subsidiaries or affiliated companies controlled by them (see definition of "Stored Value Cards (or Devices)" in the definition section).


**53.**     **Issue of Stored Value Cards or Devices (SVCs)**

53.1.     SVC issuers should provide customers with general descriptive information relating to the use of the SVC. Such information should include -

(a)     all fees and charges which will apply, including any annual fee and the basis of determining such fees and charges;

(b)     any deposit payable by customers and the refund procedures;

(c)     any expiry date of the SVC;

(d)     the procedures for stopping the use of the SVC;

(e)     the refund policy in respect of any residual value when the use of the SVC has been suspended or stopped (including where the SVC has expired or has become dormant);

(f)     the potential loss that may be suffered by customers in the case of a loss of the SVC (for example, all the remaining value in the SVC) and the procedures for reporting a loss of the SVC;

(g)     customers' liability for card damage;

(h)     the customer service hotline provided by the SVC issuer;

(i)     security of the SVC and the related personal identification number;

(j)     the range of use of the SVC (for example, transport services, fast food restaurants); and

(k)     any other services to which SVC holders may have access (for example, ATM).


**54.**     **Terms and Conditions and Fees and Charges**

54.1.     SVC issuers should comply with relevant provisions of Chapter 1.

54.2.     SVC issuers should draw the attention of customers or prospective customers to the major terms and conditions of SVCs (for example, by describing or highlighting such terms and conditions in the application forms or promotional leaflets where no application is required. The description should be printed in clear and legible type and in a font size that facilitates easy reading).

54.3.     SVC issuers should give customers at least 30 days' notice before any significant variation of the terms and conditions or any change in the level of fees and charges takes effect. The notice should show clearly the variation and the ways in which customers may seek assistance if they do not agree to the change. Institutions should adopt effective means of notification which would provide reasonable assurance that their customers will be informed of the change and which do not rely unduly on the customers' own initiative. Individual notification to customers (whether by written notice, statement insert or email message) is likely to be effective in achieving these objectives. But where this is not appropriate on grounds of disproportionate costs or likely ineffectiveness (e.g. some SVCs are issued in bearer form), institutions may adopt other means of notification, such as one or more of the following -

     (a)  press advertisement;

     (b)  prominent display of notice in banking halls or major points of card issue and usage; and/or

     (c)  notice posted on the website of the institution.

54.4.    A copy of the revised terms and conditions should be provided to customers upon their request.

54.5.    In case customers do not agree to any significant variation of the terms and conditions, they should be entitled to the full refund of the deposit and any residual value in the SVC.

## 55.    Operation of SVCs

55.1.    SVC issuers should not automatically renew a SVC without giving customers at least 30 days' notice commencing from the date of renewal to cancel the SVC without having to pay the renewal fee.

55.2.    Where a SVC malfunctions due to no fault on the part of customers, they should be given the choice either to request a replacement free of charge or to cancel the SVC and seek full refund of the deposit and any residual value in the SVC.

55.3.    Any expiry date of the SVC should be printed on the SVC.

55.4.    For SVCs which can operate as an ATM card, SVC issuers should comply with the relevant provisions in Chapter 3.

55.5.    At the time of transactions made by an SVC through any electronic means, the holder of the SVC should be provided with information on the amount being debited from or credited to the SVC.

55.6.    Channels should be available for SVC holders to check previous transactions.  Such channels may include one or more of the following -

     (a)  self-serviced transaction checking machines;

     (b)  hotline enquiry;

     (c)  service counter enquiry;

     (d)  internet checking;

     (e)  request by mail; and

     (f)  receipt of transaction records.

If there is a charge for the use of a channel, any such charge should be of a reasonable amount.

55.7.    Where a transaction cannot be completed successfully and value has mistakenly been deducted from the SVC of the customer, the SVC issuer should take all reasonable steps to alert the customer and reimburse the customer for the loss of the value in the SVC as soon as reasonably practicable.

## Annex I - Useful Definitions
_____

*These definitions explain the meaning of words and terms used in the Code.  They are not precise legal or technical definitions.*

**Authorized Agents -**

Agents authorized by an institution to deal with customers to provide services on its behalf in relation to the provision of banking services, when acting in their capacity as agents for an institution.

**Bankers' References -**

A banker's reference is an opinion about a particular customer's ability to enter into or repay a financial commitment.  It is given by an institution, to an enquirer, with the prescribed consent of the customer concerned.  Typically, the reference will cover information confirming that an account is held and how long for.  It indicates the customer's financial position but is not intended to be conclusive proof of the customer's position.

**Basic Banking Services -**

The opening, maintenance and operation of accounts which provide basic banking services, such as deposit, withdrawal and transfer of money.

**Cards -**

A general term for any card (whether physical or virtual) which may be used to pay for goods and services or to withdraw cash.  For the purpose of this Code, it excludes stored value cards (see definition of Stored Value Cards below).

Common examples are -

Credit card - a card which allows cardholders to buy on credit and to obtain cash advances.  Cardholders receive regular statements and may pay the balance in full, or in part usually subject to a certain minimum.  Interest is payable on outstanding balances.

Debit card (including an EPS card) - a card, operating as a substitute for a cheque, that can be used to obtain cash or make a payment at a point of sale.  The cardholder's account is debited for such a transaction without deferment of payment.

Cash card (ATM card) - a card used to obtain cash and other services from an ATM.

**Credit Reference Agencies -**

Any data user who carries on a business of compiling and disseminating personal information, of a factual nature, about the credit history of individuals, whether or not that business is the role or principal activity of that data user.

**Cross-boundary Payments -**

Payments in Hong Kong dollars or a foreign currency between Hong Kong and a place outside Hong Kong.

