House of Lords                                                    *A*

## *In re* HIH Casualty and General Insurance Ltd

## *In re* FAI General Insurance Co Ltd

## *In re* World Marine and General Insurance Pty Ltd

*B*

## *In re* FAI Insurances Ltd

## McGrath and others *v* Riddell and another

### [2008] UKHL 21

| | | *C* |
|---|---|---|
| 2007  Dec 11, 12; | Lord Hoffmann, Lord Phillips of Worth Matravers, | |
| 2008  April 9 | Lord Scott of Foscote, Lord Walker of Gestingthorpe | |
| | and Lord Neuberger of Abbotsbury | |

*Insolvency — Winding up — Foreign company — Companies incorporated in Australia also registered in and conducting business in England — Principal liquidation in Australia — Ancillary liquidation in England — Scheme for pari passu distribution of assets under Australian law different from English law — Whether English court should exercise discretion to direct remission of English assets to Australian liquidators — Whether discretion arising under common law or solely under statute — Insolvency Act 1986 (c 45), s 426(4)(5)*

*D*

Four insurance companies which were incorporated in Australia and managed in Australia were authorised under the Insurance Companies Act 1982 to carry on insurance business in the United Kingdom, although the majority of their assets and liabilities remained in Australia. In 2001 the four companies became insolvent and the Supreme Court of New South Wales made winding up orders in respect of them and appointed liquidators in Australia. Pursuant to letters of request issued by the Australian court, joint provisional liquidators were appointed in England by the High Court. In 2005 the Australian court issued a letter of request to the High Court, pursuant to section 426(4) of the Insolvency Act 1986[1], asking that the English provisional liquidators be directed, after payment of their expenses, to remit the assets to the Australian liquidators for distribution. The judge declined to make the direction on the ground that the scheme for pari passu distribution in the Australian liquidation was not substantially the same as under English law, in that the Australian scheme gave preference to insurance creditors to the prejudice of other creditors. The Court of Appeal upheld his decision.

*E*

*F*

On appeal by the Australian liquidators and two representative Australian insurance creditors—

*G*

*Held*, (1) that Australia had been designated a "relevant country" for the purposes of section 426(4) of the 1986 Act and English courts were, therefore, required to assist the Australian courts in exercising jurisdiction in relation to insolvency and had a discretion to order remission of assets located in England to Australia; and that in the exercise of that discretion an English court could order remission of assets located in England to a liquidator in a country whose insolvency scheme was not in accordance with English law (post, paras 29, 37, 44, 59, 61, 62, 63, 66, 68, 69, 76, 82, 83).

*H*

*Per* Lord Scott of Foscote and Lord Neuberger of Abbotsbury. A discretion to order remission of assets to a liquidator in a country whose insolvency scheme is not

[1] Insolvency Act, s 426(4)(5): see post, para 55.

A  in accordance with English law only arises under section 426 ( post, paras 59–62, 66, 69, 74–77).

   *Per* Lord Hoffmann and Lord Walker of Gestingthorpe. A discretion to order remission of assets to a country whose insolvency scheme is not in accordance with English law also arises under the inherent powers of the court under common law, pursuant to the principle that English courts should, so far as is consistent with justice and UK public policy, co-operate with the courts in the country of the principal
B  liquidation to ensure that all of a company's assets are distributed to its creditors under a single system of distribution ( post, paras 10, 11, 18–21, 24, 26, 27, 30, 63).

   *In re Bank of Credit and Commerce International SA (No 10)* [1997] Ch 213 and *Hughes v Hannover Rückversicherungs-AG* [1997] 1 BCLC 497, CA considered.

   (2) Allowing the appeal, that the mere fact that under the insolvency laws applicable in Australia there would be a significant class of preferential creditors whose debts would not have priority under English law was insufficient reason to
C  refuse to remit the English assets; that there was nothing unacceptably discriminatory or unfair about the Australian insolvency scheme in relation to preferential creditors which would justify an English court refusing to exercise its discretion to remit; and that, accordingly, it was appropriate, in all the circumstances of the case, to order remission of the English assets to Australia for distribution by the Australian liquidators in accordance with Australian law ( post, paras 31–34, 36, 37, 42–45, 59, 61, 62, 63, 65, 79–83).

   Decision of the Court of Appeal [2006] EWCA Civ 732; [2007] Bus LR 250;
D  [2007] 1 All ER 177 reversed.

   The following cases are referred to in the opinions of their Lordships:

   *AssetInsure Pty Ltd v New Cap Reinsurance Corpn Ltd* (2006) 225 CLR 331; 226 ALR 1
   *Ayerst v C & K (Construction) Ltd* [1976] AC 167; [1975] 3 WLR 16; [1975] 2 All ER 537, HL(E)
E  *Bank of Credit and Commerce International SA, In re (No 10)* [1997] Ch 213; [1997] 2 WLR 172; [1996] 4 All ER 796
   *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2006] UKPC 26; [2007] 1 AC 508; [2006] 3 WLR 689; [2006] 3 All ER 829, PC
   *Dallhold Estates (UK) Pty Ltd, In re* [1992] BCLC 621
   *England v Smith* [2001] Ch 419; [2000] 2 WLR 1141, CA
F  *English, Scottish, and Australian Chartered Bank, In re* [1893] 3 Ch 385, Vaughan Williams J and CA
   *Drax Holdings Ltd, In re* [2003] EWHC 2743 (Ch); [2004] 1 WLR 1049; [2004] 1 All ER 903
   *Forster v Wilson* (1843) 12 M & W 191
   *HIH Casualty and General Insurance Ltd, In re* (2005) 215 ALR 562
   *Hughes v Hannover Rückversicherungs-AG* [1997] 1 BCLC 497, CA
G  *International Tin Council, In re* [1987] Ch 419; [1987] 2 WLR 1229; [1987] 1 All ER 890
   *Matheson Brothers Ltd, In re* (1884) 27 Ch D 225
   *Mitchell v Carter* [1997] 1 BCLC 673, CA
   *New Cap Reinsurance Corpn Ltd v Faraday Underwriting Ltd* (2003) 117 FLR 52
   *Paramount Airways Ltd, In re* [1993] Ch 223; [1992] 3 WLR 690; [1992] 3 All ER 1, CA
H  *Stein v Blake* [1996] AC 243; [1995] 2 WLR 710; [1995] 2 All ER 961, HL(E)
   *Suidair International Airways Ltd, In re* [1951] Ch 165; [1950] 2 All ER 920

   The following additional cases were cited in argument:

   *Debtor (Order in Aid No 1 of 1979), In re A; Ex p Viscount of the Royal Court of Jersey* [1981] Ch 384; [1980] 3 WLR 758; [1980] 3 All ER 665

A

*African Farms Ltd, In re* [1906] TS 373
*Al Sabah v Grupo Torras SA* [2005] UKPC 1; [2005] 2 AC 333; [2005] 2 WLR 904;
  [2005] 1 All ER 871, PC
*Alfred Shaw & Co Ltd, In re; Ex p MacKenzie* (1897) 8 QLJ 93
*Artola Hermanos, In re* (1890) 24 QBD 640, CA
*Australian Federal Life and General Assurance Co Ltd, In re* [1931] VR 317
*Ayres v Evans* (1981) 56 FLR 235

B

*Banco de Portugal v Wadell* (1880) 5 App Cas 161, HL(E)
*Bank of Credit and Commerce International SA, In re (No 8)* [1998] AC 214; [1997]
  3 WLR 909; [1997] 4 All ER 568, HL(E)
*Bank of Credit and Commerce International SA, In re (No 9)* [1994] 1 WLR 708;
  [1994] 3 All ER 764
*Bankers Trust International Ltd v Todd Shipyards Corpn* [1981] AC 221; [1980]
  3 WLR 400; [1980] 3 All ER 197, PC
*Banque des Marchands de Moscou (Koupetschesky) v Kindersley, In re* [1951] Ch

C

  112; [1952] 1 All ER 1269, CA
*Cavell Insurance Co Ltd, In re* (2006) 269 DLR (4th) 679
*Cleaver v Delta American Reinsurance Co* [2001] UKPC 6; [2002] 2 AC 328; [2001]
  2 WLR 1202, PC
*Colorado, The* [1923] P 102, CA
*Commercial Bank of South Australia, In re* (1886) 33 Ch D 174
*Compania Merabello San Nicholas SA, In re* [1973] 1 Ch 75; [1972] 3 WLR 471;

D

  [1972] 3 All ER 448
*Federal Bank of Australia Ltd, In re* (1893) LJ Ch 561; 68 LT 728, CA
*Focus Insurance Co Ltd, In re* [1997] 1 BCLC 219
*Galbraith v Grimshaw* [1910] AC 508, HL(E)
*Goetze v Aders Preyor & Co* (1874) 2 R 150
*Jackson, In re* [1973] NI 67
*Kloebe, In re; Kannreuther v Geiselbrecht* (1884) 28 Ch D 175
*Levy's Trusts, In re* (1885) 30 Ch D 119

