Supreme Court                                          *A*

## Rubin and another *v* Eurofinance SA and others (Picard and others intervening)

## *In re* New Cap Reinsurance Corpn Ltd (in liquidation)

## New Cap Reinsurance Corpn Ltd and another *v* Grant and others

[2012] UKSC 46

2012 May 21, 22, 23, 24;          Lord Walker of Gestingthorpe, Lord Mance,
     Oct 24           Lord Clarke of Stone-cum-Ebony, Lord Sumption JJSC,
                                          Lord Collins of Mapesbury

*Insolvency — Liquidation — Foreign company — Liquidators of foreign companies
   seeking to enforce in England judgments of United States and Australian courts
   to recover moneys transferred to defendants before liquidation — Defendants
   claiming not to have been present in or submitted to jurisdiction of foreign courts
   — Whether judgments in personam — Whether ordinary rules for enforcing
   judgments in personam inapplicable to bankruptcy proceedings — Whether
   judgments enforceable at common law — Whether alternative method of
   enforcement through international assistance provisions of Model Law on Cross-
   Border Insolvency — Statutory provisions allowing English court to "assist"
   Australian court in insolvency matter and for registration and enforcement of
   Australian judgment in "civil or commercial" matter — Whether either provision
   allowing English court to enforce Australian judgment against defendants —
   Foreign Judgments (Reciprocal Enforcement) Act 1933 (23 & 24 Geo 5, c 13), s 6
   — Insolvency Act 1986 (c 45), s 426(4) — Reciprocal Enforcement of Foreign
   Judgments (Australia) Order 1994 (SI 1994/1901), art 4(a) — Cross-Border
   Insolvency Regulations 2006 (SI 2006/1030), Sch 1, art 21*

In the first case the company settled a trust under English law to hold funds for
consumers who successfully participated in sales promotions organised by it in the
United States of America. Following a successful challenge to the promotion under
United States consumer protection legislation, resulting in the trust having to pay a
substantial sum by way of settlement, it obtained an order from the English High Court
appointing the applicants as receivers of the trust's property and the applicants then
filed for protection before the bankruptcy court in New York under Chapter 11 of the
United States Bankruptcy Code.  The applicants were appointed as legal
representatives of the trust, as debtor, with authority to prosecute all causes of action
against potential defendants, and they commenced adversary proceedings in New
York, being the equivalent of undervalue transaction and preference claims under
sections 238 and 239 of the Insolvency Act 1986[1], against the defendants, the company
and its founder and his sons. The defendants, who were not present in New York at the
relevant time, did not submit to the court's jurisdiction and did not defend
the proceedings.  Default and summary judgment was entered against them. The
applicants applied to the High Court for enforcement of the orders in England against
the defendants under CPR Pts 70 and 73 on the ground that the English court had power
to do so both at common law and under article 21 of the United Nations Commission
on International Trade Law Model Law on Cross-Border Insolvency, scheduled to the

[1] Insolvency Act 1986, s 426(4)(5): see post, para 146.

© 2013 The Incorporated Council of Law Reporting for England and Wales

237

A   Cross-Border Insolvency Regulations 2006[2]. The judge held that the Chapter 11 proceedings fell within the ambit of the Model Law but that its provisions for co-operation did not extend to the enforcement of judgments. He refused to recognise the New York court's judgment at common law on the ground that it was an in personam judgment which could not be enforced where the defendants had neither been present in nor submitted to the New York court's jurisdiction. On the applicants'

B   appeal, the Court of Appeal held that the New York court's judgments made in the adversary proceedings, despite having the indicia of judgments in personam, were none the less judgments in and for the purposes of the collective enforcement regime of the bankruptcy proceedings, that the ordinary rule precluding the enforcement of a foreign judgment in personam where the judgment debtor had neither been present in, nor submitted to the jurisdiction of the courts of, the country where judgment had been given did not apply to such proceedings, and that since there should be an unitary bankruptcy proceeding in the court of the bankrupt's domicile which received

C   worldwide recognition, the judgment of the New York court could be enforced against the defendants at common law. Given that decision, the Court of Appeal deemed it unnecessary to decide whether the judgments could have been enforced under the 2006 Regulations.

    In the second case the defendants were members of a Lloyd's syndicate which placed reinsurance with an Australian reinsurance company and had received payments from it shortly before it went into liquidation. The liquidator brought

D   proceedings in New South Wales to recover the payments made to the syndicate, on the basis that the company had been insolvent when they were made. The defendants did not accept service of the proceedings or submit to the jurisdiction of the New South Wales court in that matter but did participate in creditors' meetings in Australia in relation to some unsettled claims which they had against the company. The New South Wales court held that the payments had been a preference and therefore liable to be set aside, and issued a letter of request asking, inter alia, that the

E   English court exercise its jurisdiction under section 426(4) of the Insolvency Act 1986 to order the defendants to pay the sum specified in the order. The liquidator and the company issued proceedings in England for relief as sought in the letter of request. The judge held that the English court was entitled to enforce the Australian judgment either at common law, given the decision of the Court of Appeal in the first case, or under section 426(4). Dismissing the defendants' appeal the Court of Appeal, having decided that the Foreign Judgments (Reciprocal Enforcement) Act 1933[3] was

F   applicable because the insolvency proceedings fell within the ambit of "civil or commercial matter" in article 4(a) of the Reciprocal Enforcement of Foreign Judgments (Australia) Order 1994[4], held that, by reason of section 6 of that Act, the judgment was enforceable under section 426 but not at common law.

    On appeal by the defendants in both cases—

    *Held*, (1) allowing the appeal in the first case (Lord Clarke of Stone-cum-Ebony JSC dissenting), that the common law would only enforce a foreign judgment in personam if the judgment debtors had been present or, where the 1933 Act was

G   applicable, resident in the foreign country when the proceedings had been commenced, or if they had submitted to its jurisdiction; that, as a matter of policy, the court would not adopt a more liberal rule in respect of enforcement judgments in the interests of the universality of bankruptcy; that any change in the settled law of the recognition and enforcement of judgments was a matter for the legislature; that,

H       [2] Cross-Border Insolvency Regulations 2006, Sch 1, art 21: see post, para 136.
      [3] Foreign Judgments (Reciprocal Enforcement) Act 1933, s 6: see post, para 149.
      [4] Reciprocal Enforcement of Foreign Judgments (Australia) Order 1994, art 4: "The following judgments shall be judgments to which Part I of the Foreign Judgments (Reciprocal Enforcement) Act 1933 applies, that is to say— (a) any judgment, decree, rule, order or other final decree for the payment of money (other than in respect of taxes or other charges of a like nature or an order requiring the payment of maintenance) given by a recognised court in respect of a civil or commercial matter . . ."

© 2013 The Incorporated Council of Law Reporting for England and Wales

moreover, the Model Law was not designed to provide for the reciprocal   *A*
enforcement of judgments and so the 2006 Regulations could not be used to enforce a
foreign judgment against a third party; and that, accordingly, applying the common
law, since the proceedings against the defendants in the first case had been in
personam and they had not submitted to the jurisdiction of the United States
bankruptcy court, the orders which it had made against them could not be enforced
by the English court (post, paras 10, 115, 128–129, 142–144, 169, 177, 178, 179).

    *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852, HL(E)   *B*
considered.

    *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508, PC disapproved.

    (2) Dismissing the appeal in the second case, that although the English court
could give assistance to the Australian court under section 426 of the Insolvency Act
1986, such assistance did not extend to the enforcement of judgments; that the
defendants' participation in the Australian insolvency proceeding, albeit not the   *C*
actual recovery proceedings, was sufficient for them to be taken to have submitted to
the jurisdiction of the Australian court responsible for the supervision of that
proceeding; that it followed that there could be enforcement in the English court; that
since the 1994 Order applied Part I of the 1933 Act to Australian judgments in
respect of "civil and commercial matters" and since insolvency proceedings were not
to be excluded from that term, enforcement in such cases would be under the
1933 Act rather than at common law; and that, accordingly, the Australian judgment   *D*
in the second case would be enforced by the English court on that basis (post,
paras 152, 167, 175–177, 178, 203, 205).

    *England v Smith* [2001] Ch 419, CA distinguished.

    *Per* Lord Walker of Gestingthorpe, Lord Mance, Lord Sumption JJSC and Lord
Collins of Mapesbury.  Declining to sanction a departure from the traditional rules is
unlikely to cause serious injustice.  Several of the ways in which the claims were put in
the United States proceedings in the first case might have founded proceedings by   *E*
trustees in England for the benefit of the creditors (as beneficiaries of the express
trust).  There are several other avenues available to office-holders.  Avoidance claims
by a liquidator of an Australian company may be the subject of a request by the
Australian court pursuant to section 426(4) of the Insolvency Act 1986, applying
Australian law under section 426(5).  In appropriate cases, article 23 of the Model
Law will allow avoidance claims to be made by foreign representatives under the
Insolvency Act 1986.  In the cases where the insolvent estate has its centre of main   *F*
interests in the European Union, judgments will be enforceable under article 25 of
Council Regulation (EC) No 1346/2000 (post, paras 131, 178).

    Decision of the Court of Appeal in *Rubin v Eurofinance SA* [2010] EWCA Civ
895; [2011] Ch 133; [2011] 2 WLR 121; [2011] Bus LR 84; [2011] 1 All ER (Comm)
287 reversed.

    Decision of the Court of Appeal in *In re New Cap Reinsurance Corpn Ltd* [2011]
EWCA Civ 971; [2012] Ch 538; [2012] 2 WLR 1095; [2012] Bus LR 772; [2012]   *G*
1 All ER 755; [2012] 1 All ER (Comm) 1207 affirmed on different grounds.

The following cases are referred to in the judgments:

*Adams v Cape Industries plc* [1990] Ch 433; [1990] 2 WLR 657; [1991] 1 All ER
    929, Scott J and CA
*African Farms Ltd, In re* [1906] TS 373
*Akai Pty Ltd v People's Insurance Co Ltd* [1998] 1 Lloyd's Rep 90   *H*
*Akande v Balfour Beatty Construction Ltd* [1998] IL Pr 110
*Al Sabah v Grupo Torras SA* [2005] UKPC 1; [2005] 2 AC 333; [2005] 2 WLR 904;
    [2005] 1 All ER 871, PC
*Amin Rasheed Shipping Corpn v Kuwait Insurance Co* [1984] AC 50; [1983] 3 WLR
    241; [1983] 2 All ER 884; [1983] 2 Lloyd's Rep 365, HL(E)

© 2013 The Incorporated Council of Law Reporting for England and Wales

**[2013] 1 AC**                                           Rubin v Eurofinance SA (SC(E))

A   *Bank of Credit and Commerce International SA, In re (No 10)* [1997] Ch 213; [1997]
        2 WLR 172; [1996] 4 All ER 796
    *Banque Indosuez SA v Ferromet Rescources Inc* [1993] BCLC 112
    *Barcelona Traction, Light and Power Co Ltd (Second Phase), Case concerning
        (Belgium v Spain)* [1970] ICJ Rep 3
    *Beals v Saldanha* 2003 SCC 72; [2003] 3 SCR 416
    *Bergerem v Marsh* (1921) 6 B & CR 195; 91 LJKB 80
B   *Berliner Industriebank AG v Jost* [1971] 2 QB 463; [1971] 3 WLR 61; [1971] 2 All
        ER 1513, CA
    *Byers v Yacht Bull Corpn* [2010] EWHC 133 (Ch); [2010] BCC 368
    *CCIC Finance Ltd v Guangdong International Trust & Investment Corpn* [2005]
        2 HKC 589
    *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors
        of Navigator Holdings plc* [2006] UKPC 26; [2007] 1 AC 508; [2006] 3 WLR
C       689; [2006] 3 All ER 829; [2006] 2 All ER (Comm) 695, PC
    *Cavell Insurance Co, In re* (2006) 269 DLR (4th) 679
    *Condor Insurance Ltd, In re* (2010) 601 F 3d 319
    *Credit Suisse Fides Trust SA v Cuoghi* [1998] QB 818; [1997] 3 WLR 871; [1997]
        3 All ER 673, CA
    *Desert Sun Loan Corpn v Hill* [1996] 2 All ER 847, CA
    *England v Smith* [2001] Ch 419; [2000] 2 WLR 1141, CA
D   *F-Tex SIA v Lietuvos-Anglijos UAB-Jadecloud-Vilma* (Case C-213/10) (unreported)
        19 April 2012, ECJ
    *Flightlease (Ireland) Ltd, In re* [2006] IEHC 193; [2012] IESC 12
    *Galbraith v Grimshaw* [1910] AC 508, HL(E)
    *German Graphics Graphicsche Maschinen GmbH v van der Schee* (Case C-292/08)
        [2009] ECR I-8421, ECJ
E   *Gibson (Gavin) & Co Ltd v Gibson* [1913] 3 KB 379
    *Godard v Gray* (1870) LR 6 QB 139
    *Gourdain v Nadler* (Case 133/78) [1979] ECR 733, ECJ
    *Gourmet Resources International Inc Estate v Paramount Capital Corpn* (1991)
        3 OR (3d) 286, [1993] IL Pr 583; 14 OR (3d) 319 (Note)
    *HIH Casualty and General Insurance Ltd, In re* [2008] UKHL 21; [2008] 1 WLR
        852; [2008] Bus LR 905; [2008] 3 All ER 869, HL(E)
F   *Hughes v Hannover Ruckversicherungs-Aktiengesellschaft* [1997] 1 BCLC 497, CA
    *Impex Services Worldwide Ltd, In re* [2004] BPIR 564
    *Industrial Maritime Carriers (Bahamas) Inc v Sinoca International Inc (The Eastern
        Trader)* [1996] 2 Lloyd's Rep 585
    *Indyka v Indyka* [1969] 1 AC 33; [1967] 3 WLR 510; [1967] 2 All ER 689, HL(E)
    *Maxwell Communication Corpn, In re* (1994) 170 BR 800
    *Metcalfe & Mansfield Alternative Investments, In re* (2010) 421 BR 685
G   *Modern Terminals (Berth 5) Ltd v States Steamship Co* [1979] HKLR 512
    *Morguard Investments Ltd v De Savoye* [1990] 3 SCR 1077
    *New Cap Reinsurance Corpn v Grant* [2009] NSWSC 662; 257 ALR 740
    *New Cap Reinsurance Corpn v Renaissance Reinsurance Ltd* [2002] NSWSC 856
    *Nouvion v Freeman* (1889) 15 App Cas 1, HL(E)
    *Oakley v Ultra Vehicle Design Ltd* [2005] EWHC 872 (Ch); [2006] BCC 57; [2006]
        BPIR 115
H   *Owens Bank Ltd v Bracco* [1992] 2 AC 443; [1992] 2 WLR 621; [1992] 2 All ER
        193, HL(E)
    *Paramount Airways Ltd, In re* [1993] Ch 223; [1992] 3 WLR 690; [1992] 3 All ER 1,
        CA
    *Pattni v Ali* [2006] UKPC 51; [2007] 2 AC 85; [2006] 2 WLR 102; [2007] 2 All
        ER (Comm) 427, PC

© 2013 The Incorporated Council of Law Reporting for England and Wales

*Picard v Harley International (Cayman) Ltd* (unreported) 10 November 2010,
   US Bankruptcy Ct, Southern District of New York

*Rein v Stein* (1892) 66 LT 469, DC

*Robertson, Ex p; In re Morton* (1875) LR 20 Eq 733

*Seagon v Deko Marty Belgium NV* (Case C-339/07) [2009] 1 WLR 2168; [2009]
   Bus LR 1151; [2009] ECR I-767, ECJ

*Siskina (Owners of cargo lately laden on board) v Distos Cia Naviera SA* [1979] AC
   210; [1977] 3 WLR 818; [1977] 3 All ER 803, HL(E)

*Société Eram Shipping Co Ltd v Cie Internationale de Navigation* [2003] UKHL 30;
   [2004] 1 AC 260; [2003] 3 WLR 21; [2003] 3 All ER 465, HL(E)

*Solomons v Ross* (1764) 1 H Bl 131n

*Spiliada Maritime Corpn v Cansulex Ltd* [1987] AC 460; [1986] 3 WLR 972; [1986]
   3 All ER 843, HL(E)

*Starlight International Inc v Bruce* [2002] EWHC 374 (Ch), [2002] IL Pr 617

*Stone & Rolls Ltd v Moore Stephens* [2009] UKHL 39; [2009] AC 1391; [2009]
   3 WLR 455; [2009] Bus LR 1356; [2009] 4 All ER 431; [2010] 1 All ER (Comm)
   125, HL(E)

*SwissAir Schweizerische Luftverkehr-Aktiengesellschaft, In re* [2009] EWHC 2099
   (Ch); [2010] BCC 667

*Television Trade Rentals Ltd, In re* [2002] EWHC 211 (Ch); [2002] BCC 807; [2002]
   BPIR 859

*Travers v Holley* [1953] P 246; [1953] 3 WLR 507; [1953] 2 All ER 794, CA

*Trepca Mines Ltd, In re* [1960] 1 WLR 1273; [1960] 3 All ER 304, CA

*Turners & Growers Exporters Ltd v The ship Cornelis Verolme* [1997] 2 NZLR 110

*Williams v Jones* (1845) 13 M & W 628

*Williams & Glyn's Bank plc v Astro Dinamico Cia Naviera SA* [1984] 1 WLR 438;
   [1984] 1 All ER 760; [1984] 1 Lloyd's Rep 453, HL(E)

The following additional cases were cited in argument:

*AWB (Geneva) SA v North American Steamships Ltd* [2007] EWCA Civ 739; [2007]
   2 Lloyd's Rep 315; [2007] 2 CLC 117, CA

*Atlas Shipping A/S, In re* (2009) 404 BR 726

*Barlow Clowes Gilt Managers Ltd, In re* [1992] Ch 208; [1992] 2 WLR 36; [1991]
   4 All ER 385

*Drumm (A Bankrupt), In re* (unreported) 13 December 2010, High Ct of Ireland

*Fairfield Sentry Ltd v Citco Bank Nederland NV* [2012] IEHC 81

*International Tin Council, In re* [1987] Ch 419; [1987] 2 WLR 1229; [1987] 1 All ER
   890

*Pantmaenog Timber Co Ltd, In re* [2003] UKHL 49; [2004] 1 AC 158; [2003] 3 WLR
   767; [2003] 4 All ER 18, HL(E)

*Stegmann, Ex p* [1902] TS 40

*UBS AG v Omni Holding AG* [2000] 1 WLR 916; [2000] 1 All ER (Comm) 42

**APPEALS** from the Court of Appeal

### Rubin v Eurofinance SA

On 31 July 2009 Nicholas Strauss QC sitting as a deputy judge of the
Chancery Division [2010] 1 All ER (Comm) 81 granted an application by
the applicants, David Rubin and Henry Lan, being the foreign
representatives of the Consumer Trust, for (1) recognition of proceedings
brought under Chapter 11 of the United States Bankruptcy Code, including
adversary proceedings, in relation to the trust and taking place in the United
States Bankruptcy Court for the Southern District of New York, as a foreign
proceeding under article 2(i) of the United Nations Commission on

© 2013 The Incorporated Council of Law Reporting for England and Wales

241
**[2013] 1 AC**                                          Rubin v Eurofinance SA (SC(E))

A   International Trade Law Model Law on Cross-Border Insolvency and
    (2) recognition of themselves as foreign representatives of the trust under
    article 2(j), but refused to grant an order that the United States Bankruptcy
    Court's order of 23 July 2008 be enforced as a judgment of the English
    courts in accordance with CPR Pts 70 and 73 against the defendants to the
    New York proceedings, Adrian Roman, Justin Roman, Nicholas Roman and
    Eurofinance SA.
B       On 30 July 2010, the Court of Appeal (Ward, Wilson LJJ and Henderson
    J) [2011] Ch 133 allowed the applicants' appeal against the dismissal of their
    claim for enforcement and dismissed the defendants' cross-appeal against
    the orders for recognition of the adversary proceedings as part of the
    Chapter 11 proceedings.
        On 27 October 2010 the Supreme Court (Lord Walker of Gestingthorpe,
C   Lord Mance and Lord Collins of Mapesbury JJSC) allowed an application
    by the defendants for permission to appeal, pursuant to which they
    appealed.   On 29 November 2011, 3 April 2012 and 24 April 2012
    respectively the Supreme Court gave leave to intervene in the appeal to
    (1) Irving H Picard, as trustee for the substantively consolidated "SIPA"
    liquidation (under the (United States) Securities Investor Protection Act
    1970) of the business of Bernard L Madoff Investment Securities LLC and
D   Bernard L Madoff, (2) Asphalia Fund Ltd, and (3) Vizcaya Partners Ltd.  The
    issues for the Supreme Court, as set out in the parties' statement of agreed
    facts and issues, were whether (1) the relevant proceedings should be
    recognised as a "foreign main proceeding" in accordance with the United
    Nations Commission on International Trade Law Model Law on Cross-
    Border Insolvency, scheduled to the Cross-Border Insolvency
E   Regulations 2006; (2) the applicants should be recognised as "foreign
    representatives" within the meaning of article 2(j) of the Model Law in
    relation to those proceedings; and (3) that part of the United States
    Bankruptcy Court's order of 23 July 2008 relating to the avoidance
    proceedings be enforced against the defendants as a judgment of the English
    courts in accordance with CPR Pts 70 and 73.
        The facts are stated in the judgment of Lord Collins of Mapesbury.
F

                        *In re New Cap Reinsurance Corpn Ltd*

        On 15 March 2011 Lewison J [2011] EWHC 677 (Ch) granted an
    application by the first applicant, New Cap Reinsurance Corpn Ltd (in
    liquidation), and the second applicant, John Raymond Gibbons (the first
    applicant's liquidator) for an order enforcing in England an order made on
G   11 September 2009 by the Supreme Court of New South Wales that the
    defendants, AE Grant and others, as members of Lloyd's Syndicate 991 for
    the 1997 and 1998 year accounts, pay the applicants certain commutation
    payments made by the first applicant to the defendants, and in respect of
    which order the court had issued a letter of request to the English High Court
    requesting assistance in enforcing that order.  The judge held that the order
    of the New South Wales court could not be registered and enforced under the
H   Foreign Judgments (Reciprocal Enforcement) Act 1933 (as applied to
    Australia by the Reciprocal Enforcement of Foreign Judgments (Australia)
    Order 1994), that the High Court therefore had power to assist the New
    South Wales court either at common law or under section 426 of the
    Insolvency Act 1986 and that, in the exercise of his discretion, he would

© 2013 The Incorporated Council of Law Reporting for England and Wales

assist the New South Wales court by ordering payment of the Australian *A*
judgment debt under section 426.

