1675

*A*

Privy Council

## Singularis Holdings Ltd *v* PricewaterhouseCoopers

### [2014] UKPC 36

*B*

[on appeal from the Court of Appeal for Bermuda]

2014 April 29, 30;            Lord Neuberger of Abbotsbury PSC, Lord Mance,
Nov 10                Lord Clarke of Stone-cum-Ebony, Lord Sumption JJSC,
Lord Collins of Mapesbury

*Bermuda — Insolvency — Jurisdiction — Company wound up in Cayman Islands —*
*Liquidators seeking order in Bermuda requiring auditors to produce information*
*C*     *relating to company's affairs — Judge purporting to exercise common law power*
*to order production of information which could have been ordered under statute*
*in domestic insolvency — Whether power at common law to assist foreign court*
*of insolvency jurisdiction by making order — Whether order appropriate in*
*circumstances where foreign court could not make equivalent order — Whether*
*court able to exercise powers analogous to statutory powers which were*
*exercisable in domestic insolvency but did not apply to foreign insolvency —*
*D*     *Companies Act 1981 (No 59 of 1981), s 195*[1]

A Cayman Islands company was wound up in the Cayman Islands and
liquidators were appointed. In order to trace the company's assets, the liquidators
wished to obtain information relating to the company's affairs from the company's
auditors, a Bermuda registered partnership. They obtained from the Cayman Islands
court an order requiring the auditors to transfer or deliver up certain documents but,
*E*     under Cayman Islands law, that order only extended to material belonging to the
company. In order to obtain material belonging to the auditors themselves, the
liquidators made an application in Bermuda for an order requiring the auditors to
produce all documents in their possession relating to the affairs of the company.
Under section 195 of the Bermudan Companies Act 1981[1], the Supreme Court of
Bermuda had power to make such an order but only in relation to a company which
that court had ordered to be wound up. However, the Chief Justice, sitting in the
*F*     Supreme Court of Bermuda, exercised what he termed a common law power to order
the auditors to produce information which they could have been ordered to produce
under section 195 if the company had been wound up in Bermuda. On the auditors'
appeal, the Court of Appeal for Bermuda doubted whether there was jurisdiction to
make such an order in circumstances where section 195 did not apply but set aside
the order on the basis that, in any event, it was not an appropriate exercise of
discretion because it was an order made in support of a Cayman Islands liquidation
*G*     which could not have been made by the Cayman Islands court.

On the liquidators' appeal—

*Held*, advising that the appeal be dismissed, (1) (Lord Neuberger of
Abbotsbury PSC and Lord Mance JSC dissenting) that there was a power at common
law to assist the officers of a foreign court of insolvency jurisdiction or equivalent
public officers by ordering the production of information in oral or documentary
form which was necessary for the administration of a foreign winding up, but the
*H*     power was not available to enable them to do something which they could not do
under the law by which they had been appointed; and that, although the fact that
express provision was made in Bermuda for the powers exercisable on the winding up
of companies to which the Companies Act 1981 applied did not exclude the use of

[1] Companies Act 1981, s 195: see post, para 4.

© 2015 The Incorporated Council of Law Reporting for England and Wales

common law powers in relation to other companies which lay outside the scope of
the statute altogether, it was not a proper exercise of the power of assistance for the
Bermudan court to make the order sought by the liquidators since the material which
they sought in Bermuda was not obtainable under the domestic law of the court
which had appointed them (post, paras 19, 25, 28–29, 31, 33, 109–115).

    *Norwich Pharmacal Co v Customs and Excise Comrs* [1974] AC 133, HL(E),
*In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852, HL(E) and *Rubin
v Eurofinance SA (Picard intervening)* [2013] 1 AC 236, SC(E) applied.

    (2) That the common law power of the court to recognise and grant assistance to
foreign insolvency proceedings was primarily exercised through the existing powers
of the court; that, although those powers could be extended or developed through the
traditional judicial law-making techniques of the common law, the judiciary could
not, by analogy, extend the scope of insolvency legislation to cases where it did not
apply, and a domestic court did not have power to assist a foreign court by doing
anything which it could properly have done in a domestic insolvency and could not
acquire jurisdiction by virtue of any such power; and that, accordingly, the Bermudan
court could not, by analogy, apply the statutory powers under the Companies Act
1981 as if the foreign insolvency were a domestic insolvency (post, paras 18, 32, 36,
38, 64, 82–83, 94, 108, 109, 122, 134, 149, 162).

    Dicta of Lord Walker of Gestingthorpe in *Al Sabah v Grupo Torras SA* [2005]
2 AC 333, para 35, PC applied.

    *Cambridge Gas Transportation Corpn v Official Committee of Unsecured
Creditors of Navigator Holdings plc* [2007] 1 AC 508, PC and *In re Phoenix
Kapitaldienst GmbH* [2013] Ch 61 not followed.

    *Quaere.* Whether information which the auditors acquired solely in their
capacity as the company's auditors can be regarded as belonging exclusively to them
simply because the documents in which they recorded that information are their
working papers and as such their property (post, para 30).

    Decision of the Court of Appeal for Bermuda [2013] CA (Bda) 7 Civ affirmed.

The following cases are referred to in the judgments:

*African Farms, In re* [1906] TS 373
*Al Sabah v Grupo Torras SA* [2005] UKPC 1; [2005] 2 AC 333; [2005] 2 WLR 904;
    [2005] 1 All ER 871, PC
*Arab Monetary Fund v Hashim (No 5)* [1992] 2 All ER 911
*Ashworth Hospital Authority v MGN Ltd* [2002] UKHL 29; [2002] 1 WLR 2033;
    [2002] 4 All ER 193, HL(E)
*Ayerst v C & K (Construction) Ltd* [1976] AC 167; [1975] 3 WLR 16; [1975] 2 All
    ER 537, HL(E)
*Banco Nacional de Cuba v Cosmos Trading Corpn* [2000] 1 BCLC 813, CA
*Bank of Credit and Commerce International SA (No 10), In re* [1997] Ch 213; [1997]
    2 WLR 172; [1996] 4 All ER 796
*Banque Indosuez SA v Ferromet Resources Inc* [1993] BCLC 112
*Bent v Young* (1838) 9 Sim 180
*CCIC Finance Ltd v Guangdong International Trust & Investment Corpn* [2005]
    2 HKC 589
*Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors
    of Navigator Holdings plc* [2006] UKPC 26; [2007] 1 AC 508; [2006] 3 WLR
    689; [2006] 3 All ER 829; [2006] 2 All ER (Comm) 695, PC
*Colonial Government v Tatham* (1902) 23 Natal LR 153
*Crédit Suisse Fides Trust SA v Cuoghi* [1998] QB 818; [1997] 3 WLR 871; [1997]
    3 All ER 673, CA
*Deutsche Morgan Grenfell Group plc v Inland Revenue Comrs* [2006] UKHL 49;
    [2007] 1 AC 558; [2006] 3 WLR 781; [2007] 1 All ER 449, HL(E)
*Dreyfus v Peruvian Guano Co* (1889) 41 Ch D 151
*England v Smith* [2001] Ch 419; [2000] 2 WLR 1141, CA

© 2015 The Incorporated Council of Law Reporting for England and Wales

1677

**[2015] AC**          **Singularis Holdings Ltd v PricewaterhouseCoopers (PC)**

A   *Gurr v Zambia Airways Corpn Ltd* [1998] ZASCA 16; [1998] 2 All SA 479 (A)
   *HIH Casualty and General Insurance Ltd, In re* [2008] UKHL 21; [2008] 1 WLR
      852; [2008] Bus LR 905; [2008] 3 All ER 869, HL(E)
   *Impex Services Worldwide Ltd, In re* [2004] BPIR 564
   *Incorporated Council of Law Reporting for England and Wales v Attorney General*
      [1972] Ch 73; [1971] 3 WLR 853; [1971] 3 All ER 1029, CA
   *International Tin Council, In re* [1987] Ch 419; [1987] 2 WLR 1229; [1987] 1 All ER
B     890
   *Jones v Kaney* [2011] UKSC 13; [2011] 2 AC 398; [2011] 2 WLR 823; [2011] 2 All
      ER 671, SC(E)
   *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349; [1998] 3 WLR 1095;
      [1998] 4 All ER 513, HL(E)
   *McKerr, In re* [2004] UKHL 12; [2004] 1 WLR 807; [2004] 2 All ER 409, HL(NI)
   *Masri v Consolidated Contractors International (UK) Ltd (No 4)* [2009] UKHL 43;
C     [2010] 1 AC 90; [2009] 3 WLR 385; [2009] Bus LR 1269; [2009] 4 All ER 847;
      [2010] 1 All ER (Comm) 220; [2009] 2 Lloyd's Rep 473, HL(E)
   *Matheson Bros, In re* (1884) 27 Ch D 225
   *Modern Terminals (Berth 5) Ltd v States Steamship Co* [1979] HKLR 512
   *Moolman v Builders & Developers (Pty) Ltd* [1989] ZASCA 171; [1990] 2 All SA 77
      (A)
   *Norwich Pharmacal Co v Customs and Excise Comrs* [1974] AC 133; [1973] 3 WLR
      164; [1973] 2 All ER 943, HL(E)
D   *Orr v Diaper* (1876) 4 Ch D 92; 25 WR 23
   *P & O Nedlloyd BV v Arab Metals Co (No 2) (The UB Tiger)* [2006] EWCA Civ
      1717; [2007] 1 WLR 2288; [2007] 2 All ER (Comm) 401; [2007] 2 Lloyd's Rep
      231, CA
   *Perpetual Trustee Co Ltd v BNY Corporate Trustee Services Ltd* [2009] EWHC 1912
      (Ch); [2009] 2 BCLC 400; *(Revenue and Customs Comrs intervening)* [2011]
      UKSC 38; [2012] 1 AC 383; [2011] 3 WLR 521; [2011] Bus LR 1266; [2012]
E     1 All ER 505, SC(E)
   *Phoenix Kapitaldienst GmbH, In re* [2012] EWHC 62 (Ch); [2013] Ch 61; [2012]
      3 WLR 681; [2012] 2 All ER 1217
   *Picard v Primeo Fund* 2013 (1) CILR 164, Grand Ct (Jones J); 2014 (1) CILR 379,
      CA (Cayman Islands)
   *Prest v Prest* [2013] UKSC 34; [2013] 2 AC 415; [2013] 3 WLR 1; [2013] 4 All ER
      673, SC(E)
F   *PricewaterhouseCoopers v Saad Investments Co Ltd* [2014] UKPC 35; [2014]
      1 WLR 4482, PC
   *R v Bourne* [1939] 1 KB 687; [1938] 3 All ER 615, CCA
   *R (Child Poverty Action Group) v Secretary of State for Work and Pensions* [2010]
      UKSC 54; [2011] 2 AC 15; [2011] 2 WLR 1; [2011] PTSR 185; [2011] 1 All ER
      729, SC(E)
   *R (Mohamed) v Secretary of State for Foreign and Commonwealth Affairs (No 1)*
G     [2008] EWHC 2048 (Admin); [2009] 1 WLR 2579, DC
   *R (Nicklinson) v Ministry of Justice (CNK Alliance Ltd intervening)* [2014] UKSC
      38; [2015] AC 657; [2014] 3 WLR 200; [2014] 3 All ER 843, SC(E)
   *R (Omar) v Secretary of State for Foreign and Commonwealth Affairs* [2011] EWCA
      Civ 1587, CA
   *R (Omar) v Secretary of State for Foreign and Commonwealth Affairs* [2012] EWHC
      1737 (Admin); [2013] 1 All ER 161, DC; [2013] EWCA Civ 118; [2014] QB 112;
H     [2013] 3 WLR 439; [2013] 3 All ER 95, CA
   *Rubin v Eurofinance SA (Picard intervening)* [2012] UKSC 46; [2013] 1 AC 236;
      [2012] 3 WLR 1019; [2013] Bus LR 1; [2013] 1 All ER 521; [2013] 1 All
      ER (Comm) 513; [2012] 2 Lloyd's Rep 615, SC(E)
   *Seagull Manufacturing Co Ltd, In re* [1993] Ch 345; [1993] 2 WLR 872; [1993] 2 All
      ER 980, CA

© 2015 The Incorporated Council of Law Reporting for England and Wales

1678
**Singularis Holdings Ltd v PricewaterhouseCoopers (PC)**                    [2015] AC
Argument

*Smith Kline and French Laboratories Ltd v Global Pharmaceutics Ltd* [1986] RPC
    394, CA

*Test Claimants in the FII Group Litigation v Revenue and Customs Comrs (formerly
    Inland Revenue Comrs)* [2012] UKSC 19; [2012] 2 AC 337; [2012] 2 WLR 1149;
    [2012] Bus LR 1033; [2012] 3 All ER 909, SC(E)

*Tucker (RC) (A Bankrupt), In re, Ex p Tucker (KR)* [1990] Ch 148; [1988] 2 WLR
    748; [1988] 1 All ER 603, CA

*Turners & Growers Exporters Ltd v The Ship "Cornelis Verolme"* [1997] 2 NZLR
    110

*Upmann v Elkan* (1871) LR 12 Eq 140; LR 7 Ch App 130

*Williams v Central Bank of Nigeria* [2014] UKSC 10; [2014] AC 1189; [2014] 2 WLR
    355; [2014] 2 All ER 489, SC(E)

The following additional case was cited in argument:

*Atlas Bulk Shipping A/S, In re; Larsen v Navios International Inc* [2011] EWHC 878
    (Ch); [2012] Bus LR 1124

**APPEAL** from Court of Appeal for Bermuda

On 4 March 2013 Kawaley CJ in the Supreme Court of Bermuda made an
order (i) recognising the status of the joint official liquidators of Singularis
Holdings Ltd, a Cayman Islands company ordered by the Grand Court of the
Cayman Islands to be wound up, and (ii) requiring the company's auditors,
PricewaterhouseCoopers, a Bermuda registered partnership, to produce all
documents in their possession relating to their affairs.

The auditors appealed against the production order. On 18 November
2013 the Court of Appeal for Bermuda (Zacca P, Auld JA and Bell AJA)
[2013] CA (Bda) 7 Civ allowed the appeal against the production order.

The liquidators appealed pursuant to permission granted on 21 March
2014 by the Court of Appeal for Bermuda (Zacca P, Evans and Scott
Baker JJA). The issues for the Privy Council, as set out in the parties'
statement of agreed facts and issues, were (1) whether the court had power
at common law to make an order by way of judicial assistance under or in
terms analogous to section 195 of the Bermudan Companies Act 1981 in
respect of a company in liquidation in the Cayman Islands; (2), if so,
whether assistance should be granted or refused, as a matter of discretion;
and (3) in particular, whether the liquidators were entitled to relief which
would not be available to them in the Cayman Islands under Cayman Islands
law.

The facts are stated in the judgment of Lord Sumption JSC.

*Gabriel Moss QC*, *Felicity Toube QC*, *Stephen Robins* and *Rod Attride-
Stirling* (of the Bermudan Bar) (instructed by *Blake Morgan LLP*) for the
liquidators.

The Supreme Court of Bermuda's common law power to grant judicial
assistance in cross-border insolvencies supplies the jurisdiction to require the
auditors to disclose documents relating to the company. The fact that
the liquidators cannot obtain the relevant documents from the auditors in
the Cayman Islands is no basis for refusing to provide such assistance as a
matter of discretion. It is necessary to distinguish between (1) "recognition"
and "judicial assistance" and (2) "recognition of insolvency proceedings"
and "recognition of judgments". In its strict narrow sense, "recognition"
refers to mandatory rules by which one jurisdiction gives direct effect in its

© 2015 The Incorporated Council of Law Reporting for England and Wales

A   own jurisdiction to a legal act in another. Thus if a winding up order is made
    in the Cayman Islands as the place of the company's registration, Bermuda
    in accordance with its common law conflicts rules gives effect to that to the
    extent of recognising the Cayman Islands liquidators as the sole authorised
    agents of the company under Cayman Islands law, able to act on behalf of
    the company in Bermuda: see *Dicey, Morris & Collins, The Conflict of*
B   *Laws*, 15th ed (2012), vol 2, rule 179. Bermudan conflicts rules do not
    however recognise mandatory "effects" of the Cayman Islands winding up
    proceedings, such as the statutory stay: see *Banque Indosuez SA v Ferromet*
    *Resources Inc* [1993] BCLC 112, 117. Beyond mandatory common law
    recognition rules, the case law has developed discretionary judicial
    assistance: see *Dicey, Morris & Collins*, 15th ed, paras 30-107, 30-108.
    Common law judicial assistance has two key differences from recognition:
C   (1) recognition is mandatory, whereas judicial assistance is discretionary;
    (2) recognition gives effect to foreign law, whereas judicial assistance applies
    domestic law: see *Cambridge Gas Transportation Corpn v Official*
    *Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC
    508. It is also important to distinguish between recognising foreign
    insolvency proceedings and recognising judgments arising from foreign
    insolvency proceedings. Common law mandatory conflicts rules make
D   entirely different provision for each. Thus a winding up proceeding in the
    Cayman Islands for a company registered there must be recognised in
    Bermuda to the extent of the appointment and authority of the liquidators.
    However, a judgment in personam is only recognised if certain criteria such
    as submission to jurisdiction are met: see *Rubin v Eurofinance SA (Picard*
    *intervening)* [2013] 1 AC 236. Where a foreign winding up proceeding is
E   recognised, in the sense that the authority of the liquidators is accepted, the
    recognising court is not obliged to offer any assistance. However, absent
    good reason not to assist, such as the need to protect local creditors, such
    assistance should be given: see *Rubin v Eurofinance SA*, para 29.
        Outside the European Union and in countries where the UNCITRAL
    Model Law has not been enacted, judicial assistance in cross-border
    insolvencies may be classed as of two different types. Model 1 involves the
F   provision of assistance through the commencement of an ancillary
    insolvency proceeding such as liquidation. The doctrine of ancillary
    liquidations is one by which the court has a common law power to assist a
    foreign liquidator by granting relief governed by the local law alone, even if
    that local law gives rise to the right to obtain relief of a type or character not
    available in the primary liquidation; conversely, there may be relief available
G   under the law of the main proceedings which is not available under the law
    of the ancillary winding up: see *In re Matheson Bros Ltd* (1884) 27 Ch D
    225 and *In re Bank of Credit and Commerce International SA (No 10)*
    [1997] Ch 213. Model 2 involves the provision of assistance without the
    commencement of an ancillary liquidation. Relief of this type is available
    where the relief sought is the examination of individuals and the production
    of documents: see *Rubin v Eurofinance SA* [2013] 1 AC 236, paras 29, 31,
H   33. Two alternative conceptual foundations for the model 2 power emerge
    from the authorities. Route A involves a common law hypothesis by which
    the court may grant assistance as if the foreign company were being wound
    up locally—on that basis, the foreign company is treated as if it were a
    company to which the local winding up legislation applies, even if it could

© 2015 The Incorporated Council of Law Reporting for England and Wales

not in fact fall within the definitions required to make it such a company: see   A
*In re African Farms* [1906] TS 373; *Moolman v Builders & Developers
(Pty) Ltd* [1990] 2 All SA 77 (A) and *Cambridge Gas Transportation Corpn
v Official Committee of Unsecured Creditors of Navigator Holdings plc*
[2007] 1 AC 508, para 22. Route B involves the provision of assistance
through the exercise of the assisting court's general, non-statutory powers,
including inherent equitable and common law powers, or non-insolvency       B
statutory powers, without any reliance on any particular provision of the
local winding up legislation. On either basis, in the present case, the
liquidators were able to obtain the assistance of the Bermudan Supreme
Court, and it is right for them to have that assistance.

