Homburger

# Exhibit 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO.: 09-20423-CIV-GOLD/MCALILEY

UNITED STATES OF AMERICA

        Petitioner,

vs.

UBS AG,

        Respondent.

_____/

## AMICUS BRIEF OF GOVERNMENT OF SWITZERLAND

John C. Dotterrer
Florida Bar No. 267260
Jenny Torres
Florida Bar No. 785881
JOHN C. DOTTERRER
COUNSELLORS AT LAW, P.A.
125 Worth Avenue, Suite 310
Palm Beach, FL 33480
Telephone: (561) 802-3808
Facsimile: (561) 802-3318

Stephan E. Becker*
Kemba Eneas Walden*
PILLSBURY WINTHROP SHAW
PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037
Telephone: (202) 663-8277
Facsimile: (202) 663-8007

*Admitted pro hac vice

**TABLE OF CONTENTS**

INTEREST OF THE AMICUS CURIAE ...................................................................................1

STATEMENT OF RELEVANT FACTS ...................................................................................1

     A.     Swiss Domestic Law.....................................................................................1

     B.     Swiss Cooperation In International Law Enforcement...........................................4

     C.     The Tax Treaty............................................................................................6

     D.     Negotiations To Amend the Treaty..........................................................................8

     E.     International Information Exchanges Regarding The UBS Matter .........................9

ARGUMENT ...........................................................................................................................11

I.     THE U.S. GOVERNMENT'S ATTEMPT TO OBTAIN INFORMATION
     FROM SWITZERLAND THROUGH THE SUMMONS IS
     INCONSISTENT WITH THE TAX TREATY.................................................................11

II.     COMPLIANCE WITH THE SUMMONS WOULD DIRECTLY
     VIOLATE SWISS LAW .................................................................................................13

III.     THE IRS HAS NO REASONABLE EXPECTATION OF RECEIVING
     INFORMATION IN RESPONSE TO "FISHING EXPEDITIONS".................................15

IV.     IMPOSITION OF AN ORDER TO COMPEL ENFORCEMENT OF THE
     SUMMONS WOULD BE INCONSISTENT WITH INTERNATIONAL
     COMITY..........................................................................................................................19

CONCLUSION.........................................................................................................................21

## TABLE OF AUTHORITIES

### U.S. CASES

*Avero Belgium Ins. v. American Airlines, Inc.*, 423 F.3d 73 (2d Cir. 2005)....................................11

*Cochran Consulting, Inc. v. Uwatec USA, Inc.*, 102 F.3d 1224 (Fed. Cir. 1996) .........................20

*Gonzalez v. Gutierrez*, 311 F.3d 942 (9th Cir. 2002) ......................................................11

*In re Grand Jury Proceedings (United States v. Bank of Nova Scotia)*, 740 F.2d 817 (11th Cir. 1984) ("*Nova Scotia II*")...............................................................19

*In re the Matter of Tax Liabilities: John Does*, No. C-88-0137, (N.D. Cal. Mar. 11, 1992), *reprinted in* 92 Tax Notes Int'l 26-24................................................................18

*In re Sealed Case*, 825 F.2d 494 (D.C. Cir. 1987)..........................................................14

*In re Two Grand Jury Subpoenas Duces Tecum (Union Bank of Switzerland)*, 158 Misc. 2d 222 (N.Y. Sup. Ct. 1993) ........................................................................20

*Maximov v. United States*, 373 U.S. 49 (1963).............................................................11

*Minpeco v. Conticommodity Services, Inc.*, 116 F.R.D. 517 (S.D.N.Y. 1987)................................20

*Motorola Credit Corp. v. Uzan*, No. 02 Civ. 666, 2003 WL 203011 (S.D.N.Y. Jan. 29, 2003) ...........................................................................................19, 20

*Societe Internationale v. Rogers*, 357 U.S. 197 (1958) ...................................................14

*Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176 (1982)...........................................11

*United States v. First Nat'l Bank of Chicago*, 699 F.2d 341 (7th Cir. 1983) ...........................14, 15

*United States v. Stuart*, 489 U.S. 353 (1989)...........................................................11, 12

*United States v. Theodore*, 479 F.2d 749 (4th Cir. 1973)..................................................18

### U.S. LEGISLATIVE AND ADMINISTRATIVE MATERIALS

H.R. Rep. No. 94-658 (1975)...............................................................................18

S. Rep. No. 94-938 (1975).................................................................................18

S. Exec. Rep. No. 105-10 (1997)............................................................................8

i

*Bilateral Tax Treaties And Protocol: Hearing Before the Committee On Foreign Relations*, 105th Cong. 43-44 (1997) (statement of Kenneth J. Kies, Chief Of Staff, Joint Committee On Taxation), *available at* http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=105_senate_hearings&docid=f:44110.pdf ...............................................7

Treasury News Release KD-3795 (Jan. 24, 2003), *available at* http://www.treas.gov/press/releases/kd3795.htm ...............................................................7

Treasury News Release HP-1320 (Dec. 8, 2008), *available at* http://www.ustreas.gov/press/releases/hp1320.htm.....................................................17

Treasury News Release TG-85 (Apr. 7, 2009), *available at* http://www.treas.gov/press/releases/tg85.htm. ...............................................................9

U.S. Model Income Tax Convention (2007), *available at* http://www.ustreas.gov /press/releases/reports/hp16801.pdf......................................................................16, 17

U.S. Model Technical Explanation Accompanying the U.S. Model Income Tax Convention (2007), *available at* http://www.ustreas.gov/press/releases/ reports/hp16802.pdf...............................................................................................16, 17

Dep't of the Treasury Technical Explanation of the Convention Between the United States of America and the Swiss Confederation for the Avoidance of Double Taxation With Respect to Taxes on Income, *available at* http://www.irs.gov/pub/irs-trty/swistech.pdf..............16

**TREATIES AND CONVENTIONS**

Agreement Providing for Measures Equivalent to Those Laid Down in Council Directive 2003/48/EC on Taxation of Savings Income in the Form of Interest Payments, Switz.-EC, Dec. 29, 2004, O.J. (L 385/30), *available at* http://eur-lex.europa.eu/LexUriServ/ LexUriServ.do?uri=OJ:L:2004:385: 0030:0042:EN:PDF .........................................8, 9

Agreement on Tax Cooperation and the Exchange of Information Relating to Taxes, Information Exchange Agreement, U.S.-Liech., Dec. 8, 2008, *available at* http://www.ustreas.gov/press/releases/reports/us%20liechtenstein%20tiea.pdf ...........................17

Convention for the Avoidance of Double Taxation With Respect To Taxes On Income, with Protocol, U.S.-Switz., Oct. 2, 1996, S. Treaty Doc. 105-8.....................................6, 7, 13, 14

Mutual Agreement of January 23, 2003, Regarding the Administration of Article 26 (Exchange of Information) of the Swiss-U.S. Income Tax Convention of October 2, 1996, *available at* http://www.ustreas.gov/press/releases/mutual.htm.......................................7

OECD Model Tax Convention on Income and Capital art. 26 (2006) ....................................15, 16

Treaty on Mutual Assistance in Criminal Matters (TMAC), U.S.-Switz., May 25, 1973, 27 U.S.T. 2019 (entered into force Jan. 23, 1977)..........................................................................4, 5

