```
              UNITED STATES BANKRUPTCY COURT
                 DISTRICT OF CONNECTICUT
                    BRIDGEPORT DIVISION

In Re                          *   Case No. 22-50073 (JAM)
                               *
HO WAN KWOK, GENEVER HOLDINGS  *   Bridgeport, Connecticut
 CORPORATION and GENEVER       *   January 24, 2023
 HOLDINGS, LLC,                *
                               *
            Debtor.            *
                               *
 * * * * * * * * * * * * * * * *
```

       TRANSCRIPT OF MOTION FOR ORDER FURTHER EXTENDING SALE
         PROCESS OF SHERRY-NETHERLAND APT AND RETENTION OF
         SOTHEBY'S INT'L. REALTY AS BROKER; APPLICATION TO
         EMPLOY PAUL HASTINGS LLP AS COUNSEL TO DEBTOR
        GENEVER HOLDINGS CORP AND GENEVER HOLDINGS LLC;
              MOTION TO QUASH THIRD-PARTY SUBPOENA
                 DIRECTED TO IVEY, BARNUM & O'MARA LLC
              BEFORE THE HONORABLE JULIE A. MANNING
                 UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Creditor, Pacific      ANNECCA SMITH, ESQ.
 Alliance Asia Opportunity     Robinson & Cole
 Fund L.P.:                    28 Trumbull Street
                               Hartford, CT  06103

                               STUART SARNOFF, ESQ.
                               O'Melveny & Myers LLP
                               Times Square Tower
                               7 Times Square
                               New York, NY  10036

For the Chapter 11 Trustee:    PATRICK LINSEY, ESQ.
                               Neubert, Pepe and Monteith
                               195 Church Street
                               New Haven, CT  06510

Chapter 11 Trustee:            LUC A. DESPINS, ESQ.
                               Paul Hastings LLP
                               200 Park Avenue
                               New York, NY  10166


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

APPEARANCES:   (Cont'd)

```
For the Creditors Committee:   IRVE GOLDMAN, ESQ.
                               Pullman & Comley
                               850 Main Street
                               Bridgeport, CT  06601

For the Sherry Netherland,     PATRICK N. PETROCELLI, ESQ.
 Creditor:                     Stroock & Stroock & Lavan
                               180 Maiden Lane
                               New York, NY  10038

                               ROBERT E. KAELIN, ESQ.
                               Murtha Cullina
                               280 Trumbull Street
                               Hartford, CT  06103

For Bravo Luck, Interested     FRANCIS J. LAWALL, ESQ.
 Party:                        Troutman Pepper Hamilton
                                Sanders, LLP
                               3000 Two Logan Square
                               Philadelphia, PA  19103

                               DAVID SHAIKEN, ESQ.
                               Shipman, Shaiken & Schwefel
                               433 South Main Street
                               Suite 319
                               West Hartford, CT  06110
```

1      (Proceedings commenced at 1:01 p.m.)

2           THE COURTROOM DEPUTY:  Case no. 22-50073, Ho Wan

3      Kwok, and Genever Holdings Corporation, and Genever

4      Holdings, LLC.

5           THE COURT:  Good afternoon.  If we could have

6      appearances for the record starting with the Chapter 11

7      Trustee, please.

8           MR. DESPINS:  Good afternoon, Your Honor.  Luc

9      Despins, Chapter 11 Trustee.

10          MR. LINSEY:  Good afternoon, Your Honor.  Patrick

11     Linsey, Neubert Pepe & Monteith, for the Trustee.

12          MR. SARNOFF:  Good afternoon, Your Honor.  Stuart

13     Sarnoff, O'Melveny & Myers, on behalf of Creditor PAX.  And

14     with me is local counsel Annecca Smith.

15          THE COURT:  Good afternoon.

16          MR. GOLDMAN:  Good afternoon, Your Honor.  Irve

17     Goldman, Pullman & Comley, for the creditors committee.

18          MR. PETROCELLI:  Good afternoon, Your Honor.

19     Patrick Petrocelli, from Strook & Strook & Levan, on behalf

20     of Sherry-Netherland.

21          MR. KAELIN:  Good afternoon, Your Honor.  Attorney

22     Robert Kaelin, of Murtha Cullina, also on behalf of the

23     Sherry-Netherland.

24          MR. LAWALL:  Good afternoon, Your Honor.  Fran

25     Lawall, Trout man Pepper, on behalf of Bravo Luck.  Also,

1    local is here, David Shaiken.

2              MR. SHAIKEN:  Good afternoon, Your Honor.

3              THE COURT:  Good afternoon.

4              And there's nobody here for the debtor?  Didn't

5    they object to this?

6              MR. DESPINS:  I don't believe they objected, Your

7    Honor.

8              THE COURT:  Oh, I thought they had filed an

9    objection to this motion.  I'm sorry.

10             All right.  Go right ahead, Trustee Despins.  This

11   is your motion.

12             MR. DESPINS:  Thank you, Your Honor.  May I remove

13   the mask?

14             THE COURT:  Yes.

15             MR. DESPINS:  Okay.

16             THE COURT:  Yes.  Go right ahead.

17             MR. DESPINS:  Thank you.  For the record, Luc

18   Despins with Paul Hastings, Chapter 11 Trustee.

19             So the motion, Your Honor, is -- was filed, and

20   it's at docket 1257, and it's a motion to continue the sale

21   process regarding the Sherry-Netherland, but without some of

22   the I guess bells and whistles of the -- of the prior sale

23   process.

24             So I think given this is your -- I believe it's

25   your first exposure to the Genever case, I think it's worth,

1    you know, going through the history there.

2           So Genever is the title owner to the lease or, you

3    know, to make -- to make this simple, to the apartment.  Of

4    course the way it's structured, because it's a co-op,

5    there's a lease agreement, et cetera, but conceptually the

6    title owner is Genever.

7           And that entity filed for Chapter 11 in 2020,

8    October, I believe, 2020.

9           At that time, Mr. Kwok was controlling that entity

10   and controlling the Chapter 11 case of Genever.  And the

11   other parties to the case at that time included PAX, because

12   they had been in litigation with Mr. Kwok in front of Judge

13   Ostrager in the New York Supreme Court and had either

14   obtained or were on the verge of obtaining a summary

15   judgment decision against Mr. Kwok and they were alleging or

16   asserting alter-ego claims.

17          PAX does not have a direct contractual claim

18   against Genever, but they're asserting an alter-ego claim

19   and that's what they asserted in that case.  So that's one

20   party.

21          In addition to that, in that case, the Sherry-

22   Netherland, you know, the owner of the building, is a party.

23   They're a creditor and they were involved in that case.

24          And the U.S. Trustee obviously, but there was no

25   creditors committee appointed in that case.

1       And also the other party that was involved was

2   Bravo Luck, an entity that is now apparently controlled by

3   the son of Mr. Kwok.

4       So right at the outset of the case, of that case,

5   there were a lot of what I would call hostilities between

6   PAX, Genever, and Bravo Luck, and basically in the nature of

7   PAX saying let's lift the automatic stay so I can continue

8   my action to prosecute alter-ego claims against Genever.

9   Obviously Bravo Luck opposing that.  And then eventually in

10  2021 PAX also filed a motion to convert the Genever case to

11  Chapter 7 or to appoint a trustee.

12      So all this was happening in late 2020 and also

13  during 2021.  There was no fiduciary in the case at that

14  time.  No creditors committee.  Obviously no trustee.

