B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|

**PARTY** (Check One Box Only)
☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor        ☐ Other
☐ Trustee

**PARTY** (Check One Box Only)
☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor        ☐ Other
☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR | BANKRUPTCY CASE NO. | |
| DISTRICT IN WHICH CASE IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Patrick R. Linsey | | |
| DATE | PRINT NAME OF ATTORNEY (OR PLAINTIFF) | |

## INSTRUCTIONS

      The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

      A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

      The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

-------------------------------------------------------x
:
In re:                                                                  :        Chapter 11
:
HO WAN KWOK, *et al.*,[1]                                   :        Case No. 22-50073 (JAM)
:
                Debtors.            :        (Jointly Administered)
:
-------------------------------------------------------x
:
GENEVER HOLDINGS LLC and                      :
LUC A. DESPINS, CHAPTER 11                      :
TRUSTEE,                                                           :        Adv. Proceeding No. [_____]
:
                Plaintiffs,         :
v.                                                                          :
:        February 15, 2023
HO WAN KWOK, HING CHI NGOK,            :
QIANG GUO, AND MEI GUO                        :
:
                Defendants.       :
:
-------------------------------------------------------x

**COMPLAINT OF GENEVER HOLDINGS LLC AND LUC A. DESPINS AS CHAPTER**
**11 TRUSTEE FOR ESTATE OF HO WAN KWOK FOR DECLARATORY RELIEF**
**AGAINST DEBTOR AND IMMEDIATE FAMILY MEMBERS WITH RESPECT TO**
**USE OF SHERRY NETHERLAND APARTMENT**

Genever Holdings LLC ("Genever (US)"), debtor in the above-captioned jointly

administered cases (collectively, the "Chapter 11 Cases"), and Luc A. Despins (the "Trustee"

together with the Genever (US), the "Plaintiffs"), in his capacity as trustee for the estate of Ho

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation.  The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

Wan Kwok ("Debtor"), individual debtor in the Chapter 11 Cases, by and through their

respective undersigned counsel, bring this adversary complaint (the "Complaint") against

defendants (i) the Debtor, (ii) Hing Chi Ngok, whom the Debtor has described as his spouse, (iii)

Qiang Guo, the Debtor's son, and (iv) Mei Guo, the Debtor's daughter.

## **NATURE OF ACTION**[2]

1.      The Debtor presently resides in Greenwich, Connecticut (the "Greenwich

Property").[3]  In addition, the Debtor has access to Apartment 1801, Apartment MR 2219, and

Apartment MR 719 (collectively, the "Apartment") in the building located at 781 Fifth Avenue,

New York, New York 10022, but he does not (and cannot) claim any possessory interest in the

Apartment.[4]  Rather, the Debtor is permitted to use the Apartment, rent-free, pursuant to an

agreement between Genever (US) (*i.e.*, the owner of the common stock allocated to the

Apartment and the lessee under the proprietary leases with respect to the Apartment) and The

Sherry-Netherland, Inc. (the "Sherry-Netherland") (*i.e.*, the lessor under the proprietary lease

with respect to the Apartment).  Indeed, this arrangement is fully consistent with the Debtor's

history of living a luxurious lifestyle and purporting to use the assets of others while he claims to

have no assets of his own.  Genever (US) believes that the Debtor's continued use of the

Apartment without the payment of rent or maintenance fees is incompatible with the interests of

---

[2]    Capitalized terms not defined in the Nature of the Action section shall have the meanings ascribed to them elsewhere in this Adversary Proceeding Complaint.

[3]    *See, e.g.*, *Declaration of Mr. Ho Wan Kwok in Support of the Chapter 11 Case and Certain Motions* [Docket No. 107 in Case No. 22-50073 (JAM)] ¶ 6 ("I currently reside in Greenwich, Connecticut."); March 21, 2022 Transcript of Section 341 Meeting at 27:11-13 (Q: "Mr. Kwok, do you still live at the Taconic Road property in Greenwich?" A: "Yes.").  A copy of the March 21, 2022 transcript is attached hereto as **Exhibit 5**.

[4]    The *Global Notes and Statements of Limitations, Methodology, and Disclaimers Regarding the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs* [Docket No. 77 in Case No. 22-50073(JAM)] (the "Global Notes") note that the Debtor has "access" to the Apartment.  *See* Global Notes at 4. This should be contrasted with the Debtor's statement in the Global Notes that he has "use and occupancy" of the residence in Greenwich, Connecticut.  *Id.*

Genever (US)'s estate and should end.  Accordingly, subject to entry of the order granting the relief sought by this Complaint, Genever (US) will enter into an amendment with the Sherry-Netherland to terminate the Debtor's ability to use the Apartment.

2.       Several years before the commencement of the Chapter 11 Cases, Genever (US) purchased from the prior owners the shares of common stock allocated to the Apartment and entered into the related proprietary leases, dated March 6, 2015, with the Sherry-Netherland with respect to Apartment 1801 (the "1801 Lease"),[5] Apartment MR 2219 (the "MR 2219 Lease"),[6] and Apartment MR 719 (the "MR 719 Lease,"[7] and, together with the 1801 Lease and MR 2219 Lease, the "Leases").  The purchase price for the common stock allocated to the Apartment was approximately $70 million ($2.5 million of which was allocable to furnishings).  Genever (US) and the Sherry-Netherland also executed the Agreement & Consent with Respect to Shares and Proprietary Lease, dated March 6, 2015 (the "Agreement & Consent").[8]  Pursuant to paragraph 9 of the Agreement & Consent (the "Use Provision") they permitted the Debtor and members of his immediate family (the Debtor, together with Hing Chi Ngok, Mei Guo, and Qiang Guo, the "Kwok Family"), none of whom are parties to the Leases,[9] to use the Apartment without making monthly payments for rent or maintenance expenses.  Based on the statements made by the Defendants, none of them have established a residence at the Apartment (although the Debtor accesses the Apartment from time to time).

---

[5]     A copy of the 1801 Lease is attached hereto as **Exhibit 1**.

[6]     A copy of the MR 2219 Lease is attached hereto as **Exhibit 2**.

[7]     A copy of the MR 719 Lease is attached hereto as **Exhibit 3**.

[8]     A copy of the Agreement & Consent is attached hereto as **Exhibit 4**.

[9]     None of the Debtor's family members are party to the Agreement & Consent.  And while the Debtor is a party to the Agreement & Consent, he is **not** party to the agreement between the Sherry-Netherland and Genever (US) in the Use Provision.

3.      Genever (US)'s interest in the Apartment became property of the estate upon the filing of Genever (US)'s chapter 11 case.  As debtor-in-possession, Genever (US) is obligated to maximize the value of the estate, including as it relates to the Apartment, and continuing to permit the Kwok Family to use the Apartment without paying rent and maintenance fees is inconsistent with that obligation.  Moreover, Genever (US) is currently in the process of marketing the Apartment for sale, although no actionable offers have yet been received for the Apartment, and has, by separate motion, sought Court authorization to expand its efforts by marketing the Apartment for rent as well, subject to any approval rights the Sherry-Netherland may hold.  It should be obvious that in order to maximize the prospects of identifying a party willing to buy or rent the Apartment, it is critical that Genever (US) can promise that it has the ability to deliver immediate possession of the Apartment free of the Debtor's potential interference.

4.      Upon the Court granting the relief sought in the Complaint, Genever (US) and the Sherry-Netherland will enter into an amendment (the "Amendment")[10] to revoke the Kwok Family's permissive use of the Apartment and allow Genever (US) to use the Apartment in a manner that is consistent with the best interest of its estate, including possibly renting the Apartment to a third party to the extent it does not sell (subject, of course, to the Sherry-Netherland's approval rights under the Leases).  Such Amendment is permitted under the Agreement & Consent and is consistent with New York state law.  To be clear, the Amendment will only terminate the Kwok Family's ability to use the Apartment—it will not modify any rights and/or obligations of Genever (US) or the Sherry-Netherland under the Leases, the

---

[10]    A copy of the proposed form of Amendment is attached hereto as **Exhibit 6**.

Agreement & Consent, and/or other governing corporate agreements, nor will it modify the Debtor's personal guaranty of Genever (US)'s obligations to the Sherry-Netherland.

5.       Although the Kwok Family is currently permitted to use the Apartment pursuant to the Agreement & Consent, the Kwok Family does not have a possessory interest in the Apartment under New York state law.  At most, their ability to use the Apartment under the Agreement & Consent is akin to that of a licensee, and, under New York law, a licensee has no possessory rights.  As such, upon entry into the proposed Amendment, the Kwok Family's ability to use the Apartment will terminate and they would be deemed a trespasser if they attempt to continue to use the Apartment.  Finally, even if the Debtor did have a possessory interest in the Apartment (he does not), because such interest arose prepetition it is property of the Debtor's estate subject to the control of the Trustee.  Accordingly, the Trustee is able to utilize the possessory interest pursuant to section 363(b) of the Bankruptcy Code.  For the avoidance of doubt, the Trustee consents to Genever (US) and the Sherry-Netherland entering into the Amendment.

6.       For all these reasons (and as further detailed below), Plaintiffs seek declaratory judgments finding that: (i) the Leases and the Agreement & Consent do not provide the Kwok Family with any possessory right in the Apartment; (ii) the proposed Amendment to the Agreement & Consent to modify the Use Provision so as to terminate the Kwok Family's permissive use of the Apartment does not violate New York state law and is consistent with 28 U.S.C. § 959(b); and (iii) Genever (US)'s entry into the Amendment is authorized pursuant to

section 363(b) of Title 11 of the United States Code (the "Bankruptcy Code") and the Sherry-Netherland is directed to enter into the Amendment.[11]

## JURISIDICTION AND VENUE

7.      The United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court" or the "Court") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334.

8.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      This adversary proceeding is commenced pursuant to Bankruptcy Rule 7001(2) and seeks relief under sections 105(a) and 363 of the Bankruptcy Code and 28 U.S.C. § 959(b).

10.      Plaintiffs consent to the entry of final orders or judgments pursuant to Bankruptcy Rule 7008.

## PARTIES[12]

11.      Genever (US) is a New York limited liability company.  Genever (US) is the owner of the shares of common stock allocated to the Apartment and is the lessee under the Leases and the Agreement & Consent.  As detailed below, the Trustee indirectly controls Genever (US) through the estate's ownership of all shares of Genever Holdings Corporation ("Genever (BVI)"), which, in turn, wholly owns Genever (US).

12.      The Sherry-Netherland is a New York residential cooperative housing corporation.  The Sherry-Netherland is the lessor under the Leases and the Agreement & Consent.

---

[11]   Plaintiffs have been informed by counsel to Sherry-Netherland that Sherry-Netherland takes no position with respect to the relief sought in this Complaint and will abide by the Court's directive in connection with the relief requested.

[12]   As noted, none of the Debtor's family members are parties to the Leases or the Agreement & Consent. However, they have been included as Defendants in this adversary proceeding out of an abundance of caution.

13.     The Debtor is the individual debtor in the Chapter 11 Cases.  The Debtor has stated on numerous occasions that he currently resides at 373 Taconic Road, Greenwich, Connecticut 06831.

14.     Hing Chi Ngok is the Debtor's purported spouse.[13]  Hing Chi Ngok has testified that she resides in Greenwich, Connecticut.

15.     Qiang Guo is the Debtor's son.  The proof of claim filed by Qiang Guo in the chapter 11 case of Genever (US) provides a notice address in London, United Kingdom.  In addition, both the Debtor and the Debtor's daughter, Mei Guo, have testified that Qiang Guo lives in London, United Kingdom.

16.     Mei Guo is the Debtor's daughter.  Mei Guo has testified that she currently resides in New York, New York, but not in the Apartment.

## FACTUAL ALLEGATIONS

### A.     Proprietary Leases and Agreement & Consent

17.     On March 6, 2015, Genever (US), as lessee, and the Sherry-Netherland, as lessor, entered into the Leases appurtenant to the shares of common stock allocated to the Apartment, which shares had been purchased by Genever (US) from the prior owners at that time.  Copies of the Leases are attached hereto as **Exhibit 1**, **Exhibit 2**, and **Exhibit 3**.  Genever (US) and the Sherry-Netherland are the only parties to the Leases.  The purchase price for the common stock allocated to the Apartment and the related leasehold interest was approximately $70 million ($2.5 million of which was allocable to furnishings).

---

[13]    In his *Global Notes and Statements of Limitations, Methodology, and Disclaimers Regarding the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs* [Docket No. 77 in Case No. 22-50073], the Debtor has stated that he "and his spouse consider themselves married even though they do not have a certificate from China evidencing their marriage.  The couple has been living together for over 30 years, file joint tax returns, and have two children together."

18.     Also on March 6, 2015, Genever (US) and the Sherry-Netherland entered into the

*Agreement and Consent with Respect to Shares and Proprietary Lease* (*i.e.*, the Agreement &

Consent), a copy of which is attached hereto as **Exhibit 4**, that memorializes certain additional

terms of the agreement between Genever (US) and the Sherry-Netherland regarding the

occupancy of the Apartment, which includes, among other things, a provision permitting the

Debtor and his immediate family members to use the Apartment (*i.e.*, the Use Provision).

19.     Genever (US) is obligated to make monthly payments of rent, maintenance

charges, and other sums due to the Sherry-Netherland under the Leases and other pertinent

agreements.  *See* 1801 Lease ¶ 3.1; MR 2219 Lease ¶ 3.1; MR 719 Lease ¶ 3.1.  There is no

provision, under either the Leases or the Agreement & Consent, requiring the Debtor or any of

his family members to make any monthly payments to the Sherry-Netherland or Genever (US) in

exchange for the Sherry-Netherland and Genever (US)'s agreement to allow the Kwok Family to

use the Apartment.

20.     The Use Provision of the Agreement & Consent provides:

> ***Lessor and Lessee hereby agree*** that the Apartment will be occupied as a
> private dwelling only and for residential use and for no other purpose and
> that only the Occupant, and the members of the Occupant's immediate
> family (each, a "Permitted Occupant"), may occupy or use the Apartment
> as such private dwelling only for residential use and for no other purpose.
> Lessor and Lessee agree that no person, other than Occupant and a
> Permitted Occupant, including, without limitation, any and all officers,
> directors, members, employees and agents of the Lessee, shall occupy or
> have any right to occupy or use the Apartment without the prior written
> consent of Lessor, and Lessee and Occupant shall not permit any person
> (other than Occupant and a Permitted Occupant) to occupy or use the
> Apartment, nor shall they permit the use of the Apartment for any purpose
> other than as a private dwelling for residential purposes only.

Agreement & Consent ¶ 9 (emphasis added).

21.     The Use Provision merely grants the Kwok Family permission to use the
Apartment.  This permissive use is revocable and, at most, renders the Kwok Family a licensee
under New York law with no possessory right in the Apartment.

22.     While the Debtor signed the Agreement & Consent in his capacity as the
"Occupant" of the Apartment, the Use Provision is solely an agreement between Genever (US)
and the Sherry-Netherland.  None of the Debtor's family members is a party to the Agreement &
Consent.

23.     As such, it is appropriate for Genever (US) and the Sherry-Netherland to enter
into the Amendment to terminate the Kwok Family's ability to use the Apartment rent-free,
without the consent of the Debtor or the Kwok Family.

24.     The Amendment is permitted by the Agreement & Consent, which provides that
"[t]his Agreement and any provision herein may only be modified, changes, waived, or
terminated by an instrument in writing, signed by the party against whom the modification,
change, waiver, or termination is sought."  Agreement & Consent ¶ 22.

25.     As noted, the Use Provision is an agreement solely between the Sherry-
Netherland and Genever (US), as that provision clearly states the "Lessor and Lessee hereby
agree . . ." (*i.e.*, the Sherry-Netherland and Genever (US), respectively).  Accordingly, written
consent of the Sherry-Netherland, *i.e.*, the party against whom Genever (US)'s requested
modification is sought, is all that is required for valid execution of the Amendment to the Use
Provision.

26.     To be clear, the Amendment will only terminate the Kwok Family's ability to use
the Apartment.  It will not alter, amend, or modify any rights or obligations imposed upon
Genever (US) or the Sherry-Netherland under the Leases or Agreement & Consent.

27.     According to the Global Notes to the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs (the "Global Notes"),[14] the Debtor has use and occupancy of a house located at 373 Taconic Road, Greenwich, Connecticut 06831 (the "Residence").  The Residence also forms the basis for venue of Debtor's chapter 11 case in this Court.

28.     No member of the Kwok Family has established a residence at the Apartment.

**B.      The Chapter 11 Cases**

29.     On October 12, 2020, Genever (US) filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") before the United States Bankruptcy Court for the Southern District of New York (the "SDNY Bankruptcy Court").

30.     On February 15, 2022, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code before this Court.

31.     On March 19, 2022, the United States Trustee filed a motion for an order directing appointment of an examiner or, in the alternative, directing the appointment of a chapter 11 trustee in the Debtor's case.

32.     On June 15, 2022, the Bankruptcy Court entered the Memorandum Decision directing the United States Trustee to appoint a chapter 11 trustee in the Debtor's case. Following entry of the Memorandum Decision, the United States Trustee selected Luc. A. Despins as Trustee.

33.     On July 8, 2022, the Bankruptcy Court entered an order granting the appointment of Luc. A. Despins as the Trustee in the Debtor's Chapter 11 Case.

---

[14]     *See* Global Notes and Statements of Limitations, Methodology, and Disclaimers regarding the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs, *In re Ho Wan Kwok*, No. 22-50073 [Docket No. 77].

34.     On August 10, 2022, the Bankruptcy Court entered an order (the "Corporate Governance Order")  granting the Corporate Governance Motion providing, among other things:

> [T]he Trustee holds all of the Debtor's economic and governance rights, for the benefit of the Estate, with respect to all [Individual] Debtor-Controlled Entities, including, without limitation, Genever (BVI).  For the avoidance of doubt, the foregoing rights include the Trustee's asserted authority to replace any existing officer, director, manager, or similar person of the [Individual] Debtor-Controlled Entities.  As part of the foregoing, to the extent necessary, the Trustee is authorized to act, in his capacity as the chapter 11 trustee in this Chapter 11 Case, as any such officer, director, manager, or similar person who has been removed.[15]

35.     Following entry of the Corporate Governance Order, the Trustee and the Debtor took the necessary steps for the Trustee to obtain corporate control over Genever (BVI), which is the sole member of Genever (US), including by transferring the Debtor's 100% ownership interest in Genever (BVI) to the Trustee.

36.     On October 11, 2022, Genever (BVI) filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

37.     On November 3, 2022, the SDNY Bankruptcy Court entered an order transferring the venue of Genever (US)'s Chapter 11 Case to this Court, and the Chapter 11 Cases of the Debtor, Genever (US), and Genever (BVI) are being jointly administered for procedural purposes only.

---

[15]   Order, Pursuant to Bankruptcy Code Sections 363, 521, 541, 1108, and 1505, (A) Confirming that Chapter 11 Trustee Holds All of Debtor's Economic and Corporate Governance Rights in Debtor-Controlled Entities, (B) Authorizing Chapter 11 Trustee to Act in Any Foreign Country on Behalf of Estate, and (c) Granting Related Relief ¶ 2 [Docket No. 717].

## FIRST CLAIM FOR RELIEF[16]

## (DECLARATORY JUDGMENT THAT KWOK FAMILY DOES NOT HAVE A POSSESSORY RIGHT IN THE APARTMENT)

38.     Plaintiffs repeat and reallege the allegations set forth in the forgoing paragraphs as if repeated in full.

39.     This is an action for declaratory relief brought pursuant to Bankruptcy Rule 7001(2) and section 105(a) of the Bankruptcy Code.

40.     Genever (US) and the Sherry-Netherland are the only parties to the governing Leases.

41.     Genever (US) and the Sherry-Netherland agreed to permit the Kwok Family to use the Apartment pursuant to the Agreement & Consent.

42.     The Debtor does not have a possessory right or tenancy interest in the Apartment because (a) he is a mere licensee and (b) in any event, any right or interest he may have in the Apartment vested in the Trustee upon the appointment of the Trustee.

43.     Nor does any other member of the Kwok Family have a possessory right or tenancy interest in the Apartment because they too are mere licensees.

44.     A declaration by the Court is necessary and appropriate.

45.     In view of the foregoing, Plaintiffs are entitled to a declaratory judgment finding and establishing that the Kwok Family does not have a possessory right or tenancy interest in the Apartment.

---

[16]   While Plaintiffs acknowledge that Bravo Luck Limited, owned by the Debtor's son, has asserted a beneficial interest in the Apartment pursuant to a purported trust agreement, and, as the Court is aware, have brought adversary proceedings challenging the purported trust agreement (Adv. Proc. Nos. 22-05027, 22-05035, 22-05030, 22-01157), Plaintiffs do not, through the Complaint, seek a determination as to Bravo Luck's purported beneficial interest in the Apartment.

## SECOND CLAIM FOR RELIEF

## (DECLARATORY JUDGMENT THAT THE AMENDMENT IS CONSISTENT WITH, AND NOT IN VIOLATION OF NEW YORK STATE LAW)

46.     Plaintiffs repeat and reallege the allegations set forth in the forgoing paragraphs as if repeated in full.

47.     This is an action for declaratory relief brought pursuant to Bankruptcy Rule 7001(2) and section 105(a) of the Bankruptcy Code.

48.     The Amendment is valid and permissible in accordance with the Agreement & Consent.

49.     The Amendment is consistent with New York state law and does not violate 28 U.S.C. § 959(b).

50.     A declaration by the Court is necessary and appropriate.

51.     Accordingly, Plaintiffs are entitled to a declaratory judgment finding and establishing that Genever (US)'s entry into the Amendment is permitted by and complies with 28 U.S.C. § 959(b) and does not violate New York state law.

## THIRD CLAIM FOR RELIEF

## (DECLARATORY JUDGMENT PURSUANT TO 11 U.S.C. § 363(b))

52.     Plaintiffs repeat and reallege the allegation set forth in the forgoing paragraphs as if repeated in full.

53.      Pursuant to section 363(b) of the Bankruptcy Code, after notice and hearing, a debtor or trustee has broad discretion to "use, sell, or lease, other than in the ordinary course of business, property of the estate," so long as such use is supported by a good business reason. 11 U.S.C. § 363(b)(1); *see, e.g., Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a

§ 363(b) application expressly find from the evidence presented before him [or her] at the hearing a good business reason to grant such an application.").

54.     The Apartment is property of Genever (US)'s estate.

55.     The Kwok Family does not have a possessory right or tenancy interest in the Apartment.

56.     Under the Agreement & Consent, the Kwok Family is allowed to use the Apartment without making any payments to Genever (US) or the Sherry-Netherland.

57.     There is good business reason, in the interest of Genever (US)'s estate, to enter into the Amendment to terminate the Kwok Family's permissive occupancy of the Apartment under the Agreement & Consent, including because (a) the Kwok Family is not paying rent or any maintenance expenses for such permissive occupancy and (b) in order to maximize the prospects of identifying a party willing to buy or rent the Apartment, it is critical that Genever (US) can promise that it will deliver immediate possession of the Apartment free of the Debtor's interference.

58.     In view of the foregoing, Plaintiffs are entitled to a declaration that (i) the there is good business reason for Genever (US) to execute the Amendment and (ii) the Amendment is authorized under 11 U.S.C. § 363(b).  Moreover, the Sherry-Netherland should be directed to enter into the Amendment.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs request that this Court enter judgment in its favor and granting the following relief:

      i.     A declaration that the Kwok Family does not have any possessory rights or tenancy interests in the Apartment;

ii.     A judgment that entry into the Amendment is permissible under 28 U.S.C. § 959(b) and consistent with New York state law;

iii.    A judgment that Genever (US)'s entry into the Amendment is authorized pursuant to 11 U.S.C. § 363(b) and the Sherry-Netherland is directed to enter into the Amendment, which amendment, for the avoidance of doubt, shall not modify any rights and/or obligations of Genever or the Sherry-Netherland under the Leases, the Agreement & Consent (except as set forth in the Amendment), or the other governing corporate agreements, nor modify the Debtor's personal guaranty of Genever (US)'s obligations to the Sherry Netherland, nor modify any consent rights of the Sherry Netherland and the Sherry-Netherland Coop Board with respect to the use of the Apartment; and

iv.    Such other and further relief as this Court may deem just, proper, or equitable under the circumstances.

*[Remainder of page intentionally left blank.]*

Dated: February 15, 2023
  New Haven, Connecticut

LUC A. DESPINS, CHAPTER 11 TRUSTEE,
AND GENEVER HOLDINGS LLC

By: */s/ Patrick R. Linsey*
  Douglas S. Skalka (ct00616)
  Patrick R. Linsey (ct29437)
  NEUBERT, PEPE & MONTEITH, P.C.
  195 Church Street, 13th Floor
  New Haven, Connecticut 06510
  (203) 781-2847
  dskalka@npmlaw.com
  plinsey@npmlaw.com

   *and*

  Nicholas A. Bassett (admitted *pro hac vice*)
  PAUL HASTINGS LLP
  2050 M Street NW
  Washington, D.C., 20036
  (202) 551-1902
  nicholasbassett@paulhastings.com

   *and*

  Avram E. Luft (admitted *pro hac vice*)
  G. Alexander Bongartz (admitted *pro hac vice*)
  PAUL HASTINGS LLP
  200 Park Avenue
  New York, New York 10166
  (212) 318-6079
  aviluft@paulhastings.com
  alexbongartz@paulhastings.com

  *Counsel for the Chapter 11 Trustee and*
  *Genever Holdings LLC*

# EXHIBIT 1

Apt. No.: *1801*

Shares: *2,950*

# THE SHERRY-NETHERLAND, INC.

*Lessor,*

TO

*GENEVER HOLDINGS LLC*

*Lessee.*

## Proprietary Lease

This Proprietary lease was adopted by shareholders at the Annual Meeting of Shareholders held on June 11, 1992, supercedes all prior proprietary leases and becomes effective on October 1, 1996, as amended by vote of shareholders on November 29, 2012.

## INDEX

Page

ARTICLE I - CASH REQUIREMENTS, RENT, POWER OF BOARD OF DIRECTORS
1.1  Cash Requirements.................................................................................. 2
1.2  Rent.......................................................................................................... 2
1.3  Power of Board of Directors.................................................................. 3

ARTICLE II - OBLIGATIONS OF THE LESSOR AND LIMITATIONS THEREON
2.1  Lessor's Repairs..................................................................................... 4
2.2  Maintenance and Hotel Service........................................................... 4
2.3  Damage to the Building.......................................................................... 5
2.4  Books of Account .................................................................................. 5
2.5  Terraces................................................................................................... 6
2.6  Accompanying Shares to be Specified in Proprietary Leases.......... 7
2.7  Changes in Terms and Conditions of Proprietary Leases................. 7
2.8  Quiet Enjoyment..................................................................................... 8

ARTICLE III - OBLIGATION OF THE LESSEE
3.1  Payment of Rent..................................................................................... 8
3.2  Electric Service....................................................................................... 8
3.3  Certain Consequences of Default........................................................ 9
3.4  Receipt of Rent from Subtenant on Default in Payment of Rent....... 10
3.5  Failure to Fix Cash Requirements....................................................... 10
3.6  House Rules............................................................................................ 10
3.7  Use and Occupancy of Premises......................................................... 10
3.8  Fire Insurance Rates and Requirements of Law................................ 12
3.9  Subletting................................................................................................ 12
3.10 Assignment............................................................................................ 13
3.11 Release of Lessee upon Assignment................................................. 13
3.12 No Implied Consent.............................................................................. 14
3.13 Consequences of Unauthorized Assignment or Subletting.............. 14
3.14 Pledge of Shares.................................................................................. 14
3.15 Lessee's Repairs.................................................................................. 14
3.16 Alterations............................................................................................. 15
3.17 Removal of Fixtures Installed by Lessee............................................ 16
3.18 Surrender of Possession..................................................................... 16
3.19 Lease Subordinate to Mortgages....................................................... 16
3.20 Mechanics' Liens.................................................................................. 17
3.21 Entry for Examination and Repair....................................................... 17
3.22 No Implied Wavier................................................................................ 18
3.23 Reimbursement of Lessor's Expenses............................................... 18
3.24 Special Services.................................................................................... 18

Page

3.25 Lessor's Immunities..................................................................................... 18
3.26 Notice of Defects...................................................................................... 19
3.27 Lessor's Right to Perform at Lessee's Expense................................................. 19
3.28 Lessee's Indemnity of Lessor....................................................................... 20
3.29 Injunction................................................................................................ 20
3.30 Insurance................................................................................................ 20
3.31 Cooperation............................................................................................ 21

**ARTICLE IV - TERMINATION BY CONDITIONAL LIMITATION**
4.1 Conditional Limitation................................................................................ 22
4.2 Waiver of Right of Redemption..................................................................... 24
4.3 Liability of Lessee upon Termination; Surrender of Possession.............................. 24
4.4 Sale of Shares.......................................................................................... 24

**ARTICLE V - CANCELLATION AT OPTION OF LESSEE**
5.1 Lessee's Option to Cancel........................................................................... 25
5.2 Removal of Fixtures, Surrender of Possession and Payments................................ 25
5.3 Additional Payments by Lessee; Replacements................................................. 26
5.4 Effect of Subleases................................................................................... 26
5.5 Permission to Show and Occupy Premises...................................................... 26
5.6 Cancellation of Lease; Transfer of Shares...................................................... 26
5.7 Cancellation by Holders of Two-Thirds of Shares............................................. 27

**ARTICLE VI - MISCELLANEOUS**
6.1 Restrictions on Transfer............................................................................. 27
6.2 Headings................................................................................................ 28
6.3 No Oral Changes...................................................................................... 28
6.4 Application of Covenants............................................................................ 28
6.5 More Than One Lessee.............................................................................. 28
6.6 Waiver of Trial by Jury.............................................................................. 28
6.7 Notices.................................................................................................. 28
6.8 Partial Invalidity...................................................................................... 29

# PROPRIETARY LEASE

**INDENTURE OF LEASE**, made the _6TH_ day of _MARCH_ _2015_, by and between THE SHERRY-NETHERLAND, INC. (formerly known as "Fifth Avenue & 59th Corporation"), a corporation organized under the laws of the State of New York (hereinafter called the "Lessor") and _GENEVER HOLDINGS LLC_ _____, (hereinafter called the "Lessee").

    **WHEREAS**, the Lessor is the owner of the land and the building in the Borough of Manhattan, New York, N.Y., known as "The Sherry-Netherland" and by the street number 781 Fifth Avenue (hereinafter called the "Building"); and

    **WHEREAS**, the Lessor is a cooperative housing corporation and has leased the apartments in the Building to the several owners of its capital shares by instruments known as proprietary leases; and

    **WHEREAS**, the Lessee owns _2,950_ shares of the Lessor which have been allocated to the room or suite herein designated as the apartment, and which are appurtenant to this lease;

    **NOW, THERFORE**, in consideration of the premises and of the rents, covenants and agreements hereinafter provided and contained, the Lessor hereby leases to the Lessee, subject to the terms and conditions hereinafter expressed, and the Lessee hereby hires and takes from the Lessor, all of that certain apartment in the Building, known as Apartment _801_ (hereinafter called the "apartment").

    **TO HAVE AND TO HOLD** the apartment, with the furniture, furnishings and equipment therein belonging to the Lessee and the appurtenances, unto the Lessee, and the executors, administrators, and authorized assigns of the Lessee, upon the terms and conditions herein set forth, from the _6th_ day of _MARCH_, _2015_, until the 30th day of September 2046 (unless the term shall sooner expire as hereinafter in this lease provided), at a rent for each year, or portion of a year, during said term equal to the proportionate share as hereinafter provided of the aggregate amount of the cash requirements of the Lessor, as hereinafter defined for such year or portion of a year, together with all additional rent, special maintenance charges and other sums due from the Lessee to the Lessor hereunder.

    For the purpose of fixing and determining such cash requirements and rental, the rental year shall be deemed to be the calendar year, except that the first year of the term hereunder shall be deemed to begin on the date on which such term commences and to end on the 31st day of December next ensuing, and the last year of the term hereunder shall be deemed to begin on the 1st day of January, 2046 and to end on the 30th day of September, 2046.

# ARTICLE I

## CASH REQUIREMENTS, RENT, POWER OF BOARD OF DIRECTORS

**1.1 Cash Requirements**. The cash requirements above referred to for each year or portion thereof are hereby defined and shall be deemed to be such aggregate sum as the board of directors of the Lessor from time to time, by a resolution or resolutions adopted during such year or portion thereof or the proceeding year, shall determine in its judgment is to be paid by all the lessees under proprietary leases then in force (after deducting any expected rents or incomes to be received during such year or portion thereof other than rents under proprietary leases) on account of the estimated expenses and outlays of the Lessor to the close of such year, growing out of or connected with the ownership, maintenance and operation of the Building, which sum may include among other things taxes, assessments, water rates, insurance premiums, operating expenses, alterations, replacements and repairs, expenses and liabilities incurred by the Lessor under or by reason of this or other leases, interest on mortgage indebtedness, payments on account of principal secured by mortgages, the payment of any other liens or charges, the payment of any deficit remaining from a previous period, the creation of a reasonable reserve or surplus fund and expenses for other corporate purposes.  The board of directors of the Lessor may, by resolution or resolutions duly adopted from time to time, up to the close of the year for which cash requirements have been so fixed and determined, increase or diminish (within the limits and on the conditions hereinabove provided) the amount previously fixed or determined for such year or portion thereof.  The board of directors may include in the cash requirements for the year or portion thereof (of which a share to be fixed as aforesaid shall be payable by the Lessee as rent for such year) any liabilities or items of expense which accrued or became payable in a previous year, or which might have been included in the cash requirements of a previous year but were not included therein and also any sums which the board of directors may deem it necessary or prudent to provide as a reserve against liabilities or items of expense then accrued or thereafter to accrue although not payable in that year.

**1.2 Rent**. The rent payable by the Lessee in and for each year or portion thereof, of the term shall be a sum (within the limits and on the conditions hereinabove provided) bearing to the aggregate amount of such cash requirements for such year or portion thereof, as the case may be, determined as aforesaid, the same ratio as that which the number of shares of the Lessor, owned by the Lessee at the time of the execution hereof as stated in the recitals of this proprietary lease, bears to the aggregate of the shares similarly specified in all the proprietary leases in effect at the time of the fixing and determination of such cash requirements, and such rent shall be payable in equal monthly installments in advance on the first day of each month, unless the board of directors of the Lessor shall otherwise direct. The board of directors of the Lessor may, at any time and from time to time, by resolution duly adopted, determine and direct what portion of said rent payable by the lessees under all such proprietary leases or other receipts for any year or years, but not more than such sums as are used or to be used to meet a cash requirement of the Lessor for payments on account of

principal of any mortgage on the property of the Lessor or other capital expenditures, shall be credited upon the corporate books of the Lessor as paid-in surplus.

The Lessee shall also pay the Lessee's pro-rata share (determined in the same manner as rent) of any special maintenance charge that may be levied by Lessor from time to time to pay for any repair, alteration, or improvement to the corporate property, or any deficit from operations for a prior period, or other cash requirements. Such special maintenance charge shall be deemed additional rent and shall be payable in a lump sum or in periodic installments, with or without interest, and upon such other terms and conditions as the board of directors of the Lessor shall determine.

The Lessee shall also pay such additional rent as may be provided for herein when due. The term "additional rent" shall include any and all sums due hereunder other than rent, whether or not such sums are denominated as "additional rent".

The rent hereunder shall begin to accrue on the date of the commencement of the term herein granted.

1.3 **Power of Board of Directors**. The board of directors of the Lessor shall have discretionary power to describe the manner of maintaining and operating the Building and to determine the cash requirements of the Lessor and any special maintenance charges to be paid as aforesaid by the lessees under proprietary leases. Every such determination by the board of directors shall be final and conclusive as to all lessees, and any expenditures made by the Lessor's officers, under the direction or with the approval of the Lessor's board of directors, shall, as against the lessees, be deemed necessarily and properly made for such purposes.

The power and authority to determine and establish the amount of and to require payment of the rent above provided for shall be possessed only by the board of directors of the Lessor elected by its shareholders and shall not pass to or be exercised by:

(a) Any creditor, receiver or trustee of the Lessor or any representative of any such creditor, receiver or trustee;

(b) Any board of directors elected by any such creditor receiver or trustee or by any representative of any such creditor, receiver or trustee.

- 3 -

## ARTICLE II

## OBLIGATIONS OF THE LESSOR AND LIMITATIONS THEREON

**2.1  Lessor's Repairs**. The Lessor shall keep in good repair the Building's foundations, sidewalks, walls (except interior walls of apartments, floor and ceilings, unless repairs thereto are necessitated by the failure of Lessor to make repairs for which it is by this paragraph 2.1 responsible), supports, beams, roofs, gutters, fences, cellars, chimneys, restaurants, bars and all lobbies, public spaces, entrances, street and court doorways, main halls, main stairways, elevators, pumps, tanks and all main and principal pipes for carrying water, gas or steam through the Building and all main drain pipes and electrical conduits, together with all plumbing, heating and other apparatus intended for the general service of the Building, except those portions of any of the foregoing which it is the duty of the Lessee to maintain and keep in good repair as hereinafter provided in section 3.15 hereof (Lessee's Repairs), it being agreed that the Lessee shall give the Lessor prompt notice of any accident or defect known to the Lessee and requiring repairs to be made.  Subject to the foregoing limitations, all repairs required to be made by the Lessor shall be at the expense of the Lessor, unless the same shall have been rendered necessary by the wrongful act or neglect or carelessness of the Lessee, or the Lessee's spouse, children, grandchildren, parents, grandparents, brothers or sisters, or the spouses of any of the foregoing (collectively hereinafter referred to as the Lessee's "family"), agents, servants, guests, employees or subtenants of the Lessee, in which case the Lessor shall be entitled to reimbursement from the Lessee for all expenses incurred in connection therewith, whether or not paid by the Lessor, and such reimbursements shall be due as additional rent on the first day of the calendar month following demand thereof by the Lessor on the Lessee.

**2.2  Maintenance and Hotel Service**.  Subject to the provisions of section 3.25 hereof (Lessor's Immunities), the Lessor shall maintain the Building as a luxury hotel and may engage a managing agent or management company to manage the building as such; shall keep the lobbies, public spaces, elevators and the public halls and stairways clean and properly lighted and heated; shall provide restaurant and bar facilities and room service of food and beverages (including alcoholic beverages); shall provide elevator service and the requisite number of attendants for the care and service of the Building; and shall provide the apartment with the usual high class hotel service, a sufficient supply of electricity (subject to section 3.2 hereof (Electric Service)), hot and cold water and of heat.

The covenants by the Lessor herein contained are subject, however, to the discretionary power of the board of directors of the Lessor to prescribe the manner of maintaining and operating the Building and to determine the cash requirements of the Lessor and any special maintenance charges, as hereinabove stated.  Interruption or curtailment, for whatever reason, of any services or facilities to be furnished by the Lessor shall not constitute a constructive or partial eviction nor entitle the Lessee to any compensation or abatement of rent.

**2.3   <u>Damage to the Building</u>**.   In case the building shall be damaged by fire or other cause, the same shall be restored, repaired or replaced as speedily as is reasonably possible at the expense of the Lessor, so as to conform substantially to the condition of the Building immediately preceding such fire or other casualty.   Anything in this section or section 2.1 (Lessor's Repairs) to the contrary notwithstanding, unless such damage is caused by the Lessor, or the agents or employees of the Lessor, the Lessor's obligation to restore, repair and replace pursuant to this section shall not apply to any additions, improvements, equipment, fixtures, furniture, furnishings, decorations, fine art or objets d'art placed or installed in the apartment by the Lessee or any of the Lessee's predecessors in interest, it being within the determination of the Lessee to maintain insurance to cover these items, nor shall the Lessor be obligated to repaint or replace wallpaper or other decorations in the apartment or to refinish floors located therein.

In case the damage resulting from fire or other cause shall be so extensive as to render the apartment partly or wholly untenantable, or if the means of access thereto shall be destroyed, the rent hereunder shall proportionately abate until the apartment shall, in the Lessor's reasonable opinion, again be rendered wholly tenantable or the means of access restored; but if said damage shall be caused by the act or negligence of the Lessee or the agents, employees, guests or members of the family of the Lessee or any occupant of the apartment, such rent shall abate only to the extent of the rental value insurance, if any, collected by Lessor with respect to the apartment.

If the board of directors of the Lessor shall determine that (i) the Building is totally destroyed by fire or other cause, or (ii) the Building is so damaged that it cannot be repaired within a reasonable time after loss shall have been adjusted with the insurance carriers, or (iii) the destruction or damage was caused by hazards which are not covered under the Lessor's insurance policies then in effect, and if in any such case the record holders of at least two-thirds of the issued shares at a shareholders' meeting duly called for that purpose held within one (1) year after the determination by the board of directors, shall vote not to repair, restore or rebuild, then upon the giving of notice pursuant to section 4.1 hereof (Conditional Limitation), this Lease and all other proprietary leases and all right, title and interest of the parties thereunder and the tenancies thereby created, shall thereupon wholly cease and expire and rent shall be paid to the date of such destruction or damage.   The Lessee hereby waives any and all rights under Section 227 of the Real Property Law and in no event shall the Lessee have any option or right to terminate this Lease, except as provided herein.

**2.4   <u>Books of Account</u>**.   The Lessor shall keep full and correct books of account and the same shall be open upon prior appointment during all reasonable hours to inspection by the Lessee or a representative of the Lessee.

**2.5  Terraces.**   A Lessee of an apartment having a direct access to a terrace or a portion of the roof adjoining an apartment (the "Terrace") shall have and enjoy the exclusive use of the portion of such Terrance which immediately adjoins the apartment, subject to: (i) the provisions of this paragraph, (ii) all other applicable provisions of the lease, (iii) the use of such Terrace by the Lessor to enable it to fulfill its obligations under this or any other proprietary lease entered into by the Lessor, including, but not limited to, its obligations to maintain and repair, (iv) such rules and regulations as the board of directors may, from time to time, enact and (v) the rules and regulations of the Board of Fire Underwriters and of all governmental authorities having jurisdiction over the Building.  The Lessee shall not, in the use of such Terrace, endanger the safety of any person or the property of the Lessor or that of any such person or use the Terrace so as to interfere with or annoy the lessee or occupant of any apartment underneath the same.

It shall be the Lessee's duty, at the Lessee's own cost and expense, to keep the Terrace clean and free from debris and to maintain all screens and drain boxes in good condition.  It shall be the Lessor's duty to keep the Terrace in good repair, subject to reasonable wear and tear and the provisions contained in this paragraph.  The Lessor shall not be obligated, however, to maintain or repair the tiles and brick work on the Terrace.

No structures of any kind, including but not limited to, plantings, planters, fences and lattices (the "Structures"), shall be placed, erected, installed or reinstalled following removal, for any reason whatsoever, on such Terrace without the prior written approval of the Lessor.  In the event of such placement, erection, installation or reinstallation without such approval, the Lessor shall have the right, at the Lessee's expense, to remove the Structures; further, should the Lessor, in its sole discretion, determine that repairs to such Terrace or to the apartment or to any other part of the Building, including, but not limited to any apartment in the Building, are required because of the existence of any Structures, whether or not said Structures have been approved by the Lessor, the Lessor may make such repairs, and the Lessee shall reimburse the Lessor for all of the costs of such repairs; such reimbursement shall be paid by the Lessee immediately on demand and such costs shall be deemed to be additional rent.

Any Structure erected, placed, installed or reinstalled by the Lessee or its predecessor in interest, whether or not in compliance with the provisions of this paragraph, may be removed, temporarily or permanently, in the sole discretion of the Lessor, by the Lessor, at the sole expense of the Lessee, for the purpose of insuring safety, complying with the applicable law, making repairs, or maintaining the Building.

No surfaces or walls of a Terrace shall be painted or otherwise covered by the Lessee without the prior written approval of the Lessor.

The Lessor shall have an unlimited right of access to such Terrance (i) to enforce compliance with the provisions of this paragraph, (ii) for any purpose set forth in this

- 6 -

paragraph and in this lease, and (iii) to otherwise enable it to comply with any applicable law or regulation.

The Lessor, for itself or other Lessees, shall have the right to erect, on the roof or on the outside wall of the Building, radio or television aerials and antennas or other equipment for its use and the use of the lessees in the Building and the Lessor shall have the right to access thereto for such installation and for the maintenance and repair thereof.

**2.6  Accompanying Shares to be Specified in Proprietary Leases.**  In every proprietary lease heretofore executed by the Lessor there has been specified, and in every proprietary lease hereafter executed by it there will be specified, the number of shares of the Lessor owned by the lessee therein named, which number, in relation to the aggregate of all numbers of shares similarly specified in all the proprietary leases at the time in force, shall constitute the basis for fixing, as hereinbefore provided, the proportionate share of the aggregate amount of the cash requirements of the Lessor, as hereinbefore defined, which shall be payable as rent by the Lessee.  In the event that, after the fixing of the amounts payable as rent by the lessees under proprietary leases for any period of time, one or more additional proprietary leases be made, thus increasing the aggregate number of shares specified in all proprietary leases, the rent to be paid under such additional lease or leases, unless and until otherwise fixed by the board of directors, shall be at the same rate per share for each share specified in such additional lease or is applicable to the shares specified in all other proprietary leases in effect at the time of the fixing and determination of such cash requirements; and the rent payable by lessees under such other proprietary leases, unless and until otherwise fixed by the board of directors, shall not be modified or affected by any ncrease in the aggregate number of shares specified in all proprietary leases.

**2.7  Changes in Terms and Condition of Proprietary Leases.**  Each proprietary lease shall be in the form of this Lease, except with respect to the number of shares of the Lessor owned by the Lessee, unless (i) a variation to a particular lease is authorized by lessees owing at least two-thirds (2/3) of the Lessor's shares then issued and outstanding accompanying proprietary leases then in force and such variation is agreed to in writing by the Lessor and the lessee affected or (ii) a change or amendment to the form of this lease (as distinct from house rules) shall be approved by lessees owning at least two-thirds (2/3) of the Lessor's shares then issued and outstanding accompanying proprietary leases then in force, and such changes shall be binding on all lessees even if they did not vote for such changes, except that the proportionate share of cash requirements payable by any lessee may not be increased nor may such lessee's right to cancel this lease under the conditions set forth in section 5.1 (Lessee's Right to Cancel) be eliminated or impaired without such lessee's express consent.  Approval by lessees as provided for herein shall be evidenced by written consent, or by affirmative vote, taken at a meeting called for such purpose.

- 7 -

**2.8 Quiet Enjoyment.** The Lessee, upon paying the rent and charges and performing the covenants and complying with the conditions on the part of the Lessee to be performed, as herein set forth, shall, at all times during the term hereby granted, quietly have, hold and enjoy the apartment without any suit, trouble or hindrance from the Lessor, subject however to the rights of present tenants or occupants of the apartment, and subject to any and all mortgages and underlying leases of the land and Building as provided in section 3.19 below (Lease Subordinate to Mortgages).

## ARTICLE III

## OBLIGATIONS OF THE LESSEE

**3.1 Payment of Rent.** The Lessee will pay to the Lessor the rent upon the terms, at the times and in the manner herein provided, without any abatement of, or deduction, counterclaim or set off against rent or additional rent, and if the Lessee shall fail to pay within thirty (30) days of its due date any installment of rent, additional rent or any other amount due hereunder, including but not limited to charges for special services pursuant to section 3.24 (Special Services), from the time when the same becomes due, the Lessee shall pay interest thereon at the rate of twenty percent (20%) per annum, or such other amount as may be approved from time to time by the board of directors of the Lessor, from the date when such installment shall have become due to the date of the payment thereof, and such interest shall be deemed additional rent hereunder and shall be due on the first day of the calendar month following the Lessor's demand or bill therefor. All rent and additional rent payable hereunder shall be payable in lawful money of the United States which shall be legal tender for payment of all debts and dues, public and private, at the time of payment.

**3.2 Electric Service.** If the Lessor, in its sole discretion, determines to convert the supply of electric current to the apartment to a submetered basis, the Lessor shall, at the Lessor's expense, furnish and install a submeter to measure the Lessee's consumption of electric current in the apartment. The Lessee agrees to provide access to the apartment to the Lessor, its agents and contractors for the installation, maintenance and repair of any such submeter, and all wiring associated therewith. From and after the installation of such submeter, the Lessee shall pay the Lessor for the amount of electric current as shall be indicated by the submeter furnished therefor by the Lessor. The rates payable by the Lessee for said current shall be the same as those charged by such public service corporation for consumption similar to that of the Lessee. Payments shall be due as and when bills shall be rendered and the Lessee shall comply with rules, regulations and contract provisions similar to those then prescribed by said public service corporation. Any amount as to which the Lessee shall at any time be in default for or in respect to the use of electric current, or for or in respect to any other service that shall at any time be furnished by the Lessor, shall be deemed to be additional rent that shall be due and payable by the Lessee to the Lessor on the

first day of the calendar month following the Lessor's demand therefor. The Lessor reserves the right to discontinue use of the submeters and provide electric current to the apartment without charge to the Lessee. The Lessor also reserves the right to discontinue furnishing electric current to the Lessee in the apartment at any time upon not less than ninety (90) days notice, provided that (i) Lessor shall discontinue furnishing electric current to all apartments in the building leased under proprietary leases and (ii) unless otherwise required by law, ordinance, order, regulation or requirement of any public authority having jurisdiction over the Building, the Lessor shall postpone such discontinuance for a sufficient amount of time so as to allow the Lessee to arrange to obtain electric current directly from the public utility company furnishing electric current to the Building, provided, however, that the Lessee shall, at the Lessee's expense, diligently arrange to obtain electric current from such public utility company upon receipt of the Lessor's notice that the Lessor intends to discontinue furnishing electric current to the apartment.

**3.3 Certain Consequences of Default.** In the event the Lessor resumes possession of the apartment, either by summary proceedings, action of ejectment or otherwise, because of a default by the Lessee in the payment of any rent, or additional rent, or any part of the same, or on the expiration of the term pursuant to a notice given as provided in section 4.1 (Conditional Limitation) of this lease upon the happening of any event specified in subsections (a) to (f), inclusive, of section 4.1, the Lessee shall continue to remain liable for payment of the rent or additional rent which would have become due hereunder and shall pay the same in installments from time to time as hereinbefore provided. No suit brought to recover any installment of such rent or additional rent shall prejudice the right of the Lessor to recover any subsequent installment. After resuming possession, the Lessor may, at its option, either (a) relet the apartment for the Lessor's own account or (b) from time to time relet the apartment as the agent of or for the account of the Lessee for a term or terms which may be less than or greater than the period which would otherwise have constituted the balance of the term of this lease, and may grant concessions or free rent in its discretion. The fact that the Lessor may have relet the apartment as agent for the Lessee shall not prevent the Lessor from thereafter notifying the Lessee that it proposes to relet the apartment for its own account and will no longer relet the apartment as agent for the Lessee. If the Lessor relets the apartment as the agent of, or for the account of, the Lessee, it shall, after reimbursing itself for its expenses in connection therewith, including leasing commissions and a reasonable amount for decorations, alterations and repairs in and to the apartment, apply the remaining avails of such reletting to the payment of any and all sums then due from the Lessee to the Lessor, or which would thereafter have become due from the Lessee under the provisions of this lease if the Lessor had not so resumed possession, accounting to the Lessee at the expiration of each of the several terms of such reletting for the surplus, if any. If, at any time or from time to time before the expiration of the term originally demised hereunder, there shall be a deficiency between the avails of such reletting and such sums as would have become due hereunder, the Lessee agrees to pay such deficiency for each month of the period which would otherwise have constituted the balance of the term of this lease. No demand need be made by the Lessor for the amounts of such

- 9 -

deficiency and suit may be brought therefor from time to time as the same shall arise. Any suit brought to collect the amount of such deficiency shall not in anyway prejudice the right of the Lessor to collect and sue for any deficiency in any subsequent month. The failure or refusal of the Lessor to relet the apartment or any part thereof shall not release or affect the Lessee's liability hereunder.

3.4 **Receipt of Rent from Subtenant on Default in Payment of Rent.** If the Lessee shall at any time sublet the apartment and shall default for a period of one month in the payment of any rent or additional rent, the Lessor may, at its option, so long as such default shall continue, demand and receive from any subtenant of the Lessee occupying the apartment the rent due or becoming due from such subtenant to the Lessee, up to an amount sufficient to pay all sums due from the Lessee to the Lessor, and any such payment of such rent to the Lessor shall be sufficient payment and discharge of such subtenant, as between such subtenant and the Lessee, to the extent of the amount so paid; and any such demand or acceptance of rent from any subtenant, or from any assignee hereof, shall not be deemed a consent or approval of any subletting or assignment by the Lessee.

3.5 **Failure to Fix Cash Requirements.** The omission by the board of directors of the Lessor to determine the Lessor's cash requirements for any year or portion thereof shall not be deemed a waiver or modification in any respect of the covenants and provisions hereof, or a release of the Lessee from the obligation to pay the rent or any installment thereof, but the rent last determined for any year or portion thereof shall thereafter continue to be the rent until cash requirements shall be redetermined.

3.6 **House Rules.** The Lessor may from time to time establish such reasonable house rules as its board of directors may deem appropriate for the management and control of the Building, and may also from time to time alter, amend and repeal such rules, and this lease shall be in all respects subject to such rules, which, when a copy thereof has been furnished to the Lessee, shall be taken to be part hereof, and the Lessee shall obey all such rules and see that they are faithfully observed by the family, guests, employees and subtenants of the Lessee, it being understood that such rules shall apply to and be binding upon all of the tenants of the Building, whether shareholders of the Lessor or not, but that the Lessor shall not be responsible to the Lessee for the non-observance or violation of such rules by any other lessee or person. Breach of a house rule by the Lessee, or failure by the Lessee or the Lessee's family to use reasonable efforts to ensure compliance with house rules by any other occupant of the apartment, shall be a default under this lease.

3.7 **Use and Occupancy of Premises.** The Lessee shall not, except as provided in section 3.9 (Subletting), without the written consent of the Lessor on such conditions as Lessor may prescribe, occupy or use the apartment, or the furniture or furnishings therein, or permit the same or any part thereof to be occupied or used for any purpose other than as a private dwelling for the Lessee and Lessee's family and domestic employees. In addition to the foregoing, the apartment may be occupied from time to time

- 10 -

by guests of the Lessee for periods of time not exceeding thirty days, in the aggregate, dining any calendar year, unless a longer period is approved in writing by the Lessor, as long as such occupancy is not violative of applicable zoning laws, building code or other rules and regulations of governmental authorities having jurisdiction (collectively, "Occupancy Laws"). If any guest is to occupy the apartment during any period in which the permitted adult residents are not in occupancy, the Lessee shall notify the Lessor in writing prior to the arrival of such guest(s), the name(s) of such guest(s) and the period during which such guest(s) will be in occupancy. Guests permitted under this Section 3.7 may not be charged for the use of the apartment. If a violation of any Occupancy Law is alleged to exist, and the Lessor elects not to contest such violation, the Lessee, at the Lessee's sole cost and expense, after written notice to the Lessor, may contest, by appropriate proceedings prosecuted diligently and in good faith, such violation, and the Lessor shall cooperate with the Lessee in such contest, provided that (b) the Lessor shall not be subject to criminal penalty or to prosecution for a crime, nor shall the Building, the land on which it is situated, or any part thereof be subject to condemnation or being vacated by reason of non-compliance or otherwise by reason of such contest; (c) the Lessee indemnities the Lessor against the cost of any such contest or proceedings and against all liability for damages, interest, penalties, and expenses (including attorneys' fees and expenses), resulting from or incurred in connection with such contest or non-compliance; (d) such non-compliance or contest shall not constitute or result in any violation of any mortgage on the Building or the land on which it is situated, or if any such mortgage shall permit such non-compliance or contest on condition of the taking of action or furnishing of security by the Lessor, such action shall be taken and such security shall be furnished at the expense of the Lessee; and (e) the Lessee shall keep the Lessor advised as to the status of such proceedings. Consent of the Lessor to the use of the premises for other than the uses permitted in this section 3.7 may be granted on such conditions as of the Lessor, in its discretion, may deem appropriate, including the payment of additional rent.

      **3.8 <u>Fire Insurance Rates and Requirements of Law</u>.** The Lessee shall not permit or suffer anything to be done or kept in the apartment which will increase the rate of fire insurance on the Building or the contents thereof, or which will interfere with the tights of other tenants, or annoy such tenants by unreasonable noises, odors or otherwise, or which will obstruct the public halls or stairways of the Building. The Lessee will comply with all the requirements of the Board of Health and all other governmental authorities and with all laws, ordinances, rules and regulations with respect to the apartment; and if, by reason of the occupancy or use of the apartment by the Lessee, the rate of fire insurance on the Building or its contents shall be increased, the Lessee shall become personally liable for the additional insurance premiums upon all policies covering the Building, and the Lessor shall have the right to collect the same, as additional rent hereunder on the first day of the calendar month following demand therefor by the Lessor.

      The Lessee will not clean, nor require, permit, suffer or allow any window in the apartment to be cleaned from the outside, in violation of Section 202 of the Labor Law

(or any successor statute) or of the rules of the Board of Standards and Appeals, or of any other board or body having or asserting jurisdiction; and the Lessee hereby agrees to indemnify the Lessor, its employees and other lessees, from and against any and all claims, losses, damages, fines, attorneys' fees and related costs suffered by them as a result of the Lessee's requiring, permitting, suffering or allowing any window in the Building to be leaned from the outside in violation of the requirements of the aforesaid laws, ordinances, regulations and rules.

3.9 **Subletting.** The Lessee shall not sublet the whole or any part of the apartment for any term to any person or persons nor, except as provided in section 3.7 (Use and Occupancy), permit the same to be occupied or used by any persons other than members of the Lessee's family and domestic servants, unless consent thereto shall have been duly given by an instrument in writing which is to be signed (a) by a majority of the directors of the Lessor or (b) by an officer of the Lessor when duly authorized by a resolution of the Lessor's board of directors or by a resolution adopted at any annual or special meeting of shareholders, or unless the Lessee shall have entered into a rental agreement (a "rental agreement") with the Lessor for the renting of the apartment. Any such rental agreement shall be upon such terms and conditions as the board of directors may, in its sole discretion, reasonably impose from time to time. Whenever the Lessee applies to the Lessor for consent to a subletting, the Lessor may require as a condition thereto such conditions as the directors or shareholders, as the case may be, may impose consistent with Lessor's obligation to act reasonably as set forth in the next succeeding sentence, including the obligation for the Lessee to pay a sublet fee to the Lessor in an amount fixed from time to time by the board of directors in its sole discretion in a rental agreement and the obligation for the Lessee deliver to the Lessor a copy of the sublease to which consent is requested. The Lessor shall not unreasonably withhold consent to a subletting provided, however, that consent shall not be granted until the Lessee cures all defaults hereunder and pays the sublet fee charged by the Lessor, together with a sum to be fixed by the board of directors of the Lessor to cover reasonable legal and other out-of-pocket expenses of the Lessor in connection with such subletting.

3.10 **Assignment.** The Lessee shall not assign this lease, or any interest therein, and no such assignment shall take effect as against the Lessor for any purpose, unless and until all of the following requirements have been complied with and satisfied:

(a) An instrument of assignment executed by the assignor shall have been delivered to the Lessor;

(b) An agreement, in form approved by the Lessor, containing a covenant by the assignee assuming and agreeing to perform and comply with all the covenants and conditions of this lease to be performed or complied with by the Lessee on and after the effective date of said assignment must be executed and acknowledged by the assignee and delivered to the Lessor, but no such assumption agreement shall be required if the assignee

- 12 -

surrenders the assigned lease and enters into a new lease for the remainder of the term as hereinafter provided;

(c) All shares of the Lessor accompanying this lease must be transferred to the assignee with the required transfer stamps affixed;

(d) All sums due from the Lessee, together with a sum to be fixed by the board of directors of the Lessor to cover reasonable legal and other out-of-pocket expenses of the Lessor in connection with such assignment and transfer of shares, must be paid to the Lessor; and

(e) A written consent to such assignment, either (1) signed by or authorized by a majority of the board of directors of the Lessor or (2) signed by or authorized by lessees owning of record at least two-thirds of the shares of the Lessor accompanying proprietary leases then in force, must be delivered to the Lessor. If the Lessee shall die, such consent shall not be unreasonably withheld to any assignment of this lease and the accompanying shares to a financially responsible member of the Lessee's family other than the Lessee's spouse, as to whom no consent is required. There shall be no limitation, except as above specifically provided, on the right of the directors or lessees to grant or withhold consent, for any reason or for no reason, to an assignment.

(f) Effective for all assignments of this lease pursuant to a contract of sale submitted for the Lessor's consent after December 31, 2013 (regardless of the date of the closing), the assignee shall deliver to the Lessor an amount equal to two (2%) percent (the "Transfer Fee") of the gross proceeds of sale of the apartment and appurtenant shares of the Lessor. The Transfer Fee shall be paid on the date of closing, by certified or bank check payable to the order of the Lessor. Notwithstanding the foregoing, the Transfer Fee shall not be payable with respect to an assignment of this lease and the transfer of the appurtenant shares of the Lessor by the Lessee (i) to the spouse, children, or parents of the Lessee (or if the Lessee is an entity, to a shareholder, owner, member or in the case of a trust, beneficiary of such entity) such as by means of a gift, (ii) by the Lessee or the Lessee's executor, administrator or personal representative to an entity (including a trust or limited liability company) for the benefit of Lessee or the spouse, children or parents of the Lessee, in each case, without consideration, such as by means of a gift or (iii) by testamentary bequest, trust transfer or similar disposition or operation of law, without consideration, from a deceased Lessee or from an executor, administrator or other personal representative of a deceased Lessee.

**3.11  Release of Lessee upon Assignment.**  Whenever the Lessee shall, under the provisions of this lease, be permitted to assign and shall so assign the same, and the assignee shall assume all of the unfilled obligations of the assignor hereunder, either by an instrument in writing delivered to the Lessor or by surrendering the assigned lease and entering into a new lease for the remainder of the term, the assignor shall have no further liability on any of the covenants of this lease to be thereafter performed. At the option and

- 13 -

election of the Lessor, any assigned lease may be surrendered and cancelled, and a new lease for the remainder of the term of this lease, in the same form, shall in such case be entered into between the Lessor and the assignee.

**3.12  No Implied Consent.**  No demand or acceptance of rent from any subtenant or from any assignee hereof or other person in possession or occupancy shall constitute or be deemed to constitute a consent to or approval of any assignment, sublease or occupancy.

**3.13  Consequences of Unauthorized Assignment or Subletting.**  No executor, administrator, personal representative or successor of the Lessee, or trustee, or anyone to whom the interest of the Lessee hereunder shall pass by law, shall be entitled to assign this lease, or to sublet the apartment, or any part thereof, except upon compliance with the requirements of this lease.  The character of and restriction upon the occupancy of the apartment, and upon assignment of this lease, as hereinbefore expressed, restricted and limited are an especial consideration and inducement for the granting of this lease by the Lessor to the Lessee; and in the event of a violation by the Lessee of the provisions hereof, this lease may be terminated and shall expire at the option of the Lessor as hereinafter provided, and the Lessor may restrain and prevent the occupancy of the apartment by any one other than the Lessee or the family of the Lessee.

Nothing herein contained shall be construed as preventing or prohibiting the renting of the apartment on a transient basis, provided such renting is effected with the approval of, and through, the Lessor pursuant to a rental agreement.

**3.14  Pledge of Shares.**  The Lessee shall not pledge or assign this lease or the shares to which this lease is appurtenant (the "shares") as security for a loan, nor permit the creation of a security interest or lien in such shares or this lease.

**3.15  Lessee's Repairs.**  The Lessee has inspected the apartment and accepts the same in its present condition without any warranty or representation of any kind whatsoever on the part of the Lessor.  The Lessee shall keep the interior of the apartment in good repair, shall repair, maintain, replace and install all windows, window panes, window frames, sashes and sills in the apartment, shall do all the painting and decorating required for the apartment, including painting of the window frames, sashes and sills, and shall be solely responsible for the maintenance, repair and replacement of plumbing, gas and heating fixtures and equipment such as refrigerators, dishwashers, removable and through-the-wall heating and cooling units, washing machines, dryers, ranges and other appliances as may be in the apartment.  "Plumbing, gas and heating fixtures" as used herein shall include exposed gas, steam and water pipes attached to fixtures, appliances and equipment and the fixtures, appliances and equipment to which they are attached, and any special pipes or equipment which the Lessee may install within the wall or ceiling, or under the floor, but shall not include gas, steam, water or other pipes or conduits within the walls, ceilings or floors or

- 14 -

heating equipment which is part of the standard Building equipment.  The Lessee shall be solely responsible for the maintenance, repair and replacement of all lighting and electrical fixtures, appliances and equipment in the apartment, and all meters, fuse boxes or circuit breakers and electrical wiring and conduits from the junction box of the riser into and through the Lessee's apartment.  Any ventilator or any heating and cooling unit which shall be visible from the outside of the Building shall at all times be painted by the Lessee in the standard color which the Lessor may select for the Building and shall be maintained in accordance with the specifications of the Lessor.  The Lessor shall not be held answerable for any damage in or to the foregoing, or for any damage to the apartment, or to any of its contents, caused by electric current or by the leakage or overflow of water, gas or steam from any water pipe, gas pipe, steam pipe, drain pipe, basin, tub or other receptacle belonging or appertaining to any other apartment in the Building, unless the damage shall have been caused by the act or neglect of the Lessor or of its employees.

**3.16 <u>Alterations</u>.**  The Lessee shall not, without first obtaining the written consent of the Lessor, which consent shall not be unreasonably withheld, make in the apartment or any terrace appurtenant thereto, any alteration, enclosure or addition, whether structural or otherwise, nor any enclosure or alteration of the water, gas or steam risers or pipes, heating or air conditioning system or units serving the Building generally, electric conduits, wiring or outlets, plumbing lines, intercommunication or alarm systems, or any installation or facility serving the Building generally, nor, except as hereinafter authorized, shall the Lessee remove any additions, improvements or the furniture, furnishings or fixtures from the apartment owned by the Lessor.  Decoration such as painting, wallpapering, carpeting, installation of cabinetry and similar work shall not be deemed an alteration requiring the Lessor's consent, but shall be performed only after written notice to the Lessor and delivery to the Lessor of evidence of the contractor's liability insurance, which shall be in amounts reasonably satisfactory to the Lessor.  The performance by the Lessee of any work in the apartment shall be in accordance with any applicable rules and regulations of the Lessor and governmental agencies having jurisdiction thereof.  Any consent to proposed alterations may be subject to such terms and conditions as the board of directors of the Lessor shall reasonably impose, including, without limitation, the Lessee's execution of an agreement in form and substance satisfactory to the Lessor setting forth the terms and conditions upon which such alteration may be made, including delivery by the Lessee of a security deposit securing proper performance of the alteration and compliance with the alteration agreement.  Consent shall not be granted until the Lessee cures all defaults under the lease and pays a sum to be fixed by the board of directors of the Lessor to cover reasonable legal, architectural, engineering and other out-of-pocket expenses of the Lessor and its managing agent, if any, in connection with such proposed alterations.  The Lessee shall not in any case install any appliances or electrical or other equipment which shall exceed the available load for the existing electrical, plumbing or other service facilities serving the Building generally.

- 15 -

**3.17  <u>Removal of Fixtures Installed by Lessee</u>.**  If the Lessee shall have heretofore placed or shall hereafter place, or if any prior proprietary lessee shall have heretofore placed, in the apartment any special additions, improvements or fixtures, such as mantels, refrigerators, ranges, air conditioning equipment, woodwork, panelling, ceilings or doors which can be removed without structural alterations, then the Lessee shall have the right, prior to the termination of this lease, to remove the same at the Lessee's own expense, provided: (a) that the Lessee at the time of such removal shall not be in default in the payment of rent, additional rent or in the performance of any other provision of condition of this lease, (b) that before any such removal the Lessee shall have given written notice to the Lessor specifying any of the foregoing which the Lessee proposes to remove and specifying in detail the proposed replacements to be made by the Lessee and shall have obtained the Lessor's written approval of the replacement specifications, which approval shall not be unreasonably withheld, (c) that the Lessee shall pay the cost of any such removal and reinstallation and shall, at its own cost and expense, repair any damage resulting therefrom and (d) that the Lessee shall replace and reinstall, at the Lessee's own expense, all articles, materials, or equipment owned by the Lessor that were in the apartment at the beginning of the term, or replace such articles, materials and equipment with others of a kind and quality customary in this type of Building and satisfactory to the Lessor, and all such replacements shall be first-class in workmanship, materials and finish, and as specified in the notice provided for in clause (b) of this section.

**3.18  <u>Surrender of Possession</u>.**  On the expiration of the term hereby granted, or upon an earlier termination of this lease, the Lessee shall surrender to the Lessor possession of the apartment with all additions, improvements and fixtures then included therein except as provided in Section 3.17 (Removal of Fixtures Installed by Lessee).  Any additions, improvements, furniture, furnishings or fixtures or other personal property not removed by the Lessee at the termination of this lease shall, at the option of the Lessor, either (a) be deemed abandoned and become the property of the Lessor, in which case they may be disposed of by the Lessor without accountability or liability to the Lessee, or (b) be removed by the Lessor to any place for storage and stored for the account of the Lessee without the Lessor in any way being liable for trespass, conversion or negligence by reason of any acts of the Lessor or of the Lessor's agents, or of any carrier employed for transporting such property to the place of storage or by reason of the negligence of any person in caring for such property while in storage.  Any costs incurred by the Lessor in such disposal, removal or storage shall be paid by the Lessee as additional rent on the first day of the calendar month following demand therefor by the Lessor.

**3.19  <u>Lease Subordinate to Mortgages</u>.**  This lease is and shall be subject and subordinate to the mortgages which are now liens upon the Building and security interests in the contents thereof and to any and all extensions, modifications, renewals and replacements thereof and this lease shall be subject and subordinate to the lien of any other mortgage or mortgages or security interests which shall at any time be placed on the Building or its contents.  This clause shall be self-operative and no further instrument of subordination

shall be required by any such mortgagee or secured party. The Lessee shall at any time and from time to time, on demand, execute any instruments that may be required by any mortgagee, or by the Lessor, for the purpose of more formally subjecting this lease to the lien of any such mortgage or mortgages, and the duly elected officers, for the time being, of the Lessor are each hereby irrevocably appointed the attorney-in-fact and agent of the Lessee to execute the same upon such demand, and the Lessee hereby ratifies any such instrument hereafter executed by virtue of the power of attorney hereby given.

**3.20   Mechanics' Liens.**   In case there shall be filed a notice of mechanics' lien against the Building for, or purporting to be for, labor or material alleged to have been furnished or delivered at the Building or the apartment to or for the Lessee, or anyone claiming under the Lessee, the Lessee shall forthwith cause such lien to be discharged by payment, bonding or otherwise; and if the Lessee shall fail to cause such lien to be discharged within twenty (20) days after the filing of such notice, the Lessor may cause such lien to be discharged by bonding or by paying the amount thereof or otherwise, without investigation as to the validity thereof or of any offsets or defenses thereto, and shall have the right to collect, as additional rent, all amounts so paid and all costs and expenses paid or incurred in connection therewith, including reasonable attorney's fees and disbursements, together with interest thereon from the time or times of payment. The failure of the Lessee to discharge the lien within twenty (20) days after the filing of such notice shall be deemed a default under this lease.

**3.21   Entry for Examination and Repair.**   The Lessor, its employees, agents and workers shall be permitted to enter the apartment and any storage space used by the Lessee at any reasonable hour of the day, to examine or inspect the apartment or to make or facilitate repairs in any part of the Building and to remove such portions of the walls, floors and ceilings of the apartment as may be required for the purpose of making such repairs. In order that the Lessor shall at all times have access to the apartment for the purposes provided for in this lease, the Lessee shall provide the Lessor with a key to each lock providing access to the apartment, and if any lock shall be altered or a new lock installed, the Lessee shall provide the Lessor with a key thereto immediately upon installation. If the Lessee shall not be personally present to open and permit an entry into the apartment at any time when for any reason an entry therein shall be necessary or permissible hereunder and shall not have furnished a key to the Lessor, the Lessor or the Lessor's agents may forcibly or otherwise enter the apartment without rendering the Lessor or such agents liable to any claim or cause of action for damages by reason thereof if during such entry the Lessor shall accord reasonable care to the Lessee's property, and such entry shall not in any manner affect the obligations and covenants of this lease. The right and authority hereby reserved do not impose, nor does the Lessor assume by reason thereof, any responsibility or liability whatsoever for the care or supervision of the apartment, or any of the pipes, fixtures, appliances or appurtenances therein contained or therewith in any manner connected, except as may be herein specifically provided.

- 17 -

**3.22  No Implied Waiver.**  The failure of the Lessor to insist, in any one or more instances, upon a strict performance of any of the provisions of this lease, or to exercise any right or option herein contained, or to serve any notice, or to institute any action or proceeding, or otherwise to act as though this lease had expired pursuant to the provisions of Article IV hereof, shall not be construed as a waiver, or a relinquishment for the future, of such provision, option or right thereafter to serve notice and to have this lease expire under the provisions of said Article, but such provision, or option or right shall continue and remain in full force and effect.  The receipt by the Lessor of rent, with knowledge of the breach of any covenant hereof, shall not be deemed a waiver of such breach, and no waiver by the Lessor of any provision hereof shall be deemed to have been made unless expressed in writing and signed by an officer of the Lessor pursuant to authority contained in a resolution of its board of directors; and even though a consent to an assignment hereof, or to any subletting, be given, no further assignment or subletting shall be made without express consent in writing given as hereinbefore provided.

**3.23  Reimbursement of Lessor's Expenses.**  If the Lessee shall at any time be in default hereunder, and the Lessor shall incur any expense (whether paid or not) in connection with such default or in performing acts which the Lessee is required to perform, or in instituting an action or proceeding based upon such default, or defending, or asserting a counterclaim in, any action or proceeding brought by the Lessee, the expense thereof to the Lessor, including reasonable attorney's fees and disbursements, shall be paid by the Lessee to the Lessor, on demand as additional rent on the first day of the calendar month following demand therefor by the Lessor.

**3.24  Special Services.**  The Lessee will pay and discharge all obligations incurred by the Lessee or by any person occupying the apartment or by any guest of the Lessee or of any such person for meals, beverages, telephone service, laundry, or other hotel services (except those Lessor is obligated to furnish as provided in section 2.2) rendered to and sums advanced by the Lessor to or for the Lessee, the Lessee's family and employees, and the Lessee will make such payment upon the presentation of a bill therefor, except to the extent otherwise provided in any rental agreement, and in case of the failure on the part of the Lessee to pay the same, the Lessor at its option may add the amount thereof to the next installment of rent due and the same shall be deemed additional rent.

**3.25  Lessor's Immunities.**  The Lessor shall not be liable for any failure, interruption or curtailment of heat, water supply, electric current, elevator service or other service to be supplied by the Lessor hereunder, or for injury or damage to person or property caused by the elements or by another tenant or person in the Building, or resulting from steam, gas, electricity, water, rain or snow which may leak or flow from any part of the Building, or from any of its pipes, drains, conduits, radiators, boilers, tank, appliances or equipment, unless caused by or due to the negligence of the Lessor; and no diminution or abatement of rent or other compensation due the Lessor shall be claimed or allowed therefor, or for failure to make, delay in making or inconvenience or discomfort arising from the

- 18 -

making of repairs or improvements to the Building or to its appliances, or for any space taken to comply with any law, ordinance, or order of a governmental authority. The Lessor shall not be liable for interference with light or other incorporeal hereditaments by the Lessor or anybody other than the Lessor. Mechanical refrigeration, if any, is installed for the accommodation of the Lessee, and the Lessor shall not be responsible for any failure of refrigeration, leakage or damage caused by, or the result of such mechanical refrigeration for any reason whatsoever. The Lessor shall not be responsible for any package or article left with or entrusted to any employee of the Lessor. If the Lessor shall before, during or after the term of this lease, furnish to the Lessee the use of any storage space, vault space, laundry or other facility outside of the apartment, the same shall be furnished gratuitously by the Lessor, and if any person shall use the same, such use shall be entirely at the risk of such person, and the Lessor shall not be liable for any loss of property therein, or for any damage or injury whatever to person or property therein or in connection therewith.

   **3.26 Notice of Defects.**  No notice of alleged defect requiring the Lessor's attention shall be deemed valid or effective unless in writing and delivered to the Lessor in accordance with section 6.6 hereof (Notices).

   **3.27 Lessor's Right to Perform at Lessee's Expense.**  If the Lessee shall fail to make repairs to any part of the apartment or appurtenances as herein required, or shall fail to comply with any other covenant or condition of this lease on the Lessee's part to be performed, the Lessor may, but is not obligated to, after ten (10) days' notice to the Lessee, enter the apartment and make such repairs or comply with such covenant or condition or arrange for others to do the same, without liability on the part of the Lessor. If the Lessee or any person occupying the apartment shall expressly request the Lessor, its agents or servants, to perform any act not hereby required to be performed by the Lessor, or in case of emergency, the Lessor may, but is not obligated to, without notice, enter the apartment and perform such act or take such steps as are appropriate in light of the emergency, or arrange for others to do the same, without liability on the part of the Lessor. In all such cases, the Lessor, its agents, servants and contractors shall, as between the Lessor and the Lessee, be conclusively deemed to be acting as agents of the Lessee and all contracts therefor made by the Lessor shall be so construed whether or not made in the name of the Lessee. The Lessor shall be entitled to recover from the Lessee all expenses incurred or for which it has contracted hereunder, such expenses to be payable by the Lessee as additional rent on the first day of the calendar month following demand therefor by the Lessor.

   If, in the Lessor's sole judgment, any of the Lessee's equipment or appliances shall result in damage to the Building or poor quality or interruption of service to other portions of the Building or overloading of or damage to facilities maintained by the Lessor for the supplying of water, gas, electricity or air conditioning to the Building, or if any such appliances visible from the outside of the Building shall become rusty or discolored, the Lessee shall promptly, on notice from the Lessor, remedy the condition and, pending such remedy, shall cease using any appliance or equipment which may be creating the

- 19 -

objectionable condition.  In the event that due to the negligence or carelessness of the Lessee or the Lessee's family, domestic employees, subtenants, other occupants of the apartment and guests, the Building shall be otherwise damaged, then the Lessee shall reimburse the Lessor for the cost of repairing such damage.

**3.28  Lessee's Indemnity of Lessor.**  The Lessee agrees to save the Lessor and its managing agent, if any, harmless from all liability, loss, damage and expense, including, without limitation, reasonable attorneys' fees and disbursements, arising from injury to person or property occasioned by the failure of the Lessee to comply with any provision hereof, or due wholly or in part to any wrongful act, negligence or omission of the Lessee or default by the Lessee in performing an obligation imposed under this Lease on the Lessee, the Lessee's family or of any person dwelling or visiting in the apartment, or by the Lessor, its agents, servants or contractors when acting as agent for the Lessee as in this lease provided.

**3.29  Injunction.**  In addition to other legal remedies hereinbefore or hereinafter provided for, in case of violations of any covenants by the Lessee, the same shall be restrainable by injunction and neither the mention herein nor the election hereafter of one or more of the remedies provided shall preclude the Lessor from enforcing any other right, remedy, option, election or priority allowed by law, whether or not herein specifically set forth.

**3.30  Insurance.**  The Lessee shall, at the Lessee's own cost and expense, obtain and keep in full force and effect throughout the term of this lease (a) comprehensive public liability and property damage insurance, with a minimum limit of liability of $1,000,000 for injury or death and damages to any one person, $1,000,000 for injury or death arising out of one occurrence, and $1,000,000 for damage to property, against any and all claims for personal injury, death or property damage (including, but not limited to, loss due to water damage) occurring in, upon, adjacent to or connected with the apartment or any part thereof, and (b) comprehensive all risk property damage insurance, with a minimum limit of liability of $100,000 in respect of property damage occurring in, upon, adjacent to or connected with the apartment or any part thereof (including, but not limited to, loss due to water damage), such insurance to include an endorsement for tenant's improvements and betterments on a replacement cost basis.  The limits of liability set forth in (a) and (b) above may be increased by the board of directors of the Lessor from time to time to such reasonable amounts as may reflect inflation.  The insurance required in (a) above shall name the Lessor as additional insured, as its interest may appear, and is to be written in form reasonably satisfactory to the Lessor by good and solvent insurance companies of recognized standing, admitted to do business in the State of New York which shall be reasonably satisfactory to the Lessor.  Upon ten (10) days' written notice from the Lessor, the Lessee shall deliver to the Lessor either a duplicate original of the aforesaid policies or certificates evidencing such insurance, naming the Lessor as an additional insured, and, at least thirty (30) days prior to the expiration of said policies, the Lessee shall deliver renewals to the Lessor.  Such policies

- 20 -

shall contain a provision that no act, omission or negligence of the Lessee, its contractors, licensees, agents, servants, employees, invitees or visitors will affect or limit the obligation of the insurance company to pay the amount of any loss sustained and such policy shall be non-cancellable except upon thirty (30) days' written notice to the Lessor. In the event the Lessee shall fail to obtain the insurance required in (a) and (b) above, and/or to pay all premiums and charges therefor, the Lessor may, but shall not be obligated to, obtain the same, in which event the amount of the premiums paid by the Lessor shall be paid by the Lessee to the Lessor as additional rent on the first day of the calendar month following demand therefor by the Lessor. The failure of the Lessee to obtain and maintain, throughout the term of this lease, the insurance required in (a) and (b) above shall be a default under the lease.

The Lessor and the Lessee agree to use best efforts to include in each of its policies insuring against property damage a waiver of the insurer's right of subrogation against the other party. If such waiver shall not be, or shall cease to be, obtainable without additional charge, the Lessee shall promptly notify the Lessor. In such case, if the Lessor shall so elect and shall pay the insurer's additional charge therefor, such waiver shall be included in the policy. Each party hereby releases the other party with respect to any claim (including a claim for negligence) which it might otherwise have against the other party for loss, damage or destruction with respect to its property occurring during the term of this lease to the extent to which the same party is insured under a policy containing a waiver of subrogation. If, notwithstanding the recovery of insurance proceeds by either party for loss, damage or destruction of its property, the other party is liable to the first party with respect thereto or is obligated under this lease to make replacement, repair or restoration, then provided the first party's right of full recovery under its insurance policies is not thereby prejudiced or otherwise adversely affected, the amount of the net proceeds of the first party's insurance against such loss, damage or destruction shall be off-set against the second party's liability to the first party therefor or shall be made available to the second party to pay for the replacement, repair or restoration, as the case may be.

The waiver of subrogation, if obtainable, referred to above shall extend to the agents and employees of the Lessor and all permitted occupants of the apartment. Nothing contained in this section 3.30 shall be deemed to relieve either party from any duty imposed elsewhere in this lease to repair, restore or rebuild.

**3.31 Cooperation.** The Lessee shall always in good faith endeavor to observe and promote the cooperative purposes for the accomplishment of which the Lessor is incorporated.

# ARTICLE IV

## TERMINATION BY CONDITIONAL LIMITATION

**4.1 Conditional Limitation.** If, upon, or at any time after, the happening of any of the events mentioned in sections (a) to (h), inclusive, of this section 4.1, the Lessor shall give to the Lessee a notice stating that the term hereof will expire on a date at least thirty (30) days thereafter, or if, upon, or at any time after, the happening of the event mentioned in subdivision (h) hereof, the Lessor shall give to the Lessee a notice stating that the term hereof will expire on a September 30 at least three months after the giving of such notice, this lease shall expire on the date so fixed in the notice, it being the intention of the parties here to create hereby a conditional limitation, and it shall thereupon be lawful for the Lessor to re-enter the apartment and to remove all persons and personal property therefrom, either by summary dispossess proceedings, or by any suitable action or proceeding at law or in equity, or by force or otherwise, and to repossess the apartment in its former estate as if this lease had not been made.

(a) **Lessee Ceasing to Own Accompanying Shares.** If at any time during the term of this lease the Lessee shall cease to be the owner of all of the shares of the Lessor which are hereinbefore stated to be owned by the Lessee and allocated to this lease, or if this lease shall pass or be assigned to anyone who is not then the owner of all of said shares.

(b) **Bankruptcy of Lessee.** If at any time during the term of this lease (1) the Lessee shall be adjudicated a bankrupt under the laws of the United States or adjudicated insolvent or take the benefit of any Insolvency Statute; or (2) a receiver or trustee of all of the property of the Lessee or of this lease shall be appointed under any provisions of the laws of the State of New York, or under any statute of the United States, or any statute of any state of the United States and the order appointing such receiver or trustee shall not be vacated within sixty (60) days; or (3) the Lessee shall make a general assignment for the benefit of creditors; or (4) any of shares owned by the Lessee and appurtenant to this lease shall be duly levied upon under the process of any court whatever unless such levy shall be discharged within sixty (60) days; or (5) this lease or the shares appurtenant thereto shall pass by operation of law or otherwise to anyone other than the Lessee herein named or a person to whom such Lessee has assigned this lease in the manner herein permitted, but this clause (5) shall not be applicable if this lease or its appurtenant shares shall pass to the executors or administrators of the Lessee or by will or intestacy to the spouse or ascendants or descendants of the named Lessee.

(c) **Unauthorized Assignment, Subletting or Pledge.** If at any time there shall be an assignment or pledge of this lease, or any subletting of the apartment, without full compliance with the requirements of Section 3.9 hereof (Subletting), Section 3.10 hereof (Assignment) or Section 3.14 hereof (Pledge of Shares), as the case may be.

- 22 -

(d) **Default in Rent.** If the Lessee shall default for a period of one month in the payment of any rent or additional rent, or of any installment thereof, hereinbefore provided for, and shall fail to cure such default within ten (10) days after written notice thereof shall have been given by the Lessor.

(e) **Default in Other Obligations.** If the Lessee shall default in the performance of any covenant or provision hereof, other than the covenant to pay rents, for thirty (30) days after written notice of such default shall have been given by the Lessor, provided, however, that if said default consists of the failure to perform any act the performance of which, in the reasonable opinion of the Lessor, requires more than thirty (30) days to cure, then if within said thirty (30) day period such cure is commenced and thereafter diligently prosecuted to completion, the Lessee shall be deemed to have cured such default.

(f) **Lessee's Objectionable Conduct.** If at any time the Lessor shall determine, upon the affirmative vote of the holders of record of at least two-thirds of the shares of the Lessor which are then issued and outstanding, at a meeting of such shareholders duly called to take action on the subject, that because of objectionable conduct on the part of the Lessee, or of a person dwelling in or visiting the apartment other than a transient guest, the tenancy of the Lessee is undesirable, it being understood, without limiting the generality of the provisions contained in the foregoing sentence, that repeatedly to violate or disregard the rules and regulations hereunto attached or hereafter established in accordance with the provisions of this lease, or to permit or tolerate a person or dissolute, loose or immoral character to enter or remain in the Building or the apartment, shall be deemed to be objectionable conduct.

(g) **Condemnation.** If at any time the Building or a substantial portion hereof shall be taken by condemnation proceedings, so as to render the operation of the Building as a cooperative apartment hotel impracticable or undesirable in the opinion of a majority of the board of directors of the Lessor.

(h) **Termination of All Proprietary Leases.** If lessees owning at least two-thirds of the shares of the Lessor owned by lessees under proprietary leases which are then in force and of which a notice of cancellation as provided in Article V of this lease shall not previously have been given shall determine, not less than four months before the 30th day of September in 1998, or before the 30th day of September in any year thereafter, to terminate all such proprietary leases on such 30th day of September.

A determination to terminate under this subsection (h) shall be evidenced by a written notice to the Lessor signed by the lessees making such determination, or by their vote at a meeting of shareholders duly called to take action on the subject. Promptly after the receipt of such a notice or after such a vote, the Lessor shall give to the holders of all proprietary leases which are then in force, and of which a notice of cancellation as provided

- 23 -

in said Article V shall not previously have been given, the notice provided by this section 4.1 of the expiration of the term of all such leases.

**4.2  Waiver of Right of Redemption.**  The Lessee hereby expressly waives any and all right of redemption in case the Lessee shall be dispossessed by judgment or warrant of any court or judge.  The words "enter", "re-enter" and "re-entry" as used in this lease are not restricted to their technical legal meaning.  In the event of a breach or threatened breach by the Lessee of any of the covenants or provisions herein, the Lessor shall have the right of injunction, and the right to invoke any remedy allowed at law or in equity, as if re-entry, summary proceedings and other remedies were not herein provided for.

**4.3  Liability of Lessee upon Termination; Surrender of Possession.**  Upon the termination of this lease under the provisions of subsections (a) to (f), inclusive, of section 4.1 of this lease, the Lessee shall remain liable as provided in section 3.3 hereof (Certain Consequences of Default).  Upon the termination of this lease under the provisions of subdivisions (g) or (h) of section 4.1 or upon the expiration of this lease the Lessee shall be and remain liable to pay all rent due or accrued and to perform all covenants and agreements of the Lessee up to the date of such termination and, on or before such termination, the Lessee shall vacate the apartment and remove therefrom all property of the Lessee which upon such termination does not become the property of the Lessor under the provisions of section 3.17 (Removal of Fixtures) of this lease and surrender possession of the apartment to the Lessor or its assigns, and upon demand of the Lessor or its assigns shall execute, acknowledge and deliver to the Lessor or its assigns any instrument which may reasonably be required for surrendering all estate and interest of the Lessee in the apartment or in the Building of which it is a part.

**4.4  Sale of Shares.**  Upon the termination of this lease under subdivisions (a), (b), (c), (d), (e) or (f) of section 4.1 hereof, the Lessee shall surrender to the Lessor the certificate or certificates for the shares of the Lessor owned by the Lessee and allocated to the apartment.  Whether or not said certificate or certificates are surrendered, the Lessor may issue a new certificate for the shares of the Lessor owned by the Lessee and allocated thereto when a purchaser therefor is found.  Upon such issuance, the certificate for shares owned or held by the Lessee shall automatically be cancelled and rendered null and void. The Lessor may apply the proceeds received by it for the issuance of such shares towards the payment of the Lessee's indebtedness hereunder, including interest, reasonable attorneys' fees and other reasonable expenses incurred by the Lessor and if the proceeds are sufficient to pay the same, the Lessor shall pay over any surplus to the Lessee, but if insufficient, the Lessee shall remain liable for the balance of the indebtedness.  Upon the issuance of any new proprietary lease and certificate for shares, the Lessee's continuing liability hereunder shall cease and the Lessee shall only be liable for rent, additional rent and expenses accrued to that time.  The Lessor shall not, however, be obligated to sell such shares and appurtenant lease or otherwise make any attempt to mitigate damages.

## ARTICLE V

## CANCELLATION AT OPTION OF LESSEE

5.1 **Lessee's Option to Cancel.**  This lease may be cancelled by the Lessee on September 30, 1998, or on any September 30 thereafter, upon complying with all the provisions of this Article.  Written notice of intention to cancel must be served by the Lessee upon the Lessor on or before February 28 in the calendar year in which such cancellation is to occur.  At the time of the service of such notice of intention to cancel there must be deposited with the Lessor by the Lessee:

(a) The Lessee's counterpart of this lease with a proper assignment thereof in blank whereby the full and absolute title to this lease is assigned free from all subleases (except as in section 5.4 hereof (Effect of Subleases) provided), liens, encumbrances and charges whatsoever;

(b) The Lessee's certificate for the shares of the Lessor which are hereinbefore stated to be owned by the Lessee, endorsed in blank for transfer and with all necessary transfer tax stamps affixed and with payment of any transfer taxes owed thereon;

(c) The Lessee's original of any sublease the existence of which, under the provisions of section 5.4 hereof (Effect of Subleases), shall not prevent the Lessee from cancelling this lease, together with an assignment thereof and of the subrents accruing thereunder from and after the 31st day of August next preceding the 30th day of September named in the notice of election to cancel as the date for the cancellation of this lease and an agreement in writing, executed and acknowledged by the tenant holding under such sublease, to attorn to the Lessor and to pay to the Lessor the rent reserved in such sublease from and after such 31st day of August to the expiration of the term of the sublease and during such period to perform all the terms and conditions of such sublease; and

(d) A written statement setting forth in detail those additions, improvements and fixtures, such as mantels, lighting fixtures, refrigerators, ranges, woodwork, panelling, ceilings, doors and decorations placed in the apartment at the Lessee's expense which the Lessee has under the terms of this lease, the right to remove, and which the Lessee desires to remove, and specifying in detail the proposed replacements to be made by the Lessee under the terms of this lease.

5.2 **Removal of Fixtures Surrender of Possession and Payments.**  All additions, improvements, furniture, furnishings, equipment and fixtures, which are removable under the terms of this lease and which are enumerated in the statement made as provided in subsection (d) of section 5.1 hereof, shall be removed and all required replacements made by the Lessee prior to the 31st day of August next preceding the 30th day

- 25 -

of September named in the notice of election to cancel as the date for the cancellation of this lease and on or before such 31st day of August the Lessee shall surrender possession of the apartment including all furniture and furnishings which are the property of the Lessor, to the Lessor free from all subleases (except as in section 5.4 hereof (Effect of Subleases) provided), liens, encumbrances or other charges and shall pay to the Lessor all rent and other charges which shall be payable under this lease up to and including the 30th day of September succeeding such 31st day of August.

5.3 **Additional Payments by Lessee; Replacements**. In the event of giving such notice of intention to cancel, and except as herein otherwise provided, the Lessee shall:

a) replace all mantels, lighting fixtures, refrigerators, ranges, woodwork (other than panelling), ceilings, doors or other fixtures removed by the Lessee with others of a kind and quality satisfactory to the board of directors of the Lessor, and pay the cost of such replacement; and

(b) pay the cost of repairing any damages resulting from the removal by the Lessee of any panelling or other additions, improvements or fixtures.

5.4 **Effect of Subleases**. The existence of a sublease of the apartment shall not prevent the Lessee from cancelling this lease under the provisions of this Article and such cancellation shall not affect the rights or obligations of the tenant under any such sublease, provided that the Lessor has given consent, if required, as provided in section 3.9 hereof (Subletting), to such sublease, and provided further that there shall have been deposited with the Lessor the documents specified in subdivision (c) of section 5.1 of this lease, as required by said section.

5.5 **Permission to Show and Occupy Premises**. The Lessor or its agents may show the apartment to any prospective tenant at any time and from time to time after the giving of notice of the Lessee's intention to cancel this lease as in this Article provided, and, after the 31st day of August next succeeding the date on which such notice of intention to cancel is given, the Lessor, its agents and employees and the succeeding tenant may enter the apartment, take possession thereof and make such alteration, additions and repairs therein as the Lessor may approve without diminution or abatement of the rent due hereunder.

5.6 **Cancellation of Lease; Transfer of Shares**. If the Lessee shall have done the things and made the payments at the times in the amounts and in the manner required by this Article, then upon the 30th day of September named in the notice of intention to cancel as the date of the cancellation of this lease, this lease shall terminate and all rights, duties and obligations of the parties hereunder shall cease and determine as of said 30th day of September, and the shares of the Lessor to which this lease is appurtenant shall become the absolute property of the Lessor, provided, however, that the Lessee shall not be

released or discharged from any indebtedness owing from the Lessee to the Lessor on said last mentioned date, and provided further that if the Lessee shall fail to do any of the things or make any of the payments at the times, in the amounts and in the manner required by this Article, the Lessor shall have the option (a) of returning to the Lessee this lease, the certificate of shares and other documents deposited and thereupon the Lessee shall be deemed to have withdrawn the notice of intention to cancel this lease, or (b) of treating this lease as cancelled as of the 30th day of September named in the notice of intention to cancel as the date for the cancellation of such lease, and bringing such proceedings and actions as it deems best to enforce the covenants of the Lessee in this Article contained and to collect from the Lessee the payments which the Lessee is required to make under this Article, together with reasonable attorneys' fees and disbursements.

5.7 **Cancellation by Holders of Two-Thirds of Shares.** If at any one time lessees owning at least two-thirds of the then issued and outstanding shares of the Lessor shall exercise their options to cancel their leases as provided in section 4.1 hereof (Conditional Limitation), then this and all other proprietary leases shall thereupon terminate on the 30th day of September of the calendar year in which such options shall have been exercised, as though every lessee had exercised such option. In such event the lessees shall not be required to surrender the shares accompanying the leases and all certificates for shares delivered to the Lessor by those who have, during that year, served notice of intention to cancel their leases under the provisions of this Article, shall be returned to such lessees.

## ARTICLE VI

## MISCELLANEOUS

6.1 **Restrictions on Transfer.** The shares of the Lessor to which this lease is appurtenant held by the Lessee have been acquired and are owned subject to the following conditions which have been agreed upon with the Lessor and with each of the other proprietary lessees for their mutual benefit:

(a) The shares represented by each certificate are transferable only as an entirety;

(b) Neither the Lessee nor the Lessee's personal representatives shall sell or transfer said shares except to the Lessor, or to an assignee of this lease after compliance with all of the provisions of section 3.10 of this lease (Assignment).

(c) The Lessor shall at all times have a first lien upon the shares of the Lessor owned by each lessee shareholder for all indebtedness and obligations owing by such shareholder to the Lessor arising under the provision of any proprietary lease issued by the

- 27 -

Lessor and at any time held by such shareholder or otherwise arising. The Lessor may refuse to consent to the transfer of shares of any such shareholder indebted to the Lessor unless and until such indebtedness is paid; and

(d) The Lessor shall be entitled to treat the holder of record of any share or shares as the holder in fact thereof, and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such shares on the part of any other person, including, but not limited to, creditors other than executors or administrators of the Lessee, whether or not it shall have express or other notice thereof, except as expressly provided by the laws of New York.

6.2 **Headings.** The headings of the several paragraphs of this lease shall not be deemed a part of this lease.

6.3 **No Oral Changes.** The provisions of this lease cannot be changed orally.

6.4 **Application of Covenants.** Except as otherwise in this lease provided, the references herein to the Lessor shall be deemed to include its successors and assigns, and the references herein to the Lessee or to a shareholder of the Lessor shall be deemed to include the executors, administrators, personal representatives, legatees and assigns of the Lessee or of such shareholder, and the covenants herein contained shall apply to, bind and enure to the benefit of the Lessor and its successors and assigns, and the Lessee and the executors, administrators, personal representatives, legatees and assigns of the Lessee; but nothing in this lease contained shall be deemed to confer any right or benefit on any creditor or third party.

6.5 **More Than One Lessee.** If more than one person is named as the Lessee hereunder, the Lessor may require the signatures of all such persons in connection with any notice to be given or action to be taken by the Lessee hereunder, including, without limiting the generality of the foregoing, the surrender or assignment of this lease, or any request for consent to assignment or subletting. Each person named as the Lessee shall be fully liable for all of the Lessee's obligations hereunder. Any notice by the Lessor to any person named as a Lessee shall be sufficient, and shall have the same force and effect as though given to all persons named as the Lessee.

6.6 **Waiver of Trial by Jury.** It is mutually agreed by and between Lessor and Lessee that the respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this lease, the Lessee's use or occupancy of the apartment and/or any claim or damage.

6.7 **Notices.** Any notice by the Lessor to the Lessee shall be deemed to have been duly given, and any demand by the Lessor upon the Lessee shall be deemed to have been duly made, if in writing and personally delivered or mailed by registered or certified

mail, return receipt requested, addressed to the Lessee at 781 Fifth Avenue, New York, N.Y.
10022, unless and until another address is specified in writing by the Lessee. Any notice by
the Lessee to the Lessor shall be deemed to have been duly given if in writing and
personally delivered to or mailed by registered or certified mail, return receipt requested,
addressed to The Sherry-Netherland, Inc., 781 Fifth Avenue, New York, N.Y. 10022, unless
and until another address is specified in writing by the Lessor.

**6.8 Partial Invalidity.** If any clause or provision herein contained shall
be adjudged invalid, the same shall not affect the validity of any other clause or provision of
this lease, or constitute any cause of action in favor of either party as against the other.

**IN WITNESS WHEREOF**, the Lessor and the Lessee have executed this
instrument the day and year first above written.

**THE SHERRY-NETHERLAND, INC.**

By: _____
Name: MICHAEL J. ULLMAN
Title: EXECUTIVE V.P. & C.O.O

Denevor Holdings LLC _____
Lessee

_____
Lessee

- 29 -

STATE OF NEW YORK          )
                                                     ) ss.:
COUNTY OF NEW YORK

On the _1st_ day of _March_ in the year _2015_, before me, the undersigned, personally appeared _MICHAEL J. ULLMAN_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that (s)he executed the same in (her/his/their) capacity(ies), and that by (his/her/their) signature on the instrument, the individual(s), or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

STATE OF NEW YORK          )
                                                     ) ss.:
COUNTY OF NEW YORK

On the _6th_ day of _March_ in the year _2015_, before me, the undersigned, personally appeared _Ira Silbert_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that (s)he executed the same in (her/his/their) capacity(ies), and that by (his/her/their) signature on the instrument, the individual(s), or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

- 30 -

This page intentionally left blank

This page intentionally left blank

## SHERRY-NETHERLAND HOUSE RULES

**One.** The public halls, elevator vestibules and stairways of the Building shall not be obstructed or used for any other purpose than ingress to and egress from the apartments in the Building.

**Two.** No article shall be placed in any of the halls or on any of the staircase or fire tower landings, nor shall any fire exit or fire stair be obstructed in any manner.

**Three.** Children shall not play in the public halls, elevator vestibules, stairways, fire towers or passenger elevators and shall not be permitted in the service elevators of the Building.

**Four.** No public hall or elevator vestibule above the ground floor of the Building shall be decorated or furnished by any Lessee in any manner without the prior consent of all of the Lessees to whose apartments such hall or vestibule serves as a way of ingress and egress.

**Five.** The Lessee shall keep the Lessee's apartment in a good state of preservation and cleanliness and shall not sweep or throw or permit to be swept or thrown therefrom, or from the doors, windows or terraces thereof, any dirt or other substance. Nothing shall be hung or shaken from the doors, windows or terraces or placed upon the window sills of the Building.

**Six.** No awnings or window guards visible from the outside of the Building shall be used except such as shall have been approved in writing by the Lessor.

**Seven.** No radio or television aerial shall be attached to or hung from the exterior of the Building, and no sign, notice, advertisement or illumination shall be inscribed or exposed on or at any window or other part of the Building, except such as shall have been approved in writing by the Lessor, nor shall anything be projected from any window of the Building without similar approval.

**Eight.** No ventilator or air conditioning device shall be installed by the Lessee without the prior written approval of the Lessor as to the type, location and manner of installation of such device. Through-the-wall air conditioners (as opposed to window units) shall be used whenever possible. All ventilator or air conditioning devices shall be connected to a separate electric circuit. The Lessee shall keep any such device which protrudes from the window of the apartment in good appearance and mechanical repair. The Lessee shall not permit any such device to leak condensation, or to make any noise which may unreasonably disturb or interfere with the rights, comforts or conveniences of any other occupant of the Building. If the Lessee shall fail to keep any such device in good order and repair, and

- 1 -

properly painted, the Lessor, in its discretion, may remove such device from the window, charging the cost of removal to the Lessee, collectible on demand as additional rent, and the device shall not be replaced until it has been put in proper condition. All ventilator and air conditioning devices shall be readily accessible to the Lessor.

**Nine.** All radio, television or other electrical equipment of any kind or nature installed or used in each Lessee's apartment shall fully comply with all rules, regulations, requirements or recommendations of the New York Board of Fire Underwriters and the public authorities having jurisdiction, and the Lessee alone shall be liable for any damage or injury caused by radio, television or other electrical equipment in the Lessee's apartment.

**Ten.** No velocipedes, bicycles, scooters or similar vehicles shall be taken into or from the Building through the main entrance or be allowed in the passenger elevators and no baby carriages or any of the above-mentioned vehicles shall be allowed to stand in the public halls, passageways or other public areas of the Building.

**Eleven.** No Lessee shall make or permit any disturbing noises in the Building, or do or permit anything to be done therein, which will interfere with the rights, comforts or conveniences of other occupants. No Lessee shall play upon or suffer to be played upon any musical instrument, or operate or permit to be operated a phonograph or a radio or television or other loud speaker in the Lessee's apartment between the hours of eleven o'clock P.M. and the following nine o'clock A.M. if the same shall disturb or annoy other occupants of the Building, and in no event shall practice or suffer to be practiced either vocal or instrumental music for more than two hours in any day or between the hours of six o'clock P.M. and the following nine o'clock A.M.

**Twelve.** No water beds shall be permitted to be installed or maintained in the Building.

**Thirteen.** No bird, reptile or animal shall be kept or harbored in the Building unless the same in each instance be expressly permitted in writing by the Lessor. In no event shall dogs be permitted in elevators or in any of the public portions of the Building unless carried or on leash. Large dogs shall not be carried in the passenger elevators, but only in the service elevator.

**Fourteen.** Tradespeople requiring access to apartments shall sign in and obtain proper clearance from the appropriate employee of the Lessor and shall use the

service elevators for ingress and egress and shall not use the passenger elevators for any purpose.

**Fifteen.** The passenger and service elevators in the Building shall be operated only by employees of the Lessor and there shall be no interference whatever with

such employees by Lessees or members of their families or their guests, employees or subtenants.

**Sixteen.**  Supplies, market goods and packages of every kind are to be delivered only through the service entrance of the Building and by the service elevators to the apartments. Trunks and heavy baggage shall be taken in or out of the Building by the service elevators and through the basement.

**Seventeen.**  The Lessee shall comply with all requirements and regulations of the Lessor regarding the disposal of refuse.  All Lessees shall separate their trash into "recyclable" and "nonrecyclable" materials, or into other categories, as the Lessor may require.  The Lessor may designate, from time to time, the types of materials which must be separated for recycling, the types of containers or binding materials to be used by the Lessee for the disposal of designated materials and the locations where designated materials shall be deposited.  The Lessor may also establish other regulations regarding the disposal of refuse.  Any costs or expenses incurred by the Lessor due to the Lessee's failure to comply with the requirements imposed by law or by the Lessor, including but not limited to fees, fines or penalties imposed on the Lessor or the Building by any governmental agency and reasonable attorney's fees and disbursements, shall be payable by the Lessee as additional rent under the lease.

**Eighteen.**  Water-closets and other water apparatus in the Building shall not be used for any purpose other than those for which they were designed, nor shall any sweepings, rubbish, rags or any other article be thrown into the same.  Any damage resulting from misuse of any water-closets or other apparatus in the Lessee's apartment shall be repaired and paid for by the Lessee.

**Nineteen**.  No occupant of the Building shall send any employee of the Lessor out of the Building on any private business.

**Twenty.**  The agents of the Lessor, and any contractor or workman authorized by the Lessor, may enter any room or apartment in the Building at any reasonable hour of the day for the purpose of inspecting the apartment for the presence of any vermin, insects or other pests and for the purpose of taking such measures as may be necessary to control or exterminate any such vermin, insects or other pests.

**Twenty-one**.  Each person, whether the Lessee, underlessee, guest or member of the family of the Lessee or underlessee, at any time in occupancy of any apartment in the Building shall, in compliance with the requirements of law, register in the hotel registry maintained by the Lessor at the commencement of each actual occupancy and shall notify the Lessor at the termination of each such occupancy.

**Twenty-two**.  The State of New York Liquor Authority, by its authorized investigators, agents and employees, at all times shall have the right, and shall be afforded the opportunity and access, to enter and inspect any and all apartments, rooms and other areas in the Building for the purpose of enforcing the State of New York Alcohol Beverage Control Law and the Rules and Regulations of the State of New York Liquor Authority adopted and issued pursuant thereto.

**Twenty-three**.  The Lessor will provide a safe in the office of the Building for the safekeeping of money, jewels, ornaments, currency, securities and other valuable or other small articles belonging to the Lessee, the Lessee's subtenant, guest, or any member of the family of the Lessee or subtenant.  Unless so deposited, the Lessor shall not be liable for any loss of any such items by reason of any cause whatsoever.

**Twenty-four.**  No cooking shall be permitted on any terrace of the Building or in any apartment not especially constructed and equipped therefor by Lessor, and in the latter case kitchen and pantry corridor doors shall be kept closed at all times during use for preparation or serving of food.

**Twenty-five.**  Maid service is furnished by the Lessor only for routine maintenance of cleanliness and order in the apartments.  Neither the Lessee nor any occupant of the apartment shall at any time induce, request or permit any maid to perform any personal or other service beyond such routine maintenance.  The Lessor shall not be liable for any loss or damage to any of the Lessee's property in the apartment caused by a maid in the performance of such routine maintenance, except to the extent caused by the negligence or willful act of such maid.

**Twenty-six.**  The Building does not supply any kitchen utensils, dishes or glassware.  Any such items delivered to the Lessee's apartment by Room Service are to be promptly returned by the Lessee to Room Service.  Upon failure of the Lessee promptly to return such item, the Lessee may be charged as additional rent for the value thereof.

**Twenty-seven.**  No vehicle belonging to the Lessee or to a member of the family or guest, subtenant or employee of the Lessee shall be parked in such manner as to impede or prevent ready access to any entrance to the Building by another vehicle.

**Twenty-eight**.  The Lessor may from time to time curtail or relocate any space devoted to storage purposes in the basement of the Building.

**Twenty-nine.**  Complaints regarding the service of the Building shall be made in writing to the Lessor.

**Thirty.** Any consent or approval given under these house rules by the Lessor shall be revocable at any time.

**Thirty-one.** No group tour or exhibition of any apartment or its contents shall be conducted, nor shall any auction sale be held in any apartment, without the prior written consent of the Lessor; nor shall the elevators or other facilities of the Building be unduly burdened in the sole opinion of the Lessor.

**Thirty-two.** All Lessees shall be required on demand by the Lessor to cure any illegal conditions affecting their apartments, including but not limited to any conditions resulting from alterations made to the apartment even if said alteration was previously approved by the Lessor, notwithstanding the fact that a predecessor Lessee may have been responsible for causing said illegal condition.

**Thirty-three.** If radiator covers are installed by Lessees, such covers shall permit access to the radiator for inspection, maintenance, repair, removal or replacement thereof.

**Thirty-four.** All access panels in apartments which provide access to water, steam and electric risers and other building systems shall be kept free and clear from obstruction. The Lessor shall have the right to enter apartments and open such access panels for the purpose of inspecting, maintaining and repairing the building systems contained therein.

**Thirty-five.** Except in cases of emergency, where no notice shall be required, the Lessor shall give the Lessee reasonable notice, either in writing or by telephone, of the Lessor's intent to enter the apartment pursuant to the authority granted in these House Rules or in the lease.

**Thirty-six.** These house rules may be added to, amended or repealed at any time by resolution of the board of directors of the Lessor.

**Thirty-seven.** In accordance with requirements of Lessee under Section 3.15 of the Lease and the rights of Lessor under Section 3.10(e) of the Lease, upon the assignment by Lessee of the Lease, Lessor may require, in its reasonable judgment, that the exterior windows located within Lessee's apartment be replaced. In the event of such determination, Lessee shall be required, within one year of such assignment of Lease, to replace such exterior windows with windows approved by Lessor. In such event, if Lessee fails to replace such exterior windows within one year after the assignment of the Lease, Lessor may, at Lessees' sole cost and expense, replace such windows with suitable replacement windows as determined by Lessor and the cost of such replacement shall be reimbursed to the Lessor on demand as additional rent.

This page intentionally left blank

# EXHIBIT 2

MAID's Room
Apt. No.: 2219
Shares: 50

# THE SHERRY-NETHERLAND, INC.

*Lessor,*

TO

GENEVER HOLDINGS LLC

*Lessee.*

## Proprietary Lease

**This Proprietary lease was adopted by shareholders at the Annual Meeting of Shareholders held on June 11, 1992, supercedes all prior proprietary leases and becomes effective on October 1, 1996, as amended by vote of shareholders on November 29, 2012.**

## INDEX

Page

ARTICLE I – CASH REQUIREMENTS, RENT, POWER OF BOARD OF DIRECTORS

    1.1  Cash Requirements.................................................................................... 2
    1.2  Rent......................................................................................................... 2
    1.3  Power of Board of Directors.................................................................... 3

ARTICLE II  –  OBLIGATIONS OF THE LESSOR AND LIMITATIONS THEREON

    2.1  Lessor's Repairs...................................................................................... 4
    2.2  Maintenance and Hotel Service.............................................................. 4
    2.3  Damage to the Building........................................................................... 5
    2.4  Books of Account.................................................................................... 5
    2.5  Terraces................................................................................................... 6
    2.6  Accompanying Shares to be Specified in Proprietary Leases................. 7
    2.7  Changes in Terms and Conditions of Proprietary Leases....................... 7
    2.8  Quiet Enjoyment..................................................................................... 8

ARTICLE III – OBLIGATION OF THE LESSEE

    3.1  Payment of Rent...................................................................................... 8
    3.2  Electric Service....................................................................................... 8
    3.3  Certain Consequences of Default............................................................ 9
    3.4  Receipt of Rent from Subtenant on Default in Payment of Rent............ 10
    3.5  Failure to Fix Cash Requirements........................................................... 10
    3.6  House Rules............................................................................................. 10
    3.7  Use and Occupancy of Premises............................................................. 10
    3.8  Fire Insurance Rates and Requirements of Law...................................... 12
    3.9  Subletting................................................................................................ 12
    3.10 Assignment............................................................................................. 13
    3.11 Release of Lessee upon Assignment....................................................... 13
    3.12 No Implied Consent................................................................................ 14
    3.13 Consequences of Unauthorized Assignment or Subletting..................... 14
    3.14 Pledge of Shares..................................................................................... 14
    3.15 Lessee's Repairs...................................................................................... 14
    3.16 Alterations.............................................................................................. 15
    3.17 Removal of Fixtures Installed by Lessee................................................ 16
    3.18 Surrender of Possession.......................................................................... 16
    3.19 Lease Subordinate to Mortgages............................................................ 16
    3.20 Mechanics' Liens.................................................................................... 17
    3.21 Entry for Examination and Repair.......................................................... 17
    3.22 No Implied Wavier.................................................................................. 18
    3.23 Reimbursement of Lessor's Expenses..................................................... 18
    3.24 Special Services...................................................................................... 18

Page

3.25  Lessor's Immunities ................................................................................ 18
3.26  Notice of Defects .................................................................................... 19
3.27  Lessor's Right to Perform at Lessee's Expense ...................................... 19
3.28  Lessee's Indemnity of Lessor ................................................................. 20
3.29  Injunction ............................................................................................... 20
3.30  Insurance ................................................................................................ 20
3.31  Cooperation ............................................................................................ 21

ARTICLE IV - TERMINATION BY CONDITIONAL LIMITATION ................. 22
4.1  Conditional Limitation .............................................................................. 24
4.2  Waiver of Right of Redemption ................................................................ 24
4.3  Liability of Lessee upon Termination; Surrender of Possession ............. 24
4.4  Sale of Shares ........................................................................................... 24

ARTICLE V - CANCELLATION AT OPTION OF LESSEE ............................... 25
5.1  Lessee's Option to Cancel ........................................................................ 25
5.2  Removal of Fixtures, Surrender of Possession and Payments ................. 26
5.3  Additional Payments by Lessee; Replacements ....................................... 26
5.4  Effect of Subleases .................................................................................. 26
5.5  Permission to Show and Occupy Premises ............................................. 26
5.6  Cancellation of Lease; Transfer of Shares ............................................... 27
5.7  Cancellation by Holders of Two-Thirds of Shares .................................. 27

ARTICLE VI - MISCELLANEOUS ..................................................................... 27
6.1  Restrictions on Transfer ........................................................................... 28
6.2  Headings ................................................................................................... 28
6.3  No Oral Changes ...................................................................................... 28
6.4  Application of Covenants ......................................................................... 28
6.5  More Than One Lessee ............................................................................. 28
6.6  Waiver of Trial by Jury ............................................................................ 28
6.7  Notices ...................................................................................................... 28
6.8  Partial Invalidity ...................................................................................... 29

# PROPRIETARY LEASE

**INDENTURE OF LEASE**, made the _6 th_ day of _MARCH_, _2015_. by and between THE SHERRY-NETHERLAND, INC. (formerly known as "Fifth Avenue & 59th Corporation"), a corporation organized under the laws of the State of New York (hereinafter called the "Lessor") and _GENEVER HOLDINGS LLC_ _____, (hereinafter called the "Lessee").

WHEREAS, the Lessor is the owner of the land and the building in the Borough of Manhattan, New York, N.Y., known as "The Sherry-Netherland" and by the street number 781 Fifth Avenue (hereinafter called the "Building"); and

WHEREAS, the Lessor is a cooperative housing corporation and has leased the apartments in the Building to the several owners of its capital shares by instruments known as proprietary leases; and

WHEREAS, the Lessee owns _50_ shares of the Lessor which have been allocated to the room or suite herein designated as the apartment, and which are appurtenant to this lease;

NOW, THERFORE, in consideration of the premises and of the rents, covenants and agreements hereinafter provided and contained, the Lessor hereby leases to the Lessee, subject to the terms and conditions hereinafter expressed, and the Lessee hereby hires and takes from the Lessor, all of that certain apartment in the Building, known as Apartment _2219_ _MAID'S Room_ (hereinafter called the "apartment").

TO HAVE AND TO HOLD the apartment, with the furniture, furnishings and equipment therein belonging to the Lessee and the appurtenances, unto the Lessee, and the executors, administrators, and authorized assigns of the Lessee, upon the terms and conditions herein set forth, from the _6th_ day of _MARCH, 2015_, until the 30th day of September 2046 (unless the term shall sooner expire as hereinafter in this lease provided), at a rent for each year, or portion of a year, during said term equal to the proportionate share as hereinafter provided of the aggregate amount of the cash requirements of the Lessor, as hereinafter defined for such year or portion of a year, together with all additional rent, special maintenance charges and other sums due from the Lessee to the Lessor hereunder.

For the purpose of fixing and determining such cash requirements and rental, the rental year shall be deemed to be the calendar year, except that the first year of the term hereunder shall be deemed to begin on the date on which such term commences and to end on the 31st day of December next ensuing, and the last year of the term hereunder shall be deemed to begin on the 1st day of January, 2046 and to end on the 30th day of September, 2046.

# ARTICLE I

# CASH REQUIREMENTS, RENT, POWER OF BOARD OF DIRECTORS

**1.1 Cash Requirements**. The cash requirements above referred to for each year or portion thereof are hereby defined and shall be deemed to be such aggregate sum as the board of directors of the Lessor from time to time, by a resolution or resolutions adopted during such year or portion thereof or the proceeding year, shall determine in its judgment is to be paid by all the lessees under proprietary leases then in force (after deducting any expected rents or incomes to be received during such year or portion thereof other than rents under proprietary leases) on account of the estimated expenses and outlays of the Lessor to the close of such year, growing out of or connected with the ownership, maintenance and operation of the Building, which sum may include among other things taxes, assessments, water rates, insurance premiums, operating expenses, alterations, replacements and repairs, expenses and liabilities incurred by the Lessor under or by reason of this or other leases, interest on mortgage indebtedness, payments on account of principal secured by mortgages, the payment of any other liens or charges, the payment of any deficit remaining from a previous period, the creation of a reasonable reserve or surplus fund and expenses for other corporate purposes.  The board of directors of the Lessor may, by resolution or resolutions duly adopted from time to time, up to the close of the year for which cash requirements have been so fixed and determined, increase or diminish (within the limits and on the conditions hereinabove provided) the amount previously fixed or determined for such year or portion thereof.  The board of directors may include in the cash requirements for the year or portion thereof (of which a share to be fixed as aforesaid shall be payable by the Lessee as rent for such year) any liabilities or items of expense which accrued or became payable in a previous year, or which might have been included in the cash requirements of a previous year but were not included therein and also any sums which the board of directors may deem it necessary or prudent to provide as a reserve against liabilities or items of expense then accrued or thereafter to accrue although not payable in that year.

**1.2 Rent**. The rent payable by the Lessee in and for each year or portion thereof, of the term shall be a sum (within the limits and on the conditions hereinabove provided) bearing to the aggregate amount of such cash requirements for such year or portion thereof, as the case may be, determined as aforesaid, the same ratio as that which the number of shares of the Lessor, owned by the Lessee at the time of the execution hereof as stated in the recitals of this proprietary lease, bears to the aggregate of the shares similarly specified in all the proprietary leases in effect at the time of the fixing and determination of such cash requirements, and such rent shall be payable in equal monthly installments in advance on the first day of each month, unless the board of directors of the Lessor shall otherwise direct. The board of directors of the Lessor may, at any time and from time to time, by resolution duly adopted, determine and direct what portion of said rent payable by the lessees under all such proprietary leases or other receipts for any year or years, but not more than such sums as are used or to be used to meet a cash requirement of the Lessor for payments on account of

- 2 -

principal of any mortgage on the property of the Lessor or other capital expenditures, shall be credited upon the corporate books of the Lessor as paid-in surplus.

The Lessee shall also pay the Lessee's pro-rata share (determined in the same manner as rent) of any special maintenance charge that may be levied by Lessor from time to time to pay for any repair, alteration, or improvement to the corporate property, or any deficit from operations for a prior period, or other cash requirements. Such special maintenance charge shall be deemed additional rent and shall be payable in a lump sum or in periodic installments, with or without interest, and upon such other terms and conditions as the board of directors of the Lessor shall determine.

The Lessee shall also pay such additional rent as may be provided for herein when due. The term "additional rent" shall include any and all sums due hereunder other than rent, whether or not such sums are denominated as "additional rent".

The rent hereunder shall begin to accrue on the date of the commencement of the term herein granted.

**1.3 Power of Board of Directors.** The board of directors of the Lessor shall have discretionary power to describe the manner of maintaining and operating the Building and to determine the cash requirements of the Lessor and any special maintenance charges to be paid as aforesaid by the lessees under proprietary leases. Every such determination by the board of directors shall be final and conclusive as to all lessees, and any expenditures made by the Lessor's officers, under the direction or with the approval of the Lessor's board of directors, shall, as against the lessees, be deemed necessarily and properly made for such purposes.

The power and authority to determine and establish the amount of and to require payment of the rent above provided for shall be possessed only by the board of directors of the Lessor elected by its shareholders and shall not pass to or be exercised by:

(a) Any creditor, receiver or trustee of the Lessor or any representative of any such creditor, receiver or trustee;

(b) Any board of directors elected by any such creditor receiver or trustee or by any representative of any such creditor, receiver or trustee.

- 3 -

## ARTICLE II

## OBLIGATIONS OF THE LESSOR AND LIMITATIONS THEREON

**2.1  Lessor's Repairs.** The Lessor shall keep in good repair the Building's foundations, sidewalks, walls (except interior walls of apartments, floor and ceilings, unless repairs thereto are necessitated by the failure of Lessor to make repairs for which it is by this paragraph 2.1 responsible), supports, beams, roofs, gutters, fences, cellars, chimneys, restaurants, bars and all lobbies, public spaces, entrances, street and court doorways, main halls, main stairways, elevators, pumps, tanks and all main and principal pipes for carrying water, gas or steam through the Building and all main drain pipes and electrical conduits, together with all plumbing, heating and other apparatus intended for the general service of the Building, except those portions of any of the foregoing which it is the duty of the Lessee to maintain and keep in good repair as hereinafter provided in section 3.15 hereof (Lessee's Repairs), it being agreed that the Lessee shall give the Lessor prompt notice of any accident or defect known to the Lessee and requiring repairs to be made.  Subject to the foregoing limitations, all repairs required to be made by the Lessor shall be at the expense of the Lessor, unless the same shall have been rendered necessary by the wrongful act or neglect or carelessness of the Lessee, or the Lessee's spouse, children, grandchildren, parents, grandparents, brothers or sisters, or the spouses of any of the foregoing (collectively hereinafter referred to as the Lessee's "family"), agents, servants, guests, employees or subtenants of the Lessee, in which case the Lessor shall be entitled to reimbursement from the Lessee for all expenses incurred in connection therewith, whether or not paid by the Lessor, and such reimbursements shall be due as additional rent on the first day of the calendar month following demand thereof by the Lessor on the Lessee.

**2.2  Maintenance and Hotel Service.**  Subject to the provisions of section 3.25 hereof (Lessor's Immunities), the Lessor shall maintain the Building as a luxury hotel and may engage a managing agent or management company to manage the building as such; shall keep the lobbies, public spaces, elevators and the public halls and stairways clean and properly lighted and heated; shall provide restaurant and bar facilities and room service of food and beverages (including alcoholic beverages); shall provide elevator service and the requisite number of attendants for the care and service of the Building; and shall provide the apartment with the usual high class hotel service, a sufficient supply of electricity (subject to section 3.2 hereof (Electric Service)), hot and cold water and of heat.

The covenants by the Lessor herein contained are subject, however, to the discretionary power of the board of directors of the Lessor to prescribe the manner of maintaining and operating the Building and to determine the cash requirements of the Lessor and any special maintenance charges, as hereinabove stated.  Interruption or curtailment, for whatever reason, of any services or facilities to be furnished by the Lessor shall not constitute a constructive or partial eviction nor entitle the Lessee to any compensation or abatement of rent.

- 4 -

**2.3  Damage to the Building**.  In case the building shall be damaged by fire or other cause, the same shall be restored, repaired or replaced as speedily as is reasonably possible at the expense of the Lessor, so as to conform substantially to the condition of the Building immediately preceding such fire or other casualty.  Anything in this section or section 2.1 (Lessor's Repairs) to the contrary notwithstanding, unless such damage is caused by the Lessor, or the agents or employees of the Lessor, the Lessor's obligation to restore, repair and replace pursuant to this section shall not apply to any additions, improvements, equipment, fixtures, furniture, furnishings, decorations, fine art or objets d'art placed or installed in the apartment by the Lessee or any of the Lessee's predecessors in interest, it being within the determination of the Lessee to maintain insurance to cover these items, nor shall the Lessor be obligated to repaint or replace wallpaper or other decorations in the apartment or to refinish floors located therein.

In case the damage resulting from fire or other cause shall be so extensive as to render the apartment partly or wholly untenantable, or if the means of access thereto shall be destroyed, the rent hereunder shall proportionately abate until the apartment shall, in the Lessor's reasonable opinion, again be rendered wholly tenantable or the means of access restored; but if said damage shall be caused by the act or negligence of the Lessee or the agents, employees, guests or members of the family of the Lessee or any occupant of the apartment, such rent shall abate only to the extent of the rental value insurance, if any, collected by Lessor with respect to the apartment.

If the board of directors of the Lessor shall determine that (i) the Building is totally destroyed by fire or other cause, or (ii) the Building is so damaged that it cannot be repaired within a reasonable time after loss shall have been adjusted with the insurance carriers, or (iii) the destruction or damage was caused by hazards which are not covered under the Lessor's insurance policies then in effect, and if in any such case the record holders of at least two-thirds of the issued shares at a shareholders' meeting duly called for that purpose held within one (1) year after the determination by the board of directors, shall vote not to repair, restore or rebuild, then upon the giving of notice pursuant to section 4.1 hereof (Conditional Limitation), this Lease and all other proprietary leases and all right, title and interest of the parties thereunder and the tenancies thereby created, shall thereupon wholly cease and expire and rent shall be paid to the date of such destruction or damage.  The Lessee hereby waives any and all rights under Section 227 of the Real Property Law and in no event shall the Lessee have any option or right to terminate this Lease, except as provided herein.

**2.4  Books of Account**.  The Lessor shall keep full and correct books of account and the same shall be open upon prior appointment during all reasonable hours to inspection by the Lessee or a representative of the Lessee.

**2.5   Terraces.**   A Lessee of an apartment having a direct access to a terrace or a portion of the roof adjoining an apartment (the "Terrace") shall have and enjoy the exclusive use of the portion of such Terrance which immediately adjoins the apartment, subject to: (i) the provisions of this paragraph, (ii) all other applicable provisions of the lease, (iii) the use of such Terrace by the Lessor to enable it to fulfill its obligations under this or any other proprietary lease entered into by the Lessor, including, but not limited to, its obligations to maintain and repair, (iv) such rules and regulations as the board of directors may, from time to time, enact and (v) the rules and regulations of the Board of Fire Underwriters and of all governmental authorities having jurisdiction over the Building. The Lessee shall not, in the use of such Terrace, endanger the safety of any person or the property of the Lessor or that of any such person or use the Terrace so as to interfere with or annoy the lessee or occupant of any apartment underneath the same.

It shall be the Lessee's duty, at the Lessee's own cost and expense, to keep the Terrace clean and free from debris and to maintain all screens and drain boxes in good condition. It shall be the Lessor's duty to keep the Terrace in good repair, subject to reasonable wear and tear and the provisions contained in this paragraph. The Lessor shall not be obligated, however, to maintain or repair the tiles and brick work on the Terrace.

No structures of any kind, including but not limited to, plantings, planters, fences and lattices (the "Structures"), shall be placed, erected, installed or reinstalled following removal, for any reason whatsoever, on such Terrace without the prior written approval of the Lessor. In the event of such placement, erection, installation or reinstallation without such approval, the Lessor shall have the right, at the Lessee's expense, to remove the Structures; further, should the Lessor, in its sole discretion, determine that repairs to such Terrace or to the apartment or to any other part of the Building, including, but not limited to any apartment in the Building, are required because of the existence of any Structures, whether or not said Structures have been approved by the Lessor, the Lessor may make such repairs, and the Lessee shall reimburse the Lessor for all of the costs of such repairs; such reimbursement shall be paid by the Lessee immediately on demand and such costs shall be deemed to be additional rent.

Any Structure erected, placed, installed or reinstalled by the Lessee or its predecessor in interest, whether or not in compliance with the provisions of this paragraph, may be removed, temporarily or permanently, in the sole discretion of the Lessor, by the Lessor, at the sole expense of the Lessee, for the purpose of insuring safety, complying with the applicable law, making repairs, or maintaining the Building.

No surfaces or walls of a Terrace shall be painted or otherwise covered by the Lessee without the prior written approval of the Lessor.

The Lessor shall have an unlimited right of access to such Terrance (i) to enforce compliance with the provisions of this paragraph, (ii) for any purpose set forth in this

paragraph and in this lease, and (iii) to otherwise enable it to comply with any applicable law or regulation.

The Lessor, for itself or other Lessees, shall have the right to erect, on the roof or on the outside wall of the Building, radio or television aerials and antennas or other equipment for its use and the use of the lessees in the Building and the Lessor shall have the right to access thereto for such installation and for the maintenance and repair thereof.

**2.6  Accompanying Shares to be Specified in Proprietary Leases.**  In every proprietary lease heretofore executed by the Lessor there has been specified, and in every proprietary lease hereafter executed by it there will be specified, the number of shares of the Lessor owned by the lessee therein named, which number, in relation to the aggregate of all numbers of shares similarly specified in all the proprietary leases at the time in force, shall constitute the basis for fixing, as hereinbefore provided, the proportionate share of the aggregate amount of the cash requirements of the Lessor, as hereinbefore defined, which shall be payable as rent by the Lessee.  In the event that, after the fixing of the amounts payable as rent by the lessees under proprietary leases for any period of time, one or more additional proprietary leases be made, thus increasing the aggregate number of shares specified in all proprietary leases, the rent to be paid under such additional lease or leases, unless and until otherwise fixed by the board of directors, shall be at the same rate per share for each share specified in such additional lease or is applicable to the shares specified in all other proprietary leases in effect at the time of the fixing and determination of such cash requirements; and the rent payable by lessees under such other proprietary leases, unless and until otherwise fixed by the board of directors, shall not be modified or affected by any ncrease in the aggregate number of shares specified in all proprietary leases.

**2.7  Changes in Terms and Condition of Proprietary Leases.**  Each proprietary lease shall be in the form of this Lease, except with respect to the number of shares of the Lessor owned by the Lessee, unless (i) a variation to a particular lease is authorized by lessees owing at least two-thirds (2/3) of the Lessor's shares then issued and outstanding accompanying proprietary leases then in force and such variation is agreed to in writing by the Lessor and the lessee affected or (ii) a change or amendment to the form of this lease (as distinct from house rules) shall be approved by lessees owning at least two-thirds (2/3) of the Lessor's shares then issued and outstanding accompanying proprietary leases then in force, and such changes shall be binding on all lessees even if they did not vote for such changes, except that the proportionate share of cash requirements payable by any lessee may not be increased nor may such lessee's right to cancel this lease under the conditions set forth in section 5.1 (Lessee's Right to Cancel) be eliminated or impaired without such lessee's express consent.  Approval by lessees as provided for herein shall be evidenced by written consent, or by affirmative vote, taken at a meeting called for such purpose.

**2.8 Quiet Enjoyment.** The Lessee, upon paying the rent and charges and performing the covenants and complying with the conditions on the part of the Lessee to be performed, as herein set forth, shall, at all times during the term hereby granted, quietly have, hold and enjoy the apartment without any suit, trouble or hindrance from the Lessor, subject however to the rights of present tenants or occupants of the apartment, and subject to any and all mortgages and underlying leases of the land and Building as provided in section 3.19 below (Lease Subordinate to Mortgages).

## ARTICLE III

## OBLIGATIONS OF THE LESSEE

**3.1 Payment of Rent.** The Lessee will pay to the Lessor the rent upon the terms, at the times and in the manner herein provided, without any abatement of, or deduction, counterclaim or set off against rent or additional rent, and if the Lessee shall fail to pay within thirty (30) days of its due date any installment of rent, additional rent or any other amount due hereunder, including but not limited to charges for special services pursuant to section 3.24 (Special Services), from the time when the same becomes due, the Lessee shall pay interest thereon at the rate of twenty percent (20%) per annum, or such other amount as may be approved from time to time by the board of directors of the Lessor, from the date when such installment shall have become due to the date of the payment thereof, and such interest shall be deemed additional rent hereunder and shall be due on the first day of the calendar month following the Lessor's demand or bill therefor. All rent and additional rent payable hereunder shall be payable in lawful money of the United States which shall be legal tender for payment of all debts and dues, public and private, at the time of payment.

**3.2 Electric Service.** If the Lessor, in its sole discretion, determines to convert the supply of electric current to the apartment to a submetered basis, the Lessor shall, at the Lessor's expense, furnish and install a submeter to measure the Lessee's consumption of electric current in the apartment. The Lessee agrees to provide access to the apartment to the Lessor, its agents and contractors for the installation, maintenance and repair of any such submeter, and all wiring associated therewith. From and after the installation of such submeter, the Lessee shall pay the Lessor for the amount of electric current as shall be indicated by the submeter furnished therefor by the Lessor. The rates payable by the Lessee for said current shall be the same as those charged by such public service corporation for consumption similar to that of the Lessee. Payments shall be due as and when bills shall be rendered and the Lessee shall comply with rules, regulations and contract provisions similar to those then prescribed by said public service corporation. Any amount as to which the Lessee shall at any time be in default for or in respect to the use of electric current, or for or in respect to any other service that shall at any time be furnished by the Lessor, shall be deemed to be additional rent that shall be due and payable by the Lessee to the Lessor on the

- 8 -

first day of the calendar month following the Lessor's demand therefor. The Lessor reserves the right to discontinue use of the submeters and provide electric current to the apartment without charge to the Lessee. The Lessor also reserves the right to discontinue furnishing electric current to the Lessee in the apartment at any time upon not less than ninety (90) days notice, provided that (i) Lessor shall discontinue furnishing electric current to all apartments in the building leased under proprietary leases and (ii) unless otherwise required by law, ordinance, order, regulation or requirement of any public authority having jurisdiction over the Building, the Lessor shall postpone such discontinuance for a sufficient amount of time so as to allow the Lessee to arrange to obtain electric current directly from the public utility company furnishing electric current to the Building, provided, however, that the Lessee shall, at the Lessee's expense, diligently arrange to obtain electric current from such public utility company upon receipt of the Lessor's notice that the Lessor intends to discontinue furnishing electric current to the apartment.

 **3.3 <u>Certain Consequences of Default</u>.** In the event the Lessor resumes possession of the apartment, either by summary proceedings, action of ejectment or otherwise, because of a default by the Lessee in the payment of any rent, or additional rent, or any part of the same, or on the expiration of the term pursuant to a notice given as provided in section 4.1 (Conditional Limitation) of this lease upon the happening of any event specified in subsections (a) to (f), inclusive, of section 4.1, the Lessee shall continue to remain liable for payment of the rent or additional rent which would have become due hereunder and shall pay the same in installments from time to time as hereinbefore provided. No suit brought to recover any installment of such rent or additional rent shall prejudice the right of the Lessor to recover any subsequent installment. After resuming possession, the Lessor may, at its option, either (a) relet the apartment for the Lessor's own account or (b) from time to time relet the apartment as the agent of or for the account of the Lessee for a term or terms which may be less than or greater than the period which would otherwise have constituted the balance of the term of this lease, and may grant concessions or free rent in its discretion. The fact that the Lessor may have relet the apartment as agent for the Lessee shall not prevent the Lessor from thereafter notifying the Lessee that it proposes to relet the apartment for its own account and will no longer relet the apartment as agent for the Lessee. If the Lessor relets the apartment as the agent of, or for the account of, the Lessee, it shall, after reimbursing itself for its expenses in connection therewith, including leasing commissions and a reasonable amount for decorations, alterations and repairs in and to the apartment, apply the remaining avails of such reletting to the payment of any and all sums then due from the Lessee to the Lessor, or which would thereafter have become due from the Lessee under the provisions of this lease if the Lessor had not so resumed possession, accounting to the Lessee at the expiration of each of the several terms of such reletting for the surplus, if any. If, at any time or from time to time before the expiration of the term originally demised hereunder, there shall be a deficiency between the avails of such reletting and such sums as would have become due hereunder, the Lessee agrees to pay such deficiency for each month of the period which would otherwise have constituted the balance of the term of this lease. No demand need be made by the Lessor for the amounts of such

- 9 -

deficiency and suit may be brought therefor from time to time as the same shall arise. Any suit brought to collect the amount of such deficiency shall not in anyway prejudice the right of the Lessor to collect and sue for any deficiency in any subsequent month. The failure or refusal of the Lessor to relet the apartment or any part thereof shall not release or affect the Lessee's liability hereunder.

   3.4  **Receipt of Rent from Subtenant on Default in Payment of Rent.**  If the Lessee shall at any time sublet the apartment and shall default for a period of one month in the payment of any rent or additional rent, the Lessor may, at its option, so long as such default shall continue, demand and receive from any subtenant of the Lessee occupying the apartment the rent due or becoming due from such subtenant to the Lessee, up to an amount sufficient to pay all sums due from the Lessee to the Lessor, and any such payment of such rent to the Lessor shall be sufficient payment and discharge of such subtenant, as between such subtenant and the Lessee, to the extent of the amount so paid; and any such demand or acceptance of rent from any subtenant, or from any assignee hereof, shall not be deemed a consent or approval of any subletting or assignment by the Lessee.

   3.5  **Failure to Fix Cash Requirements.**  The omission by the board of directors of the Lessor to determine the Lessor's cash requirements for any year or portion thereof shall not be deemed a waiver or modification in any respect of the covenants and provisions hereof, or a release of the Lessee from the obligation to pay the rent or any installment thereof, but the rent last determined for any year or portion thereof shall thereafter continue to be the rent until cash requirements shall be redetermined.

   3.6  **House Rules.**  The Lessor may from time to time establish such reasonable house rules as its board of directors may deem appropriate for the management and control of the Building, and may also from time to time alter, amend and repeal such rules, and this lease shall be in all respects subject to such rules, which, when a copy thereof has been furnished to the Lessee, shall be taken to be part hereof, and the Lessee shall obey all such rules and see that they are faithfully observed by the family, guests, employees and subtenants of the Lessee, it being understood that such rules shall apply to and be binding upon all of the tenants of the Building, whether shareholders of the Lessor or not, but that the Lessor shall not be responsible to the Lessee for the non-observance or violation of such rules by any other lessee or person. Breach of a house rule by the Lessee, or failure by the Lessee or the Lessee's family to use reasonable efforts to ensure compliance with house rules by any other occupant of the apartment, shall be a default under this lease.

   3.7  **Use and Occupancy of Premises.**  The Lessee shall not, except as provided in section 3.9 (Subletting), without the written consent of the Lessor on such conditions as Lessor may prescribe, occupy or use the apartment, or the furniture or furnishings therein, or permit the same or any part thereof to be occupied or used for any purpose other than as a private dwelling for the Lessee and Lessee's family and domestic employees. In addition to the foregoing, the apartment may be occupied from time to time

- 10 -

by guests of the Lessee for periods of time not exceeding thirty days, in the aggregate, during any calendar year, unless a longer period is approved in writing by the Lessor, as long as such occupancy is not violative of applicable zoning laws, building code or other rules and regulations of governmental authorities having jurisdiction (collectively, "Occupancy Laws"). If any guest is to occupy the apartment during any period in which the permitted adult residents are not in occupancy, the Lessee shall notify the Lessor in writing prior to the arrival of such guest(s), the name(s) of such guest(s) and the period during which such guest(s) will be in occupancy. Guests permitted under this Section 3.7 may not be charged for the use of the apartment. If a violation of any Occupancy Law is alleged to exist, and the Lessor elects not to contest such violation, the Lessee, at the Lessee's sole cost and expense, after written notice to the Lessor, may contest, by appropriate proceedings prosecuted diligently and in good faith, such violation, and the Lessor shall cooperate with the Lessee in such contest, provided that (b) the Lessor shall not be subject to criminal penalty or to prosecution for a crime, nor shall the Building, the land on which it is situated, or any part thereof be subject to condemnation or being vacated by reason of non-compliance or otherwise by reason of such contest; (c) the Lessee indemnities the Lessor against the cost of any such contest or proceedings and against all liability for damages, interest, penalties, and expenses (including attorneys' fees and expenses), resulting from or incurred in connection with such contest or non-compliance; (d) such non-compliance or contest shall not constitute or result in any violation of any mortgage on the Building or the land on which it is situated, or if any such mortgage shall permit such non-compliance or contest on condition of the taking of action or furnishing of security by the Lessor, such action shall be taken and such security shall be furnished at the expense of the Lessee; and (e) the Lessee shall keep the Lessor advised as to the status of such proceedings. Consent of the Lessor to the use of the premises for other than the uses permitted in this section 3.7 may be granted on such conditions as of the Lessor, in its discretion, may deem appropriate, including the payment of additional rent.

   **3.8  Fire Insurance Rates and Requirements of Law.**  The Lessee shall not permit or suffer anything to be done or kept in the apartment which will increase the rate of fire insurance on the Building or the contents thereof, or which will interfere with the tights of other tenants, or annoy such tenants by unreasonable noises, odors or otherwise, or which will obstruct the public halls or stairways of the Building. The Lessee will comply with all the requirements of the Board of Health and all other governmental authorities and with all laws, ordinances, rules and regulations with respect to the apartment; and if, by reason of the occupancy or use of the apartment by the Lessee, the rate of fire insurance on the Building or its contents shall be increased, the Lessee shall become personally liable for the additional insurance premiums upon all policies covering the Building, and the Lessor shall have the right to collect the same, as additional rent hereunder on the first day of the calendar month following demand therefor by the Lessor.

   The Lessee will not clean, nor require, permit, suffer or allow any window in the apartment to be cleaned from the outside, in violation of Section 202 of the Labor Law

- 11 -

(or any successor statute) or of the rules of the Board of Standards and Appeals, or of any other board or body having or asserting jurisdiction; and the Lessee hereby agrees to indemnify the Lessor, its employees and other lessees, from and against any and all claims, losses, damages, fines, attorneys' fees and related costs suffered by them as a result of the Lessee's requiring, permitting, suffering or allowing any window in the Building to be leaned from the outside in violation of the requirements of the aforesaid laws, ordinances, regulations and rules.

**3.9  Subletting.**  The Lessee shall not sublet the whole or any part of the apartment for any term to any person or persons nor, except as provided in section 3.7 (Use and Occupancy), permit the same to be occupied or used by any persons other than members of the Lessee's family and domestic servants, unless consent thereto shall have been duly given by an instrument in writing which is to be signed (a) by a majority of the directors of the Lessor or (b) by an officer of the Lessor when  duly authorized by a resolution of the Lessor's board of directors or by a resolution adopted at any annual or special meeting of shareholders, or unless the Lessee shall have entered into a rental agreement (a "rental agreement") with the Lessor for the renting of the apartment. Any such rental agreement shall be upon such terms and conditions as the board of directors may, in its sole discretion, reasonably impose from  time to time. Whenever the Lessee applies to the Lessor for consent to a subletting, the Lessor may require as a condition thereto such conditions as the directors or shareholders, as the case may be, may impose consistent with Lessor's obligation to act reasonably as set forth in the next succeeding sentence, including the obligation for the Lessee to pay a sublet fee to the Lessor in an amount fixed from time to time by the board of directors in its sole discretion in a rental agreement and the obligation for the Lessee deliver to the Lessor a copy of the sublease to which consent is requested.  The Lessor shall not unreasonably withhold consent to a subletting provided, however, that consent shall not be granted until the Lessee cures all defaults hereunder and pays the sublet fee charged by the Lessor, together with a sum to be fixed by the board of directors of the Lessor to cover reasonable legal and other out-of-pocket expenses of the Lessor in connection with such subletting.

**3.10  Assignment.**  The Lessee shall not assign this lease, or any interest therein, and no such assignment shall take effect as against the Lessor for any purpose, unless and until all of the following requirements have been complied with and satisfied:

(a) An instrument of assignment executed by the assignor shall have been delivered to the Lessor;

(b) An agreement, in form approved by the Lessor, containing a covenant by the assignee assuming and agreeing to perform and comply with all the covenants and conditions of this lease to be performed or complied with by the Lessee on and after the effective date of said assignment must be executed and acknowledged by the assignee and delivered to the Lessor, but no such assumption agreement shall be required if the assignee

- 12 -

surrenders the assigned lease and enters into a new lease for the remainder of the term as
hereinafter provided;

    (c) All shares of the Lessor accompanying this lease must be transferred to the
assignee with the required transfer stamps affixed;

    (d) All sums due from the Lessee, together with a sum to be fixed by the board
of directors of the Lessor to cover reasonable legal and other out-of-pocket expenses of the
Lessor in connection with such assignment and transfer of shares, must be paid to the Lessor;
and

    (e) A written consent to such assignment, either (1) signed by or authorized
by a majority of the board of directors of the Lessor or (2) signed by or authorized by lessees
owning of record at least two-thirds of the shares of the Lessor accompanying proprietary
leases then in force, must be delivered to the Lessor. If the Lessee shall die, such consent
shall not be unreasonably withheld to any assignment of this lease and the accompanying
shares to a financially responsible member of the Lessee's family other than the Lessee's
spouse, as to whom no consent is required. There shall be no limitation, except as above
specifically provided, on the right of the directors or lessees to grant or withhold consent, for
any reason or for no reason, to an assignment.

    (f) Effective for all assignments of this lease pursuant to a contract of sale
submitted for the Lessor's consent after December 31, 2013 (regardless of the date of the
closing), the assignee shall deliver to the Lessor an amount equal to two (2%) percent (the
"Transfer Fee") of the gross proceeds of sale of the apartment and appurtenant shares of the
Lessor. The Transfer Fee shall be paid on the date of closing, by certified or bank check
payable to the order of the Lessor. Notwithstanding the foregoing, the Transfer Fee shall not
be payable with respect to an assignment of this lease and the transfer of the appurtenant
shares of the Lessor by the Lessee (i) to the spouse, children, or parents of the Lessee (or if
the Lessee is an entity, to a shareholder, owner, member or in the case of a trust, beneficiary
of such entity) such as by means of a gift, (ii) by the Lessee or the Lessee's executor,
administrator or personal representative to an entity (including a trust or limited liability
company) for the benefit of Lessee or the spouse, children or parents of the Lessee, in each
case, without consideration, such as by means of a gift or (iii) by testamentary bequest, trust
transfer or similar disposition or operation of law, without consideration, from a deceased
Lessee or from an executor, administrator or other personal representative of a deceased
Lessee.

   **3.11  Release of Lessee upon Assignment.**  Whenever the Lessee shall, under
the provisions of this lease, be permitted to assign and shall so assign the same, and the
assignee shall assume all of the unfilled obligations of the assignor hereunder, either by an
instrument in writing delivered to the Lessor or by surrendering the assigned lease and
entering into a new lease for the remainder of the term, the assignor shall have no further
liability on any of the covenants of this lease to be thereafter performed. At the option and

election of the Lessor, any assigned lease may be surrendered and cancelled, and a new lease for the remainder of the term of this lease, in the same form, shall in such case be entered into between the Lessor and the assignee.

**3.12  No Implied Consent.**  No demand or acceptance of rent from any subtenant or from any assignee hereof or other person in possession or occupancy shall constitute or be deemed to constitute a consent to or approval of any assignment, sublease or occupancy.

**3.13  Consequences of Unauthorized Assignment or Subletting.**  No executor, administrator, personal representative or successor of the Lessee, or trustee, or anyone to whom the interest of the Lessee hereunder shall pass by law, shall be entitled to assign this lease, or to sublet the apartment, or any part thereof, except upon compliance with the requirements of this lease.  The character of and restriction upon the occupancy of the apartment, and upon assignment of this lease, as hereinbefore expressed, restricted and limited are an especial consideration and inducement for the granting of this lease by the Lessor to the Lessee; and in the event of a violation by the Lessee of the provisions hereof, this lease may be terminated and shall expire at the option of the Lessor as hereinafter provided, and the Lessor may restrain and prevent the occupancy of the apartment by any one other than the Lessee or the family of the Lessee.

Nothing herein contained shall be construed as preventing or prohibiting the renting of the apartment on a transient basis, provided such renting is effected with the approval of, and through, the Lessor pursuant to a rental agreement.

**3.14  Pledge of Shares.**  The Lessee shall not pledge or assign this lease or the shares to which this lease is appurtenant (the "shares") as security for a loan, nor permit the creation of a security interest or lien in such shares or this lease.

**3.15  Lessee's Repairs.**  The Lessee has inspected the apartment and accepts the same in its present condition without any warranty or representation of any kind whatsoever on the part of the Lessor.  The Lessee shall keep the interior of the apartment in good repair, shall repair, maintain, replace and install all windows, window panes, window frames, sashes and sills in the apartment, shall do all the painting and decorating required for the apartment, including painting of the window frames, sashes and sills, and shall be solely responsible for the maintenance, repair and replacement of plumbing, gas and heating fixtures and equipment such as refrigerators, dishwashers, removable and through-the-wall heating and cooling units, washing machines, dryers, ranges and other appliances as may be in the apartment.  "Plumbing, gas and heating fixtures" as used herein shall include exposed gas, steam and water pipes attached to fixtures, appliances and equipment and the fixtures, appliances and equipment to which they are attached, and any special pipes or equipment which the Lessee may install within the wall or ceiling, or under the floor, but shall not include gas, steam, water or other pipes or conduits within the walls, ceilings or floors or

- 14 -

heating equipment which is part of the standard Building equipment.  The Lessee shall be solely responsible for the maintenance, repair and replacement of all lighting and electrical fixtures, appliances and equipment in the apartment, and all meters, fuse boxes or circuit breakers and electrical wiring and conduits from the junction box of the riser into and through the Lessee's apartment.  Any ventilator or any heating and cooling unit which shall be visible from the outside of the Building shall at all times be painted by the Lessee in the standard color which the Lessor may select for the Building and shall be maintained in accordance with the specifications of the Lessor.  The Lessor shall not be held answerable for any damage in or to the foregoing, or for any damage to the apartment, or to any of its contents, caused by electric current or by the leakage or overflow of water, gas or steam from any water pipe, gas pipe, steam pipe, drain pipe, basin, tub or other receptacle belonging or appertaining to any other apartment in the Building, unless the damage shall have been caused by the act or neglect of the Lessor or of its employees.

   **3.16 Alterations.**  The Lessee shall not, without first obtaining the written consent of the Lessor, which consent shall not be unreasonably withheld, make in the apartment or any terrace appurtenant thereto, any alteration, enclosure or addition, whether structural or otherwise, nor any enclosure or alteration of the water, gas or steam risers or pipes, heating or air conditioning system or units serving the Building generally, electric conduits, wiring or outlets, plumbing lines, intercommunication or alarm systems, or any installation or facility serving the Building generally, nor, except as hereinafter authorized, shall the Lessee remove any additions, improvements or the furniture, furnishings or fixtures from the apartment owned by the Lessor.  Decoration such as painting, wallpapering, carpeting, installation of cabinetry and similar work shall not be deemed an alteration requiring the Lessor's consent, but shall be performed only after written notice to the Lessor and delivery to the Lessor of evidence of the contractor's liability insurance, which shall be in amounts reasonably satisfactory to the Lessor.  The performance by the Lessee of any work in the apartment shall be in accordance with any applicable rules and regulations of the Lessor and governmental agencies having jurisdiction thereof.  Any consent to proposed alterations may be subject to such terms and conditions as the board of directors of the Lessor shall reasonably impose, including, without limitation, the Lessee's execution of an agreement in form and substance satisfactory to the Lessor setting forth the terms and conditions upon which such alteration may be made, including delivery by the Lessee of a security deposit securing proper performance of the alteration and compliance with the alteration agreement.  Consent shall not be granted until the Lessee cures all defaults under the lease and pays a sum to be fixed by the board of directors of the Lessor to cover reasonable legal, architectural, engineering and other out-of-pocket expenses of the Lessor and its managing agent, if any, in connection with such proposed alterations.  The Lessee shall not in any case install any appliances or electrical or other equipment which shall exceed the available load for the existing electrical, plumbing or other service facilities serving the Building generally.

**3.17 Removal of Fixtures Installed by Lessee.** If the Lessee shall have heretofore placed or shall hereafter place, or if any prior proprietary lessee shall have heretofore placed, in the apartment any special additions, improvements or fixtures, such as mantels, refrigerators, ranges, air conditioning equipment, woodwork, panelling, ceilings or doors which can be removed without structural alterations, then the Lessee shall have the right, prior to the termination of this lease, to remove the same at the Lessee's own expense, provided: (a) that the Lessee at the time of such removal shall not be in default in the payment of rent, additional rent or in the performance of any other provision of condition of this lease, (b) that before any such removal the Lessee shall have given written notice to the Lessor specifying any of the foregoing which the Lessee proposes to remove and specifying in detail the proposed replacements to be made by the Lessee and shall have obtained the Lessor's written approval of the replacement specifications, which approval shall not be unreasonably withheld, (c) that the Lessee shall pay the cost of any such removal and reinstallation and shall, at its own cost and expense, repair any damage resulting therefrom and (d) that the Lessee shall replace and reinstall, at the Lessee's own expense, all articles, materials, or equipment owned by the Lessor that were in the apartment at the beginning of the term, or replace such articles, materials and equipment with others of a kind and quality customary in this type of Building and satisfactory to the Lessor, and all such replacements shall be first-class in workmanship, materials and finish, and as specified in the notice provided for in clause (b) of this section.

**3.18 Surrender of Possession.** On the expiration of the term hereby granted, or upon an earlier termination of this lease, the Lessee shall surrender to the Lessor possession of the apartment with all additions, improvements and fixtures then included therein except as provided in Section 3.17 (Removal of Fixtures Installed by Lessee). Any additions, improvements, furniture, furnishings or fixtures or other personal property not removed by the Lessee at the termination of this lease shall, at the option of the Lessor, either (a) be deemed abandoned and become the property of the Lessor, in which case they may be disposed of by the Lessor without accountability or liability to the Lessee, or (b) be removed by the Lessor to any place for storage and stored for the account of the Lessee without the Lessor in any way being liable for trespass, conversion or negligence by reason of any acts of the Lessor or of the Lessor's agents, or of any carrier employed for transporting such property to the place of storage or by reason of the negligence of any person in caring for such property while in storage. Any costs incurred by the Lessor in such disposal, removal or storage shall be paid by the Lessee as additional rent on the first day of the calendar month following demand therefor by the Lessor.

**3.19 Lease Subordinate to Mortgages.** This lease is and shall be subject and subordinate to the mortgages which are now liens upon the Building and security interests in the contents thereof and to any and all extensions, modifications, renewals and replacements thereof and this lease shall be subject and subordinate to the lien of any other mortgage or mortgages or security interests which shall at any time be placed on the Building or its contents. This clause shall be self-operative and no further instrument of subordination

- 16 -

shall be required by any such mortgagee or secured party. The Lessee shall at any time and
from time to time, on demand, execute any instruments that may be required by any
mortgagee, or by the Lessor, for the purpose of more formally subjecting this lease to the
lien of any such mortgage or mortgages, and the duly elected officers, for the time being, of
the Lessor are each hereby irrevocably appointed the attorney-in-fact and agent of the Lessee
to execute the same upon such demand, and the Lessee hereby ratifies any such instrument
hereafter executed by virtue of the power of attorney hereby given.

     **3.20  Mechanics' Liens.**  In case there shall be filed a notice of mechanics'
lien against the Building for, or purporting to be for, labor or material alleged to have been
furnished or delivered at the Building or the apartment to or for the Lessee, or anyone
claiming under the Lessee, the Lessee shall forthwith cause such lien to be discharged by
payment, bonding or otherwise; and if the Lessee shall fail to cause such lien to be
discharged within twenty (20) days after the filing of such notice, the Lessor may cause such
lien to be discharged by bonding or by paying the amount thereof or otherwise, without
investigation as to the validity thereof or of any offsets or defenses thereto, and shall have
the right to collect, as additional rent, all amounts so paid and all costs and expenses paid or
incurred in connection therewith, including reasonable attorney's fees and disbursements,
together with interest thereon from the time or times of payment. The failure of the Lessee
to discharge the lien within twenty (20) days after the filing of such notice shall be deemed
a default under this lease.

     **3.21  Entry for Examination and Repair.**  The Lessor, its employees, agents
and workers shall be permitted to enter the apartment and any storage space used by the
Lessee at any reasonable hour of the day, to examine or inspect the apartment or to make or
facilitate repairs in any part of the Building and to remove such portions of the walls, floors
and ceilings of the apartment as may be required for the purpose of making such repairs. In
order that the Lessor shall at all times have access to the apartment for the purposes provided
for in this lease, the Lessee shall provide the Lessor with a key to each lock providing access
to the apartment, and if any lock shall be altered or a new lock installed, the Lessee shall
provide the Lessor with a key thereto immediately upon installation. If the Lessee shall not
be personally present to open and permit an entry into the apartment at any time when for
any reason an entry therein shall be necessary or permissible hereunder and shall not have
furnished a key to the Lessor, the Lessor or the Lessor's agents may forcibly or otherwise
enter the apartment without rendering the Lessor or such agents liable to any claim or cause
of action for damages by reason thereof if during such entry the Lessor shall accord
reasonable care to the Lessee's property, and such entry shall not in any manner affect the
obligations and covenants of this lease. The right and authority hereby reserved do not
impose, nor does the Lessor assume by reason thereof, any responsibility or liability
whatsoever for the care or supervision of the apartment, or any of the pipes, fixtures,
appliances or appurtenances therein contained or therewith in any manner connected, except
as may be herein specifically provided.

- 17 -

**3.22  No Implied Waiver.**  The failure of the Lessor to insist, in any one or more instances, upon a strict performance of any of the provisions of this lease, or to exercise any right or option herein contained, or to serve any notice, or to institute any action or proceeding, or otherwise to act as though this lease had expired pursuant to the provisions of Article IV hereof, shall not be construed as a waiver, or a relinquishment for the future, of such provision, option or right thereafter to serve notice and to have this lease expire under the provisions of said Article, but such provision, or option or right shall continue and remain in full force and effect.  The receipt by the Lessor of rent, with knowledge of the breach of any covenant hereof, shall not be deemed a waiver of such breach, and no waiver by the Lessor of any provision hereof shall be deemed to have been made unless expressed in writing and signed by an officer of the Lessor pursuant to authority contained in a resolution of its board of directors; and even though a consent to an assignment hereof, or to any subletting, be given, no further assignment or subletting shall be made without express consent in writing given as hereinbefore provided.

**3.23  Reimbursement of Lessor's Expenses.**  If the Lessee shall at any time be in default hereunder, and the Lessor shall incur any expense (whether paid or not) in connection with such default or in performing acts which the Lessee is required to perform, or in instituting an action or proceeding based upon such default, or defending, or asserting a counterclaim in, any action or proceeding brought by the Lessee, the expense thereof to the Lessor, including reasonable attorney's fees and disbursements, shall be paid by the Lessee to the Lessor, on demand as additional rent on the first day of the calendar month following demand therefor by the Lessor.

**3.24  Special Services.**  The Lessee will pay and discharge all obligations incurred by the Lessee or by any person occupying the apartment or by any guest of the Lessee or of any such person for meals, beverages, telephone service, laundry, or other hotel services (except those Lessor is obligated to furnish as provided in section 2.2) rendered to and sums advanced by the Lessor to or for the Lessee, the Lessee's family and employees, and the Lessee will make such payment upon the presentation of a bill therefor, except to the extent otherwise provided in any rental agreement, and in case of the failure on the part of the Lessee to pay the same, the Lessor at its option may add the amount thereof to the next installment of rent due and the same shall be deemed additional rent.

**3.25  Lessor's Immunities.**  The Lessor shall not be liable for any failure, interruption or curtailment of heat, water supply, electric current, elevator service or other service to be supplied by the Lessor hereunder, or for injury or damage to person or property caused by the elements or by another tenant or person in the Building, or resulting from steam, gas, electricity, water, rain or snow which may leak or flow from any part of the Building, or from any of its pipes, drains, conduits, radiators, boilers, tank, appliances or equipment, unless caused by or due to the negligence of the Lessor; and no diminution or abatement of rent or other compensation due the Lessor shall be claimed or allowed therefor, or for failure to make, delay in making or inconvenience or discomfort arising from the

making of repairs or improvements to the Building or to its appliances, or for any space taken to comply with any law, ordinance, or order of a governmental authority. The Lessor shall not be liable for interference with light or other incorporeal hereditaments by the Lessor or anybody other than the Lessor. Mechanical refrigeration, if any, is installed for the accommodation of the Lessee, and the Lessor shall not be responsible for any failure of refrigeration, leakage or damage caused by, or the result of such mechanical refrigeration for any reason whatsoever. The Lessor shall not be responsible for any package or article left with or entrusted to any employee of the Lessor. If the Lessor shall before, during or after the term of this lease, furnish to the Lessee the use of any storage space, vault space, laundry or other facility outside of the apartment, the same shall be furnished gratuitously by the Lessor, and if any person shall use the same, such use shall be entirely at the risk of such person, and the Lessor shall not be liable for any loss of property therein, or for any damage or injury whatever to person or property therein or in connection therewith.

       **3.26  Notice of Defects.**  No notice of alleged defect requiring the Lessor's attention shall be deemed valid or effective unless in writing and delivered to the Lessor in accordance with section 6.6 hereof (Notices).

       **3.27  Lessor's Right to Perform at Lessee's Expense.**  If the Lessee shall fail to make repairs to any part of the apartment or appurtenances as herein required, or shall fail to comply with any other covenant or condition of this lease on the Lessee's part to be performed, the Lessor may, but is not obligated to, after ten (10) days' notice to the Lessee, enter the apartment and make such repairs or comply with such covenant or condition or arrange for others to do the same, without liability on the part of the Lessor. If the Lessee or any person occupying the apartment shall expressly request the Lessor, its agents or servants, to perform any act not hereby required to be performed by the Lessor, or in case of emergency, the Lessor may, but is not obligated to, without notice, enter the apartment and perform such act or take such steps as are appropriate in light of the emergency, or arrange for others to do the same, without liability on the part of the Lessor. In all such cases, the Lessor, its agents, servants and contractors shall, as between the Lessor and the Lessee, be conclusively deemed to be acting as agents of the Lessee and all contracts therefor made by the Lessor shall be so construed whether or not made in the name of the Lessee. The Lessor shall be entitled to recover from the Lessee all expenses incurred or for which it has contracted hereunder, such expenses to be payable by the Lessee as additional rent on the first day of the calendar month following demand therefor by the Lessor.

       If, in the Lessor's sole judgment, any of the Lessee's equipment or appliances shall result in damage to the Building or poor quality or interruption of service to other portions of the Building or overloading of or damage to facilities maintained by the Lessor for the supplying of water, gas, electricity or air conditioning to the Building, or if any such appliances visible from the outside of the Building shall become rusty or discolored, the Lessee shall promptly, on notice from the Lessor, remedy the condition and, pending such remedy, shall cease using any appliance or equipment which may be creating the

objectionable condition. In the event that due to the negligence or carelessness of the Lessee or the Lessee's family, domestic employees, subtenants, other occupants of the apartment and guests, the Building shall be otherwise damaged, then the Lessee shall reimburse the Lessor for the cost of repairing such damage.

**3.28  Lessee's Indemnity of Lessor.**  The Lessee agrees to save the Lessor and its managing agent, if any, harmless from all liability, loss, damage and expense, including, without limitation, reasonable attorneys' fees and disbursements, arising from injury to person or property occasioned by the failure of the Lessee to comply with any provision hereof, or due wholly or in part to any wrongful act, negligence or omission of the Lessee or default by the Lessee in performing an obligation imposed under this Lease on the Lessee, the Lessee's family or of any person dwelling or visiting in the apartment, or by the Lessor, its agents, servants or contractors when acting as agent for the Lessee as in this lease provided.

**3.29  Injunction.**  In addition to other legal remedies hereinbefore or hereinafter provided for, in case of violations of any covenants by the Lessee, the same shall be restrainable by injunction and neither the mention herein nor the election hereafter of one or more of the remedies provided shall preclude the Lessor from enforcing any other right, remedy, option, election or priority allowed by law, whether or not herein specifically set forth.

**3.30  Insurance.**  The Lessee shall, at the Lessee's own cost and expense, obtain and keep in full force and effect throughout the term of this lease (a) comprehensive public liability and property damage insurance, with a minimum limit of liability of $1,000,000 for injury or death and damages to any one person, $1,000,000 for injury or death arising out of one occurrence, and $1,000,000 for damage to property, against any and all claims for personal injury, death or property damage (including, but not limited to, loss due to water damage) occurring in, upon, adjacent to or connected with the apartment or any part thereof, and (b) comprehensive all risk property damage insurance, with a minimum limit of liability of $100,000 in respect of property damage occurring in, upon, adjacent to or connected with the apartment or any part thereof (including, but not limited to, loss due to water damage), such insurance to include an endorsement for tenant's improvements and betterments on a replacement cost basis. The limits of liability set forth in (a) and (b) above may be increased by the board of directors of the Lessor from time to time to such reasonable amounts as may reflect inflation. The insurance required in (a) above shall name the Lessor as additional insured, as its interest may appear, and is to be written in form reasonably satisfactory to the Lessor by good and solvent insurance companies of recognized standing, admitted to do business in the State of New York which shall be reasonably satisfactory to the Lessor. Upon ten (10) days' written notice from the Lessor, the Lessee shall deliver to the Lessor either a duplicate original of the aforesaid policies or certificates evidencing such insurance, naming the Lessor as an additional insured, and, at least thirty (30) days prior to the expiration of said policies, the Lessee shall deliver renewals to the Lessor. Such policies

shall contain a provision that no act, omission or negligence of the Lessee, its contractors, licensees, agents, servants, employees, invitees or visitors will affect or limit the obligation of the insurance company to pay the amount of any loss sustained and such policy shall be non-cancellable except upon thirty (30) days' written notice to the Lessor. In the event the Lessee shall fail to obtain the insurance required in (a) and (b) above, and/or to pay all premiums and charges therefor, the Lessor may, but shall not be obligated to, obtain the same, in which event the amount of the premiums paid by the Lessor shall be paid by the Lessee to the Lessor as additional rent on the first day of the calendar month following demand therefor by the Lessor. The failure of the Lessee to obtain and maintain, throughout the term of this lease, the insurance required in (a) and (b) above shall be a default under the lease.

The Lessor and the Lessee agree to use best efforts to include in each of its policies insuring against property damage a waiver of the insurer's right of subrogation against the other party. If such waiver shall not be, or shall cease to be, obtainable without additional charge, the Lessee shall promptly notify the Lessor. In such case, if the Lessor shall so elect and shall pay the insurer's additional charge therefor, such waiver shall be included in the policy. Each party hereby releases the other party with respect to any claim (including a claim for negligence) which it might otherwise have against the other party for loss, damage or destruction with respect to its property occurring during the term of this lease to the extent to which the same party is insured under a policy containing a waiver of subrogation. If, notwithstanding the recovery of insurance proceeds by either party for loss, damage or destruction of its property, the other party is liable to the first party with respect thereto or is obligated under this lease to make replacement, repair or restoration, then provided the first party's right of full recovery under its insurance policies is not thereby prejudiced or otherwise adversely affected, the amount of the net proceeds of the first party's insurance against such loss, damage or destruction shall be off-set against the second party's liability to the first party therefor or shall be made available to the second party to pay for the replacement, repair or restoration, as the case may be.

The waiver of subrogation, if obtainable, referred to above shall extend to the agents and employees of the Lessor and all permitted occupants of the apartment. Nothing contained in this section 3.30 shall be deemed to relieve either party from any duty imposed elsewhere in this lease to repair, restore or rebuild.

**3.31 Cooperation.** The Lessee shall always in good faith endeavor to observe and promote the cooperative purposes for the accomplishment of which the Lessor is incorporated.

# ARTICLE IV

## TERMINATION BY CONDITIONAL LIMITATION

**4.1 Conditional Limitation.** If, upon, or at any time after, the happening of any of the events mentioned in sections (a) to (h), inclusive, of this section 4.1, the Lessor shall give to the Lessee a notice stating that the term hereof will expire on a date at least thirty (30) days thereafter, or if, upon, or at any time after, the happening of the event mentioned in subdivision (h) hereof, the Lessor shall give to the Lessee a notice stating that the term hereof will expire on a September 30 at least three months after the giving of such notice, this lease shall expire on the date so fixed in the notice, it being the intention of the parties here to create hereby a conditional limitation, and it shall thereupon be lawful for the Lessor to re-enter the apartment and to remove all persons and personal property therefrom, either by summary dispossess proceedings, or by any suitable action or proceeding at law or in equity, or by force or otherwise, and to repossess the apartment in its former estate as if this lease had not been made.

(a) **Lessee Ceasing to Own Accompanying Shares.** If at any time during the term of this lease the Lessee shall cease to be the owner of all of the shares of the Lessor which are hereinbefore stated to be owned by the Lessee and allocated to this lease, or if this lease shall pass or be assigned to anyone who is not then the owner of all of said shares.

(b) **Bankruptcy of Lessee.** If at any time during the term of this lease (1) the Lessee shall be adjudicated a bankrupt under the laws of the United States or adjudicated insolvent or take the benefit of any Insolvency Statute; or (2) a receiver or trustee of all of the property of the Lessee or of this lease shall be appointed under any provisions of the laws of the State of New York, or under any statute of the United States, or any statute of any state of the United States and the order appointing such receiver or trustee shall not be vacated within sixty (60) days; or (3) the Lessee shall make a general assignment for the benefit of creditors; or (4) any of shares owned by the Lessee and appurtenant to this lease shall be duly levied upon under the process of any court whatever unless such levy shall be discharged within sixty (60) days; or (5) this lease or the shares appurtenant thereto shall pass by operation of law or otherwise to anyone other than the Lessee herein named or a person to whom such Lessee has assigned this lease in the manner herein permitted, but this clause (5) shall not be applicable if this lease or its appurtenant shares shall pass to the executors or administrators of the Lessee or by will or intestacy to the spouse or ascendants or descendants of the named Lessee.

(c) **Unauthorized Assignment, Subletting or Pledge.** If at any time there shall be an assignment or pledge of this lease, or any subletting of the apartment, without full compliance with the requirements of Section 3.9 hereof (Subletting), Section 3.10 hereof (Assignment) or Section 3.14 hereof (Pledge of Shares), as the case may be.

- 22 -

(d) **Default in Rent.**  If the Lessee shall default for a period of one month in the payment of any rent or additional rent, or of any installment thereof, hereinbefore provided for, and shall fail to cure such default within ten (10) days after written notice thereof shall have been given by the Lessor.

(e) **Default in Other Obligations.**  If the Lessee shall default in the performance of any covenant or provision hereof, other than the covenant to pay rents, for thirty (30) days after written notice of such default shall have been given by the Lessor, provided, however, that if said default consists of the failure to perform any act the performance of which, in the reasonable opinion of the Lessor, requires more than thirty (30) days to cure, then if within said thirty (30) day period such cure is commenced and thereafter diligently prosecuted to completion, the Lessee shall be deemed to have cured such default.

(f) **Lessee's Objectionable Conduct.**  If at any time the Lessor shall determine, upon the affirmative vote of the holders of record of at least two-thirds of the shares of the Lessor which are then issued and outstanding, at a meeting of such shareholders duly called to take action on the subject, that because of objectionable conduct on the part of the Lessee, or of a person dwelling in or visiting the apartment other than a transient guest, the tenancy of the Lessee is undesirable, it being understood, without limiting the generality of the provisions contained in the foregoing sentence, that repeatedly to violate or disregard the rules and regulations hereunto attached or hereafter established in accordance with the provisions of this lease, or to permit or tolerate a person or dissolute, loose or immoral character to enter or remain in the Building or the apartment, shall be deemed to be objectionable conduct.

(g) **Condemnation.**  If at any time the Building or a substantial portion hereof shall be taken by condemnation proceedings, so as to render the operation of the Building as a cooperative apartment hotel impracticable or undesirable in the opinion of a majority of the board of directors of the Lessor.

(h) **Termination of All Proprietary Leases.**  If lessees owning at least two-thirds of the shares of the Lessor owned by lessees under proprietary leases which are then in force and of which a notice of cancellation as provided in Article V of this lease shall not previously have been given shall determine, not less than four months before the 30th day of September in 1998, or before the 30th day of September in any year thereafter, to terminate all such proprietary leases on such 30th day of September.

A determination to terminate under this subsection (h) shall be evidenced by a written notice to the Lessor signed by the lessees making such determination, or by their vote at a meeting of shareholders duly called to take action on the subject.  Promptly after the receipt of such a notice or after such a vote, the Lessor shall give to the holders of all proprietary leases which are then in force, and of which a notice of cancellation as provided

- 23 -

in said Article V shall not previously have been given, the notice provided by this section 4.1 of the expiration of the term of all such leases.

**4.2 Waiver of Right of Redemption.** The Lessee hereby expressly waives any and all right of redemption in case the Lessee shall be dispossessed by judgment or warrant of any court or judge. The words "enter", "re-enter" and "re-entry" as used in this lease are not restricted to their technical legal meaning. In the event of a breach or threatened breach by the Lessee of any of the covenants or provisions herein, the Lessor shall have the right of injunction, and the right to invoke any remedy allowed at law or in equity, as if re-entry, summary proceedings and other remedies were not herein provided for.

**4.3 Liability of Lessee upon Termination: Surrender of Possession.** Upon the termination of this lease under the provisions of subsections (a) to (f), inclusive, of section 4.1 of this lease, the Lessee shall remain liable as provided in section 3.3 hereof (Certain Consequences of Default). Upon the termination of this lease under the provisions of subdivisions (g) or (h) of section 4.1 or upon the expiration of this lease the Lessee shall be and remain liable to pay all rent due or accrued and to perform all covenants and agreements of the Lessee up to the date of such termination and, on or before such termination, the Lessee shall vacate the apartment and remove therefrom all property of the Lessee which upon such termination does not become the property of the Lessor under the provisions of section 3.17 (Removal of Fixtures) of this lease and surrender possession of the apartment to the Lessor or its assigns, and upon demand of the Lessor or its assigns shall execute, acknowledge and deliver to the Lessor or its assigns any instrument which may reasonably be required for surrendering all estate and interest of the Lessee in the apartment or in the Building of which it is a part.

**4.4 Sale of Shares.** Upon the termination of this lease under subdivisions (a), (b), (c), (d), (e) or (f) of section 4.1 hereof, the Lessee shall surrender to the Lessor the certificate or certificates for the shares of the Lessor owned by the Lessee and allocated to the apartment. Whether or not said certificate or certificates are surrendered, the Lessor may issue a new certificate for the shares of the Lessor owned by the Lessee and allocated thereto when a purchaser therefor is found. Upon such issuance, the certificate for shares owned or held by the Lessee shall automatically be cancelled and rendered null and void. The Lessor may apply the proceeds received by it for the issuance of such shares towards the payment of the Lessee's indebtedness hereunder, including interest, reasonable attorneys' fees and other reasonable expenses incurred by the Lessor and if the proceeds are sufficient to pay the same, the Lessor shall pay over any surplus to the Lessee, but if insufficient, the Lessee shall remain liable for the balance of the indebtedness. Upon the issuance of any new proprietary lease and certificate for shares, the Lessee's continuing liability hereunder shall cease and the Lessee shall only be liable for rent, additional rent and expenses accrued to that time. The Lessor shall not, however, be obligated to sell such shares and appurtenant lease or otherwise make any attempt to mitigate damages.

- 24 -

## ARTICLE V

## CANCELLATION AT OPTION OF LESSEE

5.1 **Lessee's Option to Cancel.** This lease may be cancelled by the Lessee on September 30, 1998, or on any September 30 thereafter, upon complying with all the provisions of this Article. Written notice of intention to cancel must be served by the Lessee upon the Lessor on or before February 28 in the calendar year in which such cancellation is to occur. At the time of the service of such notice of intention to cancel there must be deposited with the Lessor by the Lessee:

(a) The Lessee's counterpart of this lease with a proper assignment thereof in blank whereby the full and absolute title to this lease is assigned free from all subleases (except as in section 5.4 hereof (Effect of Subleases) provided), liens, encumbrances and charges whatsoever;

(b) The Lessee's certificate for the shares of the Lessor which are hereinbefore stated to be owned by the Lessee, endorsed in blank for transfer and with all necessary transfer tax stamps affixed and with payment of any transfer taxes owed thereon;

(c) The Lessee's original of any sublease the existence of which, under the provisions of section 5.4 hereof (Effect of Subleases), shall not prevent the Lessee from cancelling this lease, together with an assignment thereof and of the subrents accruing thereunder from and after the 31st day of August next preceding the 30th day of September named in the notice of election to cancel as the date for the cancellation of this lease and an agreement in writing, executed and acknowledged by the tenant holding under such sublease, to attorn to the Lessor and to pay to the Lessor the rent reserved in such sublease from and after such 31st day of August to the expiration of the term of the sublease and during such period to perform all the terms and conditions of such sublease; and

(d) A written statement setting forth in detail those additions, improvements and fixtures, such as mantels, lighting fixtures, refrigerators, ranges, woodwork, panelling, ceilings, doors and decorations placed in the apartment at the Lessee's expense which the Lessee has under the terms of this lease, the right to remove, and which the Lessee desires to remove, and specifying in detail the proposed replacements to be made by the Lessee under the terms of this lease.

5.2 **Removal of Fixtures Surrender of Possession and Payments.** All additions, improvements, furniture, furnishings, equipment and fixtures, which are removable under the terms of this lease and which are enumerated in the statement made as provided in subsection (d) of section 5.1 hereof, shall be removed and all required replacements made by the Lessee prior to the 31st day of August next preceding the 30th day

- 25 -

of September named in the notice of election to cancel as the date for the cancellation of this lease and on or before such 31st day of August the Lessee shall surrender possession of the apartment including all furniture and furnishings which are the property of the Lessor, to the Lessor free from all subleases (except as in section 5.4 hereof (Effect of Subleases) provided), liens, encumbrances or other charges and shall pay to the Lessor all rent and other charges which shall be payable under this lease up to and including the 30th day of September succeeding such 31st day of August.

5.3 **Additional Payments by Lessee; Replacements**. In the event of giving such notice of intention to cancel, and except as herein otherwise provided, the Lessee shall:

a) replace all mantels, lighting fixtures, refrigerators, ranges, woodwork (other than panelling), ceilings, doors or other fixtures removed by the Lessee with others of a kind and quality satisfactory to the board of directors of the Lessor, and pay the cost of such replacement; and

(b) pay the cost of repairing any damages resulting from the removal by the Lessee of any panelling or other additions, improvements or fixtures.

5.4 **Effect of Subleases.** The existence of a sublease of the apartment shall not prevent the Lessee from cancelling this lease under the provisions of this Article and such cancellation shall not affect the rights or obligations of the tenant under any such sublease, provided that the Lessor has given consent, if required, as provided in section 3.9 hereof (Subletting), to such sublease, and provided further that there shall have been deposited with the Lessor the documents specified in subdivision (c) of section 5.1 of this lease, as required by said section.

5.5 **Permission to Show and Occupy Premises.** The Lessor or its agents may show the apartment to any prospective tenant at any time and from time to time after the giving of notice of the Lessee's intention to cancel this lease as in this Article provided, and, after the 31st day of August next succeeding the date on which such notice of intention to cancel is given, the Lessor, its agents and employees and the succeeding tenant may enter the apartment, take possession thereof and make such alteration, additions and repairs therein as the Lessor may approve without diminution or abatement of the rent due hereunder.

5.6 **Cancellation of Lease; Transfer of Shares.** If the Lessee shall have done the things and made the payments at the times in the amounts and in the manner required by this Article, then upon the 30th day of September named in the notice of intention to cancel as the date of the cancellation of this lease, this lease shall terminate and all rights, duties and obligations of the parties hereunder shall cease and determine as of said 30th day of September, and the shares of the Lessor to which this lease is appurtenant shall become the absolute property of the Lessor, provided, however, that the Lessee shall not be

- 26 -

released or discharged from any indebtedness owing from the Lessee to the Lessor on said last mentioned date, and provided further that if the Lessee shall fail to do any of the things or make any of the payments at the times, in the amounts and in the manner required by this Article, the Lessor shall have the option (a) of returning to the Lessee this lease, the certificate of shares and other documents deposited and thereupon the Lessee shall be deemed to have withdrawn the notice of intention to cancel this lease, or (b) of treating this lease as cancelled as of the 30th day of September named in the notice of intention to cancel as the date for the cancellation of such lease, and bringing such proceedings and actions as it deems best to enforce the covenants of the Lessee in this Article contained and to collect from the Lessee the payments which the Lessee is required to make under this Article, together with reasonable attorneys' fees and disbursements.

    **5.7 Cancellation by Holders of Two-Thirds of Shares.** If at any one time lessees owning at least two-thirds of the then issued and outstanding shares of the Lessor shall exercise their options to cancel their leases as provided in section 4.1 hereof (Conditional Limitation), then this and all other proprietary leases shall thereupon terminate on the 30th day of September of the calendar year in which such options shall have been exercised, as though every lessee had exercised such option. In such event the lessees shall not be required to surrender the shares accompanying the leases and all certificates for shares delivered to the Lessor by those who have, during that year, served notice of intention to cancel their leases under the provisions of this Article, shall be returned to such lessees.

## ARTICLE VI

## MISCELLANEOUS

    **6.1 Restrictions on Transfer.** The shares of the Lessor to which this lease is appurtenant held by the Lessee have been acquired and are owned subject to the following conditions which have been agreed upon with the Lessor and with each of the other proprietary lessees for their mutual benefit:

        (a) The shares represented by each certificate are transferable only as an entirety;

        (b) Neither the Lessee nor the Lessee's personal representatives shall sell or transfer said shares except to the Lessor, or to an assignee of this lease after compliance with all of the provisions of section 3.10 of this lease (Assignment).

        (c) The Lessor shall at all times have a first lien upon the shares of the Lessor owned by each lessee shareholder for all indebtedness and obligations owing by such shareholder to the Lessor arising under the provision of any proprietary lease issued by the

- 27 -

Lessor and at any time held by such shareholder or otherwise arising. The Lessor may refuse to consent to the transfer of shares of any such shareholder indebted to the Lessor unless and until such indebtedness is paid; and

(d) The Lessor shall be entitled to treat the holder of record of any share or shares as the holder in fact thereof, and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such shares on the part of any other person, including, but not limited to, creditors other than executors or administrators of the Lessee, whether or not it shall have express or other notice thereof, except as expressly provided by the laws of New York.

**6.2 Headings.** The headings of the several paragraphs of this lease shall not be deemed a part of this lease.

**6.3 No Oral Changes.** The provisions of this lease cannot be changed orally.

**6.4 Application of Covenants.** Except as otherwise in this lease provided, the references herein to the Lessor shall be deemed to include its successors and assigns, and the references herein to the Lessee or to a shareholder of the Lessor shall be deemed to include the executors, administrators, personal representatives, legatees and assigns of the Lessee or of such shareholder, and the covenants herein contained shall apply to, bind and enure to the benefit of the Lessor and its successors and assigns, and the Lessee and the executors, administrators, personal representatives, legatees and assigns of the Lessee; but nothing in this lease contained shall be deemed to confer any right or benefit on any creditor or third party.

**6.5 More Than One Lessee.** If more than one person is named as the Lessee hereunder, the Lessor may require the signatures of all such persons in connection with any notice to be given or action to be taken by the Lessee hereunder, including, without limiting the generality of the foregoing, the surrender or assignment of this lease, or any request for consent to assignment or subletting. Each person named as the Lessee shall be fully liable for all of the Lessee's obligations hereunder. Any notice by the Lessor to any person named as a Lessee shall be sufficient, and shall have the same force and effect as though given to all persons named as the Lessee.

**6.6 Waiver of Trial by Jury.** It is mutually agreed by and between Lessor and Lessee that the respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this lease, the Lessee's use or occupancy of the apartment and/or any claim or damage.

**6.7 Notices.** Any notice by the Lessor to the Lessee shall be deemed to have been duly given, and any demand by the Lessor upon the Lessee shall be deemed to have been duly made, if in writing and personally delivered or mailed by registered or certified

- 28 -

mail, return receipt requested, addressed to the Lessee at 781 Fifth Avenue, New York, N.Y. 10022, unless and until another address is specified in writing by the Lessee.  Any notice by the Lessee to the Lessor shall be deemed to have been duly given if in writing and personally delivered to or mailed by registered or certified mail, return receipt requested, addressed to The Sherry-Netherland, Inc., 781 Fifth Avenue, New York, N.Y. 10022, unless and until another address is specified in writing by the Lessor.

      **6.8  Partial Invalidity.**  If any clause or provision herein contained shall be adjudged invalid, the same shall not affect the validity of any other clause or provision of this lease, or constitute any cause of action in favor of either party as against the other.

      **IN WITNESS WHEREOF**, the Lessor and the Lessee have executed this instrument the day and year first above written.

**THE SHERRY-NETHERLAND, INC.**

By: _____
Name: MICHAEL J. ULLMAN
Title: EXECUTIVE V.P. & C.O.O.

Genever Holdings LLC
_____
Lessee

_____
Lessee

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF NEW YORK

On the 6th day of March in the year 2015. before me, the undersigned, personally appeared Michele Ullman , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that (s)he executed the same in (her/his/their) capacity(ies), and that by (his/her/their) signature on the instrument, the individual(s), or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

SUSAN HENNELLY
Notary Public, State of New York
No. 01HE4977445
Qualified in Suffolk County
Commission Expires February 4, 2019

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF NEW YORK

On the 6th day of March in the year 2015, before me, the undersigned, personally appeared Ila Hilbert , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that (s)he executed the same in (her/his/their) capacity(ies), and that by (his/her/their) signature on the instrument, the individual(s), or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

SUSAN HENNELLY
Notary Public, State of New York
No. 01HE4977445
Qualified in Suffolk County
Commission Expires February 4, 2019

- 30 -

This page intentionally left blank

This page intentionally left blank

## SHERRY-NETHERLAND HOUSE RULES

**One.**  The public halls, elevator vestibules and stairways of the Building shall not be obstructed or used for any other purpose than ingress to and egress from the apartments in the Building.

**Two.**  No article shall be placed in any of the halls or on any of the staircase or fire tower landings, nor shall any fire exit or fire stair be obstructed in any manner.

**Three.**  Children shall not play in the public halls, elevator vestibules, stairways, fire towers or passenger elevators and shall not be permitted in the service elevators of the Building.

**Four.**  No public hall or elevator vestibule above the ground floor of the Building shall be decorated or furnished by any Lessee in any manner without the prior consent of all of the Lessees to whose apartments such hall or vestibule serves as a way of ingress and egress.

**Five.**  The Lessee shall keep the Lessee's apartment in a good state of preservation and cleanliness and shall not sweep or throw or permit to be swept or thrown therefrom, or from the doors, windows or terraces thereof, any dirt or other substance. Nothing shall be hung or shaken from the doors, windows or terraces or placed upon the window sills of the Building.

**Six.**  No awnings or window guards visible from the outside of the Building shall be used except such as shall have been approved in writing by the Lessor.

**Seven.**  No radio or television aerial shall be attached to or hung from the exterior of the Building, and no sign, notice, advertisement or illumination shall be inscribed or exposed on or at any window or other part of the Building, except such as shall have been approved in writing by the Lessor, nor shall anything be projected from any window of the Building without similar approval.

**Eight.**  No ventilator or air conditioning device shall be installed by the Lessee without the prior written approval of the Lessor as to the type, location and manner of installation of such device. Through-the-wall air conditioners (as opposed to window units) shall be used whenever possible. All ventilator or air conditioning devices shall be connected to a separate electric circuit. The Lessee shall keep any such device which protrudes from the window of the apartment in good appearance and mechanical repair. The Lessee shall not permit any such device to leak condensation, or to make any noise which may unreasonably disturb or interfere with the rights, comforts or conveniences of any other occupant of the Building. If the Lessee shall fail to keep any such device in good order and repair, and

- 1-

properly painted, the Lessor, in its discretion, may remove such device from the window, charging the cost of removal to the Lessee, collectible on demand as additional rent, and the device shall not be replaced until it has been put in proper condition. All ventilator and air conditioning devices shall be readily accessible to the Lessor.

**Nine.** All radio, television or other electrical equipment of any kind or nature installed or used in each Lessee's apartment shall fully comply with all rules, regulations, requirements or recommendations of the New York Board of Fire Underwriters and the public authorities having jurisdiction, and the Lessee alone shall be liable for any damage or injury caused by radio, television or other electrical equipment in the Lessee's apartment.

**Ten.** No velocipedes, bicycles, scooters or similar vehicles shall be taken into or from the Building through the main entrance or be allowed in the passenger elevators and no baby carriages or any of the above-mentioned vehicles shall be allowed to stand in the public halls, passageways or other public areas of the Building.

**Eleven.** No Lessee shall make or permit any disturbing noises in the Building, or do or permit anything to be done therein, which will interfere with the rights, comforts or conveniences of other occupants. No Lessee shall play upon or suffer to be played upon any musical instrument, or operate or permit to be operated a phonograph or a radio or television or other loud speaker in the Lessee's apartment between the hours of eleven o'clock P.M. and the following nine o'clock A.M. if the same shall disturb or annoy other occupants of the Building, and in no event shall practice or suffer to be practiced either vocal or instrumental music for more than two hours in any day or between the hours of six o'clock P.M. and the following nine o'clock A.M.

**Twelve.** No water beds shall be permitted to be installed or maintained in the Building.

**Thirteen.** No bird, reptile or animal shall be kept or harbored in the Building unless the same in each instance be expressly permitted in writing by the Lessor. In no event shall dogs be permitted in elevators or in any of the public portions of the Building unless carried or on leash. Large dogs shall not be carried in the passenger elevators, but only in the service elevator.

**Fourteen.** Tradespeople requiring access to apartments shall sign in and obtain proper clearance from the appropriate employee of the Lessor and shall use the

service elevators for ingress and egress and shall not use the passenger elevators for any purpose.

**Fifteen.** The passenger and service elevators in the Building shall be operated only by employees of the Lessor and there shall be no interference whatever with

- 2-

such employees by Lessees or members of their families or their guests, employees or subtenants.

**Sixteen.**  Supplies, market goods and packages of every kind are to be delivered only through the service entrance of the Building and by the service elevators to the apartments. Trunks and heavy baggage shall be taken in or out of the Building by the service elevators and through the basement.

**Seventeen.**  The Lessee shall comply with all requirements and regulations of the Lessor regarding the disposal of refuse.  All Lessees shall separate their trash into "recyclable" and "nonrecyclable" materials, or into other categories, as the Lessor may require.  The Lessor may designate, from time to time, the types of materials which must be separated for recycling, the types of containers or binding materials to be used by the Lessee for the disposal of designated materials and the locations where designated materials shall be deposited.  The Lessor may also establish other regulations regarding the disposal of refuse.  Any costs or expenses incurred by the Lessor due to the Lessee's failure to comply with the requirements imposed by law or by the Lessor, including but not limited to fees, fines or penalties imposed on the Lessor or the Building by any governmental agency and reasonable attorney's fees and disbursements, shall be payable by the Lessee as additional rent under the lease.

**Eighteen.**  Water-closets and other water apparatus in the Building shall not be used for any purpose other than those for which they were designed, nor shall any sweepings, rubbish, rags or any other article be thrown into the same.  Any damage resulting from misuse of any water-closets or other apparatus in the Lessee's apartment shall be repaired and paid for by the Lessee.

**Nineteen**.  No occupant of the Building shall send any employee of the Lessor out of the Building on any private business.

**Twenty.**  The agents of the Lessor, and any contractor or workman authorized by the Lessor, may enter any room or apartment in the Building at any reasonable hour of the day for the purpose of inspecting the apartment for the presence of any vermin, insects or other pests and for the purpose of taking such measures as may be necessary to control or exterminate any such vermin, insects or other pests.

**Twenty-one**.  Each person, whether the Lessee, underlessee, guest or member of the family of the Lessee or underlessee, at any time in occupancy of any apartment in the Building shall, in compliance with the requirements of law, register in the hotel registry maintained by the Lessor at the commencement of each actual occupancy and shall notify the Lessor at the termination of each such occupancy.

- 3 -

**Twenty-two.** The State of New York Liquor Authority, by its authorized investigators, agents and employees, at all times shall have the right, and shall be afforded the opportunity and access, to enter and inspect any and all apartments, rooms and other areas in the Building for the purpose of enforcing the State of New York Alcohol Beverage Control Law and the Rules and Regulations of the State of New York Liquor Authority adopted and issued pursuant thereto.

**Twenty-three.** The Lessor will provide a safe in the office of the Building for the safekeeping of money, jewels, ornaments, currency, securities and other valuable or other small articles belonging to the Lessee, the Lessee's subtenant, guest, or any member of the family of the Lessee or subtenant. Unless so deposited, the Lessor shall not be liable for any loss of any such items by reason of any cause whatsoever.

**Twenty-four.** No cooking shall be permitted on any terrace of the Building or in any apartment not especially constructed and equipped therefor by Lessor, and in the latter case kitchen and pantry corridor doors shall be kept closed at all times during use for preparation or serving of food.

**Twenty-five.** Maid service is furnished by the Lessor only for routine maintenance of cleanliness and order in the apartments. Neither the Lessee nor any occupant of the apartment shall at any time induce, request or permit any maid to perform any personal or other service beyond such routine maintenance. The Lessor shall not be liable for any loss or damage to any of the Lessee's property in the apartment caused by a maid in the performance of such routine maintenance, except to the extent caused by the negligence or willful act of such maid.

**Twenty-six.** The Building does not supply any kitchen utensils, dishes or glassware. Any such items delivered to the Lessee's apartment by Room Service are to be promptly returned by the Lessee to Room Service. Upon failure of the Lessee promptly to return such item, the Lessee may be charged as additional rent for the value thereof.

**Twenty-seven.** No vehicle belonging to the Lessee or to a member of the family or guest, subtenant or employee of the Lessee shall be parked in such manner as to impede or prevent ready access to any entrance to the Building by another vehicle.

**Twenty-eight.** The Lessor may from time to time curtail or relocate any space devoted to storage purposes in the basement of the Building.

**Twenty-nine.** Complaints regarding the service of the Building shall be made in writing to the Lessor.

- 4 -

**Thirty.**  Any consent or approval given under these house rules by the Lessor shall be revocable at any time.

**Thirty-one.**  No group tour or exhibition of any apartment or its contents shall be conducted, nor shall any auction sale be held in any apartment, without the prior written consent of the Lessor; nor shall the elevators or other facilities of the Building be unduly burdened in the sole opinion of the Lessor.

**Thirty-two.**  All Lessees shall be required on demand by the Lessor to cure any illegal conditions affecting their apartments, including but not limited to any conditions resulting from alterations made to the apartment even if said alteration was previously approved by the Lessor, notwithstanding the fact that a predecessor Lessee may have been responsible for causing said illegal condition.

**Thirty-three.**  If radiator covers are installed by Lessees, such covers shall permit access to the radiator for inspection, maintenance, repair, removal or replacement thereof.

**Thirty-four.**  All access panels in apartments which provide access to water, steam and electric risers and other building systems shall be kept free and clear from obstruction. The Lessor shall have the right to enter apartments and open such access panels for the purpose of inspecting, maintaining and repairing the building systems contained therein.

**Thirty-five.**  Except in cases of emergency, where no notice shall be required, the Lessor shall give the Lessee reasonable notice, either in writing or by telephone, of the Lessor's intent to enter the apartment pursuant to the authority granted in these House Rules or in the lease.

**Thirty-six.**  These house rules may be added to, amended or repealed at any time by resolution of the board of directors of the Lessor.

**Thirty-seven.**  In accordance with requirements of Lessee under Section 3.15 of the Lease and the rights of Lessor under Section 3.10(e) of the Lease, upon the assignment by Lessee of the Lease, Lessor may require, in its reasonable judgment, that the exterior windows located within Lessee's apartment be replaced.  In the event of such determination, Lessee shall be required, within one year of such assignment of Lease, to replace such exterior windows with windows approved by Lessor.  In such event, if Lessee fails to replace such exterior windows within one year after the assignment of the Lease, Lessor may, at Lessees' sole cost and expense, replace such windows with suitable replacement windows as determined by Lessor and the cost of such replacement shall be reimbursed to the Lessor on demand as additional rent.

This page intentionally left blank

# EXHIBIT 3

MAID's Room
~~Apt. No.:~~ 7/9

Shares: 50

# THE SHERRY-NETHERLAND, INC.

*Lessor,*

TO

GENEVEL HOLDINGS LLC

*Lessee.*

## Proprietary Lease

**This Proprietary lease was adopted by shareholders at the Annual Meeting of Shareholders held on June 11, 1992, supercedes all prior proprietary leases and becomes effective on October 1, 1996, as amended by vote of shareholders on November 29, 2012.**

INDEX

Page

ARTICLE I - CASH REQUIREMENTS, RENT, POWER OF BOARD OF DIRECTORS

    1.1  Cash Requirements.................................................................................................... 2
    1.2  Rent........................................................................................................................... 2
    1.3  Power of Board of Directors.................................................................................... 3

ARTICLE II  -  OBLIGATIONS OF THE LESSOR AND LIMITATIONS THEREON

    2.1  Lessor's Repairs...................................................................................................... 4
    2.2  Maintenance and Hotel Service............................................................................... 4
    2.3  Damage to the Building............................................................................................ 5
    2.4  Books of Account..................................................................................................... 5
    2.5  Terraces.................................................................................................................... 6
    2.6  Accompanying Shares to be Specified in Proprietary Leases................................ 7
    2.7  Changes in Terms and Conditions of Proprietary Leases....................................... 7
    2.8  Quiet Enjoyment...................................................................................................... 8

ARTICLE III - OBLIGATION OF THE LESSEE

    3.1  Payment of Rent....................................................................................................... 8
    3.2  Electric Service........................................................................................................ 8
    3.3  Certain Consequences of Default............................................................................ 9
    3.4  Receipt of Rent from Subtenant on Default in Payment of Rent........................... 10
    3.5  Failure to Fix Cash Requirements.......................................................................... 10
    3.6  House Rules............................................................................................................ 10
    3.7  Use and Occupancy of Premises............................................................................ 10
    3.8  Fire Insurance Rates and Requirements of Law.................................................... 12
    3.9  Subletting............................................................................................................... 12
    3.10 Assignment............................................................................................................. 13
    3.11 Release of Lessee upon Assignment...................................................................... 13
    3.12 No Implied Consent................................................................................................ 14
    3.13 Consequences of Unauthorized Assignment or Subletting.................................... 14
    3.14 Pledge of Shares..................................................................................................... 14
    3.15 Lessee's Repairs..................................................................................................... 14
    3.16 Alterations.............................................................................................................. 15
    3.17 Removal of Fixtures Installed by Lessee............................................................... 16
    3.18 Surrender of Possession......................................................................................... 16
    3.19 Lease Subordinate to Mortgages........................................................................... 16
    3.20 Mechanics' Liens................................................................................................... 17
    3.21 Entry for Examination and Repair......................................................................... 17
    3.22 No Implied Wavier................................................................................................. 18
    3.23 Reimbursement of Lessor's Expenses................................................................... 18
    3.24 Special Services...................................................................................................... 18

Page

3.25 Lessor's Immunities.................................................................................. 18
3.26 Notice of Defects.................................................................................... 19
3.27 Lessor's Right to Perform at Lessee's Expense..................................... 19
3.28 Lessee's Indemnity of Lessor................................................................ 20
3.29 Injunction............................................................................................... 20
3.30 Insurance................................................................................................ 20
3.31 Cooperation........................................................................................... 21

ARTICLE IV - TERMINATION BY CONDITIONAL LIMITATION
4.1 Conditional Limitation............................................................................ 22
4.2 Waiver of Right of Redemption............................................................. 24
4.3 Liability of Lessee upon Termination; Surrender of Possession........... 24
4.4 Sale of Shares......................................................................................... 24

ARTICLE V - CANCELLATION AT OPTION OF LESSEE
5.1 Lessee's Option to Cancel...................................................................... 25
5.2 Removal of Fixtures, Surrender of Possession and Payments................ 25
5.3 Additional Payments by Lessee; Replacements...................................... 26
5.4 Effect of Subleases................................................................................. 26
5.5 Permission to Show and Occupy Premises............................................. 26
5.6 Cancellation of Lease; Transfer of Shares.............................................. 26
5.7 Cancellation by Holders of Two-Thirds of Shares................................. 27

ARTICLE VI - MISCELLANEOUS
6.1 Restrictions on Transfer.......................................................................... 27
6.2 Headings.................................................................................................. 28
6.3 No Oral Changes..................................................................................... 28
6.4 Application of Covenants........................................................................ 28
6.5 More Than One Lessee............................................................................ 28
6.6 Waiver of Trial by Jury........................................................................... 28
6.7 Notices.................................................................................................... 28
6.8 Partial Invalidity..................................................................................... 29

- ii -

**PROPRIETARY LEASE**

**INDENTURE OF LEASE**, made the ~~HARENG~~ day of *MARCH*, *2015*, by and between THE SHERRY-NETHERLAND, INC. (formerly known as "Fifth Avenue & 59th Corporation"), a corporation organized under the laws of the State of New York (hereinafter called the "Lessor") and *GENEVER HOLDINGS LLC* _____, (hereinafter called the "Lessee").

**WHEREAS**, the Lessor is the owner of the land and the building in the Borough of Manhattan, New York, N.Y., known as "The Sherry-Netherland" and by the street number 781 Fifth Avenue (hereinafter called the "Building"); and

**WHEREAS**, the Lessor is a cooperative housing corporation and has leased the apartments in the Building to the several owners of its capital shares by instruments known as proprietary leases; and

**WHEREAS**, the Lessee owns *50* shares of the Lessor which have been allocated to the room or suite herein designated as the apartment, and which are appurtenant to this lease;

**NOW, THERFORE**, in consideration of the premises and of the rents, covenants and agreements hereinafter provided and contained, the Lessor hereby leases to the Lessee, subject to the terms and conditions hereinafter expressed, and the Lessee hereby hires and takes from the Lessor, all of that certain apartment in the Building, known as ~~Apartment~~ *719 MAID'S ROOM* (hereinafter called the "apartment").

**TO HAVE AND TO HOLD** the apartment, with the furniture, furnishings and equipment therein belonging to the Lessee and the appurtenances, unto the Lessee, and the executors, administrators, and authorized assigns of the Lessee, upon the terms and conditions herein set forth, from the *5th* day of *March*, *2015*, until the 30th day of September 2046 (unless the term shall sooner expire as hereinafter in this lease provided), at a rent for each year, or portion of a year, during said term equal to the proportionate share as hereinafter provided of the aggregate amount of the cash requirements of the Lessor, as hereinafter defined for such year or portion of a year, together with all additional rent, special maintenance charges and other sums due from the Lessee to the Lessor hereunder.

For the purpose of fixing and determining such cash requirements and rental, the rental year shall be deemed to be the calendar year, except that the first year of the term hereunder shall be deemed to begin on the date on which such term commences and to end on the 31st day of December next ensuing, and the last year of the term hereunder shall be deemed to begin on the 1st day of January, 2046 and to end on the 30th day of September, 2046.

# ARTICLE I

# CASH REQUIREMENTS, RENT, POWER OF BOARD OF DIRECTORS

**1.1 Cash Requirements**. The cash requirements above referred to for each year or portion thereof are hereby defined and shall be deemed to be such aggregate sum as the board of directors of the Lessor from time to time, by a resolution or resolutions adopted during such year or portion thereof or the proceeding year, shall determine in its judgment is to be paid by all the lessees under proprietary leases then in force (after deducting any expected rents or incomes to be received during such year or portion thereof other than rents under proprietary leases) on account of the estimated expenses and outlays of the Lessor to the close of such year, growing out of or connected with the ownership, maintenance and operation of the Building, which sum may include among other things taxes, assessments, water rates, insurance premiums, operating expenses, alterations, replacements and repairs, expenses and liabilities incurred by the Lessor under or by reason of this or other leases, interest on mortgage indebtedness, payments on account of principal secured by mortgages, the payment of any other liens or charges, the payment of any deficit remaining from a previous period, the creation of a reasonable reserve or surplus fund and expenses for other corporate purposes.  The board of directors of the Lessor may, by resolution or resolutions duly adopted from time to time, up to the close of the year for which cash requirements have been so fixed and determined, increase or diminish (within the limits and on the conditions hereinabove provided) the amount previously fixed or determined for such year or portion thereof.  The board of directors may include in the cash requirements for the year or portion thereof (of which a share to be fixed as aforesaid shall be payable by the Lessee as rent for such year) any liabilities or items of expense which accrued or became payable in a previous year, or which might have been included in the cash requirements of a previous year but were not included therein and also any sums which the board of directors may deem it necessary or prudent to provide as a reserve against liabilities or items of expense then accrued or thereafter to accrue although not payable in that year.

**1.2 Rent**. The rent payable by the Lessee in and for each year or portion thereof, of the term shall be a sum (within the limits and on the conditions hereinabove provided) bearing to the aggregate amount of such cash requirements for such year or portion thereof, as the case may be, determined as aforesaid, the same ratio as that which the number of shares of the Lessor, owned by the Lessee at the time of the execution hereof as stated in the recitals of this proprietary lease, bears to the aggregate of the shares similarly specified in all the proprietary leases in effect at the time of the fixing and determination of such cash requirements, and such rent shall be payable in equal monthly installments in advance on the first day of each month, unless the board of directors of the Lessor shall otherwise direct. The board of directors of the Lessor may, at any time and from time to time, by resolution duly adopted, determine and direct what portion of said rent payable by the lessees under all such proprietary leases or other receipts for any year or years, but not more than such sums as are used or to be used to meet a cash requirement of the Lessor for payments on account of

- 2 -

principal of any mortgage on the property of the Lessor or other capital expenditures, shall be credited upon the corporate books of the Lessor as paid-in surplus.

The Lessee shall also pay the Lessee's pro-rata share (determined in the same manner as rent) of any special maintenance charge that may be levied by Lessor from time to time to pay for any repair, alteration, or improvement to the corporate property, or any deficit from operations for a prior period, or other cash requirements. Such special maintenance charge shall be deemed additional rent and shall be payable in a lump sum or in periodic installments, with or without interest, and upon such other terms and conditions as the board of directors of the Lessor shall determine.

The Lessee shall also pay such additional rent as may be provided for herein when due. The term "additional rent" shall include any and all sums due hereunder other than rent, whether or not such sums are denominated as "additional rent".

The rent hereunder shall begin to accrue on the date of the commencement of the term herein granted.

**1.3** **Power of Board of Directors**. The board of directors of the Lessor shall have discretionary power to describe the manner of maintaining and operating the Building and to determine the cash requirements of the Lessor and any special maintenance charges to be paid as aforesaid by the lessees under proprietary leases. Every such determination by the board of directors shall be final and conclusive as to all lessees, and any expenditures made by the Lessor's officers, under the direction or with the approval of the Lessor's board of directors, shall, as against the lessees, be deemed necessarily and properly made for such purposes.

The power and authority to determine and establish the amount of and to require payment of the rent above provided for shall be possessed only by the board of directors of the Lessor elected by its shareholders and shall not pass to or be exercised by:

(a) Any creditor, receiver or trustee of the Lessor or any representative of any such creditor, receiver or trustee;

(b) Any board of directors elected by any such creditor receiver or trustee or by any representative of any such creditor, receiver or trustee.

- 3 -

## ARTICLE II

## OBLIGATIONS OF THE LESSOR AND LIMITATIONS THEREON

**2.1  Lessor's Repairs**. The Lessor shall keep in good repair the Building's foundations, sidewalks, walls (except interior walls of apartments, floor and ceilings, unless repairs thereto are necessitated by the failure of Lessor to make repairs for which it is by this paragraph 2.1 responsible), supports, beams, roofs, gutters, fences, cellars, chimneys, restaurants, bars and all lobbies, public spaces, entrances, street and court doorways, main halls, main stairways, elevators, pumps, tanks and all main and principal pipes for carrying water, gas or steam through the Building and all main drain pipes and electrical conduits, together with all plumbing, heating and other apparatus intended for the general service of the Building, except those portions of any of the foregoing which it is the duty of the Lessee to maintain and keep in good repair as hereinafter provided in section 3.15 hereof (Lessee's Repairs), it being agreed that the Lessee shall give the Lessor prompt notice of any accident or defect known to the Lessee and requiring repairs to be made.  Subject to the foregoing limitations, all repairs required to be made by the Lessor shall be at the expense of the Lessor, unless the same shall have been rendered necessary by the wrongful act or neglect or carelessness of the Lessee, or the Lessee's spouse, children, grandchildren, parents, grandparents, brothers or sisters, or the spouses of any of the foregoing (collectively hereinafter referred to as the Lessee's "family"), agents, servants, guests, employees or subtenants of the Lessee, in which case the Lessor shall be entitled to reimbursement from the Lessee for all expenses incurred in connection therewith, whether or not paid by the Lessor, and such reimbursements shall be due as additional rent on the first day of the calendar month following demand thereof by the Lessor on the Lessee.

**2.2  Maintenance and Hotel Service**.  Subject to the provisions of section 3.25 hereof (Lessor's Immunities), the Lessor shall maintain the Building as a luxury hotel and may engage a managing agent or management company to manage the building as such; shall keep the lobbies, public spaces, elevators and the public halls and stairways clean and properly lighted and heated; shall provide restaurant and bar facilities and room service of food and beverages (including alcoholic beverages); shall provide elevator service and the requisite number of attendants for the care and service of the Building; and shall provide the apartment with the usual high class hotel service, a sufficient supply of electricity (subject to section 3.2 hereof (Electric Service)), hot and cold water and of heat.

The covenants by the Lessor herein contained are subject, however, to the discretionary power of the board of directors of the Lessor to prescribe the manner of maintaining and operating the Building and to determine the cash requirements of the Lessor and any special maintenance charges, as hereinabove stated.  Interruption or curtailment, for whatever reason, of any services or facilities to be furnished by the Lessor shall not constitute a constructive or partial eviction nor entitle the Lessee to any compensation or abatement of rent.

- 4 -

**2.3** **Damage to the Building**.  In case the building shall be damaged by fire or other cause, the same shall be restored, repaired or replaced as speedily as is reasonably possible at the expense of the Lessor, so as to conform substantially to the condition of the Building immediately preceding such fire or other casualty.  Anything in this section or section 2.1 (Lessor's Repairs) to the contrary notwithstanding, unless such damage is caused by the Lessor, or the agents or employees of the Lessor, the Lessor's obligation to restore, repair and replace pursuant to this section shall not apply to any additions, improvements, equipment, fixtures, furniture, furnishings, decorations, fine art or objets d'art placed or installed in the apartment by the Lessee or any of the Lessee's predecessors in interest, it being within the determination of the Lessee to maintain insurance to cover these items, nor shall the Lessor be obligated to repaint or replace wallpaper or other decorations in the apartment or to refinish floors located therein.

In case the damage resulting from fire or other cause shall be so extensive as to render the apartment partly or wholly untenantable, or if the means of access thereto shall be destroyed, the rent hereunder shall proportionately abate until the apartment shall, in the Lessor's reasonable opinion, again be rendered wholly tenantable or the means of access restored; but if said damage shall be caused by the act or negligence of the Lessee or the agents, employees, guests or members of the family of the Lessee or any occupant of the apartment, such rent shall abate only to the extent of the rental value insurance, if any, collected by Lessor with respect to the apartment.

If the board of directors of the Lessor shall determine that (i) the Building is totally destroyed by fire or other cause, or (ii) the Building is so damaged that it cannot be repaired within a reasonable time after loss shall have been adjusted with the insurance carriers, or (iii) the destruction or damage was caused by hazards which are not covered under the Lessor's insurance policies then in effect, and if in any such case the record holders of at least two-thirds of the issued shares at a shareholders' meeting duly called for that purpose held within one (1) year after the determination by the board of directors, shall vote not to repair, restore or rebuild, then upon the giving of notice pursuant to section 4.1 hereof (Conditional Limitation), this Lease and all other proprietary leases and all right, title and interest of the parties thereunder and the tenancies thereby created, shall thereupon wholly cease and expire and rent shall be paid to the date of such destruction or damage.  The Lessee hereby waives any and all rights under Section 227 of the Real Property Law and in no event shall the Lessee have any option or right to terminate this Lease, except as provided herein.

**2.4** **Books of Account**.  The Lessor shall keep full and correct books of account and the same shall be open upon prior appointment during all reasonable hours to inspection by the Lessee or a representative of the Lessee.

**2.5  Terraces.**  A Lessee of an apartment having a direct access to a terrace or a portion of the roof adjoining an apartment (the "Terrace") shall have and enjoy the exclusive use of the portion of such Terrance which immediately adjoins the apartment, subject to: (i) the provisions of this paragraph, (ii) all other applicable provisions of the lease, (iii) the use of such Terrace by the Lessor to enable it to fulfill its obligations under this or any other proprietary lease entered into by the Lessor, including, but not limited to, its obligations to maintain and repair, (iv) such rules and regulations as the board of directors may, from time to time, enact and (v) the rules and regulations of the Board of Fire Underwriters and of all governmental authorities having jurisdiction over the Building. The Lessee shall not, in the use of such Terrace, endanger the safety of any person or the property of the Lessor or that of any such person or use the Terrace so as to interfere with or annoy the lessee or occupant of any apartment underneath the same.

It shall be the Lessee's duty, at the Lessee's own cost and expense, to keep the Terrace clean and free from debris and to maintain all screens and drain boxes in good condition. It shall be the Lessor's duty to keep the Terrace in good repair, subject to reasonable wear and tear and the provisions contained in this paragraph. The Lessor shall not be obligated, however, to maintain or repair the tiles and brick work on the Terrace.

No structures of any kind, including but not limited to, plantings, planters, fences and lattices (the "Structures"), shall be placed, erected, installed or reinstalled following removal, for any reason whatsoever, on such Terrace without the prior written approval of the Lessor. In the event of such placement, erection, installation or reinstallation without such approval, the Lessor shall have the right, at the Lessee's expense, to remove the Structures; further, should the Lessor, in its sole discretion, determine that repairs to such Terrace or to the apartment or to any other part of the Building, including, but not limited to any apartment in the Building, are required because of the existence of any Structures, whether or not said Structures have been approved by the Lessor, the Lessor may make such repairs, and the Lessee shall reimburse the Lessor for all of the costs of such repairs; such reimbursement shall be paid by the Lessee immediately on demand and such costs shall be deemed to be additional rent.

Any Structure erected, placed, installed or reinstalled by the Lessee or its predecessor in interest, whether or not in compliance with the provisions of this paragraph, may be removed, temporarily or permanently, in the sole discretion of the Lessor, by the Lessor, at the sole expense of the Lessee, for the purpose of insuring safety, complying with the applicable law, making repairs, or maintaining the Building.

No surfaces or walls of a Terrace shall be painted or otherwise covered by the Lessee without the prior written approval of the Lessor.

The Lessor shall have an unlimited right of access to such Terrance (i) to enforce compliance with the provisions of this paragraph, (ii) for any purpose set forth in this

- 6 -

paragraph and in this lease, and (iii) to otherwise enable it to comply with any applicable law or regulation.

The Lessor, for itself or other Lessees, shall have the right to erect, on the roof or on the outside wall of the Building, radio or television aerials and antennas or other equipment for its use and the use of the lessees in the Building and the Lessor shall have the right to access thereto for such installation and for the maintenance and repair thereof.

**2.6  Accompanying Shares to be Specified in Proprietary Leases.**  In every proprietary lease heretofore executed by the Lessor there has been specified, and in every proprietary lease hereafter executed by it there will be specified, the number of shares of the Lessor owned by the lessee therein named, which number, in relation to the aggregate of all numbers of shares similarly specified in all the proprietary leases at the time in force, shall constitute the basis for fixing, as hereinbefore provided, the proportionate share of the aggregate amount of the cash requirements of the Lessor, as hereinbefore defined, which shall be payable as rent by the Lessee.  In the event that, after the fixing of the amounts payable as rent by the lessees under proprietary leases for any period of time, one or more additional proprietary leases be made, thus increasing the aggregate number of shares specified in all proprietary leases, the rent to be paid under such additional lease or leases, unless and until otherwise fixed by the board of directors, shall be at the same rate per share for each share specified in such additional lease or is applicable to the shares specified in all other proprietary leases in effect at the time of the fixing and determination of such cash requirements; and the rent payable by lessees under such other proprietary leases, unless and until otherwise fixed by the board of directors, shall not be modified or affected by any ncrease in the aggregate number of shares specified in all proprietary leases.

**2.7  Changes in Terms and Condition of Proprietary Leases.**  Each proprietary lease shall be in the form of this Lease, except with respect to the number of shares of the Lessor owned by the Lessee, unless (i) a variation to a particular lease is authorized by lessees owing at least two-thirds (2/3) of the Lessor's shares then issued and outstanding accompanying proprietary leases then in force and such variation is agreed to in writing by the Lessor and the lessee affected or (ii) a change or amendment to the form of this lease (as distinct from house rules) shall be approved by lessees owning at least two-thirds (2/3) of the Lessor's shares then issued and outstanding accompanying proprietary leases then in force, and such changes shall be binding on all lessees even if they did not vote for such changes, except that the proportionate share of cash requirements payable by any lessee may not be increased nor may such lessee's right to cancel this lease under the conditions set forth in section 5.1 (Lessee's Right to Cancel) be eliminated or impaired without such lessee's express consent.  Approval by lessees as provided for herein shall be evidenced by written consent, or by affirmative vote, taken at a meeting called for such purpose.

- 7 -

**2.8 Quiet Enjoyment.** The Lessee, upon paying the rent and charges and performing the covenants and complying with the conditions on the part of the Lessee to be performed, as herein set forth, shall, at all times during the term hereby granted, quietly have, hold and enjoy the apartment without any suit, trouble or hindrance from the Lessor, subject however to the rights of present tenants or occupants of the apartment, and subject to any and all mortgages and underlying leases of the land and Building as provided in section 3.19 below (Lease Subordinate to Mortgages).

<h1 style="text-align:center">ARTICLE III</h1>

<h2 style="text-align:center">OBLIGATIONS OF THE LESSEE</h2>

**3.1 Payment of Rent.** The Lessee will pay to the Lessor the rent upon the terms, at the times and in the manner herein provided, without any abatement of, or deduction, counterclaim or set off against rent or additional rent, and if the Lessee shall fail to pay within thirty (30) days of its due date any installment of rent, additional rent or any other amount due hereunder, including but not limited to charges for special services pursuant to section 3.24 (Special Services), from the time when the same becomes due, the Lessee shall pay interest thereon at the rate of twenty percent (20%) per annum, or such other amount as may be approved from time to time by the board of directors of the Lessor, from the date when such installment shall have become due to the date of the payment thereof, and such interest shall be deemed additional rent hereunder and shall be due on the first day of the calendar month following the Lessor's demand or bill therefor. All rent and additional rent payable hereunder shall be payable in lawful money of the United States which shall be legal tender for payment of all debts and dues, public and private, at the time of payment.

**3.2 Electric Service.** If the Lessor, in its sole discretion, determines to convert the supply of electric current to the apartment to a submetered basis, the Lessor shall, at the Lessor's expense, furnish and install a submeter to measure the Lessee's consumption of electric current in the apartment. The Lessee agrees to provide access to the apartment to the Lessor, its agents and contractors for the installation, maintenance and repair of any such submeter, and all wiring associated therewith. From and after the installation of such submeter, the Lessee shall pay the Lessor for the amount of electric current as shall be indicated by the submeter furnished therefor by the Lessor. The rates payable by the Lessee for said current shall be the same as those charged by such public service corporation for consumption similar to that of the Lessee. Payments shall be due as and when bills shall be rendered and the Lessee shall comply with rules, regulations and contract provisions similar to those then prescribed by said public service corporation. Any amount as to which the Lessee shall at any time be in default for or in respect to the use of electric current, or for or in respect to any other service that shall at any time be furnished by the Lessor, shall be deemed to be additional rent that shall be due and payable by the Lessee to the Lessor on the

first day of the calendar month following the Lessor's demand therefor.  The Lessor reserves the right to discontinue use of the submeters and provide electric current to the apartment without charge to the Lessee.  The Lessor also reserves the right to discontinue furnishing electric current to the Lessee in the apartment at any time upon not less than ninety (90) days notice, provided that (i) Lessor shall discontinue furnishing electric current to all apartments in the building leased under proprietary leases and (ii) unless otherwise required by law, ordinance, order, regulation or requirement of any public authority having jurisdiction over the Building, the Lessor shall postpone such discontinuance for a sufficient amount of time so as to allow the Lessee to arrange to obtain electric current directly from the public utility company furnishing electric current to the Building, provided, however, that the Lessee shall, at the Lessee's expense, diligently arrange to obtain electric current from such public utility company upon receipt of the Lessor's notice that the Lessor intends to discontinue furnishing electric current to the apartment.

    **3.3  Certain Consequences of Default.**  In the event the Lessor resumes possession of the apartment, either by summary proceedings, action of ejectment or otherwise, because of a default by the Lessee in the payment of any rent, or additional rent, or any part of the same, or on the expiration of the term pursuant to a notice given as provided in section 4.1 (Conditional Limitation) of this lease upon the happening of any event specified in subsections (a) to (f), inclusive, of section 4.1, the Lessee shall continue to remain liable for payment of the rent or additional rent which would have become due hereunder and shall pay the same in installments from time to time as hereinbefore provided.  No suit brought to recover any installment of such rent or additional rent shall prejudice the right of the Lessor to recover any subsequent installment.  After resuming possession, the Lessor may, at its option, either (a) relet the apartment for the Lessor's own account or (b) from time to time relet the apartment as the agent of or for the account of the Lessee for a term or terms which may be less than or greater than the period which would otherwise have constituted the balance of the term of this lease, and may grant concessions or free rent in its discretion.  The fact that the Lessor may have relet the apartment as agent for the Lessee shall not prevent the Lessor from thereafter notifying the Lessee that it proposes to relet the apartment for its own account and will no longer relet the apartment as agent for the Lessee.  If the Lessor relets the apartment as the agent of, or for the account of, the Lessee, it shall, after reimbursing itself for its expenses in connection therewith, including leasing commissions and a reasonable amount for decorations, alterations and repairs in and to the apartment, apply the remaining avails of such reletting to the payment of any and all sums then due from the Lessee to the Lessor, or which would thereafter have become due from the Lessee under the provisions of this lease if the Lessor had not so resumed possession, accounting to the Lessee at the expiration of each of the several terms of such reletting for the surplus, if any.  If, at any time or from time to time before the expiration of the term originally demised hereunder, there shall be a deficiency between the avails of such reletting and such sums as would have become due hereunder, the Lessee agrees to pay such deficiency for each month of the period which would otherwise have constituted the balance of the term of this lease.  No demand need be made by the Lessor for the amounts of such

- 9 -

deficiency and suit may be brought therefor from time to time as the same shall arise. Any suit brought to collect the amount of such deficiency shall not in anyway prejudice the right of the Lessor to collect and sue for any deficiency in any subsequent month. The failure or refusal of the Lessor to relet the apartment or any part thereof shall not release or affect the Lessee's liability hereunder.

**3.4 Receipt of Rent from Subtenant on Default in Payment of Rent.** If the Lessee shall at any time sublet the apartment and shall default for a period of one month in the payment of any rent or additional rent, the Lessor may, at its option, so long as such default shall continue, demand and receive from any subtenant of the Lessee occupying the apartment the rent due or becoming due from such subtenant to the Lessee, up to an amount sufficient to pay all sums due from the Lessee to the Lessor, and any such payment of such rent to the Lessor shall be sufficient payment and discharge of such subtenant, as between such subtenant and the Lessee, to the extent of the amount so paid; and any such demand or acceptance of rent from any subtenant, or from any assignee hereof, shall not be deemed a consent or approval of any subletting or assignment by the Lessee.

**3.5 Failure to Fix Cash Requirements.** The omission by the board of directors of the Lessor to determine the Lessor's cash requirements for any year or portion thereof shall not be deemed a waiver or modification in any respect of the covenants and provisions hereof, or a release of the Lessee from the obligation to pay the rent or any installment thereof, but the rent last determined for any year or portion thereof shall thereafter continue to be the rent until cash requirements shall be redetermined.

**3.6 House Rules.** The Lessor may from time to time establish such reasonable house rules as its board of directors may deem appropriate for the management and control of the Building, and may also from time to time alter, amend and repeal such rules, and this lease shall be in all respects subject to such rules, which, when a copy thereof has been furnished to the Lessee, shall be taken to be part hereof, and the Lessee shall obey all such rules and see that they are faithfully observed by the family, guests, employees and subtenants of the Lessee, it being understood that such rules shall apply to and be binding upon all of the tenants of the Building, whether shareholders of the Lessor or not, but that the Lessor shall not be responsible to the Lessee for the non-observance or violation of such rules by any other lessee or person. Breach of a house rule by the Lessee, or failure by the Lessee or the Lessee's family to use reasonable efforts to ensure compliance with house rules by any other occupant of the apartment, shall be a default under this lease.

**3.7 Use and Occupancy of Premises.** The Lessee shall not, except as provided in section 3.9 (Subletting), without the written consent of the Lessor on such conditions as Lessor may prescribe, occupy or use the apartment, or the furniture or furnishings therein, or permit the same or any part thereof to be occupied or used for any purpose other than as a private dwelling for the Lessee and Lessee's family and domestic employees. In addition to the foregoing, the apartment may be occupied from time to time

- 10 -

by guests of the Lessee for periods of time not exceeding thirty days, in the aggregate, during any calendar year, unless a longer period is approved in writing by the Lessor, as long as such occupancy is not violative of applicable zoning laws, building code or other rules and regulations of governmental authorities having jurisdiction (collectively, "Occupancy Laws"). If any guest is to occupy the apartment during any period in which the permitted adult residents are not in occupancy, the Lessee shall notify the Lessor in writing prior to the arrival of such guest(s), the name(s) of such guest(s) and the period during which such guest(s) will be in occupancy. Guests permitted under this Section 3.7 may not be charged for the use of the apartment. If a violation of any Occupancy Law is alleged to exist, and the Lessor elects not to contest such violation, the Lessee, at the Lessee's sole cost and expense, after written notice to the Lessor, may contest, by appropriate proceedings prosecuted diligently and in good faith, such violation, and the Lessor shall cooperate with the Lessee in such contest, provided that (b) the Lessor shall not be subject to criminal penalty or to prosecution for a crime, nor shall the Building, the land on which it is situated, or any part thereof be subject to condemnation or being vacated by reason of non-compliance or otherwise by reason of such contest; (c) the Lessee indemnifies the Lessor against the cost of any such contest or proceedings and against all liability for damages, interest, penalties, and expenses (including attorneys' fees and expenses), resulting from or incurred in connection with such contest or non-compliance; (d) such non-compliance or contest shall not constitute or result in any violation of any mortgage on the Building or the land on which it is situated, or if any such mortgage shall permit such non-compliance or contest on condition of the taking of action or furnishing of security by the Lessor, such action shall be taken and such security shall be furnished at the expense of the Lessee; and (e) the Lessee shall keep the Lessor advised as to the status of such proceedings. Consent of the Lessor to the use of the premises for other than the uses permitted in this section 3.7 may be granted on such conditions as of the Lessor, in its discretion, may deem appropriate, including the payment of additional rent.

     **3.8** **Fire Insurance Rates and Requirements of Law.** The Lessee shall not permit or suffer anything to be done or kept in the apartment which will increase the rate of fire insurance on the Building or the contents thereof, or which will interfere with the tights of other tenants, or annoy such tenants by unreasonable noises, odors or otherwise, or which will obstruct the public halls or stairways of the Building. The Lessee will comply with all the requirements of the Board of Health and all other governmental authorities and with all laws, ordinances, rules and regulations with respect to the apartment; and if, by reason of the occupancy or use of the apartment by the Lessee, the rate of fire insurance on the Building or its contents shall be increased, the Lessee shall become personally liable for the additional insurance premiums upon all policies covering the Building, and the Lessor shall have the right to collect the same, as additional rent hereunder on the first day of the calendar month following demand therefor by the Lessor.

     The Lessee will not clean, nor require, permit, suffer or allow any window in the apartment to be cleaned from the outside, in violation of Section 202 of the Labor Law

(or any successor statute) or of the rules of the Board of Standards and Appeals, or of any other board or body having or asserting jurisdiction; and the Lessee hereby agrees to indemnify the Lessor, its employees and other lessees, from and against any and all claims, losses, damages, fines, attorneys' fees and related costs suffered by them as a result of the Lessee's requiring, permitting, suffering or allowing any window in the Building to be leaned from the outside in violation of the requirements of the aforesaid laws, ordinances, regulations and rules.

**3.9  Subletting.**  The Lessee shall not sublet the whole or any part of the apartment for any term to any person or persons nor, except as provided in section 3.7 (Use and Occupancy), permit the same to be occupied or used by any persons other than members of the Lessee's family and domestic servants, unless consent thereto shall have been duly given by an instrument in writing which is to be signed (a) by a majority of the directors of the Lessor or (b) by an officer of the Lessor when duly authorized by a resolution of the Lessor's board of directors or by a resolution adopted at any annual or special meeting of shareholders, or unless the Lessee shall have entered into a rental agreement (a "rental agreement") with the Lessor for the renting of the apartment. Any such rental agreement shall be upon such terms and conditions as the board of directors may, in its sole discretion, reasonably impose from time to time. Whenever the Lessee applies to the Lessor for consent to a subletting, the Lessor may require as a condition thereto such conditions as the directors or shareholders, as the case may be, may impose consistent with Lessor's obligation to act reasonably as set forth in the next succeeding sentence, including the obligation for the Lessee to pay a sublet fee to the Lessor in an amount fixed from time to time by the board of directors in its sole discretion in a rental agreement and the obligation for the Lessee deliver to the Lessor a copy of the sublease to which consent is requested. The Lessor shall not unreasonably withhold consent to a subletting provided, however, that consent shall not be granted until the Lessee cures all defaults hereunder and pays the sublet fee charged by the Lessor, together with a sum to be fixed by the board of directors of the Lessor to cover reasonable legal and other out-of-pocket expenses of the Lessor in connection with such subletting.

**3.10  Assignment.**  The Lessee shall not assign this lease, or any interest therein, and no such assignment shall take effect as against the Lessor for any purpose, unless and until all of the following requirements have been complied with and satisfied:

(a) An instrument of assignment executed by the assignor shall have been delivered to the Lessor;

(b) An agreement, in form approved by the Lessor, containing a covenant by the assignee assuming and agreeing to perform and comply with all the covenants and conditions of this lease to be performed or complied with by the Lessee on and after the effective date of said assignment must be executed and acknowledged by the assignee and delivered to the Lessor, but no such assumption agreement shall be required if the assignee

- 12 -

surrenders the assigned lease and enters into a new lease for the remainder of the term as hereinafter provided;

(c) All shares of the Lessor accompanying this lease must be transferred to the assignee with the required transfer stamps affixed;

(d) All sums due from the Lessee, together with a sum to be fixed by the board of directors of the Lessor to cover reasonable legal and other out-of-pocket expenses of the Lessor in connection with such assignment and transfer of shares, must be paid to the Lessor; and

(e) A written consent to such assignment, either (1) signed by or authorized by a majority of the board of directors of the Lessor or (2) signed by or authorized by lessees owning of record at least two-thirds of the shares of the Lessor accompanying proprietary leases then in force, must be delivered to the Lessor. If the Lessee shall die, such consent shall not be unreasonably withheld to any assignment of this lease and the accompanying shares to a financially responsible member of the Lessee's family other than the Lessee's spouse, as to whom no consent is required. There shall be no limitation, except as above specifically provided, on the right of the directors or lessees to grant or withhold consent, for any reason or for no reason, to an assignment.

(f) Effective for all assignments of this lease pursuant to a contract of sale submitted for the Lessor's consent after December 31, 2013 (regardless of the date of the closing), the assignee shall deliver to the Lessor an amount equal to two (2%) percent (the "Transfer Fee") of the gross proceeds of sale of the apartment and appurtenant shares of the Lessor. The Transfer Fee shall be paid on the date of closing, by certified or bank check payable to the order of the Lessor. Notwithstanding the foregoing, the Transfer Fee shall not be payable with respect to an assignment of this lease and the transfer of the appurtenant shares of the Lessor by the Lessee (i) to the spouse, children, or parents of the Lessee (or if the Lessee is an entity, to a shareholder, owner, member or in the case of a trust, beneficiary of such entity) such as by means of a gift, (ii) by the Lessee or the Lessee's executor, administrator or personal representative to an entity (including a trust or limited liability company) for the benefit of Lessee or the spouse, children or parents of the Lessee, in each case, without consideration, such as by means of a gift or (iii) by testamentary bequest, trust transfer or similar disposition or operation of law, without consideration, from a deceased Lessee or from an executor, administrator or other personal representative of a deceased Lessee.

**3.11  Release of Lessee upon Assignment.**  Whenever the Lessee shall, under the provisions of this lease, be permitted to assign and shall so assign the same, and the assignee shall assume all of the unfilled obligations of the assignor hereunder, either by an instrument in writing delivered to the Lessor or by surrendering the assigned lease and entering into a new lease for the remainder of the term, the assignor shall have no further liability on any of the covenants of this lease to be thereafter performed. At the option and

- 13 -

election of the Lessor, any assigned lease may be surrendered and cancelled, and a new lease for the remainder of the term of this lease, in the same form, shall in such case be entered into between the Lessor and the assignee.

**3.12 No Implied Consent.** No demand or acceptance of rent from any subtenant or from any assignee hereof or other person in possession or occupancy shall constitute or be deemed to constitute a consent to or approval of any assignment, sublease or occupancy.

**3.13 Consequences of Unauthorized Assignment or Subletting.** No executor, administrator, personal representative or successor of the Lessee, or trustee, or anyone to whom the interest of the Lessee hereunder shall pass by law, shall be entitled to assign this lease, or to sublet the apartment, or any part thereof, except upon compliance with the requirements of this lease. The character of and restriction upon the occupancy of the apartment, and upon assignment of this lease, as hereinbefore expressed, restricted and limited are an especial consideration and inducement for the granting of this lease by the Lessor to the Lessee; and in the event of a violation by the Lessee of the provisions hereof, this lease may be terminated and shall expire at the option of the Lessor as hereinafter provided, and the Lessor may restrain and prevent the occupancy of the apartment by any one other than the Lessee or the family of the Lessee.

Nothing herein contained shall be construed as preventing or prohibiting the renting of the apartment on a transient basis, provided such renting is effected with the approval of, and through, the Lessor pursuant to a rental agreement.

**3.14 Pledge of Shares.** The Lessee shall not pledge or assign this lease or the shares to which this lease is appurtenant (the "shares") as security for a loan, nor permit the creation of a security interest or lien in such shares or this lease.

**3.15 Lessee's Repairs.** The Lessee has inspected the apartment and accepts the same in its present condition without any warranty or representation of any kind whatsoever on the part of the Lessor. The Lessee shall keep the interior of the apartment in good repair, shall repair, maintain, replace and install all windows, window panes, window frames, sashes and sills in the apartment, shall do all the painting and decorating required for the apartment, including painting of the window frames, sashes and sills, and shall be solely responsible for the maintenance, repair and replacement of plumbing, gas and heating fixtures and equipment such as refrigerators, dishwashers, removable and through-the-wall heating and cooling units, washing machines, dryers, ranges and other appliances as may be in the apartment. "Plumbing, gas and heating fixtures" as used herein shall include exposed gas, steam and water pipes attached to fixtures, appliances and equipment and the fixtures, appliances and equipment to which they are attached, and any special pipes or equipment which the Lessee may install within the wall or ceiling, or under the floor, but shall not include gas, steam, water or other pipes or conduits within the walls, ceilings or floors or

- 14 -

heating equipment which is part of the standard Building equipment.  The Lessee shall be
solely responsible for the maintenance, repair and replacement of all lighting and electrical
fixtures, appliances and equipment in the apartment, and all meters, fuse boxes or circuit
breakers and electrical wiring and conduits from the junction box of the riser into and
through the Lessee's apartment.  Any ventilator or any heating and cooling unit which shall
be visible from the outside of the Building shall at all times be painted by the Lessee in the
standard color which the Lessor may select for the Building and shall be maintained in
accordance with the specifications of the Lessor.  The Lessor shall not be held answerable
for any damage in or to the foregoing, or for any damage to the apartment, or to any of its
contents, caused by electric current or by the leakage or overflow of water, gas or steam
from any water pipe, gas pipe, steam pipe, drain pipe, basin, tub or other receptacle
belonging or appertaining to any other apartment in the Building, unless the damage shall
have been caused by the act or neglect of the Lessor or of its employees.

       **3.16 Alterations.**  The Lessee shall not, without first obtaining the written
consent of the Lessor, which consent shall not be unreasonably withheld, make in the
apartment or any terrace appurtenant thereto, any alteration, enclosure or addition, whether
structural or otherwise, nor any enclosure or alteration of the water, gas or steam risers or
pipes, heating or air conditioning system or units serving the Building generally, electric
conduits, wiring or outlets, plumbing lines, intercommunication or alarm systems, or any
installation or facility serving the Building generally, nor, except as hereinafter authorized,
shall the Lessee remove any additions, improvements or the furniture, furnishings or fixtures
from the apartment owned by the Lessor.  Decoration such as painting, wallpapering,
carpeting, installation of cabinetry and similar work shall not be deemed an alteration
requiring the Lessor's consent, but shall be performed only after written notice to the Lessor
and delivery to the Lessor of evidence of the contractor's liability insurance, which shall be
in amounts reasonably satisfactory to the Lessor.  The performance by the Lessee of any
work in the apartment shall be in accordance with any applicable rules and regulations of
the Lessor and governmental agencies having jurisdiction thereof.  Any consent to proposed
alterations may be subject to such terms and conditions as the board of directors of the
Lessor shall reasonably impose, including, without limitation, the Lessee's execution of an
agreement in form and substance satisfactory to the Lessor setting forth the terms and
conditions upon which such alteration may be made, including delivery by the Lessee of a
security deposit securing proper performance of the alteration and compliance with the
alteration agreement.  Consent shall not be granted until the Lessee cures all defaults under
the lease and pays a sum to be fixed by the board of directors of the Lessor to cover
reasonable legal, architectural, engineering and other out-of-pocket expenses of the Lessor
and its managing agent, if any, in connection with such proposed alterations.  The Lessee
shall not in any case install any appliances or electrical or other equipment which shall
exceed the available load for the existing electrical, plumbing or other service facilities
serving the Building generally.

- 15 -

**3.17 Removal of Fixtures Installed by Lessee.** If the Lessee shall have
heretofore placed or shall hereafter place, or if any prior proprietary lessee shall have
heretofore placed, in the apartment any special additions, improvements or fixtures, such as
mantels, refrigerators, ranges, air conditioning equipment, woodwork, panelling, ceilings or
doors which can be removed without structural alterations, then the Lessee shall have the
right, prior to the termination of this lease, to remove the same at the Lessee's own expense,
provided: (a) that the Lessee at the time of such removal shall not be in default in the
payment of rent, additional rent or in the performance of any other provision of condition of
this lease, (b) that before any such removal the Lessee shall have given written notice to the
Lessor specifying any of the foregoing which the Lessee proposes to remove and specifying
in detail the proposed replacements to be made by the Lessee and shall have obtained the
Lessor's written approval of the replacement specifications, which approval shall not be
unreasonably withheld, (c) that the Lessee shall pay the cost of any such removal and
reinstallation and shall, at its own cost and expense, repair any damage resulting therefrom
and (d) that the Lessee shall replace and reinstall, at the Lessee's own expense, all articles,
materials, or equipment owned by the Lessor that were in the apartment at the beginning of
the term, or replace such articles, materials and equipment with others of a kind and quality
customary in this type of Building and satisfactory to the Lessor, and all such replacements
shall be first-class in workmanship, materials and finish, and as specified in the notice
provided for in clause (b) of this section.

**3.18 Surrender of Possession.** On the expiration of the term hereby granted,
or upon an earlier termination of this lease, the Lessee shall surrender to the Lessor
possession of the apartment with all additions, improvements and fixtures then included
therein except as provided in Section 3.17 (Removal of Fixtures Installed by Lessee). Any
additions, improvements, furniture, furnishings or fixtures or other personal property not
removed by the Lessee at the termination of this lease shall, at the option of the Lessor, either
(a) be deemed abandoned and become the property of the Lessor, in which case they may be
disposed of by the Lessor without accountability or liability to the Lessee, or (b) be removed
by the Lessor to any place for storage and stored for the account of the Lessee without the
Lessor in any way being liable for trespass, conversion or negligence by reason of any acts
of the Lessor or of the Lessor's agents, or of any carrier employed for transporting such
property to the place of storage or by reason of the negligence of any person in caring for
such property while in storage. Any costs incurred by the Lessor in such disposal, removal or
storage shall be paid by the Lessee as additional rent on the first day of the calendar month
following demand therefor by the Lessor.

**3.19 Lease Subordinate to Mortgages.** This lease is and shall be subject
and subordinate to the mortgages which are now liens upon the Building and security
interests in the contents thereof and to any and all extensions, modifications, renewals and
replacements thereof and this lease shall be subject and subordinate to the lien of any other
mortgage or mortgages or security interests which shall at any time be placed on the Building
or its contents. This clause shall be self-operative and no further instrument of subordination

- 16 -

shall be required by any such mortgagee or secured party. The Lessee shall at any time and from time to time, on demand, execute any instruments that may be required by any mortgagee, or by the Lessor, for the purpose of more formally subjecting this lease to the lien of any such mortgage or mortgages, and the duly elected officers, for the time being, of the Lessor are each hereby irrevocably appointed the attorney-in-fact and agent of the Lessee to execute the same upon such demand, and the Lessee hereby ratifies any such instrument hereafter executed by virtue of the power of attorney hereby given.

3.20  **Mechanics' Liens.**  In case there shall be filed a notice of mechanics' lien against the Building for, or purporting to be for, labor or material alleged to have been furnished or delivered at the Building or the apartment to or for the Lessee, or anyone claiming under the Lessee, the Lessee shall forthwith cause such lien to be discharged by payment, bonding or otherwise; and if the Lessee shall fail to cause such lien to be discharged within twenty (20) days after the filing of such notice, the Lessor may cause such lien to be discharged by bonding or by paying the amount thereof or otherwise, without investigation as to the validity thereof or of any offsets or defenses thereto, and shall have the right to collect, as additional rent, all amounts so paid and all costs and expenses paid or incurred in connection therewith, including reasonable attorney's fees and disbursements, together with interest thereon from the time or times of payment. The failure of the Lessee to discharge the lien within twenty (20) days after the filing of such notice shall be deemed a default under this lease.

3.21  **Entry for Examination and Repair.**  The Lessor, its employees, agents and workers shall be permitted to enter the apartment and any storage space used by the Lessee at any reasonable hour of the day, to examine or inspect the apartment or to make or facilitate repairs in any part of the Building and to remove such portions of the walls, floors and ceilings of the apartment as may be required for the purpose of making such repairs. In order that the Lessor shall at all times have access to the apartment for the purposes provided for in this lease, the Lessee shall provide the Lessor with a key to each lock providing access to the apartment, and if any lock shall be altered or a new lock installed, the Lessee shall provide the Lessor with a key thereto immediately upon installation. If the Lessee shall not be personally present to open and permit an entry into the apartment at any time when for any reason an entry therein shall be necessary or permissible hereunder and shall not have furnished a key to the Lessor, the Lessor or the Lessor's agents may forcibly or otherwise enter the apartment without rendering the Lessor or such agents liable to any claim or cause of action for damages by reason thereof if during such entry the Lessor shall accord reasonable care to the Lessee's property, and such entry shall not in any manner affect the obligations and covenants of this lease. The right and authority hereby reserved do not impose, nor does the Lessor assume by reason thereof, any responsibility or liability whatsoever for the care or supervision of the apartment, or any of the pipes, fixtures, appliances or appurtenances therein contained or therewith in any manner connected, except as may be herein specifically provided.

- 17 -

**3.22  No Implied Waiver.**  The failure of the Lessor to insist, in any one or more instances, upon a strict performance of any of the provisions of this lease, or to exercise any right or option herein contained, or to serve any notice, or to institute any action or proceeding, or otherwise to act as though this lease had expired pursuant to the provisions of Article IV hereof, shall not be construed as a waiver, or a relinquishment for the future, of such provision, option or right thereafter to serve notice and to have this lease expire under the provisions of said Article, but such provision, or option or right shall continue and remain in full force and effect.  The receipt by the Lessor of rent, with knowledge of the breach of any covenant hereof, shall not be deemed a waiver of such breach, and no waiver by the Lessor of any provision hereof shall be deemed to have been made unless expressed in writing and signed by an officer of the Lessor pursuant to authority contained in a resolution of its board of directors; and even though a consent to an assignment hereof, or to any subletting, be given, no further assignment or subletting shall be made without express consent in writing given as hereinbefore provided.

**3.23  Reimbursement of Lessor's Expenses.**  If the Lessee shall at any time be in default hereunder, and the Lessor shall incur any expense (whether paid or not) in connection with such default or in performing acts which the Lessee is required to perform, or in instituting an action or proceeding based upon such default, or defending, or asserting a counterclaim in, any action or proceeding brought by the Lessee, the expense thereof to the Lessor, including reasonable attorney's fees and disbursements, shall be paid by the Lessee to the Lessor, on demand as additional rent on the first day of the calendar month following demand therefor by the Lessor.

**3.24  Special Services.**  The Lessee will pay and discharge all obligations incurred by the Lessee or by any person occupying the apartment or by any guest of the Lessee or of any such person for meals, beverages, telephone service, laundry, or other hotel services (except those Lessor is obligated to furnish as provided in section 2.2) rendered to and sums advanced by the Lessor to or for the Lessee, the Lessee's family and employees, and the Lessee will make such payment upon the presentation of a bill therefor, except to the extent otherwise provided in any rental agreement, and in case of the failure on the part of the Lessee to pay the same, the Lessor at its option may add the amount thereof to the next installment of rent due and the same shall be deemed additional rent.

**3.25  Lessor's Immunities.**  The Lessor shall not be liable for any failure, interruption or curtailment of heat, water supply, electric current, elevator service or other service to be supplied by the Lessor hereunder, or for injury or damage to person or property caused by the elements or by another tenant or person in the Building, or resulting from steam, gas, electricity, water, rain or snow which may leak or flow from any part of the Building, or from any of its pipes, drains, conduits, radiators, boilers, tank, appliances or equipment, unless caused by or due to the negligence of the Lessor; and no diminution or abatement of rent or other compensation due the Lessor shall be claimed or allowed therefor, or for failure to make, delay in making or inconvenience or discomfort arising from the

making of repairs or improvements to the Building or to its appliances, or for any space taken to comply with any law, ordinance, or order of a governmental authority. The Lessor shall not be liable for interference with light or other incorporeal hereditaments by the Lessor or anybody other than the Lessor. Mechanical refrigeration, if any, is installed for the accommodation of the Lessee, and the Lessor shall not be responsible for any failure of refrigeration, leakage or damage caused by, or the result of such mechanical refrigeration for any reason whatsoever. The Lessor shall not be responsible for any package or article left with or entrusted to any employee of the Lessor. If the Lessor shall before, during or after the term of this lease, furnish to the Lessee the use of any storage space, vault space, laundry or other facility outside of the apartment, the same shall be furnished gratuitously by the Lessor, and if any person shall use the same, such use shall be entirely at the risk of such person, and the Lessor shall not be liable for any loss of property therein, or for any damage or injury whatever to person or property therein or in connection therewith.

     **3.26 Notice of Defects.** No notice of alleged defect requiring the Lessor's attention shall be deemed valid or effective unless in writing and delivered to the Lessor in accordance with section 6.6 hereof (Notices).

     **3.27 Lessor's Right to Perform at Lessee's Expense.** If the Lessee shall fail to make repairs to any part of the apartment or appurtenances as herein required, or shall fail to comply with any other covenant or condition of this lease on the Lessee's part to be performed, the Lessor may, but is not obligated to, after ten (10) days' notice to the Lessee, enter the apartment and make such repairs or comply with such covenant or condition or arrange for others to do the same, without liability on the part of the Lessor. If the Lessee or any person occupying the apartment shall expressly request the Lessor, its agents or servants, to perform any act not hereby required to be performed by the Lessor, or in case of emergency, the Lessor may, but is not obligated to, without notice, enter the apartment and perform such act or take such steps as are appropriate in light of the emergency, or arrange for others to do the same, without liability on the part of the Lessor. In all such cases, the Lessor, its agents, servants and contractors shall, as between the Lessor and the Lessee, be conclusively deemed to be acting as agents of the Lessee and all contracts therefor made by the Lessor shall be so construed whether or not made in the name of the Lessee. The Lessor shall be entitled to recover from the Lessee all expenses incurred or for which it has contracted hereunder, such expenses to be payable by the Lessee as additional rent on the first day of the calendar month following demand therefor by the Lessor.

     If, in the Lessor's sole judgment, any of the Lessee's equipment or appliances shall result in damage to the Building or poor quality or interruption of service to other portions of the Building or overloading of or damage to facilities maintained by the Lessor for the supplying of water, gas, electricity or air conditioning to the Building, or if any such appliances visible from the outside of the Building shall become rusty or discolored, the Lessee shall promptly, on notice from the Lessor, remedy the condition and, pending such remedy, shall cease using any appliance or equipment which may be creating the

objectionable condition. In the event that due to the negligence or carelessness of the Lessee or the Lessee's family, domestic employees, subtenants, other occupants of the apartment and guests, the Building shall be otherwise damaged, then the Lessee shall reimburse the Lessor for the cost of repairing such damage.

**3.28  Lessee's Indemnity of Lessor.**  The Lessee agrees to save the Lessor and its managing agent, if any, harmless from all liability, loss, damage and expense, including, without limitation, reasonable attorneys' fees and disbursements, arising from injury to person or property occasioned by the failure of the Lessee to comply with any provision hereof, or due wholly or in part to any wrongful act, negligence or omission of the Lessee or default by the Lessee in performing an obligation imposed under this Lease on the Lessee, the Lessee's family or of any person dwelling or visiting in the apartment, or by the Lessor, its agents, servants or contractors when acting as agent for the Lessee as in this lease provided.

**3.29  Injunction.**  In addition to other legal remedies hereinbefore or hereinafter provided for, in case of violations of any covenants by the Lessee, the same shall be restrainable by injunction and neither the mention herein nor the election hereafter of one or more of the remedies provided shall preclude the Lessor from enforcing any other right, remedy, option, election or priority allowed by law, whether or not herein specifically set forth.

**3.30  Insurance.**  The Lessee shall, at the Lessee's own cost and expense, obtain and keep in full force and effect throughout the term of this lease (a) comprehensive public liability and property damage insurance, with a minimum limit of liability of $1,000,000 for injury or death and damages to any one person, $1,000,000 for injury or death arising out of one occurrence, and $1,000,000 for damage to property, against any and all claims for personal injury, death or property damage (including, but not limited to, loss due to water damage) occurring in, upon, adjacent to or connected with the apartment or any part thereof, and (b) comprehensive all risk property damage insurance, with a minimum limit of liability of $100,000 in respect of property damage occurring in, upon, adjacent to or connected with the apartment or any part thereof (including, but not limited to, loss due to water damage), such insurance to include an endorsement for tenant's improvements and betterments on a replacement cost basis. The limits of liability set forth in (a) and (b) above may be increased by the board of directors of the Lessor from time to time to such reasonable amounts as may reflect inflation. The insurance required in (a) above shall name the Lessor as additional insured, as its interest may appear, and is to be written in form reasonably satisfactory to the Lessor by good and solvent insurance companies of recognized standing, admitted to do business in the State of New York which shall be reasonably satisfactory to the Lessor. Upon ten (10) days' written notice from the Lessor, the Lessee shall deliver to the Lessor either a duplicate original of the aforesaid policies or certificates evidencing such insurance, naming the Lessor as an additional insured, and, at least thirty (30) days prior to the expiration of said policies, the Lessee shall deliver renewals to the Lessor. Such policies

- 20 -

shall contain a provision that no act, omission or negligence of the Lessee, its contractors, licensees, agents, servants, employees, invitees or visitors will affect or limit the obligation of the insurance company to pay the amount of any loss sustained and such policy shall be non-cancellable except upon thirty (30) days' written notice to the Lessor. In the event the Lessee shall fail to obtain the insurance required in (a) and (b) above, and/or to pay all premiums and charges therefor, the Lessor may, but shall not be obligated to, obtain the same, in which event the amount of the premiums paid by the Lessor shall be paid by the Lessee to the Lessor as additional rent on the first day of the calendar month following demand therefor by the Lessor. The failure of the Lessee to obtain and maintain, throughout the term of this lease, the insurance required in (a) and (b) above shall be a default under the lease.

The Lessor and the Lessee agree to use best efforts to include in each of its policies insuring against property damage a waiver of the insurer's right of subrogation against the other party. If such waiver shall not be, or shall cease to be, obtainable without additional charge, the Lessee shall promptly notify the Lessor. In such case, if the Lessor shall so elect and shall pay the insurer's additional charge therefor, such waiver shall be included in the policy. Each party hereby releases the other party with respect to any claim (including a claim for negligence) which it might otherwise have against the other party for loss, damage or destruction with respect to its property occurring during the term of this lease to the extent to which the same party is insured under a policy containing a waiver of subrogation. If, notwithstanding the recovery of insurance proceeds by either party for loss, damage or destruction of its property, the other party is liable to the first party with respect thereto or is obligated under this lease to make replacement, repair or restoration, then provided the first party's right of full recovery under its insurance policies is not thereby prejudiced or otherwise adversely affected, the amount of the net proceeds of the first party's insurance against such loss, damage or destruction shall be off-set against the second party's liability to the first party therefor or shall be made available to the second party to pay for the replacement, repair or restoration, as the case may be.

The waiver of subrogation, if obtainable, referred to above shall extend to the agents and employees of the Lessor and all permitted occupants of the apartment. Nothing contained in this section 3.30 shall be deemed to relieve either party from any duty imposed elsewhere in this lease to repair, restore or rebuild.

**3.31  Cooperation.** The Lessee shall always in good faith endeavor to observe and promote the cooperative purposes for the accomplishment of which the Lessor is incorporated.

## ARTICLE IV

## TERMINATION BY CONDITIONAL LIMITATION

   **4.1** <u>Conditional Limitation.</u>  If, upon, or at any time after, the happening of any of the events mentioned in sections (a) to (h), inclusive, of this section 4.1, the Lessor shall give to the Lessee a notice stating that the term hereof will expire on a date at least thirty (30) days thereafter, or if, upon, or at any time after, the happening of the event mentioned in subdivision (h) hereof, the Lessor shall give to the Lessee a notice stating that the term hereof will expire on a September 30 at least three months after the giving of such notice, this lease shall expire on the date so fixed in the notice, it being the intention of the parties here to create hereby a conditional limitation, and it shall thereupon be lawful for the Lessor to re-enter the apartment and to remove all persons and personal property therefrom, either by summary dispossess proceedings, or by any suitable action or proceeding at law or in equity, or by force or otherwise, and to repossess the apartment in its former estate as if this lease had not been made.

   (a) **Lessee Ceasing to Own Accompanying Shares.** If at any time during the term of this lease the Lessee shall cease to be the owner of all of the shares of the Lessor which are hereinbefore stated to be owned by the Lessee and allocated to this lease, or if this lease shall pass or be assigned to anyone who is not then the owner of all of said shares.

   (b) **Bankruptcy of Lessee.** If at any time during the term of this lease (1) the Lessee shall be adjudicated a bankrupt under the laws of the United States or adjudicated insolvent or take the benefit of any Insolvency Statute; or (2) a receiver or trustee of all of the property of the Lessee or of this lease shall be appointed under any provisions of the laws of the State of New York, or under any statute of the United States, or any statute of any state of the United States and the order appointing such receiver or trustee shall not be vacated within sixty (60) days; or (3) the Lessee shall make a general assignment for the benefit of creditors; or (4) any of shares owned by the Lessee and appurtenant to this lease shall be duly levied upon under the process of any court whatever unless such levy shall be discharged within sixty (60) days; or (5) this lease or the shares appurtenant thereto shall pass by operation of law or otherwise to anyone other than the Lessee herein named or a person to whom such Lessee has assigned this lease in the manner herein permitted, but this clause (5) shall not be applicable if this lease or its appurtenant shares shall pass to the executors or administrators of the Lessee or by will or intestacy to the spouse or ascendants or descendants of the named Lessee.

   (c) **Unauthorized Assignment, Subletting or Pledge.** If at any time there shall be an assignment or pledge of this lease, or any subletting of the apartment, without full compliance with the requirements of Section 3.9 hereof (Subletting), Section 3.10 hereof (Assignment) or Section 3.14 hereof (Pledge of Shares), as the case may be.

- 22 -

(d) **Default in Rent.** If the Lessee shall default for a period of one month in the payment of any rent or additional rent, or of any installment thereof, hereinbefore provided for, and shall fail to cure such default within ten (10) days after written notice thereof shall have been given by the Lessor.

(e) **Default in Other Obligations.** If the Lessee shall default in the performance of any covenant or provision hereof, other than the covenant to pay rents, for thirty (30) days after written notice of such default shall have been given by the Lessor, provided, however, that if said default consists of the failure to perform any act the performance of which, in the reasonable opinion of the Lessor, requires more than thirty (30) days to cure, then if within said thirty (30) day period such cure is commenced and thereafter diligently prosecuted to completion, the Lessee shall be deemed to have cured such default.

(f) **Lessee's Objectionable Conduct.** If at any time the Lessor shall determine, upon the affirmative vote of the holders of record of at least two-thirds of the shares of the Lessor which are then issued and outstanding, at a meeting of such shareholders duly called to take action on the subject, that because of objectionable conduct on the part of the Lessee, or of a person dwelling in or visiting the apartment other than a transient guest, the tenancy of the Lessee is undesirable, it being understood, without limiting the generality of the provisions contained in the foregoing sentence, that repeatedly to violate or disregard the rules and regulations hereunto attached or hereafter established in accordance with the provisions of this lease, or to permit or tolerate a person or dissolute, loose or immoral character to enter or remain in the Building or the apartment, shall be deemed to be objectionable conduct.

(g) **Condemnation.** If at any time the Building or a substantial portion hereof shall be taken by condemnation proceedings, so as to render the operation of the Building as a cooperative apartment hotel impracticable or undesirable in the opinion of a majority of the board of directors of the Lessor.

(h) **Termination of All Proprietary Leases.** If lessees owning at least two-thirds of the shares of the Lessor owned by lessees under proprietary leases which are then in force and of which a notice of cancellation as provided in Article V of this lease shall not previously have been given shall determine, not less than four months before the 30th day of September in 1998, or before the 30th day of September in any year thereafter, to terminate all such proprietary leases on such 30th day of September.

A determination to terminate under this subsection (h) shall be evidenced by a written notice to the Lessor signed by the lessees making such determination, or by their vote at a meeting of shareholders duly called to take action on the subject. Promptly after the receipt of such a notice or after such a vote, the Lessor shall give to the holders of all proprietary leases which are then in force, and of which a notice of cancellation as provided

in said Article V shall not previously have been given, the notice provided by this section 4.1 of the expiration of the term of all such leases.

**4.2 Waiver of Right of Redemption.** The Lessee hereby expressly waives any and all right of redemption in case the Lessee shall be dispossessed by judgment or warrant of any court or judge. The words "enter", "re-enter" and "re-entry" as used in this lease are not restricted to their technical legal meaning. In the event of a breach or threatened breach by the Lessee of any of the covenants or provisions herein, the Lessor shall have the right of injunction, and the right to invoke any remedy allowed at law or in equity, as if re-entry, summary proceedings and other remedies were not herein provided for.

**4.3 Liability of Lessee upon Termination: Surrender of Possession.** Upon the termination of this lease under the provisions of subsections (a) to (f), inclusive, of section 4.1 of this lease, the Lessee shall remain liable as provided in section 3.3 hereof (Certain Consequences of Default). Upon the termination of this lease under the provisions of subdivisions (g) or (h) of section 4.1 or upon the expiration of this lease the Lessee shall be and remain liable to pay all rent due or accrued and to perform all covenants and agreements of the Lessee up to the date of such termination and, on or before such termination, the Lessee shall vacate the apartment and remove therefrom all property of the Lessee which upon such termination does not become the property of the Lessor under the provisions of section 3.17 (Removal of Fixtures) of this lease and surrender possession of the apartment to the Lessor or its assigns, and upon demand of the Lessor or its assigns shall execute, acknowledge and deliver to the Lessor or its assigns any instrument which may reasonably be required for surrendering all estate and interest of the Lessee in the apartment or in the Building of which it is a part.

**4.4 Sale of Shares.** Upon the termination of this lease under subdivisions (a), (b), (c), (d), (e) or (f) of section 4.1 hereof, the Lessee shall surrender to the Lessor the certificate or certificates for the shares of the Lessor owned by the Lessee and allocated to the apartment. Whether or not said certificate or certificates are surrendered, the Lessor may issue a new certificate for the shares of the Lessor owned by the Lessee and allocated thereto when a purchaser therefor is found. Upon such issuance, the certificate for shares owned or held by the Lessee shall automatically be cancelled and rendered null and void. The Lessor may apply the proceeds received by it for the issuance of such shares towards the payment of the Lessee's indebtedness hereunder, including interest, reasonable attorneys' fees and other reasonable expenses incurred by the Lessor and if the proceeds are sufficient to pay the same, the Lessor shall pay over any surplus to the Lessee, but if insufficient, the Lessee shall remain liable for the balance of the indebtedness. Upon the issuance of any new proprietary lease and certificate for shares, the Lessee's continuing liability hereunder shall cease and the Lessee shall only be liable for rent, additional rent and expenses accrued to that time. The Lessor shall not, however, be obligated to sell such shares and appurtenant lease or otherwise make any attempt to mitigate damages.

- 24 -

## ARTICLE V

## CANCELLATION AT OPTION OF LESSEE

**5.1 Lessee's Option to Cancel.** This lease may be cancelled by the Lessee on September 30, 1998, or on any September 30 thereafter, upon complying with all the provisions of this Article. Written notice of intention to cancel must be served by the Lessee upon the Lessor on or before February 28 in the calendar year in which such cancellation is to occur. At the time of the service of such notice of intention to cancel there must be deposited with the Lessor by the Lessee:

(a) The Lessee's counterpart of this lease with a proper assignment thereof in blank whereby the full and absolute title to this lease is assigned free from all subleases (except as in section 5.4 hereof (Effect of Subleases) provided), liens, encumbrances and charges whatsoever;

(b) The Lessee's certificate for the shares of the Lessor which are hereinbefore stated to be owned by the Lessee, endorsed in blank for transfer and with all necessary transfer tax stamps affixed and with payment of any transfer taxes owed thereon;

(c) The Lessee's original of any sublease the existence of which, under the provisions of section 5.4 hereof (Effect of Subleases), shall not prevent the Lessee from cancelling this lease, together with an assignment thereof and of the subrents accruing thereunder from and after the 31st day of August next preceding the 30th day of September named in the notice of election to cancel as the date for the cancellation of this lease and an agreement in writing, executed and acknowledged by the tenant holding under such sublease, to attorn to the Lessor and to pay to the Lessor the rent reserved in such sublease from and after such 31st day of August to the expiration of the term of the sublease and during such period to perform all the terms and conditions of such sublease; and

(d) A written statement setting forth in detail those additions, improvements and fixtures, such as mantels, lighting fixtures, refrigerators, ranges, woodwork, panelling, ceilings, doors and decorations placed in the apartment at the Lessee's expense which the Lessee has under the terms of this lease, the right to remove, and which the Lessee desires to remove, and specifying in detail the proposed replacements to be made by the Lessee under the terms of this lease.

**5.2 Removal of Fixtures Surrender of Possession and Payments.** All additions, improvements, furniture, furnishings, equipment and fixtures, which are removable under the terms of this lease and which are enumerated in the statement made as provided in subsection (d) of section 5.1 hereof, shall be removed and all required replacements made by the Lessee prior to the 31st day of August next preceding the 30th day

- 25 -

of September named in the notice of election to cancel as the date for the cancellation of this lease and on or before such 31st day of August the Lessee shall surrender possession of the apartment including all furniture and furnishings which are the property of the Lessor, to the Lessor free from all subleases (except as in section 5.4 hereof (Effect of Subleases) provided), liens, encumbrances or other charges and shall pay to the Lessor all rent and other charges which shall be payable under this lease up to and including the 30th day of September succeeding such 31st day of August.

5.3 **Additional Payments by Lessee: Replacements**. In the event of giving such notice of intention to cancel, and except as herein otherwise provided, the Lessee shall:

a) replace all mantels, lighting fixtures, refrigerators, ranges, woodwork (other than panelling), ceilings, doors or other fixtures removed by the Lessee with others of a kind and quality satisfactory to the board of directors of the Lessor, and pay the cost of such replacement; and

(b) pay the cost of repairing any damages resulting from the removal by the Lessee of any panelling or other additions, improvements or fixtures.

5.4 **Effect of Subleases**. The existence of a sublease of the apartment shall not prevent the Lessee from cancelling this lease under the provisions of this Article and such cancellation shall not affect the rights or obligations of the tenant under any such sublease, provided that the Lessor has given consent, if required, as provided in section 3.9 hereof (Subletting), to such sublease, and provided further that there shall have been deposited with the Lessor the documents specified in subdivision (c) of section 5.1 of this lease, as required by said section.

5.5 **Permission to Show and Occupy Premises**. The Lessor or its agents may show the apartment to any prospective tenant at any time and from time to time after the giving of notice of the Lessee's intention to cancel this lease as in this Article provided, and, after the 31st day of August next succeeding the date on which such notice of intention to cancel is given, the Lessor, its agents and employees and the succeeding tenant may enter the apartment, take possession thereof and make such alteration, additions and repairs therein as the Lessor may approve without diminution or abatement of the rent due hereunder.

5.6 **Cancellation of Lease: Transfer of Shares**. If the Lessee shall have done the things and made the payments at the times in the amounts and in the manner required by this Article, then upon the 30th day of September named in the notice of intention to cancel as the date of the cancellation of this lease, this lease shall terminate and all rights, duties and obligations of the parties hereunder shall cease and determine as of said 30th day of September, and the shares of the Lessor to which this lease is appurtenant shall become the absolute property of the Lessor, provided, however, that the Lessee shall not be

- 26 -

released or discharged from any indebtedness owing from the Lessee to the Lessor on said last mentioned date, and provided further that if the Lessee shall fail to do any of the things or make any of the payments at the times, in the amounts and in the manner required by this Article, the Lessor shall have the option (a) of returning to the Lessee this lease, the certificate of shares and other documents deposited and thereupon the Lessee shall be deemed to have withdrawn the notice of intention to cancel this lease, or (b) of treating this lease as cancelled as of the 30th day of September named in the notice of intention to cancel as the date for the cancellation of such lease, and bringing such proceedings and actions as it deems best to enforce the covenants of the Lessee in this Article contained and to collect from the Lessee the payments which the Lessee is required to make under this Article, together with reasonable attorneys' fees and disbursements.

5.7 **Cancellation by Holders of Two-Thirds of Shares.**  If at any one time lessees owning at least two-thirds of the then issued and outstanding shares of the Lessor shall exercise their options to cancel their leases as provided in section 4.1 hereof (Conditional Limitation), then this and all other proprietary leases shall thereupon terminate on the 30th day of September of the calendar year in which such options shall have been exercised, as though every lessee had exercised such option.  In such event the lessees shall not be required to surrender the shares accompanying the leases and all certificates for shares delivered to the Lessor by those who have, during that year, served notice of intention to cancel their leases under the provisions of this Article, shall be returned to such lessees.

## ARTICLE VI

## MISCELLANEOUS

6.1 **Restrictions on Transfer.**  The shares of the Lessor to which this lease is appurtenant held by the Lessee have been acquired and are owned subject to the following conditions which have been agreed upon with the Lessor and with each of the other proprietary lessees for their mutual benefit:

(a) The shares represented by each certificate are transferable only as an entirety;

(b) Neither the Lessee nor the Lessee's personal representatives shall sell or transfer said shares except to the Lessor, or to an assignee of this lease after compliance with all of the provisions of section 3.10 of this lease (Assignment).

(c) The Lessor shall at all times have a first lien upon the shares of the Lessor owned by each lessee shareholder for all indebtedness and obligations owing by such sharcholder to the Lessor arising under the provision of any proprietary lease issued by the

- 27 -

Lessor and at any time held by such shareholder or otherwise arising. The Lessor may refuse to consent to the transfer of shares of any such shareholder indebted to the Lessor unless and until such indebtedness is paid; and

(d) The Lessor shall be entitled to treat the holder of record of any share or shares as the holder in fact thereof, and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such shares on the part of any other person, including, but not limited to, creditors other than executors or administrators of the Lessee, whether or not it shall have express or other notice thereof, except as expressly provided by the laws of New York.

**6.2  Headings.**  The headings of the several paragraphs of this lease shall not be deemed a part of this lease.

**6.3  No Oral Changes.**  The provisions of this lease cannot be changed orally.

**6.4  Application of Covenants.**  Except as otherwise in this lease provided, the references herein to the Lessor shall be deemed to include its successors and assigns, and the references herein to the Lessee or to a shareholder of the Lessor shall be deemed to include the executors, administrators, personal representatives, legatees and assigns of the Lessee or of such shareholder, and the covenants herein contained shall apply to, bind and enure to the benefit of the Lessor and its successors and assigns, and the Lessee and the executors, administrators, personal representatives, legatees and assigns of the Lessee; but nothing in this lease contained shall be deemed to confer any right or benefit on any creditor or third party.

**6.5  More Than One Lessee.**  If more than one person is named as the Lessee hereunder, the Lessor may require the signatures of all such persons in connection with any notice to be given or action to be taken by the Lessee hereunder, including, without limiting the generality of the foregoing, the surrender or assignment of this lease, or any request for consent to assignment or subletting. Each person named as the Lessee shall be fully liable for all of the Lessee's obligations hereunder. Any notice by the Lessor to any person named as a Lessee shall be sufficient, and shall have the same force and effect as though given to all persons named as the Lessee.

**6.6  Waiver of Trial by Jury.**  It is mutually agreed by and between Lessor and Lessee that the respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this lease, the Lessee's use or occupancy of the apartment and/or any claim or damage.

**6.7  Notices.**  Any notice by the Lessor to the Lessee shall be deemed to have been duly given, and any demand by the Lessor upon the Lessee shall be deemed to have been duly made, if in writing and personally delivered or mailed by registered or certified

- 28 -

mail, return receipt requested, addressed to the Lessee at 781 Fifth Avenue, New York, N.Y. 10022, unless and until another address is specified in writing by the Lessee.  Any notice by the Lessee to the Lessor shall be deemed to have been duly given if in writing and personally delivered to or mailed by registered or certified mail, return receipt requested, addressed to The Sherry-Netherland, Inc., 781 Fifth Avenue, New York, N.Y. 10022, unless and until another address is specified in writing by the Lessor.

       **6.8  Partial Invalidity.**  If any clause or provision herein contained shall be adjudged invalid, the same shall not affect the validity of any other clause or provision of this lease, or constitute any cause of action in favor of either party as against the other.

       **IN WITNESS WHEREOF**, the Lessor and the Lessee have executed this instrument the day and year first above written.

### THE SHERRY-NETHERLAND, INC.

By: _____
Name: MICHAEL J. ULLMAN
Title: EXECUTIVE V.P. & C.O.O.

_____
Lessee

_____
Lessee

- 29 -

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF NEW YORK

On the ___ day of _March___ in the year _2015_ . before me, the undersigned, personally appeared _Michael _ Allen_ , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that (s)he executed the same in (her/his/their) capacity(ies), and that by (his/her/their) signature on the instrument, the individual(s), or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

**SUSAN HENNELLY**
Notary Public, State of New York
No. 01HE4977445
Qualified in Suffolk County
Commission Expires February 4, 20_19_

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF NEW YORK

On the ___ day of _March___ in the year _2015_ , before me, the undersigned, personally appeared _Ian Gilbert_ , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that (s)he executed the same in (her/his/their) capacity(ies), and that by (his/her/their) signature on the instrument, the individual(s), or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

**SUSAN HENNELLY**
Notary Public, State of New York
No. 01HE4977445
Qualified in Suffolk County
Commission Expires February 4, 20_19_

- 30 -

This page intentionally left blank

This page intentionally left blank

## SHERRY-NETHERLAND HOUSE RULES

**One.**  The public halls, elevator vestibules and stairways of the Building shall not be obstructed or used for any other purpose than ingress to and egress from the apartments in the Building.

**Two.**  No article shall be placed in any of the halls or on any of the staircase or fire tower landings, nor shall any fire exit or fire stair be obstructed in any manner.

**Three.**  Children shall not play in the public halls, elevator vestibules, stairways, fire towers or passenger elevators and shall not be permitted in the service elevators of the Building.

**Four.**  No public hall or elevator vestibule above the ground floor of the Building shall be decorated or furnished by any Lessee in any manner without the prior consent of all of the Lessees to whose apartments such hall or vestibule serves as a way of ingress and egress.

**Five.**  The Lessee shall keep the Lessee's apartment in a good state of preservation and cleanliness and shall not sweep or throw or permit to be swept or thrown therefrom, or from the doors, windows or terraces thereof, any dirt or other substance. Nothing shall be hung or shaken from the doors, windows or terraces or placed upon the window sills of the Building.

**Six.**  No awnings or window guards visible from the outside of the Building shall be used except such as shall have been approved in writing by the Lessor.

**Seven.**  No radio or television aerial shall be attached to or hung from the exterior of the Building, and no sign, notice, advertisement or illumination shall be inscribed or exposed on or at any window or other part of the Building, except such as shall have been approved in writing by the Lessor, nor shall anything be projected from any window of the Building without similar approval.

**Eight.**  No ventilator or air conditioning device shall be installed by the Lessee without the prior written approval of the Lessor as to the type, location and manner of installation of such device.  Through-the-wall air conditioners (as opposed to window units) shall be used whenever possible.  All ventilator or air conditioning devices shall be connected to a separate electric circuit.  The Lessee shall keep any such device which protrudes from the window of the apartment in good appearance and mechanical repair.  The Lessee shall not permit any such device to leak condensation, or to make any noise which may unreasonably disturb or interfere with the rights, comforts or conveniences of any other occupant of the Building.  If the Lessee shall fail to keep any such device in good order and repair, and

- 1-

properly painted, the Lessor, in its discretion, may remove such device from the window, charging the cost of removal to the Lessee, collectible on demand as additional rent, and the device shall not be replaced until it has been put in proper condition. All ventilator and air conditioning devices shall be readily accessible to the Lessor.

**Nine.** All radio, television or other electrical equipment of any kind or nature installed or used in each Lessee's apartment shall fully comply with all rules, regulations, requirements or recommendations of the New York Board of Fire Underwriters and the public authorities having jurisdiction, and the Lessee alone shall be liable for any damage or injury caused by radio, television or other electrical equipment in the Lessee's apartment.

**Ten.** No velocipedes, bicycles, scooters or similar vehicles shall be taken into or from the Building through the main entrance or be allowed in the passenger elevators and no baby carriages or any of the above-mentioned vehicles shall be allowed to stand in the public halls, passageways or other public areas of the Building.

**Eleven.** No Lessee shall make or permit any disturbing noises in the Building, or do or permit anything to be done therein, which will interfere with the rights, comforts or conveniences of other occupants. No Lessee shall play upon or suffer to be played upon any musical instrument, or operate or permit to be operated a phonograph or a radio or television or other loud speaker in the Lessee's apartment between the hours of eleven o'clock P.M. and the following nine o'clock A.M. if the same shall disturb or annoy other occupants of the Building, and in no event shall practice or suffer to be practiced either vocal or instrumental music for more than two hours in any day or between the hours of six o'clock P.M. and the following nine o'clock A.M.

**Twelve.** No water beds shall be permitted to be installed or maintained in the Building.

**Thirteen.** No bird, reptile or animal shall be kept or harbored in the Building unless the same in each instance be expressly permitted in writing by the Lessor. In no event shall dogs be permitted in elevators or in any of the public portions of the Building unless carried or on leash. Large dogs shall not be carried in the passenger elevators, but only in the service elevator.

**Fourteen.** Tradespeople requiring access to apartments shall sign in and obtain proper clearance from the appropriate employee of the Lessor and shall use the

service elevators for ingress and egress and shall not use the passenger elevators for any purpose.

**Fifteen.** The passenger and service elevators in the Building shall be operated only by employees of the Lessor and there shall be no interference whatever with

such employees by Lessees or members of their families or their guests, employees or subtenants.

**Sixteen.**  Supplies, market goods and packages of every kind are to be delivered only through the service entrance of the Building and by the service elevators to the apartments. Trunks and heavy baggage shall be taken in or out of the Building by the service elevators and through the basement.

**Seventeen.**  The Lessee shall comply with all requirements and regulations of the Lessor regarding the disposal of refuse.  All Lessees shall separate their trash into "recyclable" and "nonrecyclable" materials, or into other categories, as the Lessor may require.  The Lessor may designate, from time to time, the types of materials which must be separated for recycling, the types of containers or binding materials to be used by the Lessee for the disposal of designated materials and the locations where designated materials shall be deposited.  The Lessor may also establish other regulations regarding the disposal of refuse.  Any costs or expenses incurred by the Lessor due to the Lessee's failure to comply with the requirements imposed by law or by the Lessor, including but not limited to fees, fines or penalties imposed on the Lessor or the Building by any governmental agency and reasonable attorney's fees and disbursements, shall be payable by the Lessee as additional rent under the lease.

**Eighteen.**  Water-closets and other water apparatus in the Building shall not be used for any purpose other than those for which they were designed, nor shall any sweepings, rubbish, rags or any other article be thrown into the same.  Any damage resulting from misuse of any water-closets or other apparatus in the Lessee's apartment shall be repaired and paid for by the Lessee.

**Nineteen**.  No occupant of the Building shall send any employee of the Lessor out of the Building on any private business.

**Twenty.**  The agents of the Lessor, and any contractor or workman authorized by the Lessor, may enter any room or apartment in the Building at any reasonable hour of the day for the purpose of inspecting the apartment for the presence of any vermin, insects or other pests and for the purpose of taking such measures as may be necessary to control or exterminate any such vermin, insects or other pests.

**Twenty-one**.  Each person, whether the Lessee, underlessee, guest or member of the family of the Lessee or underlessee, at any time in occupancy of any apartment in the Building shall, in compliance with the requirements of law, register in the hotel registry maintained by the Lessor at the commencement of each actual occupancy and shall notify the Lessor at the termination of each such occupancy.

**Twenty-two**.  The State of New York Liquor Authority, by its authorized investigators, agents and employees, at all times shall have the right, and shall be afforded the opportunity and access, to enter and inspect any and all apartments, rooms and other areas in the Building for the purpose of enforcing the State of New York Alcohol Beverage Control Law and the Rules and Regulations of the State of New York Liquor Authority adopted and issued pursuant thereto.

**Twenty-three**.  The Lessor will provide a safe in the office of the Building for the safekeeping of money, jewels, ornaments, currency, securities and other valuable or other small articles belonging to the Lessee, the Lessee's subtenant, guest, or any member of the family of the Lessee or subtenant.  Unless so deposited, the Lessor shall not be liable for any loss of any such items by reason of any cause whatsoever.

**Twenty-four.**  No cooking shall be permitted on any terrace of the Building or in any apartment not especially constructed and equipped therefor by Lessor, and in the latter case kitchen and pantry corridor doors shall be kept closed at all times during use for preparation or serving of food.

**Twenty-five.**  Maid service is furnished by the Lessor only for routine maintenance of cleanliness and order in the apartments.  Neither the Lessee nor any occupant of the apartment shall at any time induce, request or permit any maid to perform any personal or other service beyond such routine maintenance.  The Lessor shall not be liable for any loss or damage to any of the Lessee's property in the apartment caused by a maid in the performance of such routine maintenance, except to the extent caused by the negligence or willful act of such maid.

**Twenty-six.**  The Building does not supply any kitchen utensils, dishes or glassware.  Any such items delivered to the Lessee's apartment by Room Service are to be promptly returned by the Lessee to Room Service.  Upon failure of the Lessee promptly to return such item, the Lessee may be charged as additional rent for the value thereof.

**Twenty-seven.**  No vehicle belonging to the Lessee or to a member of the family or guest, subtenant or employee of the Lessee shall be parked in such manner as to impede or prevent ready access to any entrance to the Building by another vehicle.

**Twenty-eight**.  The Lessor may from time to time curtail or relocate any space devoted to storage purposes in the basement of the Building.

**Twenty-nine.**  Complaints regarding the service of the Building shall be made in writing to the Lessor.

- 4 -

**Thirty.**  Any consent or approval given under these house rules by the Lessor shall be revocable at any time.

**Thirty-one.**  No group tour or exhibition of any apartment or its contents shall be conducted, nor shall any auction sale be held in any apartment, without the prior written consent of the Lessor; nor shall the elevators or other facilities of the Building be unduly burdened in the sole opinion of the Lessor.

**Thirty-two.**  All Lessees shall be required on demand by the Lessor to cure any illegal conditions affecting their apartments, including but not limited to any conditions resulting from alterations made to the apartment even if said alteration was previously approved by the Lessor, notwithstanding the fact that a predecessor Lessee may have been responsible for causing said illegal condition.

**Thirty-three.**  If radiator covers are installed by Lessees, such covers shall permit access to the radiator for inspection, maintenance, repair, removal or replacement thereof.

**Thirty-four.**  All access panels in apartments which provide access to water, steam and electric risers and other building systems shall be kept free and clear from obstruction.  The Lessor shall have the right to enter apartments and open such access panels for the purpose of inspecting, maintaining and repairing the building systems contained therein.

**Thirty-five.**  Except in cases of emergency, where no notice shall be required, the Lessor shall give the Lessee reasonable notice, either in writing or by telephone, of the Lessor's intent to enter the apartment pursuant to the authority granted in these House Rules or in the lease.

**Thirty-six.**  These house rules may be added to, amended or repealed at any time by resolution of the board of directors of the Lessor.

**Thirty-seven.**  In accordance with requirements of Lessee under Section 3.15 of the Lease and the rights of Lessor under Section 3.10(e) of the Lease, upon the assignment by Lessee of the Lease, Lessor may require, in its reasonable judgment, that the exterior windows located within Lessee's apartment be replaced.  In the event of such determination, Lessee shall be required, within one year of such assignment of Lease, to replace such exterior windows with windows approved by Lessor.  In such event, if Lessee fails to replace such exterior windows within one year after the assignment of the Lease, Lessor may, at Lessees' sole cost and expense, replace such windows with suitable replacement windows as determined by Lessor and the cost of such replacement shall be reimbursed to the Lessor on demand as additional rent.

- 5 -

This page intentionally left blank

# EXHIBIT 4

## AGREEMENT AND CONSENT WITH RESPECT TO

## SHARES AND PROPRIETARY LEASE

Agreement made as of the 6 day of March, 2015, by and between The Sherry-Netherland, Inc., a New York Corporation having an address at 781 Fifth Avenue, New York, New York 10022 ("Lessor"); GENEVER HOLDINGS LLC, a New York Limited Liability Company, having an address at c/o Paul, Weiss, Rifkind, Wharton & Garrison LLC, 1285 Avenue of the Americas, New York, New York, 10019, Attn: Ira Gilbert or any other Member of the Firm ("Lessee"); and Mr. Kwok Ho Wan a/k/a Miles Kwok a/k/a Miles Guo ("Miles Kwok") ("Occupant"), having an address at 781 Fifth Avenue, Apartment 1801, New York, New York 10021.

## WITNESSETH:

**WHEREAS;** Lessee has entered into a contract to acquire 2,950 shares of the common stock of Lessor allocated to Apartment 1801 and 50 shares of the common stock of Lessor allocated to Apartment MR 2219 and 50 shares of the common stock of Lessor allocated to Apartment MR 719 (collectively, the "Shares", and collectively, the "Apartment") in the building located at 781 Fifth Avenue, New York, New York 10022 ("Building") and to become lessee under the proprietary leases (collectively, the "Lease") appurtenant to the Shares.

**WHEREAS;** Lessee has requested Lessor to consent to the transfer to Lessee of the Shares and the assignment to Lessee of the Lease and, in order to obtain such consent from Lessor, the Lessee is agreeable to restricting the occupancy of the Apartment and the direct and indirect ownership of the Lease and Shares, so that the ownership of the Lease and the Shares by Lessee, which is a limited liability company, does not affect the use of the Apartment or the beneficial ownership of the Lease and the Shares or limit or restrict in any way the responsibility

NY 75561913v5

EXHIBIT 14
WIT: Millman
DATE: 9/24/18
Melissa Gilmore

**SN 0285**

of the Lessee for the prompt payment of maintenance charges (proprietary rent) under the Lease or other amounts payable to or on behalf of Lessor nor the responsibility of the Lessee and Occupant to strictly comply with the terms of the Lease and the Lessor's House Rules, Rules and Regulations, By-Laws and other corporate documents, as the same may be amended, modified, extended, restated or replaced from time to time ("Lessor's Corporate Documents"); and

**NOW, THEREFORE,** in order to induce Lessor to give its consent to the aforesaid transfer and assignment, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

## CONSENT

1.     The Lessor hereby consents, subject to the provisions and conditions hereinafter set forth, to the transfer of ownership of the Shares to Lessee and to the assignment of the appurtenant Lease to Lessee and to the occupancy of the Apartment, as provided herein.

## LESSEE AND OCCUPANT'S COVENANTS

2.     Lessee, Occupant and all Permitted Occupants, as hereinafter defined, agree to be bound by all the covenants, terms, conditions, and other restrictions or duties specified in the Lease and Lessor's Corporate Documents as if they were jointly and/or severally the shareholder of record of Lessor and as if they were jointly and/or severally the named Lessee under the Lease.

## LESSEE'S ADDITIONAL COVENANTS

3.     In addition to its agreements and covenants made in paragraph 2 above, Lessee expressly covenants and agrees, without limitation, to comply with the obligation to pay all installments of rent (as defined in the Lease), additional rent, maintenance charges,

-2-

**SN 0286**

assessments, and any and all other charges or sums due to Lessor payable under the Lease, or

Lessor's Corporate Documents (collectively, the "Lessee's Obligations").

### REPRESENTATIONS, WARRANTIES & COVENANTS

4.     As a material inducement to Lessor to give its consent to the aforesaid

transfer and assignment, Lessee and the Occupant represent that Lessee is wholly owned by

Genever Holdings Corporation (as "Sole Member") and that there are no other members of the

Lessee other than the Sole Member.

5.     Concurrently herewith, Lessee shall deliver to Lessor the personal

guaranty of Miles Kwok, in the form annexed hereto as Exhibit A, guaranteeing the performance

of all Lessee's Obligations under this Agreement and the Lease, including, without limitation,

the payment of any and all maintenance, rent payments and other assessment charges.

6.     Lessee and the Occupant represent and warrant that:

(i)     Lessee is duly formed, validly existing and in good standing to do

business in the State of New York and will remain as aforesaid so

long as Lessee continues to be the owner of the Shares and the

lessee of Lease;

(ii)     The terms of this Agreement and the Lessee's Obligations assumed

by Lessee hereunder do not conflict with the operating agreement

of the Lessee or with any prior agreement to which Lessee is a

party;

-3-

SN 0287

(iii)    The Federal Employer Identification Number (EIN) number for the

Lessee is 4'l -3'3'3'3'3'3.0'2

7.    Lessee and the Occupant covenant that Lessee will execute, within ten (10) days of Lessor's request, any proprietary lease or other instrument, which has been duly approved and adopted by the shareholders of the Lessor and is required to be executed by the shareholders of the Lessor.

8.    Lessee and the Occupant covenant and represent that:

(i)    The Lessee does not now and will not at any time in the future own any assets other than the Shares, the Lease and the furniture, fixtures, personalty and improvements relating to the Apartment and other than the shares, lease, and furniture, fixtures, personalty and improvements relating to any other co-operative Apartment in the Building and Lessee does not now and will not at any time in the future engage in any business activity not directly related to the respective foregoing assets;

(ii)    Lessee does not now and will not at any time in the future incur any liabilities except in relation to the foregoing respective assets;

(iii)    The Shares and the Lease will not be pledged as security or pledged or hypothecated to any third party without the prior written consent of Lessor; and

-4-

SN 0288

(iv)   Lessee has not and will not at any time in the future place, or allow any third party to place, any liens, encumbrances or other indebtedness against the Shares and the Lease.

## OCCUPANCY

9.   Lessor and Lessee hereby agree that the Apartment will be occupied as a private dwelling only and for residential use and for no other purpose and that only the Occupant, and the members of the Occupant's immediate family (each, a "Permitted Occupant"), may occupy or use the Apartment as such private dwelling only for residential use and for no other purpose. Lessor and Lessee agree that no person, other than Occupant and a Permitted Occupant, including, without limitation, any and all officers, directors, members, employees and agents of the Lessee, shall occupy or have any right to occupy or use the Apartment without the prior written consent of Lessor, and Lessee and Occupant shall not permit any person (other than Occupant and a Permitted Occupant) to occupy or use the Apartment, nor shall they permit the use of the Apartment for any purpose other than as a private dwelling for residential purposes only.

10.   In furtherance of Article III, 3.9 and 3.10 of the Lease, and in accordance with the By-laws of Lessor with respect to subletting the Apartment, or to the assignment and/or transfer of the Lease and the Shares appurtenant to the Apartment, the Lessee hereby expressly covenants and agrees that any direct or indirect transfer, by operation of law or otherwise, of any interest in the Lessee, in whole or in part (whether by transfer of membership interests in or assets of Lessee, or otherwise, and including any issuance of any stock or other interest in the Lessee) shall be deemed to be an assignment and/or transfer of the Shares and/or the Lease, within the meaning of the aforesaid Articles of the Lease and shall require the prior written

-5-

SN 0289

consent of the Board of Directors of Lessor, which consent may be given or withheld in the sole discretion of said Board of Directors. The Lessee covenants not to transfer or permit or cause to be transferred, to any party, any direct or indirect interest in Lessee, whether by transfer of membership interest or assets, or otherwise, in contradiction of this paragraph and Article III 3.9 and 3.10 of the Lease. No assignment or purported assignment of any interest in the Lessee, the Lease and/or the Shares, shall release Lessee from Lessee's Obligations as set forth or provided for herein.

## DEFAULTS AND REMEDIES

11.    If any of the agreements or covenants contained herein are breached by Lessee or the Occupant, Lessor shall have, in addition to any other right or remedy available to it for damages or injunctive relief, all of the rights and remedies provided under the Lease and the Lessor's Corporate Documents,, including without limitation, the right to terminate the Lease.

12.    Lessee and Occupant agree to defend, indemnify and hold Lessor, its officers, directors, employees, agents, managers, trustees and counsel (each, an "Indemnified Party") harmless from and against all costs, suits, claims, losses, debts, damages, liabilities, contracts, controversies, actions, and expenses, including attorneys' fees and other professional fees and disbursements, which may be incurred by an Indemnified Party at any time by reason of or in any way in connection with the Lease, this Agreement, and/or the transfer of the Shares and/or the Lease, including, but not limited to, subpoenas, search warrants, court orders, demands for monetary or non-monetary relief, criminal proceedings, civil, administrative or regulatory proceedings or government investigations or the like, which either directly or indirectly involves any Indemnified Party or requires or invites any Indemnified Party's

-6-

SN 0290

response, including but not limited to the production of documents, responses to interrogatories, deposition testimony, court appearance or the like by any Indemnified Party and/or its counsel.

13.    Lessee and Occupant agree that any breach of the Lease or Lessor's Corporate Documents by any Permitted Occupant or a licensee or invitee of Lessee, Occupant or a Permitted Occupant will constitute a breach of the same by Lessee, entitling Lessor to enforce all of its rights and remedies set forth in the Lease and this Agreement against Lessee and Occupant.

14.    The Lessee and Occupant acknowledge and agree that non-monetary defaults under or failures to strictly comply with the Lease or Lessor's Corporate Documents cause injury to the Lessor, other lessees and occupants of the Building, as well as the diversion of Lessor's management resources, and that the Lessor and other lessees and occupants of the Building cannot be fairly or adequately compensated for damages caused by such defaults and failures to comply. Therefore, the Lessor shall have the right, in addition to any other rights that the Lessor may have, to seek entry of an injunction against Lessee, Occupant, Permitted Occupant and/or their licensees or invitees, enjoining such defaults or failures to comply. Moreover, recognizing and acknowledging the irreparable nature of such injuries, the Lessee and Occupant consent to entry of such an injunction and further agree to bear any attorneys' fees or other costs incurred by the Lessor in obtaining or enforcing said injunction, which amounts shall be deemed additional rent under the Lease.

15.    The Guarantor hereby designates the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019 and any member thereof ("Designee") as agent and attorney in fact to accept service of process in any

-7-

SN 0291

action or proceeding arising under or in connection with the Lease and/or this Agreement, it being expressly acknowledged that service of process need only be served upon Designee to be effective against the Lessee, the Occupant and/or any Permitted Occupant. The foregoing designation is irrevocable and one coupled with an interest.

## GOVERNING LAW

16.   This Agreement and any document contemplated by or delivered pursuant to or in connection with this Agreement, shall be governed by and construed and enforced in accordance with the laws of the State of New York applicable to contracts made in and to be performed wholly within the State of New York.

17.   In any action on or in any way connection with this Agreement, Lessee and Occupant agree to waive a trial by jury and the right to assert any counterclaim, other than a compulsory counterclaim.

18.   The parties hereto hereby agree that in any action or proceeding brought upon any matters whatsoever arising out of, relating to or in any way connected with the Shares, the Lease, the Apartment, and/or this Agreement, and/or any document contemplated by, delivered pursuant to, or in connection with this Agreement, the parties hereto, their respective heirs, legal representatives, successors and permitted assigns, shall and do hereby consent to the venue and jurisdiction of the courts of the State of New York, sitting in the County and City of New York, on behalf of themselves and their respective heirs, legal representatives, successors and permitted assigns.

## MISCELLANEOUS

-8-

SN 0292

19.    Other than as set forth above, Lessor's consent herein does not bind or

obligate the Lessor to consent to or permit any subsequent transfer of the Shares, or assignment

of the Lease at any time and is consent only to the present transfer and assignment of the Shares,

and the Lease to the Lessee.  Any future transfer, including those pursuant to the terms of any

documents to which Lessee is bound or by operation of law, shall be subject to the prior written

consent of the Lessor as provided for by the Lease.

20.    Any and all terms set forth herein and not otherwise defined herein shall

have the same meaning as set forth in the Lease or the Lessor's Corporate Documents, as the

case may be.

21.    The provisions of this Agreement shall inure to the benefit of the Lessor

and shall inure to the benefit of and be binding upon the permitted successors and permitted

assignees of the parties hereto.

22.    This Agreement and any provision herein may only be modified, changed,

waived, or terminated by an instrument in writing, signed by the party against whom the

modification, change, waiver, or termination is sought.

23.    All previous understandings and agreements between the parties with respect

to the subject matter hereof are merged into this Agreement, which alone fully expresses their

agreement.

24.    This Agreement may be executed in counterparts and such executed

counterparts, taken together, shall be considered one entire fully executed document.

NY 75561913v5

SN 0293

25.     All parties acknowledge that they have each been represented by independent counsel of their choosing in connection with this Agreement and its subject matter.

**[SIGNATURE PAGE FOLLOWS]**

NY 75561913v5

SN 0294

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the _____ day of March, 2015.

LESSOR:     **THE SHERRY-NETHERLAND, INC.**

By: _____
Name: _____
Title: _____

LESSEE:     **GENEVER HOLDINGS LLC**

By: Genever Holdings Corporation, sole member

By: _____
Name:   Ira Gilbert
Title:    Authorized Person

OCCUPANT:

_____
Kwok Ho Wan a/k/a Miles Kwok a/k/a Miles Guo

The undersigned, by execution of this Agreement, hereby agree to act as agent and attorney in fact to receive service of process as more particularly provided in this Agreement

Paul, Weiss, Rifkind, Wharton & Garrison LLP

By: _____
Name: _____
Title: _____

-11-

SN 0295

STATE OF NEW YORK )
                  )ss.:
COUNTY OF NEW YORK )

On the ___ day of March in the year 2015, before me, the undersigned, personally appeared **Ira Gilbert** personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as **Authorized Person**, of **GENEVER HOLDINGS LLC**, the corporation, and that by his signature on the instrument, the individual, on behalf of the corporation, executed the instrument.

Notary Public
SUSAN HENNELLY
Notary Public, State of New York
No. 01HE4977445
Qualified in Suffolk County
Commission Expires February 4, 20___

STATE OF NEW YORK )
                  )ss.:
COUNTY OF NEW YORK )

On the ___ day of March in the year 2015, before me, the undersigned, personally appeared **Kwok Ho Wan a/k/a Miles Kwok a/k/a Miles Guo** personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

MARYBETH CARROLL
Notary Public, State of New York
No. 01CA6048085
Qualified in Nassau County
Commission Expires Sept. 18, 20___

_____
Notary Public

STATE OF NEW YORK )
                  )ss.:
COUNTY OF NEW YORK )

On the ___ day of March in the year 2015, before me, the undersigned, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, acting on behalf of the **Sherry-Netherland, Inc.**, executed the instrument.

_____
Notary Public
SUSAN HENNELLY
Notary Public, State of New York
No. 01HE4977445
Qualified in Suffolk County
Commission Expires February 4, 20___

-12-

SN 0296

STATE OF NEW YORK    )
                            )ss.:
COUNTY OF NEW YORK    )

On the ____ day of March in the year 2015, before me, the undersigned, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, acting on behalf of **Paul, Weiss, Rifkind, Wharton & Garrison LLP**, executed the instrument.

_____
Notary Public

MARYBETH CARROLL
Notary Public, State of New York
No. 01CA6048085
Qualified in Nassau County
Commission Expires Sept. 18, 20__

-13-

SN 0297

EXHIBIT A

GUARANTY OF AGREEMENT AND LEASE BY MILES KWOK

## <u>GUARANTY OF AGREEMENT AND LEASE</u>

**WHEREAS,** The Sherry-Netherland, Inc., as Lessor ("Lessor") and GENEVER HOLDINGS LLC, as lessee ("Lessee") are concurrently entering into a proprietary lease (the "Lease") with respect to apartments 1801, MR 2219 and MR 719 (collectively, the "Apartment") at the building located at 781 Fifth Avenue, New York, New York 10022 ("Premises").

**NOW, THEREFORE,** in consideration of the foregoing, and in further consideration of the Lessor having consented to Lessee becoming the owner of the shares of Lessor allocable to the Apartment and the Lease appurtenant thereto, pursuant to an Agreement and Consent dated March __, 2015 (the "Agreement"), Kwok Ho Wan a/k/a Miles Kwok a/k/a Miles Guo (the "Guarantor") hereby unconditionally and irrevocably guarantees to the Lessor throughout the term of the Lease the timely performance of all of Lessee's Obligations under and as defined in the Agreement and the Lease and of all of the covenants and conditions on the Lessee's part to be paid and/or performed under the Agreement and the Lease, including, without limitation, the prompt payment by Lessee of maintenance charges and any and all other charges or assessments (including late charges) (collectively, "Maintenance Charges") payable under the Lease, as the same may be extended, amended, modified or renewed from time to time, on and after the date hereof to and including the date on which Lessee assigns and transfers the Shares and the Lease, with the consent of the Lessor and in compliance with the terms of the Lease.

Guarantor agrees, without notice or demand, that he shall reimburse the Lessor for all costs and expenses, including without limitation, reasonable attorneys fees and disbursements, incurred by the Lessor in connection with the enforcement of this Guaranty.

Guarantor agrees that the obligations to make payments hereunder, and any remedy of Lessor for the enforcement thereof, shall not be impaired, modified, released or limited in any way by any impairment, modification, release or limitation of the liability of the Lessee or Lessee's estate in bankruptcy, resulting from the operation of any present or future provision of the Bankruptcy Code of the United States or from the decision of any court interpreting same.

Guarantor agrees to provide to the Lessor the full performance and observance of all the covenants, conditions and agreements provided to be performed and observed by the Lessee, in its capacity as lessee, including without limitation the observance of all of the terms and conditions of the Agreement and Consent with respect to Shares and Proprietary Lease of even date herewith between the Lessor and the Lessee, Proprietary Lease, the By-Laws, the Certificate of Incorporation and the House Rules of the Lessor as they may now exist or as they may hereafter be amended from time to time.

Guarantor hereby waives (a) notice of acceptance of this Guaranty; (b) presentment, demand, protest or notice of non-payment and/or dishonor of any Maintenance Charges or of any instruments or documents evidencing and/or given pursuant thereto; (c) notice of any default by Lessee; (d) notice of demand for payment; (e) notice of full or partial payment of any

SN 0298

Maintenance Charges by the Lessee to the Lessor; and (f) any notice to or making of any claim or demand upon the Guarantor and the Guarantor further waives all defenses, offsets, and counterclaims which the Guarantor may now or hereafter have with regard to any Maintenance Charges.

Guarantor hereby consents to and agrees that the Lessor may at any time, in its discretion, before or after any default by Lessee with respect to the Agreement and/or the Lease and without notice to, knowledge of or assent from the Guarantor: (a) extend or change the time, manner, place or terms of payment of the Maintenance Charges or fees of Lessee to the Lessor; or (b) settle, modify, release or compromise with Lessee or with third parties any and all obligations with respect to Maintenance Charges or fees by Lessee to Lessor. Any or all of the foregoing shall be accomplished by the Lessor in such manner and upon such terms that it sees fit, and the Guarantor shall remain bound under this Guaranty notwithstanding any such action taken by the Lessor as aforesaid, provided Lessor notifies Lessee in writing, of any of the foregoing. The parties agree notice to the Apartment at the Premises shall be deemed good and sufficient notice.

This Guaranty shall remain in effect notwithstanding the modification, amendment or extension of the Lease or the execution of a new, amended or extended proprietary lease by Lessee or any modification thereof.

This Guaranty shall remain and continue in effect if the Lessee sublets the Apartment, whether or not the Guarantor or Lessor receive notice of and/or consents to such sublet.

This is an absolute and unconditional guaranty of payment and of performance and not of collection and the Guarantor further waives any right to require that any action be brought against the Lessee or any other person or to require that resort be had to any security held by the Lessor prior to the exercise of any rights that the Lessor may have by virtue of this Guaranty.

Further, no delay on the part of the Lessor in exercising any of its rights hereunder or failure to exercise the same shall operate as a waiver of such rights; no notice or demand on the Guarantor shall be deemed a waiver of this Guaranty or of the rights of the Lessor to take further action without notice or demand as herein provided.

The Guarantor hereby designates the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019 and any Member thereof ("Designee") as agent and attorney in fact to accept service of process in any action or proceeding arising under or in connection with this Guaranty, it being expressly acknowledged that service of process need only be served upon Designee to be effective against the Guarantor. The foregoing designation is irrevocable and one coupled with an interest.

This Guaranty and all of its provisions shall be binding on the Guarantor and his estate, heirs, executors, administrators, personal representatives, successors and assigns.

If any provision of this Guaranty shall be invalid, the remaining provisions shall continue in full force and effect and the invalid provision shall be construed as if it were not contained herein.

All rights and remedies under the Lease and under this Guaranty are cumulative.

EXHIBIT A -2-

SN 0299

This Agreement and any document contemplated by or delivered pursuant to or in connection with this Agreement, shall be governed by and construed and enforced in accordance with the laws of the State of New York applicable to contracts made in and to be performed wholly within the State of New York. This Guaranty shall be governed by the internal laws of the State of New York, without giving effect to principles or conflict of laws.

In any action on this Guaranty, Guarantor agrees to waive a trial by jury and the right to assert any counterclaim, other than a compulsory counterclaim.

The parties hereto hereby agree that in any action or proceeding brought upon any matters whatsoever arising out of, relating to or in any way connected with the Shares, the Lease, the Apartment, and/or this Agreement, and/or any document contemplated by, delivered pursuant to, or in connection with this Agreement, the parties hereto, their respective heirs, legal representatives, successors and permitted assigns, shall and do hereby consent to the venue and jurisdiction of the courts of the State of New York, sitting in the County and City of New York, on behalf of themselves and their respective heirs, legal representatives, successors and permitted assigns.

This Guaranty may not be modified or terminated orally but only by an agreement in writing signed by the Party against whom enforcement of such change or termination is sought.

Date: March ___, 2015
New York, New York

_____
Kwok Ho Wan a/k/a Miles Kwok a/k/a Miles Guo

The undersigned, by execution of this Agreement, hereby agree to act as agent and attorney in fact to receive service of process as more particularly provided for in this Guaranty.

Paul, Weiss, Rifkind, Wharton & Garrison LLP

By: _____
    Name:
    Title:

EXHIBIT A -3-

STATE OF NEW YORK )
 )ss.:
COUNTY OF NEW YORK )

On the _____ day of March in the year 2015, before me, the undersigned, personally appeared **Kwok Ho Wan a/k/a Miles Kwok a/k/a Miles Guo** personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

**MARYBETH CARROLL**
**Notary Public, State of New York**
No. 01CA6048085
Qualified in Nassau County
**Commission Expires Sept. 18, 20__**

EXHIBIT A -4-

# EXHIBIT 5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

In Re                          * Chapter 11
                               *
                               *
      HO WAN KWOK,             * Case 22-50073(JAM)
                               *
             Debtor.           *
                               *
* * * * * * * * * * * * * * * *

TRANSCRIPT OF TELEPHONIC

341 MEETING OF CREDITORS

MARCH 21, 2022

Electronically Recorded by the
Office of the United States Trustee

Transcript Prepared By:

Christine Fiore, CERT
Fiore Reporting and Transcription Service, Inc.
4 Research Drive, Suite 402
Shelton, CT  06484
(203)929-9992

Ho Wan Kwok - March 21, 2022

APPEARANCES:

For the Debtor:              WILLIAM R. BALDIGA, ESQ.
                             BEN SILVERBERG, ESQ.
                             URI PINELO, ESQ.
                             Brown Rudnick, LLP
                             Seven Times Square
                             New York, NY  10036


For the U.S. Trustee:        HOLLEY E. CLAIBORN, ESQ.
                             Office of the U.S. Trustee
                             150 State Street
                             New Haven, CT  06510


For Logan Cheng,             JAY MARSHALL WOLMAN, ESQ.
 Creditor:                   Randazza Legal Group
                             100 Pearl Street, 14th Floor
                             Hartford, CT 06103


For Pacific Alliance         DAVID V. HARBACH, II, ESQ.
 Asia Opportunity Fund,      O'Melveny & Myers, LLP
 LP, Creditors:              1625 I Street NW
                             Washington, DC  20006

                             STUART SARNOFF, ESQ.
                             LAURA ARONSSON, ESQ.
                             CRAIG McALLISTER, ESQ.
                             MAKENZIE RUSSO
                             STEVEN WARREN
                             O'Melveny & Myers, LLP
                             Times Square Tower
                             7 Times Square
                             New York, NY  10036


For Bruno Wu, Weican         KAREN WARSHAUER
 Meng and Rui Ma,            McElroy, Deutsch, Mulvaney &
 Creditors:                   Carpenter
                             One State Street
                             Hartford, CT  06103


For Xiaodan Wang,            LILLIAN GRINNELL, ESQ.
 Rong Zhang and Chong        Wolf Haldenstein Adler
 Shen Raphanella,            Freeman & Herz
 Creditors:                  270 Madison Avenue
                             New York, NY  10016

APPEARANCES: (Cont'd)

```
For Samuel Nunberg,        AMY ZAMIR, ESQ.
 Creditor:                 Nesenoff & Miltenberg, LLP
                           363 Seventh Avenue
                           New York, NY  10001


For the Sherry            EMILY KUZNICK, ESQ.
 Netherland, Creditor:    Stroock, Stroock and Lavan
                           180 Maiden Lane
                           New York, NY  10038
```

1        MS. CLAIBORN:  I'm going to repeat myself

2   from the beginning here because I want to make sure

3   it's all on the record and I apologize.

4            I'm going to basically start this meeting

5   over again and we're going to go very quickly and

6   then we'll come back to where I was just about to

7   go.

8            Today is Monday, March 21st, 2022 and we

9   are gathered for the Section 341 meeting in the

10  Chapter 11 case of Ho Wan Kwok, also known as Wengui

11  Gwo and Miles Kwok.

12           My name is Holley Claiborn and I'm a trial

13  attorney in the Office of the United States Trustee

14  and I will be conducting today's meeting.

15           I am recording this meeting and also we

16  have the presence of an interpreter on the line

17  whose name is Bin, B-I-N.

18           And so that I have it on the record, I'm

19  going to ask Bin a third time about her oath.

20           (The interpreter is sworn.)

21           For purposes of speeding this up on the

22  record we have appearances today by Jay Wolman, on

23  behalf of Logan Cheng.  We have the appearance of

24  David Harbach, Stuart Sarnoff, Mia Gonzalez, Laura

1    Aronsson, Craig McAllister and Mackenzie Russo, all

2    on behalf of Pacific Alliance.  And for creditors

3    Rui Ma, Bruno Wu and Weican Meng, we have Karen

4    Warshauer, a paralegal at McElroy.

5              THE INTERPRETER:  Sorry, I cannot get all

6    those names at once.

7              MS. CLAIBORN:  Bin, did you translate all

8    of the names for the Pacific Alliance?

9              THE INTERPRETER:  The names actually just

10   a repeat of the pronunciation.  No translation.

11             MS. CLAIBORN:  Thank you.  Whoever does

12   not have their phone on mute, could you please put

13   it on mute?  Thank you.

14             Okay.  The other appearances, Karen

15   Warshauer, from McElroy, and she represents Bruno

16   Wu, Weican Meng and Rui Ma.

17             Before I go back to the debtor, are there

18   any other creditors on the line who have counsel

19   who'd like to put their appearance on the record?

20             MS. GRINNELL:  Hi --

21             MS. CLAIBORN:  Please wait for the

22   translation.

23             MS. GRINNELL:  (Indiscernible) I'm from

24   the firm Wolf Haldenstein Adler Freeman and Herz and

25   we represent --

1              THE INTERPRETER:  Sorry.  The interpreter

2      cannot hear you clearly.

3              MS. GRINNELL:  I'm sorry. My connection

4      has been kind of off.  Can you hear me now?

5              THE INTERPRETER: Yes.

6              MS. GRINNELL:  Okay.  I'll repeat what I

7      said.

8              My name is Lillian Grinnell.  I'm an

9      attorney at Wolf Haldenstein Adler Freeman and Herz

10     and we represent the creditors, Rong Zhang, Xiaodan

11     Wang, and Chong Sheen Raphanella.

12             THE INTERPRETER:  The names you pronounced

13     I could not get them.

14             MS. GRINNELL:  I'll spell them.

15             I'll start with the creditor's names.  The

16     creditor's names are Rong Zhang, and that's -- the

17     first name is Rong, R-O-N-G, Z-H-A-N-G.

18             The second creditor's name is Xiaodan

19     Wang.  And her first name is spelled X-I-A-O-D-A-N.

20     And her last name is spelled W-A-N-G.

21             And then the third creditor, Chong Shen

22     Raphanella.  And her first name is C-H-O-N-G. And

23     then the second name is S-H-E-N.  And the third name

24     is R-A-P-H-A-N-E-L-L-A.

25             THE INTERPRETER:  I only got Chong Shen

1    and R-A-P-H-A-L.

2            MS. GRINNELL:  I'm sorry.  Are you asking

3    me to spell the third name again?

4            (No response.)

5            Sorry?  I apologize.  My connection is

6    very bad.  Do you need me to spell any of the names

7    again?

8            THE INTERPRETER:  I think I'm okay.  I

9    repeat it to Mr. Kwok already.

10           MS. GRINNELL:  Okay.

11           MS. CLAIBORN:  Are there any other

12   creditors on the line or parties on the line?

13           MS. ZAMIR:  This is Amy Zamir, from

14   Nessenoff & Miltenberg.  I'm spell that.  My last

15   name is Zamir, Z-A-M-I-R.  Nessenoff is N-E-S-S-E-N-

16   O-F-F, and Miltenberg, M-I-L-T-E-N-B-E-R-G.  And we

17   represent creditor Sam Nunberg, N-U-N-B-E-R-G.

18           MS. CLAIBORN:  Is there anyone else who

19   would like to put their appearance on the record.

20           MS. KUZNICK:  Yes.  This is Emily Kuznick,

21   E-M-I-L-Y, and then Kuznick, K-U-Z-N-I-C-K, of

22   Stroock, Stroock and Lavan, that's S-T-R-O-O-C-K,

23   and Stroock, and Lavan is L-A-V-A-N. And we

24   represent the Sherry Netherland.  And for Sherry

25   Netherland it's S-H-E-R-R-Y, and then Netherland, N-

1    E-T-H-E-R-L-A-N-D.

2            THE INTERPRETER:  I'm clarifying what he

3    said.

4            (Interpretation.)

5            THE INTERPRETER:  Let me continue

6    clarifying what was yelled out just now.

7            (Interpretation.)

8            THE INTERPRETER:  I'm sorry.  The

9    interpreter cannot get that.  Nobody picked up my

10   question so I don't know.

11           MS. CLAIBORN:  Thank you, Bin.

12           Any other creditors or parties in interest

13   before I go back to the debtor?

14           MR. HARBACH:  This is David Harbach, from

15   O'Melveny and Myers, representing PACS.  I just

16   wanted to clarify that is it correct that we have

17   not gotten an answer from the debtor about what he

18   just said?

19           I have not heard any interpretation of it

20   and I understand the interpreter was attempting to

21   clarify what was said but the debtor did not

22   respond, as far as I heard, and we'd like to know

23   what he said.

24           MR. BALDIGA:  This is Bill Baldiga.  I'll

25   accept your apologies.  That was not the debtor, but

1    I accept your apology for that inference.

2              MS. CLAIBORN:  I'm going to come back to

3    that a in minute.

4              MR. HARBACH:  Okay.  (Indiscernible)

5    whether I should apologize, but can we inquire then

6    who made the outburst?  The interpreter was

7    attempting to clarify and so are we.  Forgive the

8    inference.

9              THE INTERPRETER:  So I interpreted what

10   you requested.  Just now someone burst out with a

11   few words -- with sentences.  The interpreter did

12   not get those sentences.  So the interpreter tried

13   to clarify who talked and what those words are, but

14   nobody picked up the interpreter's question.

15             MS. CLAIBORN:  This is Holley Claiborn.

16   Could the person who spoke up please answer the

17   interpreter's question and identify themselves?

18             THE INTERPRETER:  Sorry about that.  Just

19   now it was it was just a video tape. It was not

20   someone talked.

21             MR. BALDIGA:  This is Bill Baldiga.  Mr.

22   Kwok -- what Mr. Kwok heard during that outburst was

23   someone playing back an audio of his voice and we do

24   want to know everyone who is on the phone and we

25   would like identified who played that audio clip.

1    Thank you.

2         UNIDENTIFIED:  Sorry, it was me. I played

3    Mr. Kwok's video just now.

4         MS. CLAIBORN:  Could the person who just

5    spoke identify themselves?

6         THE INTERPRETER:  The interpreter needs to

7    clarify.

8         (Interpreter inquires)

9         MR. YAN:  My name is Xingyu Yan. I'm one of

10   Mr. Kwok's creditors.

11        MR. BALDIGA:  Can we have the spelling,

12   please?  Could we obtain the spelling of that name

13   please?

14        MR. YAN:  The spelling is X, for Xray, I, as

15   India, N, as in Nancy, G as in George, Y as in Yes,

16   U as in umbrella.  Last name Y, A as in apple, N as

17   in Nancy.

18        MR. BALDIGA:  Ms. Claiborn, Bill Baldiga

19   again.  Could you please exhaust the names of

20   everyone else on the line, just so we know who is

21   participating, whether or not they intend to ask

22   questions?

23        MS. CLAIBORN:  I'm trying to get there.

24   That was my -- okay.

25        Is anyone else on the line?  If you are on

1    the line, and you could please identify yourself?

2         MR. GREIF:  Hello.  My name is Steven Greif,

3    G-R-E-I-F.

4         MR. WARREN:  Steven Warren of O'Melveny &

5    Myers.

6         MR. JALBERT:  Craig Jalbert of

7    (indiscernible).

8         INDISCERNIBLE:  (Indiscernible)  from

9    Robinson and Cole.

10         INDISCERNIBLE:  (Indiscernible)  from

11    Stroock, Stroock and Lavan.

12         MS. DEERING:  Alexandra Deering of Brown

13    Rudnick.

14         MS. CLAIBORN:  This is Holley Claiborn

15    again. Thank you all for putting your appearances on

16    the record.  And if I could go back to debtor's

17    camp, Mr. Baldiga, could you put your appearance on

18    the record and note everybody who's with you at your

19    location.

20         MR. BALDIGA:  Yes.  We're in our --

21         I'm sorry. I missed what was just said.

22         MS. CLAIBORN:  Mr. Baldiga, could you go

23    ahead, please?  Mr. Baldiga, could you go ahead,

24    please?

25         MR. BALDIGA:  Yes.  Thank you.  We are at

1   our offices at 7 Times Square in New York.

2          And can you please state the name, Mr.

3   Baldiga, of who is present with you?

4          (No response.)

5          MS. CLAIBORN:  Mr. Baldiga, could you please

6   state the names of the people who are with you?

7          MR. BALDIGA:  Ben Silverberg and Uri Pinelo.

8          MS. CLAIBORN:  Okay.  Other names I believe

9   I heard earlier are Una Menye (ph), who is an

10  interpreter, and Attorney Aaron Mitchell.

11         MR. BALDIGA:  That's right.  Yes.

12         Ms. CLAIBORN:  Okay. I'm going to swear in

13  Mr. Kwok and I would ask everyone to put their

14  phones on mute.

15     (The debtor is sworn.)

16         MS. CLAIBORN: Mr. Kwok, as you know, today's

17  meeting is being recorded and there's an

18  interpreter, Bin, who's interpreting my questions

19  and the comments of others and will also be

20  interpreting your answers.

21         Please wait to answer any questions you are

22  asked today until the official interpreter has made

23  a full translation.

24         I ask that you do not communicate with your

25  own interpreter who is present with you before you

1     answer the questions, and should you do so, I will

2     ask the official interpreter to translate that

3     discussion.

4            THE INTERPRETER:  Sorry.  Could you please

5     repeat?

6            MS. CLAIBORN:  Mr. Kwok, I ask that you do

7     not communicate with your own interpreter who is

8     with you today before you answer my questions or the

9     questions of others.

10           THE INTERPRETER:  He could not use his own

11    interpreter.

12           MS. CLAIBORN:  Bin, could you translate that

13    instruction for Mr. Kwok.

14           MR. BALDIGA:  This is Bill Baldiga.

15           To the extent --

16           MS. CLAIBORN:  Mr. Baldiga, could you just

17    wait for Bin to interpret that instruction for me

18    and then you can make your comment.

19           MR. BALDIGA:  Two things.  This is Bill

20    Baldiga.

21           Holley, you've become quite muffled again

22    and second, to the extent that Mr. Kwok needs to

23    talk to his interpreter to better understand what

24    was said or the interpreter in the room with us

25    believes that there was a misinterpretation, we will

1    tell you that so that you do know if there is a

2    further conversation.

3            MS. CLAIBORN:  Thank you.

4                    HO WAN KWOK, Sworn

5    EXAMINATION BY MS. CLAIBORN:

6      Q    Mr. Kwok, can you please explain the reason

7    to file your Chapter 11 bankruptcy case?

8            UNIDENTIFIED:  Sorry?

9      Q    Mr. Kwok, please explain the reasons behind

10   your decision to file your Chapter 11 bankruptcy

11   case?

12           MR. HARBACH:  This is David Harbach.  We're

13   having trouble understanding you again.

14           MS. CLAIBORN:  I apologize.  My phone system

15   is new and I'm yelling into the phone, but unless I

16   put it on speaker phone I won't be able to record

17   it.  Does yelling improve your ability to hear me?

18           MR. HARBACH:  It's very difficult to

19   understand your questions because they're so

20   muffled.  It's not volume, it's diction, if I may be

21   blunt.

22           MS. CLAIBORN:  I will try to speak slowly.

23   Is that any better?

24           MR. BALDIGA:  It seems to be, yes.  Thank

25   you.

1

2      Q    Okay.  We're going to try this again.

3           Mr. Kwok, can you please explain your

4    reasons behind filing your Chapter 11 bankruptcy

5    case?

6      A    I cannot understand you.  I don't know what

7    you mean by filing Chapter 11 of bank.

8      Q    Mr. Kwok, why did you file your bankruptcy

9    case?

10          THE INTERPRETER:  The interpreter would like

11   to clarify the word he said.

12     A    I'm not filing any bankruptcy certificate.

13     Q    Let me try again.

14          Mr. Kwok, you are a Chapter 11 debtor in a

15   bankruptcy proceeding here in the United States.

16          Mr. Kwok, what were the reasons behind your

17   decision to file your bankruptcy case?

18     A    So you're asking me why I'm applying for

19   bankruptcy, right?

20     Q    Yes.

21     A    I filed (indiscernible)  in mid-February in

22   my second trial, or second appearance in Southern

23   District. I was given a fine of $120 million and I

24   was ordered to pay it off within five days.  So

25   without any choices -- so I filed bankruptcy

```
 1    application at Connecticut state and Chapter 11.

 2         Q    Mr. Kwok, when was the first time you spoke

 3    with a lawyer about filing a bankruptcy case?

 4              MR. BALDIGA:  Just the date, or the

 5    approximate date.  Not the substance of the advice.

 6         A    Approximately 12, 13.

 7         Q    Can you please provide the month and the

 8    year?

 9         A    It was February the 12th of 2002.

10         Q    Did you say 2002 or 2021?

11         A    2022.  February the 12th or 13.

12         Q    Mr. Kwok, I'd ask you to take a look at your

13    bankruptcy petition that was filed with the

14    bankruptcy court at ECF 1.

15              Mr. Kwok, a handwritten signature appears on

16    that petition. Is that your handwritten signature?

17         A    Hold on a second. I'll ask the lawyer to get

18    it and I'll take a look.

19              MR. BALDIGA:  This is Bill Baldiga.  We have

20    with us the petition with the electronic signature

21    as filed.  I don't have in the conference room me

22    the handwritten signature.  If you'd like us to get

23    it, we could get it at a break.

24         Q    Mr. Kwok, can you take a look at the

25    document that your counsel has, which is the
```

1    bankruptcy petition with your printed name on it and

2    confirm that you signed that document prior to it

3    being filed with the court?

4        A    Please hold on one second.  Let me take a

5    look.

6             MR. BALDIGA:  Could I hear the translation,

7    please.  I want to hear the translation of what you

8    said.

9        (No response.)

10            MR. BALDIGA:  Is the translator still with

11   us?

12            MS. CLAIBORN:  Bin, are you on the line?

13       (No response.)

14            Bin, are you there?

15       (No response.)

16            It seems that Bin has left us so I'm going

17   to put everybody on hold and I'm going to try to

18   reconnect her. I apologize.

19            MR. BALDIGA:  That's okay.  Could we take a

20   short break?

21            MS. CLAIBORN:  It's going to take me a few

22   minutes to do that, so go ahead and we'll reconvene

23   as soon as I can get her on the line.

24            MR. BALDIGA:  Thank you very much.

25       (Off the record.)

1          MS. CLAIBORN:  We are back on the record

2    after a short break due to some technical

3    difficulties.

4    BY MS. CLAIBORN:

5          Q    The pending question was asking Mr. Kwok to

6    confirm that he signed the bankruptcy petition that

7    was filed at ECF 1.

8          A    I have finished looking at it, yes.

9          Q    Mr. Kwok, did you read and understand the

10   bankruptcy petition and information it contains

11   before you signed it?

12         A    Yes, I understood.

13         Q    Mr. Kwok, was the petition translated into

14   another language for you before you signed it?

15         A    Yes, it was translated into Chinese for me.

16         Q    Who translated the bankruptcy petition?

17         A    My lawyer did.

18         Q    Mr. Kwok, I don't think that Mr. Baldiga

19   speaks Chinese.

20              So who was the company or the person that

21   you used to translate the petition for you?

22         A    I don't know.

23         Q    Mr. Kwok, is the information in your

24   bankruptcy petition true and accurate to the best of

25   your knowledge?

1    A    Yes, it is accurate and true.

2    Q    Mr. Kwok, can you please take a look at the

3  declaration and about individual debtor's schedules

4  that was filed with the court docket at ECF No. 79.

5         THE INTERPRETER:  Sorry, could you please

6  repeat?

7    Q    Mr. Kwok, can you please take a look at the

8  declaration about an individual debtor's schedules

9  that was filed with the bankruptcy court at ECF 79.

10        Mr. Kwok, a handwritten signature appears on

11  that declaration. Is that your handwritten

12  signature?

13   A    The document in my hand.  Yes, it was signed

14  by me.

15   Q    And are you looking at ECF no. 79?

16   A    Yes.

17   Q    Mr. Kwok, was the declaration that was filed

18  at ECF 79 translated into another language for you

19  before you signed it?

20   A    Yes.

21   Q    What language was it translated into?

22   A    Chinese.

23   Q    Mr. Kwok, do you know who did the

24  translation of ECF no. 79?

25   A    Yes.

1      Q     And who was that person who translated ECF

2  79 into Chinese for you?

3      A     The lawyer.

4      Q     Can you tell me the name of the lawyer?

5      A     Bill.

6            MR. BALDIGA:  This is Bill Baldiga.  The

7  witness is not distinguishing between what I did

8  personally and what we had commissioned, to help

9  clarify.  I do not obviously do translations myself.

10           MS. CLAIBORN:  Attorney Baldiga, can you

11 tell me the name of the translation person who

12 worked for you or the name of the company?

13           MR. BALDIGA:  I'll have to get that. I don't

14 have it here.

15     Q     Mr. Kwok, did you read and understand the

16 declaration filed at ECF no. 79 before you signed

17 it?

18     A     Yes, understood.

19     Q     Mr. Kwok, can you please take a look at your

20 bankruptcy schedules that were filed with the

21 bankruptcy court at ECF 78.

22           And Mr. Kwok, for purposes of today, when I

23 used the term schedules, either collectively or by a

24 particular schedule, I'm referring to the documents

25 that were filed at ECF 78.

1          Mr. Kwok, were your bankruptcy schedules

2     translated for you?

3          A    Yes, it was translated.

4          Q    Mr. Kwok, were you involved in preparing the

5     responses and the answers to the questions in the

6     schedules?

7          A    Yes, I was.

8          Q    Mr. Kwok, did you read and understand all of

9     the responses and the answers to the questions in

10    the schedules before you signed the declaration that

11    was filed at ECF 79.

12         A    Yes.

13         Q    Mr. Kwok, who assisted you in the

14    preparation of your bankruptcy schedules?

15         A    The lawyer.

16         Q    Mr. Kwok, can you tell me which lawyers

17    helped you?

18         A    Bill.

19         Q    Mr. Kwok, are you referring to Attorney

20    Baldiga?

21         A    Yes.

22         Q    Mr. Kwok, did any other lawyers help you in

23    preparing your bankruptcy schedules?

24         A    Yes.

25         Q    Can you please tell me the names of the

1    other lawyers who assisted you?

2        A    I don't know how to say their names. I

3    cannot read English well.

4            MR. BALDIGA:  This is Bill Baldiga. I'm

5    happy to add that, of course, other of our

6    colleagues here at Brown Rudnick assisted. But I'm

7    not sure Mr. Kwok would have details as to who

8    exactly assisted on what part of it, but you could

9    ask, of course.

10       Q    Mr. Kwok, did any lawyer help you prepare

11   your schedules who is not a lawyer at Brown Rudnick?

12           MR. BALDIGA:  Excuse me. I need to talk with

13   Mr. Kwok for one second. I'm just going to put you

14   on mute for one second.

15           MS. CLAIBORN:  I'd prefer he answer the

16   question before you have your conference, Mr.

17   Baldiga.

18       A    Because the whole bankruptcy application,

19   the whole stuff was arranged by this lawyer.  But I

20   don't know all the other details.

21           MS. CLAIBORN:  Do you want to confer with

22   your client?

23           MR. BALDIGA:  I'll clarify only that Mr.

24   Kwok likely does not know of all of the

25   conversations that we've had with others, but this

1   is the opportunity to exam him, so you can obviously

2   ask that but we don't want to be misleading.

3       Q    Mr. Kwok, aside from Mr. Baldiga and lawyers

4   at Brown Rudnick did you speak with any other

5   lawyers about preparing your bankruptcy schedules?

6       A    Yes.

7       Q    Who did you speak with?

8       A    Another law firm called Ari and my personal

9   lawyer (indiscernible).

10      Q    What is the name of your personal lawyer?

11           MR. BALDIGA:  Could I confer and I might be

12   able to answer that question?

13           MS. CLAIBORN:  Go ahead.

14           MR. BALDIGA:  Could I have a second to

15   confer, please?

16           MS. CLAIBORN:  Yes.

17      (Pause.)

18           MR. BALDIGA:  Thank you.

19      Q    Mr. Kwok, what is the name of your personal

20   lawyer?

21      A    Guy Petrillo and  Ari (indiscernible).

22      Q    Mr. Kwok do I understand correctly that you

23   discussed your bankruptcy schedules with Guy

24   Petrillo and Aaron Mitchell?

25      A    Yes.

1    Q    Mr. Kwok, did you discuss your bankruptcy

2  schedules with any other lawyers that you haven't

3  yet told me about today?

4    A    I don't remember.

5    Q    Mr. Kwok, are there any errors or omissions

6  in your bankruptcy schedules?

7    A    I don't see anything like that now.

8    Q    Mr. Kwok, is everything in your bankruptcy

9  schedules true and accurate to the best of your

10  knowledge?

11    A    Yes.

12    Q    Mr. Kwok, could you please take a look at

13  your bankruptcy statement of financial affairs that

14  was filed with the court at ECF no. 77.

15        Mr. Kwok, using the numbers at the top of

16  the document can you please go to page 20 where you

17  will find a handwritten signature.

18        THE INTERPRETER: Sorry?

19    Q    Where you will find a handwritten signature.

20        Mr. Kwok, is the handwritten signature on

21  page 20 of the statement of financial affairs your

22  own?

23    A    Yes.

24    Q    Mr. Kwok, was the statement of financial

25  affairs translated for you before you signed it?

```
 1      A    Yes.

 2      Q    Mr. Kwok, were you involved in the preparing

 3 of the responses and the answers to the questions in

 4 the statement of financial affairs?

 5      A    Yes.

 6      Q    Mr. Kwok, did you read and understand all

 7 the responses and answers to the questions in the

 8 statement of financial affairs before you signed it?

 9      A    I understood all.

10      Q    Mr. Kwok, are there any errors or omissions

11 in your statement of financial affairs?

12      A    No.

13      (No response.)

14      Q    Mr. Kwok, would you please answer the

15 question?

16           MR. BALDIGA:  I'm sorry.  Could you repeat

17 that?  We didn't get the interpretation here in the

18 room for some reason.

19           MS. CLAIBORN:  I'll ask the question again.

20      Q    Are there any errors or omissions in your

21 statement of financial affairs?

22      A    Up to now I haven't found any errors or

23 omissions.

24      Q    Mr. Kwok, is everything in your statement of

25 financial affairs true and accurate to the best of
```

Ho Wan Kwok - March 21, 2022                              26

1      your knowledge?

2          A     Yes.

3          Q     Mr. Kwok, who assisted you in the

4      preparation of your statement of financial affairs?

5          A     My lawyer, Bill, and my financial advisor,

6      Matt.

7          Q     Mr. Kwok, are you referring to Attorney

8      Baldiga?

9          A     Yes.

10         Q     And what is the name -- the full name of the

11     financial advisor?

12         A     I don't know how to spell it.

13             MR. BALDIGA:  It's Matt Flynn and colleagues

14     at Verdolino and Lowey.  But you could --

15         Q     Mr. Kwok, is that correct?

16         A     I'm afraid I will say it wrong, but I will

17     ask for Mr. -- my lawyer Baldiga to clarify for you.

18         Q     We can move on.

19             MR. BALDIGA:  This is Bill Baldiga.

20             Mr. Kwok simply does not know the full name

21     of Matt Flynn or Matt's colleagues at Verlino and

22     Lowey, but I confirm that he is pointing at Matt

23     Flynn next to him when he answers the question.

24             MS. CLAIBORN:  Thank you.

25         Q     Mr. Kwok, did anyone else help you with your

1    statement of financial affairs?

2       A    No.

3       Q    Mr. Kwok, how long have you lived in the

4    United States?

5       A    Nearly seven years.

6            MR. HARBACH:  This is David Harbach.  I

7    didn't get the translation of the answer.

8            MS. CLAIBORN:  Bin, can you please repeat

9    your translation.

10           THE INTERPRETER:  Nearly 7 years.

11      Q    Mr. Kwok, do you still live at the Taconic

12   Road property in Greenwich?

13      A    Yes.

14      Q    Who owns that property in Greenwich?

15      A    My wife.

16      Q    Your bankruptcy documents refer to a company

17   called Greenwich Land, LLC.  Who owns that company?

18      A    My wife.

19      Q    What is your wife's name?

20      A    (Indiscernible)

21           MS. CLAIBORN:  Bin, could you please

22   translate that for me into a spelling?

23           THE INTERPRETER:  Let me just clarify with

24   him which Chinese characters are, then I can spell

25   it for you.

1      A    My wife's name is read at (indiscernible)

2    but she's from -- she's from Hong Kong.  Their

3    spelling is different from Mainland and I don't know

4    how to spell her name.

5      Q    Mr. Kwok, could you just please spell her

6    last name?

7      A    I don't know how to spell.

8      Q    Does anyone else have a membership interest

9    in Greenwich Land LLC aside from your wife?

10     A    I don't know.

11     Q    When was Greenwich Land LLC formed as a

12   company?

13     A    2020.

14     Q    Mr. Kwok, have you ever been a member of

15   Greenwich Land, LLC?

16     A    No.

17     Q    How much did Greenwich Land, LLC pay for the

18   purchase of the Greenwich property on Taconic Road?

19     A    I don't know specifically but approximately

20   5 million.

21     Q    And how was that purchase funded?

22     A    I don't know.

23     Q    Who would know the answer, Mr. Kwok?

24          THE INTERPRETER:  Sorry?

25     Q    Who would know the answer to that, Mr. Kwok?

1      A    My wife knows.

2           MR. HARBACH:  This is David Harbach and I

3      apologize for the interruption.

4           We missed the translation by the number of

5      that Mr. Kwok said approximately this kind of

6      property would cost.  Could that please be repeated?

7           THE INTERPRETER:  Sorry, the interpreter

8      cannot hear you clearly.

9           MS. CLAIBORN:  Mr. Harbach, I will ask your

10     question again.

11          MR. HARBACH:  Thank you.

12     Q    How much was the Taconic Road property in

13     Greenwich purchased for?

14     A    I don't know clearly but approximately 4

15     million to 5 million.

16     Q    When did Greenwich Land LLC purchase the

17     property on Taconic Road in Greenwich?

18     A    I don't know the specific time.

19     Q    Do you know the year?

20     A    2019 or 2020. I don't remember clearly.

21     (Unintelligible background chatter.)

22          MS. CLAIBORN:  Could whoever is speaking

23     identify themselves?

24          MR. BALDIGA:  Excuse me just for one second.

25     We may have a translation issue.  I'm just going to

1       put you on mute for one second.

2           (Pause.)

3               MR. BALDIGA:  This is Bill Baldiga.  We

4       believe that the answer by Mr. Kwok to the date was

5       2019 or 2020, but the translator may have said 2020

6       without a mention of 2019. I obviously don't know.

7       But that's -- if it matters, you could re-ask to be

8       sure that there's clarity around that?

9           Q    Mr. Kwok, when did Greenwich Land LLC

10      purchase the Taconic Road property in Greenwich?

11          A    Maybe it's 2020 or maybe it's 2019. I don't

12      remember clearly.  I don't know.

13          Q    Mr. Kwok, did you sign any documents in

14      connection with the purchase of the Taconic Road

15      Property in Greenwich?

16          A    No.

17          Q    Mr. Kwok, who lives at the Taconic Road

18      property in Greenwich?

19              THE INTERPRETER:  Sorry?  Who --

20          Q    Who lives at the Taconic Road property in

21      Greenwich?

22          A    My wife and I.  Sometimes my daughter who

23      lives in New York will come back.

24          Q    Mr. Kwok, are you currently employed by

25      anyone?

1            THE INTERPRETER:  Are you what?

2     Q    Are you currently employed by anyone or any

3    company?

4     A    No.

5     Q    Mr. Kwok, have you had any employment or any

6    job with an employer since you started living in the

7    United States?

8     A    I don't remember clearly.  I don't remember

9    clearly but approximately in 2015 at Golden Spring I

10   worked for some time.  After I got part of my wages

11   of salary I left and nothing else.

12    Q    What work did you do for Golden Spring in

13   2015?

14    A    I don't remember quite clearly but it seems

15   it (indiscernible)  I was put in charge of

16   developing (indiscernible)  investors. But I don't

17   remember clearly.

18    Q    Mr. Kwok, when did you stop working for

19   Golden Spring?

20          MR. BALDIGA:  Excuse me just one second. I

21   just want to make sure we -- excuse me for one

22   second. I just want to make sure we don't

23   (indiscernible) translation.  We may.

24     (Pause.)

25          MR. BALDIGA:  Our interpreter believes that

1    the response was that if he had a role at Golden

2    Springs, it was to develop investment opportunities

3    not to develop investors.

4        Q    Mr. Kwok, when did you stop working for

5    Golden Spring?

6        A    I don't remember clearly.

7        Q    Mr. Kwok, when you say Golden Spring, are

8    you referring to the company known as Golden Spring,

9    New York, Limited?

10       A    Yes.

11       Q    Mr. Kwok, did you get paid for any of the

12   work that you for Golden Spring?

13       A    Yes.

14       Q    How much were you paid?

15       A    Approximately 200,000. I don't remember

16   specifically.

17       Q    Mr. Kwok, did you receive a paycheck from

18   your work at Golden Spring?

19       A    I should have but I don't remember clearly

20   specifically.

21       Q    Mr. Kwok, did you put the money that you

22   were paid by Golden Spring into a bank account?

23       A    I should have put it into a credit card

24   account at Morgan Stanley.

25       Q    Mr. Kwok, are you saying that you had a bank

1    account at Morgan Stanley?

2        A    Yes, once I had.

3        Q    Do you still have a bank account at Morgan

4    Stanley?

5        A    No.

6        Q    When did you close your accounts at Morgan

7    Stanley?

8        A    Around April, 2017 when (indiscernible)  the

9    Chinese Communist Party stated chasing me and

10   (indiscernible)  me.  So all my bank accounts were

11   closed.

12           MR. BALDIGA:  Hold on.  There's a

13   mistranslation there.

14      (Pause.)

15           MR. BALDIGA:  The prior misstatement or

16   mistranslation was just the interpretation of the

17   word. But here the entire crux of the answer was

18   left out.  And I'm not sure what happened.

19           MS. CLAIBORN:  Maybe I can ask a different

20   question. We can try again.

21           MR. BALDIGA:  No, I think -- no, I think --

22   the answer -- I'm concerned with the accuracy of the

23   translation because there was specific mention of

24   names that were simply not produced in the answer.

25   And I'll guess, Bin, did you not hear the mention of

1    PACS and Bruno Wu, or was there a sound issue, or

2    what happened?

3        (Interpreter translates)

4            MS. CLAIBORN:  Mr. Kwok, did you --

5            MR. KWOK:  So Bruno Wu, (indiscernible)

6    Airlines and also Chinese Communist party, they all

7    chased me and wanted to kill me.  So I

8    (indiscernible)  -- all my bank accounts were

9    closed.

10           PAC, PACS.  (Indiscernible)  all the people

11   are present today at today's meeting.

12           MR. BALDIGA:  Could we have on the record

13   the entirety of what Mr. Kwok said.  That's a very

14   small part of what he said, obviously.  I don't know

15   what he said but that's much shorter.

16       (Interpreter translates)

17           THE INTERPRETER:  The interpreter is asking

18   him to (indiscernible)  every two names so that I

19   can maintain the integrity of his meaning.

20           MR. KWOK:  At today's meeting there are PAC,

21   one of the major creditors.  And also

22   (indiscernible).  And also (indiscernible)  member.

23   All the money that had to be paid went into an

24   account of the Communist Party under the name of

25   Bruno Wu.  So since that day when all the -- all the

1    representatives of the Chinese Communist party -- so

2    when the chasing and killing started I lost all my

3    bank accounts.

4           MR. HARBACH:  This is David Harbach.  Bin,

5    could you please repeat that?

6           THE INTERPRETER:  Sorry?

7           MR. HARBACH:  This is David Harbach.  You

8    just translated an answer that began with since that

9    day.  Can you please repeat the answer in English?

10          THE INTERPRETER:  Since that day all those

11   people who are representatives of Chinese Communist

12   Party, since that day I lost all my bank accounts.

13   BY MS. CLAIBORN:

14      Q    Mr. Kwok, did you have any money in your

15   Morgan Stanley account when you closed it?

16      A    Yes.

17      Q    And where did you move that money to?

18      A    Nobody bothered looking at me again since

19   the account was closed.

20      Q    Mr. Kwok, my question is where did you move

21   the money to?

22          MR. BALDIGA:  This is Bill Baldiga -- I'm

23   sorry.  This is Bill Baldiga.

24          Could you ask if perhaps you're inferring or

25   implying that he moved it as opposed to something

1    happened to it?  Could you ask it in a more neutral

2    way and you may get a more full answer?

3        Q    Mr. Kwok, did you or someone acting on your

4    behalf close the Morgan Stanley account?

5        A    The Communist Party, Bruno Wu and also the

6    (indiscernible).  It was closed by the Communist

7    party.

8        Q    Mr. Kwok, was the Morgan Stanley account in

9    the United States?

10       A    Yes.

11       Q    Mr. Kwok, how does somebody other than you,

12   or someone acting on your behalf close a bank

13   account in your name?

14            THE INTERPRETER:   He wants me to repeat the

15   question, the interpretation of the question.

16       (Interpreter translates again.)

17       A    It's the core control of the Communist

18   Party, like what's happening today. The same thing.

19   (Indiscernible)  happened on me.

20            MR. BALDIGA:  Ms. Claiborn, could I suggest

21   that you ask whether Morgan Stanley closed the

22   account, just so we could be more efficient here?

23       Q    Mr. Kwok, did you close the account at

24   Morgan Stanley?

25            THE INTERPRETER:  Sorry?

1      Q    Mr. Kwok, did you close the account at

2    Morgan Stanley?

3           THE INTERPRETER:  I'm sorry. I still didn't

4    quite get the question actually.

5      Q    Mr. Kwok, did you personally close the

6    account at Morgan Stanley?

7      A    No.

8      Q    Mr. Kwok, did you ask someone at Morgan

9    Stanley to close your account?

10     A    No.

11     Q    Mr. Kwok, how did you find out that your

12   bank account at Morgan Stanley was closed?

13     A    Morgan Stanley notified me that I was on the

14   wanted list of the Chinese government.  So it was

15   Bruno Wu who was representing (indiscernible)  name

16   on the wanted list so the account was closed.

17     Q    Mr. Kwok, when Morgan Stanley closed the

18   account, what happened to the money in the account?

19          MR. HARBACH:  Ms. Claiborn, this is David

20   Harbach. I'm sorry. I missed the second half of that

21   question.  When Morgan Stanley closed the account

22   and then I lost you.

23     Q    I'll repeat my question.

24          Mr. Kwok, when Morgan Stanley closed the

25   bank account, what happened to the money in the bank

1   account?

2       A    The last thing I know was a Chinese speaking

3   person called me telling me that my account was

4   closed because I was under a wanted list of the

5   Chinese government.  And what happened later on I

6   don't know really.

7       Q    Mr. Kwok, how much money was in the --

8            MR. BALDIGA:  This is Bill Baldiga --

9            MS. CLAIBORN:  Yes, Mr. Baldiga?

10           MR. BALDIGA:  This is Bill Baldiga. I think

11   it would be helpful -- I don't want to interrupt

12   your flow of questions, if we took a break pretty

13   soon.  But if you want to finish this line, certain

14   do that.

15           I also want -- there may be some confusion

16   with the Morgan name and so you may want to ask the

17   witness whether it's, in fact, Morgan Stanley or JP

18   Morgan Chase.

19           MR. KWOK:  Now I remember. I think it was JP

20   Morgan Chase.  I just cannot differentiate. I get

21   confused with Morgan Stanley or JP Morgan Chase.

22       Q    Mr. Kwok, was there only one account at

23   whatever it is you're calling it, be it JP Morgan

24   Chase or Morgan Stanley?

25       A    What I remember is I have this only one

1    account.

2        Q    How much money was in that account

3    approximately when it was closed?

4        A    A few thousand U.S. dollars.

5             MR. HARBACH:  I missed it. Can you repeat

6    the English, please?

7             MS. CLAIBORN:  Bin, can you please repeat

8    the answer?

9        (No response.)

10            MS. CLAIBORN:  Bin, can you please repeat

11   the answer?

12            MR. HARBACH:  This is David Harbach. I

13   missed the translation before the word thousand. I

14   did not hear the number.  Could you please repeat

15   it?

16            THE INTERPRETER:  He said a few thousand

17   U.S. dollars.

18       Q    Mr. Kwok, when you say a few thousand

19   dollars, can you give me an idea of what you mean?

20   Was it under $10,000?

21       A    I don't remember.

22       Q    Mr. Kwok, a few minutes ago you testified

23   that you were working for Golden Spring developing

24   investment opportunities.  Can you explain more?

25            THE INTERPRETER:  Sorry?

 1          MS. CLAIBORN:  I wasn't finished with the

 2     question. I apologize. I'll try again.

 3          Q    Mr. Kwok, a few minutes ago you testified

 4     that you were working for Golden Spring developing

 5     investment opportunities.  Can you please explain

 6     what you mean by that?

 7          A    I don't remember.

 8          Q    When you were working for Golden Spring,

 9     were you working in the United States?

10          A    Yes.

11          Q    When you were working with Golden Spring did

12     you have a job title?

13          A    I don't remember.

14          Q    When you were working for Golden Spring, did

15     you do any other work aside from developing

16     investment opportunities?

17          A    (indiscernible)  Communist Party of China.

18          Q    Can you please explain that?

19          A    Since 2015 up till now I have been spending

20     all my time and my energy on collecting information

21     about corruption and also human rights issues and

22     assassinations of the Community Party.  That's my

23     target and my work.

24          Q    Mr. Kwok, do you currently have any source

25     of income?

1          THE INTERPRETER:  I didn't get you.  Could

2    you please repeat?

3       Q    Mr. Kwok, do you currently have a source of

4    income?

5       A    No.

6       Q    Mr. Kwok, have you filed your tax returns

7    for the year 2021 with the Internal Revenue Service

8    in the United States?

9       A    No.

10      Q    Mr. Kwok, have you filed any tax returns in

11   states for the tax year 2021?

12          THE INTERPRETER:  Sorry?

13      Q    Have you filed any tax returns for any

14   states for the tax year 2021?

15      A    No.

16      Q    What tax returns will you need to file for

17   what states for the year 2021?

18      A    Individual tax file in Connecticut.

19      Q    Will you be filing a tax return for the

20   State of New York for the year 2021?

21      A    No.

22      Q    Mr. Kwok, you previously provided to my

23   office tax returns for the years 2019 and 2020.  Are

24   those tax returns the same as the tax returns you

25   filed with the Internal Revenue Service in the State

1    of New York?

2              THE INTERPRETER:  Sorry, the date of what?

3              MS. CLAIBORN:  2019 and 2020.

4              THE INTERPRETER:  Yes, I got that.  What's

5    the later part?

6              MS. CLAIBORN:  The State of New York.

7         A    No, I filed them in Connecticut, 2020.

8         Q    Mr. Kwok --

9         A    I in (indiscernible)  for 2019 and 2020.

10   2020 I filed in Connecticut.

11             MR. BALDIGA:  Holley, can we take a break

12   soon?

13             MS. CLAIBORN:  Unfortunately, I'm going to

14   suggest that we can't really take a break because we

15   only have the interpreter until 2:00.  So if we do,

16   it needs to be a very, very short one.

17             MR. BALDIGA:  Okay. Five minutes?

18             MS. CLAIBORN:  Yeah, let me just ask one

19   question before we do that.

20        Q    Mr. Kwok, please confirm that the tax

21   returns that you provided to the United States

22   Trustee for the year 2020 and 2019 were the same as

23   those filed with the taxing authorities?

24             THE INTERPRETER:  The what?  Sorry, the last

25   word.

1          MS. CLAIBORN:  Authorities.

2     Q    Yes --

3          THE INTERPRETER:  Could you please repeat?

4     Sorry.

5     Q    Mr. Kwok, can you please confirm that the

6     tax returns that you provided to the Office of the

7     United States Trustee for the tax years 2019 and

8     2020 are the same as those that you provided to the

9     Internal Revenue Service and to the State of

10    Connecticut and to the State of New York?

11    A    Yes.

12    Q    Mr. Kwok, in your 2020 tax return --

13         MR. BALDIGA:  I want to clarify.  As you

14    know, there were very limited redactions as to

15    Social Security number and maybe a couple of data

16    points. I'm not sure if the witness knows what we

17    did by way of that data protection, but you do. I

18    just wanted to not leave the record ambiguous in

19    that regard.

20         MS. CLAIBORN:  Thank you.

21    Q    Mr. Kwok, your 2020 tax return reports

22    interest income only and no other source of income.

23    Did you have any other source of income in 2020?

24    A    No.

25         MS. CLAIBORN:  Okay. I'm going to take a

1    very short break. It is now 12:30. I would like

2    everyone to reconvene at 12:35. I'm not going to

3    disconnect the call.  I'm just going ask you to all

4    put your phones on hold.

5          We will reconvene at 12:35.  Thank you.

6       (Off the record.)

7          MS. CLAIBORN:  Okay.  We are back on the

8    record after a short break.

9       Q    Mr. Kwok, I would like to talk to you about

10   Golden Spring, New York.

11         Do you currently work for Golden Spring in

12   any capacity?

13      A    No.

14      Q    When was Golden Spring New York Limited

15   formed?

16         THE INTERPRETER:  Sorry?

17      Q    When was Golden Spring New York Limited

18   formed?

19         THE INTERPRETER:  Sorry, I cannot get the

20   later half.  Golden New York what?

21         MS. CLAIBORN:  I'm going to actually just

22   refer to it as Golden Spring.  When I do that I'm

23   referring to Golden Spring New York.

24      Q    When was Golden Spring formed as a company?

25      A    I don't know.

1      Q     The address on the petition is 162 East 64th

2    Street.  Who owns that property?

3            I can ask the question again.

4            The address for Golden Spring is listed as

5    162 East 64th Street in New York.  Who owns that

6    property?

7      A     I don't know.

8      Q     What is the nature of that property at 162

9    East 64th Street?

10     A     I don't know which property you're talking

11   about.

12     Q     The office of Golden Spring --

13           MR. BALDIGA:  I'm not sure that was --

14           MS. CLAIBORN:  Let me just try again.

15           The office of --

16           MR. BALDIGA:  There's a translation issue.

17           Could we confer for one second because

18   obviously there's a misunderstanding.  So could Mr.

19   Kwok talk to his translator because that obviously

20   didn't come through.

21           MS. CLAIBORN:  Let me just -- I would prefer

22   if I try again.  Let me try again, please.

23     Q     The address for Golden Spring on the

24   bankruptcy petition is listed as 162 East 64th

25   Street in New York.

1          THE INTERPRETER:  Is it 54 or 64?  5-4 or 6-

2    4?

3          MS. CLAIBORN:  64.

4          THE INTERPRETER: So maybe because of the

5    phone I mistook the 6 as 5 so let me correct my

6    mistake and reinterpret again.

7      A    Yes, that's the address of Golden Spring.

8      Q    Does Golden Spring own that building that's

9    located at that address?

10     A    I don't know.

11     Q    Have you ever been to that address?

12     A    Yes.

13     Q    What type of building is it?  What's located

14   there?

15     A    It was a building.

16     Q    Is the building a residential building or a

17   commercial building?

18     A    Business building.

19         MS. CLAIBORN:  I'm sorry, Bin. I didn't hear

20   your translation.

21         THE INTERPRETER:  A commercial building or

22   business building.

23     Q    Does anyone live at that address?

24     A    I don't know.

25     Q    What type of business does Golden Spring do?

1          A     It's a big family business my son works, but

2     I don't know specifically what categories of

3     business it has.

4          Q     Mr. Kwok, when you used the term --

5          A     It is a family office owned by my son.  He

6     has other businesses, but I don't know.

7          Q     Mr. Kwok, when you use the term family

8     business or family office, what do you mean by those

9     terms?

10          A     It's mainly for the whole family, all the

11    family members.  When there is something we

12    (indiscernible)  and help each other.

13          Q     Mr. Kwok, can you explain it in more detail?

14          A     I don't know how to explain.

15          Q     Does Golden Spring have any employees?

16          A     Yes.

17          Q     How many?

18          A     I don't know.

19          Q     Does Golden Spring own any real estate?

20          A     I don't know.

21          Q     Does Golden Spring own any other business?

22          A     I don't know.

23          Q     Does Golden Spring have any bank accounts?

24          A     I don't know.

25          Q     Mr. Kwok, you have previously said in

1    documents filed with the bankruptcy court that

2    Golden Spring pays for you personal living expenses.

3    Can you please explain how they do that?

4         A    I don't know what you mean by they pay me.

5    In what regard?

6         Q    Mr. Kwok, you have previously told the court

7    in your bankruptcy documents that Golden Spring pays

8    for your clothing, your food and your housing.

9              My question is how do they do that?  Do they

10   give you money?  Do they pay other people directly?

11   How does it work?

12        A    Whenever I need any expenses for my basic

13   living I talk to my son and he will tell his office

14   to give to me.

15        Q    Who are the owners of Golden Spring?

16             MR. HARBACH:  This is David Harbach. I

17   missed the end of that question. I talk to my son

18   and he -- that answer.  I heard I talk to my son and

19   he and then I lost it.  Can I please have the

20   English again?

21             THE INTERPRETER:  Sorry, I didn't hear the

22   gentleman?

23             MS. CLAIBORN:  Mr. Harbach is asking Bin if

24   you could repeat the translation of Mr. Kwok's

25   answer about how the money flows from Golden Spring.

1              THE INTERPRETER: I'll repeat the

2      interpretation.

3              When I need expenses for my basic living I

4      tell my son.  My son will tell the office to take --

5         Q    Mr. Kwok, who are the owners of Golden

6      Spring?

7         A    My son.

8         Q    Are there any owners of Golden Spring other

9      than your son?

10        A    No.

11        Q    Mr. Kwok, have you ever owned an interest in

12     Golden Spring?

13        A    No.

14        Q    Who are the officers and directors of Golden

15     Spring?

16             MR. BALDIGA:  This is Bill Baldiga.

17             This is something for which there are very

18     serious physical security concerns and it's not that

19     the debtor would refuse to answer, if he knows.  But

20     not on a line like this where it's open to the

21     public and who else knows.  There are -- hold on.

22             Can I just confer with the witness because

23     we'd like to give you as much as possible, but we

24     don't want to cause severe security issues.

25             So could I just have one minute to confer

 1    with the witness?

 2            MS. CLAIBORN:  Yes.

 3         (Pause.)

 4            MR. BALDIGA:  This is Bill Baldiga, again.

 5            The witness believes that he may know who

 6    the directors and officers are and is prepared to

 7    testify as to the best of his knowledge in that

 8    regard.  And if we could take it one question at a

 9    time we'll go from there.

10            If you could interpret that, because I want

11    to be sure that the witness understands what I just

12    said as well, please.

13            (Interpretation)

14    BY MS. CLAIBORN:

15      Q    Mr. Kwok, as of today, who are the officers

16    of Golden Spring?

17      A    (Indiscernible)

18      Q    I'm going to repeat that name so everyone

19    understands what I thought I heard.  What I heard

20    was Yan Ping, also known as Yvonne Wang.  Is that

21    accurate?

22      A    Yes.

23      Q    Is Yvonne Wang the only officer of Golden

24    Spring?

25      A    I don't know.

Ho Wan Kwok - March 21, 2022                                         51

1     Q    As of today, who are the directors of Golden

2   Spring?

3     A    I don't know.

4     Q    Mr. Kwok, have you ever been an officer or a

5   direct or Golden Spring?

6     A    I don't remember.

7     Q    Mr. Kwok, who is Max Krazner?

8     A    I don't know. I don't know.

9          THE INTERPRETER:  Could you please repeat

10  the name again?

11    Q    Mr. Kwok, who is Max Krazner?

12     (No response)

13         Mr. Kwok, can you please answer?

14         MR. BALDIGA:  I'm conferring with the

15  witness for one second.  Hold on please?

16         MS. CLAIBORN:  Mr. Baldiga, I would rather

17  he would answer the question before you make a

18  confer.

19     (Pause.)

20         MR. BALDIGA:  Thank you for that

21  opportunity.  The witness could answer.

22    A    He has to double check with you because I

23  cannot read and cannot remember English names well.

24  So just the name, you said Max.  If it's the name

25  Max only I know Max.  But if you add another name to

1    it, I'm not sure. I don't know.

2         Q    Do you know a Max with respect to Golden

3    Spring?

4         A    Yes. I know.

5         Q    And what is Max's role with Golden Spring?

6         A    I don't know.

7         Q    Well, how do you know Max?

8         A    I don't remember.

9         Q    Do you know more than one person by the name

10   of Max?

11        A    For me English name is very complicated.

12   Like I can't remember the last name of my lawyer. If

13   you add something else to Max, I don't know.

14        Q    Mr. Kwok, the name Max Krazner is listed as

15   the person to whom the mail for Golden Spring is

16   directed to.  Do you know why that is?

17             THE INTERPRETER:  Sorry?

18        Q    Do you know why that is?

19        A    I only remember there is a Max at Golden

20   Spring. I only know this one thing.

21        Q    And what is Max's job at Golden Spring?

22        A    I'm not sure what role.  I (indiscernible)

23   know he is in charge of finance, but I'm not sure.

24        Q    What does he do for Golden Spring with

25   respect to finances?

1          A     I was not involved in the management so I

2    don't know.

3          Q     If Golden Spring gives you money, does it

4    come through Max Krazner's efforts?  Does he help

5    make that happen?

6          A     I don't know.  He didn't give me money in

7    person.

8          Q     Mr. Kwok, when you get money from Golden

9    Spring how do you get money?  Does it come in the

10   form of cash or something else?

11         A     From my son and (indiscernible).

12               MS. CLAIBORN:  I'm sorry, Bin.  I didn't

13   understand your translation.  Can you try that

14   again?

15               THE INTERPRETER:  He said from my son and

16   (indiscernible).

17         Q     My question was how do you get money from

18   your son?  Does it come in the form of cash or some

19   other form?

20         A     I don't understand what you mean by how, the

21   word how.  I never get money directly from them.

22         Q     If you don't get money directly from your

23   son, how do you get the money from your son?  Where

24   does it go?

25         A     I don't use cash and I don't use credit

1    cards.  My son and (indiscernible)  Wan they just

2    pay my expenses for me.  It's impossible for me to

3    get any cash from them. And also I don't have bank

4    account.  Any bank accounts.

5        Q    Mr. Kwok, do you have access to a credit

6    card that was taken out by Golden Spring?

7            MR. BALDIGA:  This is Bill Baldiga. I'm

8    sorry.  I think there was a translation issue with

9    the prior question.  Could you give us a minute to

10   be sure that the witness understood the question

11   correctly?  Hold on for one second.  We're going to

12   put it on mute.

13       (Pause.)

14           MR. BALDIGA:  The witness would like to

15   clarify. I think it came through, but we're not

16   sure, that Golden Spring does not give him cash, but

17   simply pays certain bills for his living expenses.

18   If that's what came through the translation, great.

19   If not, we clarify accordingly.

20       Q    Mr. Kwok, do you have access to a credit

21   card or a debit card provided to you by or through

22   Golden Spring?

23       A    No.

24       Q    Mr. Kwok, are you obligated to pay Golden

25   Spring back for the monies that it pays on your

1    behalf for your living expenses?

2        A    No.  No need.

3            MS. CLAIBORN:  At this time I'd like to open

4    the meeting to creditors, given that we have a

5    limited amount of time for today. I am not done with

6    all my questions.

7            We will need to reconvene on another day,

8    but for purposes of today's examination I'm now

9    going to open it up to creditors who may wish to

10   examine.

11           I would ask that you identify yourself when

12   you speak and to be mindful of the need for

13   interpretation.

14           MR. BALDIGA:  Just to clarify one thing for

15   the record.  You asked previously -- you referred to

16   the petition and asked whether anyone lived at 162

17   East 64th Street.

18           And as we told you informally when we filed

19   the petition there was great concern over the

20   debtor's physical security and so he used that

21   address, but has since, obviously, corrected the

22   record that he lives in the Greenwich house that you

23   asked about earlier today.

24           And so I just didn't want the record to be

25   confusing in that regard.  Thank you.

```
1          MS. CLAIBORN:  Are there any creditors who

2    wish to inquire or examine of the debtor?

3          MR. HARBACH:  Yes.  This is David Harbach

4    for PACS.  We do have some questions. We do have

5    some questions.  We can start asking the questions

6    now or if there are others who would like to ask

7    questions that's fine.  However you want to proceed.

8    But we obviously will not finish before 2 o'clock

9    either.

10          THE INTERPRETER:  I cannot hear you clearly.

11          MR. HARBACH:  This is David Harbach for PACS

12    and I was just saying that we do have some questions

13    and we are happy to proceed and ask them or if the

14    trustee would like. we can proceed with others

15    asking questions but we will certainly not finish

16    before 2 o'clock either.

17          MR. BALDIGA:  Could that be translated

18    please?

19          THE INTERPRETER:  I was saying I could not

20    get him completely.

21          MS. CLAIBORN:  Mr. Harbach, do you have the

22    ability to pick up a hand held and speak into a hand

23    held device, as opposed to a speaker phone?

24          MR. HARBACH:  Not at this moment, but let me

25    move to see if this is any better.  Can you hear me
```

1    a little better now?

2              THE INTERPRETER:  Not really.  No, sorry.

3              MR. HARBACH:  Not really.  Well, I'll tell

4    you what.  If you give me -- take a moment, I can

5    try dialing in with a phone.  Just give me a second,

6    okay?

7              MS. CLAIBORN:  Yes.

8              MR. BALDIGA:  Bin, could you translate the

9    dialogue for Mr. Kwok, please, so he knows that.

10        (Interpreter translates)

11             MR. HARBACH:  Hello?

12             MS. CLAIBORN:  Hello.  This is Holley

13   Claiborn.

14             MR. HARBACH:  This is David Harbach and I

15   just wanted to know if you could hear me better.

16             MS. CLAIBORN:  Much better.  Bin, can you

17   hear Mr. Harbach?

18             THE INTERPRETER:  Yes, I can hear him now.

19   Thank you.

20             MS. CLAIBORN:  Go ahead, Mr. Harbach.

21             MR. HARBACH:  I'll repeat what I said once

22   more so that the interpreter can interpret it.

23             I'm David Harbach and I was just saying that

24   PACS does have some questions we would like to ask,

25   but we certainly will not finish by 2 o'clock and so

1    if Ms. Claiborn would like to proceed with giving

2    other creditors an opportunity to ask questions

3    today, it's entirely up to her or we can start now.

4            MR. BALDIGA:  And this is Bill Baldiga. We

5    extended our own translator until 2 o'clock so we

6    certainly encourage whoever wants to ask questions

7    to use the time.

8            MR. WOLMAN:  This is Jay Wolman. I'm happy

9    to ask some questions now.

10           THE INTERPRETER:  Sorry, I didn't get your

11   name.

12           MR. WOLMAN: Jay Wolman, and I represent

13   Logan Chang.

14   EXAMINATION BY MR. WOLMAN:

15       Q    Good afternoon, Mr. Kwok.

16            Do you remember that I took your deposition

17   about a year ago?

18       A    I have too many --

19            THE INTERPRETER:  Someone's always talking

20   in the background.

21       A    I have too many depositions.  I don't

22   remember specifically.

23       Q    That's all right. I asked you a number of

24   questions and you invoked your rights under the

25   Fifth Amendment of the U.S. Constitution.  Do you

1    understand that?

2           THE INTERPRETER:  You and your wife what?

3    Sorry.

4      Q    You invoked your right under the Fifth

5    Amendment of the U.S. Constitution.  Do you remember

6    that?

7           MR. BALDIGA:  We have a translation issue.

8    Hold on for one second, please.

9      (Pause.)

10          MR. BALDIGA:  I think -- our interpreter is

11   hearing this translation.  The question as we

12   understand is do you remember having invoked the

13   Fifth Amendment privilege at a prior deposition.

14   That's what we are hearing.  Could that be

15   interpreter for Mr. Kwok in that way please?

16          THE INTERPRETER:  Sorry, I can I hear the

17   question again.

18          MR. WOLMAN:  Sure.

19     Q    Do you remember at a prior deposition

20   invoking the Fifth Amendment of the U.S.

21   Constitution?

22          THE INTERPRETER:  Sorry, I did not hear you

23   clearly.

24     Q    Do you remember at a prior deposition

25   invoking the Fifth Amendment of the U.S.

1    Constitution?

2          THE INTERPRETER:  At a prior what?  Sorry.

3          MR. WOLMAN:  Deposition.  D-E-P-O-S-I-T-I-O-

4    N.

5          THE INTERPRETER:  Deposition.  Sorry, just

6    one sec.

7          (Pause.)

8          THE INTERPRETER:  Okay.  In the prior

9    deposition what?

10    Q    Do you remember invoking your Fifth

11    Amendment rights?

12          THE INTERPRETER:  Invoking what?

13          MR. WOLMAN:  Can everybody else hear me or

14    is it just the interpreter?

15          MS. CLAIBORN:  This is Holley. I can hear

16    you.

17          MR. HARBACH:  This is David Harbach.  We can

18    hear you fine.

19          MR. BALDIGA:  The debtor can hear you.  It's

20    not a volume issue.

21          MR. WOLMAN:  Is it a diction issue?  I can

22    try to --

23          THE INTERPRETER:  The interpreter just

24    didn't get the word.  (Indiscernible)  rewording.

25          MR. WOLMAN:  I cannot reword that. I need

1    you to hear the words in English and translate them,

2    ma'am.

3              THE INTERPRETER:  Okay.  Could you please

4    speak slowly?

5         Q    Do you remember at a prior deposition

6    invoking your rights under the Fifth, number five

7    that is -- Fifth Amendment, ordinal number -- of the

8    U.S. Constitution?

9              THE INTERPRETER:  Invoke or evoke?

10             MR. WOLMAN:  Invoke, I-N-V-O-K-E.

11             Okay, we still have an issue.

12             UNIDENTIFIED:  Hold on.

13             UNIDENTIFIED:  Did someone just drop out?

14             MS. CLAIBORN:  Bin, are you there?  This is

15   Holley.

16             MR. WOLMAN:  Bin?

17             MS. CLAIBORN:  Bin, are you there?

18             THE INTERPRETER:  Hello.

19             MS. CLAIBORN:  Bin, this is Holley Claiborn.

20             THE INTERPRETER:  Okay. I'm back.

21             MS. CLAIBORN:  Okay.

22             THE INTERPRETER:  I don't know what

23   happened.

24             MS. CLAIBORN:  Go ahead.

25             MR. BALDIGA:  Is the interpreter -- we're

```
 1    not sure what's going on.  Is the interpreter with

 2    us or not?

 3            THE INTERPRETER:  Yes, the interpreter is

 4    here now.

 5            MR. BALDIGA:  Okay.  Thank you.

 6            My client just said something and I don't

 7    know what he said and I don't know whether you were

 8    on for what he said.  If you were, I'd like to know

 9    -- I'd like you to interpret it.  If not, could you

10    let us confer for a second so we could try to figure

11    that out, because there was a lot of confusion.

12            MR. WOLMAN:  Bill, can you just ask your

13    client to repeat what he just said?

14            MR. BALDIGA:  No --

15            THE INTERPRETER:  The interpreter would like

16    him to repeat what he said because just now all of a

17    sudden I'm not (indiscernible)  all the voices

18    sometimes.

19            I'm asking the gentleman to repeat what he

20    said just now.

21            MR. KWOK: Just now in your question you

22    mentioned that -- you asked me whether my wife used

23    something under the law or under the Constitution.

24    I don't remember that.

25            MR. WOLMAN: I said nothing about his wife.
```

1          MR. KWOK:  So did you say just now my wife

2     use any kind of law or what?

3          MR. WOLMAN:  No, that was nothing of the

4     sort.

5          MR. BALDIGA:  Could I suggest, Mr. Wolman,

6     maybe you could just go right to whatever you want

7     to ask him instead of what happened a year ago

8     because this is not getting anywhere.

9          MR. WOLMAN:  Well, I'm going to re-ask him

10    every question relative to finances where he invoked

11    the Fifth and I wanted to make sure he had that in

12    his mind as he answers here today.

13         MR. BALDIGA:  Is there a question?

14         MR. WOLMAN:  I want to make sure you're

15    aware of what I'm about to do.

16         At this point, I have no idea, but I am

17    representing to you that is exactly what I'm doing.

18    So I want to make sure your client is appropriately

19    advised.

20    BY MR. WOLMAN:

21    Q    So a year ago -- this is a lengthy one, Bin,

22    so please just write it down, or do what you need to

23    do. Let me finish and then translate.  Do not do

24    that piecemeal.

25         THE INTERPRETER:  Okay.

```
 1                 MR. BALDIGA:  I --

 2                 MR. WOLMAN:  Hold on. I want the translation

 3      of that and we'll take this in small pieces.  So

 4      Bin, please translate that for the witness because

 5      he has to hear everything.

 6         (Translation.)

 7                 THE INTERPRETER:   Yes.

 8                 MR. WOLMAN:   Thank you.

 9      BY MR. WOLMAN:

10         Q    A year ago I asked you are you employed.

11      You answered I have always been --

12                 THE INTERPRETER:  I asked you what? Sorry.

13         Q    Are you employed?

14                 There's a lot of background noise.  Can we

15      knock that off, please.

16                 A year ago I asked you are you employed?

17                 THE INTERPRETER:  You employed?

18         Q    A year ago I asked you are you employed?

19      Your answer was I have always been a consultant for

20      --

21                 THE INTERPRETER:  Sorry.  A year ago I asked

22      you are you employed?  The answer is what?

23         Q    I have always been the consultant for a lot

24      of companies --

25                 THE INTERPRETER:  I'm sorry --
```

1       Q     And my current employment is the -- I am in

2    the broadcasting and to take down the Chinese

3    Communist Party.  It is a broadcasting revolution.  I

4    then asked you how much do you get paid for that.

5             I'm re-asking that question now.  How much

6    do you get paid for that?

7             THE INTERPRETER:  So I have to do it from

8    the beginning because I didn't get the words when

9    you say a year ago I asked you whether -- are you

10   employed?  Your answer is I didn't get the word

11   after is.

12      Q     Your answer was I always been the consultant

13   for a lot of companies and my current employment is

14   the -- he paused.  I am in the broadcasting --

15            THE INTERPRETER:  Is what?  Sorry?

16      Q     -- and to take down --

17            THE INTERPRETER:  Sorry.

18      Q     I am in the broadcasting and to take down

19   the Chinese Communist Party.  It is a broadcasting

20   revolution.  I then asked you how much do you get --

21            THE INTERPRETER:  Excuse me. I'm not able to

22   --

23            MR. WOLMAN:  Excuse me. I'm not done.  Why

24   not?

25            THE INTERPRETER:  I tried to clarify --

1          MR. WOLMAN:  Why not?

2          THE INTERPRETER:  -- the words that I didn't

3     get.  Yes, I know it's simple but it's too long.  I

4     (indiscernible)  such a long time to do the

5     interpretation. I'm highly concentrating. I have a

6     human brain.

7          MR. WOLMAN:  I'm used to translators writing

8     things down as they go.

9          THE INTERPRETER:  Sorry about that.

10         Let me interpret what I got and then I will

11    ask you the rest.  Is that okay?

12         MR. WOLMAN:  Yes.

13         THE INTERPRETER:  Okay.

14      (Translation)

15         THE INTERPRETER:  Okay.  I --

16    Q    I then asked you how much do you get paid

17    for that and I am asking you now again, because you

18    invoked the Fifth, how much do you get paid for

19    that?

20      (Pause.)

21         MR. BALDIGA:  Okay. The witness is

22    struggling to -- well, is the question are you

23    getting paid for that?  And you can answer that.

24         MR. WOLMAN:  No.  I am literally asking him

25    how much do you get paid for that. He took the

1    Fifth. I'm asking it now again.

2         Q     How much do you get paid for that?

3         A     No money at all.

4         Q     A year ago I asked you what is Golden Spring

5    New York.  You answered it's a company. I then asked

6    you and what is your -- I then asked you and what is

7    your relationship to that company and so I'm asking

8    that question again.  What is your relationship to

9    that company?

10        A     I don't know what you mean by relationship.

11        Q     If you didn't know what I meant by that

12   question, why did you invoke the Fifth last year?

13        MR. BALDIGA:  Objection.  I'm not going to

14   allow the witness to describe the legal advice a

15   year ago as to the Fifth Amendment.

16        He is prepared to answer whatever questions

17   you may have. You are confusing the witness a bit by

18   in each question having three things, some reference

19   to the Fifth Amendment, some conversation from a

20   year ago and a question as to now.

21        But if you were to ask a more simple

22   question, I think this would go much more

23   productively.  That's your choice.

24        MR. WOLMAN:  No.  Your client is an

25   intelligent person who is a big businessman, who is

1    a sophisticated person. I trust he can handle these

2    simple questions.

3          MR. BALDIGA:  Proceed as you'd like.

4       (Translation interrupted)

5       Q    Last year I asked you --

6          MR. BALDIGA:  Wait.  Hold on.  Mr. Wolman,

7    there's a translation that needs to be done.  Please

8    hold on.  The witness needs to understand what's

9    being said.

10      (Translation)

11          THE INTERPRETER:  Okay.  Go ahead.

12      Q    What is your relationship to Golden Spring?

13      A    I don't understand what you mean by your

14   question?  I don't know how to answer your question.

15      Q    Do you know what the word relationship

16   means?

17      A    Relationship means love of things in China.

18   It could be between husband and wife. It could be

19   between a government relationship, a financial

20   relationship, money and it could be a lot of things.

21   So I don't know which one you mean?  Is it a

22   man/woman relationship or a money relationship or

23   what?

24      Q    Any relationship?  What is it? What is your

25   (indiscernible)  --

1          THE INTERPRETER:  Sorry?  What was your last

2     sentence again, because there was talking.

3     Q     Any relationship, what is yours to Golden

4     Spring?

5          THE INTERPRETER:  Let me do the

6     interpretation first.

7     A     Now the relationship is between -- is he

8     lends me money. I owe money to him.  He helps me.

9     Q     And why does he do this?

10    A     Because I was once a member of the Guo (ph)

11    family.

12         MR. HARBACH:  This is David Harbach.  Could

13    you please repeat that English answer?

14         THE INTERPRETER:  Because I was once a

15    member of Guo family.

16    Q     Does Golden Spring pay the expenses of any

17    other member of the Guo family?

18    A     Yes.

19    Q     Which other members of the Guo family?

20    A     I don't know.

21    Q     A year ago I asked you why does Golden

22    Spring pay Mr. Podhaskie, P-O-D-H-A-S-K-I-E, for

23    services rendered to you in your individual

24    capacity. I'm asking that again now.  Why does

25    Golden Spring pay Mr. Podhaskie for services

1    rendered to you in your individual capacity?

2           MR. BALDIGA:  This is Bill Baldiga. I

3    understand that Mr. Podhaskie may be a lawyer. I

4    just need to confer with the client to make sure he

5    doesn't disclose the substance of legal advice. I'll

6    take one second to do that.

7           MR. WOLMAN:  The question didn't indicate

8    any answer of that sort.

9       (Pause.)

10          MR. BALDIGA:  I'm sorry. The witness could

11   answer the question.

12          MR. KWOK:  I don't know.

13   Q    Have you ever asked anyone why they pay for

14   him to advise you?

15   A    I don't remember.

16   Q    I asked you last year why did Golden Spring

17   New York pay that judgment on your behalf, and I was

18   referring to the one my client, Mr. Cheng, held

19   against you.

20          I'm asking you again why did Golden Spring

21   New York pay that judgment on your behalf?

22   A    It was money lended.

23   Q    Why did Golden Spring loan you that money?

24   A    I don't have any thing so I borrowed from

25   them.

1      Q      Where did Golden Spring get the money from?

2      A      I don't know.

3      Q      Where does Golden Spring get any money from?

4      A      I don't know.

5      Q      Your son owns Golden Spring, correct?

6      A      Yes.

7      Q      Does your son owe you any money?

8      A      No.

9      Q      How did your son get the money that funds

10     Golden Spring?

11     A      I don't know.

12     Q      Did you ever provide your son with any seed

13     capital?

14     A      No.

15     Q      Have you ever invested in any of your son's

16     businesses?

17     A      No.

18     Q      When did Connecticut become your residence?

19     A      End of February or early March of 2020.

20     Q      Okay.  And you're sure about that here?

21     A      Yes.

22     Q      And was that your primary residence since

23     February, 2020 or March, 2020?

24     A      Yes.

25     Q      A year ago I asked you if you owned any

1    interest in Golden Spring New York. I am asking you

2    that again.  Do you own any interest in Golden

3    Spring New York?

4        A    No.

5        Q    A year ago I asked you are you an officer of

6    Golden Spring New York Limited. I'm asking you

7    again.  Are you an officer of Golden Spring New York

8    Limited?

9        A    No.

10        Q    A year ago I asked you why would Golden

11   Spring pay Attorney Aaron, meaning Aaron Mitchell,

12   on your behalf.

13            I'm asking you again, why would Golden

14   Spring pay Attorney Aaron Mitchell on your behalf?

15            THE INTERPRETER:  He wants me to repeat the

16   interpretation.  I'll do that for him.

17        A    A loan.  A loan or borrowed money.

18        Q    Why did they make you that loan?

19        A    I have been borrowing from them all the time

20   because I was a member of the family.

21        Q    Did you ever have any of your loans from

22   Golden Spring put in writing?

23        A    Some have, some no.

24        Q    Okay.  Which ones have been put in writing?

25        A    I don't remember.

1     Q     How many loans have you had from Golden

2   Spring?

3     A     I don't remember.

4     Q     Were any of the loans that were put in

5   writing in English?

6     A     I don't remember.

7     Q     Were any of them in Chinese?

8     A     I don't remember.

9     Q     Did you ever pledge any security interest in

10   exchange for any of these loans?

11     A     (Indiscernible)  but I don't remember

12   (indiscernible).

13          MR. BALDIGA:  Could you please repeat the

14   answer in English?

15          THE INTERPRETER:  He said (indiscernible)

16   yes, but I don't remember.

17     Q     If you don't remember how much -- if you

18   don't remember how many loans you took out, how are

19   you able to identify how much they -- you owe them

20   on your bankruptcy schedules?

21     A     I didn't quite get you.

22     Q     If you don't know how many times you took

23   out loans from Golden Spring, not all of which were

24   in writing, how do you know how much you owe them?

25     A     My lawyer and the lawyer of Golden Spring

1    they communicate with each other.  Tells me the

2    amount they can define is 21 million.

3         Q    So Golden Spring's lawyers helped prepare

4    your bankruptcy petition?  Is that correct?

5              MR. BALDIGA:  I'm sorry to interrupt.

6    (Indiscernible)  two things.

7         A    No.

8         Q    So how did the information get from Golden

9    Spring to your bankruptcy petition?

10             MR. BALDIGA:  Objection to the question.

11             THE INTERPRETER:  Sorry?

12             MR. BALDIGA:  I object to the question.

13             MR. WOLMAN: I'm just trying to figure out

14   how this information he doesn't know wound up in his

15   bankruptcy petition?

16             MR. BALDIGA:  I think you heard the answer

17   that his lawyer and Golden Spring's lawyer discussed

18   it.  Do you have another question?

19        Q    Yes.  How did you know that number was

20   right?

21             MR. BALDIGA:  Okay.  Let the interpreter go

22   first and then ask another question, please.

23             THE INTERPRETER:  Okay.  Go ahead.

24        Q    How did you know that number was right?

25             THE INTERPRETER:  Sorry?  Number of what?

1      Q     The number that was put into your bankruptcy

2   petition for what you purportedly owe to Golden

3   Spring, how did you know that was right?

4      A     I believe the professionalism of my lawyers.

5   They will review and check all the figures.

6            MS. CLAIBORN:  This is Holley --

7      Q     Do you know the documents that were

8   reviewed?

9            MS. CLAIBORN:  I apologize for interrupting.

10           MR. BALDIGA:  It's now 2 o'clock.

11           MS. CLAIBORN:  I apologize for interrupting.

12   It's Holley Claiborn.

13           MR. WOLMAN:  Yes, thank you for

14   filibustering to use up the time.  Appreciate it.

15           MR. BALDIGA:  I'm sorry. Who was that

16   addressed to?  That's quite an inappropriate

17   comment.

18           MR. WOLMAN:  You. That was me addressing

19   that to you.

20           MS. CLAIBORN:  I'd like to talk about --

21           MR. BALDIGA:  Okay --

22           MS. CLAIBORN:  -- the next date.  I was

23   going to suggest that we reconvene April 4th at

24   10:00 a.m. in person at the U.S. Trustee's Office in

25   New Haven.

```
 1              Mr. BALDIGA:  We'll look at schedules. I can

 2     start to do that if you give me a second.

 3              MS. CLAIBORN:  Bin, could you please

 4     translate that?

 5              THE INTERPRETER:  I will double check with

 6     you whether you still need me on the line for a

 7     second or you want me to log off?

 8              MS. CLAIBORN:  If you can continue on just

 9     for a second.  We need to pick a new date, so I need

10     you to translate that so the debtor understands.

11              THE INTERPRETER:  Okay.

12              MR. BALDIGA:  I'm sorry.  Was the request --

13     I'm sorry.  Was the request -- I'm just trying to

14     make sure I heard it -- April 4 at 10 o'clock in

15     Bridgeport?

16              MS. CLAIBORN:  April 4, 10 o'clock in New

17     Haven at the U.S. Trustee's Office.

18              MR. BALDIGA:  Okay.  We'll be back to you

19     very quick on that.

20              MS. CLAIBORN:  I actually need an answer on

21     that right now because we need to be able to notify

22     creditors and I want everyone to know before we

23     conclude today.

24              MR. BALDIGA:  Okay. I'll put you on hold.

25              MR. HARBACH:  Ms. Claiborn, this is David
```

1    Harbach.  I'm afraid that that day will not work for

2    us?

3            MS. CLAIBORN:  Mr. Harbach, is that you?

4            MR. HARBACH:  Yes, ma'am.  And I was just

5    about to say that I can do Wednesday, the 6th, or

6    any day after that.  But I cannot do the 4th or the

7    5th.

8            MS. CLAIBORN:  How about Friday, April 8th?

9            MR. HARBACH:  I can do that.  This is David.

10   I can do that.

11           MR. WOLMAN:  This is Jay Wolman.  I can do

12   that.

13           MS. CLAIBORN:  Attorney Baldiga, can you

14   check on April 8th, please?

15      (Pause.)

16           MR. HARBACH:  Holley, this is Dave Harbach

17   again.  Just anticipating that they're coming back

18   (indiscernible).  I could also do it (indiscernible)

19   for whatever it's worth.  I could also do it on the

20   28th, 29 or 30 of March as well, if that's better.

21           MR. BALDIGA:  This is Bill Baldiga.  The 7th

22   and 8th are Buddhist holidays so for religious

23   reasons Mr. Kwok can't do it those days.  We'll

24   clear the 4th. I'm sure there are some

25   (indiscernible). I'm wondering who could make it.

1          MS. CLAIBORN:  How about March 28th, next

2    Monday?

3          MR. HARBACH:  Holley, I didn't get the

4    second part of what you said about the 28th.

5          MS. CLAIBORN:  I only offered the 28th as a

6    new date.

7          MR. BALDIGA:  This is Bill Baldiga.  28, 29

8    and 30 Mr. Kwok has a medical issue that he

9    (indiscernible)  during those days.

10         MS. CLAIBORN:  How about Friday, April 15th?

11         MR. HARBACH:  This is David Harbach.  That's

12   good by us.

13         MR. BALDIGA:  It's Good Friday.  Good Friday

14   for me and Passover for many.

15         Can I suggest (indiscernible)?

16         MS. CLAIBORN:  I didn't hear your

17   suggestion. I'm sorry.

18         MR. BALDIGA:  I respectfully ask that we go

19   back to April 4.  One lawyer among a dozen and one

20   creditor should not --

21         MR. WOLMAN:  This is Jay Wolman. I already

22   have something for that day as well.

23         MR. BALDIGA:  I know, but there are

24   (indiscernible)  --

25         MR. WOLMAN:  Two lawyers, including myself,

1   who is in the middle of questioning.

2           MR. BALDIGA:  All right. We'll keep looking

3   then.

4           MS. CLAIBORN:  Does April 6th work?

5           MR. WOLMAN:  What was that date?

6           MS. CLAIBORN:  April 6th?

7           MR. HARBACH:  This is David Harbach. I can

8   do April 6th.

9           MR. BALDIGA:  The debtor can as well.

10          UNIDENTIFIED:  As can I.

11          MS. CLAIBORN:  Okay. I'm going to mark April

12  6th 10:00 a.m.  It's in person.  The U.S. Trustee's

13  Office in New Haven.

14          Please allow for time to go through

15  security. I'd like to start at 10:00.

16          MR. BALDIGA:  Could I ask how much time

17  would you reserve on that day, including with the

18  interpreter, just so we can plan?

19          MS. CLAIBORN:  I think you should plan for

20  the whole day but I will have to follow up and get

21  an understanding about an interpreter and I don't

22  have that at my fingertips right now.

23          MR. BALDIGA:  Okay.  Would that be 5

24  o'clock?

25          I guess we can go off the record as we

Ho Wan Kwok - March 21, 2022

80

1     finish this.  It's up to you, obviously.

2              MS. CLAIBORN:  Okay.  I think we're

3     concluded for purposes of Bin's translation services

4     for today.

5              THE INTERPRETER:  Thank you.

6              MS. CLAIBORN:  Thank you very much, Bin.

7              THE INTERPRETER:  Have a nice day.

8              MS. CLAIBORN:  Thank you.

9              I'm going to stop the recording, but we can

10    stay on the line.  I'm going to stop the recording.

11    Thank you.

12        (Meeting adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

1    I, CHRISTINE FIORE, court-approved transcriber and

2    certified electronic reporter and transcriber,

3    certify that the foregoing is a correct transcript

4    from the official electronic sound recording of the

5    proceedings in the above-entitled matter.

6

7                 *Christine Fiore*

8    _____   April 5, 2022

9        Christine Fiore, CERT

10       Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           INDEX

2

3       HO WAN KWOK                                    Page

4       Examination by Ms. Claiborn              14

5       Examination by Mr. Wolman                58

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 6

## AMENDMENT AGREEMENT

This Amendment Agreement (the "Amendment") is made as of this ____ day of _____ 2023 (the "Execution Date") by and among Genever Holdings LLC ("Lessee"), a New York Limited Liability Company, and The Sherry-Netherland, Inc. ("Lessor" together with Lessee, the "Parties"), a New York Corporation.

W I T N E S S E T H:

WHEREAS, on March 6, 2015, the Lessee purchased from the Lessor 3,050 shares of common stock allocated to certain apartment units (the "Apartment"), Apartment 1801, Apartment MR 2219, and Apartment MR 719, in the Sherry-Netherland Hotel having an address at 781 Fifth Avenue, New York, New York 10021, and the Lessor and Lessee executed the proprietary leases (collectively, the "Lease") appurtenant to the shares;

WHEREAS, on March 6, 2015, Lessor and Lessee entered into that certain *Agreement and Consent with Respect to Shares and Proprietary Lease* (the "Agreement & Consent"), that memorializes certain additional terms of the agreement between Lessor and Lessee regarding the occupancy of the Apartment, which includes, among other things, a provision, in paragraph 9 of the Agreement & Consent, permitting Ho Wan Kwok a/k/a Miles Kwok a/k/a Miles Guo ("Occupant") and his immediate family members (together with Occupant, the "Kwok Family") to use the Apartment (the "Use Provision");

WHEREAS, on October 12, 2020, Lessee filed a voluntary petition for relief (the "Genever Case") under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") before the United States Bankruptcy Court for the Southern District of New York (the "SDNY Bankruptcy Court");

WHEREAS, on February 15, 2022, the Occupant filed a voluntary petition for relief (the "Kwok Case") under chapter 11 of the Bankruptcy Code before the United States Bankruptcy Court for the District of Connecticut (the "Connecticut Bankruptcy Court");

WHEREAS, on July 8, 2022, the Connecticut Bankruptcy Court entered an order granting the appointment of Luc A. Despins (the "Trustee") as the trustee in the Kwok Case;

WHEREAS, on November 3, 2022, the Genever Case was transferred to the Connecticut Bankruptcy Court, where the Genever Case and the Kwok Case are being jointly administered for procedural purposes only;

WHEREAS, on November 17, 2023, the Trustee advised the Occupant that he would seek to terminate his use of the Apartment;

WHEREAS, on February ____, 2023, Lessee and the Trustee commenced an adversary proceeding before the Connecticut Bankruptcy Court, and filed a related motion for summary judgment, seeking the following declaratory relief: (i) the Lease and the Agreement & Consent do not provide the Kwok Family with any possessory right in the Apartment; (ii) the proposed Amendment to the Agreement & Consent to modify the Use Provision so as to terminate the Kwok Family's permissive use of the Apartment does not violate New York state law and is consistent with 28 U.S.C. § 959(b); and (iii) Lessee's entry into the Amendment is authorized pursuant to section 363(b) of the Bankruptcy Code and the Lessor is directed to enter into the Amendment;

WHEREAS, on _____, 2023 the Connecticut Bankruptcy Court granted summary judgment in favor of the Lessee and the Trustee in its entirety.

**NOW, THEREFORE**, the Lessor and Lessee hereby agree as follows:

2

1.      The Use Provision is hereby deleted in its entirety, and the Kwok Family shall no longer be permitted to use or occupy the Apartment.

2.      This Amendment does not alter, modify, change or terminate any other rights, terms or covenants contained in the Agreement & Consent, other than those contained in the Use Provision.

3.      For the avoidance of doubt, nothing in this Amendment shall modify any rights and/or obligations of Genever or the Sherry-Netherland under the Lease, the Agreement & Consent (except as set forth in this Amendment), or the other governing corporate agreements, nor modify the Debtor's personal guaranty of Genever (US)'s obligations to the Sherry Netherland, nor modify any consent rights of the Sherry Netherland and the Sherry-Netherland Coop Board with respect to the use of the Apartment.

4.      The validity, interpretation, and performance of this Amendment shall be construed and interpreted according to the laws of the State of New York, except to the extent that (a) provisions of the Bankruptcy Code apply, in which event the Bankruptcy Code shall control, or (b) applicable federal law preempts state law.

5.      This Amendment shall be binding on and inure to the benefit of the Parties and their respective agents, employees, affiliates, successors, and assigns, including any chapter 11 or chapter 7 trustee hereafter appointed or elected for the estates in the Kwok Case or Genever Case, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative in the Kwok Case or Genever Case or with respect to the property of the estate of the Kwok Case or Genever Case.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the ___ day of _____ 2023.

LESSOR:     **THE SHERRY-NETHERLAND, INC.**

By:_____
Name:
Title:

LESSEE:     **GENEVER HOLDINGS LLC**

By: Genever Holdings Corporation, sole member

By:_____
Name:
Title: