UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

| | | |
|---|---|---|
| In Re | * | Case No. 22-50073 (JAM) |
| | * | |
| HO WAN KWOK, GENEVER HOLDINGS | * | |
| CORPORATION and GENEVER | * | |
| HOLDINGS, LLC, | * | |
| | * | |
| Debtor. | * | |
| | * | |
| | | |
| LUC A. DESPINS, et al., | * | Adv. Proc. No. 22-05027 |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| BRAVO LUCK LIMITED, et al., | * | |
| | * | |
| Defendants. | * | |
| | | |
| HK INTERNATIONAL FUNDS | | Adv. Proc. No. 22-05003 |
| INVESTMENTS (USA) LIMITED, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| LUC A. DESPINS, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | | |
| GENEVER HOLDINGS, LLC, et al., | * | Adv. Proc No. 23-05002 |
| | * | |
| Plaintiffs, | * | |
| | * | Bridgeport, Connecticut |
| v. | * | March 21, 2023 |
| | * | |
| HO WAN KWOK, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |
| * * * * * * * * * * * * * * * | * | |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

TRANSCRIPT OF ORDER GRANTING REQUEST FOR STATUS CONFERENCE
MOTION TO EXTEND TIME TO RESPOND TO ORDER TO SHOW
CAUSE TO 4/27/23; MOTION TO CONTINUE HEARING ON MOTION TO
REMOVE TRUSTEE; MOTION TO EXTEND TIME TO RESPOND
TO COMPLAINT TO 4/10/23; MOTION TO EXPEDITE HEARING
ORDER GRANTING REQUEST FOR STATUS CONFERENCE
BEFORE THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

| | |
|---|---|
| For the Creditor, Pacific Alliance Asia Opportunity Fund L.P.: | ANNECCA SMITH, ESQ. Robinson & Cole 28 Trumbull Street Hartford, CT  06103 |
| | STUART SARNOFF, ESQ. PETER FRIEDMAN, ESQ. O'Melveny & Myers LLP Times Square Tower 7 Times Square New York, NY  10036 |
| For the Chapter 11 Trustee: | NICHOLAS BASSETT, ESQ. Paul Hastings LLP 200 Park Avenue New York, NY  10166 |
| | PATRICK LINSEY, ESQ. Neubert, Pepe and Monteith 195 Church Street New Haven, CT  06510 |
| Chapter 11 Trustee: | LUC A. DESPINS, ESQ. Paul Hastings LLP 200 Park Avenue New York, NY  10166 |
| For the U.S. Trustee: | HOLLEY L. CLAIBORN, ESQ. Office of the United States Trustee The Giaimo Federal Building 150 Court Street, Room 302 New Haven, CT  06510 |
| For the Creditors Committee: | KRISTIN B. MAYHEW, ESQ. Pullman & Comley 850 Main Street Bridgeport, CT  06601 |

3

```
APPEARANCES:  (Cont'd)

For The Sherry-Netherland,     SHERRY J. MILLMAN, ESQ.
 Creditor:                     Stroock & Stroock & Lavan
                               180 Maiden Lane
                               New York, NY  10038

                               TARUNA GARG, ESQ.
                               Murtha Cullina
                               280 Trumbull Street
                               Hartford, CT  06103

For the debtor, Mei Guo and    ERIC A. HENZY, ESQ.
  HK International:             JAMES M. MORIARTY, ESQ.
                               Zeisler & Zeisler, P.C.
                               10 Middle Street, 15th Floor
                               Bridgeport, CT  06604

For Bravo Luck Limited,        FRANCIS J. LAWALL, ESQ.
 Interested Party:             Troutman Pepper Hamilton
                                 Sanders LLP
                               1313 N. Market Street
                               Washington, DC  19801

For Hing Chi Ngok,             EVAN S. GOLDSTEIN, ESQ.
 Interested Party:             Updike, Kelly & Spellacy, P.C.
                               225 Asylum Street, 20th Floor
                               Hartford, CT  06103
```

1          (Proceedings commenced at 2:35 p.m.)

2          THE COURT:  Case No. 22-50073, Ho Wan Kwok and

3    Genever Holdings Corporation and Genever Holdings, LLC; 22-

4    500, excuse me -- 23-05002, Genever Holdings LLC, et al, and

5    Kwok, et al, 23-05002, Genever Holdings, LLC, et al., vs.

6    Kwok, et al., 22-05003, HK International Funds Investments,

7    USA, Limited vs. Despins; 22-05027, Despins, et. al. versus

8    Bravo Luck Limited, et al.

9          THE COURT:  Okay.  Thank you.

10         If we could have appearances for the record

11   starting with the Chapter 11 Trustee, please.

12         MR. DESPINS:  Good afternoon, Your Honor.  Luc

13   Despins, Chapter 11 Trustee.

14         THE COURT:  Good afternoon.

15         MR. BASSETT:  Good afternoon, Your Honor.  Nick

16   Bassett from Paul Hastings on behalf of the Chapter 11

17   Trustee.

18         THE COURT:  Good afternoon.

19         MR. LINSEY:  Good afternoon, Your Honor.  Patrick

20   Linsey, Connecticut counsel for the Trustee.

21         THE COURT:  Good afternoon.

22         MS. CLAIBORN:  Good afternoon.  Holley Claiborn

23   for the U.S. Trustee.

24         THE COURT:  Good afternoon.

25         MS. MAYHEW:  Good afternoon, Your Honor.  Kristin

1    Mayhew, Pullman & Comley, on behalf of the Official

2    Committee of Unsecured Creditors.

3              THE COURT:  Good afternoon.

4              MR. SARNOFF:  Good afternoon, Your Honor.  Stuart

5    Sarnoff, O'Melveny & Myers.  Thank you for granting remote

6    access to my partner, Peter Friedman, whose plane got

7    delayed.  He's with me today as well.  And Annecca Smith

8    local counsel Robinson & Cole on behalf of PAX.

9              THE COURT:  Good afternoon.

10             Could you hear all that?  Was that okay for you?

11   You couldn't really hear it.

12             I'm sorry, Mr. Sarnoff.  I am going to have to

13   make you come forward to a microphone because we just can't

14   pick it up.

15             MR. SARNOFF:  Stuart Sarnoff on behalf of creditor

16   PAX.  Mr. Friedman, my partner, is accessed remotely because

17   he had a problem with his plane.  And Annecca Smith, of

18   Robinson & Cole, is our local counsel and is here as well on

19   behalf of PAX.

20             THE COURT:  Thank you very much.  Thank you.

21             Attorney Henzy?

22             MR. HENZY:  Eric Henzy, of Zeisler & Zeisler, for

23   the debtor.

24             THE COURT:  Good afternoon.

25             MR. MORIARTY:  Good afternoon, Your Honor.  James

1   Moriarty, Zeisler & Zeisler, for the debtor, Mei Guo, and HK

2   International.

3            THE COURT:  Good afternoon.

4            MR. MORIARTY:  Good afternoon.

5            MS. GARG:  Good afternoon, Your Honor.  Taruna

6   Garg, of Murtha Cullina, representing the Sherry-Netherland.

7            THE COURT:  Good afternoon.

8            MS. MILLMAN:  Good afternoon, Your Honor.  Sherry

9   Millman, with Strook & Strook & Lavan, also representing the

10  Sherry-Netherland.

11           THE COURT:  Good afternoon.  Thank you both for

12  coming forward so we can hear your appearances.

13           Anyone else noting an appearance for the record?

14       (No response.)

15           THE COURT:  Okay.  Mr. Despins, this is your

16  request for a status conference, so please proceed.

17           Oh, I'm sorry.  We didn't talk to people on the

18  Zoom.  My fault.

19           You can come forward, Mr. Despins, but I forgot to

20  take Mr. Lawall's and Mr. Goldstein's appearances.

21           MR. GOLDSTEIN:  Yes, Your Honor.  Good afternoon.

22  Evan Goldstein on behalf of Hing Chi Ngok.

23           THE COURT:  And, Mr. Lawall, you just have to

24  unmute yourself.

25           MR. LAWALL:  My apologies, Your Honor.  Good

1   afternoon.  Fran Lawall, Troutman Pepper, on behalf of Bravo

2   Luck.  Your Honor, thank you for allowing us to participate

3   by Zoom.

4           THE COURT:  You're welcome.  And good afternoon.

5           And, Mr. Friedman, obviously, we've taken your

6   appearance for the record.  Thank you.

7           MR. FRIEDMAN:  Thank you.  Thank you, Your Honor.

8           MR. DESPINS:  Good afternoon, Your Honor.  May I

9   approach?

10          THE COURT:  Please.  Thank you.  Go right ahead.

11          MR. DESPINS:  So good afternoon, Your Honor.  For

12   the record, Luc Despins, Chapter 11 Trustee.

13          I'm just -- I'm going to cover a lot of this

14   quickly, but I think it's important for the record.

15          So on March 15th, the debtor was arrested at the

16   Sherry-Netherland Apartments.  Just to be clear, the

17   apartment is owned by Genever BVI, a Chapter 11 debtor,

18   which is itself wholly-owned by Genever U.S., which is the

19   BVI entity.  And Mr. Kwok was the sole shareholder of these

20   -- one of these entities until we took over and so,

21   therefore, the Trustee is the sole controlling party of

22   these entities at this time.

23          I forgot to mention at the last hearing that

24   Yvette Wang was also arrested last -- on March 15th.  You

25   may remember Ms. Wang was the person that I think Mr. Kwok

1   mentioned was the controlling shareholder, or director of

2   Ace Decade, one of the two, and he could not reach her or

3   was unable to reach her, did not know how to reach her.

4           But, anyway, she was arrested as well for the

5   same, participation in the same types of offenses that Mr.

6   Kwok was charged with, and she's held, my understanding, on

7   5 million bail until the $5 million bail is posted.

8           I also understand that there was -- that the FBI

9   found $100,000 -- more than $100,000 in cash in her

10  apartment when they arrested her.

11          Later in that day on March 15th, a fire broke out

12  at the Sherry-Netherland apartment.  The Trustee's informed

13  that at that time there were only FBI agents in the

14  apartment.

15          Yesterday, Your Honor, we filed a proposed amended

16  emergency order seeking to allow the Trustee's investigation

17  team to also access that apartment.  I'll cover that later.

18          THE COURT:  Okay.

19          MR. DESPINS:  Page 2, damage to the Sherry-

20  Netherland apartment.  Obviously, we have not been in the

21  apartment so we -- this is really hearsay, but it appears

22  that the damage is I would say material and/or substantial.

23          And I wanted to add that I am not one of the

24  parties that can visit the apartment, and that's not an

25  accident.  I wanted it that way because I don't want any

1    allegations that somehow I was on the premises at any time.

2    So Judge Cyganowski is really the only one that has access

3    from the point of view of the Genever debtors to that

4    property.

5         But today, as of this time, no one has access to

6    the property because the investigation is ongoing.  And if

7    the -- so it's either a combination of the FBI and the

8    Southern District of -- or the, sorry, the Police Department

9    of the City of New York.  But at this time, no one has

10   access.  I confirmed this again with counsel for the Sherry-

11   Netherland who is in the courtroom.

12        Once access is open to others then we will allow

13   others.  For example, the insurance companies have been

14   clamoring to have access, and we told them no one can have

15   access because it's still being -- the scene is still being

16   investigated.

17        In terms of insurance coverage, you know, I want

18   to be careful here.  I'm going to talk about the policies,

19   not -- you know, some people should not take this as money

20   in the bank, far from it, but there's a policy that insures

21   the apartment itself and its contents and the maximum amount

22   there is 28 million.  I'm advised by AIG, the insurance

23   company, that the maximum coverage there is 28 million and

24   change.  I think it's 28,134,000.  But, anyway -- so it's

25   around 28 million.

1    And on top of that, there's third-party liability

2    policies in place.  We don't have copies of those yet, but

3    we've been informed by AIG that those policies -- there's a

4    first layer of policy for $1 million, third-party liability,

5    and there's a supplemental policy for another $10 million.

6    And so that is for a total of $11 million of third-party

7    liability.  And I'm advised that those amounts do not reduce

8    the 28.  So they're separate policies.

9    And, again, you know, we caution people from

10   thinking that this is money in the bank at this time.

11   The next item on the agenda, Your Honor, I want to

12   spend some time on this, it's very important, is that the

13   events of last week really call for a reset in these cases.

14   And what do I mean by reset?

15   Your Honor, PAX spent years and millions of

16   dollars chasing Mr. Kwok in a New York State Court -- and,

17   again, to be clear, this is not evidence, this is just the

18   Trustee's views -- and that resulted in a very clear -- in

19   very clear findings by Judge Ostrager, not only about the

20   yacht, but also about Mr. Kwok and the way he conducts

21   business regarding the use of shell companies, shell games

22   that he played, et cetera.

23   And in a bizarre way, Mr. Kwok got a second life

24   in Chapter 11.  And I'll explain why to me it's not so

25   bizarre, but he filed schedules and statements of financial

1    affairs showing practically no assets and no transfers of

2    any kind practically in the 90 days or the year before the

3    filing.  These are the sworn-to statements that he filed.

4         And I say perhaps it was not so bizarre because

5    people believed that he would come up with a settlement.

6    And, in fact, there were discussions of settlement prior to

7    the appointment of the trustee.  And there was a lot of

8    activity on that front for a while.  And then the offer to

9    settle was withdrawn and then a trustee was appointed.

10        Upon the appointment of the Trustee, what happened

11   is we went into what I would call an investigation mode,

12   full-bore investigation mode, but that -- those efforts were

13   impeded at every turn by the debtor.  This cost the estate

14   millions of dollars.  I want to be clear about this.

15   There's just non-stop examples of Kwok, or what I call his

16   proxies or his surrogates objecting to everything,

17   appealing, challenging discovery at every turn.

18        And that includes the daughter and the son.  The

19   son through Bravo Luck.  And we know, you know, Golden

20   Spring, Ace Decade, the whole saga over Ace Decade, and so I

21   don't need to repeat that here.

22        But millions of dollars were spent on that which

23   is clear now that it was a charade.  And I'm sorry to be so

24   crude about it.  But the charade I'm referring to are the

25   schedules of assets and liabilities and the statement of

1    financial affairs.  Those bear no relationship to reality.

2    We know it now.  And this is why there needs to be a reset

3    in the case.  I'll be more explicit in what I mean by that.

4           And nevertheless, in the case, you know, before

5    the indictments, there was this whole process about a

6    settlement, potential settlement.  There was a lot of

7    energies spent on that.

