**PUNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION**

-------------------------------------------------------x
                                                    :

In re:                          :    Chapter 11
                                                    :

HO WAN KWOK *et al*.,          :    Case No. 22-50073 (JAM)
                                                    :

            Debtors.[1]        :    Jointly Administered
                                                    :
-------------------------------------------------------x

**MOTION OF CHAPTER 11 TRUSTEE, PURSUANT TO BANKRUPTCY CODE
SECTION 363(b), FOR ENTRY OF ORDER AUTHORIZING TRUSTEE TO ENTER
INTO, AND PERFORM UNDER, CERTAIN POSTPETITION AGREEMENTS
RELATING TO MAINTENANCE AND OPERATION OF THE LADY MAY**

Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee") appointed in the

chapter 11 case (the "Chapter 11 Case") of Ho Wan Kwok (the "Debtor"), respectfully submits

this motion (the "Motion") for entry of an order, substantially in the form attached hereto as

**Exhibit 1** (the "Proposed Order"), pursuant to section 363(b) of title 11 of the United States

Code (the "Bankruptcy Code"), approving the Trustee's entry into, and performance under,

(i) the yacht management agreement (the "Management Agreement"), dated April 5, 2023, with

Yachtzoo Sarl ("Yachtzoo"), a copy of which is attached hereto as **Exhibit 2**, (ii) the crew

provision agreement (the "Crew Provision Agreement"), with FDS46 Crew Series LLC ("FDS"),

the final form of which is attached hereto as **Exhibit 3**,[2] and (iii) the dock space license

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

[2]    At this time, the employer for the Lady May crew, FDS, is in the process of being incorporated. Accordingly, the Crew Provision Agreement has not yet been executed. The Trustee is informed by the incorporator of FDS, Trident Trust Marine Services Limited, that FDS will sign the Crew Provision Agreement immediately after the

agreement (the "Dockage Agreement" and, together with the Management Agreement and Crew Provision Agreement, the "Yacht Maintenance Agreements"), dated April 4, 2023, with BLD Waterfront Upland Owner, LLC (the "Bridgeport Harbor Marina"), a copy of which is attached hereto as **Exhibit 4**, including any reasonable extensions or renewals thereof.  For the avoidance of doubt, by this Motion the Trustee also seeks authorization to pay the reasonable operational expenses incurred in the ordinary course of maintaining and operating the Lady May, in accordance with the Yacht Maintenance Agreements.

  In support of this Motion, the Trustee states as follows:

### PRELIMINARY STATEMENT[3]

  1. Now that the Court has determined that the Lady May (as well as the Lady May II)[4] is property of the Debtor's estate, the Trustee must ensure that the Lay May is maintained in working order pending an eventual sale for the benefit of this estate.  The relief sought in this Motion—*i.e.*, approval of the Trustee's entry into, and performance under, the Yacht Maintenance Agreements—is a critical first step to accomplish this objective.[5]  As detailed below, absent proper maintenance, the Lady May will run the risk of falling into disrepair, which would result in additional repair expenses and/or substantially reduce the prospect of a successful sale.  In fact, without the services to be provided in connection with the Management Agreement and Crew Provision Agreement, the Lady May would fall out of compliance with applicable

---

incorporation has been completed.  The Trustee will file a fully executed copy of the Crew Provision Agreement as soon as possible.

[3] Capitalized terms used but not defined in the Preliminary Statement have the meanings ascribed to them later in this Motion.

[4] The relief sought in this Motion is limited to the Lady May.  The Trustee will seek relief related to the Lady May II in due course.

[5] The Trustee intends to seek additional relief from this Court related to the Lady May, including authorization to (i) move the Lady May to Newport, Rhode Island, to perform sea valve repair, (ii) retain a sales broker, and (iii) expand the retention of Dexter White to also include consultation on operational issues.

certifications, regulatory requirements, and insurance coverage, all of which are critical to protect and preserve the Lady May for the benefit of this estate.

2.      Properly maintaining a yacht—and especially a yacht of the size and caliber as the Lady May—is not a straightforward task and requires the expertise of a competent yacht manager and crew (including a captain).  Unlike a car, a yacht cannot simply be parked in a garage and then left on its own.  The Lady May is a complex, multi-million dollar piece of machinery with numerous integrated and interdependent systems—including propulsion systems, navigational equipment, safety equipment, environmental systems, and systems related to the housing and entertainment of guests—all of which need to operate seamlessly in a marine environment (under all weather conditions) and must be kept in working order if the Lady May is to be successfully sold.  Simply stated, without a seasoned yacht manager and crew, the Trustee would not be able to maintain the Lady May—and this is the case even though the Trustee, of course, will not "use" the Lady May pending an eventual sale.

3.      Critically, the Lady May must comply with numerous certification and regulatory requirements.  For example, the Lady May has been constructed to Lloyds classification standards and in order to maintain her certificate of classification she must be annually surveyed to these standards by a Lloyds classification surveyor.  Further, the Lady May is operated under Cayman Islands flag, and the Trustee understands that Cayman Islands laws require adherence to various safety and maritime conventions concerning safety (fire protection, life-saving equipment, etc.) and pollution (oil, air, and garbage).  These conventions have their own certifications requirements, including annual surveys by a surveyor for the Cayman Islands to ensure compliance, and the Lady May is required to maintain evidence of this compliance when in U.S. waters.

4.      In addition, the insurance coverage for the Lady May—which insurance itself is critical to protect the Lady May—requires that the Lady May be properly maintained and crewed.  For example, the hull & machinery ("H&M") policy requires a full-time crew of at least five persons (which, in this case, consists of a captain, an engineer, a first mate, a steward, and a deck hand).[6]  Moreover, the protection & indemnity ("P&I") policy excludes from coverage any claims resulting from the owner's failure to keep and/or operate the Lady May in compliance with the applicable requirements of her Flag State (*i.e.*, the Cayman Islands), Class (*i.e.*, Lloyds), and certification.  For obvious reasons, the Trustee cannot allow insurance coverage to lapse or fail to comply with the requirements under the applicable insurance policies.  Not only would that put the Lady May at a risk of loss, but, absent proper insurance coverage, the Bridgeport Harbor Marina (and likely any other marina) would not allow the Lady May to dock, which, in the worst case scenario, could result in the Lady May being unmoored and allowed to drift out to sea (at which point she would become subject to maritime salvage laws).

5.      To maintain, preserve, and protect the Lady May, the Trustee has determined to hire Yachtzoo as the yacht manager, pursuant to the Management Agreement.  Yachtzoo is the obvious and best choice for this task, as they were the yacht manager under the Lady May's prior ownership (*i.e.*, HK USA) and are thus already familiar with the yacht, its operation, and the applicable maintenance, insurance, and certification requirements.  Indeed, since the Trustee secured ownership of the Lady May, Yachtzoo has already provided valuable services in procuring and extending the requisite insurance policies with respect to the Lady May, including an H&M policy and the P&I policy.

---

[6]    As the Court is aware, the current captain of the Lady May is James Pizzaruso.  *See* Docket No. 1302.  The Trustee will continue to retain Mr. Pizzaruso as the captain of the Lady May.

6.      As further detailed below, Yachtzoo will provide a series of services required to maintain the Lady May, including technical services, compliance services, financial services, and human resources related to the crew.  For these services, Yachtzoo will charge (a) a one-time set-up fee in the aggregate amount of $9,050 and (b) a monthly management fee of $6,550.  To be clear, in connection with the Management Agreement, the Trustee will necessarily incur various operational expenses, including crew salaries, insurance premiums, and materials and supplies for the yacht.  Payment of these expenses will be processed by Yachtzoo under the Management Agreement—at cost and without a mark-up.  The precise amount of these expenses will vary from month to month (and will depend on when certain payments, such as insurance premiums, come due).  That said, based on the monthly operating expenses under the prior ownership of HK USA, those expenses are expected to range from approximately $100,000 to approximately $300,000 per month.[7]  Of course, the Trustee will work with Yachtzoo to minimize these expenses, while maintaining the Lady May in working order and ensuring compliance with applicable certifications, regulatory requirements, and insurance coverage.[8]

7.      Furthermore, as noted, the Lady May must have a proper crew of at least five individuals.  As is customary for a yacht such as the Lady May, the crew is not directly hired by the yacht owner (here, the Trustee) but by a separate legal entity (here, FDS), which, in turn entered into the Crew Provision Agreement with the Trustee for the provision of crew services for the Lady May.  For its services, FDS will charge a set-up fee of $3,500 and a monthly payroll fee of $910 (for a crew of five or less).[9]  The Crew Provision Agreement is a standard

---

[7]    As the Court will recall, the Trustee was previously authorized to use up to $500,000.00 from the repair reserve to fund operational and maintenance expenses for the Lady May.  *See* Docket No. 1608.

[8]    For the avoidance of doubt, by this Motion, the Trustee is also seeking authorization to pay the reasonable operational expenses incurred in the ordinary course of maintaining and operating the Lady May.

[9]    To be clear, the Trustee will also be responsible for funding the payment of crew salaries.

arrangement in the industry designed to protect the yacht owner from legal liability in connection with the employment of a yacht's crew.  Notwithstanding the Crew Provision Agreement, however, under the Management Agreement, Yachtzoo is responsible for ensuring that the services provided by the crew are provided in a professional, timely, and efficient manner in accordance with sound maritime employment, payroll, and crew administration practices and (as the case may be) in accordance with the requests and/or instructions of the Trustee.

8.      Finally, the Trustee seeks approval of his entry into the Dockage Agreement with Bridgeport Harbor Marina for the month of April 2023, plus any reasonable extensions or renewals thereof.  As noted, the Trustee intends to seek, in the near future, authorization to transfer the Lady May to Newport, Rhode Island, in order to have the remaining service of the sea valves performed, as well as to take advantage of Newport's free-trade zone to facilitate a sale of the Lady May.  Accordingly, the Trustee has not entered into a long-term dockage agreement with Bridgeport Harbor Marina; however, it may become necessary to enter into one or more monthly extensions or renewals of the Dockage Agreement, depending on the exact timing of that transfer.

9.      The Trustee submits that for all these reasons, and as further detailed below, the Court should approve the Trustee's entry into, and performance under, the Yacht Maintenance Agreements, including paying the reasonable operational expenses incurred in the ordinary course of maintaining and operating the Lady May, in accordance with the Yacht Maintenance Agreements.

## JURISDICTION, VENUE, AND STATUTORY BASIS

10.      The United States Bankruptcy Court for the District of Connecticut (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order*

*of Reference* from the United States District Court for the District of Connecticut.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

11.    Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12.    The statutory basis for the relief sought in this Motion is section 363(b) of the Bankruptcy Code.

## BACKGROUND

### I.    Ownership of the Lady May

13.    On April 11, 2022, HK International Funds (USA) Limited, LLC ("HK USA") initiated an adversary proceeding by filing a Complaint [Docket No. 1, in Adv. Proc. No. 22-5003] against the Debtor and Pacific Alliance Asia Opportunity Fund L.P. ("PAX"), asserting that HK USA is the owner of the Lady May.

14.    On September 23, 2022, the Trustee filed his *Answer and Counterclaims* [Docket No. 36 in Adv. Proc. No. 22-5003] (the "Answer and Counterclaims").  The Trustee's First Counterclaim sought a ruling pursuant to 11 U.S.C. §§ 541 and 542 declaring that the Lady May is property of the Debtor's chapter 11 estate to be administered by the Trustee and ordering the surrender of the Lady May to the Trustee, all as a result of Justice Ostrager having already decided that the Debtor beneficially owns and controls the Lady May in a separate New York state court litigation by PAX against the Debtor prior to the petition date.

15.    On March 19, 2023, the Trustee filed his motion for partial summary judgment [Docket No. 146 in Adv. Proc. No. 22-5003] (the "Partial SJ Motion") and supporting materials, seeking summary judgment on the First Counterclaim. *See also* Docket Nos. 147, 148, and 150 in Adv. Proc. No. 22-5003.

16.    A hearing on the Partial SJ Motion was held on March 27, 2023.  At the conclusion of the hearing, for the reasons stated on the record and further set forth in the Court's

*Supplemental Memorandum of Decision in Support of Oral Ruling Granting Motion for Partial Summary Judgment* [Docket No. 177 in Adv. Proc. No. 22-5003], the Court issued an oral ruling granting the Partial SJ Motion.  Also on March 27, 2023, the Court entered its order granting the Partial SJ Motion [Docket No. 172 in Adv. Proc. No. 22-5003] (the "Partial SJ Order"), finding, among other things, that the Lady May is the property of the Debtor's estate.[10]

## II.   Operation and Maintenance of Lady May

17.     In order to operate and maintain the Lady May and to protect and preserve this valuable asset for the benefit of the Debtor's creditors pending a future sale, the Trustee has entered into the Management Agreement and the Dockage Agreement, and intends to enter into the Crew Provision Agreement, in each instance subject to obtaining approval of this Court.

### A.     Management Agreement

18.     On April 5, 2023, subject to obtaining bankruptcy court approval, the Trustee entered into the Management Agreement with Yachtzoo, under which Yachtzoo provides various services required to maintain the Lady May, including technical services, compliance services, financial services, and human resources related to the crew.  Among other things, Yachtzoo provides the following services under the Management Agreement:

- Technical services, including, without limitation:

   o monitoring vessel certificates and ensuring compliance with applicable regulations;
   o coordinating with relevant Vessel Flag State and Port State authorities and insurance brokers;
   o conducting technical inspections of the vessel;
   o providing annual review of the vessel's maintenance and performance;
   o reviewing shipyard contracts to ensure insurance is available; and
   o providing a collaboration point for the vessel worklist to ensure efficient vessel maintenance.[11]

---

[10]   *See* Partial SJ Order ¶ 2.

[11]   *See* Management Agreement §§ 7.2, 7.3.

- Compliance services, including, without limitation:

  - ensuring that yacht operation is in compliance at all times and minimize risk of delays and/or fines;
  - addressing any Flag State/Port State/Classification Society deficiencies;
  - identifying any requirements for dispensation and follow-up to maintain compliance; and
  - providing and monitoring safety management infrastructure.[12]

- Financial services, including, without limitation:

  - preparing annual budgets and monthly funds requests for transfers of funds to client accounts;
  - processing payments and monitoring onboard payment functions;
  - establishing and maintaining a bookkeeping system; and
  - monthly reporting on expenditures.[13]

- Human resources services related to the crew, including, without limitation:

  - reviewing and monitoring crew employment contracts;
  - ensuring all crew contractual documentation is in order at all times;
  - monitoring crew leave and limiting risk of high payouts;
  - dealing with crew disputes and liaising with crew employer as necessary; and
  - crosschecking monthly crew payroll numbers and reconciling with contractual details and leave taken as necessary;
  - insurance arrangement, pursuant to which Yachtzoo arranges appropriate insurance and renewals for the vessel and the crew.[14]

19. For the services to be provided under the Management Agreement, Yachtzoo charges (a) a one-time set-up fee in the aggregate amount of $9,050 and (b) a monthly management fee of $6,550.[15] In addition, as part of its financial services, Yachtzoo will process payments of operational expenses—including crew salaries, insurance premiums, and materials and supplies for the yacht—that the Trustee may become obligated to pay as part of maintaining

---

[12] *See id.* § 7.4.

[13] *See id.* § 7.1.

[14] *See id.* § 7.6.

[15] *See id.* Part I, § 10.1.

and operating the Lady May.  The precise amount of these expenses will vary from month to month (and will depend on when certain payments, such as insurance premiums, come due). Based on the monthly operating expenses under the prior ownership of HK USA, those expenses are expected to range from approximately $100,000 to approximately $300,000 per month.

20.     In addition, the Trustee requested, and Yachtzoo agreed, to certain modifications to its standard form of yacht management agreement, including (a) removing a provision that would have required the Trustee to indemnify Yachtzoo for third party claims arising out of the Yachtzoo performing services under the Management Agreement and (b) providing that this Court has exclusive jurisdiction over any claim or disputed arising out of the Management Agreement (and eliminating the arbitration clause that would otherwise have applied).

B.     <u>Crew Provision Agreement</u>

21.     In connection with the Management Agreement, and subject to obtaining bankruptcy court approval, the Trustee also intends to enter into the Crew Provision Agreement with FDS, under which the Trustee will appoint FDS as the employer of the crew for the Lady May.  FDS will, in turn, hire the Lady May's crew.  The Crew Provision Agreement is an essential agreement for any yacht owner, as it protects a yacht owner from legal liability in connection with the employment of a yacht's crew.  Pursuant to the Crew Provision Agreement, FDS will provide, among other things, the following services:

- The selection and engagement of personnel to work onboard of the Lady May;
- Supervision and discipline of such personnel;
- Administration of all personnel matters relating to the personnel, including overseeing and arranging medicals, training courses, travel to and from the vessel, and correspondence with external agencies;
- Payroll administration relating to the employment of the personnel;
- Enforcement of all operational, health and safety, drug and alcohol and other appropriate policies; and

- Issuance of employment contracts.[16]

22.    For the services to be provided under the Crew Provision Agreement, FDS will charge (a) a one-time set-up fee in the aggregate amount of $3,500 and (b) a monthly payroll fee of $910 (for a crew between zero and five) or $1,274 (for a crew between six and eight).[17]  As noted, the crew for the Lady May will consist of five individuals, so the lower monthly fee will apply in these circumstances.

