UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

| | | |
|---|---|---|
| In Re | * | Case No. 22-50073 (JAM) |
| | * | |
| HO WAN KWOK and GENEVER | * | |
| HOLDINGS CORPORATION, | * | |
| | * | |
| Debtor. | * | |
| | | |
| HK INTERNATIONAL FUNDS | | Adv. Proc. No. 22-05003 |
| INVESTMENTS (USA) LIMITED, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| LUC A. DESPINS, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | | |
| LUC A. DESPINS, | | Adv. Proc. No. 23-05005 |
| | * | |
| Plaintiff, | * | Bridgeport, Connecticut |
| | * | April 11, 2023 |
| v. | * | |
| | * | |
| GREENWICH LAND, LLC, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT OF MOTION FOR ORDER AUTHORIZING
AGREEMENTS RE LADY MAY; MOTION TO DISMISS ADVERSARY
PROCEEDING AS TO COUNTERCLAIMS TWO, THREE, FOUR and
FIVE; EMERGENCY EX PARTE MOTION FOR TRO AND PRELIMINARY
INJUNCTION; MOTION TO CONTINUE/RESCHEDULE HEARING
BEFORE THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

APPEARANCES:

| | |
|---|---|
| For the Debtor and<br> Plaintiff, HK<br> International and<br> Mei Guo: | STEPHEN KINDSETH, ESQ.<br>Zeisler & Zeisler, PC<br>10 Middle Street, 15th Floor<br>Bridgeport, CT  06604 |
| For the Plaintiff,<br> HK International and<br> Mei Guo: | SAM DELLA FERA, JR., ESQ.<br>Chiesa Shahinian &<br>Giantomasi, PC<br>One Boland Drive<br>West Orange, NJ  07052 |
| For the Defendant,<br> Luc A. Despins, Chapter 11<br> Trustee: | G. ALEXANDER BONGARTZ, ESQ.<br>NICHOLAS BASSETT, ESQ.<br>Paul Hastings, LLP<br>200 Park Avenue<br>New York, NY  10166 |
| For the Chapter 11<br> Trustee: | PATRICK R. LINSEY, ESQ.<br>Neubert Pepe & Monteith, PC<br>195 Church Street<br>New Haven, CT  06510 |
| Chapter 11 Trustee: | LUC A. DESPINS, ESQ.<br>Paul Hastings, LLP<br>200 Park Avenue<br>New York, NY  10166 |
| For the U.S. Trustee: | HOLLEY L. CLAIBORN, ESQ.<br>Office of the United States<br> Trustee<br>The Giaimo Federal Building<br>150 Court Street, Room 302<br>New Haven, CT  06510 |
| For Greenwich Land, LLC<br> and Hing Chi Ngok: | CHRISTOPHER J. MAJOR, ESQ.<br>Meister Seelig & Fein LLP<br>125 Park Avenue<br>New York, NY  10017 |

1          (Proceedings commenced at 3:00 p.m.)

2          THE COURTROOM DEPUTY:  No. 22-5003.  I'm sorry.

3    Case No. 22-50073, Ho Wan Kwok.  Adversary No. 22-5003, HK

4    International Funds Investment Limited vs. Despins.

5    23-5005, Despins vs. Greenwich Land, LLC.

6          THE COURT:  Okay.  Good afternoon.  If we could

7    have appearances for the record, please, starting with the

8    Chapter 11 Trustee.

9          MR. DESPINS:  Good afternoon, Your Honor.  Luc

10   Despins, Chapter 11 Trustee.

11         THE COURT:  Good afternoon.

12         MR. BASSETT:  Good afternoon, Your Honor.  Nic

13   Bassett from Paul Hastings on behalf of the Chapter 11

14   Trustee.

15         THE COURT:  Good afternoon.

16         MR. LINSEY:  Afternoon, Your Honor.  Patrick

17   Linsey, Connecticut counsel for the trustee.

18         THE COURT:  Good afternoon.

19         MR. BONGARTZ:  Good afternoon, Your Honor.  Alex

20   Bongartz of Paul Hastings, also for the Chapter 11 Trustee.

21         THE COURT:  Good afternoon.

22         MS. CLAIBORN:  Good afternoon, Your Honor.  Holley

23   Claiborn for the U.S. Trustee.

24         MR. DELLA FERA:  Good afternoon, Your Honor.  Sam

25   Della Fera, Chiesa Shahinian & Giantomaso, for HK

1    International Funds Investments USA Limited, LLC and Mei

2    Guo.

3            THE COURT:  Good afternoon.

4            MR. KINDSETH:  Stephen Kindseth, Zeisler &

5    Zeisler, also for HK International and Mei Guo.

6            THE COURT:  Good afternoon.

7            MR. MAJOR:  Good afternoon, Your Honor.  Chris

8    Major from Meister Seelig & Fein.  We represent Greenwich

9    Land, LLC and Hing Chi Ngok in the adversary proceeding,

10   23-05005.

11           THE COURT:  Good afternoon.

12           MR. MAJOR:  Good afternoon, Your Honor.

13           THE COURT:  Have I taken everyone's appearances?

14           THE CLERK:  Your Honor, the gentleman to the right

15   with the glasses, I did not hear his name.  I'm sorry.

16           THE COURT:  Oh, I'm sorry.

17           MR. BONGARTZ:  That's okay.

18           THE COURT:  Counsel?

19           MR. BONGARTZ:  It's --

20           THE CLERK:  You did say it, but I just didn't hear

21   it.

22           MR. BONGARTZ:  No.  It's okay.  It's Alex Bongartz

23   of Paul Hastings.

24           THE CLERK:  Okay.  Thank you.

25           THE COURT:  From Paul Hastings.  Okay?

1          THE CLERK:  Yes.

2          THE COURT:  All right.  We have a few matters on

3    the calendar, and it seems to me -- unless, Trustee Despins,

4    you have a different view or anyone else has a different

5    view -- that we should take up the motion for order

6    authorizing agreements regarding the Lady May first.

7          MR. DESPINS:  Sure, Your Honor.

8          THE COURT:  It doesn't appear to be -- it -- I

9    didn't see any opposition to it anyway.

10         MR. DESPINS:  You're correct, Your Honor.

11   Mr. Bongartz is going to handle that aspect, Your Honor.

12         THE COURT:  Okay.  Thank you.

13         Mr. Bongartz?

14         MR. BONGARTZ:  Yes.  Good afternoon, Your Honor.

15   Again, Alex Bongartz of Paul Hastings for the Chapter 11

16   Trustee.  We're here on the motion to authorize the trustee

17   to enter into three yacht-related agreements.  They are,

18   specifically, a yacht management agreement with YACHTZOO, a

19   crew provision agreement with FDS 46 Crew Services

20   (phonetic), and a dock space license agreement with BLD

21   Waterfront.  I'll just refer them to as the Bridgeport

22   Marina.

23         Also, to be clear, in addition to requesting

24   authority to enter into the agreements, we also, obviously

25   are requesting authority to perform under these agreements

1  and in connection with them incur and pay reasonable

2  operational expenses to the extent necessary to maintain and

3  operate the Lady May.

4       We can proceed in a different form, however Your

5  Honor prefers.  I could walk you through each of the three

6  agreements and then address any questions you may have.  I

7  should note up front, as you already noted, there's no filed

8  objection.  And we've also -- have confirmation from the

9  Committee that they are not objecting.

10       But that said, we've had informal discussions with

11  the U.S. Trustee.  We understand that they'll have a handful

12  of concerns.  We have tried to resolve them as best as we

13  can, and we have actually made modifications to the proposed

14  order and some of the agreements.  And I'm happy to walk

15  Your Honor through exactly those changes.

16       But my understanding is that not all of the

17  trustee's issues have been resolved.  And, accordingly,

18  there's going to be some argument on those points.

19       THE COURT:  All right.  Well, as far as the

20  management agreement and the crew provision agreement and

21  the dockage agreement, I don't have any questions with

22  regard to the agreements, per se.

23       MR. BONGARTZ:  Okay.

24       THE COURT:  But you -- I think it might make some

25  sense -- and, Attorney Claiborn, obviously I did see you

1    stand up before, so I know that the United States Trustee's

2    Office wishes to be heard on this issue.

3           But it might make some sense for me to understand

4    what the issues are that the U.S. Trustee's Office is

5    concerned about in the proposed order.  And you could start

6    off by telling me what issues have been raised that have

7    been resolved in --

8           MR. BONGARTZ:  Okay.

9           THE COURT:  -- the proposed order.  So do you

10   want -- so I have the order, I believe, in front of me the

11   proposed order that was attached to ECF 1637.  So is that

12   the order you are working off of with the United States

13   Trustee's Office?

14          MR. BONGARTZ:  Correct.  And we have reached

15   agreement on specific language concerning what's defined as

16   the vessel account that would be set up under the agreement.

17          THE COURT:  Okay.

18          MR. BONGARTZ:  And I have copies of a revised

19   proposed order blacklined to show what that language is.

20   May I approach the bench and hand you --

21          THE COURT:  Yes, please.

22          MR. BONGARTZ:  Thank you.

23          THE COURT:  Thank you.

24      (Counsel confer)

25          MR. BONGARTZ:  Okay.  So this change actually --

1    as I noted, concerns the vessel account.  And the U.S.

2    Trustee had raised concerns about the funds in those

3    accounts technically being -- at least under the original

4    structure being estate funds and being held in a foreign

5    bank with YACHTZOO having the ability to access the account

6    and pay expenses.

7            And we have reached out to YACHTZOO, and they have

8    agreed to modify that structure such that instead of us

9    funding the account and the monies in the account being --

10   continuing to be estate funds, YACHTZOO will issue at the

11   beginning of each month an invoice based on the projected

12   amount of services and expenses incurred and to be incurred.

13   And at the end of the month, there'll be a reconciliation.

14   If there's any surplus, it'll be returned to the estate or,

15   if we so choose, applied against the next month's expenses.

16   Or if there's a shortfall, obviously the estate will have to

17   make up that shortfall.

18           So the -- and in connection with that, we've also

19   clarified that we're not funding future expenses or future

20   fees.  That had never been our intention.  This was language

21   that was in there from their form agreement.  So it had

22   always been our intention to just pay on a month-to-month

23   basis the expenses that arise under that agreement.

24           So I don't know if I -- Your Honor, if you want me

25   to read the specific language into the record, I'm happy to

1    take a break --

2                THE COURT:  No.  You don't need to do that,

3    counsel.  Thank you.

4                MR. BONGARTZ:  Okay.

5                THE COURT:  My only question is --

6                MR. BONGARTZ:  Uh-huh.

7                THE COURT:  I'm just looking at this for the first

8    time as well.

9                MR. BONGARTZ:  Of course.

10               THE COURT:  So some of these terms, the vessel

11   budget, that's defined in the motion, correct?

12               MR. BONGARTZ:  I don't think that's a defined

13   term.  Vessel is a defined term.  That is the Lady May.

14               THE COURT:  Okay.

15               MR. BONGARTZ:  And budget is simply the month's --

16               THE COURT:  Okay.  That's fine.

17               MR. BONGARTZ:  Okay.

18               THE COURT:  Oh, but the vessel account is a

19   defined term.  I see.

20               MR. BONGARTZ:  Correct.

21               THE COURT:  Okay.

22               MR. BONGARTZ:  The vessel account is the new

23   account that will be set up.  Typically, it is set up in the

24   name of the owner, but this is actually -- this is part of,

25   you know, modifying this.  This will not be an estate

1   account.  It will not be estate funds.  It's merely a -- an

2   administrative account that YACHTZOO will set up to

3   facilitate payments to the crew, for example salary, pay

4   insurance premiums, et cetera.  But we won't have control

5   over that account.

6          THE COURT:  So and, again, I'm sorry.  Just

7   looking at this, who has control over the vessel account?

8          MR. BONGARTZ:  It's YACHTZOO.

9          THE COURT:  And the account is located where?

10          MR. BONGARTZ:  It's with an entity called

11   Moneycorp.  That's a financial institution in Europe, based

12   out of Europe.  And the account is specifically located, I'm

13   told, in Gibraltar.  They have a branch there that

14   apparently specializes in maritime-related banking and

15   transfers.  So that's the reason for that location.

16          THE COURT:  And I don't -- I could be wrong, but

17   has anyone -- no one's filed an appearance on behalf of

18   YACHTZOO in the case yet.  Only the marina and different

19   parties in Connecticut, correct?

20          MR. BONGARTZ:  I believe that is correct.

21          THE COURT:  Counsel, what -- and, Attorney

22   Claiborn, because YACHTZOO has not filed an appearance in

23   this case, and I don't really have any -- you know, not that

24   I need to, but what happens if they don't do what they're

25   supposed to do in paragraph 3, right?  So what about if we

1    say YACHTZOO has consented that it shall issue, right?  I

2    mean, you've got to have -- I think we need to have

3    something in here to --

4              MR. BONGARTZ:  That's perfectly fine.  They have

5    confirmed by email to me that this language is acceptable to

6    them.

7              THE COURT:  All right.

8              MR. BONGARTZ:  So that is perfectly fine, Your

9    Honor.

10              THE COURT:  Attorney Claiborn, do you have any

11    problem with that?

12              MS. CLAIBORN:  No, Your Honor.  It's my

13    understanding that YACHTZOO is amenable to the changes we're

14    proposing and that they are on board with the language

15    specifically, so I don't think it's a problem to add their

16    consent to that language.

17              THE COURT:  And they're a signatory to the

18    management agreement, YACHTZOO?

19              MR. BONGARTZ:  Correct.  Yes.

20              THE COURT:  What about the crew provision and

21    dockage agreement?  Are they signatories to that agreement

22    as well --

23              MR. BONGARTZ:  No.

24              THE COURT:  -- those agreements?

25              MR. BONGARTZ:  No.  Those are --

1          THE COURT:  Okay.

2          MR. BONGARTZ:  -- agreements between the estate

3     and other parties.

4          THE COURT:  Okay.  Okay.  That's what I thought,

5     but I want to make sure.  Okay?

6        (Counsel confer)

7          MR. BONGARTZ:  I also want to point out, we had

8     mentioned this in our motion, but the agreement itself is --

9     any dispute arising out of the agreement is subject to the

10    exclusive bankruptcy court jurisdiction here in this court.

11    So I can point out that section in a second.

12         THE COURT:  Well --

13         MR. BONGARTZ:  It's Section 15.2.

14         THE COURT:  Of the management agreement?

15         MR. BONGARTZ:  Correct.

16         THE COURT:  Okay.  Okay.  All right.  So I see the

17    new paragraph 3.  That's what's agreed to, but there are

18    still other issues?

19         MR. BONGARTZ:  Yes, Your Honor.  And I don't want

20    to be presumptuous to assume exactly what issues remain

21    outstanding for the U.S. Trustee, but my understanding,

22    based on email correspondence, is that the issues concern

23    Section 9.2, which is the cap on the trustee's ability to

24    recover if the manager is liable for an incident arising out

25    of the agreement, the cap there being 2 million Euros.

Ho Wan Kwok - April 11, 2023                    13

1          I should note, though, that the standard cap that

2     we're -- that YACHTZOO had informed us that is typically in

3     these agreements is 500,000 Euros.  We actually negotiated

4     an increase of that amount to $2 million.

5          We also, obviously, pushed to remove the cap

6     altogether, but YACHTZOO was not able to accommodate that,

7     because their own insurer would not allow an -- an uncapped

8     liability.  So that's issue -- as I understand it, issue

9     number one.

10          Issue number two concerns Section 9.5 which

11     essentially is a carve out to any liability that may -- that

12     we could assert against employees, agents, or manager of

13     YACHTZOO.

14          But I should note that this does not take away

15     from our ability to hold the manager responsible, manager in

16     this case, to be specific, YACHTZOO itself responsible.  It

17     just means that we cannot go after their employees, agents,

18     or, lower case M manager.

