**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

-------------------------------------------------------x
:
In re:                                   :    Chapter 11
:
HO WAN KWOK, *et al*.,[1]                 :    Case No. 22-50073 (JAM)
:
Debtors.                        :    (Jointly Administered)
:
-------------------------------------------------------x

**MOTION OF CHAPTER 11 TRUSTEE, PURSUANT TO BANKRUPTCY CODE
SECTION 363(b), FOR ENTRY OF ORDER AUTHORIZING (I) MOVING LADY MAY
TO NAVIGABLE WATERS OF RHODE ISLAND AND (II) ENTRY INTO, AND
PERFORMANCE UNDER, NEWPORT DOCKAGE AGREEMENT**

Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee") appointed in the

chapter 11 case (the "Chapter 11 Case") of Ho Wan Kwok (the "Debtor"), respectfully submits

this motion (the "Motion") for entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Proposed Order"), pursuant to section 363(b) of title 11 of the United States

Code (the "Bankruptcy Code"), authorizing (i) moving the Lady May yacht to the navigable

waters of Rhode Island and (ii) entry into, and performance under, the Commercial Yard and

Dockage License and Service Agreement with SHM Newport Shipyard, LLC ("SHM"), a copy

of which is attached hereto as **Exhibit B** (the "Newport Dockage Agreement"), to dock the Lady

May at the Safe Harbor Newport Shipyard (the "Safe Harbor Shipyard") in Newport, Rhode

Island.  In support of this Motion, the Trustee respectfully states as follows:

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation.  The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

## PRELIMINARY STATEMENT[2]

1.      As the Court is well aware, the Trustee intends to sell the Lady May (and the Lady May II) for the benefit of the Debtor's estate and, for that purpose, has separately filed an application [Docket No. 1675] to retain Edmiston and Company Limited ("Edmiston") as broker to market the Lady May (and the Lady May II) for sale.  In preparation for the sale process, the Trustee has also determined, after conferring with Edmiston, that the Lady May should be moved to Newport, Rhode Island, as soon as possible, including to take advantage of Newport's foreign trade zone.  Foreign trade zones offer the opportunity to defer, reduce, or eliminate customs duties upon export, which results in significant cost savings when dealing with ships, such as the Lady May, that are foreign-flagged.

2.      As an initial step in that process, this Motion requests authorization to move the Lady May to the navigable waters of Rhode Island and entry into, and performance under, the Newport Dockage Agreement to dock the Lady May at the Safe Harbor Shipyard, including the payment of the fees and expenses under the Newport Dockage Agreement.  The Trustee files this Motion because, currently, the Lady May is subject to the restriction in the Stipulated Order that the Lady May remain in the navigable waters of Connecticut.  However, the concerns that animated that restriction—*i.e.*, that HK USA would move the Lady May outside the Court's jurisdiction and beyond the reach of the Debtor's creditors—are no longer present in light of the Court's ruling that the Lady May is property of the estate and the Trustee now having control over the Lady May.  Accordingly, at this time, that restriction should be lifted to allow the

---

[2]      Capitalized terms not defined in the Preliminary Statement shall have the meaning ascribed to them later in the Motion.

Trustee to move the Lady May to the navigable waters of Rhode Island in preparation for an

eventual sale of the Lady May.

3.      To be clear, the relief sought in this Motion is limited to moving the Lady May to

Rhode Island waters, *i.e.*, this Motion does not seek authorization to transfer the Lady May into

Newport's foreign trade zone (which is also located at the Safe Harbor Shipyard).  The Trustee

will seek separate relief from this Court in the near future to authorize such transfer.  However,

in the meantime, it makes little sense to keep the Lady May in Bridgeport, Connecticut.  For one,

Newport is a well-known hub for marketing and selling superyachts of the size as the Lady May.

In fact, Newport is home to many significant brokerage houses and dozens of brokers reside in

Newport, while Bridgeport has virtually no yacht brokerage infrastructure.  As a result, many

potential clients frequent the Newport area and the Safe Harbor Shipyard in particular.

4.      Moreover, even before the Lady May is transferred into the foreign trade zone,

Edmiston (which has a fully-staffed office in Newport) can commence the marketing of the Lady

May, which will include, as an initial matter, liaising with the crew, staging the Lady May, and

obtaining photography.  Edmiston is also already in contact with other brokers who have

expressed an interest in viewing the Lady May in Newport in early May.  In addition, whether or

not the Lady May is in Newport's foreign trade zone, it can be marketed to non-US residents,

which Edmiston obviously also intends to do.  Thus, even though the monthly cost of docking

the Lady May in Newport is higher than in Bridgeport, that difference in cost is outweighed by

the substantial benefits of relocating the Lady May to Newport in order to facilitate the

marketing of the Lady May for sale.

5.      Finally, in the interest of full disclosure, the Trustee wishes to advise the Court that he intends to postpone the sea valve service for the Lady May.[3]  Performing such service at this time would delay the marketing and sale process by six weeks (or more), including because such service would require the Lady May to be hauled out of the water.  Moreover, the Trustee is informed that the sea valve service will have to be performed in any event as part of the Lady May's upcoming 10-year inspection in 2024, which will also require the Lady May to be hauled out of the water—so, it makes little sense to perform the sea valve service now, only to have the service performed again in 2024.

6.      For all these reasons, and as further detailed below, the Trustee submits that the relief sought in this Motion is in the best interest of the Debtor's estate and should be granted.

### **VENUE, JURISDICTION, AND STATUTORY BASIS**

7.      The United States Bankruptcy Court for the District of Connecticut (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference* from the United States District Court for the District of Connecticut.

8.      This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

9.      Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The statutory basis for the relief sought in this Motion is section 363(b) of the Bankruptcy Code.

---

[3]    The Trustee recognizes that the Court recently entered an order authorizing the Trustee to perform the sea valve service at a time and location in his reasonable discretion.  *See* Docket No. 1673.  The Trustee submits that this order only authorized the Trustee to perform the service, but did not require the Trustee to do so.

**BACKGROUND**

A.     **Current Location of Lady May**

11.     On April 29, 2022, the Court entered a Stipulated Order Compelling HK International Funds Investments (USA) Limited, LLC to Transport and Deliver that Certain Yacht, the "Lady May" [Docket No. 299] (the "Stipulated Order") setting forth the terms and conditions regarding the return of the Lady May to the navigable waters of Connecticut.  In accordance with the Stipulated Order, HK International Funds (USA) Limited, LLC ("HK USA") deposited $37,000,000 (the "Escrowed Funds") into an escrow account with U.S. Bank National Association.  The Lady May was returned to the navigable waters of Connecticut in early July 2022.

12.     Pursuant to Stipulated Order, parties are to "keep and maintain at all times the Lady May physically present in the navigable waters of Connecticut, subject to the provisions of this Order and any further order of this Court upon motion of any party-in-interest, and entered after notice and a hearing."[4]  Thus, the Stipulated Order permits a party in interest to seek to modify the restriction that the Lady May must remain in Connecticut waters.

13.     The Lady May is currently docked at the Bridgeport Harbor Marina located at 10 East Main Street, Bridgeport, Connecticut (the "Bridgeport Marina").

B.     **Ownership of the Lady May**

14.     On April 11, 2022, HK USA initiated an adversary proceeding by filing a complaint [Docket No. 1, in Adv. Proc. No. 22-5003] against the Debtor and Pacific Alliance Asia Opportunity Fund L.P. ("PAX"), asserting that HK USA is the owner of the Lady May.

---

[4]     Stipulated Order ¶ 7.

15.     On September 23, 2022, the Trustee filed his *Answer and Counterclaims* [Docket No. 36 in Adv. Proc. No. 22-5003] (the "Answer and Counterclaims").  The Trustee's first counterclaim sought a ruling pursuant to 11 U.S.C. §§ 541 and 542 declaring that the Lady May is property of the Debtor's chapter 11 estate (the "First Counterclaim") to be administered by the Trustee and ordering the surrender of the Lady May to the Trustee.

