UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

```
In Re                          *   Case No. 22-50073 (JAM)
                               *
HO WAN KWOK and GENEVER        *
 HOLDINGS CORPORATION,         *
                               *
               Debtor.         *


LUC A. DESPINS, et al.,        *   Adv. Proc. No. 22-05027
                               *
               Plaintiffs,     *   Bridgeport, Connecticut
                               *   April 18, 2023
       v.                      *
                               *
BRAVO LUCK LIMITED, et al.,    *
                               *
               Defendants.     *
                               *
* * * * * * * * * * * * * * *  *
```

TRANSCRIPT OF MOTION TO COMPEL COMPLIANCE WITH
BK. RULE 2004 SUBPOENA BY UBS AG; ORDER TO SHOW
CAUSE WHY THE COURT SHOULD NOT HOLD THE NON-RESPONDING
PARTIES IN CONTEMPT OF COURT; CONTINUED
PRETRIAL CONFERENCE RE #1 COMPLAINT
BEFORE THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:
For the Chapter 11          NICHOLAS BASSETT, ESQ.
 Trustee:                   Paul Hastings, LLP
                            200 Park Avenue
                            New York, NY  10166


                            PATRICK R. LINSEY, ESQ.
                            Neubert Pepe & Monteith, PC
                            195 Church Street
                            New Haven, CT  06510

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

APPEARANCES:   (Cont'd)


```
For the Defendant, Bravo        DAVID M.S. SHAIKEN, ESQ.
 Luck Limited:                  Shipman, Shaiken &
                                 Schwefel, LLC
                                433 South Main Street
                                Suite 319
                                West Hartford, CT  06510

                                JOANNA J. CLINE, ESQ.
                                Troutman Pepper Hamilton
                                 Sanders, LLP
                                Hercules Plaza
                                1313 N. Market Street
                                Suite 5100
                                Wilmington, DE  19899

For UBS:                        LISA FRIED, ESQ.
                                Herbert Smith Freehills
                                 New York LLP
                                450 Lexington Avenue
                                New York, NY  10017

For the U.S. Trustee:           HOLLEY L. CLAIBORN, ESQ.
                                Office of the United States
                                   Trustee
                                The Giaimo Federal Building
                                150 Court Street, Room 302
                                New Haven, CT  06510
```

1          (Proceedings commenced at 2:02 p.m.)

2          THE COURTROOM DEPUTY:  Case No. 22-50073, Ho Wan

3    Kwok, Adversary No. 22-5027, Despins versus Bravo Luck,

4    Limited.

5          THE COURT:  I am having difficulty with -- are we

6    having -- isn't Mr. Despins going to be remote or is he

7    going to be remote?

8          MR. BASSETT:  He's actually not going to be able

9    to participate today.

10         THE COURT:  All right.

11         MR. BASSETT:  I think he's going to be remote on

12   Thursday.

13         THE COURT:  So am I having anyone on camera or are

14   we all set?

15         THE COURTROOM DEPUTY:  (Inaudible)

16         THE COURT:  Say that again?

17         THE COURTROOM DEPUTY:  (Inaudible)

18         THE COURT:  Okay.  All right.  Because I don't

19   have any camera, so I couldn't see anybody anyway so I just

20   wanted to make sure.  All right.

21         Then let's start with appearances with counsel for

22   the Chapter 11 Trustee, please.

23         MR. BASSETT:  Good afternoon, Your Honor.  Nick

24   Bassett, from Paul Hastings, counsel for the Chapter 11

25   Trustee.

1           THE COURT:  Good afternoon.

2           MR. LINSEY:  Good afternoon, Your Honor.  Patrick

3    Linsey, Neubert, Pepe & Monteith, Connecticut counsel for

4    the Trustee.

5           THE COURT:  Good afternoon.

6           MS. CLAIBORN:  Good afternoon.  Holley Claiborn

7    for the U.S. Trustee.

8           THE COURT:  Good afternoon.

9           Counsel?

10          MR. SHAIKEN:  Good afternoon, Your Honor.  David

11   Shaiken from Shipman, Shaiken & Schwefel, representing Bravo

12   Luck, Limited as local counsel.

13          THE COURT:  Good afternoon.

14          MS. CLINE:  Good afternoon, Your Honor.  Joanna

15   Cline, Troutman Pepper, representing Bravo Luck.

16          THE COURT:  Good afternoon.

17          All right.  There are a few matters on the

18   calendar today.  If you just bear with me for a moment, I

19   just need to make sure that my computer is working, which it

20   is, but I still need to get to the right place.  So I'm

21   sorry.  Hold on, please.

22          All right.  So we have the continued pretrial

23   conference in the Despins versus Bravo Luck adversary

24   proceeding, the motion to compel compliance with the Rule

25   2004 subpoena directed to UBS, and an order to show cause

1    why non-responding parties to the subpoenas should not be

2    held in contempt of court.

3              So, Mr. Bassett, how are you intending to proceed

4    this afternoon?

5              MR. BASSETT:  So, Your Honor, I'll let my

6    colleague, Attorney Linsey, address the motion related to

7    UBS, which I think has been consensually adjourned or that

8    would be the ask I believe by the parties.  Again, I'll let

9    him speak to that.

10             As to the -- as far as I am aware, the only two

11   matters that are going forward today are the pretrial

12   conference in the Bravo Luck adversary proceeding and then

13   the order to show cause as to why Golden Spring and Lamp

14   Capital should not be held in contempt of court although

15   surveying the courtroom, I don't believe they have appeared

16   today.

17             THE COURT:  Okay.  With regard to the motion to

18   compel compliance then are you saying that matter's going to

19   be continued?

20             MR. BASSETT:  Well, Your Honor, I mean, I think we

21   had -- we had moved to compel.  Neither Lamp Capital nor

22   Golden Spring responded in accordance with that, with the

23   Court's order, compelling them to produce documents in

24   response to our 2004 subpoenas and otherwise participate in

25   2004 discovery.

1          We then sought an order to show cause as to why

2     they should not be held in contempt.  And then the result of

3     that was an order compelling them to appear here today.  And

4     we did, by the way, file a certificate of service on the

5     docket indicating that we served both Golden Spring and Lamp

6     Capital.

7          So I guess it is a valid question of, you know,

8     where do we go from here?

9          And I think, frankly, we're finding ourselves in

10    an untenable situation, and some of this will dovetail with

11    a matter that the Court is going to hear on Thursday, which

12    is a request by the debtor to stay his compliance with the

13    Court's order on discovery, and I also think it dovetails in

14    part actually with some of the issues related to Bravo Luck.

15         We have a situation here where both Lamp Capital

16    and Golden Spring, the two subjects of the order today, are

17    critically important entities for discovery by the Trustee

18    in his investigation.

19         Both of these entities are entities that are

20    purportedly owned and controlled ultimately by the debtor's

21    son.  Both entities have funded the debtor's expenses by

22    admission of the debtor, including counsel fees in relation

23    to this bankruptcy case, so we need documents and we need

24    evidence from these two entities to complete our

25    investigation and to administer this case.

1          And there's little doubt in our mind that the

2     debtor does, in fact, control these entities.  They are

3     obviously in the family insofar as the son purportedly owns

4     and controls them.

5          The officers and directors of these entities are

6     individuals that are known associates of the debtor.  Yvette

7     Wang, whom the Court knows, is Golden Springs' president.

8     The Court already found in connection with Ace Decade that

9     the debtor controls Ms. Wang.  And Golden Spring also has

10    shared the same business address that the debtor and many of

11    his entities have shared.

12         And it's our view that because the debtor controls

13    these entities, he should be the one to produce their

14    documents.

