UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

| | | |
|---|---|---|
| In Re | * | Case No. 22-50073 (JAM) |
| | * | |
| HO WAN KWOK and GENEVER | * | |
| HOLDINGS CORPORATION, | * | |
| | * | |
| Debtor. | * | |
| | | |
| HK INTERNATIONAL FUNDS | | Adv. Proc. No. 22-05003 |
| INVESTMENTS (USA) LIMITED, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Bridgeport, Connecticut |
| | * | April 20, 2023 |
| LUC A. DESPINS, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT OF
#185  MOTION FOR PARTIAL SUMMARY JUDGMENT ON SECOND
      COUNTERCLAIM
#1453 MOTION FOR ORDER TO SHOW CAUSE WHY DEBTOR, MEI GUO and
      HK (USA) SHOULD NOT BE HELD IN CONTEMPT FOR FAILURE
      TO COMPLY W/ORDER TO COMPEL RE FRBP 2004 SUBPOENAS
#1649 MOTION FOR A LIMITED STAY OF ORDER GRANTING IN PART
      MOTION TO COMPEL COMPLIANCE WITH RULE 2004 SUBPOENA
#1679 ORDER SCHEDULING HEARING ON ORAL MOTION FOR RELIEF
      FROM JUDGMENT OR ORDER PURSUANT TO FED. R. CIV. P.60
      AND FED R. BANKR. P. 9024(THE 'MOTION') WITH REGARD
      TO THE ORDER GRANTING MOTION OF CHAPTER 11 TRUSTEE
      TO LIMIT NOTICE AND TO SEAL WITH RESPECT TO MOTION
      FOR ORDER AUTHORIZING ABANDONMENT OF PROPERTY
      PURSUANT TO BANKRUPTCY CODE SECTION 554 AND
      BANKRUPTCY RULE 6007

BEFORE THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

APPEARANCES:

| | |
|---|---|
| For the Chapter 11<br> Trustee: | NICHOLAS BASSETT, ESQ.<br>Paul Hastings, LLP<br>200 Park Avenue<br>New York, NY  10166 |
| | DOUGLAS S. SKALKA, ESQ.<br>Neubert Pepe & Monteith, PC<br>195 Church Street<br>New Haven, CT  06510 |
| Chapter 11 Trustee: | LUC A. DESPINS, ESQ.<br>Paul Hastings<br>200 Park Avenue<br>New York, NY  10166 |
| For Bravo Luck Limited: | JOANNA J. CLINE, ESQ.<br>Troutman Pepper Hamilton<br> Sanders, LLP<br>Hercules Plaza<br>1313 N. Market Street<br>Suite 5100<br>Wilmington, DE  19899 |
| For the Plaintiff,<br> HK International and<br>Mei Guo: | MELISSA F. WERNICK, ESQ.<br>Chiesa Shahinian &<br> Giantomasi, PC<br>105 Eisenhauer Pkwy<br>Roseland, NJ  07068 |
| For the U.S. Trustee: | HOLLEY L. CLAIBORN, ESQ.<br>Office of the United States<br> Trustee<br>The Giaimo Federal Building<br>150 Court Street, Room 302<br>New Haven, CT  06510 |
| For the Debtor and<br> Plaintiff, HK<br> International and Mei Guo: | JAMES MORIARTY, ESQ.<br>ERIC HENZY, ESQ.<br>Zeisler & Zeisler, PC<br>10 Middle Street, 15th Floor<br>Bridgeport, CT  06604 |
| For the Debtor: | STEPHEN BEST, ESQ.<br>WILLIAM BALDIGA, ESQ.<br>Brown Rudnick<br>601 13th Street NW, Suite 600<br>Washington, DC  20005 |

APPEARANCES (Cont'd):

For Pacific Alliance            PETER FRIEDMAN, ESQ.
 Asia Opportunity Fund, LP:     O'Melveny & Myers, LLP
                                1625 Eye Street NW
                                Washington, DC  20006

For Rui Ma, Weican Meng,        KRISTIN MAYHEW, ESQ.
 Zheng Wu, and Official         Pullman & Comley, LLC
 Committee of Unsecured         850 Main Street, 8th Floor
 Creditors:                     P.O. Box 7006
                                Bridgeport, CT  06601

1          (Proceedings commenced at 9:39. a.m.)

2          THE COURTROOM DEPUTY:  Number 22-50073, Ho Wan

3     Kwok, and Adversary Number 22-5003, HK International Funds

4     Investments vs. Despins.

5          THE COURT:  Good morning.  If we could have

6     appearances for the record, starting with the Chapter 11

7     Trustee, please.

8          MR. DESPINS:  Good morning, Your Honor.  Luc

9     Despins, Chapter 11 Trustee, appearing remotely.  Thank you.

10          THE COURT:  Good morning.

11          MR. BASSETT:  Good morning, Your Honor.  Nick

12     Bassett, from Paul Hastings, counsel to the Chapter 11

13     Trustee.

14          THE COURT:  Good morning.

15          MR. SKALKA:  Good morning, Your Honor.  Douglas

16     Skalka, of Neubert Pepe & Monteith, as Connecticut counsel

17     for the Chapter 11 Trustee.

18          THE COURT:  Good morning.

19          MS. WERNICK:  Good morning, Your Honor.  Melissa

20     Wernick, from Chiesa Shahinian & Giantomasi, on behalf of HK

21     USA.

22          THE COURT:  Good morning.

23          MR. MORIARTY:  Good morning, Your Honor.  James

24     Moriarty, Zeisler & Zeisler, for HK USA and the debtor.  And

25     I believe that Attorney Henzy will be joining me shortly,

1    also for the debtor, which I believe that's on for 10:30.

2              THE COURT:  Okay.

3              MR. MORIARTY:  Thank you.

4              THE COURT:  Thank you.  Is anyone appearing on

5    behalf of Ms. Guo?

6              MS. WERNICK:  Also on behalf of Ms. Guo, but the

7    particular summary judgment motion is really directed

8    towards HK USA.  But we are also counsel for Mei Guo in

9    connection with the motion as well.

10             THE COURT:  Okay.  Thank you.

11             MR. MORIARTY:  As is Zeisler & Zeisler, Your

12   Honor.

13             THE COURT:  Okay.  Thank you.

14             On the calendar in Adversary 22-05003 is the

15   motion for partial summary judgment filed on behalf of the

16   Chapter 11 Trustee, counterclaimant.

17             Mr. Bassett, are you going to be making that

18   argument?

19             MR. BASSETT:  Yes, Your Honor.

20             THE COURT:  All right.  Please proceed.

21             MR. BASSETT:  So, again, Your Honor, for the

22   record, Nick Bassett, from Paul Hastings, on behalf of the

23   Chapter 11 Trustee.

24             As the Court indicated, the reason we are here at

25   this part of the hearing this morning is for the Court to

6

1   consider the trustee's second motion in this adversary

2   proceeding for partial summary judgment, this time on his

3   second counterclaim which seeks a ruling from this Court

4   that HK USA is the alter ego of the debtor and, therefore,

5   all of HK USA's property is the debtor's property.

6            Your Honor, I hope I can keep my remarks this

7   morning fairly brief.  And one of the reasons for that is

8   that, as discussed in our papers and as the Court well

9   knows, we are not operating on a blank slate here.  Far from

10  it.

11           In fact, the Court has already decided many of the

12  key issues that are going to be discussed before the Court

13  today on this motion for summary judgment.

14           First, of course, the Court decided the trustee's

15  prior partial motion for summary judgment on his first

16  counterclaim.  And in doing so, the Court found that the

17  debtor and now the trustee owns and controls the Lady May.

18           Second, last Friday, the Court issued a decision

19  denying in part the defendant's motion to dismiss, denying

20  entirely the defendant's motion to dismiss the second

21  counterclaim which is at issue here.

22           And in doing so, the Court overruled arguments

23  that the counter-defendants have raised again in response to

24  summary judgment, including arguments related to the Wagoner

25  rule, in pari delicto, and arguments related to the Lady May

1    stipulation.

2              Your Honor, because of these prior rulings of the

3    Court and because of the undisputed factual record that is

4    before the Court on summary judgment, I would submit that as

5    far as alter ego cases go, this case before Your Honor is

6    about as simple as a case can get and is the perfect

7    candidate for summary judgment at this stage of the

8    litigation.

9              The established, admitted, undisputed facts are,

10   one, that HK USA never in its history conducted any business

11   activities other than owning and operating the Lady May.

12             THE COURT:  Are you referring specifically to the

13   Rule 56(a)(1) and (a)(2) statements, Attorney Bassett?

14             MR. BASSETT:  That's correct.  And I can get to

15   particular references where these facts --

16             THE COURT:  I would like both parties to do that

17   when we make the arguments this morning, because, as you

18   know, the District Court of Connecticut requires those

19   statements for very specific purposes, including for the

20   Court -- whatever Court is determining summary judgment to

21   refer to those facts when necessary.

22             So I didn't mean to interrupt your argument, which

23   I did, but I did -- I'm doing so to let both parties know

24   that I would like you to, when you can, reference the Rule

25   56 -- the Local Rule 56(a)(1), which would be your

1    statement, and then counsel for the plaintiff counterclaim

2    defendants, their 56(a)(2) statement.  Okay?  So go right

3    ahead.

4            MR. BASSETT:  That's fair, Your Honor.  And to

5    that point, on the statement I just made, if you were to

6    look at the counter-defendant's response to the trustee's

7    Rule 56 statement, which is at ECF 204, paragraph 11, the

8    counter-defendants admit that "On March 31, 2023, with the

9    consent of the counter-defendants, the Court entered an

10   order confirming that the Lady May II is also property of

11   the debtor's estate."

12           Next paragraph: "The estate thus already owns and

13   controls all of the assets that the counter-defendants

14   contend HK USA has ever owned."

15           So that, Your Honor, is -- back to what I was --

16   to my framing of the issues and the argument and why I think

17   this is a very straightforward candidate for summary

18   judgment, you have that admitted.

19           The only assets that this entity ever owned and

20   the only business it ever conducted with respect to the Lady

21   May, and then as we later determined based on the

22   undisclosed ownership of the Lady May II, the Lady May II as

23   well.

24           And then what we also have is, again, what I just

25   read to the Court.  We already have a binding ruling from

1    this Court that the debtor, not his daughter, as she

2    contends, owns and controls both of these assets which are

3    the only assets it has ever owned.

4           And there is not a single -- and I can't point you

5    to a negative, but there is not a single thing in the record

6    suggesting that the Lady May -- or, sorry, that HK USA ever

7    engaged in anything, any other business activities, any

8    other ownership of assets historically other than owning and

9    operating the Lady May and, along with it, the Lady May II.

10          That, Your Honor, is the very essence, I would

11   submit, of an alter ego claim.  Because you have complete

12   domination and control by the debtor of everything HK USA

13   has ever done.

14          In response, the counter-defendants have raised

15   certain defenses.  But I think, as I will describe later,

16   the Court has already rejected those in ruling on the motion

17   to dismiss.  And while it's a different posture for reasons

18   I will discuss, I don't think it makes a difference under

19   the facts and circumstances here.

20          So I'll spend the balance of my time -- and,

21   again, I'll try to be relatively brief, but I'll first,

22   again, walk through a little bit more -- in a little bit

23   more detail the merits of the alter ego claim itself and

24   responses to some of the counter arguments.  And then, after

25   that, I'll briefly adjust -- address some of the defenses.

1          As to the merits of the alter ego claim, I think

2     the standard is not disputed.  Under Delaware law, to

3     determine whether one entity is the alter ego of another,

4     the Court will consider first -- there's two elements.

5     First, whether the debtor -- and in this case, whether the

6     debtor in HK USA operated as basically one single unit which

7     involves a showing that the debtor dominated and controlled

8     HK USA and its activities.  That's the first element.

9          And the second is whether this alter ego status

10    was used to perpetuate some type of fraud or injustice.  And

11    I think both of those are readily satisfied beyond any

12    genuine dispute of material fact.

13         On the issue of the first prong, sort of the

14    domination and control prong as I will call it, I would

15    again emphasize that the starting point on this is the fact

16    that it is now law of the case.

17         This Court has already determined that the debtor

18    dominates and controls the only assets that HK USA has ever

19    had which formed the basis for the only business activities

20    it has ever engaged in.

21         So to the extent HK USA ever did anything, it was

22    with respect to those assets.  And the debtor controls them,

23    so it is the debtor who dominates and controls HK USA in

24    that manner.

25         Now, the counter-defendants in their papers

1    mischaracterize the trustee's argument by saying that we're

2    trying to basically, I guess you could say, bootstrap the

3    Court's prior summary judgment ruling and the collateral

4    estoppel issue at play there into effectively obtaining

5    collateral estoppel as to the alter ego issue.

6            But that is not at all what the trustee is

7    arguing.  We're not arguing that the fact that the Court

8    determined that the debtor owns and controls the Lady May

9    and the Lady May II is itself determinative of the alter ego

10   claim.

11           What we're arguing is that under the facts and

12   circumstances of this case, where the other facts establish

13   that HK USA never did anything else, that that ruling and

14   that finding goes all the way there or basically all the way

15   there in getting to that point, because there's simply

16   nothing else that HK USA has ever done for which facts need

17   to demonstrate that the debtor exercised domination and

18   control over HK USA.

19           And the trustee is also not arguing, contrary to

20   what the counter-defendants suggest, that Justice Ostrager

21   decided the alter ego question.  He did not.  He decided, as

22   the Court already recognized and held, that the debtor owns

23   and controls the Lady May.

24           And it's a little unclear to me if the

25   counter-defendants are -- I mean, it appears to me, frankly,

1   that the counter-defendants are asking the Court to revisit

2   that prior finding.  There's statements in their opposition

3   and in their statement of facts that talk about the fact

4   that, you know, the issue before Justice Ostrager was not

5   ownership of the Lady May, et cetera.

6           All that is irrelevant and not before the Court,

7   because it's been decided by the Court.  It's law of the

8   case.  They've appealed that decision.  To the extent they

9   have a problem with it, that's an issue for the district

10  court.

11          And I want to point out, because, again, the -- as

12  the counter-defendants would frame it, we're saying

13  ownership and control of the Lady May, that's it, there's

14  nothing else.  But that's not it.

15          I mean, there are significant other facts in the

16  record which go directly to the alter ego analysis and

17  prove, as I said, the fact that there was no dispute that HK

18  USA never did anything else.

19          And this is in both sets of the Rule 56 fact

20  statements.  And I can get the particular reference.  But I

21  think it's easy to find.

22          There is no dispute that HK USA "has and has never

23  had any officers, directors, or employees, that it does not

24  file tax returns, that it has no bank accounts, that it is

25  not capitalized, that it has no other assets than the Lady

1    May and the Lady May II, and that it has had no dedicated

2    email server or email suffix, i.e., it has none of its own

3    documents" according to the debtor.

4           Now, the counter-defendants say these facts could

5    simply mean that HK USA is the alter ego of the debtor's

6    daughter and not the alter ego of the debtor.  But there's

7    no basis for that position.

8           Because in order to make that argument, they would

9    have to show that HK USA has engaged in some business and

10   done something in its existence other than owning and

11   operating the Lady May, which activities the debtor's

12   daughter and not the debtor could have exercised control

13   over.

14          But whereas here there was nothing else, all of

15   these alter ego factors, the fact that it's a shell company

16   with no assets, no employees, no assets other than the Lady

17   May and the Lady May II, no employees, no officers,

18   directors, no bank account, all of that only goes to show

19   the fact that this is an entity dominated and controlled by

20   the debtor who is the one this Court has found has dominion

21   and control over the only assets that it ever had.

22          In addition to the Rule 56.1 statement, paragraph

23   11, which I referenced on this point, I would direct the

24   Court to the declaration of Mei Guo, which was submitted in

25   the main case at ECF 1544, on the issue of HK USA's

1    compliance with its document production obligations.

2            This is at paragraphs 24 and 25 where Mei Guo

3    says, "As explained above, I am the sole owner of HK USA,

4    and HK USA does not have any employees or maintain any bank

5    accounts.  Indeed, the Lady May is HK USA's sole asset."

6            Then she goes on, "Moreover, the only documents or

7    communications that I maintained for HK USA relate to the

8    Lady May, which documents were excluded from the January

9    20th order."

10           In other words, what she was saying is the only

11   documents HK USA has are documents that I have, and the only

12   documents that I have are documents that relate to the

13   operation of the Lady May, because that's all HK USA has

14   ever done.

15           Now, this is another point we emphasized in our

16   papers to which the counter-defendants did not even respond,

17   but I think it's a critically important fact to emphasize

18   for the Court and one which is, in my view, incredibly

19   damning for the counter-defendant's position that the

20   debtor's daughter and not the debtor is the one who owns and

21   controls HK USA.

22           And this is where in February 2022, before Justice

23   Ostrager in the New York court, the debtor's daughter

24   testified under oath that, as far as she knew, her brother

25   owned the Lady May II.  She was shown a picture of the Lady

1    May II, asked on the stand who owns this.  My brother does.

2            Of course, now we know, and now it's been admitted

3    and conceded, that the Lady May II is and always has been

4    registered to HK USA, including at the time she gave that

5    testimony.

6            So unless she's going to admit that she committed

7    perjury, which she's not doing, then what this shows, Your

8    Honor, is that the person who purports to own and control HK

9    USA did not even know that it owned one of HK USA's two

10   assets.

11           And this is not an immaterial asset.  The Lady May

12   II is an approximately 50-foot long boat worth more than a

13   million dollars that would be considered probably the

14   largest luxury boat many of us have ever seen or set foot

15   on.

16           The fact that she didn't know her company owned it

17   tells you all you need to know about whether or not she, in

18   fact, owned and controlled that entity.  The answer is she

19   didn't.  Her father did.

20           Just briefly, as to some of the case law -- I

21   think there's a statement in the counter-defendant's

22   response that it's somehow relevant that the debtor is not

23   the named member of HK USA in its operating agreement.

24   That's irrelevant, because it's not a requirement of

25   Delaware veil-piercing or alter ego law that the person at

1    issue in the veil-piercing analysis be the named shareholder

2    or, in this case, member of an LLC.

3              Were it otherwise, that would obviously be ripe

4    for abuse, because, as in a situation like this, any debtor

5    who wants to hide his or her assets would simply put them in

6    a company owned by, as in this case, a family member.

7    Whereas here we've shown the requisite domination and

8    control.  The fact that the debtor is not the named party in

9    the LLC agreement is obviously irrelevant.

10             On the second prong of the alter ego analysis,

11   which is the existence of a fraud or injustice that was

12   perpetuated by the alter ego relationship, although they try

13   to do so, I don't see how the counter-defendants can

14   credibly suggest that if, in fact, HK USA was the debtor's

15   alter ego, it was not used to perpetuate an injustice on the

16   debtor's creditors.

17             Indeed, the entire purpose of HK USA being the

18   debtor's alter ego is to shield the Lady May and the Lady

19   May II from recovery by the debtor's creditors.

20             That's the entire position he's taken before

21   Justice Ostrager in the New York litigation, before this

22   Court in litigation, and it's the position that the debtor's

23   daughter herself supported in the testimony she tried to

24   give before Justice Ostrager in February 2022, which

25   testimony, as the Court knows, Justice Ostrager found had no

1    credibility.

2           So I don't think it can possibly be disputed that

3    if, in fact, there's an alter ego relationship, that alter

4    ego relationship was used for the purpose of perpetuating an

5    injustice on the debtor's creditors.

6           I'll now move -- and I'll reserve time, obviously,

7    to respond to any additional comments counsel may make on

8    the sort of threshold alter ego analysis.  But I'll now move

9    to briefly talk about a couple of the defenses.

10          First, as I mentioned, the counter-defendants

11   raise the Wagoner rule and in pari delicto.  I don't think

12   there can be any disagreement -- and by the way, that brief

13   was submitted by the counter-defendants before this Court

14   issued its -- or before simultaneously with, I think, when

15   this Court issued its -- or its decision on the motion to

16   dismiss.

17          But I think the decision on the motion to dismiss

18   disposes with that issue, because as the Court properly held

19   in that decision, the Wagoner rule and in pari delicto are

20   inapplicable to the second counterclaim on alter ego,

21   because the trustee has brought that counterclaim not

22   standing in the debtor's shoes but rather in the shoes of

23   the debtor's creditors under Section 544(a) of the

24   Bankruptcy Code.  So I think that issue has been settled.

25          The other argument they raise is the argument with

1  respect to the Lady May stipulation contending that the

2  stipulation prevents this Court from entering an order on

3  the alter ego relationship, because it would result in the

4  debtor -- sorry, the trustee becoming -- the owner of the

5  estate, rather, becoming the owner of the escrowed funds

6  which originally were 37 million and now are approximately

7  $33 million.

8        Again, I think this defense has been addressed and

9  disposed of in a Court's -- in one of the Court's prior

10  rulings, this time also -- I guess also the motion to

11  dismiss ruling.

12        And as the Court will recall, in that decision the

13  Court conducted an extensive review of the applicable case

14  law talking about the circumstances under which a

15  stipulation entered into by a debtor in possession is or is

16  not binding on a subsequently appointed trustee.

17        And what the Court observed is that the case law

18  is legion in holding that the answer to that question comes

19  down to the facts and circumstances and the equities of the

20  case.

21        And then based on that law, the Court went through

22  and conducted an analysis of the facts at issue here and

23  made four points in particular.

24        And as we pointed out in the reply brief that we

25  filed, each of those four points is equally valid to the

1    motion before the Court today for summary judgment as it was

2    on the motion to dismiss, even though the standards are

3    admittedly different.

4            And the reason for that is because there is no

5    genuine dispute of material fact as to any of the facts that

6    are relevant to those four considerations that the Court

7    identified.

8            The first -- and I'll briefly recap those, but the

9    first consideration which the Court identified was the fact

10   that neither HK USA nor the debtor's daughter, parties to

11   the stipulation against whom relief is sought, is a

12   creditor.

13           And because of that, the policy concern about

14   creditors becoming comfortable with agreements in the --

15   with a debtor in possession was not implicated.  No dispute

16   as to that -- as to the facts related to that consideration.

17           The second consideration, and this one, in my

18   view, is very important, is the Court acknowledged in ruling

19   on the motion to dismiss that if it were to "find in the

20   trustee's favor on the merits of the alter ego claim,

21   allowing the trustee to recover from the escrowed funds

22   would not implicate any prejudice to HK USA, because the

23   Court would have found that HK USA is the individual debtor

24   or is owned or controlled by the individual debtor."

25           Then the Court went on to say, "There is no public

1    policy interest in allowing an individual debtor to self

2    deal in bankruptcy to shield assets from bankruptcy

3    proceedings."

4         So obviously, Your Honor, this motion before the

5    Court is all about whether or not HK USA is the debtor's

6    alter ego.  And we're only going to get to the question of

7    the applicability of the stipulation if the Court believes

8    that the trustee has demonstrated that HK USA is, in fact,

9    the debtor's alter ego.