**Customer -**

A private individual who -

(a)    maintains an account in Hong Kong (including a joint account with another private individual or an account held as an executor or trustee, but excluding the accounts of sole traders, partnerships, companies, clubs and societies) with, or who receives other services from, an institution; or

(b)    acts as guarantor or provider of third party security (whether or not the guarantor or provider of third party security is a customer of the institution) for a borrower who is an individual or otherwise.

**Day -**

Day means calendar day if not otherwise specified.

**Electronic Banking (e-banking) Services -**

Banking services, delivered over the internet, wireless network, ATMs, fixed telephone network or other electronic terminals or devices.  Accordingly, e-banking services include -

(a) Internet banking services, which refer to financial services delivered over the Internet to customers' devices including personal computers and mobile devices;

(b) contactless mobile payments which refer to the use of contactless or wireless technology to transmit payment transaction information between the customer's mobile device and the payee;

(c) financial services delivered through self-service terminals which refer to interactive terminals (including ATMs, cash deposit machines (CDMs), cheque deposit machines and virtual teller machines) which are used by institutions to provide financial services; and

(d) phone banking services which refer to financial services provided through telephone line or mobile telecommunication network, covering both manned and Interactive Voice Response (IVR) phone banking services.  For the purpose of this Code, phone banking does not include the provision of financial services for the purpose of sales promotion or activity notification/call-back confirmation, or by a designated staff member who had been assigned to provide continued and dedicated service to the relevant customer (e.g. a relationship manager).

**Guarantee -**

An undertaking given by a person called the guarantor promising to pay the debts of another person if that other person fails to do so.

**Institutions -**

Authorized institutions authorized under the Banking Ordinance (Cap. 155).  These comprise licensed banks, restricted licence banks and deposit-taking companies.

**In writing or in written form -**

Information can be provided in a non-paper based format or in printed form except where specifically indicated that it must be in printed form.  Institutions may deliver information to customers in a non-paper based format provided that the institutions have so notified the customers in advance explicitly and the customers do not object to it.

45

**Out of date (stale) Cheque -**

A cheque which cannot be paid because its date is too old or "stale", normally more than 6 months old.

**Personal Identification Numbers (PINs) -**

Confidential numbers provided on a strictly confidential basis by card issuers to cardholders.  Use of this number by the customer will allow the card to be used either to withdraw cash from an ATM or to authorize payment for goods or services in retail or other outlets, by means of a special terminal device.

**Post-dated Cheque -**

A cheque which cannot be paid because its date is some time in the future.

**Prescribed Consent -**

Express consent of a customer given voluntarily.

**Promotional Material -**

Any literature or information which is designed to help sell a product or service to a customer.  This does not include information relating to service enhancements and changes to customers' existing accounts which need to be sent to the customers to meet legislative and regulative requirements or which may be sent where it is in the interest of customers.

**Related Companies -**

This refers to an institution's subsidiary, holding company or a subsidiary of the holding company.

**Security -**

A word used to describe the mortgaging or charging of assets, such as (but not limited to) properties, life policies and shares to institutions as support for loans granted to customers.  If the loans are not repaid the institution's position is "secured" which means that it can sell the assets to meet the amount outstanding on the loan.

**Stored Value Cards (or Devices) (SVCs) -**

A card or device on which data may be stored in electronic, magnetic or optical form and for or in relation to which a person pays a sum of money to the issuer of the card in exchange for the storage of that value in the card and an undertaking by the issuer that on the production of the card, the issuer or any third party will supply goods or services.

**Third Party Security -**

Security provided by a person who is not the borrower.

## Annex II - Ban on Double-Cycle Billing

_____

Assume that the billing cycle on a credit card account starts on the first day of the month and ends on the last day of the month.  The payment due date for the account is the twenty-fifth day of the month.  Under the terms of the account, the customer will not be charged interest on purchases if the balance at the end of a billing cycle is paid in full by the following payment due date (in other words, the consumer receives a grace period).

The customer uses the credit card to make a $500 purchase on March 15.  The customer pays the balance for the February billing cycle in full on March 25.  At the end of the March billing cycle (March 31), the customer's balance consists only of the $500 purchase and the customer will not be charged interest on that balance if it is paid in full by the following due date (April 25).  However, the customer only pays $400 on April 25, leaving a $100 balance.

A schematic diagram is provided for this illustrated example -



**Option A should be adopted.  Options B, C and D, representing double-cycle billing practices, are prohibited.**

Interpretations -

Option (A) is not subject to double-cycle billing.

Option (B) is subject to double-cycle billing because finance charge is accrued on balances for days in the billing cycle that precedes the most recent billing cycle.

Option (C) is subject to double-cycle billing because finance charge is accrued on the portion of the balance repaid prior to the expiration of the grace period.

Option (D) is subject to double-cycle billing because it touches upon the double-cycle billing practices mentioned in (B) and (C).

## Annex III - Recommended template on monthly statements
_____

Assumptions -
•   Outstanding Balance = $20,000
•   Interest Rate = 30% p.a.
•   No new transaction
•   No annual fee and other fees
•   Repayments are due on the 26th day after the statement date, and it is assumed that repayments are made on or before the due date.

| If you make no additional charges using this card and each month you pay… | You will pay off the outstanding balance of $20,000 in about… | and you will end up paying an estimated total of… |
|---|---|---|
| Only the minimum payment | 26 years | $67,537 |
| $849 | 3 years | $30,565 (Savings = $36,972) |

To calculate the above information applicable to your specific case, please use our online calculator accessible from our website [relevant URL of the institution's website].