E

*Modern Terminals (Berth 5) Ltd v States Steamship Co* [1979] HKLR 512
*National Benefit Assurance Co, In re* [1927] 3 DLR 289
*National Employers' Mutual General Insurance Association Ltd, In re* (1995)
  15 ASCSR 624
*Osborn, In re; Ex p Tree* [1931-32] B & CR 189
*Sefel Geophysical Ltd, In re* (1988) 70 CBR 97; 54 DLR (4th) 117
*Solomon v Ross* (1764) 1 H Bl 131

F

*Standard Insurance Co Ltd, In re* [1968] Qd R 118
*Thurburn v Steward* (1871) LR 3 PC 478, PC
*Treco, In re* (2001) 240 F 3d 148
*Union Theatres Ltd, In re* (1933) 35 WALR 89
*Wilson, Ex p, Douglas, In re* (1872) LR 7 Ch App 490

**APPEAL** from the Court of Appeal

G

This was an appeal by (1) Anthony McGrath and Christopher Honey,
being the joint liquidators appointed by the Supreme Court of New South
Wales of HIH Casualty and General Insurance Ltd ("HIH"), FAI General
Insurance Co Ltd ("FAIG"), World Marine and General Insurance Pty Ltd
("WMG") and FAI Insurance Ltd ("FAII"), and (2) Amaca Pty Ltd and
Amaba Pty Ltd, as representatives of insurance creditors of those companies,
with leave of the House (Lord Hoffmann, Lord Walker of Gestingthorpe and

H

Lord Mance) granted on 18 October 2007 against a decision of the Court of
Appeal (Sir Andrew Morritt C, Tuckey and Carnwath LJJ) given on 9 June
2006 dismissing their appeal against a decision by David Richards J, sitting
in the Chancery Division of the High Court of Justice, given on 7 October

855

A  2005, refusing the Australian liquidators' application, under section 426 of
the Insolvency Act 1986, for directions to the provisional English liquidators
of the companies, Thomas Alexander Riddell and John Mitchell Wardrop,
to transfer the assets collected by them in the liquidation to the Australian
liquidators.

B  The facts are stated in the opinions of Lord Hoffmann and Lord Scott of
Foscote.

*Jonathan Sumption QC, Simon Mortimore QC* and *Tom Smith* for the
Australian liquidators.
*Geoffrey Vos QC* and *Peter Arden QC* for the insurance creditors.
*William Trower QC* and *Jeremy Goldring* for the English provisional
liquidators.

C
Their Lordships took time for consideration.

### 9 April 2008. **LORD HOFFMANN**

1  My Lords, this appeal arises out of the insolvent liquidation of the
HIH group of Australian insurance companies. On 15 March 2001 four of
them presented winding up petitions to the Supreme Court of New South
D  Wales. Some of their assets—mostly reinsurance claims on policies taken
out in London—were situated in England. To realise and protect these
assets, provisional liquidators were appointed in England. In Australia, the
court has made winding up orders and appointed liquidators.   The
Australian judge has sent a letter of request to the High Court in London,
asking that the provisional liquidators be directed, after payment of their
E  expenses, to remit the assets to the Australian liquidators for distribution.
The question in this appeal is whether the English court can and should
accede to that request.   The alternative is a separate liquidation and
distribution of the English assets in accordance with the Insolvency Act
1986.

2  The English and Australian laws of corporate insolvency have a
common origin and their basic principles are much the same. The general
F  rule is that after payment of the costs of liquidation and the statutory
preferred creditors, the assets are distributed pari passu among the ordinary
creditors: see section 107 of the 1986 Act and section 555 of the
Corporations Act 2001 (Cth). But Australia has a different regime for
insurance companies. I need not trouble your Lordships with the details. It
is sufficient to say that, in broad outline, it requires assets in Australia to be
G  applied first to the discharge of debts payable in Australia (section 116(3) of
the Insurance Act 1973 (Cth)) and the proceeds of reinsurance policies to be
applied in discharge of the liabilities which were reinsured (section 562A of
the Corporations Act 2001 (Cth)). It is agreed that if the English assets are
sent to Australia, the outcome for creditors will be different from what it
would have been if they had been distributed under the 1986 Act. Some
creditors will do better and others worse. Approximate figures are given in
H  the judgment of Sir Andrew Morritt C in the Court of Appeal [2007] Bus
LR 250, para 17. Generally speaking, insurance creditors will be winners
and other creditors will be losers.

3  The Australian court made its request pursuant to section 426(4) of
the Insolvency Act 1986: "The courts having jurisdiction in relation to

insolvency law in any part of the United Kingdom shall assist the courts      *A*
having the corresponding jurisdiction in . . . any relevant country . . ."

4  The Secretary of State has power under subsection (11) to designate
a country as "relevant" and has so designated Australia. Subsection (5)
describes the assistance which a UK court may give. A request from the
court of a relevant country is

"authority for the court to which the request is made to apply, in      *B*
relation to any matters specified in the request, the insolvency law which
is applicable by either court in relation to comparable matters falling
within its jurisdiction. In exercising its discretion under this subsection, a
court shall have regard in particular to the rules of private international
law."

5  This provision was introduced into insolvency law in consequence of      *C*
a recommendation in fairly general terms by the Cork Committee in 1982:
see Report of the Review Committee on Insolvency Law and Practice (Cmnd
8558), ch 49. The committee drew attention to the inadequacy of the
statutory provisions for international co-operation in personal bankruptcy
and their complete absence in the law of corporate insolvency.

6  Despite the absence of statutory provision, some degree of      *D*
international co-operation in corporate insolvency had been achieved by
judicial practice. This was based upon what English judges have for many
years regarded as a general principle of private international law, namely
that bankruptcy (whether personal or corporate) should be unitary and
universal. There should be a unitary bankruptcy proceeding in the court of
the bankrupt's domicile which receives worldwide recognition and it should
apply universally to all the bankrupt's assets.      *E*

7  This was very much a principle rather than a rule. It is heavily
qualified by exceptions on pragmatic grounds; elsewhere I have described
it as an aspiration: see *Cambridge Gas Transportation Corpn v Official
Committee of Unsecured Creditors of Navigator Holdings plc* [2007]
1 AC 508, 517, para 17. Professor Jay Westbrook, a distinguished American
writer on international insolvency has called it a principle of "modified      *F*
universalism": see also *Fletcher*, *Insolvency in Private International Law*,
2nd ed (2005), pp 15–17. Full universalism can be attained only by
international treaty. Nevertheless, even in its modified and pragmatic form,
the principle is a potent one.

8  In the late 19th century there developed a judicial practice, based
upon the principle of universalism, by which the English winding up of a      *G*
foreign company was treated as ancillary to a winding up by the court of its
domicile. There is no doubt that an English court has jurisdiction to wind up
such a company if it has assets here or some other sufficient connection with
this country: *In re Drax Holdings Ltd* [2004] 1 WLR 1049. And in theory,
such an order operates universally, applies to all the foreign company's
assets and brings into play the full panoply of powers and duties under the
Insolvency Act 1986 like any other winding up order: see Millett J in *In re*      *H*
*International Tin Council* [1987] Ch 419, 447: "The statutory trusts extend
to [foreign] assets, and so does the statutory obligation to collect and realise
them and to deal with their proceeds in accordance with the statutory
scheme."

857
[2008] 1 WLR                                                    In re HIH Insurance Ltd (HL(E))
                                                                                Lord Hoffmann

A   9   But the judicial practice which developed in such a case was to limit
the powers and duties of the liquidator to collecting the English assets and
settling a list of the creditors who sent in proofs. The court, so to speak,
"disapplied" the statutory trusts and duties in relation to the foreign assets of
foreign companies. This practice was based partly upon the pragmatic
consideration that any foreign country which applied our own rules of
private international law would not recognise the title of an English ancillary
B   liquidator to the company's assets. But it was also based upon the principle
of universalism. In *In re Matheson Brothers Ltd* (1884) 27 Ch D 225
Kay J appointed a provisional liquidator, as in this case, to protect the
English assets of a New Zealand company which was being wound up in
New Zealand. He said, at pp 230 and 231:

C       "what is the effect of the winding up order which it is said has been
    made in New Zealand? This court upon principles of international
    comity, would no doubt have great regard to that winding up order and
    would be influenced thereby"—but there was nevertheless jurisdiction
    to make a winding up order, and therefore to appoint a provisional
    liquidator, to protect the English assets.
        "I consider that I am justified in taking steps to secure the English assets
D   until I see that proceedings are taken in the New Zealand liquidation to
    make the English assets available for the English creditors pari passu with
    the creditors in New Zealand."