On 9 August 2011, the Court of Appeal (Mummery, Lloyd and
McFarlane LJJ) [2012] Ch 538 dismissed an appeal by the defendants
against the judge's order.

On 30 November 2011 the Supreme Court (Lord Walker of
Gestingthorpe, Lord Mance, Lord Dyson JJSC) allowed an application by
the defendants for leave to appeal, pursuant to which they appealed. On *B*
18 January 2012 the Supreme Court (Lord Walker of Gestingthorpe, Lord
Mance and Lord Dyson JJSC) allowed an application by the applicants to
cross-appeal, pusuant to which they cross-appealed.

The issues for the Supreme Court, as set out in the parties' statement of
agreed facts and issues, were (1) whether the court was being asked to apply
section 426(4) of the Insolvency Act 1986 to the enforcement of foreign *C*
judgments or (2) whether instead the court was being asked (i) to apply that
part of section 588FF(1) of the (Australian) Corporations Act 2001 which
empowered the court to make an order directing the defendants to pay
money to the claimants and/or (ii) to direct the defendants to pay money to
the claimants under the court's general jurisdiction and powers; (3) whether,
if the court was being asked to apply section 426(4) to the enforcement of *D*
foreign judgments, that section extended to the enforcement of foreign
judgments; (4) whether section 6 of the Foreign Judgments (Reciprocal
Enforcement) Act 1933 had application to judgments for the payment of
money in foreign insolvency proceedings; (5) (on the cross-appeal) whether
the Australian judgment was a judgment to which Part I of the 1933 Act (as
applied by the Reciprocal Enforcement of Foreign Judgments (Australia)
Order 1994) applied; (6) (on the cross-appeal) whether, if the Australian *E*
judgment was a judgment to which Part 1 of the 1933 Act applied, the
declarations in the Australian judgment (a) were binding under section 8 of
the 1933 Act and/or at common law, and/or (b) could form the subject of
judicial assistance; (7) whether *Rubin v Eurofinance SA* [2011] Ch 133 was
rightly decided; (8) whether, if *Rubin's* case was wrong, registration of the
Australian judgment under the 1933 Act would be set aside by the English *F*
court, and whether the courts below were right to assist the Australian court
under section 426(4) of the 1986 Act; (9) whether, if section 426(4) was
available but registration of the Australian judgment under the 1933 Act
would be set aside, it was appropriate to assist the Australian court under
section 426(4); (10) whether the defendants had submitted to the insolvency
jurisdiction of the Australian court and, if so, with what consequence; and
(11) whether the English court should in any event assist the Australian *G*
court at common law.

The facts are stated in the judgment of Lord Collins of Mapesbury.

*Robin Knowles QC* and *Blair Leahy* (instructed by *Edwards Wildman
Palmer UK LLP*) for the defendants in the second case.

Section 426(4) of the Insolvency Act 1986 does not provide a procedure *H*
by which a judgment of a court having jurisdiction in relation to insolvency
law in a "relevant country or territory" may be enforced in the United
Kingdom. It is not concerned with "assistance", not "enforcement" of
judgments. Enforcement is dealt with by section 426(1)(2), where it is
confined to orders made by courts in other parts of the United Kingdom.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   Although Lloyd LJ [2012] Ch 538, paras 58, 61, 72 refers to "assistance by way of enforcement", enforcement is not to be treated as a form of assistance. Since section 426(4) also applies to courts having jurisdiction in other parts of the United Kingdom, if "assistance" in section 426(4) meant enforcement, section 426(1)(2) would be redundant. Enforcement of judgments, a subject which goes to jurisdiction, has always been a matter for

B distinct provision and rules. In the context of insolvency law, section 426(4) is about assisting with information provision, evidence gathering, the conduct of an insolvency administration and the undertaking of proceedings.

  Where the judgment is one to which Part I of the Foreign Judgments (Reciprocal Enforcement) Act 1933 applies, the procedure provided for by that Act—registration, subject to an application to set aside the

C registration—must be used. Where a "relevant country or territory" under section 426 of the 1986 Act is also the country of a "recognised court" under the 1933 Act, section 6 of the 1933 Act requires proceedings for the recovery of a sum payable under a foreign judgment to be by way of registration. The availability of the 1933 Act procedure (albeit not used) precludes reliance on enforcement at common law in respect of the Australian judgment.

D   At common law the United Kingdom courts will not enforce a foreign money judgment obtained against a defendant not subject to the jurisdiction of the foreign court: see rule 43 of *Dicey, Morris & Collins, The Conflict of Laws*, 15th ed (2012). That position has not been changed by the 1933 and 1986 Acts. [Reference was made to section 426(4) of the 1986 Act and section 4(1)(a)(ii) of the 1933 Act.] The decision of the Court of Appeal in the *Rubin* case [2011] Ch 133 that a foreign insolvency judgment could be

E enforced in England and Wales at common law against a defendant not subject to the jurisdiction of the foreign court is a radical departure from the existing law rather than an incremental development recognisable to the common law and is wrong. Concepts of co-operation and universalism do not justify rewriting the private international law position. Universalism may be accorded to matters of distribution of the insolvent estate (see

F *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508, paras 16, 22, 25 and *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852, paras 6, 9) but not to the collection of assets for the estate. Co-operation enables assistance to be given but enforcement is available only when private international law allows. Private international law is best developed uniformly by comprehensive legislation and international agreement, not by

G uncertain development of the common law. In insolvency law certainty is of crucial importance: see *In re Flightlease (Ireland) Ltd* [2006] IEHC 193; [2012] IESC 12. To leave this area of law subject to the incidence of discretion (at common law, or under section 426) is unsatisfactory. Parties, the courts and other litigants need to know where they stand when litigation begins, not when it comes to an attempt to enforce a judgment.

H   *Marcus Staff* (instructed by *Brown Rudnick LLP*) for the defendants in the first case.

  Whether the judgment of a foreign court may be enforced at common law depends on its classification as a judgment in personam, a judgment in rem, or an order of the type recognised in *Cambridge Gas Transportation Corpn v*

© 2013 The Incorporated Council of Law Reporting for England and Wales

*Official Committee of Unsecured Creditors of Navigator Holdings plc*   A
[2007] 1 AC 508.

The order in the present case does not fall within the latter classification.
The purpose of the order in the *Cambridge Gas* case was simply to establish
a mechanism of collective execution against the property of the debtor by
creditors whose rights were admitted or established. The claims that gave
rise to the foreign judgment in the present case were in adversary          B
proceedings to determine or establish the existence of rights. As an in
personam judgment that judgment did not meet the requirements of rule 43
of *Dicey, Morris & Collins, The Conflict of Laws*, 15th ed (2012). The
defendants were not resident in New York when the proceedings were
instituted and they did not submit to the jurisdiction of the New York courts
by voluntarily appearing there. A decree pronounced in absentia by a
foreign court, to the jurisdiction of which the defendant has not in any way   C
submitted, is by international law a nullity.

The decision in the *Rubin* case [2011] Ch 133 drives a coach and horses
through well established principles of English law in relation to the
recognition and enforcement of foreign in personam judgments. The
decision means that defendants cannot predict where they might be sued.
Such a lack of predictability is contrary to the guiding principles of European
law and undermines the principle of commercial certainty which is a         D
constant and important objective of English commercial law. If the law on
recognition of foreign judgments is to be changed, that should be done only
in respect of countries or territories selected by the legislature so that the
consequences of the change can be mapped out in a way which is predictable
and therefore fair for all parties. The decision extends relief well beyond the
provisions of the UNCITRAL Model Law.                                        E

*Robin Dicker QC* and *Tom Smith* (instructed by *Chadbourne &
Parke LLP*) for the applicants in the first case.

The primary purpose of insolvency law is to provide a regime where the
liquidator acts in the public interest and not merely in the interests of the
creditors and contributories. The community itself has always been
recognised as having an interest in such proceedings: see *In re Pantmaenog*   F
*Timber Co Ltd* [2004] 1 AC 158, para 52; *In re Barlow Clowes Gilt*
*Managers Ltd* [1992] Ch 208, 221 and *Ex p Stegmann* [1902] TS 40, 47.

English law takes the view that fairness between creditors requires that
bankruptcy proceedings should have universal application. There should be
a single bankruptcy in which all creditors are entitled and required to prove.
No one should have an advantage because he happens to live in a jurisdiction
where more of the assets or fewer of the creditors are situated: see          G
*Cambridge Gas Transportation Corpn v Official Committee of Unsecured*
*Creditors of Navigator Holdings plc* [2007] 1 AC 508, para 16; *In re*
*HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852, para 30;
*Bergerem v Marsh* (1921) 6 B & CR 195 and *In re Impex Services*
*Worldwide Ltd* [2004] BPIR 564. Common law courts in England and
elsewhere refuse to allow execution to issue on a debtor's local assets when
the debtor is subject to insolvency proceedings in another jurisdiction in    H
which the creditors can participate: see *Solomons v Ross* (1764) 1 H Bl 131n;
*Modern Terminals (Berth 5) Ltd v States Steamship Co* [1979] HKLR 512
and *CCIC Finance Ltd v Guangdong International Trust & Investment*
*Corpn* [2005] 2 HKC 589.

© 2013 The Incorporated Council of Law Reporting for England and Wales

245

A    At an early stage of the development of the law of corporate insolvency the potential conflict between the locally effective winding up of an overseas company in England and an universal winding up in the country of the debtor's incorporation was resolved by a judge-made principle which treated the English proceedings as ancillary to the principal winding up: see *In re International Tin Council* [1987] Ch 419, 446–447. [Reference was also made to the UNCITRAL Legislative Guide on Insolvency Law (2004), paras 150–152 and *Fletcher, The Law of Insolvency*, 4th ed (2009), paras 26-001–26-003.]

B

   The guiding principles to be applied in relation to foreign insolvency proceedings are, first, that the court should seek so far as possible to give effect to the principle of there being a single insolvency proceeding in relation to an insolvent debtor which has universal effect and, secondly, that

C active assistance should be given to that insolvency proceeding. The application of these principles may require the court to recognise and enforce an order made in the course of the foreign insolvency proceedings. The rules governing the recognition of such orders are separate and distinct from the rules governing the recognition and enforcement of judgments in rem and judgments in personam. The *Cambridge Gas* case establishes that there is a third category of judgment independent of judgments in rem and

D judgments in personam, namely, orders which form part of insolvency proceedings. A different approach is taken for each. A similar distinction is recognised under EU law: see *Seagon v Deko Marty Belgium NV* (Case C-339/07) [2009] 1 WLR 2168; *F-Tex SIA v Lietuvos-Anglijos UAB-Jadecloud-Vilma* (Case C-213/10) (unreported) 19 April 2012 and *German Graphics Graphicsche Maschinen GmbH v van der Schee* (Case C-292/08)

E [2009] ECR I-8421.

   Avoidance provisions by which prior transactions can be adjusted and assets recovered to supplement the estate available for distribution to creditors are an integral part of the process of collective enforcement represented by an insolvency proceeding. They are central to the purpose of insolvency proceedings because they are a necessary means of constituting the estate of the debtor against which collective enforcement then takes

F place.

   The assistance sought in the present case is well within the limits of what the courts can properly provide: see *Byers v Yacht Bull Corpn* [2010] BCC 368; *Oakley v Ultra Vehicle Design Ltd* [2006] BCC 57 and *UBS AG v Omni Holding AG* [2000] 1 WLR 916.

   The relevant parts of the judgment can also be recognised and enforced

G under the Model Law as implemented by the Cross-Border Insolvency Regulations 2006 (SI 2006/1030). The approach under the Model Law, as enacted by the Regulations, is consistent with that at common law. The court is empowered to grant appropriate relief including any type of relief which is available under the law of the enacting state. In the present case the relief sought reflects relief which would have been available under the English statutory scheme if the trust had been in an insolvency procedure in

H England. It is therefore a type of relief which is available under English law. Furthermore, the relief sought is in the interests of creditors because it will facilitate the recovery of assets for distribution in accordance with the applicable statutory scheme to the creditors of the trust. [Reference was made to *In re Atlas Shipping A/S* (2009) 404 BR 726; *In re Metcalfe &*

© 2013 The Incorporated Council of Law Reporting for England and Wales

*Mansfield Alternative Investments* (2010) 421 BR 685 and *In re Condor*   A
*Insurance Ltd* (2010) 601 F 3d 319.]

Whether at common law or under the Model Law there is no reason why
the court should not exercise its jurisdiction to provide assistance to the
Chapter 11 proceeding by recognising and enforcing the relevant parts of the
judgment.

*Gabriel Moss QC* and *Barry Isaacs QC* (instructed by *Mayer Brown*   B
*International LLP*) for the applicants in the second case.

The judge was right to grant the relief sought in the letter of request under
section 426 of the Insolvency Act 1986 and/or the common law. The nature
of cross-border insolvency is such that a court in one jurisdiction should
render whatever assistance it properly can to a court in another in respect of
assets located or persons resident within the territory of the former: see
*Credit Suisse Fides Trust SA v Cuoghi* [1998] QB 818, 827.   C

Section 426 is not merely concerned with procedure but is part of the
substantive insolvency scheme. It imposes a duty on English courts to
provide assistance to insolvency courts in relevant countries and territories:
see section 426(4)(5)(10). The Australian proceedings were based on section
588FF(1) of the Australian Corporations Act 2001, which corresponds to
section 239 of the 1986 Act. The English court was asked to apply that part   D
of section 588FF(1) which empowers the court to make an order directing a
person to pay money to a company. In granting this form of assistance the
English court was applying Australian insolvency law; it was not applying
section 426 to the enforcement of a foreign judgment. The court was also
asked to make an order directing a person to pay money under its general
jurisdiction and powers. The English court has the power under section 426
to apply its own general jurisdiction and powers by way of assistance to the   E
Australian court: see *Hughes v Hannover Ruckversicherungs-
Aktiengesellschaft* [1997] 1 BCLC 497, 517. The *Report of the Review
Committee on Insolvency Law and Practice* (1982) (Cmnd 8558) refers to
the "enforcement" of foreign insolvency judgments: see para 1902.

Section 6 of the Foreign Judgments (Reciprocal Enforcement) Act 1933 has
no application to judgments for the payment of money in foreign insolvency   F
proceedings. The intention of the 1933 Act was to provide a simpler and
more convenient mode of enforcement than the common law provided. The
Act applies only to cases where foreign judgments used to be enforced by
bringing an action at common law based on the foreign judgment. The
position in relation to foreign insolvency judgments before the 1933 Act was
governed by section 122 of the Bankruptcy Act 1914. There is no indication
that the 1933 Act was intended to affect this pre-existing jurisdiction. The   G
Bankruptcy Act 1914 did not feature in the Greer Report, which led to the
passing of the 1933 Act: see the *Report of the Foreign Judgments (Reciprocal
Enforcement) Committee* (1932) (Cmd 4213).

The rules governing insolvency proceedings have diverged significantly
from the general provisions of civil law: see *Seagon v Deko Marty Belgium
NV* (Case C-339/07) [2009] 1 WLR 2168, 2175, 2176–2178, paras 27, 33,
35, 39. The decision of the Court of Appeal [2011] Ch 133 was correct. All   H
that was new in the decision was the application of the principles in
*Cambridge Gas Transportation Corpn v Official Committee of Unsecured
Creditors of Navigator Holdings plc* [2007] 1 AC 508 and *In re
HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852 to a foreign

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   insolvency judgment which required payment of a sum of money. As to *In re Flightlease (Ireland) Ltd* [2006] IEHC 193; [2012] IESC 12, which declined to follow the reasoning in *Cambridge Gas*, see *In re Drumm (A Bankrupt)* (unreported) 13 December 2010 (High Court of Ireland) and *Fairfield Sentry Ltd v Citco Bank Nederland NV* [2012] IEHC 81.

B   In any event the defendants in the present case submitted to the jurisdiction of the Australian court by participating in meetings of creditors of, and submitting proofs of debt in the administration, liquidation and scheme of arrangement relating to, the liquidated company. Having chosen to submit to that Australian insolvency proceeding, they should not be allowed to benefit from it without the burden of complying with the orders made in that proceeding.

C   *Pushpinder Saini QC*, *Adrian Briggs*, *Shaheed Fatima*, *Ian Fletcher* and *Stephen Robins* (instructed by *Taylor Wessing LLP*) for the first intervener in the first case, by written submissions.

As a matter of English private international law it is necessary to distinguish between (a) judgments in rem and in personam and (b) foreign orders which form integral parts of foreign insolvency proceedings: see *Cambridge Gas Transportation Corp v Official Committee of Unsecured*
D   *Creditors of Navigator Holdings plc* [2007] 1 AC 508, paras 13–15 and *Pattni v Ali* [2007] 2 AC 85, para 23. The effect of this distinction is that where the foreign court seeks assistance in England in respect of the implementation of a foreign insolvency order such assistance (which is discretionary) will not be subject to the English private international law rules regarding the enforcement of foreign judgments in rem or in personam as set out in rule 43 of *Dicey, Morris & Collins, The Conflict of Laws*, 15th
E   ed (2012). The distinction arises because the enforcement of judgments in rem and in personam is rooted in the doctrine of obligation whereby the successful party to the foreign proceedings is able, when seeking recognition and enforcement in England, to show that the other owes him an obligation by virtue of that other's being bound by the foreign judgment as res judicata. By contrast, cross-border judicial assistance and co-operation in insolvency
F   does not relate to the court's function of resolving disputes between private litigants but to the separate function of administering insolvent estates in a collective process which is performed with regard to the wider public interest: see *Ex p Stegmann* [1902] TS 40 and *In re Barlow Clowes Gilt Managers Ltd* [1992] Ch 208, 220–221. English common law takes the view that insolvency proceedings should have universal application. This requires that the estate which the insolvency court administers should be the
G   worldwide estate of the insolvent debtor. In order for the court which is seised of the administration of the worldwide estate to administer it effectively, it will frequently be necessary for courts in other jurisdictions to provide assistance to further that objective, acting under the principle of modified universalism: see *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852, para 30 and *Credit Suisse Fides Trust SA v Cuoghi* [1998] QB 818, 827. To be effective, insolvency proceedings must be able to
H   thwart the underhand conduct of debtors and connected creditors.

The proper approach, when determining whether a foreign order is an insolvency order, is to consider whether it is part of foreign insolvency proceedings. It is not correct to consider, in isolation from the context, whether the effect of the order is akin to a judgment in rem or in personam,

© 2013 The Incorporated Council of Law Reporting for England and Wales

nor therefore whether the order "establishes" rights rather than seeking to *A* enforce them. Judgments in rem and in personam will, by definition, "establish" rights. In broad terms a foreign order will be part of foreign insolvency proceedings if it is integral to the foreign insolvency law's scheme for the collection and distribution of the assets of the insolvent estate to creditors. In particular, avoidance orders (which are not unique to English or United States insolvency proceedings but are a feature of every developed system of insolvency law) form an integral part of the insolvency *B* proceedings: see *Oakley v Ultra Vehicle Design Ltd* [2006] BCC 57, para 42; *AWB (Geneva) SA v North American Steamships Ltd* [2007] 2 Lloyd's Rep 315, para 27 and the *HIH* case [2008] 1 WLR 852, para 19. Where the English court is considering whether to exercise its discretion to assist the foreign court, there is a presumption in favour of assistance, which should therefore be provided unless there is a good reason for it to be refused. It is *C* irrelevant that the person against whom the insolvency order takes effect was not present in the foreign country at the time of the issue of the writ.

*Michael Driscoll QC* and *Rosanna Foskett* (instructed by *Wilsons Solicitors LLP*) for the second intervener in the first case (and instructed by *Wedlake Bell LLP*) for the third intervener in the first case, by written submissions. *D*

The English court's inherent jurisdiction to assist a foreign representative (as that expression is used in article 2 of the UNCITRAL Model Law) should not extend to enforcement of any money judgment against a third party defendant obtained by a foreign representative in a foreign court on the application of principles of a foreign law where the foreign court does not have competent jurisdiction over the defendant according to English private international law, and the inherent jurisdiction should not extend, therefore, *E* to the enforcement of money judgments against defendants. The assistance to be given by the English court should be limited to recognition of the foreign representative and of the rights and powers over the debtor's property which his appointment gives him. It should extend to authorising the foreign representative to bring proceedings in England equivalent to those which an English representative could bring based upon principles of *F* English law and not foreign law.

Whilst many national insolvency laws include provisions to avoid certain preferences and fraudulent transfers made by the debtor before the commencement of the insolvency proceedings, those laws operate in materially different ways and have materially different consequences. In particular, an United States Securities Investor Protection Act ("SIPA") liquidation enables an United States SIPA trustee to bring avoidance claims *G* which an English liquidator or trustee in bankruptcy cannot bring. Moreover, the consequences of a successful avoidance claim in the United States by a SIPA trustee defeats rather than gives effect to the fundamental principle of equitable pro rata distribution among all unsecured creditors of the debtor. The English court should not develop new law by assuming to itself a jurisdiction which Parliament has not conferred on it to enforce a money judgment obtained by a foreign representative against a third party in *H* insolvency proceedings before a foreign court where the third party is not, as a matter of English law, subject to the jurisdiction of the foreign court.