The most authoritative statement of the common law assumption in route
A continues to be the *Cambridge Gas* case, para 22. The judgment has two
distinct limbs. Firstly, the ordinary rules of private international law relating   C
to the enforcement of foreign judgments do not apply to insolvency—this
limb of the judgment was disapproved in *Rubin v Eurofinance SA* [2013]
1 AC 236 but it is of no relevance to the present appeal, which is not
concerned with recognition of a judgment. Secondly, route A means that a
domestic court can provide assistance by doing whatever it could have done
in the case of a domestic insolvency. This second limb has been followed       D
widely: see *In re Phoenix Kapitaldienst GmbH* [2013] Ch 61, para 62;
*Perpetual Trustee Co Ltd v BNY Corporate Trustee Services Ltd* [2009]
2 BCLC 400, para 48; *In re Atlas Bulk Shipping A/S* [2012] Bus LR 1124,
paras 30–32 and *Picard v Primeo Fund* 2013 (1) CILR 164, para 41. The
development of this common law jurisdiction is a legitimate and typical
example of the necessary evolution of the common law to meet the changing
needs of the times: see *Jones v Kaney* [2011] 2 AC 398, para 112. The ability   E
of the common law to adapt itself to new circumstances and changing needs
is one of its strengths. Such changes are not necessarily incremental but may
be radical: see *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC
349, 377–379. The role of the common law is to cover those areas which are
not governed by statute. Those considerations are particularly relevant in
the field of cross-border insolvency. Commercial necessity in the modern
globalised world requires judicial assistance to be given to foreign insolvency   F
proceedings, particularly where large sums are involved and assets or
documents are missing: see *Crédit Suisse Fides Trust SA v Cuoghi* [1998] QB
818, 827, and *Turners & Growers Exporters Ltd v The Ship "Cornelis
Verolme"* [1997] 2 NZLR 110, 126. It is also essential for offshore
jurisdictions to be able to ensure that they can apply their laws and
procedures to make sure that the use of their jurisdiction in cross-border      G
business does not facilitate fraud or the hiding of assets or documents. Such
policies have led to the development of the principle of modified
universalism: see the *Cambridge Gas* case [2007] 1 AC 508; *In re HIH
Casualty and General Insurance Ltd* [2008] 1 WLR 852 and *Rubin v
Eurofinance SA* [2013] 1 AC 236. Where there is a local proceeding, such as
ancillary liquidation, the court having control over that local proceeding is
required to assist the main proceeding. Where there is no local proceeding,   H
the argument for judicial assistance is even more compelling, since there is
no alternative insolvency proceeding. Whatever needs to be done in the local
jurisdiction can only be done by way of judicial assistance. Common law
judicial assistance does not require reciprocity. Local creditors and policies

© 2015 The Incorporated Council of Law Reporting for England and Wales

A  are protected by the fact that the giving of judicial assistance is discretionary.
The provision of such assistance at common law is not inconsistent with *Al
Sabah v Grupo Torras SA* [2005] 2 AC 333. The observations, at para 35, in
relation to the position at common law are obiter. Further and in any event,
the views expressed are not persuasive, since the point was not fully
developed in argument.   Moreover, para 35 was superseded by the
*Cambridge Gas* case [2007] 1 AC 508, in which the Privy Council set out
B  detailed views on the question of common law assistance having heard full
argument. There is nothing in the local legislation in the present case to
forbid the court from granting assistance in this way in cross-border
insolvencies. Accordingly, as a matter of jurisdiction, route A enables the
court to make an order under section 195 of the Bermudan Companies Act
1981 on the basis of the common law hypothesis identified in the *Cambridge
C  Gas* case [2007] 1 AC 508, para 22, as if the company were in ancillary
liquidation in Bermuda.
   Alternatively, route B involves the provision of assistance through the
exercise of the assisting court's general and non-statutory powers (including
inherent and common law powers), without any reliance on any specific
provisions of the local winding up legislation: see *In re Impex Services
Worldwide Ltd* [2004] BPIR 564 and *Perpetual Trustee Co Ltd v BNY
D  Corporate Trustee Services Ltd (Revenue and Customs Comrs intervening)*
[2012] 1 AC 383. Those powers are present in the instant case. There is an
inherent and/or common law and/or equitable power to compel discovery or
a power in a statutory provision which is not limited in application to local
liquidations. The inherent powers of a court of equity are vested in the
Supreme Court of Bermuda: see section 12 of the Supreme Court Act 1905.
E  As a consequence, the equitable jurisdiction to compel discovery in aid of
proceedings in some other court remains exercisable by the Supreme Court
of Bermuda. A non-statutory power to compel discovery can be exercised by
way of judicial assistance in a cross-border insolvency case: see *In re Impex
Services Worldwide Ltd* [2004] BPIR 564 and *Rubin v Eurofinance SA*
[2013] 1 AC 236. The power to order discovery under Ord 24, r 12 of the
F  Bermudan Rules of the Supreme Court 1985 applies only to cases falling
within that rule, outside its scope the court's general equitable power to
compel discovery continues to apply. Accordingly, route B enables the court
to make an order under Ord 24, r 12, if it is applicable, or, if it is not, under
the court's general equitable jurisdiction to compel discovery, which is
preserved by section 12 of the Supreme Court Act 1905. [Reference was
made to *Dreyfus v Peruvian Guano Co* (1889) 41 Ch D 151 and *In re Atlas
G  Bulk Shipping A/S; Larsen v Navios International Inc* [2012] Bus LR 1124.]
   As a matter of discretion, such assistance should be provided to the
liquidators. The documents sought are in the possession of the auditors, are
not available from any other source and will be crucial to the recovery of
assets for the benefit of the company's creditors and to the ascertainment of
the company's liabilities. The fact that the Cayman Islands court could not
itself make an order for production of the documents provides no basis for
H  refusing assistance. First, the objection does not apply to assistance through
the commencement of an ancillary liquidation in which local statutory
provisions are applied without any such restriction and there is no principled
reason why it should apply to assistance without an ancillary liquidation,
which will apply only domestic law. Secondly, to withhold assistance on

© 2015 The Incorporated Council of Law Reporting for England and Wales

1682
**Singularis Holdings Ltd v PricewaterhouseCoopers (PC)**    [2015] AC
Argument

that basis would largely undermine the concept of assistance. If the Grand
Court of the Cayman Islands were able to make an effective order in those
terms, the liquidators would not require assistance from the Supreme Court
of Bermuda. The requested court providing common law judicial assistance
can only apply its own law. That law will invariably differ in some respects
from the courts having jurisdiction over the applicant who seeks judicial
assistance. It cannot be unfair or unreasonable vis-à-vis the auditors to
apply the law of its own country of incorporation in requiring disclosure.
Accordingly, the court has jurisdiction at common law to assist the
liquidators by requiring the auditors to disclose relevant documents and
there is no reason for declining to assist as a matter of discretion.

*David Chivers QC*, *Paul Smith* and *Scott Pearman* (of the Bermudan and
English Bars) (instructed by *Herbert Smith Freehills LLP*) for the auditors.

The Bermudan court has no jurisdiction at common law to grant
assistance to a foreign liquidator by ordering the disclosure of documents or
the examination of witnesses. Developments in the common law of
Bermuda may be modelled upon equivalent developments in England or in
other common law jurisdictions but it is essential to understand why any
particular development is necessarily to be incorporated as part of the
common law of Bermuda and special care must be taken where the statutory
landscape is different. The common law principle identified in *In re Bank of
Credit and Commerce International SA (No 10)* [1997] Ch 213 was that
there had developed a practice whereby the English court permitted an
English liquidator to transmit to a foreign liquidator funds to enable a pari
passu distribution to worldwide creditors to be made. Subject to that
principle, an English liquidator was bound by English law, including English
insolvency law. Indeed, an English ancillary liquidation might, due to the
overriding requirement of English rules of set-off, prevent rather than
promote the worldwide parri passu distribution of assets. Where there is an
English liquidation of a foreign company there is no additional "assistance"
given to a foreign liquidator. Any remedies sought in the winding up will
have to be through the actions of the English liquidator. Further, the
common law consequence of the English winding up may either assist or not
assist the foreign liquidator depending upon the provisions under
consideration. The "long arm" reach of the English winding up jurisdiction
has meant that English courts have considered assistance from the
perspective of an English liquidation. The only common law intervention
was to suspend the operation of the English statutory scheme in favour of the
foreign liquidation by "disapplying" the statutory scheme and directing the
remission of assets: see *In re HIH Casualty and General Insurance Ltd*
[2008] 1 WLR 852, para 9. Beyond that, English law has not developed a
general common law power of assistance. The analysis of common law
powers in *Cambridge Gas Transportation Corpn v Official Committee of
Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508 was
undertaken in the context of an English jurisprudence based upon the
disapplication of English statutory law in the context of a "long arm"
jurisdiction to wind up. In countries which have not adopted that model of
winding up the question of assistance is very different. The issue is the
source—indeed the very existence—of a power which a foreign liquidator
seeks to be exercised by a local court. That cannot be resolved by reference

© 2015 The Incorporated Council of Law Reporting for England and Wales

A   to the existence of a very different English common law power in the context
of a very different English juridical position, but if anything can be taken
from the English common law position it is that the common law is
recognising a single system of distribution under the principles of
universalism.

B   The principles of universalism, modified or not, provide no juridical basis
to credit the Bermudan court with the power to make an order in terms of
section 195 of the Companies Act 1981 in respect of a foreign entity not the
subject of its winding up jurisdiction. The principle is concerned with the
collection and distribution of assets: see *In re HIH Casualty and General
Insurance Ltd* [2008] 1 WLR 852, para 6 and *Rubin v Eurofinance SA
(Picard intervening)* [2013] 1 AC 236, paras 11–20. However, it says
nothing, and can say nothing, about the powers of different local courts
C   around the world to make collateral orders as regards how assets are to be
collected, let alone what coercive powers of the local court may be exercised
in favour of the foreign liquidator. The principle can provide no justification
for recognising common law powers to provide assistance to foreign
liquidators beyond those which are necessary to give effect to the principle,
viz, the powers to ensure that there is a unitary system for the collection and
distribution of assets. Neither *In re African Farms* [1906] TS 373 nor the
D   principle of modified universalism leads to the conclusion that the assisting
court has common law powers to treat a foreign liquidator as if he were a
domestic liquidator of a domestic company. *In re African Farms* was
concerned with enforcing foreign rights as a matter of comity. It was no part
of its ratio that the court had common law powers beyond those involving
the collection and distribution of assets. There is no principle brought into
E   play by *Moolman v Builders & Developers (Pty) Ltd* [1990] 2 All SA 77
(A) which requires local powers to be given to a foreign liquidator where
those powers do not exist in the liquidator's home jurisdiction. The case is
not authority for the proposition that assistance at common law may include
making orders for examination which could not be ordered in a foreign
jurisdiction. *Cambridge Gas Transportation Corpn v Official Committee of
Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508 concerns
F   the enforcement of a foreign judgment. The question of what would happen
if the foreign liquidation involved a company which could not be wound up
in the domestic court was not addressed. It does not stand as authority for
the proposition that a domestic court has a common law power to make
orders in favour of a foreign liquidator simply because had the company
been a domestic company such an order could have been made in favour of a
G   domestic liquidator. It did not directly address the application of a statutory
provision at all. *Al Sabah v Grupo Torras SA* [2005] 2 AC 333 was cited in
the *Cambridge Gas* case [2007] 1 AC 508 but the analysis at para 35 of the
*Al Sabah* case of the limits on the power of the courts to give assistance was
not questioned. The Board should follow its own decision in the *Al Sabah*
case since para 35 is directly on point and should be determinative of the
appeal. *In re Phoenix Kapitaldienst GmbH* [2013] Ch 61 was wrongly
H   decided and was in any case prior to the decision in *Rubin v Eurofinance SA*
[2013] 1 AC 236. Accordingly, the court has no jurisdiction at common law
to grant assistance to a foreign liquidator by ordering the disclosure of
documents or the examination of witnesses. The court has no inherent
power or equitable power or power under its rules of court to give such

© 2015 The Incorporated Council of Law Reporting for England and Wales

*A*

disclosure. There are no grounds for extending the common law to give such powers to a foreign liquidator. The application of Cayman law in Bermuda was a universalist principle, but the liquidators' claim to the application of a law which went beyond Cayman law was not. Principles of universalism do not require or justify such an extension and any such extension and the circumstances in which such powers may be exercised are matters to be considered by the legislature of Bermuda. [Reference was made to *Bent v Young* (1838) 9 Sim 180.]

*B*

*Moss QC* replied

The Board took time for consideration.

10 November 2014. The following judgments were handed down.

*C*

## LORD SUMPTION JSC

### *Introduction*

1   This appeal is closely connected with the concurrent appeal in *PricewaterhouseCoopers v Saad Investments Co Ltd* ("SICL") [2014] 1 WLR 4482. The two appeals concern related companies incorporated in the Cayman Islands, both of which have been ordered by the Grand Court of the Cayman Islands to be wound up. Hugh Dickson, Stephen Akers and Mark Byers of Grant Thornton Special Services (Cayman) Ltd were appointed by that court as the joint official liquidators of both companies. The background to both appeals is set out in the advice of the Board on that appeal, delivered by Lord Neuberger of Abbotsbury PSC, and it need not be repeated here.

*D*

*E*

2   The common feature of both appeals is that they concern attempts on the part of the liquidators to obtain from the companies' former auditors PricewaterhouseCoopers ("PwC"), information, whether in oral or documentary form, relating to the companies' affairs. The evidence is that the liquidators have been unable to trace certain assets which they consider must have existed, and that relevant information about those assets is likely to be in the possession of PwC. This has not been accepted in terms, but neither has it been disputed. The Board will proceed on the footing that it is correct.

*F*

3   The Grand Court of the Cayman Islands has power under section 103 of the Cayman Islands Companies Law to order any person, whether or not resident in the Islands, who has a relevant connection to a company in liquidation (including its former auditor) to "transfer or deliver up to the liquidator any property or documents belonging to the company." The Grand Court has made such an order against PwC, and the Board was told that PwC has complied with it. Consistently with the provision conferring the power, it extends only to material belonging to the companies.

*G*

4   Both the SICL and the Singularis appeals concern attempts by the liquidators to obtain material belonging to the auditors themselves, principally their working papers, by invoking the corresponding powers conferred on the Supreme Court of Bermuda. They are in wider terms, which are not limited to information belonging to the company. Section 195 of the Companies Act 1981 of Bermuda provides:

*H*

© 2015 The Incorporated Council of Law Reporting for England and Wales

A          "*Power to summon persons suspected of having property of company etc*

"(1) The court may, at any time after the appointment of a provisional liquidator or the making of a winding up order, summon before it any officer of the company or persons known or suspected to have in his possession any property of the company or supposed to be indebted to the company, or any person whom the court deems capable of giving

B    information concerning the promotion, formation, trade, dealings, affairs or property of the company.

"(2) The court may examine such person on oath, concerning the matters aforesaid, either by word of mouth or on written interrogatories, and may reduce his answers to writing and require him to sign them.

"(3) The court may require such person to produce any books and

C    papers in his custody or power relating to the company, but, where he claims any lien on books or papers produced by him, the production shall be without prejudice to that lien, and the court shall have jurisdiction in the winding up to determine all questions relating to that lien."

5    The power of the Bermuda court under section 195 is exercisable only in respect of a company which that court has ordered to be wound up. It was

D    therefore dependent in this case on the existence of a power to wind up a company incorporated outside Bermuda. In the case of SICL the Supreme Court of Bermuda made a winding up order, and then made an order for production and oral examination against PwC in the winding up. However, in the SICL appeal the Board has advised Her Majesty [2014] 1 WLR 4482 that the winding up order must be stayed because (with immaterial

E    exceptions) the court had no jurisdiction to wind up a company incorporated outside Bermuda. The consequence is that all proceedings in the winding up of SICL have ceased to be effective, including the order made under section 195.

6    In the case of Singularis a different procedure was adopted. No winding up order was ever sought or made in Bermuda. Instead, Kawaley CJ made an order recognising in Bermuda the status of the liquidators by virtue

F    of their appointment by the Grand Court of the Cayman Islands, and exercising what he termed a common law power "by analogy with the statutory powers contained in section 195 of the Companies Act" to order PwC and Paul Suddaby (an officer of PwC) to produce the same documents which they could have been ordered to produce under section 195. PwC were also ordered to have a partner, employee or agent acceptable to the

G    liquidators available to answer oral or written interrogatories. The liquidators were given leave to serve the proceedings on Mr Suddaby and any other "partners or officers" of PwC out of the jurisdiction.

7    The Court of Appeal (Bell AJA, Zacca P and Auld JA) [2013] CA (Bda) 7 Civ set aside the Chief Justice's order. Bell AJA and Zacca P doubted whether there was jurisdiction to make a section 195 order at common law in circumstances where section 195 did not apply. But the ground of their

H    decision was that it was not in any event an appropriate exercise of discretion, because the court should not make an order in support of a Cayman liquidation which could not have been made by the Cayman court itself. They regarded the liquidators' claim as "unjustifiable forum shopping". Auld JA agreed with this, but went further. In his view, there

© 2015 The Incorporated Council of Law Reporting for England and Wales

was no jurisdiction because the Bermuda court could not disregard the *A* limitation of section 195 of the Bermuda Act to cases where a winding up order could be and had been made.

8 Accordingly two issues arise on the present appeal. The first is whether the Bermuda court has a common law power to assist a foreign liquidation by ordering the production of information (in oral or documentary form), in circumstances where (i) the Bermuda court has no power to wind up an overseas company such as Singularis and (ii) its *B* statutory power to order the production of information is limited to cases where the company has been wound up in Bermuda. The second issue is whether, if such a power exists, it is exercisable in circumstances where an equivalent order could not have been made by the court in which the foreign liquidation is proceeding.

*C*

### A common law power?

9 The common law of Bermuda is the same, in every relevant respect, as that of England. The difficulty is that in England the common law concerning cross-border insolvencies has developed to fill the interstices in what is essentially a statutory framework, and the statutory framework differs in significant respects in Bermuda. The main difference is that the *D* English courts have jurisdiction to wind up unregistered companies, including those incorporated outside the United Kingdom. This jurisdiction has existed since it was first conferred by section 199 of the Companies Act 1862 (25 & 26 Vict c 89). It is currently conferred by section 221 of the Insolvency Act 1986. The Bermuda courts have no equivalent power.

10 The English courts have for at least a century and a half exercised a power to assist a foreign liquidation by taking control of the English assets *E* of the insolvent company. The power was founded partly on statute and partly on the practice of judges of the Chancery Division. Its statutory foundation was the power to wind up overseas companies. The exercise of this power generated a body of practice concerning what came to be known as ancillary liquidations. The English court would order the winding up in England of a company already in liquidation or likely to go into liquidation under the law *F* of its incorporation, provided that there was a sufficient connection with England and a reasonable possibility of benefit to the petitioners. In theory, the effect of the winding up order was to create a statutory trust of the worldwide assets of the company to be dealt with in accordance with English statutory rules of distribution: *Ayerst v C & K (Construction) Ltd* [1976] AC 167, *Banco Nacional de Cuba v Cosmos Trading Corpn* [2000] 1 BCLC 813, 819–820 (Sir Richard Scott V-C). In practice, as Millett J pointed out in *G In re International Tin Council* [1987] Ch 419, 446–447, "Although a winding up in the country of incorporation will normally be given extra-territorial effect, a winding up elsewhere has only local operation." The English courts recognised the limits of the international reach of their own proceedings by treating the English winding up as ancillary to the principal winding up in the country of the company's incorporation. They exercised *H* their power of direction over the liquidator by limiting his functions to getting in the English assets and to dealing with them in such a way as to bring about a distribution of the company's worldwide assets on as uniform a basis as was consistent with certain overriding principles of English insolvency law. The earliest reported case in which the practice was

© 2015 The Incorporated Council of Law Reporting for England and Wales

1687

A  recognised is the decision of Kay J in *In re Matheson Bros Ltd* (1884) 27 Ch D 225, but it is likely to have been older than that. In these cases, the court is exercising the ordinary powers of the English court to control the winding up of a company, which are wholly statutory. But the court was using them for a purpose which differed from that for which they were conferred, and on principles which departed from those applicable by law in the winding up of an English company. To that extent only, the English courts were exercising a common law power.

B
    11  In Bermuda, the court has no jurisdiction to conduct an ancillary liquidation, except in the (irrelevant) case of a company to which Part XIII of the Companies Act is expressly applied. The question what if any power the court has to assist a foreign liquidation without conducting an ancillary liquidation of its own, must depend on the nature of the assistance sought.

C  Winding up proceedings have at least four distinct legal consequences, to which different considerations may apply. First, the proceedings are a "mechanism of collective execution against the property of the debtor by creditors whose rights are admitted or established", to use the expression of Lord Hoffmann in *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508, para 14. Inherent in this function of a winding up is the statutory trust

D  of the company's assets, to which I have already referred, and an automatic stay of other modes of execution. Second, it provides a procedural framework in which to determine what are the provable rights of creditors in cases where they are disputed. Third, it brings into play statutory powers to vary the rights of persons dealing with the company or its assets by impugning certain categories of transaction. These powers are less extensive

E  in Bermuda than they are in England, but include the avoidance of dispositions after the commencement of the winding up and fraudulent preferences. Fourth, it brings into play procedural powers, generally directed to enabling the liquidator to locate assets of the company or to ascertain its rights and liabilities. In Bermuda these include the power under section 195 of the Companies Act to order the production of information. In England, the corresponding statutory powers would all be exercisable in an

F  ancillary liquidation.
    12  The main purpose of the winding up order in England is usually to enable the court to take control of the English assets of the company, so as to remove them from the free-for-all which would have resulted if creditors were entitled to gain priority by levying execution on them. But, even without a winding up, the court could, on ordinary principles of private

G  international law, have recognised as a matter of comity the vesting of the company's assets in an agent or office-holder appointed or recognised under the law of its incorporation. For many years before a corresponding rule was recognised for the winding up of foreign companies, the principle had been applied in the absence of any statutory powers to the English moveable assets of a foreign bankrupt which had been transferred to an office-holder in an insolvency proceeding under the law of his domicile. Moreover, while

H  the same rule did not apply to immovable property, the court would ordinarily appoint the foreign office-holder a receiver of the rents and profits: see *Dicey, Morris & Collins, The Conflict of Laws*, 15th ed (2012), vol 2, rules 216 and 217. The more difficult question in such cases was whether the court, in the absence of winding up proceedings, could impose a

© 2015 The Incorporated Council of Law Reporting for England and Wales

1688
Singularis Holdings Ltd v PricewaterhouseCoopers (PC)                    [2015] AC
Lord Sumption JSC

stay on creditors trying to levy execution against the English assets   A
equivalent to the automatic stay that would by statute have followed the
initiation of winding up proceedings.