Treaty on Mutual Assistance in Criminal Matters, U.S.-Neth., June 12, 1981, 35 U.S.T. 1361...............................................................................................................................5

Vienna Convention on the Law of Treaties art. 31, May 23, 1969, 1155 U.N.T.S. 331 ...............11

## SWISS LEGISLATIVE AND ADMINISTRATIVE MATERIALS

Schweizerisches Strafgesetzbuch (StGB) [Criminal Code]

SR 311.0, art. 271, *available at* http://www.admin.ch/ch/d/sr/3/311.0.de.pdf ....................1

SR 311.0, art. 273, *available at* http://www.admin.ch/ch/d/sr/3/311.0.de.pdf ....................3

Bundesgesetz über internationale Rechtshilfe in Strafsachen (Rechtshilfegesetz, IRSG) [Federal Act on International Mutual Assistance in Criminal Matters], March 20, 1981, SR 351.1, *available at* http://www.rhf.admin.ch/ etc/medialib/data/rhf/recht.Par.0016.File.tmp/sr351-1-e_070101.pdf................................5

SR 952.0, art. 47, *available at* http://www.admin.ch/ch/d/sr/952_0/a47.html ...............3, 4

Bundesgesetz über die Bekämpfung der Geldwäscherei und der Terrorismusfinanzierung im Finanzsektor (Geldwäschereigesetz, GwG) [Federal Act Combating Money Laundering and Terrorist Financing in the Financial Sector (Anti-Money Laundering Act, AMLA)] Oct. 10, 1997, SR 955.0, arts. 3-5, *available at*http://www.admin.ch/ch/d/sr/9/955.0.de.pdf ...................................................4

Bundesamt für Statistik [Federal Office of Statistics], Verurteilungen wegen Straftaten nach dem Strafgesetzbuch (StGB), Seit 1984 [Convictions For Offenses Under the Criminal Code (CC), Since 1984] (2007), *available at* http://www.bfs.admin.ch/bfs/portal/de/index/themen/19/03/03/key/straftaten/delikte_im_ei nzelnen.Document.83251.xls....................................................................................................2, 3

Press Release, Fed. Dep't of Justice and Police, Montesinos Torres Affair: USD 50 Million Blocked in Switzerland (Mar. 11, 2003), *available at* http://www.ejpd.admin.ch/ejpd/en/home/dokumentation/ mi/2000/ref_2000-11-03.html..............6

Press Release, Fed. Dep't of Justice and Police, Philippines Given Access to Over USD 683 Million: Confiscation Ruling Closes Marcos Case (Aug. 5, 2003), *available at* http://www.bj.admin.ch/bj/en/home/dokumentation /medieninformationen/2003/2003-08-05.html ...............................................................................6

Press Release, Fed. Dep't of Justice and Police, Abacha Assets to be Handed Over to Nigeria: Switzerland Doesn't Provide a Refuge for Funds of Criminal Origin (Feb. 16, 2005), *available at* http://www.bj.admin.ch/bj/en/home/dokumentation/ medieninformationen/2005/2005-02-16.html ................................................................................6

Press Release, Fed. Dep't of Foreign Affairs, Initiative by the World Bank and UNODC on the Restitution of Stolen Assets (Sep. 18, 2007), *available at* http://www.eda.admin.ch/eda/en/home/recent/media/single.html?id=14599 ...................................6

Press Release, Fed. Dep't of Foreign Affairs, Switzerland's Credit Line to the IMF (Mar. 13, 2009), *available at* http://www.eda.admin.ch/eda/en/home/reps/ eur/vgbr/ukemlo/news/prerel.html ..................................................................................................9

**INTERNATIONAL CASES**

*Gabcikovo-Nagymaros Project* (Hung. v. Slovk.), 1997 I.C.J. 7 (Sep. 25)....................................12

*Military and Paramilitary Activities in and Against Nicaragua* (Nicar. v. U.S.), 1986 I.C.J. 14 (June 27).................................................................................................................................12

**MISCELLANEOUS**

D. M. Edwards, *Commission III: Taking of Evidence Abroad in Civil or Commercial Matters*, *in* The Eleventh Session of the Hague Conference of Private International Law, 18 Int'l & Comp. L.Q. 646 (1969)...................................................................................................2

The Hague Conference on Private International Law April 1969, *Report of the U.S. Delegation to the Eleventh Session of the Hague Conference on Private International Law*, *reprinted in* 8 Int'l Legal Materials 785 (1969)..............................................................................2

Oppenheim's International Law, Vol.1 (R. Jennings & A. Watts, eds., 9th ed. 1996)....................2

Pascal Gossin, *International Mutual Legal Assistance In Switzerland*, *in* 138th International Senior Seminar Visiting Experts' Papers, U. N. Asia and Far East Inst. for the Prevention of Crime and the Treatment of Offenders (UNAFEI) Resource Material Series No. 77 (March 2009), *available at* www.unafei.or.jp/ english/pdf/PDF_rms/no77/08_p19-22.pdf. ....................................................................................5

Press Release, FINMA, FINMA Makes Possible Settlement between UBS and the US Authorities and Announces the Results of Its Own Investigation (Feb. 18, 2009), *available at* http://www.finma.ch/e/aktuell/pages/mm-ubs-xborder-20090218.aspx. ...................................10

*Report of the International Law Commission to the General Assembly*, (1964) 2 Y.B. Int'l L. Comm'n 177, U.N. Doc. A/5809, *available at* http://untreaty.un.org/ilc/publications/yearbooks/1964.htm.........................................................12

Restatement (Second) of the Foreign Relations Law of the United States § 40 (1965) ................19

Restatement (Third) of the Foreign Relations Law of the United States (1987)

    § 301......................................................................................................................................11

    § 321......................................................................................................................................11

    § 325(1)..................................................................................................................................11

    § 441......................................................................................................................................15

    § 442(2)..................................................................................................................................15

Pursuant to the Court's order dated April 13, 2009, the Government of Switzerland respectfully files this brief as *amicus curiae*.

## INTEREST OF THE AMICUS CURIAE

The Government of Switzerland has a strong interest in the preservation of the integrity of Swiss law and sovereignty and in promoting respect by the United States of its international treaty obligations to Switzerland. Through the filing of this brief, the Government of Switzerland seeks to make the Court aware of its view that conflicts between the laws of the United States and Switzerland should be avoided, in particular when there is already a treaty in place through which the legal requirements of the two nations have been reconciled.

## STATEMENT OF RELEVANT FACTS

This section reviews (a) the relevant provisions of Swiss domestic law, (b) the availability of Swiss assistance to foreign countries in criminal and civil investigations, (c) the history and content of the intergovernmental information exchange provisions of the Swiss-U.S. income tax treaty, (d) the recent announcement by the Government of Switzerland of a change in policy regarding information exchanges on tax evasion and the related initiation of negotiations to amend the Swiss-U.S. treaty, and (e) the status of intergovernmental information exchanges relating to the UBS matter.