15      Eventually the parties were able to reach

16  agreement on something, namely that the apartment should be

17  put up for sale, and that's memorialized into an agreement

18  that we -- that we cited in our papers.  And that agreement

19  gave various rights to Bravo Luck and PAX.  It also -- and

20  I'll come back to that obviously.

21      And also it called for the appointment of a sales

22  agent, which is an unusual structure, because neither side

23  trusted each other obviously.  The idea was why don't we

24  have a third party, a former bankruptcy judge, Judge

25  Cyganowski, have this role of sales agent so that she can

1    retain a broker and make the ultimate decision of whether,

2    you know, when and whether to sell and at what price.  And

3    that was all memorialized in that agreement.

4            And in that agreement, I said generally that Bravo

5    Luck and PAX had some rights sort of in the sale process as

6    they -- they have consulting rights, meaning that the sales

7    agent is supposed to consult with them regarding the sale

8    process.

9            And also there is a provision in paragraph 5 that

10   says, of the settlement agreement, that says draft of motion

11   to sell, eventual motion to sell, needs to be provided to

12   Bravo Luck and PAX for review and approval prior to filing.

13           You know, we were not around.  Obviously we didn't

14   exist at that time.  But there's a real issue here, which is

15   what does that mean approval?  Approval as to form?

16   Approval as to substance?  Unclear.  It doesn't say.

17           So that agreement, also in paragraph 4.E, provided

18   that the sale process will be limited initially to a 180-day

19   period from the retention of the broker, the broker being --

20   I forgot, sorry, I have it -- the broker being Sotheby's,

21   I'm sorry.  And so 180 days from the retention of the broker

22   subject to extension upon written agreement of the debtor,

23   Bravo Luck and PAX, so all of these have to consent, or by

24   further order of the Court for cause shown.

25           And, in fact, that apartment has been on the

1    market for I'm not sure if it's a year.  Or if it's not a

2    year, it's close to a year.  Maybe it's a little bit more

3    than a year.  But that apartment has been on the market and,

4    therefore, the 180 days has come and has gone.

5           And, in fact, the parties have agreed to extend

6    the process with the last extension, not entered by Your

7    Honor, but entered by Judge Garrity in that case, in the

8    Genever Holding case, at docket no. 222, which said that

9    that period, that extended period, would expire on October

10   31st without prejudice to further extension upon the consent

11   of the parties I just mentioned.

12          So October 31st of this year, you know, has

13   occurred.  There was no agreement to extend.  Our belief,

14   because we control Genever through the trustee position we

15   have, is that the sale should continue.

16          I don't believe anyone disputes that the sale

17   should continue, at least I've not heard any objection to

18   that.  And so we wanted to continue the sale process.

19          We also thought, and I reflected on for not a long

20   time, maybe for five minutes, about, well, now that there's

21   a trustee, does it make sense to continue the role of Judge

22   Cyganowski, and I decided that it made sense.  The reason

23   being the current atmospherics in the case it can't hurt to

24   have a third party, such as a former bankruptcy judge,

25   making these decisions and I decided to keep her in that

1    role.

2              And also I'm saying this a little bit in a cynical

3    way, but she hasn't been accused of being a member of the

4    CCP yet so, therefore, it looks like for now she's still

5    proceed as independent.  And that's why -- and that's what

6    we're doing.

7              Basically, we're seeking to continue the continued

8    role of Judge Cyganowski, the continued role of Sotheby's as

9    the broker.

10             The apartment is on the market.  It's right now on

11   the market for 32,500,000.  Remember, that that apartment

12   was acquired for, you know, there are various references by

13   the debtor of how much he paid, but around 60 or 70 million.

14   It doesn't matter.  It's still at 32.  It's still half of

15   what was paid.  And it's on the market.

16             But it's important to understand that although the

17   debtor is using the apartment from time to time, the

18   debtor's is not paying rent, and nobody is paying rent on

19   that apartment.  And the maintenance is shocking.  But the

20   maintenance on the apartment is something like 80, I want to

21   say 82, maybe I'm off by a few thousand dollars, but 80,000

22   or 82,000 a month.  That's just on maintenance.

23             And what's happening is that there was an account

24   funded pre-petition to cover the Sherry-Netherland for that

25   maintenance.  That account had a million and change on the

1    petition date.  And of course it's been depleted since then.

2    To be honest with you, I've not done the math as to when

3    that will be exhausted, but it will be exhausted eventually.

4           And, therefore, one of the reasons we are moving

5    in this direction is that if the apartment doesn't sell we

6    may have to pivot into a different direction.  For example,

7    renting.  And I don't want to get into an issue of you're

8    proposing to stop the sale process?  No, we want to sell.

9    That's the goal, et cetera, et cetera.  But at one point,

10   unless somebody's willing to write a check for $82,000 a

11   month, the Sherry-Netherland is going to say who's paying

12   that?

13          So obviously we need to start thinking about that.

14   That's not part of the relief we're seeking, but I want to

15   make sure Your Honor knows part of the thinking here is that

16   we may have to go in that direction.

17          And of course I want to be clear, the Sherry-

18   Netherland has whatever rights they have.  We're not trying

19   to say that we have the right to rent it to anyone or to

20   rent it at all.  Whatever the documents provide, they

21   provide.  We're not trying to go in that direction at all.

22          We just want to mention that we need -- we may

23   need flexibility here, but we're not seeking that

24   flexibility in this order right now.  We want to continue

25   the sale process, but I want to flag for Your Honor that

1    these consulting rights and all that may cause conflict

2    issues.

3           So if we talk about Bravo Luck for a second, Bravo

4    Luck is the company that apparently is controlled by the

5    debtor's son.  Of course, they're doing Mr. Kwok's bidding.

6    Mr. Kwok uses the apartment for free.  And if we told them

7    that he needs to leave so we can rent it, I guarantee you

8    that they would not support that.  Although I'm happy to

9    hear a contrary view on that.

10          But, again, that's not before the Court.  But it

11   goes to the issue continuing the sale process and with -- in

12   a different posture.

13          So the argument here is that let's talk about PAX.

14          It pains me to be adverse to them because they've

15   been very supportive of the trustee's work.  And I hate

16   this.  But on the other hand, we have to be clear, PAX is an

17   unsecured creditor of Genever, at least as alleged, an

18   unsecured claim.  It's an alter-ego claim.  Don't want to go

19   there, but it's unclear as to whether the trustee owns that

20   claim or they do.  We don't need to go there.

21          But the point is that they're an unsecured

22   creditor.  They're not a fiduciary.  And by the way, they

23   were carrying the banner of unsecured creditors before the

24   appointment of a trustee.  They did that in the Genever

25   case.  And, you know, all unsecured creditors should thank

1    them for that.  But at the end of the day, they're not a

2    fiduciary.

3           I'm not saying anything negative about them, but

4    they have a business to run.  They're going to do -- make

5    decisions to the extent it's in their own economic best

6    interest to do that and, therefore, we don't believe that

7    they should have a veto or consulting rights.

8           And as I said, it pains me to say that because

9    they've been very supportive of the process.  And we intend

10   to continue to cooperate with them to the extent we can, but

11   just given the circumstances it's a different landscape and

12   they should not have consulting rights or veto rights

13   regarding the sale motion.