8           And then there was the whole First Amendment,

9    alleged, I would call faked First Amendment harassment

10   campaign which kept everyone busy for at least two months.

11          And all this sideshow happened for a purpose,

12   which was to keep us from focusing on the obvious thing

13   here, which is that the schedules of assets and liabilities

14   and the statement of financial affairs were fictions.

15          And we need to hit the reset button because the

16   SEC complaint and the DOJ indictment, although they're not

17   -- they have not been proven, they're allegations and we

18   understand all of that, but they clearly paint a picture,

19   the picture that we have been advocating all along, which is

20   this concept that the son somehow is a successful

21   businessman that's funding his father's expenses and his

22   defense counsel, and also paying for his sister's yacht.

23   And the fact that the daughter would own a $30 million

24   yacht, that's all a fiction.

25          And what I want to focus the Court on is in the

1    indictment, there are specific allegations about transfers

2    of millions of dollars from Kwok to the daughter and the

3    son.  And you might say how do you know it's the daughter

4    and the son?

5           Well, there are two relatives mentioned, and, you

6    know, they mention the relative -- I forget whether it's

7    number one or number two -- but relative X is, you know,

8    involved with the Lady May, so we know who that is.  And the

9    other relative is involved in a different capacity.  That's

10   the son.  So we know they're making allegations about

11   transfers of millions of dollars.

12          So this is not spin by the DOJ.  They're alleging

13   at specific times transfers of millions of dollars to the

14   son, to the daughter, to the wife.  I'm saying DOJ.  It

15   includes the SEC.

16          And the point is these allegations have not been

17   proven.  We understand that.  But the DOJ would not be

18   making allegations, specific allegations to transfers unless

19   there was substantial evidence of that.  So what does that

20   mean?

21          From our point of view, Your Honor, and I'm sorry

22   to say it that way, but it's obvious that this pretense that

23   the son is paying for Zeisler and for Walken is just not

24   reality.

25          And I want to be clear, I am sure they got money

1   from entities that they believe are controlled by the son or

2   the son told them that that's where the money comes from,

3   but we know this is Kwok paying Kwok.

4           And that's pretty serious.  And that -- and that

5   applies across the board.  It applies to the expenses for

6   the yacht, et cetera, et cetera.   And these companies are

7   created every day.  There's a new name every day.  I swear

8   there has to be an employee that works for Kwok whose only

9   job is to come up with names for these companies because

10  they're creating some every day.  And there's than 500

11  companies at this point that are part of the Kwok empire.

12          And this is why Zeisler has to file supplemental

13  disclosures saying, well, actually, it's not the son, it's

14  company X, Macarone or whatever, it changes names all the

15  time.  That's because they're engaged in exactly what the

16  DOJ -- they, I want to be clear, I'm talking about the son

17  and the father here, not Zeisler -- are engaged in this

18  shell game that Ostrager described.

19          And there's another event, you know, that calls

20  for a reset, which is there's not going to be plan funded by

21  Mr. Kwok or his family.  That's over.  That was fiction we

22  believe.  And we believe it's over now and that changes the

23  dynamic completely.

24          And so you might think, Your Honor, this is an

25  interesting speech, but practically what does that mean?  So

1    let me talk about really concrete things.

2              The ownership of the Sherry-Netherland apartment,

3    you have to recall, Genever USA is the owner, legal titled

4    owner of that apartment.  So if somebody is claiming an

5    interest in that, it's their burden to show that, in fact,

6    Genever is not the owner.

7              And so the party that's coming in is Bravo Luck,

8    which is the son of Mr. Kwok, saying, well, I have this

9    trust agreement, and trust agreement which was never

10   disclosed during three or four years of litigation before

11   Judge Ostrager, was never mentioned to Judge Ostrager.  What

12   does that tell you about the views of the lawyers who

13   defended Mr. Kwok?

14             Because this would have been a trump card for them

15   to say, wait a minute, that apartment is not owned by Kwok.

16   It's owned by the son.  That's an easy one, right?  But

17   never mentioned for three years in that litigation.

18             So now we have this agreement that they're

19   providing saying, well, the son owns the Sherry-Netherland.

20   And there's a fundamental issue here, which is there are two

21   people to that agreement, the father and the son.  I don't

22   think the father is going to come and testify about that

23   agreement.  And now that leaves the son.

24             And so practically what I think the Court should

25   do, not today, but soon, is to direct Mr. Lawall to confirm

1    that the son will come to the United States to submit to a

2    deposition to explain the facts surrounding that trust

3    agreement.

4           And why do I say that?  Because I don't believe

5    that anybody in their right mind would ever tell him to come

6    to the United States to testify in this, not only because we

7    believe that his testimony that he gave elsewhere is not

8    accurate, but because he's a relief defendant in the SEC

9    action and he's named as a transferee of millions of dollars

10   in the DOJ investigation.  But I don't care what his reasons

11   are or not.

12          But we cannot be spending hundreds of thousands of

13   dollars on that litigation which is based on this fiction

14   that somehow the son could buy a $70 million apartment.

15          And if he wants to pursue that and try to undo the

16   presumption, which is that we own the apartment because it's

17   owned by Genever, he needs to come to the United States and

18   be deposed.  If not, Your Honor, there should be a very

19   streamlined process to establish or to confirm title in

20   Genever USA.  So that's one of the --

21          I also forgot to mention that Mr. Kwok testified

22   in the Ostrager litigation that it was Mr. Zang Wey, not the

23   son, that owned the apartment.  But that's a different --

24   that's a different issue.

25          So other aspects of the reset button, Your Honor,

1    the proxies or satellites, what I call the satellites of

2    Kwok or Kwok himself, should not get the benefit from his

3    incarceration or from the fire at the Sherry-Netherland.

4    This case needs to continue to move on.

5            And what I mean by that is, this is like a runway

6    at the airport.  There are dozens of planes that need to

7    take off and people are saying, well, there's no rush,

8    nobody's going on vacation, we can wait for the planes to

9    take off later.

10           But that's wrong.  Because although it's true that

11   nobody's going to rent the apartment next week or the week

12   after or the week after that, I understand that, we need to

13   get rid of all the -- we need to clean up all these alleged

14   ownership or rights that these people think that they have,

15   because they will appeal, and that's going to take time.  So

16   we need to have all these planes take off so the runway is

17   clear.

18           And trust me, Your Honor, there will be many

19   issues in this case that will be appealed.  And, therefore,

20   waiting because the debtor is in prison or because there was

21   a fire is not the right thing to do.

22           Could they -- could they get one week?  This is --

23   actually we've offered them one week, sure.  But generally

24   this case needs to move forward.

25           Other aspects of the reset button, I believe that

1    counsel for Kwok and counsel for the proxies and satellites

2    need to take responsibility for promoting the fiction at

3    this point.  And the fiction, as I told you, is that he owns

4    nothing.  It's all owned by them.  And by that I mean that

5    they cannot just say my client told me so and that's what

6    I'm arguing in court.

7            We're at a point now where they have to have a

8    good-faith belief in what they're advancing, including the

9    fact that the yacht is owned by the daughter, including the

10   fact that the apartment is owned by the son, including the

11   fact that the wife owns the -- owned the two houses in

12   Connecticut, in Greenwich.  I mean, that's just -- it's all

13   fiction.

14           And so lawyers need to have a responsibility for

15   that because it's costing the estate hundreds of thousands

16   of dollars to deal with these issues.

17           So where is this case heading?

18           First, Your Honor, we need to secure assets, which

19   involves getting ownership of assets or at least obtaining

20   PJR's over those assets.

21           Second, we need to pursue the proxies, satellites,

22   for recoveries.  That means the daughter, the son, the wife,

23   et cetera.  And there are other companies as well.

24           Third, we need to monetize assets and get the

25   legal infrastructure in place to start making distributions

1    to holders of valid claims.  We cannot wait for the criminal

2    case to be resolved.  That will take -- I'm not a -- so it

3    could take I should say years to resolve.

4            And if we can get assets and we can monetize them

5    and distribute them to real creditors, we should do that

6    because that's our duty, and I think that it's fundamental.

7            Fourth, we need to do all of that while

8    eliminating or minimizing any potential conflict with the

9    DOJ because we have a mutual shared goal which is to

10   compensate victims.

11           And I've done a number of cases, Your Honor, with

12   the DOJ on the other side and I'm familiar with their

13   forfeiture rights.

14           I think Your Honor dealt with this in the -- was

15   it the *Goldberg* case or one of these cases, and, you know,

16   they have very powerful tools.

17           And we're not interested in what's happening in

18   their case and they're not interested in what's happening

19   here except if this case is going to somehow impede their

20   prosecution.  And that is why, Your Honor, we're in constant

21   contact with them with respect to the assets only.

22           So, for example, before we filed this motion for

23   summary judgment that we wanted heard on an expedited basis,

24   we called them.  We had a call with them on Saturday to say

25   we want to make sure you understand we are seeking ownership

1    of the yacht now which is on your list of future potential

2    forfeiture.  And they understood that and basically the

3    message was go in peace.  We understand you need to do that.

4    We're not going to interfere with that in any way.

5         And we will continue to do that for every material

6    decision in the case because there's no point in being in

7    conflict with them because they are seeking to return money

8    to victims and so are we.

9         Okay.  So, Your Honor, that's the general speech.

10   I apologize if it took too long.  Now, I'm ready to turn to

11   point B, which is update on Sherry-Netherland apartment.

12        And we didn't intend this to be a real formal,

13   pretrial conference of any kind.  This is -- sorry.  To be

14   clear, there are many adversary proceedings involving the

15   Sherry-Netherland.  This is the ownership adversary

16   proceedings, the three of them that have been consolidated.

17        So we have no specific update other than what I've

18   covered before on this one, except that we renew our request

19   that Mr. Lawall be compelled to file, you know -- he can

20   have enough time to consult with this client, but we need to

21   understand that the son will come to the U.S. to testify

22   under oath.  Because if that's not happening, that's a huge

23   waste of time.

24        So there are other Sherry-Netherland related

25   adversary proceedings and those involve the termination of

1    the use by Mr. Kwok and potentially other family members of

2    the apartment.  And on that the issue is very simple.  You

3    know, they filed, or a number of them filed a request to

4    say, oh, we should get three more weeks because of the

5    incarceration or because of the fire.  There's no rush

6    because nobody can use the apartment anyway.

7         And I told you, Your Honor, our view is, okay, if

8    they need more time, a week is plenty of time, but we need

9    to move forward on this because we need to clear all of

10   these things out for other matters that need to be -- that

11   need to be dealt with.  Otherwise the runway will be

12   completely congested.

13        Next, is still -- I'm sorry.  In that adversary

14   proceeding, the second one, which is what's called the

15   termination of use adversary proceeding, Bravo Luck filed an

16   intervention motion.

17        We've had discussions with them about settling

18   that by basically saying that nothing that will happen in

19   that proceeding will affect the ownership issue, but those

20   discussions are still pending.

21        Still in the Sherry-Netherland, the last point,

22   point two, is the emergency order.  We submitted a

23   modification yesterday to provide that the Trustee -- not

24   the Trustee, but the experts retained by the Trustee should

25   have access to the apartment subject to supervision from the

1    Sherry-Netherland.

2            The point is very simple, Your Honor.  You can

3    imagine that with these sums involved, there could be a

4    debate over coverage based on various arguments.  And our

5    job is to make sure there is coverage if we can because

6    that's in the interest of the estate.

7            And so if the insurance companies who financially

8    are conflicted, I'm not saying this in a negative way, but

9    it's not in their interest of paying normally, if they're

10   going to have their experts there, we want to have our

11   people side by side with them to see what they're doing,

12   what they're looking at, so that if there's ever an issue

13   six months down the road, we're in the position where

14   there's an expert from AIG that comes in with this, you

15   know, video with very detailed information, and our expert

16   comes in to say I never saw the place, I have no idea what

17   went on there, so that's why we want access.

18           You know, again, if people want to object to that,

19   we'd be happy to entertain their objections, but we think

20   that that modification should be made to the emergency order

21   to allow us to send our own experts to monitor what's going

22   on.

23           Moving on, Your Honor, to the Lady May.  That's

24   item C.  As we said in our motion that's being heard now,

25   today, seeking an expedited hearing, we're really concerned

1    that in light of the recent events, and we know that Mr.

2    Vartan as lead counsel is not here, not on Zoom either, that

3    the Lady May is being abandoned.  So I'm happy to be wrong

4    on that.

5              But, you know, they called us like on March 6th to

6    say, oh, we can't get -- this was before the fire, Your

7    Honor, they called us to say we can't get insurance for the

8    Lady May.  It expires on March 28.  And the reason they said

9    is that the ownership of the yacht -- and, you know, the

10   subtext there is Kwok, and, you know -- we cannot let this

11   asset be uninsured.

12             And also at the same time, remember you had

13   ordered that the daughter appear here for a hearing on the

14   issue of Lamp Capital's obligation to pay.  Well they

15   withdrew that motion, which they thought was a clever way

16   of, well, then she doesn't need to appear, because it's

17   their motion and, therefore, she doesn't need to appear and

18   we don't need to deal with that issue and we'll just let the

19   Trustee deal with the consequences.

20             But, you know, we're, you know, and creditors are

21   calling me.  You know, I'll say -- sorry to out PAX, but

22   they're saying what are you doing Trustee to protect this

23   asset?  If there's a fire at the Sherry-Netherland, there

24   could be a fire there too.  So what are you doing about

25   this?

1          And my response is I don't own that asset.  I

2    can't go in and insure or put, you know, security guards

3    there.  I have no control over this asset.

4          And on top of that, Your Honor, we received a call

5    from the Yachtzoo folks today saying that they have no more

6    -- there's no contact between them and what they call the

7    family office, which is probably Golden Spring or something

8    like that, and that they're concerned that the yacht is

9    being abandoned.  They didn't use those terms.  That's my

10   spin on it to be fair.  They're concerned that there are no

11   more payments being made and that they don't know what the

12   future holds.

13         So, therefore, what we did, Your Honor, is to file

14   a discrete summary judgment just on the collateral estoppel.

15         And I want to be very clear, Your Honor, that's

16   not my preference.  That was not my preference.  Why?

17   Because I believe the evidence is compelling as a package.

18   I believe that that count is compelling as well.  But I

19   don't -- I never want to put all my eggs in the same basket,

20   but here we are doing that because that's the only claim

21   that's discrete, that's legal in nature only.