23.    In addition, the Crew Provision Agreement reflects certain modifications to the standard form, including providing that this Court has exclusive jurisdiction over any claim or disputed arising out of the Crew Provision Agreement (and eliminating the arbitration clause that would otherwise have applied).  Moreover, in order to minimize costs, FDS will only employ the minimum of five crew members.

24.    To be clear, notwithstanding the Crew Provision Agreement, Yachtzoo is responsible for ensuring that the services provided by the crew are provided in a professional, timely, and efficient manner in accordance with sound maritime employment, payroll, and crew administration practices and (as the case may be) in accordance with the requests and/or instructions of the Trustee.[18]

C.    Dockage Agreement

25.    In addition to the Management Agreement and Crew Provision Agreement, and subject to obtaining bankruptcy court approval, the Trustee has also entered into a Dockage Agreement with Bridgeport Harbor Marina for the period of April 1, 2023 through April 30, 2023.  The Dockage Agreement provides in pertinent part, that the Trustee will pay a monthly

---

[16]    *See* Crew Provision Agreement § 2.

[17]    *See id.* at Schedule 1.

[18]    *See* Management Agreement § 7.6.2.

total of approximately $16,484.25 for the period of April 1 through April 30, 2023, to have

access to a dock space and use the marina facilities incidental to the dockage of the Lady May at

the Bridgeport Harbor Marina.[19]

## RELIEF REQUESTED

26.    The Trustee respectfully requests that the Court enter an order approving the

Trustee's entry into, performance under, the (i) Management Agreements, (ii) the Crew

Provision Agreement, and (iii) the Dockage Agreement (including any reasonable extensions or

renewals thereof), including paying the reasonable operational expenses incurred in the ordinary

course of maintaining and operating the Lady May, in accordance with such agreements.

## BASIS FOR RELIEF

27.    The Trustee requests that the Court authorize and approve his entry into the Yacht

Maintenance Agreements pursuant to section 363(b) of the Bankruptcy Code.  Section 363(b)(1)

of the Bankruptcy Code provides in pertinent part, that "[t]he trustee, after notice and a hearing,

may use, sell or lease, other than in the ordinary course of business, property of the estate."

Under section 363(b) of the Bankruptcy Code, courts require only that the trustee "show a sound

business purpose justifies such actions."  *See, e.g.*, *Comm. of Equity Sec. Holders v. Lionel Corp.

(In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) ("The rule we adopt requires that a

judge determining a § 363(b) application expressly find from the evidence presented before him

at the hearing a good business reason to grant such an application."); *Comm. of Asbestos-Related

Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr.

S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as

---

[19]    *See* Dockage Agreement at 1.

distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct").

28.     In addition, a chapter 11 trustee has a "statutory duty to protect and preserve property of the estate for the purpose of maximizing a distribution to creditors." *In re Ngan Gung Rest.*, 254 B.R. 566, 570 (Bankr. S.D.N.Y. 2000) (citing 11 U.S.C. § 1106(a)).  As the Court has determined that the Lady May is property of the Debtor's estate, the Trustee is obligated to properly maintain, preserve, and protect the Lady May pending an eventual sale for the benefit of this estate.

29.     Properly maintaining a 152-feet luxury yacht such as the Lady May requires a seasoned yacht manager and an experienced crew—and this is true even though the Trustee will not "use" the Lady May pending an eventual sale.  The Lady May is a complex piece of machinery with numerous integrated and interdependent systems, all of which need to operate seamlessly in a marine environment (under all weather conditions) and must be kept in working order if the Lady May is to be successfully sold.

30.     Critically, the Lady May must comply with numerous certification and regulatory requirements.  For example, the Lady May has been constructed to Lloyds classification standards.  Lloyds Register is one of the non-governmental organizations that establish and maintain technical standards for the construction of ships.  Classification rules concern, among other things, material/ship structures, main and auxiliary machinery, control engineering systems, and electrical installations.  In order to maintain her status as a Lloyds Class, the Lady May must be surveyed annually.

31.     The Lady May is registered in the Cayman Islands and operates under the Cayman Islands flag.  The Flag State is responsible for incorporation of various conventions

13

(including International Convention for the Safety of Life at Sea, the International Convention for the Prevention of Pollution from Ships, and the International Convention on Standards of Training, Certification and Watchkeeping) into statutory law and policing the implementation of statutes, codes and resolutions with respect to, among other thing, (i) ship construction, equipment and seaworthiness, (ii) manning levels, crew training and service conditions, (iii) signals, communications, and collision prevention arrangements, (iv) statutory surveys, audits, and/or certifications, and (v) regulation of risk to health and safety for work activities and accommodation spaces.  These conventions have their own certifications requirements, including annual surveys by a surveyor for the Cayman Islands to ensure compliance.  Moreover, the Lady May is required to maintain evidence of this compliance when in U.S. waters.

33.    In addition, the insurance coverage for the Lady May requires that the Lady May be properly maintained and crewed.  For example, the H&M policy requires a full-time crew of at least five persons, and the P&I policy excludes from coverage any claims resulting from the owner's failure to keep and/or operate the Lady May in compliance with the applicable requirements of her Flag State, Class, and certification.  It is critical for the Trustee to maintain, and remain in compliance with, insurance policies for the Lady May.

33.    Yachtzoo is the obvious and best choice for providing yacht management services under the circumstances, as they are already familiar with the Lady May, its operation, and the applicable maintenance, insurance, and certification requirements.  Moreover, Yachtzoo will only charge modest fees for its services, namely (a) a one-time set-up fee in the aggregate amount of $9,050 and (b) a monthly management fee of $6,550.  Of course, the Trustee will necessarily incur additional operational expenses in connection with the maintenance of the Lady May, such as crew salaries, insurance premiums, and materials and supplies for the yacht.

However, to be clear, under the Management Agreement, all such expenses will be passed on to the Trustee at cost, without a mark-up by Yachtzoo. Yachtzoo will merely provide financial services to process such payments. As noted above, based on past experience, the Trustee anticipates that monthly operating expenses will range from approximately $100,000 to approximately $300,000 per month.

34.     Furthermore, the Lady May must have a proper crew of at least five individuals. Accordingly, the Trustee has determined to enter into a Crew Provision Agreement with FDS for the provision of crew services for the Lady May. As noted, this is a standard arrangement designed to protect the yacht owner from legal liability in connection with the employment of a yacht's crew.

35.     Finally, the Trustee requests approval of the Dockage Agreement with Bridgeport Harbor Marina for the month of April 2023, plus any reasonable extensions or renewals thereof. Currently, the Lady May is docked at the Bridgeport Harbor Marina, and the Trustee merely intends to continue the existing arrangement. If and when the Trustee intends to transfer the Lady May to Newport, Rhode Island, he will seek additional relief in that regard from this Court.

36.     The Trustee's entry into the Yacht Maintenance Agreements is a sound exercise of the Trustee's business judgment. The Trustee believes that Yachtzoo, FDS, and Bridgeport Harbor Marina are qualified to provide the necessary services to preserve and protect Lady May for the benefit of the Debtor's estate. In light of the foregoing, the Trustee submits that his entry into the Yacht Maintenance Agreements is appropriate and necessary and in the best interests of the Debtor's estate.

37.     Finally, the Trustee requests a waiver of the fourteen-day stay requirements under Bankruptcy Rule 6004(h), such that the Proposed Order be effective immediately upon entry

thereof.  For all the reasons set forth above, any delays in maintaining and preserving the Lady May could adversely affect the Lady May and the value that could ultimately recovered in an eventual sale.

## NO PRIOR REQUEST

38.     The Trustee has not previously sought the relief requested herein from this or any other court.

## CONCLUSION

39.     For all these reasons, the Trustee requests entry of an order approving the Trustee's entry into, performance under, (i) the Management Agreement, (ii) the Crew Provision Agreement, and (iii) the Dockage Agreement (including any reasonable extensions or renewals thereof), including payment of the reasonable operational expenses incurred in the ordinary course of maintaining and operating the Lady May, in accordance with the Yacht Maintenance Agreements.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Trustee respectfully requests entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: April 5, 2023                    LUC A. DESPINS, CHAPTER 11 TRUSTEE
   New Haven, Connecticut

            By: */s/ Patrick R. Linsey*
             Douglas S. Skalka (ct00616)
             Patrick R. Linsey (ct29437)
             NEUBERT, PEPE & MONTEITH, P.C.
             195 Church Street, 13th Floor
             New Haven, Connecticut 06510
             (203) 781-2847
             dskalka@npmlaw.com
             plinsey@npmlaw.com

              *and*

             Nicholas A. Bassett (admitted *pro hac vice*)
             PAUL HASTINGS LLP
             2050 M Street NW
             Washington, D.C., 20036
             (202) 551-1902
             nicholasbassett@paulhastings.com

              *and*

             Avram E. Luft (admitted *pro hac vice*)
             G. Alexander Bongartz (admitted *pro hac vice*)
             PAUL HASTINGS LLP
             200 Park Avenue
             New York, New York 10166
             (212) 318-6079
             aviluft@paulhastings.com
             alexbongartz@paulhastings.com

             *Counsel for the Chapter 11 Trustee*

## **Exhibit 1**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

-------------------------------------------------------x
                                                       :
In re:                                                 :    Chapter 11
                                                       :
HO WAN KWOK *et al.*,                                  :    Case No. 22-50073 (JAM)
                                                       :
            Debtors.[1]                                :    Jointly Administered
                                                       :
-------------------------------------------------------x

**ORDER AUTHORIZING TRUSTEE TO ENTER INTO, AND PERFORM**
**UNDER, CERTAIN POSTPETITION AGREEMENTS RELATING TO**
**MAINTENANCE AND OPERATION OF THE LADY MAY**

Upon the motion (the "Motion")[2] of Luc Despins, in his capacity as the chapter 11 trustee

(the "Trustee") appointed in the chapter 11 case of Ho Wan Kwok (the "Debtor"), requesting

entry of an order approving the Trustee's entry into, and performance under, (i) the Management

Agreement, (ii) the Crew Provision Agreement, and (iii) the Dockage Agreement (including any

reasonable extensions or renewals thereof), all as further detailed in the Motion; and the Court

having reviewed the Motion and having considered the statements of counsel before the Court at

a hearing (the "Hearing"); and the Court having found that (a) the Court has jurisdiction over this

matter pursuant to 28 U.S.C. §§ 157 and 1334; (b) this is a core proceeding pursuant to 28 U.S.C.

§ 157(b); (c) venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and (d) good and

sufficient notice of the Motion having been given; and no other or further notice being required;

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles
       Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever
       Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The
       mailing address for the Trustee, Genever Holdings LLC, and Genever Holdings Corporation is Paul Hastings
       LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok
       (solely for purposes of notices and communications).

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

and the Court having found and determined that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein; and it appearing that the relief requested

by the Motion, as modified by the terms of this Order is in the best interest of the Debtors'

estates and creditors; and upon all of the proceedings had before the Court and after due

deliberation and sufficient cause appearing therefor, it is hereby

ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      The Trustee is authorized to enter into, and perform under, the Maintenance

Agreements, including payment of the reasonable operational expenses incurred in the ordinary

course of maintaining and operating the Lady May, in accordance with the Yacht Maintenance

Agreements.

3.      The Trustee is authorized and empowered to take all actions necessary to

effectuate the relief granted in this Order.

4.      The terms and conditions of this Order shall be immediately effective and

enforceable upon its entry.

5.      This Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation, interpretation, and enforcement of this Order.

## Exhibit 2

**Management Agreement**

## PART 1

## PARTIES AND SELECTED SERVICES

| 1.   Owner | | | 2.    Manager | |
|---|---|---|---|---|
| Name: | Luc A Despins, as the chapter 11 trustee for the estate of Ho Wan Kwok | | Name: | Yachtzoo Sarl |
| Address: *(registered office, if company)* | c/o Paul Hastings LLP, 200 Park Avenue, New York, New York 10166 | | Address: | Le Beau Rivage, 9 ave d'Ostende, Monaco, MC 98000 |
| Jurisdiction of Residence (or, if company, Incorporation): | USA | | Jurisdiction of Incorporation | Monaco |

| 3.   The Yacht | | | |
|---|---|---|---|
| Name: | Lady May | Flag State: | Cayman Islands |
| Official Number: | 745195 | Load line length: | 44.25m |
| Beam: | 9m | Draft: | 2.37m |
| Classification Society: | Lloyds Register | GT: | 406 |
| Registration: | Pleasure vessel | | |

| 4.   Notices and communication to the Owner: | | 5.   Notices and Communication to the Manager: | |
|---|---|---|---|
| Attention: | G. Alex Bongartz | Attention: | Russell Stockil |
| Address: | Paul Hastings LLP, 200 Park Avenue, New York, New York 10166 | Address: | C/O Yachtzoo Sarl, Le Beau Rivage, 9 ave d'Ostende, Monaco, MC 98000 |
| Contact Tel (not for notices): | 212 318 6000 | Contact Tel (not for notices): | +33 640 613 962 |
| Email: | alexbongartz@paulhastings.com | Email: | russell@yacht-zoo.com |

| 6.   Total Management Fee ($/monthly): | $6,550.00 | 7.   Effective Date | 28th March 2023 |
|---|---|---|---|

| 8.   Breakdown of selected Management Services and Monthly Fees | | | | | |
|---|---|---|---|---|---|
| Service | Scope | $/month | | Scope | $/month |
| FINANCIAL ADMINISTRATION | 7.1 | 1,500.00 | TECHNICAL SUPPORT | 7.2 | 1,650.00 |
| SAFETY MANAGEMENT | 7.4 | 1,200.00 | INSURANCE | 7.7 | 250.00 |
| CREW COMPLIANCE | 7.5 | 975.00 | | | |
| CREW HR | 7.6 | 975.00 | | | |

| 9.   Set-up Fees (one-time, charged on commencement) | | | | | |
|---|---|---|---|---|---|
| *Please refer to Annex 1 for additional services and fees that may be selected on an ad hoc basis.* | | | | | |
| Yacht Management | $6,550.00 | Crew Payroll Set-up | $2,500.00 | Software | $ (waived) |

| This Agreement is hereby signed and agreed on behalf of the Owner | This Agreement is hereby signed and agreed on behalf of the Manager |
|---|---|
| *Luc Despins as Trustee* | *[signature]* |
| Name/Position: Luc A. Despins, as the chapter 11 trustee for the estate of Ho Wan Kwok | Name/Position: *TRIMIEK* |
| Date of Signature:   April 5, 2023 | Date of Signature:  5 APLIL 2023 |

 

# Contents

1   1.   Definitions ........................................................................................................................ 3
2   2.   Appointment of Manager ................................................................................................ 4
3   3.   Basis of Agreement ......................................................................................................... 4
4   4.   Manager's obligations ..................................................................................................... 4
5   5.   Owner's obligations ........................................................................................................ 5
6   6.   Insurance ......................................................................................................................... 6
7   7.   Services ............................................................................................................................ 7
8   8.   Confidentiality and Intellectual Property ...................................................................... 13
9   9.   Liability, Ratification and Indemnity ............................................................................. 14
10  10.  Compensation, Charges & Fees ................................................................................... 15
11  11.  Termination .................................................................................................................... 17
12  12.  Miscellaneous ................................................................................................................ 19
13  13.  Interpretation ................................................................................................................. 21
14  14.  Law, Jurisdiction & Arbitration .................................................................................... 21
15       ANNEX I ........................................................................................................................ 22




**PART II**

**YACHT MANAGEMENT AGREEMENT**

## 1. Definitions

16
17
In this Agreement save where the context otherwise requires, the following words and expressions shall have the meanings hereby assigned to them.

| | | |
|---|---|---|
| 18 19 | "Agreement" | this Management Agreement and any schedule thereto as originally executed or from time to time amended or supplemented |
| 20 | "Captain" | Master of the Vessel |
| 21 | "Crew" | the personnel on board the Vessel |
| 22 23 24 25 26 | "Crew Employer" | a Crew employment, payroll and employment administration services provider as may from time to time be engaged by the Owner or, at the Owner's request and on the Owner's behalf, by the Manager in connection with the Services specified in Part II Clause 7.6 of this Agreement |
| 27 | "CSO" | Company Security Officer |
| 28 | "DPA" | Designated Person Ashore |
| 29 30 | "ISM" | The International Management Code for the Safe Operation of Ships and for Pollution Prevention |
| 31 | "ISPS" | International Ship and Port Facility Security Code |
| 32 | "Manager" | Yachtzoo Sarl |
| 33 34 | "Mini ISM" | Safety management system as defined by the relevant Flag State of the Vessel |
| 35 | "MLC" | The Maritime Labour Convention 2006 |
| 36 | "Owner" | the company mentioned in Part I Box I |
| 37 | "Regulatory Authorities" | Flag State, Classification Society and Port State Authorities |
| 38 39 | "Services" | the management services specified in Part I Box 8 as further detailed in Part II Clause 7 of this Agreement |
| 40 | "STCW 95" | International Standards of Training Watch Keeping of 1995 |
| 41 | "Vessel" | the yacht identified in Part I Box 3 |

 

42

## 2. Appointment of Manager

43     2.1. With effect from the Effective Date as stated in Part I Box 7 and continuing unless and until
44     terminated in accordance with Clause 11 of this Agreement the Owner hereby appoints the
45     Manager and the Manager agrees to act as manager of the Vessel on the terms and conditions set
46     forth in this Agreement. This Agreement is subject to approval of the United States Bankruptcy
47     Court for the District of Connecticut (the "Bankruptcy Court"), in which court the chapter 11
48     case of Ho Wan Kwok, Case No. 22-50073 is pending.