19          And then -- and this is the third item which I'm

20     not sure if the U.S. Trustee is pursuing it, and then that

21     is Section 5.3 which requires payments without setoff,

22     counterclaim, et cetera.

23          We believe that this is a standard provision under

24     the -- and I'm not quite sure whether the changes we've made

25     to the order regarding the monthly invoicing resolved the

1    U.S. Trustee's concern with respect to 5.3.  But, obviously,

2    I will let Ms. Claiborn speak for herself on those three

3    points.  Thank you.

4              THE COURT:  Okay.  Thank you.

5              MS. CLAIBORN:  Your Honor, Attorney Bongartz is

6    correct.  Those are the three sections that need further

7    discussion.

8              THE COURT:  Tell me the first section again.  I

9    didn't hear it clearly.

10             MS. CLAIBORN:  9.2, 9.5, and 5.3.

11             THE COURT:  I've got the other two.  Okay.  Go

12   ahead.  Section 9 -- so, Attorney Claiborn, please let me

13   know what is the U.S. Trustee's office with regard to --

14   issue with regard to Section 9.2.

15             MS. CLAIBORN:  So 9.2 is a limitation on liability

16   that caps the exposure of YACHTZOO at $2 million.  And the

17   U.S. Trustee generally opposes limitation on liability

18   clauses in professional contracts and agreements and

19   consistent with that has a problem with this particular one.

20             The scope of the services and the cost of

21   YACHTZOO's involvement in this case is discussed in the

22   motion, and the motion also talks about the fact that the

23   general maintenance costs of running this yacht and keeping

24   it in operating condition, you know, can span the cost of

25   $100,000 to, I think, $300,000 per month.  So against that

1    backdrop, a limitation of liability that is only at $2

2    million is insufficient from the U.S. Trustee's point of

3    view.

4             The other issue is -- just is a practical one.

5    The estate is exposed if it cannot recover from others the

6    actual cost of whatever damage happens.

7             THE COURT:  So this is 9.5 you're talking about?

8             MS. CLAIBORN:  9.2 has the limitation of

9    liability.

10            THE COURT:  Right.

11            MS. CLAIBORN:  9.5 and 5.3 are sort of companion

12   concepts to that idea that we're limiting remedies.  5.3

13   limits remedies on the part of the trustee, and it waives

14   the right to assert setoff, counterclaim, condition and

15   qualification and response to payments.  So if there were a

16   payment dispute or there was a conduct dispute, those sorts

17   of remedies would not be available to the trustee.

18            And then 9.5 speaks to protections that are

19   afforded to employees or agents or managers of YACHTZOO and

20   gives up rights to go against those.

21            It does at the very end of 9.5 provide for the

22   manager being responsible for those sorts of bad acts that

23   are in the nature of gross negligence or willful misconduct.

24   But Section 9.5 in generality gives up rights as against

25   others and limits them only to certain types and only

1     against YACHTZOO.

2              So taken together, this grouping of limitations on

3     the rights to recover in the event of problems and bad acts

4     puts the estate in a place of being more exposed than the

5     U.S. Trustee thinks ought is -- ought to be reasonable.

6              THE COURT:  Okay.  Thank you.

7              MR. BONGARTZ:  May I respond, ma'am?

8              THE COURT:  Yes, counsel.  Go right ahead.

9              MR. BONGARTZ:  Okay.  Yes.  To be honest, I mean,

10    we certainly appreciate the comments we've -- that

11    Ms. Claiborn has given us.  And we obviously wanted to

12    negotiate and would want to negotiate the best contract

13    possible.  And, in fact, we've raised these issues with

14    YACHTZOO both before and after -- again, after Ms. Claiborn

15    communicated with us.  And on balance, this is, you know,

16    from our perspective, the best deal we could obtain.

17             Obviously, at the end of the day, we submit it's

18    the trustee's business judgment that should control on

19    these.  And while it would have been nice to get, you know,

20    improvements on these specific provisions, unfortunately

21    that just wasn't possible.

22             I should also note that we did actually -- in

23    negotiating the agreement did get actually what we believe

24    are substantial concessions, including with respect to these

25    provisions.  I should just reiterate the point about the

1    increase in the liability cap to 2 million Euros.

2            But there were also other provisions that we

3    successfully improved from the perspective of the estate

4    during our negotiations.

5            We flagged a few of those in our motion, but, you

6    know, they include exclusive bankruptcy court jurisdiction,

7    the removal of the arbitration clause.

8            We've also -- YACHTZOO also agreed at our request

9    to remove a provision that would have required us to

10   indemnify them from third-party claims.  That used to be in

11   Section 9.4.  That was also removed.

12           So I think, on balance, we submit that the

13   contract should be -- entry into the contract as currently

14   before the Court should be approved.  Thank you.

15           THE COURT:  Thank you.  All right.  I want to

16   look -- I'm looking at these provisions in the agreement at

17   the moment that we just discussed.  I'll start with 9.2,

18   because that's where you started.

19           So with regard to 9.2 and the concern about the

20   limitation on liability and the cap of 2 million Euro, I

21   mean, this clause existed in -- did this clause exist in the

22   management agreement that was in place prior to the trustee

23   entering --

24           MR. BONGARTZ:  Yes.  We were informed that it did.

25           THE COURT:  And do you know if there was a cap?

1          MR. BONGARTZ:  There was.  We're told by YACHTZOO

2     that the cap was 1 million Euros.

3          THE COURT:  So you've exceed the -- you've

4     increased the cap?

5          MR. BONGARTZ:  Correct.

6          THE COURT:  And the Section 9.2 says that the

7     manager shall have no liability whatsoever to the owner for

8     any loss, damage, delay, or expense unless it is proved to

9     have resulted directly or indirectly from or has been

10    materially contributed to by the negligence or gross

11    negligence or willful conduct.

12         So it's not just gross negligence and willful

13    misconduct.  It's negligence as well.

14         MR. BONGARTZ:  Yes.  That's -- yes, that's

15    correct.  Yes.

16         THE COURT:  And it's negligence or gross

17    negligence or willful misconduct of the manager or its

18    employees or agents or managers or subcontractors employed

19    by the manager in connected with the -- in connection with

20    this agreement.  So I don't see that Section 9.2 is limited

21    solely to the manager.

22         MR. BONGARTZ:  No.  I believe what -- again, I

23    don't want to be presumptuous to speak for Ms. Claiborn.

24    But I believe in this particular instance she's referring to

25    Section 9.5 which essentially, the way I read it, precludes

1    us from suing the employees.  But this does not mean that

2    the manager can avoid liability for the actions of its

3    employees.  So if the employee does something wrong --

4             THE COURT:  Right.

5             MR. BONGARTZ:  -- and, obviously, the manager acts

6    through its employees -- then we can pursue claims against

7    the manager.  It just -- 9.5 just, you know, precludes us

8    from going after the employee individually.

9             THE COURT:  So, Attorney Claiborn, I'm looking at

10   the sections that still remain in dispute, I would say, or

11   at least not in agreement.  So I'm -- with regard to 9.2,

12   the limitation on the liability, the dollar amount is 2

13   million Euro.  I see that.  And counsel is saying that the

14   dollar amount prior to this was 1 million.

15            So isn't that an improvement for the estate if the

16   amount is increased by a million dollars?

17            MS. CLAIBORN:  It definitely is an improvement.

18   Our position is just that professionals should not be able

19   to protect themselves by limiting their liability in advance

20   of performing services.

21            THE COURT:  Understood.  The trustee's counsel is

22   saying, though, that they wouldn't enter into this agreement

23   without that provision.

24            MS. CLAIBORN:  That is the typical refrain that I

25   hear from the other side of the aisle as to

1    professionals' --

2              THE COURT:  Well --

3              MS. CLAIBORN:  -- positions on things.  It's --

4              THE COURT:  You may be right.

5              MS. CLAIBORN:  It's understandable.  But that

6    said, it's the point that the estate is exposing itself in a

7    way that the U.S. Trustee would prefer and thinks it is not

8    appropriate.

9              THE COURT:  Well, let's think that --

10             MS. CLAIBORN:  So I'm raising that issue.

11             THE COURT:  What do we have for insurance with

12   regard to the Lady May right now?

13             MR. BONGARTZ:  There is various insurance.  I

14   think there is a -- I know there's a P&I policy, a

15   protection and indemnity policy which I believe has a cap of

16   $100 million.  There is a Holland machinery policy which

17   protects the boat from property damage.  I don't -- and I'm

18   sorry.  I don't know off the top of my head what the

19   liability limit is for that.  And then there's various other

20   smaller policies for cyber -- covering cyber attacks.  And

21   for the crew there's also going to be a health insurance.

22             THE COURT:  The reason I ask the question is

23   the -- if the manager does something wrong with regard to

24   the boat, right, even just acts negligently, at least under

25   Paragraph 9.2, if that negligence is proven to have resulted

Ho Wan Kwok - April 11, 2023                                    21

1    directly or indirectly from or has been material

2    contributed -- materially, excuse me, contributed to by the

3    negligence or gross negligence or willful misconduct of the

4    manager or its employees or agents or managers, then there's

5    a possible recovery of 2 million Euro.

6           Plus, what would the manager -- what would happen?

7    I mean, let's just use a hypothetical, right?  They

8    didn't -- the manager forgot to fuel the boat, and some

9    reason -- they start the boat and it burns up the engine,

10   right?  That would be -- you could argue that would be

11   negligence.  They were negligent in taking care of the boat.

12          That's what they're doing.  They're managing the

13   boat, right?  Isn't that their -- that's the reason they're

14   being retained?

15          MR. BONGARTZ:  Through the crew, yes.  I mean, the

16   manager is either -- their offices are in Europe, so they're

17   not physically on the boat.  But they are responsible for --

18          THE COURT:  Well, and as it says --

19          MR. BONGARTZ:  Yeah.

20          THE COURT:  -- the manager, its employees or

21   agents or managers or subcontractors --

22          MR. BONGARTZ:  Correct.

23          THE COURT:  -- employed by the manager in

24   connection with this agreement, right?

25          MR. BONGARTZ:  Correct.

1          THE COURT:  So you'd have a claim against the

2     manager, and you might even have an insurance claim, right?

3          MR. BONGARTZ:  Depending -- I mean, I would

4     have -- it all depends on the specifics.

5          THE COURT:  I'm just saying hypothetically.

6          MR. BONGARTZ:  But yes.  Yes.

7          THE COURT:  Right?  Hypothetically.  And the

8     estate now has negotiated a better bargain under Article --

9     or section 9.2 to have the cap be $2 million.

10          So with regard to 9.2, I understand the United

11     States Trustee's position that they don't -- that the office

12     does not support what is -- can be interpreted as a

13     limitation on liability.

14          But I think under the circumstances of this case

15     and under the circumstances that the cap has been increased,

16     I think it's reasonable, and I think that the trustee's

17     acting within his business judgment to agree to 9.2 in the

18     management agreement.  I think there's protection not only

19     under this agreement but potentially other agreements that

20     are to ensure or -- the boat, the yacht for the purposes of

21     the estate.

22          So I don't know that you made a formal written

23     objection, Attorney Claiborn, but to the extent --

24          MS. CLAIBORN:  Your Honor, we did not based -- and

25     that was due, in part, to the fact that this was just filed

1    last week, and so --

2              THE COURT:  Right.  With regard to Section 9.2,

3    while I agree that, you know, no section and no wording are

4    perfect -- are often perfect in agreements, I think that

5    this language has some broad implications, and I think it's

6    protective of the estate in a reasonable manner under the

7    circumstances of this case.  Okay?

8              With regard to 9.5, 9.5 references 9.2.  So it

9    says except to the extent the manager would be held liable

10   under 9.2, the owner hereby undertakes and agrees that it

11   will -- and agrees that it will undertake to obtain an order

12   from the bankruptcy court to enjoin legal actions brought by

13   third parties against the manager arising out of or caused

14   or occasioned by the manager performing any of the services

15   under the terms hereof.

16             MR. BONGARTZ:  Your Honor, I --

17             THE COURT:  All that's saying is that you're going

18   to try to get an order to stop people from doing that,

19   right?

20             MR. BONGARTZ:  That is correct, Your Honor.  I

21   just would note --

22             THE COURT:  Oh, except I just read the wrong --

23             MR. BONGARTZ:  -- you're reading 9.4.

24             THE COURT:  I just read the wrong provision.

25   That's 9.4.

1          MR. BONGARTZ:  Yeah.  Correct.

2          THE COURT:  So 9.5.  I'm sorry.  Yeah.  So 9.5 is,

3     to me anyway, saying you can't sue the individual employees

4     or agent or manager.  You have to serve -- you have to sue

5     YACHTZOO --

6          MR. BONGARTZ:  That's our understanding.

7          THE COURT:  -- and they're responsible for all of

8     those people's -- all those parties' actions anyway under

9     9.2.

10         MR. BONGARTZ:  Correct.  That's our understanding

11    and reading of that provision as well.

12         THE COURT:  Okay.  I think 9.5 is reasonable again

13    under the circumstances of this case.

14         THE COURT:  All right.  Let me look at the Section

15    5.3 setoff, counterclaims, and payment issue.

16         Well, I mean, it does say -- it doesn't foreclose

17    the ability for a setoff or a counterclaim or a condition or

18    qualification free and clear of and without any deduction,

19    because you could get the prior written consent of the

20    manager to do that, correct?

21         MR. BONGARTZ:  That is correct.

22         THE COURT:  So I think that's fine too.  I think

23    that the trustee --

24         MR. BONGARTZ:  Okay.

25         THE COURT:  -- can exercise his business judgment

1   to have that provision in the agreement.  The one thing,

2   counsel, that I would add, though, in addition to what I

3   just stated, that minor language about YACHTZOO --

4           MR. BONGARTZ:  Yes.

5           THE COURT:  -- has consented that it shall issue,

6   right --

7           MR. BONGARTZ:  Correct.

8           THE COURT:  -- although I understand it says it in

9   the management agreement, it might make sense in this order

10  to state that YACHTZOO has agreed that the exclusive

11  jurisdiction of the -- you know, this Court has exclusive

12  jurisdiction over any -- you know, whatever the provision is

13  that you already noted on the record.

14          MR. BONGARTZ:  That's fine.  They have agreed to

15  the insertion of Section 15.2.  And I don't think it's a

16  problem to also specifically note that in the order itself.

17          THE COURT:  I would do that.

18      (Counsel confer)

19          MR. BONGARTZ:  That's fine, Your Honor.

20          THE COURT:  I think it'll make it easier -- it

21  could make it easier for future issues.

22          All right.  Then is there anything further we need

23  to address with regard to this order, the order authorizing

24  the trustee to enter into and perform under certain

25  post-petition agreements relating to the maintenance and

1    operation of the Lady May?

2             MS. CLAIBORN:  There are two other contracts that

3    are a part of this motion, and we do have some updates on

4    one, and we need to have some discussion about the other.

5             THE COURT:  Okay.  So this order does encompass

6    the other two agreements?

7             MS. CLAIBORN:  Yes.

8             MR. BONGARTZ:  Correct.  It covers all three.

9    It's the defined term --

10            THE COURT:  Three.  Okay.

11            MR. BONGARTZ:  It's the defined term maintenance

12   agreements --

13            THE COURT:  Okay.

14            MR. BONGARTZ:  -- which is -- okay.

15            THE COURT:  So what about the crew provision

16   agreement?  That's the next agreement.