16.     On March 19, 2023, the Trustee filed his motion for partial summary judgment [Docket No. 146 in Adv. Proc. No. 22-5003] (the "Partial SJ Motion") and supporting materials, seeking summary judgment on the First Counterclaim. *See also* Docket Nos. 147, 148, and 150 in Adv. Proc. No. 22-5003.

17.     A hearing on the Partial SJ Motion was held on March 27, 2023. At the conclusion of the hearing, for the reasons stated on the record and further set forth in the Court's *Supplemental Memorandum of Decision in Support of Oral Ruling Granting Motion for Partial Summary Judgment* [Docket No. 177 in Adv. Proc. No. 22-5003], the Court issued an oral ruling granting the Partial SJ Motion.  Also on March 27, 2023, the Court entered its order granting the Partial SJ Motion [Docket No. 172 in Adv. Proc. No. 22-5003] (the "Partial SJ Order"), finding, among other things, that the Lady May is the property of the Debtor's estate.[5]

**C.     Operation and Maintenance of the Lady May**

18.     On April 5, 2023, in order to operate and maintain the Lady May and to protect and preserve this valuable asset for the benefit of the Debtor's creditors pending a future sale, the Trustee filed the *Motion of Chapter 11 Trustee, Pursuant to Bankruptcy Code Section 363(b), for Entry of Order Authorizing Trustee to Enter Into, and Perform Under, Certain Postpetition Agreements Relating to Maintenance and Operation of the Lady May* [Docket No. 1637] (the

---

[5]     *See* Partial PJ Order ¶ 2.

6

"Yacht Maintenance Motion") for entry of an order to approve the yacht management agreement (the "Management Agreement"), dated April 5, 2023 with Yachtzoo Sarl, the dock space license agreement (the "Bridgeport Dockage Agreement"), and the crew provision agreement (the "Crew Provision Agreement" together with the Management Agreement and Dockage Agreement, the "Yacht Maintenance Agreements").  The Bridgeport Dockage Agreement covered the period up until April 30, 2023, subject to reasonable extensions or renewals.

19.     In the Yacht Maintenance Motion, the Trustee indicated to the Court that he would seek authorization to move the Lady May to the Safe Harbor Shipyard located at 1 Washington Street, Newport, Rhode Island, to take advantage of Newport's foreign trade zone to facilitate a sale of the Lady May.[6]  On April 12, 2023, the Court entered an order granting the relief sought in the Yacht Maintenance Motion authorizing the Trustee to enter into the Yacht Maintenance Agreements.

20.     On April 18, 2023, the Trustee filed the *Application of Trustee, Pursuant to Bankruptcy Code Sections 327(a) and 328, Bankruptcy Rules 2014(a) and 2016, and Local Rule 2014-1, for Entry of Order Authorizing Employment and Retention of Edmiston and Company Limited as Broker for Sale of Lady May and Lady May II* [Docket No. 1675] (the "Broker Retention Application"), seeking an order authorizing the retention of Edmiston as broker to sell the Lady May for the benefit of the Debtor's estate.  The Broker Retention Application is scheduled to be heard on April 27, 2023.

21.     On April 24, 2023, the Trustee entered into the Newport Dockage Agreement with SHM.[7]  Entry into the Newport Dockage Agreement is necessary in order for the Lady May

---

[6]     *See* Yacht Maintenance Motion ¶ 1 n.5, ¶¶ 8, 35.

[7]     For the avoidance of doubt, the Shipyard Agreement includes the *Rider to Commercial Yard and Dockage License and Service Agreement, Executed on April 24], 2023, Between (i) Luc A. Despins, as the Chapter 11*

to have a place to dock while in Newport, Rhode Island.  As detailed on the estimate attached hereto on **Exhibit C**, the monthly dockage fee (including electricity) is estimated to be approximately $42,000 per month.  The Newport Dockage Agreement will continue on a month-to-month basis until terminated by either the Trustee or SHM.[8]  To be clear, the Trustee intends to move the Lady May into the foreign trade zone at the Safe Harbor Shipyard as soon as possible, and will request separate relief from this Court in this regard.

## RELIEF REQUESTED

22.    The Trustee respectfully requests that the Court enter an order authorizing (i) moving the Lady May to the navigable waters of Newport, Rhode Island, and (ii) the Trustee's entry into, and performance under, the Newport Dockage Agreement, including payment of any fees and expenses that come due under that agreement.

## BASIS FOR RELIEF

23.    The Trustee requests that the Court authorize and approve the Motion pursuant to section 363(b) of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  Under section 363(b) of the Bankruptcy Code, courts require only that the trustee "show a sound business purpose justifies such actions." *See, e.g.*, *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re*

---

*Trustee for the Estate of Ho Wan Kwok and (ii) SHM Newport Shipyard, LLC (the "Rider to Dockage Agreement").*

[8]    *See* Ex. B, Standard Terms ¶ 1.

*Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct").

24.     In addition, a chapter 11 trustee has a "statutory duty to protect and preserve property of the estate for the purpose of maximizing a distribution to creditors." *In re Ngan Gung Rest.*, 254 B.R. 566, 570 (Bankr. S.D.N.Y. 2000) (citing 11 U.S.C. § 1106(a)).  The Trustee is obligated to employ a process for the sale of the Lady May that is the most beneficial to the estate.  This requires (i) the Lady May to be moved to the Safe Harbor Shipyard and (ii) entry into the Newport Dockage Agreement—with the eventual goal of transferring the Lady May into the foreign trade zone in Newport.

25.     While the Stipulated Order required the Lady May to remain in the navigable waters of Connecticut, the Stipulated Order also provides that this restriction is subject to "any further order of this Court upon motion of any party-in-interest, and entered after notice and a hearing."[9]  Importantly, at the time of the Stipulated Order, the Trustee had not yet been appointed, nor had the Court yet determined that the Lady May was property of the Debtor's estate.  Now that the Court has ruled that the Lady May is property of the estate and the Trustee has taken control of the Lady May, the foregoing restriction should be lifted to facilitate the process of marketing and selling the Lady May.

26.     The Trustee submits that the Safe Harbor Shipyard is the best location for the Lady May, including because the Lady May can easily be moved into the foreign trade zone in Newport (again, subject to separate Court approval), which is also located at the Safe Harbor Shipyard.  As noted, Newport is a well-known hub for marketing and selling superyachts, and

---

[9]     Stipulated Order ¶ 7.

even though the Lady May will not be transferred into the foreign trade zone right away, relocating the Lady May to Newport now will facilitate the marketing process to be conducted by Edmiston.  Indeed, Edmiston is already in contact with other brokers who have expressed an interest in viewing the Lady May in Newport in early May.  In addition, whether or not the Lady May is in Newport's foreign trade zone, it can and will be marketed to non-US residents.  Thus, even though the monthly cost of docking the Lady May in Newport is higher than in Bridgeport, that difference in cost is outweighed by the substantial benefits of building momentum now to market and eventually sell the Lady May.