15         What is now happening, of course, as the Court

16    knows from the motions that have been filed and what's going

17    to be heard on Thursday, is that the debtor is asserting the

18    Fifth Amendment and saying he can't produce this

19    information.  He can't go out and get documents that are in

20    their control.  So that leaves us with one option which, of

21    course, is to pursue the documents from these entities

22    themselves.

23         But of course these entities are nowhere to be

24    found.  They're not appearing before this court.  They're

25    not responding to anything we serve.  They're not

1    participating at all.  And I think that's what leads also

2    into the situation with Bravo Luck.

3            As the Court knows, Bravo Luck is another entity

4    that is purportedly owned and controlled by the debtor's

5    son.

6            And what the debtor's son is doing in connection

7    with the Bravo Luck litigation, in connection with the claim

8    he filed in this court, in connection with other things

9    Bravo Luck is doing in this case, including filing an

10   objection to the motion to limit notice that the Trustee

11   filed over the last few days, is he's basically litigating

12   in this court and availing himself of this court's resources

13   and jurisdiction, when it's convenient for him to do so,

14   through counsel from apparently the United Kingdom, without

15   ever actually coming over and participating himself.

16           But he's doing that selectively.  Because when it

17   comes to the other entities that he owns and controls, or

18   that he says he owns and controls, Lamp Capital, which is

19   one of the debtor's cases, Golden Spring, which has done the

20   same, he's not doing that.  We have no ability to find them.

21           In fact, the debtor's son most recently has been

22   evading service of documents we've tried to serve on him.

23   We originally had a location of his apartment in the United

24   Kingdom.  We served him documents there.

25           When we went back to serve more documents after

1   the debtor's indictment, all of a sudden the person at the

2   desk said he no longer lived there and they'd never heard of

3   him.  So we're in a situation where, you know, we're kind of

4   at a loss.

5          And obviously I don't have a proposal for the

6   Court, and I'm not prepared to tell the Court today exactly

7   what relief we might be seeking to deal with this situation,

8   but in the Trustee's view something needs to happen to

9   prevent the situation where we have people, including the

10  debtor, his relatives, and those who control these entities,

11  who are orchestrating a scenario in which the debtor is --

12  in which the Trustee rather is simply unable to get the

13  information that he needs to conduct his investigation.

14         The debtor's taking the Fifth.  The daughter is

15  now taking the Fifth.  The entities that would not have any

16  ability to take the Fifth are not responding.  But the

17  person who controls those entities, the son, is

18  participating when he wants to through counsel, through

19  other entities.

20         So something needs to happen to level the playing

21  field to make sure that there's fair participation by the

22  people who are ultimately making the decisions here to allow

23  the Trustee to get the discovery that he needs.  Again, some

24  of this will come up again on Thursday.

25         Like I said, I wish I had a creative proposal as

1    to what exactly to do, but we are considering our options.

2            On the order before the Court, obviously, the

3    Court could impose costs on -- and we think it's -- I think

4    there's a clear basis for a finding of contempt now as

5    against Golden Spring and Lamp Capital.

6            I think the Court could impose costs and do other

7    things that the Court has at its disposal to address

8    contempt of court and to try to force compliance with the

9    Court's orders, but obviously from our perspective that type

10   of relief is going to be of little value for entities that

11   we cannot contact and have no means of enforcing any order

12   against.

13           So that's the update and the Trustee's view on

14   where we stand as it relates to discovery from those two

15   entities, Your Honor.

16           THE COURT:  All right.  Let's just step back a

17   moment.  Other than the pretrial conference, what is on the

18   calendar today is the order to appear and show cause why the

19   non-responding parties, Lamp Capital and Golden Spring,

20   should not be held in contempt of court.  That's today.

21           Then also the motion to compel compliance with the

22   Rule 2004 subpoena served on UBS.  And I think I heard you

23   say that that's going to be continued, that UBS --

24           MR. BASSETT:  That's correct.

25           MR. LINSEY:  And I can speak to that at the

1    appropriate time, Your Honor.

2              THE COURT:  I think right now is the appropriate

3    time.

4              MR. LINSEY:  Okay.

5              THE COURT:  I'd like to understand.  If we're

6    continuing it, that's fine.  I just want to know that so

7    then we can focus on what we need to focus on this

8    afternoon.

9              MR. LINSEY:  That's fine.  And counsel from UBS is

10   here in the courtroom --

11             THE COURT:  Yes.

12             MR. LINSEY:  -- who may wish to appear.

13             THE COURT:  I see counsel has stood up.

14             MS. FRIED:  Good afternoon, Your Honor.

15             THE COURT:  Would you just come up so we can hear

16   your name for the record, please.

17             MS. FRIED:  Certainly.

18             THE COURT:  If you could speak into a microphone.

19             MS. FRIED:  Thank you.

20             THE COURT:  Sorry.  Everything is audio so if we

21   can't pick you up on the microphone, we won't be able to

22   hear you.

23             MS. FRIED:  Of course.  Your Honor, I'm Lisa

24   Fried, from Herbert Smith Freehills, for UBS.

25             THE COURT:  Thank you.  Good afternoon.

1          MR. LINSEY:  Thank you, Your Honor.  Again,

2    Patrick Linsey for the Trustee.  My office has been handling

3    UBS matters as conflicts counsel.

4          Since the prior adjournment of the motion to

5    compel, counsel for UBS and my office have had numerous

6    email correspondence and also telephone conferences about

7    compliance.  There have been batches of document production.

8          Based on what we've received and based on the

9    Trustee's investigation, there are subjects and areas that

10   the Trustee wants to drill down into.  And I have been in

11   touch with Mr. Fried, in fact, last week about that.

12         And we are seeking to work together

13   collaboratively to agree on discovery procedures that would

14   include things like ESI searches, but it's involved and

15   complicated given that we're talking about discovery in

16   different jurisdictions, we're talking about obviously

17   different technological platforms, and also different

18   languages.

19         So all of that poses challenges that are not

20   insurmountable, but that require some effort and cooperation

21   between counsel.  And right now, it seems like that's

22   coming.

23         So what I would like to propose and the Trustee

24   would like to propose, subject to the Court's consideration,

25   is adjourning the motion to compel out something roughly two

1      weeks.

2              I saw that there was a court date where matters

3      related to this Chapter 11 case or related adversary

4      proceedings are scheduled on May 2nd.  That would work for

5      counsel or something following that.

6              And hopefully by that point, I don't know that

7      we'll have production completed given sort of the nature of

8      what everybody is talking about right now, but I do think

9      it's reasonable to think that we could have agreement on the

10     four corners of a discovery and ESI plan that hopefully will

11     allow for production to happen in an orderly way.  And the

12     Trustee has been pleased with the cooperation that we've

13     seen in the last couple of months in that regard.

14             THE COURT:  Counsel?

15             MS. FRIED:   Thank you, Your Honor.

16             I agree with everything Mr. Linsey said.  I would

17     just note that as Mr. Linsey suggested with a global

18     financial institution of the size of UBS sometimes it takes

19     us a little time to connect and liaise with various

20     representatives from our client around the world.

21             We have been working diligently to do that and

22     have been updating Mr. Linsey regularly and are committed to

23     working collaboratively to search for what the Trustee has

24     asked us to search for following our initial productions and

25     we'll continue to do so.

1          THE COURT:  Okay.  Thank you.

2          Do you have any objection to continuing this

3    hearing to May 2nd?

4          MS. FRIED:  Not at all, Your Honor.  With the

5    understanding that I think Mr. Linsey previewed, which is

6    that we may not have completed production by then, but we

7    certainly expect to have made progress agreeing on a

8    protocol going forward by then.