10        So we're operating in a world where all the facts

11   relevant to this consideration of the Court and the motion

12   to dismiss decision have been established.

13        And I would stress that I think the Court was

14   absolutely correct in emphasizing the -- this issue or these

15   considerations, because I don't see how there could be any

16   doubt that it would be highly inequitable, to say the least,

17   to allow the debtor here in the event it is determined that

18   HK USA is and always has been his alter ego, to have used

19   the Lady May stipulation as an effective subterfuge to

20   shield $30-plus million of assets that are now his from his

21   creditors.

22        Were that the case, were that known at the time,

23   there's no way the parties to that stipulation, including

24   PAX and the Committee, would have agreed to it.  And I can't

25   imagine the Court would have approved it either.

1        So I think that is a -- that, in and of itself, is

2    reason enough on the equities for this Court to hold that

3    the Lady May stipulation does not the -- does not prevent

4    the relief that the trustee seeks.

5        The next consideration that the Court identified

6    is similar to the last one, which is that the debtor's

7    history of engaging in shell games, et cetera, also provides

8    appropriate context to decide for equitable reasons that the

9    stipulation is not binding.

10       And the Court observed there, again, I think,

11   accurately, that the type of proof that the trustee would

12   offer to show this type of use of shell games may be the

13   same as the proof that the debtor -- or that the trustee has

14   offered to show that HK USA is the debtor's alter ego.

15       I say that that's exactly true.  And for the

16   reasons I just discussed, the fact that the debtor has used

17   HK USA to shield assets from creditors is another reason why

18   the stipulation here should not be used to prevent the

19   relief the trustee seeks.

20       Fourth consideration that the Court identified was

21   that, unlike in many of the other cases that have held that

22   stipulations of a debtor in possession are binding on a

23   trustee, here the stipulation does not -- it's undisputed

24   the stipulation on its face does not expressly bind the

25   trustee despite the pendency at the time of the stipulation

1   of a motion to appoint the trustee.

2           So, again, those are all the considerations the

3   Court identified in finding that the stipulation is not

4   binding on the trustee, and none of them involve a genuine

5   issue of material fact.  Therefore, the Court can grant

6   summary judgment as to that issue in the trustee's favor.

7           The last point I would make is that we had raised

8   another argument in our motion for summary judgment that the

9   Court did not address in the motion to dismiss decision

10  which is related to the ones that I just made, but it's the

11  fact that, as a matter of law, if HK USA and the debtor were

12  alter egos at the time of the Lady May stipulation, meaning

13  that there was no distinction between them, then as a matter

14  of law, and this is Hornbook contract law, an agreement

15  between them is not binding, because it is a immutable

16  principle of contract law that one cannot enter into an

17  agreement with itself.  Every agreement needs two parties.

18  And we've cited authority for that in our briefing.

19          So, Your Honor, the last point I'll make, and then

20  I'll reserve any additional comments for rebuttal, is that

21  the counter-defendants had raised at the end of their

22  opposition what appears to be a request to dissolve the PJR

23  and the preliminary injunction in the event the Court grants

24  the motion for summary judgment.

25          All I would say in response to that is that that's

1     a separate request for relief.  And, in fact, acknowledging

2     that, the counter-defendants have filed a separate motion

3     asking for that relief, and that motion remains pending.

4            They had asked to expedite it to have it heard

5     today.  We objected to that.  And as far as I'm aware, the

6     Court has not issued an order setting that on the calendar.

7     So all I would say is that the trustee reserves his rights

8     to address that argument if and when appropriate in response

9     to that motion.

10           Thank you, Your Honor.

11           THE COURT:  Just a few questions.

12           MR. BASSETT:  Sure.

13           THE COURT:  So I understand your arguments, I

14    believe.  I've read the papers.  As I noted at the beginning

15    of your argument, I'm going to be -- I am focused on the

16    five -- the 56(a)(1) and (a)(2) statement.

17           And when counsel for the counter-defendant --

18    counterclaim defendants speak -- and I mean, I've seen

19    several facts that the trustee put forth that the

20    counterclaim defendants object to.

21           And you may need to be prepared to respond to that

22    if and when the counterclaim defendants raise those

23    objections in their argument, because there are, as you

24    know, the 44 facts in the trustee's 56(a)(1) statement, and

25    then there's these additional material facts that the

1    counterclaim defendants have set forth.

2           And while I -- you have not addressed those at

3    this point, but I'm going to have the parties address those

4    issues.  So --

5           MR. BASSETT:  No, no.

6           THE COURT:  -- I don't know if you want to make

7    any statements at this point with regard to the additional

8    material facts set forth by the counterclaim defendants, but

9    I'm going to have you respond -- either tell me now or I'm

10   going to have you respond to those issues when the

11   counterclaim defendants make their arguments.

12          MR. BASSETT:  Sure.  And I'm happy to -- maybe

13   I'll respond now to the extent that I can.  And then,

14   obviously, when counsel -- if and when counsel raises

15   particular issues, I can respond to those again in rebuttal.

16          What I would say is that -- well, obviously, our

17   56.1 statement contained a number of facts, many of which

18   are contextual, in leading up to the relief that we're

19   ultimately seeking.

20          What I tried to do in my argument today was

21   emphasize for the Court the only facts that I think are the

22   material facts that the Court needs to consider in order to

23   determine that HK USA is the debtor's alter ego.

24          And, you know, they dispute other facts.  There

25   may be facts that are disputed in our 56.1 statement, but

1    the Court -- to the extent that some of those facts are

2    disputed, that would not prevent the issuance of summary

3    judgment.

4              THE COURT:  I'm not saying it would or wouldn't.

5    I'm just saying I want the record to be clear --

6              MR. BASSETT:  And what I would --

7              THE COURT:  -- with regard to these issues.

8              MR. BASSETT:  And I would emphasize is that the

9    Rule 56.1 statements are clear, and I articulated this

10   before and I gave references to it, that the only assets

11   that HK USA has ever had are the Lady May and now the Lady

12   May II.  It's also undisputed that the trustee, via the

13   debtor, owns and controls those assets.  There's an

14   admission.  I think it was paragraph 12 that I referenced.

15             It's also undisputed, and this is a quote, because

16   it's a -- this comes from, in part, a letter that Attorney

17   Vartan had submitted, I believe, to the New York court that

18   we put before the Court.  And they, of course, admitted this

19   in full in their statement of facts that HK USA has never

20   had any officers, employees, or bank accounts or directors.

21   It's never had any assets other than the Lady May and the

22   Lady May II.  It's never had -- it's never been capitalized

23   in any way.  It's never maintained its own email server for

24   communications.

25             Those facts demonstrate that all that's ever --

1    all HK USA has ever done -- and there's no counter -- other

2    than there are a couple of statements in the

3    counter-defendant's statement of facts where they say that,

4    well, HK USA through Mei Guo has entered into certain

5    contracts.  These contracts that they reference are a series

6    of non-disclosure agreements with parties who work on the

7    boat and then one agreement with the staffing company.

8          A couple of responses to that.  First, these are

9    agreements that go to the ownership and control of the Lady

10   May.  It has already been established that the debtor's

11   daughter does not control the Lady May or its operations.

12   And that's for good reason, by the way.  This record is

13   before the Court, because the Court decided in connection

14   with the first summary judgment motion.

15         And while the Court decided that on the basis of

16   collateral estoppel, there's a reason why Justice Ostrager

17   reached the decision that he reached.

18         Because at the February 2022 hearing, when all of

19   these individuals testified -- and, by the way, this is also

20   before this Court in Mei Guo's deposition testimony that we

21   submitted as part of our reply on the motion for summary

22   judgment where we asked her to review and confirm and agree

23   with the statements that these individuals made before

24   Justice Ostrager.

25         The former captain of the Lady May, a person at

1    the management company, YACHTZOO, they all took the stand,

2    and they all said they never had contact with the debtor's

3    daughter.  She was not giving them directions.  And she

4    agreed to all of that in her deposition.  And I can give the

5    Court citations to the deposition transcript.

6           They also testified that it was the debtor's --

7    that it was the debtor himself, the daughter's father, who

8    gave directions as to where the boat should go.  One of them

9    was asked, you know, who was on the boat more, the debtor or

10   the debtor's daughter.  He said the debtor by far.

11          All of that is relevant given the fact that the

12   only thing counter-defendants can point to as purportedly

13   additional activities of HK USA -- if you look at all of

14   their statements of facts, it's all noise about what Justice

15   Ostrager did or did not decide.  That's irrelevant and moot,

16   because it's law of the case that collateral estoppel

17   applies to the ownership question.  Everything else is

18   irrelevant to the alter ego analysis.

19          Again, because as far as I can recall, the only

20   thing they point to are these contracts.  But those

21   contracts prove nothing when they relate to the Lady May,

22   which is the only asset of HK USA, which the Court has

23   already found the debtor owned and controlled.

24          So, again, I'm happy to address other facts, but I

25   don't think there's anything else they raise that's material

1    to the analysis.

2              THE COURT:  Ms. Guo's deposition that you're

3    speaking of, that is attached to your declaration, the

4    deposition in January of this year?

5              MR. BASSETT:  That's correct.  And I'll just give,

6    for the record, some citations to particular testimony.  And

7    so that deposition transcript, page 93 --

8              THE COURT:  All right.  Just give me a moment.

9    Okay?  I'm looking --

10             MR. BASSETT:  Sure.

11             THE COURT:  I'm looking at your declaration, and I

12   believe it -- the deposition transcript is Exhibit 12 to

13   your declaration.  Is that right or no?

14             MR. BASSETT:  Let me check.

15             THE COURT:  I want to make sure I'm looking at the

16   right thing.  Oh, maybe not.

17             MR. BASSETT:  Well, it's --

18             THE COURT:  Oh, you're look -- you're talking

19   about your -- in the reply.

20             MR. BASSETT:  Yeah.  It's attached to the reply.

21             THE COURT:  Okay.  So not attached to your

22   original declaration but attached to the reply.

23             MR. BASSETT:  That's right.

24             THE COURT:  Which is ECF Number 209 that was filed

25   on Monday.  I mean, what's today?  On Tuesday.  On Tuesday

1    the 18th.

2              MR. BASSETT:  That's right.

3              THE COURT:  Okay.  Go ahead.  You want me to go to

4    page 93?  Is that what you're saying?

5              MR. BASSETT:  Sure.  And Your Honor can do it now,

6    or I can give you the citations to the record to look at it

7    later.  It --

8              THE COURT:  I'd like to go --

9              MR. BASSETT:  Sure.

10             THE COURT:  -- there right now.

11             MR. BASSETT:  Sure.

12             THE COURT:  Okay?  So where on page 93 do you

13   specifically want me to look at?

14             MR. BASSETT:  So if you -- I think it's beginning

15   at line 16.  There are questions asked of -- we asked in the

16   deposition Ms. Guo to look at the testimony of Russell

17   Stockil, who was the person responsible for management at

18   YACHTZOO.

19             And if you look at that testimony from 93, I

20   think, 16 to 94-16, she -- Mei Guo confirms the accuracy of

21   his testimony that she never contacted him about the yacht.

22             If you go down to 95-13 to 96-3, Mei Guo confirms

23   the testimony that she never spoke to Mr. Stockil.

24             And if you go to 96-4 to 22, she confirms his

25   testimony that all instructions related to the Lady May came

1    from "the family office."

2            So again, you know, to the extent that they're

3    pointing to these management agreements, it doesn't

4    establish independent control over HK USA, one, because the

5    Court already found that the debtor has that control, and

6    two, because the other facts demonstrate that she, in

7    reality, was not exercising control.

8            97-13 to 99-3 is another excerpt.  This is

9    questions about the testimony of Momchil Ivanov.

10           THE COURT:  I'm sorry.  97 what?  I apologize.

11           MR. BASSETT:  97-13 to 99-3.

12           THE COURT:  Okay.  Give me one second, please.

13           MR. BASSETT:  Sure.

14           THE COURT:  Okay.  Go ahead.

15           MR. BASSETT:  These are the questions about the

16   testimony of Momchil Ivanov who is the former captain of the

17   Lady May.  And here, again, if you look at the transcript,

18   Mei Guo agreed with Mr. Ivanov's testimony that he never

19   spoke to Mei Guo and never took directions from her.

20           If you go to page 102, line 4 to 107, line 17,

21   this is testimony about Craig Heaslop, who's the current

22   Lady May captain.  And the testimony here, which Mei Guo

23   confirmed she did not disagree with, was that the debtor was

24   "on and off the yacht."  And when asked, he said that the

25   debtor was on the yacht much more than his daughter.

1          Mei Guo also confirmed the accuracy in this

2     excerpt that I've referred the Court to of Mr. Heaslop's

3     testimony that Mei Guo was not the one who ultimately told

4     him -- told Mr. Heaslop that the yacht no longer needed to

5     stay in New York.  She also confirmed his testimony that the

6     debtor, when he would use the yacht, would direct where it

7     goes on all occasions.

8          I would also point the Court to page 168 of the

9     deposition transcript.

10         THE COURT:  Give me a moment to get there, please.

11         MR. BASSETT:  Sure.

12         THE COURT:  Okay.  Go right ahead.

13         MR. BASSETT:  And she was asked in particular

14    about these NDAs and this staffing agreement and asked --

15    this is 168-13.  She was asked whether she was aware of any

16    other documents at HK USA that bearing -- that bear her

17    signature.  Her testimony, "I'm not sure."

18         That's not surprising, because, again, it is

19    admitted and not disputed, much less genuinely disputed,

20    that HK USA didn't do anything else.  There's nothing else

21    for her to have signed a contract regarding.

22         And the fact that she -- to be clear, the fact

23    that she signed these NDAs and one staffing agreement does

24    nothing to wrestle control over HK USA from the debtor where

25    the debtor, indisputably at this point, is the one who owned

1    and controlled the Lady May.  He was the one making the

2    decisions for the Lady May.  He controlled it, not her.

3         I would also point out that these agreements, the

4    NDAs and the staffing agreements, were provided and dated --

5    curiously, to say the least, they were provided in the midst

6    of the PAX litigation in New York where the debtor's

7    daughter was trying to show through the testimony which

8    Justice Ostrager deemed completely not credible that there

9    was some separateness and that she somehow exercised

10   independent control over HK USA.

11        And because of that curious timing, we, of course,

12   asked her, as the deposition transcript indicates, whether

13   she's aware of any other agreements, any NDAs with the

14   current captain, any documents from other times.

15        THE COURT:  You asked her that?

16        MR. BASSETT:  We asked her that in her deposition.

17        THE COURT:  Not in the deposition -- on the page

18   you were just showing me?  Is that where you're talking

19   about?  You said this came out during the PAX litigation --

20        MR. BASSETT:  No.  That did.  But we were asking

21   her about that --

22        THE COURT:  Okay.

23        MR. BASSETT:  -- in her deposition.

24        THE COURT:  Okay.  Go ahead.

25        MR. BASSETT:  And it's the -- I think the

1    deposition testimony that I just cited for the Court stands

2    for that proposition, because we asked her are you aware of

3    any other agreements.  She said, I'm not sure.

4           I think there was a point where we asked her more

5    specifically about whether there were NDAs with other

6    people.  And I could find that.  But either way, the answer

7    was no.  And I think that's revealing, because the only NDAs

8    and the only agreement she were (sic) able to come up with

9    were ones that came about when there was a litigation reason

10   to produce them.

11          So, you know, the other thing I would point out

12   just on the issue -- all these facts that I've been

13   discussing go to this.

14          But on the issue of whether collateral estoppel

15   applies here, again, that's not what we're arguing.  We're

16   not arguing that this is a collateral estoppel issue where

17   Ostrager decided collateral -- decided, you know, alter ego.

18          Rather, the Court already decided ownership.

19   That's binding.  That's law of the case.  Needs not be --

20   does not need to be revisited.

21          But even if for some reason the Court were

22   inclined to -- and, again, I don't even think the Court can,

23   because it's on appeal, and there's no jurisdiction.  But

24   even if the Court could reconsider that, these facts that

25   I've just read and other facts in the record make clear

1    beyond doubt who the owner and controller of the Lady May

2    was.

3              In addition to the facts that I just read, if you

4    look at the complaint itself, the story in the complaint in

5    this action is that while Mei Guo was detained in China, her

6    brother in February of 2015 purchased the Lady May for her

7    even though she did not come to the U.S. and have access to

8    the Lady May even in theory until -- by her own admission in

9    her complaint, until May 2017.

10             But who was in the U.S. and who did have access to

11   the boat?  This is the paragraph immediately preceding the

12   paragraph talking about the Lady May being purchased in

13   February 2015 in their complaint.  The debtor fled to the

14   United States in early 2015.

15             It just -- and for all of these reasons, which

16   again I -- we shouldn't even be talking about, because this

17   issue need not be re-litigated.  But that's why Justice

18   Ostrager reached the decision that he did.  There's simply

19   no credible basis to believe that this yacht was actually

20   purchased for the daughter and not the debtor.

21             And it's also undisputed -- you looked at the

22   complaint.  HK USA was created for the purpose of having the

23   Lady May transferred from a BDI entity to a US entity.

24             And I think Mei Guo said in her deposition -- I

25   don't have the particular site for it -- the deposition in

1    this case that, oh, she thought it would be easier to

2    control if the entity were in the U.S.

3            But what the point is, is that by her own

4    admission this was just a shell company created to own the

5    yacht.  That's all it is.  And it's already been established

6    that the debtor owns and controls the yacht.

7            This is a rare alter ego case, as I said, for its

8    simplicity.  You have a situation where this entity did

9    nothing else ever, and the debtor dominated and controlled

10   its only asset which provided the basis for the only

11   operations and business the entity ever engaged in.  Thank

12   you.

13           THE COURT:  All right.  Thank you, Attorney

14   Bassett.

15           Let me hear from the counterclaim defendants,

16   please.

17           MS. WERNICK:  Good morning, Your Honor.

18           THE COURT:  Good morning.

19           MS. WERNICK:  Hi.  This morning, the trustee has

20   asked the Court to make a remarkable finding that a

21   non-record owner is the alter ego of a Delaware limited

22   liability company.

23           And it's remarkable, because there's no construct

24   under Delaware corporate law to make such a finding.  And

25   the trustee notably in its reply to the motion for summary

1    judgment offers no case law to the contrary and makes just a

2    passing reference in its presentation this morning.

3                  THE COURT:  Let me just stop you right there.

4                  MS. WERNICK:  Uh-huh.

5                  THE COURT:  What do you mean when you say there's

6    no law in Delaware that supports a finding that there can't

7    be an alter ego --

8                  MS. WERNICK:  Sure.  Certainly.  So under sort of

9    black letter Delaware law, veil piercing applies to hold a

10   member or shareholder responsible for a company's liability.

11   And then there's a separate construct of a reverse

12   veil-piercing claim that applies to hold the company liable

13   for a shareholder's liability.

14                 THE COURT:  Well, what about Judge Walrath's case

15   that says it doesn't have to be companies, it doesn't have

16   to be -- it says as long as there isn't a relationship,

17   there can be veil piercing.  What about that case?

18                 MS. WERNICK:  So the relationship has to be

19   established.  And so, here, the essence of our argument is

20   that the trustee is skipping steps, is taking the conclusion

21   in the summary judgment decision that the Lady May is owned

22   by the debtor and applying that, and I think it's stated

23   quite clearly on page 2 of the initial moving papers, to say

24   that the only reasonable conclusion must be that the debtor

25   also controls and owns HK USA.

1          But that's a separate legal analysis and step that

2     is really entirely glossed over in the entirety of the

3     summary judgment proceedings, right?  It's --

4          THE COURT:  Okay.  I just want to understand your

5     argument.  And I'm not saying -- just don't understand your

6     argument at the moment.  Okay?  This is a counterclaim

7     asserting an alter ego theory, right?  So they've made these

8     assertions in the third counterclaim.  And you're saying

9     they're skipping steps because summary judgment was entered

10    on the first counterclaim?

11         MS. WERNICK:  So, I mean, I think -- I don't know

12    if it was inadvertent or intentional, but referencing, I

13    think, the third counterclaim here is important, right?  So

14    right now we're here on summary judgment proceedings with

15    respect to the second counterclaim --

16         THE COURT:  I'm sorry.  The second counterclaim.

17         MS. WERNICK:  -- on alter ego.  But I think it is

18    important that the Court notes that there is a third

19    counterclaim where the trustee specifically asserted a claim

20    that HK USA is owned by the debtor in contrast to the alter

21    ego claim that's now before the Court.

22         And our position is that that's really a necessary

23    step in the Court's consideration to reach the alter ego

24    question.  And by skipping essentially what they had raised

25    as a separate counterclaim in terms of ownership of HK USA,

1    the Court -- the trustee is asking the Court to really rely

2    on more of a conclusory argument in reaching its alter ego

3    determination.

4            THE COURT:  All right.  So you're saying that the

5    motion for summary judgment should be on both Counts 2 and

6    3?

7            MS. WERNICK:  So the -- because I think that

8    the --

9            THE COURT:  Is that your argument?

10           MS. WERNICK:  Yeah.  Essentially.  Because it's an

11   important step to -- for -- and it's really -- it's the

12   trustee's burden, right?

13           We're here on a summary judgment motion to

14   establish the ownership and control of HK USA as part of the

15   alter ego analysis.  And the ownership and control of HK USA

16   is a much more fact-intensive question than this really

17   threadbare record that's before the Court this morning.

18           THE COURT:  Well, when you say threadbare record,

19   you've admitted in the -- in your 56(a)(2) statement at

20   paragraph 7 that HK USA generated no revenue; has no

21   directors, officers, or employees; has not filed tax

22   returns; had no bank account and otherwise -- had not

23   otherwise been capitalized; and maintained no documents

24   other than those relating to the Lady May.  That's your

25   admission.  So how is that threadbare?

1              MS. WERNICK:  Because there's no nexus -- and

2      that's the key, to the summary judgment motion here this

3      morning.

4              And I think it would be all the more clear if we

5      were here in connection with a Count 3 counterclaim

6      regarding ownership of HK USA.  Because there's nothing in

7      paragraph 7 that connects to the debtor, right?

8              So those are assertions generally with respect to

9      HK USA.  But nothing therein ties back to ownership or

10     control to the debtor.  And I think that's the step that the

11     trustee is --

12             THE COURT:  Well, when you say nothing ties back

13     to ownership or control, so you're saying the Court's prior

14     orders don't matter with regard to that issue?

15             MS. WERNICK:  No, of course not, Your Honor.  But

16     they're addressing separate things.  And so the Court's

17     prior order with respect to the -- Count 1 of the

18     counterclaim relates to ownership of a specific asset, the

19     Lady May.

20             THE COURT:  Right.  And you've just admitted in

21     paragraph 7 that's all -- HK USA ever had.

22             MS. WERNICK:  So that's the -- but that's not

23     the -- there's no admission there that that's the entirety

24     of the purpose or connecting the debtor to HK USA --

25             THE COURT:  Well, wait a minute.

1           MS. WERNICK:  -- the entity.

2           THE COURT:  Hold on.  That's a little bit

3    different.  You're changing your argument now.  You admit

4    that the only asset of the -- of HK USA is the Lady May.