    10   It seems clear from the last sentence that Kay J envisaged the English
assets being distributed in the New Zealand liquidation, provided that
English creditors shared pari passu with New Zealand creditors. It was on
E   the authority of this and similar statements in other cases that Sir Richard
Scott V-C held in *In re Bank of Credit and Commerce International
SA (No 10)* [1997] Ch 213, 247 that an English court had power in an
ancillary liquidation (provisional or final) to authorise the English
liquidators to transmit the English assets to the principal liquidators. The
basis for the practice could only be what Kay J called principles of
international comity, the desirability of a single bankruptcy administration
F   which dealt with all the company's assets.
    11   It is this jurisdiction, reinforced by the provisions of section 426,
which the Australian liquidators (supported by two Australian insurance
creditors who stand to gain from the application of Australian law) invite
the court to exercise. But David Richards J [2006] 2 All ER 671, in a
judgment which carefully examined all the arguments and authorities, held
G   that the jurisdiction did not extend to authorising the assets to be remitted to
principal liquidators for distribution which was not pari passu but gave
preference to some creditors to the prejudice of others. The Court of Appeal
(Sir Andrew Morritt C, Tuckey and Carnwath LJJ) [2007] Bus LR 250 held
that there was such a jurisdiction, which might be exercised if distribution
in the country of the principal liquidation produced advantages for the
non-preferred creditors which counteracted the prejudice they suffered. But
H   the present case offered no such advantages. The appeal was therefore
dismissed.
    12   My Lords, I would entirely accept that there are no administrative
savings to be gained from remitting the assets to Australia. In order to avoid
delay in distributing the available assets, the English provisional liquidators

and the Australian liquidators have co-operated in securing the approval of *A* two alternative schemes of arrangement, one based on the outcome which would occur if all the assets were distributed according to Australian law and the other on the outcome of separate liquidations in England and Australia. Depending upon your Lordships' decision, one or the other will be carried into effect. All that remains is to press button A or button B. So the question is whether an order for remittal should be made, not to achieve *B* any economies in the winding up, but simply because it is the right thing to do. Is it what principle and justice require?

13   The judge denied the existence of a power to order remittal to Australia on two grounds. The first was the absence of a power in the English court to disapply any part of the statutory scheme for the collection and distribution of the assets of an insolvent company. That included the provision in section 107 for pari passu distribution. The second was the *C* weight of authority, in the specific context of an ancillary winding up, which laid emphasis upon the fact that the co-operation of the English court was given on the assumption that there would be a pari passu distribution in the principal liquidation.

14   In my opinion there is force in both of these reasons but the judge carried them too far. There is no doubt that, at least until the passing of *D* section 426, an English court and an English liquidator had no option but to apply English law to whatever they actually did in the course of an ancillary winding up. As Wynn-Parry J said of an ancillary winding up in *In re Suidair International Airways Ltd* [1951] Ch 165, 173: "this court sits to administer the assets of the South African company which are within its jurisdiction, and for that purpose administers, and administers only, the relevant English law . . ." *E*

15   Similarly Sir Richard Scott V-C decided in *In re Bank of Credit and Commerce International SA (No 10)* [1997] Ch 213 that in settling a list of creditors, the English court was bound to apply English law. It could not disregard rule 4.90 of the Insolvency Rules 1986 (SI 1986/1925), which requires that the amount owing by the company to the creditor or vice versa shall be determined after setting off mutual debts against each other. *F*

16   However, Sir Richard Scott V-C went further and directed the English ancillary liquidators not to remit the assets in their hands to the principal liquidators in Luxembourg (which did not recognise rights of set off) without making provision to ensure that the overall distributions to English creditors were in accordance with English law.

17   On the facts of the case I think, if I may respectfully say so, that the decision was correct. The mutual debts which were set off against each other *G* appear to have been entirely governed by English law, which regards set off as a matter of substantial justice between the parties: see *Forster v Wilson* (1843) 12 M & W 191, 204. The court of the principal winding up in Luxembourg had made it clear that it was going to apply its lex fori and disallow the set off, notwithstanding the close connection of the transactions with England. In the circumstances, I think that justice required that a remittal of the assets should have been qualified by a provision which *H* ensured that the English set off was given effect. Luxembourg has not been designated a "relevant country" under section 426 and there was accordingly no jurisdiction to apply Luxembourg law, but, as at present advised, I think that even if there had been, I would not have thought it

A  appropriate to do so. The mutual debts were too closely connected with
England.

18 Where I respectfully part company with my noble and learned
friend, Lord Scott, is in relation to the reason which he gave, and maintains
in his speech in this appeal (which I have had the privilege of reading in
draft) for deciding that he should not remit the assets to Luxembourg
without protecting the position of creditors who had proved in England. In
B  my opinion he was right to do so as a matter of discretion. But he says that
he had no jurisdiction to do otherwise because creditors in an English
liquidation (principal or ancillary) cannot be deprived of their statutory
rights under English law.

19 In my opinion, however, the judicial practice to which I have
referred and which my noble and learned friend approved in *In re Bank of
C  Credit and Commerce International SA (No 10)* [1997] Ch 213 is
inconsistent with the broad proposition that creditors cannot be deprived of
their statutory rights under the English scheme of liquidation. The whole
doctrine of ancillary winding up is based upon the premise that in such cases
the English court may "disapply" parts of the statutory scheme by
authorising the English liquidator to allow actions which he is obliged by
statute to perform according to English law to be performed instead by the
D  foreign liquidator according to the foreign law (including its rules of the
conflict of laws.) These may or may not be the same as English law. Thus
the ancillary liquidator is invariably authorised to leave the collection and
distribution of foreign assets to the principal liquidator, notwithstanding
that the statute requires him to perform these functions. Furthermore, the
process of collection of assets will include, for example, the use of powers to
E  set aside voidable dispositions, which may differ very considerably from
those in the English statutory scheme.

20 Once one accepts, as my noble and learned friend rightly accepted in
*In re Bank of Credit and Commerce International SA (No 10)*, that the logic
of the ancillary liquidation doctrine requires that the court should have
power to relieve an English ancillary liquidator from the duty of distributing
the assets himself but can direct him to remit them for distribution by the
F  principal liquidator, I think it must follow that those assets need not be
distributed according to English law. The principal liquidator would have
no power to distribute them according to English law any more than the
English liquidator, if he were doing the distribution, would have power to
distribute them according to the foreign law.

21 It would in my opinion make no sense to confine the power to direct
G  remittal to cases in which the foreign law of distribution coincided with
English law. In such cases remittal would serve no purpose, except some
occasional administrative convenience. And in practice such a condition
would never be satisfied. Almost all countries have their own lists of
preferential creditors. These lists reflect legislative decisions for the
protection of local interests, which is why the usual English practice is,
remittal to a foreign liquidator is ordered, to make provision for the
H  retention of funds to pay English preferential creditors. But the existence of
foreign preferential creditors who would have no preference in an English
distribution has never inhibited the courts from ordering remittal. I think
that the judge was inclined to regard these differences as de minimis
variations which did not prevent the foreign rules from being in substantial

compliance with the pari passu principle. But they are nevertheless foreign    A
rules. The fact that the differences were minor might be relevant to the
question of whether a court should exercise its discretion to order remittal.
But any differences in the English and foreign systems of distribution must
destroy the argument that an English court has absolutely no jurisdiction to
order remittal because it cannot give effect to anything other than the
English statutory scheme.
                                                                               B
22   The other ground relied upon by the judge was based upon a number
of statements by eminent judges (including Sir Richard Scott V-C in *In re
Bank of Credit and Commerce International SA (No 10)*) to the effect that
the object of an ancillary liquidation was to ensure that all the company's
assets worldwide were made available for distribution pari passu to all its
creditors. One example is the passage I have quoted from the judgment of
Kay J in *In re Matheson Brothers Ltd* 27 Ch D 225, 231 (see para 9 above) in    C
which he said that he would continue the provisional liquidation "until I see
that proceedings are taken in the New Zealand liquidation to make the
English assets available for the English creditors pari passu with the creditors
in New Zealand." That, said David Richards J, showed that pari passu
distribution in the principal liquidation was a sine qua non for the assistance
of the ancillary liquidator.
                                                                               D
23   In my opinion, however, such observations have to be read in their
context. Kay J was plainly anxious to secure that English creditors were
treated equally with New Zealand creditors. He never directed his mind
to the question of whether it would matter if New Zealand law gave
preferences on grounds unrelated to the residence or nationality of the
creditor. And your Lordships have not been referred to any case in which
this question has been considered. In my opinion the authorities relied upon    E
by the judge do not justify limiting the court's jurisdiction.

24   It follows that in my opinion the court had jurisdiction at common
law, under its established practice of giving directions to ancillary
liquidators, to direct remittal of the English assets, notwithstanding any
differences between the English and foreign systems of distribution. These
differences are relevant only to discretion.
                                                                               F
25   Even on the question of whether the court should make the kind of
provision for protecting rights of set off which Sir Richard Scott V-C made in
*In re Bank of Credit and Commerce International SA (No 10)* [1997] Ch
213, much will depend upon the degree of connection which the mutual
debts have with England. If the country of principal liquidation does not
recognise bankruptcy set off and the mutual debts arise out of transactions in
that country, it is hard to see why an English court should insist on rights of    G
set off being preserved in respect of claims by the foreign creditors against
assets which happen to be in England. The English court would be entitled
to exercise its discretion by remitting the assets to the principal jurisdiction
and leaving it to apply its own law. (Compare *In re Paramount Airways Ltd*
[1993] Ch 223, discussing the discretion not to apply the English law on
voidable dispositions.)
                                                                               H
26   It was submitted by the appellants that the argument for the
existence of such a jurisdiction under section 426 was even stronger, because
it expressly gives the court power to apply the foreign insolvency law to the
matter specified in the request. As Sir Andrew Morritt C said [2007] Bus
LR 250, para 49, section 426 is "itself part of the statutory scheme", no less

A  than section 107. The court therefore has power to apply the Australian law
of distribution. It may be that it does, but in my opinion that is not what a
court directing remittal of the assets is doing. It is exercising its power under
English law to direct the liquidator to remit the assets and leave their
distribution to the courts and liquidators in Australia. It is they who apply
Australian law, not the English ancillary liquidator. As Morritt LJ said in
*Hughes v Hannover Rückversicherungs-AG* [1997] 1 BCLC 497, 517, a
B  court asked for assistance under section 426 may exercise "its own general
jurisdiction and powers" as well as the insolvency laws of England and the
corresponding laws of the requesting state. The power to direct the remittal
of assets collected in an ancillary liquidation falls within the former
category.