The default judgments were judgments in personam given by a foreign court which did not have competent jurisdiction over the defendants so as to

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   make the default judgments enforceable as of right in an English court: see
    *Adams v Cape Industries plc* [1990] Ch 433, 513, 528, 530–544, 549–550,
    557–572. They are therefore a nullity as far as the English court is
    concerned. Until the Court of Appeal decision in the *Rubin* case [2011]
    Ch 133 no English court has gone so far as to enforce as a matter of
    discretion money judgments obtained in such circumstances. The legislature
B   and the executive through its treaty-making powers are in a better position
    than the judiciary to develop and extend the laws of co-operation between
    English courts and others in the field of cross-border insolvency. A principle
    of universalism can only properly come about through international treaty.

       *Knowles QC* replied.

       *Staff* also replied.

C
       The court took time for consideration.

       24 October 2012. The following judgments were handed down.

       **LORD COLLINS OF MAPESBURY** (with whom **LORD WALKER OF
    GESTINGTHORPE** and **LORD SUMPTION JJSC** agreed)

D
    *I Introduction*

       *The appeals*

       **1** There are two appeals before the court: *Rubin v Eurofinance SA*
    ("*Rubin*") and *New Cap Reinsurance Corpn Ltd v Grant* ("*New Cap*").
    These appeals raise an important and novel issue in international insolvency
E   law. The issue is whether, and if so, in what circumstances, an order or
    judgment of a foreign court (on these appeals the United States Bankruptcy
    Court for the Southern District of New York, and the New South Wales
    Supreme Court) in proceedings to adjust or set aside prior transactions,
    e g preferences or transactions at an undervalue ("avoidance proceedings"),
    will be recognised and enforced in England. The appeals also raise the
F   question whether enforcement may be effected through the international
    assistance provisions of the UNCITRAL Model Law (implemented by the
    Cross-Border Insolvency Regulations 2006 ("CBIR")), which applies
    generally, or the assistance provisions of section 426 of the Insolvency Act
    1986, which applies to a limited number of countries, including Australia.

       **2** In *Rubin* a judgment of the US Federal Bankruptcy Court for the
    Southern District of New York ("the US Bankruptcy Court") in default of
G   appearance for about US$10m under State and Federal law in respect of
    fraudulent conveyances and transfers was enforced in England at common
    law. In *New Cap* (in which the Court of Appeal was bound by the prior
    decision in *Rubin*) a default judgment of the New South Wales Supreme
    Court, Equity Division, for about US$8m in respect of unfair preferences
    under Australian law was enforced under the Foreign Judgments (Reciprocal
    Enforcement) Act 1933, and, alternatively, pursuant to powers under
H   section 426 of the Insolvency Act 1986.

       **3** In each of the appeals it was accepted or found that the party against
    whom they were given was neither present (nor, for the purposes of the
    1933 Act, resident) in the foreign country nor submitted to its jurisdiction
    (which are the relevant conditions for enforceability at common law and

© 2013 The Incorporated Council of Law Reporting for England and Wales

under the 1933 Act), but that those conditions did not apply to judgments or orders in foreign insolvency proceedings.

4 In addition to the arguments on these two appeals, the court has had the great benefit of written submissions on behalf of parties to proceedings pending in Gibraltar. Those proceedings are to enforce default judgments entered by the United States Bankruptcy Court for some $247m in respect of alleged preferential payments to companies in the British Virgin Islands and Cayman Islands arising out of the notorious Ponzi scheme operated by Mr Bernard Madoff.

5 It has been necessary to emphasise that the judgments in all three matters were in default of appearance, because if the judgment debtors had appeared and defended the proceedings in the foreign courts, the issues on these appeals would not have arisen. The reason is that the judgments would have been enforceable on the basis of the defendants' submission to the jurisdiction of the foreign court. Enforcement would have been at common law, or, in the *New Cap* case either under the common law, or under the 1933 Act which substantially reproduces the common law principles—there is a subsidiary issue on this appeal as to whether the 1933 Act applies to judgments in insolvency proceedings, dealt with in section IX below.

6 Under the common law a court of a foreign country has jurisdiction to give a judgment in personam where (among other cases) the judgment debtor was present in the foreign country when the proceedings were instituted, or submitted to the jurisdiction of the foreign court by voluntarily appearing in the proceedings. In the case of the 1933 Act the foreign court is deemed to have jurisdiction where the judgment debtor submitted to the jurisdiction by voluntarily appearing in the proceedings otherwise than for the purpose (inter alia) of contesting the jurisdiction; or where the judgment debtor was resident at the time when the proceedings were instituted, or being a body corporate had an office or place of business there: section 4(2)(a)(i)(iv).

*The Dicey rule*

7 The general principle has been referred to on these appeals, by reference to the common law rule set out in *Dicey, Morris & Collins, The Conflict of Laws*, 14th ed (2006), as "*Dicey's rule 36*." This was only by way of shorthand, because the rules in the 1933 Act are not quite identical, and in any event has been purely for convenience, because the rule has no standing beyond the case law at common law which it seeks to re-state. What was rule 36 now appears (incorporating some changes which are not material on this appeal) as rule 43 in the new 15th edition, and I shall refer to it as "the *Dicey* rule". So far as relevant, rule 43 (*Dicey, Morris & Collins, The Conflict of Laws*, 15th ed (2012), vol 1, para 14R-054) states:

"a court of a foreign country outside the United Kingdom has jurisdiction to give a judgment in personam capable of enforcement or recognition as against the person against whom it was given in the following cases:

"*First Case*—If the person against whom the judgment was given was, at the time the proceedings were instituted, present in the foreign country.

"*Second Case*—If the person against whom the judgment was given was claimant, or counterclaimed, in the proceedings in the foreign court.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    "*Third Case*—If the person against whom the judgment was given
submitted to the jurisdiction of that court by voluntarily appearing in the
proceedings.

"*Fourth Case*—If the person against whom the judgment was given
had before the commencement of the proceedings agreed, in respect of the
subject matter of the proceedings, to submit to the jurisdiction of that
court or of the courts of that country."

B

8    The first edition of *Dicey* in 1896 stated (rule 80) that the foreign
court would have jurisdiction if "the defendant was resident [or present?]" in
the foreign country "so as to have the benefit, and be under the protection, of
the laws thereof". By the 6th edition in 1949 the formula was repeated by
Professor Wortley (rule 68) but without the doubt about presence as a basis
C    of jurisdiction. In the 8th edition in 1967 Dr (later Professor) Clive Parry
removed the phrase (then rule 189) about the benefit and protection of the
foreign country's laws. The rule, subsequently edited by Dr Morris and then
by Professor Kahn-Freund, remained in that form until the decision in
*Adams v Cape Industries plc* [1990] Ch 433 (CA), which established that
presence in the foreign jurisdiction, as opposed to residence, was a sufficient
basis for the recognition of foreign judgments. Then, edited by myself and
D    later by Professor Briggs, the rule took substantially its present form in the
12th edition in 1993.

9    The theoretical basis for the enforcement of foreign judgments at
common law is that they are enforced on the basis of a principle that where a
court of competent jurisdiction has adjudicated a certain sum to be due from
one person to another, a legal obligation arises to pay that sum, on which an
E    action of debt to enforce the judgment may be maintained: *Williams v Jones*
(1845) 13 M & W 628, 633, per Parke B; *Godard v Gray* (1870) LR 6
QB 139, 147, per Blackburn J; *Adams v Cape Industries plc* [1990] Ch 433,
513 and *Owens Bank Ltd v Bracco* [1992] 2 AC 443, 484, per Lord Bridge
of Harwich. As Blackburn J said in *Godard v Gray*, this was based on the
mode of pleading an action on a foreign judgment in debt, and not merely as
evidence of the obligation to pay the underlying liability: LR 6 QB 139, 150.
F    But this is a purely theoretical and historical basis for the enforcement of
foreign judgments at common law. It does not apply to enforcement under
statute, and makes no practical difference to the analysis, nor, in my
judgment, to the issues on these appeals.

10    Consequently, if the judgments in issue on the appeals are regarded
as judgments in personam within the *Dicey* rule, then they will only be
G    enforced in England at common law if the judgment debtors were present
(or, if the 1933 Act applies, resident) in the foreign country when the
proceedings were commenced, or if they submitted to its jurisdiction. It is
common ground that the judgment debtors were not present or resident,
respectively, in the United States or in Australia, although there is an issue as
to whether the New Cap defendants submitted to the jurisdiction of the
Australian court, which is dealt with in section VIII below.

H

*Insolvency proceedings and the international dimension*

11    There are some general remarks to be made. First, from as early as
the mid-18th century the English courts have recognised the effect of foreign
personal bankruptcies declared under the law of the domicile: *Solomons v*

© 2013 The Incorporated Council of Law Reporting for England and Wales

*Ross* (1764) 1 H Bl 131n, where Dutch merchants were declared bankrupt in *A* Amsterdam, and the Dutch curator was held entitled to recover an English debt in priority to an English creditor of the merchants who had attached the debt after the bankruptcy: see *Nadelmann, Conflict of Laws: International and Interstate* (1972), p 273 and *Blom-Cooper, Bankruptcy in Private International Law* (1954), pp 107–108.

12   In *Galbraith v Grimshaw* [1910] AC 508 Lord Dunedin said that *B* there should be only one universal process of the distribution of a bankrupt's property and that, where such a process was pending elsewhere, the English courts should not allow steps to be taken in its jurisdiction which would interfere with that process:

"Now so far as the general principle is concerned it is quite consistent with the comity of nations that it should be a rule of international law *C* that if the court finds that there is already pending a process of universal distribution of a bankrupt's effects it should not allow steps to be taken in its territory which would interfere with that process of universal distribution . . .": p 513.

13   Second, in the case of corporations the English courts have exercised a winding up jurisdiction which is wider than that which at common law *D* they have accorded to foreign courts. The court exercises jurisdiction to wind up a foreign company if there is a sufficient connection between the company and England, there are persons who would benefit from the making of a winding up order, and there are persons interested in the distribution of assets of the company who are persons over whom the court can exercise jurisdiction: see *Dicey*, 15th ed, para 30R-036. But as regards *E* foreign liquidations, the general rule is that the English court recognises at common law only the authority of a liquidator appointed under the law of the place of incorporation: *Dicey*, 15th ed, para 30R-100. That is in contrast to the modern approach in the primary international and regional instruments, the EC Insolvency Regulation on Insolvency Proceedings (Council Regulation (EC) No 1346/2000) ("the EC Insolvency Regulation") and the Model Law, which is that the jurisdiction with international *F* competence is that of the country of the centre of main interests of the debtor (an expression not without its own difficulties). It is ultimately derived from the civil law concept of a trader's domicile, and was adopted in substance in the draft EEC Convention of 1980 as a definition of the debtor's centre of administration: see Report by M Lemontey on the draft EEC Bankruptcy Convention, Bulletin of the European Communities, Supp 2/82, p 58; American Law Institute, *Transnational Insolvency: Global Principles for* *G* *Co-operation in International Insolvency Cases* (2012), Principle 13, pp 83 et seq.

14   Third, it is not only in recent times that there have been large insolvency proceedings with significant cross-border implications. Even before then there were the Russian bank cases in the 1930s (arising out of the nationalisation and dissolution of the banks by the Soviet Government) and *H* the *Barcelona Traction* case in the 1940s and 1950s (see *Case concerning Barcelona Traction, Light and Power Co Ltd (Second Phase) (Belgium v Spain)* [1970] ICJ Rep 3), but there is no doubt that today international co-operation in cross-border insolvencies has become a pressing need. It is only necessary to recall the bankruptcies or liquidations of Bank of Credit

© 2013 The Incorporated Council of Law Reporting for England and Wales

A  and Commerce International, Maxwell Communications, or Lehman
Brothers, each with international businesses, assets in many countries, and
potentially competing creditors in different countries with different laws.
There is not only a need to balance all these interests but also to provide
swift and effective remedies to combat the use of cross-border transfers of
assets to evade and to defraud creditors.

B  15  Fourth, there is no international unanimity or significant
harmonisation on the details of insolvency law, because to a large extent
insolvency law reflects national public policy, for example as regards
priorities or as regards the conditions for the application of avoidance
provisions: "the process of collection of assets will include, for example, the
use of powers to set aside voidable dispositions, which may differ very
considerably from those in the English statutory scheme": *In re*
C  *HIH Casualty and General Insurance Ltd* ("*HIH*") [2008] 1 WLR 852,
para 19, per Lord Hoffmann.

16  Fifth, there has been a trend, but only a trend, to what is called
universalism, that is, the "administration of multinational insolvencies by a
leading court applying a single bankruptcy law": Jay Westbrook, "A Global
Solution to Multinational Default" (2000) 98 Mich L Rev 2276, 2277.
What has emerged is what is called by specialists "modified universalism."

D  17  The meaning of the expression "universalism" has undergone a
change since the time it was first used in the 19th century, and it later came to
be contrasted with the "doctrine of unity." In 1834 Story referred to the
theory that assignments under bankrupt or insolvent laws were, and ought
to be, of universal operation to transfer movable property, in whatever
country it might be situate, and concluded that there was great wisdom in
E  adopting the rule that an assignment in bankruptcy should operate as a
complete and valid transfer of all his movable property abroad, as well as at
home, and for a country to prefer an attaching domestic creditor to a foreign
assignee or to foreign creditors could

"hardly be deemed consistent with the general comity of nations . . .
the true rule is, to follow out the lead of the general principle that makes
F  the law of the owner's domicil conclusive upon the disposition of his
personal property,"

citing *Solomons v Ross* 1 H Bl 131n as supporting that doctrine: *Story,
Commentaries on the Conflict of Laws*, 1st ed (1834), pp 340–341,
para 406.

18  Professor Cheshire, in his first edition (*Cheshire, Private
G  International Law* (1935), pp 375–376), said that although English law
"neglects the doctrine of unity it recognizes the doctrine of universality".
What he meant was that English law was committed to separate
independent bankruptcies in countries where the assets were situate, rather
than one bankruptcy in the country of the domicile (the doctrine of unity),
but also accepted the title of the foreign trustee to English movables
provided that no bankruptcy proceedings had begun within England
H  (universality). He cited *Solomons v Ross* for this proposition:

"The English courts . . . have consistently applied the doctrine of
universality, according to which they hold that all *movable* property, no
matter where it may be situated at the time of the assignment by the
foreign law, passes to the trustee."

© 2013 The Incorporated Council of Law Reporting for England and Wales

19 In *HIH* [2008] 1 WLR 852, para 30, Lord Hoffmann said:                   A

"The primary rule of private international law which seems to me
applicable to this case is the principle of (modified) universalism, which
has been the golden thread running through English cross-border
insolvency law since the 18th century. That principle requires that
English courts should, so far as is consistent with justice and UK public
policy, co-operate with the courts in the country of the principal                B
liquidation to ensure that all the company's assets are distributed to its
creditors under a single system of distribution."

And in *Cambridge Gas Transportation Corporation v Official Committee of
Unsecured Creditors of Navigator Holdings plc* ("*Cambridge Gas*") [2007]
1 AC 508, para 16 he said, speaking for the Privy Council:

"The English common law has traditionally taken the view that            C
fairness between creditors requires that, ideally, bankruptcy proceedings
should have universal application. There should be a single bankruptcy
in which all creditors are entitled and required to prove. No one should
have an advantage because he happens to live in a jurisdiction where
more of the assets or fewer of the creditors are situated."

20 The US Bankruptcy Court accepted in *In re Maxwell*                        D
*Communication Corpn* (1994) 170 BR 800 (Bankr SDNY) that the United
States courts have adopted modified universalism as the approach to
international insolvency:

"the United States in ancillary bankruptcy cases has embraced an
approach to international insolvency which is a modified form of
universalism accepting the central premise of universalism, that is, that        E
assets should be collected and distributed on a worldwide basis, but
reserving to local courts discretion to evaluate the fairness of home
country procedures and to protect the interests of local creditors."

*II International co-operation and assistance*

21 Jurisdiction in international bankruptcy has been the subject of           F
multilateral international instruments at least since the Montevideo Treaty
on International Commercial Law of 1889, Title X, although bilateral
treaties go back much further, and the subject of international recognition
and co-operation in insolvency was the subject of early discussion by the
International Law Association (1879), the Institut de droit international
(1888–1912) and the Hague Conference on Private International Law            G
(1904): see Nadelmann, pp 299 et seq.

22 In more modern times, the European Convention on Certain
International Aspects of Bankruptcy (the Istanbul Convention) was
concluded under the auspices of the Council of Europe in 1990, but never
came into force. The European Community/Union initiative took 40 years
to come to fruition. In 1960 the European Community embarked on a
project for a Bankruptcy Convention, which resulted in a draft Convention        H
in 1980, to which there was significant opposition. But the project was
renewed in 1989, and this led to the tabling of a draft Convention in 1995,
which provided that it would only come into force when signed by all 15 of
the then member states. The United Kingdom, however, alone of the states,

© 2013 The Incorporated Council of Law Reporting for England and Wales

255

A   did not sign the Convention (for political reasons), and it never came into force. In 1999 the project was re-launched as a Council Regulation, which resulted in the EC Insolvency Regulation in 2000 (Council Regulation No 1346/2000).

23   The United Nations Commission on International Trade Law ("UNCITRAL") adopted a Model Law on cross-border insolvency in 1997.
B   The Model Law was adopted following initiatives in the 1980s by the International Bar Association and later by INSOL International (the International Association of Restructuring, Insolvency and Bankruptcy Professionals). In 1993 UNCITRAL adopted a resolution to investigate the feasibility of harmonised rules of cross-border insolvencies. In 1994 an expert committee was assembled consisting of members of INSOL and representatives of the UNCITRAL Secretariat, and following a series of
C   reports and drafts, UNCITRAL adopted the Model Law in May 1997. The Model Law provides for a wide range of assistance to foreign courts and office-holders. It has been implemented by 19 countries and territories, including the United States and Great Britain (although by some states only on the basis of reciprocity). It was not enacted into law in Great Britain until 2006, by the CBIR.

D   24   Apart from the EC Insolvency Regulation, none of these instruments deals expressly with the enforcement of judgments in insolvency proceedings. The question whether the Model Law does so by implication will be considered below in section IV.

25   Consequently, there are four main methods under English law for assisting insolvency proceedings in other jurisdictions, two of which are part of regionally or internationally agreed schemes. First, section 426 of the
E   Insolvency Act 1986 provides a statutory power to assist corporate as well as personal insolvency proceedings in countries specified in the Act or designated for that purpose by the Secretary of State. All the countries to which it currently applies are common law countries or countries sharing a common legal tradition with England. They include Australia: the Co-operation of Insolvency Courts (Designation of Relevant Countries and
F   Territories) Order 1986 (SI 1986/2123).

26   Second, the EC Insolvency Regulation applies to insolvency proceedings in respect of debtors with their centres of main interests (COMI) within the European Union (excluding Denmark). The EC Insolvency Regulation has no role in the present appeal because none of the debtors has its centre of main interests in the European Union.

G   27   Third, the CBIR came into force on 4 April 2006, implementing the Model Law. The CBIR supplement the common law, but do not supersede it. Article 7 of the Model Law provides: "Nothing in this Law limits the power of a court or British insolvency office-holder to provide additional assistance to a foreign representative under other laws of Great Britain."

28   Article 23 of the Model Law allows avoidance claims to be made by foreign representatives under the Insolvency Act 1986, and the CBIR apply
H   to preferences after they came into force on 4 April 2006. The UNCITRAL Guide to Enactment (to which resort may be had for the purposes of interpretation of the CBIR) also emphasises that the Model Law enables enacting states to make available to foreign insolvency proceedings the type of relief which would be available in the case of a domestic

© 2013 The Incorporated Council of Law Reporting for England and Wales

insolvency (*UNCITRAL Legislative Guide on Insolvency Law* (2005),   A
Annex III, Ch IV, p 311, para 20(b)):

"The Model Law presents to enacting states the possibility of aligning
the relief resulting from recognition of a foreign proceeding with the relief
available in a comparable proceeding in the national law . . ."

**29** Fourth, at common law the court has power to recognise and grant   B
assistance to foreign insolvency proceedings. The common law principle is
that assistance may be given to foreign office-holders in insolvencies with an
international element. The underlying principle has been stated in different
ways: "recognition . . . carries with it the active assistance of the court": *In
re African Farms Ltd* [1906] TS 373, 377; "This court . . . will do its utmost
to co-operate with the US Bankruptcy Court and avoid any action which
might disturb the orderly administration of [the company] in Texas under ch   C
11": *Banque Indosuez SA v Ferromet Resources Inc* [1993] BCLC 112, 117.

**30** In *Credit Suisse Fides Trust v Cuoghi* [1998] QB 818, 827, Millett LJ
said:

"In other areas of law, such as cross-border insolvency, commercial
necessity has encouraged national courts to provide assistance to each
other without waiting for such co-operation to be sanctioned by   D
international convention . . . It is becoming widely accepted that comity
between the courts of different countries requires mutual respect for the
territorial integrity of each other's jurisdiction, but that this should not
inhibit a court in one jurisdiction from rendering whatever assistance it
properly can to a court in another in respect of assets located or persons
resident within the territory of the former."