13   That question appears to have been first addressed in the common
law world in the important decision of the full court of the Supreme Court
of the Transvaal in *In re African Farms Ltd* [1906] TS 373. African Farms Ltd
was an English company with substantial assets in the Transvaal. It was in   B
liquidation in England. There was no power to wind it up in the Transvaal
because the number of members had fallen below the minimum required to
qualify it as a "company" for the purpose of the statutory power of winding
up. The leading judgment was given by the great South African judge Sir
James Rose Innes, then Chief Justice of the Transvaal. Having recognised
the absence of a statutory power to wind up the company, he continued,
at p 377:                                                                   C

"It only remains to consider whether we are justified in recognising the
position of the English liquidator. And by that expression I do not mean a
recognition which consists in a mere acknowledgment of the fact that the
liquidator has been appointed as such in England, and that he is the
representative of the company here; I mean a recognition which carries
with it the active assistance of the court. A declaration, in effect, that the   D
liquidator is entitled to deal with the Transvaal assets in the same way as
if they were within the jurisdiction of the English courts, subject only to
such conditions as the court may impose for the protection of local
creditors, or in recognition of the requirements of our local laws. If we
are able in that sense to recognise and assist the liquidator, then I thin[k]
we should do so; because in that way only will the assets here be duly   E
divided and properly applied in satisfaction of the company's debts. If we
cannot do so, then this result follows, that the directors cannot deal with
the property here, and that the liquidator cannot prevent creditors seizing
it in execution of their judgments. Unnecessary expenses will be incurred,
and the estate will be left to be scrambled for among those creditors who
are in a position to enforce their claims."                                 F

Innes CJ then considered (p 378) the objection that "the grant of assistance
to the English liquidator, in a case where the court could not wind up itself,
may possibly be open to the objection that we are doing by indirect means
what the law has given us no power to do directly." He rejected the
submission because its acceptance would have prevented the court from
recognising the power of the liquidator to dispose of property or rights of the   G
company under the law of its incorporation, contrary to ordinary principles
of private international law: see pp 378–380. He went on, at pp 381–382:

"The true test appears to me to be not whether we have the power to
order a similar liquidation here, but whether our recognising the foreign
liquidation is actually prohibited by any local rules; whether it is against
the policy of our laws, or whether its consequences would be unfair to   H
local creditors, or on other grounds undesirable . . . So far from such
circumstances being present here, the case before us is one in which every
consideration of equity and convenience demands that the position of the
English liquidator should be recognised. Unless that can be done then, as

© 2015 The Incorporated Council of Law Reporting for England and Wales

A   already pointed out, the Transvaal assets are at the mercy of the first
creditor who can manage to secure a writ of execution."

In the result, the court recognised the liquidator by virtue of his appointment
in England as being entitled to the sole administration of the company's
assets in the Transvaal, on terms that the liquidator:

B       "recognise the right of all creditors in this colony to prove their claims
against the company before the master; and that the admission or
rejection of such claims, the liability of the company therefor to the extent
of its assets in the Transvaal, and all questions of mortgage or preference
in respect of such assets, shall be regulated by the laws of this colony, as if
the company had been placed in liquidation here."

C   The proved claims of local creditors were ordered to be satisfied rateably
from the local assets and the balance made available for distribution to other
creditors. Execution of the local judgment creditor's judgment was stayed to
enable this to be done.

   14   It is right to point out (i) that the recognition of the English
liquidator's power of disposition over the company's assets in the Transvaal
was no more than what he was entitled to as a matter of private international
D   law; (ii) that the conduct of what amounted to an ancillary liquidation in the
Transvaal was expressed as a discretionary condition of the court's
recognition order; and (iii) that the Transvaal court no doubt had the same
inherent power as the English court to stay enforcement of its own
judgments. But the decision is nevertheless a significant one, because in
substance what the court was doing was to direct the assets of the company
E   to be dealt with as if it was in liquidation in the Transvaal, when there was
no power to conduct a liquidation there. It also deprived an existing
judgment creditor of what was on the face of it an accrued and absolute right
under his judgment and exposed him to having his debt written down to a
figure consistent with the rateable distribution of assets in the Transvaal.
The court therefore unquestionably modified the rights of the company and
its creditors. Moreover, the sole basis on which it did so was the inherent
F   power of the court to assist the orderly liquidation of the company's affairs
pursuant to a foreign winding up order. As Innes CJ put it, at p 377,
"recognition . . . carries with it the active assistance of the court." Or, in the
words of the concurring judgment of Smith J (at p 390), the basis of the order
was the recognition and enforcement of rights and the recognition of a status
acquired under a foreign law, unless they conflict with the law or policy of
G   the jurisdiction in which they were sought to be enforced.

   15   The flexibility and breadth of the English court's powers in an
ancillary liquidation, together in more recent times with the incorporation
into English law of a number of international schemes of judicial
co-operation, have had the effect of arresting the development of the
common law in England in this area. However, the issue returned in 2006
with the decision of the Privy Council in *Cambridge Gas Transportation
H   Corpn v Official Committee of Unsecured Creditors of Navigator Holdings
plc* [2007] 1 AC 508. In this case the Privy Council, affirming the decision of
the Staff of Government Division in the Isle of Man, held that effect should
be given in the Isle of Man to the judicial reorganisation by a Federal
Bankruptcy Court in the United States of a group of Liberian ship-owning

© 2015 The Incorporated Council of Law Reporting for England and Wales

companies. The effect of the reorganisation was to vest the shares of an Isle *A* of Man company in the committee of creditors, in circumstances where the US court had neither jurisdiction in rem over the shares (because they were rights situated outside its territorial jurisdiction) nor jurisdiction in personam over the shareholders (because they were not present in the US and took no part in the US proceedings). The principal shareholder, Cambridge Gas, objected on the ground that it was not bound by the *B* decision of the US court. The advice of the Board was given by Lord Hoffmann. He discerned in the English case law a consistent "aspiration" to produce a result equivalent to that which would obtain if there were a single universal bankruptcy jurisdiction. He regarded this "principle of universality" as having been the foundation of the decision in *In re African Farms* [1906] TS 373, and considered that it justified the Isle of Man courts in giving effect to the US reorganisation plan [2007] 1 AC 508, paras 16–21. *C* In his view, and that of the Board, the absence of jurisdiction in rem or in personam in the US court was irrelevant, because the jurisdiction was founded not on any obligation on the part of Cambridge Gas to comply with the judgments of the Federal Bankruptcy Court but on the duty of the Isle of Man court to assist a foreign principal liquidation so as to achieve a universal distribution of the assets on, as far as possible, a common basis. At *D* paras 13–14, he said:

"13. . . . Judgments in rem and in personam are judicial determinations of the existence of rights: in the one case, rights over property and in the other, rights against a person. When a judgment in rem or in personam is recognised by a foreign court, it is accepted as establishing the right which it purports to have determined, without *E* further inquiry into the grounds on which it did so. The judgment itself is treated as the source of the right.

"14. The purpose of bankruptcy proceedings, on the other hand, is not to determine or establish the existence of rights, but to provide a mechanism of collective execution against the property of the debtor by creditors whose rights are admitted or established."

*F*

The essence of the decision and the reasoning which supported it is to be found, at paras 20–22:

"20. . . . But the underlying principle of universality . . . is given effect by recognising the person who is empowered under the foreign bankruptcy law to act on behalf of the insolvent company as entitled to do so in England. In addition, as Innes CJ said in the Transvaal case *In re* *G* *African Farms Ltd* [1906] TS 373, 377, in which an English company with assets in the Transvaal had been voluntarily wound up in England, 'recognition which carries with it the active assistance of the court' . . .

"21. Their Lordships consider that these principles are sufficient to confer on the Manx court jurisdiction to assist the committee of creditors, as appointed representatives under the Chapter 11 order, to give effect to the plan . . . *H*

"22. . . . At common law, their Lordships think it is doubtful whether assistance could take the form of applying provisions of the foreign insolvency law which form no part of the domestic system. But the domestic court must at least be able to provide assistance by doing

© 2015 The Incorporated Council of Law Reporting for England and Wales

1691

A    whatever it could have done in the case of a domestic insolvency. The
purpose of recognition is to enable the foreign office holder or the
creditors to avoid having to start parallel insolvency proceedings and to
give them the remedies to which they would have been entitled if the
equivalent proceedings had taken place in the domestic forum."

The provisions of the domestic system of insolvency of the Isle of Man,
B    which were relevant in *Cambridge Gas*, were the statutory provisions for
sanctioning a scheme of arrangement in the course of a winding up. Because
the Isle of Man courts would have had power to wind up Navigator and
sanction a scheme of arrangement on terms substantially the same as those
of the judicial reorganisation approved by the Federal Bankruptcy Court, it
could give effect to the reorganisation plan at common law.   "Why
C    therefore," asked Lord Hoffmann (para 25), "should the Manx court not
provide assistance by giving effect to the plan without requiring the creditors
to go to the trouble of parallel insolvency proceedings in the Isle of Man?"
*Cambridge Gas* is authority, if it is correct, for three propositions. The first
is the principle of modified universalism, namely that the court has a
common law power to assist foreign winding up proceedings so far as it
properly can.   The second is that this includes doing whatever it could
D    properly have done in a domestic insolvency, subject to its own law and
public policy.   The third (which is implicit) is that this power is itself the
source of its jurisdiction over those affected, and that the absence of
jurisdiction in rem or in personam according to ordinary common law
principles is irrelevant.

16   The first and second propositions were revisited by Lord Hoffmann
E    in *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852. HIH
was an Australian insurance company in liquidation in Australia. A winding
up petition had been presented in England and provisional liquidators
appointed to conduct an ancillary liquidation. The question at issue was
whether the English court should accede to a letter of request from the
Australian court inviting it to direct the English provisional liquidators to
remit the assets in their hands to the Australian liquidators, in circumstances
F    where they would be distributed there in accordance with statutory
priorities which differed from those applicable in a domestic winding up in
England. At paras 6–7, Lord Hoffmann said:

"6. Despite the absence of statutory provision, some degree of
international co-operation in corporate insolvency had been achieved by
judicial practice.   This was based on what English judges have for many
G    years regarded as a general principle of private international law, namely
that bankruptcy (whether personal or corporate) should be unitary and
universal.   There should be a unitary bankruptcy proceeding in the court
of the bankrupt's domicile which receives worldwide recognition and it
should apply universally to all the bankrupt's assets.

"7. This was very much a principle rather than a rule. It is heavily
qualified by exceptions on pragmatic grounds; elsewhere I have described
H    it as an aspiration: see *Cambridge Gas Transportation Corpn v Official
Committee of Unsecured Creditors of Navigator Holdings plc* [2007]
1 AC 508, 517, para 17. Professor Jay Westbrook, a distinguished
American writer on international insolvency has called it a principle of
'modified universalism': see also *Fletcher, Insolvency in Private*

© 2015 The Incorporated Council of Law Reporting for England and Wales

*International Law*, 2nd ed (2005), pp 15–17. Full universalism can be attained only by international treaty. Nevertheless, even in its modified and pragmatic form, the principle is a potent one."

Reviewing the English case law, Lord Hoffmann discerned in it a "golden thread running through English cross-border insolvency law since the 18th century" which, adopting a label devised by Professor Jay Westbrook, he called the "principle of (modified) universalism" (para 30):

"That principle requires that English courts should, so far as is consistent with justice and UK public policy, co-operate with the courts in the country of the principal liquidation to ensure that all the company's assets are distributed to its creditors under a single system of distribution."

17   The Committee in *HIH* was unanimous in holding that the assets should be remitted to Australia, but they were divided in some aspects of their reasoning. Lord Hoffmann, with whom Lord Walker of Gestingthorpe agreed, considered that the court had an inherent power to direct the remittal of the assets at common law. However, that view was not adopted by the rest of the Committee. Lord Scott of Foscote and Lord Neuberger of Abbotsbury considered that the power was wholly derived from section 426 of the Insolvency Act 1986. Lord Phillips of Worth Matravers held that the statutory power was a sufficient jurisdictional basis for the proposed direction, and declined to decide whether jurisdiction could have been established at common law. It is, however, important to appreciate that this difference of opinion related not to the principle of universalism itself, nor to the juridical basis of the power to assist a foreign liquidation in general. The difference was about whether that power could be exercised in a manner which would deprive creditors proving in England of their statutory right under section 107 of the Insolvency Act 1986 to a pari passu distribution according to English rules of priority. The principle justifying judicial assistance in a foreign insolvency which was stated in *In re African Farms* [1906] TS 373 and affirmed in *Cambridge Gas* was [1906] TS 373, 377 subject to "such conditions as the court may impose for the protection of local creditors, or in recognition of the requirements of our local laws" or, as it was put more broadly in *HIH* itself [2008] 1 WLR 852, para 30, "justice and UK public policy". The division in the Committee in *HIH* was about whether this meant that it was subject to the mandatory requirements of section 107 of the Insolvency Act 1986. The relevance of section 426 in the view of Lord Scott and Lord Neuberger was that on their construction of that section it authorised the treatment of the assets in accordance with the law of the foreign jurisdiction notwithstanding its inconsistency with mandatory rules of English law: see Lord Scott, at para 61, and Lord Neuberger, at para 68. Absent that provision, the remittal of the assets to Australia would have been contrary to English law. Lord Phillips did not, any more than Lord Scott and Lord Neuberger, question the principle of modified universalism. Indeed, he regarded it as determinative of the manner in which the discretion should be exercised, albeit leaving open the question of its juridical source: see para 44.

18   *Cambridge Gas* [2007] 1 AC 508 marks the furthest that the common law courts have gone in developing the common law powers of the

© 2015 The Incorporated Council of Law Reporting for England and Wales

A   court to assist a foreign liquidation. It has proved to be a controversial decision. So far as it held that the domestic court had jurisdiction over the parties simply by virtue of its power to assist, it was subjected to fierce academic criticism and held by a majority of the Supreme Court to be wrong in *Rubin v Eurofinance SA (Picard intervening)* [2013] 1 AC 236. So far as it held that the domestic court had a common law power to assist the foreign court by doing whatever it could have done in a domestic insolvency, its

B   authority is weakened by the absence of any explanation of whence this common law power came and by the direct rejection of that proposition by the Judicial Committee in *Al Sabah v Grupo Torras SA* [2005] 2 AC 333, a case cited in argument in *Cambridge Gas* but not in the advice of the Board. Lord Walker, giving the advice of the Board in *Al Sabah*, had expressed the view that there was no inherent power to set aside Cayman trusts at the

C   request of a foreign court of insolvency, in circumstances where a corresponding statutory power existed under the Cayman Bankruptcy Law but did not apply in the circumstances. The Board considers it to be clear that although statute law may influence the policy of the common law, it cannot be assumed, simply because there would be a statutory power to make a particular order in the case of domestic insolvency, that a similar

D   power must exist at common law. So far as *Cambridge Gas* suggests otherwise, the Board is satisfied that it is wrong for reasons more fully explained in the advice proposed by Lord Collins of Mapesbury. If there is a corresponding statutory power for domestic insolvencies there will usually be no objection on public policy grounds to the recognition of a similar common law power. But it cannot follow without more that there is such a power. It follows that the second and third propositions for which

E   *Cambridge Gas* [2007] 1 AC 508 is authority cannot be supported.

19 However, the first proposition, the principle of modified universalism itself, has not been discredited. On the contrary, it was accepted in principle by Lord Phillips, Lord Hoffman and Lord Walker in *HIH* [2008] 1 WLR 852, and by Lord Collins of Mapesbury (with whom Lord Walker and Lord Sumption JJSC agreed) in *Rubin v Eurofinance SA*

F   [2013] 1 AC 236. Nothing in the concurring judgment of Lord Mance JSC in that case casts doubt on it. At paras 29–33, Lord Collins summarised the position in this way:

"29. Fourth, at common law the court has power to recognise and grant assistance to foreign insolvency proceedings. The common law principle is that assistance may be given to foreign office-holders in insolvencies with an international element. The underlying principle has

G   been stated in different ways: 'recognition . . . carries with it the active assistance of the court': *In re African Farms Ltd* [1906] TS 373, 377; 'This court . . . will do its utmost to co-operate with the US Bankruptcy Court and avoid any action which might disturb the orderly administration of [the company] in Texas under Chapter 11': *Banque Indosuez SA v Ferromet Resources Inc* [1993] BCLC 112, 117.

H   "30. In *Crédit Suisse Fides Trust v Cuoghi* [1998] QB 818, 827, Millett LJ said: 'In other areas of law, such as cross-border insolvency, commercial necessity has encouraged national courts to provide assistance to each other without waiting for such co-operation to be sanctioned by international convention . . . It is becoming widely

© 2015 The Incorporated Council of Law Reporting for England and Wales

accepted that comity between the courts of different countries requires    *A*
mutual respect for the territorial integrity of each other's jurisdiction, but
that this should not inhibit a court in one jurisdiction from rendering
whatever assistance it properly can to a court in another in respect of
assets located or persons resident within the territory of the former.'

"31. The common law assistance cases have been concerned with such
matters as the vesting of English assets in a foreign office-holder, or the    *B*
staying of local proceedings, or orders for examination in support of the
foreign proceedings, or orders for the remittal of assets to a foreign
liquidation, and have involved cases in which the foreign court was a
court of competent jurisdiction in the sense that the bankrupt was
domiciled in the foreign country or, if a company, was incorporated
there . . .

"33. One group of cases involved local proceedings which were stayed    *C*
or orders which were discharged because of foreign insolvency
proceedings. Thus in *Banque Indosuez SA v Ferromet Resources Inc*
[1993] BCLC 112 an English injunction against a Texas corporation in
Chapter 11 proceedings was discharged; cf *In re African Farms Ltd*
[1906] TS 373 (execution in Transvaal by creditor against
English company in liquidation in England stayed by Transvaal court),
applied in *Turners & Growers Exporters Ltd v The Ship 'Cornelis*    *D*
*Verolme'* [1997] 2 NZLR 110 (Belgian shipowner in Belgian bankruptcy:
ship released from arrest); *Modern Terminals (Berth 5) Ltd v States*
*Steamship Co* [1979] HKLR 512 (stay in Hong Kong of execution against
Nevada corporation in Chapter 11 proceedings in United States federal
court in California), followed in *CCIC Finance Ltd v Guangdong*
*International Trust & Investment Corpn* [2005] 2 HKC 589 (stay of    *E*
Hong Kong proceedings against Chinese state-owned enterprise in
Mainland insolvency). Cases of judicial assistance in the traditional sense
include *In re Impex Services Worldwide Ltd* [2004] BPIR 564, where a
Manx order for examination and production of documents was made in
aid of the provisional liquidation in England of an English company."

In the Board's opinion, the principle of modified universalism is part of the    *F*
common law, but it is necessary to bear in mind, first, that it is subject to
local law and local public policy and, secondly, that the court can only ever
act within the limits of its own statutory and common law powers. What are
those limits? In the absence of a relevant statutory power, they must depend
on the common law, including any proper development of the common law.
The question how far it is appropriate to develop the common law so as to    *G*
recognise an equivalent power does not admit of a single, universal answer.
It depends on the nature of the power that the court is being asked to
exercise. On this appeal, the Board proposes to confine itself to the
particular form of assistance which is sought in this case, namely an order
for the production of information by an entity within the personal
jurisdiction of the Bermuda court. The fate of that application depends on
whether, there being no statutory power to order production, there is an    *H*
inherent power at common law do so.

20   The fundamental question is whether a power of compulsion of this
kind requires a statutory basis. For this purpose, it is important to
distinguish between evidence and information. By evidence, the Board

© 2015 The Incorporated Council of Law Reporting for England and Wales

A   means evidence to prove facts in legal proceedings. The power to compel a
person to give evidence in legal proceedings was not originally statutory.
Like the power to order discovery, it was an inherent power of the Court of
Chancery, devised by judges to remedy the technical and procedural
limitations associated with the proof of fact in courts of common law. In
England, it was first put on a statutory basis by the Perjury Act 1563 (5 Eliz
1, c 9), which extended the power to issue a subpoena ad testificandum to all
B   courts of record. In Bermuda, its basis is now section 4 of the Evidence Act
1905. The origins of these powers in the procedural history of the English
courts go some way to explain why those courts have always disclaimed any
inherent power to compel the furnishing of evidence for use in foreign
proceedings: see *Bent v Young* (1838) 9 Sim 180, 192 (Shadwell V-C);
*Dreyfus v Peruvian Guano Co* (1889) 41 Ch D 151; *R (Omar) v Secretary of*
C   *State for Foreign and Commonwealth Affairs* [2013] 1 All ER 161
(Divisional Court), paras 58–63. No such power existed in England until it
was created by statute, initially by the Foreign Tribunals Evidence Act 1856
(19 & 20 Vict c 113).