### A.    Swiss Domestic Law

Like a number of other civil law countries, Switzerland exercises more control over the collection of evidence in legal matters than does the United States. Switzerland considers the taking of evidence within its territory to be a domestic judicial function, and that the Swiss authorities have the sovereign and exclusive right to take compulsory measures against persons, including corporations, that are located in Switzerland. Accordingly, a unilateral attempt by

foreign authorities to compel the release of information from Switzerland without the participation

or consent of the Government of Switzerland would be an infringement of Swiss sovereignty.[1]

      This principle of the civil law derives from the doctrine of territorial jurisdiction in

international law.[2]  Only the nation in which the requested evidence is located has the authority to

enforce and execute the gathering of evidence within that nation.

      Judicial sovereignty is an important concept in Switzerland.  Since 1937, the Swiss

Criminal Code has made it a crime for any person to take evidence on Swiss territory for use by

foreign governments without prior authorization of the appropriate authorities (even if there is no

violation of the privacy laws).  Article 271, paragraph 1 of the Swiss Criminal Code of December

21, 1937 provides:

> 1.  Whoever, without authorization, performs acts for a foreign state on Swiss
> territory reserved to an authority or an official,
>
> whoever performs such acts for a foreign party or another foreign organization,
>
> whoever aids and abets such acts,
>
> shall be sentenced to imprisonment for up to three years or a fine, in serious cases,
> to imprisonment for not less than one year.[3]

Since 1984, there have been 29 convictions of violations of Article 271.[4]

---

[1]     *See, e.g.,* The Hague Conference on Private International Law April 1969, *Report of the U.S. Delegation to the Eleventh Session of the Hague Conference on Private International Law*, *reprinted in* 8 Int'l Legal Materials 785, 806 (1969); D. M. Edwards, *Commission III: Taking of Evidence Abroad in Civil or Commercial Matters, in* The Eleventh Session of the Hague Conference of Private International Law, 18 Int'l & Comp. L.Q. 646, 647 (1969).

[2]     Oppenheim's International Law, Vol.1 (R. Jennings & A. Watts, eds., 9th ed. 1996), at 458 ("Territoriality is the primary basis for jurisdiction; even if another state has a concurrent basis for jurisdiction, its right to exercise it is limited if to do so would conflict with the rights of the state having territorial jurisdiction.").

[3]     Schweizerisches Strafgesetzbuch (StGB) [Criminal Code] Dec. 21, 1937, as amended SR 311.0, art. 271 (Switz.), *available at* http://www.admin.ch/ch/d/sr/3/311.0.de.pdf.  The English translations of Swiss laws in this brief are unofficial, and in case of any discrepancy the wording of the laws in their original languages should be given precedence.

There are two principal statutes that protect the privacy of bank account information, Article 273 of the Swiss Criminal Code and Article 47 of the Federal Act on Banks and Savings Banks. Article 273 of the Swiss Criminal Code (also enacted in 1937) provides:

> Whoever seeks to discover a manufacturing or business secret in order to make it accessible to a foreign official agency or a foreign organization or private enterprise or their agents,
>
> whoever makes a manufacturing or business secret accessible to a foreign official agency or a foreign organization or private enterprise or their agents,
>
> shall be sentenced to imprisonment for up to three years or a fine, in serious cases, to imprisonment for not less than one year. A fine can be combined with the imprisonment.[5]

Since 1984, there have been 26 convictions of violations of Article 273.[6]

Article 47 of the Federal Act on Banks and Savings Banks provides:

> 1. Whoever intentionally:
>
>> a. divulges a secret entrusted to him in his capacity as a management body, employee, mandatary or liquidator of a bank, as a officer or employee of an audit company or that he became aware of in this capacity;
>>
>> b. seeks to induce others to such a violation of professional secrecy
>
> shall be sentenced to imprisonment of up to three years or a fine.
>
> 2. Where the offender acts through negligence, he or she is liable to a fine of up to 250,000 Swiss francs.
>
> 3. In the case of a repetition of the offense within five years of the conviction taking full legal effect, the monetary penalty will be a minimum of 45 daily penalty units.

---

[4]    *See* Bundesamt für Statistik [Federal Office of Statistics], Verurteilungen wegen Straftaten nach dem Strafgesetzbuch (StGB), seit 1984 [Convictions For Offenses Under the Criminal Code (CC), Since 1984] (2007), *available at* http://www.bfs.admin.ch/bfs/portal/de/index/themen/19/03/03/key/straftaten/delikte_im_einzelnen.Document.83251.xls (translation of relevant excerpt provided in Appendix Tab 1).

[5]    StGB SR 311.0, art. 273 (Switz.), *available at* http://www.admin.ch/ch/d/sr/3/311.0.de.pdf.

[6]    *See* Federal Office of Statistics, *supra* note 4.

- 3 -

> 4.  Violation of professional secrecy remains punishable after termination of the official relationship or the practice of the profession.
>
> 5.  Federal and Cantonal regulations concerning the obligation to testify and to furnish information to a government authority remain reserved.
>
> 6.  Prosecution and judgment of the acts under this provision are the responsibility of the cantons. The general provisions of the Swiss Criminal Code shall apply.[7]

This statute was originally enacted in 1934. Since 1993, there have been 48 convictions for violations of Article 47.[8]

### B.   Swiss Cooperation In International Law Enforcement

The Swiss laws described above reflect a national political tradition that places great value on the sovereign independence of the nation and the individual autonomy of its citizens. However, Swiss judicial sovereignty and the laws that protect it are not designed to frustrate legitimate foreign government investigations.[9] Indeed, Switzerland has been innovative and proactive in adopting laws and policies to facilitate cooperation with foreign investigations, and its laws authorize the release of information otherwise protected by the privacy laws when requests are made through authorized intergovernmental channels.

For example, in 1972, Switzerland and the United States signed the Treaty on Mutual Assistance in Criminal Matters ("TMAC"), which entered into force in 1977.[10] The TMAC

---

[7]   StGB SR 952.0, art. 47 (Switz.), *available at* http://www.admin.ch/ch/d/sr/952_0/a47.html (original German).

[8]   *See* Declaration of Rudolf Wyss at ¶ 2, Appendix Tab 2.

[9]   There is a common popular misconception that Switzerland allows bank accounts to be opened anonymously. To the contrary, Switzerland has an aggressive "know your customer" law that requires banks to have the identities of their customers. *See* Bundesgesetz über die Bekämpfung der Geldwäscherei und der Terrorismusfinanzierung im Finanzsektor (Geldwäschereigesetz, GwG) [Federal Act on Combating Money Laundering and Terrorist Financing in the Financial Sector (Anti-Money Laundering Act, AMLA)], StGB Oct. 10, 1997, SR 955.0, arts. 3-5 (Switz.), *available at* http://www.admin.ch/ch/d/sr/9/955.0.de.pdf. An unofficial English translation is *available at* http://www.admin.ch/ch/e/rs/955_0/index.html.