14          And as far as Bravo Luck is concerned, you know,

15   we'll talk about this at 2 o'clock, but, you know, they're a

16   defendant in that adversary proceeding because their

17   argument is that they own this apartment through a trust

18   agreement which was, quote/unquote, "A secret trust

19   agreement," never disclosed in litigation for years.  And we

20   think it's a fraudulent transfer in any event and we don't

21   believe they should have any consulting rights.  One of the

22   reasons being is that they're doing their debtor's bidding

23   here.

24          And, for example, if we need to pivot to something

25   different than a sale, we don't want them to have any say

1   other than -- that they can have a say in court, but they

2   shouldn't have any contractual say in that decision.

3          Again, we're not asking the Court to approve

4   anything other than the continued role of Judge Cyganowski

5   as the sales agent and the continued role of Sotheby's as

6   the sale broker.

7          And so for these reasons, Your Honor, we believe

8   that this should be approved.  We believe --

9          You know, Bravo Luck is arguing that this is a

10  60(b), that if there's a settlement, you're trying to undo

11  the settlement, you need to seek court relief on that.

12  That's not the case.

13         The document itself had an expiration provision,

14  the 180 days.  It was extended several times.  But it was

15  not extended on October 31st and, therefore, the agreement

16  regarding a sale process is no longer in effect.  And,

17  therefore, we believe that there's no need to move under

18  60(b) or other forms of relief.

19         We're not undoing the settlement agreement or the

20  sale process that is governed by that agreement, expired by

21  its own terms, but we are continuing some features of it,

22  namely, Judge Cyganowski and Sotheby's.

23         And for these reasons, Your Honor, we would ask

24  Your Honor to approve the motion, but happy to answer any

25  questions you may have.

1           THE COURT:  I do not have any questions at the

2     moment.  I might as the hearing progresses.

3           MR. DESPINS:  Thank you.

4           THE COURT:  Thank you.

5           MR. SARNOFF:  May I be briefly heard?

6           THE COURT:  Yes.  Sure.  Certainly.

7           MR. SARNOFF:  May I remove my mask?

8           THE COURT:  Yes.  Yes.  Thank you.

9           MR. SARNOFF:  Good afternoon, Your Honor.  I'm

10    Stuart Sarnoff from O'Melveny & Myers on behalf of Creditor

11    PAX.  Mr. Friedman was not able to be here today, so I will

12    do as good a job as I can to replicate his skills.

13          As Mr. Despins said, this may be an unusual

14    situation we're we've sort of had a disagreement with the

15    trustee on the prosecution of the case.

16          And it's also an unusual situation in this dispute

17    where PAX's view is it wasn't broken, it doesn't need to be

18    fixed.

19          As we said in our papers, PAX, which is by far the

20    largest creditor, objects to Trustee Despins' motion only to

21    the extent that it seeks to eliminate PAX's consultation

22    rights with respect to the marketing and sale of the Sherry-

23    Netherland apartment.

24          We're not objecting to the continuation of the

25    approved sale process, whether it's the continuation of the

1    agreement or the entry into a new agreement, we are fully

2    supportive of the sale process with Judge Cyganowski and

3    with Mr. Despins' role.

4          But PAX, like the trustee, and like Bravo Luck,

5    and like the debtor, are aligned in that our primary

6    motivation here is to maximize the sale proceeds from the

7    apartment.  That benefits all of the creditors as well as

8    the debtor in a sense.  We're aligned on this.

9          But recognizing that the sale of the Sherry-

10   Netherland is one of the means to achieve the estate

11   maximizing the objective of maximizing value PAX bargained

12   for these consent rights.  It gave up its -- and resolved

13   its lift-stay motion in consideration for having the right

14   to weigh in effectively, not to have a veto right.  It

15   doesn't have a veto right.  In fact, the agreement provides

16   -- the existing agreement expressly provides that the sales

17   officer has final authority in the event of any dispute.

18         PAX's rights was to be -- were to be consulted and

19   to have a view and to weigh in, and we don't see any reason

20   having bargained for that right and resolved the lift-stay

21   to be cut out of that process where we don't have veto

22   rights.

23         We have consultation rights and consent rights,

24   the rights to review the sale motion prior to filing, the

25   right to be kept informed regarding the sales process,

1    offers received, materials relating to the negotiation of

2    the sale of the apartment, the right to be consulted

3    regarding the bank that's going to hold the proceeds.

4           These are not draconian rights.  These are rights

5    to be kept in the loop, and we don't -- and, again, we'd

6    like that status quo preserved.

7           The sales process creates a status quo and is

8    really in this case one of the few examples of the parties

9    working together and reaching a consensus.  It's creating

10   defining -- it's creating defined rights and allowing the

11   parties to participate in the process which is a positive.

12   It reduces the potential for conflict by giving the parties

13   an opportunity to voice their concerns.

14          It additionally creates a process by which there's

15   no dispute that the apartment is going to be sold and

16   liquidated so that there's assets for the creditors of the

17   estate.  There's no need for the equilibrium here to be

18   disrupted.

19          It's a little strange that in the Sherry-

20   Netherland's reply in support of the trustee's motion, they

21   point out at page -- at paragraph 8 of their reply brief --

22   or their brief in support -- that PAX and Bravo Luck somehow

23   hindered the sales process.  But you'll note, Your Honor,

24   there's absolutely no evidence or argument supported other

25   than that blanket statement, and it's just not true.

1           In fact, you heard Mr. Despins a few minutes ago

2    and he didn't make the argument that we've been obstructive

3    or we've hindered the sales process.  And god knows, Trustee

4    Despins is a talented guy and he's not shy.  If he thought

5    we had been hindering the process, he would have told you.

6    So I don't think that allegation that somehow we or Bravo

7    Luck for that matter has been hindering the sales process is

8    valid and it's certainly not supported by anything.

9           And, you know, obviously the Sherry-Netherland is

10   a secured creditor, but they are the one party who probably

11   doesn't care what price the apartment gets sold as long as

12   it's enough to cover their security.  And so they may be the

13   one party least aligned in terms of maximizing value, but

14   that's not an issue before Your Honor today.

15          I'm just making the point that we haven't been

16   hindering the sales process.  There's no argument.  And

17   Trustee Despins, you know, with whom we have a pretty good

18   working relationship, wouldn't even make that suggestion to

19   you.

20          So, in summary, you know, as I said at the outset,

21   we were the largest creditor.  We negotiated for the consent

22   right.  And it's not a (indiscernible) right.  We're not

23   being obstructive.  And we want to preserve the status quo.

24   And we support the ongoing sales process, but we shouldn't

25   be stripped of the rights that we bargained for.

1          And just to wrap it up, we don't think it's

2     broken.  We don't think it needs to be fixed.

3          If you don't have any questions, I'll sit down.

4          THE COURT:  I do not have any questions at this

5     time.  Thank you.

6          MR. SARNOFF:  Thank you, Your Honor.

7          MR. GOLDMAN:  Your Honor, may I be heard on behalf

8     of --

9          THE COURT:  Did you file a response?

10         MR. GOLDMAN:  We did not.

11         THE COURT:  Okay.  I'm going to take the people

12    that filed responses first.  Okay?