22         There's no witnesses there, meaning there's, you

23   know, no need to bring Judge Ostrager as a witness to see

24   what he said.  We have that.  The Trustee does not need to

25   testify because I had no knowledge of this.  I didn't exist

1    at that time.  And it's a very discrete count, but it gives

2    us ownership.  We believe it should give us ownership of the

3    ship.

4              As I said, that's not our preference.  I'd rather

5    have a full-blown hearing because we believe the evidence is

6    compelling.  But the facts force us to seek summary

7    judgment.  And we're not saying that's the basis to grant

8    summary judgment.

9              We're just saying that -- explaining to the Court

10   why we are seeking summary judgment on that count only

11   because that's the only one we see as a clear path without

12   evidence, without delay, to get title to the ship, which is

13   important to protect the ship.

14             We also believe that's there no prejudice at all

15   to the other side because, one, this issue has been on the

16   table for more than six months.  Two, fully briefed.  For

17   the PJR, this issue of collateral estoppel was fully briefed

18   on both sides.  And I expressly told the team do not add one

19   new case to the brief so that nobody can say, oh, there's a

20   new argument, et cetera.  It's exactly the same argument,

21   the same cases, same case law, it's all the same.

22             So we were ready to argue this before Your Honor

23   on March 15th, so people should be ready to do that.  We

24   said, next week, on Monday, because that's the day before

25   the expiration of the insurance coverage not knowing your

1    calendar, Your Honor.

2         But the point is people should be ready to brief

3    that like immediately because it's already been briefed.  So

4    that's the Lady May and the situation there from our

5    perspective.

6         And I want to be clear that before doing this we

7    did send the team, what I call the Kwok team and the Lady

8    May team, an email saying, look, we understand the policy is

9    about to expire.  If we're wrong, if you found somebody

10   else, tell us.  That was sent on Saturday.

11        If we're wrong about your willingness to fund the

12   cost of the Lady May, you know, tell us.  Other than through

13   the repair reserve which they've already taken the position

14   that it should be taken out of the repair reserve, other

15   than that, you know, tell us.  And there was no response.

16   There's still no response to date.  So that's more than 48

17   hours ago.  So that's why we're proceeding in that fashion,

18   Your Honor.

19        So, Your Honor, there are updates on the 2004

20   discovery, but -- and they're matters on specifically on

21   2004 that I believe you scheduled.

22        For example, the issue if the debtor should get

23   more time to respond to the refusal to produce based on the

24   Fifth Amendment.  I believe that you scheduled that for

25   today.  Mr. Bassett will handle that.

1          I just don't want to spend -- take too much of

2    your time.  But I think I've covered a lot of ground.  I'm

3    sure that opposing counsel will have views.  And also people

4    on what I would call our side of the aisle may have views as

5    well.  So at this point, subject to Your Honor having

6    questions for me, I think I will let others be heard on

7    these various issues.

8          THE COURT:  Okay.  I do have a question or two.

9    And I think I understood your report.  So taking your

10   report in order.

11         So you don't have any -- you don't have any

12   information yourself right now about what the status of the

13   damage to the apartment is?  You just, you said you had

14   hearsay basically at this point.

15         MR. DESPINS:  Correct.  It's materially

16   substantial, but I don't have first hand, no.

17         THE COURT:  And they're -- your understanding is

18   that there's some investigation by authorities?

19         MR. DESPINS:  Correct.

20         THE COURT:  The FBI, the fire --

21         MR. DESPINS:  Yes.  So I've checked twice a day,

22   and she's been properly annoyed with me for doing this, but

23   counsel for the Sherry-Netherland, saying can we get in, can

24   we get in, can we get in?  Not we, but the insurance people

25   and all that.  And she's reported to me every time it's a

1    sealed place.  Only the police department or the FBI can

2    have access.  The minute it's open, we will let you know.

3    So as of today, as of now.  But she's here.  She has new

4    news, she will tell us, so I don't think there's, you know,

5    still a closed scene.

6           THE COURT:  Okay.  And with regard to the

7    insurance coverage issue that you raised, does the estate

8    have to make a formal claim on AIG's policies here, or --

9           MR. DESPINS:  Well, we have in a sense that we put

10   them on notice.

11          THE COURT:  Okay.

12          MR. DESPINS:  And so we're covering those bases.

13   But I think we're talking about a lot of time before we hear

14   what their position is.

15          THE COURT:  Understood.

16          MR. DESPINS:  Yeah.

17          THE COURT:  Just curious about the claim issue.

18          With regard to a hearing we've already had on the

19   Sherry-Netherland and the motion, I think it was a motion

20   that you filed to allow Sotheby's to also lease the

21   property, not just try to sell the property, there was a

22   notation on the docket I believe that we needed a new

23   proposed order to grant that.  And I don't think we've seen

24   that yet with regard to the Sherry-Netherland.  At least if

25   it's been filed, I haven't seen it.

1          MR. DESPINS:  I thought we had.  But my colleague

2     is here.  If I may consult?

3          THE COURT:  Sure.

4          MR. DESPINS:  I'm told that it was emailed to the

5     courtroom deputy on March 10th, the revised order.

6          THE COURT:  Oh, okay.  Well, then I -- we'll find

7     that.  Okay.  I don't -- maybe I'm wrong, but I didn't see

8     it.  So that might be my fault.

9          The amended emergency order that you filed

10    yesterday with regard to the access to the apartment, are

11    you asking that that be set for a hearing or are you asking

12    the Court to enter that?

13         MR. DESPINS:  We're asking the Court to enter it.

14    Unless people have objections.  But I have not heard

15    objections.  But of course given it's done on 24-hour's

16    notice --

17         THE COURT:  All right.  We'll address that then.

18         MR. DESPINS:  Yeah.

19         THE COURT:  I'll need to address that as part of

20    this conference.

21         So one thing we haven't done yet is -- one of the

22    matters -- mean, we set the hearing today on the status

23    conference in which you stated that you were going to

24    address the things that you have addressed in your report.

25    We have not addressed the --

1          MR. DESPINS:  The motion to remove the Trustee.

2          THE COURT:  Right.

3          MR. DESPINS:  Yeah.

4          THE COURT:  And when you talk about the PJR

5    hearing that was supposed to start last week, obviously that

6    didn't start.  Well, it started.  We had a hearing.

7          MR. DESPINS:  Yeah.

8          THE COURT:  But the orders have entered.

9          But with regard to the issue about the summary

10   judgment on the collateral estoppel effect of Justice

11   Ostrager's findings regarding the ownership of the boat,

12   that's something you want to be addressed before next

13   Tuesday?

14         MR. DESPINS:  Yeah.  We want Your Honor today to

15   schedule a hearing so that it's -- of course, we don't know

16   your schedule, so we said Monday because wanted to give them

17   the most amount of time possible to challenge this.  So they

18   would file a response on Sunday and then we would have a

19   hearing on Monday.  Not ideal for anyone, but that's what we

20   propose.

21         But for us, we believe that's the only clear

22   chance, and I say chance, not a guarantee, of getting

23   insurance in place by -- before the expiration of the other

24   policy.

25         THE COURT:  Okay.  I just wanted to make sure I

1    understood your request.

2            MR. DESPINS:  Yeah.  So on the issue of removing

3    the Trustee, Your Honor, this is another, you know, reset

4    button issue.  Whatever the merits of that motion were then,

5    which I thought didn't, had no merits, but at this point, we

6    believe it's sanctionable for them to prosecute that motion

7    today given what has transpired since then.

8            THE COURT:  Okay.

9            MR. DESPINS:  But I'll let them be heard on that.

10           THE COURT:  Right.  I'm just -- I'm just trying to

11   keep everything in order here.  Just give me one moment,

12   please.

13          (Pause.)

14           THE COURT:  So, Trustee Despins, you also said

15   that at one point, and I think you don't want to address it

16   right now, but you talked about the 2004 discovery issues.

17           And then I have no idea where things stand with

18   regard to the contempt findings made with regard to the HK

19   parties and what has happened with Golden Spring and Lamp

20   Capital on the order to show cause.

21           I think we have a hearing scheduled on that

22   correct, April 18th, I think it is.  And there was an issue

23   about service of that the first time, service of the order

24   to show cause on Golden Spring and Lamp Capital.  And where

25   does that stand?

1          MR. BASSETT:  Good afternoon, Your Honor.

2          THE COURT:  Good afternoon.

3          MR. BASSETT:  For the record, it's Nick Bassett,

4    from Paul Hastings, on behalf of the Chapter 11 Trustee.

5    I'm happy to address those issues, Your Honor.

6          So with respect to -- first of all, I'm happy to

7    provide a more extensive update on 2004 discovery generally

8    if that would be helpful to the Court.

9          THE COURT:  I don't think we need to do that right

10   at the moment.

11         MR. BASSETT:  Okay.

12         THE COURT:  But Trustee Despins mentioned it.

13         What I'm really trying to understand is --

14         MR. BASSETT:  Sure.

15         THE COURT:  -- there are a lot of things

16   obviously, but there was the contempt finding with the HK

17   parties and Attorney Vartan.  I know that you asked for some

18   time, additional time, to file your documents with regard to

19   fees and that's fine.  I think that was granted even, I

20   believe.  Okay.

21         And then with regard to Golden Spring and Lamp

22   Capital, the issue when we had that -- we had a hearing a

23   few weeks ago and the issue was that the order to show cause

24   hadn't been served.

25         And then there was something filed by the HK

1   parties I believe that at least gave an address for Lamp

2   Capital that you didn't have before for service.  Is that

3   correct?

4          MR. BASSETT:  That's exactly right, Your Honor.

5          As I reported at the last hearing at which we

6   addressed this topic, we had received notification that the

7   registered agent we had served previously for Lamp Capital

8   was reporting that they no longer served as the registered

9   agent, so that was the issue that we were having at the

10  time.  We were able to resolve that and find a party to

11  serve based on what Your Honor just alluded to.

12         THE COURT:  Okay.

13         MR. BASSETT:  I believe it was the HK parties who,

14  themselves, served Lamp Capital through an individual whose

15  name has come up throughout the course of these proceedings.

16  So we have -- we've served Lamp Capital through that person.

17         We also -- and this happened I think just

18  yesterday as a matter of fact, and we also have served

19  Golden Spring again.

20         And we will, if we have not already, be filing

21  certificates of service on the docket so they will then have

22  notice from our perspective of the hearing on the 18th on

23  the order to show cause.  And we're prepared to appear then

24  and, you know, address whatever issues may need to be

25  addressed at that time.

1          THE COURT:  Okay.  And then I don't know if you're

2     the right person to answer this question or the Trustee is

3     or a combination of both of you, or anyone else I suppose

4     that might want to be heard, so Yvette Wang has been

5     arrested according to the Trustee.  And how does that impact

6     what's going on with the Ace Decade entities in the UBS

7     litigation in London?

8          MR. DESPINS:  If I may, Your Honor, I'll address

9     that?

10         THE COURT:  Yes.

11         MR. DESPINS:  So what's happening in the U.K. is

12    that there's still people appearing on behalf of Ace Decade

13    saying -- lawyers, not saying who they're getting their

14    instructions from, but -- and who claim that their clients

15    control Ace Decade.  They're not saying who that is.

16         And the Appellate Court in the U.K. ruled in favor

17    of -- ruled against UBS, meaning found that there's

18    jurisdiction in the U.K. to proceed with the claim.

19         So what's happening right now is that UBS has sent

20    me a letter saying you sat on the sidelines on the appeal.

21    Going forward we need to know what your position is because

22    the costs here will be in the order of maybe 300-500,000

23    pounds.  And so I'm dealing with that issue.

24         But they're making the same request of Ace Decade

25    and I understand there are negotiations going on between Ace

1    Decade and UBS on that matter.

2          So the point is, I don't know what impact Yvette

3    Wang has on this.  To be clear, our position has always been

4    --

5          THE COURT:  Well, isn't that the whole -- wasn't

6    that the whole issue before was that --

7          MR. DESPINS:  Yes.  Well, our position has always

8    been Yvette Wang is just a -- she's a title holder.  She has

9    no -- she's an assistant.  She doesn't make decisions.  She

10   just -- she's the owner or the controlling person of many of

11   Mr. Kwok's entities, but it means nothing in terms of really

12   her decision-making power.  It's all Kwok decides.

13         So the answer is I don't know who's behind Ace

14   Decade.  Personally, I think it's Kwok.  But I can't --

15         THE COURT:  What about -- weren't you -- I mean,

16   maybe Mr. Bassett has to answer this question too, but

17   wasn't there a problem with you trying to subpoena her

18   because you didn't have an address and nobody would provide

19   you with an address --

20         MR. DESPINS:  Correct.

21         THE COURT:  -- and all the questions that were

22   asked said we don't know how to locate her.

23         MR. DESPINS:  Yes.

24         THE COURT:  Well, do you know how to locate her

25   now?

1          MR. DESPINS:  Well, we know which -- where we can

2    locate her, yes.

3          THE COURT:  Okay.

4          MR. DESPINS:  We know she's at the --

5          THE COURT:  So then you could serve her with a

6    subpoena?  Well, I don't know if you're going to, but you're

7    saying --

8          MR. DESPINS:  No.

9          THE COURT:  -- you can locate her now?

10         MR. DESPINS:  Well --

11         THE COURT:  The issue -- at least as of now

12   because there's an arrest.  There's an indictment?

13         MR. DESPINS:  Correct.  Well, there's --

14         THE COURT:  What is there?

15         MR. DESPINS:  I don't know if it's a -- it was not

16   a grand jury indictment.  It was some other form that I'm

17   not familiar with.  But certainly she was charged with

18   something.  And she was held on $5 million bail.  So I don't

19   know if she posted bail or not.  So we will check the docket

20   in our case to see if she was released.

21         But if she's going to be released, I know that one

22   of the conditions is that she had to stay at her apartment

23   with ankle bracelet and the whole --

24         THE COURT:  Okay.

25         MR. DESPINS:  -- you know, the whole thing.

1          THE COURT:  All right.  I just -- that's, you

2     know, that's an issue that's been raised before this court

3     several times --

4          MR. DESPINS:  Yeah.

5          THE COURT:  -- the issue of Ace Decade, who

6     controls it, and the issue about Ms. Wang and her location.

7          MR. DESPINS:  Yes.

8          THE COURT:  So I assume if she's been arrested,

9     somebody knows where she is.

10          MR. DESPINS:  Yeah.  We know where she is, yeah.

11          THE COURT:  All right.

12          MR. DESPINS:  Yes.

13          THE COURT:  Then the only other questions or

14     issues that the parties, you know, asked the Court to look

15     at, well, I don't know if all the parties asked the Court to

16     look at, but you did, I know that, you asked me last week

17     when we were starting the PJR hearing to look at the

18     indictment that names Mr. Kwok and Mr. Je I believe.