## 3. Basis of Agreement

49     During the term of this Agreement, the Manager shall carry out the Services in respect of the Vessel
50     as agent for and on behalf of the Owner. Without overriding the other terms and conditions of this
51     Agreement the Manager shall have authority to take such actions as it may from time to time in its
52     absolute discretion consider being reasonably necessary to enable it to properly perform its
53     responsibilities pursuant to this Agreement. The Manager shall at any time during the term of this
54     Agreement act in accordance with sound yacht management practice; for the purposes of this
55     Agreement "sound yacht management practice" shall imply, *inter alia*, the Manager continuously
56     fostering in good faith the best legitimate interests of the Owner and avoiding any action or omission
57     which could harm those interests (including without limitation any conflict of interest or failure to
58     observe provisions of Part II Clause 12 hereof).

## 4. Manager's obligations

59     4.1. The Manager undertakes to use its best endeavours to perform the Services promptly and in a
60     proper and professional manner, including without limitation acting on the basis of sound
61     information and in reasonable and prudent consideration of risks, possibilities and alternatives. The
62     Manager shall have sole responsibility for the supervision of its employees, agents and sub-
63     contractors.

64     Provided however, that in the performance of its responsibilities under this Agreement, the
65     Manager shall be entitled to have regard to its overall responsibility in relation to all vessels as may
66     from time to time be entrusted to its management and in particular, but without prejudice to the
67     generality of the foregoing, the Manager shall be entitled to allocate available supplies, manpower
68     and services in such manner as in the prevailing circumstances the Manager in its absolute discretion
69     considers to be fair and reasonable, further provided, however, that the interests of the Owner
70     shall at all times be at least equally regarded with the interests of other persons that have engaged
71     the Manager to provide similar services.

72     4.2. The Manager shall be entitled to employ at its own expense such experts, and advisers as it deems
73     necessary or expedient to procure proper performance of the Services (with liberty to appoint
74     any person associated with the Manager) but not without prior agreement from the Owner. The
75     Manager shall be held responsible for any act, omission or neglect on the part of any such persons
76     employed by the Manager from time to time in the same manner and to the same extent as if the
77     same has been committed by the Manager itself.

 

78　4.3. The Manager will not advise the Owner with respect to the ownership structure of the Vessel,
79　items related to VAT, taxation and customs compliance.

80　4.4. The Manager shall promptly upon the Owner's request make available to the Owner or its
81　representatives all documents and information relating to the Vessel and the Services and, upon
82　reasonable notice from the Owner or its representatives, allow the Owner or its representatives
83　(as appropriate) to inspect during normal working hours the Manager's accounts, books and
84　records relating to the Vessel and/or the Services.

85　4.5. The Manager shall keep the Owner and the Captain promptly informed of any incident of which
86　the Manager becomes aware which gives or may give rise to delay to the Vessel and/or claims or
87　disputes involving third parties.

88　4.6. The Manager shall promptly notify the Owner and the Captain, and keep the Owner and the
89　Captain fully and timely informed of any matters with respect to the condition and regulatory
90　compliance of the Vessel that impair or may reasonable be expected to impair in any way operation
91　of the Vessel as Private Yacht, as well as any other matters that are material in the context of
92　maintaining the Vessel and her Crew fully insured against usual hull and machinery risks, P&I risks,
93　Crew-related risks and such other risks as the Owner and/or the Captain may from time to time
94　advise to the Manager as required or desirable to be ensured against in connection with any
95　concurrent and/or anticipated operation of the Vessel, or as the Manager may consider prudent
96　to be ensured against in connection with any concurrent and/or anticipated operation of the Vessel.

97　4.7. The Manager shall at all times during the term of this Agreement at its own expense maintain such
98　valid authorizations, licenses, registrations, permits or other clearances from appropriate authority
99　or authorities as the Manager may reasonably be required to properly perform its responsibilities
100　hereunder; failure of the Manager to maintain any such valid authorizations, licenses, registrations,
101　permits or other clearances, or any delay in maintaining the same, shall not release the Manager
102　from any of its responsibilities under this Agreement.

## 5. Owner's obligations

103　5.1. The Owner shall instruct its representatives, advisors, Captain and Crew to cooperate with the
104　Manager to the extent of its Services and to provide to the Manager such information and
105　documentation as the Manager may reasonably request to carry out its responsibilities as laid down
106　in this Agreement. The Manager cannot be liable for breaches of this Agreement if it has not been
107　provided in a timely and proper manner with the information or input required and detailed above
108　for successful accomplishment of its responsibilities.

109　5.2. Without limiting the generality of Part II Clause 5.7, the Owner shall use reasonable endeavours
110　to ensure that the Captain of the Vessel follows the requirements of the Manager's administration
111　guidelines.

112　5.3. All payments by the Owner to the Manager under this Agreement shall be made punctually and
113　without set-off, counterclaim, condition or qualification and free and clear of and without any
114　deduction or withholding whatsoever unless prior written consent of the Manager has been

 

115  obtained. Payments shall be made in the currency applicable and to the bank account specified by
116  the Manager.

117  5.4.  The Owner warrants and will procure that all funds provided to the Manager by the Owner will
118      not contravene any applicable law, or other regulatory measure or procedure implemented to
119      combat "money laundering" (as defined in paragraph 3 of Article I of the Directive (EU) 2015/849
120      of the European Parliament and of the Council of 20 May 2015  , or as amended). The Owner
121      further agrees to provide relevant documentation reasonably requested by the Manager for its due
122      diligence to establish origin of funds and source of funds. The Manager agrees to hold such
123      information strictly confidential unless disclosure is required by a competent authority or by any
124      bank for the purposes of opening a separate bank account in accordance with Clause 7.1.

125  5.5.  The Owner will notify the Manager in writing if it makes arrangements for the Vessel to be sold
126      or chartered and of any other significant relevant facts regarding any aspect of the Vessel, her
127      ownership and operation.

128  5.6.  The Owner shall ensure that sufficient resources in accordance with the description of the Services
129      provided as specified under Part I and referenced to Part II Clause 7.1 of this Agreement are made
130      available to the Manager in order that the Manager may carry out its responsibilities under this
131      Agreement.

**Master's Responsibilities**

132  5.7.  The Captain will at all times have full authority with regard to, and be responsible for, the
133      safekeeping and welfare of the Vessel and all persons on board (including without limitation her
134      and their safety and security), whether in port or at sea, and he will help maintain the Vessel in
135      order both mechanically and cosmetically as is consistent with usage and weather for the use of
136      the Owner, clients, guests, passengers and others on board.

# 6. Insurance

137  6.1.  The Owner shall procure appropriate insurances for the Vessel, whether by instructing the
138      Manager under Clause 7.7 or by making its own arrangements, and shall warrant that the Vessel
139      shall be held insured at all times to the reasonable satisfaction of the Manager including all usual
140      hull and machinery marine risks (including Crew negligence) and excess liabilities, protection and
141      indemnity risks (including pollution risks and Crew Insurances), and war risks (including protection
142      and indemnity and Crew risks) in accordance with the best practice of prudent owners of vessels
143      of a similar type to the Vessel and with proper account to the concurrent and/or anticipated
144      operation of the Vessel, with first class insurance companies, underwriters or associations. The
145      Owner shall provide the Manager with copies of the insurance certificates during the period of this
146      Agreement (the **"Owner's Insurances"**).

147  6.1.1. The Owner's Insurances (both physical damage insurance and P&I cover) shall name the
148      Manager (and, subject to the Owner's and the underwriters' prior agreement, any third party
149      designated by the Manager) as a joint-assured for its respective rights and interests, on terms
150      such that neither the Manager nor any such third party shall be under any liability in respect
151      of premiums or calls arising in connection with the Owner's Insurances.

 

6.1.2. The Owner shall provide written evidence, to the reasonable satisfaction of the Manager, of its compliance with its obligations under Clause 6.1.1 before the Effective Date of this Agreement, and at each renewal date and, if applicable, on each instalment payment date of the Owner's Insurances.

6.2. The Manager shall obtain and maintain throughout the term of this Agreement and for the period of at least six (6) months following its termination, at the Manager's cost, (i) third party liability insurance on terms customary for the recreational marine industry, and (ii) professional indemnity insurance in an amount of no less than €500,000 (Five hundred thousand Euro) per claim, in each case with first class insurance companies, underwriters or associations reasonably satisfactory to the Owner. The Manager shall provide to the Owner written evidence, to the reasonable satisfaction of the Owner, of its compliance with its obligations under the first part of this Clause before the Effective Date, and thereafter promptly upon the Owner's request.

## 7. Services

Service deliverables outlined below refer to those services which have been selected in Part I Box 8.

### 7.1. <u>**Financial Administration**</u>

The Manager shall establish a Vessel's budgeting and bookkeeping system that keeps a continuous record of all her operational expenditures and supplies regular reports, as well as ensures efficient financial planning and allows to meet her financial obligations in a timely and efficient manner. Unless otherwise instructed by the Owner, such system shall use US Dollar as the base currency. The Manager shall in particular (but without limitation) carry out the following functions:

7.1.1. Banking - Open and maintain a separate dual currency (US Dollar and EURO) bank account for the benefit of the Owner for use in the management and operation of the Vessel. The Manager shall have the power to open and manage such account (the "**Vessel Account**"). All cash receipts including disbursements from the Owner and revenues from the charter of the Vessel (if applicable) shall be deposited in the Vessel Account. All expenses and other items provided for in the Vessel budget including Crew payroll and the Manager's fees (unless otherwise provided in Part II Clause 10.7) shall be paid from the Vessel Account. The Manager will arrange payment in due course of invoices connected to the normal day-to-day operation of the Vessel with the funds maintained in the Vessel Account. The Manager shall arrange for up to five (5) credit and/or debit cards to be issued to the Vessel for the use by the Captain and such members of the Crew as may from time to time be instructed by the Owner.

7.1.2. Budgeting - Produce a draft budget for a twelve (12) months period and present it to the Owner not less than one month before the end of the budget year, for the Owner's approval. The draft budget shall reflect the Manager's reasonable projections based on, *inter alia*, past financial data of the Vessel, anticipated operations of the Vessel and associated fees and expenses, and comparable financial data as may be available to the Manager. In the event the parties fail to agree on the annual budget, either party may terminate this Agreement by giving the other party not less than one month's notice, the result of which will be the expiry of the Agreement at the end of the then current budget period or on expiry of the notice period, whichever is the later.

 

7.1.3. Vessel accounting – All expenses concerning the Vessel will be verified, recorded and settled if provided in the Vessel budget or otherwise authorised under this Agreement or by the Owner. The Manager shall review and negotiate in the event of any disputed items all invoices raised by third parties in connection with the Vessel's operations, and shall ensure that all expenses concerning the Vessel (including exceptional expenditures referred to in Part II Clause 7.1.6.1) are properly and sufficiently documented. Petty cash & credit card expenses will be verified and queried before being accounted for.

7.1.4. Reporting – Produce and deliver to the Owner monthly financial statements of all expenditures incurred by the Vessel, together with budget utilization report, current balance of the Vessel Account and forecast of utilization of the funds maintained in the Vessel Account for the next three (3) months' period on rolling basis. Any additional reports will be charged as per Annex I – Supplementary fees.

7.1.5. All discounts and commissions obtained by the Manager in the course of the management of the Vessel shall be credited to the Owner.

7.1.6. Management of Funds:

7.1.6.1. The Manager shall be entitled, if reasonably necessary, to authorize exceptional expenditure of up to three thousand euros (€3,000.00) in respect of one or more extraordinary items (whether on lumpsum basis or in the aggregate in relation to the same expense item or a group of related expense items) not provided for in the then current budget without first having obtained the Owner's consent. The Manager shall forthwith notify the Owner of any such exceptional expenditure and provide a reasonably detailed justification for the same.

7.1.6.2. Notwithstanding anything contained herein, the Manager shall in no circumstances be required to use or commit its own funds to finance the provision of the Services or the operation of the Vessel (with the exception of Manager's office costs).

7.1.6.3. The Owner shall provide the Manager with the funding required for each calendar month no later than ten (10) banking days after the commencement of the relevant month. The amount of funding shall be based on the agreed Vessel budget. The Manager reserves the right to revise funding projections as may be reasonably required based on the changes in the actual Vessel program (compared to the Vessel plan available to the Manager at the time of drafting the then current budget) and associated funding requirements. The Owner has ten (10) days following receipt of the revised budget to object to any revised funding projection, after this time period the Owner is deemed to have accepted the revision. If the Manager and the Owner cannot agree on a revised funding projection after thirty (30) days, the Manager may terminate this Agreement.

7.1.6.4. Notwithstanding the aforesaid, the Owner may from time to time advance to the Manager amount(s) on account of future expenses of the Vessel exceeding the funding required for the then current months in accordance with the then current budget as the Owner may in its sole discretion determine; should this be the case, relevant amounts shall be held by the Manager in trust to the credit of the Owner in the Vessel Account, and the Manager shall debit against such amount(s) expenses of the Vessel as they fall due; the Manager shall notify the Owner in writing reasonably in advance if the balance of such account falls below an amount sufficient to pay all expenses of the Vessel falling due during the next months in accordance with the then approved budget.

 

236   7.2.  **Technical Support**

237      The Manager shall provide personnel to overlook the maintenance and general efficiency of the
238      Vessel (hull, machinery and equipment). The Manager shall carry out the following functions:

239      7.2.1. Maintenance - Provide an annual review of Vessel maintenance and performance (on board
240          technical inspection); regular review of the Vessel's planned maintenance system (PMS),
241          ensuring its compliance with the applicable classification society and manufacturer
242          requirements and advising the Captain in connection with the appropriate technical planning
243          schedule; review of records of planned and unplanned (emergent) maintenance and defect
244          reports, suggesting appropriate corrective action and advising the Captain in connection with
245          its implementation; conduct damage surveys as and when necessary, suggesting appropriate
246          corrective action and advising the Owner and the Captain in connection with its
247          implementation; coordinate and manage warranty claims.
248      7.2.2. Compliance - Regular monitoring of Vessel certificates and ensure compliance with applicable
249          technical regulations of the classification society and/or flag state and/or other authorities (as
250          appropriate) and/or manufactures.
251      7.2.3. Assistance - Provide advice on and assistance with the selecting, evaluating and engaging of
252          suppliers, contractors and sub-contractors. Appointment of technical consultants and
253          surveyors that the Manager deems necessary with prior consent of the Owner.
254      7.2.4. Statutory and insurance - facilitate communications and timely arrangements with the flag
255          state, classification society, other authorities (as appropriate) and insurance broker /
256          underwriters; coordinate classification society surveys and flag state compliance surveys (if
257          applicable); keeping the Vessel up-to-date with changes in applicable laws, codes of practice,
258          and other regulatory requirements.
259      7.2.5. Worklist - Monitor and provide input on worklist items in connection with any planned and
260          unplanned (emergent) maintenance and any arrangements to facilitate completion of works
261          items in the most efficient manner, including in particular review of and advice with respect
262          to the Vessel's technical maintenance budget.