17            MR. BONGARTZ:  So --

18            THE COURT:  What are the issues in that?

19            MR. BONGARTZ:  On the crew provision agreement, we

20   actually did resolve all of the U.S. Trustee's concerns by

21   making two modifications to the agreement itself.  They are,

22   first, changing the applicable law from Cyprus law to New

23   York law.  And that was acceptable to the crew employer.

24            And then the second change is adding a

25   clarification to the end of Section 5.3 to -- just as quick

1    background, Section 5.3 deals with our obligation to obtain

2    insurance coverage for the crew as well as P&I insurance,

3    which we in the case of P&I insurance already have and in

4    the case of crew insurance will obtain as soon as this

5    agreement has been entered into.  And that under those

6    insurance policies, the employer will be included as a

7    co-insured.

8         And there had been some confusion about the word

9    "indemnified" which some -- which the U.S. Trustee had

10   concerns about that somehow the trustee was agreeing to

11   indemnify the crew employer.  That's actually not the case.

12   It simply means that under the insurance, the employer will

13   be indemnified.

14        But in order to resolve and button this issue up

15   entirely and prevent any argument that somehow the estate is

16   releasing or discharging potential future claims against the

17   crew employer, we've agreed and the employer has also agreed

18   to add the following language at the end of Section 5.3, and

19   that will read, "Notwithstanding the foregoing, nothing

20   herein shall release or discharge FDS" which is the employer

21   "from any liability to LDS," that's the estate, "that may

22   arise out of this agreement."

23        And I have a copy of the revised agreement

24   available as well if Your Honor --

25        THE COURT:  I don't need the copy of the revised

1    agreement.  But I think what you could do, counsel, is if

2    that's -- if the U.S. Trustee has -- does that resolve the

3    U.S. Trustee's issues with regard to the crew provision

4    agreement?

5                    MS. CLAIBORN:  That new language does, Your Honor.

6                    THE COURT:  So the crew provision agreement

7    attached to the motion then is now going to be different

8    from the crew provision agreement that the trustee is going

9    to sign and enter into?

10                   MR. BONGARTZ:  That is correct.  And we were -- we

11   can do it either way.  We can either file a revised proposed

12   order attaching the updated form --

13                   THE COURT:  I don't think you need to do that. I

14   think you just say in the order the crew provision agreement

15   as modified, you know, after the filing of the motion,

16   right?

17                   MR. BONGARTZ:  Okay.

18                   THE COURT:  I think that's fine.

19                   MR. BONGARTZ:  Okay.  We will make that change.

20   And --

21                   THE COURT:  All right.  Then we -- moving on to

22   the dockage agreement.  Is that right?

23                   MR. BONGARTZ:  That is correct.  I need to set the

24   stage a little bit for this --

25                   THE COURT:  Sure.

1          MR. BONGARTZ:  -- for this agreement.  We're

2    essentially entering into a month-to-month-based agreement

3    with the Bridgeport Harbor Marina.  Specifically, we would

4    be entering into it for the month of April and any

5    reasonable extension.

6          I want to be clear, our -- and this sort of now

7    bleeds into a few housekeeping matters.  We are not

8    intending to keep the Lady May indefinitely or even long or

9    medium term in Bridgeport.  Obviously, we would seek relief

10   from the Court before we move the Lady May.  But our

11   intention is to move the Lady May to Rhode Island,

12   specifically the free trade zone in Newport, to facilitate

13   marketing and sale of the boat.

14         And so what we're looking at here is definitely

15   the month of April, which obviously has already started,

16   potentially some portion or maybe the month of May.  But

17   we're not looking at a horizon that would go beyond that.

18         And in light of that -- and we do recognize that

19   there are objections that the U.S. Trustee has raised.  But

20   in light of that, the short-term nature of this agreement,

21   we would ask that the -- this -- entry into this agreement

22   also be approved.

23         Now I want to just briefly preview -- and I'm not

24   trying to take anything away from Ms. Claiborn, but I want

25   to just briefly preview what we understand the three issues

1    to be.  And they all are in the terms and conditions portion

2    of the agreement.  It's the proverbial fine print, page --

3    and it's all on page 3 of those terms and conditions.

4              THE COURT:  Okay.  Hold on one second.  I'm

5    looking at a document that starts the terms and conditions

6    on page 2.

7              MR. BONGARTZ:  Correct.

8              THE COURT:  And then --

9              MR. BONGARTZ:  And then on the very next page

10   that's --

11             THE COURT:  So you want me to look at page 3?

12             MR. BONGARTZ:  Correct, Your Honor.

13             THE COURT:  Okay.  Go ahead.

14             MR. BONGARTZ:  So I want to preface what I'm going

15   to say next is that we have tried to modify these

16   provisions.  We've reached out to Bridgeport Marina and to

17   ask them if they were -- would modify them.  But they

18   have -- we've gotten a very clear and hard no.  And so I

19   want to just put that into context before I start my -- you

20   know, the discussion of this -- these sections.

21             So the first comment, we understand, is the

22   section that starts with the vessel agent and owner hereby

23   release and discharge marina, which we understand is a

24   release of the marina for any claims of negligence.  That is

25   in little one, like the fourth line down.

1          We, however, read this provision as not precluding

2     claims against the marina arising from intentional conduct

3     and gross negligence.

4          Specifically, if you go into item number three,

5     there is a parenthetical not rising to the level of gross

6     negligence and intentional conduct, which is specifically

7     carved out there.  So our position and our view of this

8     agreement is that while there is a release of negligence

9     claims, claims rising to the level of intentional conduct or

10    gross negligence would not be released.  So that was issue

11    number one.

12         Issue number two is the indemnification provision

13    which is the very next section.  Unfortunately, it doesn't

14    have a section number, but it's the one that starts with

15    vessel agent and owner shall indemnify and hold harmless

16    marina.

17         Again, it's -- from our perspective, it's the same

18    distinction that I would like to draw here between, on the

19    one hand, claims arising out of the marina's negligence for

20    which there would be indemnification and -- on the one hand

21    and on the other hand claims rising to the level of gross

22    negligence and intentional conduct which, again, our reading

23    is are excluded.

24         And I want to -- yes, it's -- I'm sorry.  It took

25    me a second to find the languages.  It's the last line of

1    that section of the terms and condition at the end, again

2    the parenthetical, not rising to the level of gross

3    negligence, et cetera.  So that was the second issue.

4            And the third issue is the responsibility for

5    attorney's fees.  Obviously, you know, that's not something

6    that, you know, we would ever offer up lightly.  But we

7    pushed back as hard as we could on this, and the marina just

8    simply said that this was just not acceptable to in any way

9    modify their standard terms and conditions.

10           But I should also note the attorney's fees is

11   limited to enforcement of this agreement.  We obviously have

12   every intention to pay and comply with this agreement.

13           In fact, we've already made the Bridgeport Marina

14   a co-insured under the insurance policies, both the P&I

15   policy and the Holland machinery policy as they required us

16   to do.

17           So we don't believe on balance that there's a --

18   you know, obviously, there's always a risk.  So I can't give

19   any assurances here.  But we don't believe there's a

20   material risk that they would ever have to come to court or

21   any other court to enforce this agreement.

22           And in any event, I should also note that we

23   specifically negotiated that this Court will have exclusive

24   jurisdiction over any claim or dispute arising out of this

25   agreement.

1          So to the extent that there is a -- ever a dispute

2    over what any of the foregoing provisions that I just

3    summarized mean and what their effect is, this Court would

4    ultimately be the arbiter of that.

5          So I know I said a lot, and I will pass the podium

6    to Ms. Claiborn now to respond.  Thank you.

7          MS. CLAIBORN:  Thank you.

8          Your Honor, the boilerplate language that's on

9    page 3 that Attorney Bongartz has just summarized for the

10   Court is a common and regular appearing sort of language in

11   maritime agreements and has been routinely held to be

12   enforceable.  So should something happen that is the fault

13   of the marina, the marina is actually not going to be

14   responsible, because this language gives up on that

15   responsibility.

16         The location of the language regarding gross

17   negligence or intentional conduct is purposefully confusing,

18   I think, and could be read to be limited to the concepts

19   that follow immediately before it which are strict

20   liability, breach of warranty, or other fault.

21         It does not say in an easy to read and easy to

22   understand way that such conduct that rises to the level of

23   gross negligence or intentional conduct of any kind would be

24   excluded from the protections that are given to the marina.

25         So the U.S. Trustee again has concerns that should

1    something happen, and even if it's the fault of someone at

2    the marina, that the estate is not only liable for it but

3    the estate also has to pay for the attorney's fees in

4    connection with the dispute that involves that.

5            So I appreciate Attorney Bongartz reaching out to

6    the marina to ask them to consider walking back some of

7    these protections, but like I said, from what I've seen in

8    the case law, these types of protections are routine, and

9    they are held to be enforceable.  And so based on that

10   backdrop, I understand why the marina said no, but that

11   doesn't make it an appropriate risk that the estate should

12   bear.

13           MR. BONGARTZ:  I don't have much further to add

14   except to note that if the marina -- if we don't enter into

15   this agreement, which again is a short-term agreement, but

16   if we don't enter this, the fate of the yacht is uncertain.

17           I can't stand here right now and tell you that the

18   marina would not unmoor the ship and just let it drift off

19   to sea.  I think that would be incredibly irresponsible on

20   their part.  But if we don't have a contract with them, I

21   just don't know what they would do.

22           And then the other aspect is, in some sense this

23   is kind of the hand that we've been dealt, because that's

24   where the boat was and currently is at the time of the -- of

25   ownership having been determined to be in the -- with the

1    estate.

2              We have, as I mentioned earlier, no intention of

3    keeping the boat there long term.  This is simply a

4    short-term arrangement that we have to accept,

5    unfortunately.

6              We would love to have improved these terms, but I

7    unfortunately cannot.  I don't have the power to force the

8    marina to change their standard terms and conditions.

9              So under those circumstances, we submit that given

10   the lack of alternatives and given that our objective is to

11   move the boat as soon as possible, we would ask that the

12   agreement be approved.  Thank you, Your Honor.

13             THE COURT:  I have a question about the fees and

14   expenses right now that are due to the marina.  What is due

15   to the marina right now?

16             MR. BONGARTZ:  We understand that they are -- they

17   have been paid through the end of March.  So the only

18   "outstanding" is -- they're not outstanding.  They're fees

19   that are due for this month, the month of April.  They are

20   $16,484.  And they have not yet been paid.

21             THE COURT:  And that's all the marina will be

22   billing the estate for in April, the marina itself?

23             MR. BONGARTZ:  Correct.  Yes.

24             THE COURT:  In accordance with the dockage

25   agreement?

1          MR. BONGARTZ:  Just one second, Your Honor.

2          THE COURT:  Yeah.

3          (Counsel confer)

4          MR. BONGARTZ:  I'm sorry.  There could be an

5     adjustment based on the amount of electricity consumed, and

6     there might be a reconciliation at the end of the month.

7     But we're not talking a large amount of dollars here.

8          THE COURT:  But that electricity would be -- have

9     to be paid for regardless of who was in the party to the

10    dockage agreement with the marina?  That's not something

11    unique to this vessel?

12         MR. BONGARTZ:  No, of course not.  No.

13         THE COURT:  And so if you keep the Lady May at the

14    marina through the end of May, which it sounds like you --

15    the intent is that may not happen.  It may be moved before

16    the end of --

17         MR. BONGARTZ:  Well, we may be able to move it

18    sooner than that.  I mean, we're exploring right now like

19    how soon we can move it.  But it may be before the end of

20    the month, obviously subject to this Court approving any

21    transfer of the yacht.

22         THE COURT:  So if you do not move the Lady May

23    before the end of April, do you have to enter into another

24    license agreement for the month of May?

25         MR. BONGARTZ:  We would have to do it for every

1    month.  And we had as a -- you know, as -- in order to avoid

2    having to file such a motion, every month we would ask as

3    part of the relief requested in the motion that also any

4    reasonable extension be approved.  But I still reiterate my

5    earlier point.  We have no intention of this being a

6    long-term arrangement.  We want to move and ultimately sell

7    the Lady May as soon as possible.

8              THE COURT:  It does look like the electric --

9    well, the electricity estimate is part of the $16,484.25.

10   But I understand that may change depending upon a true-up or

11   whatever at the --

12             MR. BONGARTZ:  Yeah.  I think --

13             THE COURT:  -- of the month, right?

14             MR. BONGARTZ:  Correct.  You're accurate.  It's

15   estimated at $5,000, so it could be somewhat higher or

16   somewhat lower --

17             THE COURT:  Right.

18             MR. BONGARTZ:  -- based on actual usage.

19             THE COURT:  All right.  Attorney Claiborn, is

20   there anything else you'd like to add with regard to the

21   dockage agreement?

22             MS. CLAIBORN:  No, Your Honor.

23             THE COURT:  Okay.  Thank you.  I understand the

24   United States Trustee's Office concerns with regard to the

25   dockage agreement.  However, given the specific facts and

1    circumstances of this case and the fact that the boat has --

2    the vessel's been there since July of last year and there

3    haven't been any issues that the Court's been made aware of

4    with regard to the dockage agreement with the marina and

5    because it looks as though the language in the agreement

6    does exclude a release of any injury or damage not rising to

7    the level of gross negligence or an intentional conduct,

8    that these provisions, including the indemnity provision and

9    the payment of fees and expenses, while standard and

10   enforceable, are within reason in order for the trustee to

11   attempt to liquidate this asset of the estate.

12            And so, therefore, unless there's -- there is

13   no -- there are no changes that are going to be made to the

14   dockage agreement that have been -- that has already been

15   submitted and filed with the Court.

16            MR. BONGARTZ:  That's correct.

17            THE COURT:  So therefore I -- with regard to the

18   United State's Trustee's objections, I don't see any need to

19   change the proposed order other than in the manner that

20   we've already stated on the record.  Okay?

21            MR. BONGARTZ:  Thank you, Your Honor.

22            THE COURT:  So the -- does anyone else wish to be

23   heard on these agreements?  Okay.  Hearing nothing, then the

24   motion is granted for the reasons and in the manner stated

25   on the record, and a revised proposed order will be

1    submitted.

2              How much time do you need, counsel?

3              MR. BONGARTZ:  We can do that tomorrow or --

4              THE COURT:  Okay.

5              MR. BONGARTZ:  Yeah.  That's not a problem.

6              THE COURT:  I'll give you to Friday just to be on

7    the safe side.  The clerk's office likes to be able to track

8    when things are submitted, when they're supposed to be

9    submitted by.

10             So I will indicate, when I get to the right place,

11   that the motion for order authorizing agreements regarding

12   the Lady May is granted, and a revised proposed order will

13   be submitted on or before April 14th.

14             MR. BONGARTZ:  Thank you, Your Honor.

15             THE COURT:  Thank you.  Now, it seems to me that

16   we should be turning to the -- to Adversary 23-5005 where we

17   have the motion for a preliminary injunction, TRO, and the

18   defendant's motion to adjourn to April 11.

19             I've seen -- it seems to me, Trustee Despins, and

20   I could be wrong, but that you don't necessarily have a

21   disagreement on the adjournment, but that you need to have

22   an agreement, which I didn't see that there was an

23   agreement, that the temporary restraining order would remain

24   in place until the hearing on the adjourned preliminary

25   injunction, correct?

1          MR. DESPINS:  May I, Your Honor?

2          THE COURT:  Yes, please.

3          MR. DESPINS:  For the record, Luc Despins, Chapter

4     11 Trustee.  There is an agreement on continuing the TRO --

5     or the injunction in place.  Where there's no agreement or

6     at least it's not clear that there's an agreement is that we

7     said as an additional condition they should agree, because

8     we served them under subpoena.

9          We served Mr. Major with a subpoena for his client

10    to appear today.  We understand that she didn't appear

11    today, but that subpoena, the acceptance of the subpoena

12    should carry over to the adjourned hearing date so we --

13         Your Honor, you're familiar with this.  We've had

14    also some issues of people not appearing, not accepting

15    subpoenas and all that.  So that's really the issue.