27.     Finally, the notes that he requested, and SHM agreed, to make certain important modifications to the Newport Dockage Agreement for the benefit of the Debtor's estate.  For example, pursuant to the Rider to Newport Dockage Agreement, (a) the Bankruptcy Court has exclusive jurisdiction over any dispute arising out of the Newport Dockage Agreement, (b) the indemnity under the Dockage Agreement excludes liability for SHM's fraud or fraudulent misrepresentation, knowing or willful violation of law, willful misconduct, breach of fiduciary duty, self-dealing, bad faith, or gross negligence, and (c) SHM must file an application for any indemnification claim in this Court.[10]

## NO PRIOR REQUEST

28.     The Trustee has not previously sought the relief requested herein from this or any other court.

## CONCLUSION

29.     For all these reasons, the Trustee submits that moving the Lady May to Newport, Rhode Island, in anticipation of moving the Lady May into the foreign trade zone, as well as

---

[10]     *See* Ex. B, Rider to Shipyard Agreement ¶ 4.

entry into, and performance under, the Newport Dockage Agreement, is a reasonable exercise of the Trustee's business judgment, and, accordingly, the relief requested in this Motion should be granted.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Trustee respectfully requests entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: April 24, 2023
New Haven, Connecticut

LUC A. DESPINS, CHAPTER 11 TRUSTEE

By: */s/ G. Alexander Bongartz*
Avram E. Luft (admitted *pro hac vice*)
G. Alexander Bongartz (admitted *pro hac vice*)
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6079
aviluft@paulhastings.com
alexbongartz@paulhastings.com

*and*

Nicholas A. Bassett (admitted *pro hac vice*)
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C., 20036
(202) 551-1902
nicholasbassett@paulhastings.com

*and*

Douglas S. Skalka (ct00616)
Patrick R. Linsey (ct29437)
NEUBERT, PEPE & MONTEITH, P.C.
195 Church Street, 13th Floor
New Haven, Connecticut 06510
(203) 781-2847
dskalka@npmlaw.com
plinsey@npmlaw.com

*Counsel for the Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

-------------------------------------------------------x
                                                        :
In re:                                                  :    Chapter 11
                                                        :
HO WAN KWOK, *et al.*,[1]                               :    Case No. 22-50073 (JAM)
                                                        :
                    Debtors.                            :    (Jointly Administered)
                                                        :
-------------------------------------------------------x

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on April 24, 2023, the foregoing Motion, and all declarations, exhibits and attachments thereto, was electronically filed. Notice of this filing was sent by e-mail to all parties to the above-captioned chapter 11 case by operation of the Court's electronic filing ("<u>CM/ECF</u>") system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

Dated:    April 24, 2023
          New Haven, Connecticut

                                        By: */s/ G. Alexander Bongartz*
                                        Avram E. Luft (admitted *pro hac vice*)
                                        G. Alexander Bongartz (admitted *pro hac vice*)
                                        PAUL HASTINGS LLP
                                        200 Park Avenue
                                        New York, New York 10166
                                        (212) 318-6079
                                        aviluft@paulhastings.com

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

alexbongartz@paulhastings.com

 *and*

Nicholas A. Bassett (admitted *pro hac vice*)
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C., 20036
(202) 551-1902
nicholasbassett@paulhastings.com

 *and*

Douglas S. Skalka (ct00616)
Patrick R. Linsey (ct29437)
NEUBERT, PEPE & MONTEITH, P.C.
195 Church Street, 13th Floor
New Haven, Connecticut 06510
(203) 781-2847
dskalka@npmlaw.com
plinsey@npmlaw.com

*Counsel for the Chapter 11 Trustee*

## Exhibit A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

------------------------------------------------------x
                                 :

In re:                            :     Chapter 11
                                 :

HO WAN KWOK *et al*.,          :     Case No. 22-50073 (JAM)
                                 :

          Debtors.[1]        :     Jointly Administered
                                 :
------------------------------------------------------x

**ORDER, PURSUANT TO BANKRUPTCY CODE SECTION 363(b), AUTHORIZING (I) MOVING LADY MAY TO NAVIGABLE WATERS OF RHODE ISLAND AND (II) ENTRY INTO, AND PERFORMANCE UNDER, NEWPORT DOCKAGE AGREEMENT**

Upon the motion (the "Motion"),[2] filed Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee") appointed in the chapter 11 case of Ho Wan Kwok (the "Debtor"), requesting entry of an order, pursuant to section 363(b) of the Bankruptcy Code, authorizing (i) moving the Lady May yacht to the navigable waters of Rhode Island and (ii) the Trustee's entry into, and performance under, the Newport Dockage Agreement, all as further detailed in the Motion; and the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (c) venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and (d) good and sufficient notice of the Motion having been given; and no other or further notice being required and the Court having found and determined that the legal and factual bases set forth in the Motion establish just cause for the relief

---

[1] The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation.  The mailing address for the Trustee, Genever Holdings LLC, and Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

granted herein; and it appearing that the relief requested by the Motion, as modified by the terms of this Order is in the best interest of the Debtors' estates and creditors; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

1.     The Motion is GRANTED as set forth herein.

2.     Notwithstanding anything to the contrary in the Stipulated Order, the Trustee is authorized to move the Lady May to the navigable waters of Rhode Island (including, for the avoidance of doubt, the Safe Harbor Shipyard in Newport, Rhode Island).  For the avoidance of doubt, and notwithstanding the declaration signed by the current captain of the Lady May, Mr. James Pizzaruso (the "Captain") on January 9, 2023, the Captain is permitted to move the Lady May to the navigable waters of Rhode Island.

3.     The Trustee is authorized to enter into, and perform under, the Newport Dockage Agreement, including any payment of fees and expenses that come due thereunder.

4.     All requests of SHM for payment of indemnity pursuant to the Shipyard Agreement shall be made by means of an application (interim or final as the case may be) filed with this Court and served upon all parties in interest; *provided*, *however*, that in no event shall SHM be indemnified for any liability, loss, costs, or claim that is found by this Court to be the result of SHM's fraud or fraudulent misrepresentation, knowing or willful violation of law, willful misconduct, breach of fiduciary duty, self-dealing, bad faith or gross negligence.

5.     All parties' rights to object to any request of SHM for payment of indemnity pursuant to the Agreement shall be preserved.

6.     In accordance with Section 3 of the Rider to Shipyard Agreement, this Court has exclusive jurisdiction over any claim or dispute in respect of or arising out of the Shipyard Agreement.

7.      The Trustee and SHM are authorized and empowered to take all actions necessary to effectuate the relief granted in this Order.

8.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

9.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## Exhibit B

**Newport Dockage Agreement**



## SAFE HARBOR
### — NEWPORT SHIPYARD —

## COMMERCIAL YARD & DOCKAGE LICENSE AND SERVICE AGREEMENT

| GENERAL INFORMATION | | |
|---|---|---|
| Arrival Date: May 1, 2023 | Departure Date: to be determined | Black Card#: |
| Additional Arrival and Departure Dates: | | |

| BOAT INFORMATION | | | | | |
|---|---|---|---|---|---|
| Boat Name: Lady May | | | Builder: Feadship | | |
| ☐ Sail  ☒ Power  ☐ Multihull | LOA: 46.2m | Beam: 9m | Draft: 2.37m | | Height: 18m |
| Registration #: Official# 745195 | | | | | |
| Does the vessel have a tender? ☒ Yes  ☐ No | | Tender Make: Williams | | Tender LOA: 21' | |

| ELECTRICAL REQUIREMENTS | |
|---|---|
| ☐ 20A  ☐ 30A  ☐ 50A  ☐ 100A Single Phase  ☒ 100A 3-Phase  ☐ 480V | Number of cords needed: 1 |

| OWNER INFORMATION | |
|---|---|
| Name: Luc A. Despins, as chapter 11 trustee for the estate of Ho Wan Kwok | E-mail: lucdespins@paulhastings.com |
| If Owner is an entity, the name of registered agent: | |
| Mobile Phone: 917 699 7310 | Office Phone: 212 318 6001 |
| Billing Address: c/o Paul Hastings LLP, 200 Park Avenue, New York, NY 10188 | |
| Business Name & Address: | |
| Emergency Contact: G. Alexander Bongartz | Phone: 617 838 5117 |

| CAPTAIN/AUTHORIZED REPRESENTATIVE INFORMATION | |
|---|---|
| Name: James Pizzaruso | E-mail: captain@yachtladymay.com |
| Mobile Phone: 401-338-2738 | Boat Phone: 401-344-9040 |
| Management Company: Yachtzoo Sarl | |

| INSURANCE INFORMATION | | |
|---|---|---|
| Insurance Company: Norwegian Hull | | Policy #: MA2308970 |
| Expiration Date: 2/25/2024 | Agent Name: Howden Sturge | Agent Phone: +44 (0) 2380 222666 |

This Commercial Yard & Dockage License and Service Agreement (this "Master Agreement") is entered into by and between SHM Newport Shipyard, LLC ("SHM") and the above-named Owner, as owner of the boat identified above, including, without limitation, any rigging, engines, appurtenances and contents stored thereon (collectively, the "Boat"), with respect to the marina located at 1 Washington St, Newport, RI 02840 (the "Marina"), on the following terms and conditions. This Master Agreement contemplates SHM and Owner entering into one or more mutually agreeable, written agreements signed by both parties (each, an "Agreement") for dockage, storage, service, or other activities at the Marina. The terms of this Master Agreement shall be incorporated into each Agreement, and in the event of a conflict between the terms of this Master Agreement and the terms of any Agreement, this Master Agreement shall govern unless the parties expressly agree otherwise in writing.