9          THE COURT:  I think that's fair.  And then I'll

10   know where things stand.  If there's additional time needed,

11   additional issues that need to be addressed or resolved, I

12   think that's fair.

13         And as far as May 2nd is concerned, we have time

14   at -- we have time -- we have something scheduled in this

15   case at 1 p.m. and something scheduled at 2 p.m.  I would

16   schedule -- I would continue this to 1 p.m. because I think

17   you'll -- whatever it is you have to tell the Court I

18   believe won't be controversial.  Although, who knows, it

19   could be.  But I'm going to continue it to 1 p.m. then.

20   Okay.  And then we'll see where things stand.

21         And as you both have acknowledged, you know, you

22   both have continuing duties to cooperate and comply with the

23   Federal Rules of Civil Procedure and the Federal Rules of

24   Bankruptcy Procedure, so I think it makes sense then to

25   continue this matter, given what you've both stated as far

1    as the cooperative nature that you've been proceeding under,

2    and that there is some additional time necessary for both

3    parties to take certain actions.  I think it's fair and have

4    no issue with continuing this hearing to May 2nd at 1 p.m.

5    Okay?

6              MS. FRIED:  Thank you, Your Honor.

7              MR. LINSEY:  Thank you, Your Honor.

8              THE COURT:  All right.  Thank you both.

9              MS. FRIED:  Your Honor, may I be excused?

10             THE COURT:  Yes, you may.  Thank you.

11             MS. FRIED:  Thank you very much.

12             All right.  Now, Mr. Bassett, I understand what

13   you've said about the order to show cause with regard to

14   Lamp Capital and Golden Spring.

15             Is there anybody in the courtroom representing

16   Lamp Capital or Golden Spring in connection with the Chapter

17   11 jointly administered cases of Ho Wan Kwok's 22-50073?

18       (No response)

19             THE COURT:  All right.  I'm hearing nothing and

20   I'm not seeing any individuals in the courtroom that are not

21   here on other matters or that I am aware of the parties that

22   they represent.

23             So, Mr. Bassett, you're asking the Court to enter

24   an order finding these two parties in contempt, is that

25   correct?

1          MR. BASSETT:  That's correct, Your Honor.

2          And, you know, one other -- one other thought that

3     I had is the debtor's son has filed a proof of claim in this

4     case so I think there's no question that the Court has

5     jurisdiction over him.

6          To the extent that he claims to own and control

7     both of these entities, I think the Court could order that

8     he be required to accept service of the Rule 2004 subpoenas

9     on behalf of those entities and be required to facilitate

10    the responsive documents, the provision of documents in

11    response to those subpoenas.

12         Short of that, the question also becomes, or in

13    addition to that the question becomes, you know, what else,

14    what would be the consequences of finding both Lamp Capital

15    and Golden Spring in contempt of court?

16         Like I said, I certainly think costs and expenses

17    that have been incurred in pursuing discovery from them

18    would be appropriate, as well as any other sanctions that

19    the Court thinks would be appropriate to try to force them

20    to comply.

21         But, again, when you're dealing with parties who

22    have not shown up and we're not able to, you know, readily

23    contact, it's not clear how effective those types of

24    sanctions would be, but I guess on balance it would be

25    better to have them than not have them.

1          THE COURT:  Well, Golden Spring had an appearance

2     in this case for a while, didn't it?

3          MR. BASSETT:  They did, Your Honor.  And I believe

4     that that appearance was subsequently withdrawn.

5          THE COURT:  I agree.  Did Lamp Capital ever have

6     an appearance in this case?

7          MR. BASSETT:  I don't -- I don't believe so, Your

8     Honor.

9          THE COURT:  But they were the -- were they the

10    source of the $8.8 million loan that was supposed to be made

11    to the debtor or was that Golden Spring?

12         MR. BASSETT:  Lamp Capital -- off the top of my

13    head, I don't recall the $8.8 million, the source, but Lamp

14    Capital was an entity that had provided a retainer

15    originally to Brown Rudnick as part of its representation of

16    the debtor in the case.  And then Golden Spring has also

17    funded the debtor's expenses.

18         THE COURT:  And you've obtained discovery from

19    Brown Rudnick?

20         MR. BASSETT:  We have obtained Rule 2004 discovery

21    from Brown Rudnick, correct.  But we have obviously not

22    obtained that discovery from Lamp or from Golden Spring

23    themselves.

24         THE COURT:  All right.  Give me just a moment,

25    please.  I just want to look back at --

1          MR. BASSETT:  Sure.

2          THE COURT:  -- early filings in the case.

3      (Pause)

4          THE COURT:  Okay.  There's a document filed on

5  March 22nd, 2022, so more than a year ago, in which the

6  debtor sought approval of an $8 million post-petition

7  financing transaction in which Golden Spring, LTD, the DIP

8  lender, is an entity controlled and owned by the debtor's

9  son according to documents filed by the debtor in this case.

10     (Pause)

11         THE COURT:  And you're saying, Attorney Bassett,

12 that the million dollar retainer paid to Brown Rudnick at or

13 about the time of the commencement of the case was funded by

14 Lamp Capital?

15         MR. BASSETT:  Yeah.  That's correct, Your Honor.

16         And I don't know, maybe the U.S. Trustee has an

17 actual reference to something on the docket, but I --

18         THE COURT:  I'm sure there is somewhere.

19         MS. CLAIBORN:  Your Honor, my recollection is that

20 it's in the application to employ Brown Rudnick, but it's

21 also in the 2060(b) disclosure filed by Brown Rudnick.

22         THE COURT:  Okay.  With regard to -- I'm going to

23 take a look at that in a second.

24         With regard to the DIP financing motion that was

25 filed by the debtor seeking a loan of $8 million for the

1    estate from Golden Spring, an entity that the debtor asserts

2    in its pleadings was controlled by the debtor's son --

3         (Pause)

4         MS. CLAIBORN:  Your Honor, we also had a hearing

5    at which the debtor testified in connection with that loan

6    and my recollection is he gave testimony as to how he went

7    about arranging the loan with Golden Spring.

8         THE COURT:  I agree.  I'm looking -- I was just

9    looking for that hearing, which was I think in April, late

10   March or April.

11        MS. CLAIBORN:  I will take a look at the docket as

12   well.  I don't remember the date off the top of my head.

13        THE COURT:  Well, there's 1,700 docket entries, so

14   I wouldn't expect that you would remember the date of the

15   hearing off the top of your head.  But I think we can find

16   it pretty easily if we just take a moment.

17        (Pause)

18        THE COURT:  There was a hearing on April 28th,

19   2022, but I believe there was a hearing in March too.  April

20   27, excuse me, 2022, that was continued to May 4th, 2022.

21   There was also a hearing on April 13th, 2022 on the DIP

22   motion.

23        So the first hearing was April 13.  Then it was

24   continued to April 27.  And then again to May 4th, 2022.

25   And then on May, I think, 11th, but I'll triple check that

1    before -- the motion for DIP financing was withdrawn by the

2    debtor.

3            May 11th, ECF No. 345, the debtor filed a notice

4    of withdrawal of motion for entry of interim and DIP final

5    orders without indicating in the document why the motion was

6    being withdrawn and while the Court had that motion under

7    advisement, after an evidentiary hearing, to rule on what

8    relief would be granted, if any, on that motion.

9            With regard to Lamp Capital, on March 16th an

10   application was filed by the debtor for an entry of an order

11   authorizing the employment and retention of Brown Rudnick as

12   counsel for the debtor.

13           In that document, ECF 86, Brown Rudnick indicates

14   that immediately preceding the commencement of this Chapter

15   11 case Brown Rudnick received payments in the amount of

16   $500,000 U.S. on February 14, 2022, and an additional

17   deposit of $500,000 U.S. on the morning of February 15,

18   2022.