5    And you just stated that this Court found that the debtor

6    owns and controls the Lady May, right?  So --

7           MS. WERNICK:  Yeah.

8           THE COURT:  So then I don't understand your

9    argument.

10          MS. WERNICK:  And so that's the exact equation

11   that the trustee is asking you to make this morning, that

12   the finding that the debtor owns -- that the debtor owns the

13   Lady May is sufficient to determine that the debtor also

14   must, without having additional showings or determinations,

15   own HK USA or that it must therefore be the alter ego.

16          And one thing -- and I think this is an important

17   point that was absent from the earlier conversation with

18   counsel is that while there -- we recognize that HK USA's

19   asset was the Lady May, the real reason why we're here,

20   right, is not the Lady May.  The trustee already has the

21   Lady May.  The real reason why we're here is the $37 million

22   loan from Himalaya that the trustee also wants to have as

23   part of the estate.

24          And so there's no question, and we've included it

25   in our statement of material facts -- and I'll give you the

Ho Wan Kwok - April 20, 2023                            41

1   paragraph references related -- beginning at paragraph 53 of

2   our additional facts -- is that the loan agreements with

3   Himalaya --

4           THE COURT:  Wait.  Hold on.  You're on page what?

5           MS. WERNICK:  I'm sorry.  On paragraph 53.

6           THE COURT:  Paragraph 53 of your additional

7   material facts?

8           MS. WERNICK:  Yes.  It's page 23, paragraph 53.

9           THE COURT:  Okay.  Go right ahead.

10          MS. WERNICK:  Is that the agreements relating to

11  the Himalaya loan were entered by Ms. Guo and Ms. Guo has

12  taken a personal guaranty with respect to the $37 million

13  loan.  And she was, in fact, personally sued in an

14  arbitration that's pending in the London Court of

15  International Arbitration as a result of the failure to

16  repay that loan amount.

17          THE COURT:  Well, okay.  Where does it say that in

18  paragraph 53, what you just said?

19          MS. WERNICK:  So 53, continuing on to 56 on the

20  next page.

21          THE COURT:  Okay.  All right.  That's what I'm

22  saying.

23          MS. WERNICK:  Yes.

24          THE COURT:  Just tell me where you're reading it.

25  Tell me -- okay.

1          MS. WERNICK:  Sure.  No problem.  And so not

2     reading directly.  But those points are referenced generally

3     in paragraph --

4          THE COURT:  Okay.

5          MS. WERNICK:  -- 53 to 56.

6          THE COURT:  Okay.  And when at the time that the

7     $37 million was put into escrow was the Court made aware of

8     that the loan was guaranteed by Mei Guo?  Because I don't

9     recall ever learning that until now.

10          MS. WERNICK:  So this is certainly part of the

11     record.  My belief is as part of the prior PJR

12     proceedings --

13          THE COURT:  But at the time -- I -- that wasn't

14     the question.

15          MS. WERNICK:  Yeah.  So I --

16          THE COURT:  The question was, when --

17          MS. WERNICK:  I don't know the answer to that

18     specific question as whether in August of 2022 that issue

19     was raised.

20          THE COURT:  Oh, I think it was earlier than August

21     2022.  I think the $37 million was delivered to the -- into

22     escrow before -- while the debtor was still a debtor in

23     possession.

24          That was all part of the resolution of the motion

25     for relief from stay and in connection with the debtor's

1     proposed plan of reorganization in which the Lady May was

2     going to be gifted, essentially, to the estate for the

3     benefit of creditors.

4              So my question is, you're raising facts now that

5     were not ever disclosed or raised at the time that the $37

6     million transaction occurred.  It was a loan from Himalaya

7     financial is my recollection.  And there was no -- I mean,

8     someone should correct me if I'm wrong.

9              But I don't remember ever hearing anything about

10    Ms. Guo, who I don't even think had filed an appearance in

11    the case at this time -- at that time and certainly wasn't

12    represented in this Court at that time, that she guaranteed

13    that $37 million loan.

14             So now you're adding -- so you're -- and the

15    reason I'm having this conversation with you is you're

16    saying to me that these are additional material facts.

17    Well, how is it material?

18             How is it material to whether or not summary

19    judgment should enter on the second counterclaim of whether

20    Ms. Guo personally guaranteed a loan, didn't repay it, and

21    there's some proceeding in Europe?  How is that a material

22    fact?

23             MS. WERNICK:  Certainly.  Because Ms. Guo

24    guaranteed the loan as the owner of HK USA.  HK USA had the

25    loan agreement with Himalaya.  Ms. Guo --

1          THE COURT:  Well, where is the guarantee

2     agreement?  Did you submit it?

3          MS. WERNICK:  It is -- it's referenced in the

4     cites to the -- yeah.  So in our statement of fact --

5          THE COURT:  But is the actual agreement --

6          MS. WERNICK:  Correct.

7          THE COURT:  Okay.

8          MS. WERNICK:  As part of -- because I think they

9     were all included in the exhibits to the PJR proceedings.

10    And so the referenced statement of facts --

11         THE COURT:  Yeah.  But did you submit it in

12    connection with this summary judgment motion, is my

13    question.

14         MS. WERNICK:  So, yes, by reference to the

15    specific docket numbers in the statement of facts.

16         THE COURT:  All right.  Let's go back to your

17    paragraph then.  You were at 53?

18         MS. WERNICK:  Correct.  And so really the point

19    is, is because that's the point why we're here.  And so I

20    think it's important to take note of that, right?  We're

21    here because the trustee is looking for the $37 million that

22    are being held in escrow.

23         And just on that alone makes clear that HK's

24    separate corporate existence goes hand in hand with Ms. Guo

25    as its sole member who signed the loan agreement and who

1    guaranteed the loan.

2            THE COURT:  All right.  Hold on one minute.  I

3    want to look at this.  You're referring to, I believe, in

4    this adversary proceeding -- the guarantee agreement, you

5    say, is at ECF 84.  So let's just take a look at that for a

6    second.

7            And as you'll recall, your clients consented to

8    the entry of the PJR.  So the Court never looked at and

9    no -- nor was that exhibit introduced into evidence.  I

10   mean, it's part of the record, but insofar as it appears on

11   the docket.  So let me just take a look.  And your exhibits

12   were 3,206 pages.  So I will look at Exhibit 84-2.  It's

13   going to take a moment to --

14           Well, I'm looking at 84-1 which is in this

15   adversary proceeding.  It says, HK International Funds

16   Investments USA, incorporated in the State of Delaware,

17   borrower, and Himalaya International Financial Group BBI

18   (phonetic), lender, April 29, 2022.  Side letter to loan

19   agreement dated April 19, 2022.

20           MS. WERNICK:  Right.  And I believe --

21           THE COURT:  So the --

22           MS. WERNICK:  -- 84 proper is the full loan

23   agreement, and the 84-1 is the side letter.

24           THE COURT:  But the side letter, when was that

25   ever introduced into evidence in the debtor's case when the

1    debtor was a debtor in possession?

2           MS. WERNICK:  I guess I can't comment.  But I'm

3    also not entirely sure as to the relevance as part of our

4    discussion this morning.

5           THE COURT:  Well, you're making it relevant,

6    right?  You're saying that this is a -- this is a genuine

7    issue of material fact.  You're saying to me that this is

8    relevant.  So I'm saying to you, when was this ever -- and

9    it's absolutely relevant.

10          I mean, you're making an argument that this Court

11   should somehow look at facts that have never been put into

12   evidence before in any kind of evidentiary hearing that --

13   about a guarantee of a loan that when the loan was made and

14   disclosed to this Court as part of a settlement of a motion

15   for relief from stay none of these -- none of this was put

16   before the Court.  None of this information was in front of

17   the Court.

18          And so now -- and you're saying -- and your

19   argument is and, by the way, that stipulation that

20   results -- that relates to all this 37 million, the

21   trustee's bound by it.  That's what your argument is.

22          So you're now saying to me how do I -- why do I

23   think this is relevant?  Because you've now said you think

24   it's relevant.  And I'm saying when was this information

25   ever put in the record of the case prior to this adversary

1   proceeding.  And, apparently, it wasn't.

2           MS. WERNICK:  Well, so, I mean, I guess my

3   question is, is -- and I apologize if I'm, you know, having

4   a misunderstanding over more semantics.  Because my -- we're

5   addressing it now --

6           THE COURT:  I don't think it's semantics.  I think

7   it's facts, right?

8           MS. WERNICK:  Well, it's fact, but it's -- the

9   existence of these agreements are facts that are material

10  facts for purposes of --

11          THE COURT:  So how are they -- no.  Excuse me.

12  But they're facts.  How are they material if you're now

13  saying the trustee should be bound by this stipulation, and

14  you're saying the trustee should be bound by this

15  stipulation for many reasons, including that Ms. Guo

16  guaranteed the loan, a fact that no one knew prior to this

17  adversary proceeding?

18          MS. WERNICK:  So to be clear, I'm -- my argument

19  right now is not with respect to the stipulation.  And I

20  understand that the Court ruled in its motion to dismiss on

21  the arguments surrounding the stipulation.  So that was not

22  my intent.

23          Why I wanted to raise this guarantee is with

24  respect to the notion that there's no connection between

25  Ms. Guo and HK USA separate and apart from the agreements

1    that counsel had already referenced this morning.  And it

2    gets --

3              THE COURT:  Well, the 37 million was related to

4    the Lady May.  So it's all related to the Lady May.  The $37

5    million that was put in escrow was put in escrow with regard

6    to the stipulation for the return of the Lady May.  Isn't

7    that correct?

8              MS. WERNICK:  Yes.  And she -- and personally

9    guaranteed by Ms. Guo.

10             THE COURT:  And no one knew that it was personally

11   guaranteed.  And by the way, I'm looking at the guarantee

12   agreement, and it says it's dated effective as of April 19,

13   and it's signed with no witness, no nothing, no date.  So we

14   have no idea when that guarantee agreement was signed.

15             There's nothing in the record that establishes

16   that this guarantee agreement was actually entered into at

17   the time that the loan was made.

18             And there was no evidence submitted to this Court

19   at the time of the resolution of the relief from stay motion

20   that talked about Ms. Guo personally guaranteeing the $37

21   million loan.  And what was she personally guaranteeing it

22   with?

23             MS. WERNICK:  Yeah.

24             THE COURT:  What was the collateral?

25             MS. WERNICK:  So --

1          THE COURT:  What does she have?

2          MS. WERNICK:  No.  And so right --

3          THE COURT:  You could get into that.

4          MS. WERNICK:  Yeah.

5          THE COURT:  If you want to get into the

6     materiality of it, and if you think it's material, then it

7     would have to be material as to what it was that she had as

8     assets to -- that -- why Himalaya Financial would want her

9     personal guarantee.  Because that's what a guarantee's for.

10         So what is it that she had as assets?  If you're

11    saying that these facts are material, then you haven't gone

12    all the way you need to go.  Okay?

13         So I don't find that this is material unless you

14    can somehow establish that -- first of all, there's a

15    guarantee agreement that isn't -- is not dated.  It says

16    effective as of.  I don't know when she signed it.  It never

17    was part of this record.

18         And you're now coming here and saying to me, but,

19    you know, Judge, the reason you can't grant summary judgment

20    on this counterclaim is because Mei Guo guaranteed the loan

21    that Himalaya Financial made for the $37 million to come

22    into this estate and to provide for the return of the Lady

23    May to the United States.  That's what you're saying.

24         MS. WERNICK:  So, I mean, I -- respectfully, Your

25    Honor, I would submit that this has been part of the record

1    since it was included with our exhibits.  The trustee

2    certainly --

3                THE COURT:  The PJR exhibits --

4                MS. WERNICK:  Right.  Correct.

5                THE COURT:  -- that were filed months ago and well

6    after the loan was made and after Mr. Kwok was no longer a

7    debtor in possession, correct?

8                MS. WERNICK:  Correct.

9                THE COURT:  Okay.

10               MS. WERNICK:  Correct.

11               THE COURT:  Go ahead.

12               MS. WERNICK:  Yeah.  And there's no dispute that

13   Ms. Guo has now been sued on this guarantee and is

14   personally on the hook by virtue of --

15               THE COURT:  Well, I don't know that there's no

16   dispute.  You put something in here that she's been sued.

17   Okay.

18               MS. WERNICK:  Yeah.  So, I mean --

19               THE COURT:  She's been sued.

20               MS. WERNICK:  -- but we are -- I mean, we're --

21   we've again appended to --

22               THE COURT:  Okay.

23               MS. WERNICK:  -- the docket --

24               THE COURT:  Why don't you continue.

25               MS. WERNICK:  -- a -- all right.  Thank you, Your

1    Honor.

2          THE COURT:  Why don't you continue.

3          MS. WERNICK:  But this is exactly the point.  And

4    I think it's a fallacy to say that this is the only thing

5    that's being put forward to demonstrate Ms. Guo's ownership

6    of --

7          THE COURT:  Well, you put it into -- you've put it

8    into question, because you say it's material.

9          MS. WERNICK:  Oh, and I would maintain that point.

10   I think it's material.  I think all -- the operating

11   agreement for HK USA is material.  I think all of the --

12         THE COURT:  And it all relates -- and the only

13   asset that HK USA had was the Lady May.

14         MS. WERNICK:  Correct.

15         THE COURT:  And the only guarantee that supposedly

16   Ms. Guo gave was with regard to a loan that relates directly

17   to the Lady May, correct?

18         MS. WERNICK:  And she is now on the hook for.

19   Correct.

20         THE COURT:  Well, whether she is or isn't, that's

21   not this Court's issue, right?

22         MS. WERNICK:  But it speaks directly to the point

23   of the domination that the trustee is asking you to infer.

24   The domination and the --

25         THE COURT:  They're not asking me to infer

1    anything.  They're asking me to find that there are no

2    genuine issues of material fact, most of which you have

3    admitted to in your Rule 56(a)(2) statement.  They're not

4    asking me to infer anything.

5         MS. WERNICK:  I mean, I disagree.  Because they

6    are starting with the proposition that the Lady May is owned

7    by the debtor, which this Court found, which is subject to

8    the appeal and we're not looking to collaterally attack in

9    this proceeding this morning.

10        However, they're taking that proposition that the

11   Court decided and -- I don't know how else you would phrase

12   it but inferring, because that's essentially what they say

13   on page 2 of their brief -- that the only possible

14   conclusion on the record is that the debtor also owns and

15   controls HK USA.

16        I don't know what else to call that but for an

17   inference that's not supported by any material facts

18   presented in their statement connecting the debtor to the

19   separate corporate entity, HK USA.

20        I mean, again, going back to the paragraph that

21   we -- that the Court referenced in paragraph 7.  Nothing in

22   that paragraph connects HK USA to the debtor.  And so that's

23   really the essence of the proceeding this morning is, from

24   our perspective, to skip necessary steps in actually making

25   a determination with respect to the debtor's ownership of HK

1    USA, which I don't see any, frankly, on the record that was

2    submitted by the trustee.

3            And I think, you know, to cut to the point of the

4    alter ego determination -- and, I think, you know, it's fair

5    to say the undisputed two-prong test that courts look to

6    under Delaware law, this goes back to the domination and

7    control discussion that we had a little while ago and

8    whether there is operation as a single economic entity.

9            So the record before the Court -- and, again, I

10   would point you to in our statement of additional facts

11   beginning at paragraph 10 is that Ms. Guo is the owner of HK

12   USA.  She's the only member in -- referenced in the

13   operating agreement.

14           I think it's undisputed that she formed the

15   company in 2019 which, incidentally, predates this

16   bankruptcy by a number of years and predates the judgment in

17   the New York action.  That Ms. Guo is the signatory on

18   agreements relating to HK USA.  And, again, that Ms. Guo

19   personally guaranteed the loan obligations of HK USA.

20           And what is, you know, all the more important for

21   purposes of this conversation, because the Court is not --

22   the trustee is not asking the Court to make a determination

23   that HK USA has a alter ego.  It's asking the Court to make

24   a determination that the debtor is HK USA's alter ego.  But

25   there are no agreements involving the debtor.  There's no

1    agreements where the debtor is a signatory or a beneficiary.

2              THE COURT:  Where in the law does it say there

3    have -- there has to be?

4              MS. WERNICK:  Well, so --

5              THE COURT:  What cases are you citing from --

6    under Delaware law that says it has to -- there -- that has

7    to be before any court could make the finding that the

8    trustee's --

9              MS. WERNICK:  Sure.  And I would reference the

10   Court to the cases cited in our brief with respect to the

11   fact --

12             THE COURT:  Well, no.  I'm asking you.

13             MS. WERNICK:  It's a fact --

14             THE COURT:  You tell me in those cases where --

15             MS. WERNICK:  Yeah.  Where --

16             THE COURT:  -- where it holds that.

17             MS. WERNICK:  Certainly.  That it's a

18   fact-specific determination under Delaware law.  And the

19   facts before the Court, respectfully, do not yield to the

20   conclusion that the trustee is asking the Court to find on

21   summary judgment where it's their burden, right?

22             So a number of times in counsel's presentation

23   this morning is nothing that -- looking back to HK USA,

24   nothing that we've presented to, you know, challenge their

25   assumptions.  But it's their burden, right?  They have the

Ho Wan Kwok - April 20, 2023                                    55

1    burden to show that --

2            THE COURT:  Where does it say under Delaware law

3    that they have the burden to show that the party who they're

4    seeking to have this second counterclaim have summary

5    judgment enter has to be a party to a contract?  Where does

6    it say that under any of the cases that you've cited?

7            MS. WERNICK:  It's a -- so, I mean, respectfully,

8    it's a holistic determination.  But there's no case -- to

9    put the shoe on the other foot, there's no case that the

10   trustee has cited, and I'm sure that if there were, they

11   would have pointed it out to the Court with flashing lights,

12   that stands for the proposition that solely because there's

13   a determination with respect to an asset that that must mean

14   that a separate legal entity is the alter ego of the owner

15   of that asset.

16           And, in fact, I think it's --

17           THE COURT:  The only asset of that entity.  And

18   you've admitted that --

19           MS. WERNICK:  Yeah.

20           THE COURT:  -- numerous occasions, as has your

21   client in testimony.

22           MS. WERNICK:  Certainly.  But that would create a

23   slippery slope for conclusions that any holding company is

24   automatically the alter ego --

25           THE COURT:  Well, no, it wouldn't, because you

1    just stated it would depend upon the facts and circumstances

2    of the case, correct?

3              MS. WERNICK:  Correct.

4              THE COURT:  Okay.

5              MS. WERNICK:  Certainly.  It's a fact-specific --

6              THE COURT:  Okay.

7              MS. WERNICK:  -- inquiry that is often found by

8    courts not to be ripe for determination on summary judgment

9    because of that factual inquiry.  And so I would apologize

10   for -- I'm finding the page.  But I would refer to the cases

11   cited in paragraph 55 of our brief.

12             THE COURT:  Okay.

13             MS. WERNICK:  So that was touching upon the first

14   prong of the alter ego analysis.  And I think the second

15   prong is equally as conclusory from the trustee's

16   presentation that somehow that HK USA was perpetrating a

17   fraud or injustice.

18             And I would go back to the notion that HK USA was

19   formed by Ms. Guo in 2019, years before the bankruptcy

20   proceeding and prior to the judgment in the New York action.

21             So for them to conclusorily state that there can

22   be no other conclusion that it was intended to serve as some

23   fraud again jumps and seeks to skip necessary factual

24   determinations on summary judgment.

25             And so really, Your Honor, I mean, that's the

1    essence of our argument and what we put forward in our

2    papers is going back to the very simple assertion that we

3    have a fundamental disagreement with where the trustee seeks

4    to take part one that the Lady May is owned by the debtor

5    and skip forward two or three steps to argue that HK USA

6    therefore must somehow be the debtor's alter ego.  There is

7    necessary findings that are required to reach that

8    conclusion that we respectfully submit can't be made on the

9    record before the Court.

10            THE COURT:  Okay.  Anything further?

11            MS. WERNICK:  Nothing further.  Thank you.

12            THE COURT:  Mr. Bassett, do you have any response?

13            MR. BASSETT:  Yes, Your Honor.  Just a few points

14   in response.  First, one of the arguments counsel made at

15   the outset was that we're skipping a step, because we first

16   have to establish that the debtor owns HK USA before we can

17   thereafter ask for a finding that its his alter ego.  I

18   don't think there's any support in the law for that

19   proposition.

20            The standard, as I think the Court acknowledged,

21   is what it is as set out in the case law, which is you have

22   to show that one person or one entity exercised dominion and

23   control over another and that it did so for the purpose of

24   perpetuating a fraud or an injustice.

25            And I have some cases that I can point the Court

1     to that stand for the proposition that in order to -- and I

2     think it's an obvious one, but that in order to pierce the

3     corporate veil or to find an alter ego relationship, it's

4     not a predicate that the person who allegedly is using

5     another entity as the alter ego is a named shareholder or

6     owner or member of that company.

7             Case I would cite the Court to is the United

8     States vs. Golden Acres case, 702 F. Supp. 1097 at page 113,

9     Note 7, District of Delaware, 1988.  It was affirmed

10    subsequently by the Third Circuit.  "The alter ego doctrine

11    may be applied even where defendants personally own no stock

12    in the corporation so long as the necessary action and total

13    control have been established."

14            Another case, United States Securities and

15    Exchange Commission vs. Levine, 671 F. Supp. 2d. 14, pages

16    34 to 35.  This was the -- this one is District of D.C. 2009

17    applying Delaware law and finding that the lack of a status

18    of shareholder, officer, or director is not preclusive in

19    finding veil piercing.

20            There's cases from other jurisdictions that have

21    similar standards.  Freeman vs. Complex Computing Company,

22    119 F.3d 1044, Second Circuit, 1997, page 1051.  The court

23    noted that New York courts only require equitable rather

24    than actual ownership for piercing the corporate veil.

25            Mallard Auto Group Ltd. vs. LeClair Management

1    Corporation, 153 F. Supp. 2d. 1211, District of Nevada 2001

2    at page 1215.  It has been noted elsewhere in decisions that

3    the Delaware and Nevada analysis are the same for alter ego

4    purposes.  And the case that I mentioned, the Court found

5    that the lack of stock ownership is not determinative of the

6    alter ego question.

7            So, Your Honor, I don't think it's disputed that

8    there's no predicate determination that needs to be made

9    that the debtor first owns HK USA before it can be found to

10   be his alter ego.  And I had made this point in my opening

11   remarks, but just think about the consequences of that from

12   a practical and an equitable point of view.

13           Any debtor who's trying to shield assets from its

14   creditors through the use of an alter ego would simply have

15   his daughter, for example, or somebody else be the nominal

16   owner.  And then, according to the defendants, the

17   counter-defendants, veil piercing or reverse veil piercing

18   and a finding of alter ego could never be established.  That

19   can't be the law.