C     27   This point highlights, I think, the difference between my noble and
learned friend Lord Scott and myself. In relying upon section 426, Lord
Scott holds that a court which directs remittal of the English assets to the
Australian principal liquidator is applying the insolvency law of Australia.
My own view is that the order cannot be characterised in this way and that
the court is exercising a power, established well before the 1986 Act, under
the insolvency law of England.

D     28   The power to remit assets to the principal liquidation is exercised
when the English court decides that there is a foreign jurisdiction more
appropriate than England for the purpose of dealing with all outstanding
questions in the winding up. It is not a decision on the choice of the law to be
applied to those questions. That will be a matter for the court of the
principal jurisdiction to decide. Ordinarily one would expect it to apply its
own insolvency laws but in some cases its rules of the conflict of laws may
E  point in a different direction. Section 426, on the other hand, extends the
jurisdiction of the English court and the choice of law which it can make in
the exercise of its own jurisdiction, whether original or extended. For
example, section 426 can confer jurisdiction to make an administration
order in respect of a foreign company when that jurisdiction is ordinarily
confined to UK companies: *In re Dallhold Estates (UK) Pty Ltd* [1992]
BCLC 621. Or it may enable the court to apply a foreign law when, as in
F  *In re Suidair International Airways Ltd* [1951] Ch 165, it would otherwise
be obliged to apply only English law, as in *England v Smith* [2001] Ch 419
(Australian law applied to examination of accountant connected with
insolvent Australian company). But the present case involves neither an
extension of the English jurisdiction or an application by the English court of
a foreign law.

G     29   I therefore agree with the Court of Appeal that the court has
jurisdiction, even if not for precisely the same reasons. But the Court of
Appeal nevertheless decided that the jurisdiction should not be exercised
because the outcome for some creditors would be worse than if the English
assets were distributed according to English law. There was, said
Carnwath LJ [2007] Bus LR 250, para 72, no "rule of private international
law, or any other countervailing benefit" which would require the court to
H  disregard the principles applicable under English insolvency law.

      30   I must respectfully disagree. The primary rule of private
international law which seems to me applicable to this case is the principle of
(modified) universalism, which has been the golden thread running through
English cross-border insolvency law since the 18th century. That principle

requires that English courts should, so far as is consistent with justice and *A* UK public policy, co-operate with the courts in the country of the principal liquidation to ensure that all the company's assets are distributed to its creditors under a single system of distribution. That is the purpose of the power to direct remittal.

31   In the present case I do not see that it would offend against any principle of justice for the assets to be remitted to Australia. In some cases *B* there may be some doubt about how to determine the appropriate jurisdiction which should be regarded as the seat of the principal liquidation. I have spoken in a rather old-fashioned way of the company's domicile because that is the term used in the old cases, but I do not claim it is necessarily the best one. Usually it means the place where the company is incorporated but that may be some offshore island with which the company's business has no real connection. The Council Regulation on *C* insolvency proceedings (Council Regulation (EC) No 1346/2000 of 29 May 2000) uses the concept of the "centre of a debtor's main interests" as a test, with a presumption that it is the place where the registered office is situated: see article 3(1). That may be more appropriate. But in this case it does not matter because on any view, these are Australian companies. They are incorporated in Australia, their central management has been in Australia and the overwhelming majority of their assets and liabilities are situated in *D* Australia.

32   It is true that Australian law would treat insurance creditors better and non-insurance creditors worse than English law did at the relevant time. But that seems to me no reason for saying that the Australian law offends against English principles of justice. As it happens, since the appointment of the provisional liquidators, English law has itself adopted a regime for the *E* winding up of insurance companies which gives preference to insurance creditors: see regulation 21(2) of the Insurers (Reorganisation and Winding Up) Regulations 2004 (SI 2004/353), giving effect to the European Parliament and Council Directive 2001/17/EC on the reorganisation and winding up of insurance companies. So English courts are hardly in a position to say that an exception to the pari passu rule for insurance creditors offends against basic principles of justice. *F*

33   Furthermore, it seems to me that the application of Australian law to the distribution of all the assets is more likely to give effect to the expectations of creditors as a whole than the distribution of some of the assets according to English law. Policy holders and other creditors dealing with an Australian insurance company are likely, so far as they think about the matter at all to expect that in the event of insolvency their rights will be *G* determined by Australian law. Indeed, the preference given to insurance creditors may have been seen as an advantage of a policy with an Australian company.

34   As for UK public policy, I cannot see how it would be prejudiced by the application of Australian law to the distribution of the English assets. There is no question of prejudice to English creditors as such, since it is *H* accepted that although section 116(3) of the Insurance Act 1973 (Cth) gives creditors whose debts are payable in Australia a first call upon Australian assets, this provision will not in practice prejudice the interests of creditors in the English assets. Furthermore, if there were to be a separate liquidation of the English assets in England, all creditors would be entitled to prove. Those

863
**[2008] 1 WLR**                                          **In re HIH Insurance Ltd (HL(E))**
                                                          **Lord Hoffmann**

A  Australian (or other foreign) creditors who see an advantage in proving in England after bringing into hotchpot their dividends in Australia would no doubt do so. But UK public policy does not require them to be afforded this facility.

35   The fact that there are assets in England is principally the result of the companies having placed their reinsurance business in the London market. For the purposes of deciding how the assets should be distributed,

B  that seems to me an entirely adventitious circumstance. Indeed, it may not be to the advantage of London as a reinsurance market if the distribution of the assets of insolvent foreign reinsurance companies is affected by whether they have placed their reinsurance business in London rather than somewhere else.

36   In my opinion, therefore, this is a case in which it is appropriate to

C  give the principle of universalism full rein. There are no grounds of justice or policy which require this country to insist upon distributing an Australian company's assets according to its own system of priorities only because they happen to have been situated in this country at the time of the appointment of the provisional liquidators. I would therefore allow the appeal and make the order requested by the Australian court.

D
## LORD PHILLIPS OF WORTH MATRAVERS

37   My Lords, I have had the benefit of reading in draft your Lordships' speeches. They contain areas of common ground that result in the conclusion that this appeal should be allowed. I share those areas of common ground and agree with the result to which they lead. They are:

E  (i) section 426(4) and (5) of the Insolvency Act 1986 gives the court jurisdiction to accede to the request of the Australian court and (ii) on the facts of this case the court ought to accede to that request.

38   I had initially reservations about the second proposition. The business of insurance has certain special characteristics. These include the fact that, for a premium paid at the start of the contractual relationship the insurer undertakes obligations that may extend over a considerable

F  future period. It is commonplace for countries to regulate insurance business under conditions that require insurers to demonstrate that they have adequate resources to meet such obligations before being authorised to enter into contracts of insurance. That is certainly the case in the United Kingdom. It appears also to be the case in Australia.

39   Where the law of a country requires an insurer to maintain assets,

G  which may include rights under contracts of reinsurance, that are designed to protect policy holders who have taken out insurance within that country, one would normally expect the insolvency law of that country to afford priority to those policy holders in relation to such assets. In such circumstances, one would not expect rules of private international law or international comity to require the transfer of those assets to liquidators in another country who would not recognise such priority.

H  40   There are now in place in this jurisdiction Regulations which make special provision for distribution to creditors of insolvent insurance companies. These are the Insurers (Reorganisation and Winding-up) Regulations 2004 (SI 2004/353) which implement European Parliament and Council Directive 2001/17/EC of 19 March 2001.

41 These Regulations do not apply to the insolvencies with which this appeal is concerned because they were not in force when the provisional liquidators were appointed. Those insolvencies are, however, subject to Australian legislation whose overall effect will be, if the English assets are remitted to the Australian liquidators, that insurance and reinsurance creditors as a whole will benefit at the expense of other creditors in the case of the three insurance companies where remission had an effect. On the other hand insurance and reinsurance creditors whose liabilities are not in Australia will (except in the case of FAII) be worse off. This is not, however, the result of any special priority given to them under English law.

42 When considering the exercise of discretion under section 426(4) and (5) of the 1986 Act the following matters seem to me to be material. (i) The companies in liquidation are Australian insurance companies. (ii) Australian law makes specific provision for the distribution of assets in the case of the insolvency of such companies. (iii) These do not conflict with any provisions of English law in force at the material time designed to protect the holders of policies written in England. (iv) The policy underlying these provisions appears to accord with the policy of Regulations that have since been introduced in this jurisdiction.