E

**31** The common law assistance cases have been concerned with such
matters as the vesting of English assets in a foreign office-holder, or the
staying of local proceedings, or orders for examination in support of the
foreign proceedings, or orders for the remittal of assets to a foreign
liquidation, and have involved cases in which the foreign court was a court
of competent jurisdiction in the sense that the bankrupt was domiciled in the
foreign country or, if a company, was incorporated there.   F

**32** An early case of recognition was *Solomons v Ross* 1 H Bl 131n,
where, as I have said, the bankruptcy was in Holland, and the bankrupts
were Dutch merchants declared bankrupt in Amsterdam, and the Dutch
curator was held entitled to recover an English debt: see also *Bergerem v
Marsh* (1921) 6 B & CR 195 (English member of Belgian firm submitted to
Belgian bankruptcy proceedings: movable property in England vested in   G
Belgian trustee).

**33** One group of cases involved local proceedings which were stayed or
orders which were discharged because of foreign insolvency proceedings.
Thus in *Banque Indosuez SA v Ferromet Resources Inc* [1993] BCLC 112 an
English injunction against a Texas corporation in Chapter 11 proceedings
was discharged; cf *In re African Farms Ltd* [1906] TS 373 (execution in
Transvaal by creditor in proceedings against English company in liquidation   H
in England stayed by Transvaal court), applied in *Turners & Growers
Exporters Ltd v The Ship Cornelis Verolme* [1997] 2 NZLR 110 (Belgian
shipowner in Belgian bankruptcy: ship released from arrest); *Modern
Terminals (Berth 5) Ltd v States Steamship Co* [1979] HKLR 512 (stay in

© 2013 The Incorporated Council of Law Reporting for England and Wales

257

A Hong Kong of execution against Nevada corporation in Chapter 11 proceedings in United States federal court in California), followed in *CCIC Finance Ltd v Guangdong International Trust & Investment Corpn* [2005] 2 HKC 589 (stay of Hong Kong proceedings against Chinese state-owned enterprise in Mainland insolvency). Cases of judicial assistance in the traditional sense include *In re Impex Services Worldwide Ltd* [2004] BPIR 564, where a Manx order for examination and production of

B documents was made in aid of the provisional liquidation in England of an English company.

34 Cases involving remittal of assets from England to a foreign office-holder include *In re Bank of Credit and Commerce International SA (No 10)* [1997] Ch 213 (Luxembourg liquidation of Luxembourg company); and *HIH* [2008] 1 WLR 852 (the view of Lord Hoffmann and Lord Walker of

C Gestingthorpe) (Australian liquidation of Australian insurance company); and *In re SwissAir Schweizerische Luftverkehr-Aktiengesellschaft* [2010] BCC 667 (Swiss liquidation of Swiss company).

### III The Cambridge Gas and HIH decisions

35 The opinion of Lord Hoffmann, speaking for the Privy Council, in

D *Cambridge Gas* [2007] 1 AC 508 and his speech in the House of Lords in *HIH* [2008] 1 WLR 852 have played such a major role in the decisions of the Court of Appeal and in the arguments of the parties on these appeals that it is appropriate to put them in context at this point.

#### Cambridge Gas

36 The broad facts of *Cambridge Gas* [2007] 1 AC 508 were these. In

E 1997 a shipping business was initiated by a Swiss businessman, Mr Giovanni Mahler. The investors borrowed $300m on the New York bond market and the business bought five gas transport vessels. The venture was a failure, and ended with a Chapter 11 proceeding in the US Bankruptcy Court in New York. The question for the Privy Council on appeal from the Isle of Man was whether an order of the New York court was entitled to implementation

F in the Isle of Man.

37 The corporate structure of the business was that the investors owned, directly or indirectly, a Bahamian company called Vela Energy Holdings Ltd ("Vela"). Vela owned (through an intermediate Bahamian holding company) Cambridge Gas, a Cayman Islands company.

38 Cambridge Gas owned directly or indirectly about 70% of the shares of Navigator Holdings plc ("Navigator"), an Isle of Man company.

G Navigator owned all the shares of an Isle of Man company which in turn owned companies which each owned one ship.

39 In 2003 Navigator petitioned the US Bankruptcy Court for relief under Chapter 11 of the US Bankruptcy Code, which allows insolvent companies, under supervision of the court and under cover of a moratorium, to negotiate a plan of reorganisation with their creditors. The petition was

H initiated by the investor interests, who proposed a plan to sell the ships nominally by auction but in fact to the previous investors, but the bondholders did not accept this and proposed their own plan under which the assets of Navigator would be vested in the creditors and the equity interests of the previous investors would be extinguished. The judge rejected the investors' plan and approved the creditors' plan.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A
40   The mechanism which the plan used to vest the assets in the creditors
was to vest the shares in Navigator in their representatives, i e, the creditors'
committee.  That would enable them to control the shipping companies and
implement the plan.  The plan provided that upon entry of the confirmation
order title to all the common stock of Navigator would vest in the creditors'
committee to enable it to implement the plan.  The order of the New York
court confirming the plan recorded the intention of the court to send a letter
of request to the Manx court asking for assistance in giving effect to "the
plan and confirmation order" and such a letter was sent.  The committee of
creditors then petitioned the Manx court for an order vesting the shares in
their representatives.

B

41   At this point it is necessary to emphasise two features of the case.
The first feature is that Navigator was an Isle of Man company and 70% of
its common stock was owned directly or indirectly by Cambridge Gas.
Under the normal principles of the conflict of laws the shares would have
been situate in the Isle of Man: *Dicey*, 15th ed, para 22-045.  That is why
Lord Hoffmann said, at para 6, that the New York court was aware that the
order vesting title to the common stock of Navigator in the creditors'
committee could not automatically have effect under the law of the Isle of
Man; and also why he accepted (paras 12–13) that if the judgment were a
judgment in rem it could not affect title to shares in the Isle of Man.

C

D

42   The second feature which it is necessary to emphasise is that
Cambridge Gas was a Cayman Islands company which (as held by the Manx
courts) had not submitted to the jurisdiction of the US Bankruptcy Court.
Lord Hoffmann said, at para 8, that the position that Cambridge Gas had
not submitted to the jurisdiction of the US Bankruptcy Court bore little
relation to economic reality since the New York proceedings had been
conducted on the basis that the contest was between rival plans put forward
by the shareholders and the creditors; Vela, the parent company of
Cambridge Gas, participated in the Chapter 11 proceedings; and they had
been instituted by Navigator.  Consequently the claim by Cambridge Gas
that it had not submitted was highly technical, but there was no appeal from
the decisions of the Manx courts that it had not submitted.  But Lord
Hoffmann also accepted that if the order of the US Bankruptcy Court were to
be regarded as a judgment in personam it would not be entitled to
recognition or enforcement in the Isle of Man because "the New York court
had no personal jurisdiction over Cambridge [Gas]": para 10.

E

F

43   Nevertheless the Privy Council held that the plan could be carried
into effect in the Isle of Man.  The reasoning was as follows: first, if the
judgment had to be classified as in personam or in rem the appeal would
have to be allowed, but bankruptcy proceedings did not fall into either
category:

G

"13. . . .  Judgments in rem and in personam are judicial
determinations of the existence of rights: in the one case, rights over
property and in the other, rights against a person.  When a judgment in
rem or in personam is recognised by a foreign court, it is accepted as
establishing the right which it purports to have determined, without
further inquiry into the grounds upon which it did so.  The judgment itself
is treated as the source of the right.

H

"14. The purpose of bankruptcy proceedings, on the other hand, is not
to determine or establish the existence of rights, but to provide a

© 2013 The Incorporated Council of Law Reporting for England and Wales

A      mechanism of collective execution against the property of the debtor by
       creditors whose rights are admitted or established . . .

           "15. . . . bankruptcy, whether personal or corporate, is a collective
       proceeding to enforce rights and not to establish them. Of course, as
       Brightman LJ pointed out in *In re Lines Bros Ltd* [1983] Ch 1, 20, it may
       incidentally be necessary in the course of bankruptcy proceedings to
B      establish rights which are challenged: proofs of debt may be rejected; or
       there may be a dispute over whether or not a particular item of property
       belonged to the debtor and is available for distribution. There are
       procedures by which these questions may be tried summarily within the
       bankruptcy proceedings or directed to be determined by ordinary action.
       But these again are incidental procedural matters and not central to the
       purpose of the proceedings."

C
       44   Second, the principle of universality underlay the common law
       principles of judicial assistance in international insolvency, and those
       principles were sufficient to confer jurisdiction on the Manx court to assist,
       by doing whatever it could have done in the case of a domestic insolvency:
       paras 21–22. Third, exactly the same result could have been achieved by a
       scheme under the Isle of Man Companies Act 1931. Fourth, it was no
D      objection to implementation of the plan in the Isle of Man that the shares in
       Navigator belonged to a person (Cambridge Gas) which was not a party to
       the bankruptcy proceedings for these reasons, at para 26:

           "a share is the measure of the shareholder's interest in the company: a
       bundle of rights against the company and the other shareholders. As
       against the outside world, that bundle of rights is an item of property, a
E      chose in action. But as between the shareholder and the company itself,
       the shareholder's rights may be varied or extinguished by the mechanisms
       provided by the articles of association or the Companies Act. One of
       those mechanisms is the scheme of arrangement under section 152 [of the
       Isle of Man Companies Act 1931]. As a shareholder Cambridge is bound
       by the transactions into which the company has entered, including a plan
F      under Chapter 11 or a scheme under section 152."

       45   At this point it is necessary to point out that the opinion in
       *Cambridge Gas* does not articulate any reason for holding that, in the eyes of
       the Manx court, the US Bankruptcy Court had international jurisdiction
       in either of two relevant senses.
       46   The first sense is the jurisdiction of the US Bankruptcy Court in
G      relation to the Chapter 11 proceedings themselves. The entity which was in
       Chapter 11 was Navigator. The English courts exercise a wider jurisdiction
       in bankruptcy and (especially) in winding up than they recognise in foreign
       courts. At common law, the foreign court which is recognised as having
       jurisdiction in personal bankruptcy is the court of the bankrupt's domicile or
       the court to which the bankrupt submitted (*Dicey*, 15th ed, vol 2, para 31R-
       059) and the foreign court with corresponding jurisdiction over
H      corporations is the court of the place of incorporation: *Dicey*, 15th ed, vol 2,
       para 30R-100. Under United States law the US Bankruptcy Court has
       jurisdiction over a "debtor", and such a debtor must reside or have a
       domicile or place of business, or property in the United States. From the
       standpoint of English law, the US Bankruptcy Court had international

*A*

jurisdiction because although Navigator was not incorporated in the United States, it had submitted to the jurisdiction by initiating the proceedings.

47   The second sense in which international jurisdiction is relevant is the jurisdiction over the third party, Cambridge Gas, and its shares in Navigator. Cambridge Gas was not incorporated in the United States, and it was held by the Isle of Man courts that it had not submitted to the jurisdiction of the US Bankruptcy Court (and this was, as I have said, accepted with evident reluctance by the Privy Council). The property which was the subject of the order of the US Bankruptcy Court was shares in an Isle of Man company.    Consequently the property dealt with by the US Bankruptcy Court was situate, by Manx rules of the conflict of laws, in the Isle of Man, and the shareholder relationship was governed by Manx law.

*B*

48   *Cambridge Gas* [2007] 1 AC 508 was the subject of brief comment a few months later by the Privy Council in *Pattni v Ali* [2007] 2 AC 85. The decision in that case was simply that a Kenyan judgment deciding that A was bound to sell shares in a Manx company to B was entitled to recognition in the Isle of Man.  It resulted in an order in personam against a person subject to the jurisdiction of the Kenyan court, and was not a judgment in rem against property in the Isle of Man and outside the jurisdiction of the Kenyan court, because the fact that a judicial determination determines or relates to the existence of property rights between parties does not in itself mean that it is in rem.  Lord Mance, speaking for the Board, said, at para 23:

*C*

*D*

"In *Cambridge Gas* . . . the Board touched on the concepts of in personam and in rem proceedings, but held that the bankruptcy order with which it was concerned fell into neither category.  Its purpose was simply to establish a mechanism of collective execution against the property of the debtor by creditors whose rights were admitted or established."

*E*

*HIH*

49   The decision in *HIH* does not deal with foreign judgments. *HIH* concerned four Australian insurance companies which were being wound up in Australia and in respect of which provisional liquidators had been appointed in England.  The question was whether the English court had power to direct remission of assets collected in England to Australia, notwithstanding that there were differences between the English and Australian statutory regimes for distribution which meant that some creditors would benefit from remission whilst some creditors would be worse off.  The House of Lords unanimously directed that remission should take place, but the reasons differed.

*F*

*G*

50   The reasoning of the majority (Lord Scott of Foscote and Lord Neuberger of Abbotsbury, with Lord Phillips of Worth Matravers agreeing) was based exclusively on the statutory power to assist foreign insolvency proceedings under section 426 of the Insolvency Act 1986, but Lord Hoffmann (with whom Lord Walker of Gestingthorpe agreed) also considered that such a power existed at common law.

*H*

51   Lord Hoffmann characterised the principle of universality as a principle of English private international law that, where possible, there should be a unitary insolvency proceeding in the courts of the insolvent's

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   domicile which receives worldwide recognition and which should apply universally to all the bankrupt's assets, at para 6:

"Despite the absence of statutory provision, some degree of international co-operation in corporate insolvency had been achieved by judicial practice. This was based upon what English judges have for many years regarded as a general principle of private international law,
B   namely that bankruptcy (whether personal or corporate) should be unitary and universal. There should be a unitary bankruptcy proceeding in the court of the bankrupt's domicile which receives worldwide recognition and it should apply universally to all the bankrupt's assets."

52   Other parts of Lord Hoffmann's speech have already been quoted above, and it is only necessary for present purposes to recall that he said that
C   (a) "the process of collection of assets will include, for example, the use of powers to set aside voidable dispositions, which may differ very considerably from those in the English statutory scheme" (para 19) and (b) that the purpose of the principle of universality was to ensure that the debtor's assets were distributed under one scheme of distribution, and that the principle required that English courts should co-operate with the courts in the country of the principal liquidation to ensure that all the company's
D   assets are distributed to its creditors under a single system of distribution: para 30.

*Subsequent treatment of Cambridge Gas*

53   The decision in *Cambridge Gas* was not applied by the Supreme Court of Ireland in *In re Flightlease (Ireland) Ltd* [2012] IESC 12 (to which
E   I shall revert) and has been subject to academic criticism. Professor Briggs has expressed the view (2006) 77 BYIL 575, 581 that

"the decision in [*Cambridge Gas*] is wrong, for it requires a Manx court to give effect to a confiscation order made by a foreign court of property belonging to a person who was not subject to the personal jurisdiction of the foreign court. That a Manx court could have done so
F   itself is nothing to the point."

I shall return to the question whether it was correctly decided.

*IV The cases before the court and the issues*
*Rubin*

G   54   Eurofinance SA is a company incorporated in the British Virgin Islands. It was established by Adrian Roman, the second appellant on the *Rubin* appeal. Eurofinance SA settled "The Consumers Trust" ("TCT") under a deed of trust made in 2002 under English law, with trustees resident in England, of whom two were accountants and two were solicitors.

55   TCT was established to carry on a sales promotion scheme in the USA and Canada. The class of beneficiaries was made up of persons who
H   had successfully participated in the scheme by claiming validly in certain sales promotions owned and operated by Eurofinance SA. The trustees were to hold the capital and income of TCT for the beneficiaries and subject thereto for Eurofinance SA as beneficiary in default. The promotion, known as the cashable voucher programme, was entered into with participating

© 2013 The Incorporated Council of Law Reporting for England and Wales

merchants in the United States and Canada who, when they sold products or                    *A*
services to their customers, offered those customers a cashable voucher
comprising a rebate of up to 100% of the purchase price for the product or
service.  Under the terms of the voucher the rebate was to be paid to
customers in three years' time provided that certain conditions were
followed by the customer involving the completion by the customer of both
memory and comprehension tests.                                                               *B*

56   The participating merchants paid TCT 15% of the face value of each
cashable voucher issued by the merchant during a week. TCT retained 40%
of the payments received (i e 6% of the face value of each cashable voucher).
About one half of the 60% balance received from merchants was paid to
Eurofinance SA (and so effectively to Adrian Roman) and the remainder was
paid to others involved in the operation of the programme, such as solicitors,
accountants and US lawyers.  From about 2002 Adrian Roman's sons,                             *C*
Nicholas Roman and Justin Roman, each began to receive about 2%. The
trustees maintained bank accounts in the USA and Canada where the
payments they had received from merchants were kept.

57   Since the trustees only retained 6% of the face value of the issued
vouchers, the success of the scheme necessarily involved the consumers
either forgetting to redeem the vouchers or being unsuccessful in navigating                  *D*
the process required to be followed in order to obtain payment.  When the
scheme folded in 2005 the trustees held nearly US$10m in bank accounts in
the United States and Canada.

58   By about 2005 TCT's business ceased after the Attorney General of
Missouri brought proceedings under Missouri's consumer protection
legislation which resulted in a settlement involving a payment by the trustees
of US$1,650,000 and US$200,000 in costs.                                                      *E*

59   When it became clear that further proceedings were likely to be
brought by Attorneys General in other states, that the number of consumer
claims would increase, and that TCT would not have sufficient funds to meet
all the valid claims of its beneficiaries, in November 2005 Adrian Roman
caused Eurofinance to apply for the appointment by the High Court of the
respondents on the *Rubin* appeal, David Rubin and Henry Lan, as receivers                    *F*
of TCT for the purposes of causing TCT then to obtain protection under
Chapter 11 of Title 11 of the United States Code ("Chapter 11"). The
English court was told that Chapter 11 reorganisation proceedings would
result in an automatic stay of proceedings against TCT, would enable the
receivers to reject unprofitable or burdensome executory contracts, and
might result in the recovery as preferential payments of sums paid to
consumers and to the Missouri Attorney General.                                               *G*

60   In November 2005 the respondents were appointed as receivers by
order of Lewison J, and in the following month, the respondents and the
trustees then caused TCT to present a voluntary petition to the
US Bankruptcy Court for relief under Chapter 11. TCT was placed into
Chapter 11 proceedings in New York as virtually all of its 60,000 creditors
were located in the United States or Canada as were its assets. As a matter of                *H*
United States bankruptcy law, TCT could be the subject matter of a petition
for relief under Chapter 11 as a debtor.  This is because a trust such as TCT is
treated under Chapter 11 as a separate legal entity under the classification of
a "business trust".

© 2013 The Incorporated Council of Law Reporting for England and Wales

A  61  A joint plan of liquidation for TCT was prepared, and in September 2007 Lewison J ordered that the respondents (as receivers) be at liberty to seek approval of the plan from the US Bankruptcy Court. Under the terms of the plan the respondents were appointed legal representatives of TCT and given the power to commence, prosecute and resolve all causes of action against potential defendants including the appellants. The US Bankruptcy Court approved the plan in October 2007, and appointed the respondents as

B  "foreign representatives" of the debtor to make application to the Chancery Division in London for recognition of the Chapter 11 proceedings as a foreign main proceeding under the CBIR; and to seek aid, assistance and co-operation from the High Court in connection with the Chapter 11 proceedings, and, in particular to seek the High Court's assistance and co-operation in the prosecution of litigation which might be commenced in

C  the US Bankruptcy Court including "the enforcement of judgments of this court that may be obtained against persons and entities residing or owning property in Great Britain . . ."

62  In December 2007 proceedings were commenced in the US Bankruptcy Court by the issue of a complaint against a number of defendants including the appellants. These claims fall within the category of "adversary proceedings" under the US bankruptcy legislation, and I will use

D  this term to refer to them. The adversary proceedings comprised a number of claims including causes of action arising under the US Bankruptcy Code, which related to funds received by TCT from merchants which were paid out to the defendants (including the appellants), or to amounts transferred to the defendants within one year prior to the commencement of the TCT bankruptcy case including the appellants.

E  63  The defendants were the appellants and other parties involved with the programme. The appellants were served personally with the complaint commencing the adversary proceedings but did not defend, or participate, in the adversary proceedings, although it appears from a judgment of the US Bankruptcy Court that Eurofinance SA had filed a notice of appearance in the main Chapter 11 proceedings: order of 22 July 2008, paras 42–43.

F  64  On 22 July 2008 default and summary judgment was entered against the appellants in the adversary proceedings by the US Bankruptcy Court. The US Bankruptcy Court entered a judgment against the appellants on the ten counts of the complaint.

65  In November 2008 the respondents applied as foreign representatives to the Chancery Division for, inter alia, (a) an order that the Chapter 11 proceedings be recognised as a "foreign main proceeding" (b) an

G  order that the respondents be recognised as "foreign representatives" within the meaning of article 2(j) of the Model Law in relation to those proceedings; and (c) an order that the US Bankruptcy Court's judgment be enforced as a judgment of the English court in accordance with CPR Pts 70 and 73.

66  Nicholas Strauss QC, sitting as a deputy judge of the Chancery Division, [2010] 1 All ER (Comm) 81 recognised the Chapter 11

H  proceedings (including the adversary proceedings) as foreign main proceedings, and the respondents as foreign representatives, but refused to enforce the judgments in the adversary proceedings because (a) at common law the English court will not enforce a judgment in personam contrary to the normal jurisdictional rules for foreign judgments; and (b) there was

© 2013 The Incorporated Council of Law Reporting for England and Wales

264
Rubin v Eurofinance SA (SC(E))                                              [2013] 1 AC
Lord Collins of Mapesbury

nothing in CBIR, articles 21(e) (realisation of assets) and 25 (judicial     A
co-operation), which justified the enforcement of judgments in insolvency
proceedings.