21   What is sought in this case, however, is not evidence for use in
forensic proceedings but information required for the performance of the
liquidators' ordinary duty of identifying and taking possession of assets of
D   the company. In *R (Omar) v Secretary of State for Foreign and*
*Commonwealth Affairs* [2014] QB 112, para 12 the Court of Appeal
doubted whether the distinction between evidence and information was
helpful, and their doubt was probably justified in that case, where
information was being sought for use in foreign proceedings. But the
distinction is of broader legal significance. The courts have never been as
E   inhibited in their willingness to develop appropriate remedies to require the
provision of information when a sufficiently compelling legal policy calls for
it.

22   The classic modern illustration is the jurisdiction recognised by the
House of Lords in *Norwich Pharmacal Co v Customs and Excise Comrs*
[1974] AC 133. The House, drawing mainly on the earlier decisions in *Orr v*
*Diaper* (1876) 4 Ch D 92; 25 WR 23 and *Upmann v Elkan* (1871) LR 12 Eq
F   140; LR 7 Ch App 130, recognised a common law power to order the
production of information about the identity of a wrongdoer where the
defendant had been involved, even innocently, in the wrong. Such an order,
as they recognised, would not have been available to compel the giving of
evidence, because of the long-standing objection of courts of equity to a bill
of discovery against a "mere witness": see, in particular, pp 173–174 (Lord
G   Reid). In *Smith Kline and French Laboratories Ltd v Global Pharmaceutics*
*Ltd* [1986] RPC 394 the Court of Appeal in England applied the same
principle to information about the identity of a wrongdoer outside the
jurisdiction. These decisions were founded not on the procedural
requirements for proving facts in English litigation, but on the recognition of
a duty to provide the information in certain circumstances. The duty of a
person who had become involved in another's wrongdoing was held [1974]
H   AC 133, 175 (Lord Reid) to be to "assist the person who has been wronged
by giving him full information and disclosing the identity of the
wrongdoers"; cf p 195 (Lord Cross of Chelsea). It is, however, clear that this
duty was of a somewhat notional kind. It was not a legal duty in the
ordinary sense of the term. Failure to supply the information would not give

© 2015 The Incorporated Council of Law Reporting for England and Wales

rise to an action for damages. The concept of duty was simply a way of  *A*
saying that the court would require disclosure. Indeed, Lord Morris of
Borth-y-Gest (pp 181–182) thought that the duty would not arise until the
court had held that the conditions were satisfied. Viscount Dilhorne (p 190)
agreed and so, it seems, did Lord Cross: p 198. Lord Kilbrandon, citing with
apparent approval the South African decision in *Colonial Government v
Tatham* (1902) 23 Natal LR 153, observed (p 205) that the duty lay "rather
on the court to make an order necessary to the administration of justice than  *B*
on the respondent to satisfy some right existing in the plaintiff."

23   The present case is not a *Norwich Pharmacal* case. The significance
of *Norwich Pharmacal* in the present context is that it illustrates the capacity
of the common law to develop a power in the court to compel the production
of information when this is necessary to give effect to a recognised legal
principle. In the Board's opinion, an analogous power arises in the present  *C*
case. Relief is not being sought by way of assistance to a litigant who can
rely on ordinary forensic procedures for the purpose. It is being sought by
the officers of a foreign court. The principle of modified universalism is a
recognised principle of the common law. It is founded on the public interest
in the ability of foreign courts exercising insolvency jurisdiction in the place
of the company's incorporation to conduct an orderly winding up of its
affairs on a worldwide basis, notwithstanding the territorial limits of their  *D*
jurisdiction. The basis of that public interest is not only comity, but a
recognition that in a world of global businesses it is in the interest of every
country that companies with transnational assets and operations should be
capable of being wound up in an orderly fashion under the law of the place
of their incorporation and on a basis that will be recognised and effective
internationally. This is a public interest which has no equivalent in cases  *E*
where information may be sought for commercial purposes or for ordinary
adversarial litigation. The courts have repeatedly recognised not just a right
but a duty to assist in whatever way they properly can. The Bermuda court
has properly recognised the status of the liquidators as officers of that court.
The liquidators require the information for the performance of the ordinary
functions attaching to that status. Their acknowledged right to take
possession of the company's worldwide assets is of little use without the  *F*
ability to identify and locate them, if necessary with the assistance of the
court. The information is unlikely to be available in any other way. None of
the reasons which account for the common law's inhibition about the
compulsory provision of evidence have any bearing on the present question.
The right and duty to assist foreign office-holders which the courts have
acknowledged on a number of occasions would be an empty formula if it  *G*
were confined to recognising the company's title to its assets in the same way
as any other legal person who has acquired title under a foreign law, or to
recognising the office-holder's right to act on the company's behalf in the
same way as any other agent of a company appointed in accordance with the
law of its incorporation. The recognition by a domestic court of the status of
a foreign liquidator would mean very little if it entitled him to take
possession of the company's assets but left him with no effective means of  *H*
identifying or locating them.

24   There are two reported cases in which an order for the production of
documents or information has been made by way of common law assistance
to a foreign court. The first is *Moolman v Builders & Developers (Pty) Ltd*

1697

A [1990] 2 All SA 77 (A), a decision of the Supreme Court of South Africa. The appeal arose out of the winding up in the Transkei of a company incorporated there, at a period of South African history when the Transkei was in law a foreign country. The liquidator sought an order of the South African court for the examination of certain persons in South Africa with a view to locating assets of the company. Such an order would have been available to him by statute if there had been an ancillary liquidation in South

B Africa, but there was no statutory power to wind up this particular company in South Africa. The court held that a power to make such an order at common law was within the principle of *In re African Farms Ltd* [1906] TS 373. The second case is *In re Impex Services Worldwide Ltd* [2004] BPIR 564, a decision of the High Court of the Isle of Man. Section 206 of the Isle of Man Companies Act 1931 conferred a power to order an examination but

C only in relation to a Manx company. Deemster Doyle nevertheless gave effect by way of common law judicial assistance to a letter of request of the High Court in England seeking the examination of persons in the Isle of Man on behalf of the liquidator of an English company. The Board would not wish to endorse all of the reasoning given in these judgments, in particular those parts which appear to support the concept of applying statutory powers by mere analogy in cases outside their scope. But the Board

D considers that the decisions themselves were correct in principle.

25 In the Board's opinion, there is a power at common law to assist a foreign court of insolvency jurisdiction by ordering the production of information in oral or documentary form which is necessary for the administration of a foreign winding up. In recognising the existence of such a power, the Board would not wish to encourage the promiscuous creation

E of other common law powers to compel the production of information. The limits of this power are implicit in the reasons for recognising its existence. In the first place, it is available only to assist the officers of a foreign court of insolvency jurisdiction or equivalent public officers. It would not, for example, be available to assist a voluntary winding up, which is essentially a private arrangement and although subject to the directions of the court is not conducted by or on behalf of an officer of the court. Secondly, it is a power

F of assistance. It exists for the purpose of enabling those courts to surmount the problems posed for a worldwide winding up of the company's affairs by the territorial limits of each court's powers. It is not therefore available to enable them to do something which they could not do even under the law by which they were appointed. Thirdly, it is available only when it is necessary for the performance of the office-holder's functions. Fourth, the power is

G subject to the limitation in *In re African Farms Ltd* [1906] TS 373 and in *HIH* [2008] 1 WLR 852 and *Rubin* [2013] 1 AC 236, that such an order must be consistent with the substantive law and public policy of the assisting court, in this case that of Bermuda. It follows that it is not available for purposes which are properly the subject of other schemes for the compulsory provision of information. In particular, as the reasoning in *Norwich Pharmacal* [1974] AC 133 and *R (Omar) v Secretary of State for Foreign and*

H *Commonwealth Affairs* [2013] 1 All ER 161; [2014] QB 112 (at both levels) shows, common law powers of this kind are not a permissible mode of obtaining material for use in actual or anticipated litigation. That field is covered by rules of forensic procedure and statutory provisions for obtaining evidence in foreign jurisdictions which liquidators, like other litigants or

© 2015 The Incorporated Council of Law Reporting for England and Wales

potential litigants, must accept with all their limitations. Moreover, in some *A* jurisdictions, it may well be contrary to domestic public policy to make an order which there would be no power to make in a domestic insolvency. Finally, as with other powers of compulsion exercisable against an innocent third party, its exercise is conditional on the applicant being prepared to pay the third party's reasonable costs of compliance.

26 Order 11, rule 1(2) of the Rules of the Bermuda Supreme Court (as *B* applied by order 11, rule 9(1)) authorises the service of an originating summons, petition, notice of motion or similar originating process out of the jurisdiction without leave in respect of any "claim which by virtue of any enactment the court has power to hear and determine". Because the common law power of the court to compel the production of information in aid of a foreign liquidation is not statutory nor derived from any analogy with the statute, this rule had no application to it. There is a more general *C* power to serve originating process (other than a writ) out of the jurisdiction with the leave of the court under Order 11, rule 9(4), but it is not exercisable against persons whose engagement in the affairs of a foreign company has no connection with Bermuda and there is no implicit statutory authority for such a course: see *In re Seagull Manufacturing Co Ltd* [1993] Ch 345. It follows that on any view the Chief Justice had no power to authorise the service out of the jurisdiction on Mr Suddaby or other partners or officers of *D* PwC who were not within the jurisdiction of the court. The most that he could do, in a case within the ambit of the power, was order PwC, as the only party present within the jurisdiction, to comply for their own part and to take reasonable steps to procure the co-operation of others.

*Application to the present case* *E*

27 The Board has summarised the limitations on the common law power to compel the production of information. Of these limitations, two are potentially relevant in the case of Singularis.

28 The first arises from PwC's argument that the order sought against them is not consistent with the law or public policy of Bermuda, because the statutory power to compel the production of information under section 195 *F* of the Bermuda Companies Act impliedly excludes the possibility of an equivalent power at common law. The argument is that because section 195 is limited to cases where the company is being wound up in Bermuda, it would be inconsistent with the statutory scheme to recognise a common law power which, if it existed, would be subject to no such limitation. The Board is not persuaded by this. The existence of a statutory power covering part of the same ground may impliedly exclude a common law power *G* covering the whole of it. But it does not necessarily do so. An implied exclusion of non-statutory remedies arises only where the statutory scheme can be said to occupy the field. This will normally be the case if the subsistence of the common law power would undermine the operation of the statutory one, usually by circumventing limitations or exceptions to the statutory power which are an integral part of the underlying legislative policy: see *Deutsche Morgan Grenfell Group plc v Inland Revenue Comrs* *H* [2007] 1 AC 558, para 19 (Lord Hoffmann); *R (Child Poverty Action Group) v Secretary of State for Work and Pensions* [2011] 2 AC 15, paras 27–34 (Lord Dyson JSC). There is, however, no reason to suppose that the limitation of the power under section 195 of the Companies Act to

© 2015 The Incorporated Council of Law Reporting for England and Wales

A  companies in the course of winding up in Bermuda reflects a legislative policy adverse to assisting foreign courts of insolvency jurisdiction. It simply reflects the limits of the ambit of the Act. The relevant provisions of the Act have been analysed in the advice of the Board in *PricewaterhouseCoopers v Saad Investments Co Ltd* [2014] 1 WLR 4482. In summary, the effect of section 4 is that it applies to companies incorporated in Bermuda or authorised to carry on business there. However, the fact that express

B  provision is made for the powers exercisable on the winding up of companies to which the Act applies, does not in the Board's opinion exclude the use of common law powers in relation to other companies which lie outside the scope of the statute altogether.

29  The second limitation which is relevant presents more formidable problems for the joint liquidators. The material which they seek in Bermuda

C  would not be obtainable under the law of the Cayman Islands pursuant to which the winding up is being carried out there. Where a domestic court has a power to grant ancillary relief in support of the proceedings of a foreign court, it is not necessarily an objection to its exercise that the foreign court had no power to make a corresponding order itself. Thus in *Crédit Suisse Fides Trust SA v Cuoghi* [1998] QB 818, the English court made a worldwide *Mareva* injunction in support of Swiss proceedings against

D  Mr Cuoghi in circumstances where the Swiss court could not have made such an order. But that decision cannot be taken to reflect a universal principle. The critical factors which justified the order in that case were that there was an unqualified statutory power to give ancillary relief and that the Swiss court's inability to make the order was due to the fact that Mr Cuoghi was not resident in Switzerland whereas he was resident in England. Rather

E  different considerations apply to the common law power with which the Board is presently concerned. Its whole juridical basis is the right and duty of the Bermuda court to assist the Cayman court so far as it properly can. It is right for the Bermuda court, within the limits of its own inherent powers, to assist the officers of the Cayman court to transcend the territorial limits of that court's jurisdiction by enabling them to do in Bermuda that which they could do in the Cayman Islands. But the order sought would not constitute

F  assistance, because it is not just the limits of the territorial reach of the Cayman court's powers which impede the liquidators' work, but the limited nature of the powers themselves. The Cayman court has no power to require third parties to provide to its office-holders anything other than information belonging to the company. It does not appear to the Board to be a proper use of the power of assistance to make good a limitation on the powers of a

G  foreign court of insolvency jurisdiction under its own law. This was in substance the ground on which the liquidators failed in the Court of Appeal when they characterised the present application as "forum shopping". In the opinion of the Board it is correct.

30  The liquidators have not contended at any stage of this litigation that the order which they seek can be justified at common law independently of the power of the Bermuda court to assist a foreign court of insolvency

H  jurisdiction. Moreover, they have accepted before the Board that the information which they seek belongs to PwC and was therefore properly excluded from the order made by the Grand Court of the Cayman Islands. Whether this was correct was not therefore a point argued before the Board. None the less, the Board would not wish to part with this case without

© 2015 The Incorporated Council of Law Reporting for England and Wales

expressing their doubts about whether information which PwC acquired *A* solely in their capacity as the company's auditors can be regarded as belonging exclusively to them simply because the documents in which they recorded that information are their working papers and as such their property.

*Conclusion*                                                                    *B*

31   The Board will humbly advise Her Majesty that this appeal should be dismissed.

## LORD COLLINS OF MAPESBURY

*Introduction*                                                                  *C*

32   In my opinion the appeal should be dismissed because the ground on which the joint liquidators based their appeal is unsupportable, namely that the court has at common law the ability to exercise powers which are analogous to statutory powers which would have been exercisable in the case of a domestic insolvency, but which do not apply in the international context.   This opinion is intended to explain why that conclusion is *D* inescapable in the light of the relationship between the judiciary and the legislature.

33   As the Supreme Court confirmed in *Rubin v Eurofinance SA (Picard intervening)* [2013] 1 AC 236 the court has a common law power to assist foreign winding up proceedings so far as it properly can.   In my view, in common with Lord Sumption JSC and despite Lord Mance JSC's powerful opinion to the contrary, the Bermuda court has the power to make an order *E* against persons subject to its personal jurisdiction in favour of foreign liquidators for production of information for the purpose of identifying and locating assets of the company, provided they have a similar right under the domestic law of the court which appointed them.   I therefore agree with Lord Sumption JSC that this was not a proper case for exercise of that power.

34   The existence of a common law power to order information *F* (otherwise than by analogy with local statutory powers) was not pursued by the liquidators on the appeal, and it was virtually disclaimed by them until questioning by the Board (quoted in Lord Mance JSC's opinion at para 128) may have led them to adopt it as a subsidiary basis for their appeal.

35   Consequently the parties are entitled to have the views of the Board on the argument which was actually put before it, in essence whether *G* *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508 ("*Cambridge Gas*") correctly decided that the court has a common law power to assist foreign winding up proceedings by exercising powers which are analogous to statutory powers which would have been exercisable in the case of a domestic insolvency, but do not apply to the international insolvency.

36   The primary way in which the case was put by the liquidators was *H* that the common law develops to meet changing circumstances and that in international insolvencies the common law should be developed by the adoption of a principle that where local legislation does not provide for relevant assistance to a foreign office holder, the legislation should be applied by analogy "as if" the foreign insolvency were a local insolvency.

© 2015 The Incorporated Council of Law Reporting for England and Wales

1701

A  This argument was accepted by the Chief Justice. But it involves a fundamental misunderstanding of the limits of the judicial law-making power, and should not go unanswered.

37  A second reason for dealing with the main point of the liquidators' appeal was that the question whether local legislation could be applied by analogy arose in an appeal in the Cayman Islands Court of Appeal, and that court gave only an interim judgment pending the decision of this Board on
B  this appeal: *Picard v Primeo Fund* 2013 (1) CILR 164. That case, as will appear below, involved anti-avoidance proceedings for the recovery of assets, and not (as in the present case) proceedings to obtain information to recover assets. On the principal argument of the liquidators, there is no material difference between this case and the Cayman Islands case. In each case the argument was that the local legislation should, if it does not apply
C  according to its terms (and there is a question about this in the Cayman Islands case), be applied by analogy or on an "as if" basis. The Board took the view that it would be failing in its duty if it did not reach this question on this appeal, and simply left the Cayman Islands Court of Appeal to decide the matter with a possible further appeal to the Privy Council. That appeal has recently been settled, but the point of principle may still arise.

38  In my judgment the answer to the present appeal is to be found in the
D  following propositions. First, there is a principle of the common law that the court has the power to recognise and grant assistance to foreign insolvency proceedings. Second, that power is primarily exercised through the existing powers of the court. Third, those powers can be extended or developed from existing powers through the traditional judicial law-making techniques of the common law. Fourth, the very limited application of legislation by
E  analogy does not allow the judiciary to extend the scope of insolvency legislation to cases where it does not apply. Fifth, in consequence, those powers do not extend to the application, by analogy "as if" the foreign insolvency were a domestic insolvency, of statutory powers which do not actually apply in the instant case.

*The practical issue*
F
39  Both the Cayman Islands and Bermuda have statutory provisions for the examination of persons connected with an insolvent company. In England the statutory power is contained in the Insolvency Act 1986, section 236.

40  This is an exclusively statutory power, which goes back a very long way. As early as the Statute of Bankrupts Act 1542 (34 & 35 Hen 8, c 4), the
G  authorities (including, among others, the lord chancellor and the chief justices) were given power to examine on oath persons who were suspected of having property (including debts) belonging to the debtor. The Joint Stock Companies Act 1844 (7 & 8 Vict c 110) gave a similar power to the court in the case of companies, and there is a continuous line of statutory authority in both corporate and personal insolvency confirming (and extending) the power thereafter to the present day.
H
41  The provisions of neither the Cayman Islands nor Bermuda statutes apply to the material sought by the liquidators in this case. That is because: (1) the power in section 103 of the Cayman Islands Companies Law to order any person, whether or not resident in the Cayman Islands, who has a relevant connection with a company in liquidation (including its former

© 2015 The Incorporated Council of Law Reporting for England and Wales

auditor) to "transfer or deliver up to the liquidator any property or documents belonging to the company" extends only to material belonging to the companies (subject to what Lord Sumption JSC says at para 29); and (2) the "power to summon persons suspected of having property of company etc" in section 195 of the Companies Act 1981 of Bermuda does not apply because the power is exercisable only in respect of a company which that court has ordered to be wound up, and in the SICL appeal the Board has advised that the winding up order must be stayed because the court has no jurisdiction to wind up a company incorporated outside Bermuda, to which Part XIII of the Companies Act is not expressly applied: *PricewaterhouseCoopers v Saad Investments Co Ltd* [2014] 1 WLR 4482.

42   The problem in this and other similar or analogous cases has arisen largely in relation to those British colonies, dependencies, and overseas territories, such as Bermuda, and the Isle of Man, which do not have the statutory powers to assist foreign office-holders which exist under United Kingdom law. Consequently, except in a rare situation to which I will revert, the practical result of this appeal is largely confined to such countries, or those countries (such as the Cayman Islands) where the extent of the statutory powers is controversial.

43   Some of these territories do have such powers. The British Virgin Islands has given effect to the UNCITRAL Model Law in the Insolvency Act 2003, Part XIX, which contains powers to assist foreign office-holders, but only from countries or territories which are designated by the Financial Services Commission. There are nine such countries or territories, including the United States and the United Kingdom. Section 470 of the Insolvency Act 2003 preserves the power of the court to provide assistance under any other rule of law.

44   The Cayman Islands Companies Law, section 241, gives the court power to make orders ancillary to a foreign bankruptcy proceeding (including the power to require a person in possession of information relating to the business or affairs of a bankrupt: section 241(1)(d)). But the application of these powers to anti-avoidance proceedings has been controversial. The Cayman Islands Court of Appeal reserved pending the outcome of this appeal the question whether the anti-avoidance provisions of its law can be used at common law (in addition to, or alternatively to, its statutory power to do so) in aid of a US bankruptcy proceeding: *Picard v Primeo Fund* 2014 (1) CILR 379. As mentioned above, the appeal has recently been settled.