[10]   27 U.S.T. 2019.

authorizes cooperation in obtaining documents, information, and other assistance in investigating a wide range of crimes. It overrides Swiss laws that would otherwise prohibit disclosure of information to foreign parties. The TMAC was the first treaty of its kind for the United States, and subsequently was used as a model for similar U.S. treaties with other countries.[11] Switzerland has bilateral agreements on legal assistance with a number of other nations.[12]

In 1981, Switzerland enacted the Federal Act on International Mutual Assistance in Criminal Matters ("IMAC").[13] Under this domestic law, all foreign governments, whether or not they have a treaty with Switzerland, can request assistance in criminal matters, provided that they extend reciprocity to requests from Switzerland. Like the TMAC, the IMAC takes precedence over the Swiss privacy laws.[14] Each year the Government of Switzerland processes approximately 1500 to 1800 requests for assistance in criminal matters from other countries.[15]

Switzerland has also been an international pioneer in the return of assets deposited in Switzerland by "politically exposed persons" (i.e., current or former senior political officials). Under its proactive policy of providing assistance in such matters, Switzerland has returned approximately $1.6 billion to the governments of other countries in recent years.[16]

---

[11]     *See, e.g.*, Treaty on Mutual Assistance in Criminal Matters, U.S.-Neth., June 12, 1981, 35 U.S.T. 1361.

[12]     *See* list of treaties *available at* http://www.admin.ch/ch/d/sr/0.35.html#0.35 (guide to webpage provided in Appendix Tab 3).

[13]     Bundesgesetz über internationale Rechtshilfe in Strafsachen (Rechtshilfegesetz, IRSG) [Federal Act on International Mutual Assistance in Criminal Matters ("IMAC")] StGB March 20, 1981, SR 351.1. Unofficial translation of the IMAC *available at* http://www.rhf.admin.ch/etc/medialib/data/rhf/recht.Par.0016.File.tmp/sr351-1-e_070101.pdf.

[14]     *See* Pascal Gossin, *International Mutual Legal Assistance In Switzerland*, *in* 138th International Senior Seminar Visiting Experts' Papers, U.N. Asia and Far East Inst. for the Prevention of Crime and the Treatment of Offenders (UNAFEI) Resource Material Series No. 77 (March 2009), at 19, *available at* www.unafei.or.jp/english/pdf/PDF_rms/no77/08_p19-22.pdf.

[15]     *Id.* at 22.

[16]     Press Release, Fed. Dep't of Foreign Affairs, Initiative by the World Bank and UNODC on the Restitution of Stolen Assets (Sep. 18, 2007), *available at*

C.    The Tax Treaty

As part of negotiations to update their 1951 income tax treaty, Switzerland and the United

States agreed on new wording for the provisions on exchange of information.  That wording was

incorporated into the Convention Between The United States of America And The Swiss

Confederation For The Avoidance of Double Taxation With Respect To Taxes On Income signed

on October 2, 1996 ("Tax Treaty").[17]  Article 26 states in relevant part:

> The competent authorities of the Contracting States shall exchange such
> information (being information available under the respective taxation laws of the
> Contracting States) as is necessary for carrying out the provisions of the present
> Convention for the prevention of tax fraud or the like in relation to the taxes which
> are the subject of the present Convention.  In cases of tax fraud,
>
> > (a) the exchange of information is not restricted by Article 1 (Personal
> > Scope) and
> >
> > (b) if specifically requested by the competent authority of a Contracting
> > State, the competent authority of the other Contracting State shall provide
> > information under this Article in the form of authenticated copies of
> > unedited original records or documents.

Simultaneously, Switzerland and the United States executed a Memorandum of Understanding

and a Protocol, which elaborated on the meaning of the term "tax fraud or the like" for purposes of

the exchange of information provisions.[18]

---

http://www.eda.admin.ch/eda/en/home/recent/media/single.html?id=14599; *see, e.g.,* Press
Release, Federal Department of Justice and Police ("FDJP"), Philippines Given Access to Over
USD 683 Million: Confiscation Ruling Closes Marcos Case (Aug. 5, 2003), *available at*
http://www.bj.admin.ch/bj/en/home/dokumentation/medieninformationen/2003/2003-08-05.html;
Press Release, FDJP, Abacha Assets to be Handed Over to Nigeria: Switzerland Doesn't Provide a
Refuge for Funds of Criminal Origin (Feb. 16, 2005), *available at* http://www.bj.admin.ch/
bj/en/home/dokumentation/medieninformationen/2005/2005-02-16.html; Press Release, FDJP,
Montesinos Torres Affair: USD 50 Million Blocked in Switzerland (Mar. 11, 2003), *available at*
http://www.ejpd.admin.ch/ejpd/en/home/dokumentation/ mi/2000/ref_2000-11-03.html.

[17]    Oct. 2, 1996, S. Treaty Doc. 105-8.

[18]    *See* Letter of Submittal, *id.*

- 6 -

In 2002, Switzerland and the United States entered into further discussions regarding the Tax Treaty's exchange of information provisions, and subsequently signed the Mutual Agreement of January 23, 2003 Regarding the Administration of Article 26 (Exchange of Information) of the Swiss-U.S. Income Tax Convention of October 2, 1996 ("2003 MOU").[19]  The 2003 MOU provided additional guidance for interpreting the term "tax fraud or the like," including 14 hypothetical scenarios.[20]  In an exchange of notes dated January 24, 2003, Switzerland and the United States affirmed the importance of the Tax Treaty and 2003 MOU.[21]

There are a number of contemporaneous statements by the U.S. Government acknowledging that the Tax Treaty's information exchange provisions were limited to cases involving tax fraud.  For example, at the time of ratification by the U.S. Senate, the Chief of Staff of the Joint Committee on Taxation testified as follows:

> The exchange of information provisions of the proposed treaty are somewhat more useful than those of the current treaty [the 1951 Income Tax Treaty], but are nonetheless more restrictive than the comparable provisions in tax treaties with other countries.  Information generally may be exchanged to carry out the purposes of the proposed treaty . . . . Information may also be exchanged to prevent tax fraud.[22]

A letter from the Department of Treasury to the Senate Finance Committee, included in the Committee's report on the Tax Treaty, stated:

> Although the exchange of information provisions of the proposed treaty are not as broad as the U.S. Model provisions, they represent a significant improvement over those in the present treaty . . . . [T]he new treaty and Protocol contain a clear, broad definition of "tax fraud" that should lead to improved information exchange. The

---

[19]     *Available at* http://www.ustreas.gov/press/releases/mutual.htm.

[20]     *Id.*

[21]     Treasury News Release KD-3795 (Jan. 24, 2003), *available at* http://www.treas.gov/press/releases/kd3795.htm.

[22]     *Bilateral Tax Treaties And Protocol: Hearing Before the Committee On Foreign Relations*, 105th Cong. 43-44 (1997) (statement of Kenneth J. Kies, Chief Of Staff, Joint Committee On Taxation), *available at* http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname =105_senate_hearings&docid=f:44110.pdf.

new treaty also provides that information will, where possible, be provided in a form that will make it possible for the information to be used in court proceedings. While these measures do not go as far as we would like, the improvement that they will allow in our exchange of information program with Switzerland should make the anti-avoidance provisions of the new treaty far more effective than under the present treaty.[23]

Accordingly, the apparent implication of the February 6, 2009 Declaration of Barry B. Shott (paragraphs 15-17) that the Internal Revenue Service ("IRS") was somehow surprised or disappointed that the Government of Switzerland interprets the Tax Treaty to allow information exchange only in cases of "tax fraud or the like" should be viewed in context.