13         MR. GOLDMAN:  Sure.

14         MR. PETROCELLI:  May I be heard next, Your Honor?

15         THE COURT:  Yes.  Go right ahead.

16         MR. PETROCELLI:  Good afternoon.  Again, for the

17    record, Patrick Petrocelli on behalf of the Sherry-

18    Netherland.  I'll be very brief.

19         The settlement agreement was signed over a year

20    ago.  The apartment, as far as we're aware, is no closer to

21    being sold than when the settlement was agreed -- was

22    originally entered into.  The Sherry-Netherland is the only

23    direct creditor of Genever, the titled owner of the

24    apartment at issue, who has filed papers in support or in

25    opposition to this application.

1              Certainly the trustee believes that something in

2     the process needs to be fixed or changed, whether you want

3     to call it hindered, whether you want to say it's broken,

4     something needs to be changed or else the trustee would not

5     have filed the application.

6              I heard reference before to we don't have a veto

7     right, we have a consent right.  If someone has the right to

8     consent to something and they withhold their consent, that

9     is by definition a veto.

10             And the Sherry-Netherland does believe that when

11    you have a sales officer, you have a real estate broker, you

12    have a trustee, you have Bravo Luck and PAX, that's five

13    people who are making decisions, who are being listened to

14    in terms of any decision that is going to be made, we,

15    therefore, really have nobody who's making decisions and we

16    do believe that that is a hindrance.

17             The Sherry-Netherland, as a secured creditor, as

18    the trustee noted, the security deposit, which is a finite

19    source of funds, is being used to cover certain post-

20    petition claims of the Sherry-Netherland on a month-by-month

21    basis.  You know, if the sales process continues to drag out

22    and that fund is exhausted, there is going to be an open

23    question as to what then needs to happen in terms of being

24    able to cover the maintenance costs.

25             And so we support the trustee in his application

1    today.

2            You know, whatever bargained-for rights were

3    contained in the settlement agreement, those bargained-for

4    rights had an expiration date and that expiration date has

5    since passed.

6            And so we think that given where we are today and

7    the circumstances that are here, again, the Sherry-

8    Netherland as the only direct creditor of Genever, the

9    titled owner of the apartment, we support the application

10   that the sales process should continue and that the best way

11   to achieve a value maximizing sale of the apartment under

12   current marketing conditions is for that sale process to

13   continue without whatever consent or consultation rights

14   were previously in place.

15           Unless the Court has any questions, we'll --

16           THE COURT:  I don't have at the moment.  Thank

17   you.

18           MR. PETROCELLI:  Thank you very much.

19           THE COURT:  Counsel for Bravo Luck?

20           MR. LAWALL:  Thank you, Your Honor.  And good

21   afternoon.  First of all, I am Fran Lawall on behalf of

22   Troutman Pepper and on behalf of Bravo Luck.  And thank yo

23   for executing our pro hac vice motion, Your Honor.  This is

24   the first time I've been able to be before Your Honor.

25           THE COURT:  You're welcome.

1      MR. LAWALL:  Your Honor, I have a copy of the

2   settlement agreement which might be informative.  I don't

3   know if Your Honor has a copy in front of you or whether

4   you'd like to have a copy.

5      THE COURT:  I do.  I mean, if I'm looking at the

6   right thing, I do have a copy of the settlement agreement,

7   which I believe is the right thing.

8      MR. LAWALL:  Great.

9      THE COURT:  Let me just -- let me just make sure

10  though.  And we could always pull it up so everyone can see

11  it at the same time, but I think it's attached to the

12  trustee's motion as Exhibit C or B.  Here it is.  The

13  settlement -- second, amended and restated settlement

14  agreement, is that what you're looking at, Counsel?

15     MR. LAWALL:  That is correct, Your Honor.

16     THE COURT:  Okay.  Then I'm on the same page with

17  you.

18     MR. LAWALL:  Thank you, Your Honor.  And, Your

19  Honor, just a couple of things up front.

20     And I'm not going to make a big deal of this, but

21  suggestions by the trustee that Bravo Luck is doing Mr.

22  Kwok's bidding is simply not the case.  There is litigation

23  that's pending.  There are three complaints against my

24  client.  A couple of things just from the top.

25     It's undisputed that a Bravo Luck account funded

1   the purchase of the Sherry, so the suggestion that the

2   Sherry is the only creditor of Genever New York, which is

3   how I refer to it, which is the direct owner of the Sherry,

4   that's not correct, in effect, because PAX is not a direct

5   creditor at this point of Genever.

6          Bravo Luck is actually the largest creditor if it

7   turns out that it's not the owner of the property under the

8   trust agreement.  And we've recognized from the beginning

9   that there was an issue with respect to this trust

10  agreement.

11         In fact, Your Honor, the entire settlement

12  agreement was negotiated in New York as a pathway to provide

13  a sensible way of resolving those issues while at the same

14  time allowing the sale of the Sherry.

15         And, by the way, something that I think the Sherry

16  has not taken into account was that there was a major

17  concession with respect to that deposit that was not funded

18  by the debtor, which was allowed through lift-stay to pay

19  the maintenance fee throughout the course of this settlement

20  agreement.

21         So, in effect, it's not simply that this

22  settlement agreement resolved either a trustee motion or

23  lift-stay motion, it resolved a myriad of issues including

24  it provided a pathway for the sale of this property and the

25  funding of an escrow once those monies -- once it was

1    liquidated so that the dispute with respect to ownership

2    could be resolved.

3            This negotiation went on for several months,

4    several hearings in front of Judge Garrity, substantial

5    participation by the United States Trustee, so this was not

6    simply a document that was thrown together.

7            And I agree with Mr. Sarnoff and I'm hoping this

8    action creates a bridge at some point for some kind of a

9    resolution in this case that this has worked all the way

10   through.  In fact, participation has been by all the

11   parties, giving suggestions to the sales officer with

12   respect to how to proceed.

13           And, in fact, there hasn't been any major

14   disputes.  There have been sharing of information to try and

15   get to the endpoint, which we all agree on is the highest

16   and best price.

17           Now, a couple of important things with respect to

18   the settlement agreement.

19           There's been a suggestion that there is a veto

20   right.  There's anything but that.  It is a consultation

21   right.  And, in fact, in several places within the

22   settlement agreement it makes clear that the sales officer

23   has the final say.  And if there is a dispute at all, it

24   comes before Your Honor.  Neither PAX nor us, Bravo, has a

25   veto right here.  It is simply a consultation right to weigh

1    in.

2              And, in fact, that's the way Chapter 11 is

3    supposed to work.  You're supposed to bring the major

4    parties in, try and reach an agreement, and then file your

5    papers.  And that's all this was intended to do.

6              Had the Genever case proceeded and the Connecticut

7    cases not been filed, what would have happened is this

8    property would have been sold and there would have been

9    litigation, which the settlement agreement provides, for an

10   ultimate determination with respect to the trust agreement.

11   We recognize there's an issue.  We're not trying to hide it.

12   We're prepared to litigate it.  We have three complaints

13   against us right now which we're prepared -- to which we'll

14   respond.

15             And I pledge to Your Honor we are going to do this

16   in an orderly fashion with as little fanfare as possible.

17   We're going to do it by the numbers.  We'll develop the

18   facts.  We'll try the case if it becomes necessary.  We've

19   been fine with that from the very beginning.

20             And we knew that this was an issue, allegations

21   that the settlement agreement -- the trust agreement was

22   hidden or what have you, we'll deal with that.  I don't

23   believe that's the case, but we'll deal with that.