19          And there were assets that were -- seemed to be

20     identified in that indictment that I'd never heard of in

21     this case.  So is that the issues that you're trying to work

22     out with the Department of Justice?

23          MR. DESPINS:  That's one of the items that we're

24     going to discuss with them.  There are two types of issues.

25     Assets that they have actually frozen, like bank accounts.

1          THE COURT:  Yeah, I saw that.

2          MR. DESPINS:  And that -- and there's hundreds --

3          THE COURT:  I'm talking more about things --

4          MR. DESPINS:  Yeah.

5          THE COURT:  -- that I'd never heard.  Not that I

6     should.  I'm just saying.  There's a -- there's a --

7          MR. DESPINS:  No.  For example, there's a house in

8     New Jersey.

9          THE COURT:  Right.  That was one.

10         MR. DESPINS:  That was news to us.

11         THE COURT:  And then a number of luxury

12    automobiles.

13         MR. DESPINS:  We knew about some of those, but --

14         THE COURT:  Okay.

15         MR. DESPINS:  -- so we were -- you know, that's

16    one -- it was on our task list.  So, yeah.  We learned of

17    new things in there.

18         So one of the discussion items with them is how do

19    we proceed?  Because they're on the same wavelength that we

20    need to make distributions to victims as quickly as

21    possible.

22         They know that even though they have stronger and

23    better tools than we have in terms of identifying assets and

24    all that, that we probably can proceed faster than them

25    because they need to wait for a criminal conviction and that

1    could take a long time.  A trial is not likely to happen for

2    a year or so.  So that's one of the discussions I am -- we

3    need to have with them.  And hopefully it will be --

4              I mean, in the past, Your Honor, you know this

5    from Goldberg, is that in the past these -- the way these

6    cases have been resolved is the Chapter 11 Trustee gets

7    appointed in both courts.

8              Well, I'm already a Chapter 11 Trustee in this

9    court, but gets appointed as the forfeiture manager or

10   receiver, I forget the exact term, in the other court, and

11   then this court has jurisdiction over how that process

12   works.

13             By the way, I don't want to mislead anyone.

14   Nobody has agreed to that.  I'm just saying that there have

15   been -- there are many examples involving Ponzi schemes or

16   other cases of the sort where the Government realizes that

17   they're very good at finding people, finding assets, but

18   they're not the best at distributing assets and

19   understanding who has a valid claim and who doesn't.

20             So just to give you an example, the Fair Fund that

21   the SEC collected for the *GTV* matter more than a year ago,

22   only 70 million of that 425 million has been distributed.

23   I'm not knocking them.  I'm just saying that they're -- this

24   is not what they do.

25             THE COURT:  So is one of the issues that you're

1    going to have to coordinate at some point I would assume is

2    the -- some people -- you've made -- some people have made

3    comments about this SEC complaint and Fair Fund, but I don't

4    believe that's anywhere in the record of this case I don't

5    think.  But you've talked about it so I have an idea.

6              MR. DESPINS:  Yes.

7              THE COURT:  And actually, one of the witnesses

8    testified about it --

9              MR. DESPINS:  Yes.

10             THE COURT:  -- during the preliminary injunction

11   hearing, right?  She got back half of what she put in.

12             MR. DESPINS:  The 500,000.

13             THE COURT:  So, yeah.

14             MR. DESPINS:  The Government employee, yes.

15             THE COURT:  So I have an idea about what it is,

16   but I don't -- I'm not professing to fully understand it.

17             But is one of the issues that you're going to have

18   to deal with in this case and with the I guess the

19   Securities and Exchange Commission, if there are claims

20   asserted in both that proceeding and this proceeding?

21             MR. DESPINS:  Yes.  Except that --

22             So just a little bit of background on that case.

23   Kwok was not a named party in that case.

24             THE COURT:  Okay.

25             MR. DESPINS:  His companies, again, that's my spin

1      on it, were involved.  And so what happened is the SEC

2      realized that there was a public offering going on that was

3      not registered and there were thousands of people sending

4      money in.  So they froze that.  They were able to freeze the

5      money or most of the money.  I think they're missing 37

6      million -- I shouldn't say 37 million because that's going

7      to look like the other 37 -- but 30 million and change is

8      missing, but they were able to freeze 425 million.

9              And so they told the victims please come to us,

10     file a request to receive some money.  People have done

11     that.  But most of them are in Mandarin, not English

12     speakers, so there's a lot of -- and so, therefore, to date,

13     they've only been able to validate 70 million of

14     distributions --

15             THE COURT:  Okay.

16             MR. DESPINS:  -- out of the 425.

17             THE COURT:  Now, what you just said is -- I may be

18     just -- again, I don't -- you have a lot more knowledge than

19     I do, but the 400 and some odd thousand that you're --

20     million, excuse me -- that you're talking about that the SEC

21     has frozen, is that separate and distinct from the monies

22     that are set forth in the --

23             MR. DESPINS:  From the 600, yeah.  From the 630,

24     yes.

25             THE COURT:  Okay.  Okay.

1        MR. DESPINS:  A lot of money.  Yes.

2        THE COURT:  Okay.  All right.  That's --

3        MR. DESPINS:  It's 630 plus 425, yes.

4        THE COURT:  Okay.  All right.

5             Now, I think, unless someone has some objection to

6        the contrary, that we should deal with the issues in the

7        main case first and then turn to specific motions and things

8        that are in the adversary proceedings, that we put -- you

9        know, as part of this status conference so that we can try

10       to figure out where we're going from here.  All right.

11            So if I were to look at the main case first, and I

12       could be completely wrong, but it seems to me, unless the

13       attorneys for Mr. Kwok and Ms. Guo and HK have some other

14       position, and maybe Mr. Kwok's spouse, does anyone have an

15       objection to the motion to amend the emergency order about

16       access to the apartment?

17            I have looked at the order.  I have to tell you

18       have I studied it?  No.  But I've looked at it.  And my

19       original -- my review of it was that it didn't seem to me to

20       be controversial.  However, I obviously could be wrong.  I

21       mean, that parties -- it got filed yesterday.  I don't

22       remember what time it got filed.  We've had hearings today.

23       I've looked at -- I've looked at it.

24            Does any party, either in the courtroom or on the

25       phone, on the Zoom hearing, have an objection to the entry

43

1    of the amended emergency order regarding access to the

2    Sherry-Netherland apartment?

3              MR. MORIARTY:  Your Honor, James Moriarty on

4    behalf of the debtor.

5              Between Attorney Henzy and I, admittedly we did

6    not look at that order yesterday.  I don't recall seeing it

7    come through on ECF.

8              THE COURT:  It did though because I got it.

9              MR. MORIARTY:  Okay.

10             THE COURT:  So then you got it.

11             MR. MORIARTY:  I don't doubt it.

12             THE COURT:  Yeah.

13             MR. MORIARTY:  As I said, I didn't see it.

14             THE COURT:  No.  I'm just telling you it did,

15   that's all.

16             MR. MORIARTY:  If we -- if we can have a chance to

17   take a look at it, maybe the Trustee's counsel has a copy, I

18   don't think we've going to have an objection.

19             THE COURT:  We can print out a copy for you right

20   now if you'd like.

21             MR. MORIARTY:  We do need to read it first.

22             THE COURT:  I understand.  Hold on a second.

23   Okay?

24             MR. MORIARTY:  Sure.  Thank you.

25             MR. DESPINS:  We have a copy here.

44

1              MR. MORIARTY:  They have a copy over there, Your

2      Honor.

3              THE COURT:  Oh, they have a copy right there?

4              MR. MORIARTY:  Thank you.

5          (Pause.)

6              THE COURT:  All right.  Well, hold on a second.

7          (Pause.)

8              THE COURT:  So the proposed amended order appears

9      as 1562.  And it may be, Mr. Moriarty, you didn't know what

10     it was because it doesn't say in the title, you know, you'd

11     have to open up the document, that it shows that it's

12     amending the order about the access to the apartment.  So in

13     your ECF notification, I think it just said notice of

14     proposed order or something.

15             MR. MORIARTY:  So having looked at it, no

16     objection, Your Honor.

17             THE COURT:  Okay.  Thank you.

18             MR. LAWALL:  Your Honor?

19             THE COURT:  Yes.

20             MR. LAWALL:  On Zoom, Your Honor, again, Fran

21     Lawall on behalf of Bravo.

22             Your Honor, the concern we have is not giving the

23     Trustee access and the ability to investigate, it's simply

24     that Bravo, again, given the ownership issues, would like to

25     be able to do a walk-through with the Trustee so we can

1    report to the client the status of the property and have the

2    ability to hire our own investigator so that there's

3    complete transparency here.

4            Obviously, there's been a lot of allegations,

5    which this is not the appropriate place to refute, but there

6    is a significant issue with respect to ownership and we

7    would simply like to have the ability to have our own

8    independent investigator come in, work closely with the

9    Trustee's investigator, so there's full transparency, but to

10   make sure that we have access and we understand exactly what

11   happened here as well.

12           We would not impede the Trustee's investigation,

13   but we would like the ability to bring in our own

14   investigator to take a look at what's happening given the

15   serious allegations that exist here.

16           And until the issue with respect to ownership of

17   this property is determined, and we can speak to that in a

18   couple of minutes, Your Honor, when you turn to the Sherry

19   issues, but at this stage, those issues remain live and they

20   are important.

21           And, again, we're not looking to impede the

22   Trustee's doing.  Simply to make sure that we are able to

23   take a look independently and see exactly what happened

24   here.

25           MR. DESPINS:  Your Honor?

1          THE COURT:  Yes.

2          MR. DESPINS:  Thank you.

3          I need to address that because Bravo Luck is Kwok.

4    Okay.  Let's not kid ourselves.

5          The DOJ, FBI, I don't think he's going to -- I

6    don't want to get involved in whether -- what rights he has

7    to go and inspect the property.  Whether he has these rights

8    under criminal law, he'll exercise those rights, but not

9    through the back door of Bravo Luck.

10          I am 150 percent motivated to find that there's no

11   coverage issue so that I'm covering the bases for Bravo Luck

12   here.  The argument that somehow -- on what planet would we

13   go there and try to find that there's no coverage?  That's

14   insanity.  My job is to get all the coverage that's

15   available.

16          So we don't need to have Bravo Luck, which by the

17   way, let's not kid ourselves, Bravo Luck is Mr. Lawall and

18   the son of the debtor.  The debtor is in prison.

19          You know, this court should not be involved in

20   whatever the rights of the defendant in a criminal case are

21   to send someone to inspect the property or not.  That's for

22   the criminal court to decide that.  If he has that right,

23   God bless him, he'll have access.  But it's not for this

24   court to do that.

25          And to allow Bravo Luck access is really, you

1   know, a disguised way for the debtor to have access.

2   Because the argument that an allegation's been made, yeah,

3   tons of allegations have been made.

4           But my job as the Trustee, as I said, is for

5   everyone to see I want insurance coverage.  So if anything,

6   we're in a bizarre way aligned on that issue.  So we don't

7   need to have supervision.  And it's just going to muddy the

8   water with the criminal case and I don't want to do that,

9   Your Honor.

10          MR. LAWALL:  Your Honor, if I may?

11          I have been listening to the Trustee besmirch

12  counsel, Bravo Luck and everyone else without evidence and

13  at some point it's got to stop.

14          The Trustee itself filed a motion with respect to

15  the ownership issue.  The Trustee acknowledges the $70

16  million came from Bravo Luck to buy this property.  We have

17  been before this court at every step of the way trying to

18  move this litigation forward in a respectful way where

19  evidence actually matters.  The Trustee is trying to run

20  roughshod over this.

21          But to take shots at counsel, Your Honor, are

22  entirely inappropriate.

23          All we're asking for, Your Honor, and we're not

24  trying to delay this, simply there is an ownership issue.

25  And we will be there.  There are issues with respect to

1    insurance.

2            It goes beyond insurance, Your Honor.  Because if

3    there are allegations with respect to how this happened, the

4    Trustee has made wild allegations.  And at some point,

5    they're probably going to spin an allegation that somehow

6    Bravo Luck caused this fire.  I'm saying, Your Honor,

7    respectfully, enough already.

8            All we're asking for is to follow the procedure.

9    Let us -- let us at least have our own expert with the

10    Trustee at our own cost to investigate what happened here.

11    That's all.

12            But I apologize, Your Honor, for getting animated.

13            THE COURT:  That's fine.

14            MR. DESPINS:  Your Honor, there was no allegations

15    vis-a-vis -- first of all, I haven't heard -- I have not

16    made any allegations regarding how the fire started or

17    anything like that.

18            So the allegations were about the fact that

19    there's -- that the schedules of assets and liabilities in

20    this case are fiction and I stand by that.

21            Now, no argument has been made as to how and why

22    the Trustee is not completely motivated to find coverage

23    here and to find all the arguments in support of coverage,

24    which should be Bravo Luck's position as well.

25            So the only reason why they should have access is

1    because there's another angle that they want to pursue.  If

2    they -- if they think they should be covered, so do we.

3    That's our job to try to make sure there is coverage.

4          So what's the argument as to why they need to be

5    involved?

6          MR. LAWALL:  Your Honor, the reason is simple.

7    The Trustee has repeatedly turned allegations into facts and

8    then asked Your Honor to act on them.  We don't want the

9    Trustee doing this in connection with the investigation.

10          All we're asking for is to have an independent

11    investigator, which, Your Honor, you can review the results.

12    But we do, given the way the Trustee has conducted himself

13    up to now, we are concerned about the neutrality of this

14    investigation.

15          THE COURT:  Well, let me -- let me just stop you

16    for a second, Counsel.

17          The only change to the order that's requested,

18    that was requested in the -- an order has already entered.

19    The only change in the order that was requested yesterday

20    was to -- for access to any experts engaged by the Trustee

21    and/or Genever U.S. to investigate the condition of the

22    Sherry-Netherland apartment and/or the circumstances of the

23    fire as accompanied by personnel of the Sherry-Netherland.

24          So no one is going into the apartment other than

25    authorities that have the right to go into the apartment

1    over which this court has no jurisdiction to -- they have to

2    be accompanied by the personnel of the Sherry-Netherland.

3    So with that in place, I think your clients interests are

4    protected.

5         And I'm prepared to enter that order with that

6    change.  Okay?  So I understand your concerns, but I'm

7    overruling your concerns.