263   7.3.  **Technical Management**

264      The Manager shall designate a technical superintendent ("Technical Superintendent") who will carry
265      out the following services as the Manager may deem appropriate or applicable to the Yacht or as
266      requested by the Owner or Captain:

267      7.3.1. Completion of an initial inspection of the Yacht as soon as reasonably practicable following
268          the Effective Date;
269      7.3.2. Advising the Owner and the Captain of any corrective actions required before implementation
270          of the services hereunder;
271      7.3.3. Managing the setup of the Yacht's planned maintenance system;
272      7.3.4. Provision of daily technical operational management and support comprising:
273          7.3.4.1. daily review of the noon report received from the Yacht (whilst at sea);
274          7.3.4.2. weekly review of the reports received from the Yacht;
275          7.3.4.3. periodical Yacht status report submission to the Owner;
276          7.3.4.4. review and approval of all technical standard operating procedures;
277          7.3.4.5. arranging for the supply of bunkers; and
278          7.3.4.6. regular periodic visits to the Yacht by the Technical Superintendent;
279      7.3.5. Provision of financial overview (relating to technical budgets, and to supplement the services
280          listed in Part II, section 7.1) comprising:
281          7.3.5.1. review and approval by the Technical Superintendent of the Yacht's technical budget;

 

282       7.3.5.2. review and approval of purchase requests / orders / invoices;

283       7.3.5.3. financial strategy proposal (with reference to the technical aspects only) and/or

284       implementation thereof;

285       7.3.5.4. financial forecast (with reference to the technical aspects only) for a period up to three

286       (3) years; and

287       7.3.5.5. bi-annual review of the financial forecast referred to in sub-section (iv) above;

288     7.3.6. Provision of planned and emergent (unplanned) maintenance management comprising:

289       7.3.6.1. assistance in compiling the Yacht's maintenance strategy;

290       7.3.6.2. assisting the Crew in producing a maintenance forecast for a period of up to three (3)

291       years;

292       7.3.6.3. approval of an agreed maintenance system and plan for the Yacht;

293       7.3.6.4. provision of support to the Crew with regard to emergent maintenance;

294       7.3.6.5. implementation of third party Manager's fleet contracts where considered beneficial to

295       the Owner (and subject to the Owner's prior written approval, such approval not to be

296       unreasonably withheld or delayed); and

297       7.3.6.6. monitoring planned and emergent maintenance in conjunction with the Crew.

298     7.3.7. Provision of periodic technical reports to the Owner (and, as applicable, the Captain)

299     comprising:

300     7.3.8.  Yacht status report;

301       7.3.8.1. fuel consumption report;

302       7.3.8.2. distance travelled and location report;

303       7.3.8.3. report of deficiencies notified to the Manager by the Crew;

304       7.3.8.4. report of pending items requiring Owner approval and/or urgent action including

305       purchase orders, machinery failures, reduced capabilities; and

306       7.3.8.5. Report outlining the upcoming technical planning schedule;

307     7.3.9. Project setup and management for minor works and;

308     7.3.10.  Periodic appraisal of, and assistance in interviews of, technical Crew.

309   **7.4.**  **Safety Management** -

310     The Manager shall provide for the Vessel a bespoke safety management system as dictated by the

311     tonnage of the Vessel in full compliance with the Vessel Flag State, IMO and all Port State

312     requirements, but in no case below the standard envisaged by the simplified International Safety

313     Management System (as defined in REG (part A) and common annexes ). In the course of the

314     provision of this service, the Manager shall ensure:

315     7.4.1. Compliance – Manager's company certification for compliance with ISM as confirmed by a

316     document of compliance covering the type of ships the Vessel belongs to, such document of

317     compliance to be maintained valid at any times during the term of this Agreement, Vessel

318     certification (if required or requested by the Owner) and any exemptions or equivalencies;

319     perform ongoing monitoring and annual audit of the Vessel's compliance with her safety

320     management system;

321     7.4.2. Emergency Response – coordination of initial response and any follow-up actions with all

322     stakeholders; advising and supporting the Owner and the Captain in relation to accident and

323     incident investigations;

324     7.4.3. Provision of qualified and experienced DPA / CSO / Responsible Person and relevant policies;

325     7.4.4. Provision of qualified and experienced safety/security auditors and providing to the Owner

326     regular (but at least semi-annually) safety, security and regulatory compliance status reports

327     for the Vessel.

 

328    7.5.  **Crew Compliance**

329    The Manager shall monitor statutory compliance as set by the Vessel Flag State legislation and any
330    local Port State regulations for all Crew employed onboard the Vessel. The Manager shall in
331    particular (but without limitation) carry out the following functions:

332    7.5.1. Procure that the applicable requirements are satisfied in respect of the Vessel's manning levels,
333        rank, qualification and certification of the Crew members;
334    7.5.2. Monitor the status of Crew certificates and procure for their timely renewals as appropriate;
335    7.5.3. Suggest and provide support for the Crew training in accordance with STCW 95 and/or such
336        other regulations as may be applicable to the Vessel, develop and operate an appropriate
337        performance assessment system and maintain the crew training logs; and
338    7.5.4. Procure that all the members of the Crew have passed a medical examination with a qualified
339        doctor certifying that they are fit for the duties for which they are engaged and are in
340        possession of valid medical certificates issued in accordance with appropriate Vessel Flag State
341        requirements; in the absence of applicable Flag State requirements the medical certificate shall
342        be dated not more than three months prior to the respective Crew members leaving their
343        country of domicile to join the Vessel and maintained for the duration of their service on
344        board the Vessel and ashore (as the case may be).

345    7.6.  **Crew HR**
346

347    7.6.1. The Manager shall, or (as appropriate) shall procure that the Crew Employer shall, employ
348        the appropriately qualified and experienced individuals to serve as Crew. The Manager shall
349        in particular (but without limitation) carry out, or (as appropriate) shall procure that the Crew
350        Employer carries out, in each case in compliance with the requirements of Regulation 1.4,
351        Standard A1.4 and Guideline B1.4 of the MLC, the following functions:
352        7.6.1.1. Provide to the Owner recommendations with respect to employment of suitably
353            qualified Crew (including without limitation recommendations with respect to the
354            Consolidated Wages proposed to be paid to individual Crew members in accordance
355            with Regulation 2.2, Standard A2.2 and Guideline B2.2 of the MLC); for the purposes of
356            this Agreement the "**Consolidated Wages**" shall have the meaning in accordance with
357            paragraph (c) of Guideline B2.2.1 of the MLC;
358        7.6.1.2. Verify the individual Crew member's qualifications and, if requested by the Owner,
359            perform pre-employment security checks, including without limitation ensuring that the
360            members of the Crew shall have a command of the English language of a sufficient level
361            to enable them to perform their duties safely and efficiently;
362        7.6.1.3. Issue, negotiate (with support from the Captain as may reasonably be required) and
363            execute in the Crew Employer's name the Crew employment contracts meeting
364            requirements of the MLC and the Vessel Flag State regulations, manage appropriate
365            correspondence and paperwork related to the Crew employment and generally
366            undertake all contractual administration in connection with the Crew employment;
367        7.6.1.4. Make appropriate payroll arrangements with respect to timely payment to the Crew of
368            any and all Consolidated Wages, severance payments and any other amounts consistent
369            with the relevant contractual terms;
370        7.6.1.5. Make recommendations to the Owner with respect to the Social Security Scheme and
371            administer the Social Security Scheme approved by the Owner; for the purposes of this
372            Agreement the "**Social Security Scheme**" shall have the meaning in accordance with
373            Clause 1 of Standard A4.5 of the MLC);




374            7.6.1.6. Make appropriate arrangements for timely payment of any and all taxes and/or social
375                  security charges as assessments that may apply in relation to the Crew employment;

376            7.6.1.7. Handle any union negotiations (as the case may be);

377            7.6.1.8. Arrange transportation of the members of the Crew, including repatriation and, if the
378                  death of a member of the Crew occurs, (i) repatriation of such Crew member's body
379                  and possessions; (ii) informing all relevant authorities and persons as appropriate; (iii)
380                  co-operation in connection with any investigations into the death of the relevant
381                  member of the Crew; and (iv) arranging for suitable replacement for the late member
382                  of the Crew;

383            7.6.1.9. Implement and administer a drug and alcohol policy;

384            7.6.1.10.     Implement and operate a Crew complaints procedure, provide mediation and
385                  facilitate resolution of any Crew employment disputes; and

386            7.6.1.11.     Provide guidance for the Owner, the Captain and the Crew with respect to
387                  implementation of and compliance with MLC requirements (as applicable), including
388                  without limitation with respect to establishing a financial security system in compliance
389                  with Standard A2.5.2 of the MLC.

390        7.6.2. The Manager shall procure that the services referred to in Part II Clause 7.6.1 are provided
391            to the Owner in a professional, timely and efficient manner in accordance with sound maritime
392            employment, payroll and crew administration practice and (as the case may be) in accordance
393            with the requests and/or instructions of the Owner.

394        7.6.3. Should the Vessel be required to carry a Maritime Labour Certificate, the Owner shall be
395            identified as the party named as "Ship Owner" on such Maritime Labour Certificate. The
396            Manager shall, to the extent of its services, assume the Ship Owner's duties as imposed by
397            the MLC (as applicable) and the relevant Flag State legislation for the Vessel and ensure
398            compliance in this respect.

399        7.6.4. Unless otherwise instructed by the Owner, the Manager shall liaise on the Owner's behalf
400            with the Crew Employer in connection with any matter related to the Crew employment.

401        7.6.5. The Owner shall procure, whether by instructing the Manager under Clause 7.7 (Insurance
402            Arrangements) or otherwise, insurance cover or financial security to satisfy the Ship Owner's
403            financial security obligations under the MLC.

404        7.6.6. Where the Owner finds any member of the Crew, on reasonable grounds, to be unsuitable
405            for service the Owner may require the Manager to find a replacement, and the Manager shall
406            promptly procure for a replacement member of the Crew to be provided.

407        7.6.7. For the avoidance of doubt, the Manager shall not, or shall procure that the Crew Employer
408            shall not, without (i) the prior consultations with the Captain, and (ii) the prior written
409            consent of the Owner (which consent should not be unreasonably withheld) –

410            7.6.7.1. Terminate without a good cause the employment of any existing member of the Crew,
411                  or modify terms and conditions of his/her employment (including without limitation with
412                  respect to the Consolidated Wages), except as modification may be required to comply
413                  with any applicable regulations; or

414            7.6.7.2. Employ any new member of the Crew, unless so required to procure for compliance
415                  with any applicable requirements with respect to the Vessel's manning levels, rank,
416                  qualification and certification of the Crew members; or

417            7.6.7.3. Modify terms and conditions of any Social Security Scheme approved by the Owner.

418      7.7. **Insurance Arrangements**

419         The Manager shall arrange appropriate insurances and renewals for the Vessel and her Crew as
420         provided in Part II Clause 6.1 on such terms as the Owner has instructed or agreed, in particular
421         regarding insured values, deductibles, and limits of liability, including in particular:

 

| 422 | a. | Hull & Machinery - Arrangement of cover for usual hull and machinery marine risks and |
| 423 | | excess liabilities. |
| 424 | b. | Protection & Indemnity - Arrangement of cover for protection and indemnity risks. |
| 425 | c. | War - Arrangement of cover for war risks. |
| 426 | d. | Administration - Ensure that all premiums and calls are paid promptly on their due date. |
| | e. | Handling of any insurance claims that may arise during the term of the Manager's engagement hereunder. |

## 8. Confidentiality and Intellectual Property

427    8.1.   Each party agrees that it will maintain strict confidence in respect of all information of a proprietary
428         nature received by it directly or indirectly under or pursuant to this Agreement, and each party
429         will use its best endeavours to procure that its respective officers, employees, servants, managers,
430         contractors, experts, advisers and affiliates will likewise maintain strict confidence and secrecy in
431         respect of such information.

432    8.2.   Information and documentation provided to the Manager pursuant to Part II Clause 5.1, as well as
433         any other information related to the Owner, the Vessel, the Captain, the Crew and/or any other
434         person on board the Vessel becoming available to the Manager by virtue of its engagement
435         hereunder or as a result of, or in connection with, performance of the Services, shall at all times
436         remain the property of the relevant persons (as appropriate), and the Manager shall not at any
437         time during the term of this Agreement or following its termination (without limitation of time
438         after termination) disclose such information or documentation to any other person (including by
439         way of confirming the existence and/or accuracy of such information or documentation) without
440         the prior written approval of the Owner and the relevant person. For the avoidance of doubt the
441         information and documentation referred to in this Clause shall include (without limitation)
442         identities of any persons making use of the Vessel (invitees, visitors, guests, etc.) (including in each
443         case and without limitation their respective previous, current and/or anticipated personal and/or
444         business affairs, assets, and existence, nature and terms of their respective activities, the Vessel's
445         past, current and anticipated operations and itineraries). The Manager recognizes and
446         acknowledges that any unauthorized disclosure or threatened disclosure of the information or
447         documentation referred to in this Clause may cause irreparable injury and that, in addition to all
448         other remedies available to the Owner and/or the other relevant persons referred to in this Clause
449         in law, the Owner and any such persons (as appropriate) will also be entitled to seek specific
450         performance, injunctive and other equitable relief as a remedy for any threatened or actual breach,
451         without the necessity of proving actual damages.

452    8.3.   The Manager shall use information referred to in Part II Clause 8.2 solely for the purposes of
453         providing the Services hereunder and may only allow for such information to be available to the
454         Manager's respective officers, employees, servants, managers, contractors, experts, advisers and
455         affiliates on need-to-know basis for the purposes set forth above in this Clause, and further
456         provided that the Manager shall be held liable for any unauthorized disclosure of such information
457         by either of such persons in the same manner and to the same extent as if such unauthorized
458         disclosure has been committed by the Manager itself.

459    8.4.   The Manager shall not, and shall procure that neither of the persons referred to in Part II Clause
460         8.3 shall, without prior written consent of the Owner or the Captain take any photos or videos of
461         the Vessel and/or any persons onboard the Vessel, except as may be required for the purposes of

 

462  providing the Services hereunder, in which case provisions of Part II Clause 8.2 shall apply to any
463  such photos or videos *mutatis mutandis*.

464  8.5.  All proprietary information, intellectual property, software and materials including manuals which
465  may be issued to the Owner from time to time by the Manager in the course of the provision of
466  the Services are to be held confidential by the Owner, no copies are to be made, and such materials
467  and information are to be returned to the Manager on termination of this Agreement. The Owner
468  understands that such information and materials are of vital commercial value and importance to
469  the Manager. For the avoidance of doubt, the Owner shall be deemed to have a non-exclusive,
470  non-transferrable worldwide rights of use of such Manager's proprietary information, intellectual
471  property, software and materials on free of charge basis during the term of this Agreement.

472  8.6.  The Owner and related companies and persons agree not to employ, or to attempt to employ
473  employees of the Manager until six (6) months after such employee has left the employ of the
474  Manager.

## 9. Liability, Ratification and Indemnity

475  9.1.  Neither the Owner nor the Manager shall be under any liability for any failure to perform any of
476  their respective obligations hereunder by reason of any cause whatsoever of any nature or kind
477  beyond their reasonable control and which the relevant party was unable to foresee and/or avoid
478  or overcome by the exercise of due diligence, further provided that such cause is not resulting
479  from negligence of the relevant party.

480  9.2.  Without prejudice to Clause 9.1, the Manager shall be under no liability whatsoever to the Owner
481  for any loss, damage, delay or expense of whatsoever nature, whether direct or indirect and
482  howsoever arising in the course of the performance of the Services under this Agreement, unless
483  it is proved to have resulted directly or indirectly from, or has been materially contributed to by,
484  the negligence or gross negligence or wilful misconduct of the Manager, or its employees or agents
485  or managers or sub-contractors employed by the Manager in connection with this Agreement, in
486  which case the Manager's liability for each incident giving rise to a claim under this Clause shall
487  never exceed Two million Euros (€2,000,000.00).

488  9.3.  Notwithstanding anything that may appear to the contrary in this Agreement, the Manager shall
489  not be liable for any of the actions of the Crew, even if such actions are negligent, grossly negligent
490  or wilful, except only to the extent that they are shown to have resulted from a failure by the
491  Manager to discharge its obligations for Crew Compliance, if applicable, as set out in Part II Clause
492  7.5, in which case its liability limitation as set forth in Part II Clause 9.2 shall apply *mutatis mutandis*.