16         I thought this would be resolved by now, but we

17    made it very clear that the only thing we wanted is an

18    agreement that his client would appear pursuant to the

19    subpoena at the adjourned hearing.  And that's the only

20    thing that we would condition that and the continuation of

21    the injunction in place.  That's the only thing we're

22    seeking.

23         So I guess I'll let Mr. Major address that.

24         THE COURT:  Mr. Major?

25         MR. MAJOR:  Thank you, Your Honor.  Chris Major

1    for Greenwich Land, LLC and Ms. Ngok.

2              So first of all, with respect to the restraining

3    order, it specifically states that it remains in place until

4    further order of the Court.  So there's no need for an

5    agreement or stipulation of the parties.  The defendants

6    have not sought relief from that order or the --

7              THE COURT:  Well, you could make an argument --

8    you could make an argument that it expires today under the

9    Federal Rules of Civil Procedure.  So I want to -- I want

10   a -- an affirmative consent for an extension or I have to

11   make findings as to why I have to extend it.

12             MR. MAJOR:  So, Your Honor, as we did indicate to

13   the trustee's counsel, we are in agreement that the

14   restraining order can remain in place post today provided

15   that we're not prohibited from coming into the court,

16   including if necessary on an emergency basis, to seek some

17   relief from that order.  But we have no objection to the

18   order continuing on the basis that we're seeking this

19   adjournment.  And we certainly are not looking to put the

20   Court through the paces of making findings at this juncture.

21             THE COURT:  Well, I think what -- I think that's

22   fine, because you have whatever rights you have under the

23   Federal Rules of Civil Procedure --

24             MR. BONGARTZ:  Yes, Your Honor.

25             THE COURT:  -- with regard to if you seek relief

1    from a temporary restraining order.

2            So but you need -- you can affirmatively consent,

3    which you just have, to the extension of the temporary

4    restraining order until the adjourned hearing on the

5    preliminary injunction unless you seek relief from that

6    order.  And you could do that.  Whether or not you'd obtain

7    that, I have no idea.  Obviously, it would have to be

8    whatever you put before the Court seeking that type of

9    relief.  Okay?

10           MR. MAJOR:  Okay.

11           THE COURT:  But what about the subpoena issue?

12           MR. MAJOR:  So in terms of the subpoena, the way

13   that that was pitched to us was that not only that we accept

14   service of a subpoena which -- and we've never been

15   authorized to accept service and haven't accepted service of

16   the subpoena, but what -- the pitch was, was in exchange for

17   the trustee taking no position on our adjournment request

18   was that we accept service of the subpoena and agree that

19   Ms. Ngok would, in fact, testify at a preliminary injunction

20   hearing.

21           And as our motion for adjournment that we filed

22   over the -- I believe Friday evening over the weekend --

23   yeah, Friday evening -- we are not in a position to be

24   prepared to substantively respond to the preliminary

25   injunction motion.  And that includes, without limitation,

1    analyzing all the myriad of legal issues, procedural issues,

2    factual issues.

3            As Your Honor knows better than me, there's a lot

4    of water under the bridge in this bankruptcy case.  And

5    there is a lot that's even alleged in the various filings

6    that the trustee has made in this specific adversary

7    proceeding.

8            So what I can't do is tell the trustee that we are

9    waiving rights, various objections and things like that that

10   we may have or -- and may wish to pursue with respect to our

11   client having to testify.

12           And so I will accept service on -- and I am

13   authorized to accept service of a subpoena.  I'm certainly

14   not going to put the Court through anything or make the

15   trustee send a process server out.  We're in the case now,

16   and we can take the service of the subpoena.

17           But I can't waive any rights or objections we may

18   have in responding to that subpoena, whether it be a motion

19   to quash, whether it be objections, whether it be some

20   negotiated resolution on scope or anything like that.

21           But we're not yet in a position to know, despite

22   having asked generally, why the trustee needs to call

23   Ms. Ngok and what testimony the trustee may seek to elicit.

24           So we're just not in a position to go that far

25   down the road, but we will accept service of a subpoena for

1    the adjourned date.

2              THE COURT:  Okay.  I appreciate that, that you

3    will accept service.  With regard to the statements, I --

4    and I understand that you need some time, although you're

5    being given time through an adjournment, right, an

6    agreed-upon adjournment?  They're not opposing your

7    adjournment request, so you'll have some time.

8              But with regard to that you don't know what the

9    trustee will be asking or seeking, I'm not sure that's

10   accurate, at least from your client's point of view, given

11   prior testimony that your client has given with regard to

12   Greenwich Land and that she's the owner of Greenwich Land

13   and the -- as you know, prior counsel was -- already

14   appeared for Greenwich Land and Ms. Ngok.  I know you've now

15   come in, and you have to do whatever you have to do.  And I

16   understand that.

17             However, your client has already given testimony,

18   and that testimony, at least what I've seen, has been

19   submitted to the Court and is part of the record of this

20   adversary proceeding.

21             So I think the issue is this.  If you're saying

22   you'll accept service of subpoena, but you want to reserve

23   your right to file a motion to quash, then we'd have to, at

24   the very least -- and I'm not suggesting that this is

25   definitely what we're doing yet.  But I'm making a

1    suggestion to you to think about is you'd have to accept

2    service of the subpoena on X date.  You'd have to serve your

3    motion to quash by Y date.

4           Because you're not serving your motion to quash

5    the morning of the hearing on the preliminary injunction.

6    We're not going to do that, right?

7           We're either going to have a hearing on whatever

8    you're moving to quash or whatever you decide to do or not.

9    We're not going to do that on the morning of the hearing,

10   because -- and that's fine, because you're consenting to the

11   extension of the temporary restraining order.

12          And if you then come in and you seek to somehow

13   get relief from that temporary restraining order, which

14   you're absolutely entitled to do under applicable Federal

15   Rules of Civil Procedure, then I would think that's your

16   burden, and you'd need to have your client testify.  I don't

17   know how else you couldn't have her testify since this is a

18   temporary restraining order against Greenwich Land and your

19   client -- and your individual client.

20          So I hear that there's progress with regard to the

21   subpoena, but I also think that there is a hurdle that

22   you're not willing to go over at this point.  Maybe you'll

23   have further discussions.  Maybe you won't.  I don't know.

24          But if you're going to take the position that you

25   have -- you accept service, but you're still going to

1    reserve all your rights to quash, whatever you want to do,

2    that's fine, but we're going to set up a process for that so

3    that it's not the hearing -- the morning of the hearing or

4    the afternoon of the hearing and the preliminary injunction.

5    I'm not going to -- I mean, subject to the argument that I'm

6    going to get that that's not fine.

7           You know I'm going to get that argument right now

8    that it's not fine for you to -- I don't know if you're --

9    if I'm going to get that argument.  I'm making a presumption

10   that maybe I shouldn't that, you know, great that you're

11   going to accept service, but if you're not going to produce

12   her to testify, then let's fight it out right now.  Why

13   waste any time, essentially, is what I think I'm going to be

14   told.

15          So I don't know what your response to that is, if

16   any.  But this has to proceed in some way, shape, or form.

17   And at this point, your clients are defendants in an

18   adversary proceeding.  The time for your clients to file a

19   response is running.

20          There is a -- there was supposed to be a hearing

21   and a preliminary injunction today.  Because, as I said, the

22   argument can be made that the temporary restraining order

23   expires today.  And the trustee is saying, okay, you'd like

24   to adjourn the hearing.  That's fine.  But I need you to

25   accept service and produce your client for testimony.

1    I think you're saying I'll produce the -- I'll

2    accept service, but I'm not necessarily producing the client

3    for testimony.  So we need to address that issue somehow.

4    Because we're not going to have another hearing about it.

5    It's either it's going to happen or it's not going to

6    happen.

7    And it's fine whatever way you proceed.  I mean,

8    you have to do whatever you think is appropriate for your

9    client and your client -- but -- your clients.  But that's

10    where we are right now.

11    So, Trustee Despins, I've heard counsel say that

12    he'll accept the subpoena, but I assume that is not enough

13    from your perspective.  Is that correct?

14    MR. DESPINS:  Actually --

15    THE COURT:  Maybe I'm wrong.

16    MR. DESPINS:  No.  Actually, Your Honor, we're

17    going to take the Court's lead on that, meaning as long as

18    there's a process before the hearing so that that issue can

19    be vetted out, we're okay with him just accepting service.

20    So there won't be any games about was she properly served or

21    not.  That's over.

22    And then if he wants to -- her not to testify,

23    then there'll be another hearing before the preliminary

24    injunction hearing.  We're okay with that suggestion, Your

25    Honor.

1        THE COURT:  Okay.

2        MR. DESPINS:  So but I think we need to -- we

3    should really pick the dates and have the usual structure

4    you have which is both sides have to produce their exhibits

5    and their witness list by --

6        THE COURT:  Yes.

7        MR. DESPINS:  -- seven business days, and then we

8    have four business days to respond or to object.  We should

9    build that in today if we --

10        THE COURT:  We are going to do that.  Thank you.

11        So, Attorney Major, what time frame -- I looked at

12    your motion, but I have to say I looked at it very briefly.

13    So I didn't see in this -- I didn't see, but I could have

14    missed, okay, what kind of -- you said two weeks.  But are

15    you -- have you and the trustee discussed a date for an

16    adjourned hearing?

17        MR. MAJOR:  Your Honor, we discussed the two

18    weeks.  And let me just tell the Court, if I may, what the

19    genesis of the two weeks were.

20        We were in an exigent circumstance, which is there

21    was a hearing scheduled for today.  And we had a lot of work

22    today to get prepared for that hearing.  And that's not just

23    in terms of, you know, preparing exhibits and things like

24    that but to figure out what's available to do and then what

25    is advisable to do and then to consult with a client, which

1    as I said in our request for an adjournment is not a

2    simplistic process.  And there's a language barrier, and

3    there are health issues and so forth.

4           So I needed to get the adjournment as quickly as

5    possible.  And I wanted to make sure that I asked for a time

6    that I thought that the Court would sign off on, that I

7    thought the trustee may join if they were willing to.

8           But also not knowing exactly how the existing

9    restraining order could impact things going forward, I

10   wanted to not ask for a date that was too far out that might

11   make it harder for me to get a hearing date if it's

12   determined that we do need to seek relief from that order

13   before the PI hearing.  Which at this point I don't plan to

14   do that, but circumstances change.  And, you know, the

15   order -- it may be something we have to come into the court

16   with.

17          So there was no, from my perspective, hard and

18   fast idea behind the two weeks except that, like I said, I

19   wanted to try to get something that I could persuade the

20   trustee to join or -- and, more importantly, that I could

21   get the Court to go along with.

22          I certainly don't have a problem with, you know,

23   setting a specific date.  And the other reason I just said

24   two weeks is I certainly wasn't aware of Your Honor's

25   availability.  So I thought it would be too presumptuous to

1       suggest a specific date on when you --

2                THE COURT:  No, that's fine.  That's fine.

3                MR. MAJOR:  Okay.

4                THE COURT:  I was just asking if you had talked

5       about a specific date.  But now, given what you've stated --

6       and which is fine.

7                And the trustee's statements about -- and I think

8       it is the proper way to proceed -- is that we're going to

9       set a date by which you're going to accept service of the

10      subpoena.  And then we're going to set a date by which

11      you're going to have to file any motions under the Federal

12      Rules of Civil Procedure with regard to the subpoena.

13               And then we're going to have a hearing date set on

14      that, assuming you file something.  And then we're going to

15      then have the preliminary injunction hearing date after

16      that.  And in between those two hearings are going to be the

17      dates by which a list of witnesses and exhibits need to be

18      filed with the Court.

19               So that is how we're going to proceed with regard

20      to this matter.  Because we're not -- I'm not going to have

21      parties come in the day of a preliminary injunction hearing

22      and say -- and I'm not saying you -- I'm talking about

23      anybody -- and say we're not going to testify, because you

24      need to -- the subpoena needs to be quashed.  I mean, we

25      need to deal with that in advance of the hearing.

Ho Wan Kwok - April 11, 2023                           51

1          So do you two want to confer for a few minutes

2     about dates?  I can tell you right now that what I would

3     offer to you all, and you'll have to all think about it, is

4     that the subpoena --

5          And is it one or two subpoenas?  Are you also

6     subpoenaing Greenwich Land?

7          MR. DESPINS:  We probably will have to, Your

8     Honor.

9          THE COURT:  All right.  So the subpoenas -- you

10    will accept service of the subpoenas based upon your

11    agreement on the record, counsel, on or before Friday, April

12    14.  You will file any objections, motions to quash,

13    whatever you feel is appropriate with regard to those

14    subpoenas on or before April 28th.

15         We'll have a hearing on the issue of the

16    subpoenas, if there is any objection filed to the

17    subpoenas -- and I'm just checking a time frame on a date,

18    so just bear with me, please.  On May 3rd at 12:00 p.m.  And

19    the preliminary injunction hearing will be held -- will

20    begin 10:00 a.m. on May 17 and continue to May 18 if

21    necessary.  Those are my proposed dates.

22         Would the parties like some time to discuss those?

23    I can take a short recess.  Whatever you prefer.  And the

24    temporary restraining order will remain in place until at

25    least May 17.

1          MR. DESPINS:  From the trustee's point of view,

2     these are fine, but we should add exhibit --

3          THE COURT:  Oh, yes.  I apologize.

4          MR. DESPINS:  -- and witness list --

5          THE COURT:  The exhibit and witness lists will be

6     filed on or before May 10.

7          MR. MAJOR:  Your Honor, may I be heard on that

8     point?

9          THE COURT:  Yes.

10          MR. MAJOR:  I was told when this issue came up

11     during our meet and confer process that Your Honor has

12     followed that procedure of simultaneous exchange --

13          THE COURT:  That is correct.

14          MR. MAJOR:  -- of witness lists, exhibits.  I

15     would just like to be heard on that.  And I know you -- I've

16     heard, obviously, what Your Honor has said on the record

17     today.

18          But given the way the burden works on this motion

19     and given the fact that the trustee has already submitted a

20     certification and has submitted exhibits and made, you know,

21     statements and pleadings filed with the Court and as a

22     result of that has already obtained orders on an ex parte

23     basis, I think it's only fair, and I think it would also be

24     the most efficient way to proceed is for the trustee -- and

25     they don't necessarily have to file it, but if they would

1    serve on us first their witness list and their exhibit

2    list -- since they own the burden here and have already told

3    the Court they can satisfy the burden, that they make those

4    disclosures to us and then we do it in a responsive way.

5          So I'd ask the Court to consider that procedure

6    for this particular proceeding given what's happened so far

7    in it and given the way the burden works.

8          THE COURT:  When you say given so far what's

9    happened in it, what do you mean?

10         MR. MAJOR:  Meaning that the trustee has already

11   put in that certification that I mentioned and has obtained

12   orders on an ex parte basis, I think it would be appropriate

13   for the trustee to first disclose to us his exhibit list and

14   his witness list and then we do so in a responsive manner.

15   And then at that time the parties could file them with the

16   Court.

17         Like I said, I'm not insisting or asking the

18   trustee to do that by filing it, but I'm just asking the

19   Court if the Court would entertain that sequential method,

20   and then we could work out the particulars.

21         THE COURT:  When you say work out the particulars,

22   what do you mean?

23         MR. MAJOR:  Meaning, for example, this filing

24   versus service issue.  I'm just trying to be accommodative

25   to see if I can get the trustee to join me in this process.

1          THE COURT:  Trustee Despins, what --

2          MR. DESPINS:  Yeah.  Your Honor, the issue is not

3    service versus filing.  The issue is that, you know, they

4    have our full -- all our cards are on the table.  They are

5    through these various pleadings we filed and there's

6    certification.  If anything, it should be the opposite,

7    meaning they should go first.  But we're not insisting on

8    that.