Owner acknowledges that Owner has read and fully understands this Master Agreement, including without limitation the Standard Terms, NSY Rates for the current year, and EPA/DEM/OSHA Notice, and Rules and Regulations which are incorporated by reference, and will comply with them in all respects. Owner certifies that the information provided is correct and agrees to promptly notify SHM in the event of changes to the above information. Owner shall keep copies of the current Boat registration or documentation and certificates of current insurance policies at the Marina office for as long as the Boat is in the Marina.

| SHM | OWNER/AUTHORIZED REPRESENTATIVE |
|---|---|
| _Signature_ | /s/ Luc A. Despins, as trustee<br>_Signature_ |
| Authorized Signatory | Luc A. Despins, as chapter 11 trustee for estate of Ho Wan Kwok |
| General Manager | Date: April 24, 2023 |
| SHM Newport Shipyard | |
| 4/24/2023 | |

1

**Rider to Commercial Yard and Dockage License and Service Agreement, executed on April 24, 2023, Between (i) Luc A. Despins, as the Chapter 11 Trustee for the Estate of Ho Wan Kwok and (ii) SHM Newport Shipyard, LLC**

Capitalized terms used but not defined herein have the meanings set forth in the Commercial Yard and Dockage License and Service Agreement, executed on April 24, 2023, with respect to the Lady May (the "Dockage Agreement").

1. Mr. Luc A. Despins is party to the Dockage Agreement solely in his capacity as the chapter 11 trustee for the estate of Ho Wan Kwok, and not in his personal capacity. Accordingly, no claim whatsoever may be asserted by SHM against Mr. Luc A. Despins in his personal capacity or Paul Hastings LLP.

2. The Dockage Agreement is subject to approval of the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court"), in which court the chapter 11 case of Ho Wan Kwok, Case No. 22-50073 (the "Chapter 11 Case"), is pending.

3. The Bankruptcy Court shall have exclusive jurisdiction over any claim or dispute in respect of or arising out of the Dockage Agreement.

4. Notwithstanding anything to the contrary in the Standard Terms, all requests of SHM for payment of indemnity pursuant to the Dockage Agreement will be made by means of an application (interim or final as the case may be) and served upon all parties in interest in the Chapter 11 Case; provided, however, that in no event shall SHM be indemnified from any liability, loss, costs, or claim that is found by the Bankruptcy Court to be the result of SHM's fraud or fraudulent misrepresentation, knowing or willful violation of law, willful misconduct, breach of fiduciary duty, self-dealing, bad faith, or gross negligence. All parties' rights to object to any request of SHM for payment of indemnity pursuant to the Dockage Agreement shall be preserved.

**Owner**

By: _/s/ Luc A. Despins, as trustee_

Name: Luc A. Despins, as chapter 11 trustee for the estate of Ho Wan Kwok

Date: April 24, 2023

**SHM Newport Shipyard, LLC**

By: _____

Name: _Michael Millcick_

Title: _General Manager_

Date: April 24, 2023

## STANDARD TERMS

**1. Term.** The term of this Master Agreement (the "Master Term") begins on the earlier of the Arrival Date or the date that the Owner is permitted to occupy a slip or storage space in the Marina and continues month-to-month until terminated by either party by at least 30 days' prior written notice or otherwise terminated as provided herein. Upon the expiration or earlier termination of this Master Agreement, all Agreements then in effect shall automatically terminate, except for those provisions thereof that expressly survive termination or which by their nature should survive termination.

**2. Fees.**
**(a)** If a Payment Card is on file with the Marina, the Payment Card will be charged for any outstanding fees, charges, and/or sales tax, including Dockage Fees, Storage Fees, and Other Fees, as the same may be defined in any Agreement (collectively, "Fees"), on or about the due date thereof.

**(b)** If any Fees are not paid by the applicable due date or if any check is returned for insufficient funds, a late charge of $30.00 may be imposed. If any Fees remain unpaid beyond the applicable due date, then SHM may, in addition to the foregoing late charge, collect interest on the delinquent amounts at the lesser of the highest rate permitted by law or one and one-half percent (1.5%) per month (eighteen percent (18%) per annum) (the "Default Rate") until paid in full. SHM may require payment by credit card or by ACH bank draft. Non-receipt of any billing statement does not relieve Owner of the obligation to pay all charges due. All payments shall be made at the Marina or as indicated on the statement. SHM may measure all boats for accurate billing purposes and may charge the greater of the LOA (length overall), Slip/Space length, or the cubic feet of the Boat. The LOA shall include any bowsprits or pulpits, swim platforms or similar protuberances or extensions.

**3. Use of Slip/Space.**
**(a)** Owner shall not use or permit the use of the Boat or any Slip/Space for any unlawful or commercial purpose. SHM reserves the right to exercise exclusive control over the use of the dock space at the Marina and has the right to refuse to provide services. In the event of any change of ownership of the Boat, Owner shall immediately give notice to SHM. Owner shall remain responsible for all sums due and owing until such new owner enters into an agreement with SHM. If SHM permits outside contractors, subcontractors or other workers employed by Owner ("Contractors") to perform work for the Owner, all Contractors must comply with the Marina's contractor policy.

**(b)** SHM reserves the right to change any Slip or Space licensed pursuant to an Agreement (provided the new slip is of comparable size and has similar utility availability). Owner agrees, if notified by SHM of any relocation required in connection with the foregoing sentence, to move the Boat to the newly designated Slip/Space within twenty-four (24) hours following receipt of such notice or such longer time period as SHM may specify. If Owner fails to move the Boat to the newly designated Slip/Space within twenty-four (24) hours following receipt of such notice (or such longer time period as SHM may specify), then SHM may move the Boat to the new Slip/Space on Owner's behalf and at Owner's cost. SHM may move or relocate the Boat to accommodate normal marina operations, repairs or for special events.

**(c)** Owner agrees that SHM may use any Slip/Space when temporarily not in use by Owner, without compensation to Owner. Further, Owner shall notify SHM if the Boat will not be in the assigned space at the Marina for any period exceeding two (2) consecutive days. In such event, Owner agrees SHM may, without compensation to Owner, assign another vessel to the Slip/Space during the period of the absence of the Boat. Even if another boat or vessel is so assigned to the Slip/Space during such period of temporary absence Owner understands and agrees Owner will remain responsible for payment of Fees. To assure the assigned Slip/Space is available upon the Boat's return, in the event the Boat is absent from the Slip/Space for two (2) or more consecutive days, Owner is required to provide SHM at least 24 hours' advance notice of the date and time the Boat will return to the Slip/Space.

**4. Special Events.** SHM reserves the right to require Owner to vacate the Slip/Space for special events, including without limitation, boat shows, fishing tournaments, regattas, and dredging ("Special Events"). In the event SHM has given notice of a Special Event and Owner fails to relocate the Boat within forty-eight hours of the time specified in such notice, SHM may relocate the Boat on Owner's behalf and at Owner's sole cost. Owner may be required to remove the Boat for Special Events up to ten (10) days per year.