19           To fund the retainer, this is in paragraph 17,

20   Lamp Capital, LLC made a $1 million loan to Mr. Kwok and Mr.

21   Kwok directed Lamp Capital, LLC to remit the proceeds

22   directly to Brown Rudnick.

23           Lamp Capital is an entity owned by Mr. Kwok's son.

24   That is in a document, as I said, dated March 16, 2022, ECF

25   No. 86, filed by Mr. Kwok -- signed by Mr. Kwok.

1          And in the affidavit of Attorney Baldiga attached

2     to the application, he recites in paragraph 7 that Brown

3     Rudnick received payments totaling $1,000,000 U.S. on

4     account of services to be performed, and expenses incurred

5     in connection with its advice to Mr. Kwok as follows.

6     $500,000 U.S. on February 14 and $500,000 U.S. on February

7     15, each by wire from Lamp Capital, LLC as a retainer for

8     services to be performed in preparation of this Chapter 11

9     case.

10          To fund the retainer, Lamp Capital made a

11    $1,000,000 U.S. loan to Mr. Kwok and Mr. Kwok directed Lamp

12    Capital, LLC to remit the proceeds directly to Brown

13    Rudnick.  That's also in Mr. Baldiga's affidavit, which

14    appears at page 14 of 30 on ECF 36, I'm sorry, 86, 86.

15          So, Mr. Bassett, let's go through how you served

16    Golden Spring and Lamp Capital with regard to the original

17    discovery requests.  And then the order to appear and show

18    cause, why they should not be held in contempt of court?

19          MR. BASSETT:  So, Your Honor, I don't -- I don't

20    have it at my immediate fingertips.  I'm sure I could find

21    it, if I was given a short break, as to how we served them

22    with the original discovery requests.

23          THE COURT:  We could probably pull it up, I mean.

24          MR. BASSETT:  Yeah.  I'm sure.  I'm sure we could

25    pull it up, Your Honor.

1          MR. LINSEY:  Your Honor, I'll look for it while

2    Mr. Bassett's speaking.

3          MR. BASSETT:  Okay.

4          THE COURT:  Okay.

5          MR. BASSETT:  But as to the most recent order to

6    show cause, the Court -- I think this was ECF 1546 -- was

7    the order to show cause which required the Trustee to serve

8    the document on Golden Spring and Lamp Capital. That was

9    served on March 20th.  And I'm looking at our certificate of

10   service is at ECF 1593.

11         THE COURT:  Okay.  Hold on.  Let me --

12         MR. BASSETT:  Sure.

13         THE COURT:  I just want to make sure I'm looking

14   at everything.  Okay?

15         MR. BASSETT:  Sure.

16      (Pause)

17         THE COURT:  So what was the original order to

18   appear and show cause, 14 what?

19         MR. BASSETT:  Well, the operative order for

20   today's hearing I believe is 1546.  Because I believe what

21   happened, Your Honor, is there was an initial order --

22         THE COURT:  That wasn't served?

23         MR. BASSETT:  Exactly.  And then we adjourned to

24   today.  And that order I believe is 1546.

25         THE COURT:  Okay.  All right.  Then ECF 1546 is an

1      order to appear at continued hearing and show cause why the

2      Court should not hold the non-responding parties in contempt

3      of court.

4              And it says in the order the Court has found that

5      Golden Spring New York, Limited and Lamp Capital, LLC,

6      together with Golden Spring, the non-responding parties,

7      neither responded to nor complied with Rule 2004 subpoenas

8      authorized by the Court.  And there's a reference to ECF

9      Nos. 1353 and 758.

10             The Court issued a first order to show cause on

11     January 27, 2023, set a hearing for March 7, 2023, at which

12     the non-responding parties were to show cause why this court

13     should not hold them in civil contempt of court for failing

14     to respond or comply with subpoenas.

15             During the show cause hearing, the Chapter 11

16     Trustee informed the Court he had been unable to serve Lamp

17     Capital with the first show cause order and had not served

18     Golden Spring because the Trustee wished to serve both of

19     the non-responding parties simultaneously.

20             So on the record, the Court continued the show

21     cause hearing to April 18 and set a new service deadline of

22     March 24th.  Service was to be made on or before March 24th

23     with a certificate of service filed on or before March 27.

24             And you're saying the certificate of service is

25     1593?

1          MR. BASSETT:  That's correct, Your Honor.

2          And I was also able to find the information about

3     how we served them with the original subpoenas if we want to

4     go back to that later.

5          THE COURT:  Okay.  So the certificate of service

6     filed on March 24th, 2023, ECF No. 1593, certifies that on

7     March 16, 2023, the Court's order to appear at continued

8     hearing and show cause why the Court should not hold the

9     non-responding parties in contempt of court was filed

10    electronically.

11         And on and May [sic] 20, 2023, the undersigned

12    caused copies of the order to show cause to be served on

13    Golden Spring New York, Limited and Lamp Capital by FedEx

14    overnight delivery and by first class mail at the following

15    addresses:, Golden Spring New York, Limited, care of the

16    Corporation Trust Company, Corporation Trust Center, 1209

17    Orange Street, Wilmington, Delaware, and Lamp Capital, LLC,

18    Attention Bernardo Enriquez, 667 Madison Avenue, New York,

19    New York  10065.

20         On March 21st, the undersigned caused a copy of

21    the order to show cause to be served on Lamp Capital, LLC by

22    UPS overnight delivery and First Class mail at the following

23    address,  Lamp Capital, LLC, care of CT Corporation System,

24    820 Bear Tavern Road, West Trenton, New Jersey 068 -- 08628,

25    excuse me.

1          And what else did you want to note for the record,

2     Attorney Bassett, with regard to service of the subpoenas?

3          MR. BASSETT:  Yes.  So to the extent the Court was

4     interested in having that information as well, I was able to

5     pull up original motion to compel, which is at ECF 1046.

6     And if you were to scroll to page 16, or paragraph 30 of

7     that document, there's a detailed discussion of the

8     Trustee's efforts to serve and contact both Lamp Capital and

9     Golden Spring.

10         THE COURT:  I'm looking at paragraph 30 on page 16

11    of ECF No. 1046 filed on October 28th, 2022, and it says the

12    defaulting respondents are Lamp Capital and Golden Spring.

13    The Trustee has served each with a subpoena but none has

14    responded.

15         Specifically the Trustee served Lamp Capital via

16    process server on August 23rd, 2022, at a Delaware address

17    for its registered agent.  Trustee sent two letters to the

18    registered agent of Lamp Capital to follow up on the

19    subpoena.  The first on September 13 and the second on

20    October 19.  Counsel for the Trustee has received no

21    response to either correspondence.

22         Trustee served Golden Spring via process server on

23    August 22nd, 2022, at a Delaware address for its registered

24    agent.  Golden Spring's deadline to serve objections was

25    September 6th and its deadline for production of documents

1    was September 21st, 2022.  Trustee has not received any

2    objections or document productions from Golden Spring.

3           Trustee sent two letters to the registered agent

4    of Golden Spring to follow up on the subpoena, the first on

5    September 13, 2022, and the second on September 30, 2022.

6    Counsel for the Trustee received no response to either

7    correspondence.

8           Okay.  So then when we look at 1593, which is your

9    certificate of service on the continued hearing on the order

10   to show cause, Golden Spring was served at care of the

11   Corporation Trust Company, Corporation Trust Center, 1209

12   Orange Street, Wilmington, Delaware, and Lamp Capital was

13   served at an address on Madison Avenue, as I've already

14   recited, and then again at a -- what appears to be a

15   registered agent address care of CT Corporation, 829 Bear

16   Tavern Road, West Trenton, New Jersey.  Okay.

17          The non-responding parties, Lamp Capital and

18   Golden Spring were to personally appear through an officer,

19   director, manager, or member, at 2 p.m. on April 18, 2023.