20           There was a lot of discussion about -- and, in

21   fact, as it turns out, the entire counter argument on the

22   facts as to why -- as I understand it, at least, basically

23   the entire counter argument as to why HK USA is not the

24   debtor's alter ego is because the daughter signed a personal

25   guarantee of the Himalaya loan and because the Himalaya loan

1    itself was allegedly taken out by the daughter on behalf of

2    HK USA.  A couple of responses to that.

3        First of all, I think the Court was correct in

4    noting that I don't see how there's any materiality to that

5    fact, particularly as it relates to the personal guaranty.

6    I mean, if, as we've alleged, HK USA -- and as we've proven,

7    HK USA is the debtor's alter ego, the fact that the

8    daughter, even if this is a real enforceable guarantee, the

9    fact that the daughter took it out shows nothing more than

10   that she guaranteed what was effectively her father's

11   obligation.  It doesn't show in any way that she is the one

12   who owns and controls HK USA.

13       Also on the 33 -- or on the -- yeah.  On the

14   Himalaya loan issue, I think the context and history and

15   larger record of undisputed facts are absolutely critical.

16   Because what we have is a situation where, for all the

17   reasons I've discussed, and as the statement of the facts

18   that the Court has gone through make clear, there's no

19   dispute that HK USA has never done anything other than own

20   the Lady May and the Lady May II.

21       It's never had employees, officers, directors,

22   bank account, no capitalization, no ability, frankly, to

23   engage in any other business.  And that was all true.  It

24   has been established that was all true at the time of the

25   Lady May stipulation, at the time of this alleged loan.

1          So all you have, according to what the defendants

2     are alleging, is you have a situation where at best the

3     debtor's daughter decided to use her father's alter ego to

4     take out a loan.  And oh, by the way, that makes a lot of

5     sense given the context.

6          Because the whole impetus for that loan and the

7     whole impetus for the Lady May stipulation was the fact that

8     the debtor was standing before this Court desperate to avoid

9     the Court's lifting of the stay to allow PAX to proceed with

10    its litigation before Justice Ostrager.

11         So what I think the record pretty clearly shows is

12    that this was all done for the debtor's benefit.  Again,

13    that's fully consistent with the fact that HK USA was and

14    always has been, including at the time of the loan, the

15    debtor's alter ego.

16         It can't be that -- the best they're doing is

17    pointing to this one isolated event in HK USA's entire

18    history.  But it can't be that that -- even if Mei Guo is a

19    signatory to some of these documents, it can't be that that

20    changes the true character of HK USA; it means it's not the

21    alter ego of the debtor.

22         I mean, what they're asking the Court to conclude,

23    I think, is truly remarkable, because basically what they

24    would be saying is that the daughter could execute this loan

25    on behalf of HK USA, which was at the time and has always

1    been the debtors alter ego, for the purpose of misleading

2    the Court on the Lady May stipulation.

3           And then because she did that, because of that,

4    that in and of itself means that the Court could not

5    subsequently find that HK USA is the debtor's alter ego.  I

6    mean, I think that's an absurd proposition, because it

7    allows them through misconduct to prevent a remedy for that

8    misconduct.

9           A couple of other points that were raised.  The

10   fact that the -- and this goes to the fraud or injustice

11   point as well.

12          But I think counsel said that while the daughter

13   nominally formed HK USA and it did so -- and she did so, you

14   know, prior to some of the events in question, but that's a

15   misconstruction of Delaware law to the extent she's arguing

16   that the entity in question has to have been created from

17   its inception for the purpose of perpetuating a fraud or

18   injustice or to be an alter ego or another -- that's just

19   not the law.

20          What the law is, is that it has to be used to be

21   the alter ego of another.  But even if it were the law,

22   which it's not, again I think the record is absolutely clear

23   what happened here.  You had the debtor's daughter say that

24   her brother bought her a yacht in 2015 when she is in China,

25   but yet she didn't come to the United States until 2017.

1    Meanwhile, the debtor was here the entire time.  And then

2    she says HK USA was formed as a shell company to hold the

3    yacht.

4           I mean, none of that changes the alter ego

5    analysis.  So it's just simply material, to go to the

6    question the Court asked.

7           Counsel did not revisit any of the defenses.  I

8    think that's because there is an acknowledgment that the

9    Court has already decided those in the motion to dismiss.

10   So I won't revisit those again in my concluding remarks.

11          All I would say, Your Honor, is that we do think

12   this -- even though alter ego is admittedly usually a

13   fact-intensive analysis, this is a case, due to the facts as

14   agreed upon by their -- by the parties in their submissions,

15   where it is ripe for summary judgment.

16          Because there is simply no genuine dispute of

17   material fact that the debtor dominated and controlled HK

18   USA by exercising domination and control over its only asset

19   which provided the only basis for any business that it

20   conducted and that he did so for the purpose of shielding

21   assets from his creditors which is made clear by the fact

22   that the debtor and his daughter have scratched and clawed

23   for years to put up the facade of separateness to hide the

24   Lady May from creditors.

25          So we think and we respectfully request that the

1       Court grant the motion for the trustee.  Thank you.

2                 THE COURT:  Thank you.

3                        (Counsel confer)

4                 THE COURT:  I'm going to give them one more

5       minute, and then I'll give you an opportunity to respond.

6       Okay, counsel?

7                        (Counsel confer)

8                 MR. BASSETT:  Sorry about that, Your Honor.  I

9       appreciate the indulgence.  Thank you.

10                THE COURT:  Okay.  Attorney Wernick, would you

11      like to respond?

12                MS. WERNICK:  Sure.  Just briefly.  Thank you.

13      One point just for clarification with respect to the

14      defenses relating to the Wagoner rule, in pari delicto, and

15      the Lady May stipulation.

16            Just for clarity of the record, HK USA is not

17      waiving and maintains its position on those doctrines and on

18      the stipulation but in recognition of the Court's motion to

19      dismiss ruling will not belabor those points for purposes of

20      this argument this morning.

21            And the lasting thing that I would want to leave

22      with the Court, just with all of the information that was

23      put forward in the briefing, I would just enforce that there

24      is nothing connecting the debtor to the HK USA entity

25      separate and apart from the Lady May.  And we would continue

1    to submit that's insufficient for an alter ego determination

2    at this stage.  Thank you.

3              THE COURT:  Okay.  Thank you.

4              All right.  I have taken the arguments of the

5    parties.  I think there may have been one or two cases cited

6    today that were not in the briefs.  Is that correct,

7    Mr. Bassett, those cases that you cited?

8              MR. BASSETT:  A couple of the cases that I cited

9    on rebuttal, yes, that's correct.  They were not.  But

10   they --

11             THE COURT:  All right.  So I'd have to take a look

12   at those.

13             MR. BASSETT:  Thank you.

14             THE COURT:  So I will review the matter after our

15   hearings today, and I will rule accordingly.  Okay?  Thank

16   you.

17             The next matter on the calendar today is the

18   motion -- there are several matters, but the motion for

19   order to show cause why the debtor, Mei Guo, and HK should

20   not be held in contempt for failure to comply with the 2004

21   subpoenas and the motion for a limited stay of order filed

22   by Mr. Kwok, which I believe those matters -- I see those

23   matters as related matters.

24             So I would proceed first with the moving party's

25   motion regarding contempt and the Fifth Amendment issue

1    regarding the Court's ruling that there be some further

2    hearing on the Fifth Amendment issue.  Okay?

3              MR. MORIARTY:  Yes.  Your Honor, just for the

4    record, the motion -- the contempt motion only relates as to

5    the debtor.

6              THE COURT:  Right now it does.

7              MR. MORIARTY:  Okay.

8              THE COURT:  That's correct.

9              MR. MORIARTY:  So --

10             THE COURT:  But I'm just -- that was the title of

11   the motion.  That's all.

12             MR. MORIARTY:  I understand.  Attorney Wernick --

13   I think we're done with HK and Mei -- and Ms. Guo for today.

14   So I think she will be excused, and other counsel will be

15   joining us.

16             THE COURT:  You do whatever you think is

17   appropriate, counsel.

18             MR. MORIARTY:  Thank you, Your Honor.

19             MR. DESPINS:  Your Honor, this is Trustee Despins

20   speaking.  I would like to be heard as a preliminary matter

21   with respect to the Brown Rudnick involvement in these

22   matters before we go to address the merits, if I may.

23             THE COURT:  I will allow you to be heard, and then

24   I'll have to allow the counsel to be able to respond to

25   whatever your statements are for the record, Trustee

1    Despins.

2              MR. DESPINS:  So just tell me when I can proceed.

3              THE COURT:  Go right -- oh, actually, you're

4    right.  Hold on a second.  We need to take appearances for

5    Mr. Kwok, please.

6              MR. BEST:  Thank you, Your Honor.  Stephen Best

7    with the law firm of Brown Rudnick in the Washington D.C.

8    office, B-E-S-T.

9              THE COURT:  Good morning.

10             MR. BALDIGA:  Good morning again, Your Honor.

11   William Baldiga.

12             THE COURT:  Good morning.

13             MR. BALDIGA:  Thank you.

14             MR. HENZY:  Eric Henzy, of Zeisler & Zeisler, for

15   Mr. Kwok.

16             THE COURT:  Good morning.

17             MR. HENZY:  Good morning, Your Honor.

18             MR. MORIARTY:  James Moriarty, Zeisler & Zeisler,

19   also for the debtor.

20             THE COURT:  Good morning.

21             Hold on a second, Trustee Despins.

22             Attorney Friedman, did you want to note your

23   appearance?

24             MR. FRIEDMAN:  Yes, Your Honor.  Peter Friedman,

25   from O'Melveny & Myers, on behalf of PAX.  I will ask to

1    make brief remarks in the context of the motions.

2              THE COURT:  Thank you.

3              MR. FRIEDMAN:  Thank you, Your Honor.

4              MS. CLAIBORN:  And good morning, Your Honor.

5    Holley Claiborn for the U.S. Trustee.

6              THE COURT:  Good morning.

7              All right.  I understand there have been some

8    pleadings filed recently with regard to these issues, and

9    apparently Trustee Despins would like to make an argument

10   with regard to some of the issues that, while I may be aware

11   of them, I don't know that I've actually studied yet.

12             So go ahead, Trustee Despins.

13             MR. DESPINS:  And just to facilitate the Court's

14   task, you know, we're not seeking any relief today on this.

15   But we certainly didn't want to be perceived as waiving any

16   rights.

17             And the point was made in the filing we made

18   regarding the motion for a stay, and it is as follows that,

19   you know, Brown Rudnick represented the debtor as debtor in

20   possession in the case and now is representing him

21   individually in a criminal -- as criminal counsel.

22             And as Your Honor may know, we are -- as part of

23   our investigation as to what happened here, we're deposing

24   all the law firms that have prior -- previously provided

25   services to the debtor.  That will include Brown Rudnick,

1    and that will include Mr. Baldiga.

2           And the concern comes from the fact that,

3    guaranteed, one of the questions that will be asked at their

4    deposition is when did you know that the Government was

5    investigating Mr. Kwok, when did you know that the

6    Government was taking the position that all of this was

7    Kwok's, meaning all of these assets were Kwok's assets.

8           If that puts them in a position where he cannot

9    answer those questions, because he's now appearing as

10   criminal counsel, we have a problem with that.

11          And if there's no issue, then we'll continue to

12   monitor the situation.  But that issue is pretty

13   fundamental.  When you represent a debtor in possession, you

14   don't represent him individually.  You represent him as a

15   fiduciary to the creditors.

16          And now they don't.  And they could be a

17   connection between these two worlds that it was not foreseen

18   at the beginning when they took on this representation of

19   Mr. Kwok as a criminal defendant.  But I want to be clear on

20   the record that there may very well be connections.  And,

21   therefore, we have to act very prudently in that regard.

22          That's the only statement I wanted to make, Your

23   Honor.  Thank you.

24          THE COURT:  Okay.  Mr. Baldiga, just before you --

25   was -- the U.S. Trustee's office was here a moment ago, and

1    they're not -- oh.  Attorney Claiborn?

2              MS. CLAIBORN:  Yes.

3              THE COURT:  Did you hear what Mr. Despins just

4    stated for the record?

5              MS. CLAIBORN:  I did, Your Honor.

6              THE COURT:  And has the U.S. Trustee's Office

7    known about -- I'm not saying you should have known.  I'm

8    saying is this the first time that you are hearing that the

9    trustee has a concern with regard to Brown Rudnick's prior

10   representation of the debtor as a debtor in possession and

11   now Brown Rudnick's representation of the debtor in a

12   criminal matter?

13             MS. CLAIBORN:  Your Honor, I read the pleading

14   filed yesterday by the trustee which raised the issue on

15   some level.  And then the comments made today are the first

16   time I've heard the explanation of some of the issues.  So

17   the U.S. Trustee is, at this time, not prepared to make any

18   comments further about the issue.

19             THE COURT:  I understand you're not prepared at

20   this time to make any comments, but when will you be

21   prepared?

22             MS. CLAIBORN:  I cannot say, Your Honor.  But I

23   will bring the facts of today back to the U.S. Trustee.

24             THE COURT:  Well, I think you need to be prepared

25   to respond as the United States Trustee, as the party that

1    oversees the administration of cases and deals with many

2    issues, including conflict issues.  If this issue is -- if

3    this is an issue, it needs to be raised and addressed.  And

4    the United States Trustee's Office will need to have some

5    position on this issue.

6             This is not -- I mean, I just heard what

7    Mr. Despins said.  I'm going to hear from Mr. Baldiga,

8    obviously.  But, you know, we've been talking about

9    conflicts in this case since the day it was filed.  And the

10   parties need to appropriately address the issues before the

11   Court in this case.

12            And so the United States Trustee's Office, one of

13   the roles is to -- as the overseer of the administration of

14   cases has to assert a position on this issue.

15             And so, Trustee Despins, you're saying you're not

16   putting it before the Court today.  But you are, because you

17   just did.  I mean, it may not be in writing, and there may

18   not be a schedule with regard to briefing and issues and

19   determinations that may or may not be made.

20            But now the Court is in a position where we're

21   having a hearing on whether or not -- and, Mr. Baldiga,

22   Mr. Best can disagree with what I'm going to say.

23            But my belief is that this hearing is -- has the

24   debtor complied with the requirements of his obligations

25   to -- his discovery obligations and, therefore, he's

1    essentially -- because he's asserted the Fifth Amendment

2    privilege, you know, can't be held in contempt and is not --

3    has no ability to purge himself from the contempt.  That's

4    what I think you're going to argue.  Isn't that what you're

5    going to argue, Mr. Best?

6            MR. BEST:  Yes, Your Honor.

7            THE COURT:  Okay.  So then we're in a difficult

8    position, because right now the trustee is saying that he's

9    concerned -- he hasn't said it in writing yet other than

10   I -- in a statement, I understand, in a document that was

11   filed yesterday which I didn't have an opportunity to read

12   yet -- that if you represent -- my understanding of the

13   argument is, is if you represent -- if Brown Rudnick

14   represents Mr. Kwok in a criminal case and has already

15   represented him as a debtor in possession, and the trustee's

16   seeking information with regard to the assets of Mr. Kwok's

17   estate and has to get that information or attempts to seek

18   that information from Brown Rudnick, he believes he will be

19   met with a statement that you can't respond, because you

20   represent him in a -- now criminally.

21           That could cause a problem.  I don't know what

22   else to say about that.  What do you think, Mr. Best and

23   Mr. Baldiga?

24           MR. BEST:  Yeah.  Well, I'm going to -- excuse me.

25   So it may very well be a germane issue in the future.  For

1    the purposes of this hearing and your determination of

2    whether there has been compliance on the subpoena, I don't

3    think the issue is germane.  And it may affect --

4    Mr. Despins' concern may affect future proceedings.  It

5    doesn't affect this proceeding.

6              I think the law -- by the way, thank you.  This is

7    my first appearance before a bankruptcy court.  So I'm

8    normally in other --

9              THE COURT:  You're welcome.

10             MR. BEST:  -- federal courts.

11             THE COURT:  Welcome to the bankruptcy court.

12             MR. BEST:  Thank you very much.  I think that

13   you're going to hear in a measured explanation that we have

14   black letter law before us on the assertion of the Fifth

15   Amendment privilege.

16             And then Your Honor can then revisit the conflict

17   issue if you think that after the arguments today that

18   somehow they're implicated.  But I don't think it's germane

19   for today at least.

20             I'm going to let Mr. Baldiga speak.

21             THE COURT:  Okay.  What I think I'm going to do is

22   I'm going to take a five-minute recess.  I'll come back out

23   here at 11 -- maybe more than five minutes, because I guess

24   it's only 11:21.  But I'll come back out at 11:30.  And it's

25   likely that we'll proceed with arguments.  But I'd like to

1    take a look at something for a moment.

2            So Court is in recess until 11:30.

3            THE COURTROOM DEPUTY:  All rise.  Court is in

4    recess until 11:30.

5            (Court recessed from 11:21 a.m. to 11:30 a.m.)

6            THE COURTROOM DEPUTY:  All rise.  The United

7    States Bankruptcy Court for the District of Connecticut is

8    now in session after recess.  The Honorable Julie Manning

9    presiding.

10           THE COURT:  Okay.  Please be seated.  Will someone

11   mind going out and letting the trustee's counsel know that

12   we're ready?  Oh, I think they're coming.

13           UNIDENTIFIED SPEAKER:  I believe Attorney Skalka

14   just did that.

15           THE COURT:  Thank you.

16                   (Pause)

17           THE COURT:  All right.  Before the Court took a

18   recess, you know, the issue was raised about conflicts

19   and -- with regard to Brown Rudnick serving as both the

20   debtor in possession counsel to Mr. Kwok and the duties and

21   obligations that Brown Rudnick has in that role that

22   continue regardless of the fact that the debtor is no longer

23   in possession and Brown Rudnick's now representation of

24   Mr. Kwok in connection with the allegations -- the criminal

25   allegations made against Mr. Kwok.

1      Mr. Best stated that he doesn't think there's a

2 conflict at the moment.  I'm not -- I don't know if that's

3 fair, but I think that's what you said.  And that you'd like

4 to --

5           MR. BEST:  In essence.

6           THE COURT:  -- proceed with your arguments.  I

7 think we're going to proceed with the arguments today, and

8 then we'll see where things go.

9           But the burden, I think, for this morning,

10 Mr. Best and Mr. Baldiga, are on the debtor in first

11 instance.  And then I'll hear from counsel for the trustee.

12 And then as part of your argument, are you also going to

13 argue, Mr. Best, about this limited stay, or are you going

14 to take that separately?  How are you --

15           MR. BEST:  I can do it all.  I think it's all

16 wrapped up.

17           THE COURT:  I think it is too.  So that'd be fine.

18 Thank you.

19           MR. BEST:  Thank you, Your Honor.

20           MR. DESPINS:  Your Honor, just briefly on this.

21 This is Luc Despins, Chapter 11 Trustee.

22           THE COURT:  Yes.

23           MR. DESPINS:  I want to be clear that there is --

24 that Brown Rudnick is agreeing on the record that there is

25 no waiver of any argument with respect to the issues I

1    raised so that that's very clear.  Otherwise, we should not

2    go forward without -- with that waiver.

3              THE COURT:  Well, I'm not finding that there's a

4    waiver, so I don't know that I need to have Brown Rudnick

5    find -- to make any statement, Mr. Despins.  The

6    statement --

7              MR. DESPINS:  Okay.

8              THE COURT:  -- that you made this morning we've

9    all just talked about.  It's an issue.  I think it's pretty

10   clear that I'm going to have the parties have to address

11   that, including the Office of the United States Trustee.

12   Okay?

13             So I understand your point, but --

14             MR. DESPINS:  Okay.

15             THE COURT:  -- there will be no waiver of the

16   argument made, because it was made last night in a pleading

17   for which I have not had an opportunity to really have any

18   kind of thoughtfulness about it yet.

19             And I will make -- I'm going to -- at the end of

20   today, we're going to have some kind of scheduling order

21   issue with regard to this issue so that it can be addressed

22   in short order.

23             Because even though we're going to have these

24   arguments today, which I agree we should, the issue is going

25   to have to be resolved one way or another, because the

1    Court's not going to proceed down a path of many, many

2    issues in this case if there is an issue that needs to be

3    resolved one way or another with regard to conflicts.  Okay?

4           MR. DESPINS:  Thank you, Your Honor.

5           THE COURT:  All right.  Go ahead, Mr. Best.

6           MR. BEST:  Thank you, Your Honor.  May it please

7    the Court.  I am here to assert that the debtor, also

8    Mr. Guo, also known as Mr. Kwok, has fully complied with his

9    obligations under the subpoena that's before the Court

10   today.  In wrapping the second argument as to a stay in, I

11   give Your Honor and the parties multiple options to explore

12   past that, but it's all wrapped up into the following.

13          The documents that have been requested under the

14   subpoena I am sure will be part of the Government's

15   production, the U.S. Department of Justice's production in

16   the criminal case at issue.

17          And the trustee or any other party who believes

18   they have standing can subpoena those documents which are

19   germane to the specific issue, documents that evidence

20   custody and control by Mr. Guo or Mr. Kwok in other entities

21   or persons.

22          And so whether Your Honor takes it as a stay where

23   then the documents then will be produced and we can agree on

24   protective orders or they're publically produced by the

25   Department of Justice, they are going to be produced in

1    terms of their discovery demands.

2            And now there's two cases.  There's the Southern

3    District case where Mr. Guo is a defendant.  And now there's

4    also as of, I think, yesterday or the day before an Eastern

5    District of New York case where Mr. Guo is a victim.  And so

6    there will be ample evidence provided by the Department of

7    Justice in that case as well.

8            Today, however, the issue that's implicated is an

9    invocation of the Fifth Amendment privilege against

10   self-incrimination.  And, specifically, the question before

11   the Court is, well, how can a mere act of production of

12   documents implicate the Fifth Amendment privilege.

13           And so the doctrine -- and if I may?  I'm sure

14   this is not always on your plate, so I'll walk you

15   through --

16           THE COURT:  Go right ahead.

17           MR. BEST:  -- a bit of history of this privilege.

18   It's called the act of production document doctrine.  And

19   the first case that addressed this that became controlling

20   law for this country was in, I believe, 1974 or 1976.  And

21   it's the Harris case.  And I'll give you the cite, Your

22   Honor.

23           THE COURT:  Isn't the Harris case 1911?

24           MR. BEST:  No.  425 -- excuse me.

25           THE COURT:  Well, what's --

1          MR. BEST:  1976.  There may -- excuse me.  It's

2     the Fisher case.

3          THE COURT:  Okay.

4          MR. BEST:  I apologize.  I misstated.  Fisher v.

5     U.S., 425 U.S. at 408.  1976 decision.  But the issue is

6     whether or not compulsion of production of documents

7     implicates the Fifth Amendment privilege that, in pertinent

8     part, no person shall be compelled in any criminal case or

9     any case which has criminal implications to be a witness

10    against himself.