43 These matters have persuaded me that it is in accordance with international comity and with the principle of universalism, as explained by my noble and learned friend, Lord Hoffmann, that the English court should accede to the request of the Australian liquidators.

44 These are my reasons for agreeing that this appeal should be allowed. I do not propose to stray from the firm area of common ground onto the controversial area of whether, in the absence of statutory jurisdiction, the same result could have been reached under a discretion available under the common law.

## LORD SCOTT OF FOSCOTE

### Introduction

45 My Lords, this appeal concerns the question whether the English assets of four insolvent Australian insurance companies, each of which is in compulsory liquidation in Australia and, in England, is under the control of provisional liquidators appointed by the High Court pursuant to a request made by the Australian liquidators, should in principle be remitted to the Australian liquidators for distribution in accordance with the Australian statutory scheme applicable to the liquidation of insolvent insurance companies, or should be retained in England and distributed in accordance with the English statutory scheme. Both David Richards J at first instance and the Court of Appeal (Sir Andrew Morritt C and Tuckey and Carnwath LJJ) held that an order for the remission of the English assets to the Australian liquidators could not, or should not, be made. The Australian liquidators and two of the Australian insurance creditors have appealed to this House. The respondents are the provisional liquidators appointed by the High Court. The appeal depends on the answer to the question I have referred to, and the answer to that question depends, in my opinion on how section 426(4) and (5) of the Insolvency Act 1986 should be applied in a case such as this. The facts that have given rise to a need for an answer to the question are fully set out in the 7 October 2005 judgment of David

865
**[2008] 1 WLR**                                    In re HIH Insurance Ltd (HL(E))
                                                    Lord Scott of Foscote

A    Richards J [2006] 2 All ER 671, paras 9–21, and the judgment of Sir Andrew
     Morritt C [2007] Bus LR 250, paras 2–9. It is not necessary for me to do
     more than outline the nature of the problem that has arisen and sufficient of
     the details to explain why I, and I believe all your Lordships, have come to a
     different conclusion from that reached by the courts below.

B    *The facts*
         46   The four insolvent companies were incorporated in Australia. They
     are conveniently referred to in the judgments below as HIH, FAIG, WMG and
     FAII and I shall so refer to them. They are members of the HIH Group
     which, until its collapse in March 2001, was the second largest insurance
     group in Australia. Its corporate members, 274 in number, included eight
     companies that were licensed insurance companies in Australia. The four
C    companies with which this appeal is concerned were among them but were
     authorised also, under the Insurance Companies Act 1982, to carry on
     insurance business in the United Kingdom, and did so, as well as carrying on
     business in Australia and elsewhere. The majority of the assets and liabilities
     of the four companies are located in Australia but each has significant assets
     and liabilities in England. The relative size of the assets and liabilities in each
D    of these countries can be judged from the table set out in para 12 of David
     Richards J's judgment and, for convenience, repeated here. The figures are
     approximate, based on estimates as at 31 March 2005 and expressed in
     millions of Australian dollars.

| *Assets* | HIH | FAIG | FAII | WMG |
|---|---|---|---|---|
| Australia | 864 | 799 | 33 | 15 |
| UK | 206 | 23 | 10 | 8 |
| Total | 1,111 | 892 | 43 | 23 |
| *Liabilities* | | | | |
| Australia | 3,488 | 2,274 | 1,903 | 35 |
| UK | 882 | 5 | 85 | 12 |
| Elsewhere | 129 | 50 | 154 | 0 |
| Total | 4,500 | 2,329 | 2,142 | 47 |

     The figures demonstrate the great preponderance of Australian assets and
     Australian liabilities over those in the United Kingdom.
         47   Winding up orders in respect of the four companies were made in
     Australia on 27 August 2001 (they had previously been in provisional
G    liquidation). Petitions for winding up orders against the four companies in
     England had been presented on 24 July 2001 by a corporate member of the
     HIH Group that was a creditor of each of the companies. Those petitions
     remain pending but each of the companies is insolvent and, pursuant to
     letters of request issued by the Australian court on 10 September 2001, the
     High Court in England made orders appointing the respondents joint
     provisional liquidators (and at the same time revoking a similar
H    appointment that had been made before the presentation of the petitions).
     The orders appointing the provisional liquidators do not contain any
     provision permitting the remission of English assets to Australia.
         48   On 4 July 2005 the New South Wales Supreme Court issued a letter
     of request asking the High Court in England to assist the Australian

liquidators by hearing and determining an application issued on the same $A$
day. The application asked the High Court to direct the provisional
liquidators in England to pay over to the Australian liquidators "all sums
collected, or to be collected, by them in their capacity as English provisional
liquidators, after paying or providing for all proper costs, charges and
expenses of the English provisional liquidators". This application, together
with an application to the High Court by the provisional liquidators for $B$
directions, was heard by David Richards J and led to his judgment to which
I have referred. He rejected the Australian liquidators' request for the
direction above referred to.

49   It had been common ground that the way in which a winding up of
the four companies would be most satisfactorily achieved would be via a
scheme of arrangement approved under section 411 of the Corporations Act
2001 in Australia and section 425 of the Companies Act 1985 in England. $C$
The schemes would need to reflect the priorities that would be applicable to
the distribution of assets among creditors if the liquidations were to run their
ordinary course (see para 4 of David Richards J's judgment). It was here that
the problem which led to David Richards J's refusal to make the order for
remission to Australia of the English assets arose. Australian law has certain
statutory provisions relating to insurance companies which depart from the
insolvency principle of a pari passu distribution of assets among unsecured $D$
creditors. It is necessary to describe the effect of those provisions.

50   Section 116(3) of the Australian Insurance Act 1973 provides that, in
the winding up of a company authorised under the Act to carry on insurance
business, "the assets in Australia of the [company] shall not be applied in the
discharge of its liabilities other than its liabilities in Australia unless it has no
liabilities in Australia". The Australian courts have held that "assets in $E$
Australia" in section 116(3) means assets in Australia at the time of the
winding up: *New Cap Reinsurance Corpn Ltd v Faraday Underwriting Ltd*
(2003) 117 FLR 52 and *In re HIH Casualty and General Insurance Ltd*
(2005) 215 ALR 562. It is common ground, therefore, that section 116(3)
would not apply to assets transferred or remitted to Australia after the
commencement of the winding up. Moreover, in the *New Cap Reinsurance*
case 117 FLR 52 it was held that the principle of hotchpot applied in relation $F$
to section 116(3) so that creditors with "liabilities in Australia" who received
distributions from the proceeds of "assets in Australia" would not be entitled
to participate in a distribution of the proceeds of other assets until the same
level of dividend had been paid on debts which were not liabilities in
Australia. David Richards J held that section 116 did not constitute a bar to
an order directing remission to Australia of the English assets of the four $G$
companies and there has been no cross-appeal on that point.

51   Section 562A of the Australian Corporations Act 2001 does,
however, present a more substantial problem. The section is fully set out in
para 44 of the judgment of David Richards J. It provides, in summary, that
the reinsurance recoveries of an insurance company must be distributed, in
priority to other creditors, to those creditors who have insurance claims
against the company. It has been held by the High Court of Australia that $H$
the term "contract of insurance" in section 562A(1) includes a contract of
reinsurance and that "contract of reinsurance" includes a contract of
retrocession: *AssetInsure Pty Ltd v New Cap Reinsurance Corpn Ltd* (2006)
225 CLR 331. Accordingly, it is common ground that section 562A confers

867

A on all creditors of an insurance company with insurance and reinsurance claims priority over all other creditors in respect of reinsurance, including retrocession, recoveries. Moreover, section 562A(4) gives the court power, in relation to amounts received under a contract of reinsurance or retrocession, to confer further priority on a particular insurance or reinsurance creditor, in "a manner that the court considers just and equitable in the circumstances". Section 562A has no territorial limits. Its application
B is mandatory so far as Australian liquidators are concerned. And, in *In re HIH Casualty and General Insurance Ltd* 215 ALR 562, 591 the Supreme Court of New South Wales held that the principles of hotchpot do not apply so as to require dividends received by a creditor under section 562A(3) or (4) to be brought into account by the creditor when proving against other assets of the insolvent insurance company.

C 52 By contrast, David Richards J held, and it was common ground before the Court of Appeal and not disputed before your Lordships, that, in a winding up in England governed by English distribution rules, creditors who had received dividends under section 562A in Australia would have to bring them into account, by way of hotchpot, when claiming dividends in the English winding up.

D 53 The approximate effect on creditors of the remission to Australia of the English assets, according to a table produced by the Australian liquidators and the English provisional liquidators (but not agreed by the third and fourth appellants) is set out below.

| Type of creditor | Company | Anticipated dividend (cents/A\$) if there is no remission of English assets | Anticipated dividend (cents/A\$) if there is remission of English assets |
|---|---|---|---|
| *Insurance/reinsurance creditors with liabilities in Australia* | HIH | 25.8 | 28.5 |
| | WMG | 49.0 | 55.1 |
| | FAII | 1.3 | 13.3 |
| *Insurance/reinsurance creditors with liabilities that are not liabilities in Australia* | HIH | 25.4 | 19.3 |
| | WMG | 49.0 | 39.49 |
| | FAII | 1.3 | 12.8 |
| *Other creditors with liabilities in Australia* | HIH | 25.4 | 19.3 |
| | WMG | 49.0 | 44.9 |
| | FAII | 1.3 | 0.9 |
| *Other creditors with liabilities that are not liabilities in Australia* | HIH | 25.4 | 19.3 |
| | FAII | 1.3 | 0.4 |

H According to the agreed statement of facts and issues (para 41) the Australian liquidators believe that the dividends receivable by the creditors of FAIG would be unaffected by the remission.