67   At first instance the respondents sought to enforce the entirety of the
US Bankruptcy Court's judgment, but before the Court of Appeal they
sought an order for the enforcement of those parts of the judgment which
were based on state or federal avoidance laws, including fraudulent          B
conveyance under State Fraudulent Conveyance Laws, and under federal
law, namely fraudulent transfers under section 548(a) of 11 USC; liability of
transferees of avoided transfers under section 550; fraudulent transfers
under section 548(b) and liability of transferees of avoided transfers under
section 550.

68   The Court of Appeal (Ward, Wilson LJJ and Henderson J) [2011] Ch
133 allowed an appeal, and held that the judgment was enforceable.            C

*New Cap*

69   In the *New Cap* appeal the appellants are members of Lloyd's
Syndicate Number 991 ("the syndicate") for the 1997 and 1998 years of
account. The respondents are a reinsurance company ("New Cap") and its
liquidator, a partner in Ernst & Young in Sydney.                            D

70   New Cap is an Australian company, which was licensed as an
insurance company in Australia under the (Australian) Corporations Act
2001 ("the Australian Act"). New Cap did not conduct insurance business
in any country other than Australia, and the majority of New Cap's business
was generated through reinsurance brokers conducting business in Australia
and the balance was generated from overseas insurance brokers.

71   New Cap reinsured the syndicate in relation to losses occurring on      E
risks attaching during the 1997 and 1998 years of account under reinsurance
contracts which were subject to English law, and contained London
arbitration clauses and also (oddly) English jurisdiction clauses.   The
reinsurance contracts were placed with New Cap by the syndicate's
Australian broker, which was the sub-broker for the syndicate's London
broker.                                                                      F

72   Each reinsurance contract contained a commutation clause.  The
syndicate and New Cap entered into a commutation agreement to commute
the reinsurances with effect from 11 December 1998.    Under the
commutation agreement, New Cap agreed to make a lump sum payment to
the syndicate by 31 December 1998 in consideration for its release from
liability under the reinsurance contracts. The payments were calculated on
the basis of a 7·5% discount and a deduction from premium. New Cap made      G
payment pursuant to the commutation agreements in two instalments of
US$2,000,000 and US$3,980,600 in January 1999.   The commutation
payments were made from a bank account held by New Cap at the Sydney
branch of the Commonwealth Bank of Australia to a bank account in
London.

73   The second respondent was appointed the administrator of New            H
Cap by a resolution of its directors in April 1999. In September 1999 the
creditors of New Cap resolved that New Cap be wound up and the second
respondent ("the liquidator") was appointed its liquidator. Under the
Australian legislation, the winding up is deemed to have commenced on the
day on which the administration began.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    74   In April 2002 the liquidator caused proceedings to be commenced against the syndicate in the Supreme Court of New South Wales alleging that because New Cap was insolvent when the commutation payments were made in January 1999, and because those payments were made within the period of six months ending on the date when the administrator was appointed, they constituted unfair preferences and were thus "voidable

B transactions" under Part 5.7B of the Australian Act.

    75   The syndicate (which does not accept that the payments were preferences) refused to accept service of the Australian proceedings. The liquidator obtained leave from the Australian court to serve the Australian proceedings on the syndicate's English solicitors in London. The syndicate did not enter an appearance to the proceedings, but corresponded with the liquidator's solicitors, including commenting on an independent expert's

C report to be used by the respondents as evidence of New Cap's insolvency in all of the avoidance proceedings including the proceedings against the syndicate.

    76   The Australian court (White J in a judgment in September 2008, and Barrett J in a judgment in July 2009) recognised that there had been no submission by the syndicate to the jurisdiction of the Australian court in that

D it did not enter an appearance, but White J held that the Australian court had jurisdiction over the syndicate because a cause of action available under the Australian Act for the recovery of a preferential payment to an overseas party made when the company is insolvent was a cause of action which arose in New South Wales for the purposes of the New South Wales provisions for service out of the jurisdiction.

E    77   Barrett J gave a reasoned judgment in July 2009 holding the syndicate liable. After the respondents had been given leave to re-open their case so that the orders made by the Australian court would more accurately reflect the differences between those appellants who were members of the syndicate for the 1997 year of account and those appellants who were members for the 1998 year of account, the Australian court entered final judgment against the syndicate in its absence on 11 September 2009. The

F Australian judgment declared that the commutation payments were voidable transactions within the meaning of part 5.7B of the Australian Act and ordered the syndicate to repay the amount of the commutation payments to the liquidator together with interest.

    78   On the liquidator's application the Australian court issued, in October 2009, a letter of request to the High Court in England and Wales

G requesting that the court "act in aid of and assist" the Australian court and exercise jurisdiction under section 426 of the Insolvency Act 1986 by: (1) ordering the syndicate to pay the sums specified in the Australian judgment; alternatively (2) allowing the liquidator to commence fresh proceedings under the Australian Act in the English court; (3) granting such further and other relief as the High Court may consider just; and (4) making such further or other orders as may, in the opinion of the High Court, be

H necessary or appropriate to give effect to the foregoing orders.

    79   On 30 July 2010, the Court of Appeal handed down judgment in *Rubin* [2011] Ch 133. As a result, the respondents' alternative application for permission to commence fresh proceedings against the syndicate under the Australian Act in England pursuant to section 426 of the Insolvency Act

1986 was adjourned generally, and the respondents were granted permission  *A*
to seek relief at common law as an alternative to relief under section 426.

80   In *New Cap* Lewison J and the Court of Appeal were bound by the
decision of the Court of Appeal in *Rubin*. Lewison J held [2011] EWHC 677
(Ch): (a) the judgment was not enforceable under the Foreign Judgments
(Reciprocal Enforcement) Act 1933 because, although it applied to
Australian judgments, it did not apply to orders made in insolvency
proceedings; but (b) the judgment was enforceable under the assistance  *B*
provision of section 426 of the Insolvency Act 1986 and also at common
law.

81   The Court of Appeal (Mummery, Lloyd and McFarlane LJJ) [2012]
Ch 538 affirmed Lewison J's judgment on these grounds: (a) the 1933 Act
applied, and registration would not be set aside for lack of jurisdiction in the
foreign court, because of the *Rubin* decision; (b) section 426 could also be  *C*
used and was not excluded by section 6 of the 1933 Act; (c) but section 6
would preclude an action at common law; (d) it was not necessary to decide
whether the court's power of assistance at common law was exercisable
where the statutory power was available.

### *Picard v Vizcaya Partners Ltd*
*D*
82   This court gave permission for intervention by a written submission
on behalf of Mr Irving Picard ("the trustee"), the trustee for the liquidation
in the United States under the Securities Investor Protection Act of 1970
("SIPA") of Bernard L Madoff Investment Securities LLC ("Madoff"), which
was Bernard Madoff's broking company. The trustee is seeking to enforce at
common law in Gibraltar judgments of the US Bankruptcy Court against  *E*
Vizcaya Partners Ltd ("Vizcaya"), a British Virgin Islands company, for
$18om, and against Asphalia Fund Ltd ("Asphalia"), a Cayman Islands
company, for $67m, representing alleged preferential payments. He is also
seeking to enforce a US Bankruptcy Court default judgment in excess of $1
billion in the Cayman Islands in *Picard v Harley International (Cayman) Ltd*
(unreported) 10 November 2010. The Gibraltar and Cayman Islands  *F*
proceedings have been adjourned to await the outcome of the present
appeals.

83   In *Picard v Vizcaya Partners Ltd* proceedings have been brought in
Gibraltar to enforce the default judgments against Vizcaya and Asphalia
because $73m is held there on behalf of Vizcaya which the trustee maintains
is available to satisfy the judgments. Vizcaya and Asphalia have also, with
the permission of the court, intervened by written submission.

84   There is no agreed statement of facts relating to this aspect of the  *G*
case, and nothing which is said here about the facts should be taken as
representing or reflecting any finding. According to Vizcaya and Asphalia
the position is as follows. Between 2002 and 2007, a bank in Europe, acting
as a custodian trustee for Vizcaya, sent $327m to Madoff for investment in
securities. Unknown to the bank, or to Vizcaya, or its shareholder Asphalia,
Madoff had been engaged in a Ponzi scheme for some 30 years, and their  *H*
money was never invested in securities. In 2008, at the time of the credit
crunch and the banking crisis, the custodian trustee withdrew $180m
(leaving $147m with Madoff) and $67m of the $180m was paid to Asphalia.

85   In late 2008, the Madoff fraud came to light, and the trustee was
appointed. The trustee targeted investors who had withdrawn investments

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    from Madoff in the two years before its collapse in December 2008 as a
source for recovery of "customer property" for the benefit of other investors
who had not withdrawn their investments.    The trustee commenced
adversary proceedings in the US Bankruptcy Court alleging preference and
fraudulent conveyance against Vizcaya and Asphalia under SIPA and under
the Bankruptcy Code, the effect of which, they say, is that (a) as the trustee
argues, a person who, on the basis that he has received "customer money"
B    has been required to repay a preference, does not necessarily become a
"customer" and thereby entitled to share with other customers in the
bankruptcy; and (b) the trustee may avoid a payment made by the bankrupt
to a creditor 90 days before the commencement of the bankruptcy,
irrespective of the intention with which the payment is made or received.

86    The trustee obtained judgments in default, and Vizcaya and
C    Asphalia say that they took no part in the New York proceedings because
they had no connection with New York, and in particular (a) Asphalia was
not a customer of Madoff but a shareholder of Vizcaya; (b) arguably Vizcaya
was not a customer since it had appointed the bank to act as custodian
trustee and it was the bank which entered into contracts with Madoff.

*The issues*
D
87    The principal issue on these appeals is whether the rules at common
law or under the 1933 Act regulating those foreign courts which are to be
regarded as being competent for the purposes of enforcement of judgments
apply to judgments in avoidance proceedings in insolvency, and, if not, what
rules do apply: section V below.    The other issues are whether, in the *Rubin*
appeal, enforcement may be effected through the assistance provisions of the
E    Cross-Border Insolvency Regulations 2006 (section VI) or, in the *New Cap*
appeal, section 426 of the Insolvency Act 1986 (section VII); whether the
judgments are enforceable as a result of the submission by the judgment
debtors to the jurisdiction of the foreign courts (section VIII); and, in the
*New Cap* appeal, if the judgment is enforceable, whether enforcement is at
common law or under the 1933 Act: section IX.

F    *V The first issue: recognition and enforcement of foreign judgments in
insolvency proceedings*
    *Reasoning of the Court of Appeal in Rubin and the issue on the appeal*
88    The Court of Appeal in the *Rubin* appeal decided that a foreign
insolvency judgment could be enforced in England and Wales at common
law against a defendant not subject to the jurisdiction of the foreign court
G    under the traditional rule as formulated in the *Dicey* rule.

89    As I have already said, on the *Rubin* appeal in the Court of Appeal
the receivers sought only to enforce those parts of the judgment which in
effect related to the avoidance causes of action.    The Court of Appeal held
that the judgment (as narrowed) was enforceable at common law.    The
reasoning [2011] Ch 133, paras 38, 41, 43, 45, 48, 50, 61–62, 64 was as
follows: (a) the judgment was final and conclusive, and for definite sums of
H    money, and on the face of the orders was a judgment in personam; (b) it was
common ground that the judgment debtors were not resident (this was a slip
for "present" since the action was at common law and not under the
1933 Act) when the proceedings were instituted, and did not submit to the
jurisdiction, and so at first blush had an impregnable defence; (c) *Cambridge*

© 2013 The Incorporated Council of Law Reporting for England and Wales

*Gas* decided that the bankruptcy order with which it was concerned was   *A*
neither in personam nor in rem, and its purpose was simply to establish a
mechanism of collective execution against the property of the debtor by
creditors whose rights were admitted or established: *Pattni v Ali* [2007]
2 AC 85, para 23; (d) bankruptcy was a collective proceeding to enforce
rights and not to establish them: *Cambridge Gas* [2007] 1 AC 508, para 15;
(e) the issue was whether avoidance proceedings which could only be   *B*
brought by the representative of the bankrupt were to be characterised as
part of the bankruptcy proceedings, i e part of the collective proceeding to
enforce rights and not to establish them; (f) the adversary proceedings were
part and parcel of the Chapter 11 proceedings; (g) the ordinary rules for
enforcing foreign judgments in personam did not apply to bankruptcy
proceedings; (h) avoidance mechanisms were integral to and central to the   *C*
collective nature of bankruptcy and were not merely incidental procedural
matters; (i) the process of collection of assets will include the use of powers
to set aside voidable dispositions, which may differ very considerably from
those in the English statutory scheme: *HIH* [2008] 1 WLR 852, para 19;
(j) the judgment of the US Bankruptcy Court was a judgment in, and for the
purposes of, the collective enforcement regime of the insolvency
proceedings, and was governed by the sui generis private international law   *D*
rules relating to insolvency; (k) that was a desirable development of the
common law founded on the principles of modified universalism, and did
not require the court to enforce anything that it could not do, mutatis
mutandis, in a domestic context; (l) there was a principle of private
international law that bankruptcy should be unitary and universal, and there
should be a unitary insolvency proceeding in the court of the bankrupt's   *E*
domicile which receives worldwide recognition and should apply universally
to all the bankrupt's assets; (m) there was a further principle that recognition
carried with it the active assistance of the court which included assistance by
doing whatever the English court could do in the case of a domestic
insolvency; (n) there was no unfairness to the appellants in upholding the
judgment because they were fully aware of the proceedings, and after taking
advice chose not to participate.  It was unnecessary to decide whether the   *F*
judgment was enforceable under the CBIR: para 63.

90   In short, Ward LJ accepted that the judgment was an in personam
judgment, but he decided that the *Dicey* rule did not apply to foreign
judgments in avoidance proceedings because they were central to the
collective enforcement regime in insolvency and were governed by special
rules.

91   The essential questions on this aspect of the appeals are these. Is the   *G*
judgment in each case to be regarded as a judgment in personam within the
scope of the traditional rules embodied in the *Dicey* rule, or is it to be
characterised as an insolvency order which is part of the bankruptcy
proceedings, i e part of the collective proceeding to enforce rights and not to
establish them?  Is that a distinction which has a role to play?  Is there a
distinction between claims which are central to the purpose of the
proceedings and claims which are incidental procedural matters?  As a   *H*
matter of policy, should the court, in the interests of universality of
insolvency proceedings, devise a rule for the recognition and enforcement of
judgments in foreign insolvency proceedings which is more expansive, and
more favourable to liquidators, trustees in bankruptcy, receivers and other

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   office-holders, than the traditional common law rule embodied in the *Dicey* rule, or should it be left to legislation preceded by any necessary consultation?

    92  Ward LJ's conclusion derives from a careful synthesis of dicta in Lord Hoffmann's brilliantly expressed opinion in *Cambridge Gas* and his equally brilliant speech in *HIH*, each of which has on these appeals been subjected to an exceptionally detailed analysis. For reasons which will be

B developed, I do not agree with the conclusions which Ward LJ draws.

    93  But I begin with two matters on which I accept the respondents' analysis. The first is that avoidance proceedings have characteristics which distinguish them from ordinary claims such as claims in contract or tort. The second is that, if it were necessary to draw a distinction between insolvency orders and other orders, it would not be difficult to formulate

C criteria for the distinction, along similar lines to that drawn by the European Court in relation to the Brussels Convention, the Brussels I Regulation (Council Regulation (EC) 44/2001) and the EC Insolvency Regulation.

### *Nature of avoidance proceedings*

    94  In order to achieve a proper and fair distribution of assets between

D creditors, it will often be necessary to adjust prior transactions and to recover previous dispositions of property so as to constitute the estate which is available for distribution. The principle of equality among creditors which underlies the pari passu principle may require the adjustment of concluded transactions which but for the winding up of the company would have remained binding on the company, and the return to the company of payments made or property transferred under the transactions or the

E reversal of their effect. Systems of insolvency law use avoidance proceedings as mechanisms for adjusting prior transactions by the debtor and for recovering property disposed of by the debtor prior to the insolvency. Thus under the Insolvency Act 1986 an administrator, or liquidator, or trustee in bankruptcy may, where there has been a transaction at an undervalue, or amounting to an unlawful preference, apply for an order restoring the

F position to what it would have been had the transaction not taken place: sections 238 et seq and 339 et seq. Other systems of law have similar mechanisms, but they will differ in matters such as the period during which such transactions are at risk of reversal and the role of good faith of the parties to the transaction.

    95  The underlying policy is to protect the general body of creditors against a diminution of the assets by a transaction which confers an unfair or

G improper advantage on the other party, and it is therefore an essential aspect of the process of liquidation that antecedent transactions whose consequences have been detrimental to the collective interest of the creditors should be amenable to adjustment or avoidance: *Fletcher, The Law of Insolvency*, 4th ed (2009), para 26-002; *Goode, Principles of Corporate Insolvency Law*, 4th ed (2011), para 13-03.

H     96  Thus the UNCITRAL Legislative Guide on Insolvency Law (2005) says:

      "150. Many insolvency laws include provisions that apply retroactively from a particular date (such as the date of application for, or commencement of, insolvency proceedings) for a specified period of time

© 2013 The Incorporated Council of Law Reporting for England and Wales

(often referred to as the 'suspect' period) and are designed to overturn     A
those past transactions to which the insolvent debtor was a party or
which involved the debtor's assets where they have certain effects . . .

"151. It is a generally accepted principle of insolvency law that
collective action is more efficient in maximizing the assets available to
creditors than a system that leaves creditors free to pursue their individual
remedies and that it requires all like creditors to receive the same           B
treatment.  Provisions dealing with avoidance powers are designed to
support these collective goals, ensuring that creditors receive a fair
allocation of an insolvent debtor's assets consistent with established
priorities and preserving the integrity of the insolvency estate."

97   In *In re Condor Insurance Ltd* (2010) 601 F 3d 319, 326, the Court
of Appeals for the Fifth Circuit said that:                                     C

"Avoidance laws have the purpose and effect of re-ordering the
distribution of a debtor's assets . . . in favor of the collective priorities
established by the distribution statute . . . [and] must be treated as an
integral part of the entire bankruptcy system."

98   In different phases of the Australian proceedings in *New Cap*
Barrett J made similar points.  He said that in an action for unfair preference  D
under the Australian legislation the liquidator might obtain an order for the
payment of money, but the action did not contemplate recovery in the sense
applicable to damages and debts; and the proceedings sought to remedy or
counter the effects of that depletion caused by the payment by New Cap:
*New Cap Reinsurance Corpn v Renaissance Reinsurance Ltd* [2002]
NSWSC 856, paras 23, 27.  The order does not vindicate property rights          E
which the company itself would have had prior to liquidation, but statutory
rights which the liquidator has under the statutory scheme in consequence of
winding up.  The purpose of the order for the payment of money to a
company in liquidation is not to compensate the company, but to adjust the
rights of creditors among themselves in such a way as to eliminate the effects
of favourable treatment afforded to one or more creditors, to the exclusion
of others, in the period immediately before an insolvent administration        F
commences: *New Cap Reinsurance Corpn v Grant* (2009) 257 ALR 740,
paras 20–21.

*Difference between insolvency claims and others*

99   I also accept that, if there were to be a separate rule for the
recognition and enforcement of insolvency orders, it would not normally be      G
difficult to distinguish between judgments in insolvency proceedings which
are peculiarly the subject of insolvency law such as avoidance proceedings,
and other judgments of the kind which are covered by the *Dicey* rule.

100   In the context of the Brussels Convention, the Brussels I Regulation
and the EC Insolvency Regulation, the Court of Justice of the European
Union has developed a distinction between claims which derive directly from     H
the bankruptcy or winding up, and which are closely connected with them,
on the one hand, and those which do not, on the other hand, and the
distinction has been applied by the English court.  In my judgment, the
distinction is a workable one which could be adapted to other contexts
should it be useful or necessary to do so.

© 2013 The Incorporated Council of Law Reporting for England and Wales

271

A    101   Claims which were regarded as bankruptcy claims have been held to include a claim under French law by a liquidator against a director to make good a deficiency in the assets of a company (*Gourdain v Nadler* (Case 133/78) [1979] ECR 733); or a claim under German law to set aside a transaction detrimental to creditors: *Seagon v Deko Marty Belgium NV* (Case C-339/07) [2009] 1 WLR 2168. Claims outside the category of bankruptcy claims have been held to include an action brought by a seller

B based on a reservation of title against a purchaser who was insolvent (*German Graphics Graphische Maschinen GmbH v van der Schee* (Case C-292/08) [2009] ECR I-8421) or a claim by a liquidator as to beneficial ownership of an asset: *Byers v Yacht Bull Corpn* [2010] BCC 368. In *Oakley v Ultra Vehicle Design Ltd* [2006] BCC 57, para 42 Lloyd LJ (sitting as an additional judge of the Chancery Division) said:

C     "it has been held that a claim by a liquidator to recover pre-liquidation debts, although made in the course of the winding up and so, in a sense, relating to it, does not derive directly from it and is therefore not excluded from the Brussels Convention (and therefore now not from the [Brussels I] Regulation) by article 1.2(b): see *In re Hayward decd* [1997] Ch 45, and *UBS AG v Omni Holding AG* [2000] 1 WLR 916. By contrast,

D proceedings by a liquidator against a director or a third party to set aside a transaction as having been effected at an undervalue or on the basis of wrongful or fraudulent trading would be claims deriving directly from the winding up and therefore excluded from the Brussels Convention and now from the [Brussels I] Regulation."

E   *In personam or sui generis?*

   102   I have already quoted the passage in *Cambridge Gas* [2007] 1 AC 508 in which Lord Hoffmann distinguished between judgments in rem and in personam, on the one hand, and judgments in bankruptcy proceedings, on the other, but it is necessary to repeat it at this point. He said, at paras 13–14:

F     "13. . . . Judgments in rem and in personam are judicial determinations of the existence of rights: in the one case, rights over property and in the other, rights against a person. When a judgment in rem or in personam is recognised by a foreign court, it is accepted as establishing the right which it purports to have determined, without further inquiry into the grounds upon which it did so. The judgment itself is treated as the source of the right.