45   In the United Kingdom, except where the EU Insolvency Regulation (Council Regulation (EC) 1346/2000 of 29 May 2000 on insolvency proceedings (OJ 2000 L160, p 1)) applies, the English court has a very wide power to wind up foreign companies, and where a foreign company is being wound up in England the liquidator is generally free to invoke the relevant provisions of the Insolvency Act 1986 in discharge of his functions, which would include the power to ask for examination under the Insolvency Act 1986, section 236.

46   Where the foreign company is not being wound up in England, under the Cross-Border Insolvency Regulations 2006 (SI 2006/1030), which give effect to the UNCITRAL Model Law, the court may co-operate to the maximum extent possible with foreign courts or foreign representatives: article 25(1). By article 21(1) of the 2006 Regulations, on recognition of a

© 2015 The Incorporated Council of Law Reporting for England and Wales

A foreign proceeding, the English court may grant appropriate relief, including the examination of witnesses, and the taking of evidence or the delivery of information concerning (inter alia) the debtor's assets. Secondary proceedings may be opened in the United Kingdom, but only where the debtor has an establishment in the United Kingdom and only as regards assets in the United Kingdom.

B 47 Under section 426 of the Insolvency Act 1986 the English court with jurisdiction in relation to insolvency is to assist the courts having the corresponding jurisdiction in any other part of the United Kingdom "or any relevant country or territory" (section 426(4)) by applying the law of either jurisdiction (section 426(5), a very difficult section: see *Dicey, Morris & Collins, Conflict of Laws*, 15th ed (2012), vol 2, para 30-110 et seq). These powers apply to only a limited numbers of countries (including Australia, C the Bahamas, and the Isle of Man).

48 An order for examination may be made under this section in aid of a foreign liquidation. In *England v Smith* [2001] Ch 419 it was held, in a case of an order for examination under Australian law of a person concerned with the affairs of a company, that application of the law of the requesting state should not be circumscribed by limitations to be found in the corresponding provisions of section 236 of the 1986 Act unless some D principle of English public policy were infringed.

49 Where the EU Insolvency Regulation applies, a foreign officeholder may exercise all the powers conferred on him by the law of the state of the opening of proceedings: article 18(1).

50 Accordingly the statutory powers of the UK courts to assist foreign office-holders to trace assets are very extensive. It follows that the existence E of a common law power to order examination will almost certainly never arise in England, and the same is true of the other statutory powers of which foreign office-holders may wish to take advantage. This is subject to what is said below about *In re Phoenix Kapitaldienst GmbH* [2013] Ch 61, where clawback under the Insolvency Act 1986, section 423 (transactions at an undervalue) was sought and granted, in a case where the EU Insolvency F Regulation did not apply because the German company involved was an investment undertaking; the UNCITRAL Model Law did not apply because the 2006 Regulations were not in effect at the relevant time; and Germany was not a relevant country for the purposes of section 426(4).

*Assistance at common law in international insolvency*

G 51 The UK Supreme Court accepted, and re-confirmed, in *Rubin v Eurofinance SA* [2013] 1 AC 236 that at common law the court has power to recognise and grant assistance to foreign insolvency proceedings: para 29.

52 In my judgment in *Rubin v Eurofinance SA*, at para 29, I quoted what Millett LJ had said in *Crédit Suisse Fides Trust v Cuoghi* [1998] QB 818, 827:

H "In other areas of law, such as cross-border insolvency, commercial necessity has encouraged national courts to provide assistance to each other without waiting for such co-operation to be sanctioned by international convention . . . It is becoming widely accepted that comity between the courts of different countries requires mutual respect for the territorial integrity of each other's jurisdiction, but that this should not

© 2015 The Incorporated Council of Law Reporting for England and Wales

inhibit a court in one jurisdiction from rendering whatever assistance it    *A*
properly can to a court in another in respect of assets located or persons
resident within the territory of the former."

53   The common thread in those cases in which assistance has been
given is the application or extension of the existing common law or statutory
powers of the court.

54   Most of the cases fall into one of two categories. The first group    *B*
consists of cases where the common law or procedural powers of the court
have been used to stay proceedings or the enforcement of judgments. Several
of these cases were mentioned in *Rubin v Eurofinance SA* [2013] 1 AC 236,
para 33. They include (subject to what is said below) *In re African Farms Ltd*
[1906] TS 373, where execution in Transvaal by a creditor in proceedings
against an English company in liquidation in England was stayed by the
Transvaal court, which was applied in *Turners & Growers Exporters Ltd v    *C*
The Ship "Cornelis Verolme"* [1997] 2 NZLR 110 (Belgian shipowner in
Belgian bankruptcy: ship released from arrest); and *Banque Indosuez SA v
Ferromet Resources Inc* [1993] BCLC 112, where an English injunction
against a Texas corporation in Chapter 11 proceedings was discharged; and
two cases in Hong Kong: *Modern Terminals (Berth 5) Ltd v States Steamship
Co* [1979] HKLR 512 (stay in Hong Kong of execution against Nevada    *D*
corporation in Chapter 11 proceedings in United States federal court in
California), followed in *CCIC Finance Ltd v Guangdong International Trust
& Investment Corpn* [2005] 2 HKC 589 (stay of Hong Kong proceedings
against Chinese state-owned enterprise in Mainland insolvency).

55   In my judgment too much has been read into *In re African Farms Ltd*
[1906] TS 373. It was not mentioned in any English case until it was cited in    *E*
argument in *In re Bank of Credit and Commerce International SA (No 10)*
[1997] Ch 213, 219, for the proposition that the English court will not allow
funds to be transmitted to the jurisdiction of the foreign court of the principal
winding up without first making provision for the local secured, preferential
and statutory creditors, and then subsequently approved in *Cambridge Gas*.
It had never been mentioned in the classic company law texts, *Buckley*, *Gore-
Browne*, and *Palmer* (nor in *Williams on Bankruptcy*), nor in *Fletcher*,    *F*
*Insolvency in Private International Law*, 2nd ed (2005). It received only a
passing mention in the successive editions of *Forsyth* on South African private
international law now called *Private International Law: The Modern
Roman-Dutch Law* (now 5th ed (2012), p 456), although it has been
mentioned (obiter) with approval by the Supreme Court of Appeal of South
Africa: *Gurr v Zambia Airways Corpn Ltd* [1998] 2 All SA 479 (A).    *G*

56   Apart from the stay of execution ordered against a secured creditor
(Standard Bank) which had obtained a judgment, the only part of the order
in *In re African Farms Ltd* [1906] TS 373 which is relevant for present
purposes is the order that all questions of mortgage or preference be
regulated by Transvaal law as if the company had been placed in liquidation
in the Transvaal. It is not stated how that was to be achieved, but it is
significant that Innes CJ said, at p 382: "Such conditions are not easy to    *H*
devise; and it is possible that to place the foreign liquidator in such a position
as to ensure beyond doubt a distribution such as I have indicated would
require reciprocal legislation in the two countries". Even though the
company could not have been wound up in the Transvaal, the decision is

© 2015 The Incorporated Council of Law Reporting for England and Wales

1705
**[2015] AC**           **Singularis Holdings Ltd v PricewaterhouseCoopers (PC)**
**Lord Collins of Mapesbury**

A    certainly not authority for the proposition that local statutory law may be applied by analogy.

57    *In re Impex Services Worldwide Ltd* [2004] BPIR 564 also falls into the category of the use or extension of the existing powers of the court. In that case a Manx order for examination and production of documents was made in aid of the provisional liquidation in England of an English company.

B    That was referred to in *Rubin v Eurofinance SA* [2013] 1 AC 236, para 33 as a case of judicial assistance in the traditional sense because the order was based on a request by the English court, but the decision was not the subject of examination before the Supreme Court and cannot be said to have been approved by it. The request could not be accommodated under the Manx Companies Act 1931, or under the inherent jurisdiction of the court, but the order was made at common law without articulation of its basis.

C    58    A second group of cases is where the statutory powers of the court have been used in aid of foreign insolvencies. The best known example is the use of the long-standing power to wind up foreign companies which are being wound up (or even have been dissolved) in the country of incorporation. In *In re Bank of Credit and Commerce International SA (No 10)* [1997] Ch 213 Sir Richard Scott V-C conducted an exhaustive

D    analysis of the cases on ancillary liquidations, and concluded (at p 246): (1) Where a foreign company was in liquidation in its country of incorporation, a winding up order made in England would normally be regarded as giving rise to a winding up ancillary to that being conducted in the country of incorporation. (2) The winding up in England would be ancillary in the sense that it would not be within the power of the English

E    liquidators to get in and realise all the assets of the company worldwide: they would necessarily have to concentrate on getting in and realising the English assets. (3) Since in order to achieve a pari passu distribution between all the company's creditors it would be necessary for there to be a pooling of the company's assets worldwide and for a dividend to be declared out of the assets comprised in that pool, the winding up in England would be ancillary

F    in the sense, also, that it would be the liquidators in the principal liquidation who would be best placed to declare the dividend and to distribute the assets in the pool accordingly. (4) None the less, the ancillary character of an English winding up did not relieve an English court of the obligation to apply English law, including English insolvency law, to the resolution of any issue arising in the winding up which was brought before the court.

G    59    *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852 also falls within this category because the majority in the House of Lords decided that the power of the English court to accede to the letter of request from the Australian court, inviting it to direct the English provisional liquidators to remit the assets in their hands to the Australian liquidators derives from section 426 of the Insolvency Act 1986.

60    As part of the majority in *HIH* Lord Scott of Foscote (at para 59)

H    re-affirmed what he had said in *In re Bank of Credit and Commerce International SA (No 10)* [1997] Ch 213:

"The English courts have a statutory obligation in an English winding up to apply the English statutory scheme and have, in my opinion, in respectful disagreement with my noble and learned friend Lord

© 2015 The Incorporated Council of Law Reporting for England and Wales

A   Hoffmann, no inherent jurisdiction to deprive creditors proving in an
English liquidation of their statutory rights under that scheme."

See also Lord Neuberger of Abbotsbury at para 72.

*The liquidators' argument and the Chief Justice's decision*

B   61   The primary argument of the liquidators before the Board, which
had found favour with the Chief Justice as the principal ground of his
decision (which he described as "more principled" at para 49), was that the
Bermuda court should apply directly the examination provisions of
section 195 of the Companies Act 1981 by analogy.

62   That was said to be based on what Lord Hoffmann had said in
*Cambridge Gas* [2007] 1 AC 508, para 22:

C   "What are the limits of the assistance which the court can give? . . . At
common law, their Lordships think it is doubtful whether assistance
could take the form of applying provisions of the foreign insolvency law
which form no part of the domestic system. But the domestic court must
at least be able to provide assistance by doing whatever it could have done
in the case of a domestic insolvency. The purpose of recognition is to
D   enable the foreign office holder or the creditors to avoid having to start
parallel insolvency proceedings and to give them the remedies to which
they would have been entitled if the equivalent proceedings had taken
place in the domestic forum."

E   63   In the Court of Appeal in the present case Auld JA had described the
development of the common law jurisdiction to grant assistance to a foreign
liquidator as if the foreign company were being wound up locally as
amounting to impermissible "legislation from the bench." In answer, the
liquidators in their argument to the Board relied on many dicta to the effect
that the common law develops to meet changing circumstances.

64   In my view to apply insolvency legislation by analogy "as if" it
applied, even though it does not actually apply, would go so far beyond the
traditional judicial development of the common law as to be a plain
F   usurpation of the legislative function.

*Judicial law-making*

G   65   The liquidators are plainly right to say that the common law
develops, sometimes radically, to meet changing circumstances. It hardly
requires citation of authority to make that point. No one now doubts that
judges make law, although English and Scottish judges were slow to
acknowledge it until the seminal writings by Lords Reid, Denning and
Devlin, citation of which is unnecessary. But there are limits to their power
to make law. In *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC
349, 378 Lord Goff of Chieveley said:

H   "When a judge decides a case which comes before him, he does so on
the basis of what he understands the law to be. This he discovers from the
applicable statutes, if any, and from precedents drawn from reports of
previous judicial decisions. Nowadays, he derives much assistance from
academic writings in interpreting statutes and, more especially, the effect
of reported cases; and he has regard, where appropriate, to decisions of

1707

A  judges in other jurisdictions. In the course of deciding the case before him
he may, on occasion, develop the common law in the perceived interests
of justice, though as a general rule he does this 'only interstitially,' to use
the expression of OW Holmes J in *Southern Pacific Co v Jensen* (1917)
244 US 205, 221. This means not only that he must act within the
confines of the doctrine of precedent, but that the change so made must be
B  seen as a development, usually a very modest development, of existing
principle and so can take its place as a congruent part of the common law
as a whole. In this process, what Maitland has called the 'seamless web,'
and I myself (*The Search for Principle*, Proc Brit Acad vol LXIX (1983)
170, 186) have called the 'mosaic,' of the common law, is kept in a
constant state of adaptation and repair . . ."

C  66  What Justice Holmes said in the passage to which Lord Goff referred
was: ". . . I recognise without hesitation that judges do and must legislate,
but they can do so only interstitially." The point was developed by Justice
Cardozo in *The Nature of the Judicial Process* (1921), at pp 103, 113:

"We must keep within those interstitial limits which precedent and
custom and the long and silent and almost indefinable practice of other
D  judges through the centuries of the common law have set to judge-made
innovations . . . We do not pick our rules of law full-blossomed from the
trees . . . [The judge] legislates only between gaps. He fills the open
spaces in the law . . ."

67  More recently similar points have been made by eminent judges of
our time. Judge Richard Posner said in *How Judges Think* (2008), p 86:
E  "The amount of legislating that a judge does depends on the breadth of his
'zone of reasonableness'—the area within which he has discretion to decide
a case either way without disgracing himself."

68  And Lord Bingham of Cornhill said, in *The Business of Judging*
(2000), p 32: "On the whole, the law advances in small steps, not by giant
bounds."

69  The approach which is articulated by Lord Sumption JSC is itself an
F  example of the development of the common law since, as Lord Mance JSC's
opinion clearly shows, it goes beyond what has previously been understood
to be the power of the court to order information.

*The judiciary and legislation*

70  But that is not the issue on this part of the appeal, which is whether,
G  as the liquidators argue, legislation may be extended by the judiciary to
apply to cases where the legislature has not applied it. It raises a much more
radical question than the familiar question whether a common law rule
should be extended or developed or whether the extension or development
should be left to Parliament.

71  The latter question arises frequently and yields different answers. In
the human rights context, it was the subject of intense debate in the recent case
H  on assisted suicide: *R (Nicklinson) v Ministry of Justice (CNK Alliance Ltd
intervening)* [2015] AC 657. In the private law area, for example, the
majority in *Jones v Kaney* [2011] 2 AC 398 decided to remove immunity from
expert witnesses. The minority thought that that was a question which should
be left to consideration by the Law Commission and reform by Parliament.

© 2015 The Incorporated Council of Law Reporting for England and Wales

72   By contrast, in *Rubin v Eurofinance SA* [2013] 1 AC 236 the     A
majority considered that a change in the law relating to foreign judgments to
apply a different rule (removing the need for a jurisdictional basis) in the
context of insolvency was a matter for the legislature. Similarly members of
the present Board have at various times made the same point in other
contexts: *Prest v Prest* [2013] 2 AC 415, para 83 (Lord Neuberger of
Abbotsbury PSC); *Test Claimants in the FII Group Litigation v Revenue and     B
Customs Comrs (formerly Inland Revenue Comrs)* [2012] 2 AC 337,
para 200 (Lord Sumption JSC); *Perpetual Trustee Co Ltd v BNY Corporate
Trustee Services Ltd (Revenue and Customs Comrs intervening)* [2012] 1 AC
383, para 174 (Lord Mance JSC).

73   But I emphasise that that is not the issue here. Nor is the issue the
question whether legislation may influence the development of a common
law rule. A famous early example where that was regarded as legitimate was     C
*R v Bourne* [1939] 1 KB 687, where a direction was given that the eminent
obstetrician Aleck Bourne was entitled as a defence to an abortion charge to
rely by analogy on the provision of the Infant Life (Preservation) Act 1929
that infanticide could be justified to preserve the life of the mother.

74   The question of the extent to which statutes may influence the
development of the common law is a well known and controversial one.     D
Professor Atiyah addressed the questions in this way ("Common Law and
Statute Law" (1985) 48 MLR 1, 6):

"is [it] possible for the courts to take account of statute law, in the very
development of the common law itself?  Can the courts, for instance, use
statutes as analogies for the purpose of developing the common law?  Can
they justify jettisoning obsolete cases, not because they have been actually     E
reversed by some statutory provision, but because a statute suggests that
they are based on outdated values?  Could the courts legitimately draw
some general principle from a limited statutory provision, and apply that
principle as a matter of common law?"

75   In each of those situations it is not difficult to find cases which justify
the forms of reasoning which Professor Atiyah identifies. But none of them     F
comes anywhere near what the Board is asked to do in this case.

76   Nor is the issue whether a statutory rule may be taken into account
in the exercise of a discretion. An example is the use of statutory limitation
periods in the exercise of the equitable doctrine of laches: *P & O Nedlloyd
BV v Arab Metals Co (No 2)* [2007] 1 WLR 2288; *Williams v Central Bank
of Nigeria* [2014] AC 1189, para 12.

77   Nor is the issue whether the courts may develop the common law by     G
entering or re-entering a field regulated by legislation. As Lord Nicholls of
Birkenhead said in *In re McKerr* [2004] 1 WLR 807, para 30, the courts
have been slow to do that because "otherwise there would inevitably be the
prospect of the common law shaping powers and duties and provisions
inconsistent with those prescribed by Parliament."

H

*The equity of a statute*

78   What the liquidators propose is very much more radical. It is that
the court should apply legislation, which ex hypothesi does not apply, "as if"
it applied.

© 2015 The Incorporated Council of Law Reporting for England and Wales

1709

A    79   That proposition is reminiscent of the concept of the "equity of a statute". When used properly today, it means no more than interpreting a statute by reference to its purpose or the mischief which it was designed to cure: e g *Incorporated Council of Law Reporting for England and Wales v Attorney General* [1972] Ch 73, 88.

B    80   But it once meant something which "has been relegated to the limbo of legal antiquities" (Loyd, "The Equity of a Statute" (1909) 58 U Pa L Rev 76), and had been formulated in this way: "Equitie is a construction made by the judges that cases out of the letter of a statute yet being within the same mischief or cause of the making of the same, shall be within the same remedy that the statute provideth . . ." (Co Litt Lib I, Ch II, para 21, quoting Bracton).

C    81   Under that doctrine the courts felt themselves free to enlarge a statute so as to apply it to situations which were not covered by the words of the statute but were regarded by the courts as within its spirit and analogous: Burrows, "The Relationship between Common Law and Statute in the Law of Obligations" (2012) 128 LQR 232, 241; Atiyah, "Common Law and Statute Law" (1985) 48 MLR 1, 7–8. That concept of the "equity of a statute" fell into disfavour in the 18th century and was abandoned by the beginning of the 19th century, and the judges were no longer able in effect to exercise a direct legislative function.

D    82   The liquidators' argument is that the common law rule of assistance in insolvency matters extends to the application of local legislation even though as a matter of its legislative scope it does not apply to the case in hand. In the present case the argument is that, even if section 195 of the Companies Act 1981 does not apply to foreign companies, it should be applied by analogy or "as if" the Cayman Islands company were a Bermuda company.

E    83   In my judgment, that argument is not only wrong in principle, but also profoundly contrary to the established relationship between the judiciary and the legislature. To the extent that it depends on some part of the opinion in *Cambridge Gas* [2007] 1 AC 508, that decision was not only wrong in its recognition of the New York order regulating the title to Manx shares, as decided in *Rubin v Eurofinance SA* [2013] 1 AC 236, it was also wrong to apply the Manx statutory provisions for approval of schemes of arrangement by analogy or "as if" they applied.

F

*Cambridge Gas*

G    84   The essence of the decision in *Cambridge Gas* [2007] 1 AC 508 was that the New York order would be recognised, and would be given effect because a similar scheme could have been sanctioned as a scheme of arrangement under the Isle of Man law.

85   The facts of *Cambridge Gas* are set out in *Rubin* [2013] 1 AC 236, paras 36 et seq. For present purposes it is only necessary to recall that a gas transport shipping business venture ended in failure, and resulted in a Chapter 11 proceeding in the US Bankruptcy Court in New York. The question for the Privy Council on appeal from the Isle of Man was whether an order of the New York court was entitled to implementation in the Isle of Man. The New York court had rejected the investors' plan and accepted the bondholders' plan.