Since the Tax Treaty entered into force, the Government of Switzerland has received an average of three requests per year from the IRS for information under Article 26, and has been able to transmit the requested information in virtually all of the cases. The Government of Switzerland has successfully defended against court challenges brought by affected persons in the Swiss courts seeking to block its ability to provide the information.[24]

### D.    Negotiations To Amend the Treaty

Until recently, Switzerland's tax treaties have limited agreements to share information to situations in which the underlying offense involved tax fraud, but not tax evasion. Nonetheless, Switzerland has accommodated the interests of other countries in tax collection. Notably, Switzerland remits to the member states of the European Union, on an anonymous basis, a 35 percent withholding tax from interest paid by Swiss paying agents to E.U. residents.[25] With respect to U.S. taxpayers, the Qualified Intermediary Agreement concluded between UBS (as well

---

[23]    S. Exec. Rep. No. 105-10, at 10 (1997).

[24]    Declaration of Eric Hess at ¶¶ 3-4, Appendix Tab 4.

[25]    *See* Agreement Providing for Measures Equivalent to Those Laid Down in Council Directive 2003/48/EC on Taxation of Savings Income in the Form of Interest Payments, Switz.-E.C., Dec. 29, 2004, O.J. (L 385/30), *available at* http://eur-lex.europa.eu/LexUriServ/ LexUriServ.do?uri=OJ:L:2004:385: 0030:0042:EN:PDF.

as other Swiss banks) and the IRS provides procedures for reporting and for the withholding of interest paid on U.S. securities.

On March 13, 2009, the Government of Switzerland announced a decision to modify its tax treaties to allow international administrative assistance in tax matters in full accordance with the standards of the Organization for Economic Cooperation and Development ("OECD") by eliminating the currently applied limitation of assistance to "tax fraud or the like." This change in policy is intended to be reflected in revisions to the double taxation treaties to which Switzerland is a party.[26] Negotiations between the Government of Switzerland and the U.S. Government to amend the Tax Treaty are already underway. The first meeting was held on April 28, 2009.[27]

### E.   International Information Exchanges Regarding The UBS Matter

The Petition and supporting declarations present a confusing and incomplete depiction of the status of intergovernmental cooperation on the provision of information regarding UBS's activities and its customers. UBS has already entered into a Deferred Prosecution Agreement with the U.S. Department of Justice and a settlement with the Securities and Exchange Commission regarding its own conduct. In connection with the tax fraud schemes that were identified as part of that criminal investigation, the Swiss authorities, acting through the Swiss Financial Market Supervisory Authority ("FINMA"), were able to take exceptional measures, consistent with the requirements of Swiss law, to allow the requested information to be shared with the U.S.

---

[26]   *See* Press Release, Fed. Dep't of Foreign Affairs, Switzerland's Credit Line to the IMF (Mar. 13, 2009), *available at* http://www.eda.admin.ch/eda/en/home/reps/eur/vgbr/ukemlo/news/prerel.html.

[27]   Treasury News Release TG-85 (Apr. 7, 2009), *available at* http://www.treas.gov/press/releases/tg85.htm.

- 9 -

Government on an expedited basis.  The U.S. Government agreed to withdraw its pending treaty

requests to the Federal Tax Authority as part of this arrangement.[28]

The John Doe summons at issue in this case has a vastly different scope than the U.S.

treaty requests.  In fact, when the IRS was preparing to issue the summons, it informed the

Government of Switzerland that that it was doing so to avoid the running of the limitations period

and that it did not intend to seek enforcement pending the outcome of the U.S. negotiations with

UBS in the criminal case and the progress of the treaty requests.[29]  The U.S. Government later

entered into a Deferred Prosecution Agreement with UBS, the Government of Switzerland took

the necessary steps to allow it to provide the information, and the U.S. Government then withdrew

the requests after receiving the information.  It is therefore unclear why the IRS seems to be

relying on complaints about the Swiss response to the treaty requests as a justification for

enforcement of the summons.

The Government of Switzerland has repeatedly expressed its objections to the John Doe

summons to U.S. Government officials.  Most recently, on April 29, 2009, the Government of

Switzerland delivered to the U.S. Department of State a diplomatic note setting forth its concerns

regarding the threat this case poses to the negotiation of the proposed amendments to the Tax

Treaty.[30]

---

[28]     *See* Press Release, FINMA, FINMA Makes Possible Settlement between UBS and the US
Authorities and Announces the Results of Its Own Investigation (Feb. 18, 2009), *available at*
http://www.finma.ch/e/aktuell/pages/mm-ubs-xborder-20090218.aspx.

[29]     Declaration of Urs Zulauf at ¶ 2, Appendix Tab 5.

[30]     Diplomatic Note (April 29, 2009), Appendix Tab 6.

## ARGUMENT

**I.    The U.S. Government's Attempt To Obtain Information From Switzerland Through The Summons Is Inconsistent With The Tax Treaty**

The rules and procedures set out in Article 26 of the Tax Treaty provide the legal basis for Switzerland to exchange information concerning tax issues with the United States.  In return, the United States is under an international obligation to respect Article 26 in seeking to obtain information from Switzerland.  As explained below, the IRS's attempt to evade Article 26 through use of the summons is inconsistent with the treaty.

The basic rules for interpreting treaties are set out in the Vienna Convention on the Law of Treaties of 23 May 1969 ("Vienna Convention").[31]  Article 31 of the Vienna Convention provides that "[a] treaty shall be interpreted in good faith, in accordance with the ordinary meaning to be given the terms of the treaty in their context and in the light of its object and purpose."[32]  The Supreme Court has held similarly that "[t]he clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.'"  *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 180 (1982) (*quoting Maximov v. United States*, 373 U.S. 49, 54 (1963)).  The Supreme Court has also affirmed that "[n]ontextual sources … often assist us in 'giving effect to the intent of the Treaty parties'."  *United States v. Stuart*, 489 U.S. 353, 366 (1989) (quoting *Sumitomo*, 457 U.S. at 185).  In the *Stuart* case, which involved interpretation of the U.S.-Canada double taxation treaty, the Supreme Court stated that "a treaty should generally be 'construe[d] . . .

---

[31]    1155 U.N.T.S. 331.  Switzerland is a party to the Vienna Convention.  Although the United States has not ratified the Convention, the U.S. Government and the U.S. courts have consistently accepted that it represents "customary international law" binding upon the United States.  *See* Restatement (Third) of the Foreign Relations Law of the U.S. §§ 301 and 321 (1987); *See also Avero Belgium Ins. v. American Airlines, Inc.*, 423 F.3d 73, 79 & n.8 (2d Cir. 2005); *Gonzalez v. Gutierrez*, 311 F.3d 942, 949 n.15 (9th Cir. 2002).

[32]    Restatement (Third) § 325(1).

- 11 -

liberally to give effect to the purpose which animates it. ...'" *Stuart*, 489 U.S. at 368. Of course, a treaty should not be interpreted liberally only when it is to the benefit of the U.S. Government to do so.