24             And, again, we're looking at the four corners of a

25   settlement agreement which was done by final order of Judge

1    Garrity more than a year ago that provides for a

2    comprehensive resolution with respect to the disposition of

3    this property in an orderly fashion.  And there are no veto

4    rights.

5              One of the things that we raised with respect to

6    the trustee's motion is there seems to be an awful lot of

7    inconsistency.  And if I may, Your Honor, I'm going to start

8    with the relief requested in the original motion.

9              In paragraph 24 --

10             THE COURT:  Let me catch up with you though.

11             MR. LAWALL:  Sure, Your Honor.

12             THE COURT:  I'd like to follow you.  So let me

13   pull the motion up.

14        (Pause.)

15             THE COURT:  So paragraph 24, did you say?  I'm not

16   quite there yet.

17             MR. LAWALL:  Sure, Your Honor.  Whenever --

18             THE COURT:  Paragraph 24, but I'm in the document.

19   Is that the document?  Is that the paragraph you just noted?

20             MR. LAWALL:  That is correct, Your Honor.

21             And specifically I'm looking at the third line in

22   the middle of the sentence where it says in accordance with

23   the terms of the settlement agreement except that -- well,

24   let me go back.

25             It says movant's requests for authorizations to

1    continue the now-expired sale process of the Sherry-

2    Netherland under the auspices of the sale officer -- I'm

3    skipping some words -- through February 1, 2023 in

4    accordance with the terms of the settlement agreement.

5            So the initial motion was we want to -- we want to

6    continue the settlement agreement in place, but we want to

7    make this change.

8            And then when you go to paragraph 27 of the same

9    motion it further says while the sale and marketing process

10   will continue to be conducted by the sales officer and

11   Sotheby's in accordance with the terms of the settlement

12   agreement, movants propose that the order extending the sale

13   marketing process not continue any of PAX's and Bravo Luck's

14   consultation and consent rights.

15           So my point on this right now, Your Honor, is that

16   what the trustee was trying to do was to amend the

17   settlement agreement, but yet stay within the four corners

18   of all the other terms and conditions and benefits of it,

19   which is why in our response we said this is, in effect, a

20   Rule 60 motion.

21           Then, Your Honor, when you go to their omnibus

22   opposition --

23           THE COURT:  Okay.  Let me get there too please so

24   I can follow you.  What's the document number on the top of

25   that document you're looking at right now?

1          MR. LAWALL:  Yes, Your Honor.  It's document 1359.

2          THE COURT:  Okay.  If you give me one second,

3     please.

4          (Pause.)

5          THE COURT:  All right.  And where in this document

6     would you like me to focus on?

7          MR. LAWALL:  Yes, Your Honor.  Page 3.  Paragraph

8     3, page 3, it's the last sentence at the end of paragraph 3.

9          THE COURT:  Okay.

10          MR. LAWALL:  It says instead movant seeks

11     authorization to continue to attempt to sell the Sherry-

12     Netherland apartment outside the ambit of the settlement

13     agreement.

14          So on the one hand the initial motion is we want

15     to stay within the terms of the settlement agreement.  Then

16     the omnibus motion says, no, actually we want

17     (indiscernible) outside the terms of the settlement

18     agreement.  I assume that was somehow to try and escape the

19     Rule 60 issue.

20          Put that aside, Your Honor, from our perspective,

21     what we want is clarification.

22          If the trustee's going to blow up the settlement

23     agreement, well, then so be it, but that will have

24     consequences which may not be good for the estate.  And we

25     are prepared to honor the settlement agreement, move forward

1    with the sale, put forth our consultation rights, and be

2    cooperative and constructive in connection with the sale,

3    and then we'll litigate with respect to the issue of the

4    ultimate ownership.

5            And if, in fact, it is determined that we somehow

6    don't own this property under the trust agreement, there is

7    still a 65 to $70 million of cash that was put into this

8    property for the acquisition.  One way or the other, both of

9    those issues are going to have to be resolved and we

10   recognize that.

11           But, from the top, Your Honor, again, it's still

12   unclear whether the trustee's trying to keep the settlement

13   agreement in place or whether he's trying to go outside the

14   settlement agreement and says it doesn't exist.

15           I will point out under the terms of the settlement

16   agreement itself the provision that deals with the sale of

17   the property, the extension, if I can just find this, it's

18   paragraph 4 of the settlement agreement, Your Honor.  And I

19   apologize for jumping back and forth --

20           THE COURT:  That's all right.  I've got it.  I

21   just have to get to paragraph 4.  Okay.  The marketing

22   terms, is that what you're saying, that paragraph?

23           MR. LAWALL:  Yes, Your Honor.

24           THE COURT:  Okay.

25           MR. LAWALL:  It says, and let me have the exact

1    words, I have it written down in my own left-handed chicken

2    scratch --

3            Your Honor, I'm sorry.  I have the wrong

4    paragraph.  I'm looking for the paragraph that deals with

5    duration.  And I may have --

6            THE COURT:  Hold on.  I might be able to find it.

7    Actually 4.E says, at the top of page 5, notwithstanding

8    anything contained herein to the contrary of the duration of

9    the sales process shall be limited to 180 days from the

10   retention of the broker.

11           Is that what you were looking for?

12           MR. LAWALL:  Yes.  Thank you, Your Honor.  I

13   appreciate that.

14           Your Honor, the one thing I'll just point out

15   there is the extension of the sales process.

16           You'll notice it's not a defined term.  It's a

17   capital -- it's a small S, small O.  This process, the sales

18   process, this entire settlement agreement, dealt with the

19   sale of this property.  Everybody had hoped that it would

20   sell within 180 days, but people understood that it could be

21   extended.  But it was extended within the four corners of

22   this settlement agreement, not some third-party sale

23   process.

24           I appreciate the fact that Mr. Despins is the

25   trustee of the Kwok Estate, but the Genever New York is

1    still a debtor in possession under the auspices of the

2    trustee indirectly through Genever BVI.  This was an

3    agreement that was reached with Genever New York after a

4    long period of time which was beneficial to the estate.

5    And, respectfully, we see no reason why it should be changed

6    at this point.

7             We're simply asking the trustee to allow the major

8    parties to continue to consult, to be part of the process,

9    to be productive, and move towards the sale of this

10   property.

11            If the trustee is going to move outside of this

12   sales and start a different sales process with respect to

13   Genever New York, then what we're suggesting is then that

14   may call into question whether this settlement agreement is

15   still valid or not or whether it has now been terminated as

16   a result of their actions.

17            I don't want to go there, Your Honor.  We'd rather

18   just continue the settlement agreement as is, as a prior

19   entered court order, and to move forward with this estate.

20   I'm sure we're going to have enough fights.  This is not one

21   we necessarily need to have.

22            That's all I have, Your Honor, unless you have any

23   questions.

24            THE COURT:  I don't at the moment.  Thank you.

25            MR. LAWALL:  Thank you, Your Honor.

1          THE COURT:  Mr. Goldman, you wanted to be heard?

2          MR. GOLDMAN:  Yes.  Thank you, Your Honor.  I'll

3     be brief.

4          I just wanted to express the committee's support

5     for the trustee's position in this case.