8         And I'm going to enter the amended emergency order

9    with the -- with that, that's the only change in the order.

10   The order's been in place since last week.  So it will be --

11   I will tell the courtroom deputy that the order appears in

12   15 -- document I.D. ECF No. 1562, and the conclusion of the

13   hearings today --

14        Oh, I'm sorry, Counsel.  Did you wish to be heard?

15        MS. MILLMAN:  Yes, Your Honor.

16        Not to challenge entry of the amended order now --

17        THE COURTROOM DEPUTY:  I'm sorry, Your Honor.

18        THE COURT:  Yeah.  Hold on one second.

19        MS. MILLMAN:  Yeah.  This is Sherry --

20        THE COURT:  Just if you'd state your name for the

21   record, please.

22        MS. MILLMAN:  Apologies.  This is Sherry Millman

23   with Strook on behalf of the Sherry-Netherland.  And we're

24   not by any means challenging the changes to the order.

25        I just wanted to state again for the record that

1   as I think Mr. Despins told the Court the Sherry-Netherland

2   is under direction from the federal, you know, authorities

3   investigating that no one can get in as of yet.

4           THE COURT:  Sure.

5           MS. MILLMAN:  So any implementation of the other

6   aspects of this order would await the authorities

7   instructing us --

8           THE COURT:  Absolutely.

9           MS. MILLMAN:  -- that we're allowed to.

10          THE COURT:  Absolutely.  And the only addition to

11  the order that the Trustee's asked for says any experts

12  engaged by the Trustee.  So he hasn't done that yet as far

13  as I know.  And so this is -- this is just to have that

14  provision in the order.

15          And I completely agree with you.  When we

16  discussed this order last week at the hearings, we all

17  understood that this is an investigation scene that is under

18  the jurisdiction apparently of the FBI, the New York City

19  Police and Fire Department.  So this court has no control

20  over any of those entities and would never expect to have

21  control.

22          All this order does is -- not all, but what it

23  does is once there's an ability for any of the parties in

24  this order, other than those investigation authorities to

25  have access, they will have access, but only with regard to

1    your clients being -- accompanying them through access.

2              MS. MILLMAN:  Correct.  Correct.

3              THE COURT:  So there will be a record kept by your

4    client --

5              MS. MILLMAN:  Correct.  Correct.

6              THE COURT:  -- of every time anybody other than

7    the authorities over which this court has no jurisdiction

8    accesses the apartment, and your client will accompany those

9    people --

10              MS. MILLMAN:  Correct.

11              THE COURT:  -- through the apartment at all times.

12              MS. MILLMAN:  Correct, Your Honor.

13              THE COURT:  And that's what the order provides.

14              MS. MILLMAN:  Yes, Your Honor.  I understand.

15              THE COURT:  Yup.

16              MS. MILLMAN:  But I just didn't want there to be

17    any misunderstanding.

18              THE COURT:  No, I appreciate that.  No.  I know

19    that no one has access to this apartment.  I mean, I don't

20    know, I've been told --

21              MS. MILLMAN:  Yes.

22              THE COURT:  -- but it seems logical, correct --

23              MS. MILLMAN:  Correct.

24              THE COURT:  -- that no one would have access to

25    this apartment at this time.  There's an ongoing

1    investigation --

2              MS. MILLMAN:  Correct.

3              THE COURT:  -- of which has nothing to do with --

4    (Courtroom audio recording equipment malfunction occurred

5    between 3:45:33 p.m. and 3:51:30 p.m.  No available audio

6    recording between these time stamps.)

7              THE COURT:  --  and so what I'm saying to you is

8    it's going to be heard fairly soon.  The issue is, is your

9    client going to withdraw the motion or proceed with it?

10             Which is completely -- you know, that

11   determination needs to be made.  I understand that.  And I'm

12   not quarreling with it.  But it's going to happen one way or

13   another because it has to happen.

14             You can't have a case where there's a position of

15   a party that says the Trustee who's acting on behalf of

16   everyone can't act.  I'm not going to go through three or

17   four more months of things and then five months from now

18   decide that he can't be the Trustee.  That makes no sense.

19             I mean, it's a -- it's an imperative issue in the

20   case.

21             MR. HENZY:  Your Honor, I understand.  I point out

22   the motion's been pending for two and a half months, but --

23             THE COURT:  The reason's been pending for two and

24   a half months, as you well know --

25             MR. HENZY:  Is because of the mediation.

1          THE COURT:  It's also because of the preliminary

2      injunction and the other issues that --

3          MR. HENZY:  There's been a lot --

4          THE COURT:  -- the Court has had to address --

5          MR. HENZY:  Right.

6          THE COURT:  -- and the Federal Rules of Civil

7      Procedure require the Court to address first.

8          MR. HENZY:  Understood, Your Honor.

9          THE COURT:  Okay.

10         MR. HENZY:  Your Honor, I would ask through April

11     13.  And I understand everything you've said.

12             I don't know when I'm going to be able to speak to

13     my client.  The communication I've gotten through the, you

14     know, frankly, prospective criminal counsel is that -- and

15     it's not to say that the bankruptcy is not extremely

16     important, but that's -- that is not his priority today.  It

17     just is not.  Which I, maybe I'm alone on this, but I

18     understand that --

19         THE COURT:  I don't think anybody's quarreling

20     with that.  I mean --

21         MR. HENZY:  So I --

22         THE COURT:  -- but the issue still is either the

23     motion gets withdrawn, it gets granted, or it gets denied.

24         MR. HENZY:  Understood, Your Honor.

25         THE COURT:  Okay?

1          MR. HENZY:  And I would ask for a continuance

2     through April 13.

3          And, Your Honor, I will say I want this to be

4     resolved also, believe me.  So I just -- I need to talk to

5     the client.  I don't know when I'm going to be able to do

6     that.  You know, we're whatever it is, five days out from

7     fairly significant events taking place.  I don't know what

8     ability I'm going to have to communicate unless and until

9     he's got criminal counsel.

10          Now, again, maybe the federal public defender will

11     speak to me.  I'm not sure about that because I think that

12     that counsel's input here is going to be important.

13          So, anyway, I would ask that the motion be

14     continued to April 13.  I understand that I'm going to need

15     to press it as quickly as possible and report to the parties

16     and to the Court what the decision is.

17          THE COURT:  Okay.  Thank you.

18          Trustee Despins?

19          MR. DESPINS:  Yeah.  Your Honor, there is a

20     prejudice to the pendency of this matter.

21          I remember something along those lines being

22     raised in the U.K. about the Trustee might be removed.  So

23     we just can't have this, you know, stay out there,

24     particularly given that the arguments in that motion about

25     the settlement was undone for improper reasons, all proved

1    out to be true.  Meaning true that the arguments that I made

2    about H Coin and all that, exactly what happened.

3           So that's why I say that to prosecute this motion

4    at this time is sanctionable and we will seek sanctions.

5    And it should be --

6           MR. HENZY:  And he can beat it to death.  Okay.  I

7    have a client and I need to speak to my client.  I don't

8    think that's hard to understand.  If he wants to threaten me

9    with sanctions because I have a client and I need to speak

10   to my client, then he can -- he can threaten me with

11   sanctions.  I don't think this is -- the position is hard to

12   understand though, Your Honor.

13          You have a person who's in jail.  He's my client.

14   I can't make decisions independent of my client.  I have to

15   speak to my client.

16          THE COURT:  Anyone else wish to be heard?

17          What's the U.S. Trustee's Office position on the

18   motion to remove the Trustee?

19          MS. CLAIBORN:  Your Honor, it does need an end.

20          THE COURT:  I can't hear you, Attorney Claiborn.

21   I'm sorry.

22          MS. CLAIBORN:  I think this microphone is --

23          THE COURT:  That microphone doesn't seem to be

24   working.  Huh?  Sorry.

25          (Pause.)

1          MS. CLAIBORN:  Your Honor, I wanted to say that I

2    do think that the motion to remove the Trustee does need an

3    end and it can't stay in perpetuity.

4          And I think that what I didn't quite understand

5    from what Attorney Henzy said is whether or not he actually

6    has tried to speak to his client.  I heard different things

7    around other people not being to access his client, but I

8    don't know whether or not he personally tried and was not

9    able to access his client.

10         Long story short, I realize that there are

11   competing interests for Mr. Kwok right now, but this

12   bankruptcy case does need to go and move and it can't sit

13   here until Mr. Kwok decides to prioritize it.

14         So it may be that the Court's best solution is to

15   impose a date and a response time and then Mr. Kwok will

16   have to abide by that.

17         THE COURT:  What do you mean a response time?

18         MS. CLAIBORN:  Meaning that a continuance to April

19   13th may just result in Mr. Henzy showing up on April 13th

20   saying I haven't been able to get access to my client.  I

21   don't know what the answer is.

22         THE COURT:  I see.  I just wanted to make sure I

23   understood.

24         MS. CLAIBORN:  And what I'm suggesting is that we

25   pick a path that has a very specific time frame for action

1    and decision making.

2              THE COURT:  Okay.  Thank you.

3              MR. HENZY:  Your Honor?

4              THE COURT:  Yes.

5              MR. HENZY:  I have said I am going to try to the

6    best of my ability, whatever that ability is, to communicate

7    with my client as soon as I can.  I'm not a criminal lawyer.

8    Right now, my communication has been through prospective

9    criminal counsel.

10             So I don't know when I'll be able to communicate

11   with my client and when my client will be ready and in a

12   position to talk about this motion.

13             I'm going to act with as much diligence as I

14   possibly can.  I'm committing to the Court to that, to the

15   parties, but I can't -- I can't do any more than that.

16             THE COURT:  Okay.  Thank you.

17             Does anyone else wish to be heard on the motion to

18   remove the Trustee?

19        (No response.)

20             THE COURT:  Okay.  I will take a look at the --

21   right now, we have it scheduled for Thursday.  It can't be

22   this Thursday because you have, excuse me, a mediation in

23   another case in this that's already been ordered by a court.

24             So I, Mr. Despins, am not going to move forward

25   with the motion to remove the Trustee on Thursday.  I don't

1   know what I'm going to do yet.  I heard what everyone has

2   said.  I'm going to think about it and probably --

3          What we need to think about is are the matters on

4   -- are the other matters on Thursday, one of I think you're

5   seeking to employ counsel in the U.K.  And I don't remember,

6   I'll look right now, what the other matters are on Thursday.

7   Hold on one second, please.

8          So right now, what's scheduled, oh, are motions to

9   quash subpoenas and a cross-motion to compel the

10  application.  It's all -- mostly is discovery related.

11         The motion to remove the Trustee will not be going

12  forward on Thursday, the 23rd, at noon.  That's clear.  When

13  it will, I'll take a look at it and we'll go from there.

14         With regard to the discovery issues on Thursday,

15  let's come back to those after we go through the specific

16  matters in each of the adversary proceedings.  Okay?

17         But just so everyone's clear, we are not having a

18  hearing on the motion to remove the Trustee on Thursday,

19  March 23rd.  That will be continued and I will figure out

20  till what date and time after the hearing today.

21         All right.  Now, let's -- now we can start turning

22  to, I'm sorry, we still have to deal with the motion to

23  extend time to respond to the show cause order with regard

24  to Mr. Kwok.

25         Mr. Moriarty, I think you filed that motion,

1    correct?

2              MR. MORIARTY:  I did, Your Honor.

3              THE COURT:  Okay.  Go right ahead.

4              MR. MORIARTY:  Thank you, Your Honor.  James

5    Moriarty for the debtor, Ho Wan Kwok.

6              Your Honor, the debtor's response to the order to

7    show cause, which requires him to show cause for his

8    invocation of his Fifth Amendment privilege against self-

9    incrimination in response to this court's order on a motion

10   compel, is currently due on March 28th, 2023.

11             For the reasons that Attorney Henzy just

12   articulated, the inability to get to speak with Mr. Kwok,

13   and really importantly for this issue, Your Honor, we had

14   been communicating on this issue with criminal counsel who

15   had represented Mr. Kwok in various matters, those attorneys

16   are not going to be representing him in this criminal case.

17             Mr. Kwok does not have private criminal counsel at

18   this point in time.  He's represented by a public defender

19   as Attorney Henzy said.  Mr. Kwok has, we believe, been

20   engaged in trying to find counsel based on conversations

21   that Attorney Henzy has had.

22             So what we're asking for is a 30-day extension to

23   April 27th, 2023 to respond to the order to show cause so

24   that we can communicate with our client regarding the

25   response and communicate with his criminal counsel regarding

1    this response which is really going to be a critical

2    response because it's a Fifth Amendment issue.  And there

3    can't be any doubt at this point in time that Mr. Kwok has a

4    reasonable belief that his liberty is in jeopardy since he's

5    been indicted and arrested.

6            And as we pointed out, one other point, Your

7    Honor, in the motion, the Department of Justice is taking a

8    very hard stance on Mr. Kwok being let out on bail.

9    Nobody's made a bail application at this point in time.

10           But assuming that he remains incarcerated, to the

11   extent this court orders him to do something, I don't know

12   how he could possibly do it.  So that's another factor that

13   goes into moving for this extension of time.

14           THE COURT:  Okay.  Thank you.

15           Response to the motion, please.

16           MR. BASSETT:  Your Honor, again, Nick Bassett,

17   from Paul Hastings, on behalf of the Trustee.

18           The Trustee opposes the request, Your Honor.  In

19   fact, strongly opposes the request for an extension for

20   several reasons.

21           First, I think we need to not be blind to the

22   history here and how long it's taken to get to this point.

23   I won't go way back to the beginning, but as the Court well

24   knows, we've been seeking this discovery from the Trustee

25   since August.

1      We went through a long arduous process of having a

2  motion to compel, a hearing on that motion, an order that

3  was not followed, an order to show cause.

4      And it was on February 7th actually that the --

5  and it was even prior to that that we learned from his

6  counsel that the debtor was going to be asserting the Fifth

7  Amendment in a blanket manner supposedly to prevent him from

8  producing a single additional document to the Trustee on any

9  topic whatsoever.

10      And then on February 7th, the debtor submitted a

11  declaration with this court, at that time, that's a month

12  and eight days before the announcement of the indictment and

13  the criminal charges, he at that point had already taken the

14  position that in his view under the law he had the right to

15  assert the Fifth Amendment in blanket fashion as to all

16  discovery sought for him.

17      So to allow the debtor to now -- and I'll get to

18  other points in a moment, but just to level set where we

19  are, to allow the debtor to now get an additional 30 days,

20  he was supposed to comply with the Court's order compelling

21  production in January.