493  9.4.  Except to the extent that the Manager would be held liable under Part II Clause 9.2, the Owner
494  hereby undertakes and agrees that it will undertake to obtain an order from the Bankruptcy Court
495  to enjoin legal actions brought by third parties against the Manager arising out of, or caused or
496  occasioned by the Manager performing any of the Services under the terms hereof, in each case
497  to the extent the same exceed the insurance cover under the insurances arranged by the Manager
498  as provided in Part II Clause 6.2.
499
500  9.5.  It is hereby expressly agreed that no employee or agent or manager of the Manager (including
501  every sub-contractor from time to time employed by the Manager) shall in any circumstances

 

502   whatsoever be under any liability whatsoever to the Owner for any loss, damage or delay of
503   whatsoever kind arising or resulting directly or indirectly from any act, gross negligence or wilful
504   misconduct on his part while acting in the course of or in connection with his employment and,
505   without prejudice to the generality of the foregoing provisions in Part II Clause 5 (Owner's
506   Obligations), every exemption, limitation, condition and liberty herein contained and every right,
507   exemption from liability, defence and immunity of whatsoever nature applicable to the Manager or
508   to which the Manager is entitled hereunder shall also be available and shall extend to protect every
509   such employee or agent or manager of the Manager acting as aforesaid, and for the purpose of the
510   foregoing the Manager shall be held responsible for any act, gross negligence or wilful misconduct
511   on the part of any such person.

512   9.6.   Without prejudice to provisions of Part II Clause 4 (Manager's Obligations) the Manager shall not
513   be restricted from providing similar services to other companies or from entering into other
514   agreements with other companies or rendering other types of services or assistance to other
515   companies.

516   9.7.   The Manager shall not be restricted (whether as manager, owner, operator, charterer or
517   otherwise) from carrying on or being concerned or interested in any business or activity which is
518   or may be similar to or competitive with the business or activity now or at any time hereafter
519   carried on by the Owner; provided, however, that no such business or activity shall result in a
520   conflict of interest, and further provided, that, should any actual or potential conflict of interest
521   nevertheless arise the Manager shall forthwith notify the Owner accordingly, in which case the
522   Owner shall be entitled to terminate this Agreement with immediate effect by notice in writing.

523   9.8.   The Manager may sub-contract parts (but not the whole) of its responsibilities under this
524   Agreement to appropriately qualified persons, provided that the Manager remains at all times liable
525   for the fulfilment in accordance with the terms of this Agreement of any and all responsibilities
526   which are from time to time sub-contracted.

527   9.9.   Save for a conflict of interest, if the Owner so requests the Manager may be involved in the sale
528   or charter of the Vessel.

529   9.10.  For the avoidance of doubt, Owner shall not be liable to the Manager or any of its employees or
530   agents or managers with respect to any events that occurred prior to the Effective Date.
531   Furthermore, Mr. Luc A. Despins is party to this Agreement solely in his capacity as the chapter
532   11 trustee for the estate of Ho Wan Kwok, and not in his personal capacity. Accordingly, no claim
533   whatsoever may be asserted by Manager or any of its employees or agents or managers against
534   Mr. Luc A. Despins in his personal capacity or Paul Hastings LLP.

## 10.   Compensation, Charges & Fees

535   10.1.The Owner shall pay to the Manager as remuneration for the Services to be provided under this
536   Agreement the Management Fee specified in Part I Box 6. Supplementary fees may be charged in
537   accordance with Annex I of this Agreement where such fees reasonably accrue in connection with
538   supplementary services requested by the Owner. No supplementary services shall be provided
539   unless requested by the Owner in advance and in writing. The Management Fee shall be payable
540   monthly in arrears as further provided in Part II Clause 10.8. The Set-up Fees specified in Part I Box
541   9 shall be paid upon the commencement of the Manager's engagement hereunder as further

 

542          provided in Part II Clause 10.8. Reimbursable expenses shall be compensated as further provided
543          in Part II Clause 10.8.

544     10.2. VAT is not included and will be added if applicable.

545     10.3. Each party reserves the right to request revision of the Management Fee once per annum on the
546          anniversary date of this Agreement. Such revision shall be limited to an increase or reduction (as
547          the case may be) not exceeding the rate of CPI as reported by the UK Office of National Statistics
548          with respect to the previous calendar year, unless the parties agree otherwise in writing. The
549          requesting party must give the other at least one (1) months' notice of any proposed change to the
550          Management Fee. Any changes to the Management Fee shall only be effective if agreed in writing
551          between the Owner and the Manager.

552     10.4. If the Manager performs work outside the scope of this Agreement, for example project
553          management, it will be undertaken at a daily rate agreed between the parties in advance, unless the
554          parties agree on a different fee structure to apply with respect to such work.

555     10.5. The Owner shall reimburse the Manager and/or its representatives, for all reasonable expenses
556          arising from travel, accommodation and international travel subsistence properly and necessarily
557          incurred by the Manager in performance of the Services and based on an expense sheet with copies
558          of the invoices. Any air travel over four (4) hours shall be in economy plus or business class
559          (depending on availability). For any road trip over six (6) hours in the day, the Manager is entitled
560          to consider an alternative transport such as a flight or overnight accommodation. Accommodation
561          shall be with 3-star or equivalent hotels. International travel subsistence allowance shall be charged
562          at the daily rate of Five hundred Euro (€500) and shall be pro-rated for any day of less than ten
563          (10) hours. Except as otherwise provided in this Clause payment of the Management Fee shall be
564          deemed to constitute full and complete compensation to the Manager in respect of any costs and
565          expenses arising incurred by the Manager in connection with its performance hereunder.

566     10.6. The Manager may reimburse itself from the Vessel Account for all documented expenses related
567          to travel, accommodation and international travel subsistence incurred in the performance of the
568          Services and expressed to be reimbursable under this Agreement.

569     10.7. The Manager shall submit invoices to the Owner in respect of the Management Fee and
570          reimbursable expenses within ten (10) days following the end of the calendar month such invoice
571          relates to, together with all supporting documentation; an invoice for the Set-up Fees specified in
572          Part I Box 9 shall be submitted to the Owner within five (5) days following the Effective Date. The
573          full amount of each invoice (unless any part of the amount so invoiced is disputed by the Owner,
574          in which case the undisputed amount of the relevant invoice) shall be payable by bank transfer in
575          same day funds to the bank account of the Manager specified in the relevant invoice within fifteen
576          (15) banking days of receipt of the relevant invoice; for the purposes of this Agreement a *"banking
577          day"* means any calendar day (except for Saturday and Sunday) that is not a public holiday and on
578          which commercial banks are open to conduct business in the ordinary course in Monaco and
579          Switzerland. For the avoidance of doubt, a SWIFT confirmation document issued by the Owner's
580          bank shall serve as sufficient evidence of the proper discharge by the Owner of its obligation to
581          pay relevant amounts under this Agreement, and any transfer, banking or currency exchange fees
582          charged by the bank of the Manager shall be for the Manager's account.

 

583   10.8. Without prejudice to the generality of Part II Clause 10.7, the Owner may from time to time
584         advance to the Manager such amount(s) on account of future Management Fee as the Owner may
585         in its sole discretion determine; should this be the case, relevant amounts shall be held by the
586         Manager in trust to the credit of the Owner in the Vessel Account, and the Manager shall debit
587         against such amount(s) any Management Fee becoming due and payable in accordance with the
588         provisions of Part II Clause 10.1. The Manager shall notify the Owner in writing reasonably in
589         advance if the balance of such account falls below an amount sufficient to cover next following
590         Management Fee payment.

591   10.9. Without prejudice to the generality of Part II Clause 10.7, the Owner may from time to time
592         advance to the Manager such amount(s) on account of future reimbursable expenses as the Owner
593         may in its sole discretion determine; should this be the case, relevant amounts shall be held by the
594         Manager in trust to the credit of the Owner in the Vessel Account, and the Manager shall debit
595         against such amount(s) any reimbursable expenses becoming due and payable in accordance with
596         the provisions of Part II Clause 10.1. The Manager shall notify the Owner in writing reasonably in
597         advance if the balance of such account falls below an amount sufficient to cover any anticipated
598         reimbursable expenses.

## 11.   Termination

599   11.1. Subject to Part II Clause 11.2 and pursuant to Part II Clause 2.1, the appointment of the Manager
600         under this Agreement shall take effect on the Effective Date and such appointment shall continue
601         unless and until terminated by either party (with or without cause) by giving to the other not less
602         than thirty (30) days' prior notice in writing.

603   11.2. This Agreement shall be deemed terminated without notice (i) if the Vessel is sold otherwise than
604         to an affiliate of the Owner - on the date of the Owner ceasing to be the registered owner of the
605         Vessel; or (ii) when the Vessel becomes an actual total loss or is declared as a constructive or
606         compromised or arranged total loss; or (iii) when the Vessel is requisitioned; or (iv) if an order is
607         made and not stayed within 10 business days or resolution is passed for the winding up, dissolution,
608         liquidation or bankruptcy of either party (otherwise than for the purpose of reconstruction or
609         amalgamation without insolvency) in any jurisdiction or a receiver or administrator or a liquidator
610         or another person with similar authority is appointed with respect to either party or all or
611         materially all of its respective assets, or it becomes bankrupt, ceases to carry on business or makes
612         any special arrangement or composition with its creditors in connection with any existing or
613         anticipated financial difficulties; provided, however, that sub-clause (iv) is not triggered by the
614         currently pending chapter 11 case of Ho Wan Kowk (i.e., Case No. 22-50073 in the Bankruptcy
615         Court), in which case the Owner has been appointed as the chapter 11 trustee for the estate of
616         Ho Wan Kwok.

617   11.3. The Manager may suspend performance of the Services by notice in writing to the Owner should
618         any sum due or payable by the Owner to the Manager remain outstanding for more than twenty
619         (20) days.

620   11.4. If the Owner fails to meet its obligations under this Agreement, the Manager may give notice of
621         the default to the Owner requiring it to remedy it as soon as practically possible. In the event that
622         the Owner fails to remedy the default to the reasonable satisfaction of the Manager within thirty

 

623        (30) days from receipt of such notice, the Manager shall be entitled to terminate the Agreement
624        with immediate effect by notice in writing.

625   11.5.If the Manager fails to meet its obligations under this Agreement, the Owner may give notice of the
626        default to the Manager requiring it to remedy it as soon as practically possible. In the event that the
627        Manager fails to remedy the default to the reasonable satisfaction of the Owner within thirty (30)
628        days from receipt of such notice, the Owner shall be entitled to terminate the Agreement with
629        immediate effect by notice in writing; the Owner may suspend payment of the Management Fee
630        starting on the day that notice of default is given. Notwithstanding the foregoing, the Owner may
631        terminate the Agreement with immediate effect by notice in writing in an event the relevant default
632        of the Manager (i) is in the reasonable opinion of Owner not capable of being remedied, or (ii)
633        constitutes a material breach of this Agreement.

634   11.6.Any work required of the Manager by the Owner (or its representatives) after the termination date
635        will be performed according to the scale of charges published in the rate sheet current at that time.

636   11.7.The Manager shall have no liability for any losses of whatever nature incurred by the Owner in
637        consequence of suspension or termination in accordance with this Clause 11.

638   11.8. The termination of this Agreement shall be without prejudice to all rights accrued between the
639        parties prior to the date of termination.

640   11.9.Notwithstanding anything contained herein, should the Owner operate the Vessel in such a way as
641        to contravene any laws and regulations of the Flag State and/or the places where the Vessel is
642        operated and sails through, where the relevant regulatory compliance requirements have been
643        made known by the Manager to the Captain reasonably in advance, the Manager reserves the right
644        to terminate this Agreement with immediate effect.
645   11.10.     Upon termination, for whatever reason, of this Agreement, the Manager shall forthwith
646        deliver to the Owner the following:

647      (a)     All certificates, logs, records and other documents belonging to the Vessel (in original)
648         and then remaining in possession or under control of the Manager and/or its agents
649         and sub-contractors (as the case may be);

650      (b)     All the reports, records, notes, accounts and other documents specifically related to
651         the Vessel and her operation (in original or as certified copies) that the Manager and/or
652         its agents and sub-contractors (as the case may be) produced in connection with
653         performance of the Services.

654   11.11.     Upon termination, for whatever reason, of this Agreement, the Manager shall upon request
655        of the Owner provide to the Owner reasonable assistance with any handover of the management
656        of the Vessel to a new manager.

657   11.12.     Any positive balance of the Vessel Account remaining upon termination of this Agreement
658        shall be repaid to the Owner within five (5) days following such termination.

659

660

 

## 12.   Business Ethics, Anti-Bribery and Corruption

12.1. The Manager warrants, confirms and undertakes to the Owner that during the term of this Agreement:

(a)   it shall not, and will procure that neither of its officers, employees, servants, managers, agents and/or subcontractors shall, engage in any activity, practice or conduct comprising bribery or corruption (either as provider or recipient) or any practice which may contravene any relevant anti-bribery or anti-corruption law (including, without limitation, the (UK) Bribery Act 2010, as amended, and the (US) Foreign Corrupt Practices Act 1977, as amended);

(b)   it has and will maintain in place, and will procure that each of its agents and/or subcontractors has and will maintain in place procedures (which shall be adequate for the purposes of the (UK) Bribery Act 2010, as amended) designed to prevent any person associated with any of them from undertaking any conduct that would give rise to an offence under any such anti-bribery or anti-corruption law, and shall supply copies of such procedures to the Owner upon request;

(c)   from time to time, at the request of the Owner, it will confirm in writing that it has complied with its undertakings under this Part II Clauses 12.1(a) and 12.1(b); and

(d)   forthwith notify the Owner in writing of any breach or purported breach of either of Part II Clause 12.1(a) or Part II Clause 12.2 the Manager becomes aware of, or if the Manager has reason to believe that it or any of its officers, employees, servants, managers, agents and/or subcontractors has received a request or demand for, or was otherwise solicited to make payment of any money or give anything of value as further set forth in Part II Clause 12.2.

12.2. Without prejudice to the generality of Part II Clause 12.1, the Manager warrants, confirms and undertakes to the Owner that it has not offered, paid or promised to pay, or will during the term of the Agreement, offer, pay or promise to pay, in each case directly or indirectly, any money or give anything of value to any member of the Owner's Team, including any relative, affiliate or associate of such member, or to any third party while knowing or being aware of a high probability that any such money or thing of value will be offered, paid, given or promised, directly or indirectly, to any member of the Owner's Team, including any relative, affiliate or associate of such member, for the purposes of influencing any act or decision of the relevant member of the Owner's Team, or inducing the relevant member of the Owner's Team to use their influence to affect or influence any act or decision of others in connection with the Services or securing any improper benefit for the Manager which the Manager would not otherwise be entitled to hereunder.

For the purposes of this Clause, "Owner's Team" shall mean the Captain, any member of the Crew (whether permanently or temporarily engaged or contracted), together with all and any of the Owner's directors, officers, employees, advisers, agents, contractors or suppliers.

12.3. Any breach by the Manager or either of its officers, employees, servants, managers, agents and/or subcontractors of this Clause 12 shall constitute a material breach of this Agreement.




### 13.   Miscellaneous

699
700

13.1. This Agreement is personal to the parties and is not capable of being assigned in whole or in part by either party without the prior written consent of the other party.

701
702
703

13.2. Each document, instrument, certificate, statement, notice, request, demand, consent or other communication to be delivered by any party to the other parties under or pursuant to this Agreement shall be in the English language.

704
705

13.3. No person who is not party to this Agreement shall have any right under the Contracts (Right of Third Parties) Act 1999 directly to enforce its terms. Notwithstanding the aforesaid –

706
707
708
709
710

(a)   persons named in Part II Clause 8.2 are the permitted third party beneficiaries of this Agreement to the extent their rights can be infringed by unauthorized disclosure of the information and documentation referred to in that Clause, and such persons possess full right, power and authority to enforce provisions of Part II Clause 8 as if they were the parties to this Agreement.

711
712

13.4. None of the provisions of this Agreement shall be deemed to constitute a partnership or joint venture between the parties for any purpose.

713
714

13.5. This Agreement may not be amended, supplemented or modified except by a written agreement or instrument signed by or on behalf of both parties.

715
716
717
718
719
720
721

13.6. Any provision of this Agreement prohibited by or unlawful or unenforceable under any applicable law actually applied by any court of competent jurisdiction shall, to the extent required by such law, be severed from this Agreement and rendered ineffective so far as is possible without modifying the remaining provisions of this Agreement. Where, however, the provisions of any such applicable law may be waived, they are hereby waived by the parties to the full extent permitted by such law to the end that this Agreement shall be a valid and binding agreement enforceable in accordance with its terms.

722
723
724
725

13.7. Each of the parties shall bear its own costs and expenses (including without limitation any legal fees and out-of-pocket expenses) incurred by such party in connection with the preparation, negotiation of and entry into this Agreement.

726
727
728

13.8. This Agreement may be executed in any number of counterparts, and by the parties on separate counterparts, each of which when so executed and delivered shall be an original but all counterparts shall together constitute one and the same Agreement.