9          For one year now almost in the case we've always

10   operated in the same -- you know, in this fashion of having

11   disclosure at the same time.  There's no reason why it

12   shouldn't be the case -- the same here.  In every

13   litigation, somebody has a burden; somebody does not.  And

14   we've always operated with disclosure at the same time.

15         And here they have our full game plan.  It's in

16   our pleadings.  So there's no prejudice to them in

17   submitting their exhibits at the same time.  And we don't

18   see any reason why we should change the approach.

19         THE COURT:  Anything further, counsel?

20         MR. MAJOR:  Yes, Your Honor.  I do think that it's

21   not necessary to just follow the procedure because it's been

22   done in other settings in the case.  I think that the --

23   this case --

24         THE COURT:  It's not just done in other settings.

25   That's how I -- that's my pretrial process, which under the

1   Federal Rules of Civil Procedure every judge has the right

2   to decide how the pretrial process will work.  And I have

3   found over many, many years that that process works very

4   well.  You've asked them to consider it.  They're not

5   considering it.

6          I will note that at the time of the filing of the

7   complaint, 50 exhibits were filed in support of the

8   complaint.  So you already have -- and that -- those have

9   been on the record of this adversary since March 27 of 2023.

10  You already have 50 exhibits, which, you know, they're

11  probably going to be their list of exhibits.

12         You know who they want to call as a witness.  They

13  want to call your client.  I don't know if they're going to

14  call any other people, but I'm sure if you ask them they

15  could tell you if they are.

16         But I -- it's not an issue of burden.  It's an

17  issue of how the Court manages the trial.  And that's in

18  the -- there's -- the federal rules support that the Court

19  make its determination of how to manage a trial.

20         And as I said, I've done this in I don't know how

21  many but very many cases over the last ten years, and never

22  has anyone raised an issue with regard to the simultaneous

23  filings of list of witnesses and exhibits.

24         You have.  And I've heard your concern.  And I've

25  listened to the trustee.  And I think in this circumstance I

1    don't see any reason why I should deviate from the trial

2    management of this adversary in the -- from the way I do in

3    all other adversaries.  There's nothing -- and adversaries

4    which include injunctive relief, by the way.  We've had

5    plenty of them.  And I've never deviated from that case

6    management process with regard to lists of witnesses of

7    exhibits.

8           I think it's important for the parties to see at

9    the same time who's doing what in preparation for the trial.

10   And maybe it results in some communications.  Maybe it

11   doesn't.  But in many cases, it has resulted in

12   communications where parties have either stipulated to facts

13   and/or stipulated to the introduction of exhibits.

14          So that's part of the reason that I proceed in

15   that manner.  So I'm not going to -- I'm not persuaded that

16   there's any reason in this adversary proceeding that I

17   should deviate from that trial management process.

18          MR. MAJOR:  Thank you, Your Honor.

19          THE COURT:  Thank you.

20          So those dates that I've set forth, counsel, do

21   you have any questions about those dates?

22          MR. MAJOR:  Your Honor, just if we could confirm

23   the exchange of witnesses and exhibit lists.  I think

24   it's --

25          THE COURT:  May 3rd.

1             MR. MAJOR:  Okay.

2             THE COURT:  And that will be -- I'm sorry.  No.

3     That's the hearing.  Wait a minute.  I apologize.  I made a

4     mistake.

5             MR. DESPINS:  I think you said May 10th.

6             THE COURT:  May 10th.  May 10th.  I apologize.

7             MR. MAJOR:  Thank you, Your Honor.

8             THE COURT:  May 3rd would be the hearing on your

9     objections --

10            MR. MAJOR:  Right.

11            THE COURT:  -- to the subpoena.  And that'll be at

12    noon.  So it'll be May 10th.

13            And the way that we do -- we handle exhibits in

14    this court is, you know, Plaintiff's 1 through whatever,

15    Defendant's 1 through whatever.  Or you can place a name on

16    it.  If you wanted to say Greenwich Land 1, whatever.  I

17    don't use letters.  I use numbers.

18            And they're all filed in PDF format, and they're

19    all filed as separate PDFs.  So if you have any issue with

20    regard to that -- and sometimes people do if they haven't

21    done it before.  The clerk's office will help you and -- or

22    someone at your office explain how to do that.  Once you do

23    it, it's -- you understand it.

24            But if you've never done it before, and you need

25    any assistance, you can contact the clerk's office, and

1    they'll help you with that.  Okay?

2                    MR. MAJOR:  Thank you, Your Honor.

3                    THE COURT:  All right.  So with regard to the

4    matters in Adversary 23-5005, the defendant's motion to

5    adjourn is granted in part for the reasons stated on the

6    record.  And then we will then issue a scheduling order with

7    regard to all of the issues leading up to the continued

8    hearing on the preliminary injunction which will begin at 10

9    a.m. on May 17th.

10                    I would assume that scheduling order will issue in

11    the next day or two.  We have some other things we have to

12    address.  But I would assume -- I would be surprised if it

13    didn't issue before Friday.

14                    MR. MAJOR:  Okay.  Thank you.

15                    THE COURT:  But we all -- the order -- the dates

16    are so ordered on the record, but they will be memorialized

17    in a scheduling order.  Okay?

18                    Then so ECF 19 is granted in part.  ECF 12 is

19    continued to May 17 at 10:00 a.m. and will continue on to

20    May 18th if necessary at 10:00 a.m.

21                    Just one moment, please.

22                    Attorney Major, did you have a question?

23                    MR. MAJOR:  Yes, Your Honor.  I actually just

24    forgot to clarify one thing --

25                    THE COURT:  Sure.

1          MR. MAJOR:  -- or ask the Court to clarify one

2     thing, which is the response date for -- to the extent we

3     file a motion to quash or some other motion relative to the

4     subpoenas, when the trustee would respond in writing.

5          THE COURT:  You have until April 28th to file your

6     objection, and the hearing is then on May 3rd.  So I will

7     give the trustee until May 2nd.

8          MR. MAJOR:  Thank you, Your Honor.

9          THE COURT:  But 5:00 p.m. on May 2nd if possible,

10    Trustee --

11         MR. DESPINS:  Yes,  Your Honor.

12         THE COURT:  Okay?  So that I could actually read

13    it before we have a hearing on the 3rd.  Okay?  Thank you.

14    Thank you, counsel.  Okay?  So we'll make sure that that's

15    part of the scheduling order as well.

16         All right.  Then the last matter on the calendar

17    today is in Adversary 22-5003, the motion to dismiss the

18    adversary proceeding, Counterclaims 2, 3, 4, and 5.

19         MR. DELLA FERA:  Good afternoon, Your Honor.  Sam

20    Della Fera, Chiesa Shahinian & Giantomasi, for the movants,

21    HK International Foods Investments USA Limited, LLC, which I

22    will refer to as HKI, and Ms. Mei Guo.

23         THE COURT:  Good afternoon.

24         MR. DELLA FERA:  Good afternoon, Your Honor.  And

25    as the Court noted, this is the motion of HKI and Ms. Guo to

1   dismiss certain counterclaims filed by the trustee.  In

2   response to the complaint commencing this adversary

3   proceeding, the trustee filed an answer and five

4   counterclaims.

5           This motion, when filed, sought to dismiss four of

6   those counterclaims, namely Counterclaims 2, 3, 4, and 5.

7   Since then, Your Honor, as I'm sure the Court will recall,

8   Your Honor has entered summary judgment on Count 1 of the

9   trustee's counterclaims, leaving the four counterclaims that

10  are the subject of this motion.

11          More recently, Your Honor, we were -- my office

12  was advised by trustee's counsel that the -- for lack of a

13  better term, I suppose, the trustee considered Count 4 of

14  the counterclaims to be moot and advised our office, and I

15  believe the Court as well, that the trustee would not be

16  addressing that count but would be reserving its rights.

17  I'm sure counsel for the trustee can elaborate on that.

18          So that leaves for determination the motion to

19  dismiss as to Counts 2, 3, and 5 of the counterclaims.  The

20  motion has been extensively briefed by both sides, Your

21  Honor.  I don't intend to regurgitate the arguments here.

22          Suffice it to say that the motion is brought

23  pursuant to Federal Rules of Civil Procedure 12(b)(1) and

24  12(b)(6) as incorporated herein by Federal Rule of

25  Bankruptcy Procedure 7012.  Both of those rules form the

1    bases for the motion to dismiss each of the three remaining

2    counterclaims.  Namely, Your Honor, the lack of subject

3    matter jurisdiction and a failure to state a claim upon

4    which relief can be granted.

5         The lack of subject matter jurisdiction is based

6    on the trustee's lack of standing under both the Wagoner

7    rule and its close cousin, the doctrine of in pari delicto.

8    The trustee, as he has acknowledged in his filings, brings

9    these claims essentially standing in the shoes of the

10   debtor.

11        The trustee is given that benefit by law, but in

12   accepting that benefit, the trustee must accept the burden

13   of acting as the successor of the debtor.

14        And that burden, Your Honor, includes being

15   subject to the application of the Wagoner rule and the

16   doctrine of in pari delicto which are effectively the same

17   and effectively prevent the trustee from bringing claims

18   against HKI and Ms. Guo that the debtor himself could not

19   bring because the debtor was a participant in the alleged

20   wrongdoing.

21        Taking the counts in reverse order, Your Honor,

22   Count 5 alleges negligence against HKI and presumably

23   Ms. Guo, although Your Honor would be hard pressed to find

24   any reference to Ms. Guo, frankly, anywhere in the trustee's

25   counterclaims but specifically in Count 5.

1          The negligence is alleged to have arisen by HKI

2     and Ms. Guo, causing the debtor to fail to return the Lady

3     May as directed by the New York court and thereby causing

4     the debtor to incur a contempt fine.

5          Of course, again, it's worth noting that there's

6     no allegation that Ms. Guo herself caused the debtor to

7     violate the New York court order.

8          But more importantly, Your Honor, in order to --

9     for this Court to find negligence, the Court, of course,

10    needs to determine that there was a duty of care that was

11    breached by either HKI and/or Ms. Guo.  The trustee alleges

12    no such duty.  Nor can there be any such duty, Your Honor.

13         The debtor was obligated to return the Lady May as

14    directed by the New York court.  The debtor failed to do

15    that.  As cited in our brief, under New York law, in pari

16    delicto bars claims against a co-conspirator for negligence

17    and, at the very least, the debtor here is a co-conspirator.

18    After all, the debtor himself was bound to return the ship.

19    His failure to do so is now attributably to the trustee.

20         And in any event, negligence does not sound in a

21    generalized duty not to interfere with the obligation of a

22    third  party whom, by the way, the trustee alleges is an

23    independent third party, at least for purposes of Count 5.

24         And so without a specific duty owed by either HKI

25    or Ms. Guo to the debtor and, here, the trustee, there can

1    be no -- as a matter of law, no finding that there has

2    been -- that there's liability on behalf of HKI or Ms. Guo

3    for negligence.

4           The trustee relies on some generalized duty of all

5    persons not to harm other people.  That, frankly, does not

6    exist.  And that's made clear, Your Honor, in the <u>Hamilton</u>

7    case that's cited, the New York Court of Appeals case cited

8    in our briefing.

9           So with respect to Count 5, the negligence count,

10   we submit that there is no duty as a matter of law of either

11   HKI or Ms. Guo not to interfere with the application of the

12   court's order -- the New York court's order.  And we -- also

13   the in pari delicto doctrine and/or <u>Wagoner</u> rule prevents

14   the trustee from asserting that claim in any event.

15          With respect to Counts 2 and 3, similarly, the

16   allegations essentially boil down to the debtor having

17   entered into a scheme to hide assets from his creditors.

18   The debtor obviously being an active participant in such a

19   scheme, to the extent it existed, cannot -- could not bring

20   a cause of action against HKI or Ms. Guo.

21          And as a result, the trustee standing in the shoes

22   of the debtor similarly cannot bring such a cause of action

23   based on both in pari delicto and the application of the

24   <u>Wagoner</u> rule.

25          Moreover, Your Honor, with respect to Count 2 --

1    and Count 3, as the Court may recall, is a very short,

2    one-paragraph allegation essentially relying on the

3    allegations in Count 2, which -- both of which counts

4    essentially boil down to HKI is the alter ego of the debtor

5    and/or the debtor is the equitable owner of HKI.

6    Essentially, the same allegations.

7         With respect to both claims, Your Honor, HKI and

8    Ms. Guo assert that the trustee is bound by the stipulated

9    order that this Court entered on April 29, 2022.  That order

10   expressly provided that there shall be no execution or

11   attachment of the escrowed funds that were deposited by HKI

12   in exchange for the -- or to ensure the return of the Lady

13   May to these waters.  The stipulated order was the result of

14   negotiations among not only the debtor but PAX, the

15   creditors' committee, other creditors that were represented

16   by counsel.

17        The trustee described that stipulated order as

18   essentially the debtor agreeing with himself.  But the

19   trustee fails to acknowledge that that order resolved the

20   motion of PAX for stay relief.  That motion was negotiated

21   among multiple parties, including the then representative of

22   the general unsecured creditor body, namely the committee,

23   and that that order expressly provides that if the Lady May

24   is returned timely that the $37 million in escrow funds

25   will -- would not be subject to execution or attachment.

1          So in addition to the application of the in pari

2     delicto and Wagoner doctrine and rule, we submit that as a

3     matter of law the counts that suggest that the trustee

4     should have access to the $37 million in escrow funds by way

5     of being an -- the debtor being the alter ego of HKI or

6     otherwise through some other equitable ownership of HKI

7     fails as a matter of law.

8          The trustee, no doubt, will argue as -- to Your

9     Honor as he did in his papers that the in pari delicto

10    doctrine and the Wagoner rule don't apply here.  And they

11    note two exceptions to those doctrines.  But we submit, as

12    we did in our papers, that those exceptions do not apply.

13         Certainly, the doctrines do not shield insiders of

14    an entity from claims brought by that entity that would

15    otherwise be imputed to the entity.  In other words, if an

16    insider has done wrong and that wrongdoing is otherwise

17    attributable to -- or imputed to the plaintiff, the insider

18    cannot use the in pari delicto or Wagoner rules to protect

19    himself or herself.

20         That is not the case here.  The wrongdoer here,

21    Your Honor, is the debtor.  And by virtue of his being a

22    successor to the debtor, the wrongdoer, for purposes of

23    these claims anyway, is the trustee.

24         Again, the issues have been briefed.  I'm happy to

25    answer any questions that the Court may have.  But,

1   otherwise, we would rely on our papers.

2              THE COURT:  Okay.  Thank you.

3              MR. DELLA FERA:  Thank you, Your Honor.

4              THE COURT:  I don't have any questions at this

5   time.  Thank you.

6              MR. MAJOR:  Your Honor, pardon the interruption,

7   but may I be excused?

8              THE COURT:  Yes.  But before you're excused, the

9   one thing I didn't do that you made me think about before we

10  started talking about the motion to dismiss is that

11  scheduling order will also have a date by which you have to

12  respond to the preliminary injunction relief.  So it'll be

13  that same date of the list of witnesses and exhibits where

14  you'll have to file your reply or objection to the

15  preliminary injunction.  Okay?

16             MR. MAJOR:  Thank you, Your Honor.

17             THE COURT:  All right.  Thank you.

18             UNIDENTIFIED SPEAKER:  Your Honor, with the

19  Court's indulgence, may I take one minute?

20             THE COURT:  Yes.  Certainly.

21             UNIDENTIFIED SPEAKER:  Thank you.

22             MR. DESPINS:  Your Honor, there were some

23  housekeeping matters -- really housekeeping matters.  I

24  could cover those in two seconds.