**5. Indecorous Conduct.** Owner shall be responsible for the conduct and control of all Owner Parties. Indecorous conduct by Owner or Owner Parties that in SHM's opinion (i) is a nuisance, (ii) disturbs or interferes with the enjoyment of other Marina users (including the use of illegal drugs or becoming intoxicated), or (iii) might cause harm to any person or property (including the Marina reputation) shall, at the option of SHM, be cause for immediate termination, without refund, of this Master Agreement and/or any Agreement.

**6. Hazardous Substances/Oil Disposal.** Owner shall not release or permit to be released any hazardous waste or environmentally objectionable substances, including oil, gasoline or untreated sewage ("Hazardous Substances"). For the avoidance of doubt, Owner shall not dispose of any Hazardous Substances in dumpsters, nor shall Owner permit such disposal. Owner shall be solely responsible for all costs, claims, damages and liability resulting therefrom, including the costs of booms, absorbent pads, disposal of the Hazardous Substance, clean up oversight by governmental agencies and Marina personnel, and any legal fees, costs and penalties incurred in defense of any violations. Owner shall immediately report any such release to the appropriate government authorities and to the Marina's safety manager or dock office and shall clean up any release of Hazardous Substances. Owner shall keep SHM informed daily of Owner's clean-up actions. If SHM is not satisfied with Owner's actions, SHM may take any action it deems appropriate at Owner's expense. This provision is in addition to, and not in lieu of other environmental and liability limitation/exoneration terms herein and shall survive the termination or expiration of this Master Agreement and/or any Agreement. SHM may, but is not obligated to, offer oil disposal services for a fee; Owner may inquire about any such services by contacting the Marina's dock office.

**7. Utilities.** Subject to availability, SHM may make electrical power or water (the "Utilities") available at the Slip/Space. SHM is not a utility or service provider. SHM does not warrant the availability or compatibility of the Utilities, and shall not be responsible for any damage or injury due to the interruption or unavailability of the Utilities nor shall such interruption or unavailability entitle Owner to any reduction or abatement of any Fees.

**8. Security.** SHM may but is not required to retain the services of security personnel, install and operate monitoring cameras or otherwise provide security features.

Owner agrees and consents that Owner, the Boat and any Owner Parties may be recorded by any security system or monitoring cameras. Such security is provided solely for the protection of SHM's property, and SHM assumes no responsibility for the personal safety of Owner or Owner's family members, agents, employees, contractors, crews, guests, invitees, passengers or permittees (collectively, "<u>Owner Parties</u>"), or for the safety of the Boat or any other vessels or their respective appurtenances or any other property.

**9. Laws, Rules, and Regulations.** Owner shall comply with all applicable laws, codes, ordinances, rules and regulations of federal, state and local entities, including environmental laws, rules and regulations of the U.S. Coast Guard (collectively, "<u>Applicable Laws</u>"). Owner shall comply with all rules adopted by SHM ("<u>Rules</u>"). SHM reserves the right to alter, amend and modify the Rules at any time by posting a copy of the updated Rules at the Marina, on the Marina's website, or by furnishing a copy to Owner.

**10. Good Repair.** The Boat shall be maintained in good condition and repair ("<u>Good Repair</u>") by Owner and operated in a careful and safe manner. If SHM determines that the Boat is not in Good Repair, SHM may remove and relocate the Boat at the Marina or elsewhere at Owner's sole risk and expense. Owner agrees to pay for any work done by SHM. Owner agrees to have a working automatic bilge pump on the Boat at all times, connected to one or more fully charged batteries.

**11. Weather.** SHM is not obligated or required to provide any protection or alternative location to the Boat or its occupants in the event of hazardous weather. Owner acknowledges and agrees that it is Owner's sole responsibility to take whatever measures are necessary to prevent the possibility of damage in such conditions and that SHM is not responsible in any manner for any damages to Boat or occupants as a result of hazardous weather, regardless of preventative measures taken by Owner or any action taken by SHM. SHM may require the Boat to leave the dock based on predicted weather conditions; provided, SHM will provide as much notice as is reasonably practicable in such circumstance.

**12. Boarding and Removal of Boats.** In case of a perceived emergency by SHM, SHM is authorized to do whatever SHM deems reasonably appropriate without incurring any liability for damages or losses from such action or inaction.

**13. Insurance.** Owner agrees to purchase and maintain insurance against such risks as Owner deems prudent and shall look only to said insurance for compensation or damages related to any losses regardless of responsibility. Owner shall at all times during the course of this Master Agreement maintain, with an insurance company that is acceptable to SHM, a Protection and Indemnity policy of insurance with limits of not less than $500,000 and a deductible of not more than $10,000 per occurrence, naming <u>Sun Communities, Inc. and its affiliates and subsidiaries as additional insureds</u>. Owner shall also maintain a Hull and Machinery policy covering at least 100% of the present actual cash value of the Boat, with endorsements for extended perils, damage by fire, electrolysis or stray current corrosion, pollution and fuel spills, salvage and wreckage removal, vandalism and burglary. Such limits of insurance are minimum requirements only and are not intended in any way to limit the insurance available under such insurance policies or Owner's liability. Upon execution of this Master Agreement and as requested by SHM from time to time, Owner shall provide SHM with a certificate of insurance evidencing required coverage and shall produce evidence of the renewal of the policies no later than 30 days prior to their expiration. All policies of insurance shall require 30 days' advance notice by the insurance company to SHM of any amendment or cancellation. As to all such policies of insurance and all claims made thereon, for himself/herself/itself and his/her/its insurers, Owner specifically waives all rights of recovery against SHM and the SHM Parties.

**14. Lien.** Owner hereby grants to SHM a lien on the Boat for any fees or damages payable under this Agreement which are not paid to SHM when due and SHM may pursue all legal and equitable remedies to perfect and foreclose said lien, including but not limited to chaining or locking the Boat. The right of enforcement of the lien herein granted to SHM shall be in addition to any and all other rights and remedies available to SHM hereunder or in connection herewith and shall not in any manner alter, waiver or abrogate Owner's personal liability hereunder. To secure the lien rights granted herein, SHM shall have the right to file one or more financing statements in the jurisdiction of Owner's residence as that jurisdiction appears on the certificate of title to the Boat or an equivalent document. **<u>BEWARE – THE VESSEL AND ITS CONTENTS MAY BE SOLD AT PUBLIC AUCTION FOR FAILURE TO PAY STORAGE CHARGES.</u> AN EXPRESS MECHANIC'S LIEN IS HEREBY ACKNOWLEDGED ON THE BOAT TO SECURE THE COSTS OF ANY REPAIRS THERETO. FURTHER, THIS AGREEMENT INCORPORATES BY REFERENCE FEDERAL STATUTE 46 U.S.C., § 31342 (A/K/A THE COMMERCIAL INSTRUMENTS AND MARITIME LIEN ACT), TITLE 34, CHAPTERS 46-1 THROUGH 46-7 OF THE RHODE ISLAND STATE LAW, AND ANY AMENDMENTS THERETO, TITLE 34, CHAPTER 35 OF RHODE ISLAND STATE LAW, AND ANY AMENDMENTS THERETO, TITLE 46, CHAPTERS 46-8 THROUGH 46-10 OF THE RHODE ISLAND GENERAL LAWS, AND ANY AMENDMENTS THERETO, AS WELL AS TITLE 6A, CHAPTER 9 OF THE RHODE ISLAND GENERAL LAWS, AND ANY AMENDMENTS THERETO, UNDER WHICH SHM MAY TAKE POSSESSION OF, DISPOSE OF AND/OR FORECLOSE ITS LIEN ON OWNER'S BOAT IN THE EVENT OF ABANDONMENT OR NON-PAYMENT OF THE FEES DUE AND PAYABLE HEREUNDER. THE RIGHTS AVAILABLE TO SHM UNDER SAID STATUTES ARE IN ADDITION TO ANY AND ALL OTHER RIGHTS WHICH SHM HAS AVAILABLE TO IT UNDER THIS AGREEMENT OR OTHERWISE AT LAW AND/OR IN EQUITY.**

**15. Default/Remedies.** The parties agree that all terms and conditions in this Master Agreement and all Agreements are material and fundamental, and that in the event of a breach by Owner or Owner Parties of any of the terms or conditions of this Master Agreement or any other written agreement between SHM and Owner, including any Agreement or any of the Marina's rules and regulations, SHM may immediately terminate this Master Agreement and/or the applicable Agreement (except as otherwise provided herein), without refund, by notice to Owner, whereupon Owner shall immediately pay all sums due and payable to SHM and remove the Boat from the Marina. Notwithstanding the above, SHM may elect to provide notice of an opportunity to correct such breach, rather than immediately terminating this Master Agreement or the applicable Agreement. In the event of any such breach by Owner of this Master Agreement, SHM may also cancel any parking passes and restrict access to the Boat, although if access is restricted Owner shall be permitted entry by requesting access at the Marina office.