20   There's no one in the court that's responding to the inquiry

21   of whether Lamp Capital and/or Golden Spring are in the

22   courtroom.

23          Those registered agent addresses, Attorney

24   Bassett, are what anyone could find if they were looking for

25   a registered agent address to serve these two entities, is

1    that accurate?

2            MR. BASSETT:  That's correct, Your Honor.  Those

3    registered agent addresses are the ones that we found on the

4    relevant Secretary of State websites I believe for purposes

5    of serving these entities.

6            THE COURT:  And you've had no further discussions

7    with -- I mean, you haven't had any discussions with anyone,

8    is that correct?

9            MR. BASSETT:  We've never had any discussions with

10   any representatives of either entity, that's correct.

11        (Pause)

12           THE COURT:  I'm just looking at one other thing

13   here.  So I'm just trying to -- there isn't anything I can

14   see in the record other than what you've put in your

15   certificate of service that indicates who the registered

16   agent is, which I'm not saying there should be. I'm just

17   looking to see whether I see anything.

18           MR. BASSETT:  I'm not aware of anything either,

19   Your Honor.  I suspect that if we had submitted that

20   documentation, that would have been part of the original

21   motion to compel.  And I'm not seeing in that motion any

22   attached documentation containing documents from the

23   Secretary of State websites or otherwise.

24           Obviously, I can go back and take another look to

25   see if there is something, and/or we're happy to find

1    something that we could submit to the Court if you would

2    like.

3                 THE COURT:  I'm just trying to, you know, just --

4    because there's nothing in this record yet other than -- I'm

5    not saying what you said is incorrect, I just -- for me to

6    determine that those are the registered agents, right, there

7    is -- I don't think there's -- I'm just -- I just -- I think

8    I need to see that.

9                 MR. BASSETT:  Sure.

10                THE COURT:  Because if I'm going to say that they

11   should be held in contempt of court, I have to -- it has to

12   -- I have to establish that, or it has to be established

13   that they were served at those -- and those have to be the

14   addresses.

15                MR. BASSETT:  And we can -- and, Your Honor, we

16   can either -- I think we'll do two things.

17                Obviously, we'll look back and check to see if it

18   is somewhere in what we've already submitted.  If not, we

19   can certainly submit by declaration or otherwise copies of

20   the documents we relied upon in serving at these addresses.

21                THE COURT:  I think you can do it by declaration

22   after today.

23                I just -- because there is nothing in the record

24   that establishes that those are the proper addresses, other

25   than your certificate of service, I think I need to -- if

1  I'm going to hold them in contempt, I need to be able to say

2  that you served them at their proper, registered agent

3  addresses.  And, you know, I'm not saying you didn't.  I'm

4  just saying it's not in the record.  Right?

5          MR. BASSETT:  Understood.  Understood, Your Honor.

6          THE COURT:  It's just not in the record.

7          And, you know, there's no -- obviously, as you

8  know, in order for contempt to be found, you have to also

9  find that the parties' due process rights were met, so I

10  need to be able to do that.

11          So I think, you know, you can do that.  How much

12  time would you like to do that?

13          MR. BASSETT:  A day or two tops, I'm sure we can

14  do that.

15          THE COURT:  Okay.  I do find though that the

16  record does establish that the debtor's son, according to

17  the debtor in documents filed by the debtor and the debtor's

18  counsel, controls the two entities -- because it's an

19  admission of a party.

20          It's an admission of the debtor and his counsel

21  that Lamp Capital, LLC and Golden Spring New York, Limited

22  are controlled by the debtor's son.  And as I've already

23  stated before --

24          MR. BASSETT:  And just to make perfectly clear,

25  just so the record is clear, I think the Trustee's position

1    is that that's what the debtor has said.  I think our

2    objective and our intent in this case would be to prove that

3    is, in fact, the debtor who controls these entities.

4              THE COURT:  I understand.  But there's no question

5    that the debtor has already admitted on the docket of this

6    case in pleadings filed by -- that he signed and his counsel

7    signed while he was a debtor in possession that he was

8    asserting that Golden Spring New York, Limited and Lamp

9    Capital, LLC were controlled by his son, and he directed his

10   son to have Golden Spring make a loan to the estate of $8

11   million, which was later withdrawn, and that he directed

12   Lamp Capital to pay the million dollar retainer to Brown

13   Rudnick.  When I say he, I'm talking about Mr. Kwok.  That's

14   what these documents say.  So I just want to make that clear

15   for the record.

16             So I need you to submit a further declaration, or

17   maybe just submit a declaration in further support of the

18   order to appear and show cause demonstrating -- giving me

19   the information from the respective or relevant Secretary of

20   States Office to establish that the addresses that you used

21   in service -- in serving the order to appear and show cause

22   are the registered agents for service of these two entities.

23             And you can do that by this Friday, which is I

24   think the 21st.  Okay?

25             MR. BASSETT:  And the last -- we will do that,

1   Your Honor.

2           The last thing I would note is that if the Court

3   were inclined to enter an order in light of the admissions

4   that we just discussed that the debtor's son purportedly

5   owns and controls these entities, if the Court were to order

6   that, something to the effect of that these two subpoenas on

7   these entities could be served on the son, I'm just looking

8   forward to the next issue which of course then we'll still

9   have a problem with serving the son.

10          And I think a potential solution to that would be

11  if the son is going to continue to prosecute through Bravo

12  Luck this adversary proceeding, including obviously

13  appearing for and attending a deposition by the Trustee,

14  that he could be served through Bravo Luck's counsel in

15  connection with any such litigation in a Bravo Luck

16  adversary proceeding, which obviously is before this court,

17  that would be a submission by the son to the jurisdiction of

18  this court, because obviously if we just have an order

19  saying we can serve the son as I said before, unfortunately,

20  he's hard to find I think on purpose based on our recent

21  efforts to contact him and serve him with documents.

22          MS. CLINE:  May I be heard on that, Your Honor.

23          THE COURT:  Sure.

24          MS. CLINE:  Yeah.  So Joanna Cline on behalf of

25  Bravo Luck.

1          I mean, we understand that the Trustee's position

2      is that all of these entities can be disregarded and that

3      the distinct members of the debtor's family can be

4      disregarded and that they're all the same, one in the same,

5      but we're here to represent Bravo Luck.

6          And sort of the logical leap that these two

7      entities, Golden Spring and Lamp Capital, can somehow be

8      served by -- by service upon counsel for Bravo Luck has no

9      basis in the law.  There's no veil that's been pierced and

10     we just think it's improper.

11         So it may be putting the cart before the horse,

12     because I don't know that Your Honor is addressing that

13     issue today, but since counsel for the Trustee put it out

14     there, we just wanted to record our objection.

15         THE COURT:  Understood.  Thank you.

16         All right, Attorney Bassett.  I understand your

17     position.  And I will look at a declaration with regard to

18     the registered agents of Lamp Capital and Golden Spring and

19     I will act accordingly.  Okay?

20         MR. BASSETT:  Thank you, Your Honor.

21         THE COURT:  Thank you.

22         Now, the final matter on the calendar is the

23     continued pretrial conference in Despins versus Bravo Luck,

24     Limited, et al.

25         And I did see, although I didn't study, that there

1    was a request for entry of a pretrial order, but it appeared

2    to me there was a lot of -- there weren't really a lot of

3    agreements on any dates in that pretrial order.  So I'm

4    going to have to just pick those dates then if there isn't

5    an agreement.