11         And the Fisher case really lines out what is at

12    issue with the production of documents.  And so it starts

13    with, you know, breaking down the Fifth Amendment privilege

14    which is the information sought was compelled here.

15    Nobody's arguing that the information sought, i.e.

16    documents, was compelled under a subpoena.

17         Second, that it arguably could be incriminating.

18    And so to that end, may I approach your --

19         THE COURT:  Certainly.  Thank you.

20         MR. BEST:  I passed up for Your Honor the unsealed

21    indictment in the Kwok case.

22         THE COURT:  We've seen this.  We --

23         MR. BEST:  Yeah.

24         THE COURT:  -- saw this a few weeks ago.  Right?

25         MR. BEST:  Yeah.  That's right.  And so I point

1    out for Your Honor page 3 of this indictment speaking on

2    paragraph 6 to the relevant persons and entities.  Just to

3    point to specifically the relevant parts of the

4    indictment -- and it's relevant -- the whole indictment's

5    relevant -- but in part, those entities which have been

6    alleged to be in the custody or control of Mr. Guo, also

7    known as Mr. Kwok.

8             So the second prong of the Fifth Amendment

9    privilege, which is could this be incriminating, I think is

10   by itself, on its face, clearly shown here that his custody

11   and control of various entities has been -- is part of an

12   active criminal case now filed before the Southern District.

13            Importantly, I don't have to even stop there, even

14   though I think that's enough under the prong.  As I

15   understood from my conversations today, the Department of

16   Justice is also conducting a criminal investigation of

17   whether there's been bankruptcy fraud.

18            And I point out that that is a second --

19            THE COURT:  And what -- how do you know that, sir?

20            MR. BEST:  I'm going to have my colleague -- I

21   think there's a subpoena.

22            MR. HENZY:  Yes.  Yeah.  I'm sure Mr. Best will

23   address this, Your Honor, but the trustee has been served

24   with a subpoena.  And --

25            MR. BEST:  Can I approach?

1          THE COURT:  Yes, please.

2          MR. BEST:  So I'm presenting to Your Honor a copy

3    of the subpoena that I think that was served on Paul

4    Hastings regarding an active criminal investigation of

5    bankruptcy fraud which I think is gleaned from --

6          THE COURT:  The statutes.

7          MR. BEST:  Yeah.

8          THE COURT:  Yeah.

9          MR. BEST:  So, importantly, if that hasn't built

10   the cake, and I haven't put icing on it, let me put the

11   cherry on top.  In the Second Circuit, which is the only

12   circuit in the country that has actually acknowledged this

13   extension -- incredible extension of the law, the Second

14   Circuit recognizes that you can commit a criminal violation

15   not only by lying to the court but by lying to attorneys who

16   are cooperating with the Government, if you will.

17          And so I cite that.  It's U.S. vs. Kumar from the

18   Second Circuit.  And it's the Computer Associates case,

19   which is widely known in the white collar community, where

20   Sanjay Kumar and other individuals pled guilty to lying in

21   their corporate criminal -- excuse me, corporate internal

22   investigation that was being conducted because the

23   Government has taken the position -- and in fact they ended

24   up pleading guilty, it's settled law in this jurisdiction --

25   they knew or should have known that the private counsel were

1    cooperating with the Government.

2            And the Sanjay Kumar case, for Your Honor, is 617

3    F.3d 612.  That's a Court of Appeals decision not reversing

4    the convictions.  Really, they were pleas to these types of

5    counts.

6            So the second prong, which was their criminal --

7    it's -- real criminal process could be implicated by

8    production of these documents, I think, is not in question.

9    The final one is whether or not -- and this is where I'm

10   going to spend most of my time discussing, which is whether

11   the production is testimonial in nature.

12           There are two critical reasons why, in fact, this

13   prong has been met.  First, while it is our obligation to

14   show that the assertion of the privilege is appropriate

15   here, once you get to the testimonial piece of it, the

16   burden tends to shift to the United States or, in this case,

17   the counterparty to show that the Government doesn't already

18   have the information in question.

19           And it's not totally germane to Your Honor, but it

20   is in the criminal cases, because if the Government doesn't

21   already have the information -- it's called the foregone

22   conclusion piece of this prong, which is the Government has

23   to show that they already had access to the information or

24   had it.  If that hat can't be shown either by the Government

25   or the counterparty here, then the Fifth Amendment assertion

1    is valid.

2              And where it impacts Your Honor is if that is

3    turned over by compulsion and the Government isn't shown to

4    have a foregone -- it's not a foregone conclusion that they

5    already had this information, it will have significant and

6    negative implications for the Government in their criminal

7    proceedings.

8              So one thing that Your Honor should consider is

9    getting the U.S. Department of Justice's view on this

10   specific issue and asking that they as a related party to

11   this argument make a presentation on the foregone conclusion

12   piece.

13             If that is asking too much, then I specifically --

14   excuse me, I respectfully submit that it's not a foregone

15   conclusion that they have this information.  I don't know,

16   because we haven't gotten discovery yet.

17             So that's the first core argument.  The second

18   core argument is by producing any documents --

19             THE COURT:  May I stop you for a second just --

20             MR. BEST:  Of course.

21             THE COURT:  So if it is a foregone conclusion, if

22   the Government already has this information, what are you

23   saying then?  That the trustee has to get it from the

24   Government?

25             MR. BEST:  It would be the cleanest way, right?

1    And so the ask is going to be on -- it would be the same ask

2    to the Government as to us.  We'd have to sign -- and so

3    that's a perfectly relevant question.

4           I couldn't turn over anything I get in discovery

5    without the Government's consent anyway, because it's all

6    part of the Southern District's confidentiality provisions

7    of the discovery in the case.

8           So the Government and the Southern District Court

9    will be necessarily involved in any future production of

10   that discovery anyway.  So they're going to be involved one

11   way or the other.  They might as well make the request of

12   the Government.

13          The trustee actually in this case is a member of

14   the Department of Justice.  Another arm of her department is

15   the one with the documents in question.  So it's a natural

16   course that way, Your Honor.

17          THE COURT:  Okay.  One other question --

18          MR. BEST:  Yeah.

19          THE COURT:  -- before you go on with regard to

20   this issue that you raised, the foregone conclusion, the

21   third prong.

22          MR. BEST:  Yeah.

23          THE COURT:  The subpoena and the request for

24   information was -- the subpoena was served, and the request

25   and the order granting the 2004 examination were -- those

1    issues -- the order was issued and the subpoena was served

2    well before the indictment, right?

3           And while -- and some of -- you could argue some,

4    if not all, of the information sought by the trustee

5    relates -- definitely some of the -- and I'm not going to

6    say, because I don't know what the percentage is.

7           But I would say most likely more than half if --

8    of the information, maybe even more, that the trustee seeks

9    was information that the debtor was obligated to maintain

10   and provide and provide to the Court and others while he was

11   a debtor in possession, well before the indictment.

12          So how does that change, if at all, from your

13   perspective this whole issue of the foregone conclusion?

14   Because the foregone conclusion, at least my reading of the

15   indictment -- and that doesn't mean anything, okay -- but is

16   that it's related to certain business entities and

17   transactions that the debtor is alleged to have controlled

18   and raised money through and doesn't necessarily relate to

19   all of the issues that the debtor would be responsible for

20   providing while a debtor in possession in a bankruptcy

21   proceeding.

22          So how do you respond to that with regard to this

23   foregone conclusion?  Because if all the Government has --

24   and let's just be -- you know, give a hypothetical and -- if

25   all the Government has is issues related to this indictment

1    and, as you said, the relevant persons and entities in

2    paragraphs 6 and 7 -- you know, 6 --

3            MR. BEST:  Yeah.  6 through, I think, 10 or 11.

4            THE COURT:  Right.

5            MR. BEST:  Right.

6            THE COURT:  That doesn't necessarily cover all the

7    issues in this case, believe it or not.  You may not have

8    looked at that, but it doesn't.  I mean, it doesn't relate

9    to, in particular -- you were here, I think, and had to hear

10   a lot of the argument with regard to the Lady May and the

11   loan.

12           MR. BEST:  Right.

13           THE COURT:  It doesn't on its face -- the

14   indictment on its face does not necessarily address those

15   issues or seek information with regard -- doesn't put into

16   issue those issues.  Nor does it put into issue issues or

17   information that are relevant to the trustee's investigation

18   with regard to --

19           MR. BEST:  Right.

20           THE COURT:  -- an apartment in New York.

21           And so while I understand what you're saying, the

22   concern I have at this point -- but I'm going to let you --

23   I'm going to -- I want to hear from you about what your

24   position is, is how does that -- how does the argument that

25   he doesn't have to produce anything with regard to matters

1    that aren't specific to the indictment, how does that case

2    law protect him on those issues?

3           MR. BEST:  Yeah.  So the -- thank you, Your Honor.

4    Another perfectly relevant point.

5           One, he doesn't have to be indicted and doesn't

6    have to be named, right?

7           THE COURT:  Understood.

8           MR. BEST:  And so at this point, everything that's

9    under his custody and control, I would argue, is under

10   federal criminal investigation.

11          THE COURT:  Has he sworn to that, though?  I mean,

12   wouldn't you have to -- if you're going to make a record

13   with this Court that says, look, we can't turn over anything

14   because it's all subject to the indictment and/or your

15   argument under Fisher, right --

16          MR. BEST:  Right.

17          THE COURT:  -- which I, you know, have to look at,

18   and under Kumar, right, these two cases that you've told me

19   about --

20          MR. BEST:  Okay.

21          THE COURT:  -- doesn't he still have to create the

22   record here in this court that he swears that he has turned

23   over -- he has nothing in his possession or control and

24   whatever he had the Government has?  Doesn't he still have

25   to do that?

1          MR. BEST:  That request of him is testimonial in

2     nature.  He doesn't have -- under his Fifth Amendment

3     privilege, respectfully, he doesn't have to say anything.

4     And, in fact, swearing one way or the other -- so I'll give

5     you the perfect example.

6          If he swears to Your Honor on that point, and the

7     Government finds evidence that contradicts that affirmation,

8     then he can be criminal indicted --

9          THE COURT:  Well, it doesn't even have to be the

10    Government.  It could be someone in this court, right?  It

11    doesn't have to be the Government.  It could be that he

12    swears he doesn't have anything, right?

13         MR. BEST:  Yeah.

14         THE COURT:  And then the trustee finds it.  The

15    trustee could bring it forth, right?  And then he'd still

16    have -- he'd have --

17         MR. BEST:  He'd --

18         THE COURT:  -- exposure.  But isn't that part of

19    the process?

20         MR. BEST:  It isn't.  Part of the process is that

21    he's frozen right now, and he can't make any statements one

22    way or the other without implicating himself.  And that's

23    black letter law as to the invocation of the Fifth Amendment

24    privilege.

25         THE COURT:  Well, but, you know, when you said at

1    the beginning of your argument -- and I'm not suggesting I'm

2    ruling on anything.  I'm trying to understand the positions

3    of the parties, right?  You did mention the Harris case

4    which is a case that was decided in 1911.

5              MR. BEST:  Yeah.

6              THE COURT:  And when you read the language of it,

7    it's interesting.  But it talks about the constitutional

8    rights against self-incrimination in -- of a bankrupt and

9    that they -- when a trustee or a receiver was trying to get

10   the books and records, right?

11             MR. BEST:  That law -- I think it -- I may have

12   quoted it, because -- no.  I got another case.  I've been

13   trying to learn bankruptcy law pretty quickly this morning,

14   but --

15             THE COURT:  Well, I don't think this has a lot to

16   do with bankruptcy law, actually.

17             MR. BEST:  But any cases that deal with the issue

18   of invocation of the Fifth Amendment privilege as regards

19   production of documents are controlled by Fisher and its

20   progeny, including U.S. vs. Doe, which was 1984.

21             I'll give you the cite.  And then I have really

22   the more recent U.S. Supreme Court case is U.S. vs. Hubbell,

23   which was a grand jury proceeding.

24             And then even more recently in the Second Circuit,

25   it's U.S. vs. Greenfield.  The Hubbell case is -- excuse me,

1    120 S. Ct. 2037.  And I'll pass it up to Your Honor.

2              THE COURT:  I actually have it right here --

3              MR. BEST:  You do?

4              THE COURT:  -- so you don't need to pass that up.

5              MR. BEST:  Okay.  And then I have Greenfield, if

6    you'd like me to pass that up.  It's --

7              THE COURT:  I don't think I have seen Greenfield

8    before.  I don't think that is -- is that cited in your

9    papers?

10             MR. BEST:  It isn't.  It was me doing --

11             THE COURT:  Okay.

12             MR. BEST:  -- work on the airplane coming up.

13             THE COURT:  That's fair.  Then I would like you

14   to -- and you gave counsel --

15             MR. BEST:  I --

16             THE COURT:  Okay.  Thank you.

17             MR. BEST:  Yeah.  The other piece to this -- so

18   there is no unclean hand -- and may I -- the question you

19   asked had multiple ways to answer it.

20             THE COURT:  It did.

21             MR. BEST:  Right?  And so there is no unclean

22   hands argument that because he didn't produce it and he

23   obstructed the process before, he has waived his right to

24   assert his Fifth Amendment privilege.

25             Importantly, you know, the foregone conclusion

Ho Wan Kwok - April 20, 2023                                        91

1    piece, if indeed he had produced under compulsion and we had

2    had these arguments months ago, and you nonetheless held him

3    in contempt and -- okay, then he has a choice.

4              And I actually don't know if the law goes this far

5    as to -- I don't know if it's ever been decided that if a

6    court forces compulsion and he produces under that

7    compulsion whether he's waived his privilege.  I doubt it.

8    I can't imagine that that would be the case.

9              But if he did -- if we had this exercise months

10   ago before the indictment in the case, there would be a

11   significant challenge to the U.S. Government to put on a

12   Kastigar hearing to show that they already had or knew about

13   this information prior to that -- prior to our hearing that

14   we're having today if it had taken place months before.

15             The foregone conclusion piece is an obligation on

16   the Government to show that they already had the information

17   and knew about it.  And so it would have arguably tainted

18   the Government's case that they wanted to bring against Kwok

19   if we had had this exercise months before the indictment.

20             So that would be my second answer to the query as

21   to whether or not we had addressed this months before.  I

22   wasn't involved at that point, but --

23             THE COURT:  No.  I don't think it was whether it

24   was addressed.  I think my question was what about the

25   information that doesn't directly relate to the indictment.

1   And, you know, with regard to the boat, we -- the yacht --

2          MR. BEST:  Yeah.

3          THE COURT:  -- there's nothing in the indictment

4   about the yacht that I see.  Now, you could say it doesn't

5   matter, Judge, because that -- the Government can doesn't

6   have to say anything about the yacht.

7          MR. BEST:  Yeah.

8          THE COURT:  But I'm trying to understand why he

9   doesn't need to make a record before this Court to say what

10  you're saying, which is, look, whatever I had the Government

11  has anyway.

12         MR. BEST:  So, again, first of all, as Mr. Baldiga

13  has pointed out, paragraph 23 of the indictment does talk

14  about the boat.

15         THE COURT:  Okay.  Well, then it talks about the

16  boat.  Then I'm wrong.

17         MR. BEST:  But to your -- to the relevant question

18  as to anything else that's not covered in the indictment,

19  the perfect answer to this is all of these inquiries and the

20  invocation of this, 95 percent of the time it happens

21  pre-indictment, right?  And so and the relevance of that is

22  you don't know what is at issue for the Government or not

23  when you're getting a compulsory process.

24         If there is a -- if they -- there is a

25  determination that he wants to invoke -- he or she wants to

1    invoke their Fifth Amendment privilege against

2    self-incrimination, that's where the exercise has to stop.

3    There is no inquiry as to -- past that as to him or her, in

4    this case him, affirming to any court the breadth of that

5    invocation of the Fifth Amendment privilege, if you will.

6             And so it's a -- look, the simplest answer is his

7    invocation of the Fifth Amendment privilege can never be

8    held to be an obstruction of any process.  It's as simple as

9    that.  So I've never seen one instance where an invocation

10   of the privilege has been held to be an obstruction.

11            THE COURT:  Okay.  So you're saying that the only

12   way the trustee can proceed is to get the information from

13   the Government?

14            MR. BEST:  Correct.  Now --

15            THE COURT:  Did you say that you have to agree to

16   that too?

17            MR. BEST:  Well, I don't think we'd object, right?

18            THE COURT:  Well, I'm trying to understand the

19   process, right?  I don't understand the process.

20            MR. BEST:  Yeah.  So I'm sorry.

21            THE COURT:  I don't -- as you said quite clearly

22   and correctly, this is not something that the bankruptcy

23   court has to deal with on a regular basis, although we deal

24   with it.  But so your point is --

25            MR. BEST:  The could go to --

Ho Wan Kwok - April 20, 2023                                    94

1        THE COURT:  -- the only way the trustee can

2    proceed is to get it from the Government.  And I thought you

3    said earlier in the -- in your comments that you'd have to

4    agree to that.

5        MR. BEST:  No.  If it was through -- if the

6    exercise was we as defense counsel received a discovery

7    packet, we would have to go to the Government and get their

8    assent.  We would also then have to go to the Court and get

9    the Court's assent to make a production to this Court

10   vis-a-vis the subpoena.  They could go directly to the

11   Government and bypass all of that.

12       I don't know whether the Government would reach

13   out to us and say do we have your assent or not.

14       THE COURT:  Is it required?

15       MR. BEST:  I don't -- no, it's not.

16       THE COURT:  Okay.  I'm just asking.  I --

17       MR. BEST:  No.  I mean, I think it's more of a

18   courtesy than anything else.  So the testimonial piece of

19   this, which is the second prong past the foregone

20   conclusion, Your Honor, is in the demand that's before us

21   which is, in essence, to produce documents which necessarily

22   are within his custody and control, which means that if

23   anything is produced pursuant to that provision of the

24   subpoena, then it's a tacit, if not explicit, admission that

25   the information in those entities were within his custody or

1    control, which directly implicates his right against

2    self-incrimination, because those issues are squarely before

3    the Court.

4            And they don't even have to be squarely before the

5    Court.  As I said, it -- 99 percent of the time it's prior

6    to an indictment that all these issues come up.

7            And so when I looked at this originally, I didn't

8    even think about the foregone conclusion argument.  It was

9    simply black letter law that what's being asked for here by

10   the trustee -- counsel for the trustee is testimonial in

11   nature in that if anything gets turned over, then it's an

12   admission that, in fact, those entities were within his

13   custody and control.

14           And that's simply black letter law that it's a

15   compulsion of process and once -- for information which

16   there's a causal link to incriminate him that he does not

17   have to -- he doesn't have to comply with pursuant to his

18   constitutional rights.

19           And so, for those reasons, I submit to Your Honor

20   that he has complied with the subpoena.  Once you invoke

21   your constitutional rights on these points, unless there's

22   anything else that's open, it is -- it is considered fully

23   complied.  So thank you very much.

24           THE COURT:  Thank you.

25           Attorney Bassett or -- and Trustee Despins?

1           MR. DESPINS:  Your Honor, I know Mr. Bassett will

2      address the technical parts of this, but I wanted to correct

3      one statement that was made, which is that I'm a Department

4      of Justice employee or somehow working for the Department of

5      Justice.

6           I'm not the Department of Justice.  I was

7      appointed by the Department of Justice, but I don't report

8      to them.  I have no -- as Your Honor knows, a trustee has no

9      reporting function to the Department of Justice.  I wanted

10     to correct that.  Thank you.

11          MR. BEST:  Yeah.  I didn't mean to imply that

12     Mr. Despins was a DOJ employee.  But the U.S. -- a

13     representative from the U.S. Trustee's Office is, in fact,

14     here who is a Department of Justice employee.  That's who I

15     was referring to, Mr. Despins.  Thank you.

16          THE COURT:  Okay.  Thank you.

17          MR. BASSETT:  So, Your Honor, again, it's Nick

18     Bassett from Paul Hastings on behalf of the Chapter 11

19     Trustee.

20          So I think -- I'm going to address, to the best I

21     can, the substance of all of the legal arguments that

22     counsel made as well as address one of the proposals he made

23     about getting documents that are subject to disclosure by

24     the Government in a criminal case which I do think may be a

25     useful subject to the trustee getting the right order on

1    that point.

2            Before I do those things, I do think, as I often

3    have done in this case, I think just to understand exactly

4    how we got here, which is part of what the Court was doing

5    with counsel, is important.

6            So obviously this case has been going on for over

7    a year.  Trustee was appointed last summer.  Immediately

8    upon his appointment, by operation of law -- and this is a

9    fact that's important and has sort of been glossed over to

10   some degree to this point.

11           But by operation of law, the debtor was required

12   and is still required, under Section 521 of the Bankruptcy

13   Code, (a)(3) and (a)(4), to produce records concerning

14   property of the estate to the trustee and also to provide

15   any property of the estate to the trustee.  That's by

16   operation of the Bankruptcy Code.

17           In addition to that, shortly after the trustee's

18   appointment in August of 2022, as the Court knows, the

19   trustee served a Rule 2004 subpoena on the debtor.  As the

20   Court also knows, and the reason we are here today, is in

21   the six-plus however months we are now since then, we've

22   received nothing but delay, excuses, obstruction, et cetera.

23           And as the Court pointed out, we're now at a point

24   where the debtor is actually using all that past obstruction

25   and delay essentially to his benefit, because he's now,

1    whether he wanted to or not, created a bridge to a situation

2    where he is under criminal indictment.  Now he's using that

3    criminal indictment as a means to say I can't give you

4    anything.  Sorry.  No more cooperation from me.  No more

5    documents related to property of the estate.  Nothing else.

6    Can't do it, because I'm under criminal investigation, and

7    there's a criminal case against me.

8            I think that backdrop is very important, because

9    we're not operating on a blank slate.  And the fact that

10   we're in bankruptcy in particular is important.  We cited

11   some of these cases in the brief that we submitted to the

12   Court, and it goes back to the In Re Harris case that came

13   up during counsel's argument and during some of the Court's

14   comments.

15           But I think, first, it's important to point out

16   that I don't believe in the motion to stay or in the

17   response on the order to show cause counsel has cited to any

18   bankruptcy case involving a stay as it relates to the debtor

19   in that case.

20           They cite one case that's in our papers, I'm

21   trying to find it, that I'm escaping the name.  But the one

22   case they cite that's a bankruptcy case involved an

23   adversary proceeding by the debtor against other defendants

24   who were under criminal investigation.  Completely different

25   situation.

1          What they're asking for here is an order staying

2    the bankruptcy case -- order staying discovery in the

3    bankruptcy case from the debtor related to property of the

4    estate and other issues that are critical to the trustee's

5    investigation and to the ultimate administration of this

6    case.

7          What they're saying is, well, they're not seeking

8    a stay of the whole case.  And they cite cases from district

9    courts and other civil litigation where courts have stayed

10   discovery.

11         But what they haven't cited to, and what I don't

12   think any court would hold, is that the trustee here has to

13   go forward, as he must, in the interest of the bankruptcy

14   process and in the interest of the debtor's creditors and

15   continue to administer this case and ultimately bring it to

16   a conclusion.