54 Following the judgment of David Richards J the proposed schemes of arrangement were redrafted. They have, as I understand it, been drafted on alternative footings, dependant on whether your Lordships dismiss this

appeal and hold that David Richards J and the Court of Appeal were right to    *A*
refuse to direct the remission of the English assets to Australia, or allow this
appeal and hold that in principle the English assets ought to be remitted to
Australia. These schemes of arrangement providing for alternative modes of
distribution, I understand, have been approved both in Australia and in
England. How they will be implemented depends upon your Lordships'
decision, first, whether the High Court has power to direct the remission of    *B*
the English assets to Australia and, second, whether in the circumstances of
this case that power should, in principle, be exercised. There are two
possible sources of such a power. One, espoused by my noble and learned
friend Lord Hoffmann, whose opinion I have had the advantage of reading
in draft, is an inherent power in the court established not by statute but by
previous judicial decisions. The other is section 426 of the Insolvency Act
1986, introduced into our law, as Lord Hoffmann has explained (para 5 of    *C*
his opinion), in consequence of a recommendation by the Cork Committee in
1982.

*Section 426*

55  The section is headed "Co-operation between courts exercising
jurisdiction in relation to insolvency" and subsections (4) and (5) provide as    *D*
follows:

"(4) The courts having jurisdiction in relation to insolvency law in any
part of the United Kingdom shall assist the courts having the
corresponding jurisdiction in any other part of the United Kingdom or
any relevant country or territory.

"(5) For the purposes of subsection (4) a request made to a court in any    *E*
part of the United Kingdom by a court in any other part of the United
Kingdom or in a relevant country or territory is authority for the court to
which the request is made to apply, in relation to any matters specified in
the request, the insolvency law which is applicable by either court
in relation to comparable matters falling within its jurisdiction.  In
exercising its discretion under this subsection, a court shall have regard
in particular to the rules of private international law."    *F*

By the Co-operation of Insolvency Courts (Designation of Relevant
Countries and Territories) Order 1986 (SI 1986/2123) Australia was
designated a "relevant country" for the purposes of section 426.

56  David Richards J, in para 112 of his judgment, expressed the
conclusion that:
                                                                              *G*
"in an English liquidation of a foreign company, the court has no
power to direct the liquidator to transfer funds for distribution in the
principal liquidation, if the scheme for pari passu distribution in that
liquidation is not substantially the same as under English law."

He said that he regarded that conclusion as an application of my reasoning
in *In re Bank of Credit and Commerce International (No 10)* [1997] Ch 213.
I think, with respect, that that was a mistaken basis for his conclusion. My    *H*
reasoning in *In re Bank of Credit and Commerce International (No 10)*
related only to the inherent power of the court. It had nothing to do with
section 426. *In re Bank of Credit and Commerce International (No 10)*
was concerned with the question of remission of assets from England to

A  Luxembourg, the country where Bank of Credit and Commerce International had been incorporated and the seat of the principal liquidation. Luxembourg had not been designated a "relevant country" for the purposes of section 426. A letter of request under section 426, asking for the remission to Luxembourg of the assets held by the English liquidators, had not been, and could not have been, issued by the Luxembourg court to the High Court. The issue was whether the High Court had an inherent
B  jurisdiction to authorise the English liquidators, conducting an ancillary liquidation in England, to remit assets to the liquidators conducting the principal liquidation and, if so, the scope of that inherent jurisdiction. It was common ground in *In re Bank of Credit and Commerce International (No 10)* that the High Court had no statutory jurisdiction to remit the assets or to direct the liquidators to do so.

C  57  Although David Richards J expressed his conclusion as a lack of "power" to give the direction sought by the Australian liquidators, I think, reading his judgment as a whole, that he was not really taking a jurisdictional point but was concluding that it would not be right to direct a remission of assets in circumstances where the remission would reduce the dividends that would have been recovered under the English scheme of
D  insolvency distribution by those creditors who were not insurance creditors. That certainly was the approach of Sir Andrew Morritt C when the case reached the Court of Appeal. He said [2007] Bus LR 250, para 35 that "the concept of 'assistance' should not be restrictively construed so as to limit the jurisdiction of the court" and that the assistance that the New South Wales court had requested by its letter of request of 4 July 2005 did not fall "outside the ambit of that concept." He concluded, at para 50:

E      "if the companies were in liquidation in England the court in England would have jurisdiction to entertain a request under section 426 for directions to the liquidators in England to transfer the assets collected by them to the liquidators in the principal liquidation even though the result of such a transfer would be to interfere with the statutory scheme imposed on those assets by [the] Insolvency Act 1986"

F  With all of that I respectfully agree. The Chancellor went on to consider whether the High Court could "properly" give the requested direction. That, he thought, was the critical question: para 36. Again, I respectfully agree.

58  The reason why the Chancellor concluded that the court's power under section 426 to direct the provisional liquidators to remit the English assets to Australia ought not to be exercised appears from para 52 of his
G  judgment. He held that, on the authority of *Hughes v Hannover Rückversicherungs-AG* [1997] 1 BCLC 497 and *England v Smith* [2001] Ch 419, the court should comply with the letter of request issued by the Australian court "if it may properly do so", and went on to say:

       "That will involve a consideration of all the circumstances including whether the transfer sought will prejudice the creditors or any class of
H      them and whether there would be other advantages sufficient to counteract such prejudice. In relation to the facts of this case it is quite clear that the transfer sought would prejudice all creditors of each of the companies except FAIG and except Australian insurance and reinsurance creditors of HIH, WMG and FAII and non-Australian insurance and

A

reinsurance creditors of FAII. The advantage to the latter classes of
creditor cannot counteract the prejudice suffered by all the other classes.
Nor can those advantages and any benefit obtained from avoiding
duplication enable the court to conclude that a transfer would be for the
benefit of the estate as a whole."

B

The last sentence in this citation was a response to a submission made by the
Australian liquidators that the remission of the English assets should be
directed if it would be for the benefit of the estate or the creditors as a whole:
see para 51 of the Chancellor's judgment.

C

59 The Chancellor's reasoning does not, however, seem to me to
explain why the identification of disadvantage to creditors other than
the insurance and reinsurance creditors referred to should require the
conclusion that the English assets should not be remitted to Australia. The
exercise of the section 426 power so as to direct the remission of the assets to
Australia would not constitute the disapplication of the English insolvency
scheme. Section 426 is part of the English insolvency scheme. To hold that
the power under the section to direct the remission of assets from the country
where an ancillary liquidation is being conducted (England) to the country
where the principal liquidation is being conducted (Australia) cannot be
exercised if the effect would be to reduce the amount of dividends receivable

D

in England by any class of creditors, or, I suppose, by any individual
creditor, would be to deprive the section, at least in relation to remission of
assets from an ancillary to a principal liquidation, of much of its intended
potential to enable a single universal scheme for insolvency distribution to
be achieved. If an ancillary liquidation is being conducted in England under
an insolvency scheme that does not include section 426, eg where the
country of the principal liquidation is not a United Kingdom country and has
not been designated a "relevant country or territory"; the position seems to

E

me quite different. The English courts have a statutory obligation in an
English winding up to apply the English statutory scheme and have, in my
opinion, in respectful disagreement with my noble and learned friend Lord
Hoffmann, no inherent jurisdiction to deprive creditors proving in an
English liquidation of their statutory rights under that scheme. I expressed

F

that opinion in In re Bank of Credit and Commerce International (No 10)
[1997] Ch 213 and remain of that opinion. Luxembourg was not a "relevant
country or territory". Australia, however, is and, accordingly, section 426 is
part of the statutory scheme applicable under the 1986 Act to these four
Australian companies. I do not think it would be proper for the courts of
this country, in reliance on an inherent jurisdiction, in effect to extend the

G

benefits of section 426 to a country that had not been designated a "relevant
country or territory" by the Secretary of State, and thereby to deprive some
class of creditors of statutory rights to which they would be entitled under
the English statutory insolvency scheme. There is no case law that supports
the proposition that the inherent jurisdiction can be used so as to bring about
such deprivation.

H

60 Indeed, the case law is to an entirely contrary effect. Vaughan
Williams J said in In re English, Scottish and Australian Chartered Bank
[1893] 3 Ch 385, 394:

"One knows that where there is a liquidation of one concern the
general principle is—ascertain what is the domicile of the company in

A   liquidation; let the court of the country of domicile act as the principal
court to govern the liquidation; and let the other courts act as ancillary, as
far as they can, to the principal liquidation. *But although that is so, it has
always been held that the desire to assist in the main liquidation—the
desire to act as ancillary to the court where the main liquidation is going
on—will not ever make the court give up the forensic rules which govern*
B   *the conduct of its own liquidation*" (my emphasis).