G     "14. The purpose of bankruptcy proceedings, on the other hand, is not to determine or establish the existence of rights, but to provide a mechanism of collective execution against the property of the debtor by creditors whose rights are admitted or established."

   103   There is no doubt that the order of the US Bankruptcy Court in *Cambridge Gas* did not fall into the category of an in personam order. Even

H though the question whether a foreign judgment is in personam or in rem is sometimes a difficult one (*Dicey*, 15th ed, para 14-109), that was not a personal order against its shareholders, including Cambridge Gas. The order vested the shares in Navigator in the creditors' committee. It did not declare existing property rights. Indeed the whole purpose of what was the

© 2013 The Incorporated Council of Law Reporting for England and Wales

272
**Rubin v Eurofinance SA (SC(E))**              [2013] 1 AC
**Lord Collins of Mapesbury**

functional equivalent of a scheme of arrangement was to alter property *A*
rights.  But it is not easy to see why it was not an in rem order in relation to
property in the Isle of Man in the sense of deciding the status of a thing and
purporting to bind the world: see *Jowitt's Dictionary of English Law*, 3rd ed
(2010) (ed Greenberg), p 1249.

104  The judgments in the *Rubin* and *New Cap* appeals were based on
avoidance legislation which, with some differences of substance, performs
the same function as the equivalent provisions in the Insolvency Act 1986 *B*
and its predecessors.  But Ward LJ in *Rubin* accepted that the judgment
was in personam and the *Rubin* respondents have not sought to argue that it was
not an in personam judgment.  What they say is that, even if it is in
personam, it is within a sui generis category of insolvency orders or
judgments subject to special rules.

105  There can be no doubt that the avoidance orders in the present *C*
appeals are in personam.  In *In re Paramount Airways Ltd* [1993] Ch 223,
238 Nicholls LJ said that the remedies under section 238 of the Insolvency
Act 1986 (transactions at an undervalue) were "primarily of an in personam
character", and that accords with the nature of the orders in these appeals.
The form of judgment of the US Bankruptcy Court in the *Rubin* case was
that "plaintiffs have judgment . . . against the defendants" in the sums *D*
awarded, and the orders of the New South Wales Supreme Court in the *New
Cap* case included orders that "the defendants . . . pay to the first plaintiff"
the sums due under section 588FF(1) of the Australian Corporations Act.

### *The question of principle and policy*

106  Since the judgments are in personam the principles in the *Dicey* rule
are applicable unless the court holds that there is, or should be, a separate *E*
rule for judgments in personam in insolvency proceedings, at any rate where
those judgments are not designed to establish the existence of rights, but are
central to the purpose of the insolvency proceedings or part of the
mechanism of collective execution.

107  Prior to *Cambridge Gas* [2007] 1 AC 508 and the present cases,
there had been no suggestion that there might be a different rule for
judgments in personam in insolvency proceedings and other proceedings. *F*
There are no cases in England which are helpful.  The normal rules for
enforcement of foreign judgments were applied to a claim by a liquidator for
moneys due to the company (*Gavin Gibson & Co Ltd v Gibson* [1913]
3 KB 379) and to a claim on a debt ascertained in bankruptcy under German
law: *Berliner Industriebank AG v Jost* [1971] 2 QB 463.  A judgment of the
US Bankruptcy Court in Chapter 11 proceedings for repayment of a *G*
preferential transfer was enforced in Ontario on the basis of the judgment
debtor's submission to the New York court, without any suggestion that the
normal rules did not apply: *Gourmet Resources International Inc Estate v
Paramount Capital Corpn* (1991) 3 OR (3d) 286, [1993] IL Pr 583, appeal
dismissed (1993) 14 OR (3d) 319(Note) (Ont CA).

108  The principles in the *Dicey* rule have never received the express *H*
approval of the House of Lords or the UK Supreme Court and the leading
decisions remain *Adams v Cape Industries plc* [1990] Ch 433 and the older
Court of Appeal authorities which it re-states or re-interprets.  But there can
be no doubt that the references by the House of Lords in the context of
foreign judgments to the foreign court of "competent jurisdiction" are

© 2013 The Incorporated Council of Law Reporting for England and Wales

273

A  implicit references to the common law rule: e g *Nouvion v Freeman* (1889)
15 App Cas 1, 8 and *Owens Bank Ltd v Bracco* [1992] 2 AC 443, 484.

109  The *Rubin* respondents question whether the rules remain sound in
the modern world. It is true that the common law rule was rejected in
Canada, at first in the context of the inter-provincial recognition of
judgments. The Supreme Court of Canada held that the English rules
developed in the 19th century for the recognition and enforcement of
B  judgments of foreign countries could not be transposed to the enforcement
of judgments from sister provinces in a single country with a common
market and a single citizenship. Instead a judgment given against a person
outside the jurisdiction should be recognised and enforced if the subject
matter of the action had a real and substantial connection with the province
in which the judgment was given: *Morguard Investments Ltd v De Savoye*
C  [1990] 3 SCR 1077, para 45. This approach was applied, by a majority, to
foreign country judgments in *Beals v Saldanha* [2003] 3 SCR 416 (applied to
the recognition of an English order convening meetings in a scheme of
arrangement in *In re Cavell Insurance Co* (2006) 269 DLR (4th) 679 (Ont
CA)).

110  There is no support in England for such an approach except in the
field of family law. In *Indyka v Indyka* [1969] 1 AC 33 it was held that a
D  foreign decree of divorce would be recognised at common law if there was a
"real and substantial connection" between the petitioner (or the respondent)
and the country where the divorce was obtained. This rule (now superseded
by the Family Law Act 1986) was in part devised to avoid "limping
marriages", i e cases where the parties were regarded as divorced in one
country but regarded as married in another country. It has never been
E  adopted outside the family law sphere in the context of foreign judgments.

111  The Supreme Court of Ireland in *In re Flightlease (Ireland) Ltd*
[2012] IESC 12 declined to follow *Cambridge Gas* (and also the decision of
the Court of Appeal in *Rubin*) and also held that the *Dicey* rule should not be
rejected in favour of a real and substantial connection test. In *Flightlease* the
airline Swissair was in a form of debt restructuring proceeding in
Switzerland, where it was incorporated. Flightlease is an Irish company in
F  the same group as Swissair. An application was before the Swiss courts
under the Swiss federal statute on debt enforcement and bankruptcy seeking
the return of money paid by Swissair to Flightlease. The proceedings had
reached the stage of judgment, but the liquidators of Flightlease were
concerned to know whether a Swiss judgment would be enforceable in
Ireland so that they could decide whether to appear in the Swiss proceedings.
G  112  The Irish Supreme Court held that the judgment would not be
enforceable if Flightlease did not appear in the Swiss proceedings for these
reasons: (1) the effect of the Swiss order would be to establish a liability on
Flightlease to repay moneys and would therefore result in a judgment in
personam; (2) it would be preferable for any change in the rules relating to
the enforcement of foreign judgments to take place in the context of
international consensus by way of treaty or convention given effect by
H  legislation. In particular, the Irish Supreme Court said that it would not
adopt the approach in *Cambridge Gas* because it had resulted from
legislative changes in the United Kingdom (this appears to have been based
on a misapprehension), and should not be adopted in Ireland in the absence
of consensus among common law jurisdictions.

© 2013 The Incorporated Council of Law Reporting for England and Wales

113   But there is no suggestion on this appeal that the principles    A
embodied in the *Dicey* rule should be abandoned.   Instead the *Rubin*
respondents suggest that the principles should not apply to foreign
insolvency orders.

114   The respondents accept that the *Dicey* rule applies to claims which
may be of considerable significance by an office-holder in a foreign
insolvency, such as a claim for breach of contract, or a tort claim, or a claim    B
to recover debts.   It is clear that such claims may affect the size of the
insolvent estate just as much, and often more, than avoidance claims.   Like
claims to recover money due to the insolvent estate such as restitutionary
claims not involving avoidance, avoidance claims may establish a liability to
pay or repay money to the bankrupt estate (as in the present cases).   There is
no difference of principle.

115   The question, therefore, is one of policy.   Should there be a more    C
liberal rule for avoidance judgments in the interests of the universality of
bankruptcy and similar procedures?   In my judgment the answer is in the
negative for the following reasons.

116   First, although I accept that it is possible to distinguish between
avoidance claims and normal claims, for example in contract or tort, it is
difficult to see in the present context a difference of principle between a    D
foreign judgment against a debtor on a substantial debt due to a company in
liquidation and a foreign judgment against a creditor for repayment of a
preferential payment.   The respondents suggest that a person who sells
goods to a foreign company accepts the risk of the insolvency legislation of
the place of incorporation.   Quite apart from the fact that the suggestion is
wholly unrealistic, why should the seller/creditor be in a worse position than
a buyer/debtor?    E

117   The second reason is that if there is to be a different rule for foreign
judgments in such proceedings as avoidance proceedings, the court will have
to ascertain (or, more accurately, develop) two jurisdictional rules.   There
are two aspects of jurisdiction which would have to be satisfied if a foreign
insolvency judgment or order is to be outside the scope of the *Dicey* rule: the
first is the requisite nexus between the insolvency and the foreign court, and
the second is the requisite nexus between the judgment debtor and the    F
foreign court.

118   In *Cambridge Gas* Navigator was an Isle of Man company, and the
jurisdiction of the United States Bankruptcy Court depends on whether
the "debtor" resides or has a domicile or place of business, or property, in the
United States.   The shares in Navigator owned by Cambridge Gas (a
Cayman Islands company) were, on ordinary principles of the conflict of    G
laws, situated in the Isle of Man, and the shareholder relationship between
Navigator and Cambridge Gas was governed by Manx law.   The Privy
Council, as noted above, did not articulate any rule for the jurisdiction of the
US Bankruptcy Court over Navigator (although it had plainly submitted to
its jurisdiction) or over Cambridge Gas (which, the Manx courts had held
and the Privy Council accepted, had not submitted) or over Cambridge Gas'
Manx assets.    H

119   Nor did the Court of Appeal in *Rubin* articulate the reasons why
the English court recognised the jurisdiction of the US Bankruptcy Court
over TCT, or over the appellants.   The receivers appear to have proceeded
originally on the basis that the US Bankruptcy Court had jurisdiction under

© 2013 The Incorporated Council of Law Reporting for England and Wales

275

A  United States bankruptcy law because of TCT's residence and principal
place of business in New York (petition, 5 December 2005), but the
US Bankruptcy Court, in deciding to appoint the receivers as foreign
representatives also noted that TCT's business operations were conducted
primarily in the United States, the majority of its creditors, substantially all
of its assets, and its centre of main interests, were all in the United States.

B  The basis of jurisdiction of the US Bankruptcy Court under United States law
over the individual defendants in *Rubin* was that they were subject both to
the general jurisdiction of the court (i e connection of the defendant with the
jurisdiction) and also to the specific jurisdiction of the court (i e connection
of the cause of action with the jurisdiction) because they specifically sought
out the United States as a place to do business and specifically sought out
United States merchants and consumers with whom to do business.

C  Accordingly, the exercise of jurisdiction satisfied the due process
requirements of the Fifth Amendment.

120  The basis of jurisdiction in *New Cap* over New Cap itself was of
course that it was incorporated in Australia. The basis of jurisdiction over
the syndicate under New South Wales law was that the cause of action
against the syndicate arose in New South Wales.

D  121  The respondents do not put forward any principled suggestion for
rules which will deal with the two aspects of jurisdiction. They accept, as
regards the jurisdictional link between the foreign country and the insolvent
estate, that English law has traditionally recognised insolvency proceedings
taking place in an individual bankrupt's place of domicile, or, in the case of
corporations, the place of incorporation, but (because the connection which
the trustees of the TCT, or the TCT itself, had with the United States was that

E  the trust's main business was there) they rely on what Lord Hoffmann said in
*HIH* [2008] 1 WLR 852, para 31:

"I have spoken in a rather old-fashioned way of the company's
domicile because that is the term used in the old cases, but I do not claim it
is necessarily the best one. Usually it means the place where the company
is incorporated but that may be some offshore island with which the

F  company's business has no real connection. The Council Regulation
on insolvency proceedings (Council Regulation (EC) No 1346/2000 of
29 May 2000) uses the concept of the 'centre of a debtor's main interests'
as a test, with a presumption that it is the place where the registered office
is situated: see article 3.1. That may be more appropriate."

G  122  They propose that each of these issues be resolved, not by a black
letter rule like the common law rule for enforcement of judgments, but
instead by an appeal to what was said in oral argument to be the discretion
of the English court to assist the foreign court.

123  On the second aspect, the jurisdictional link between the foreign
country and the judgment debtor, they accept that it is necessary for there to
be an appropriate connection between the foreign insolvency proceeding
and the insolvency order in respect of which recognition and enforcement is

H  sought. They propose that, in the exercise of the discretion, the court should
adopt an approach similar to that taken by the English court in deciding
whether to apply provisions of the Insolvency Act 1986, such as section 238
(transactions at an undervalue), to persons abroad, relying on *In re
Paramount Airways Ltd* [1993] Ch 223.

© 2013 The Incorporated Council of Law Reporting for England and Wales

124 That case decided that there is no implied territorial limitation to *A*
the exercise of jurisdiction over "any person". The Court of Appeal rejected
the argument that the section applied only to British subjects and to persons
present in England at the time of the impugned transaction. In particular the
physical absence or presence of the party at the time of the transaction bore
no necessary relationship to the appropriateness of the remedy. Nor was the
test of "sufficient connection" with England satisfactory because it would
hardly be distinguishable from the ambit of the sections being unlimited *B*
territorially: p 237. Instead, the approach was to be found in the discretion
of the court, first to grant permission to serve the proceedings out of the
jurisdiction, and secondly, to make an order under the section. On both
aspects the court would take into account whether the defendant was
sufficiently connected with England for it to be just and proper to make the
order against him despite the foreign element. *C*

125 The *Rubin* respondents say that *In re Paramount Airways Ltd* is
instructive because, if the facts of the present case were reversed such that
TCT had carried on the scheme in England and had been placed into
insolvency proceedings here and the appellants were resident in New York,
then it can be expected that the English court would have considered that
England was the correct forum in which to bring section 238 proceedings to *D*
recover payments made to the appellants and would have given permission
to serve out of the jurisdiction accordingly. They go on to say that it is
implicit in this that the English court would have expected the New York
court then to recognise and enforce any judgment of the English court even if
the appellants had remained in New York and had not contested the
proceedings; and that by the same token that the court seeks and expects the
recognition and enforcement abroad of its own insolvency orders, the court *E*
should recognise and enforce in England insolvency orders made in
insolvency proceedings in other jurisdictions.

126 There is no basis for this line of reasoning. There is no necessary
connection between the exercise of jurisdiction by the English court and its
recognition of the jurisdiction of foreign courts, or its expectation of the
recognition of its judgments abroad. It has frequently been said that the
jurisdiction exercised under what used to be RSC Ord 11, r 1 (and is now *F*
CPR Practice Direction 6B, paragraph 3.1) is an exorbitant one, in that it
was a wider jurisdiction than was recognised in English law as being
possessed by courts of foreign countries in the absence of a treaty providing
for recognition: see *Siskina (Owners of cargo lately laden on board) v Distos
Cia Naviera SA* [1979] AC 210, 254, per Lord Diplock; *Amin Rasheed Shipping
Corpn v Kuwait Insurance Co* [1984] AC 50, 65, per Lord Diplock *G*
and *Spiliada Maritime Corpn v Cansulex Ltd* [1987] AC 460, 481, per Lord
Goff of Chieveley.

127 Outside the sphere of matrimonial proceedings (see *Travers v
Holley* [1953] P 246, disapproved on this aspect in *Indyka v Indyka* [1969]
1 AC 33) reciprocity has not played a part in the recognition and
enforcement of foreign judgments at common law. The English court does
not concede jurisdiction in personam to a foreign court merely because the *H*
English court would, in corresponding circumstances, have power to order
service out of the jurisdiction: *In re Trepca Mines Ltd* [1960] 1 WLR 1273.

128 In my judgment, the dicta in *Cambridge Gas* and *HIH* do not
justify the result which the Court of Appeal reached. This would not be an

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   incremental development of existing principles, but a radical departure from
    substantially settled law. There is a reason for the limited scope of the *Dicey*
    rule and that is that there is no expectation of reciprocity on the part of
    foreign countries. Typically today the introduction of new rules for
    enforcement of judgments depends on a degree of reciprocity. The
    EC Insolvency Regulation and the Model Law were the product of lengthy
    negotiation and consultation.
B
       129 A change in the settled law of the recognition and enforcement of
    judgments, and in particular the formulation of a rule for the identification
    of those courts which are to be regarded as courts of competent jurisdiction
    (such as the country where the insolvent entity has its centre of interests and
    the country with which the judgment debtor has a sufficient or substantial
    connection), has all the hallmarks of legislation, and is a matter for the
C   legislature and not for judicial innovation. The law relating to the
    enforcement of foreign judgments and the law relating to international
    insolvency are not areas of law which have in recent times been left to be
    developed by judge-made law. As Lord Bridge of Harwich put it in relation
    to a proposed change in the common law rule relating to fraud as a defence
    to the enforcement of a foreign judgment, "if the law is now in need of
    reform, it is for the legislature, not the judiciary, to effect it": *Owens Bank
D   Ltd v Bracco* [1992] 2 AC 443, 489.
       130 Furthermore, the introduction of judge-made law extending the
    recognition and enforcement of foreign judgments would be only to the
    detriment of United Kingdom businesses without any corresponding benefit.
    I accept the appellants' point that if recognition and enforcement were
    simply left to the discretion of the court, based on a factor like "sufficient
E   connection", a person in England who might have connections with a
    foreign territory which were only arguably "sufficient" would have to
    actively defend foreign proceedings which could result in an in personam
    judgment against him, only because the proceedings are incidental to
    bankruptcy proceedings in the courts of that territory. Although I say
    nothing about the facts of the Madoff case, it might suggest that foreigners
    who have bona fide dealings with the United States might have to face the
F   dilemma of the expense of defending enormous claims in the United States or
    not defending them and being at risk of having a default judgment enforced
    abroad.
       131 Nor is there likely to be any serious injustice if this court declines to
    sanction a departure from the traditional rule. It would not be appropriate
    to express a view on whether the office-holders in the present cases would
G   have, or would have had, a direct remedy in England, because there might
    be, or might have been, issues as to the governing law, or issues as to time-
    limits or as to good faith. Subject to those reservations, several of the ways
    in which the claims were put (especially those parts of the judgment which
    were not the subject of these proceedings) in the United States proceedings in
    *Rubin* could have founded proceedings by trustees in England for the benefit
    of the creditors (as beneficiaries of the express trust). In addition there are
H   several other avenues available to office-holders. Avoidance claims by a
    liquidator of an Australian company may be the subject of a request by the
    Australian court pursuant to section 426(4) of the Insolvency Act 1986,
    applying Australian law under section 426(5). In appropriate cases,
    article 23 of the Model Law will allow avoidance claims to be made by

© 2013 The Incorporated Council of Law Reporting for England and Wales

foreign representatives under the Insolvency Act 1986. In the cases where       A
the insolvent estate has its centre of main interests in the European Union,
judgments will be enforceable under article 25 of the EC Insolvency
Regulation.

132    It follows that, in my judgment, *Cambridge Gas* [2007] 1 AC 508
was wrongly decided. The Privy Council accepted (in view of the conclusion
that there had been no submission to the jurisdiction of the court in New       B
York) that Cambridge Gas was not subject to the personal jurisdiction of the
US Bankruptcy Court. The property in question, namely the shares in
Navigator, was situate in the Isle of Man, and therefore also not subject to
the in rem jurisdiction of the US Bankruptcy Court. There was therefore no
basis for the recognition of the order of the US Bankruptcy Court in the Isle
of Man.

                                                                                C

*VI Issue 2: Rubin: Enforcement under the Cross-Border Insolvency
Regulations*

133    In the *Rubin* appeal it was argued by the respondents that the
judgment should also be enforced through the CBIR, implementing the
UNCITRAL Model Law.

134    The order made by the deputy judge [2010] 1 All ER (Comm) 81,         D
paras 46, 47 recognised the Chapter 11 proceeding "including the adversary
proceedings," because "bringing adversary proceedings against debtors of
the bankrupt is clearly part of collecting the bankrupt's assets with a view to
distributing them to creditors" and "the adversary proceedings are part and
parcel of the Chapter 11 insolvency proceedings". The Court of Appeal was
of the same view [2011] Ch 133, para 61(2)–(3). The appellants no longer       E
maintain that the adversary proceedings should not be recognised under the
Model Law.

135    The issue which still arises in relation to the Model Law as
implemented by the CBIR is whether the court has power to grant relief
recognising and enforcing the relevant parts of the judgment.

136    Article 21 provides:

    "1. Upon recognition of a foreign proceeding, whether main or             F
    non-main, where necessary to protect the assets of the debtor or the
    interests of the creditors, the court may, at the request of the foreign
    representative, grant any appropriate relief, including— (a) staying the
    commencement or continuation of individual actions or individual
    proceedings concerning the debtor's assets, rights, obligations or
    liabilities, to the extent they have not been stayed under paragraph 1(a) of   G
    article 20; (b) staying execution against the debtor's assets to the extent it
    has not been stayed under paragraph 1(b) of article 20; (c) suspending the
    right to transfer, encumber or otherwise dispose of any assets of the
    debtor to the extent this right has not been suspended under
    paragraph 1(c) of article 20; (d) providing for the examination of
    witnesses, the taking of evidence or the delivery of information
    concerning the debtor's assets, affairs, rights, obligations or liabilities;   H
    (e) entrusting the administration or realisation of all or part of the
    debtor's assets located in Great Britain to the foreign representative or
    another person designated by the court; (f) extending relief granted under
    paragraph 1 of article 19; and (g) granting any additional relief that may

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   be available to a British insolvency office-holder under the law of Great
    Britain, including any relief provided under paragraph 43 of Schedule B1
    to the Insolvency Act 1986."