H

© 2015 The Incorporated Council of Law Reporting for England and Wales

1710

A
86   The corporate structure of the business was that the investors owned, directly or indirectly, a Bahaman company called Vela Energy Holdings Ltd ("Vela"). Vela owned (through an intermediate Bahaman holding company) Cambridge Gas, a Cayman Islands company. Cambridge Gas owned directly or indirectly about 70% of the shares of Navigator Holdings plc ("Navigator"), an Isle of Man company. Navigator owned all the shares of an Isle of Man company which in turn owned companies which each owned one ship.

B

87   The New York order vested the shares in Navigator (the Isle of Man company) in the creditors' committee, which subsequently petitioned the Manx court for an order vesting the shares in their representatives. The Manx Staff of Government Division acceded to this petition by making an order under the Manx Companies Act 1931, section 101, rectifying the share register by entering the creditors' committee as shareholders. In the Privy Council [2007] 1 AC 508, para 23, Lord Hoffmann rejected this solution on this basis: the power was exercisable when "the name of any person is, without sufficient cause, entered in or omitted from the register". But for that purpose it was necessary to show that by the law of the Isle of Man the company was obliged to do so. The source of such an obligation could be found only in an order of the court, pursuant to its common law power of assistance, which required the company to make such an entry. Consequently, the argument based on section 101 was therefore circular. The prior question was whether the court has power to declare that the Chapter 11 plan should be carried into effect.

C

D

88   The Privy Council held that the plan could be carried into effect in the Isle of Man. The reasoning was as follows. First, if the judgment had to be classified as in personam or in rem the appeal would have to be allowed, but bankruptcy proceedings did not fall into either category. Second, the principle of universality underlay the common law principles of judicial assistance in international insolvency, and those principles were sufficient to confer jurisdiction on the Manx court to assist, by doing whatever it could have done in the case of a domestic insolvency. Third, exactly the same result could have been achieved by a scheme of arrangement under the Isle of Man Companies Act 1931, section 152.

E

F

89   In *Rubin* [2013] 1 AC 236, a majority of the Supreme Court (Lord Collins of Mapesbury with whom Lords Walker of Gestingthorpe and Sumption JJSC agreed) decided that *Cambridge Gas* was wrongly decided because the shares in Navigator owned by Cambridge Gas (a Cayman Islands company) were, on ordinary principles of the conflict of laws, situated in the Isle of Man, and the shareholder relationship between Navigator and Cambridge Gas was governed by Manx law. Consequently the property in question, namely the shares in Navigator, was situate in the Isle of Man, and therefore also not subject to the in rem jurisdiction of the US Bankruptcy Court. There was therefore no basis for the recognition of the order of the US Bankruptcy Court in the Isle of Man. Lord Mance JSC, in his concurring judgment, left the correctness of the decision open, and Lord Clarke of Stone-cum-Ebony JSC, dissenting, thought that it was correctly decided.

G

H

90   I have already quoted the passage in *Cambridge Gas* [2007] 1 AC 508, para 22 in which Lord Hoffmann said that "the domestic court must at least be able to provide assistance by doing whatever it could have done in

© 2015 The Incorporated Council of Law Reporting for England and Wales

A  the case of a domestic insolvency" and that the purpose of recognition of the foreign office-holders was to "to give them the remedies to which they would have been entitled if the equivalent proceedings had taken place in the domestic forum."

91   The effect of this part of the opinion in *Cambridge Gas* was to make an order equivalent to one which could have been made under a Manx scheme of arrangement without going through the statutory procedures for

B  approval of a scheme. The passages in the opinion which are relevant are these:

"24. In the present case it is clear that the New York creditors, by starting proceedings to wind up the Navigator companies and then proposing a scheme of arrangement under section 152 of the Companies

C  Act 1931, could have achieved exactly the same result as the Chapter 11 plan.   The Manx statute provides: '(1) Where a compromise or arrangement is proposed between a company and its creditors . . . the court may on the application in a summary way of the company or of any creditor or member of the company, or, in the case of a company being wound up, of the liquidator, order a meeting of the creditors . . . to be summoned in such manner as the court directs.   (2) If a majority in

D  number representing three-fourths in value of the creditors . . . agree to any compromise or arrangement, the compromise or arrangement shall, if sanctioned by the court, be binding on all the creditors . . . and also on the company or, in the case of a company in the course of being wound up, on the liquidator and contributories of the company.'

"25. The jurisdiction is extremely wide.  All that is necessary is that the

E  proposed scheme should be a 'compromise or arrangement' and that it should be approved by the appropriate majority.  Why, therefore, should the Manx court not provide assistance by giving effect to the plan without requiring the creditors to go to the trouble of parallel insolvency proceedings in the Isle of Man? . . .

"26. . . . as between the shareholder and the company itself, the shareholder's rights may be varied or extinguished by the mechanisms

F  provided by the articles of association or the Companies Act.  One of those mechanisms is the scheme of arrangement under section 152.  As a shareholder, Cambridge is bound by the transactions into which the company has entered, including a plan under Chapter 11 or a scheme under section 152.  It is the object of such a scheme to give effect to an arrangement which varies or extinguishes the rights of creditors and

G  shareholders.  Thus, in the case of an insolvent company, in which the shareholders have no interest of any value, the court may sanction a scheme which leaves them with nothing . . . The scheme may divest the company of its assets and leave the shareholders with shares in an empty shell.  It may extinguish their shares and recapitalise the company by issuing new shares to others for fresh consideration.  Or it may, as in this case, provide that someone else is to be registered as holder of the shares.

H  Whatever the scheme, it is, by virtue of section 152, binding on the shareholders when it receives the sanction of the court.  The protection for the shareholders is that the court will not sanction a scheme, even if adopted by the statutory majority, if it appears unfair.  And no doubt the discretion to refuse assistance in the implementation of an equivalent plan

© 2015 The Incorporated Council of Law Reporting for England and Wales

A    which has been confirmed in a foreign jurisdiction would be exercised on
similar lines. But no such question arises in this case. Although it must be
accepted that Cambridge did not technically submit to the jurisdiction in
New York, it had no economic interest in the proceedings and ample
opportunity to participate if it wished to do so. It would therefore not be
unfair for the plan to be carried into effect. Their Lordships therefore
consider that the Court of Appeal was right to order its implementation."

B    92    It is to be noted that Lord Hoffmann said that the New York
creditors *could have achieved* exactly the same result as the Chapter 11 plan
by a scheme of arrangement under the Companies Act 1931, section 152,
and asked why the Manx court could not provide assistance by giving effect
to the plan without requiring the creditors to go to the trouble of parallel
insolvency proceedings in the Isle of Man.

C    93    Those proceedings required the calling of meetings and the passage
of appropriate resolutions. The majority of the UK Supreme Court decided
in *Rubin v Eurofinance SA* [2013] 1 AC 236 that *Cambridge Gas* was
wrongly decided on the ground that the New York court did not have
jurisdiction over title to shares in a Manx company. The question whether
there was any lawful basis for applying the legislation on an "as if" basis, or
D    of dispensing with the statutory procedures, did not therefore arise in *Rubin v
Eurofinance SA*. But for the reasons I have given, in my judgment there can
be no doubt that, unless Manx law allowed the relaxation of the statutory
procedures for the approval of schemes of arrangement, the judiciary was
not entitled to apply those procedures by analogy at common law.

*The application of Cambridge Gas*

E    94    It follows in my view that those courts which have relied on these
passages to apply legislation which the legislature had not itself seen fit to
apply are wrong, including the decision of the Chief Justice in the present
case.

95    That conclusion also applies to the decision in *In re Phoenix
Kapitaldienst GmbH* [2013] Ch 61. In that case a company incorporated in
Germany for the apparent purpose of investing individuals' funds in futures
F    trading was used as a vehicle for a worldwide fraud. The German
administrator applied for relief pursuant to the Insolvency Act 1986,
section 423 (transactions at an undervalue) against former investors of the
company who were resident in England, claiming back initial investment
funds and fictitious profits for the benefit of the company's creditors by
setting aside transactions entered into at an undervalue.

G    96    As I have said, the EU Insolvency Regulation did not apply because
the German company involved was an investment undertaking; the
UNCITRAL Model Law did not apply because the 2006 Regulations were
not in effect at the relevant time; and Germany was not a relevant country
for the purposes of section 426(4).

97    Proudman J decided that the court had the power at common law to
H    recognise a foreign administrator and to provide him with the same
assistance as it was entitled to provide in a domestic insolvency; and that
since proceedings to set aside antecedent transactions were central to the
purpose of an insolvency the court therefore had jurisdiction to authorise the
administrator to invoke section 423. Applying *Cambridge Gas* Proudman J

© 2015 The Incorporated Council of Law Reporting for England and Wales

A  held that the power to use the common law to recognise and assist an administrator appointed overseas "includes doing whatever the English court could have done in the case of a domestic insolvency": para 62.

98  In my judgment that decision is wrong because it involved an impermissible application of legislation by analogy.

99  In *Picard v Primeo Fund* 2013 (1) CILR 164 the US bankruptcy trustee of the principal Bernard Madoff company sought to claw back payments made by the company to a Cayman Islands company. The claims were based on US law (fraudulent transfers and preferential payments) and on Cayman law (preferential payments). The Cayman Islands have mutual assistance provisions (Companies Law (2012 Revision), sections 241–242), but the judge (Jones J) held that they did not apply because the power to make orders "ordering the turnover to a foreign representative of any property belonging to a debtor" did not apply to property which was only recoverable under transaction avoidance provisions.

100  The judge then went on to decide that the Cayman court was able to apply the Cayman voidable preferences provision of its law (section 145) to the payments made by the US company to the Cayman company, by applying *Cambridge Gas* and *In re Phoenix Kapitaldienst GmbH* [2013] Ch 61.

101  On 16 April 2014 the Court of Appeal of the Cayman Islands (consisting of Sir John Chadwick P and Mottley and Campbell JJA )2014 (1) CILR 379, reversed Jones J on the first part of the case and held that the Cayman court was entitled to apply the Cayman anti-avoidance provisions under the assistance provisions of Cayman company law, because the making of a transaction avoidance order restores to the debtor the property which is the subject of that order, and so enables the court to order the "turnover" of that restored property to the foreign representative: para 45.

102  The Court of Appeal did not reach the question whether Jones J was entitled to apply the Cayman anti-avoidance provision at common law. The court had been informed that an issue central to that question, namely whether *Cambridge Gas* should be followed, was before the Court of Appeal for Bermuda. Because the matter was before this Board and shortly to be heard, the Court of Appeal was invited to hand down an interim judgment dealing only with the issues on the mutual assistance statutory provisions. The appeal has now been settled. It follows from what I have said that the decision of Jones J on the present aspect of the case was wrong.

*Al Sabah v Grupo Torras SA*

G  103  There was also a prior opinion of the Privy Council, in which what was said is directly contrary to the approach in *Cambridge Gas* advocated by the liquidators. In *Al Sabah v Grupo Torras SA* [2005] 2 AC 333 the trustee in bankruptcy of a debtor in The Bahamas obtained from the Bahaman court a letter of request directed to the Grand Court of the Cayman Islands seeking its aid in setting aside two Cayman trusts established by the debtor. The Grand Court (affirmed by the Court of Appeal of the Cayman Islands) held that it had jurisdiction to provide such assistance under either section 156 of the Bankruptcy Law of the Cayman Islands or section 122 of the Bankruptcy Act 1914 (which provided for mutual assistance between bankruptcy courts throughout the UK and the Empire) or under the court's inherent jurisdiction, and that it should as a

© 2015 The Incorporated Council of Law Reporting for England and Wales

matter of discretion grant the Bahaman trustee powers under section 107 of    A
the Cayman Bankruptcy Law to enable him to set aside the trusts. The Privy
Council held that (i) section 156 of the Cayman Bankruptcy Law did not
apply, but that (ii) section 122 had not been repealed in its application to the
Cayman Islands and did apply, so that there was jurisdiction to authorise the
Bahaman trustee to exercise the statutory power even though it might not
have been available to him if the trusts had been governed by Bahaman law.    B

104    But the Board in an opinion given through Lord Walker of
Gestingthorpe said, at para 35:

"The respondents relied in the alternative . . . on the inherent
jurisdiction of the Grand Court. This point was not much developed in
argument and their Lordships can deal with it quite shortly. If the Grand
Court had no statutory jurisdiction to act in aid of a foreign bankruptcy it    C
might have had some limited inherent power to do so. But it cannot have
had inherent jurisdiction to exercise the extraordinary powers conferred
by section 107 of its Bankruptcy Law in circumstances not falling within
the terms of that section. The non-statutory principles on which British
courts have recognised foreign bankruptcy jurisdiction are more limited
in their scope [citing what is now *Dicey, Morris & Collins, Conflict of
Laws*, 15th ed (2012), vol 2, paras 31R-059 et seq] and the inherent    D
jurisdiction of the Grand Court cannot be wider."

105    The Board plainly considered that the court had no power to apply
the Bankruptcy Law "in circumstances not falling within" the Law. In *In re
Phoenix Kapitaldienst GmbH* [2013] Ch 61, above, Proudman J
distinguished this clear statement on the basis that she should follow what
she described as "the later and more considered views expressed by Lord    E
Hoffmann and approved by Lord Walker" in the *HIH* case [2008] 1 WLR
852, namely that the court was able, if consistent with justice and UK public
policy, to achieve the aim of a unitary and universal bankruptcy law. In
*Picard v Primeo Fund* 2013 (1) CILR 164 Jones J explained the dictum in *Al
Sabah* as meaning that the common law cannot be invoked to apply
provisions of the Bankruptcy Law to achieve an objective outside its scope.    F

106    Neither of these supposed distinctions is valid. There is nothing in
*HIH* to support Proudman J's suggestion that Lord Walker had changed his
view, and Jones J's suggestion that Lord Walker was only directing his
intention to objectives outside the scope of the Bankruptcy Law is wholly
inconsistent with Lord Walker's plain words that the court does not have an
inherent jurisdiction to exercise the powers conferred by the Bankruptcy
Law "in circumstances *not falling within the terms* of that section."    G
(Emphasis added.)

107    In my judgment Lord Walker's dictum in the opinion in *Al Sabah v
Grupo Torres* [2005] 2 AC 333, para 35 (in which, among others, Lords
Hoffmann and Scott concurred) was plainly right, and, to the extent it is
inconsistent with the passage in *Cambridge Gas* applying the Isle of Man
scheme of arrangement provisions on an "as if" basis, it is to be preferred to
*Cambridge Gas*.    H

108    I would therefore humbly advise Her Majesty not only that the
appeal should be dismissed, but also that to have allowed it on the basis of
the liquidators' primary argument would have involved Her Majesty's
judges in a development of the law and their law-making powers which

© 2015 The Incorporated Council of Law Reporting for England and Wales

1715

A would have been wholly inconsistent with established principles governing the relationship between the judiciary and the legislature and therefore profoundly unconstitutional.

### LORD CLARKE OF STONE-CUM-EBONY JSC

109   I agree that this appeal should be dismissed for the reasons given by Lord Sumption JSC. I add a short judgment of my own on the first issue
B raised by Lord Sumption JSC in para 8, namely whether the Bermuda court has a common law power to assist a foreign liquidation by ordering the production of information (in oral or documentary form) in circumstances where (i) the Bermuda court has no power to wind up an overseas company such as Singularis and (ii) its statutory power to order the production of information is limited to cases where the company has been wound up in
C Bermuda. The second issue is whether, if such a power exists, it is exercisable in circumstances where an equivalent order could not have been made by the court in which the foreign liquidation is proceeding.

110   I have reached the conclusion that, for the reasons given by Lord Sumption JSC, the answer to the first issue is that the Bermuda court does have such a power. The steps which lead me to that conclusion are these. While the recognition of such a power in an ancillary liquidation has not
D thus far been recognised at common law, it is common ground that the common law has developed step by step and that it may be extended or developed in appropriate circumstances. It follows that the question is whether the circumstances are appropriate to justify the recognition of such a power in this class of case.

111   As Lord Sumption JSC demonstrates in para 20, significant
E developments have been made by the common law in the past. They included the power to compel a person to give evidence, which was not originally statutory. As Lord Sumption JSC puts it, like the power to order discovery, it was an inherent power of the Court of Chancery devised by judges to remedy the technical and procedural limitations associated with the proof of facts in courts of common law. I agree with Lord Sumption JSC (at para 23) that the significance of the *Norwich Pharmacal* case [1974] AC
F 133 in the present context is that it illustrates the capacity of the common law to develop a power in the court to compel the production of information when it is necessary to do so in order to give effect to a recognised legal principle.

112   The recognised legal principle in the present case is the principle of modified universalism derived from *Cambridge Gas* [2007] 1 AC 508: see
G paras 19 and 23 in Lord Sumption JSC's judgment. I agree with him that it is founded on the public interest in the ability of foreign courts exercising insolvency jurisdiction in the place of the company's incorporation to conduct an orderly winding up of its affairs on a worldwide basis notwithstanding the territorial limits of their jurisdiction. An important aspect of that public interest is a recognition that in a world of global businesses it is in the interest of every country that companies with
H transnational assets and operations should be capable of being wound up in an orderly fashion under the law of the place of their incorporation and on a basis that will be recognised and effective internationally. I also agree with Lord Sumption JSC at para 23 (i) that this is a public interest which has no equivalent in cases where information may be sought for commercial

© 2015 The Incorporated Council of Law Reporting for England and Wales

purposes or for ordinary adversarial litigation; (ii) that the Bermuda court       A
has properly recognised the status of the liquidators as officers of that court;
(iii) that the liquidators require the information for the performance of the
ordinary functions attaching to that status; (iv) that the information is
unlikely to be available in any other way; (v) that none of the reasons which
account for the common law's inhibition about the compulsory provision of
evidence have any bearing on the present question; (vi) that the right and       B
duty to assist foreign office-holders which the courts have acknowledged on
a number of occasions would be an empty formula if it were confined to
recognising the company's title to its assets in the same way as any other
legal person who has acquired title under a foreign law, or to recognising the
office-holder's right to act on the company's behalf in the same way as any
other agent of a company appointed in accordance with the law of its
incorporation; and (vii) that the recognition by a domestic court of the status       C
of a foreign liquidator would mean very little if it entitled him to take
possession of the company's assets but left him with no effective means of
identifying or locating them.

113   These are powerful factors. What then are the limits? I agree with
Lord Sumption JSC that, as he puts it at para 25, the Board would not wish
to encourage the promiscuous creation of other common law powers to       D
compel the production of information but that the limits of this power are
implicit in the reasons for recognising its existence. He gives four reasons.
(1) It is available only to assist the officers of a foreign court of insolvency
jurisdiction or equivalent public officers. It would not, for example, be
available to assist a voluntary winding up, which is essentially a private
arrangement and although subject to the directions of the court is not
conducted by or on behalf of an officer of the court. (2) It is a power of       E
assistance and exists for the purpose of enabling those courts to surmount
the problems posed for a worldwide winding up of the company's affairs by
the territorial limits of each court's powers; so that it is not available to
enable them to do something which they could not do even under the law by
which they were appointed. (3) It is available only when it is necessary for
the performance of the office-holder's functions. (4) It is subject to the       F
limitation that such an order must be consistent with the substantive law and
public policy of the assisting court, in this case that of Bermuda. I further
agree with Lord Sumption JSC that it follows that it is not available for
purposes which are properly the subject of other schemes for the compulsory
provision of information. Common law powers of this kind are not a
permissible mode of obtaining material for use in actual or anticipated
litigation. That field is covered by rules of forensic procedure and statutory       G
provisions for obtaining evidence in foreign jurisdictions which liquidators,
like other litigants or potential litigants, must accept with all their
limitations. Moreover, in some jurisdictions, it may well be contrary to
domestic public policy to make an order which there would be no power to
make in a domestic insolvency.

114   I further agree with Lord Sumption JSC, for the reasons he gives in       H
para 28, that the common law power is not impliedly excluded by reason of
section 195 of the Bermuda Companies Act but that it cannot be applied on
the facts of this case because there is no similar power in the Cayman Islands
and it would not be a proper use of the power of assistance to make good a

© 2015 The Incorporated Council of Law Reporting for England and Wales

1717

A limitation on the powers of a foreign court of insolvency jurisdiction under its own law.

115   Like Lord Sumption JSC, I appreciate that it is important that this development should not open the floodgates to different unrelated classes of case. However, I see no reason why it should. I appreciate that Lord Mance JSC has reached a different conclusion. I do not pretend that it is

B possible to predict precisely how the development of the principle, which has been identified by Lord Sumption JSC and which both Lord Collins of Mapesbury and I support, will proceed. I agree with Lord Mance JSC that it is a step forward but do not agree that it is a step leap. I also agree with him (at para 137) that courts have tended to confine remedies of the kind we are discussing to situations where there is a recognisable legal claim to protect, based either on a title or right to property or on some wrongdoing supported

C by appropriate evidence. However, there is no reason why the common law should not be developed, provided that the development is measured and supports a recognised principle.