Vienna Convention Article 26 states that a treaty "is binding upon the parties to it and must be performed by them in good faith," a principle commonly referred to as *pacta sunt servanda*.[33] The International Court of Justice has commented on this principle as follows:

> Article 26 combines two elements, which are of equal importance. It provides that "Every treaty in force is binding upon the parties to it and must be performed by them in good faith." This latter element, in the Court's view, implies that, in this case, it is the purpose of the Treaty, and the intentions of the parties in concluding it, which should prevail over its literal application. The principle of good faith obliges the Parties to apply it in a reasonable way and in such a manner that its purpose can be realized.[34]

Importantly, this requirement of good faith requires that a party to a treaty refrain from acts calculated to frustrate the purpose of the treaty.[35]

Article 26 of the Tax Treaty provides specific rules governing the exchange of information between Switzerland and the United States. According to these rules, the competent authorities of the countries are to exchange information as is necessary for carrying out the provisions of the Tax

---

[33]    Restatement (Third) § 321.

[34]    *Gabcikovo-Nagymaros Project* (Hung. v. Slovk), 1997 I.C.J. 7, ¶ 142 (Sep. 25).

[35]    *Report of the International Law Commission to the General Assembly*, (1964) 2 Y.B. Int'l L. Comm'n 177, U.N. Doc. A/5809, *available at* http://untreaty.un.org/ilc/publications/yearbooks/1964.htm ("Some members felt that there might be advantage in also stating that a party must abstain from acts calculated to frustrate the objects and purposes of the treaty. The Commission, however, considered that this was implicit in the obligation to perform the treaty in good faith...."). *See also Military and Paramilitary Activities in and Against Nicaragua* (Nicar. v. U.S.), 1986 I.C.J. 14, ¶ 275 (June 27) ("In respect of the claim that the United States activities have been such as to deprive the 1956 FCN [Friendship Commerce and Navigation] Treaty of its object and purpose, the Court has to make a distinction. It is unable to regard all the acts complained of in that light; but it does consider that there are certain activities of the United States which are such as to undermine the whole spirit of a bilateral agreement directed to sponsoring friendship between the two States parties to it.").

- 12 -

Treaty and to prevent tax fraud.  Article 26 also provides assurances against unauthorized

disclosures.[36]

By proceeding unilaterally outside of the terms of the Tax Treaty and avoiding the

established intergovernmental procedures for the exchange of information, the U.S. Government

would frustrate the fundamental purposes of the treaty and therefore violate it.  More specifically,

the treaty's standards and procedures for the exchange of information would become meaningless

if a Party to the treaty pursued alternative means of obtaining information from the other.

Enforcement of the summons therefore would undermine the implementation of the treaty and be

contrary to international law.

The U.S. Government of course had the authority to withdraw from the Tax Treaty, but it

has not done so.  The treaty therefore remains valid and binding under both international and U.S.

law.  The Government of Switzerland respectfully submits that this Court should not allow itself

to be used as an instrument for carrying out the breach proposed by the IRS.

## II.    Compliance With The Summons Would Directly Violate Swiss Law

As discussed above, Switzerland's laws prohibit the release of confidential information to

foreign governments when the request has not been made through authorized intergovernmental

channels.  If the Court were to order UBS to produce evidence from Switzerland, and backed that

order with coercive powers, the Court would be substituting its own authority for that of the

competent Swiss authorities, and therefore would violate Swiss sovereignty and international law.

This violation of sovereignty would be compounded because Swiss law specifically prohibits

release of the information.  In particular, if UBS were to comply with the summons, it would

---

[36]      Tax Treaty, art. 26(1).

directly violate Articles 271[37] and 273 of the Swiss Criminal Code and Article 47 of the Federal

Act on Banks and Savings Banks.

> In this regard, Article 26(3) of the Tax Treaty states:
>
> In no case shall the provisions of this Article be construed so as to impose upon
> either of the Contracting States the obligation to carry out administrative measures
> at variance with the regulations and practice of either Contracting State or which
> would be contrary to its sovereignty, security or public policy or to supply
> particulars which are not procurable under its own legislation or that of the state
> making application.[38]

The U.S. Government therefore agreed that the Government of Switzerland was not obligated to

take actions contrary to its own sovereignty or to supply information not procurable under its own

legislation.  By implication, the U.S. Government acknowledged that it would respect Swiss

sovereignty, and that the Government of Switzerland was not expected to stand by passively while

the U.S. Government directed a Swiss entity to violate Swiss law.

That enforcement of the summons would violate Swiss law by itself provides strong

grounds for this Court to deny enforcement, or otherwise to decline to impose coercive sanctions

on UBS.  *See, e.g., Societe Internationale v. Rogers*, 357 U.S. 197, 211 (1958) ("It is hardly

debatable that fear of criminal prosecution [under Article 273 of the Swiss Criminal Code and

Article 47 of the Federal Act on Banks and Savings Banks] constitutes a weighty excuse for

nonproduction, and this excuse is not weakened because the laws preventing compliance are those

of a foreign sovereign."); *In re Sealed Case*, 825 F.2d 494, 498 (D.C. Cir. 1987) ("[I]t causes us

considerable discomfort to think that a court of law should order a violation of law, particularly on

the territory of the sovereign whose law is in question....."); *United States v. First Nat'l Bank of*

---

[37]     Pursuant to the first paragraph of Article 271(1), it is theoretically possible that the Federal
Council could authorize a private person to act for a foreign State.  However, such an
authorization could be given only for activities which would otherwise be covered by the
applicable Swiss procedures for international criminal and administrative assistance, which is not
the case here.  *See* Declaration of Rudolf Wyss at ¶ 3, Appendix Tab 2.

[38]     Tax Treaty, art. 26(3).

*Chicago*, 699 F.2d 341, 346 (7th Cir. 1983) ("Although the interest of the United States in collecting taxes is of importance to the financial integrity of the nation, the interest of Greece, served by its bank secrecy law is also important, and so conceded by Government counsel."). *See also* Restatement (Third) § 442(2) (discouraging sanctions when the requested disclosure of information is prohibited in the country in which the information or person is located); *Id.* § 441 ("In general, a state may not require a person ... to do an act in another state that is prohibited by the law of that state or by the law of the state of which he is a national.").

**III.    The IRS Has No Reasonable Expectation Of Receiving Information In Response To "Fishing Expeditions"**

The history and context of the Tax Treaty and other relevant treaties indicates that the IRS could not have reasonably expected to be able to enforce a summons of this nature to obtain information from Switzerland.

The Tax Treaty generally follows the OECD Model Tax Convention on Income and Capital ("OECD Model Convention"), which does not authorize "fishing expeditions" such as the summons at issue in this case. The OECD Model Convention includes a provision for the exchange of information which requires a degree of relevancy or specificity. Article 26 (Exchange of Information) states as follows:

> 1. The competent authorities of the Contracting States shall exchange such information as is <u>foreseeably relevant</u> for carrying out the provisions of this Convention or to the administration or enforcement of the domestic laws concerning taxes of every kind and description imposed on behalf of the Contracting States, or of their political subdivisions or local authorities, insofar as the taxation thereunder is not contrary to the Convention. The exchange of information is not restricted by Articles 1 and 2.[39]

---

[39]    OECD Model Tax Convention on Income and Capital, art. 26 (2006) (emphasis added). Switzerland took a reservation as follows:

> "Switzerland reserves its position on paragraphs 1 and 5. It will propose to limit the scope of the Article to information necessary for carrying out the provisions of the Convention. This reservation shall not apply in cases involving acts of fraud subject to imprisonment according to the laws of both Contracting States."