6          I'll take him up on his invitation to thank PAX

7     which I think is deserving of thanks.  They certainly served

8     as a protectorate so to speak of the interests of all

9     unsecured creditors, although it may have been unwittingly

10    and for their own interests.

11         But the bottom line is they really have no special

12    or priority interest in this asset, vis-a-vis other

13    unsecured creditors of the Kwok Estate.

14         They assert an alter-ego claim which is a claim

15    that is common to all creditors of Kwok's Estate and,

16    therefore, it's our position that that type of claim is held

17    by the trustee in accordance with controlling Second Circuit

18    authority, most recent of which was the *In re: Tronics* case

19    from the Second Circuit.

20         The case now is obviously in a completely

21    different posture than when this settlement agreement was

22    entered into and approved.

23         At that time, you had ostensibly Mr. Kwok who was

24    the indirect equity owner of Genever Holdings through his

25    100 percent interest in Genever BVI.

1        Since that agreement was entered into, Mr. Kwok

2    has filed a voluntary Chapter 11 case, a trustee has been

3    appointed.  The trustee now controls the corporate authority

4    that exists in both Genever Holdings and Genever BVI, which

5    in turn controls Genever Holdings, so the whole reason for

6    the procedures that were established in that case no longer

7    exist now that the trustee is serving as the protectorate

8    for the unsecured creditors.

9        And the agreement itself, although it may be a

10   technical reading, it does state that it's establishing

11   procedures for the sale of the property in the Chapter 11

12   case.  And the Chapter 11 case is defined as the case that

13   was pending in New York.  The case is now pending in

14   Connecticut under a completely different set of

15   circumstances.

16       So, with that, I'll just conclude, and again

17   express our support for the trustee's position.

18       THE COURT:  Okay.  Thank you.

19       Mr. Despins, do you have any response?

20       MR. DESPINS:  Yes, Your Honor.  Very briefly.

21       The first thing that needs to be corrected is this

22   concept that somehow the son paid for the apartment or some

23   of it.

24       The money all came from Hong Kong from Mr. Kwok.

25   It did go through a Bravo Luck account, but Mr. Kwok had

1     control with the son over the account.  He's the one who

2     authorized the transfer for the funds.

3             So this concept that somehow the son, who as far

4     as we know -- they don't like it when we say that -- but has

5     never had a let's put it this way a job that would support

6     paying $60 million for an apartment.  You know, that

7     concept, is just -- it's heresy.  But that's for another

8     day.

9             Now, as far as -- there's a fundamental issue

10    here.  The document says that they have approval rights over

11    a motion.  They're saying we just have consulting rights.

12            Frankly, I'm not that concerned about them having

13    consulting rights as long as they don't have approval

14    rights.  But the document says approval right and they skirt

15    that.  They don't even mention that.

16            But as the counsel for Sherry-Netherland said if

17    you have consent rights, you have a veto right.

18            So the estate cannot be in a position where anyone

19    can veto the sale and that's really the crux of the issue

20    here and we can't hide that through the reference to

21    consulting rights.

22            And both sides, you know -- and, again, I'm saying

23    this with all due respect to Mr. Sarnoff, but also Bravo

24    Luck -- you know, completely ignore that language,

25    notwithstanding anything contained herein.  Notwithstanding

1     anything contained herein that the duration of the sale

2     process shall be limited to 180 days unless everyone agrees

3     or the Court orders for cause shown.

4              And these conditions are not present.  They were

5     not present on November 1st when the prior extensions

6     expired and that's the state of play, that that agreement

7     ended.

8              And it's important to look at the extensions that

9     were agreed to, Your Honor.

10             For example, you've never extended it and that's

11    why we wanted to raise the issue before you actually put an

12    order in this case.

13             But there were extensions in the case when it was

14    before Judge Garrity before.

15             And I'm looking, for example, at the one where

16    there's an expiration date of October 31st, which is

17    document 222 in case 22-50592.  And in there it says whereas

18    the parties, that includes Bravo Luck and PAX, would like to

19    further continue the sales process of the residence, number

20    one.

21             Two, the debtor's -- I say two, there's no two

22    there, but, you know, comma, the debtor's employment of Ms.

23    Cyganowski as sales officer, and the retention of Sotheby's

24    as the debtor's broker to market and sell the residence.

25             So these are the three aspects that the parties

1    realized that needed to be continued otherwise they would

2    end by their terms.

3             And it clearly says order that pursuant to the

4    settlement agreement the sale process of the residence is

5    extended from September 12 through October 31st, 2022,

6    without prejudice to further extension upon the consent of

7    the parties.  That never happened.  So we can ignore that

8    provision.

9             But that provision said notwithstanding anything

10   contained herein the sale process shall end at that time.

11   So, therefore, there's no breach or termination of that

12   agreement.  It's by it's own terms it terminated.

13            And the question is should we continue the same

14   consent rights that they have?

15            We believe that's imprudent because we don't want

16   to be in a position where somebody can veto that.

17            So that's why we moved for that relief and we're

18   asking the Court to enter the order.  Thank you.

19            THE COURT:  Thank you.

20            MR. SARNOFF:  May I just be very, very briefly

21   heard, Your Honor?

22            THE COURT:  Yes.

23            MR. SARNOFF:  Stuart Sarnoff, O'Melveny & Myers on

24   behalf of PAX.

25            I do find myself slightly in the unusual position

1    of arguing a contrary position to the trustee and that will

2    happen sometimes.

3            I would just point Your Honor to paragraph 6 of

4    the settlement agreement, approval powers.

5            The sales officer shall have the final approval

6    power after consultation with the debtor Bravo Luck and PAX

7    and subject to the Court, bankruptcy court approval with

8    right to object by Bravo Luck and PAX regarding -- and then

9    it goes on -- the marketing and sale of the residence

10   including.

11           I don't know why we're tripped up over

12   consultation versus veto.

13           I think Mr. Lawall and I have represented that we

14   don't believe we have veto power or rights.

15           I think paragraph 6 of the agreement, and I

16   understand there's a question about whether it continues or

17   this is a new agreement, but I think we could agree that we

18   don't have veto power and I think that's what paragraph 6

19   says.

20           We have the right to be consulted and informed,

21   express our views, and then the sales officer shall have the

22   final authority with bankruptcy approval to reach its

23   decision.

24           So, I mean, if the Court wants to make it clear in

25   an order that we're to be consulted, but we don't have veto

1    power, I think we would -- I can't speak for Mr. Lawall -- I

2    think PAX would consent to that.  But I think it's

3    consistent with what PAX and Mr. Lawall on behalf of Bravo

4    Luck always thought we did have and didn't have.

5           So I just -- I don't want us -- and I know that

6    the Sherry-Netherland lawyer stood up and said there must

7    have been something wrong with it, or Mr. Despins, I don't

8    think that's true.  I don't think Mr. Despins has said one

9    sentence in support of a notion that we've been obstructive

10   or we've hindered this.

11          And I just don't see any reason to deprive us of a

12   right which we bargained for when it is not veto power.  It

13   is consult.  It is consultation power.

14          That's all I had.  Thank you.

15          THE COURT:  Thank you.

16          MR. PETROCELLI:  Very briefly, Your Honor?

17          THE COURT:  Certainly.

18          MR. PETROCELLI:  Just two things quickly.

19          I want to -- I could have misheard, but I thought

20   I heard counsel for Bravo Luck suggest that the Sherry-

21   Netherland's ability to use the security deposit for post-

22   petition maintenance was somehow tethered to the settlement

23   agreement or the terms in the sale process or anything of

24   that nature.  That's incorrect.