22      And then he was supposed to, if he was going to

23  assert a Fifth Amendment privilege in his declaration that

24  the Court ordered him to do on February 7th, he should have

25  explained at that time why it was appropriate for him to

1    make that assertion and why he, in fact, is entitled to rely

2    on the Fifth Amendment to not produce any documents.

3            So, yes, the criminal charges have now been filed.

4    But as of February 7th, he represented to this court in a

5    declaration that his counsel submitted saying he had the

6    Fifth Amendment protection at that time.  At a minimum, they

7    need to be able to explain to the Court why that was

8    justified then.

9            If anything now, in light of the criminal charges,

10   he may have other things to add to it, but he thought at

11   that time he had the ability to make that argument and that

12   should be explained.

13           The other thing is there's absolutely no reason he

14   can't respond by the 28th, which is the current deadline.

15           Yes, I understand counsel apparently -- you know,

16   I don't know the extent to which access has been tried to

17   get by Zeisler to their client.  I understand there's an

18   issue with criminal counsel.  But it will be nearly two

19   weeks by the 28th since his arrest.  That, under the

20   circumstances, I mean, it should be -- it should be enough

21   time for them to find a way to consult with their client.

22           I don't know what COVID protocols there are at the

23   jail, but it can't be that he's not able to visit with

24   counsel while he's being held.  That just can't be.

25           The other thing I would say is this idea that he

1   can't produce -- and the statement in the motion for an

2   extension was actually shocking when I read it -- the

3   statement was that so long as the debtor's incarcerated,

4   which based on the charges could theoretically be for the

5   rest of his life, he's not able to produce documents in

6   response to an order on a motion to compel.

7           I don't know why the debtor would need to be

8   outside of jail to have his counsel and others in possession

9   of documents of which he has custody or control why he can't

10  do that while he's incarcerated.  Of course he can.  So I

11  don't understand that at all.

12          The last point I would make, Your Honor, is that

13  there is real urgency here.  We can't just sit back and let

14  the debtor continue to perpetually ignore orders of this

15  court and ignore his discovery obligations as he has for

16  nearly the past year, especially in light of recent events.

17          Your Honor, there have been news reports.  And

18  obviously what happened at the Sherry-Netherland is under

19  investigation.  We don't know what the cause will be.  But

20  the *New York Post* reported that one of the things that's

21  being investigated is whether the fire was started remotely

22  in the apartment.

23          And just a few hours ago, a reputable news outlet

24  published a story talking about how in 2017 a Chinese court

25  found that the debtor's brother and three other defendants

1   had burned 80 to 90 -- 70 to 80 boxes of documents, burned

2   70 to 80 boxes of documents that contained accounting

3   records, receipts, et cetera that would have been damaging

4   to the debtor.

5           So, Your Honor, in light of what's going on, there

6   are admittedly a lot of crazy events that none of us every

7   anticipated, we can't be in a world where whoever has

8   documents that might be critical to this case that we

9   requested long ago can just sit on them and we the Trustee

10  have to bear the risk of what might happen to those

11  documents in the future.

12          So we strongly object.  And to a 30-day extension,

13  we absolutely object to that, Your Honor.  There's no reason

14  it should be delayed at all, and certainly not by 30 days.

15          Thank you.

16          THE COURT:  The only thing I would say in response

17  to what you just said, Counsel, is with regard to the

18  reports about the fire and the burning of other information

19  some time ago, there's nothing in the record here in this

20  court to support any of that, so I have to not consider

21  that.  I mean, it's not at this point, you know --

22          MR. BASSETT:  And I'm not asking the Court to

23  consider that, Your Honor, as facts.  Certainly not.  All

24  I'm saying is that just in light of the possibility that

25  anything can happen --

1          THE COURT:  I understand that.  I mean --

2          MR. BASSETT:  -- we can't be in a world where we

3    just sit back and wait.

4          THE COURT:  -- that's possible in any situation,

5    right?  I understand your point.  I do understand that

6    point.

7          But, you know, unless and until the investigation

8    produces some -- the investigation by the authorities who

9    are investigating, right, produces something about how the

10   fire was started or whatever, I just am not taking that into

11   consideration.

12         What I'm taking into consideration are issues that

13   both parties have raised, which are that the discovery's

14   been pending since August of 2020, that there have been

15   different orders of this court that have required compliance

16   with that discovery, that Mr. Kwok filed a blanket assertion

17   of his Fifth Amendment privilege in February before -- I

18   think more than a month before the indictment was issued,

19   and that counsel is saying they need time to communicate

20   with him.

21         I'm going to take all of that into consideration

22   in determining what to do in connection with the motion for

23   extension of time.

24         MR. FRIEDMAN:  Your Honor.

25         THE COURT:  I think Mr. Friedman wants to be

1    heard.

2              Hold on just a second, Mr. Friedman.

3              MR. FRIEDMAN:  Yes.  I just wanted to make --

4    sorry.

5              THE COURT:  Just hold on a second.

6              So, Mr. Bassett, is there anything else you wanted

7    to add?

8              MR. BASSETT:  No.  Thank you, Your Honor.

9              THE COURT:  Okay.  Thank you.

10             All right.  Go ahead, Mr. Friedman.

11             MR. FRIEDMAN:  Your Honor, I just wanted to say we

12   think it's really important that this issue get addressed

13   quickly because, for example, the debtor's obligations are

14   ongoing.

15             The debtor may, in the context of his defense,

16   receive financial information from the Government, that is,

17   the Government's required to produce.  He may on his own

18   accord, if he has counsel, go out and do an investigation

19   that would bring into -- under his auspices, custody or

20   control, financial documents in order to disprove the

21   Government's allegations, and those should be turned over to

22   the Trustee because they relate to the debtor's financial

23   condition.

24             And, you know, once those are out there, they

25   should be produced immediately if they're in the debtor's

1   custody, control, or one of his agents.  And resolving this

2   issue I think will bring that issue to a head as well and on

3   the Trustee hopefully with additional information to be able

4   to pursue the debtor's assets wherever they are.

5             THE COURT:  Okay.  Anyone else wish to be heard on

6   the motion to extend time for Mr. Kwok to respond to the

7   order to show cause?

8             MR. MORIARTY:  Your Honor, if I may, just a couple

9   of points.

10            THE COURT:  Go right ahead.

11            MR. MORIARTY:  To the extent that the Court finds

12  that Mr. Kwok's invocation of his Fifth Amendment privilege

13  was appropriate --

14            THE COURT:  I couldn't hear you.  I'm sorry.

15  Could you say that again?

16            MR. MORIARTY:  Sure.

17            THE COURT:  His invocation of his Fifth Amendment?

18            MR. MORIARTY:  Privilege was appropriate under the

19  circumstances --

20            THE COURT:  You mean as of February 7th?

21            MR. MORIARTY:  Correct.

22            THE COURT:  Okay.  Go ahead.

23            MR. MORIARTY:  Then he has applied with the

24  Court's order because he has invoked his Fifth Amendment

25  privilege under the Constitution which he's entitled to do.

1          And that is one of the reasons why it's critical

2     that we have access to Mr. Kwok's criminal counsel once

3     criminal counsel is retained.

4          As I said, we had been working with criminal

5     counsel on this issue.  They're moving on.  Mr. Kwok is in

6     the process of retaining new criminal counsel.

7          We're asking for 30 days to protect a

8     constitutional right and that's all that we're asking for.

9     Thank you.

10          THE COURT:  Okay.  Anything further from anyone?

11     (No response.)

12          THE COURT:  Okay.  I will review this matter.  And

13     as true with the motion for extension of time on the hearing

14     to remove the Trustee, I will rule hopefully within the next

15     few days.  But I'm going to review it all given what we've

16     all talked about today.

17          All right.  And as far as the other matters on the

18     calendar today, I'm going to turn -- I am now going to turn

19     to specific adversary proceedings.  Give me one second,

20     please.  It may be more than one.  Okay.

21     (Pause.)

22          THE COURT:  So now we're turning to the adversary

23     proceedings.  And I'm first going to turn to 23-05002,

24     Genever Holdings, LLC, et al, versus Kwok, et al.  And there

25     are two motions that I said we were going to discuss at the

1    hearing, at the status conference today in that adversary

2    proceeding.

3            And the first motion is the motion to extend time

4    to respond to the complaint, Mr. Moriarty, that you filed on

5    behalf of the defendant, Mr. Kwok, seeking an extension of

6    time until April 10 to respond to the complaint.

7            MR. MORIARTY:  Yes, Your Honor.

8            And it's probably not fair to do this, but we

9    asked for 21 days.  The Trustee agreed to seven.  If the

10   Trustee is willing to split the difference and agree to 14,

11   and if the Court's willing to do that, we would say the

12   extension to April 3rd, 2023, that should give us sufficient

13   time.  This is going to be an answer to a complaint.  That

14   should give us sufficient time to communicate with our

15   client hopefully and also to get the client's position on

16   this.

17           As Your Honor probably recalls, this is really a

18   case to effectively evict the debtor and his family from the

19   Sherry-Netherland.  And in light of what happened, I would

20   like to speak to my client and determine if there's been a

21   change of position.  Maybe there hasn't been, but maybe

22   there has been.

23           THE COURT:  Attorney Bassett?

24           MR. BASSETT:  Your Honor, I think it's been a

25   theme today that obviously the Trustee's view --

1        THE COURT:  Can you get the microphone closer to

2    you?  I'm sorry.

3        MR. BASSETT:  That's okay.

4        The Trustee's view is -- is very clearly, as the

5    Trustee stated in his status report and as I was

6    communicating during the last matter that, you know, we

7    cannot be in a position where there are continual delays in

8    the progress that the Trustee is trying to make in this case

9    as a result of the recent events, et cetera.

10       That very significant caveat being said, in the

11   case of this particular request, we had said, you know,

12   we'll give you a week to kind of get your bearings and get

13   the answer on file.  We're not going to stand in the way of

14   extending that to 14 days, so we're fine with that.

15       THE COURT:  So you'll agree to April 3rd?

16       MR. BASSETT:  That's correct, Your Honor.

17       THE COURT:  Okay.  Thank you.

18       Then the motion to extend time will be granted in

19   part and the extension will be granted through and including

20   April 3rd.

21       Okay, Mr. Moriarty?

22       MR. MORIARTY:  Yes, Your Honor.

23       And I know Attorney Goldstein also has a motion

24   for his client at this time.

25       THE COURT:  Yeah.  He's next.  That's the next

1    matter.  Thank you.

2           All right.  Hold on -- just let me make a note.

3       (Pause.)

4           THE COURT:  All right.  So then the next matter in

5    22, sorry, 23-05002 is the motion to extend time to respond

6    to complaint to April 10.

7           Attorney Goldstein, you represent the defendant in

8    that, in connection with ECF No. 31, correct?

9           MR. GOLDSTEIN:  Yes, Your Honor.  I represent Hing

10   Chi Ngok.

11          And we filed our first motion for an extension of

12   time to respond to the complaint of the 21 days based on the

13   previous conversation of the Court and the Trustee.  If the

14   Trustee is willing to extend the time to 14 days, Ms. Ngok

15   would agree to the same.

16          THE COURT:  Thank you.

17          Attorney Bassett?

18          MR. BASSETT:  That's fine, Your Honor.

19          THE COURT:  All right.  So then the motion to

20   extend time to respond to complaint will be granted in part.

21   An order will enter granting an extension of time to April

22   3rd.

23          MR. GOLDSTEIN:  Thank you, Your Honor.

24          THE COURT:  Thank you.

25          Then turning to the adversary 22-05003, HK

1   International, the HK International adversary proceeding.

2   This is the motion to expedite the hearing on the summary

3   judgment motion, correct?

4            MR. DESPINS:  Yes, it is, Your Honor.

5            THE COURT:  Okay.  And so you're asking that the

6   summary judgment motion -- well, no one has responded yet

7   because it was filed yesterday.

8            So what is the -- what are the -- what is the HK

9   parties' response to the motion to expedite the hearing on

10  the summary judgment?

11           MR. MORIARTY:  Good afternoon, Your Honor.  James

12  Moriarty, from Zeisler & Zeisler, for the HK parties as Your

13  Honor just described them.

14           The summary judgment motion was filed on

15  Sunday/Monday.  Part of it was filed Sunday evening, late.

16  Part of it was filed on Monday morning early.  The Trustee

17  is asking that the HK parties respond to this motion within

18  six days and that the Court hold a hearing on the seventh

19  day.

20           The local rule, as Your Honor knows, is 21 days to

21  respond to motions.  And motions for summary judgment

22  generally are even further than that by agreement.  We

23  wouldn't ask for more than 21 days here. The issue that the

24  Trustee raises is a res judicata issue and it was addressed

25  in prior briefing.

Ho Wan Kwok-March 21, 2023                                    74

1          But this is a summary judgment motion.  This is

2     not a motion for judgment on the pleadings or a motion to

3     dismiss.  It's a summary judgment motion.

4          The Trustee, through his counsel, has filed a I

5     believe 48-paragraph, I could be off by a couple, Local Rule

6     56(a)(1) statement.  HK is required to respond to that Local

7     Rule 56(a)(1) statement.  It's required to prepare its own

8     56(a)(2) statement with evidence.

9          And there may be some additional facts that HK

10    wants point out based on the record before Judge Ostrager,

11    which is primarily what the Trustee relies on.  There also

12    may be evidentiary issues that the HK parties which to

13    address within the 56(a)(1) statement of the Trustee.

14         Is all of the evidence that the Trustee is relying

15    on admissible?  We don't know because we've only had the

16    motion for a day.

17         To require the HK parties, and I believe it's just

18    HK in this case, Your Honor, not also Ms. Guo --

19         THE COURT:  Yes, it is.

20         MR. MORIARTY:  -- so to require to HK to respond

21    to a summary judgment motion where the Trustee is seeking a

22    judgment which would give the Trustee title to the Lady May,

23    a 25-ish million dollar asset, in six days is just

24    fundamentally unfair.  HK should have at least the full 21

25    days to respond to this motion, Your Honor.

1          THE COURT:  Okay.  Well, I'm not sure if I

2    completely agree with you that it's fundamentally unfair.  I

3    understand your argument.  But Mr. Vartan represented HK and

4    Ms. Guo and he has an appearance in this adversary

5    proceeding in the matter before Justice Ostrager, and so I'm

6    not sure it's fundamentally unfair.  However, I will take

7    into consideration what you've said.

8          The problem is in this situation the same

9    counsel's been involved for several years now.  The matters

10   in front of Justice Ostrager were brought to the Court's

11   attention I think on the second or third day of the filing

12   of this case.  We're more than a year past that now.