729
730

13.9. Any notices under this Agreement shall be delivered in writing and may be sent by email, registered or recorded mail or by personal service. The addresses of the parties for service are as follows:

731
732
733

| **Owner:** | **Manager:** | Yachtzoo Sarl |
| | | Att: Russell Stockil |
| Luc A. Despins, as chapter 11 trustee | | Le Beau Rivage |
| for the estate of Ho Wan Kwok | | |

| 734 | **c/o Paul Hastings LLP** | | **9 Ave d'Ostende** |
| 735 | **200 Park Avenue** | | **Monaco, MC98000** |
| 736 | **New York, New York 10166** | | |
| 737 | Tel:  +1 212 318 6000 | Tel: | +33 640 613 962 |
| 738 | Email:  lucdespins@paulhastings.com | Email: | ladymay@yacht-zoo.com |

739 Any notice given under this Agreement shall take effect on receipt by the other party and shall be
740 deemed to have been received upon personal delivery, or on the seventh calendar day after turning
741 the relevant notice over to a postal service, or, if sent by email, on the same business day if so sent
742 before 4.00 pm at the recipient's location or on the next business day if so sent after 4.00 pm at
743 the recipient's location provided an automatic delivery receipt confirming that the message has
744 been relayed to the recipient's address shall be produced as proof that the relevant notice has
745 been given.

## 14.    Interpretation

746 14.1. Unless the context otherwise required, words importing the singular number only shall include
747 the plural and vice versa and words importing persons shall include firms and corporations.

748 14.2. References to Clauses are to the clauses of this Agreement.

749 14.3. Clause headings are inserted for convenience of reference only and shall be ignored in the
750 interpretation of this Agreement.

## 15.    Law, Jurisdiction

751 15.1. This Agreement and any non-contractual disputes arising out of it shall be governed by and
752 construed in accordance with English law (excluding its conflict of laws provisions).

753 15.2. The Bankruptcy Court shall have exclusive jurisdiction over any claim or dispute in respect of or
754 arising out of this Agreement which cannot be settled amicably between the parties within
755 reasonable time.

756

 

757  **ANNEX I**

| Supplementary fees | Time | Price |
|---|---|---|
| Technical / Safety / Marine consultancy for specific projects not covered by the Services: dry dock, repairs, refits, etc. | Day | 1,200 |
| | Hour | 150 |
| Assistance in respect of specific projects which fall outside the scope of this Agreement: <br> • Handling the registration of the vessel on behalf of the Owner <br> • Handling the documentation relating to a change of flag or classification society on behalf of the Owner <br> • Crew background checks | Day <br><br> Hour | 1,200 <br><br> 150 |
| Accounting Services: <br> • Any financial service connected to a special service outside the scope of the Agreement or related to a special project <br> • Production of any financial statement or reports outside the scope of the Agreement | Day <br><br> Hour | 1,200 <br><br> 150 |
| In order to comply with local law and regulations and/ or with the requirements of the Flag State, the Manager may be required to prepare and obtain a selection of specific documents, plans or endorsements as listed below on behalf of the Vessel and subject to the Owner's prior approval and planned itinerary for the Vessel, of which the Owner shall keep the Manager notified at all times: <br> 1. SOPEP required for vessels over 400 tons  (excl. Flag State and mailing fees). <br> 2. NTVRP required for vessels over 400 tons in U.S. waters.  NTVRP regulations vary from state to state in the U.S. so additional plans may be required.  (+annual fee). <br> 3. California NTVRP ( for California COFR). <br> 4. Washington (State) NTVRP <br> 5. Alaska NTVRP <br> 6. Canada (East Coast) NTVRP <br> 7. Canada (West Coast) NTVRP <br> 8. Ship Energy Efficiency Management Plan (SEEMP) <br> 9. Inventory for Hazardous Materials – to be quoted as required (on a case-by-case basis). <br><br> Unless expressly included, the fees above do not include 3rd party costs for survey or approval which will be re-charged at cost to the Owner. For the avoidance of doubt, where the Vessel maintains valid any of the aforesaid documents, plans or endorsements, which may need to be updated/re-issued to replace reference to the Vessel's previous manager with reference to the Manager, no Supplementary Fees shall be charged as provided above in connection with the Manager arranging such update/re-issue on behalf of the Vessel. | | 2,500 <br><br> 2,500 <br><br> 2,000 <br> 1,875 <br> 3,125 <br> 1,875 <br> 1,875 <br> 1,850 |

**Time invoiced does not include travel time which may be charged in addition at a pro-rated hourly fee.**
**All rates quoted exclude VAT/TVA which will be added if appropriate.**

The Manager may review these Supplementary Fees once per annum on the anniversary of this Agreement. No changes to the Supplementary Fees shall take effect until and unless this Annex I is amended as provided in Part II Clause 13.5.




## Exhibit 3

**Crew Provision Agreement**

**CREW PROVISION AGREEMENT**

**Dated      APRIL 2023**

**Between**

**LUC A. DESPINS, AS THE CHAPTER 11 TRUSTEE FOR THE ESTATE OF HO WAN KWOK**

**and**

**FDS46 CREW SERIES LLC**

**THIS AGREEMENT** is made this      day of April Two Thousand and Twenty Three

**BETWEEN**:

(1) **LUC A. DESPINS, AS THE CHAPTER 11 TRUSTEE FOR THE ESTATE OF HO WAN KWOK** whose address is situated at c/o Paul Hastings LLP, 200 Park Avenue, New York, New York, 10166 ("**LDS**");

(2) **FDS46 CREW SERIES LLC** whose registered office is situated at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960 ("**FDS**).

**RECITALS:**

(1) **LDS** is the owner/operator of the Vessel "**Lady May**", registered in the Cayman Islands and with official number 745195, and wishes to retain the services of **FDS** to employ and remunerate such personnel (as defined in this Agreement) as are required to man and operate the Vessel.

(2) **FDS** has agreed to employ such personnel as are required by **LDS** in accordance with and subject to the terms as set out below.

**NOW IT IS AGREED AS FOLLOWS: -**

1. **Appointment**

    **LDS** agrees to appoint **FDS** to employ personnel to work onboard the various Vessels as required by **LDS** with effect from the      day of April 2023 ("the commencement date"). This Agreement is subject to approval of the United States Bankruptcy Court for the District of Connecticut in which court the chapter 11 case of Ho Wan Kwok, Case No. 22-50073 is pending. For the avoidance of doubt, LDS shall not have any liability to FDS for any events that occurred prior to the commencement date. Furthermore, Mr. Luc A. Despins is party to this Agreement solely in his capacity as the chapter 11 trustee for the estate of Ho Wan Kwok, and not in his personal capacity. Accordingly, no claim whatsoever may be asserted by FDS against Mr. Luc A. Despins in his personal capacity or Paul Hastings LLP.

2. **Services**

    **FDS** will perform the following services: -

    2.1    Selecting and engaging personnel.

    2.2    Supervision of efficiency of personnel.

    2.3    Discipline of personnel, including, but not limited to, grievances, appeals, written warnings and dismissals.

2.4   Administration of all personnel matters relating to the personnel, including, but not limited to overseeing and arranging of medicals, training courses and travel to and from vessels, day to day administration and correspondence with external agencies, including, but not limited to, HMRC.

2.5   Payroll and administration relating to the employment of the personnel, including, but not limited to, gross to net calculation and payment of salaries, expenses, and all relevant deductions, including, but not limited to trade union subscriptions, pensions and statutory deductions.

2.6   Enforcement of all Operational, Health and Safety, Drug and Alcohol and other appropriate policies as laid down by **LDS**.

2.7   Issue Contracts of Employment in accordance with relevant standard form contracts.

2.8   All other tasks as may be reasonably required by **LDS** relating to the employment of personnel for the operating of various vessels.

3.   **Sub-Contracts**

**FDS** will be entitled to sub-contract all or any administrative tasks in connection with their employment of the personnel to a third party or parties subject to the prior written consent of **LDS**. For the avoidance of doubt the employment contract shall remain with **FDS** irrespective of the tasks subcontracted to a third party.

4.   **Payment and Remittances**

4.1   **FDS** will be paid an agreed fee per employee per payroll for the provision of the services provided pursuant to this Agreement as detailed in schedule 1.  The fee shall be paid on receipt of a monthly invoice per payroll processed and shall be fixed for a period of one year from the commencement date.  All fees are to be paid in full at the same time as salary funds are transferred.  Additional charges will be applied for out of payroll payments, re-runs of payrolls and bank charges will the responsibility of **LDS**.

Thereafter the fee will be reviewed annually, on the anniversary of the commencement date.

4.2   **LDS** agree and will ensure sufficient cleared funds to a designated bank account from time to time such that **FDS** is able to honour all commitments with regard to the fulfilment of this Agreement including payment of employee salaries and the payment of all deductions from the same employees with, plus all funds to cover employer commitments to any pension fund or other agreed contributions.  Such instructions shall be acted on immediately upon receipt of the appropriate advice from **FDS** and funds shall be transferred immediately upon receipt of the appropriate advice from **LDS.**

4.3   **FDS** shall provide a monthly detailed invoice.

5. **Insurances**

5.1     **LDS** agrees to ensure that all personnel employed under this Agreement are fully covered for death in service, personal accident and health insurance whilst onboard the vessel, travelling to and from the vessel and on courses during their employment.  **LDS** to provide evidence that **FDS** is named as co-assured**.** All deductibles are to be for the account of **LDS**.

5.2     **LDS** further agrees to ensure that all personnel employed by **FDS** for service under the terms of this Agreement will be covered under **LDS** insurance arrangements for employers and public liability in accordance with statutory requirements.

5.3     In accordance with usual practice within the marine industry **LDS** shall ensure that, in arranging such insurances on behalf of **FDS**, **FDS** are indemnified from and against all actions, costs, claims, demands, losses, charges and liabilities whatsoever and howsoever arising which **FDS** may suffer, sustain or incur as a result of providing the services described herein.

6. **Duration and Termination**

6.1     Subject to earlier termination in accordance with this clause 6, this Agreement shall remain in force until the termination of the last period of employment for personnel employed by **FDS** for service on any of the vessels covered by this Agreement.

6.2     **LDS** and **FDS** shall have the right to withdraw from this Agreement upon giving not less than thirty (30) days notice in writing to the other party of such intention to withdraw, notwithstanding the provisions of clauses 6.3 and 6.4.

6.3     This Agreement may be terminated without notice if either party shall commit, or allow to be committed, any breach of any term of this Agreement which being capable of rectification is not rectified within twenty one days of receiving written notice from the other party.

6.4     This Agreement shall terminate if either party goes into liquidation or is wound up (other than for re-organisation or amalgamation) or makes any composition or arrangement with its creditors; provided, however, that this clause is not triggered by the currently pending chapter 11 case of Ho Wan Kwok (i.e., Case No. 22-50073 in the United States Bankruptcy Court for the District of Connecticut), in which case **LDS** has been appointed as the chapter 11 trustee for the estate of Ho Wan Kwok.

6.5     In the event that **LDS** do not comply with the payment and remittance terms as detailed in clause 4, **FDS** shall have the right to cancel this Agreement.  **LDS** shall have seven days to comply with the request for funds and if such funds are not received as stated **FDS** shall have the right to cancel this Agreement at two days notice.

6.6    **LDS** may also terminate this Agreement in the event of, and effective upon, a sale of the Lady May to a third party.

6.7    Any termination of this Agreement by either party under clauses 6.3, 6.4, 6.5 or 6.6 shall be without prejudice to any other rights which either party may have against the other which may have accrued up to the date of termination.

## 7.    <u>Confidentiality</u>

Both parties to this Agreement shall keep and treat as confidential and not disclose to any third party, without the prior written consent of the other party information relating to the other party or their business.

## 8.    <u>Warranty</u>

Each of the parties warrants its power to enter into this Agreement and has obtained all necessary approvals to do so, provided, however, that **LDS**'s entry into this Agreement is subject to approval of the United States Bankruptcy Court for the District of Connecticut..

## 9.    <u>Force Majeure</u>

Both parties shall be released from their respective obligations in the event of national emergency, war, prohibitive governmental regulation or if any other cause beyond the reasonable control of the parties or either of them renders the performance of this Agreement impossible whereupon all money due under this Agreement shall be paid immediately.

## 10.    <u>Severance</u>

If any provision of this Agreement is declared by any judicial or other competent authority to be void, voidable, illegal or otherwise unenforceable or indications to that effect are received by either of the parties from any competent authority the parties shall amend that provision in such reasonable manner as achieves the intention of the parties without illegality.

## 11.    <u>Whole Agreement</u>

Each party acknowledges that this Agreement contains the whole agreement between the parties and that it has not relied upon any oral or written representation made to it by the other or its employees or agents and has made its own independent investigations into all matters relevant to it.

## 12.    <u>Notices</u>

Any notice to be served on either of the parties by the other shall be sent by prepaid recorded delivery or registered post to the address of the relevant party shown at the head of this Agreement

or by facsimile transmission or by electronic mail or by telex and shall be deemed to have been received by the addressee within seventy two hours of posting or twenty four hours if sent by facsimile transmission or by electronic mail or by telex to the correct facsimile number or electronic mail number of the addressee (with correct answerback).

13. **Headings**

Headings contained in this Agreement are for reference purposes only and should not be incorporated into this Agreement and shall not be deemed to be any indication of the meaning of the clauses to which they relate.

14. **Right to Assign**

This Agreement and all rights under it may not be assigned or transferred by either party.

15. **Proper Law and Jurisdiction**

15.1    This Agreement shall be governed by and construed in accordance with law of the Republic of Cyprus and for all purposes shall be deemed to have been made in Cyprus.

15.2    Each party submits to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Connecticut.

16. **Costs**

Each of the parties shall pay any costs and expenses incurred by it in connection with this Agreement.

## SCHEDULE 1 – FEES

Set up fee                $3,500.00

Monthly payroll Fee -   $910.00 for between 0-5 crew

                        $1,274.00 for between 6-8 crew

The above fees shall be paid on receipt of a monthly invoice per payroll processed.  Such fees are to be paid in full at the same time as salary funds are transferred.

Additional charges will be applied for out of payroll payments and bank charges will the responsibility of the Client.

Ad-Hoc Fees

Payroll re-run:  $300

Advanced HR Support:  chargeable on a time spent basis

The above fees shall be paid on receipt of a monthly invoice.

**IN WITNESS WHEREOF** this Agreement has been executed on the date which appears first on page one.

SIGNED by
**LUC A. DESPINS, AS THE CHAPTER 11**
**TRUSTEE FOR THE ESTATE OF HO WAN KWOK**
In the presence of:


_____
Luc Despins


_____
Witness

SIGNED for and on behalf of
**FDS46 CREW SERIES LLC**
In the presence of:


_____
Marilena Stylianou
Acting on behalf of
**Bridport Ventures Limited,** Director


_____
Witness

## Exhibit 4

**Dockage Agreement**



3648

**Bridgeport Harbor Marina**
10 East Main Street
Bridgeport, Connecticut 06608
203-330-8787 Telephone
203-330-8777 Fax
Monitor VHF CH-16/9

CUST. # _____

SLIP # **B-08**

PLEASE RETURN YOUR GATE KEYS
TO AVOID BEING CHARGED!
GATE KEY DEPOSIT $100.00 EACH.

## DOCK SPACE LICENSE AGREEMENT – TRANSIENT

Arrival Date: **4 / 1 / 23**    Departure Date: **4 / 30 / 23**

Vessel Name: **Lady May**

Name of Vessel Owner: **Luc A. Despins, as Chapter 11 Trustee**

Owner's Address: **c/o Paul Hastings, LLP  200 Park Ave**

City: **New York**   State: **NY**   Zip: **10166**

Owner's Telephone Number: **212-318-6000**

Owner's Email Address: **luc.despins @ paulhastings.com**

Vessel Make: **Feadship**   Vessel Type: **MY**

\*\*Length OA **150**   Beam **29**   Draft **8**

~~Daily~~ Rate: $ **70**   Per Ft / Month   $ **10,500.00**

Service Fee: **Elec estimate**   $ **5,000.00**
          **980v 100 amp**

Tax @ 6.35%:   $ **984.25**

~~Daily~~ Total: **Month**   $ **16,484.25**

Key Deposit: $100 x ___ Paid By: _____   $ _____

**Dock Space assignments are temporary and
may be changed at MARINA's sole discretion.**

\*\*VESSEL LENGTH/DOCK MIN: _____
(Subject to Measurement - LENGTH OA means overall length of
VESSEL, including all appendages, appurtenances and rigging,
NOT the manufacturer's designated length.)

**CHECK OUT TIME IS 12:00 NOON**
**VESSEL HAS 7 DAYS TO CONVERT TO LONG-TERM CONTRACT**

This LICENSE AGREEMENT ("AGREEMENT") is made by and between BLD Waterfront Upland Owner LLC ("MARINA"), through its Marina manager and operator, RCI BRIDGEPORT LLC, First Party, and, Vessel ("VESSEL"), its Owner ("OWNER") and OWNER's Agent ("AGENT"), collectively Second Party, in regard to dockage of VESSEL at the Marina ("Marina"). The Parties agree that this AGREEMENT is not a lease or other rental agreement relating to real property.