25             THE COURT:  Sure.

1          MR. DESPINS:  The first one is, remember, there

2     was -- there were repairs that were not done to the ship, to

3     the valves, sea valves.  And so we're in discussions with

4     Mr. Moriarty about them consenting to use of the repair

5     reserve to make those repairs.  That's floating out there,

6     but we might be coming to Your Honor with a consent order

7     soon, so I want to flag that.

8          The second --

9          THE COURT:  There was a consent order filed

10    yesterday too on -- with regard to the motion to intervene

11    and one of the adversaries.  That's been taken care of --

12         MR. DESPINS:  That's been entered.  I saw that.

13         THE COURT:  Yes.

14         MR. DESPINS:  Yes.

15         THE COURT:  Okay.

16         MR. DESPINS:  The second one is that there --

17    we -- there's a motion to expand the scope of the retention

18    of our expert, Dexter White (ph).  So that's coming.  We're

19    not asking --

20         THE COURT:  Has it been filed?

21         MR. DESPINS:  No.

22         THE COURT:  Oh, okay.

23         MR. DESPINS:  No.  He's been --

24         THE COURT:  Okay.

25         MR. DESPINS:  -- retained, but we --

1          THE COURT:  Okay.

2          MR. DESPINS:  -- need to expand his role --

3          THE COURT:  I was going to say, I don't recall

4     seeing that.  Okay.

5          MR. DESPINS:  No.  Yes.  Then a motion to move the

6     Lady May to Newport.  That's coming.

7          And then most importantly is the motion to approve

8     the retention of a sales broker for the ship.  I've been

9     working on that extensively.  It will -- you know, learning

10    a lot about shipping.

11         You know, the commissions that these people charge

12    are more than a real estate broker.  So if you think of a

13    ship -- let's assume it's worth, in my dreams, $30 million.

14    You know, if their commission is 6 percent, you can imagine

15    how much that is.

16         So we're getting three brokers to submit bids on

17    that.  But, obviously, we cannot hire a broker without Your

18    Honor's authorization, so we're going to come back to Your

19    Honor for that, because this is priority number one, to sell

20    the ship.  So that --

21         THE COURT:  Okay.  Thank you.

22         MR. DESPINS:  These are all the housekeeping

23    matters I wanted to raise.

24         THE COURT:  All right.  Thank you.

25         MR. DESPINS:  Thank you.

1          MR. BASSETT:  Good afternoon, Your Honor.  For the

2     record, Nic Basset from Paul Hastings on behalf of the

3     Chapter 11 Trustee.

4          Your Honor, before I begin addressing some of the

5     arguments made by counsel, I'd like to start by mentioning

6     Count 4 which counsel also mentioned.  And as counsel said,

7     we had sent the Court a note yesterday which we thought

8     might be helpful just in terms of, as the Court was

9     preparing for today, to inform Your Honor that we did not

10    intend to have argument on Count 4 which is our fraudulent

11    transfer claims.

12         And just to be clear for the record, the reason

13    the trustee has taken that position is because those claims,

14    the relief sought was the return of the Lady May by -- via a

15    fraudulent transfer claim to the estate.

16         Since the Court has already granted summary

17    judgment on Count 1 of the trustee's counterclaims which

18    sought ownership of the Lady May, there's no longer a reason

19    at this time to pursue the fraudulent transfer claims in

20    Count 4.  And, in fact, that -- Count 4 was expressly pled

21    in the alternative for that reason.

22         So the trustee reserves his rights to the

23    extent -- and I believe a notice of appeal was just filed of

24    the summary judgment decision.  The trustee, of course,

25    reserves his rights to pursue those fraudulent transfer

1    claims at a later date if necessary.  But as of right now,

2    given the state of play, there's no effective relief that

3    could be granted on those claims, and, therefore, we don't

4    view them as being --

5              THE COURT:  So you're not going to withdraw

6    Counterclaim 4.  You're going to keep it in place, depending

7    upon what happens with the appeal.  And if the Counterclaim

8    1 is somehow defeated, then you're going to assert the

9    causes of action under Counterclaim 4?

10             MR. BASSETT:  That's right, Your Honor.

11             THE COURT:  Okay.

12             MR. BASSETT:  You know, and to give like a pretty

13   simply different example, I mean if --

14             THE COURT:  No.  It's fine.

15             MR. BASSETT:  Yeah.  Okay.

16             THE COURT:  I just want to make sure you're not

17   withdrawing it.

18             MR. BASSETT:  Sure.  No.  That's --

19             THE COURT:  But you're not --

20             MR. BASSETT:  That's correct, Your Honor.

21             THE COURT:  You're not pursuing them.  So the HKI

22   parties' motion to dismiss the counterclaims right now, as

23   of today, are -- the parties are only asking the Court to

24   address Counterclaims 2, 3, and 5.

25             MR. BASSETT:  That's correct.  And, in fact, I

Ho Wan Kwok - April 11, 2023                                    71

1    don't know that the Court would even have jurisdiction over

2    Count 4 given that there's no effective relief that can be

3    granted and given the notice of appeal.  But that's correct,

4    Your Honor.

5              THE COURT:  Okay.  Go right ahead.

6              MR. BASSETT:  So, Your Honor, I will -- I'll start

7    by making the general observation that the -- if you look at

8    the motion to dismiss Counts 2, 3, and 5, there's really no

9    argument that the trustee has not sufficiently pled the

10   substantive elements of his causes of action, if you will,

11   in that there's really no allegation that the trustee has

12   not sufficiently pled that HK USA is the debtor's alter ego,

13   that the debtor beneficially owns HK, or that there was

14   some, you know, conduct that harmed the trustee -- or,

15   sorry, the debtor with respect to the negligence claim in

16   Count 5 of the complaint.

17             Instead, what we see are a bunch of what I would

18   call sort of strawman legal arguments that the

19   counter-defendants have raised in an effort to defeat the

20   otherwise facially valid and well-pled claims that the

21   trustee has brought.  And I would submit that each of those

22   legal arguments lacks merit.  And I'll walk through them.

23             I'll actually start in reverse order in terms of

24   the order that counsel raised the arguments.  I'll start

25   with the second and third counterclaims, the second being

1    the alter ego counterclaim.  Which, as the Court is aware,

2    there's also the pending motion for summary judgment.

3    Assuming that the count is not dismissed, we would have that

4    argument on the 20th.

5          And I don't know that the Court -- obviously, it's

6    up to the Court.  I'm not sure if there needs to be a ruling

7    on this before then or not.  But just mentioning that we do

8    have the summary judgment motion out there.

9          The second counterclaim is the alter ego

10   counterclaim.  The third counterclaim is a counterclaim that

11   seeks equitable ownership of HK USA based on, you know,

12   similar concepts and similar principles.

13         The first argument that the counter-defendants

14   have raised is that -- I guess there's two arguments.  And

15   I'll put the in pari delicto and the Wagoner rule sort of in

16   one bucket, and I'll address those.  And then the other

17   argument is that the stipulation that this Court entered

18   with respect to the Lady May would bar the relief the

19   trustee is seeking to the extent it relates to the 37

20   million, now $33 million, I believe, that is held in escrow.

21         On the Wagoner rule and in pari delicto, I think

22   it is absolutely the case that both of the exceptions, one

23   being the insider exception and the other -- I don't even

24   know if it's an exception, per se, but the fact that the

25   trustee has pled the claim under Section 544, I think each

1    of those gets around the Wagoner rule on Counts 2 and 3, no

2    question.

3            But before getting to each of those exceptions, I

4    think it's helpful to point out that in this case, under the

5    circumstances, the principles that underlie and that

6    motivate the in pari delicto doctrine and the Wagoner rule

7    are simply not at all implicated.  In fact, I would submit

8    that the opposite is true.

9            One of the cases cited by the counter-defendants

10   actually talks about what the motivating principle behind

11   the in pari delicto doctrine is, and that's the Teras

12   International Corp. v. Gimbel case that they cite.  And a

13   portion of that decision, what the court says is that the in

14   pari delicto doctrine, which is very similar to the Wagoner

15   rule, is based on the policy that courts should not lend

16   their good offices to mediating disputes among wrongdoers

17   and that denying judicial relief to an admitted wrongdoer is

18   an effective means of deterring illegality.

19           So in other words, the motivating factor behind

20   the rule is that, you know, courts don't want to give relief

21   to a plaintiff in a situation where doing so would encourage

22   illegality.  And by denying relief, they discourage the

23   illegal conduct that allegedly occurred.

24           So that makes sense in a situation where one

25   wrongdoer who's the plaintiff in a later action might want

1    to obtain some monetary recovery from his co-conspirator or

2    his co-wrongdoer.  And the court would say, no, we're not

3    going to let you do that, because if we do let you do that

4    then you're basically benefitting from the fruits of your

5    wrong and the courts are intervening to help you recover

6    something from that other party.

7          But here it's the exact opposite.  Denying relief

8    to the trustee or to the debtor if the trustee had never

9    been appointed would have the exact opposite effect, because

10   it would encourage the exact kind of illegality that the

11   debtor has been engaged in with the assistance of HK USA and

12   Mei Guo.  Specifically, his entire purpose has been to keep

13   his assets outside the reach of his creditors.

14         And if the Court were to hold that the in pari

15   delicto doctrine and the Wagoner rule apply to prevent the

16   trustee from getting this estate access to those assets,

17   then the debtor wins.  It's exactly what he's always wanted.

18   So it would actually encourage him to have done that and

19   would vindicate his efforts to hide his assets from

20   creditors.

21         And in the future, any other debtor that wants to

22   try to hide assets in shell companies, keep them away from

23   creditors, presumably could do that.  And it would -- he

24   would find comfort that if he ever filed for bankruptcy, the

25   trustee would not be able to recover those assets, because

1    the defendant would assert in pari delicto.

2              So I would submit that in this particular

3    instance, it would do a complete disservice to justice to

4    allow either rule to apply.  But the Court need not issue a

5    decision based on that, because there are two, as I said,

6    very well-established exceptions that apply.

7              The first, as counsel alluded to, is the insider

8    exception.  And we've cited cases in our papers.  I think

9    there is no doubt.  I mean, the cases that we cite say point

10   blank the Wagoner rule does not apply to claims against

11   insiders.  That's the PHS Group, Inc. case, 581 B.R. 16

12   (Bankr. E.D.N.Y. 2018).

13             There's the TS Employment case, 597 B.R. 543

14   (Bankr. S.D.N.Y. 2019): "The Wagoner rule does not protect

15   insiders."

16             I don't think there's really any dispute at all

17   about that general proposition.  Nor is there a dispute that

18   under the Bankruptcy Code under Section 101(31) of the

19   Bankruptcy Code both Mei Guo and HK USA are insiders of the

20   debtor.

21             The argument instead that we've received is, okay,

22   be that as it may, even if they are insiders and even if

23   there is this insider exception, the counter-defendants

24   would read the cases to say, well, that exception only

25   applies in a principal agent scenario where the defendant is

1    the agent to a corporation and the agent's wrongdoing would

2    be imputed to the corporation, and it has to be the agent

3    who is the one who is primarily engaged in the wrongdoing,

4    and it can't be the debtor or it can't be the plaintiff.  It

5    can't be the other way around.

6          I think that's -- that argument is wrong both on

7    the law and on the facts.  On the law, I think there is no

8    such limitation to the insider exception in the case law.

9    The cases that were cited by counsel and in their papers

10   just don't apply to an individual debtor situation and leave

11   to one side whether the Wagoner rule even applies to

12   individual debtors.  But the cases that they cite clearly

13   wouldn't apply here, because the debtor is not a

14   corporation.

15         But setting that aside, there's other cases that

16   make clear that this is not a requirement.  One of the cases

17   that we cite to and discuss in our brief is the Butler case

18   which is a 2015 case from the bankruptcy court in

19   Massachusetts.  That case was -- is a Chapter 7 case of an

20   individual who was the sole shareholder and director of a

21   corporation which was a dental practice.  And as the sole

22   shareholder and decision maker, the debtor authorized the

23   payment of, I think, an allegedly exorbitant salary paid to

24   his wife who was an employee of the corporation.

25         And in response to that, the in pari delicto

1    doctrine and the Wagoner rule were raised.  And the issue

2    was whether the insider defense applied given that the

3    recipient of the transfer, the defendant, was the debtor's

4    wife and, therefore, was an insider.

5            And, notably, in that case there was zero

6    allegation that the debtor's wife, who was merely an

7    employee of this entity who just received a salary, was the

8    one who, acting as an agent for the debtor, somehow caused

9    him to engage in this wrongful conduct.  In fact, the

10   opposite was true.  The court noted that the debtor was the

11   one in control.  The debtor was the one who decided to make

12   the salary payment.  But yet the insider exception applied,

13   because the wife -- his wife who received the transfer is a

14   statutory insider.  So I think that case is instructive.

15           The other thing I would note is if you look at

16   some of the cases that go through the kind of analysis of

17   control and whether the defendant, you know, had sufficient

18   control over the debtor for purposes of applying the

19   exception -- the TS Employment case is an example -- those

20   deal with non-statutory insiders.  So the analysis that is

21   undertaken is in connection with determining whether the

22   control, you know, language in Section 101(31) was

23   triggered.

24           And this is a situation where there's been no

25   dispute.  Nobody's argued that HK USA and Mei Guo are not

1    statutory insiders.

2           Briefly -- I don't want to spend too much time on

3    all these points, Your Honor.  But one of the cases that's

4    worth pointing out that's cited by the counter-defendants in

5    their papers is the Madoff case, Bankruptcy Court Southern

6    District of New York 2011.  Again, that's a case that very

7    clearly recites the insider exception and says that the in

8    pari delicto or Wagoner rule does not apply to claims

9    against insiders.

10          In that case, the court ultimately held that the

11   insider exception did apply, and, therefore, the in pari

12   delicto doctrine and Wagoner rule did not apply to claims by

13   Bernie Madoff's investment advisory company, BLMIS, against

14   certain officers, directors, and compliance managers who

15   helped Madoff carry out his fraud.

16          And I just -- I don't see how this case is any

17   different.  Even if the debtor is the principal architect of

18   his shell game, which of course he is, all you have to do is

19   replace Bernie Madoff with Kwok, and these officer,

20   director, and compliance manager defendants with HK USA and

21   Mei Guo, and you get to the same result.

22          The last thing I would note -- and I won't address

23   all the cases, but I'm happy to discuss more of them.  But

24   the last thing I would note on this insider exception is

25   that to the extent that there is some requirement of the

1    insider exception that we demonstrate that the insider was

2    complicit or did engage in some wrongful conduct, I don't

3    think it's accurate that we haven't alleged that.  In fact,

4    I think we've done it in spades.

5           I think if you look at the counterclaims and the

6    overall backdrop for this entire case and the counterclaims

7    themselves, Mei Guo and HK USA have been instrumental in

8    helping the debtor carry out this shell game to hide assets

9    from creditors.  This is all over the counterclaims.

10          Paragraph 27 of the counterclaim we have a

11   reference to, you know, Mei Guo executing the instrument of

12   transfer to transfer ownership of HK International to

13   herself -- or to -- from -- purportedly from the debtor to

14   her for consideration of $1.

15          We have her at paragraph 30.  She executed an LLC

16   agreement for HK USA as the sole member of the company.

17          We go on.  Paragraphs 58, 61, we talk about Mei

18   Guo's testimony in front of Justice Ostrager which he found

19   had -- he found "cannot be credited in any respect."  She

20   was instrumental in trying to uphold the facade of

21   separateness between the debtor and HK USA to enable him to

22   keep his assets out of -- outside the reach of his

23   creditors.

24          And, in fact, Justice Ostrager found in his

25   contempt decision that the debtor's daughter introduced no

1  evidence that she exercised dominion and control of the Lady

2  May and provided no confirmation that she came into

3  possession of the Lady May "other than as a ruse to shield

4  the Lady May from being levied upon by her father's

5  creditors."