**16. Warranties.** SHM MAKES NO WARRANTIES, EXPRESS OR IMPLIED, including as to the condition of any Slip/Space or the Marina (including floats, walkways, gangways, ramps, equipment and related items) or the suitability of any Slip/Space, Utilities, or the Marina for

Owner's intended purposes and undertakes no duty to advise Owner or Owner Parties of any hazardous conditions. Owner acknowledges that Owner has had an opportunity to inspect the Marina prior to execution of this Master Agreement and agrees to accept the same in its current "as-is" condition. Owner represents and warrants that (i) Owner has an ownership interest in the Boat or Owner is fully authorized to bind the owners of the Boat to the terms and conditions of this Master Agreement; (ii) Owner and the Boat shall comply in all respects with all Applicable Laws, including, without limitation, the Federal Water Pollution Acts (33 U.S.C. Section 1321 - prohibiting discharge of oil or oily water; 33 U.S.C. Section 1322 - prohibiting discharge of untreated sewage; and (iii) (1) Owner is not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control of the Department of the Treasury ("OFAC"); (2) Owner is currently in compliance with and shall at all times during the Term (including any extension of the Term) remain in compliance with the regulations of the OFAC; (3) Owner shall comply with all requirements of United States law relating to money laundering, anti-terrorism, trade embargos and economic sanctions, now or hereafter in effect; and (4) Owner shall not use funds which Owner receives from any "Prohibited Person" (as such term is defined in the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism) to make any payment due to SHM under this Master Agreement.

**17. Liability and Indemnity.**
**(a) All risk of loss or damage to property and of personal injury or death shall be upon the Owner, and Owner shall be responsible for and shall promptly, upon demand, pay SHM for any costs or damage incurred by SHM or others due to acts or omissions of the Owner, the Boat, or the Owner Parties. Owner agrees that SHM, Safe Harbor Marinas, LLC, SHM TRS, LLC, and their respective subsidiaries and affiliates, and the officers, agents and employees of each of the foregoing (collectively, the "SHM Parties") shall not be liable to Owner or to any party claiming by, through or under Owner for (and Owner hereby releases SHM and the SHM Parties from any claim or responsibility for) any injury to persons (including death), damages (no matter how occurring), or damage to or destruction, loss, loss of use, or theft of any property (including the Boat), caused by casualty, electrical shock, electrical shock drowning, interruption of or interference with utilities, theft, fire, third parties, collision, allision, chafing, dock maintenance or faulty repair, or any other matter or cause (including any named storm or act of God), EVEN IF SUCH CLAIMS AROSE OUT OF OR IN CONNECTION WITH THE NEGLIGENCE OR FAULT OF THE SHM PARTIES; EXCEPT TO THE EXTENT CAUSED BY THE SOLE NEGLIGENCE, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT OF THE SHM PARTIES, WHICH MAY NOT BE PRESUMED AND MUST BE AFFIRMATIVELY ESTABLISHED.**
**(b) Owner agrees to indemnify, protect, defend and hold harmless SHM and the SHM Parties for, from and against all liabilities, costs, expenses damages or injuries (including death) to Owner, any Owner Parties or any other persons; damages to or loss of property or the Boat; expenses of any nature, kind or description of any person or entity, directly or indirectly arising out of, caused by, or resulting from (in whole or part) (i) theft, fire, collision,** allision, chafing, dock maintenance or faulty repair, or by reason of any other cause, (ii) Owner's or the Owner Parties' use of the Boat, the Marina or the areas in, on or around the Boat, the Slip/Space, the dock areas, basins, the walks, floats, ramps, gangways, convenience facilities, parking areas, walkways, and roads in, around and leading to and around the Marina's premises, (iii) any activity, work or other things done, permitted or suffered by the Owner or Owner Parties, (iv) any breach or default in the performance of any of Owner's obligations under this Master Agreement or the exercise by Owner of its rights, (v) any act, omission, negligence or willful misconduct of Owner or Owner Parties, or (vi) any damage to Owner's, an Owner Party's, or third party's property; EVEN IF SUCH CLAIMS AROSE OUT OF OR IN CONNECTION WITH THE NEGLIGENCE OR FAULT OF THE SHM PARTIES; EXCEPT TO THE EXTENT CAUSED BY THE SOLE NEGLIGENCE, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT OF THE SHM PARTIES, WHICH MAY NOT BE PRESUMED AND MUST BE AFFIRMATIVELY ESTABLISHED.**
**(c)** The terms of this section shall survive notwithstanding the termination or expiration of this Master Agreement or any Agreement.

**18. Master Lease.** If the Marina is adjacent to or connected with a body of water over which a private entity or federal, state or local governmental authority with whom SHM has entered an agreement pertaining to the use of the land or water by SHM (the "Master Lease"), then the terms of the Master Lease are incorporated by reference into this Master Agreement and all Agreements and shall apply to Owner with the same force and effect as SHM. This Master Agreement and all Agreements shall be subject and subordinate to the Master Lease. If there are any conflicts or inconsistencies between this Master Agreement or any Agreement and the Master Lease, the Master Lease shall govern and control. Notwithstanding the foregoing, nothing in this Master Agreement or any Agreement gives Owner any direct or third-party interest in the Master Lease.

**19. Photographs.** The Marina staff or others may take pictures of customers or boats (including Owner, Owner Parties, or the Boat). Owner consents for himself and all Owner Parties that these photographs may be used by SHM for purposes such as advertising and display in all media without further notification or compensation. All film negatives and positives and electronic images and data shall remain the property of the photographer except where otherwise specified by contract. SHM will use reasonable efforts to avoid photographing Owner, the Owner Parties (to the extent such Owner Parties are known to SHM), or the Boat upon Owner's request.

**20. Notices.** All notices shall be in writing and shall be deemed to be given (i) when personally delivered to the other party; (ii) five (5) days after deposit in the mail, postage prepaid, addressed to the other party, and sent by Certified Mail Return Receipt Requested; or (iii) with respect to notice to Owner, when sent via email to Owner or when affixed to the Boat. Owner is responsible for informing SHM of any changes to Owner's current address or phone number. Notices to the Owner shall be delivered to either the mailing address or email address listed in the section titled Owner Information or at the Slip/Space. Notices to SHM shall be delivered to the physical address of the Marina first referenced above, with a required copy by email to notices@shmarinas.com and info@newportshipyard.com.

**21. Affiliate Transfer; Sale; and Assignments.** Notwithstanding anything in this Master Agreement to the

contrary, SHM may transfer or assign (in whole or in part) the rights, duties and obligations of SHM under this Master Agreement and/or any Agreement to any affiliate of SHM or to any party that purchases the Marina at any time without the consent or approval of Owner. In the event of any such transfer or assignment (in whole or in part) to any affiliate of SHM, SHM may continue to collect and receive all or any portion of the amounts payable hereunder by Owner as agent for and on behalf of such affiliate-transferee/assignee and notify Owner thereof in writing. Without SHM's written consent, Owner may not sublet, transfer, or assign this Master Agreement or the right to use the Slip/Space. Any attempt to sublet, transfer, or assign this Master Agreement without SHM's prior written consent shall be void.