6              So do the parties want to be heard on that or do

7    you want me to just -- I will just enter whatever dates I

8    think are appropriate?

9              MR. BASSETT:  Your Honor, I think it may be

10   helpful for us to be heard briefly.

11             THE COURT:  Sure.  Go right ahead.

12             MR. BASSETT:  Thank you.

13             So we did submit the proposed pretrial order

14   that's at ECF 73 in the adversary proceeding.  As the Court

15   correctly noted, there is really not agreement at all.

16   Actually with one exception.  I think we've agreed on a

17   deadline for initial disclosures.

18             Outside of that, there is agreement on a form

19   generally of an order that sets forth a schedule in this

20   case.

21             I don't think there are any major disagreements

22   about kind of what an orderly sequence of events would look

23   like and what types of disclosures and discovery deadlines

24   are necessary.

25             But within that generally agreed upon framework,

1    there's a lot of disagreement about how long this case

2    should take.

3            Our schedule, and I won't belabor all the interim

4    deadlines in going over that, but the bottom line is that we

5    think it is imminently reasonable to have a trial in this

6    case, if necessary, if the course of litigation is not

7    resolved by other means prior to that time, by approximately

8    the end of July.

9            The position of Bravo Luck is that this litigation

10   should take six months longer than that and we should have a

11   trial in December.

12           The position that we've heard from Bravo Luck is

13   that the time table that we've proposed is just way too

14   fast, it's not workable.  They may need a bunch of

15   discovery.  And I think I would respond to that in a few

16   ways.

17           First of all, we've all been at this case for, at

18   least as the Trustee is concerned, you know, coming up on

19   the one-year anniversary here before we know it.  And Bravo

20   Luck is not new to it either.

21           So the events and the circumstances underlying the

22   allegations in the adversary proceeding with the Sherry-

23   Netherland, all of that, has been out there for a very long

24   time with the parties to think about the positions and

25   arguments for a very long time.  That's point number one.

1     Point number two is that obviously the

2   reasonableness of any schedule depends upon the complexity

3   of a particular litigation, the amount of discovery that it

4   requires, and other related issues.

5     From my experience, while a federal district court

6   civil litigation may typically take longer than what we

7   proposed, the time table that we proposed here is not at all

8   uncommon.

9     As the Court well knows, in bankruptcy, you know,

10   there are many contested matters that are far more complex

11   than adversary proceedings and often those are heard in a

12   matter of weeks.  So I think this schedule is imminently

13   doable.

14     The last point I would make is that there's really

15   no reason why the type of complicated and drawn-out

16   discovery proposed by Bravo Luck would even conceivably be

17   necessary here.

18     And this is an adversary proceeding about Bravo

19   Luck's alleged ownership of the Sherry-Netherland apartment

20   through a trust agreement.

21     And if it doesn't own the Sherry-Netherland

22   apartment through a trust agreement, we have alternative

23   fraudulent transfer claims where the debtor fraudulently

24   transferred beneficial ownership of the Sherry-Netherland to

25   his son through Genever without consideration and for the

1    purpose of hindering or delaying his creditors.

2          All the facts that Bravo Luck would need to

3    respond, to make its case in response to that complaint, are

4    necessarily entirely, or at a minimum almost entirely,

5    within its control and those of its purported owner and

6    controller, the debtor's son, or possibly the debtor.

7          Bravo Luck is going to have to show to defeat the

8    Trustee's claims that it owns and controls the Sherry-

9    Netherland.  Those facts, whether that's true, they're

10   necessarily within its control.  It wouldn't need discovery

11   from third parties to demonstrate that it owns an asset.

12         To the extent anybody would have information, it

13   may be the debtor.  Obviously, I don't think -- I could be

14   wrong, but I would imagine that the debtor's son is not

15   going to seek formal discovery from his father, so that

16   should not elongate the schedule.

17         And then, you know, there may be some discovery

18   needed from parties like the Sherry-Netherland, et cetera,

19   but that's not -- this is not the type of case where we need

20   several months for fact discovery.

21         Bravo Luck has indicated that it may have an

22   expert.  They haven't told us what expert that would be.  We

23   expanded the original schedule we sent them by a few weeks

24   to accommodate expert discovery.  We do not at this time

25   intend to have an expert, although we reserve the right to

1      have an rebuttal expert.

2             So, Your Honor, we just don't think this is a case

3      that needs to take that long, particularly where the Trustee

4      has a real need to move, not just this adversary proceeding

5      forward, but this case forward, and this adversary

6      proceeding is a critical component of this overall case.

7             So I think it would be unfair to everybody

8      involved, most notably the debtor's creditors, to let this

9      drag out until December.

10            So, Your Honor, subject to any response to what

11     counsel may raise, you know, for those reasons, we think the

12     schedule that we've submitted is a reasonable one.  Thank

13     you.

14            THE COURT:  Thank you.

15            MS. CLINE:  So, Your Honor, the Trustee says

16     there's no reason that we need to go through a discovery

17     process in this case.  And from Bravo's perspective, there

18     is a reason that it's called due process.

19            By contrast, we've not heard articulated a reason

20     for any urgency to attend to the schedule set forth by the

21     Trustee in this case.

22            We heard Your Honor loud and clear that you wanted

23     this case tried by December, you wanted it tried in this

24     year, and we put forth a schedule that does that.

25            This is a dispute over a $70 million apartment.

1    The parties are still amid briefing as the Court knows on a

2    motion to dismiss that finishes up I guess in a week or so.

3    And due process requires that we get a fair shot, assuming

4    our motions to dismiss are not granted, to defend the case

5    that the Trustee has the burden to put on.

6          Yes, counsel is right that there is some evidence

7    in our control, but not all of it, and we're talking about a

8    transaction that happened eight years ago.

9          In terms of, you know, we've all been going at

10   this a long time, I mean, yes, we've been involved for a

11   bit, but we've not been taking the 2000 and -- we don't have

12   the advantage of being the ones driving the aggressive 2004

13   campaign that the Trustee's been involved in.

14         We don't know the extent of the documents they've

15   collected.  We don't know what they have.  We're going to

16   ask for it.  Presumably then we'll need some time to review

17   it, decide upon whether we need to follow up with our own

18   supplemental subpoenas or anything like that, and it's

19   simply infeasible to assume that this is all going to take

20   place within the next 45 days.

21         Just by way of specific example, there are

22   subpoenas that presumably have resulted in relevant

23   information with respect to the following custodians, UBS,

24   Paul Weiss, Williams & Connolly, Brown Harris Stevens, the

25   Sherry, maybe Stevenson, Wong.

1          It's Bravo Luck's right to get this information

2     that presumably is already in the Trustee's possession,

3     examine it, and see whether we need it to defend Bravo's

4     rights.  So if that's not the case and we're not able to

5     take our discovery, our rights will be severely prejudiced.

6          By contrast, as I said, we haven't heard the

7     Trustee articulate what's going to happen to it.  What is

8     the harm that the Trustee faces if our -- if the Court were

9     to go with our schedule rather than the Trustee's schedule?

10         The only thing we heard in the course of meet and

11    confer, and, Your Honor, I can submit that the parties

12    engaged in a few meet and confer calls on this to try to get

13    some agreement here, the only thing that we heard was that

14    the Trustee was anxious to sell the property.

15         But there's already an agreement, a settlement

16    agreement, on a sales process and a sales agent.  And we

17    think if that's what the Trustee wants, it can go ahead and

18    do that and any money can be put in escrow until this is all

19    taken care of.

20         But bottom line, there's no reason for any

21    urgency.  There's every reason to give Bravo Luck some due

22    process and at least an abbreviated schedule as we've set

23    forth to complete discovery here so we can get this to trial

24    and can get it taken care of.