17         But he has to do that without any participation or

18   cooperation from the debtor in providing to the trustee the

19   documents that we've not only requested in discovery but are

20   entitled to under the Bankruptcy Code.

21         And I think that's where the Harris case and some

22   of the other cases that it relies on come into play.  And

23   the Harris case is, admittedly, an old decision from the

24   Supreme Court back in 1911, but it involved the question of

25   the production of documents from a debtor in possession and

1    whether or not his Fifth Amendment rights would be

2    implicated.

3         And what the court said was in that situation

4    constitutional rights were not touched, because "The

5    question is not of testimony but of surrender, not of

6    compelling the bankrupt to be a witness against himself in a

7    criminal case present or future but of compelling him to

8    yield possession of property that he is no longer entitled

9    to keep.  That is one of the misfortunes of bankruptcy if it

10   follows a crime.  The right not to be compelled to be a

11   witness against oneself is not a right to appropriate

12   property that may tell one's story."

13        And the Supreme Court in the Baltimore City

14   Department of Social Services v. Bouknight case in 1990

15   again referenced the Harris decision.  Bouknight involved a

16   different regulatory regime.

17        It involved a mother who was forced to bring her

18   child to the court or to child services by compulsion of

19   law, and the court said that is not -- you know, citing to

20   the principle annunciated in Harris, that type of action is

21   not something that invokes the Fifth Amendment through the

22   act of production doctrine or otherwise.

23        Like counsel, I've been moving quickly here.  The

24   motion was filed on an expedited basis.  I've also been

25   doing some further looking.  And I'm sure we all could do

1    more.

2              But another case that's more recent that I would

3    encourage the Court to take a look at is the In Re Ross case

4    from the Bankruptcy Court District of Idaho, 1993.  That's

5    156 B.R. 272 at -- and the discussion is extensive.  I think

6    part of it's at page 279.

7              But that was a case involving the question of

8    whether requiring a debtor in a Chapter 7 case to exercise

9    his rights under Section -- or to comply with his rights

10   under Section 521 of the Bankruptcy Code would implicate the

11   Fifth Amendment, including specifically the act of

12   production doctrine.

13             So what the Court did in that case is conduct an

14   extensive analysis talking about the interplay between the

15   act of production doctrine and bankruptcy cases.

16             In addition to Harris, there's progeny that

17   developed from there.  The Ross court cited Johnson vs.

18   United States from a 1913 decision where the court again

19   articulated the same general principle of Harris that

20   compelling a debtor in possession to turn over property and

21   records of the estate is not something that implicates the

22   Fifth Amendment.

23             The court also cited the Fuller case, 262 U.S. 91

24   from 1923.  The Dier v. Banton case, Supreme Court, 262 U.S.

25   147 from 1923.  And McCarthy v. Arndstein, 266 U.S. 34 from

1    1924.

2         Ultimately, in the Ross case, the court

3    concluded -- I'm just going to quote from it, because I

4    think it's helpful.  "The court finds that the Fifth

5    Amendment privilege may not be claimed by the debtors with

6    regard to property of the estate for the following reasons.

7    First, the Fifth Amendment provides no protection for the

8    contents of the documents."  I think that's an immutable

9    principle.

10        "Second, the act of producing documents required"

11   in that case the court found, "was not sufficiently

12   testimonial or incriminating to come within the protection

13   fo the Fifth Amendment.

14        "Third," the court observed, "the Harris line of

15   cases holds that a bankrupt is not able to claim the

16   privilege with regard to documents relating to property of

17   the estate, and Fisher does not modify that rule."

18        "Fourth, even if the act of producing documents

19   (sic) might be testimonial by implicitly authenticating the

20   documents, the debtors have not made a positive disclosure

21   to support invocation of the privilege" in that way.

22        And then there's a fifth reason that -- yeah, the

23   fifth reason is: "Fifth, even if the act of production

24   doctrine (sic) involved here was both testimonial and

25   incriminating, the nature of Chapter 7 as a regulatory

1   regime directed toward society as a whole, and not

2   inherently toward suspected (sic) criminal classes renders

3   the act of production doctrine (sic) outside the protection

4   of the Fifth Amendment."

5           So there's several reasons here.  I'm not

6   disputing that this is a complicated, nuanced area of

7   criminal law that's not normally before this Court and

8   certainly isn't what I normally deal with.  But there are a

9   lot of issues that I don't think have been addressed as it

10   relates to do these concepts even apply in bankruptcy.  If

11   they do apply in bankruptcy, how is it modified by the fact

12   that there are statutory obligations that require the

13   production of these documents?

14           And by the way, the motion to compel that we filed

15   which led to the order to show cause also referenced 521 and

16   the obligations thereunder as the basis for the production.

17   We were not solely relying on our 2004 subpoena and the lack

18   of compliance with that.

19           So another point I want to address that came up

20   during the argument previously is the type of showing -- and

21   I think the Court hit on this in some of the questions that

22   Your Honor asked -- the type of showing that if the act of

23   production doctrine applies and if the debtor is going to

24   seek to invoke it, what kind of showing does he have to make

25   in order to demonstrate to the Court that he has fully

1    complied with all aspects of the January 20th order.

2         And I think what the case law makes pretty clear

3    is that the showing has to be particularized.  The debtor

4    cannot just say in a blanket matter -- and that's really

5    what I hear the argument being.  You know, I'm under

6    criminal indictment.  And our -- and criminal investigation.

7         And our position is that that means that

8    everything the debtor owns, everything he's ever touched,

9    everything he has in his possession that could somehow be

10   relevant to this bankruptcy case is somehow involved in or

11   related to these criminal issues and, therefore, production

12   of them could implicate the Fifth Amendment.

13        I don't think the debtor can do that in that

14   blanket manner.  And the trustee is entitled, for good

15   reason, to a more specific showing.

16        To give a particular example, counsel spent a lot

17   of time talking about the fact that if the debtor were

18   required to produce documents under the control of certain

19   other associated entities and associated individuals as

20   those terms are defined in our subpoena that he would

21   basically be conceding that control by producing documents,

22   and that would implicate the indictment and his criminal

23   exposure.

24        But I don't see how the debtor can possibly say

25   that -- and I think the Court was attuned to this as well --

1    that literally every -- and I don't have our subpoena right

2    here, and it wouldn't be a productive use of time to go

3    through every entity we've identified and every person we've

4    identified in those defined terms, but there's a lot of

5    them.

6              And I don't see how the debtor can say that every

7    single one of those entities somehow falls within the scope

8    of what's been plausibly alleged in the criminal case for

9    which he is under investigation and, therefore, he doesn't

10   need to say anything else.  He just doesn't have to produce

11   anything, doesn't have to look for anything, and he's done

12   complying with the January 20th order.

13             He has to do more than that, and we're entitled to

14   more than that.  We're entitled to a particularized showing

15   or assertion by the debtor as to each of those entities.

16   And that's consequential.

17             Because if he's going to say that I can't produce

18   documents from this entity, because that would demonstrate

19   my control over it, then we're entitled to ask the Court to

20   take an adverse inference from that as we have in the past.

21             He can't simply get away with saying I'm not

22   producing anything and giving the trustee no recourse which

23   he would otherwise have to ask this Court to take

24   appropriate -- to make appropriate findings as a result of

25   his invocation of the Fifth.

1      The other -- so subject to checking my notes,

2   the -- and the one other point I wanted to make was to go

3   back to this question of the documents that the Government

4   will  produce to the debtor, purportedly is going to produce

5   to the debtor in connection with the criminal case.

6      Obviously, the trustee would want those documents.

7   Counsel said that, well, we -- you know, we could subpoena

8   them and then, you know, do whatever we want to try to do to

9   get them.

10      Two main points in response to that.  First, I

11   don't see why we would need to subpoena them.  There's

12   already a subpoena that the debtor is under.  And to the

13   extent that the documents are responsive to that subpoena,

14   when the debtor becomes in possession of them, they need to

15   be produced not only in accordance with that subpoena but in

16   accordance with the January 20th order that is operative.

17      To the extent the trustee needed to serve a new

18   subpoena asking specifically for these documents, we could

19   do so.  We may do so anyway.  But I don't think it's

20   necessary.

21      The second point I would make, which I think is

22   critical, is that if they're offering that as a partial

23   solution to the issue, any order that this Court issues in

24   the trustee's view has to very clearly require the debtor to

25   take whatever action it needs to take vis-a-vis the

1    Government or vis-a-vis the criminal court to get permission

2    to give us those documents.

3              What it sounds like they're proposing is, well,

4    let's put the onus on the trustee.  It's not our problem.

5    If you want to try to get the documents, you can.  You go

6    ask the criminal court.  You go ask the Government.

7              We may well do that as well, but the debtor has

8    obligations before this Court under the orders of this Court

9    and under the Bankruptcy Code.  So the onus should be on him

10   to do what's necessary to get us the documents that we're

11   entitled to, not on the trustee.

12             I just want to check my notes, Your Honor, to see

13   if I had other points I wanted to make.

14                        (Counsel confer)

15             MR. BASSETT:  I think that's all for the moment,

16   Your Honor.  The one thing I noticed in looking at my

17   outline is that the case I was trying to find earlier that

18   is the only case in bankruptcy that I've noticed that the

19   debtor cited was the In Re Julmice case, Bankruptcy Court

20   Eastern District of New York, 2011.  And, again, that was

21   not a case involving, you know, the debtor and a stay of

22   discovery against the debtor but rather an adversary

23   proceeding against other defendants.

24             Subject to the Court's questions, that's what I

25   had.

1          THE COURT:  I do not have any questions of you at

2     this time.  Thank you, Attorney Bassett.

3          Attorney Friedman, you wish to be heard?

4          MR. FRIEDMAN:  Yes, Your Honor.  Peter Friedman

5     from O'Melveny & Myers on behalf of PAX.  I wanted to add a

6     little bit of context to what Attorney Bassett said in his

7     remarks.

8          This is not just an issue of what's happened in

9     this Chapter 11 case.  PAX has been pursuing its claims

10    against Mr. Kwok for years going back to the inception of

11    the loan made more than a decade ago.  It has been

12    consistently told there are no assets.  There have been

13    shifting assertions of the Fifth Amendment in the past when

14    it was convenient and then they have been revoked.

15         There was a Chapter 11 filing, a filing that said

16    Mr. Kwok had $3,850, as you'll recall, and a Pomeranian, but

17    he needed time to put together his schedules.  He hired the

18    Verdolino & Lowey entity which apparently he, you know,

19    didn't tell them about substantial assets that actually

20    exist in his name.

21         But this has been going on for years.  PAX has

22    been frustrated for years.  And yet, with very little

23    insight into this debtor's assets, of course money shows up

24    whenever it's needed to pay lawyers, although, you know,

25    purportedly not from Mr. Kwok.

1      We'll find out shortly who's paying for Brown

2  Rudnick to be here today when they file their required

3  pleadings, unless of course they try to claim that's -- some

4  sort of barrier to that because that would also incriminate

5  Mr. Kwok.

6      If you think about the logical extent of what

7  they're saying, they would be immune from having to comply

8  with that regulation as well, that statute as well, which of

9  course can't be right.

10      But in any event, Your Honor, the other thing I

11  wanted to just raise with you is in one of the pleadings

12  there's a statement that the bankruptcy and the prior case

13  is all a product of CCP machinations.  And I think as Your

14  Honor has heard from me before, that's just -- I don't know

15  whether to be mad about it or to laugh at it, but it's just

16  absurd.

17      This Court, I think, knows the bona fides of the

18  PAX litigation that proceeded in front of Justice Ostrager.

19  And it knows that Mr. Kwok actually offered to pay, because

20  he broadcasted on Twitter or GETTR, you know, an

21  extraordinarily large amount of money, maybe not his own

22  money but somebody's money, to PAX to settle litigation.

23      And Mr. Kindseth testified that Mr. Kwok knew that

24  PAX was owed money and that Mr. Kwok went on GETTR to say

25  that they had to make piece with Kwok, all of which are

1      completely at odds with this phony narrative that's being

2      pitched both here and, sadly, in federal court in the

3      criminal matter just to make what are absurd assertions that

4      have no basis in truth and are, you know, more of the same.

5              One point, Your Honor.  Well, I won't -- I

6      actually can't do it, because counsel for the summary

7      judgment proceedings wasn't here.  So I won't go back and

8      re-argue that.  But there's stuff in the documents there

9      that's very troubling.

10             In any event, Your Honor, I did want to echo also

11     Mr. Bassett's comments about the very nature of bankruptcy,

12     the obligation as to, you know, fulsome disclosure that

13     arose immediately when Mr. Kwok voluntarily filed for

14     bankruptcy, filed schedules, showed up at 341s that he

15     needed to appear in and may not have testified honestly.

16     But there were certainly many requests made there that we

17     still need to be able to prove out.

18             And for parties like PAX that have waited for over

19     a decade to be repaid, the idea and prospect that, yet

20     again, there can be obfuscation and delay should be viewed

21     with, you know, intense skepticism by this Court.  Thank

22     you, Your Honor.

23             THE COURT:  Thank you.

24             Mr. Best, would you like to respond?

25             MR. BEST:  Yes, Your Honor.  I literally could not

1    have made a better argument for the proper invocation of the

2    Fifth Amendment privilege than what we just heard from

3    opposing counsel or creditor's counsel and trustee's

4    counsel.  Their explanations to Your Honor are the absolute

5    reason why a proper invocation of the Fifth Amendment

6    privilege is applicable here.

7            Specifically, the trustee's counsel said, I

8    think -- I think the record will be correct.  I counted

9    three times trustee's counsel said that my client has

10   obstructed the bankruptcy process.

11           Even better, counsel for the creditor from

12   O'Melveny & Myers -- or is it just O'Melveny?  I don't know.

13   But said that -- I think the words were "phony narrative"

14   that has been advanced, which is essentially a fraud on the

15   bankruptcy court.

16           And I will tell you that the head of O'Melveny's

17   white collar practice, Steven Olson, would also tell Your

18   Honor this is the perfect application of the Fifth Amendment

19   privilege for these exact issues which are before us.

20           Counsel has conceded the issues that are before

21   us.  It's not that he doesn't have a right.  And by the way,

22   I want to start by saying with all due respect to Your

23   Honor, the bankruptcy court, and counsel who are all

24   bankruptcy practitioners, the constitutional rights of an

25   individual trump any Bankruptcy Code.

Ho Wan Kwok - April 20, 2023

1    And so when bankruptcy counsel was quoting the

2    <u>Harris</u> case, it specifically referenced that the <u>Harris</u> case

3    noted that what was being asked for -- and I don't -- I

4    haven't dug into it -- but he specifically said was not

5    testimonial in nature.  It's the specific requests beyond

6    the foregone conclusion piece.

7    It's the demand of the trustee's counsel asking

8    for all documents which are in the custody and control of

9    the individual which then specifically, tacitly requires my

10   client to turn over documents of entities which he may be in

11   custody and control of.

12   And with all due respect to trustee's counsel,

13   it's not for him to determine whether it has been brought

14   before the Department of Justice in their criminal case.

15   To give clarity now to the issue of a blanket

16   invocation, when it happens in the grand jury and a

17   prosecutor is allowed to ask specific questions and not

18   accept a blanket invitation (sic passim) of the privilege,

19   so instead of accepting the blanket invitation, they can ask

20   a hundred questions specific to the issues before, and that

21   individual can then assert the privilege on those specific

22   questions.  But you end up at the same place, which is

23   they're allowed to assert a blanket privilege or do it

24   through either one blanket privilege or a hundred different

25   questions that are posed to them.

Ho Wan Kwok - April 20, 2023

113

1      I tried to come in here and craft a solution which

2 may work.  This whole notion that we have some obligation to

3 present any documents when they can simply go -- the

4 trustee -- the representative from the Department of Justice

5 is here from the U.S. Trustee's Office -- is a member of the

6 Department of Justice.

7      They can go to the Department of Justice Criminal

8 Division, U.S. Attorney's Office Southern District and ask

9 for the discovery.

10      What they -- what the problem, which we need to

11 figure out, is the Southern District has a protective order

12 over the use of that information.  I don't know how that can

13 be worked out with Your Honor and with counsel, but that

14 will come up whether it's directly to the Department of

15 Justice or through us.

16      And so this whole notion that we have to turn

17 something over is, quite honestly, having no respect for the

18 proceedings in the Southern District.  It all has to be

19 addressed.  I wanted -- I fronted this as an opportunity,

20 which I didn't have to do, to show a way through this rather

21 than just-- and basically a grounds for the stay here while

22 that gets worked out.

23      Again, with all due respect to the Bankruptcy Code

24 and this Court, an individual's constitutional rights

25 against self-incrimination trump any requirements and

1    demands under a Bankruptcy Code proceeding.  And I'm happy

2    to answer any questions, and I appreciate Your Honor giving

3    me the time.

4            THE COURT:  The only question I have is -- I think

5    you just said you haven't read Harris yet.  Is that what you

6    said?

7            MR. BEST:  No.  I haven't read the details of --

8    the specific fact details.

9            THE COURT:  Because it does talk about -- it's an

10   old case.

11           MR. BEST:  Yeah.

12           THE COURT:  It's 1911.  But it is the United

13   States Supreme Court saying under the Bankruptcy Act that

14   was in existence at the time, before the 1978 Bankruptcy

15   Code was modernized, that the debtor's duty in turning over

16   the information was surrender and not testimonial.  That's

17   what it says in light of a Fifth Amendment privilege against

18   self-incrimination.

19           So I -- what I'm saying to you is, I understand

20   your argument.  And I don't think anyone is arguing that --

21   at least I haven't heard anyone argue that the debtor -- any

22   debtor isn't entitled to assert a Fifth Amendment privilege

23   when they feel -- when they assert it.  They're entitled to

24   assert it.

25           I think what Harris is saying is that there are

1    some limitations on the application of that assertion.

2            MR. BEST:  It has to be -- so the limitations

3    here, Your Honor -- would it be a harder argument for me if

4    there was just a subpoena issued broadly for all documents?

5    Probably.

6            What was -- the limitations, though -- I can

7    guaranty you in that case it doesn't talk about a specific

8    issue where the documents that are requested are not simply

9    the documents that were in possession of the debtor,

10   Mr. Guo.

11           It was those documents in addition to those that

12   he possessed, which I believe as I understand have been

13   turned over, that -- for him to go and get documents in the

14   custody or control of him which by production necessarily is

15   testimonial that he's in custody or control of those

16   entities.  And I can -- I know that Harris didn't stand for

17   that.

18           THE COURT:  Okay.  And then this Ross case that

19   counsel has cited from Idaho in 1993 talks about Harris, and

20   it also talks about some of the cases you cited saying

21   that -- in Doe -- well, you cited Doe.  You said -- you

22   mentioned Doe.  It says -- and I'm not saying it's -- I'm

23   just telling you what it says.  I --

24           MR. BEST:  I appreciate this.

25           THE COURT:  Okay.  It says -- Justice O'Connor

1    states she has written to make explicit what is implicit in

2    the analysis of that opinion, that the Fifth Amendment

3    provides absolutely no protection for any contents of

4    private papers of any kind.

5              MR. BEST:  Yeah.

6              THE COURT:  That's what it says.

7              MR. BEST:  That had --

8              THE COURT:  And then the Bouknight case that -- I

9    don't know that you addressed but counsel cited.  That's the

10   case that was not a bankruptcy case.  No question.  It was

11   the case involving the mother of the child with regard to

12   the city department of social services turning over

13   information with regard to the custody of her child.

14             I mean, the facts of the case are very difficult

15   facts.  But the Bouknight case said that the mother couldn't

16   resist production of the information on the grounds that the

17   child might reveal incriminating evidence.

18             MR. BEST:  I understand your argument, and I'm

19   not --

20             MR. BEST:  Let me --

21             THE COURT:  I'm not saying anything you're saying

22   is inaccurate.  I'm saying --

23             MR. BEST:  Let me --

24             THE COURT:  -- there appears to be some cases out

25   there that limit the applicability -- there appears to be,

1    that limit the applicability of the extent of the Fifth

2    Amendment privilege with regard to the obligations of a

3    debtor under the Bankruptcy Code.

4        MR. BEST:  I would agree with that.  It has to be

5    a determination, one, as to whether or not -- really,

6    it's -- I would -- you know, all the analysis you see in

7    court cases start with the foregone conclusion argument

8    first.

9        I focus on the testimonial nature of the admission

10   that if he produces documents as regards entities that he's

11   in the custody or control of or be required to, as you

12   brought up at our first discussion about it, affirm one way

13   or the other as to those, that that is the most -- is the

14   reason why he has the best argument as to invocation of his

15   Fifth Amendment privilege on these issues.

16       Their request is, essentially, admit that these

17   are within your custody and control and give me the

18   documents.  That's what's being asked by the subpoena.  So I

19   agree with you there are limitations.

20       Doe did not address that piece.  Doe was squarely

21   focused on the foregone conclusion piece.  And, in fact, Doe

22   ended up in the defendant's favor, affirming his right to

23   invoke the privilege against self-incrimination and

24   admonishing the Government for using Doe to get information

25   which they should have been able to get themselves through

1    the grand jury process.

2           So Doe does not talk about the -- it focuses on

3    foregone conclusion.  It doesn't focus on really what is

4    being asked here is the testimonial nature of the

5    production.

6           So happy to go through -- I'm happy to do a full

7    briefing on this.  I know it's not normally before Your

8    Honor or these esteemed counsel from fine firms.

9           I do this for a living.  I will tell you the

10   Government wouldn't be super happy if their case was

11   negatively implicated because of the demands of a creditor's

12   counsel or of trustee's counsel.  Because I'd be using that

13   in the Southern District case to require the U.S. Department

14   of Justice to put on a Kastigar hearing to prove that they

15   have this information before it was turned over.

16          And if not -- and by the way, the lineage of cases

17   is that the Government's burden on Kastigar is severe.  And

18   it would -- if I win that, which I'm pretty confident I

19   would on a number of issues and other entities, it would,

20   one, thwart their present investigations they have going on,

21   and two, implicate what they could do and what evidence they

22   could produce in their present case.

23          And so I'm not speaking for the Government.  I'm

24   just talking about all the complications that would arise

25   out of this Court requiring either that he produce and not

1    honor his Fifth Amendment privilege or then have him sign

2    some sort of declaration or affidavit attendant thereto.

3              THE COURT:  Well, I just -- on the Bouknight case

4    that has been cited, the Supreme Court case, you know,

5    they -- the Supreme Court talks about that -- says even if

6    the act of production would amount to what you call a tacit

7    admission of the debtor's control over something or

8    possession of something, that that -- the privilege can't be

9    invoked to resist the production in the -- in that

10   circumstance, right?

11             And so the circumstances that we have in this case

12   is that, as we've all talked about and you know, this is

13   information that the trustee is looking to obtain which the

14   debtor was required to produce once he voluntarily consented

15   to this -- the jurisdiction of this Court by filing a

16   bankruptcy case, which he did.  He voluntarily did it.