In *In re Suidair International Airways Ltd* [1951] Ch 165, 173 Wynn-Parry J,
having cited the passage from the judgment of Vaughan-Williams J in *In re
English, Scottish and Australian Chartered Bank* cited above, said:

"It appears to me that the simple principle is that this court sits to
administer the assets of the South African company which are within its
C   [i e the English court's] jurisdiction, and for that purpose administers, and
administers only, the relevant English law; that is, primarily, the law as
stated in the Companies Act 1948 looked at in the light, where necessary,
of the authorities. If that principle be adhered to, no confusion will result.
If it is departed from, then for myself I cannot see how any other result
would follow than the utmost possible confusion."

D   I cited these authorities, and others, in *In re Bank of Credit and Commerce
International (No 10)* [1997] 1 Ch 213, 246, in coming to the conclusion
that:

"the ancillary character of an English winding up does not relieve an
English court of the obligation to apply English law, including English
insolvency law, to the resolution of any issue arising in the winding up
E   which is brought before the court."

61   It is, of course, desirable as a general proposition that there should
be one universally applicable scheme of distribution of the assets of an
insolvent company. And it is also obvious that, in general, where a
company is being wound up not only in its place of incorporation but also in
other countries where it carried on some of its business, the winding up
F   process in the latter countries should be regarded as ancillary to the
principal winding up being conducted in the country of its incorporation. In
such a case there is, therefore, a potential conflict between, on the one hand,
the desirability of that general proposition and, on the other hand, the
undesirability of the confusion to which Wynn-Parry J referred in the
*Suidair* case [1951] Ch 165 coupled with the obligation of English courts to
G   accord to claimant creditors in an English winding up the statutory rights to
which they are entitled under English insolvency statutes. This conflict has
been resolved by Parliament in enacting section 426. Section 426 has
become part of the statutory scheme. But the resolution achieved by
section 426 does not apply to all countries. It does not apply where the
principal winding up is being conducted in a country which is neither part of
the United Kingdom nor has been designated by the Secretary of State as a
H   "relevant country or territory". The proposition that the assistance and
directions sought by the Australian court and the Australian liquidators in
the present case could be given under an inherent power of the court
without reliance on section 426(4) and (5) is, in my respectful opinion,
unacceptable. It would mean that the assistance and directions could be

given in relation to a winding up being conducted in a foreign country that *A* had not been designated a "relevant country or territory" by the Secretary of State. It would constitute the usurpation by the judiciary of a role expressly conferred by Parliament on the Secretary of State. Moreover, the issue is one that does not arise in the present case. If the assistance and directions sought cannot, on a proper exercise of the court's discretion, be given pursuant to section 426(4) and (5), they could hardly be given as a proper *B* exercise of the court's inherent power. Exactly the same considerations would come into play. And, as I understand it, your Lordships all agree that the directions sought should be given.

62 If the country of the principal winding up is a "relevant country or territory" for section 426 purposes and the liquidators in that country have requested English liquidators to remit to them the assets collected in *C* England so that they (the principal liquidators) can, pursuant to the insolvency law of that country, implement a universal scheme of pari passu distribution to ordinary unsecured creditors, the request is one to which, in principle, the English liquidators ought, in my opinion, to accede. I agree, as I think is common ground, that the English liquidators should first discharge the debts of those creditors who, under the English insolvency scheme, are entitled to preferential payment. There may be other *D* circumstances in which a refusal to remit assets pursuant to such a request might be justified. It has been suggested that a refusal would be justified if it would give rise to "manifest injustice to a creditor". So indeed it might. But reliance simply on the fact that under the insolvency scheme applicable to the principal winding up there would be a significant class or classes of preferential creditors whose debts would not have priority under the English insolvency scheme is not, in my opinion, sufficient to justify a refusal. It *E* would, in my opinion, as I hope I have made apparent, have been sufficient if the country of the principal winding up had not been a "relevant country or territory" for section 426 purposes. These four companies are Australian companies whose principal place of business, as well as their place of incorporation, was Australia. The Australian statutory scheme allows insurance and reinsurance creditors of insolvent insurance companies to be paid in priority to ordinary creditors. There is nothing unacceptably *F* discriminatory or otherwise contrary to public policy in these statutory provisions. The general acceptability by English law standards of the Australian insolvency scheme is confirmed by the designation of Australia as a "relevant country or territory" for section 426 purposes. I can see no sufficient reason why the Australian liquidators' request for the remission of the English assets should not be acceded to. I would allow this appeal but *G* repeat that I would do so on the footing that the power to accede to the Australian liquidators' request derives from section 426 and not from any inherent jurisdiction of the court.

**LORD WALKER OF GESTINGTHORPE**
63 My Lords, I have had the privilege of reading in draft the opinion of *H* my noble and learned friend Lord Hoffmann. I am in full agreement with his opinion, which dispels several obscurities on the authorities and clarifies the nature of the court's powers under section 426 of the Insolvency Act 1986. I too would allow this appeal and make the order requested by the Supreme Court of New South Wales.

*A*    **LORD NEUBERGER OF ABBOTSBURY**

   64   My Lords, this appeal concerns the English assets of four insolvent Australian insurance companies, in compulsory liquidation in Australia and in provisional liquidation in England, pursuant to the Australian liquidators' request. The question is whether those assets should be remitted to the Australian liquidators for distribution in accordance with the Australian insolvency regime, or whether they should be distributed here in accordance with the English insolvency regime.

*B*

   65   Your Lordships all agree that the answer is that the assets should be remitted for distribution in accordance with the Australian insolvency regime, albeit that the Australian liquidators and the English provisional liquidators have very sensibly agreed what the practical consequences are to be in either case, as my noble and learned friend Lord Hoffmann explains in

*C*  para 12 of his speech (which I have had the opportunity of seeing in draft), so that there will be no need for any formal remittal. However, there is disagreement as to the basis upon which the assets can be distributed in accordance with the Australian insolvency regime. Accordingly, I shall give my reasons for allowing the appeal, albeit that they can be expressed relatively shortly, as the relevant facts, statutory provisions, case law and the relevant principles are comprehensively covered in the preceding speeches.

*D*

   66   The question I shall primarily address is whether the remittal of the English assets to the Australian liquidators for distribution in accordance with the Australian insolvency regime can be effected pursuant to the established judicial practice described in paras 8 and 9, or whether it can only be effected pursuant to section 426 of the Insolvency Act 1986. I have come to the conclusion that, while remittal of assets can be effected pursuant

*E*  to established judicial practice, the power to do so where the distribution will not be in accordance with the English insolvency regime derives from section 426.

   67   The main substantive features of the English insolvency regime in relation to unsecured creditors can be broadly summarised as follows. First, preferential creditors (listed in Schedule 6 to the 1986 Act) enjoy priority on

*F*  a pari passu basis as between themselves (sections 175 and 386 of the 1986 Act). Secondly, all other creditors rank behind them, also on a pari passu basis as between themselves (rule 4.181 of the 1986 Rules). Thirdly, there is a mandatory set-off requirement (rule 4.90 of the 1986 Rules) as explained by Lord Hoffmann (albeit in a bankruptcy context) in *Stein v Blake* [1996] 1 AC 243.

   68   As a matter of general principle, it seems to me that, at any rate in the

*G*  absence of section 426(4) and (5), where a company is wound up in this country, its assets are held on terms that they must be applied in accordance with that statutory insolvency regime: see *Ayerst v C & K (Construction) Ltd* [1976] AC 167, 176E–177F. As Millett LJ put it in *Mitchell v Carter* [1997] 1 BCLC 673, 686,

*H*       "the making of a winding up order divests the company of the beneficial ownership of its assets which cease to be applicable for its own benefit. They become instead subject to a statutory scheme for distribution among the creditors and members of the company."

   69   This principle applies in the case of an English liquidation of a foreign company. In particular, section 221(1) of the 1986 Act confirms that

the provisions of that Act "about winding up" apply to "unregistered    *A*
companies", which includes foreign companies, in the same way that they
apply to English companies. That is confirmed by the judgment in *In re
International Tin Council* [1987] Ch 419, 446–447. As Millett J there
explained, the application of the English insolvency regime applies in theory
to all the assets of the foreign company, and in theory and practice to its     *B*
assets within the jurisdiction. In the absence of a provision such as
section 426, I therefore find it difficult to see on what basis an English court
could have jurisdiction to disapply the English insolvency regime to assets in
this jurisdiction of a company subject to a winding up order made by an
English court.

70  Of course, in this case the companies have not been the subject of a
winding up order in England, although winding up petitions have been
presented and provisional liquidators appointed. Further, as David           *C*
Richards J said in his judgment at first instance [2006] 2 All ER 671,
para 184, there is "a significant prospect that, in the absence of schemes of
arrangement, winding up orders would be made" by the High Court in
respect of each of the four companies. He went on to say, it was "a principal
function" of the provisional liquidators "to safeguard the assets of the
companies for the benefit of those interested in their distribution in the event   *D*
of a winding up." Accordingly, he considered that he should not authorise
them to do anything whose "effect would be to undermine the proper
working out of the statutory insolvency scheme which would be mandatory
if winding up orders were made".