    137   The reference to relief under paragraph 43 of Schedule B1 to the
    Insolvency Act 1986 (as inserted by section 248 of and Schedule 16 to the
    Enterprise Act 2002) is a reference to a moratorium on claims in an
B   administration.
    138   The Guide to Enactment states, at paras 154, 156:

       "154. . . . The types of relief listed in article 21, paragraph 1, are
    typical or most frequent in insolvency proceedings; however, the list is not
    exhaustive and the court is not restricted unnecessarily in its ability to
    grant any type of relief that is available under the law of the enacting state
C   and needed in the circumstances of the case . . .
       "156. It is in the nature of discretionary relief that the court may tailor
    it to the case at hand. This idea is reinforced by article 22, paragraph 2,
    according to which the court may subject the relief granted to conditions
    that it considers appropriate."

    139   Article 25 provides (under the heading "Co-operation and direct
D   communication between a court of Great Britain and foreign courts or
    foreign representatives") that:

       "1. . . . the court may co-operate to the maximum extent possible with
    foreign courts or foreign representatives, either directly or through a
    British insolvency office-holder.
       "2. The court is entitled to communicate directly with, or to request
E   information or assistance directly from, foreign courts or foreign
    representatives."

    140   Article 27 provides that the co-operation referred to in article 25
    may be implemented "by any appropriate means", including

       "(a) appointment of a person to act at the direction of the court;
    (b) communication of information by any means considered appropriate
F   by the court; (c) coordination of the administration and supervision of the
    debtor's assets and affairs; (d) approval or implementation by courts of
    agreements concerning the coordination of proceedings; (e) coordination
    of concurrent proceedings regarding the same debtor."

    141   The respondents say that (a) the power under article 21 is to grant
    any type of relief that is available under the law of the relevant state, and that
G   the fact that recognition and enforcement of foreign judgments is not
    specifically mentioned in article 21 as one of the forms of relief available,
    does not mean that such relief cannot be granted; (b) the recognition and
    enforcement of the judgments of a foreign court is the paradigm means of
    co-operation with that court; and (c) the examples of co-operation in
    article 27 are merely examples and are not exhaustive.

    142   But the CBIR (and the Model Law) say nothing about the
H   enforcement of foreign judgments against third parties. As Lord Mance JSC
    pointed out in argument, recognition and enforcement are fundamental in
    international cases. Recognition and enforcement of judgments in civil and
    commercial matters (but not in insolvency matters) have been the subject of
    intense international negotiations at the Hague Conference on Private

© 2013 The Incorporated Council of Law Reporting for England and Wales

International Law, which ultimately failed because of inability to agree on recognised international bases of jurisdiction.

143   It would be surprising if the Model Law was intended to deal with judgments in insolvency matters by implication. Articles 21, 25 and 27 are concerned with procedural matters. No doubt they should be given a purposive interpretation and should be widely construed in the light of the objects of the Model Law, but there is nothing to suggest that they apply to the recognition and enforcement of foreign judgments against third parties.

144   The respondents rely on United States decisions but the only case involving enforcement of a foreign judgment in fact supports the appellants' argument. The Model Law has been implemented into United States law through Chapter 15 of Title 11 of the United States Code, which has in sections 1521, 1525 and 1527 provisions which are, with modifications not relevant for present purposes, equivalent to articles 21, 25 and 27 of the CBIR. In *In re Metcalfe & Mansfield Alternative Investments* (2010) 421 BR 685 (Bankr SDNY) the US Bankruptcy Court ordered that orders made by a Canadian court in relation to a plan of compromise and arrangement under the (Canadian) Companies' Creditors Arrangement Act 1985 be enforced. That decision does not assist the respondents because the US Bankruptcy Court applied the normal rules in non-bankruptcy cases for enforcement of foreign judgments in the United States: pp 698–700. In my judgment the Model Law is not designed to provide for the reciprocal enforcement of judgments.

*VII Issue 3: New Cap: Enforcement through assistance under section 426 of the Insolvency Act 1986*

145   In view of my conclusion in the next section (section VIII) that the syndicate submitted to the jurisdiction of the Australian court, the issues on section 426(4)(5) of the Insolvency Act 1986, and their relationship with section 6 of the Foreign Judgments (Reciprocal Enforcement) Act 1933 do not arise, but since the matter was fully argued I will express a view on the applicability of section 426(4) to a case such as this.

146   Section 426(4)(5) of the Insolvency Act 1986 provides:

"(4) The courts having jurisdiction in relation to insolvency law in any part of the United Kingdom shall assist the courts having the corresponding jurisdiction in any other part of the United Kingdom or any relevant country or territory.

"(5) For the purposes of subsection (4) a request made to a court in any part of the United Kingdom by a court in any other part of the United Kingdom, or in a relevant country or territory is authority for the court to which the request is made to apply, in relation to any matter specified in the request, the insolvency law which is applicable by either court in relation to comparable matters falling within its jurisdiction. In exercising its discretion under this subsection, a court shall have regard in particular to the rules of private international law."

147   The reference to the application of rules of private international law in section 426(5) is difficult and obscure: see *Dicey*, 15th ed, para 30-119; my discussion in *In re Television Trade Rentals* [2002] BCC 807, para 17, and the cases there cited; and *Al-Sabah v Grupo Torras SA* [2005] 2 AC 333, para 47. But nothing turns on it on these appeals.

© 2013 The Incorporated Council of Law Reporting for England and Wales

281

A   148   The question is whether section 426(4) of the 1986 Act provides a procedure by which a judgment of a court having jurisdiction in relation to insolvency law in a "relevant country or territory" may be enforced in the United Kingdom. As I have said, Australia is a relevant country.

149   A further question arises if section 426(4) applies to the enforcement of foreign judgments and that is whether section 426 is ousted by section 6 of the Foreign Judgments (Reciprocal Enforcement) Act 1933, which provides:

B
"No proceedings for the recovery of a sum payable under a foreign judgment, being a judgment to which this Part of the Act applies, other than proceedings by way of registration of the judgment, shall be entertained by any court in the United Kingdom."

C   150   Both Lewison J and the Court of Appeal [2012] Ch 538 held that section 426(4) was available as a tool for the enforcement of the judgment.

151   Section 426(4) has been given a broad interpretation: see *Hughes v Hannover Rückversicherungs-Aktiengesellschaft* [1997] 1 BCLC 497 (CA); *England v Smith* [2001] Ch 419 (CA) and *HIH* [2008] 1 WLR 852. It has been held that the fact that a letter of request has been made is a weighty factor, and public policy and comity favour the giving of assistance: *Hughes v Hannover*, at pp 517–518 and *England v Smith*, at p 433. Thus in *England v Smith* the Australian court overseeing the liquidation of the Bond Corporation made an order for the examination of a London partner in Arthur Andersen. It issued a letter of request asking the English court to assist it by making its own order for the examination. The Court of Appeal decided that the order should be made.

D

E   152   But, despite the respondents' argument to the contrary, *England v Smith* was not a case of the enforcement of the Australian order, but rather the making of the court's own order in aid of the Australian liquidation. In my judgment, subsections 426(4) and 426(5) of the 1986 Act are not concerned with enforcement of judgments. Section 426(1)(2), by contrast, deals with enforcement of orders in one part of the United Kingdom in another part, and refer expressly to the enforcement of such orders ("shall be enforced" in section 426(1)). Section 426(4) deals with assistance not only for foreign designated countries such as Australia but also to intra-United Kingdom assistance. If section 426(4) applied to intra-United Kingdom enforcement of orders, then section 426(1) would be largely redundant, going beyond what the Court of Appeal [2012] Ch 538, para 57 described as "a degree of overlap".

F

G   153   Section 426(1)(4) has its origin in sections 121 and 123 of the Bankruptcy Act 1914. Section 121 of the 1914 Act provided that orders of bankruptcy courts in one part of the United Kingdom were to be enforced in other parts. Section 122 provided that the courts exercising bankruptcy and insolvency jurisdiction in the United Kingdom and "every British court elsewhere" were to act in aid of, and be auxiliary to, each other; and, upon a request by the non-English court, could exercise the jurisdiction of either court.

H

154   The *Report of the Review Committee on the Insolvency Law and Practice* (1982) (Cmnd 8558) (the "Cork Report") said, at paras 1909–1913, that section 122 was the "vital section in this context", and recommended that the section should be extended to winding up. But, despite the

© 2013 The Incorporated Council of Law Reporting for England and Wales

respondents' arguments, I do not discern any recommendation which would
suggest that section 426(4) applies to the enforcement of foreign judgments.
*A*

155   Consequently the applicability of section 6 of the 1933 Act does not
arise for decision, except in a context which makes little practical difference,
and to which I will revert.

*VIII Submission*
*B*

156   If the *Dicey* rule applies the judgments in issue will be enforceable
in England if the judgment debtors submitted to the jurisdiction of the
foreign court.

*New Cap*

157   The Australian court granted leave to serve these proceedings out
of the jurisdiction on the syndicate: section IV, above. The syndicate did not
enter an appearance, but its solicitors commented in writing on evidence
presented to the Australian court about New Cap's insolvency and their
comments were placed before the Australian judge.
*C*

158   More relevant is the fact that from August 1999 the syndicate
submitted proofs of debt (in relation to unsettled claims and outstanding
premiums for the 1997, 1998, and 1999 years of account, and not to the
reinsurance contracts which are the subject of these proceedings) and
attended and participated in creditors' meetings. In particular at an
adjourned meeting of creditors on 16 September 2009 the syndicate had
given a proxy for that meeting to the chairman, and submitted a proof of
debt and proxy form for that meeting. The syndicate voted at a meeting of
creditors in favour of a scheme of arrangement. The liquidator has admitted
claims by the syndicate for the sterling equivalent of more than £650,000,
although the liquidator is retaining the dividend in partial settlement of the
costs incurred in these proceedings.
*D*

*E*

159   The general rule in the ordinary case in England is that the party
alleged to have submitted to the jurisdiction of the English court must have
"taken some step which is only necessary or only useful if" an objection to
jurisdiction "has been actually waived, or if the objection has never been
entertained at all": *Williams & Glyn's Bank plc v Astro Dinamico Cia
Naviera SA* [1984] 1 WLR 438, 444 (HL) approving *Rein v Stein* (1892)
66 LT 469, 471 (Cave J).
*F*

160   The same general rule has been adopted to determine whether there
has been a submission to the jurisdiction of a foreign court for the purposes
of the rule that a foreign judgment will be enforced on the basis that the
judgment debtor has submitted to the jurisdiction of the foreign court:
*Adams v Cape Industries plc* [1990] Ch 433, 459 (Scott J) and *Akai Pty Ltd
v People's Insurance Co Ltd* [1998] 1 Lloyd's Rep 90, 96–97 (Thomas J); see
also *Desert Sun Loan Corpn v Hill* [1996] 2 All ER 847, 856 (CA); *Akande v
Balfour Beatty Construction Ltd* [1998] IL Pr 110; *Starlight International
Inc v Bruce* [2002] IL Pr 617, para 14 (cases of foreign judgments) and
*Industrial Maritime Carriers (Bahamas) Inc v Sinoca International Inc (The
Eastern Trader)* [1996] 2 Lloyd's Rep 585, 601 (a case involving the
question whether the party seeking an anti-suit injunction in support of an
English arbitration clause had waived the agreement by submitting to the
jurisdiction of the foreign court).
*G*

*H*

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    161   The characterisation of whether there has been a submission for the
purposes of the enforcement of foreign judgments in England depends on
English law. The court will not simply consider whether the steps taken
abroad would have amounted to a submission in English proceedings. The
international context requires a broader approach. Nor does it follow from
the fact that the foreign court would have regarded steps taken in the foreign
B    proceedings as a submission that the English court will so regard them.
Conversely, it does not necessarily follow that because the foreign court
would not regard the steps as a submission that they will not be so regarded
by the English court as a submission for the purposes of the enforcement of a
judgment of the foreign court. The question whether there has been a
submission is to be inferred from all the facts.

C    162   It is in that context that Scott J said at first instance in *Adams v
Cape Industries plc* [1990] Ch 433, 461 (a case in which the submission issue
was not before the Court of Appeal):

     "If the steps would not have been regarded by the domestic law of the
     foreign court as a submission to the jurisdiction, they ought not . . . to be
     so regarded here, notwithstanding that if they had been steps taken in an
     English court they might have constituted a submission. The implication
D    of procedural steps taken in foreign proceedings must . . . be assessed in
     the context of the foreign proceedings."

     163   I agree with the way it was put by Thomas J in *Akai Pty Ltd v
People's Insurance Co Ltd* [1998] 1 Lloyd's Rep 90, 97:

     "The court must consider the matter objectively; it must have regard to
E    the general framework of its own procedural rules, but also to the
     domestic law of the court where the steps were taken. This is because the
     significance of those steps can only be understood by reference to that
     law. If a step taken by a person in a foreign jurisdiction, such as making a
     counterclaim, might well be regarded by English law as amounting to a
     submission to the jurisdiction, but would not be regarded by that foreign
F    court as a submission to its jurisdiction, an English court will take into
     account the position under foreign law."

     164   The syndicate did not take any steps in the avoidance proceedings
as such which would be regarded either by the Australian court or by the
English court as a submission. Were the steps taken by the syndicate in the
liquidation a submission for the purposes of the rules relating to foreign
G    judgments?

     165   In English law there is no doubt that orders may be made against a
foreign creditor who proves in an English liquidation or bankruptcy on the
footing that by proving the foreign creditor submits to the jurisdiction of the
English court. In *Ex p Robertson; In re Morton* (1875) LR 20 Eq 733
trustees were appointed over the property of bankrupt potato merchants in a
liquidation by arrangement. A Scots merchant received payment of £120
H    after the liquidation petition was presented, and proved for a balance of
£247 and received a dividend of what is now 20p in the pound. The trustees
served a notice of motion, seeking repayment of the £120 paid out of the
insolvent estate, out of the jurisdiction. The respondent objected to the
jurisdiction of the English court on the ground that he was a domiciled

Scotsman.  On appeal from the county court, Bacon CJ held that the court    *A*
had jurisdiction.  He said, at pp 737–738:

"what is the consequence of creditors coming in under a liquidation or
bankruptcy?  They come in under what is as much a compact as if each of
them had signed and sealed and sworn to the terms of it—that the
bankrupt's estate shall be duly administered among the creditors.  That
being so, the administration of the estate is cast upon the court, and the    *B*
court has jurisdiction to decide all questions of whatever kind, whether of
law, fact, or whatever else the court may think necessary in order to effect
complete distribution of the bankrupt's estate . . . can there be any doubt
that the appellant in this case has agreed that, as far as he is concerned . . .
the law of bankruptcy shall take effect as to him, and under this
jurisdiction, to which he is not only subjected, but under which he has
become an active party, and of which he has taken the benefit . . . [The    *C*
appellant] is as much bound to perform the conditions of the compact,
and to submit to the jurisdiction of the court, as if he had never been out
of the limits of England."

166  The syndicate objected to the jurisdiction of the Australian court.
Barrett J in his judgment of 14 July 2009 accepted that it had made it clear
that it was not submitting to its jurisdiction, and he also accepted that as a    *D*
result the judgment of the Australian court would not be enforceable in
England.  His judgment is concerned exclusively with the preference claims,
and he did not deal with the question of submission by reference to the
syndicate's participation in the liquidation by way of proof and receipt of
dividends.  He decided that the court had jurisdiction because the New
South Wales rules justified service out of the jurisdiction on the basis that the    *E*
cause of action arose in New South Wales.

167  I would therefore accept the liquidators' submission that, having
chosen to submit to New Cap's Australian insolvency proceeding, the
syndicate should be taken to have submitted to the jurisdiction of the
Australian court responsible for the supervision of that proceeding.  It
should not be allowed to benefit from the insolvency proceeding without the
burden of complying with the orders made in that proceeding.    *F*

### Rubin

168  The position is different in the *Rubin* appeal.  It would certainly
have been arguable that Eurofinance SA had submitted to the jurisdiction of
the United States District Court, for these reasons: first, it was Eurofinance
SA which applied for the appointment by the High Court of Mr Rubin and
Mr Lan as receivers of TCT specifically for the purpose of causing TCT then    *G*
to obtain protection under Chapter 11; second, it was Eurofinance SA which
represented to the English court that office-holders appointed by the United
States court would be able to pursue claims against third parties; third, the
judgment of the US Bankruptcy Court states that the court had personal
jurisdiction over Eurofinance SA not only because it did business in the
United States but also (as I have mentioned above) because it had filed a    *H*
notice of appearance in the Chapter 11 proceedings: order 22 of July 2008,
paras 42–43.

169  But the *Rubin* appellants did not appear in the adversary
proceedings, and it was not argued in these proceedings that Eurofinance

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   SA (or Mr Adrian Roman, who caused Eurofinance SA to make the application) had submitted to the jurisdiction of the US Bankruptcy Court in any other way and it is not necessary therefore to explore the matter further.

*IX New Cap: enforcement at common law or under the 1933 Act*

170   In view of my conclusion that the Australian judgment in *New Cap*
B   is enforceable by reason of the syndicate's submission, a purely technical point arises on the method of enforcement. The point is whether the enforcement is to be under the 1933 Act or at common law. If insolvency proceedings are excluded from the 1933 Act, then enforcement would be at common law. If they are not excluded, then (as I have said) section 6 has the effect of excluding an action at common law on the judgment and making registration under the 1933 Act the only method of enforcement of
C   judgments within Part I of the Act.

171   Section 11(2) of the 1933 Act provides that the expression "action in personam" shall not be deemed to include (inter alia) proceedings in connection with bankruptcy and winding up of companies. But the effect of section 4(2)(c) is that in the case of a judgment given in an action other than an action in personam or an action in rem, the foreign court shall be deemed
D   to have jurisdiction if its jurisdiction is recognised by the English court, i e at common law. Accordingly, the question whether insolvency proceedings are wholly excluded from the operation of the 1933 Act still arises. There is no other provision in the 1933 Act which throws any light on the point.

172   The main object of the 1933 Act was to facilitate the enforcement of commercial judgments abroad by making reciprocity easier. The only reference to insolvency proceedings in the *Report of the Foreign Judgments*
E   *(Reciprocal Enforcement) Committee* (1932) (Cmd 4213) ("the Greer Report"), which recommended the legislation, is the statement (para 4): "It is not necessary for our present purposes to consider the effect in England of foreign judgments in bankruptcy proceedings . . ." The report annexed draft Conventions which had been drawn up in consultation with experts from Belgium, France and Germany. The draft Conventions with Belgium
F   (article 4(3)(4)) and Germany (article 4(4)) provided that the jurisdictional rules in the Convention did not apply to judgments in bankruptcy proceedings or proceedings relating to the winding up of companies or other bodies corporate, but that the jurisdiction of the original court would be recognised where such recognition was in accordance with the rules of private international law observed by the court applied to. That provision paralleled what became sections 4(2)(c) and 11(2) of the 1933 Act. The
G   draft Convention with France did not apply to judgments in bankruptcy proceedings etc (article 2(3)), but provided that nothing was deemed to preclude the recognition and enforcement of judgments to which the Convention did not apply: article 2(4).

173   The Conventions concluded with countries to which the 1933 Act applied adopted similar techniques. It is unnecessary to set them out in detail. But there is no reason to suppose that bankruptcy proceedings were
H   not regarded as being "civil and commercial matters". Thus the 1961 Convention with the Federal Republic of Germany of 1961 (set out in the Schedule to the Reciprocal Enforcement of Foreign Judgments (Germany) Order (SI 1961/1199)) provided in article I(6) that the expression "judgments in civil and commercial matters" did not include

© 2013 The Incorporated Council of Law Reporting for England and Wales

judgments for fines or penalties, and had a separate provision in article    A
II(2) that the Convention did not apply to judgments in bankruptcy
proceedings or proceedings relating to the winding up of companies or
other bodies corporate (although, in accordance with the usual technique,
it did not rule out recognition and enforcement: article II(3)).    Other
Conventions simply excluded bankruptcy proceedings from the specific
jurisdictional provisions of the Convention, like the draft Conventions    B
annexed to the Greer Report: article IV(5) of the Schedule to the Reciprocal
Enforcement of Foreign Judgments (Austria) Order 1962 (SI 1962/1339),
article IV(3) of the Schedule to the Reciprocal Enforcement of Foreign
Judgments (Norway) Order 1962 (SI 1962/636), and article IV(3) of
Schedule 1 to the Reciprocal Enforcement of Foreign Judgments (Italy)
Order 1973 (SI 1973/1894).