116   It will not always be easy to draw the line between permissible applications and impermissible applications. However, Lord Sumption JSC has identified, not only the policy, but also the principle derived from its

D policy and some of the limitations in its exercise, which to my mind provide a sensible approach for the future. I respectfully disagree with Lord Mance JSC when he says at para 146 that this is a development which is neither permissible nor appropriate. In doing so, I express no view on Lord Mance JSC's concerns (expressed in paras 120 and 121) as to the breadth of the terms of the order and as to the lack of safeguards to protect against costs

E or loss. These may well be sound and can be investigated in a case where such issues fall for decision. That is not this case because of the narrow ground on which the appeal must be dismissed.

### LORD MANCE JSC

117   There are two potential issues of importance on this appeal: (a) whether the common law power to assist a foreign (Cayman Islands)

F liquidation enables the Bermudan courts to order anyone within its jurisdiction who may have relevant information or documentation about the company's assets (or, possibly also, its affairs generally) to attend for questioning about and disclose the same; (b) whether, if this power exists, it should be exercised by ordering such disclosure and questioning when the Cayman Islands courts have no equivalent power over persons within their

G jurisdiction.

118   I agree with Lord Sumption JSC that the short answer to the second question is negative. So it is unnecessary on this appeal to answer the first question, although Lord Sumption JSC has devoted the major part of his opinion to this question. I understand why it might be helpful if the Board could give a clear answer to it, but I think it unfortunate that it should try to do so on this appeal, bearing in mind the limitations in the way in which the

H question has been argued at all lower stages (see para 122 below) and its largely unexplored ramifications: see generally paras 130–145 below.

119   Before addressing the second issue in detail, it is relevant—and in my view important—to note three points. The first is the Chief Justice's order which the Court of Appeal set aside, and which the liquidators ask the

Board to restore. The respondents, PwC, were (by clause 3a) ordered within *A*
14 days to provide to the joint official liquidators ("JOLs")

"all information they may have, including information and
documentation in their possession, power, custody or control, concerning
the promotion, formation, trade, dealings, affairs or property of the
company [and] for the avoidance of doubt, such information and
documentation to be provided is not to be limited to audit information . . ." *B*

In addition PwC was (by clause 3d)

"required to have a partner and/or employee or agent acceptable to the
JOLs, examined on oath forthwith, within ten (10) days of being called
on to meet by the JOLs, concerning the matters aforesaid, by word of
mouth and on written interrogatories, and be required to reduce his/her
answer to writing and require him/her to sign this . . ." *C*

By clause 3e the JOLs were given leave to serve "Paul Suddaby and any other
partners or officers of PwC . . . out of the jurisdiction", specific liberty was
given to examine Paul Suddaby and he was specifically ordered to produce
information in accordance with clause 3a. Clause 3f provided that

"If PwC . . . does refuse to comply with any of the orders set out *D*
herein, it and its partners and officers shall be in contempt of court and
they may be imprisoned, fined or their assets seized."

120  No doubt in case clause 3 did not go far enough, clause 4 provided:

"Further and without limiting the generality of the foregoing, that the
documentation referred to in Exhibit HD-7 of Hugh Dickson's third
affidavit dated 7 February 2013 be produced within seven days by *E*
PwC . . . , in relation to [Singularis] . . . That the JOLs be able to obtain
all information and documentation described herein that is in the
possession, power, custody, or control of PwC . . . , whether this be in
Bermuda, Dubai, or wherever it may be located."

Redaction was only to be permitted where necessary to protect information *F*
of a confidential nature belonging to third parties, and clause 4b required
that:

"the relevant partners and officers of PwC . . . do confirm on oath that
all the documents requested have been produced."

The only exempt documents were to be those required to be produced in the
Cayman Islands—that is documents actually belonging to Singularis. *G*

121  No provision was made for the JOLs to meet, still less secure, any
costs that PwC or its partners, officers or agents would incur complying with
such an order, and no undertaking was given to meet any such costs or any
other loss or liability that might result from doing so—even though PwC had
asked the Chief Justice to deal with this aspect. This omission was raised in
the Court of Appeal, where it remained relevant in relation to the order *H*
against SICL which that court upheld. PwC suggested that costs could be in
the order of $500,000 and the JOLs argued that management time spent in
compliance could not be recovered. The Court of Appeal declined to make
any order or require any undertaking "in the absence of authority" and
"particularly in circumstances where the cost of compliance is far from

© 2015 The Incorporated Council of Law Reporting for England and Wales

1719

A   clear". "Absence of authority" is hardly surprising in relation to an order which was itself effectively unprecedented. PwC's costs of compliance would clearly be likely to be very substantial. Whether or not they were or could be quantified when the order was made, PwC should have been protected in respect of them. Common justice and established practice relating to freezing injunctions, *Anton Pillar* orders and *Norwich Pharmacal*
B   relief should have confirmed the need for an appropriate order or undertaking in that respect.

122   The second point is that, in respect of Singularis, the only basis of Kawaley CJ's order against PwC and its officers was that the Bermudan courts have a common law power to grant assistance in aid of the Cayman Islands liquidation by applying local procedural remedies, in particular either "by directly applying" or "by analogy with" section 195 of the Bermuda
C   Companies Act 1981, although it was common ground that this section does not in terms apply. This was also the only case put by the JOLs' written submissions to or adjudicated on by the Court of Appeal as well as the only basis on which permission was sought to appeal to the Board. Kawaley CJ considered that he could none the less rely directly on section 195 by virtue of inter alia *In re African Farms* [1906] TS 373,
D   *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508 and *Rubin v Eurofinance SA (Picard intervening)* [2013] 1 AC 236 (paras 8, 49–74), or alternatively that he could proceed "by analogy with" it: paras 8, 36–48. The Court of Appeal held the contrary: see para 52, per Bell AJA, para 1, per Zacca P, and paras 4–59, per Auld JA. There is a hint in paras 49(1) and 50 of Auld JA's case that the JOLs may have begun to put their case more
E   widely in oral submissions by suggesting some wider power based on "modified universalism" and independent of the Bermudan statutory power. But, if this is so, it can have received little prominence. Only before the Board has focus been directed to such an argument. As to the submission which was pursued below and accepted by Kawaley CJ, I agree with Lord Sumption JSC and Lord Collins of Mapesbury that there is no basis for
F   judicial re-fashioning of, or action outside the bounds of but by analogy with, domestic legislation such as section 195. The Chief Justice's order cannot therefore be justified on the basis on which he made it. But it is perhaps ironic that so firm a rejection of any possibility of the domestic court exercising the powers conferred on domestic liquidators should be replaced by an embrace of the possibility of the domestic court giving effect to the wishes and/or powers of foreign liquidators: see paras 130 et seq below.

G   123   Neither court below addressed any observations to the question whether any jurisdiction existed or, if it existed, could properly be exercised to make orders against and serve Paul Suddaby and other partners or officers of PwC outside the jurisdiction of the Bermudan court. As paras 119 and 120 above show, the Chief Justice's order did that, though without joining Mr Suddaby or any other officer or partner in their personal capacities. In their written submissions before the Court of Appeal, the JOLs submitted
H   that section 195 gave jurisdiction to serve abroad and relied on the English authority of *In re Seagull Manufacturing Co Ltd* [1993] Ch 345 (decided under a section of the Insolvency Act 1986 using similar terms to section 195). Once one concludes, as the Board has, that section 195 is applicable neither directly nor by analogy, the question becomes whether there can be

any such common law jurisdiction to order service out, on pain of sanctions, *A* as that for which the JOLs argue.

124  Approaching the matter on that basis, it is clear that the Chief Justice's order must on any view have gone well beyond any jurisdiction which exists at common law in relation to PwC's partners and officers outside the Bermudan jurisdiction, as opposed to PwC itself which was within such jurisdiction. The area was examined in *Masri v Consolidated Contractors International (UK) Ltd (No 4)* [2010] 1 AC 90, para 12, where the House of Lords (in a judgment given by myself with which all other members of the House concurred) spoke in these terms of:

"the limitation of the court's power to enforce the attendance of witnesses or fine defaulting witnesses. From the Statute of Elizabeth 1562 (5 Eliz 1, c 9) onwards, this had been regulated by statute and had never extended beyond the United Kingdom. The procedure enacted in relation to other jurisdictions involves the taking of evidence, on commission or otherwise, with the assistance of the foreign court. The service of a writ of subpoena is still only possible under section 36 of the Supreme Court Act 1981 in respect of persons in one of the parts of the United Kingdom. The limitation of the court's power in this respect corresponds with the principle of international law, summarised robustly by Dr Mann in his Hague lecture 'The Doctrine of Jurisdiction in International Law', *Recueil des Cours*, 1964-I, *The Definition of Jurisdiction,* p 137): 'Nor is a state entitled to enforce the attendance of a foreign witness before its own tribunals by threatening him with penalties in case of non-compliance. There is, it is true, no objection to a state, by lawful means, inviting or perhaps requiring a foreign witness to appear for the purpose of giving evidence. But the foreign witness is under no duty to comply, and to impose penalties on him and to enforce them either against his property or against him personally on the occasion of a future visit constitutes an excess of criminal jurisdiction and runs contrary to the practice of states in regard to the taking of evidence as it has developed over a long period of time.'"

125  The issue in *Masri* was whether a power under rules (CPR r 71) *F* made under statutory authority extended to enable an order for examination of an officer of a judgment creditor company, who was out of the jurisdiction. The House held that, in view of the presumption against extra-territoriality, it did not. In the course of so doing, it considered prior authority on other powers with a statutory basis. In *In re Tucker (RC) (A Bankrupt), Ex p Tucker (KR)* [1990] Ch 148, section 25(1) of the *G* Bankruptcy Act 1914 gave the court power to summon before it for examination "any person whom the court may deem capable of giving information respecting the debtor, his dealings or property". But the Court of Appeal set aside an order obtained by a trustee in bankruptcy for the examination of the debtor's brother, a British subject resident in Belgium. Dillon LJ, after noting the limitations of the powers to serve out of the *H* jurisdiction (then contained in RSC Ord 11) and to subpoena witnesses, said against this background that he "would not expect section 25(1) to have empowered the English court to haul before it persons who could not be served with the necessary summons within the jurisdiction of the English court": p 158E–F.

© 2015 The Incorporated Council of Law Reporting for England and Wales

A    **126** In contrast, in *In re Seagull Manufacturing Co Ltd* [1993] Ch 345, section 133 of the Insolvency Act 1986 authorised the public examination of a narrower category of persons, viz

"any person who— (a) is or has been an officer of the company; or (b) has acted as liquidator or administrator of the company or as receiver or manager . . . or (c) not being a person falling within paragraph (a) or

B    (b), is or has been concerned, or has taken part, in the promotion, formation or management of the company",

and rule 12.12 of the Insolvency Rules 1986 (SI 1986/1925) gave the court express authority to order service out of the jurisdiction of any process or order requiring to be so served for the purposes of insolvency proceedings. The Court of Appeal upheld an order made for the public examination of a

C  former director living in Alderney. Peter Gibson J, with whose judgment the other members of the court concurred, said (p 354F–H) that:

"Where a company has come to a calamitous end and has been wound up by the court, the obvious intention of this section was that those responsible for the company's state of affairs should be liable to be subjected to a process of investigation and that investigation should be in

D  public. Parliament could not have intended that a person who had that responsibility could escape liability to investigation simply by not being within the jurisdiction. Indeed, if the section were to be construed as leaving out of its grasp anyone not within the jurisdiction, deliberate evasion by removing oneself out of the jurisdiction would suffice."

    **127** Although the House in *Masri* [2010] 1 AC 90 regarded

E  impracticability of enforcement as a factor of greater significance than Peter Gibson J had suggested, it acknowledged the public interest served by section 133, and referred (in para 23) to "The universality of a winding up order, in the sense that it relates at least in theory to all assets wherever situate". That factor being absent in *Masri*, it could lend no assistance to the argument that CPR r 71 extended extra-territorially. But the important

F  feature of all these cases is that they turned on express statutorily conferred powers. There was no suggestion in any of them of any relevant common law power in any of the areas discussed.

    **128** The third point is that the JOLs' case has been at all times and is advanced solely on the basis that PwC have documents and information which it would help the JOLs to inspect and about which it would be helpful for them to be able to question PwC and its officers. The basis is not that

G  PwC have property or assets of Singularis (beyond the documents which they have already been ordered by the Cayman Islands court to produce); nor is it that PwC have themselves done anything wrong or that they have been or are mixed up in any third party's wrongdoing. The House of Lords authority *Norwich Pharmacal Co v Customs and Excise Comrs* [1974] AC 133 was not relied upon, or even among the authorities put, before the

H  Supreme Court. It was mentioned in passing during the final oral submissions in reply of Mr Moss QC for the JOLs, when the transcript records this exchange:

"*Lord Mance JSC.* If they are accountants, as you told me earlier that they were, then on the face of it there is an advisory relationship and if

© 2015 The Incorporated Council of Law Reporting for England and Wales

A
you wish to know something which you yourself have mislaid or don't
have from your accountant advisers one might think there was quite a
good case for saying they owed a duty to disclose it to you, to help you.

"*Mr Moss*. There might be an arguable case relating to that advice, but
what we're interested in are these audit documents which go to the assets
of the company. I don't know whether the accounting had anything to do
with that at all.

B

"*Lord Collins*. Is there nowhere a *Norwich Pharmacal* order can be
obtained?

"*Mr Moss*. Well, yes. We've had a discussion about this. The problem
with *Norwich Pharmacal* is that it is based on fraud.

"*Lord Collins*. Any wrongdoing, I think.

"*Lord Sumption JSC*. It is based on wrongdoing generally.

C
"*Mr Moss*. Yes, but it does involve alleging wrongdoing. You would
have to allege that PwC became innocently mixed up in that
wrongdoing—

"*Lord Clarke JSC*. They only have to be innocently mixed up.

"*Mr Moss*. Yes.

"*Lord Sumption JSC*. That's a fairly low threshold, after all the
Customs and Excise were about as innocent mixed up people almost that
D
you could probably want.

"*Mr Moss*. Yes. The result of that would be if we can get *Norwich
Pharmacal* relief, then the Bermuda courts do have common law powers
to give us exactly the type relief that we have here. It actually comes to
the same thing. It wouldn't make much sense to send us right back to the
Chief Justice to then ask for *Norwich Pharmacal* relief—
E
"*Lord Mance JSC*. It may not be as easy as that. You haven't
formulated it as *Norwich Pharmacal*.

"*Mr Moss*. Yes, it would have to be abandoned and reformulated as a
*Norwich Pharmacal*, but in substance it comes to the same sort of end.
What that perhaps illustrates is that what we have and what we seek to
maintain, or rather we have at one stage and the Court of Appeal have
taken it away on a rather narrow ground, but we seek to have back is not
F
something that radical in these types of circumstances, where there is a
gigantic deficit, there has clearly been wrongdoing, documents have been
taken and not available. It's exactly the kind of context in which one
would expect relief to be given. It's not extravagant in any shape or
form."

G
129   Contrary to Mr Moss's submission, the JOLs are seeking to do
something very radical, and there is a deep dividing line between the basis on
which they put their case and *Norwich Pharmacal*. The JOLs are seeking
(a) to justify a far wider and more stringent order than could ever be
obtained in *Norwich Pharmacal* proceedings and (b) to do so on the basis of
an unverified assertion that they would, if they had tried, have been able to
obtain a *Norwich Pharmacal* and without exposing themselves to the
H
trouble and difficulty of showing that PwC were mixed up in any sort of
wrongdoing about which they have any relevant information or
documentation. I see neither force nor attraction in Mr Moss's invitation to
prejudge the outcome of normal procedures by short-cutting them.

© 2015 The Incorporated Council of Law Reporting for England and Wales

A        130   In the light of these points, I come to the substance of the argument now presented. That is that a common law power exists to assist any foreign liquidation by ordering any person (whether or not an officer or agent of the company) to attend and be interrogated and produce documentation and information, on pain of contempt, in the manner which the JOLs advocate. The only explicit limits to the jurisdiction for which the JOLs now contend is that it should not be inconsistent with the law or policy of the forum. The

B   negative answer which the Board is giving to the second issue on this appeal means that there would exist a further limitation, that the jurisdiction would not exist or be exercisable to enable an order which could not be made against a person within the jurisdiction of the country of the insolvency.

        131   Lord Sumption JSC now suggests that the principle should be further limited to any court-ordered liquidation (though that, in turn, leaves

C   uncertain the status of any winding up under supervision in any jurisdiction where that possibility, which existed formerly under section 311 of the English Companies Act 1948, still exists). Although Lord Sumption JSC speaks at one point of this as a "means of identifying or locating" assets (para 23), elsewhere he speaks of "enabling [foreign] courts to surmount the problems posed for a worldwide winding up of the company's affairs by the territorial limits of each court's powers": para 25. The order in fact made by

D   the Chief Justice was, as noted, of great width. The scope of the proposed common law jurisdiction is therefore uncertain.

        132   The suggested jurisdiction is said to follow from the principle of "modified universalism". This is a principle developed in English common law over the last 20 years with the strong support of Lord Hoffmann, though recognised over a 100 years ago in a Transvaal case which was itself until

E   recently lost in (unfair) obscurity. *In re African Farms* [1906] TS 373, was decided by Sir James Innes, who in addition to his own great legal distinction was grandfather of the distinguished wartime humanitarian lawyer Helmuth James von Moltke. The essence of the principle consists, as Lord Sumption JSC notes in his para 14(i), in the recognition by one court of the foreign liquidator's power of disposition over the company's assets in the

F   domestic jurisdiction. That justified an order restraining their disposition or seizure inconsistently with the foreign liquidation. The novelty of this decision lay in the making of such an order in circumstances where there was no power to wind up the company in the domestic forum. In this respect, therefore, the co-operation extended in *In re African Farms* went a step further than that demonstrated in *In re Matheson Bros Ltd* (1884) 7 Ch D 225, where Kay J was, in the light of the fact that the English courts would

G   have had power to wind up the relevant foreign company up in England, prepared to secure English assets to prevent English creditors executing against them, pending steps in the company's winding up in its country of incorporation to make the assets available for the company's English creditors pari passu with its foreign creditors.

        133   The principle may also justify an order for the remission of the assets out of the jurisdiction to the foreign liquidator, if the foreign

H   liquidation rules would distribute them in the same way as the domestic jurisdiction. Even if the foreign liquidation rules would distribute them differently, but there is express statutory power enabling the remission to take place none the less, the principle may lend support to the exercise of that express statutory power. Beyond that, I do not read the majority of the

© 2015 The Incorporated Council of Law Reporting for England and Wales

House in *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852    A
as going, and anything that any of its members did say more widely about
the existence or scope of a common law power was on any view obiter, since
the appeal was decided on the basis that there existed express statutory
authority for a remission although the assets would be distributed in the
Australian liquidation differently from the way in which they would have
been distributed in the English liquidation.

134    I agree with Lord Sumption JSC and Lord Collins that the second    B
and third propositions for which *Cambridge Gas Transportation Corpn v
Official Committee of Unsecured Creditors of Navigator Holdings plc*
[2007] 1 AC 508 stands cannot be supported. A domestic court does not
have power to assist a foreign court by doing anything which it could
properly have done in a domestic insolvency; and it cannot acquire
jurisdiction by virtue of any such power. As to the first proposition, for    C
reasons which I explained in *Rubin v Eurofinance SA* [2013] 1 AC 236,
*Cambridge Gas* can, if correct, stand for no more than the proposition that a
domestic court should, so far as it can consistently with its own law,
recognise a foreign bankruptcy order and deal with identifiable assets within
its jurisdiction consistently with the way in which the foreign insolvency
would deal with them. In another earlier decision of the Board, *Al Sabah v
Grupo Torras SA* [2005] 2 AC 333, para 35, Lord Walker said, aptly in my    D
view, that the Cayman court "might have had some limited inherent power"
to act in aid of the Bahaman winding up, but that it could not have the
suggested power to set aside a voidable disposition modelled on a section in
the Cayman Island bankruptcy legislation governing domestic liquidation
which did not in terms apply in relation to a Bahaman winding up.

135    Where I part company with Lord Sumption JSC is in his assertion    E
that the hitherto limited principle of modified universalism which I have just
described extends to or justifies (or would be "an empty formula" without) the
assumption or exercise of a common law power to "haul" anyone before
the court (to use Dillon LJ's word in *Ex p Tucker* [1990] Ch 148), to be
interrogated and to produce documentation on pain of being in contempt,
simply because it would be useful for the foreign liquidator to be able to do
so and might enable him to locate some assets (or better understand the    F
company's affairs). There is a step leap between enforcing rights to
identifiable assets and obliging third parties to assist with documentation
and information in order to discover a company's assets (or, still more
widely, in order to enable insolvency practitioners to understand a
company's affairs). Lord Sumption JSC relies in para 23 on the House of
Lords' decision in *Norwich Pharmacal Co v Customs and Excise Comrs*    G
[1974] AC 133 as illustrating "the capacity of the common law to develop a
power in the court to compel the production of information when this is
necessary to give effect to a recognised legal principle." But the reference to
"a recognised legal principle" begs the question whether the principle of
modified universalism extends beyond the protection of identifiable assets
within the jurisdiction, to enable orders to be made compelling third parties
to assist with the provision of information and documentation which may    H
assist the tracing of such assets (or otherwise assist the insolvency
practitioners in their understanding of the company's affairs).