With respect to the purpose of Article 26, the commentary to the OECD Model Convention indicates that a request for information should include some degree of specificity and not be a means for a "fishing expedition." The Commentary states:

> The standard of "foreseeably relevant" is intended to provide for exchange of information in tax matters to the widest possible extent and, at the same time, to clarify that Contracting States are not at liberty to engage in "fishing expeditions" to request information that is unlikely to be relevant to the tax affairs of a given taxpayer. Contracting States may agree to an alternative formulation of this standard that is consistent with the scope of the Article (e.g. by replacing "foreseeably relevant" with "necessary" or "relevant").[40]

Because Article 26 of the Tax Treaty is closely based on the OECD Model Convention, this commentary is relevant in interpreting the Tax Treaty.[41]

In 2006, the U.S. Government published the United States Model Income Tax Convention of November 15, 2006 ("U.S. Model Convention") and the corresponding United States Model Technical Explanation Accompanying The United States Model Income Tax Convention of November 15, 2006 ("U.S. Model Technical Explanation").[42] Article 26 of the U.S. Model

---

OECD Model Convention, Commentary On Article 26 Concerning The Exchange Of Information, ¶ 24. In other words, Switzerland indicated that it would provide information about individuals when the request related to tax fraud, but not tax evasion. That approach is reflected in the current Tax Treaty.

[40]    *See id.*, ¶ 5.

[41]    *See* Dep't of the Treasury Technical Explanation of the Convention Between the United States of America and the Swiss Confederation for the Avoidance of Double Taxation With Respect to Taxes on Income, *available at* http://www.irs.gov/pub/irs-trty/swistech.pdf ("Negotiations took into account the U.S. Treasury Department's current tax treaty policy, the Model Income Tax Convention on Income and Capital, published by the OECD in 1992 and amended in 1994 and 1995 (the "OECD Model") and recent tax treaties concluded by both countries").

[42]    U.S. Model Income Tax Convention (2007), *available at* http://www.ustreas.gov/press/releases/reports/hp16801.pdf; U.S. Model Technical Explanation Accompanying the U.S. Model Income Tax Convention (2007), *available at* http://www.ustreas.gov/press/releases/reports/hp16802.pdf.

Convention is nearly identical to the OECD Model Convention.[43]  Similar to the comments

provided with the OECD Model Convention, the U.S. Model Technical Explanation provides

guidance for the degree of specificity required for the exchange of information.  The guidance to

Paragraph 1 of Article 26 of the U.S. Model Convention states in relevant part:

> The information to be exchanged is that which may be relevant for carrying out the
> provisions of the Convention or the domestic laws of the United States or of the
> other Contracting State concerning taxes of every kind applied at the national
> level.... However, the language "may be" would not support a request in which a
> Contracting State simply asked for information regarding all bank accounts
> maintained by residents of that Contracting State in the other Contracting State, or
> even all accounts maintained by its residents with respect to a particular bank.[44]

Indeed, the U.S. Government recently entered into a new treaty on information sharing in tax

matters with Liechtenstein that requires requests to include the identity of each taxpayer whose tax

or criminal liability is at issue.[45]

In the case of UBS, the Government of Switzerland adopted a liberal interpretation of the

Tax Treaty to allow the release of information where, even though specific individuals were not

identified, there was sufficient detail about the nature of the alleged tax fraud pattern used by

---

[43]  U.S. Model Convention, art. 26, ¶ 1 states:

> "The competent authorities of the Contracting States shall exchange such information as
> may be relevant for carrying out the provisions of this Convention or the domestic laws of
> the Contracting States concerning taxes of every kind imposed by a Contracting State to
> the extent that the taxation thereunder is not contrary to the Convention, including
> information relating to the assessment or collection of, the enforcement or prosecution in
> respect of, or the determination of appeals in relation to, such taxes ...."

[44]  U.S. Model Technical Explanation, at 86 (emphasis added).

[45]  *See* Agreement on Tax Cooperation and the Exchange of Information Relating to Taxes,
Information Exchange Agreement, U.S.-Liech., Dec. 8, 2008, *available at*
http://www.ustreas.gov/press/releases/reports/ us%20liechtenstein%20tiea.pdf ("[a]ny request for
information made by a party shall be framed with the greatest degree of specificity possible"
including "the identity of the taxpayer whose tax or criminal liability is at issue" and evidence of
foreseeable relevance with respect to the identified taxpayer).  The Department of Treasury stated
that "The Tax Information Exchange Agreement ... with Liechtenstein will provide the United
States with access to information it needs to enforce U.S. tax laws, including information related
to bank accounts in Liechtenstein."  Treasury News Release HP-1320 (Dec. 8, 2008), *available at*
http://www.ustreas.gov/press/releases/hp1320.htm.

- 17 -

certain UBS clients.  The John Doe summons, however, is so broad and lacking in detail that there is no manner in which compliance with the summons could be carried out consistently with Swiss law or the Tax Treaty.[46]

Although the courts often give the IRS some latitude in issuing summonses, courts have declined to enforce John Doe summonses that are overly broad and vague.  *See, e.g., In re the Matter of Tax Liabilities: John Does*, No. C-88-0137, (N.D. Cal. Mar. 11, 1992), *reprinted in* 92 Tax Notes Int'l 26-24 (Tax Analysts) ("[T]he John Doe summons which the IRS seeks to enforce here is generic both in its terms and purpose.  It does not arise from an investigation of any particular misconduct, nor does it seek evidence of particular identified transactions."); *United States v. Theodore*, 479 F.2d 749, 754 (4th Cir. 1973)  ("[W]here it appears that the purpose of the summons is 'a rambling exploration' of a third party's files, it will not be enforced.").  Indeed, when Congress considered the John Doe summons process, the House Committee on Ways and Means and the Senate Finance Committee warned against the use of such a summons for "fishing expeditions:"

> While the committee believes it is important to preserve the John Doe summons as an investigative tool which may be used in appropriate circumstances, at the same time, the committee does not intend that the John Doe summons is to be available for purposes of enabling the Service to engage in a possible "fishing expedition."  For this reason, the committee intends that when the Service does seek court authorization to serve John Doe summons, it will have specific facts concerning a specific situation to present to the court.

H.R. Rep. No. 94-658, at 311 (1975), *accord*, S. Rep. No. 94-938, at 373 (1975).  Although the U.S. Government has alleged facts concerning UBS, the charges against UBS have already been settled.  No specific facts are alleged concerning any of the thousands of account holders targeted by the summons.

---

[46]     *See* Declaration of Eric Hess at ¶ 4, Appendix Tab 4.

- 18 -

In light of the Tax Treaty's history and the current practice of the U.S. Government as reflected in its own model tax treaty and the recent treaty it executed with Liechtenstein, the IRS could not have had a reasonable expectation that "fishing expedition" type requests for information in Switzerland would be allowed. The overly broad nature of the summons is clearly inconsistent with the Tax Treaty.