25          The consent order allowing the Sherry-Netherland

1    to use the security deposit speaks for itself.  It's at case

2    22-50592, docket no. 107.

3              And, you know, to the extent any compromise or

4    anything is hammered out here today, the Sherry-Netherland

5    would just ask that it be crystal clear that you're talking

6    about consent, I'm sorry, consultation only, because I think

7    there is hangup there about certain instances in the

8    agreement refers to consent.

9              And, again, consent and veto, I don't what the

10   difference is between those two (indiscernible).

11             THE COURT:  When you say the agreement, do you

12   mean ECF 107 that you just spoke about?

13             MR. PETROCELLI:  I'm sorry.  I switched back to

14   the settlement agreement for that point.

15             THE COURT:  Okay.  Okay.

16             MR. PETROCELLI:  There has been some suggestion

17   here that, you know, and I take counsel for PAX at his word,

18   that they don't believe that they have a veto right.

19             You know, I would like to hear him say they don't

20   believe they have a consent right either.  Because, again, I

21   don't see a distinction between those two.

22             And, otherwise, again, the Sherry-Netherland as a

23   secured creditor of the titled owner of the apartment is

24   interested in an expeditious, volume maximizing sale of this

25   apartment, you know, given the market conditions, and we

1    support that application.  Thank you.

2                THE COURT:  Thank you.

3                Counsel?

4                MR. LAWALL:  Your Honor, may I be heard briefly?

5                THE COURT:  Yes.

6                MR. LAWALL:  The settlement agreement itself does

7    specifically address in paragraph 7.E the deposit.  It says

8    stay relief is confirmed to allow the Sherry-Netherland to

9    apply all accrued and owing post-petition maintenance fees

10   and assessments.

11               So I think what was said earlier is incorrect to a

12   point, that the use of that deposit was part and parcel of

13   this overall agreement.  In fact, to the point where the

14   parties felt it necessary to put that in there.

15               Your Honor, there are also other provisions in

16   this settlement agreement which further confirm the veto

17   rights that Mr. Sarnoff had pointed out.

18               One, for example, Your Honor, discusses the fact

19   that the trustee -- the sales officer under the operating

20   agreement -- and that's a document that's not before Your

21   Honor -- as part of what happened here, there was an

22   operating agreement that was put in place and it confirmed

23   that the sales officer has all of the authority under the

24   operating agreement -- and the operating agreement

25   (indiscernible) the sales officer the ability to run this

1    whole process.

2              And, again, I think, Your Honor, you can get the

3    flavor of this.

4              We all agreed that there was going to be an

5    independent sales officer, a well-recognized, reputable

6    lawyer, who was going to run this.  And in the event there

7    was a dispute, she ultimately had the final say subject to

8    now Your Honor's final approval.  And that's how the process

9    was going to work.  It was nothing fancier than that.

10             Thank you, Your Honor.

11             THE COURT:  Thank you.

12             MR. DESPINS:  Your Honor, if I may?  I apologize,

13   Your Honor.  Just one minute.

14         (Pause.)

15             MR. DESPINS:  Your Honor, I'm happy for them to

16   have consulting rights as long as they agree they don't have

17   a veto right.

18             It's not like this issue just came up today.  I

19   raised it and I said I cannot live with the consent

20   provision that allows you to consent.

21             I didn't raise it with Mr. Lawall, but I raised it

22   with PAX.

23             I cannot live with the provision that says you

24   have consent right over the motion.

25             If that -- if they're saying we don't have that

1   consent right, and if Bravo Luck agrees they don't have the

2   consent right, that's the end of it.  They can have -- they

3   can continue to have the same consulting rights.

4            So I'm not trying to pick a fight here, but we

5   can't -- the point here is we cannot give -- continue to

6   give people consent rights which in our mind means veto

7   right.

8            If they're willing to confirm on the record that

9   they don't have that right, then I think that's the end of

10   the process.

11           THE COURT:  Well, do you want to take a recess and

12   go chat?

13           MR. DESPINS:  Sure.  Sure, Your Honor.

14           THE COURT:  Because it sounds -- I thought I heard

15   Mr. Sarnoff say he thinks PAX would consent to that,

16   although I may have misheard.

17           Attorney Sarnoff?

18           MR. SARNOFF:  Your Honor, that is my understanding

19   and belief.

20           But if Your Honor would allow me the opportunity

21   just to confirm --

22           THE COURT:  Yes.  That's why I think we need to --

23   either we can take a recess right now or we can continue

24   with the matters at 2 o'clock and we can discuss it later.

25   You know.  Whatever, however, the parties want to proceed.

1          MR. SARNOFF:  Your Honor --

2          THE COURT:  We have other matters on at 2 o'clock

3     though.

4          MR. SARNOFF:  Your Honor, my only time

5     consideration with respect to this is the 13-hour time

6     difference that I have in trying to reach my client who is

7     13 hours ahead.

8          Would it be something that we could consult and

9     get back to you tomorrow and --

10          THE COURT:  Yes.  Yes.

11          MR. SARNOFF:  -- and give you an answer on?  At

12     least on behalf of PAX.  I can't speak obviously for Bravo

13     Luck.

14          THE COURT:  I think that's fine.

15          Is that fine with you, Counsel?

16          MR. LAWALL:  It is, Your Honor.  I can't imagine

17     this is going to be an issue.

18          THE COURT:  Okay.  So I think that makes a lot of

19     sense.  Let's see what happens.

20          You may not know, Counsel, but the way we

21     communicate -- Attorney Shaiken would know -- is when and if

22     you all agree, or don't agree, a communication comes through

23     the courtroom deputy email box in Bridgeport.  It's a

24     generic email box.

25          But everybody's got to be on the same email.  So

1    whoever sends it, doesn't matter, but they have to make sure

2    they CC everybody else.  Otherwise the Court won't take it

3    into account.  Because I need to know that everybody is on

4    the same communication.

5            MR. LAWALL:  Thank you, Your Honor.  And I

6    appreciate you letting me know that.

7            THE COURT:  Okay.  Thank you.

8            MR. DESPINS:  Your Honor, does that mean that this

9    motion is adjourned until Thursday?

10           THE COURT:  Well, maybe not Thursday.  Maybe

11   tomorrow if you're all in agreement.  I mean, maybe it

12   doesn't have to be --

13           MR. DESPINS:  Well, short of an agreement.

14           THE COURT:  What I can do is I can say that the

15   hearing -- you know, I can continue the hearing until

16   tomorrow or Thursday.  But if you're all in agreement on

17   what an order would say, then we don't have a controversy.

18           MR. DESPINS:  I meant short of an agreement that

19   it would be adjourned until Thursday?

20           THE COURT:  That's fine.  We can do that.  Because

21   we have other matters scheduled for Thursday.

22           Counsel for the Sherry-Netherland, I would ask you

23   one thing.

24           At some point, even if this is an agreed issue,

25   ultimately if you all have an agreement, the Court is going

1    to need to be aware at some point what the amount of the

2    security deposit is that you still have, if any, and what's

3    being paid on a monthly basis just so the Court is aware.