13         And Attorney Vartan, not only has he appeared here

14   and made arguments on behalf of HK and Mei Guo, but

15   apparently argued this and introduced evidence and

16   introduced witnesses on behalf of HK and Mei Guo in the PAX

17   litigation in front of Justice Ostrager even though those

18   parties were not parties to that litigation.

19         So while I hear what you're saying, I think that

20   this is -- this is not a normal case where someone has been

21   met with a motion for summary judgment and never had an

22   opportunity to litigate or discuss these issues in the past.

23         And as a summary judgment motion does, and this

24   one appears to do, it's saying there's already a final

25   judgment that can't be disturbed.

1          Now, you all have briefed the issue.  And

2     apparently under New York Law, the ability to make a finding

3     of collateral estoppel or res judicata is not impacted by a

4     pending appeal where it would be in Connecticut under

5     Connecticut law.

6          So I will consider everything you've said, but I

7     think that this is a different situation.

8          If this was a case where there was no prior

9     litigation among the parties, if the same entity who

10    voluntarily commenced this adversary proceeding by the way,

11    HK commenced this adversary proceeding, not Trustee Despins,

12    and HK was represented in the action in which the Trustee is

13    asking this court to make findings based on collateral

14    estoppel or res judicata by the same lawyer who's in this

15    case in front of this court, so it's not the same.

16         It doesn't mean I might not agree with you fully,

17    ultimately, but it's not the same.  It's not as if this was

18    a brand new case filed and nobody had any idea of what was

19    going on.

20         And, in fact, you know, summary judgment in

21    Connecticut -- and the district court rule says, which is

22    the rule we follow with regard to summary judgment, that,

23    you know, you don't -- you don't seek summary judgment in a

24    district court unless you're convinced you're going to be

25    successful.

1          I mean, there's a -- there's very strong words

2     that the district court judges includ in their local rules

3     on summary judgment.  I have to look at them sometimes.  I

4     don't remember all the words.

5          But it says the Court appreciates the utility of

6     summary judgment as a tool to manage the Court's workload by

7     avoiding unnecessary trials.

8          But at the same time, the Court wishes to

9     discourage the filings of motions for summary judgment in

10    circumstances where responsible counsel and self-represented

11    parties should recognize the motion cannot be granted.

12         Therefore, the Court has adopted this local rule

13    to remind counsel and self-represented parties of the

14    standard for summary judgment and of their obligations with

15    respect to motions for summary judgment.

16         So I just, you know, that's something that I look

17    at anyway when motions for summary judgment are filed.  It

18    doesn't mean that it means the summary judgment motion is

19    granted.  It's that there's a -- the party who files the

20    motion for summary judgment has an obligation to assert that

21    there's no genuine issue of material fact to try.

22         And if the -- if Trustee Despins is correct, which

23    I don't know if he is or not, then -- and collateral

24    estoppel can apply based upon a prior ruling that is --

25    under New York has collateral estoppel effect, then I don't

1  know -- I'm not sure what there would be to try.

2          What you're asking is -- you're saying you need

3  time to respond.  The 21-day response period would be what?

4          MR. MORIARTY:  I believe April 10th, Your Honor.

5  I believe.

6          THE COURT:  April 10th?

7          MR. MORIARTY:  Yes.

8          MR. DESPINS:  Your Honor, may I be heard on this?

9          THE COURT:  Yes.

10          MR. DESPINS:  I have to say I'm quite surprised by

11  the argument here.

12          Of course, in theory, they should get 21 days, but

13  not a word about the insurance lapsing on the 28th.  Not a

14  word about, don't worry, we have the money.  We'll pay the

15  crew.  We'll pay.  So that's what tips this.

16          One, there's no prejudice because this had already

17  been fully briefed.  The only thing that changed is that the

18  standard -- the standard of proof is different on summary

19  judgment than on prejudgement attachment, of course.  But

20  the --

21          We cited the same cases, exactly the same cases.

22  Didn't add one case.  So there's no surprise.  This is just,

23  you know, re-jiggering their brief that they already filed

24  in opposition to this.  So there's no -- there's no

25  prejudice to them.

1          But the prejudice to the estate here is that if

2     we're right that this is our yacht, there's no insurance on

3     the 28th.  They're not paying for anything.  The crew is

4     going to walk.  So the point is that from the estate's point

5     of view there is extreme prejudice.

6          And the fact that he's not saying a word about

7     that really surprised me.  I thought they would say the

8     Trustee's being an alarmist.  We're going to take care of

9     this.  It's fine.  But, no.  It's scorched earth, meaning

10    they're walking away from the ship.

11         So we need to protect the estate.  And that's

12    plenty of reason to overcome the 21 days.  And if it were

13    not for the fact that there's no prejudice, there's extreme

14    prejudice to the estate if we don't go forward, Your Honor.

15         Thank you.

16         THE COURT:  Thank you.

17         Mr. Moriarty?

18         MR. MORIARTY:  Your Honor, the -- so there is an

19    issue with insurance.  And I'm not denying that there's an

20    issue with insurance.

21         THE COURT:  You just need to talk a little louder

22    so we can hear you.

23         MR. MORIARTY:  Sure.

24         THE COURT:  Go ahead.

25         MR. MORIARTY:  I said there is an issue with

1    insurance.  And I'm not denying that there's an issue with

2    insurance.

3            But what I'm focused on and what's before the

4    Court is the motion to force a response to a summary

5    judgment motion on six days.

6            THE COURT:  I understand.  I guess what Mr.

7    Despins is saying though is if you come up with payment for

8    insurance, he won't press the summary judgment motion.

9            MR. MORIARTY:  Right.  And it's not -- the issue's

10   not payment, Your Honor.  The issue is the ability to

11   procure a policy.  That's the issue.

12           THE COURT:  Well, you've had a policy in the past.

13   What happened?

14           MR. MORIARTY:  People will not -- insurers will

15   not write it.

16           THE COURT:  Why?

17           MR. MORIARTY:  Well, what we've been told is the

18   primary issue is what they call the UBO, the ultimate

19   beneficial owner.  And where this -- so this is hearsay,

20   Your Honor.  I'm just telling you what's been explained to

21   me.

22           This came up and really started to be an issue for

23   insurer of vessels after the Russia/Ukraine war started and

24   yachts of Russian oligarchs were being seized by western

25   governments.  Not because the insurers were on the hook for

1   the value of the boats, but because the insurers were

2   concerned about reputational risks and because the insurers

3   were concerned about violating sanctions orders that were

4   put in place by western governments.

5           Now, that's not our issue here.  It's not a

6   Ukraine/Russia issue.  But as a result of that issue,

7   insurers started to look at what they call ultimate

8   beneficial owner.  And here they see a relationship, whether

9   it's correct, incorrect, true or not true, between this

10  yacht and Mr. Kwok and they refused to write a policy.

11          THE COURT:  Well, who wrote the policy that was in

12  play -- that's in place until the 28th?

13          MR. MORIARTY:  It is a company by the name of --

14  just give me -- Skuld, S-K-U-L-D.  That policy expired

15  actually on February 28th.  Skuld agreed to extend it by one

16  month and they've refused to extend it going forward.

17          THE COURT:  Okay.  And who negotiated with them to

18  agree to extend it by one month?

19          MR. MORIARTY:  I believe -- I don't know, Your

20  Honor.  I know that there was attorneys in my office that

21  had conversations, but I can't tell you who negotiated that

22  with them.

23          THE COURT:  But your office negotiated an

24  extension?

25          MR. HENZY:  No.  I believe, Your Honor, that an

1    attorney in my office had discussions with whoever

2    negotiated the extension, but I don't think we negotiated

3    the extension.

4            THE COURT:  Okay.  Well, who was it that --

5            MR. HENZY:  And I don't --

6            THE COURT:  -- negotiated the extension?

7            MR. HENZY:  I don't know.

8            MR. MORIARTY:  Yeah.  Your Honor, I --

9            THE COURT:  Well, you have to know.  Somebody in

10    your office has to know if they had discussions with

11    somebody who negotiated the extension.

12            MR. MORIARTY:  I agree.  But it wasn't myself and

13    it wasn't Attorney Henzy.  There's obviously --

14            THE COURT:  But let's just step back.  Listen to

15    what you just said to me, right?  You said no insurer will

16    insure because, whether they're right or wrong, they

17    associate the yacht with Mr. Kwok.  That's what you just

18    said, right?

19            MR. MORIARTY:  That's what we have been told.

20            THE COURT:  Okay.  So then if you can't get an

21    extension of the insurance, why shouldn't the Trustee move

22    forward with summary judgment in that short amount of time?

23    Because the insurers think that the yacht is associated with

24    Mr. Kwok.

25            MR. MORIARTY:  Your Honor, two things.

1        One, the Trustee could have moved for this motion

2    or he could have moved for summary judgment months ago if he

3    believes --

4        THE COURT:  Not with regard to the fact that the

5    insurance is lapsing.

6        MR. MORIARTY:  I agree.  But if it's just a legal

7    issue and it's that simple of a motion, he could have made

8    the motion a long time ago.

9        But there's also no guarantee that the --

10       THE COURT:  But that doesn't matter.  That doesn't

11   matter.  Let's just cut to the chase of what really matters

12   here, right?

13       MR. MORIARTY:  There's no guarantee that the

14   Trustee is going to be able to insure this boat either.  So

15   he's seeking to take this asset on six-days notice with no

16   guarantee that he's going to be able to get a policy.

17       THE COURT:  And so why do you care?  About that.

18   About that.  I'm saying -- I'm just trying to understand

19   your thought process.

20       MR. MORIARTY:  So I --

21       THE COURT:  Why would you care if the Trustee

22   can't get a policy?

23       MR. MORIARTY:  Because the whole basis for the

24   Trustee's we need this done yesterday is there's not going

25   to be insurance.  And if the Trustee can't get a policy,

1   then that's not a basis for moving this forward at lightning

2   speed.

3            THE COURT:  Well, what are you going -- what's

4   your client going to do?  You're client's going to let the

5   policy lapse and not have any insurance?  Isn't that --

6   isn't that -- wouldn't that be cause of action right there

7   to not insure and asset that your client claims the entity

8   owns?

9            MR. MORIARTY:  Your Honor, the client can only do

10  what the client can do.  And --

11           THE COURT:  But I don't know what that means.

12           MR. MORIARTY:  So we've -- again, my

13  understanding, I wasn't involved in this, have had

14  discussions or there have been discussions with 13 carriers,

15  none of whom are willing to write a policy on this boat.

16  And it's a particular type of insurance.  It's called

17  protection and indemnity insurance.  There's three other

18  policies that are currently in place and they're in place

19  through 2024.  But for some reason, and again--

20           There's been three reasons.  The primary reason

21  has been this UBO, ultimate beneficial owner.  The two other

22  reasons that have been given for the refusal to write

23  policies are the boat is in the navigable waters of the

24  United States and the owner is a U.S. company.  Why that

25  matters to insurers, Your Honor, I don't know.

1          THE COURT:  Well, we need to find out, right?

2     Otherwise, you're going to have to respond to the summary

3     judgment motion.

4          So do you want to try to find the answers to these

5     questions and inform the Court, or do you want to -- I mean,

6     I know you don't want to respond to the summary judgment

7     motion.

8          But, I mean, you know, you can't have an asset, a

9     potential asset that's subject to a temporary restraining

10     order that your client agreed to, by the way, your client

11     agreed to all that, now subject to a PJR, and another

12     preliminary injunction, be uninsured.  I mean, you just

13     can't have that, right?

14          So, you know, we can either try to come up with a

15     solution to that or then I may have no choice but to mandate

16     that you respond to summary judgment over your objection.

17     And I understand your objection.  I do.  I'm not quarreling

18     with it.

19          But, you know, you -- you know.  Some of us are

20     old enough to remember that the first thing Judge Krechevsky

21     used to say is do you have insurance?  And if you didn't, he

22     didn't want to hear about it or he said you better get that

23     insurance and not come back into this courtroom until you

24     have it.  Right?

25          So the -- we need to solve the problem one way or

1    another.  But we've got to solve --

2           MR. MORIARTY:  Your Honor --

3           THE COURT:  We can't wait until next week to solve

4    it.  Today is Tuesday, right?

5           MR. MORIARTY:  It is.

6           THE COURT:  We don't have a lot of time.  And I've

7    seen insurance binders written in, you know, three hours.

8    So what -- it can happen.  I mean, it could happen.  I'm not

9    saying it will happen.  I'm saying it's not outside of the

10   realm of possibility, right?  So we need to figure out how

11   that's going to happen or I may have to do what the

12   Trustee's asking me to do.

13          MR. MORIARTY:  Understood, Your Honor.

14          Is there a time by which you would like us to

15   report back?

16          THE COURT:  Well, let me think about that.  I

17   mean, we have hearings scheduled on Thursday.  I don't know

18   if Thursday gives you enough -- if, for example, you report

19   back that there's no way that there's insurance coverage for

20   another month or two, I'm cutting into your time to respond

21   to summary judgment if I have to go down the path that the

22   Trustee has proposed.

23          So that's up to you I suppose in some respects.  I

24   mean, I don't think we should go beyond Thursday.  I think

25   our Thursday hearings are at 11 a.m.

1          What were you going to say, Trustee Despins.

2          MR. DESPINS:  Your Honor, we have people looking

3     for insurance in a presumptuous way in the event the Court

4     would grant the relief we're seeking.  And these people need

5     to be working full bore.  We cannot wait until Thursday to

6     know.

7          THE COURT:  Okay.

8          MR. MORIARTY:  Your Honor, we'll report back by 5

9     p.m. tomorrow if that's acceptable to the Court.

10          THE COURT:  Well, I think we're going to have to

11    have a hearing.  I don't think it's necessarily report back.

12    I'm going to have to listen to what you have to say, right,

13    because then I'm going to have to rule.  I'm going to have

14    to figure out -- if you can't -- and whether you can or

15    cannot, I have no idea.

16          But if there's no ability from your perspective to

17    have some insurance on this yacht after the 28th of March,

18    then I may have no choice then but to move.  I have to

19    protect, I don't, but the Court as the person that oversees

20    the case as a whole, has to make sure that there are

21    protections in place for assets.  I mean, you know --

22          So I think we have to have a hearing.  I think

23    we'll have to continue this.

24          But what I'll do is, and I might do the same on

25    Thursday too, we'll see, and it's only under the specific

1   circumstances of what's going on right now, okay, because

2   there's a lot going on as you can tell.  We've been sitting

3   here talking for a long time.  I'm sure everybody's tired,

4   but we have to deal with these issues.