If the person signing this AGREEMENT is not the OWNER, such person: (a) must fully name and identify the OWNER above, (b) warrants and represents his/her authority to obligate OWNER and VESSEL to this AGREEMENT, (c) agrees to be bound personally, jointly and severally, with OWNER and VESSEL to this AGREEMENT, and, (d) certifies that he/she has lawful custody and control of VESSEL as AGENT of OWNER.

In consideration of advance payment on behalf of OWNER of the total amounts due for the intended length of stay (whether or not VESSEL is present at Marina for all, part or none of the TERM), including all deposits, and the promise to pay all fees and charges invoiced by MARINA to Second Party, and the mutual covenants contained or incorporated herein, MARINA licenses Second Party to use a space adjacent to a dock ("dock space") for dockage of the VESSEL and no other vessel or thing, and, licenses Second Party to access a dock space and use Marina facilities incidental to dockage of Vessel at Marina (collectively "Licenses"), in accordance with and subject to the **TERMS AND CONDITIONS-TRANSIENT DOCKAGE** (hereinafter "TERMS AND CONDITIONS") posted at the **Dock Master's office**, which TERMS AND CONDITIONS are fully incorporated into this AGREEMENT by reference. Second Party and his/her/its crew, contractors and guests shall comply with the current MARINA RULES AND REGULATIONS also posted at the Dock Master's office, and MARINA reserves the right to alter, amend, and modify these RULES AND REGULATIONS at any time.

**Second Party agrees that all payments made under this AGREEMENT are earned and non-refundable.** OWNER and/or AGENT hereby authorize MARINA to immediately charge against the account of a submitted credit/debit card, any and all MARINA fees and charges incurred by OWNER or any other person connected with VESSEL, including OWNER's AGENT, crew, contractors and guests, during the VESSEL's presence at Marina. In the event any fees or charges are not paid prior to the VESSEL's departure, OWNER and/or AGENT acknowledge having executed a credit/debit card slip and hereby authorize its use in order to effect payment of the foregoing amounts.

CREDIT/DEBIT CARD: VISA _____ MC _____ AMEX _____ : CREDIT/DEBIT CARD #: _____
EXP. DATE: _____   SEC #: _____   INITIALS: _____

The TERM of the Licenses under this AGREEMENT shall be from the Arrival Date to the Departure Date, irrespective of whether VESSEL is located at the Marina or elsewhere. Notwithstanding anything in this AGREEMENT to the contrary, MARINA may terminate and/or revoke the Licenses granted under this AGREEMENT, and Second Party shall immediately quit Marina and remove VESSEL from Marina, on oral notice of termination and/or revocation stated to OWNER or AGENT, or written notice placed on VESSEL, in the event that any Second Party breaches any provision, TERM or CONDITION of this AGREEMENT or any Second Party, his/her/its crew, passengers or guests refuse or fail to follow or comply with any of the MARINA RULES AND REGULATIONS.

**OWNER/AGENT ACKNOWLEDGES HAVING READ AND UNDERSTOOD ALL CONTENTS OF THIS AGREEMENT, INCLUDING THE TERMS AND CONDITIONS INCORPORATED HEREIN BY REFERENCE AND THE CURRENT RULES AND REGULATIONS. THE TERMS AND CONDITIONS AND CURRENT RULES AND REGULATIONS ARE POSTED AT THE DOCK MASTER'S OFFICE. PRIOR TO SIGNING THIS AGREEMENT, OWNER'S AND AGENT'S ATTENTIONS ARE ESPECIALLY DIRECTED TO CERTAIN CLAUSES SET FORTH IN THE TERMS AND CONDITIONS ENTITLED "INSURANCE, RELEASE, INDEMNIFICATION AND ATTORNEYS' FEES."**

By: _**Luc Despins, as Trustee**_
OWNER/For OWNER

Executed on this __4th__ day of __April__, 20_23_

BLD Waterfront Upland Owner, LLC

## TERMS AND CONDITIONS

This AGREEMENT is made by and between MARINA,[*] as First Parties, and VESSEL, its OWNER and AGENT (collectively referred to as "OWNER"), as Second Parties, in regard to dockage of VESSEL at Bridgeport Harbor Marina (herein "Marina") for the TERM agreed to on the APPLICATION. When not inconsistent with the context, words in the singular include the plural and words in the plural include the singular. The Parties agree that this AGREEMENT is not a lease or other rental agreement relating to real property.

In consideration of the total amounts due for the full TERM (whether or not VESSEL is present at MARINA for all, part or none of the TERM) and the mutual covenants contained herein, MARINA (a) grants a license to OWNER for a space adjacent to a dock ("slip") at Marina to use for dockage of the VESSEL and for no other purpose and for no other vessel or thing, and (b) grants a license to OWNER to access the slip and use Marina facilities incidental to dockage of VESSEL at Marina (collectively "Licenses"). The TERM of this AGREEMENT for the assigned slip is from the BEGINNING DATE to the ENDING DATE. All amounts pre-paid, including for the last month of the TERM, are earned and non-refundable upon payment. The remaining total amounts due will be pro-rated per month, and the pro-rated amount for each month shall be paid by OWNER in advance, on or before the 1st day of each month. VESSELs remaining at Marina after the end of the TERM for which this AGREEMENT applies, will be charged the then current prevailing transient dockage rates per day until VESSEL is removed. SECURITY DEPOSIT sums shall be held by MARINA on its own account in order to assure the full and faithful performance of this AGREEMENT by Second Parties. Any SECURITY DEPOSIT sums which are due OWNER as of the expiry of these Licenses, shall be returned to OWNER within fifteen (15) days, provided that MARINA may apply any sums which it holds to any balance remaining on OWNER's account. No slips will be reserved without a signed AGREEMENT and payment must be received in full prior to slip occupancy. Dockage fees are non-refundable. OWNER is responsible for total slip charges in full regardless of whether VESSEL sells prior to or during the TERM.

All invoices are due and payable upon receipt. SECOND PARTIES SHALL PAY MARINA $5.00 PER DAY ("SERVICE CHARGE") FROM THE DAY OF RECEIPT IF ALL CHARGES BILLED TO OWNER (INCLUDING PREPAYMENTS) HAVE NOT BEEN PAID BY 5:00 P.M. ON THE 5TH DAY AFTER RECEIPT. SERVICE CHARGE SHALL CONTINUE TO ACCRUE UNTIL ALL CHARGES, INCLUDING THOSE BILLED AFTER LATE FEES ARE FIRST INCURRED, ARE PAID CURRENT. A $50.00 charge will apply for all checks returned for insufficient funds. A 1.5% environmental fee is due with all TERM agreements during the summer, with a $75 maximum fee per AGREEMENT.

MARINA reserves the right to reassign a slip if it feels VESSEL or its draft is too large or too small for the assigned slip, or for any other reason at its discretion. In no event may OWNER transfer VESSELs between any slips. This AGREEMENT is freely assignable by MARINA. If OWNER expects to have VESSEL out of the slip for an extended period, MARINA must be notified. MARINA reserves the right to license the slip during any such period. This AGREEMENT is not assignable by OWNER; any attempt by OWNER to assign any license or privilege arising under this AGREEMENT, in whole or in part, is void. If OWNER uses what is deemed by MARINA to be excessive amount of electrical power (e.g., for electric heaters or air conditioners), OWNER may be subject to pay electrical fees in addition to that which is included in the dockage fee.

OWNER hereby authorizes MARINA to at any time charge against the account of the submitted credit/debit card, any and all MARINA FEES and CHARGES incurred during the TERM by OWNER or any other person connected with VESSEL, including OWNER's agents, crew, contractors and guests. OWNER acknowledges having executed and delivered to MARINA a credit/debit card slip in order to effect payments under this paragraph. In addition, if FEES and CHARGES billed to OWNER are not paid in full by 5:00 p.m. on the 5th day of the month following delivery of a bill, Second Parties hereby authorize MARINA to charge the billed amounts plus LATE FEES against said credit/debit card account. OWNER and AGENT acknowledge having executed and delivered to MARINA a credit/debit card slip in order to effect payments under this paragraph.

Notwithstanding anything contained herein, OWNER waives demand for payment, all notice required by law and any time period for notice of termination and revocation, and the Parties otherwise agree as follows:

A. MARINA may terminate or revoke the Licenses granted under this AGREEMENT, and OWNER shall remove VESSEL from Marina immediately on delivery of written notice of termination or revocation to OWNER, in the event that:
  1. OWNER defaults in the timely payment of any amount due under this AGREEMENT;
  2. OWNER breaches any provision, TERM or CONDITION of this AGREEMENT;
  3. OWNER or a guest, vendor, contactor or crewmember thereof refuses or fails to follow or comply with any of MARINA'S RULES AND REGULATIONS;
  4. OWNER or AGENT assigns or attempts to assign this AGREEMENT or one or more of the Licenses granted under this AGREEMENT, in whole or in part, to a third party; or
  5. MARINA determines, in its sole discretion, that a Marina pier or part thereof is or may be unsafe or unserviceable for any reason whatsoever; or,

B. MARINA may terminate or revoke the Licenses granted under this AGREEMENT at its will (for any reason or no reason) and OWNER shall remove VESSEL from Marina within ten (10) days after delivery of written notice thereof to OWNER.

If OWNER defaults in the timely payment of any amount due under this AGREEMENT, or if OWNER breaches any provision or any of the TERMS AND CONDITIONS of this AGREEMENT, MARINA shall have all rights and remedies provided by this AGREEMENT and by applicable laws (now or hereafter existing).

It is agreed that VESSEL is itself responsible as OWNER to perform and abide all provisions, TERMS AND CONDITIONS of this AGREEMENT, and further, responsible for performance of all of OWNER's obligations and responsibilities under this AGREEMENT. Any and all sums due MARINA by OWNER, his/her/its crew, contractors and/or guests, under, arising out of or relating to this AGREEMENT, shall also be charges against VESSEL. In addition to all other remedies, MARINA may also proceed in accordance with Connecticut and/or federal laws to enforce any and all liens against VESSEL created or recognized by Connecticut and/or federal laws, or may proceed against VESSEL in accordance with Connecticut's laws concerning abandoned vessels, Section 15-140c of the Connecticut General Statutes, if applicable. Nothing in this AGREEMENT shall be construed as a waiver by MARINA of any rights created or recognized by Connecticut or federal laws. MARINA shall have the option to proceed against VESSEL, in rem, and personally against OWNER and AGENT, or any combination thereof, for breach of this AGREEMENT, to enforce any and all liens, and to enforce any and all provisions, TERMS AND CONDITIONS of this AGREEMENT. All remedies provided for in this AGREEMENT, and by Connecticut and federal laws, are cumulative and non-exclusive.

At all times, OWNER and AGENT retain exclusive care, custody and control of, and are solely responsible for, VESSEL. MARINA is not a bailee of VESSEL and assumes no responsibility for safe operating condition, custody, tie up, dockage or maintenance of VESSEL. OWNER is solely responsible for security of VESSEL and for preventing entry by unauthorized persons to VESSEL. This AGREEMENT contains no provision or obligation for the providing of on-site security, guard service or surveillance by MARINA. While MARINA will make reasonable efforts to provide as secure a facility as possible, OWNER agrees that MARINA shall not be held liable for theft or vandalism or other criminal acts taking place at Marina or on VESSEL.

OWNER and his/her/its guest, vendor, contactor or crewmember, shall comply with the MARINA RULES AND REGULATIONS, current copy attached, and any alteration, amendment or modification thereof. MARINA reserves the right to alter, amend, and modify these RULES AND REGULATIONS, at any time, by posting or by delivery of a notice to OWNER.

---

[*] The term "MARINA" means the entities identified as MARINA on the APPLICATION, page 1 of this AGREEMENT, as well as each entity's owners, operators, employees, agents, and any affiliates or successors and assigns.

OWNER hereby acknowledges that the Marina and its facilities may be committed to one or more special events, including but not limited to boat shows, occurring during the TERM of this AGREEMENT. OWNER and VESSEL agree that upon no less than fifteen (15) days written notice ("Notice") from MARINA, VESSEL shall be removed from the Marina, at OWNER's sole cost and expense, for the dates and duration (not to exceed 30 days) set forth in the Notice, and that for said time period neither OWNER nor VESSEL shall have any privileges under the Licenses provided herein. OWNER's account will be credited the pro-rata amount for the number of days set forth in the Notice during which privileges are suspended.

All outside contractors must check in and sign in with the Dock Master and may not undertake any work on VESSEL in Marina without the prior approval of MARINA. Each contractor must provide evidence of liability insurance equal to Five Million Dollars ($5,000,000.00), with MARINA reflected as an "additional insured." Adequate worker's compensation (or its federal equivalent) and/or disability coverage must be maintained by each contractor at all times. MARINA reserves the right to stop any contractor or "do-it-yourselfer" from work that is harmful to the environment, disruptive to other MARINA customers, or not approved.

OWNER shall remove VESSEL from the Marina within eight (8) hours after the issuance of a named storm watch for Fairfield County, Connecticut, or after MARINA provides notice to OWNER of the approach of a major storm or weather event. If OWNER fails to remove VESSEL, OWNER authorizes MARINA, its managers, operators, employees, or agents to remove the VESSEL from its slip and take any and all actions deemed appropriate by MARINA, its managers, operators, employees or agents in order to better secure the VESSEL, to minimize damage to it and to protect persons, Marina property, private property, and the environment. OWNER shall pay all reasonable fees and expenses for any such actions taken.

### INSURANCE, RELEASE, INDEMNIFICATION and ATTORNEYS' FEES

***MARINA DOES NOT CARRY INSURANCE*** covering persons, or, property of OWNER. ***MARINA WILL NOT BE RESPONSIBLE*** for any personal injury (including death) or property damage resulting, caused by or arising out of these Licenses or other use of the dock or other Marina facilities. OWNER SHALL KEEP COMPLETE MARINE INSURANCE on VESSEL and its operator(s), current and in place, including full insurance on hull and machinery and other property, covering at least 100% of the present actual cash value of VESSEL, with endorsements for extended perils, damage by fire, electrolysis or stray current corrosion, pollution and fuel spills, salvage and wreckage removal, vandalism and burglary. OWNER shall also maintain insurance coverage against OWNER's, AGENT's and VESSEL's liabilities to third parties.

Upon execution of this AGREEMENT and as requested by MARINA from time-to-time, OWNER shall provide MARINA with certificate(s) of insurance evidencing required coverages, and upon request provide MARINA with a complete copy of the policy(ies), and shall produce evidence of the renewal of the policy(ies) no later than 30 days prior to expiration. All policies of insurance shall require 30 days advance notice by the insurance company to MARINA of any amendment or cancellation.

***VESSEL, AGENT AND OWNER HEREBY RELEASE AND DISCHARGE MARINA*** (and officers, directors, managers, operators, agents, servants, employees, contractors and insurers thereof) from any and all liability for loss, personal injury (including death), or damage to person or property sustained while in Marina, on Marina property, and/or using any part of Marina or its facilities, arising out of, relating to or caused (directly or indirectly) by: (1) any ***negligence*** of MARINA or officer(s), director(s), manager(s), operator(s), agent(s), servant(s) employee(s), and/or contractor(s) thereof; (2) performance or nonperformance by MARINA of the obligations imposed by this AGREEMENT; and/or (3) strict liability, breach of warranty or other fault (not rising to the level of gross negligence or intentional conduct) of MARINA; irrespective of whether said loss, personal injury (including death) or damage to person or property arises out of, relates to or is caused (directly or indirectly) by failure of MARINA's product, equipment or facilities, fire, theft, vandalism, water damage, collision, allision, weather event (wind, precipitation, rising water) or other casualty.

***VESSEL, AGENT AND OWNER SHALL INDEMNIFY AND HOLD HARMLESS MARINA*** (and officers, directors, managers, operators, agents, servants, employees, contractors and insurers thereof) from and against each and every claim, suit, liability, loss, damage (including without limitation damage to MARINA docks, pilings, and cleats, and, others' vessels), fee and expense (including without limitation attorneys' and paraprofessionals' fees), directly or indirectly arising out of, relating to or in connection with OWNER's, AGENT's or VESSEL's presence in Marina or on Marina property, or use of any part of Marina or its facilities; ***it being expressly acknowledged and agreed that the indemnification and hold harmless obligations of OWNER, AGENT and VESSEL under this Clause shall apply*** even if such claim, suit, loss, damage, fee or expense arises out of, relates to or is caused (directly or indirectly), in whole or in part, by: (1) ***negligence*** of MARINA or officer(s), director(s), manager(s), operator(s), agent(s), servant(s), employee(s) and/or contractor(s) thereof; (2) performance or nonperformance by MARINA of the obligations imposed by this AGREEMENT; and/or, (3) strict liability, breach of warranty or other fault (not rising to the level of gross negligence or intentional conduct) of MARINA.