6          So I -- and this is all in the counterclaims.  So

7  I don't think it can be possibly disputed that, to the

8  extent we are required to allege some improper conduct on

9  the part of the insider defendants, that we've alleged that

10 more than sufficiently.

11         The second reason the in pari delicto and <u>Wagoner</u>

12 rules do not apply here, Your Honor, is because of the

13 Section 544 issue.  And, Your Honor, I'll walk through

14 this -- the key points related to the Section 544 issue now.

15

16         But one thing I would like to point out for the

17 Court is that a lot of these same arguments came up in the

18 PJR briefing, and just to the extent it's helpful for the

19 Court to have a reference point, a lot of what I'm going to

20 discuss can also be found at paragraphs -- I think it's

21 roughly 23 to 25 of the reply that the trustee submitted on

22 the PJR motion.  And that's at ECF 101.  But, again, I -- we

23 don't need to incorporate that.  I'm just putting that out

24 there for the Court's convenience.

25         So the argument that the counter-defendants have

1    made is that the -- I think they would concede that to the

2    extent a claim has been brought under Section 544(a) of the

3    Bankruptcy Code, it is by definition a claim that's being

4    brought on behalf of creditors.

5             So one thing that counsel said at the very

6    beginning of his remarks was that we're bringing these

7    claims, including our claims in Counts 2 and 3, in the shoes

8    of the debtor.  Well, that's not the case at all to the

9    extent we're bringing them under Section 544(a), which we

10   are.

11            And to the extent that -- I believe in their

12   papers the counter-defendants cite a case or two that calls

13   into question whether or not an alter ego claim can be

14   brought under Section 544(a).  I'll cite a bunch of

15   authority to the Court in a second that demonstrates that it

16   can.

17            But what I would like to start with noting is

18   there's a distinction between Section 544(a) and Section

19   544(b) of the Bankruptcy Code.  Section 544(b), which is

20   cited in -- which case was it -- the Harrison v. Soroof case

21   that counter-defendants site, Section -- that was a case

22   where specifically the plaintiff in that case had argued

23   that his claim he was trying to bring arose under Section

24   544(b) and not, as the court noted, Section 544(a).

25            And the difference is, of course, critical,

1    because Section 544(a) says, "The trustee shall have, as of

2    the commencement of the case and without regard to any

3    knowledge of the trustee or of any creditor, the rights and

4    powers of," and then it goes on to say, "or may avoid any

5    transfer of property of the debtor or any obligation

6    incurred by the debtor that is voidable by," and then

7    there's a list of certain types of creditors, one of which

8    in the second subsection is a judgment creditor.

9              So the key language there is the rights and powers

10   of, because this is not limited, as counter-defendants would

11   suggest, to traditional avoidance actions.  A trustee shall

12   have, as of the commencement of the case, the rights and

13   powers of a judgment creditor.

14             And under Delaware law, the rights and powers of a

15   judgment creditor -- and I don't think this is disputed --

16   include the ability to bring an alter ego claim.  And as I

17   mentioned, this is distinct from Section 544(b) which does

18   not contain that same language concerning the rights and

19   powers of creditors but rather speaks only to traditional

20   avoidance actions.

21             One of the cases cited by the counter-defendants

22   is almost squarely on point and proves the trustee's

23   argument.  This is the Titan Real Estate case, In Re

24   Flanagan, Bankruptcy Court Connecticut 2007.  That was a

25   case where the trustee was trying to bring an alter ego

1    claim, but it, as the court noted, specifically did not

2    choose to bring that claim under Section 544.  The court

3    said, "Notably, Titan" -- and this -- Titan was an assignee

4    actually of claims that I believe the trustee had.  The

5    court said, "Notably, Titan declines at this time to assert

6    any of the trustee's 'hypothetical creditor' rights and

7    powers under Code Section 544, even though, as discussed

8    more fully infra, that statutory source provides the most

9    coherent basis for the core Titan claims."

10          And then if you go infra below in the opinion, the

11   court expands on what it meant.  And what the court said was

12   that -- and the court was saying that the trustee could have

13   brought his claim under 544(a).

14          And the court said, "The essential question under

15   Section 544(a)(2)," which is a judgment creditor's rights,

16   "is whether the claim that a trustee is asserting is one

17   that an execution creditor would possess under applicable

18   law.  At least two of the Titan claims -- the alter ego

19   claim and the constructive trust claims -- are claims that

20   an execution creditor may prosecute under Connecticut law,"

21   which was at issue in that case.

22          The court went on to say, thus, the alter ego

23   claim appears to have a more natural and effective

24   foundation under Section 544(a)(2) than under Section

25   541(a)(1).

1              And then the court said, and this is the key

2      language, this is true primarily because the assertion of

3      claims to recognize a constructive trust or to disregard a

4      separate legal entity (sic), i.e. alter ego, on behalf of a

5      hypothetical, unsatisfied judgment creditor would be limited

6      by none of the equitable deficiencies -- such as the in pari

7      delicto disability -- that they suffer in the hands of the

8      debtor.

9              So the court in that case gave a roadmap for how

10     you would assert those claims in a way that obviously does

11     not bind the trustee.  And, oh, by the way, that's a way

12     around what I was talking about at the outset which is that

13     it makes no sense as a policy matter to imply the in pari

14     delicto doctrine to these facts, because it would encourage

15     debtors to simply hide all their assets in shell companies

16     and then their response would be in pari delicto; you can't

17     get them back.  But under 544(a), you can.

18             And in the _Titan_ case, the only reason that the

19     trustee couldn't have brought them, it turns out, is that a

20     statute of limitations issue had lapsed after the claims

21     were assigned to the trustee.  Not the case here.

22             As I'm sure Your Honor knows, the _Titan_ court's

23     analysis is consistent with what you wrote in your decision

24     in the _In Re Farrell_ case that was from February 12th of

25     2021.  That case, which the Court will recall better than

1    I've gathered based on my reading of it, is that it involved

2    a trustee who was seeking to execute against a jointly held

3    bank account between the debtor and his son.  And what I

4    believe Your Honor held was that the trustee had the

5    authority to do that under Section 544(a) and applicable

6    Connecticut law.

7         And the opinion said, "Whenever applicable

8    non-bankruptcy law affords a right of action that would be

9    generally available to judgment lien creditors, Section

10   544(a) should be construed to afford the estate

11   representative standing to assert the claim."

12        So that's exactly what we have here.  We have a

13   claim that a judgment creditor could bring for alter ego or

14   beneficial ownership.  Under applicable law, the trustee is

15   now able to assert that claim under Section 544(a).

16        There are numerous other cases, Your Honor, that

17   have held this, that the trustee can assert an alter ego

18   claim under Section 544(a).  Another one from this district

19   is the David X. Manners Co. case.  That's Bankruptcy Court

20   District of Connecticut November 27, 2018.  I won't discuss

21   it in detail, but it stands for the proposition that an

22   alter ego claim can be brought under Section 544(a).

23        In Re Archdiocese of Milwaukee, Bankruptcy Court

24   Eastern District of Wisconsin 2012.  That's 483 B.R. 693.

25   Same thing.

1      In Re Wolf, 595 B.R. 735 (Bankr. N.D. Ill. 2018).

2   Same holding.

3         In Re Howland, 516 B.R. 163 (Bankr. E.D. Ky.

4   2014).  Same thing.

5         So, Your Honor, to recap that issue, I think it's

6   clear as a policy matter in pari delicto and the Wagoner

7   rule do not apply here.  The exceptions bear that out,

8   because both also apply here.  Insider exception applies as

9   does the fact that these claims are brought under Section

10   544(a).

11         The next argument that the counter-defendants

12   raise on Counts 2 and 3 is with respect to the Lady May

13   stipulation.  The Lady May stipulation does not prevent any

14   aspect of the relief that the trustee is seeking for several

15   reasons.  The first thing I would note that the trustee is

16   indisputably not a party to the stipulation and neither is

17   he bound by it for reasons that I will discuss.

18         But before I get to circumstances surrounding

19   entry into the stipulation and why the trustee is not bound

20   and all of that, there's a threshold issue that I think sort

21   of obviates all of that which is that the stipulation on its

22   face, even assuming it were binding on the trustee, is not

23   even implicated by the relief that the trustee is seeking in

24   Counts 2 and 3 of his counterclaims.

25         And this is so because the operative paragraph of

1    the stipulation is paragraph 12, and paragraph 12 only

2    prohibits the debtor -- again, I'm operating under the

3    assumption that the debtor's obligations would extend to the

4    trustee here -- but it only prohibits the debtor from taking

5    certain affirmative acts.

6          It says, specifically, PAX, the debtor, the

7    committee, and the creditors, the two creditors who are

8    parties to the agreement "Shall not take any act," and then

9    it goes on to say, "to assert, create, perfect, or enforce

10   any right, title, lien, or other interest in the escrow

11   funds..."

12         Here, I think it's important to focus on the

13   relief that the trustee is actually seeking in Counts 2 and

14   3.  In Count 2, the trustee is seeking a ruling from the

15   Court that HK USA is and always has been the debtor's alter

16   ego, including at the time the debtor and HK USA entered

17   into the stipulation.

18         Now, because HK USA, as this theory goes, is the

19   debtor's alter ego, then HK USA and all of its property are

20   property of the estate by operation of law.  This includes

21   the 37 million which is property of HK USA.

22         This is not a case where the trustee is seeking to

23   claw back the $37 million through an avoidance action or

24   recover it as damages.  As it relates to Counts 2 and 3 --

25   or -- and I'm on Count 2 right now, the trustee is simply

1    seeking to confirm that the $37 million, which is property

2    of HK USA, is and always has been property of the estate

3    from the moment it came into HK USA's hands, because HK USA

4    is the debtor's alter ego.

5            The third counterclaim is similar in that what the

6    trustee is seeking a ruling of is that the debtor and now

7    the estate beneficially owns the equity in HK USA.  In other

8    words, yeah, the fact -- the idea that HK USA was owned by

9    Mei Guo was a fiction and that, in fact, the debtor has

10   always been the beneficial owner of HK USA.  That's asserted

11   in the alternative to our alter ego claim.

12           But there again, the trustee is not seeking any

13   relief with respect to the $37 million in particular.  If

14   the trustee prevails on that claim, then he becomes the

15   owner of the equity in HK USA.  The $37 million doesn't go

16   anywhere.  It remains property of HK USA.  But now the

17   debtor owns HK USA itself.

18           And I, in fact, have been on the other side of

19   this recently in a different issue where there's a transfer

20   of property under an agreement, but there's an agreement

21   that purports to prohibit the transfer of property from one

22   entity to another.  And instead of the property itself being

23   transferred, the transfer occurs at the top level with an

24   interest in the equity of the company that owns the

25   property.  That doesn't work, because the agreement in

1    question only talks about the property itself and not the

2    transaction at the next level up.  That's exactly the

3    situation here.

4           So even if -- like I said, I don't think paragraph

5    12 of the stipulation is implicated by these claims for the

6    reasons I just discussed.  But even if it was, the

7    stipulation itself is not binding on the trustee for at

8    least two reasons.

9           The first reason -- and this argument is discussed

10   more in our summary judgment motion which will be address on

11   the 20th.  That's ECF 186.

12          But the trustee's position is that HK USA and the

13   debtor are alter egos and always have been, including at the

14   time the stipulation was entered into.  If that's true, then

15   there was no distinction between them.  They were one and

16   the same.

17          And it is black letter law, black letter contract

18   law, that one cannot enter into a contract with oneself.  So

19   if HK USA and the debtor are the same, and they purported to

20   enter into a stipulation or an agreement that bound one

21   another to do things for the other, that's unenforceable as

22   a matter of law.  We cited several cases in our SJ motion --

23   in our summary judgment motion on this point.  Since that's

24   not part of the record here, I'll note the cases.

25          Wilbanks vs. Simmons, 2013 WL 9542015.  It's

1   Western District of Texas 2013.  "Where debtor and

2   counter-party to agreement" -- well, the case -- to

3   summarize the point in the case, the court said the debtor

4   and the counter-party to the agreement were alter egos and,

5   therefore, the agreement was "without legal effect."

6          Another case is the Animazing Entertainment case.

7   That's 88 F. Supp. 2d 265 (S.D.N.Y. 2000).  "It is well

8   settled under contract formation law in New York that there

9   must be two parties to a contract.  If one of the parties is

10  wanting, then one of the formal constituents of a legal

11  transaction is absent."

12         Persky vs. Bank of America National Association,

13  261 N.Y. 212.  That's from 1933.  Same concept.

14         Moore v. Denslow, 14 Conn. 235.  Same concept.

15         Lavitman v. Uber Technologies, Inc.,

16  2015 WL 728187.  That's a Massachusetts state court case

17  from 2015.  Same concept.  One cannot contract with itself.

18         Finally, the well-known treatise, Williston on

19  Contracts, Section 3, Part 2, 4th Edition.  Same concept.

20         So assuming, which we must for purposes of this

21  analysis, that the trustee and HK USA are alter egos, then

22  the stipulation is not enforceable as between them.  And

23  that does not change simply because certain of the other

24  parties -- that there are other parties to the stipulation.

25  Because the issue before the Court, of course, is whether it

1    is -- whether the stipulation is enforceable as against the

2    debtor which they contend renders it applicable to the

3    trustee.  The question is not whether it's enforceable as to

4    the committee or PAX or anybody else.

5           The other reason which we spend time discussing in

6    our papers as to why the stipulation is not binding on the

7    trustee is because there is an exception in the case law.

8    The general rule -- there are a lot of courts that say

9    typically if a debtor enters into a contract or an

10   agreement, it's binding on a subsequently appointed trustee.

11   But almost all of those cases talk about exceptions to that

12   general rule, including cases that are cited by the

13   counter-defendants.

14          For example, the Feldman case that they cite, it

15   specifically notes that if there are special reasons for

16   vacating the agreement or order in question, the result may

17   be different.  And in that case, the party, the court noted,

18   did not claim that there was any fraud or bad faith by any

19   party that led to the order in question.

20          Similar statement in the Eastern Airlines case, In

21   Re Ionosphere Clubs case that I believe also is cited by the

22   counter-defendants.  The Court noted that there was no

23   allegation of improper conduct.

24          Here, there is an abundance of allegations of

25   improper conduct.  I frankly don't think it is hyperbole at

1   this juncture to call the stipulation a borderline, if not

2   full out, fraud on the Court, plain and simple.

3         To recap the history of what happened, back in the

4   spring of 2022, the debtor was desperate to avoid the Court

5   lifting the automatic stay to allow PAX to pursue remedies

6   before Justice Ostrager.  And HK USA and Mei Guo were

7   instrumental in helping the debtor to achieve that

8   objective.

9         And, again, our allegation, which we are assuming

10  for purposes of this discussion is true, is that HK USA was

11  and always has been a sham, the alter ego of the debtor, not

12  a separate entity, having no independent existence but

13  rather a mere vehicle for the debtor to use to carry out his

14  wishes.

15        HK USA filed a statement attempting to moot the

16  stay motion.  That's at paragraph 75 of our counterclaims.

17  HK USA commenced this adversary proceeding to further the

18  ruse that was being played on everyone.  That's at paragraph

19  76 of our counterclaims.

20        And then, of course, on April 13th, there was the

21  hearing on the motion to lift the stay.  This is discussed

22  at paragraphs 79 to 81 of our counterclaims.  During that

23  hearing, after the Court had made some comments, what is

24  very interesting is that the debtor's counsel, then Brown

25  Rudnick, proposed the $37 million bond that would be posted

1    eventually pursuant to the stipulation.  A 15-minute recess

2    was taken, and then all of a sudden HK USA had $37 million

3    with which to post a bond.