**22. Service.**

**(a)** SHM shall have the right, but not the obligation, to assign a project manager to any service projects performed by SHM or its subcontractors at the Marina ("Service"). SHM will estimate the dollar value of the contemplated Service and initial work and, if applicable, any subsequent work in performing the Service will be scheduled solely by the project manager. Unless Owner expressly requires all Service requests to be signed before work starts, all verbal Service requests by Owner or Owner's authorized representative will duly authorize work to commence. Owner agrees that all Service requested by Owner or Owner's authorized representative is necessary and proper to the preservation of the Boat in a seaworthy condition. SHM reserves the right to suspend work on any portion of the Service described in any work order or change orders thereto when, in the sole judgement of SHM, the amount of work and/or materials necessary to complete the Service exceeds SHM's or the Owner's original assessment of the scope of the work needed to complete the Service to a standard which is normal and customary on vessels similar to the Boat. In such event, SHM will complete condition reports and meet with Owner to discuss the increased scope of work and materials and to obtain additional authorization based on such condition reports, in the form of a change order, to complete the necessary Service.

**(b)** Owner shall pay to SHM a deposit equal to 50% of the initial assessment of the Service is prior to commencement of work. Progress invoices will be issued bi-weekly and the deposit will be applied at the completion of the Service. Owner shall pay SHM for any Service on or before the earlier of (i) 10 days of receipt of an invoice therefor or (ii) prior to the Boat leaving the Marina. If payments are delinquent, work will cease until the account is current. Account balances must be up to date before the Boat will be launched or leaves the Marina. A monthly late charge at the Default Rate will be added to balances 30 days past due. Owner shall pay all legal and collection expenses incurred by SHM or its representatives and agents.

**(c)** Owner acknowledges and agrees that the liability of SHM for any Service is limited to repair and replacement of defects of material and workmanship which occur within 90 days from date of delivery (the "Limited Warranty"). Owner must make any claims under this Limited Warranty in writing within 10 days after the expiration of such 90-day period; any claim not so delivered to SHM within the time period specified in this sentence shall be deemed waived. The Limited Warranty does not cover (i) normal wear and tear, (ii) damage or defects arising from any casualty, misuse, abuse, neglect, or unauthorized repairs; (iii) calibration adjustment or compensation of any instrument; (iv) minor cosmetic items; or (v) racing performance. Due to weather conditions in the Northeast, shrink wrapping cannot be warranted and is not covered by the Limited Warranty. SHM will, at its option, either repair or replace defective materials or workmanship at its own expense for parts and labor or advise Owner where to take the Boat for service. SHM shall offer no warranty with respect to items of equipment and inventory supplied to SHM by third parties, and the warranties, if any, of such third-party suppliers shall be Owner's exclusive remedy in connection therewith. The foregoing Limited Warranty is, to the extent permitted by Applicable Law, in lieu of all other warranties, express or implied, including without limitation the implied warranties or merchantability and fitness for particular purpose, and shall be Owner's exclusive remedy for any defect or non-conformity of the Boat or Service. SHM shall in no event be liable for any consequential, incidental, or special damages (including, without limitation, loss of profits or loss of use).

**(d)** Service Charge. Subcontractors contacted by SHM on behalf of Owner will be issued a purchase order. SHM will invoice Owner a service charge of 20% of the amount invoiced by the subcontractor to compensate SHM for the benefit to Owner and subcontractor of the use of SHM's services, facilities and overhead and for administrative services.

**23. Outside Contractors.**

**(a)** Day Workers. Owner shall either (i) cause general labor, cleaners, polishers and varnishers working on the Boat to be covered as "Temporary Crew" under Owner's vessel insurance policy or (ii) maintain Workers' Compensation and Liability insurance covering any such workers hired by Owner. Day workers must park outside the Marina gate.

**(b)** Contractors. Before engaging an outside Contractor to work on the Boat, Owner must (i) submit sufficient information to the yard manager to allow the yard manager to verify the Contractor's status and (ii) notify the Marina office prior to Contractor arrival. Neither SHM nor any SHM Party shall be responsible for any work performed or and materials supplied by any Contractor. Contractors must (i) sign and return a Contractor Agreement to SHM, (ii) provide SHM with a certificate of insurance naming Sun Communities, Inc. its affiliates and subsidiaries as additional insureds, (iii) provide SHM with evidence of Workers Compensation insurance or Notice of Designation as independent contractor, (iv) sign in and out at the security office daily, and (v) have MSDS forms available for all Hazardous Materials brought into the Marina. Owners contacting Contractors directly will be invoiced by the Contractor.

**(c)** Service Charge. A service charge of 15% of the amount invoiced by the Contractor will be charged to Owner by SHM, to compensate SHM for the benefit to Owner and Contractor of the use of SHM's services, facilities and overhead.

**24. Final Agreement; Other.**

**(a)** The Section and paragraph captions contained in this Master Agreement shall not be considered in the construction or interpretation of this Master Agreement. In this Master Agreement, (i) the singular includes the plural and the plural includes the singular and the masculine gender includes the feminine and neuter and vice versa, (ii) "or" means "and/or", (iii) "including" or "include" means "including without limitation", and (iv) unless otherwise specified, when exercising its right to approve or consent to an action is entitled to withhold or condition such consent or approval in its sole and absolute discretion.

**(b)** SHM's rights and remedies are cumulative, and pursuit of any remedy is not an election of remedies or a waiver of any other remedies. No waiver or forbearance of a breach of this Master Agreement or any Agreement shall be construed as a waiver or forbearance of any subsequent breach. The acceptance of any performance or the payment of any amounts after the same has become due or at a time when any other default exists shall not constitute a waiver of the right to demand payment of all other amounts owed or a waiver of any other default then or existing thereafter. If any provision of this Master Agreement or any Agreement is deemed invalid or unenforceable by any court of competent

jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited and the remainder of this Master Agreement and the applicable Agreement shall continue in full force and effect. This Master Agreement and the exhibits attached hereto, if any, together with the applicable Agreements, contain all of the agreements of the parties with respect to any matter covered or mentioned in this Master Agreement and the applicable Agreements, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose. No provision of this Master Agreement or any Agreement may be amended or added to except by an agreement in writing signed by the parties or their respective successors in interest.

**(c)** If the Boat is owned by an entity, the person signing below affirms that he/she has full authority to bind the Owner to this Master Agreement, and that such person (signing this Master Agreement) personally guarantees performance of the payment and all other contractual obligations of the Owner. If the person signing this Master Agreement is an agent of Owner, including a captain, such person represents that he/she has the authority to bind the Owner, and that he/she shall personally guarantee performance of payment and all other contractual obligations of the Owner in the event that he/she does not actually have such authority to bind the Owner. If more than one party signs this Master Agreement as Owner, all of such parties shall be jointly and severally liable for the performance of all obligations of Owner and shall be bound by this Master Agreement. Unless SHM is notified in advance in writing, anyone in possession of or apparent charge of the Boat shall be deemed to have the authority to act on behalf of Owner and SHM shall be entitled to accept and act in reliance upon orders or requests by such persons for services, supplies, work, labor and other material of any kind for the benefit of Boat or Owner.

**(d)** This Master Agreement and any Agreement may be executed in one or more counterparts, including facsimile signatures (e.g., pdf. files transmitted by email) or digital signatures affixed to electronic counterpart signature pages using digital signature software that electronically captures, or allows a signatory to adopt, an identifying mark as such person's signature to this Master Agreement or the applicable Agreement (e.g., Docusign®). The parties intend that such electronic signatures shall constitute original signatures and be binding upon the parties and that the terms and conditions of this Master Agreement and all Agreements shall be binding upon the parties.

**(e)** This Master Agreement shall be binding upon and inure to the benefit of the parties hereto, their heirs, executors and administrators and permitted successors and assigns.