25         THE COURT:  Okay.  I just have a question or two.

1          I noticed that you filed your appearance the other

2     day.  I think you still need to file a corporate ownership

3     statement under Rule 7007.1  Okay?

4          MS. CLINE:  Understood.

5          THE COURT:  And that needs to happen.

6          With regard to the initial disclosures, it does

7     appear that you have an agreed-upon date for the initial

8     disclosures.  I don't want to see that date change without

9     good cause being shown.  And so if either party changes that

10    date, someone's going to have to come in and explain to me

11    why, because you could make an argument that the initial

12    disclosures should have already happened under the Federal

13    Rules of Civil Procedure.

14         But if you have it, you do agree on that date, I

15    did see that, whatever, I'm ordering that date on the record

16    right now regardless of what I do with the rest of the

17    dates.  Okay?  Because I think that that -- as I said,

18    someone could come in and argue that the initial disclosures

19    should have already occurred.

20         With regard to the other issues that you raise,

21    I'm going to take it all under consideration.  I'm not going

22    to determine dates right now as we sit here.  Will I

23    determine dates by -- we have other hearings on Thursday.  I

24    don't recall whether you will be here on Thursday.  I have

25    to always look because there are so many things each day

1    it's hard to remember.

2            Could I make that ruling by Thursday?  It's

3    possible.  I just don't know.  I have to go back and look at

4    it.

5            As I said, I saw the document that was filed

6    yesterday.  I saw it this morning, that was filed yesterday

7    afternoon, and I noticed -- I think the initial belief was,

8    just because of the docket entry, that it might be an agreed

9    upon order, but I quickly learned, saw that it was not.  And

10   that's fine.  It's fine.  So I don't -- I have to take a

11   look at it and see what we're going to do.

12           I do agree with you though that I did say that

13   this is going to move ahead.  So we'll see where we end up

14   at the end of the day.

15           Is there anything else you'd like to add for the

16   record?

17           MS. CLINE:  Yes, Your Honor.  I just wanted to put

18   one thing on the record with respect to a comment that Mr.

19   Bassett had made with respect to the motion to limit notice.

20   I just wanted to make a record on that if I may?

21           THE COURT:  Yes.

22           MS. CLINE:  So we saw Your Honor's ruling on the

23   motion and I guess I just wanted to articulate --

24           THE COURT:  On which motion are you talking about?

25           MS. CLINE:  Sorry.  The motion to limit notice

1    with respect to a motion to abandon property.

2              THE COURT:  Oh, yes, yes, yes.  Okay.  Sorry.  I

3    just --

4              MS. CLINE:  I understand.

5              THE COURT:  -- want to be as clear as we can be.

6    So thank you.

7              MS. CLINE:  Yes.  Apologies.

8              And so we just wanted to put our position on the

9    record, which is that, as the Court's painfully aware I

10   think, the definition of what is property of the estate is

11   very much at issue here.

12             And as a result of the Court's granting that

13   motion to limit notice, Bravo really has no idea what the

14   property is that the Trustee may seek to abandon.  And it

15   may well have nothing to do with us.  On the other hand, it

16   may in our view have everything to do with property that we

17   believe to be owned by Bravo.

18             So from our perspective, Bravo is being denied due

19   process and the right to object to whatever it is the

20   Trustee might do with respect to whatever it is, the

21   property that's at issue.

22             And from our perspective, the Trustee has not

23   articulated a specific concern.  There's been a general

24   argument about confidentiality.  And if that were a problem,

25   we could take it on a asset by asset basis, and I'm sure we

1    could figure out some kind of a, you know, attorney's eyes

2    only or some kind of a way to deal with that.  But as it

3    stands, we're sort of hamstrung and not able to even stand

4    up and object as to what we may think may be Bravo's

5    property.

6            So we just wanted to sort of put on the record

7    that we think that there's a due process issue with respect

8    to that motion to limit notice.  We would ask under Rules 59

9    and 60 for the Court to reconsider and just include Bravo in

10   the notice provision.

11           THE COURT:  All right.  I'll take a look at that.

12           I have to say, sitting here right now without

13   looking at it, I don't recall everything it says.  But even

14   though it's limiting notice and shortening time, I think you

15   still have an ability to object.  But I could be wrong about

16   that.

17           Attorney Linsey?

18           MR. LINSEY:  One of the things that the motion to

19   limit notice does is it defines the noticed parties.  And

20   with respect to the notice parties, they are the U.S.

21   Trustee, PAX, and the Creditors Committee as a

22   representative of creditors at large.

23           THE COURT:  Well, that's the noticed parties.

24           If someone become aware of a motion and they want

25   to object to it, I don't think they're precluded from doing

1    that.

2            MR. SHAIKEN:  If I may, Your Honor, the motion and

3    the order say that the motion will be sealed.  So even

4    someone with access to the docket --

5            THE COURT:  I understand.  But there's --

6            MR. SHAIKEN:  -- won't know what it's about, and

7    the courtroom will be sealed.

8            THE COURT:  But there's -- we have mechanisms in

9    this case with regard to confidential information, so you

10   need to talk to the Trustee's counsel about that and see if

11   there can be some kind of agreement.

12           There's been a mechanism in place for almost a

13   year with regard to confidential information in the case as

14   a whole.  And whether that applies to this issue, I don't

15   know sitting here.

16           But what I'm saying to you is you're all, and you

17   know this, so I really don't -- you're all lawyers, you have

18   the conversations and try to figure it out.

19           If Bravo Luck wants to file an objection to

20   something that they don't know what it is and they think

21   their due process rights haven't been met, then they can

22   file that.  Whatever happens with it, I can't say as we sit

23   here right now.  They have a right to do that.  Whether or

24   not any relief will be given to Bravo Luck, is not before

25   the Court today.  Okay?

1          But I understand your oral request.  I will look

2     at it.  And then I might say, okay, you made an -- I don't

3     know what I'm going to say.

4          But I might say you made an oral request during a

5     pretrial conference, which you're absolutely entitled to do,

6     and I might say, okay, I agree with you.  I might say I

7     disagree with you.  Or I might say I'd like the Trustee to

8     file something or respond to that.

9          I just have to think about it having not -- you

10    know, it's not something I was prepared to address at the

11    moment, but I'm fine -- it's fine that you raised it and

12    we'll see where we go.

13         But with regard to the confidential information

14    and the issues that you raised, and Attorney Shaiken raises,

15    with regard to you don't know what you don't know, there are

16    mechanisms in this case.

17         Parties can be -- there is a confidentiality

18    agreement that parties can decide to be bound by, and they -

19    - you know, there is a process.  Whether or not you decide

20    to be bound by that, I have no -- your clients, I have no

21    idea, but there is a process.

22         And, unfortunately, it's been a case in which --

23    it's not unfortunate, it is -- it's the facts, there's a

24    case in which there's been a lot of need for confidentiality

25    agreements.

1          You know, the District Court in Connecticut has

2     standing confidentiality agreements the minute you file a

3     case.  The minute it gets filed, it gets spit out as an

4     automatic confidentiality agreement.

5          So this isn't anything, from this court's

6     perspective anyway, that's a novel issue.  It's just an

7     issue of how the lawyers handle it.  And so I will let you

8     all have that discussion and we'll see where we go.

9          MS. CLINE:  Understood.

10         THE COURT:  Okay?

11         MS. CLINE:  Thank you, Your Honor.

12         THE COURT:  All right.  Thank you.

13         MR. BASSETT:  And, Your Honor, if I may, I just

14    wanted to add one very brief point in response to a comment

15    that counsel made as to the discovery schedule?