17   Nobody forced him to do it.

18             And so that Supreme Court case, when you -- I

19   understand your argument about if he has to turn it over

20   then he's -- and -- then he's admitting that he had

21   possession or control.

22             Well, this Supreme Court case, Bouknight case,

23   seems to say that that's not necessarily determinative of

24   whether or not the Fifth Amendment privilege would apply to

25   not require the debtor -- or the party -- it wasn't a debtor

1   in that case, it's the -- that's the case that we talked

2   about already through the mother and the son --

3            MR. BEST:  Uh-huh.

4            THE COURT:  -- to require the debtor to provide

5   this information to the trustee.

6            Now, all I'm saying to you is I think it's -- I

7   understand all the arguments that you've made.  I believe I

8   do.  And I've looked at a lot of the cases, if not all of

9   the cases, that you've cited.  But there is an issue here

10  that's a little bit different from some of the -- from

11  Fisher and other cases that you've cited, because those were

12  not addressing the present circumstances and the specific

13  circumstances of a debtor in possession --

14           MR. BEST:  Right.

15           THE COURT:  -- who voluntarily came before the

16  Court and --

17           MR. BEST:  Right.

18           THE COURT:  -- and subjected himself to the duties

19  and responsibilities of a debtor under the Bankruptcy Code.

20           MR. BEST:  I also think that it needs to be stated

21  that the case that trustee cited -- is it the Idaho case?

22           THE COURT:  The Rogers case, I think it was

23  called.

24           MR. BEST:  As well as the --

25           THE COURT:  Ross case.  I'm sorry.

1          MR. BASSETT:  Ross.

2          THE COURT:  The Ross case.

3          MR. BEST:  As well as the case Your Honor's

4    referring to does not have in play that the debtor that's

5    before you is actively criminally charged and is --

6          THE COURT:  But as you said --

7          MR. BEST:  -- as well --

8          THE COURT:  -- he doesn't have to be actively

9    criminally charged, right?

10          MR. BEST:  I understand.  But is under active

11   criminal investigation for fraud in this Court.  And so

12   that's a nuance to this whole exercise that -- there's no

13   question if he's under investigation for fraud in relation

14   to any of his statements in the Bankruptcy Court that any

15   demand upon him for production along those lines is a

16   compulsory process which he's allowed to invoke his Fifth

17   Amendment privilege of.

18          It in essence is the documents that would be

19   produced, if there are any, would be used not only for Your

20   Honor's purposes and the trustee's purposes and the

21   bankruptcy purposes but would be part of a ongoing criminal

22   investigation of what we now know is allegations of fraud in

23   this Court.

24          I mean, it -- there's no stronger case that I know

25   of for the testimonial component of a production of

Ho Wan Kwok - April 20, 2023                              122

1    documents which is being called for in this case.

2              And I respect this Court's desire to honor its

3    obligations.  And I understand that he filed for protections

4    here.  There are always intervening circumstances that have

5    to be taken into consideration here.  And that is what's

6    before us right now.

7              THE COURT:  Okay.  I understand.  Thank you.

8              MR. BEST:  Okay.

9              THE COURT:  Is there anything further you'd like

10   to add?

11             MR. BEST:  Not at this time.  I'm happy to do

12   further briefing if Your Honor desires.

13             THE COURT:  I need to think about that.  But thank

14   you.

15             MR. BEST:  Yeah.

16             MR. BASSETT:  Your Honor, may I be heard and

17   respond to this?

18             MR. DESPINS:  Your Honor, if I -- just if I can

19   just jump in here for a second?  I want to offer a practical

20   solution to this.  I understand the issue.  Act of

21   production.  Got it.

22             But I think counsel for Mr. Kwok will agree that

23   the act of production doctrine does not apply to documents

24   provided by the Government to Mr. Kwok.  There's no act of

25   production issue there.

1        So he's saying let's have the U.S. Trustee call

2    the DOJ, da, da, da.  That's not the way that works.  We

3    don't exist in the criminal court.  We don't exist in the

4    Southern District of New York U.S. Attorney group, I mean,

5    meaning that they do their own thing.  And we wish them the

6    best, also Mr. Kwok.  It's not our issue.

7        But the defendant, he has standing in that court

8    to say, you know what, Judge, criminal judge, we would like

9    a modification to the protective order, and that

10   modification would be that we can provide to the trustee --

11   Chapter 11 trustee copies of the documents that the

12   Government gives us.  This Court, Your Honor, could direct

13   the debtor to seek such a modification to the protective

14   order.

15       That doesn't guarantee that the criminal court

16   will agree to that or that the Government will agree to

17   that.  But the debtors seem to be okay with that, meaning

18   have no problems with us seeing the documents that are being

19   produced to the defendant by the Government.  He just

20   doesn't want to be involved in it.

21       And as I -- I'm telling you, Your Honor, we have

22   no standing in that court.  We cannot go to the criminal

23   court and be heard on that issue.  But the defendant can.

24   And he -- the defendant happens to be a debtor in your

25   court, and you can direct the defendant to seek that relief.

1    No guarantee of a positive result.  But, to me, that would

2    avoid a lot of brain damage on everyone's part.

3         And the second part is that on the issue of

4    negative inferences that we want to be able to derive from

5    his invocation of the Fifth, there is a way for that

6    invocation of the Fifth Amendment to be particularized and

7    to address our concern.  And I don't think that criminal

8    counsel to Mr. Kwok should have an issue about that, because

9    they are invoking the Fifth as to all those documents.  It's

10   not like some of them they'll answer.  They're invoking the

11   Fifth as to all of them.

12        There should be a procedural way -- Mr. Bassett

13   can propose something -- but that would allow for that

14   individualized or particularized invocation of the Fifth as

15   to each of the document production requests.

16        So, to me, if we deal with these two issues, I

17   think we've resolved or we've arguably made a lot of

18   progress in resolving the issues without going into a --

19   what I would call a complete clash between criminal court

20   and bankruptcy court.

21        THE COURT:  Mr. Best?

22        MR. BEST:  Yeah.  I have no objections if counsel

23   for the trustee wants to put a long list of requests

24   together to do a particularized -- review them, make sure

25   it's appropriate with -- in how they're written, to go

1   through them with the client and get his determination as to

2   whether he is going to do a particularized invocation on one

3   or all of the inquiries by the trustee's counsel.

4          So to that point, I agree with Mr. Despins that if

5   that's presented, it's -- if that's a solution, I -- I'm

6   here to try to solve -- I understand the issues.  I'm

7   trying -- I want to -- I went through it, and I offered it

8   up as to how the process works in grand jury.  And it would

9   be the normal course for that to be the way here as well.

10          THE COURT:  What about the -- and I have no idea.

11   But what about what Trustee Despins just said about a

12   modification of the protective order in the criminal

13   proceeding to have the Government share the documents they

14   have that they were going to produce to your client also to

15   the trustee?

16          MR. BEST:  So it's not our protective order.

17   That's the point.  I have no problem working with the court

18   and the Department of Justice on that.  But it's the court's

19   order.  And so that, I'm sure, can get figured out along the

20   way.  But --

21          MR. DESPINS:  Your Honor, the criminal court --

22          MR. BEST:  But just understand --

23          MR. DESPINS:  -- the criminal court does not enter

24   (indiscernible).

25          MR. BEST:  -- I can't force the Southern District

1   Court to amend their order, but --

2             THE COURT:  I don't think that -- I think Trustee

3   Despins already acknowledged that.

4             MR. DESPINS:  No, that's not what --

5             THE COURT:  He's already acknowledged that they

6   might not do it.

7             MR. BEST:  Yeah.

8             THE COURT:  Right?

9             MR. BEST:  Happy to try.

10            THE COURT:  I think what he was asking was would

11  this Court enter an order requiring the debtor to seek that

12  relief from the Southern District of New York, knowing that

13  the Southern District of New York may say no.  But I don't

14  know --

15            MR. DESPINS:  Correct.

16            THE COURT:  -- you know, if you oppose that.  If

17  you don't oppose that, and you all can come up with an order

18  that this Court could enter, then that's fine.  But, I mean,

19  you need -- yeah.  You need time to talk about it.  That's

20  fine.

21            MR. BEST:  Yeah.  If I may?

22            THE COURT:  Do you want a few minutes?

23            UNIDENTIFIED SPEAKER:  Sure.

24            UNIDENTIFIED SPEAKER:  Yes.  If we could.

25            THE COURT:  All right.  So before we take a break

1    on this, okay, and we'll take a recess, we have one other

2    matter in this case today.  And it was -- it's with regard

3    to Bravo Luck whose counsel's been, I think, here the whole

4    time.

5              And it's -- it was an issue regarding this motion

6    for relief for judgment or order on -- I guess that -- I'm

7    asking, how much time do the parties think that hearing is

8    going to take?  Do you have any idea?

9              MS. CLINE:  It should be short (indiscernible).

10             MR. DESPINS:  From my point of view, Your Honor,

11   three minutes.  What I have to say will take three minutes.

12             THE COURT:  So this is what my thought is.  Okay?

13   And so I -- and I think, counsel, you're agreeing with

14   Trustee Despins that it would be a short hearing?

15             MS. CLINE:  So depending on what he says, yes,

16   Your Honor, it should be short.

17             THE COURT:  That's fair, I suppose.  In any event,

18   why don't you all -- the -- Mr. Kwok's counsel be excused

19   for now.  We'll pass the hearing that is ongoing right now.

20   We'll stop it for now.  You'll be excused.  You can go have

21   some conversations.

22             You're going to have to have conversations with

23   the trustee's counsel at some point, though, too.

24             MR. BEST:  Absolutely.

25             THE COURT:  Okay.  So why don't we hear this final

1   matter, and then I'll take some form of a recess, and you

2   all -- you can all convene first, and then you can talk to

3   the trustee's counsel.

4           MR. BEST:  Great.

5           THE COURT:  Okay?  I think that's -- let's do

6   that.  And there are conference rooms, they should be

7   unlocked, in the hallways.

8           MR. BEST:  They're much nicer than any conference

9   rooms I deal with on criminal cases, so --

10          THE COURT:  Well, that's good.

11          MR. BEST:  It is.

12          THE COURT:  Maybe that'll produce a result.

13          MR. BEST:  Yes.

14          THE COURT:  Okay?  But in any event, why don't you

15  do that.  All the -- Mr. Kwok's lawyers can be excused for

16  now.  And I'll have Bravo Luck's counsel come forward.

17  We'll address the final matter on the calendar.  And then

18  I'm going -- I am going to take a recess, because not only

19  we -- does the staff need some time but then you can have a

20  conversation with trustee's counsel.

21          MR. BEST:  Absolutely.  Why don't we plan at least

22  on -- I don't know how long your recess -- 2:00, 2:15 being

23  back.

24          THE COURT:  I would think we would do about an

25  hour.

1          MR. BEST:  Okay.

2          THE COURT:  Because I have some other things I

3    have to attend to later this afternoon.

4          MR. BEST:  Come back at 2:00 or 2:15?

5          THE COURT:  I would say 2:00, please.

6          MR. BEST:  Great.

7          THE COURT:  Okay?

8          MR. BEST:  Thank you, Your Honor.

9          THE COURT:  Thank you.

10          All right.  Now, we -- because we're suspending

11    that hearing in some respects so that parties can have some

12    discussions, let's turn to the last matter on the calendar

13    that was set for hearing quickly, because counsel -- oh,

14    counsel, could you state your appearance for the record,

15    please?

16          MS. CLINE:  Yes, Your Honor.  Joanna Cline,

17    Troutman Pepper, on behalf of Bravo Luck.

18          THE COURT:  Good afternoon.  All right.  Hold on

19    one second, please.

20          So with regard to the -- ECF Number 1679, the

21    order scheduling hearing on motion -- on the oral motion

22    that Attorney Cline made the other day when she was in court

23    on Tuesday in a pretrial conference, she was concerned about

24    the notice parties -- who are deemed to be the notice

25    parties in connection with a proposed abandonment motion

1    that has not been filed yet but that the Court had allowed

2    to be filed under seal.

3           So, Trustee Despins, I set this for a hearing

4    because I wanted to give counsel the opportunity -- she

5    explained why she wants to be a notice party.  From what I

6    understand on the record the other day, there was an

7    affirmative decision not to make Bravo Luck a notice party.

8    Is that correct?

9           MR. DESPINS:  That's correct.

10          THE COURT:  Okay.  Could you just explain --

11          MR. DESPINS:  Or any other creditor other than the

12   ones that are listed -- that's correct, Your Honor.

13          THE COURT:  That are already what?  Subject to the

14   protective order?

15          MR. DESPINS:  That are listed -- so the -- no.  So

16   the -- it would be the creditors' committee, PAX, the U.S.

17   Trustee, and the debtor.

18          THE COURT:  All of whom are --

19          MR. DESPINS:  And there's a --

20          THE COURT:  -- signatories to the protective

21   order, correct?

22          MR. DESPINS:  Yes.  But it was not driven by that.

23   But, yes, they are all signatories for that.

24          But so if I can explain in my three minutes?

25   Basically, this is an issue that -- granted, the motion that

1    Mr. Linsey filed does not disclose what property is to be

2    abandoned.

3            But I can tell -- and I hope that it would give

4    comfort to -- but, actually, we've already tried that, I

5    don't think it worked -- to counsel for Bravo Luck that has

6    nothing to do with The Sherry Netherland or Bravo Luck.  So

7    that's the first part.  It's an issue in the Kwok case.

8            So they're saying, well, we're a creditor in the

9    Kwok case.  They're not a fiduciary.  We have a fiduciary,

10   which is the creditors' committee.

11           As Your Honor will know from the testimony I will

12   give at that hearing, there are very sensitive issues to be

13   discussed in terms of strategy of abandonment and potential

14   other alternative approaches.  And I just don't want this to

15   be out there.

16           And it doesn't involve Bravo Luck.  Bravo Luck --

17   you know, let's remember, they're a fraudulent transfer of

18   defendant.  And that's all they are.  And they -- you know,

19   their principal has refused to be served.

20           It's just -- you know, they can't be involved in

21   any other thing.  They should not be involved in any other

22   thing.  This is an issue that goes to the core of the

23   administrative of the case.  There's a fiduciary, the

24   creditors' committee.  The U.S. Trustee is there.  The

25   debtor's counsel is there.

1        And PAX is there.  And the reason for PAX is that,

2   you know, they do happen to have a judgment for millions of

3   dollars.

4        So they're not like a defendant that is trying to

5   get involved in the case in some fashion.  So that --

6   basically, that's my (indiscernible), Your Honor.  They

7   don't belong there.  They shouldn't be there.  This deals

8   with very sensitive information.

9        And it does not affect them, because it doesn't

10  affect The Sherry Netherland or Bravo Luck directly.  So it

11  may impact them as a creditor of Kwok.  Frankly, I'm not

12  sure how they're a creditor of Kwok.  But assuming that they

13  are, it may affect them in that capacity.  But there's

14  plenty of coverage there with the U.S. Trustee and the

15  creditors' committee covering that.

16        Thank you, Your Honor.

17        THE COURT:  Thank you.

18        Counsel, you wish to be heard?

19        MS. CLINE:  Yes, Your Honor.  Joanna Cline on

20  behalf of Bravo Luck.

21        I guess what the trustee is seeking are two

22  things: one, to limit notice, and two, to file this motion

23  for abandonment under seal.  And there's no basis in the

24  case law or nor has he articulated a factual reason for

25  either request.

1       On the issue of notice, limiting notice usually is

2   done where the party giving notice seeks to avoid the cost

3   or the time that's required for notice.  The case cited by

4   the trustee in his papers, In Re Karan (ph), does relate to

5   the Court's ability to limit notice in the context of an

6   abandonment proceeding, but it actually supports our

7   position and underscores the proposition that the purpose of

8   the notice requirement is to provide an opportunity for

9   people to be heard and to object.

10      That case doesn't articulate the standard for

11  limiting notice, and instead if denies a motion for an entry

12  of a consent order on abandonment, because the parties did

13  not file an appropriate motion to limit notice that fully

14  stated the limits of service that was supported by an

15  affidavit.

16      We are not aware of and the trustee has not cited

17  any cases in which a court has, in fact, limited notice in

18  an abandonment proceeding for a reason other than cost or

19  timing of notice.  In fact, the case law says that notice is

20  a crucial aspect of abandonment.  And that can be found in a

21  case called In Re Telcar.

22      With respect to the notion of filing under seal --

23      THE COURT:  Do you have a cite for that case,

24  In Re Telcar?

25      MS. CLINE:  Yeah.  In Re Telcar, 363 B.R. 345 at

1    Note 19, Bankruptcy Eastern District 2007.

2              THE COURT:  Thank you.

3              MS. CLINE:  And all of this is also in Collier's

4    section on Rule 6007.

5              THE COURT:  On Rule 6007?  Okay.

6              MS. CLINE:  Yes, Your Honor.

7              THE COURT:  Okay.  Thank you.

8              MS. CLINE:  And then on the second point, filing

9    under seal, as a preliminary matter, we're not aware of any

10   case in which an abandonment motion was sealed and kept from

11   parties in interest in a litigation.

12             But the proper standard is under Rule 107(b),

13   which if one are -- is to read it carefully, I think the

14   cite that the trustee is relying on relates to the notion

15   that the Court may protect an entity with respect to a trade

16   secret or confidential research, development, or commercial

17   information.  So that's the prong they rely on.

18             This is a case involving an individual debtor, and

19   the trustee has not articulated whether there's a trade

20   secret, what's so confidential, what's the commercial -- the

21   supposedly commercial information that's in dispute here.

22             The trustee has a burden to overcome the

23   presumption of open public access to our court system that

24   is the very foundation of the way we do business in the

25   United States courts.  A generalized interest is not enough.

1    And types of information that the courts have found to be

2    confidential relate to sort of -- some sort of business

3    value when the debtor's asset is at stake, a customer list

4    or a creditor list or something to that effect.

5            But to sort of generalize -- generally just say,

6    as the trustee here does even in his brief, things would run

7    more smoothly without the interference of Bravo is an

8    argument that has been squarely rejected by courts on this

9    point.  And that case is called Itel, I-T-E-L, which is

10   cited -- there's a discussion in Collier's -- the Collier's

11   section on Rule 107.03(a).

12           The trustee's essentially saying what we're doing

13   may affect the rights of others, so we'd like to keep them

14   in the dark so they can't complain.  And that's just at odds

15   with the way our system of justice works and is at odds with

16   Bravo's due process rights.

17           THE COURT:  Okay.  Thank you, counsel.

18           Anything further, Trustee Despins?

19           MR. DESPINS:  Your Honor, you know, the right of

20   others is not Bravo Luck.  It's somebody else.  We don't

21   want them to be -- to know of this or to learn of this.  And

22   I haven't heard anything about the particularized interest

23   that Bravo Luck has after the representation I made that

24   this has nothing to do with Bravo Luck, it doesn't involve

25   The Sherry Netherland.

1          And they are represented by the U.S. Trustee and

2     the creditors' committee.  They're there as watch dogs to

3     make sure we're not doing anything crazy.

4          In terms of the secrecy around this is because it

5     involves complex strategies involving that asset and how

6     it's being abandoned and what is being preserved that I

7     really don't want Bravo Luck to have any knowledge of or

8     other creditors, by the way.  Because they -- unless they

9     have a particularly -- particularized interest in that

10    matter, they should not participate in this.  Because it's

11    highly confidential and could be damaging to the estate

12    (indiscernible).

13          THE COURT:  Okay.  Thank you.

14          MR. DESPINS:  Thank you.

15          THE COURT:  Anything further, counsel?

16          MS. CLINE:  Yeah.  Just, Your Honor, that -- yeah,

17    just to point out the obvious, which is that the burden is

18    not ours.  The burden is on the trustee to overcome the

19    presumption of access to the public records in the court

20    system.

21          THE COURT:  Okay.  Thank you.

22          Does anyone else wish to be heard?

23          MS. MAYHEW:  The only thing I'd like to add, Your

24    Honor -- Kristen Mayhew, Pullman & Comley, on behalf of the

25    committee -- is that based on the representations from the

1    Chapter 11 Trustee that this is a highly confidential,

2    sensitive matter, we believe that as a fiduciary to all of

3    the creditors, the creditors' committee having received

4    notice, we will be in an appropriate position if there's

5    anything that will be of concern to individualized

6    creditors, we will have that information.  But based on the

7    representations of the trustee, we do not believe that Bravo

8    Luck should be given notice of the abandonment.

9              THE COURT:  Okay.  Thank you.

10             MS. MAYHEW:  Thank you.

11             THE COURT:  Anyone else wish to be heard?

12             MS. CLINE:  If I may?  Just one last --

13             THE COURT:  Sure.

14             MS. CLINE:  -- thing, Your Honor.  I guess if the

15   committee has access and PAX has access, we haven't heard

16   why -- why Bravo can't have access.

17             There's been no particularized explanation as to

18   why our client needs to be kept into the -- in the dark

19   other than, I assume, the trustee's theory that underlies

20   his whole case.  But there's been no showing here, and

21   there's no basis for denying us access.

22             THE COURT:  Okay.  Anyone else wish to be heard?

23             All right.  I am going to take the matter under

24   advisement, and I will rule accordingly.  Okay?

25             And, counsel, you do not need to stay unless you

1    want to.  You're more than welcome to.  I didn't anticipate

2    that the hearings would be this length and that we wouldn't

3    have gotten to your hearing sooner.  But that's completely

4    up to you.

5         But the Court is going to take a recess until 2

6    p.m. as noted with regard to the prior matter that the Court

7    was hearing so that the parties can have some discussions.

8    So Court is in recess until 2 p.m.

9         THE COURTROOM DEPUTY:  Court is in recess until 2

10   p.m.

11        (Court recessed from 1:07 p.m. to 2:03 p.m.)

12        THE COURT:  Please be seated.  All right.  Before

13   we took a recess --

14        MR. BASSETT:  Your Honor, I apologize for

15   interrupting, but I don't see Trustee Despins on the Zoom.

16        THE COURT:  Oh.  Here he comes, it appears.

17        MR. DESPINS:  Apologies.  Sorry.

18        THE COURT:  That's okay.  That's fine.

19        All right.  Before we took a recess, we were

20   addressing two motions that are pending in the case -- in

21   the main case of Mr. Kwok.

22        And the motions were the motion for an order --

23   related to the motion for order to show cause why Mr. Kwok

24   should not be held in contempt with regard to his invocation

25   of his Fifth Amendment privilege and then Mr. Kwok's motion

1   for a limited stay of the order granting in part the motion

2   to compel compliance with the 2004 examination.  And

3   Mr. Best and the parties were going to have some

4   discussions.

5            Mr. Best, did you want to report on where things

6   stand at the moment?

7            MR. BEST:  Yes, Your Honor.  We were in agreement

8   even, I think, before the recess as to the -- Mr. Despins'

9   request that the invocation of the Fifth be specific --

10  subject matter specific.  And then the only remaining

11  question was on any discovery in the Southern District case

12  and the trustee's availability to it.