71  That appears to me to be right. It seems clear that the companies are
insolvent, and that the only reason that the English court has accepted       *E*
jurisdiction is because the Australian courts have ordered them to be wound
up because of their insolvency. Although no formal winding up orders have
been made, provisional liquidators have been appointed ultimately because
of the companies' insolvency. In those circumstances, I consider that the
court's powers should not be more flexible or wider in connection with the
remitting or distribution of assets than if formal winding up orders had been
made. Accordingly, I approach the issue, as the parties and the courts below   *F*
did, on that basis.

72  There appears to be no suggestion in any of the earlier authorities
cited to your Lordships that the court, when exercising its jurisdiction to
remit to another jurisdiction for distribution the assets of a company subject
to a winding up order in this country, could authorise the distribution of
those assets other than in accordance with the English insolvency regime.     *G*
However, there are judicial observations which emphasise the mandatory
nature of the English regime, although they are not directly concerned with
the question of remittal, in relation to foreign insolvent companies. I have
in mind the observations of Vaughan Williams J (whose decision was upheld by
the Court of Appeal) in *In re English, Scottish and Australian Chartered
Bank* [1893] 3 Ch 385, 394 and of Wynn-Parry J in *In re Suidair
International Airways Ltd* [1951] Ch 165, 173–174, as applied by Sir         *H*
Richard Scott V-C in *In re Bank of Credit and Commerce International
SA (No 10)* [1997] Ch 213, 246D–E. The relevant passages are quoted by my
noble and learned friend, Lord Scott of Foscote (whose speech I have had the
opportunity of seeing in draft), in para 60.

A   73   In paras 95–107 of his excellent judgment at first instance, David
Richards J considered a number of cases in this jurisdiction, Canada and
Australia, in which courts were invited to remit to foreign liquidators local
assets of a foreign company which was being wound up. In all those cases, it
was made clear that the court had to be satisfied that the foreign liquidators
would distribute pari passu, in accordance with the domestic insolvency
B   regime. Of course, it can be said that those cases merely emphasise the
importance of the pari passu principle, but they appear to me to indicate that
the courts concerned were seeking to ensure that the principles of their local
insolvency regime were honoured.

74   I accept that in no case where the court has been asked to exercise its
power to remit assets to liquidators in another jurisdiction has it refused to
do so on the grounds that the categories of preferential creditors, or other
C   aspects, of that other jurisdiction's insolvency regime differed from those in
this country. However, I do not consider that that argument goes anywhere,
because, so far as I am aware, that point has not been raised in any case
where the court has been invited to remit assets. Even if the court would
have had the power to remit in such circumstances at some point in the past, it
seems to me that, absent section 426 of the 1986 Act, it would not have such
power now.
D
75   I accept that, on this basis, the value of the English court's inherent
ancillary liquidation power is very much more circumscribed than if it
could effectively disapply, or authorise the disapplication of, the English
insolvency regime. However, the fact that the English court has an inherent
power to relieve an ancillary liquidator in this country from the duty of
distributing the assets himself, and to order that the assets be remitted to be
E   distributed by a foreign liquidator, does not mean that it necessarily follows
that those assets can then be distributed other than in accordance with the
English insolvency regime. The fact that English assets are bound to be
distributed in accordance with certain principles does not prevent the assets
being passed to someone else so that they can be distributed in accordance
with those principles, but it would prevent the passing on of those assets for
distribution in accordance with different principles. If this is right, it means
F   that the court's inherent power to remit assets is, I accept, of much more
limited value than if the law were otherwise, but the power would
nonetheless not be valueless: it could assist in achieving administrative
convenience.

76   The notion that the court has inherent jurisdiction to remit English
assets to liquidators in another jurisdiction on the basis that the insolvency
G   regime of that jurisdiction would apply, seems to me to sit uneasily with the
provisions of section 426(4) and (5), at least in relation to remittal of assets.
The inherent jurisdiction to remit must be exercisable in relation to any
other country whereas section 426 only applies to a "relevant country or
territory", i e one designated by the Secretary of State. If the courts had an
inherent power to remit to a country with a different insolvency regime,
either the courts could exercise that power in relation to a country which
H   was not so designated, or section 426 impliedly restricts the inherent
jurisdiction to designated states. The former possibility renders the
significance of designation questionable in a case where remittal is sought;
indeed it can be said to involve the inherent jurisdiction almost thwarting the
statutory purpose. The latter possibility not only involves an implication as

to the effect of section 426 which is not exactly obvious: it would mean that     *A*
the inherent power (if it ever existed) had very little, if any, further purpose.

77   Accordingly, in agreement with Lord Scott, were it not for
section 426, I would have been of the view that this appeal should be
dismissed.

78   I should add that I agree with Lord Hoffmann when he says that "the
common law power to remit is about choice of jurisdiction, whereas         *B*
section 426 is about choice of law", at least in relation to the present type of
case. What section 426(5) says in terms is that an English court, to which an
appropriate request is made, may "apply . . . the insolvency law which is
applicable by [the foreign court making the request]". Whether the English
court does that in the present case by ordering the English provisional
liquidators to distribute in accordance with the Australian regime, or
whether it orders remittal of the assets to Australia in accordance with its     *C*
common law powers, to enable the Australian liquidators to distribute in
accordance with the Australian regime, is a decision for the English court in
each case. However, the questions whether to remit assets to another
country and whether to apply, or to permit the application of, the
distribution law of that country are two different issues, although resolution
of the latter question will no doubt often dictate the answer to the former     *D*
question. I consider that the first of those questions is governed by the
common law and the second is governed by section 426 of the 1986 Act.

79   That leads me to the second aspect which I should deal with, namely
the ultimate issue in this case: should the English court accede to the
Australian liquidators' request to remit the English assets for distribution in
accordance with the Australian insolvency regime? This aspect can be
disposed of more quickly, as I agree with all your Lordships that this would     *E*
be an appropriate case for remission of the English assets to Australia for
distribution by the liquidators in accordance with Australian law. It is true
that this will mean that some of the creditors will be worse off than under a
distribution in accordance with the English insolvency regime, but, by the
same token, it will mean that some of the creditors will be better off. That is
almost inevitable where one applies any regime which differs in any way
from the English regime.                                                          *F*

80   More importantly, I do not consider that any fundamental principle
of English insolvency law would be offended, or any unfairness would be
perpetrated, by the application of the Australian insolvency regime. Under
Australian law, preferential treatment is accorded to certain creditors of
insurance companies, who would not have been given such treatment in
English law. However, that does not in itself mean that the application of     *G*
the Australian regime should be rejected. Further, as my noble and learned
friend, Lord Phillips of Worth Matravers (whose speech I have read in draft)
points out, the companies are, and always have been, Australian insurance
companies, and Australia has been designated as a "relevant country or
territory" for section 426 purposes. Clearly the fact that Australia has been
so designated cannot be the end of the matter, but it does indicate, at least in
general terms, that the Secretary of State considers that the insolvency law of     *H*
Australia is acceptable in principle in this jurisdiction.

81   More particularly, the notion of preferential creditors is, and long
has been, part of our insolvency regime, and it is almost inevitable that
different insolvency regimes will have slightly different categories of

877
**[2008] 1 WLR**                                     **In re HIH Insurance Ltd (HL(E))**
                                                     **Lord Neuberger of Abbotsbury**

A   preferential creditors. It cannot be right that such differences should always,
    or (arguably) even frequently, be a bar to an order for remittal, as that would
    appear inconsistent with the purpose of section 426(4) and (5), especially in
    view of the slightly mystifying reference therein to "the rules of private
    international law". The fact that the categories of preferential creditors have
    changed significantly in this jurisdiction more than once over the past 15
B   years rather underlines the point. Further, there is nothing unreasonable or
    unfairly discriminatory in the application of the Australian statutory
    provisions with regard to preferential creditors in this case. On the contrary,
    as Lord Hoffmann and Lord Phillips point out in paras 32 and 40
    respectively, since 2004 the English insolvency regime has now included
    preferential provisions for insurance companies which are very similar to the
    Australian regime. It is not as if the Australian regime would distribute
C   assets between groups of unsecured creditors (whether preferential or not)
    other than on a pari passu basis, or has significantly different set-off rules
    from those which apply in this jurisdiction.

    82  Accordingly, although I take the view that it would not have been
    open to an English court to make the order sought by the Australian
    liquidators in the absence of section 426(4) and (5) of the 1986 Act,
    I consider that a different answer is appropriate in light of section 426.
D   David Richards J and the Court of Appeal thought otherwise, but that was at
    least in part because they were constrained by the reasoning in *Hughes v
    Hannover Rückversicherungs-AG* [1997] 1 BCLC 497 (much of which is
    unexceptionable as Lord Hoffmann and Lord Scott have said).

    83  For these reasons, I too would allow this appeal.

E                              *Appeal allowed.*
                               *Assets ordered to be remitted to*
                                 *Australia.*
                               *Submissions on costs invited within 14*
                                 *days.*

F   *Solicitors: Norton Rose LLP; Clifford Chance LLP; Freshfields
    Bruckhaus Deringer.*

                                                                      B L S

G

H