174   The Reciprocal Enforcement of Judgments (Australia) Order 1994    C
(SI 1994/1901) extended the 1933 Act to Australia, implementing the UK-
Australia Agreement for the reciprocal enforcement of judgments in civil
and commercial matters.    The Agreement (set out in the Schedule to the
Order) is expressed in article 1(c)(i) to apply to judgments in civil and
commercial matters.    The Order applies Part I of the Act to judgments in
respect of a "civil or commercial matter": article 4(a).    D

175   There is no reason to conclude that the phrase "civil and
commercial matters" does not include insolvency proceedings, and the
history of the 1933 Act and the Conventions shows that it does.   The fact
that insolvency was expressly excluded from the operation of the Brussels
Convention, the original and revised Lugano Conventions and the Brussels
I Regulation in fact suggests that otherwise they would have been within
their scope.    The respondents relied on a passage in the ruling of the    E
Court of Justice of the European Union in Gourdain v Nadler (Case
133/78) [1979] ECR 733, paras 3–4, as suggesting that the exclusion of
bankruptcy in article 1 of the Brussels Convention was an example of a
matter excluded from the concept of civil and commercial matters.    But it
is clear from the context (and from the opinion of Advocate General
Reischl) that the court was simply saying that because the expression    F
"civil and commercial matters" in article 1 had to be given an
autonomous meaning, so also was the case with the expression
"bankruptcy".    That the exclusion of bankruptcy proceedings does not
affect their character as civil or commercial matters is confirmed by the
recent ruling in F-Tex SIA v Lietuvos-Anglijos UAB-Jadecloud-Vilma
(Case C-213/10) 19 April 2012, where the court said that the Brussels
I Regulation was "intended to apply to all civil and commercial matters    G
apart from certain well-defined matters" and as a result actions directly
deriving from insolvency proceedings and closely connected with them
were excluded: para 29.

176   It follows that the 1933 Act applies to the Australian judgment and
that enforcement should be by way of registration under the 1933 Act.

H

### X Disposition

177   I would therefore allow the appeal in Rubin, but dismiss the appeal
in New Cap on the ground that the syndicate submitted to the jurisdiction of
the Australian court.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   **LORD MANCE JSC**

178   I agree with Lord Collins of Mapesbury's reasoning and
conclusions in his judgment on these appeals, essentially for the reasons he
gives, though without subscribing to his incidental observation (para 132)
that the Privy Council decision in *Cambridge Gas Transportation Corpn v
Official Committee of Unsecured Creditors of Navigator Holdings plc*
B   [2007] 1 AC 508 was necessarily wrongly decided. This was not argued
before the Supreme Court, and I would wish to reserve my opinion upon it.
*Cambridge Gas* is, on any view, distinguishable.

179   The common law question central to these appeals is whether the
Supreme Court should endorse or introduce a special rule of recognition and
enforcement, one falling outside the scope of the *Dicey* rule which Lord
Collins has identified (rule 36 in the 14th and rule 43 in the 15th edition) and
C   applicable to judgments in foreign insolvency proceedings setting aside
voidable pre-insolvency transactions. For the principal reasons which Lord
Collins gives in paras 95–131, I agree that we should not do so.

180   Since much weight was placed by the respondents and the Court of
Appeal upon the Board's reasoning and decision in *Cambridge Gas*, I add
some observations to indicate why, as the present appellants submitted, it
concerned circumstances and proceeded upon factual assumptions and a
D   legal analysis which have no parallel in the present case.

181   *Cambridge Gas* has attracted both Irish judicial dissent and English
academic criticism, to which Lord Collins refers in paras 53 and 111–112.
Giving the judgment of the Board in *Pattni v Ali* [2007] 2 AC 85, I said that
the purpose of the bankruptcy order with which the Board was concerned in
*Cambridge Gas* "was simply to establish a mechanism of collective
E   execution against the property of the debtor [Navigator] by creditors whose
rights were admitted or established": para 23.

182   This analysis, admittedly, involved treating the vesting in creditors
of shares *in* Navigator as no different in substance from the vesting in
creditors of Navigator's shares in its ship-owning subsidiaries. But it is clear
from paras 8 and 9 and again 24–26 of the Board's advice in *Cambridge Gas*
F   that the Board saw no difference. It did not regard Cambridge Gas as having
any interest of value to advance or protect in the shares still held nominally
in its name. Their vesting in Navigator's creditors was no more than a
mechanism for disposing of Navigator's assets, which did not affect or
concern Cambridge Gas. The Board was therefore, in its view (and rightly
or wrongly), concerned with distribution of the insolvent company's assets
in a narrow and traditional sense.

G   183   Amplifying this, the Board approached the situation in *Cambridge
Gas* as follows. The New York court had jurisdiction over Navigator's
assets, since Navigator had submitted to the New York proceedings.
Cambridge Gas's shares in Navigator (located in the Isle of Man,
Navigator's place of incorporation) were "completely and utterly worthless"
[2007] 1 AC 508, para 9. The transfer to Navigator's creditors of
Cambridge Gas's shares in Navigator had the like effect to a transfer of
H   Navigator's assets, since Navigator was "an insolvent company, in which the
shareholders ha[d] no interest of any value": para 26. Cambridge Gas's
shares in Navigator were vulnerable in the Isle of Man, under section 152 of
the Companies Act 1931, to a similar scheme of arrangement to that which
the New York Court intended by its Chapter 11 order. More generally, as

© 2013 The Incorporated Council of Law Reporting for England and Wales

I noted in *Stone & Rolls Ltd v Moore Stephens* [2009] AC 1391, *A*
paras 236–238, in insolvency shareholders' interests yield to those of
creditors.

184   It was in this limited context that the Board concluded that the
New York and Manx courts' orders could be regarded as doing no more
than facilitating or enabling collective execution against Navigator's
property.                                                              *B*

185   The Court of Appeal believed on the contrary that the answer to the
present cases lay in the Board's general statements in *Cambridge Gas* [2007]
1 AC 508, paras 19–21 regarding the nature of insolvency proceedings. It is
true that proceedings to avoid pre-insolvency transactions can be related to
the process of collection of assets. That is, their general purpose and effect is
to ensure a fair allocation of assets between all who are and were within
some specified pre-insolvency period creditors. A dictum of Lord Hoffmann *C*
in *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852,
para 19, quoted by Lord Collins in paras 15 and 52, is to that effect, though
again uttered in a different context to the present.

186   However, the Board did not see these considerations as answering
or eliminating all questions regarding the existence of jurisdiction or at least
its exercise in *Cambridge Gas*. On the contrary, it went on to examine in *D*
close detail in paras 22–26 the limits of the assistance that a court could
properly give. In rejecting the argument that the interference with the
shareholding held in Cambridge Gas's name was beyond the Manx court's
jurisdiction (para 26), the only reason it gave related to the nature of shares
in an insolvent company. This meant, according to its advice, that
Cambridge Gas had no interest of any value to protect and that registration *E*
of the shares in Navigator's creditors' name was no more than a mechanism
for giving creditors access to Navigator's assets.

187   On this basis, the decision in *Cambridge Gas* is, as Professor Adrian
Briggs noted in a penetrating case-note in *The British Year Book of
International Law 2006*, pp 575–581, less remarkable (although, as
Professor Briggs also notes, it perhaps still poses problems of reconciliation
with the House's decision in *Société Eram Shipping Co Ltd v Cie* *F*
*Internationale de Navigation* [2004] AC 260). But, because the actual
decision in *Cambridge Gas* was so narrowly focused on the nature of a
shareholder's rights in an insolvent company and was not directly
challenged, I prefer to leave open its correctness.

188   Whatever view may be taken as to the validity of the Board's
reasoning in *Cambridge Gas*, it is clear that it does not cover or control the *G*
present appeal. The present cases are not concerned with shares, with
situations in which shares are, or are treated by the court as, no more than a
key to the insolvent company's assets or even with situations in which it is
clear that those objecting to recognition and enforcement of the foreign
courts' orders have no interests to protect. There are, on the contrary,
substantial issues as to whether there were fraudulent preferences giving rise
to in personam liability in large amounts. The persons allegedly benefitting *H*
by fraudulent preferences did not appear in the relevant foreign insolvency
proceedings in which judgment was given against them. They were (leaving
aside any question of submission) outside the international jurisdiction of
the relevant foreign courts.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    189   Lord Clarke of Stone-cum-Ebony JSC takes a different view from
Lord Collins, but does not define either the circumstances in which a foreign
court should, under English private international law rules, be recognised as
having "jurisdiction to entertain" bankruptcy proceedings or, if one were
(wrongly in my view) to treat the whole area as one of discretion, the factors
which might make it either unjust or contrary to public policy to recognise
an avoidance order made in such foreign proceedings: see paras 193, 200
B    and 201 of Lord Clarke JSC's judgment.   The scope of the jurisdiction to
entertain bankruptcy proceedings which English private international
law will recognise a foreign court as having is described in *Dicey* (in para 31-064
in the 14th and 15th editions) as a "vexed and controversial" question. But
it would include situations in which the bankrupt or insolvent company had
simply submitted to the foreign bankruptcy jurisdiction.      On Lord
C    Clarke JSC's analysis, in such a case (of which *Rubin v Eurofinance* is an
example), it would be irrelevant that the debtor under the avoidance order
had not submitted, and was not on any other basis subject, to the foreign
jurisdiction.   It would be enough that the judgment debtor had had the
chance of appearing and defending before the foreign court.   For the reasons
given by Lord Collins, I do not accept that this is the common law.

D    190   In the light of the above, the Court of Appeal was, in my view, in
error in seeing the solution to the present appeals as lying in the advice given
by the Board in *Cambridge Gas*.   Even on an assumption that the actual
decision in *Cambridge Gas* can be supported, it cannot and should not be
treated as supporting the respondents' case that fraudulent preference claims
and avoidance orders in insolvency proceedings generally escape the
common law rules requiring personal or in rem jurisdiction.

E
### LORD CLARKE OF STONE-CUM-EBONY JSC

191   I would like to pay tribute to the learning in Lord Collins of
Mapesbury's comprehensive judgment.   However, left to myself, I would
dismiss the appeal in the *Rubin* case.   Since I am in a minority of one, little is
to be gained by my writing a long dissent.   I will therefore try to explain my
reasons shortly.   In doing so, I adopt the terminology and abbreviations used
F    by Lord Collins.

192   I agree with Lord Collins and Lord Mance JSC that the decision of
the Privy Council in *Cambridge Gas Transportation Corpn v Official
Committee of Unsecured Creditors of Navigator Holdings plc* [2007]
1 AC 508 is distinguishable.   The facts there were quite different from those
here.   However, in so far as it is suggested that *Cambridge Gas* was wrongly
G    decided, I do not agree.   Moreover, I do not think that it would be
appropriate so to hold because it was not submitted to be wrong in the
course of the argument.   To my mind the approach which should be adopted
is presaged in the speech of Lord Hoffmann in *In re HIH Casualty and
General Insurance Ltd* [2008] 1 WLR 852 and in his judgment in *Cambridge
Gas*.

H    193   As I see it, the issue is simply whether an avoidance order made by a
foreign bankruptcy court made in the course of the bankruptcy proceedings,
whether personal or corporate, which the court has jurisdiction to entertain,
is unenforceable if it can fairly be said to be an order made either in
personam or in rem.   I would answer that question in the negative.   Put
another way, the question is whether the English court has jurisdiction under

© 2013 The Incorporated Council of Law Reporting for England and Wales

English rules of private international law to enforce an avoidance order *A* made in foreign bankruptcy proceedings in circumstances where, under those rules, the foreign court has jurisdiction to entertain the bankruptcy proceedings themselves. I would answer that question in the affirmative. It is not, as I understand it, suggested here that the US court did not have jurisdiction to entertain the bankruptcy proceedings themselves.

194  The relevant paragraphs of Lord Hoffmann's judgment in *B* *Cambridge Gas* are in these terms (as quoted by Lord Collins at para 43 above):

"13. . . . Judgments in rem and in personam are judicial determinations of the existence of rights: in the one case, rights over property and in the other, rights against a person. When a judgment in rem or in personam is recognised by a foreign court, it is accepted as *C* establishing the right which it purports to have determined, without further inquiry into the grounds upon which it did so. The judgment itself is treated as the source of the right.

"14. The purpose of bankruptcy proceedings, on the other hand, is not to determine or establish the existence of rights, but to provide a mechanism of collective execution against the property of the debtor by creditors whose rights are admitted or established . . . *D*

"15. . . . bankruptcy, whether personal or corporate, is a collective proceeding to enforce rights and not to establish them. Of course, as Brightman LJ pointed out in *In re Lines Bros Ltd* [1983] Ch 1, 20, it may incidentally be necessary in the course of bankruptcy proceedings to establish rights which are challenged: proofs of debt may be rejected; or there may be a dispute over whether or not a particular item of property *E* belonged to the debtor and is available for distribution. There are procedures by which these questions may be tried summarily within the bankruptcy proceedings or directed to be determined by ordinary action. But these again are incidental procedural matters and not central to the purpose of the proceedings."

195  The critical paragraph is para 15, which seems to me to make it *F* clear that it is possible to have an order which is both in personam or in rem and an order of the kind referred to by Lord Hoffmann in para 14. Thus it may be incidentally necessary to establish substantive rights in the course of the bankruptcy proceedings as part of a collective proceeding to enforce rights. In such a case the order will be doing two things. It will be both establishing the right and enforcing it. This can be seen from the examples given in para 15. Proofs of debt may be rejected, which is a process which *G* may involve determining, for example, the substantive rights of the creditor against the debtor. Or it may be necessary to determine whether or not a particular item of property belongs to the debtor and is available for distribution. As para 15 contemplates, such procedures may be tried either summarily within the bankruptcy proceedings or by ordinary action. In either such case Lord Hoffmann describes them as incidental procedures which are not central to the purpose of the bankruptcy proceedings. As I see *H* it, in such a case, an avoidance order may be both an order in personam or in rem and an order in the bankruptcy proceedings.

196  I agree with Lord Collins at para 103 that it is not easy to see why the order of the US Bankruptcy Court in *Cambridge Gas* was not an order in

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   rem. However, that does not to my mind show that *Cambridge Gas* was
wrongly decided but demonstrates that it is possible to have an in rem order
which is made as incidental to bankruptcy proceedings but which is
enforceable at common law, provided that the bankruptcy court has
jurisdiction in the bankruptcy.

197   The approach is explained by Lord Hoffmann in *HIH* [2008]
1 WLR 852, para 30 and in *Cambridge Gas* [2007] 1 AC 508, para 16, both
B   of which are quoted by Lord Collins at para 19 above. In *HIH* he said:

   "The primary rule of private international law which seems to me
   applicable to this case is the principle of (modified) universalism, which
   has been the golden thread running through English cross-border
   insolvency law since the 18th century. That principle requires that
C   English courts should, so far as is consistent with justice and UK public
   policy, co-operate with the courts in the country of the principal
   liquidation to ensure that all the company's assets are distributed to its
   creditors under a single system of distribution."

In *Cambridge Gas* he said:

   "The English common law has traditionally taken the view that
D   fairness between creditors requires that, ideally, bankruptcy proceedings
   should have universal application. There should be a single bankruptcy
   in which all creditors are entitled and required to prove. No one should
   have an advantage because he happens to live in a jurisdiction where
   more of the assets or fewer of the creditors are situated."

198   At paras 94–98 above Lord Collins discusses the nature of
E   avoidance proceedings. I entirely agree with his analysis. Avoidance
provisions requiring the adjustment of prior transactions and the recovery of
previous dispositions of property so as to constitute the estate available for
distribution are necessary in order to maintain the principle of equality
among creditors. At para 15 Lord Collins notes that Lord Hoffmann said at
para 19 of *HIH* that "the process of collection of assets will include, for
example, the use of powers to set aside voidable dispositions, which may
F   differ very considerably from those in the English statutory scheme". In
short, avoidance proceedings, and therefore avoidance orders, are central to
the bankruptcy proceedings. As Lord Collins puts it at para 99, avoidance
proceedings are peculiarly the subject of insolvency law.

199   I accept that to permit the enforcement of an avoidance order in
circumstances of this kind would be a development of the common law.
G   However, it seems to me that it would be a principled development. It
would in essence be an application of the principle identified by Lord
Hoffmann in the passage quoted above from para 30 of *HIH* that the
principle of modified universalism requires that English courts should, so far
as is consistent with justice and United Kingdom public policy, co-operate
with the courts in the country of the principal liquidation to ensure that all
the company's assets are distributed to its creditors under a single system of
H   distribution.

200   The position of the judgment debtor in such a case would be
protected by the principle that the English court would only enforce a
judgment in a case like this where to do so was consistent with justice and
United Kingdom public policy. All would depend upon the facts of the

© 2013 The Incorporated Council of Law Reporting for England and Wales

particular case.  In the case of *Rubin*, there would be no injustice in enforcing    A
the judgment against the appellants.

201  Lord Mance JSC notes at para 189 that I do not define either the
circumstances in which a foreign court should be recognised as having
jurisdiction to entertain bankruptcy proceedings or the factors which would
make it unjust or contrary to public policy to recognise an avoidance order
made in such foreign proceedings.  As I see it, these are matters which would    B
be worked out on a case by case basis in (as Lord Hoffmann put it in *HIH*
[2008] 1 WLR 852, para 30) co-operating with the courts in the country of
the principal liquidation to ensure that all the company's assets are
distributed to its creditors under a single system of distribution.  It would not
be irrelevant that the debtor under the avoidance order had not submitted.
All would depend upon the particular circumstances of the case, including
the reasons why the debtor had not submitted.                                    C

202  In essence, on the critical question, I prefer the reasoning of the
Court of Appeal, which is contained in the judgment of Ward LJ [2011] Ch
133, paras 38, 41, 43, 45, 48, 50, 61–62, 64, with whom Wilson LJ and
Henderson J agreed.  Lord Collins has concisely summarised their reasoning
in paras 88–90, substantially as follows: (a) the judgment was final and
conclusive, and for definite sums of money, and on the face of the orders was    D
a judgment in personam; (b) it was common ground that the judgment
debtors were not present when the proceedings were instituted, and did not
submit to the jurisdiction, and so at first blush had an impregnable defence;
(c) *Cambridge Gas* decided that the bankruptcy order with which it was
concerned was neither in personam nor in rem, and its purpose was simply to
establish a mechanism of collective execution against the property of the
debtor by creditors whose rights were admitted or established: *Pattni v Ali*    E
[2007] 2 AC 85, para 23; (d) bankruptcy was a collective proceeding to
enforce rights and not to establish them: *Cambridge Gas* [2007] 1 AC 508,
para 15; (e) the issue was whether avoidance proceedings which could only
be brought by the representative of the bankrupt were to be characterised as
part of the bankruptcy proceedings, i e part of the collective proceeding to
enforce rights and not to establish them; (f) the adversary proceedings were    F
part and parcel of the Chapter 11 proceedings; (g) the ordinary rules for
enforcing foreign judgments in personam did not apply to bankruptcy
proceedings; (h) avoidance mechanisms were integral to and central to the
collective nature of bankruptcy and were not merely incidental procedural
matters; (i) the process of collection of assets will include the use of powers to
set aside voidable dispositions, which may differ very considerably from
those in the English statutory scheme: *HIH* [2008] 1 WLR 852, para 19;      G
(j) the judgment of the US Bankruptcy Court was a judgment in, and for the
purposes of, the collective enforcement regime of the insolvency proceedings,
and was governed by the sui generis private international law rules relating to
insolvency; (k) that was a desirable development of the common law founded
on the principles of modified universalism, and did not require the court to
enforce anything that it could not do, mutatis mutandis, in a domestic
context; (l) there was a principle of private international law that bankruptcy    H
should be unitary and universal, and there should be a unitary insolvency
proceeding in the court of the bankrupt's domicile which receives worldwide
recognition and should apply universally to all the bankrupt's assets;
(m) there was a further principle that recognition carried with it the active

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   assistance of the court which included assistance by doing whatever the English court could do in the case of a domestic insolvency; (n) there was no unfairness to the appellants in upholding the judgment because they were fully aware of the proceedings, and after taking advice chose not to participate [2011] Ch 133, paras 38, 41, 43, 45, 48, 50, 61–62, 64.

203   That seems to me to be a correct summary of the views of the Court of Appeal. I agree with those views subject to this comment on point (c). I am not
B   sure that in *Cambridge Gas* the Privy Council decided that the bankruptcy order with which it was concerned was neither in personam nor in rem. It held that the purpose of the order was simply to establish a mechanism of collective execution against the property of the debtor by creditors whose rights were admitted or established. As discussed above, it may well have appreciated that it was also an order in rem. However that may be, I agree with Lord Collins at
C   para 90 that, in short, the Court of Appeal accepted that the judgment sought to be enforced in the instant cases was an in personam judgment, but decided that the *Dicey* rule did not apply to foreign judgments in avoidance proceedings because they were central to the collective enforcement regime in insolvency and were governed by special rules. I agree with the reasoning of the Court of Appeal. Put another way, the *Dicey* rule should in my opinion be modified to include a fifth case in which a foreign court has jurisdiction to give
D   a judgment in personam capable of enforcement or recognition as against the person against whom it is given. That fifth case would be if the judgment was given in avoidance proceedings as part of foreign bankruptcy proceedings which the foreign court had jurisdiction to entertain.

204   I recognise that there are other ways of achieving such a result, as for example by an equivalent provision to the EC Insolvency Regulation: per
E   Lord Collins at paras 99–101. I also recognise that it would be possible to adopt a more radical approach not limited to avoidance proceedings. However, so limited, I respectfully disagree with the view expressed by Lord Collins at para 128 that this development would not be an incremental development of existing principles but a radical departure from substantially settled law. For the reasons given in para 199, it would in essence be an application of the principle of modified universalism. It seems to me that in
F   these days of global commerce, the step taken by the Court of Appeal was but a small step forward. Judgment debtors are protected by the principle that no order would be made if it were contrary to justice or United Kingdom public policy. Moreover, on the facts here, I can see no basis upon which the order made by the Court of Appeal would be either unjust or contrary to public policy. Finally, I do not think that that conclusion is undermined by any absence of reciprocity.
G   205   For these reasons, I would dismiss the appeal in the *Rubin* case on the common law point. On all other issues I agree with the judgment of Lord Collins.

*Appeal in first case allowed.*
*Appeal in second case dismissed.*

H                                        COLIN BERESFORD, Barrister

© 2013 The Incorporated Council of Law Reporting for England and Wales