136    Information is a precious commodity, but it is not one which is
generally capable of being extracted in court from private individuals

© 2015 The Incorporated Council of Law Reporting for England and Wales

A without special reason; and the potentially intrusive, vexatious and costly nature of the exercise of any power to do so is apparent from the form of the Chief Justice's order in this case. The common law has not hitherto accepted any such jurisdiction. The existence of foreign insolvency proceedings, conducted for the benefit of creditors, does not appear to me to provide any justification for doing so now. The mere fact that insolvency practitioners are, at least in a compulsory liquidation, officers of the foreign court charged

B with winding up its affairs seems quite insufficient at common law, though it may be a factor which assists determine the scope of Parliament's likely intention where relevant legislation exists. There are many ordinary creditors, litigants and other persons who would like a facility to gather information to discover or trace assets or to assist them to pursue claims or to conduct their affairs generally. It is unclear what the logic is or would be

C for restricting the suggested common law power to foreign insolvencies. However much it may be intended, by using adjectives like "promiscuous", to discourage attempts to bring within this new jurisdiction either domestic insolvencies (if and where no complete common law scheme exists) or situations entirely outside the insolvency context, such attempts seem bound to occur. In the absence of any clear justification for giving insolvency practitioners the unique common law privilege which the JOLs now claim,

D such attempts may well be difficult to resist. Although I disagree with it, such attempts can only be encouraged by the statement at the end of para 21 of Lord Sumption JSC's opinion that "The courts have never been as inhibited in their willingness to develop appropriate remedies to require the provision of information when a sufficiently compelling legal policy calls for it."

E 137 In reality, far from displaying uninhibited willingness to develop appropriate remedies requiring the provision of information, courts have in my view been careful to confine such remedies to situations where there is a recognisable legal claim to protect, based either on a title or right to property or on some wrongdoing supported by appropriate evidence. Thus: (i) A court has jurisdiction to protect identifiable property rights, which would include ordering a person shown to be likely to have property belonging to

F the company to deliver it up or disclose its whereabouts. (ii) A sustainable case of wrongdoing is the basis for the well-established jurisdiction to order the disclosure of information by or in conjunction with the making of an asset freezing (formerly *Mareva*) order or a search (*Anton Pillar*) order. (iii) The legal principle recognised in *Norwich Pharmacal* is that persons innocently mixed up in wrongdoing could be expected to disclose a limited

G amount of information and documentation about it to assist the victims.

138 On this appeal, no case has been advanced under any of these heads. The first could cover the disclosure by an agent of information which he held for, or owed a duty to pass to, his principal. As the transcript extract quoted in para 128 above confirms, no case is advanced on any such basis. Moreover, auditors are not agents, they are independent contractors engaged to review a company's accounts and report in accordance with

H statutory and professional requirements—in which connection there has been no suggestion of any failure or shortcoming on PwC's part. The second and third situations depend on evidence of wrongdoing, which has again not been asserted or attempted to be established. The third situation in particular bears no resemblance to the present case, in which it is said that

© 2015 The Incorporated Council of Law Reporting for England and Wales

innocent third parties can be compelled to produce information and    A
documentation, without any allegation or evidence of wrongdoing, on
insolvency practitioners showing that this could be useful to enable them to
locate assets or better to understand the company's affairs.

139   It is notable that, even in the context of wrongdoing, the courts
have been at pains to emphasise the narrow scope of the *Norwich Pharmacal*
jurisdiction. It is "an exceptional one": *Ashworth Hospital Authority v*    B
*MGN Ltd* [2002] 1 WLR 2033, para 57, per Lord Woolf CJ. It depends on
the existence of wrongdoing. The person with information must have been
mixed up, however innocently in wrongdoing: *R (Omar) v Secretary of State
for Foreign and Commonwealth Affairs* [2014] QB 112. Originally the
jurisdiction was confined to discovery of the identity of the wrongdoer:
*Ashworth Hospital Authority*, para 26, per Lord Woolf CJ; *Arab Monetary
Fund v Hashim (No 5)* [1992] 2 All ER 911, 914, per Hoffmann J,    C
emphasising that it was "no authority for imposing on 'mixed up' third
parties a general obligation to give discovery or information when the
identity of the defendant is already known."

140   More recently, the Divisional Court has said that *Norwich
Pharmacal* may extend beyond the discovery of the identity of a wrongdoer
or of a "missing piece of the jigsaw", but under the strict caveat that "the    D
action cannot be used for wide ranging discovery or the gathering of
evidence and is strictly confined to necessary information": *R (Mohamed) v
Secretary of State for Foreign and Commonwealth Affairs (No 1)* [2009]
1 WLR 2579, para 133, cited by the Court of Appeal in *R (Omar) v
Secretary of State for Foreign and Commonwealth Affairs* [2011] EWCA Civ
1587 at [4].

141   Lord Sumption JSC suggests (para 20) that it will be possible in the    E
present situation to draw a distinction between information which can
permissibly be sought and evidence which cannot. At least two problems
arise in this connection. First, it is, as I have noted, unclear whether any
distinction or limitation is proposed between on the one hand information
and documentation relating to assets and on the other hand information and
documentation relating more generally to the company's affairs. Any such
distinction or limitation seems likely in any event to be in practice illusory.    F
An insolvency practitioner is ultimately only interested in assets and their
distribution. Any questioning put, or information or documentation sought,
will be scrutinised with a view to identifying assets, in whatever form, even if
they only consist of potential claims for maladministration or negligence.

142   The second problem is that the distinction between information
and evidence seems likely also to be illusory. Evidence is at least confined to    G
the issues in identified litigation, domestic or foreign. In contrast, the
proposed relief sought against PwC is completely unconfined, in nature and
scope. The later *Omar* case [2014] QB 112 highlights (para 12) a justified
scepticism about maintaining a distinction between information and
evidence which gives cause for caution about further extension by analogy of
the *Norwich Pharmacal* jurisdiction to circumstances where identifiable
wrongdoing is not in issue. The Chief Justice's remark in para 80 that    H
"PwC . . . is not an overt target for adverse litigation brought by the JOLs at
this stage" was I think also shrewd. Who can doubt that the JOLs would, in
their examination both of the working papers and other documents and
information disclosed by PwC and in their questioning of the partners and

© 2015 The Incorporated Council of Law Reporting for England and Wales

1727

[2015] AC     Singularis Holdings Ltd v PricewaterhouseCoopers (PC)

Lord Mance JSC

A   officers attending under an order such as that made by the Chief Justice, have a close eye on the possibility that this might show some possible claim against PwC as auditors? The Chief Justice's ensuing comment that the court should take "a healthily sceptical approach in evaluating the complaints made about the validity and scope of the ex parte orders", because "it seems clear that a combative and sophisticated defensive strategy has been engaged" appears to me in contrast unjustified. The jurisdiction to

B   make or justification for such an order cannot depend on the defensive strategy adopted to resist it.

143   The principle now advanced by the JOLs lacks any substantial authority. The two first instance authorities cited by Lord Sumption JSC in para 24 offer the weakest of encouragement for the novel jurisdiction now proposed. *Moolman v Builders & Developers (Pty) Ltd* [1990] 2 All SA 77

C   (A) treats the issue as one of applying *In re African Farms* [1906] TS 373, giving as the only reason that information is necessary if the ultimate aim of recovery of assets is to be realised. The court then in fact applied the statutory provisions of the forum on an "as if" basis [1990] 2 All SA 77 (A), sub-paragraph (d) on pp 4–5 and p 16. That I agree with Lord Sumption JSC and Lord Collins is not a sustainable approach.

D   144   The judgment in *In re Impex Services Worldwide Ltd* [2004] BPIR 564 suggests a breadth of common law power which would again be completely unlimited in its scope, enabling the Manx court "if it thinks fit" to make "an order summoning before it any person whom the court deems capable of giving information concerning the promotion, formation, trade, dealings and affairs or property of the company": para 106(8). Deemster

E   Doyle explained this on the basis that (para 107):

"Friendly and sophisticated jurisdictions which respect the rule of law and human rights need to be aware that if things go wrong in their jurisdiction and entities in the Isle of Man have information, documentation and evidence in their possession custody control or power that would assist them, then the Manx courts, in a proper case

F       and subject to suitable safeguards and protections where necessary, will offer judicial co-operation and assistance where that is reasonably requested by the judicial authority in that friendly jurisdiction. When the call for help comes the Manx courts will, in proper cases, answer the call positively and provide the necessary co-operation and assistance."

G   English liquidators were the beneficiary of the far reaching principle thus promulgated, but I cannot accept that it represents English or Bermudan common law. If there might seem to be a hint in the Deemster's phrase "if things go wrong" that the reasoning and order may have been based on wrongdoing, that does not appear to be borne out by the full account of the background and proposed questions given earlier in his judgment. Like the order made by the Chief Justice in the present case, the Deemster's ready

H   acceptance of the scope of the assistance which might be provided as extending to any information about the company's promotion, formation, trade, dealings and affairs or property as well as to evidence once again indicates the difficulty that there could be in keeping this novel power within bounds.

© 2015 The Incorporated Council of Law Reporting for England and Wales

1728
Singularis Holdings Ltd v PricewaterhouseCoopers (PC)      [2015] AC
Lord Mance JSC

145   Lord Collins's approving dictum in *Rubin v Eurofinance SA* [2013]   A
1 AC 236, para 33, quoted by Lord Sumption JSC in his para 19, is found in
a paragraph listing a series of authorities on modified universalism, in
circumstances where there was no examination in argument or in the
Board's opinion of differences between them, or between situations where
identifiable assets were in issue and other situations.  But another dictum of
Lord Collins in that case is in my view relevant.  At para 129, he said that:   B

"The law relating to the enforcement of foreign judgments and the law
relating to international insolvency are not areas of law which have in
recent times been left to be developed by judge-made law.  As Lord Bridge
of Harwich put it in relation to a proposed change in the common law
rule relating to fraud as a defence to the enforcement of a foreign
judgment, 'if the law is now in need of reform, it is for the legislature, not   C
the judiciary, to effect it': *Owens Bank Ltd v Bracco* [1992] 2 AC 443,
489."

That stands in stark contrast with the development of common law powers
which the majority on this appeal supports.

146   The description of *In re Impex* [2004] BPIR 564 as a case of
"judicial assistance in the traditional sense" can be seen now to be on any   D
view unsustainable, and Lord Sumption JSC himself says (para 24) that he
"would not wish to endorse all of the reasoning given" in the judgments in
either *Moolman* [1990] All SA 77 (A) or *In re Impex*.  He instances "in
particular" those parts which appear to support the concept of applying
statutory powers by mere analogy.  That leaves open—in the context of the
JOLs' present case that the Bermudan court can assist the Cayman Islands'   E
liquidation without relying on Bermudan law—how far his approach
accepts or disapproves the breadth of the reasoning and orders in *In re
Impex* (see the previous paragraph)—or indeed in the present case: see
paras 119–120 above.  That is another of the unresolved uncertainties about
the scope of the proposed new jurisdiction.

147   In these circumstances, and although anything said may be obiter,
I am not at present persuaded that it is appropriate to extend the common   F
law power to assist by ordering the provision of information beyond
categories which have some recognisable basis in current law, that is cases
where there is (a) evidence that the person ordered to provide the
information or documentation has property belonging to the insolvent
company, or (b) evidence of some wrongdoing by the person so ordered or
(c) evidence of some wrongdoing by another person in which the person so
ordered was or is innocently mixed up.  A general common law power to   G
order the disclosure of information and documentation by, and the
questioning of, anyone, either because a foreign liquidator shows that this
may assist him identify or recover assets anywhere in the world or, a fortiori,
because it would enable him understand the company's affairs, goes not only
beyond anything which it is necessary to contemplate on this appeal, but is
also beyond anything that I can, as at present advised, regard as permissible
or appropriate.   H

148   I therefore consider that the appeal must be dismissed, because of
the negative answer given to the second issue.  But I would, if necessary, also
have considered that it should be dismissed on the ground that a negative
answer should be given on the first issue.

© 2015 The Incorporated Council of Law Reporting for England and Wales

A  **LORD NEUBERGER OF ABBOTSBURY PSC**

149  I agree with the other members of the Board that we should humbly advise Her Majesty that this appeal should be dismissed. However, there is an issue which divides the members of the Board. It is whether, as Lord Sumption and Lord Clarke of Stone-cum-Ebony JJSC and Lord Collins of Mapesbury consider, the appeal should only be dismissed on the grounds

B  (i) that there is no common law power to apply legislation which applies to domestic insolvencies by analogy to foreign insolvencies, and (ii) that the Bermudan courts should not exercise a common law power ("the Power") described by Lord Sumption JSC in para 25, as he explains in paras 29–30, the Cayman Islands courts have no such power, or whether, as Lord Mance JSC concludes, the appeal should also be dismissed on the ground (iii) that the common law power in question does not exist. On that

C  issue, if it is appropriate to decide whether the alleged power exists, I would be in agreement with Lord Mance JSC.

150  As this is a judgment which dissents from the majority view on ground (iii), and there is little which I wish to add to the judgment of Lord Mance JSC, I can express my reasons relatively shortly.

151  It is unnecessary to decide whether the Power exists, because we are all agreed that, even if it does, it should not be exercised. I accept, of course,

D  that we can decide (albeit, at least arguably, strictly only obiter) whether the Power exists. However, as it is not necessary for us to rule on that issue in order to dispose of this appeal, we should, in my opinion, be very cautious of doing so. While judges in a final court of appeal, perhaps particularly in a common law system, should give as much guidance as they can as to the substantive and procedural law in any area, they must always bear in mind

E  the risks inherent in determining issues which do not have to be decided in order to dispose of the case before them.

152  As new problems arise, and as societal values and practices, technological techniques and business practices change, it is inevitable that judges can and should introduce new common law principles or procedures or make alterations to established common law principles and procedures.

F  However, such developments should always be adopted cautiously, not least because, even with the benefit of submissions from advocates and consideration of previous cases, textbooks and articles, the wider implications of any new principle or alteration to an existing principle are very hard to assess. The need for caution in this connection is, in my view, supported by the judicial observations cited by Lord Collins in paras 65–68, although those observations were made in relation to a different aspect of

G  the need for caution.

153  In the present case, there is obvious force in the point that the Board should determine whether the common law power alleged by the liquidators exists, as it is an important issue on which the sooner an authoritative decision is given the better, especially in the light of the somewhat confused state of the law as revealed in the judgments in this case.

H  154  However, that very confusion underlines the need for caution. The extent of the extra-statutory powers of a common law court to assist foreign liquidators is a very tricky topic on which the Board, the House of Lords and the Supreme Court have not been conspicuously successful in giving clear or consistent guidance: see the judgment of Lord Hoffmann on behalf of the Board in *Cambridge Gas Transportation Corpn v Official Committee of*

© 2015 The Incorporated Council of Law Reporting for England and Wales

1730
Singularis Holdings Ltd v PricewaterhouseCoopers (PC)          [2015] AC
Lord Neuberger of Abbotsbury PSC

*Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508, all five     A
opinions in the House of Lords in *In re HIH Casualty and General Insurance
Ltd* [2008] 1 WLR 852, and the judgment of Lord Collins of Mapesbury for
the majority of the Supreme Court in *Rubin v Eurofinance SA (Picard
intervening)* [2013] 1 AC 236, discussed by Lord Sumption JSC at
paras 16–19, and the judgment of Lord Collins in this case.

155   The message I take from those cases is that, at least in this area, it     B
would be better for the Board to approach any case in this field with a view
to deciding it on a relatively minimalist basis, rather than by seeking to lay
down general principles which it is not necessary to determine, particularly
when those principles involve extending the court's powers in a way which
may have substantial ramifications.    While Lord Sumption JSC's
explanation of the nature and extent of this alleged common law power
appears very attractive, I think it could lead to all sorts of problems and     C
uncertainties, as is implicit in the qualifications which Lord Sumption JSC
makes, at para 25. It is all very well saying that they can be dealt with when
they arise, but the fact that it is apparent that there will be problems and
complications if the law is developed in a certain way suggests to me that the
development should not be adopted unless it is necessary to do so.
Accordingly, as it is unnecessary to decide whether the common law power     D
exists, I would have preferred to leave the issue to be decided when it needs
to be—with the benefit of the powerful arguments either way contained in
the judgments on this appeal, which, with all respect to counsel, range more
widely and deeply than the arguments which the Board heard during the
hearing.

156   If, however, it is incumbent on me to express a view, I would
conclude, in agreement with Lord Mance JSC, that the alleged common law     E
power does not exist.   He has set out the grounds for that conclusion
convincingly, and they include reasons both of principle and of practicality.
Accordingly, I do not propose to repeat those reasons, but there are one or
two points I would like to emphasise.

157   The extreme version of the "principle of universality", as
propounded by Lord Hoffmann in *Cambridge Gas*, has, as Lord
Sumption JSC explains, effectively disappeared, principally as a result of the     F
reasoning of Lord Collins speaking for the majority in *Rubin*, and speaking
for the Board in this appeal. However, as with the Cheshire Cat, the
principle's deceptively benevolent smile still appears to linger, and it is now
invoked to justify the creation of this new common law power. It is almost
as if the Board is suggesting that, while we went too far in *Cambridge Gas*
and should pull back as indicated in *Rubin*, we do not want to withdraw as     G
completely as we logically ought.   In my view, the logic of the withdrawal
from the more extreme version of the principle of universality is that we
should not invent a new common law power based on the principle.

158   The limitation of the Power to insolvency cases may be seen by
many to be questionable.   More specifically, the limitation to liquidations
which are being conducted by officers of a foreign court seems to me to be
potentially arbitrary.  Companies may be in court-imposed liquidation in     H
many jurisdictions when it is "just and equitable" to wind them up, even if
they are solvent: I do not see why liquidators in such a case should be able to
invoke the Power when other people running solvent companies could not
do so. Further, there is no reason why a statutory regime should not provide

© 2015 The Incorporated Council of Law Reporting for England and Wales

1731

A   that voluntary liquidations are to be conducted under the aegis of the court, and, if so, the Power would seem to apply in such cases. And the status of administrators in administrations may be unclear in this connection.

**159**   The need to make subtle distinctions also concerns me. Thus, the distinction between information and documentation which is obtainable under this power, and "material for use in actual or anticipated litigation", appears very likely to give rise to difficult practical problems. I appreciate
B   that these problems can arise in other circumstances, but that is not a reason for extending the circumstances in which these problems may arise; and, as the facts of this case suggest, I suspect that they are particularly likely to arise in relation to the exercise of the Power. Similarly, the question what is necessary for the performance of a liquidator's functions, which is said to be a prerequisite for the exercise of the Power, seems to be a fertile area for
C   uncertainty and dispute.

**160**   More broadly, these distinctions seem to me to embody the sort of requirements one would expect to see in a statutory code rather than in judge-made law. As the judicial observations cited by Lord Collins suggest, judge-made law should be limited to "very modest development[s] . . . of existing principle", and should be made "in small steps" or "within . . . interstitial limits". Although I accept that the United Kingdom courts have
D   been prepared to recognise a new common law right in *Norwich Pharmacal Co v Customs and Excise Comrs* [1974] AC 133, the right involved was only exercisable in very specific circumstances where a serious wrong had been committed. I do not consider that that decision alters the fact that the creation of the Power would represent a development in the law which is, as Lord Mance JSC puts it, "radical". It may not seem radical in the sense that
E   it can be said to be a fairly routine feature of the extreme "principle of universality" enunciated by Lord Hoffmann in *Cambridge Gas* [2007] 1 AC 508, but that view is no longer maintainable given that extreme principle has now been rejected by Lord Collins, speaking for the majority of the House of Lords in *Rubin* [2013] 1 AC 236 and for the Board on this appeal.

**161**   The contention that judges should not be creating the Power is reinforced when one considers the extent of domestic statutory law and
F   international convention law in the area of international insolvency. Examples of such laws are described and discussed in paras 40–50 of Lord Collins's judgment. In this highly legislated area, I consider that the Power which is said to arise in this case is one which should be bestowed on the court by the legislature, and not arrogated to the court of its own motion.

**162**   I acknowledge the force of the arguments the other way, which are
G   so clearly set out by Lord Sumption JSC. However, as already intimated, while I agree with the judgment of Lord Collins and otherwise agree with the judgment of Lord Sumption JSC, I would for my part reject the existence of the Power, if it is appropriate to decide that issue at all.

JILL SUTHERLAND, Barrister

H

© 2015 The Incorporated Council of Law Reporting for England and Wales