## IV.   Imposition Of An Order To Compel Enforcement Of The Summons Would Be Inconsistent With International Comity

In applying the principle of international comity, U.S. courts engage in a "balancing test" in their analysis of potential conflicts between U.S. and foreign law. It is not necessary to conduct an assessment of interests in this case, since it is unambiguous that compliance with the summons would violate the Tax Treaty and Swiss law, and because the summons is unreasonably broad and vague. However, should the Court decide to engage in a balancing of interests, the relevant factors strongly favor the Court declining to enforce the summons.

In *In re Grand Jury Proceedings (United States v. Bank of Nova Scotia)*, 740 F.2d 817 (11th Cir. 1984) ("*Nova Scotia II*"), the Court of Appeals for the Eleventh Circuit affirmed the district court's reliance on the balancing test set out in Section 40 of the Restatement (Second) of Foreign Relations Law, which recommended that courts evaluate factors such as the vital national interests of the nations, the extent and nature of the hardship that inconsistent enforcement actions would impose, the extent to which the required conduct would take place in the other country, the nationality of the person, and the extent to which enforcement could reasonably be expected to achieve compliance. The court in *Nova Scotia II* concluded that the subpoena at issue should be enforced, but that case involved a grand jury investigation of drug trafficking, an alleged lack of good faith by the bank, and other factors not pertinent to this case.

U.S. courts have recognized the strong interest of Switzerland in defending its sovereignty and the integrity of its laws. *See, e.g., Motorola Credit Corp. v. Uzan*, No. 02 Civ. 666, 2003 WL

- 19 -

203011 (S.D.N.Y. Jan. 29, 2003); *Minpeco v. Conticommodity Services, Inc.*, 116 F.R.D. 517

(S.D.N.Y. 1987); *Cochran Consulting, Inc. v. Uwatec USA, Inc.*, 102 F.3d 1224 (Fed. Cir. 1996);

*In re Two Grand Jury Subpoenas Duces Tecum (Union Bank of Switzerland)*, 158 Misc. 2d 222

(N.Y. Sup. Ct. 1993).

Although the interests of Switzerland and the United States in enforcing their laws

generally should be considered to be of equal value, the summons enforcement proceeding is civil,

while the Swiss laws that would be violated by compliance with the summons are criminal.  In

addition, the information at issue is held by a Swiss company within Switzerland, and accordingly

execution of an enforcement order of the Court would have to take place within Swiss territory.

Moreover, the U.S. request for information in the summons is exceedingly vague, broadly

requesting information for thousands of accounts in a manner to which the U.S. Government

would not expect any foreign government to provide a response if requested.  In this regard, the

Tax Treaty itself represents a negotiated compromise between nations intended to reflect the

mutual best interests of both countries.  Its limitations should be respected.

Finally, the Governments of Switzerland and the United States are currently engaged in

negotiations to amend the Tax Treaty in a manner that would broaden the scope of treaty requests

to which Switzerland can reply.  As explained in the diplomatic note the Government of

Switzerland has delivered to the U.S. Department of State, the threatened enforcement of the

summons in violation of the Tax Treaty and Swiss law represents an impediment to the successful

conclusion of those negotiations.[47]  The Court should refrain from issuing an order that would

interfere with those negotiations and the more general intergovernmental relations between

Switzerland and the United States.

---

[47]     Appendix Tab 6.

### CONCLUSION

For the foregoing reasons, the Government of Switzerland respectfully urges the Court to

deny the petition to enforce the summons.

Respectfully submitted,

By:   _s/ John C. Dotterrer___

John C. Dotterrer
Florida Bar No. 267260
Jenny Torres
Florida Bar No. 785881
JOHN C. DOTTERRER
COUNSELLORS AT LAW, P.A.
125 Worth Avenue, Suite 310
Palm Beach, FL 33480
Telephone: (561) 802-3808
Facsimile: (561) 802-3318

Stephan E. Becker*
Kemba Eneas Walden*
PILLSBURY WINTHROP SHAW
PITTMAN LLP
2300 N Street, N.W.
Washington, D.C.  20037
Telephone: (202) 663-8277
Facsimile: (202) 663-8007

*Admitted pro hac vice

Dated:  April 30, 2009

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on April 30, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

JOHN C. DOTTERRER
COUNSELLORS AT LAW, P.A.


By:   s/ John C. Dotterrer
      John C. Dotterrer

## SERVICE LIST

**United States of America v. UBS AG**
**Case  No. 09-20423-GOLD/MCALILEY**
**United States District Court, Southern District of Florida**

**Attorneys for Petitioner,**
**United States of America**

Stuart D. Gibson
Department of Justice
Tax Division
P.O. Box 403
Ben Franklin Station
Washington, D.C. 20044
Stuart.D.Gibson@usdoj.gov

Richard D. Euliss
United States Department of Justice
P.O. Box 14198
Ben Franklin Station
Washington, D.C. 20044
Richard.D.Euliss@usdoj.gov

**Attorneys for Respondent,**
**UBS AG**

Eugene E. Stearns
estearns@swmwas.com
Ana Hirfield Barnett
abarnett@swmwas.com
Gordon McRae Mead Jr.
gmead@swmwas.com
Geri Fischman
gfischman@swmwas.com
Stearns Weaver Miller Weissler Alhadeff &
Sitterson
150 W Flagler Street
Suite 2200
Miami, FL 33130

John F. Savarese
jfsavarese@wlrk.com
Martin J.E. Arms
mjearms@wlrk.com
Ralph M. Levene
rmlevene@wlrk.com
Wachtell Lipton Rosen & Katz
51 W 52nd Street
New York, NY 10019

Francis P. Barron
fbarron@cravath.com
David N. Greenwald
dgreenwald@cravath.com
Cravath Swaine & Moore LLP
825 8th Avenue
New York, NY 10019-7475
212-474-1000
212-474-3700 (fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 09-20423-CIV-GOLD/MCALILEY

UNITED STATES OF AMERICA

Petitioner,

vs.

UBS AG,

Respondent.

## DECLARATION OF RUDOLF WYSS

Rudolf Wyss, pursuant to 28 U.S.C. § 1746, declares:

1. I am Deputy Director of the Federal Office of Justice (FOJ) in Bern, Switzerland, where I am in charge of the Division of International Legal Assistance in Criminal Matters. I have held this position since December 1st, 2007, and have worked in the Division since September 1st, 1996.

2. Based on our review of decisions by Swiss courts, since 1993 there have been 48 convictions for violations of Article 47 of the Swiss Banking Act.

3. The first paragraph of Article 271(1) of the Swiss Penal Code suggests that it is possible that the Federal Council could authorize a private person to act for a foreign State within Switzerland. Based on my review of the relevant scholarly commentary on Article 271 and the practice of the Federal Council, as well as my experience in my role as Deputy Director of the FOJ, such an authorization could be given by the competent Federal authority only under

1

circumstances in which international criminal and/or administrative assistance would be possible

(see: Basler Kommentar, Niggli/Wiprächtiger,Strafrecht II, Art. 111-392, 2.Auflage, Basel 2007,

Th. Hopf, Nr. 6 und Nr. 18 zu Art. 271 StGB;VPB 61.82;Entscheid des Bundesrates vom

25. Juni 1997).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of April 2009 in Bern, Switzerland

Rudolf Wyss
Deputy Director, Federal Office of Justice

2