4    Right?

5            At some point, hopefully, there'll be a sale of

6    this property and I would want to know in advance of that

7    sale is this a situation where the security deposit was

8    exhausted four months ago or is it going to be exhausted in

9    four months?  You know, that kind of -- I would want to know

10   that.

11           MR. PETROCELLI:  Understood, Your Honor.  And we

12   can certainly provide that specific information.

13           My rough understanding is that the security

14   deposit was initially in the neighborhood of $3 million.

15   And it's something lower than that, but it has not been

16   exhausted.

17           THE COURT:  Okay.

18           MR. PETROCELLI:  It has not been exhausted yet.

19           THE COURT:  All right.  Well, that's hopeful to

20   know.  Thank you.

21           MR. PETROCELLI:  Thank you, Your Honor.

22           THE COURT:  All right.  So then what we'll --

23           Oh, Attorney Shaiken?

24           MR. SHAIKEN:  What time Thursday?

25           THE COURT:  Well, I was just about to get there.

1    Because we have some other things on Thursday.  But I'm

2    hoping that we actually won't see any of you on Thursday on

3    this issue because you're all going to resolve it it sounds

4    like.  So give me one moment, please.

5         (Pause.)

6              THE COURT:  We're scheduled at noon on Thursday.

7    So we can continue this matter to noon on Thursday with the

8    understanding that it's highly likely there will be no

9    continued hearing because there will be an agreed-upon

10   order.  Okay?

11             Does that -- does anyone have any questions?

12        (No response.)

13             MR. SHAIKEN:  Thank you, Your Honor.

14             THE COURT:  Okay.  Great.  Thank you all then.

15             This matter is continued until the 26th at noon.

16             And there are other matters on at noon, so it

17   doesn't mean that we'll get heard right away.  But actually

18   I'm convinced that there won't be anything to hear because

19   there will be a consensual order before that date.  All

20   right?

21             So that concludes the matter at 1 p.m.

22             Now we have matters at 2 p.m.  And it happens to

23   be 1:58 p.m.  So we can proceed with the 2 o'clock matters

24   as far as the Court is concerned.

25             MR. DESPINS:  Actually, Your Honor, there was a

1    housekeeping matter I've been asked to raise with Your Honor

2    by friends of the Zeisler firm, which is that we -- they

3    submitted last week, that's docket no. 1340, a consent order

4    regarding the Lady May expense reserve.  They're using --

5              THE COURT:  Yeah.  We didn't get to it yet, but I

6    know it's there.

7              MR. DESPINS:  They've asked me to remind you and

8    that's all I'm doing.  Thank you, Your Honor.

9              THE COURT:  Thank you.

10             All right.  So the first matter on the calendar

11   today at 2 o'clock is an application to employ Paul Hastings

12   as counsel to the debtor.

13             Trustee Despins, do you want to proceed or is

14   someone else proceeding on your behalf?

15             MR. DESPINS:  I was going to handle that because

16   there's no objection.  That's what I do best.

17             THE COURT:  Go right ahead.

18             MR. DESPINS:  So, Your Honor, we filed this at

19   docket 1293.  Our understanding is that no objections have

20   been filed, so we would ask that the order be entered.

21             THE COURT:  I'm looking.  I just want to look at

22   the proposed order again.

23             Attorney Claiborn, did you wish to be heard on

24   this matter?

25             MS. CLAIBORN:  Thank you, Your Honor.  Holley

1    Claiborn for the U.S. Trustee.

2              I just wanted to report that the U.S. Trustee has

3    no objection.

4              THE COURT:  And have you reviewed the proposed

5    order, Attorney Claiborn?

6              MS. CLAIBORN:  Yes.

7              THE COURT:  Okay.  Thank you.

8              You know, I -- it's not really at all important,

9    but in the proposed orders that have been submitted in this

10   case they often include the standing order of reference from

11   the United States District Court for the District of

12   Connecticut and then have in parentheses as amended, but

13   it's not amended.  It's never been amended.  So I just --

14   I'm probably going to delete that so it doesn't confuse

15   someone.

16             There's only -- as of September of 1984, there's

17   only one order of reference from the United States District

18   Court for the District of Connecticut.  Now, that doesn't

19   mean they couldn't amend it sometime in the future, but they

20   haven't amended it.

21             So on the proposed order, the proposed order

22   doesn't have page numbers at the bottom of it, which is

23   fine, but -- oh, maybe it does on page 2.  I'm sorry, it

24   does on page 2.

25             So on page 2 at the -- I'm talking to the

1    courtroom deputy -- at the top of page 2, third line, in the

2    top of page 2, third line, there's a standing order of

3    reference from the United States District Court for the

4    District of Connecticut, onto line 4, do you see that?

5                THE COURTROOM DEPUTY:  I do not.  Maybe I'm

6    looking at the incorrect order.  Sorry.

7                THE COURT:  It's the order, proposed order for

8    1293.

9                THE COURTROOM DEPUTY:  Oh, I am.  That's what it

10   is.  I apologize.

11               THE COURT:  That's okay.  Well, we don't have to

12   discuss it now.  We can do it later.

13               THE COURTROOM DEPUTY:  Okay.

14               THE COURT:  We're just going to delete that word.

15               THE COURTROOM DEPUTY:  Okay.

16               THE COURT:  It's not really that important as I

17   said when I started talking.

18               I think most other jurisdictions, or a lot of

19   other jurisdictions, have revised that reference order, but

20   Connecticut has not.

21               I have no problem with any other -- or no concerns

22   or questions with regard to any other terms and conditions

23   of the order.

24               So no one has filed a written objection to the

25   motion.  There's no one participating in this hearing today

1    that is objecting to the motion.  The United States

2    Trustee's Office supports the motion.

3             And for all those reasons, the motion -- oh, I'm

4    looking at the wrong document right at the moment.  Sorry.

5    Give me one second.

6             The application to employ Paul Hastings is granted

7    and the proposed order can enter.

8             MR. DESPINS:  Thank you, Your Honor.

9             THE COURT:  There was another matter on the

10   calendar today, a motion to quash a third-party subpoena.

11            That has been withdrawn by Ivey, Barnum & O'Mara.

12            UNIDENTIFIED:  Correct, Your Honor.  The issue has

13   been resolved.

14            THE COURT:  So we don't need to address that.

15   That's moot.

16        (Pause.)

17            THE COURT:  Then the final motion is really, it's

18   in three separate proceedings, but it's a motion to

19   consolidate all three of the adversary proceedings into one

20   adversary proceeding.

21            MR. DESPINS:  That's correct, Your Honor.

22            THE COURT:  Who's going to proceed with that

23   motion?

24            THE COURTROOM DEPUTY:  Judge, could I just call

25   the case?

1          THE COURT:  Oh, yes.  Go right ahead.  I'm sorry.

2          Let her -- my apologies.

3          She just needs to call the adversary proceeding

4     numbers.  Although this recording's going to be --

5          THE COURTROOM DEPUTY:  Right.  But we still need

6     it.

7          THE COURT:  Yeah.

8        (Proceedings concluded at 2:03 p.m.)

9      I, CHRISTINE FIORE, Certified Electronic Court Reporter

10    and Transcriber, certify that the foregoing is a correct

11    transcript from the official electronic sound recording of

12    the proceedings in the above-entitled matter.

13

14    *Christine Fiore*

15    _____      January 31, 2023

16       Christine Fiore, CERT

17

18

19

20

21

22

23

24

25