5           Let me just look back at the calendar for a

6   second, please.

7           (Pause.)

8           THE COURT:  Did you have a thought before I said

9   something, Counsel?  Were you going to say something else?

10          MR. MORIARTY:  I did, Your Honor.  May I just

11  speak with the Trustee for a moment?

12          THE COURT:  Certainly.  Go right ahead.

13          (Pause.)

14          MR. MORIARTY:  So, Your Honor, what I just spoke

15  to the Trustee about is, and we've agreed that we will

16  report back by 5 o'clock tomorrow, that we either have found

17  insurance or we don't, and if we don't, then the Court can

18  grant the Trustee's motion.

19          THE COURT:  All right.  All right.

20          MR. MORIARTY:  Then that saves us from having --

21          THE COURT:  So when you report back, you're going

22  to send an email to the courtroom deputy box with CC'ing, is

23  that what you're planning on doing?

24          MR. MORIARTY:  Yes.

25          THE COURT:  Okay.  By 5 p.m. tomorrow?

1          MR. MORIARTY:  Yes.

2          THE COURT:  So, okay.  All right.  And if you

3     don't have insurance, then what I would do is grant their

4     scheduling order essentially --

5          MR. MORIARTY:  Okay.

6          THE COURT:  -- requiring you to respond, to the

7     extent that you decide to, to respond to the motion for

8     summary judgment.  And then we'll -- so we're looking for a

9     hearing on Monday the 27th on the summary judgment motion?

10          MR. DESPINS:  Yes, Your Honor.

11          And just to clarify, this is bound and paid

12     insurance, you know,

13          THE COURT:  You know, whatever you two agreed to

14     is fine with me.  I just -- there has to be insurance.

15     There just has to be.

16          So when I'm looking at Monday's calendar, I have a

17     couple of things that I could -- it's not -- I can --

18     they're easily movable, but I'm thinking obviously --

19          I don't know if you agree, Attorney Moriarty, but

20     from what I've seen so far, it's a legal argument.  You may

21     disagree with it.

22          I'm not -- I would expect that you both wouldn't

23     need more than an hour each side for an argument.  Do you

24     think you'd need more than an hour each side for argument?

25          MR. BASSETT:  No, Your Honor.  I would say less

1    than that.

2            MR. MORIARTY:  I don't think so, Your Honor.

3            The one thing that I do want to say, and Attorney

4    Vartan's name has come up a few times today, he had a 2

5    o'clock court hearing in New Jersey today.  This was

6    scheduled yesterday.  My expectation is that he is going to

7    be arguing this motion on Monday.

8            MR. DESPINS:  Yes.

9            MR. MORIARTY:  But I do not believe --

10           THE COURT:  You want to go text him?  Because

11   we're having a hearing on Monday if there isn't an agreement

12   with insurance.  So I'm not changing the time because of --

13   I mean, that's not your issue.  I understand that.  But I'm

14   not changing the time once I set it because of his

15   availability or unavailability.

16           MR. MORIARTY:  Just so I'm clear, Your Honor,

17   you're saying text him and find out his schedule on Monday

18   so we --

19           THE COURT:  Yeah.

20           MR. MORIARTY:  Okay.

21           THE COURT:  I mean, I'm prepared to start this

22   hearing at 11:00 a.m., give each side an hour each at the

23   most.  That's it.

24           MR. MORIARTY:  Okay.  All right.  May I step out?

25           THE COURT:  Yes, please.

1              MR. MORIARTY:  Thank you.

2              THE COURT:  Yes, please.

3              Why don't we take a five-minute recess, or, you

4      know, maybe ten minutes.

5              But, Attorney Moriarty, that's what I need you to

6      do, okay, and then you can report back.

7              MR. MORIARTY:  Yes.

8              THE COURT:  Okay.  If Mr. Moriarty needs more

9      time, Attorney Henzy, let me know.

10             MR. HENZY:  I'm just -- I'm going to step out,

11     Your Honor, and try to see if I can find (indiscernible) --

12         (Court recessed at 4:43 p.m.)

13         (Proceedings resumed at 4:53 p.m.)

14             THE COURT:  Go right ahead.  Did you have a chance

15     to reach out?

16             MR. MORIARTY:  I did, Your Honor, but I was

17     unsuccessful.

18             THE COURT:  You were unsuccessful?

19             MR. MORIARTY:  Yes.

20             THE COURT:  All right.  Well, then you'll have to

21     be prepared to argue the motion for summary judgment if --

22     you or someone in your office if Mr. Vartan is not

23     available, if there is not insurance by tomorrow, because

24     I'm going to have that hearing on Monday morning regardless.

25     Okay?

1        MR. MORIARTY:  Okay.  I understand, Your Honor.

2   Thank you.

3        THE COURT:  All right.  So we're going to -- we're

4   going to -- so the motion to expedite the hearing on the

5   motion for summary judgment, I'm not going to touch that

6   right now.  Because if tomorrow at 5:00, there's a -- I'm

7   correct, right?  Tomorrow at 5:00, if there's a report that

8   there's insurance for a period of time, we're not going

9   forward with summary judgment next Monday or are we,

10  Attorney -- Trustee Despins?

11       MR. DESPINS:  No.  Conceptually, yes.  I'm just

12  thinking whether it would be better to schedule that hearing

13  and cancel it or -- that's really your decision?

14       THE COURT:  Well, I guess we'll grant it in part

15  and schedule it and we'll enter something.  It won't be in

16  tonight.  It will be tomorrow for Monday at 11:00, with the

17  understanding that if there's some agreement with regard to

18  insurance by 5:00 p.m. tomorrow, that hearing may not

19  proceed on Monday at 11:00.

20       Now, that doesn't mean -- we'll have to -- we can

21  discuss it again on Thursday I suppose.

22       I mean, I don't know if you're -- if either of you

23  are planning on being here on Thursday.  I'm not sure it

24  impacts the debtor directly.

25       MR. MORIARTY:  I don't believe --

1        THE COURT:  They're mostly discovery issues on

2    Thursday now that the motion to remove the trustee won't be

3    heard on Thursday.

4        MR. MORIARTY:  Correct.  I know Attorney Henzy

5    won't be here because he'll be somewhere else.

6        THE COURT:  Right.  Right.  I'm sorry.  I forgot.

7        MR. MORIARTY:  And I don't know that anybody else

8    from my office plans to be here.  But if the Court schedules

9    something that causes us to be here, we'll be here.

10        THE COURT:  Well, this is what -- let me just ask

11    everyone before we go any further.

12        I think, except for one thing that I haven't

13    addressed with the parties yet, that I've addressed

14    everything that you asked, Trustee Despins, and that the

15    Court ordered today, is that correct?

16        MR. DESPINS:  That's correct.

17        THE COURT:  I mean, is there -- I have one issue I

18    need to raise with everyone, but it's not -- it's not

19    anything with regard to what you've all talked about today.

20        MR. DESPINS:  That's correct.  That's correct,

21    Your Honor.

22        THE COURT:  Okay.  So what I'm going to do is as

23    follows.  I have one issue still.  We have one issue.

24        So we talked about this, Trustee Despins a few

25    weeks ago, well before any of the events of last week, and

1     it had to do with Epiq's services and the fact that the

2     clerk of the court and Epiq have been talking about

3     transferring all the information back to the -- to this

4     court, the clerk's office, to have the public claims

5     register be in the control of the clerk's office with all

6     the public claims and then have the confidential claims also

7     be in control of the clerk's office but under seal, you

8     know.

9               And your concern was, or one of your concerns, and

10    I think maybe the committee raised a concern and the U.S.

11    Trustee raised a concern, about your ability to get into

12    what is basically a portal to review claims.

13              And so I think, although I think you need to

14    confirm this and then you can tell me on Thursday, okay,

15    that Epiq would still allow that to happen for the Trustee,

16    the U.S. Trustee, and the committee if you want to get that

17    information that way.

18              But if they don't, you can still get it through

19    the clerk's office.  There's going to be some kind of

20    listing of confidential claims say, you know, confidential

21    claimant one through whatever it is. That will be on the

22    docket of the main case.  Nobody will know who the claimants

23    are or anything.  So there's ways that it can happen.  But I

24    don't know.

25              You have to -- I would -- I think it makes sense

1    for you to talk to Epiq.  You retained them.  So see if they

2    can keep that open.

3            And see if they can keep open, if you wanted to,

4    and I think you said you did, and I understand why you did,

5    that -- I'm speaking to you, Trustee Despins.

6            I'm looking at you, but obviously this is audio so

7    nobody can understand who I'm speaking to -- that you wanted

8    to have the docket still be available so that -- but that

9    would mean that Epiq would have to continue to upload and

10   maintain the docket.  I don't know if they're willing to do

11   that or if you want them to do that or whatever.

12           But I need to know those two issues by Thursday.

13   Okay?  If possible, I need to understand what your thoughts

14   are.  Because I have to enter some kind of order that amends

15   their services and still -- they're still going to be -- and

16   my understanding is they completely agree that they'll still

17   be compelled to turn over any proofs of claim they get to

18   the clerk's office if they get any more.  My understanding

19   is there haven't been any proofs of claim for the last week

20   or two.

21           But we need to make sure that there's an order

22   that they understand their ongoing obligations with regard

23   to any proofs of claim they might receive.

24           Then, whether or not they're going to keep this

25   ability for you and the parties to the protective order and

1    the U.S. Trustee to get into, which is part of the bar date

2    order, right, the bar date order talks about the protective

3    order, to get into this shared information so you can see

4    it, and whether or not they're going to maintain the docket,

5    which would require them to do something, which I don't know

6    if they're willing to do.

7             So you need to talk to them about that.  Okay?

8             MR. DESPINS:  Will do.

9             THE COURT:  They'd have to continue to maintain

10   the docket.

11            MR. DESPINS:  Will do, Your Honor.

12            THE COURT:  Okay.  Then the only other thing I

13   would say with regard to the claims in the case, I don't

14   know the number, but I understand it's, you know, between

15   public and confidential claims, it's over a thousand claims.

16   You know, whatever it is, it is.

17            MR. DESPINS:  I think it's over 1300.

18            THE COURT:  Okay.  Whatever it is, it is.  It's a

19   substantial number.

20            Our local rules have a process for the -- of how

21   claims are objected to, both individual claims or omnibus

22   claims.

23            What that order is going to provide whenever I

24   enter it after you give me an update on Thursday, Trustee

25   Despins, is it's going to provide for a 45-day response

1    period, as opposed to a 30-day response period, because of

2    the specific facts and circumstances of this case and

3    because claimants are located all over the place and they

4    need to have appropriate time to have things mailed and

5    whatever.  If they're not ECF filers, they're going to have

6    to get mailed an objection to a proof of claim.

7           I know that's off in the future, but I still have

8    to enter this order to make sure it makes sense.  Okay?

9    That will have to happen.  Everybody's going to have to

10   understand that.

11          And the other thing that people will have to

12   understand is that there may -- most of the claims will have

13   two claim numbers.  A claim number from Epiq and a claim

14   number from the Court.  You just figure it out.  It's not

15   going to be that hard.  We'll be able to figure it out.

16          But just so everybody understands, since

17   everything's coming back to the clerk's office, there is

18   going to be two ways that you can identify a proof of claim.

19   And we'll deal with that.  We'll address it when it happens.

20   Okay.

21          But given the orders in the *Norwich* case, and then

22   apparently other cases throughout the country, as I said in

23   prior hearings, I just don't want to have hearings about

24   what was disclosed and not disclosed.  And it's just --

25   there's too many things that we need to address in this case

1    and we're not going to -- I don't want to spend any time on

2    that.  So that's where we are.

3              Does anybody have any questions about that?  That

4    issue?

5              MR. DESPINS:  No, Your Honor.

6              THE COURT:  Okay.  All right.  Then with regard to

7    Thursday's hearings, what I'm going to do is I'm going to

8    allow those hearings to be held via Zoom since there's a

9    possibility everybody has to be back here on Monday for

10   another hearing.  And they are discovery issues, in my

11   opinion.

12             The motion to remove the Trustee is not going to

13   be heard on the 23rd, so that's coming off the calendar.

14             So the only things on the calendar on Thursday are

15   motions to quash subpoenas and an application to employ.

16   That's the only other thing.

17             That can be -- I'm going to allow it to be held

18   via Zoom so that we can try to minimize some costs here in

19   the case.

20             If there were other more substantial matters to be

21   heard that day, which there were, but it's not going to be,

22   then I would have required everyone to be here in person.

23   But right now, given the specific facts and circumstances of

24   these cases as they exist now, that's what I'm going to do.

25             So I will -- I have to talk to the courtroom

1    deputies about do the parties have to reach out to get -- we

2    haven't even set up the Zoom information so I don't have it

3    yet to give to you.

4            But is that how it should be obtained from the

5    parties for Thursday?  They will reach out to the courtroom

6    deputy box and then the Zoom information will be provided?

7            THE COURTROOM DEPUTY:  Calendar connect.

8            THE COURT:  Calendar connect box.  Sorry.  The

9    calendar connect box.  Okay.  Sorry.

10           Thank you.

11           And then you will be provided with the information

12   for the Zoom hearing.  And it will be, you know, limited to

13   participants in that hearing.  Okay?

14           Anything further we need to address this afternoon

15   then?

16       (No response.)

17           THE COURT:  All right.  So, Attorney Moriarty,

18   once we hear from you, and you'll CC, obviously, the Trustee

19   and everything when you send your email tomorrow afternoon

20   about the insurance.

21           If there is not an agreement, then that -- the

22   order will -- I've already scheduled the hearing for Monday

23   at 11:00, but then that order will follow, which will

24   require your reply in connection with the request that the

25   Trustee made.  Okay?

1      MR. MORIARTY:  Yes, Your Honor.

2      THE COURT:  All right.  No one has any further

3  questions?  Or is there anything else we need to address?

4      (No response.)

5      THE COURT:  All right.  Then court is adjourned.

6      MR. DESPINS:  Thank you.

7      (Proceedings adjourned at 5:05 p.m.)

8          I, CHRISTINE FIORE, court-approved

9  transcriber and certified electronic reporter and

10  transcriber, certify that the foregoing is a correct

11  transcript from the official electronic sound recording of

12  the proceedings in the above-entitled matter.

13

14  *Christine Fiore*

15  _____        March 27, 2023

16     Christine Fiore, CERT

17

18

19

20

21

22

23

24

25