***VESSEL, AGENT AND OWNER, JOINTLY AND SEVERALLY, SHALL PAY*** all costs and expenses, including reasonable attorneys' and paraprofessionals' fees, incurred by MARINA in seeking to enforce, through judicial proceedings or otherwise, any and all provisions, TERMS AND CONDITIONS of this AGREEMENT or to effect collection of any sums due MARINA.

The above INSURANCE, RELEASE, INDEMNIFICATION and ATTORNEYS' FEES Clauses shall survive (1) termination of this AGREEMENT, and/or, (2) termination or revocation of the Licenses granted under this AGREEMENT.

If any provision or any of the TERMS AND CONDITIONS contained in this AGREEMENT shall be held to be invalid, illegal, or unenforceable in any respect, this shall not affect any other provision, TERM or CONDITION, and this AGREEMENT shall be construed as if such provision, TERM or CONDITION had never been contained in this AGREEMENT. This AGREEMENT is the entire AGREEMENT between the Parties and supersedes all prior agreements. No changes to this AGREEMENT are valid unless in writing and signed by both Parties. MARINA's failure to require strict performance of this AGREEMENT, or MARINA's waiver of any provision, TERM or CONDITION, shall not be deemed a future waiver of any provision, TERM or CONDITION or of any of MARINA's rights under this AGREEMENT.

Any notice to OWNER called for by this AGREEMENT is effective upon delivery at either the address specified in the APPLICATION or to VESSEL. Any notice to MARINA called for by this AGREEMENT is effective upon delivery to a MARINA person in the Dock Master's office during business hours.

All disputes and matters whatsoever arising under, in connection with or incident to this AGREEMENT, shall be litigated, if at all, in and before a court of competent jurisdiction in Fairfield County, Connecticut, to the exclusion of all other courts of any other county, state, territory or country.

# MARINA RULES AND REGULATIONS

For your safety and the safety of others, and to provide an inviting atmosphere, the following Rules and Regulations are implemented by MARINA for all using the Marina. Your compliance with these Rules and Regulations is required by reason of your presence in the Marina, or your use of any Marina facility or property, and, under all License Agreements.

1. NO WAKE within or approaching the Marina. The Rules of the Road and Navigational Laws of the United States apply to all vessels within, entering or leaving the Marina.
2. Only vessels in good condition, and under their own power, shall be admitted to the Marina or any areas therein.
3. Fires (charcoal, gas or otherwise) are not permitted on any pier, dock or vessel unless prior written approval has been obtained from the Dock Master.
4. Swimming, diving, and fishing are prohibited anywhere in the Marina.
5. Unauthorized use of Marina-supplied fresh water is prohibited.
6. All charter or other commercial operators, contractors and outside workers operating or working out of or in the Marina must have liability insurance covering their liabilities arising during or out of their operations and work, with a single limit of liability of at least $5,000,000. Insurance limits of liability for others may be set by MARINA. OWNERS, VESSELS, operators, contractors and workers must provide current Certificates of Insurance to MARINA. Current insurance policies must be provided to MARINA upon request.
7. All charter or other commercial operators, contractors and outside workers operating or working out of or in the Marina must have all licenses, permits and certificates required by all governing agencies, current and in full force.
8. In the event of an emergency during OWNER's absence (e.g., breakdown of bilge pump, leaks, bad lines, etc.) MARINA is authorized to make or order necessary repairs, at reasonable charges, which will be charged to and paid/reimbursed by OWNER.
9. Disorder, indecorous conduct, or other conduct by any person that might injure another person, cause damage to property or harm the reputation of MARINA, are prohibited. Noise shall be kept to a minimum at all times. All persons shall use discretion in operating engines, generators, radios, and television sets, etc., so as not to create a nuisance or disturbance. All VESSELs must have underwater exhaust in operation. The use of electrical or mechanical tools (buffers, sanders, etc.) outside VESSEL is prohibited. Painting, scraping, or repairing of any item shall not be permitted on any walkway, dock, or pier. The extent of repairs and maintenance permitted on VESSELs shall be at the sole discretion of MARINA. Laundry shall not be hung on any VESSEL, walkway, dock, or pier in the Marina.
10. Pets are permitted only if they do not disturb others. Pets must be leashed within the confines of the Marina and may be toileted only on designated areas.
11. VESSELs leaving for an extended absence must so notify the Dock Master's office. MARINA reserves the right to re-license any slip when vacant. OWNER acknowledges dock space assignment is temporary and may be reassigned by MARINA for any reason. Sub-licensing of dock spaces, transfer of VESSELs between dock spaces, or from one dock space to another, shall not be allowed, except upon prior written approval of MARINA. OWNER authorizes that in case of an emergency, or if the VESSEL is not moved in accordance with a prior notice from MARINA, MARINA may move the VESSEL from a particular dock space to any other place at OWNER's expense. VESSELs may be moved to another dock space to make room for special events at Marina, and MARINA will make reasonable efforts to provide 30 days notice. Dinghies must be secured afloat within the dock space assigned to the VESSEL and shall not interfere with adjoining dock space.
12. Refuse shall not be thrown overboard. Garbage shall be deposited only in cans (garbins) or other receptacles provided for that purpose. OWNERs shall notify MARINA of anything that will not fit in these cans and MARINA will dispose of same. No person shall discharge effluent, oil, fuel, spirits, flammable substances, or oily bilge liquids into or near the Marina. If VESSEL has a sanitation device, OWNER must comply with the most advanced state-of-the-art requirements of the Coast Guard governing its manufacture, installation and use. Every sanitation device must be properly functioning at all times while VESSEL is in the Marina.
13. VESSEL shall not be used for commercial or business purposes and advertising or soliciting shall not be permitted on any VESSEL within the Marina. No VESSEL or OWNER may use the Marina, its name, address, or phone number, for commercial or business purposes. No "for sale" or "for hire" signs may be put on any VESSEL, unless prior written approval has been obtained from the Dock Master. Commercial vessels in the commercial zone with written authorization from MARINA are excepted.
14. OWNERs shall not store supplies, materials, accessories, or debris on any walkway, dock, or pier and shall not construct or place thereon any locker, chest, cabinet, or similar structure, except upon written approval from MARINA.
15. License day starts at 6:00 a.m. Any VESSEL using Marina prior to 6:00 a.m. will be charged for the previous day. Check out time shall be 12:00, noon. Any VESSEL present in Marina after 12:00 noon will be charged for the following day.
16. An OWNER or VESSEL checking out of Marina shall report to the Dock Master's office and settle accounts prior to leaving. It is suggested that all OWNERs leave a forwarding address in order to permit prompt handling in the event a telephone call or mail is received for them. However, in any event, MARINA assumes no responsibility whatsoever for forwarding mail or messages. All personal property must be removed from Marina when the Licenses are at an end. MARINA assumes no responsibility for any personal property that may be remaining.
17. MARINA governs and limits Marina parking spaces in the parking areas. No person(s) may operate or ride any vehicle, motorcycle, bicycle, skateboard, or roller blades on any dock or pier and they must be stored on the VESSEL or in designated areas.
18. Employees of MARINA may not be hired to perform work on any vessel at the Marina nor may they be hired to perform any other sort of task at the Marina for or on behalf of any OWNER, patron, crewmember, guest or other person.
19. **OWNERs are urged to study and be vigilant to comply with the provisions of their LICENSE AGREEMENTs.**

**Rider to Dock Space License Agreement, executed on April 4, 2023**

Capitalized terms used but not defined herein have the meanings set forth in the Dock Space License Agreement, executed on April 4, 2023 with respect to the Lady May (the "Dock Space License Agreement").

1. For the avoidance of doubt, Owner shall not be liable to BLD Waterfront Upland Owner, LLC, RCI Bridgeport LLC, RCI Marine, Inc., or Brideport Landing Development, LLC or any of their respective employees or agents or managers (collectively, the "Bridgeport Marina") with respect to any events that occurred prior to April 1, 2023.

2. Mr. Luc A. Despins is party to the Dock Space License Agreement solely in his capacity as the chapter 11 trustee for the estate of Ho Wan Kwok, and not in his personal capacity. Accordingly, no claim whatsoever may be asserted by the Bridgeport Marina against Mr. Luc A. Despins in his personal capacity or Paul Hastings LLP.

3. The Dock Space License Agreement is subject to approval of the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court"), in which court the chapter 11 case of Ho Wan Kwok, Case No. 22-50073, is pending.

4. The United State Bankruptcy Court for the District of Connecticut shall have exclusive jurisdiction over any claim or dispute in respect of or arising out of the Dock Space License Agreement.

**Owner**

By: _____

Name: Luc A. Despins, as chapter 11 trustee for the estate of Ho Wan Kwok

Date: April 4, 2023

**BLD WATERFRONT UPLAND OWNER, LLC**, a Delaware limited liability company

By: _____

Name: Robert W Christoph Jr

Title: President

Date: 4/4/2023



Date: _4/4/2023_

**ADDENDUM TO DOCK SPACE
LICENSE AGREEMENT,**
**executed on** _4/4_ **, 2023:**

**Vessel Name:**  LADY MAY
**License Term:**  April 1, 2023 - April 30, 2023

On behalf of the MV *Lady May* ("Vessel"), its Owner, and its Crew, and pursuant to the attached Letter of Appointment (Exhibit A) to this Addendum, I, **James Pizzaruso,** as Captain, acknowledge, confirm and agree to the following:

A. Vessel will be fully operational with an adequate crew complement to address any and all conditions including weather, seasonal conditions and, if necessary, relocation.

B. Vessel will relocate to Pier C at the Dockmasters direction but no later than April 20.

C. Understand that, as long as the vessel uses the facilities at the Bridgeport Harbor Marina, these facilities are offered on an "As Is - Where Is" basis, and further acknowledge that due to its seasonal shutdown, the following services **will not** be provided:

    a. Marina security with gate access control,

    b. Water and sewage services

    c. Dock surface and snow removal on docks, ramps and baywalk,

    d. Fire suppression and/or life safety.

    e. Trash collection from dockside receptacles will not be available, so all trash must be brought to the trash compactor room by the restaurant service area in the main building.

D. Due to seasonal storms, electrical service to docks and/or vessel could be disrupted.

E. Captain **James Pizzaruso** represents that all persons, at all times on board the vessel (crew or otherwise) are legally in the United States of America, will properly maintain their right to be in the United States, and will hold the marina harmless for any issues to the contrary.

F. Effective immediately, MV *Lady May,* its Owner, its Captain and its crew will hold the Marina harmless from any incidents and damage that may occur while the vessel is docked at the marina and its owner and crew use the docks, ramps, public areas and or facilities there. Further, the Lady May will provide without any lapse or interruption, full property damage insurance as covered and represented on the Howden Sturge endorsement for Policy #20232489 dated March 28, 2023, and full Liability Insurance coverage (covering Captain, Crew, Contractors, Visitors and Guests), of no less than $10,000,000.00 with the following entities as additionally named insured commercially:

    a. **Bridgeport Landing Development, LLC**

    b. RCI Marine, Inc.

    c. BLD Waterfront Upland Owner, LLC

    d. RCI Bridgeport, LLC

PAGE 1 OF 2

Initials: _____

**ADDENDUM TO DOCK SPACE LICENSE AGREEMENT**
**Cont'd.**

IN WITNESS WHEREOF, Licensor and Captain have executed this Addendum as of the Effective Date.

**CAPTAIN:**

By: _____

Name: **JAMES PIZZARUSO**

Title: ____Captain_____

Date: ____4 /4/2023____

**LICENSOR:**

**BLD WATERFRONT UPLAND OWNER, LLC, a**
Delaware limited liability company

By: _____

Name: Robert W Christoph, Jr

Title: ____President_____

Date: ____4/4/2023_____

PAGE 2 OF 2

Exhibit A

**Luc A. Despins, as the chapter 11 trustee for the estate of Ho Wan Kwok**
c/o Paul Hastings LLP, 200 Park Avenue, New York, New York 10166 (the "**Owner**")

---

LETTER OF APPOINTMENT

On the 31st March 2023, **Luc A. Despins, as the chapter 11 trustee for the estate of Ho Wan Kwok** registered address of which is c/o Paul Hastings LLP, 200 Park Avenue, New York, New York 10166 (the "Owner"), does hereby nominate, constitute and appoint:

**JAMES EVAN PIZZARUSO**

Holder of Passport # A04391490 issued by Passport Office, UNITED STATES DEPARTMENT OF STATE on 24th of March 2023 and expiring on 23rd of March 2033 (hereinafter "the Captain "), to exercise the office of Master of the currently Cayman Islands registered vessel LADY MAY O/N 745195 "the Yacht ", to do or execute all or any of the acts and things hereinafter mentioned:

1. Act as Captain of the Yacht and to have authority in relation to all matters concerning the navigation and safety of the Yacht;
2. Operate and maintain the Yacht in first-class condition and in accordance with sound seamanship practices, provided that any individual item or service purchased for the Yacht, and/or any other commitment or obligation on behalf of the Owner, shall not exceed three thousand Euros (€3,000.00) without the express advance written permission of the Owner and / or their managers except in the event of an emergency;
3. Take any reasonable action and sign all documents and instruments in connection with the sailing, repairing, berthing, safety and/or day-to-day operation of the Yacht, subject to: a) paragraph 2 above; and b) not limiting nor waiving the Owner's (or its Insurer's) rights without the express advance written permission of the Owner and/or the Managers.
4. Oversee and direct the Yacht's crew in accordance with Manager's policies;
5. Deal with any Registry, Port or Customs authorities, or other person in connection with the fulfilment of the duties set out above.

Notwithstanding anything herein to the contrary, the Captain shall not get the Yacht underway (i.e., cast off or depart the pier) unless the Owner has given his prior consent in writing (which may be by email).

This Letter of Appointment does not confer upon the Captain the authority to secure registration of the Yacht or to transfer in any manner the Owners interest therein, or to borrow money in the name of the Owner of the Yacht or on the Owner's behalf, or to pledge the credit of the Owner or the Yacht in any way.

This Letter of Appointment shall be effective until such time as James Evan Pizzaruso ceases for any reason to be Captain of the Yacht. The Owner may terminate the appointment of James Evan Pizzaruso as the Captain of the Yacht under this Letter of Appointment at any time (with or without cause) upon 14 days' prior written notice.

This Letter of Appointment should in no way be deemed to constitute a contract of employment between the Owner and James Evan Pizzaruso.

For the avoidance of doubt, the Owner is signing this Letter of Appointment solely in his capacity as the chapter 11 trustee for the estate of Ho Wan Kwok, and not in his personal capacity or on behalf of Paul Hastings LLP. Neither Mr. Luc A. Despins (whether in his personal capacity or as chapter 11 trustee) nor Paul Hastings LLP shall have any liability whatsoever under this Letter of Appointment.

THE OWNER DECLARES that this Letter of Appointment is restricted to the matters aforesaid and shall in no way be deemed to be a general power of attorney in connection with any matter not related to the above.

Executed as a deed for and on behalf of Luc A. Despins, as the chapter 11 trustee for the estate of Ho Wan Kwok:

Name: Luc A. Despins, as chapter 11 trustee for the estate of Ho Wan Kwok

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

------------------------------------------------------x
:
In re:                                                           :        Chapter 11
:
HO WAN KWOK *et al*.,                             :        Case No. 22-50073 (JAM)
:
                              Debtors.[1]           :        Jointly Administered
:
------------------------------------------------------x

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 5, 2023, the foregoing Motion, and all

declarations, exhibits and attachments thereto, was electronically filed.  Notice of this filing was

sent by e-mail to all parties to the above-captioned chapter 11 case by operation of the Court's

electronic filing ("CM/ECF") system or by mail to anyone unable to accept electronic filing as

indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's

CM/ECF system.

Dated:        April 5, 2023
              New Haven, Connecticut         By: */s/ Patrick R. Linsey*
                                                            Douglas S. Skalka (ct00616)
                                                            Patrick R. Linsey (ct29437)
                                                            NEUBERT, PEPE & MONTEITH, P.C.
                                                            195 Church Street, 13th Floor
                                                            New Haven, Connecticut 06510
                                                            (203) 781-2847
                                                            dskalka@npmlaw.com
                                                            plinsey@npmlaw.com

                                                            *Counsel for the Chapter 11 Trustee*

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles
       Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever
       Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation.  The
       mailing address for the Trustee, Genever Holdings LLC, and Genever Holdings Corporation is Paul Hastings
       LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok
       (solely for purposes of notices and communications).