4           So if HK USA is the debtor's alter ego, the entire

5    exercise was a fraud upon this Court and everybody involved,

6    because it was the debtor simply using his mere

7    instrumentality to take money that would be his in the

8    possession of HK USA and pretending it was not, pretending

9    that there was separateness, and pretending that HK USA was

10   not really just doing his bidding.

11          I don't think anyone would have entered into that

12   agreement if the Court had already found that HK USA and the

13   debtor were the alter -- were alter egos.  Nor do I think

14   the Court would have approved it.

15          So under these circumstances, I think -- if there

16   was ever a case where an exception should apply to the

17   general rule that an agreement by a debtor in possession is

18   binding on a trustee, it's this case.

19          I won't discuss it in detail, but I want to direct

20   the Court to it, because I think it's very important and on

21   point.  The Alma Energy case that we cite in our papers

22   which I think counsel alluded to.  It's an Eastern District

23   of Kentucky case from 2010.  It goes exactly through this

24   type of analysis.

25          It was a debtor whose sole member was also a

Ho Wan Kwok - April 11, 2023                                      94

1    claimant against the debtor.  And there was a settlement

2    agreement reached.  And the court said, wait a minute, that

3    sounds like self-dealing.  You had somebody who was

4    controlling the debtor, and then you had a claimant, and

5    then there was deal reached.

6           And the court said we're going to look at this

7    with heightened scrutiny.  It took note of the fact that the

8    defendant was an insider.  Took note of the questionable

9    circumstances related to the debtor's Chapter 11 case,

10   including failure to make required disclosures, including

11   the debtor's counsel having acted before another party

12   before the court, including possible fraud.  And in light of

13   all of that, the court ultimately held that in that

14   situation, that agreement, that settlement agreement would

15   not be binding on the trustee.

16          The final thing I would note on the stipulation

17   itself, Your Honor, it's common that a stipulation,

18   especially, I would submit, in a case like this where the

19   debtor was seriously having trouble managing his Chapter 11

20   process, to include language in a stipulation or an order

21   saying expressly that it's binding on a trustee.  We don't

22   have that here.

23          I think that's indicative of the intent,

24   particularly given that the motion to appoint the trustee

25   was pending at the time, as was a motion to dismiss the

1      case.  The stipulation actually alludes to the pending

2      motion to dismiss but not to the motion to appoint a

3      trustee.  And I think that's very telling.

4            The other thing that's telling about the text of

5      the stipulation is that the debtor under that stipulation

6      has no right to inspect the yacht at all.  And the reason

7      why that's important, I think, is because if it were the

8      intent that the stipulation would be binding on a trustee,

9      that just wouldn't work, because of course a trustee would

10     have inspection rights.

11           So I think there's -- I've gone through a lot, but

12     I think the bottom line because of that is there are

13     numerous reasons why the stipulation does not preclude the

14     relief the trustee is seeking.

15           The last point that I'll conclude on, Your Honor,

16     is some brief remarks about the fifth counterclaim, which is

17     the negligence claim.  This claim, I think it's important to

18     note, assumes that the debtor and HK USA are separate.

19           And the reason for that is because it's a claim

20     that seeks to recover damages for negligence.  And if HK USA

21     is the debtor's alter ego, then there's no reason -- then,

22     you know, the debtor owns all of HK USA's property, and

23     there's no reason or ability for the debtor to obtain a

24     recovery from HK USA.  The trustee would already have all of

25     its assets.

1          So it's asserted in the alternative in a world

2     where they aren't alter egos and, therefore, in a world

3     where HK USA is acting independently and, you know,

4     furthering its own interests to keep the yacht away from the

5     United States, that's important because that brings it

6     outside the purview of the in pari delicto and Wagoner rule

7     doctrines in that alternative scenario, because it's not the

8     debtor who is the one who is engaging in this conduct.  It's

9     HK USA and Mei Guo doing it on their own.

10         The main argument then that the counter-defendants

11    rely on is they say that this claim isn't viable, because

12    there's no duty here.  And I think there's very clearly a

13    duty here for a couple of reasons.

14         A duty that one owes to another to not take action

15    that will cause it harm in the context of negligence

16    includes a situation where there is a relationship between

17    the plaintiff and the defendant that would require the

18    defendant to protect the plaintiff.  Examples include a

19    parent and child relationship.  That's in the Hamilton case.

20    I believe that was cited.

21         And of course, here, Mei Guo is the debtor's

22    daughter.  And she was aware that the stipulation existed.

23    And to the extent that she caused HK USA to keep the -- she

24    was aware that Justice Ostrager's contempt order existed.

25    And to the extent that she caused HK USA to keep the yacht

1    outside of US waters and, therefore, caused the debtor to

2    incur hundreds of millions of dollars in fines, she had a

3    duty to not do that.

4         The other thing that counter-defendants haven't

5    mentioned that's equally important is that a duty can be

6    imposed by operation of law such as a statute or, for

7    example, a court order.

8         And here, that is critically important, because

9    Justice Ostrager's contempt order specifically applied to HK

10   USA.  This is in paragraphs 43 and 44 of our counterclaims

11   which discusses Justice Ostrager's order and says -- and

12   this was the October 2020 restraining order that was in

13   place by Justice Ostrager at the time -- applied to HK USA

14   because it was the registered owner of the Lady May.  The

15   stipulation itself by its terms said that it applied to

16   Mr. Kwok and/or the registered owners of the Lady May.

17        The registered owner of the Lady May at the time

18   was unquestionably HK USA.  Thus, the order itself by

19   Justice Ostrager imposed this duty, placed HK USA on notice.

20   And by defying that, knowing that the consequences would be

21   for the debtor to incur hundreds of millions of dollars in

22   contempt fines, HK USA is liable for negligence.

23        I think that covers my remarks, Your Honor.  I

24   wanted to be thorough.  I apologize for taking a lot of the

25   Court's time.  I'm happy to answer any questions.  But

1    that's all I had for now.

2            THE COURT:  I don't think I have any questions at

3    the moment.

4            MR. BASSETT:  Thank you.

5            THE COURT:  Thank you.

6            Counsel, do you have any response?

7            MR. DELLA FERA:  For the record, Sam Della Fera,

8    Chiesa Shahinian & Giantomasi, for the movants.  Only that I

9    just wanted to note that Justice Ostrager's order did not

10   impose any duty, statutory or otherwise, on Mei Guo.

11   Perhaps HKI or HK USA.  It's been referred to by both

12   monikers today.  Certainly Ms. Guo had no duty.  And to

13   suggest that a parent's duty to a child flows the other, a

14   child's duty to a parent, trustee offers no authority for

15   that proposition, Your Honor.

16           So we -- as I've argued, as you've heard counsel

17   mention, we submit that there was no duty owed by this

18   independent party for purposes of this counterclaim

19   asserted.

20           In the alternative, HKI, an independent third

21   party, owes no duty to the debtor.  To the extent any duty

22   was imposed by Justice Ostrager's order, that does not flow

23   to Ms. Guo.  Nor does any duty flow from Ms. Guo as the

24   debtor's daughter to the debtor vis-a-vis Justice Ostrager's

25   order and the need to return the Lady May to the territorial

1    waters of the U.S.  Thank you, Your Honor.

2              THE COURT:  Thank you.

3              Anything further, Attorney Bassett?

4              MR. BASSETT:  No, Your Honor.  Thank you.

5              THE COURT:  Okay.  Thank you.

6              As I think both counsel has noted during argument,

7    the motion to dismiss the adversary proceeding does have an

8    impact on the pending motion for summary judgment.  And I

9    have reviewed your briefs and listened to the argument

10   today.  I feel that I am substantially familiar with your

11   arguments.  I need to take a little time to look at them

12   again given what you've said on there record today, take a

13   look back at some of the cases that you've noted.  I have

14   looked at quite a few of those cases, I would say.

15             And I am, I believe, you know, going to be in a

16   position to rule shortly.  I do think the parties briefed

17   the issues well and made the arguments for their respective

18   clients well.  But I will be ruling on this in short order.

19             Does anybody else have any other issues they want

20   to raise with the motion to dismiss?  Okay.  Then the motion

21   to dismiss, subject to some further review of what was

22   raised in the arguments, most of which I -- as I said, I'm

23   familiar with and I believe have been raised in the papers,

24   then, you know, the ruling will be coming soon, unless

25   something occurs that I'm not aware of at this point in

1    time.  Okay?

2         I believe that that concludes all of the matters

3    in the Kwok cases and the adversary proceedings today.  Does

4    anyone -- is there something else that someone wants to

5    discuss before we adjourn court today?  Maybe.

6         Oh, yes, there is, actually.  It's not on the

7    calendar today, but -- and I thank you for the reminder.  We

8    have hearings next week on a number of issues, including the

9    issue about the debtor's assertion of his Fifth Amendment

10   rights.  And Brown Rudnick filed a motion to expedite I

11   think yesterday, last night maybe.  I mean, I can look at it

12   right now very quickly.  I don't know if the trustee's

13   planning to respond to that.

14        But they're looking to have -- Brown Rudnick as

15   now criminal counsel is looking to have a hearing scheduled

16   next week along with the hearing on the Fifth Amendment

17   privilege issue seeking basically a stay to -- with regard

18   to the motion to compel compliance and the Rule 2004

19   subpoena.  So that was filed actually -- yes, it was filed

20   last night.  Oh, I'm not sure what time.  I shouldn't say

21   that.  I can find out in a second.

22        I'm inclined to put that matter on the calendar

23   for next Tuesday as well, but if the trustee wants an

24   opportunity to respond to that motion, I can give you some

25   time, not a substantial amount of time, but I can give you

1    some time to respond.  I don't know if you -- it was filed

2    at 5 -- at 6:00 last night.  Okay?  So 24 hours ago.

3          MR. DESPINS:  Your Honor, would it be possible,

4    because we already have a hearing on the 20th as well, to

5    have that matter heard on the 20th?  Or --

6          THE COURT:  Let me take a look.

7          MR. DESPINS:  All right.

8          THE COURT:  Maybe I'm wrong about the 18th.

9    There's some matters on the 18th, and there is a matter on

10   the 20th.  So you're probably right, Trustee Despins.  Just

11   with so many things in front of me and dates, I'm -- I may

12   have misspoken.  So just give me a second.

13         MR. DESPINS:  I know the feeling.  But I think

14   that the 20th is the summary judgment motion on Count 2.

15      (Counsel confer)

16         THE COURT:  The 20th is the summary judgment

17   motion on Count 2 at 9:30 a.m.  The motion that was filed by

18   the debtor's criminal counsel -- appears that Brown Rudnick

19   is representing the debtor in the proceedings in the

20   Southern District of New York -- is seeking to stay the --

21   to compel compliance.  But I think that might -- let me look

22   at the 18th.  Yeah, the motion to compel compliance is on --

23   that's the UBS compliance, though.  Just give me a minute.

24   There's so many pleadings that were filed last night.  I

25   need to look for a moment.

1           UNIDENTIFIED SPEAKER:  Yeah.  That's on the 18th,

2    Your Honor, the --

3           THE COURT:  Right.

4           UNIDENTIFIED SPEAKER:  Yeah.

5           THE COURT:  That's the UBS I'm talking about.  I'm

6    also -- there's a number of things on the 18th.  Just give

7    me one moment, please.  I'm just pulling up a document.

8           So the motion to expedite hearing was also filed

9    last night in connection with the motion to -- for a stay to

10   compel the debtor to comply with the Rule 2004 examination

11   subpoenas.

12          The motion to expedite the hearing, which is 1651,

13   it's the trustee's motion for order to show cause why the

14   debtor should not be held in contempt of court for failure

15   to comply with the January 20 order which is on for hearing

16   on April 18, 2023.

17          So that's separate and distinct from the summary

18   judgment motion.  The issue I'm raising is not related to

19   the motion to dismiss and the summary judgment motion.  It's

20   motions that were filed last night by Mr. Kwok's criminal

21   counsel with regard to the trustee's motion for order to

22   show cause why the debtor should not be held in contempt of

23   court.

24          Now, we -- everyone recalls the trustee filed --

25   I'm sorry.  The debtor filed a response to that motion

1     asserting his Fifth Amendment privilege.  But this motion

2     that the debtor's criminal counsel filed last night seeking

3     an expedited hearing for next Tuesday relates --

4                MR. DESPINS:  Yes.

5                THE COURT:  -- in my opinion to the trustee's

6     motion for order to show cause.

7                MR. DESPINS:  It probably does, Your Honor.  So

8     what we're thinking is to give us more time to respond, if

9     we could move that to the 20th.

10               THE COURT:  Well, I -- you'd have to get the

11    agreement of Brown Rudnick on that, I think.  I mean,

12    they're asking for this on -- I have no -- I don't -- I have

13    no idea what's going on in the criminal proceedings, but

14    they're asking for the hearing on their motion that they

15    filed yesterday afternoon, last night, 24 hours ago, to be

16    scheduled along with the trustee's motion to show cause why

17    the debtor shouldn't be held in contempt.  Okay?

18               We already all know what happened.  The debtor

19    asserted his Fifth Amendment privilege before there was an

20    indictment.  Now there's an indictment.

21               MR. DESPINS:  Correct.  But given that the two are

22    connected --

23               THE COURT:  Well, why don't you just tonight ask

24    Brown Rudnick what their position is.  If you --

25               MR. DESPINS:  We will.

1    THE COURT:  -- both agree that it can be on the

2    20th, it can be on the 20th.  That's fine.  You know, we're

3    already here, so it won't make really any difference.

4        We might just -- and the 20th summary judgment

5    motion I think starts at 9:30.  I think that's what it says.

6    Let me triple check since it's difficult to keep all these

7    things in order.  But we will do that.

8        MR. DESPINS:  That's correct, Your Honor.

9        THE COURT:  9:30.

10       MR. DESPINS:  Yeah.

11       THE COURT:  So if the parties agree to that, if

12   the trustee and Brown Rudnick agree to continue the matter

13   on the 18th regarding the order to show cause, regarding

14   contempt for failure to comply by Mr. -- by the debtor to

15   the 20th, that's fine.

16       But there's still other matters on the 18th as

17   well.

18       MR. DESPINS:  Understood.  Understood, Your Honor.

19       THE COURT:  Okay?

20       MR. DESPINS:  So we will send an email to

21   Courtroom Deputy --

22       THE COURT:  Yes, please.

23       MR. DESPINS:  -- with an update tomorrow morning.

24       THE COURT:  Yes.  Because I have not ruled on this

25   motion to expedite yet, although it was brought to my

1    attention before we came out today -- this afternoon on

2    these hearings.  All right?

3         So and then if you have an agreement about

4    continuing it, I'd like -- if you have an agreement that the

5    expedited hearing can be held and continued to April 20,

6    then I think you'd still need to file some response to the

7    substantive motion probably by the 18th.  Okay?

8         MR. DESPINS:  Yes, Your Honor.

9         THE COURT:  All right.  I think that will -- in

10   order for the Court to be as -- understanding the parties'

11   positions as much as possible prior to the hearing, that's

12   what I would like to have happen.  Okay?

13        MR. DESPINS:  And, Your Honor, may I ask whether

14   it's possible for me to attend that hearing by Zoom?  I will

15   not be arguing.  Mr. Bassett will be.  But can I participate

16   by Zoom?

17        THE COURT:  Yes.

18        MR. DESPINS:  Okay.  Thank you, Your Honor.

19        THE COURT:  All right.  I think that does conclude

20   everything then on today's calendar, so court is adjourned.

21        THE COURTROOM DEPUTY:  All rise.  Court is

22   adjourned.

23        (Proceedings concluded at 5:45 p.m.)

24

25

1

2          I, CHRISTINE FIORE, Certified Electronic

3  Court Reporter and Transcriber, certify that the foregoing

4  is a correct transcript from the official electronic sound

5  recording of the proceedings in the above-entitled matter.

6

7

8  _____          April 18, 2023

9      Christine Fiore, CERT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25