**(f)** Owner shall not record this Master Agreement, any Agreement or any memorandum in the real property records.

**(g)** If either party defaults under this Master Agreement or any Agreement the other party shall be entitled to recover all costs incurred, including reasonable attorneys' fees, in enforcing or protecting its rights. This Master Agreement and each Agreement shall be governed by the laws of the State where the Marina is located. Any action brought related to this Master Agreement or any Agreement shall be brought in the county in which the Marina is located or the Federal District in which the Marina is located.

**(h)** OWNER AND SHM HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS MASTER AGREEMENT, ANY AGREEMENT, OR THE RELATIONSHIP OF SHM AND OWNER. THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

**25. Renewal Term.** This Master Agreement shall automatically renew for successive one-year terms (each, a "Renewal Term") beginning on the first anniversary of the Commencement Date and on each anniversary thereafter, unless terminated in accordance herewith. Either party may terminate a Renewal Term by giving the other party notice not less than 30 days in advance of the next upcoming Renewal Term. Each Renewal Term will be upon the same terms and conditions set forth in this Master Agreement.

# RULES AND REGULATIONS

**1. Terms.** Capitalized terms used but not defined herein have the meanings assigned to them in the Commercial Yard & Dockage License and Service Agreement to which these Rules and Regulations are attached.

**2. Dockage.**
**(a)** Check-In time is 3:00 p.m. Check-Out is 11:00 a.m. Upon arrival, contact the Dock Office on VHF channel 9 for your slip assignment. Owner agrees to pay the applicable dockage, utility and environmental compliance charges during the Boat's stay.
**(b)** Boats may be required to go stern to docking from time to time.
**(c)** A 50% deposit based on the initial expected stay is required at time of reservation. For reservations of 3 days or less, payment in full is required at time of reservation.
**(d)** All accounts must be paid in full before the Boat leaves the Marina.

**3. Cancelation Policy.**
**(a)** Long Term Reservations (15 Days or More): Cancellations more than 15 days prior to the scheduled Arrival Date forfeit 50% of the deposit. Cancellations within 15 days of the Arrival Date forfeit the entire deposit.
**(b)** Short Term Reservations (14 Days or Less): Cancellations more than 7 days prior to the scheduled Arrival Date forfeit 10% of the deposit. Cancellations within 7 days of the Arrival Date but more than 48 hours prior to the Arrival Date forfeit 50% of the deposit. Cancellations within 48 hours of the Arrival Date forfeit 100% of the deposit.

**4. Parking.** All vehicles parked at the Marina must have a valid parking pass or the vehicle will be towed at the owner's expense. Parking passes are available at the Dock Office, and must be displayed at all times on the rearview mirror. SHM must be able to move a vehicle at all times; accordingly, a cell phone number must be clearly visible on all parking passes. Subject to availability, additional pay-to-park is located at the Gateway Visitors Center.

**5. Electricity.** Dockside receptacles are provided by SHM. Shore power cables/adaptors are available through the Dock Office and will be assigned to the Boat. All cables and adaptors provided by SHM MUST be returned to the Dock Office prior to check-out. Owner will be charged a fee for any cables or adaptors not timely returned.

**6. Water.** Boats hooked up to dockside water must have a water pressure regulator & gauge at the dock end of the faucet. All hoses must have a shut off nozzle. Water must be turned off when the Boat leaves the dock.

**7. Tenders.** No dinghy or inflatable shall be left in a slip or on the dock while the primary Boat is away overnight, unless prior arrangements have been made with SHM. At no time may tenders be left on the dock or finger.

**8. Atmospheric Conditions.** In the event of a storm, vessel owners are solely responsible for damage prevention measures. SHM will attempt, if reasonably practicable, to provide these services on a first-come, first-served basis. In case of emergency, SHM may require a vessel move to a different slip or require that a vessel leave the dock. Any damage done to the dock or vessels is the responsibility of the vessel owner.

**9. Winter Storage.** Winter storage licenses run from November 15th to April 15th. Boats stored outside of the terms of a winter storage license are subject to the land storage rates. After November 1st all dockside electricity and water may be shut off. All vessels not licensed for winter storage that remain in the water beyond November 15th will be charged the standard dockage rate and utilities.

**10. Pets.** Pets must be on a leash at all times. Pet owners are responsible for the pet's safety and clean up.

**11. Trash, Waste and Oil Disposal.** All garbage must be placed in plastic bags and put in the dumpster. Paper and plastic recycling bins are located throughout the Marina; please take advantage of them. Nothing may be thrown into the water. No discharging of sanitary waste is permitted in the Marina. No discharging of oil, spirits, liquids or oily bilges into the water is permitted. Please see the Dock Office for more information on disposing of trash, waste and oil.

**12. Alterations.** No alterations shall be made to the docks, pilings, electric, phone, television or water systems provided by the Marina without the express permission of SHM. No supplies, material accessories or debris shall be left on the docks at any time.

**13. Regulations.** When a vessel enters the Marina, it immediately comes under the jurisdiction of yard management and shall be berthed and maneuvered only as directed. It is the Owner's responsibility to ensure that SHM can reach either the Owner or an authorized representative at all times. In emergency situations, should SHM not be able to reach the Owner or authorized representative, SHM may act in any manner in which SHM deems, in its sole discretion, to be reasonable and Owner shall be responsible for all charges incurred in so acting. Any vessel that is in the confines of the yard for more than sixty (60) days, during which time SHM has been unable to communicate with the owner or authorized representative, will be deemed abandoned. After such sixty-day period, SHM may take steps to obtain title to the vessel and the vessel will then be disposed of as provided by applicable law. Any agreement made to offset these conditions must be specifically stated in a separate written contract between the vessel owner and SHM.

**14. Service.** All service projects performed in connection with a dockage license at the Marina will be assigned a project manager. The project manager will estimate the dollar value of the work to be done. Initial work and any subsequent work will be scheduled solely by the project manager. Unless Owner expressly requires all work requests to be signed before work starts, all verbal work requests by Owner or Owner's authorized representative will duly authorize work to commence.

**15. Working on your own Boat.** All tools, equipment and materials must be handled in a safe and environmentally conscious manner in accordance with applicable law. If scraping or sanding paint outdoors, loose paint must be contained and disposed of properly. All bottom paint must be vacuum sanded. Respirators and protective suits are strongly recommended. Waste oil and battery disposal areas are offered by the Marina; please use them appropriately. Vessel owners must keep the area around their vessels clean, or SHM may do so at the owner's expense. Sandblasting, spray painting and shrink wrapping by vessel owners or their representatives is prohibited.

**16. Subcontractors.** Subcontractors must (i) sign and return a Subcontractor Agreement to SHM, (ii) provide SHM with a certificate of insurance naming Sun Communities, Inc. and its affiliates and subsidiaries as additional insureds, (iii) provide SHM with evidence of Workers Compensation insurance or Notice of Designation as independent contractor, (iv) sign in and out at the security office daily, and (v) have MSDS forms available for all Hazardous Materials brought into the Marina. Passes will be issued once proof of insurance, including auto insurance, is provided to SHM. All parking passes are required to hang on the rearview mirror while in the yard with cell phone number visible on the pass.

**17. Collections.** Work performed at SHM is performed on a "cash when invoiced" basis.

## Exhibit C

**Estimate**



**SAFE HARBOR**
— N E W P O R T   S H I P Y A R D —

| | Estimate # | |
|---|---|---|
| | Date | 4/21/2023 |

**M/Y Lady May 152'**                                                    Cust#

| Description | Charges | Payments | Balance |
|---|---|---|---|
| Dockage | | | |
| Estimate | | | |
| **Nightly Dockage Rate** | | | |
| 5/1/23-9/1/23 | $7.00/ft/night | | $130,872.00 |
| **Shore Power** | | | |
| 480 Volt | $240.00/cord/night | | $29,520.00 |
| **5% Environmental Fee** | | | $8,019.60 |

Please submit your current insurance information to
nsydockoffice@shmarinas.com

*5% Environmental Fee will be added to all invoices

Thank you!                                                    **Estimate Total:    $168,411.60**

Remit checks to:
SHM Newport Shipyard 1 Washington Street Newport, RI 02840