16         THE COURT:  Yes.

17         MR. BASSETT:  And it's simply that counsel had

18    emphasized the Trustee has been conducting 2004 discovery,

19    and has discovery from other parties that may be relevant to

20    the adversary proceeding, and they need all that, and that's

21    something that from their point of view they have been

22    saying to us at least, and to the Court, is the reason why

23    this litigation is going to take a significant amount of

24    time.  I just wanted to point out to the Court that we

25    looked at that in advance of today's hearing.

1           And the parties that they mentioned, Paul Weiss,

2    we have 715 documents, we have not taken a deposition.  UBS,

3    we have 124 documents, we have not taken a deposition.  We

4    have something like 4,000 documents from Williams &

5    Connolly, but most of those are unrelated to this adversary

6    proceeding.

7           We also did a search in our entire database across

8    the hundreds of thousands of documents, if not more than

9    that, that we've received, and I think there is something

10   like 2500 total documents related to Bravo Luck or the

11   Sherry-Netherland.

12          So the bottom line is it's not -- it's not the

13   case that we're sitting on some just vast volume of

14   information that's relevant to this adversary proceeding and

15   it's going to take Bravo Luck months to go through it.

16          For a variety of reasons, as the Court well knows,

17   we've, you know, struggled to get a lot of information in

18   this case, so it's not like we have so much that it's going

19   to really impact the discovery schedule here.

20          That's all I wanted to say.  Thank you.

21          THE COURT:  Okay.  Thank you.

22          And I will say that, you know, as I say quite

23   often, not just in this case, but in every case, as you all

24   know, you all have duties as lawyers to act in good faith

25   and to continue to try to resolve issues, specifically

1    discovery issues.

2            And if there are discovery disputes regarding the

3    scope or what is requested by one party from another, then

4    if it's not worked out, then the Court will have to rule.

5    And that's what we'll do.  Okay?

6            But this adversary proceeding is about -- the

7    complaint as I read it has two counts.  One is -- I think

8    the first count talks about saying that the trust agreement

9    is void or at the very least voidable.

10            And the second is that it's a fraudulent transfer,

11    that the whole transaction was a fraudulent transfer under

12    state law.  That's it.  Those are the causes of action.

13            Not that those don't -- aren't -- do not require

14    discovery necessarily, but with regard to the information

15    that the Trustee's obtained through 2004 examination

16    processes, which the Trustee is entitled to do, and the

17    Bankruptcy Code provides that ability in a bankruptcy case,

18    I'm not sure all of whatever the Trustee has obtained

19    through 2004 discovery would be relevant in this adversary

20    proceeding, but you'll let me know.  Okay?

21            MS. CLINE:  Yes, Your Honor.

22            If I may?  Understood.  And I'm sure there are

23    reams of paper that are not relevant to these particular

24    proceedings.  And just wanted to note that there's actually

25    three proceedings that have been consolidated.

1          THE COURT:  Yes.  I'm glad you raised that

2     actually.  We've got to figure out a different way than

3     filing three motions to dismiss and three answers and all

4     those other things, right?

5          So what I -- I understand the argument that there

6     could be some specific issues in each one, but then I want

7     you to talk, figure out a way to have a complaint and an

8     answer both, that, you know, have different -- have the

9     count either apply to all three, two of the three, one of

10    the three, however you want to do it, but I don't think it

11    makes sense to be filing three pleadings.  These are

12    consolidated for a reason, right?  Otherwise they wouldn't

13    be consolidated.  So the pleadings should be consolidated.

14    All right?

15         And I think you, both of you, can agree on that

16    without -- you should be able to come to an agreement

17    without impacting any substantive rights that either --

18    either the plaintiffs -- plaintiff or the defendants have

19    with regard to the ultimate relief sought in the complaint.

20    Okay?  But it doesn't' make sense to have three different

21    pleadings in the -- in these jointly administered adversary

22    proceedings.  Okay?

23         MS. CLINE:  Understood.

24         THE COURT:  Attorney Bassett, I'm sure you can --

25    you can all figure out a way to deal with that, right?

1          MR. BASSETT:  We will, Your Honor.

2          THE COURT:  Okay.  I've raised that before, so I

3     would like that to be addressed.

4          Is there any other matter that we need to address

5     in this adversary proceeding today?

6        (No response)

7          THE COURT:  No?  What about -- all right.  What

8     other matters are not on the calendar that you want to bring

9     to the Court's attention?

10         MR. LINSEY:  It's one we've already discussed if

11    that helps, Your Honor.  The motion to limit notice with

12    respect to the motion to abandon.

13         The Court entered an order yesterday granting that

14    motion.  And I believe that the Court's order that the

15    schedule in the order would seem to anticipate the immediate

16    filing of a motion to abandon.

17         There is some information that my office is

18    compiling from third-party sources to go into that motion

19    and we may not have the motion finalized until the end of

20    the week.

21         The reason I report that to Your Honor is because

22    the motion to limit notice contemplates a 14-day objection

23    period between the filing of the motion to abandon and the

24    hearing on the motion to abandon which has been scheduled

25    for May 2nd.

1          So here's what the Trustee contemplates. The

2     Trustee contemplates that none of the noticed parties are

3     going to object to the motion to abandon and that no one is

4     going to have a problem with having the hearing go forward

5     as scheduled on less than 14-day's notice.

6          I've spoken with debtor's counsel about this

7     earlier today.

8          And what I suggest that we do is the Trustee will

9     file the motion to abandon later this week, will reach out

10    to counsel for the various noticed parties.

11         If anyone takes issue with the less than 14-day

12    notice period, then we will reach out to the Court and

13    request to continue the hearing date on the motion to

14    abandon.

15         And if, as the Trustee anticipates, no one has an

16    issue, then we'll continue with the hearing as scheduled.

17         And I realize I'm technically bringing up

18    something that's not on the docket, but we just wanted to

19    make sure the Court wasn't looking at the docket saying

20    where is this motion that I thought was going to be

21    immediately filed?  So that's why I bring it up.

22         THE COURT:  Okay.  Thank you.

23         I heard what you just said, but you also heard

24    what Bravo Luck said.  You may have an objection to your

25    motion, even if you claim that they're not entitled to

1    object to it.

2            So I'm going to look back at the -- at the whole

3    issue and revisit it.  I don't know if I'm going to do

4    anything, but there's -- I need to look back at it and see

5    whether or not we have to think about that a little bit

6    more.

7            MR. LINSEY:  And if Your Honor wants a written

8    submission from the Trustee on the reason that the Trustee

9    did not include Bravo Luck as a noticed party, we're happy

10    to do that.

11            The Trustee -- I have discussed that issue with

12    the Trustee as recently as last Friday and that was an

13    intelligently made decision, so he'd probably want to be

14    heard on that as well.

15            THE COURT:  All right.  Well, I'm going to think

16    about it.  And if I'm going to do anything, you'll all know

17    because it will be on the docket.  Okay?

18            MR. LINSEY:  Thank you, Your Honor.

19            THE COURT:  All right.  Thank you.

20            Anything further we need to address this

21    afternoon?

22            MS. CLINE:  Not from Bravo, Your Honor.

23            THE COURT:  Thank you.

24            MR. BASSETT:  No, Your Honor.

25            THE COURT:  Okay.  All right.  Thank you.

1          Then this is the last hearing on the Court's

2     calendar today, so court is adjourned.

3          (Proceedings concluded 3:24 p.m.)

4              I, CHRISTINE FIORE, court-approved

5     transcriber and certified electronic reporter and

6     transcriber, certify that the foregoing is a correct

7     transcript from the official electronic sound recording of

8     the proceedings in the above-entitled matter.

9

10

11    _____          April 26, 2023

12        Christine Fiore, CERT

13

14

15

16

17

18

19

20

21

22

23

24

25