13           We are in agreement in principle that, subject to

14  the U.S. Department of Justice and really, most importantly,

15  the district court judge agreeing to the disclosure of it,

16  I'm sure with many limitations or qualifications, that we

17  won't stand in the way of that.  The discussion really is

18  what's the best way -- how's the best way to accomplish

19  that.

20           We have not received any discovery, as I

21  understand, yet.  Whether it be that the present subpoena

22  remains in force with specific provisos regarding this

23  specific issue -- all this is, I guess -- we didn't talk

24  about this, but, you know, I would ask that the motion to

25  hold the client in contempt be withdrawn without prejudice

1    and that we'll withdraw our extension motion as well.  And

2    then we're left with let's sit down and try to figure out

3    the best course ahead.

4         There is a concern from the U.S. Trustee's counsel

5    that they don't have standing in the Southern District for

6    this subpoena.  I don't care how we get home.  There are

7    multiple ways to do it so that -- they spoke about not

8    wanting to have the obligation to go to the Department of

9    Justice themselves.

10        They're going to end up -- just so I'm transparent

11   with the Court, they're going to end up in front of the U.S.

12   District Court judge in the Southern District of New York,

13   because I'm sure she or he is going to want to hear from

14   them on the issues regarding limitations of use and the

15   confidentiality and protective order.  So --

16        THE COURT:  When you say they, do you mean the

17   Office of the United States Trustee?

18        MR. BEST:  Correct.

19        THE COURT:  Okay.

20        MR. BEST:  And so I want to help the Court explore

21   this and then help the Court in fashioning an order that --

22   or a ruling or -- and you don't -- I mean, I don't even know

23   if you need to issue a ruling.  But I'd like clarity on the

24   way forward.  I know you would.  I know everyone would.  And

25   understanding that we will abide by whatever process makes

1    the best sense.

2              THE COURT:  Okay.  Thank you.

3              MR. DESPINS:  Your Honor, the U.S. Trustee has

4    nothing to do with this, with all due respect.  This is

5    discovery of the Chapter 11 Trustee.

6              MR. BEST:  Chapter 11 Trustee.

7              MR. DESPINS:  So and, you know, that's very

8    different.

9              THE COURT:  Yes.

10             MR. DESPINS:  And so what should happen is that I

11   think the Court should enter an order saying that the debtor

12   is directed to seek a modification of any applicable

13   protective order in the criminal case to allow the Chapter

14   11 Trustee access to the documents produced by the

15   Government to the debtor.  And you can add language saying

16   that the debtor does not represent in any way that they have

17   the ability to achieve that, but they're just going to ask

18   and -- because they have standing.

19             And if they get shot down, they get shot down.

20   That's the risk we take.  They cannot oppose that relief,

21   because there's nothing -- with act of production, that's

22   totally out the door then.

23             So I think that should happen.  And we should

24   adjourn the hearing on the underlying motions for 20 days or

25   something like that to see what transpires in the criminal

1    case.  That's, I think, the path forward.

2         And, again, it doesn't cause the debtor to agree

3    to something that they cannot deliver, because it's

4    understood that they will simply ask.  And that's our

5    pathway to that.  And if that doesn't work, you know,

6    because the criminal court or the DOJ vetoes it, that's our

7    risk.  We understand that.

8         But the debtor has no standing -- I'm not using

9    standing in the legal sense but practical sense -- to oppose

10   an order that says you shall seek the right to share this

11   with your Chapter 11 Trustee.  Thank you.

12        THE COURT:  Thank you.

13        Attorney Claiborn?

14        MS. CLAIBORN:  Thank you, Your Honor.  I do want

15   to echo the clarification just made by Trustee Despins which

16   is to say that Attorney Best's references to the Chapter --

17   to the U.S. Trustee are, in fact, references to the Chapter

18   11 Trustee.  The U.S. Trustee is not part of the discussions

19   that have been happening between counsel and is not party to

20   the agreement or lack thereof that they've been discussing.

21        MR. BEST:  I apologize that I misspoke.

22        THE COURT:  That's okay.

23        MR. BEST:  I'm sorry.  Go ahead.

24        MR. FRIEDMAN:  Go ahead.  Go ahead.

25        MR. BEST:  No.  I'm fine with counsel proposing a

1   draft order that we look at and get to Your Honor if that's

2   the easiest way of doing it.

3          I just want to make sure everybody knows that

4   there will be -- the protective order has limitations of use

5   of the information.  And I think -- I see Mr. Despins

6   shaking his head in acknowledgment.

7          So that I think there's an agreement to be --

8   abide by if the Southern District Court so allows to use the

9   information subject to the protective -- them being part of

10  the protective order.

11         THE COURT:  Okay.  So I think what I'm hearing

12  is -- Mr. Friedman, did you want to be heard?

13         MR. FRIEDMAN:  I did, Your Honor.  It's Peter

14  Friedman for O'Melveny & Myers.  And I'm going to also be

15  joined by Ms. Mayhew --

16         MS. MAYHEW:  Yes.

17         MR. FRIEDMAN:  -- on the committee.  We would both

18  ask for -- to be in whatever discussions there are about a

19  modification to the protective order in SDNY.  Both of our

20  clients would like to be able to have access to documents

21  or -- you know, subject to their willingness to sign onto

22  any protective order the same way as occurred in the Chapter

23  11 case.

24         THE COURT:  The problem is, it's not the Chapter

25  11 case, though.  I mean, that's the problem, right?

1              I mean, Trustee Despins, you have -- you're trying

2       to get this information for your investigation.

3              MR. DESPINS:  Correct.  And, by the way, I could

4       not hear what Mr. Friedman said, because he was --

5              THE COURT:  Mr. Friedman is --

6              MR. DESPINS:  -- too far from the --

7              THE COURT:  Oh, yeah.  He --

8              MR. FRIEDMAN:  Sorry.

9              THE COURT:  Go ahead.

10             MR. FRIEDMAN:  May I -- should I speak, Your

11      Honor, or --

12             THE COURT:  Please.

13             MR. FRIEDMAN:  Okay.  We were just requesting

14      permission to also be able to review documents that are

15      received in connection with your investigation subject to

16      being a party to any protective order.  And I think the

17      committee is making the same request.

18             MR. DESPINS:  And I -- normally, I would say

19      absolutely.  But this is a sure bet way of making sure that

20      we never get access to those documents.  The more people

21      have access, the less likely it is that we have a right

22      to -- that even we have the right to seek it.  So I'm not

23      trying to be a difficult participant here, but I just --

24      it's not going to work.

25             MR. FRIEDMAN:  Your Honor, we believe that we

1   should be -- that the trustee should -- and we should be

2   permitted to make the request.  If the judge in New York

3   says that's an issue, then that's an issue.  But --

4           THE COURT:  Well, it's not an issue for the judge

5   in New York.  It's an issue here.  Right?  We're resolving

6   matters that are in front of this Court.  And whether the

7   judge in New York agrees to what the trustee is seeking is a

8   different issue.

9           But right now, the trustee is seeking to continue

10   to perform his duties under the Bankruptcy Code.

11   Apparently, Mr. Best, I think, and the trustee have an

12   agreement that there'll be some form of an order that will

13   be presented to this Court resolving these two matters that

14   are on today's calendar, which is the trustee's motion

15   which -- with regard to the trustee's motion to compel and

16   the debtor's motion for stay.

17           And the resolution is that the trustee is going to

18   seek those documents from the court in the Southern District

19   of New York, which the District of New York court may say

20   no.  And but --

21           MR. DESPINS:  Well, actually, Your Honor, it's

22   that the debtor will seek --

23           THE COURT:  Well, yes.

24           MR. DESPINS:  We're not seeking.

25           THE COURT:  I'm sorry.

1          MR. DESPINS:  The debtor will seek.

2          THE COURT:  The debtor will seek but then share

3     with you once they're -- when they're --

4          MR. DESPINS:  Correct.

5          THE COURT:  Right.  Right.  And I have to say,

6     under the circumstances as we're in right now, I have to

7     agree with the Chapter 11 Trustee at this point that the --

8     that at this point, if the debtor seeks a modification of

9     whatever the application orders are in the Southern District

10    of New York, and if the Southern District of New York judge

11    and, I guess, the U.S. Attorney's Office don't oppose that

12    and it's granted, then the only information that will be

13    produced to -- at this point to Mr. Kwok would be shared

14    only with the Chapter 11 Trustee.

15         There's just too much going on in this case right

16    now that we can't have another month of fight about who gets

17    what.  And that's what's going to happen.  And I'm not going

18    to have that happen.

19         The trustee has been appointed by this Court to

20    conduct the investigation.  That's what he's going to do.

21    And whatever -- or he's going to try to do.  And if he is --

22    if his resolution of these motions between the trustee and

23    the debtor are on the terms and conditions that Mr. Best and

24    Mr. Despins agree to, then that's how we're going to proceed

25    at this time.

1           MR. FRIEDMAN:  So, Your Honor, I guess my concern

2     is then suppose the trustee files something in this Court

3     under seal --

4           THE COURT:  Then we'll address that --

5           MR. FRIEDMAN:  -- we would --

6           THE COURT:  -- when that happens.

7           MR. FRIEDMAN:  So would we then have the ability

8     to ask this Court to permit us --

9           THE COURT:  We'll --

10          MR. FRIEDMAN:  -- to review documents filed under

11    seal and not be precluded, because we've been told we -- you

12    know, that when the negotiations occur in -- between the

13    trustee and the debtor in SDNY that, well, that order

14    doesn't say that parties can apply to Judge Manning in order

15    to obtain documents filed under seal.  That --

16          THE COURT:  We'll address that when and if that --

17    we get to that point.

18          Look, the situation is this.  As you all know,

19    we're up to over 1,700 docket entries in this case.  Every

20    single day there is a new motion filed that needs an

21    emergency hearing.  Every day.  I don't think we've gone

22    through a day -- a week where we haven't had that.  Okay?

23          There's an agreement here to try to make some

24    progress between the trustee and Mr. Kwok's counsel.  I'm

25    going to allow that to occur, and then we'll see what

1    happens.  Every single thing in this case has changed from

2    day to day and week to week.  And so we'll see.

3           I understand the concerns of PAX, and I understand

4    the concerns of the committee.  But if I'm -- I'm seeing

5    that when you made that request, the debtor's counsel shake

6    their head no.  I'm not going to have another fight.  We're

7    not going to have briefs that are going to be filed about

8    who can get what and --

9           There's an agreement.  We're going to proceed with

10   that agreement.  I'm going to hold Mr. Best and Mr. Despins

11   to that agreement.  If they don't -- if something goes awry,

12   then they'll have a problem in this Court.

13          But right now, there's an agreement that could

14   result in some progress for the trustee.  And that's where

15   we're going to -- that's how we're going to resolve the

16   issue right now.

17          That doesn't mean you can't ask anything you want

18   to ask at some point in the future.  But I -- we can't

19   provide for every eventuality, or we'll never leave this

20   room.  And we've been here on this matter -- you know, we've

21   been here on this matter then -- many more times than

22   complex Chapter 11 corporate cases have been.

23          And I think it's time to -- everyone has been

24   trying.  And I understand that.  But at this point, that's

25   where we are.

1          The trustee and Mr. Best are going to submit an

2     order.  How much time do you both need?  Are you going to do

3     it by tomorrow?

4               MR. DESPINS:  Yes, from our point of view.

5               MR. FRIEDMAN:  Thank you, Your Honor.  May I be

6     excused from the lectern so that it can be used?

7               THE COURT:  Yes.  Thank you.

8               MR. FRIEDMAN:  Thanks.

9               MR. BEST:  If Mr. Despins or his colleagues can

10    get us the draft order for Your Honor to sign, we just need

11    a little time to take it to see our client.  We don't have

12    him -- we don't have easy access in that vein.  So by

13    Monday, if we can get by close of business Monday?

14              THE COURT:  All I would say about what you just

15    said is when you say see your client -- I understand you

16    have to see your client.  But you've agreed that your

17    client's not going to oppose this.  So --

18              MR. BEST:  I agree.

19              THE COURT:  Okay.

20              MR. BEST:  He just needs to see the order and --

21              THE COURT:  Okay.  And that's fair.

22              MR. BEST:  Yeah.

23              THE COURT:  I'm not suggesting anything to the

24    contrary.  I'm just saying I don't want to hear that there's

25    not -- there's no longer an agreement, because otherwise

1    then I'm --

2              MR. BEST:  I completely understand.

3              THE COURT:  -- going to rule on these motions.

4              MR. BEST:  And without a doubt, you'd be free to.

5    And I'm not using it as a qualifier.

6              THE COURT:  I'm not suggesting you are.

7              MR. BEST:  Okay.

8              THE COURT:  I want to make it very clear for the

9    record.  Okay?

10             MR. BEST:  And as I -- so in that vein, when we

11   submit it and it's ordered, as I understand it, the

12   trustee's motion for sanctions or contempt, show cause

13   hearing and contempt are going to be withdrawn --

14             THE COURT:  I don't think there is an agreement on

15   withdrawal.

16             MR. DESPINS:  No.  Adjourned.

17             THE COURT:  I think the agreement was about the

18   order.  What the Court what I would do, and I think is

19   appropriate in this case, that we would continue these

20   hearings out for some time to see where things stand.

21   Because we need -- the trustee -- I know you haven't been

22   involved in this case, Mr. Best --

23             MR. BEST:  Right.

24             THE COURT:  -- for very long.  But the trustee

25   needs to do his investigation, right?  What he -- and if

1   this is -- it may not even work, what he's trying to do,

2   right?  But he's trying to do it.  And this Court's going to

3   support that, because that's why the trustee -- not

4   Mr. Despins in particular, but that's why a trustee was

5   appointed in this case.  Okay?

6           So I am not going to have the motions be withdrawn

7   to only have them have to be filed again.  I'm going to

8   continue them for some time.  And we'll see where things

9   stand.

10          And what we need to do is have the parties, you -

11   and you will, you and Mr. Despins, cooperate and see what

12  can be done, if anything, in the Southern District of New

13  York.

14          I have ruled right now that the only parties that

15  are going to see these documents are -- is the trustee.  No

16  one else.  Okay?  And where that goes, who knows.  We'll

17  see.  But at this point, I am not going to have either of

18  the motions withdrawn.  I will have them both continued.

19  Okay?

20          MR. BEST:  Yes, Your Honor.

21          THE COURT:  And we will figure out -- and I'm

22  going to continue them -- well, I'll take a look at the

23  calendar in a moment.  But I'm not going to go much beyond

24  30 or so days, because I want to see what progress has been

25  made in the Southern District of New York.

1           MR. BEST:  I want to be clear.  We haven't gotten

2     any discovery yet, so I --

3           THE COURT:  I understand all that.

4           MR. BEST:  So --

5           THE COURT:  I completely --

6           MR. BEST:  Okay.

7           THE COURT:  And I appreciate that.

8           MR. BEST:  Okay.

9           THE COURT:  But once you both start talking to the

10    parties in the Southern District of New York, who knows what

11    will happen, right?

12          MR. BEST:  Right.

13          THE COURT:  Or you may report back they're telling

14    us they're not going to give us anything for 60 days.  I

15    don't know what you're going to report back.  But we need to

16    keep the trustee's ability to try to do his job at least

17    moving in a forward direction --

18          MR. BEST:  Understood.

19          THE COURT:  --  however small that may be.

20          MR. BEST:  Understood.

21          THE COURT:  Okay?

22          MR. BEST:  Yes, Your Honor.

23          THE COURT:  All right.  So then let's see.  Well,

24    we have a hearing scheduled in the case -- in the -- I'm

25    sorry.  Not in the case but in an adversary proceeding

1    related to Mr. Kwok's case on March -- excuse me, May 30 at

2    1 p.m.  So I would continue the -- both of these matters

3    until May 30 at 1:00 p.m., both the motion -- I will note it

4    for the record since we -- our record is only audio, so we

5    have to be very careful about what we say, make sure it's

6    clear.

7            So the motion for order to show cause with regard

8    to the contempt issue with -- in particular with regard to

9    Mr. Kwok, ECF 1453, is continued until May 30 at 1:00 p.m.,

10   as is the debtor's motion -- if you just give me one second,

11   I'm sorry -- as is the debtor's motion for a limited stay of

12   the order granting in part motion to compel compliance with

13   Rule 2004 examination.  Subpoena, I should say.  Excuse me.

14   Subpoena.  So that matter is continued which is ECF 1649.

15   That matter is also continued to May 30 at 1:00 p.m.

16           Now, Mr. Despins, before we adjourn for the day,

17   you've now -- and you're both going to get that order to the

18   Court no later than Monday, the agreed-upon order regarding

19   documents in the control of the Southern District of New

20   York.  I guess that's really what it is, right?

21           MR. BEST:  Yes, Your Honor.

22           THE COURT:  So, Mr. Despins, you started the

23   argument today by indicating your concern about a conflict

24   issue.  And I let these hearings go forward for many

25   reasons, including the fact that everyone's here, and these

1    issues do need to be addressed.

2            Are you pressing the issue of the conflict now, or

3    are you holding that -- are you not pressing it at the

4    moment in light of trying to proceed with your

5    investigation?  Because I need to determine whether or not I

6    need to set a briefing schedule.

7            And if -- I'll -- to be fair, since some -- you've

8    had some discussions over the last hour.  I will allow you

9    to tell the Court that when you and Mr. Best submit the

10   order regarding the attempt to -- you know, the process of

11   trying to obtain the information in the Southern District of

12   New York, if that's how you want to proceed.

13           MR. DESPINS:  Yeah.  I was going to say I need to

14   reflect on it.  There's something I learned through the

15   hearing today that, you know, made me think more about it,

16   which is I knew we had received a subpoena, of course I knew

17   that, from the DOJ.  And it was to produce the deposition

18   transcripts.  That was very clear to me on that.

19           But what I did not -- I have not focused on is

20   that there was a line item that Mr. Best, you know, focused

21   on which is Title 18 Section 152 which is bankruptcy crime,

22   bankruptcy fraud.  And the point there is -- first of all,

23   there's nothing in the indictment about that at all.  The

24   subpoena clearly says that.

25           And if that's real, I mean, if that -- they

1    actually are looking at that, that could only cover the

2    period during which Brown Rudnick was counsel.  So I need to

3    get smarter about that issue, frankly, before I come back to

4    Your Honor.  I'm sorry.

5            THE COURT:  That's fine.  That's fine.  No.

6            MR. DESPINS:  I would love to be able to do it on

7    the spot, but --

8            THE COURT:  That's fine.  That's fine.  I do not

9    want to have parties engage in briefing when it's not clear

10   we're going to be doing that at this point in time.  Okay?

11           MR. DESPINS:  Okay.  And, Your Honor, I have a few

12   housekeeping matters, if we can.

13           THE COURT:  Go right ahead.

14           MR. DESPINS:  First, I want to make sure you've

15   seen the -- you remember that emergency order that describes

16   who can have access to The Sherry Netherland and who cannot?

17   We're submit --

18           THE COURT:  All I know is --

19           MR. DESPINS:  We submitted --

20           THE COURT:  All I know is at some point yesterday

21   afternoon there was a request that it be amended.  But I --

22   do I actually have an amended order?  The courtroom deputy

23   is nodding her head.

24           MR. DESPINS:  You should have it, I believe.

25           THE COURT:  All right.  I haven't seen it yet, but

1    I'll take a look at it.

2              MR. DESPINS:  Okay.  So that's one thing.  The

3    second thing is that we had asked for a hearing date or

4    objection deadline for the retention of Edmiston,

5    E-D-M-I-S-T-O-N.  They're the Lady May sales broker.  We

6    asked for -- we moved on an expedited basis.  Apologies.

7    But, you know, they -- since they're starting to sell the

8    yacht now, we need -- they want an order entered saying

9    they're retained.

10             So I just -- you don't have to decide that now.  I

11   want to make sure it's on -- you know, that it's on your

12   radar screen.

13             THE COURT:  So hold on.

14             MR. DESPINS:  And the last --

15             THE COURT:  Hold on a second.

16             MR. DESPINS:  Oh.

17             THE COURT:  An emergency motion on -- I thought we

18   retained all the people for the yacht.  No?

19             MR. DESPINS:  No.  There was a -- the broker piece

20   was missing.  We basically interviewed three different

21   brokers.  We received bids for that.  And we filed a motion,

22   I want to say --

23             THE COURT:  Oh, okay.

24             MR. DESPINS:  -- Monday or --

25             THE COURT:  Okay.  All right.

1          MR. DESPINS:  -- seeking emergency relief on that.

2     So I just wanted to make sure it's on your radar --

3          THE COURT:  Is that where you're seeking a hearing

4     for next Thursday?  Is that the one?  I --

5          MR. DESPINS:  Well, not this Thursday.  The

6     Thursday next week for --

7          THE COURT:  Right.  A week from today.  Isn't

8     today Thursday?  I hope it's Thursday.  Okay.

9          MR. DESPINS:  Yeah, you're right.  Sorry.

10          THE COURT:  A week from today.

11          MR. DESPINS:  Yes, you're right.  Yes.

12          THE COURT:  All right.  Yeah.  I believe that the

13     Court can accommodate the request, but it will -- might --

14     won't -- it most likely will not be until noon or later that

15     day.

16          MR. DESPINS:  That's fine, Your Honor.

17          THE COURT:  Okay?

18          MR. DESPINS:  And the last point I wanted to

19     mention is that the order you entered, and thank you very

20     much for doing that, regarding the motion to abandon

21     scheduled a hearing on that motion for May 2nd.  And, of

22     course, implicit in that is that we would file the motion,

23     which we have not.  This week -- or and I'm not sure we'll

24     be in a position to do that.  And, therefore, we may need to

25     move that May 2nd hearing to a later date, not too much

1    later but maybe five days or six days after --

2                THE COURT:  That's fine.  You can report on that

3    next week.  You can report on that --

4                MR. DESPINS:  Okay.

5                THE COURT:  -- next week if you're not ready to go

6    forward on the 2nd of May on that issue.

7                MR. DESPINS:  Okay.  Okay.  Thank you, Your Honor.

8    So that's all I had in terms of housekeeping matters.

9                THE COURT:  Okay.  Thank you.

10               All right.  So then all of the matters then on

11   today's calendar have been addressed, and the Court has no

12   further hearings this afternoon.  So court is adjourned.

13               THE COURTROOM DEPUTY:  All rise.  Court is

14   adjourned.

15               MR. DESPINS:  Thank you.

16          (Proceedings concluded at 2:33 p.m.)

17

18

19

20

21

22

23

24

1

2

3        I, CHRISTINE FIORE, court-approved transcriber and

4   certified electronic reporter and transcriber, certify that

5   the foregoing is a correct transcript from the official

6   electronic sound recording of the proceedings in the above-

7   entitled matter.

8

9

10  _____          April 27, 2023

11      Christine Fiore, CERT

12

13

14

15

16

17

18

19

20

21

22

23

24